Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3                        - - -

 4    IN RE:  NATIONAL        )

      PRESCRIPTION OPIATE     )  MDL No. 2804

 5    LITIGATION              )

      _____)  Case No. 1:17-MD-2804

 6                             )

      THIS DOCUMENT RELATES    )

 7    TO ALL CASES            )  Hon. Dan A. Polster

 8

 9

10                        - - -

11            Tuesday, November 27, 2018

12        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13               CONFIDENTIALITY REVIEW

14                        - - -

15

16        Videotaped deposition of Eric Brantley,

17    held at the Durham Hotel, 315 East Chapel Hill

18    Street, Durham, North Carolina, commencing

19    at 9:01 a.m., on the above date, before Karen

20    Kidwell, Registered Merit Reporter and Notary Public.

21                        - - -

22

23

24            GOLKOW LITIGATION SERVICES

             877.370.3377 ph | 917.591.5672 fax

25               deps@golkow.com
```

```
 1                A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
 3        MCHUGH FULLER LAW GROUP
          BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4            mike@mchughfuller.com
          97 Elias Whiddon Road
 5        Hattiesburg, Mississippi  39402
          601-261-2220
 6
                  and
 7
          LEVIN PAPANTONIO THOMAS MITCHELL
 8          RAFFERTY & PROCTOR P.A.
          BY:  MICHAEL PAPANTONIO, ESQUIRE
 9            mpapantonio@levinlaw.com
          BY:  ARCHIE C. LAMB, ESQUIRE
10            alamb@levinlaw.com
          316 South Baylen Street, Suite 600
11        Pensacola, Florida  32502
          205-435-7000
12
13                and
14        SEEGER WEISS LLP
          BY:  DAVID R. BUCHANAN, ESQUIRE
15            dbuchanan@seegerweiss.com
          77 Water Street, 8th Floor
16        New York, NY  10005
          212-584-0700
17
18
     On behalf of the Cardinal Health, Inc.:
19
          WILLIAMS & CONNOLLY LLP
20        BY:  STEVEN M. PYSER, ESQUIRE
              spyser@wc.com
21        BY:  MATTHEW MONAHAN, ESQUIRE
              mmonahan@wc.com
22        725 Twelfth Street, N.W.
          Washington, DC  20005
23        202-434-5899
24
25
```

```
 1    APPEARANCES CONTINUED:
 2    On behalf of the AmerisourceBergen:
 3          REED SMITH LLP
             BY:  ABIGAIL M. PIERCE, ESQUIRE
 4                apierce@reedsmith.com
             Three Logan Square
 5          1717 Arch Street, Suite 3100
             Philadelphia, Pennsylvania  19103
 6          215-241-7947
 7
      On behalf of HBC Service Company:
 8
             MARCUS & SHAPIRA LLP
 9          BY:  DARLENE M. NOWAK, ESQUIRE
                  (Via Teleconference)
10                nowak@marcus-shapira.com
             BY:  PAUL MANNIX, ESQUIRE
11                (Via Teleconference)
                  pmannix@marcus-shapira.com
12          One Oxford Center, 35th Floor
             301 Grant Street
13          Pittsburgh, Pennsylvania  15219-6401
             412-338-5214
14
15    On behalf of Walmart:
16          JONES DAY
             BY:  LOUIS P. GABEL, ESQUIRE
17                lgabel@jonesday.com
             150 West Jefferson Street
18          Suite 2100
             Detroit, MI 48226-4438
19          313-733-3939
20
21    On behalf of Prescription Supply, Inc.:
22          PELINI, CAMPBELL & WILLIAMS LLC
             BY:  PAUL B. RICARD, ESQUIRE
23                pbricard@pelini-law.com
             8040 Cleveland Avenue NW, Suite 400
24          North Canton, Ohio  44720
             330-305-6400
25
```

```
 1    APPEARANCES CONTINUED:
 2    On behalf of McKesson:
 3          COVINGTON & BURLING, LLP
             BY:  AMBER CHARLES, ESQUIRE
 4                acharles@cov.com
             850 Tenth Street, NW
 5           Washington, DC  20001
             202-662-5531
 6
 7    On behalf of Endo Pharmaceuticals, Inc., and
      Endo Health Solutions Inc. and Par:
 8
             McCARTER & ENGLISH, LLP
 9           BY:  AMY M. VANNI, ESQUIRE
                  avanni@mccarter.com
10           1600 Market Street, Suite 3900
             Philadelphia, PA  19103
11           215-979-3848
12    On behalf of Purdue Pharma:
13           DECHERT LLP
             BY:  PAUL A. LAFATA, ESQUIRE
14                paul.lafata@dechert.com
             Three Bryant Park
15           1095 Avenue of the Americas
             New York,NY  10036
16           212-698-3539
17
18    On behalf of C&R Pharmacy:
19           COLLINSON, DAEHNKE, INLOW & GRECO
             BY:  AMANDA E. ROSENTHAL, ESQUIRE
20                (Via Telephone)
                  amanda.rosenthal@cdiglaw.com
21           2110 East Flamingo Road
             Suite 305
22           Las Vegas, NV  89119
             702-979-2132
23
24
25
```

```
 1    APPEARANCES CONTINUED:

 2    On behalf of Rochester Drug Cooperative, Inc.:

 3           ALLEGAERT BERGER & VOGEL LLP

              BY:  DAVID A. SHAIMAN, ESQUIRE

 4                (Via Telephone)

                  dshaiman@abv.com

 5           111 Broadway, 20th Floor

              New York, NY  10006

 6           212-571-0550

 7

 8    On behalf of Validus Pharmaceuticals:

 9           FOX ROTHSCHILD LLP

              BY:  MAURA L. BURKE, ESQUIRE

10                (Via Telephone)

                  mburke@foxrothschild.com

11           2000 Market Street, 20th Floor

              Philadelphia, PA  19103

12           215-299-2872

13

14

15    ALSO PRESENT:

16           Lauren E. Massey, Levin Papantonio

17           Sarah Merced, Levin Papantonio

18           Carol Moore, Levin Papantonio

19           Sandra Di Iorio, In-house counsel, Endo

20           Edna Johnson Jamison, McHugh Fuller

21           Scott Seigel, Seeger Weiss

22           Elina Rakhlin, Seeger Weiss

23           Evan J. Wolfe, Trial Technician

24           Dan Lawlor, Videographer

25                        - - -
```

```
 1                    I N D E X

 2  WITNESS/EXAMINATION                           Page

 3  ERIC BRANTLEY

 4    By Mr. Papantonio                             15

 5    By Mr. Fuller                                360

 6    By Mr. Buchanan                              397

 7    By Ms. Vanni                                 560

 8    By Mr. Lafata                                580

 9    Further by Mr. Papantonio                    616

10    Further by Mr. Buchanan                      647

11

12

13

14                   E X H I B I T S

15    Number              Description         Page

16  Cardinal-Brantley 1  .........................16

            E-mail chain, Confidential, Bates

17            CAH-MDL2804_02142793-2801

18  Cardinal-Brantley 1  .........................16

            Clawed back by Cardinal Health

19            Counsel

20  Cardinal-Brantley 2  .........................24

            9/24/2007 E-mail, Steve Reardon to

21          Eric Brantley and others, Subject:

            DEA Suspicious Order Monitoring with

22          Summary of the DEA-HDMA Meeting on

            Suspicious Orders Meeting Date Sept.

23          7, 2007, FOIA Confidential Treatment

            requested by Cardinal, Bates

24            CAH_MDL_PRIORPROD-DEA07_01198345-358

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 E X H I B I T S (Cont'd)
 2     Number          Description              Page
 3   Cardinal-Brantley 3  ........................59
            3/11/2013 E-mail, Bill de
 4          Gutierrez-Mahoney to Donald Walker
            and others, Subject:  HDMA notes,
 5          Highly Confidential-Subject to
            Protective Order, Bates
 6          MCKMDL00545341-347, with attachment
 7   Cardinal-Brantley 4  ........................72
            Settlement and Release Agreement and
 8          Administrative Memorandum of
            Agreement between US DOJ DEA and
 9          Cardinal Health, Inc. Confidential,
            Bates
10          CAH_MDL_PRIORPROD_DEA12_00001571-1618
11   Cardinal-Brantley 5  .......................115
            P1.324, 1999 Maps through P1.324.37
12
     Cardinal-Brantley 6  .......................168
13          9/1/2005 E-mail, Elaine Trautman to
            Robert Giacalone, Subject: FW:
14          Internet Pharmacies, FOIA
            Confidential Treatment Requested by
15          Cardinal, Bates
            CAH_MDL_PRIORPROD_DEA07_02454619-621
16
     Cardinal-Brantley 7  .......................193
17          Presentation Supply Chain Integrity,
            November 6th, 2008, Mark Hartman,
18          Cardinal Health, Confidential, Bates
            CAH_MDL2804_00225017-048
19
     Cardinal-Brantley 8  .......................210
20          Presentation CardinalHealth Operation
            One Cardinal Health Quality
21          Management Meeting, Opportunity Team
            Presentations, 13-14 January 2005,
22          FOIA Confidential Treatment requested
            by Cardinal, Bates
23          CAH_MDL_PRIORPROD_DEA07_01181262-1332
24   Cardinal-Brantley 9  .......................219
            Distribution Center Map
25
```

```
 1              E X H I B I T S (Cont'd)
 2    Number          Description              Page
 3   Cardinal-Brantley 10  .......................219
          2016 Death Map
 4
     Cardinal-Brantley 11  .......................219
 5        Distribution Center Map and 2016
          Death Map combined
 6
     Cardinal-Brantley 12  .......................232
 7        5/12/2005 E-mail, Mark Mitchell to
          Cassi Baker and others, Subject: Drug
 8        Wholesale Advisory Council, FOIA
          Confidential Treatment Requested by
 9        Cardinal, Bates
          CAH_MDL_PRIORPROD_DEA07_00318789
10
     Cardinal-Brantley 13  .......................239
11        7/27/2006 E-mail, Mignette Strife to
          Dan Tolar, Subject: Facility
12        Assessment - Birmingham, AL, with
          attachments, Confidential, Bates
13        CAH_MDL_PRIORPROD_DEA07_00828657-8674
14   Cardinal-Brantley 14  .......................257
          Presentation, McKesson, State of
15        Prescription Drug Abuse, Gary Boggs,
          Confidential, Exempt from Public
16        Disclosure, Subject to
          Confidentiality Agreement, Bates
17        MCKMDL00336833-6886
18   Cardinal-Brantley 15  .......................267
          US DOJ DEA, The Trafficking and Abuse
19        of Prescription Controlled
          Substances, Legend Drugs and Over the
20        County Products, February 21, 2013
          presentation, Bates
21        CAH_MDL2804_00094605-94835
22   Cardinal-Brantley 16  .......................274
          Chart, Purchases of Hydrocodone by
23        Known or Suspected Rogue Internet
          Pharmacies - 2006
24
25
```

```
 1                E X H I B I T S (Cont'd)
 2     Number          Description              Page
 3   Cardinal-Brantley 17  ......................279
             E-mail chain, top e-mail 10/3/2005,
 4           Ed Dziadon to Richard Sydoriak,
             Subject: FW: Results from our
 5           Internal Quarterly Audit, FOIA
             Confidential Treatment Requested by
 6           Cardinal, Bates
             CAH_MDL_PRIORPROD_DEA07_00045902-904
 7
 8   Cardinal-Brantley 18  ......................281
             9/15/2006 E-mail, Rafael Varela to
 9           Rob Betchley, Subject: Mike Williams,
             Confidential, Bates
10           CAH_MDL_PRIORPROD_DEA07_00997449
11   Cardinal-Brantley 19  ......................287
             E-mail chain, top e-mail 12/18/2007,
12           GLT Communication to GLT
             Communication, Subject: The Daily
13           Dose: Tuesday, December 18, 2007,
             Confidential, Bates
14           CAH_MDL_PRIORPROD_DEA07_00828103-111
15   Cardinal-Brantley 20  ......................299
             8/21/2018 State Reaches Agreement
16           with Cardinal on Drug Trading Issues,
             article, with attachment, Assurance
17           of Discontinuance Pursuant to
             Executive Law Section 63(15),
18           P1.4575-P1.4575.35
19   Cardinal-Brantley 21  ......................317
             May 10, 2007 News Release, US
20           Attorney's Office Western District of
             Virginia, The Purdue Frederick
21           Company, Inc. and Top Executives
             Plead Guilty to Misbranding
22           Oxycontin; will pay over $600
             Million, P1.4961-P1.4961.5
23
     Cardinal-Brantley 22  ......................360
24           Drawing done by Attorney Papantonio,
             Oxy Express
25
```

```
 1              E X H I B I T S (Cont'd)
 2    Number          Description              Page
 3  Cardinal-Brantley 23  .......................360
            Drawing done by Attorney Papantonio,
 4          glut
 5  Cardinal-Brantley 24  .......................364
            E-mail chain, top e-mail 12/5/2007,
 6          Bob Kurtz to Rafael Varela, Subject:
            RE: URGENT - More Information on DEA
 7          Suspension, FOIA Confidential
            Treatment Requested by Cardinal,
 8          Bates
            CAH_MDL_PRIORPROD_DEA07-00135433-434
 9
    Cardinal-Brantley 25  .......................375
10          Charts, top chart Total Dosage of
            Oxycodone and Hydrocodone Shipped by
11          Cardinal Health to Cuyahoga County,
            Ohio, Confidential-Subject to
12          Protective Order, P1.4923
13  Cardinal-Brantley 26  .......................379
            GAO, Report to Congressional
14          Requesters, December 2003, OxyContin
            Abuse and Diversion and Efforts to
15          Address the Problem, P1.1087
16  Cardinal-Brantley 27  .......................413
            E-mail chain, top e-mail 3/7/2013,
17          Sandra Parker to Jon Smollen and
            others, Subject:FW: Charts from DEA
18          Meeting, Highly Confidential -
            Subject to Protective Order, Bates
19          ENDO-OPOID_MDL-02975958-59 with chart
            attachments
20
    Cardinal-Brantley 28  .......................434
21          E-mail chain, top e-mail 2/27/2014,
            Keith Margolis to William Price and
22          others, Subject: FW: Bellco,
            Qualitest SOMS letter and
23          Quesionnaire 12/3, 1/20, 2/21,
            Confidential - Subject to Protective
24          Order, Bates ABDCMDL00337067-73
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Cont'd)
 2     Number          Description              Page
 3   Cardinal-Brantley 29  ......................449
            10/7/2013 E-mail, Eric Brantley to
 4          Eric Brantley, Confidential - Subject
            to Protective Order, Bates
 5          PAR_OPOID_MDL_0000018938-42
 6   Cardinal-Brantley 30  ......................485
            10/7/2013 E-mail, Larry Shaffer to
 7          Eric Brantley, Subject: SOMS Info,
            with attachments, Confidential -
 8          Subject to Protective Order, Bates
            PAR_OPOID_MDL_0000018920-36
 9
     Cardinal-Brantley 31  ......................498
10          10/20/2015 E-mail, Heather Jones to
            Stephen Macrides and others, Subject:
11          DEA Regulatory Risk of Offering
            One-Time Buys of Controlled
12          Substances to Customers, with
            attachments, Confidential-Subject to
13          Protective Order, Bates
            PAR_OPIOID_MDL_0000005961-5971
14
     Cardinal-Brantley 32  ......................514
15          E-mail chain, top e-mail 1/31/2017,
            Eric Brantley to Paul Hamby, Subject:
16          RE: EXTERNAL: RE: Latest from DE,
            Confidential-Subject to Protective
17          Order, Bates
            PAR_OPIOID_MDL_0000093848-851
18
     Cardinal-Brantley 33  ......................516
19          1/26/2017 E-mail, Eric Brantley to
            Eric Brantley, Subject Attached
20          image, with Compliance Addendum
            Attachment, Confidential-Subject to
21          Protective Order, Bates
            PAR_OPIOID_MDL_0000015775-15811
22
     Cardinal-Brantley 34  ......................524
23          DEA Compliance Manual, Cardinal
            Health, FOIA Confidential Treatment
24          Requested by Cardinal, Bates
            CAH_MDL_PRIORPROD_DEA07_01383895-1384
25          238
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Cont'd)
 2     Number         Description              Page
 3   Cardinal-Brantley 35  .......................551
              4/27/2007 E-mail, Steve Reardon to
 4            Mark Parrish and others, Subject:
              Internet Pharmacy/ABC Update, with
 5            letter attachment, Confidential,
              Bates CAH_MDL2804_02102142-146
 6
     Cardinal-Brantley 36  .......................555
 7            E-mail chain, top e-mail 7/23/2007,
              Steve Reardon to Eric Brantley,
 8            Subject: FW: Distributor
              Notification, Confidential, Bates
 9            CAH_MDL_PRIORPROD_DEA07_02075115-5118
10   Cardinal-Brantley 37  .......................570
              Standard Operating Procedure,
11            Qualitest, New Account Approval &
              Existing Account Review,
12            Confidential-Subject to Protective
              Order, Bates
13            PAR_OPIOID_MDL_0000097389-391
14   Cardinal-Brantley 38  .......................573
              Standard Operating Procedure,
15            Qualitest, Customer Due Diligence
              Visits, effective 12/23/2013,
16            Confidential-Subject to Protective
              Order, Bates
17            PAR_OPIOID_MDL_0000097381-84
18   Cardinal-Brantley 39  .......................575
              Standard Operating Procedure,
19            Qualitest, Cage/Vault Suspicious
              Order Monitoring, effective
20            12/23/2013, Confidential-Subject to
              Protective Order, Bates
21            PAR_OPIOID_MDL_0000097379-380
22   Par-Brantley 40  ............................576
              Standard Operating Procedure, PAR,
23            Identifying, Blocking, and Reporting
              Suspicious Orders, effective
24            12/23/2013, Confidential-Subject to
              Protective Order, Bates
25            PAR_OPIOID_MDL_0000096529-532
```

```
 1                E X H I B I T S (Cont'd)
 2     Number          Description              Page
 3   Cardinal-Brantley 40 E-mail chain, top .......618
             e-mail 1/21/2008, Mike Kaufmann to
 4           Gary Dolch and others, Subject: RE:
             In the Penalty Box, Confidential,
 5           Bates
             CAH_MDL_PRIORPROD_DEA07_00827893-894
 6
 7   Purdue-Brantley 41  ........................583
             Document Details, Know Your Customer
 8           Due, 9/25/2017, Confidential-Subject
             to Protective Order, Bates
 9           PPLP004393084-098
10   Cardinal-Brantley 41  .....................641
             Article Too Many Bodies in Ohio
11           Morgue, so Coroner Gets Death
             Trailer, P1.1453
12
     Purdue-Brantley 42  ........................589
13           Document Details, Identifying,
             Evaluating and Reporting Suspicious
14           Orders, 9/25/2017,
             Confidential-Subject to Protective
15           Order, Bates PPLP0043668538-543
16   Cardinal-Brantley 42  .....................665
             Supply Chain & DEA Compliance
17           document, Highly Confidential -
             Subject to Protective Order, Bates
18           ENDO-OPIOID_MDL-02278909-917
19   Purdue-Brantley 43  ........................594
             Document Details, Downstream Customer
20           Monitoring and Reporting, 1/25/2018,
             Confidential, Bates
21           PPLPC023000971890-96
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 E X H I B I T S (Cont'd)
 2     Number            Description                 Page
```

```
 3   Cardinal-Brantley 43  .......................682
            E-mail chain, top e-mail 3/22/2013,
 4          Jill Connell to Tracey Hernandez,
            Subject: FW: composite risk
 5          assessment, Confidential-Subject to
            Protective Order, Bates
 6          PAR_OPIOID_MDL_0000035162-164, with
            attachment E0573
 7

     Cardinal-Brantley 44  .......................696
 8          4/17/2014 E-mail, Eric Brantley to
            Tracey Hernandez, Subject: SOM
 9          update, with Qualitest SOM update
            attachment, Confidential-Subject to
10          Protective Order, Bates
            PAR_OPIOID_MDL_0000021256-72
```

```
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      TUESDAY, NOVEMBER 27, 2018, DURHAM, NORTH CAROLINA

 2                   P R O C E E D I N G S

 3                        -oOo-

 4           VIDEOGRAPHER:  We are now on the record.

 5      My name is Dan Lawlor.  I'm a videographer with

 6      Golkow Litigation Services.  Today's date is

 7      November 27th, 2018, and the time is 9:01 a.m.

 8           This video deposition is being held in

 9      Durham, North Carolina, in the matter of

10      National Prescription Opiate Litigation, MDL

11      Number 2804.  The deponent is Eric Brantley.

12           Counsel will be noted on stenographic

13      record.

14           The court reporter is Karen Kidwell, who

15      will now swear in the witness.

16                     ERIC BRANTLEY

17  being first duly sworn, testified as follows:

18                     EXAMINATION

19  BY MR. PAPANTONIO:

20      Q.   Sir, state your name, please.

21      A.   Eric Brantley.

22      Q.   Put up document 3751, please.

23           MS. MOORE:  Cardinal-Brantley Number 1.

24      (Cardinal-Brantley 1 was marked for

25  identification.)
```

```
 1          (Cardinal-Brantley 1 clawed back by Cardinal

 2   Health counsel.)

 3   BY MR. PAPANTONIO:

 4        Q.   Mr. Brown, take a look at that document,

 5   would you?

 6             Do you know who Corey Goldsand is?

 7        A.   Yes.

 8        Q.   Tell the jury who Corey Goldsand is.

 9             MR. PYSER:  Objection.  Counsel, this is a

10        privileged document that was inadvertently

11        produced and has been clawed back.

12             MR. PAPANTONIO:  Well, we will take that

13        up with the court.

14             MR. PYSER:  Well, it's already been clawed

15        back, so there's no --

16             MR. PAPANTONIO:  When you say it's been

17        "clawed back," nobody has given me notice it's

18        been clawed back.  I've used it in -- in the

19        line of discovery, and we're going to use it in

20        the deposition.

21             MR. PYSER:  Well, no, we're not, Counsel,

22        because it's a communication between two

23        attorneys for Cardinal Health.  It's a clearly

24        privileged document.  We're clawing it back now.

25        Everyone on the document is a -- is an attorney.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PAPANTONIO:  No, they're not.  We'll
 2         put it -- you can take it -- this portion of the
 3         deposition you can put under camera if you want
 4         to, but I'm going to ask this witness questions
 5         about it.
 6              MR. PYSER:  Counsel, we've clawed the
 7         document back.  There's no basis to ask
 8         questions about it.
 9              MR. PAPANTONIO:  Well, I think the judge
10         has already ruled on the point of
11         attorney-client privilege.  He just ruled
12         Friday, if you were at the hearing, okay?
13              MR. PYSER:  That ruling has nothing to do
14         with this document.
15              MR. PAPANTONIO:  Well --
16              MR. PYSER:  That's an attorney-client
17         communication.  Upon discovery of this document,
18         it should have been produced -- it should have
19         been noted to the Defendants under the ethical
20         rules, because it's a clearly privileged
21         document.
22              MR. PAPANTONIO:  No.  No, this was one
23         of -- this was one of the documents that you all
24         tried to bury in stacks of other documents.
25              Now, I'm going to ask the question.  You
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         can instruct him not to answer the question, at
 2         which time we will reset the deposition and get
 3         into this document another time.
 4              I'm going to finish the deposition today;
 5         don't get me wrong.
 6              MR. PYSER:  You can finish the
 7         deposition --
 8              MR. PAPANTONIO:  But if you want --
 9              MR. PYSER:  -- but you can't use this
10         document.
11              MR. PAPANTONIO:  If you want to put on the
12         record -- well, I'm going to ask the question,
13         and you can object as you see fit.
14    BY MR. PAPANTONIO:
15         Q.   Sir, you -- you were a -- you were in
16    charge of regulatory -- regulatory is one of your
17    responsibilities with Cardinal; is that correct?
18         A.   I worked in the quality and regulatory
19    affairs department.
20         Q.   And -- and with you was a fellow named
21    Reardon; is that right?
22         A.   Steve Reardon was my boss.
23         Q.   And how many years was he your boss?
24         A.   I would say 2005 to 2008, maybe.
25         Q.   And did you have a system when you worked
```

1    with Mr. Reardon where you would actually -- you'd

2    have a suspicious order that you would have in-house,

3    and then you would ship the product, even after being

4    notified that it might be suspicious?

5            Do you recall ever doing that,

6    Mr. Brantley?

7        A.   No.

8        Q.   Okay.  And do you have any idea that the

9    company was carrying on a monitoring system where

10   they would identify and report potentially suspicious

11   excessive purchases of controlled substances after

12   the substances were shipped?

13           Had anybody ever told you that that was

14   going on with Cardinal?

15       A.   We had ingredient limit reports that

16   were -- that were ran every month and submitted to

17   the DEA.  And those ingredient limit reports were the

18   potentially suspicious orders --

19       Q.   Okay --

20       A.   -- and I reviewed those reports.

21       Q.   Yeah, you reviewed them, and after you

22   reviewed them, you would ship anyway; is that

23   correct?

24       A.   I would review the reports, and I would

25   conduct investigations of any downstream -- any

 1    pharmacies that I needed to investigate.

 2         Q.   And --

 3         A.   And I would conduct a site visit of those

 4    pharmacies.

 5         Q.   And my question is, sir, there were times

 6    when you, Brantley, saw suspicious orders and decided

 7    to ship the orders anyway.  That's a yes-or-no

 8    question.

 9         A.   That is incorrect.

10         Q.   Okay.  So what -- what system did you use

11    before you would ship?

12         A.   My job was to review the ingredient limit

13    reports on a monthly basis, and if I noticed any

14    pharmacies that I wanted to further investigate, I

15    would contact those pharmacies and I would conduct a

16    site visit.  If those pharmacies were deemed

17    suspicious, they were shut off from controlled

18    substances, and they were reported to -- to Kyle

19    Wright at the DEA.

20         Q.   And so --

21         A.   That was my job.

22         Q.   That was your job?

23         A.   Yes.

24         Q.   And you feel like you carried your job out

25    appropriately?

1      A.   Yes.

2      Q.   Were you there -- what were the years that

3  you were in charge of that job?

4      A.   I was never in charge of the -- the job.

5  But I was at the corporate office -- from 2005 till

6  about 2008, I had responsibility for reviewing the

7  ingredient limit reports and conducting

8  investigations.

9      Q.   Had anybody told you that -- that within

10  management there was a feeling that few, if any,

11  directives from the company leadership were ever

12  passed down regarding controlled substances and

13  shipment of controlled substances?

14           MR. PYSER:  Objection to the question to

15      the extent it comes from a document that's been

16      clawed back.  It's an inappropriate question.

17  BY MR. PAPANTONIO:

18      Q.   Is that the first --

19           MR. PYSER:  And counsel -- and counsel's

20      violating ethical rules by continuing to use a

21      document that's been clawed back by the defense.

22  BY MR. PAPANTONIO:

23      Q.   Is that the first time you've heard that,

24  sir?

25      A.   Can you please repeat what you --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Yes.  Where management clearly understood

 2   that there was few, if any, directives at all from

 3   the company leadership regarding substances being

 4   shipped after they were deemed suspicious orders?

 5          MR. PYSER:  Same objections.

 6          THE WITNESS:  This is my first time

 7      hearing that, and I don't agree with that.

 8   BY MR. PAPANTONIO:

 9          Q.   Okay.  First time you've heard that is

10   today, though, right?

11          A.   As far as I -- I can recall, yes.

12          Q.   How long did you prepare for this

13   deposition?

14          A.   What do you mean, how long did I prepare?

15          Q.   How long did you sit down with anybody

16   from the company and prepare for this deposition?

17          A.   Well, I didn't sit down with anyone from

18   the company, but I did sit down with --

19          Q.   How many hours?

20          A.   -- with attorneys.

21          Several hours.  I don't know the exact

22   number of hours.

23          Q.   Okay.  So today -- and you're no longer

24   with Cardinal; is that correct?

25          A.   No, I'm not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Okay.  So today, what I'm going to be

2     asking you is what you have reviewed prior to the

3     time you came here and what you knew at the time that

4     you were an employee with Cardinal.  All right?

5          A.   Okay.

6          Q.   And so, sir, had anybody ever told you

7     that -- that your company was giving discounts to

8     people -- to -- to customers who were ordering large

9     bulk orders of narcotics?

10              MR. PYSER:  Counsel, same objection.  To

11         the extent you're reading from a document that's

12         been clawed back, it's inappropriate, and we

13         should cease the practice.  It's a violation of

14         the ethical rules and a violation of deposition

15         protocol that allows clawbacks of documents that

16         are clearly privileged.

17              MR. PAPANTONIO:  You're going to be able

18         to put this under camera if you want, Counselor.

19    BY MR. PAPANTONIO:

20         Q.   Had anybody ever told you that?

21         A.   No.

22              MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24         Q.   First time you ever heard it; is that

25    right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2                    THE WITNESS:  As far as I can recall.

 3                    MR. PAPANTONIO:  Okay.  Put up

 4        document 4195.

 5                    MS. MOORE:  This will be

 6        Cardinal-Brantley 2.

 7         (Cardinal-Brantley 2 was marked for

 8     identification.)

 9  BY MR. PAPANTONIO:

10        Q.   Sir, state your name again for the record.

11        A.   Eric Brantley.

12        Q.   Okay.  And you're looking at document

13     number 4195.  Take a look at it.

14                    Do you see it?  You're welcome to use the

15     screen, or you're welcome to use the hard copy we

16     give you, or you're welcome to use this screen up

17     here; this is easy to read.  However you want to do

18     it.  Feel free.

19        A.   That's blurry up there.  I'll -- I'll read

20     this.

21        Q.   All right.  Who is -- who is Steve

22     Reardon?

23        A.   Steve Reardon was my boss at the time.

24        Q.   And you see your name on there -- you see,

25     Mr. Brantley, where it says "To Brantley"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   Yes.

2          Q.   And who is McPherson?

3          A.   I don't know what her position was at the

4    time, but she was in the quality and regulatory

5    affairs department, I believe.

6          Q.   Do you recognize everybody on the -- on

7    the line where it says "To"?

8          A.   No.

9          Q.   Who don't you recognize?

10         A.   Al M-o-h-n, Mohn, Mohn.

11         Q.   You don't recognize Al Mohn; you never had

12   any contact with Al Mohn?

13         A.   I don't remember that name.

14         Q.   All right.  Let's read this first

15   paragraph.

16              It says:  "HDMA met with DEA officials

17   last Friday, September 7th, to discuss the agency's

18   current policy positions on suspicious orders."

19              Did you know that that meeting had taken

20   place?

21         A.   No.

22         Q.   Okay.  And in your review before you came

23   in here today, did any -- did you -- you weren't

24   shown this document, I take it?

25         A.   This particular --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Yes.

 2        A.    -- e-mail?

 3        Q.    Right.

 4        A.    This is my first time seeing this e-mail.

 5        Q.    But it's got your name on it?

 6        A.    It does.

 7        Q.    Okay.  And it says:  "A summary

 8   highlighting the key points made during the meeting

 9   are attached for your review."

10              It says:  "DEA is setting a new standard

11   with which we must comply.  This is all coming about

12   as a result of the problem with Internet pharmacies

13   and controlled substance diversion."

14              Now, you -- you had some -- part of your

15   job was to be involved with Internet pharmacies,

16   wasn't it?

17        A.    Part my job was to try to identify

18   potential Internet activity from the ingredient limit

19   reports and investigate, yes.

20              MR. PAPANTONIO:  All right.  So would you

21         underline "Internet pharmacies" for me there,

22         Evan?

23   BY MR. PAPANTONIO:

24        Q.    And it says:  "Controlled substance

25   diversion."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    That was your job, wasn't it?  To -- to be

 2    involved with controlling the substance diversion of

 3    narcotics, correct?

 4                    MR. PYSER:  Object to the form of the

 5        question.

 6    BY MR. PAPANTONIO:

 7        Q.   Is that true?

 8        A.   My job was to review ingredient limit

 9    reports and search for pharmacies that needed further

10    investigation and shut those pharmacies off if deemed

11    necessary and report that to the DEA.

12        Q.   And that's controlling substance abuse of

13    narcotics, true?

14                    MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.   That's -- part of your goal was to stop

17    diversion of narcotics; yes or no?

18        A.   Part of our job was to help to prevent

19    diversion through the -- potential Internet

20    pharmacies, as well as the physical security in the

21    distribution centers and the cage and the vault and

22    everything else.

23        Q.   Right.  And --

24        A.   There was a lot to --

25        Q.   Well, sir --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    -- security, you know --

 2          Q.    Now, I'm just going to ask you

 3   questions -- I'm going to ask you questions, okay?

 4          A.    And I'm going to answer the questions.

 5          Q.    If you're not clear about the question,

 6   you tell me you're not clear.  If you want to give a

 7   speech, Mr. Pyser is going to be able to talk to you

 8   after the end of it; you can give your speeches.

 9              So if I ask you a yes-or-no question, I

10   really want a yes-or-no answer.  Okay?

11              MR. PYSER:  Counsel, object -- object to

12       that speech.  The witness was answering your

13       question.  You cut him off.

14              MR. PAPANTONIO:  All right.

15              MR. PYSER:  He's allowed to answer your

16       questions in full.  You're not here to instruct

17       the witness on how to answer questions.  He's

18       here to answer your questions.  And that's what

19       we're going to do.

20   BY MR. PAPANTONIO:

21          Q.    Okay.  So now this goes on.  It says:

22   "Recently they suspended an ABC registration and used

23   the suspension to get them to implement a complex and

24   onerous suspicious order monitoring program that

25   meets the requirement, meets the criteria spelled out
```

```
 1    in HDMA."

 2              Now, sir, you would agree it's a good idea

 3    to have a system in place that -- that actually

 4    monitors suspicious orders; you would agree with

 5    that, wouldn't you?

 6              MR. PYSER:  Object to form.

 7              THE WITNESS:  It is required in the

 8        regulation to have a system to help identify

 9        suspicious orders --

10    BY MR. PAPANTONIO:

11        Q.   And --

12        A.   -- and to report those orders to the DEA.

13        Q.   And you knew that the day you went to work

14    with Cardinal; you understood that that was the law.

15    Correct?

16        A.   The day that I went to work with Cardinal

17    Health?

18        Q.   Yeah.

19        A.   I was not in this capacity.  And no, I

20    can't say that I was familiar with all the

21    regulations.

22        Q.   At some time you learned that that was the

23    law, though, to report suspicious orders, correct?

24              MR. PYSER:  Object to form.  Calls for

25        legal conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Is that true?

 3        A.   At one point during my employment with

 4   Cardinal Health, I learned that it was the -- the

 5   requirement to report --

 6        Q.   And you --

 7        A.   -- suspicious orders.

 8        Q.   And you understood not to do that would be

 9   breaking the law -- I mean, simply put:  If you don't

10   follow the law, you break the law, true?

11             MR. PYSER:  Object to form.  Calls for a

12        legal conclusion.

13             THE WITNESS:  I understand that the

14        regulation was that we were to design a system

15        to identify and report suspicious orders, which

16        we did.

17   BY MR. PAPANTONIO:

18        Q.   And if you don't do it, though, you're

19   breaking the law, right?  That's all I'm asking.  If

20   you don't do that, you and I can agree you're

21   breaking the law?

22        A.   If a company --

23             MR. PYSER:  Object --

24             THE WITNESS:  -- fails to do that --

25             MR. PYSER:  Object --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  -- they're outside of the

 2      regulation.

 3              MR. PYSER:  Object to form.  Calls for a

 4      legal conclusion.  Asked and answered.

 5              MR. PAPANTONIO:  Okay.  You're going to

 6      object as to form, and that's it.  Okay?  It's a

 7      form -- your role is to object as to form, not

 8      to tell him -- not to give him any indication of

 9      what you want him to say.

10   BY MR. PAPANTONIO:

11      Q.   Now, Mr. Brantley --

12              MR. PAPANTONIO:  Would you read back the

13      part of his response that we actually got?

14              You didn't get it, did you?

15              THE REPORTER:  I didn't get it, because --

16   BY MR. PAPANTONIO:

17      Q.   What's the last thing you said before

18   your -- your attorney jumped in there and started

19   talking?  What -- what did -- what did you want to

20   tell me?

21      A.   I don't recall.  You have to ask the

22   question again.

23      Q.   Okay.  You understood, sir, that there was

24   a law that said that you had to report suspicious

25   orders; yes or no?
```

```
 1          A.   I understood --

 2               MR. PYSER:  Object to the form.

 3               THE WITNESS:  I understood there was a

 4     regulation around identifying and reporting

 5     suspicious orders.

 6  BY MR. PAPANTONIO:

 7          Q.   You knew it was law, CFR.  You knew it was

 8  a CFR, right?

 9               MR. PYSER:  Object to form.

10  BY MR. PAPANTONIO:

11          Q.   Did you know that or didn't you?

12          A.   It is in the -- the CFR.

13          Q.   Okay.

14          A.   1301.74(b).

15          Q.   Oh, you even know it by heart, right?

16          A.   I know that it's 1301.74(b).

17          Q.   And you know that it's a law, true?

18               MR. PYSER:  Object to form.

19  BY MR. PAPANTONIO:

20          Q.   Correct?  It's the law?

21          A.   It's the regulation in -- in CFR,

22  21 CFR 1301.74(b).

23          Q.   And not to do -- not to conform with the

24  regulation -- you're going to be seeing this a lot;

25  I'm glad you know it by heart.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              But that's the regulation you're talking

 2     about, right?

 3              MR. PYSER:  Object to form.

 4              THE WITNESS:  If that is 1301.74(b), yes.

 5     BY MR. PAPANTONIO:

 6         Q.   You -- you know it by heart.  And to break

 7     that regulation would be breaking a regulatory law;

 8     correct or incorrect?

 9              MR. PYSER:  Object to form.  Asked and

10         answered.

11              MR. PAPANTONIO:  Not -- no, it hasn't

12         been.

13     BY MR. PAPANTONIO:

14         Q.   Not to -- not to do this as you're

15     instructed to do would be breaking a regulation,

16     correct?

17              MR. PYSER:  Object to form.  Asked and

18         answered, repeatedly.

19     BY MR. PAPANTONIO:

20         Q.   Yes or no?

21         A.   If one does not follow a regulation and

22     one is not following that regulation -- I cannot

23     answer to whether it is objecting a law.  It is a

24     regulation.  I don't know the legal terminology

25     between laws, regulation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I -- I do know that that's in the CFR as a

 2    regulation.  And I do know the language of that

 3    regulation was being followed.

 4        Q.    Okay.  And you think it was being

 5    followed, and we're going to be talking about whether

 6    it was followed or not.

 7              So you and I might disagree with that, but

 8    you would agree, not to do it would be a violation of

 9    a regulation, correct?

10              MR. PYSER:  Object to form.

11              THE WITNESS:  Not to follow the

12         regulation --

13    BY MR. PAPANTONIO:

14        Q.    Would be a violation?

15        A.    -- would not be following the regulation.

16        Q.    Yeah.  Are you -- are you afraid to use

17    the word "violation"?

18              MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20        Q.    I mean, you know what the term "violation"

21    means?

22        A.    I am not afraid to --

23        Q.    Well --

24        A.    -- use any word.

25        Q.    Okay.  Well, "violation" --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    That's your words.

 2            Q.    Well, let's say "violation."  Can you

 3    use --

 4            A.    I'm saying --

 5            Q.    -- the word "violation" here?

 6            MR. PYSER:  Object to form.

 7            Give me a chance to object before you

 8      answer his question.

 9            Counsel, stop being argumentative with the

10      witness.

11            MR. PAPANTONIO:  I'm not.

12    BY MR. PAPANTONIO:

13            Q.    Sir, the word "violation":  Do you

14    understand what it means?  I take it you do.  You're

15    a bright man.  You understand what "violation" means,

16    right?

17            MR. PYSER:  Object to form.

18            THE WITNESS:  "Violate" means not to do

19      something --

20    BY MR. PAPANTONIO:

21            Q.    Right.  So if you don't --

22            A.    -- as -- as written.  Yes.

23            Q.    Right.  So if you don't follow the law as

24    it's written, you violate that law, right?

25            MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   True?  I mean, look at the camera and tell

 3   me if that's not true or not.

 4        A.   If one does not follow the regulation,

 5   then they are not following that regulation.

 6        Q.   Great.  Okay.

 7             So we picked up with -- "Recently they

 8   suspended an ABC registration and used the suspension

 9   to get them to implement a complex and onerous

10   suspicious order monitoring."

11             Would you underline "complex" and

12        "onerous"?  We're going to come back to those

13        words.

14             ". . . complex and onerous suspicious

15   order monitoring program that meets the criteria

16   spelled out in the HDMA meeting summary."

17             Tell the jury what the "HDMA" is.

18             MR. PYSER:  Object to form.

19             THE WITNESS:  HDMA is a -- an agency

20        comprised of pharmaceutical distributors.

21   BY MR. PAPANTONIO:

22        Q.   And your company was part of the HDMA,

23   true?  Cardinal was part of the HDMA?

24        A.   Cardinal Health, I believe, was part of

25   HDMA, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And did you ever go to HDMA meetings?

 2          A.   I've been to HDMA meetings.  I do not

 3    think I attended any while I was at Cardinal, but I

 4    don't remember.

 5          Q.   Okay.  But you've been with other

 6    companies besides Cardinal, right?

 7               You've been with Kinray, correct?

 8          A.   Yes.  Kinray is a Cardinal company.

 9          Q.   And you're now with Purdue?

10          A.   Yes.

11          Q.   And both of those companies, one's a --

12    one is a narcotic distributor, and the other is a

13    narcotic manufacturer, correct?

14               MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16          Q.   True?

17               MR. PYSER:  Misstates evidence.

18               THE WITNESS:  Kinray is a distributor of

19        pharmaceuticals, over-the-counter controlled

20        substances.  Purdue is a manufacturer of

21        controlled substances.

22    BY MR. PAPANTONIO:

23          Q.   Well, I want to use the term -- it's a

24    narcotic, isn't it?

25          A.   It's not just a narcotic company, as you
```

```
 1  said.

 2        Q.   Yeah.

 3        A.   It manufactures controlled substances --

 4        Q.   But -- but --

 5        A.   -- prescription drugs.

 6        Q.   Right.  But Purdue manufactures narcotics,

 7  correct?

 8        A.   Purdue -- that is one of the things that

 9  Purdue manufactures, yes.

10        Q.   And Kinray distributed narcotics, right?

11        A.   That is one of the many things that --

12  that Kinray distributed.

13        Q.   And Cardinal distributed narcotics?

14        A.   That is one of the many things that

15  Cardinal distributed.

16        Q.   When we talk about "opioid," that's a

17  narcotic, isn't it?

18        A.   I believe so.

19        Q.   Okay.  All right.

20             Then it goes on to say:  "ABC presented

21  their program at the DEA industry conference this

22  week that I attended, and I have attached a copy of

23  the presentation."

24             Now, you see Steve Reardon sent that to

25  you, didn't he?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   Yes.

2          Q.   All right.  And he sent it back in 2007,

3     true?  September 2007, right?

4          A.   Yes.

5          Q.   And it says -- goes on to say,

6     "Suspicious" -- let me read it.  It says:  "A complex

7     and onerous" -- pick up from there:

8               ". . . complex and onerous suspicious

9     order monitoring program that meets the criteria

10    spelled out by the HDMA meeting summary.  ABC

11    presented their program at the DEA industry

12    conference this week."

13              Were you there when they presented that?

14         A.   No, I was not.

15         Q.   And -- "And I attended, and I have a copy

16    attached to the presentation."

17              So you didn't attend, but Steve Reardon

18    did, correct?

19         A.   Apparently.  That's what he says, yes.

20         Q.   Yeah.  It says:  "DEA referred to the ABC

21    program as the new industry standard."

22              MR. PAPANTONIO:  Underline that term, "the

23         new industry standard."

24    BY MR. PAPANTONIO:

25         Q.   Sir, you know what a -- you've -- you've

1   worked with industry standards, both with -- well,

2   with Cardinal, industry standards with Kinray,

3   industry standards with Purdue, I take it?  You've

4   worked with industry standards with all three of

5   those companies, right?

6        A.   Yes.

7             MR. PYSER:  Object to form.  Vague.

8   BY MR. PAPANTONIO:

9        Q.   How many years have you been working with

10  industry standards within the distribution of

11  narcotics?

12       A.   Well, an industry standard is -- is what,

13  exactly?  I mean, an industry standard is what one

14  company may be doing.

15       Q.   Okay.  And it says:  "The DEA referred to

16  the ABC program as the new industry standard."

17            Do you see that?

18       A.   Yes.

19       Q.   All right.  It says:  "I will be setting

20  up a meeting to initiate discussions on this topic in

21  the near future."

22            Did you attend that meeting where there

23  were discussions about the industry standards for

24  narcotics?

25       A.   I don't recall if I was present at --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   That's fair enough.  That was a long time

 2     ago, wasn't it?

 3          A.   Yes.

 4               MR. PYSER:  Counsel, please allow the

 5          witness to answer your question --

 6     BY MR. PAPANTONIO:

 7          Q.   And it says --

 8               MR. PYSER:  -- before you ask the next

 9          one.

10     BY MR. PAPANTONIO:

11          Q.   It says:  "Additionally, I am aware that

12     MKC is in ongoing negotiations with DEA relating to

13     order to show cause."

14               Do you know who "MCK" is?

15          A.   I will take that to mean McKesson.

16          Q.   Okay.  And you worked with McKesson; you

17     were familiar with their business.  True?

18               MR. PYSER:  Object --

19     BY MR. PAPANTONIO:

20          Q.   What they did?

21               MR. PYSER:  Object to form.

22     BY MR. PAPANTONIO:

23          Q.   Or you didn't?

24          A.   I knew -- I knew that they were a

25     wholesale distributor.  I did not know the details of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   their business, no.

 2        Q.   They were a competitor of yours, weren't

 3   they?

 4        A.   They were another wholesale distributor,

 5   just like Cardinal Health.

 6        Q.   It says "an order to show cause."  What is

 7   "an order to show cause"?  You've -- you've dealt

 8   with those before, haven't you?

 9             MR. PYSER:  Object to form.  Legal

10        conclusion.

11             THE WITNESS:  I have not dealt directly

12        with an order to show cause.

13   BY MR. PAPANTONIO:

14        Q.   Do you know what one is?  I mean, you've

15   worked around regulatory long enough to know what an

16   "order to show cause" is?

17        A.   I --

18             MR. PYSER:  Object to form.

19             THE WITNESS:  I have a general idea.

20   BY MR. PAPANTONIO:

21        Q.   Tell me what you think it is.

22        A.   I -- I think an order to show cause in

23   this case is if DEA has allegations against a

24   registrant, it gives the registrant an opportunity to

25   answer to those allegations.
```

1    Q.   That's what it says; it says, "An order to

2  show cause affords a registrant the opportunity to

3  argue why a registration should not be suspended or

4  revoked."  Right?

5          Now, while you were with the company, with

6  Cardinal, there were -- your customers that you

7  worked with, they had suspensions and revocations of

8  their license to sell narcotics, people you worked

9  with, correct?

10          MR. PYSER:  Object to form.

11          THE WITNESS:  Can you reask the question?

12  BY MR. PAPANTONIO:

13    Q.   Yeah.  While you were charge of

14  regulatory, along with Reardon -- Reardon was your

15  boss, correct?

16    A.   Steve Reardon was my boss, correct.

17    Q.   That's the first part.  Now let me ask you

18  the second part:  While you were in that role, some

19  of the customers that you were working with actually

20  had their licenses suspended or revoked, true?

21    A.   I cannot recall any customers that had

22  licenses suspended or revoked.

23    Q.   Well, who -- who -- you say "customers."

24          Who had their -- who had their licenses

25  suspended or revoked for Cardinal?

```
 1              MR. PYSER:  Object to form.  Vague.

 2    BY MR. PAPANTONIO:

 3         Q.   Do you understand what I'm saying?

 4         A.   I understand that by "customers," you mean

 5    the hospitals, pharmacies, that --

 6         Q.   Yeah.

 7         A.   -- that Cardinal Health was shipping drugs

 8    to.

 9         Q.   Right.

10         A.   Yes.  I do not recall any pharmacies

11    having suspensions revoked.

12         Q.   Do you -- did you work with Internet

13    pharmacies?

14         A.   I did not work with Internet pharmacies.

15    I, during the course of my job, identify pharmacies

16    that were engaged with Internet activity.

17         Q.   Okay.  So --

18         A.   And we -- and we discontinued business

19    with those pharmacies, and we reported them to the

20    DEA.

21         Q.   Right.  We're going to talk about that as

22    we go along.

23              Did you talk -- but prior to coming in

24    here, did you review documents where Cardinal had

25    actual suspensions of their ability to sell
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   narcotics?

 2            MR. PYSER:  Object to form.

 3            Instruct you not to answer the question to

 4       the extent that it's anything you reviewed with

 5       counsel.  If you reviewed it outside counsel,

 6       you're free to answer the question.

 7   BY MR. PAPANTONIO:

 8       Q.   You understand?

 9       A.   According to my attorney, I will not

10   answer the question on what documents I saw during my

11   meeting with counsel.

12       Q.   Sir, the first time you saw any documents

13   about suspension was when?

14            MR. PYSER:  You can -- you can answer the

15       question about when you might have seen -- if

16       you saw documents regarding suspensions.  Just

17       don't include in your answer any documents you

18       might have reviewed with counsel.  That make

19       sense?

20            THE WITNESS:  Yes.

21            MR. PYSER:  Okay.

22            THE WITNESS:  I do not recall when I have

23       reviewed documents concerning suspension.

24   BY MR. PAPANTONIO:

25       Q.   Matter of fact, you don't recall
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspensions at all, do you?

 2              MR. PYSER:  Object to form.

 3    BY MR. PAPANTONIO:

 4         Q.   Is that what you told me a minute ago?

 5    You don't -- you don't recall suspensions?

 6         A.   I recall suspensions.  You asked had I

 7    recall suspensions of customers.  And my answer was

 8    no.

 9         Q.   Oh, okay.  Well, who do you recall

10    suspensions of?

11         A.   I recall that at some point, there were

12    suspensions of DEA registrations for Cardinal Health.

13         Q.   Explain to the jury what that means.

14              MR. PYSER:  Object to form.  Calls for a

15         legal conclusion.

16    BY MR. PAPANTONIO:

17         Q.   Explain to the jury what you just -- what

18    you just said.  Break it down for the jury right now

19    so they understand, before we go through this

20    deposition, what you recall about suspensions, before

21    I start asking you questions about it.  Tell the

22    jury.

23              MR. PYSER:  Object to form.

24              THE WITNESS:  I do not remember the time

25         frame.  But there were allegations -- it was
```

```
 1          alleged -- I don't remember the details around

 2          shipments to customers.

 3               I remember that during the course of my

 4          job, identifying pharmacies, shutting those

 5          pharmacies off from receiving controlled

 6          substances, and reporting those pharmacies to

 7          the DEA.  And then at some point, I remember

 8          those same pharmacies being a part of whatever

 9          the documents were around the -- the suspension,

10          pharmacies that we had shut off 12 to 18 months

11          prior.

12     BY MR. PAPANTONIO:

13          Q.   We'll show you documents, and we'll -- the

14     jury will be able to see what you cut off and when.

15     But we'll -- we'll leave that for the jury to look

16     at, but let me go ahead with what this says right

17     here.

18               MR. PYSER:  Object to form on that last

19          speech.

20     BY MR. PAPANTONIO:

21          Q.   Let me ask you a question.  It says:  "I

22     think it would be safe to assume that the DEA will

23     use this opportunity to get MCK to implement an

24     ABC-like program."

25               Who is "ABC"?  Do you know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.   I would take ABC to be AmerisourceBergen.

 2           Q.   Okay.  It says:  "Also at the industry

 3     meeting, the H.D. Smith director of regulatory

 4     compliance was pulled aside and told that the DEA has

 5     concern with some of their customers and to schedule

 6     a meeting with DEA in D.C. to discuss that he should

 7     bring his IT people with him."

 8                See that?

 9           A.   Yes.

10           Q.   Okay.  And then this last paragraph, it

11     says -- put a box around this, if you can, because

12     this is where we're going to be spending some time.

13                It says:  "We need to be proactive and

14     implement a program that we develop that will satisfy

15     DEA expectations, and this is not -- and is not

16     dictated to us by the Agency pursuant to regulatory

17     actions.  The ABC program is not customer friendly

18     and results in delayed filing and delivery of

19     controlled substances -- substance orders to the

20     customer."

21                Do you see that?  You see where I read

22     that?  You got --

23           A.   Yes.

24           Q.   You got this letter, didn't you?

25           A.   My name is on the address list, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   And then if you'll go to the next page,
2    let's take a look at what the -- actually let's go
3    right -- go to page 4, and we'll -- we'll just review
4    what the ABC -- the new program for ABC was.  Page 4.
5               You see that?  Looks like this
6    (indicating).
7          A.   Yes.
8          Q.   Okay.  So AmerisourceBergen, which is the
9    company that we're talking about here, their
10   programs, it says:  "Drug Enforcement Administration
11   Pharmaceutical Industry Conference."
12              You see that?  September 11th, 2007?
13         A.   Yes.
14         Q.   And if you'll go to -- if you will go then
15   to the bottom of that page, it says:  "Regulatory
16   responsibility.  Title 21 of code -- of the Code of
17   Federal Regulations," and it gives 1301.71.
18              "All applicants and registrants shall
19   provide effective controls and procedures to guard
20   against theft and diversion of a controlled
21   substance."
22              Right?  See that?
23         A.   Yes.
24         Q.   And you knew that -- you knew about that
25   statute, didn't you?  When you were working, you knew
```

1   about the statute, right?

2       A.   At the time that I was responsible for

3   reviewing the ingredient limit reports and

4   identifying pharmacies, yes.

5       Q.   And so what you were supposed to do --

6            MR. PAPANTONIO:  Underline, please,

7       Evan --

8   BY MR. PAPANTONIO:

9       Q.   "Provide effective controls and guard

10  against diversion."

11           See that?

12      A.   Yes.

13      Q.   "Guard against diversion of controlled

14  substances."  Right?

15           And it says:  "Distributor response:

16  Develop policy" -- and then it goes on to the next

17  page:  "Develop policy.  This is what a" -- do you

18  understand what I'm asking you here?

19      A.   No.  I'm listening to you read this --

20      Q.   Do you --

21      A.   -- slides.

22      Q.   Do you understand that ABC had a -- had

23  something in place to deal with diversion?  That's

24  what this letter is about; you understand that?

25           MR. PYSER:  Object to form.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

```
 1        speculation.
 2              MR. PAPANTONIO:  Well, no, it doesn't.
 3              THE WITNESS:  I understand that Cardinal
 4        Health had a program in place --
 5  BY MR. PAPANTONIO:
 6        Q.   Well --
 7        A.   -- to help identify and --
 8        Q.   Do you understand, ABC laid out examples
 9  of what they're doing in their program; and in the
10  letter, Reardon says it's "onerous"?
11              Do you recall that?  Do you want to go --
12  look at the letter again?
13        A.   No, I remember you reading that.
14        Q.   Okay.  You remember that Reardon said that
15  that would be too complex and too onerous?  Remember
16  that?
17              MR. PYSER:  Object to form.
18              THE WITNESS:  I remember you reading that
19        slide.
20  BY MR. PAPANTONIO:
21        Q.   Okay.  Well, then, let's look at what
22  these onerous things were.
23              "Distributors usually implement policies
24  that mirror the Code of Federal Regulations."
25              That's something that's a good idea,
```

Highly Confidential - Subject to Further Confidentiality Review

 1    right?  You would agree with that, wouldn't you, sir?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  It's our job to comply with

 4       federal regulations.

 5    BY MR. PAPANTONIO:

 6         Q.   And that's not onerous, is it?

 7         A.   It's our job to comply with the federal

 8    regulations.

 9         Q.   Okay.  And -- and according to the ABC

10    program, they say "physical security controls."

11              You had physical security controls?

12    Cardinal?

13         A.   Yes.

14         Q.   Do you know who Mike Williams is?

15         A.   That name does not ring a bell.

16         Q.   We'll talk about it in just a minute.

17              How about ". . . records and reports of

18    registrants, information, maintenance, and inventory

19    requirements."  See that?

20         A.   Yes.

21         Q.   Does that seem onerous to do that?  I

22    mean, you did it as a regulator.

23              Does that seem onerous, to have records

24    and reports of registrants with information about

25    maintenance and inventory?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3         Q.   Does that seem onerous?

 4         A.   First, I'm not a regulator, and I never

 5   have been a regulator.  And -- can you repeat

 6   everything you said --

 7         Q.   Yeah.  Does -- does it seem onerous --

 8         A.   -- referring to --

 9         Q.   Does it seem onerous to you for a company

10   that's selling narcotics all over the country to have

11   a system that reports and -- reports registrants'

12   information, maintenance, and inventory?  Does that

13   seem onerous to you?

14                 MR. PYSER:  Object to form.

15                 THE WITNESS:  I -- I will say that a

16         company has to comply with the -- the

17         regulations.

18   BY MR. PAPANTONIO:

19         Q.   And that's what you -- that -- that was

20   part of your job, right?

21         A.   Part of my job was to help design and

22   implement a program to identify suspicious orders and

23   report those orders.

24         Q.   So would you disagree with Mr. Reardon

25   when he says that recording and reporting
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   registrants' information and maintenance is onerous?

 2             MR. PYSER:  Object to form.  Misstates

 3       evidence.

 4             THE WITNESS:  I can't speak to Steve's

 5       wording or his thinking at the time.

 6   BY MR. PAPANTONIO:

 7       Q.   Does that seem onerous to you, sir, to

 8   report records and information and maintenance and

 9   inventory requirements?  Does that seem onerous to

10   you?

11             MR. PYSER:  Object to form.

12             VIDEOGRAPHER:  It seems like something

13       that -- that we did.

14   BY MR. PAPANTONIO:

15       Q.   And we'll see in a minute, but --

16       A.   Okay.

17       Q.   So you don't think that's onerous, right?

18             MR. PYSER:  Object to form.

19             THE WITNESS:  I think it's something that

20       is in the CFR, that we did.

21   BY MR. PAPANTONIO:

22       Q.   Okay.  Well, we'll look at that in a

23   minute.

24       A.   Okay.

25       Q.   But right now, you don't think that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    onerous, correct?

 2            MR. PYSER:  Object to form.  Asked and

 3        answered.

 4            THE WITNESS:  Again, I can't speak to

 5        Steve's wording.

 6    BY MR. PAPANTONIO:

 7        Q.   How about this?  "Orders for Schedule I

 8    and II controlled substances, ordering, filling,

 9    executing, and endorsing DEA Forms 222."

10            See that?

11        A.   Yes.

12        Q.   Does that seem onerous to you, and

13    complex?

14        A.   Again, that is something that we did.  And

15    that is something that's in the CFR.

16        Q.   And you think you did that successfully?

17        A.   I would say that we put forth our best

18    effort and did it successfully.

19        Q.   Okay.  So right now, your testimony,

20    Mr. Brantley, would be that your system was

21    successful in controlling narcotic distribution in

22    America?  Is that your testimony?

23        A.   I will say --

24            MR. PYSER:  Object to form.  Misstates

25        testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I will -- I will say that
 2          the system was compliant with the regulation.
 3   BY MR. PAPANTONIO:
 4          Q.   Was it successful in keeping control of
 5   narcotics that were distributed throughout the
 6   country; yes or no?  That's all I'm asking for.
 7                    MR. PYSER:  Object to form.
 8                    THE WITNESS:  Well, so far what you've
 9          mentioned is the -- the cage and vault
10          construction.  And yes, that was compliant and
11          safe, as far as the security of the controlled
12          substances.
13                    You also mentioned maintenance and
14          inventory requirements.  And we kept records for
15          Schedule II as well as Schedule III through V
16          controlled substances.
17                    Then you mentioned the order filling and
18          executing and endorsing of 222 forms, which
19          again, we did, and we were successful with
20          properly executing those 222 forms.
21   BY MR. PAPANTONIO:
22          Q.   And you think you were successful in all
23   that, huh?  Is that -- is that Eric Brantley's
24   testimony, that Cardinal was successful in
25   controlling the diverted -- diversion with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   narcotics that it distributed?  Is that your

 2   testimony here today?  That's the only thing I'm

 3   wondering.

 4        A.   I can speak --

 5             MR. PYSER:  Object --

 6             THE WITNESS:  -- to what I did.

 7             MR. PYSER:  Object to form.

 8        Argumentative.  Asked and answered.

 9   BY MR. PAPANTONIO:

10        Q.   You can speak to what you did.  And did

11   you think you did it successfully?

12        A.   I believe I did it successfully --

13        Q.   All right.  Well, we'll --

14        A.   -- yes.

15        Q.   We'll go through some of that and let the

16   jury decide that.

17             MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   Next -- next thing on here that -- when

20   we're talking about things that are onerous, that

21   Mr. Reardon determined was onerous, "other security

22   controls.  Make a good faith inquiry.  Report

23   suspicious orders.  Report significant losses.  Gray

24   area."

25             You think it's -- you think it's onerous
```

Highly Confidential - Subject to Further Confidentiality Review

1    to make a good faith inquiry to report suspicious

2    orders and report significant losses?  Is that

3    onerous?

4              MR. PYSER:  Object to form.  Misstates

5         evidence.

6    BY MR. PAPANTONIO:

7         Q.   Is that onerous, sir?

8         A.   Again, I think that it's our

9    responsibility to comply with the regulations and

10   identify and report suspicious orders.

11        Q.   Well, then, but as far as you're

12   concerned, it's not onerous to report suspicious

13   orders, true?

14        A.   Again, I can't speak to "onerous."  Those

15   were Steve Reardon's words.  I can't speak to his

16   words or --

17        Q.   But you can --

18        A.   -- or his mindset at the time.

19        Q.   You can speak to your words.  Is that

20   something you would expect Cardinal to do, the very

21   things that we've read here?  Is it your testimony

22   you've done all those things?

23             MR. PYSER:  Object to form.

24             THE WITNESS:  We had policies and

25        procedures in place that were in compliance with

```
 1        all of these things, and we did all of these

 2        things that you've read on this slide.

 3             MR. PAPANTONIO:  Well, show him 1941,

 4        please.

 5   BY MR. PAPANTONIO:

 6        Q.   So your testimony is that your company at

 7   that point was --

 8             MS. MOORE:  Cardinal-Brantley 3.

 9        (Cardinal-Brantley 3 was marked for

10   identification.)

11   BY MR. PAPANTONIO:

12        Q.   Your testimony, Mr. Brantley, is at the

13   time, that your company was reporting suspicious

14   orders, right?

15        A.   We generate ingredient limit reports, and

16   we submitted those reports to the DEA every month.

17        Q.   So you're reporting suspicious orders,

18   according to what your testimony is here today?  Is

19   that a yes or a no?

20        A.   We --

21             MR. PYSER:  Object to form.

22             THE WITNESS:  We filed ingredient limit

23        reports with the DEA every month.

24   BY MR. PAPANTONIO:

25        Q.   So you did report suspicious orders,
```

1    according to your testimony today, correct?

2        A.    We reported orders that were on the

3    ingredient limit report to the DEA every month.

4        Q.    Yeah.  Okay.  And so prior to coming here,

5    nobody showed you this document, I take it, right?

6              Take a look at this document.  Look at the

7    -- let's just go right to -- to this -- bottom of

8    this.  You see the bottom of the second page?  I just

9    want to ask you this question.

10       A.    Bottom of the second --

11       Q.    Bottom of --

12       A.    -- page?  Where are you --

13       Q.    -- the second page.  Yeah.

14       A.    Are you referring to --

15             MR. PAPANTONIO:  Blow that to where he

16       can --

17             THE WITNESS:  -- the last paragraph?

18             MR. PAPANTONIO:  Blow -- blow that up to

19       where he can read that.  I can't . . .

20    BY MR. PAPANTONIO:

21       Q.    Says:  "Later, had dinner with the group.

22    Interesting gossip came from Reardon, Quintero . . ."

23             Who's Quintero?

24       A.    I don't recall.

25       Q.    ". . . who relayed that Cardinal is not

Highly Confidential - Subject to Further Confidentiality Review

```
 1   reporting suspicious orders to the DEA on the advice

 2   of outside counsel Linden Barber."

 3            MR. PAPANTONIO:  Would you underline this

 4       line because we're going to spend some time with

 5       this.

 6   BY MR. PAPANTONIO:

 7       Q.   Okay, so before I showed you this

 8   document, I think it was your testimony that you --

 9   your company was reporting suspicious orders, right?

10            MR. PYSER:  Object to form.  Vague as to

11       time frame, when you're showing him a 2013

12       document.

13   BY MR. PAPANTONIO:

14       Q.   Your company was reporting suspicious

15   orders, according to you, in 2007; is that what you

16   told me just a minute ago?

17       A.   My testimony was that we were submitting

18   ingredient limit reports to the DEA during the time

19   frame when I was reviewing the ingredient limit

20   reports from 2005 to whatever time someone else came

21   in and took that responsibility.

22       Q.   And according to the law -- I'm showing

23   you this again.  You know this law.  You had a duty

24   as early as 1971 to report suspicious orders.

25            You know that, don't you, Mr. Brantley?
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. PYSER:  Object to form.

2   BY MR. PAPANTONIO:

3       Q.   Yes or no?

4           MR. PYSER:  Object to form.  Asked and

5       answered.  Legal conclusion.

6           THE WITNESS:  I know that

7       21 CFR 1301.74(b) requires registrants to

8       identify and report suspicious orders.

9   BY MR. PAPANTONIO:

10      Q.   And that was all back -- all the way back

11  to 1971, wasn't it?

12      A.   I don't recall the exact year that the

13  regulation was written, but I do believe it was --

14  the '70s.

15      Q.   In the '70s?

16      A.   I don't recall --

17      Q.   Okay, well --

18      A.   -- the exact time, though.

19      Q.   And so your -- and so your testimony then

20  was that in 2007, your company was reporting

21  suspicious orders.  That's what you told me, correct?

22      A.   We were submitting ingredient limit

23  reports to the DEA every month, as -- as required by

24  21 CFR 1301.74(b).

25      Q.   Why don't you -- here.  Take this.

1            And why don't you tell me where it says

2     "reporting ingredient reports" in there?

3            MR. PYSER:  Object to form.

4            Counsel, are you going to mark it as an

5        exhibit?

6            MR. PAPANTONIO:  No, we're going to --

7        we're going to -- we'll mark it before it's out.

8    BY MR. PAPANTONIO:

9        Q.   Show me where it says that it's okay to

10   just send in ingredient reports.  If you can find it

11   in that CFR, please tell me where it is.

12           MR. PYSER:  Object to form.

13           THE WITNESS:  "The registrant shall design

14       and operate a system to disclose to the

15       registrant suspicious orders of the controlled

16       substances."

17           In the case of Cardinal, that was

18       ingredient limit reports.

19   BY MR. PAPANTONIO:

20       Q.   Well, you see --

21       A.   "The registrant shall inform the field

22   division office of the administration in this area of

23   suspicious orders when discovered by the registrant."

24           We submitted those ingredient limit

25   reports to the DEA every month.

1      Q.   And nevertheless, you have a document in

2   front of you that's written as late as 2013, with

3   your supervisor, Mr. Reardon, saying that -- hand me

4   that back, and let's look at it again.  We're --

5      A.   Mr. Reardon was not my supervisor in 2013.

6      Q.   Well, he was your supervisor in 2007,

7   wasn't he?

8           MR. PYSER:  Object to form.

9   BY MR. PAPANTONIO:

10     Q.   True?

11     A.   I do not recall when I transferred out of

12   the role.

13     Q.   He was your supervisor at some point,

14   wasn't he?

15     A.   Yes.

16     Q.   Okay.  And how many years was he your

17   supervisor?

18     A.   From 2005 until 2007-8.  I don't recall

19   the exact time.

20     Q.   And you think, when you left in 2007, that

21   there was a system to report suspicious orders?

22          That's what Mr. Brantley thinks today, as

23   he's talking to the jury here, right?

24          MR. PYSER:  Object to form.  Asked and

25          answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   True?

 3        A.   Yeah.

 4        Q.   I mean, in good faith -- you really

 5   believed there was a suspicious order program in

 6   place when you left the company; is that your

 7   testimony?

 8        A.   There was a suspicious order program in

 9   place while I was at the company.  And there is a

10   suspicious order in -- in place at the company, yes.

11        Q.   You thought that?

12        A.   I knew that because I worked on the

13   program.

14             My job was to identify such orders by

15   reviewing the ingredient limit reports, and in

16   addition, to go above and beyond, to go out and

17   conduct a site visit of that customer and shut that

18   customer off from controlled substances, and then

19   report not a suspicious order, but a customer to the

20   DEA.

21        Q.   And you wanted to do your job, didn't you?

22   You, Mr. Brantley, you wanted to do your job by

23   reporting suspicious orders, true?

24        A.   I -- that was my job.

25        Q.   That's what -- you did your job.  Let's
```

```
 1    read this again.

 2              "Later, at dinner with the group,

 3    interesting gossip came from Reardon, Quintero who

 4    related that Cardinal" --

 5              MR. PAPANTONIO:  Let's just be very

 6         clear -- put a second line underneath it so I

 7         make sure I'm -- I'm catching this right.

 8              MS. CHARLES:  Counsel, can I object that

 9         this is a McKesson confidential document, and I

10         have no record that you asked for permission of

11         that.

12              MR. PAPANTONIO:  Yeah, you -- you can

13         object.

14    BY MR. PAPANTONIO:

15         Q.   Cardinal is not --

16              MR. PYSER:  Actually, that's a valid

17         objection.  We've received no notice that this

18         document, produced by McKesson, which is marked

19         "highly confidential," has been designated --

20              MR. PAPANTONIO:  Yeah.

21              MR. PYSER:  -- to be used in this --

22              MR. PAPANTONIO:  All right.  We're

23         going --

24              MR. PYSER:  -- deposition.

25              MR. PAPANTONIO:  -- to use it.  You take
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          it up with the judge.  This is going to be --

 2                  MR. PYSER:  And we're going to mark this

 3          entire area of testimony as improper, to be

 4          excluded --

 5                  MR. PAPANTONIO:  All right.

 6                  MR. PYSER:  -- and failure to follow

 7          the --

 8                  MR. PAPANTONIO:  That's your right --

 9                  MR. PYSER:  -- deposition protocol.

10                  MR. PAPANTONIO:  That's your right to do

11          it, sir.

12      BY MR. PAPANTONIO:

13          Q.   "Cardinal is not reporting suspicious

14      orders to DEA on the advice of outside counsel."

15                  You see that?

16                  MR. PYSER:  Object to form.  Vague as

17          to --

18      BY MR. PAPANTONIO:

19          Q.   You see that?

20                  MR. PYSER:  Object to form.  Vague as to

21          time frame.

22      BY MR. PAPANTONIO:

23          Q.   Did I read that right?

24          A.   I see the line that you read.

25          Q.   Okay.  And this document was written in
```

```
 1    2013, correct?

 2             MR. PYSER:  Object to form.  Calls for

 3         speculation.

 4             THE WITNESS:  According to this, the

 5         e-mail was sent 2013.

 6    BY MR. PAPANTONIO:

 7         Q.   And it says this is on the advice of

 8    outside counsel, Linden Barber.

 9             Have you met Linden Barber?

10             MR. PYSER:  Object to form.  Misstates

11         evidence.  Speculation.

12    BY MR. PAPANTONIO:

13         Q.   Have you met Linden Barber?

14         A.   Yes, if you narrow a -- a time frame.

15         Q.   When did you meet him?

16         A.   I met Linden Barber -- I can't say what --

17    what year, but I was not in my role with -- as far as

18    reporting suspicious orders.  I was in a role as a

19    compliance officer at the time, the first time I met

20    Linden Barber.

21         Q.   And it's -- it's fair for me to say, based

22    on what you've told me so far, that in 2007, Eric

23    Brantley, you, believed that you had a suspicious

24    order system in place.  Correct?

25             MR. PYSER:  Object --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   You believed -- you believed that in 2007;

 3   is that true?

 4             MR. PYSER:  Object to form.  Asked and

 5        answered.

 6   BY MR. PAPANTONIO:

 7        Q.   Correct?

 8        A.   We had a system in place, reviewing

 9   ingredient limit reports and submitting those

10   ingredient limit reports to the DEA, as well as

11   conducting site visits of pharmacies identified on

12   those reports, discontinuing sales of controlled

13   substances to those pharmacies, and reporting those

14   pharmacies to the DEA.

15        Q.   And when you -- when you left, you thought

16   that was a successful program, didn't you?  You

17   thought, "We're doing a good job with this," didn't

18   you?

19             MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   You thought you were doing a good job with

22   suspicious orders, didn't you?

23        A.   Please put a time frame on when I left.

24        Q.   Well, when you left --

25        A.   Do you mean when I left the role --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   When did you leave?

 2          A.   -- when I left the company?

 3          Q.   When you left the company, you thought

 4   everything was good; suspicious orders are in place;

 5   we're making sure narcotics don't get out there

 6   without reporting suspicious orders.

 7               That's what -- that's what Eric Brantley

 8   thought?

 9               MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11          Q.   True?

12               MR. PYSER:  Object to form.  Vague.

13   BY MR. PAPANTONIO:

14          Q.   That's a true statement, isn't it?  Eric

15   Brantley --

16          A.   When I left Cardinal Health --

17          Q.   Well, let me finish my question, just so I

18   can be real clear.

19               In 2007, when you left -- when you left

20   Cardinal Health, Eric Brantley believed that he had a

21   system in place that was a suspicious order system,

22   yes or no?

23               MR. PYSER:  Object to form.

24               THE WITNESS:  I did not leave Cardinal

25        Health in 2007.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Well, when did --

 3        A.   I did not leave Cardinal Health until 2013

 4   I believe.

 5        Q.   All right.  In 2013, you were still there,

 6   right?  True?

 7        A.   I -- I was an employee at Kinray.

 8        Q.   And what's the date on that letter that

 9   you're looking at in front of you where it says:

10   "Cardinal is not reporting suspicious orders to the

11   DEA"?

12        A.   The e-mail apparently was sent March 11,

13   2013.

14             MR. PYSER:  Object to form.  Calls for

15        speculation.

16   BY MR. PAPANTONIO:

17        Q.   All right.

18             MS. CHARLES:  Counsel, can you please put

19        the Bates number, for clarity, on the record?

20             MR. PAPANTONIO:  No, I won't put Bates

21        number.  We'll read them in -- you're welcome to

22        read them in.  We're not going to waste time

23        reading 15-digit --

24             MS. CHARLES:  MCKMDL00545341.

25             I'm going to object to showing a McKesson
```

```
 1        highly confidential document to the witness that

 2        did not provide -- showing it to him.

 3              MR. PAPANTONIO:  Show Mr. Brantley 4230,

 4        please.

 5              MS. MOORE:  Cardinal-Brantley 4.

 6         (Cardinal-Brantley 4 was marked for

 7    identification.)

 8              MR. PAPANTONIO:  You see that settlement?

 9        You got that, Evan?  Could you blow that up,

10        that first page -- settlement release agreement

11        and administrative memorandum of agreement.

12    BY MR. PAPANTONIO:

13        Q.   Now, you were there when this was -- this

14    is 2008.  You were there in 2008?  You were with

15    Cardinal in 2008, weren't you?

16        A.   I was an employee of Cardinal Health in

17    2008.

18        Q.   Okay.  And then it goes on.  This says

19    "Applicability," and then it goes, "Background."

20              Says:  "Cardinal is registered with DEA in

21    27 facilities as distributors, Schedule II to V

22    controlled substances, under provision of the

23    Comprehensive Drug Abuse Prevention Act, 1970."

24              Remember, we talked about the date of the

25    Act, and you said it was in the '70s.  And you were
```

Highly Confidential - Subject to Further Confidentiality Review

1   right.  It was in '70s, wasn't it?

2        A.   According to this, yes.

3        Q.   Yeah.

4             "On November 28th, 2007, the DEA, by its

5   deputy administrator, Leon -- Michele Leonhart,

6   issued an order to show cause . . . ."

7             And you told us you know what an order to

8   show cause is, right?

9             MR. PYSER:  Object to form.

10            THE WITNESS:  I spoke to -- I believe it's

11       a chance to give the -- the registrant an

12       opportunity to answer to allegations by the DEA.

13  BY MR. PAPANTONIO:

14       Q.   So you were actually involved in this,

15  weren't you?

16            MR. PYSER:  Object to form.

17  BY MR. PAPANTONIO:

18       Q.   In -- in the order to show cause, you --

19  Eric Brantley was involved in that, true?

20       A.   I was not involved in the order to show

21  cause.

22       Q.   Who was?

23       A.   I do not recall the individuals that would

24  have been.  I suspect, legal.

25       Q.   But were you working in regulatory in 2008

Highly Confidential - Subject to Further Confidentiality Review

```
 1   when this memorandum came through from the DEA?

 2       A.   I do not know the exact -- are you saying

 3   November 28th?

 4       Q.   Yeah.

 5            MR. PYSER:  Object to form.  Vague.

 6            What year are we talking about?

 7            MR. PAPANTONIO:  It's November 28th --

 8       underline the one I -- underline that, so

 9       counsel can understand what we're doing here.

10   BY MR. PAPANTONIO:

11       Q.   November 28th, 2007, you were there.

12   True?

13       A.   I was an employee of Cardinal Health, yes.

14       Q.    "The DEA, by its deputy administrator,

15   Michele Leonhart, issued an order to show cause and

16   immediate suspension of registration to

17   Cardinal . . ."

18            You see that?

19       A.   Yes.

20       Q.   Didn't I just begin this deposition by

21   asking you whether you recalled any -- any

22   suspensions that Cardinal was involved with?

23            What did you tell me?

24            MR. PYSER:  Object to form.

25            THE WITNESS:  You asked me --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   What did you tell me?

 4        A.   You asked me did I recall suspensions of

 5   Cardinal customers.

 6        Q.   Oh.

 7        A.   And I said no.

 8        Q.   Oh, it was "Cardinal customers."  I'm

 9   sorry, I didn't use the right word.

10              But this says --

11              MR. PAPANTONIO:  Would you please

12         underline this.

13   BY MR. PAPANTONIO:

14        Q.   It says:  "Immediate suspension of

15   registration to Cardinal."

16              Is that clear?

17              MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   Is that pretty clear to you?

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   Mr. Brantley, is that pretty clear to you?

23        A.   Is what pretty clear?

24        Q.   "Immediate suspension of registration to

25   Cardinal"?
```

    1          A.   There was an immediate suspension order

    2    issued, according to this document.

    3          Q.   Well, the jury is going to see how we

    4    started this deposition, where you gave me answers

    5    about it, and I want to make sure that we're clear

    6    about what you said at the beginning of this

    7    deposition.

    8               In the beginning of the deposition, did

    9    you tell me that there were no suspensions of

    10   registration to Cardinal customers?  That's what you

    11   said, right?

    12              MR. PYSER:  Object to form.

    13              THE WITNESS:  I said I did not recall

    14      suspensions of Cardinal customers.

    15   BY MR. PAPANTONIO:

    16         Q.   Right.  This is -- this is a suspension of

    17   registration to the company itself, Cardinal,

    18   correct?

    19         A.   This is a -- a suspension to Cardinal

    20   Health.

    21         Q.   And it goes on to say:  "With respect to

    22   distribution facility" -- gives the address, Auburn,

    23   Washington.

    24              You know where that is, right?

    25         A.   It's in Washington state.

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.   Right.  And then it -- next one, it says

2    on December 5th, 2007 -- just so we have the dates

3    right -- it says:  "The DEA, by its administrator" --

4    again, Michele Leonhart -- did you ever meet -- by

5    the way, did you ever meet Michele Leonhart?

6            A.   I did not.

7            Q.   Do you know who she is?

8            A.   According to this document, she was the

9    deputy administrator.

10           Q.   And that's all you know about it,

11   according to this document?

12           A.   Yes.

13           Q.   Did anybody with the company -- not your

14   lawyers, but anybody with the company review this

15   with you before you came in here to testify and give

16   your testimony about whether or not Cardinal had been

17   involved in any kind of suspensions?

18                MR. PYSER:  Object to form.

19                THE WITNESS:  Is your question did anyone

20       review this particular document with me?

21   BY MR. PAPANTONIO:

22           Q.   Yeah.

23           A.   No.

24           Q.   Is this first time you've seen this

25   document?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   It is the first time I have seen this

 2   document during these proceedings.  It is not my

 3   first time seeing this document.  I have read it at

 4   some point over the last several years.

 5          Q.   You knew about it all the way back to

 6   2008, didn't you, about this document?

 7          A.   I did not know about this document in 2008

 8   because I did not review the document then.

 9          Q.   Nobody with the company showed you this

10   document while you were employed as -- in regulatory,

11   correct?

12               MR. PYSER:  Object to form.  Vague as to

13      time.

14   BY MR. PAPANTONIO:

15          Q.   Is that true, that nobody showed you this

16   document while you were employed with regulatory in

17   2008?  Correct?

18          A.   I do not recall anyone at the company

19   showing me this document.

20          Q.   All right.  Well, let's -- let's go ahead

21   and spend some time with it and see what you think.

22               MR. PYSER:  Object to form.  The

23      document --

24   BY MR. PAPANTONIO:

25          Q.   It says -- it says --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  To be clear, the document's

 2         dated September of 2008, if you were employed in

 3         regulatory at that time.

 4              You're asking a misleading question,

 5         Counsel.

 6              MR. PAPANTONIO:  All right.  We'll clear

 7         the question up.  I think it'll be very clear by

 8         the time it's all over.

 9   BY MR. PAPANTONIO:

10      Q.   It says:  "The DEA, by its administrator,

11   Michele Leonhart, issued an order to show cause" --

12              MR. PAPANTONIO:  Underline that word, "to

13         show cause."

14   BY MR. PAPANTONIO:

15      Q.   -- "and an immediate suspension of

16   registration to Cardinal."

17              Now, what does that mean, "an immediate

18   suspension"?  What does that mean?  Tell the jury,

19   now that you see this, tell the jury what "immediate

20   suspension" means.

21              MR. PYSER:  Object to form.  Legal

22         conclusion.

23              THE WITNESS:  I believe that "immediate

24         suspension" means an immediate suspension of the

25         DEA registration.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   And they can't sell narcotics anymore.

 3   That's what that means, right?

 4             MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6        Q.   They can't sell narcotics -- December 5th,

 7   2007, in Lakeland, Florida, they can't sell

 8   narcotics, the Cardinal operation?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  If there is an immediate

11        suspension order in place, a registrant cannot

12        sell controlled substances.

13   BY MR. PAPANTONIO:

14        Q.   And you didn't know about this prior to me

15   coming in here and asking you these questions, did

16   you?

17             MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   True?  I mean, in fairness to you, you

20   just didn't know about this?

21             MR. PYSER:  Object to form.  Misstates

22        evidence.  Misstates testimony.

23             THE WITNESS:  I knew about this prior to

24        coming in.  Your question was, had anyone showed

25        me this document at Cardinal Health, and my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        answer was and is no.

 2   BY MR. PAPANTONIO:

 3        Q.   Well, if you knew it before you came in

 4   here, when I asked you at the beginning of this

 5   deposition, do you know whether or not Cardinal

 6   pharmacies or customers, whether there's any

 7   suspensions, what did you tell me?

 8             MR. PYSER:  Object to form.  Asked and

 9        answered.

10             THE WITNESS:  You asked me was I aware of

11        any suspensions of Cardinal customers.  And I

12        responded no, and I respond no again.  This --

13        this --

14   BY MR. PAPANTONIO:

15        Q.   But you knew about -- go ahead.

16        A.   This is a suspension order, as it reads,

17   of Cardinal, not a Cardinal customer.  So you asked

18   about customers, and I answered no.

19        Q.   Okay.  So this is not -- this is not just

20   the customer.  This is the company itself that is

21   being suspended by the DEA for immediate suspension,

22   correct?

23             MR. PYSER:  Object to the form.

24   BY MR. PAPANTONIO:

25        Q.   The company itself, that you worked for?
```

```
 1                  MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3       Q.   Correct?  Are you --

 4                  MR. PYSER:  Object to form.  Misstates

 5        evidence.

 6                  MR. PAPANTONIO:  Let me finish my question

 7        before you -- I -- I get it.  I get what you're

 8        doing.  But you're going to have to listen to

 9        the question.

10                  MR. PYSER:  Well, I'm trying to get in

11        there before, so --

12                  MR. PAPANTONIO:  All right.

13                  MR. PYSER:  All right.  Let me just ask --

14        give me a second to interject my objection.

15        That way it will be easier for you to finish

16        your question.  Okay?

17                  MR. PAPANTONIO:  Yes.

18                  MR. PYSER:  I'm not trying to interrupt

19        you, Counsel.

20                  MR. PAPANTONIO:  Okay.

21                  MR. PYSER:  -- I'm just not sure where

22        your question's answering --

23                  MR. PAPANTONIO:  Well --

24                  MR. PYSER:  -- ending because you're

25        asking a series of them in each -- in each
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       question.

 2            MR. PAPANTONIO:  Let me see if I can ask

 3       this question pretty clear.

 4  BY MR. PAPANTONIO:

 5       Q.    Immediate suspension of a registration to

 6  Cardinal itself means Cardinal cannot sell narcotics

 7  in Lakeland, Florida.  Yes?

 8            MR. PYSER:  Object to form.

 9            THE WITNESS:  If the Lakeland, Florida,

10       facility has an immediate suspension order,

11       Lakeland, Florida, cannot sell or distribute

12       controlled substances.

13  BY MR. PAPANTONIO:

14       Q.    And that's a Cardinal facility, correct?

15  According to this?

16       A.    This facility is a Cardinal Health

17  facility.

18       Q.    All right.

19       A.    Or at least was at the time.  I cannot

20  speak for now.

21       Q.    Fair enough.  Let's go on to number 4:

22  "On December 7th, 2007, the DEA, by its

23  administrator, Michele Leonhart, issued an order to

24  show cause and immediate suspension registration to

25  Cardinal with respect to its New Jersey facility."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Do you see that?

 2                 MR. PAPANTONIO:  Underline "New Jersey."

 3                 THE WITNESS:  Yes, I see that.

 4                 MR. PAPANTONIO:  And then underline, if

 5          you would, please, "order to show cause" and

 6          "immediate suspension of registration."

 7   BY MR. PAPANTONIO:

 8          Q.   And that's Swedesboro facility, right?

 9          A.   That's what it says, yes.

10          Q.   So so far, we have a suspension of -- we

11   have suspension of the Auburn facility.

12                 Have you ever been to the Auburn Cardinal

13   facility?

14          A.   In Auburn, no.

15          Q.   Have you ever been to the Lakeland

16   Cardinal facility that was suspended?

17          A.   I have been to the Lakeland facility.

18          Q.   Have you been to the Swedesboro facility

19   that was suspended?

20          A.   I have been to the Swedesboro facility.

21          Q.   Then -- okay, then the next one,

22   number 5 -- and by the way, those are -- those are

23   all different parts of the country.  We're not just

24   talking about one area of the country, are we?

25                 Here, we're talking about Washington
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    state.  We're talking about Florida.  We're talking

 2    about New Jersey.  Those are different parts of the

 3    country.  I just want to be sure we're clear on that

 4    as we go.

 5            These are different Cardinal facilities in

 6    different parts of the country, correct?

 7            MR. PYSER:  Object to form.

 8            THE WITNESS:  It's a facility in

 9        Washington state and Lakeland, Florida, and

10        Swedesboro, New Jersey.

11    BY MR. PAPANTONIO:

12        Q.  All across the U.S.  I mean, you know

13    where Washington state is, right?

14        A.  Yes.

15        Q.  All right.  Lakeland, Florida:  You said

16    you've been there?

17        A.  Yes.

18        Q.  All right.  It says:  "On January 30,

19    2008, the DEA, by its deputy assistant, Joseph

20    T. Rannazzisi, issued an order to show cause to

21    Cardinal with respect to its distributor facility in

22    Stafford."

23            That's in Texas.  All right?  So we've

24    got --

25        A.  Yes.
```

```
 1          Q.   -- so far we've got Auburn.  We've got

 2    Lakeland, Florida.  We've got New Jersey, Swedesboro.

 3    And now we've got another one at Stafford -- the

 4    Stafford facility.  That's in Texas.

 5                Have you been there, too?

 6                MR. PYSER:  Object to form.

 7                THE WITNESS:  I have been to the Texas

 8        facility.

 9    BY MR. PAPANTONIO:

10          Q.   And that's in January 2008.  Let's go to

11    the next one, please.

12                "The orders" -- "The orders to show cause

13    referenced above alleged, among other things, that

14    Cardinal failed to maintain effective controls

15    against diversion of particular controlled substance

16    into other than legitimate medical, scientific, and

17    industrial channels as evidenced by sales to

18    customers of Cardinal."

19                Did you know that was going on,

20    Mr. Brantley?  Did you know that your company was

21    failing to maintain effective controls --

22                MR. PAPANTONIO:  Underline "effective

23        controls," please.

24    BY MR. PAPANTONIO:

25          Q.   Your company was failing to maintain
```

1    effective controls of controlled substances.

2              Did you know, when you were working

3    there -- I'm not saying you did know.  I'm just

4    asking, did you know that at all?

5              MR. PYSER:  Object to form.  And misstates

6       evidence.

7    BY MR. PAPANTONIO:

8         Q.   Did you know that?

9         A.   We had a program in place to identify and

10   report suspicious orders to the DEA, and we did.

11        Q.   Okay.  And you did, and whatever you were

12   reporting still wasn't adequate to protecting the

13   American public from narcotics, if we look at this

14   order, right?

15             MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   True?

18        A.   We had a system in place.  We operate in

19   a -- in a closed supply chain.  We had a system in

20   place to identify orders and report those orders to

21   the DEA.

22        Q.   Let's see how well --

23        A.   Report pharmacies to the DEA.

24        Q.   Let's see how well it worked.

25             So far -- so far, your system that you're

Highly Confidential - Subject to Further Confidentiality Review

```
 1    describing didn't work in Washington, in Auburn.  It

 2    didn't work in Lakeland, Florida.  It didn't work in

 3    New Jersey, at Swedesboro.  It didn't work in

 4    Stafford facility in Texas -- so far.  Now, that's

 5    just the beginning.

 6              But so far, you would agree, your system,

 7    according to the DEA, failed to do its job, if we

 8    just look at this first page of the document.  Right?

 9              MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11         Q.   Failed to do its job?

12         A.   These are allegations.

13         Q.   Well, sir, you pled to the allegations and

14    paid a fine -- did you know that?  Did you know your

15    company actually paid a fine?

16              MR. PYSER:  Object to form.  Misstates

17         evidence.

18              THE WITNESS:  I know that these were

19         allegations.  I know that there was settlement.

20         I do not believe there was any acknowledgment of

21         anything.  These were allegations from the DEA.

22    BY MR. PAPANTONIO:

23         Q.   Okay.  So you just paid up -- do you know

24    how much money you paid to the DEA?  I'm just curious

25    whether you know how much money you paid to the DEA
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    because of the failure of your company to have a

2    controlled substance suspicious order system in

3    place.

4              Do you know how much you paid?

5              MR. PYSER:  Object to form.

6              THE WITNESS:  I do not recall how much the

7         company settled.

8    BY MR. PAPANTONIO:

9         Q.   All right.  Well, let's go up to the next

10   page, page 2.

11        A.   But the company did not fail to have a

12   system in place.  There was a system in place.

13        Q.   The DEA disagreed with you, didn't they?

14   They disagree that you had a system in place.  If we

15   look at just this part of the document, DEA did not

16   believe you had a system in place, according to this

17   document?

18             MR. PYSER:  Object to form.  Misstates

19        evidence.  Calls for speculation.

20             THE WITNESS:  This document did not say

21        that Cardinal Health did not have a program in

22        place.

23   BY MR. PAPANTONIO:

24        Q.   Oh?  Well, let's go to the next page.

25        A.   Okay.  Because the page that I read did
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    not say that --
 2         Q.   Let's go to the next page, number 7.
 3              It says:  "DEA also alleges that Cardinal
 4    failed to maintain effective controls against
 5    diversion . . ."
 6              Is that pretty clear to you?  DEA says
 7    that "Cardinal failed to maintain effective control
 8    against diversion of controlled substances."
 9              You see that?
10              MR. PYSER:  Object to form.
11    BY MR. PAPANTONIO:
12         Q.   You didn't -- you didn't -- you didn't --
13    see that line before you just gave me that last
14    answer, did you?
15         A.   I do see that line, and I repeat my
16    previous answer.
17         Q.   They were wrong, just -- DEA is wrong
18    here, huh?
19         A.   This does not say that Cardinal Health did
20    not have a program in place.
21         Q.   Sir, they took your license away.  They
22    took your license away in Washington.  Right?  Yes?
23              MR. PYSER:  Object to form.
24    BY MR. PAPANTONIO:
25         Q.   They took your license away in Washington?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   Correct?

 4                MR. PYSER:  Object to form.  Misstates

 5        evidence.  Asked and answered.

 6                THE WITNESS:  There was a -- there was an

 7        order to show cause and an immediate suspension

 8        of registration.

 9   BY MR. PAPANTONIO:

10        Q.   They suspended your license in Washington

11   to sell narcotics.  They suspended your license in

12   Lakeland to sell narcotics.  They suspended your

13   license in Swedesboro to sell narcotics.  They

14   suspended your license in Texas to sell narcotics.

15   Correct?

16                MR. PYSER:  Object to form.  Asked and

17        answered.

18   BY MR. PAPANTONIO:

19        Q.   Is that correct?

20        A.   There was --

21                MR. PYSER:  Object to form.

22                THE WITNESS:  There was an immediate

23        suspension order issued for the facilities that

24        you mentioned.

25
```

1    BY MR. PAPANTONIO:

2         Q.   Okay.  And then if you look down, the next

3    page, it goes on.  I mean, the Jerry Steele Lane,

4    Georgia, facility, the McDonough facility.

5              Have you been there?

6         A.   Yes.

7         Q.   Where is that?  You've been to Georgia;

8    you've been to the facility itself, haven't you?

9         A.   Yes.

10        Q.   And that's a Cardinal facility, correct?

11        A.   It was at the time, yes.

12        Q.   And you were in charge of Georgia, just --

13   that was part of your territory, wasn't it?

14        A.   What do you mean by "in charge of

15   Georgia"?  Do you mean --

16        Q.   Oversight.

17        A.   -- reviewing -- I -- I had no oversight of

18   Georgia.  My job was to review ingredient limit

19   reports from all of the Cardinal facilities.

20        Q.   Right.  And so every one of these things

21   that we've been talking about, where the license has

22   been suspended, you were in charge of reviewing

23   reports, correct?

24              MR. PYSER:  Object to form.

25              THE WITNESS:  I was one individual that

Highly Confidential - Subject to Further Confidentiality Review

```
 1        did review those reports.  Those reports were

 2        also submitted to the DEA from these particular

 3        distribution centers.

 4   BY MR. PAPANTONIO:

 5        Q.   Well, you might be confused about that, so

 6   I'm going to let that one go.

 7             But let me ask you this --

 8             MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10        Q.   Strike that.  Strike that.

11             And let me ask you this:  So we're on

12   page -- we're on number 7 on page 2 of this document.

13             Now, we've talked about all these other

14   places, and now we're talking about McDonough

15   facility.  And you reviewed orders for McDonough

16   facility, true?

17        A.   I reviewed ingredient limit reports --

18        Q.   And according to --

19        A.   -- for the McDonough facility.

20        Q.   -- the DEA, they say that "Cardinal failed

21   to maintain effective controls against diversion of

22   controlled substances at the following addresses."

23             MR. PAPANTONIO:  Underline "following

24        addresses," please.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1  BY MR. PAPANTONIO:

 2      Q.   First one there is McDonough, right?  You

 3  actually visited the place, right?

 4          MR. PYSER:  Object to form.

 5          THE WITNESS:  That is the first facility

 6      listed.

 7  BY MR. PAPANTONIO:

 8      Q.   And then the next one is all the way out

 9  in California, Valencia facility, right?

10          You visited that, true?

11      A.   I believe I have been to the -- to the

12  Valencia facility.

13      Q.   And you reviewed reports coming from

14  Valencia facility, correct?

15      A.   I did review ingredient limit reports for

16  the Valencia facility.

17      Q.   And according to the DEA, the DEA is

18  saying that Cardinal failed to maintain effective

19  controls against diversion of controlled substances

20  at Valencia facility, right?

21          MR. PYSER:  Object to form.

22          THE WITNESS:  This document alleges that

23      Cardinal failed to maintain effective controls

24      against diversion.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Okay.  And -- and then the next one is the

 3   Denver facility in Colorado.  That's a totally

 4   different facility; that's in Colorado.  True?

 5             And you reviewed reports there, too,

 6   correct?

 7        A.   I did review ingredient limit reports for

 8   the Denver, Colorado, facility.

 9        Q.   All right.  Let's go to -- let's go down

10   to -- here it says "General" -- Stipulation

11   agreement, General" -- specific questions I have for

12   you.

13        A.   Same page?

14        Q.   Yes, sir, it's the same page.

15             You see where it says "general," the word

16   "general" there?

17        A.   Yes.

18        Q.   Okay.  It says:  "Intentions of parties to

19   effect settlement."

20             And then it -- it goes -- says:  "In order

21   to avoid the uncertainty and the expense of

22   litigation, in furtherance of the parties' belief

23   that a settlement, this administration is in the

24   public interest, parties desire to settle and resolve

25   . . ."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You see that?

 2       A.   I do see that.

 3       Q.   ". . . parties desire to settle and

 4  resolve and hereby do settle and resolve all

 5  outstanding administrative claims and/or issues with

 6  respect to alleged failure of Cardinal" --

 7              MR. PAPANTONIO:  Underline "failure of

 8       Cardinal" --

 9  BY MR. PAPANTONIO:

10       Q.   ". . . to detect and report suspicious

11  orders and alleged failure of Cardinal to maintain

12  adequate controls against the diversion of controlled

13  substances on or prior to September 30, 2008."

14              See that?

15       A.   I do see that.

16       Q.   All right.  And then if you look down

17  below that, you see where it says "covered conduct"?

18              "For purposes of this agreement, covered

19  conduct shall mean the following.  The conduct

20  alleged in the orders to show cause."

21              See that?

22       A.   Is that under the paragraph "No admission

23  or concession"?

24       Q.   See where it says "covered conduct"?

25       A.   Yes.
```

```
 1          Q.   "The conduct alleged in the orders to show

 2     cause," and then the -- go to the next page.

 3               It says:  "The alleged failure of Cardinal

 4     to maintain adequate controls of controlled

 5     substances prior to 2008."

 6               That's when -- that's when you were in

 7     regulatory, prior to 2008, right?

 8               MR. PYSER:  Object to form.  And misstates

 9         evidence.  Rule of completeness.

10     BY MR. PAPANTONIO:

11          Q.   You were there in regulatory in 2008?

12          A.   I was in quality and regulatory affairs

13     from 2005 until some point -- either 2007, 2008.  I

14     don't recall the exact time frame.

15          Q.   And you were reviewing all of the reports

16     for everything we've just covered -- Georgia,

17     California, Florida, Colorado, Washington -- you were

18     reporting -- you were the guy reporting -- reviewing

19     reports, right?

20          A.   We were reviewing those reports for those

21     facilities.

22          Q.   Says:  "The alleged failure of Cardinal to

23     maintain adequate controls against the diversion of

24     controlled substances on or prior -- all -- at all

25     distribution site facilities."  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Let's -- let me slow -- let me slow down

 2    here.  This is -- we're on page 3 right now.  Okay?

 3    Are you on page 3?

 4          A.   Yes.

 5          Q.   Okay.  At the very top of page 3, it says:

 6    "The alleged failure of Cardinal to maintain adequate

 7    controls against the diversion of controlled

 8    substances prior -- on or prior to September 30th,

 9    2008, at all" --

10          MR. PAPANTONIO:  Would you underline "all

11      distribution facilities listed in Appendix A"?

12      Got that?

13    BY MR. PAPANTONIO:

14          Q.   Now, remember what that says.  We're

15    talking about the failure of Cardinal to maintain

16    adequate controls against the diversion of controlled

17    substance at all facilities that are listed in

18    Appendix A.

19          MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21          Q.   And let's look at Appendix A; see what it

22    has to say.  Go to page 12, and then turn one more

23    page.

24          Now, I want to make sure these are all

25    facilities, sir, that you reviewed reports for.

```
 1    Start at the top, if you would, please.

 2            "Cardinal facilities referenced in

 3    paragraph 1 of this agreement."

 4            That's just what we were looking at,

 5    correct?

 6        A.   This is Appendix A to the agreement, yes.

 7        Q.   So this is Appendix A.  And so in

 8    Appendix A, it talks about New York operating under

 9    DEA registration, correct?

10        A.   Yes.

11        Q.   And see where it gives a number there, it

12    even gives a DEA registration number?

13        A.   Yes.

14        Q.   Tell the jury how important that DEA

15    registration number is.

16            MR. PYSER:  Object to the form.

17            THE WITNESS:  The DEA registration number

18        is the license given to a registrant in order to

19        house and distribute controlled substances.

20    BY MR. PAPANTONIO:

21        Q.   And it's way -- it's ways that DEA can

22    identify a particular facility, correct, by its -- by

23    its registration number?

24        A.   That registration number is the license to

25    distribute controlled substances.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So if I wanted to find out about a

2 particular facility, say, in New York, one thing I

3 could look to is I could look to the registration

4 number, correct?

5    A.   That registration number identifies the

6 DEA license, yes.

7         MR. PAPANTONIO:  Underline that

8      registration number, please.

9 BY MR. PAPANTONIO:

10   Q.   And then the next one, it says:

11 "Interstate Drive, Lakeland, Florida."

12        See that?

13   A.   Yes.

14   Q.   And then the next one is -- and these --

15 by the way, those two are Cardinal facilities, true?

16   A.   Yes.

17   Q.   And then the next one is Mississippi.  We

18 hadn't talked about that, but that's a facility,

19 correct?  That's a Cardinal facility?

20   A.   At the time, I believe it was, yes.

21   Q.   And then the next -- and by the way -- and

22 just so -- I want to be clear:  You were also in

23 charge of reviewing reports coming out of Cardinal --

24 out of Madison, Mississippi?

25   A.   I did review ingredient limit reports from

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Madison, Mississippi.
 2        Q.   Registration RC0221236.  Those -- those
 3   registration numbers are -- are important, aren't
 4   they?  I mean, keeping up with the facility, the
 5   registration number is what allows the facility to
 6   do -- to sell narcotics, true?
 7             MR. PYSER:  Object to form.
 8             THE WITNESS:  That registration number is
 9        the DEA license --
10   BY MR. PAPANTONIO:
11        Q.   Okay.  Yeah.
12        A.   -- to distribute controlled substances.
13        Q.   It's important, isn't it?
14        A.   You cannot distribute controlled
15   substances without a DEA registration.
16        Q.   Right.  And then the next one is
17   La Vergne, Tennessee.  Did I say that -- La Vergne?
18   That's Tennessee.
19             And you also reviewed -- you also reviewed
20   that, reports coming out of there?
21        A.   I do not believe I reviewed reports for
22   La Vergne, Tennessee.
23        Q.   Okay.  Knoxville, Tennessee:  How about
24   that?
25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   McDonough, Georgia:  You already told us

2  you did, right?

3      A.   Yes.

4      Q.   The next one is -- next one is number 7,

5  and that's in Ohio, right?

6      A.   Findlay, Ohio, yes.

7      Q.   And you reviewed reports there, true?

8      A.   Yes.

9      Q.   Yeah.  And just to be clear, now, what

10  we're reviewing here, just so we don't lose sight of

11  what we're talking about, these are facilities that

12  the DEA said were not complying, weren't at the --

13  did not have adequate controls against -- for

14  controlled substance.

15          DEA said these facilities listed, that

16  we're going over right now, did not have controls,

17  true?

18          MR. PYSER:  Object to form.  Misstates

19      evidence.

20  BY MR. PAPANTONIO:

21      Q.   Correct?

22      A.   According to the document, DEA alleged --

23      Q.   Yeah.

24      A.   -- that the pharmacies listed in

25  Appendix -- or, I'm sorry, the registrants listed in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Appendix A --

 2       Q.   And -- and these so far -- we've been

 3   through all these, and there's only one facility that

 4   you didn't review the reports for?  So far?

 5       A.   So far.

 6       Q.   Okay.  Let's go back to the list.  And

 7   what -- what number you want?  13.  That's -- no, 8.

 8            Groveport, Ohio:  Did you review reports

 9   for them?

10       A.   If this is the NLC --

11       Q.   Yeah.

12       A.   -- I did not.

13       Q.   Okay.  Fair enough.

14            If you don't -- this is your time to tell

15   us what you did and didn't do, so -- feel free.

16            MR. PYSER:  Object to form.  Improper

17      speech.

18   BY MR. PAPANTONIO:

19       Q.   Stafford, Texas:  You did review reports

20   there, right?

21       A.   Yes.

22       Q.   Zanesville, Ohio:  You reported -- you

23   reviewed reports there, right?

24       A.   I do not believe I did reports for

25   Zanesville, Ohio.  I believe that is a repackaging
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   operation.

 2          Q.   Okay.  How about Reno, Nevada?

 3          A.   I do not believe I reviewed reports for

 4   Reno, Nevada.

 5          Q.   And then how about Massachusetts?

 6          A.   Are you referring to number 12 --

 7          Q.   Yeah.

 8          A.   -- Peabody, Massachusetts?

 9          Q.   Peabody, Massachusetts.

10          A.   Yes.

11          Q.   Okay.  And again, these are -- this is an

12   appendix of places that the DEA said you were not

13   reporting the things that you were supposed to be

14   reporting to the DEA, correct?

15               MR. PYSER:  Object to form.  Misstates

16          evidence.

17               THE WITNESS:  This is what the DEA alleged

18          of not having -- whatever the wording was.  It

19          was not that you did not have a system in place,

20          but they alleged that -- can I go back and read

21          the --

22   BY MR. PAPANTONIO:

23          Q.   Yeah.  Go back and read it because I want

24   to make -- the next -- there it is:  "The alleged

25   failure of Cardinal to maintain" --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.  DEA alleged --

 2          Q.   -- "adequate controls against the

 3   diversion of controlled substances."

 4               And we can agree controlled substances are

 5   narcotics, true?

 6          A.   A narcotic is a controlled substance.

 7          Q.   Yeah.  And so every one of these

 8   facilities we're talking about, we're talking about

 9   Cardinal selling narcotics from those facilities,

10   correct?

11          A.   Cardinal selling controlled substances

12   from those facilities, including narcotics, yes.

13          Q.   And it says that Cardinal failed to

14   maintain adequate control -- just to catch up with

15   where we were -- correct?

16               MR. PYSER:  Object to form.  Misstates --

17   BY MR. PAPANTONIO:

18          Q.   You failed to -- to maintain adequate

19   control?

20               MR. PYSER:  Object to form.

21               THE WITNESS:  DEA alleged --

22   BY MR. PAPANTONIO:

23          Q.   Yeah.

24          A.   -- failure to maintain adequate control.

25          Q.   And then you all signed the document and
```

```
 1   paid the fine, didn't you?

 2            MR. PYSER:  Object to form.

 3   BY MR. PAPANTONIO:

 4        Q.   Right?

 5        A.   It was a settlement.

 6        Q.   Yeah, right.

 7        A.   Yes.

 8        Q.   But you didn't just pay the money -- sir,

 9   did you have a vote in whether you paid the money or

10   not?

11            MR. PYSER:  Object to form.

12            THE WITNESS:  I didn't have a vote, no.

13        But you left off the -- the "no admission or

14        concession" paragraph.  You --

15   BY MR. PAPANTONIO:

16        Q.   No, no, we're --

17        A.   You skipped over that.

18        Q.   Well, you don't -- the jury can --

19        A.   You just asked, did we -- so . . .

20            MR. PAPANTONIO:  Hand me that, please.

21   BY MR. PAPANTONIO:

22        Q.   $34 million, did you --

23            MR. PAPANTONIO:  No, I want one of those

24        candies, please.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   $34 million, did you know your company

 3   paid $34 million?  Huh?

 4             MR. PYSER:  Object to form.

 5             THE WITNESS:  I know now.

 6   BY MR. PAPANTONIO:

 7        Q.   Does that seem like a -- that's pretty big

 8   fine, isn't it, $34 million?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  It's -- well, big as

11        compared to what?

12   BY MR. PAPANTONIO:

13        Q.   Well, you're -- well, that's a good

14   question.

15             Did you know that at the time they paid

16   $34 million, your company was rated a $90 billion

17   company?  Cardinal was rated a $90 billion company?

18   Did you know that?

19             MR. PYSER:  Object to form.

20             THE WITNESS:  At the time, I did not keep

21        up with sales or revenue.

22   BY MR. PAPANTONIO:

23        Q.   Do you know how many employees Cardinal

24   had when you were working?

25        A.   I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   How about 40,000?  Does that sound

 2   familiar to you?  Did anybody ever tell you that you

 3   had 40,000 employees worldwide?

 4          A.   I do not recall at the time how many

 5   employees --

 6          Q.   Well, tell me --

 7          A.   -- Cardinal had.

 8          Q.   -- how many people were in charge of

 9   reviewing documents about diversion of controlled

10   substance.

11          A.   You have to give me a time frame.

12          Q.   Any time.  Just pick it.

13               How about 2007?  How many people were

14   involved with reviewing the kind of things we're

15   talking about, reviewing reports from this list of

16   people -- this list of facilities, in 2007?

17               MR. PYSER:  Object to form.

18               THE WITNESS:  Well --

19   BY MR. PAPANTONIO:

20          Q.   Would you like a -- would you like a mint?

21   They're pretty good.

22          A.   Not yet.  No, thank you.

23          Q.   Okay.  Go ahead.

24               MR. PYSER:  Object to form.

25               THE WITNESS:  There would have been an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            individual or individuals at the facilities who

 2            submitted the ingredient limit reports to the

 3            DEA, as well as -- I can't say a -- a certain

 4            number at the corporate level.  Two or three.

 5   BY MR. PAPANTONIO:

 6        Q.   Two or three.  Two or three people at the

 7   corporate level.  I think that's the number I had,

 8   and that's what I was going to ask you.

 9            It could have been two; it could have been

10   three, correct?

11            MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.   Correct?

14        A.   Two or three individuals that actually

15   reviewed the reports.

16        Q.   And you're selling narcotics all over the

17   country -- Ohio, California, Florida, Texas, all over

18   the country, Colorado -- right?

19            MR. PYSER:  Object -- object to form.

20            THE WITNESS:  There were distribution

21        centers at several states, yes.

22   BY MR. PAPANTONIO:

23        Q.   And you've got 40 -- if I represented to

24   you 40,000 employees working for the company, would

25   you object to that, or would you just say, "I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know"?

 2         A.    I would say I don't know.  I . . .

 3         Q.    But you do know there were only three --

 4    two or three people actually reviewing -- doing this

 5    work of reviewing these documents; you know that?

 6         A.    That's not what I said.  I said at the

 7    corporate office --

 8         Q.    At the corporate office?

 9         A.    -- and then there were individuals at the

10    distribution centers who generated and submitted

11    those reports to the DEA.

12         Q.    Well, the corporate office can shut things

13    down immediately if they want to, can't they?

14    Corporate office can shut a facility down immediately

15    if they see that there's a problem, right?

16              MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18         Q.    Yes?

19         A.    I -- I don't know all of the authorities

20    that a corporate office holds.

21         Q.    Go back to the list.  Let's go ahead and

22    finish up this list.  We're on number 14 -- 13.

23    Number 13, Wheeling, West Virginia.  Right?  That's

24    on the list.

25              Next is Auburn, Washington, on the list.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Next is Kansas City, Missouri, on the list.

 2    Valencia, California, on the list.  Aurora, Illinois.

 3    Elk Grove, California.

 4              MR. PAPANTONIO:  Go ahead and just

 5         highlight them, so the jury --

 6    BY MR. PAPANTONIO:

 7         Q.   Elk Grove, California.  Hudson, Wisconsin.

 8              I'm just curious; now we've been about all

 9    over the country.

10              Were you in charge of reviewing reports in

11    Wisconsin, too?

12         A.   I reviewed ingredient limit reports for

13    the Wisconsin facility.

14         Q.   And it would be you and maybe two other

15    people?

16         A.   Yes.

17         Q.   You or two other people --

18         A.   At the corporate --

19         Q.   At the corporate level?

20         A.   -- level.

21         Q.   Yeah.  You or two other people reviewing

22    all this stuff?

23              MR. PYSER:  Object to form.  Misstates

24         testimony.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   At the corporate level?

 3         A.   On the team --

 4         Q.   Right?

 5         A.   -- that I was a manager of --

 6         Q.   Yeah.

 7         A.   -- we reviewed the ingredient limit

 8    reports, yes.

 9         Q.   And then we got, where did I -- Hudson,

10    Wisconsin.  Then we got Greensboro, North Carolina.

11    We got Tolleson, Arizona.  Denver, Colorado,

12    Swedesboro, New Jersey.  Roanoke, Texas.  Charles,

13    Missouri.  Niagara Falls, New York.

14              You see that?

15         A.   I do see that.

16         Q.   Now, that list that we just reviewed is a

17    list that is in addition to -- in this document, in

18    addition, they're saying that -- if you go back to

19    page 1, just so we -- we remember what we're talking

20    about here because that's a lot of -- that's a lot of

21    different facilities.

22              But if we go back to page 1, it says:

23    "Cardinal is registered with DEA at 27 facilities."

24              See that?  And then it gives a list of the

25    ones where they have actually -- been a suspension of
```

 1   registration, right underneath that.  We talked about

 2   that.  One, two, three, four, five -- see that?

 3   Right?

 4              And then we've got a list of -- number 7,

 5   if we go to the list on number 7, underneath that, it

 6   says:  "These are facilities where Cardinal failed to

 7   maintain controls against diversion."

 8              See that?  One, two, three -- all over the

 9   country?

10        A.    Which page are you on?

11              MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.    I'm on page 2.

14              MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.    Right?

17              MR. PYSER:  Object to form.  Is there a

18     question?

19              THE WITNESS:  What was your question?

20   BY MR. PAPANTONIO:

21        Q.    Yeah.  My question is:  In addition to

22   those -- the first page, where we're talking about

23   facilities actually losing their license, then we've

24   got another set of -- of facilities that the DEA says

25   these facilities failed to maintain effective

Highly Confidential - Subject to Further Confidentiality Review

```
 1   controls against diversion of controlled substances,

 2   or narcotics.  Right?

 3              MR. PYSER:  Object to form.

 4              THE WITNESS:  I see the DEA has written

 5         that it alleges that Cardinal Health failed to

 6         maintain effective controls against the

 7         diversion of controlled substances.

 8   BY MR. PAPANTONIO:

 9       Q.   And then we go to the appendix that we've

10   just been talking about -- what page?  12?  13?

11   Page 13.

12              And that gives us a list of facilities,

13   also Cardinal-owned facilities, Cardinal-owned

14   facilities that -- where the DEA is saying that you

15   failed to have an adequate program in those

16   facilities, too, right?

17              MR. PYSER:  Object to form.

18              THE WITNESS:  DEA alleged, yes.

19   BY MR. PAPANTONIO:

20       Q.   Yeah, right.  Well, let me show you

21   something.  When is the first time you saw the death

22   map?

23              MR. PYSER:  Object to form.  Vague.

24   BY MR. PAPANTONIO:

25       Q.   Have you seen -- have you seen the CDC
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   death map?

 2         A.   I'm not familiar with a death map, no.

 3         Q.   Did nobody tell you that as early as 1999,

 4   that this company had access to a map -- your

 5   company, Cardinal, early as 19- -- had access to a

 6   map that showed the progression of death from opioid

 7   overdoses between 1999 and 2016?

 8              MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10         Q.   Anybody ever show you that?

11         A.   I'm not familiar with the death map.

12         Q.   You've never seen that?  And you --

13              MS. MOORE:  Cardinal-Brantley 5.

14         (Cardinal-Brantley 5 was marked for

15   identification.)

16              MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18         Q.   And just to be clear, you have worked with

19   Cardinal.  You've worked with Kinray -- that's owned

20   by Cardinal, right?  Just so the jury understands,

21   Kinray is owned by Cardinal?

22         A.   Kinray is a division of Cardinal, yes.

23         Q.   Right.  And so you've worked with

24   Cardinal.  You've worked with Kinray Cardinal, and

25   then you've worked with Purdue.  You've been in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this -- you've been in this -- this business of

 2   selling -- or been involved with the sale of opioids

 3   for how many years total?

 4        A.   I have been in the pharmaceutical industry

 5   since 2000.

 6        Q.   Okay.  And nobody has shown you this death

 7   map.

 8             MR. PAPANTONIO:  Could you put this up?

 9             THE WITNESS:  I do not recall seeing this

10      death map, or whatever this is.

11             MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.   Well, let me show it to you since this is

14   the first time you've seen it.  That's page -- you'll

15   have it right in front of you.  You can see it better

16   on the screen, though, the colors.  I'm going to ask

17   you about the colors.

18             See those little red areas right there, up

19   on the screen?  You might --

20        A.   I do see red areas.

21        Q.   Okay.

22        A.   I can see it better on the --

23        Q.   Okay.  Wherever you can see it is fine

24   with me.

25             And then it's got brown -- it's got a
```

Highly Confidential - Subject to Further Confidentiality Review

1    brown below that.  You see -- you see the scale,

2    estimated age, death rate per hundred thousand

3    people?

4         A.   I do see that, to the right.

5         Q.   So you never knew that while you were

6    involved with the sale of opioids, that the CDC was

7    actually following to find out how many people were

8    dying from overdoses of opioids?

9              MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   Right?

12             MR. PYSER:  Object to form.  Misstates

13        evidence.

14   BY MR. PAPANTONIO:

15        Q.   You --

16             MR. PYSER:  It's not what this document

17        shows.

18   BY MR. PAPANTONIO:

19        Q.   You never knew that?

20             MR. PAPANTONIO:  We're going to stand by

21        the question.

22   BY MR. PAPANTONIO:

23        Q.   You never knew that, correct?

24             MR. PYSER:  Object to form.  That

25        misstates what this document is.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   You never knew that?  You never knew --

 3   well, let's say it this way:  You never even knew

 4   there was something called a "death map," did you?

 5             MR. PYSER:  Object to form.  There is no

 6        indication that this document is called a "death

 7        map."  It's misleading by counsel.

 8   BY MR. PAPANTONIO:

 9        Q.   Well, did you -- did you -- have you ever

10   seen this map?  You said "No, I've never seen" --

11   okay.

12        A.   I don't recall seeing this.

13        Q.   Okay.

14             MR. PAPANTONIO:  Well, hey, do me a favor,

15        would you, Evan, put 1999 on half the screen.

16        And then put all the way up to 2016 right beside

17        it.

18   BY MR. PAPANTONIO:

19        Q.   This might be fascinating for you.

20             MR. PAPANTONIO:  There you go, right

21        there.

22   BY MR. PAPANTONIO:

23        Q.   So, 2016.  Do you see that?

24        A.   I do.

25        Q.   You see it really well up on the screen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    You see where it says "30 deaths per 100,000 people"?

 2    You see that?  30 deaths, in the brown.  Correct?

 3              MR. PYSER:  Object to form.

 4              THE WITNESS:  I see it on the right,

 5         the 30, at the bottom.

 6    BY MR. PAPANTONIO:

 7         Q.   30 -- uh-huh.  So between 1999, where this

 8    starts out, it doesn't have all that brown, does it?

 9              MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11         Q.   Does it?  Got a little bit of brown, but

12    not a lot of brown, does it?

13              MR. PYSER:  Object to form.  Counsel, it

14         appears from the document that --

15              MR. PAPANTONIO:  Let's -- I don't want a

16         speech.  I'm going to -- I'm going to ask

17         questions about the document without you leading

18         this witness.  It's very apparent what the

19         document says.

20              The document says while he was doing his

21         job with Cardinal that people were dying all

22         over the country.  And I'm going to ask him

23         about that.

24    BY MR. PAPANTONIO:

25         Q.   Now, I want to ask you the question --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  And I'll make my objections,

 2         Counsel.

 3                  MR. PAPANTONIO:  You make your objections.

 4                  MR. PYSER:  You're making misleading

 5         statements about that.

 6                  MR. PAPANTONIO:  We'll let the jury decide

 7         whether it's misleading.  The jury is going to

 8         see this.

 9    BY MR. PAPANTONIO:

10         Q.   Okay.  So you see where it says "30," at

11    the bottom, marked in brown?

12         A.   Yes.

13         Q.   Now, in 1999, tell me how many places you

14    see brown.

15         A.   On the actual map?

16         Q.   Yeah.

17         A.   I can't tell if there's any brown.

18         Q.   I can't see it.  I thought maybe you

19    could.

20                  Okay.  You go to --

21                  MR. PYSER:  Object to form.

22    BY MR. PAPANTONIO:

23         Q.   You go to 2016.  Can you see some brown

24    there on 2016?

25         A.   I --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   How about that?  Does that help you, if we

 2   blow it up?

 3               MR. PYSER:  Object to form.  And also

 4        object that the document before the witness is

 5        different in coloration than the document --

 6   BY MR. PAPANTONIO:

 7          Q.   Well, let's use the one on the -- let's

 8   use the one that's on the screen, so the jury can see

 9   it right along with you.

10               You see some brown on that document?

11               MR. PYSER:  Object to form.

12               THE WITNESS:  I see brown on the screen.

13   BY MR. PAPANTONIO:

14          Q.   It's all over the place, isn't it?

15               MR. PYSER:  Object to form.

16               THE WITNESS:  I see brown on the screen.

17   BY MR. PAPANTONIO:

18          Q.   All right.  Well, let me show you

19   something else.

20               And you understand that the brown

21   represents 30 deaths per 100,000.  The red represents

22   28 to 29 deaths per 100,000.  You see that?  How --

23   the progression of that?

24          A.   It says "The estimated age-adjusted death

25   rate per 100,000."
```

```
 1          Q.   Okay.  Good.

 2               So let me show you -- let's take a look

 3   at -- we've covered your distribution sites.

 4               MR. PAPANTONIO:  Can you -- can you

 5          superimpose the distribution sites over the

 6          death map for him, please?

 7   BY MR. PAPANTONIO:

 8          Q.   Now first of all, before we get to the

 9   second, to the -- these -- take a look, and I want to

10   make sure that all of those are -- are distribution

11   sites that Cardinal had that were doing business.

12               MR. PYSER:  Object to form.  Vague.

13   BY MR. PAPANTONIO:

14          Q.   Is there something vague about that?  That

15   I asked you -- I'm interested.

16               Is there something really vague about what

17   I just asked you?

18          A.   The time frame is vague because --

19          Q.   Well --

20          A.   -- what time frame are you referring to?

21          Q.   Let's say -- let's say up to two

22   thousand -- let's say 2008.

23          A.   At -- at 2008, did Cardinal Health have

24   all of these facilities?

25          Q.   Yeah.  How about 2013?  Weren't you there
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   in 2013?

 2           MR. PYSER:  Object to form.

 3           THE WITNESS:  I can't say with a certainty

 4       whether all of the facilities were present in

 5       2008.  There was an acquisition.

 6   BY MR. PAPANTONIO:

 7       Q.  Well, the jury's heard about Swedesboro,

 8   right?

 9       A.  Yes.

10       Q.  Jury's heard about Wheeling, West

11   Virginia, right?

12       A.  You mentioned those.

13           MR. PAPANTONIO:  Did you -- can -- do you

14       have a -- do we have a pointer?  This is -- so I

15       can get this -- I want to -- do you have a laser

16       pointer?  Or can you do it?  Okay.  Good.

17   BY MR. PAPANTONIO:

18       Q.  Let's -- Swedesboro.  I want to make sure

19   we're not -- we're not mixing anything up.  Take --

20   Swedesboro, we talked about, right?  Wheeling, West

21   Virginia, right, talked about?  Zanesville, Ohio?

22           Now tell me when it -- stop me when I'm

23   wrong about the fact that we've talked about these

24   already in your testimony.

25           Zanesville, Ohio, we talked about, didn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   we?

 2               MR. PYSER:  Object to form.

 3               THE WITNESS:  Zanesville was on the list,

 4        and I believe I mentioned that during the time

 5        frame when I was reviewing the reports from 2005

 6        to 2007-8 time frame, somewhere, that I do not

 7        recall Zanesville.  I believe that's the

 8        repackaging operation.

 9   BY MR. PAPANTONIO:

10        Q.   How about Findlay, Ohio?

11        A.   I believe that Findlay, Ohio, was there

12   during that time frame.

13        Q.   Just go throughout the country.  How about

14   Syracuse, New York, up there in the right corner?

15        A.   Yes.

16        Q.   Niagara Falls, New York?

17        A.   I do not know with a certainty if Niagara

18   Falls was there.  I believe that's ParMed, which was

19   an acquisition.  And I don't -- I do not remember

20   what year that company was acquired.

21        Q.   It's on the list, if you take a look at

22   the list.

23               MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25        Q.   You want to take a look at the list?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.   It was on that list, but your question

 2  was, was I reviewing ingredient limit reports --

 3            Q.   Okay.

 4            A.   -- for them.

 5            Q.   Well, let's --

 6            A.   Was that there in 2008?  And I cannot say

 7  with a certainty it was.

 8            Q.   Fair enough.  Fair enough.

 9            A.   I don't recall the acquisition date.

10            Q.   Lakeland, Florida, we talked about, right?

11  Stafford, Texas, we talked about, right?

12                 You're going to have to tell me yes or no.

13  Yes?

14                 MR. PYSER:  Object to form.

15                 THE WITNESS:  Well, you don't give me a

16         chance to answer.  You asked a question, you say

17         "right."  And then you keep going.  So I'm

18         thinking you're making a statement --

19  BY MR. PAPANTONIO:

20            Q.   No.

21            A.   -- as opposed to asking a question.

22            Q.   Am I right about Stafford, Texas, being

23  something you -- a facility you actually reviewed?

24                 MR. PYSER:  Object to form.

25                 THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Okay.  And -- and Roanoke, Texas, is a

 3   facility you reviewed?  Yes or no?

 4        A.   Yes.

 5        Q.   And Saint Charles, Missouri, correct?

 6        A.   Correct, in that I reviewed it, yes.

 7        Q.   And then all -- let's go all the way out

 8   to California.  Valencia, California:  You reviewed

 9   orders there, didn't you?

10        A.   I reviewed ingredient limit reports, yes.

11        Q.   And Elk Grove, California, you reviewed

12   that?

13        A.   I reviewed ingredient limit reports, yes.

14        Q.   And Auburn, Washington, you reviewed that?

15        A.   I reviewed ingredient limit reports, yes.

16        Q.   Let me show you something now.

17             MR. PAPANTONIO:  Could you superimpose

18        that distribution facility with the death map --

19        with -- with the map that we've been -- that

20        I've been calling "the death map."  See what it

21        looks like.

22             MR. PYSER:  Object to form.  Object to --

23   BY MR. PAPANTONIO:

24        Q.   Have you ever seen --

25             MR. PYSER:  -- using this demonstrative.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   Have you ever seen this reduced to

 3    something that would -- that demonstrates the

 4    expansion of opioid deaths in America?  Have you ever

 5    seen that prior to today?

 6              MR. PYSER:  Object to form.  And misstates

 7         evidence that the map makes that statement in

 8         any way, shape, or form.

 9    BY MR. PAPANTONIO:

10         Q.   Have you ever seen anything, whether it's

11    this map or anything, that showed you the expansion

12    of death among people throughout the United States

13    from opioids?

14              MR. PYSER:  Same --

15    BY MR. PAPANTONIO:

16         Q.   Anything?

17              MR. PYSER:  Same objections.

18              THE WITNESS:  I have not seen this.  And I

19         do not recall any document or graph of, as you

20         state, deaths across the country.

21    BY MR. PAPANTONIO:

22         Q.   How about numbers?  Anybody ever show you

23    numbers, when you were working with the company,

24    about people in Washington -- number -- this is the

25    number of people dying in Washington; this is the
```

```
 1   number of people dying in Lakeland?

 2           Did anybody ever spend any time going over

 3   that with you?

 4           MR. PYSER:  Object to form.

 5           THE WITNESS:  Again, when I was at the

 6      company, I do not recall seeing any numbers or

 7      graphs about, as you say, deaths across the

 8      country.

 9   BY MR. PAPANTONIO:

10      Q.   Why don't you tell me -- let's just --

11   since we got it up there, you've got around -- let's

12   say Denver -- Denver, Colorado.

13           What -- what areas would Denver, Colorado,

14   distribute to?  They'd distribute right to that brown

15   area, wouldn't they?

16           MR. PYSER:  Object to form.

17           THE WITNESS:  I do not recall the

18      distribution parameters or --

19   BY MR. PAPANTONIO:

20      Q.   You don't know where your company

21   distributed?  Is that -- you don't recall where your

22   company distributed?

23           MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25      Q.   Is that what you're saying?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I can't say into what city and county each

 2   distribution center distributed into.

 3          Q.   Well, can you tell me whether -- do you

 4   have any memory about Salt Lake City, Utah, whether

 5   it distributed in that area of brown?

 6               MR. PYSER:  Object to form.

 7               THE WITNESS:  Again, I don't know exactly

 8          where every distribution center distributed

 9          drugs.

10   BY MR. PAPANTONIO:

11          Q.   And while you were an employee working,

12   being paid by the company, through 2013, nobody even

13   told you that there were agencies that were keeping

14   out -- keeping up with the death of human beings

15   relating to opioids.

16               Is that a correct statement?

17               MR. PYSER:  Object to form.  Misstates

18          evidence.

19               THE WITNESS:  I do not recall any

20          conversations, while an employee at Cardinal

21          Health, regarding --

22               MR. PAPANTONIO:  Let's take --

23               THE WITNESS:  -- death by opioids.

24               MR. PAPANTONIO:  Let's take a ten-minute

25          break.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              VIDEOGRAPHER:  Going off the record.  The
2         time is 10:33.
3              (A recess transpired from 10:33 a.m. until
4              10:52 a.m.)
5              VIDEOGRAPHER:  We're going back on the
6         record, beginning of media file number 2.  Time
7         is 10:52.
8    BY MR. PAPANTONIO:
9         Q.   Now, Mr. Brantley, we had a pending
10   question when you walked out about that map that we
11   were talking about.
12              First of all, you -- you haven't talked to
13   counsel about any of this testimony, right?  You know
14   the rule on that.  Did somebody tell you the rule on
15   that, that you're not permitted to talk to counsel
16   during the break about questions that are pending in
17   this deposition?
18        A.   I did not speak to counsel --
19        Q.   You didn't speak --
20        A.   -- regarding questions pending in this
21   investigation.
22        Q.   So there was no discussion about -- about
23   testimony here; is that -- is that what you're
24   telling us?
25        A.   That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   All right.  We're going to try to take

 2   breaks if we can.  That was a little longer than we

 3   typically do.

 4             MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6        Q.   All right.  So, sir, if we get back to the

 7   document we've been -- that we have been reviewing.

 8   We just got off the map, and we showed -- I showed

 9   you where the distribution facilities were

10   superimposed on a map.

11             Do you recall that?

12        A.   Yes.

13        Q.   And you told me, I think earlier, that you

14   had never seen that map, right?

15             MR. PYSER:  Object to form.

16             THE WITNESS:  That's correct.

17             MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   Okay.  Now would you go to page 16, since

20   we're going to talk about some specifics about some

21   of this --

22        A.   Are we on the map, or --

23        Q.   Page 16 on -- on the document 4230.

24             Now, you understand, again, this is a

25   continuation of the document we've been talking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about -- you see that -- in the matter of Cardinal

 2    Health, right?  You see that?

 3          A.   I see that.

 4          Q.   And that's November 28, 2007.  You see

 5    that date?

 6          A.   That is the stamp, November 28, 2007.

 7          Q.   So in addition to some of the other issues

 8    we've been talking about -- earlier we talked

 9    suspension.  We talked about -- we talked about

10    facilities where the DEA didn't believe that there

11    was proper recording.

12               You recall those lists that we talked

13    about?

14               MR. PYSER:  Object to form.

15               THE WITNESS:  I do recall the list.

16    BY MR. PAPANTONIO:

17          Q.   Okay.  So on here, let's talk about some

18    other things.

19               It says:  "Order to show cause and

20    immediate suspension of registration."

21               It says:  "Notice is hereby given to

22    inform Cardinal Health of the immediate suspension of

23    drug enforcement -- DEA certificate registration."

24               And there it's -- if you look, it says:

25    "DEA certificate of registration is" -- and then it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    gives a number -- see, that's RW0191813 -- "is

 2    assigned to Cardinal Health's Auburn, Washington,

 3    distribution center."

 4            That's another facility we haven't talked

 5    about.  You see that?

 6            MR. PYSER:  Object to form.  Misstates

 7        testimony.

 8            THE WITNESS:  I do see the sentence you

 9        just read.

10    BY MR. PAPANTONIO:

11        Q.   Okay.  Now, correct me if I'm wrong, but

12    this is -- this is talking about the suspension of

13    the certificate of registration for Auburn,

14    Washington, correct?

15        A.   This is a notice of immediate suspension.

16        Q.   And then it says, under 2, it says:

17    "Respondent has failed to maintain effective controls

18    against diversion of a particular controlled

19    substance into other than legitimate medical,

20    scientific, and industrial channels in violation of

21    21 USC."

22            You see that?

23            MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:

25        Q.   Is that -- do you recall this incident
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   where Auburn, Washington, all the way up there in --

 2   in Washington, that they had failed to maintain

 3   controls for diversion?

 4           MR. PYSER:  Object to form.

 5           THE WITNESS:  To answer your first

 6       question, I do see the sentence.

 7   BY MR. PAPANTONIO:

 8       Q.   Okay.

 9       A.   And what was your second question again?

10       Q.   I just wanted to make -- were you involved

11   with -- were you involved with checking orders for --

12   for Auburn, Washington?

13       A.   I was reviewing ingredient limit reports

14   for Auburn, Washington.

15       Q.   And you were at corporate headquarters,

16   correct?

17       A.   I was at the corporate office.

18       Q.   Says:  "Respondent's largest purchaser of

19   combination hydrocodone products in 2007, Horen's

20   Drug Incorporated, is a pharmacy engaged in a scheme

21   to dispense controlled substances based on

22   prescriptions that are issued for other than

23   legitimate medical purposes by physicians acting

24   outside the usual course of professional practice.

25   This pharmacy dispenses excessive amounts of
```

Highly Confidential - Subject to Further Confidentiality Review

1  hydrocodone based on illegitimate prescriptions

2  originating from rogue Internet pharmacy websites in

3  violation of applicable federal and state law."

4          Now, the question I have about that:  What

5  involvement did you have with -- with monitoring

6  Internet pharmacies?

7          MR. PYSER:  Object to form.  Misread the

8      statement in the document.

9          THE WITNESS:  My involvement was to review

10      the ingredient limit reports on a monthly basis,

11      and conduct investigations of --

12  BY MR. PAPANTONIO:

13      Q.   Did you do that with web -- with Internet

14  pharmacies?

15      A.   I did that with all of the customers that

16  appeared on the ingredient limit reports.

17      Q.   And Internet pharmacy was one of them --

18  Internet pharmacies, correct?

19      A.   Again, all customers that appeared on the

20  ingredient limit report.

21      Q.   Yeah.  Okay.  And this -- apparently these

22  people appeared -- because this -- this facility lost

23  its registration to sell narcotics in Washington;

24  this Cardinal facility, again, lost its registration

25  to sell narcotics, correct, according to this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  According to this document,

 4         there was an immediate suspension of the

 5         registration for this facility.

 6    BY MR. PAPANTONIO:

 7         Q.  And they said:  "This pharmacy dispensed

 8    excessive amounts of hydrocodone based on

 9    illegitimate" --

10              MR. PAPANTONIO:  Would you underline

11         "illegitimate" -- oh, you already got it --

12    BY MR. PAPANTONIO:

13         Q.  -- "illegitimate prescriptions originating

14    from rogue Internet pharmacy websites."

15              What is a "rogue Internet pharmacy

16    website"?

17              MR. PYSER:  Object to form.

18              THE WITNESS:  I would say that a rogue

19         Internet pharmacy website is a website where an

20         individual could log on, place an order for a

21         drug, controlled substance, and have that order

22         or have that drug shipped to that individual's

23         house or place of business, what have you.  And

24         there may have been a phone consultation or --

25         or something.
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Without being -- okay.  Let me break that

 3   down.

 4        A.   So, to make it a --

 5        Q.   First, let me ask the question.  Okay,

 6   here it is:  First of all, we agree Cardinal dealt

 7   with rogue Internet pharmacies, according to this

 8   document?  They -- they were your customers?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  Cardinal had all types of

11        pharmacy customers:  Hospitals, VA, DOD, so

12        forth.

13   BY MR. PAPANTONIO:

14        Q.   Right.  And so one of the things that you

15   know that the rogue Cardinal -- that the rogue

16   pharmacy would do is they would just ship narcotics

17   all the way across the country without a doctor ever

18   even reviewing whether the patient needed them, true?

19             MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   Is that what you told me just a minute

22   ago?

23        A.   I believe how a rogue Internet pharmacy

24   operates is an individual owned -- owned a website,

25   and that website was affiliated with pharmacies and
```

Highly Confidential - Subject to Further Confidentiality Review

1   doctors across the country.  An individual could log

2   onto a computer and place an order for a prescription

3   drug or a controlled substance.  And I believe there

4   was a phone consultation.  There was a pharmacy

5   shipment directly to the individual.

6         Q.   And you remember how many -- how many

7   years you dealt directly with Horen's Drug Store

8   there up in Washington that was a rogue Internet

9   pharmacy?  Do you remember how many years you did

10  that --

11              MR. PYSER:  Object --

12  BY MR. PAPANTONIO:

13        Q.   -- Cardinal did that?

14              MR. PYSER:  Object to form.

15              THE WITNESS:  Is your question how many

16         years I dealt with Horen's Pharmacy?  I never, I

17         should say, dealt with Horen's Pharmacy.  But

18         from 2005 until -- whatever the time frame was

19         in 2007 or '8, I reviewed the ingredient limit

20         reports.

21  BY MR. PAPANTONIO:

22        Q.   So you would have had to okay the shipment

23  to Horen's Pharmacy, wouldn't you?

24              MR. PYSER:  Object to form.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   Eric Brantley would have had to okay it?

 3       A.   That is not correct.  I reviewed

 4   ingredient limit reports on a monthly basis.

 5       Q.   Well, I mean, somebody had to --

 6       A.   I did not okay a shipment.

 7       Q.   Somebody had to ship it to Horen's

 8   Pharmacy.  And in this document, they're saying

 9   Cardinal shipped narcotics to this rogue Internet

10   pharmacy.  That's what the document says, right?

11            MR. PYSER:  Object to form.

12            THE WITNESS:  The document says that there

13       were shipments of controlled substances to this

14       pharmacy.

15   BY MR. PAPANTONIO:

16       Q.   And they called it a "rogue Internet

17   pharmacy," didn't they?

18       A.   This document refers to it as a rogue

19   Internet pharmacy.

20       Q.   And you're well aware of what the term

21   "rogue Internet pharmacy" means, aren't you?

22       A.   I just stated --

23            MR. PYSER:  Object to form.

24            THE WITNESS:  I just stated what I thought

25       a rogue Internet pharmacy was.
```

```
 1    BY MR. PAPANTONIO:

 2         Q.   Fair enough.

 3              It says:  "Despite substantial guidance

 4    provided to respondent by DEA regarding identifying

 5    rogue pharmacies such as Horen's Drug and despite the

 6    public information readily available to respondent"

 7    -- now, you understand "respondent" here is Cardinal;

 8    you know that, right?

 9              When you hear the word -- when we hear the

10    word "respondent," we're talking about Cardinal,

11    correct?

12         A.   I do understand that.

13         Q.   Okay.  "And despite the public information

14    readily available to respondent regarding Horen's

15    Pharmacy Drugs' association with rogue Internet

16    pharmacy websites, respondent" -- or Cardinal, right?

17    Right?  Cardinal?  When we see the word "respondent,"

18    we're talking about Cardinal?

19         A.   Cardinal is the respondent.

20         Q.   "Respondent repeatedly supplied Horen's

21    Drug Store with excessive amounts of hydrocodone.

22    Respondent distributed in excess of 600,000 dosage

23    units of hydrocodone to Horen's Drug Store from 2007

24    through -- through September -- excuse me, "March of

25    2007 through September of 2007."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                Do you see that?
 2                MR. PYSER:  Object to form.
 3     BY MR. PAPANTONIO:
 4          Q.   Right?
 5          A.   I do see that.
 6          Q.   So here we have a rogue Internet pharmacy
 7     that Cardinal is shipping in excess of 600,000 dosage
 8     units of hydrocodone between March 2007 and
 9     September 2007 according to this document, correct?
10                MR. PYSER:  Object to form.
11                THE WITNESS:  The document does not say
12           that Horen's Drug Store was a rogue Internet
13           pharmacy.  It says, "Horen's Drug Store's
14           association with rogue Internet pharmacy
15           website."
16     BY MR. PAPANTONIO:
17          Q.   Oh, it's just associated with a rogue
18     pharmacy?  That's -- that's what you're saying here?
19          A.   I just wanted to clarify your statement.
20     You stated that the document said that it was a
21     rogue --
22          Q.   Yes.
23          A.   -- Internet pharmacy, and it indeed says
24     it was associated with --
25          Q.   They just --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    -- a rogue Internet pharmacy.

 2            Q.    They just did business with rogue

 3       pharmacies, which were illegal, correct?

 4            MR. PYSER:  Object to form.

 5       Argumentative.

 6            THE WITNESS:  Whatever DEA meant by

 7       "association."

 8       BY MR. PAPANTONIO:

 9            Q.    Rogue pharmacies were illegal, correct?

10            MR. PYSER:  Object to form.  Calls for a

11       legal conclusion.

12       BY MR. PAPANTONIO:

13            Q.    They're illegal?

14            A.    Rogue pharmacies were rogue pharmacies.  I

15       believe the term "rogue" implies something.

16            Q.    Is "rogue" legal?  Does that mean it's

17       legal to you, when you hear the word "rogue"?

18            MR. PYSER:  Object to form.  Legal

19       conclusion.

20            THE WITNESS:  I don't know what -- what

21       definition of "rogue" is implied here, but a

22       rogue Internet pharmacy is what I explained it

23       to be, what I thought it to be.

24       BY MR. PAPANTONIO:

25            Q.    So -- so Cardinal -- just so we can break
```

Highly Confidential - Subject to Further Confidentiality Review

1   this down a little bit, Cardinal shipped 600,000

2   dosage units to Horen's Drug Store between 2007

3   and -- March 2007 to September 2007 -- and Horen's

4   had an association with an illegal Internet pharmacy,

5   correct?

6           MR. PYSER:  Object to form.

7           THE WITNESS:  Horen's had an association

8       with a rogue Internet pharmacy.

9   BY MR. PAPANTONIO:

10      Q.   And so it says -- goes on to say:

11  "Including over 116,000 dosage units in July."

12          See that?  116,000 dosage units in July,

13  and over 120,000 -- 129,000 dosage units in August,

14  and over 122,000 dosage units in September.

15          Did these orders come across your desk?

16  Did you review these documents, these kind of

17  numbers?

18      A.   These numbers should have been on the

19  ingredient limit report.

20      Q.   Yeah.

21      A.   Yes.

22      Q.   And they were shipped, weren't they?

23  These -- these numbers were shipped?  To the rogue --

24  to Horen's, which was doing business with a rogue

25  illegal pharmacy, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Object to form.

 2                THE WITNESS:  According to this document,

 3        these numbers were shipped to Horen's.

 4   BY MR. PAPANTONIO:

 5        Q.   And it says:  "Respondent" -- or Cardinal

 6   -- "Respondent, disregarding the clear indication

 7   that Horen's Drug Store was engaged in diversion of

 8   controlled substances, distributed unusually large

 9   amounts of hydrocodone to Horen's Drug Store."

10                Now they're talking about your company

11   distributed those kind of numbers, right?

12        A.   This document says that the respondent

13   shipped those numbers to Horen's Drug Store.

14        Q.   Okay.  Then it goes on to say -- the next

15   paragraph, you see where it -- pick up where it says

16   "Respondent has failed to maintain effective controls

17   against diversion."

18                You see that?

19        A.   I see where it says:  "It is my

20   preliminary finding that respondent has failed to

21   maintain effective control" --

22        Q.   Right.

23        A.   -- yes.

24        Q.   You understand that was the final finding?

25   Did you know that?
```

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3         Q.   Did you even remember this?  Did you even

 4    remember shipping those kind of numbers to an

 5    Internet -- to an organization that was doing

 6    business with a rogue illegal Internet pharmacy?

 7         A.   I believe you asked two or three

 8    questions.  So --

 9         Q.   Okay, break it down for --

10         A.   -- the first question was --

11         Q.   Break it down for -- answer it any way you

12    want.

13         A.   It said something about a final.  I can't

14    speak to that.  I can only say what it -- the

15    paragraph that we are addressing here says:  "It is

16    my preliminary finding that the respondent has failed

17    to maintain" -- so forth and so on.

18         Q.   And I asked you --

19         A.   So what was your second question?  Sorry.

20         Q.   Did you remember that?  Did you remember

21    shipping those kinds of numbers to an -- to Horen's

22    Drug Store, which was doing business with an illegal

23    Internet pharmacy?

24                    MR. PYSER:  Object to form.

25                    THE WITNESS:  I do not remember any -- any
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      numbers --

 2  BY MR. PAPANTONIO:

 3      Q.   Okay.

 4      A.   -- shipped to customers during this time

 5  frame.

 6      Q.   Well, the next paragraph says:  "In view

 7  of the foregoing, and pursuant to 21 USC and 8824 is

 8  my preliminary findings that respondent" -- that's

 9  Cardinal, right?  Correct? --

10      A.   Respondent is Cardinal.

11      Q.   -- "has failed to maintain effective

12  controls against diversion, and continued

13  registration of respondent would be otherwise

14  inconsistent with public health and safety."

15           Now, sir, how is diversion -- how does

16  diversion, according to -- in your experience, doing

17  this so many years, how does diversion create a

18  public health problem?

19           MR. PYSER:  Object to form.

20  BY MR. PAPANTONIO:

21      Q.   Tell the jury.

22      A.   I'm sorry?

23      Q.   No, go ahead.

24      A.   Your question is, how is -- how does

25  diversion --
```

1    Q.   How does diversion create a public health

2  problem?

3    A.   In my opinion?

4    Q.   In your opinion.

5         MR. PYSER:  Object to form.

6         THE WITNESS:  Diversion could be the theft

7      of drugs.  Diversion is -- diversion happens

8      when drugs leave the secure supply chain in

9      which we operate in.

10 BY MR. PAPANTONIO:

11   Q.   That's a term, "secure supply chain."

12 That's what -- that's what I was going to ask you

13 about.

14   A.   So the -- the supply chain is, of course,

15 the manufacturer manufactures a prescription drug,

16 sells that drug to a wholesale distributor based on

17 an order that the wholesale distributor places.  That

18 wholesale distributor places orders based on the

19 pharmacies and the hospitals and the VA and the DOD

20 and such that they serve.  And those pharmacies place

21 orders based on scripts that are run in from

22 patients, written by doctors.  So that is the supply

23 chain.

24   Q.   Okay.  And if everything --

25   A.   So diversion is going outside of that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   supply chain --

 2         Q.   Right.

 3         A.   -- which we don't operate in.  Our -- our

 4   supply chain is as I mentioned.

 5         Q.   And it's illegal to operate in a -- it's

 6   illegal to operate within a realm of diversion,

 7   correct?  You'd agree with that?

 8              MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10         Q.   Yes?

11         A.   If there -- if there is an entity that

12   operates outside of that chain, which Cardinal Health

13   does not --

14         Q.   Well, there -- according to this, you did.

15   Because Horen's was a drug store that was -- that was

16   supplying an illegal rogue pharmacy, and Cardinal was

17   the people that were supplying 600,000 dosage units

18   to Horen's Drug Store.

19              That's what this says, doesn't it?

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22         Q.   I mean, that's what this document says?

23         A.   The document says that -- that Cardinal

24   shipped the -- the quantities that you mentioned

25   earlier to Horen's Drug Store.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  But again, in that supply chain, from
 2       manufacturer to distributor to the pharmacy, all of
 3       these are licensed entities by the State as well as
 4       the DEA.  That's the supply chain in which Cardinal
 5       operate -- operated and operates.
 6            Q.   Right.  And in this situation, Cardinal
 7       lost its license to operate because they weren't
 8       playing by the rules, correct?
 9                  MR. PYSER:  Object to form.  Misstates --
10       BY MR. PAPANTONIO:
11            Q.   They were suspended.  The license was
12       actually suspended because Cardinal was not playing
13       by the rules of a supply chain?
14                  MR. PYSER:  Object to form.
15       BY MR. PAPANTONIO:
16            Q.   Yes?
17                  MR. PYSER:  Misstates evidence.
18                  THE WITNESS:  The -- the registration for
19            this facility was suspended.  Not because
20            Cardinal was not playing by the rules, because
21            Cardinal operated within that chain.  There was
22            a player here, Horen's Drug Store, that was
23            operating apparently outside of the chain by
24            being associated with a rogue Internet pharmacy
25            or rogue Internet pharmacy -- yeah, rogue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Internet pharmacy website.
 2   BY MR. PAPANTONIO:
 3        Q.   Right.  And it says -- right, look at B.
 4   You're answering the question, but here, look at B.
 5             "Despite substantial guidance provided to
 6   respondent" -- or that would be Cardinal -- "by DEA
 7   regarding identifying rogue pharmacies such as --
 8   such as Horen's Drug Store, and despite the public
 9   information readily available to respondent regarding
10   Horen's Drug Store's association with rogue Internet
11   pharmacies, respondent repeatedly supplied Horen's
12   Drug Store with excessive amounts of hydrocodone."
13             That's what that just said.  Did I read
14   that right?
15             MR. PYSER:  Object to form.
16   BY MR. PAPANTONIO:
17        Q.   Did I read that right?
18        A.   That is what the document says.
19        Q.   And you were the guy in corporate that was
20   reviewing these orders, weren't you?
21        A.   I was an individual at the corporate
22   office that was reviewing ingredient limit reports on
23   a monthly basis.
24        Q.   And there were only two more of you,
25   weren't there?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   At the corporate level?

2          Q.   Yeah.

3          A.   As far as the team that I managed, yes.

4          Q.   And this is -- and these drugs are going

5     out, these narcotic drugs are going out all over the

6     country, aren't they?  Yes?

7          A.   During --

8               MR. PYSER:  Object to form.

9               THE WITNESS:  During a certain time frame,

10          during a certain time frame, there were two or

11          three of us, from 2005 until, again, 2007-8 time

12          frame.

13    BY MR. PAPANTONIO:

14          Q.   There were --

15          A.   And then there were others added.  But

16    during that time frame, yes, there were two or three.

17          Q.   At corporate level?

18          A.   At the corporate level.

19          Q.   At corporate level, you have the right to

20    shut down anybody you want to at any time you want

21    to, once you see excessive orders coming in.

22               You have the right to do that, don't you?

23               MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:

25          Q.   At corporate?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   At the corporate level, I had the ability

 2   to identify customers based on the ingredient limit

 3   reports --

 4          Q.   And you didn't do that with Horen's Drug?

 5          A.   -- and make a recommendation to --

 6          Q.   Excuse me.  Go ahead.

 7          A.   -- to discontinue sales to that particular

 8   customer.

 9          Q.   And you didn't do that with Horen's Drug,

10   did you?

11          MR. PYSER:  Object to form.  And objection

12      to that question as it was asked before.

13   BY MR. PAPANTONIO:

14          Q.   You didn't do that with Horen's Drug?

15          A.   I did not do what?

16          Q.   You didn't stop the flow?  You don't shut

17   Horen's Drug Store down, even though -- even though

18   the DEA talked to you about rogue pharmacies such as

19   Horen's Drug, you didn't shut them down, did you?

20          A.   Apparently, Horen's Drug Store was not

21   shut down --

22          Q.   Yeah.

23          A.   -- prior to DEA taking action on Horen's

24   Drug Store.

25          Q.   Well, let's see what it says.  Look at C:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "Respondent, disregarding the clear indications that

 2    Horen's Drug Store was engaged in diversion of

 3    controlled substances, distributed unusually large

 4    amounts of hydrocodone to Horen's Drug Store."

 5              You see that?

 6              MR. PYSER:  Object to form.

 7              THE WITNESS:  I do see that.

 8    BY MR. PAPANTONIO:

 9         Q.   That's C.  And that would be -- that would

10    come across your desk, right?

11         A.   What would come across my desk?

12         Q.   Orders would come across your desks.  You

13    would review orders?

14         A.    Ingredient limit reports would come

15    across --

16         Q.   Yeah.

17         A.    -- my desk on a monthly basis.

18         Q.   Right.  Exactly.  And -- and then the next

19    one says:  "In view of the foregoing and pursuant to

20    21 USC, it is my preliminary finding that respondent"

21    -- that's Cardinal again -- "has failed to maintain

22    effective controls against diversion, and that the

23    continued registration of respondent would be

24    otherwise inconsistent with public health and

25    safety."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Now, is this the first time that you
 2   reviewed the fact that the DEA was shutting down
 3   Cardinal's ability to do business with Horen's Drug
 4   Store because it posed a public health and safety
 5   threat?
 6              MR. PYSER:  Object to form.
 7   BY MR. PAPANTONIO:
 8       Q.   Did you know that, prior to coming here
 9   today?
10              MR. PYSER:  Object to form.
11              THE WITNESS:  Prior to coming here today,
12         I was aware that DEA issued a show cause and an
13         immediate suspension order for the Auburn
14         distribution center.
15   BY MR. PAPANTONIO:
16       Q.   It says:  "Moreover, it is my preliminary
17   conclusion that respondent's continued
18   registration while these proceedings are pending
19   would constitute" -- let me read it -- "It is my" --
20   let me just read it again.
21              "Moreover, it is my preliminary conclusion
22   that respondent's continued registration while these
23   proceedings are pending would constitute an imminent
24   danger to public health and safety."
25              You see that?
```

```
 1                How does -- how does -- how does diversion

 2      create an imminent threat, in your experience?

 3      What -- what examples can you give me of diversion

 4      creating an imminent threat?

 5                MR. PYSER:  Object to form.

 6                THE WITNESS:  I believe that would be a

 7           question for the DEA regarding what they view to

 8           be an imminent threat.

 9      BY MR. PAPANTONIO:

10           Q.   So you --

11           A.   That's a claim they made.

12           Q.   So at this point, you don't -- you don't

13      have an opinion of how drugs cause an imminent threat

14      to public health?

15                MR. PYSER:  Object to form.

16                THE WITNESS:  In the case of this

17           paragraph that we're reading --

18      BY MR. PAPANTONIO:

19           Q.   Yeah.

20           A.   -- I cannot speak to what DEA claims to be

21      an -- I believe constitute an imminent danger to the

22      public health and safety.

23           Q.   Okay.  How many times have you seen your

24      company, while you were there, being told that their

25      conduct actually created an imminent threat to public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    health and safety?  Can you recall right now how many
 2    times your company -- how many times your company was
 3    told that your company creates an imminent threat to
 4    public health and safety?  You recall?
 5                MR. PYSER:  Object to form.
 6                THE WITNESS:  Told by whom?
 7    BY MR. PAPANTONIO:
 8         Q.   By the DEA or the Department of Justice.
 9         A.   Are you referring to immediate suspension
10    orders or --
11         Q.   Yeah.
12         A.   -- orders to show cause?
13         Q.   Yeah.  Both.
14         A.   Well, according to this document, there
15    were four.
16         Q.   Okay.  And then we're going to -- that's
17    just part -- that's part of the answer, but let me go
18    ahead and ask it -- maybe I didn't ask the question
19    right, in fairness to you.  Go to page 20.
20                You see where, page 20, it's talking:
21    "Notice is hereby given to inform Cardinal Health of
22    the immediate suspension of Drug Enforcement
23    Administration certificate of registration," and this
24    is Cardinal Health's Lakeland, Florida, distribution
25    center.  You see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I do see that.

 2          Q.   And then number 2, it says, down at the

 3     bottom:  "Respondent has failed to maintain effective

 4     control against the diversion of particular

 5     controlled substances in other than legitimate

 6     medical, scientific, and industrial channels in

 7     violation of 21 USC."

 8               And they even give the dates, between

 9     August 2005 and October 2007.

10               So in those years between -- here's my

11     question:  In those years between 2005 and 2007, your

12     company failed to maintain effective controls against

13     the diversion of narcotics; is that a correct

14     statement?  After you've just read that?

15          MR. PYSER:  Object to form.

16          THE WITNESS:  That is what the DEA

17       alleged.

18     BY MR. PAPANTONIO:

19          Q.   It said:  "Respondent distributed over

20     8 million dosage units of combination hydrocodone

21     products to customers" -- and then -- follow me here,

22     underline this -- "customers that it knew or should

23     have known were diverting hydrocodone into other

24     legitimate -- into other than legitimate medical or

25     scientific industrial channels."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              See that?

2         A.   I do see that.

3         Q.   Did you know that was going on while you

4    were working with the company?

5              MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7         Q.   That you were actually diverting

8    hydrocodone into other than legitimate medical or

9    scientific channels?  Did you know that, when you

10   were an employee with Cardinal?

11             MR. PYSER:  Object to form.

12             THE WITNESS:  While I was an employee with

13        Cardinal --

14   BY MR. PAPANTONIO:

15        Q.   Yes, sir.

16        A.   -- we reviewed ingredient limit reports

17   and -- and submitted those reports to the DEA.

18        Q.   According to this report, it didn't work

19   all that well, did it?

20             MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   You weren't succeeding in your mission to

23   try to -- to do the things you said you were trying

24   to do.  It just wasn't working, was it?

25             MR. PYSER:  Same objections.  And
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          argumentative.

2               THE WITNESS:  According to what you've

3          read on this first page, page 20, DEA has

4          alleged that the respondent has failed to

5          maintain effective controls.

6    BY MR. PAPANTONIO:

7          Q.   Yeah.  Let's go to the next page.  21.

8               "Many of the respondent's largest

9    purchases of combination hydrocodone products were

10   pharmacies engaged in a scheme" -- see the word

11   "scheme" there?

12         A.   I do see that word.

13         Q.   ". . . scheme to distribute controlled

14   substances based on purported prescriptions that are

15   issued for other than a legitimate medical purpose."

16              Do you see that?

17         A.   I do see that.

18         Q.   "And by physicians acting outside the

19   usual course of professional practice."

20              Do you see that?

21         A.   I do see that.

22         Q.   So according to this, your -- who are your

23   largest customers?  Who do you remember your largest

24   customers?

25         A.   I have no idea.
```

```
 1        Q.   Remember CVS?  Is that a large customer?

 2        A.   If CVS was a customer, that's a large

 3   customer, being a chain, yes.

 4        Q.   Yeah.  And how about Walgreens?  Do you

 5   remember Walgreens being a large customer?

 6        A.   I don't remember if Walgreens was a

 7   customer or not.

 8        Q.   Don't remember that?

 9        A.   I don't remember if Walgreens was a

10   customer.

11        Q.   Fair enough.  But according to this,

12   they're saying that your largest -- the largest

13   purchasers of your -- of your narcotics engaged in a

14   scheme.

15             What does that word, "scheme" -- you

16   understand what the word "scheme" means?

17             MR. PYSER:  Object to form.

18             THE WITNESS:  I have a general idea of

19        what a "scheme" is.

20   BY MR. PAPANTONIO:

21        Q.   Okay.  Just so we're on the same sheet

22   of --

23        A.   A -- a plan.

24        Q.   Yeah.

25        A.   Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   A plan -- okay.  Let's call it a "plan" --

 2    to distribute controlled substances, which are

 3    narcotics, right?  "To distribute controlled

 4    substances based on purported prescriptions that are

 5    issued for other than legitimate medical purposes."

 6              MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8              Q.   That's what that says, doesn't it?

 9              A.   Well, to clarify, Schedule II controlled

10    substances --

11              Q.   Well, you were working -- you were the

12    person at -- in corporate, you and how many other

13    people -- say, 2008, how many other people were in

14    charge of doing all this review?

15              MR. PYSER:  Counsel, the witness did not

16         get a chance to finish his answer.  Please let

17         him finish his answer --

18              MR. PAPANTONIO:  I'm sorry.  I thought

19         you --

20              MR. PYSER:  -- before you ask your next

21         question.

22    BY MR. PAPANTONIO:

23              Q.   Your lips had stopped moving.  That's why

24    I thought you had finished your answer.  Go ahead.

25              MR. PYSER:  Counsel, that's inappropriate.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Let him finish his answer.  We don't need your

 2        commentary.

 3   BY MR. PAPANTONIO:

 4        Q.   Go ahead.

 5             MR. PAPANTONIO:  I don't need your

 6        objection, either.  Just object as to form.  If

 7        I'm doing something wrong, put it on the record.

 8        This man -- I'm giving this man every

 9        opportunity he wants to answer his questions.

10             MR. PYSER:  That's what I'm here for.

11             MR. PAPANTONIO:  You're the guy

12        interrupting his ability to answer.

13   BY MR. PAPANTONIO:

14        Q.   Now, sir, I want to ask -- let's take all

15   that away, and let me ask you this question again.

16             You were one of the three people involved

17   in reviewing documents that showed whether there were

18   any abnormalities in the orders that were being filed

19   for narcotics all over the country?  Yeah?

20             MR. PYSER:  Object to form.

21             And if you need to finish your last

22        answer, you can always go ahead.

23             THE WITNESS:  During the time frame

24        between 2005 and either late 2007, early 2008 --

25        I don't recall -- I was one of the individuals,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        yes, that was reviewing ingredient limit reports

 2        for --

 3    BY MR. PAPANTONIO:

 4        Q.   And -- and this -- this document's talking

 5    about 2007, aren't they?  See it says --

 6        A.   I believe that was the -- the time frame,

 7    yes.

 8        Q.   Yeah.  And then it says:  "Retail

 9    pharmacies in Florida order an average of less than

10    8,000 dosage units of hydrocodone per month."

11             Did you know that?  Do you remember that

12    now, that retail pharmacies -- those are people you

13    sold to, right?

14             MR. PYSER:  Object to form.

15             THE WITNESS:  Cardinal Health did sell to

16        retail pharmacies, yes.

17    BY MR. PAPANTONIO:

18        Q.   "In Florida."  You sold in Florida, right?

19        A.   Yes, we sold them to the state of Florida.

20        Q.   ". . . order an average of less than 8,400

21    dosage units of hydrocodone per month."

22             See that?

23        A.   I do see that.

24        Q.   It says:  "Respondent distributed

25    hydrocodone to pharmacies engaged in the diversion of
```

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances as reflected in the chart

2    below."

3              And then it says:  "Respondent" --

4    Cardinal -- "knew or should have known that these

5    pharmacies were diverting hydrocodone into other than

6    legitimate medical, scientific, industrial channels."

7              That's what that says, doesn't it?  You

8    see -- did I read that right?

9              First of all -- let's start there.  Is

10   there anything you want to add to that paragraph?

11       A.   That is -- that is how it reads.

12       Q.   Okay.  And then if we look at the chart

13   below, we then see in Florida, the average is less

14   than 8,400 dosage units hydrocodone a month, and then

15   it compares what Cardinal was actually sending to its

16   customers.  See that?

17              MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19       Q.   Monthly average.  Look at that -- look at

20   that area that says "Monthly Average."  Read those

21   monthly average for MediPharm.

22              What does that say out next to -- under

23   "Monthly Average"?  What does that say?

24       A.   For MediPharm?  155,007.

25       Q.   And for DRM, what does it say?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.   42,254.

 2           Q.   And let's look down to QR -- QRG.  What

 3   does it say?

 4           A.   242,640.

 5           Q.   And let's look at United Prescriptions.

 6   What does it say?

 7           A.   287,025.

 8           Q.   And then if you look up to -- and those

 9   are -- you understand those are Florida pharmacies,

10   right?

11           A.   That's what this document states, yes.

12           Q.   And so we compare those numbers to what

13   the DEA says is an average of less than 8,000 dosage

14   units.  It's a pretty big difference, isn't it,

15   Mr. Brantley?

16           MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18           Q.   Pretty big difference?

19           MR. PYSER:  Object to form.

20           THE WITNESS:  There is a difference.

21   BY MR. PAPANTONIO:

22           Q.   Yeah.  8,000 to 287,000, that's a pretty

23   big difference?

24           MR. PYSER:  Object to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Okay.  You agree, that -- that's a big

 3   difference, right?

 4        A.   It's a difference.

 5        Q.   Yeah.  All right.  So you know that --

 6   that -- Reardon told you that the DEA had met with

 7   him and said that anything over 5,000 a month should

 8   be considered a suspicious order.  Did you know that?

 9             MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   Did you know that Reardon met with the

12   DEA, and the DEA told Reardon, who was your boss,

13   that anything over 5,000 orders, 5,000 units, should

14   be considered a suspicious order?

15             MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   Correct?

18        A.   I do know that Steve had a meeting.

19        Q.   And -- and he didn't tell you that?

20        A.   And at some point, I believe that may have

21   been discussed.

22        Q.   Okay.  And you know the number was 5,000,

23   correct?

24        A.   If that's what you say was said during the

25   conversation, then . . .
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   I don't want you to take my word for it.
 2    I want to ask you.  I'm asking you straight up.
 3            A.   Well, please show me the documentation --
 4            Q.   I'm going --
 5            A.   -- so I can know --
 6            Q.   I'm going to. --
 7            A.   -- that it's accurate.
 8            Q.   I'm trying to figure out what you remember
 9    and what you don't remember.  A, you remember Reardon
10    meeting with the DEA, don't you?
11            A.   I remember that happened.  I don't
12    remember the meeting.
13            Q.   And then you remember Reardon writing a
14    letter -- or writing an e-mail that went to you and
15    said that, we had a meeting and the number should not
16    be above 5,000; you know that?
17                 MR. PYSER:  Object to form.
18    BY MR. PAPANTONIO:
19            Q.   Right?
20            A.   Again, I don't recall the meeting.
21            Q.   Yeah.
22                 MR. PAPANTONIO:  Let me go ahead and show
23         it to him.  There's no -- show him 4781.  Hold
24         that other document you got there, hold that
25         right where it is, because we're going to get
```

Highly Confidential - Subject to Further Confidentiality Review

 1          back to it after we do this.

 2                MS. MOORE:  Cardinal-Brantley 6.

 3          (Cardinal-Brantley 6 was marked for

 4     identification.)

 5     BY MR. PAPANTONIO:

 6          Q.   See where it says "Steve Reardon" at the

 7     top?

 8          A.   Yes.

 9          Q.   Okay.  And do you see where -- go to the

10     second page.

11                You see where it says "Pete Stoy," there,

12     about a quarter down?

13          A.   Yes.

14          Q.   And then it says "Internet pharmacies";

15     you see that?

16          A.   In the "Subject" line?

17          Q.   "Subject" line, right.

18          A.   I see that, yes.

19          Q.   And then it says -- it says, "Eric" -- is

20     that you?  Eric Brantley?

21          A.   I am Eric Brantley.

22          Q.   And you were the -- were you -- at this

23     point, you were the person that was reviewing

24     these -- these numbers that were coming across your

25     desk for these pharmacies?

```
 1            A.    This e-mail was sent August 2005.

 2            Q.    Yeah.

 3            A.    I was -- I was reviewing limit reports in

 4    2005.

 5            Q.    And it's got your name on it, right?

 6            MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8            Q.    Correct?  It has your -- and it says, this

 9    is from Eric -- from Steve Reardon, and it's -- you

10    see your name in the people who -- who actually

11    received this.  "Eric Brantley"?  See that?

12            A.    Are you referring to the e-mail at the

13    bottom of page 2?

14            Q.    Yeah.  Yeah.

15            MR. PYSER:  Just for the record, the video

16        was displaying a different e-mail, which I think

17        explains the confusion.

18    BY MR. PAPANTONIO:

19            Q.    Well, let's be clear about it.  We're

20    looking at -- are we looking at 4781 right now?

21            MR. PYSER:  Counsel, just to be clear, the

22        video before was showing --

23            MR. PAPANTONIO:  All right.

24            MR. PYSER:  -- the e-mail above, which

25        has --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PAPANTONIO:  All right.

 2                    MR. PYSER:  -- a different Eric on it.

 3                    MR. PAPANTONIO:  Are we on the right --

 4        we're on the right one.

 5                    MR. PYSER:  Now you're on the right spot.

 6   BY MR. PAPANTONIO:

 7        Q.   Okay.  It says -- you see where it says

 8   "Internet pharmacies"?  "Subject, Internet

 9   pharmacies"?

10        A.   In the "Subject" line, yes.

11        Q.   Yeah.  It says:  "DEA has recently

12   initiated investigations of Internet pharmacies who

13   are purchasing excessive quantities of controlled

14   substances, primarily phentermine and hydrocodone,

15   and dispensing these controlled substances without a

16   valid prescription."

17                    Do you see that?

18        A.   I do see that.

19        Q.   "In that there was not the required

20   doctor-patient relationship."

21                    Now you understand that rogue pharmacies

22   were just shipping this -- shipping narcotics

23   throughout the country in situations where a doctor

24   had not even reviewed or met with the patient?  You

25   know that, right?
```

```
 1                 MR. PYSER:  Object to form.

 2                 THE WITNESS:  I know that -- what a rogue

 3           Internet pharmacy did was ship product to

 4           customers based on a script from a doctor that

 5           may not have performed a physical examination.

 6    BY MR. PAPANTONIO:

 7           Q.   And we know that Cardinal supplied rogue

 8    pharmacies like that, right?

 9           A.   Cardinal shipped drugs to pharmacies in

10    hospitals and VA and DOD and --

11           Q.   And rogue pharmacies?

12           A.   -- final dispensers.

13           Q.   Rogue pharmacies, too.  Let's not forget

14    that.  You -- you want to add rogue pharmacies, that

15    Cardinal shipped narcotics to rogue Internet

16    pharmacies.  We've already established that, right?

17                 MR. PYSER:  Object to form, and asked and

18           answered.

19    BY MR. PAPANTONIO:

20           Q.   Am I right?

21                 MR. PYSER:  Object to form.

22                 THE WITNESS:  Are you referring to the

23           pharmacies listed in the previous --

24    BY MR. PAPANTONIO:

25           Q.   Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   -- document?

 2         Q.   Yeah.

 3         A.   Cardinal shipped controlled substances to

 4    the pharmacies listed in this --

 5         Q.   I'm not going to --

 6         A.   -- document.

 7         Q.   I'm not going to rehash.  The jury's heard

 8    it.  DEA --

 9              MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11         Q.   It says -- it says:  "DEA has recently

12    initiated investigations of Internet pharmacies who

13    are purchasing excessive quantities of controlled

14    substances."

15              And they were actually purchasing them

16    from you, from your company, Cardinal, those

17    excessive substances.

18              MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20         Q.   Right?  According to this?

21         A.   According to this document, Cardinal

22    shipped controlled substances to the list of

23    pharmacies in the previous document.

24         Q.   Okay.  And it says:  "And there was not

25    the required doctor-patient relationship."  Correct?
```

```
 1          A.   Are we still -- are we reading the same

 2   e-mail?

 3          Q.   Yeah.

 4          A.   According to the e-mail, yes.

 5          Q.   So somebody could just call up an Internet

 6   pharmacy, say, "Hey, I'd like 100 hydrocodone,"

 7   without ever seeing a doctor, and Cardinal would ship

 8   it, according to this?

 9               MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11          Q.   True?

12          A.   If someone called up a pharmacy and

13   ordered hydrocodone, there would have been a

14   prescription, and a pharmacy would have placed an

15   order with Cardinal, and if it's one of these

16   pharmacies listed, then Cardinal shipped to those

17   pharmacies.

18          Q.   To rogue pharmacies?

19               MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21          Q.   Correct?

22          A.   Cardinal -- Cardinal shipped to the

23   pharmacies listed.

24          Q.   You don't like using the word "rogue."  I

25   get it.  But they were --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.   You --

2         Q.   -- considered -- they were --

3         A.   You --

4         Q.   -- qualified as rogue pharmacies?

5         A.   You have identified them as rogue

6    pharmacies.

7         Q.   Okay.  And the DEA --

8              MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10        Q.   -- did too, correct?

11        A.   And the DEA said that they were, I think,

12   associated with rogue Internet --

13        Q.   Okay.

14        A.   -- websites.

15        Q.   Good enough.

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18        Q.   It says:  "As part of this ongoing

19   initiative, the DEA has been meeting with drug

20   distributors, including Cardinal" -- right?  That's

21   what it says -- "and soliciting their assistance in

22   monitoring Internet pharmacy activities.  As a result

23   of these meetings, we have become aware that one

24   wholesaler has recently ceased doing business with

25   24 pharmacies located in Florida and Texas."
```

1        But it wasn't your company that ceased

2    doing business with those 24 companies, was it?

3        MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   You don't remember in 2005 where your

6    company ceased doing business with 24 pharmacies,

7    Florida or Texas, do you?

8        A.   We ceased doing business with several

9    pharmacies, I believe, including the ones listed in

10   this document.

11       Q.   Well, we're going to get to that.  I'm

12   going to -- we're going to talk about that, and I

13   want to make sure you understand -- I want to be sure

14   I understand -- you never knew that Reardon had been

15   told that anything in excess of 5,000 dosage units

16   should be considered suspicious order.  You never

17   knew that, did you?

18       MR. PYSER:  Object to form.  Misstates

19       evidence.

20   BY MR. PAPANTONIO:

21       Q.   We're going to read it in a minute, but --

22       A.   Steve went to a meeting, and there may be

23   a -- a communication.  I don't recall that meeting

24   with Steve Reardon.

25       Q.   Okay.  You weren't there, were you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I don't recall a meeting.

 2          Q.   You weren't there?

 3               MR. PYSER:  Object.

 4               THE WITNESS:  I don't recall --

 5   BY MR. PAPANTONIO:

 6          Q.   A meeting?

 7          A.   -- a particular meeting.

 8          Q.   You recall getting this, though, don't

 9   you?  This document you're looking at is sent to you,

10   Eric Brantley?

11          A.   I don't remember my initial reading of his

12   e-mail.  I read this e-mail now.  I don't recall back

13   in 2000 --

14          Q.   '5?

15          A.   -- '5, receiving it.

16          Q.   Okay, but --

17          A.   That's not saying that I did not receive

18   it.  I don't recall.

19          Q.   Well, what was your job in 2005?

20          A.   As I've stated several times, my -- my job

21   was to review ingredient limit reports, conduct

22   investigations, and report those to the DEA.

23          Q.   And you knew that, in 2005, you should not

24   ship an order that's in excess of 5,000 dosage units

25   of hydrocodone a month?  You knew that, didn't you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PYSER:  Object to form.  Misstates

 2       evidence.

 3   BY MR. PAPANTONIO:

 4       Q.   I mean, you knew that there was a 5,000

 5   number out there when you were working in your job

 6   with Cardinal?

 7                 MR. PYSER:  Object to form.

 8   BY MR. PAPANTONIO:

 9       Q.   True?

10       A.   I knew that I had to review the ingredient

11   limit reports and report those after conducting

12   investigations.

13       Q.   Well, it says:  "Additionally, DEA has

14   identified Colorado as the state that has an Internet

15   pharmacy problem."

16                 Your -- part of your territory was

17   Colorado, wasn't it?

18       A.   I did review ingredient limit reports for

19   the Colorado facility.

20       Q.   It says:  "Your excessive purchase reports

21   should be reviewed to see if you have customers that

22   are purchasing over 3,000 dosage units of phentermine

23   or 5,000 dosage units of hydrocodone a month."

24                 You see that?

25       A.   I do see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   Now, if we go back to the -- go back to

 2      that chart that we just talked about there.

 3                 You would agree that 155,000 is larger

 4      than 5,000?  I mean, pretty obvious, right?

 5            A.   Agreed.

 6            Q.   You would agree that 242,000 is certainly

 7      bigger than 5,000, right?

 8            A.   Agreed.

 9            Q.   Go to the next page on 4230, please.

10                 It says:  "Respondent knew that pharmacies

11      generally order a wide variety of controlled

12      substances and other drug products with wholesale

13      distributors.  Respondent also knew that orders that

14      deviate substantially from a normal pattern to a

15      suspicious -- were suspicious as the term 21 CFR --"

16                 Now, I want to ask you, you understood

17      that one -- one thing you look at with the suspicious

18      order is the pattern of what the customer's ordering

19      changes, correct?

20            A.   A suspicious order is identified as an

21      order of unusual size, frequency, or that deviates

22      substantially from a normal pattern.

23            Q.   Right.  So you would have been able to see

24      that an order pattern went from 5,000 dosage units a

25      month to 287,000 dosage units a month, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Object to form.  Calls for
 2        speculation.
 3   BY MR. PAPANTONIO:
 4        Q.   You would have been able to see that?
 5                MR. PYSER:  Object.
 6   BY MR. PAPANTONIO:
 7        Q.   It comes across your desk, doesn't it?
 8                MR. PYSER:  Object to form.
 9                THE WITNESS:  I receive the ingredient
10        limit reports every month.  And I review them.
11        And I will see quantities for the month.
12   BY MR. PAPANTONIO:
13        Q.   Well, what if you saw 5,000 to -- 5,000 to
14   200 and -- hang on just a second -- 5,000 to 287,000?
15   Or -- yeah, 5,000 to 287,000?  Would that look
16   suspicious to you?
17        A.   This is one, I would have contacted the
18   pharmacy, I would have conducted an investigation,
19   and I would have reported that pharmacy to the DEA,
20   which was done --
21        Q.   Yeah, well, let's see --
22        A.   -- in the case of this pharmacy.
23        Q.   -- if it was done.  We're going to talk
24   about that in just a second.
25                MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Not only that -- if I may

 2        continue to answer the question.

 3    BY MR. PAPANTONIO:

 4        Q.    You can continue to say anything you want,

 5    but --

 6        A.    The -- the ingredient limit reports --

 7    reports were reported to the DEA every month --

 8        Q.    And you --

 9        A.    -- as required.

10        Q.    And you continued to do business -- even

11    though you would report a suspicious order, you'd

12    continue doing business with people like Horen's

13    Pharmacy, wouldn't you?

14                MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.    Yes?

17        A.    The pharmacies listed on the page before

18    me, page 21 of P423021, I believe these pharmacies

19    were -- Cardinal had discontinued business of

20    controlled substances and reported these pharmacies

21    to the DEA --

22        Q.    Well, we'll see what the --

23        A.    -- months --

24        Q.    Go ahead.

25        A.    -- prior -- I think 12 to 18 months prior
```

1   to --

2          Q.   Yeah.  So your testimony is that --

3          A.   -- this document.

4          Q.   -- you thought that DEA found about --

5   found out about this by you reporting it?  Is that

6   your testimony here today?

7          A.   My testimony is that we reported -- we

8   submitted to the DEA ingredient -- ingredient limit

9   reports --

10         Q.   Well, I want to be sure --

11         A.   -- with these customers --

12         Q.   I want to be sure about what --

13         A.   -- on a monthly basis, and that I

14  conducted investigations and reported these customers

15  to the DEA.

16         Q.   So when the -- when the DEA says that we

17  discovered, the DEA found out about it, you're saying

18  that you actually are the ones reporting all this?

19  Is that your testimony here?

20              MR. PYSER:  Object to form.

21  BY MR. PAPANTONIO:

22         Q.   I want to be sure about that.

23         A.   Where does it say that the DEA said that

24  they discovered?

25         Q.   Listen to my question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   That was your question.

 2         Q.   My question is:  You understand that right

 3   now you're testifying that these -- these pharmacies

 4   were only put on the DEA's radar because you reported

 5   it?  Is that your testimony?

 6         A.   I never said --

 7              MR. PYSER:  Object -- hold on.  Object to

 8        form.

 9   BY MR. PAPANTONIO:

10         Q.   All right.  Go ahead.  I thought you said

11   that.  I want to be sure you didn't say that before

12   we spend a lot of time here.

13         A.   I never said that.

14              MR. PYSER:  Object to form.

15              MR. PAPANTONIO:  Okay.  All right.

16              MR. PYSER:  I'm going to object.

17              THE WITNESS:  What I said was --

18   BY MR. PAPANTONIO:

19         Q.   Go ahead.

20         A.   You asked me a question.  What I said

21   was --

22         Q.   Yeah.

23         A.   -- that on a monthly basis, we submitted

24   ingredient limit reports to the DEA, and these --

25   these customers would have been listed on those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ingredient limit reports.

 2         Q.   And you continued shipping to them,

 3    though, didn't you?  You didn't --

 4         A.   And then I conducted investigations of

 5    these pharmacies, and we discontinued business with

 6    these pharmacies and reported those --

 7         Q.   Yeah, and so --

 8         A.   -- to the DEA.

 9         Q.   So -- so your testimony, I want to be

10    sure, is not -- this is not your testimony, that you

11    reported this and then stopped shipping.  Correct?

12              You're saying you reported it and we

13    stopped shipping?  Is that -- is that your testimony

14    here today?

15              MR. PYSER:  Object to form.  Asked and

16         answered.

17              MR. PAPANTONIO:  No, it's not.

18              MR. PYSER:  Misstates evidence.

19              MR. PAPANTONIO:  It's not been asked and

20         answered.  I want to be very clear on this.

21    BY MR. PAPANTONIO:

22         Q.   Your testimony is that you would report to

23    DEA, and you would stop shipping?  Is that what you

24    testified to?

25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  What I say -- said, and what
 2        I say again, is that we submitted the ingredient
 3        limit reports to the DEA every month, and
 4        customers would have been on those reports.  And
 5        if I had done an investigation of a customer and
 6        made the recommendation to discontinue shipment,
 7        we did that, and those pharmacies were reported
 8        to the DEA.
 9   BY MR. PAPANTONIO:
10        Q.   And that's why the DEA is calling your
11   conduct an imminent threat to public health?  You
12   understand that's what this is saying?
13        A.   I don't know why DEA made that --
14                MR. PYSER:  Object to form.
15                THE WITNESS:  -- allegation.
16   BY MR. PAPANTONIO:
17        Q.   So you're --
18                MR. PYSER:  Object to form on the
19        question.
20                And please let me interject --
21   BY MR. PAPANTONIO:
22        Q.   So you're saying --
23                MR. PYSER:  -- before you answer.
24   BY MR. PAPANTONIO:
25        Q.   -- the DEA just got it all wrong; that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    -- that your company was not an imminent threat to

 2    public health, that you didn't overship quantities of

 3    narcotics?  That's your testimony here today; is that

 4    right?

 5              MR. PYSER:  Object to form.

 6    BY MR. PAPANTONIO:

 7         Q.   Yes or no?  It takes a yes-or-no answer

 8    before we move on here.

 9         A.   My testimony, as I have said repeatedly,

10    is that -- and these -- the case of these customers

11    on this form, or customers you are referring to, they

12    were on the ingredient limit reports, which were

13    submitted to DEA on a monthly basis.  And that if I

14    had identified customers such as these, I conducted a

15    -- an investigation.  And those customers, if deemed

16    necessary, we discontinued shipment of -- of

17    controlled substances to those customers and reported

18    those customers to Kyle Wright at the DEA.

19         Q.   And that's why they filed -- that's -- and

20    that's why they fined you $34 million, because you

21    did it right?  Is that your testimony?

22              MR. PYSER:  Object to form.

23              MR. PAPANTONIO:  Wait -- wait a second.

24    BY MR. PAPANTONIO:

25         Q.   Your testimony --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PYSER:  I'm not going to wait a
 2        second.
 3                 MR. PAPANTONIO:  Wait, wait.
 4                 MR. PYSER:  When you --
 5                 MR. PAPANTONIO:  Let me finish my --
 6                 MR. PYSER:  -- ask a question --
 7                 MR. PAPANTONIO:  Let me finish my
 8        question.
 9                 MR. PYSER:  -- I'm going to interject an
10        objection.
11                 MR. PAPANTONIO:  Let me finish my
12        question, because --
13                 MR. PYSER:  You had asked a question
14        that --
15                 MR. PAPANTONIO:  I know you --
16                 MR. PYSER:  -- there's a question mark on
17        it --
18                 MR. PAPANTONIO:  -- want to preach to him
19        right now, and it's very obvious where he's
20        going.
21                 MR. PYSER:  When you ask a question and
22        there's a question mark on the transcript, I'm
23        going to interject --
24                 MR. PAPANTONIO:  Okay.
25                 MR. PYSER:  -- an objection at that point.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PAPANTONIO:  Well, I'm going to ask

 2      the question again.

 3  BY MR. PAPANTONIO:

 4        Q.   Is it your testimony, sir, that it was

 5  your -- that you reported all this bad conduct, and

 6  that the DEA said that you were violating the law,

 7  and you were fined $34 million because you did things

 8  right?  Is that your testimony here, really?

 9                 MR. PYSER:  Same objections.  Object to

10      form.

11  BY MR. PAPANTONIO:

12        Q.   I wonder, is that really your testimony

13  here today?

14        A.   You've asked the same question several

15  times, so my answer does not change.

16        Q.   Okay, good.  Then --

17        A.   I --

18        Q.   -- what is your answer?

19        A.   My answer is --

20        Q.   Let me --

21        A.   -- we submitted ingredient limit reports

22  to the DEA on a monthly basis --

23        Q.   Great.

24        A.   -- and that I conducted investigations --

25        Q.   All right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   -- and we discontinued business with
 2   customers and reported that to Kyle Wright --
 3          Q.   And they --
 4          A.   -- at the DEA.
 5          Q.   -- fined you 34 --
 6               MR. PYSER:  Counsel, Counsel, let him
 7       finish his answer --
 8   BY MR. PAPANTONIO:
 9          Q.   Are you finished?
10               MR. PYSER:  -- and stop interjecting --
11   BY MR. PAPANTONIO:
12          Q.   Are you finished?
13               MR. PYSER:  -- in the middle of his
14       answer.
15   BY MR. PAPANTONIO:
16          Q.   Are you finished?
17          A.   I -- I am finished now that --
18          Q.   I thought you were.
19               So, so -- so they fined you $34 million
20   for doing things right?  Is that your testimony?
21               MR. PYSER:  Object to form.
22   BY MR. PAPANTONIO:
23          Q.   Is that your testimony here today?
24          A.   There were allegations made, and there was
25   a settlement.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Yeah.  And so you're saying you paid --
 2    you settled for $34 million because your company was
 3    doing things right?  Is that your testimony?
 4              MR. PYSER:  Object to form.  Asked and
 5         answered, repeatedly.
 6    BY MR. PAPANTONIO:
 7          Q.   Yes or no.
 8          A.   There were allegations made.  There were
 9    issues of -- there were issues of show cause made.
10    And there was at some point a settlement.  That's all
11    I can speak to.
12          Q.   Okay.  That's right.  That's all you can
13    speak to, isn't it?
14              MR. PYSER:  Object --
15    BY MR. PAPANTONIO:
16          Q.   That's all you can speak to in this
17    deposition, isn't it?  What you just said?
18              MR. PYSER:  Object to form.
19         Argumentative.
20    BY MR. PAPANTONIO:
21          Q.   Right?
22              MR. PYSER:  You're crossing the line,
23         Counsel.
24    BY MR. PAPANTONIO:
25          Q.   That's all you can speak to?  Yes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I can answer the questions that you ask

 2   me.

 3        Q.   Okay, well, let's -- let's see --

 4        MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6        Q.   -- if you can answer this question.  Go to

 7   the next paragraph, D.

 8        A.   Which page are we on?

 9        Q.   I'm on -- still on page 22.  It says:  "On

10   September 2006, Eric Brantley, manager of quality and

11   regulatory affairs" -- that's you.  See that?

12        A.   I do see that.

13        Q.   It says, it says that you, the respondent

14   "sent an e-mail to DEA" -- right?  This is an e-mail

15   -- "E-commerce Section stating that respondent had

16   discontinued its sales of controlled substances to 13

17   Internet pharmacies."

18             That's what that said.  Read it again and

19   make sure I got that right -- I'll read it again.

20             "On September 1st, Eric Brantley" --

21   that's you, sitting in the chair right there, right?

22        A.   I am Eric Brantley.

23        Q.   ". . . manager of quality and regulatory

24   affairs, sent an e-mail to DEA commerce section

25   stating the respondent had discontinued its sales of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    controlled substances to 13 suspected Internet

 2    pharmacies.  Included in respondent's report of

 3    discontinued accounts was the -- was RKR Holdings,

 4    RKR.  On that same date" -- let me make sure -- lot

 5    slow -- you know, I want to make sure we get this

 6    right.

 7              "On that same date, respondent distributed

 8    200 doses -- dosage unit combination products RKR

 9    from September 1st to -- 2006, January 2007,

10    respondent distributed 393,000 dosage units."

11              Now, I read that right, didn't I?

12         A.   Yes.

13         Q.   So you reported it, and you continued to

14    ship anyway.  That was my question earlier, and you

15    didn't answer.

16              Does this paragraph answer that question

17    for you?

18              MR. PYSER:  Object to form.

19              THE WITNESS:  I reported RKR Pharmacy

20         along with several other pharmacies.  And I

21         recall this pharmacy because there was an

22         acquisition of a company.  I don't recall -- I

23         believe it was Dohmen -- and that acquisition,

24         that company was shipping to RKR as well.  Once

25         I discovered it on the ingredient limit reports,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        we discontinued.
 2   BY MR. PAPANTONIO:
 3        Q.   "September 1st, 2006, through
 4   January 2007, Cardinal (respondent) distributed
 5   393,000 dosage units of combination hydrocodone
 6   products to RKR."
 7             That's what it says, doesn't it?
 8             MR. PYSER:  Object to form.
 9             THE WITNESS:  That's how it reads.
10             MR. PAPANTONIO:  Yeah, okay.
11             Let's take lunch.  Just go ahead and take
12        lunch break.  Get it done.
13             MR. PYSER:  Let's -- let's keep going,
14        because --
15             MR. PAPANTONIO:  Oh, I don't mind.  I
16        mean, I just thought I'd give you --
17             THE WITNESS:  I'm fine.
18   BY MR. PAPANTONIO:
19        Q.   Okay.  Well, I'm fine, too.
20             All right, here we go.  Let's go ahead and
21   look at -- go ahead and --
22             MR. PAPANTONIO:  Give me 4689, please.
23             THE WITNESS:  Are we finished with this
24        document?
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   Not quite.  You might keep it handy.

 3    We'll probably go back to that.

 4              MS. MOORE:  This is Cardinal-Brantley 7.

 5         (Cardinal-Brantley 7 was marked for

 6    identification.)

 7    BY MR. PAPANTONIO:

 8         Q.   Now, who was Hartman?  Do you know who

 9    that -- who Hartman is?

10         A.   I'm familiar with the name Mark Hartman.

11         Q.   How do you know him?

12         A.   At some point, I believe in 2008, he

13    joined the QRA organization in some form.  I think he

14    was a president or something.  I don't remember

15    exactly.

16         Q.   Okay.  And did you ever see -- have you

17    seen this document prior to coming in here?  He made

18    a -- Hartman made a presentation -- were you there

19    when he made his presentation?

20         A.   I don't remember if I was there for the

21    presentation, and I don't remember this document.

22         Q.   All right.  Well, look at page 26.

23         A.   26.

24         Q.   You see that one -- you see that one

25    statement, "The drug dealer is us"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I do see that.

 2        Q.   Do you know that Hartman represented to

 3   the folks there that Cardinal was part of being a --

 4   part of the drug dealer process?

 5             MR. PYSER:  Object to form.  Misstates

 6        evidence.  There's a quote from a different

 7        person there.

 8   BY MR. PAPANTONIO:

 9        Q.   What does that say?

10             MR. PYSER:  That's outrageous, Counsel.

11   BY MR. PAPANTONIO:

12        Q.   What does that say?  "The drug dealer is

13   us."  You see that?

14        A.   It says:  "John Watson, National Drug

15   Czar, February 2007."

16        Q.   Okay.  And he showed this -- and he showed

17   this to the employees there with -- with your

18   company, Cardinal, correct?

19             MR. PYSER:  Object to form.

20             THE WITNESS:  That's what you said.

21        Again, I don't recall this -- this meeting or

22        this presentation.

23   BY MR. PAPANTONIO:

24        Q.   Did you ever meet Hartman and talk to him

25   about whether -- what he meant about "The drug dealer
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   is us"?

2              MR. PYSER:  Object to form.

3              THE WITNESS:  I have met Mark Hartman, but

4        we have not had a discussion about "The drug

5        dealer is us" quote from John Watson, National

6        Drug Czar.

7   BY MR. PAPANTONIO:

8        Q.   Okay.  And let's look at page 2, as we

9   work our way to "The drug dealer is us" slide.

10             You understand this is slides that were --

11  that were prepared and shown to Cardinal employees.

12  You understand that, right?

13             MR. PYSER:  Object to form.  Misstates

14       evidence.

15             THE WITNESS:  If you say that.  I don't

16       recall this presentation.

17  BY MR. PAPANTONIO:

18       Q.   All right.  And then it says -- it talks

19  about Cardinal.  It says, "Number 19 on the

20  Fortune 500."  As far as being a Fortune 500 company,

21  they were number 19.

22             Did you know that?

23       A.   I know that now, from reading this slide.

24       Q.   And did you know that they had 43,500

25  employees, more than 25 countries -- in more than
```

```
 1    25 countries?

 2         A.   I did not know that at the time.

 3         Q.   So this is the first time -- that's 2008,

 4    isn't it?  This is 2008 we're talking about?

 5         A.   I don't know when this was drafted.

 6         Q.   Well --

 7         A.   Going back to the first slide, it says

 8    November 6th, 2008.

 9         Q.   Okay.  And so out of those 43,500

10    employees, there were three employees that were in

11    charge, in corporate, of reviewing orders that were

12    being placed all the way from Washington state to

13    Lakeland, Florida, correct?

14              MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16         Q.   In 2008?

17         A.   From about 2005 to late 2007, early 2008.

18    In November of 2008, there were more --

19         Q.   How many more?

20         A.   -- at the corporate level.

21         Q.   How many?

22         A.   I don't know the exact number, but there

23    were --

24         Q.   Was it more than five?

25              MR. PYSER:  Counsel, let him finish his
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        answer.

 2             THE WITNESS:  There were more than five.

 3        A new VP came in.  Couple directors.  Again, I

 4        don't know the exact number, but it was more

 5        than ten, I would say.

 6   BY MR. PAPANTONIO:

 7        Q.   So they got 43,000 employees in the -- how

 8   many years were you operating with just three

 9   employees in quality control?

10             MR. PYSER:  Object to form.  Misstates

11        testimony.

12   BY MR. PAPANTONIO:

13        Q.   How many -- how many years were you

14   working in quality control, where there were 43,000

15   employees?

16             MR. PYSER:  Object to form.

17             THE WITNESS:  2005 to either late 2007 or

18        early 2008.  I don't recall the exact time

19        frame.

20   BY MR. PAPANTONIO:

21        Q.   And you see the first paragraph says:

22   "Cardinal Health is an 87 billion-dollar global

23   company."  See that?

24             Did you -- is that the first time you've

25   heard about how much money this company is --
```

```
 1    considered a 87 billion-dollar global company?

 2         A.   I do see that now.

 3         Q.   And then it says, down here, second to the

 4    last, it says:  "Currently, Cardinal Health is ranked

 5    number 19 on the Fortune 500."

 6              We've already talked about that, correct?

 7              MR. PYSER:  Object to form.  Asked and

 8        answered.

 9              THE WITNESS:  I do see that.

10    BY MR. PAPANTONIO:

11         Q.   Okay.  And look at page 4.

12              It says:  "Supply chain integrity is a

13    holistic approach to the supply chain."

14              This is what -- you were trying to explain

15    what the supply chain was, right?

16         A.   Yes.

17         Q.   Earlier?

18         A.   Well, from the manufacturer to the

19    wholesale distributor to the final dispenser to the

20    patient, based on a script from a doctor.

21         Q.   And if every part of it works right, then

22    we don't have diversion, hopefully, correct?

23         A.   If every part of it works right, then from

24    the manufacturer down to the person with the script,

25    should get their drug.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Those entities, manufacturers and

 2    wholesalers, operate within that security supply

 3    chain.

 4        Q.   Okay.  So in -- go to page 7, please.  I

 5    just want to talk about what Mr. Hartman actually

 6    said to the people in that -- or showed the people

 7    in -- along with -- along with showing that "The drug

 8    dealer is us," he didn't say that, but he showed it

 9    to the audience, obviously, as part of his -- part of

10    his -- if you look at this page 7.  Let's go down

11    this.

12                 Let's start with the issue of diversion.

13    We have populated a couple of the boxes on our grid

14    to represent the tremendous problem of rogue Internet

15    drug sales.

16                 Isn't that what we've just been talking

17    about, rogue Internet drug sales?

18                 MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20        Q.   Didn't we just talk about drug Internet --

21        A.   We discussed that in a previous document.

22        Q.   Okay.  Representing diversion for abuse,

23    so our beautiful supply chain flow shows an obstacle.

24    Here it is.  "Drugs our kids are abusing.  Vics,

25    nearly 10 percent of our high school seniors abuse
```

Highly Confidential - Subject to Further Confidentiality Review

1     this drug.  40 bars OxyContin, robotripping."

2                 Do you know what "robotripping" is?

3                 MR. PYSER:  Object to form.

4                 THE WITNESS:  I do not.

5     BY MR. PAPANTONIO:

6          Q.   You never heard the term?

7          A.   I do not know what "robotripping" is.

8          Q.   And while you were working there, you

9     didn't understand that -- that -- this concept that

10    drugs were being abused by kids?  Did you not -- did

11    you not understand that when you were working there?

12                MR. PYSER:  Object to form.

13                THE WITNESS:  I did not -- I do not recall

14         this document, no.

15    BY MR. PAPANTONIO:

16         Q.   Well, did you know that, though?  Did you

17    know that drugs is -- I mean, this goes all the way

18    back, 2008 -- that drugs were being abused by kids?

19                MR. PYSER:  Object to form.

20                THE WITNESS:  I believe certain drugs have

21         been abused for a long time.

22    BY MR. PAPANTONIO:

23         Q.   And it said "Vics."  Tell us what a "Vic"

24    is.

25         A.   I don't know what a "Vic" is.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Do you know what "Vicodin" is?

 2          A.   I do know what "Vicodin" is.

 3          Q.   What is "Vicodin"?

 4          A.   I believe it is a form of hydrocodone.

 5          Q.   And your company sold that, correct?

 6          A.   I believe --

 7               MR. PYSER:  Object to form.

 8               THE WITNESS:  I believe Cardinal Health

 9     did sell hydrocodone.

10   BY MR. PAPANTONIO:

11          Q.   You distributed Vicodin, didn't you?

12          A.   Cardinal Health did distribute

13   hydrocodone.

14          Q.   And you don't know what "robotripping" is?

15          A.   I do not know what "robotripping" is.

16               MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18          Q.   And do you know what "Skittles" is, the

19     term "Skittles," when we talk about -- within the

20     drug use, what "Skittles" is?

21          A.   I only know Skittles as the candy.

22          Q.   That's what you think it is, is candy?

23               MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25          Q.   Correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Object to form.
 2   BY MR. PAPANTONIO:
 3        Q.   You know -- you know Skittles as candy?
 4   Is that what you're telling the jury?
 5        A.   There is --
 6                  MR. PYSER:  Object to form.
 7                  THE WITNESS:  -- Skittles and candy.  I
 8        mean, it's a brand of candy, Skittles.
 9   BY MR. PAPANTONIO:
10        Q.   Have you ever heard Skittles being
11   referred to when the discussion of drugs come up?
12        A.   I don't recall Skittles.
13        Q.   Never heard the term?
14        A.   I don't recall.
15                  MR. PYSER:  Object to form.
16                  THE WITNESS:  I don't recall Skittles.
17   BY MR. PAPANTONIO:
18        Q.   And you weren't at this -- you weren't at
19   the -- this presentation where he's talking about all
20   these issues, correct?  We've established that?
21                  MR. PYSER:  Object to form.  Asked and
22        answered.
23   BY MR. PAPANTONIO:
24        Q.   Right?
25        A.   I do not recall this presentation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And then it says:  "There is a website
 2   dedicated to the use of Skittles that will calculate
 3   by body weight the number of pills one must ingest to
 4   reach different levels of abuse."
 5             Did you know that as you were distributing
 6   narcotics throughout the country, that there was a
 7   website dedicated to the use of Skittles, that could
 8   actually have somebody calculate how many drugs they
 9   needed to -- to ingest?  Did you know that?
10             MR. PYSER:  Object to form.
11             THE WITNESS:  I was not aware of a website
12        referring to Skittles and body weight of abuse
13        which is outside of the closed supply chain.
14   BY MR. PAPANTONIO:
15        Q.   Okay.  So the DEA -- next paragraph:  "DEA
16   estimates that nearly 7 million Americans currently
17   abuse prescription drugs, up 80 percent from 2000."
18             See that?
19        A.   I do see that.
20        Q.   When did you start with the company?
21        A.   When did I start with Cardinal Health?
22        Q.   No, with Cardinal -- yeah.  When did you
23   start with them?  2000, right?
24        A.   I started with a company that was acquired
25   by Cardinal Health in 2002.  I started with that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    company in 2000.  January of 2000, I started with

 2    Bentley Trading Company.  And sometime in 2002, they

 3    were acquired by Cardinal Health.

 4         Q.   So in 2000, you were working with

 5    Cardinal, correct?

 6              MR. PYSER:  Object to form.  Misstates

 7         testimony.

 8    BY MR. PAPANTONIO:

 9         Q.   Right?

10         A.   In 2002 --

11         Q.   Does that misstate your testimony, to say

12    that -- let me just phrase it another way.

13         A.   Well, you asked the question, and --

14         Q.   Well, let me ask -- let me rephrase the

15    question.

16              MR. PYSER:  Let him finish the -- let him

17         finish the answer, Counsel.

18    BY MR. PAPANTONIO:

19         Q.   You were working --

20              MR. PAPANTONIO:  No.  You objected.  I'm

21         going to rephrase the question.

22    BY MR. PAPANTONIO:

23         Q.   So you were working in the area of opioids

24    as early as 2000, weren't you?

25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  In 2000, I was working for
 2        Bentley Trading Company, in the -- in the
 3        distribution center.
 4   BY MR. PAPANTONIO:
 5        Q.   Okay.  In narcotics, correct?
 6                MR. PYSER:  Object to form.
 7                THE WITNESS:  There were controlled
 8        substances present.
 9   BY MR. PAPANTONIO:
10        Q.   And so --
11        A.   Excuse me.
12        Q.   Yeah.  Go ahead.
13        A.   There was Schedule III through V
14   controlled substances present.  There was no vault,
15   so there was no Schedule II --
16        Q.   So the --
17        A.   -- controlled substances.
18        Q.   "The DEA estimates that nearly 7 million
19   Americans currently abuse prescription drugs, up
20   80 percent from 2000."
21                And we're talking -- this document is
22   2008, correct?
23        A.   This document, according to the first
24   page, 2008.
25        Q.   So between -- according to Hartman, who
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    worked for Cardinal, he says between 2000 and 2008,

2    that -- that there was -- that there -- the

3    prescription abuse was up 80 percent.  Right?

4               MR. PYSER:  Object to form.

5               THE WITNESS:  That's what's written on

6       this page.

7    BY MR. PAPANTONIO:

8        Q.   And during those years between 2005 and

9    2008, you were one of the people at Cardinal that was

10   actually determining how many -- how much drugs we

11   can send out throughout the country?

12              MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14       Q.   You were reviewing records?  True?

15       A.   I was reviewing ingredient limit reports,

16   yes.

17       Q.   And it says:  "10 percent of high school

18   seniors admit to abusing painkillers."

19              See that?

20       A.   I do see that.

21       Q.   "Every day, 2,500 youths 12 to 17 abuse a

22   prescription pain reliever for the first time."

23              See that?

24       A.   I do see that.

25       Q.   So that was the environment that you were
```

```
 1    working in when you were making a decision about

 2    whether or not you should send drugs out to rogue

 3    pharmacies.  Correct?

 4           MR. PYSER:  Object to form.  Vague as to

 5        time.

 6           THE WITNESS:  Again, from 2005 to late

 7        2007 -- or early 2008; I'm not certain -- it was

 8        my job to review those ingredient limit reports,

 9        operating in that closed supply chain.

10    BY MR. PAPANTONIO:

11        Q.   Okay.  So what I'm getting at is, this was

12    the environment that we just described.  I don't want

13    to go through it again, but we just described the

14    environment that was existing with drug abuse during

15    the time that you were choosing to sell drugs to

16    rogue pharmacies that were operating on the Internet,

17    correct?

18           MR. PYSER:  Object to form.

19           THE WITNESS:  I was an employee of

20        Cardinal Health during the time frame of 2005 to

21        late 2007, early 2008, doing that job.  I was

22        not -- I -- I did not have that role, I believe,

23        in November of -- of 2008; but yes, I was

24        employed with the company, doing that role, from

25        2005 to early 2008.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   And I'm asking you about the environment

 3   that you were working in.  You're aware that that

 4   environment existed?  The environment of drug abuse,

 5   certainly -- this is talking about children.

 6            But you were aware that this drug abuse

 7   environment and culture was existing during the time

 8   that you were shipping narcotic drugs to rogue

 9   Internet pharmacies?  Yes or no?

10            MR. PYSER:  Object to form.

11            THE WITNESS:  There has been some form of

12      drug abuse forever.  Whether that drug is --

13   BY MR. PAPANTONIO:

14       Q.   That doesn't answer my question.  Listen

15   to my question.

16       A.   What was -- well --

17       Q.   Would you -- no, no -- no, no --

18            MR. PYSER:  Let him finish the answer.

19            MR. PAPANTONIO:  No, I'm --

20   BY MR. PAPANTONIO:

21       Q.   Okay.  Can you answer --

22            MR. PYSER:  He was not --

23            THE WITNESS:  I believe your question

24      was --

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Answer my question.

 3        A.   Your -- your question was, was I employed

 4   doing my role that I've expressed during the time of

 5   drug abuse?  And I said there has been drug abuse.

 6   And, yes, I was working for Cardinal Health during

 7   the time period from 2005 to early 2008 or '7 in that

 8   role where I was reviewing ingredient limit reports.

 9        Q.   Okay.

10        A.   Was that your question?

11        Q.   Well, if that's your answer, I'll go with

12   your answer right now because I know you want -- you

13   want to say what you want to say, so you -- that's

14   fine.

15             MR. PAPANTONIO:  Show him 4765.

16             MR. PYSER:  Object to form.

17             Strike the commentary from counsel.

18   BY MR. PAPANTONIO:

19        Q.   Yeah.  We're going to read -- I'm going to

20   read the question back in just a minute.  I'm going

21   to read your answer back with this document, okay,

22   that we're about to look at.

23             MR. PAPANTONIO:  Show him this document,

24        please.

25             MS. MOORE:  Cardinal-Brantley 8.
```

```
 1          (Cardinal-Brantley 8 was marked for

 2     identification.)

 3     BY MR. PAPANTONIO:

 4          Q.   You know what this is, don't you?

 5               MR. PYSER:  Object to form.

 6     BY MR. PAPANTONIO:

 7          Q.   Do you know what this is?

 8          A.   At first glance, I do not.

 9          Q.   Take a minute and look at it, so I can --

10     I'm going to ask you some questions about this, and I

11     want to make sure you know what it is.

12          A.   I see that the date is January 13 or 14th,

13     2005.  And I was not in the role that we've been

14     speaking of since this morning during that time

15     frame.

16          Q.   What were you doing in 2005?

17          A.   I moved to the corporate office, I

18     believe, in May 2005.  Prior to that, I was still

19     down in Texas, with the distribution center there.

20          Q.   Okay.  You did -- did you have a training

21     program in place when you left, for training people

22     in the field on how they should be involved with this

23     closed system that you talk about with narcotics?

24     Did you have a training system in place?

25          A.   Did I have a training system in place when
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I left --

 2        Q.   Yeah.

 3        A.   -- Cardinal Health, the company --

 4        Q.   Yeah.

 5        A.   -- in 2013?

 6        Q.   Uh-huh.

 7        A.   There was a training system.

 8        Q.   Oh, there was?  Standardized training

 9   system was in place?  Is that your testimony?

10             MR. PYSER:  Object to form.  Vague as to

11        time.

12   BY MR. PAPANTONIO:

13        Q.   Was that your testimony, that there was a

14   training -- a training system in place to standard --

15   let's call it "standardized training system" -- in

16   place when you left the company?

17             MR. PYSER:  Object --

18   BY MR. PAPANTONIO:

19        Q.   Is that what you're telling the jury?

20        A.   When I left --

21             MR. PYSER:  Object to form.

22             THE WITNESS:  When I left the company

23        in -- in 2013, training was conducted.

24   BY MR. PAPANTONIO:

25        Q.   Standardized training?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I don't know what --

 2          Q.   Do you understand what --

 3          A.   I don't know what your --

 4          Q.   Well, let me show you.

 5          A.   -- version of standardized --

 6          Q.   I mean --

 7          A.   -- training is, but training -- training

 8   was conducted.  I myself conducted training --

 9          Q.   Oh, you did?

10          A.   -- when I was at the company.

11          Q.   You did.  Okay.  So let's look at page 15,

12   see what it says.

13               See the top, it says:  "FY 05 current

14   state in estimated regulatory training cost."

15               It says:  "No standardized training

16   process."

17               You see that?

18               MR. PYSER:  Object to form.  Vague as to

19        time.

20   BY MR. PAPANTONIO:

21          Q.   Did I read that right?  "No" -- did I read

22   that right?  "No standardized training process"?

23               MR. PYSER:  Object to form.  Vague.

24   BY MR. PAPANTONIO:

25          Q.   Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   That is what that statement says on the
 2     slide.
 3          Q.   It says, underneath it:  "Inconsistent
 4     training across sites."
 5               You see that?
 6               MR. PYSER:  Object to form.
 7               THE WITNESS:  I do see that on the slide.
 8     BY MR. PAPANTONIO:
 9          Q.   And then if you go down to "Current
10     State," let's see where they land.  It says:  "Lack
11     of corporate sponsorship for training.  Authority, if
12     there is any real accountability rests, if" -- I read
13     that -- let's -- let's start -- slow down.
14               "Lack of corporate sponsorship for
15     training authority, if there is any real
16     accountability, rests on individual sites in most
17     cases.  In most cases, no repercussions for problems
18     in training, not showing up, not completing training"
19     -- see -- what does that say, "testing"?
20               It says:  "Training process is nonexistent
21     in some sites."
22               You see that?
23               MR. PYSER:  Object to form.
24     BY MR. PAPANTONIO:
25          Q.   "Training process is nonexistent"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   Do you see that?

 4        A.   I do see that.

 5        Q.   Okay.  And we're talking about people that

 6   are handling narcotics to be distributed throughout

 7   the country.  Women, children.  And there's no -- the

 8   training process is nonexistent in some sites.

 9   Right?

10                  MR. PYSER:  Object to form.  And

11        argumentative.  And vague as to time.

12   BY MR. PAPANTONIO:

13        Q.   Correct?  That's what this says?

14        A.   That's on this slide.

15        Q.   Right.  And this is -- this is 2000 --

16   this is 2005.

17                  Now go to the next -- go to the next line,

18   right underneath, where it says:  "Training process

19   is nonexistent in some sites."  It says:  "References

20   to insufficient training."

21                  And it even lays out the references that

22   you can see where there's insufficient training.

23   That's what that says, isn't it?

24                  MR. PYSER:  Object to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2         Q.   Right?

 3         A.   It says that there are references to

 4   insufficient training.

 5         Q.   Okay.  And right -- right under -- see

 6   where it says "Numerous 483"?

 7              "References to insufficient training, one

 8   of root causes or symptom of causes, staff is not

 9   trained -- staff not trained."

10              MR. PAPANTONIO:  Underline "staff not

11         trained."

12   BY MR. PAPANTONIO:

13         Q.   See that?

14              MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16         Q.   "Trainers not qualified."

17              MR. PAPANTONIO:  Underline that.

18   BY MR. PAPANTONIO:

19         Q.   And then it goes:  "Training not provided

20   in a timely manner."

21              And then it goes:  "No minimum training

22   requirements."

23              But didn't you just tell me that -- yeah,

24   when you left -- when you were there, there was a

25   training system involved?
```

```
 1                  MR. PYSER:  Object to form.
 2    BY MR. PAPANTONIO:
 3        Q.   Did you tell me that?
 4        A.   Yes.  So this document is dated, again,
 5    January 13th, 14th, 2005.
 6        Q.   Right.
 7        A.   I joined -- I moved to corporate, I
 8    believe, middle of the year 2005, around May.  And I
 9    myself conducted training.  And when I left Cardinal
10    Health in 2013, there was training.
11                  This document is dated January 13th of
12    2005.
13        Q.   Okay, so you'd have been --
14        A.   I can't speak to prior to my time at the
15    corporate office.
16        Q.   Okay.  Let me get this right:  When did
17    Cardinal start selling narcotics across the
18    United States?  What year?
19                  MR. PYSER:  Object to form.  Asked and
20         answered.
21    BY MR. PAPANTONIO:
22        Q.   Was it 1999?
23        A.   I don't know when Cardinal started.
24        Q.   Well, we know they were selling in 2000,
25    right?  You know they were selling narcotics in 2000?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Cardinal Health was distributing

 2   controlled substances in --

 3        Q.   And now we're in 2005, and --

 4             MR. PYSER:  Counsel, again, please let him

 5        finish his answer before you begin your next

 6        question.

 7   BY MR. PAPANTONIO:

 8        Q.   We're now in 2005.  And there's no

 9   training, according to this.

10             MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   Right?  Isn't that what it says?

13             MR. PYSER:  Object to form.  Calls for

14        speculation.  Misstates evidence.

15             THE WITNESS:  This slide states as you

16        read, the references to insufficient training.

17   BY MR. PAPANTONIO:

18        Q.   Okay.

19        A.   According to this slide.

20             MR. PAPANTONIO:  Let's take a lunch break

21        now.  We'll be back -- let's take 45 minutes.

22             VIDEOGRAPHER:  Going off record at 12:09.

23             (Going off video record at 12:09 p.m.)

24             (Off record discussion.)

25             MR. PYSER:  We're still on the record.
```

```
1        That's incorrect.  There's no discussion about

2        any pending questions.  I refer counsel to the

3        order on discovery and Track 1 cases 2006-2018.

4        Communications between a witness and his or her

5        counsel during a break taken with no question

6        pending shall not be the subject of inquiry.

7        Such conversations are subject to the

8        attorney-client and work product privileges.

9            MR. PAPANTONIO:  No, they're not.  There's

10       another part to it.  But you -- you take

11       whatever avenue you want.  You want to talk to

12       him, go ahead.

13           MR. PYSER:  We will not discuss any

14       pending question, as the rules require.

15           MR. PAPANTONIO:  There's about a dozen of

16       them pending right now.

17           MR. PYSER:  So the record is clear, there

18       is no pending question.  And to the extent there

19       is, I object to any pending question.

20           MS. MOORE:  So Cardinal-Brantley 9 is

21       distribution center map.  Cardinal-Brantley 10,

22       2016 death map.  Cardinal-Brantley 11, 2016

23       death map and Cardinal distribution center map

24       combined.

25        (Cardinal-Brantley 9 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   identification.)

 2        (Cardinal-Brantley 10 was marked for

 3   identification.)

 4        (Cardinal-Brantley 11 was marked for

 5   identification.)

 6              (Off the stenographic record at

 7              12:12 p.m.)

 8              (Returning to video and stenographic

 9              record at 1:17 p.m.)

10              VIDEOGRAPHER:  We're going back on record.

11        Beginning of media file 3.  Time is 1:17.

12   BY MR. PAPANTONIO:

13        Q.   All right.  Sir, when we -- Mr. Brantley,

14   when we broke up, we were talking about 4765.  I

15   think it's in front of you right now.

16              Remember we talked about training?

17        A.   Yes.

18        Q.   Look at page 64.  It's document 4765.

19        A.   Did you say page 64?

20        Q.   Page -- yeah.  It's -- here it is.

21   4765.64.  It may not be the page number, but --

22        A.   Oh, okay.

23        Q.   -- what I'm looking at, 4765.64.

24        A.   I have it.  Thank you.

25        Q.   I think this is where we kind of left off
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1   on this.

 2              So it says:  "Internal client perspective

 3   of QRA."  And that's -- okay, "Internal client

 4   perspective of QRA."

 5              And that's where you worked as -- in your

 6   role at QRA.  Correct?

 7        A.   Yes, from 2005 till --

 8              MR. PAPANTONIO:  Okay.  Let's underline

 9        the first thing it says, "QRA model."

10   BY MR. PAPANTONIO:

11        Q.   See that?

12        A.   Yes.

13        Q.   This is when you were working in QRA,

14   correct?

15        A.   What's the date there?

16        Q.   Take a look at it.  It is 2005.

17        A.   Are we talking -- I was not in QRA in

18   January 2005, when this was --

19        Q.   Okay.

20        A.   -- presented.

21        Q.   So -- so it says:  "Number 1, quality is

22   not a mindset at Cardinal Health."

23              See that?

24              MR. PAPANTONIO:  Underline that:  "Quality

25        is not a mindset at Cardinal Health."
```

```
 1   BY MR. PAPANTONIO:

 2         Q.   Then it says:  "We are not proactive."

 3              MR. PAPANTONIO:  Underline "We are not

 4        proactive."

 5   BY MR. PAPANTONIO:

 6         Q.   And then it says:  "This is not high

 7   enough priority today."

 8              See that?  "This is not high enough

 9   priority today."

10              MR. PAPANTONIO:  Underline that.

11   BY MR. PAPANTONIO:

12         Q.   Do you see these things I'm reading -- I'm

13   reading to you?

14         A.   I do.

15         Q.   Okay.  Is this the first time you've seen

16   this?

17         A.   It is.

18         Q.   Did you know that quality, as late as

19   2005, was not a mindset at Cardinal Health?

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22         Q.   Did you -- did you know that?

23         A.   I did not know that.  That is this

24   person's opinion.

25         Q.   Do you know who the person is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Please refresh my memory who wrote this.

 2          Q.    We'll go back to it.

 3          A.    Okay.

 4          Q.    Okay.  Then the second thing it says --

 5    did you know that in 2005, the -- the attitude was,

 6    "We are not proactive."

 7                You see that?  "We are not proactive"?

 8          A.    I do see that.

 9          Q.    And this again is 2005.  And just refresh

10    your -- you're not sure when Cardinal started selling

11    narcotics, whether it was 1999, 2000; you simply

12    don't know.  Correct?

13                MR. PYSER:  Object to form.

14                THE WITNESS:  I don't remember when --

15    BY MR. PAPANTONIO:

16          Q.    Okay.

17          A.    -- Cardinal Health was started.

18          Q.    And it says:  "This is not high enough

19    priority today."

20                You see that?  "This is not high enough

21    priority today"?

22          A.    I see that.

23                MR. PAPANTONIO:  Would you flip up --

24          would you go to that -- that map, what I'll call

25          "the death map," and put it up on the screen,
```

```
 1        2005.  Just put it right next to this document,

 2        if you would, where it says "This is not high

 3        enough priority today."  2005.

 4   BY MR. PAPANTONIO:

 5        Q.   See, that's the map -- that's the map that

 6   the CDC -- where it says "Source, National Center for

 7   Health Statistics."  See that?

 8             You know what CDC is, right?

 9             MR. PYSER:  Object to form on the --

10   BY MR. PAPANTONIO:

11        Q.   Right?

12             MR. PYSER:  -- beginning part of that

13        question.  Misuse of the term "death map."

14             THE WITNESS:  I do know what CDC is.

15   BY MR. PAPANTONIO:

16        Q.   As a matter of fact, it even gives a -- it

17   even gives a site, even gives you a website you can

18   go to to find this.

19             Did you have a computer in your office?

20             MR. PYSER:  Object to form.

21             THE WITNESS:  I did have a computer.

22   BY MR. PAPANTONIO:

23        Q.   Okay.  And then it even gives citations,

24   doesn't it?  See down there?  And it tells you where

25   you can actually get the citations.  1999 through
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    2016.  Do you see that?

2         A.   I can see that.

3         Q.   And then -- and then where we look at this

4    where this is saying "This is not a high enough

5    priority today," this is the number of people that

6    are -- are up here on this map, it's showing the

7    number of people affected by opioids, right?

8              MR. PYSER:  Object to form.  Misstates

9         evidence.

10             THE WITNESS:  I believe the map --

11   BY MR. PAPANTONIO:

12        Q.   I mean, you see the map, don't you, 2005?

13        A.   Yeah.  It's estimated age-adjusted death

14   rate per 100,000, yes.

15        Q.   Right.  And it says:  "Quality is not a

16   mindset at Cardinal Health."

17             Then it goes on to say, "We're not

18   proactive," and that "This is not a high enough

19   priority today."

20             And what I'm wondering, Mr. Brantley, is

21   how many people have to die of -- of drug overdoses

22   before it becomes a priority with Cardinal?

23             MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25        Q.   How many people have to die?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. PYSER:  Object to form.

2              THE WITNESS:  This statement is, as far

3        as -- as far as quality, is someone's opinion.

4    BY MR. PAPANTONIO:

5        Q.  Sir, this was -- this is a -- this is a

6    Cardinal document.  This was created by Cardinal.  In

7    the front of it says "Operation 1, Cardinal Health

8    quality management."

9              We're talking about quality management,

10   right?  Correct?  That's what this document is,

11   quality management?

12             MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14       Q.  True?  Look at the front page.

15       A.  It says "Quality."

16       Q.  Look at the front page.  What does the

17   front of the document say?

18       A.  "Operation 1.  Cardinal Health quality

19   management meeting."

20       Q.  And what were you?  Weren't you a quality

21   manager?

22             MR. PYSER:  Object to form.

23             THE WITNESS:  Not in January 2005, I was

24       not.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   Right.  Okay.  So 2005, if we go back to

 3    that same page that says -- it says:  "This is not --

 4    This is not a high enough priority," what I'm

 5    wondering is, what does it take, in Eric Brantley's

 6    mind, to say that -- what number of deaths make this

 7    a high enough priority to pay attention to?

 8              MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10         Q.   Eric Brantley --

11         A.   Once again --

12         Q.   Eric Brantley.  How many people have to

13    die?

14         A.   Again I go back --

15              MR. PYSER:  Object to form.

16              THE WITNESS:  -- to the quality statement

17         was, apparently, one individual's opinion.

18    BY MR. PAPANTONIO:

19         Q.   Okay.  We're going to -- we're going to

20    talk about -- more about this document, but you don't

21    even know who wrote that, do you?

22              MR. PYSER:  Object to form.

23              THE WITNESS:  I don't remember.

24    BY MR. PAPANTONIO:

25         Q.   Okay.  Because it's marked "Confidential"
```

```
 1   on the bottom of it, but you've seen this before.

 2   True?

 3        A.   I saw it when you gave it to me before

 4   lunch.  That was my first time seeing it, that I

 5   recall.

 6        Q.   Well, let's look at the next line.  It

 7   says:  "When financials are tight, quality suffers."

 8             Did you know that the quality of your

 9   quality management was dependent on your financial

10   status as a company?

11             MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.   Did you know that?  Somebody had made that

14   determination?

15        A.   Again, this is someone's opinion, and I

16   can't speak to someone's opinion.

17        Q.   Well, but did you -- had you ever talked

18   to anybody about these things that are laid out in

19   a -- in a team?

20             Now, let me just ask you:  Who was Gary

21   Dech?  Delch?  Dolch, D-o-l-c-h.  Who was Gary Dolch?

22        A.   Gary Dolch?

23        Q.   Yeah.

24        A.   I believe he was a VP or something like

25   that in the quality regulatory affairs department.
```

```
 1          Q.   Right.  And how about Tony Esposito?  You

 2   knew Tony, didn't you?

 3          A.   I don't recall Tony Esposito.

 4          Q.   Well, did you know John Figalora?

 5          A.   I don't think I've ever seen that name.

 6          Q.   Kim Arnold?

 7          A.   Again, I don't recall a Kim Arnold.

 8          Q.   Well, these are -- you see where they're

 9   all listed, it says:  "Operation 1, Cardinal Health,

10   Audit and Compliance."

11               You see that?

12          A.   I do.

13          Q.   And you were in quality compliance,

14   weren't you?  That was part of your role as quality

15   compliance?

16          A.   Again, January 13th through 14th, 2005, I

17   was not in that role.

18          Q.   Okay.  And we know this -- let's say that

19   Cardinal started selling these narcotics in the year

20   2000.  We're five years down the road here.

21               You understand that?  We're talking about

22   2005 here.

23               MR. PYSER:  Object to form.

24               THE WITNESS:  I understand you're just

25        saying from 2000 to 2005, yes.
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Do you know what the death rate was for --

 3   how many human beings were dying every day from

 4   opioids, specifically opioid narcotics, from

 5   overdoses?  Do you know that number?

 6        A.   I do not know that number.

 7        Q.   Has anybody ever told you that number that

 8   you can think of, and maybe you forgot?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  I do not recall anyone

11        telling me that number, other than I think you

12        may have discussed that prior to lunch on that

13        chart.

14   BY MR. PAPANTONIO:

15        Q.   All right.  Let's go back to point 64,

16   that same document.  You see where it says "People"?

17        A.   Yes.

18        Q.   It says:  "Under resourced today."

19             See that?

20        A.   Yes.

21        Q.   Says:  "People we have are good, but they

22   don't have enough bench strength."

23             Do you know how many employees this

24   company had in 2005?

25             MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I do not.

 2    BY MR. PAPANTONIO:

 3         Q.   Do you know how many billions of dollars

 4    they were making in 2005?

 5                    MR. PYSER:  Object to form.

 6                    THE WITNESS:  I do not.

 7    BY MR. PAPANTONIO:

 8         Q.   Do you know what the net worth of the

 9    company was, in billions, in 2005?

10                    MR. PYSER:  Object to form.

11                    THE WITNESS:  I do not.

12    BY MR. PAPANTONIO:

13         Q.   And then -- then next, it says:  "Not

14    enough people."

15                    You see that?

16         A.   I do.

17         Q.   And it says:  "We need to upgrade, and we

18    need to deepen our talent."

19                    Do you see that?

20         A.   I do.

21         Q.   And then you see where it says

22    "Processes"?  It says:  "Keep us out of trouble, but

23    not very proactive or innovative."

24                    You see that?

25         A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   "Not very proactive or innovative."
 2          Did you ever remember a time when you were
 3   with the company where there was just -- y'all were
 4   running out of money, and you just didn't have enough
 5   money to go around and pay for employees?  Was there
 6   ever a time like that that you recall?
 7          MR. PYSER:  Object to form.
 8          THE WITNESS:  Not that I recall.
 9   BY MR. PAPANTONIO:
10          Q.   Was there ever a time where -- where you
11   all were so worried about finances that you couldn't
12   hire extra people to do some of these jobs that
13   needed to be done to -- to prevent diversion?  Do you
14   remember a time like that?
15          A.   I do not recall a time.
16          Q.   It says -- that first line -- "Not very
17   proactive.  Not innovative."
18          And again, we're in 2005 at this point.
19   It says, "Site level measurements and incentives can
20   hinder investment in quality."  See that?
21          A.   I do.
22          Q.   And then the last thing it says:  "Limited
23   policy standardization."
24          Do you know what that means?
25          A.   I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Fair enough.  All right.

2                MR. PAPANTONIO:  Show him 4631.  4631.

3                MS. MOORE:  Cardinal-Brantley 12.

4        (Cardinal-Brantley 12 was marked for

5   identification.)

6   BY MR. PAPANTONIO:

7        Q.    And this is 2005.  You see that?

8        A.    I do.

9        Q.    And were you there 5-12-2005?

10       A.    I was an employee of Cardinal Health,

11   May 12th, 2005, yes.

12       Q.    And then number 1, it says:  "We three

13   wholesalers were asked by Greg Jones if we have

14   specific protocol to monitor possible drug diversion

15   outside of ARCOS activity with Internet pharmacies or

16   wholesale accounts."

17                You see that?  "Greg Jones asked if we

18   have specific protocols to monitor."

19                You see that?

20       A.    I do see that.

21       Q.    "To monitor diversion."

22                You see that?

23                MR. PYSER:  Object to form.

24                THE WITNESS:  I do see that.

25

```
 1   BY MR. PAPANTONIO:

 2        Q.   And then it says:  "To my knowledge, we do

 3   not."

 4             Do you see that?

 5        A.   I do see that.

 6        Q.   And then under -- underneath that, it

 7   says:  "If a distributor or Internet pharmacy

 8   customer is properly licensed and a legal entity to

 9   purchase from us, we typically do not monitor what

10   they purchase or track who they sell to."

11             You see that?

12        A.   I do.

13        Q.   So according to that, I mean, you could

14   have an Internet company that is buying drugs over

15   the Internet.

16             They could be -- they could be a drug

17   cartel, for all you know, right, according to that?

18             MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20        Q.   They could be a drug cartel, couldn't

21   they?

22             MR. PYSER:  Same objection.

23             THE WITNESS:  Again, I go back -- I read

24        what this says, but ingredient limit reports

25        were submitted to the DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   That's not my question.  Listen to my

 3   question very well.

 4       A.   Your -- your question was if they --

 5       Q.   If we -- if we buy what was just stated --

 6   by -- who --

 7            MR. PAPANTONIO:  Carol, let me have that

 8       document again.

 9   BY MR. PAPANTONIO:

10       Q.   If we -- if we agree with what was just

11   stated by Steve Reardon, who is -- who was your

12   supervisor, correct?

13       A.   What are we agreeing to?

14       Q.   Hang on.  Let -- let me finish my

15   question.

16       A.   Well, you asked a question --

17       Q.   No, I haven't asked a question.

18       A.   Okay.

19       Q.   If we agree what Steve Reardon says, that

20   "To my knowledge, we don't have a monitoring system,

21   and we typically don't monitor -- monitor or track

22   Internet sales," you don't know where the drugs are

23   going, do you?

24            MR. PYSER:  Object to form.  That's

25       blatantly misleading.  This is not an e-mail
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          from Steve Reardon.

 2              MR. PAPANTONIO:  It's got Steve Reardon's

 3          name on it -- you're right.

 4    BY MR. PAPANTONIO:

 5          Q.   It's got Steve Reardon's name on it,

 6    right?

 7          A.   I was just going to ask, where did you

 8    read that, because --

 9          Q.   It's got --

10          A.   -- I don't remember reading that.

11          Q.   -- Steve Reardon's name.

12              I did misstate it, didn't I?

13              It says -- it says "Mark Mitchell" -- who

14    you know, correct?

15          A.   No.

16          Q.   You don't know Mark?

17          A.   No.

18          Q.   It says "To Steve Reardon."

19              Do you see "Reardon," right there?

20          A.   I do.

21          Q.   And he was your boss, correct?

22          A.   Yes.

23          Q.   And if we believe what is being said here,

24    let's -- actually, by Mark Mitchell, it says:  "To my

25    knowledge, we don't have a monitoring system for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Internet pharmacies."

 2              That's what it says, doesn't it?

 3              MR. PYSER:  Object to form.

 4              THE WITNESS:  That is what Mark says.  I

 5        don't agree with that.

 6    BY MR. PAPANTONIO:

 7         Q.   Well, okay.

 8         A.   Who is Mark Mitchell?  Vice president,

 9    health system sales?

10         Q.   Yeah, who is Steve Reardon?  Steve Reardon

11    did your job, didn't he?

12              MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14         Q.   He was your boss, correct?

15         A.   Steve Reardon was my boss.

16         Q.   And he's on a document that says:  "You

17    know what?  We typically don't monitor Internet

18    sales."

19              That's what it says, doesn't it?

20         A.   It does say that.

21              MR. PYSER:  Objection.

22              THE WITNESS:  Steve did not draft that

23        document.

24    BY MR. PAPANTONIO:

25         Q.   And you understand --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   -- if you are not monitoring sales, this

 4   stuff could be going all over the country, to drug

 5   cartels, for all we know, right?

 6                  MR. PYSER:  Object.

 7   BY MR. PAPANTONIO:

 8        Q.   If that's true, it could be going to drug

 9   cartels.  Yes?

10        A.   You started your question with, "If you

11   don't monitor sales."

12        Q.   Yes.

13        A.   And again I state, we were submitting

14   ingredient limit reports to DEA on a monthly basis.

15        Q.   That's not my question.  If we don't have

16   a way -- your company, Cardinal -- doesn't have a way

17   to monitor Internet sales, for all you know,

18   Mr. Brantley, those sales could be going to drug

19   cartels all over the country:  Yes or no?

20                  MR. PYSER:  Object to form.

21                  And also an objection to the prior

22      question.  I didn't want to disrupt --

23   BY MR. PAPANTONIO:

24        Q.   Yes or no?

25                  MR. PYSER:  -- the questioner.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Again, you asked a question,
 2         if we do not have this.
 3    BY MR. PAPANTONIO:
 4         Q.    Right.  If you don't --
 5         A.    We did have this.  So that's my answer to
 6    the question.
 7         Q.    Not according to this document, you don't.
 8         A.    This -- this document is not from Steve
 9    Reardon.  It's from Mark Mitchell and health system
10    sales, who I do not know.
11         Q.    Sales.  He's in the business of sales,
12    right?
13                    MR. PYSER:  Object to form.
14                    THE WITNESS:  He's in --
15    BY MR. PAPANTONIO:
16         Q.    He's selling?
17         A.    He's in sales; he's not in QRA.
18         Q.    That doesn't make -- he's in sales, and he
19    works for the company, gets a paycheck from your
20    company, doesn't he?
21                    MR. PYSER:  Object to form.
22    BY MR. PAPANTONIO:
23         Q.    Yes or no?
24         A.    At this -- time of this e-mail, I'm to
25    assume that he was an employee of the company, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.  All right.  All right, so let's talk about
 2   444.  44 -- 4444.  How about that?  Take a look at
 3   4444.
 4          Right now, what I'm doing as you look at
 5   this, I'm going through the systems that you had in
 6   place while you were there.  Okay?
 7          MS. MOORE:  Cardinal-Brantley 13.
 8     (Cardinal-Brantley 13 was marked for
 9   identification.)
10          THE WITNESS:  Okay.
11   BY MR. PAPANTONIO:
12          Q.  I'm asking you questions about the systems
13   that they had in place -- that you had in place.  So
14   as we go, take a look at this document, 4444.
15          Have you seen this document?
16          It's got your name on it; that's why I was
17   wondering.
18          A.  I don't recall seeing it, but if it was
19   sent to me --
20          Q.  Yeah, it was sent to you.
21          A.  -- back in 2006 --
22          Q.  Right.
23          A.  -- I'm sure I saw it at the time.
24          Q.  It says:  "Attached find the report
25   detailing the findings of the compliance assessment
```

Highly Confidential - Subject to Further Confidentiality Review

 1    conducted at the pharmaceutical distribution facility

 2    in Birmingham, Alabama."

 3            That was an area that you were responsible

 4    for, correct?

 5        A.   By "responsible," if you mean did I review

 6    ingredient limit reports --

 7        Q.   Right.

 8        A.   -- if it was a Cardinal Health

 9    distribution center, yes.

10        Q.   Okay.  And it says:  "From June 26th to

11    June 29th, 2006, a regulatory compliance review was

12    conducted at the pharmaceutical distribution Dohman

13    facility in Birmingham."

14            You're familiar with that facility, right?

15        A.   No.  So -- this is probably why.  So if

16    this was a Dohmen facility --

17        Q.   Yeah.

18        A.   -- which is -- which is what you said,

19    I --

20        Q.   Well, tell the jury who a Dohmen facility

21    is.  We haven't talked about that.  Who are they?

22        A.   Again --

23            MR. PYSER:  Counsel, please let him finish

24        his answer.

25            THE WITNESS:  -- there was an acquisition

Highly Confidential - Subject to Further Confidentiality Review

```
 1        at some point.  We discussed it earlier with, I

 2        believe, the RKR, and you asked about sales --

 3   BY MR. PAPANTONIO:

 4        Q.   Right.

 5        A.   -- and I told you that there was an

 6   acquisition and a Dohmen.

 7        Q.   Uh-huh.

 8        A.   So if this was a Dohmen facility -- which

 9   is why -- I'm very -- I'm not very familiar with the

10   Birmingham, Alabama, location.  It may have been a

11   Dohmen facility.  You read that somewhere.  I may not

12   have had responsibility --

13        Q.   It's got your name --

14        A.   -- for reviewing reports for Dohmen.

15        Q.   It's got your name on it, doesn't it?

16        A.   The -- the e-mail was sent to me, yes,

17   but --

18        Q.   Yeah.  And when you got -- so you got the

19   e-mail.

20             You don't remember getting the e-mail,

21   right?

22        A.   That is correct.

23        Q.   And then if you look at page 4, you see

24   where it says "Significant issues"?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   See where it says "DEA" -- it says:  "DEA

2   theft loss reports are not submitted to DEA within

3   7 days of discovery."

4             And you know that they were supposed to

5   be, right?

6             MR. PYSER:  Object to form.

7             THE WITNESS:  DEA, theft loss reports.

8        Would that be a 106?

9   BY MR. PAPANTONIO:

10       Q.   Uh-huh.  You know they're supposed to be

11  reported, correct?  Within 7 days?

12            Yes or no?  Do you know?

13       A.   Sir, I'm -- I'm trying to remember the

14  regulation.  You asked me a question.

15       Q.   Okay.

16       A.   So I do know that the 106s must be filed

17  within a certain time of discovery.  I don't remember

18  the time frame.

19            If it says 7 days here, I'm going with

20  what it says here.  I know that it needs to be filed

21  within X amount of days of discovery.  I just don't

22  remember the exact time frame.

23       Q.   And why is that so important, that you

24  report theft from your facilities?  Tell the jury why

25  that's so important.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   We report theft and loss from distribution

2    centers so that the DEA is aware that there has been

3    a theft or a loss at the facility.

4          Q.   Then it goes:  "Customers were receiving

5    scheduled product they were not entitled to receive

6    due to their DEA registrations are not being reviewed

7    and set up correctly in the computer system."

8               Is that something you were in charge of?

9               MR. PYSER:  Object to form.

10              THE WITNESS:  No, I was not in charge of

11        that.

12              And -- and I would just like to ask, was

13        this a Dohmen facility, or what was this --

14   BY MR. PAPANTONIO:

15        Q.   The document's going to speak for itself.

16   I don't think it's -- we're not just talking about

17   Dohmen.  If you take a look at it, you'll see that,

18   but . . .

19        A.   Okay.

20        Q.   So it says --

21        A.   No, I was not responsible for that.

22        Q.   Okay.  It says "There is" --

23              MR. PYSER:  Feel free to -- feel free to

24        review the document as long as you need in

25        order --

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   You see where it says --

 3             MR. PYSER:  -- to answer the question.

 4   BY MR. PAPANTONIO:

 5        Q.   -- "There is no system to determine

 6   excessive or suspicious ordering"?

 7             Did you see that?  That's right up

 8   underneath.  It says -- in plain words:  "There is no

 9   system to determine excessive or suspicious ordering

10   by customers of controlled substance products."

11             You see that?

12        A.   I do see that.

13        Q.   And you know there's supposed to be,

14   correct?  There's supposed to be a system to

15   determine excessive or suspicious orders by a

16   customer?

17             MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   True?

20        A.   21CFR states that a registrant should have

21   a system in place to detect and report suspicious

22   orders.

23        Q.   And this says there is no system.

24             That's what it says, doesn't it?  There is

25   no system; there is no system to determine suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    ordering.  That's what this says, correct?

 2         A.   So if -- if --

 3         Q.   Well, first of all, answer my question.

 4              There is -- according to this document,

 5    there is no system to determine suspicious ordering,

 6    according to that line.

 7              That's what it says, right?

 8         A.   According to that line --

 9              MR. PYSER:  Object to -- object to form.

10              You've got to let him answer the question.

11              MR. PAPANTONIO:  No, I'm going to -- I'm

12         going to ask a question, and he's going to

13         answer the question.  If you want to give

14         speeches, that's your opportunity to do -- it's

15         called a redirect; you can do that.  Feel free

16         to do it.

17              MR. PYSER:  Counsel, you asked him a

18         question --

19              MR. PAPANTONIO:  I'm going to move on.

20              MR. PYSER:  -- "So that's what that says,

21         correct?"  He began to answer, and you asked a

22         different question.

23    BY MR. PAPANTONIO:

24         Q.   Is that what that says?  Correct?  Am I

25    right that this says, "There is no system to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   determine excessive or suspicious ordering"?  Yes or
 2   no?  Does it say that?
 3              MR. PYSER:  Object to form.
 4              THE WITNESS:  That is what this says.  And
 5         if you are going to ask me questions about this
 6         document, I would like to read it to see if it
 7         is indeed Dohmen.
 8   BY MR. PAPANTONIO:
 9         Q.   Fine.  Go off the clock, because we're not
10   going to take time --
11              MR. PYSER:  No, we're going to stay on the
12         record --
13   BY MR. PAPANTONIO:
14         Q.   -- to read it on the record.
15              MR. PAPANTONIO:  No, we're not.  But we
16         stay on the record --
17              MR. PYSER:  He's going to read it if he
18         needs to read it.
19              THE WITNESS:  I want to read this document
20         to see if it --
21              MR. PAPANTONIO:  You can read it, but it's
22         not going to be on our time, friend; okay?  It's
23         not going to be on our time.
24              THE WITNESS:  I just want to read the
25         document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. PAPANTONIO:  Just keep up with the

 2        time on this.

 3    BY MR. PAPANTONIO:

 4        Q.   We're not going to go on our time for you

 5    to read the document.

 6                   How many hours did you prepare for this

 7    deposition?

 8        A.   This is my first time seeing this

 9    document --

10        Q.   How many --

11        A.   -- and you're asking me questions -- you

12    asked me that earlier, and I said I did not know, and

13    that's my same answer --

14        Q.   Was it more than 12?

15        A.   More than 12 what?

16        Q.   Hours.

17        A.   Probably -- yes.

18        Q.   Was it two days?

19        A.   Meaning -- meaning 48 hours?  No.

20        Q.   Was it three days?

21        A.   Meaning 72 hours?  No.

22        Q.   How many hours was it?

23        A.   Again, I don't know.  But I did not review

24    this document.  You're --

25        Q.   Right.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   You're asking me questions --

2          Q.   Nobody from the company showed you -- not

3   your lawyer, but nobody from the company showed you

4   this document before you came in here, where it says,

5   "There is no system to determine suspicious

6   ordering," nobody showed that to you prior to me

7   showing it to you right now, correct?

8               MR. PYSER:   Object to form.

9   BY MR. PAPANTONIO:

10         Q.   Yes or no?

11         A.   That is correct.

12              So I'm going to read the document if

13  you're going to continue asking me questions about

14  the document.

15         Q.   Only thing I'm asking you is one page.  If

16  your attorney wants to ask you questions after that,

17  he can do it, but I'm asking the questions I want to

18  ask.  That's my right to do it.  That's how this

19  works.

20         A.   And it's my right to read the document, I

21  believe.

22         Q.   You're right.  And you haven't read the

23  document.  Take a minute -- if you want to take --

24  and we're going to just go off the record --

25         A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   -- so we don't spend our time doing

 2    something you haven't done before you came here

 3    today.

 4          A.   Okay.

 5          Q.   Okay?

 6               MR. PAPANTONIO:  Give me a time.

 7               THE WITNESS:  How much time do I have?  Am

 8        I limited?  Do I have ten minutes, do I have --

 9    BY MR. PAPANTONIO:

10          Q.   You -- you have --

11          A.   -- five hours?

12          Q.   -- as much time as you want, because right

13    now we're going off the record --

14          A.   Okay.

15          Q.   -- and I'm going to get the time back

16    anyway.

17          A.   Okay.  Sounds good.

18               VIDEOGRAPHER:  Going off record.  Time

19        is 1:43.

20               (Off the video record at 1:43 p.m.)

21               MR. PAPANTONIO:  Keep the camera rolling.

22        No, I want the judge to see this.

23               MR. PYSER:  Counsel --

24               MR. PAPANTONIO:  No, I have the right to

25        do it.  I want the camera rolling, because I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          going to bring this up to special counsel.  And

 2          we're going to take the depo again if --

 3               MR. PYSER:  If you're going to keep the

 4          camera rolling, we're on the record.  You can

 5          have it on the record or off the record.

 6               MR. PAPANTONIO:  We're off the record with

 7          the camera rolling.

 8               MR. PYSER:  You can be on the record or

 9          off the record, but you can't be off the record

10          with the camera on.

11               MR. PAPANTONIO:  We're going to have the

12          camera on, and we're going to be off the record,

13          then, because we're wasting time because you

14          don't have this witness prepared.  That's your

15          job.  They meet with witnesses and they talk

16          with them about documents.

17               MR. PYSER:  Counselor, you're showing him

18          a document from 12 years ago.

19               MR. PAPANTONIO:  Right.

20               THE WITNESS:  I've read what I needed.

21               MR. PAPANTONIO:  You can.  Okay.  Good.

22               VIDEOGRAPHER:  All right.  Stand by to go

23          back on.

24               MR. PYSER:  I will say for the record that

25          the time taken, because counsel wanted him to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        review a record should count against his own

 2        time.

 3   BY MR. PAPANTONIO:

 4        Q.   Okay.  Upon review --

 5             VIDEOGRAPHER:  We're going back on the

 6        video record.  The time is 1:44.

 7             (Back on the video record at 1:44 p.m.)

 8   BY MR. PAPANTONIO:

 9        Q.   Upon review of purchase and sales, DEA

10   forms, you -- what -- tell me what DEA Form 222 is.

11        A.   A DEA Form 222 is a form that's in

12   triplicate of a brown, a green, and a blue, that is

13   used for the sale and distribution of Schedule II

14   controlled substances.

15        Q.   And according to this, it had customer

16   data missing.  Correct?

17        A.   I'm sorry, I just -- I lost my page.

18        Q.   So it says --

19        A.   What page are we on?

20        Q.   We're on page -- what's that page number?

21             I don't know what page you're on.  Hang

22   on.  What is it -- 4.  Page 4.

23             See where it says:  "Upon review of

24   purchase and sales, DEA form 222, several errors were

25   found, including data was missing."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  You don't want data missing on a --

 2      something that's a 222, do you?  That's not a good

 3      thing, is it?

 4                  MR. PYSER:  Object to form.

 5                  THE WITNESS:  Based on this statement, I

 6          don't know what data was missing.

 7      BY MR. PAPANTONIO:

 8          Q.   Then it says:  "Controlled substance

 9      returns to vendors are shipped without proof of

10      delivery."

11                  You understand that?  "Controlled

12      substance returns to vendors are shipped without

13      proof of delivery."

14                  See that?

15          A.   I do see that.

16          Q.   That would be improper, wouldn't it?

17                  MR. PYSER:  Object to form.

18                  THE WITNESS:  I don't know if I fully

19          understand what that means.

20      BY MR. PAPANTONIO:

21          Q.   Okay.  Fair enough.

22                  "Destruction and theft losses of ARCOS

23      reportable items are not being consistently reported

24      to ARCOS."

25                  Tell the jury what "ARCOS" is.  They've
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    heard about it by this time in the trial, but tell

 2    them what your -- you describe ARCOS for them.

 3         A.   ARCOS is an automated reporting tool for

 4    Schedule II controlled substances.  It tracks the

 5    transactions of those drugs from receipt to sale.  It

 6    tracks -- basically -- basically that's it.  It

 7    tracks the movement of Schedule II ARCOS

 8    reportable -- ARCOS reportable controlled substances.

 9         Q.   Go to the next page, point 5, very next

10    page.

11              See where it says "DEA," about halfway

12    down the page?

13         A.   Yes.

14         Q.   It says:  "DEA quarterly exception report

15    is not used to verify customers' licensure is still

16    active."

17              See that?

18         A.   I do.

19         Q.   What is "a customers' licensure"?

20         A.   The license.  If the -- either the State

21    license or the DEA license; I don't know which one

22    this statement is referring to.

23         Q.   So according to this, there's no report

24    used to verify a customer's license is even active,

25    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              THE WITNESS:  According to this, a

 3        quarterly exception report is not used.

 4   BY MR. PAPANTONIO:

 5        Q.   Yeah.  Well, tell -- what's a quarterly

 6   exception -- what is that report?

 7        A.   I really don't know.  There are various

 8   ways to identify or to verify a DEA registration.

 9   I'm not sure what the exception report, the quarterly

10   exception report is.

11        Q.   Fair enough.  Look at page 7.  Point 7.

12              You see where it says down here,

13   "Controlled substance order filing"?

14        A.   Yes.

15        Q.   "There is no system in place" -- "There is

16   no system in place to determine excessive purchasing

17   of controlled substance products."

18              Do you see that?

19        A.   I do see that.

20        Q.   And that is improper, not to have a system

21   to determine excessive purchasing?  That's improper,

22   isn't it?

23              MR. PYSER:  Object to form.

24              THE WITNESS:  The regulation states,

25        21 CFR 1301.74(b), that a system must be in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        place to identify and report suspicious orders.

 2   BY MR. PAPANTONIO:

 3        Q.   And if you'll go to -- tell us, first of

 4   all, what is a "periodic controlled substance

 5   inventory"?  What is that, "periodic controlled

 6   substance inventory"?

 7        A.   A periodic control substance inventory?

 8        Q.   Uh-huh.

 9        A.   There are several inventories taken of

10   controlled substances, so I don't know what this is

11   referring to.

12             But there is a daily movement count; any

13   controlled substance that had a movement the previous

14   day is counted in the cage and vault.  There is an

15   inventory taken at -- I think the end of the month

16   for certain substances.  You have your ARCOS report.

17   Inventory, you have your biannual, biannual

18   inventory.

19             So there are several inventories.  I don't

20   know what this one is exactly referring to.

21        Q.   Tell the jury why these inventory reports

22   are important.

23             MR. PYSER:  Object to form.

24             THE WITNESS:  Well -- well, I --

25
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Why are they important?

 3        A.   Which report are we referring to?

 4        Q.   Any type of inventory report.

 5             Why are inventory reports important?

 6        A.   Well, the biannual inventory is required

 7   by the CFR.

 8        Q.   Right.

 9        A.   Yes.

10        Q.   And tell the jury what that is.

11        A.   What what is?

12        Q.   Biannual.

13        A.   It's an annual -- it's a report taken

14   every two years.

15        Q.   And it's to keep up with the drugs that

16   are supposed to have been moving through the hands of

17   Cardinal, correct?

18        A.   It's an inventory of all the drugs from

19   the cage vault.

20             MR. PAPANTONIO:  All right.  Let's go

21        1165.  Show him 1165.

22             MS. MOORE:  This will be

23        Cardinal-Brantley 14.

24        ( Cardinal-Brantley 14 was marked for

25   identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   You've seen this, haven't you?

 3        A.   This is a McKesson document.

 4        Q.   Right.  Have you seen this?

 5        A.   No, I have not.

 6        Q.   Do you understand that the same

 7   presentation was made to Cardinal?  Did you know

 8   that?

 9             MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   From the DEA?

12             MR. PYSER:  Object to form.

13             THE WITNESS:  Again, I've never seen this

14        document.

15   BY MR. PAPANTONIO:

16        Q.   Well, I'll show you --

17        A.   And it's a McKesson document.

18        Q.   Well, okay.  Did you know that Purdue --

19   you're working for Purdue right now, right?

20        A.   Correct.

21        Q.   And you know they were fined $635 million

22   in 2007?  You knew that, right?

23             MR. LAFATA:  Object to form.

24   BY MR. PAPANTONIO:

25        Q.   They were fined $635 million in 2007?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2                    MR. LAFATA:  Object to form.

 3                    THE WITNESS:  I don't know --

 4   BY MR. PAPANTONIO:

 5        Q.   Right?

 6        A.   -- the exact amount.  I -- there was some

 7   type of fine or settlement at some point.

 8        Q.   Well, you know that they were criminally

 9   indicted?  You know that?

10                    MR. LAFATA:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   Before you went to work with them, you

13   knew that, didn't you?

14        A.   I did not know that.

15                    MR. LAFATA:  Same objection.

16   BY MR. PAPANTONIO:

17        Q.   Is that the first time you've heard that?

18   The people you've been -- how many -- how many years

19   you been working with Purdue?

20        A.   Since February 2017.

21        Q.   Okay.  So -- so I'm just telling you this

22   for the first time, that the company you went to work

23   for was criminally investigated, was fined

24   $635 million; that's the first time you've heard

25   that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LAFATA:  Object to form.

 2                    MR. PYSER:  Object to form.

 3                    THE WITNESS:  I do not know the details of

 4          that settlement, or whatever that was.

 5    BY MR. PAPANTONIO:

 6          Q.   Is that important to you, that you went to

 7    work with a company that had actually been criminally

 8    investigated by the Department of Justice?

 9                    MR. PYSER:  Object.

10    BY MR. PAPANTONIO:

11          Q.   Does that bother you at all, that you're

12    working for a company that's selling narcotics all

13    across the country, and they've been criminally

14    investigated by the Department of Justice?  Does that

15    concern you at all, as we sit here?

16                    MR. PYSER:  Object to form.

17                    THE WITNESS:  With the scope of the --

18          whatever it is that you're referring to, that

19          settlement or whatever it is -- again, I don't

20          know all the details.

21    BY MR. PAPANTONIO:

22          Q.   Right.

23          A.   So to put it into the full context, I

24    can't answer that.  I -- I'm employed by Purdue.

25          Q.   But you knew this --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I was aware of the settlement, penalty,

 2   whatever it was.

 3          Q.   Did you -- were you aware of the fact

 4   that -- that Purdue was accused of phoneying --

 5   phoneying up research to make it look like the

 6   product they were making was not addictive?  Did you

 7   know that --

 8               MR. LAFATA:  Object to form.

 9   BY MR. PAPANTONIO:

10          Q.   -- before you went to work with this

11   company, Purdue?

12               MR. PYSER:  Object to form.

13               THE WITNESS:  Again, I did not know the

14      details of the proceedings back then.

15   BY MR. PAPANTONIO:

16          Q.   Go ahead.

17          A.   I was aware of a monetary settlement or

18   fine or whatever it was, but I was not aware of the

19   details of the settlement.  So I can't speak to that.

20          Q.   All right.  Well, we're going to go back

21   to that, but I just want to know what you knew prior

22   to coming in here.

23               Did you know that in 2000, the year 2000,

24   the GAO -- excuse me -- yeah, GAO had determined that

25   Purdue was making up lies about the safety of their
```

```
 1   product?  Did you know that?
 2              MR. PYSER:  Object to form.
 3   BY MR. PAPANTONIO:
 4        Q.    Prior to coming in here today, before you
 5   went to work for them?
 6              MR. PYSER:  Object to form.
 7              THE WITNESS:  Again, I don't know all of
 8         the details about the proceedings from the
 9         settlement, fine, whatever it was.
10   BY MR. PAPANTONIO:
11        Q.    Well, Mr. Brantley, is it important that
12   you know about the background of a company before you
13   go to work with them?  Is that important to you, Eric
14   Brantley, as we sit here today?
15        A.    Again --
16              MR. LAFATA:  Object to form.  Asked and
17         answered.
18   BY MR. PAPANTONIO:
19        Q.    Is that important?
20        A.    Again, I knew of some amount of a
21   settlement, fine, whichever it was; did not know all
22   the details.  I have read some.  And that's what I
23   know, and that's what I can speak to.
24              I do not -- to this day, I do not know all
25   of the details of whatever happened with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    settlement or the fine or the case.

2        Q.   So it doesn't -- it doesn't matter to you,

3    right?  It doesn't matter to, Eric Brantley, that --

4    what Purdue did?  That just doesn't matter to you,

5    does it?

6            MR. LAFATA:  Same objection.

7            THE WITNESS:  Again, I was aware of an

8        amount of money that was paid for a fine,

9        settlement, back then.  I don't remember the

10       year, but I was aware of it.

11   BY MR. PAPANTONIO:

12       Q.   And you know what they did?  Can you tell

13   the jury what they did, as far as what your -- what

14   was in your head when you said, "Yeah, I'm going to

15   go to work with this company"?

16           What was in your head when --

17       A.   I did not know what they did.

18       Q.   You still today, you don't -- you still

19   don't know what they did?

20       A.   To this day, I have not read the details

21   of the settlement.

22           Just because I'm an employee of the

23   company does not mean I know everything that happened

24   as -- as far as a settlement or a fine or whatever

25   the case was.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   But you have a choice where you want to go

 2    to work, don't you?  I mean, you can choose what

 3    company you want to go to work for, correct?

 4            A.   Yes.

 5            Q.   And you made the choice, with the

 6    information you had about Purdue, that you're going

 7    to work with them --

 8                 MR. PYSER:  Object --

 9    BY MR. PAPANTONIO:

10            Q.   -- true?

11                 MR. PYSER:  Object to form.

12                 THE WITNESS:  I am a current employee of

13        Purdue.

14    BY MR. PAPANTONIO:

15            Q.   Okay.  We'll come back to that.

16                 Let's go to -- let's go to page -- do you

17    have the document?

18            A.   Are we still in the McKesson document?

19            Q.   Yeah.  Yeah, yeah.  Go to page -- go to

20    point 15 in that document.

21                 MS. CHARLES:  I object to using a McKesson

22        confidential document.  You have not asked

23        permission to use the document with this

24        witness.  You only asked permission to use it on

25        Friday, with a further note that he is a Purdue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        employee, and you have not asked to use that for

 2        this deposition.

 3   BY MR. PAPANTONIO:

 4        Q.   All right.  Go to page -- go to point 15,

 5   please.

 6        A.   Okay.

 7        Q.   Now, you see this list that's up there.

 8   You see this document -- see this list?  Have you

 9   ever seen that list before?

10        A.   Again, this is a McKesson document, so I

11   would not have seen it.

12        Q.   Well, how about -- how about I'm getting

13   ready to show it to you in a Cardinal document?

14             Now, do you see --

15             MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   You see where it says "DEA" --

18             MR. PYSER:  Strike counsel's speech.

19   BY MR. PAPANTONIO:

20        Q.   You see where it says "DEA numbers"?

21        A.   I do.

22        Q.   And you're going to love this.

23             What is the DEA number again?

24             MR. PYSER:  Object to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   Let me ask you:  What is the DEA number?

 3       A.   That's the DEA registration.

 4       Q.   Right.  And what -- in -- why is that

 5   important, that DEA number?

 6       A.   That's the registration to distribute

 7   controlled substances.

 8       Q.   Right.  And a person that wants to find

 9   out about one of these registrants, they can actually

10   track them down with the DEA number, can't they?

11       A.   What do you mean by "track them down"?

12       Q.   They can find out everything they want to

13   about any of these people through a DEA number, can't

14   they?

15           MR. PYSER:  Object to form.

16           THE WITNESS:  No.  The DEA number only

17       tells you their address and their -- the type of

18       registration, whether they're a distributor or a

19       pharmacy.  It tells you their location.

20   BY MR. PAPANTONIO:

21       Q.   But that's -- that's important

22   information, isn't it?  I mean --

23       A.   I mean, it --

24       Q.   It's important information, is what I'm

25   asking.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   It tells you the name, address of the

 2   registrant, and the type of registration:  Are they

 3   engaged as a distributor or a pharmacy or a doctor?

 4          That's what the DEA number tells you.

 5          Q.   Right.  And the name of the pharmacy

 6   certainly is important if you want to find out what

 7   transactions took place with the name of the

 8   pharmacy, with the pharmacy, right?  It's important?

 9   The name of a pharmacy -- see how it's got the name

10   right there?

11          A.   The name of the pharmacy is a part of the

12   DEA registration.

13          Q.   And that's important, isn't it?

14          MR. PYSER:  Object to form.  Vague.

15          THE WITNESS:  I don't know what you're

16      asking.

17   BY MR. PAPANTONIO:

18          Q.   Well, let me show you what I'm asking.

19          A.   Okay.

20          Q.   Do you know that you're -- do you know --

21   and I'm wondering whether you did this or had

22   anything to do with it.

23          MR. PAPANTONIO:  Show him document 4831,

24      please.  Put these side by side.  Would you,

25      please.  This is page -- show him the document
```

```
 1        first.

 2               MS. MOORE:  Cardinal-Brantley 15.

 3         (Cardinal-Brantley 15 was marked for

 4    identification.)

 5    BY MR. PAPANTONIO:

 6         Q.   Page -- go to page 175.  What it will be,

 7    Mr. Brantley, you see down here in the corner, it

 8    will have a point 175 on it:  Point 175.

 9               MR. PAPANTONIO:  Can I have one of those

10        candies, please?

11               THE WITNESS:  Can I take the clip off?

12    BY MR. PAPANTONIO:

13         Q.   Yes, sir, you can take a clip off.

14         A.   I'm sorry, point 175?

15         Q.   Right.  175.

16         A.   Is it going to be this number -- this

17    number?

18         Q.   Here's what it's going to look like.  See

19    up there on the screen?  That's what it's going to

20    look like, the one to the right.

21         A.   I don't see a point number at the bottom

22    of the page.

23         Q.   You don't have a point 175?  Bottom

24    right-hand corner?

25         A.   Is it a CAH MDL number?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   It says -- it will say "P1" -- actually,
 2    you know what's even better than that --
 3          A.   Oh, is that the --
 4          Q.   You see where --
 5          A.   At the top?
 6          Q.   You see right here, it's got 176 on it?
 7    Go to the page that says 176.
 8               You got it?
 9          A.   Is it the same, this one, the screen?
10          Q.   Yes, sir.  It's the same one up on the
11    screen.
12          A.   I'll view it on the screen --
13          Q.   Okay.
14          A.   -- because I can't find it.
15               MR. PYSER:  You can take your time and
16          look at the document, if you want to look at the
17          document and review it.
18               THE WITNESS:  This numbering system, I'm
19          not seeing a point something.  And I'm trying
20          to --
21    BY MR. PAPANTONIO:
22          Q.   Well, maybe counsel can help you with it.
23    That's what -- that's what they're here for, is to
24    help you with this, so -- It's got a 176 --
25          A.   Ah, wait a minute.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    You got it?

2       A.    No, I thought that was it.  122 . . .

3       Q.    Bottom left-hand corner, it will have

4   a 176.

5       A.    Okay.  Now I see your --

6       Q.    There we go.

7       A.    -- system here.

8             I believe it's 175.

9       Q.    Okay.  175.

10      A.    Yes.

11      Q.    Okay.  So you got 175 in front of you,

12  right?

13      A.    Yes.

14      Q.    Now, you notice the difference between the

15  document that appears on the left side of the screen

16  and the document that appears on the right side of

17  the screen?  See that?

18            MR. PYSER:  Object to form.

19            THE WITNESS:  I'm going to look at it

20      here.

21  BY MR. PAPANTONIO:

22      Q.    Yeah, go ahead and look --

23      A.    I have glasses on, but that doesn't --

24  still doesn't allow me to see --

25      Q.    Yeah, look at -- that's fine.  But you see

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the difference between what appears on the document

 2    you're looking at and the document that McKesson sent

 3    us?  See that?

 4              MR. PYSER:  Object to form.

 5              THE WITNESS:  I see the two documents.

 6         Again, what am I looking for?

 7    BY MR. PAPANTONIO:

 8         Q.   Let me -- let me ask you a question about

 9    it.

10              Were you responsible for removing -- were

11    you responsible for removing all those DEA numbers

12    and the names of the pharmacy that don't appear on

13    the Cardinal document?

14              MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16         Q.   It's pretty important, because we're going

17    to ask for sanctions on this.  Okay?

18         A.   Was I responsible for removing --

19         Q.   Just so you understand -- yes, sir.

20         A.   No.

21         Q.   Do you -- do you understand that on the

22    Cardinal document, all of the -- all of the -- the

23    names of the pharmacy -- see that?  They're not --

24    they're not there, are they?

25              MR. PYSER:  Counsel, you just made a
```

```
 1          threat of sanctions.  I'd like to understand the

 2          basis for your threat of sanctions.

 3                  MR. PAPANTONIO:  I won't --

 4                  MR. PYSER:  If you're doing it -- if

 5          you're doing it to intimidate the witness, it's

 6          highly improper.

 7   BY MR. PAPANTONIO:

 8      Q.    Then take sanctions out of it.  That's not

 9   between me -- that's between me and the lawyers.

10                  But you understand that somebody left off

11   the numbers of the pharmacies on the one on the right

12   hand, and they left the names of the pharmacies on

13   the one on the right hand.

14                  Do you see that?

15                  MR. PYSER:  Counsel, are you accusing DEA

16          of sanctions?  Because this is a DEA

17          presentation --

18                  MR. PAPANTONIO:  No, I'm --

19                  MR. PYSER:  -- from 2013.

20                  MR. PAPANTONIO:  I'm accusing your -- I'm

21          accusing your company of removing it before we

22          got it.  That's what I'm accusing it of.

23                  MR. PYSER:  Okay.  And on --

24                  MR. PAPANTONIO:  So -- so --

25                  MR. PYSER:  -- what basis are you accusing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Mr. Brantley of --
 2              MR. PAPANTONIO:  We'll -- we'll take --
 3              MR. PYSER:  -- something that's
 4        sanctionable?
 5              MR. PAPANTONIO:  We'll take this up with
 6        Mr. -- this is not about Mr. Brantley's problem,
 7        unless he did it.
 8              I suspect a lawyer did that that works
 9        somewhere for your organization.  So we're going
10        to find out.
11   BY MR. PAPANTONIO:
12        Q.   Did you have anything to do with removing
13   the numbers, the DEA numbers, on the -- in the
14   document on the right?
15              MR. PYSER:  Object --
16   BY MR. PAPANTONIO:
17        Q.   Did -- did Eric Brantley have anything to
18   do with that?
19              MR. PYSER:  Object to form.
20   BY MR. PAPANTONIO:
21        Q.   Yes or no?
22        A.   No.
23        Q.   Did Eric Brantley have anything to do with
24   removing the names of the pharmacies there on the
25   right side of the document?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Object to form.

 2                  THE WITNESS:  No.

 3      BY MR. PAPANTONIO:

 4           Q.   Eric Brantley?

 5                Huh?

 6           A.   No.

 7           Q.   And you would agree, those -- that -- that

 8      number and the name of that pharmacy tells you a lot,

 9      doesn't it?  If you want information about whether

10      there was any kind of misconduct by the pharmacy, you

11      got to know who they are, right?

12                  MR. PYSER:  Object to form.  Asked and

13           answered.

14      BY MR. PAPANTONIO:

15           Q.   True?

16           A.   It identifies the name and the DEA

17      registration of the registrant.

18           Q.   Okay.  Now, the next document --

19                  MR. PAPANTONIO:  What number is this?

20                  MS. MOORE:  Internet pharmacy.

21                  MR. PAPANTONIO:  Yeah.  Internet -- there

22           we go.  Go to the next one, please.  All right.

23      BY MR. PAPANTONIO:

24           Q.   Now, you see these are all -- these --

25      these are Internet pharmacies.  You see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Counsel, if you're going to

 2         ask him questions about an exhibit, can you show

 3         him the document, please?

 4              MR. PAPANTONIO:  These are Internet

 5         pharmacies.  Yeah, I thought we did.  Go

 6         ahead --

 7              MR. PYSER:  You have not given the witness

 8         that exhibit.

 9              MR. PAPANTONIO:  Yeah.

10              Here, take mine.  Take mine.  I'll use the

11         board up here.

12          (Cardinal-Brantley 16 was marked for

13      identification.)

14      BY MR. PAPANTONIO:

15          Q.   You see the -- where it's all highlighted

16      in red?

17              MR. PYSER:  Feel free to review this

18         exhibit.  It doesn't have a Bates number on it.

19         It's unclear what it is.

20              MR. PAPANTONIO:  Where is it?

21              MS. MOORE:  It's this.

22              MR. PAPANTONIO:  Oh, this is an exhibit.

23      This is a demonstrative exhibit.  Okay.

24      BY MR. PAPANTONIO:

25          Q.   Now, do you see where it's all highlighted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in red?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  I do see red highlights.

 4    BY MR. PAPANTONIO:

 5         Q.   Those are pharmacies, sir.

 6              Out of that entire list -- how many are

 7    there?  34?  34, right?

 8         A.   This list does have 34 --

 9         Q.   Would --

10         A.   -- entities.

11         Q.   Would you count for the jury how many are

12    highlighted in red.

13         A.   I count 21.

14         Q.   Do you -- is there anybody in there with

15    those red that are not Cardinal customers, as far as

16    you know?

17              MR. PYSER:  Object to form.

18              THE WITNESS:  Is there anyone highlighted

19       in red --

20    BY MR. PAPANTONIO:

21         Q.   That are not Cardinal customers.

22         A.   -- that is not a Cardinal customer?

23         Q.   Yeah.

24              MR. PYSER:  Object to form.

25              THE WITNESS:  Are you saying that was not
```

Highly Confidential - Subject to Further Confidentiality Review

1       a Cardinal customer in 2006?

2    BY MR. PAPANTONIO:

3        Q.   Uh-huh.

4            MR. PYSER:  Object to form.

5            THE WITNESS:  I don't remember.  I -- I

6        can't remember all the names of pharmacies.

7    BY MR. PAPANTONIO:

8        Q.   Well, look at MediPharm.

9            You see that, "MediPharm" up there,

10   MediPharm?  Isn't that number 1?

11       A.   MediPharm, yes.

12       Q.   Do you know that you -- that we went --

13   went through this already, but you remember the

14   document that I showed you, 4230, point 21, where we

15   found out that MediPharm had a monthly average in

16   sales of 155,000 opioids?  You remember that?  This

17   thing right here?

18       A.   I do remember seeing that sheet.

19       Q.   Okay.  And do you -- can you go down the

20   list and tell us how many of those -- how many of

21   those that you can recall right now that you did

22   business with?

23           AccuMed:  Do you remember them?

24       A.   No.

25       Q.   New Care:  Don't remember them, huh?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              THE WITNESS:  New Care rings a bell.

 3   BY MR. PAPANTONIO:

 4      Q.   Okay.  So you just don't -- it's been a

 5   long time --

 6      A.   I remember some, and I don't remember

 7   others.  It's been a number of years.

 8      Q.   All right.  Fair enough.

 9              We're going to attach that to the

10   deposition, so hold that -- hold that thing with the

11   red -- with the red there.

12              All right.  What else have you got here?

13   Stand by.

14              MR. PYSER:  Counsel, I'm going to note for

15        the record the -- again, raising objection to

16        the improper threat of sanctions.

17              Had counsel done just a little bit of

18        research, they would have seen that this

19        document is available on a public website, with

20        a .gov address, listed exactly as it's shown,

21        with no pharmacies or DEA numbers listed.

22              MR. PAPANTONIO:  Right, because Cardinal

23        removed them, and that's what we're going to

24        take out.  It doesn't have anything to do with

25        Mr. Brantley.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  That allegation is ridiculous.
 2      And the fact that you raised it with
 3      Mr. Brantley --
 4              MR. PAPANTONIO:  We'll -- we'll -- we'll
 5      see.
 6              MR. PYSER:  -- rather than raising it with
 7      counsel, if you actually have a real concern --
 8              MR. PAPANTONIO:  We'll -- that's what --
 9      that's what --
10              MR. PYSER:  -- is absolutely improper.
11              MR. PAPANTONIO:  That's what hearings are
12      for.  Okay?
13              MR. PYSER:  So you're -- you're more than
14      welcome to use the public website where this
15      document is available --
16              MR. PAPANTONIO:  Right.  Right.
17              MR. PYSER:  -- without accusing Cardinal
18      or Mr. Brantley of removing information.
19              MR. PAPANTONIO:  That's for another day.
20      Mr. Brantley hasn't been accused of anything.
21  BY MR. PAPANTONIO:
22      Q.  You didn't do anything wrong, Mr.
23  Brantley.
24              You had nothing to do with that document,
25  did you?  Either one of those documents.  You had
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    nothing to do with it?

 2         A.    I have not seen those documents.

 3         Q.    Okay.  So that's clear.

 4               MR. PAPANTONIO:  Carol?

 5    BY MR. PAPANTONIO:

 6         Q.    Sir, what we -- tell me, I asked you

 7    earlier whether or not you know Mike Williams, and

 8    you said -- I think you said you didn't know who he

 9    was.

10         A.    That name does not ring a bell.

11         Q.    Okay.  Now, so you have -- have you seen

12    this document, 4453?

13               She's going to get it for you right now.

14         A.    Okay.

15               MS. MOORE:  Cardinal-Brantley 17.

16         (Cardinal-Brantley 17 was marked for

17    identification.)

18               MR. PAPANTONIO:  Do you have a way of

19         marking the section there?  If you can mark a

20         section of the video?  We've got -- we've got it

21         covered, that last section that we just did.  We

22         got it.

23    BY MR. PAPANTONIO:

24         Q.    Okay.  So 4453.  You see that?

25         A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Monday, October 2005.  Results from an

 2    internal quality audit.

 3               Remember, we talked about the need to

 4    audit and -- talked about that earlier?

 5          A.   About audits?

 6          Q.   Yeah.

 7          A.   Okay.

 8          Q.   Okay.  So Mike Williams -- it says:  "DEA

 9    on site background information, package is not

10    update."

11               It says:  "The alarm system has not been

12    tested by the alarm company."

13               You see that?

14               "CCTV equipment is not working properly."

15               Do you see that?

16          A.   I do.

17          Q.   Do you realize -- anybody tell you that

18    Mike Williams was accused of actually stealing and

19    reselling opioids from the facility where he was in

20    charge of security?

21               MR. PYSER:  Object to form.

22    BY MR. PAPANTONIO:

23          Q.   Had anybody told you that prior to coming

24    in here today?

25               MR. PYSER:  Object to form.
```

```
 1              THE WITNESS:  I -- I don't recall that,

 2      no.

 3  BY MR. PAPANTONIO:

 4      Q.   And if -- certainly if you've got the guy

 5  in charge of security that's actually stealing

 6  product and selling it on the street, that would be

 7  called diversion, wouldn't it?

 8              MR. PYSER:  Object to form.

 9              THE WITNESS:  That would be called theft.

10  BY MR. PAPANTONIO:

11      Q.   Would be called theft.

12              And do you understand -- since you don't

13  know Mike, take a look at 4485.  Let's -- let's

14  introduce you to Mike Williams.

15              You would agree that theft of -- theft

16  from a facility that is supposed to be locked down

17  and protected actually promotes diversion, doesn't

18  it?

19              MS. MOORE:  Cardinal-Brantley 18.

20      (Cardinal-Brantley 18 was marked for

21  identification.)

22              THE WITNESS:  I'm sorry --

23  BY MR. PAPANTONIO:

24      Q.   Yeah, you would agree that --

25      A.   -- what's your question?
```

```
 1          Q.   -- a facility that's supposed to be locked

 2    down and the product protected, if it's being sold

 3    from the facility by the guy in charge, the head guy

 4    at security, that actually promotes diversion,

 5    doesn't it?

 6               MR. PYSER:  Object to form.

 7               THE WITNESS:  That's theft.

 8    BY MR. PAPANTONIO:

 9          Q.   Right.  Right.  That's theft, and that's

10    wrong.

11               And you should have systems in place that

12    prevent that, correct?

13          A.   And there are and were systems in place.

14          Q.   There were systems in place?  Let's read

15    this document.

16               It says:  "The police showed up at 7 p.m.

17    tonight asking to talk to a supervisor.  I asked both

18    officers to hide their badges and leave their guns

19    outside so that our folks would not freak out seeing

20    police seizing property.  I also gave them some old

21    Cardinal badges that they wore so folks would think

22    they were part of the audit team or something like

23    that.  The two other officers stayed in the

24    conference room with Althea and interviewed Jeff from

25    maintenance."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 Are you familiar with any of this?

 2         A.   No.

 3         Q.   This is the first time you've ever heard

 4    this before?

 5              MR. PYSER:  Object to form.

 6              THE WITNESS:  Yes.  I do not recall any of

 7       this.

 8    BY MR. PAPANTONIO:

 9         Q.   Okay.  And you don't have any idea how

10    long Mike was involved with security?  Head man at

11    security of this facility?  You don't have any idea?

12         A.   Again, I had not heard of Mike.

13         Q.   And you don't know how many incidents like

14    this, where there's theft from the -- from the

15    facility by employees where drugs are taken from the

16    vault and sold on the street?  You don't have any

17    idea how many times that occurred with Cardinal, do

18    you?

19              MR. PYSER:  Object to form.

20              THE WITNESS:  I do not know.

21    BY MR. PAPANTONIO:

22         Q.   And as a matter of fact, one reason you're

23    given a license to sell the product is because it's

24    your responsibility -- Cardinal's responsibility --

25    to make sure the product is not diverted by way of
```

```
 1    theft, correct?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  One of the responsibilities

 4         is to have systems in place for security of

 5         controlled substances.

 6    BY MR. PAPANTONIO:

 7         Q.   And if you violate this -- if you -- if

 8    you violate that, you're actually violating the

 9    right -- well, you're violating the -- the standard

10    for how you ought to engage in business, aren't you?

11              MR. PYSER:  Object to form.

12              THE WITNESS:  This is referring to an

13         individual.  And again --

14    BY MR. PAPANTONIO:

15         Q.   Right.

16         A.   -- I don't know what this individual did.

17    I don't know the details --

18         Q.   Right.

19         A.   -- and so forth.

20         Q.   Oh, I believe.  I believe it.

21              But you don't know how many times this

22    occurred.  Let's -- let's read it.

23              You don't have any -- any idea how many

24    times this kind of thing occurred to your facilities

25    from Washington to Lakeland, do you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MR. PYSER:  Object --

 2   BY MR. PAPANTONIO:

 3        Q.   You have no idea?

 4               MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6        Q.   Right?

 7        A.   I do not know.

 8        Q.   Okay.

 9               It says -- see where it says:  "They

10   recovered from Mike pills for Xanax and OxyContin."

11               I'm reading right here, you see there

12   "They recovered" --

13        A.   I do see that.

14        Q.   "They recovered from Mike pills for Xanax

15   and OxyContin, 40 milligrams."

16               That's pretty strong, isn't it,

17   40 milligrams?

18               MR. PYSER:  Object to form.

19               THE WITNESS:  What is?  Oxycodone --

20   BY MR. PAPANTONIO:

21        Q.   Yeah.

22        A.   -- 40 milligrams?

23        Q.   That's pretty strong, isn't it?

24        A.   I couldn't speak to the strength.  There

25   are several strengths of oxycodone.
```

```
 1            Q.   "They suspect from the transcripts of

 2    their chat log that Mike has done this in the past.

 3    This time, his motivation was not money.  He was

 4    supposedly exchanging pills for sex."

 5                 And that's the first time you've heard

 6    that story?  That's the first thing I want to ask:

 7    First time you heard that story?

 8                 MR. PYSER:  Object to form.

 9                 THE WITNESS:  Yes.

10    BY MR. PAPANTONIO:

11            Q.   And as we sit here, you're not able to

12    tell me how many times this very thing occurred

13    throughout the country, are you?

14                 MR. PYSER:  Object to form.  Calls for

15        speculation.

16                 THE WITNESS:  I do not know.

17    BY MR. PAPANTONIO:

18            Q.   But you are able to tell me that the

19    responsibility, once they found out that Mike

20    Williams was stealing pills and selling them for sex,

21    what was the responsibility of Cardinal once they

22    found that out?  Tell the jury.

23                 MR. PYSER:  Object to form.

24                 THE WITNESS:  The CFR states that a theft

25        and loss report or a 106 needs to be filed
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        within X number of days of discovery.

 2  BY MR. PAPANTONIO:

 3        Q.   Didn't we establish -- I think we

 4  established it was -- it was 7 days, right?

 5        A.   I believe that's what our earlier document

 6  said, 7 days.

 7        Q.   All right.

 8             MR. PAPANTONIO:  Show him a -- document

 9        4999, please.

10  BY MR. PAPANTONIO:

11        Q.   And before we go to that, I just want to

12  be sure:  Nobody's talked to you about how many times

13  this occurred throughout the country, over what

14  period of time?

15        A.   That is correct.

16        Q.   Okay.

17             MS. MOORE:  Cardinal-Brantley 19.

18        (Cardinal-Brantley 19 was marked for

19  identification.)

20  BY MR. PAPANTONIO:

21        Q.   4999, see where it says, "2007"?

22             MR. PYSER:  4999?

23             MR. PAPANTONIO:  4999.

24             THE WITNESS:  Yes.

25
```

```
 1    BY MR. PAPANTONIO:

 2         Q.   December 18, 2007.

 3         A.   Yes.

 4         Q.   You were still working with the company

 5    then, weren't you?

 6         A.   Yes.

 7         Q.   It says:  "Cardinal Health gets another

 8    controlled substance suspension."

 9              See that?

10         A.   Yes.

11         Q.   It says:  "Dow Jones News Service."

12              And then it says:  "Drug wholesaler

13    Cardinal Health has notified customers that the U.S.

14    Drug Enforcement Administration suspended the

15    company's license to distribute controlled substance

16    from a third distribution center."

17              See that?

18         A.   Yes.

19         Q.   Do you remember this incident?

20         A.   I do not.

21         Q.   Well, you see where there's a -- there's

22    actually a -- a document -- if you look at the third

23    page, there's actually a news article that's attached

24    to the e-mail.  And it says:  "Cardinal Health gets

25    another controlled substance suspension."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              See that?

 2              It says:  "Drug wholesaler Cardinal Health

 3    Incorporated has notified customers that U.S. Drug

 4    Enforcement Administration suspended the company's

 5    license to distribute controlled substances from a

 6    third distributor center."

 7              See that?

 8         A.   Yes.

 9         Q.   Did you know about this?

10         A.   Are these the same three that were listed

11    in the earlier document that you showed me with the

12    settlement agreement?

13         Q.   Some of them are different.  That's why

14    we're going to go through them.

15              MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17         Q.   It says:  "In all three cases the DEA

18    cited problems with the center's distribution of the

19    narcotic pain reliever hydrocodone, known commonly as

20    Vicodin, a Cardinal spokesman said.  The suspensions

21    prohibit the distribution of any controlled

22    substances from the three centers, the spokesman

23    said.  Cardinal, based in Dublin, Ohio, wrote to

24    customers of its Swedesboro, New Jersey,

25    pharmaceutical distribution center last week that the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   DEA would suspend the license to distribute

 2   controlled substances from the facility

 3   December 13th, 2007."

 4           Were you working with the company

 5   December 13, 2007?

 6           MR. PYSER:  Object to form.

 7           THE WITNESS:  Yes.

 8   BY MR. PAPANTONIO:

 9      Q.   "Cardinal didn't issue a news release

10   about the latest suspension, which followed its

11   recent announcements that the DEA was suspending its

12   license to distribute controlled substances from its

13   centers in Auburn, Washington and Lakeland, Florida."

14           You see that?

15      A.   Yes.

16      Q.   And you knew about the suspensions.  We've

17   already talked about them, in Auburn, Washington, and

18   Lakeland, Florida, correct?

19      A.   Yes.  With the earlier document.

20      Q.   Right.  It says:  "The company operates

21   25 pharmaceutical distribution centers."

22           And the jury has already seen a picture of

23   those -- of those distribution centers, correct?

24      A.   I believe an earlier document said 27.

25      Q.   27; it did.  This says 25.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   "The DEA, in an order to Cardinal

 3   suspending the Auburn license, said the company had

 4   failed to maintain effective controls against the

 5   diversion of a particular controlled substance,

 6   citing the sale of hydrocodone to a pharmacy that

 7   allegedly dispensed excessive amounts of drug based

 8   on illegitimate Internet prescriptions."

 9             Now, were you asked to get involved in

10   this investigation at all?  Did anybody from the DEA

11   call you and say, "We need your help as far as this

12   investigation's concerned"?

13             MR. PYSER:  Object to form.

14             THE WITNESS:  What investigation are you

15        referring to?  Because these -- these three are

16        the same that we discussed prior to lunch.

17        Right?

18   BY MR. PAPANTONIO:

19        Q.   Okay.  What -- what I'm asking you,

20   were -- listen to my question.

21             Were you asked to get involved in this at

22   all, as far as an investigation?  Were you asked to

23   comment or interviewed or any involvement in this

24   investigation that we're talking about right here?

25        A.   From the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Yes, sir.

 2             MR. PYSER:  Object to form.

 3             THE WITNESS:  In regards to the Lakeland

 4        facility, I had conversations with the Lakeland

 5        DEA office as I made the recommendation to

 6        discontinue business to certain pharmacies.  And

 7        those were reported to the DEA.

 8   BY MR. PAPANTONIO:

 9        Q.   Okay.

10        A.   And I remember there was an e-mail

11   communication with -- I cannot remember her name, but

12   she was, I believe, the supervisor for the Florida

13   office.

14        Q.   It says -- okay.  It says:  "In spite of a

15   DEA warning about rogue Internet pharmacies,

16   Cardinal's Auburn branch distributed nearly

17   18 million dosage units of hydrocodone to retail

18   pharmacies in the first nine months of this year."

19             Now, do you remember that, that your

20   company distributed 18 million doses of hydrocodone

21   after the DEA had warned you about rogue Internet

22   pharmacies?  Do you remember that?

23             MR. PYSER:  Object to form.

24             THE WITNESS:  I don't remember how many

25        dosage units of a drug was distributed.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   Okay.  Let's see about the next line, see

 3    if you remember anything about that.

 4              "In spite of the DEA warning about rogue

 5    Internet pharmacies, Cardinal's Auburn branch

 6    distributed nearly 18 million doses of -- dosage

 7    units of hydrocodone to retail pharmacies in the

 8    first nine months of this year, including 605,000

 9    units to Burlington Drug Store, which received a

10    suspension of its DEA certificate of registration."

11              You see that?

12         A.   I do.

13         Q.   Now, Burlington -- you're familiar with

14    Burlington, too, aren't you?

15              MR. PAPANTONIO:  Underline Burlington,

16         please?

17              THE WITNESS:  I believe that's the one we

18         discussed earlier in an earlier document.

19    BY MR. PAPANTONIO:

20         Q.   Well, let's go on here.  Where is

21    Burlington?  Tell -- tell me where Burlington is.

22    Where -- where is the location of Burlington?  Is

23    it --

24         A.   I believe it was -- it was serviced by the

25    Auburn facility.  So I want to assume that it was in
```

```
1   Washington state.

2       Q.   Was that within the purview of your job,

3   to take care of looking at -- at orders coming from

4   Washington state?

5       A.   I did review ingredient limit reports for

6   the Auburn facility.

7       Q.   Okay.  You have 1941 in front of you.  Go

8   ahead and take a minute and find 1941.  1941.

9       A.   Is that in this document?

10      Q.   Yes, sir.  It's 1941.  1941.

11      A.   Where would that number be?

12      Q.   That's going to be probably right on the

13  left-hand --

14      A.   Are we still talking about this document?

15      Q.   No, sir.  We're going to a different

16  document.  We're going to 1941.

17      A.   Is that one that I already have?

18      Q.   Yes.

19      A.   Okay.

20      Q.   It will be your third -- about your third

21  exhibit there.

22      A.   Give me --

23      Q.   I told you that we'd come back to it.

24      A.   You said 1941?

25      Q.   1941, right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Ah.

 2        Q.   You got it?

 3        A.   It's a pretty nice stack here.

 4             MS. CHARLES:  I'm repeating my earlier

 5        objection about using this document.

 6   BY MR. PAPANTONIO:

 7        Q.   So you see the first page on that

 8   document, it says:  "Perhaps the most surprising

 9   revelation was Steve Reardon and Gilberto Quintero

10   saying Cardinal does not report suspicious orders to

11   DEA."

12             And then it says:  "No upside."

13             You see that?

14        A.   Yes.

15        Q.   What is the "upside"?  This says:  "No

16   upside to reporting to DEA."

17             Why don't you tell us what you think is

18   the upside to reporting to the DEA?

19             MR. PYSER:  Object to form.

20             THE WITNESS:  I cannot speak to what Bill

21        Mahoney --

22   BY MR. PAPANTONIO:

23        Q.   Right.

24        A.   -- said.

25        Q.   I don't want you -- no, I don't want you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to.

 2        A.   Referring to "upside," I don't know what

 3   that means.

 4        Q.   Well, there's a benefit in -- there's a

 5   benefit in reporting what you're supposed to,

 6   following the law, reporting to the DEA, correct?

 7             MR. PYSER:  Object to form.

 8   BY MR. PAPANTONIO:

 9        Q.   I mean, that's a good thing, isn't it?

10        A.   I cannot provide an opinion on what Bill

11   Mahoney from McKesson said.

12        Q.   I don't want -- I don't want you to.  I

13   want to ask you.

14             When you were working in quality

15   regulatory, there was an upside to actually telling

16   the truth about suspicious orders to the DEA:  Yes or

17   no?

18             MR. PYSER:  Object to form.

19             Counsel, if you're asking a question,

20        that's fine; but then take down the document you

21        say that you're not asking him about.

22   BY MR. PAPANTONIO:

23        Q.   Yes or no?

24        A.   And again, 21 CFR 1301.74(b) states that

25   the registrant shall design a system to identify and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report suspicious orders.

 2         Q.   Right.  And if you don't --

 3         A.   I can't speak to an upside or a downside.

 4    There's the regulation, and you comply with the

 5    regulation.

 6         Q.   Well, the downside is you're breaking the

 7    law if you don't, true?

 8              MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10         Q.   That's a downside.  When you are breaking

11    the law, that's a downside, wouldn't you say?

12         A.   Again, "upside" and "downside" is a --

13    seems like a figure of speech that I can't speak to.

14         Q.   Okay.

15         A.   I can tell you what the regulation is.

16         Q.   Yeah.  Let's go to to the second page.

17    Bottom paragraph.

18              "Later had dinner with the group.

19    Interesting gossip came from Reardon and Quintero,

20    who relate that Cardinal is not reporting suspicious

21    orders to DEA on the advice of outside counsel.  We

22    don't get any credit for doing it."

23              You see that?  "We don't get any credit

24    for doing it."

25              Now, you didn't say that, did you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Objection.

 2   BY MR. PAPANTONIO:

 3        Q.   "We don't get any credit for reporting

 4   suspicious orders to DEA."

 5                MR. PAPANTONIO:  Underline that:  "We

 6        don't get any credit for doing it."

 7                MR. PYSER:  Object to form.

 8   BY MR. PAPANTONIO:

 9        Q.   See that?

10        A.   I do see that.

11        Q.   And then it says -- goes on and says:

12   "There is no upside."

13                MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15        Q.   Do you see that?  Those aren't your words,

16   because you would never use "upside" and "downside,"

17   is what you told us.

18                MR. PYSER:  Object to form.

19                THE WITNESS:  That's a terminology I -- I

20        can't speak to "upside," "downside."

21   BY MR. PAPANTONIO:

22        Q.   "There's no upside."

23        A.   I did not --

24                MR. PYSER:  Object to form.

25                THE WITNESS:  That's not a statement that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        I made.
 2             MR. PAPANTONIO:  All right.  So what we're
 3        going to do is we're going to -- these guys have
 4        got some questions here.  I'm going to see if
 5        I'm done.  Let's take ten minutes and do some
 6        housekeeping to see if we can move on.  Okay?
 7             VIDEOGRAPHER:  Off the record.  The time
 8        is 2:27.
 9             (A recess transpired from 2:27 p.m. until
10             2:42 p.m.)
11             VIDEOGRAPHER:  Going back on the record.
12        Beginning of media file number 5.  Time is 2:42.
13   BY MR. PAPANTONIO:
14        Q.   Sir, a little artwork here.
15             MR. PAPANTONIO:  Show him 4575, please.
16             MS. MOORE:  Brantley 20.
17        (Cardinal-Brantley 20 was marked for
18   identification.)
19   BY MR. PAPANTONIO:
20        Q.   Take a look at that, sir.
21             Have you ever seen that document?
22        A.   This -- is this a news release?
23        Q.   Uh-huh.  Have you ever seen it?
24        A.   I don't recall seeing this news release,
25   no.
```

```
 1          Q.   Okay, let's talk about it.  All right.

 2    Let's see here.

 3               "State reaches agreement with Cardinal on

 4    drug trading issues."

 5               You see that?

 6          A.   Yes.

 7          Q.   It says:  "Attorney General Spitzer today

 8    announced an agreement with Cardinal to improve

 9    safety and security practice in trading of

10    prescription pharmaceutical among wholesalers."

11               And you were aware of this investigation,

12    right?

13          A.   Yes.

14          Q.   Okay.

15               "An investigation by the Attorney

16    General's Office into trading pharmaceuticals on the

17    secondary market determined that certain trading

18    practices by wholesalers had the potential to

19    compromise the security and the safety of national

20    drug distribution."

21               Tell the jury what a "secondary market"

22    is.

23          A.   A secondary wholesaler would be a -- I

24    guess an alternate-source vendor; a -- I don't really

25    know what the exact definition of a secondary
```

1    wholesaler would be, but it would be, I guess, a

2    smaller -- I don't know the exact definition.

3        Q.   That's okay.  I mean, you're not

4    expected --

5        A.   A nonauthorized distributor.

6        Q.   Yeah, that's okay.

7             It said:  "Cardinal, based in Dublin,

8    ranked 19th on the Fortune 500 list of America's

9    corporation -- largest corporation, is one of the

10   three primary distributors."

11            Now, tell me who the three primary

12   distributors are, from your -- from your memory.

13       A.   The -- the big three would be Cardinal

14   Health, AmerisourceBergen, and McKesson.

15       Q.   And they had special licenses to be able

16   to sell narcotics, correct?  McKesson, Cardinal, and

17   ABC?

18       A.   It takes a DEA registration with

19   Schedule II on it.

20       Q.   Not everybody can sell narcotics, correct?

21       A.   It takes a DEA registration with

22   Schedule II, yeah.

23       Q.   Right.  And you have to -- to get that,

24   you have to make certain promises that you're going

25   to do certain things in line with what the DEA

```
 1   requires, true?

 2        A.   You have to apply for an application with

 3   the DEA.  I'm not familiar with what's all on the

 4   application, but you do have to apply with the DEA

 5   for that license.

 6        Q.   It says:  "Cardinal has agreed to adopt a

 7   set of wholesale safe product practices to establish

 8   a new standard for safe trading pharmaceuticals and

 9   point the way forward for an industry that is vital

10   to the health of Americans."

11             You see that?

12        A.   Yes.

13        Q.   Do you remember what the -- do you

14   remember what your promise was about going forward

15   and establishing these new standards?  Remember what

16   your promise was, back in 2005?

17             MR. PYSER:  Object to form.

18             THE WITNESS:  If you're referring -- if

19        you're referring to the wholesaler safe product

20        practices --

21   BY MR. PAPANTONIO:

22        Q.   Yeah.

23        A.   -- this was around buying and selling

24   prescription pharmaceuticals from another wholesaler,

25   or pharmaceutical trading.  And it was all around
```

1    pedigree.

2         Q.   It was around what?  Pedigree?

3         A.   Pedigree.

4         Q.   Tell the jury what "pedigree" is.

5         A.   So what a pedigree is is basically

6    tracking a -- a pharmaceutical drug back to an

7    authorized distributor.  And what an authorized

8    distributor is, or was at this time, was if you had

9    made two transactions with a -- with a manufacturer

10   within 24 months, per PDMA regulations, you were

11   considered an authorized distributor.

12            So that pedigree tracked all of the

13   movement from the drug back to an authorized

14   distributor.  Okay?  And that pedigree had to be

15   passed.

16            So the wholesale safe product practices

17   were -- and again, I'm trying to go by memory -- was

18   something that we had the customer sign, stating that

19   they would only purchase -- you know, I don't

20   remember the exact wording, but it was around passing

21   pedigree, and it was around authorized distributors.

22        Q.   Okay.  And look at the last paragraph.

23            "The investigation determined that

24   Cardinal purchased drugs from certain

25   alternate-source vendors despite risks associated

 1    with buying from those vendors to take advantage of

 2    higher available profit margins."

 3              Did you know that that was going on when

 4    you were there?

 5              MR. PYSER:  Object to form.

 6    BY MR. PAPANTONIO:

 7         Q.   At Cardinal?  That you were actually

 8    buying from alternative sources so you could take

 9    advantage of a higher profit margin?  Did you know

10    that?

11              MR. PYSER:  Object to form.

12              THE WITNESS:  I knew that we were buying

13         from other wholesalers, from alternate --

14    BY MR. PAPANTONIO:

15         Q.   You had no --

16         A.   -- source wholesalers.

17    BY MR. PAPANTONIO:

18         Q.   Go ahead.

19         A.   No, that's it.

20         Q.   Yeah.  So you had no idea that it was

21    going to make higher profit margins by doing that?

22    Is that what you're telling us?

23         A.   I never got into the profit or sale or

24    pricing.

25         Q.   "Cardinal also sold pharmaceuticals to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   certain customers, even in the the face of evidence

 2   that those customers may have been illegally

 3   diverting the drugs outside of their intended

 4   channels of distribution."  Correct?

 5             MR. PYSER:  Object to form.

 6             THE WITNESS:  That is what it says.

 7   BY MR. PAPANTONIO:

 8        Q.   Did you know that that was going on?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  Did I know what, exactly?

11        I'm sorry.

12   BY MR. PAPANTONIO:

13        Q.   Well, did you know that the investigation

14   had determined that Cardinal purchase drugs from

15   alternative sources, could take advantage of the --

16   the higher profits -- you said you didn't know about

17   that, correct?

18             MR. PYSER:  Object to form.

19             THE WITNESS:  Correct.

20   BY MR. PAPANTONIO:

21        Q.   You didn't know that?

22        A.   I don't know the pricing.

23        Q.   And you didn't know that Cardinal also

24   sold pharmaceuticals to certain customers, even in

25   the face of evidence that those customers may have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   been illegally diverting drugs outside their intended

 2   channels of distribution?

 3            MR. PAPANTONIO:  Where is my document on

 4       this?  That's not it.

 5   BY MR. PAPANTONIO:

 6       Q.   Did you know that?

 7       A.   This is referring to price diversion.

 8       Q.   I understand.

 9            Did you know about this?

10            MR. PYSER:  Object to form.

11            THE WITNESS:  I knew that there were --

12       there were purchases made from alternate-source

13       wholesalers.

14   BY MR. PAPANTONIO:

15       Q.   Okay.

16       A.   That there was trading amongst

17   wholesalers.

18       Q.   And this was taking place in New York,

19   correct?

20            MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22       Q.   Or all -- actually taking place all over

23   the country, true?

24            MR. PYSER:  Object to form.

25            THE WITNESS:  There was a facility when I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          started in Texas that was the trading company.

 2   BY MR. PAPANTONIO:

 3          Q.   Right.  And you knew that this -- this

 4   practice was taking place all over the country, did

 5   you not?  Did you not know that?

 6               MR. PYSER:  Object to form.

 7               THE WITNESS:  This practice was taking

 8        place in Texas.

 9   BY MR. PAPANTONIO:

10          Q.   Okay.

11          A.   At the Texas facility.  That was the

12   facility that bought and sold the product from other

13   wholesalers.

14          Q.   Did it happen in other states besides

15   Texas?

16               MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18          Q.   This is New York Attorney General here.

19          A.   The trading company was based in Texas.

20   That is the facility that purchased drugs from other

21   wholesalers and then distributed drugs to other

22   wholesalers in Texas.  That's where the facility was

23   located.

24          Q.   All right.  I understand where the

25   facility is located, but you understand that that --
```

1   that process of buying these drugs from that

2   secondary source and selling them all over the --

3   were being sold all over the country?  You know that,

4   don't you?

5            MR. PYSER:  Object to form.

6            THE WITNESS:  They were sold into several

7        states, yes.

8   BY MR. PAPANTONIO:

9        Q.   Okay.  That's all I wanted.

10            Okay.  So would you go to page 4 of this

11   document.

12            You see where that says -- this says, at

13   the top:  "Attorney General of the State of New York

14   Medicaid Fraud Control Unit and Health Care Bureau in

15   the matter of Cardinal Health incorporated."

16            And this was during a time that you were

17   working for the company in 2005, correct?

18        A.   Yes.

19        Q.   Says:  "Assurance of discontinuance

20   pursuant to executive law 6315."  See that?

21        A.   Yes.

22        Q.   Now, let me see what it is you assured --

23   well, not you, but your company assured the Attorney

24   General of New York that you were going to do.

25            Number -- you see page -- point 5?  It's

1    the next page.  It says:  "Cardinal is one of the

2    three primary distributors of pharmaceuticals in the

3    United States.  Up until it ended the practice in

4    2005, Cardinal, like other national full-line

5    distributors, bought and sold drugs in the secondary

6    market, buying from and selling to wholesale known as

7    alternative vendors."

8            So there was -- you know, did you know

9    whether McKesson was doing that?

10           MR. PYSER:  Object to form.

11           THE WITNESS:  I only knew what -- what

12       Cardinal Health was doing.

13   BY MR. PAPANTONIO:

14       Q.   Okay.  It says the -- it says:  "As one

15   Cardinal employee wrote in a 2001 e-mail to

16   colleagues worried about the risk of ASV market, 'The

17   firm must understand the need to not kill the goose,

18   ASV, who is laying the golden eggs.'  Through its

19   conduct, Cardinal has violated executive law 63(12)."

20           Are you familiar with that?  63(12)?

21           MR. PYSER:  Object to form.

22           THE WITNESS:  I cannot cite 63(12) at this

23       moment.

24   BY MR. PAPANTONIO:

25       Q.   And do you know the employee who wrote in

Highly Confidential - Subject to Further Confidentiality Review

 1    2001 e-mail that they were worried about the risks of

 2    the alternative-source market possibly killing the

 3    golden -- killing the goose who is laying the golden

 4    eggs?  Did you know the employee who said that?

 5            MR. PYSER:  Object to form.

 6            THE WITNESS:  No.

 7    BY MR. PAPANTONIO:

 8        Q.   I'm sorry.  Did you -- did you answer

 9    that?

10        A.   No, I do not know who said that.

11        Q.   Okay.

12            Go down to paragraph 5.  It says:  "Unique

13    opportunities.  In 2003, internal Cardinal e-mail is

14    a compliance officer, one executive addressed the

15    issue of smaller vendors which provided unique

16    opportunities to Cardinal.  Although the

17    acknowledging that the vendors are high risk, the

18    writer wrote that since we need the margin from these

19    high risk vendors, we will continue to buy from

20    them."

21            What is -- when you talk about a high-risk

22    vendor, tell me what that means to you, as somebody

23    in quality control?

24        A.   A high-risk vendor -- again, this is going

25    back to price diversion and the secondary market.  So

Highly Confidential - Subject to Further Confidentiality Review

```
 1   depending on who you ask, a -- an alternate-source

 2   vendor, according to this document, they're stating

 3   that they -- some of them could have been high risk.

 4            MR. PYSER:  Object to form of the last

 5       question.

 6   BY MR. PAPANTONIO:

 7       Q.   And so you're -- you're dealing with a

 8   high-risk vendor that is actually dealing with

 9   narcotics, correct?  I mean -- if we accept what that

10   says, you're dealing with narcotics.  That's the

11   first thing you can agree with, right?

12            MR. PYSER:  Object to form.

13            THE WITNESS:  I actually don't remember if

14       Schedule II controlled substances were traded at

15       Trading Company.

16   BY MR. PAPANTONIO:

17       Q.   Let's read on, then.  Okay?

18       A.   Okay.

19       Q.   It says our -- "One employee in 2002 wrote

20   an e-mail discussing a newspaper article" --

21       A.   Are you on another page?  I'm sorry.

22       Q.   Yes, sir.  I'm on point 6 there.

23       A.   Okay.

24       Q.   Well, actually, you know what?  Get

25   through this a little quicker.  Go to page 7.
```

```
 1              See where it says H -- 11, excuse me.

 2   That's 11 down there.  See that 11?  It says

 3   "Cardinal" --

 4        A.   Page 7?

 5        Q.   Yes.  Page 7.  Point 7.

 6        A.   Oh, point 7.  I'm looking at the page

 7   number on the bottom.

 8        Q.   Point 7.

 9              "Cardinal repeatedly sold pharmaceuticals

10   to customers that it knew or should have known were

11   diverting pharmaceuticals."

12              Were you one of the people at Cardinal

13   that knew that?

14              MR. PYSER:  Object to form.

15              THE WITNESS:  I was an employee at

16        Cardinal Health prior to March 2005.

17   BY MR. PAPANTONIO:

18        Q.   Okay.  But did you know -- did you ever

19   learn that Cardinal had repeatedly sold

20   pharmaceuticals to customers that it knew or should

21   have known were diverting pharmaceuticals?  Did you

22   know that?

23              MR. PYSER:  Object to form.

24              THE WITNESS:  No, I --

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   First time you saw that?

 3        A.   It is not the first time I have seen

 4   the --

 5        Q.   Okay.

 6        A.   -- actual -- whatever this form is called.

 7        Q.   It says:  "Prior to 2005, Cardinal made

 8   numerous sales of pharmaceuticals to Nevada -- to a

 9   Nevada company which purported to be a closed-door

10   pharmacy that served only nursing homes."

11             Then it says:  "In a routine pattern, the

12   Nevada company placed two orders at the same time.

13   One was for products likely to be needed by its

14   stated patient population or nursing home residents,

15   typically in quantities of 1s or 2s, as would be

16   expected for its needs.  The other was for much

17   higher quantities, included products unlikely to be

18   needed by nursing home residents.  Despite this

19   pattern, Cardinal continued to fill the company's

20   dual orders as described."

21             Did you ever -- were you aware of this

22   pattern that was taking place in nursing homes in

23   Nevada?

24             MR. PYSER:  Object to form.

25
```

```
 1    BY MR. PAPANTONIO:

 2         Q.    This pattern of distribution?

 3         A.    No.

 4         Q.    The dual -- you understand what this is

 5    saying there:  A dual pattern to distribution?  You

 6    never did that, I take it, Mr. Brantley?  I have no

 7    information that you did; I want to make sure you

 8    didn't.

 9         A.    No.

10              MR. PYSER:  Object to form.

11              Give me a moment to get the objection in.

12    BY MR. PAPANTONIO:

13         Q.    It says:  "Similarly, starting

14    January 2003, Cardinal was alerted to its customers

15    of the Carrington network of closed-door pharmacies

16    were diverting drugs."

17              Again, then it goes down -- I -- are you

18    familiar with the Carrington story, where they were

19    diverting drugs?  Was that something that came across

20    your desk?

21              MR. PYSER:  Object to form.

22              THE WITNESS:  I don't remember it.  But

23         it's not my first time hearing --

24    BY MR. PAPANTONIO:

25         Q.    Uh-huh?
```

```
 1         A.   It's not my first time hearing of

 2    Carrington, but I don't remember.

 3         Q.   Well, tell me what you know about

 4    Carrington.

 5         A.   I don't remember the details at all.  I

 6    just -- the name sounds familiar.

 7         Q.   Okay.

 8              So after this, your company made a promise

 9    that you were going to put together an anti-diversion

10    system for your company, didn't you?

11              I understand this is 2005.  Right?

12         A.   Does it state that in here?

13         Q.   I'm just asking you:  Do you know whether

14    they did or didn't?

15              MR. PYSER:  Object to form.

16              THE WITNESS:  Again, you're going back to

17         a time frame and you're asking me, did we put a

18         system in place.  I don't understand your

19         question.

20    BY MR. PAPANTONIO:

21         Q.   Well, did you put a system in place

22    after -- after the Attorney General told you you were

23    doing things wrong?  Did you correct the problem?  Or

24    do you know?

25              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  There was a system in place?

 2                    MR. PYSER:  Object to form.

 3     BY MR. PAPANTONIO:

 4          Q.   Well, there was a system in place at the

 5     time this was occurring, where you were actually --

 6     where you were actually buying secondary market?

 7     You're saying you had a system in place --

 8                    MR. PYSER:  Object --

 9     BY MR. PAPANTONIO:

10          Q.   -- to protect from diversion?  Is that

11     your testimony?

12                    MR. PYSER:  Object to form.

13                    THE WITNESS:  I was answering your

14          question, after the settlement, was there a -- a

15          system in place, and I say that there was a

16          system in place.

17                    MR. PAPANTONIO:  Okay.  Show him 4961,

18          please.

19     BY MR. PAPANTONIO:

20          Q.   Now, that was New York we were talking

21     about, right?  That was New York Attorney General we

22     just got finished talking about, right?

23          A.   This is from the New York Attorney

24     General, yes.

25          Q.   Okay.  Now, this is 4961.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MOORE:  Brantley 21.

 2         (Cardinal-Brantley 21 was marked for

 3    identification.)

 4    BY MR. PAPANTONIO:

 5         Q.   Now, this is -- this is about Purdue, who

 6    you're working with now.

 7              And I wanted to ask you what you --

 8    remember, I was asking you what you knew about Purdue

 9    prior to the time you took the job?

10         A.   Yes.

11         Q.   And it says:  "John L. Brown, the United

12    States Attorney for the Western District of Virginia

13    and Virginia Attorney General announced today that

14    the Purdue Frederick Company, along with its

15    president, chief legal officer, and former chief

16    medical officer, have pleaded guilty to charges of

17    misbranding Purdue's addictive and highly abusable

18    drug, OxyContin."

19              Is that the first time that you've seen

20    those words, where they actually had to plead guilty

21    to misbranding highly addictive and abusable drug

22    OxyContin?

23              MR. LAFATA:  Object to form.

24    BY MR. PAPANTONIO:

25         Q.   Have you ever seen that before?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. LAFATA:  Same objection.

 2              THE WITNESS:  Again, like I stated

 3         earlier, I did not review detailed documents of

 4         this proceeding, settlement, whatever it was.

 5    BY MR. PAPANTONIO:

 6         Q.   Well, would that have impacted your

 7    decision to go to work for them, if you knew that

 8    they had pleaded guilty to a criminal charge of

 9    misbranding addictive abusable drug OxyContin, would

10    that have affected Eric Brantley's decision to go to

11    work for these people?

12              MR. LAFATA:  Object to form.

13              THE WITNESS:  Well, again, I'd have to

14         know in the full context.  But to my knowledge,

15         oxycodone and OxyContin comes in a bottle with a

16         "C II" on it, which means it's a Schedule II

17         controlled substance.  And that's issued by the

18         DEA.  So --

19    BY MR. PAPANTONIO:

20         Q.   Well, let me -- let's see what this says.

21         A.   So it's known that it's a Schedule II

22    drug, and it contains oxycodone.

23              And the fact that it's Schedule II means

24    that it is prone to --

25         Q.   So you don't know what they did, do you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   You don't know what this company that you decided to
2   go to work for -- when did you go to work for them?
3        A.   February 2017.
4             MR. LAFATA:  Object to form.
5   BY MR. PAPANTONIO:
6        Q.   Well, you see, what I'm trying to figure
7   out, Mr. Brantley, is we've been sitting here
8   questioning you about -- about your company Cardinal,
9   which you worked for, right?
10            In a second, I'm going to ask you about
11  Kinray, who you worked for.
12            And I'm wondering how you make a decision,
13  because -- how you make a decision on what company
14  you're going to go for and not go to work for.
15            MR. LAFATA:  Object.
16  BY MR. PAPANTONIO:
17       Q.   So -- so here's what I'm asking -- let me
18  ask you this question:  Did you know that Purdue and
19  the three executives will pay a total of
20  $634 million?  Did you know that, after they pleaded
21  guilty to a criminal offense?  Did you know that?
22            MR. LAFATA:  Object to form.
23            THE WITNESS:  Again, prior to going to
24       work for Purdue, I did not know all of the
25       details.  I have read a couple sentences from an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        article online from -- from Google or something.

 2   BY MR. PAPANTONIO:

 3        Q.   Would you have --

 4        A.   Excuse me.

 5             But I did not know the details of --

 6        Q.   Would you have gone to work for them if

 7   you found out that the Purdue Frederick Company and

 8   three executives admitted that Purdue fraudulently

 9   marketed OxyContin by falsely claiming that OxyContin

10   was less addictive, less subject to abuse, and less

11   likely to cause withdrawal symptoms than other

12   medications?  If somebody had told you that the day

13   you said, "I'm going to work for this company," would

14   you have gone to work for them anyway?

15             MR. LAFATA:  Object to form.

16             THE WITNESS:  Again, with my knowledge of

17        controlled substances, knowing that it is a

18        Schedule II controlled substance, and the API is

19        oxycodone, and the fact that it is a Schedule II

20        controlled substance, that means that it is

21        prone to abuse or addiction.

22   BY MR. PAPANTONIO:

23        Q.   And you --

24        A.   So knowing that, it's a Schedule II

25   controlled substance.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.   Well, how the about the fraud part?  You

2    understand, these people admitted fraud in the way

3    they marketed?  You didn't know that before I just

4    showed it to you, did you?

5                MR. LAFATA:  Object to form.

6                THE WITNESS:  I -- I understand that the

7         bottle has a "C II" on it, which means it is a

8         Schedule II controlled substance, which means it

9         is --

10          Q.   Sir, you know --

11          A.   So if the bottle had not had a Schedule II

12   on it, I may be able to answer that question.  But

13   the fact that the bottle has a "C II" on it means

14   that it is a Schedule II controlled substance.

15          Q.   Let me ask again.

16               Three executives for the company admitted

17   and pled guilty to a felony fraud in the way they

18   represented their -- their product, and that's okay

19   with you.

20               Is that -- is that what you're telling me?

21               MR. LAFATA:  Object to form.

22   BY MR. PAPANTONIO:

23          Q.   That's okay?

24               MR. LAFATA:  Asked and answered, over and

25         over.  Object to form.
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Mr. Brantley?

 3        A.   I was not an employee of Purdue at the

 4   time.  And I go back to saying that if the bottle --

 5   if the three executives were referring to a

 6   controlled substance where the bottle had a "C II" on

 7   it, meaning that it is a Schedule II controlled

 8   substance, knowledge of a controlled substance that

 9   the industry has --

10        Q.   Okay.  And I guess go to page --

11        A.   -- I have that knowledge, and that's my

12   answer to that question.

13        Q.   Okay.  Go to point 2.  Go to the next

14   page.

15             You see about halfway down, it says:  "The

16   Purdue Frederick Company pleaded guilty to felony

17   misbranding of OxyContin with the intent to defraud

18   and mislead."

19             And you're saying you would have gone to

20   work with a company even though you knew that; is

21   that what you're saying?

22             MR. LAFATA:  Objection.  Asked and

23        answered, about six times now.

24             MR. PAPANTONIO:  No, this is a new one.

25        This -- this is --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. LAFATA:  Objection.  Asked and
 2        answered.
 3   BY MR. PAPANTONIO:
 4        Q.   Let me ask you --
 5        A.   Again, the bottle of OxyContin has a "C"
 6   with a Roman numeral II on it, which means it is a
 7   Schedule II controlled substance issued by the DEA,
 8   which means, as a Schedule II drug containing
 9   oxycodone --
10        Q.   Highly addictive?
11        A.   -- it is prone to abuse.
12        Q.   It's highly addictive, right?  Highly
13   addictive?
14        A.   The fact that a controlled substance has a
15   "Schedule II" on it means that the DEA is saying --
16   has claimed that it is prone to addiction.
17        Q.   And you didn't -- and you knew, then, I
18   take it, that -- what you're telling me, you knew
19   then that the executives to Purdue, they actually
20   pleaded guilty to a felony, misbranding OxyContin,
21   where they misbranded OxyContin with an intent to
22   defraud and mislead; you're saying you knew that when
23   you decided, "I'm going to go to work with this
24   stellar company, Purdue"?
25                MR. LAFATA:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. PAPANTONIO:

2        Q.   Is that what you're telling us?

3             MR. LAFATA:  Same objection.

4             THE WITNESS:  I'm stating, again, I don't

5        know what the misbranding was or so forth, but

6        the brand, the label had a "C" with a Roman

7        numeral Schedule II, which meant it was a

8        Schedule II controlled substance, and the active

9        ingredient is oxycodone.

10            So the fact that it is a Schedule II

11       controlled substance means it is prone --

12       Q.   If they lied about --

13            MR. LAFATA:  Mr. Brantley, you can finish

14       your answer.

15  BY MR. PAPANTONIO:

16       Q.   Go ahead.

17       A.   Prone to abuse and addiction.  So --

18       Q.   Right.

19       A.   You can't get around the "C" with a Roman

20  numeral II on it.  That means --

21       Q.   Right.

22       A.   -- this is a Schedule II drug --

23       Q.   Right.

24       A.   -- that's prone to abuse and addiction.

25       Q.   And if they lied about it, that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   something you're proud of?  If they lied about the

 2   addictive nature, is that something you're proud of?

 3            MR. LAFATA:  Objection.  Badgering.

 4            THE WITNESS:  Are you saying that they

 5        lied that it was a Schedule II controlled

 6        substance?

 7   BY MR. PAPANTONIO:

 8        Q.   Yeah.   Yeah.

 9            MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   Do you -- are you proud of the fact that

12   you went from Cardinal, and you went to Kinray, and

13   now you're with Purdue, with a company where the

14   executives had to plead guilty to committing fraud

15   and misleading the public about the addictive nature

16   of their drug?  Does that make you proud to be with

17   that company?

18            MR. LAFATA:  Object to form.

19            THE WITNESS:  To answer your first

20        question, because you asked about two or three

21        in that sentence --

22   BY MR. PAPANTONIO:

23        Q.   No.

24            MR. LAFATA:  The witness --

25            MR. PAPANTONIO:  No, no.  No, no, no, no,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        no.

 2              MR. LAFATA:  Mr. Brantley, you can finish

 3        your answer.

 4              MR. PAPANTONIO:  No, no, no.  Read the

 5        question --

 6              MR. LAFATA:  You will not interrupt his --

 7              MR. PAPANTONIO:  I will interrupt his

 8        answer --

 9              MR. LAFATA:  Mr. Brantley, you may finish

10        your answer to that question by counsel.

11              THE WITNESS:  The -- the first --

12              MR. PAPANTONIO:  Whoa, whoa, whoa, whoa,

13        whoa.

14              MR. LAFATA:  Mr. Brantley, there's a

15        question on the table.

16              MR. PAPANTONIO:  There is not a question

17        on the table.

18              MR. LAFATA:  You can finish your answer.

19              MR. PAPANTONIO:  There's not a question on

20        -- read --

21              MR. LAFATA:  You can finish the answer --

22              MR. PAPANTONIO:  Read the question back,

23        Madam Court -- the question I asked him, I want

24        read back in the record, before --

25              MR. LAFATA:  No.  You've interrupted the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          witness.

2                  Mr. Brantley, you may answer the

3          question --

4                  MR. PAPANTONIO:  Read the question --

5                  MR. LAFATA:  -- you're in the middle of

6          answering --

7                  MR. PAPANTONIO:  No.  You're -- it's not

8          going to happen.  Hush.  It's not going to

9          happen.  Okay?

10                 So read the question back.

11                 MR. LAFATA:  Mr. Brantley, you may

12         continue with the answer you were giving

13         before --

14                 MR. PAPANTONIO:  You may not, until the

15         question is read to you.

16                 Madam Court Reporter, read the question

17         back to him that I asked.

18                 MR. PYSER:  Mr. Brantley, you can finish

19         your answer.  And if they want the question read

20         back after that, they can go ahead all they

21         want.  But he can't interrupt your answer.

22                 MR. PAPANTONIO:  Do you remember the

23         question?

24                 MR. LAFATA:  Mr. Brantley, you can answer

25         the question you were in the middle of answering
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         before counsel interrupted you.  That's the

 2         proper --

 3               THE WITNESS:  The -- the first part of the

 4         question was --

 5    BY MR. PAPANTONIO:

 6         Q.   Yeah.

 7         A.   -- about executives lying.

 8         Q.   Right.  They lied.

 9         A.   And I said, are you stating that they lied

10    about the fact that it was a Schedule II controlled

11    substance?

12         Q.   The answer is yes.

13         A.   And you said yes.

14         Q.   Yes.

15         A.   So I don't know how you can lie about the

16    fact that something is a Schedule II controlled

17    substance when it's printed on every bottle.

18         Q.   What would they tell you --

19         A.   That's my -- that's my answer to the first

20    part of your question.

21               So if you can please repeat the second and

22    third part of that question.

23         Q.   Okay.  Second part is:  What were they

24    telling the American public about the addictive

25    nature of their drugs?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                Do you know the answer to that, since

 2    you're going to give me all these answers?

 3        A.   I can't speak to --

 4        Q.   The company that you're working for right

 5    now, who pled guilty a felony for fraud and

 6    misleading -- misleading statements about their

 7    product, can you please tell us what your company,

 8    that you're so proud of, was telling the American

 9    public?

10                MR. LAFATA:  Object to form.

11    BY MR. PAPANTONIO:

12        Q.   What -- what is it?  What were they

13    telling the American public?

14                MR. LAFATA:  Same objection.

15    BY MR. PAPANTONIO:

16        Q.   This is your chance.

17                MR. LAFATA:  Same objection.

18                THE WITNESS:  I have no idea what was

19       being said to the public.

20    BY MR. PAPANTONIO:

21        Q.   You have no idea.  That's what I was

22    trying to get at.  So the attorney down here is

23    objecting to what you -- he wants you to answer your

24    question.

25                But truthfully -- I'll ask it this way:
```

Highly Confidential - Subject to Further Confidentiality Review

1    You have no idea what Purdue was doing to lie to the

2    American public, to commit fraud to the American

3    public, and to get fined for a $600,000 felony

4    criminal event.

5           You don't know the answer to that, do you?

6           MR. LAFATA:  Object to the colloquy.

7      Object to the form.

8           THE WITNESS:  I do not know the details of

9      the proceedings, what was said and what was not

10     said.

11   BY MR. PAPANTONIO:

12     Q.   Okay.

13     A.   Again, the only thing I know is that

14   OxyContin is oxycodone, and it comes in a bottle with

15   a "C II" on it, which means it's a Schedule II

16   controlled substance issued by the DEA, which means

17   it is prone to addiction.

18     Q.   We'll have the opportunity to talk about

19   this again at another deposition, okay?  Because I'm

20   going to move on.

21           MR. LAFATA:  Object to the colloquy.

22   BY MR. PAPANTONIO:

23     Q.   It says -- you read the -- you read the

24   next-to-the-last paragraph here:  "The falsification

25   of drug product information is very serious breach of

1    the public trust."

2              You agree with that?

3        A.   Again, I don't know the details of what

4    was said and what was not said.

5        Q.   Well, I'm just asking, do you agree with

6    it?

7              MR. LAFATA:  Objection.  Asked and

8         answered.

9    BY MR. PAPANTONIO:

10       Q.   That -- do you agree with the statement

11   that the falsification of drug product information is

12   very serious breach of the public trust?

13       A.    I would need to know the definition of

14   "drug product information."  That's a very broad

15   term.  It could be a lot of information -- like part

16   of the information is, is it a Schedule II drug?  And

17   if it is, what does that mean?

18       Q.   Well, we know this much, don't we:  They

19   were prosecuted for it.  You know that, don't you?

20             MR. LAFATA:  Object to form.

21   BY MR. PAPANTONIO:

22       Q.   You know that, don't you?  They were --

23       A.    I know according to this document, you've

24   mentioned a number, 600-or-so million dollars that

25   was paid.  So --

```
 1          Q.   Sir, I didn't say that.  I said that three

 2   executives pled guilty to felonies.

 3          You knew that when you signed up with

 4   Purdue, didn't you?

 5          A.   Earlier, you threw out a number.  You said

 6   it was 600-and-some million.  You just said that you

 7   did not say that, but you said it earlier.

 8          So what was the second part to your

 9   question, after you made that statement?

10          Q.   The second part is:  You knew when you

11   signed up with this company that you were taking a

12   paycheck from a company that had pled guilty to fraud

13   and misleading the public about the dangers of

14   addiction with their product?  You knew that when you

15   signed on to this company?  You knew that?

16          MR. LAFATA:  Objection to form.

17          THE WITNESS:  When I signed on at Purdue,

18      I was aware of a proceeding where there was a

19      settlement or fine, or whatever it was, of

20      600-some million, or something like that.  Yes.

21      I was aware of --

22   BY MR. PAPANTONIO:

23          Q.   And that didn't bother you, signing up

24   with that?  Didn't bother you, did it?

25          MR. LAFATA:  Object to form.  Asked and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        answered.

 2              THE WITNESS:  Again, having knowledge of

 3        what OxyContin is, it's oxycodone that comes in

 4        a bottle with a "C" with a Roman numeral II, so

 5        it's a Schedule II controlled substance.

 6   BY MR. PAPANTONIO:

 7        Q.   Well, Mr. Brantley, you understand why I'm

 8   asking this question, don't you?  Because you've been

 9   sitting here --

10        A.   I --

11        Q.   -- all day -- wait a second.

12              You've been sitting here all day

13   testifying about the conduct of Cardinal.

14              Can we agree to that, that you've been in

15   that chair all day testifying about the conduct of

16   Cardinal.  True?

17              MR. LAFATA:  Object to form.  Compound.

18              MR. PYSER:  Object to form.

19              THE WITNESS:  I would ask that you ask one

20        question at a time, because you're asking two or

21        three questions --

22   BY MR. PAPANTONIO:

23        Q.   No, no --

24        A.   -- and then when I try to answer you --

25        Q.   That's one question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    -- you --

 2        Q.    It's one question.

 3        A.    -- you don't let me.

 4        Q.    You've been siting here all day long

 5   testifying about the conduct of Cardinal.  Yes or no?

 6              MR. PYSER:  Object to form.

 7              THE WITNESS:  I've been sitting here

 8        answering questions about documents that you've

 9        shown me and graphs and e-mails, and I've been

10        answering those questions.

11   BY MR. PAPANTONIO:

12        Q.    And then I asked you about the new company

13   you're with, Purdue, who is a felon, pled felony

14   charges, and you said that you were willing to work

15   with them.  True?

16              MR. LAFATA:  Object to form.

17   BY MR. PAPANTONIO:

18        Q.    That's what you said; you were willing to

19   work with Purdue.

20        A.    Again, you showed me a document, and I

21   said that the knowledge I had was about the

22   settlement or the fine or whatever it was, and that I

23   took a job at Purdue Pharma.

24        Q.    Okay.  And then you did the -- and you

25   knew another company that you worked for -- just so
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   we can get Eric Brantley's view of the world --

 2   another company that you worked for was called

 3   Kinray, correct?

 4            MR. PYSER:  Object to form.  Harassing the

 5      witness.

 6   BY MR. PAPANTONIO:

 7        Q.   Is that correct?  You worked for Kinray,

 8   true?

 9        A.   Yes.

10            MR. PYSER:  Object.

11   BY MR. PAPANTONIO:

12        Q.   Tell the jury what years you worked for

13   Kinray before you went to work with Purdue.  Tell us

14   what years those were.

15        A.   I am trying to remember the exact years.

16   I know I left Kinray -- I left Kinray -- I want to

17   say October 2013.

18        Q.   Right?

19        A.   And I was there for I believe two years.

20   So I would have started in 2011, from '11 to 2013, is

21   what I am remembering.

22        Q.   And you know that Kinray was -- was fined

23   $10 million for their conduct in the way they

24   distributed narcotics?  You know that as you sit here

25   today, don't you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              THE WITNESS:  I read that somewhere, yes.

 3  BY MR. PAPANTONIO:

 4        Q.   You said you read it somewhere?

 5        A.   Yes.

 6        Q.   Where do you think you read it?

 7              MR. PYSER:  Object to form.

 8              THE WITNESS:  I don't know.  Probably

 9        Google.

10  BY MR. PAPANTONIO:

11        Q.   And you know --

12        A.   I don't recall if I was an employee at

13  that time of the settlement or proceeding, whatever

14  it was.

15        Q.   All right.  So I want to ask you --

16              MR. PAPANTONIO:  Could I get the -- could

17        I get the Elmo, please?

18  BY MR. PAPANTONIO:

19        Q.   I want to talk to you a little bit about

20  Pleasantville.

21              You know where Pleasantville is, sir?

22              MR. PYSER:  Counsel, if you're marking --

23              MR. PAPANTONIO:  I'm going to mark it and

24        offer it.  I'll do it at the right time.  Okay?

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Do you know where Pleasantville is?

 3        A.   I do not.

 4        Q.   Okay.  Do you know where -- have you --

 5   have you worked West Virginia?

 6        A.   Have I worked in West Virginia?

 7        Q.   Uh-huh.

 8        A.   I have never worked in West Virginia.

 9        Q.   Have you reviewed -- have you reviewed

10   sales and distribution in the state of West Virginia?

11        A.   During the 2005 to late 2007 or early 2008

12   time frame, I was responsible for viewing ingredient

13   limited reports, which would have included --

14        Q.   Now, the --

15        A.   -- the Wheeling, West Virginia, facility.

16        Q.   Right.  Okay.  So if -- let's just make up

17   some facts, and I want to ask you what you know.

18             You -- well, first of all, you know that

19   there was a city in West Virginia where there was a

20   population -- I'm going to call it "Pleasantville."

21             You know what the real name is, don't you?

22        A.   I do not.

23             MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25        Q.   That doesn't surprise me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.  Move to
 2         strike counsel's --
 3    BY MR. PAPANTONIO:
 4         Q.   You know there was a city in -- you know
 5    there was a city in West Virginia where there were
 6    400 people, and there were 6 million pills sold to
 7    those 400 people, and your company was involved in
 8    selling 6 million pills to 400 people.
 9              Did you -- have you ever heard that
10    before?
11              MR. PYSER:  Object to form.
12              MR. PAPANTONIO:  Name of the town?
13              I'm asking you, Michael.  Kermit?
14              THE WITNESS:  I have not heard of Kermit.
15    BY MR. PAPANTONIO:
16         Q.   Do you know what Kermit is?  Have you ever
17    heard of Kermit?
18              MR. PYSER:  Object to form.
19    BY MR. PAPANTONIO:
20         Q.   Huh?
21         A.   I have not heard of Kermit.
22         Q.   Have you ever heard of Mount Gay?
23         A.   I have not heard of Mount Gay.
24         Q.   But you're the person who cleared orders
25    for West Virginia; you're one of the people that did
```

Highly Confidential - Subject to Further Confidentiality Review

1    that, right?

2            A.    I reviewed --

3            MR. PYSER:  Object to form.

4            THE WITNESS:  I reviewed ingredient limit

5        reports that included --

6    BY MR. PAPANTONIO:

7            Q.    And nobody --

8            A.    -- the Wheeling, West Virginia, facility.

9            Q.    Okay.  Nobody told you that there was a

10   town called Kermit -- let's call it -- let's call it

11   Kermit, not Pleasantville.

12           There's a town called Kermit, with

13   400 people, and 6 million pills were pumped into the

14   city of Kermit.

15           You didn't know that, prior to me telling

16   you that right now?

17           MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19           Q.    Yes or no?

20           A.    I did not know that.

21           Q.    Okay.  Now, tell me, how would -- you've

22   been doing this a long time.  Tell me how 400 people

23   would absorb 6 million pills over a period of two

24   years?

25           MR. PYSER:  Object to form.  Misstates

Highly Confidential - Subject to Further Confidentiality Review

```
 1        evidence.
 2   BY MR. PAPANTONIO:
 3        Q.   Tell me how that happened?
 4        A.   I cannot state how 400 people -- are you
 5   suggesting that 6 million pills were shipped to
 6   400 people?
 7        Q.   Yeah.
 8             MR. PYSER:  Object to form.
 9   BY MR. PAPANTONIO:
10        Q.   Is that the first you've heard that, that
11   6 million pills were shipped to 400 people?  That
12   surprises you, doesn't it?
13             MR. PYSER:  Object to form.  Misstates
14        evidence.
15   BY MR. PAPANTONIO:
16        Q.   Doesn't it?
17        A.   I have not heard it.
18        Q.   The first time you've heard it is me
19   telling you about it, right?
20             MR. PYSER:  Object to form.
21             THE WITNESS:  That is correct.
22   BY MR. PAPANTONIO:
23        Q.   And in these days that you prepared to
24   come here to testify, nobody even shared that with
25   you, had they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object.

 2   BY MR. PAPANTONIO:

 3        Q.   That 400 people, a city of 400 people,

 4   that there were 6 million pills pumped into that

 5   city.  Right?

 6              MR. PYSER:  Object to form.

 7              And I counsel the witness not to answer

 8        any questions about his conversations with

 9        counsel.

10   BY MR. PAPANTONIO:

11        Q.   You didn't know --

12              MR. PYSER:  That's privileged, and counsel

13        knows that it's privileged.

14   BY MR. PAPANTONIO:

15        Q.   Oh, did counsel tell you that?

16              MR. PYSER:  Counsel --

17   BY MR. PAPANTONIO:

18        Q.   Nobody -- nobody told you that, did they,

19   prior to coming here?

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   Let me ask the question again:

23              Did anybody from the company tell you that

24   there was a city, there were 400 people that had

25   6 million pills pumped into it over a period of two
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   years?

 2              MR. PYSER:  Object to form.

 3   BY MR. PAPANTONIO:

 4        Q.   Anybody tell you that?

 5              MR. PYSER:  Object to form.

 6              THE WITNESS:  No one from the company told

 7         me that.

 8   BY MR. PAPANTONIO:

 9        Q.   Well, does that sound like too many pills

10   to you?

11              MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.   In all your experience working for Purdue

14   and then working for Kinray and working for Cardinal,

15   does that sound like too many pills being pumped into

16   an area of 400 people?

17              MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19        Q.   Two years?

20              MR. PYSER:  Object to form.

21              THE WITNESS:  So, not knowing the context,

22         earlier you stated that 6 million pills were

23         shipped to 400 people.

24   BY MR. PAPANTONIO:

25        Q.   Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   And I asked, were they shipped to
 2   400 people?  Then you later stated they were shipped
 3   to a town with residents of --
 4          Q.   Kermit.
 5          A.   -- of 400 people.
 6          Q.   Right.
 7          A.   So in the whole context, was it only the
 8   400 people that consumed the 6 million pills, or were
 9   there people coming in from other towns or states?  I
10   don't know the context, so I can't answer the
11   question.
12          Q.   Nobody showed it to you, did they?
13               How about -- let me ask you this.
14               MR. PYSER:  Object to the form.
15   BY MR. PAPANTONIO:
16          Q.   How about if we just have 3 million pills,
17   3 million pills shipped to Kermit over a period of
18   two years, with 400 people.
19               That's too many pills, isn't it?
20               MR. PYSER:  Object to form.
21               THE WITNESS:  My answer does not change.
22   BY MR. PAPANTONIO:
23          Q.   All right.  I believe that.
24               Now, you understand -- you traveled to
25   these areas, and they had salespeople that actually
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lived in these various areas, right?  Salespeople?

 2    True?

 3              MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5         Q.   Yes?

 6         A.   I'm not familiar where the salespeople

 7    lived.

 8         Q.   Well, did the salespeople --

 9         A.   But they were salespeople.

10         Q.   They were salespeople, and they lived in

11    cities all over the country, correct?

12              MR. PYSER:  Object to form.  Whose

13         salespeople?

14    BY MR. PAPANTONIO:

15         Q.   Yes or no?  Cardinal had salespeople --

16    you know what I'm talking about.  Cardinal had

17    salespeople that lived in these cities all over the

18    country.

19              Did you know that, prior to coming here

20    today?

21              MR. PYSER:  Object to form.

22              THE WITNESS:  Cardinal has salespeople

23         that lived in the various cities.

24    BY MR. PAPANTONIO:

25         Q.   Yeah.  And you've actually seen pictures,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    haven't you, of pill mills where people are actually

 2    lined up around the pill mill to be able to get their

 3    pill.

 4              Have you ever seen pictures like that --

 5              MR. PYSER:  Object to form.

 6    BY MR. PAPANTONIO:

 7         Q.   -- throughout the country?

 8              MR. PYSER:  Object to form.

 9              THE WITNESS:  Yes.

10    BY MR. PAPANTONIO:

11         Q.   Yeah.  And as a matter of fact, the

12    salesperson that lives in a city where there's a pill

13    mill has the ability to see the pill mill, right?  I

14    mean, they drive by the pill mills; that's the way

15    it's set up.  Right?

16              MR. PYSER:  Object to form.  Calls for

17         speculation.

18              THE WITNESS:  I can't answer to where they

19         drive to.

20    BY MR. PAPANTONIO:

21         Q.   Okay.  So your testimony is you don't know

22    whether a salesperson living in a city where there's

23    pill mills with people lined up around them, you

24    don't know whether they would see that or not?

25    That's your testimony, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              THE WITNESS:  My testimony -- my testimony

 3         is that I cannot answer to where a particular

 4         salesperson would drive.

 5   BY MR. PAPANTONIO:

 6         Q.   Well, do you know cities all over the

 7   country where salespeople live, they would have

 8   newspaper reports -- you ever seen newspaper reports

 9   about overdoses in cities all over the country?  You

10   ever see even one?  Did anybody send you even one

11   article talking about people dying from overdoses

12   because of the product that your company was selling?

13              MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15         Q.   Did they ever do that?

16         A.   No one has sent me an article.

17         Q.   Have you seen any articles about your

18   company selling products that were killing people by

19   overdoses?

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22         Q.   Yes or no?

23              MR. PYSER:  Vague.

24              THE WITNESS:  Which company are we

25         referring to?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   Cardinal.

 3       A.   Have I seen articles?

 4       Q.   Yeah.

 5       A.   Can you ask the question again, so I know

 6   the --

 7       Q.   Yeah.  Have you seen articles that state

 8   that people were dying of overdoses relating to the

 9   sale of opioids?  Let's -- let's start there.

10       A.   I've seen articles about people dying from

11   the abuse of opioids.

12       Q.   And when did you start seeing those first

13   articles?

14       A.   I don't recall when I first started seeing

15   the articles.  They were over the last several years.

16       Q.   Saw them in newspaper reports, I take it?

17            True?

18       A.   I don't know if it was a newspaper report

19   or CNN or the TV or the Internet.

20       Q.   But you -- you saw plenty -- would it be

21   fair to say you saw plenty of articles where people

22   were dying from drug overdoses related to opioids?

23            MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25       Q.   True?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I don't know what the definition -- what

 2     the definition is of "plenty," but I have seen

 3     articles over the last --

 4          Q.   Okay.  If you had a city like -- let's

 5     say --

 6          A.   -- couple years.

 7               MR. PYSER:  Sir, were you done with your

 8          answer?

 9               THE WITNESS:  Yeah.  I was just saying

10          that I have seen articles over the last couple

11          of years.

12     BY MR. PAPANTONIO:

13          Q.   If you have a city like Kermit, sir,

14     and it's -- let's say 3 million pills are coming into

15     Kermit.

16               If 400 people can't absorb those pills,

17     where do the pills go?

18               MR. PYSER:  Object to form.

19     BY MR. PAPANTONIO:

20          Q.   Do you -- have you analyzed that at all?

21     When you were in quality control, did you ever

22     analyze -- if I'm shipping 3 million pills into a

23     city of 400 people, where did all the rest of the

24     pills go?

25               MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   You ever even thought about that prior to

 3   coming in here today?

 4        A.   So which -- which question would you like

 5   me to answer?

 6        Q.   Have you ever thought about what happens

 7   when 3 million pills are shipped into a city of

 8   400 people, what happens to the other pills if

 9   they're not absorbed by those 400 people?

10             MR. PYSER:  Object to form.

11             THE WITNESS:  I cannot speak to exactly

12        where pills go.  But again, not knowing the

13        context of -- I think you mentioned Kermit -- I

14        don't know if there are surrounding counties,

15        surrounding cities, if people came into -- I

16        don't know if it's rural area, if it's an urban

17        industrial area; have people traveled from a

18        neighboring county or city to come to it?

19             Again, I don't know the context of --

20   BY MR. PAPANTONIO:

21        Q.   Right.

22        A.   -- Kermit.

23        Q.   So that tells me a lot.  Tells me a lot,

24   because what you're saying is you're the guy that's

25   signing off on all of these drugs to be shipped all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    over the country, and you never even visited the

 2    cities that you were shipping drugs to.

 3         A.   I reviewed ingredient limit reports on a

 4    monthly basis, and I submitted those reports, and

 5    those reports were submitted to the DEA.  I conducted

 6    investigations as necessary and reported those

 7    pharmacies to the DEA.  I review ingredient limit

 8    reports.

 9         Q.   Did you go to Kermit?

10              MR. PYSER:  Object -- object to form on

11         the prior question.  I didn't want to --

12    BY MR. PAPANTONIO:

13         Q.   Did you go to Kermit?

14              MR. PYSER:  -- interrupt the question.

15         Object to form again.

16    BY MR. PAPANTONIO:

17         Q.   Did you visit Kermit?

18              MR. PYSER:  Object to form.

19              THE WITNESS:  I have not visited Kermit,

20         to my knowledge.

21    BY MR. PAPANTONIO:

22         Q.   Did you visit Mount Gay --

23              MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:

25         Q.   -- West Virginia?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I have not been to Mount Gay, West
 2   Virginia, to my knowledge.
 3          Q.   So you wouldn't know whether 3 million
 4   pills were being shipped into a population of 400 or
 5   not, would you?  You have no idea?  True?
 6               MR. PYSER:  Object to form.
 7               THE WITNESS:  I know nothing of Mount Gay
 8        or Kermit.
 9   BY MR. PAPANTONIO:
10          Q.   But nevertheless, you were the person that
11   was permitting -- you were signing off on orders in
12   places like West Virginia, weren't you?
13               MR. PYSER:  Object to form.  Misstates
14        evidence.
15   BY MR. PAPANTONIO:
16          Q.   Correct?
17          A.   I was reviewing ingredient limit reports
18   on a monthly basis.
19          Q.   Right.  Now, tell us, tell the jury what
20   the "Oxy Express" is.  Oxy Express.
21          A.   I don't know what the Oxy Express is.
22          Q.   You've never heard the term "Oxy Express"?
23   Is that -- is that your testimony today, really?
24          A.   I don't know what Oxy Express is.
25          Q.   Okay.  Did you know that there was --
```

```
 1    there was a connection between South Florida and all

 2    the way up to Maine, where people would pick up

 3    drugs, opioids, and sell them all along the way?  You

 4    ever heard that before?

 5              MR. PYSER:  Object to form.

 6    BY MR. PAPANTONIO:

 7         Q.   First time you've ever heard of an Oxy

 8    Express?

 9              MR. PYSER:  Object to form.

10              THE WITNESS:  Again, I have not heard the

11         term "Oxy Express."

12    BY MR. PAPANTONIO:

13         Q.   What term is a term that describes what I

14    just said?

15         A.   I've not heard the term "Oxy Express."

16         Q.   And you've --

17         A.   You just explained a -- a scenario.

18         Q.   And you've worked with Cardinal, and

19    you've worked with Kinray, and now you're there with

20    Purdue, and you've never heard of an Oxy Express; is

21    that your testimony?

22              MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24         Q.   Yes?

25              MR. PYSER:  Asked and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I have worked for Cardinal,

 2       Kinray, and as you said, now Purdue.  I'm not

 3       familiar with the term "Oxy Express."

 4  BY MR. PAPANTONIO:

 5       Q.   Oh, Endo:  You worked for Endo, too,

 6  didn't you?

 7       A.   I did work for QualiTest Pharmaceuticals.

 8       Q.   Okay, I missed Endo.

 9            So you've worked for -- you worked for

10  Cardinal, you worked for Endo, you worked for Kinray,

11  you worked for Purdue, and not one time have you ever

12  heard the term "Oxy Express"; is that your testimony

13  here today?

14              MR. PYSER:  Object to form.

15              MS. VANNI:  Objection.

16              THE WITNESS:  Again, I have not heard the

17       term "Oxy Express."

18  BY MR. PAPANTONIO:

19       Q.   So, sir, if you got a town, you got a town

20  of 400 people, let's say just -- let's say just two

21  million pills are coming in there, a million a year.

22  Take it down to 2 million.

23            And if the 400 people, the children and

24  the mommas and the daddies, they can't absorb

25  those -- those 2 million pills, where do the other
```

```
 1    pills go?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  My answer does not change

 4         from the other two or three times you asked the

 5         question.

 6    BY MR. PAPANTONIO:

 7         Q.   Have you ever heard of the term "glut"?

 8              MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10         Q.   Have you ever heard the term "glut"

11    before?

12         A.   I have not heard the term "glut."

13         Q.   Well, what -- do you understand what the

14    term "glut" means?  I?

15         A.   I do not know what "glut" means.

16              What does "glut" mean?

17         Q.   Well, you -- I'm not going to answer that

18    for you.  I just want to know, you've been at this --

19    how many years have you just described that you've

20    been in the -- in the opioid business, and you never

21    heard the term "glut"?

22              MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24         Q.   A glut of opioids in small towns; you've

25    never heard that term?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              THE WITNESS:  To answer your -- one of two

 3      or three questions --

 4  BY MR. PAPANTONIO:

 5         Q.   Yeah.

 6         A.   -- the first one is, I've been in the

 7  industry since January 2000.

 8         Q.   Okay.

 9         A.   And I have not heard the term "glut."

10         Q.   Have you ever seen a -- you have the --

11  have you ever seen anything like I'm -- let's put it

12  up on the screen.

13              MR. PYSER:  Object to form.

14              And, Counsel, are you going to be marking

15      those as exhibits?

16              MR. PAPANTONIO:  Oh, yeah.  Yeah, I would

17      not dream of not putting my artwork in there.

18              Hold it right there.

19  BY MR. PAPANTONIO:

20         Q.   Let's go to Mount Gay, population

21  1,700 people.

22              Do you know where Mount Gay is, sir?

23              MR. PYSER:  Object to form.  Asked and

24      answered.

25              THE WITNESS:  Again, I do not -- it's in
```

```
 1        West Virginia.
 2   BY MR. PAPANTONIO:
 3        Q.   Yeah.  Do --
 4        A.   But I do not know where in West Virginia
 5   Mount Gay is.
 6        Q.   But you were a person that signed off on
 7   order requests in West Virginia, weren't you?  You
 8   were one of the three people that did that, right?
 9        A.   You say "signed off on order requests" --
10   I'm sorry.
11             MR. PYSER:  Object to form.
12   BY MR. PAPANTONIO:
13        Q.   Or review?
14        A.   You say "signed off on order requests."  I
15   review ingredient limit reports on a monthly basis.
16        Q.   Right.  Okay.  And you did that for West
17   Virginia, right?
18        A.   I did that for the facility located in
19   Wheeling, West Virginia.
20        Q.   All right.  And you knew that -- that
21   there was a town -- you didn't know, I take it, that
22   there was a town called Mount Gay, where a population
23   of 1,700 people lived, never even heard that?
24             MR. PYSER:  Object to form.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   True?

 3        A.   Again, up until a few minutes ago when you

 4   mentioned Mount Gay, I've never heard of Mount Gay.

 5        Q.   All right.  Let's see what -- do you have

 6   any -- so right now, you couldn't tell me how many

 7   pills were sold in Mount Gay, as we sit here, right?

 8             MR. PYSER:  Object to form.

 9             THE WITNESS:  That is correct.

10   BY MR. PAPANTONIO:

11        Q.   And you've been in this business -- you

12   worked for Cardinal for -- I'm sorry, how many years

13   total?  Cardinal?

14        A.   I started with a company, January of 2000,

15   that was acquired by Cardinal in 2002.  And I left

16   Cardinal in 2013.

17        Q.   And you've never heard of the term "glut,"

18   right?

19             MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   Never heard that?

22        A.   I've never heard the term "glut."

23        Q.   And you've never head of the term "Oxy

24   Express"; is that correct?

25             MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   Yes or no?

 3        A.   I'm giving my lawyer a chance to see if he

 4   wants to speak.

 5        Q.   Yes or no?  You've never --

 6        A.   I've never --

 7             MR. PYSER:  Counsel -- object to form.

 8             You've got to give me a chance to enter --

 9        intersperse an objection if needed, and you've

10        got to give the witness a chance to answer your

11        question before you ask your next question.

12   BY MR. PAPANTONIO:

13        Q.   Yes or no:  You've never heard of the term

14   "Oxy Express"?

15             Easy.  Yes or no?

16             MR. PYSER:  Object to form.

17             THE WITNESS:  Again, again, I have not

18        heard the term "Oxy Express."

19   BY MR. PAPANTONIO:

20        Q.   Have you ever seen a depiction of what

21   happens with pills when a town like Mount Gay is

22   getting millions of pills and then understanding

23   where those millions of pills went if they weren't

24   absorbed in a town like Mount Gay?  Have you ever

25   heard an analysis of that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Object to form.
 2   BY MR. PAPANTONIO:
 3        Q.   Dealing with the -- dealing with the term
 4   "Oxy Express"?
 5                MR. PYSER:  Object to form.
 6   BY MR. PAPANTONIO:
 7        Q.   Have you ever heard of it?
 8        A.   Again, I've not heard the term "Oxy
 9   Express."
10                MR. PAPANTONIO:  Play this thing.  Just go
11        ahead and play it.
12   BY MR. PAPANTONIO:
13        Q.   So we got a town of 1,700 people.  They
14   can't absorb the pills.  So you didn't even know
15   there was something called an Oxy Express that
16   actually drove through Mount Gay and distributed
17   those pills along the Eastern Seaboard; nobody had
18   ever told you that prior to coming in here today,
19   right?
20                MR. PYSER:  Object to form.
21   BY MR. PAPANTONIO:
22        Q.   Huh?
23        A.   Again, I have not heard the term "Oxy
24   Express."
25        Q.   Fair enough.  I believe that.  All right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PAPANTONIO:  David, you want to --

 2      or --

 3              MR. FULLER:  You want to take a quick

 4      break?

 5              MR. PAPANTONIO:  Yeah, let's take a break.

 6              VIDEOGRAPHER:  We're going off the record.

 7      The time is 3:31.

 8              (A recess transpired from 3:31 p.m. until

 9              3:44 p.m.)

10         (Cardinal-Brantley 22 was marked for

11      identification.)

12         (Cardinal-Brantley 23 was marked for

13      identification.)

14              VIDEOGRAPHER:  We're going back on the

15      record.  Beginning of media unit file number 6.

16      The time is 3:44.

17                        EXAMINATION

18      BY MR. FULLER:

19         Q.   Mr. Brantley, you've been speaking with

20      Mr. Papantonio for quite some time.  I wanted just to

21      follow up on a few things and cover a few new areas;

22      I'm going to try not to repeat anything.  Okay?

23         A.   Okay.

24         Q.   So the two or three people that also

25      filled your role from '05 to '07, who were they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Tim Dunham.

 2          Q.    Okay.

 3          A.    And Nick Rausch.

 4          Q.    Okay.  And you were talking with

 5   Mr. Papantonio about the memorandum agreement from

 6   2007, 2008, correct?  I think it's 4230.

 7          A.    Is that in this stack?

 8          Q.    Yeah, it's Exhibit Number 4.

 9          A.    Is there a number at the top, a PI number?

10          Q.    4230, if that helps you.

11                Not that one.  Keep going.

12          A.    Here it is.

13          Q.    There you go.

14                I think you testified earlier, Cardinal

15   entered into -- Cardinal Health entered into this

16   memorandum agreement; is that right?

17          A.    Yes.

18          Q.    And you were there during this time frame.

19   This is the time frame where a bunch of facilities

20   lost their license, had their license suspended,

21   correct?

22          A.    Yes.

23          Q.    And Cardinal made certain obligations or

24   took on certain obligations as part of this

25   agreement; isn't that true?
```

```
 1            A.   If they're listed in here somewhere.

 2            Q.   Sure.   I think they start on page 3.

 3    "Terms and conditions, obligations of Cardinal."

 4                 Do you see that?

 5            A.   Yes.

 6            Q.   And if you turn to page 4 and go to F --

 7    see Section F there?

 8            A.   Yes.

 9            Q.   And you're aware, are you not, that

10    Cardinal, through Section F, agreed to do an 18-month

11    lookback and review its shipments to current

12    customers for -- let's see:   "Oxycodone, hydrocodone,

13    alprazolam, phentermine, retail and physician

14    customers for the 18 months immediately preceding the

15    execution of this agreement, and identify any

16    customers who purchased those same drugs that

17    exceeded thresholds."

18                 Do you see that there?

19            A.   I do.

20            Q.   And you are therefore aware that Cardinal

21    took on this obligation and completed this

22    obligation.

23                 Did you have any role in that?

24            A.   What time frame are we talking -- are we

25    talking --
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   The agreement was entered in the end of

2     2008.

3     A.   So that would be -- no, I was no longer in

4     the role I was in when I was speaking -- speaking

5     earlier.

6     Q.   Where were you at this point?

7     A.   I was still at Cardinal Health, but

8     sometime in 2008, I moved over to where I was solely

9     doing the price diversion.

10    Q.   Okay.

11    A.   Monitoring and investigations.

12    Q.   Fair enough.

13         And you mentioned --

14         MR. FULLER:  Let's roll to 4722 and talk

15    again just briefly about the Lakeland facility.

16    BY MR. FULLER:

17    Q.   You mentioned several times that the

18    system that was in place was this reviewing

19    ingredient limit reports, correct, is what you would

20    do?

21    A.   Yes.

22    Q.   And you did that manually; is that right?

23    A.   Yes.

24         I'm sorry, you said 4722?

25    Q.   I'm sorry.  Yeah, I didn't even pass it

```
 1   out yet.

 2        A.   Oh.

 3        Q.   I apologize.

 4             MR. FULLER:  Bates number 4722, and it's

 5        Exhibit Number -- what's the exhibit number at

 6        the bottom?

 7             MS. JAMISON:  24.

 8             MR. FULLER:  24.  Oh, the sticker?

 9             THE WITNESS:  024.

10             MR. FULLER:  Got it.

11        (Cardinal-Brantley 24 was marked for

12   identification.)

13   BY MR. FULLER:

14        Q.   This will be Plaintiffs' Exhibit

15   Number 24.

16             And you see this e-mail, it starts off

17   from Mr. Kurtz, Bob Kurtz:

18             Do you know who Bob Kurtz is?

19        A.   I do not.  I think I've heard that name

20   before, but I don't remember who he was.

21        Q.   Operations manager down in Lakeland,

22   Florida; does that sound familiar?

23        A.   Again, I've heard the name before, but --

24        Q.   Fair enough.

25        A.   -- that still does not put it into
```

1    context.

2         Q.   And he's sending it to Rafael Varela; do

3    you know Mr. Varela?

4         A.   I have heard that name as well.

5         Q.   If you scan down a little bit lower on the

6    e-mail, Mr. Varela is the compliance and QA manager

7    for Cardinal Health, Lakeland, Florida.

8              Do you see that?

9         A.   Yes.

10        Q.   Okay.  And it starts off -- now let's go

11   through the time frame.  I apologize.  December 5th,

12   2007.

13             MR. FULLER:  Up at the top, Evan.  There

14      you go.

15   BY MR. FULLER:

16        Q.   December 5th, 2007.  It's right about the

17   time that these immediate suspension orders are

18   coming out, correct?

19        A.   I don't remember the dates.

20   November 28th, 2007, was -- seems like to be the

21   first one, yes.

22        Q.   Okay.  So right about that time, and this

23   e-mail is in response, because it says "More

24   information on DEA suspension."

25             Do you see that there?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And then it says:  "Just some thoughts on

 3   Auburn, Washington, incident that concern me."

 4             It says -- and if we skip down to the next

 5   paragraph:  "The manual process we perform now with

 6   the discovery of suspected excessive purchases being

 7   left up to the keyer notifying myself or the picker,

 8   double-checker, QCer questioning the amount being

 9   processed seems to leave ample opportunity for

10   failure."

11             MR. FULLER:  And Evan, if you could

12        underline that.

13   BY MR. FULLER:

14        Q.   "Ample opportunity for failure."  It's

15   clearly a concern being voiced by the people in

16   Lakeland, right?

17             MR. PYSER:  Object to form.

18             THE WITNESS:  This is a concern being

19        stated by Bob Kurtz.

20   BY MR. FULLER:

21        Q.   And if you look back at 4230, what's the

22   date of the immediate suspension order for Lakeland?

23             Go to page 20.  4230, 20.

24             MR. FULLER:  You don't need to go, Evan;

25        just --
```

```
 1                    MR. PYSER:  Is it -- on this first page,

 2        is it December 5th?

 3   BY MR. FULLER:

 4        Q.   Yes?

 5        A.   2007?

 6        Q.   There you go.

 7        A.   Okay.

 8        Q.   Same day that e-mail is sent, isn't it?

 9        A.   December 5th, 2007.  December 5th, 2007.

10   Yes.

11        Q.   They say:  "A system-generated flag would

12   be a more complete, thorough method for

13   determining" -- or excuse me -- "of determining

14   spikes or excessive quantities than we are currently

15   performing."

16                    Did I read that correctly?

17        A.   Yes.

18        Q.   And during that time frame, there was no

19   automated system for generating flags, was there?

20                    MR. PYSER:  Object to form.

21                    THE WITNESS:  To my knowledge, the system

22        was reviewing the ingredient limit reports that

23        I was doing then.

24   BY MR. FULLER:

25        Q.   You had the monthly reports that you were
```

Highly Confidential - Subject to Further Confidentiality Review

1    sending off, and then you had pickers and checkers

2    looking for excessive orders in the building, right?

3         A.   Yes.  That report was a computer-generated

4    report.

5         Q.   Right.  But there was no red flags that

6    got flagged, correct?

7              MR. PYSER:  Object to form.

8    BY MR. FULLER:

9         Q.   None?

10        A.   Every -- every entity that appeared on

11   that ingredient limit report had reached the

12   threshold requirement.

13        Q.   Exceeded the threshold, correct?

14        A.   Exceeded the threshold for -- reached or

15   exceeded the threshold for that substance.

16        Q.   And those reports came out well after

17   those products were shipped, after the pills were out

18   on the street, right?

19             MR. PYSER:  Object to form.

20             THE WITNESS:  Those were monthly reports.

21   BY MR. FULLER:

22        Q.   And the report came out after the pills

23   were already on the street, didn't they?

24             MR. PYSER:  Object to form.

25             THE WITNESS:  The report was generated

Highly Confidential - Subject to Further Confidentiality Review

1       after the shipments had shipped.

2    BY MR. FULLER:

3       Q.   It says:  "As you know, I've investigated

4    many accounts, tracked their ordering history and

5    reached out for guidance and directions.  But without

6    someone bringing a suspected excessive quantity order

7    to our attention, many, many more could be going out

8    the door under our noses."

9            And as Mr. Papantonio showed you earlier,

10   that was the problem.  All the pills were going out

11   the door; no one was stopping them, wasn't it?

12            MR. PYSER:  Object to form.

13            THE WITNESS:  Well, the cage vault

14      personnel did have the ability to identify and

15      order at time of picking and report that order.

16   BY MR. FULLER:

17      Q.   Well, in order to do that, they would have

18   to know what they're picking.

19            You would agree with that, wouldn't you?

20      A.   Based on their knowledge.

21      Q.   They would have to to know what they're

22   picking to be able to --

23      A.   They would have to know what's in front of

24   them, what they are picking.

25      Q.   Absolutely.

```
 1                  MR. PYSER:  Object to form.

 2   BY MR. FULLER:

 3        Q.   And if they don't, they can't do their

 4   job, can they?

 5                  MR. PYSER:  Object to form.

 6                  THE WITNESS:  If they don't know what

 7        they're picking?

 8   BY MR. FULLER:

 9        Q.   Absolutely.

10        A.   If they don't know what they're picking,

11   are you saying they can't do their job?  They can

12   still pick and ship orders, right?

13        Q.   They can pick and ship orders, but they

14   can't pick out the excessive orders, right?

15                  MR. PYSER:  Object to form.

16                  THE WITNESS:  If they don't know what

17        they're picking -- I'm just trying to

18        understand.  If they don't know what they're

19        picking, they can --

20   BY MR. FULLER:

21        Q.   If they don't know it's a Control II, or

22   what type of product it is that they're picking, they

23   can't do their job to bring it to someone's

24   attention, can they?

25                  MR. PYSER:  Object to form.
```

```
 1              THE WITNESS:  Well, if you don't know what
 2         you're picking, then you can't identify it, yes,
 3         true.
 4    BY MR. FULLER:
 5         Q.   Fair enough.
 6              And then it says, "I wonder, could a
 7    similar situation happen in Lakeland and management
 8    be questioned why wasn't this discovered?"
 9              Do you see that there?
10         A.   Yes.
11         Q.   It happens the same day the immediate
12    suspension order is issued for Lakeland, doesn't it?
13              MR. PYSER:  Object to form.
14              THE WITNESS:  Yes, we did verify that the
15         two dates match the December 5th, yes.
16    BY MR. FULLER:
17         Q.   Pickers and checkers.
18              Do you know Mr. Baranski?
19         A.   I do not.
20         Q.   He was the director of operations -- is
21    the director of operations for the Wheeling facility.
22    You know the Wheeling distribution center in West
23    Virginia?
24         A.   I'm familiar with the Wheeling facility.
25         Q.   That also serviced not only West Virginia
```

Highly Confidential - Subject to Further Confidentiality Review

1    but portions of Ohio as well, correct?

2         A.   I don't remember.  I know that -- I'm sure

3    they service West Virginia.  It's possible they could

4    have serviced -- I just don't remember.

5         Q.   Well, let's see what Mr. Baranski had to

6    say about the picker's knowledge on what they were

7    picking.  Okay?  He would be the one to ask, you

8    would agree, correct?

9              MR. PYSER:  Objection.

10   BY MR. FULLER:

11        Q.   He's the director of operations for that

12   facility?

13             MR. PYSER:  Object to form.  Vague as to

14      time frame.

15             THE WITNESS:  I can't say that he would be

16      the one to ask, I mean, at that level, but --

17   BY MR. FULLER:

18        Q.   He's the one that runs the building,

19   right?

20        A.   He has oversight of the -- he's the

21   director of operations of the facility.

22        Q.   He's the head honcho, as far as that

23   building, correct?

24        A.   He is the highest-ranking person at that

25   facility.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Fair enough.

2               MR. FULLER:  Go ahead.

3               (Whereupon a portion of a video played.)

4               "Q Now, when we're going to pick up

5          the product -- and let's deal with the

6          controls.

7               "A Sure.

8               "Q If you have -- and I guess this

9          depends on how you get the order.  If

10         I'm going to pick up the same substances

11         both in a brand name and in a generic,

12         how do I know which to grab, if I'm the

13         picker?

14              "A The unit tells them what

15         location to go to.

16              "Q And would the order have

17         specified whether it was picking up a

18         generic -- you know, something made by a

19         particular manufacturer versus a

20         generic?

21              "A We teach our people to pick from

22         location to tote.  I don't even care if

23         they know the product.  I want them to

24         know location to tote.

25              MR. PYSER:  Object to form on the use of
```

Highly Confidential - Subject to Further Confidentiality Review

 1          the video, and the time frame.

 2     BY MR. FULLER:

 3          Q.   So according to Mr. Baranski, they're

 4     picking by location only.  He doesn't even care if

 5     they know the product.  Right?  That's what he

 6     testified to, correct?

 7          A.   He stated that he doesn't care whether

 8     they know the product.  That does not mean that the

 9     person picking does not know what the product is.  He

10     expressed his opinion.

11          Q.   Sure.  And according to him, the one over

12     the Wheeling distribution center, he doesn't even

13     care if they know the product:  Pick from location to

14     tote.

15               That's what he testified to, correct?

16               MR. PYSER:  Object to form.

17               THE WITNESS:  That is the statement that

18        he made.

19     BY MR. FULLER:

20          Q.   Okay.  Now, we looked at that MOU just for

21     a second.  Are you aware whether Cardinal did do an

22     18-month lookback over its distributions?

23          A.   I don't know.

24          Q.   Fair enough.  Let's go to 4923.

25               MR. FULLER:  Go ahead and pass them.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          (Cardinal-Brantley 25 was marked for

 2     identification.)

 3     BY MR. FULLER:

 4          Q.   Now, what you have in front of you is a

 5     chart of Cardinal distributions.

 6               Oh, and I apologize; for the record, it is

 7     Plaintiffs' Exhibit Number 29 -- 25.  This is

 8     Cardinal's distributions into Cuyahoga County for

 9     hydrocodone and oxycodone.

10               Do you see that there, at the top?

11               MR. PYSER:  Just for the record, we've got

12          a black-and-white version that the witness has,

13          and a color copy up on the screen.

14               MR. FULLER:  Yeah, you do.

15          Q.   Do you see that?

16          A.   Yes, I do see that at the top.

17          Q.   Okay.  And you see during the time frame

18     that you have been with Cardinal -- and let's go all

19     the way back to '96.  You're aware that 1996 is when

20     OxyContin came onto the market, correct?

21          A.   I do not remember when OxyContin came onto

22     the market.

23          Q.   Okay.  I'll represent to you it's around

24     1996.

25          A.   Okay.
```

1        Q.    And you see the spike in pills from 1996

2    to 2008?  The dosage units going into Cuyahoga

3    County?

4               MR. PYSER:  Object to form.

5               THE WITNESS:  I do see an increase.

6    BY MR. FULLER:

7        Q.    And in fact, if you do the math, it's over

8    1,000 percent increase from 1996 to 2008?

9               MR. PYSER:  Object to form.

10   BY MR. FULLER:

11       Q.    Are you aware of anything in Cuyahoga

12   County that would have caused this increase in pain?

13              MR. PYSER:  Object to form.

14   BY MR. FULLER:

15       Q.    Any epidemic going on during that time

16   frame?

17              MR. PYSER:  Object to form.

18              THE WITNESS:  I'm not familiar with

19        Cuyahoga.

20       Q.    Do you know where Cuyahoga County is?

21       A.    I do not.

22       Q.    It's Cleveland, Ohio.

23       A.    Okay.

24       Q.    If we go to page 3 of the document.

25       A.    That was page 3.  You mean the third page?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Yeah, the third page.

 2          A.   It says.

 3          Q.   I apologize; it's point 3, at the top.

 4          A.   Okay.  Oh.  Gotcha.

 5          Q.   This is the same information for Summit

 6   County, which is Akron, Ohio.

 7               You see the same spike from 1996 up to

 8   2008 as well, correct?

 9          A.   There is an increase.

10          Q.   And during this time frame, Cardinal was

11   aware -- well, let me back up.

12               In the anti-diversion group, the QRA

13   department, did you ever pull numbers like this to

14   look at the history and pattern of your customer

15   sales?

16               MR. PYSER:  Object to form.

17          A.   When I was doing my role from 2005 to

18   early '8 or late '7, whichever it was, I did not --

19   excuse me.  I did not pull such reports.

20          Q.   So you're not aware of anybody in the

21   diversion department, at least to your knowledge that

22   pulled such reports, correct?

23               MR. PYSER:  Object to form.

24               THE WITNESS:  I can't speak for what

25          others did.  I can only speak for what I did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And my question is:  To your knowledge, no

 2    one pulled any type of reports of this nature,

 3    correct?

 4          A.    To my knowledge, I don't know if they did

 5    or not.

 6          Q.    Okay.  Now, you see the spike, and you see

 7    the color on the overhead.  And as it represents at

 8    the bottom, it's oxycodone and hydrocodone.

 9                Do you see that there?

10          A.    Yes.

11          Q.    Okay.  And other than -- other than the --

12    strike that.

13                Let's move on to the pill comparison.

14    Actually, hold on one second, Evan.  You're aware,

15    are you not, that in the government -- let me ask it

16    differently.

17                You know that during the time frame that

18    you were at Cardinal, certain areas of the country

19    were having more of a problem with opioid abuse than

20    others, correct?

21                MR. PYSER:  Object to form.

22                THE WITNESS:  I actually learned that

23          after I left the company.  Again, that was more

24          through media than anything else.  And that

25          was . . .
```

```
 1    BY MR. FULLER:

 2         Q.   Let's go to 1087.

 3              Do you know what the GAO is?  Government

 4    Accounting Office?

 5         A.   I'm not familiar with the office.  I've

 6    heard the term "GAO."

 7         Q.   You've heard the acronym before, correct?

 8         A.   Yes.

 9         (Cardinal-Brantley 26 was marked for

10    identification.)

11              MR. FULLER:  This will be Plaintiffs'

12         Number 26.

13    BY MR. FULLER:

14         Q.   You see this document?  "OxyContin abuse

15    and diversion, and the effects to address the

16    problem.  Prescription drugs."

17              And what is the date indicated on this

18    document, Mr. Brantley?

19         A.   December 2003.

20         Q.   Okay.  And this is shortly after you came

21    to Cardinal, but you're still in Texas, right?

22         A.   In 2003 I was still in Texas, correct.

23         Q.   If you'll turn to page 14.  And let's see

24    what the government report says about who is having

25    problems with OxyContin, at least during this time.
```

```
1           A.    Okay.  Do you mean point 14 at the top?

2           Q.    Yes, sir.  I'm sorry.

3           A.    I was thinking 14 at the bottom.  Okay.

4           Q.    Force of habit.  By the time you get used

5     to it, we'll be done.

6                 See the last full paragraph with the last

7     paragraph on the page:  "Media reports of OxyContin

8     abuse and diversion began to surface in 2000.  The

9     reports first appeared in rural areas of some states,

10    generally in the Appalachian regions, and continued

11    to spread in other rural areas in large cities in

12    several states.  Rural communities in Maine,

13    Kentucky, Ohio, Pennsylvania, Virginia, and West

14    Virginia were reportedly being devastated by the

15    abuse and diversion of OxyContin."

16                Is that the first time you're seeing this?

17          A.    This is my first time seeing this

18    document, yes.

19          Q.    We can agree, can we not, that Cardinal

20    should have been aware of this, being that they were

21    a distributor of a dangerous substance during this

22    time frame, correct?

23                MR. PYSER:  Object to form.

24                THE WITNESS:  Are you saying that Cardinal

25          should have been aware of this document?  I -- I
```

```
 1        can't speak to that.

 2   BY MR. FULLER:

 3        Q.   So even though they're distributing

 4   OxyContin, oxycodone, hydrocodone, across the

 5   country, when the government does a massive

 6   investigation and report based on those

 7   distributions, your opinion is Cardinal doesn't

 8   necessarily need to be aware of it, correct?

 9             MR. PYSER:  Object to form.

10             THE WITNESS:  That's not what I said.

11        What I said is I don't know who would have read

12        the GAO report.  I -- again --

13   BY MR. FULLER:

14        Q.   Can we at least agree they should have

15   read it?

16        A.   I've heard of GAO, but I -- I don't know

17   who would have -- I don't know what this is.  I don't

18   know if this is a financial document.  It says it's

19   from the General Accounting Office.  Does that mean

20   it went to someone in accounting or finance?  I can't

21   speak to that.

22        Q.   Can we at least agree that they should

23   have been aware of it?

24             MR. PYSER:  Object to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. FULLER:
 2        Q.   Cardinal should have been aware of this
 3   report?
 4             MR. PYSER:  Object to form.
 5             THE WITNESS:  I can't agree that someone
 6        should have read a document that came from the
 7        General Accounting Office.
 8   BY MR. FULLER:
 9        Q.   Fair enough.
10             And here it indicates several states that
11   are being more impacted.  Ohio and West Virginia are
12   two of them, aren't they?
13        A.   According to this paragraph.
14        Q.   Well, let's look and see what's going on,
15   even shortly after this time frame, with the
16   distribution of OxyContin.
17             MR. FULLER:  Let's go to the PowerPoint
18        presentation, Evan.
19   BY MR. FULLER:
20        Q.   Now, here we're going to look at first,
21   Mr. Brantley, is comparison between Illinois and
22   Ohio, two neighboring states, correct?
23             Is that right, Mr. Brantley?
24        A.   Yes.
25        Q.   Similar in size, I'll represent to you,
```

Highly Confidential - Subject to Further Confidentiality Review

1    and you'll see, similar in population.  And this is

2    just Cardinal distributions from 2006 through 2014.

3    All right?

4         A.   Okay.

5              MR. FULLER:  So let's see the first slide,

6         Evan.

7    BY MR. FULLER:

8         Q.   So 2006, in Illinois, we have 4.9 million

9    pills of oxycodone distributed.  In Ohio, we have

10   67 million oxycodone pills distributed.

11             Does that cause you any concern?

12             MR. PYSER:  Object to form.

13             THE WITNESS:  I don't know the context.

14        Where -- was Cardinal the primary supplier for

15        pharmacies in Ohio, and it was not the primary

16        supplier of pharmacies in Illinois?

17   BY MR. FULLER:

18        Q.   That could be one explanation, right?

19        A.   I don't know the -- you put numbers on the

20   screen, but I don't know the context of the customer

21   base in those states.

22        Q.   Fair point.  That could be one

23   explanation, right?

24        A.   I would say that's probably an

25   explanation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   You think that may be the only

 2   explanation, correct?

 3               MR. PYSER:  Object to form.

 4   BY MR. FULLER:

 5          Q.   You don't know?

 6          A.   I don't know.  That's just the first thing

 7   that came to mind when you asked the question.

 8          Q.   Fair enough.  How many customers do we

 9   have in the respective state compared to Ohio, right?

10               MR. PYSER:  Object to form.

11   BY MR. FULLER:

12          Q.   And then what is everybody else

13   distributing to the respective states, correct?

14               MR. PYSER:  Object to form.

15               THE WITNESS:  I don't know who the primary

16          supplier is for the customers in Illinois.  I

17          don't know what chains and --

18   BY MR. FULLER:

19          Q.   Let's keep going through the slide, and

20   we'll get to that, okay?

21          A.   Okay.

22               MR. FULLER:  Let's go to 2007, Evan.

23               MR. PYSER:  Counsel, do you have this as

24          an exhibit?

25               MR. FULLER:  I don't have a printout, but
```

Highly Confidential - Subject to Further Confidentiality Review

1        I'll get you one.  It's not a problem.

2   BY MR. FULLER:

3        Q.   So in 2007, 5.9 million into Illinois and

4   72-plus million into Ohio, still.

5             Cause you any concern?

6        A.   Again, I have my same response.  I don't

7   know the customer base.

8        Q.   Right.

9        A.   I don't know if there's a large chain in

10  Ohio that's serviced by Cardinal and a large chain in

11  Illinois that's serviced by another wholesaler.

12       Q.   Well, this time -- during this time frame,

13  you were servicing CVS; you know that, right?

14  2006-7, you're there reviewing ingredient limit

15  reports?

16       A.   Of course I don't recall all back then,

17  but I -- I know that CVS is a Cardinal customer.

18       Q.   Big customer.  Nationwide company.

19  Correct?

20       A.   CVS is a -- a large chain.

21       Q.   Absolutely.

22            MR. FULLER:  Let's keep going, Evan.

23  BY MR. FULLER:

24       Q.   2008, 6.3, 75 million.  Still a huge

25  disparity.

Highly Confidential - Subject to Further Confidentiality Review

```
1              We can at least agree on that, correct?

2              MR. PYSER:  Object to form.

3              THE WITNESS:  There is a difference

4         between 75 million and 6 million, yes.

5    BY MR. FULLER:

6         Q.   It's about 11-time difference, over

7    11-time -- 12-time difference, isn't it?

8              MR. PYSER:  Object to form.

9              THE WITNESS:  If you did the math that

10        fast in your head, I will accept that it's

11        12 times.

12   BY MR. FULLER:

13        Q.   I will give you my pen if you want to

14   write it out.

15        A.   I have a calculator.

16        Q.   So let's keep going.

17             2009, 6.884.  2010, 7.6 to 94 million.

18   2011, 8.9, 96 million.  2012, 10 million to

19   100 million.

20             Now, we can both do the math on that,

21   Mr. Brantley, right:  10 times --

22        A.   That was a little easier.

23        Q.   -- the amount of pills?

24             MR. PYSER:  Object to form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. FULLER:

2         Q.  ████████████████████████████

     ███████████████████████████████████████

     ██████████████████    ████████████████

     █████████████████    █████████████████████

     ██████████

     ██████████████████████

     ████    ██████████████

9              MR. FULLER:  Let's go to the next slide,

10        Evan.

11   BY MR. FULLER:

12        Q.   So this is the number of customers.

13   ██████ Cardinal customers in Illinois; ██████  Cardinal

14   customers in Ohio.

15              Very close, isn't it?

16              MR. PYSER:  Object to form.

17              THE WITNESS:  Just based on those numbers,

18        but that doesn't tell how many were chains, how

19        many were hospitals, how many was DOD, how many

20        was VA.

21   BY MR. FULLER:

22        Q.   Sure.

23        A.   That's just customers, so I -- I don't

24   know --

25        Q.   But very close in the number of customers,
```

Highly Confidential - Subject to Further Confidentiality Review

1   isn't it?

2              MR. PYSER:  Object to form.

3              THE WITNESS:  For the overall customers,

4       without knowing the details, whether there was a

5       large chain or a hospital or a VA --

6   BY MR. FULLER:

7       Q.   Well, let me ask:  At least during the --

8   the first few years when this disparity is going on,

9   did anybody that you're aware of at Cardinal pull

10  this information and look and say, "Hey, look, we

11  know there's an outbreak of a problem in Appalachian

12  areas; let's compare them to like states and see

13  what's going on"?

14             You don't have any knowledge of that

15  happening at Cardinal Health, do you?

16             MR. PYSER:  Object to form.

17             THE WITNESS:  I don't know whether that

18      was done or not by --

19  BY MR. FULLER:

20      Q.   At least nobody informed you if they did,

21  did they?

22      A.   I was not aware.

23      Q.   No one said, "Hey, when you're reviewing

24  your ingredient limit reports, pay particular

25  attention to Ohio, West Virginia"; you were never

Highly Confidential - Subject to Further Confidentiality Review

```
 1   told that, were you?

 2        A.   When I review ingredient limit reports, I

 3   reviewed them the same.

 4        Q.   So again --

 5        A.   I reviewed the reports.

 6        Q.   My -- my question, though, is, no one came

 7   to you and said, "Hey, pay particular attention to

 8   West Virginia and Ohio," did they?

 9             MR. PYSER:  Object to form.  Asked and

10        answered.

11             THE WITNESS:  I do not recall anyone

12        coming to me, but I looked at all of the

13        ingredient limit reports all the same.

14   BY MR. FULLER:

15        Q.   Fair enough.

16             MR. FULLER:  Keep going, Evan.

17   BY MR. FULLER:

18        Q.   So this lays out the population.  There's

19   a million more people in Illinois than Ohio, but Ohio

20   got over 10 times the number of pills.

21             You see that?

22        A.   I do see that chart, yes.

23        Q.   Can we at least agree that this deserves

24   some looking into as to why the disparity?

25             MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. FULLER:

 2        Q.   Would you agree with that?

 3        A.   This states -- pills that Cardinal

 4   shipped?  Is this -- is this just Cardinal?

 5        Q.   Yes, sir.

 6        A.   So again, I go back to my earlier

 7   statement as far as not knowing what type of

 8   registrants --

 9        Q.   Fair enough.

10        A.   -- Cardinal was shipping into in the two

11   states, because that makes a --

12        Q.   Sure.

13        A.   -- a difference.

14        Q.   You can't tell by the raw numbers, right?

15        A.   Correct.  I -- I can't tell if it's a

16   chain or if it's a hospital --

17        Q.   But we at least need to do an

18   investigation to find out why; can we agree with

19   that?

20             MR. PYSER:  Object to form.

21             THE WITNESS:  Again, you first need to

22        know --

23   BY MR. FULLER:

24        Q.   You have to do your investigation to know.

25             MR. PYSER:  Object to form.
```

1   BY MR. FULLER:

2       Q.   Is there a reason for this?

3       A.   I'd have to know if these are chains, if

4   these are retail, if these are hospitals.  I mean,

5   you have to have the complete picture or the proper

6   context before I can answer the question.

7            Again, I don't know what the customers

8   were.  I don't know if they were retail independents

9   in one state and chains in another state, or

10  hospitals, or . . .

11      Q.   And unless we pull the information, we're

12  not going to know.

13           We can agree with that, right?

14           MR. PYSER:  Object to form.

15           THE WITNESS:  Unless you can show me the

16      information that says, you know, how many chains

17      were in Ohio versus Illinois, and hospitals and

18      pharmacy -- I mean DOD, VA, so forth.

19  BY MR. FULLER:

20      Q.   And as far as you're aware, Cardinal never

21  pulled that information to do that comparison, did

22  they?

23           MR. PYSER:  Object to form.

24  BY MR. FULLER:

25      Q.   When you were there, they never pulled

```
 1   that information to do that comparison, did they?

 2              MR. PYSER:  Object to form.

 3              THE WITNESS:  Again, like I stated

 4       earlier, I don't know.

 5   BY MR. FULLER:

 6       Q.   At least you're not aware of it if they

 7   did, correct?

 8              MR. PYSER:  Same objection.

 9              THE WITNESS:  I don't know.  I'm not aware

10       if they did or not.

11   BY MR. FULLER:

12       Q.   Fair enough.

13              MR. PAPANTONIO:  Let's go to the next

14       slide, Evan.

15   BY MR. FULLER:

16       Q.   So this is distributions from all

17   distributors.  One of the questions you had earlier,

18   right, were we primary versus someone else?  Were we

19   primary in Ohio versus someone else being primary in

20   Illinois?  One of the concerns you voiced earlier,

21   right?

22       A.   Right.

23       Q.   And this shows that even going back to

24   2006, 29 million pills into Illinois, that's all

25   distributors; and 170 million going into a very
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    similar state of Ohio, from all distributors.  And

 2    this is just oxycodone.

 3              And then we see in 2007, 30 and 190; and

 4    it -- it keeps going with a huge disparity.  That's

 5    what the information shows, correct?

 6              MR. PYSER:  Object to form.

 7              THE WITNESS:  The information shows there

 8        is a difference between the two states in

 9        shipments.

10    BY MR. FULLER:

11        Q.   Now, let me ask you:  There at Cardinal,

12    did anybody come to you, made you aware of any huge

13    epidemic of pain in the state of Ohio during this

14    time frame?

15              MR. PYSER:  Object to form.

16              THE WITNESS:  During that time frame, I

17        was not made aware of any -- as you say,

18        epidemic of pain.

19    BY MR. FULLER:

20        Q.   Okay.

21              MR. FULLER:  Let's go to the next slide,

22        Evan.

23    BY MR. FULLER:

24        Q.   So during this same time span in Illinois,

25    which has a million more people than the state of
```

```
 1    Ohio, you have ████████████ pills compared to

 2    ███████████ pills in the state of Ohio.

 3              MR. FULLER:  Next slide, Evan.

 4    BY MR. FULLER:

 5         Q.   Six times the number of pills into the

 6    state of Ohio compared to Illinois.

 7              Do you see that there?

 8              MR. PYSER:  Object to form.

 9              THE WITNESS:  That slide says that

10         Illinois received ████████ pills and Ohio

11         received ████

12    BY MR. FULLER:

13         Q.   █████████ --

14         A.   Oh.

15         Q.   -- is what it's supposed to say.

16         A.   So it was a misprint.  Okay.  Now -- okay.

17         Q.   He changed it quick.

18              So let me ask the question again.

19    ████████████ pills into the state of Ohio, and

20    ███████████ pills -- excuse me.  ████████████ pills

21    in the state of Illinois.

22              MR. PYSER:  Object to form.

23              THE WITNESS:  That's what the slide

24         states.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. FULLER:

 2        Q.   And do you have any knowledge as to why --

 3   strike that.

 4             We can agree that that is a huge

 5   disparity, right?

 6             MR. PYSER:  Object to form.

 7             THE WITNESS:  That is a difference.  And I

 8        don't know why doctors wrote more scripts in

 9        Ohio versus Illinois.

10   BY MR. FULLER:

11        Q.   But we do know who shipped more pills to

12   Ohio versus Illinois, don't we?

13             MR. PYSER:  Object to form.

14   BY MR. FULLER:

15        Q.   We saw the numbers coming out of Cardinal.

16   And Cardinal, as you stated earlier, is providing

17   pills to pharmacy, and have a regulatory obligation

18   to look for suspicious activity, don't they,

19   suspicious orders?  Correct?

20             MR. PYSER:  Object to form.

21             THE WITNESS:  According to the CFR, they

22        have an obligation to identify and report

23        suspicious orders.

24   BY MR. FULLER:

25        Q.   And as you mentioned earlier, they need to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    use the information they have to do so, don't they?

 2    Correct?

 3              THE WITNESS:  Yes.  And as I stated, we

 4         used -- I used ingredient limit reports, and

 5         they are also used at the division -- they were

 6         distributed to the DEA from the distribution

 7         centers.

 8    BY MR. FULLER:

 9         Q.   And the other part of that system is we

10    had pickers and checkers trying to flag excessive

11    orders, as we saw in Lakeland, which didn't work out

12    very well for Lakeland as well, correct?

13              MR. PYSER:  Object to form.

14              THE WITNESS:  The -- the pickers and

15         checkers were in addition to the ingredient

16         limit reports that were submitted to the DEA,

17         and -- and in addition to the review that I was

18         doing and submitting to the DEA.

19    BY MR. FULLER:

20         Q.   Right.  And you, as you testified earlier,

21    you reported customers to the DEA, not suspicious

22    orders, correct?

23         A.   I reported customers.

24         Q.   Fair enough.

25              MR. FULLER:  I don't have anything
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        further.

 2              VIDEOGRAPHER:  Going off record.  Time

 3        is 4:19.

 4              (A recess transpired from 4:19 p.m. until

 5              4:25 p.m.)

 6              VIDEOGRAPHER:  We're going back on record,

 7        the beginning of media file number 7.  The time

 8        is 4:25.

 9                        EXAMINATION

10   BY MR. BUCHANAN:

11        Q.   Mr. Brantley, good afternoon.

12        A.   Good afternoon.

13        Q.   My name is Dave Buchanan, and I have a few

14   other questions for you.  I want to kind of move

15   through a different period of time.

16              MR. BUCHANAN:  Evan, could we -- could we

17        go to the -- the CDC document?  I don't know the

18        exhibit number in the deposition, but it's

19        P1.324.3.

20   BY MR. BUCHANAN:

21        Q.   You recall looking at this with

22   Mr. Papantonio earlier?

23        A.   Yes.

24        Q.   Okay.  And you have it in your stack there

25   as well, if that's easier; I don't know what's best
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    for you.  But I just wanted to orient ourselves.
2              So as I understand it, sir, you first got
3    involved at least with companies involved in the
4    opioid and narcotics business in around 2001; is that
5    right?
6         A.   I started with Bentley Trading January of
7    2000.
8         Q.   Okay.
9         A.   And that company was acquired, 2002, by
10   Cardinal Health.
11        Q.   And on the screen, we have got this
12   period -- this is 2001.
13             That would have been during your period
14   with Cardinal or Billy Trading; is that right?
15        A.   With Bentley Trading, yes.
16        Q.   Bentley; thank you.
17             MR. BUCHANAN:  Let's go forward to 2006.
18        All right.  Thank you.
19   BY MR. BUCHANAN:
20        Q.   So this would have been a period of time
21   when you were with Cardinal still, right?
22        A.   Yes.
23        Q.   And this would have been a point in time
24   when you had some role or involvement in connection
25   with suspicious orders, or at least monitoring and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting functions from a regulatory perspective,

 2    fair?

 3              MR. PYSER:  Same objections to the use of

 4        this document.

 5              THE WITNESS:  2006, yes.

 6    BY MR. BUCHANAN:

 7        Q.   Okay.

 8              MR. BUCHANAN:  And can we scroll forward

 9        to 2007.

10    BY MR. BUCHANAN:

11        Q.   As I understand, you were still in that

12    function in 2007; is that right?

13              MS. VANNI:  Object to the form.

14              THE WITNESS:  2007, yes.

15    BY MR. BUCHANAN:

16        Q.   And did you stay in that function as well

17    in 2008?

18              MS. VANNI:  Same.  Objection.  Form.

19              THE WITNESS:  I'm not clear whether it was

20        late 2007 or early 2008 time frame where I

21        started the transition.

22              MR. BUCHANAN:  Evan, could you scoot it

23        forward to 2008.

24    BY MR. BUCHANAN:

25        Q.   All right.  We see -- and you see the map
```

 1    on the screen, as it's changing over time, you see

 2    blue starting to fade, white starting to pop, brown,

 3    red, orange, yellow, indicating greater age-adjusted

 4    death rates per 100,000 people.

 5            Do you see that, sir, as we've been

 6    looking at these?

 7            MS. VANNI:  Objection.

 8            THE WITNESS:  I am seeing the transition

 9        of color.

10    BY MR. BUCHANAN:

11        Q.    Okay.  Okay.  And did you stay in a

12    suspicious-order monitoring function in some way in

13    2009, '10, '11?

14            MS. VANNI:  Objection to the form.

15            THE WITNESS:  No.  2009, '10 and '11 --

16        2009, I moved to the McDonough, Georgia,

17        facility, and I was the compliance officer for

18        the McDonough, Georgia, facility until 2011,

19        until they closed the facility in 2011.  That's

20        when I went to Kinray in New York, and I

21        commuted back and forth.

22            During both times I served in the capacity

23        as compliance officer, not in suspicious order

24        monitoring.

25

```
 1    BY MR. BUCHANAN:

 2         Q.   And "compliance officer," as that term was

 3    being used in that 2009, '10, '11 period of time,

 4    didn't include any responsibility or role or function

 5    for suspicious order monitoring?

 6         A.   My only responsibility in that regard

 7    would have been doing site visits, surveillance

 8    visits, type thing, and then reporting back to the

 9    corporate department that handled it.

10              MR. BUCHANAN:  Could we go forward, Evan,

11         2009; let's just see how it looks.

12    BY MR. BUCHANAN:

13         Q.   Getting better or getting worse, sir?

14              MS. VANNI:  Objection.

15              THE WITNESS:  Pardon me?

16    BY MR. BUCHANAN:

17         Q.   Getting better, getting worse?

18              MS. VANNI:  Same objection.

19              THE WITNESS:  The -- by the color

20         transitioning?

21    BY MR. BUCHANAN:

22         Q.   Yeah.

23         A.   It's about the same.

24              MR. BUCHANAN:  Next slide, please.

25
```

```
 1   BY MR. BUCHANAN:

 2        Q.   Getting better or getting worse during

 3   2010?

 4             MS. VANNI:  Objection.

 5             THE WITNESS:  2010's still looking about

 6        the same.

 7             MR. BUCHANAN:  Okay.  Let's fast forward,

 8        2012, sir.

 9   BY MR. BUCHANAN:

10        Q.   You -- I think in 2012 you joined

11   QualiTest; is that right?

12        A.   No.  Late 2013.  I believe October 2013 is

13   when I joined QualiTest.

14        Q.   Thank you.  Thank you.

15             So 2012, we'd agree, you got more red, you

16   got more orange, you got more yellow, more white --

17             MS. VANNI:  Objection.

18   BY MR. BUCHANAN:

19        Q.   -- than you had in 2007, 2008, when you

20   were fulfilling that suspicious order monitoring

21   role?

22             MS. VANNI:  Objection.

23   BY MR. BUCHANAN:

24        Q.   True?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Okay.

 2               MR. BUCHANAN:  Let's go to 2013.

 3    BY MR. BUCHANAN:

 4          Q.   This, now, would be your first year with

 5    QualiTest; is that right?

 6               MS. VANNI:  Objection to form.

 7               THE WITNESS:  I believe October 2013.

 8    BY MR. BUCHANAN:

 9          Q.   Okay.  And you'd agree, sir, that

10    certainly this map is showing an increasing rate of

11    death on an age-adjusted rate basis as compared to

12    2001 when we first looked at the chart with

13    Mr. Papantonio, true?

14               MS. VANNI:  Object to the form.

15               THE WITNESS:  Based on this scale, yes,

16        the chart shows a color difference.

17    BY MR. BUCHANAN:

18          Q.   Okay.  When you were at QualiTest, sir,

19    QualiTest was a manufacturer of opioids and

20    narcotics.  Fair?

21               MS. VANNI:  Object to the form.

22               THE WITNESS:  They were a manufacturer of

23        prescription drugs, including controlled

24        substances, including narcotics.

25
```

```
1   BY MR. BUCHANAN:

2        Q.   About 70 percent of which were controlled

3   substances, right?

4             MS. VANNI:  Object to the form.

5             THE WITNESS:  I don't know.

6   BY MR. BUCHANAN:

7        Q.   Okay.  You didn't have an appreciation,

8   sir, that the company -- the vast majority of the

9   company's business was in fact scheduled drugs?

10            MS. VANNI:  Object to form.

11            THE WITNESS:  You asked did I know was it

12       70 percent, and I said no, I did not know that

13       it was 70 percent.

14  BY MR. BUCHANAN:

15       Q.   Okay.  Fair enough.

16            Did you have an appreciation, sir, that

17  the vast majority -- or the majority of the company's

18  sales were for scheduled drugs?

19            MS. VANNI:  Object to form.

20            THE WITNESS:  There was a -- I can't -- I

21       don't know for sure, but that sounds about

22       right.  It was -- controlled substances was a

23       large part of the business, yes.

24  BY MR. BUCHANAN:

25       Q.   Okay.  And so let's -- let's orient
```

 1    ourselves, I guess, in terms of where QualiTest is in

 2    the picture.  QualiTest is a generic manufacture of

 3    drugs, true?

 4              MS. VANNI:  Objection.  Form.

 5              THE WITNESS:  Yes.

 6    BY MR. BUCHANAN:

 7         Q.   Okay.  They operated through a couple --

 8    couple of different companies; you remember Vintage

 9    Pharmaceuticals?  You remember that name?

10         A.   Vintage Pharmaceuticals, yes.

11         Q.   Okay.  They were one of the registrant

12    holders doing business as QualiTest, true?

13              MS. VANNI:  Object to the form.

14              THE WITNESS:  Yes, I -- I believe that

15        Vintage was one of the DEA registration.

16    BY MR. BUCHANAN:

17         Q.   Okay.  And I guess -- let's talk about

18    that DEA registration.

19              As I understand this, I mean, you can't

20    just decide, legally, that you'd like to distribute

21    or make or sell narcotics, scheduled narcotics,

22    without having a registration, true?

23              MS. VANNI:  Object to the form.

24              THE WITNESS:  A DEA registration is

25        required to handle controlled substances.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2       Q.   Okay.  And as part of that registration

 3   process, I mean, a manufacturer, a distributor, a

 4   pharmacy, they're making a promise, right?

 5            MS. VANNI:  Object to the form.

 6            THE WITNESS:  I don't know the details of

 7       acquiring a -- a registration.  You fill out an

 8       application and -- and so forth, and pay the

 9       fee, and a registration is issued.

10   BY MR. BUCHANAN:

11       Q.   It's a closed system, designed to be,

12   right?

13       A.   It is -- it is designed to be a closed

14   system.

15       Q.   When it's not a closed system, then we

16   have drugs, controlled drugs, leaking out of the

17   system, creating the risk of diversion, abuse,

18   addiction, and injury.  Fair?

19            MS. VANNI:  Objection to form.

20            THE WITNESS:  It is a closed system, like

21       I stated earlier, from the manufacturer to the

22       distributor to the pharmacy to the patient,

23       based on a script that he or she received from

24       the doctor.  That is the system.  So when it

25       goes outside of that system, that's not the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        system that the manufacturers and distributors

 2        operate in.

 3   BY MR. BUCHANAN:

 4        Q.   And so when you get that registration, or

 5   when you apply for it, apply to the government, say,

 6   "I'd like to be a registrant; I'd like to be a

 7   distributor," you're promising that "We're going to

 8   maintain effective controls to prevent diversion,"

 9   right?

10             MS. VANNI:  Object to the form.

11             THE WITNESS:  What comes with obtaining a

12        DEA registration is compliance with the Code of

13        Federal Regulations that govern controlled

14        substances.

15   BY MR. BUCHANAN:

16        Q.   Well, that's a statute, right?

17        A.   The statute, and --

18        Q.   Yeah.

19        A.   -- the Controlled Substances Act, and --

20   yes, 21 CFR, I believe 1300 to the end is what

21   governs controlled substances.

22        Q.   Staying with the the Controlled Substances

23   Act, staying with the statute, staying with the

24   federal law, you'd agree, sir, that a registrant, a

25   distributor, has to maintain effective controls to
```

```
 1   prevent diversion, true?

 2            MS. VANNI:  Object to the form.

 3            THE WITNESS:  That is part of the --

 4        that's part of the regulation, yes.

 5   BY MR. BUCHANAN:

 6        Q.   That's part of the public trust?

 7            MS. VANNI:  Object to the form.

 8   BY MR. BUCHANAN:

 9        Q.   You ask -- "you" being a manufacturer or

10   "you" being a distributor who wishes to distribute a

11   controlled substance -- asks for a registration so

12   that they can distribute controlled substances;

13   that's the ask of the government, right?

14            MS. VANNI:  Object to the form.

15            THE WITNESS:  One asks for a registration

16        so that they can either manufacture and/or

17        distribute controlled substances.

18   BY MR. BUCHANAN:

19        Q.   And in return, you commit to maintain

20   effective controls to prevent diversion.  Fair?

21            MS. VANNI:  Object to the form.

22            THE WITNESS:  That is what the regulation

23        states, and that is what registrants are held

24        to.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   That's what the statute states, right?

 3        A.   That's what -- the statute.

 4        Q.   Okay.  And so we'd agree at the point in

 5   time, sir, in 2013 -- when did you first get

 6   approached -- or did you get approached about joining

 7   QualiTest?  How did that come about, sir?

 8             MS. VANNI:  Object to the form.

 9             THE WITNESS:  I believe it was indeed a

10        job search engine.  I was looking for a job,

11        simply because the commute from Atlanta to

12        La Guardia -- La Guardia is horrible, and I did

13        that for a year and a half, commuting.  I just

14        couldn't do it anymore, so I started looking for

15        another job.

16             So I believe the job search was on the

17        Internet; maybe Indeed or Monster, or whatever

18        the thing was at the time.  I don't remember.

19   BY MR. BUCHANAN:

20        Q.   So was it before or after you interviewed

21   for the job that you learned that QualiTest had

22   problems with their suspicious-orders monitoring

23   system?

24             MS. VANNI:  Object to the form.

25             THE WITNESS:  I never knew that QualiTest
```

```
 1          had problems with their suspicious order

 2          monitoring system.

 3   BY MR. BUCHANAN:

 4        Q.   Not until you got there?

 5             MS. VANNI:  Object to the form.

 6             THE WITNESS:  When I got there, I wasn't

 7          aware of any problems with the suspicious order

 8          monitoring system.

 9   BY MR. BUCHANAN:

10        Q.   Oh.  Okay.  We'll talk about that.

11             At the point in time when you were

12   interviewing with QualiTest, or about the time when

13   you joined, were you aware that the company was

14   selling billions of oxycodone pills on a yearly or

15   biyearly basis?

16             MS. VANNI:  Object to the form.

17             THE WITNESS:  I was not aware of the

18          quantity or sales of controlled substances by

19          the company.

20   BY MR. BUCHANAN:

21        Q.   Were you aware that the DEA had a sitdown

22   with them --

23             MR. PAPANTONIO:  Object to the form.

24   BY MR. BUCHANAN:

25        Q.   -- and said, "You're not doing what you
```

Highly Confidential - Subject to Further Confidentiality Review

1   need to do with regard to your suspicious order

2   monitoring"?

3              Were you aware of that, sir?

4              MS. VANNI:  Object to the form.

5              THE WITNESS:  What time frame are you

6       asking was I aware of it?

7   BY MR. BUCHANAN:

8       Q.   Would be March 2013.

9       A.   No, I mean what time frame are you asking

10  was I aware of a meeting with DEA?

11      Q.   I guess at the point in time before you

12  joined.

13      A.   Was it prior to my employment?  No, I was

14  not aware.

15      Q.   Okay.  Because before you joined, in fact,

16  the company had a little sitdown with the DEA, and

17  DEA expressed concern with what the company was doing

18  with regard to its monitoring of orders.  Fair?

19              MS. VANNI:  Object to the form.

20              THE WITNESS:  I was not aware of any

21       sitdown prior to my employment with QualiTest.

22  BY MR. BUCHANAN:

23      Q.   After you joined the company, sir, did you

24  subsequently learn that the company had a sitdown

25  with the DEA where the DEA expressed concern with the

Highly Confidential - Subject to Further Confidentiality Review

1   suspicious-order monitoring system the company was

2   employing?

3            MS. VANNI:  Same objection.

4            THE WITNESS:  After my employment, I did

5       have a meeting, and I was told that there was a

6       meeting with DEA.

7   BY MR. BUCHANAN:

8       Q.   The meeting, right?

9            MS. VANNI:  Objection.

10           THE WITNESS:  I don't know what "the

11      meeting" means, but there was a meeting with the

12      DEA.

13  BY MR. BUCHANAN:

14      Q.   Isn't that how you referred to it in your

15  presentation, sir, "the meeting"?

16           MS. VANNI:  Object to the form.

17           THE WITNESS:  I don't recall.

18  BY MR. BUCHANAN:

19      Q.   Okay.  Well, I mean, let's talk about

20  QualiTest in the scheme of narcotics and opioids.

21           MR. BUCHANAN:  Can I have, please, 575.

22      And what's our next in order for the deposition?

23  BY MR. BUCHANAN:

24      Q.   Sir, I'm going to pass you Exhibit 27 to

25  your deposition.

```
 1            (Cardinal-Brantley 27 was marked for

 2     identification.)

 3            MR. BUCHANAN:  Can you pull it up, please,

 4       Evan, while we're getting copies distributed.

 5    BY MR. BUCHANAN:

 6       Q.   And I'll wait until you get one before I

 7    ask you questions.  Here you go.  Here you are.

 8            MR. BUCHANAN:  Counsel, there's a couple

 9       coming over for you.

10    BY MR. BUCHANAN:

11       Q.   Sir, these are charts of -- that were

12    shown to the company at a meeting with the DEA in

13    March of 2013.  I direct your attention, please,

14    to -- I want to use the page numbers in the top

15    right, those little dot numbers; just dot 3, to get

16    it rolling.

17            First of all, have you seen these before?

18       A.   I did see these, I believe, in a binder.

19       Q.   Yeah.  We -- we don't actually get them in

20    a binder when they come to us in litigation, but

21    hopefully you recognize this as something you saw

22    while you were at QualiTest.

23       A.   Yes, that's what I mean.  I -- I believe I

24    saw them in a binder when I was there at QualiTest.

25       Q.   Okay.  So just to set the scene, as you
```

Highly Confidential - Subject to Further Confidentiality Review

1  understand this, sir, the DEA sat down with the

2  company in 2013, March of 2013, and identified a

3  number of concerns with regard to the company's

4  suspicious order practices.  True?

5           MS. VANNI:  Objection to form.

6           THE WITNESS:  If that says that in here --

7     I haven't read it yet; these are just graphs.

8  BY MR. BUCHANAN:

9     Q.  Do you have that recollection, sir?

10          MS. VANNI:  Objection.

11 BY MR. BUCHANAN:

12    Q.  Do you have that recollection or

13 understanding from your time at QualiTest that the

14 DEA sat down, presented charts -- these charts -- had

15 a discussion with the company where they raised

16 concerns with the company's practices as it related

17 to suspicious orders?

18          MS. VANNI:  Object to form.

19          THE WITNESS:  I do remember sitting down

20     and seeing the charts, and I do remember there

21     was a conversation that they had met with DEA.

22     I don't remember what the findings were or the

23     details from that conversation.

24 BY MR. BUCHANAN:

25    Q.  Okay.  And so this comes from the DEA's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    assembly of data across manufacturers and the

 2    information they captured.  We're on point 3.

 3             And you see the first two columns on the

 4    left, sir?  Not really columns; like I said, the

 5    vertical bars.  Vintage Pharmaceuticals and Generics

 6    Bidco, LLC.

 7             Do you see those two?

 8        A.   Yes.

 9        Q.   Now you recognize those companies, sir, as

10    QualiTest affiliates that were in the business of

11    making narcotics?

12             MS. VANNI:  Objection.

13             THE WITNESS:  I remember seeing Vintage

14       Pharmaceuticals and Generic Bidco.

15    BY MR. BUCHANAN:

16        Q.   Okay.  So this is showing, sir, if I've

17    got it right, that -- and follow along with me here.

18    We have got 102 million pills.

19             And what's the period of time, sir?

20    Vintage Pharmaceuticals, 102 million pills they're

21    making?  What year is that?

22             MS. VANNI:  Object to the use of this

23       document, to the extent it predates his

24       employment with the company.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2       Q.   I think you said you saw it, right?

 3   During your employment with the company, sir?

 4       A.   Well, the question is -- the date is

 5   March 6th, 2013, and during my employment, I did see,

 6   again, a binder with these graphs in it.

 7       Q.   Oh, good.  I just want to make sure we

 8   were still on the same page.

 9            102 million pills.  And this is -- this is

10   just one -- one tablet strength, and for one pill

11   bottle format, correct?

12            MS. VANNI:  Object to the form.

13   BY MR. BUCHANAN:

14       Q.   Oxycodone, 15 milligrams; you see that,

15   right?  Right there, sir?

16       A.   Yes, oxycodone, 15 milligrams.

17       Q.   Okay.  And between the two, what's that,

18   200 million pills?

19            MS. VANNI:  Object to the form.

20            THE WITNESS:  Yes.

21   BY MR. BUCHANAN:

22       Q.   200 million pills.  One dosage, one bottle

23   size, and one year; is that right?

24            MS. VANNI:  Object to the form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BUCHANAN:

2         Q.   Is that what this shows, sir?

3         A.   According to this form --

4              MS. VANNI:  Same objection.

5              THE WITNESS:  -- yes, 200 million pills.

6    BY MR. BUCHANAN:

7         Q.   All right.  Let's -- let's move forward.

8              I guess I should -- I probably didn't set

9    this chart up right.  We'll do -- and we said -- and

10   I'm -- we're doing some rounding here, sir, just

11   because I think we're -- we're close enough if we're

12   within a million or so, but 200 million pills in

13   2011.  Fair?

14             MS. VANNI:  Objection.

15             THE WITNESS:  Yes.

16   BY MR. BUCHANAN:

17        Q.   Okay.  Could you scroll forward with me,

18   sir, to -- let's see -- point 10.  Two pages down.

19             Again we see that Vintage Pharmaceuticals

20   and Generics Bidco.  You see that?  First two columns

21   on the left?

22        A.   Yes.

23        Q.   What's that up to, roughly?  250?

24   250 million?

25             MS. VANNI:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes, about -- about 250.

 2   BY MR. BUCHANAN:

 3       Q.   All right.  250 million pills.  And that's

 4   2012, right?

 5       A.   Yes.

 6       Q.   Okay.  So you went from 200 million oxy,

 7   15 milligrams, in that one bottle size, to

 8   250 million over that year.  Is that right?

 9              MS. VANNI:  Object to form.

10              THE WITNESS:  This year was 2012.  I don't

11        remember what the other year was, but . . .

12   BY MR. BUCHANAN:

13       Q.   Okay.

14              MR. BUCHANAN:  And can I just have the

15        Elmo real quick, Evan.

16   BY MR. BUCHANAN:

17       Q.   So-- I just want to make sure we don't get

18   too far down; we're kind of keeping track, right?

19       A.   Okay.

20       Q.   Those are -- those numbers track, we've

21   been talking about?

22              MS. VANNI:  Object to the form.

23   BY MR. BUCHANAN:

24       Q.   Oxy, 15 milligrams, 100-count bottles,

25   200 million in 2011, 250 million in 2012, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VANNI:  Same objection.

 2              THE WITNESS:  Yes.

 3  BY MR. BUCHANAN:

 4      Q.   Okay.  Oxycodone was a drug of abuse,

 5  true?

 6              MS. VANNI:  Objection.

 7              THE WITNESS:  Oxycodone is a Schedule II

 8       controlled substance.  As a Schedule II, it's

 9       prone to abuse.

10  BY MR. BUCHANAN:

11      Q.   Okay.  And also prone to diversion; you

12  knew that, right, sir?

13              MS. VANNI:  Objection.

14              THE WITNESS:  By being a Schedule II drug,

15       that means it's prone to abuse and diversion.

16  BY MR. BUCHANAN:

17      Q.   Okay.

18              MR. BUCHANAN:  Let's see if we can get to

19       -- scroll forward a little bit.

20  BY MR. BUCHANAN:

21      Q.   The company also sold oxy, 15 milligrams,

22  in 500-count containers; isn't that right?

23              MS. VANNI:  Object to the form.

24  BY MR. BUCHANAN:

25      Q.   If you go to page 18.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Okay.

 2          Q.   Sorry.  Been a few years.

 3               All right.  Now we're back on 2011.

 4               Oxy, 15-milligram, 500-count bottles; see

 5     those?

 6          A.   Yes.

 7          Q.   And I guess you sold less of this

 8     particular bottle size, right, sir?

 9               MS. VANNI:  Objection.

10     BY MR. BUCHANAN:

11          Q.   That -- what's that, about 13 million?

12     Does that sound right?

13          A.   Yes.

14          Q.   All right.  Let's move on to point 24.

15               Okay.  This looks like -- what, about

16     23 million pills sold in 2012?

17               MS. VANNI:  Objection.

18     BY MR. BUCHANAN:

19          Q.   Of this oxy 15 in the 500-bottle count,

20     right?

21               MS. VANNI:  Same objection.

22               THE WITNESS:  Yes.

23     BY MR. BUCHANAN:

24          Q.   Okay.

25               MR. BUCHANAN:  Can I just flip back to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Elmo real quick, Evan.

 2   BY MR. BUCHANAN:

 3          Q.   All right.  I guess just in -- in these

 4   two bottle counts, sizes, sir, you're up to a half a

 5   billion pills in two years at QualiTest for oxy 15s,

 6   right?

 7               MS. VANNI:  Object to the form.

 8               THE WITNESS:  270.  213.

 9   BY MR. BUCHANAN:

10          Q.   I'm sorry, for two years, yeah, 200.

11   That's 450 -- I'm sorry, sir.  What is that?

12   About --

13          A.   About 490.

14          Q.   490.  Getting close?

15          A.   Yes.

16          Q.   All right.  Let's -- there was another

17   dosage strength of oxycodone that the company made

18   and sold, right?

19          A.   I believe so.  I'd have to see the data.

20          Q.   All right.  Let's see what that looks

21   like.

22               MR. BUCHANAN:  Could I please have --

23          let's go to page point 30, Evan.

24               MS. VANNI:  I'm sorry, what page?

25               MR. BUCHANAN:  Point 30.  Top right
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        corner.

 2             MS. VANNI:  Thank you.

 3   BY MR. BUCHANAN:

 4        Q.   All right.  And is this showing, sir,

 5   the -- the pill counts manufactured and sold by the

 6   two QualiTest entities in 2011 for the oxy

 7   30-milligram dosage strength?

 8             MS. VANNI:  Object to the form.

 9             THE WITNESS:  Yes.

10   BY MR. BUCHANAN:

11        Q.   And what do you have, about 182 million

12   pills for 2011?

13             MS. VANNI:  Object to the form.

14   BY MR. BUCHANAN:

15        Q.   Does that look right to you, sir?

16        A.   Yes.

17        Q.   Okay.  All right.

18             MR. BUCHANAN:  Let's go to 2012.  Page

19        point 43.  All right.

20   BY MR. BUCHANAN:

21        Q.   Page point 43, two left columns.  That's

22   reflecting the production there for the other two

23   QualiTest facilities, Generics Bidco and Vintage

24   Pharmaceuticals.  Oxy, 30 milligrams, again in the

25   100-count bottle.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And -- looks like you're growing the

 2    market, huh?

 3              MS. VANNI:  Object to the form.

 4    BY MR. BUCHANAN:

 5         Q.   What are we up to, 280 million?

 6              MS. VANNI:  Object to the form.

 7              THE WITNESS:  Yes.

 8    BY MR. BUCHANAN:

 9         Q.   Probably a little low with the 280, but

10    that's good enough for our purposes; two hundred

11    and --

12              MS. VANNI:  Object to the colloquy.

13              MR. BUCHANAN:  Okay, I'll be more precise.

14    BY MR. BUCHANAN:

15         Q.   285 million:  Does that sound closer to

16    you, sir?

17         A.   Yes.

18         Q.   Okay.  Wow.  Picked up 100 million pills

19    you sold between 2011, 2012.

20              All right, we're following each other,

21    right, sir?  My -- my writing is not the best, but

22    does that correlate with your memory of your

23    testimony?

24         A.   Yes.

25         Q.   Okay.  Let's move on.
```

```
 1              Let's see -- oxy -- I'm sorry, Oxy,

 2    30 milligrams, and 500 count.

 3              MR. BUCHANAN:  All right.  Can we go to

 4       point 50.

 5    BY MR. BUCHANAN:

 6       Q.   And I think that's showing -- what, about

 7    20 million pills, sir, in those two columns, if you

 8    add them up?  Oxycodone, 30-milligram, 500s.  Okay?

 9       A.   Yes.

10       Q.   All right.  Moving on to point 54, let's

11    look at the 2012 numbers.

12              Is that 46 million?

13              MS. VANNI:  Object to the form.

14    BY MR. BUCHANAN:

15       Q.   46 million dosage units, sir?

16       A.   Yes.  Yes.

17       Q.   Okay.  Close to a billion oxy, sir, in two

18    years, two dosage strengths?

19              Is that what you have?

20              MS. VANNI:  Objection.

21              THE WITNESS:  Give or take, yeah, close to

22       a billion.

23    BY MR. BUCHANAN:

24       Q.   A billion pills.  Oxycodone, highly

25    abused, highly diverted.  True, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. VANNI:  Objection.

 2                THE WITNESS:  I can't speak if it's highly

 3         abused or highly diverted.  It is definitely

 4         prone to abuse and diversion.

 5    BY MR. BUCHANAN:

 6         Q.    Okay.  And the company made other schedule

 7    drugs, right?

 8         A.    Yes.

 9         Q.    Hydrocodone was a popular one the company

10    sold?

11                MS. VANNI:  Object to the form.

12                THE WITNESS:  The company sold

13         hydrocodone.

14    BY MR. BUCHANAN:

15         Q.    And you know that hydrocodone was

16    ultimately a Schedule II; was that 2013, '14?

17         A.    It was up-scheduled, I believe, October of

18    one of those years.

19         Q.    Okay.  And another drug that was prone to

20    abuse, true?

21                MS. VANNI:  Object to the form.

22                THE WITNESS:  Yes.

23    BY MR. BUCHANAN:

24         Q.    And diversion?

25                MS. VANNI:  Same objection.
```

```
 1                  THE WITNESS:  Yes.

 2   BY MR. BUCHANAN:

 3        Q.   Another one you made billions of tablets

 4   of, right?

 5                  MS. VANNI:  Objection.

 6                  THE WITNESS:  I'd have to see the charts

 7       to know how many tablets we made.

 8   BY MR. BUCHANAN:

 9        Q.   Okay.  Just -- let me just take you to

10   one, and -- we're going to have to build this one out

11   for this one, too, but -- can you go to point 59.

12                  These are, again, the two QualiTest

13   facilities there on the bottom left:  Vintage and

14   Generics Bidco.

15                  Do you see that?

16        A.   Yes.

17        Q.   Okay.  And I won't build the full chart

18   out, sir, but it's -- what's that, 262 million dosage

19   units of the hydrocodone 10s combined with

20   acetaminophen?

21        A.   Yes.

22        Q.   And that's just in the hundred-count

23   bottle, right?

24                  MS. VANNI:  Object to the form.

25                  THE WITNESS:  Yes.
```

```
 1              MR. BUCHANAN:  Could we go to point 67.

 2  BY MR. BUCHANAN:

 3       Q.   Looks like, sir, in 2012, you guys are up

 4  to 560 million dosage units.  560 million dosage

 5  units of hydrocodone 10, acetaminophens, in the

 6  100-count bottle, in one year.

 7              Do I have that correct, sir?

 8              MS. VANNI:  Object to the form.

 9              THE WITNESS:  Yes.

10  BY MR. BUCHANAN:

11       Q.   You wouldn't fuss with me, sir, in saying

12  that just based on your experience with one year and

13  one dosage and one combination, that you sold

14  billions in hydrocodone in 2011 and 2012, would you,

15  sir?

16              MS. VANNI:  Object to the form.

17              THE WITNESS:  I can't attest to the

18       billions, but I'm sure there was -- just from

19       what I've looked at so far, a billion, at least.

20  BY MR. BUCHANAN:

21       Q.   Yeah, and that was just --

22       A.   Yeah.

23       Q.   That was just for one, right?

24              There's other pages in here, and I've got

25  a limited window of time, so I'm going to -- I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    going to move along.  If the jury would like to look

 2    at it, I'm sure they'll have the chance.

 3              All right, sir.  So we can agree it's a

 4    closed system -- supposed to be a closed system,

 5    right?

 6              MS. VANNI:  Object to the form.

 7              THE WITNESS:  Yes.

 8    BY MR. BUCHANAN:

 9       Q.   And your promise as a registrant is that

10    you -- you, the registrant -- are going to ensure and

11    create effective controls to prevent diversion,

12    right?

13              MS. VANNI:  Object to the form.

14              THE WITNESS:  That we're going to have

15        systems in place to help prevent diversion, to

16        identify and prevent diversion.

17    BY MR. BUCHANAN:

18       Q.   Well, I mean, you're getting fuzzy on the

19    statute with me, sir.

20              We talked about the statute earlier,

21    right?

22              MS. VANNI:  Objection.

23              THE WITNESS:  Yes.  And the statute states

24        that the registrant shall implement a system to

25        identify and notify DEA of potential -- of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        suspicious orders.

 2   BY MR. BUCHANAN:

 3        Q.   "A registrant shall have effective

 4   controls to prevent diversion."

 5             Does that language sound familiar to you,

 6   sir?

 7        A.   I was referring to 21 CFR 1301.74(b).

 8        Q.   And I'm referring you to the statute in

 9   the Controlled Substances Act, sir.  It's a statute

10   you're familiar with; you cited it in your

11   PowerPoints, right?

12             MS. VANNI:  Object to the form.

13             THE WITNESS:  I may have put it in the

14        PowerPoints over time, yes.

15   BY MR. BUCHANAN:

16        Q.   Right.  And a registrant shall maintain

17   effective controls against -- to prevent diversion.

18             That's what the statute says, right?

19             MS. VANNI:  Object to the form.

20             THE WITNESS:  Yes.

21   BY MR. BUCHANAN:

22        Q.   As a manufacturer, sir, pumping out

23   billions of pills with hydrocodone, oxycodone, would

24   you agree, sir, that the company has a

25   responsibility, as a reasonable company, to prevent
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diversion?

 2              VIDEOGRAPHER:  Object to the form.

 3              THE WITNESS:  According to the statute and

 4         the regulation that we both discussed, that's a

 5         responsibility of a registrant.

 6              MR. BUCHANAN:  Even separate from that,

 7         sir, this is dangerous stuff.  True?

 8              MS. VANNI:  Object to the form.

 9              THE WITNESS:  The two drugs that you

10         mentioned are Schedule II controlled substances,

11         which means, as you know, they are prone to

12         abuse and diversion.

13    BY MR. BUCHANAN:

14         Q.   Okay.  And I said "dangerous."

15              Would you agree with me?

16              MS. VANNI:  Objection.  Form.

17              THE WITNESS:  These are drugs that are

18         prescribed by a doctor and dispensed by a

19         pharmacy and consumed.  So your definition of

20         "dangerous" is your definition, but they are a

21         prescription drug that are prescribed by doctors

22         and dispensed by pharmacies and so forth.

23    BY MR. BUCHANAN:

24         Q.   Well, we looked at the chart, sir, and we

25    looked at overdose deaths.  You see that?  Remember,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    we went through from 2000 -- I think we picked it up

 2    at 2006?

 3            A.   Yes, this chart.

 4            Q.   You looked at that, right?

 5            A.   Yes.

 6            Q.   You saw the death rate climb as the years

 7    went along?

 8                 MS. VANNI:  Objection.

 9                 THE WITNESS:  I did see the change in

10            colors over the -- from 2001 to -- I think you

11            went up to '13 or something.

12    BY MR. BUCHANAN:

13            Q.   Right.  So this stuff, oxycodone,

14    hydrocodone, is dangerous; can we agree?

15                 MS. VANNI:  Objection.

16                 THE WITNESS:  I would say that the abuse

17            of these drugs could be dangerous.

18    BY MR. BUCHANAN:

19            Q.   Right.  A reasonable manufacturer, sir,

20    implements systems to prevent diversion, true?

21                 MS. VANNI:  Object to the form.

22                 THE WITNESS:  Manufacturers implement

23            systems to identify diversion.

24    BY MR. BUCHANAN:

25            Q.   A reasonable one does that, right?
```

```
 1              MS. VANNI:  Object to the form.

 2   BY MR. BUCHANAN:

 3        Q.   Should do that.

 4        A.   A manufacturer that has a DEA

 5   registration, per the statute and the -- the

 6   regulation that we've gone over, is to identify -- is

 7   to have a system in place to identify and report

 8   suspicious orders.

 9   BY MR. BUCHANAN:

10        Q.   I'm just saying as a -- as a member of the

11   public -- and I'm -- I'm using a company as a

12   member -- as a member of the public in this country,

13   selling something that is addictive, that can lead to

14   overdoses, that can tear up families, that can tear

15   up communities, that can kill people, would you

16   agree, sir, even if the DEA didn't say anything more,

17   if you were going to pump out 2 billion pills, you

18   better take care in your distribution of this product

19   to make sure the usage is contained as designed?

20              MS. VANNI:  Object to the form.

21   BY MR. BUCHANAN:

22        Q.   Can we agree on that?

23              MS. VANNI:  Objection.

24              THE WITNESS:  I will say that a

25        manufacturer, per the regulation, should operate
```

1          in a closed-door system and design a system to

2          identify and report suspicious orders.

3     BY MR. BUCHANAN:

4          Q.   You see, sir -- would you agree, sir, that

5     when these products that you made billions of tablet

6     of in 2011 and 2012, when they leave legitimate

7     channels they've been manufactured to support,

8     heart-wrenching consequences can occur; would you

9     agree with me on that?

10              MS. VANNI:  Object to the form.

11              THE WITNESS:  The abuse of controlled

12         substances is sad.

13    BY MR. BUCHANAN:

14         Q.   Would you agree, sir, as a responsible

15    corporate citizen, you got to do as much as you can

16    do to prevent drug abuse and diversion in the

17    communities?

18              Would you agree to that, sir?

19              MS. VANNI:  Object to the form.

20    BY MR. BUCHANAN:

21         Q.   As a responsible corporate citizen?

22         A.   Again, I go back to the governing statute

23    and regulation --

24         Q.   Okay.

25         A.   -- of having a secure supply chain and

1    designing a system to identify and report suspicious

2    orders.

3              MR. BUCHANAN:  Let's get 594 for the

4        witness and counsel.

5              And what's the next in order, Scott?  28?

6        Okay.

7    BY MR. BUCHANAN:

8        Q.   This is going to be Exhibit 28 to your

9    deposition, sir.

10       (Cardinal-Brantley 28 was marked for

11   identification.)

12   BY MR. BUCHANAN:

13       Q.   This is kind of fresh after your arrival

14   at the company, sir.  This is, I believe,

15   October 2013.

16             I'm sorry, there's an e-mail, and then

17   behind the e-mail, there's a letter.  I'm going to be

18   spending my time with the letter.  You're free to

19   peruse the cover page if you'd like.

20             It's an October 18, 2013, letter.  "Dear

21   Valued Customer."

22             You see that, sir?

23       A.   Yes.

24       Q.   "A large percentage of QualiTest products

25   are categorized as controlled substances or listed

Highly Confidential - Subject to Further Confidentiality Review

1   chemicals that are regulated by the Drug Enforcement

2   Administration."

3           Sir, do you see that?

4       A.   Yes.

5       Q.   That's what you wrote in the letter, and

6   that's consistent with your memory, right?

7           MS. VANNI:  Objection to the

8       characterization of him writing the letter.

9           THE WITNESS:  This letter was signed by

10      Tracey Hernandez.

11  BY MR. BUCHANAN:

12      Q.   Oh, I see.  And -- and are you not cc'd on

13  this, sir?

14      A.   I'm listed at the bottom as a DE

15  Compliance Department contact.

16  BY MR. BUCHANAN:

17      Q.   Okay.  You are a DE Compliance Department

18  contact on this letter that went out to your

19  customers on October 18, 2013, correct, sir?

20          MS. VANNI:  Object to the form.

21          THE WITNESS:  Yes.

22  BY MR. BUCHANAN:

23      Q.   Okay.  Continuing the first paragraph, it

24  says, "These products, while necessary for patients,

25  can be targets for abuse and diversion."

```
 1                You'd agree with that statement; true,

 2   sir?

 3        A.   Yes.  As a controlled substance, they are

 4   prone to abuse and diversion.

 5        Q.   "And as a result, these products have

 6   become highly desirable and to those seeking to abuse

 7   or divert for profit."

 8                See that?

 9        A.   I do.

10        Q.   Okay.  You had that knowledge in 2013,

11   sir?

12                MS. VANNI:  Object to the form.

13                THE WITNESS:  Again, as a Schedule II

14        or III controlled substance, they are prone to

15        abuse and addiction.

16   BY MR. BUCHANAN:

17        Q.   I'm just -- I'm not asking you to reframe

18   it or give me something else; I just want to make

19   sure you had that knowledge.

20                You agree with that?

21        A.   I can only go back to the regulation.

22        Q.   Well, this doesn't relate to the

23   regulation, sir.  This is just a fact:  "Certain

24   QualiTest products have become highly desirable to

25   seeking to abuse or divert for profit."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you agree or disagree, sir?

 2         A.    That is the definition of a Schedule II

 3    controlled substance.

 4         Q.    I'm not asking whether it's a definition,

 5    sir.  I'm asking you factually.

 6                   This is just an event?

 7         A.    Factually, it is a Schedule II --

 8    factually, it is a Schedule II controlled substance,

 9    and as a Schedule II controlled substance, they are

10    prone to abuse and diversion.

11         Q.    Okay.

12                   "When our products leave legitimate

13    channels they have been manufactured to support,

14    heart-wrenching consequences often occur."

15                   See that, sir?

16         A.    I do.

17         Q.    Next in this letter to your valued

18    customers, sir, it's written response -- "As

19    responsible corporate citizens, individuals, parents,

20    friends, caregivers, relatives, and acquaintances, we

21    need to do as much as we can do to prevent drug abuse

22    and diversion in our communities."

23                   Did I read that correctly, sir?

24                   MS. VANNI:  Object to the colloquy in the

25         beginning.
```

```
 1   BY MR. BUCHANAN:

 2        Q.   Did I read that correctly?

 3        A.   Yes.

 4        Q.   Thank you.

 5             It states:  "Each company and individual

 6   in the supply chain has that responsibility."

 7             Did I read that correctly, sir?

 8        A.   Yes.

 9        Q.   "To put adequate controls in place to

10   discourage and prevent the diversion of prescription

11   products for uses other than those for which they

12   were originally intended."

13             Did I read that correctly, sir?

14        A.   Yes.

15        Q.   Okay.  And the context around this letter,

16   sir, is that you had a visit with the DEA down in

17   Washington in the spring of 2013, right?

18             MS. VANNI:  Object to the form.

19   BY MR. BUCHANAN:

20        Q.   I'm sorry, your QualiTest -- I'd say

21   co-employees, once you joined, but Ms. Hernandez and

22   others had a meeting with the DEA in the spring of

23   2013, right?

24        A.   There was a meeting with the DEA.

25        Q.   Okay.  And you were scheduled to go back
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and see the DEA again in October of 2013 and show how

 2   you shored up your systems, right?

 3             MS. VANNI:  Object to the form.

 4             THE WITNESS:  I don't know if -- if there

 5        was another meeting in October 2013.

 6   BY MR. BUCHANAN:

 7        Q.   Okay.  All right.

 8             It states what you're going to do here at

 9   the bottom.  You're making changes that may impact

10   your customers when placing orders, right?  Changes?

11        A.   Are you on the same page?

12        Q.   I am.  Second paragraph -- third

13   paragraph, sir:  "Some of these changes may impact

14   you in placing orders with us in the future," just to

15   orient you, sir:

16             You see that?

17             I'm going to read the --

18        A.   "QualiTest would like to make you aware of

19   some changes that we are making."  Okay, yes.

20        Q.   Okay.  So QualiTest was making changes,

21   right?

22             MS. VANNI:  Object to the form.

23             THE WITNESS:  Yes.

24   BY MR. BUCHANAN:

25        Q.   Okay.  "QualiTest is enhancing its due
```

1    diligence efforts when fulfilling orders to provide

2    greater assurance that our products are purchased by

3    appropriate patients for prescribed uses."

4              Is that right?

5         A.   That's what it says.

6         Q.   Okay.  That's something reasonable for a

7    company to do, right?

8              MS. VANNI:  Object to the form.

9              THE WITNESS:  It's always good to make

10        enhancements.

11   BY MR. BUCHANAN:

12        Q.   Well, it's always good to do whatever you

13   can do to make something that's really dangerous less

14   dangerous; would you agree with me, sir?

15             MS. VANNI:  Objection.

16             THE WITNESS:  It's always good to enhance

17        any program.

18   BY MR. BUCHANAN:

19        Q.   Right.  And what you're talking about here

20   is products that have become highly desirable to

21   those seeking to abuse or divert for profit, right?

22        A.   I believe that was stated in the letter.

23        Q.   Okay.  And then you're talking about

24   changes that are going to be implemented, right, as a

25   responsible corporate citizen, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. VANNI:  Object to the form.

 2                    THE WITNESS:  This letter is about the

 3            changes that would be implemented.

 4      BY MR. BUCHANAN:

 5            Q.   Okay.  And you're just telling your

 6      customers that, right?  So they're not surprised when

 7      all of a sudden, if -- you know their orders start

 8      getting canceled, right?

 9                    MS. VANNI:  Object to the form.

10                    THE WITNESS:  Just telling the customers

11            about the changes.

12      BY MR. BUCHANAN:

13            Q.   Okay.  You say, "As a result, you may

14      receive more frequent inquiries from QualiTest

15      regarding your own suspicious monitoring efforts."

16                    Let's pause on that.

17                    So what you did when you implemented this

18      change is you started asking your customers, these

19      people -- well, withdrawn.

20                    QualiTest is a manufacturer, true?

21            A.   Yes.

22            Q.   Also had a distributor registration, true?

23            A.   Yes.

24            Q.   Okay.  And so -- but when QualiTest is

25      selling to folks like Cardinal, your prior employer,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    they're a middleman, right?  They're not -- they're

2    not dispensing the drug to patients, right?

3         A.   Who's a middleman?  QualiTest?

4         Q.   Cardinal, wholesalers -- wholesalers,

5    distributors -- they're middlemen?

6         A.   Your question wasn't clear.  So you're

7    asking me whether Cardinal is a middleman or whether

8    QualiTest is a middleman?

9         Q.   If it wasn't clear, I apologize, sir.

10   What I was saying is, QualiTest was making pills,

11   right?

12        A.   QualiTest is the manufacturer of --

13        Q.   We saw, you know, billions of scheduled

14   drugs being made in 2011 and 2012 alone, true?

15             MS. VANNI:  Objection.

16             THE WITNESS:  Yes, according to the -- the

17        graphs that we --

18   BY MR. BUCHANAN:

19        Q.   Okay.

20        A.   -- reviewed earlier.

21        Q.   And then QualiTest is going to put those

22   in the hands of -- sometimes directly with retail

23   pharmacies, but mostly through distributors, right?

24             MS. VANNI:  Object to the form.

25             THE WITNESS:  Yes.
```

Highly Confidential – Subject to Further Confidentiality Review

```
1    BY MR. BUCHANAN:

2         Q.   Right.  And the distributors are then

3    going to route these things to their ultimate home, a

4    pharmacy, where they could be dispensed if they're

5    not diverted, right?

6         A.   Right.  They were selling to the final

7    dispensers:  Pharmacies, hospitals, and so forth.

8         Q.   So one of the things you're going to do is

9    you're going to start asking if they have suspicious

10   order monitoring processes, right?  Going to start

11   knowing your customer, right?

12            MS. VANNI:  Object to the form.

13            THE WITNESS:  By the phrase start, I can't

14        speak to what was done prior to my arrival.  So

15        to say that something is going to start with

16        this letter, again, I can't speak to what was

17        done prior to October 2013, when I arrived.

18   BY MR. BUCHANAN:

19        Q.   Okay.  But you were going to be asking

20   your customers for their suspicious-order monitoring

21   protocols, right?

22        A.   That is a question on the attached

23   questionnaire.

24        Q.   Yeah.  I mean, that's -- that's what's

25   listed as a change, right?  Some things are going to
```

```
 1   change, and that's one of the things you list as a

 2   change, right?

 3              MS. VANNI:  Object to the form.

 4              THE WITNESS:  Show me the exact statement

 5         so I can know exactly what it says, please.  I

 6         got lost in here.

 7   BY MR. BUCHANAN:

 8         Q.   Okay.

 9         A.   Where, exactly --

10         Q.   Beginning of the paragraph, it says "going

11   to be making some changes"; do you see that?

12         A.   No, I mean to the question that you asked

13   about specifically what was going to change.

14         Q.   Okay.  "As a result, you may receive more

15   frequent inquiries from QualiTest regarding your own

16   suspicious-order monitoring efforts, the quantity of

17   the product you are ordering from us, or the customer

18   service."

19              Do you see that, sir?

20         A.   Yes, "you may receive more frequent

21   inquiries," which means --

22         Q.   My question to you, sir, is do you see

23   that?

24         A.   Yes, it is, which means that they were --

25         Q.   No, no.  No, no, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   -- prior to --

 2              MS. VANNI:  Let him finish.

 3   BY MR. BUCHANAN:

 4          Q.   My question is:  Do you see it?

 5          A.   I see it.

 6              MR. FULLER:  You'll have an opportunity to

 7         do a direct examination --

 8              MS. VANNI:  No, let him answer

 9         his question.

10              THE WITNESS:  I was answering your

11         previous question.

12              MR. BUCHANAN:  No, no, no.  That's not how

13         it works.  An examination -- an examination here

14         is supposed to proceed as it would in court.  A

15         witness would not be permitted to do that in

16         court.

17              MS. VANNI:  He's allowed to answer his --

18         your question.

19              MR. BUCHANAN:  That's not an answer.  The

20         answer was -- did it -- do you see that, sir?

21              MS. VANNI:  It may not be an answer you

22         like --

23              MR. BUCHANAN:  No, that's not --

24              MS. VANNI:  -- that's an answer.

25              MR. BUCHANAN:  Okay.  We'll move along.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        It's not a matter of whether I like it or not,

 2        sir.  I just like responsive answers to my

 3        questions.

 4             MS. VANNI:  Move to strike the colloquy.

 5   BY MR. BUCHANAN:

 6        Q.   All right.  You're also going to start

 7   doing due diligence visits.

 8             You see that, sir?

 9             MS. VANNI:  Object to the form.

10             THE WITNESS:  I'm trying to read where it

11        says that.

12   BY MR. BUCHANAN:

13        Q.   Did you do due diligence visits while you

14   were at QualiTest, sir?

15        A.   Yes.

16        Q.   Okay.  This is -- what's the date of this

17   -- October 18th, 2013.  So this is -- what, two

18   weeks, two and a half weeks after you joined the

19   company?

20        A.   I don't remember my exact start date.  I

21   believe it was October 2013.  I don't remember when.

22        Q.   Do you remember sharing with your

23   colleagues, sir, your vision for QualiTest's

24   suspicious order monitoring system?

25             MS. VANNI:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  Are you referring to a
 2          training?  Are you referring to a PowerPoint?
 3          Are you referring to -- a conversation?
 4   BY MR. BUCHANAN:
 5          Q.   I'm referring to your vision for it.
 6                  MS. VANNI:  Object to the form.
 7                  THE WITNESS:  What was your original
 8          question?
 9   BY MR. BUCHANAN:
10          Q.   Do you recall sharing, sir, with your
11   colleagues, your vision for their suspicious order
12   monitoring system?
13                  MS. VANNI:  Same objection.
14                  THE WITNESS:  Again, on several occasions
15          I've had meetings with colleagues regarding
16          the -- the system.  So, yes, I remember sharing.
17   BY MR. BUCHANAN:
18          Q.   Okay.  And so this arises, as we said,
19   there was a -- there's this meeting with the FDA in
20   March of 2013.  There's a further meeting with FDA in
21   October of 2013.  You step in September of 2013.
22   True?
23                  MS. VANNI:  Objection.
24                  THE WITNESS:  Do you mean DEA?  You stated
25          "FDA."
```

```
 1   BY MR. BUCHANAN:

 2        Q.   Thank you.  I appreciate the

 3   clarification.  I'll withdraw that question.

 4             There was a meeting with DEA, March of

 5   2013, during which suspicious order monitoring was

 6   discussed?

 7             MS. VANNI:  Object to the form.

 8             THE WITNESS:  I believe that's what we

 9        reviewed.

10   BY MR. BUCHANAN:

11        Q.   There was a follow-up six months later,

12   right?

13             MS. VANNI:  Objection.

14        Q.   In October of 2013, with the DEA?

15        A.   I believe that's what you stated.

16        Q.   Okay.  And you joined the company in

17   September 2013, right?

18             MS. VANNI:  Objection.

19             THE WITNESS:  I don't recall if it was

20        September or October 2013.

21   BY MR. BUCHANAN:

22        Q.   Okay.

23        A.   Somewhere around that time frame.

24             MR. BUCHANAN:  Can we pass the witness 58,

25        please -- 583.  Excuse me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   This is an e-mail, sir -- and I'll -- I'll

 3   wait before I get into the meat of it -- from

 4   yourself to yourself, Monday, October 7, 2013.

 5             I'll represent to you, sir, I've seen

 6   reference that you started on September 30.

 7             Does that refresh your recollection?  I

 8   mean, it's your testimony; I'm just asking if that

 9   helps you remember.

10        A.   If you have seen something that stated I

11   started September 30th, I accept that.

12        Q.   Okay.  So we're looking now at --

13             MR. BUCHANAN:  What was the exhibit we

14        identified?  29?  This is Brantley 29.

15        (Cardinal-Brantley 29 was marked for

16   identification.)

17   BY MR. BUCHANAN:

18        Q.   "Below is a high-level outline of my

19   vision for our SOM program."

20             Do you see that, sir?

21        A.   Yes.

22        Q.   Okay.  You talk about implementing new

23   account setup criteria, correct?

24        A.   Yes.

25        Q.   Do you recall, sir, the implementation of
```

1    questionnaires now for new accounts as part of the

2    setup process and the verification process of

3    QualiTest in this fall of 2013 time?

4              MS. VANNI:  Object to form.

5              THE WITNESS:  I did draft questionnaires.

6         I believe one was attached to the previous

7         document.

8    BY MR. BUCHANAN:

9         Q.   Okay.  So the letter that we just looked

10   at, the one from October, was that 18th?  You're

11   saying you did the questionnaire that was attached to

12   that?

13        A.   This looks like a draft of the

14   questionnaire that I did, yes.

15        Q.   Okay.  Well, it's -- it's attached to a

16   signed letter, right?

17             MS. VANNI:  Object to the form.

18   BY MR. BUCHANAN:

19        Q.   I'm just confirming, sir, that --

20   that's -- that's the one that went with it, right?

21        A.   It's -- it's stapled to this letter, yes.

22        Q.   Okay.  And that's something you prepared

23   once you got to QualiTest, right?

24        A.   This questionnaire is one that I -- it

25   looks like one that I prepared.

```
 1           Q.   Okay.  Getting back now to the -- what

 2   exhibit are we on, Scott?  29?

 3                It's a high-level outline of your vision

 4   for the SOM program, right?

 5           A.   I'm sorry.  I was on the wrong page.

 6                Yes.

 7                MS. VANNI:  Object to the form.

 8   BY MR. BUCHANAN:

 9           Q.   Okay.  And basically there's going to be a

10   vetting process in connection with new accounts now,

11   right?

12                MS. VANNI:  Objection.

13                THE WITNESS:  There would be a vetting

14        process.  You say "now."  I don't -- again, I

15        can't speak to what was done prior to me.

16   BY MR. BUCHANAN:

17           Q.   Okay.  Well, if we go down here, third,

18   fourth bullet, we see:  "The DEA compliance team will

19   verify DEA numbers, verify information on the

20   questionnaire, including license verification among

21   other things, conduct Internet research on the

22   company ownership and pick, including disciplinary

23   history."

24                Did I read that correctly, sir?

25           A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   That's something that's reasonable for a

 2    company to do, is trade in billions of pills of

 3    narcotics, true?

 4              MS. VANNI:  Objection.

 5              THE WITNESS:  That is part of the program

 6         that I was rolling out as part of the

 7         questionnaire, Know Your Customer, which is not

 8         in 21 CFR 1301.74(b).

 9    BY MR. BUCHANAN:

10          Q.   Okay.  So that's something that's

11    reasonable for a company who is trading in billions

12    of pills of narcotics to do, correct?

13              MS. VANNI:  Object to the form.

14              THE WITNESS:  That is something over and

15         above what the regulations stated, that we did.

16    BY MR. BUCHANAN:

17          Q.   I'm not asking you that, sir.  I'm asking

18    you whether it was reasonable for you to do that:

19    Yes or no?

20          A.   It is something that we did.

21          Q.   Okay.  Was it unreasonable to do that?

22          A.   You state reasonable --

23              MS. VANNI:  Objection.

24              THE WITNESS:  -- unreasonable; I'm stating

25         a fact.  It was something that we did.
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   Okay, it was something --

 3        A.   It's a fact.

 4        Q.   -- that a responsible company would do,

 5   right?

 6             MS. VANNI:  Objection.

 7             THE WITNESS:  It was something that

 8        QualiTest did.

 9   BY MR. BUCHANAN:

10        Q.   Okay.  We saw the letter before, sir, that

11   described the changes that were being implemented,

12   and said:  "As responsible corporate citizens, we

13   need to do as much as we can do to prevent drug abuse

14   and diversion in our communities."

15             Do you recall reading that with me a few

16   minutes ago, sir?

17        A.   I do.

18        Q.   Okay.  "Each company and individual in the

19   supply chain has that responsibility."

20             Do you recall reading that with me a few

21   moments ago, sir?

22        A.   I see that.

23        Q.   "To put adequate controls in place to

24   discourage and prevent the diversion of prescription

25   products for uses other than those for which they
```

```
 1   were originally intended."

 2            You see that, sir?

 3        A.   I do.

 4        Q.   Okay.  All right.  And what we see here in

 5   your proposal, sir, are the adequate controls that

 6   you were proposing to your team, right?

 7            MS. VANNI:  Object to the form.

 8            THE WITNESS:  These are my proposals that

 9        I'm sharing with my team.

10   BY MR. BUCHANAN:

11        Q.   Okay.  Then you talk about -- if you

12   identify red flags, towards the bottom, you're going

13   to investigate that through an SOM manager, right?

14   Not a salesperson?  Right?

15        A.   (Reading) It's stating that the DEA team

16   member can engage the SOMS manager, who was -- I was

17   the SOMS manager.

18        Q.   Okay.  And then you get the wholesalers

19   and distributors; this is onboarding for them, right?

20            These are your proposals for your SOM

21   program, right?

22            MS. VANNI:  Objection to form.

23            THE WITNESS:  Yes.

24   BY MR. BUCHANAN:

25        Q.   Okay.  And on these, sir, again, you're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   going to do due diligence on your wholesale and

 2   distributor customers, right?

 3            MS. VANNI:  Object to the form.

 4            THE WITNESS:  Yes.

 5   BY MR. BUCHANAN:

 6       Q.   Okay.  You also want to get an agreement

 7   from your -- your supply chain that they're not going

 8   to trade more than three times; is that right?

 9            Do you see that, sir?

10       A.   I do see that.

11       Q.   Okay.  Do you agree with me?

12            That was your proposal, sir?

13       A.   That was in this original proposal, yes.

14       Q.   Did you end up doing that?

15       A.   I don't believe so.

16       Q.   We go on the next page, it says "Cage

17   vault SOM."  See that?

18       A.   Yes.

19       Q.   Let's talk about this.  I mean, so these

20   are drugs -- and we went round and round as to

21   whether these are dangerous or not, and -- or the

22   extent of their danger.  These are drugs, certainly

23   if they're Schedule II, sir, you got to keep them in

24   a safe and locked up, right?

25            MS. VANNI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BUCHANAN:

2         Q.    In a vault?

3         A.    Schedule II drugs are stored in a vault.

4         Q.    Right.  This stuff, Schedule II drugs,

5    that you were pumping out billions of pills -- or at

6    least a billion pills -- between 2011 and 2012, when

7    it's in your facilities, got to keep it in a vault,

8    right?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  Yes.

11   BY MR. BUCHANAN:

12        Q.    Because it presents that much risk, right?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  Because 21 CFR 1300 to end

15        states that Schedule II drugs are to be stored

16        in a vault.

17   BY MR. BUCHANAN:

18        Q.    You understand that it's kept in a vault

19   because it's a highly addictive drug and it's prone

20   to diversion, right?

21             MS. VANNI:  Object to form.

22        A.    It's kept in a vault to be more secure,

23   because it is a Schedule II drug that is prone to

24   abuse and diversion.

25        Q.    Right.  So if you're going to keep it in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   vault while it's in your facility, you'd agree with

 2   me, sir, that as a responsible corporate citizen, you

 3   should do your best, as the letter said, to make sure

 4   that it stays within that closed system, right?

 5           MS. VANNI:  Object to form.

 6           THE WITNESS:  According to the

 7       regulations, it is to be kept in a closed,

 8       secure supply chain.

 9   BY MR. BUCHANAN:

10       Q.   That's right.

11       A.   Yes.

12       Q.   And you as a registrant, sir, you promised

13   to maintain effective controls to keep it in that

14   supply chain, true?

15           MS. VANNI:  Object to form.

16           THE WITNESS:  Again, as the regulation

17       states, if you have that DEA registration, you

18       are to maintain effective controls.

19   BY MR. BUCHANAN:

20       Q.   So you're now on the job two weeks, sir,

21   and you'd -- you'd agree, sir, you're proposing to

22   revamp the company's SOM process; is that right?

23           MS. VANNI:  Object to form.

24           THE WITNESS:  Not knowing what the process

25       was prior to, these are my thoughts going in,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        that I would like -- these are my initial

 2        thoughts, and apparently this was drafted to

 3        myself.  I don't know how --

 4   BY MR. BUCHANAN:

 5        Q.   Okay.

 6        A.   -- far this got into distribution, but

 7   these were my original thoughts of a system.

 8        Q.   You're proposing that you set thresholds

 9   on a customer-by-customer basis, right?

10        A.   Yes.

11        Q.   Company didn't have thresholds before?

12        MS. VANNI:  Objection.

13   BY MR. BUCHANAN:

14        Q.   Right?

15        A.   I don't know.

16        Q.   I mean, you didn't look to see what the

17   company was doing before versus what it did after

18   changes were implemented, after the DEA visit in

19   March of 2013?

20        MS. VANNI:  Objection.

21        THE WITNESS:  I did not.

22   BY MR. BUCHANAN:

23        Q.   Okay.  And you identify a bunch of factors

24   you're saying should be looked at, right, in setting

25   those thresholds?
```

```
1          A.   Which page -- yes.

2          Q.   It's page 2.  Retail independent closed

3    door.  Number of scripts dispensed per month,

4    percentage of scripts for controlled substances,

5    percentage of scripts from pain management clinics,

6    and doctors, number of vendors other than QualiTest,

7    demographics, number of pharmacies in the area,

8    purchase history, number of beds -- do you see all

9    those factors, sir?

10         A.   I do.

11         Q.   And what you're proposing, sir, is that

12   the company integrate a lot of information and try

13   and tailor a threshold that fits the customer, right?

14   Know Your Customer?

15              MS. VANNI:  Object to the form.

16              THE WITNESS:  Establish thresholds based

17       on the -- the customer information.

18   BY MR. BUCHANAN:

19         Q.   Okay.  And -- and moving on to wholesales,

20   wholesales and distributors, one of your check boxes

21   there is an existence of a robust SOM program, right?

22         A.   Yes.

23         Q.   It's a closed system.  You should be doing

24   business with people, sir, that are maintaining that

25   closed system, right?
```

```
 1            MS. VANNI:  Object to form.

 2            THE WITNESS:  We should be doing business

 3        with companies that are in compliance with the

 4        regulation.

 5   BY MR. BUCHANAN:

 6        Q.   If you're not, if there's a break in that

 7   system, sir, it's not a closed system anymore, right?

 8        A.   If there's a break in that system --

 9            MS. VANNI:  Object to the form.

10            THE WITNESS:  -- they wouldn't have a

11        registration.  So we do business with companies

12        that have a -- a registration.

13   BY MR. BUCHANAN:

14        Q.   But we saw, obviously, in your Cardinal

15   examination, sir, a number of Cardinal entities were

16   doing business, sir, without effective SOM programs,

17   and their registrations were pulled, right?

18            MS. VANNI:  Objection to form.

19            MR. PYSER:  Object to form.

20   BY MR. BUCHANAN:

21        Q.   Do you recall that?

22        A.   Those entities were pharmacies, and

23   pharmacies do not have SOM programs.  The pharmacist

24   has a corresponding responsibility that he or she

25   does not have to fill a script that a doctor has
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   written.  So there is a different standard for a

 2   pharmacist versus a wholesaler.

 3        Q.   I guess my question wasn't clear.  I was

 4   referring to the wholesalers.  Cardinal got their

 5   registrations pulled on a bunch of sites, right?

 6             MR. PYSER:  Object to form.

 7             MS. VANNI:  Objection.

 8             THE WITNESS:  There were, I believe, four

 9        sites that we discussed previously.

10   BY MR. BUCHANAN:

11        Q.   Yeah.  Sites.  Distribution centers,

12   right?

13        A.   Distribution centers.

14        Q.   Right.  Pushing out millions of pills,

15   right?

16             MS. VANNI:  Objection.

17             THE WITNESS:  Distribution centers that

18        were distributing tablets, pills, to customers.

19   BY MR. BUCHANAN:

20        Q.   You said further, sir, chain warehouses,

21   they should also have an effective and robust

22   suspicious-order monitoring program, correct?

23        A.   Yes.

24        Q.   Okay.  And then you talk about other

25   things a company should do, or you were proposing to
```

Highly Confidential - Subject to Further Confidentiality Review

1  do, as part of your suspicious-order monitoring

2  system, right?

3       A.   Yes.

4       Q.   Okay.  Well, first, there's threshold

5  events that you list, and these are circumstances

6  where a client or a customer -- wholesaler or

7  distributor, retail pharmacy -- wants to place an

8  order that goes beyond their threshold, right?

9            MS. VANNI:  Object to the form.

10           THE WITNESS:  Yes, when a customer has

11      reached an allotted dosage unit, yes.

12  BY MR. BUCHANAN:

13       Q.   Okay.  And then you can go through and try

14  to figure out why their order is greater than the

15  threshold you ascribed to them, right?

16           MS. VANNI:  Object to the form.

17           THE WITNESS:  Yes.

18  BY MR. BUCHANAN:

19       Q.   You say if that doesn't sort out, with

20  these factors that you list here, the DEA will be

21  notified on all cut/suspicious orders, right?

22       A.   Yes.

23       Q.   So you'd agree, sir, that if an order

24  comes in and it exceeds a threshold, it's not

25  appropriate for the company to structure that order

Highly Confidential - Subject to Further Confidentiality Review

```
 1   in a way to stay within a threshold, true?
 2           MS. VANNI:  Object to the form.
 3           THE WITNESS:  If an order comes in and it
 4      exceeds a threshold, then that's it.  It -- it
 5      exceeds that threshold.
 6           So are you stating a change to the order?
 7   BY MR. BUCHANAN:
 8      Q.   Yeah.  Yeah, I mean, the company shouldn't
 9   change the order, the order size, to sneak it within
10   the threshold; shouldn't structure the order to fit
11   within the threshold.
12           Agreed?
13           MS. VANNI:  Object to the form.
14           THE WITNESS:  I wouldn't use your exact
15      verbiage, but if a company -- I mean, if an
16      order comes in that exceeds the threshold, that
17      event needs to be investigated.
18   BY MR. BUCHANAN:
19      Q.   Well, not only does it need to be
20   investigated, sir; if you cut it, you're supposed to
21   tell the DEA.  That's what you're proposing, right?
22      A.   If you cut that order, it's -- it's to be
23   reported to the DEA.
24      Q.   Right.  You got to tell the DEA if you cut
25   the size of that order, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   When I say "cut," i don't refer to cut

2   down; I mean "cut," meaning cut.

3    Q.   Oh, I see.  Okay.

4    A.   That does not mean cut down.

5    Q.   You'd agree, sir, though, it's not

6   appropriate for the company to cut down the size of

7   an order to fit within a threshold, right?

8         MS. VANNI:  Object to the form.

9         THE WITNESS:  Again, my statement is that

10       if an order comes in that exceeds a threshold,

11       an investigation should be conducted.

12  BY MR. BUCHANAN:

13       Q.   Okay.  It's not my question to you, sir.

14       A.   But that's my answer.

15       Q.   Okay.  Then stay with my question, because

16  I get to ask them.

17            MS. VANNI:  Objection.

18  BY MR. BUCHANAN:

19       Q.   You'd agree, sir, that it's not

20  appropriate for a company to structure its customer

21  orders in a certain way so that they stay within the

22  thresholds, and therefore are not reported to the

23  DEA; that would not be appropriate, would it, sir?

24            MS. VANNI:  Objection to the form.

25            THE WITNESS:  I'm not a regulatory

```
 1        authority, so I can't speak to what is

 2        appropriate.

 3            Again, my answer is:  If an order comes in

 4        that exceeds the threshold, an investigation

 5        should be conducted.

 6   BY MR. BUCHANAN:

 7        Q.   Okay, sir.  You were, in fact -- wasn't

 8   your position at this point in time, or at some point

 9   in time during your period of QualiTest, the head of

10   suspicious-order monitoring?

11        A.   I was the manager of -- of

12   suspicious-order monitoring.

13        Q.   Okay.

14        A.   Regulatory authorities -- regulatory

15   authority.  I mean an agency, DEA, state government,

16   FDA.

17        Q.   Okay.  I just want to understand, sir --

18        A.   Whomever.

19        Q.   -- from Mr. Brantley's perspective as the

20   head manager of SOM for QualiTest from 2013 to '17,

21   or at least the beginning of '17, would you endorse a

22   decision by QualiTest to structure its customers'

23   orders in a way to stay within the thresholds and not

24   report those orders then to the DEA?

25            MS. VANNI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  That's the same question,
 2         and I offer the same answer.  If an order comes
 3         in, and it exceeds the threshold, an
 4         investigation needs to be conducted.
 5  BY MR. BUCHANAN:
 6         Q.   All right.  Let's talk about, sir, what
 7  else you're saying needs to be done.
 8              Chargebacks.  All right?  Chargebacks
 9  provide visibility to a manufacturer about what its
10  customers -- customers are selling, right?
11              MS. VANNI:  Object to the form.
12              THE WITNESS:  It provides a manufacturer
13         visibility in what a customer's customer is
14         ordering --
15  BY MR. BUCHANAN:
16         Q.   Okay.
17         A.   -- not selling.  Ordering.  From the
18  wholesaler.
19         Q.   Fair enough.  So what you can see as the
20  manufacturer, through chargeback data, in
21  consideration of chargeback data, is the extent to
22  which, for example, Cardinal, Cardinal's pharmacy
23  customers are ordering your product from Cardinal.
24  Fair?
25         A.   Yes.
```

```
 1                MS. VANNI:  Object to form.

 2    BY MR. BUCHANAN:

 3         Q.   Okay.  So what you're saying here is one

 4    thing you got to start doing is looking at chargeback

 5    data, right?

 6                MS. VANNI:  Object to form.

 7                THE WITNESS:  Again, your verbiage of

 8         "start doing" speaks to what was done prior to

 9         me, and I can't speak to that.

10    BY MR. BUCHANAN:

11         Q.   Well, was chargeback data being done

12    before you got there, sir?

13         A.   I don't --

14         Q.   Was it being looked at?

15         A.   I don't know.

16         Q.   Okay.  Was it being looked at to evaluate

17    suspicious orders, to be more clear?

18         A.   I don't know.

19         Q.   Okay.  What you're saying here is that

20    monthly reports would be generated in review, and

21    chargeback data will be used to identify activity of

22    final dispensers with wholesalers.  That's one point,

23    right?

24         A.   Yes.

25         Q.   Identify suspicious activities of chains,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2            Do you see that?

3        A.    Yes.

4        Q.    Identify potential price diversion, right?

5        A.    Yes.

6        Q.    Okay.  Go on, and you list about your

7    wholesaler/distributor communications.

8            You're talking about sending letters to

9    your customers to get information about their

10   customers, right?

11           MS. VANNI:  Object to the form.

12   BY MR. BUCHANAN:

13       Q.    That's your proposal; this is your vision?

14       A.    If a customer --

15       Q.    Right?

16           MS. VANNI:  Objection.

17           THE WITNESS:  -- is identified, reviewing

18       the data, we'll reach out to the wholesaler to

19       ask for additional information regarding that

20       downstream customer.

21   BY MR. BUCHANAN:

22       Q.    Okay.  So that's a reasonable thing to do,

23   right?

24           MS. VANNI:  Objection.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2         Q.   As a manufacturer of billions of pills of

 3    scheduled narcotics?

 4              MS. VANNI:  Objection.

 5              THE WITNESS:  Again, your use of the term

 6         "reasonable," I can't speak to.  I can state

 7         what I wrote here is the fact that after

 8         reviewing data, if a downstream customer was

 9         identified, reach out to the wholesaler and ask

10         for additional information.

11    BY MR. BUCHANAN:

12         Q.   That's one way, sir, of trying to

13    implement an effective control against diversion,

14    right?

15              MS. VANNI:  Object to the form.

16              THE WITNESS:  That is one way of having an

17         effective control against diversion.

18    BY MR. BUCHANAN:

19         Q.   Okay.  All right, sir.  And you say you're

20    going to send letters; you're going to ask for

21    information from the wholesaler and distributor

22    customers, right?

23              MS. VANNI:  Object to the form.

24              THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:
 2        Q.   You're also going to employ, as part of
 3   your due diligence, sir, in knowing your customer and
 4   your customer's customer, intelligence from
 5   regulatory bodies, right?
 6             MS. VANNI:  Object to the form.
 7             THE WITNESS:  Yes.
 8   BY MR. BUCHANAN:
 9        Q.   Intelligence from media sources, right?
10        A.   Yes.
11        Q.   Intelligence from industry organizations,
12   right?
13        A.   Yes.
14        Q.   Those are all good things, sir, to try and
15   keep this system closed, right?
16             MS. VANNI:  Object to the form.
17             THE WITNESS:  Those are all things that I
18        listed in this e-mail to myself of things to
19        implement.
20   BY MR. BUCHANAN:
21        Q.   In your vision?
22        A.   Yes.
23        Q.   Okay.
24        A.   In my -- in my initial thoughts of
25   building my version of a program.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  And to be clear, sir, chargeback

2   data has been around for years, right?

3           MS. VANNI:  Object to the form.

4           THE WITNESS:  I don't know how long

5      chargeback data had been around, but I know that

6      it is incomplete.  Not every customer

7      participates in a chargeback program, and I

8      don't know how long it's been around.

9   BY MR. BUCHANAN:

10     Q.   Okay.  So staying with my question, you

11  just don't know how long it's been around?

12     A.   I do not know how long chargeback data has

13  been around.

14     Q.   Would it surprise you to learn, sir, that

15  Endo, the owner of QualiTest, had chargeback

16  agreements all the way back into the '90s?  Would

17  that surprise you, sir?

18          MS. VANNI:  Okay.

19          THE WITNESS:  Again, I don't know how long

20     chargeback data has been around.

21  BY MR. BUCHANAN:

22     Q.   Okay.  And chargeback data, again,

23  provides visibility into what the end pharmacy is

24  ordering from the intermediary wholesaler or

25  distributor, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. VANNI:  Object to the form.
 2                  THE WITNESS:  That is some
 3         identification -- that is some information that
 4         could be gained from chargeback data.
 5   BY MR. BUCHANAN:
 6         Q.   Okay.
 7         A.   But understand, chargeback data is a
 8   financial transaction.
 9         Q.   Okay.  In fact, you did use chargeback
10   data, didn't you, sir?
11         A.   I did use chargeback data.
12         Q.   Right.  Okay.  And the DEA presented
13   chargeback -- they presented data to you on your
14   customers' customers -- I shouldn't say "you," the
15   royal you, QualiTest "you" -- in March of 2013,
16   didn't they, sir?
17                  MS. VANNI:  Objection to the form.
18                  THE WITNESS:  In the ARCOS data.
19   BY MR. BUCHANAN:
20         Q.   Yes.  And you saw, in fact, the visibility
21   to what Cardinal's customers were buying from --
22   withdrawn.
23                  You saw visibility to your product
24   downstream through your intermediary wholesalers,
25   true?
```

```
 1              MS. VANNI:  Objection.  Form.

 2              THE WITNESS:  The ARCOS data that was

 3         provided, the DEA has a complete picture through

 4         the ARCOS data.

 5   BY MR. BUCHANAN:

 6         Q.   Right.  And that provided visibility --

 7   that provided visibility, sir, to what the pharmacies

 8   were buying from the distributors, right?

 9              MS. VANNI:  Objection.

10         A.   Based on the sheet of paper, the chart.  I

11   have to see which graph because the charts that we

12   reviewed were all sales.  It didn't -- it didn't list

13   any pharmacies.

14         Q.   Fair enough.  The subsequent pages do,

15   sir, but --

16         A.   So I can't respond if it didn't --

17         Q.   You know what, sir, why don't -- why don't

18   you pull it out and just go to the next page, right

19   after the first chart?

20         A.   Pull what out?

21         Q.   Do you have the exhibit -- the ARCOS data

22   we looked at?

23              MS. VANNI:  What's the number?

24              THE WITNESS:  Oh, yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. BUCHANAN:

2        Q.   If you just go to the second page, sir.

3        A.   I'm out of order, so is this the first

4   page?

5        Q.   Just --

6        A.   5.3?

7        Q.   Yeah, if you'll just turn the page, sir.

8             Do you see, sir, downstream --

9             MS. VANNI:  What page are you referring

10       to?  Because he's looking at page 4.  Is that --

11            THE WITNESS:  These are just states.  It

12       doesn't list customers.  This -- this lists

13       states.

14   BY MR. BUCHANAN:

15       Q.   Oh, I'm sorry.  Yeah, let's go to the next

16   page.

17            MR. BUCHANAN:  Can we go, please, to 575,

18       Evan.  Let's just go to 575.5.

19   BY MR. BUCHANAN:

20       Q.   You see, sir, what the DEA presented to

21   you in March of 2013 -- and I say "you," I mean

22   QualiTest -- included data on retail pharmacy

23   purchases from Morris & Dickson on this particular

24   page, right?

25            MS. VANNI:  Object to the form.
```

```
 1                    THE WITNESS:  Yes.
 2    BY MR. BUCHANAN:
 3         Q.   Do you recognize Morris & Dickson as an
 4    intermediary wholesaler/distributor?
 5                    MS. VANNI:  Object to the form.
 6                    THE WITNESS:  They are a wholesaler in
 7         Louisiana.
 8    BY MR. BUCHANAN:
 9         Q.   Okay.  In fact, what you see there, sir,
10    is some pharmacies just -- that are off the charts in
11    terms of their purchases of, in this case, oxycodone,
12    15 milligrams, from Morris & Dickson, correct?
13                    MS. VANNI:  Object to the form.
14                    THE WITNESS:  Again, you use the term "off
15         the charts," and I don't know anything about
16         these pharmacies.  I don't know if they're
17         associated with hospitals.
18              Again, I don't know anything about the
19         pharmacies, so I can't --
20    BY MR. BUCHANAN:
21         Q.   Okay.
22         A.   -- speak to "off the chart," not knowing
23    what type of pharmacy --
24         Q.   Fair enough.  Okay.
25         A.   -- what size pharmacy --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And what you do see, sir, is visibility

 2   from the DEA data of what your customer's customer

 3   was buying from Morris & Dickson -- Morris & Dickson,

 4   correct?

 5          MS. VANNI:  Object to the form.

 6          THE WITNESS:  Yes, for these four

 7      registrants.

 8   BY MR. BUCHANAN:

 9          Q.   Right.  And so what chargeback data allows

10   a manufacturer to do is prepare similar pictures of

11   what its customer's customer is doing -- should say

12   purchasing -- from a wholesaler/distributor, correct?

13          MS. VANNI:  Objection to the form.

14          THE WITNESS:  Chargeback data is not even

15      close to ARCOS data.  ARCOS data represents a

16      complete picture.  Chargeback data, again, is a

17      financial transaction based on a contract price

18      and a GPO, whereas ARCOS data, it is what it is.

19      If you receive it, ship it, it's captured via

20      ARCOS.

21          Not everyone participates in chargeback

22      data; chargeback does not capture everything.

23      So I cannot say that it's like ARCOS data.

24      ARCOS data is everything.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:
 2       Q.   Okay.  And -- and QualiTest is a
 3   corporation, right?
 4       A.   I believe it's a corporation.
 5       Q.   In the business of making money, right?
 6            MS. VANNI:  Objection.
 7            THE WITNESS:  I can't speak to if the
 8       business is making money.
 9   BY MR. BUCHANAN:
10       Q.   In the business of making money?
11            MS. VANNI:  Form.
12            THE WITNESS:  I can say that the
13       Huntsville branch is no longer.
14   BY MR. BUCHANAN:
15       Q.   My -- my question to you, sir, was:
16   QualiTest itself is a business entity in the business
17   of making money, right?
18            MS. VANNI:  Objection to form.
19            THE WITNESS:  This day, no.  Back then, I
20       don't know how much money they made, but
21       QualiTest, the Huntsville campus is closed.
22   BY MR. BUCHANAN:
23       Q.   Oh, I see.  Okay.  So --
24       A.   So I don't know how much money they were
25   making, but they're closed.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Where I was going, sir, is chargebacks,

 2     there are agreements that can surround the chargeback

 3     data, right?

 4          A.   What type of agreements?

 5          Q.   Chargeback agreements.

 6          A.   Contractual agreements based on a

 7     contractual price, with a group purchasing

 8     organization or 340B contract with the government.

 9     Again, it's so many different types of contracts.

10          Q.   Pursuant to which parties exchange

11     information to exchange money based on the volume of

12     drug purchased, correct?

13               MS. VANNI:  Objection to form.

14     BY MR. BUCHANAN:

15          Q.   And the discounts ascribed to it?

16          A.   Based on a sale of a chargeback --

17          Q.   Okay.

18          A.   -- a transaction happens that a pharmacy

19     purchases a drug from a wholesaler at a certain

20     price, based on a contract that pharmacy has with --

21     that the government or an organization, and based on

22     that, there's a transaction, a chargeback.

23          Q.   Let's talk about customer due diligence

24     visits, sir.

25               So one of the things you're advocating is
```

```
 1   putting boots on the ground, right?

 2       A.   One of the things I'm advocating is going

 3   out, and I will conduct a Know Your Customer visit of

 4   the customer, to ensure that they have a SOMs program

 5   and they demonstrate it for me.

 6       Q.   Right.  And when I say "boots on the

 7   ground" is actually going and looking at the

 8   facility, right?

 9           MS. VANNI:  Object to form.

10           THE WITNESS:  I'm going to discuss their

11       suspicious-order monitoring program.

12   BY MR. BUCHANAN:

13       Q.   So that's one thing you're going to do,

14   right?

15       A.   Sometimes that is at the corporate office;

16   it is not necessarily at the facility.

17       Q.   Surveillance visits for retail independent

18   and chain pharmacies, true?

19       A.   Yes.

20       Q.   Observe clientele for suspicious activity?

21   Putting eyes on the customer, right?

22       A.   That's a part of the surveillance visit.

23       Q.   Looking for suspicious activity, right?

24           MS. VANNI:  Object to the form.

25           THE WITNESS:  Yes, a drug transaction in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        parking lot.

 2   BY MR. BUCHANAN:

 3        Q.   Long lines, right?

 4        A.   That could be deemed something of interest

 5   to look into.

 6        Q.   I mean, that's what you put after

 7   suspicious activity, long lines, right?

 8        A.   Well, if it's there, there it is, yes.

 9        Q.   Okay.  Illicit drug use, right?

10        A.   Yes.

11        Q.   Out-of-state license plates, right?

12        A.   Yes.

13        Q.   Looking for suspected Internet activity,

14   right?

15        A.   Yes.

16        Q.   Remember that discussion with

17   Mr. Papantonio about Internet pharmacies, right?

18        A.   It was a pretty in-depth discussion.

19        Q.   Okay.  And so looking for boxes, for

20   example, of -- you know, FedEx envelopes?

21             MS. VANNI:  Object to the form.

22   BY MR. BUCHANAN:

23        Q.   Right?

24        A.   That can be one way to identify potential

25   activity.
```

```
 1          Q.   Sure.  Sure.  And looking to see

 2    whether -- and capturing information from these

 3    customers, prescriptions paid for in cash?

 4    Percentage of controlled substances:  Are they doing

 5    mostly controlled substances?  Are they doing other

 6    stuff?  All this information you can ask for from the

 7    customer, right?

 8               MS. VANNI:  Object to the form.

 9               THE WITNESS:  Yes.

10    BY MR. BUCHANAN:

11          Q.   Okay.  And so these are all things that a

12    reasonable company would do to implement a

13    suspicious-order monitoring system, right?

14               MS. VANNI:  Objection.

15               THE WITNESS:  Again, you use the term

16          "reasonable," and I just go back to the

17          regulation, that -- it states that -- should

18          implement a program to identify and report

19          suspicious orders, and also the regulation

20          states that -- having the closed supply chain.

21    BY MR. BUCHANAN:

22          Q.   Right.  Or is it just at this point in

23    time, sir, in 2013, that you started to get concerned

24    about the fines?

25               MS. VANNI:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Again, I can't speak to what
 2         the company did prior to -- to my arrival.
 3    BY MR. BUCHANAN:
 4         Q.   Well, I guess that's my question, sir.
 5    Was it -- was it the tens of millions of dollars of
 6    fines you were seeing for other companies who were
 7    not properly monitoring suspicious orders, or was it
 8    the body count?
 9                    MS. VANNI:  Objection.
10    BY MR. BUCHANAN:
11         Q.   We looked at the body count between 2000
12    and 2012.  You recall that, sir?
13                    MS. VANNI:  Objection.
14                    THE WITNESS:  Is that the color graph --
15    BY MR. BUCHANAN:
16         Q.   Yeah.
17         A.   -- you put on the screen?
18                    Yes, I recall that.
19         Q.   Okay.  Because we saw a change in color
20    over the years, right?  It didn't -- well, let's talk
21    about, before we get there, sir, how QualiTest
22    changed their practices.
23                    MR. BUCHANAN:  Where is it?  Could I have,
24         please, 606.
25
```

```
 1   BY MR. BUCHANAN:

 2        Q.   Are you okay?  You need a break?  Or are

 3   you all right?

 4        A.   No, I'm just stretching my leg.  I'm fine.

 5        Q.   Okay.

 6             All right, sir, can we pull up 606.  This

 7   looks like -- you know, if you started in September,

 8   sir, this is shortly after you get to the company,

 9   right?  2013?

10        A.   Yes.

11        Q.   Larry Shaffer; he's in DEA compliance; is

12   that right?

13        A.   Yes, he was.

14        Q.   Okay.  And what Larry Shaffer sends you,

15   sir, are -- is titled "SOMs info."

16             SOMS is suspicious-order monitoring

17   system?

18        A.   Yes.

19        Q.   And did you call it "SOMS"?

20        A.   I call it a "SOM".

21        Q.   SOM?  Okay.

22        A.   S-O-M.

23        Q.   All right.  He attaches a couple of files.

24             One is called "SOMS violations," right?

25             I'm looking at the attachment list on the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    first page.  You see that, sir?  SOMS violations.xls?

 2         A.   Oh.  Yes.

 3         Q.   Okay.  And the first attachment, sir,

 4    directing your attention to dot 2 -- I'm sorry,

 5    dot 4.  It's a collection of all the violations for

 6    inadequate SOMS that have been imposed.

 7              You see that, sir?

 8              MS. VANNI:  Objection to form.

 9              THE WITNESS:  I do see a list of the

10         violations.

11    BY MR. BUCHANAN:

12         Q.   Okay.  So the first attachment is a list

13    of violations.  And, in fact, sir, are you aware that

14    some of the entities that are listed here are ones

15    that the DEA called to your attention that were

16    customers of your customer in the March of 2013

17    meeting?

18              MS. VANNI:  Objection.

19              THE WITNESS:  If they were listed in that

20         binder, I saw it after I started at QualiTest.

21    BY MR. BUCHANAN:

22         Q.   Right.  You would have seen that, right?

23         A.   I stated earlier that I did see the

24    binder.

25         Q.   And you would have seen the list of

1   violations, right?

2           MS. VANNI:  Objection to form.

3           THE WITNESS:  I don't recall a list of

4       violations in the binder.  I recall ARCOS data,

5       and I think some examples of some old court

6       cases.

7   BY MR. BUCHANAN:

8       Q.   Okay.

9       A.   But I don't recall any -- any list of

10  violations.

11      (Cardinal-Brantley 30 was marked for

12  identification.)

13  BY MR. BUCHANAN:

14      Q.   We're in Exhibit 30 right now, sir, and

15  Exhibit 30 contains a list of violations, right?

16      A.   Is that --

17          MS. VANNI:  Objection to the form.

18          THE WITNESS:  Is that what we're looking

19      at?

20  BY MR. BUCHANAN:

21      Q.   That is.  It is Exhibit 30 before you,

22  sir, and I've just taken you to dot 6.  See that?

23          I'm sorry.  Dot 4, 5, and 6 is a list of

24  SOM violations?

25      A.   I guess this appears to be a list that

1    Larry composed, yeah.

2         Q.   Okay.  And you see -- and I'm a little

3    tight on time, sir, but I'm sure you will have this

4    document.  It lists a number of facilities that have

5    been talked about today, and it further lists

6    facilities that were customers of your customer that

7    the DEA showed you in March of 2013, "you" being

8    QualiTest.

9              MS. VANNI:  Objection.

10   BY MR. BUCHANAN:

11        Q.   Do you see the list of violations, sir?

12        A.   I do.

13        Q.   Okay.  Let's -- let's go on with this file

14   because there's a PowerPoint in here sent to you

15   shortly after you joined.  "Current SOMS process."

16             You see this?

17             MS. VANNI:  Can you tell us what page

18        you're on, please?

19             MR. BUCHANAN:  Point 14.  Sorry, Counsel.

20             MS. VANNI:  Thank you.

21   BY MR. BUCHANAN:

22        Q.   Presently the SOMS process at QualiTest

23   was only implemented for your retail customers,

24   right?

25             MS. VANNI:  Objection.

```
 1                    THE WITNESS:  This does not -- this page,
 2          point 14, does not say it was only implemented
 3          for retail pharmacy customers.
 4     BY MR. BUCHANAN:
 5          Q.   Okay.  Retail pharmacy is based on set
 6     product threshold amounts, right?
 7          A.   Yes.
 8          Q.   And the sales department could change
 9     them, right?
10                    MS. VANNI:  Objection.
11                    THE WITNESS:  It says that they were set
12          by the sales department.
13     BY MR. BUCHANAN:
14          Q.   Also says they can be changed by the sales
15     department, doesn't it, sir?
16          A.   Oh.  The next bullet point.
17          Q.   Yeah.  You know that's a conflict of
18     interest, right?
19                    MS. VANNI:  Objection.
20                    THE WITNESS:  Is that your opinion, or is
21          that a -- is that --
22     BY MR. BUCHANAN:
23          Q.   I'm asking you, sir.
24          A.   -- in the regulation?
25          Q.   You know that.
```

```
 1              MS. VANNI:  Objection.

 2   BY MR. BUCHANAN:

 3       Q.   Having people whose goal is to push more

 4   product, and billions and billions -- and we saw the

 5   sales growth in at least those two years; you recall

 6   looking at those numbers with me?

 7              MS. VANNI:  Objection.

 8              THE WITNESS:  I do recall looking at those

 9        numbers.

10   BY MR. BUCHANAN:

11       Q.   Okay.  You would agree, sir, that having

12   the sales folks, giving them the discretion to just

13   change the thresholds on their own, that's not good

14   practice, right?

15              MS. VANNI:  Object to the form.

16              THE WITNESS:  Again, I cannot speak to the

17        practice that was set before me.

18   BY MR. BUCHANAN:

19       Q.   Well, that's certainly not the practice

20   you recommended, right?

21       A.   That was not my practice.

22       Q.   Okay.  Let's go to dot 15, "Issues with

23   current process."

24              And this is right around the time you're

25   joining, in 2013, right after the time billions and
```

```
 1    billions of oxy 15s, 30s, and hydrocodones were sold,

 2    right?

 3              MS. VANNI:  Objection.

 4              THE WITNESS:  According to your reference

 5         from the previous slide, when you stated how

 6         many were sold --

 7    BY MR. BUCHANAN:

 8         Q.   Okay.

 9         A.   -- there were -- I think we stated one or

10    two billion.

11         Q.   Okay.  So one, "The system only addresses

12    retail pharmacy by looking at product thresholds."

13              Did I read that correctly, sir?

14         A.   That's what it says.

15         Q.   "Other COTs" -- is that a term of art in

16    your field, sir?

17              MS. VANNI:  Object to the form.

18              THE WITNESS:  I don't know what a "COT"

19         is.

20    BY MR. BUCHANAN:

21         Q.   Classes of trade?

22         A.   Okay.

23         Q.   "Other classes of trade are not evaluated

24    for suspicious-order monitoring," correct?

25         A.   That's what it says.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Okay.  Other classes of trade, that would

 2     be wholesalers, right?

 3               MS. VANNI:  Objection.

 4               THE WITNESS:  Other classes of trade other

 5        than pharmacies.

 6     BY MR. BUCHANAN:

 7          Q.   Right.

 8          A.   It could be --

 9          Q.   So wholesalers, distributors, hospitals?

10          A.   Those all could be other classes of trade.

11          Q.   Okay.  And so as of this point in time,

12     sir, nine months into 2013, other classes of trade

13     were not being evaluated for suspicious-order

14     monitoring, correct?

15               MS. VANNI:  Object to form.

16               THE WITNESS:  According to this slide.

17     BY MR. BUCHANAN:

18          Q.   Mm-hmm.  Next says:  "Retail pharmacy

19     review and approval is handled by the sales

20     department," right?

21          A.   That's what it says.

22          Q.   Could you read the next sentence, sir?

23          A.   "Sales department should not set the

24     threshold amount or be involved with the releasing

25     held orders."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Just pause there for a moment.

 2             So what this states, this PowerPoint of

 3    the company from October of 2013, is the sales

 4    department should not set the threshold amount,

 5    first.

 6             That's what it says, right?

 7        A.   Yes.

 8        Q.   Or be involved with releasing held orders,

 9    right?

10        A.   I just want to say that you mentioned that

11    this was 2013; where it's printed, it says 2012.

12        Q.   Well, this is what was sent to you, sir,

13    by Larry Shaffer, on October 7th, 2013, correct?

14        A.   Yes.  I'm just stating when this document

15    says that it was printed, or --

16        Q.   Okay.

17        A.   -- or drafted.  2012.

18        Q.   You know when you got it?

19        A.   So I answered the question correctly.  You

20    asked if -- if you say 2013 but the document says

21    2012, I have to state that the document says 2012.

22        Q.   Fine.  So let's -- let's agree, sir, that

23    this is what Mr. Shaffer sent to you on October 7,

24    2013, following the list of violations for SOMS

25    processes, and -- looks like a summary of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious-order monitoring system of QualiTest,

 2    looking at dot 12, right?

 3               MS. VANNI:  Objection to form.

 4               THE WITNESS:  Yes.

 5    BY MR. BUCHANAN:

 6         Q.    Okay.  And, you know, the second page,

 7    dot 13, says what is SOMS.  Next page says "Current

 8    SOMS process."

 9               And that's what you were being given in

10    October of 2013, correct, sir?

11         A.    Apparently this was e-mailed --

12               MS. VANNI:  Object to the form.

13               THE WITNESS:  -- to me in 2013.

14    BY MR. BUCHANAN:

15         Q.    Okay.  And it's run through issues with

16    the current process, and we were just talking about

17    the retail pharmacy review and approval being handled

18    by the sales department; DEA views this as a conflict

19    of interest, right?

20         A.    That's what it states here.

21         Q.    And considers the sales department as the

22    department that is driven by dollars, right?

23         A.    Again, that's what is stated here.

24         Q.    No, look, you've been in business --

25    you've been working for companies involved in selling
```

```
 1    drugs for 15, 20 years; you know the sales

 2    department's goal is to sell, right?

 3              MS. VANNI:  Object to the form.

 4              THE WITNESS:  Sales department, their job

 5        is sales, by their name.

 6    BY MR. BUCHANAN:

 7        Q.   Right.  I mean, the job description is not

 8    suspicious-order monitoring, right?

 9              MS. VANNI:  Object to form.

10              THE WITNESS:  I have not seen the job

11        description for a salesperson.

12    BY MR. BUCHANAN:

13        Q.   Well, sir, would you think that's

14    something they're trained in, to -- I mean, we saw

15    the sales growth between 2011 and 2012, right?

16              MS. VANNI:  Object to form.

17              THE WITNESS:  Is that the color chart

18        again?

19              MR. BUCHANAN:  Can we go back to the Elmo.

20    BY MR. BUCHANAN:

21        Q.   That's the chart.

22        A.   Oh, yes.  I remember that.

23        Q.   Okay.  That's -- you know, a billion pills

24    or so of oxycodone in various formulations, right?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And we got to a billion with just one, I
 2   think, unit of hydrocodone for that same period of
 3   time, right?
 4             MS. VANNI:  Object to form.
 5             THE WITNESS:  One strength.
 6   BY MR. BUCHANAN:
 7        Q.    One strength.  All right.
 8             So sales was doing a good job, right?
 9             MS. VANNI:  Object to the form.
10   BY MR. BUCHANAN:
11        Q.    In term of growing sales?
12             MS. VANNI:  Objection.
13             THE WITNESS:  I can't state whether they
14      were doing a good job or a bad job.
15   BY MR. BUCHANAN:
16        Q.    Well, you see it grew -- it grew between
17   2011 and 2012 pretty well, right?
18             MS. VANNI:  Objection.
19             THE WITNESS:  There was growth.
20   BY MR. BUCHANAN:
21        Q.    Okay.  And so during that period of time,
22   sir, the sales group had the ability to raise
23   thresholds for the customers, right?
24             MS. VANNI:  Objection.
25             THE WITNESS:  According to this document.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Again, I wasn't there.

2    BY MR. BUCHANAN:

3        Q.    Okay.

4        A.    I can only speak to --

5        Q.    They also had the ability --

6        A.    Sorry.

7        Q.    They also had the ability to set

8    thresholds, right?

9        A.    Again, according to this document.

10       Q.    Okay.  "No separate and unbiased check for

11   order quantity outside of the sales and marketing

12   departments."

13            See that, sir?

14       A.    Yes.

15       Q.    "No separate unbiased check of order

16   quantity outside of sales and marketing department."

17            Did I read that correctly, sir?

18       A.    Yes.

19       Q.    "No check for order frequency and pattern

20   discrepancies."

21            Did I read that correctly, sir?

22       A.    Yes.

23       Q.    In fact, the regulation you cited to us

24   earlier in the CFR talks about unusual quantities,

25   unusual frequencies, things of that nature, as a

```
 1   suspicious order, correct?

 2        A.   Unusual --

 3             MS. VANNI:  Objection to form.

 4             THE WITNESS:  Unusual size, frequency,

 5        and -- that deviates substantially from a normal

 6        pattern.

 7   BY MR. BUCHANAN:

 8        Q.   Right.  And so what this is saying, sir,

 9   in this PowerPoint that was sent to you in 2013,

10   shortly after you joined, there was no check for

11   order frequency and pattern discrepancies, right?

12             MS. VANNI:  Objection.

13             THE WITNESS:  That's what this slide says.

14   BY MR. BUCHANAN:

15        Q.   And the system didn't allow to know your

16   customer, right?

17        A.   That's what the slide states.

18        Q.   Okay.  And so these are listed on "Issues"

19   with the current process; then we go to the next

20   page, and then the "Requirements for Improvement."

21             Do you see that, sir?

22        A.   Yes.

23        Q.   And there's, what, a dozen bullets?  Maybe

24   more?

25        A.   Around there.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. VANNI:  Objection.

 2   BY MR. BUCHANAN:

 3        Q.   Okay.  Things you got to do to get this

 4   thing in check, right?

 5                MS. VANNI:  Objection.

 6                THE WITNESS:  Requirements for

 7        improvement.

 8   BY MR. BUCHANAN:

 9        Q.   Got to start looking at all trades and all

10   customers, right?

11                MS. VANNI:  Objection.

12                THE WITNESS:  This is asking to look at

13        all classes of trade, customers.

14   BY MR. BUCHANAN:

15        Q.   I mean, your biggest customers -- "you"

16   being QualiTest -- your biggest customers are

17   wholesalers and distributors, right?

18        A.   Yes.

19        Q.   And so in 2013, after twelve years of blue

20   going to white going to orange going to red, and

21   death rates increasing throughout this country, and

22   pills going from tens of millions to hundreds of

23   millions to billions, this company's not looking at

24   its largest trades, its largest customers, to

25   evaluate for suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VANNI:  Objection.

 2   BY MR. BUCHANAN:

 3        Q.   Right?

 4        A.   That's what the PowerPoint stated.

 5        Q.   Okay.

 6              MR. BUCHANAN:  Can we take a short break?

 7              MS. VANNI:  Can we also have a time check?

 8              VIDEOGRAPHER:  Going off record.  Time

 9        is 5:54.  Total time is 6:52.

10              (A recess transpired from 5:54 p.m. until

11              6:01 p.m.)

12              VIDEOGRAPHER:  We're going back on the

13        record.  This is beginning of media file

14        number 8.  Time is 6:01.

15   BY MR. BUCHANAN:

16        Q.   All right, sir.  Try and bring this in for

17   a landing here.  I've got a few minutes left on the

18   clock, so -- probably going to try and be as

19   efficient as I can.

20              Can you pass over to counsel -- it's E611.

21        (Cardinal-Brantley 31 was marked for

22   identification.)

23   BY MR. BUCHANAN:

24        Q.   While that's getting across the table to

25   you --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. BUCHANAN:  And what's -- what exhibit
 2        number is it, Scott?  31?  This is Brantley 31.
 3   BY MR. BUCHANAN:
 4        Q.   Sir, do you remember -- what is that, in
 5   2015 or so -- getting in a bit of a fuss with your
 6   sales colleagues at QualiTest?
 7                 MS. VANNI:  Object to the form.
 8                 THE WITNESS:  I don't remember.  Is -- is
 9        this about a particular incident?
10   BY MR. BUCHANAN:
11        Q.   Well, this is about just -- frankly, a
12   practice at QualiTest, concerning promotional
13   discounting, one-time buys, bulk sales of narcotics.
14                 Do you recall that?
15                 MS. VANNI:  Object to the form.
16                 THE WITNESS:  I don't remember that exact
17        conversation, but if this e-mail is that, I can
18        read this real quick.
19   BY MR. BUCHANAN:
20        Q.   Well, you were expressing concern, sir,
21   about -- let me just ask you some questions
22   independent of the document.
23                 Do you remember having concerns about the
24   company sales practices -- that was the end of the
25   month, or the end of the quarter -- reaching out to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customers and offering them one-time buys?

 2            MS. VANNI:  Object to form.

 3    BY MR. BUCHANAN:

 4        Q.   Big volumes?  Discounts?  Remember that?

 5            MS. VANNI:  Objection to form.

 6            THE WITNESS:  I do not remember specific

 7        conversations, but yes, I had conversations

 8        about one-time buys.

 9    BY MR. BUCHANAN:

10        Q.   That's -- let's look at the exhibit now.

11            You and your colleague, I guess it's

12    Heather Jones, sent it off to Mr. Macrides and

13    Magerkurth.  You're cc'd on it.  "Importance, high"?

14        A.   Yes.

15        Q.   "DEA regulatory risk of offering one-time

16    buys to customers from suspicious-order monitoring

17    perspective for upper management review," right?

18        A.   Yes.

19        Q.   You all were trying to call something to

20    the attention of management that was happening in the

21    sales function, right?

22            MS. VANNI:  Object to form.

23            THE WITNESS:  She was alerting -- she was

24        sending in an e-mail to DEA expressing this.  I

25        haven't read it yet.
```

```
 1    BY MR. BUCHANAN:

 2         Q.   You said to the DEA?

 3         A.   I'm sorry, I misspoke.  To management.

 4         Q.   Because this didn't go to the DEA, right?

 5         A.   This went to management.

 6         Q.   Right.

 7         A.   Again, I take that back.  I misspoke.

 8    This was sent to members of management.

 9         Q.   Okay.  And it says, "As discussed" --

10    "Dear Steve, as discussed, Eric Brantley and I have

11    put together a risk assessment regarding the DEA

12    regulatory risk of offering one-time buys of

13    controlled substances to our customers at the end of

14    every quarter, and how it impacts your SOMS program."

15              You see that, sir?

16         A.   Yes.

17         Q.   Okay.  And she writes, "I would like to

18    ensure that a dialogue is started at high levels to

19    stop the cycle of these one-time buys if possible,

20    and preferably in this quarter."  Right?

21         A.   Yes.

22         Q.   Because you all had concluded, sir, that

23    this practice of reaching out to customers and

24    offering them large quantities and discounts is

25    itself a suspicious order, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VANNI:  Objection.

 2              THE WITNESS:  Where are you reading that,

 3       so I can find it?

 4  BY MR. BUCHANAN:

 5       Q.   No, I'm -- do you recall that?  Do you

 6  recall what I --

 7       A.   I don't recall that exact verbiage.

 8  That's what I'm asking, where --

 9       Q.   Okay.

10       A.   -- so I can --

11       Q.   Let's go to point 3 -- I'm sorry, point 2,

12  just to orient ourselves.

13              "DEA regulatory risk of offering one-time

14  buys to customers from a suspicious-order monitoring

15  perspective."

16       A.   Okay.

17       Q.   "Prepared for upper management review

18  October 20, 2015."

19              You then cite the regulation concerning

20  suspicious orders, right?

21       A.   Yes.

22       Q.   "Suspicious orders include orders of

23  unusual size, orders deviating substantially from a

24  normal pattern, and orders of unusual frequency."

25              Do you see that, sir?
```

```
 1          A.   Yes.

 2          Q.   And it continues.  I'm going to direct you

 3     to the bottom; I'm a little tight on time.

 4               It says, "Therefore, the extension of

 5     one-time buy opportunities to customers presents a

 6     tangible DEA regulatory risk for the company, because

 7     the offer itself may be categorized as a suspicious

 8     order."

 9               Did I read that correctly, sir?

10          A.   Yes.

11          Q.   Okay.  Let me just ask:  As a factual

12     matter, did the company report its one-time buys to

13     the DEA as suspicious orders?

14               MS. VANNI:  Objection.

15               THE WITNESS:  A suspicious record is an

16          order that is placed by the customer, sent to

17          the customer.  I don't recall what orders were

18          sent to the DEA or not.  I don't -- I don't

19          recall specific orders.

20     BY MR. BUCHANAN:

21          Q.   Okay.

22          A.   So to say --

23          Q.   My question --

24          A.   To ask was a one-time buy reported, as a

25     general question, I would have to know a specific
```

Highly Confidential - Subject to Further Confidentiality Review

1   order.

2        Q.   Okay.  This practice that's being flagged

3   for senior management of offering one-time buys at

4   the end of quarters, larger volumes that would

5   ordinarily be bought at discounts, were those type of

6   orders reported to the DEA as suspicious orders?

7             MS. VANNI:  Objection.

8   BY MR. BUCHANAN:

9        Q.   Yes, no, or you don't know?

10       A.   If they were deemed suspicious, I would

11  say that how I handled a one-time buy situation, I

12  reached out to the customer.  It may have been a

13  short data item; I don't know what the situation was.

14            And I said, "What does this represent?  Is

15  this a one-month purchase or a two-month purchase?"

16  So forth.

17            If it was a two-month purchase, I locked

18  their DEA number up in the system so they cannot

19  order that controlled substance again until that time

20  had expired.

21            So that way, I could keep the pattern to

22  where -- if they -- if they were ordering 10,000,

23  10,000, and they went to 30,000, then 00, and then

24  10,000 again, that, I can't explain.  I cannot

25  explain the 10, 10, 30, and then back to 10 again.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   So you would --

 2          A.   So that's how I regulated that.

 3          Q.   I see.  So what you would do, sir, is

 4   allow the customer, in a dialogue with you, structure

 5   this in a way so that it would fit within a

 6   threshold?

 7          A.   No.

 8               MS. VANNI:  Objection.

 9   BY MR. BUCHANAN:

10          Q.   Okay.  Well, let's look at the next page,

11   sir.  The Controlled Substances Act says --

12          A.   Are you asking a question, or are you --

13          Q.   -- 611.4 --

14          A.   -- done with that?

15          Q.   We have your answer, sir.

16          A.   Okay.

17          Q.   "One-time buy orders represent an anomaly

18   that could potentially compromise the closed system."

19               Did I read that correctly, sir?

20          A.   Yes.

21          Q.   If a 60-to-180-day supply of a controlled

22   substance is distributed to a wholesale or chain at

23   one time or on a quarterly basis, there is an

24   undeniable probability that the supply will flow to

25   final dispensers, and eventually to end users or
```

```
 1   abusers, potentially increasing the risk of

 2   diversion."

 3          Did I read that correctly, sir?

 4   A.   Yes.

 5   Q.   "There is an undeniable probability that

 6   the supply will flow to final dispensers and

 7   eventually to end users or abusers" -- that is

 8   diversion, right?

 9   A.   If --

10          MS. VANNI:  Object to the form.

11          THE WITNESS:  If it gets to an abuser, I'd

12       have to know that definition of -- of what type

13       of abuse.

14   BY MR. BUCHANAN:

15   Q.   Right.  And then, "You know that it's a

16   question about whether these entities are willing or

17   capable of supporting the surplus inventory in a

18   closed and secure manner."

19          Did I read that correctly, sir?

20   A.   Yes.

21   Q.   You also were concerned because if you're

22   giving discounts to your wholesaler community,

23   they're probably passing that on to their customer

24   base, right?

25          MS. VANNI:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:
 2        Q.   Isn't that what you write, sir?
 3             MS. VANNI:  Objection.
 4             THE WITNESS:  I can't say that.  It was --
 5        it was probably -- it does say that it is likely
 6        that the offer the customer took advantage of is
 7        extended to at least a portion of their own
 8        customer base.
 9   BY MR. BUCHANAN:
10        Q.   Right.  And we go to the next page,
11   point 5.  The further concern you flag is the
12   secondary market.
13             You recall talking to Mr. Papantonio about
14   the secondary market?
15        A.   Yes.
16        Q.   Okay.  So "Manufacturers may potentially
17   be a supply source for nonreputable alternative
18   sources when one-time buys are extended to their
19   customers, who may in turn distribute this product to
20   the secondary market."
21             Right?
22        A.   That's what it says.
23        Q.   Okay.  Did the company stop -- did you
24   present this to upper-level management, sir?
25        A.   I believe this -- this e-mail was sent
```

1    to -- was sent by Heather to management, and I was

2    copied.

3         Q.   Okay.  And how did that work out?  Did the

4    company stop their one-time buys?

5              MS. VANNI:  Object to the form.

6              THE WITNESS:  I believe so.

7    BY MR. BUCHANAN:

8         Q.   Okay.

9         A.   I'm -- I believe so.

10        Q.   And did the company go back after it made

11   that change, and did it notify the FDA -- excuse me,

12   the DEA -- withdrawn.

13             Did the company go back, as of this point

14   in time, when you said they could be characterized as

15   suspicious orders, and notify the DEA of all the

16   one-time buys it had facilitated in the period of

17   time you were there?

18             MS. VANNI:  Objection.

19             THE WITNESS:  Not to my knowledge.

20   BY MR. BUCHANAN:

21        Q.   Okay.  Is there a system at the company

22   where the due diligence that was conducted on the

23   customers and the customers of customers was tracked?

24             MS. VANNI:  Object to the form.

25             THE WITNESS:  Was there a time that the

1      due diligence was tracked?  What do you mean by

2      "tracked"?

3  BY MR. BUCHANAN:

4      Q.   I'm sorry.  So as I understand this, sir,

5  you had a vision for what a suspicious-order

6  monitoring system would compose, right?

7           MS. VANNI:  Objection.

8           THE WITNESS:  Yes.

9  BY MR. BUCHANAN:

10      Q.   Okay.  One component of that was due

11  diligence, right?

12           MS. VANNI:  Objection.

13           THE WITNESS:  Meaning site visits, or due

14      diligence on -- I mean --

15  BY MR. BUCHANAN:

16      Q.   Yeah, it involved a lot of things, right?

17  But one thing you should be doing is you should be

18  looking on the Internet, right?  On your customers,

19  right?

20           MS. VANNI:  Objection.

21  BY MR. BUCHANAN:

22      Q.   That's one thing you should do?

23      A.   That's one of the things that was in

24  the --

25      Q.   Right.  You should be also --

```
 1          A.   -- e-mail.

 2          Q.   -- drawing intelligence from industry

 3    sources on your customers:  Are they pill mills?

 4    Have they been subject to inquiry?  Are there other

 5    red flags?

 6               That's something you should be doing,

 7    right?

 8               MS. VANNI:  Object to the form.

 9               THE WITNESS:  That's something I

10       suggested.  It doesn't say I -- I should be

11       doing it; it's something that I suggested.

12    BY MR. BUCHANAN:

13          Q.   Well, did there come a time, sir, where

14    the company implemented SOPs related to

15    suspicious-order monitoring?

16          A.   I drafted SOPs.  I can't speak to what the

17    company had prior to my arrival.

18          Q.   Okay.  And did some portion of your

19    proposal get considered and adopted by the company

20    with regard to suspicious-order monitoring?

21          A.   I did implement a portion.  I don't know

22    what portion of all this was implemented.  I haven't

23    read the entire thing, but --

24          Q.   Using chargeback data?

25          A.   I did review chargeback data.  This one.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   And so, notwithstanding the limitations

 2      you talked about earlier, chargeback data was one of

 3      the things you were going to be looking at to know

 4      your customer's customer, right?

 5            A.   Yes.  That was a thing that I looked at.

 6            Q.   Okay.  Not something that had been done

 7      prior to 2013, when you started with the company,

 8      correct?

 9                 MS. VANNI:  Objection.

10                 THE WITNESS:  I don't know.  Again, I

11         can't speak to what was done prior to the

12         company.

13      BY MR. BUCHANAN:

14            Q.   And that was the 13 bullets; you didn't

15      see that that was one of the things you had to start

16      looking at?

17            A.   That was an individual --

18                 MS. VANNI:  Objection.

19                 THE WITNESS:  -- expressing his thoughts.

20         Again, I have no knowledge of what was done

21         prior to 2013.

22      BY MR. BUCHANAN:

23            Q.   Getting back to the question, just as a --

24      you know, basic matter of company systems, did the

25      company keep records of its due diligence activities
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with regard to customers?

 2        A.   I kept records.

 3             MS. VANNI:  Object to form.

 4   BY MR. BUCHANAN:

 5        Q.   What's that?

 6        A.   I kept records.

 7        Q.   Hard copy, on a computer system, in a

 8   Sharepoint?

 9        A.   I kept hard copy of some records, and I --

10   I think everything was stored on -- on computer.

11        Q.   Okay.  So all your due diligence

12   activities that you were involved with and your group

13   was involved with was stored somewhere in a

14   Sharepoint at the company?

15        A.   It should be shored somewhere.

16        Q.   Okay.

17             Also, sir, when you decided to -- when an

18   order would come in and you would assign a code to

19   either release the order or not release the order, if

20   it tripped a wire, so to speak, did you keep track of

21   whether the DEA was notified of that order as a,

22   quote, suspicious order, or not?

23             MS. VANNI:  Object to the form.

24             THE WITNESS:  If an order was deemed to be

25        suspicious, I would e-mail the -- the DEA, and I
```

```
 1            would save a copy of that e-mail.

 2   BY MR. BUCHANAN:

 3        Q.   Okay.  And -- and what was the system the

 4   company kept track of that stuff in?  Was there a

 5   computer system where you tracked all that?

 6        A.   I kept a -- I believe I kept a printed

 7   version, and I kept a copy on my hard drive.

 8   Eventually they may have been put on to a shared

 9   drive.  I don't remember.

10        Q.   All right.  Last item, sir.

11             MR. BUCHANAN:  Can you pass 609 to the

12        witness, and 626.

13   BY MR. BUCHANAN:

14        Q.   Sir, as I understand this -- no, I'm

15   sorry.  I already gave you that one.  It's 613 and

16   626.

17             MR. BUCHANAN:  What are the exhibit

18        numbers going to be?

19             MS. VANNI:  Is this your last document?

20             MR. BUCHANAN:  It is.

21             MR. SEIGEL:  32 and 33.

22             MR. BUCHANAN:  Thank you, Counsel.

23   BY MR. BUCHANAN:

24        Q.   We'll keep this one real quick, sir.

25             You left the company to join Purdue in --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    sometime in 2017, right?

2         A.    February 2017.

3         Q.    Gotcha.  Okay.

4              And shortly before you joined Purdue,

5    there was a settlement that was reached, or an MOA

6    that was reached, between the DEA and McKesson.

7              Do you recall that?

8         A.    I do recall a McKesson MOA.

9              MR. BUCHANAN:  Did we pass it to the

10        witness?  613?  Can we get 613 to the screen?

11        Okay.  I'm sorry, it's 613, Evan.  There we go.

12   BY MR. BUCHANAN:

13        Q.    Sir, this is right before you leave.

14   You're having an exchange with a Mr. Hamby, from

15   U.S. IMS Health.

16              Do you see that?

17              MR. BUCHANAN:  What's the exhibit number

18        for the deposition?

19              MS. VANNI:  Object to the form.

20              MR. SEIGEL:  32 is 613.

21        (Cardinal-Brantley 32 was marked for

22   identification.)

23   BY MR. BUCHANAN:

24        Q.    Okay.  Exhibit 32, sir, before you, is

25   your exchange with Mr. Hamby concerning the McKesson
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   settlement.

 2              Do you see that?

 3              MS. VANNI:  Object to the form.

 4   BY MR. BUCHANAN:

 5        Q.   MOA.  Excuse me.

 6        A.   Yes.

 7        Q.   Okay.  Passing you across the table, sir,

 8   a copy of the MOA, which I believe reflects your

 9   highlights.

10              Your initial e-mail at the bottom is

11   Monday, January 30, 2017, at 4:40.

12              "Gentlemen, I'm sure you've heard about

13   McKesson's $150 million settlement with the DEA.  I'm

14   sure you've also read the MOA and compliance

15   addendum."

16              And then it goes on and talks about your

17   assessment of the MOA.

18              Do you see that, sir?

19        A.   Yes.

20        Q.   Okay.  And then you note on the next page,

21   sir, "One can almost build an SOM program using this

22   document as a guide."

23              Did I read that correctly, sir?

24        A.   Yes.

25        Q.   Okay.  And that's one thing you did in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   industry, right, to inform yourself and continue to

 2   collect information as you coordinate -- you looked

 3   at what others were doing with regard to maintaining

 4   effective controls to prevent diversion.  Fair?

 5        A.   I read --

 6             MS. VANNI:  Objection to form.

 7             THE WITNESS:  I read MOAs from DEA to see

 8        what they was thinking, because it was a moving

 9        target on SOMS.  The regulation hasn't changed,

10        but DEA's interpretation is -- was fluid.

11   BY MR. BUCHANAN:

12        Q.   Okay.  So one of the things you did,

13   getting back to my question, sir, is you looked at

14   MOAs?

15        A.   I read MOAs.

16        Q.   Okay.  And you noted here that "One can

17   almost build an SOM program using this document as a

18   guide."  Correct?

19        A.   Yes.

20             MR. BUCHANAN:  Did you pass it across the

21        table?  Okay.

22        (Cardinal-Brantley 33 was marked for

23   identification.)

24   BY MR. BUCHANAN:

25        Q.   Passing you the last exhibit, sir.  That's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit Number 33.

 2              Exhibit 33, sir, is that the compliance

 3    addendum that you're referring to in your e-mail with

 4    Mr. Hamby?

 5         A.   Yes.

 6         Q.   The -- the compliance addendum from which

 7    one could almost build an SOM program, fair?

 8              MS. VANNI:  Object to the form.

 9              THE WITNESS:  That's what I stated, yes.

10              MR. BUCHANAN:  Thank you.  I think

11         counsel's indulgement of a few extra minutes, I

12         appreciate that; I understand I'm out of time.

13              So at this point, I have to pass the

14         witness.

15              VIDEOGRAPHER:  Going off record.  The time

16         is 6:16.

17              (A recess transpired from 6:16 p.m. until

18              6:29 p.m.)

19              VIDEOGRAPHER:  We're going back on record,

20         beginning of media file number 9.  The time

21         is 6:29.

22

23                        EXAMINATION

24    BY MR. PYSER:

25         Q.   Good afternoon, Mr. Brantley.
```

```
 1              A.    Good afternoon.

 2              Q.    My name's Steven Pyser, and I represent

 3     Cardinal Health.

 4                    Can you introduce yourself to the jury.

 5              A.    Yes.  My name is Eric Brantley.

 6              Q.    Where did you grow up, Mr. Brantley?

 7              A.    Flint, Michigan.

 8              Q.    And did there come a time when you went to

 9     work as an employee of Cardinal Health?

10              A.    Yes.

11              Q.    When was that, approximately?

12              A.    I started with Bentley Trading in

13     January 2000, and that company was acquired by

14     Cardinal Health in 2002.

15              Q.    And how long did you work at Cardinal

16     Health?

17              A.    I left Cardinal Health 2013; I want to say

18     October, September.

19              Q.    So 2002 --

20              A.    2013.

21              Q.    -- to roughly 2013; we're talking about

22     11 years, roughly?

23              A.    Yes.

24              Q.    During your -- your 11 years, can you

25     describe from your perspective Cardinal Health's role
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in the health care distribution system in the United

 2    States?

 3         A.   Yes.  As a distributor, Cardinal purchases

 4    prescription drugs, including controlled substances,

 5    from the manufacturer and distributes those to final

 6    dispensers:  Pharmacies, chain pharmacies, hospitals,

 7    DOD, VA.  Things like that.

 8         Q.   There's been a lot of discussion about

 9    controlled substances.

10              Is Cardinal Health's role broader than

11    just controlled substances?

12         A.   Yes.  Controlled substances represent a

13    relatively small percentage of overall with Cardinal

14    distributes.  They distribute over-the-counter

15    products, all prescription drugs, everything down

16    from toothpaste and toothbrushes.

17         Q.   And in addition to the many things that go

18    to a hospital or a pharmacy, does Cardinal Health

19    also have a medical side unrelated to

20    pharmaceuticals?

21         A.   Yes.  So pharmaceutical distribution is

22    just one part of Cardinal Health.  There is a medical

23    side that has distribution centers across the

24    country, and various organizations that the company

25    owns.
```

Highly Confidential - Subject to Further Confidentiality Review

     1          Q.   In your experience, does -- does Cardinal

     2    Health ever interact directly with patients?

     3          A.   No.

     4          Q.   Does Cardinal Health ever interact

     5    directly with doctors?

     6          A.   No.

     7          Q.   So if you could, starting around 2002,

     8    describe -- actually, strike that.

     9               Was there a point in time when your job at

    10    Cardinal Health focused on anti-diversion efforts?

    11          A.   Yes.

    12          Q.   About when was that?

    13          A.   2005.  Time frame 2005 till late 2007 or

    14    early 2008, somewhere around in there.

    15          Q.   And could you describe in your own words

    16    what types of things you did as an employee for

    17    Cardinal Health working on anti-diversion issues?

    18               What were your main responsibilities?

    19          A.   My main responsibilities were reviewing

    20    ingredient limit reports on a monthly basis, and I

    21    would conduct investigations as necessary on

    22    pharmacies, and I would report those pharmacies to

    23    the DEA -- report those pharmacies to the DEA.

    24          Q.   When you say "conduct investigations,"

    25    were there times when you went out and visited

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies?

2         A.   They would be site visits, yes.  I would

3    go out and visit the pharmacy and -- and ask

4    questions and see what was going on.  Do an

5    investigation.

6         Q.   You mentioned ingredient limit reports, or

7    ILRs.  What is an ingredient limit report?

8         A.   An ingredient limit report is -- is based

9    on a formula to identify a formula provided by DEA to

10   identify a certain limit or a threshold, as you will.

11   And so the report would generate for any customer

12   that exceeded that threshold.  And then that report

13   was sent to DEA every month.

14        Q.   And do you know where the criteria came

15   from for Cardinal Health to develop its ingredient

16   limit reports?

17        A.   Yes.  It came from the DEA.

18        Q.   In your job, were you at the Dublin center

19   for Cardinal Health, the corporate offices?

20        A.   Yes, I was in Dublin, Ohio, at corporate.

21        Q.   How did you receive the ingredient limit

22   reports that you reviewed?

23        A.   They came via mail, or like a UPS-type

24   service.

25        Q.   And do you know if anyone else other than

Highly Confidential - Subject to Further Confidentiality Review

1  yourself received identical ingredient limit reports

2  from the various distribution centers of Cardinal

3  Health?

4      A.   The distribution centers generate their

5  report.  Someone there reviewed the report.  The

6  report was sent to the DEA from the distribution

7  center, and then I reviewed the reports along with

8  members of the team.

9      Q.   So the ingredient limit reports that you

10  would be reviewing, DEA would have that full report;

11  is that fair?

12      A.   Yes.

13          MR. PAPANTONIO:  Objection.  Form.

14      Leading.

15  BY MR. PYSER:

16      Q.   Do you know whether anyone at DEA also

17  received ingredient limit reports?

18      A.   The ingredient limit reports were sent to

19  the DEA on a monthly basis.

20      Q.   You talked a little bit about site visits

21  and additional work you did beyond just reviewing the

22  ingredient limit reports.  It -- were there times

23  when you made decisions as a result of site visits?

24      A.   Yes.  If -- if during a site visit it was

25  deemed that they were doing, for instance,

```
 1   Internet -- they were associated with an Internet
 2   pharmacy, then I would make a recommendation to
 3   discontinue business with that -- or discontinue
 4   controlled substance shipments with that pharmacy and
 5   then report that pharmacy to Kyle Wright at the DEA.
 6        Q.   And to your knowledge, when you made a
 7   decision to discontinue business with a pharmacy, did
 8   Cardinal Health follow that recommendation?
 9        A.   Yes.
10        Q.   And when you reported a pharmacy to the
11   DEA, who did you send that information to?
12        A.   I sent the -- an e-mail to Kyle Wright at
13   DEA headquarters.
14        Q.   Who -- who is Kyle Wright?
15        A.   I don't remember his exact title, but I
16   believe he may have been over the e-commerce section.
17   But he was where registrants submitted such reports
18   to the DEA.
19        Q.   Was it your understanding that the purpose
20   of sending ingredient limit reports to DEA was to
21   comply with the DEA regulations for suspicious-order
22   reporting?
23        A.   Yes.
24        Q.   So why did you conduct site visits and
25   investigations of customers on top of the ingredient
```

Highly Confidential - Subject to Further Confidentiality Review

1   limit reports?

2        A.   That was over and above the requirement.

3   The requirement was to report the suspicious orders,

4   and then based on the report I saw, I would actually

5   go out and investigate the pharmacies to actually

6   report those pharmacies to the DEA as well, in

7   addition to orders.

8        Q.   Let's take a look at a document.

9             I'm showing you a document that's been

10  marked Exhibit 34 in this deposition.  It's a new

11  exhibit.

12       (Cardinal-Brantley 34 was marked for

13  identification.)

14  BY MR. PYSER:

15       Q.   Just so we can see it, I'll put it in

16  front of Exhibit 34, up on the Elmo.

17            What is Exhibit 34?

18       A.   This is the Cardinal Health DEA compliance

19  manual.

20       Q.   And if you look at the -- the table of

21  contents, does it cover several different areas of

22  DEA compliance?  It's a thick document, a couple

23  hundred pages.

24       A.   Yes.

25       Q.   And if you look at Section 7 of the DEA

```
1    compliance manual, is that section titled "Required

2    Reports to DEA"?

3         A.   Section 7?

4         Q.   If you turn to Bates page ending 898 --

5         A.   Oh, yes.

6         Q.   -- of the table of contents.

7         A.   I see it.  I see it.

8         Q.   So let's go together to Section 7.

9              And I'll give you the Bates number, which

10   is going to be the number in the bottom right corner.

11   It's going to be Bates ending 937.

12             And to your recollection, was this DEA

13   compliance manual in effect during the time that you

14   worked at Cardinal Health?

15        A.   Yes.

16        Q.   Okay.  And specifically during the time

17   period 2005 through '07 or '08, when you were working

18   the anti-diversion area?

19        A.   Yes.

20        Q.   So if you look at Section 7-1, the

21   required reports to DEA, the first report mentioned

22   is ARCOS.

23             Can you tell me what an ARCOS report is?

24        A.   Yes.  The ARCOS report is -- is a report

25   of all movement of ARCOS-reportable controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1   substances, the Schedule II controlled substances,

2   all movement.  Those reports were sent to the DEA

3   every month.

4        Q.   So it's a report received by DEA about

5   every movement of every controlled substance; is that

6   a fair kind of shorthand for ARCOS?

7        A.   Yes, of all the ARCOS reportable

8   controlled substances, yes.

9        Q.   Now, if you -- were there any other

10  reports that went to DEA?

11       A.   Yes.  The ARCOS report, the biannual

12  report, there was end-of-year inventory taken, the

13  ingredient limit reports every month.

14       Q.   Pausing on the ARCOS reports for a minute,

15  in a situation where a hospital or a pharmacy ordered

16  controlled substances from more than one distributor,

17  would the distributors necessarily know that that

18  hospital or that pharmacy received controlled

19  substances from multiple sources?

20            MR. PAPANTONIO:  Objection to form.

21       Speculation as to what they would know.

22  BY MR. PYSER:

23       Q.   You can answer the question.

24       A.   No.

25       Q.   When you were at Cardinal Health, were you

```
1    aware of what distributions a hospital or a pharmacy

2    might have received from other distributors, not

3    Cardinal Health?

4         A.   No.

5         Q.   To your knowledge, were ARCOS reports

6    submitted by all distributors?

7         A.   Yes.  All registrants.

8         Q.   So in your understanding, by looking at

9    ARCOS reports, would DEA be able to see the full

10   picture of what a particular hospital or pharmacy

11   received from all distributors?

12            MR. PAPANTONIO:  Objection as to form.

13       Speculating on what -- what DEA might know.

14            THE WITNESS:  Yes, the DEA through the

15       ARCOS data has visibility into all transactions

16       of controlled substances from all registrants.

17   BY MR. PYSER:

18        Q.   Let me ask it a -- a slightly different

19   way, in response to the objection.

20            What's your understanding of what ARCOS

21   contains when you put together all of the ARCOS

22   submissions from all the distributors?

23            MR. PAPANTONIO:  Objection as to form.

24            THE WITNESS:  It would have data from all

25       of the DEA registrants; for instance, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            wholesalers and all of the purchases and the

 2            shipments of those controlled substances to

 3            other DEA registrants.  The complete picture.

 4            You could see all of the drugs that a pharmacy,

 5            for instance, was purchasing from every source

 6            and all of the sales from the wholesaler to

 7            pharmacies.  It was a complete picture of all

 8            the transactions of those controlled substances.

 9   BY MR. PYSER:

10        Q.   Just to be clear, did Cardinal Health have

11   access to that information?

12        A.   No.

13        Q.   Did DEA have access to that?

14        A.   Yes.

15        Q.   Turning the page to 7-3, there's a section

16   titled "Suspicious Orders."

17             Do you see that?

18        A.   Yes.

19        Q.   And under it is listed 21 CFR 1301.74(b).

20   Do you see that?

21        A.   Yes.

22        Q.   What is that, 21 CFR 1301.74(b)?

23        A.   That's the regulation for suspicious

24   orders.  It's -- states that registrant is

25   responsible for implementing, designing a -- a system
```

Highly Confidential - Subject to Further Confidentiality Review

1  to identify suspicious orders and report those to the

2  DEA.  And further goes on to say that a suspicious

3  order is an order of unusual size, frequency, that

4  deviates substantially from a normal order pattern.

5      Q.   And Cardinal Health has a description

6  of -- underneath, in its compliance manual, of --

7  strike that.

8          In the compliance manual for Cardinal

9  Health, under "Suspicious Orders," can you read the

10  first sentence?

11      A.   "Wholesalers are" -- are you meaning the

12  first sentence under "Suspicious Orders"?

13      Q.   Correct, yes.

14      A.   "Wholesalers are responsible for designing

15  and operating a system that would disclose to the

16  wholesaler suspicious orders."

17      Q.   Did Cardinal Health have such a system in

18  2005, when you began your work in anti-diversion?

19      A.   Yes.

20      Q.   When you came into your role in 2005, was

21  that system already up and running?

22      A.   Yes.

23      Q.   In fact, if you look at the date of this

24  document, in the bottom left, you see that it's

25  April 5th, 2000?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   The next bold heading is "Establishing

 3   Suspicious Order Criteria."

 4             Do you see that?

 5        A.   Yes.

 6        Q.   And if you turn the page to page 7-4, you

 7   see at the top of that page, it states, quote:

 8   "Complying with 21 CFR 1301.74(b) is a two-step

 9   process"?

10        A.   Yes.

11        Q.   Can you describe for me in your own words

12   what the two-step process that's discussed in

13   Cardinal Health's compliance manual are?

14        A.   Yes.  The ingredient limit reports that

15   are done are sent to the DEA every month, as well as

16   the cage vault personnel had the ability to identify

17   anything that they deemed to be suspicious and

18   reported that as well.

19        Q.   The -- the first description in the manual

20   says, "First, each Cardinal division submits to DEA

21   on a monthly basis an ingredient limit report,

22   Exhibit M."

23             I'd like to direct your attention to

24   Exhibit M in this document, which is Bates page

25   ending 4157, if you turn there with me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Is this an example of an ingredient limit

 2   report?

 3        A.   Yes.

 4        Q.   It's a little bit hard to read on the

 5   screen, but if you could help us out a little bit,

 6   can you tell us what's in this document; what's in

 7   this report that's sent to DEA?

 8        A.   This is a report of the customers, along

 9   with the date -- date of the transactions and the

10   drug, and the amount in -- in grams, what was ordered

11   of that controlled substance for the month.  And it

12   lists what the ingredient limit was and what the

13   total was for that drug.

14        Q.   Zooming in a little bit here, it gives the

15   customer name at the top, you mentioned, correct?

16        A.   Yes.

17        Q.   And then it provides the ingredient you

18   mentioned, right?

19        A.   Yes.

20        Q.   And then it speaks to specific orders

21   underneath, and those are sent to the DEA, right?

22        A.   Yes.

23        Q.   And then all the way on the right side of

24   the page gives some additional information, a

25   customer total and ingredient limit.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Can you explain for us what those are?

2          A.   Yes.   The ingredient limit is the -- the

3    limit that was calculated using a formula received

4    from DEA, and then the customer total is what that

5    customer ordered that month.

6          Q.   I recognize this is just an example from

7    Cardinal Health's compliance manual, but was similar

8    information provided in each ingredient limit report

9    sent to the DEA during the time you were reviewing

10   ingredient limit reports?

11         A.   Yes.

12         Q.   You can go back to page 7-4.  And 7-4,

13   after it discusses Exhibit M, goes on to state:

14   "This report is based on a computer program which

15   monitors controlled substance purchases for a month

16   and compares these purchases to predetermined

17   averages or limits, and if a customer's purchase

18   quantities exceed the established parameters, the

19   customer's activity is printed on the report."

20         Is this an accurate description of the

21   ingredient limit report as you understood it?

22         A.   Yes.

23         Q.   Fair description of how it worked during

24   your time?

25         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And these parameters that are used for the
 2    computer program, the established parameters that are
 3    discussed, where did they come from?
 4          A.   They came from DEA.
 5          Q.   A little bit further down, it discusses
 6    the second piece of Cardinal Health's two-step
 7    process to comply with 1301.74(b).
 8               And can you read for me in the next
 9    paragraph the sentence beginning "Second"?
10          A.   "Second, on a daily basis, cage and vault
11    personnel should be policing and identifying
12    individual orders that appear excessive in relation
13    to what other customers are buying and/or the
14    customer's purchase history."
15          Q.   All right.
16          A.   Read the entire paragraph, or just that?
17          Q.   That's good.
18          A.   Okay.
19          Q.   Earlier in the day, when you were being
20    asked questions by plaintiff's counsel, they played
21    you a video of someone by the name of Mr. Baranski
22    talking about pickers and packers.
23               Do you recall that?
24          A.   I do.
25          Q.   In your experience, are there pickers and
```

Highly Confidential - Subject to Further Confidentiality Review

1    packers in Cardinal facilities for items other than

2    controlled substances?

3         A.   Yes.  So there are pickers and packers in

4    the general warehouse, and then there are separate

5    pickers and packers in the controlled substance cage,

6    and then separate packers in the vault -- separate

7    pickers and packers in a vault.

8         Q.   Is it true that the vast majority of

9    products that Cardinal ships have nothing to do with

10   controlled substances or opioids?

11        A.   That is correct.

12        Q.   In your experience, the folks who get

13   selected to work in the cage area or the vault area,

14   where Cardinal Health stores opioid medications, are

15   they the best of the best of Cardinal's warehouse

16   employees?

17        A.   Yes.  They are the crème de la crème, as I

18   call them.  The -- the best ones are selected to work

19   in the cage and vault area.

20        Q.   So in your experience, would a reference

21   to pickers and packers just putting things in totes,

22   would that necessarily apply to cage and vault

23   employees, or would that be something different?

24        A.   No, the cage and vault pick process was --

25   was different.  There were other -- there were

Highly Confidential - Subject to Further Confidentiality Review

```
 1   additional checks and balances on picking orders in

 2   the -- the cage and vault.  It was -- it was

 3   different than how it was done in the general

 4   warehouse.

 5        Q.   In the event that through this second

 6   process, someone in the distribution center

 7   identified an issue, whose responsibility was it to

 8   alert DEA of such an issue?

 9        A.   That person would notify their supervisor,

10   and then someone at the division would notify DEA of

11   the suspicious order.

12        Q.   So -- so would that potentially come

13   straight from a distribution center, not necessarily

14   through corporate?

15        A.   That would come straight from the

16   distribution center.

17        Q.   Have you ever heard of the DEA's Internet

18   pharmacy initiative?

19        A.   Yes.

20        Q.   Okay.  What is it?

21        A.   It's guidance that they issued in relation

22   to identifying potential suspicious orders through

23   Internet pharmacies.

24        Q.   And who asked you to undertake the

25   Internet pharmacy initiative?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    My boss, Steve Reardon.

 2          Q.    What was Mr. Reardon's role at Cardinal

 3   Health?

 4          A.    At the time, I believe he was director of

 5   quality and regulatory affairs.

 6          Q.    And we're in kind of the 2005-2006 time

 7   frame, right?

 8          A.    Yes.

 9          Q.    Do you know Mr. Reardon's background

10   before he came to work at Cardinal Health as director

11   of quality and regulatory affairs?

12          A.    I actually believe he was a police

13   officer.

14          Q.    Do you know where he was a police officer?

15          A.    I believe the Boston area.

16          Q.    As part of the Internet pharmacy

17   initiative, what -- what did you do to help comply

18   with the Internet pharmacy initiative?

19          A.    My role was, in addition to the

20   distribution centers submitting the report to DEA

21   every month, I would also review the reports, and I

22   would identify pharmacies that would need further

23   investigation, and I would conduct an investigation

24   and a site visit.  And based on those findings, I

25   would recommend -- make a recommendation to
```

```
 1   discontinue shipment of controlled substances to

 2   those pharmacies and report those pharmacies to the

 3   DEA.

 4        Q.   I'd like to direct your attention to an

 5   exhibit you looked at earlier; it should be right in

 6   front of you.  It's marked as Brantley Exhibit 4.

 7             Do you have that one?

 8        A.   Yes.

 9        Q.   And this was a settlement release

10   agreement and administrative memorandum of agreement.

11             Do you remember discussing that document

12   earlier today?

13        A.   Yes.

14        Q.   Is it true that on the first page of

15   Exhibit 4, it states that Cardinal has 27 separate

16   distribution facilities?

17        A.   Yes.

18        Q.   And are the distribution facilities --

19   generally; I know there's some unique ones -- but

20   generally speaking, do the distribution facilities

21   cover particular geographic areas?

22        A.   Yes.

23        Q.   To your knowledge, was there ever a

24   suspension order of any of the facilities that

25   shipped to the Northern Ohio area?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   No.

 2          Q.   A little bit more on Exhibit 4.  You spent

 3   a fair bit of time talking about allegations that the

 4   DEA -- the DEA had made.

 5               To your knowledge, did DEA ever prove its

 6   allegations?

 7          A.   No.

 8          Q.   In fact, there -- there was a piece that

 9   was skipped over earlier when you were discussing

10   this document with counsel.  On page 2, there's a

11   section that counsel for the Plaintiffs didn't read

12   that begins, "No admission or concession."

13               Do you see that section?

14          A.   Yes.

15          Q.   And does it say:  "This agreement is

16   neither an admission by Cardinal of liability or of

17   the veracity of any allegation made by DEA in the

18   orders to show cause."

19               See that?

20          A.   Yes.

21          Q.   Did I read it correctly?

22          A.   Yes.

23          Q.   Is that consistent with your understanding

24   of this document?

25          A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    I believe you also have in front of you
 2    Exhibit 8.
 3                 Do you see Exhibit 8?
 4           A.    Yes.
 5           Q.    Okay.  And is this document from January
 6    of 2005?  Correct?
 7           A.    Yes.
 8           Q.    Okay.  You were asked whether you
 9    recognize some of the names in that exhibit.
10                 Do you recall that?
11           A.    Yes.
12           Q.    And the Plaintiffs pointed out some
13    criticisms or critiques that were part of the audit
14    in Exhibit 8.
15                 Do you recall that?
16           A.    Yes.
17           Q.    And those were related to the -- the QRA
18    department, fair?
19           A.    Yes.
20           Q.    Okay.  Is the QRA department broader than
21    just anti-diversion work?
22           A.    Yes.
23           Q.    Do you have any reason to believe that the
24    document that counsel spent time talking to you about
25    has anything at all to do with anti-diversion work
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   related to opioids?

 2        A.   No.

 3        Q.   You were also asked some questions about

 4   an e-mail -- this is Exhibit 12 now; do you have

 5   Exhibit 12 in front of you?

 6        A.   Yes.

 7        Q.   And Exhibit 12 was an e-mail from Mark

 8   Mitchell.

 9             Do you recall this document now?

10        A.   Yes.

11        Q.   And this e-mail was not to you, was it?

12        A.   No.

13        Q.   In the copy you were given, it has no

14   response from Steve Reardon to Exhibit 12, does it?

15        A.   No.

16        Q.   Exhibit 12 has statements from Mark

17   Mitchell about his knowledge of whether Cardinal

18   Health monitors purchases from hospitals or

19   pharmacies.

20             Do you recall that?

21        A.   Yes.

22        Q.   You were asked questions about

23   Mr. Mitchell's understanding.  Is Mr. Mitchell the

24   author of this e-mail in Exhibit 12?

25             Is he part of the QRA or anti-diversion
```

Highly Confidential - Subject to Further Confidentiality Review

1  team?

2       A.   No.

3       Q.   Was Mr. Mitchell's understanding of how

4  Cardinal Health monitored possible diversion correct?

5            MR. PAPANTONIO:  Objection as to what

6       Mr. Mitchell -- form.  Just form.  Just object

7       to form.  Let you figure it out.

8            THE WITNESS:  No.

9            MR. PAPANTONIO:  Objection as to form.

10  BY MR. PYSER:

11       Q.   Do you recall counsel for the Plaintiffs

12  asking you questions in which Mr. Mitchell made

13  statements about Cardinal Health's process for

14  anti-diversion steps?

15       A.   Yes.

16       Q.   Do you believe Mr. Mitchell's

17  understanding of how Cardinal Health monitored for

18  possible diversion and took anti-diversion steps is

19  correct?

20            MR. PAPANTONIO:  Objection to form.

21       Objection to form.

22            THE WITNESS:  No.

23  BY MR. PYSER:

24       Q.   What do you think is wrong about

25  Mr. Mitchell's understanding in Exhibit 12?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PAPANTONIO:  Objection as to form.

 2                    THE WITNESS:  We had a system in place.

 3      BY MR. PYSER:

 4           Q.  Let me rephrase that question.

 5                    What do you disagree with from the

 6      statements Mr. Mitchell makes in the e-mail at

 7      Exhibit 12?

 8           A.  I disagree with the statement that he made

 9      that we do not monitor what they purchase or -- or

10      track.

11           Q.  Why do you disagree with that?

12           A.  Because we monitor purchases of all of

13      our -- all of our customers.

14           Q.  Is it the case that every entity that

15      receives any controlled substance from Cardinal

16      Health has to have a DEA license?

17                    MR. PAPANTONIO:  Objection as to form.

18                    THE WITNESS:  Yes.

19      BY MR. PYSER:

20           Q.  Does Cardinal Health ship to anyone who

21      does not have a DEA license?

22           A.  Not a controlled substance, no.

23           Q.  When Plaintiffs' counsel was asking you

24      questions, they asked whether Cardinal Health

25      distributed to drug cartels.
```

```
 1                   To your knowledge, has Cardinal Health
 2    ever distributed to a drug cartel?
 3         A.   No.
 4         Q.   I believe you also have in front of you
 5    Exhibit 13, which talks about a facility assessment
 6    in Birmingham, Alabama.
 7                   You recall that document?
 8         A.   Yes.
 9         Q.   This was an e-mail that I believe you
10    received, along with others, about this facility
11    assessment in Birmingham.
12                   Did this document, when you reviewed it,
13    cover all of the different parts of anti-diversion
14    reporting within Cardinal Health?
15         A.   No.
16         Q.   So, for example, did it cover Cardinal
17    Health's corporate anti-diversion work?
18         A.   No.
19         Q.   So is it fair to say that in addition to
20    whatever activity was happening at local distribution
21    centers, there was also other work being done at the
22    corporate level by people like yourself?
23              MR. PAPANTONIO:  Objection as to form.
24              THE WITNESS:  Yes.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PYSER:

 2         Q.   What other work was being done for

 3    Cardinal Health -- rephrase the question.

 4              What other work was being done for

 5    Cardinal Health beyond the work that was being done

 6    just at the distribution centers like the Birmingham,

 7    Alabama, site?

 8         A.   I was reviewing the ingredient limit

 9    reports, and I was conducting site visits and

10    investigations and reporting those customers to the

11    DEA.

12         Q.   Were there times when you reported a

13    customer to DEA because you believed they might be

14    involved in Internet pharmacy activity?

15         A.   Yes.

16         Q.   And what did Cardinal Health do when it

17    came to believe that a customer might be involved in

18    Internet activity?

19         A.   We discontinued shipments of controlled

20    substances to that customer and reported that

21    customer to the DEA.

22         Q.   You were asked earlier today questions

23    about Exhibit 6.

24              Do you have Exhibit 6 in front of you?

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   And in particular, you were asked about an

2    e-mail in Exhibit 6 from Steve Reardon, on which you

3    were one of the recipients.

4               You see that e-mail from August 30th,

5    2005?

6               It's on the second page of the document.

7    It's the bottom e-mail.

8          A.   Yes.

9          Q.   Okay.  So we've got an August 30th, 2005,

10   e-mail from Steve Reardon.  And in it, Mr. Reardon

11   states:  "Your excessive purchase report should be

12   reviewed to see if you have customers that are

13   purchasing over 3,000 dosage units of phentermine or

14   5,000 dosage units of hydrocodone a month."

15              Do you see that language?

16         A.   Yes.

17         Q.   I just want to be clear about the reports

18   that we're talking about.  These excessive purchase

19   reports that are referenced here, of having more than

20   3,000 or 5,000 dosage units, are those reports that

21   would have already been sent to the DEA?

22              MR. PAPANTONIO:  Objection as to form.

23              THE WITNESS:  Yes.

24   BY MR. PYSER:

25         Q.   Who else would have received, in addition
```

Highly Confidential - Subject to Further Confidentiality Review

1    to yourself, these reports that are referenced at

2    3,000 dosage units or 5,000 dosage units, to your

3    knowledge?

4        A.   They were received at the distribution

5    level at the distribution centers, as well as my team

6    at -- at corporate as well as the DEA.

7        Q.   So in its normal practice, would Cardinal

8    Health have reported all of these orders that are

9    referenced here to the DEA?

10            MR. PAPANTONIO:  Objection.  Form.

11            THE WITNESS:  Yes.

12   BY MR. PYSER:

13       Q.   Were there ever times when you personally

14   had to call a customer and tell them they would no

15   longer be eligible to receive controlled substances

16   from Cardinal Health?

17       A.   Yes.

18       Q.   To the extent that you can remember now,

19   ten years later, can you describe a little bit about

20   those phone calls?

21       A.   I don't remember the exact --

22            MR. PAPANTONIO:  Objection.  Hearsay.

23            THE WITNESS:  I don't remember the exact

24       details, but they would be -- I would call the

25       customer and let them know that they were being

```
 1        shut off from receiving controlled substances.
 2   BY MR. PYSER:
 3        Q.   And when you made those calls, were the
 4   pharmacists sometimes angry with you?
 5             MR. PAPANTONIO:  Objection.  Hearsay.
 6             THE WITNESS:  Yes.
 7   BY MR. PYSER:
 8        Q.   Why?  Did they tell you?
 9        A.   Because they would not be --
10             MR. PAPANTONIO:  Objection.  Hearsay.
11             THE WITNESS:  Because they would not be
12        receiving controlled substances from Cardinal
13        Health any longer.
14   BY MR. PYSER:
15        Q.   And these pharmacies that we're talking
16   about that Cardinal Health was refusing to ship to,
17   do you know, typically, did they still have a valid
18   DEA license?
19        A.   Yes.
20        Q.   In addition to your work in
21   anti-diversion, did you also do training of other
22   Cardinal Health employees?
23        A.   Yes.
24        Q.   Can you tell me a little bit about what
25   types of training you did?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I did training with members of senior
 2   management, and I did training with the sales force,
 3   and I did training with members of my team.
 4        Q.   And just generally speaking, what was the
 5   subject matter that you would train other people at
 6   Cardinal Health on?
 7        A.   On our Internet or anti-diversion policy.
 8        Q.   And were those policies, talking about the
 9   2005, '6, '7 time period, were those policies during
10   that time period consistent with what you understood
11   DEA wanted?
12             MR. PAPANTONIO:  Objection as to what DEA
13        wanted.  Form.
14             THE WITNESS:  Yes.
15   BY MR. PYSER:
16        Q.   Were the policies that Cardinal Health had
17   back in 2006 consistent with the guidance that you
18   received from DEA?
19        A.   Yes.
20        Q.   How did you come to the conclusion that
21   Cardinal's policies back in this time period were
22   consistent with the guidance you received from DEA?
23        A.   Kyle Wright with DEA told us.
24             MR. PAPANTONIO:  Objection.  Move to
25        strike.  Hearsay, what they told this witness.
```

```
 1   BY MR. PYSER:

 2       Q.   What did Mr. Wright tell you about

 3   Cardinal Health's policies?

 4           MR. PAPANTONIO:  Objection as to form

 5       about anything Mr. Wright told this witness.

 6       Hearsay.

 7           THE WITNESS:  He said --

 8   BY MR. PYSER:

 9       Q.   You can answer.

10       A.   He said that we're doing the right things,

11   and we're going in the right directions, and that we

12   had a -- a good program.

13           MR. PAPANTONIO:  Objection.  Move to

14       strike.  Just rank hearsay.

15   BY MR. PYSER:

16       Q.   Did you have a -- a strong working

17   relationship with Mr. Wright in DEA?

18       A.   Yes.

19       Q.   Did Kyle Wright from DEA ever tell you

20   that Cardinal Health's anti-diversion program was

21   deficient in any way?

22           MR. PAPANTONIO:  Objection as to form.

23       Anything Mr. Wright told this witness, hearsay.

24           MR. PYSER:  Counsel, you can object to

25       form and keep it at that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PAPANTONIO:  Okay.  Form.  I'll let
 2        you figure it out for yourself.  Okay.
 3                    THE WITNESS:  No.
 4    BY MR. PYSER:
 5        Q.   Did Mr. Wright ever tell you that Cardinal
 6    Health's suspicious -- strike that.
 7             Did you receive any suggestions or
 8    critiques from DEA, from Mr. Wright in particular, on
 9    Cardinal Health's system?
10        A.   No.
11        Q.   If back in 2006 or '7, Mr. Wright or
12    someone else at DEA had offered suggestions to
13    Cardinal Health on its suspicious-order monitoring or
14    reporting system, what would you have done?
15        A.   We would have --
16                    MR. PAPANTONIO:  Objection.  Speculation.
17        Speculation as to what was offered and what his
18        reaction would be.
19    BY MR. PYSER:
20        Q.   You can answer.
21        A.   We would have implemented those
22    suggestions.
23        Q.   I'm showing you a document entitled
24    Exhibit 35.
25             (Cardinal-Brantley 35 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2    BY MR. PYSER:

 3         Q.   Do you recognize this document?

 4         A.   Yes.

 5         Q.   What is it?

 6         A.   It's an e-mail from my boss, Steve

 7    Reardon, of a summary of a conversation that we had

 8    with Kyle Wright.

 9         Q.   Okay.  And the -- the time period of that

10    call was on April 2007; is that right?

11         A.   Yes.

12         Q.   And Mr. Reardon states --

13              MR. PAPANTONIO:  Just for the record,

14         objection to this entire document as hearsay.

15         Anything Mr. Wright talked to as far as

16         Mr. Reardon or Mr. Brantley is hearsay.  We

17         object to the use of the document.

18    BY MR. PYSER:

19         Q.   Direct your attention to the sentence that

20    begins:  "The purpose of the call was to confirm we

21    have the appropriate program and processes in place.

22    Ask if there is anything else we should be doing,

23    reiterate our willingness to work with the agency on

24    this issue, and to extend an offer to meet with the

25    agency to further discuss the details of our
```

Highly Confidential - Subject to Further Confidentiality Review

1   program."

2            Do you see that language?

3        A.   Yes.

4        Q.   Based on your recollection, is that an

5   accurate description of the call?

6        A.   Yes.

7        Q.   If you look at the first bullet point, can

8   you read that out loud?

9            MR. PAPANTONIO:  Continuing objection as

10       to hearsay and use of this document in part of

11       hearsay.

12           THE WITNESS:  He thinks we are doing the

13       right things, heading in the right direction.

14  BY MR. PYSER:

15       Q.   And that statement, that was described by

16  Mr. Reardon as the key feedback from Kyle.

17           Do you see that?

18       A.   Yes.

19           MR. PAPANTONIO:  Same objection as to what

20       Mr. Reardon characterized what Mr. Kyle told him

21       as hearsay.

22  BY MR. PYSER:

23       Q.   And did Cardinal Health incorporate this

24  information that it learned from Mr. Wright into its

25  anti-diversion programs?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   What impact did those statements have on

 3   you?

 4        A.   They made me feel that we had a good

 5   program in place, and as he said, we were heading in

 6   the right direction.  We were doing the right thing.

 7             MR. PAPANTONIO:  Objection.  Move to

 8        strike.  His statement is based on hearsay.

 9        Foundationally on hearsay.

10   BY MR. PYSER:

11        Q.   And the next bullet is, quote:  "Stated

12   that Eric, who manages their program centrally in

13   Dublin, has established an excellent working

14   relationship with his office."

15             Do you see that statement?

16        A.   Yes.

17        Q.   Do you agree with that statement?

18        A.   Yes.

19        Q.   If you go to the next page in Exhibit -- I

20   believe we're -- we're at 35 -- is there a letter

21   attached?

22        A.   Yes.

23        Q.   Is it a letter you wrote?

24        A.   Yes.

25        Q.   And who did you send the letter to?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Jan Hamilton, with the DEA in the Miami

 2   field division in Miami, Florida.

 3          Q.   And there's some discussion in the letter

 4   about information that had been provided back and

 5   forth with DEA, in the first two paragraphs.

 6               Do you see those paragraphs?

 7          A.   Yes.

 8          Q.   And I want to direct your attention to the

 9   third paragraph, about ten lines down.  It begins:

10   "As mentioned above."

11               You see that language?

12          A.   Yes.

13          Q.   And it reads:  "As mentioned above, all of

14   the Internet pharmacy accounts listed below have been

15   terminated as customers for controlled substances.

16   In addition, prior to this action on our part, DEA

17   had been notified by us of excessive purchases of

18   controlled substances via ingredient limit reports

19   for these accounts in advance of our decision.

20   Rather than wait upon a response from DEA, Cardinal

21   Health initiated the following actions as described

22   below.  That being the case, we believe that our

23   program is in accordance with DEA's expectations, and

24   we continue to improve it and add resources to it.

25   For example, we added an additional head count in
```

```
 1    February 2007."

 2              Did I read that correctly?

 3        A.    Yes.

 4        Q.    Did you personally agree with the

 5    conclusion in this letter that Cardinal's program was

 6    in accordance with DEA's expectations?

 7        A.    Yes.

 8        (Cardinal-Brantley 36 was marked for

 9    identification.)

10    BY MR. PYSER:

11        Q.    Showing you a document that's been marked

12    as Exhibit 36.

13              What is Exhibit 36?

14        A.    This is an e-mail from -- from Kyle Wright

15    that he was sent to wholesale with the -- listed

16    pharmacies that wholesalers had -- had discontinued

17    business with and notified DEA of that action.

18        Q.    Okay.  Did you receive e-mails like this

19    from Mr. Wright?

20        A.    Yes.

21        Q.    What would you typically do when you

22    received an e-mail like this from Mr. Wright, letting

23    you know that a wholesaler -- not necessarily

24    Cardinal Health, but some wholesaler -- had

25    discontinued distribution of controlled substances to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   particular pharmacies or hospitals?

 2       A.   I would review the list to see if there

 3   were any current Cardinal Health customers, and if

 4   so, I would look into those customers; I would

 5   conduct an investigation of those customers if they

 6   were on the list.

 7       Q.   Okay.  And were there times when a

 8   customer appeared on the list and Cardinal Health

 9   subsequently refused to do business with them?

10       A.   Yes.

11       Q.   And the pharmacies on this list, are they

12   pharmacies that necessarily lost their DEA license?

13       A.   No.

14       Q.   Okay.  So these are pharmacies that a

15   distributor had cut off but that DEA hadn't taken

16   their license from?

17            MR. PAPANTONIO:  Objection as to form.

18       Leading.

19            THE WITNESS:  Correct.

20   BY MR. PYSER:

21       Q.   Do you know whether or not the pharmacies

22   that are on this list as having been cut off by a

23   distributor still had their DEA license or not?

24       A.   Yes.

25       Q.   Did they have DEA licenses, typically,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   still?

 2        A.   Yes.

 3        Q.   Did there come a time when -- well, first

 4   of all, let me ask:  Did you receive e-mails like

 5   this periodically from Mr. Wright?

 6        A.   Yes.

 7        Q.   Did there come a time when DEA and Kyle

 8   Wright stopped sending e-mails like the one we just

 9   saw?

10        A.   Yes.

11        Q.   Do you know why?

12             MR. PAPANTONIO:  Objection as to form.

13        Speculating.

14             THE WITNESS:  I do -- I do not know why.

15        I can only speculate.

16   BY MR. PYSER:

17        Q.   But to your knowledge, DEA just stopped

18   providing this information to distributors.

19             You know that, right?

20        A.   Yes.

21             MR. PAPANTONIO:  Objection.  Form.

22        Leading on that last question.  Move to strike

23        the question.

24   BY MR. PYSER:

25        Q.   Did you continue to receive this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    information from DEA, or did it stop at some point?

 2         A.   It stopped at some point.

 3         Q.   Around 2010, did you begin work at a

 4    Cardinal Health facility near Atlanta?

 5         A.   Yes.  2009, I started work at the

 6    McDonough, Georgia, distribution center.

 7         Q.   And in your role at the McDonough,

 8    Georgia, distribution center, did you have

 9    responsibilities related to the physical security of

10    medications that were at that facility?

11         A.   Yes.  I was a compliance officer, so my

12    role was to conduct audits and assure compliance with

13    DEA, FDA, PDMA, OSHA, DOT regulations.

14         Q.   Can you in your experience compare the

15    specificity of regulations for DEA guidance on

16    physical security of handling medications versus

17    anti-diversion?

18         A.   Yes.  So the anti-diversion regulation is

19    21 CFR 1301.74(b), which states that the registrant

20    shall have a system in place to identify suspicious

21    orders and report those orders.  And it defines those

22    orders as orders of unusual size, frequency, or that

23    deviate substantially from a normal pattern.

24              As far as the regulations around physical

25    security, they were very detailed.  They went into
```

1    the thickness of the vault walls, the type of

2    security system, the monitoring, the -- the testing,

3    the cage itself, the space between the cage and the

4    locking mechanism.  And it spelled out in detail a

5    thorough list of things to follow.

6        Q.    In your time at McDonough, and generally

7    at Cardinal Health, were distribution centers

8    regularly inspected by DEA?

9        A.    Yes.  There was a cyclical inspection

10   generally every two to three years or so.

11       Q.    In your experience at Cardinal Health for

12   over ten years, did you ever see Cardinal Health ship

13   an order that you believed would be diverted?

14       A.    No.

15             MR. PYSER:  No further questions.

16             VIDEOGRAPHER:  Going off the record.  Time

17       is 7:18.

18             (A recess transpired from 7:18 p.m.

19             until 7:23 p.m.)

20             MR. PAPANTONIO:  I'm going to move -- all

21       these documents are moved into evidence, so you

22       can take an inventory and accounting of them

23       after we're finished with these questions.

24             VIDEOGRAPHER:  We're going back on record,

25       beginning of media file number 10.  Time

Highly Confidential - Subject to Further Confidentiality Review

 1        is 7:23.

 2                       EXAMINATION

 3   BY MS. VANNI:

 4        Q.   Good evening, Mr. Brantley.

 5        A.   Good evening.

 6        Q.   It's been a long evening.  Are you okay?

 7        A.   I'm fine.  Thank you.

 8        Q.   My name is Amy Vanni, as you know, and I

 9   represent Endo and Par, and I'm going to be asking

10   you some questions.

11             When did you first begin working at

12   QualiTest?

13        A.   I believe September 30th, 2013.

14        Q.   And when you joined QualiTest, what was

15   your position?

16        A.   I was a manager of suspicious-order

17   monitoring.

18        Q.   And what group did you report to?

19        A.   DEA compliance.

20        Q.   What was the DEA compliance group

21   responsible for at QualiTest?

22        A.   They were responsible for DEA compliance

23   for the campus, so for the tablets manufacturing

24   facility, the liquids manufacturing facility, as well

25   as the distribution center.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And as part of -- SOMS was part of

 2   the DEA compliance; is that -- is that fair to say?

 3          A.    Yes.

 4          Q.    How long did you work there?

 5          A.    Until February 2017.

 6          Q.    When you joined QualiTest, did it have a

 7   SOMS program in place?

 8          A.    Yes.

 9          Q.    What is QualiTest's customer base?

10          A.    Primarily wholesalers and chain

11   distribution centers.

12          Q.    During the time that you worked at

13   QualiTest, did your position change?

14          A.    No.

15          Q.    Did anyone report to you?

16          A.    Yes.

17          Q.    I want to talk about some of the details

18   of the suspicious-order monitoring program when you

19   came on board at QualiTest, but before I do that,

20   first, as manager of the SOMS program, can you just

21   generally describe for the jury what "SOMS" is?

22          A.    "SOMS" stands for suspicious-order

23   monitoring, which meant that we -- we monitored

24   orders and implemented a Know Your Customer program.

25   So the -- or the program in detail is -- it -- it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    started with the Know Your Customer piece, so all

 2    customers that ordered controlled substances received

 3    a questionnaire, and on that questionnaire, we asked

 4    certain background information.  I asked about their

 5    SOMS program.  I asked the number and types of

 6    customers that they have, whether there have been any

 7    disciplinary actions, so forth and so on.

 8              And then the -- the second piece of the

 9    Know Your Customer was the site visit.

10              And then, as far as the SOMS system

11    itself, the day-to-day operation, all orders passed

12    through the algorithm.  And if the algorithm

13    identified an order -- it was what I called an "order

14    of interest" -- we looked into that order, reached

15    out to the customer, asked for additional

16    information.

17              If, after receiving that information that

18    order was deemed to be suspicious, then we cut that

19    order, meaning reject it, and we reported that order

20    to the DEA.

21              The second part of the day-to-day

22    operation was I established thresholds based on IMS

23    dispensing data and information received from the

24    customer, as far as the number of customers that you

25    have.
```

```
 1              So I had the dispensing data for
 2     pharmacies, chain pharmacies, mail order, and -- and
 3     such.  And I would multiply that by the number of
 4     customers and have a threshold, a ballpark threshold.
 5              And then I would figure out if we were a
 6     primary for a certain drug, or a secondary, or just
 7     one of several, because that dictated the percentage
 8     of the national average that we would get.
 9              So of course, primary status, a larger
10     percentage; secondary status was a lower percentage.
11     And then if we were one of several, there was like a
12     default percentage.
13        Q.   With -- with respect to to the way
14     thresholds were set, is that -- is that a change that
15     you implemented when you came on board?
16        A.   Yes, as -- as far as using a -- the IMS
17     dispensing data, yes.
18        Q.   We heard some questions during Plaintiffs'
19     counsel's questioning of you with respect to sales
20     setting thresholds.
21              You recall that line of testimony?
22        A.   Yes.
23        Q.   Is that something that you changed when
24     you came on board?
25        A.   Yes.
```

```
 1            Q.   What is the purpose of a SOMS program?

 2            A.   One of the purposes of the SOMS program is

 3    to comply with the regulation 21 CFR 1301.74(b).  And

 4    it's to identify potentially suspicious orders, and

 5    to help to maintain that secure supply chain that we

 6    spoke of earlier.

 7            Q.   You mentioned the algorithm and

 8    identification of an order of interest.  Is an order

 9    of interest something that's different than a

10    suspicious order?

11            A.   Yes.  So an order of interest is any order

12    that's identified by the algorithm.  So the algorithm

13    could identify an order, because it's -- it's based

14    on history.  It needs something to compare it to, so

15    it needs an order history.  So if it is a customer's

16    first time ordering a substance or if it's a new drug

17    that was released -- those are just a couple

18    examples -- then that order would be held by the

19    algorithm, because it has nothing to compare it to.

20            Q.   And when an order is held by the

21    algorithm, what -- what would you do at that point in

22    time?

23            A.   All orders that were held by the algorithm

24    were further researched, and when necessary, reached

25    out to the customer to ask for additional
```

1    information.

2         Q.   Okay.   What -- I was going to ask you, can

3    you expound a little bit on what that research

4    involved.

5         A.   Yes.   Sometimes I would have information

6    from the customer in advance.   So if a major

7    wholesaler had added a -- a new chain, if someone --

8    at one point someone picked up Target's pharmacies.

9    I was notified in advance, "Hey, you know, we just

10   picked up Target pharmacies to distribute."

11            They have X number of pharmacies.   So I

12   know in advance, for instance, that a pharmacy chain

13   just acquired another pharmacy chain, how many stores

14   that they have for each distribution center, so I can

15   implement that into that other threshold -- so I

16   would know that in advance.

17        Q.   In situations where you didn't know that

18   in advance, what would you do?

19        A.   I would reach out to the customer and ask

20   them for additional information.

21        Q.   During the interim, while you were doing

22   your investigation, what would -- what would happen

23   to that order?

24        A.   That order was on hold until I received

25   adequate information.   And if I did not receive

1    adequate information, that order was cut or rejected,

2    and it was reported to the DEA.

3         Q.   And as your role as SOMS manager, you had

4    opportunity to do that on -- on occasions?

5         A.   Yes.

6         Q.   And if you felt like you had, as a result

7    of your investigation, enough information, and then

8    the order wasn't suspicious, what would happen?

9         A.   Well, then that order would be released,

10   and the reason from the customer was saved into the

11   SOM system.

12        Q.   How long would an investigation take,

13   generally?

14        A.   It depended on how long it actually took

15   the customer to respond to my e-mail.  So some could

16   take 10, 15 minutes, the research; some could take a

17   couple days.  But they remained on hold until I got

18   the information that I needed.

19             And if a customer just failed to respond,

20   you know, within 48 hours, I would just notify the

21   customer, "This order is getting cut," and I would

22   report it to the DEA.

23        Q.   You were asked some questions by

24   Plaintiffs' counsel about a March 2013 DEA meeting.

25             Do you recall that line of testimony?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   That line of questioning?

 3        A.   Yes.

 4        Q.   This predated your employment with

 5   QualiTest, right?

 6        A.   Yes.

 7        Q.   You were aware of the meeting; is that

 8   fair?

 9        A.   I was told about the meeting, yes.

10        Q.   And as a result of that meeting, what

11   actions did -- if any -- did QualiTest take?

12        A.   I was hired in September, and I

13   implemented the system that I just outlined.  So

14   whatever sales had been doing was taken over by the

15   SOM team.

16        Q.   You were shown a document that was marked

17   as Plaintiffs' Exhibit 29, if you could pull that.

18             And it was an e-mail dated October 7th,

19   2013, from you to you.

20             Do you remember this -- being shown this

21   document?

22        A.   Yes.

23        Q.   So you were at the company just a little

24   over a week, or maybe two weeks, at this point in

25   time; is that fair?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   Yes.

2    Q.   What was your purpose in -- in preparing

3    this document?

4    A.   Just -- this was a document so -- I just

5    arrived at the company, and I'm charged with -- with

6    managing the suspicious-order monitoring program.  So

7    I drafted this document, and I sent it to myself to

8    share with the team for feedback.  These are my

9    thoughts.  These are some things, you know, that I'm

10   planning.

11   Q.   Okay.  And were you able to implement some

12   of those proposals?

13   A.   Yes.

14   Q.   One of those proposals talks about

15   threshold events, correct?

16   A.   Yes.

17   Q.   And I believe we talked about the changes

18   you implemented with respect to thresholds; is

19   that -- is that fair?

20   A.   Yes.

21   Q.   It also mentions chargebacks, and you were

22   asked some questions about chargebacks.

23        Do you remember that?

24   A.   Yes.

25   Q.   Did you begin looking at chargeback data?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes, I reviewed chargeback data.

 2          Q.    And customer due diligence visits:  Do you

 3    remember that -- that line of questioning?

 4          A.    Yes.

 5          Q.    Did you personally visit customers in your

 6    role as SOMS manager?

 7          A.    Yes.

 8          Q.    And -- and what was your purpose in doing

 9    that?

10          A.    The purpose of the site visit, it was a

11    Know Your Customer visit, to actually do just that,

12    to get the know the customer.  My main purpose was to

13    discuss SOMS, so I would give them a high-level

14    overview of how our system operated, in case they

15    were contacted by me, they would know why.

16               And then the bulk of the meeting was about

17    their SOM system:  How did it work?  Did it follow

18    their SOP?  Give me a demonstration of their system.

19    So it was basically a SOMS visit.

20          Q.    Why was it important for you to understand

21    their SOMS program?

22          A.    Because I felt that the customer needed to

23    have a -- a SOMS program.  And I had already received

24    either an SOP or a kind of a high-level summary of

25    how their program operated, but I wanted to go on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   site and see it in action, see some examples, and
 2   verify that they had one in place.
 3          Q.   This document also refers to SOPs, and you
 4   just referred to some SOPs.  Were you able to
 5   implement SOPs as your role as SOMS manager?
 6          A.   Yes.
 7               MS. VANNI:  I'm going to mark as
 8        Exhibit 37, I think, we're up to.
 9        (Cardinal-Brantley 37 was marked for
10   identification.)
11               MS. VANNI:  Hand that to you.  Counsel.
12               MR. BUCHANAN:  Thank you.
13               MS. VANNI:  Of course.
14   BY MS. VANNI:
15          Q.   Also put it on the -- for other people.
16               What I've put in front of you is an SOP
17   titled "Customer Due Diligence Visits."  Is that
18   right?
19          A.   I have the one for new account approval
20   and existing account overview or --
21          Q.   Oh, yeah.  Okay.  Thank you.  Take that
22   back.  Sorry about that.
23               Can you identify this document?
24          A.   Yes.  This is an SOP that I drafted for
25   new account approval and existing account review.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   And what was the purpose of this?

2          A.   Purpose of this was having an SOP around

3    setting up new customers and reviewing existing

4    customers, from the point that I drafted this.

5          Q.   If I could direct your attention to page 2

6    of that document, under General Section 1, letter A.

7          A.   Yes.

8          Q.   "The SOM team conducts a thorough review

9    and research of the customer, including ownership.

10   If the research concludes that the potential customer

11   poses an unreasonable risk for diversion of

12   controlled substances and/or List 1 chemicals, the

13   customer will be blocked from ordering controlled

14   substances and/or List 1 chemicals."

15              Did I read that correctly?

16         A.   Yes.

17         Q.   Is that a step that you would implement as

18   your role as SOMS manager?

19         A.   Yes.  If a new customer was set up, we

20   would conduct a review.

21         Q.   Did you ever send questionnaires to

22   existing customers as well?

23         A.   Yes.

24         Q.   And what was your purpose in doing that?

25         A.   Consistency, so that every customer would
```

1  have a -- a questionnaire on file, along with number

2  of customers that they had, because I needed that to

3  establish thresholds, even for the existing

4  customers.

5       Q.   "Section 2 of that document, Know Your

6  Customer, talks about the customer questionnaire, but

7  if I could direct your attention to letter B:

8            "The SOM team reviews and validates the

9  information provided by the customer.  This

10  information includes but is not limited to . . ."

11           And it lists a number of things, but if I

12  could direct your attention to number 2:

13           "State and DEA licenses are verified and

14  any disciplinary action is researched."

15           Did I read that correctly?

16       A.   Yes.

17       Q.   If any disciplinary action during the

18  course of your research was identified, what would

19  happen?

20       A.   I would review that action to see when

21  it take -- when it took place, what had taken place,

22  any revocations of licenses or suspensions, and that

23  would be reviewed with my boss in legal.

24       Q.   And also number 4, affiliation with

25  Internet pharmacies:  Why was that important?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   To see if there was affiliation with --
 2    with Internet pharmacies, to make sure that there was
 3    no affiliations with rogue Internet pharmacies, as
 4    opposed to ones that were VIPPS certified or . . .
 5          Q.   If a customer failed to provide the
 6    information that you were requesting, what would
 7    happen?
 8          A.   If a customer failed to provide all the
 9    information, then we would give them a period of time
10    to respond, and then we would -- we would not ship
11    controlled substances to them.
12               MS. VANNI:  I'm going to mark as my next
13          exhibit Number 38.
14          (Cardinal-Brantley 38 was marked for
15    identification.)
16               MS. VANNI:  Hand that to you, Counsel.
17    BY MS. VANNI:
18          Q.   Can you identify for the record what that
19    is?
20          A.   Yes.  This is an SOP that I drafted around
21    customer due diligence visits.
22          Q.   And what was your purpose in doing that?
23          A.   To have an SOP in place as -- as far as
24    how to conduct a visit and how to proceed with those
25    visits.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Q.   Why is it important to have a standard

 2  operating procedure in place?

 3    A.   One, the DEA asked to see them, you know,

 4  for doing an audit.  Two is to have a working

 5  procedure of how to accomplish a task, just in case

 6  someone fills the role that I'm in; anyone could step

 7  in and have a procedure to follow to -- to do the job

 8  or the task.

 9    Q.   If I could direct your attention to the

10  second page of that document, under "Procedure":

11        "Customer due diligence site visits shall

12  be considered under the following circumstances."

13        And then it lists four.  One is "SOM team

14  requests a visit when more information is needed in

15  approving a new customer account request for

16  controlled substances or List 1 chemicals."

17        Did I read that correctly?

18    A.   Yes.

19    Q.   What instances would this occur?

20    A.   If a customer submitted a questionnaire

21  and they did not provide an SOP of their SOM system,

22  but produced kind of like a -- a summary, and there

23  wasn't much there to that summary; or if there were

24  something that was found on the Internet search as

25  far as any -- any disciplinary action, or some action

```
 1   taken with the owner, or that we needed to confirm or

 2   actually get more information on, then a -- a site

 3   visit would be warranted before we could open that

 4   customer up to kind of clear those -- all those

 5   things to get additional information.

 6        Q.   And with respect to number 4, "SOM team

 7   requests a visit when a customer requests to begin

 8   ordering controlled substances, List 1 chemicals, or

 9   is seeking a boundary increase" -- what does that

10   refer to?

11        A.   Yes, so when it's a new customer, we would

12   want to conduct a site visit.  And then if a customer

13   was seeking an increase that needed further

14   justification, then we would conduct a site visit.

15        Q.   And is that something that you would do as

16   part of your role as SOMS manager?

17        A.   Yes.

18             MS. VANNI:  My next exhibit, Number 39.

19        (Cardinal-Brantley 39 was marked for

20   identification.)

21             MS. VANNI:  If you could take a look at

22        that.  Counsel.

23   BY MS. VANNI:

24        Q.   Can you identify for the jury what

25   Exhibit 39 is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.  This is an SOP that I drafted around

 2    the cage and vault personnel.  Monitoring.

 3          Q.   And what was the purpose of this SOP?

 4          A.   This was an SOP to spell out to give the

 5    cage and vault personnel that were actually picking,

 6    packing, and shipping orders the ability to identify

 7    based on their knowledge anything that they felt was

 8    suspicious.

 9          Q.   As your role as SOMS manager, did you ever

10    conduct any training?

11          A.   Yes.

12          Q.   And who would you train?

13          A.   I actually conducted training of the -- of

14    the cage and vault personnel on this SOP, and I would

15    conduct training of the -- of my team.  I conducted

16    training of the sales force and sales management.

17               MS. VANNI:  Exhibit 40.

18          (Par-Brantley 40 was marked for

19    identification.)

20    BY MS. VANNI:

21          Q.   If you could identify for the jury what

22    Exhibit 40 is, please.

23          A.   This is an SOP that I drafted around

24    identifying, blocking, and reporting suspicious

25    orders.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   And what was your purpose in doing this?

 2          A.   To have a procedure in place that can be

 3   followed by someone that would follow me that could

 4   step in and -- and do the role, and plus to have a --

 5   a guide, a procedure in place for identifying orders

 6   and reporting orders.

 7          Q.   Does this SOP reflect what we talked about

 8   with respect to the investigation that would be

 9   conducted if you got a -- an order tagged by the

10   algorithm?

11          A.   Yes.

12          Q.   You can set that aside.

13               I want to look at exhibit -- Plaintiffs'

14   Exhibit Number 28.  It was a document you were shown

15   that was a letter written by Tracey Hernandez,

16   director of DEA compliance, on October 18th, 2013, to

17   the valued customers of QualiTest.

18               Do you have that document in front of you?

19          A.   Yes.

20          Q.   If I could direct your attention to the

21   third paragraph, third sentence:

22               "As a result of this enhanced process, you

23   may receive more frequent inquiries from QualiTest

24   regarding your own suspicious order monitoring

25   efforts, the quantity of product you are ordering
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   from us or the customers' use service."

 2            Did I read that correctly?

 3       A.   Yes.

 4       Q.   Do you remember being asked some questions

 5   about this by Plaintiffs' counsel?

 6       A.   Yes.

 7       Q.   First of all, what does the word

 8   "enhanced" suggest to you?

 9            MR. BUCHANAN:  Objection to form.

10            THE WITNESS:  That we take something that

11       already exists and improve upon it.  Or to

12       expand it, make it robust.

13   BY MS. VANNI:

14       Q.   And you were also asked questions with

15   respect to more frequent inquiries from QualiTest

16   regarding your own suspicious order monitoring

17   efforts.  What does the word frequent -- "more

18   frequent inquiries" suggest to you?

19            MR. BUCHANAN:  Objection.  Form,

20       foundation.

21            THE WITNESS:  That there were inquiries

22       being made, and that they may be made more

23       frequently.

24   BY MS. VANNI:

25       Q.   How would you describe your interactions
```

```
 1   with the local office of the DEA?

 2        A.   I would say we had a good relationship.

 3   They would come to the facility, conduct an audit.  I

 4   would send an e-mail of any suspicious order to the

 5   Birmingham office, and I would e-mail or -- or call

 6   with questions and received answers.  We had a good

 7   working relationship.

 8        Q.   You mentioned audits.  Would DEA

 9   occasionally do audits at QualiTest?

10        A.   Yes.

11        Q.   What was the purpose of those audits?

12             MR. BUCHANAN:  Objection.  Foundation.

13             THE WITNESS:  Cyclical inspections.

14        The -- the different registrations would be

15        audited.  The distribution center, the tablets

16        manufacturing, the liquids manufacturing;

17        whatever registration we had would be audited.

18   BY MS. VANNI:

19        Q.   During your course as -- or during your

20   employment as SOMS manager, did the DEA ever do an

21   audit of the SOMS program at QualiTest?

22        A.   Yes.

23        Q.   And what was the result of that?

24        A.   They stated that we had a good program and

25   that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. BUCHANAN:  Objection.  Move to strike.

 2                 THE WITNESS:  They specifically said in

 3          the -- the exit interview that we were very

 4          knowledgeable about suspicious order monitoring

 5          and that they liked our program.

 6                 MR. BUCHANAN:  Objection.  Form.  Move to

 7          strike.

 8   BY MS. VANNI:

 9          Q.   As a result of that SOMS audit conducted

10   by the DEA, did you have to make any changes to the

11   SOMS program at QualiTest?

12          A.   No.

13                 MS. VANNI:  Thank you.  I have nothing

14          further.

15                 VIDEOGRAPHER:  Going off record.  Time

16          is 7:49.

17                 (A recess transpired from 7:49 p.m. until

18                 7:51 p.m.)

19                 VIDEOGRAPHER:  We're going back on the

20          record, beginning of media file number 11.  Time

21          is 7:51.

22                         EXAMINATION

23   BY MR. LAFATA:

24          Q.   Good evening, Mr. Brantley.  I know you've

25   been here for about ten and a half hours; I have a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    few additional questions for you.  All right?

 2          A.   Okay.

 3          Q.   Do you currently work for Purdue Pharma?

 4          A.   Yes.

 5          Q.   And how long have you worked at Purdue

 6    Pharma?

 7          A.   Since February 2017.

 8          Q.   Do you work for the Purdue Frederick

 9    Company?

10          A.   I work for Purdue Pharma LP.

11          Q.   Have you ever worked for the Purdue

12    Frederick Company?

13          A.   No.

14          Q.   What's your job title at Purdue Pharma

15    right now?

16          A.   Senior management -- senior manager,

17    ethics and compliance.

18          Q.   And as the senior manager of ethics and

19    compliance, who do you report to?

20          A.   I report to Alexis Stroud, the director of

21    ethics and compliance.

22          Q.   What are your primary responsibilities as

23    a senior manager of ethics and compliance?

24          A.   My primary responsibility --

25               MR. PAPANTONIO:  Objection.  Beyond the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        scope of direct.

 2   BY MR. LAFATA:

 3        Q.   You can answer.

 4        A.   My primary responsibilities are suspicious

 5   order monitoring.  I manage the suspicious order

 6   monitoring program.

 7        Q.   During the examinations today, there's

 8   been reference to the term "customer."  In the

 9   context of Purdue, what does a Purdue customer refer

10   to?

11        A.   A wholesale distributor.

12        Q.   And have you heard the phrase "customer's

13   customer"?

14        A.   Yes.

15        Q.   In the context of Purdue, what is the

16   customer's customer?

17        A.   Customer's customer would be the pharmacy,

18   hospital, et cetera, that the wholesaler distributes

19   Purdue products to.

20        Q.   Does Purdue sell medications directly to

21   patients?

22        A.   No.

23             MR. PAPANTONIO:  Objection.  Scope.

24             THE WITNESS:  No.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LAFATA:

 2        Q.   Does Purdue sell medications directly to

 3   doctors?

 4             MR. PAPANTONIO:  Objection.  Scope.

 5             THE WITNESS:  No.

 6   BY MR. LAFATA:

 7        Q.   I want to ask you some questions about the

 8   procedures at Purdue for order monitoring and due

 9   diligence.

10        (Purdue-Brantley 41 was marked for

11   identification.)

12   BY MR. LAFATA:

13        Q.   Mr. Brantley, I'm handing you Exhibit 41.

14   Mr. Brantley, can you identify Exhibit 41?

15             MR. PAPANTONIO:  Objection.  This document

16        is beyond the scope of cross.  There's been no

17        discussion about the contents of what's

18        contained in this document.

19             At this point, this -- this entire

20        examination seems to be shifting towards a

21        direct of -- of Purdue, of Mr. Brantley as a

22        Purdue witness.  This is well beyond the scope,

23        and I move to strike the use of even this

24        document.

25             MR. LAFATA:  Okay.  Speaking objections
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        noted.

 2   BY MR. LAFATA:

 3        Q.    Would you please identify Exhibit 41.

 4        A.    Yes.  This is an SOP that I authored

 5   around Know Your Customer due diligence.

 6        Q.    What is the scope of this SOP?

 7        A.    This -- this SOP applies to all customers

 8   purchasing Schedule II through V controlled

 9   substances and List 1 chemicals.

10        Q.    Is this a fair and accurate copy of that

11   standard operating procedure?

12             MR. PAPANTONIO:  Continuing objection to

13        the use of this document and the line of

14        questioning beyond the scope of cross

15        examination.

16   BY MR. LAFATA:

17        Q.    You can answer.  Excuse me.

18        A.    Yes.

19             MR. BUCHANAN:  Counsel, this violates the

20        protocol.

21             MR. LAFATA:  That's not correct.  That's

22        not correct.

23             MR. BUCHANAN:  Questioners are permitted

24        only to the extent testimony specifically

25        concerns their client.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. LAFATA:  Okay, well, this concerns my
2      client.
3              MR. BUCHANAN:  I'm -- I'm sorry, Counsel,
4      there was no examination concerning your client
5      to which this questioning pertains.  Did you
6      notice --
7              MR. LAFATA:  There was examination --
8      there was examination --
9              MR. BUCHANAN:  Did you notice this
10     deposition?
11             MR. LAFATA:  Your objection is noted.
12             MR. BUCHANAN:  No, no, no, my question --
13             MR. PAPANTONIO:  No, no, we're not going
14     to note objection and you waste our time --
15             MR. LAFATA:  You -- you heard -- you heard
16     examinations of Purdue.
17             MR. PAPANTONIO:  No, there was no
18     examination.
19             MR. LAFATA:  We're going to have -- yes.
20             MR. PAPANTONIO:  There was
21     cross-examination.  You are way beyond the
22     scope, and you --
23             MR. LAFATA:  This is ridiculous.  We're
24     going to get this on the record.
25             MR. PAPANTONIO:  Don't hold your hand up
```

```
 1        at me.  You're wasting our time.
 2             MR. LAFATA:  Mr. Brantley --
 3             MR. PAPANTONIO:  You have no authority to
 4        go forward with this examination.
 5             MR. LAFATA:  That's not correct.
 6             MR. PAPANTONIO:  You know that; everybody
 7        in the room knows that.
 8             MR. LAFATA:  Hush.
 9             MR. PAPANTONIO:  So it's -- no, don't tell
10        me to hush.  It's continuing objection.  So
11        you're wasting my time and everybody in this
12        room's time --
13             MR. LAFATA:  Counsel -- Mr. Brantley --
14             MR. PAPANTONIO:  -- including the witness,
15        Mr. Brantley.
16             MR. LAFATA:  Mr. Brantley --
17             MR. BUCHANAN:  You were required to
18        provide two days' notice to the extent an
19        examination --
20             MR. LAFATA:  No.
21             MR. BUCHANAN:  -- was going to go beyond
22        90 minutes.
23             MR. LAFATA:  I've had --
24             MR. PAPANTONIO:  We have already --
25             MR. LAFATA:  -- five minutes.  I've been
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        five minutes.
 2              MR. PAPANTONIO:  No, no, no.  Not yours.
 3              MR. LAFATA:  This is --
 4              MR. PAPANTONIO:  The combined
 5        examination --
 6              MR. LAFATA:  This is totally --
 7   BY MR. LAFATA:
 8        Q.   Mr. Brantley, I have a question --
 9              MR. BUCHANAN:  No, no --
10              MR. PAPANTONIO:  Don't cut me off.
11              MR. BUCHANAN:  I'm noting for the record,
12        there has been no notice provided by defense
13        counsel for an examination going beyond
14        90 minutes.
15              MR. LAFATA:  We haven't gone beyond
16        90 minutes.
17              MR. BUCHANAN:  You are now treading
18        into --
19              MR. LAFATA:  I've been five minutes.
20              MR. BUCHANAN:  -- his history with Purdue
21        and SOMS processes at Purdue.
22              Counsel, it's inappropriate.  There's been
23        no advance notice.  I join in the objection to
24        strike and bar.
25              MR. LAFATA:  Okay.
```

```
 1    BY MR. LAFATA:

 2         Q.   Mr. Brantley, does this Exhibit 41

 3    accurately reflect Purdue's protocol for Knowing Your

 4    Customer's due diligence?

 5         A.   Yes.

 6         Q.   All right.

 7              MR. PAPANTONIO:  Continuing objection to

 8         use of the document and the line of questioning.

 9              MR. BUCHANAN:  And reserve the right to

10         re-call the witness to examine concerning

11         Purdue's processes, since this was not a subject

12         of examination.

13              MR. PAPANTONIO:  And I -- I join in that.

14         This now raises the issue of making this witness

15         available for full examination in a Purdue

16         examination.

17              So, Counselor, if you're willing to do

18         that, let's go ahead and rock and roll.

19              MR. LAFATA:  Absolutely not.  Absolutely

20         not.

21              MR. PAPANTONIO:  Well, no, you've opened

22         the door for it.  So we -- Mr. Brantley, just so

23         you know, we will set your deposition again for

24         Purdue, based on what this lawyer has done here

25         right now, just so you know what's happening to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        you in this room.  Okay?

 2         (Purdue-Brantley 42 was marked for

 3    identification.)

 4    BY MR. LAFATA:

 5        Q.   Mr. Brantley, I'm handing you a copy of

 6    Exhibit 42.

 7              MR. PAPANTONIO:  Same objection.  Move to

 8         strike the use of the document.  Move to --

 9         to -- move to object.  I'm moving to object the

10         whole line of questioning.  Well beyond the

11         scope of any cross-examination that took place

12         in this room.

13              Secondly, there was no notice of any

14         direct that was going to be taken.  We're

15         entitled to a direct.  Notice of that.

16              MR. LAFATA:  I want the record to reflect

17         that counsel's extensive speaking objections

18         will not come from the time permitted me for

19         cross-examination --

20              MR. PAPANTONIO:  Well, I'm just preserving

21         the record, sir, so --

22              MR. LAFATA:  -- the direct examination for

23         the witness.

24              MR. PAPANTONIO:  Yeah.

25              MR. BUCHANAN:  It certainly will.  As did
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        all yours against ours.

2   BY MR. LAFATA:

3        Q.   Mr. Brantley, what is Exhibit 42?

4             MR. PAPANTONIO:  Same objection.  Same

5        objection on use of the document.  Continuing

6        objection as to this line of questioning.  It's

7        beyond the scope of cross-examination, in trying

8        to -- to go forward with the direct where the

9        Defendants have not been put notice -- where the

10       Plaintiffs have not been put notice on the

11       direct.

12  BY MR. LAFATA:

13       Q.   Mr. Brantley, what is Exhibit 42?

14       A.   It is an SOP on identifying, evaluating,

15  and reporting suspicious orders.

16       Q.   And who authored this SOP?

17            MR. PAPANTONIO:  Same objection.

18       Objection, continuing objection of this line of

19       questioning.

20  BY MR. LAFATA:

21       Q.   Mr. Brantley, who authored this SOP?

22       A.   I did.

23            MR. PAPANTONIO:  Same objection.

24  BY MR. LAFATA:

25       Q.   Okay.  And what is the scope of this SOP?
```

```
 1              MR. PAPANTONIO:  Line of -- same line of
 2         objection on these -- on this line of
 3         questioning.  Objection as to the question.
 4         Move to strike any answer based on the question.
 5              MR. LAFATA:  You're interfering with the
 6         conduct of this examination.
 7              MR. PAPANTONIO:  You go ahead with your
 8         question.
 9    BY MR. LAFATA:
10         Q.   Mr. Brantley --
11              MR. PAPANTONIO:  Let me worry about what
12         I'm interfering with.
13    BY MR. LAFATA:
14         Q.   -- what is the scope of this -- of this
15    SOP?
16         A.   This procedure applies to all customers
17    and customer orders for Schedule II through V
18    controlled substances and List 1 chemicals.
19              MR. PAPANTONIO:  Objection.  Move to
20         strike the answer.  Move to strike the answer
21         from a direct.
22              MR. LAFATA:  Okay.
23              MR. PAPANTONIO:  It is beyond the scope of
24         cross.
25              MR. LAFATA:  Counsel is physically
```

```
 1          interfering with the witness's answering of a

 2          question.

 3   BY MR. LAFATA:

 4          Q.   Mr. Brantley, would you please --

 5               MR. PAPANTONIO:  Go ahead with your

 6          question --

 7   BY MR. LAFATA:

 8          Q.   -- repeat your answer --

 9               MR. PAPANTONIO:  -- and I'll protect the

10          record.

11   BY MR. LAFATA:

12          Q.   -- about what the scope is of this

13   Exhibit 42.

14          A.   This procedure applies to all customers

15   and customer orders for Schedule II through V

16   controlled substances and List 1 chemicals.

17          Q.   And does this SOP accurately reflect

18   Purdue's policy for identifying, evaluating, and

19   reporting suspicious orders?

20               MR. PAPANTONIO:  Objection as to the

21          question.  Beyond the scope of

22          cross-examination.  Move to strike the use of

23          the document.  Move to strike the question.

24               THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LAFATA:

 2        Q.   All right.

 3             MR. PAPANTONIO:  Move to strike the

 4        answer.

 5   BY MR. LAFATA:

 6        Q.   They don't like you answering these

 7   questions, do they?

 8        A.   No.

 9             MR. BUCHANAN:  Frankly, Counsel, if you

10        wanted to conduct an examination, you should

11        have provided notice.

12             MR. PAPANTONIO:  There are rules --

13             MR. LAFATA:  This is --

14             MR. PAPANTONIO:  Counsel, there are

15        rules --

16             MR. LAFATA:  This is a direct examination

17        of a witness.

18             MR. PAPANTONIO:  -- that you have to

19        comply with.  Read them, and then we'll be --

20        we'll be glad to afford you a direct

21        examination.

22             But right now, just to be clear, we're

23        going to reset Brantley on Purdue, just so you

24        know that.

25             MR. LAFATA:  No, that's not -- that's not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        right.

 2              MR. PAPANTONIO:  Well, it's going to

 3        happen.

 4         (Purdue-Brantley 43 was marked for

 5     identification.)

 6     BY MR. LAFATA:

 7        Q.   Mr. Brantley, I'm handing you a copy of

 8     Exhibit 43.  Here you go.

 9              MR. PAPANTONIO:  Same objection.  Move to

10        strike the use of the document.  Move to strike

11        any questioning or answers in regard to this

12        document.

13     BY MR. LAFATA:

14        Q.   Mr. Brantley --

15              MR. PAPANTONIO:  Beyond the scope --

16     BY MR. LAFATA:

17        Q.   -- what is Exhibit 43?

18              MR. PAPANTONIO:  -- of direct, beyond the

19        scope of cross-examination.

20     BY MR. LAFATA:

21        Q.   You can answer.

22        A.   I'm sorry, what was your question?

23        Q.   What is Exhibit 43?

24        A.   This is an SOP that I drafted for

25     downstream customer monitoring and reporting.
```

```
 1           Q.   Does this accurately reflect the standard

 2   operating procedure for Purdue downstream customer

 3   monitoring and reporting?

 4           MR. PAPANTONIO:  Objection as to form of

 5        the question.  Objection as to the question at

 6        all beyond the scope of cross-examination.

 7        Objection to any answer.  Move to strike any

 8        answer that -- that responds to that question.

 9   BY MR. LAFATA:

10           Q.   You can answer.

11           A.   Yes.

12           Q.   Okay.

13           MR. PAPANTONIO:  Move to strike.

14   BY MR. LAFATA:

15           Q.   Mr. Brantley, does Purdue, as part of its

16   order monitoring process, require its wholesalers and

17   distributors by questionnaire to make disclosures to

18   Purdue about their business practices?

19           MR. PAPANTONIO:  Objection as to use --

20        objection as to the question beyond the scope,

21        objection as to response of any document that's

22        been introduced in the line of this question.

23           MR. LAFATA:  I want this record to be seen

24        by the special master, because your conduct --

25           MR. PAPANTONIO:  Oh, it will be.  Trust --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LAFATA:  -- is so outrageous.

 2                    MR. PAPANTONIO:  Trust me, it will be.

 3     BY MR. LAFATA:

 4          Q.   Mr. Brantley, you can answer my question.

 5          A.   Yes.

 6          Q.   Okay.  And as part --

 7                    MR. PAPANTONIO:  Move to strike.

 8     BY MR. LAFATA:

 9          Q.   -- of those disclosures, does Purdue

10     require its wholesalers and distributors to prove

11     that they are licensed with federal government

12     agencies?

13                    MR. PAPANTONIO:  Objection --

14                    THE WITNESS:  Yes.

15                    MR. PAPANTONIO:  -- as to question.

16     BY MR. LAFATA:

17          Q.   Which government agencies?

18                    MR. PAPANTONIO:  Beyond the scope of

19        cross-examination.

20     BY MR. LAFATA:

21          Q.   Which government agencies?

22          A.   DEA and State Board of Pharmacy.

23          Q.   Does Purdue, as part of its suspicious

24     order monitoring program, require wholesalers and

25     distributors to disclose to Purdue their own
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   suspicious order monitoring program information?

 2           MR. PAPANTONIO:  Objection as to form.

 3       Objection as to the question.  Beyond scope of

 4       cross-examination.

 5   BY MR. LAFATA:

 6       Q.  You can answer.

 7           MR. PAPANTONIO:  Move to strike the

 8       question and any subsequent answer to the

 9       question.

10           THE WITNESS:  Yes.

11   BY MR. LAFATA:

12       Q.  And does Purdue --

13           MR. PAPANTONIO:  Move to strike the

14       answer.

15   BY MR. LAFATA:

16       Q.  Does Purdue review that information?

17       A.  Yes.

18       Q.  Okay.  Does Purdue require the wholesalers

19   and distributors, its customers, to disclose any

20   disciplinary actions the company may have had, the

21   wholesaler or distributors may have had with respect

22   to the Controlled Substances Act?

23           MR. PAPANTONIO:  Same continuing

24       objection.  Beyond the scope of

25       cross-examination.  Move to strike the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Move to strike the use of any document used

 2          pursuant to the question.  Move to strike any

 3          answer given to the question.

 4   BY MR. LAFATA:

 5          Q.   You can answer.

 6          A.   Yes.

 7          Q.   And how often does Purdue require

 8   distributors and wholesalers to make these

 9   disclosures to it?

10          A.   On an annual basis.

11               MR. PAPANTONIO:  Same objection.

12          Continuing objection.  Beyond the scope.

13   BY MR. LAFATA:

14          Q.   And in addition to these disclosures, does

15   Purdue do research on the customers for any

16   disciplinary actions?

17               MR. PAPANTONIO:  Objection as to form of

18          the question.  Beyond the scope of cross.

19               THE WITNESS:  Yes.

20   BY MR. LAFATA:

21          Q.   Okay.  And does it do research on the

22   customer to look for any enforcement actions that may

23   have been brought against them?

24          A.   Yes.

25               MR. PAPANTONIO:  Objection as to --
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1        objection as to the question.  Beyond the scope

 2        of cross-examination.

 3   BY MR. LAFATA:

 4        Q.   Does Purdue review the suspicious order

 5   monitoring protocols of its customers?

 6             MR. PAPANTONIO:  Continuing objection.

 7        Beyond the scope of cross-examination.

 8             THE WITNESS:  Yes.

 9   BY MR. LAFATA:

10        Q.   Okay.  As part of its order monitoring

11   protocol, does Purdue do any site visits to its

12   customers' places of business?

13             MR. PAPANTONIO:  Same objection.

14        Continuing objection.  Beyond the scope of

15        cross-examination, without any --

16   BY MR. LAFATA:

17        Q.   You can answer the question.

18             MR. PAPANTONIO:  -- any -- excuse me.

19             Without any notice of direct to the

20        Plaintiffs in this case, pursuant to the rules

21        of the management order.

22   BY MR. LAFATA:

23        Q.   Go ahead.

24        A.   Yes.

25        Q.   Okay.  And as part of these site visits,
```

```
 1    does Purdue review the suspicious order monitoring

 2    protocol of the company that it visits?

 3              MR. PAPANTONIO:  Objection as to --

 4         objection as to question beyond the scope.

 5              THE WITNESS:  Yes.

 6    BY MR. LAFATA:

 7         Q.   Would there -- if there were any deficient

 8    results of those inspections that were discovered,

 9    what would be done with respect to those -- what was

10    learned there?

11              MR. PAPANTONIO:  Objection as to scope.

12         Objection as to speculative nature of the

13         question.  Move to strike the question --

14    BY MR. LAFATA:

15         Q.   You can answer.

16              MR. PAPANTONIO:  -- and any document used

17         pursuant to the question.  Move to strike the

18         answer.

19              THE WITNESS:  That would be reviewed by --

20         by members of management, and potentially would

21         not ship controlled substances to that customer.

22    BY MR. LAFATA:

23         Q.   If there is a deficiency in a customer's

24    suspicious order monitoring program as discovered as

25    part of these inspections, is that ever reported?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.   It would be reported, yes.

 2              MR. PAPANTONIO:  Objection as to the

 3         question.  Objection as to use of any document

 4         in the question.  Objection as to the answer,

 5         and move to strike all three.

 6   BY MR. LAFATA:

 7         Q.   And Mr. Brantley, if the review that's

 8   done reveals an unreasonable risk of diversion with

 9   the wholesaler or distributor, will Purdue sell any

10   of its opioid medications to that customer?

11              MR. PAPANTONIO:  Objection --

12              THE WITNESS:  No.

13              MR. PAPANTONIO:  -- as to question beyond

14         the scope.

15   BY MR. LAFATA:

16         Q.   You were asked questions today about

17   ARCOS.  Do you remember that?

18         A.   Yes.

19         Q.   Does the DEA provide Purdue access to the

20   ARCOS data?

21              MR. PAPANTONIO:  Objection as to anything

22         between -- in response to Purdue in particular.

23         It's beyond the scope of the cross-examination.

24         Responses to ARCOS in general will -- we're okay

25         with, but anything having to do with Purdue
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        directly is beyond the scope.

2             MR. LAFATA:  That's an improper objection,

3        Counsel.

4             He likes to speak from the corner of the

5        room when he makes objections.

6   BY MR. LAFATA:

7        Q.   Mr. Brantley, does the DEA provide Purdue

8   with access to its ARCOS data?

9        A.   No.

10            MR. PAPANTONIO:  Objection as to form.

11  BY MR. LAFATA:

12       Q.   Okay.

13            MR. PAPANTONIO:  It's beyond the scope of

14       cross-examination.

15  BY MR. LAFATA:

16       Q.   So is Purdue able to use --

17            (Reporter requests clarification.)

18            THE WITNESS:  No.

19  BY MR. LAFATA:

20       Q.   Is Purdue able to use the DEA's ARCOS data

21  as part of its suspicious order monitoring program?

22       A.   No.

23            MR. PAPANTONIO:  Objection.  Move to

24       strike.  Move to -- move to strike the question

25       and the answer, both of them beyond the scope of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          cross-examination.

 2   BY MR. LAFATA:

 3          Q.   And Mr. Brantley, when Purdue receives an

 4   order for an opioid medication, does the order go

 5   through any process or review?

 6          MR. PAPANTONIO:  Same objection.

 7      Continuing objection on cross-examination and

 8      use of any document related to this

 9      cross-examination at all.

10   BY MR. LAFATA:

11          Q.   You can answer the question.

12          A.   All orders pass through an algorithm, and

13   the algorithm will hold an order that is out of the

14   ordinary, or an order of interest, yes.

15          MR. PAPANTONIO:  Move to strike.

16   BY MR. LAFATA:

17          Q.   And after that order is held, what happens

18   then?

19          MR. PAPANTONIO:  Objection as to question.

20      Beyond the scope.

21          THE WITNESS:  That order is reviewed, and

22      I reach out to the customer and ask for

23      additional information.

24          MR. PAPANTONIO:  Objection as to answer.

25      Move to strike.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. LAFATA:
 2         Q.   And if you reach out to the customer --
 3              MR. PAPANTONIO:  Beyond the scope.
 4   BY MR. LAFATA:
 5         Q.   -- and ask for additional information and
 6   you're not satisfied with the results, what happens
 7   then?
 8         A.   That order is rejected --
 9              MR. PAPANTONIO:  Objection as to question.
10              THE WITNESS:  -- and reported to the DEA.
11              MR. PAPANTONIO:  Beyond the scope.
12         Objection, move to strike the answer.  Beyond
13         the scope of cross-examination.
14              MR. LAFATA:  Counsel is deliberately
15         speaking over the witness to interfere with the
16         conduct of this deposition.
17              MR. PAPANTONIO:  Well, it's going to be
18         taken again anyway, so, you know, it doesn't
19         make any difference.
20   BY MR. LAFATA:
21         Q.   Mr. Brantley, if -- if you are satisfied
22   with the information you receive from the customer
23   from your investigation, what happens then to the
24   order?
25         A.   Then the order is released, and the
```

```
1    response is documented --

2              MR. PAPANTONIO:  Objection as to --

3              THE WITNESS:  -- in our system.

4              MR. PAPANTONIO:  Objection as to the

5         question.  Objection as to answer.  Beyond the

6         scope of cross-examination.

7    BY MR. LAFATA:

8         Q.   Mr. Brantley, if you're -- let me

9    rephrase.

10             Are there circumstances which an order can

11   be flagged by that algorithm but is, based on your

12   investigation, not found to be suspicious?

13             MR. PAPANTONIO:  Objection as to question.

14        Beyond the scope.

15             THE WITNESS:  Yes, there are several

16        circumstances.  For instance, if a customer

17        adds -- like I mentioned earlier, a new customer

18        base, or a new chain, and they tell me that in

19        advance, with the number of customers, that

20        order would still be flagged by the system

21        because it's an increase because the wholesaler

22        needs to -- needs to supply their customer as

23        well as stock their warehouse.

24             Also, if it is a initial order of a drug

25        family, that order would be held because there
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        is no history for that algorithm to compare it

 2        to.  So those are just a couple of examples of

 3        an order that could be identified by an

 4        algorithm that are not suspicious, but are

 5        flagged due to lack of history.

 6             MR. PAPANTONIO:  Objection as to the

 7        answer.  Move to strike.  Beyond the scope of

 8        cross-examination.

 9             MR. LAFATA:  Counsel, there's no question

10        before you pending.

11             MR. BUCHANAN:  Just so the record is

12        clear, was notice provided of intent to conduct

13        an examination that exceeded 90 minutes?

14             MR. LAFATA:  I never intended -- I still

15        don't intend to conduct an examination that

16        exceeds an hour and a half.

17             MR. BUCHANAN:  No, no, I mean among --

18        among defense counsel.

19             MR. LAFATA:  Okay.  Well --

20             MR. BUCHANAN:  We're over an hour and a

21        half.

22             MR. LAFATA:  Well, part of it is because

23        of you and your colleagues' extensive colloquies

24        on the record.  This is --

25             MR. BUCHANAN:  My question --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. LAFATA:  All right.

 2                 MR. BUCHANAN:  -- only, sir, was notice

 3         provided?  I just want to make sure that aspect

 4         of the record is clear.

 5                 MR. LAFATA:  All right.

 6                 MR. BUCHANAN:  Was it provided?  Yes or

 7         no?

 8                 MR. LAFATA:  There was no need to provide

 9         notice because there's no intent or actual

10         examination over 90 minutes that I'm conducting.

11                 MR. BUCHANAN:  No, no.  Among all defense

12         counsel.

13                 MR. LAFATA:  I'm not here to be deposed

14         by --

15                 MR. PAPANTONIO:  No, no.  I want to

16         hear --

17                 MR. LAFATA:  I'm not here to be deposed by

18         you.

19                 MR. PAPANTONIO:  I want to hear his

20         statement on the record, because this is what

21         the special master has stated.

22                 Mr. -- David, would you please finish what

23         you were saying?  And I'll join in it.

24                 MR. BUCHANAN:  I'm not aware of notice

25         having been provided.  If any defense counsel's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          provided notice of intent, collectively, to

2          conduct an examination beyond 90 minutes, would

3          you please so state on the record.

4              MR. PAPANTONIO:  And to further join in

5          that, there is no notice that this -- that this

6          lawyer for Purdue was going to come into the

7          room and do a direct examination of this

8          witness.  We're entitled to notice of that so we

9          can prepare cross-examinations that deal with

10         the very issues he's asking.

11             He's moved beyond cross.  He understands

12         he has.  He's now made it -- I believe it's

13         going to be important that we take Brantley's

14         deposition in Purdue alone.

15             MR. LAFATA:  Okay.  That's outrageous, so

16         your comments are, you know, just wasting time

17         now.

18  BY MR. LAFATA:

19      Q.  Mr. Brantley, we need to continue with

20  your examination.

21             Mr. Brantley, do you personally deal with

22  the DEA with your work at Purdue?

23             MR. PAPANTONIO:  Objection.  Beyond the

24         scope.  Same continuing objection.

25             THE WITNESS:  No.
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1   BY MR. LAFATA:

 2       Q.   And as part of your investigation of

 3   orders, if there is any doubt in your mind whether or

 4   not to report an order for medications to the DEA,

 5   how do you resolve that?

 6            MR. PAPANTONIO:  Objection.  Beyond scope.

 7            THE WITNESS:  If I do not have substantial

 8       information to release an order, that order is

 9       cut, and it's reported to the DEA.

10   BY MR. LAFATA:

11       Q.   What do you mean when say "the order is

12   cut"?

13       A.   It is rejected.

14            MR. PAPANTONIO:  I want to get something

15       on record.

16            Mr. Fuller, you're Plaintiffs' lawyer in

17       this room:  Did you receive any notice from

18       Purdue to conduct a direct examination in this

19       -- in this --

20            MR. LAFATA:  Okay, Counsel, you're

21       interfering with the examination.

22            MR. PAPANTONIO:  No, no.

23            MR. LAFATA:  You're interfering with the

24       examination.

25            MR. PAPANTONIO:  Did you -- did you,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        sir -- I want this on the record.

 2              MR. LAFATA:  You're interfering with the

 3        examination.

 4              MR. PAPANTONIO:  Did you prepare -- did

 5        you receive any notice from -- I'm sorry, sir, I

 6        don't even know your name.  What is your name?

 7  BY MR. LAFATA:

 8        Q.   Okay, Mr. Brantley, did you --

 9              MR. PAPANTONIO:  What -- no, no, we're

10        going to get this on the record.

11              MR. LAFATA:  No.

12              MR. PAPANTONIO:  Mr. Fuller, did you

13        receive any notice at all that this counselor

14        was going to perform a direct examination of

15        Mr. Brantley at this setting?

16              MR. FULLER:  No, sir.

17              MR. LAFATA:  Counsel's statements --

18              MR. PAPANTONIO:  Mr. -- wait, wait -- wait

19        a second.

20              MR. LAFATA:  Counsel's statements --

21              MR. PAPANTONIO:  David --

22              MR. LAFATA:  -- on the record are actually

23        longer than the witness's testimony.

24              MR. PAPANTONIO:  David, did you receive

25        any notice from this -- from this lawyer stating
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      that he was going to perform a direct

 2      examination on behalf of Purdue at this setting?

 3            MR. BUCHANAN:  No, sir.

 4            MR. PAPANTONIO:  I can attest we did not

 5      receive any notice at all saying that this

 6      lawyer intended to come into the room and

 7      conduct a direct examination of Mr. Brantley.

 8            Move to strike all of this, and move to --

 9      to reserve the right to be able to take a

10      cross-examination, a setting of just

11      cross-examination of Mr. Brantley.

12            Now go ahead, Counselor.

13            MR. LAFATA:  That's outrageous, what

14      you're doing.

15            MR. PAPANTONIO:  Well, great.

16            MR. LAFATA:  It's outrageous.

17            MR. PAPANTONIO:  You call it what you

18      want --

19            MR. LAFATA:  Yeah.

20            THE WITNESS:  -- but go ahead and -- and

21      proceed.

22   BY MR. LAFATA:

23      Q.   Mr. Brantley, as part of your work for

24   Purdue, have you ever heard any criticisms by the DEA

25   about Purdue's order monitoring program?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PAPANTONIO:  Objection as to form.

 2         Beyond the scope.  Secondary.  It's hearsay.

 3    BY MR. LAFATA:

 4         Q.   You can answer.

 5                    MR. PAPANTONIO:  Move to strike the

 6         question and any -- any subsequent answer to the

 7         question.

 8                    THE WITNESS:  No.

 9    BY MR. LAFATA:

10         Q.   When you joined Purdue in 2017, was there

11    already a program in place for suspicious order

12    monitoring?

13                    MR. PAPANTONIO:  Objection.

14                    THE WITNESS:  Yes.

15                    MR. PAPANTONIO:  Objection.  Objection.

16         Beyond scope.

17    BY MR. LAFATA:

18         Q.   And during the time working for Purdue,

19    has Purdue, to your knowledge, ever released an order

20    that was believed that might be diverted?

21         A.   No.

22         Q.   With respect to your answers today with --

23    regarding your work for Purdue in the suspicious

24    order monitoring program and your job

25    responsibilities for Purdue, are your answers to
```

```
 1    those questions the same regardless of what state in

 2    the country they might pertain to?

 3         A.   Yes.

 4         Q.   All right.

 5              MR. PAPANTONIO:  Objection as to -- beyond

 6         scope.

 7    BY MR. LAFATA:

 8         Q.   Mr. Brantley, do you have a copy of

 9    Plaintiffs' Exhibit 26 in front of you?

10         A.   What does it look like?

11         Q.   The GAO.

12         A.   Oh, yes.

13         Q.   All right.  Mr. Brantley, on the cover

14    page of this, do you see a date?

15              MR. PAPANTONIO:  Objection as to question.

16              THE WITNESS:  Yes.

17    BY MR. LAFATA:

18         Q.   And what's the date there?

19         A.   December 2003.

20         Q.   Did you work for Purdue in December 2003?

21         A.   No.

22         Q.   Do you have any personal knowledge about

23    the content of this document?

24         A.   No.

25         Q.   Do you have any personal knowledge about
```

```
 1    the circumstances surrounding GAO's creation of this

 2    document?

 3        A.   No.

 4             MR. LAFATA:  All right.  Pass the witness.

 5             MR. PAPANTONIO:  Okay.  I want to get back

 6        on the record.

 7             Mr. Brantley, we're -- just so you know,

 8        we're going to reserve the right for your

 9        cross-examination dealing with Purdue.  The

10        questions I'm going to ask you now are uniquely

11        questions about Cardinal.

12             MR. LAFATA:  Mr. Brantley, you can

13        disregard --

14             MR. PAPANTONIO:  Can you please --

15             MR. LAFATA:  -- adverse counsel's --

16             MR. PAPANTONIO:  Carol, do you have the

17        documents?

18             MR. LAFATA:  -- instructions to you.

19             And the record should be clear that it was

20        never the intent to do any examination, any

21        direct examination over 90 minutes, and that the

22        protocol did not require that any notice be

23        given unless there was an intent to an

24        examination over 90 minutes.

25             And I think counsel's arguments, on their
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          own, greatly exceeded even the testimony of the

 2          witness.

 3                  MR. BUCHANAN:  Counsel, in my experience,

 4          if somebody is going to do what you just did,

 5          they discuss it with the Plaintiffs' counsel and

 6          confer about so that everybody, as a courtesy,

 7          can anticipate the impact on their travel plans.

 8          To do what you just did, at the end of a

 9          ten-hour day, is unprofessional.

10                  MR. PAPANTONIO:  Well, it's not only

11          unprofessional, it's improper.  It's

12          unauthorized, it's improper.  This counselor

13          knows it and he knew it when he set -- when he

14          stood up here to do it.

15                  So we're going to -- we're going to --

16          we're going to deal with this.  This won't be

17          something that's not dealt with, sir.

18                  What is your name, by the way?

19                  MR. LAFATA:  My name is Paul Lafata.

20                  MR. PAPANTONIO:  Paul Lafata?  You'll see

21          us again on this one, okay?

22                  MR. LAFATA:  I look forward to it.

23                  MR. PAPANTONIO:  Yeah.

24                  MR. PYSER:  Let's go off the record.

25          Let's take a break, since we've all got a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        little --

 2              MR. PAPANTONIO:  What, do you want to take

 3        a break?

 4              MR. PYSER:  Yeah.  Just a quick break.

 5              MR. PAPANTONIO:  Okay.  That's fine.

 6              VIDEOGRAPHER:  Going off the record.  The

 7        time is 8:14.

 8              (A recess transpired from 8:14 p.m. until

 9              8:20 p.m.)

10              VIDEOGRAPHER:  Go back on the record.

11        Beginning media file number 12.  Time is 8:20.

12                    FURTHER EXAMINATION

13   BY MR. PAPANTONIO:

14        Q.   Mr. Brantley, first of all, you knew

15   before you started that examination with Purdue with

16   Mr. Lafata down there, you knew that you were going

17   to do direct examination, didn't you?  You knew you

18   were going to sit -- you knew you were going to sit

19   here and answer questions, didn't you, about -- for

20   Purdue?

21              MR. LAFATA:  Objection.  Instruct the

22        witness not to reveal any discussions he has

23        been having with counsel in preparation for

24        today's deposition, unless you can answer the

25        question without revealing that.  If you can
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          answer the question without revealing that, then

2          you can answer.

3     BY MR. PAPANTONIO:

4          Q.   Sir, you knew before you came in here and

5     sat down and were questioned by the Purdue lawyer,

6     you knew you were going to give an examination, that

7     you were going to ask questions -- answer questions

8     about Purdue?  You knew that, didn't you?

9               MR. LAFATA:  Mr. Brantley, again, I

10         instruct you that if you're not able to answer

11         that question without revealing discussions with

12         counsel, which are privileged, and this guy

13         knows that, I instruct you not to answer.

14              MR. PAPANTONIO:  Okay, that's even more --

15              THE WITNESS:  At the advice of counsel,

16         I --

17    BY MR. PAPANTONIO:

18         Q.   Okay.  So in other words, you can't answer

19    that, you can't answer that, because if you answered

20    it, you would have to share what the advice of

21    counsel was, correct?

22         A.   At the advice of counsel, I'm -- I don't

23    answer the question.

24         Q.   All right.  Well, good.  I think you

25    established -- you answered my question right there.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Okay.  So --

 2              MR. LAFATA:  Move to strike.  Move to

 3      strike counsel's colloquy on that end there.

 4  BY MR. PAPANTONIO:

 5         Q.  4391, please.  4391.

 6         (Cardinal-Brantley 40 was marked for

 7  identification.)

 8              MS. MOORE:  Brantley 40.

 9  BY MR. PAPANTONIO:

10         Q.  Now let's talk about -- let's talk about

11  Cardinal.

12              See this document, it's 2008, right?  See

13  that?  Top of the document --

14         A.  Yes.

15         Q.  -- 2008.  And where were you in 2008?

16         A.  I was still in Dublin, Ohio.

17         Q.  And you were working for Cardinal in 2008,

18  right?

19         A.  Yes.

20         Q.  And you see the subject is "In the penalty

21  box."  What's the penalty box?

22         A.  I don't know.

23         Q.  Well, what is a penalty box?  Do you know

24  what a penalty box is?

25         A.  In hockey?
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Yeah.  It's when you do something wrong,

2   isn't it?

3      A.   I'm not a hockey fan, but I've heard of

4   the penalty box in hockey.  I don't watch hockey, but

5   I know it exists in hockey.  I don't know the purpose

6   of it or what it is and so forth.

7      Q.   Well, you know it's when you break a rule,

8   right?  You go in the penalty box when you break a

9   rule.  You know that, don't you?

10      A.   No.  Again, I've heard of a penalty box in

11   hockey, but I don't know what the penalty box is,

12   because I don't watch hockey.

13      Q.   Mm-hmm.

14           MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16      Q.   So --

17           MR. PYSER:  Object to this line of

18       questioning.

19   BY MR. PAPANTONIO:

20      Q.   So you know what a penalty --

21           MR. PYSER:  Beyond the scope of the

22       examination.

23   BY MR. PAPANTONIO:

24      Q.   You know what a penalty box is, correct?

25           MR. PYSER:  Move to strike this entire

Highly Confidential - Subject to Further Confidentiality Review

```
 1        line of questioning.
 2   BY MR. PAPANTONIO:
 3        Q.   You know what a penalty box is, right?
 4        A.   Like I just answered, I've heard of a
 5   penalty box in the sport of hockey, but I do not know
 6   what a penalty box is --
 7        Q.   Now --
 8        A.   -- because I don't watch hockey.
 9        Q.   Now, when Mr. Pyser started asking you
10   questions about how you did this right for the DEA,
11   how you followed this rule about the DEA, you
12   answered a lot of questions about that for -- for
13   Mr. Pyser, didn't you?
14             MR. PYSER:  Object to form.
15             THE WITNESS:  If Mr. Pyser had asked me
16        did I know what a penalty box was, I would have
17        gave him the same answer I gave you.
18   BY MR. PAPANTONIO:
19        Q.   I know.  But that's not --
20        A.    I've heard about it in hockey; I don't
21   know what it is.
22        Q.   That's not my question.  You answered
23   questions from Mr. Pyser about how you followed --
24   how you followed the rules and how Cardinal followed
25   the rules expected of them by the DEA.  When he asked
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you questions, you answered questions about that,

2    didn't you?

3         A.   When he asked questions, I answered the

4    questions.

5         Q.   Right.  And some of them involved the fact

6    you were saying that you were -- you did everything

7    right; Cardinal did everything right where it came to

8    DEA.  Isn't that what you told us?

9         A.   I don't recall ever saying that Cardinal

10   did everything right or that I did everything right.

11        Q.   But you did everything right?

12        A.   I never recall saying that I did

13   everything right.

14        Q.   Because you didn't do everything right,

15   did you?

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18        Q.   Right?

19        A.   I -- I was never asked a question did I do

20   anything -- did I do everything right.  I've never

21   said that I did everything right.

22        Q.   And you didn't do everything right,

23   correct?

24             MR. PYSER:  Object to form.

25             THE WITNESS:  I don't know what was . . .
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Well, Cardinal didn't do everything right,

 3   did they?

 4             MR. PYSER:  Object to form.

 5             THE WITNESS:  I don't know, because you

 6      have to define "right."

 7   BY MR. PAPANTONIO:

 8        Q.   Well, let's --

 9        A.   That's --

10        Q.   Let's do that right now.  Let's -- let's

11   define --

12        A.   That's subjective.

13        Q.   Let's -- let's define "right."

14             MR. PYSER:  Give me a chance to object.

15             THE WITNESS:  Okay.

16   BY MR. PAPANTONIO:

17        Q.   All right.  It says -- you see the last

18   paragraph down here?  It says "I wanted" -- it says

19   "fellow GLT members."  What's GLT?  What is GLT?

20        A.   I don't know.

21        Q.   Never heard of that?

22             It says, "I wanted to share some thoughts

23   on the subject of regulatory compliance since some of

24   our failures in this area are burdening our financial

25   performance in market capitalization."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Now, how would your failures in your --
 2   since you were -- you were giving us all this history
 3   about how Cardinal did this right and that right,
 4   tell me how your -- how your -- your failures in
 5   regulatory compliance were burdening the financial
 6   performance of -- of Cardinal or the market
 7   capitalization of Cardinal.  Tell us how that was.
 8        A.   You would have to ask Kerry Clark.
 9        Q.   So had you ever heard that prior to the
10   time that Mr. Pyser started asking you all these
11   questions about how -- whether or not Cardinal did
12   things right, had you even heard that the failure to
13   do things right, the failure to comply with
14   regulatory, was actually causing financial
15   performance problems for the -- for the company?
16              MR. PYSER:  Object to form.
17              THE WITNESS:  This is my first time seeing
18        this.
19   BY MR. PAPANTONIO:
20        Q.   Doesn't surprise me.
21              And what year is it?  What year is on top
22   of that document?
23        A.   2008.
24        Q.   2008.  You told us you were still with the
25   company in 2008, and nobody showed you that, did
```

Highly Confidential - Subject to Further Confidentiality Review

1    they?

2              MR. PYSER:  Object to form.

3    BY MR. PAPANTONIO:

4         Q.   Let's go to the next page.  It says, "One

5    of the most important small things was avoiding

6    penalties that give our competition an advantage."

7              Do you see that in the first paragraph?

8    "One of the most important small things was avoiding

9    penalties that give our competition an advantage."

10        A.   Yes, I see that.

11        Q.   What -- what advantage did your

12   competition have when you engaged in regulatory

13   misconduct?

14             MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.   Explain that to the jury.

17        A.   Again, you would have to ask the -- the

18   author of this e-mail what he or she meant.

19        Q.   Well, did you know that there was an

20   analysis according to whether you did something wrong

21   as far as how much it was going to cost the company

22   financially?  Had you ever seen that analysis being

23   done before?

24             MR. PYSER:  Object to form.

25

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PAPANTONIO:

2         Q.   Before I just showed this, had anybody

3    told you that they had in place an analysis, and the

4    analysis was a financial analysis that said, "When we

5    do something wrong, it costs the company money"?  Is

6    that the first time you've heard that?

7              MR. PYSER:  Object to form.  Misstates

8         evidence.

9    BY MR. PAPANTONIO:

10        Q.   Yes or no?

11        A.   I have not seen this.

12        Q.   Well, it says, "But we keep getting

13   penalties, big penalties that are costing us customer

14   loyalty."

15             You see, that's in the second paragraph.

16   "But we keep getting penalties, big penalties that

17   are costing us customer loyalty, employee loyalty,

18   and shareholder loyalty."

19             Well, I thought when you testified -- and

20   here's what I want to figure out:  When you testified

21   for Mr. Pyser, didn't you say that you did things

22   right where it came to regulatory?

23             MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:

25        Q.   Didn't you say that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.  And an
 2          ongoing objection to use of this document --
 3      BY MR. PAPANTONIO:
 4          Q.   Yes --
 5                    MR. PYSER:  -- as beyond the scope.
 6      BY MR. PAPANTONIO:
 7          Q.   Yes or no?  Did you -- did you say that
 8      when --
 9                    MR. LAFATA:  I join that objection.
10      BY MR. PAPANTONIO:
11          Q.   Did you -- did you say that when you were
12      questioned by Mr. Pyser?
13                    MR. PYSER:  Object to form.
14      BY MR. PAPANTONIO:
15          Q.   That you -- that your company did things
16      right where it came to regulatory?
17                    MR. PYSER:  Object to form.
18                    THE WITNESS:  I stated that when asked
19          what Kyle Wright thought --
20      BY MR. PAPANTONIO:
21          Q.   Yeah.
22          A.   -- that that was his statement.
23          Q.   Yeah.  Well, Kyle Wright -- tell us your
24      relationship with Kyle Wright, while we're at it.
25      Tell us your friendship with Kyle Wright.
```

```
 1                MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   How -- how many years does your friendship

 4   with Kyle Wright go back?

 5                MR. PYSER:  Object to form.

 6                THE WITNESS:  There was a working

 7        relationship with --

 8   BY MR. PAPANTONIO:

 9        Q.   How many years?

10        A.   -- with Kyle Wright while I --

11        Q.   How many years?

12        A.   I can't state how many years.

13                MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15        Q.   Do you socialize with Carl Wright?

16        A.   I do not.

17        Q.   Have you ever socialized with Carl Wright?

18        A.   I have not.

19        Q.   No time did you socialize with Carl

20   Wright; that's your testimony?

21        A.   I socialize -- what do you mean --

22                MR. LAFATA:  Objection.

23   BY MR. PAPANTONIO:

24        Q.   Huh?

25        A.   Please define "socialize."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Well, did you go have drinks with him?

 2               MR. PYSER:  Object to form.  Asked and

 3     answered.

 4     BY MR. PAPANTONIO:

 5          Q.   Did you go have drinks with Carl Wright?

 6          A.   I don't drink --

 7          Q.   Did you have --

 8          A.   -- alcohol.

 9          Q.   -- dinner with Carl Wright?

10          A.   I have not.

11          Q.   What did you do with Carl Wright socially?

12               MR. PYSER:  Object to form.

13               THE WITNESS:  Nothing outside of work.

14     BY MR. PAPANTONIO:

15          Q.   Okay.  So you did nothing socially with

16     Carl Wright; that's your testimony here today.  Is

17     that correct?

18               MR. PYSER:  Object to form.

19     BY MR. PAPANTONIO:

20          Q.   That's your testimony --

21          A.   That's correct.

22          Q.   -- right now, that you did nothing

23     socially with Carl Wright, true?

24          A.   That is correct.

25          Q.   All right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LAMB:  It's Kyle, Mike.  Kyle.

 2                    MR. PAPANTONIO:  Kyle.  Excuse me.  Kyle.

 3        Kyle.

 4   BY MR. PAPANTONIO:

 5        Q.   All right.  Well, let's look at the next

 6   paragraph.  We'll get back to that.

 7                    It says, next paragraph, "Obviously the

 8   biggest are the SEC issue, two consecutive Alaris

 9   recalls."  What's Alaris?

10        A.   I don't know for sure.  I think it's a

11   medical device or dispensing robot or something like

12   that.

13        Q.   "A number of MPT recalls, and the DEA

14   controlled -- and the DEA controlled substance

15   license suspensions."

16                    You see where it says that?  "And the DEA

17   substance control" -- what is it --

18   "substance license suspensions in three locations."

19                    You see where it says that?

20        A.   Yes.

21        Q.   All right.  And then it goes on to say,

22   "Beyond these, Gary Dolch's quarterly QRA report

23   lists a startling number of issues, including six

24   OSHA violations and a significant fine at our

25   Syracuse, New York, facility.  If you added up our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    fines, settlements, and lost business over the last

 2    18 months, the total would come close to $1 billion."

 3              That's shocking, isn't it Mr. Brantley?

 4              MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6         Q.   It's shocking.  It says -- as a matter of

 7    fact, it says right here, it's shocking, isn't it?

 8              MR. PYSER:  Object to form.  Ongoing and

 9         continuing objection to this line of

10         questioning.  This document is beyond the scope

11         of examination.

12    BY MR. PAPANTONIO:

13         Q.   Right?  It says "shocking."  Are you

14    shocked by the fact that your failure to comply with

15    regulatory actually cost a billion dollars?

16              MR. PYSER:  Object to form.  Misstates

17         evidence.

18    BY MR. PAPANTONIO:

19         Q.   Does that surprise you?

20              MR. PYSER:  Object to form.

21              THE WITNESS:  Those are the author's

22         words.

23    BY MR. PAPANTONIO:

24         Q.   Okay, but does that surprise you?  If it's

25    more than a billion dollars in your failure to comply
```

```
 1   with regulatory, if it's more than $1 billion, that's

 2   shocking, isn't it?

 3               MR. PYSER:  Object to form.  Misstates

 4        evidence.

 5   BY MR. PAPANTONIO:

 6        Q.   You would say that's shocking, wouldn't

 7   you?

 8               MR. PYSER:  Object.

 9               THE WITNESS:  I would not.  I do not speak

10        to shocking or surprising or anything like that.

11        I can say what was stated in the document.

12   BY MR. PAPANTONIO:

13        Q.   So your testimony is it's not shocking; to

14   Eric Brantley, it's not shocking that your failure to

15   comply with regulatory rules exceeded a cost to the

16   company of $1 billion?  That is not shocking to Eric

17   Wright; is that -- Eric Brantley; is that correct?

18               MR. PYSER:  Object to form.  Misstates

19        evidence.

20   BY MR. PAPANTONIO:

21        Q.   Yes?

22        A.   My testimony is that I don't comment on

23   shocking or . . .

24        Q.   Well, they're -- somebody is saying it's

25   shocking.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   The author of this --

 2          Q.   Who says -- well, let's look --

 3          A.   The author of this document stated that.

 4          Q.   Well, who is Mark Kaufmann?  You know who

 5   Mark Kaufmann is -- Mike Kaufmann.  You know who that

 6   is?

 7          A.   I don't remember what his title was.  I

 8   think he was a VP or something like that --

 9          Q.   Yeah, you knew him, didn't you?  You knew

10   him?

11          A.   I knew Mike Kaufmann.

12          Q.   Okay.  So do you -- and so you just

13   disagree that it's shocking that the company, because

14   of its failures to comply with regulatory rules,

15   actually was cost a billion dollars to the company?

16   You don't find that shocking, do you?

17               MR. PYSER:  Object to form.  Misstates

18        evidence.

19   BY MR. PAPANTONIO:

20          Q.   Right?  You don't find it shocking?

21               MR. PYSER:  Object to form.  Misstates

22        evidence.  And renewing again the continuing

23        objection to this line of questioning as beyond

24        the scope.

25               THE WITNESS:  Again, the -- the term
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          "shocking" was used by the author of this

 2          e-mail.

 3   BY MR. PAPANTONIO:

 4      Q.   Okay.  And then, see the line right

 5   underneath that:  "The conundrum is how can a company

 6   that believes ethics is a core value find itself in a

 7   situation -- such a situation?"

 8           You see that?  "How can a company that

 9   believes ethics is a core value find itself in such a

10   situation?"

11           Why don't you tell me?  Do you know,

12   Mr. Brantley, how a company could find itself in a

13   situation that it would violate so many regulatory

14   standards that it cost them a billion dollars in

15   losses financially?

16           MR. PYSER:  Object to form.  Misstates

17       evidence.  Nothing about this says that

18       regulatory violations cost a billion dollars.

19   BY MR. PAPANTONIO:

20      Q.   Can you tell me, the consortium is how can

21   a company that believes ethics is a core value find

22   itself in a situation?  Do you have an answer to that

23   as we sit here today?

24           MR. PYSER:  Object to form.  Ongoing

25       continuing objection to this line of questioning
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        as beyond the scope.
 2             THE WITNESS:  I don't comment on the
 3        authors of -- I have no opinion on a author's
 4        use of words.  This is his question.
 5   BY MR. PAPANTONIO:
 6        Q.   You -- you knew, when you were working
 7   there, that the lack of ethics at the company and the
 8   lack of following regulatory rules with the company
 9   was actually affecting the trust of the employees?
10   You knew that when you were there, didn't you?
11             MR. PYSER:  Object to form.
12             THE WITNESS:  I did not know that.  This
13        actually states that -- believes that ethics is
14        a core value.
15   BY MR. PAPANTONIO:
16        Q.   Well, let's see what it says in that --
17   you didn't know that the -- you didn't know that the
18   lack of filing -- filing -- following regulatory
19   standards with Cardinal was so bad that it was
20   affecting employees in their attitude about the
21   company?
22             MR. PYSER:  Objection.
23   BY MR. PAPANTONIO:
24        Q.   Where the employees did not trust the
25   company?  Did you know that?
```

```
 1              MR. PYSER:  Object to form.  Ongoing

 2       objection.

 3  BY MR. PAPANTONIO:

 4       Q.   Just a simple question:  Did you know

 5  that?

 6       A.   I --

 7              MR. PYSER:  Object to form.

 8              THE WITNESS:  I'm not aware of any of

 9       that.

10  BY MR. PAPANTONIO:

11       Q.   Okay.  Well, let's read it.

12              "As we begin to look at the 'Voice of the

13  Employee' results" -- you knew that there was -- and

14  actually you participated in -- that was actually --

15  they sent around a questionnaire, and they did --

16  they did a questionnaire that has to do with what

17  they call the "Voice of Employees."  You remember

18  that?

19              MR. PYSER:  Object to form.

20  BY MR. PAPANTONIO:

21       Q.   You actually responded to it, didn't you?

22              MR. PYSER:  Object to form.

23              THE WITNESS:  I do remember the Voice of

24       Employee questionnaires or whatever, but I

25       don't -- I don't recall if I participated or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       not.

 2   BY MR. PAPANTONIO:

 3       Q.   It says, "As we begin to look at the

 4   'Voice of Employee' results, which are being compiled

 5   and analyzed as we speak, it's clear we have vertical

 6   communications issues, and our employees do not fully

 7   trust their leaders."

 8            Did you know that, prior to the time you

 9   came in here to testify today, that the ethical

10   problem was so bad at Cardinal that according to

11   research that was done of the employees, they said

12   that the employees don't even trust the leaders?

13            MR. PYSER:  Object to form.  Beyond the

14       scope.

15   BY MR. PAPANTONIO:

16       Q.   Did you ever hear -- did you ever hear

17   that prior to coming here?  That's the only question

18   I'm asking.

19            MR. PYSER:  Object to form.

20            THE WITNESS:  I was not aware of that.

21   BY MR. PAPANTONIO:

22       Q.   All right.  Then it goes on to say,

23   "Perhaps our results-oriented culture is leaning to

24   ill-advised or short-sighted decisions."

25            Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PYSER:  Same objections to the
 2        continuing use of this document.
 3                  THE WITNESS:  I do see that.
 4   BY MR. PAPANTONIO:
 5        Q.   Okay.  This is a bad document for you,
 6   isn't it?  I mean, it really is --
 7                  MR. PYSER:  Counsel, it's just beyond the
 8        scope.
 9                  MR. PAPANTONIO:  No, it is a bad -- no, it
10        really is a bad document.  I agree.
11                  MR. PYSER:  It doesn't have anything to do
12        with the issues --
13                  MR. PAPANTONIO:  Okay.
14                  MR. PYSER:  -- in play here.
15   BY MR. PAPANTONIO:
16        Q.   Let's -- let's be clear about the scope of
17   this document.  You were asked by Mr. Pyser direct
18   questions about regulatory issues of this company.
19   On his direct of you, you answered questions, didn't
20   you?
21                  MR. PYSER:  Object to form.
22                  THE WITNESS:  I did answer his questions.
23   BY MR. PAPANTONIO:
24        Q.   Okay.  And he asked you about regulatory
25   standards of the company, didn't he?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. PYSER:  Object to form.

 2                 THE WITNESS:  I don't recall all of the

 3        questions that were asked.

 4   BY MR. PAPANTONIO:

 5        Q.   So it says -- let's go on the last

 6   paragraph:  "In closing, let me make an important

 7   point.  As Dave and Dwight would have concurred, the

 8   regulatory bodies hold general management

 9   accountable.  Their names are the ones on the FDA

10   consent order related to Alaris SE recall.  The final

11   DEA resolution may have a comparable outcome.  The

12   final DEA resolution may have a final outcome."

13                 Now, this is -- this document was

14   written -- and you said you were still with the

15   company -- in 2008.  What was the pending DEA

16   question in 2008?

17                 MR. PYSER:  Object to form.  Ongoing

18        objection to this line of questioning on this

19        document.

20                 THE WITNESS:  I do not --

21                 MR. PYSER:  Beyond the scope.

22                 THE WITNESS:  I do not know what the

23        author was referring to when he said "the final

24        DEA resolution."

25
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   "While the" -- it goes on to say, "While

 3   the legal and QRA functions are responsible for

 4   helping us run our business, the general managers are

 5   ultimately responsible for the results."

 6             You'd agree with that, wouldn't you?

 7        A.   I don't know who the general managers are.

 8   So I -- I can't speak to that.

 9        Q.   Well, the -- how about -- how about where

10   it says "So general managers need to proactively

11   search for potential quality and legal regulatory

12   issues, and when they find them, they need to make

13   the hard right calls, not the easy wrong calls."

14             Did you know about those -- those

15   words being used -- being -- being spoken?

16             MR. PYSER:  Object to form.  Ongoing

17        objection --

18   BY MR. PAPANTONIO:

19        Q.   You ever heard --

20             MR. PYSER:  -- to this line of --

21   BY MR. PAPANTONIO:

22        Q.   -- words like that --

23             MR. PYSER:  -- this line of questioning.

24   BY MR. PAPANTONIO:

25        Q.   -- being spoken?
```

```
 1          A.   No, I had not heard those words.  This is

 2    my first time reading this document.

 3          Q.   Well, it says, "This is a big issue, and

 4    the leaders of Cardinal, we need to address it.

 5    Accountability leadership is essential."

 6               Now, you would agree with that:

 7    Accountability leadership is -- is essential in any

 8    organization, isn't it?

 9          A.   Again, those are the words of an

10    individual.

11          Q.   Yeah.  Let -- let me -- let me ask you,

12    just -- just to -- did you know about the -- did you

13    know about the -- the death wagon that was up in

14    Ohio?  Did you see the articles where Ohio actually

15    had to bring in a -- a death wagon, that actually

16    drove around dead bodies from so many people dying up

17    in Ohio from opioid overdoses?

18               MR. PYSER:  Object to --

19    BY MR. PAPANTONIO:

20          Q.   Had you -- have you ever seen that before?

21               MR. PYSER:  Object to form.  This is way,

22         way, way beyond the scope of the examination.

23         It is entirely improper to bring in a new

24         exhibit, an entirely new subject that wasn't

25         touched upon in the direct examination.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PAPANTONIO:  No -- no, sir.

 2    BY MR. PAPANTONIO:

 3         Q.   You understand, you were asked -- you were

 4    asked whether or not the regulatory aspects of

 5    Cardinal were a success.  What did you tell us?

 6              MR. PYSER:  Move to strike --

 7              MS. MOORE:  Cardinal 41.

 8         (Cardinal-Brantley 41 was marked for

 9    identification.)

10              MR. PYSER:  -- this entire line of

11         questioning.

12    BY MR. PAPANTONIO:

13         Q.   What did you tell us?

14              MR. PYSER:  Move to strike --

15              MR. PAPANTONIO:  We're going to enter

16         this --

17              MR. PYSER:  -- this line of questioning.

18              MR. PAPANTONIO:  This document's coming in

19         whether they object to it or not.

20              MR. PYSER:  It is objected to --

21              MR. PAPANTONIO:  So -- so --

22              MR. PYSER:  -- in the line of

23         questioning --

24              MR. PAPANTONIO:  -- okay, that's fine.

25              MR. PYSER:  Let me put my objection on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        record without --

 2             MR. PAPANTONIO:  Go ahead.

 3             MR. PYSER:  -- speaking over me.

 4             MR. PAPANTONIO:  Go ahead.

 5             MR. PYSER:  This line of questioning is

 6        beyond the scope.  This entire line of

 7        questioning, the introduction of the exhibit is

 8        beyond the scope, and it should be stricken from

 9        the record.  I have a standing objection to this

10        entire line of questioning.

11   BY MR. PAPANTONIO:

12        Q.   Did you know that there was a rolling

13   morgue that had to be called in to Ohio -- the very

14   area, as a matter of fact, where you were reviewing

15   reports about the sale of opioids?

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18        Q.   Did you know that?  Had anybody ever told

19   you about this before?

20        A.   I was not aware of, as you say, a rolling

21   morgue.

22        Q.   You never -- nobody ever told you about a

23   rolling morgue that had to be called up to Ohio

24   because there was so many dead bodies dealing with

25   opioids, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   Right?

 4        A.   That is correct.  I was never told

 5   about --

 6        Q.   And -- and I believe --

 7        A.   -- as you say, a rolling morgue.

 8        Q.   I believe earlier you said -- we went

 9   through your idea of what are important things for

10   people to understand and be aware of where it comes

11   to things like diversion.  And you said, didn't you,

12   in the -- in the documents that were reviewed, that

13   news is important, that people stay abreast of what

14   news is, dealing with opioids.  Right?

15                MR. PYSER:  Object to form.  Misstates

16        testimony.

17   BY MR. PAPANTONIO:

18        Q.   Didn't you say that?

19                MR. PYSER:  Ongoing objection to this line

20        of questioning.

21   BY MR. PAPANTONIO:

22        Q.   Mr. Brantley, didn't you say that?

23        A.   I -- that document was an outline at a

24   high level of things that I wanted to implement.

25        Q.   And one thing you wanted to implement was
```

```
 1    the use of staying abreast of what news reports are,

 2    correct?

 3              MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5         Q.   In fairness to your good idea, that's one

 6    thing you wanted to do?

 7              MR. PYSER:  Object to form.  Object,

 8         beyond the scope, as this is an examination

 9         based on another plaintiff's counsel examination

10         of an Endo document.  It has nothing to do with

11         the direct examination that was conducted by

12         counsel for the defense.

13    BY MR. PAPANTONIO:

14         Q.   Well, let's not even talk about your

15    document.  You believe it's important for a person in

16    your role, in your capacity, to stay informed about

17    what the various news reports are saying about the

18    industry.  You -- you would agree that's important,

19    right?

20              MR. PYSER:  Same objections.

21              THE WITNESS:  The media, the -- the

22         documentation that I had listed in my report as

23         far as reviewing searches and Google searches

24         and such was for the customers.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2        Q.   For the customers?

 3        A.   And researching customers.

 4        Q.   And so that article sitting in front of

 5   you about the -- about a morgue, a rolling morgue

 6   having to be brought in to Ohio, you didn't know

 7   anything about that, right?

 8             MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10        Q.   Correct?

11        A.   I did not know anything about this.  This

12   is not relating to a customer.

13        Q.   Not related to a customer; it's just --

14        A.   That's why I did not know anything about

15   this.

16        Q.   Oh, it's just related to dead people,

17   isn't it?

18             MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20        Q.   Dead people.

21             MR. PYSER:  Argumentative.

22   BY MR. PAPANTONIO:

23        Q.   Right?  Talking about dead people here.

24             MR. PYSER:  Object to form.

25             Argumentative.  Beyond the scope.
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Right?  You want to take a minute to look

 3   at that document?

 4             MR. PYSER:  Counsel, it's 8:41 p.m.  We're

 5        not sitting here so you can harass the witness.

 6   BY MR. PAPANTONIO:

 7        Q.   Do you want to read that document before I

 8   ask you the next question?

 9             MR. PYSER:  Object to form.

10             If you want to read the document, you can

11        go right ahead.

12             THE WITNESS:  Do you want me to read the

13        document?

14   BY MR. PAPANTONIO:

15        Q.   You're welcome to.

16        A.   Are you going to ask a question relating

17   to the document?

18        Q.   I will.

19        A.   If you ask your question, then I will

20   determine whether or not I need to read the

21   document --

22        Q.   Well, we'll let the jury read it.

23        A.   -- to answer your question.

24        Q.   We'll let them determine.

25             MR. PYSER:  Object to form.
```

```
 1              MR. PAPANTONIO:  Dave, why don't you take

 2      over from here.

 3              MR. BUCHANAN:  Okay.

 4              MS. MOORE:  P1-1453.  It's -- if you

 5      would, sir -- this is Cardinal-Brantley 41.

 6              Thank you, sir.

 7              (Pause in proceedings.)

 8                  FURTHER EXAMINATION

 9  BY MR. BUCHANAN:

10      Q.   All right, we're on the record.  Now,

11  Mr. Brantley -- go ahead; finish your sip.

12      A.   Thank you.

13      Q.   All right.  I just have a few follow-up

14  questions.  We'll try and keep this brief and -- and

15  bring this in for a landing pretty quickly here.  We

16  will not use our 90-plus minutes in further

17  examination.

18           You were shown Brantley Exhibits 37, 38,

19  39, and 40.  Do you have those before you?

20      A.   I see 40.

21      Q.   Yeah.

22              MR. BUCHANAN:  I can -- I can pop them up

23      here on the Elmo, if I can have the Elmo, Evan,

24      we'll move this along real quick.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   You remember these, sir?

 3        A.   Yes.

 4        Q.   In your examination of Par -- by Par

 5   counsel?

 6             And just so the record's not confusing,

 7   sir, because some of these documents say "Par"; some

 8   of these documents say "QualiTest."  What happened,

 9   QualiTest -- Endo acquired Par, and QualiTest --

10   essentially those functions moved into Par?

11             MS. VANNI:  Object to the form.

12             THE WITNESS:  At some point, Endo acquired

13        Par.  And then Par and QualiTest -- I don't know

14        what the correct term is, but Par and QualiTest

15        kind of merged, for lack of a better term.

16   BY MR. BUCHANAN:

17        Q.   Yeah, whatever the -- you know, corporate

18   formation thing was --

19        A.   Right.

20        Q.   -- one went into the other, the other went

21   into the first.

22             Whatever it was, essentially, we see

23   QualiTest and Par, we can think of those as

24   essentially generic manufacturers of Class II,

25   Class III controlled substances, correct?
```

```
 1          A.   As well as other controlled substances and

 2   prescription drugs.

 3          Q.   Right.  And we -- you know, we didn't get

 4   into too much of it, but the majority of the

 5   production, certainly of QualiTest, was controlled

 6   substances, correct?

 7          A.   There -- there was a -- I don't remember

 8   the percentage, but yes, it was mostly controlled

 9   substances, I believe.

10          Q.   Okay.  And you spent some time with

11   counsel going through Exhibit 37, which the jury will

12   have on the screen.  They'll remember this one.

13               38, and it's -- excuse my quick notations

14   there in the top right corner.  That's just for

15   tracking it.  Customer due diligence visits, cage,

16   vault, suspicious order monitoring, and identify,

17   blocking, and reporting suspicious orders.  Remember

18   going through those with counsel?

19          A.   Yes.

20          Q.   Okay.  And these were all new SOPs in

21   2013, correct, sir?

22          A.   Those were SOPs that I drafted.

23          Q.   Right.  So they -- they would -- by

24   definition, sir, they would not have existed prior to

25   your arrival at the company, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Those particular SOPs did not.

 2          Q.   Right.  And we looked, did we not, sir, at

 3     Exhibit 30, in your direct examination -- or my

 4     initial examination of you, concerning issues with

 5     the current process, right?  Do you recall looking at

 6     this with me, sir?

 7          A.   I do recall looking at that, yes.

 8          Q.   Okay.  And just to orient ourselves on

 9     Exhibit 30 -- I'm sorry, I guess I did have a sticker

10     on the front -- this is that e-mail from Mr. Shaffer

11     to yourself, SOMS info.  And recall that it included

12     all the violations in an Excel spreadsheet, that was

13     first couple of pages?  Remember that?

14               I can turn it so it's burned into our tape

15     here.  If this helps you.  I know it's been a day,

16     but . . .

17          A.   I do remember.

18          Q.   Okay.  We looked at that together.

19               All right.  And there's more information

20     here, and ultimately we get with current SOMS

21     process, says "Retail pharmacies based on set product

22     thresholds."  And they could be changed by the sales

23     department.  Right?

24               MS. VANNI:  Objection.  Asked and

25          answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   You see that at the bottom there, retail

 3   pharmacy threshold amounts?

 4        A.   Yes, that's what it says.

 5        Q.   Okay.  And then, as of the time you

 6   arrived in 2013, after that period of time where

 7   millions and billions of pills of hydrocodone and

 8   oxycodone had been sold, these were the current

 9   issues with the SOMS process, right?

10             MS. VANNI:  Objection.  Form.

11             THE WITNESS:  As Mr. Shaffer listed on the

12        PowerPoint.

13   BY MR. BUCHANAN:

14        Q.   Right.  And you -- you don't dispute these

15   characterizations, right?

16        A.   I cannot speak to them, because I was not

17   there.

18        Q.   Right.  He was?

19        A.   He was.

20        Q.   Okay.  And so what he sent you to orient

21   you, one week into your post with QualiTest, was

22   this -- was this PowerPoint, correct?

23             MS. VANNI:  Objection.

24             THE WITNESS:  Yes.  I don't have it in

25        front of me, but I believe it was sent --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   Okay.

 3        A.   -- like you said, my first week of

 4   employment, or something like that.

 5        Q.   And it said, "System only looks at retail

 6   pharmacies."  Right.  See that?

 7        A.   It says, "The system only addresses retail

 8   pharmacies by looking at product thresholds."  It

 9   does not say "System only looks at retail

10   pharmacies."

11        Q.   Okay, fair enough.  Okay.  It does say

12   here, "Other classes of trade are not evaluated for

13   SOMS," right?

14        A.   It does say that, yes.

15        Q.   Okay.  You understand "other classes of

16   trade" to be -- frankly what QualiTest's biggest

17   customers were, right?  Distributors and wholesalers?

18             MS. VANNI:  Objection.

19             THE WITNESS:  "Other classes of trade"

20        would include wholesalers, distributors, and

21        hospitals, whomever else, yes.

22   BY MR. BUCHANAN:

23        Q.   And I believe when you were asked

24   questions by Par counsel earlier -- not me, but by

25   Par counsel -- you told her that the majority of
```

```
 1    QualiTest and Par's business was to distributors and

 2    wholesalers, fair?

 3         A.   Yes.

 4         Q.   Okay.  So, fair to say that as of this

 5    point in time, at least by the person who was boots

 6    on the ground at QualiTest, other classes of trades

 7    were not evaluated for suspicious orders, right?

 8              MS. VANNI:  Object to form.

 9              THE WITNESS:  According to Mr. Shaffer,

10      yes.

11    BY MR. BUCHANAN:

12         Q.   Okay.  And that -- that statute that we

13    talked about, the Controlled Substances Act, that

14    required you all to maintain effective controls to

15    prevent diversion; that statute goes way back in

16    time, right?  Prior to 2013, right?

17              MS. VANNI:  Objection.

18              THE WITNESS:  Yes.

19    BY MR. BUCHANAN:

20         Q.   And prior to 2000, right?

21         A.   Yes.

22         Q.   Back to the '70s or earlier?

23              MS. VANNI:  Objection.

24              THE WITNESS:  I believe back to the '70s.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   Okay.  So that obligation to maintain

 3   effective controls existed, certainly, before you

 4   were selling billions and billions of pills to

 5   wholesalers and distributors in 2011 and 2012,

 6   oxycodone and hydrocodone.  Fair?

 7             MS. VANNI:  Object to form.

 8             THE WITNESS:  It existed since the '70s.

 9   BY MR. BUCHANAN:

10        Q.   Okay.  Well, that would give a company a

11   long time to figure out effective controls against

12   diversion then, right?

13             MS. VANNI:  Objection.

14   BY MR. BUCHANAN:

15        Q.   30, 40 years?

16             MS. VANNI:  Objection.

17             THE WITNESS:  Since the '70s, when the

18        regulations made effective.

19   BY MR. BUCHANAN:

20        Q.   Right.  So if I understand your testimony

21   on examination by Par counsel, you started the

22   company on September 30th -- I don't think you could

23   remember that date when I was asking you questions.

24   You had your memory refreshed, I guess, on a break?

25        A.   Yes, because either you or someone
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually put the date up there of September 30th, and

 2    I remembered that from someone's presentation.

 3         Q.   Fair enough.  So while the Act had been

 4    around for 30, 40 years about developing effective

 5    controls, you started at the company on

 6    September 30th, right?

 7         A.   2013, yes.

 8         Q.   2013.  And one week later, sir, in one

 9    week's time, you sent around your vision for an

10    effective suspicious order monitoring protocol.

11    Fair?

12              MS. VANNI:  Object to the form.

13              THE WITNESS:  I sent my -- my high-level

14         thoughts on what I wanted to do as far as

15         implementing a suspicious order monitoring

16         program.

17    BY MR. BUCHANAN:

18         Q.   Right.  So this company, notwithstanding

19    the existence of a CSA for years about the obligation

20    to maintain effective controls to prevent diversion,

21    was not looking at chargeback data before you got

22    there, right?

23              MS. VANNI:  Objection.

24              THE WITNESS:  I -- I don't know if they

25         were looking at chargeback data or not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   Okay.  If I told you, sir, they were not,

 3   would you dispute that?

 4             MS. VANNI:  Object to the form.

 5             THE WITNESS:  If you --

 6   BY MR. BUCHANAN:

 7        Q.   As it relates to effective controls

 8   against diversion?

 9        A.   If you showed me a document that stated

10   that they were not reviewing it, I would believe

11   that.

12        Q.   You wouldn't dispute it?

13        A.   I would believe that document.

14        Q.   Okay.

15        A.   Depending on who it was written by.

16        Q.   Okay.  And then this continues, and

17   further explains the retail pharmacy review is being

18   handled by the sales folks, right?

19             MS. VANNI:  Object to the form.

20   BY MR. BUCHANAN:

21        Q.   Fourth bullet?  Sorry, right here, sir.

22        A.   Yes.

23        Q.   Okay.  And that's a conflict of interest,

24   at least in the DEA's eyes, right?

25             MS. VANNI:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  According to Mr. Shaffer, he
 2        stated that in that -- the bullet point.
 3   BY MR. BUCHANAN:
 4        Q.   Okay.  Well, let's just talk about it
 5   going forward, in terms of setting thresholds, was
 6   that coming out of the DEA compliance group going
 7   forward, or was the sales department, the marketing
 8   department, continuing to do it?
 9        A.   By "going forward," do you mean since I
10   arrived?
11        Q.   Yeah.  2013, '14?
12        A.   When I arrived, that practice was stopped,
13   and it was handled by --
14        Q.   Okay.
15        A.   -- my team.
16        Q.   And so when you arrived, that would be the
17   period of time after the blue was mostly gone from
18   the map -- that's the death map -- after the blue was
19   mostly gone, in 2012, and we had white.  And we had
20   orange.  And we had yellow.  And we had brown.  In
21   terms of body counts, throughout this country, due to
22   opioid deaths.  Fair?
23                MS. VANNI:  Objection.
24                THE WITNESS:  That was after the dates on
25        the maps that you put up on the screen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2         Q.   Right.  So it's after that body count,

 3    after the escalating deaths, after QualiTest or Par

 4    had sold billions and billions and billions of

 5    oxycodone- and hydrocodone-containing products that

 6    this SOMS process -- or you're hired, and a new SOMS

 7    process gets implemented.  Fair?

 8              MS. VANNI:  Objection.

 9    BY MR. BUCHANAN:

10         Q.   Is that the timing, sir?  It happened

11    after you started?

12         A.   During the time fame that you mentioned of

13    the chart, I started in 2013, which is after that.

14    And I enhanced the program.

15         Q.   Understood, sir.  And in fact the DEA

16    identified gaps in the program; isn't that right?

17              MS. VANNI:  Object to the form.

18    BY MR. BUCHANAN:

19         Q.   You understood, sir --

20         A.   At -- at what point?  The program since I

21    had been there or --

22         Q.   Yeah, there were some questions by

23    counsel --

24         A.   -- prior to my arrival?

25         Q.   Withdrawn.  I'm getting -- you know, it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   late.  I apologize.  You've been here a long day.  I

 2   have too.  It's not your fault, and I should slow

 3   down, because I'm sure I do have ample time, and I'm

 4   not going to use it.

 5           There were some questions by counsel for

 6   Par about a DEA audit of SOMS.  Do you remember that?

 7       A.   During my time, yes.

 8       Q.   Okay.  To be clear, that was -- that was

 9   at a point in time after new SOPS had been

10   implemented, after you were putting boots on the

11   ground to actually start talking to wholesalers and

12   distributors, after you were looking at chargeback

13   data, after you were doing Internet investigations on

14   your customers and your customers' customers and

15   after you were considering intelligence that you were

16   collecting from other sources, that's the point in

17   time -- that was the audit you were talking about,

18   right?

19       A.   Yes.  So the --

20           MS. VANNI:  Object to the form.

21           THE WITNESS:  -- audit was after I became

22       SOM manager.

23   BY MR. BUCHANAN:

24       Q.   And fair, sir, that, you know, in this

25   period of time before you arrived, there was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    intelligence that could be gathered on your

 2    customers, right?

 3              MS. VANNI:  Objection.

 4    BY MR. BUCHANAN:

 5        Q.   Before you arrived?  Before you got there,

 6    there were sources of intelligence on your customers,

 7    true?

 8              MS. VANNI:  Objection.

 9              THE WITNESS:  Before I arrived, there was

10         the Internet, and -- and there were searches

11         available.

12    BY MR. BUCHANAN:

13        Q.   And there were sources available on your

14    customers' customers, right?

15              MS. VANNI:  Objection.

16              THE WITNESS:  I cannot speak -- if you're

17         referring to chargeback data, I do not know what

18         data was -- what chargeback data was available

19         prior to me.

20    BY MR. BUCHANAN:

21        Q.   Okay.  So I mean, that's a discernible

22    fact, though, right?  I mean, within the walls of

23    QualiTest, within the walls of Endo, within the walls

24    of Par, we can figure out when chargeback data was

25    available, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  Object to the form.

 2                THE WITNESS:  That is discernible, yes.

 3   BY MR. BUCHANAN:

 4        Q.   Okay.  And we know that before you got to

 5   QualiTest, there were pill mills, right?

 6                MS. VANNI:  Object to the form.

 7                THE WITNESS:  I don't know exactly when

 8        pill mills started.  It started with the

 9        Internet, and then, when the DEA cracked down,

10        on Internet, it kind of evolved to pill mills.

11        I don't recall the time frame.

12   BY MR. BUCHANAN:

13        Q.   But before you got -- I mean, you remember

14   that discussion you had with Mr. Papantonio about --

15   during Cardinal, even during the Cardinal time, there

16   was concern about pill mills and Internet pharmacies.

17   Fair?

18                MS. VANNI:  Objection to form.

19                THE WITNESS:  Fair, yes.

20   BY MR. BUCHANAN:

21        Q.   Okay.

22        A.   Yes.

23        Q.   So there was concerns about diversion well

24   before 2013, right?

25                MS. VANNI:  Objection.
```

```
 1                  THE WITNESS:  Diversion was a concern

 2          before 2013.

 3   BY MR. BUCHANAN:

 4          Q.   Right.  Right.  And in fact, I mean, we

 5   know it's a concern because as a registrant, you make

 6   a promise when you get that registration that you're

 7   going to maintain effective controls to prevent

 8   diversion, right?

 9                  MS. VANNI:  Object to form.

10                  THE WITNESS:  As I stated earlier, that's

11          what the regulation says, that --

12   BY MR. BUCHANAN:

13          Q.   That's what the statute says?

14          A.   Yeah, the statute, regulation, I get them.

15          Q.   Right.  As a registrant, you are promising

16   to the American people, to the American government,

17   that you are going to operate within this closed

18   system to prevent diversion, right?

19                  MS. VANNI:  Objection.

20                  THE WITNESS:  I don't know if the statute

21          mentions a promise, but the statute does say

22          that you will have procedures in place to

23          prevent diversion.

24   BY MR. BUCHANAN:

25          Q.   Yeah.  I mean, don't you understand --
```

```
 1            A.   The word "promising," I can't speak to

 2    that.  I don't recall that being in the regulation --

 3            Q.   Yeah.  And frankly --

 4            A.   -- or the statute; I'm sorry.

 5            Q.   That's -- that's me, I think, trying to

 6    make friendly with a statute.  But when you file an

 7    application, when you file an application, that is

 8    your promise as a registrant to operate as a good

 9    citizen within a closed system designed to contain

10    controlled substances within that system, right?

11            MS. VANNI:  Object to form.

12            THE WITNESS:  Again, since the regulation

13        does not mention the word "promise," I cannot

14        speak to promise.

15    BY MR. BUCHANAN:

16            Q.   Okay.  Would you fault -- would you fault

17    people, sir, for considering your application as a

18    registrant as a representation by you to the

19    government, and by extension to the American people,

20    that you're going to do your best to prevent

21    diversion?  Would you fault people for perceiving

22    that's what you were willing to do when you went to

23    the DEA and said, I want to be a registrant?

24            MS. VANNI:  Objection.

25            THE WITNESS:  I can't speak to how one
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          finds fault and at what one finds faults.  And I

2          can't speak to other -- to someone else's

3          opinion.

4   BY MR. BUCHANAN:

5          Q.   Okay.  If the jury were to perceive, sir,

6   that when you made your application to the

7   government, that you were in fact making a promise to

8   do your best to have effective controls to prevent

9   diversion, at all times you were carrying that

10  license, at all times you were manufacturing, at all

11  times you were distributing, would you fault the jury

12  for understanding that that was essentially what you

13  were representing to the government?

14          MS. VANNI:  Objection.  Beyond the scope.

15          THE WITNESS:  Again, you started that

16          question with the word "promise."  And since

17          "promise" is not in the statute, I -- I cannot

18          speak to what is promised.  I can only speak to

19          what's in the statute, and that the companies

20          will be in compliance with what the statute and

21          the regulation states.

22  BY MR. BUCHANAN:

23          Q.   All right.  So turning ourselves back,

24  we've got it on the screen.  This is Exhibit 30.  We

25  went through this earlier today.  I just wanted to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orient ourselves that as of the point in time here,

 2    in 9/30/2013, or, you know, a few weeks after you

 3    joined the company, these were the issues with

 4    current process, right?

 5         A.    According to Mr. Shaffer.

 6         Q.    Okay.  Somebody who had been there, boots

 7    on the ground, before you got there, right?

 8              MS. VANNI:  Objection.

 9              THE WITNESS:  Mr. Shaffer was there prior

10         to my arrival, yes.

11    BY MR. BUCHANAN:

12         Q.    Fair enough.  Okay.

13              MR. BUCHANAN:  Could I please have -- can

14         I please have 391?

15              MR. SEIGEL:  Exhibit 42.

16              MR. BUCHANAN:  This will be Brantley

17         Exhibit 42.

18          (Cardinal-Brantley 42 was marked for

19    identification.)

20    BY MR. BUCHANAN:

21         Q.    And just to orient you, sir, I mean, you

22    saw some of the DEA charts that we looked at

23    together, where we did some calculations about the --

24    the substantial production of opioids and sale of

25    opioids by QualiTest; do you recall that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.   Would that be the ARCOS data graphs?

 2            Q.   That -- that was the -- from the DEA

 3   meeting in -- "the meeting," in March of 2013?

 4            MS. VANNI:  Object to the form.

 5   BY MR. BUCHANAN:

 6            Q.   Do you recall that?

 7            A.   Again, would that be the ARCOS data that

 8   listed Generics Bidco and Vintage?

 9            Q.   I -- I think you referred to it as

10   something you saw in a binder, and within the

11   company.

12            A.   Yes.

13            Q.   Do you recall that?  Okay.

14            A.   The ARCOS data that was in a binder.

15            Q.   Okay.  I'd like to show you, sir --

16            MR. BUCHANAN:  What did we call this?  40?

17            MR. SEIGEL:  42.

18            MR. BUCHANAN:  42.  All right.

19   BY MR. BUCHANAN:

20            Q.   I'd like to show you, sir, 42.  This is

21   supply chain and DEA compliance.  Okay?  Produced by

22   Endo and the MDL.  It's on the screen now.

23            MS. VANNI:  Objection.  Beyond the scope.

24   BY MR. BUCHANAN:

25            Q.   Let's see.  Executive sponsor, there's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    some folks -- do you know those people, sir?  Peter

 2    Bigelow, Brian Lortie?

 3         A.   No.

 4         Q.   Okay.  And it says here, "BOD committee"

 5    -- is that "board of directors," sir?

 6         A.   I don't know.

 7         Q.   Okay.  It says, "BOD committee, full

 8    board" -- I'll just say "full BOD -- key action dates

 9    off on the right.  "June 6th, 2013, ELC discussion."

10              Is that the executive leadership

11    committee, sir?

12         A.   I don't know for sure.  I think the "EL"

13    stands for executive leadership, so that could be

14    executive leadership.

15         Q.   Okay.  And then BOD, is that board of

16    director discussion?  Or you don't know what "BOD" is

17    referring to?

18         A.   I don't know for sure, but it could be

19    board of directors, as you stated.

20         Q.   Okay.

21         A.   That makes sense.  I just don't know for

22    sure.

23         Q.   Okay.  Well, let's -- at the bottom here,

24    it's talking about an assessment of critical risk

25    components.  You see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And we're just going to work off my

 3   highlights, try and move this along, all right?

 4        A.   Okay.

 5        Q.   And it says here, "Risk component two

 6   impacted DEA remediation efforts to address the

 7   compliance findings in our internal manufacturing

 8   plants.  The potential business impact could vary

 9   from formal agency regulatory observations during

10   external audits to agency regulatory actions

11   preventing us from commercially distributing one or

12   more products due to license revocation."

13             Do you see that?

14             MS. VANNI:  Just note my objection to use

15        of the document as an Endo document.  This

16        witness is a QualiTest employee.

17             Go ahead.

18             THE WITNESS:  I'm sorry.  Could you repeat

19        that?  Because I was trying to find the page.

20        You had skipped from page 1 all the way to -- I

21        think --

22             MR. BUCHANAN:  Evan, could you actually

23        pull it up on the screen?  It will make it

24        easier to navigate, and I've got some scribbles

25        on here.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2         Q.   We're going to pull it up on the screen

 3    for you.  Okay.  All right.

 4              I'm sorry.  It's 391.6.  We were carrying

 5    over from 391.5.

 6              There was a statement by counsel that this

 7    is an Endo document; I shouldn't be using it with

 8    you.  Let's direct your attention to the "QualiTest

 9    Business Unit" heading.  Do you see that, sir?

10         A.   Yes.

11         Q.   Is that in fact where you worked, sir,

12    QualiTest, at this point in time?  In 2013, at least,

13    when you joined?

14         A.   Yes.

15         Q.   Okay.  And it identifies a series of

16    items.  And actually, I do want to get back to the

17    carryover paragraph:  "The potential business impact

18    could vary from formal agency regulatory observations

19    during external audits to agency regulatory actions

20    preventing us from commercially distributing one or

21    more products due to license revocation."

22              Do you see that, sir?

23         A.   Yes.

24         Q.   Okay.  And it says in the second bullet --

25    could you read that for us, sir?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   The second bullet:  "In a meeting with DEA

2     on March 6, 2013, DEA identified gaps associated with

3     our suspicious order monitoring system (SOMS) and

4     lack of monitoring of sales to customers' customers."

5          Q.   And to be clear, sir, that's a statement

6     with regard to the QualiTest business unit, right?

7               MS. VANNI:  Object to the form.

8               THE WITNESS:  According to this document,

9          yes, it's under the QualiTest business unit.

10    BY MR. BUCHANAN:

11         Q.   Seemingly from executives of the company.

12    Fair, sir?

13              MS. VANNI:  Objection.

14              THE WITNESS:  Whomever drafted this, yes.

15    BY MR. BUCHANAN:

16         Q.   Okay.  And --

17         A.   I didn't recognize those names that you

18    mentioned.

19         Q.   Okay.  It's been a few years; you don't

20    remember them?

21         A.   I -- I don't think I've ever heard of

22    those two names.

23         Q.   Okay.  All right.  And -- and talks about

24    action plans, right?

25         A.   Yes.

1          Q.   See that?

2          A.   Yes.

3          Q.   To address various DEA-related concerns.

4    And it says "management's preparedness."  What did

5    the company say -- if you could scroll up a little,

6    Evan.

7               Management preparedness.  How prepared was

8    management for this?

9               MS. VANNI:  Object to the form.

10              THE WITNESS:  Management preparedness --

11       evolving.

12   BY MR. BUCHANAN:

13         Q.   Okay.  Evolving.  All right.  And then, so

14   third bullet down, under "Action Plans," to address

15   various DEA-related concerns -- you do understand,

16   sir, that the DEA had expressed concerns to QualiTest

17   about suspicious order monitoring at the meeting in

18   March of 2013.  True?

19              MS. VANNI:  Object to the form.

20              THE WITNESS:  I think I've seen that in

21       certain documents that were --

22   BY MR. BUCHANAN:

23         Q.   Okay.

24         A.   -- given to me throughout the course of

25   the day.

```
1          Q.   Fair enough.  Thank you.  And when we

2     scroll down here, third bullet, it says, "Implement

3     the suspicious order monitor program."

4               Right?  Do you see that, sir?

5          A.   That's what it says.

6          Q.   "Implement the suspicious order monitor

7     program."  Okay?

8               The authors of this document certainly

9     didn't use the word "enhance," right?

10              MS. VANNI:  Object to the form.

11              THE WITNESS:  It says "implement."

12    BY MR. BUCHANAN:

13         Q.   Okay.  It didn't say "supplement," or

14    "spiff it up," right?

15              MS. VANNI:  Objection.

16              THE WITNESS:  No.

17    BY MR. BUCHANAN:

18         Q.   What -- what word did they use, sir?

19         A.   "Implement."

20         Q.   Thank you.  All right.  And it said, going

21    to do that by the end of 2013.  See that?

22         A.   Yes.

23         Q.   Might you be one of the additional head

24    count QualiTest was out scrambling to find before

25    they had to go back and see the DEA in the third
```

```
1    quarter of 2013 to say, "We're going to do

2    something"?

3              MS. VANNI:  Objection to form.

4    BY MR. BUCHANAN:

5         Q.   Might you be that person, sir?

6              MS. VANNI:  Objection.

7              THE WITNESS:  Again, I can't speak to if I

8         was a person, but I was hired September 30th of

9         2013.

10   BY MR. BUCHANAN:

11        Q.   And you were hired into what position?

12        A.   SOMS manager.

13        Q.   SOMS manager.

14        A.   Yes.

15        Q.   Okay.  All right.  And that was in the end

16   of 2013, after those billions and billions of pills?

17              MS. VANNI:  Objection.

18   BY MR. BUCHANAN:

19        Q.   All right.  And what does it say there on

20   the next sentence?  I guess I should stop there.

21              "The program will" -- what?  "Will

22   create"?

23              Did I read that correctly, sir?  Second

24   sentence?  "The program will create" --

25        A.   Yes.
```

```
 1          Q.    -- "a solution to monitor"?

 2          A.    Yes, that's what it says.

 3          Q.    Not "enhance," not "spiff it up," not just

 4    add some window dressing.  It's going to create,

 5    right?

 6                MS. VANNI:  Objection to form.

 7    BY MR. BUCHANAN:

 8          Q.    "Create a solution to monitor," right?

 9          A.    It says "Create solution to monitor."

10          Q.    Okay.  Good.  Let's go on.

11                What's it going to create a solution to

12    monitor?  What was the first thing it was going to

13    do?

14          A.    Are you asking me to read the bullet?

15          Q.    I am, yes, please, sir.  I'm -- I'm sorry.

16    It's getting late in the day.

17          A.    "Sales orders to customers."

18          Q.    Okay.  What's the next thing it's going to

19    create a solution to monitor?

20          A.    "Review of chargeback data."

21          Q.    Okay.  Does that help you understand, sir,

22    whether this company was looking at chargeback data

23    before you got to the company or not?

24                MS. VANNI:  Objection.

25                THE WITNESS:  It says that the program
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        will -- will create a solution to monitor, and

 2        one of the things is review of chargeback data.

 3   BY MR. BUCHANAN:

 4        Q.   Okay.  Let's go on.  It says it's going to

 5   create a solution, create a solution to monitor, 1,

 6   sales orders to customers.  That's a good thing to

 7   do, right?

 8             MS. VANNI:  Objection.

 9             THE WITNESS:  That's -- that's part of a

10        SOMS program.

11   BY MR. BUCHANAN:

12        Q.   Right.  Because you can't really look for

13   suspicious orders and evaluate suspicious orders if

14   you're not even looking at the orders?

15             MS. VANNI:  Objection.

16   BY MR. BUCHANAN:

17        Q.   Could we agree on that?

18        A.   One has to look at an order to evaluate a

19   suspicious order.

20        Q.   Right.  Right.  And you got to look at the

21   whole class of trade.  You got to look at the

22   majority of your business, wholesalers and

23   distributors, right?

24             MS. VANNI:  Objection.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   National chain pharmacies?

 3             MS. VANNI:  Objection.

 4             THE WITNESS:  One has to look at the

 5        customer base in order to --

 6   BY MR. BUCHANAN:

 7        Q.   Okay.

 8        A.   -- identify potentially suspicious orders.

 9        Q.   Pretty important, with a class of drugs

10   that you store in a vault in your warehouse, right?

11             MS. VANNI:  Objection.

12             THE WITNESS:  It is in the statute in the

13        regulations that --

14   BY MR. BUCHANAN:

15        Q.   This is stuff that people get addicted to,

16   stuff that people do all kinds of crazy things to try

17   and steal.  This is stuff that breaks up families,

18   makes people nonproductive at work, and kills people.

19   Right?

20             MS. VANNI:  Objection.

21             THE WITNESS:  The abuse of controlled

22        substances can lead to those things.

23   BY MR. BUCHANAN:

24        Q.   Right.  And that's what you said in your

25   letter that you sent out in the middle of 2013,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   right?

 2              MS. VANNI:  Objection.

 3   BY MR. BUCHANAN:

 4        Q.   Heart-wrenching consequences.

 5   Heart-wrenching consequences when this product gets

 6   diverted and abused.  Right?

 7              MS. VANNI:  Objection.

 8              THE WITNESS:  Are you referring to the

 9        letter that --

10   BY MR. BUCHANAN:

11        Q.   I'm referring to the October 18 --

12        A.   -- was signed by Tracey Hernandez?

13        Q.   I'm referring -- sorry.  I'm referring to

14   the October 18, 2013, letter that you were cc'd on,

15   right after you got to the company as a SOMS manager.

16   Do you recall that?

17        A.   Sir, I asked -- I have stacks of documents

18   ahead of me, in front of me.  I'm asking, are you

19   referring to the document -- the letter that was

20   signed by Tracey Hernandez?

21        Q.   To which you were copied on, yeah.

22        A.   The letter that was signed by Tracey

23   Hernandez, is -- is that the letter you're referring

24   to?

25        Q.   Yeah.  I -- I thought I was being clear
```

Highly Confidential - Subject To Further Confidentiality Review

1   with you.

2          A.   You never said yes or no.

3          Q.   Okay.  Because I'm the one asking the

4   questions.

5               But yes, I mean, to help you remember,

6   yes, it was a letter that was sent by Tracey

7   Hernandez a few weeks after you joined, after you

8   sent your vision for a proper SOM program, after you

9   were briefed on all the deficiencies that currently

10  existed, and after apparently you started preparing

11  standard operating procedures, all within a few weeks

12  of joining the firm, that letter.

13              MS. VANNI:  Object to the form.

14              THE WITNESS:  I do recall the letter that

15       was signed --

16  BY MR. BUCHANAN:

17         Q.   Thank you.

18         A.   -- by Tracey Hernandez.

19         Q.   There we go.  Now let's look at the

20  program --

21              MS. VANNI:  Objection.

22              MR. BUCHANAN:  I'm sorry.  Withdrawn.

23              And I apologize, Counsel.  I'm just

24       getting a little punchy.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   The program will create a solution to

 3   monitor.  We talked about sales orders to customers.

 4   We talked about review of chargeback data.  And it's

 5   also going to create a solution to monitor, Know Your

 6   Customers.  Right?

 7        A.   It does say "Know Your Customer program,"

 8   yes.

 9        Q.   Yeah.  And a SOMS database.  Right?

10        A.   Yes, it says "SOMS database."

11        Q.   Okay.  And one of the things you were

12   advocating, sir, is not only looking at trends, not

13   -- you know, from the customer stuff, but going and

14   getting prescription-level data from IMS.  Right?

15   That was one of the things you said people should do.

16   Right?

17             MS. VANNI:  Object to the form.

18             THE WITNESS:  That's something that I said

19        that I would do in aiding me to establish

20        thresholds.

21   BY MR. BUCHANAN:

22        Q.   Right.  Look to see what prescribers are

23   the retail pharmacies selling to, or what -- what

24   prescribers are writing prescriptions for your drugs

25   and being filled at those retail pharmacies, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   What the IMS data provided was dispensing

 2   data from the pharmacy, how many dosage units of a

 3   particular drug was dispensed.  It did not provide

 4   prescriber data to review.

 5          Q.   Are you -- are you not aware, sir, that

 6   IMS data can provide prescriber-level data to you?

 7          A.   I'm answering the question to what I

 8   reviewed --

 9          Q.   Okay.

10          A.   -- and what I referred to on my document

11   that you referenced.

12          Q.   Okay.

13          A.   Dispensing data.

14          Q.   All right, sir.  So these are all things

15   that are being done to address this kind of -- what

16   are they, gaps, I think that are highlighted above?

17   DEA identified gaps associated with your suspicious

18   order monitoring program, right?

19               MS. VANNI:  Object to the form.

20               THE WITNESS:  If that's what it says.  I

21        have to read it again.  Where is it?

22   BY MR. BUCHANAN:

23          Q.   There it is right there.  Identify gaps,

24   right?

25          A.   Yes.  That's what it says.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.   So when you were answering questions about
2    audits of SOPs or SOMS programs, it certainly was not
3    this meeting with the DEA in 2013 that led to the
4    company creating a suspicious order monitoring
5    program, right?
6              MS. VANNI:  Objection.
7              THE WITNESS:  It was an audit conducted
8         while I was the SOMS manager.
9    BY MR. BUCHANAN:
10        Q.   Okay.  So after you fixed all the issues
11   with the current process and the billions and
12   billions of pills being sold and all the bodies
13   piling up, right?
14             MS. VANNI:  Objection.
15             THE WITNESS:  After I started with
16        QualiTest, September 30th, 2013.
17   BY MR. BUCHANAN:
18        Q.   Okay.  You can set that one aside.
19   Actually -- all right.
20             MR. BUCHANAN:  Could I please have 573?
21        Mark that as the next in order.  What are we up
22        to, 43?
23             MR. SEIGEL:  Brantley 43.
24             THE WITNESS:  Excuse me:  Can I ask for
25        some more water, or get up --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   Whatever you need.

 3        A.   -- and get some more water?

 4        Q.   If you need to stand or stretch, it's been

 5   a long day, and --

 6        A.   I just want to get some more water,

 7   please.

 8        Q.   I'd like to treat you like the guest of

 9   honor, sir.  Do you need a minute?

10        A.   I just need a bottle, yeah.  Thank you.

11             We can go ahead.  I didn't need a break.

12   I just wanted to ask for some water.

13        Q.   No worries.  And -- and I'm pretty close.

14   Okay?

15             MR. BUCHANAN:  All right.  What did we

16        mark that as?  43?

17             MR. SEIGEL:  43.

18             MR. BUCHANAN:  Okay, Evan, could you

19        please pull up 573, please.

20        (Cardinal-Brantley 43 was marked for

21   identification.)

22   BY MR. BUCHANAN:

23        Q.   Just asking you, sir, first of all, this

24   is from that March 2013 period of time.  You

25   mentioned Ms. Hernandez.  She was a person who was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    involved in suspicious orders, at least in terms of

 2    DEA compliance, before you got there, right?

 3              MS. VANNI:  Objection.

 4              THE WITNESS:  She was the director of DEA

 5         compliance.

 6    BY MR. BUCHANAN:

 7         Q.   Got it.  Okay.  Who was the suspicious

 8    order -- the SOM manager before you became it?

 9         A.   I don't know if there was a SOM manager.

10         Q.   Okay.  Well, that makes sense.  They

11    didn't have a SOM program before you got there,

12    right?

13              MS. VANNI:  Objection.

14              THE WITNESS:  I believe there was a SOMS

15         program in place.

16    BY MR. BUCHANAN:

17         Q.   Okay.  We just saw a document that talked

18    about that, right?

19              MS. VANNI:  Objection.

20              THE WITNESS:  We saw a document written by

21         someone that made some statements -- thank

22         you -- that made statements, yes.

23    BY MR. BUCHANAN:

24         Q.   Okay.  Right.  And we just read the

25    executive briefing talking about creating a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious order monitoring program, right?  Do you

 2    recall that document we just looked at, sir?

 3              MS. VANNI:  Object to the form.

 4              THE WITNESS:  I do.

 5              MR. BUCHANAN:  Okay.  All right, Evan,

 6        could you please go to 573.6.

 7    BY MR. BUCHANAN:

 8        Q.   So this is an integrated compliance risk

 9    assessment.  You see that?

10        A.   Yes.

11        Q.   At the top?  And it talks about the

12    various areas, and -- and the risk name and the risk

13    description and the composite risk, and there's an

14    "H" and a big red -- see the red on the screen, sir?

15    Or on your paper, either way?  See it?

16        A.   Yes.

17        Q.   Okay.  Cool.  Let's go down to

18    regulatory -- it's like the third row.  It says "DEA,

19    suspicious order monitoring."  You see that?

20        A.   Yes.

21        Q.   It says, "Monitoring reporting not meeting

22    all requirements.  Inconsistency across Endo."

23              Do you see that?

24        A.   Yes.

25              MR. BUCHANAN:  And then -- Evan, could you
```

 1          blow up, please, you know, the heading and the

 2          -- for each of the columns.  That will help me

 3          out.  There you go.  Let's pull that above.

 4          Okay.

 5    BY MR. BUCHANAN:

 6          Q.   Does that make it easier to read it, sir?

 7    You can kind of see the headings that go with things.

 8               So the risk name is what, that we've blown

 9    up for you?

10          A.   The risk name is suspicious order

11    monitoring.

12          Q.   And the risk description is you're

13    monitoring reporting's not meeting all requirements.

14    That's what it says, right?

15          A.   That's what it says.

16          Q.   Composite risk:  What color did they put

17    in the box?

18          A.   Red.

19          Q.   And what letter did they put in the box?

20          A.   H.

21          Q.   Okay.  Potential impact:  What's written

22    there?

23          A.   "Fines.  Required action with oversight.

24    Cease selling to certain accounts."

25          Q.   Okay.  You know, how about as a potential

Highly Confidential - Subject to Further Confidentiality Review

```
 1    impact, that we are not keeping the circle closed, in

 2    the closed system of controlled substances?  How

 3    about that as a potential impact?

 4              MS. VANNI:  Object to form.

 5    BY MR. BUCHANAN:

 6         Q.   We can agree that the absence of measures

 7    to prevent diversion jeopardizes the closed system.

 8    True?

 9              MS. VANNI:  Objection.

10              THE WITNESS:  The absence, but there is

11         another document that stated that it -- that

12         there was a -- a system in place.  So we have

13         two documents; one stating that there was a

14         system from the -- from Mr. Shaffer's

15         PowerPoint.  Then there was this last document,

16         written by another individual, or a set of

17         individuals, that stated otherwise.  So there's

18         conflicting --

19              MR. BUCHANAN:  Move to strike.

20    BY MR. BUCHANAN:

21         Q.   Okay?

22         A.   Okay.

23         Q.   If someone is not implementing effective

24    controls against diversion, we jeopardize the closed

25    system that's supposed to exist as part of a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    registration or a registrant's registration for

 2    controlled substances, true?

 3              MS. VANNI:  Objection.

 4              THE WITNESS:  If someone is not

 5         implementing a -- a system, they are not

 6         complying with the statute nor the regulation.

 7    BY MR. BUCHANAN:

 8         Q.   Okay.  Jeopardizing the closed system.

 9    Can you agree with me on that?

10              MS. VANNI:  Objection.

11              THE WITNESS:  Again, I --

12    BY MR. BUCHANAN:

13         Q.   You can't -- you can't go there, huh?

14         A.   As I've done all day --

15              MS. VANNI:  Objection.

16              THE WITNESS:  -- I stick with the statute

17         and the regulation.

18    BY MR. BUCHANAN:

19         Q.   Well, let's -- let's just now take a step

20    back now.  As a human being -- okay?  As a human

21    being aware that there is a product that is deemed so

22    concerning that it's got to be kept in a vault in a

23    warehouse, would you agree that the handlers and the

24    shippers and the customers need to take measures to

25    ensure that it stays within the closed system?  Would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you agree with that?

 2              MS. VANNI:  Objection.

 3              THE WITNESS:  That's what the regulation

 4        and the statute states.

 5   BY MR. BUCHANAN:

 6        Q.   So you can't just say it as a matter of a

 7   reasonable company, a company dealing with something

 8   really dangerous, should make sure that it knows it's

 9   dealing with customers that are going to handle it

10   with the same level of care and with the same intent

11   for which that product was made?  You can't agree

12   with me on that, sir?

13              MS. VANNI:  Objection.

14              THE WITNESS:  Since 9:00 o'clock this

15         morning, I have consistently stated the statute

16         and the regulation, and I state that again.

17         21 CFR 1301.74(b), the registrant shall design

18         and implement a system to identify suspicious

19         orders and report those orders to the DEA.

20         Orders include orders of unusual size,

21         frequency, or that deviate substantially from a

22         normal pattern.

23              That has been my answer since

24         9:00 o'clock, and that is my answer until 9:00,

25         10:00, 12:00 o'clock, whenever we go.
```

```
 1   BY MR. BUCHANAN:

 2        Q.   Okay, sir.  And you keep citing the

 3   suspicious order regulation --

 4        A.   And the statute that you've cited.

 5        Q.   Okay.  And the statute is to have

 6   effective controls against diversion, right?

 7        A.   Correct.

 8        Q.   Okay.  That is what a registrant shall do,

 9   right?

10        A.   To be in compliance with the statute and

11   the regulation, yes.

12        Q.   Yeah, I mean, that's -- that's right.  I

13   mean, that's the concept, the closed system.  To be

14   in compliance, you got to have effective controls

15   against diversion.  Agreed?

16        A.   To be in compliance with the statute and

17   regulation --

18        Q.   Okay.

19        A.   -- yes.

20        Q.   All right.  So we can agree here that it

21   doesn't say anything, in terms of potential impact,

22   about breaking the closed system; we can agree it

23   doesn't say that, right?

24             MS. VANNI:  Objection.

25             THE WITNESS:  What does not say that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:
 2        Q.   This -- what's blown up to your screen,
 3   sir, from Exhibit 42, talking about potential impact
 4   of not meeting requirements with regard to suspicious
 5   order monitoring.  We can agree that doesn't say that
 6   diversion could occur?  We agree it's not listed
 7   there, right?
 8             MS. VANNI:  Objection.
 9             THE WITNESS:  It says, "Fines.  Required
10        action with oversight.  Cease selling to certain
11        accounts."
12   BY MR. BUCHANAN:
13        Q.   Please stay with my question at this point
14   in the day, sir.  I'm asking you, we can agree it
15   doesn't say, "could increase diversion"?
16             MS. VANNI:  Objection.
17   BY MR. BUCHANAN:
18        Q.   Can we agree it doesn't say that, sir?
19        A.   That -- that section that you have blown
20   up does not say what you just stated.
21        Q.   Thank you.  Can we agree that it doesn't
22   say "may lead to additional deaths"?
23             MS. VANNI:  Objection.
24   BY MR. BUCHANAN:
25        Q.   Can we agree it doesn't say that?
```

```
 1                  MS. VANNI:  Objection.

 2                  THE WITNESS:  That section that is blown

 3       up does not say what you just stated.

 4   BY MR. BUCHANAN:

 5       Q.   Can we agree that it doesn't say "may lead

 6   to additional addicts" --

 7                  MS. VANNI:  Objection.

 8   BY MR. BUCHANAN:

 9       Q.   -- "and abusers"?

10                  MS. VANNI:  Objection.

11                  THE WITNESS:  The section that is blown up

12       does not say what you just stated.

13   BY MR. BUCHANAN:

14       Q.   Right.  Fines.  Fines are -- that's money?

15                  MS. VANNI:  Objection.

16                  THE WITNESS:  There are monetary fines.

17   BY MR. BUCHANAN:

18       Q.   Okay.  That's what I thought.

19                  All right.  Evidence of risk includes both

20   DEA regulations and observations from inspection,

21   right?

22       A.   That's what it states.

23       Q.   Okay.  Then it looks like what happened

24   there with Cardinal caught the eye here now of some

25   executives, right?
```

```
 1              MS. VANNI:  Objection.

 2              THE WITNESS:  It does list Cardinal.

 3    BY MR. BUCHANAN:

 4         Q.    Okay.  The death maps didn't catch the

 5    executives' attention, huh?

 6              MS. VANNI:  Objection.

 7    BY MR. BUCHANAN:

 8         Q.    Just the fines?

 9              MS. VANNI:  Objection.

10    BY MR. BUCHANAN:

11         Q.    And suspensions?

12              MS. VANNI:  I will note at this point that

13         this recross is going beyond my direct, and I

14         just note my objection for the record.  This is

15         supposed to be minute for minute, and we have

16         far exceeded that at this point.

17              MR. BUCHANAN:  It's -- it's a 96-minute

18         examination conducted by defense counsel.  And I

19         will not use anything close to that.

20              MS. VANNI:  I didn't use 96 minutes.

21              MR. BUCHANAN:  Oh, it's -- I don't think

22         that's way it works, Counsel.

23              MS. VANNI:  Note my objection.

24              THE WITNESS:  I'm sorry.  Can you repeat

25         the question?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. BUCHANAN:  Can you read it back,

 2        please.

 3                 (Whereupon the Court Reporter read the

 4                 previous question.)

 5                 MS. VANNI:  Objection.

 6     BY MR. BUCHANAN:

 7        Q.   Do you see any reference here, sir, in the

 8     evidence of risk, to the death maps and the

 9     escalating rate of overdose deaths?

10                 MS. VANNI:  Objection.

11                 THE WITNESS:  I do not see in the

12         highlighted area any reference to as you call a

13         death map.

14     BY MR. BUCHANAN:

15        Q.   How about just escalating overdose deaths?

16                 MS. VANNI:  Objection.

17                 THE WITNESS:  It does not say what you

18         just stated.

19     BY MR. BUCHANAN:

20        Q.   How about escalating abuse?

21                 MS. VANNI:  Objection.

22                 THE WITNESS:  It does not say that.

23     BY MR. BUCHANAN:

24        Q.   Okay.  I have some questions, sir, about

25     those suspicious order monitoring SOPS.  I had them
```

1    on the screen.

2              MR. BUCHANAN:  You can take that down,

3       Evan.

4    BY MR. BUCHANAN:

5         Q.   And I think counsel for Par walked you

6    through the details of those; you recall that?

7              MR. BUCHANAN:  Can I have 614, please.

8              THE WITNESS:  What document are we

9       referring to again?

10   BY MR. BUCHANAN:

11        Q.   I'm sorry.  Do you remember -- I think

12   it's 32.

13             Do you remember the SOPs that you were

14   involved with after you got to QualiTest?

15        A.   Oh, the SOPS that --

16        Q.   Okay.  I'm not going to show you those,

17   but I remember you discussed those with --

18        A.   Yes.

19        Q.   -- counsel?

20        A.   I do remember the SOPS --

21        Q.   Okay.

22        A.   -- discussing them.

23        Q.   I -- I think you said one of the things

24   you were going to do is you were going to go out and

25   get the suspicious order monitoring programs of your

```
 1    customers.  Is that right?

 2         A.   That is something that we asked for on the

 3    questionnaire, and that is something that I verified

 4    during a site visit.

 5         Q.   And my understanding of your testimony,

 6    sir, was that you wouldn't ship if you didn't have

 7    that information, right?  Because you needed

 8    confidence that your customers had good SOM programs,

 9    right?

10         A.   After we gave the customer a -- a period

11    of time, if they did not provide the information that

12    I had asked for, then the SOP states that we would

13    not ship to that customer.

14         Q.   Right.  Right.  And so how much time did

15    you give them to give you their SOP program?

16         A.   I don't recall.  It could have been on a

17    case-by-case basis.

18         Q.   Okay.

19         A.   I don't -- I don't know if it was spelled

20    out.

21         Q.   So it wouldn't have been appropriate to be

22    shipping to your customers who just were kind of

23    dodging your request on the SO -- the SOM program,

24    would it?

25              MS. VANNI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  If I asked the customer
 2        about their SOMS program, then I needed to know
 3        that they had a SOMS program, so I needed
 4        something.
 5   BY MR. BUCHANAN:
 6        Q.   Right.  Okay.  So can we please pass the
 7   counsel -- what is this?
 8                MR. SEIGEL:  Brantley 44.
 9        (Cardinal-Brantley 44 was marked for
10   identification.)
11   BY MR. BUCHANAN:
12        Q.   Sir, this is my last exhibit with you
13   today, unless examining counsel has further questions
14   for you.
15                So this is an update -- this is in 2014,
16   right?  An e-mail from you to Tracey Hernandez?  Look
17   at the cover page.
18        A.   This is an e-mail to Tracey Hernandez.
19        Q.   All right, great.  And you're attaching --
20   the subject is "QualiTest SOM update," attach a
21   PowerPoint.  Right?
22        A.   Yes.
23        Q.   Okay.  And let's go to -- if we could,
24   it's dot 11 in the top right corner, sir.
25                I'm sorry.  Actually we're going to use --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and this is so, what, about six months after you sent

 2    the letters out, that Ms. Hernandez's letter that we

 3    saw, that I referenced again from October of 2013?

 4          A.    I believe that letter was dated sometime

 5    in October --

 6          Q.    Right.  And we're --

 7          A.    -- 2013.

 8          Q.    -- we're now in April, right?

 9          A.    This is April of 2014, yes.

10          Q.    All right.  And so let's get to -- where

11    is it?  Nothing is happening quick at this hour.

12                MR. BUCHANAN:  Point 9, Evan.

13                THE WITNESS:  I'm sorry.  What --

14    BY MR. BUCHANAN:

15          Q.    I'm sorry.  I was talking to our trial

16    tech.

17                "Wholesaler chain."  Do you see that?

18          A.    Yes.

19          Q.    Says, "The following customers have not

20    provided SOM information."  Do you see that?

21          A.    Yes.

22          Q.    Ahold, Drogueria Betances, F.W Kerr,

23    Kinney Drugs, Meijer, and Weis Markets.  Right?

24          A.    Yes.

25          Q.    This is six months after your letter went
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    out with the questionnaire, right?

 2         A.   This is --

 3              MS. VANNI:  Object to the form.

 4              THE WITNESS:  This is after the e-mail was

 5         sent from Tracey to --

 6    BY MR. BUCHANAN:

 7         Q.   Okay.

 8         A.   -- to me, was it?  Or was that an e-mail

 9    to the customer?  Or was that an e-mail from Tracey

10    to myself?

11         Q.   Well, the letter was addressed to the

12    customer.  You recall seeing that from October 2013?

13         A.   I -- I do.  I just don't recall if that

14    was the e-mail from her to me or her to a customer.

15         Q.   Okay.  So we're now about six months out,

16    and October 2013 letter --

17              MS. VANNI:  Well, I note that this --

18              MR. BUCHANAN:  After six months -- I'm

19         sorry?

20              MS. VANNI:  I just want to note that this

21         document that you're referring to, it's 14.9, if

22         I'm looking at the right one, right?

23              MR. BUCHANAN:  Yes.

24              MS. VANNI:  It's -- has a water mark of

25         2012 QualiTest Pharmaceuticals.
```

```
 1              MR. BUCHANAN:  I'm assuming that's a -- I
 2         noted that, Counsel.  I'm assuming that's a
 3         production artifact, because the e-mail at the
 4         front -- and we -- we can agree that
 5         Mr. Brantley was not there in 2012, true?
 6              MS. VANNI:  That's correct.
 7              MR. BUCHANAN:  Okay.
 8    BY MR. BUCHANAN:
 9         Q.   And you were forwarding an SOM update,
10    correct?
11         A.   Correct.
12         Q.   Okay.  And this is April 2014, from the
13    covering e-mail, 14.1, right?  From the cover of
14    the -- cover of the PowerPoint.  You see that, sir?
15         A.   Yes, correct.
16         Q.   And sometimes those PowerPoint footnotes
17    can be tough to get rid of.
18              All right.  So let's go forward now, back
19    to 614.9.  And we see F.W. Kerr still hasn't provided
20    you with SOM information, right?
21         A.   According to this -- this slide, yes.
22         Q.   So notwithstanding what was in your 2013
23    SOPs, as of April 2014, you still had customers that
24    had not provided you with SOM information, right?
25              MS. VANNI:  Object to the form.
```

```
 1              THE WITNESS:  According to this
 2         PowerPoint, yes.  But I do not know when the
 3         questionnaires were sent to the customers.
 4         That's why I was asking about that e-mail, was
 5         that from Tracey to me or Tracey to a customer.
 6         I don't know when the questionnaires were sent
 7         to the customer.
 8    BY MR. BUCHANAN:
 9         Q.  Well, one of the things you were supposed
10    to be doing with that SOP, sir, was knowing your
11    customer, in the first instance, right?
12              MS. VANNI:  Object to the form.
13              THE WITNESS:  That is part of the thing
14         with the SOP was Know Your Customer.
15    BY MR. BUCHANAN:
16         Q.  I think you called out, in examination
17    with counsel for Par and QualiTest, that one of the
18    important things you were looking for was, do they
19    have an SOM program, right?
20         A.  That is correct.
21         Q.  To maintain that closed system, right?
22         A.  As a part of our SOM system, I needed the
23    SOMS information, yes.
24         Q.  Can we agree, sir, that it would not have
25    been compatible with your SOPs to be shipping drug
```

1    to -- drugs to wholesalers who didn't have SOM

2    programs?

3            MS. VANNI:  Object to form.

4    BY MR. BUCHANAN:

5        Q.   Can we agree?

6        A.   Again, I do not know when the

7    questionnaires were sent to the customers.

8        Q.   My question is more fundamental.  It would

9    not have been appropriate, under your SOPs, to be

10   selling drugs to wholesalers and distributors that

11   did not have a suspicious order monitoring program.

12   True?

13           MS. VANNI:  Object to form.

14           THE WITNESS:  It would not have been in

15       accordance with the SOP.

16   BY MR. BUCHANAN:

17       Q.   Okay.  And you all were still shipping to

18   Kerr during this period of time, right?

19           MS. VANNI:  Object to form.

20           THE WITNESS:  This does not state that

21       Kerr did not have a SOM program, just that I did

22       not have information at the time.  And again, I

23       note, I do not know when the questionnaire was

24       sent to Kerr, or any customer.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BUCHANAN:

 2        Q.   You were pestering quite a bit to get it

 3   from Kerr, weren't you?  Remember that?

 4        A.   If I did not --

 5             MS. VANNI:  Object to form.

 6             THE WITNESS:  If I did not have a

 7        questionnaire, I -- I continually asked the

 8        customers for the questionnaire.

 9   BY MR. BUCHANAN:

10        Q.   Right.  So we can look in the company's

11   order system, you'd agree, sir, and we can see

12   whether or not you were shipping orders to Kerr

13   during this point in time, true?

14        A.   Yes.

15        Q.   And we could look to see in your system,

16   sir, when you actually got SOM program information,

17   right?  You captured that, right?

18        A.   When I got SOM --

19             MS. VANNI:  Object to the form.

20             THE WITNESS:  -- program information from

21        these customers?

22   BY MR. BUCHANAN:

23        Q.   Yeah.

24        A.   It should be in the system somewhere.

25        Q.   Right.  Right, because you wanted to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    ready in the event you had to actually see the

2    underlying data, right?

3              MS. VANNI:  Objection.

4    BY MR. BUCHANAN:

5         Q.   If somebody asked?

6         A.   I would have filed the information when I

7    received it.

8         Q.   Because you wouldn't want to just have a

9    paper program, with SOPs that looked pretty that

10   weren't really filed -- followed, right?

11             MS. VANNI:  Object to the form.

12             THE WITNESS:  Again, we had SOPs.  I do

13        not know when the questionnaires were sent to

14        the customer.  I don't know -- I do not know how

15        much time had -- had elapsed prior to me

16        providing this PowerPoint.

17   BY MR. BUCHANAN:

18        Q.   Do you remember getting leaned on by the

19   salesfolks about shipping orders to Kerr even though

20   you didn't have information on their SOP program?

21             MS. VANNI:  Object to the form.

22   BY MR. BUCHANAN:

23        Q.   When you were trying to hold it up, sales

24   was leaning on you to release it?  Do you remember

25   that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. VANNI:  Object to the form.

 2                  THE WITNESS:  I -- I don't recall specific

 3          e-mails or instances with the sales.

 4   BY MR. BUCHANAN:

 5          Q.   Well, you were still having interactions

 6   with sales even after these SOPs, right?

 7                  MS. VANNI:  Object to the form.

 8                  THE WITNESS:  I consistently had

 9           interactions with sales, yes.

10   BY MR. BUCHANAN:

11          Q.   Right.  And you remember the salesfolks

12   leaning on you, sir, to release Kerr's order even

13   though you didn't have the SOM program for them?  Do

14   you remember that, sir?

15          A.   I do not remember that.

16          Q.   Do you remember identifying that they had

17   several pharmacies, several pharmacies that had been

18   identified as problematic pharmacies that they were

19   selling to?  Do you remember that?

20          A.   I don't remember the specifics --

21          Q.   Do you remember --

22          A.   -- about that.

23          Q.   -- getting leaned on by the sales team to

24   release Kerr orders notwithstanding your SOP?

25                  MS. VANNI:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Again, I answer just like I
 2        did before:  I do not remember that.
 3   BY MR. BUCHANAN:
 4        Q.  So from your time at QualiTest and Par,
 5   sir, could you tell me what systems you'd go and look
 6   in to see how many orders you shipped, how many of
 7   those oxycodones, how many of those hydrocodones you
 8   shipped to Kerr, while they didn't give you any
 9   assurance they even had a suspicious order monitoring
10   program?
11                MS. VANNI:  Objection.
12                THE WITNESS:  I would have to look at
13        Kerr's questionnaire to see if they had checked
14        the box, because I asked, "Do you have a
15        suspicious order monitoring program, yes or no?"
16        And they were checked.
17                Then below that, I would ask for an
18        example, either an SOP or a written summary.  So
19        Kerr could have stated they had a program and
20        had not yet provided a sample or SOP of that
21        program, for clarification.
22   BY MR. BUCHANAN:
23        Q.  My question to you, sir, is what systems
24   would you go to look at to see the orders that were
25   shipped to Kerr during this period of time.  The name
```

Highly Confidential - Subject to Further Confidentiality Review

1  of it.

2      A.   All of the data was stored in the -- the

3  SOM tool, the algorithm.

4      Q.   Okay.  And it's a discernible fact in that

5  SOM tool, sir, whether orders were shipped in the

6  presence or absence of due diligence information

7  clearing the customer of red flags, right?

8          MS. VANNI:  Object to the form.

9          THE WITNESS:  No, that -- that SOM system

10      just stored order data.  That -- it was just a

11      repository for order data.  It didn't have

12      anything --

13  BY MR. BUCHANAN:

14      Q.   Where is the due diligence data, sir?

15      A.   That would be in the customer file.

16      Q.   Okay.  And you had a -- I assume that

17  suspicious -- excuse me, the SOM department, or the

18  SOM group, had an area where it kept its information

19  on each of the customers, right?

20      A.   Yes.  I had a folder for each customer,

21  and I believe it was also stored electronically.  But

22  I had a folder in a file cabinet --

23      Q.   Oh, you had a physical folder?

24      A.   I had a physical folder in a file cabinet

25  that stored all the questionnaires.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Who did you hand all that stuff off to

 2     when you left?

 3          A.   When I left, the team that was in place

 4     had access to all of my files.  And it -- again, it

 5     was also stored electronically.

 6          Q.   If you could just give us some names,

 7     because that will just help me if I have to follow up

 8     on it.

 9          A.   Oh.  The members of team were Sherry Price

10     and Amy Cooper.

11          Q.   Okay.  Not Tracey Hernandez?

12          A.   Tracey Hernandez was not there when I

13     left.

14          Q.   She had left?

15          A.   She had left previously, yes.

16          Q.   Okay.  I don't have any further questions.

17     Thank you.

18               VIDEOGRAPHER:  Go off record?

19               MR. BUCHANAN:  Off the record.

20               VIDEOGRAPHER:  We're going off record.

21        The time is 9:35.

22               MR. PYSER:  Nothing further.

23               MS. VANNI:  Nothing further for me.

24               MR. BUCHANAN:  Thank you, sir.

25               Let's stay on the stenographic record and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        conclude the deposition.
 2             MR. PYSER:  I have one request on the
 3        record:  Any document or video or any
 4        demonstrative that was used during the day, I'd
 5        like to be marked as an exhibit, included in the
 6        record, so that both defense counsel and
 7        Plaintiffs' counsel have access to it.
 8             MR. BUCHANAN:  Just so we're clear, I
 9        believe demonstratives that were used by
10        Plaintiffs' counsel were all shown and burned
11        into -- they're preserved permanently in the
12        video record.  So you'll have a copy --
13             MR. PYSER:  As long as there is a record
14        of it.
15             MR. BUCHANAN:  They are preserved in the
16        video record.  Drawings, handwriting,
17        professional stuff is all burned into the video
18        feed.  So you will have that.
19             MR. PYSER:  Okay.  Thank you.
20             MR. BUCHANAN:  That concludes the
21        deposition.  Defense counsel has indicated no
22        further questions.  Everyone's got their
23        reservations.
24             And thank you, sir, for your time.  We
25        appreciate it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              (The deposition was concluded

2               at 9:37 p.m.)

3              (Signature reserved.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    STATE OF NORTH CAROLINA

2    COUNTY OF MECKLENBURG

3

4           I, Karen K. Kidwell, RMR, CRR, CLR, in and

5    for the State of North Carolina, do hereby certify that

6    there came before me on Tuesday, November 27, 2018,

7    ERIC BRANTLEY, who was by me duly sworn to testify to

8    the truth and nothing but the truth of his knowledge

9    concerning the matters in controversy in this cause;

10   that the witness was thereupon examined under oath, the

11   examination reduced to typewriting under my direction,

12   and the deposition is a true record of the testimony

13   given by the witness.

14          I further certify that I am neither attorney

15   or counsel for, nor related to or employed by, any

16   attorney or counsel employed by the parties hereto or

17   financially interested in the action.

18          This the 29th day of November, 2018.

19

20

21          _____

            Karen K. Kidwell, RMR, CRR, CLR

22          Notary Public #19971050142

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, ERIC BRANTLEY, do hereby certify that I

 4    have read the foregoing pages and that the same is a

 5    correct transcription of the answers given by me to

 6    the questions therein propounded, except for the

 7    corrections or changes in form or substance, if any,

 8    noted in the attached Errata Sheets.

 9

10

11         _____

                ERIC BRANTLEY        Date

12

13

14

15         Subscribed and sworn to before me this ____ day

16    of_____, 20____.

17

18

           _____

19                Notary Public

20    My Commission Expires:

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                    E R R A T A

  2          VIDEOTAPED DEPOSITION OF ERIC BRANTLEY

  3    PAGE     LINE        CHANGE

  4    _____    _____    _____

  5    REASON:    _____

  6    _____    _____    _____

  7    REASON:    _____

  8    _____    _____    _____

  9    REASON:    _____

 10    _____    _____    _____

 11    REASON:    _____

 12    _____    _____    _____

 13    REASON:    _____

 14    _____    _____    _____

 15    REASON:    _____

 16    _____    _____    _____

 17    REASON:    _____

 18    _____    _____    _____

 19    REASON:    _____

 20    _____    _____    _____

 21    REASON:    _____

 22    _____    _____    _____

 23    REASON:    _____

 24    _____

 25    (DATE)                      (SIGNATURE)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         _ _ _ _ _ _ _

 2                         LAWYER'S NOTES

 3                         _ _ _ _ _ _ _

 4      PAGE     LINE      _____

 5      _____    _____     _____

 6      _____    _____     _____

 7      _____    _____     _____

 8      _____    _____     _____

 9      _____    _____     _____

10      _____    _____     _____

11      _____    _____     _____

12      _____    _____     _____

13      _____    _____     _____

14      _____    _____     _____

15      _____    _____     _____

16      _____    _____     _____

17      _____    _____     _____

18      _____    _____     _____

19      _____    _____     _____

20      _____    _____     _____

21      _____    _____     _____

22      _____    _____     _____

23      _____    _____     _____

24      _____    _____     _____

25      _____    _____     _____
```