Highly Confidential - Subject to Further Confidentiality Review

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -
November 29, 2018
- - -

        Videotaped deposition of
KANITHA BURNS, taken pursuant to notice,
was held at the Topnotch Resort, 4000
Mountain Resort, Stowe, Vermont,
beginning at 9:21 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.
                - - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1    APPEARANCES:
 2
      THE LANIER FIRM
 3    BY:  EVAN M. JANUSH, ESQ.
           ZARAH LEVIN-FRAGASSO, ESQ.
 4         IAN S. MILLICAN, ESQ.
      126 East 56th Street
 5    6th Floor
      New York, New York 10022
 6    (212) 421-2800
      evan.janush@lanierlawfirm.com
 7    zarah.levin-fragasso@lanierlawfirm.com
      ian.millican@lanierlawfirm.com
 8    Representing the Plaintiffs
 9
10    O'MELVENY & MYERS, LLP
      BY:  SABRINA H. STRONG, ESQ.
11         LAURA E. LORENZ, ESQ.
      400 South Hope Street, 18th Floor
12    Los Angeles, California 90071
      (213) 430-6665
13    sstrong@omm.com
      llorenz@omm.com
14    Representing the Defendants, Janssen
      and Johnson & Johnson and the
15    Witness
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 3

```
 1      TELEPHONIC APPEARANCES:
 2
 3      HUGHES HUBBARD & REED, LLP
        BY:  TINA M. SCHAEFER, ESQ.
 4      2345 Grand Boulevard
        Kansas City, Missouri 64108
 5      (816) 709-4159
        tina.schaefer@hugheshubbard.com
 6      Representing the Defendant, UCB,
        Inc.
 7
 8      WILLIAMS & CONNOLLY, LLP
        BY:  JOEL S. JOHNSON, ESQ.
 9      725 12th Street, NW
        Washington, D.C. 20005
10      (202) 434-5148
        jjohnson@wc.com
11      Representing the Defendant, Cardinal
        Health
12
13      ARNOLD & PORTER KAYE SCHOLER, LLP
        BY: CAITLIN MARTINI MIKA, ESQ.
14      70 West Madison Street, Suite 4200
        Chicago, Illinois 60602
15      (312) 583-2434
        Caitlin.mika@arnoldporter.com
16      Representing the Defendants, Endo
        Health Solutions; Endo
17      Pharmaceuticals, Inc.; Par
        Pharmaceutical Companies, Inc. f/k/a
18      Par Pharmaceutical Holdings, Inc.
19
        PELINI CAMPBELL & WILLIAMS
20      BY:  WILLIAM M. SHACKELFORD, ESQ.
        8040 Cleveland Avenue NW
21      Suite 400
        North Canton, Ohio 44720
22      (330) 305-6400
        wms@pelini-law.com
23      Representing the Defendant,
        Prescription Supply, Inc.
24
```

Page 4

```
 1        TELEPHONIC APPEARANCES:   (Cont'd.)
 2
          FOX ROTHSCHILD, LLP
 3        BY: ADAM BUSLER, ESQ.
          1301 Atlantic Avenue
 4        Midtown Building, Suite 400
          Atlantic City, New Jersey 08401
 5        (609) 348-4515
          Abusler@foxrothschild.com
 6        Representing the Defendant, Validus
          Pharmaceuticals
 7
 8        REED SMITH, LLP
          BY:  CHRISTIAN SAUCEDO, ESQ.
 9        Three Logan Square
          1717 Arch Street, Suite 3100
10        Philadelphia, Pennsylvania 19103
          (215) 851-8226
11        csaucedo@reedsmith.com
          Representing the Defendant,
12        Amerisource Bergen Drug Corporation
13
          JONES DAY
14        MEREDITH KINCAID, ESQ.
          1420 Peachtree Street, NE
15        Suite 800
          Atlanta, Georgia 30309
16        (404) 581-8043
          Mkinkaid@jonesday.com
17        Representing the Defendant, Walmart
18
19        ALSO PRESENT:
20        VIDEOTAPE TECHNICIAN:
21           David Kim
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 5

```
 1                    -  -  -
 2                I N D E X
 3                    -  -  -
 4

    Testimony of:
 5                        KANITHA BURNS
 6        By Mr. Janush          12, 388
 7        By Ms. Strong         368, 395
 8
 9                    -  -  -
10            E X H I B I T S
11                    -  -  -
12
```

```
13   NO.          DESCRIPTION          PAGE
14   Janssen
     Burns-1      LinkedIn Profile     40
15                Kanitha Burns
16   Janssen
     Burns-2      Excel Spreadsheet    44
17                2012 Brand Investment
                  Summary
18                JAN 00119068
19   Janssen
     Burns-3      Pain Marketing       118
20                Team Roles/
                  Responsibilities
21                As of February 2013
                  JAN-MS-00672183-85
22
23
24
```

Page 6

```
 1                        -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5     NO.             DESCRIPTION           PAGE
 6     Janssen
       Burns-4         Slide Deck           125
 7                     Nucynta
                       2013 Business Plan
 8                     Review
                       JAN-MS-00749778
 9
       Janssen
10     Burns-5         E-mail 6/19/13       172
                       Subject, Key Insights
11                     And Key Business
                       Questions
12                     & Attachment
                       JAN-MS-02386918-19
13
       Janssen
14     Burns-6         Nucynta Target       194
                       Optimization
15                     2/13/14
                       JAN-MS-02919928
16
       Janssen
17     Burns-7         Slide Deck           226
                       Pain Force
18                     JAN-MS-00772224
19     Janssen
       Burns-8         Creative Brief       235
20                     JAN-MS-00772413
21     Janssen
       Burns-9         Slide Deck           242
22                     Pain Business Review
                       4/23/14
23                     JAN-MS-002389698
24
```

Page 7

```
 1                        -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5     NO.             DESCRIPTION              PAGE
 6     Janssen
       Burns-10        E-mail Thread           262
 7                     2/27/13
                       Subject, Nucynta ER
 8                     Summary Page
                       And Leave Behind Piece
 9                     JAN-MS-00753700-01
10     Janssen
       Burns-11        Slide Deck              268
11                     Burden of Pain
                       JAN-MS-00771526
12
       Janssen
13     Burns-12        Risk Management         277
                       REMS for Tapentadol ER
14                     JAN-MS-01057540-78
15     Janssen
       Burns-13        E-mail Thread           312
16                     2/26/13
                       Subject, Meeting
17                     Presentation on ADF
                       & Attachment
18                     JAN-MS-02385922-24
19     Janssen
       Burns-14        E-mail Thread           316
20                     7/11/14
                       Subject, Updated Script
21                     For Monday-MRC Approved
                       JAN-MS-00758697-02
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 8

```
 1                    - - -
 2          E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5    NO.            DESCRIPTION            PAGE
 6    Janssen
      Burns-15       E-mail Thread         331
 7                   4/16/13
                     Subject, INTAC
 8                   Technology in NER
                     Asset
 9                   JAN-MS-00760716-17
10    Janssen
      Burns-16       E-mail Thread         335
11                   7/11/14
                     Subject, Review RADARS
12                   And Inflexxion Data
                     JAN-MS-00758691
13
      Janssen
14    Burns-17       Prescribe Responsibly 337
                     JAN-MS-00766218
15
      Janssen
16    Burns-18       E-mail Thread         339
                     1/3/13
17                   Subject, Nucynta App
                     JAN-MS-00748937-38
18
      Janssen
19    Burns-19       E-mail, 1/17/13       346
                     Subject Prescribe
20                   Responsibly Description
                     For App
21                   JAN-MS-00749260
22
23
24
```

```
                                                   Page 9

 1                      -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                      -  -  -
 4
 5     NO.            DESCRIPTION           PAGE
 6     Janssen
       Burns-20       E-mail Thread         348
 7                    2/6/13
                      Subject, Important
 8                    Outstanding Items
                      JAN-MS-00753246-48
 9
       Janssen
10     Burns-21       Slide Deck            356
                      US/Canada
11                    Sharing of Current Plans
                      & Insights
12                    3/1/12
                      JAN-MS-01053015
13
       Janssen
14     Burns-22       E-mail Thread         362
                      6/17/13
15                    Subject, I Want To
                      Remove Jeffrey Rogers
16                    From the Speakers Bureau
                      JAN-MS-00751625
17
       Janssen
18     Burns-23       Demonstrative         368
                      Picture of Kanitha
19                    Burns with Handwritten
                      Notes
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1                    -  -  -
 2          DEPOSITION SUPPORT INDEX
 3                    -  -  -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      None.
10
11    Stipulations
12    PAGE    LINE
      None.
13
      Questions Marked
14
      PAGE    LINE
15    None.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are
 2         now on the video record.  My name
 3         is David Kim.  I'm a videographer
 4         for Golkow Litigation Services.
 5         Today's date is November 29, 2018,
 6         and the time is 9:21 a.m.
 7              This location -- this video
 8         deposition is being held in Stowe,
 9         Vermont in the matter of National
10         Prescription Opiate Litigation
11         MDL-2804 for the U.S. District
12         Court, the Northern District of
13         Ohio Eastern Division.
14              The deponent is Kanitha
15         Burns.
16              Counsel will be noted on the
17         stenographic record.
18              The court reporter is
19         Michelle Gray and will now swear
20         in the witness.
21                   -  -  -
22              ... KANITHA BURNS, having
23         been first duly sworn, was
24         examined and testified as follows:
```

```
 1                    -  -  -
 2                 EXAMINATION
 3                    -  -  -
 4   BY MR. JANUSH:
 5          Q.    Hi, Ms. Burns.  How are you
 6   today?
 7          A.    Hi.  I'm fine.
 8          Q.    My name is Evan Janush.  We
 9   had the pleasure of meeting briefly
10   before this deposition began.  I'm with
11   the The Lanier Firm, and we represent
12   plaintiffs in this case.  Thank you for
13   being here today to give your testimony.
14   I understand you're no longer at
15   Janssen --
16          A.    Correct.
17          Q.    -- employee.  So we
18   appreciate your time even more given that
19   fact.
20          A.    You're welcome.
21          Q.    Before we begin, I just want
22   to go over a few different ground rules.
23   Number one, I'm going to do my best to
24   speak as clearly as I can.  If you don't
```

Page 13

1   understand a question, please let me

2   know.  I'll seek to rephrase it.

3            Number two, if you need a

4   break, you let me know.  I'm going to be

5   ago respectful as humanly possible.

6   That's how I try to operate.  So you let

7   me know, and I will accommodate.

8            A.   Okay.

9            Q.   Number three, I need to ask

10  whether there's anything prohibiting you

11  today, like medication or otherwise, from

12  giving your best and most accurate and

13  honest testimony?

14           A.   No, nothing.

15           Q.   Okay.  Moving on from there

16  then, I'd like to know whether you've

17  ever been deposed in a case before.

18           A.   No.

19           Q.   No.  Okay.  Welcome to the

20  party.

21           A.   Thank you.

22           Q.   I'm not sure it'll be fun.

23  I'm not sure it'll be a party.  But

24  hopefully I'll be as efficient as I can.

Highly Confidential - Subject to Further Confidentiality Review

1   I've got a lot to accomplish today.  I'm

2   going to promise you to do my very best.

3   Okay?

4           A.    Appreciate it.

5           Q.    I want to start by getting

6   an understanding of who Kanitha Burns is.

7   So background, biographical information.

8   This is just for demonstrative purposes

9   so I can take some notes.

10          A.    Okay.

11          Q.    I understand that you had a

12  long history with Janssen; is that right?

13          A.    About 15 years.

14          Q.    Okay.  Let's go back before

15  Janssen.  Let's start with your

16  education.

17          A.    Sure.

18          Q.    Tell us about your education

19  starting from after you graduated from

20  high school?

21          A.    Sure.  So I went to the

22  University of Carnegie -- I'm sorry.  I

23  went to Carnegie Mellon University, and I

24  had a bachelor's degree in mechanical

Page 15

1    engineering.  Then I worked for about

2    three, three and a half years, and then I

3    went to graduate school.  I went to the

4    University of North Carolina Chapel Hill,

5    where I received a master of business

6    administration.

7              Q.    All right.

8              A.    And from there, I went to

9    work at Janssen.

10             Q.    So Janssen was your first

11   job after obtaining your MBA?

12             A.    Correct.

13             Q.    Okay.  Tell us about your

14   first job at Janssen.  If I understand it

15   correctly, you started as an assistant

16   project manager on the Pepcid team; is

17   that right?

18             A.    Correct.

19             Q.    I show a job for three years

20   and one month from your LinkedIn page at

21   Caterpillar?

22             A.    Correct.

23             Q.    So when was the Caterpillar

24   job?  It looks like it's January of '96

Highly Confidential - Subject to Further Confidentiality Review

1    through January of '99.

2            A.    So Caterpillar was right

3    after Carnegie Mellon.

4            Q.    Okay.

5            A.    I received a mechanical

6    engineering degree.  And then I went to

7    work at Caterpillar as an engineer for

8    about three an a half years.  And then

9    that's when I went to graduate school.

10           Q.    Got it.  Okay.  And so after

11   graduating from University of North

12   Carolina, you started at Johnson &

13   Johnson Merck Consumer Pharmaceuticals in

14   January of 2000; is that right?

15           A.    That is the correct date.

16   Just to explain.  I -- I had that job

17   with that company prior to going to the

18   University of North Carolina.  So it was

19   a short period of time.

20           Q.    Okay.  And that's J&J Merck

21   for Pepcid, right?

22           A.    For Pepcid, yes.

23           Q.    All right.  What were your

24   job --

Page 17

```
 1              MS. STRONG:  Mr. Janush,

 2         just to be clear for the record.

 3         I just want to make sure it's

 4         understood that Mr. Janush is

 5         writing these notes down and that

 6         it's not the witness writing.

 7         Just so we have clarity as to

 8         what's happening here in the room.

 9              MR. JANUSH:  Fair enough.

10         It's all me.  Forgive my sloppy

11         handwriting as well.  I'm writing

12         as fast as I can to stick with

13         you.

14              THE WITNESS:  No problem.

15    BY MR. JANUSH:

16         Q.   All right.  So Pepcid, let's

17    talk about what you did for -- for J&J

18    Merck concerning Pepcid.

19         A.   So that role, I was there

20    for a short period of time.  I believe

21    two or three months.  And I was a project

22    manager.  The -- the company was getting

23    ready to launch Pepcid Complete.  And I

24    was asked to help with some of the
```

Page 18

1   production issues that they had in terms

2   of storage of the products.  So I had

3   sort of a project management role

4   resolving some of the issues that came up

5   right before launch, from a logistics and

6   operations perspective.

7           Q.   Okay.  Your LinkedIn profile

8   shows that -- that you were there for six

9   months in Fort Washington, Pennsylvania.

10  Would it be closer to two to three months

11  as you just testified or about six

12  months?

13          A.   Gosh, I don't -- I don't

14  recall.

15          Q.   Okay.  And then following

16  that, you became a marketing associate

17  for Plavix at Bristol-Myers Squibb from

18  June 2001 to August 2001.  Is that about

19  right?

20          A.   Yes.  That sounds about

21  right.  That was between my first year

22  and second year at the University of

23  North Carolina.  So it was kind of like a

24  summer internship.

Highly Confidential - Subject to Further Confidentiality Review

Page 19

1         Q.    Okay.  And incidentally,

2    what year did you graduate from

3    University of North Carolina?

4         A.    2002, I believe.

5         Q.    So the next job that I show

6    is Johnson & Johnson Centocor, Inc.  Tell

7    us about that job.

8         A.    So that was the first role I

9    had after receiving my MBA.  I worked on

10   a product called Remicade which is a

11   biologic, for -- now it has a lot of

12   different indications.  At the time the

13   first role I worked on dermatology

14   franchise as the company was getting

15   ready to launch Remicade for a

16   dermatology indication.  And that was a

17   marketing role.

18        Q.    What role in marketing did

19   you have?

20        A.    So at the time it was prior

21   to receiving FDA indication.  So we were,

22   you know, getting ready to launch.  So a

23   lot of what I did was what we call launch

24   preparation in terms of understanding,

Highly Confidential - Subject to Further Confidentiality Review

Page 20

1    you know, how to position the product,

2    what would we talk about the product in

3    terms of the benefits that it would bring

4    to the marketplace.

5          Q.    All right.  And I show a

6    position for one year as an associate

7    manager Remicade dermatology marketing.

8    Is that what you're speaking to?

9          A.    Yes, correct.

10         Q.    Okay.  And after that, it

11   looks like you became a senior manager

12   for Remicade commercial payer marketing;

13   is that right?

14         A.    Correct.

15         Q.    Okay.  And as a senior

16   manager in the commercial payer

17   marketing, what did your duties entail?

18         A.    Well, it was a pretty small

19   team, so I had a large sort of list of

20   responsibilities.  Setting the strategy,

21   creating the message for the product,

22   creating sales tools, training the sales

23   representatives.  So it's -- it's pretty

24   encompassing in terms of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   responsibilities.

 2        Q.    Okay.  So what training did

 3   you have before transitioning to this

 4   role that enabled you to set strategy,

 5   create messaging, and train sales reps?

 6             MS. STRONG:  Objection to

 7        form.

 8             MR. JANUSH:  I can break it

 9        down.

10   BY MR. JANUSH:

11        Q.    What training did you have

12   before taking on this position that

13   enabled you to set strategy for the

14   commercial payer marketing team?

15        A.    I don't recall any specific

16   training for the purpose that you stated.

17        Q.    What about setting strategy?

18             MS. STRONG:  Object --

19        objection to form.

20             THE WITNESS:  I'm sorry,

21        what's the --

22   BY MR. JANUSH:

23        Q.    So the question is, what

24   training did you have specific to setting
```

Page 22

1    commercial brand strategy or payer

2    marketing strategy?

3              MS. STRONG:  Same objection.

4              THE WITNESS:  I don't

5         recall --

6              MS. STRONG:  Go ahead.

7              THE WITNESS:  I don't recall

8         any particular training to set

9         strategy.  It's assumed that I

10        would be able to do that.

11   BY MR. JANUSH:

12        Q.   And how about the same

13   question as it pertains to training that

14   you received to create brand messaging.

15             MS. STRONG:  Objection to

16        form.

17             THE WITNESS:  So likewise, I

18        don't recall any particular

19        training.

20   BY MR. JANUSH:

21        Q.   Okay.  And how about, did

22   you have any particular training for the

23   purposes of giving you expertise in

24   training sales representatives?

Page 23

1            MS. STRONG:  Objection to

2       form.

3            THE WITNESS:  Again, there's

4       no particular training for that.

5       You know, I was hired in with an

6       expectation that these are skill

7       sets that -- that I would bring to

8       the table.

9  BY MR. JANUSH:

10      Q.    Incidentally, a little bit

11 ago we talked about Carnegie Mellon,

12 bachelor in mechanical engineering,

13 University of North Carolina MBA.

14            Do you have any medical

15 education background, formal education?

16      A.    Medical as in -- what do you

17 mean by medical?

18      Q.    Science.  Bio -- biology,

19 medical, specific medical training.  You

20 don't have a medical degree, right?

21      A.    Correct, I don't have a --

22      Q.    Not a doctor?

23      A.    Correct.

24      Q.    Not a pharmacist?

Page 24

1          A.     Correct.  Now, as part of my

2    engineering training, I had to take

3    science classes, like biology, chemistry,

4    physics, as part of the curriculum.

5          Q.     Following the three years as

6    Remicade commercial payer marketing, in

7    that role with commercial payer

8    marketing, it looks like you became an

9    associate director at J&J for Simponi

10   global strategic marketing; is that

11   right?

12         A.     Correct, Simponi.

13         Q.     What's it called?

14         A.     Simponi.

15         Q.     Simponi?  And what is that?

16         A.     It's another biologic for

17   the treatment for, you know, conditions

18   in rheumatology, gastroenterology, and

19   dermatology.

20         Q.     Okay.  And what did you do

21   in that role?

22         A.     So I was in that role for

23   several years.  So it was a global

24   marketing position, and the role was to

Highly Confidential - Subject to Further Confidentiality Review

Page 25

1    bring Simponi to market.  So working with

2    the team to set the strategy for how we

3    would launch the product.  You know,

4    identify different shading factors and

5    characteristics about the product and

6    developing sort of the overall launch

7    strategy.

8           Q.    How did that go?

9                 MS. STRONG:  Objection to

10          form.

11                THE WITNESS:  Yeah, I'm not

12          sure what you're asking.

13   BY MR. JANUSH:

14          Q.    How did your role go in

15   total?

16                MS. STRONG:  Objection to

17          form.

18   BY MR. JANUSH:

19          Q.    How would you describe it?

20          A.    I don't know what you mean

21   how the role went.

22          Q.    Did you do a good job?

23                MS. STRONG:  Objection to

24          form.

Page 26

1             THE WITNESS:  I think I did

2        a good job.

3   BY MR. JANUSH:

4        Q.    What led you to leave that

5   role and -- actually I should say you

6   transitioned from that role to become the

7   acting global marketing leader; is that

8   right?

9        A.    Correct.

10       Q.    Okay.  And in that role you

11  led the global commercial team?

12       A.    Correct.

13       Q.    What does that mean, to lead

14  the global commercial team?

15       A.    It meant I was the leader of

16  the team, so I had two people on the team

17  that I was responsible for.

18             I was responsible for

19  Simponi and also for Remicade at the

20  time.

21       Q.    And your LinkedIn profile

22  states that -- that you advanced Simponi

23  long-term commercial strategy as a voting

24  member on a clinical board of some --

Highly Confidential - Subject to Further Confidentiality Review

1    some type.  What was that?

2          A.    Correct.  So there's a

3    clinical development team, has, you know,

4    cross-functional members on that team.

5    And that's the team that makes decisions

6    about high level strategic decisions

7    about what we do with the compound in

8    terms of what indication it would be

9    studied.

10                You know, where we might

11   market the product, what countries in the

12   world.  So that team would be responsible

13   for making those decisions.  So I was --

14   since I was the acting global marketing

15   leader, I represented the commercial team

16   and I was a voting member on that board.

17         Q.    And then after that role it

18   looks like you then transitioned to

19   Nucynta; is that correct?

20         A.    Correct.

21         Q.    Tell us about your role at

22   Janssen as it started in December of 2011

23   with Nucynta.

24         A.    Okay.  So I was on the

Page 28

1    Nucynta team for about three years, I

2    believe, total.  And I had a variety of

3    responsibilities over the three years,

4    because the team leader believed that we

5    should all sort of, you know, get

6    different experiences.  So I worked on

7    several different things on that team.

8          Q.    Who was your -- when you

9    said the team leader thought that you

10   should all have several different

11   experiences.  Who was your team leader?

12         A.    At the time, David Lin was

13   the director of marketing, and he led the

14   team.

15         Q.    Okay.  Why don't you

16   describe your role more specifically.

17              MS. STRONG:  Objection to

18         form.

19              THE WITNESS:  Okay.  Well,

20         over -- as I stated before, over

21         time, you know, I worked on

22         several different things.  I would

23         say that the most substantial work

24         was being responsible for what we

Page 29

```
 1          call professional marketing, which
 2          is marketing to clinicians and
 3          prescribers.  And I was
 4          responsible for, you know, making
 5          recommendations around the
 6          strategy, the messages, and
 7          sales -- educational sales tools
 8          for the sales team.
 9   BY MR. JANUSH:
10          Q.   Let's talk about what you
11   specifically did within marketing.
12               I understand that you tout
13   yourself as having delivered more
14   relevant market insights.  What does that
15   mean?
16               MS. STRONG:  Objection to
17          form.
18               THE WITNESS:  I'm sorry.
19          Ask your question again.
20   BY MR. JANUSH:
21          Q.   Sure.
22          A.   I just want to make sure.
23          Q.   I said, let's talk about
24   what you specifically did within
```

Page 30

1   marketing.  I understand that you tout

2   yourself as having delivered more

3   relevant market insights.  What does that

4   mean?

5            MS. STRONG:  Again, same

6        objection.

7            THE WITNESS:  So what does

8        delivering more --

9   BY MR. JANUSH:

10       Q.    -- relevant market insights

11  mean.

12       A.    -- relevant market insights.

13  So in general, that means that I'm taking

14  insight about what I have learned or the

15  team has learned about the marketplace or

16  about the customers and using that to,

17  you know, develop or change our strategy

18  about what we do with the product, so

19  that we can, you know, better bring value

20  to the prescribers and educate them about

21  the product, you know, that we were

22  responsible for.

23       Q.    Okay.  And I also see here

24  that you optimized customer target and

Page 31

1    sales incentive compensation.  What does

2    that mean?

3                  MS. STRONG:  Objection to

4           form.

5                  THE WITNESS:  So what I was

6           referring to is a process that the

7           team went through to change sort

8           of the way that we were targeting

9           who the sales representatives

10          would call on to make it more

11          relevant and, you know, better

12          suit what we were trying to

13          accomplish.

14   BY MR. JANUSH:

15        Q.   So let's break that down.

16   What specifically were you doing to

17   optimize customer target and make it more

18   relevant to suit what you were trying to

19   accomplish?

20        A.   When I first joined the

21   Nucynta team, Nucynta was being sold by a

22   sales team that was also selling two

23   other products.  So we had to balance who

24   we had to talk to depending on all three

Page 32

1    product needs.  So we were calling on

2    people who might not have had as much

3    interest in Nucynta as they might have

4    had for the other -- the other products.

5                    We, you know, wanted to make

6    sure that we can focus the sales team on

7    clinicians that were more important to

8    the product, and actually the list of

9    clinicians that the company called on was

10   reduced and, you know, and made more

11   relevant to Nucynta without having to

12   sort of share the resources with other

13   products.

14        Q.    When you say that you

15   focused on clinicians that were more

16   relevant to the product.  Does that

17   equate to focusing on clinicians that

18   were higher prescribers?

19                    MS. STRONG:  Objection to

20        form.

21                    THE WITNESS:  Not -- not

22        necessarily.

23   BY MR. JANUSH:

24        Q.    You sure about that?

Page 33

1            MS. STRONG:  Objection to

2       form.

3            THE WITNESS:  That's what I

4       recall.  Mm-hmm.

5  BY MR. JANUSH:

6       Q.    Okay.  We'll come back to

7  that a little later.

8       A.    Sure.

9       Q.    Just taking notes.  So if it

10  was not necessarily that you were focused

11  on higher prescribers, what was it that

12  you were focused on when you were looking

13  at clinicians that were more important to

14  the product?

15            MS. STRONG:  Objection to

16       form.

17            THE WITNESS:  You know,

18       there's a lot of factors that went

19       into it.  You know, I don't recall

20       all the different factors.

21  BY MR. JANUSH:

22       Q.    Why don't you give me the

23  top three.

24            MS. STRONG:  Objection to

Page 34

```
 1        form.
 2             THE WITNESS:  I don't know
 3        if I would be accurate in
 4        recalling back so many years ago
 5        in terms of what the top three
 6        reasons were.
 7             I would say that the main
 8        reason was that we were splitting
 9        resources among three other
10        brands, and we were sort of
11        competing with ourselves in terms
12        of how we would direct each
13        salesperson, who they would call
14        on, how much time they would spend
15        talking about Nucynta versus
16        talking about a cardiovascular
17        product for example.
18             So that was the primary
19        reason for pulling Nucynta out of
20        that sales team so that we can be,
21        you know, much more focused.
22   BY MR. JANUSH:
23        Q.   Can you appreciate that the
24   primary reason in terms of the split or
```

Highly Confidential - Subject to Further Confidentiality Review

Page 35

1    division of resources among salespeople

2    is different from the question I'm

3    asking?  I'm asking what led to the focus

4    on clinicians that were, quote, more

5    important to the product?

6                    MS. STRONG:  Objection to

7            form.

8                    THE WITNESS:  I believe I'm

9            answering that question.  So let

10           me try again.  If you have a sales

11           team that is selling a pain

12           product and also selling a

13           cardiovascular disease product and

14           a diabetes product, there are

15           going to be some clinicians that

16           don't see all three of those

17           patients.

18                   So it's really about going

19           to clinicians that treat pain, and

20           that would make it more relevant

21           for Nucynta, because there are

22           some people who don't do that.

23                   So that's really the driving

24           factor of what would be more

Page 36

1          relevant for Nucynta.  Does that

2          make sense?

3     BY MR. JANUSH:

4          Q.    Okay.  So to make sure I

5     understand you, focusing on clinicians

6     more important to the product was equated

7     to focusing sales resources, detail reps,

8     on doctors that treat pain management?

9               MS. STRONG:  Objection to

10         form.

11              THE WITNESS:  I'm sorry.  I

12         kind of lost you.

13    BY MR. JANUSH:

14         Q.    You can read it back.  It's

15    on that iPad right there.

16              MS. STRONG:  Hold on.  Same

17         objection.

18              THE WITNESS:  Yeah, so I

19         would say that clinicians who are

20         more important to the product were

21         the clinicians who treat pain,

22         yes.

23    BY MR. JANUSH:

24         Q.    And in this role as an --

1    initially, it looks like for the first

2    three years, from December 2011 through

3    October 2014, while you were working on

4    Nucynta, you were a product director; is

5    that right?

6          A.    Correct.

7          Q.    Okay.  What does that mean

8    to be a product director?

9          A.    A product director at the

10   time meant that I was a director level,

11   and I was a marketer responsible for a

12   particular product, in this case Nucynta.

13         Q.    Okay.  Who many -- how many

14   people above you did you report to?

15         A.    Well, I have one direct --

16   one person that I reported to directly.

17   And then that person reported to another

18   marketing person.

19         Q.    Okay.  And who did you

20   report directly to?

21         A.    So that changed over time.

22   At first it was Tricia Yap.

23         Q.    Okay.  And thereafter?

24         A.    And then after was -- why is

Page 38

1    it not coming to me?  Oh, my God.  I can

2    see his face.  Terry Davidson.  Sorry

3    about that.

4            Q.    And who did -- Tricia is

5    short for Patricia, correct?

6            A.    Yes, I think so.

7            Q.    Okay.  And who did Tricia

8    Yap report directly to?

9            A.    David Lin.

10           Q.    Okay.  And who did Terry

11   Davidson report to?

12           A.    Fred Tewell.

13           Q.    And what was the reason for

14   the switch in terms of Terry reporting to

15   Fred Tewell as opposed to David Lin?  Did

16   David leave at that time?

17                 MS. STRONG:  Objection to

18           form.

19                 THE WITNESS:  Dave -- at the

20           time that Terry was on the team,

21           David was no longer on the team.

22   BY MR. JANUSH:

23           Q.    Okay.  Where did David go?

24           A.    He had left Janssen.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 39

1    don't recall exactly where he went.

2         Q.    Okay.  And then after

3    October of 2014, after working on Nucynta

4    for about two years and 11 months, you

5    transitioned to a different job within

6    Janssen; is that right?

7         A.    Correct.

8         Q.    And what was that job?

9         A.    I was a district manager

10   working on Invega Sustenna and Invega

11   Trinza.

12        Q.    And what led to that

13   transition?

14        A.    I wanted to have a different

15   experience, and I wanted to also try my

16   hand at sales management.

17        Q.    Okay.  Did anything have to

18   do with the fact that Nucynta's business

19   was winding down and Janssen was getting

20   ready to sell Nucynta in 2015?

21             MS. STRONG:  Objection to

22        form.

23             THE WITNESS:  It was a

24        personal development of mine to do

Highly Confidential - Subject to Further Confidentiality Review

Page 40

1              something different.  You know,

2              and I had been on the team for

3              close to three years.  So it was

4              something that I had planned for

5              my own personal development.

6  BY MR. JANUSH:

7       Q.    Got it.  Okay.

8              I'm going to move to a large

9  budget document that we printed out.

10  This is, let's see, Bates number

11  JAN-00119068 and I'm going to give you a

12  complete set.  I'm going to mark this

13  as -- actually before I do that, just for

14  housekeeping purposes, I'm going to mark

15  the LinkedIn document as Exhibit 1.  I'll

16  give you a chance to look at that, just

17  to make sure if that's your LinkedIn

18  page.

19              (Document marked for

20              identification as Exhibit

21              Janssen-Burns-1.)

22  BY MR. JANUSH:

23       Q.    Tell me if you recognize

24  that.

Page 41

1          A.    Yeah, it looks -- looks

2     familiar.  I don't know.  I haven't gone

3     in there in a long time.

4          Q.    Okay.

5          A.    But yeah, it looks familiar.

6          Q.    That -- and that picture is

7     you, right?

8          A.    Yes.

9          Q.    And that name is your name,

10    right?

11         A.    Yes.

12         Q.    And the titles and

13    responsibilities are yours, correct, your

14    history?

15         A.    Yes.

16         Q.    And did anyone write this,

17    this document or go into LinkedIn and

18    write your bio up, or did you handle this

19    personally?

20         A.    I handled it personally.

21         Q.    Okay.  So having marked that

22    as Exhibit 1, now I'm going to move on to

23    the document I previously spoke about,

24    which is --

Page 42

```
 1          A.    Would you like this back
 2   or --
 3          Q.    You can set it aside right
 4   there.
 5                MS. STRONG:  And to be clear
 6          just for the record, Exhibit 1,
 7          Mr. Janush, you represent that you
 8          printed that off of the LinkedIn
 9          page?
10                MR. JANUSH:  I represent
11          that I actually took complete
12          screen shots of the page in order
13          to get the best print.  It's very
14          hard to print it by just hitting
15          print.  You get a lot of jumbled
16          information.  So the best way, the
17          cleanest way is to take screen
18          shots.  So that's what I've done.
19                There are, as a caveat to
20          that, because screen -- the screen
21          is limited in size, there are
22          areas where you would have to
23          click on a "more" link to read
24          more.  So it doesn't give
```

Highly Confidential - Subject to Further Confidentiality Review

Page 43

1          everything.  It gives, I would

2          say, 90 percent of the essence

3          of -- of the LinkedIn bio.

4              MS. STRONG:  Thank you.  I

5          just want to make clear it wasn't

6          Ms. Burns who printed this and

7          provided it.  That you provided it

8          for purposes of this deposition

9          today.

10             MR. JANUSH:  That's right.

11         I didn't get a CV in advance of

12         the deposition and I was forced to

13         go on LinkedIn to obtain that.

14             MS. STRONG:  And to be

15         clear, I don't think you -- one

16         was requested, but that's fine.  I

17         don't think you were forced in any

18         way.

19  BY MR. JANUSH:

20         Q.   So you're going to get --

21  this is marked as Exhibit 2.  And I'm

22  going to hand that over to you.

23             (Document marked for

24          identification as Exhibit

Page 44

1          Janssen-Burns-2.)

2     BY MR. JANUSH:

3          Q.    I printed this as large as I

4     could.  Now admittedly you're getting a

5     shorter copy because of the fact that we

6     were incapable of printing multiple large

7     copies.  I'm not probably going to use

8     anything else, but if I go beyond this

9     shorter copy -- she has the complete set.

10    There's multiple tabs.  We can put it up

11    on the -- on the Elmo.

12               Again, this is JAN-00119068.

13    And --

14               MS. STRONG:  And so -- and

15          you are representing that I, as

16          counsel, I'm getting --

17               MR. JANUSH:  You're getting

18          as counsel -- yes.

19               MS. STRONG:  -- a limited

20          version --

21               MR. JANUSH:  Ms. Burns is

22          getting -- has the full version

23          next to her.

24    BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 45

1        Q.    And this looks to be a 2012

2   brand investment summary.  Do you recall

3   seeing spreadsheets that looked like

4   this?

5        A.    I recall spreadsheets that

6   looked like this, yes.

7        Q.    Okay.

8             MS. STRONG:  And just for

9             the record, I just -- I object to

10            not getting a complete copy of

11            what the witness has and what --

12            what you have at this time.

13            So going forward, I would

14            ask that you please make sure that

15            we have complete copies of

16            whatever it is that you're showing

17            the witness.

18            MR. JANUSH:  That's fair.

19            My other option is that I

20            can take back the witness's copy

21            and use the Elmo entirely and give

22            you a copy if you'd like.

23            MS. STRONG:  I'm fine to

24            proceed in this way right now.  I

Page 46

1              just want -- going forward, I

2              think best practice ought to be to

3              have complete copies of whatever

4              is presented to the witness.

5                    So if it becomes a problem,

6              we can stop and change approach,

7              but --

8                    MR. JANUSH:  Yes.

9                    MS. STRONG:  -- just want to

10             note that going forward.

11                    MR. JANUSH:  I think we ran

12             out of the big paper, and this is

13             a fairly complex custom print.  So

14             please forgive me on that -- in

15             that regard.

16                    MS. STRONG:  Understood.

17                    MR. JANUSH:  But it is why

18             we have -- one of the reasons why

19             we have the Elmo here.  So you'd

20             never be cheated and get to see

21             everything.

22    BY MR. JANUSH:

23             Q.    So this -- I'm going to

24    represent to you that this came out of

Page 47

1    your custodial file production.  Do you

2    understand what a custodial file -- file

3    production is?

4          A.    I mean I don't know the

5    term.

6          Q.    Okay.

7          A.    I assume it's --

8          Q.    So it's my understanding

9    that attorneys who work for Janssen, and

10   perhaps inhouse counsel as well, went

11   through and looked for what Kanitha Burns

12   maintained on her hard drive, in her

13   e-mails, et cetera.

14         A.    Okay.

15         Q.    And produced documents that

16   were potentially relevant to this

17   litigation.

18         A.    Okay.

19         Q.    And that this was produced

20   within your custodial file production as

21   a budget or a brand investment summary

22   for the -- what appears to be the budget

23   for 2012.  It seems to list the

24   objectives, the brand tactics on the left

Page 48

1    side.  Do you see that?

2           A.     Mm-hmm.

3           Q.     And then right next to that,

4    you see vendor?

5           A.     Mm-hmm.

6           Q.     And then right next to that

7    in the third column over -- actually the

8    fourth column over, owner?

9           A.     Mm-hmm.

10          Q.     And then PO, what does PO

11   stand for?

12          A.     Purchase order.

13          Q.     Okay.  And it looks like

14   that there's an initial 23.5 JU budget.

15   What does JU stand for?

16          A.     June.

17          Q.     June?  Okay.  And then it --

18   it seems to say that -- that -- there --

19   it looks like there was a goal to cut 1.7

20   million from this budget.

21                 And then I'm going to jump

22   to the end in the orange -- the orange

23   column.  I'm going to put this up here.

24   And it looks like the total budget was

Page 49

1   21.8 million for 2012 strategic

2   imperatives concerning Nucynta.  Do you

3   see that?

4           A.    I see it.

5                 MS. STRONG:  Objection to

6           form.

7   BY MR. JANUSH:

8           Q.    Okay.  Now, on this second

9   page, if you flip it to the second page.

10                MR. JANUSH:  And you'll have

11          that, Ms. Strong.

12  BY MR. JANUSH:

13          Q.    I see that you are tasked

14  with DPN overview training e-module,

15  vendor Axiom, and a $85,903 amount

16  ultimately coming from within the

17  $21.8 million budget.  Do you see that?

18                MS. STRONG:  Objection to

19          form.

20                THE WITNESS:  I see what

21          you're saying.

22  BY MR. JANUSH:

23          Q.    Okay.  What is the DPN

24  overview training E-module?

Page 50

```
1           A.    You know, it's been a long
2      time.  I don't recall what, you know,
3      what that would entail, but it has
4      something to do with the DPN indication.
5           Q.    And, and the training
6      E-module concerns sales training
7      E-modules, electronic sales training
8      modules for representatives, doesn't it?
9                MS. STRONG:  Objection to
10               form.
11     BY MR. JANUSH:
12          Q.    I see that name throughout
13     the document production in this case.
14     The concept of training E-module, quote?
15          A.    So the --
16               MS. STRONG:  Same objection.
17               THE WITNESS:  The -- my
18               recollection is that this would be
19               for sales training.
20     BY MR. JANUSH:
21          Q.    And do you recall who Axiom
22     is?
23          A.    No.  I don't.
24          Q.    Okay.  And moving on down,
```

Highly Confidential - Subject to Further Confidentiality Review

Page 51

1    it looks like you were tasked with "grow

2    brand awareness through print and online

3    media and digital."

4                    Do you see that?

5                    MS. STRONG:  Objection to

6            form.

7                    THE WITNESS:  Can you point

8            to --

9    BY MR. JANUSH:

10           Q.    Sure.

11           A.    Yes, I see it.

12           Q.    Okay.  And the owner, owner,

13   owner means the person tasked at Janssen

14   responsible to carry out a given line

15   item, correct?

16                    MS. STRONG:  Objection to

17           form.

18                    THE WITNESS:  So I would say

19           that in general owner is the

20           person who is responsible for

21           making sure that that happens.  It

22           doesn't necessarily mean that they

23           work on it alone.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 52

1          Q.    Okay.  So I'm not addressing

2     whether you work on it alone.  I'm

3     addressing ultimate responsibility rests

4     with an owner, correct?

5               MS. STRONG:  Objection to

6          form.

7               THE WITNESS:  That would be

8          the -- yeah, that would be the

9          go-to person for that particular,

10         whatever that is.

11    BY MR. JANUSH:

12         Q.    So for example, can you

13    address the items that -- that you would

14    have been listed as the go-to person, the

15    owner in grow brand awareness?

16              Let's rip through this as

17    quickly as we can starting with compass

18    credits?

19         A.    I'm sorry, what do you want

20    me to do?

21         Q.    Address what you would have

22    been -- testify as to what you were the

23    owner of as you look at this document.

24              MS. STRONG:  Objection to

Page 53

1          form.

2                    THE WITNESS:  Do you want me

3          to just go through the list --

4    BY MR. JANUSH:

5          Q.    Yep, I sure do.

6          A.    -- and -- and see where my

7    name is, and --

8          Q.    And talk about it.  Yep.

9                    MS. STRONG:  Objection to

10         form.  Let me see a question.

11                   THE WITNESS:  I'm not

12         understanding what you want me to

13         do.

14                   So do you want me to tell

15         you, for example, what compass

16         credits is?

17   BY MR. JANUSH:

18         Q.    I -- I first want -- wanted

19   you to confirm that you were the owner

20   for compass credits, correct?

21         A.    I don't even -- I don't even

22   know what compass credits is.  I'm sorry.

23         Q.    You were listed as the owner

24   in Janssen's budget for compass credits,

Page 54

1    correct?

2           A.    I see my name.  So first of

3    all, you know, budget sheets are living

4    documents.  And things can change.  And

5    as you can see, it looks like that we

6    were trying to make some modification.

7    So this could have been a draft form.  So

8    it could have been that hey we want to do

9    something like compass credits, which I

10   don't recall what that is.

11             And then we may decide to

12   not do it.  So even if it's listed here

13   doesn't mean that the project actually

14   went through to completion.  Going back

15   to that Axiom, I don't recall the vendor.

16   And maybe we never worked with that

17   vendor because we never went through with

18   that item because of budget cuts.

19           Q.    Except for the fact that

20   there's a purchase order for $85,903, and

21   this looks to be a debit against the

22   budget at some point in the year.

23             Do you see that?

24             MS. STRONG:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  So in general

3            if there's a PO, it can also be

4            closed out without having been

5            used.  So just because there's a

6            PO doesn't mean that it was used.

7     BY MR. JANUSH:

8            Q.    Actually --

9            A.    That's what I'm trying to

10    say.

11           Q.    Actually, invoicing means

12    that, doesn't it?  And the PO confirms

13    that it was done.  So invoiced at

14    $85,903, and then a PO that matches.

15                   MS. STRONG:  Objection to

16           form.

17    BY MR. JANUSH:

18           Q.    Do you see that?

19           A.    I see what you're talking

20    about with the invoice.

21           Q.    And doesn't -- and if there

22    is a debit at year-end of the total

23    budget for that amount, wouldn't you

24    presume -- would you agree as a general

Highly Confidential - Subject to Further Confidentiality Review

Page 56

1    principle that if something is listed on

2    the budget, and then at the -- at some

3    point in time you get to the bottom of

4    the budget and the budget is reduced by

5    that line item, then that line item was

6    actually completed.  Would you agree --

7                   MS. STRONG:  Objection to

8              form.

9    BY MR. JANUSH:

10        Q.    -- in principle with that

11   concept?

12                   MS. STRONG:  Same objection.

13                   THE WITNESS:  I would say

14              that in principle, yes, that makes

15              sense, that if you have a budget

16              and then you have, you know,

17              reduced by that amount in general.

18                   But again, this was a long

19              time ago.  And I don't know at

20              what point this was pulled.

21              Because again, this is a living

22              document, and it was always sort

23              of being updated.

24                   So, you know, I'm hesitant

Highly Confidential - Subject to Further Confidentiality Review

```
1              to say for sure, you know, at any

2              point in time, you know, what

3              these things represented.  But,

4              yeah, in principle.

5    BY MR. JANUSH:

6         Q.    So if you go to the back of

7    the -- let me count pages.  If you go

8    forward another one, two, three, four,

9    five, six pages, you get to this page.

10   And it's the last page on this first tab.

11   I believe you have it too.

12              And this page seems to imply

13   what was done and what was not done

14   because it addresses the remaining budget

15   based on two point -- $21.8 million for

16   Nucynta.

17              Do you see that?  I'm

18   pointing to it.

19              MS. STRONG:  Objection to

20        form.

21   BY MR. JANUSH:

22        Q.    Remaining budget, remaining.

23   And it shows that the brand team -- that

24   this budget was over budget by $30,380.
```

Page 58

1                    Do you see that?

2                    MS. STRONG:  Objection to

3          form.

4    BY MR. JANUSH:

5          Q.    Where my finger is pointing.

6    See, look, I'm guiding you.

7          A.    I see the number that you're

8    pointing to.

9          Q.    Okay.  And it shows total

10   purchase orders of $22,007,286.

11                   Do you see that?

12         A.    I see -- I see what you're

13   pointing at.

14         Q.    It shows total invoicing at

15   22,617 -- $22,617,386.

16                   Do you see that?

17                   MS. STRONG:  Objection to

18         form.

19                   THE WITNESS:  I see the

20         number that you're pointing to.

21   BY MR. JANUSH:

22         Q.    This looks like to me, that

23   a reasonable conclusion is that it's

24   sometime fairly -- it's analyzing some

Page 59

1    time after much of the budget allocation

2    line items have been addressed and

3    showing that Janssen's $30,000 over the

4    $21.8 million original budget.  Is that a

5    fair reading of this?

6                    MS. STRONG:  Objection to

7            form.

8                    THE WITNESS:  I -- you know,

9            I don't know.  I don't know.  I

10           don't know if all this is correct

11           or not in terms of, you know, what

12           we're seeing here.

13   BY MR. JANUSH:

14           Q.    Did Janssen --

15           A.    Because this is also a

16   formula -- a bunch of formulas in here.

17   So you're assuming that all the

18   calculations are made correctly.

19           Q.    No, I'm not assuming

20   anything.  I'm looking at a budget that's

21   addressing all that's been invoiced under

22   a 2012 brand investment summary budget.

23   And showing that -- showing every

24   purchase order, all that's been invoiced,

Highly Confidential - Subject to Further Confidentiality Review

1    and showing where Janssen's $30,000 over

2    budget.  And you're telling me that you

3    can't count on this budget?

4              MS. STRONG:  Objection to

5         form.  Misstates testimony.

6              THE WITNESS:  I am -- I'm

7         saying that you're asking me to

8         review a document that is very

9         large from many years ago.

10   BY MR. JANUSH:

11        Q.    Right.

12        A.    That was always changing

13   depending on, you know, what information

14   was populated.  And you're asking me to

15   make assumptions about what is here.  So

16   I'm saying that I see the numbers, but,

17   you know, I'm not sure if -- I'm not sure

18   what you're asking me.

19        Q.    You're not sure whether it's

20   accurate.  Is that what you're

21   addressing?

22             MS. STRONG:  Objection to

23        form.  Misstates testimony.

24             THE WITNESS:  I'm not sure

Page 61

1          what it's accurate to --

2    BY MR. JANUSH:

3          Q.    Okay.

4          A.    -- because it's -- like I

5    said, it's a living document, and the

6    information is received from another

7    system to be put into here.  So if there

8    are things that are not put into here,

9    then I'm also not seeing it.

10          Q.    Let's go to some very

11    specific issues.  Were you responsible --

12    the owner of specialty print media -- I'm

13    going back to the second page of this

14    document.

15          A.    "Specialty print media," two

16    lines after the "grow brand awareness"?

17          Q.    Yes.

18          A.    Okay.

19          Q.    Were you the owner of that?

20          A.    I see my name here.  But I

21    don't recall what "specialty print media"

22    would refer to.

23          Q.    Okay.  "MediScript

24    prescription pad ads."  Are you the owner

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    that was associated with that?

2         A.    Yes.

3         Q.    What is MediScript

4    prescription pad ads?

5         A.    MediScript is a company that

6    produces prescription pads that they sell

7    to clinicians or prescribers.

8    Prescription pad ad is when, you know,

9    someone like Janssen can buy an ad spot

10   in the prescription pad.

11        Q.    So for example, at the very

12   bottom of a prescription pad it might

13   have an advertisement.  No?

14             Where would the ad be?

15             MS. STRONG:  Objection to

16        form.

17             THE WITNESS:  The ad would

18        be interspersed with the actual

19        prescription pads.  The

20        prescription pads are not changed.

21             So there will be

22        prescription pads, and then maybe

23        every ten pages, there will be a

24        page that has an ad.

Page 63

```
 1              MR. JANUSH:  Thank you for
 2         that clarification.
 3              MS. STRONG:  From a
 4         technical issue here, my screen
 5         just went through the password
 6         screen.  Can we take a moment to
 7         fix that?  Thank you.  Go off the
 8         record.
 9              THE VIDEOGRAPHER:  We are
10         now going off the record, and the
11         time is 10:09 a.m.
12              (Short break.)
13              THE VIDEOGRAPHER:  We are
14         now going back on the record.  And
15         the time is 10:18 a.m.
16  BY MR. JANUSH:
17         Q.   Earlier I had represented
18  that this budget spreadsheet came from
19  your personal custodial file.  It
20  actually -- I was corrected, it actually
21  came from the Nucynta SharePoint
22  custodial file production.  And that I
23  have a separate similar spreadsheet that
24  came from your custodial file that I'll
```

Highly Confidential - Subject to Further Confidentiality Review

Page 64

1    present to you.

2              A.    Okay.

3              Q.    With respect to this Nucynta

4    SharePoint custodial file, that is

5    something you would have had routine

6    access to; is that right?

7              A.    Yes.

8              MS. STRONG:  Objection to

9         form.

10   BY MR. JANUSH:

11             Q.    And do you recall generally

12   that as Nucynta was close -- Nucynta was

13   closer -- or Janssen was closer to

14   launching Nucynta ER in 2012, would have

15   been just not that far after the launch;

16   is that right?

17             A.    I joined the team after

18   Nucynta ER had already been launched.

19             Q.    Right.  But 2012 was real --

20   it was launched in '11, right?

21             A.    I don't recall exactly.  I

22   joined late 2011.  It was already in the

23   marketplace.

24             Q.    Do you recall generally

Highly Confidential - Subject to Further Confidentiality Review

1    whether a budget of around $21.8 million

2    sounds like -- seems like the actual

3    budget for Nucynta at that time?

4                MS. STRONG:  Objection to

5          form.

6                THE WITNESS:  I mean I'm

7          seeing it on paper.  But to be

8          honest, I don't -- I don't recall.

9    BY MR. JANUSH:

10         Q.    You just don't recall one

11   way or the other; is that right?

12         A.    I -- yeah, I don't recall

13   one way or the other.

14         Q.    Okay.  I'm going to

15   represent to you that on our computer

16   working through this actual Excel file,

17   we -- we filtered for your name to just

18   pull out the items that you were

19   associated with owning.

20         A.    Okay.

21         Q.    And we came up with a total

22   sub budget allocated to you --

23         A.    Okay.

24         Q.    -- of $2.1 million of the

Page 66

1    total listed budget of 21.8.

2              Would 10 percent of the

3    total budget attributed to you seem about

4    right in your estimation?

5              MS. STRONG:  Objection to

6         form.

7              THE WITNESS:  I can't -- I

8         can't even comment one way or the

9         other.

10   BY MR. JANUSH:

11        Q.   You don't -- you don't

12   remember what portion of the budget you

13   were responsible for?

14             MS. STRONG:  Objection to

15        form.

16             THE WITNESS:  I don't

17        remember.  No.  I never looked at

18        it that way.

19   BY MR. JANUSH:

20        Q.   Okay.  You never analyzed

21   how much total dollars you were being

22   tasked with overseeing?

23        A.   No, it's not --

24             MS. STRONG:  Objection to

Page 67

1          form.

2                    THE WITNESS:  -- it's not a

3          way that I would have looked at

4          it.

5    BY MR. JANUSH:

6          Q.    Okay.  How would you have

7    looked at it?

8                    MS. STRONG:  Objection to

9          form.

10                   THE WITNESS:  I would look

11         at it in terms of what projects I

12         was responsible for.  And what,

13         you know, what budget was required

14         to make those projects happen.

15   BY MR. JANUSH:

16         Q.    Okay.  And let's -- let's

17   keep going quickly.  I'll try and rip

18   through this with you, but projects that

19   you were responsible for.

20                   We started with the -- the

21   MediScript pads.  And under MediScript

22   pads, it looks like there was a six-month

23   pad program from March through August.

24   Do you see that?

Page 68

1          A.     I see it.

2          Q.     And it looks like that was

3    budgeted for 295,468.  Do you see that?

4          A.     I see the number.

5          Q.     And it looks like it was

6    actually invoiced at that number as well.

7    Do you see that?

8          A.     I see it in the invoice

9    column, yes.

10         Q.     Okay.  And moving on from

11   there, it looks like there was a

12   four-month pad program.  Would that be

13   similar to what you -- you described

14   above in terms of prescription pads with

15   advertisements interspersed?

16         A.     Yeah.  It would be similar

17   to that.  Mm-hmm.

18         Q.     Okay.  And this one shows a

19   budget of -- shows an invoice amount,

20   excuse me, of $200,437.  Do you see that?

21         A.     I see the number.

22         Q.     Okay.  And as you sit here

23   today, you don't know whether that's a

24   real invoice that was actually paid as

Page 69

1    opposed to whether it's just an invoice

2    with a number; is that right?

3         A.    Yeah, correct.  I don't

4    know.

5         Q.    Okay.  But you were -- do

6    you recall whether you were responsible

7    for this six-month pad program and the

8    four-month pad program?

9         A.    I don't recall that

10   specifically, in terms of a six-month

11   program or the four-month program.  I

12   recall working on the MediScript

13   prescription pad in general.

14        Q.    Okay.

15        A.    And, you know, I recall we

16   went back and forth in terms of what we

17   want to do, what we committed to doing,

18   what changes we had to make along the

19   way.  So...

20        Q.    Moving onto digital media

21   online banners.  Says there's a -- looks

22   like there's a total budget allocation of

23   $1.4 million for digital media

24   advertising.  So here you are listed as

Page 70

1    an owner for the topic of digital media

2    online banners.  Were you the owner in

3    control of or the person most responsible

4    for digital media online banner

5    advertising?

6              MS. STRONG:  Objection to

7         form.

8              THE WITNESS:  I was

9         responsible for digital media as

10        part of, you know, one of the

11        responsibilities I had.  I assume

12        it was during that 2012 period.

13   BY MR. JANUSH:

14        Q.    And what did those

15   responsibilities entail?

16        A.    To use digital as a way to,

17   you know, do online advertising.

18        Q.    Okay.  And what type of

19   online advertising would have been

20   performed?

21              MS. STRONG:  Objection to

22        form.

23              THE WITNESS:  I don't recall

24        what specifically we did.  But

Page 71

1          here it says online banners.  So

2          if that's accurate as to what we

3          ended up doing, it would be what

4          we call banner ads.

5               Do you know what banner ads

6          are?  Like things you would see --

7  BY MR. JANUSH:

8          Q.   Some types --

9          A.   Yeah, things you would see

10  that pop up online.

11          Q.   And would these banner ads

12  be specific to the brand you were working

13  on, Nucynta?

14               MS. STRONG:  Objection to

15          form.

16               THE WITNESS:  I didn't work

17          on anything else but Nucynta.

18  BY MR. JANUSH:

19          Q.   So the answer to that is

20  "yes"?

21          A.   So -- so if -- if I worked

22  on any ads, it would have been on

23  Nucynta, yeah.

24          Q.   Okay.  And I'm going to skip

Page 72

1    down to "paid search Razorfish" with an

2    invoiced amount of $245,607.  Do you see

3    that?

4          A.    Yes.

5                MS. STRONG:  Objection to

6          form.

7    BY MR. JANUSH:

8          Q.    Did you work with Razorfish?

9          A.    I worked with Razorfish.

10         Q.    And who is Razorfish?  What

11   kind of company is Razorfish?

12         A.    One of the vendors that we

13   worked with at -- that specialize in

14   search engine optimization.

15         Q.    So what types of things

16   would you have been seeking to accomplish

17   by working with Razorfish?

18               MS. STRONG:  Objection to

19         form.

20               THE WITNESS:  I recall one

21         thing that I worked with them on

22         was to sort of optimize search

23         when people were searching for

24         Nucynta, that it would actually

Page 73

1          come up, or if they searched for a

2          related topic, that it would come

3          up.

4    BY MR. JANUSH:

5          Q.    What kind of a related topic

6    would you be seeking to have come up with

7    Nucynta?

8          A.    So it's -- you know, it

9    involves a lot of different things.  So

10   for example one thing would be opioid, if

11   someone is searching for opioid or pain

12   relief, opioid, then Nucynta would be

13   part of that consideration set.

14         Q.    And moving to the next page.

15   The middle of the page, you're listed as

16   being the owner for a topic called

17   "evaluate patient strategy."

18               Do you see that?

19         A.    Mm-hmm.

20         Q.    Were you the owner of this

21   topic, evaluating patient strategy?

22         A.    I was tasked to evaluate

23   patient strategy.

24         Q.    What does it mean to

Page 74

1    evaluate patient strategy?

2          A.    It means at the time I was

3    asked to think about what if anything we

4    should do with regard to educating

5    patient about Nucynta ER.  That was the

6    task.

7          Q.    And what if anything was

8    done?

9          A.    So I did an evaluation

10   using, you know, sort of typical

11   marketing framework, thinking about what

12   the needs are.  And how we could meet

13   those needs.  And I presented the

14   recommendation to, you know, management

15   at the time.

16              I don't recall recommending

17   a whole lot given, you know, the sort of

18   lack of budget to work on things.  And so

19   it was a pretty small portion of what I

20   did.

21         Q.    Okay.  And in fact, when we

22   look to the right, we actually don't see

23   dollars associated with "evaluate patient

24   strategy."

Page 75

1              Does that surprise you or --

2              MS. STRONG:  Objection to

3         form.

4    BY MR. JANUSH:

5         Q.    -- or does that support the

6    notion that you didn't do much with

7    respect to direct patient strategy?

8              MS. STRONG:  Objection to

9         form.

10             THE WITNESS:  Again, to what

11        I was saying before, this is kind

12        of like a live document.  At that

13        time of the capture, it seems like

14        there was no budget allocated.

15   BY MR. JANUSH:

16        Q.   Okay.  I know -- I know that

17   you're saying it's a live document, and

18   at that time concerning, you know, the

19   capture, but I believe that this is a

20   year-end reflection after many invoices

21   had come in, in terms of where your

22   business was.

23             You have no way of assessing

24   that one way or the other looking at

Page 76

1    this, with all the experience you have on

2    the brand team, looking at what invoicing

3    and purchase orders means and has meant

4    historically at Janssen to the budget

5    process?

6              MS. STRONG:  Objection to

7         form.  And just generally

8         speaking, it seems, Mr. Janush,

9         that you're attempting to testify

10        to a lot of things that have not

11        been testified to by Ms. Burns.

12             MR. JANUSH:  I'm actually

13        asking a question.

14   BY MR. JANUSH:

15        Q.    I'm asking if you have no

16   way of assessing that one way or the

17   other looking at this with all the

18   experience you have on the brand team,

19   looking at what invoicing historically at

20   Janssen, you know, occurred within the

21   budget process?

22             MS. STRONG:  Objection to

23        form.

24             THE WITNESS:  So with much

Page 77

1            experience with Janssen and the

2            way things work with the budget,

3            that's exactly why I cannot make

4            those conclusions.  Because this

5            would be something that would be

6            updated on a regular basis.  It

7            could be updated weekly, biweekly,

8            monthly.

9                 So, and I relied on

10           information from several sources

11           as well.  So this is a sort of a

12           gut check documentation about

13           where we are.  So because I have

14           that experience it is -- that's

15           why I'm reluctant to make any

16           conclusions about a snapshot in

17           time.

18    BY MR. JANUSH:

19           Q.   What would be the document

20    that you would be looking for?  Is there

21    a particular date and time that you'd be

22    looking for to have more comfort that

23    you've been presented with, as an

24    example, a year-end or an accurate budget

Page 78

1    summary as of the date it was printed?

2                  MS. STRONG:  Objection to

3          form.

4    BY MR. JANUSH:

5          Q.    In other words, if a

6    document is printed as of a given date,

7    and it shows invoiced amounts and

8    purchase order amounts, what would you be

9    looking for within the document to

10   confirm that something was actually paid?

11                 MS. STRONG:  Objection to

12         form.

13                 THE WITNESS:  So if I'm

14         looking to understand what was

15         actually paid, I would go to

16         accounts payable, and I would ask

17         them for their record of what was

18         paid.  That's the only true way of

19         knowing that something happened

20         because they pay the vendors.

21                 So this is -- this is --

22         marketing track is just for our

23         own sort of understanding of where

24         we are.  But truly only the

Highly Confidential - Subject to Further Confidentiality Review

Page 79

1           finance folks, accounts payable,

2           would have the correct

3           information.

4     BY MR. JANUSH:

5           Q.    So if I wanted to obtain,

6     outside of the Nucynta SharePoint, the

7     best budget information concerning what

8     was invoiced and what was actually paid

9     for the Nucynta brand team for 2012, I

10    would go to the finance folks at Janssen?

11          A.    I would say the finance

12    folks have the most accurate information.

13          Q.    Okay.  Incidentally, just as

14    a preliminary matter, going back to the

15    start of the deposition, I didn't ask you

16    a couple of fundamental questions that I

17    wanted to go over.  Today, who do you

18    work for?

19          A.    Quest Diagnostics.

20          Q.    Okay.  And what do you do

21    for Quest Diagnostics?

22          A.    I'm a director of marketing

23    for one of the tests that we sell.

24          Q.    Okay.  And what is that

Highly Confidential - Subject to Further Confidentiality Review

Page 80

1   test?

2        A.    Well, the franchise is

3   called Prescription Drug Monitoring.  So

4   it's urine drug testing for the most part

5   in layman's term.

6        Q.    Okay.  So you're a -- did

7   you say marketing director?

8        A.    Director of marketing, yeah.

9   Marketing.

10       Q.    For a urine drug testing

11  company?

12            MS. STRONG:  Objection to

13       form.

14  BY MR. JANUSH:

15       Q.    Or a product that tests

16  urine for -- is it for, like, illicit

17  drugs?

18       A.    So my employer -- my

19  employer --

20            MS. STRONG:  Objection.

21       Give me a moment to object.

22            THE WITNESS:  I'm sorry.

23            MS. STRONG:  Objection to

24       form.

Page 81

1          Go ahead.

2          THE WITNESS:  So, my

3     employer is Quest Diagnostics.

4     It's a diagnostics company.  They

5     take a lot of, you know, like

6     lab --

7  BY MR. JANUSH:

8          Q.    Sure.

9          A.    -- lab testing.

10          Q.    And your -- the specific

11  product that you're associated with is a

12  urine drug test?

13          A.    Yes.

14          Q.    And what kinds of things

15  does this test for?

16          A.    A lot of different things.

17  But it tests for prescription drugs or

18  illicit drugs.

19          Q.    Okay.  When did you learn

20  that you were going to be a witness in

21  this case?

22          MS. STRONG:  Objection to

23     form.

24          THE WITNESS:  When did I

Page 82

1           learn that I was going to be a

2           witness in this case?  I want to

3           say a few months ago.  A couple

4           months ago.

5   BY MR. JANUSH:

6           Q.    And without getting into

7   specific discussions, who first reached

8   out to you?

9           A.    Who first reached out to me?

10  I believe it was a gentleman named Tad.

11          Q.    Tad Allan?

12          A.    Yeah, I think so.

13          Q.    Did you have an opportunity

14  to prepare for this deposition with

15  attorneys?

16          A.    Yes.

17          Q.    On how many different

18  occasions?

19          A.    I think three or four.

20          Q.    And starting when?

21          A.    This is end of November, so

22  I think maybe six weeks ago.

23          Q.    Okay.  And was six weeks ago

24  the first preparation session that you

Page 83

```
 1    would have had?

 2           A.     Correct.

 3           Q.     And about how many -- did

 4    that last for a full day?

 5           A.     I think we met maybe a

 6    couple of days.

 7           Q.     Okay.  And over -- were they

 8    full day sessions -- meeting sessions?

 9    How many hours would you say?

10           A.     Like, we might start at 9:00

11    and go until 3:00, 4:00.  I don't know.

12           Q.     And where did you meet?

13           A.     The first time we met on

14    Janssen property.

15           Q.     In New Jersey?

16           A.     In New Jersey.

17           Q.     Okay.  Were you flown out to

18    New Jersey?

19           A.     No.  I was living in

20    Pennsylvania at the time, and that was

21    close.  It was a close location.

22           Q.     Sure.  Were you paid for

23    your time?

24           A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 84

1          Q.     Okay.  And who did you meet

2      with?

3          A.     I met with Tad and Mike.

4      Tad and Mike.

5          Q.     Do you know Mike's last

6      name?

7          A.     I don't recall his last

8      name.

9          Q.     Okay.  And so the first time

10     that you met to prepare for your

11     deposition occurred over a two-day period

12     in New Jersey on Janssen property; is

13     that right?

14         A.     That is correct.

15         Q.     When was the second time

16     that you met to prepare for your

17     deposition?

18         A.     With -- I believe it was a

19     two-day session.  So if you call that a

20     second time, it was like the next day.

21     It was a long time ago.  So it might have

22     been like a day in between or something

23     like that, based on the schedule.

24         Q.     And that was also with Tad?

Page 85

1         A.    Yes.  Tad and Mike, I

2   believe.

3         Q.    And was -- let's go to the

4   third deposition preparation session.

5   When was that?

6         A.    I think there was like a

7   one-month gap in between, and then we met

8   on Janssen property.

9         Q.    And were you living in

10  Pennsylvania then too?

11        A.    Yes.

12        Q.    Okay.  And who did you meet

13  with then?

14        A.    I think it was -- I think it

15  was Mike and Sabrina.

16        Q.    And how long was that third

17  preparation session?

18        A.    I think similar.  Similar

19  to --

20        Q.    So start 9:00 a.m. to 3:00

21  or 4:00 p.m.?

22        A.    Mm-hmm.  With like breaks

23  and lunch and stuff.

24        Q.    And was there a fourth

Page 86

1   session?

2           A.    Yes.

3           Q.    When was that?

4           A.    Last week here in Vermont.

5           Q.    And who did you meet with

6   last week here in Vermont?

7           A.    Sabrina.

8           Q.    Where did you meet in

9   Vermont with Sabrina?

10          A.    Here, at this location.

11          Q.    Here?  Okay.  And how long

12  was that session?

13          A.    Similar.  Similar to the

14  other ones.

15          Q.    So again, like 9:00 a.m. to

16  3:00 or 4:00 p.m.?

17          A.    Something like that, yeah.

18          Q.    And during any of these

19  sessions were you shown documents?

20               MS. STRONG:  Again, I'd like

21          to object to the extent this is

22          going to get into attorney/client

23          privilege communications.  I'd

24          instruct her not to answer.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. JANUSH:  She is

2         permitted to say whether she was

3         shown documents.

4              MS. STRONG:  Right.  But I

5         don't want to get into the content

6         of any materials.

7              MR. JANUSH:  I won't.

8              MS. STRONG:  But generally

9         speaking, that's fine.

10              THE WITNESS:  Yeah, I --

11              MR. JANUSH:  It would be

12         unethical to do that.  I won't --

13              THE WITNESS:  I've been

14         shown some documents, yes.

15    BY MR. JANUSH:

16         Q.   Okay.  About how many

17    documents were you shown?

18              MS. STRONG:  Again --

19              THE WITNESS:  I don't know.

20              MR. JANUSH:  I'm not getting

21         into content.

22              MS. STRONG:  I just think

23         we're getting close to the line

24         here.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. JANUSH:  I'm allowed to

2       ask this question.

3          THE WITNESS:  You know, I

4       don't know.  Several.  And

5       sometimes, you know, it's not --

6       not -- it could be like partial of

7       something.  So I don't recall how

8       many.

9    BY MR. JANUSH:

10       Q.    More than ten?

11       A.    Again, I don't --

12          MS. STRONG:  Excuse me.

13       Just a moment.

14          MR. JANUSH:  This is an

15       absolutely appropriate line of

16       questions.

17          MS. STRONG:  The number

18       of -- the number of documents

19       shown to the witness I do not

20       believe is appropriate.  I think

21       we're getting into --

22          MR. JANUSH:  It's absolutely

23       not a privileged issue.  I'm not

24       asking about content, I'm not

Highly Confidential - Subject to Further Confidentiality Review

Page 89

```
 1          asking subject matter.  I'm just
 2          asking the number of documents
 3          that --
 4               MS. STRONG:  Just ask --
 5               MR. JANUSH:  And you're
 6          giving a speaking objections.
 7          That is in violation of the
 8          deposition protocol.
 9               MS. STRONG:  Well, I think,
10          like I said, we're talking about
11          attorney/client privilege
12          communications.  And I just want
13          to make sure --
14               MR. JANUSH:  We can call
15          Special Master Cohen on this.  I'm
16          guaranteeing that he's going to
17          agree with me that -- that the
18          number of documents a witness is
19          shown is not privileged
20          communication.  And I'm sure,
21          based on what I heard on
22          November 20th, that Judge Polster
23          would agree.
24               MS. STRONG:  Look, we don't
```

 1          have to get into an argument over

 2          this.  I don't -- go ahead and

 3          answer the question the best you

 4          can.

 5               But again, please do

 6          caution -- I caution you not to

 7          speak to the contents of the

 8          communications --

 9               MR. JANUSH:  Nor am I --

10          again, I'm too ethical to ask you

11          the contents of the documents.

12          You won't hear that question from

13          me.

14               THE WITNESS:  I think it

15          depends on how you define a

16          document.  Is one document multi

17          pages, is that one document, or is

18          each page, you know, a document.

19          So I don't know how you're

20          classifying it.

21   BY MR. JANUSH:

22          Q.    Sure.  I'll help you there.

23          A.    Maybe ten.

24          Q.    I'm -- I'm talking about,

Highly Confidential - Subject to Further Confidentiality Review

Page 91

1    you know, like -- multi-page documents

2    can qualify as a single document.

3         A.    Yeah, maybe, maybe ten.

4         Q.    Thank you.

5         A.    Mm-hmm.

6         Q.    I'm going to have you flip

7    forward to -- let's see.  I'm going to

8    put it up on the Elmo to see if you can

9    track me.  Since we don't have page

10   numbers.  The print is -- the cell file

11   is so large.

12            I've gone down to the cycle

13   meetings, it's in the middle of the page.

14   And actually there is a highlighted line

15   that you'll see -- yes, you are on the

16   right page.  And I'm going to ask

17   Ms. Strong to either share the document

18   with you or look at the Elmo.  I'm going

19   to present it on the Elmo so that

20   Ms. Strong can see it as well.  Do you

21   see that?

22            I'm going to put my fingers

23   around, boxing around the area that I'm

24   focusing on.

Page 92

1              MR. JANUSH:  Do you see

2         that, Ms. Strong?

3              MS. STRONG:  Yes.

4    BY MR. JANUSH:

5         Q.    Okay.  So I'm specifically

6    focusing on cycle meetings, presentation,

7    support videos, customer/patient panels,

8    speech writing, printing materials, et

9    cetera.  Do you see that?  I'm going to

10   circle it.

11        A.    I see it.

12        Q.    Okay.  And it looks like

13   your name is under owner for Danny cycle

14   one support.  Do you know what that

15   means?

16        A.    Mm-hmm.

17        Q.    What does that mean?

18        A.    Danny is a consultant.  I

19   don't remember his last name.  He is kind

20   of like a presentation coach.

21        Q.    Okay.  And going to the next

22   section that's highlighted, not by me,

23   but in the document.  It says, "Pain

24   specialists consultants, 18, at regional

Highly Confidential - Subject to Further Confidentiality Review

Page 93

1    cycle meeting.  Owner, Kanitha Burns."

2                    And then it looks like that

3    there's an invoiced amount of $26,456 and

4    then a, in the red, a total PO of

5    $31,435.

6                    What would it mean to

7    have -- to have an initial invoiced

8    amount and then have a number that's

9    highlighted in red on budget sheets, if

10   you know?

11         A.    I don't know why this would

12   have been highlighted red.

13         Q.    Okay.  Could it be

14   because -- because this item went over

15   budget and so it was in the red?

16             MS. STRONG:  Objection to

17             form.

18             THE WITNESS:  It doesn't

19             look like it went over budget.

20   BY MR. JANUSH:

21         Q.    Well --

22         A.    According to this, it's --

23         Q.    Well, the budget, if I

24   circle it for you, I'm looking at, is out

Page 94

1    of the $21.8 million, it looks like

2    $26,456 is budgeted.  Do you see that?

3              MS. STRONG:  Objection to

4         form.

5              THE WITNESS:  I see what

6         you're pointing to, yes.

7    BY MR. JANUSH:

8         Q.    Okay.  And then the total

9    PO, that would be total purchase order,

10   right?

11        A.    That's, that's what it seems

12   to indicate.

13        Q.    Is listed at $31,436 in red,

14   right?

15        A.    I see it in red.

16        Q.    Okay.  So that wouldn't

17   indicate that -- that this was slightly

18   over budget?

19        A.    So this is why I go back --

20        Q.    If these numbers were

21   accurate.  Let me restate.

22        A.    Yeah.  So this is why I go

23   back to -- I -- this is a working

24   document and things could have been

Page 95

1    changed for the purpose of, you know,

2    evaluating where we are, what needs to be

3    changed.  So this is why it's -- I think

4    it's really hard to interpret, because as

5    you can see, many columns represent many

6    things and probably different scenarios.

7                   So for instance, the

8    original -- the budget, the JU budget was

9    34,380.  And you see the PO was open for

10    31,436, already they don't match.  Then

11    the invoice is 26,456, which shows

12    hypothetically that at that time that

13    much has been invoiced.

14           Q.    So --

15           A.    So, like, I'm not sure what

16    was the final approved budget for that

17    particular item.

18           Q.    Got it.

19           A.    At that point in time.

20           Q.    Let's just --

21           A.    So I'm just trying to --

22           Q.    Yeah, and I'm going to try

23    and help -- I'm going to try and help a

24    little bit since I've read -- maybe I've

Highly Confidential - Subject to Further Confidentiality Review

Page 96

1  read this document more than you more

2  recently.

3          A.    Okay.

4          Q.    It looks like there's an

5  original June budget of 23.5 here.  It

6  looks like there was an imperative at the

7  company to cut from that budget

8  $1.7 million to get to a 21.8 total

9  actual budget.  Do you see that?

10         MS. STRONG:  Objection to

11         form.

12         THE WITNESS:  I see what

13         you're saying.

14 BY MR. JANUSH:

15         Q.    Okay.  And then so -- so

16 the -- isn't it -- is it possible, just

17 asking, is it possible that that June

18 budget you were looking at and referring

19 to, this not being over budget, was

20 actually cut when the marketing team was

21 asked to take out 600 K from their

22 allocation?

23         MS. STRONG:  Objection.

24 BY MR. JANUSH:

Page 97

1          Q.    See this -- this box here?

2    I'm just saying is it possible.  That's

3    all I'm asking.

4               MS. STRONG:  Okay.  And

5               there's two different questions:

6               Is it possible or do you see it.

7               Which is the one you'd like her to

8               answer?

9    BY MR. JANUSH:

10         Q.    First you see the 600 K

11   reduction box?

12         A.    I see the column.

13         Q.    Okay.  Is it possible that

14   in order to make it to $21.8 million,

15   that that June budget got reduced by your

16   marketing team?

17         A.    Is it possible that it was

18   reduced?  It's possible that's under

19   consideration.

20         Q.    Okay.

21         A.    And that's a scenario that

22   we would run.

23         Q.    Let's --

24         A.    I guess I'm -- I'm sorry, I

Page 98

1    really want to be helpful.  But I'm not

2    sure what you're looking for.

3            Q.    Well, I was just --

4            A.    If you can tell me what

5    you're looking for, I think I can better

6    answer.

7            Q.    We're -- we're fussing over

8    the accuracy of a budget that -- that --

9            A.    Right.

10           Q.    So I'm going to skip that

11   and more onto something more substantive.

12           A.    Okay.

13           Q.    What is the pain specialist

14   consultant's line item with 18 in

15   parentheses at regional cycle meeting?

16   There's -- is that concerning having 18

17   consultants at a regional meeting?

18               MS. STRONG:  Objection to

19           form.

20               THE WITNESS:  I don't know

21           what the 18 represents.  I don't

22           recall that number.  So I don't

23           know what that would have meant.

24   BY MR. JANUSH:

Page 99

1         Q.    Is it referring to have pain
2    specialist consultants at a regional
3    cycle meeting?
4         A.    I don't -- so I'm -- I'm
5    just seeing the words, but I don't
6    recall.  Like I can't picture what that
7    is.  But it's possible that we were
8    considering having pain specialists in
9    some form of consultation for the purpose
10   of a regional cycle meeting.
11        Q.    Got it.
12        A.    But I don't know, like, what
13   that would have been.  I don't recall.
14        Q.    Okay.  Were you -- were you
15   involved in the rebate program on behalf
16   of Nucynta?
17        A.    No.
18        Q.    Not at all?
19        A.    Not my responsibility.
20        Q.    So I'm going to have you
21   list each of your key oversight or
22   managerial responsibilities when you
23   worked on Nucynta.
24        A.    For the entire three years?

Highly Confidential - Subject to Further Confidentiality Review

Page 100

```
 1         Q.    Yeah.  The key oversight
 2    responsibilities.
 3              MS. STRONG:  Objection to
 4         form.
 5              THE WITNESS:  Professional
 6         marketing, digital -- digital
 7         advertising and just in general
 8         advertising, search engine
 9         optimization.
10              And again, this is, like,
11         things that I've worked on.  It's
12         not telling how long I worked on
13         them.  You know, during the
14         three-year period, because
15         responsibility shifted.  So just
16         to be clear.
17              I worked on the website a
18         little bit.  I worked on sales
19         meetings.  Those are the things
20         that come to mind, big ones.
21    BY MR. JANUSH:
22         Q.    Did you work on sales
23    incentive compensation?
24         A.    It was not my
```

Highly Confidential - Subject to Further Confidentiality Review

Page 101

1    responsibility.

2         Q.    Sales incentive

3    compensation.

4              Okay.  Did you work on key

5    opinion leader development?

6              MS. STRONG:  Objection.

7         Form.

8              THE WITNESS:  So let me

9         just -- I want to make sure that

10        we're clear.  When you say "did I

11        work on," what do you -- can you

12        clarify what that -- what that

13        means.

14   BY MR. JANUSH:

15        Q.    Well, I'm going to -- I'm

16   going to ask you that.  What role did you

17   have, if any, with regard to developing

18   or hiring key opinion leaders?

19             MS. STRONG:  Objection to

20        form.

21             THE WITNESS:  It was not my

22        responsibility.

23   BY MR. JANUSH:

24        Q.    Okay.  Did you have any

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    responsibility to allocate budgets to --

2    for key opinion leaders to speak

3    regionally or nationally?

4            A.    No.  It's not mine.

5            Q.    No responsibility to

6    allocate budgets for -- we'll call them

7    KOLs --

8            A.    Sure.

9            Q.    -- to speak regionally --

10   regionally or nationally.  Okay.

11              How about advisory boards?

12   Did you have any responsibility with

13   regard to allocating budgets for advisory

14   board participants?

15           A.    No.

16           Q.    Earlier I had shown you your

17   LinkedIn document and marked it as

18   Exhibit 1.  And in it, you wrote that

19   you -- optimizing -- you were involved in

20   optimizing customer target and sales

21   incentive compensation.

22              Moments ago, I asked you

23   whether you were involved in sales

24   incentive compensation, and you wrote

Highly Confidential - Subject to Further Confidentiality Review

1     "not my responsibility."

2               Which is correct, your

3     LinkedIn profile or your testimony today?

4               MS. STRONG:  Objection to

5          form.

6               THE WITNESS:  So this is why

7          I asked you what you meant by

8          working on certain things.  So the

9          way things work, at least at the

10         time -- well, I would say in

11         general too.  I was responsible

12         for certain things, and I, you

13         know, testified as such in terms

14         of what things I was responsible

15         for.

16              But there are certain things

17         that I was involved in discussions

18         and had input, but technically not

19         my responsibility.  Does that make

20         sense?

21              So because it's a very

22         matrix organization, a lot of

23         people are involved in, you know,

24         multiple conversations.  And just

Highly Confidential - Subject to Further Confidentiality Review

1          because you don't have technical

2          responsibility doesn't mean you

3          don't, you know, hear about, or

4          you talk about or you have input

5          on.

6                So that's why I want it to

7          be very clear in delineating,

8          like, exact responsibility or not.

9   BY MR. JANUSH:

10          Q.    Thank you.  But I'm not sure

11   that answered my question.  My question

12   was that -- I asked you whether you were

13   involved with sales incentive

14   compensation, and you said quote, "Not my

15   responsibility."

16          A.    Which is accurate.  But it's

17   not my responsibility.

18          Q.    And yet, on -- so what

19   you're saying is, although you weren't

20   responsible for it, now you're saying --

21   are you saying now that you were involved

22   in it?

23                MS. STRONG:  Objection to

24          form.

Page 105

1   BY MR. JANUSH:

2        Q.    In other words, I didn't ask

3   you, you know, whether you were

4   responsible for that.  I'm asking you

5   were you involved in sales incentive

6   compensation?

7        A.    Oh, okay.

8             MS. STRONG:  Objection to

9        form.

10            Go ahead.

11            THE WITNESS:  All right.  So

12       it depends on, like, you know,

13       what you mean by that.

14            So there was some incentive

15       compensation discussions that

16       happened that, you know, my

17       knowledge had to do with incentive

18       compensation for the Quintile

19       sales team, the reduced size sales

20       team.

21            So I was not responsible for

22       it.  But I was in the room for

23       some of the discussions, you know,

24       at different parts.  So I would

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1          say that's involvement.

2    BY MR. JANUSH:

3          Q.    So where I'm highlighting on

4    your LinkedIn profile, "Sales incentive

5    compensation," you were in the room for

6    some discussions concerning Quintiles

7    sales representatives?

8          A.    Representatives.

9          Q.    Okay.  All right.  And you

10   have made a point of differentiating

11   between working with people who also had

12   responsibilities as opposed to whether

13   you had primary responsibility.

14         A.    Yes.

15         Q.    And that's a fair summary on

16   my part, right?

17              MS. STRONG:  Objection to

18         form.

19              THE WITNESS:  Well, I want

20         to be as accurate in my answer as

21         possible.  So you asked me to list

22         my responsibilities.  And so I

23         did.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 107

1          Q.   Got it.  Okay.  Were you

2     responsible for turning around the

3     Nucynta molecule business?

4               MS. STRONG:  Objection to

5          form.

6               THE WITNESS:  Our team --

7          our marketing team, and together

8          with the sales team, our goal was

9          to turn around the business.  It

10         wasn't performing well, and that's

11         our job, is to do that.

12     BY MR. JANUSH:

13         Q.   So on this profile, that's

14    for you, not your marketing team, right?

15    This is individual to you, correct?

16         A.   Correct.

17         Q.   You listed, "Turned around

18    the Nucynta molecule business," didn't

19    you?

20         A.   Yes.

21         Q.   Did you mean to say it was

22    part of a team that turned around the

23    Nucynta molecule business?

24               MS. STRONG:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 108

1          form.

2                  THE WITNESS:  I meant -- I

3          don't know what you mean by did I

4          mean to say.  That's what I said,

5          is I contributed to turning around

6          the business.

7    BY MR. JANUSH:

8          Q.    Okay.  And you next wrote,

9    revitalized all elements of marketing

10   including delivering more relevant market

11   insights.  Do you see that?

12         A.    I do.

13         Q.    How did you revitalize all

14   elements of marketing?

15         A.    So that is referring to the

16   fact that when I joined the team and I

17   was responsible for professional

18   marketing, as stated before, we uncovered

19   some insights.  We made changes to the

20   marketing messages and the marketing

21   material.  And so when, you know, we

22   revitalize all elements of marketing,

23   that means the different -- different

24   pieces of educational material or sales

Highly Confidential - Subject to Further Confidentiality Review

Page 109

1    material were updated with, you know,

2    whatever the message was.  That's what it

3    means.

4            Q.    What were the -- what were

5    the insights that you uncovered?

6                 MS. STRONG:  Objection to

7            form.

8                 THE WITNESS:  There were,

9            you know, sort of -- I don't

10           recall all of them.  But there

11           were some, you know, pretty key

12           things that we understood.

13                Would you like me to give

14           you one insight?

15                Okay.  One insight was that

16           the prescribers were not

17           prescribing Nucynta ER correctly

18           according to the doses that were

19           studied in the clinical trial.

20                They didn't understand the

21           dosing of the product and were not

22           achieving, you know, the results

23           that were represented in the

24           clinical results from our study,

Highly Confidential - Subject to Further Confidentiality Review

1          because of the incorrect dosing.

2     BY MR. JANUSH:

3          Q.    Are you referring to the

4     lower back pain study?

5          A.    Well, the lower back pain

6     study was one of the, you know -- was one

7     of the studies that's in the package

8     insert, yeah.  Mm-hmm.

9          Q.    Is that the -- which study

10    are you referring to when you say the

11    prescribers were not prescribing --

12         A.    Yeah, predominately the low

13    back pain study.

14         Q.    Okay.  In the second bullet,

15    as compared with the first, you used

16    different language such as "partnered

17    with sales leadership to develop

18    actionable sales strategy and direction."

19              Do you see that?

20         A.    I do.

21         Q.    You didn't use words like

22    "partnered with" anyone in the first

23    bullet; is that right?

24         A.    Apparently, yes.  Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

Page 111

1           Q.    Okay.  How did you -- let's

2    talk about how you partnered with sales

3    leadership to develop actionable sales

4    strategy and direction.

5           A.    Okay.

6                 MS. STRONG:  Objection to

7           form.

8                 What's the question?

9    BY MR. JANUSH:

10          Q.    How did you partner with

11   sales leadership to develop actionable

12   sales strategy and direction?

13          A.    You know, that covers a lot

14   of --

15                MS. STRONG:  Objection to

16          form.

17                THE WITNESS:  -- a lot of

18          different things.  I mean, it's a

19          capture of, you know, interaction

20          over two years.  So -- I don't

21          know how to explain it because

22          there's just so many different

23          things that we did.

24                I mean, do you want me to

Highly Confidential - Subject to Further Confidentiality Review

Page 112

1          just give an example of one way of

2          partnering with them?

3    BY MR. JANUSH:

4          Q.    I mean, this is -- this is

5    essentially your resumé, not mine, so I'm

6    asking you to explain it.

7          A.    Yeah, and I'm also -- I'm

8    trying to see, you know, like what it is

9    you want to understand.  Because, you

10   know, resumés are for people who are

11   hiring people who would understand a lot

12   of these things, so...

13         Q.    Pretend I'll understand a

14   lot of these things.  I want you to

15   explain it the best you can.

16         A.    Okay.  So partnering with

17   sales leadership means that, you know, I

18   didn't -- it's intended to convey that

19   marketing, like myself, wasn't always

20   directive and demanding that they do

21   certain things.  Partnership refers to

22   consultation.  It talks about, okay, here

23   is what we're trying to achieve.  What do

24   you think would be the best way to

Page 113

1   achieve it.  If we had to, you know, tell

2   the sales representatives to deliver our

3   particular message to educate the

4   clinicians, well, how do you think is the

5   best way for us to get them to do that.

6   How do we motivate them to do that.  If

7   we, you know, wanted to kind of, you

8   know, emphasize the dosing issue that we

9   have in the marketplace, when should we

10  do that, how should we do that.  That's

11  what I mean by partnering with them on

12  how to, you know, deliver what we want

13  the sales representatives to do in the

14  most effective way.

15         Q.   And moving onto the next

16  statement, "Equip and train specialty

17  sales team with resources to maximize

18  impact and deliver on financial

19  commitment."

20              What does that mean?

21         A.   Okay.  That's -- that's a

22  lot in there.  So, equip and train.  So

23  let me just kind of like break it down

24  because there's a lot in there, right.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1              So equip and train means I

2    was responsible for equipping them with

3    sales tools.  So I was responsible for

4    professional marketing which includes

5    developing sales tools.

6              So equipping them means I'm

7    developing sales tools that they can use

8    for the purpose of educating clinicians

9    about the benefits and the profile of

10   Nucynta ER.  Okay.  So that's what

11   equipping mean.

12             Training them means now that

13   I have the sales material, I need to give

14   it to them and make sure they understand

15   the intent, the objective of what the

16   material is supposed to do.  Make sure

17   that they don't have any questions that,

18   you know, that will cause any kind of

19   confusion about what -- what it says and

20   how to use it.  That's kind of what it's

21   referring to.

22             And then -- this is a

23   multipart question here.  Are you good on

24   that?

Highly Confidential - Subject to Further Confidentiality Review

Page 115

1          Q.    You can keep going.

2               MS. STRONG:  Well, no, I

3          think there needs to be a question

4          pending.

5               So to the extent she's tried

6          to answer the question to the best

7          of her ability, I think that's

8          sufficient.

9               He can ask another question.

10              MR. JANUSH:  Stop speaking

11         objections.

12              MS. STRONG:  There's no

13         question pending --

14              MR. JANUSH:  The question I

15         had -- I'll go back to it if I

16         have to.

17  BY MR. JANUSH:

18         Q.    Concerned, in addition to

19  equipping and training, you addressed

20  equipping and training with resources,

21  what does it mean to maximize impact and

22  deliver on financial commitment?

23              MS. STRONG:  Objection to

24         form.

Page 116

1          THE WITNESS:  Okay.  So I'm

2     going to mention the first one.

3          Maximize impact.  Maximize

4     impact means that when the sales

5     representatives are taking action

6     with a customer, that there is

7     actually an impact, right.

8          Because I think you can just

9     go through the motions, I show up,

10     I clock in from 9 to 5.  You know,

11     I showed up, and I did my thing.

12     And that's not considered

13     impactful.

14          Impactful means they are

15     articulate, they are knowledgeable

16     and well trained.  They speak

17     eloquently, clearly.  They answer

18     questions to the clinicians.  And

19     they make sure that what they do,

20     you know, meets sort of the goal

21     of the organization of making sure

22     that clinicians know about, you

23     know, Nucynta ER, what it's

24     indicated for, how to properly use

Highly Confidential - Subject to Further Confidentiality Review

Page 117

1         it, answer any questions that they

2         might have.  So that's delivering

3         with impact.

4    BY MR. JANUSH:

5         Q.    And what does "deliver on

6    financial commitment" mean?

7         A.    So that means that what --

8    everything that we're doing is meaningful

9    and leads to, you know, a growth in sales

10   of the product to meet the financial

11   commitment that we made to Janssen of

12   what Nucynta ER should deliver

13   financially.

14        Q.    And what was the financial

15   commitment that you made to Janssen on

16   what Nucynta ER should deliver

17   financially?

18             MS. STRONG:  Objection to

19        form.

20             THE WITNESS:  So every --

21        you know, just like most

22        businesses, every year there's a

23        goal.  I don't recall, you know,

24        over the three years, you know,

Page 118

```
1              those numbers fluctuated.  I don't
2              recall what the -- they were.  But
3              there was, you know, every year
4              there's a number in which that's
5              the projection.
6   BY MR. JANUSH:
7         Q.    Are we talking about numbers
8   in the hundreds of millions of dollars?
9              MS. STRONG:  Objection to
10             form.
11             THE WITNESS:  I -- you know,
12             I don't recall.  In the low
13             hundred millions, I would say.
14                (Document marked for
15             identification as Exhibit
16             Janssen-Burns-3.)
17  BY MR. JANUSH:
18        Q.    I'm going to hand you what
19  I've marked as Exhibit 3.  It's
20  JAN-MS-00672183.  It's a breakdown of
21  roles and responsibilities as of February
22  2013.  And you appear in the upper
23  right-hand corner of this sheet.
24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 119

1          A.     Mm-hmm.

2          Q.     Okay.  And it says that your

3    primary responsibilities are -- involve

4    messaging HCP materials including iPad.

5    What is that referring to?

6          A.     Which part, the HCP

7    material?

8          Q.     Yes.

9          A.     HCP stands for healthcare

10   professional.  So any sales material that

11   is intended for healthcare professionals.

12         Q.     Okay.  And including iPad,

13   is -- is that referring to the electronic

14   iPad sales resource tool that was

15   provided to sales representatives?

16         A.     Mm-hmm, yeah.

17         Q.     Okay.  And sales strategy

18   development, what is that referring to?

19         A.     Sales strategy development.

20   You know, I don't recall what that would

21   mean.

22         Q.     You know, I'm asking you

23   because, out of the entire marketing

24   team, pain marketing team, you are the

Highly Confidential - Subject to Further Confidentiality Review

Page 120

1    only one that's listed with that primary

2    responsibility.  And as you sit here

3    today, you don't know what that means?

4              MS. STRONG:  Objection to

5         form.

6              THE WITNESS:  Yeah, actually

7         the way it's worded, I don't know

8         what it was intended to be.

9              And I also don't know if

10        this was final because what would

11        happen is -- I recall seeing a

12        document like this.  You know,

13        David Lin who is the leader of the

14        team would propose these

15        responsibilities and give to us

16        and say what do you think of this.

17             And as you recall from

18        earlier, I shared that over the

19        three-year period I had different

20        responsibilities because he was

21        big on making sure that everybody

22        gets like different experiences

23        over time.  So we don't get bored

24        and we develop and things like

Highly Confidential - Subject to Further Confidentiality Review

Page 121

```
1            that.  So it could have been that
2            this was what he proposed, but it
3            wasn't final.
4   BY MR. JANUSH:
5            Q.    You see the words "as of
6   February 2013" here?
7            A.    Mm-hmm, yeah.
8            Q.    It seems to imply that these
9   are responsibilities as of a given date,
10  doesn't it?
11                 MS. STRONG:  Objection to
12           form.
13                 THE WITNESS:  It could mean
14           a lot of different things.  It
15           could be he drafted it
16           February 2013 for discussion.
17                 You know, I don't know.  I'm
18           not disputing that this is not a
19           legitimate document.  I'm just
20           saying I don't know at what point,
21           like was this finalized or -- or
22           what.  That's just one point.  But
23           I don't recall sales strategy
24           development and what that would
```

Page 122

1          mean.

2     BY MR. JANUSH:

3          Q.    Do you recall being the

4     primary person responsible for the

5     business plan in 2013?

6          A.    I recall being responsible

7     for business plan one of the years.  It

8     could have been 2013, yeah.

9          Q.    Do you recall being --

10         A.    That rotated as well.

11         Q.    Do you recall being

12    responsible for sales training in 2013?

13         A.    Did I do that?  I don't -- I

14    can't say for sure.  Because we also have

15    a sales training department.  So that

16    might just be to be the main liaison with

17    the sales training department.

18         Q.    Okay.  And how about with

19    regard to field communications.  Do you

20    recall being the person responsible for

21    field communications in 2013?

22         A.    Mm-hmm, yeah.

23         Q.    What does being responsible

24    for field communications mean?

Highly Confidential - Subject to Further Confidentiality Review

Page 123

1           A.      So field refers to the sales

2    team.  So field communications would be

3    communicating to the sales team, like

4    direction or messages that we would send

5    them.

6           Q.      Direction or messages, is

7    that right?

8               MS. STRONG:  Objection.

9           Form.

10              What is the question.

11              MR. JANUSH:  I wanted to

12          make sure I got my notes right.

13          So I'll look at the screen.

14   BY MR. JANUSH:

15          Q.     Okay.  Moving on.  Patient

16   strategy and execution.  Were you the

17   primary person responsible in 2013 for

18   patient strategy and execution?

19          A.      I don't recall the time

20   period specifically, but I remember, as I

21   shared with you earlier, that I was

22   responsible for evaluating, you know,

23   patient strategy and executing whatever

24   we, you know, come up with.

Highly Confidential - Subject to Further Confidentiality Review

Page 124

1          Q.    Okay.  And earlier, just

2     above that, when we spoke about field

3     communications, communicating to the

4     sales team directions or messages, we're

5     speaking about on a national level,

6     correct?

7               MS. STRONG:  Objection to

8          form.

9               THE WITNESS:  Field

10         communications is all field

11         communications.

12    BY MR. JANUSH:

13         Q.    So that's a national level,

14    correct?

15         A.    Well, it could be.

16         Q.    In other words, you were the

17    primary person responsible for

18    communicating to sales -- to the sales

19    team with direction or messages and

20    that's not unique to, say, New Jersey.

21    You would have been responsible for the

22    country; is that correct?

23         A.    Correct.

24         Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 125

1         A.    But to be clear, I'm not the

2    only person who can communicate to the

3    sales team.  That's just representing the

4    marketing, the team.

5         Q.    Understood.  On the

6    marketing team --

7         A.    Yes.  Yes.

8         Q.    -- you were the primary

9    person?

10        A.    Yes.  Yes.

11            (Document marked for

12            identification as Exhibit

13            Janssen-Burns-4.)

14   BY MR. JANUSH:

15        Q.    I'm going to hand you what

16   I've marked as Exhibit 4.  This is a

17   PowerPoint.  It's got a Bates page that

18   I've included on the front of it of

19   JAN-MS-00749778.  And this concerns a

20   Nucynta 2013 business plan overview.

21            Do you see that?

22        A.    Mm-hmm.

23        Q.    I'm going to have you turn

24   to page -- let's see.  It's hard with

Page 126

1    pages since -- they don't have page

2    numbers.

3            A.    On the bottom.

4            Q.    Page 3.  Excuse me.  Is it 3

5    that I want?  No.  It's Page 4.  The

6    number seems to be cut off on that.  And

7    in the upper left-hand corner it states,

8    "How do we leverage sales and marketing

9    resources to grow Nucynta ER

10   disproportionately within a focused

11   strategic customer base?"

12                Do you see that?

13           A.    I do.

14           Q.    What does it mean to grow

15   Nucynta ER disproportionately within a

16   focused strategic customer base?

17                MS. STRONG:  Objection to

18           form.

19                THE WITNESS:  So first,

20           before going into here, I do want

21           to say that I recognize some of

22           the, you know, the pages here.

23           But I don't know if this was final

24           because, you know, we're always

Highly Confidential - Subject to Further Confidentiality Review

Page 127

1          working on it, and it lasts for

2          months, the business process.

3               So I don't know if this was

4          the final version, and if it was

5          the one that was approved by legal

6          and regulatory.  Just as a caveat.

7               In general, in marketing we

8          sort of use this term, "grow

9          disproportionately in area of

10         focus."  It means -- I'm going to

11         try to best explain this.

12              It means how do we show more

13         growth in an area that we focus on

14         versus areas that we don't focus

15         on.

16              So that's what

17         disproportionately means.  So

18         that -- because marketing is all

19         about making strategies.  You do

20         this, and you don't do that.  So

21         if you're going to do this, how do

22         you show impact of growth more so

23         than over here that you said you

24         didn't do.  So that's what it's

Page 128

1            trying to say.

2    BY MR. JANUSH:

3          Q.    And what is a focused

4    strategic customer base referring to?

5          A.     To my best recollection, it

6    means that this was after the time that

7    we had reduced the sales force size to

8    the Quintiles sales force only with

9    about -- much less number of reps.  And,

10   therefore, we could only call on so many

11   doctors because there's only so many, you

12   know, hours in the day.

13              So focused strategic

14   customer base means we went from calling

15   on this many customers, clinicians, down

16   to this many.  So that's the focused

17   strategic customer base, because when we

18   were calling on all these doctors, some

19   of them were much more important for the

20   cardiovascular business or the diabetes

21   business.  So that's what we're basically

22   saying.

23              Now that we've cut out all

24   these people, how do we show that this

Page 129

1    model works, that by focusing only on,

2    you know, these clinicians, that our

3    strategy works.

4         Q.    Are you speaking about the

5    pain force sales team?

6         A.    Yes.

7         Q.    The pain force sales team

8    had somewhere between 70 and 80 sales

9    representatives; is that right?

10        A.    Yes.

11        Q.    But the pain force sales

12   team, that was considered a specialty

13   sales team, right?

14        A.    Yes.

15        Q.    And that was what was

16   staffed out of Quintiles, right?

17        A.    Yes.

18        Q.    Okay.  But that was not the

19   only sales team that was selling Nucynta;

20   isn't that right?

21        A.    No.  When we established a

22   pain force with Quintiles, they were the

23   only representatives selling Nucynta ER.

24   Those 77 to 80 reps.  No one else.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1          Q.    And all of the -- all of the
2     other representatives, the many hundreds
3     that previously existed --
4          A.    They stopped.
5          Q.    -- were gone?
6               MS. STRONG:  Objection.
7     BY MR. JANUSH:
8          Q.    Stopped selling Nucynta?
9          A.    They --
10              MS. STRONG:  Wait a second.
11         Objection to form.
12              THE WITNESS:  Correct.  They
13         don't -- they stopped selling
14         Nucynta ER.
15    BY MR. JANUSH:
16         Q.    And Quintiles also provided
17    the district manager support employees as
18    well for that specialty pain force sales
19    team; isn't that right?
20              MS. STRONG:  Objection to
21         form.
22              THE WITNESS:  If I'm
23         understanding you correctly,
24         you're asking if the district

Highly Confidential - Subject to Further Confidentiality Review

                                                    Page 131

 1          managers are also Quintiles

 2          employees?  Yes.

 3   BY MR. JANUSH:

 4          Q.    So the entire pain force was

 5   supplied by Quintiles?

 6          A.    Quintiles, yes.

 7          Q.    And they were contract

 8   employees for Janssen; is that right?

 9              MS. STRONG:  Objection to

10          form.

11              THE WITNESS:  I don't know

12          the legal arrangements, but

13          they're not -- they are not

14          Janssen employees.  So I guess

15          they're like contract salespeople.

16   BY MR. JANUSH:

17          Q.    Okay.  Let's talk about --

18   moving on to the second bullet under,

19   "Establish Nucynta ER as first choice

20   long-acting opioid.

21              "Build, educate, and equip

22   best-in-class pain force (specialty sales

23   team) to win in targeted accounts."

24              What does that mean?

Highly Confidential - Subject to Further Confidentiality Review

Page 132

1          A.    Our --

2                MS. STRONG:  Objection to

3          form.

4    BY MR. JANUSH:

5          Q.    What does it mean to win in

6    targeted accounts?

7          A.    To win in targeted accounts

8    is sort of -- means to be successful in

9    those targeted accounts.

10         Q.    And what are targeted

11   accounts?

12         A.    Targeted accounts are the

13   clinicians or clinics -- clinics are

14   considered accounts -- that the pain

15   force was asked to call on.

16         Q.    And I'm going to move down

17   to enhanced speaker program platform and

18   delivery vehicle.

19                Do you see that?

20         A.    Mm-hmm.

21         Q.    What if anything was done to

22   enhance the speaker program platform and

23   delivery vehicle?

24         A.    So the primary thing that

Page 133

1    the team worked on, which was not my

2    direct responsibility, was to create the

3    platform, is how do we, you know, train

4    the speakers in a way that was effective,

5    compliant, and -- but reduced costs.  And

6    also the delivery vehicle also was around

7    doing the speaker programs more virtually

8    instead of all in person for cost savings

9    perspective.

10            Q.    Okay.  And were you a part

11   of the transition to the virtual key

12   opinion leader programs that were

13   accessible online?

14                 MS. STRONG:  Objection to

15            form.

16                 THE WITNESS:  I was on the

17            team when that happened.  But that

18            was not my responsibility, not my

19            direct responsibility.

20   BY MR. JANUSH:

21            Q.    Earlier you talked about the

22   difference between having direct

23   responsibility, but you might -- but

24   somebody still might be involved in the

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    team.  When you say that you were on the

2    team that did that, did you play any role

3    with regard to developing the enhanced

4    speaker program platform, the electronic

5    transmittal of video of key opinion

6    leaders that were accessible at a click?

7                  MS. STRONG:  Objection to

8            form.

9                  THE WITNESS:  I did not have

10           any direct -- I didn't have much

11           input.

12   BY MR. JANUSH:

13           Q.   Who would have been the

14   person that most oversaw that program?

15                  MS. STRONG:  Objection to

16           form.

17                  THE WITNESS:  I'm not sure

18           about the timing.  I think it

19           might have been -- it might have

20           been Frank DeMiro at the time.

21                  At one point he was

22           responsible for the speaker

23           program.  But I don't know if he

24           was the one responsible for that

Highly Confidential - Subject to Further Confidentiality Review

Page 135

1          transition.

2     BY MR. JANUSH:

3          Q.    And I'm going to go back up

4     to the top under key business questions.

5     I'm going to circle a key business

6     question.  I'm going to change color to

7     differentiate here.

8               The question that's posed on

9     this document states, "How will potential

10    legislative and policy events affect

11    overall pain market growth?"  And then

12    there's a separate sub question, "Does

13    this vary by region?"

14               Do you see it?

15         A.    I see it.

16         Q.    Okay.  Are you able to tell

17    me what this question was driving at?

18               MS. STRONG:  Objection.

19         Which question?

20    BY MR. JANUSH:

21         Q.    The first question.  "How

22    will potential legislative and policy

23    events affect overall pain market

24    growth?"  What was the concern being

Page 136

1    addressed here?

2              MS. STRONG:  Objection to

3         form.

4              THE WITNESS:  I don't know

5         if it's a concern, first of all.

6              Can I tell you what that

7         means?

8              So I would say that in

9         general anything having to do with

10        legislative, you know, policy and

11        stuff was not my, you know,

12        responsibility.  So this would

13        have been submitted by somebody

14        else.

15             So I don't know what they

16        would have, you know, meant by

17        that specifically to be included

18        in here.  I can -- I can speculate

19        what --

20   BY MR. JANUSH:

21        Q.    I'm not asking you to

22   speculate.

23        A.    Okay.

24        Q.    Moving into the middle

Highly Confidential - Subject to Further Confidentiality Review

Page 137

1    column, "Capitalize on and maintain

2    favorable access."

3          A.      Mm-hmm.

4          Q.     Let's go to the very first

5    point, "Strength and dissemination of

6    value proposition."  What does this mean?

7          A.      Strength and dissemination

8    of value proposition.  I don't recall

9    specifically.  I'm sorry, I don't know

10   what this means, because I wasn't

11   responsible for the payer access.

12         Q.     Do you remember what the --

13   what the value proposition was at all

14   concerning Nucynta?

15              MS. STRONG:  Objection to

16         form.

17              THE WITNESS:  So this, this

18         section here refers to payer

19         access.  Someone else was

20         responsible for the payer

21         marketing.  I had professional

22         marketing.

23              So I don't know how they

24         would have articulated the value

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1          proposition to payers.  That's

2          what it -- I think this is

3          referring to.

4    BY MR. JANUSH:

5          Q.    Okay.  I'm going to move on

6    to the next page, Slide 5.  And there

7    appears to be a list of discontinued

8    marketing objectives and a list of

9    continued marketing objectives.  Is that

10   a fair recitation?

11         A.    It appears so.  Yes, it

12   appears so.

13         Q.    Okay.  So let's look at what

14   was discontinued.  There was this ten

15   free pill voucher program.  Do you -- do

16   you recall that program?

17         A.    No, I don't.

18         Q.    So it's -- I'm going to

19   represent to you that -- that I have a

20   basic understanding from reviewing

21   documents and I'm only doing this just

22   for background purposes --

23         A.    Sure.

24         Q.    -- to see if I can jog your

Page 139

```
1    memory.  That there was an administrator

2    of a ten-free-pill voucher program named

3    McKesson, a distributor --

4            A.    Okay.

5            Q.    -- who was paid by Janssen,

6    as I understand it, $2 million to

7    administer a ten-free-pill voucher

8    program to get patients started on

9    Nucynta.  That's my understanding.  Now

10   I'm not testifying.

11              So I want to ask you, given

12   that prefatory background information,

13   does any of that strike a chord with you

14   or refresh your recollection about what

15   this program may have been about?

16              MS. STRONG:  Objection to

17         form.

18              THE WITNESS:  No.

19   BY MR. JANUSH:

20           Q.    Had you ever heard of a

21   $2 million administrative fee paid to

22   McKesson for a ten-free-pill voucher

23   program?

24           A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 140

1          Q.     And moving onto that -- that

2     which was continued.  It looks like PNMT

3     $25 savings card.  Do you recall what

4     this program concerned?

5          A.     PNMT stands for pay no more

6     than.  So I'm aware that we had a program

7     called pay no more than $25 savings card.

8          Q.     Were you at all part of, as

9     you helped turn around the marketing team

10    for Nucynta, the program to introduce $25

11    savings cards so that patients could have

12    easy initial access and not feel a

13    financial burden in paying for a new

14    branded drug that was on the market?

15               MS. STRONG:  Objection to

16          form.

17               THE WITNESS:  I'm sorry,

18          what's your question?

19    BY MR. JANUSH:

20          Q.     Were you aware at all as

21    part of -- as a person who is a part of

22    turning around, helping to turn around

23    the Nucynta marketing program, of the

24    objective to introduce $25 savings cards

Page 141

1    so that patients could have easy initial

2    access and not feel a financial burden

3    when being prescribed Nucynta?

4                MS. STRONG:  Objection to

5           form.

6                THE WITNESS:  It's not --

7           it's not clear to me what you're

8           asking.  It's pretty long.

9    BY MR. JANUSH:

10          Q.    Do you -- let's break it

11   down.  Do you recall being -- you recall

12   a $25 savings program, right?

13          A.    Yes.  I know of its

14   existence.

15          Q.    Okay.  And this was a

16   program that was implemented to make

17   Nucynta more cost effective for a patient

18   who might have to make a co-pay or pay

19   out of pocket for the drug; isn't that

20   right?

21                MS. STRONG:  Objection to

22          form.

23                THE WITNESS:  So I wasn't

24          responsible for the savings card.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

```
 1          Someone else was.  I know that it
 2          was out there.  I don't know -- I
 3          don't know the reason for Janssen
 4          developing it.  So I can't -- I
 5          can't speak to why it was
 6          developed or when it came to be.
 7          I just knew -- I just recall that
 8          the time that I was on the team,
 9          we always had one that I can
10          remember.
11  BY MR. JANUSH:
12          Q.   Okay.  Do you know how much
13  that savings program cost Janssen?
14               MS. STRONG:  Objection to
15          form.
16               THE WITNESS:  No, I don't
17          know.
18  BY MR. JANUSH:
19          Q.   Next slide is "Advocacy
20  strategies, support appropriate
21  prescribing of opioids."  Were you
22  involved in --
23          A.   Wait.  I'm sorry, that's not
24  my next page.  Hold on.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 143

1          Q.     Sorry.

2          A.     This --

3          Q.     Policy strategy?  I

4    apologize.  I didn't realize that it was

5    stuck to -- I passed by that and I went

6    to 7.

7          A.     Okay.  You want to go here.

8          Q.     Forgive me.

9          A.     That's okay.

10         Q.     Slide 7.  Advocacy strategy.

11   Were you involved in advocacy strategy?

12         A.     No.

13         Q.     Were you involved at all

14   with Prescribe Responsibly, the website

15   that was -- that's listed here as being a

16   resource on appropriate prescription of

17   opioids?

18         A.     No.

19         Q.     Were you involved in -- so

20   you weren't involved in any aspect of

21   Prescribe Responsibly?

22         A.     Correct.

23         Q.     Okay.  Same question if it

24   concerned Prescribe Responsibly, for

Page 144

1    example, on, I don't know, those sales

2    rep iPads, would you have been involved

3    in Prescribe Responsibly on sales rep

4    iPads?

5                 MS. STRONG:  Objection to

6         form.

7                 THE WITNESS:  No.

8    BY MR. JANUSH:

9         Q.    Not at all?

10        A.    Not at all.

11        Q.    Okay.  Next is Smart Moves

12   Smart Choices.

13                Well, going back.  Do you

14   know what Prescribe Responsibly is?

15        A.    I feel like I should, but

16   not -- not really.  I know it is an

17   unbranded website.  It has nothing to go

18   with Nucynta or Nucynta ER.

19        Q.    Nothing, huh?

20                MS. STRONG:  Objection to

21        form.

22                THE WITNESS:  What I'm

23        saying is I'm not -- I'm not

24        familiar.  My understanding is

Page 145

1              that it's unbranded and it doesn't

2              have to do with Nucynta or Nucynta

3              ER.  That's my understanding.

4    BY MR. JANUSH:

5              Q.   Did you always have that

6    understanding?

7                   MS. STRONG:  Objection to

8              form.

9                   THE WITNESS:  Always?  I

10             don't know what you mean by

11             always.  That's my understanding

12             of it.

13   BY MR. JANUSH:

14             Q.   Medical associations.  Were

15   you involved in sponsoring medical

16   associations?

17             A.   No.

18             Q.   Did you know whether Janssen

19   sponsored medical associations while you

20   were a product team leader in the

21   marketing team?

22                  MS. STRONG:  Objection to

23             form.

24                  THE WITNESS:  No, I'm not

Page 146

1          aware.

2      BY MR. JANUSH:

3          Q.    Did you ever hear of AAPM?

4          A.    Mm-hmm.

5          Q.    American Academy of Pain

6      Management?

7          A.    Mm-hmm.

8          Q.    Are you completely unaware

9      of whether Janssen sponsored AAPM?

10             MS. STRONG:  Objection to

11         form.

12             THE WITNESS:  I'm not aware

13         what if any sponsorships we had.

14         It wasn't my responsibility.

15     BY MR. JANUSH:

16         Q.    Moving on to the bottom.

17     Smart Moves Smart Choices.  Raises

18     awareness of teen prescription drug

19     abuse, school tool kit, videos, lesson

20     plans and brochures.  I've just read

21     what's listed on -- as the third prong of

22     this slide; is that right?

23         A.    That's -- that's what you

24     read.  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 147

1          Q.    Okay.  So I just want to

2    make sure I read it correctly.  Moving on

3    to my question.  Were you involved at all

4    with Smart Moves Smart Choices?

5          A.    No, I was not.

6          Q.    Now, I'm going to move onto

7    Slide 10.  And this is the slide that

8    addresses building and deploying the new

9    pain force.  This is what we were

10   speaking to earlier regarding the

11   Quintiles pain force sales

12   representatives and seven district

13   managers; is that right?

14         A.    Correct.

15               MS. STRONG:  Objection to

16         form.

17   BY MR. JANUSH:

18         Q.    So what does NSD stand for?

19         A.    National sales director.

20         Q.    And is that a Quintiles

21   person or a Janssen person?

22         A.    Quintiles person.

23         Q.    And who would that have

24   been?

Page 148

1          A.    Greg.  I don't know his -- I
2    can't recall his last name.  Greg.  Greg?
3    Okay.  The name Greg is coming to me, but
4    I don't remember the last name.
5          Q.    And there were seven
6    district managers for -- for the country;
7    is that right?
8          A.    Correct.
9          Q.    And Quintiles employed all
10   seven of those district managers?
11         A.    Correct.
12         Q.    And there were 77 sales
13   representatives on this new pain force,
14   right?
15         A.    Yes.
16         Q.    And Quintiles employed all
17   77 of these representatives?
18         A.    Yes.
19         Q.    What led to the shift in
20   terms of choosing at Janssen not to
21   segregate out other current sales
22   representatives that could only focus on
23   a specific targeted list of doctors and
24   going outside of Janssen to hire

Highly Confidential - Subject to Further Confidentiality Review

1    Quintiles?

2              MS. STRONG:  Objection to

3         form.

4              THE WITNESS:  So I think

5         you're asking why didn't Janssen

6         take some sales reps from

7         somewhere --

8    BY MR. JANUSH:

9         Q.    And transition?

10        A.    -- and transition them

11   versus going to Quintiles?

12        Q.    That's what I'm asking.

13        A.    So the decision was not

14   mine.  It's like, you know, many pay

15   grades above.  So I don't know, like, all

16   of the reasons.  I am aware of sort of in

17   general, my understanding is that with

18   Quintiles you can get them up and running

19   faster.  And we would be able to recruit

20   people with pain experience.

21              If you were to take, you

22   know, reps from somewhere else.  Okay,

23   I'm sorry, this is not my knowledge.

24   This is my -- this part would be sort of

Page 150

1    what I'm speculating.

2         Q.    Let me ask you a different

3    question.

4              You addressed the notion of

5    getting people up and running faster with

6    Quintiles.  In 2009 the Nucynta

7    molecule -- the Nucynta ER -- excuse me,

8    IR, immediate release pill hit the

9    market, right?

10             MS. STRONG:  Objection to

11        form.

12   BY MR. JANUSH:

13        Q.    You are aware of that?

14        A.    I don't know the exact

15   timing.  That sounds about right, yeah.

16        Q.    Okay.  And sales

17   representatives who are trained on

18   Nucynta IR are already really familiar

19   with the molecule and with Nucynta in

20   terms of converting them over to Nucynta

21   ER.  Wouldn't that be the case?

22             MS. STRONG:  Objection.

23             THE WITNESS:  You're asking

24        if someone knows Nucynta, would it

Highly Confidential - Subject to Further Confidentiality Review

Page 151

1          be easier to train them on Nucynta

2          ER than -- versus --

3    BY MR. JANUSH:

4          Q.    In other words, than going

5    to a complete outside entity.  You

6    already have sales representatives,

7    hundreds of them, selling Nucynta IR

8    before 2013, correct?

9              MS. STRONG:  Objection to

10         form.

11             THE WITNESS:  People selling

12         Nucynta IR before 2013?  That's

13         correct.

14   BY MR. JANUSH:

15         Q.    Hundreds of sales

16   representatives were selling Nucynta IR

17   before 2013, right?

18             MS. STRONG:  Objection to

19         form.

20             THE WITNESS:  I don't know.

21         Like, that was before my time.  I

22         didn't join until 2011 so I don't

23         know.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 152

1          Q.     It's not before your time.

2     In 2011, hundreds of people were selling

3     Nucynta IR, right?

4          A.     Oh, I thought you meant 2019

5     -- in 2011, when we had the original

6     sales force, there, yeah.

7          Q.     Many hundreds of sales

8     representatives were selling --

9          A.     I don't know how many

10    hundreds, but hundreds, yeah.

11         Q.     And they were -- they would

12    have been tasked with being familiar with

13    Nucynta as a molecule, correct?

14         A.     Yes.

15         Q.     And the differentiating

16    factor between Nucynta IR and Nucynta ER

17    was the extended-release component,

18    correct?

19              MS. STRONG:  Objection to

20         form.

21    BY MR. JANUSH:

22         Q.     The main -- the main --

23         A.     The product, yes.  But you

24    would have to study the studies.

Highly Confidential - Subject to Further Confidentiality Review

Page 153

1          Q.    Sure.

2          A.    Mm-hmm.

3          Q.    But if you trusted reps to

4    study the studies for Nucynta IR, why not

5    trust them to study the studies for

6    Nucynta ER?  Why go outside and hire a

7    Quintiles pain force?

8               MS. STRONG:  Objection to

9          form.

10              THE WITNESS:  That was not

11         my decision.  So I don't know.

12   BY MR. JANUSH:

13         Q.    Did you ever question it as

14   a project team leader?

15         A.    I can --

16              MS. STRONG:  Object to form.

17              THE WITNESS:  I can

18         speculate, but I don't know.

19              MS. STRONG:  Hold on.

20   BY MR. JANUSH:

21         Q.    I'm only asking if you ever

22   questioned it.

23              MS. STRONG:  Object.

24              Can we pause for a second?

Page 154

```
1            If you can take a moment so I can

2            interpose an objection.

3                  THE WITNESS:  I'm sorry.

4                  MS. STRONG:  Just for the

5            record, it's objection to form.

6    BY MR. JANUSH:

7            Q.    You can answer my question.

8            A.    I'm sorry.

9            Q.    Did you ever question this

10   issue as a project team leader?

11                 MS. STRONG:  Objection to

12           form.

13                 THE WITNESS:  Did I question

14           what?

15   BY MR. JANUSH:

16           Q.    Why Janssen was going to

17   move away from all of the many hundreds

18   of Nucynta-trained sales reps to hire 77

19   outside folks at Quintiles?

20                 MS. STRONG:  Objection to

21           form.

22                 THE WITNESS:  So you're

23           asking why I didn't question as in

24           I wasn't curious?  Why would I
```

Highly Confidential - Subject to Further Confidentiality Review

Page 155

 1          question if I had an understanding

 2          of what it is?

 3   BY MR. JANUSH:

 4          Q.    I didn't ask you why.  I

 5   asked you did you ever question this

 6   issue?

 7                MS. STRONG:  Objection to

 8          form.

 9                THE WITNESS:  I just

10          wouldn't classify it as did I

11          every question it.

12                I mean, I had an

13          understanding of why.  So if you

14          have an understanding of

15          something, why would you question

16          it?

17   BY MR. JANUSH:

18          Q.    So that I better understand,

19   because maybe I don't, explain why

20   Janssen moved away from the hundreds of

21   sales representatives already detailing

22   Nucynta IR and hired a fresh team of 77

23   sales representatives and seven district

24   managers and one national sales director

Page 156

1    from Quintiles to exclusively promote

2    Nucynta ER?

3              MS. STRONG:  Objection to

4         form.

5              THE WITNESS:  So I can tell

6         you my understanding of it.  But I

7         just want to say that that was

8         not -- that was not my decision.

9         So I don't know for a fact that

10        these were the reasons or the only

11        reasons, but I can tell you my

12        understanding of it, is that -- is

13        that -- can I share that with you?

14   BY MR. JANUSH:

15        Q.    Please do.

16        A.    Okay.  The objective was to

17   have a dedicated sales force to sell

18   Nucynta and Nucynta ER because we were

19   sharing the sales force with other

20   products.

21              There are many factors that

22   go into the decision of how you do that.

23   One of the factors is that because we are

24   sharing the sales representatives on

Highly Confidential - Subject to Further Confidentiality Review

Page 157

1   three other products, you have to make a

2   decision on pulling those representatives

3   to sell Nucynta and Nucynta ER, and then

4   having to find new representatives that

5   you have to train for two other products

6   that are completely different, one is

7   cardiovascular and one is diabetes.

8                    The diabetes product was

9   about to come to market, and there's a

10  lot of training involved and a lot of new

11  knowledge that reps had to learn.

12                   So one of the reasons is it

13  doesn't make sense to throw all that

14  training away on a new product that needs

15  to come to marketplace to pull those

16  representatives.  That's one reason.

17                   Another reason is that

18  because the footprint changed and reduced

19  so much -- footprint meaning if you map

20  out the United States, where the

21  clinicians are that you're going to call

22  on -- there will be a lot of white space.

23  Meaning you can't cover everywhere in the

24  country with 77 people.  So you have to

Page 158

1    be able to assign representatives that

2    can cover the area geographically.

3              And to do it cleanly is

4    another factor in making a decision about

5    how you form that sales team.

6              So that's two examples of

7    multiple factors that went into it.  So

8    it's a complex business decision that I

9    can only share with you like I did now,

10   my understanding.  But there's probably a

11   whole lot more and deeper than that in

12   terms of a decision like that.

13             Does that make sense?

14        Q.   So just to be clear, as to

15   Issue 1 that you addressed, the sales

16   force that was selling two other products

17   that were different from Nucynta, is it

18   your testimony today that all Nucynta

19   sales representatives were concomitantly

20   selling diabetes medication and

21   cardiovascular medication at the same

22   time as they were also representing or

23   detailing Nucynta IR?

24             MS. STRONG:  Objection to

Page 159

1          form.

2                    THE WITNESS:  I cannot say

3          definitively that every single

4          sales representative did that.

5     BY MR. JANUSH:

6          Q.    In fact, isn't it the case

7     that hundreds of sales representatives

8     only were scoped with -- directed to sell

9     Nucynta to specific targeted physicians?

10                   MS. STRONG:  Objection to

11         form.

12                   Are you talking about

13         Nucynta IR or ER?

14                   MR. JANUSH:  Nucynta IR.

15                   THE WITNESS:  And are you

16         talking about the sales team that

17         is not the Quintiles sales --

18    BY MR. JANUSH:

19         Q.    That is exactly what I'm

20    talking about.  I'm essentially

21    challenging you on the issue that you

22    testified that all sales representatives

23    were at the same time selling two other

24    products that were different from Nucynta

Highly Confidential - Subject to Further Confidentiality Review

Page 160

1    IR, one being a cardiovascular medicine

2    and one being a diabetes medication.

3                 And I am asking you, if you

4    are saying that the company actually

5    didn't have hundreds of sales

6    representatives that were specifically

7    and only focused before Nucynta ER hit

8    the market on selling IR, Nucynta IR?

9                 MS. STRONG:  Objection to

10           form.

11                THE WITNESS:  Okay.  So as I

12           stated earlier, I am not aware of

13           the details of what happened early

14           on before I joined the team.

15           Okay.  So the sales team evolved

16           over time with different teams and

17           different responsibilities.

18                When you're talking about

19           Nucynta IR, and who sold those, I

20           have no idea.

21    BY MR. JANUSH:

22           Q.    But you were on the team as

23    of 2011, fair?

24           A.    I was on the team at the end

Highly Confidential - Subject to Further Confidentiality Review

Page 161

1  of 2011.

2       Q.    And through -- and through

3  the time period between the end of 2011

4  and when Nucynta IR launched in 2013?

5       A.    No, Nucynta IR did not

6  launch in 2013.

7       Q.    When -- sorry.

8       A.    Nucynta IR --

9       Q.    Sorry.  ER.  I said it

10 wrong.  Sorry.  My apology.

11            Nucynta ER launched when?

12      A.    I don't know.

13      Q.    '11, right?

14      A.    Sometime in '11.

15      Q.    In '11.  And you -- and

16 you -- when you took over or had your

17 role with respect to Nucynta in 2011,

18 first started, and hadn't yet

19 transitioned to this newly developed pain

20 force --

21      A.    Correct.

22      Q.    -- you had sales

23 representatives that were selling Nucynta

24 IR and Nucynta ER.  Is that a fair

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    statement?

2              MS. STRONG:  Objection to

3         form.

4              THE WITNESS:  There were

5         sales representatives that sold IR

6         and ER and other stuff.

7    BY MR. JANUSH:

8         Q.    And so it's your position

9    that when you first came on, all sales

10   representatives were selling Nucynta IR,

11   ER and other medications?

12             MS. STRONG:  Objection to

13        form.

14   BY MR. JANUSH:

15        Q.    Is that right?

16             MS. STRONG:  Objection to

17        form.

18             THE WITNESS:  I cannot say

19        all definitively because I wasn't

20        very close to it.  But my

21        understanding is that they were,

22        yes.

23   BY MR. JANUSH:

24        Q.    And moving onto the

Highly Confidential - Subject to Further Confidentiality Review

Page 163

1    innovative new training -- training

2    curriculum to prepare the new pain force.

3    It's Slide 11.  Do you see that?

4           A.    Mm-hmm.

5           Q.    Okay.  Were you involved in

6    the training program to prepare the new

7    pain force?

8           A.    Yes.

9           Q.    What was your involvement?

10          A.    Let me think.  It's been a

11   while.  So to bring on board the new pain

12   force there was what we call home study,

13   some of the training that they had to do

14   at home on their own during that

15   onboarding process to get ready for the

16   national sales meeting, where they would

17   get more training in person where we all

18   came together.

19                I was responsible for sort

20   of shepherding the national sales meeting

21   preparation and what we would train them

22   there at the meeting.  So that was

23   something that I worked on.

24                Someone else was responsible

Highly Confidential - Subject to Further Confidentiality Review

Page 164

1    for putting together much of the home

2    study, but some of the information needed

3    to come from marketing.  So I provided

4    some of that information to the person

5    who was putting this together.

6            Q.    Who put together the -- the

7    E-learning home study?

8                  MS. STRONG:  Objection to

9            form.

10                 THE WITNESS:  I believe that

11           the home study was put together by

12           Stephanie Mello.

13   BY MR. JANUSH:

14           Q.    How do I spell her last

15   name?

16           A.    M-E-L-L-O.

17           Q.    And so you would have been

18   more involved on the right side of the

19   page, the live session at the national

20   sales meeting; is that right?

21                 MS. STRONG:  Objection to

22           form.

23                 THE WITNESS:  I was -- I was

24           responsible for pulling together

Page 165

1           the -- the national sales meeting.

2           So a lot of the material that was

3           used was either developed by

4           myself or I put them together

5           based on what other people

6           contributed to the content.

7    BY MR. JANUSH:

8           Q.    And I see that there are

9    four circles here, each touching a side

10   of the square.  And one of the circles

11   starts with -- is application training,

12   and one is specialty centric simulations,

13   and one is oral assessment and

14   certification, and the last is practice

15   perspectives.

16              And in the center I see KOL

17   immersion.  What is KOL immersion?

18         A.    We had some key opinion

19   leaders at the meeting, at the sales

20   meeting to give some insight to the pain

21   force about, you know, how they practice,

22   how they see the marketplace, how they

23   prescribe, things like that.

24         Q.    Do you remember the names of

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    the key opinion leaders that -- that were

2    part of the live national sales meeting?

3              A.    I remember one name.

4              Q.    And who would that be?

5              A.    Dr. Pergolizzi.

6              Q.    Dr. who?

7              A.    Pergolizzi.

8              Q.    Okay.  And what is specialty

9    centric simulations?

10             A.    I don't know --

11             Q.    Is that role play?

12             A.    I don't recall.  There was

13   role play.  But I don't know if that's

14   what specialty centric simulation is.

15             Q.    Earlier we talked about

16   the new enhanced more cost effective

17   speaker programs.  Do you remember that?

18             A.    Yes.

19             Q.    And we talked about virtual

20   programs.  Here it looks like this is a

21   slide addressing the multiple delivery

22   vehicle for peer-to-peer speaker

23   programs.  What is peer --

24                   MS. STRONG:  I'm sorry, what

Highly Confidential - Subject to Further Confidentiality Review

Page 167

1        page number are you on?

2               MR. JANUSH:  Sorry, Page 17.

3               MS. STRONG:  Thank you.

4               MR. JANUSH:  It's -- it's on

5        the Elmo as well.

6               MS. STRONG:  Okay.

7               THE WITNESS:  What's your

8        question?

9   BY MR. JANUSH:

10       Q.    What is peer-to-peer speaker

11  programs?

12       A.    Those are the speaker

13  programs -- peer-to-peer means doctor to

14  doctor or clinician to clinician speaker

15  programs where the speaker would -- would

16  present to other clinicians.

17       Q.    So when you -- when you had

18  speakers -- well, let -- let's break it

19  down.  Live programs.  Streamlined deck

20  with option of IPB.  I don't -- I don't

21  understand that acronym.  Do you know?

22       A.    I don't either.  I don't

23  recall.

24       Q.    Round table format for

Highly Confidential - Subject to Further Confidentiality Review

Page 168

1    subset of live programs.  Are you able to

2    discuss and explain what a round table

3    format for a subset of live programs

4    means?

5            A.    I can explain partially.

6            Q.    Okay.

7            A.    Round table format just

8    means that you sit at a round table and a

9    speaker would be at the table and the

10   participants would be sitting together at

11   that round table.

12           Q.    And when you speak about a

13   speaker being at that table with

14   participants sitting around that round

15   table, that would be a paid key opinion

16   leader as the speaker; is that right?

17                MS. STRONG:  Objection to

18           form.

19                THE WITNESS:  You're talking

20           about the speaker?

21   BY MR. JANUSH:

22           Q.    Yes.

23           A.    So you're asking if the

24   speaker is paid?

Page 169

1          Q.     Yes.

2          A.     Yes, they receive

3    honorarium.

4          Q.     Okay.  And typically in

5    the -- in the thousands of dollars to

6    speak at an event; is that right?

7                MS. STRONG:  Objection to

8          form.

9                THE WITNESS:  I'm not sure

10         how much they get paid.  And it's

11         based on fair market -- fair

12         market value that's assessed by

13         compliance.

14   BY MR. JANUSH:

15         Q.     And --

16         A.     I'm sorry, can I go back and

17   correct something?  It's a

18   misrecollection.  Sorry.

19                Round table format just

20   means they sit at round tables.  It

21   doesn't mean the speaker is sitting

22   there.  It could be like the speaker is

23   at the podium.

24         Q.     Understood.

Page 170

1          A.    Sorry.

2          Q.    And let's go to virtual

3    programs.  Meeting direct virtual

4    programs, speaker direct for low-see or

5    no-see healthcare practitioners or

6    healthcare professionals.

7                Can you further describe

8    this and explain what this is?

9          A.    Which part?  The virtual

10   program?

11         Q.    Yes.

12         A.    So the virtual program is

13   still a speaker program, but it's not

14   live in-person, like the speaker would be

15   on a computer screen.  But so you would

16   see his face, you would see his slides,

17   but all participants can be anywhere on

18   the computer.

19         Q.    And it looks like this is --

20   what is speaker direct, do you know what

21   that means?

22         A.    I'm sorry, where are you

23   pointing to?

24                Oh, that's just the name of

Page 171

1    the program, I think.

2         Q.    So are these live programs

3    that you have to dial into at a very

4    specific time or programs that you can

5    pull up at any point in time and -- and

6    have a healthcare practitioner watch a

7    given program held by a or overseen by a

8    specific key opinion leader on a given

9    topic?

10              MS. STRONG:  Objection to

11         form.

12              THE WITNESS:  I'm not

13         definitive.  It could be either

14         the speaker is live at that time

15         or could be -- I don't know.  I

16         can't answer that.

17   BY MR. JANUSH:

18         Q.    What are pull-through

19   vehicles?

20         A.    You know, I don't know

21   enough to speak about it.  So I don't

22   want to get it wrong.

23              MS. STRONG:  Mr. Janush, we

24         are at noon.  I just wanted to

Highly Confidential - Subject to Further Confidentiality Review

Page 172

1         flag.  Will we be stopping for

2         lunch soon?

3               MR. JANUSH:  We can go off

4         the record.

5               THE VIDEOGRAPHER:  We are

6         now going off the record.  And the

7         time is 11:59 a.m.

8                  -  -  -

9               (Lunch break.)

10                 -  -  -

11    A F T E R N O O N   S E S S I O N

12                 -  -  -

13              THE VIDEOGRAPHER:  We are

14        now going back on the record.  And

15        the time is 1:11 p.m.

16                 -  -  -

17              EXAMINATION (Cont'd.)

18                 -  -  -

19   BY MR. JANUSH:

20        Q.   Hi, Ms. Burns.  I hope you

21   had a nice lunch.

22        A.   Yep.  Thanks.

23        Q.   I'm going to transition to

24   Exhibit 5.

Page 173

1              (Document marked for

2              identification as Exhibit

3              Janssen-Burns-5.)

4      BY MR. JANUSH:

5          Q.    Exhibit 5 is an e-mail from

6      you to Patricia Yap and David Lin.  It's

7      dated June 19, 2013.  The subject is key

8      insights and key business questions.  And

9      it includes a draft for tomorrow's BP

10     meeting.

11             And the attachments noted on

12     the e-mail are the 2014 BP insights and

13     KBQs, two pages, dot PPTX.

14             And the Bates numbers for

15     this, the cover e-mail is JAN-MS -- there

16     you go.  JAN-MS-02386918.

17             And I'm going to represent

18     to you that the attachment is what was

19     produced together with this e-mail in the

20     same family.  And it is JAN-MS-002386919.

21             We have made the Bates page

22     that is the separator sheet in order to

23     make it clear, so I just wanted to note

24     that for the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1            So starting with the cover

2    e-mail, I guess I just wanted to

3    understand real briefly what a -- is a BP

4    meeting the acronym for a business plan

5    meeting?

6            A.    Yes.

7            Q.    Okay.  And it appears that

8    you are addressing this to two of your --

9    I would say your two key superiors; is

10   that right?

11           A.    Yeah, mm-hmm.

12           Q.    And you're writing,

13   "Attached please find the draft key

14   insights and key business questions.

15           I've taken notes from both

16   KBQ meetings and rolled up various

17   ideas" -- and I'm going to pause now,

18   what is a KBQ meeting?

19           A.    Key business question.

20           Q.    Okay.  And are these --

21   where -- where are these key business

22   questions typically -- or emanating from,

23   if you can answer?

24           MS. STRONG:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 175

```
 1          Form.
 2               THE WITNESS:  So in general,
 3          as part of business planning
 4          process, we would start with some
 5          key business questions that would
 6          be relevant for that business
 7          plan.  And it would come from
 8          various places, various people,
 9          things that we have learned kind
10          of like throughout the year
11          leading up to that time point.
12     BY MR. JANUSH:
13          Q.   Okay.  And you have it in
14     front of you.  I'm just putting it on the
15     Elmo as a demonstrative.
16               It says, "The objective of
17     the meeting will be to get feedback on
18     these, ensure that we've captured ideas
19     from previous meetings, and narrow down
20     three to four insights and three to four
21     KBQs.  If time permits we can start to
22     get input on things that we can do to
23     address these questions (strategies and
24     tactics)."
```

Page 176

1                    I read that correctly,

2    right?

3         A.    Yes.

4         Q.    Okay.  I did that just to

5    give a preview before we turn the page

6    and move on to the two-page PowerPoint

7    that's referenced in the attachment to

8    the e-mail.

9                    The attachment is addressing

10   key insights, and I'm going to start with

11   the first one, which is -- well, first of

12   all, this e-mail was from you to Patricia

13   and David Lin.  And it appears that this

14   is your attachment to the e-mail.

15                   Did you write this e-mail,

16   if you were attaching it to Patricia and

17   David Lin, saying, "I've taken these

18   notes from both KBQ meetings and rolled

19   up various ideas"?  Would this be your

20   two-page PowerPoint?

21                   MS. STRONG:  Objection to

22        form.

23                   THE WITNESS:  Are you --

24        wait.

Page 177

1    BY MR. JANUSH:

2         Q.    Go back to the cover e-mail

3    if you need help.

4         A.    Yeah, I'm just trying to

5    narrow down your question.  Are you

6    asking if this is the e-mail I wrote?

7         Q.    Well, you wrote the e-mail,

8    right?

9         A.    Right, right.

10        Q.    Yes.  And in the e-mail, you

11   wrote, "I've taken notes from both KBQ

12   meetings and rolled up various ideas,"

13   did you not?

14        A.    That's what it says, yes.

15        Q.    Okay.  And, "Please review

16   and comment," is referring to the

17   attachment, right?

18        A.    Yes.

19        Q.    So you drafted the

20   attachment, right?

21        A.    I -- it seems, yes.

22        Q.    Okay.  So you drafted the

23   attachment.  So I'm going to ask you very

24   specific questions about what you

1  drafted.  Let's start with Bullet Point

2  Number 1:  "In a habitual prescribing

3  market, consistent promotional intensity

4  is required."

5              Can you explain that

6  statement?

7          A.    "In the habitual prescribing

8  market" refers to the fact that

9  prescribers have been prescribing opioids

10  for a long time.  They've had multiple

11  options of opioids for decades.  And

12  habitual means that they are used to --

13  based on our understanding of the market

14  at that time, they tend to write or

15  prescribe products that they are

16  comfortable with, that have clinical

17  experience with.  So that's what it

18  means.

19              "Consistent promotional and

20  intensity is required" was intended to

21  say that because prescribers are so used

22  to the options that had been available

23  for decades, in order for us to educate

24  them on anything new, specifically

Highly Confidential - Subject to Further Confidentiality Review

Page 179

1  Nucynta ER, it takes a lot of effort,

2  meaning promotional intensity, in terms

3  of how frequently you, you know, get the

4  sales rep in front of them, or how much

5  time it takes to communicate everything

6  that you need to communicate so that they

7  can truly understand what Nucynta ER is

8  all about, what the benefits, and you

9  know, risks are and how to use.

10        Q.    Okay.  I'm just making some

11  notes.

12             MS. STRONG:  And, again, we

13        talked about this earlier, we

14        object to you making notes and

15        displaying it during the

16        testimony.  Because we noted it

17        earlier, we will argue about our

18        objection to this at a later time.

19             MR. JANUSH:  I appreciate

20        it.  I understand you.  If I were

21        in court and had the witness on

22        stand and had this blown up on the

23        poster board, I'd be able to take

24        a big fat marker in my hand and

Highly Confidential - Subject to Further Confidentiality Review

Page 180

1          mark it up.  And I'm doing no

2          different right now.

3    BY MR. JANUSH:

4          Q.    Moving to Bullet 2:  "Broad

5    anti-opioid sentiment is negatively

6    impacting stakeholder behaviors

7    (pharmacies, HCPs, and patients)."

8                Can you shed light on what

9    you meant when you wrote that, "Broadly

10   anti-opioid sentiment is negatively

11   impacting stakeholder behaviors"?

12         A.    Let me think about that.

13               MS. STRONG:  Objection to

14         form.

15               Go ahead.

16               THE WITNESS:  Give me a

17         second.  I just also want to see

18         what else is here.  Okay.  So I

19         don't know if I recall specifics

20         for each one of these

21         stakeholders, like pharmacies,

22         HCPs, and patients, because this

23         is kind of like a long time ago.

24               But in general at the time,

Highly Confidential - Subject to Further Confidentiality Review

Page 181

```
1            as you probably are aware, there
2            is a lot of discussion about sort
3            of, you know, opioid misuse, or
4            worries about overuse or
5            inappropriate use of opioids.  And
6            a lot of the things that sort
7            of -- in the press, we felt that
8            it was having -- it was changing
9            the way that some of the
10           stakeholders were behaving.
11                So as an example, HCPs mean
12           healthcare providers or
13           prescribers, might have sort of
14           been fearful of doing things, you
15           know, sort of incorrectly or
16           whatever and would sort of pull
17           back on their prescribing of
18           opioids, even for patients that,
19           you know, had chronic pain and
20           needed the medical treatment.
21                So that's kind of what we
22           meant by some of the negative
23           impact of people changing the
24           behavior in a way that negatively
```

Page 182

1           impact patients who really needed

2           the treatment.

3    BY MR. JANUSH:

4           Q.    Do you have any appreciation

5    for the concept that broad anti-opioid

6    sentiment may also be related to

7    healthcare practitioners at this time

8    being concerned that opioid products lead

9    to abuse, misuse, and diversion?

10          MS. STRONG:  Objection to

11          form.

12   BY MR. JANUSH:

13          Q.    You may answer.

14          A.    Do I have an appreciation

15   for that?

16          Q.    Yeah, I'm asking you this

17   question for a very specific reason.  You

18   limited your prior answer to the notion

19   that broad anti-opioid sentiment, as an

20   example, may be impacting prescribers who

21   may be pulling back -- I'm paraphrasing,

22   but may be pulling back for prescribing

23   for people with chronic pain that need

24   medicine.  Am I somewhat accurately

Page 183

1    paraphrasing what you --

2            A.    No.

3            Q.    -- said earlier as your

4    example?

5            A.    No, no.  I'm sorry.  That's

6    not -- that's not what I meant.

7            Q.    Okay.

8            A.    I'm not saying that the

9    prescribers pulled back on their

10   prescribing and the opioid sentiment is

11   one of the reasons.  I'm saying that the

12   opioid, the anti-opioid sentiment caused

13   some of the behavior that I explained.

14   So you flipped the cause and effect.

15           Q.    So broad -- I think we were

16   saying the same thing.  I don't think we

17   were far off.  Broad anti-opioid

18   sentiment led to, caused, physicians to

19   pull back --

20           A.    Yes.

21           Q.    -- on prescribing for people

22   with chronic pain needs.  That's your

23   testimony, right?

24                 MS. STRONG:  Objection to

Page 184

```
 1          form.
 2                 THE WITNESS:  That -- yeah,
 3          that's close, yeah to what I was
 4          saying.  Mm-hmm.  But what you
 5          said --
 6   BY MR. JANUSH:
 7          Q.    And what I'm saying --
 8          A.    -- here was different than
 9   that.
10          Q.    Well, I'm glad we're close
11   now.  And what I'm saying is, do you have
12   any appreciation for the notion that
13   anti-opioid sentiment may not be only
14   linked to doctors who pull back on
15   prescribing to patients with chronic
16   pain, but may be linked to a concern that
17   opioids are related to an increased risk
18   of abuse, misuse, and diversion?
19                 MS. STRONG:  Objection to
20          form.
21                 THE WITNESS:  So I think
22          you're asking me a different
23          question than what this statement
24          was intended to say, right?
```

Page 185

1   BY MR. JANUSH:

2         Q.    What --

3         A.    So I'm saying that --

4         Q.    No, I'm -- I'm not asking

5    you a different question.  You wrote

6    that, "Broad anti-opioid sentiment is

7    negatively impacting stakeholder

8    behaviors."  And you -- your exemplar,

9    your example as to how it's negatively

10   impacting was limited to the doctor who

11   is pulling back on prescribing for a

12   patient who may need pain management in

13   chronic pain care.

14              And I'm saying, isn't it

15   possible that broad anti-opioid sentiment

16   went far beyond that and concerned

17   doctors who themselves may have been

18   concerned at this date with the notion --

19   with the notion that opioids are linked

20   to an increased risk of abuse, misuse,

21   and diversion?

22              MS. STRONG:  Objection to

23        form.

24              THE WITNESS:  So first you

Page 186

1          asked me to explain the bullet

2          point, what I meant when I wrote

3          it or when we collectively, you

4          know, came up with this.  And I

5          explained that what -- when we

6          said broad anti-opioid sentiment,

7          what it meant to us and what's an

8          example of the impact.

9               So now you're asking me if

10          broad anti-opioid sentiment could

11          mean something else.  And

12          that's -- so I'm saying that how I

13          explain it is what we believed it

14          to be.

15               But if you're asking me a

16          different question unrelated to

17          how I wrote this, I can answer

18          that.  But --

19     BY MR. JANUSH:

20          Q.   You asked -- you answered,

21     actually, a different question in a

22     sense, because -- let me -- I'll take a

23     step back and break this down and make it

24     simpler.

Page 187

1          A.    Okay.

2          Q.    What is -- what was broad

3    anti-opioid sentiment?

4          A.    As I'm sitting here right

5    now, I can't tell you specifically, you

6    know, what that meant, if it meant one

7    thing or multiple things.  I gave you an

8    example of one thing.

9          Q.    No.  You gave me an example

10   of the effect of broad opioid sentiment,

11   meaning a doctor would pull back a

12   prescription of someone who was in need

13   of pain.  That is an effect of a

14   situation.

15              I'm now addressing the

16   situation and asking what broad

17   anti-opioid sentiment means?

18              MS. STRONG:  Objection to

19          form.  Misstates testimony.

20              THE WITNESS:  I did explain

21          that.

22   BY MR. JANUSH:

23          Q.    No, no, you said --

24          A.    If you will just listen.

Page 188

1        Q.    I will.

2        A.    Your statement was correct

3   that I gave an example of the cause.

4   That was the second part.

5             I started out explaining

6   that anti-opioid sentiment meant that

7   some of the negative press about opioid

8   misuse, do you recall that?  That's what

9   I said.

10       Q.    So in order to get that

11  cleanly out, why don't you clarify

12  exactly what broad anti-opioid sentiment

13  is without linking it to what the effects

14  of that are?

15       A.    Broad anti-opioid sentiment,

16  I explained, refer to some of the

17  negative press around opioid, opioid use,

18  opioid misuse in the marketplace.

19       Q.    Moving down to the -- the

20  bottom -- actually let's flip to the next

21  page.  First bullet.  "How can we propel

22  adoption of Nucynta ER in an anti-opioid

23  market and expand use to maximize broad

24  indication?"

Highly Confidential - Subject to Further Confidentiality Review

1          What -- what does this mean?

2     A.    Okay.  So I'm going to have

3  to break it down because it's -- there's

4  a lot here.  So how do we propel adoption

5  of Nucynta ER refers to the fact that

6  Nucynta ER was relatively new in the

7  marketplace and the majority of

8  prescribers are not aware of Nucynta ER.

9  They are not even aware of the name of

10  the product or what it can do.  So propel

11  adoption meant how do we educate enough

12  clinicians to make sure that they really

13  understand what it does, how to use it,

14  what are the benefits, you know, and who

15  it would be appropriate for, so that they

16  can adopt it, meaning, so that they can

17  start prescribing it for the appropriate

18  patients.

19          In an anti-opioid market, as

20  we discussed just a little bit ago, that

21  because of sort of the negative press

22  around, you know, opioid use and misuse,

23  the appetite to learn about new products

24  may be impacted by that, so that kind of

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1   paints the picture of what the

2   marketplace was like at the time.

3               Expand use to maximize broad

4   indication.  Expand use meaning get more

5   clinicians to actually prescribe Nucynta

6   ER for the right patients.  Maximize

7   broad indication and talks about the fact

8   that Nucynta ER has a broad indication

9   for chronic pain, not specific to, you

10  know, a limit -- a subset of patients,

11  but broadly.  If you have chronic pain,

12  an opioid is appropriate for you, and,

13  you know, the rest of the details of the

14  prescribing -- the PI, that's what it

15  means.  It's we have a great indication

16  that's been approved by the FDA.  How do

17  we get this into the marketplace for the

18  right patients that it was meant to be

19  for.

20          Q.    In an anti-opioid market?

21          A.    In -- in a marketplace where

22  there is concern about, you know,

23  overuse, or misuse of opioids, correct.

24          Q.    Okay.  So based on your

Highly Confidential - Subject to Further Confidentiality Review

Page 191

1    answer, you knew that the market that

2    Janssen was selling in was an anti-opioid

3    market and yet you were seeking to then

4    expand the use of Nucynta and maximize a

5    broad indication; is that right?

6                    MS. STRONG:  Objection to

7          form.

8                    THE WITNESS:  So let me

9          clarify what I meant by that, is

10          our goal wasn't to expand use of

11          opioids in general.  It wasn't to

12          say if the U.S. was, you know,

13          using this much opioids, we want

14          to expand it to here.

15                    What we -- what our goal was

16          was to say if this is the amount

17          of opioid use in the marketplace,

18          we want to be a part of that pie,

19          because we felt like we had a

20          really good product that's

21          appropriate, for, you know, a lot

22          of patients, have a really good

23          efficacy, safety profile, that it

24          would be great -- a great solution

Highly Confidential - Subject to Further Confidentiality Review

Page 192

1          for people who are already

2          suffering from chronic pain, and

3          are already using some kind of a

4          long-acting opioid.

5               We just wanted the

6          clinicians to use Nucynta instead

7          of something else.  So it's for

8          appropriate patients.  It's not to

9          grow the overall usage of opioids.

10         Does that make sense?

11  BY MR. JANUSH:

12         Q.   I think I understand what --

13  what you've said.

14              What did you mean in the

15  fourth bullet when you wrote, "What sales

16  force deployment is needed to reach the,

17  quote, right targets with the, quote,

18  right promotional intensity," quote?

19         A.   Let me look back at the

20  timeline.  June '13.  I was looking at

21  that because -- trying to understand what

22  this was referring to at that time for

23  sales force deployment.

24              I believe this was after the

Page 193

1    pain force was already deployed.  So this

2    talks about with limited sales

3    representatives of, you know, between,

4    you know, 77 and 80, the right targets

5    mean -- targets mean clinicians.  So who

6    do we want the sales representatives to

7    talk and educate about Nucynta ER.

8    Because we don't have unlimited number of

9    sales representatives and right

10   promotional intensity means -- that

11   refers to frequency and reach.  So it

12   talks about how often would a sales rep

13   need to be in front of a particular

14   clinician to have enough time to explain

15   the full story of Nucynta ER.

16          Q.    Okay.  And the focus at

17   Janssen and within your marketing

18   department was very, very, very

19   specifically geared to which physicians

20   prescribed the most Nucynta ER; isn't

21   that right?

22          MS. STRONG:  Objection to

23       form.

24          THE WITNESS:  Hold on.  Let

Page 194

```
 1          me -- let me read that question
 2          again.
 3                No, that wouldn't be
 4          accurate.
 5   BY MR. JANUSH:
 6          Q.    How confident are you in
 7   that answer?
 8                MS. STRONG:  Objection to
 9          form.
10                THE WITNESS:  I think it
11          depends on, if I'm understanding
12          it correctly, is that we focus our
13          efforts against doctors who are
14          already prescribing the most
15          Nucynta ER?
16   BY MR. JANUSH:
17          Q.    And doctors -- I didn't say
18   that --
19          A.    I think that's what it says.
20   Which -- focusing on -- on prescribers
21   that prescribe the most Nucynta ER.
22          Q.    Yeah.  That's a component of
23   it.  I said very, very specifically
24   geared to which physicians prescribe the
```

Page 195

1    most Nucynta ER.  I didn't mean that as

2    the exclusive goal.  I think that there's

3    also a goal to grow doctors that have the

4    potential to be high prescribers, isn't

5    there?

6              MS. STRONG:  Objection to

7         form.

8              THE WITNESS:  There -- okay.

9         So when we go through the

10        targeting exercise, there's a lot

11        of factors that went into that

12        determination of who we would, you

13        know, target.

14             I think you're asking is

15        high prescribing of Nucynta ER a

16        primary factor?

17   BY MR. JANUSH:

18        Q.    Yes.

19        A.    That's your question?  I

20   don't believe that that's correct.

21        Q.    Okay.

22             MS. STRONG:  Are you leaving

23        this document?

24             MR. JANUSH:  Possibly.

Highly Confidential - Subject to Further Confidentiality Review

Page 196

1            MS. STRONG:  For the record
2        then, if we're leaving this
3        document, I see you're setting it
4        aside.  I just wanted to know that
5        on the attachment there's a date
6        that's 11/27/2018.
7            MR. JANUSH:  Yes, that's
8        because that's the print date.
9        That's yesterday.  So apparently
10       this PowerPoint was coded a
11       certain way that when you access
12       it, it auto populates a new print
13       date.
14           MS. STRONG:  Okay.  I just
15       wanted to make clear for the
16       record that that what's going on.
17           MR. JANUSH:  Again, way too
18       ethical to play games on stuff
19       like that.
20           MS. STRONG:  Just wanted for
21       clarity.
22           MR. JANUSH:  All right.
23           MS. STRONG:  And I was
24       referring to Exhibit 5 just for

Highly Confidential - Subject to Further Confidentiality Review

Page 197

1        the record.

2   BY MR. JANUSH:

3        Q.    I'm going to hand you what's

4   been marked as Exhibit 6.

5             (Document marked for

6             identification as Exhibit

7             Janssen-Burns-6.)

8   BY MR. JANUSH:

9        Q.    This is a document that is

10  Bates numbered JAN-MS-02919928.

11            This document came out of

12  Patricia Yap's custodial file, but it

13  also has you listed as an all custodian

14  recipient.

15            And on the first page of

16  this document, turning your direction

17  right upfront --

18            MS. STRONG:  I don't -- is

19        there somewhere it shows that

20        she's an all custodian recipient?

21            MR. JANUSH:  Yeah, in

22        relativity, in your metadata that

23        you produced.

24            MS. STRONG:  Okay.  So you

1          are making that representation.

2                    MR. JANUSH:  I absolutely

3          am.  If you'd like to pause the

4          deposition to go on Relativity

5          with me, I have my laptop here

6          with you.

7                    MS. STRONG:  No, no.  I just

8          want to be clear as to where that

9          was coming from.  Thank you.

10                   MR. JANUSH:  You got it.

11    BY MR. JANUSH:

12         Q.    Okay.  So, "reallocate

13    effort to increase call frequency against

14    highest value targets."

15              Do you see that?

16         A.    I see it.

17         Q.    And do you see the axis,

18    including the vertical axis showing high

19    Nucynta ER share, and then at the bottom

20    of the page, low value?

21              So high value Nucynta ER

22    share and low Nucynta --

23         A.    It doesn't say that.

24         Q.    It says low Nucynta --

Highly Confidential - Subject to Further Confidentiality Review

Page 199

```
 1          A.    It doesn't -- it doesn't say
 2   high volume.
 3          Q.    It says high Nucynta ER
 4   share, right?
 5          A.    Correct.
 6          Q.    Yeah.  And sorry.  I was
 7   referring to value targets right above
 8   it.  You're --
 9          A.    Right.
10          Q.    -- you're right.
11                But it says low Nucynta ER
12   share and high Nucynta ER share, right?
13          A.    Correct.
14          Q.    And silver is addressing
15   2,986 targets.  Those are clinicians,
16   correct?
17          A.    Targets are clinicians.
18          Q.    That's doctors, right?
19          A.    Mm-hmm.
20          Q.    Okay.  And it's talking
21   about 20 -- 21 percent average ER share,
22   that this silver category comprises
23   21 percent of the average Nucynta ER
24   share in prescriptions, right?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 200

```
 1            MS. STRONG:  Objection to
 2       form.
 3            THE WITNESS:  So hold on.
 4       I'm sorry.  This is a complicated
 5       document.  So let me just kind of
 6       take a minute to look.
 7            Also we had many iterations
 8       of this before we finalized it.
 9            Do you know if this is a
10       final version?
11  BY MR. JANUSH:
12       Q.    For my purposes and what I'm
13  questioning you on, it's irrelevant.  I
14  think it actually says draft.  What's
15  relevant for my purposes --
16       A.    Okay.
17       Q.    -- is that I'm showing you
18  and seeking to elicit testimony from
19  you --
20       A.    Okay.
21       Q.    -- that Nucynta -- that
22  Janssen tracked highest value targets
23  based on their prescriptions of Nucynta
24  ER and their share of Nucynta ER
```

Page 201

1    prescriptions.  Do you understand that

2    concept?

3              A.    I understand what you're --

4                    MS. STRONG:  Objection to --

5              objection to form.

6                    THE WITNESS:  I understand

7              what you said, but it's not

8              accurate.

9    BY MR. JANUSH:

10             Q.    Okay.  Let's go through it.

11             A.    Okay.

12             Q.    Instead of just making

13   statements that don't answer my question.

14                    I'm asking you specifically,

15   silver quadrant, upper left corner, 2,986

16   targets, correct?

17             A.    That's what I see.

18             Q.    Yep.  And it's saying,

19   "Current effort 21 percent," and that's

20   referring to sales force effort, isn't

21   it?  That the current sales force effort

22   targeting these doctors is at 21 percent

23   and the optimal effort should be

24   30 percent?

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1           MS. STRONG:  Objection to

2      form.

3           Is there a question pending.

4  BY MR. JANUSH:

5      Q.    Isn't that right?

6      A.    I think you're reading it

7  correctly.  It says current effort 21,

8  optimal effort 30.

9      Q.    Okay.  And that's -- and

10  that's to increase the effort of the

11  sales force in the highest prescribing

12  quadrant on this page, fair?

13           MS. STRONG:  Objection to

14      form.

15           THE WITNESS:  Not fair,

16      because there are two axes.

17      There's a Y and there's an X.  You

18      did definitely highlight the Y

19      axis.  There's also an X axis,

20      which means the high Nucynta ER

21      share and low Nucynta ER share is

22      not the only factor that goes into

23      deciding, right.  It's a

24      two-by-two.  So we have to also

Highly Confidential - Subject to Further Confidentiality Review

Page 203

1           look at the low branded LAO and

2           the high branded LAO as another

3           factor.

4    BY MR. JANUSH:

5           Q.    Okay.  So I got one of the

6    factors right when you target physicians,

7    that you look at their share?

8                MS. STRONG:  Objection to

9           form.

10               THE WITNESS:  Like I said,

11          there are many factors.  One of

12          the factors is Nucynta ER share.

13   BY MR. JANUSH:

14          Q.    Okay.  But earlier, when I

15   asked you that same question, you said

16   no?

17               MS. STRONG:  Objection to

18          form misstates testimony.

19               THE WITNESS:  Your earlier

20          question asked if the way that

21          Janssen targeted doctors was

22          predominately based on Nucynta ER,

23          high Nucynta ER share.  And you

24          said very, very, very, very

Page 204

```
 1          important.  And I said that it's
 2          one of the factors.
 3   BY MR. JANUSH:
 4          Q.    Give me a moment to pull
 5   back.
 6               I said, "Yeah, that's a
 7   component of it."  I said, "Very, very
 8   specifically geared to which physicians
 9   prescribe the most Nucynta ER.  I didn't
10   mean that as the exclusive goal.  I think
11   that that's also a goal to grow doctors
12   that have the potential to be high
13   prescribers, isn't there?"  And then you
14   said, there, "Okay, so" -- I think the
15   word is wrong here on the transcript, the
16   word exercise.  It says, "There's a lot
17   of factors that went into that
18   determination of who we would target.
19   You're asking is high prescribing of
20   Nucynta ER a primary factor," and I said,
21   "Yes."  And you said, "That's your
22   question:  I don't believe that's
23   correct."
24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 205

1          Q.    Now, you're saying I said

2     earlier that that's one of the factors.

3     You didn't say that earlier.  You said,

4     "I don't believe that's correct," didn't

5     you?

6               MS. STRONG:  Objection to

7          form.

8               THE WITNESS:  I said that

9          there are a lot of factors that go

10         into it, right?  And that no, I

11         don't believe that that's correct,

12         that high Nucynta ER share is the

13         primary factor.  It's not the

14         primary factor.

15              I'm trying to be accurate in

16         my answer, and I'm saying there

17         are a lot of factors that went

18         into it.  If you have -- if you

19         ask me to clarify, what was the

20         primary factor, my answer is not

21         high Nucynta ER share.

22     BY MR. JANUSH:

23         Q.    What is your answer?

24         A.    I don't really have one for

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    the primary factor that I can recall.  I

2    need to study this and go back --

3         Q.    But it's not on this sheet?

4              MS. STRONG:  Objection to

5         form.

6              THE WITNESS:  I'm not -- I

7         didn't say it's not on this sheet.

8         I didn't say it one way or the

9         other.

10   BY MR. JANUSH:

11        Q.    Okay.  Is it -- is -- this

12   is a sheet that you provided to your

13   superiors addressing reallocating effort

14   to increase call frequency against

15   "highest value targets," and I'm asking

16   you what is the other factor beyond that

17   these highest value targets or high

18   prescribers?

19        A.    That's a new question.  You

20   haven't asked that before.

21        Q.    I'm asking you that now.

22        A.    Okay.

23              MS. STRONG:  Just a moment.

24        Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 207

```
 1                 THE WITNESS:  So that's why
 2           I pointed you to the X axis, which
 3           is another point, right?  Whether
 4           or not they are low or high
 5           branded long-acting opioid
 6           prescriber.  That's one factor.
 7           Current effort is another factor.
 8    BY MR. JANUSH:
 9           Q.    So let's pause and break
10    that down.
11           A.    So that's at least three
12    now.
13           Q.    Okay.  So one is, you admit,
14    high prescriber?
15           A.    No.
16           Q.    You said that earlier that
17    it is one of the factors.  I'll pull up
18    your testimony.
19                 MS. STRONG:  I would just
20           object.  The record speaks for
21           itself.  She's trying to answer
22           your questions as you're asking
23           them.  I think it would help to
24           just ask clean questions.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. JANUSH:

 2          Q.    So --

 3          A.    Okay.

 4          Q.    So let me ask -- let me ask

 5    this.

 6                You are denying that one of

 7    the reasons to increase call frequency

 8    against highest value targets is because

 9    they are high prescribers?  You are

10    denying that as a factor; is that

11    correct?

12                MS. STRONG:  Objection to

13          form.  Misstates testimony.

14                THE WITNESS:  I am saying

15          that being a high Nucynta ER

16          prescriber is not the primary

17          reason for increasing efforts to

18          call on that doctor.

19                For example, if you look in

20          the bottom right corner, the

21          platinum group, current effort is

22          32 percent.  Optimal effort is to

23          increase it to 39 percent.  That

24          disputes what you said about

Highly Confidential - Subject to Further Confidentiality Review

Page 209

1          making -- prioritizing people who

2          are already high Nucynta ER

3          prescriber, because these people

4          are low Nucynta ER prescribers.

5     BY MR. JANUSH:

6          Q.    No, it complements it,

7     doesn't it, because it's targeting the

8     highest prescribing branded long-acting

9     opioid doctors that are not prescribing

10    Nucynta ER.

11               MS. STRONG:  Objection.

12               THE WITNESS:  That wasn't

13         a --

14               MS. STRONG:  Just a minute.

15    BY MR. JANUSH:

16         Q.    I'm just ask --

17               MS. STRONG:  Objection to

18         form.

19    BY MR. JANUSH:

20         Q.    I'm saying isn't the bottom

21    right corner in the platinum target with

22    2,262 target doctors, the second highest

23    ranking group of doctors in this grid,

24    targeting doctors who prescribe a high

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1   branded amount of long-acting opioid

2   products but a low amount of Nucynta?

3          A.    What's the question?

4                MS. STRONG:  Are you talking

5          about -- objection to form.

6   BY MR. JANUSH:

7          Q.    I asked it.  Do you want the

8   court reporter to read it for you?

9          A.    Sure.

10         Q.    Okay.

11               MR. JANUSH:  From 186:22.

12               (Whereupon, the requested

13         portion of the testimony was read

14         back by the court reporter.)

15               THE WITNESS:  I don't hear a

16         question in that.

17   BY MR. JANUSH:

18         Q.    Let me say it again.

19   Isn't -- "isn't" is the start of a

20   question.

21         A.    Okay.

22         Q.    Isn't the bottom right

23   corner in the platinum target with 2,262

24   targets, which happens the second highest

Page 211

1    ranking group on this grid being targeted

2    because they are high prescribers of

3    branded long-acting opioids but also

4    happen to have a low Nucynta prescription

5    rate, question mark?

6              MS. STRONG:  Objection to

7         form.

8              THE WITNESS:  Okay.  So

9         first of all, at the beginning of

10        your question, you said the

11        platinum group with 2,262 targets

12        is the highest --

13   BY MR. JANUSH:

14        Q.    Second highest.

15        A.    -- the second highest --

16        Q.    On this grid.

17        A.    -- ranking group?

18        Q.    I'm -- let me -- instead of

19   mincing every word with me, I'm

20   addressing the sheer numbers of targets

21   on the grid.  Can you appreciate that

22   gold has 366 targets, bronze has 985 --

23        A.    You mean the largest number,

24   the largest group, the second largest

Highly Confidential - Subject to Further Confidentiality Review

1    group?

2          Q.    That's what I'm saying.

3                MS. STRONG:  Objection.

4          Just a minute.  Let's have a

5          question and an answer.  And keep

6          it --

7                THE WITNESS:  Okay.  So I'm

8          not mincing words.  But I am

9          accurate -- I'm trying to be

10         accurate in my answer because we

11         did not consider the platinum

12         group the second highest ranking

13         group.  If you're saying the

14         second largest group, yes, that's

15         correct.

16   BY MR. JANUSH:

17         Q.    Okay.  That's what I'm

18   saying.

19         A.    Okay.  So -- but you can

20   understand that I'm confused.

21         Q.    Second largest group of

22   doctors is the platinum group, right?

23         A.    Correct.

24         Q.    And that's the group where

Highly Confidential - Subject to Further Confidentiality Review

Page 213

1    you're saying the optimal effort should

2    be increased from the current effort of

3    32 percent to 39 percent, correct?

4              A.    Correct.

5              Q.    And that's the group that

6    only prescribes 3 percent average Nucynta

7    ER share, correct?

8              A.    Correct.

9              Q.    But they happen to have a

10   high number of total prescriptions,

11   29,977 -- 29,777 LAO total prescriptions

12   across this doctor group in the high

13   branded LAO market, right?

14              MS. STRONG:  Objection to

15         form.

16              THE WITNESS:  That defines

17         that group in the lower right

18         corner.

19   BY MR. JANUSH:

20              Q.    Okay.  So sales efforts are

21   being increased for targets i.e.,

22   doctors, who prescribe a lot of branded

23   LAO, correct?

24              MS. STRONG:  Objection to

Page 214

 1          form.

 2                  THE WITNESS:  For the

 3          platinum group, yes.

 4   BY MR. JANUSH:

 5          Q.   Okay.  And sales efforts are

 6   also being increased for the silver group

 7   that prescribe the largest amount of

 8   average Nucynta ER share, correct?

 9                  MS. STRONG:  Objection to

10          form.

11                  THE WITNESS:  Correct.

12          According to this, yep.

13   BY MR. JANUSH:

14          Q.   And sales efforts are being

15   decreased from 40 percent to 25 percent

16   for your bronze group that has the lowest

17   branded long-acting opioid prescription

18   and the lowest Nucynta ER share, correct?

19                  MS. STRONG:  Objection to

20          form.

21                  THE WITNESS:  According to

22          this, yes, correct.

23   BY MR. JANUSH:

24          Q.   Okay.  And in the gold

Highly Confidential - Subject to Further Confidentiality Review

Page 215

1    category, there are 366 target doctors,

2    clinicians, correct?

3           A.    As it's -- that's what this

4    shows.

5           Q.    Right.

6           A.    But again, I just want to

7    emphasize, I don't know if this was the

8    final.  So the final number could have

9    been a little bit different.

10          Q.    Okay.  But at this point in

11   time --

12          A.    At this point in time --

13          Q.    -- when you drafted it to

14   your bosses, this is what you included,

15   right?

16          MS. STRONG:  Objection to

17          form.

18          THE WITNESS:  I -- that's

19          what I see at this point in time.

20          I don't know if I was the one who

21          drafted this version.

22   BY MR. JANUSH:

23          Q.    Fair.  So as I look at this,

24   it seems like for the silver group, high

Highly Confidential - Subject to Further Confidentiality Review

Page 216

1    prescribers of Nucynta share, Nucynta ER

2    share, were being targeted for increased

3    sales efforts.  Yes or no?

4         A.    No.

5         Q.    You -- you don't agree

6    that -- that 21 percent average ER share

7    represents on this grid the highest

8    average ER share amongst the groups?

9         A.    So I want to be accurate in

10   my answer.  You said that we, at this

11   point in time, were targeting prescribers

12   who had high Nucynta ER share.

13        Q.    Pause.  That wasn't my

14   question.  Move to strike, nonresponsive.

15             I said, so as I look at this

16   group it seems for the silver group, high

17   prescribers of Nucynta share, Nucynta ER

18   share, were being targeted for increased

19   sales efforts.  Yes or no.

20        A.    Oh, okay.

21             MS. STRONG:  Objection to

22        form.  And there's no need to

23        harass the witness.

24             MR. JANUSH:  I'm not

Highly Confidential - Subject to Further Confidentiality Review

Page 217

```
1        harassing.  She was answering a
2        question I didn't ask.  I move to
3        strike.
4             MS. STRONG:  That is not --
5        your questions are extremely
6        confusing and hard to follow.
7        She's doing the best she can.  So
8        just please --
9             MR. JANUSH:  No speaking
10       objections --
11            MS. STRONG:  Please use
12       respect for the witness.
13            THE WITNESS:  So if you're
14       talking -- I missed that part
15       about the silver.  I thought you
16       meant everything above the line.
17            MR. JANUSH:  Okay.
18            THE WITNESS:  So if you're
19       just restricting it to the silver
20       group, the silver group does have
21       high Nucynta ER share.
22  BY MR. JANUSH:
23       Q.   The highest on this grid,
24  correct?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1          A.     The highest on the grid.

2          Q.     And they also have an

3    increase in optimal sales efforts listed

4    as compared with the current 21 percent

5    effort, correct?

6          A.     That's what it shows.

7          Q.     Okay.  And the targets in

8    bronze that have the lowest average share

9    have a decreased suggested optimal sales

10   force -- sales force effort, right?

11         A.     Yes, and they also have low

12   branded long-acting opioid.

13         Q.     Right.  So these are folks

14   that are the least likely to prescribe

15   long-acting opioid drugs --

16         A.     In general.

17         Q.     -- in general?

18         A.     Mm-hmm.

19         Q.     Actually I want to address a

20   couple more things on this document.

21   This document also addresses that an

22   Excel file with preliminary -- excuse

23   me -- with preliminary target lists for

24   each territory will have the following

Page 219

1    columns:  Territory, a J&J -- that's

2    Johnson & Johnson -- ID for a doctor; is

3    that right?

4          A.    I believe so.

5          Q.    And that's an IMS ID for a

6    doctor; is that right?

7          A.    I believe so.

8          Q.    And here they are segmented,

9    that's their classification as to whether

10   they are platinum, or silver or gold or

11   bronze, right?

12         A.    Correct.

13         Q.    And then their name, the

14   address, city, state, zip, et cetera.

15               And it says, "There will be

16   a column, this column will list the

17   recommended action for each HCP."

18               And it seems like

19   recommended actions included, may have

20   not been limited to, start calling and

21   stop calling.  Do you see that?

22         A.    I see it.

23         Q.    Okay.  And in addition, it

24   says it in the red bubble that I'm

Page 220

1    pointing to, "Market, ER and Nucynta

2    usage in the past 12 months will be

3    included."

4              So the past 12 months of

5    total prescriptions, that's ER TRx stands

6    for Nucynta ER total prescriptions, are

7    being listed next to the doctor's name;

8    is that right?

9         A.    That's what it looks like,

10   yeah.

11        Q.    And it also says, "Nucynta

12   ER share will be listed as well."

13   That's -- that's their total share of

14   prescribing within their territory or

15   district, right?

16        A.    I am not sure.  I didn't

17   produce this document.  So this is my

18   first time sort of looking at this.  I

19   don't know, where it says Nucynta ER

20   share, I don't know share of what.

21        Q.    Got it.

22        A.    It could be share of

23   long-acting opioid.  It could be share of

24   CII.  It could be share of, you know.

Highly Confidential - Subject to Further Confidentiality Review

Page 221

1    So -- but it's some kind of a share.

2         Q.    Okay.  And then if you move

3    forward a few pages there's back-up for

4    this presentation, back-up for

5    discussion, and it's addressing "Nucynta

6    ER called on share growth in 2H 2013."

7              Do you see that?

8         A.    Yes.

9         Q.    Okay.  And it seems like

10   long-acting opioid share change is being

11   reviewed by -- compared to the prior

12   month, for a three-month average from

13   December 12, 2201 to December 2013.  Do I

14   have that about right?

15        A.    Yeah, it looks like.

16        Q.    Okay.  And in order to get

17   this data, the source at the bottom

18   states, "IMS Xponent monthly,

19   December 2013," and it also states, "Pain

20   force targets 4Q '13."

21             IMS Xponent monthly, do you

22   know what that is?

23        A.    I mean I know it's IMS data.

24        Q.    That's -- isn't it right,

Page 222

1    that Xponent is the monthly, like

2    prescriber level, granular level

3    prescription tracking data?

4              MS. STRONG:  Objection to

5         form.

6              THE WITNESS:  You know, I'm

7         not -- I'm not the expert in IMS

8         data.  Because different types of

9         data have different levels of

10        details.

11   BY MR. JANUSH:

12        Q.    Right.

13        A.    I think this is prescription

14   data.

15        Q.    Okay.

16        A.    For just the -- just the

17   targets that the pain force calls on.

18   Not the entire universe.

19        Q.    We -- I'm with you.

20        A.    Okay.

21        Q.    And earlier we went through

22   a lot of discussion on a goal to grow

23   platinum targets.  And I used the words

24   "very, very, very" when prescribing the

Highly Confidential - Subject to Further Confidentiality Review

Page 223

1    intent to grow platinum targets.  So

2    let's look at the slide that says, "We

3    are growing."  I have it up, you have it

4    up in front of you.

5              "We are growing Nucynta ER

6    share with 40 percent of platinum targets

7    in the most recent three months!"

8              Did I read that right?

9              MS. STRONG:  And just a

10             moment.  I would object to the

11             commentary that you're inserting

12             in -- before you ask the question.

13             I would please ask that you not

14             comment on testimony as you

15             proceed.

16             MR. JANUSH:  Well, I'm

17             refreshing the memory that earlier

18             we addressed this issue and now

19             I'm coming back to it.

20             MS. STRONG:  I believe you

21             were trying to do more than that.

22             But we'll proceed.

23             THE WITNESS:  I'm looking at

24             this page.

Highly Confidential - Subject to Further Confidentiality Review

Page 224

1    BY MR. JANUSH:

2         Q.    Okay.  So here, is it the

3    case that growers is referring to 793

4    healthcare practitioners whose share

5    changed by 38 percent or is it that they

6    represent that the growers represented

7    38 percent of total Nucynta ER

8    prescriptions?

9              MS. STRONG:  Objection.

10   BY MR. JANUSH:

11        Q.    I'm just trying to

12   understand.

13             MS. STRONG:  Objection to

14        form.

15             THE WITNESS:  Okay.  Let me

16        study this.  I don't recall this

17        exactly.

18             I would interpret this to be

19        that 38 percent of the people in

20        the platinum group grew.

21   BY MR. JANUSH:

22        Q.    Okay.  And --

23        A.    And then the rest, you know,

24   either decline or whatever.

Highly Confidential - Subject to Further Confidentiality Review

Page 225

1          Q.    Got it.  Okay.  And then

2    here, again for this data it looks like

3    Janssen is using IMS Xponent monthly

4    data.  Is that a fair understanding on my

5    part?

6          A.    That looks like it's the

7    source.

8          Q.    Okay.

9          A.    But again, it's only for the

10   limited targets that the reps called on.

11         Q.    Okay.  And then on the last

12   page, it's showing that all seven

13   districts showing growth in Nucynta ER

14   platinum share in recent three months.

15   Do you see that?

16         A.    I see the page.

17         Q.    Okay.  So this is just

18   analyzing previous three-month share,

19   current three-month share; is that right?

20         A.    So it looks -- it seems to

21   be, looking at the platinum group again,

22   yeah, three months over three months.

23         Q.    Okay.

24         A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1          Q.    And that's what three by

2    three refers to?

3          A.    Mm-hmm.

4          Q.    Okay.  Let's put that

5    document aside.  I'll move onto

6    Exhibit 7.

7                (Document marked for

8                identification as Exhibit

9                Janssen-Burns-7.)

10               MR. JANUSH:  It's Bates

11               marked JAN-MS-0077224.

12   BY MR. JANUSH:

13         Q.    This came from your

14   custodial file production, I'll

15   represent.  And this first page, pain

16   force.  This is referring to that, that

17   77 sales rep force from Quintiles; is

18   that right?

19         A.    Yes.

20         Q.    Okay.  And today's agenda,

21   performance review, messaging and

22   resources, second half game plan.  Is

23   second half game plan referring to like

24   second half of the year?

Highly Confidential - Subject to Further Confidentiality Review

Page 227

1             MS. STRONG:  Objection to

2        form.

3             THE WITNESS:  Actually, I

4        was -- I was going to ask, is

5        there a date on this document?  I

6        have no idea what year or month

7        this was.

8   BY MR. JANUSH:

9        Q.   It's dated by some of the

10  data that's in it, I believe.  But for

11  example there is data from IMS in March

12  of '13, and the last month tracked at

13  Page 10 is December of '13.  So I'm

14  assuming it runs -- it's current at least

15  through December '13 based on the sales

16  data that's tracked.

17             MS. STRONG:  Objection.

18             MR. JANUSH:  Well, that's --

19             MS. STRONG:  It misstates on

20        what's on Page 10.  It looks like

21        it's a forecast.  I doesn't look

22        like an actual, so I don't know

23        that that's what that reflects.

24             MR. JANUSH:  While my

Highly Confidential - Subject to Further Confidentiality Review

Page 228

1           colleague, Ian Millican, is

2           getting -- is getting this

3           information, I can say this much.

4    BY MR. JANUSH:

5           Q.    On the top of Page 8, it

6    says, "March 2013 exceeded forecast by

7    plus 2 percent."  So it's at least

8    March 2013.  Hopefully that helps us

9    until we get the actual metadata.

10          The IMS Xponent data is

11   dated on Page 12 as March 29, 2013.  So

12   that further helps date this document.

13          A.    Okay.  I'm flipping through.

14   And I'm not sure what this is for.

15          Q.    Let me ask you a question.

16   On Page 5, "Pain force vision.  Dedicated

17   to renewing hope and transforming lives

18   of those impacted by pain."

19          A.    I'm sorry.

20          Q.    The question is this.  Whose

21   hope -- what hope was Janssen dedicated

22   to renewing?

23          MS. STRONG:  Objection to

24          form.

Page 229

```
 1              THE WITNESS:  Okay.  So let
 2         me think back.  It's been a while.
 3         I'm just trying to remember.  I
 4         think this was hope for patients
 5         and hope for clinicians, probably
 6         predominately.
 7              That's just my best
 8         recollection at this time.
 9    BY MR. JANUSH:
10         Q.   What studies did Janssen do
11    in order to determine that patients
12    needed renewed hope concerning their pain
13    treatment options?
14              MS. STRONG:  Objection to
15         form.
16              THE WITNESS:  So first I
17         want to clarify.  When we have a
18         vision like this, this is an
19         internal statement.  This is
20         something that is typically
21         created to inspire people, you
22         know, to do the best that they
23         can, whether you're in marketing,
24         whether you're in sales, because
```

Page 230

```
 1          we're in healthcare, because we
 2          care about, you know, the people
 3          we serve.
 4               So this is not something
 5          that would be shown outside.  It's
 6          really for internal sort of
 7          motivation.  Okay.
 8               So to your question about
 9          what research did we do to better
10          understand that patients need
11          hope?
12     BY MR. JANUSH:
13          Q.    Needed renewed hope.
14          A.    Needed -- right.  I would
15     say that there was no specific research
16     that we did in order to do this.  It was
17     understanding of the marketplace,
18     understanding that patients with chronic
19     pain really suffer for many, many years.
20     And many of them are depressed because
21     pain is very debilitating.
22               So it's more of
23     understanding, you know, the feeling that
24     a lot of chronic pain patients have
```

1    through, you know, whether, you know,

2    it's medical affairs person or sales or,

3    you know, interaction in the marketplace.

4    That's how we came to have that

5    understanding.

6           Q.    Earlier I asked what studies

7    did Janssen do in order to determine that

8    patients needed renewed hope concerning

9    their pain treatment options.  Is the

10   answer to my question, we didn't do any

11   studies?

12          A.    No.

13                MS. STRONG:  Objection to

14          form.

15                THE WITNESS:  No.

16   BY MR. JANUSH:

17          Q.    On that topic?

18          A.    No.  I was answering in the

19   context of your showing this to me, that

20   this was our pain force vision.  And as I

21   explained, this is meant to be an

22   internal motivator, right.  So when we

23   crafted this vision, we didn't say, okay,

24   we need to craft a vision, let's go do

Highly Confidential - Subject to Further Confidentiality Review

Page 232

1    some research.  No, we didn't do it that

2    way.

3                    It's based on knowledge that

4    we have gained over time collectively

5    through a lot of different sources to

6    understand that chronic pain patients

7    suffer greatly, and many of them are

8    depressed and many of them lose hope,

9    hope about ability to function, hope

10   about ability to go on with normal life

11   that we take for granted.

12                   So that's what we're saying

13   is we are bringing an option to the

14   marketplace that hopefully can properly

15   treat their chronic pain, so that they

16   can function like a normal human being,

17   and that's renewing hope about what they

18   can look for in life.  That's how we got

19   there.

20        Q.    What, if anything, did you

21   personally do to confirm the marketing

22   slogan here that patients needed renewed

23   hope?

24                   MS. STRONG:  Objection to

Page 233

```
 1          form.
 2                THE WITNESS:  As I explained
 3          before, this is not a marketing --
 4          what did you say?
 5   BY MR. JANUSH:
 6          Q.    Slogan, a vision.
 7          A.    Slogan.  It's not a
 8   marketing slogan.  Okay.  A marketing
 9   slogan would be something that we
10   communicate externally.  This is not it.
11   This is something that no one outside the
12   company would see.
13          Q.    So what did you do to
14   confirm the marketing vision that
15   patients needed renewed hope?
16                MS. STRONG:  Objection to
17          form.
18                THE WITNESS:  We didn't
19          create the vision and then go test
20          it to confirm.  This is a vision
21          that you develop based on what you
22          know about the marketplace and
23          about what we collectively as a
24          team wanted to accomplish.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1              And -- but it's rooted in

2         deep understanding about the

3         marketplace and about the patients

4         and what they suffer through.

5    BY MR. JANUSH:

6         Q.    I'm going to jump to the

7    last page of this PowerPoint before

8    moving on.  It says, "Are you ready to

9    lead the pack and become a Fast Start

10   contest winner?"

11             What is a Fast Start

12   contest?

13             MS. STRONG:  Objection to

14        form.

15             THE WITNESS:  I don't know

16        about the particular detail of the

17        contest itself because Quintiles

18        is the company that would

19        administer anything that has to do

20        with pay.

21             But Fast Start refers to --

22        it's a common term that Janssen

23        uses to mean a -- kind of like an

24        early in the year sales meeting or

Highly Confidential - Subject to Further Confidentiality Review

Page 235

1          sales initiative, perhaps in the

2          January/February time frame and it

3          is meant to convey like a fast

4          start, as in let's get started,

5          the year, you know, on a good

6          foot.

7     BY MR. JANUSH:

8          Q.    I'm going put that away.

9     And move on to Exhibit 8.

10              (Document marked for

11         identification as Exhibit

12         Janssen-Burns-8.)

13              MR. JANUSH:  This is

14         JAN-MS-00772413.

15    BY MR. JANUSH:

16         Q.    It's the creative brief that

17    has your name on it as the marketing

18    project leader.  And it has an agency

19    project leader name of Lori Schuermann.

20    I'm going to point it to make it easier

21    for you to see what I'm looking at.

22    Okay.

23              I appreciate that this is an

24    unsigned document.  So the first question

Page 236

1    I have is, who would have created the

2    creative brief, the agency?  It's on

3    Janssen letterhead.  That's why I'm

4    asking.  Is it Janssen or the agency?

5              MS. STRONG:  Objection to

6         form.

7              THE WITNESS:  I don't know.

8         I see that it's on the Janssen

9         letterhead.  I can't tell you for

10        sure if I drafted it or the agency

11        drafted it or, you know, we could

12        have sort of done it together.

13   BY MR. JANUSH:

14        Q.   So I want to focus on the

15   middle of the page, the who.  Who do we

16   need to reach here, the audience.  And it

17   states, "Patients who suffer from chronic

18   pain and just received the prescription

19   for Nucynta ER from their physician for

20   the first time demographically, according

21   to the 2009 patient segmentation study,

22   our patient is defined as:  Approximately

23   40 to 50 years old, mix of male and

24   female through slightly more female" --

Page 237

1    "though slightly more females suffer from

2    chronic pain as they age; would have

3    commercial insurance to afford the

4    medication and qualify for the co-pay

5    card; has a median household income of

6    $55,000; and is less likely to have

7    completed college (from 2009 study); is

8    being treated for moderate to severe

9    chronic pain."

10            I'm going to stop reading

11    before it gets into the, "Psychologically

12    our target is" -- or, "Psychologically

13    our target:"

14            This language,

15    demographically speaking, according to

16    the 2009 patient segmentation study, our

17    patient is defined as, seems to imply

18    that the "our" is referring to Janssen;

19    is that right?

20            MS. STRONG:  Objection to

21        form.

22            THE WITNESS:  So a couple of

23        things.  First, the 2009 patient

24        segmentation study would have been

Page 238

1          completed prior to me joining the

2          team, so I don't know the details

3          of that study.

4               In the context of what I'm

5          reading here, our patient doesn't

6          mean they're -- they're not

7          patients who are already on

8          Nucynta ER.  It means our -- I

9          think -- I believe it's meant to

10         mean our target patient is, as in

11         these are the people who we want

12         to talk to.

13    BY MR. JANUSH:

14         Q.   Okay.  And it looks like

15    you're saying, if these are the people we

16    want to talk to, the first sentence

17    states, "Patients who suffer from chronic

18    pain and just received a prescription for

19    Nucynta ER from the physician for the

20    first time."  Is that right?

21              MS. STRONG:  Objection to

22         form.

23              THE WITNESS:  That's what it

24         says.

Page 239

1    BY MR. JANUSH:

2         Q.    Okay.  So they are not

3    people who have never gotten a

4    prescription.  They just received it for

5    the first time?

6         A.    So that's the intent of the

7    creative brief is to define who it is

8    that we are talking to.  And in this

9    case, we want to talk to the patients as

10   described here.  They have chronic pain,

11   they have just received Nucynta ER from a

12   prescription from their physician,

13   meaning that we're not meant to plaster

14   this thing everywhere.  It has to be a

15   patient that's already being considered

16   for Nucynta ER.

17        Q.    Okay.  Why was the target

18   patient folks with a median household

19   income of $55,000, but who are less

20   likely to have completed college?

21             MS. STRONG:  Objection to

22             form.  Misstates what the document

23             says.

24   BY MR. JANUSH:

Page 240

```
 1          Q.    Well, I'll read it.  Let me
 2     restate it.  "Has a median household
 3     income of $55,000 and is less likely to
 4     have completed college (from 2009
 5     study)."
 6                Why was that a component of
 7     the target patient?
 8                MS. STRONG:  Objection to
 9          form.
10                THE WITNESS:  So as I stated
11          before, I was not involved in that
12          2009 patient segmentation study.
13          But this would have come from
14          there, which the intent for a
15          segmentation study in general,
16          which, you know, again, I wasn't
17          involved in this particular one,
18          is to identify groups of patients
19          that are appropriate, and based on
20          that study looks like these bullet
21          points represent the people that
22          the team had decided that these
23          are the appropriate people that --
24          that they want to talk to.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 241

1    BY MR. JANUSH:

2         Q.    So you can't answer, from

3    your perspective, from your personal

4    knowledge, why these people with median

5    household income of $55,000 but who are

6    less likely to have completed college

7    would be potential Nucynta ER targets?

8         A.    No.  I can't answer.  Other

9    than the fact that, you know, typically a

10   study like that would look at a lot of

11   patients and would collect the data.  It

12   looks like this is the kind of data that

13   they collected.

14        Q.    When the creative brief was

15   written, would you have wanted to go back

16   and actually look at the 2009 study

17   before including it in -- in this

18   document?

19        A.    Would I have wanted to?

20        Q.    Yes.

21        A.    I don't know what I wanted

22   back then.

23        Q.    Do you believe you should

24   have?

Highly Confidential - Subject to Further Confidentiality Review

 1              MS. STRONG:  Objection to

 2         form.

 3              THE WITNESS:  I don't -- no.

 4    BY MR. JANUSH:

 5         Q.   No.  You're comfortable

 6    citing aspects of studies, outcomes of

 7    studies in your own written work product

 8    where you've never read the underlying

 9    study?

10              MS. STRONG:  Objection to

11         form.

12              THE WITNESS:  So when you

13         work on a brand, the brand lasts

14         for a long time, you come and go.

15         There are decisions that are made

16         prior to you getting here, and

17         there's some decisions that are

18         made after you leave.

19              There was no -- at the time,

20         there was no question about who

21         the patients are that we were

22         targeting, there was no reason to

23         question the work or the decision.

24         So, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 243

1    BY MR. JANUSH:

2         Q.    Okay.  We are marking

3    JAN-MS-00238968 -- excuse me.  9698.

4    That's 002389698 as Exhibit 9.

5              (Document marked for

6              identification as Exhibit

7              Janssen-Burns-9.)

8    BY MR. JANUSH:

9         Q.    And this is a document

10   entitled Pain Business Review dated

11   April 23, 2014.  It is a draft document.

12              I want to ask you a question

13   concerning something that seems to appear

14   in a number of Janssen documents.  And it

15   concerns this statement on Page 2, "Large

16   unmet need for patients suffering from

17   pain."

18              Do you know what the basis

19   is for Janssen's position in 2014 that

20   there was a large unmet need for patients

21   suffering from pain?

22         A.    I can't speak for Janssen as

23   a whole.  I can -- I can explain to you

24   from my point of view, if that's fine.

Page 244

1          Q.    Sure.

2          A.    Okay.  So despite all the

3    drugs out there to treat chronic pain,

4    there's still a lot of people who are

5    suffering from chronic pain where nothing

6    helps, nothing relieves the pain enough

7    that they can function normally.  People

8    are debilitated.  They can't do things

9    that regular people can do.  Therefore,

10   there's an unmet need because the

11   products that are available to treat and

12   control pain are not working for

13   everyone.  And there's still a large

14   number of patients who continue to suffer

15   and, therefore, there's an opportunity to

16   bring products that can maybe relieve

17   pain for those people who haven't been

18   able to find it.

19         Q.    What do you base that on?

20         A.    A lot of places, people have

21   pain, from talking to doctors, through

22   market research, through interacting with

23   them.  When you talk about the

24   perspective of pain, about the patients

Highly Confidential - Subject to Further Confidentiality Review

Page 245

1    that they see.  People, people that

2    people know, you know.  People have

3    relatives that can't do things because

4    they suffer from pain who have tried

5    everything.  Not just pharmaceutical

6    drugs, but procedures as well.

7             So I think it's -- it's, you

8    know, a variety of sources confirm that

9    notion that it's still a big issue out

10   there, a medical need out there.

11        Q.    Nothing that you testified

12   about just now included the subject of

13   studies of research though.  Is that fair

14   to say?

15             MS. STRONG:  Objection to

16        form.

17             THE WITNESS:  No.  No,

18        that's not fair to say.  So when I

19        talk about feedback from patients

20        and -- and doctors, that's

21        through -- part of it is through

22        market research and part of it is

23        through conversation.  So I would

24        say that research is part of that.

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    BY MR. JANUSH:

2         Q.    So market research conducted

3    by whom?

4         A.    Janssen.

5         Q.    So your own company's market

6    research helps support the notion that

7    there's a large unmet need for patients

8    suffering from pain?

9         A.    Yes.

10         Q.    What about outside of

11    Janssen, what work was done outside of

12    Janssen, unfunded by Janssen, to support

13    the notion that large unmet need for

14    patients -- that there's a large unmet

15    need for patients suffering from pain in

16    2014?

17              MS. STRONG:  Objection to

18         form.

19              THE WITNESS:  You're asking

20         what other sources of information

21         confirm that, that Janssen didn't

22         sponsor?

23    BY MR. JANUSH:

24         Q.    No, that's not -- that's not

Page 247

 1   what I'm asking.

 2              All right.  What I asked

 3   was:  What about outside of Janssen, what

 4   work was done outside of Janssen,

 5   unfunded by Janssen, to support the

 6   notion that large unmet need for

 7   patients -- that there was a large unmet

 8   need for patients suffering from pain in

 9   2014?

10              MS. STRONG:  Objection to

11         form.

12              THE WITNESS:  Right.  So

13         that's what I wanted to clarify.

14         When you say work done outside of

15         Janssen, not funded by Janssen,

16         that's work that anyone would have

17         done?

18   BY MR. JANUSH:

19         Q.    Yeah.

20         A.    That we weren't related to.

21         Q.    Yep.

22         A.    So what sources are out

23   there.

24              Plenty of articles like peer

Page 248

1    review journals in the pain space.  When

2    people publish, a lot of times the

3    beginning sort of section of papers that

4    are published talk about an overview of

5    the marketplace.  You know, there's a

6    large unmet need.  It might cite, you

7    know, number of patients suffering from

8    pain.  So I would say that it's quite

9    broad.

10                  You can go to any pain

11   journal, pick up articles and that

12   sentiment is -- is broadly understood and

13   accepted.

14          Q.    As you sit here today,

15   can you cite to any specific journal

16   article that -- that would support this

17   concept?

18          A.    I can't cite anything in

19   particular, but I can tell you that if

20   you go to, you know, any major pain

21   publication, any major pain conference,

22   you will hear people talk about unmet

23   need.  That is why people still pour

24   effort into looking for therapies that

Highly Confidential - Subject to Further Confidentiality Review

Page 249

1    will work for people with chronic pain,

2    whether it's pharmaceuticals or

3    procedures.  That's why people invest in

4    that area, because there's so much unmet

5    need.

6          Q.    I'm going to move to

7    Slide 7.  Actually before I do that, yes.

8                It says, "CII market growth

9    has slowed in recent years due to policy

10   efforts to curb abuse."

11               When this was written in

12   2014, did you share that understanding,

13   that because policy efforts to curb abuse

14   existed, that market growth has slowed in

15   recent years?

16               MS. STRONG:  Objection to

17         form.

18               THE WITNESS:  Did I agree --

19         did I personally agree with this?

20   BY MR. JANUSH:

21         Q.    Mm-hmm.  Yes.

22         A.    Yeah.  I would say.

23         Q.    And despite sharing the

24   understanding that policy efforts were

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    underway to curb abuse, your pain force

2    specialty sales team was working under a

3    sales model that in part focused on

4    getting Nucynta ER into high value

5    prescribers, wasn't it?

6              MS. STRONG:  Objection.

7         Objection to form.

8              THE WITNESS:  Into high -- I

9         think you're kind of connecting

10        things that maybe shouldn't be

11        connected.

12   BY MR. JANUSH:

13        Q.    I'm addressing that there's

14   a general environment that you have

15   recognized that there's policy efforts to

16   curb abuse and -- let me connect this for

17   a moment.  I'll just take a step back.

18              Do you agree with the

19   principle that the more opioid products

20   that are out in the marketplace, the

21   greater the risk for opioid abuse?

22              MS. STRONG:  Objection to

23        form.

24              THE WITNESS:  That the more

Highly Confidential - Subject to Further Confidentiality Review

Page 251

1          opioids out there in the

2          marketplace, there is more abuse?

3     BY MR. JANUSH:

4          Q.    Yes.

5               MS. STRONG:  Objection to

6          form.

7               THE WITNESS:  No.

8     BY MR. JANUSH:

9          Q.    No?

10         A.    No.  Because there are many

11    factors that lead to abuse and not -- and

12    using opioids for a legitimate reason,

13    for example, for chronic pain doesn't

14    mean that you're abusing it.

15         Q.    So I wasn't saying that

16    because there might be people using

17    opioids for chronic pain doesn't mean

18    they're abusing it.  I was addressing the

19    general principle that the more opioids

20    that are out -- prescribed and in the

21    market, the greater the risk for abuse,

22    and you don't agree with that; is that

23    right?

24               MS. STRONG:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 252

```
 1        form.
 2              THE WITNESS:  I don't agree
 3        with it, no.
 4   BY MR. JANUSH:
 5        Q.   We talked about pain force
 6   specialty model focusing on high value
 7   prescribers earlier.
 8              And is it correct that the
 9   pain specialists that this pain force
10   focused on included anesthesiologists --
11   I'm at Page 10 -- physical, medical and
12   rehabilitation specialists, pain
13   specialists, and rheumatologists?
14              MS. STRONG:  Objection.
15        Again, I'd ask that you not
16        characterize prior testimony
17        before asking the question.
18              THE WITNESS:  According to
19        this, it looks like that's how
20        we're defining pain specialist.
21   BY MR. JANUSH:
22        Q.   Okay.  And so high value
23   prescribers -- the group of high value
24   prescribers included pain specialists.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 253

1    That included --

2              A.    As defined --

3              Q.    As defined below.  PCPs,

4    that's primary care physicians, right?

5              A.    Correct.

6              Q.    NPs and PAs, that's nurse

7    practitioners and physician assistants?

8              A.    Correct.

9              Q.    And there's a group of other

10   that's 9 percent and that's undefined; is

11   that right?

12             A.    Correct.

13             Q.    I'm going to move on to

14   slide 20.  And this is addressing the new

15   commercial model in 2013 with pain force,

16   according to the title.  It states here

17   that there are three hiring criteria for

18   pain force DNA.

19                   Clinical expertise,

20   marketplace savvy, and thriving in

21   ambiguity.

22                   What does it mean for

23   someone to have in their DNA that they

24   thrive in ambiguity?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

```
 1              MS. STRONG:  Objection to
 2         form.
 3              THE WITNESS:  So I don't
 4         recall the specific conversations
 5         about that.
 6              What I do remember is that
 7         we wanted the pain force sales
 8         team to be able to operate well
 9         with -- in the face of, you know,
10         ambiguity, meaning things aren't
11         going to be certain.  There could
12         be a lot of changes.  It could be
13         that -- because we are forming a
14         new team and we're trying out
15         certain models, we want them to be
16         able to navigate if things change
17         and react, you know, well to that.
18         Just not someone who is rigid and
19         needs certain sort of steady
20         environment to work in.
21    BY MR. JANUSH:
22         Q.   Okay.  This doesn't have a
23    number.  It looks like it's 29.  So look
24    for Slide 30 and peel back one page.  Are
```

Page 255

1    you with me?

2           A.     Mm-hmm.

3           Q.     Okay.  This is a similar

4    chart concerning silver, gold, bronze,

5    and platinum that we saw earlier, just

6    without corresponding prescription

7    numbers; is that right?

8           A.     Yes.

9           Q.     And it's addressing that in

10   2014, your -- your target optimization

11   has led to a decrease of ten -- from

12   10,000 healthcare practitioners to 8,000

13   and now it looks like 7,000 healthcare

14   practitioners is the goal; is that right?

15          A.     Yes.  Looks like it.

16   Mm-hmm.

17          Q.     Okay.  And turn to Page 74

18   if you will.

19          A.     Is this a mixture of

20   different decks?  Because they don't even

21   look the same.

22          Q.     It's actually one deck that

23   was produced as one deck, at least how we

24   got it.

Highly Confidential - Subject to Further Confidentiality Review

Page 256

1          A.    Okay.  And this is from my
2    file?
3          Q.    It is from your custodial
4    file.
5          A.    Okay.
6          Q.    Actually, it came from, the
7    initial primary custodian, is it Ron --
8    is it Kuntz?
9               MS. STRONG:  Kuntz.
10              THE WITNESS:  Kuntz.
11   BY MR. JANUSH:
12         Q.    And you are listed as
13   custodian all on the metadata, that you
14   would have received this.
15         A.    Okay.  I'm on Page 74.
16   Okay.  So this is listed in the backup
17   section of this -- I mean, on this deck.
18         Q.    Mm-hmm.
19         A.    Okay.
20         Q.    Moving to the middle of the
21   page, and addressing dual MOA -- that
22   stands for mode of action, right?
23         A.    Mechanism of action.
24         Q.    Mechanism of action, right.

Page 257

1    With -- is it mu or mu?

2           A.    Mu.

3           Q.    Mu opioid agonism and

4    norepinephrine reuptake inhibition.  And

5    this is -- this is -- falls within

6    bullets under RTBs.  What does RTB stand

7    for?

8           A.    Reason to believe.

9           Q.    Okay.  So reason to believe

10   in what?

11          A.    Okay.  So this here says

12   positioning statement.  Positioning

13   statement is a marketing form.  I don't

14   know what the right word is, but for

15   every product that you market, you want

16   to have a positioning statement, which is

17   an internal document that talks about --

18   about your product, who it's for, what

19   it's good for, why should you believe

20   that, you know, these are the benefits.

21               So it's -- it's kind of

22   internal-facing document.  It's not

23   something that you would show to someone

24   external.  And some of it can be

Page 258

1    aspirational as well, that you can't

2    deliver on today, but maybe in the

3    future, depending.

4         Q.    Do you know whether the

5    concept of dual mechanism of action with

6    mu opioid agonism and norepinephrine

7    reuptake inhibition went beyond internal

8    aspirational statements and made it to

9    the outside public?

10        A.    So in our messaging and

11   sales tools, we do include a little bit

12   around the mechanism of action for

13   Nucynta ER.  There's very limited -- in

14   terms of what we're able to say.  I don't

15   recall the specifics, but it might be in

16   this document in terms of what we were

17   able to say about it.

18        Q.    Okay.  That's what I want to

19   focus on, the dual mechanism of action

20   topic for a moment.

21        A.    Okay.

22        Q.    And isn't it true that

23   Nucynta and Nucynta ER's exact mechanism

24   of action is scientifically unknown?

Page 259

1          A.    I believe that that's what

2     we say.

3          Q.    So you believe that that's

4     true, right?

5          A.    Yeah, I believe that

6     that's -- I believe that that's what we

7     were able to say to the doctors.  To the

8     extent that people within Janssen, like

9     the science folks in Janssen -- at

10    Janssen, have a deeper understanding of

11    it, that's something that I can't testify

12    to.

13         Q.    In fact, the only evidence

14    regarding the mechanism of action was

15    derived from limited preclinical animal

16    research; isn't that right?

17              MS. STRONG:  Objection to

18         form.

19              THE WITNESS:  So mechanisms

20         of actions are very complicated

21         scientific things that I don't

22         really -- I don't feel comfortable

23         speaking to.  I think someone else

24         can better answer these things.

Highly Confidential - Subject to Further Confidentiality Review

Page 260

1              All I know is there's --

2         from a marketing perspective, I

3         know that there's limited things

4         that we can say, and that's what

5         we say in our marketing material,

6         and that's what we train the sales

7         representatives to say.

8    BY MR. JANUSH:

9         Q.    What's the "that's what we

10   say"?  I'm not -- I'm not following you.

11   What is it that you say in your marketing

12   materials and train your sales

13   representatives to follow?

14              MS. STRONG:  Objection to

15         form.

16              THE WITNESS:  So -- so

17         that's what I'm saying.  I -- I

18         don't recall, like sitting here.

19         But I think there's probably

20         documentation that shows what --

21         what it is that we're able to say.

22              I want to be careful to -- I

23         can't recall it.  But I remember

24         it's brief in terms of what we

Page 261

1           were able to say.

2    BY MR. JANUSH:

3           Q.    Do you know as you sit here

4    today whether the Janssen -- whether

5    Janssen marketed Nucynta ER as having a

6    dual mechanism of action?

7                MS. STRONG:  Objection to

8           form.

9                THE WITNESS:  I believe

10          we -- I believe we were able to

11          say that we have a dual mechanism

12          of action, but I would -- I would

13          like to check it because it's been

14          a long time.

15   BY MR. JANUSH:

16          Q.    And that dual mechanism of

17   action was important, was it not, because

18   it permitted Janssen to portray Nucynta

19   and Nucynta ER as milder opioids that

20   were less addictive than other available

21   Schedule II opioids such as OxyContin;

22   isn't that true?

23                MS. STRONG:  Objection to

24          form.

Page 262

1              THE WITNESS:  No.

2    BY MR. JANUSH:

3         Q.    You disagree with that?

4         A.    Yes.

5         Q.    Okay.  In fact, there came a

6    point in time where you personally left

7    out of communications when citing to the

8    dual mechanism of action, left out the

9    caveat that the exact mechanism of action

10   is unknown and someone at Janssen called

11   you out on it.  Isn't that right?

12              MS. STRONG:  Objection to

13         form.

14              THE WITNESS:  No.  I don't

15         recall -- I don't know what you're

16         talking about.

17   BY MR. JANUSH:

18        Q.    Okay.

19              (Document marked for

20         identification as Exhibit

21         Janssen-Burns-10.)

22   BY MR. JANUSH:

23        Q.    I'm pulling up

24   JAN-MS-00753700.  It's Exhibit 10.

Page 263

1              MS. STRONG:  The last one

2         was 9?

3              MR. JANUSH:  I think so.

4         Yes.  So we are at 10.

5    BY MR. JANUSH:

6         Q.    And who is Phung Quach?  I

7    might be mispronouncing the name, so

8    forgive me entirely.

9         A.    It's okay.  Phung Quach, she

10   was medical communications.

11        Q.    Okay.  And is that a role

12   that -- that seeks to ensure that folks,

13   employees at Janssen, are always using

14   correct language when referring to what

15   you can and cannot say about a product's

16   qualities?

17        A.    I -- I wouldn't say that

18   that was her role.  I wouldn't describe

19   it in that way.  Medical communications,

20   I guess in my own words, they -- they

21   check things like references, that we

22   have proper references, that they, you

23   know, comply with, I don't know, AMA

24   standards and things like that.  That we

Page 264

1    can source correctly and accurately.

2              So if we're sourcing to

3    certain publications or we're certain --

4    sourcing to certain data, that we're

5    accurate in how we're sourcing our

6    information.  I recall that that's the

7    majority of what they do.  It's sort of

8    the nitty-gritty of the medical check.

9    That's their role.

10         Q.    It's a compliance role in a

11   sense as well, right?

12         A.    The title is not compliance.

13         Q.    Right.

14         A.    And what they do is not like

15   a compliance officer.  They are more

16   medical.  They are more medical

17   correctness.

18         Q.    Okay.  Thank you for that

19   clarification.

20         A.    Mm-hmm.

21         Q.    And it looks like Phung

22   Quach is writing to you directly on

23   February 27, 2013, and addressing an

24   omission of a line in the iPad Nucynta ER

Highly Confidential - Subject to Further Confidentiality Review

Page 265

1    summary page and leave-behind visual aid.

2    Do you see that?

3            A.    I see it.

4            Q.    And that, more specifically,

5    addressing under the header dual

6    mechanism of action, the following

7    sentence should be added as the first

8    sentence below the header, quote, the

9    exact mechanism of action is unknown,

10   quote.

11                Do you see that?

12           A.    I see.

13           Q.    So Phung is -- is asking you

14   to make that change now in the iPad and

15   separately for the leave-behind piece,

16   when it times to review or reprint the

17   piece, whichever comes first, you were

18   being asked to also add in that sentence;

19   is that right?

20           A.    I see that.

21           Q.    Okay.  So a leave-behind

22   piece by definition is something that

23   makes it to the physician's office and is

24   left behind; is that right?

Page 266

```
 1            MS. STRONG:  Objection to
 2       form.
 3            THE WITNESS:  Yes, in
 4       general that's what it means.
 5  BY MR. JANUSH:
 6       Q.   Okay.  So dual mechanism of
 7  action was printed in a leave-behind
 8  piece that made it into the physician's
 9  office, right?
10       A.   Right.
11            MS. STRONG:  Objection to
12       form.
13  BY MR. JANUSH:
14       Q.   Okay.  And probably because
15  it's hard to go into physician's offices
16  and find leave-behind pieces and repull
17  them, Phung was saying, when it's time to
18  re-review or reprint the piece, whichever
19  comes first, can you please add in that
20  sentence?
21       A.   I'm sorry, what was the
22  first part?
23       Q.   I said probably because it's
24  very hard to go into the physician's
```

Page 267

1    office and pull back the piece that was

2    left behind, Phung is saying, when it's

3    time to re-review or reprint the piece,

4    whichever comes first, can you please add

5    in this sentence, that the exact

6    mechanism of action is unknown; is that

7    right?

8          A.    I don't know if that's what

9    she was thinking at the time that the

10   reason to wait is because it's hard to

11   pull.

12         Q.    But either way, you were

13   being directed that at re-review or

14   reprint --

15         A.    Right.

16         Q.    -- we need to add the

17   sentence, "The exact mechanism of action

18   is unknown" --

19         A.    Correct.

20         Q.    -- on a document that made

21   it into the physician's office?

22               MS. STRONG:  Objection to

23         form.

24               THE WITNESS:  On a

Page 268

```
1        leave-behind piece.

2  BY MR. JANUSH:

3        Q.    Which is a document that

4  goes to the physician's office, right?

5        A.    Yes, it's meant for a

6  physician's office.

7        Q.    Okay.

8             MR. JANUSH:  Let's go off

9        the record for a short break,

10       please.

11            THE VIDEOGRAPHER:  We are

12       now going off the record and the

13       time is 2:45 p.m.

14            (Short break.)

15            THE VIDEOGRAPHER:  We are

16       now going back on the record.  The

17       time is 3:12 p.m.

18              (Document marked for

19       identification as Exhibit

20       Janssen-Burns-11.)

21  BY MR. JANUSH:

22       Q.    Ms. Burns, I'm going to hand

23  you what I've marked as Exhibit 11.  It's

24  JAN-MS-00771526.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 269

1          MS. STRONG:  Mr. Janush,
2     just before you begin.
3          MR. JANUSH:  Sorry.  I
4     apologize.
5          MS. STRONG:  Yeah, no, it's
6     okay.  Just before you get on -- I
7     don't want to forget.  We noticed
8     that Exhibit 8 that was shown to
9     the witness at the deposition
10     doesn't reflect any track changes.
11     But we believe that when looking
12     at the document on relativity that
13     it does have track changes in it.
14          So I just wanted to note
15     that, and Mr. Janush said he would
16     look into that.  It may have been
17     just something that happened with
18     the printing or an image or a
19     native form that was printed.  So
20     I'm just noting it for the record.
21          MR. JANUSH:  Sure.  Yeah,
22     some of these documents have been
23     produced by Janssen in two
24     different formats.  And we have --

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1            we may have only printed a format

2            that didn't have the changes.  So

3            we'll look at it as well.

4    BY MR. JANUSH:

5        Q.    This is a PowerPoint,

6    Ms. Burns, that -- that appears to be

7    dated July 2011.  It's titled Burden of

8    Pain.

9            And I wanted to come back to

10   a topic we hit upon earlier regarding

11   unsatisfactory pain control.  Do you

12   remember when we talked about that?

13       A.    Yes.

14       Q.    Okay.  So I'm going to draw

15   your attention to Page 9 or Slide 9.

16       A.    Okay.  And also I just want

17   to make a comment that July 2011 was

18   before I joined the Nucynta team.  And

19   I've never seen this documentation

20   before.

21       Q.    Okay.  We knew that it was

22   before you joined the team.

23       A.    Okay.

24       Q.    However, it was produced as

Highly Confidential - Subject to Further Confidentiality Review

Page 271

1    part of your custodial file and reflected

2    that -- I think that reflected that at

3    one point in time you'd been sent this

4    document.  So I'm just representing --

5           A.    Okay.  Okay.

6           Q.    -- in front of your counsel

7    and for your benefit that I didn't pull

8    it from someone else's custodial file.

9    It absolutely came from your custodial

10   file production.

11          A.    Okay.  I've just never seen

12   it.  But that's okay.

13          Q.    Well, I'll be quick then.

14          A.    Sure.

15          Q.    Earlier I was seeking to

16   address the concept of whether Janssen

17   studied the notion of unmet pain.  Do you

18   remember that?

19          A.    Unmet need in pain.

20          Q.    Unmet need in pain, yeah.

21   Okay.

22                And this document seems to

23   be addressing that topic.  At the top in

24   the blue banner, it's stating, "Severe

Page 272

1  and very severe chronic pain patients

2  report unsatisfactory pain control."

3            Would you consider

4  unsatisfactory pain control to be unmet

5  pain management?

6      A.    Yes, in general.  Mm-hmm.

7      Q.    And this is in 2011.  And

8  the citation, the reference for this

9  concept of patients reporting

10  unsatisfactory pain control concerns a

11  1998 telephone interview study conducted

12  by the American Pain Society which sought

13  to measure patient perceptions of their

14  current pain treatments.

15            Are you familiar with that

16  1998 American Pain Society telephone

17  study that's cited here?

18      A.    No, not at all.

19      Q.    Okay.  Are you -- are you

20  aware that the -- that the study that's

21  cited by Janssen in this July 2011

22  PowerPoint, citing to -- cites -- it's --

23  let me take a step back and re-ask that

24  question.

Page 273

1                    Are you aware that this

2      study was funded and in part -- and

3      conducted in part -- well, funded in part

4      by Janssen Pharmaceutica, are you aware

5      of that?

6                    MS. STRONG:  Objection to

7            form.

8                    THE WITNESS:  No, I'm not.

9      BY MR. JANUSH:

10         Q.    Are you aware that it was

11     conducted by Roper Starch Worldwide for

12     the American Academy of Pain Medicine,

13     the American Pain Society, and Janssen

14     Pharmaceutica in 1999?

15                   MS. STRONG:  Objection to

16           form.

17                   THE WITNESS:  I'm not

18           familiar with any of this.

19     BY MR. JANUSH:

20         Q.    Do you know that the --

21     whether the American Academy of Pain

22     Medicine is a pain advocacy group that

23     was sponsored by companies that

24     manufactured opioid products, including

Page 274

```
 1   Janssen?

 2              MS. STRONG:  Objection to

 3         form.

 4              THE WITNESS:  There's two

 5         parts to that question.  I am

 6         aware of American Pain Society, as

 7         a society, you know, having to do

 8         with pain.  I'm unaware of the

 9         second part.

10   BY MR. JANUSH:

11         Q.    You're unaware of American

12   Academy of Pain Medicine?

13         A.    No, the sponsorship --

14         Q.    There are two societies

15   listed here.

16         A.    The sponsorship part.

17         Q.    Okay.  So let's break it

18   down.  There's two different societies

19   that are listed, American Academy of Pain

20   Medicine and the American Pain Society.

21   So you stated that you were aware of the

22   American Pain Society.  Is it correct to

23   say that you're unaware as to whether the

24   American Pain Society was sponsored in
```

Highly Confidential - Subject to Further Confidentiality Review

Page 275

1  part by Janssen?

2         A.    Yeah, I'm unaware that the

3  American Pain Society was sponsored by

4  Janssen.

5         Q.    Okay.  Are you similarly

6  unaware that the American Academy of Pain

7  Medicine was sponsored in part by

8  Janssen?

9              MS. STRONG:  Objection to

10             form.

11             THE WITNESS:  Correct.  I am

12             unaware of that.

13  BY MR. JANUSH:

14         Q.    And before today, you had

15  never seen this study, never read this

16  study regarding the 805 telephone

17  interviews that were conducted in 1998 by

18  the American Pain Society?

19         A.    Correct.

20         Q.    Okay.  Before we put it

21  entirely away.  I'm going to ask you to

22  turn to Page 28.  I'm going to transition

23  to a different topic concerning abuse

24  potential of opioid products.

Page 276

1                  Now, are you aware of

2     Janssen engaging in marketing efforts to

3     address that the incidence of opioid

4     abuse and addiction after chronic opioid

5     therapy is less than addiction in the

6     general population?

7                       MS. STRONG:  Objection to

8           form.

9                       THE WITNESS:  I've never

10          seen this slide or this entire

11          deck.  And I'm not aware of that

12          at all.

13    BY MR. JANUSH:

14          Q.    To break that down, I

15    just -- I did get your answer, I think.

16    But I want to break that down into two

17    pieces.  First, you've never seen this

18    slide deck.  And separately, you're

19    unaware of Janssen taking the position

20    that the prevalence of -- the incidence

21    of opioid abuse and addiction after

22    chronic opioid therapy is less than the

23    prevalence of addiction in the general

24    population?

Page 277

1              MS. STRONG:  Objection to

2         form.

3              THE WITNESS:  I'm not aware

4         of that at all.

5    BY MR. JANUSH:

6         Q.    Okay.  Are you familiar with

7    the article referenced at Footnote 1

8    below written by Fishbain and Cole and

9    Lewis titled "What Percentage of Chronic

10   Nonmalignant Pain Patients Exposed to

11   Chronic Opioid Analgesic Therapy Develop

12   Abuse/Addiction and/or Aberrant

13   Drug-Related Behaviors?  A Structured

14   Evidence-Based Review"?

15        A.    No, I've never seen it or --

16   aware of it before.

17        Q.    Okay.  I'm going hand you

18   what's been marked as Exhibit 12.

19             (Document marked for

20             identification as Exhibit

21             Janssen-Burns-12.)

22   BY MR. JANUSH:

23        Q.    Its Bates number is

24   JAN-MS-01057540, and it looks like this

Page 278

1    is a risk management or REMS for

2    tapentadol ER for internal training

3    purposes only.  Have you ever seen this

4    before?  Let me -- before I ask you that

5    question, let me also, as I have been

6    trying to do, advise that the primary

7    custodian for this document is Ron Kuntz.

8    The custodian all category includes you

9    as a recipient of this document.

10        A.    So I'm aware that tapentadol

11   ER has a REMS.  But as I'm flipping

12   through this, it's -- you know, it's not

13   fresh in my mind.

14        Q.    Okay.  And earlier I asked

15   you whether you would agree with the

16   concept that as the number of

17   prescriptions for opioid drugs increases,

18   so does the frequency of misuse, abuse,

19   and diversion.  Do you remember that?

20             MS. STRONG:  Objection to

21        form.

22             THE WITNESS:  Actually,

23        that's not exactly how you

24        answered it.  I mean, that's not

Highly Confidential - Subject to Further Confidentiality Review

Page 279

1          exactly how you asked it.  I think

2          the only part that you asked me

3          about was addiction.  Not misuse,

4          abuse and diversion.

5    BY MR. JANUSH:

6          Q.    We're going to pause and I'm

7    going to have the court reporter search

8    that back for me and seek out the words,

9    "misuse," "abuse" and "diversion."

10               (Whereupon, a discussion was

11          held off the stenographic record.)

12               MR. JANUSH:  Back on the

13          record.

14   BY MR. JANUSH:

15         Q.    Do you believe in the

16   concept that as prescriptions of opioid

17   products increases, so too does the risk

18   for abuse?

19               MS. STRONG:  Objection to

20          form.

21               THE WITNESS:  Sorry, I'm

22          just trying to process the

23          question.

24               So you're asking do I

Page 280

1          believe in the concept that if the

2          number of prescriptions increase,

3          the risk of abuse increase?  Not

4          necessarily, no.  Because I think

5          there's a lot of factors that go

6          into abuse.

7    BY MR. JANUSH:

8          Q.   So I'm going to turn your

9    attention to Page 11 and ask that you

10   read along with me.  And I'll put it up

11   here, so you see where I am.  I'm close

12   to the bottom of the page.  And I'm

13   reading this.  That "the regulatory

14   controls and restrictions imposed by

15   Schedule II designations serve as an

16   important means of preventing the abuse,

17   and diversion of opioid drugs.  Despite

18   the regulatory controls that are in place

19   to prevent the misuse, abuse and

20   diversion of Schedule II drugs, data show

21   that as the number of prescriptions of

22   opioid drugs increases, so does the

23   frequency of misuse, abuse, overdose and

24   drug-related fatalities."

Highly Confidential - Subject to Further Confidentiality Review

Page 281

1              Do you see that?

2         A.    I do.

3         Q.    Can you appreciate that this

4    is a position that your former employer

5    Janssen took in its REMS on tapentadol

6    ER?

7              MS. STRONG:  Objection to

8         form.

9              THE WITNESS:  So I'm not

10        sure -- I'm not sure how much of

11        what we read or, you know, this

12        document, is Janssen's position

13        versus statements or beliefs that

14        were adopted from the CDC or the

15        FDA or the DEA, for example.

16   BY MR. JANUSH:

17        Q.    You're not -- are you taking

18   the position that -- that a risk

19   management document created for

20   tapentadol ER for which Janssen was then

21   the -- was the only manufacturer, was --

22   was nothing more than like having your --

23   its arm bent by the CDC and not really

24   embracing this language?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

```
 1              MS. STRONG:  Objection to
 2         form.
 3              THE WITNESS:  I'm not sure
 4         what you're asking me.
 5    BY MR. JANUSH:
 6         Q.    Well, let me ask you this.
 7    Turn to page -- page -- let me ask you a
 8    different question.
 9              You know what a REMS is,
10    right?
11         A.    Mm-hmm.
12         Q.    And the -- the goal of a
13    REMS is to ensure that the -- the
14    benefits of a drug outweigh its risks;
15    isn't that right?
16              MS. STRONG:  Objection to
17         form.
18              THE WITNESS:  I'm not sure
19         if that's the goal of REMS.  I
20         think to ensure that the benefit
21         of a drug outweighs the risks,
22         that's -- that's an evaluation
23         that the FDA makes in approving
24         the drug in the first place.  So
```

Highly Confidential - Subject to Further Confidentiality Review

Page 283

1          by the FDA approving the drug, the

2          benefits already outweigh the

3          risks.

4    BY MR. JANUSH:

5          Q.    Okay.

6          A.    So --

7          Q.    So take a look at Page 3.

8    I'm going to highlight it.  And Janssen

9    writes, "The goal of a REMS ensuring the

10   benefits of a drug outweigh its risks is

11   in keeping with the Johnson & Johnson

12   credo which begins, quote, we believe our

13   first responsibility is to the doctors,

14   nurses and patients, to mothers and

15   fathers, and all others who use our

16   products and services."

17               Do you see that?

18         A.    Mm-hmm.

19         Q.    So Johnson & Johnson and

20   Janssen seems to be saying that the goal

21   of a REMS ensuring the benefits of a drug

22   outweigh its risks is in keeping with the

23   Johnson & Johnson credo.

24               Would you agree with that?

Page 284

1              MS. STRONG:  Objection to

2         form.

3              THE WITNESS:  I mean I'm --

4         I'm not disputing this statement.

5    BY MR. JANUSH:

6         Q.   Okay.  And it's saying

7    that -- that -- isn't this also saying

8    that the goal of a REMS is to ensure that

9    the benefits of a drug outweigh its

10   risks?

11             MS. STRONG:  And objection

12        to form.

13             THE WITNESS:  So if you

14        looked at the first paragraph

15        under overview, it kind of says

16        what you say.  But I think there's

17        this nuance saying that the

18        benefits of the drug outweigh the

19        risks associated with its use, and

20        I think that's more representative

21        of what a REMS is for.

22             Whereas, what I said

23        earlier, I think the FDA approves

24        drugs where they have determined

Highly Confidential - Subject to Further Confidentiality Review

Page 285

1           that the benefit outweighs the

2           risk for the drug to be approved

3           and the REMS is there to ensure

4           that the use, there's certain

5           precautions and certain steps that

6           are taken, to make sure that it's

7           used safely.

8    BY MR. JANUSH:

9           Q.    So you're -- you're stuck on

10   the drug wouldn't be approved if it

11   wasn't safe by the FDA.  And REMS is

12   different, isn't it?  Isn't REMS

13   addressing after a drug has been approved

14   in a -- in a postmarket, in a

15   postapproval scenario, what is the

16   drugmaker seeing concerning the risks

17   associated with its drugs and what

18   actions should the drug -- should the

19   drugmaker take to address those risks.

20   That's what REMS is addressing, isn't it?

21           MS. STRONG:  Objection to

22           form.

23           THE WITNESS:  Okay.  So I

24           think this is probably a good time

Page 286

```
1          for me to say I don't understand

2          the nuance of REMS.  I know that

3          REMS are risk mitigation programs,

4          that are required, mandated by the

5          FDA.

6               Now the details of REMS,

7          what's in it, I -- I don't -- I

8          can't speak to the details of it.

9               I know there is risk

10         mitigation -- it is risk

11         evaluation and mitigation plan.

12         It has, you know, quite a lot in

13         here.  But, you know, I don't know

14         all the different components of

15         it.

16  BY MR. JANUSH:

17      Q.   Okay.  Earlier we talked a

18  bit about the dual mechanism of action

19  promotional language by Janssen.  I'd

20  like you to turn to the bottom of Page 7.

21               It says, "Tapentadol, the

22  active ingredient in tapentadol ER has a

23  dual mechanism of action.  It is believed

24  to act as both a mu opioid receptor
```

Page 287

1    agonist and as a noradrenaline reuptake

2    inhibitor which potentiates the effects

3    of opioids?"

4              Do you see that?

5         A.   Yes, I see it.

6              MS. STRONG:  And again, I'm

7         just going to object to the

8         precursor to the questions.

9    BY MR. JANUSH:

10        Q.   Okay.  Again, as with the

11   physician leave-behind that Phung Quach

12   corrected you on, in this Janssen

13   document on REMS for internal training

14   purposes of its employees, there's no

15   caveat saying, hey, this really isn't

16   true.  We only did this preclinical

17   research that the FDA says we can't rely

18   on.  Isn't that right?

19             MS. STRONG:  Objection to

20        form.

21             THE WITNESS:  I -- I object

22        to the characterization that hey,

23        it's not true.  At no place do we

24        say that it's not true.

Highly Confidential - Subject to Further Confidentiality Review

Page 288

1    BY MR. JANUSH:

2         Q.    That's my point.  I think

3    you're proving my point.

4         A.    No, I don't think so.

5         Q.    My point -- I think you

6    might not understand that you're proving

7    my point, but you're proving my point.

8              You're staunchly taking the

9    position that there is a dual mechanism

10   of action, and even to this date, there

11   is no science that has been performed

12   proving a dual mechanism of action and

13   the FDA has taken the position that

14   preclinical animal studies cannot be

15   cited to demonstrate a dual mechanism of

16   action.  Are you aware of that?

17              MS. STRONG:  Okay.

18         Objection to form.

19              THE WITNESS:  So first, I --

20         I don't know what -- I don't know

21         what you mean by staunchly taking

22         the position.  I'm not taking any

23         position.  I'm only explaining

24         that the dual -- the dual

Page 289

1          mechanism of action of tapentadol

2          is something that we communicated

3          and tried to educate, you know,

4          share as much as is available in

5          the package insert.  And that's

6          it.  We're not trying to say any

7          more than that.

8                 And we were very careful, we

9          meaning, you know, the review --

10         the review committee has legal,

11         regulatory compliance, medical,

12         review the statements about what

13         we can and cannot say.  And that's

14         what we -- you know, that's what

15         we ended up using.

16                I think there's also an

17         issue of timing.  I don't know the

18         timing of this document, but the

19         language on what we felt

20         comfortable to say or not say, I

21         believe changed over time as well.

22         And some of the new language that

23         was added may not be in, you

24         know -- may not have been

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1          retroactively applied to

2          everything that's out there.  So,

3          you know.

4   BY MR. JANUSH:

5          Q.    Are you saying that there's

6   the possibility that at some point in

7   time Janssen was able to say without any

8   caveat that tapentadol ER has a dual

9   mechanism of action?

10         A.    No, I did not say that.

11         Q.    What are you saying?  I'm

12  trying to really understand your -- your

13  testimony on this issue.

14         A.    What I'm saying is the dual

15  mechanism of action is a very complex

16  topic in which Janssen was very careful

17  about how they phrase the language, and

18  what was able to be said publicly outside

19  of the organization.  We stayed very

20  close to what is in the package insert.

21         Q.    Not always though, right?

22              MS. STRONG:  Objection to

23         form.

24              THE WITNESS:  Not always to

Highly Confidential - Subject to Further Confidentiality Review

Page 291

1            what?

2    BY MR. JANUSH:

3            Q.    Well, you got corrected by

4    Phung Quach on the physician leave-behind

5    that left the organization, was

6    disseminated in the public and didn't

7    include the language that -- concerning

8    the lack of a proven link between --

9    concerning the dual mechanism of action?

10           A.    No, that's not --

11                 MS. STRONG:  Objection to --

12           objection to form.

13                 THE WITNESS:  No, that's not

14           true.  The function of medical

15           communications is to ensure

16           accuracy, and it is their job to

17           pick out things that may have been

18           omitted inadvertently before, you

19           know, everything is finalized.

20                 That was pointed out that

21           what we had submitted for review

22           did not have that in the iPad or

23           whatever.  And she said to put it.

24           And the final product that was

Page 292

```
 1            finally approved likely had it

 2            because that is the process that

 3            Janssen has to ensure accuracy of

 4            things.  So it was caught during

 5            the process before it was

 6            finalized, before the iPad was

 7            finalized.

 8  BY MR. JANUSH:

 9       Q.   Well, you're addressing only

10  the iPad asset.  But there were also

11  physician leave-behinds that were

12  addressing the need to reprint in the

13  future when reprints are required.  You

14  recall that, right?

15            MS. STRONG:  Objection to

16            form.

17            THE WITNESS:  So with regard

18            to the leave-behind, which I don't

19            remember the specifics, my best

20            recollection would be that that

21            statement was something that was

22            agreed upon by the approvers in

23            the organization to be added to --

24            you know, it was an addition that
```

Highly Confidential - Subject to Further Confidentiality Review

Page 293

1           we added on future things going

2           forward.  And whenever

3           appropriate, we would go back and

4           add to other things too.

5  BY MR. JANUSH:

6           Q.   And that language, that

7  qualifying language concerning the lack

8  of a clinical correlation, is absent at

9  Page 7 of this document --

10          A.   And I don't believe that's a

11 correct characterization.

12               MS. STRONG:  Let me object.

13          Objection to form.  Go ahead and

14          give your answer.  Please wait for

15          me to object.

16               THE WITNESS:  Sorry.

17               MS. STRONG:  That's okay.

18               THE WITNESS:  So I just

19          don't want to rephrase that

20          statement.  I believe we should

21          just stick to that statement.

22          Because you're -- you're

23          characterizing it as something

24          different, and words matter when

Page 294

1          it comes to that particular

2          statement.

3   BY MR. JANUSH:

4          Q.    So the statement that I'm

5   referring to is, "The exact mechanism of

6   action is unknown."

7          A.    Correct.  It says the

8   exact --

9          Q.    Do you know -- do you

10  know --

11         A.    -- mechanism of action is

12  unknown.

13         Q.    Do you know why the exact

14  mechanism of action is unknown?

15         A.    I do not know.

16         Q.    Do you know that the reason

17  the exact dual mechanism of action or

18  mechanism of action is unknown is because

19  no study post-preclinical studies,

20  following preclinical studies, ever

21  proved in human models a mechanism of

22  action?

23             MS. STRONG:  Objection to

24         form.

Page 295

1    BY MR. JANUSH:

2          Q.    Did you know that?

3          A.    I don't know that that's the

4    reason for why an exact mechanism of

5    action is unknown.  And I'm not sure that

6    that's how you actually find out how it

7    works, because I'm not a medical person.

8          Q.    Okay.  Fair enough.  As

9    someone who oversaw the Nucynta brand

10   team for marketing -- excuse me -- for a

11   portion of the marketing team between

12   2011 and 2013, do you have an opinion as

13   to whether the increase in the drug

14   overdose fatalities observed throughout

15   1990 to 2007 in the United States has

16   been largely attributable to the misuse

17   and abuse of prescription opioid drugs?

18                MS. STRONG:  Objection to

19          form.

20                THE WITNESS:  I'm sorry.  I

21          just -- I just want to clarify.

22          The beginning statement that you

23          said is not correct, exactly.  I

24          did not oversee the team.  I was

Page 296

```
1          just a product director on the

2          team.  I had no direct reports.

3  BY MR. JANUSH:

4          Q.    Stated differently, to

5  correct the first part of my question, I

6  will replace the first part from leading

7  a team to the following language.

8          A.    Okay.

9          Q.    As someone who credits

10 herself as, "Turned around the Nucynta

11 molecule business, revitalized all

12 elements of marketing, including

13 delivering more relevant market insights,

14 optimizing customer target and sales

15 incentive compensation, and launching a

16 new standalone specialty sales team of 77

17 representatives and seven sales

18 managers," do you have an opinion as to

19 whether the increase in the drug overdose

20 fatalities observed throughout 1990 to

21 2007 in the United States has been

22 largely attributable to the misuse, and

23 abuse of prescription opioid drugs?

24                MS. STRONG:  Objection to
```

Highly Confidential - Subject to Further Confidentiality Review

Page 297

```
 1          form.
 2                  THE WITNESS:  You're asking
 3          me about an opinion leading up to
 4          2007.  That's before I even worked
 5          in the pain space.
 6                  So prior to the end of 2011,
 7          I was not focused on pain space,
 8          and I didn't have particular
 9          interest in the pain space.  So
10          no, I did not have an opinion.
11  BY MR. JANUSH:
12          Q.   So to be clear, the reason I
13  asked you it, is because in this document
14  that was found in your custodial file at
15  Page 12.
16                  MS. STRONG:  What document?
17                  MR. JANUSH:  This Janssen
18          document.  This exhibit -- what
19          are we up to?  It's the one in
20          front of you.
21                  THE WITNESS:  12.
22  BY MR. JANUSH:
23          Q.    12.  At Exhibit 12 at Page
24  12, in the middle of the page, in 2011
```

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1   Janssen is looking back and addressing

2   rates of unintentional drug overdose

3   deaths in the United States between 1990

4   and 2007.

5             Do you see that?

6             MS. STRONG:  The question

7        is, do you see that?

8   BY MR. JANUSH:

9        Q.    Do you see that?

10       A.    I see what you circled, yes.

11       Q.    Okay.  And how about this,

12   what I'm circling here?

13       A.    Yeah, I see that.

14       Q.    Okay.  So you understand the

15   concept that you could -- may not have

16   been employed in 2007 in the pain space,

17   but that in 2011 at a time when you were

18   employed in the pain space, Janssen was

19   apparently taking a look back at

20   opioid-related deaths from 1990 to 2007.

21             Do you see that?

22             MS. STRONG:  I want to say

23        objection to form.

24             THE WITNESS:  You made a

Page 299

1          statement, and then you asked me

2          if I see it.  Which one?  Do you

3          want me to answer if I agree with

4          the statement or do I --

5    BY MR. JANUSH:

6          Q.    I don't need you to agree

7    with it.

8          A.    -- am I looking at it?

9    Okay.

10         Q.    I'm asking you this concept.

11   You earlier stated --

12         A.    Right.

13         Q.    -- that you can't take a

14   position to something that occurred

15   before you joined the pain space.  And

16   I'm making the point that Janssen in 2011

17   was looking back at data from 1990 to

18   2007.  Do you appreciate that?

19         A.    I don't know what you mean

20   by do I appreciate it.  I mean, you're

21   telling me they looked at it.  And I'm

22   not disputing that they looked at it.

23         Q.    Okay.  So you agree --

24         A.    So yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 300

1          Q.    You agree that Janssen -- my

2    point is this.  The fact that you were

3    not employed in 2007 in the pain space is

4    wholly irrelevant to whether you could

5    have learned information like this data

6    right here that Janssen published in

7    2011; isn't that true?

8               MS. STRONG:  Objection to

9          form.

10              THE WITNESS:  So this is

11         linked to the question you asked

12         me.  Specifically you asked me,

13         did I have an opinion about

14         whatever the trend was leading up

15         to -- you asked me if I had a

16         personal opinion.  And I said no,

17         I did not.

18              MR. JANUSH:  Move to strike.

19         Nonresponsive.

20              THE WITNESS:  Back in 2007.

21              MR. JANUSH:  It's not

22         responsive to my question.

23              MS. STRONG:  It's absolutely

24         responsive.  You don't need to

Page 301

1          harass the witness.

2                    MR. JANUSH:  I'm not

3          harassing her.  I'm moving to

4          strike as nonresponsive.

5     BY MR. JANUSH:

6          Q.    My question that was on the

7     record at that moment was not what you're

8     answering.  My question concerned, you

9     could be employed in 2011 and see

10    information that concerns an earlier time

11    period and form an understanding about

12    Janssen's position concerning that

13    earlier time period.  True or false?

14                   MS. STRONG:  Objection to

15         form.

16                   THE WITNESS:  I'm not trying

17         to be difficult.  I don't

18         understand your question.

19    BY MR. JANUSH:

20         Q.    Okay.  So when you got this

21    document at some point in your files and

22    your computer, did you -- you just never

23    read it?

24         A.    I don't -- as I'm looking at

Page 302

1  it now, it doesn't look familiar to me.

2         Q.    REMS is a pretty important

3  topic, isn't it?

4         A.    Yeah.   Right.   What I mean

5  by that is I may have read it, but I

6  can't tell you what's in this document,

7  and we're just flipping pages and you're

8  pointing me to a particular spot and

9  asking me a question.   I'm not super

10  familiar.   It's not like -- it doesn't

11  feel familiar to me.   That's all I'm

12  saying.

13              And I'm not saying that I

14  never read it or that I read it.   But I'm

15  also not understanding what you're

16  asking.

17              You're making a statement

18  that Janssen -- that the study, can I

19  appreciate that.

20         Q.    That's not exactly what I'm

21  saying.

22         A.    I don't know what to say.

23  Do I appreciate that?

24         Q.    Let me highlight language

Highly Confidential - Subject to Further Confidentiality Review

Page 303

1   for you.  I'm saying this.  Janssen made

2   a statement in its REMS on Nucynta ER

3   that, "This increase in the drug overdose

4   fatalities has been largely attributable

5   to the misuse and abuse of prescription

6   opioid drugs."

7            You see that, right?

8        A.    I see the statement.

9        Q.    Do you -- do you have an

10  opinion as to whether that's correct or

11  not?  Do you disagree with your former

12  employer on that topic?

13           MS. STRONG:  Objection to

14       form.

15           THE WITNESS:  I can't agree

16       or disagree.  I mean, I mean, they

17       had a reason to make that

18       statement.  I'm sure it's based on

19       data.  So I'm not sure if I'm in a

20       position to agree or disagree with

21       something that's source.

22  BY MR. JANUSH:

23       Q.    Okay.

24       A.    So...

Page 304

1          Q.    Did you ever -- do you ever

2     recall reading a REMS for Nucynta ER?

3          A.    I recall having -- you know,

4     having access and, you know, gone through

5     it, but it has been a long time.

6          Q.    I'm just going to need one

7     minute to find something I'm looking for

8     within this document.

9                I'm going to turn your

10    attention to Page 15.  Are you familiar

11    with the concept of being physically

12    dependent on opioids?

13         A.    Yes.

14         Q.    Okay.  What's your

15    understanding concerning physical

16    dependence?

17         A.    Well, I'm not a -- you know,

18    I'm not a clinician or doctor of any

19    kind, but opioids, if taken over an

20    extended period of time, the body can

21    have physical sort of dependence on the

22    opioids, and, therefore, you know, it

23    would want to continue to be on opioids.

24         Q.    Okay.  And does the

Highly Confidential - Subject to Further Confidentiality Review

Page 305

1    statement at the bottom here of that

2    paragraph that says, "However, once

3    opioid treatment is no longer needed,

4    patients are able to discontinue opioid

5    use without difficulty provided the

6    dosage is tapered gradually."

7                    Do you see that?

8         A.    I do.

9         Q.    Do you have familiarity with

10   this concept?

11        A.    Yes.

12        Q.    What -- can you explain your

13   familiarity with this concept?

14        A.    In general, it's good

15   medical practice to taper patients off of

16   opioids, from whatever the dose that they

17   are on, gradually reduce a dose until

18   they can completely go off opioids.  And

19   that's how it should be discontinued.

20        Q.    Okay.  This states that

21   patients are able to discontinue opioid

22   use, quote, without difficulty, quote,

23   provided the dosage is tapered gradually.

24        A.    You're on the same sentence,

Page 306

1   right?

2           Q.    Yeah.  Do you know the --

3   what the support is for the concept that

4   patients should be -- would be able to

5   discontinue opioid use without difficulty

6   provided that the dosage is tapered

7   gradually?

8           A.    Hold on a second.

9                 Is this -- is this section

10  specifically about Nucynta ER or is this

11  about opioids in general?

12          Q.    Well, it's the REMS for

13  Nucynta ER.  But this -- there isn't a

14  difference as per the FDA in the

15  class-wide label concerning Nucynta ER as

16  compared with other Schedule II

17  products --

18                MS. STRONG:  I would just

19          object to anything along these

20          lines to the extent that you're

21          testifying about --

22                MR. JANUSH:  So -- so -- I

23          was just going to ask a question

24          in the same --

Highly Confidential - Subject to Further Confidentiality Review

Page 307

1    BY MR. JANUSH:

2          Q.    Are you aware of that fact?

3                MS. STRONG:  Objection to

4          form.

5                THE WITNESS:  Which fact?

6    BY MR. JANUSH:

7          Q.    Are you aware that there

8    isn't -- that the FDA treated Nucynta ER

9    the exact same as its competitors in

10   the -- in the class when it came to label

11   language concerning its -- the warning,

12   the package insert warning?

13               MS. STRONG:  Objection to

14         form.

15               THE WITNESS:  I am not aware

16         of the specific warnings that

17         other products have.  But I would

18         agree that there is sort of

19         class-wide language that is also

20         applicable to Nucynta ER.

21   BY MR. JANUSH:

22         Q.    That's what I'm addressing.

23         A.    Right.

24         Q.    Class-wide language?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Right.  Yeah, but what I'm

2    saying here is you're pointing me to a

3    particular paragraph -- a particular

4    sentence.

5          Q.     Mm-hmm.

6          A.     And it says, "However once

7    opioid treatment," you know, and the rest

8    of it.  I'm just asking is that opioid

9    treatment is a general statement about

10   opioid treatment or is it specifically to

11   Nucynta ER?

12         Q.     This is --

13         A.     Before I answer your

14   question.

15         Q.     This is Janssen's --

16         A.     I understand.

17         Q.     -- risk assessment, risk

18   management for tapentadol ER.

19         A.     Right.  I understand what

20   the document is --

21         Q.     That's all I got for you.

22         A.     Right.  So I'm just going to

23   look in here, just for context before I

24   answer your question.  Because sometimes

Page 309

1    something like this talks about opioids

2    in general and sometimes it talks about

3    Nucynta ER in particular.  So I just

4    wanted to, you know, orient myself to

5    this section.

6              Okay.  So in reading a

7    couple paragraphs ahead of this in this

8    section, it seems that these two

9    paragraphs on the top of Page 15,

10   including the sentence that starts with

11   however, that you pointed me to, this is

12   talking about opioids in general.

13        Q.   Go to the top of the page.

14   It's talking about opioids and tapentadol

15   ER, isn't it?

16        A.   That's the chapter, yes.

17        Q.   Yeah.

18        A.   But you have to read things

19   in context.

20        Q.   You're -- are you taking the

21   position that the Janssen REMS for

22   tapentadol ER was -- was not including

23   Nucynta ER when it was talking about the

24   discontinuation of opioid use without

Page 310

1    difficulty?

2          A.     No, I did not say that.

3          Q.     Okay.

4          A.     No, I did not say that it's

5    opioid excluding Nucynta ER.

6          Q.     So I -- technically I'm

7    actually not fussing the point of whether

8    it's Janssen making the statement that

9    all opioids can be tapered gradually

10   and that discontinuance would occur

11   without difficulty as compared with

12   whether the statement was only made for

13   Nucynta ER.

14            I'm making the point that

15   it's made in the Nucynta ER REMS.  Do you

16   understand that?

17            MS. STRONG:  Objection.

18        Objection to form.  I'm not sure

19        what the question is.

20            THE WITNESS:  Okay.  So, so

21        this whole discussion about

22        whether or not this is Nucynta ER

23        specific or just opioid in general

24        has to do with your last question

Page 311

```
1            to me, which I think was along the

2            lines of have I seen evidence or

3            study to prove that patients are

4            able to discontinue opioids

5            without difficulty, right?

6   BY MR. JANUSH:

7            Q.    Provided the dosage is

8   tapered gradually, question mark.

9            A.    Right.  So I just wanted to

10  clarify, are you asking me for -- if I

11  have seen study or data for Nucynta ER

12  specifically or just opioid in general?

13  Because this seems to be talking about

14  opioid in general.  So I just wanted to

15  clarify your question.

16           Q.    Let's start with opioid in

17  general.

18           A.    Okay.

19           Q.    Have you seen such studies?

20           MS. STRONG:  Objection to

21           form.

22           THE WITNESS:  I -- I have

23           not seen specific studies that I

24           can point to that talk about
```

Page 312

1              discontinuation without

2              difficulty, you know, provided

3              dosage is tapered gradually.

4                    I think that's --

5      BY MR. JANUSH:

6              Q.    So if you haven't seen it

7      with respect to opioids generally, then

8      you certainly haven't seen it with

9      Nucynta ER specifically, right?

10                   MS. STRONG:  Objection to

11             form.

12                   THE WITNESS:  I haven't seen

13             anything specific to Nucynta ER.

14             My understanding is that that is

15             general good medical practice that

16             doctors are supposed to do.  And

17             it's also in the package insert

18             from Nucynta ER, that if they

19             wanted to discontinue, they have

20             to taper gradually.  That's within

21             the package insert for Nucynta ER.

22                   (Document marked for

23             identification as Exhibit

24             Janssen-Burns-13.)

Page 313

1    BY MR. JANUSH:

2         Q.    This is Exhibit 13.  It

3    includes a cover e-mail that attaches a

4    slide deck.  The cover e-mail is

5    JAN-MS-02385922.  Again, it's Exhibit 13.

6               The attachment is

7    JAN-MS-02385924.  It is listed on the

8    document platform as being part of the

9    family and the attachment PowerPoint for

10   this e-mail.

11              This came from your

12   custodial file directly, Ms. Burns.

13        A.    Okay.

14        Q.    And it appears to be a slide

15   deck that was sent to Ron Kuntz from a

16   Hany Rofael concerning FDA guidance for

17   ADF.  ADF stands for anti-diversion

18   formula; is that right?  For -- or

19   anti-abuse formula -- anti-diversion

20   formula of a pill, right?

21        A.    Abuse-deterrent formula.

22        Q.    Or abuse-deterrent formula.

23   Okay.  And the second slide deck -- let's

24   see.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1              There are two slide decks,

2    only one of which we took from the family

3    of product -- of production.  And I'm

4    focusing very specifically on Page 22,

5    "Abuse potential of tapentadol

6    immediately release" -- "immediate

7    release?"

8              And I wanted to -- in order

9    to focus on 22, I need to take you back

10   to 19, because different employees owned

11   different sections of this PowerPoint.

12   And this particular study was addressed

13   by a Peter Zannikos.  Do you know who

14   Peter Zannikos is?

15             MS. STRONG:  Objection to

16        the commentary prior to the

17        question.

18             THE WITNESS:  I don't know

19        who he is.  And I'm actually -- as

20        I'm flipping through this, I'm not

21        familiar with this presentation.

22   BY MR. JANUSH:

23        Q.   Okay.  Are you familiar with

24   any -- hearing -- have you heard about

Highly Confidential - Subject to Further Confidentiality Review

Page 315

1    any likability study that was done to

2    compare tapentadol IR to hydromorphone

3    IR?

4           A.    The likability,

5    quote-unquote, study sounds familiar, but

6    I don't know the details of it.

7           Q.    Did you ever recall hearing

8    or learning that the likability between

9    tapentadol IR and the equal doses of

10   hydromorphone IR was shown to be similar

11   across the -- that there wasn't a

12   statistically different -- significant

13   difference across the studied

14   participants?

15          MS. STRONG:  Objection to

16          form.

17          THE WITNESS:  No, I'm not --

18          I'm not aware of that.

19          MR. JANUSH:  Can we go off

20          the record for a moment.  We're

21          organizing really fast.  We cut

22          out a chunk of stuff, and

23          skipping, trying to find a

24          document that's out of order.

Page 316

```
 1              THE VIDEOGRAPHER:  We are

 2          now going off the record.  And the

 3          time is 4:05 p.m.

 4              (Short break.)

 5              THE VIDEOGRAPHER:  We are

 6          now going back on the record.  And

 7          the time is 4:17 p.m.

 8    BY MR. JANUSH:

 9          Q.    So, Ms. Burns, I've handed

10    you what I've marked as Exhibit 14 during

11    the break.

12              (Document marked for

13          identification as Exhibit

14          Janssen-Burns-14.)

15              MR. JANUSH:  And it is

16          JAN-MS-00758697.

17    BY MR. JANUSH:

18          Q.    It's an e-mail from you to a

19    Jenna Ramalho on July 11, 2014.  And it's

20    attaching a sample audio-visual script in

21    a document form which itself is the

22    second -- the next sequential Bates

23    number, JAN-MS-58698.  All of this has

24    been collated together to be marked as
```

Page 317

1    Exhibit 14.

2                    Who is Jenna Ramalho?

3         A.    I've been trying to figure

4    that out while you were talking.  I

5    don't -- I don't remember.  With group

6    DCA.  You know, I don't know actually.

7    Not a Janssen person.

8         Q.    All right.  And are you --

9    are you familiar with the topic of

10   titrating the Nucynta dosing to get to an

11   optimal dose?

12        A.    Nucynta ER dosing.

13        Q.    Nucynta ER dosing.  Are you

14   familiar with that?

15        A.    Yes.

16        Q.    Okay.  What's your

17   understanding of -- of the subject of

18   titrating Nucynta ER to get to an optimal

19   dose?

20        A.    It's been a while.  So hold

21   on a second, okay.

22                The idea is that when a

23   patient is given Nucynta ER, the

24   prescriber will pick a starting dose but

Page 318

1   that's just a starting dose.  They need

2   to titrate up to a therapeutic level to

3   see the kind of efficacy effect that we

4   saw in the clinical study.

5              So the idea is that you

6   don't get the efficacy that has been

7   shown in the study unless you are at a

8   certain range that's also matching what

9   was in the clinical study.

10      Q.    So is the -- I'm just trying

11  to understand this.  Is the concept that

12  every patient needs to be titrated up to

13  get this optimal dose?

14      A.    The idea is that to get the

15  efficacy effect as you would expect to

16  get per the clinical study, you have to

17  use the doses that were used in the

18  clinical study.

19              If you use below that -- the

20  study was studied at a therapeutic level.

21  So if you're not within that window,

22  you're not likely to see effect.  So you

23  have to get into the right dose as it was

24  studied.

Page 319

```
 1         Q.    So is it the case that all
 2   patients need to track the outcomes of
 3   that clinical study and all patients need
 4   to be titrated upward to get into that
 5   efficacious dose that you're describing?
 6              MS. STRONG:  Objection to
 7         form.
 8              THE WITNESS:  Okay.  I think
 9         that was two parts to that
10         question.
11   BY MR. JANUSH:
12         Q.    I'm just trying to
13   understand exactly what you're saying
14   about titrating in terms of does that
15   apply to all patients?
16              MS. STRONG:  Objection to
17         form.
18              THE WITNESS:  Let me -- let
19         me use an analogy.  If you have
20         like a Tylenol or something like
21         that and you're supposed to take
22         500 milligrams, if you take 10
23         milligrams there's probably no
24         guarantee that you'll get any
```

Page 320

```
1            relief because you didn't take the
2            dose that was recommended.
3                 So the whole idea is that
4            Nucynta ER also has to be taken at
5            the dose that's recommended that's
6            in the package insert because that
7            has been shown to have efficacy.
8                 So that's the whole idea
9            behind this is that the patient
10           has to be given the right dose and
11           taking the right dose in order to
12           get effect.
13                See?  So that's the concept.
14           All right.  So that's one concept.
15           You have to get to the right dose
16           to get effect.
17                The other part about that is
18           about the titration, which is when
19           they are first given the Nucynta
20           ER they are likely given a lower
21           dose than where they need to be.
22           And titrating means you change the
23           dose up until you get to that
24           therapeutic level.
```

Page 321

```
 1              And once you're within that
 2         therapeutic level, you should be
 3         fine and you should be able to
 4         feel the effect of the drug.
 5              Does that make sense?
 6  BY MR. JANUSH:
 7         Q.   Okay.  Are you familiar
 8  with -- well, what milligrams did Nucynta
 9  get prescribed in, in terms of the actual
10  pill itself?
11              How was it sold?
12         A.   Okay.  So --
13              MS. STRONG:  Objection to
14         form.
15              THE WITNESS:  So I think
16         that's two separate things, right?
17         Dosing, like what they take --
18  BY MR. JANUSH:
19         Q.   Dosing is different than the
20  milligrams.
21         A.   -- is different from -- from
22  the pills.
23         Q.   I understand.
24         A.   Okay.  So the pills -- I
```

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    don't remember.  I'm going to cheat a

2    little bit here and look at the

3    referencing here.  So actually on Page 2,

4    at the bottom --

5              MS. STRONG:  To the

6         extent -- to the extent that you

7         don't -- if you're just reading

8         from a document, to make it clear,

9         if you don't recall, you --

10             THE WITNESS:  Oh, okay.

11        Yeah, I mean, I don't --

12             MS. STRONG:  I don't think

13        he's asking you to just read the

14        document.  I think he's asking

15        what you recall.

16             THE WITNESS:  Yeah, so there

17        were multiple dosages in terms of

18        the -- the pills.  Like four or

19        five.  For -- you know, to be

20        tailored for patients in terms of

21        what they need.

22   BY MR. JANUSH:

23        Q.    Separately do you have an

24   understanding as to whether Nucynta ER

Highly Confidential - Subject to Further Confidentiality Review

Page 323

1   was to be a -- was to provide 12 hours of

2   pain relief?

3           A.    Wait, I'm sorry, what's the

4   question?

5           Q.    Do you have an understanding

6   as to whether Nucynta ER, the extended

7   relief, was to provide 12 hours of pain

8   relief?

9           A.    Nucynta ER is extended

10  release, so it's supposed to provide

11  extended relief, yes.

12          Q.    But it doesn't provide

13  continuous release throughout the entire

14  12 hours, right?  There's a -- there's a

15  peak and a valley in terms of the timing

16  during that 12 hours; isn't that right?

17              MS. STRONG:  Objection to

18          form.

19              THE WITNESS:  So I think the

20          details of the peaks and troughs

21          can be answered by a medical

22          person much better.

23              But my understanding is that

24          all drugs work in that way, the

Page 324

1            tablets that you take, you get

2            sort of a peak and then you get a

3            trough.  That's why when you have

4            an extended release, you -- you

5            reduce the numbers of the peaks

6            and troughs so that you can have a

7            more consistent pain management.

8    BY MR. JANUSH:

9            Q.    And if you're titrating

10   upwards and adding dosing of Nucynta to a

11   patient, you're also reducing the peaks

12   and troughs, aren't you?

13            MS. STRONG:  Objection to

14            form.  I mean this is really

15            just -- she's not a doctor.

16   BY MR. JANUSH:

17            Q.    Just asking if you know.

18   You seem to know a lot.

19            A.    I cannot answer that.

20   That's a very complicated medical

21   question.

22            Q.    Turning to Page 2, I'll put

23   a sticker on what I want to look at.  So

24   I'll highlight it instead.

Page 325

1              This is -- what does this

2      mean, "Kanitha catches challenge coin"?

3          A.    It's off screen.

4          Q.    Sorry.  You have it on

5      Page 2 as well.

6          A.    Yeah, okay.  What does it

7      mean?  So I think we were trying to make

8      the entire presentation interesting.  So

9      when we transition from one speaker to

10     the next, we throw this coin to each

11     other and we kind of catch it and it's

12     supposed to reflect like a transition

13     from -- like passing the baton to the

14     next speaker.

15         Q.    Got it.  Thank you.

16              And is this your speech that

17     was recorded or filmed starting with,

18     "Thanks Terry" and --

19         A.    Yeah.  Yeah.  It looks like

20     it.  It looks like this is the script

21     that we would have read for recording.

22         Q.    Okay.  And here you address,

23     "As you know, proper dosing is critical

24     in achieving the powerful efficacy that

Page 326

1    Nucynta ER has to offer.  We also know

2    that a major challenge around this topic

3    is the fact that most HCPs don't titrate

4    quickly enough or high enough for

5    patients to reach their optimal dose,

6    which can result in patients not

7    achieving adequate analgesia and being

8    switched off the product and HCPs having

9    a negative clinical experience."

10                   I read that to now lead into

11    the ensuing question.

12                   How did you know that a

13    major challenge around this topic was

14    that HCPs, healthcare practitioners,

15    weren't titrating quickly enough or high

16    enough for patients to reach their

17    optimal dose?

18           A.     So a couple of things.

19    Earlier on, when we talked about -- when

20    I testified to like having insight that

21    allowed us to tailor what we did from a

22    marketing standpoint, that referred to us

23    doing market research with, you know,

24    some clinicians to understand their

Page 327

1    perception or their experience with

2    Nucynta ER.

3              So there was one particular

4    market research that I remember.  We

5    specifically talked to clinicians who had

6    started to prescribe Nucynta ER, just a

7    little bit, and then stopped.  And we

8    wanted to know why, because we really

9    truly believed that Nucynta ER is a good

10   product, and if they get initial

11   experience that they would continue to,

12   you know, prescribe Nucynta ER for

13   appropriate patients.

14             So when we asked these

15   doctors, you know, a number of them said

16   that when they prescribed Nucynta ER to

17   patients, they did not get a positive

18   feedback from the patient that the pain

19   control was working.

20             So they were getting

21   negative feedback from patients that they

22   didn't get proper pain control, so the

23   doctor would switch them off and give

24   them something else and kind of determine

Page 328

1   that Nucynta ER doesn't work, right, that

2   it wasn't providing efficacy as it

3   should.

4                   And then we would probe some

5   more, like, you know, what dose were you

6   using?  We really tried to understand the

7   clinical relevance of what they were

8   telling us.  And we found out that the

9   doctors were using much lower doses than

10  the dose that we studied in the clinical

11  study.

12                  So the patients didn't

13  really have a chance to have proper

14  amount of drug in the system to provide

15  that efficacy effect.

16                  So that's how we found out.

17  And then we used that to emphasize to the

18  representatives that they need to spend

19  more time educating the doctors around

20  the dose, what doses were studied in the

21  clinical study, why was it done in that

22  way, what did we see, you know, as a

23  result.

24         Q.    I think you answered my

Page 329

1  follow-up question.  And is this -- when

2  you say the study, this is all from the

3  chronic low back pain study; is that

4  right?

5          A.    Yeah.  Predominately the

6  chronic low back pain study.

7          Q.    Do you know how many

8  physicians were studied for their

9  perceptions in order for Janssen or for

10  you to form this understanding that

11  physicians weren't titrating quickly

12  enough and, therefore, patients were

13  dissatisfied with Nucynta ER?

14          A.    I don't remember exactly.  I

15  would say it was a qualitative market

16  research.  So my best guess is less than

17  a hundred.  But then we also tried to

18  validate with field input.

19                So then we started to ask

20  the sales representatives, are you

21  hearing this?  What are you finding out?

22  What are the doctors doing?  And it

23  seemed to confirm our finding.

24          Q.    Did you use an external

Page 330

```
 1   company to do this physician perception

 2   market research?

 3           A.    Market research?  I believe

 4   so.

 5           Q.    Do you know the name of that

 6   company?

 7           A.    No.  Because that would -- I

 8   don't recall.  It would have been

 9   something that the market research person

10   would have selected.

11           Q.    And who was that?

12           A.    Oliver Bock at the time.

13           Q.    You said at the time.  Was

14   Oliver Bock also someone who -- did he

15   move over from market research to

16   analytics or perhaps the other way around

17   at one point?

18           A.    He has done both, yeah.  And

19   I think at one point market research and

20   analytics reported up to the same person.

21   So he did both functions, yes.

22                 MS. STRONG:  Do you have an

23           extra paperclip?

24                 MR. JANUSH:  What's that?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 331

1            MS. STRONG:  Do you have

2       extra paperclip by chance?  Thank

3       you.

4            MR. JANUSH:  Sure.

5            (Document marked for

6       identification as Exhibit

7       Janssen-Burns-15.)

8   BY MR. JANUSH:

9       Q.    I'm going to move onto

10  Exhibit 15.  This is an e-mail from Phung

11  Quach to Patricia Yap, cc'g you,

12  April 16, 2013.  And it appears that this

13  is addressing the instruction to

14  patients, the -- let me read this.

15            "The important safety

16  information insert, select ISI,

17  concerning Nucynta ER tablets and the

18  instruction to add back into the

19  important safety information that

20  swallowing Nucynta ER tablets whole" --

21  excuse me -- "to add back that crushing,

22  dissolving, or chewing Nucynta ER can

23  cause rapid release and absorption of a

24  potentially fatal dose of tapentadol."

Highly Confidential - Subject to Further Confidentiality Review

Page 332

```
 1              Do you remember this
 2   communication in April of 2013 between
 3   Phung and Patricia Yap and copying you?
 4              MS. STRONG:  Objection to
 5          the form.
 6              And particularly the
 7          commentary prior to the question.
 8   BY MR. JANUSH:
 9       Q.    Oh, sorry.  I didn't read
10   the Bates number in.  JAN-MS-00760716.
11              And, incidentally, you are
12   on this e-mail earlier in the string as
13   well.
14       A.    Okay.  To answer your
15   question, I don't remember this
16   particular conversation or the e-mail
17   exchange.  But I am familiar with the
18   language.
19       Q.    Okay.  So INTAC technology
20   in NER asset.  I understand INTAC
21   technology is a more crush-resistant
22   technology created by Grünenthal.  Do you
23   share that understanding or have any
24   knowledge about that?
```

Page 333

1          A.    Yes.

2          Q.    Okay.  And it says, going

3    down in the -- in the -- to the subject

4    line, "INTAC" -- it's "Re:  INTAC

5    technology in NER asset."  Is that

6    Nucynta ER asset?

7          A.    Nucynta ER.

8          Q.    Okay.  And someone -- Phung

9    is saying in the middle of this page,

10   "Not sure if the follow-up meeting has

11   occurred, but my comments are below to

12   what Tricia sent last Friday.  Martha,

13   let me know if you have decided to get

14   rid of abuse language altogether in the

15   select ISI."

16              And then Patricia responds,

17   "Phung, meeting with Michael is on

18   Wednesday.  Why are we adding back,

19   'Instruct patients to swallow Nucynta ER

20   tablets whole.  Crushing, dissolving, or

21   chewing Nucynta ER can cause rapid

22   release and absorption of a potentially

23   fatal dose of tapentadol'?  Please

24   advise.  Thanks, Tricia."

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1           And Phung responds, "I

2    didn't hear why it was deleted in the

3    first place."

4           So my question following --

5    reading the e-mail is, do you have any

6    idea for how long this safety information

7    was deleted at Janssen concerning the

8    language about crushing, dissolving, or

9    chewing Nucynta ER could be fatal?

10           MS. STRONG:  Objection to

11       form.

12           THE WITNESS:  Again, I am

13       not familiar with this kind of

14       back and forth.  This is a little

15       bit out of context.  I don't know

16       where this is supposed to be added

17       to or removed from.  Like, I don't

18       know what section of what asset.

19       And I think that matters a little

20       bit, just to have an

21       understanding.

22           But in general, no, I cannot

23       answer that question.  I don't

24       know when something was added or

Page 335

1          deleted.  And I -- it seems like

2          this conversation is not finished,

3          like it would go on because it

4          doesn't seem like it's resolved

5          yet in here.

6    BY MR. JANUSH:

7          Q.    You know that this warning

8    language exists in the product insert in

9    the important safety insert to this date,

10   do you not?

11             MS. STRONG:  Objection to

12             form.

13             THE WITNESS:  I don't know

14             to this date.  I don't know what

15             it looks like now.  And Nucynta ER

16             is no longer --

17   BY MR. JANUSH:

18         Q.    Forgive me.

19         A.    -- with Janssen.

20         Q.    Not Janssen's.  So that's

21   fair.  It's not your product.  Not your

22   former employer's product, I should say.

23             (Document marked for

24             identification as Exhibit

Highly Confidential - Subject to Further Confidentiality Review

Page 336

1          Janssen-Burns-16.)

2    BY MR. JANUSH:

3          Q.    I'm going to hand you what's

4    been marked as Exhibit 16.  And this is a

5    one-page e-mail from you to Terry

6    Davidson and Ron Kuntz from July 11th of

7    2014.  And it's JAN-MS-00758691.

8                And in this e-mail string

9    you appear to be writing to Ron Kuntz,

10   addressing that Gary, and I believe

11   that's Gary Vorsanger, Dr. Vorsanger,

12   said that "RADARS will be here on 7/22

13   and we should join that meeting and

14   cancel this 7/30 meeting."

15               And Terry writes back.  And

16   I won't read in the interest of time the

17   entire e-mail.  I'm going to focus on a

18   portion.

19               On July 11th, writes back,

20   "In my opinion we are getting nothing out

21   of RADARS data right now.  I'm not sure

22   how much we are spending but it is sunk

23   money in my opinion.  Purdue is

24   leveraging it and so should we.  That

Page 337

1    will be the purpose of the meeting on the

2    30th.  Let me know if I need to address

3    with Gary.  I'll also fill you in on a

4    very disappointing experience with Hany

5    on Wednesday regarding RADARS data."

6              And you wrote back, "Good

7    plan.  Makes sense."

8              Do you remember this

9    interaction in July of 2014?

10        A.    No.  Actually not.

11        Q.    Not at all?

12        A.    No.

13        Q.    Do you know who RADARS is?

14             MS. STRONG:  Objection to

15        form.

16             THE WITNESS:  Not exactly.

17   BY MR. JANUSH:

18        Q.    Okay.  No memory at all with

19   respect to what RADARS data is?

20        A.    Like I feel like I should

21   know but I've -- I've forgotten.

22        Q.    Okay.  Any idea what Terry

23   Davidson was referring to when he was

24   addressing that Purdue was leveraging

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    RADARS data and so should we?

2          A.    No.

3                (Document marked for

4          identification as Exhibit

5          Janssen-Burns-17.)

6    BY MR. JANUSH:

7          Q.    I'm going to hand you what

8    I'm -- I've marked as Exhibit 17.

9    JAN-MS-0076218.  This came directly from

10   your custodial file production, and it

11   appears to be a document concerning the

12   website, Prescribe Responsibly and the

13   Nucynta website.

14               And it's showing that on the

15   top, I think it's showing, and I want to

16   get your clarification, that at the top

17   link, link from --

18         A.    You are off screen.

19         Q.    Sorry.  Link from, it's hard

20   to read, Nucynta.com resources managing

21   chronic pain, link to

22   PrescribeResponsibly.com pain assessment

23   resources.  And there's a bunch of these.

24   This is just one example.  And anchor

Page 339

1    text says "Pain association resources."

2    And in the on-page copy, out of sentence

3    like, "Please read on for further pain

4    resources."

5                 Who would be writing these

6    notes on the context concerning these

7    linking notes between Nucynta and --

8    Nucynta's website and the Prescribe

9    Responsibly website?

10                 MS. STRONG:  Objection to

11          form.

12                 THE WITNESS:  First, I don't

13          recall seeing this.  So my best

14          guess would be Ron Kuntz or an

15          agency that he works with.

16   BY MR. JANUSH:

17          Q.    Okay.  Do you recall ever

18   even seeing this document?

19          A.    It doesn't look familiar.

20          Q.    Okay.  I'm going to put that

21   away.  I promised Sabrina that I'd get

22   faster here.

23                 I'll hand you what's been

24   marked as Exhibit 18.  It's

Page 340

1    JAN-MS-00748937.

2              (Document marked for

3         identification as Exhibit

4         Janssen-Burns-18.)

5    BY MR. JANUSH:

6         Q.    Here, you appear to be cc'd

7    on this e-mail string.  Hold on one

8    second.  You are present on e-mail

9    correspondence that's regarding

10   PrescribeResponsibly.com, and --

11        A.    It is?  You sure?

12        Q.    Maybe I'm wrong.

13        A.    This is something else.

14        Q.    Sorry, this is speaker

15   bureaus.  I apologize.

16        A.    No, this is not speaker

17   bureau.

18        Q.    One second.  One second.  I

19   may have given you the wrong document.

20              Yeah, no, this is -- this is

21   about -- it seems to be about templates

22   and -- let's look at the first -- it's

23   for the Nucynta app.  I think it's the

24   Nucynta app on the iPad.  And it's, I

Highly Confidential - Subject to Further Confidentiality Review

Page 341

1    think, about how the app links up to

2    other bits of information, so I wanted to

3    confirm that.

4              Category resources.  That's

5    a -- that's a resources tab in the

6    Nucynta app; is that right?

7              MS. STRONG:  Objection to

8         form.  In particular, the

9         commentary in advance of the

10        question.

11             MR. JANUSH:  The commentary

12        is being provided prefatory for

13        background to try and assist the

14        witness in understanding why I'm

15        handing her a document that is

16        otherwise very difficult to read.

17             THE WITNESS:  Hold on.

18        Maybe I can interpret what this

19        is.

20             Okay.  I'm sorry, ask your

21        question again.

22   BY MR. JANUSH:

23        Q.    So I'm looking at this and I

24   think this concerns the Nucynta app.

Page 342

1          A.     Yes.

2          Q.     And you were involved --

3          A.     Yes.

4          Q.     -- in the Nucynta iPad

5    app --

6          A.     Yes.

7          Q.     -- in rolling that out,

8    right?

9          A.     Yes.

10         Q.     And you were involved in the

11   editorial review of certain language on

12   that app and involved in content for that

13   app; is that right?

14         A.     I was responsible for the --

15   for the content, yes.

16         Q.     Okay.  What is -- was there

17   a category -- is there a category in the

18   app, resources with subcategories like

19   appointment templates for sales reps,

20   speaker programs, unbranded, managed

21   care, clinical trial?

22              MS. STRONG:  Objection to

23         form.

24              THE WITNESS:  There are

Page 343

1            sections in the app, and these

2            were the categories and the

3            subcategories.

4      BY MR. JANUSH:

5            Q.    Okay.  And so one of the

6      sections in the app would be an

7      appointment template that would -- that

8      would link to a request, you know,

9      appointment request e-mail template,

10     right?

11           A.    So the appointment template

12     would be a template that the reps could

13     use.

14           Q.    Right.  That's --

15           A.    Right.

16           Q.    We're on the same page.

17           A.    Okay.

18           Q.    And then another -- another

19     subcategory or tab or a component of the

20     app would be the speaker program

21     component, which would link to

22     Janssenspeakerprograms.com,

23     Janssenmeetingdirect.com, and the

24     attendee news channel, right?

Page 344

1      A.    So I was responsible for the

2  app and there were multiple sort of like

3  sections and things.  I'm not sure like

4  this particular e-mail captures the

5  final.  Because we went back and forth a

6  lot about which sections we would have

7  and which subcategories.  So these may

8  not be final just -- just to be clear.

9            But these were things that

10  we definitely considered and may have

11  been final.

12      Q.    Okay.  And one of the topics

13  included unbranded.  Does that refer to

14  unbranded marketing?

15      A.    It would be anything that's

16  unbranded.  Anything that's not like

17  Nucynta or Nucynta ER specific would be

18  considered unbranded.

19      Q.    And best practices links to

20  pain community resources, and in the

21  parenthetical is

22  PrescribeResponsibly.com, right?

23      A.    That's what it says.  I

24  don't recall if that was final, if we

Page 345

1    actually had one on unbranded and those

2    were the things in it.  I don't recall.

3         Q.    Earlier in the deposition I

4    asked you at Page 125, Line 6, were you

5    involved at all with Prescribe

6    Responsibly, the website that's listed

7    here as being a resource on appropriate

8    prescription of opioids and you answered

9    no.  I then asked you at line -- Page

10    125, Line 11, were you involved -- "So

11    you weren't involved in any aspect of

12    Prescribe Responsibly?"  And your answer

13    was, "Correct."

14              I said, "Same question, if

15    it concerned Prescribe Responsibly for

16    example if" -- this has typos in it --

17    "but if the sales reps had iPads with

18    Prescribe Responsibly on it, would you

19    have been involved in Prescribe

20    Responsibly on sales rep iPads," and you

21    said, "No."

22              Do you remember being --

23    being asked those questions and giving

24    those answers?

Page 346

1          A.     I remember the questions

2    except for the last one.  The nuance of

3    the question on the last one.

4          Q.     There's typos admittedly.

5    And it's hard for me to read it.  I was

6    essentially trying to address whether you

7    were -- would have been involved in

8    Prescribe Responsibly as it concerned

9    sales rep iPads, and the answer was no.

10   Do you recall that?

11         A.     Yeah.

12               (Document marked for

13               identification as Exhibit

14               Janssen-Burns-19.)

15   BY MR. JANUSH:

16         Q.     Okay.  And it may be that

17   that's correct.  I'm seeking to probe

18   that a little more by handing you

19   Exhibit 19, which is an e-mail from Ron

20   Kuntz to you regarding the Prescribe

21   Responsibly description for the app.  And

22   since you oversaw the app, I wanted to

23   ask you, once more whether you were

24   involved with linking or otherwise having

Highly Confidential - Subject to Further Confidentiality Review

Page 347

1    information concerning Prescribe

2    Responsibly on the sales reps' iPad

3    assets?

4              MS. STRONG:  Objection to

5         form.

6              THE WITNESS:  So when it

7         comes to the content, the

8         substantive consent or what

9         Prescribe Responsibly is all

10        about, you know, what it conveys,

11        what stuff is in it, I didn't have

12        any involvement.  It was -- Ron

13        Kuntz was the person responsible

14        for it.

15             To the extent that once that

16        content is developed, that -- if

17        it needs to be linked via

18        technology, like in this case, I

19        was just a conduit for, you know,

20        trying to make the link happen,

21        which I'm still not sure if we

22        actually linked it or not.

23             We had a lot of discussion

24        with IT, whether or not that was a

Highly Confidential - Subject to Further Confidentiality Review

Page 348

1            capability to kind of link in and

2            link out and not lose people and

3            not crash the app.

4                 So I'm not sure if we ended

5            up going with it in terms of

6            linking to Prescribe Responsibly.

7            I would say that my answers are

8            still accurate in that I didn't

9            really -- I didn't have anything

10           to do with working on it.  So...

11               (Document marked for

12           identification as Exhibit

13           Janssen-Burns-20.)

14   BY MR. JANUSH:

15           Q.   Okay.  I'm going to give you

16   Exhibit 20.  That is Bates number

17   JAN-MS-00753246.  It's dated February 6,

18   2013.  And it's an e-mail string between

19   you and Ron Kuntz at the top.  And

20   further below, you writing to Ron Kuntz

21   and Patricia Yap.  And it seems like at

22   the very bottom, you're writing, "Cool.

23   Please provide me with exact language to

24   use for the sales direction on Prescribe

Highly Confidential - Subject to Further Confidentiality Review

Page 349

1    Responsibly.  Something like, 'This needs

2    to be discussed in a separate call from a

3    promo call,' et cetera.  I need to

4    approve the language and document it."

5              A.    Okay.

6              Q.    Does this -- is this related

7    to you overseeing at least some language

8    concerning Prescribe Responsibly on the

9    sales rep app?

10              MS. STRONG:  Objection to

11              form.

12              THE WITNESS:  If I

13              understand your question

14              correctly, no.  Prescribe

15              Responsibility -- I'm sorry,

16              Prescribe Responsibly was Ron's

17              responsibility to work on.  So he

18              directed, you know, the content,

19              the language.

20              I'm involved with him on

21              this or involved with other people

22              on the team with other projects.

23              When they -- when these

24              items sort of come together for

Page 350

1          something where things need to be

2          collated, so like a sales meeting

3          or an app where, although I'm not

4          responsible for the pieces, I need

5          to collect all the pieces together

6          to launch something, like a sales,

7          you know, app for example.

8               So this is a communication

9          back and forth between me and Ron

10         to say, this is the kind of stuff

11         I need, but he needs to provide me

12         that language.

13              And then in totality,

14         everything needs to be approved.

15         So that's why he needs to provide

16         me with the language, because I'm

17         not familiar with the program or

18         how to even describe what it does.

19    BY MR. JANUSH:

20         Q.   Okay.  And it may be the

21    case that it wasn't about the app itself.

22    It may be the case that it concerned how

23    to use -- how sales reps were to use

24    Prescribe Responsibly information in

Highly Confidential - Subject to Further Confidentiality Review

Page 351

1    general.

2              So I'm going to move to the

3    second page and address Number 3,

4    Paragraph Number 3.  Let me clear this up

5    here.

6              And you write to Ron, "In

7    regards to the Prescribe Responsibly

8    brochure, this was not approved to be

9    used proactively in conjunction with a

10   promotional call.  There are component of

11   the brochure that refer to disease

12   awareness, i.e., case studies, expert

13   opinion, et cetera.  I did discuss this

14   with Martha, and I will be discussing

15   with Amit on Friday when I meet with him.

16   We'll need to have further discussions on

17   how we move forward in a proactive

18   fashion after promotional presentation.

19   The reps can still use the PR brochure.

20   They would need to use it in a separate

21   call from a promotional call."

22              What does it mean that a rep

23   could still use the Prescribe Responsibly

24   brochure but would need to use it in a

Page 352

1    separate call from a promotional call?

2           A.    Yeah, so in general the

3    guidelines from the compliance -- from

4    compliance -- jeez, it's getting late --

5    from regulatory and compliance is that

6    sales representatives have two types

7    of -- broadly speaking, two types of

8    tools:  Branded tools, which are tools

9    and brochures, you know, educational

10   pieces that talk specifically about the

11   product that they sell; and unbranded,

12   would be anything else that don't talk

13   about the product directly.

14           The general guidance is that

15   they have to use those pieces in separate

16   settings, like in separate calls.  You

17   can't use them together.

18           So that's all this paragraph

19   is about, is that we need clear direction

20   on how to use it because they just can't

21   use it in the same call with the -- with

22   the doctor.  They can use it with the

23   same doctor, but like on a different day,

24   for example, different conversation.

Highly Confidential - Subject to Further Confidentiality Review

Page 353

1          Q.    Thank you for that

2     explanation.

3                With respect to the website

4     Prescribe Responsibly, are you aware

5     whether, during your employment, Janssen

6     maintained sole editorial control over

7     the content of the unbranded site?

8                MS. STRONG:  Objection to

9          form.

10               THE WITNESS:  I don't know.

11    BY MR. JANUSH:

12         Q.    Did you know that Janssen

13    owned the site?

14               MS. STRONG:  Objection to

15         form.

16               THE WITNESS:  Technically, I

17         don't know.

18    BY MR. JANUSH:

19         Q.    Did you know that Janssen

20    linked from its Nucynta site to the

21    Prescribe Responsibly website?

22         A.    I'm not 100 percent sure.

23    But based on some of the stuff that we

24    were looking at, it seems like it might

Page 354

1    have been, yeah.

2         Q.    And do you know whether

3    Janssen created Prescribe Responsibly to

4    alleviate prescribers' concerns over the

5    risks associated with opioid use,

6    including the risks of diversion and

7    misuse?

8              MS. STRONG:  Objection to

9         form.

10             THE WITNESS:  I don't

11        believe that -- I don't know

12        for -- I don't know the, you know,

13        the reasons for, like, all the

14        different objectives.  But I don't

15        believe that it was to alleviate

16        concern.  It was more to educate.

17   BY MR. JANUSH:

18        Q.    And do you know whether the

19   Prescribe Responsibly website contained

20   links to tools, and to this day, contains

21   links to tools that purport to assist

22   healthcare professionals in assessing

23   patient pain levels and assessing and

24   managing risks associated with aberrant

Highly Confidential - Subject to Further Confidentiality Review

Page 355

1    drug-related behavior?

2         A.    You said to this day.  Like,

3    I definitely don't know what would be

4    today.  And even when I was working on

5    the brand, I didn't actually visit the

6    website to know all that's there.  But

7    that's possible.

8         Q.    So while you were working on

9    the Nucynta brand, you never visited the

10   Prescribe Responsibly website?

11        A.    Not really, no.

12        Q.    In -- it's my understanding

13   that in 2011 Janssen created the Let's

14   Talk Pain website.  Is -- do you know

15   whether that's -- my understanding is

16   correct?

17        A.    I've heard of Let's Talk

18   Pain, but I don't know exactly what it

19   is.

20        Q.    Never been on it?

21        A.    Not really, no.

22        Q.    "Not really" is kind of an

23   iffy answer, so --

24        A.    I might have typed in it and

Page 356

1    looked at it, but I can't tell you what

2    it is or what it does.  I can't describe

3    to you what's on this.

4            Q.    Okay.

5            A.    Not substantial.

6            Q.    So if I were to ask you any

7    questions on the Let's Talk Pain website,

8    you wouldn't be able to provide me with

9    any answers?

10           A.    Not really, no.  Sorry.

11   That's not -- that wasn't part of my

12   responsibility.

13                 THE VIDEOGRAPHER:  We are

14           now going off the record.  The

15           time is 5:02 p.m.

16                 (Short break.)

17                 THE VIDEOGRAPHER:  We are

18           now going back on the record.  The

19           time is 5:06 p.m.

20                 (Document marked for

21           identification as Exhibit

22           Janssen-Burns-21.)

23   BY MR. JANUSH:

24           Q.    I'm going to hand you what

Page 357

1    I've marked as Exhibit 21.  This is hard

2    to read because of the way it printed.

3    It's a print in native.  JAN-MS-01053015.

4              This came from your

5    custodial -- from -- excuse me, from

6    custodian Ron Kuntz, but I believe that

7    you were referenced in the family, or the

8    custodial recipients.

9              Going to Page 3, would this

10   have been an accurate depiction of the

11   pain marketing team organization chart in

12   March 2012 to the best of your

13   recollection?

14        A.    I don't remember who Hitu

15   is, but --

16        Q.    Who?  Who?  Who --

17        A.    This person, Hitu.

18   Whatever.  I don't recall that name.  I

19   recognize all the other names.

20        Q.    There may be some reason

21   why -- for you not remembering Hitu.  He

22   is not listed with any responsibilities

23   on Slide 5.  Who knows what happened to

24   Hitu.

Page 358

1          A.    I'm not familiar with this

2     deck.  Because it has a lot of

3     U.S./Canada stuff.  I didn't do anything

4     outside of the U.S.

5          Q.    Did you have any involvement

6     in the speaker direct program in terms of

7     selecting the speakers for the speaker

8     direct program?

9          A.    No.

10          Q.    Or otherwise setting it up?

11     No?

12          A.    No.  That was someone else's

13     responsibility.

14          Q.    How about the meeting direct

15     program, a live and archive

16     videoconference series?

17          A.    No.

18          Q.    Okay.  Did you have any

19     involvement with working with key opinion

20     leaders to train them for speaking

21     engagements?

22          A.    No.

23          Q.    Did you have any involvement

24     with the key opinion leader training

Page 359

1   sessions or attend them that occurred in

2   Philadelphia or Dallas in October of

3   2012?

4           A.    I recall attending a

5   training session.  I don't remember which

6   one as like an observer.

7           Q.    As an observer?

8           A.    Mm-hmm.

9           Q.    And was that a training

10  session at which 150 key opinion leaders

11  were brought to -- was that Dallas or

12  Philadelphia, I should ask?

13          A.    Yeah, I don't remember which

14  one I went to.  It would have been only

15  one of them.  And I don't remember how

16  many people.

17          Q.    And I'm speaking

18  specifically about the one where 150 key

19  opinion leaders or thereabouts was

20  brought in, and I understand this

21  happened on two occasions in Dallas on

22  October 15th and Philadelphia on

23  October 22nd of 2012.

24                  MS. STRONG:  What's the

Page 360

1          question?

2     BY MR. JANUSH:

3          Q.    So were you at either of

4     those?

5          A.    I'm not sure.  I was at a

6     training meeting, but I don't remember

7     150.  It -- it seemed to me a smaller

8     meeting.  So it might have been something

9     separate from these two.  I don't know.

10         Q.    Approximately, how many key

11    opinion leaders were at the meeting that

12    you attended?

13              MS. STRONG:  Objection to

14         form.

15              THE WITNESS:  I don't have a

16         really good memory of it.

17              I would say in the 30 range

18         is what I recall.  But it's been a

19         while.

20    BY MR. JANUSH:

21         Q.    And where was that?

22         A.    I don't remember.

23         Q.    Do you remember the state?

24         A.    No, I don't remember, sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 361

1          Q.    You know, I want to turn to
2    the last slide of this document.  And
3    this last slide is addressing major
4    conferences in 2012.  I understand you
5    didn't put this PowerPoint together, but
6    I just want to ask you about the star
7    next to four of these conferences.  It
8    says, "Product theater being held."  Do
9    you know what that means?
10          A.    I was never responsible for
11    product theater.  In general, product
12    theater is like a presentation.
13          Q.    So for example, at -- if at
14    the AAPM Palm Springs, California,
15    February 23 to 25 congress or meeting,
16    Janssen would be participating in a
17    presentation.
18          A.    I can't answer to the
19    specific meeting whether or not the team
20    attended AAPM that year at that location
21    and had the presentation, because I
22    didn't go to any of them.
23               In general, if you attend a
24    meeting and you have a product theater,

Page 362

1    you would have like a presentation at

2    your booth.

3         Q.    Okay.  And you were never

4    involved in product theaters whatsoever?

5         A.    No.

6         Q.    Earlier when I asked you

7    about the Let's Talk Pain website, you

8    said that you never been on it.

9              Do you know who would be the

10   primary point person at Janssen that

11   oversaw Let's Talk Pain?

12             MS. STRONG:  Objection to

13        form.

14             THE WITNESS:  You know, I'm

15        not sure who was responsible for

16        that.

17   BY MR. JANUSH:

18        Q.    Earlier we talked about,

19   recently, your involvement or lack

20   thereof with regard to key opinion

21   leaders, product theaters, advisory board

22   round tables.  What role, if any, did you

23   play within Janssen in terms of adding or

24   removing a speaker to the speakers

Highly Confidential - Subject to Further Confidentiality Review

Page 363

1   bureau?

2          A.     I don't recall having a role

3   in it.

4                 (Document marked for

5          identification as Exhibit

6          Janssen-Burns-22.)

7   BY MR. JANUSH:

8          Q.     I'm going to give you what's

9   been marked as Exhibit 22.  It's

10  JAN-MS-007516 -- I'm sorry, 625.

11                And this is -- the bottom

12  e-mail appears to be an e-mail from David

13  Sims to you and your supervisor, Patricia

14  Yap, addressing the subject of "I want to

15  remove Jeffrey Rogers from the speakers

16  bureau."

17                Do you see that?

18         A.     Yes.

19         Q.     And there's an explanation

20  as to why Jeffrey Rogers is to be

21  removed, including that, "He will not

22  drive an hour to speak in Cincinnati but

23  will be glad to fly to California or

24  Florida for a speaker program.  He never

Highly Confidential - Subject to Further Confidentiality Review

Page 364

1   saw my rep, Beth Sence" -- "never saw my

2   rep, Beth Sence until she wrote him a

3   note asking if he was still interested in

4   speaking for us.  Until that time, he

5   never had time to see her when she

6   stopped in repeatedly at the office.

7   I've told Beth we will not use Dr. Rogers

8   if he's not willing to speak locally."

9               And I'm going to skip down

10  to the end of this, and David is writing

11  to you and Patricia and saying, "On the

12  other hand Dr. Bratanow is a former

13  Nucynta speaker and is well received and

14  respected in the upper midwest.  She has

15  served on several national committees for

16  pain management, none of which are

17  government affiliated.  Please add her to

18  the speakers bureau and we will get her

19  scheduled."

20              So my question is, is it the

21  case that David Sims made a mistake by

22  directing this e-mail to you and Patricia

23  Yap?  In other words, should this e-mail

24  have only gone to Patricia Yap?

Highly Confidential - Subject to Further Confidentiality Review

Page 365

1            MS. STRONG:  Objection to

2         form.

3            THE WITNESS:  Each of the

4         marketing people on the team had a

5         connection with district sales

6         manager, kind of like a key

7         contact.  So he could have

8         included me for that reason.  But

9         I was not responsible for, you

10        know, the speaker program.

11    BY MR. JANUSH:

12        Q.    Who is -- who is David Sims?

13    He's a sales --

14        A.    He's a -- he's a sales

15    director -- or a sales manager for

16    Quintiles.  He would have sales reps

17    report to him.

18        Q.    Okay.  Was he the national

19    sales manager for Quintiles, the top

20    person?

21        A.    No.

22        Q.    Who --

23        A.    He's one of the --

24        Q.    One of the seven?

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1          A.    -- seven.

2          Q.    Okay.  One of the seven

3    regional or district managers?

4          A.    District managers.

5          Q.    Who -- what's the name of

6    the top sales manager, the national sales

7    manager for Quintiles that oversaw that

8    entire pain force team?

9          A.    I think you asked me this

10   earlier.  Greg.

11         Q.    Oh, right.  I apologize.

12         A.    Greg.  His name --

13         Q.    I did.

14         A.    Yeah.

15         Q.    You didn't know the last

16   name?

17         A.    Greg.  It's not coming to

18   me.  Sorry.

19         Q.    So -- so did you routinely

20   get requests to add someone to the

21   speakers bureau?

22         A.    No, I wouldn't say

23   routinely.  So I am kind of like a

24   conduit for him.  So if he needed

Highly Confidential - Subject to Further Confidentiality Review

Page 367

1    something he would come to me and then I

2    would triage.  So in this case, as you

3    can see, I didn't respond to him, and

4    Tricia did.  I mean, I wouldn't have

5    responded because it's not my position

6    to.  I had nothing to do with that.

7            Q.    Okay.

8            MR. JANUSH:  I have no

9        further questions at this time.

10           MS. STRONG:  Thank you.  Off

11       the record for a moment.

12           THE VIDEOGRAPHER:  Okay.  We

13       are going off the record.  And the

14       time is 5:20 p.m.

15           (Short break.)

16           THE VIDEOGRAPHER:  We are

17       now going back on the record.  And

18       the time is 5:42 p.m.

19           MR. JANUSH:  While we were

20       off the record plaintiff's counsel

21       Evan Janush marked three pieces of

22       paper that were the Elmo notes

23       taken by counsel as Exhibit 33 --

24       23.

Page 368

```
 1              MS. STRONG:  Taken by
 2          Mr. Janush himself, and we've had
 3          a discussion about whether we
 4          think those notes are appropriate
 5          to display during the testimony of
 6          Ms. Burns, and he recognized I
 7          have an objection to it and it
 8          will be saved for another day as
 9          to the potential use of those
10          notes.
11              Correct, Mr. Janush?
12              MR. JANUSH:  All objections
13          are reserved for trial absolutely.
14              (Document marked for
15          identification as Exhibit
16          Janssen-Burns-23.)
17              MS. STRONG:  Thank you.
18                  -  -  -
19              EXAMINATION
20                  -  -  -
21  BY MS. STRONG:
22          Q.    Good afternoon, Ms. Burns.
23          A.    Hi.
24          Q.    It's been a long day.
```

Page 369

1          A.    Yes.

2          Q.    We'll try and have a few

3    more minutes together.

4          A.    Sure.

5          Q.    You stated in -- and to be

6    clear, I'm Sabrina Strong representing

7    Janssen and Johnson & Johnson, and you in

8    connection with this deposition here

9    today.  And I want to just ask a few

10   questions at this point.

11              Do you understand that?

12         A.    Yes.

13         Q.    And you said you started

14   with Janssen in 2002 and started working

15   on Remicade, correct?

16         A.    Correct.

17         Q.    And you were asked questions

18   about whether or not you received

19   specific training to set strategy,

20   develop messages, and to train sales reps

21   in that role.  Do you recall those

22   questions?

23         A.    Yes, I do.

24         Q.    Did you receive any training

Page 370

1    when you started with Janssen in 2002?

2          A.    Yes, I did.

3          Q.    And what was that training,

4    if you can describe it for us briefly?

5          A.    Sure.  There's quite a lot

6    of training, onboarding training, HR, so

7    the rules, policies, expectations,

8    importantly a lot of compliance training

9    specific to, you know, the marketing

10   role.

11         Q.    And did you have any other

12   training when you worked at Janssen after

13   you started in 2002 over the years?

14         A.    Yes, I did.

15         Q.    And if you can describe that

16   for us briefly.

17         A.    Sure.  So periodically we

18   would have -- we would have to repeat the

19   compliance training.  I believe that's

20   probably about once a year we had to do

21   that.  You know, it's pretty extensive

22   training to make sure that we are very

23   compliant -- we're compliant in what we

24   do and complying with, you know, rules

Highly Confidential - Subject to Further Confidentiality Review

Page 371

1    and expectations that the FDA sets about

2    how we communicate.

3         Q.    And you started with Janssen

4    working on the Nucynta ER product in

5    2011, you testified, correct?

6         A.    Correct.  At the end of

7    2011.

8         Q.    And your title at the time

9    was?

10        A.    Product director.

11        Q.    There's been testimony about

12   the marketing team and the sales team,

13   correct, two different teams?

14        A.    Correct.

15        Q.    What is the primary

16   differences, or what are the primary

17   differences for those two teams?

18        A.    So in general, marketing is

19   responsible for setting strategy,

20   developing messages, and developing sales

21   tools and educational tools.  And sales

22   reps are responsible for executing those

23   strategies and using those tools.

24        Q.    And I believe you testified

Page 372

1    that it's the sales team that executes

2    the training for the reps as well; is

3    that correct?

4            A.    Correct.

5            Q.    From your perspective, why

6    was the company interested in marketing

7    Nucynta ER?

8            A.    From my perspective, and my

9    understanding, Janssen believed that

10   there was unmet need in the marketplace

11   for chronic pain.  And that Nucynta ER

12   had an opportunity to provide a great

13   option for those patients in need of

14   opioid for chronic pain.  It was believed

15   to have good strong efficacy profile and

16   a really strong side effects profile.

17                It also had a

18   tamper-resistance formulation that would

19   help, you know, strengthen the

20   differentiation for the product in the

21   marketplace.

22           Q.    And so you mentioned a good

23   side effect profile.  Were you permitted

24   or were sales reps permitted to say that

Page 373

1    Nucynta ER had a better GI profile than

2    other long-acting opioids, were you able

3    to say that to doctors?

4           A.    No, we were not able to say

5    that.

6           Q.    And why not?

7           A.    We're not able to make

8    comparative statements because there's no

9    data, head-to-head, comparing Nucynta ER

10   with anything else.  And also the GI side

11   effect profile was one of the side

12   effects and we can't just tease out one

13   particular item to highlight.  We had to

14   present all of the side effects in -- in

15   its totality together.

16          Q.    And you mentioned that one

17   of the attributes of Nucynta ER was its

18   tamper-resistance characteristics.  What

19   can you tell us about what that meant?

20   How was it that Nucynta ER was tamper

21   resistant?

22          A.    Nucynta ER was designed to

23   not be crushed or dissolved and so that

24   makes it, you know, resistant to being

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    amended.

2         Q.    And were you allowed to

3    highlight that characteristic, that

4    tamper-resistant characteristic of the

5    product, in marketing materials?

6         A.    No, we were not.

7         Q.    And why not?

8         A.    We were only allowed to

9    promote or educate around attributes that

10   are in the package insert and tamper

11   resistance is not in the package insert.

12        Q.    You've testified about your

13   role in developing marketing materials

14   for prescribers.  Can you briefly

15   describe that process, how you go about

16   the process of creating marketing

17   materials for prescribers?

18        A.    Sure.  We start first with

19   gathering insight about the marketplace,

20   about the prescriber, because we need to

21   learn from them what's important to them.

22   What are attributes that are important to

23   them when they are selecting, you know,

24   an opioid.  What are sort of their

Page 375

1    concerns, what are their needs.  What do

2    they need to hear, in what order.  So we

3    would conduct market research to gain

4    that insight.  We would then develop

5    marketing messages.  We would sort of

6    talk about it, vet it, and once we felt

7    pretty comfortable with that draft we

8    would submit it for -- to a committee to

9    review and to be discussed and approved.

10   And that committee consists of medical,

11   legal, compliance, and regulatory.  And

12   it's a pretty involved process.  We would

13   submit that document into -- to the

14   committee.  They would review the

15   document, they would make some comments.

16   Based on those comments then someone

17   would -- who was responsible for that

18   process, would schedule a meeting for all

19   of us to have a discussion about the

20   piece.

21              The marketer, in this case

22   myself, I would present the piece that I

23   submitted for review.  I would explain

24   the objective, what we're trying to

Page 376

1    achieve, and then the reviewers would ask

2    questions to gain better understanding.

3    They would ask a lot of questions.  And

4    you know, they may ask us to make some

5    revisions to the document, and then we

6    submit it for review again.  So it's a

7    pretty robust process.

8         Q.    And what is that committee

9    called internally at Janssen?

10        A.    PRC.

11        Q.    And what does PRC stand for?

12        A.    Promotional review

13   committee.

14        Q.    And what was the purpose in

15   creating these marketing materials for

16   Nucynta ER?

17        A.    It's to educate clinicians

18   about Nucynta ER.  Explain to them the

19   product profile, the efficacy, the

20   safety, the dosing, how to use.  So it's

21   really to educate clinicians on what

22   they, you know, should know about the

23   product.

24        Q.    And ultimately, stated a

Page 377

1    different way, what were the goals of the

2    marketing team with respect to the

3    messaging you created?

4         A.    Our goal ultimately is to

5    help clinicians understand Nucynta ER and

6    prescribe Nucynta ER for appropriate

7    patients that it's indicated for.

8         Q.    And this PRC process that

9    you just described for us briefly, how

10   long would that process take for any

11   given marketing material that you

12   submitted?

13        A.    I would say it varies quite

14   a bit depending on the piece, depending

15   on the complexity of the piece, and the

16   length of the piece.  It could be weeks

17   to many months, you know, again depending

18   on the particulars of that piece.

19        Q.    And once the marketing

20   materials were approved by the PRC, could

21   it then -- could the marketing material

22   then be used by the sales reps?

23        A.    Well, not immediately.  They

24   have to be trained on the piece.

Page 378

1          Q.    Okay.  And how did Janssen

2    go about training representatives on new

3    marketing materials?

4          A.    So the marketer -- for

5    example, myself, I would collaborate with

6    the sales trainer, or the sales training

7    manager.  And, you know, I would make

8    sure that they understand the objective

9    of the piece, the messages and how to

10   use.  And then they would use their

11   expertise in terms of adult learning

12   principles and design the training for

13   the -- for the material.

14               And then, you know, they

15   would train -- in conjunction we would

16   train the sales reps together.  And at

17   that point the sales reps can ask

18   questions, and once they would fully

19   understand the piece then they can begin

20   using the piece.

21          Q.    Similar question.  What is

22   the goal of the training process of sales

23   representatives on new marketing

24   materials?

Page 379

1         A.    So the goal is to make sure

2    that they really understood the objective

3    of the piece, how to properly use the

4    piece.  Allow opportunities for them to

5    ask any clarification questions.  And a

6    lot of times it also covers -- we cover

7    dos and don'ts.  Do this, don't do that.

8         Q.    Was there a review process

9    for the training materials that you used

10   with the sales representatives

11   internally?

12        A.    Yes.  There was also a

13   pretty robust review process as well

14   with, you know, medical, regulatory,

15   compliance.

16        Q.    And in addition to the

17   training on particular marketing

18   materials, do you know whether the sales

19   representatives at Janssen received any

20   other training from Janssen?

21        A.    Yes.  In addition to the

22   specific marketing pieces, they also have

23   quite a lot of training around

24   compliance, FDA compliance, that's

Page 380

1    specific to their role as sales

2    representatives.

3         Q.    And, again, you are not on

4    the sales team, so this is not your

5    responsibility, correct?

6         A.    Correct.  It's not my

7    responsibility.

8         Q.    When -- I just want to make

9    sure I've asked you this question.  When

10   you joined Janssen, did you receive

11   training on FDA and regulatory and

12   compliance issues?

13        A.    Yes, I did.  I did.  And

14   ongoing as well.

15        Q.    What do you mean by that?

16        A.    Not just at the beginning.

17        Q.    What do you mean by ongoing?

18        A.    Like every year we have to

19   renew our training.

20        Q.    You were asked some

21   questions about REMS, and you generally

22   responded that didn't know details

23   related to REMS.  Do you recall that

24   testimony?

Page 381

1           A.     Yes, I do.

2           Q.     Why is it that you were not

3    familiar with the details of REMS?

4           A.     I was not responsible for

5    working on REMS.  That was the

6    responsibility of Ron Kuntz, who worked

7    very closely with medical affairs.  So I

8    was aware of it but I -- you know, I did

9    not have responsibility for it.

10          Q.     And so you would expect that

11   Ron Kuntz would better know the details

12   related to the reps, correct?

13          A.     Yes, correct.

14          Q.     You were also asked some

15   questions about Prescribe

16   Responsibility -- Responsibly website.

17                 Do you recall those

18   questions?

19          A.     Yes.

20          Q.     And I believe you asked

21   whether you viewed the website and you

22   testified something to the effect of no,

23   not really.  Do you recall that

24   testimony?

Page 382

1          A.     Yes.

2          Q.     Do you know today whether

3    the time when you were working on Nucynta

4    ER, whether you accessed the Prescribe

5    Responsibly website or not?

6          A.     I may have, but I do not

7    remember.

8          Q.     And the same question with

9    respect to Let's Talk Pain.  I believe

10   you were asked about Let's Talk Pain.

11   And you gave an answer that said

12   essentially no, not really in terms of

13   whether or not you accessed that content.

14   Do you recall that testimony?

15         A.     Yes, I do.

16         Q.     And same question.  Sitting

17   here today, do you know at the time that

18   you worked on Nucynta ER, whether you

19   accessed the content of Let's Talk Pain

20   or not?

21         A.     I may have, but I do not

22   remember.

23         Q.     From your perspective, was

24   Nucynta ER successful in the marketplace?

Page 383

1          A.     No, I don't think it was

2     successful.

3          Q.     And why is it that you

4     believe -- let me first ask.

5               How do you know that it

6     wasn't successful, or why is it that you

7     believe that it wasn't successful?

8          A.     Well, I believe that it's

9     not successful because a lot of

10    clinicians still were not aware of

11    Nucynta ER.  They didn't recall the

12    product by name.  If you asked them to

13    describe Nucynta ER and why it's

14    different, they couldn't really

15    articulate.

16               So I don't think it was

17    successful in that clinicians didn't

18    really understand the benefits of Nucynta

19    ER and couldn't differentiate, you know,

20    why it's different from other products.

21         Q.     And why is it that you

22    believe that they weren't able to

23    appreciate the differentiation of Nucynta

24    ER as compared to other long-acting

Page 384

1    opioids?

2              MR. JANUSH:  Objection.

3              THE WITNESS:  I believe that

4         the attributes of Nucynta ER that

5         we're differentiating were the

6         things that we couldn't talk

7         about, the GI side effects, the

8         really good data.  We couldn't

9         tease out and highlight that.  So

10        it was not highlighted.  The

11        tamper resistance, which is a

12        great attribute, we couldn't talk

13        about it.

14             So from that perspective,

15        the things that we were able to

16        talk about were not the key

17        differentiating factors of Nucynta

18        ER.

19             So for that reason,

20        clinicians couldn't -- couldn't

21        have known that information.

22   BY MS. STRONG:

23        Q.   And so, your testimony is

24   that they weren't able to experience

Highly Confidential - Subject to Further Confidentiality Review

Page 385

1    using the product with its patients?  I

2    just wanted to clarify.  Are you saying

3    that the clinicians who used the product

4    couldn't understand the differentiating

5    factors, or are you talking about

6    clinicians that did not use the product?

7            A.    Oh, I'm sorry, to clarify,

8    there were many clinicians who never

9    tried prescribing Nucynta ER.  And those

10   were the clinicians who never were

11   communicated a reason to try Nucynta ER.

12   So the clinicians who tried Nucynta ER

13   you know, had the experience.

14            But I'm talking about many,

15   many clinicians who didn't feel compelled

16   to try prescribing Nucynta ER because we

17   weren't able to communicate

18   differentiating attributes to catch their

19   attention.

20            Q.    And if Nucynta ER was not

21   successful in the marketplace from your

22   perspective, why did you write in your

23   LinkedIn profile "turned around the

24   Nucynta molecule business"?

Page 386

1          A.     So from -- from the company

2    perspective, Nucynta ER had a low market

3    share.  So that's not success from the

4    company's perspective.  But from me, my

5    perspective, my professional experience,

6    we were proud of what we did.  We turned

7    around the Nucynta ER brand performance

8    in the limited clinicians that we

9    targeted and the sales reps spoke to.  We

10   were able to show impact that we had an

11   opportunity to educate the clinicians.

12   They had an opportunity to try the

13   product.  And for those limited number of

14   clinicians, their use of Nucynta actually

15   increased by a little bit.  So we were

16   able to show impact at that scale of what

17   we were able to control.

18               So that's why I said that we

19   were able to make that impact where we

20   could control.

21          Q.     And so from your perspective

22   professionally, you believed it was

23   successful in terms of what you were able

24   to do with the resources and the

Highly Confidential - Subject to Further Confidentiality Review

Page 387

1    circumstances that you were given?

2          A.    Yes, absolutely.

3          Q.    When did you ultimately

4    leave Janssen, what time period?

5          A.    I would say in the

6    March 2017.

7          Q.    Janssen as a company?

8          A.    As a company.

9          Q.    And you stopped working on

10   Nucynta ER, I believe you previously

11   testified, in 2014, correct?

12         A.    Correct.

13         Q.    And you worked in other

14   products thereafter?

15         A.    Correct.

16         Q.    And left the company in

17   2017?

18         A.    Correct.

19               MS. STRONG:  No further

20         questions at this time.

21               THE WITNESS:  Okay, thanks.

22               MS. STRONG:  Shall we go off

23         the record for a moment?

24               THE VIDEOGRAPHER:  We are

Page 388

1          now going off the record, and the

2          time is 6:01 p.m.

3               (Short break.)

4               THE VIDEOGRAPHER:  We are

5          now going back on the record.  And

6          the time is 6:09 p.m.

7                    -  -  -

8               EXAMINATION

9                    -  -  -

10  BY MR. JANUSH:

11       Q.   Hi -- excuse me.  Hi,

12  Ms. Burns --

13       A.   Hi.

14       Q.   I'm going to keep this

15  fairly quick.

16       A.   Okay.

17       Q.   I'm going to address two

18  issues with you.

19       A.   Okay.

20       Q.   One, you were asked

21  questions concerning GI tolerability and

22  the fact that -- and you answered that

23  Janssen couldn't market on GI

24  tolerability; is that right?

Page 389

```
1              MS. STRONG:  Objection to

2         form.

3              THE WITNESS:  I'm sorry, say

4         your question again.

5  BY MR. JANUSH:

6         Q.   You couldn't -- Janssen

7  couldn't market -- Janssen sales reps

8  couldn't market and promote Nucynta based

9  on claims of superior GI tolerability; is

10 that right?

11             MS. STRONG:  Objection to

12        form.

13             THE WITNESS:  Right.  We

14        couldn't say that we were

15        superior.

16 BY MR. JANUSH:

17        Q.   Okay.  So if we have found

18 evidence that Janssen did market against

19 its competitors that Nucynta -- as part

20 of its core messaging platform, that

21 Nucynta had better GI tolerability

22 compared to Oxycodone, specifically

23 nausea, vomiting -- less nausea, vomiting

24 and constipation, would that be a --
```

Page 390

1    would that be improper?

2                MS. STRONG:  Objection to

3          form.

4                THE WITNESS:  So to the best

5          of my knowledge, during my time on

6          the team, we never made that

7          comparison.

8    BY MR. JANUSH:

9          Q.    Are you aware that as part

10   of Nucynta's core message platform,

11   better GI tolerability was -- that better

12   GI tolerability was part of Nucynta's

13   core message platform at a point in time?

14         A.    I am not aware that better

15   GI tolerability is a message that was

16   ever presented.

17         Q.    Are you aware that within

18   the context of better tolerability,

19   Janssen promoted that there were -- that

20   fewer discontinuations means more

21   patients can achieve pain relief, quote?

22                MS. STRONG:  Objection to

23          form.

24                THE WITNESS:  Wait, say that

Highly Confidential - Subject to Further Confidentiality Review

Page 391

1          quote again.  I'm sorry.

2     BY MR. JANUSH:

3          Q.    "Fewer discontinuations

4     means more patients can achieve pain

5     relief."

6               MS. STRONG:  Objection.

7          Form -- what is the question?

8     BY MR. JANUSH:

9          Q.    Are you aware that that was

10    promoted within the context of better GI

11    tolerability?

12         A.    No, I am not aware.

13         Q.    And if that was, in fact,

14    promoted concerning the topic of GI

15    tolerability, that would have been

16    inappropriate --

17              MS. STRONG:  Objection.

18    BY MR. JANUSH:

19         Q.    -- from a regulatory

20    standpoint, correct?

21              MS. STRONG:  Objection to

22         form.

23              THE WITNESS:  I don't know

24         if the discontinuation -- I don't

Page 392

1           remember if discontinuation has to

2           do with -- is part of the GI side

3           effect.  So I'm kind of not

4           linking the two together.

5    BY MR. JANUSH:

6           Q.    If it was linked, however,

7    to -- if fewer discontinuations was

8    linked to the better GI tolerability

9    compared to Oxycodone, as that concerned

10   nausea, vomiting, constipation, that

11   would be inappropriate marketing,

12   correct?

13               MS. STRONG:  Objection to

14          form.

15               THE WITNESS:  So again,

16          everything that you stated in

17          terms of promoting the superior GI

18          side effects compared to

19          OxyContin, I'm not aware of that

20          happening.

21               And I -- not knowing what

22          this hypothetical is, it would be

23          very hard for me to evaluate its

24          appropriateness.

Page 393

1    BY MR. JANUSH:

2         Q.    Well, earlier you said it

3    would have been inappropriate and that's

4    why Janssen didn't do it, correct?

5              MS. STRONG:  Objection to

6         form.

7    BY MR. JANUSH:

8         Q.    You specifically addressed

9    that it would have been inappropriate

10   to market on GI tolerability and Janssen

11   did not so market.

12             MS. STRONG:  Objection to

13        form.  Misstates testimony.

14             THE WITNESS:  I don't

15        remember using the word

16        "appropriate," that it was not

17        appropriate to -- to do something.

18   BY MR. JANUSH:

19        Q.    Would it have been

20   appropriate?

21             MS. STRONG:  Objection to

22        form.

23             THE WITNESS:  It would be

24        something that we -- we promoted

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1          things that we were allowed to

2          according to what's in the package

3          insert.

4    BY MR. JANUSH:

5          Q.    And you weren't -- and this

6    was not in the package insert, this

7    concept of better GI tolerability, was

8    it?

9               MS. STRONG:  Objection to

10         form.

11              THE WITNESS:  Better GI

12         tolerability, quote-unquote, I

13         don't believe is in the package

14         insert.

15   BY MR. JANUSH:

16         Q.    Okay.  And separately, you

17   addressed -- you testified about the

18   abuse-deterrent formulation of Nucynta

19   ER.  Technically, Nucynta ER, or I should

20   say Janssen, never got an abuse-deterrent

21   formulation rating from the FDA on

22   Nucynta ER; isn't that right?

23         A.    I don't know if it's called

24   a rating, but a tamper-resistant

Page 395

1   formulation is not part -- it's not in

2   the package insert.

3        Q.   All right.  Stated

4   differently, Janssen never got a

5   tamper-resistant formulation approval

6   from the FDA for Nucynta ER, true?

7        A.   As far as I'm aware, we

8   never -- Janssen never received that.

9        Q.   And that's why Janssen

10  didn't tout a tamper-resistant

11  formulation, true?

12       A.   Correct.

13            MR. JANUSH:  I have no

14       further questions.

15            MS. STRONG:  Can I just have

16       a moment.  We'll go off the

17       record.

18            THE VIDEOGRAPHER:  Okay.  We

19       are now going off the record.  And

20       the time is 6:15 p.m.

21            (Short break.)

22            THE VIDEOGRAPHER:  We are

23       now going back on the record.  And

24       the time is 6:35 p.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 396

```
1                   -  -  -

2               EXAMINATION

3                   -  -  -

4    BY MS. STRONG:

5          Q.    Okay.  A few more questions?

6          A.    Okay.

7          Q.    I previously asked you

8    whether you could have marketing

9    materials that Nucynta ER had a better GI

10   profile than other long-acting opioids.

11   Do you recall that question?

12         A.    Yes.

13         Q.    And your answer was?

14         A.    No.

15         Q.    Okay.  Were you allowed to

16   have marketing materials that addressed

17   tolerability generally?

18         A.    Yes.

19         Q.    Okay.  So you were allowed

20   to have marketing materials that

21   addressed tolerability, but you could not

22   make a comparative statement as to

23   another long-acting opioid as to that

24   tolerability; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 397

1          A.     That's correct.

2                 MR. JANUSH:  Objection.

3    BY MS. STRONG:

4          Q.     And I'd like to have you

5    look for your Exhibit 21 from earlier

6    today.

7          A.     I have it.

8          Q.     And if you could turn to

9    Page 36 of that exhibit.

10         A.     Okay.  I have it.

11         Q.     Can you describe for us

12   generally what is on the slide that's

13   shown at Slide 36?

14         A.     Okay.  So the table on the

15   slide that's entitled Tolerability

16   Profile -- or in a clinical study in

17   chronic low back pain, tolerability

18   profile.  This is representing the

19   tolerability profile for Nucynta ER from

20   the chronic low back pain.  So there's

21   different types of side effects that you

22   would see here.

23                There are three columns.

24   The first column represents the data from

Page 398

1    the placebo arm.  The second column

2    represents the data from the Nucynta ER

3    arm, and then the last one represents

4    data from the Oxycodone arm.  That was

5    also included in the study.

6          Q.    Okay.  So, and

7    the information that's on the insert of

8    this slide starting with in a clinical

9    study in chronic low back pain,

10   tolerability profile, that component of

11   this slide, were you allowed to share

12   that with doctors in marketing materials?

13         A.    Yes.  That was allowed.

14   Mm-hmm.

15         Q.    And so what did you mean

16   when you said you couldn't highlight GI

17   tolerability?

18         A.    So when we present this data

19   from the study, we had to present all of

20   this in its totality.  We weren't able to

21   make -- pull out statements from any one

22   of these to highlight certain aspects.

23   So for example, we know that an attribute

24   that's important to clinicians is

Page 399

1  constipation, because there's a lot of

2  opioid-induced constipation that's quite

3  painful and discomforting.

4            Our data is good data.  But

5  we couldn't, say, pull out, just to talk

6  about constipation, for example.  The

7  only way to present the data for the

8  tolerability profile is like this, in its

9  totality.

10      Q.    And just for clarity, could

11  you say that your GI data was better than

12  the data in -- for oxycodone in this

13  study as shown on the slide?

14      A.    No.  It's absolutely not.

15  You cannot compare Nucynta ER to

16  oxycodone for tolerability or for

17  efficacy in this study.  Even though

18  oxycodone is in the study, it's an active

19  control and it's not meant -- it was

20  never meant to be a comparison to compare

21  Nucynta ER and oxycodone.  So we could

22  never make that statement to compare the

23  two.

24      Q.    Okay.  But it was

Highly Confidential - Subject to Further Confidentiality Review

Page 400

1    appropriate to share this data in terms

2    of the study data that included oxycodone

3    and data related to Nucynta ER together

4    to doctors, correct?

5          A.    Yes, absolutely.  This is

6    the way that we needed to show it because

7    there was -- these were the arms that

8    were in the study, and we needed to show

9    it in totality.

10          MS. STRONG:  Okay.  No

11       further questions at this time.

12          MR. JANUSH:  No questions.

13          THE VIDEOGRAPHER:  Okay.

14       This concludes the video

15       deposition of Kanitha Burns.  We

16       are now going off the record, and

17       the time is 6:39 p.m.

18          (Excused.)

19          (Deposition concluded at

20       approximately 6:39 p.m.)

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 401

```
 1
 2                    CERTIFICATE
 3
 4
 5          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
            It was requested before
 8   completion of the deposition that the
     witness, KANITHA BURNS, have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  December 4, 2018
16
17
18          (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 402

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    - - - - - -

                     E R R A T A

2                    - - - - - -

3

4    PAGE   LINE   CHANGE

5    ____  ____   _____

6       REASON:   _____

7    ____  ____   _____

8       REASON:   _____

9    ____  ____   _____

10      REASON:   _____

11   ____  ____   _____

12      REASON:   _____

13   ____  ____   _____

14      REASON:   _____

15   ____  ____   _____

16      REASON:   _____

17   ____  ____   _____

18      REASON:   _____

19   ____  ____   _____

20      REASON:   _____

21   ____  ____   _____

22      REASON:   _____

23   ____  ____   _____

24      REASON:   _____

Highly Confidential - Subject to Further Confidentiality Review

Page 404

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5      hereby certify that I have read the

 6      foregoing pages, 1 - 405, and that the

 7      same is a correct transcription of the

 8      answers given by me to the questions

 9      therein propounded, except for the

10      corrections or changes in form or

11      substance, if any, noted in the attached

12      Errata Sheet.

13

14

15      _____

16      KANITHA BURNS                    DATE

17

18

19      Subscribed and sworn
        to before me this

20      _____ day of _____, 20_____.

21      My commission expires:_____

22

        _____

23      Notary Public

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 405

1                    LAWYER'S NOTES

2     PAGE   LINE

3     _____  _____  _____

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____