1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION
3

    IN RE: NATIONAL          )
4   PRESCRIPTION             )  MDL No. 2804
    OPIATE LITIGATION        )
5   _____ )  Case No.
                             )  1:17-MD-2804
6                            )
    THIS DOCUMENT RELATES )  Hon. Dan A.
7   TO ALL CASES             )  Polster
8
             FRIDAY, JUNE 28, 2019
9
     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                    - - -
12        Videotaped deposition of Ronald
13   W. Buzzeo, R.Ph., held at the offices of Williams
14   Mullen, 200 South 10th Street, Suite 1600,
15   Richmond, Virginia, commencing at 9:08 a.m.,
16   on the above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter and Certified
18   Realtime Reporter.
19
20
21
22                    - - -
        GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
24
25

```
 1                A P P E A R A N C E S :
 2
        KELLER ROHRBACK LLP
 3      BY:  DEREK W. LOESER
             dloeser@kellerrohrback.com
 4           DAVID J. KO
             dko@kellerrohrback.com
 5           DEAN KAWAMOTO
             dkawamoto@kellerrohrback.com
 6      1201 Third Avenue, Suite 3200
        Seattle, Washington 98101
 7      (206) 623-1900
 8
        SIMMONS HANLY CONROY LLC
 9      BY:  JAYNE CONROY
             jconroy@simmonsfirm.com
10           LAURA FITZPATRICK
             lfitzpatrick@simmonsfirm.com
11           (VIA REALTIME STREAM)
             SANFORD SMOKLER
12           (VIA REALTIME STREAM)
        112 Madison Avenue, Seventh Floor
13      New York, New York 10016
        (212) 784-6400
14
15      WEISMAN KENNEDY & BERRIS CO., L.P.A.
        BY:  DANIEL P. GOETZ
16           dgoetz@weismanlaw.com
             (VIA REALTIME STREAM)
17      101 West Prospect Avenue
        Cleveland, Ohio 44115
18      (216) 781-1111
        Counsel for Plaintiffs
19
20      NAPOLI SHKOLNIK, PLLC
        BY:  HUNTER J. SHKOLNIK
21           hunter@napolilaw.com
             (VIA TELECONFERENCE)
22      360 Lexington Avenue, 11th Floor
        New York, New York 10017
23      (212) 397-1000
        Counsel for Cuyahoga County
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        ROPES & GRAY LLP
          BY:  WILLIAM DAVISON
 2            william.davison@ropesgray.com
              ANDREW O'CONNOR
 3            andrew.o'connor@ropesgray.com
              CASSANDRA A. LARUSSA
 4            cassandra.larussa@ropesgray.com
          800 Boylston Street
 5        Boston, Massachusetts 02199-3600
          (617) 951-7000
 6        Counsel for Mallinckrodt & SpecGx
 7
          WILLIAMS & CONNOLLY LLP
 8        BY:  JENNIFER G. WICHT
              jwicht@wc.com
 9        725 Twelfth Street, N.W.
          Washington, DC 20005
10        (202) 434-5331
          Counsel for Cardinal Health, Inc.
11
12        DECHERT LLP
          BY:  ERIK W. SNAPP
13            erik.sapp@dechert.com
          35 West Wacker Drive, Suite 3400
14        Chicago, Illinois  60601
          (312) 646-5800
15        Counsel for Purdue Pharma
16
          ZUCKERMAN SPAEDER LLP
17        BY:  PAUL B. HYNES, JR.
              phynes@zuckerman.com
18        1800 M Street NW, Suite 1000
          Washington, DC  20036-5807
19        (202) 778-1800
          Counsel for CVS Indiana, LLC, and
20        CVS RX Services, Inc.
21
          MARCUS & SHAPIRA LLP
22        BY:  DARLENE M. NOWAK
              nowak@Marcus-Shapira.com
23        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
24        (412) 338-4690
          Counsel for HBC
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        KIRKLAND & ELLIS LLP
          BY:  CATIE VENTURA
 2            catie.ventura@kirkland.com
          1301 Pennsylvania Avenue, N.W.
 3        Washington, DC 20004
          (202) 389-5000
 4        Counsel for Allergan Finance, LLC
 5
          O'MELVENY & MYERS LLP
 6        BY: ZHAO LIU
              zliu@omm.com
 7        1625 Eye Street, NW
          Washington, DC 20006
 8        (202) 383-5300
          Counsel for Johnson & Johnson and
 9        Janssen
10
          LOCKE LORD LLP
11        BY:  BRANDAN MONTMINY
              brandan.montminy@lockelord.com
12        2200 Ross Avenue, Suite 2800
          Dallas, Texas 75201
13        (214) 740-8445
          Counsel for Henry Schein, Inc., and
14        Henry Schein Medical Systems, Inc.
15
          JONES DAY
16        BY:  TARA A. FUMERTON
              tfumerton@jonesday.com
17            (VIA TELECONFERENCE)
          77 West Wacker
18        Chicago, Illinois 60601-1692
          (312) 782-3939
19        Counsel for Walmart
20
          COVINGTON & BURLING LLP
21        BY:  ALISON DICIURCIO
              (VIA TELECONFERENCE)
22            ALEXANDRIA WIDAS
              awidas@cov.com
23            (VIA REALTIME STREAM)
          850 Tenth Street, NW
24        Washington, DC 20001-4956
          (202) 662-6000
25        Counsel for McKesson Corporation
```

```
 1        MORGAN, LEWIS & BOCKIUS LLP
          BY:   MAUREEN K. BARBER
 2              maureen.barber@morganlewis.com
                (VIA TELECONFERENCE)
 3        One Oxford Centre, 32nd Floor
          Pittsburgh, Pennsylvania  15219-6401
 4        (412) 560-7463
          Counsel for Teva Pharmaceuticals
 5        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Inc., Actavis LLC,
 6        Actavis Pharma, Inc., f/k/a Watson
          Pharma, Inc.
 7
 8        MORGAN, LEWIS & BOCKIUS LLP
          BY:   JOHN P. LAVELLE, JR.
 9              john.lavelle@morganlewis.com
                (VIA TELECONFERENCE)
10        1701 Market Street
          Philadelphia, Pennsylvania 19103-2921
11        (215) 963-5000
          Counsel for Rite Aid
12
13        FOLEY & LARDNER LLP
          BY:   GREGORY N. HEINEN
14              gheinen@foley.com
                (VIA TELECONFERENCE)
15        777 East Wisconsin Avenue
          Milwaukee, WI 53202-5306
16        (414) 271-2400
          Counsel for Anda
17
18        FOX ROTHSCHILD LLP
          BY:   ZACHARY MARTIN
19              Zmartin@foxrothschild.com
                (VIA TELECONFERENCE)
20        2700 Kelly Road, Suite 300
          Warrington, Pennsylvania  18976-3624
21        (215) 345-7500
          Counsel for Prescription Supply, Inc.
22
23
24
25
```

```
 1        BARNES & THORNBURG LLP
          BY:  ALYSSA C. HUGHES
 2             ahughes@btlaw.com
               (VIA TELECONFERENCE)
 3        11 South Meridian Street
          Indianapolis, Indiana  46204-3535
 4        (317) 236-1313
          Counsel for HD Smith
 5
 6        BAILEY WYANT PLLC
          BY:  JOHN FULLER
 7             jfuller@baileywyant.com
               (VIA REALTIME STREAM)
 8        500 Virginia Street East, Suite 600
          Charleston, West Virginia 25301
 9        (304) 345-4222
          Counsel for West Virginia Board of
10        Pharmacy
11
12     VIDEOGRAPHER:
               DEVYN MULHOLLAND,
13          Golkow Litigation Services
14
                       - - -
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX

 2                                       PAGE

 3   APPEARANCES..................................   2

 4   EXAMINATIONS

 5     BY MR. LOESER............................   11

 6     BY MR. DAVISON.......................... 455

 7

 8                    EXHIBITS

 9     No.     Description                   Page

10   Buzzeo 1  Plaintiffs' Notice of Oral     14

               Videotaped Expert Deposition of

11             Ronald Buzzeo

12   Buzzeo 2  Mallinckrodt's Anti-Diversion  15

               Program: Selected Highlights

13

     Buzzeo 3  Ronald Buzzeo invoice          16

14

     Buzzeo 4  Expert Report of Ronald W.     69

15             Buzzeo, R.Ph. May 31, 2019

16   Buzzeo 5  Ronald W. Buzzeo, R.Ph.        72

               Curriculum vitae

17

18

19

20

21

22

23

24

25
```

```
 1                    VIDEOGRAPHER:  We are now on

 2          the record.

 3                    My name is Devyn Mulholland.

 4          I'm a videographer with Golkow

 5          Litigation Services.

 6                    Today's date is June 28, 2019.

 7          The time is 9:08 a.m.

 8                    This video deposition is being

 9          held in Richmond, Virginia in the

10          matter of National Prescription Opiate

11          Litigation.

12                    The deponent is Ronald Buzzeo.

13                    Counsel, please identify

14          yourselves for the record.

15                    MR. LOESER:  Derek Loeser for

16          the plaintiffs.

17                    MR. KAWAMOTO:  Dean Kawamoto

18          for the plaintiffs.

19                    MR. KO:  David Ko, also on

20          behalf of the plaintiffs.

21                    MS. CONROY:  Jayne Conroy,

22          plaintiffs.

23                    MR. LIU:  Zhao Liu, O'Melveny &

24          Myers on behalf of Johnson & Johnson

25          and Janssen.
```

1          MS. NOWAK:  Darlene Nowak,

2     Marcus & Shapira, on behalf of HBC

3     Services.

4          MR. MONTMINY:  Brandan Montminy

5     on behalf of Henry Schein defendant.

6          MR. SNAPP:  Erik Snapp on

7     behalf of the Purdue defendants.

8          MR. HYNES:  Paul Hynes on

9     behalf of CVS, Indiana LLC and CVS RX

10    Services, Inc.

11         MS. WICHT:  Jennifer Wicht on

12    behalf of Cardinal Health.

13         MS. VENTURA:  Catie Ventura on

14    behalf of the Allergan defendants.

15         MR. O'CONNOR:  Andrew O'Connor

16    on behalf of Mallinckrodt LLC and

17    SpecGx.

18         MS. LARUSSA:  Cassandra LaRussa

19    on behalf of Mallinckrodt and SpecGx.

20         MR. DAVISON:  William Davison

21    on behalf of Mallinckrodt LLC and

22    SpecGx.

23         THE WITNESS:  I'm Ron Buzzeo.

24         VIDEOGRAPHER:  The court

25    reporter is Carrie Campbell, who will

Highly Confidential - Subject to Further Confidentiality Review

```
 1            now swear in the witness.

 2                 RONALD W. BUZZEO, R.Ph.,

 3    of lawful age, having been first duly sworn

 4    to tell the truth, the whole truth and

 5    nothing but the truth, deposes and says on

 6    behalf of the Plaintiffs, as follows:

 7                 MS. BARBER:  Maureen Barber

 8            with Morgan Lewis for the Teva

 9            defendants.

10                 MS. HUGHES:  Alyssa Hughes with

11            Barnes & Thornburg on behalf of

12            HD Smith.

13                 MR. MARTIN:  Zach Martin with

14            Fox Rothschild on behalf of

15            Prescription Supply.

16                 MS. DICIURCIO:  Alison

17            DiCiurcio of Covington & Burling on

18            behalf of McKesson.

19                 MR. HEINEN:  Greg Heinen, Foley

20            & Lardner, on behalf of Anda.

21                 MR. LAVELLE:  John Lavelle from

22            Morgan Lewis on behalf of Rite Aid.

23                 MS. FUMERTON:  Tara Fumerton

24            from Jones Day on behalf of Walmart.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    EXAMINATION
2    QUESTIONS BY MR. LOESER:
3         Q.    Good morning, Mr. Buzzeo.
4         A.    Good morning.
5         Q.    Could you please state and
6    spell your name for the record, your last
7    name?
8         A.    Yeah.  Ronald W. Buzzeo,
9    B-u-z-z-e-o.
10        Q.    And have you ever been known by
11   any other name?
12        A.    Ron, Buzz.
13        Q.    And, Mr. Buzzeo, you understand
14   that you're under oath today?
15        A.    Yes.
16        Q.    And is there any reason why you
17   would be unable to testify truthfully and
18   accurately today?
19        A.    There's no reason that I'm
20   aware of.
21        Q.    Are you taking any medication
22   that would interfere with your ability to
23   answer my questions fully and truthfully?
24        A.    No.
25        Q.    Sir, have you been deposed
```

```
 1    previously?

 2         A.     I believe one occasion.

 3         Q.     Okay.  Well, I'll remind you of

 4    the ground rules, and just a few of them that

 5    are most important.

 6                The first rule, it's important

 7    that we not talk at the same time, and so if

 8    I ask you a question, if you could let me

 9    finish asking the question before you try and

10    answer, and I'll do the same with your

11    answers.  I'll try not to interrupt you while

12    you're answering.

13                Is that okay?

14         A.     (Witness nods head.)

15         Q.     And when you answer a question,

16    if you could do so verbally --

17         A.     Okay.

18         Q.     -- so shaking your head --

19         A.     I understand.

20         Q.     Okay.  So yes or no or an

21    explanation.

22         A.     Yes.

23         Q.     And if you don't understand a

24    question, please ask me to restate it and I

25    will try to do so.
```

```
 1          A.      I will.

 2          Q.      And if you do answer the

 3    question, I assume that you understood the

 4    question.

 5                  If at any time you need to take

 6    a break, please let me know or let your

 7    counsel know.  And it might not be

 8    immediately upon request, but I'll try and

 9    take a break soon after you've requested one.

10                  Does that sound fair to you?

11          A.      That's fine.

12          Q.      And if you can't hear me

13    because I'm not speaking loud enough or I'm

14    speaking too quickly, please let me know.

15          A.      I will tell you.

16          Q.      And this is a good little test

17    case for us because on a few occasions you've

18    nodded.  I understand what you're saying, but

19    you do need to state clearly and verbally for

20    the record.

21          A.      I agree.

22                  I ask one thing, though, that

23    you look at me when you -- if you could when

24    you're asking the question.

25          Q.      Sure, I'll try and do that.
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      If you try.

2               (Buzzeo Exhibit 1 marked for

3       identification.)

4    QUESTIONS BY MR. LOESER:

5       Q.      Why don't we go ahead and mark

6    your deposition notice as Exhibit 1.

7               Mr. Buzzeo, you've been handed

8    what is now marked Exhibit 1, which is the

9    notice of your deposition for today.

10              Have you seen this document

11   before?

12      A.      Yes.

13      Q.      And when did you see it?

14      A.      Yesterday.

15      Q.      And, sir, have you brought any

16   materials with you today to this deposition?

17      A.      No.

18      Q.      Okay.  I see that there's --

19   what looks like a chart or a spreadsheet

20   sitting in front of you.

21              Is that something that you

22   intend to rely on during your testimony?

23      A.      Yes.

24              MR. LOESER:  Okay.  If we could

25      have that marked as an exhibit, I

1          would appreciate it.

2                    (Buzzeo Exhibit 2 marked for

3          identification.)

4                    MR. LOESER:  Mark that as

5          Exhibit 2.

6     QUESTIONS BY MR. LOESER:

7          Q.    Mr. Buzzeo, do you mind if I

8     take a quick look at that document?

9                    MR. DAVISON:  This might be

10         easier.

11    QUESTIONS BY MR. LOESER:

12         Q.    And, sir, can you tell me what

13    this document is?

14         A.    It's a timeline so that I could

15    be as accurate as possible if we talk about

16    certain issues and the time frame it was in.

17         Q.    And who prepared this timeline?

18         A.    I discussed it with one of the

19    Ropes & Gray attorney and asked him to

20    prepare it.

21         Q.    And when did you do that?

22         A.    Early part of this week.

23         Q.    And is there anything on this

24    timeline that was put on by counsel instead

25    of by you?

1    A.    This was put on after we had

2    that discussion of what I would like to see

3    on the timeline.  Because as you know, I

4    wrote my report in various sections.

5    Q.    Your counsel has provided us

6    the invoice that you submitted for your work

7    in this case, and I'll -- we'll mark that as

8    the next exhibit.

9         (Buzzeo Exhibit 3 marked for

10        identification.)

11   QUESTIONS BY MR. LOESER:

12   Q.    Sir, you're now looking at

13   what's been marked Exhibit 3.

14        Is this the invoice that you

15   submitted to Mallinckrodt counsel --

16   A.    Yes.

17   Q.    -- for this matter?

18        And your hourly rate is $450 an

19   hour; is that correct?

20   A.    Correct.

21   Q.    And is that the same rate for

22   all the work that you're going to do in this

23   case?

24   A.    Yes.

25   Q.    And so if you testify at trial,

```
 1    for example, it would not be a different

 2    rate?

 3           A.      No, same.

 4           Q.      And is this the only invoice

 5    that you've submitted to counsel for

 6    Mallinckrodt?

 7           A.      Yes.

 8           Q.      And did you prepare this

 9    invoice?

10           A.      Yes.

11           Q.      You did personally?

12           A.      Yes.

13           Q.      And are there other invoices

14    that you intend to submit?

15           A.      One for this week.

16           Q.      Okay.  Do you know how many

17    hours are indicated on that?

18           A.      Depending on today, maybe 17,

19    18, somewhere around -- let's say

20    approximately 20 hours.

21           Q.      Okay.  And the amount of this

22    invoice is $130,050; is that correct?

23           A.      Yes.

24           Q.      And that's for a total of

25    289 hours?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      And according to this invoice,

3    you spent 176 hours reviewing documents; is

4    that correct?

5        A.      Correct.

6        Q.      And 45.5 hours drafting your

7    report?

8        A.      Yes.  Preparing the report.

9        Q.      Preparing your report.

10               Is that different than drafting

11   the report?

12       A.      To me it is because what I'll

13   usually do is when I -- if I know I'm going

14   to be preparing a report, as I review

15   documents, if I feel that I'm going to use

16   any information in that document in my

17   report, I will begin to write out a paragraph

18   or something of what I've read that I think

19   is important that I may want to put in the

20   room.

21       Q.      Okay.  And so do you know how

22   many hours you spent actually drafting your

23   report?

24       A.      For the actual report, when I

25   was taking my notes and everything and

```
1    putting into it, it was 45 hours.

2         Q.     And do you have copies of those

3    notes?

4         A.     Yes.

5         Q.     Did you bring them with you

6    today?

7         A.     No.

8         Q.     But you've kept copies of them?

9         A.     Yes.

10        Q.     And the other item on this

11   invoice, it says, "Meetings and calls with

12   Ropes & Gray attorneys," and it indicates

13   67.5 hours?

14        A.     Yes.

15        Q.     When did those meetings and

16   calls occur?  Over what time period?

17        A.     Probably starting in April.

18        Q.     And how many meetings?

19               And by "meetings," does that

20   mean in-person meetings?

21        A.     Yes.

22        Q.     How many in-person meetings?

23        A.     About eight, I'd say.

24        Q.     And who were those meetings

25   with?
```

```
1          A.      Counsel from Ropes & Gray.

2          Q.      And can you name who was

3    present?

4          A.      Yes, the two attorneys to my

5    left, Bill and Case {sic}.

6          Q.      And nobody else was there?

7          A.      No.

8          Q.      No counsel for any other

9    defendants?

10         A.      No.

11         Q.      And what about the calls, how

12   many calls have you had?

13         A.      I don't really recall, but I'd

14   say approximately five or six calls.

15         Q.      And were those with the same

16   two counsel from Ropes & Gray?

17         A.      Yes, but on one -- one call

18   there was a couple other counsels from Ropes

19   & Gray.

20         Q.      And on this invoice, on review

21   of documents, 176 hours, are those -- is that

22   the review of all the documents that are

23   identified on your materials considered list?

24         A.      Yes.  Yes.

25         Q.      Okay.  There were no other
```

```
 1    documents that you reviewed that's

 2    included --

 3         A.     No other documents.

 4                MR. DAVISON:  Let him finish

 5    his questions.

 6    QUESTIONS BY MR. LOESER:

 7         Q.     No other documents that you

 8    reviewed that are not on that list?

 9         A.     Correct.

10         Q.     And did you meet with counsel

11    to prepare for this deposition?

12         A.     Yes.

13         Q.     How many times?

14         A.     Maybe three times.

15         Q.     And can you tell me the length

16    of each meeting?

17         A.     I'd say approximately six

18    hours, six and a half hours.

19         Q.     Okay.  Where did those meetings

20    occur?

21         A.     In Chocowinity, North Carolina,

22    and Richmond.

23         Q.     And who was present at those

24    meetings?

25         A.     The two counsels to my left.
```

```
 1            Q.      In the course of preparing your

 2      report, did you meet with any employees of

 3      Mallinckrodt?

 4            A.      No.

 5            Q.      Did you talk on the phone to

 6      any employees of Mallinckrodt?

 7            A.      No.

 8            Q.      Sir, what company retained you

 9      in this case?

10            A.      Ropes & Gray.

11            Q.      And they did so on behalf of

12      Mallinckrodt?

13            A.      Yes.

14            Q.      And I may have asked, but what

15      was the date of when you were retained?

16            A.      I want to say -- again, I don't

17      really remember, but -- I don't recall the

18      exact date, but probably was in -- probably

19      March sometime.  I could be off, but I would

20      say around March maybe, possibly.

21            Q.      March, March of 2019?

22            A.      Yes.

23            Q.      And is Mallinckrodt a client of

24      yours in any other capacity than as an

25      expert?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Of mine, no.

 2            Q.     Has Mallinckrodt ever been a

 3    client of yours in the past?

 4                   And by "yours" I mean you or

 5    BuzzeoPDMA or...

 6            A.     Mine a number of years ago, and

 7    I don't recall if -- currently if they are a

 8    client of my old company or not.

 9            Q.     Okay.  So let me try and

10    understand what you're saying.

11                   Mallinckrodt was a client of

12    yours some number of years ago?

13            A.     Way back.

14            Q.     And was that while you were

15    with BuzzeoPDMA?

16            A.     I don't recall whether it was

17    when I was with the Agency -- or excuse me,

18    probably when I was BuzzeoPDMA --

19            Q.     Okay.

20            A.     -- or Buzzeo & Associates.

21            Q.     Do you recall what year that

22    was?

23            A.     God, no.

24            Q.     Do you recall what the nature

25    of the consulting or whatever your
```

```
 1    involvement with them was?

 2         A.     Yes, I do.

 3         Q.     Can you tell me about that,

 4    please?

 5         A.     It was to review their bulk

 6    manufacturing operation.

 7         Q.     And what were you reviewing

 8    about it?

 9         A.     How to do an accountability or

10    an accountability of raw material and the

11    alkaloids associated with raw material.

12              So if you have opium and you

13    process it, how much hydrocodone you're going

14    to get out of it, how much codeine, how much

15    morphine, in order to account for the

16    process.

17              Because the DEA requires if you

18    import so much opium, what are you actually

19    getting out of it, how do you account for

20    that.

21         Q.     And do you recall -- you don't

22    recall the year that that occurred?

23         A.     No, I don't recall.  It was so

24    long ago.

25         Q.     Any rough range when you think
```

```
 1     it may have happened?

 2          A.      (Witness shakes head.)

 3          Q.      And did you conduct --

 4          A.      Excuse me.  Now, you used the

 5     word "client," so I had to be careful on

 6     that.  I don't remember whether it was when I

 7     was with the Agency or when I first went out

 8     on my own.

 9          Q.      You don't recall whether you

10     were actually retained by Mallinckrodt or

11     not, because I gather you wouldn't have been

12     retained if it was with the Agency?

13          A.      No, that's right.  Yes, so I

14     wouldn't have been retained, so I wanted to

15     be very clear on that.

16               But if it was still when I

17     first went out, say, in the early '90s, then

18     it would have been a client.

19          Q.      And do you recall whether you

20     prepared a report about that engagement?

21          A.      I don't recall.  I would

22     assume, but I don't recall.

23          Q.      Was that your normal practice

24     when you were engaged to review a company's

25     procedures or systems?
```

```
1           A.      What -- clarify when you say

2     "normal practice."

3           Q.      Was it a normal practice of

4     yours to prepare a report for your consulting

5     clients?

6           A.      It depended on the client, it

7     depended why I was there, whether a report

8     was prepared or not.  So if it was a training

9     session, there'd be no report.  If it was a

10    review and they requested a report, there'd

11    be a review.  It could have been verbal.

12          Q.      And do you have any files that

13    would allow you to check and learn more

14    details about this engagement?

15          A.      No.

16          Q.      Would --

17          A.      Go ahead.

18          Q.      Do you believe BuzzeoPDMA would

19    have those files?

20                  MR. DAVISON:  Objection.

21                  THE WITNESS:  The practice was

22          not to -- when I was there -- I don't

23          know what the practice is today -- is

24          once you do a report, they would --

25          there really is no need to keep that,
```

```
1         those reports.
2              So I don't know if they have
3         them or they don't have them.  I know
4         I don't have any.  I didn't keep
5         anything.
6    QUESTIONS BY MR. LOESER:
7         Q.    Okay.  Now, you've described
8    one prior potential engagement with
9    Mallinckrodt.
10             Can you recall any others prior
11   to this one?
12        A.    I don't recall any others.  And
13   the only reason that sticks in my mind is
14   because it's a bulk manufacturer, and the
15   process is just intriguing.
16        Q.    And how about any -- just any
17   contact with Mallinckrodt?  Did you
18   communicate with Mallinckrodt at any time, or
19   counsel for Mallinckrodt, prior to your
20   engagement in this case?
21             MR. DAVISON:  Objection.
22             THE WITNESS:  The only contact
23        was on a call when they were
24        considering whether -- when Ropes &
25        Gray was considering -- that was it.
```

1          It was just whether I should be hired

2          or not hired.

3     QUESTIONS BY MR. LOESER:

4          Q.     And when did that occur?

5          A.     Prior to my being retained.

6     Because we didn't discuss business.  It was

7     more of a, you know, who are you, what do you

8     do, things like that.

9          Q.     And this was before

10    Mallinckrodt actually retained you?

11         A.     Excuse me?

12         Q.     This was before you were

13    actually retained?

14         A.     Yes.

15         Q.     Have you been retained to serve

16    as an expert by any other defendant in this

17    case?

18         A.     No.

19         Q.     Have you communicated with any

20    of the other defendants or their counsel

21    regarding this case?

22         A.     No.

23         Q.     Now, your opinions in this

24    case, they are on behalf of Mallinckrodt?

25         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And are your opinions intended

2    to be on behalf of any other defendant?

3        A.      I was retained to look at

4    Mallinckrodt's program and prepare a report

5    on Mallinckrodt's compliance with the

6    regulations.  I don't intend to share with

7    anybody else, and so I would say no.

8        Q.      And so you are, in fact, not

9    providing an opinion on behalf of any other

10   defendant; is that right?

11       A.      I'm not.

12       Q.      As you sit here today, do you

13   anticipate doing significant additional work

14   in this case before trial?

15       A.      To prepare for trial, I would

16   say yes.

17       Q.      And describe for me what you

18   think you will be doing.

19       A.      Reviewing the report, my

20   report, maybe looking at depositions from the

21   plaintiffs' side, any reports from the

22   plaintiffs' side, documents such as that.

23       Q.      Okay.  And other than the items

24   listed in your materials considered, have you

25   reviewed any of those reports or other

Highly Confidential - Subject to Further Confidentiality Review

1    matters that you think you might review to

2    prepare for trial?

3         A.    The only thing I've reviewed is

4    what's in my report -- what I list in my

5    report.

6         Q.    Okay.  So you're saying that

7    you may review additional materials prior to

8    trial?

9              MR. DAVISON:  Objection.

10             THE WITNESS:  I think I -- oh,

11       I'm sorry.

12             MR. DAVISON:  Go ahead.

13             THE WITNESS:  I got to stop

14       that.

15             I would leave the option open

16       that maybe there's some additional

17       records I should -- I feel I should

18       look at.

19   QUESTIONS BY MR. LOESER:

20        Q.    Did anyone assist you with your

21   work in preparing your report in this case?

22        A.    When I -- I prepared the

23   report, the words of my report.  The

24   assistance provided was putting it in -- you

25   know, putting it in final format.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And so is that

2    assistance that was provided by counsel for

3    Mallinckrodt?

4    A.    Yeah, Ropes & Gray.

5    Q.    And tell me what you mean by

6    "putting it into final format."

7    A.    I had a draft report, had to be

8    finalized.  They were good enough to type it

9    out and put in the footnotes for me because I

10   really don't know how to put footnotes in the

11   report.

12   Q.    And did they write parts of the

13   report?

14   A.    Not at all.

15   Q.    Okay.  So you wrote every word

16   that's in that report?

17   A.    Yes.

18   Q.    And you wrote the footnotes as

19   well?

20   A.    I pulled -- when I used -- in

21   writing my report, a section, I pulled it

22   from a document or deposition, something like

23   that, I would list what I took it from, and

24   they would put the footnote in for me.

25   Q.    Okay.  What was the condition

Highly Confidential - Subject to Further Confidentiality Review

1    of the draft when you provided it to counsel

2    to put into final format?

3                    MR. DAVISON:  Objection.

4                    THE WITNESS:  What I do when I

5           write a report is I will use a

6           computer and prepare the report, and

7           that will be a draft.  And then maybe

8           a day or so later I'll go back to it,

9           and I'll change something and save it.

10          So I'm working always on the same

11          document and saving it.

12                   I may read another document

13          that I have, a deposition, pull

14          something out of that, you know, put

15          them in my own words again.  Take that

16          same draft I had, put the changes in

17          there and save that.

18                   So that -- that's the condition

19          of my draft.

20                   So when I prepared the final --

21          and Ropes & Gray, like I said, was

22          good enough to add the footnotes and

23          prepare this document.

24   QUESTIONS BY MR. LOESER:

25          Q.    Okay.  And so did you -- I want

1    to make sure I understand what assistance

2    counsel provided for this.

3            Did you draft the table of

4    contents in your report?

5        A.    Yes.

6        Q.    Okay.  So if I flip through

7    this report, did you organize the report in

8    the order that it's in?

9        A.    Yes.

10       Q.    And did you write the headings

11   in the report?

12       A.    When you say "the headings,"

13   what are you referring to?

14       Q.    The different sections that are

15   in bold.

16       A.    Yes.

17       Q.    Okay.  And did you write the

18   summary of your opinions at the beginning of

19   your report?

20       A.    Excuse me?

21       Q.    Did you write the summary of

22   your opinions at the beginning of your

23   report?

24       A.    Yes.  After I -- as I mentioned

25   earlier, I was retained to look at

```
 1    Mallinckrodt's program, to render a decision

 2    on that, and that's the way I wrote my

 3    report.  And the summary of findings are --

 4    as I said, everything in here is my words.

 5         Q.    And you mentioned assistance

 6    from Ropes & Gray.

 7              Did you have anyone else

 8    working with you directly in preparing your

 9    report?

10         A.    No.

11         Q.    So you worked by yourself?

12         A.    Yes.

13         Q.    Sir, can you tell me what you

14    think this case is about?

15              MR. DAVISON:  Objection.

16              THE WITNESS:  Plaintiffs are --

17         filed a civil case against the

18         industry purporting that the industry

19         has led to the diversion problem in

20         the United States, abuse problem.

21              When we all -- when, you

22         know -- so that's it.

23              Okay.  Go ahead.  Back to your

24         question.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.      Were you finished answering,

 3    sir?

 4         A.      Yes.

 5         Q.      And is that an explanation that

 6    you came up with on your own after reviewing

 7    materials, or was that provided to you by

 8    somebody else?

 9         A.      No, that's what I read in the

10    news media or heard on TV or understanding.

11         Q.      And you used the expression

12    "diversion problem."

13               Can you please explain to me --

14         A.      Well, I should have used the

15    word "abuse problems" in the United States,

16    that there's some allegations that

17    pharmaceutical products are being abused.

18               We also know that heroin and

19    fentanyl are major problems in the United

20    States that are causing a lot of deaths.  And

21    that's what I was referring to, both the

22    licit and illicit.

23         Q.      So you're equating abuse

24    problem with diversion problem?

25               MR. DAVISON:  Objection.
```

```
 1                    THE WITNESS:  Well, it's like
 2            heroin is diverted, or it comes from a
 3            diverted product, or fentanyl.  We
 4            know a lot of it's coming in from
 5            overseas.  Is it being diverted from a
 6            pharmaceutical company over in China
 7            or is it clandestinely manufactured.
 8                    So when I use the term
 9            "diversion," it's a very broad term.
10            You could have diversion of trucks or
11            cars or liquor or anything else.
12    QUESTIONS BY MR. LOESER:
13            Q.     And do you use the term also to
14    mean diversion of prescription opioids?
15            A.     Probably the word "diversion"
16    was a poor choice.  I probably should have
17    used the word "abuse."
18                    But if you have leakage from a
19    legitimate distribution chain, that would be
20    considered diversion.
21            Q.     And are there any other kinds
22    of diversion that you think contributed to
23    what you earlier referred to as the diversion
24    problem?
25            A.     Clarify that question.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.      Would you say prescription

2   drugs are also diverted?

3     A.      You wouldn't -- yeah, there's

4   some diversion of prescription product.

5             The question is, where is it

6   being diverted, how large of a problem it is,

7   is it causing a lot of deaths.

8             So it's all of those issues.

9     Q.      And, sir, what's your

10  understanding of the plaintiffs' claims

11  against Mallinckrodt specifically?

12    A.      That some of their product was

13  abused on the street, which when I looked at

14  their program, and based upon my 50-something

15  years of experience, I think Mallinckrodt

16  has -- not that I think -- I know

17  Mallinckrodt has a very compliant program.

18    Q.      Right.

19            But in terms of what the

20  plaintiffs' claims are against Mallinckrodt,

21  can you provide any other detail on what you

22  think those claims are about?

23    A.      Well, the claim is, as I

24  understand it, is that their product is being

25  abused on the street, which I haven't found

1    evidence of it.

2         I think that's one of the

3    issues when it comes to a generic product and

4    not a branded product, is you really don't

5    know what products are being diverted on the

6    street.

7         So -- and then I still think

8    that the vast majority of the abuse on the

9    street is from heroin and fentanyl.

10   Q.    And, sir, what have you

11   reviewed to develop your understanding of the

12   plaintiffs' claims against Mallinckrodt?

13   A.    Just what I've heard on the

14   news and the newspapers, things like that.

15   Q.    Did you read the complaint in

16   this case?

17   A.    Just read quickly through it.

18   I didn't really go into very much detail.  I

19   skimmed it.

20   Q.    Do you recall when you did

21   that?

22   A.    A few months ago.

23   Q.    Do you recall who the plaintiff

24   was in the complaint that you skimmed?

25   A.    States, counties, probably some

Highly Confidential - Subject to Further Confidentiality Review

```
 1    cities.
 2         Q.     And, sir, did you read or skim
 3    one complaint or many complaints?
 4         A.     I looked at many documents from
 5    the -- from the courts.
 6         Q.     But of those documents, do you
 7    know how many were actual complaints filed in
 8    this case?
 9         A.     No.  No.
10         Q.     Mr. Buzzeo, do you believe
11    there's an opioid epidemic in this country?
12              MR. DAVISON:  Objection.
13              THE WITNESS:  Are you talking
14         about --
15              MR. DAVISON:  Go ahead.
16              THE WITNESS:  Are you talking
17         about licit or illicit?
18    QUESTIONS BY MR. LOESER:
19         Q.     How would you define the term
20    "opioid epidemic"?
21         A.     Licit or illicit?
22         Q.     Do you define it as including
23    both of those things or just one or the
24    other?
25         A.     Well, "epidemic" is a broad
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    term.  You know, what's causing the most

 2    deaths in the United States.  So is that the

 3    epidemic?

 4               If it's opioid -- legitimate

 5    opioids, you know, is it actually -- is there

 6    large quantities?  Is there's not large

 7    quantities that's causing injuries?  What's

 8    the injuries?  So "epidemic" to me is a very

 9    broad term.

10               If you're talking about deaths,

11    my opinion would be fentanyl and heroin.

12         Q.    Okay.  So I'm trying to

13    understand whether you believe there is, in

14    fact, an opioid epidemic.

15               However you define that term,

16    do you believe there's an opioid epidemic in

17    this country?

18               MR. DAVISON:  Objection.

19               THE WITNESS:  I think there's a

20         illicit epidemic in the United States,

21         and I think some pharmaceutical

22         products, yes, are being abused.

23               There's probably a certain

24         percentage of the population that will

25         abuse anything.
```

```
 1                   You do have pain clinics out

 2          there.  You had the Internet

 3          pharmacies in the past.  You had

 4          pharmacies dispensing excessive

 5          quantities.  You had doctors

 6          prescribing.  You had doctors hired to

 7          prescribe, and you had people owning

 8          pharmacies so they could divert.

 9          Yeah, you have that issue.

10   QUESTIONS BY MR. LOESER:

11          Q.    Sir, have you ever read any

12   books or articles that use the term "opioid

13   epidemic"?

14          A.    Just what I've seen in the

15   paper and the -- some of the stuff I looked

16   at.

17          Q.    And when you've seen reference

18   to the opioid epidemic, have you thought to

19   yourself, well, there really isn't an opioid

20   epidemic?

21          A.    I've never said there's not

22   really an epidemic.  I've said there's an

23   abuse of controlled substances, both licit

24   and illicit.

25                   And if you look at the number
```

1    of deaths, I firmly believe that most of them

2    are caused by heroin and fentanyl.  If you

3    look at the abuse of legitimate

4    pharmaceuticals, yes, there is some abuse.

5              But, like I said, I was hired

6    mainly and retained mainly to look at

7    Mallinckrodt's program and to see whether

8    they were compliant with the regulations, not

9    to look down at a pharmacy or some other type

10   of registrant.

11             As you know, there's a total

12   distribution chain, an entire distribution

13   chain.

14        Q.    Mr. Buzzeo, you mentioned

15   before that you thought there were more

16   deaths.

17             Do you recall saying that?

18        A.    (Witness nods head.)

19        Q.    How do you know there are more

20   deaths?

21             MR. DAVISON:  Objection.

22             THE WITNESS:  I've seen -- I'd

23        heard that on a TV show, that the vast

24        majority of the deaths caused in the

25        United States was caused by heroin and

```
 1              fentanyl.

 2                   And there was a discussion the

 3              other day on the radio I was listening

 4              to when I was driving that talked --

 5              and I don't have all the details,

 6              something CDC is even questioning now,

 7              whether they were overstringent in

 8              some of their correspondence and it's

 9              having a negative impact on legitimate

10              patients trying to get pain.

11                   I'm not an expert in that area.

12              There are experts in that area.  I'm

13              just repeating what I've heard.

14       QUESTIONS BY MR. LOESER:

15              Q.    Okay.  And so --

16              A.    I heard yesterday.

17              Q.    -- this conversation started

18       with me asking you if you're aware of the

19       opioid epidemic, and you provided some

20       information now about more deaths.

21                   And the source for your

22       testimony was something that you saw on

23       television?

24                   MR. DAVISON:  Objection.

25                   THE WITNESS:  News media.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Let's say the news media.
 2    QUESTIONS BY MR. LOESER:
 3        Q.    Okay.  Do you recall what news
 4    media?
 5        A.    Oh, I don't remember, the radio
 6    or the TV -- some TV show.
 7            But, again, when we talk about
 8    an opioid epidemic, we need to clarify
 9    whether we're talking about legitimate or
10    illicit.
11        Q.    And you mentioned that you --
12    that the vast majority of opioids being
13    abused are illicit opioids.
14            How do you know that?
15        A.    Excuse me?
16        Q.    You testified a few minutes ago
17    that the vast majority of opioids being
18    abused are illicit opioids.
19        A.    Like I said, what I've seen and
20    what I've read.
21        Q.    Okay.  So your basis for that
22    statement was things you've seen on
23    television?
24        A.    Television, news media,
25    articles on the Internet.  But again, I'm not
```

1    saying I'm an expert in that area, and there

2    are experts out there that -- and even CDC,

3    as I was telling you about yesterday, that

4    should be talked to.  Those are the people

5    you should focus on.

6         Q.    And, sir, what is a legitimate

7    opioid?  You used that expression.

8         A.    A legitimate controlled

9    substance is something that's made by --

10   either a raw material is imported or it's

11   made in the United States and flows through

12   the distribution chain.

13             And it's controlled by quota,

14   by DEA.  If you're talking about opioids, the

15   DEA controls, and FDA, the amount that can be

16   manufactured.

17        Q.    And what do you mean by licit

18   versus illicit?

19        A.    Illicit is something that's

20   clandestinely manufactured.  Heroin-like is

21   clandestine.  Cocaine is clandestine, even

22   though it's legitimately manufactured

23   cocaine.  Fentanyl, there's illicit, which

24   comes out -- it's smuggled into the United

25   States, versus what's manufactured in the

Highly Confidential - Subject to Further Confidentiality Review

```
1     United States.

2          Q.     And is a prescription pill, if

3     diverted, an illicit opioid?

4          A.     No.

5                 MR. DAVISON:  Objection.

6     QUESTIONS BY MR. LOESER:

7          Q.     How would you characterize a

8     prescription pill that is diverted then?

9          A.     It's for a nonmedical use.

10         Q.     And do you know, sir, what

11    portion of the opioids that are abused in

12    this country fall into that category as

13    opposed to the illicit category?

14         A.     I don't know.

15         Q.     You've never tried to study

16    that?

17         A.     Well, years ago, you know, I

18    would look at the DAWN data.

19         Q.     I'm sorry, you'd look at?

20         A.     DAWN data, Drug Abuse Warning

21    Network.  It came out of NIDR or FDA.

22                MR. DAVISON:  And, Ron, if

23         you're going into things that you did

24         at DEA that would go into confidential

25         investigations or anything, I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            want to remind you of the Touhy letter

 2            that you received on that.  I'm not

 3            sure what time period you're talking

 4            about.

 5                  THE WITNESS:  Yeah, thank you.

 6                  I'm talking about when I was --

 7            when I was working full-time.

 8    QUESTIONS BY MR. LOESER:

 9         Q.    I'm sorry, did you complete

10    your answer?

11         A.    When I was working full-time.

12    I didn't refer -- I wasn't referring to the

13    Agency time.

14         Q.    Do you agree that opioid abuse

15    and diversion has become a serious public

16    health problem?

17         A.    Opioids have become a serious

18    health problem, both the illicit and to some

19    extent licit.

20                But the illicit, I think

21    since -- from what my understanding is, the

22    amount of prescriptions are decreasing.  And

23    that's what the program I was listening to

24    the other day was talking about:  Has there

25    been a switch where legitimate patients are
```

```
 1    not getting their medication.

 2              So there's always a balance, as

 3    I've looked over my whole career, between

 4    meeting a legitimate medical need but not

 5    feeding the illicit market through bad

 6    pharmacies and bad physicians.

 7         Q.    And, sir, have you met patients

 8    who are not able to obtain opioids for

 9    legitimate medical purposes?

10         A.    Not currently, no.

11         Q.    Have you ever met such a

12    person?

13         A.    Yes.  I was on a number of

14    panels where we would put seminars on for

15    physicians, nurses, pharmacists, and on that

16    panel discuss -- I would talk about the

17    regulatory requirements.

18              There was a doctor in there who

19    talked about pain management.  There were

20    state people that would talk about what the

21    state does.  There were people in there that

22    would talk about patients, illicit patients,

23    trying to get medical -- medicine outside of

24    legitimate distribution chain.  So that was

25    the type of panel.
```

```
 1                     And so I would hear -- and we
 2      also would have a patient, a former addict, a
 3      patient that was having problems getting --
 4      they would provide, and it was also CE
 5      credits issued by the state.  So the state
 6      actually put it on, working with the
 7      pharmaceutical industry, to provide education
 8      to physicians, pharmacists, on how they
 9      should handle controlled substances, how they
10      should handle these drug-seeking patient.  So
11      these were educational seminars to address
12      certain issues that we're talking about.
13           Q.    And when did those occur?
14           A.    I was on those -- and don't
15      hold me to these dates, but I would say -- it
16      was after I retired, so it was probably
17      starting in the '90s.
18           Q.    Okay.  And when was the last
19      one you recall?
20           A.    I don't recall.
21           Q.    Have there been any of those
22      panels --
23           A.    I don't recall.
24           Q.    -- since the '90s?
25           A.    I don't recall if they carried
```

Highly Confidential - Subject to Further Confidentiality Review

1    on.

2         Q.    And so, sir, your understanding

3    of a legitimate opioid is one that's used for

4    a medical purpose?

5         A.    No, the legitimate controlled

6    substance is one that's manufactured in the

7    United States by a pharmaceutical company and

8    then moves down to the distribution chain to

9    the practitioner level.

10        Q.    That's the definition of

11   legitimate?

12        A.    That's legitimate.

13        Q.    Mr. Buzzeo, do you believe that

14   diversion of prescription opioids contributed

15   to the opioid crisis in this country?

16             MR. DAVISON:  Objection.

17             THE WITNESS:  Contributed --

18        repeat your question.

19   QUESTIONS BY MR. LOESER:

20        Q.    Do you believe that the

21   diversion of prescription opioids contributed

22   to the opioid crisis in this country?

23             MR. DAVISON:  Objection.

24             THE WITNESS:  No, I think it's

25        a combination of some -- you know, of

Highly Confidential - Subject to Further Confidentiality Review

```
 1            abuse of pharmaceutical products, but
 2            then you also have the large market of
 3            illicit substances, which is heroin
 4            and fentanyl today, that also led to
 5            that.
 6                 But -- and beyond that, it's
 7            probably a much larger issue than --
 8            and I'm not an expert that I can
 9            discuss about society and issues such
10            as that.  So I think it's -- it's a
11            much larger issue that you would have
12            to talk to other experts on.  That's
13            my firm belief.
14   QUESTIONS BY MR. LOESER:
15       Q.    And, sir, do you believe that
16   any opioid manufacturers contributed to the
17   opioid crisis by not having in place adequate
18   controls to prevent diversion?
19                 MR. DAVISON:  Objection.
20                 THE WITNESS:  Like I said
21            earlier, I was retained by Ropes &
22            Gray to look at the Mallinckrodt
23            program.  And I can speak to the
24            Mallinckrodt program; I haven't
25            reviewed any others.
```

```
 1                    And as far as I'm concerned,
 2          based upon my 50-plus years of
 3          experience, Mallinckrodt has -- to me
 4          has a compliant program.
 5   QUESTIONS BY MR. LOESER:
 6          Q.    And, sir, I'm asking you about
 7   your 50-plus years of experience, and so I'll
 8   ask again.
 9                 Do you believe that any opioid
10   manufacturers contributed to the opioid
11   crisis by not having in place adequate
12   controls to prevent diversion?
13                    MR. DAVISON:  Objection.
14                    THE WITNESS:  I can't answer
15          that question.  You could give me a
16          name or something, but I can't answer
17          that question.  I don't know.  I'm not
18          aware of -- I should put it this way,
19          I'm not aware of any.
20   QUESTIONS BY MR. LOESER:
21          Q.    Okay.  In your 50-plus years of
22   guiding and providing consulting services to
23   opioid manufacturers, you're not aware of any
24   manufacturers that contributed to the problem
25   by not having in place adequate suspicious
```

```
 1    order monitoring systems?

 2              MR. DAVISON:  Objection.

 3              THE WITNESS:  If you're asking

 4         me -- I can't talk about anything with

 5         the Agency, so that period of time we

 6         have to take out of there.

 7              If you're -- the people I dealt

 8         with -- and I have -- I can't -- I

 9         can't recall.  Like I said, I focused

10         on the Mallinckrodt program, and only

11         the Mallinckrodt program, at this

12         time.

13    QUESTIONS BY MR. LOESER:

14         Q.    Mr. Buzzeo, do you believe that

15    any opioid distributors contributed to the

16    opioid crisis by not having in place adequate

17    controls to prevent diversion?

18              MR. DAVISON:  Objection.

19              THE WITNESS:  Again, I --

20              MS. DICIURCIO:  Objection.

21              COURT REPORTER:  Who on the

22         phone objected?

23              MS. DICIURCIO:  That was Alison

24         DiCiurcio from Covington.

25              THE WITNESS:  I was retained --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          repeat your question.
 2                  MR. LOESER:  Could you read the
 3          question back, please?
 4                  (Court Reporter read back
 5          question.)
 6                  THE WITNESS:  As I said
 7          earlier, I don't recall, but I was
 8          hired by Ropes & Gray to look at the
 9          Mallinckrodt program.  I'm not here to
10          talk about other individuals, the
11          other registrants, that I may not be
12          aware of.
13                  MR. LOESER:  Could you read the
14          question back again, please?
15    QUESTIONS BY MR. LOESER:
16          Q.    Sir, Mr. Buzzeo, I'm going to
17    ask you the question again, and if you could
18    please answer it, I'd appreciate it.
19                  (Court Reporter read back
20          question.)
21                  MR. DAVISON:  Objection.
22                  MS. DICIURCIO:  Objection.
23                  THE WITNESS:  It's too broad of
24          a question.  I'm not aware of any.  I
25          know there's been some action years
```

Highly Confidential - Subject to Further Confidentiality Review

1         ago by DEA on some, but I'm not aware

2         of any.

3    QUESTIONS BY MR. LOESER:

4         Q.    Sir, when you say "there's been

5    some action by the DEA," what are you

6    referring to?

7         A.    Some of the -- I'm assuming,

8    I'm just guessing, there's been some action

9    by them.  I'm not aware of any.

10        Q.    You're not aware of any, but

11   you recall some action by the DEA?

12        A.    Well, there's been a lot of

13   action.  Whether they've gone down that road

14   or not, I'm really not aware.

15             Again, I keep wanting to

16   repeat, I was retained to look at the

17   Mallinckrodt program and to determine whether

18   they met the compliance requirements.

19        Q.    Mr. Buzzeo, do you believe that

20   any chain pharmacies contributed to the

21   opioid crisis by not having in place adequate

22   controls to prevent diversion?

23             MR. DAVISON:  Objection.

24             THE WITNESS:  I'm not aware of

25        any.

```
 1      QUESTIONS BY MR. LOESER:

 2           Q.      I'm sorry?

 3           A.      I'm not aware of any.

 4           Q.      Mr. Buzzeo, through your years

 5      of providing guidance to DEA registrants, did

 6      you become familiar with the concept of pill

 7      migration?

 8           A.      Pill migration?  I've never

 9      heard of that term.

10           Q.      Have you ever heard the term

11      "the Oxy Express"?

12           A.      Give me that again.

13           Q.      "Oxy Express."

14           A.      I assume you're referring, when

15      you say "oxy," oxycodone?

16           Q.      Correct.

17           A.      No.

18           Q.      How about The Blue Highway?

19           A.      The what?

20           Q.      The Blue Highway?

21           A.      The Blue Highway, we call it Ts

22      and Bs, I think it was.  And I forgot what

23      those two -- the Ts and Bs talked to.  But I

24      think that may have been the same thing.

25           Q.      And when you say "we" refer to,
```

```
 1    who are you speaking of?
 2         A.    When I was -- when I was with
 3    the Agency.  That's as much as I'll say about
 4    it.
 5         Q.    Are you familiar with the DEA's
 6    distributor initiative program?
 7         A.    What I've read about it.
 8         Q.    And what do you mean, what you
 9    read about it?
10         A.    It was a program where DEA met
11    with the distributors to discuss certain
12    issues, and I believe it's also in the
13    letters that the Agency put out in '06 and
14    '07.
15         Q.    And what's your recollection of
16    when the Distributor Initiative Program
17    started?
18         A.    As I recall, I think it was
19    around '06, '05, '06, that period of time may
20    have been right before the first letter came
21    out or after the first letter.
22         Q.    And when you refer to "first
23    letter," what are you speaking to?
24         A.    The letters that Joe Rannazzisi
25    from the Agency, when he was with the Agency,
```

```
 1    put out to the industry, to the distributors

 2    first and then manufacturers.

 3         Q.    And what was the purpose of the

 4    Distributor Initiative Program?

 5              MR. DAVISON:  Objection.

 6              THE WITNESS:  The purpose of

 7         the program, as I recall, was to

 8         advise the distributors, and I wasn't

 9         in any of these meetings so I can --

10         just to advise the distributors or

11         have a discussion on the requirements,

12         what they expect from the industry.

13    QUESTIONS BY MR. LOESER:

14         Q.    And do you recall why the

15    Distributor Initiative Program was started?

16              MR. DAVISON:  Objection.

17              THE WITNESS:  No, but I do

18         recall that it was a sea change to the

19         industry.  You know, they had been

20         following certain processes and

21         procedures which was accepted by the

22         Agency, and you even have -- there's

23         even some depositions where the Agency

24         says, yes, this was acceptable.

25              And then when the letters came
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           out, it caused a sea change in what
 2           DEA expected the industry to do.
 3  QUESTIONS BY MR. LOESER:
 4           Q.     And do you recall if there was
 5  a crisis or something related to opioids that
 6  the DEA was trying to confront through the
 7  Distributor Initiative Program?
 8                MR. DAVISON:  Objection.
 9                THE WITNESS:  DEA was
10           addressing an issue, and they were
11           talking about, I believe, pharmacy
12           diversion and practitioner diversion
13           where the pharmacists and some
14           pharmacies and some physicians were
15           involved in diverting controlled
16           substances for nonmedical need.
17  QUESTIONS BY MR. LOESER:
18           Q.     So your understanding of the
19  issue that DEA was addressing was diversion
20  by pharmacies and practitioners?
21                MR. DAVISON:  Objection.
22                THE WITNESS:  I was not with
23           the Agency at the time, but as I
24           recall, they were addressing the
25           large-scale diversion by physicians
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          and pharmacists, some physicians and
 2          some pharmacists, into the illicit
 3          market for -- they were prescribing
 4          and dispensing for nonmedical needs.
 5   QUESTIONS BY MR. LOESER:
 6          Q.    And why was the DEA meeting
 7   with distributors about that?
 8               MR. DAVISON:  Objection.
 9               THE WITNESS:  Well, as I
10          mentioned earlier, the distribution
11          chain starts here and ends up down
12          here.
13   QUESTIONS BY MR. LOESER:
14          Q.    Can you explain your answer
15   further, please?
16          A.    Yeah.  It goes from
17   manufacturer to the distributor to the
18   practitioner level, which is hospitals,
19   physicians, pharmacists.
20          Q.    And so, sir, why was the DEA
21   meeting with distributors about diversion by
22   practitioners and pharmacies?
23               MR. DAVISON:  Objection.
24               THE WITNESS:  I don't know.  I
25          don't recall the reason why, or maybe
```

```
 1            I never remembered it, but I would

 2            assume -- I don't want to assume, but

 3            maybe ask for their assistance, maybe

 4            make them aware of the issues.

 5     QUESTIONS BY MR. LOESER:

 6            Q.    And, sir, did the Distributor

 7     Initiative Program impact the guidance you

 8     gave to your DEA registrant clients?

 9            A.    Personally or when I was with

10     the company?

11            Q.    Personally.

12            A.    Personally?

13            Q.    Well, let me -- let me ask you:

14     At the time that you became aware of the

15     Distributor Initiative Program, did it impact

16     the guidance that you gave to your DEA

17     registrant clients?

18            A.    Well, what -- when we worked

19     with clients, it was always to, you know,

20     discuss the regulatory requirements with

21     them, ensure that -- or recommend maybe some

22     enhancements to a program, maybe recommend

23     some things that were over and above the

24     regulations based upon our industry

25     experience.  So that's what we're working
```

1    with the industry.

2              When DEA made the sea change,

3    which was a major change -- because you've

4    got to understand, since the '70s up until

5    the first letter went out, the issue -- and

6    DEA accepted a certain process.  They came

7    out with the letter and made a sea change.

8              So I was working with them to

9    say, you know -- or they contacted us to

10   explain some sense of what DEA meant by those

11   letters, that they -- you know, it's

12   suspicious order reporting, excessive

13   reports you don't have to provide any more.

14   That's my understanding of it.

15        Q.    So your answer to my question

16   is, yes, the DEA Distributor Initiative

17   Program did impact the guidance you gave your

18   clients?

19              MR. DAVISON:  Objection.

20              THE WITNESS:  Enhanced the

21         recommendation to go from an excessive

22         report to where all you do is give us

23         what's suspicious, which industry was

24         doing in most cases anyway, that they

25         would -- they would tell the DEA when

```
 1             they had a suspicious order, but they

 2             were also sending in these vast --

 3             these excessive order reports.

 4    QUESTIONS BY MR. LOESER:

 5        Q.     And so again, your answer is,

 6    yes, the DEA Distributor Initiative Program

 7    did impact the guidance that you gave to your

 8    clients?

 9             MR. DAVISON:  Objection.

10             THE WITNESS:  Depends how you

11        use the word "impact."  It depends how

12        you use the word "guidance."

13             But, yes, we did work with the

14        industry to ensure that they

15        understood what those letters were

16        saying.

17    QUESTIONS BY MR. LOESER:

18        Q.     Sir, what does "impact" mean to

19    you?

20        A.     Does it impact a program?  Does

21    it change a program?  Does it enhance a

22    program?  Does it go beyond the program?

23             Because even with Mallinckrodt,

24    as we'll probably get into it, there's things

25    that they did way beyond regulatory
```

Highly Confidential - Subject to Further Confidentiality Review

1    requirements.  And so that -- you know, those

2    are some things that could impact the

3    program.

4         Q.    So using the explanation you

5    just gave, do you agree that the Distributor

6    Initiative Program impacted the guidance that

7    you gave your clients?

8              MR. DAVISON:  Objection.  Asked

9         and answered.

10             THE WITNESS:  I've answered

11        that.

12   QUESTIONS BY MR. LOESER:

13        Q.    You have not, so I'll ask

14   again.

15             Did the Distributor Initiative

16   Program impact the guidance you gave your

17   clients?

18             MR. DAVISON:  Objection.  Asked

19        and answered.  Argumentative.

20             THE WITNESS:  We would take the

21        letters, as we did, and we would sit

22        down with the companies and have a

23        discussion to make sure that we were

24        all on the same page of what the

25        intention was of DEA.  Because it

```
 1          was -- besides those letters, there's

 2          been very little, if any, guidance.

 3    QUESTIONS BY MR. LOESER:

 4          Q.    Sir --

 5          A.    And even DEA has admitted that.

 6                So what we were trying to do

 7    was make sure we were all on the same page.

 8          Q.    Sir, can you answer the

 9    question, yes or no:  Did the Distributor

10    Initiative Program impact the guidance you

11    gave your clients?

12                MR. DAVISON:  Objection.

13                THE WITNESS:  As I said

14          earlier, it was a sea change to the

15          industry.

16    QUESTIONS BY MR. LOESER:

17          Q.    So your answer is yes?

18                MR. DAVISON:  Objection.

19                THE WITNESS:  There was a sea

20          change to the industry.

21    QUESTIONS BY MR. LOESER:

22          Q.    And did that sea change impact

23    the guidance that you gave to your clients?

24                MR. DAVISON:  Objection.

25                THE WITNESS:  We work with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              industry on what the regulatory
 2              requirements are.
 3                   When you look at the regulatory
 4              requirements, if we're talking about
 5              1301.74(b), it talks about suspicious
 6              orders and reporting suspicious
 7              orders.  The industry practice and
 8              accepted by DEA was to report
 9              excessive orders -- excessive orders
10              on a monthly or quarterly basis.
11                   When the letters came out, it
12              said, stop that, so that had an impact
13              on the industry.  And then it -- and
14              so it did have an impact.
15         QUESTIONS BY MR. LOESER:
16              Q.    Mr. Buzzeo, you provided
17         consulting services to a number of defendants
18         in this case; is that correct?
19              A.    What period of time are we
20         talking about?
21              Q.    Through your entire career
22         after leaving the DEA.
23              A.    Oh, I don't recall all the
24         clients, but we've given consulting services
25         and provided consulting service to a number
```

```
1    of DEA registrants from the entire

2    distribution chain:  the importers,

3    exporters, both manufacturers --

4    manufacturers, distributors, pharmacies, some

5    physician groups and chain pharmacies.

6         Q.     And the DEA registrants for

7    which you provided guidance include some of

8    the defendants that are in this case,

9    correct?

10        A.     May.  I don't -- I don't

11   recall.

12        Q.     Did you ask any of the other

13   defendants in this case whether they were

14   okay with you serving as an expert for

15   Mallinckrodt?

16        A.     I had no discussions with any

17   of them.

18        Q.     Do you know if anyone asked on

19   your behalf?

20             MR. DAVISON:  Objection.

21             THE WITNESS:  I don't know.

22   QUESTIONS BY MR. LOESER:

23        Q.     Did you discuss with anyone,

24   other than counsel for Mallinckrodt, whether

25   you should serve as an expert in this case?
```

```
 1            A.    The only discussions I had was

 2    with Ropes & Gray.

 3            Q.    And what was your initial

 4    assignment in this case?

 5            A.    To evaluate Mallinckrodt's

 6    compliance with the regulations.

 7            Q.    And has that assignment changed

 8    at all since you were first retained?

 9            A.    No.

10            Q.    And are there any restrictions

11    that were provided to you on what opinions

12    you can offer?

13            A.    No restrictions.

14            Q.    Any restrictions on parties or

15    entities that you could refer to in your

16    report?

17            A.    No restrictions.

18            Q.    Sir, did you review any

19    documents to prepare for your deposition

20    today?

21            A.    Excuse me again.

22            Q.    Did you review any documents to

23    prepare for your deposition today?

24            A.    My report.

25                  You mean yesterday or what time
```

1    period?  Let's go back to time period

2    because --

3         Q.     In the time period for the

4    preparation --

5         A.     Okay.

6         Q.     -- for your deposition.

7         A.     Yes, my report.  Some other

8    depositions I looked at just to refresh my

9    memory.  Some reports.

10        Q.     Do you recall what other

11   depositions you looked at?

12        A.     Whitehall, McCann, Keller I've

13   looked at, Rafalski.

14        Q.     And that was for -- preparing

15   for your deposition?

16        A.     Well, it was for the review

17   leading up to the report and the deposition.

18        Q.     Okay.

19        A.     But for the deposition, it was

20   mainly my report.

21        Q.     I'll go ahead and mark your

22   report as an exhibit.

23             (Buzzeo Exhibit 4 marked for

24        identification.)

25

```
 1     QUESTIONS BY MR. LOESER:

 2          Q.     And I believe -- is that

 3     Exhibit 4 that you're looking at there?

 4          A.     4.

 5          Q.     And Exhibit 4 is the report

 6     that you prepared in this case?

 7          A.     Yes.

 8          Q.     And that's the copy that you

 9     brought with you today?

10          A.     It was a copy that legal

11     provided me today.

12          Q.     All right.  And it appears to

13     be your actual report?

14          A.     Yes.

15          Q.     And Exhibit 3 to your -- or

16     exhibit -- your report has three exhibits; is

17     that correct?

18          A.     Yes.

19          Q.     A through C?

20          A.     Yes.

21          Q.     And Exhibit A is your CV?

22          A.     Yes.

23          Q.     And, sir, if you can look at

24     your CV for a moment.

25          A.     Yes.
```

1    Q.    Did you prepare your own CV?

2    A.    Yes.

3    Q.    And is it -- did you review it

4  to make sure it was accurate?

5    A.    Yes.

6    Q.    And do you have other versions

7  of your CV that you use for purposes other

8  than litigation?

9    A.    Different formats.

10    Q.    Same information, just put in

11  different form?

12    A.    That I used over the years.

13  Yeah, basically the same information.  It

14  would be written in a different way.

15    Q.    And I believe we were provided

16  with an updated copy of your CV; is that

17  correct?

18         MR. DAVISON:  That's correct.

19  QUESTIONS BY MR. LOESER:

20    Q.    Do you know what the difference

21  is between the version in your report and the

22  updated version?

23    A.    Yes, it's publications.

24    Q.    Okay.  There's some additional

25  publications --

```
 1          A.      Yes, sir.

 2          Q.      -- on the updated version?

 3          A.      Yes.

 4          Q.      And were those publications

 5    that you identified or counsel discovered and

 6    added to your CV?

 7          A.      Some I identified and I think

 8    you were provided a copy.  Other, it was

 9    counsel who found or located, because I don't

10    recall some of these.

11                  Plus, we were in the middle of

12    a move.  We just moved into a new house.

13    Everything's in boxes, which I have research,

14    so...

15          Q.      Do you recall what publications

16    you discovered that were then added?

17          A.      It was -- like I said, it was

18    the one you got today.

19                  (Buzzeo Exhibit 5 marked for

20          identification.)

21    QUESTIONS BY MR. LOESER:

22          Q.      We'll go ahead and mark that as

23    Exhibit 5.

24                  Mr. Buzzeo, you're looking at

25    the updated copy of your CV that was provided
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     to us by counsel.
 2              Can you turn to the
 3     publications?
 4        A.    Yes.
 5        Q.    And, sir, can you identify for
 6     us which additional publications you
 7     discovered which were then added to this
 8     list?
 9        A.    Number 1.  I think that's the
10     one I found.
11        Q.    And, sir, you've made sure that
12     this is a complete list of all publications
13     that you have authored?
14              MR. DAVISON:  Objection.
15              THE WITNESS:  This is not all
16          the publications I have authored over
17          the years, not at all.
18     QUESTIONS BY MR. LOESER:
19        Q.    Do you have a list somewhere of
20     the publications that you've authored?
21        A.    No.
22        Q.    You haven't provided counsel
23     with a list of your publications?
24        A.    No.
25              I don't recall most of them.
```

```
 1          Q.      Do you keep records of them?

 2          A.      No.

 3                  Especially after the move, I

 4    have nothing except boxes.  But I never kept

 5    copies of anything.

 6          Q.      So this list of publications is

 7    not actually complete?

 8          A.      It's not --

 9                  MR. DAVISON:  Objection.

10                  THE WITNESS:  Oh, I'm sorry.

11                  MR. DAVISON:  Go ahead.

12                  THE WITNESS:  No, it's not.

13                  As you can see, you got one

14          today that I just located.

15    QUESTIONS BY MR. LOESER:

16          Q.      So your CV indicates for

17    education that you attended St. John's

18    University College of Pharmacy.

19                  You received a BS in 1963; is

20    that correct?

21          A.      Yes.

22          Q.      And have you had any other

23    formal education since 1963?

24          A.      Well, I was sent to University

25    of -- when I was with the Agency, University
```

1    of Rhode Island for a month on a

2    specialization course for manufacturing and

3    how to tablet manufactured product.

4         Q.    I'm sorry, how to what?

5         A.    How to manufacture products.

6         Q.    Okay.  And what products?

7         A.    It was just general, when I was

8    with the Agency.

9         Q.    How to manufacture controlled

10   substances?

11        A.    A manufactured process given by

12   the University of Rhode Island.

13        Q.    For drugs or for --

14        A.    Oh, for drugs.

15        Q.    -- chairs --

16        A.    When I say "manufacturing," I

17   meant -- yes, to be clear, drugs.

18        Q.    Okay.  And did you receive a

19   certificate or anything for completing?

20        A.    Oh, I probably received

21   something.  I don't recall.

22        Q.    And any other formal --

23        A.    Oh, I'm sorry.  Go ahead.

24        Q.    Any other formal education

25   since then?

1          A.      When we're talking formal, I

2     assume it's like something I just mentioned,

3     University of Rhode Island.

4          Q.      Correct.

5          A.      Yes.

6                  No.

7          Q.      In your areas of expertise in

8     your CV, the second to last bullet item is

9     opioid management guidance.

10                 Do you see that on the first

11    page of your CV under areas of expertise?

12         A.      Yes.

13         Q.      Can you explain to me what

14    opioid management guidance is?

15         A.      What I meant by any of these is

16    that from a regulatory perspective is, you

17    know, how do you look at your opioid

18    products, how do you manage it in an

19    operation, what kind of reporting do you do

20    with opioids, things like that.

21         Q.      Who did you give opioid

22    management guidance to?

23         A.      Our clients.  We would talk to

24    them about it.  Training sessions that we

25    would hold.

1    Q.    So manufacturers, distributors,

2    chain pharmacies?

3    A.    Chain pharmacies, physicians,

4    pharmacy groups.

5    Q.    I want to try and quickly go

6    through your professional experience starting

7    with the first entry.  Flip a couple of pages

8    into your CV.

9         It looks like you got your

10   start with the New York Department of Health

11   Bureau of Narcotics in 1966; is that correct?

12   A.    Yes, 1966.

13   Q.    And so from 1966 to '69, what

14   was your job?

15   A.    I was an inspector for the

16   New York State Department of Health, Bureau

17   of Narcotics, Dangerous Drugs, or Bureau of

18   Narcotics.  It was -- handled all controlled

19   substances.

20        I handled mainly Nassau -- I

21   think County of Nassau and Suffolk, if I

22   recall, and I was an investigator of, as I

23   say here, nursing homes, pharmacies,

24   hospitals.  And then we did a lot of work

25   throughout the state on forged prescriptions

```
1    and even some undercover work.
2         Q.    And was diversion part of what
3    you were looking for at that time?
4         A.    That was it, it was drugs.  And
5    the diversion part was the forged
6    prescriptions, which was a major problem at
7    that time when I was there in New York state.
8         Q.    And then from 1969 through '72
9    you worked for the Bureau of Narcotics and
10   Dangerous Drugs, which then became the DEA;
11   is that correct?
12        A.    Correct.
13        Q.    And your CV says you were a
14   special agent?
15        A.    I was special agent in
16   New York.  I did a lot of undercover work,
17   worked a lot of clandestine labs.  And then I
18   started getting new hires in their diversion
19   investigators, and so my group -- then I
20   became a group supervisor, so we handled both
21   illicit and licit.
22        Q.    Okay.  And what do you mean by
23   that?
24        A.    I had agents that were handling
25   the illicit substances, heroin, cocaine,
```

1    marijuana, clandestine labs, and also -- and

2    the diversion investigators who were

3    regulating the pharmaceutical industry,

4    hospitals and pharmacies.

5              And then that was the time when

6    the implementing regulations came out, so we

7    did some -- right after that, we got involved

8    in that area.

9        Q.    And so among the companies --

10   types of companies you were investigating,

11   you mentioned pharmacies.

12             Did you also investigate

13   manufacturers?

14       A.    We would investigate the entire

15   distribution chain or -- and inspect -- in

16   those days it was doing a lot of inspections

17   because the new regulations were in place, so

18   we were doing a lot of inspections to ensure

19   that they understood what the regulatory

20   requirements were.

21             And we gave a lot of

22   presentations to the various registrant

23   groups.

24       Q.    And what were the regulatory

25   requirements?

1          A.      13 -- the implementing

2     regulations for the Controlled Substances

3     Act.

4          Q.      Can you elaborate on what those

5     regulations required?

6               MR. DAVISON:  Objection.

7               THE WITNESS:  We had

8          registration requirements, security

9          requirements, import/export

10         requirements, labeling, recordkeeping,

11         reporting requirements, inventory

12         requirements.

13              Those are some of the things

14         that we would sit down with, train,

15         offer assistance and also investigate.

16    QUESTIONS BY MR. LOESER:

17         Q.      So moving down the timeline,

18    from '72 to '73 you were the group supervisor

19    at the DEA?

20         A.      Correct.

21         Q.      And you mentioned that -- how

22    would you -- your CV indicates that you

23    conducted criminal and regulatory

24    investigations of dosage, form and bulk

25    manufacturers, distributors and hospitals.

Highly Confidential - Subject to Further Confidentiality Review

```
1                     Is that accurate?
2          A.     Yes.
3          Q.     And how would you conduct your
4    investigations?  What would you be looking
5    for?
6                     MR. DAVISON:  So I'm just going
7              to remind you not to get into the
8              actual confidential investigative
9              techniques of the DEA that you learned
10             during your time there because you
11             don't have Touhy authorization to
12             provide that information.
13                    THE WITNESS:  I'm going to
14             follow counsel's advice and not talk
15             about investigative techniques.
16   QUESTIONS BY MR. LOESER:
17         Q.     So you were investigating for
18   diversion; is that correct?
19         A.     As I had mentioned, I had -- I
20   had -- are we talking about headquarters or
21   the field now?  In the head --
22         Q.     Talking about the '72 to '73
23   when you were a group supervisor.
24         A.     In the field.
25                    So we had a mixed group, and
```

1    the agents were specializing in both domestic

2    and international cases associated with the

3    illicit substances.

4              The other group, the other half

5    I had, was diversion investigators who were

6    specializing in the regulated industry on

7    illicit substances.

8              If they ever had a case, the

9    diversion investigators, that seemed to be --

10   that was criminal in nature, some of the

11   agents -- I would assign some of the agents

12   to assist them.

13        Q.    And in general terms, what kind

14   of diversion was occurring at that time?

15        A.    Thefts, which included in

16   transit and sometimes employee thefts.

17   Maybe -- yeah, that was -- that was mainly

18   it, as I recall.  I don't recall all the

19   types of investigations.

20        Q.    Do you recall whether there was

21   diversion as a result of the failure of any

22   companies to have effective controls to

23   prevent diversion?

24        A.    I'd like to talk to counsel

25   before I have some -- before I -- because of

```
 1      the Touhy thing.

 2                  MR. DAVISON:  Is it a Touhy

 3          question?

 4                  THE WITNESS:  Yeah.

 5                  MR. DAVISON:  Let's go off the

 6          record for a second.

 7                  MR. LOESER:  Sure.

 8                  VIDEOGRAPHER:  Off the record

 9          at 10:13 a.m.

10           (Off the record at 10:13 a.m.)

11                  VIDEOGRAPHER:  We're back on

12          the record at 10:15 a.m.

13      QUESTIONS BY MR. LOESER:

14          Q.     And, sir, do you have an answer

15      to the question I asked before?

16          A.     Yes.  It's -- just to clarify,

17      were there any manufacturers, or what was --

18      repeat your question.

19          Q.     Sure.  Why don't we...

20                  Do you recall whether there was

21      diversion as a result of the failure of any

22      companies to have effective controls to

23      prevent diversion?

24          A.     I'm going to give you a broad

25      response to that.
```

1          I recall -- I don't recall all

2     the details, but I recall we had one

3     situation where a company who's been -- was

4     put out of business as soon as we found out

5     about it, that was manufacturing during the

6     day.  And at night they also manufactured,

7     and the stuff manufactured in the evening was

8     sent -- it was in the illicit market.

9          Now, this was a -- you know,

10    right when the regulations went into effect.

11    And, like I said, it's a criminal case made

12    against them.

13          And then there was another one

14    where -- yeah, there was another one where

15    the -- there was a company that was

16    supposedly exporting drugs, and they were

17    sent down to a location, I don't remember

18    where, someplace in the Southwest or

19    something, and it was never exported or

20    shipped to the licit market.

21          Those are two cases that I

22    remember.

23     Q.    Okay.

24     A.    And they were put out of

25    business very quickly, too.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      So moving to the next item on

2   your CV for professional experience, from

3   1973 to 1982 you were the head of

4   diversion -- head of the diversion prevention

5   program for the DEA?

6      A.      Yes.

7      Q.      Is that right?

8      A.      Well, the -- yeah, the Office

9   of Diversion Control.

10      Q.      And you note that this was a

11   new program, is that right, the diversion --

12      A.      Yes.

13      Q.      -- prevention program?

14      A.      As I had mentioned earlier,

15   when I was in New York as a supervisor, I

16   started getting this newly trained workforce

17   of diversion investigators.  And so then I

18   was asked if I would come down to Washington

19   and help develop this program, implement the

20   program, and I said, yes, I would.

21           And when I went to Washington,

22   I changed jobs series from special agent to

23   diversion investigator since I would now be

24   supervising a new program.

25      Q.      And the description you have on

Highly Confidential - Subject to Further Confidentiality Review

```
1    your CV says that you "implemented and
2    directed domestic and worldwide programs
3    associated with preventing the diversion of
4    legally produced controlled substances and
5    chemicals, formulating legislation and
6    regulations to curtail diversion and audit
7    and investigative procedures."
8              Did I read that correctly?
9        A.    Yes.
10       Q.    So, first of all, for purposes
11   of this job, how did you define diversion?
12       A.    When drugs left the legitimate
13   distribution chain for illicit purposes, for
14   nonmedical use.
15       Q.    Okay.  And when you say
16   "drugs," you mean when controlled
17   substances --
18       A.    Controlled substances, I'm
19   sorry.
20       Q.    Yeah.  And you mean when they
21   left control of the manufacturer or the
22   distributor, or who on the supply chain were
23   you investigating at that time?
24       A.    It was -- a lot of the
25   diversion was at the practitioner level, by
```

```
 1    physicians and pharmacy.

 2         Q.    Okay.  And did you also

 3    investigate diversion at the distributor and

 4    manufacturer level?

 5         A.    There was a -- the field --

 6    there was a routine program where they would

 7    inspect the non-practitioner and also some

 8    practitioner level to the new regulations.

 9              And again, keep in mind, these

10    were in the new implementing regulations.

11    There was a learning curve.  And so I was

12    working with the industry, the entire

13    distribution chain -- I should say, let's

14    make it easier, practitioner level and

15    non-practitioner level.

16         Q.    And define what you mean by

17    that.

18         A.    Non-practitioner level is

19    manufacturers and distributors, I think

20    researchers, too.  And the practitioner level

21    would be your pharmacies, hospitals,

22    researchers, categories like that.

23              So there would be an inspection

24    program -- there'd be a training program,

25    training sessions, and also inspection
```

 1    program working with the industry.

 2         Q.    And by "the industry," you mean

 3    both the practitioners and the

 4    non-practitioners?

 5         A.    Yes, sir.

 6         Q.    And so the training programs

 7    applied to manufacturers and distributors and

 8    to chain pharmacies as well?

 9         A.    Yes.

10         Q.    And the training program would

11    train them on the principles of diversion?

12         A.    The program was -- is we would

13    offer to an association or to individual

14    companies that we would come in and we would

15    work with them, or explain to them, what the

16    new regulatory requirements were, whether it

17    was security, whether it was on records,

18    whether it was on reporting.  And also, you

19    know, would we accept what was currently in

20    place because of a -- previous regulations or

21    did they have to follow the new requirements

22    for security, let's say.

23              And it was working.  It was

24    sort of -- I want to call it a compliance

25    program for the industry, for the

1    registrants, practitioners and

2    non-practitioners.

3         Q.    And what were the requirements

4    that you explained to the manufacturers,

5    distributors and chain pharmacies with regard

6    to diversion?

7         A.    The implementing regulations

8    that applied to that industry, just like we

9    would do for the non -- for the

10   practitioners --

11        Q.    And do you recall any of the

12   specific requirements?

13             MR. DAVISON:  Objection.

14             THE WITNESS:  Security,

15        records, you know, registration

16        issues.

17             If it was a manufacturer, can I

18        distribute what I manufacture or would

19        I need a distributor registration, or

20        if I buy something and I distribute

21        that, do I need a -- can I do that

22        under coincident activity or

23        manufacturer -- it was issues such as

24        that we were involved in.

25

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.     And what about reporting

 3    requirements?

 4         A.     Reporting requirements.

 5         Q.     What did you explain to

 6    manufacturers, distributors and chain

 7    pharmacies about reporting requirements?

 8         A.     I want to be careful I don't

 9    get into the Touhy situations.

10              MR. DAVISON:  Yeah, if it's

11         these general trainings, which it

12         seems you're talking about general,

13         it's fine to talk about the general

14         trainings, but not, you know, a

15         one-on-one investigation or anything

16         like that.

17              THE WITNESS:  Yeah.

18              What we would talk about is,

19         let's say -- let's -- we'll talk about

20         security as a broad category.

21              Depending on the schedule, do I

22         need a vault, can I use an enclosure.

23         If I have an enclosure, like bulk

24         manufacturing, the whole building

25         would be considered controlled.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    We'd get into maybe labeling
 2           issues.  We'd get into registration
 3           requirements, you know, do you know
 4           your customer's registered, things
 5           like that.  Loss in theft reporting,
 6           suspicious order monitoring, whether
 7           the regulation was 1301.74(b) about
 8           reporting suspicious orders.  You
 9           know, just things like that.
10   QUESTIONS BY MR. LOESER:
11           Q.    Elaborate on the last thing you
12   just said about reporting suspicious orders.
13           A.    What the regulation was, you
14   know, manufacturer -- or registrants have a
15   requirement to report suspicious orders if
16   they meet certain -- such as, and it talked
17   about frequency, pattern, quantity.
18           Q.    And you explained all of that
19   back in the '73 to 1982 time period?
20                 MR. DAVISON:  Objection.
21                 THE WITNESS:  '73 to '82, yes.
22                 MR. DAVISON:  And, Derek,
23           when -- sorry, I didn't mean to
24           interrupt.  Whenever is a good time
25           for a break, we've been going a little
```

1        over an hour.

2                MR. LOESER:  Okay.  Go through

3        a few more things.

4                MR. DAVISON:  That's fine.

5    QUESTIONS BY MR. LOESER:

6        Q.    Your CV notes that you

7    implemented programs during this '73 to '82

8    time period.

9                What programs did you

10   implement?

11               MR. DAVISON:  You can discuss

12       public programs that you have

13       implemented, but you can't discuss

14       nonpublic programs that you

15       implemented with the DEA.

16               THE WITNESS:  We implemented

17       programs directed at the practitioner

18       level.  That's a broad category.

19   QUESTIONS BY MR. LOESER:

20       Q.    Okay.  What about the

21   non-practitioner level?

22       A.    The main part of our focus at

23   that time, the main part, was against the

24   practitioner level.

25       Q.    Okay.  And you mentioned that

```
1    you formulated legislation.

2              What legislation did you

3    formulate?

4              MR. DAVISON:  And I'm just

5         going to, again, advise you if there's

6         any deliberative process that was done

7         regarding legislation or nonpublic

8         information, that's fine.

9              If it is legislation that is

10        public, you're fine to share that.

11             THE WITNESS:  Yeah.

12             He was working -- one of them

13        that I recall had to do with the

14        Narcotic Addict Treatment Act and the

15        regulations associated with that.  Had

16        to do with treatment programs.

17             NATA, National Association --

18        excuse me, addiction -- now you got me

19        confused.  National -- NAT --

20        national -- I'm confused now.  It's --

21        I'll have to -- I'll think about it.

22        I'll tell you later.

23             Narcotic Treatment Act.  That's

24        it.

25
```

```
 1      QUESTIONS BY MR. LOESER:

 2           Q.     And what about regulations?

 3      You note that you formulated regulations.

 4           A.     Implementing regulations on the

 5      NATA.  And also, I was brought down to

 6      Washington when I was still stationed in

 7      New York to work on a committee that

 8      implemented -- that was writing some of the

 9      regulations, along with a team.

10           Q.     Regulations for what?

11           A.     Implementing -- for the CSA.

12           Q.     For the Controlled Substances

13      Act?

14           A.     Yes.

15           Q.     And did you work on the

16      regulations pertaining to reporting?

17           A.     The committee --

18                  MR. DAVISON:  Objection.

19                  THE WITNESS:  -- worked on most

20           of the regulations associated.  The

21           committee was made up of legal, the

22           regulatory folks.

23      QUESTIONS BY MR. LOESER:

24           Q.     And were you on the committee?

25           A.     Yes.
```

1      Q.      And do you recall what the

2   regulations required at that time with regard

3   to reporting?

4      A.      Well, the regulations you see

5   is what we -- we wrote a lot of those.

6      Q.      Okay.  And did you advise

7   distributors and manufacturers and chain

8   pharmacies on the reporting requirements?

9      A.      I don't recall whether -- what

10  was involved in it, but I know -- I recall

11  being on that committee to write those

12  regulations.

13     Q.      And if you advised distributors

14  and manufacturers and chain pharmacies with

15  regard to the reporting regulations, would

16  you have done so accurately?

17             MR. DAVISON:  Objection.

18             THE WITNESS:  If we were

19         advising on regulations --

20  QUESTIONS BY MR. LOESER:

21     Q.      Yeah.  If you --

22     A.      Now, if we --

23     Q.      -- Mr. Buzzeo, advised

24  distributors and manufacturers and chain

25  pharmacies when you worked at the DEA with

1    regard to the reporting requirements, would

2    you have done so accurately?

3                    MR. DAVISON:   Objection.

4                    THE WITNESS:   The diversion

5         program, the Agency, if they're

6         advising the industry on the

7         regulations at that time, we would

8         advise them what the regulations said.

9    QUESTIONS BY MR. LOESER:

10        Q.     So yes?

11        A.     The answer is yes.

12        Q.     Your résumé notes that you were

13   focused during this time period on curtailing

14   diversion.

15               What diversion were you focused

16   on curtailing?

17        A.     As I recall -- could have been

18   others.  As I mentioned, those other two

19   cases in New York, I was focusing on the

20   practitioner-level diversion.

21        Q.     Your CV also notes for this

22   time period that you formulated audit and

23   investigative procedures.

24               Were those procedures for

25   investigating diversion?

```
 1            A.     The one I recall was for bulk

 2     manufacturers, and I led a team of a chemist,

 3     an accountant and myself, and we visited a

 4     bulk manufacturer to develop the

 5     accountability procedures for opium

 6     processes.

 7                   MR. LOESER:  We can take a

 8            break.

 9                   MR. DAVISON:  Take a break.

10                   VIDEOGRAPHER:  Off the record

11            at 10:28 a.m.

12             (Off the record at 10:28 a.m.)

13                   VIDEOGRAPHER:  We're back on

14            the record at 10:45 a.m.

15     QUESTIONS BY MR. LOESER:

16            Q.     Mr. Buzzeo, looking more at

17     your CV, the entry for 1982 through 1990,

18     your position was deputy director for the

19     DEA; is that correct?

20            A.     Yes.

21            Q.     And what were your

22     responsibilities as deputy director?

23            A.     Similar.  Worldwide program,

24     registration, scheduling and quotas, ARCOS,

25     all of those requirements.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And you mentioned ARCOS.

2           When did ARCOS come into being?

3     A.    19 -- well, it came into being

4     in the early '70s.  When I got there in '73,

5     the program was being worked on, and that --

6     I was put in charge of that.

7     Q.    And as deputy director, did you

8     oversee investigation of manufacturers?

9     A.    We oversaw investigations

10    conducted by the field.

11          Again, let's go back to the

12    chain of command.  The chain of command was

13    the program in the field reported to the

14    special agent in charge in each office.  So

15    we provided from headquarters policy

16    guidance.  That was mainly our function.

17          And also, if there was joint

18    investigations that covered many different

19    regions -- states, we would oversee that.

20    Q.    And would you oversee

21    investigations?

22          MR. DAVISON:  Objection.

23          THE WITNESS:  Not in a manner

24        that we would be involved in the

25        investigation, but more in the policy

```
 1              area or bringing together a number of
 2              officers to work on similar type --
 3              you know, cases, things like that.
 4      QUESTIONS BY MR. LOESER:
 5              Q.      And so did you oversee policy
 6      for the Controlled Substances Act as it
 7      applied to manufacturers?
 8              A.      The entire distribution chain,
 9      both non-practitioners and practitioners.
10              Q.      So that would include
11      manufacturers?
12              A.      That would include all the
13      registrants.
14              Q.      And it would include
15      distributors?
16              A.      Manufacturers, distributors,
17      chain pharmacies, independent pharmacies,
18      hospitals, physicians, stuff like that.
19              Q.      And at that time did you help
20      set policy for the reporting requirements?
21              A.      Yeah, I don't know if it was
22      policy, but direction to the field,
23      requirements to the field.  But they had
24      their own structure also.  Like I said, they
25      reported to a special agent in charge.
```

1       Q.      And what were your directions

2    to the field in the 1982 to '90 time period

3    with regard to reporting requirements?

4               MR. DAVISON:  And I'm going to

5          remind you of the Touhy obligations.

6          If there is public information that's

7          available, you can testify to that.

8          If it's nonpublic, the government has

9          not provided you Touhy authorization.

10              THE WITNESS:  Any

11         requirement -- any requirements that

12         we involve -- that was involved with

13         the field that we were telling would

14         be confidential.

15   QUESTIONS BY MR. LOESER:

16      Q.      Well, I'm asking you about your

17   guidance to the field, so that probably can't

18   be confidential, right?

19      A.      We provided a lot of -- some

20   guidance to the field on the regulatory

21   requirements.

22      Q.      Including the reporting

23   requirements?

24      A.      Including all the requirements

25   of the CSA and implementing regulations.

```
 1                    From a regulatory perspective,

 2      we had to have legal that would do any legal

 3      issues that we would discuss jointly from a

 4      legal perspective.  We were providing

 5      regulatory guidance, not legal.

 6           Q.     And were you careful to ensure

 7      that the guidance you provided was accurate?

 8                    MR. DAVISON:  Objection.

 9                    THE WITNESS:  We were providing

10           regulatory guidance.  We would have

11           discussions with legal, yes.

12      QUESTIONS BY MR. LOESER:

13           Q.     So, yes, you were careful to

14      ensure the guidance you provided was

15      accurate?

16           A.     Oh, yeah.  Oh, yeah,

17      definitely.

18                    And I should say this:  If it

19      was policy, they'd be for the registrant.

20           Q.     And what about suspicious order

21      monitoring programs, was that something for

22      which you provided policy guidance when you

23      were the deputy director of the DEA?

24           A.     We would provide guidance on

25      all segments, and that's part of the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    regulations.

 2         Q.    And do you recall what guidance

 3    you provided to the field in the 1982 to '90

 4    time period with the regard to the suspicious

 5    order monitoring programs?

 6              MR. DAVISON:  And I'm also

 7         going to remind you again of the Touhy

 8         obligations.  If it's public

 9         information, you can provide it.  If

10         it's nonpublic information or is

11         related to a nonpublic investigation,

12         you don't have Touhy authorization.

13              THE WITNESS:  The way I'll

14         respond to that is that we provided

15         guidance, coordination, on all aspects

16         of the CSA in implementing regulations

17         from a regulatory perspective.

18    QUESTIONS BY MR. LOESER:

19         Q.    And did you ensure that the

20    guidance that you provided with regard to

21    suspicious order monitoring programs was

22    accurate?

23         A.    All the information that was

24    provided by headquarters was well-coordinated

25    and would be accurate.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      So, sir, you left the DEA in
 2    1991; is that correct?
 3          A.      1990.
 4          Q.      1990.
 5                  And then did you -- it looks
 6    like you started Buzzeo in 1991?
 7          A.      I believe it was '91.
 8          Q.      Okay.  And why did you leave
 9    the DEA?
10          A.      I retired.
11          Q.      I'm sorry?
12          A.      Retired.
13          Q.      Why did you retire?
14          A.      I wanted to start my own
15    company.
16          Q.      And why did you want to start
17    your own company?
18          A.      Well, I saw a need.  One is to
19    work with the industry in meeting the
20    regulatory requirements, and the second one
21    is, is that to ensure that there was
22    sufficient amount of controlled substance,
23    which -- in the practitioner.  So there's
24    work with the industry and also the medical
25    need.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1          Q.      And I'm sorry, sir, you said
 2    you saw a need.
 3                  What was the need that you saw?
 4          A.      That -- you know, assisting the
 5    industry in meeting the regulatory
 6    requirements.
 7          Q.      And that need is different than
 8    the need for the patients to obtain pain
 9    medication?
10          A.      It's -- it was also ensuring --
11    or working with the industry, also
12    assisted -- indirectly assist the patients in
13    meeting -- in obtaining -- you know, the
14    drugs were available to meet their medical
15    needs.
16          Q.      And did you see those needs,
17    those two needs, as somewhat at odds?
18          A.      At odds?
19          Q.      Yeah, the guiding the industry
20    on compliance and ensuring access to opioids?
21          A.      Not legitimate access, no.
22          Q.      Okay.  And so what you state in
23    your CV is that the purpose of Buzzeo was to
24    "provide guidance regarding implementing
25    regulations of the CSA," correct?
```

```
 1            A.      Correct.

 2            Q.      And what do you mean by that?

 3            A.      The implementing regulations of

 4    the Controlled Substances Act and the impact

 5    they had on the -- both practitioner level

 6    and non-practitioner, the manufacturers, the

 7    distributors, researchers, analytical labs,

 8    hospitals, chain pharmacies, retail --

 9    independent pharmacies, the whole

10    distribution chain, importers, exporters.

11            Q.      And so you were providing

12    guidance to the entire distribution chain?

13            A.      Not everyone.  That would be a

14    couple million.  But we had, you know, a nice

15    client base.  I don't recall all of them.

16            Q.      But in terms of the types of

17    registrants, you were providing guidance to

18    manufacturers, correct?

19            A.      We probably touched everyone --

20    somebody from every part of that distribution

21    chain.

22            Q.      So that would include

23    manufacturers?

24            A.      Manufacturers, distributors.

25            Q.      Pharmacies?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Practitioners, independent

 2    pharmacies, chain pharmacies, researchers,

 3    analytical labs, universities, states,

 4    counties.  Counties, yeah.

 5               And some international issues,

 6    import/export issues that impact the United

 7    States or foreign countries.

 8        Q.      And when you say you provided

 9    to states and counties --

10        A.      It was counties, I should say.

11        Q.      And what guidance did you

12    provide to counties?

13        A.      We worked with one -- just

14    saying high level, one county, and I don't

15    recall, it was somewhere in the Southwest, I

16    think, where they brought us in to look at

17    how their county facilities were meeting the

18    regulatory requirements and handling

19    controlled substances.

20               And then we did some work

21    for -- where we inspected a number of jails

22    throughout the United States, how they

23    handled their controlled -- both as when they

24    brought somebody in that was going to be

25    imprisoned, put into prison, if they had any
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    drugs on them, how they handled that, and

 2    also the health care they provided, how they

 3    handled the controlled substances throughout

 4    that process.

 5              So those are -- those are --

 6    even though the company -- a company hired us

 7    who were supplying drugs to the jails, it's

 8    still helping out -- they were county jails

 9    and some state, and then the county that we

10    did out in the Southwest someplace.

11         Q.    Okay.  So the county you

12    referred to, you were actually hired by the

13    county?

14         A.    We were hired by the county in

15    that situation.

16         Q.    And the jail that you referred

17    to, you were not hired by the jail?

18         A.    We were hired by a company that

19    supplied certain outsourced services to the

20    institutions.

21         Q.    And what portion of your

22    consulting was for industry versus for public

23    entities?

24         A.    Oh, probably a larger

25    percentage was in the -- the indus -- the
```

1    non -- between practitioners and

2    non-practitioners.

3         Q.    And when you say the "larger

4    percentage," would you say over 90 percent?

5         A.    I don't want to give you -- it

6    was a high percentage, but there may have

7    been some other non -- nonindustry people

8    that were involved, and I just don't recall.

9    But it was a high percentage.

10        Q.    Okay.  So you recall one

11   county?

12        A.    One county.

13        Q.    Do you recall any other?

14        A.    I don't recall.

15        Q.    Okay.  And we're talking about

16   the time period 1991 through 2015.

17              So during that entire time

18   period you can recall one public entity for

19   which you provided consulting services?

20              MR. DAVISON:  Objection.

21              THE WITNESS:  That's all I can

22        recall.

23   QUESTIONS BY MR. LOESER:

24        Q.    Okay.  And so the rest of your

25   clients were from industry during that time

1    frame?

2         A.    Except the jails.  We did a lot

3    of due diligence work, but that would have

4    been with the industry.

5         Q.    And the jail you mentioned was

6    also for the industry, right?

7              MR. DAVISON:  Objection.

8              THE WITNESS:  That was a

9         company that supplies services.  Now,

10        did they supply anything else beside

11        the drugs, I don't recall.

12   QUESTIONS BY MR. LOESER:

13        Q.    And, sir, without naming any

14   specific companies, during this time frame,

15   1991 to 2015, did you provide CSA guidance to

16   any companies that were investigated by the

17   DEA when you worked there?

18             MR. DAVISON:  Objection.

19             THE WITNESS:  I don't recall.

20   QUESTIONS BY MR. LOESER:

21        Q.    So you may have --

22        A.    But, again, keep in mind that

23   our function was to -- more proactive, was to

24   help companies meet the regulatory

25   requirements.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So, sir, you don't recall

2  whether you did or did not provide guidance

3  with BuzzeoPDMA to any company that was

4  investigated by the DEA when you worked

5  there?

6              MR. DAVISON:  Objection.

7              THE WITNESS:  I don't recall.

8  QUESTIONS BY MR. LOESER:

9    Q.    Now, your résumé indicates that

10  for BuzzeoPDMA you provided guidance.

11              Can you explain to me what you

12  mean by guidance?

13    A.    There's the CSA, Controlled

14  Substances Act, and there's the implementing

15  regulations.  So we would -- we would sit

16  down -- we would provide guidance on the

17  regulatory requirements and also industry

18  standards.  And also any correspondence that

19  came out from DEA, we would discuss that with

20  them.

21              Now, we know the guidance on

22  SOM, suspicious order monitoring, has been

23  very -- there's been very little guidance on

24  that.

25    Q.    And did you do anything else to

1    provide guidance to your clients when you

2    were with BuzzeoPDMA?

3            A.      Oh, yeah.   We did a lot of

4    outsource services.

5            Q.      What does that mean?

6            A.      Well, under the Prescription

7    Drug Marketing Act, there's a requirement

8    that inventories of sales reps be conducted,

9    so we would conduct the inventories of the

10   samples.  We did reconciliation.  They're

11   required to reconcile the samples on a

12   monthly basis, at least once a year.

13           We would provide those services

14   either on site or in our office, which some

15   of the companies in the controlled substances

16   area, if they had a need to, they would hire

17   somebody.  Somebody left, we would provide

18   somebody that had certain expertise to handle

19   that program.  Some of those assignments may

20   have lasted a week; some would last two

21   years.

22           So we did a lot of outsource

23   services as a company also, besides the

24   regulatory inspections that we did.

25           Q.      Did you --

```
 1            A.      And -- excuse me.  And also

 2    registration.  With some companies we

 3    actually handled the state registration

 4    requirements.  Companies, in most states, are

 5    required to get a license, out-of-state

 6    license.  Companies would outsource that

 7    function to us.

 8            Q.      And did you operate the

 9    suspicious order monitoring programs for any

10    companies?

11                MR. DAVISON:  Objection.

12                THE WITNESS:  No.  Not that I

13        recall.

14    QUESTIONS BY MR. LOESER:

15            Q.      So if you had operated any

16    suspicious order monitoring programs for

17    companies, would BuzzeoPDMA have some record

18    of that?

19                MR. DAVISON:  Objection.

20                THE WITNESS:  Yeah, but I don't

21        recall any that we did.

22    QUESTIONS BY MR. LOESER:

23            Q.      Okay.

24            A.      Again, I don't know if they --

25    but I don't recall in my time there any
```

1    programs in that area.  Because that's

2    more of an, you know, immediate reporting

3    requirement if you -- once you determine it's

4    suspicious.

5              No, I don't think we ever did

6    that.

7         Q.    And did you operate any

8    diversion control programs for any of your

9    clients?

10        A.    We would inspect, but, no,

11   operation, no.  No.

12        Q.    Did you help your clients

13   respond to DEA investigations?

14             MR. DAVISON:  Objection.

15             THE WITNESS:  Respond, no, but

16        where we would be involved is if a

17        registrant had a regulatory issue and

18        we were retained, we would not contest

19        the findings, but we may look at it --

20        the future compliance where we would

21        do a report to say, this is what you

22        should be doing.

23             And some of those reports, I

24        understand, were shared with the

25        US Attorney or with state attorneys or

 1          with DEA.

 2     QUESTIONS BY MR. LOESER:

 3          Q.      And why would you not contest

 4     the findings?

 5               MR. DAVISON:  Objection.

 6               THE WITNESS:  Because our

 7          function was to look to the future and

 8          make sure a company stays out of

 9          problems, if they had a problem.

10     QUESTIONS BY MR. LOESER:

11          Q.      Did anyone ever try to hire you

12     to contest the DEA's findings?

13          A.      We would never do that.

14          Q.      Why not?  Why not?

15          A.      We just wouldn't do it.  We

16     decided that we weren't going to do that.

17               Our function was to either

18     ensure compliance or help them meet

19     compliance, or if they got in trouble, to put

20     together a regulatory program so they

21     wouldn't get in future trouble.

22               Now, we're talking about the

23     legitimate industry.  If you were a diverter,

24     we wouldn't even touch you, even under those

25     circumstances.

1        Q.      Did the DEA ever come to you to

2    ask you to help investigate compliance by a

3    DEA registrant?

4        A.      No.

5        Q.      In 2015, according to your CV,

6    your position with Buzzeo changed from chief

7    regulatory officer to senior consultant; is

8    that right?

9        A.      It changed -- repeat your

10   question.

11       Q.      Yeah.

12               If you look at the first page

13   of your CV --

14       A.      Yes.

15       Q.      -- in 2015 there's -- it

16   states, "2015 to August 2016, BuzzeoPDMA,

17   Inc., founder and senior consultant."

18               Do you see that?

19       A.      What happened was, is when we

20   were acquired in 2005, I think it was, my

21   title changed, and I remained in that title.

22               So when I look at this, just to

23   be on the safe -- independent consultant now,

24   2015 to 2016, I was more or less the chief

25   compliance officer for the company.  I

1    assumed the different positions from 2005 on.

2         Q.    Okay.  I want to make sure I

3    understand.

4              From '91 through 2015, you were

5    the chief regulatory officer, correct?

6         A.    '91 to 2005, I was -- yeah,

7    chief regulatory officer.  I founded the

8    company.  I had -- I had a dual role because

9    once 2005 came together, then I switched

10   title.  I wasn't the president of the company

11   any longer.

12        Q.    Okay.  So you were the

13   president up until 2005, but you were the

14   chief regulatory officer for the entire time

15   period '91 through 2015?

16        A.    For that business unit, yes.

17        Q.    Okay.  And what was your job as

18   the chief regulatory officer?

19        A.    Just to ensure that the

20   regulatory requirements that were discussed

21   by the company was accurate; to oversee some

22   of the reviews that were done, if they were

23   very detailed or -- you know, to do that.

24   From a business perspective, maybe sales

25   calls.

```
 1                    Or when I -- I don't mean sales

 2      calls.  From a business perspective, if the

 3      company wanted to develop a new business

 4      plan, they wanted to enter a certain market,

 5      they wanted to ensure that they met the

 6      regulatory requirements, I would sit down

 7      with them.  And from that perspective -- not

 8      from a legal perspective, from a regulatory

 9      perspective, these are the things they have

10      to do, meet with their attorneys, from the

11      business attorneys or the -- this regulatory

12      area.  So from that perspective, that's what

13      I meant by that.

14           Q.    So when you say "chief

15      regulatory officer," the regulatory you're

16      referring to is the Controlled Substances

17      Act?

18           A.    And the PDMA.

19           Q.    And the implementing

20      regulations for the Controlled Substances

21      Act?

22           A.    And the Prescription Drug

23      Marketing, yes.

24           Q.    And for BuzzeoPDMA, you were

25      the person in charge of making sure the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    guidance provided to clients on the CSA and

2    its implementing regulations was accurate?

3         A.     From -- for that period of

4    time, from when I sold the company in '05 to

5    I retired, I had a regulatory -- yes, a

6    regulatory function or an expertise function,

7    a training program function with the staff.

8         Q.     Right.

9              So you would agree with me then

10   that during time period you were the person

11   in charge of making sure that the regulatory

12   guidance you gave to BuzzeoPDMA clients

13   regarding the CSA and its implementing

14   regulations was accurate?

15             MR. DAVISON:  Objection.

16             THE WITNESS:  Yeah, but keep in

17        mind it was a point in time that I

18        stopped going out in the field in some

19        situations, so I would provide -- make

20        sure the guidance being provided by

21        the staff was accurate, especially if

22        there was any written reports.

23   QUESTIONS BY MR. LOESER:

24        Q.     Right.

25             You're saying that at one time
```

Highly Confidential - Subject to Further Confidentiality Review

1    you provided the guidance, and you made sure

2    that was accurate, right?

3         A.      Pending with state.

4         Q.      Right?

5                 And then later your staff

6    provided the guidance, but you made sure that

7    was accurate, right?

8         A.      Correct.

9         Q.      Okay.  And currently -- sorry,

10   not currently.

11                In -- from 2015 through

12   August 2016, your position became senior

13   consultant, correct?

14        A.      Yes.

15        Q.      And how did your position

16   change between -- as senior consultant?

17        A.      From -- August 2016, I retired.

18        Q.      Right.

19                But from 2015 through

20   August 2016, you were the senior consultant,

21   right?

22        A.      Oh, yes.  Yes.  Yes.

23                It was -- I went from -- then I

24   went -- from chief compliance officer I went

25   part-time, and I was just a senior

Highly Confidential - Subject to Further Confidentiality Review

1    consultant.  Again, the position really

2    didn't change, but since I went half-time, we

3    all felt that it would be better if I just

4    became a senior consultant.

5         Q.    Okay.  So your function was

6    basically the same; you were just doing it

7    less?

8         A.    Somewhat, but only part-time.

9    I couldn't be involved in everything.

10             And they had -- there was

11   major -- like I said, more of in the business

12   area from -- if a company wanted to set up a

13   business plan or go in a different direction,

14   or acquisitions, things like that I was

15   mainly focused on.

16        Q.    And just because you were part

17   time, you didn't stop caring if the guidance

18   that BuzzeoPDMA provided was accurate, did

19   you?

20             MR. DAVISON:  Objection.

21             THE WITNESS:  Well -- I'm

22        sorry.

23             MR. DAVISON:  Go ahead.

24             THE WITNESS:  It was different

25        because now I was more of a part-time

1          employee, so any guidance would be

2          provided by the company.

3     QUESTIONS BY MR. LOESER:

4          Q.     Okay.  And in terms of where

5     you were involved, you made sure the guidance

6     was accurate, right?

7          A.     It was -- like I said, it was

8     from a business planning, acquisitions,

9     things like that.

10         Q.     Fine.

11                But --

12         A.     It was a little different.

13         Q.     -- to the extent you were

14    involved, you made sure your guidance was

15    accurate, right?

16                MR. DAVISON:  Objection.

17                THE WITNESS:  Yes.

18    QUESTIONS BY MR. LOESER:

19         Q.     And from August 2016 to the

20    present, you've been an independent

21    consultant?

22         A.     Yes.

23         Q.     And you left BuzzeoPDMA, Inc.,

24    why?

25         A.     Well, I've been in this

1    business over 50 years.  The wife and I

2    wanted to spend more time together and

3    travel.  You reach a certain age, it's time

4    to fade off, ride off into the dust or the

5    evening.

6              And I didn't want to be full

7    time or part time.  I wanted to have more

8    time to myself, but I wanted to keep my hand

9    in it.  So there was a number of law firms I

10   consult with on regulatory requirements, not

11   legal requirements but regulatory

12   requirements.  I don't even think I billed

13   for them.

14        Q.    So basically what you're saying

15   is you retired from the company, but you

16   still do some consulting?

17        A.    Yeah.

18        Q.    And you mentioned law firms you

19   consult with.

20              What law firms do you consult

21   with?

22              MR. DAVISON:  To the extent

23        it's privileged that you're working

24        on -- confidential that you're working

25        on specific things, I'll instruct you

Highly Confidential - Subject to Further Confidentiality Review

1           not to answer.

2                   THE WITNESS:  Yeah, I think

3           I -- I'd like to say -- I'm going to

4           agree with my attorney.  I'm not going

5           to mention it.

6               I wouldn't mention them unless

7           I got their approval, so I'm not going

8           to mention them.

9   QUESTIONS BY MR. LOESER:

10          Q.     And the type of consulting you

11  do for law firms, is that with regard to the

12  regulatory requirements for DEA registrants?

13          A.     Yes.  Mainly in the

14  registration area.

15          Q.     Okay.  And tell me about the

16  consulting that you do now.

17              Who do you consult for now?

18          A.     Some law firms.

19          Q.     And any --

20          A.     It's very casual.

21          Q.     Any companies directly?

22          A.     No.

23          Q.     I want to make sure I

24  understand the corporate history of Buzzeo.

25          A.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     It started as Buzzeo

2    Associates; is that correct?

3      A.     As I recall, Buzzeo Associates.

4      Q.     And that was in 1991?

5      A.     That would have been in --

6    yeah, '91.

7      Q.     And then you started the

8    company called PDMA, Inc.?

9      A.     Yes.

10     Q.     And those companies merged in

11   the early '90s?

12     A.     Yes, because we finally -- we

13   looked at it and said, well, gee, why would

14   we be two companies.

15            Hired a PR firm to come up with

16   a new name, and after spending a lot of

17   money, they came up with BuzzeoPDMA.

18     Q.     And what did PDMA, Inc., do?

19     A.     Excuse me?

20     Q.     What did PDMA, Inc., do?

21     A.     In to?

22     Q.     What did it do?

23     A.     Oh, Prescription Drug Marketing

24   Act of samples, physician samples.  And we

25   worked with the companies that would sample

1    the products.  And most of that was

2    noncontrolled substances.

3         Q.    And did you evaluate companies'

4    samples for controlled substances?

5         A.    Very few companies would sample

6    controlled substances.

7         Q.    Why is that?

8         A.    Because of the additional

9    regulatory requirements, the DEA

10   requirements.  It was almost like you had to

11   maintain two recordkeeping systems.

12             No companies that I'm aware of

13   would sample a Schedule II because now not

14   only do they have the PDMA requirements for

15   records but you've got the 222 form.  So

16   there was a hand -- I don't recall the

17   companies, maybe three or four companies,

18   that would sample even a Schedule III or IV

19   substance.  Very few.

20        Q.    And did you advise controlled

21   substances manufacturers that it was not a

22   good idea to provide free samples?

23             MR. DAVISON:  Objection.

24             THE WITNESS:  No, because

25        mainly -- no.  If somebody -- like I

Highly Confidential - Subject to Further Confidentiality Review

1           said, there were very few companies

2           that would even consider it.  They

3           just didn't want to be -- it was the

4           recordkeeping system, which would have

5           been a double burden.

6                   And a lot of the controlled

7           substances, as I recall, are generic.

8           And, you know, you get into a

9           pharmacy, you never know which

10          manufacturer you're getting if it's a

11          generic.  And they can dispense any

12          generic product they want, that they

13          have in stock.

14                  So companies really didn't

15          sample controlled substances.

16      QUESTIONS BY MR. LOESER:

17          Q.      So BuzzeoPDMA was purchased by

18      Dendrite International, Inc., in 2005; is

19      that correct?

20          A.      First acquisition was Dendrite,

21      which is a French -- no, Dendrite.  Domestic

22      company.

23          Q.      And do you recall what Dendrite

24      paid for BuzzeoPDMA?

25          A.      Maybe roughly somewheres -- I'm

```
 1    going to give you a range.  About 12 to 15

 2    million.

 3           Q.     And what portion of that was

 4    paid to you directly?

 5           A.      Roughly maybe 6.

 6           Q.     6 million?

 7                  And did you receive any other

 8    compensation as a result of that sale from

 9    Dendrite, any stock or anything like that?

10           A.     No.  No.  We did give our three

11    managers a portion of that.

12                  And I'll never forget the

13    president of the company said, "Ron, why are

14    you making such a low salary?"

15                  And I said, "Well, we want to

16    pour money back into the company to build

17    it."

18           Q.     What was your salary?

19           A.     Back then?

20           Q.     Yeah.

21           A.     Hundred and something, maybe.

22           Q.     And then in --

23           A.     And when I finally retired,

24    before I went part time, it was maybe around

25    200.  And when I went part time, it was
```

1    probably about 80.

2        Q.    Okay.

3        A.    When I had the company, we

4    wanted to do as much as we could for our

5    staff, so we gave them health insurance, we

6    gave them retirement plans.  So that -- our

7    side story is I could have made a lot more

8    money when I sold the company if I didn't

9    consider my employees.  And we didn't want to

10   do that.  Either they take everybody or they

11   take nobody.

12       Q.    How many employees were there

13   in 2005?

14       A.    Rough guess, 80 to 90.

15       Q.    And other than the other

16   managers that you mentioned, did any of the

17   sale proceeds go to those employees?

18       A.    Excuse me?

19       Q.    Other than the managers that

20   you mentioned, did any of the sale proceeds

21   go to those employees?

22       A.    It went to my son.

23       Q.    And what was your son's role?

24       A.    He was the president, I think,

25   at the time.  He was the president or senior

Highly Confidential - Subject to Further Confidentiality Review

```
 1    vice president.

 2         Q.    And so what amount was -- from

 3    the sale proceeds was paid to your son?

 4         A.    He would have gotten the same I

 5    received, give or take.

 6         Q.    Around 6 million?

 7         A.    Around 6 million.  I could be

 8    off.

 9         Q.    And how long did your son work

10    for the company?

11         A.    Well, I have to tell people, I

12    built a business, he built a company.  He was

13    very business-oriented.

14              God, I don't recall when he

15    came in.  It was before we sold the company.

16    Probably -- I don't want to guess, but it was

17    before we sold the company.  He was there --

18    he was there a period of time.

19         Q.    He wasn't there at the

20    beginning?

21         A.    No.  God, no.

22         Q.    And do you recall if he started

23    maybe after 2000?

24         A.    Well, I started the company in

25    '90 -- 2000, I don't recall.  It could have
```

1    been late '90s, early 2000.

2          Q.    And did the work at BuzzeoPDMA

3    change at all as a result of the Dendrite

4    acquisition?

5          A.    No, basically the business --

6    they maintained a separate business unit, and

7    it really didn't change.

8          Q.    And did your responsibilities

9    change at all?

10         A.    Well, yeah.  My son became the

11   head of the company.  They asked us who wants

12   to be president, and I said, "My son's got a

13   better business mind than I do."  Let -- I'll

14   be chief regulatory officer for the -- for

15   that business unit, not for the whole

16   company.

17         Q.    Right.

18               And then in 2007, Dendrite was

19   acquired by Cegedim; is that right?

20         A.    Yes, a French company.

21         Q.    Any idea how that sale came

22   about?

23               MR. DAVISON:  Objection.

24               THE WITNESS:  No.  No.  I

25         wouldn't be involved in that.

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.     And did you receive any

 3    additional compensation as a result of that

 4    sale?

 5         A.     No, I think the salary was

 6    about the same.

 7         Q.     And did you receive any stock

 8    or any other compensation?

 9         A.     No.

10         Q.     And did the work that

11    BuzzeoPDMA performed change as a result of

12    the Cegedim acquisition?

13         A.     We were doing international

14    work.  Maybe we picked up additional

15    international because of its -- you know, the

16    holdings the company had.

17         Q.     And then in 2015, Cegedim was

18    acquired by IMS Health; is that correct?

19         A.     I think it was IMS, yeah, IMS

20    Health.

21         Q.     And --

22         A.     What year was that?

23         Q.     2015?

24         A.     I don't recall the exact date,

25    but, yeah, IMS Health, I believe, was the
```

```
1      next acquisition.

2            Q.      And do you have any idea how

3      that sale came about?

4                    MR. DAVISON:  Objection.

5                    THE WITNESS:  No.

6      QUESTIONS BY MR. LOESER:

7            Q.      Were you familiar with IMS?

8            A.      I know they were a data company

9      that provided prescription data, things like

10     that, but I think they provided a lot of

11     data.

12           Q.      And did you utilize IMS data at

13     all in your work with BuzzeoPDMA?

14           A.      I don't believe so.

15           Q.      And did you receive any

16     compensation as a result of that sale to IMS

17     Health?

18           A.      No.

19           Q.      No stock or anything?

20           A.      No.

21           Q.      And the work of BuzzeoPDMA, did

22     it more or less stay the same following that

23     acquisition?

24           A.      I don't recall.

25           Q.      Can you estimate for me the
```

Highly Confidential - Subject to Further Confidentiality Review

1    total amount you have earned as an industry

2    consultant for manufacturers, distributors

3    and chain pharmacies from 1991 to the

4    present?

5              MR. DAVISON:  Objection.

6              THE WITNESS:  It would be what

7         I sold the company for, plus the

8         little salary I was getting.  No, I

9         couldn't estimate.

10   QUESTIONS BY MR. LOESER:

11        Q.    Okay.  Fair to say that the

12   total amount you earned is probably something

13   north of $10 million?

14             MR. DAVISON:  Objection.

15             THE WITNESS:  I don't recall.

16        I mean, I'd have to add what I sold it

17        for and go back each year and add what

18        I made as salary.

19   QUESTIONS BY MR. LOESER:

20        Q.    And the range of salary from

21   when you started until when you ended was

22   what?

23        A.    Well, when I first started the

24   company, I was making nothing.  I took all my

25   money out of retirement when I started,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    worked at my dining room table, so I was

 2    probably making hardly anything.

 3         Q.    That was year one?

 4         A.    Yeah, year one.

 5         Q.    Okay.

 6         A.    And then I took a large salary,

 7    so maybe close to six figures, maybe, at the

 8    beginning.

 9              And like I said, the most I

10    probably ever made was maybe somewheres

11    between 150 to 200,000.  Because when I

12    retired I -- give or take.  I don't -- you

13    know, I'm just giving you estimates.

14    Probably 2,000 with bonus -- 200,000 with

15    bonuses just before I retired.

16              And then I went down to about

17    80,000 for a year or two and then...

18         Q.    And what were your -- what were

19    you making the last year you worked for the

20    DEA?

21         A.    Probably 80,000.

22              So it wasn't much more.

23         Q.    On your CV under additional

24    relevant experience --

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      -- one of the items listed --

2    the third bullet point is "served as a member

3    of the National Advisory Committee to the

4    Robert Wood Johnson Foundation for Pain

5    Management and state regulatory policy"?

6      A.      Yes.

7      Q.      Do you know when you served in

8    that capacity?

9      A.      No, I don't recall the dates.

10      Q.      Do you recall what you did as a

11    member of that committee?

12      A.      Yeah.  Some recollection, but I

13    know it had to do with ensuring that the

14    regulatory requirements or policy didn't

15    impact with legitimate -- patient's

16    legitimate use, or legitimate use of opioids

17    and controlled substances for patient medical

18    needs.

19              And I, again, was put on that

20    committee, or asked to serve on that

21    committee, for the regulatory expertise that

22    I had.

23      Q.      And do you recall if there were

24    members of industry that also participated on

25    that committee?

```
 1         A.      I don't recall who was on the

 2    committee.  I don't -- let's put it -- I

 3    don't remember anybody, any industry people,

 4    on the committee.  But I don't recall.  I

 5    don't recall who was on the committee.

 6         Q.      Do you recall anything specific

 7    about the work that you did on that

 8    committee?

 9         A.      Making sure that the people

10    were getting sufficient controlled

11    substances, because there was a period of

12    time there where pain was undertreated.

13              Again, I'm not an expert in

14    that area.  Just based upon what people have

15    said that were on this committee and other

16    presentations I've given that experts were

17    there.  And, no.  So they just -- it had to

18    do with -- my part was the regulatory

19    requirements, appropriate registrations,

20    physician training.  Also, I think there was

21    some things there about the appropriate

22    prescribing, appropriate prescribing process.

23         Q.      You mentioned a couple of times

24    that pain was undertreated.

25              What's the basis for your
```

1    statements that you thought pain was

2    undertreated?

3           A.      Speakers that were on the

4    panels that I was on.

5           Q.      Okay.  And do you recall who

6    those speakers were?

7           A.      Oh, God, there were some from

8    some of the cancer institution.  No, I don't

9    recall.

10          Q.      Do you recall if any of those

11   speakers were funded by the pharmaceutical

12   industry?

13               MR. DAVISON:  Objection.

14               THE WITNESS:  And to me, the

15          groups I was on was not funded by the

16          industry.  Any money that was given, I

17          think -- I worked -- they worked it

18          out with the state.  The state paid

19          everything.  The state did everything.

20   QUESTIONS BY MR. LOESER:

21          Q.      So is it your understanding

22   that the National Advisory Committee to the

23   Robert Wood Johnson Foundation for Pain

24   Management was not funded by industry?

25          A.      I don't recall who funded that.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Okay.   Your CV also indicates

2     "extensive public speaking events for law

3     enforcement agencies, major pharmaceutical

4     companies, professional associations and

5     civics groups."

6             Can you tell me what major

7     pharmaceutical companies you spoke -- whose

8     events you spoke at?

9        A.     I don't recall, but there was

10     law enforcement associations, there was

11     industry associations.  Companies would hire

12     us to come in and give training programs to

13     their staff, the refresher presentations,

14     mainly the refresher, new hires on regulatory

15     requirements.  Some of the sessions would

16     last an hour, some would last eight hours.

17     Associations, as I mentioned earlier, again,

18     the regulatory requirements, any changes in

19     policy that we were aware of, things like

20     that.

21             But I don't recall the

22     companies, and unless I had it in here, I

23     don't even recall the associations.  But I'm

24     sure it was mostly health industry

25     associations.

1    Q.      Okay.  And so these major

2    pharmaceutical companies, would those have

3    been opioid manufacturers?

4    A.      Controlled substance

5    manufacturers.  I don't remember whether --

6    maybe it was just -- but it would be

7    controlled substance manufacturers.  There

8    was -- it was some of those.

9            It was -- it touched -- what we

10   did touched the distributor chain.  I

11   remember CE programs, pharmacy groups.

12   Q.      Can you identify any specific

13   major pharmaceutical companies that put on

14   events where you spoke?

15   A.      Like I said, I don't recall the

16   company.  I know somebody -- it would have

17   been regulatory issues or PDMA issues.  I

18   remember speaking to sales reps on the PDMA

19   issues.

20           So it's more the content

21   because I'm always involved in it, but not

22   really the company.  I just don't recall.

23   Q.      So you can't recall a single --

24   A.      In 53 years there's a lot of

25   companies I was involved with, a lot of

1    registrants, both at the practitioner and

2    non-practitioner, chains, independents,

3    manufacturers, distributors, universities.

4    Did a lot of work with universities.  I just

5    don't recall.

6          Q.    So where your résumé notes

7    "major pharmaceutical companies," you can't

8    recall a single major pharmaceutical company

9    who put on an event at which you spoke?

10               MR. DAVISON:  Objection.

11               THE WITNESS:  I know there were

12         some, but I don't recall the names.

13   QUESTIONS BY MR. LOESER:

14         Q.    Okay.  Do you recall whether

15   you were paid to speak by any of these

16   pharmaceutical companies?

17         A.    Some I would be paid; some I

18   would not be paid.

19         Q.    And what would you be paid?

20         A.    Some of the training we did as

21   a company, maybe 2,000, 3,000, plus expenses.

22   And not necessarily myself, a member --

23   you're talking about the company.  It's other

24   members of the company.

25         Q.    And so over these 50-plus

Highly Confidential - Subject to Further Confidentiality Review

1    years, how many times were you paid 2 to

2    $3,000 to speak on behalf of a pharmaceutical

3    company?

4         A.    Most of my speaking was to

5    associations.  Most of the speaking to

6    companies would have been handled by my

7    staff.

8         Q.    Okay.  And what associations

9    were you involved with?

10        A.    NACDS, FMI, some of the

11   wholesalers -- it was in the wholesale

12   association that -- DWI or something, now

13   it's HDMA.  That's mainly the American

14   Society of Consultant Pharmacists.

15             So mostly associations.  So

16   safely I could give those names because it

17   was mostly associations.

18        Q.    And so over your 50-plus years

19   in the industry, how much would you say you

20   were paid to speak at these events that you

21   mention your CV?

22        A.    Well, my 50-years-plus included

23   three years as a pharmacist, three years with

24   the State of New York --

25        Q.    Okay.  Let's start with when

1    you were a consultant.

2         A.    How much I was paid?

3         Q.    Yeah.

4         A.    Minimum.  Not much.  It was the

5    company pay.  We didn't make much money on

6    training.  It was a service.

7         Q.    So 2 to $3,000 per event.

8               And can you estimate the number

9    of events?

10        A.    I can't.

11        Q.    No idea at all?

12        A.    I don't recall.

13        Q.    Could have been a thousand?

14        A.    Thousands?

15              MR. DAVISON:  Objection.

16   QUESTIONS BY MR. LOESER:

17        Q.    Yeah.

18        A.    I don't recall.  We made some

19   money on it, but it wasn't much at all.  It

20   was more of a service program we gave.

21              When I became president of the

22   company, a lot of the decisions were -- I

23   wouldn't even get involved in.

24        Q.    Your additional relevant

25   experience also notes that you "coauthored

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the controlled substances regulatory guide

 2    and compliance manual and CSA compliance and

 3    counseling kit."

 4               Do you see that?

 5         A.    Yes.

 6         Q.    When did you do that?

 7         A.    That would have been in the

 8    early days, probably -- I don't recall the

 9    exact date, but let's say probably in the

10    late -- maybe around 2000, that period of

11    time.  I don't recall.

12         Q.    And were you paid to do that?

13         A.    No.  But one was the CE

14    program, I believe.  And so the CE program,

15    we did it through a university.  I think for

16    that was -- they would get like $25 and we'd

17    get a piece of that.  So paid directly, it

18    was all through the university.

19         Q.    What university?

20         A.    Something -- someplace in

21    Georgia.  I don't recall.

22         Q.    Do you have any copies of

23    that --

24         A.    I don't.

25         Q.    Do you know where we could find
```

Highly Confidential - Subject to Further Confidentiality Review

1    a copy?

2         A.    Good luck, because I've been

3    looking through boxes that we had from

4    moving, and I can't find anything.  No, I

5    don't have any copies.

6              And one of them was on a disk,

7    I do remember that.  It was the size of a

8    business card.

9              And then one of the earlier

10   ones was a paper document.

11        Q.    So with regard to the events

12   where you spoke, did you have any idea at the

13   time who was funding those events?

14        A.    The association?  They probably

15   got it from dues or something.  I don't know.

16        Q.    Or any of the events.  For

17   example, where you spoke for major

18   pharmaceutical companies, were there

19   conferences that they put on?

20        A.    Oh, we had conferences we put

21   on.

22        Q.    And did industry put on

23   conferences as well?

24        A.    The associations, some of the

25   ones I mentioned, yes.

1          In our conferences, we paid for

2    it.

3          Q.    The last bullet on your

4    additional relevant experience states,

5    "Developed course entitled 'Preparing for the

6    DEA Pharmacy Audit for the Accreditation

7    Council for Pharmacy Education' in 2016."

8                Tell me about that.

9          A.    We would -- one of the things

10   that we would train on was how to handle a

11   DEA audit, DEA pharmacy audit or a DEA --

12   anything in the distribution chain.  You

13   know, it's like the DEA arrives, welcome

14   them, give them a pass if they need one, if

15   they need a pass, identify the person who has

16   been trained in that area of expertise to

17   handle that.

18                Same way when FDA goes in, the

19   staff that handles that.  You know, how do

20   you handle DEA's questions.  How do you -- if

21   they ask for certain records, make sure you

22   understand when they say "a distribution

23   record," what is a distribution record.  If

24   they ask for a receiving record, what's a

25   receiving record.

```
 1                    After the review each night,

 2     prepare a written memo report, things like

 3     that.

 4                    And never lie.

 5          Q.       And are there written materials

 6     for this 2016 course?

 7          A.       I wouldn't have anything.  I

 8     don't recall anything.

 9          Q.       You don't know --

10          A.       You're talking about the last

11     bullet, right?

12          Q.       Yeah.

13          A.       Yeah.

14          Q.       So for this 2016 course, you

15     don't recall if there are any written

16     materials?

17          A.       I don't recall.

18          Q.       And --

19          A.       I don't have a copy.

20          Q.       So the last thing on your CV is

21     a list of publications?

22          A.       Yes.

23          Q.       And we went through, you found

24     some more, they've been added, and that's in

25     your updated CV.  We don't need to go over
```

```
 1    that more.

 2              All right.  Let's look at

 3    Exhibit B to your report.

 4              And if you turn to the first

 5    page after the slip sheet that says

 6    Exhibit B, there's a document that starts --

 7    that says, "Materials Considered."

 8              Do you recognize this document?

 9       A.    Well, these are documents that

10    I've touched in some way.

11       Q.    Okay.  Can you page through the

12    whole materials considered list and just --

13    I'll ask you some specific questions, but

14    just flipping through the list, have you ever

15    seen this materials considered list before?

16       A.    Oh, yeah.

17       Q.    And did you create this list of

18    materials considered?

19       A.    I gave the list to Ropes & Gray

20    to put into this format.

21       Q.    Okay.  So all of the items on

22    this list were things you told Ropes & Gray

23    to put on the list?

24       A.    Yes.

25       Q.    Okay.  And what do you mean by
```

1    "considered"?

2         A.    I reviewed it in detail or I

3    went through it and just picked out what I

4    thought was important or something.  That's

5    what I mean by it, that I touched every one

6    of these.

7              And I don't mean physically,

8    physically touched, but reviewed it.

9         Q.    And did you consider any

10   materials that are not listed in this

11   materials considered list for purposes of

12   preparing your report?

13        A.    No.

14        Q.    And you say you touched all the

15   items.  You've read all of the items that

16   are on this list?

17        A.    I've read -- I've read either

18   in detail or I read it and said, no, I really

19   don't need this particular document.

20        Q.    And are there any items on this

21   list that you have not read at all?

22        A.    No.  And I utilized -- these

23   are the documents I utilized in preparing my

24   report.

25        Q.    So Mallinckrodt has produced I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    think over 9 million pages of documents in

 2    this case.

 3               How did you select these

 4    particular documents that have this

 5    Mallinckrodt Bates stamp from those 9 million

 6    pages?

 7         A.     Good question.

 8               There was things that I would

 9    ask for.  Once I found out what the purpose

10    of me being retained was, to look at their

11    compliance program associated with suspicious

12    order monitoring, there are certain documents

13    that I requested.  And the other documents is

14    what counsel provided me for my project.

15         Q.     So looking at this list of

16    Mallinckrodt Bates numbers, which are the

17    ones you requested?

18               Going back to the very first

19    page of your materials considered.

20         A.     Yeah.

21         Q.     I'll ask you about the other

22    sections, but if you go back to the first

23    page --

24         A.     Well, on those -- those -- the

25    first page, those were provided by counsel,
```

Highly Confidential - Subject to Further Confidentiality Review

1    that they felt that I needed these in order

2    to complete the assignment that I had.

3        Q.    Okay.  So all of the documents

4    that bear a Bates stamp MNK-T1 and then a

5    number, those are items that counsel provided

6    to you?

7        A.    Yeah.  But it's also probably

8    based upon -- you know, you've asked me to

9    look at Mallinckrodt's SOM program.  I want

10   to see everything associated with that so I

11   can make an independent decision on that

12   program.  And these are some -- these would

13   be the documents that they would provide me.

14       Q.    Okay.  So you asked for

15   everything --

16       A.    That was a very broad question

17   of things I wanted to see that applied to the

18   program.

19       Q.    Okay.  So you asked for

20   everything related to Mallinckrodt's program,

21   and what you got were the documents listed in

22   your materials considered with the

23   Mallinckrodt Bates number?

24       A.    Correct.

25       Q.    Did you get all of these all at

Highly Confidential - Subject to Further Confidentiality Review

1    once, or were these things that were given to

2    you over time?

3           A.      No, they kept coming to the

4    house over time.  One day I'd get two boxes,

5    next day maybe three boxes.

6           Q.      Okay.

7           A.      Maybe another box.

8           Q.      And you didn't make any effort

9    to review Mallinckrodt's production generally

10   to find other materials than the ones that

11   Mallinckrodt identified for you?

12          A.      I asked for documents that I --

13   based upon my 50-plus years of experience

14   that I would need in order to review their

15   program and render a decision.

16          Q.      And did you have any concern

17   that Mallinckrodt was cherry-picking

18   particular documents for you and not showing

19   you documents that would have been damaging

20   to Mallinckrodt?

21          A.      I have no reason to expect

22   that -- to suspect that.

23          Q.      Okay.  You didn't have any

24   concern about that?

25          A.      None whatsoever.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you didn't ask whether that

2    occurred?

3    A.    Oh, I did ask, "Am I being

4    shown everything that I need in order to

5    review this and render an opinion" based

6    upon, as I mentioned earlier in my expert

7    opinion, they meet the requirements.

8    Q.    Okay.  And you made that

9    decision based upon this list of Mallinckrodt

10   documents in your materials considered list?

11   A.    Based upon my review of these

12   documents, I made that decision.

13   Q.    And did you make sure that all

14   of these documents that are listed here, and

15   again, the Bates-stamped documents, were

16   complete, that you hadn't been given some

17   part of a document but not the whole thing?

18   A.    I have no reason to suspect

19   that.  Plus, when I read some of the

20   depositions from some of the plaintiffs'

21   experts, there was documents that were

22   utilized in there, and I asked for copies of

23   those and made sure I got those.  So I have

24   no reason to suspect that any of these

25   documents are tampered with, I would say.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And as you've said, you've

2    looked at every single one of these

3    documents?

4    A.    I've looked at them.

5    Q.    And none of them are

6    incomplete?

7    A.    Not to my knowledge.

8    Q.    Okay.  And every one is a

9    document that pertains to Mallinckrodt's

10   suspicious order monitoring program?

11   A.    Yes.

12   Q.    And if you had received one of

13   these files and you saw that it was

14   incomplete or did not contain anything, you

15   would have asked for the document that was

16   identified?

17   A.    If I received something that

18   didn't apply, you know, after I've requested

19   certain documents, I would say to them, "Hey,

20   this is not what I asked for.  I asked for

21   something that touched the SOM program for a

22   period of time."  And so -- but that never

23   happened.

24   Q.    And these were hard copy

25   documents that were sent to you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes.

 2            Q.      Okay.  And did you put these

 3     documents in a binder or try to organize them

 4     in some way?

 5            A.      I didn't put them in a binder.

 6     I received them in a binder.

 7            Q.      Okay.  And did you take any

 8     notes on the documents?

 9            A.      Like I said earlier, when I

10     prepare my reports, I like to take -- like to

11     take notes.  So depending on what I was

12     reading, I may only put a sticky in so I knew

13     that I read that page.

14            In some cases if I thought,

15     "Gee, this would be helpful in my report, my

16     evaluation in my report," I would make a note

17     on the sticky or actually write out a

18     paragraph or something so that I could

19     consider it for my future report.

20            Q.      So in just flipping through

21     this list of Bates stamps, the very first one

22     says ABDC MDL.

23            Do you know what that document

24     is?

25            A.      Oh, I don't recall.
```

1    Q.    In judging from the Bates

2    number, it was not produced by Mallinckrodt.

3            So can you tell me, did you

4    review -- other than what's on this list, did

5    you review any documents that were produced

6    by any other defendant in this case?

7    A.    No.  No.  Everything I've done

8    has just been for the Mallinckrodt, who

9    retained -- for Ropes & Gray, who retained

10   me.

11   Q.    Now, the next item in the

12   materials considered list is portions of

13   deposition transcripts and certain exhibits.

14           Do you see that?

15   A.    Yes.

16   Q.    And I've counted, and it looks

17   like there's 19 deposition transcripts that

18   are indicated here?

19   A.    Yep.  Yes.

20   Q.    And this notes that you

21   reviewed portions of these transcripts; is

22   that accurate?

23   A.    Some of the transcripts, as I

24   started reading, I said this is -- this is

25   what I need in detail, and I read it in

Highly Confidential - Subject to Further Confidentiality Review

1    detail.

2         Q.    So how did you choose these

3    deponents?

4              How did you choose these

5    transcripts to review?

6         A.    When I asked -- I said, look,

7    you retained me to look at Mallinckrodt's SOM

8    program.  I need to have at my disposal

9    everything that's going to help me render a

10   decision, whether it's good or whether it's

11   bad.  And these are the documents that they

12   applied.

13             The other thing I asked them

14   was, "Look, you tell me that there's

15   plaintiff depositions that could impact

16   Mallinckrodt.  I asked -- I want to see

17   copies of that.  And anything that DEA

18   provided in the way of depositions or

19   information, I want to see those."

20             That's how this came about.

21        Q.    Okay.  And so you --

22        A.    And I said, "Assure me -- or

23   make sure that I get every document that I

24   need in order to render a decision."

25        Q.    Okay.  So you relied on

1    Mallinckrodt to provide you with, as you say,

2    every document that would help you with your

3    decision?

4          A.    Not Mallinckrodt.  Ropes &

5    Gray.  All my discussions have been with

6    Ropes & Gray.

7          Q.    Okay.  So you relied on

8    Mallinckrodt's lawyers to provide you with

9    every document that you need to make your

10   decision?

11              MR. DAVISON:  Objection.

12              THE WITNESS:  I relied on

13        Ropes & Gray to provide me with

14        documents, yes.

15   QUESTIONS BY MR. LOESER:

16         Q.    Okay.  And as I asked before,

17   you read portions of these deposition

18   transcripts; is that right?

19         A.    Some of them I read --

20              MR. DAVISON:  Objection.

21              THE WITNESS:  -- in detail.

22        Some I read in -- portions of it.

23   QUESTIONS BY MR. LOESER:

24         Q.    Okay.  Which ones did you --

25   did you read all of any of them?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Some of them I read in detail.

Yes, I've read all of them, but some in

detail; some not.

4      Q.      So you've read every page of

all of these depositions?

6      A.      I didn't say that.  I said some

of them I've read in detail, others I just

read portions of, depending on what I felt I

needed in evaluating Mallinckrodt's program.

10     Q.      Have you read every page of any

deposition on this list?

12     A.      Yes.

13     Q.      Which ones?

14     A.      McCann, Whitelaw, Rafalski and

Kelly {sic}, I think it was.

16     Q.      Okay.

17     A.      And just -- some of the things

that Joe Rannazzisi said I read in detail.

19             Rafalski, I think I said that.

20             So there's some other I just

don't recall.

22     Q.      So of the 29 depositions on

this list --

24     A.      Oh, pre -- I can never

pronounce his name, Prevoznik or whatever the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    heck it is, p-r-e-v-o-z-n-i-k.

 2                Stewart, I read a number of

 3    sections of that one.  Yeah.

 4         Q.    Okay.  So you mentioned -- I

 5    lost count, but was it five that you read in

 6    full?

 7                MR. DAVISON:  Objection.

 8                THE WITNESS:  Yeah.  Give or

 9         take, yeah.  I'd say that.

10    QUESTIONS BY MR. LOESER:

11         Q.    Okay.  And the rest you read

12    parts?

13         A.    Parts that I thought was

14    appropriate for what I was assigned.

15         Q.    Are there any that you didn't

16    read at all?

17         A.    No, I think I touched every one

18    of these.

19         Q.    Okay.  Which are the ones that

20    you just skimmed a little bit?

21         A.    Oh, God.  Harper was another

22    one I read in full detail.  Karen Harper.

23         Q.    And when you say "full detail"

24    you mean --

25         A.    I read the whole report.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.

2       A.      Stacy Harper from DEA, I only

3   read partial, partial sections of it.

4       Q.      Well, let me make this easier

5   for you.

6               Are there any on here that you

7   just barely skimmed?

8       A.      No, there was -- I think every

9   one of them I read portions of it.  I

10  wouldn't say barely skimmed.  You know, I

11  read maybe 10 percent, maybe 20 percent of

12  it.  I'd skim through and say, "Wait, this is

13  a section that I want to really read in

14  detail."

15      Q.      And how did you choose which

16  portion to read?

17      A.      Again, looking -- recalling

18  what I was assigned to do, based upon that,

19  that's how I would determine what I'm reading

20  in detail and what I'm not.

21      Q.      Did you ask Mallinckrodt's

22  lawyers to identify the portions that you

23  should read?

24      A.      No, not at all.

25      Q.      So all of the portions you read

1    were as a result of your skimming these

2    depositions and focusing on certain sections?

3         A.    Yes, it's what I determined I

4    thought was appropriate for me to review so I

5    could render a decision on Mallinckrodt's

6    program.

7         Q.    And no one told you to review

8    one portion or another?

9         A.    No.

10              MR. DAVISON:  Objection.

11              THE WITNESS:  I wouldn't -- I

12        wouldn't have accepted that.

13   QUESTIONS BY MR. LOESER:

14        Q.    And in your report when you

15   refer to the depositions and you quote them,

16   were those quotations things that you found

17   on your review?

18        A.    Yes.

19        Q.    All of them?

20        A.    Yes.

21              And then they would put the

22   number in and the number down.  So, yeah, I

23   gave them, said, "This is the footnote I want

24   in this report.  This is what I -- or this is

25   what I reviewed," and then they would put it

Highly Confidential - Subject to Further Confidentiality Review

1    in the report for me.

2            Q.      What does that mean?

3            A.      What that means is --

4                    MR. DAVISON:  Objection.

5                    THE WITNESS:  -- when you read

6            the report, it refers to a number, 136

7            or something.

8    QUESTIONS BY MR. LOESER:

9            Q.      Right.

10           A.      That was part of the -- that

11   was something I reviewed for my report.

12                   And as I said earlier, we

13   discussed this earlier this morning,

14   that's mentioned in the footnote and

15   mentioned in the report.

16           Q.      So you would say -- you would

17   provide some testimony that you wanted

18   included, and then they would find where that

19   testimony was?

20           A.      No, I found it --

21                   MR. DAVISON:  Objection.

22                   THE WITNESS:  -- and told them,

23           "This is what I reviewed for my

24           report."

25

```
1    QUESTIONS BY MR. LOESER:

2         Q.    Okay.  And they would provide

3    the citation in the report?

4         A.    They would put the footnote in.

5         Q.    Okay.  Your materials

6    considered has a list of expert reports under

7    the expert materials?

8         A.    Yes.

9         Q.    And did you choose -- how did

10   you choose those particular experts?

11        A.    Well, it's -- I wanted

12   testimony from the plaintiff side that

13   referred to Mallinckrodt, so these are some

14   of the depositions -- these are the

15   depositions that I received in that case.

16             And then I said to them, I want

17   to see all the attachments that are in those

18   depositions and other documents that you may

19   have that will allow me to render a decision

20   on Mallinckrodt's program.

21        Q.    So you told Mallinckrodt's

22   counsel generally what you were looking for,

23   and they identified these specific experts

24   and gave you those reports?

25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      And did you read every page of
 2     each of these reports?
 3           A.      This list, yes.
 4           Q.      And you read all the materials
 5     as well?
 6           A.      Yes.
 7           Q.      Attached materials?
 8           A.      Yes.
 9                   The one I didn't was the last
10     one here, expert report of Edward -- I only
11     skimmed that.
12           Q.      How long did you say you took
13     to skim that report?
14           A.      Oh, I don't know.  I think the
15     total hours I put on my expense account I
16     think is what, 172 hours.  That's all it
17     took.
18           Q.      But you don't recall the amount
19     of time you spent --
20           A.      No.
21           Q.      -- skimming --
22           A.      No.
23           Q.      -- the Buthusiem report?
24           A.      No.
25           Q.      And so these reports listed
```

1    here, these are the ones that you address in

2    your report; is that right?

3         A.    This -- a lot of these

4    materials are addressed in the report.

5         Q.    But these expert reports are

6    the ones that your report responds to?

7         A.    Well, no, I also -- some of the

8    others, Joseph Rannazzisi --

9         Q.    No, I'm asking you specifically

10   about the expert materials, and there's a

11   list of seven.

12        A.    Oh, yeah, but there's others

13   that I've read in detail.

14        Q.    You read other expert reports?

15        A.    These, what's in here.

16        Q.    Those are depositions.

17        A.    I know that.

18        Q.    Okay.

19        A.    Okay.  You just asking about

20   the expert -- this material, yeah.

21        Q.    Those are the expert reports

22   that you reviewed?

23        A.    Yes.

24        Q.    And you didn't review any other

25   ones?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     No.

2          Q.     Do you know how many others

3    there are in this case?

4          A.     No.

5          Q.     Did you ever ask to see any

6    expert reports other than these ones on this

7    list?

8          A.     Like I said, my general

9    question was -- to them was, "Provide me with

10   all documents that I need in order to render

11   a decision on Mallinckrodt's program."

12         Q.     And in response to that

13   question, among other things, Mallinckrodt

14   provided you -- or their counsel -- with this

15   list of expert reports?

16         A.     They provided me with this

17   material, yes.

18         Q.     And so are there any other

19   expert reports that your report responds to?

20         A.     No.

21              MR. DAVISON:  And, Derek, we've

22         been going another hour, so whenever

23         is a good time, just --

24              MR. LOESER:  Okay.  We'll just

25         finish this.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVISON:  That's fair.

 2      QUESTIONS BY MR. LOESER:

 3           Q.     The next thing in your

 4      materials considered are case documents?

 5           A.     Yes.

 6           Q.     And there's a list of

 7      pleadings.

 8                  Did you select this list?

 9           A.     Again, it was based upon my

10      general question of what I needed, and these

11      are the documents that I was provided.

12           Q.     Okay.  So this is another

13      category of information that you relied on

14      Mallinckrodt's counsel to provide to you so

15      that you could prepare your report?

16           A.     Yes, sir.

17           Q.     And did you read all of these

18      documents?

19           A.     Again, I read a lot of the

20      detail.  Others I may have just read portions

21      of it.

22           Q.     Are there any that you didn't

23      read at all?

24           A.     No, I touched every one of

25      them.
```

```
1          Q.      And how did you choose which

2     portions to read?

3          A.      When I started the report, I

4     skimmed and said, "Yeah, I think I better

5     read this in detail."

6                  Some were...

7          Q.      A couple of these items just

8     list specific interrogatory numbers.

9                  Do you see that?

10         A.      Yes.

11         Q.      How did you choose those

12    interrogatories?

13         A.      Again, based upon what I was

14    assigned to do or asked to do, requested to

15    do.  In reading it, those are the ones I felt

16    was appropriate.

17         Q.      So did Mallinckrodt's counsel

18    identify these particular responses?

19         A.      No.

20         Q.      So you --

21         A.      They provided the documents

22    based upon my general question, and then I

23    looked at -- when I would look at it, I'd

24    say, "Yeah, this is something I want to maybe

25    touch on my report."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Now, all of these case
 2    documents that are listed are discovery
 3    responses by Mallinckrodt; is that right?
 4          A.      Uh-huh.
 5          Q.      And are you aware that other
 6    parties also responded to discovery in this
 7    case?
 8          A.      No.
 9          Q.      So you didn't read any
10    discovery responses by any other defendant?
11          A.      No.  Like I said, everything
12    is here.
13          Q.      Okay.  So you didn't read any
14    discovery responses by the plaintiffs in this
15    case?
16          A.      No.
17          Q.      You didn't think that was
18    something that would be worth taking into
19    account when --
20          A.      No.
21          Q.      -- reaching your decision?
22                  MR. DAVISON:  Objection.
23                  THE WITNESS:  No.  Like I said,
24          what I was asked to do or requested to
25          do, I felt that I had the material
```

1          here to render a regulatory opinion

2          based upon my expertise.

3     QUESTIONS BY MR. LOESER:

4          Q.     Okay.  Moving on to cases and

5     statutes, the last page of your materials

6     considered.

7          A.     Yes.

8               MR. LOESER:  And then, Counsel,

9          we'll take a break right after we're

10         through this.

11    QUESTIONS BY MR. LOESER:

12         Q.     This lists -- cases and

13    statutes lists 18 items.  And how did you

14    come up with this list?

15         A.     Again, it comes back to what I

16    was asked to do and how I put the question to

17    them.  These are some of the things I wanted

18    to see, especially -- and I did ask them

19    specifically, if there's anything that DEA

20    provided in the way of testimony or reports

21    or something, I want to see those documents.

22         Q.     Okay.  So this is another list

23    that was -- these items were selected by

24    Mallinckrodt's counsel in response to your

25    question for all information that you needed

Highly Confidential - Subject to Further Confidentiality Review

1    to form your opinion?

2          A.     Yes.

3                 MR. DAVISON:  Objection.

4    QUESTIONS BY MR. LOESER:

5          Q.     And so it was not you that

6    identified the bench trial transcript, United

7    States v. Four Hundred Sixty Three Thousand

8    Four Hundred Ninety Seven Dollars and Seventh

9    Two Cents; it was Mallinckrodt's counsel?

10         A.     Based upon the general question

11   that I asked them, yes.

12         Q.     And would the answer to that

13   question be the same for each of the items on

14   this list?

15         A.     Yes.

16         Q.     And prior to this case, did you

17   have any familiarity with United States v.

18   Four Hundred Sixty Three Thousand, that

19   matter?

20         A.     Which one now?

21         Q.     The first item on that list,

22   bench trial transcript.

23                Do you see that?

24         A.     This was -- no.  This was based

25   upon my general question.  This is one of the

Highly Confidential - Subject to Further Confidentiality Review

1    documents that was provided.  I don't recall

2    I had any prior knowledge.

3         Q.    Okay.  And you'll see that

4    there's a couple entries there for the

5    Masters Pharmacy, Inc. v. Drug Enforcement

6    Administration?

7         A.    Uh-huh.

8         Q.    Did you have prior knowledge of

9    that case?

10        A.    I was aware of the Masters

11   case.

12        Q.    And how were you aware of it?

13        A.    It was in the Federal Register,

14   and I just -- how I came about it was like

15   the Southwood one also.  It's just -- it was

16   a well-known -- those are well-known cases.

17        Q.    And did you consider the

18   Masters case an important case in the area of

19   Controlled Substances Act compliance?

20             MR. DAVISON:  Objection.

21             THE WITNESS:  I looked at it

22        and considered it, as I did Southwood,

23        as I did the regulations.

24   QUESTIONS BY MR. LOESER:

25        Q.    So for those two cases, Masters

Highly Confidential - Subject to Further Confidentiality Review

1    and Southwood, would you agree that those are

2    important cases in the area of Controlled

3    Substances Act compliance?

4             MR. DAVISON:  Objection.

5             THE WITNESS:  They're cases

6        that should be read, and there's some

7        importance to it.  I don't want to --

8        I don't want to downplay it, but it

9        has a role.

10   QUESTIONS BY MR. LOESER:

11       Q.    And what's that role?

12       A.    Role is when you're dealing

13   with the regulations and the industry and the

14   Agency, you want to know as much as you can

15   and what the consideration is, especially in

16   this case, like Masters or Southwood, what

17   was the -- what was the comments and

18   testimony, what was the considerations.  You

19   want to look at it from that perspective.

20            Does it change any

21   recommendations you want to make, general

22   recommendations, to companies, to the

23   industry, to practitioners,

24   non-practitioners, things like that.

25       Q.    And did those cases change

```
 1     recommendations that you made?

 2                MR. DAVISON:  Objection.

 3                THE WITNESS:  I don't recall,

 4          but if I felt -- we felt it was

 5          important, we would have made maybe

 6          some recommendations.

 7     QUESTIONS BY MR. LOESER:

 8          Q.    But you don't recall whether

 9     you did that or not?

10          A.    I don't recall.

11          Q.    Do you agree that these

12     decisions provide important guidance on how

13     to identify orders that are unusual or not

14     normal?

15                MR. DAVISON:  Objection.

16                THE WITNESS:  Well, the

17          important guidance is what the

18          regulation says and the letters that

19          DEA came out.

20                Now, in the guidance of letters

21          is, you know, it's not policy, it's

22          just a guidance document.  But those

23          are -- those are important, because

24          that gives you the -- how the --

25          possibly how the Agency is thinking.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LOESER:

 2           Q.    And, sir, do you believe that

 3      the Masters case and the Southwood case

 4      provide important guidelines on how to

 5      specifically identify orders that are unusual

 6      or not normal?

 7           A.    Well, they provide important --

 8                 MR. DAVISON:  Objection.

 9                 Wait until he finishes.

10                 THE WITNESS:  Could you repeat

11      your question?

12                 MR. LOESER:  Can you read the

13      question back, please?

14                 (Court Reporter read back

15      question.)

16      QUESTIONS BY MR. LOESER:

17           Q.    And let me modify the question

18      slightly.

19                 Instead of guidelines,

20      guidance.  Important guidance.

21           A.    Important guidance?

22           Q.    I'm sorry, I'm speaking.

23           A.    Like one of the things that

24      sticks out in my mind is the quantities that

25      were being sold.  So from a perspective when
```

```
 1    you look at that, that could be one thing you

 2    should consider.

 3              So from that perspective, yeah,

 4    it did provide insight into the whole issue

 5    of suspicious order monitoring.

 6         Q.    And so you'd agree that it

 7    provides -- the decisions provide important

 8    guidance?

 9              MR. DAVISON:  Objection.  Asked

10         and answered.

11              THE WITNESS:  The what?

12    QUESTIONS BY MR. LOESER:

13         Q.    Important guidance?

14              MR. DAVISON:  Objection.  Asked

15         and answered.

16              THE WITNESS:  I didn't hear

17         what you said.

18              MR. DAVISON:  I just said

19         "objection."

20              You can answer.

21              THE WITNESS:  Oh.  It

22         provides -- it provides some guidance,

23         especially when you start looking at

24         the quantities involved.  Yeah.

25
```

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.      And did you provide guidance to

 3    your DEA registrant clients regarding the

 4    Masters case?

 5         A.      What we provide is the

 6    regulatory requirements, industry standards.

 7    And when we receive -- like we reviewed one

 8    of these reports, and I don't recall the

 9    whole detail of either the Masters or

10    Southwood except what sticks out in my mind

11    about the quantities.  We would talk about it

12    with our clients.

13              And we may say, "Gee, based

14    upon our understanding, in order -- you may

15    want to consider, you know, doing something

16    else with your program."

17              But, yeah, so I would say yes.

18    You know, knowledge is important, especially

19    when you're dealing in a regulated industry

20    with both practitioners and

21    non-practitioners.

22         Q.      And do you recall if the

23    Masters decision evaluated whether

24    prescriptions were legitimate as opposed to

25    just the quantity of the orders?
```

```
 1            A.     I don't recall all the details
 2    of it.  It was a while ago since I looked at
 3    it.
 4            Q.     When's the last time you read
 5    the Masters decision?
 6            A.     Excuse me?
 7            Q.     When was the last time you read
 8    the Masters decision?
 9            A.     About a month ago, month and a
10    half ago.
11            Q.     Very last thing on your
12    materials considered list are reports, public
13    documents and studies.
14                   Same question on this:  Is this
15    a list of items that was created by
16    Mallinckrodt's counsel, or is this a list
17    that you came up with?
18                   MR. DAVISON:  Objection.
19                   THE WITNESS:  Some of these are
20         what I requested, and some of them
21         pursuant to my general question about
22         rendering a decision were provided by
23         counsel.
24    QUESTIONS BY MR. LOESER:
25            Q.     And which ones did you request?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I requested the Ryan Haight Act

 2      and the Council of Economic Advisors.

 3            Q.      Okay.  And are you familiar

 4      with all the documents on this list?

 5            A.      Yes.

 6            Q.      Have you read them?

 7            A.      I read them all.

 8            Q.      And what's the relevance of the

 9      Chemical Handlers Manual?

10            A.      Back in the early days when

11      they didn't have much -- there wasn't a lot

12      of guidance put out by the Agency, some of

13      the associations, they started talking about

14      utilizing -- and some verbal comments from, I

15      guess, some diversion investigators -- to

16      look at the -- and I think may have been in

17      2003 -- the suspicious order monitoring

18      explanations they gave in trying to develop a

19      program that would apply to controlled

20      substances.

21            Q.      And so do you agree that the

22      guidance provided in the Chemical Handlers

23      Manual with regard to suspicious order

24      monitoring is important?

25                    MR. DAVISON:  Objection.
```

```
 1                THE WITNESS:  It's important,

 2          but you have to be very careful with

 3          suspicious order monitoring programs

 4          that one size doesn't fit all.  So

 5          what may be appropriate for you is not

 6          appropriate for me.

 7                And I'm talking about if you're

 8          a company and I'm a company, not you

 9          as a lawyer and an expert sitting

10          here.

11                You know, and then you have to

12          look at your customer base.  You have

13          a large customer base, like 10,000

14          pharmacies, whether independents or

15          chain, or you're dealing with a small

16          number of customers.

17                So to say one is more

18          appropriate than the other, to me,

19          is -- it doesn't count.  It doesn't

20          mean anything.

21     QUESTIONS BY MR. LOESER:

22          Q.    So did you advise your clients,

23     your DEA registrant clients, to review the

24     Chemical Handlers Manual?

25                MR. DAVISON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Well, in some
 2         situations we would say, you know,
 3         here's what -- regulatory
 4         requirements.  You got to report a
 5         suspicious order.  Here's one method.
 6              Depending on, again, who the
 7         client is and their customer base,
 8         maybe, yeah, you -- maybe something we
 9         should consider.
10              If, depending on your client
11         base, number of clients you have, or
12         customers, I should say, we may say,
13         "No, this is not appropriate for your
14         company."
15              So it depends on a lot of
16         different things.  So talking about an
17         individual thing or a general comment
18         on what the industry should do, to me,
19         is very difficult.
20    QUESTIONS BY MR. LOESER:
21         Q.    But with regard to the
22    suspicious order reporting requirements, did
23    you look to the Chemical Handlers Manual as a
24    guide for clients?
25              MR. DAVISON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Well, what we

2       tell clients is that they need to

3       report -- once they identify an order

4       as suspicious, once you make that

5       determination as to what's suspicious,

6       you got to report it to the DEA.

7           Again, depending on who the

8       registrant is and their customer base

9       and the type of drugs they're handling

10      and the quantities they sell, there

11      may be different types of reports that

12      we -- programs we may recommend.

13      Maybe a paper-based system will do it;

14      maybe an electronic system.

15          We go back to Mallinckrodt,

16      their systems, they had a combination

17      of things, which was appropriate.

18          MR. LOESER:  I'll ask the

19      question again.

20          Can we read the question back,

21      please?

22          (Court Reporter read back

23      question.)

24          MR. DAVISON:  Objection.

25          THE WITNESS:  In some

```
 1            situations, again, depending on who

 2            the registrant is and their customer

 3            base, the drugs they handled, number

 4            of clients -- their customers that

 5            they have, it may have been one that

 6            we would discuss with the industry.

 7            We discussed a lot of things with the

 8            industry.

 9      QUESTIONS BY MR. LOESER:

10            Q.    It may have been one or it was

11      one?

12            A.    May have been one.  Depending,

13      again, as I said, who the client is and who

14      the -- what their customer base is.

15                 And again, I go back to one

16      program doesn't fit the entire industry.

17            Q.    Yeah, I just want to make sure

18      I understand your testimony.

19                 You said it may have been one

20      of the things that you provided to your --

21            A.    That we --

22            Q.    -- that you provided guidance

23      to your clients.

24                 But was it, in fact, something

25      that you provided to your -- some of your
```

Highly Confidential - Subject to Further Confidentiality Review

1    clients as guidance?

2         A.    It's possible.  I don't recall

3    everything that we did, but, yeah, it's

4    possible.

5         Q.    Can you give me an example of a

6    client who shouldn't follow the guidance

7    provided by the Chemical Handlers Manual?

8              MR. DAVISON:  Objection.

9    QUESTIONS BY MR. LOESER:

10        Q.    Let me ask it a different way.

11             Did you ever advise a client

12   not to follow the guidance provided by the

13   Chemical Handlers Manual?

14        A.    No, we -- the guidance we were

15   providing was based upon your operation:

16   Here's some recommendations we would make.

17   It may have been something from the Chemical

18   Handlers since it was really the only

19   guidance that they had.  It may not have

20   been.

21             In fact, we may have said, you

22   know, "This type of program utilizing your

23   customer service reps, your product managers,

24   maybe -- you know, and your compliance group

25   and your legal group and your security group

Highly Confidential - Subject to Further Confidentiality Review

1    would be more appropriate."

2              Others we would say, "Here's

3    something that DEA has put out.  It's not

4    mandated.  It's something that should be

5    considered."

6              MR. LOESER:  Could you read the

7         question back, please?

8              MR. DAVISON:  And, Derek, we've

9         been going now an extra 20 minutes on

10        top of the break, so...

11             MR. LOESER:  This is the last

12        question.

13             MR. DAVISON:  Okay.

14             MR. LOESER:  Well, when it's

15        answered it's the last question.

16             MR. DAVISON:  Objection.

17             (Court Reporter read back

18        question.)

19             THE WITNESS:  No.

20             VIDEOGRAPHER:  Off the record

21        at 12:03 p.m.

22         (Off the record at 12:03 p.m.)

23             VIDEOGRAPHER:  We're back on

24        the record at 12:19 p.m.

25

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.    Mr. Buzzeo, earlier you

 3    testified in response to my questions that

 4    there's an obligation to report a suspicious

 5    order.

 6               Do you recall that testimony?

 7         A.    Yes.

 8         Q.    How do you define a suspicious

 9    order?

10         A.    Well, the regulation defines it

11    as -- such as it gives quantity, pattern and

12    size of the order, frequency.

13         Q.    And is that -- or can that be

14    determined with an algorithm?

15         A.    Again, it depends on the

16    registrant, their customer base, the drugs,

17    for them to determine which system is best

18    for them or which -- which system is best for

19    them.

20         Q.    And for certain registrants, at

21    least, that can be determined with an

22    algorithm; is that right?

23         A.    Yes, that can.

24         Q.    And you previously testified

25    that you worked for the legitimate industry,
```

1    and I think your words were that you wouldn't

2    touch diverters.

3              Do you recall that testimony?

4         A.    I mentioned something to that

5    effect, that we would turn down, to my

6    knowledge, customers that would --

7    registrants that were involved in what we

8    felt was the illicit market.  And I'm going

9    back a long time.

10        Q.    Yeah.  And, sir, how do you

11   define the legitimate industry?

12        A.    They meet the DEA requirements

13   for registration.

14        Q.    And what do you mean by

15   "diverters"?

16        A.    Is when drugs or controlled

17   substances departs or leaks out or however,

18   what terms you want to use, from the

19   distribution chain in an illicit manner.

20        Q.    So if a pharmacy provides

21   controlled substances for other than

22   legitimate medical purposes, is that a

23   pharmacy a diverter?

24              MR. DAVISON:  Objection.

25              THE WITNESS:  Yes.  If --

```
 1           anybody who diverts, let's say,

 2           controlled substances for illicit

 3           purposes would be a diverter -- would

 4           be, you know, involved in diversion,

 5           let's say.

 6     QUESTIONS BY MR. LOESER:

 7           Q.    So a pain clinic that provides

 8     prescriptions for other than legitimate

 9     medical purposes, that would be a diverter

10     too?

11           A.     Pain clinics -- pain clinics

12     were an issue that DEA looked at very

13     carefully, to my knowledge.

14                 I inspected some of them for a

15     member of the industry, and some of them are

16     probably very honest, but there are a number

17     of them that were basically selling drugs.

18           Q.     And you say you inspected some

19     pain clinics for a member of industry.

20                 Who did you inspect pain

21     clinics on behalf of?

22                 MR. DAVISON:  Objection.

23                 THE WITNESS:  I don't recall

24           who it was.  I just remember us doing

25           it.  That was many years ago, when I
```

1          was involved in it.  So that would

2          have been back probably way before --

3          probably in the '90s sometime.

4     QUESTIONS BY MR. LOESER:

5          Q.    And is a dispensing physician,

6     in areas where physicians can dispense, who

7     provides prescriptions for other than

8     legitimate medical purposes a diverter?

9               MR. DAVISON:  Objection.

10              THE WITNESS:  For a -- based

11         upon your question, a physician who

12         provides drugs outside of

13         legitimate -- for not for legitimate

14         medical need is performing an illicit

15         activity and probably would be

16         prosecuted.

17    QUESTIONS BY MR. LOESER:

18         Q.    So the answer is yes?

19         A.    Yes.

20         Q.    And I want to make sure I

21    understand.

22              What is the difference between

23    a company that is a diverter and one that is

24    part of a legitimate industry?

25         A.    A company that's a diverter?

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Yeah.

2          A.      What -- you have to rephrase

3    the question.

4          Q.      Is there a difference between

5    what you're calling a company that is part of

6    the legitimate industry and a company that is

7    a diverter?

8          A.      Well, I would assume if you're

9    a diverter and DEA knows it, they're going to

10   move against your registration, if it's a

11   legitimate pharmaceutical practitioner or

12   non-practitioner.

13         Q.      As you understand it, is a

14   company that ships suspicious orders a

15   diverter?

16              MR. DAVISON:  Objection.

17              THE WITNESS:  When you talk

18         about a company -- first of all, the

19         requirement is that a company

20         reports -- once they make a

21         determination that the order is

22         suspicious, they report it to DEA, and

23         then they have to make a determination

24         of ship, don't ship.

25              The regulation really doesn't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          say anything more than that.
 2     QUESTIONS BY MR. LOESER:
 3          Q.      Right.  I'm asking --
 4          A.      But I don't follow your
 5     question.
 6          Q.      -- a slightly different
 7     question.
 8                  You use this terminology
 9     between a legitimate business and a diverter.
10     And I'm asking you if a company that ships
11     suspicious orders, is that, in your view, a
12     diverter?
13                  MR. DAVISON:  Objection.
14                  THE WITNESS:  Let's -- it's
15          possible -- let me put it this way.
16                  The regulatory requirement is
17          you report suspicious orders.  Okay?
18          That's regulatory requirement.  And
19          you notify DEA of that.
20                  If you continually ship
21          suspicious orders, that you've
22          determined is suspicious and DEA
23          determines -- if there's diversion
24          associated with that suspicious order,
25          then you are supplying drugs into
```

1            the -- outside the regulatory

2            requirements, outside of the

3            distribution chain, outside that

4            registration chain.

5                  So it ties into -- you could

6            have an order pended that could be,

7            based upon your criteria, suspicious,

8            but when you do your investigation,

9            it's not suspicious.  So if it's just

10           based upon your program, then it's

11           very difficult to answer that

12           question.

13     QUESTIONS BY MR. LOESER:

14           Q.     Let me try --

15           A.     But if you know -- if you know

16     that the drug is being diverted, then you

17     have somebody who is supplying the illicit

18     market.

19           Q.     Let me try and get an answer.

20                  If a company ships suspicious

21     orders, is that company a diverter?

22                  MR. DAVISON:  Objection.  Asked

23           and answered.

24     QUESTIONS BY MR. LOESER:

25           Q.     Actually ships a suspicious

```
 1    order, is that company a diverter?

 2               MR. DAVISON:  Objection.  Asked

 3          and answered.

 4               THE WITNESS:  If the drug -- if

 5          the drug is diverted into the illicit

 6          market and they're aware of that,

 7          that's a -- but you could have -- I'm

 8          trying to say is that you can have an

 9          order that your system -- and based

10          upon your cri -- you say, "this order

11          is suspicious."  It turns out maybe

12          it's not suspicious.

13               So unless there's something

14          connected with that, like diversion or

15          something, you're supplying the

16          illicit market, then you shouldn't

17          have a registration.

18    QUESTIONS BY MR. LOESER:

19          Q.    Okay.  So if the order is

20    suspicious, not if it might be, not if it's

21    later determined to be, but if an order is

22    suspicious and a company ships that order, is

23    the company a diverter?

24               MR. DAVISON:  Objection.  Asked

25          and answered.
```

```
 1                  THE WITNESS:  And is diversion
 2         associated with it?  Yes.
 3   QUESTIONS BY MR. LOESER:
 4         Q.    Is a company that has its
 5   license to distribute controlled substances
 6   revoked by the DEA, in your view, a diverter?
 7                  MR. DAVISON:  Objection.
 8                  THE WITNESS:  I don't have
 9         enough details to even answer that
10         question.
11   QUESTIONS BY MR. LOESER:
12         Q.    If the DEA revokes a company's
13   license to distribute controlled substances
14   because the company has not utilized
15   appropriate controls against diversion, is
16   that company a diverter?
17                  MR. DAVISON:  Objection.
18                  THE WITNESS:  Again, I need to
19         know the details.
20                  Is it just a recordkeeping
21         issue or a security issue, you know,
22         physical security?
23                  Was it they didn't have proper
24         records but there was no actual no
25         evidence of diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  I don't know.  I'd have to know

 2          the details.

 3     QUESTIONS BY MR. LOESER:

 4          Q.     And again, I'm trying to

 5     understand your terminology.  You used this

 6     word "diverter."

 7                  If the DEA revokes a company's

 8     license to distribute controlled substances

 9     because that company allowed for

10     prescriptions without legitimate medical

11     purposes, would you consider that company a

12     diverter?

13          A.     If a registrant distributed

14     controls drugs without -- not pursuant to a

15     prescription, then they're actually dealing

16     in controlled substances and probably would

17     be a criminal charge.

18          Q.     What about if it's pursuant to

19     a prescription but it's not for a legitimate

20     medical purpose?

21          A.     If a registrant distributes

22     controlled substances either pursuant to a

23     prescription or not and it's not for

24     legitimate medical purposes, there could be a

25     violation of the CSA, again, depending on all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the details.

 2              And the same way with the

 3    doctor.  Did the physician prescribe not for

 4    legitimate medical need.  So does that

 5    physician -- there's a corresponding

 6    liability on the pharmacist because -- that's

 7    it.

 8       Q.     And, therefore, using the

 9    terminology that you used, you would label

10    those entities diverters in those instances?

11              MR. DAVISON:  Objection.

12              THE WITNESS:  Well, the drugs

13         that leaked out of legitimate medical

14         distribution.

15    QUESTIONS BY MR. LOESER:

16       Q.     Mr. Buzzeo, is this the first

17    time you've served as an expert consultant in

18    litigation?

19       A.     No.

20       Q.     How many times have you served

21    as an expert?

22       A.     I don't recall the number, but

23    it was a few.

24       Q.     And more than ten?

25       A.     It's hard to say.  I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    think it would be more than ten, no.
 2         Q.    Do you recall any of the
 3    specific matters for which you've previously
 4    served as an expert?
 5         A.    Mainly registration issues.
 6         Q.    In litigation?
 7         A.    No, in front of an
 8    administrative law judge.
 9         Q.    Okay.  And do you recall
10    anything specific -- do you recall what those
11    matters were, who you were an expert on
12    behalf of?
13         A.    The registrant -- or the
14    company making application for registration.
15         Q.    Do you recall the name of the
16    company?
17         A.    No.
18         Q.    And --
19         A.    In 53 years, it's hard to
20    recall the names of a lot of --
21         Q.    Do you recall any other times
22    that you served as an expert in litigation?
23         A.    There was one that was for --
24    and I don't recall who it was.  It was a
25    pharmacy.  Had to do with I think security or
```

1    something.  One of the pharmacists was

2    stealing drugs.

3         Q.    Do you recall what pharmacy

4    that was?

5         A.    No, I don't.

6         Q.    Are there any other matters

7    that you recall?

8         A.    No, that's about it.

9               And of course when I was with

10   the Agency, criminal trials.

11        Q.    Right.

12              And do you recall what law

13   firms retained you in those matters?

14        A.    God, no, I don't.

15        Q.    Do you recall any other details

16   at all about either of those matters?

17        A.    No.  Registration -- and that

18   had to do with obtaining a registration.

19   But, no, that's about all that I can recall.

20        Q.    And in those two matters, were

21   you an expert for the plaintiff or the

22   defendant?

23        A.    In one it was with the --

24   expert for the registrant, and the others

25   were as an expert for either maintaining a

 1    registration or obtaining a new registration.

 2              It was not a civil issue.  It

 3    was not a criminal issue.

 4         Q.    Okay.  And you don't recall

 5    the -- who the registrant was in either of

 6    those?

 7         A.    I don't.  Probably had to do

 8    with a bulk manufacturer or somebody trying

 9    to get into that business.

10         Q.    And do you recall when you last

11    served as an expert in any litigation?

12         A.    Probably would have been in

13    early 2000, late 2000.  Maybe right after

14    2000 -- you know, 2001, sometime in that time

15    frame.

16         Q.    And you don't have any records

17    that would --

18         A.    No.  God, no.

19         Q.    Have you ever testified under

20    oath in any capacity?

21         A.    Oh, yes.

22         Q.    After you left the DEA?

23         A.    Some of these trials.

24         Q.    And were there trials in both

25    of those --

```
1              A.      One was a trial.  The others

2      were administrative hearings in front of a

3      law judge.

4              Q.      Okay.  You mentioned two.

5                      Do you think there might have

6      been more than two?

7              A.      Of the registration hearings?

8              Q.      Anytime you served as an

9      expert.

10             A.      Yes.  Yes.  There was -- here

11     was -- I don't recall the exact number, but I

12     know it was more than two.

13             Q.      And do you recall how many of

14     those matters went to trial?

15             A.      The registration ones?  I don't

16     think any of them went to trial.

17             Q.      Were there administrative

18     proceedings?

19             A.      It was an administrative law

20     judge, and then they -- the law judge would

21     publish a finding in the Federal Register.

22             Q.      Okay.  So if we searched on

23     your name in the Federal Register, we should

24     be able to find it?

25             A.      Sure, try that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Have you ever offered testimony

2   before a grand jury?

3        A.      No.

4        Q.      And other than the

5   administrative proceeding you mentioned, any

6   testimony before any federal agencies after

7   you left DEA?

8        A.      I don't recall the facts, but

9   it was before FDA at a -- they were gathering

10  evidence for some regulation or something.  I

11  don't remember the details.  It was a while

12  ago.  But that was the only one.

13       Q.      Was that something to do with

14  controlled substances?

15       A.      It would have had something to

16  do with controlled substances.

17       Q.      Do you have any recollection --

18       A.      No.

19       Q.      -- of what?

20       A.      (Witness shakes head.)

21       Q.      Do you know the year that that

22  occurred?

23       A.      No.

24       Q.      A range of possible years?

25       A.      It was the only thing I was
```

1    involved in.  Probably in the 2000 time frame

2    or late '90s maybe.

3         Q.    Do you recall why you were

4    involved in that?

5         A.    Probably had do with a control

6    issue or could have been a recordkeeping

7    issue or something that we felt that should

8    be added to it, but the details I don't

9    recall.  But I know there was that one, but

10   that's about it.

11              And then criminal trials, which

12   I've told you.  When I was with the Agency,

13   there was a number of criminal trials.

14        Q.    Has your -- in the matters

15   that -- I understand you don't recall very

16   well, but where you have been an expert, has

17   there been any challenge to your ability to

18   serve as an expert?

19        A.    None whatsoever.

20        Q.    What about prior litigation

21   experience, have you ever been a litigant in

22   a lawsuit?

23        A.    No.

24        Q.    Never been a plaintiff?

25        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Never been a defendant?

2        A.      No.

3        Q.      So we went through your CV in

4    detail, and fair to say that from 1991

5    through 2015 you provided consulting services

6    to DEA registrants specifically pertaining to

7    compliance with the Controlled Substances Act

8    and the implementing regulations of the CSA,

9    correct?

10       A.      And the PDMA.

11       Q.      And the PDMA.

12               And since leaving BuzzeoPDMA,

13   you have continued to consult DEA registrants

14   on CSA compliance?

15       A.      Since I left the company?

16               No, the only discussions I've

17   had is with some law firms.

18       Q.      Okay.  If we could look at your

19   report, if you could turn to paragraph 19.

20               In paragraph 19, in describing

21   your expert report, you state, "I have

22   reviewed these reports based on my years of

23   industry experience focusing on the

24   Controlled Substances Act and its

25   implementing regulations."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      Did I read that correctly?
 2          A.      Yes.
 3          Q.      And then in the following
 4   paragraph, paragraph 20, you state that
 5   you've been asked by counsel for Mallinckrodt
 6   to review Mallinckrodt's suspicious order
 7   monitoring program and anti-diversion
 8   program, "consistent with my years of
 9   industry experience auditing manufacturers
10   and distributors of controlled substances."
11                      Did I read that correctly?
12          A.      Correct.  Yes.
13          Q.      And then in paragraph 21 you
14   state at the end of the paragraph, "I have
15   also relied on my more than 50 years of
16   experience in the industry, including my
17   22 years working for the DEA."
18                      Is that right?
19          A.      Correct.
20          Q.      And so you would agree that
21   your experience auditing and providing
22   guidance to other DEA registrants, including
23   manufacturers, distributors and chain
24   pharmacies, informs your opinions in this
25   case?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2          Q.      And in reaching the conclusions

3      that you indicate in your report, it's fair

4      to say that you rely on your prior experience

5      auditing and providing guidance to DEA

6      registrants?

7          A.      And the regulations.

8          Q.      So that's correct?

9          A.      And my time with DEA.

10         Q.      Okay.

11         A.      And probably the state

12     somewhat.

13         Q.      And so the answer is, yes, you

14     do --

15         A.      Yes.

16         Q.      Yes, you rely on your prior

17     experience, as you've just described it, in

18     reaching the opinions that you indicated --

19         A.      And the other thing --

20             MR. DAVISON:  Let him finish.

21     QUESTIONS BY MR. LOESER:

22         Q.      -- in reaching the opinions

23     that you've stated in your report?

24         A.      And the regulations and

25     experience I have in those regulations.

 1          Q.     Okay.  So again, the answer is

 2    yes.  And in addition to what I've indicated,

 3    you've added you've also relied on the

 4    regulations --

 5          A.     Correct.

 6          Q.     -- and your experience with the

 7    regulations?

 8          A.     Correct.

 9          Q.     If you look at Section 4 of

10    your report, paragraph 28, you state, "During

11    my 50 years of experience in the industry, I

12    have conducted dozens of audits of compliant

13    systems, anti-diversion efforts and

14    suspicious order monitoring programs for DEA

15    registrants.  I have audited and evaluated

16    suspicious order monitoring programs and

17    anti-diversion programs of a number of

18    controlled substances, pharmaceutical

19    manufacturers.  I have assisted numerous

20    registrants, including controlled substances

21    manufacturers, in implementing suspicious

22    order monitoring programs and anti-diversion

23    programs."

24                 Did I read that correctly?

25          A.     Yes.

1    Q.    And, sir, could you please read

2    the first sentence of paragraph 29?

3    A.    "In preparing this report, I

4    evaluated Mallinckrodt's suspicious order

5    monitoring program and anti-diversion efforts

6    in the same way as I have in dozens of audits

7    and evaluations of controlled substance

8    registrants in my 50 years of experience.

9    Consistent" -- first sentence.

10    Q.    Okay.  Thank you.

11          And so you were asked by

12    Mallinckrodt counsel to give an opinion about

13    Mallinckrodt's compliance with the CEA and

14    the implementing regulations of the CSA,

15    correct?

16    A.    Yes.

17    Q.    And in order to provide this

18    opinion, you followed the same procedures you

19    follow when a DEA registrant hires you to

20    perform an audit or evaluation, correct?

21    A.    Yes.

22    Q.    So your evaluation of

23    Mallinckrodt for this case was done in the

24    same way, as you say in your report, as your

25    prior audits of DEA registrants, correct?

```
 1          A.      Yes.

 2          Q.      Sir, would you consider

 3    yourself to be an expert in compliance with

 4    the Controlled Substances Act?

 5          A.      Yes.

 6          Q.      What is the purpose of the

 7    Controlled Substances Act?

 8                  MR. DAVISON:  Objection.

 9                  THE WITNESS:  To implement a

10          program or a requirement that sets up

11          a chain of various registrants to

12          handle controlled substances.

13                  And in order to put that in

14          place, you got registration -- there

15          are various other requirements of

16          the -- of the CSA in implementing

17          regulations.

18    QUESTIONS BY MR. LOESER:

19          Q.      And what is -- what are the --

20    what is the purpose of the implementing

21    regulations of the CSA?

22                  MR. DAVISON:  Objection.

23                  THE WITNESS:  To prevent

24          diversion, abuse of controlled

25          substances.
```

```
 1    QUESTIONS BY MR. LOESER:

 2          Q.     And how do they do that?

 3          A.     Through the various

 4    requirements that the regulations and any

 5    guidance provided by DEA.

 6                 So you have a registration, so

 7    you're required to get a registration.  In

 8    order to get a registration, you have to have

 9    the appropriate security in place.

10                 So once you get the

11    registration, then you have certain

12    recordkeeping requirements, reporting

13    requirements, that try to prevent that.

14    Prescription requirements.

15          Q.     And reporting requirements?

16          A.     Yeah.

17          Q.     And if one wanted to understand

18    the purpose and the requirements imposed by

19    the CSA, where would one look?

20          A.     Proposed by the CSA?

21          Q.     Yeah.  If you wanted to fully

22    understand what the requirements are of the

23    CSA, what would one look at?

24          A.     You'd look at the act and the

25    implementing regulations.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And what about regulatory

 2   guidance; would you look at that as well?

 3          A.     Yeah, there's -- there's --

 4   DEA, I guess, on SOM, in '06 and '07, put out

 5   three guidance letters.

 6          Q.     And specifically with regard to

 7   manufacturers, what obligations does the CSA

 8   impose on them?

 9          A.     Well --

10          MR. DAVISON:  Objection.

11          THE WITNESS:  -- the

12          practitioner level, the -- a good --

13          both the practitioner and the

14          non-practitioner level have the

15          regulations that they have to put in

16          place.

17               Manufacturers and distributors,

18          or the non-practitioners, are a little

19          different than the practitioner level.

20          One of them would be prescriptions.

21          You have to be a physician to

22          prescribe.  You have to be a pharmacy

23          to dispense, unless you're in a state

24          that has dispensing physicians.

25               But manufacturers and
```

Highly Confidential - Subject to Further Confidentiality Review

 1              distributors, if you involve the

 2              quota, the manufacturer has to obtain

 3              from DEA what they're allowed to

 4              manufacture to meet their distribution

 5              requirements.

 6                   You know, so you have different

 7              requirements at each -- at each level.

 8    QUESTIONS BY MR. LOESER:

 9         Q.    What are the reporting

10    requirements that apply to an opioid

11    manufacturer?

12         A.    Manufacturer?  ARCOS, loss and

13    theft, suspicious order monitoring.

14    Depending on what type of manufacturer, they

15    may have some UN reporting requirements, the

16    data that they have to provide DEA for DEA to

17    send in to the UN.

18                   Those are some of the -- then

19    there's labeling issues, physical security,

20    things like that.

21         Q.    And generally speaking, and

22    we'll get into more specifics later, but what

23    are the obligations the CSA imposes on opioid

24    distributors?

25         A.    I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      What are the obligations the

 2     Controlled Substances Act imposes on

 3     distributors?

 4          A.      Distributors?

 5                  MS. DICIURCIO:  Objection.

 6          Outside the scope.

 7                  MR. DAVISON:  You can answer.

 8     QUESTIONS BY MR. LOESER:

 9          Q.      Outside the room.

10          A.      For distributors, it would be

11     security.  It would be reporting requirements

12     similar to what the manufacturers have.  So

13     you'd have ARCOS, loss and theft, SOMs,

14     recordkeeping requirements, which is similar.

15     Or if you're a manufacturer, of course you've

16     got batch records and stuff like that.

17     Distribution records.

18                  And there's other things in

19     there that -- I didn't go into everything,

20     but that's basically it.

21          Q.      And what would you say are the

22     differences between the CSA obligations

23     imposed on manufacturers and those imposed on

24     distributors?

25          A.      The difference?
```

1      Q.      Yeah.

2      A.      Well, the manufacturing, you're

3   getting into where you're actually

4   manufacturing something, so they're going to

5   have a whole slew of recordkeeping, batch

6   records, and FDA plays a role.  Lab analysis.

7   They may do some drug research.  Depending,

8   they may require other registrations.

9              You get into a distributor,

10   it's the distributor registration.  They

11   can't repackage or manufacture, no

12   manufacturing activities.  And I'm not

13   talking about putting a bottle in a box and

14   shipping it.  They have security

15   requirements, receiving records, distribution

16   records.

17              And, of course, I said

18   reporting requirements.  That's the loss and

19   theft, registration, verification, and the

20   SOM.

21              So basically the same, with

22   different exceptions, requirements, that

23   manufacturers have.

24      Q.      And are the reporting

25   requirements the same for distributors and

1   manufacturers?

2        A.      Again, depending -- if you're

3   talking about ARCOS, they both have ARCOS.

4   Depending on the type of drugs they handle,

5   yes, they would be the same if they're

6   handling the same drugs, which is Schedule II

7   and Schedule III narcotics, Schedule I and

8   Schedule II and Schedule III narcotics.

9             If you're talking about SOM,

10  yes, it's a distribution requirement.

11            And loss and theft, yes.  The

12  manufacturer may have some other areas where

13  they have differences in loss and theft.

14            And in selecting a common

15  contract carrier that provides adequate

16  security, yes.

17            And verification --

18  registration verification, yes, they would be

19  the same.

20       Q.     Sir, do you believe it's

21  important for a DEA registrant to have

22  standard operating procedures for its

23  anti-diversion and suspicious order

24  monitoring system?

25            MR. DAVISON:  Objection.

```
 1                THE WITNESS:  Well, there's no

 2           requirement to have SOPs in the CSA or

 3           the implementing regulations

 4           whatsoever.

 5                FDA is the one who has

 6           requirements, like in the PDMA that

 7           handles samples, stuff like that.

 8                But does it make it easier

 9           or -- that a company have something,

10           either you want to call it an SOP or a

11           memorandum or something and they train

12           their employees?  That could be

13           acceptable, but you should have

14           something.

15      QUESTIONS BY MR. LOESER:

16           Q.    And so you generally advise

17      your DEA registrant clients to have SOPs or

18      something like it with regard to its

19      suspicious order monitoring and

20      anti-diversion practices?

21                MR. DAVISON:  Objection.

22                THE WITNESS:  The short answer

23           is yes, but we'll advise it that

24           security, access, how do you handle

25           the visitors, how do you handle DEA
```

```
 1              audit, SOM, something, either -- like

 2              I said, SOPs or, as you mentioned, or

 3              other documents, training procedures.

 4                    So there's a number of things

 5              that we would recommend.

 6      QUESTIONS BY MR. LOESER:

 7              Q.    If a DEA registrant is aware of

 8      an unusual pattern of geographic distribution

 9      of their product to pharmacies, pain clinics

10      and physicians, does the CSA require the

11      registrant to report these orders to the DEA?

12                    MR. DAVISON:  Objection.

13                    THE WITNESS:  Again, it depends

14              on the type of customers you have.  If

15              it's a manufacturer that only

16              services, let's say, wholesalers,

17              well, they may not have that

18              information.

19                    A distributor whose customer

20              base is pharmacies, they may have that

21              information.

22      QUESTIONS BY MR. LOESER:

23              Q.    So let me ask you again.

24              A.    Okay.

25              Q.    And I'm not asking what
```

```
 1    information they have.  I'm asking if a DEA

 2    registrant is actually aware of an unusual

 3    pattern of geographic distribution of their

 4    product to pharmacies, pain clinics and

 5    physicians, does the CSA require the

 6    registrant to report these orders to the DEA?

 7              MR. DAVISON:  Objection.

 8              THE WITNESS:  The regulation

 9         requires you to report suspicious

10         orders.  If your customer base is what

11         you mentioned, yes, you would have.

12              Now, if you have -- if you're

13         aware of diversion or something, you

14         read about something in the newspaper

15         or whatever way you get the

16         information -- like Mallinckrodt

17         reacted to that and addressed the

18         issue in Florida, Nevada, Ohio, when

19         they found out about it.

20              Now, when you talk about the

21         CSA, the requirement is you're a

22         registrant, you have requirements.

23         Next registrant, you have

24         requirements.

25              As you go down to the
```

1           distribution line, everybody has a

2           requirement.  If you possess that

3           product, you have your requirement to

4           meet those sections of the

5           regulations.

6    QUESTIONS BY MR. LOESER:

7           Q.    If a DEA registrant is aware

8    that specific pharmacies, pain clinics and

9    physicians are purchasing unusual amounts in

10   increasing frequency from multiple

11   distributors, should the registrant report

12   these orders to the DEA?

13              MR. DAVISON:  Objection.

14              THE WITNESS:  If you make a

15         determination, the registrant makes a

16         determination, that order is

17         suspicious after they do their due

18         diligence, the answer...

19   QUESTIONS BY MR. LOESER:

20          Q.    The answer is?

21          A.    Did you have another part of

22   that question?

23              No, I'm just asking because you

24   started to say something.  I don't --

25          Q.    Yeah, I can ask the question --

```
 1              A.      If it wasn't directed to me,

 2       then I'll back up.

 3                      Just repeat the question,

 4       please.

 5              Q.      Yeah.  If a DEA registrant is

 6       aware that specific pharmacies, pain clinics

 7       and physicians are purchasing unusual amounts

 8       in increasing frequency from multiple

 9       distributors, should the registrant report

10       these orders to the DEA?

11                      MR. DAVISON:  Objection.

12                      THE WITNESS:  If you're -- if

13              you -- if an order, let's say, pends

14              because of the criteria you just gave,

15              and you do your due diligence, as part

16              of that due diligence is you go out --

17              you're a distributor, let's say.  You

18              go out and look or whatever, and it

19              turns out the order is suspicious, you

20              report it to DEA.

21       QUESTIONS BY MR. LOESER:

22              Q.      What if the registrant flags

23       the order as suspicious because its algorithm

24       indicates that the order is an unusual amount

25       in increasing frequency from multiple
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors, at that point should the

 2    registrant report that to the DEA?

 3              MR. DAVISON:  Objection.

 4              THE WITNESS:  Well, in that

 5         situation, if your order pends, for

 6         whatever reason it is, you have to

 7         make a determination if it's

 8         suspicious or not.  Just because

 9         something pends doesn't make it

10         suspicious.

11              I'll give you an example.  You

12         set up an algorithm that says anything

13         over 20,000 -- and I'm just making up

14         a number -- is going to pend.  Well,

15         just because it pends at 20,000

16         doesn't make it suspicious.

17              You go out and you look at who

18         the customer is.  Is the customer a

19         hospital that's using large quantities

20         of opioids and they're purchasing

21         30,000, does that make it suspicious?

22         Not necessarily.

23              You may have a customer that's

24         only purchasing a thousand, which is

25         way under.  That may be suspicious if
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            your system kicked it out.

2                 So it's hard to make a definite

3            statement.

4    QUESTIONS BY MR. LOESER:

5            Q.    Let me try and make sure I get

6    you a question that you understand.

7            A.    Okay.

8            Q.    If the DEA registrant

9    determines that an order or series of orders

10   are in unusual amounts, they are in

11   increasing frequency and they're from

12   multiple distributors, is that a circumstance

13   that you would describe as suspicious?

14                 MR. DAVISON:  Objection.

15                 THE WITNESS:  If you make -- if

16            you look at that and make a

17            determination that it is suspicious,

18            you've looked at everything that you

19            should be looking at, then you report

20            it to DEA.

21   QUESTIONS BY MR. LOESER:

22           Q.    Okay.  I want to better

23   understand the kinds of audits that you do

24   since you've testified that you took the same

25   approach here with your task for
```

```
 1    Mallinckrodt.
 2              First of all, how does a DEA
 3    registrant find out about you and hire you?
 4        A.    Website.  Well, first of all,
 5    I'm not --
 6        Q.    When you were more active.
 7        A.    Okay.  Website, word of mouth,
 8    recommendations from lawyers, recommendations
 9    from US Attorneys, recommendations from other
10    customers, I've said that, association
11    meetings we go to, presentations we give in
12    front of associations.
13              A number of ways.
14        Q.    And when you're hired by a
15    company to perform an audit of their CSA
16    compliance, what do you do to investigate?
17        A.    What do we -- I didn't get
18    that.  What do we --
19        Q.    When you're hired to perform a
20    CSA audit, what do you do to investigate?
21        A.    To investigate?
22        Q.    Yeah.
23        A.    Well, it's really an
24    inspection.  It's a regulatory review.
25              Now, depending on what the
```

 1    client is actually asking for, we would go on

 2    site and we review records.  We may do an

 3    accountability, you know, look at internal

 4    documentation, look at how they receive

 5    product, how they ship product, how they

 6    select the common contract carrier, if

 7    they're a manufacturer or a distributor, if

 8    it's a pharmacy or a chain, whatever it is,

 9    independent chain, go in and look at how they

10    handle controlled drugs and prescriptions and

11    stuff like that.

12              Due diligence, we're looking at

13    are there any regulatory issues -- we don't

14    look at anything financial -- any regulatory

15    issues.  Are they meeting the regulatory

16    issues.  If they are -- regulatory

17    requirements -- you know, you can go ahead,

18    and our recommendation would be, yeah, we

19    haven't found any.

20              So it really depends on the

21    situation, who is requesting it and what are

22    they actually requesting.

23         Q.    And do you interview people

24    that work for the company?

25         A.    If we're on site, yeah.

1    Q.    And are you typically on site

2    when you're auditing a company's compliance

3    with the CSA?

4    A.    No, we've done some paper

5    reviews off site.

6    Q.    Okay.  What's the norm for your

7    practice?

8    A.    It really depends on the

9    client.  Some want just a paper review, and

10   we'll ask for the documents.  Some will ask

11   us to go on site and look at various

12   situations.  Especially if they're asking you

13   to look at the physical security, if they

14   want the physical security looked at, so we

15   send our security expert.

16   Q.    And what percentage of the time

17   would you say that there's an on-site review?

18   A.    Oh, I don't recall, but there

19   was -- we had a number of on-sites and a

20   number of paper reviews.

21   Q.    And when you're not on site, do

22   you ever interview people?

23   A.    We may, may not.  Depends on

24   what they're asking us to do.

25   Q.    And how do you choose who to

1    interview?

2         A.      Excuse me?

3         Q.      How do you choose who to

4    interview?

5         A.      Depending on what we're being

6    asked to do.  If we determine -- if we're

7    doing an off-site review, let's say a paper

8    review, we may or may not.  It really depends

9    on what we're looking at.

10               If we have a question -- let's

11   say they want us to look at their receiving

12   and distribution records, they send us

13   examples.

14               If we have a question on the

15   record, like, is this really a distribution

16   record?

17               Well, yeah.

18               Are you sure it's really a

19   distribution record, because it doesn't have

20   the customer's registration number on it.

21               So it's things like that we may

22   go back and have a discussion.

23        Q.      What about when you're

24   reviewing a suspicious order monitoring

25   program and anti-diversion controls, is that

1    typically on site?

2         A.    Yeah.  A lot of them are on

3    site; some can be off site.

4         Q.    And then they're on site, how

5    do you determine who to interview?

6         A.    Depending on who's involved in

7    the program.

8         Q.    Okay.  So you look for all the

9    people that are involved and you interview

10   them?

11              MR. DAVISON:  Objection.

12              THE WITNESS:  Yeah, if it's

13        required to be on site.

14   QUESTIONS BY MR. LOESER:

15        Q.    And what are the tools that you

16   use to assess compliance?

17        A.    Compliance?

18              MR. DAVISON:  Objection.

19   QUESTIONS BY MR. LOESER:

20        Q.    Yeah, with the CSA.

21              And specifically -- let me be

22   clear -- compliance with the reporting

23   requirements, the SOM program and the

24   anti-diversion.

25        A.    Okay.  Compliance people,

1   security, legal -- and not necessarily in

2   this order -- probably sales and operations,

3   product managers.  Depending on the review,

4   we may touch all of them, touch some of them.

5   HR, hiring processes, hiring procedures.

6          Q.      And what are the tools that you

7   use to assess compliance?

8                  MR. DAVISON:  Objection.

9                  THE WITNESS:  Tools?

10  QUESTIONS BY MR. LOESER:

11         Q.      Do you have a set of standards

12  that you apply?  Are there a set of metrics

13  that you utilize when you're evaluating a SOM

14  program or anti-diversion efforts?

15         A.      If you're talking about that,

16  then we'll look at it based upon the

17  regulations, we'll base it upon industry

18  standards, and we'll base it upon -- we may

19  take a -- one of our people with us, if they

20  want us to look at a SOMs program, which

21  could be a statistician.  It could be an

22  expert in com -- if it's a computer program,

23  a computer service, you know, how to handle

24  the computer.  It really depends on what

25  we're being asked to do.

 1          Q.     Well, let's say you're being

 2   asked to evaluate whether a SOM program

 3   complies with regulations and the CSA.

 4          A.     Well, it's not necessary that

 5   you have a system, okay?  So --

 6          Q.     Let's say a company has a

 7   system, and they're hiring you and BuzzeoPDMA

 8   to audit that system.  Are there factors or

 9   standards that you utilize when doing that?

10                 MR. DAVISON:  Objection.

11                 THE WITNESS:  Well, we'll

12          look -- well, again, depending on the

13          client and the process they have in

14          place will determine how we look at

15          it.

16                 Are we looking at it just based

17          upon records and how that process

18          works?  Are they asking us to go in

19          depth into, if they have electronic

20          system, how that system works?  We'll

21          look at it that way.

22                 But it really depends on what

23          we're being asked to do.  Because,

24          like I said, depending on your client

25          base will determine what kind of

```
 1          system you have in place.

 2                  So if you have a large client

 3          base, that is one determination you

 4          use in which you -- how you're looking

 5          at it.  If you have a very small

 6          client base, that will influence how

 7          you look at it.

 8   QUESTIONS BY MR. LOESER:

 9          Q.    Well, let me try and clarify.

10                  If you've been asked by a major

11   pharmaceutical manufacturer to evaluate its

12   SOM program and anti-diversion efforts, are

13   there metrics or tools that you utilize to

14   assess compliance?

15                  MR. DAVISON:  Objection.

16                  THE WITNESS:  The regulations

17          and the experience that either I have

18          or, when I had the company, the people

19          have.

20   QUESTIONS BY MR. LOESER:

21          Q.    And do you have any kind of

22   checklist or standard procedures that you

23   would utilize when performing an audit like

24   that?

25          A.    We had checklists.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  And what was on the

 2   checklist?

 3          A.     A number of questions of how do

 4   you receive physical security questions,

 5   examples of receiving records, what's the

 6   distribution record, things like that.

 7   Prescriptions, how many prescriptions.  You

 8   know, if it's a pharmacy, how much of your

 9   business is noncontrolled, controlled, how

10   much is cash, how much is check or insurance

11   plan.  Depending on who the registrant is.

12          Q.     What was on your checklist for

13   reporting requirements?

14          A.     That would be in the security

15   section.  Do you have an SOM program.

16          Q.     And what would you look for

17   with regard to the SOM program?

18          A.     Again, we'd -- first thing we'd

19   look at is your client -- your customer base,

20   and then we'd look at -- if it was a computer

21   program and they wanted us to look at that

22   point, then we'd bring in one of our computer

23   people.

24                 If it was just how the process

25   works, how the employees are involved in it,
```

```
 1    then that's handled differently, and that's
 2    really a paper review, a process review.
 3              So it really depends.  Again,
 4    it gets back to what you've been hired to do
 5    and what's your customer base.
 6        Q.    Did you make any --
 7        A.    I've seen systems -- let me say
 8    this.  I've seen systems that had -- where
 9    companies had very small -- has a very small
10    number of customer base.  Everything's done
11    on paper.
12        Q.    And did you make any effort to
13    measure the effectiveness of a suspicious
14    order monitoring program?
15              MR. DAVISON:  Objection.
16              THE WITNESS:  Again, depending
17         on what we were asked to do, we would
18         look at the process, you know, how do
19         you determine -- how do you pend an
20         order.  Whether it's paper-based
21         system or electronic, how do you pend
22         that order, and then what do you do if
23         it pends.
24    QUESTIONS BY MR. LOESER:
25        Q.    And what would you evaluate
```

Highly Confidential - Subject to Further Confidentiality Review

1    about that?  What were you looking for?

2        A.    Looking for is if they -- did

3    the determination of what's suspicious/not

4    suspicious work?  And --

5        Q.    How did you determine that?

6        A.    Well, it's -- again, it

7    depends.  I was more in the regulatory area,

8    and I would look for the process, an order --

9    when an order comes in, what happens to that

10   order?  How does it go through the process?

11   How do people look at it from a suspicious

12   order monitoring program?  Who looks at it

13   first?  Does your customer service reps look

14   at it first?  Do your product managers look

15   at it?  Does security get involved in it?

16   Does legal get involved in the process?  Does

17   compliance get involved in the process?

18            These are -- these are not

19   simple questions.  They're detailed

20   questions.  You have to know the details, the

21   customer base, before -- in order to render

22   that decision.

23       Q.    Let me ask you this.  In all of

24   your years of auditing suspicious order

25   monitoring programs, did you ever see one

```
 1    that you thought was inadequate?

 2         A.    Inadequate?

 3         Q.    Yeah.

 4               MR. DAVISON:  Objection.

 5               THE WITNESS:  It's possible.  I

 6         would -- I think possibly.

 7    QUESTIONS BY MR. LOESER:

 8         Q.    And give me an example of what

 9    would be an inadequate suspicious order

10    monitoring program.

11               MR. DAVISON:  Objection.

12               THE WITNESS:  Again, I said

13         it's possible because I don't recall

14         actual investigations that I've done

15         or was involved in.

16    QUESTIONS BY MR. LOESER:

17         Q.    You don't recall a single --

18    the details of a single suspicious order

19    monitoring program that was inadequate?

20               MR. DAVISON:  Objection.

21               THE WITNESS:  No, because,

22         again, we wouldn't work for a company

23         that was really involved in diversion.

24         So a lot of the systems we looked at,

25         we may recommend something that's not
```

1           a regulatory requirement but something

2           you should look at and consider.

3                 Or if there are guidance

4           letters that came out, we may -- as we

5           talked about earlier, we may recommend

6           something else that they should add to

7           their system.

8                 Or we may say, you know, you

9           have to involve security in the

10          process of determining whether

11          security or not security.

12                So it's things like that.

13   QUESTIONS BY MR. LOESER:

14       Q.    Did you ever get involved in an

15   audit where you determined that diversion was

16   actually occurring based upon the flawed

17   suspicious order monitoring program that the

18   registrant utilized?

19                MR. DAVISON:  Objection.

20                THE WITNESS:  Not suspicious

21          order.  Most of them were involved in

22          employee theft and how to prevent

23          employee theft.  How were they

24          doctoring the records.

25                And I'm talking about the

1          distribution chain, not just the

2          manufacturer, is where -- how can I

3          prevent -- I've had some theft, how do

4          I prevent it.  I'm a bulk manufacturer

5          and somebody is stealing some of my

6          product.  You know, it's things like

7          that we'd look at.  Or I had an

8          extraordinary loss.  Is that diversion

9          or was it just a manufacturing loss

10         because the filter broke?

11                At the practitioner level,

12         hospital says, you know, we had a

13         nurse or a PA or a physician

14         apparently is maybe a drug user, how

15         do we prevent that from happening

16         again.

17                At the pharmacy level, same

18         situation.

19                So those are the type of losses

20         we were involved in.

21     QUESTIONS BY MR. LOESER:

22         Q.     So let me ask you this --

23         A.     And we were looking at it from,

24     how do I prevent this from happening again.

25     How do I prevent somebody from doctoring a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    record in the hospital so they don't divert

 2    product and give it to themselves instead of

 3    giving it to the patient.

 4              At a distributor level, the

 5    distributor wants to know, I want to prevent

 6    diversion of my product.  How do I do that?

 7              Or this is -- I shouldn't say

 8    that.  I put this in place.  How do I

 9    prevent -- you know, do I -- there's ways --

10    should I upgrade it.  Because you've looked

11    at a lot of industry.  And the same way with

12    the manufacturer.

13              That was mainly the losses that

14    we were involved.

15              MR. DAVISON:  And, Derek,

16         whenever is a good point, it's almost

17         1.  We could take a break.

18              MR. LOESER:  Okay.  A couple

19         more questions.

20    QUESTIONS BY MR. LOESER:

21         Q.    Mr. Buzzeo, would you agree

22    that every time you completed an audit or

23    prepared a recommendation or a report for a

24    DEA registrant client, it was done with the

25    view of ensuring that the registrant would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   be, in your view, in full compliance with the
 2   CSA?
 3              MR. DAVISON:  Objection.
 4              THE WITNESS:  As I mentioned
 5        earlier, when we looked at a -- we did
 6        a review of a registrant, we were
 7        looking at it from you meet the
 8        requirements, here's what we suggest.
 9        You maybe enhance it.  Here's some
10        recommendations we would make.  That's
11        what we look at.
12   QUESTIONS BY MR. LOESER:
13        Q.    And, sir, when you would give
14   your registrant client a report or make a
15   recommendation, was that done for the purpose
16   of ensuring that if the registrant followed
17   your recommendation, they would be in full
18   compliance with the CSA?
19              MR. DAVISON:  Objection.
20              THE WITNESS:  At that point in
21        time.
22   QUESTIONS BY MR. LOESER:
23        Q.    Yes.
24              At that point in time, yes?
25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.      Okay.

2         A.      Let me back up on that.

3                 I want to clarify -- can I

4     clarify a statement?

5         Q.      You know, you'll have a chance

6     when -- if your counsel wants to ask you to

7     clarify it.

8         A.      Okay.  Go ahead.

9                 MR. DAVISON:  Take a break.

10                 VIDEOGRAPHER:  Off the record

11        at 1:03 p.m.

12         (Off the record at 1:03 p.m.)

13                 VIDEOGRAPHER:  We're back on

14        the record at 1:54 p.m.

15    QUESTIONS BY MR. LOESER:

16        Q.      Mr. Buzzeo, when you were with

17    BuzzeoPDMA, was it the general practice to

18    provide your DEA registrant clients with a

19    written report following an audit or an

20    evaluation that you did of their CSA

21    compliance?

22        A.      If they requested a report or

23    wanted a report, again, depending on how we

24    were retained, yes.

25        Q.      And was it generally the case
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that the written report summarized the --

 2    your findings with regard to their CSA

 3    compliance?

 4         A.    Based upon what they were

 5    asking for, yes.

 6         Q.    And described the investigation

 7    that you had done?

 8         A.    We had some details on the type

 9    of inspection.

10         Q.    And would also provide -- if

11    your investigation identified deficiencies

12    with regard to CSA compliance, would the

13    report identify those deficiencies?

14              MR. DAVISON:  Objection.

15              THE WITNESS:  Yes.  If we found

16         deficiencies or enhancements, we

17         recommended the recommendations.

18    QUESTIONS BY MR. LOESER:

19         Q.    And as you just said, you'd

20    then, in your report, generally provide

21    recommendations to how -- for how to cure

22    those deficiencies; is that right?

23         A.    If it was actually a

24    deficiency -- well, if we're talking a

25    regulatory issue or -- regulatory issue or
```

1    just a business consideration, we would

2    recommend enhancements.

3         Q.     You would recommend

4    enhancements when you identified deficiencies

5    with regard to compliance with CSA

6    regulations and requirements?

7         A.     Yes.

8         Q.     And when you were hired to

9    provide guidance to your DEA registrant

10   clients with regard to their CSA compliance,

11   did you view that as important work?

12        A.     Yes.

13        Q.     And you always took that work

14   seriously?

15        A.     Yes.

16        Q.     And has it been your practice

17   to carefully monitor DEA guidance and

18   pronouncements regarding the Controlled

19   Substances Act and implementing regulations?

20        A.     Yes.

21        Q.     And have you done this so you

22   can advise your clients appropriately about

23   what they need to do to comply with the law?

24        A.     Yes.

25        Q.     And when you conduct an audit

Highly Confidential - Subject to Further Confidentiality Review

1    or an evaluation of a DEA registrant client,

2    are you thorough?

3         A.      Yes.

4         Q.      And are you careful?

5         A.      Yes.

6         Q.      And do you provide truthful and

7    accurate information to your clients?

8         A.      Yes.

9         Q.      And we discussed this some

10   before, but do you accurately describe the

11   legal requirements of the CSA and the

12   implementing regulations of the CSA?

13        A.      We didn't do any legal -- we

14   didn't get into the legal area.  We left that

15   up to the attorneys.

16        Q.      And so did you accurately

17   describe the regulatory requirements of the

18   CSA and the implementing regulations?

19        A.      Yes.

20        Q.      And did you accurately portray

21   your understanding of how the DEA interpreted

22   the CSA and its implementing regulations?

23        A.      It was more of a -- our

24   understanding of the regulations that we

25   would apply or if DEA had any guidance.  DEA

1    may look at something one way, you know, so

2    it really -- it was regulatory expertise,

3    looking at either guidance or the

4    regulations.

5         Q.    And when you were describing

6    for your clients DEA guidance, did you

7    describe DEA guidance, in your view,

8    accurately?

9         A.    We -- keep in mind, we're not

10   speaking for the Agency.  But as far as we

11   knew it was accurately -- yes, we would try

12   to be as accurate as possible.

13             Or we may recommend they

14   contact DEA on a number of occasions.

15        Q.    And did you give your clients

16   guidance and advice that was consistent with

17   your understanding of your clients'

18   regulatory obligations under the CSA?

19        A.    Yes.

20        Q.    You didn't mislead your DEA

21   registrant clients, did you?

22        A.    Never.

23        Q.    Or distort the law?

24        A.    Not at all.

25        Q.    Or spin the law in any way?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Not at all.

2                  If somebody wanted us do that,

3      we'd walk away from them.

4          Q.      And you didn't make up legal

5      requirements that didn't, in your view,

6      actually exist?

7          A.      We never talked about any legal

8      requirements.

9          Q.      And you didn't make up

10     regulatory requirements that in your view did

11     not exist?

12         A.      No, we based everything on what

13     we thought the regulations were and also

14     industry standards and any guidance DEA put

15     out.

16         Q.      And you advised your clients to

17     take the actions that you thought they needed

18     to take in order to fully comply with the

19     regulatory requirements?

20                 MR. DAVISON:  Objection.

21                 THE WITNESS:  From a regulatory

22         perspective, we may have recommended

23         they talk to DEA, as I said, or even

24         to their counsel.

25

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.     And, sir, do you stand behind

 3    the audits and the evaluations that you've

 4    done in the past for your clients?

 5         A.     Yes.

 6         Q.     Did you ever give presentations

 7    at industry events and meetings?

 8         A.     Yes.

 9         Q.     And would you say that these

10    presentations were in the regular course of

11    your business?

12         A.     Yes.

13         Q.     And when you gave these

14    presentations, did you truthfully and

15    accurately describe your understanding of the

16    CSA and its implementing regulations?

17         A.     Yes.

18         Q.     And during those presentations

19    when you discussed DEA guidance, did you

20    truthfully and accurately state your

21    understanding of the DEA guidance?

22         A.     DEA guidance, DEA regulations,

23    industry standards, it really depends on what

24    they -- what they were asking -- what we were

25    asked to present on.  So it may be DEA
```

1    guidance or what's going on in the industry

2    today, what's the state requirement.  It

3    really depends on the situation.

4         Q.    And with regard to all of those

5    things, you provided what you viewed as

6    truthful and accurate information?

7         A.    From a regulatory perspective,

8    yes.

9         Q.    And you stand by this work as

10   well?

11        A.    Yes.

12        Q.    Mr. Buzzeo, can you define for

13   me what an algorithm is?

14             MR. DAVISON:  Objection.

15             Sorry, go ahead.

16             THE WITNESS:  Keep in mind, I'm

17        not an expert when it comes to

18        statistical models, algorithms, stuff

19        like that.

20             My understanding is that's

21        something to do with purchases for a

22        given period of time, maybe a running

23        period of time, for 6 months or 8

24        months or 12 months, and then there'd

25        be a standard deviation.

```
1    QUESTIONS BY MR. LOESER:

2         Q.    And just in terms of the

3    meaning of the term "algorithm," do you have

4    an understanding of what it is?

5         A.    My understanding is what I just

6    described.

7         Q.    Is it a -- is it math?  Is it a

8    calculation?

9         A.    It can be math, calculation.

10        Q.    Okay.  And is it something like

11   2 times X is an algorithm?

12        A.    Yeah, 2 times X, 3 times X.

13        Q.    And, sir, what is a

14   threshold-based system?

15        A.    It's when -- like you take

16   an -- let's take an average of all your sales

17   and your certain customer base and you divide

18   it out.  That could be one of the ways to

19   have a threshold.

20        Q.    And, sir, is there a problem

21   with relying on a threshold-based system in a

22   registrant's SOM program?

23             MR. DAVISON:  Objection.

24             THE WITNESS:  It really depends

25        on the registrant, depends on the
```

1          class of trade they have.  It really

2          depends on a lot of things and what

3          you really recommend for an SOM

4          program.

5     QUESTIONS BY MR. LOESER:

6          Q.     And are you familiar with any

7     guidance that has been provided by the DEA as

8     to whether a threshold-based system is

9     appropriate under the CSA?

10         A.     I think there was something in

11    one of the letters.  I'd have to refresh my

12    memory, but I think there's something in

13    there that talks about systems previously

14    approved but not currently -- you know, the

15    DEA made no recommendations on.

16         Q.     Do you have any recollection of

17    whether the DEA indicated that a

18    threshold-based system was not adequate?

19              MR. DAVISON:  Objection.

20              THE WITNESS:  I don't recall.

21    QUESTIONS BY MR. LOESER:

22         Q.     Now, sir, do you agree that an

23    adequate suspicious order monitoring program

24    measures the size of an order?  Is that one

25    of the things that it measures?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Size, frequency, pattern.

2       Q.      Okay.  So you mentioned three

3  things.

4               Are those -- all of those

5  things are required to be measured in an

6  adequate suspicious order monitoring program?

7       A.      As the regulation reads, they

8  give those as three standards.

9       Q.      And can an algorithm be used to

10  measure these factors?

11      A.      Could.

12      Q.      Can you give me an example of

13  how that would work?

14      A.      Let's say it's a pending --

15  it's a order that you -- based upon a number,

16  let's say, 8,000, 10,000, whatever that

17  number is, and anything exceeds that would

18  pend to make a determination if it's

19  suspicious or not.

20      Q.      And when you say "exceeds

21  that," can you give me an example of what

22  metric would be used to indicate whether

23  something exceeds?

24      A.      If the order exceeds 8,000 in a

25  given period of time, so let's say 30 days,

1   that could be a metric, and that would pend

2   the order.

3          Q.     And is it a CSA compliance

4   problem if a SOM program doesn't take into

5   account all three of these factors:  size,

6   frequency and pattern?

7                 MR. DAVISON:  Objection.

8                 THE WITNESS:  If you have a

9          program in place, those things could

10         be done by different elements of your

11         program.

12                So just one system, one

13         algorithm, doesn't have to do all

14         three of them.  But you have to do all

15         three of them to have a successful

16         program.

17   QUESTIONS BY MR. LOESER:

18          Q.     And if you don't have all three

19   of those things, does your program then not

20   comply with the CSA?

21          A.     It's possible --

22                 MR. DAVISON:  Objection.

23                 THE WITNESS:  -- depending on

24         the details.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LOESER:
 2         Q.     Is it possible not to have one
 3    or more of those items in your program and
 4    have the program still comply with the CSA?
 5              MR. DAVISON:  Objection.
 6              THE WITNESS:  In some manner,
 7         you should be looking at the entire
 8         regulation and what is required.
 9    QUESTIONS BY MR. LOESER:
10         Q.     So the regulations require that
11    you measure all three of those factors; is
12    that right?
13         A.     Yes.
14              MR. DAVISON:  Objection.
15    QUESTIONS BY MR. LOESER:
16         Q.     If an order is flagged as
17    potentially suspicious by a registrant SOM
18    program or SOM program, is there a
19    requirement to investigate the flagged
20    orders?
21              MR. DAVISON:  Objection.
22              THE WITNESS:  If the system, in
23         my terminology, pends an order, you
24         have to make a determination if it's
25         suspicious or not suspicious.
```

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.    And is that determination what

 3    you refer to as due diligence?

 4         A.    Due diligence.

 5         Q.    And what is required -- let's

 6    start with a manufacturer.

 7               What is a manufacturer required

 8    to do with regard to due diligence on what

 9    you're calling a pended order?

10               MR. DAVISON:  Objection.

11               THE WITNESS:  There's nothing

12          in the regulation that requires

13          anything.  The only thing the

14          regulation requires is you report

15          suspicious orders.

16    QUESTIONS BY MR. LOESER:

17         Q.    And in all your years and

18    experience advising opioid manufacturers,

19    what is your understanding of what the due

20    diligence must include?

21               MR. DAVISON:  Objection.

22               THE WITNESS:  Due diligence?

23               Well, again, depending on the

24          customer base, the number of customers

25          you have, the type of customers you
```

1     have, due diligence can include

2     telephone communication, on-site

3     visits, questionnaires, sales --

4     customer sales reps looking at it,

5     security looking at it.

6           It really depends on the --

7     these other issues of the client --

8     you know, the customer or their

9     customer base.  The registrant or the

10    customer base.

11  QUESTIONS BY MR. LOESER:

12    Q.    And based on all the reviews

13  that you've done, what are some examples of

14  when due diligence has not been performed

15  adequately by a manufacturer?

16           MR. DAVISON:  Objection.

17           THE WITNESS:  I don't think

18    there was -- repeat the question

19    again.  I want to make sure I

20    understand the question.

21  QUESTIONS BY MR. LOESER:

22    Q.    In the course of auditing DEA

23  registrants, including manufacturers, did you

24  ever come across due diligence that you

25  believed was inadequate?

1          MR. DAVISON:  Objection.

2          THE WITNESS:  Due diligence

3     that needed some enhancements, I've

4     come across.

5  QUESTIONS BY MR. LOESER:

6     Q.    Can you give some examples of

7  due diligence that needed some enhancements?

8     A.    Well, again, depending -- I

9  don't recall them all, but in generalities,

10 if you have a registrant, again, depending on

11 the customer base, you may want to do on-site

12 visits.  Or --

13    Q.    When would you want to do

14 on-site visits?

15    A.    Depending on the customer base

16 you have.

17    Q.    Okay.  Well, what would be an

18 example of when an on-site visit would be

19 appropriate?

20    A.    If there's a spike in a given

21 area, you may want to go look at the

22 registrants that are in that area.

23    Q.    And what would you look for

24 when you visited the registrant in that area?

25    A.    Well, it depends on who I am as

Highly Confidential - Subject to Further Confidentiality Review

1    a registrant and what my customer base is.

2          Q.     Let's say you're visiting a

3    pain clinic.  What would you look for?

4          A.     Oh, the type of -- how many

5    people are coming in and out, license plates.

6          Q.     Why license plates?

7          A.     Well, if they come in from out

8    of state to a particular pain clinic.

9          Q.     And why is that important?

10         A.     Well, if you have pain, why

11   would you be driving to another state?

12   That's the question.

13               Now, there could be a

14   legitimate reason for it.  Not everybody

15   drives into a pain clinic from another state.

16   It could be, in fact, you know, an illicit

17   activity.  But it's things you look at.

18               Do they pay cash.

19         Q.     And why does that matter?

20         A.     Most people have insurance of

21   some type.

22               Or, you know, they hand you a

23   baggy with the pills in it.

24               You talk to the professional on

25   staff, and are they professional, aren't they

```
 1    a professional.

 2              Do they provide alternative

 3    services?  Not everybody needs pain

 4    medication.  Do they have alternative

 5    services?  Do they have physical therapy?

 6              I was in one place one time,

 7    they had good credentials, they had all this

 8    physical therapy stuff, and when they showed

 9    it to you, it was all stacked with boxes.

10    That tells you right away that something is

11    not right here.

12              The patients were walking out

13    with bags of pills.  That's something not

14    right here.

15              They were -- they had to pay

16    cash at the window before they went into the

17    back.  That's not right.

18              So those are some of the things

19    you look for.

20         Q.   And would you say those things

21    are red flags for diversion?

22              MR. DAVISON:  Objection.

23              THE WITNESS:  Red flags for an

24         activity that needs to be looked at

25         further.  And possibly for pain
```

1          clinics I looked at, it did reflect

2          diversion.  But not all of them.  Some

3          of them are completely legitimate.

4     QUESTIONS BY MR. LOESER:

5          Q.    Is it enough for due diligence

6     just to determine if a customer has a DEA

7     registration?

8               MR. DAVISON:  Objection.

9               THE WITNESS:  Well, as you

10         know, the DEA registration is required

11         by -- you got to look at it --

12         required by regulation.  You have to

13         verify.

14              DEA and the regulations and the

15         Act has put forth, I think, 14 or 15

16         things you have to look at.  And the

17         DEA, for non-practitioners, we do it

18         every year, and the same things are

19         looked at by the Agency.

20              So it should be adequate, but

21         you do have to look further because

22         something could happen during a, you

23         know, period of time.

24    QUESTIONS BY MR. LOESER:

25         Q.    So just checking to see if the

```
1     recipient of controlled substances has a DEA

2     registration is not a complete and adequate

3     due diligence?

4                   MR. DAVISON:  Objection.

5                   THE WITNESS:  Again, it depends

6            on the type of registrant --

7     QUESTIONS BY MR. LOESER:

8            Q.     Well, when would it ever be the

9     case that determining that someone has a DEA

10    registration is adequate due diligence?

11           A.     You have to check and see

12    whether everybody has a registration.

13           Q.     Okay.  But when would that be

14    all that is necessary for due diligence?

15                  MR. DAVISON:  Objection.

16                  THE WITNESS:  I doubt people

17           would just do that.  Usually on a new

18           customer or something, they want to

19           see the operation.

20    QUESTIONS BY MR. LOESER:

21           Q.     Okay.  So it never would be

22    adequate due diligence just to check to see

23    if there was a DEA registration?

24                  MR. DAVISON:  Objection.

25                  THE WITNESS:  It really depends
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          on the customer base you're looking

2          at.

3     QUESTIONS BY MR. LOESER:

4          Q.    So for what customer base would

5     it be adequate due diligence just to check to

6     see if there was a DEA registration?

7          A.    It depends -- I'm just giving

8     you -- like you're asking hypothetical

9     questions.  I'm trying to give you answers

10    that -- some of the things you'd look at.  It

11    would be, is it adequate.  How long have they

12    been a customer of mine.  Do I have to do it

13    every -- do I do it every single time.  Do I

14    only do it when I get an order.  It's things

15    like that.

16         Q.    Right.  And I'm asking you a

17    simpler question.

18               Is it ever adequate due

19    diligence just to check to see if there's a

20    DEA registration?

21               MR. DAVISON:  Objection.

22               THE WITNESS:  I've never in my

23         career seen that.  They usually look

24         further.

25
```

```
 1    QUESTIONS BY MR. LOESER:
 2         Q.    So you would agree that it
 3    would not be adequate due diligence just to
 4    check for a DEA registration?
 5              MR. DAVISON:  Objection.
 6              THE WITNESS:  Well, when you're
 7         checking registration, are you also
 8         checking the security.  Are you going
 9         on site to do it.  It's things like
10         that.
11    QUESTIONS BY MR. LOESER:
12         Q.    If the only due diligence
13    that's conducted of a pended order is
14    checking to see if there's a DEA
15    registration --
16         A.    I've never seen that in my
17    client base.
18         Q.    And would that ever be
19    adequate?
20              MR. DAVISON:  Objection.
21              THE WITNESS:  You should be
22         checking further than just a
23         registration.
24    QUESTIONS BY MR. LOESER:
25         Q.    So it would not be adequate?
```

```
 1                 MR. DAVISON:  Objection.

 2                 THE WITNESS:  Probably not.

 3      QUESTIONS BY MR. LOESER:

 4           Q.    Is it a problem for a

 5      manufacturer to rely too heavily on customer

 6      service staff or salespeople when conducting

 7      due diligence on pended orders?

 8           A.    Not at all.  Depending on what

 9      program you have, what type of registrant you

10      are, you want to bring as many people as

11      possible into that.

12                 As I mentioned earlier, you're

13      looking at your customer service reps, you're

14      looking at product managers.  You may bring

15      security in on it, bring compliance in on it.

16      They're responsible for it in the company,

17      most companies.  You bring legal into it.

18      You're bringing a lot of people to get by in,

19      into that process.

20           Q.    Would it be a problem -- would

21      it be adequate due diligence just to rely on

22      customer service and salespeople to conduct

23      due diligence on pending orders?

24           A.    Well, depending on your client

25      base, it would be part of your program.  I
```

1    would say it has to be part of your program.

2         Q.    Right.  But --

3         A.    And I don't know of many

4    programs that just has the customer sales rep

5    look it.  They usually expand it to have

6    their compliance people involved in the

7    process because it's -- that's where the

8    responsibility lies.  They make the final

9    decisions, as does legal, involved in the

10   process.

11        Q.    Would you agree that it would

12   not be appropriate to rely solely on your

13   salespeople or customer service staff to

14   conduct due diligence on pended orders?

15             MR. DAVISON:  Objection.

16             THE WITNESS:  Unless I have

17        more details on it, I -- it's hard for

18        me to answer that question.

19   QUESTIONS BY MR. LOESER:

20        Q.    So can you think of

21   circumstances where it would be appropriate

22   to rely solely on salespeople and customer

23   service staff to conduct due diligence on

24   pended orders?

25        A.    I'd have to have the details on

1    it.

2                    MR. DAVISON:  Objection.

3                    THE WITNESS:  I'd have to the

4         details on the type of registrant.

5    QUESTIONS BY MR. LOESER:

6         Q.    So you can't answer whether it

7    would be inappropriate to rely solely on

8    customer service and salespeople to conduct

9    due diligence?

10                   MR. DAVISON:  Objection.

11                   THE WITNESS:  It depends on the

12        customer base.  It depends if I'm

13        dealing with 5 clients or 10,000

14        clients.

15   QUESTIONS BY MR. LOESER:

16        Q.    Have you ever advised --

17        A.    What's the role the customer

18   sales rep does.

19        Q.    Sir, have you ever advised your

20   DEA registrant clients that it would not be

21   appropriate to rely too heavily on their

22   customer service or sales personnel?

23        A.    The regulation really doesn't

24   address that issue.  The regulation says,

25   this is what you have to do.  And based upon

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the regulations, you could put any system you
 2    want into place as long as you're meeting
 3    that regulatory requirement of reporting
 4    suspicious orders.
 5              So to say somebody can't be
 6    involved in it or this person shouldn't be
 7    involved in it, it's a difficult question to
 8    answer.
 9         Q.    So I'm going to use the term
10    "too heavily."  I'm going to ask you, so that
11    we're clear what we're talking about:  Do you
12    believe it would be a problem for a DEA
13    registrant, a manufacturer, to rely too
14    heavily on sales staff and customer service
15    staff to conduct due diligence on pended
16    orders?
17              MR. DAVISON:  Objection.
18              THE WITNESS:  I think it's an
19         element in your program that should be
20         relied upon.
21              MR. LOESER:  Can you read the
22         question back, please?
23              (Court Reporter read back
24         question.)
25              THE WITNESS:  Again, as I said,
```

1          it really depends on the registrant

2          and their customer base.

3               And I don't know what "too

4          heavily" means.  If they're

5          providing -- you want as many

6          people -- as many employees of that

7          company or operations in that company

8          involved in the process, as long as

9          the final decision is made by

10         compliance and legal.

11    QUESTIONS BY MR. LOESER:

12         Q.    So in the context of the

13    question I just asked you, you don't know

14    what too heavily means?

15         A.    Oh, I know what too heavily

16    means, but, again, too heavily on one company

17    may be -- you know, two individuals or maybe

18    all they do -- it really depends on the

19    registrant you're dealing with, the customer

20    base they have.

21         Q.    So you would never advise any

22    of your DEA registrant clients not to rely

23    too heavily on customer service or sales

24    personnel?

25              MR. DAVISON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I would recommend
 2        that a large majority of your
 3        operations in that company be involved
 4        in the process, as long as compliance
 5        and legal have the final say on what's
 6        being reported as suspicious.
 7                MR. LOESER:  Can you read the
 8        question back, please?
 9                (Court Reporter read back
10        question.)
11                MR. DAVISON:  Objection.  Asked
12        and answered.
13    QUESTIONS BY MR. LOESER:
14        Q.    Can you answer that question,
15    please?
16        A.    Excuse me?
17        Q.    Can you answer that question?
18        A.    I did answer the question.  So
19    let me -- look, what I'm saying is is that
20    when you build a program in a company, a
21    suspicious order monitoring program, not just
22    an algorithm but a program, you want as many
23    people in that company involved in the
24    process:  security -- or compliance, let's
25    start with compliance, number one --
```

```
 1    security, legal, sales and marketing, to be

 2    part of the program, because you want the

 3    entire company to have buy-in.

 4              So customer sales reps would be

 5    involved in the program, product managers,

 6    depending on the type of company, would be

 7    involved in the program, security, all these

 8    other elements, as long as compliance and

 9    legal make the final decision.

10        Q.    So let me ask it this way.

11              Do you agree or disagree with

12    the following statement:  Customer service

13    and sales personnel should not be relied on

14    too heavily when conducting due diligence on

15    pended orders?

16              Do you agree with that

17    statement or disagree with that statement?

18              MR. DAVISON:  Objection.

19              THE WITNESS:  I believe that

20        they should be part of the process.

21    QUESTIONS BY MR. LOESER:

22        Q.    And is it a problem to rely too

23    heavily on them?

24              MR. DAVISON:  Objection.

25              THE WITNESS:  Well, are you
```

```
1            relying too heavily on security?  Are

2            you relying too heavily on legal?

3            It's not a yes or no question.

4     QUESTIONS BY MR. LOESER:

5            Q.    Okay.  So you can't answer the

6     question whether it's a problem to rely too

7     heavily on sales and customer service

8     personnel?

9                  That's all I'm asking you, is

10    if --

11           A.    I know.  But I'm answering the

12    question saying it really depends on the type

13    of program you have, who you rely on and what

14    role they play in it.

15           Q.    So the answer to my question

16    is, no, you can't answer that question?

17                 MR. DAVISON:  Objection.

18                 THE WITNESS:  I didn't say no;

19           I didn't say yes.  I'm just saying the

20           type -- the registrant has to

21           determine who their customer base is,

22           what sales they make, what type of

23           drugs they have, and who should be

24           involved in the company -- in the

25           program.
```

1            And as many elements or silos

2       that you have in the company should be

3       involved in the process, not making

4       final decisions but involved in the

5       process.

6            So I can't really say yes or no

7       on that question.

8    QUESTIONS BY MR. LOESER:

9       Q.    And that's not something you

10   would ever advise your clients then?

11      A.    Excuse me?

12      Q.    That's not something you would

13   ever advise your clients of?

14      A.    Oh, we would advise clients,

15   depending on the other elements that I said.

16      Q.    Would you advise your clients

17   not to rely too heavily on sales personnel or

18   customer service personnel?

19            MR. DAVISON:  Objection.

20            THE WITNESS:  I would advise

21       clients and the company would advise

22       clients that we want to include as

23       many people.  So if we went into a

24       company and, say, security was

25       involved, we would say, you should

Highly Confidential - Subject to Further Confidentiality Review

```
 1          involve security.

 2                    HR is not involved.  Well,

 3          maybe you should involve HR but on

 4          a -- more on the perimeter.

 5                    Sales and marketing should be

 6          involved so they have a good

 7          understanding of what a suspicious

 8          order is, what people should be

 9          looking for.

10                    You don't want to make cops out

11          of your sales reps or your

12          salespeople, but you want them

13          involved to have an understanding of

14          the program.

15    QUESTIONS BY MR. LOESER:

16          Q.    Sir, have you ever advised any

17    DEA registrant client not to rely too heavily

18    on customer service or sales personnel to

19    investigate pended orders?

20                    MR. DAVISON:  Objection.

21    QUESTIONS BY MR. LOESER:

22          Q.    Yes or no?

23          A.    At this point, in all the years

24    I've had in this, my best answer I can give

25    you on that is, depending -- as I've been
```

1    saying right along, depending on your

2    customer base, the type of registrant you're

3    dealing with, the type of drugs, you want as

4    many people involved in the process and all

5    to play a role in that process, as long as

6    your decision is made by compliance operation

7    and legal.

8         Q.    Have you ever advised any DEA

9    registrant client not to rely too heavily on

10   customer service or sales personnel to

11   conduct due diligence on pended orders?

12              MR. DAVISON:  Objection.  Asked

13        and answered.

14   QUESTIONS BY MR. LOESER:

15        Q.    You either have or haven't or

16   you don't recall.

17        A.    What I'm trying to say to you

18   is --

19        Q.    I understand what you're trying

20   to say, but I'm trying to get you to answer

21   whether you have or have not provided that

22   guidance, or if you don't recall, if that's

23   the case.

24              MR. DAVISON:  Objection.

25              THE WITNESS:  I don't recall,

1          because we'd usually have a discussion

2          about who should be involved in the

3          program and what role they should

4          play.

5                    So a customer sales rep would

6          have a better handle on what the

7          ordering pattern is, what they usually

8          order, what type of company they are,

9          and that should be brought into the

10         process of making the final decision.

11    QUESTIONS BY MR. LOESER:

12         Q.    So your answer --

13         A.    I'm not ignoring your question.

14    I'm just trying to give you a straight answer

15    of how the process should work from a

16    regulatory perspective.

17         Q.    So your answer is you don't

18    recall?

19              MR. DAVISON:  Objection.

20    QUESTIONS BY MR. LOESER:

21         Q.    Is that what you're saying?

22         A.    No, what I'm saying is --

23         Q.    I don't need to hear the whole

24    explanation again.  I'm asking you a

25    straightforward question.

Highly Confidential - Subject to Further Confidentiality Review

1              Have you advised your clients

2    not to rely too heavily on customer service

3    and sales personnel, or have you not advised

4    your clients of that?

5              MR. DAVISON:  Objection.  Asked

6         and answered I think seven or eight

7         times now.

8              THE WITNESS:  What I've said --

9    QUESTIONS BY MR. LOESER:

10        Q.    Sir, I don't need to hear the

11   whole explanation again.  What I'd like --

12        A.    Then I can't answer your

13   question because there's times when we advise

14   them --

15        Q.    So the answer is, yes, you have

16   sometimes --

17        A.    No.  There's time -- you told

18   me not to step on your questions.

19              There's time when you want to

20   advise them that they should be included and

21   the role they should play in the process,

22   just like you advise that if security is not

23   involved, they should be involved in the

24   process and what role they should play.  And

25   so in order to build a program, that's what

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you're doing.

 2               For me to stand here and say,

 3    no, they shouldn't be involved, they're

 4    involved too much, I'd have to have all the

 5    details in front of me, and I'd have to be

 6    aware of who the client -- the customer is,

 7    the registrant is.

 8        Q.    So I have not asked you whether

 9    they should be involved.  I've asked you

10    whether you've before advised your clients

11    not to rely too heavily on sales personnel

12    and customer service reps.

13        A.    And I'm telling you I can't

14    answer that question.  It really depends

15    on --

16        Q.    Have you ever advised clients

17    on that?

18               MR. DAVISON:  Objection.

19               THE WITNESS:  I don't recall.

20    QUESTIONS BY MR. LOESER:

21        Q.    Mr. Buzzeo, what specifically

22    should a manufacturer know about its customer

23    in order to adequately know its customer for

24    purposes of CSA compliance?

25               MR. DAVISON:  Objection.
```

```
 1                    THE WITNESS:  Are they
 2           registered.  Do whatever checks they
 3           do on it.  They've been on site
 4           probably before they establish a new
 5           customer.  If you have customer sales
 6           reps and product managers, they've
 7           been on site.  Your compliance people
 8           will go out and look at the operation
 9           in some cases, depending on the
10           situations and how often.
11                    It's things like that you're
12           looking at.
13   QUESTIONS BY MR. LOESER:
14           Q.    Are there particular red flags
15   a manufacturer should look for when
16   evaluating orders by its distributor
17   customers?
18                    MR. DAVISON:  Objection.
19                    THE WITNESS:  Well, you look at
20           the same thing from -- if you're
21           looking at the regulatory issues.  You
22           know, what quantities are they buying,
23           what type of drugs, patterns, things
24           like that, but keeping in mind that
25           that could vary, especially when
```

```
 1            you're dealing at the wholesale level.

 2                 Their client base may change.

 3            Maybe there's a recall on somebody

 4            else's product so your product may be

 5            up at that point in time.

 6                 So, again, there's this --

 7            there's a lot of things you have to

 8            look at before you make those

 9            decisions.

10   QUESTIONS BY MR. LOESER:

11       Q.    And is there a set of red flags

12   that you would look for every time in an

13   adequate --

14       A.    The ones I gave you.  We're

15   talking about the practitioner -- the

16   non-practitioner level, correct?

17       Q.    Right.

18       A.    Yeah.

19       Q.    Sir, is it important for a

20   manufacturer or registrant to pay attention

21   to what media reports say about the state or

22   geographical area where its controlled

23   substances are being shipped by its

24   distributor customers?

25                 MR. DAVISON:  Objection.
```

```
 1                THE WITNESS:  Well, it's one

 2           thing that you would look at.  If you

 3           got media reports like Mallinckrodt

 4           did, media reports of high

 5           distribution into Florida, they looked

 6           at that very carefully and they put

 7           some -- they took some steps, put some

 8           steps in place.

 9      QUESTIONS BY MR. LOESER:

10           Q.     And why would you look at that?

11           A.     Well, it's a source of

12      information.

13           Q.     Is it a source of information

14      about diversion?

15           A.     It's a source -- not

16      necessarily diversion -- until you look at it

17      to determine whether it's diversion or not,

18      it's a source of information.

19           Q.     Information of what?  What kind

20      of information?

21           A.     Patterns, maybe, what's going

22      on in that given area.

23           Q.     So circumstances that the

24      manufacturer should take into account in its

25      SOM program?
```

```
 1                    MR. DAVISON:  Objection.

 2                    THE WITNESS:  Well, again, as

 3           you know, there's no regulatory

 4           required for it, but if something --

 5           if you see something going on, that

 6           there's some steps that you would

 7           take.

 8   QUESTIONS BY MR. LOESER:

 9           Q.    And you would take those steps

10   so that you didn't allow diversion to occur

11   when you could otherwise stop it?

12                    MR. DAVISON:  Objection.

13                    THE WITNESS:  It's -- you

14           don't -- you don't want to see a

15           product -- if you become aware of --

16           to the news media, let's say, that

17           there's a problem in a given area,

18           you're going to react to it.

19                    And like Mallinckrodt did, they

20           reacted to it, they took certain

21           steps.  And there's a number of

22           clients -- not clients, but

23           registrants, that will do that.

24   QUESTIONS BY MR. LOESER:

25           Q.    And so what actions should a
```

1    company take when it identifies that a

2    particular geographic area where it's

3    products are being shipped has -- there are

4    reports that there's widespread diversion in

5    that area?

6              MR. DAVISON:  Objection.

7              THE WITNESS:  Maybe audits,

8         audits of -- if you have a distributor

9         in that given area or -- you do an

10        audit of that distributor or some type

11        of review of that distributor.

12   QUESTIONS BY MR. LOESER:

13        Q.    And would you say the same is

14   true for distributors?

15        A.    Distributors have a completely

16   different customer --

17        Q.    If there's reports of a

18   particular problem of diversion in an area,

19   should the distributor also pay attention to

20   those reports and take that information into

21   account in its SOM program?

22             MR. DAVISON:  Objection.

23             THE WITNESS:  Again, depending

24        on the customer base they have -- and

25        I can just answer this just in

```
 1              generalities.  The customer base they

 2              have, type of drugs, area, there would

 3              be probably some type of due

 4              diligence.

 5    QUESTIONS BY MR. LOESER:

 6         Q.      And the distributor, just like

 7    the manufacturer, would want to do that due

 8    diligence so that it could take it into

 9    account in its SOM program?

10              MR. DAVISON:  Objection.

11              THE WITNESS:  The due diligence

12              could be whatever.  It could be news

13              media, it could be telephone calls, it

14              could be whatever, but to look at the

15              issue.

16    QUESTIONS BY MR. LOESER:

17         Q.      You're saying distributors

18    should look at that information as well?

19              MR. DAVISON:  Objection.

20              THE WITNESS:  I didn't say

21              that.  I said depending on the issue,

22              depending on the customer base,

23              depending on what you're -- what

24              you're aware of.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LOESER:

 2          Q.    But you can't think of any

 3    reason why a distributor would not want to

 4    pay attention to media reports of diversion

 5    in an area of where it's shipping its

 6    products?

 7                MR. DAVISON:  Objection.

 8                THE WITNESS:  I think everybody

 9          should have a suspicious order

10          monitoring program in place where

11          they're looking at orders and make a

12          determination whether somebody is

13          suspicious or not suspicious.

14    QUESTIONS BY MR. LOESER:

15          Q.    Okay.  And so the distributor,

16    like the manufacturer, should pay attention

17    to media reports of diversion in particular

18    geographic areas, right?

19                MR. DAVISON:  Objection.

20                THE WITNESS:  What I'm saying

21          is, is that it's something -- if they

22          become aware of something, they would

23          react to it.

24    QUESTIONS BY MR. LOESER:

25          Q.    They should react to.  Is that
```

```
 1    what you're saying?

 2                MR. DAVISON:  Objection.

 3                THE WITNESS:  It would

 4         determine what was causing it.

 5                Don't forget, there's a lot of

 6         anecdotal information out there, and

 7         you want to make sure you don't get

 8         involved in that.  And there's even

 9         examples of that, where there was all

10         this so-called diversion.  Went and

11         out did reviews on it, there was

12         nothing.  There was one case, and they

13         built it into a hundred.

14    QUESTIONS BY MR. LOESER:

15         Q.    Are manufacturers required to

16    monitor what their customers' customers do

17    with controlled substances made by the

18    manufacturer?

19         A.    There's nothing in the

20    regulations that addresses that.

21         Q.    And so are you saying that they

22    are not required to monitor that?

23         A.    There's no requirement in the

24    regulations.

25         Q.    So again, are you saying that
```

 1    therefore manufacturers --

 2        A.    And even DEA has said that.

 3        Q.    So, sir, you're saying that

 4   there's no requirement for manufacturers to

 5   monitor what their customers' customers are

 6   doing with the manufacturers' products?

 7        A.    There's no regulatory

 8   requirement that requires you to look at your

 9   customers' customer, no matter what --

10   whether you're a manufacturer or distributor

11   or a pharmacy that's distributing.

12        Q.    And so, sir, are you saying

13   that based on that, it's not necessary for

14   the manufacturer to evaluate its customers'

15   customers?

16        A.    It's not -- it's -- DEA doesn't

17   even require -- didn't require you to do

18   that.  There was nothing in the regulations

19   require you to do it.

20        Q.    And so --

21        A.    And if we go ahead and start

22   monitoring our customers, or customers'

23   customers, we'll end up with a medicine

24   cabinet.

25        Q.    So what you're saying is that

1    you do not believe manufacturers have an

2    obligation to monitor their customers'

3    customers; is that what you're saying?

4         A.    Yes, they have no obligation.

5         Q.    As part of a manufacturer's SOM

6    program, should the manufacturer evaluate

7    the -- what particular drugs its customers

8    are ordering?

9         A.    Particular drugs?

10        Q.    Yeah.

11        A.    Well, they should monitor all

12   controlled substances.

13        Q.    Okay.  And should manufacturers

14   look at the ratio of controlled substances to

15   noncontrolled substances purchased by its

16   distributor customers?

17             MR. DAVISON:  Objection.

18             THE WITNESS:  That's more for

19        pharmacy activity.

20   QUESTIONS BY MR. LOESER:

21        Q.    That's not something that

22   manufacturers should do when evaluating

23   distributor orders?

24        A.    To me, that's a red flag for

25   the practitioner level.  Your customer is

1    paying cash, your customer has insurance.

2    Are you only ordering controlled drugs and

3    not noncontrolled drugs.  Do you have fun

4    items.  Do you have toothpaste, aspirin,

5    stuff like that.  That's a red flag for the

6    pharmacist.

7         Q.     Should manufacturers look to

8    see if their distributor customers are

9    ordering just certain controlled substances,

10   for example, those that are known to be

11   abused and diverted?

12        A.     What you have to look at is the

13   circumstances behind it.  Because let's say I

14   get a better price from somebody else.  I'll

15   buy one drug from that other manufacturer,

16   buy another drug from another manufacturer.

17             It's not just a yes or no

18   question.

19        Q.     So is that something that if a

20   manufacturer is evaluating its wholesale

21   distributor customers' orders -- they do have

22   to evaluate their wholesale distributor

23   customers' orders, right?

24        A.     They have a suspicious order

25   monitoring program in place.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And should that
 2   suspicious order monitoring system evaluate
 3   whether the wholesale distributor customer is
 4   buying predominantly controlled substances
 5   that are known to be abused and diverted?
 6               MR. DAVISON:  Objection.
 7               THE WITNESS:  I think -- I
 8          think in that situation your customer
 9          sales representative may say to them,
10          hey, how come you're not buying X and
11          X from me or, you know, this
12          controlled drug instead of that
13          controlled drug.
14               And somebody may say, well, I
15          only need this from you.
16               And next time the product
17          manager goes on site, they look at
18          it -- again, it depends on the
19          customer.
20               Now, if you have a customer --
21          you know, it really depends what
22          they're buying from you.  But, again,
23          it depends on the circumstances behind
24          it.
25               So if you go out on site and
```

```
 1              review that, it may be nothing.

 2    QUESTIONS BY MR. LOESER:

 3         Q.     I'll try again.

 4              So when a manufacturer is

 5    operating its SOM program and evaluating the

 6    orders from its wholesaler distributor

 7    customers, should one of the things the

 8    manufacturer always evaluate is whether the

 9    wholesale distributor customer is ordering

10    predominantly controlled substances that are

11    known to be abused and diverted?

12              For example --

13              MR. DAVISON:  Objection.

14    QUESTIONS BY MR. LOESER:

15         Q.     -- if the wholesale distributor

16    is just ordering oxycodone.

17              MR. DAVISON:  Objection.

18              THE WITNESS:  If the

19         manufacturer has a broad number of

20         products, let's -- or they just limit

21         it to controlled drugs, well, then you

22         would expect the wholesaler is only

23         going to buy a controlled substance

24         from you.

25              If you have a broad base, where
```

```
 1          you have control and noncontrol, then

 2          you may expect a wholesaler to buy

 3          both from you or maybe just buy one

 4          from you.

 5    QUESTIONS BY MR. LOESER:

 6          Q.    So you agree that it would be a

 7    red flag that the manufacturer should take

 8    into account in its SOM program if one of its

 9    customers only purchases controlled

10    substances, and within that only purchases

11    those that are most likely to be abused and

12    diverted?

13               MR. DAVISON:  Objection.

14               THE WITNESS:  If the only drugs

15          you're supplying is controlled

16          substances, that's not a yes or no

17          question.

18               If you're providing both

19          controlled and noncontrolled, it's

20          something you may want to look at.

21          Why are they only buying controlled

22          from you and not noncontrolled.  It

23          could be a pricing issue.

24               It's something you would look

25          at.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LOESER:

 2        Q.    Are you aware of whether

 3    particular prescription opioids are more

 4    abused and diverted than others?

 5        A.    Well, today my understanding

 6    is -- and I've been out of it a few years

 7    now -- is some of the oxy, some of the

 8    fentanyl products, hydrocodone products.  And

 9    then you got the lower Schedule IIIs and IVs

10    and non-narcotic that are being abused.  It

11    runs the gamut.

12            But we shouldn't forget out

13    there that also we have large quantities of

14    heroin and illicit fentanyl.

15        Q.    And so if a wholesale

16    distributor customer is ordering

17    predominantly oxy and that's one of those

18    that is most abused and diverted, is that

19    something that the manufacturer should take

20    into account in its SOM evaluation of that

21    wholesale distributor?

22            MR. DAVISON:  Objection.

23            THE WITNESS:  Those type

24        questions, without the details and

25        hypothetical questions, are extremely
```

```
 1          hard to answer.

 2     QUESTIONS BY MR. LOESER:

 3          Q.     Are there particular types of

 4     businesses which -- to which wholesale

 5     distributor clients ship their controlled

 6     substances that you believe a manufacture

 7     should be particularly concerned about?

 8          A.     Well, I'd like to --

 9               MR. DAVISON:  Objection.

10               THE WITNESS:  I was retained to

11          look at a manufacturer's program, not

12          to look at the wholesaler's business

13          and what they're distributing.

14               Those, again, we get back to

15          hypothetical questions.  They're too

16          general.  You'd have to give me an

17          awful lot of details before I could

18          respond to that question.

19     QUESTIONS BY MR. LOESER:

20          Q.     So in all of your years of

21     auditing, did you develop any understanding

22     of whether pain clinics were a problematic

23     type of business that should be taken into

24     account and evaluated in a SOM program?

25               MR. DAVISON:  Objection.
```

```
 1              THE WITNESS:  The pain clinics

 2       I looked at were problematic.

 3  QUESTIONS BY MR. LOESER:

 4       Q.    So do you believe that a

 5  manufacturer, when evaluating orders by its

 6  wholesale distributors, should consider

 7  whether those distributors are shipping

 8  predominantly to pain clinics?

 9       A.    Well, it depends.  Again I'll

10  ask you:  Is the pain clinic associated with

11  an institution such as a hospital?  Then you

12  would -- you know, you look at it maybe a

13  little differently.  Is it a private clinic?

14              It really depends on the

15  circumstances and details.  All I said was,

16  the ones I looked at were problematic.

17              But you may have some out there

18  completely legitimate.  You got to look at

19  them carefully before you make a decision.

20              Like one of the depositions I

21  looked at said anything over 8,000 is

22  suspicious, should be reported to the DEA.

23  That doesn't make sense to me.

24       Q.    Sir, do you believe it's

25  important for a manufacturer to evaluate
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    whether multiple distributors that are

2    purchasing from the manufacturer are shipping

3    to the same downstream customer?

4              MR. DAVISON:  Objection.

5              THE WITNESS:  You're going to

6         have to -- give me that question

7         again.

8              And I don't want to say it, but

9         try --

10   QUESTIONS BY MR. LOESER:

11        Q.    Do you believe that a

12   manufacturer should evaluate whether multiple

13   of its distributor clients are shipping the

14   manufacturer's product to the same downstream

15   customer?

16              MR. DAVISON:  Objection.

17              THE WITNESS:  The same --

18   QUESTIONS BY MR. LOESER:

19        Q.    Downstream customer?

20        A.    Multiple distributors selling

21   to the same --

22        Q.    Selling controlled substances

23   to the same downstream customer?

24              MR. DAVISON:  Objection.

25              THE WITNESS:  Same doctor, same
```

Highly Confidential - Subject to Further Confidentiality Review

 1          registrant --

 2     QUESTIONS BY MR. LOESER:

 3          Q.     Right.

 4          A.     -- multiple distributors to the

 5     same...

 6               Well, yeah, you would look at

 7     that from a perspective of, is it a pricing

 8     issue?  Is it a possible suspicious

 9     situation?  It may be somebody that can't get

10     the product from or is it a backorder on the

11     product or somebody's recall?  So you have to

12     look at the circumstances.

13               If I'm buying from 14 different

14     manufacturers and everybody is supplying with

15     the drug, well, I need to look at that maybe

16     a little more deeper.  But again, it depends

17     on the circumstances.

18               Maybe I've been buying from A

19     because -- and B but -- I was buying from A,

20     and now I'm buying from B because A is out of

21     stock, or there's a recall or something, and

22     only C has the product.  So right there and

23     then, that one scenario, I've purchased from

24     all three of them over a period of time.

25               So what's the time period?

1    What's the circumstances behind it?  But it's

2    something you would look at.

3         Q.    It's something that if you saw

4    that the same downstream customer was

5    obtaining controlled substances from multiple

6    distributors, you would want to investigate

7    that and make sure that there wasn't

8    diversion occurring, correct?

9              MR. DAVISON:  Objection.

10             THE WITNESS:  Again, it depends

11        on the customer base.  And like I

12        said, I was retained only to look at

13        Mallinckrodt's program.  I did not get

14        into the customer bases for

15        distributors and what their functions

16        should be.

17   QUESTIONS BY MR. LOESER:

18        Q.    But the circumstances that

19   we've been discussing is a potential cause

20   for concern that the registrant would want to

21   investigate, right?

22             MR. DAVISON:  Objection.

23             THE WITNESS:  The question I

24        thought I heard from you was, if a

25        manufacturer dealing with wholesalers

1          is -- and this wholesaler is buying

2          from multiple manufacturers.

3     QUESTIONS BY MR. LOESER:

4          Q.    No.  One manufacturer, multiple

5     wholesalers, shipping to the same downstream

6     customer.

7          A.    Oh, I wouldn't know.

8          Q.    You don't have any opinion on

9     that?

10         A.    Well, it really depends on the

11    circumstances.

12         Q.    So you've indicated in your

13    report that you audited a lot of registrants,

14    including pharmacies --

15         A.    Uh-huh.

16         Q.    -- including some pain clinics,

17    correct?

18         A.    Yes.

19         Q.    And if a pain clinic is

20    receiving oxy from multiple different

21    distributors, all sold by the same

22    manufacturer, is that a circumstance that you

23    think would require further investigation?

24              MR. DAVISON:  Objection.

25              THE WITNESS:  If you knew that

1        as factual, it was something we would

2        look at.  But the only one that has

3        that --

4    QUESTIONS BY MR. LOESER:

5        Q.    Why would you look at that?

6        A.    Excuse me.  The only one that

7    has that information is DEA through their

8    ARCOS report.  Nobody else -- customer --

9    registrants don't share their customer base

10   with other registrants, usually.

11       Q.    Let me try one more time.

12             If you're a manufacturer and

13   you have multiple distributors purchasing

14   your product, and all those multiple

15   distributors are sending that product to the

16   same pharmacy, the manufacturer has

17   information then showing all of those sales

18   to the pharmacy, correct?

19       A.    Oh, yeah.

20             MR. DAVISON:  Objection.

21             THE WITNESS:  I understand the

22       question better now.

23             If the manufacturer is aware of

24       that through a chargeback program,

25       let's say, as Mallinckrodt did, they

```
 1          would send a letter to the wholesalers

 2          and to DEA, not saying it's suspicious

 3          or not, but it's something that should

 4          be looked at, and they would say,

 5          we're not going to reimburse that

 6          company for any -- reimbursement on

 7          chargebacks.

 8     QUESTIONS BY MR. LOESER:

 9          Q.     And why is it something that

10     should be looked at?

11               MR. DAVISON:  Objection.

12               THE WITNESS:  I mean, you gave

13          me the example.  This one

14          distributor -- the multiple

15          distributors selling to one person.

16          The only one that really knows that

17          information is DEA because they -- you

18          know, DEA gets the information.

19               Now, if the manufacturer's

20          aware of that for whatever reason,

21          maybe through the chargeback program,

22          then they would look at it.

23               And as Mallinckrodt has, they

24          send a letter to distributors.  We're

25          not going to honor any more
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          chargebacks, and they send copies of

2          that letter to DEA.

3    QUESTIONS BY MR. LOESER:

4          Q.    And a manufacturer would do

5    that because there may be diversion occurring

6    at the downstream customer?

7                MR. DAVISON:  Objection.

8                THE WITNESS:  All they know is,

9          it's something that should be looked

10         at, and they're reporting to DEA so

11         DEA can look at it.  It's not part of

12         their SOM program.

13   QUESTIONS BY MR. LOESER:

14         Q.    Should orders flagged as

15   potentially suspicious be held until the due

16   diligence investigation is complete?

17         A.    I missed the first part of your

18   question.

19         Q.    Should orders flagged as

20   potentially suspicious be held until the due

21   diligence investigation is complete?

22                MR. DAVISON:  Objection.

23                THE WITNESS:  When you hold an

24         order that's pend till you make a

25         determination whether the order is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          suspicious or not, then you make a
 2          determination whether you're going to
 3          ship it or not.
 4               So if it's suspicious, you
 5          report it to DEA.  You make a
 6          determination, do I ship or not ship.
 7               There's nothing in the
 8          regulation that says you can ship,
 9          there's nothing that says you
10          should -- you can ship it -- can't
11          ship it.
12     QUESTIONS BY MR. LOESER:
13          Q.    Sir, in your view, is it okay
14     for manufacturers to decrease the size of an
15     order to avoid triggering a suspicious order
16     flag?
17          A.    No.
18          Q.    What training is required for
19     the personnel who are involved in the
20     manufacturer SOM program?
21               MR. DAVISON:  Objection.
22               THE WITNESS:  From DEA
23          perspective?
24     QUESTIONS BY MR. LOESER:
25          Q.    From the compliance
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    perspective.

2         A.     There's no requirement.

3         Q.     And how would you advise your

4    clients in terms of how they should train the

5    personnel involved in SOM programs?

6         A.     If you handle controlled drugs,

7    you'd be aware of your responsibility and

8    requirements, depending on what function they

9    have.

10        Q.     I asked you about whether a

11   threshold system was appropriate for a

12   manufacturer's SOM program, and I'll ask you

13   the same thing about distributors.

14               Is a threshold-based system

15   acceptable for a distributor's SOM program?

16               MR. DAVISON:  Objection.

17               THE WITNESS:  All I know is

18          what I've been hired to do is look at

19          Mallinckrodt's program, not the

20          distributor program, not how they

21          function, none of the regulatory

22          issues associated with distributors.

23               And that's a hypothetical

24          question that I really can't answer.

25          It depends -- again, I get back to the
```

1          same thing.  It depends on the

2          customer base, what they're doing and

3          stuff like that.  But --

4    QUESTIONS BY MR. LOESER:

5          Q.    So is it your testimony that a

6    distributor can utilize a threshold-based

7    system for its SOM program?

8          A.    I'm not -- I'm not recommending

9    what distributors do or not do.  I was here

10   to evaluate Mallinckrodt's.

11         Q.    And, sir, do you know if it's

12   acceptable for a distributor to use a

13   threshold-based system for its SOM program?

14         A.    All I know is that not one

15   system fits all.  Every -- depending on the

16   registrant and the customer base, everything

17   is different.  Could be a paper-based system,

18   it could be a statistical system.  It depends

19   on the customer base and the clients.

20              Again, I get back to it.  I was

21   retained to look at Mallinckrodt's program

22   and make a determination on that, not the

23   distributor programs.

24         Q.    So, sir, you can't answer the

25   question whether it's acceptable for a

1    distributor to use a threshold-based system?

2              MR. DAVISON:  Objection.

3              THE WITNESS:  It depends on the

4         customer base.

5    QUESTIONS BY MR. LOESER:

6         Q.    So it may be acceptable?

7         A.    I'm not saying that either.  It

8    depends on the customer base, who are they

9    distributing to, number of clients they have,

10   what type of drugs.

11        Q.    And so when is it acceptable

12   for a distributor to use a threshold-based

13   system?

14             MR. DAVISON:  Objection.

15             THE WITNESS:  Again, you're

16        asking me the same question.  You need

17        to know the customer base.  You need

18        to know the details about it before

19        you recommend anything to any

20        registrant.

21             It's like a pharmacy.  If they

22        distribute drugs, they have to have an

23        SOM program in place.

24             Now, what's acceptable to a

25        pharmacy?  I don't know unless I see

1            the type of pharmacy, I see who

2            they're distributing to, what

3            percentage of drugs they're

4            distributing, should they be

5            registered to distribute or not to

6            distribute.

7                 You can't make a determination

8            or answer a question just on a

9            hypothetical.  It's extremely

10           difficult.

11    QUESTIONS BY MR. LOESER:

12           Q.    So in terms of the guidance you

13    provided to your clients, there was no

14    categorical rule that a distributor cannot

15    use a threshold-based system for its SOM

16    program?

17                 MR. DAVISON:  Objection.

18                 THE WITNESS:  Can -- the

19           recommendations were made were

20           entirely based -- to any registrant

21           was based upon client -- customer

22           base, types of drugs, location, things

23           like that.

24    QUESTIONS BY MR. LOESER:

25           Q.    And, sir, are you aware of

```
 1    whether the DEA ever advised distributors

 2    that they could not use threshold-based

 3    systems?

 4         A.    I'm not -- I don't recall that

 5    at all.

 6         Q.    Does a distributor SOM need to

 7    evaluate order size, frequency and pattern?

 8         A.    Got to --

 9         Q.    Does a distributor's SOM need

10    to evaluate order size, frequency and

11    pattern?

12         A.    The regulation says that you

13    have to report suspicious orders, and the

14    criteria for that is such as quantity,

15    pattern, frequency, size.  All those things

16    go into it.

17         Q.    And I asked you before about

18    manufacturers.

19               What due diligence should a

20    distributor do for orders that are flagged as

21    suspicious?

22               MR. DAVISON:  Objection.

23               THE WITNESS:  It's a

24          hypothetical question again.  I would

25          have to have more details on it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Again, I was not hired to look

 2          at or retained to look at the

 3          distributors.  It was the

 4          manufacturer, Mallinckrodt.

 5     QUESTIONS BY MR. LOESER:

 6          Q.    And you don't recall from all

 7     the audits you've done over your 50-plus

 8     years whether there are particular factors

 9     that a distributor should take into account

10     when conducting due diligence of pended

11     orders?

12          A.    Those factors --

13                   MR. DAVISON:  Objection.

14                   THE WITNESS:  -- are all based

15          upon the registrant and their customer

16          base that they have and what type of

17          drugs they were distributing.

18     QUESTIONS BY MR. LOESER:

19          Q.    And for orders that are flagged

20     as suspicious by a distributor, should those

21     orders be held until the investigation is

22     complete?

23                   MR. DAVISON:  Objection.

24                   THE WITNESS:  Well, I go back

25          on the regulation.  The regulation
```

1           says you're supposed to submit

2           suspicious orders.  It says nothing

3           else.  There's nothing else that it

4           says.

5                   The registrant has to make that

6           determined -- based upon what they

7           take into consideration.  And the due

8           diligence they perform is -- depends

9           on the customer base, what they're

10          selling.

11   QUESTIONS BY MR. LOESER:

12          Q.    So is it your view that a

13   distributor can go ahead and ship orders that

14   it flags as suspicious without doing any due

15   diligence investigation?

16          A.    I didn't say that at all.

17                MR. DAVISON:  Objection.

18   QUESTIONS BY MR. LOESER:

19          Q.    Is that your view?

20          A.    No, I didn't say that at all.

21                What I said was, it really

22   depends on the circumstances, the customer

23   base, the types of drugs, of what a

24   registrant has to look at before they make a

25   determination to ship, don't ship.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     When can a distributor ship

 2   suspicious orders without doing any due

 3   diligence of the orders?

 4                 MR. DAVISON:  Objection.

 5                 MS. DICIURCIO:  Objection.

 6                 THE WITNESS:  I didn't hear

 7        what they said.

 8                 Thank you.

 9                 Repeat your question.

10                 MR. LOESER:  Sorry.

11                 Read it back, please.

12                 (Court Reporter read back

13        question.)

14                 THE WITNESS:  Again, I'll say

15        that any registrant, depending on

16        where they are in the distribution

17        chain, that has a reporting

18        requirement for suspicious orders, has

19        to make the determination if they

20        declare something as suspicious

21        whether to ship or not ship.

22                 They do review and it's not

23        suspicious, they go ahead and ship the

24        product.  If this is suspicious, they

25        have to make that determination.
```

```
 1                    The regulation only talks about

 2            having a reporting requirement if --

 3            and I make a determination that the

 4            order is suspicious.

 5                    The talk about hypotheticals

 6            without having all the details is

 7            extremely difficult.

 8    QUESTIONS BY MR. LOESER:

 9        Q.     Is it your understanding of the

10    law that distributors who routinely report

11    suspicious orders, yet fill those orders

12    without investigating them, are failing to

13    maintain effective controls against

14    diversion?

15                    MR. DAVISON:  Objection.

16                    THE WITNESS:  What you got to

17            look at is at one time DEA accepted,

18            up until 2006, I guess, excessive

19            order reports from the industry.  It

20            was the industry standard accepted by

21            DEA, excessive order reports.

22    QUESTIONS BY MR. LOESER:

23        Q.     I guess I'll try again.

24                    Is it your understanding of the

25    law that distributors who routinely report
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious orders, yet fill those orders

2    without investigating them, are failing to

3    maintain effective controls against

4    diversion?

5         A.    What period of time are we

6    talking about?

7              MR. DAVISON:  Objection.

8    QUESTIONS BY MR. LOESER:

9         Q.    Ever.  Now.  How about now?

10             MS. FUMERTON:  This is Tara

11        Fumerton on behalf of Walmart, and I'm

12        just going to object to all of these

13        questions relating to distributors or

14        to chain pharmacies as outside the

15        scope of this deposition.

16   QUESTIONS BY MR. LOESER:

17        Q.    You can answer.

18        A.    As I said, I was retained by

19   Mallinckrodt to look at their program, not by

20   any distributors.

21             Your questions are

22   hypothetical.  It's very difficult to answer

23   a hypothetical question without knowing all

24   the facts.

25             The only requirement in the
```

1    regulation is that a company has to report

2    suspicious orders.  That's all it says.

3             You can -- by regulation, if

4    you want to send excessive reports in, send

5    them in, as long as you report your orders

6    when they're suspicious, that you call

7    suspicious.

8             And for the beginning of the

9    regulations until up to the letter came out

10   from DEA in, I think it was, 2006, 2007 -- as

11   a matter of fact, it was 2007, DEA

12   accepted -- the industry standard was,

13   accepted by DEA -- and they even said in

14   their testimony, depositions, that excessive

15   order reports were fine.

16        Q.    And I'm just trying to get an

17   understanding of your interpretation of the

18   law.

19        A.    Yeah.

20        Q.    So was it your understanding of

21   the law that -- currently, that distributors

22   who routinely report suspicious orders, yet

23   fill those orders without investigating them,

24   are failing to maintain effective controls

25   against diversion?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. DAVISON:  Objection.

 2                  THE WITNESS:  And again, I'll

 3          ask to read back what I said

 4          previously.  It's the same answer.

 5   QUESTIONS BY MR. LOESER:

 6          Q.    So you can't answer that

 7   question?

 8                  MR. DAVISON:  Objection.

 9                  THE WITNESS:  I didn't say I

10          can't answer it.  I answered the

11          question.

12   QUESTIONS BY MR. LOESER:

13          Q.    Are distributors required to

14   know their customers?

15                  MR. DAVISON:  Objection.

16                  THE WITNESS:  The registrants

17          that distribute control substances

18          would know their customer base.

19   QUESTIONS BY MR. LOESER:

20          Q.    And why should -- why are

21   distributors required to know their

22   customers?

23                  MR. DAVISON:  Objection.

24                  THE WITNESS:  Well, it's -- if

25          you want to determine whether an order
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            is suspicious or not, you have to know

2            who you're selling it to or

3            distributing it to, and you want to

4            know certain -- you know, are they

5            registered.

6     QUESTIONS BY MR. LOESER:

7            Q.     And what should a distributor

8     do to know its customers?

9                  MR. DAVISON:  Objection.

10                 THE WITNESS:  It's outside my

11           scope.  Again, it's a hypothetical

12           question as far as I'm concerned.

13                 I was retained in order to

14           address Mallinckrodt's program, who is

15           a manufacturer.

16    QUESTIONS BY MR. LOESER:

17           Q.     Yet, sir, you testified that

18    you relied on your 50-plus years in the

19    industry to form the opinions you have in

20    this case, so I'm trying to understand your

21    understanding of the law.

22           A.     And if you read my opinion

23    based upon -- what I was retained to do,

24    Mallinckrodt.

25           Q.     And so, sir, can you answer
```

```
 1    what your understanding is of what

 2    distributors need to do in order to know

 3    their customers?

 4              MR. DAVISON:  Objection.

 5              THE WITNESS:  1301.74(b).

 6    QUESTIONS BY MR. LOESER:

 7         Q.    And that's the CSA regulation?

 8         A.    That's CSA regulation.

 9         Q.    Anything else?  Any other

10    source of requirement?

11         A.    It's not a regulatory

12    requirement, but look at the guidance letters

13    put out by DEA in 2006, 2007, 2012.

14         Q.    Can a distributor keep shipping

15    controlled substances to a customer whose

16    order it flags as suspicious without first

17    investigating and clearing the flagged order?

18              MR. DAVISON:  Objection.

19              THE WITNESS:  Again, you're

20         getting into hypothetical questions.

21              I was retained to look at a

22         manufacturer's SOM program.  I did no

23         review of any other registrant for

24         this deposition.  My report only deals

25         with manufacturer -- for a
```

```
 1              manufacturer for Mallinckrodt.
 2      QUESTIONS BY MR. LOESER:
 3              Q.      However, you audited a lot of
 4      distributor SOM programs in your career,
 5      correct?
 6              A.      Yeah, in my past.
 7              Q.      And is it your understanding
 8      that a -- that a distributor can keep
 9      shipping controlled substances to a
10      registrant where it has flagged as suspicious
11      an order to that registrant?
12                      MR. DAVISON:  Objection.
13      QUESTIONS BY MR. LOESER:
14              Q.      Can you keep shipping other
15      orders to that registrant?
16                      MR. DAVISON:  Objection.
17                      THE WITNESS:  Again, it's the
18              circumstances.  If I was here
19              representing a distributor, I would
20              want to know -- or looking at, I'd
21              want to know all the details
22              associated with the process, anything,
23              just to say, can you keep shipping.
24                      What's the -- you know, is that
25              really factual or are they actually
```

Highly Confidential - Subject to Further Confidentiality Review

1           doing that or what's the circumstances

2           behind it.  Are we talking about a

3           distributor?  I want to talk about

4           Mallinckrodt.

5    QUESTIONS BY MR. LOESER:

6           Q.      In a distributor's SOM, should

7    the distributor evaluate what particular

8    drugs its customers are ordering?

9                   MR. DAVISON:  Objection.

10                  THE WITNESS:  Your SOMs program

11          is looking at all controlled

12          substances.  ARCOS looks at only

13          Schedule I and II and Schedule III

14          narcotics unless you're a manufacturer

15          in some other areas.  Then you have to

16          report those.

17                  That's the requirement.  So if

18          you're asking me the requirement,

19          that's the requirement.

20   QUESTIONS BY MR. LOESER:

21          Q.      And should the distributor's

22   SOM also evaluate the ratio of controlled

23   substances to noncontrolled substances?

24                  MR. DAVISON:  Objection.

25                  THE WITNESS:  There are certain

```
 1          red flags out there, again, not part

 2          of the regulations, that you look at

 3          in your customer base, depending on

 4          who your customer base is.

 5              Whether a distributor does all

 6          of them or some of them or any -- I --

 7          in fact a registrant does some of them

 8          or all of them, it's up to the

 9          registrant and the customer base they

10          have.

11   QUESTIONS BY MR. LOESER:

12          Q.    And what are those red flags?

13          A.    Well, in Mallinckrodt's case it

14   would be the distributors, and do you have a

15   registration, do you have appropriate

16   security in place.  It would be questions

17   such as that.

18          Q.    For a distributor's SOM

19   program, though, when a distributor is

20   operating its SOM, should it evaluate the

21   ratio of controlled substances to

22   noncontrolled substances of its customers?

23              MR. DAVISON:  Objection.

24              THE WITNESS:  Again, I would

25          say I was hired to look at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Mallinckrodt's SOM program.
 2                 From my past experience, there
 3            would be red flags that you could look
 4            at depending on the circumstances.
 5            One would be cash versus check or
 6            insurance.  One would be -- and I
 7            mentioned this earlier -- do they
 8            handle only controlled drugs and no
 9            noncontrolled, they don't have any fun
10            items but they're not a medical -- in
11            the medical center where they probably
12            would only handle certain fun items.
13                 These are things you would look
14            at, or could look at depending on the
15            circumstances.
16       QUESTIONS BY MR. LOESER:
17            Q.    Thank you.
18                 Should the distributor's SOM
19       evaluate the location of its customers?
20                 MR. DAVISON:  Objection.
21                 THE WITNESS:  Again, I'll
22            repeat myself.  Depending on the
23            details, would any registrant -- any
24            type of customers, you make a
25            determination what's good and what's
```

```
 1            not good, or what you should do -- or

 2            what you should look at and not look

 3            at or what you need to look at.

 4    QUESTIONS BY MR. LOESER:

 5            Q.    And should the distributor's

 6    SOM take into account the number of opioid

 7    pills it is sending into one town or county?

 8                 MR. DAVISON:  Objection.

 9                 THE WITNESS:  Again, it's the

10            circumstance behind it.  It's -- I

11            can't sit here and just give you

12            general answers.

13                 You know, do they have a large

14            hospital in the area?  They have a

15            cancer center in the area?

16                 Just to say, well, this town,

17            everybody got 10,000 pills, well, is

18            that really true?  Did everybody

19            really get 10,000 pills?  Or was it

20            high prescribing because they had

21            certain other conditions.

22    QUESTIONS BY MR. LOESER:

23            Q.    How does the distributor figure

24    that out?  If I understand what you're

25    saying, if there's a distributor that's
```

1    shipping a large number of pills to one town

2    or county, what due diligence should that

3    distributor do with regard to that county to

4    make sure that the pills aren't being

5    diverted?

6                MR. DAVISON:  Objection.

7                THE WITNESS:  Any registrant

8         would look at their suspicious order

9         monitoring program, and that's what

10        they should be following.

11               So if I receive an order -- if

12        an order pends based upon the criteria

13        I have in place, I have to make -- I

14        should make a determination if it's

15        suspicious or not and report it to the

16        DEA.

17               What I look at depends on the

18        customer base, the circumstances

19        behind it, who's placing the orders,

20        things like that.

21   QUESTIONS BY MR. LOESER:

22        Q.    Do you believe that it would be

23   a red flag for diversion where a distributor

24   is shipping a large number of pills into a

25   small town or county?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DAVISON:  Objection.

 2      QUESTIONS BY MR. LOESER:

 3           Q.     Something that should be

 4      further investigated?

 5                    MR. DAVISON:  Objection.

 6                    THE WITNESS:  Depending on the

 7           circumstances, maybe, maybe not.

 8                    MR. DAVISON:  Derek -- I'm

 9           sorry, go ahead.

10                    THE WITNESS:  I'm sorry.

11                    MR. DAVISON:  No, finish.

12                    THE WITNESS:  You're giving me

13           hypothetical situations.

14      QUESTIONS BY MR. LOESER:

15           Q.     Tell me the circumstances when

16      you think that should be investigated.

17                    MR. DAVISON:  Objection.

18                    THE WITNESS:  Again, what's in

19           that area, what's my customer base,

20           who am I shipping to, are there a

21           large concentration of physicians in

22           that given area which would create

23           possibly a spike.

24                    I mentioned earlier if there is

25           a cancer institute in there, surgery
```

1           centers.  Is there a lot of surgery

2           centers in that area.  I mean, some

3           counties had 10, 15, 20 surgery

4           centers.  Well, they had a high

5           consumption of some of the drugs

6           because of the surgical procedures.

7                It depends on a lot of

8           circumstances.  Very difficult to

9           answer a question yes or no based on

10          hypothetical situations.

11     QUESTIONS BY MR. LOESER:

12          Q.    So the circumstances that you

13     just described, are those things that the

14     distributor should look into when shipping

15     large quantities of pills to a small town or

16     county?

17                MR. DAVISON:  Objection.

18                THE WITNESS:  Based upon the

19          regulations, a registrant has to take

20          into consideration what the

21          regulations require and also any

22          guidance provided by the Agency.

23                MR. DAVISON:  Derek, we've been

24          going about an hour, so we just need

25          to take a break.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  Can we take a
 2        break?
 3                   VIDEOGRAPHER:  Going off the
 4        record at 2:56 p.m.
 5         (Off the record at 2:56 p.m.)
 6                   VIDEOGRAPHER:  We're back on
 7        the record at 3:17 p.m.
 8   QUESTIONS BY MR. LOESER:
 9        Q.     Mr. Buzzeo, you've said a
10   number of times when I've asked you questions
11   about the adequacy of a SOM program that it
12   depends on the customer base, the
13   circumstances behind orders and who is
14   placing the orders; is that correct?
15        A.     Yes.
16        Q.     Can you tell me what
17   investigation you did for Mallinckrodt of its
18   customer base, the circumstances behind
19   orders and who was placing the orders?
20        A.     Yes.  I looked at the
21   depositions.  I looked at the, as I said in
22   my report, all the e-mails and text messages,
23   memoranda, testimony, depositions, as I
24   mentioned earlier, in order to render my
25   opinion.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.     And did you evaluate any

2    information about Mallinckrodt's customer

3    base?

4    A.     I looked at the customers that

5    they had, that they were distributors or tier

6    one companies.

7    Q.     Did you evaluate specifically

8    who Mallinckrodt's customers were?

9    A.     No.  I was more interested in

10   how they handle -- or I was retained to look

11   at their -- Mallinckrodt's SOM program and

12   how they handled their orders.

13   Q.     And did you evaluate

14   specifically any of Mallinckrodt's orders?

15   A.     No.  I just looked at their

16   program.

17   Q.     And did you evaluate

18   specifically who placed orders to

19   Mallinckrodt?

20   A.     No.  I just -- how they handled

21   their orders that came in from a customer

22   service representative.

23   Q.     And did you evaluate

24   specifically what orders were flagged as

25   suspicious by Mallinckrodt?

Highly Confidential – Subject to Further Confidentiality Review

```
 1          A.      No.

 2          Q.      And did you --

 3          A.      Well, I should say a couple --

 4    I dealt with a couple of the companies, but

 5    more from the process.

 6          Q.      Okay.  And did you evaluate

 7    specifically what investigation Mallinckrodt

 8    did across the board with orders that it

 9    flagged as suspicious?

10          A.      I looked at a couple of the

11    reviews, due diligence that they did on a

12    couple of their customers.

13          Q.      On a couple of orders?

14          A.      Uh-huh.  A couple of their

15    customers.

16          Q.      And yet notwithstanding what

17    you did not review from Mallinckrodt, you

18    were able to provide an opinion on whether

19    you believed Mallinckrodt's SOM and

20    anti-diversion programs were adequate?

21                  MR. DAVISON:  Objection.

22                  THE WITNESS:  Based upon what I

23          looked at, the records, the various

24          depositions, the reports, I was able

25          to render the decision that they met
```

1          the regulatory requirements, and also

2          guidance from the Agency.

3     QUESTIONS BY MR. LOESER:

4          Q.     And what particular customers

5     of Mallinckrodt's did you evaluate?

6               MR. DAVISON:  Objection.

7               THE WITNESS:  I looked at how

8          they handled KeySource, Sunrise, I

9          think Masters.

10    QUESTIONS BY MR. LOESER:

11         Q.     And why those customers?

12         A.     Because their -- I was provided

13    those.  I asked, what customers did you

14    have -- did you do some due diligence on.

15              I do know that they met with

16    some of the big three distributors to discuss

17    programs and possible pharmacies.

18         Q.     Earlier you stated that the

19    fact that an order is triggered as suspicious

20    by an algorithm is not enough to report the

21    order as suspicious to the DEA.

22              Do you recall that testimony?

23              MR. DAVISON:  Objection.

24         Misstates his testimony.

25              THE WITNESS:  I believe what I

1        said was, as, as an order is pend, you

2        should review it to determine if it's

3        suspicious or not suspicious.

4    QUESTIONS BY MR. LOESER:

5        Q.     And what is the basis for that

6    conclusion?

7        A.     Well, first of all, the

8    regulation talks about reporting suspicious

9    orders.  You have to make a determination

10   whether an order is suspicious or not.

11              To me, an algorithm in itself

12       is not enough.  As far as I'm concerned,

13       based upon my vast experience, an algorithm

14       just tells you, here's something you should

15       look at further.

16       Q.     And so if a DEA registrant

17   doesn't do any further investigation, does

18   that mean it doesn't have to report anything

19   to the DEA?

20              MR. DAVISON:  Objection.

21              THE WITNESS:  The regulation

22       says you have to report suspicious

23       orders.  So if -- you have to make a

24       determination whether the order is

25       suspicious or not.  How you do that is

1        up to you.

2    QUESTIONS BY MR. LOESER:

3        Q.     So if you don't do anything and

4    you don't do any investigation, you don't

5    have to report anything to the DEA?

6        A.     No.

7              MR. DAVISON:  Objection.

8              THE WITNESS:  Then it's

9         possible, it's possible, that order

10        may be suspicious.  It's possible it's

11        not suspicious.

12              You got -- the requirement is

13        you have to report suspicious orders

14        to DEA.

15    QUESTIONS BY MR. LOESER:

16        Q.     Sir, have you ever advised your

17    DEA registrant clients that they should

18    complete the investigation of orders flagged

19    as suspicious before shipping the orders?

20        A.     In order to make a

21    determination, you have to do due diligence

22    on an order that pends to determine if it's

23    suspicious or not suspicious.

24              The requirement is if the order

25    is suspicious, you should report -- you have

Highly Confidential - Subject to Further Confidentiality Review

 1    to report it to DEA.  Then you have to make a

 2    determination of ship, don't ship.

 3              We've talked clients in the

 4    past, if you make that determination, you

 5    probably should not ship it until you do a --

 6    further reviews and looking at the -- your

 7    possible customer.

 8         Q.    Okay.  I want to try again and

 9    make sure I understand.

10              Have you ever actually advised

11    your DEA registrant clients that they should

12    complete the investigation of orders flagged

13    as potentially suspicious before shipping the

14    orders?

15              MR. DAVISON:  Objection.  Asked

16         and answered.

17              THE WITNESS:  We advise clients

18         to make a determination, do the due

19         diligence, make a determination if the

20         order is suspicious, not suspicious,

21         and report it to the DEA if it is

22         suspicious.

23    QUESTIONS BY MR. LOESER:

24         Q.    And when did you start advising

25    your clients of that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Oh, probably 2000.

 2          Q.      And have you ever advised --

 3          A.      Or probably -- yeah, 2000 --

 4    when did I retire?

 5                  Yeah, when I first started the

 6    company and working with various clients.

 7          Q.      Have you ever advised your DEA

 8    registrant clients to report orders to the

 9    DEA that cannot be cleared of suspicion and

10    cancel the entire order?

11                  MR. DAVISON:  Objection.

12                  THE WITNESS:  Give me that

13          question again.

14    QUESTIONS BY MR. LOESER:

15          Q.      Have you ever advised your DEA

16    registrant clients to report orders to the

17    DEA that cannot be cleared of suspicion and

18    cancel the entire order?

19                  MR. DAVISON:  Objection.

20                  THE WITNESS:  The last part,

21          when you put in "the entire order," so

22          are you saying that the order comes

23          in, they look at, say, "Well, this one

24          drug is suspicious," but ship the rest

25          of it?
```

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.    No, I'm asking you if you've

 3    ever advised your clients to report to the

 4    DEA orders that cannot be cleared of

 5    suspicion and cancel the order.

 6              MR. DAVISON:  Objection.

 7    QUESTIONS BY MR. LOESER:

 8         Q.    Does that make sense?

 9              Have you ever advised your DEA

10    registrant clients to report orders to the

11    DEA that your clients have done due diligence

12    on, can't clear, and cancel the order?

13              MR. DAVISON:  Objection.

14              THE WITNESS:  If the order is

15         suspicious -- we would tell them, if

16         your order is suspicious, you have to

17         report to DEA.

18              So if a pended order is

19         suspicious, you report it to DEA.

20              If you do due diligence and

21         it's not suspicious, then you don't

22         have to report it.

23              Is that the question?

24    QUESTIONS BY MR. LOESER:

25         Q.    And when do you advise your
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    clients they have to cancel an order and

2    report it to the DEA?

3              MR. DAVISON:  Objection.

4              THE WITNESS:  Well, what I say

5         to DEA -- what I say to DEA, if it's

6         suspicious, you report to DEA.

7              You have to make a

8         determination based upon the facts you

9         have whether you should ship it or not

10        ship.  Regulation doesn't cover that.

11             And DEA will probably -- in

12        some cases I've heard the DEA has

13        already told clients that:  We can't

14        tell you to ship it or not ship it.

15        Your requirement is to tell us the --

16        you know, the report as far as if it's

17        suspicious.  If it turns out it's

18        diverted, you shipped it, we very well

19        may come after you.

20   QUESTIONS BY MR. LOESER:

21        Q.    Okay.  Have you ever told your

22   clients if they can't clear a suspicious

23   order that they should cancel an order?

24             MR. DAVISON:  Objection.  Asked

25        and answered.
```

```
 1                THE WITNESS:  We tell our

 2          clients that they have to meet the

 3          regulatory requirement.  If it's

 4          suspicious, you have to report it.

 5                So if an order pends, you have

 6          to make a determination.  And if it's

 7          suspicious, you have to report it to

 8          DEA.

 9                I don't recall any

10          circumstances that you're talking

11          about where if you can't pend -- you

12          can't determine one way or the other,

13          just to go ahead and ship it.  I'd

14          probably recommend, better talk to

15          DEA.  Maybe you should go out and do

16          an on site if you haven't done that.

17          Go further on the order so you can

18          make that determination.

19     QUESTIONS BY MR. LOESER:

20          Q.    Have you ever advised your

21     clients that they should cancel orders that

22     they can't clear of suspicion?

23                MR. DAVISON:  Objection.  Asked

24          and answered four times.

25                THE WITNESS:  If an order is
```

Highly Confidential - Subject to Further Confidentiality Review

1      canceled and there's a reason why you

2      cancel it, if it's suspicious, you

3      better report it to DEA.  If you

4      cancel because you don't have

5      sufficient facts, you'd better go out

6      and do a further due diligence.

7  QUESTIONS BY MR. LOESER:

8      Q.    I'm asking you a pretty simple

9  but different question.

10          Have you ever advised your

11 clients that if they can't clear the

12 suspicions for an order, that they should

13 cancel the order?

14          MR. DAVISON:  Objection.  Asked

15      and answered five times.

16          THE WITNESS:  If -- go back to

17      the regulation.  If the order is

18      suspicious, you report it to DEA.  If

19      the order is not suspicious, you don't

20      report it to DEA.

21          If you cannot make a

22      determination, we advise the client,

23      go out and do more due diligence.  You

24      want us to do it for you, you want to

25      do it, you want to hire somebody to do

```
 1            it, you want to do it yourself, send

 2            your security people out to the firm,

 3            you have to make a determination.

 4    QUESTIONS BY MR. LOESER:

 5            Q.    So you've never actually

 6    advised your clients that they should cancel

 7    orders where they haven't been able to clear

 8    the suspicion?

 9            A.    That's the answer I have.

10            MR. DAVISON:  Objection.  Asked

11            and answered six times.

12    QUESTIONS BY MR. LOESER:

13            Q.    You haven't ever advised your

14    clients of that?

15            MR. DAVISON:  Objection.

16            THE WITNESS:  We advise our

17            client that if the order is

18            suspicious, report it.  If the order

19            is not suspicious after you do your

20            due diligence, go ahead and ship it.

21            If you cannot make a

22            determination based upon the facts

23            that you've used, go out -- let's say

24            you haven't gone on site.  Go on site

25            and make that determination.  Look at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           it in depth, but make a determination.

 2                Because if you're canceling the

 3           order, there's a reason why you

 4           canceled it.  If you're shipping the

 5           order and you haven't made that

 6           determination, then you could be

 7           running into issues.

 8      QUESTIONS BY MR. LOESER:

 9           Q.    And what do you mean by

10      "issues"?

11           A.    Well, if it's a suspicious

12      order, you haven't met the regulatory

13      requirement.

14           Q.    And so if an order is flagged

15      by the SOM as suspicious, is the default then

16      that it's suspicious until due diligence

17      clears it?

18           A.    To me --

19                MR. DAVISON:  Objection.

20                THE WITNESS:  I'm sorry.

21                To me an order, when it's

22           flagged, does not necessarily mean

23           it's suspicious.  You have to do your

24           due diligence on it.

25                You can't use one criteria to
```

1           say, hey, it's flagged, it's exceeded

2           a certain number, it's suspicious.

3                   As I gave examples earlier, I

4           could have a doctor or a pharmacy

5           ordering a thousand dosage units,

6           nothing flags it, but it turns out to

7           be the person's diverting.

8                   If I have a number of 8,000 and

9           it exceeds that, it may not be

10          suspicious.

11                  So I like the terminology

12          better, it flagged, it's probably --

13          it's something that should be looked

14          at further.  So let's call it

15          excessive.  Let's call it peculiar.

16          Let's call it something.  And then you

17          make your determination whether it's

18          suspicious or not.

19      QUESTIONS BY MR. LOESER:

20          Q.    So due diligence is required on

21      all orders flagged as suspicious?

22          A.    Some form --

23                  MR. DAVISON:  Objection.

24                  THE WITNESS:  Either customer

25          sales reps are involved in it,

```
 1          security is involved in it,

 2          somebody -- you're looking at all the

 3          facts involved with that.  You're

 4          having discussions with the customer,

 5          you may have a questionnaire, whatever

 6          you're looking at to make that

 7          determination.  And if it's

 8          suspicious, then you'd better report

 9          it.

10    QUESTIONS BY MR. LOESER:

11          Q.    Have you ever advised your DEA

12    registrant clients that they should not

13    reduce an order that exceeds size thresholds

14    to the threshold limit and then ship the

15    reduced order?

16               MR. DAVISON:  Objection.

17               THE WITNESS:  I've never

18          advised a client on that.  I would

19          advise a client not to do that.

20    QUESTIONS BY MR. LOESER:

21          Q.    When did you start advising

22    your clients not to do that?

23          A.    Probably right from the -- I

24    don't recall when, but it's probably close to

25    when I started the company.
```

1            To me the whole order is

2     suspicious, not just one item in the order.

3         Q.     Have you ever advised your DEA

4     registrant clients that it's important for

5     them to know their customers?

6             MR. DAVISON:  Objection.

7             THE WITNESS:  Well, you want to

8         know your customer base from a

9         regulatory perspective, from a

10        financial perspective, before you

11        establish them as a client -- a

12        customer and also to maintain them as

13        a customer.

14    QUESTIONS BY MR. LOESER:

15        Q.     And when did you start advising

16    your clients that it's important for them to

17    know their customers?

18            MR. DAVISON:  Objection.

19            THE WITNESS:  Well, the

20        regulations address it, too.  You

21        know, you're verifying the

22        registration, and you're probably

23        doing a Dun & Bradstreet on them,

24        probably doing a financial on them,

25        you know, to determine if the customer

Highly Confidential - Subject to Further Confidentiality Review

```
1            is legit, is real.

2     QUESTIONS BY MR. LOESER:

3            Q.    And when did you start advising

4     your clients?

5            A.    Right from the beginning.

6            Q.    Okay.  And have you ever

7     advised your manufacturer clients they need

8     to know their customers' customers?

9                 MR. DAVISON:  Objection.

10                THE WITNESS:  No.  Not that I

11           recall.

12                What I would advise them is you

13           have -- the regulation talks about

14           your customer -- your registration,

15           and when you ship to your customer

16           that the responsibility switches to

17           them.

18                There could be circumstances

19           when you find out about something that

20           you want to look at.  And that's what

21           Mallinckrodt did with their chargeback

22           program.

23    QUESTIONS BY MR. LOESER:

24           Q.    Have you ever advised your

25    distributor clients that they should evaluate
```

1    what their customers do with controlled

2    substances they purchase from your client?

3                 MR. DAVISON:  Objection.

4                 THE WITNESS:  Again, I'm in a

5         better position to talk about

6         Mallinckrodt's program than I am the

7         wholesaler's program.  Then we're

8         going to get back into hypothetical

9         questions.

10                And as I've stated on numerous

11        occasions, it has to do with the

12        customer base, the circumstances, the

13        drugs you're handling.

14   QUESTIONS BY MR. LOESER:

15        Q.    And I'm asking you a very

16   specific question.

17                Have you ever advised your

18   distributor clients that they should evaluate

19   what their customers do with the controlled

20   substances they purchase from your client?

21                MR. DAVISON:  Objection.

22                THE WITNESS:  We advise

23        registrants that -- to look at their

24        customer base from a number of

25        perspectives, you know, from a

Highly Confidential - Subject to Further Confidentiality Review

```
1          regulatory perspective and

2          registration, SOM, things like that.

3     QUESTIONS BY MR. LOESER:

4          Q.      When did you start advising

5     your distributor clients that they should

6     evaluate what their customers do with

7     controlled substances they purchase from the

8     distributor?

9               MR. DAVISON:  Objection.

10              THE WITNESS:  From the

11         beginning, we would advise our clients

12         on the requirements of the regulations

13         and that the regulations -- you know,

14         here's some recommendations how to

15         meet those regulatory requirements

16         from a regulatory perspective.

17    QUESTIONS BY MR. LOESER:

18         Q.      And did that include -- did the

19    regulations include requiring distributors to

20    know what their customers did with the

21    controlled substances they purchased from

22    distributors?

23         A.      Again, I'm going to refer --

24              MR. DAVISON:  Objection.

25              THE WITNESS:  I'm going to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            refer to my manufacturer client and --

2            and I should say or registrants, that

3            if you're going to be in the

4            controlled substance business, that

5            these are regulatory requirements, and

6            here's the industry standards, and

7            this is what you have to meet.

8                  And I found the -- almost every

9            one of the -- I should say probably

10           99.9 percent of the legitimate

11           industry wants to meet the regulatory

12           requirements, probably has limited

13           guidance.  So you have to depend on

14           your knowledge, the knowledge of the

15           industry standards and things like

16           that.

17    QUESTIONS BY MR. LOESER:

18           Q.    Is a DEA registration that has

19    had its license to distribute controlled

20    substances revoked part of a legitimate

21    industry?

22                  MR. DAVISON:  Objection.

23                  THE WITNESS:  It really depends

24           on the circumstances, why was it

25           revoked.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      QUESTIONS BY MR. LOESER:
 2          Q.    If a DEA registrant has its
 3      licensed revoked by the DEA because it
 4      enabled diversion, do you consider that
 5      registrant to have been part of the
 6      legitimate industry?
 7                  MR. DAVISON:  Objection.
 8                  THE WITNESS:  Well, you know,
 9            there's registrant -- it depends on
10            the circumstances behind it.
11                  If they have their registration
12            revoked because of a diversion issue,
13            that's an issue.
14      QUESTIONS BY MR. LOESER:
15          Q.    Does that make them not part of
16      the legitimate industry?
17          A.    Yeah.
18                  MR. DAVISON:  Objection.
19      QUESTIONS BY MR. LOESER:
20          Q.    Have you ever advised your
21      manufacturer clients that they should
22      evaluate what their distributor customers do
23      with controlled substances they purchase from
24      a manufacturer?
25                  MR. DAVISON:  Objection.
```

```
 1              THE WITNESS:  That's getting

 2        back to the issue of know your

 3        customer's customer.  There's no

 4        regulatory requirement for that.  It's

 5        extremely difficult.

 6              However, like in Mallinckrodt's

 7        case, they were able to use the

 8        chargeback program in some of the --

 9        some issues, not necessarily a

10        diversion issue but some issues where

11        they would stop -- they told the

12        wholesalers that they would not honor

13        chargeback requests or -- and they

14        reported to DEA and the entire

15        distribution chain.

16   QUESTIONS BY MR. LOESER:

17        Q.    And what I asked you was

18   whether you advised your manufacturer clients

19   that they should evaluate what their

20   distributor customers do with controlled

21   substances purchased from the manufacturer.

22              MR. DAVISON:  Objection.

23   QUESTIONS BY MR. LOESER:

24        Q.    That's the customer of the

25   manufacturer.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1          A.     I know.  It's the customer's

 2     customer.

 3                 MR. DAVISON:  Objection.

 4     QUESTIONS BY MR. LOESER:

 5          Q.     No, not the customer's

 6     customer.

 7          A.     You said the --

 8          Q.     The wholesaler distributor is

 9     the customer of the manufacturer, right?

10          A.     The wholesale distributor is

11     the customer of the manufacturer.

12          Q.     Right.

13                 Have you ever advised your

14     manufacturer clients that they need to know

15     what their wholesale distributor customers do

16     with the drugs they purchase from the

17     manufacturer?

18          A.     The way I'm interpreting

19     that --

20                 MR. DAVISON:  Objection.

21                 THE WITNESS:  -- is that you're

22        asking me about a customer's customer.

23        And that's extremely difficult.

24                 But in Mallinckrodt's

25        situation, they have looked at -- to a
```

Highly Confidential - Subject to Further Confidentiality Review

1    chargeback program and also working

2    with their whole -- some of their

3    wholesalers to identify pharmacies and

4    look at those pharmacies.

5  QUESTIONS BY MR. LOESER:

6       Q.    Have you ever advised your

7  manufacturer clients that they should utilize

8  chargeback data in order to better understand

9  what their distributor clients do with the

10  controlled substances they purchase from

11  manufacturers?

12           MR. DAVISON:  Objection.

13           THE WITNESS:  Chargeback --

14    chargebacks -- first of all, it's not

15    a regulatory requirement.  Understand

16    that.

17           Chargebacks are a financial

18    issue -- a financial program.  It's

19    always in finance.  It had to do with

20    the pricing, contractual arrangements

21    between the -- let's say the

22    wholesaler and the type of clients

23    they have or if the manufacturer was

24    shipping directly, and it would be a

25    reimbursement to make up for the

 1          difference in pricing.

 2                  So like I said, not a

 3          regulatory requirement.  It's always

 4          been a financial report.

 5                  When Mallinckrodt -- in one of

 6          their reviews, their finance

 7          department was able to do a study --

 8          and this is rare.  They probably --

 9          they're probably one of the first

10          companies to do this.  And even DEA

11          said it was a standard for the

12          industry -- looked at their chargeback

13          data in one of the reviews they did,

14          and they saw that it did help them,

15          and now they have a chargeback as part

16          of their program.

17    QUESTIONS BY MR. LOESER:

18          Q.    And, sir, I'm asking you again

19    a very specific question.

20                  Have you ever advised your

21    manufacturer clients that they should utilize

22    chargeback data in order to better understand

23    what their distributor clients do with

24    controlled substances they purchase from

25    manufacturers?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  So I'm asking about the
 2     advice --
 3          A.     Yeah.
 4          Q.     -- whether you have given that
 5     advise to your clients.
 6                  MR. DAVISON:  Objection.
 7                  THE WITNESS:  I understand.
 8                  And this is probably my later
 9          years with the company, but once we
10          became aware of it, depending on the
11          client, the customer or the registrant
12          and their customer base and what they
13          were actually -- you know, had to
14          market, they were dealing in, we said,
15          one of the things you may want to look
16          at is the chargeback data.
17                  It's may not -- it's after the
18          fact.  It's not an order, but it's
19          very possible it may give you some
20          issues that DEA may want -- or some,
21          let's say, issues that DEA may want to
22          look at, and we described to them what
23          the industry was doing.
24                  And that's what Mallinckrodt
25          did.
```

```
 1     QUESTIONS BY MR. LOESER:

 2          Q.     And when did you start

 3     advising --

 4          A.     And Mallinckrodt, like I said,

 5     DEA said they set the standard in the

 6     industry.

 7          Q.     When did you start advising

 8     your manufacturer clients to use chargeback

 9     data?

10               MR. DAVISON:  Objection.

11               THE WITNESS:  As you know,

12          chargeback data was a financial thing.

13          It was done mainly for pricing.

14               Once the industry found out

15          about it, once we found out about it,

16          we said, geez, something, depending on

17          the registrant we're dealing with, we

18          want to -- we may want to recommend

19          that they look at it as a possible --

20     QUESTIONS BY MR. LOESER:

21          Q.     And when did you start giving

22     that advice?

23          A.     Remember, it's not a regulatory

24     requirement.

25          Q.     When did you start giving that
```

```
 1    advice?

 2         A.      I don't recall.

 3         Q.      You don't have any idea?

 4         A.      Excuse me?

 5         Q.      You have no idea?

 6         A.      No, it's probably like -- I

 7    don't recall.

 8         Q.      Have you ever advised a DEA

 9    registrant client to stop shipping to certain

10    types of downstream customers like pain

11    clinics?

12              MR. DAVISON:  Objection.

13              THE WITNESS:  We would tell

14         them -- now, I'm recalling this.  We

15         would tell them to be very careful

16         with the down -- if they were pain

17         clinics, and you better look at it

18         very carefully.  Just like we would

19         tell them as part of our due

20         diligence, Internet pharmacies, if

21         they're an Internet pharmacy, you

22         better look at it very carefully, that

23         it's legit.

24    QUESTIONS BY MR. LOESER:

25         Q.      And why did you tell your
```

```
 1    clients to look very carefully at pain

 2    clinics?

 3              MR. DAVISON:  Objection.

 4              THE WITNESS:  Because of the

 5         information we had that some of them

 6         were not meeting the regulatory

 7         requirements and actually were

 8         diverters.  And just like some of the

 9         Internet pharmacies were not meeting

10         some of the requirements and actually

11         they were diverting, let's say for

12         nonmedical uses, into the trade.

13              And DEA looked at that and

14         put -- my understanding is put a lot

15         of resources into Internet pharmacies

16         and pain clinics.

17    QUESTIONS BY MR. LOESER:

18         Q.    And when did you start advising

19    your DEA registrant clients to look very

20    carefully at pain clinics and Internet

21    pharmacies?

22         A.    I don't -- I don't recall.

23         Q.    You have no idea?

24         A.    I don't recall.  You know, it's

25    been a long career dealing with a lot of
```

1    different clients and customers and different

2    issues, business issues and due diligence,

3    that I don't recall all the dates.

4         Q.    Have you ever advised any of

5    your DEA registrant clients to implement

6    rules to prevent orders that are suspicious

7    on their face from being shipped?

8              MR. DAVISON:  Objection.

9              THE WITNESS:  We would advise

10        our clients that the regulations said,

11        and if the order is suspicious, report

12        it to DEA.  And make sure you do good

13        due diligence and that you probably --

14        you know, then you got to make a

15        determination ship/don't ship.

16             And if you made a determination

17        that it's suspicious, report it to the

18        DEA, be careful if you ship it.

19   QUESTIONS BY MR. LOESER:

20        Q.    What were the characteristics

21   that would make an order suspicious on its

22   face?

23             MR. DAVISON:  Objection.

24             THE WITNESS:  What the

25        regulation says.  Well, I shouldn't

Highly Confidential - Subject to Further Confidentiality Review

```
1            say that.  The regulation is giving
2            you things that you should look at so
3            the order would pend, or you would
4            stop it to make a determination if
5            it's suspicious.  Because the
6            regulation just says report suspicious
7            orders.  We have to make some
8            determination if it's suspicious.
9                 The DEA is giving you a hint --
10           or the regulation is giving you a hint
11           to talk about pattern, you know,
12           orders of size, and that's a starting
13           point to me.
14                What you got to look at then is
15           type of customer that they're shipping
16           to, what are the circumstances, is it
17           an institution, is it a major
18           hospital.  Those are the things you'd
19           look at in making a determination
20           whether it is suspicious or not.
21                If it's a pharmacy you're
22           looking at, you know, if you decide to
23           do -- and especially an independent
24           pharmacy, you decide to do an on-site
25           review of it, you'd list some of the
```

1          things you look at, you know, long

2          lines, out of state.

3     QUESTIONS BY MR. LOESER:

4          Q.     And so after all of your years

5     in the industry, is there a list -- a set of

6     characteristics that you can identify that

7     would -- that would indicate that an order is

8     suspicious on its face?

9          A.     There's things that -- like red

10    flags you're referring to earlier that you

11    could look at.

12         Q.     And you talked about some red

13    flags.

14                Are there others that come to

15    mind that would make an order suspicious on

16    its face?

17         A.     Well, it's red flags that you

18    would look at that say, yeah, this could be

19    suspicious.  We may want to look further.

20         Q.     What about not could be

21    suspicious but suspicious on its face?

22         A.     Well, to make a -- it's very

23    difficult to say on its face that it's

24    suspicious.  Like I said, if you have a fixed

25    program and you set a fixed number, let's

1   say, of 10,000 or 15,000, just because it

2   exceeds that doesn't make it suspicious.

3   It's something you should look further at.

4           Q.      So you're saying that you

5   haven't used the expression "suspicious on

6   its face" before when advising your clients?

7               MR. DAVISON:  Objection.

8               THE WITNESS:  I could advise

9           them, you have to report suspicious

10          orders in that -- an order when it

11          pends in your system.  Whether it's a

12          paper-based system or electronic

13          system, you have to make a

14          determination.  You have to look

15          further and do your due diligence.

16              Again, that due diligence is

17          based on the type of registrant

18          whether the order is suspicious or

19          not.

20  QUESTIONS BY MR. LOESER:

21          Q.      When you were with BuzzeoPDMA,

22  did the company market SOM programs that

23  clients could purchase and utilize to detect

24  suspicious orders?

25          A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And did any companies purchase

2    those programs?

3              MR. DAVISON:  Objection.

4              THE WITNESS:  I would believe

5        so.  Otherwise I wouldn't have been

6        selling it.

7    QUESTIONS BY MR. LOESER:

8      Q.     Do you recall which companies

9    purchased those programs?

10     A.     No.

11     Q.     Can you explain how those

12   programs operated?

13     A.     Not really.  My main role

14   was -- is from a regulatory perspective.  We

15   would discuss -- statisticians would sit down

16   with us and discuss the regulatory issues as

17   we would have an attorney in the room, and

18   that's how it was done.

19              And again, I wouldn't say

20   that -- there's no system that fits

21   everybody's needs.  So I may go in to a

22   client and say, this is not what you want.  I

23   would recommend this.

24              So but my role in it was just

25   from a regulatory perspective.

1    Q.    Do you know if the SOM program

2    that BuzzeoPDMA marketed contained a SOM

3    algorithm?

4    A.    It contained a threshold.  How

5    that was put together, you'd have to ask the

6    statisticians.

7    Q.    Do you have any -- do you

8    recall --

9    A.    But again -- let me clarify

10   this -- that didn't mean it was suspicious

11   when it pend.  An order pend, as any system

12   would, that tells you you should relook at

13   it.

14          And again, when you're

15   implementing a system, any system, it takes a

16   lot of time to revise it so it fits your

17   model, your customer base.  So it's not a

18   system you put in place today and say it's

19   functioning.  It's functioning, but it

20   doesn't mean that it doesn't need to be

21   adjusted over time as more and more data

22   enters the program.  That's with any of them,

23   any good system.

24   Q.    What do you recall about the

25   threshold that the BuzzeoPDMA SOM program

```
 1    utilized?

 2         A.     I have no idea.  I don't

 3    recall.

 4         Q.     Is that something that would

 5    be, you know, in a written marketing proposal

 6    to any of your clients?

 7         A.     I don't know.  My only area of

 8    expertise in that was from a regulatory

 9    perspective and what it had to do in

10    reporting to DEA.

11         Q.     And was it your understanding

12    that the algorithm used in the BuzzeoPDMA SOM

13    program could be tailored for the particular

14    needs of customers that would buy that

15    program?

16         A.     My understanding was -- is when

17    a customer -- that program took -- could take

18    time in order to accumulate a database in

19    order to fit that customer or that

20    registrant.

21         Q.     Do you know if the BuzzeoPDMA

22    SOM program utilized any type of basic

23    formula for identifying orders of unusual

24    size?

25         A.     I don't know the details on how
```

```
 1     it identified excessive orders or orders to

 2     pend.

 3          Q.     Is it your recollection when

 4     the BuzzeoPDMA SOM program -- if an order

 5     pinged as suspicious, that then due diligence

 6     was necessary on that order?

 7          A.     It pend as -- my understanding

 8     is it pend as excessive, and then a

 9     determination was made whether it was

10     suspicious or not.

11          Q.     And how would that

12     determination be made?

13          A.     Through due diligence.

14          Q.     And did that determination need

15     to be made before the order could be shipped?

16               MR. DAVISON:  Objection.

17               THE WITNESS:  That's a deter --

18          the company would have to make a

19          determination, first of all, is it

20          suspicious, and then they report it to

21          DEA.  Then the determination is made

22          to ship/don't ship.

23     QUESTIONS BY MR. LOESER:

24          Q.     And that's how the BuzzeoPDMA

25     SOM program operated?
```

```
 1                   MR. DAVISON:  Objection.

 2                   THE WITNESS:  No.  The system

 3          would just pend orders that need to be

 4          looked at to determine if they were

 5          suspicious.

 6   QUESTIONS BY MR. LOESER:

 7          Q.    Turn back to your report.

 8          A.    Okay.

 9          Q.    On page 3 of your report, Roman

10   Numeral III, summary of opinions,

11   paragraphs 22 through 27 --

12          A.    22 through 27?

13          Q.    Yeah.

14                -- summarize six opinions.

15                Are those the six opinions that

16   you're providing in this case that are listed

17   under that summary?

18          A.    Yes.

19          Q.    And these opinions are the

20   result of the work that you did in this

21   engagement?

22          A.    Yes.

23          Q.    And are you going to be

24   providing any other opinions in this case

25   other than those six?
```

```
 1            A.     At this time, I don't know.  I
 2     left it saying that I may end up amending
 3     or -- depending if more information becomes
 4     available.  But for right now, this is my
 5     opinion on the program, and I really have no
 6     reason to change it.
 7            Q.     And you haven't been asked to
 8     provide any other opinions?
 9            A.     No, not at this point.
10            Q.     By Mallinckrodt?
11            A.     Not at this -- well, I've been
12     dealing with Ropes & Gray.  No, not at this
13     point.
14            Q.     Okay.  And no other defendant
15     or counsel has asked you to provide any
16     opinions?
17            A.     No, sir.
18                   You know, I clarify.  I've been
19     only retained by Ropes & Gray on behalf of
20     Mallinckrodt.
21            Q.     And you have no intention of
22     testifying at trial as to any opinions other
23     than those six that are provided in your
24     report?
25                   MR. DAVISON:  Objection.
```

```
 1                   THE WITNESS:  At this time.

 2    QUESTIONS BY MR. LOESER:

 3         Q.     Are you aware of any aspects of

 4    your opinion that you may supplement in the

 5    future?

 6         A.     Not at this point.

 7         Q.     On paragraph 55 of your report,

 8    the second sentence states, "The

 9    anti-diversion language of the CSA has not

10    changed since 1971, nor has the suspicious

11    order monitoring regulation."

12         A.     Yes.

13         Q.     Did you write that sentence?

14         A.     Yes.

15         Q.     And do you believe that to be

16    true?

17         A.     Yes.

18         Q.     In paragraph 61 you state,

19    "Neither the CSA, nor any of the implementing

20    regulations, defines the term 'unusual

21    size.'"

22                Do you see that?

23         A.     Yes.

24         Q.     What's your understanding of

25    the terms -- and the paragraph actually goes
```

1    on and notes, "The DEA has not defined

2    unusual size, frequency or pattern."

3                What's your understanding of

4    those terms?

5                MR. DAVISON:  Objection.

6                THE WITNESS:  What I said here,

7          number one, is they haven't defined

8          the term, so in my opinion it would

9          be -- you'd have to look at -- again,

10         I get back to this -- your customer

11         base.  Average order size you may look

12         at, the types of drugs, in order to

13         determine, you know, what's unusual a

14         size.  Is for a pharmacy 10,000 pills

15         unusual, anything over that for a

16         distributor?  Is it a million pills,

17         that's unusual size?

18               Normal pattern.  Is a normal

19         pattern for this particular customer

20         they were ordering once a month, now

21         all of a sudden they're ordering twice

22         a month?

23               Frequency is also -- maybe

24         instead of every two days, they're

25         ordering every day.

1           So it really depends.  It

2      depends -- basically the regulation

3      allowed the industry, or the

4      registrant who has this requirement,

5      to determine what is unusual to them,

6      what's pattern, what's frequency.

7           I think that, in my opinion, is

8      what the regulation intended.  There

9      was no way to set a standard.  Let the

10     industry determine what -- how they

11     should implement this regulatory

12     requirement.

13          That's why I said earlier, one

14     system doesn't fit everybody's needs.

15 QUESTIONS BY MR. LOESER:

16     Q.    And you haven't, in all of your

17 work in the industry, haven't tried to come

18 up with some metrics that you can utilize to

19 guide your clients on what those terms means?

20     A.    No.

21          MR. DAVISON:  Objection.

22 QUESTIONS BY MR. LOESER:

23     Q.    If you turn to paragraph 72 of

24 your report.

25     A.    72.

1    Q.    You note that "some registrants

2    have explored the question of how they might

3    use alternative data sources like downstream

4    transactional data to address specific

5    instances of potential downstream diversion

6    that they become aware of."

7           Do you see that?

8    A.    Yes.

9    Q.    And that's chargeback data that

10   you're referring to there?

11   A.    Yeah, that's chargeback data.

12   Q.    And this exploration that

13   you're referring to here of those data

14   sources, is it your understanding that that's

15   something that some registrants did at --

16   just on their own, at their own behest?

17   A.    To utilize the chargeback data?

18   Q.    Yeah.

19   A.    Yes.  And Mallinckrodt first

20   started that on their own when they had a

21   situation with -- I think it was some

22   Tennessee investigation or something from

23   local police, and they utilized that in order

24   to determine something that needed to be

25   looked at further.  And that's how they begun

Highly Confidential - Subject to Further Confidentiality Review

```
1    to use the chargeback data.

2            Because you remember I said

3    earlier, or I'm sure other people have said,

4    chargeback data is a financial report.  It

5    was always considered a financial report,

6    always had to do with reimbursement because

7    of the different client bases.

8         Q.    If you turn to paragraph 82.

9         A.    Excuse me, 83?

10        Q.    82.

11        A.    82.

12        Q.    You indicate in this paragraph

13   that "the goal of reporting excessive

14   purchases was to provide DEA with information

15   that the Agency could use to determine

16   whether to investigate certain registrants."

17        A.    Yes.

18        Q.    "The industry standard at the

19   time was to provide this information to DEA,

20   and then it was DEA, not the manufacturer,

21   who was responsible for undertaking any

22   investigation of purchases reflected on

23   excessive purchase reports."

24            Do you see that?

25        A.    The industry standard -- yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     And this paragraph is in the
2    section that you've described as 1998 through
3    2007; is that correct?
4          A.     Correct.
5          Q.     And there's no citation to this
6    paragraph for -- or any materials cited.
7                 What's the basis for that
8    statement?
9                 MR. DAVISON:  Objection.
10                THE WITNESS:  The basis of that
11           statement is that based upon my
12           experience, is the industry from the
13           early days till the first letter came
14           out, I guess it was 19 -- December
15           2007, was providing excessive reports
16           that they would print out and provide
17           these to DEA, basically as a tool for
18           DEA use for possible -- identifying
19           possible targets for investigation or
20           further investigation.  And this went
21           on through the vast majority of the
22           industry, I would assume.
23                And the DEA finally, after that
24           letter came out -- like in
25           Mallinckrodt's case, St. Louis says,
```

1        "Hey, you know, thank you, but we

2        don't need these any longer."  We've

3        seen the new guidance.

4              And that's when I said it was a

5        standard of change.  It really was a

6        big change to the industry, after all

7        these years to be told what we've been

8        doing, we don't want them anymore.

9   QUESTIONS BY MR. LOESER:

10       Q.    And does paragraph 82

11  accurately reflect the guidance you gave your

12  clients in the 1998 through 2007 time period?

13             MR. DAVISON:  Objection.

14             THE WITNESS:  Well, what else

15       we would tell them -- now this is what

16       was going on in the industry.  We'd

17       also tell them that, remember now, on

18       suspicious orders you have to report.

19  QUESTIONS BY MR. LOESER:

20       Q.    Right.

21             But you told them that they

22  were to report suspicious orders to the DEA,

23  but it was the DEA, not the manufacturer, who

24  was responsible for undertaking any

25  investigation of purchases reflected on the

Highly Confidential – Subject to Further Confidentiality Review

```
1    excessive purchase reports.

2                That's guidance that you

3    provided to your clients in that time period?

4         A.    It's guidance that, you know,

5    that industry, companies are supplying,

6    monthly, quarterly basis, these printouts of

7    excessive orders, what was considered

8    excessive orders, providing that to DEA.

9                The intention was that DEA

10   would use this as possible investigative

11   targets, not necessarily but could, and

12   that -- but you still had the requirement to

13   report suspicious orders.

14               But this was the standard in

15   the industry and accepted by DEA until the

16   letter came out.  So DEA -- this is what DEA

17   was getting.  This is what DEA expected.

18        Q.    And all I'm trying to

19   understand, sir, is whether that standard

20   that you've described in paragraph 82, is

21   that the guidance that you provided to your

22   clients between the time frame 1998

23   through 2007?

24               MR. DAVISON:  Objection.

25               THE WITNESS:  Well, if --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LOESER:

2         Q.      With regard to that standard.

3         A.      Yeah.  This section, we would

4    tell them it was an industry standard and

5    this is what industry was using.  As a new

6    registrant, this is what was being done, but

7    we also explained to them the regulatory

8    requirement.

9         Q.      And --

10        A.      And this was, again, accepted

11   by DEA.

12        Q.      And so you told your clients

13   that after they reported the order, they

14   didn't have further obligation to investigate

15   those orders, but instead it was the DEA that

16   did that?

17             MR. DAVISON:  Objection.

18             THE WITNESS:  What we said was,

19        is you're reporting excessive orders,

20        what your system has determined as

21        excessive, not suspicious.

22             And if they felt -- in some

23        cases that I'm aware of, they felt

24        that they were helping the Agency, but

25        you still had to discuss with them the
```

1          requirement of the regulation about

2          reporting suspicious orders.

3      QUESTIONS BY MR. LOESER:

4          Q.    And --

5          A.    But keep in mind, this was

6      accepted by the Agency from 19 -- from the

7      '70s, probably, till up until 2007.

8          Q.    Right.

9              And so for the period 1998

10     through 2007, the guidance you gave to your

11     clients was that they needed to report

12     suspicious orders.  However, the

13     investigation of those orders after they

14     reported them was something that the DEA did

15     and that your clients did not have to do?

16         A.    Yeah.

17             MR. DAVISON:  Objection.  Asked

18         and answered three times.

19             THE WITNESS:  No.  The thing is

20         that if it's -- if an order -- if

21         yours pend and you think it's maybe

22         suspicious, do the due diligence on

23         it.  And if it is suspicious, then

24         report it to the DEA.

25

```
 1     QUESTIONS BY MR. LOESER:

 2          Q.     And that's what you told your

 3     clients between the time period 1998

 4     through 2007?

 5          A.     Yes.

 6          Q.     Is it your opinion that a

 7     registrant can use any data available to it

 8     to assist in determining whether an order is

 9     suspicious?

10               MR. DAVISON:  Objection.

11               THE WITNESS:  When you say "any

12          data," there would be -- they could

13          use, you know, their own reviews that

14          they do, any on-sites, any

15          questionnaires.  They could use a

16          number of processes or procedures or

17          knowledge in order to make a

18          determination that order is suspicious

19          or not suspicious.

20     QUESTIONS BY MR. LOESER:

21          Q.     And you mentioned chargeback

22     data is one source of data they could use?

23          A.     That -- not so much a

24     suspicious order but a -- because everything

25     is after the fact, and it was never intended.
```

1                    But to tell you, you know,

2    there's something here that this person is

3    buying from all these distributors, and I'm

4    getting hit with multiple chargebacks, this

5    doesn't make sense.  Let me tell my

6    customers, I'm not going to give you any more

7    chargebacks on this -- this registrant.

8                    And I'll also -- so I sent them

9    a letter, all the distributors, and I sent a

10   letter to DEA, copied that letter telling

11   DEA, "Hey, we may have an issue here.  Here's

12   the issue."

13                   And DEA would do something with

14   that.

15        Q.    And are you familiar with IMS

16   data?

17        A.    Not really.  No.  Unless it's

18   prescription data or something, no, it's --

19   no, I'm not familiar.

20        Q.    Is prescription data something

21   that a registrant could utilize as part of

22   its SOM program?

23        A.    I --

24                   MR. DAVISON:  Objection.

25                   THE WITNESS:  I couldn't answer

```
1              that question.  I know DEA uses it for

2              quotas, I think at one time.  I don't

3              know if they still do.

4      QUESTIONS BY MR. LOESER:

5              Q.    Are you familiar with IQVIA?

6              A.    That's a company that -- one of

7      those companies, but I was gone before that

8      happened.  So there was a whole chain of

9      companies.

10             Q.    Are you familiar with the data

11     that they generate?

12             A.    No.

13             Q.    What about --

14             A.    We had -- excuse me.  We had

15     our own business unit that had many functions

16     besides Buzzeo, but I really can't tell you

17     what they are, but it was outside the data

18     area.

19             Q.    What about 852 data?

20             A.    What is that?

21             Q.    852 data, do you know what that

22     is?

23             A.    No.

24             Q.    867 data?

25             A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      844 data?

2      A.      No.

3      Q.      Are you familiar with any other

4   data sources that manufacturers or

5   distributors could utilize to help inform

6   their SOM program?

7              MR. DAVISON:  Objection.

8              THE WITNESS:  Possibly

9         newspaper articles could be helpful.

10        Federal Registers could be helpful.

11        If you get information from state

12        police or local police.  Mallinckrodt

13        had one of those cases from Tennessee.

14             You know, there's data you

15        could look at, and depending on the

16        circumstances, you want that

17        additional data.

18   QUESTIONS BY MR. LOESER:

19        Q.      In this 1998 to 2007 time

20   frame, do you know if the DEA provided any

21   guidance regarding what an excessive purchase

22   was?

23        A.      The first guide came out --

24   manufactured in 2007, December 2007, and

25   that's -- and in following that, in

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt's case, they were notified by, I

2    think it was, the St. Louis office that they

3    no longer were accepting excessive order

4    reports.  And that was conveyed throughout

5    the industry.

6               That's the only guidance I'm

7    aware of during that period of time.

8         Q.    If you can look at

9    paragraph 87.

10        A.    87.

11        Q.    Paragraph 87, you note that you

12   were unable to find any standard operating

13   procedures for Mallinckrodt's anti-diversion

14   and SOM program for the time period 1998

15   through 2007; is that right?

16              MR. DAVISON:  Objection.

17              THE WITNESS:  Yes.

18   QUESTIONS BY MR. LOESER:

19        Q.    And did you determine based on

20   your review of Mallinckrodt materials whether

21   Mallinckrodt, in fact, had standard operating

22   procedures for anti-diversion in its SOM

23   program for this time period?

24        A.    They had draft procedures.

25        Q.    Did you review these

```
 1    procedures?

 2         A.      Yes.

 3         Q.      You reviewed procedures for the

 4    1998 through 2007 time --

 5         A.      I reviewed SOP -- SOP -- draft

 6    SOPs for this period of time.  And like any

 7    program, especially when changes are coming

 8    back -- changing guidance, new guidance is

 9    coming out, it's a changing process.

10             Now, as you know, there's no

11    requirement that a DEA registrant have

12    operating procedures.  FDA has -- there was

13    no requirement that DEA registrants had

14    operating procedures.  There were

15    requirements under the PDMA of wholesale

16    distribution, but under DEA, no.

17             But you have to have something

18    so your employees know what you expect.  So

19    in Mallinckrodt's they had draft SOPs,

20    internal documentations, training, to ensure

21    that their employees knew what the company

22    wanted.

23         Q.      And so you saw drafts, but you

24    did not see any final SOPs?

25         A.      There is a final -- I think it
```

1    was in 19 -- in 2012 or 2011.  I don't

2    remember the date.

3           Q.     All right.  I'm asking you

4    about the 1998 through 2007 time period.

5           A.     No, it was mainly drafts during

6    that period of time that I looked at.

7           Q.     How many drafts did you look

8    at?

9           A.     They kept changing.  I don't

10   want to give a number, but there was a number

11   of them, as I recall.

12          Q.     And were you able to determine

13   from those drafts what SOPs Mallinckrodt

14   actually had in place?

15          A.     Well, they were draft SOPs that

16   was followed by the staff, and they kept --

17   as guidance would change, as the program

18   changed, go from excessive order to peculiar,

19   they would update the drafts.  Who was

20   involved in the process, they'd update the

21   drafts till they finalized it.  And I've seen

22   that on other occasions.

23          Q.     Sir, if you look at

24   paragraph 89 of your report, you write, "It

25   is my opinion that 1998 through 2007,

1      Mallinckrodt's suspicious order monitoring

2      system was sufficient and effective to detect

3      and report suspicious orders to DEA."

4                  Did I read that right?

5      A.      Yes.

6      Q.      So is it your opinion that

7      Mallinckrodt's SOM program for that time

8      period detected all suspicious orders

9      received by Mallinckrodt?

10     A.      Yes.

11     Q.      And reported all such orders to

12     the DEA?

13     A.      They reported -- during this

14     period, they had a system in place where they

15     would report -- I think that was what, 2007?

16     Might be 2007.

17                 They had -- that period of time

18     they had an excessive order report and they

19     had -- they utilized that in order to meet

20     the regulatory requirements, and that was the

21     report that was accepted by DEA and was an

22     industry standard.

23     Q.      Okay.  I just want to make sure

24     I understand.  Your opinion is that they did,

25     in fact, identify and report all suspicious

```
 1    orders during that time period?

 2         A.      That they were reporting --

 3                 MR. DAVISON:  Objection.

 4                 THE WITNESS:  -- excessive

 5         orders during that period until the

 6         DEA letter came out.

 7                 And, you know, it states you

 8         have to report suspicious orders, and

 9         this was being accepted by DEA as an

10         industry standard for a number of

11         years.

12    QUESTIONS BY MR. LOESER:

13         Q.      In forming this opinion that is

14    expressed in paragraph 89, did you do any

15    evaluation of the orders received and shipped

16    by Mallinckrodt during this time period?

17         A.      No, I looked at the operating

18    procedures, depositions, testimony, in order

19    to render my opinion.

20         Q.      Your report indicates that "in

21    addition to having an algorithm to identify

22    suspicious orders, Mallinckrodt also had

23    additional procedures to identify suspicious

24    orders, including having customer service

25    reps and national account managers review and
```

1    provide input."

2              Is that right?

3         A.    What paragraph are you looking

4    at?

5         Q.    Paragraph 85.

6         A.    Yes, they had the excessive

7    order reports in place.  They utilize, as you

8    can see here, the customer service

9    representatives because they were looking at

10   all the incoming orders and the 222 forms.

11   They utilized their project managers looking

12   for -- because they were on site.  They would

13   know their customers.  They had been trained.

14             So it's what I said here.  So

15   this was all part of their program.

16        Q.    And other than what's

17   identified in paragraph 85, were there any

18   other aspects of the suspicious order program

19   that you were able to identify based on your

20   review?

21        A.    In that period of time?

22        Q.    Yeah.

23        A.    It was mainly this.

24        Q.    Was there anything else at all

25   that you identified?

```
 1          A.     Let's see.  The excessive

 2   order, customer sales reps, project managers,

 3   compliance.  That's probably as I recall, as

 4   I wrote here.

 5               But I didn't see -- keep in

 6   mind that it was still compliance that was

 7   making the final decision to ship/don't ship,

 8   not the salespeople.

 9          Q.     And in paragraph 85 you

10   reference the algorithm that generated

11   excessive purchase reports.

12               How did that algorithm work?

13          A.     Okay.  They had -- they had a

14   process, algorithm, that was █ times, then

15   they lowered it to █, and then it's back --

16   it was back up at ███.

17               So as the process evolved and

18   they looked, you know, at the orders and they

19   had additional data in the system, that

20   algorithm would change.  That number would

21   change.

22          Q.     And so if you were to diagram

23   that algorithm mathematically, it would look

24   like ███  or ███  or ████.

25          A.     Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      There was no other calculation

 2    that needed to happen?

 3          A.      No.

 4                  MR. DAVISON:  Objection.

 5                  VIDEOGRAPHER:  Off the record

 6          at 4:10 p.m.

 7           (Off the record at 4:10 p.m.)

 8                  VIDEOGRAPHER:  We're back on

 9          the record at 4:33 p.m.

10    QUESTIONS BY MR. LOESER:

11          Q.      Mr. Buzzeo, when we were

12    talking about paragraph 87 of your report,

13    you mentioned draft SOPs that you claim that

14    you reviewed.

15                  There are no draft SOPs cited

16    in your report and -- is that right?

17                  MR. DAVISON:  Objection.

18                  THE WITNESS:  Yeah, I -- you

19          mean in my report?

20                  I did under footnote 100.  I

21          talked about written SOPs.

22    QUESTIONS BY MR. LOESER:

23          Q.      Right.

24                  But footnote 100 says, "There

25    is no statutory or regulatory requirement
```

1    that a company have written SOPs related to

2    suspicious order monitoring."

3              And I'm asking you, in your

4    testimony you talked about draft SOPs --

5         A.    Yes.

6         Q.    -- for the pre-2008 time

7    period.

8              And what I'm asking you is

9    whether you cite to those draft SOPs anywhere

10   in your report?

11        A.    Oh, I see what you're saying.

12             As I recall, no.

13        Q.    And are those draft SOPs listed

14   in your materials considered in Exhibit B of

15   your report?

16        A.    I don't recall.  There's so

17   much material in here, I'd have to go back

18   and look.  I don't recall.

19        Q.    And you're certain, sir, that

20   you reviewed draft SOPs from the pre-2008

21   time period?

22        A.    There was draft SOPs that I

23   reviewed and -- I don't recall the dates, but

24   I think it's from that period, yes.

25             MR. LOESER:  Counsel, I don't

```
 1            believe we received any pre-2008 draft

 2            SOPs, so if you could check to see if

 3            those have actually been produced.

 4                    MR. DAVISON:  Everything has

 5            been produced, and everything he

 6            reviewed has been listed in his

 7            materials considered list.

 8                    MR. LOESER:  Okay.  Well,

 9            perhaps you can identify on -- not

10            right now, but subsequently, of the

11            Bates-numbered items which ones are

12            draft SOPs.

13                    MR. DAVISON:  We'll take it

14            under advisement.

15     QUESTIONS BY MR. LOESER:

16            Q.    Sir, could you tell me what an

17     order of interest is?

18            A.    Excuse me?

19            Q.    An order of interest.  You

20     referred to an order of interest when we were

21     talking about suspicious orders.

22                    What is an order of interest?

23                    MR. DAVISON:  Objection.

24                    THE WITNESS:  It could be the

25            excessive order or order of interest,
```

1          something that you should look

2          further, to make a determination it

3          may be suspicious or not.

4                  But in the chargeback area, to

5          me it's just an order of interest.

6          It's not suspicious.  It warrants some

7          further review if we refer to

8          chargeback data, and it's something

9          that we would refer to DEA, or it

10         would be referred to DEA to look at.

11    QUESTIONS BY MR. LOESER:

12         Q.      And what are some

13    characteristics of what you would consider an

14    order of interest?

15         A.      Maybe purchases from more than

16    one distributor.  Maybe quantity.  It could

17    be, you know, different things that really is

18    not suspicious in nature but it's -- because

19    remember, it's an after-the-fact.  It's not

20    an order, it's a distribution, so it's after

21    the fact.

22                 And until that financial report

23    comes in, it could be, you know, requests,

24    chargeback.  It could be a month, two months,

25    three months.  You know, I don't know how

1    long that could be.

2              So it's more of an order of

3    interest, so I'm sending it to DEA and, you

4    know, all the distributors that there's

5    something that you may want to look at.

6         Q.    Is it appropriate to stop an

7    order than fill the order from a different

8    source?

9              MR. DAVISON:  Objection.

10   QUESTIONS BY MR. LOESER:

11        Q.    So if a distributor stops an

12   order, or a manufacturer stops an order from

13   a distributor and then fills the same order

14   from another source, is that appropriate?

15             MR. DAVISON:  Objection.

16             THE WITNESS:  I don't -- so

17        manufacturer stops an order for one of

18        their customers, stops an order for

19        one of their customers, then ships

20        from another location?

21   QUESTIONS BY MR. LOESER:

22        Q.    Right.

23        A.    Are we talking about

24   Mallinckrodt?  Because -- okay.

25             I don't know the circumstances

1   why they stopped it.  Was it because they're

2   out of stock or they made a determination it

3   was suspicious?

4                   I can't answer that question.

5   I don't know all the details.

6        Q.    You mentioned text messages in

7   your earlier testimony.

8                   Did you review text messages --

9        A.    No, I made a mistake on that.

10  I spoke out of turn.

11                  I reviewed the documents here.

12  There were memos and e-mails, I meant to say.

13  And then as you see here, the list.  I

14  didn't -- that was just a slip of the tongue.

15       Q.    And does your son William still

16  work for BuzzeoPDMA?

17       A.    He works for IQVIA.  He has a

18  business unit in that company, and one of the

19  operations is the old BuzzeoPDMA company.  I

20  don't know what the other ones are.

21                  I can't remember the last time

22  we discussed business.  Basically when we get

23  together, it's quality time.

24       Q.    In paragraph 85 where you talk

25  about the involvement of the national account

```
 1    managers and the customer service reps in

 2    Mallinckrodt's suspicious order monitoring

 3    program, you cite some deposition testimony.

 4              And is the testimony cited all

 5    of the testimony that you reviewed pertaining

 6    to the involvement of NAMs and customer

 7    service reps in Mallinckrodt's SOM program?

 8         A.    This was the data I looked at.

 9         Q.    Okay.  Those were the

10    depositions you looked at?

11         A.    Yes.

12         Q.    And those were the pages that

13    you identified that related to this issue of

14    the involvement --

15         A.    Yes.

16         Q.    -- of national account

17    managers --

18         A.    Yes.

19         Q.    -- and customer service reps?

20         A.    Yes.

21              I'm sorry.

22         Q.    Do you know if you reviewed the

23    depositions of the national account managers?

24         A.    I looked at them, so I reviewed

25    them, yes.
```

1      Q.     Okay.  And you haven't cited

2    any of their testimony here.

3              Is there a reason for that?

4      A.     No, I just looked at it, and it

5    didn't really...

6      Q.     And do you know if you have --

7    if you read the entirety of the transcripts

8    for the national account managers?

9      A.     No.  I don't recall, but I

10   doubt it.  I just read excerpts of them.

11     Q.     Was your son William involved

12   in any of the audits you did of SOM programs

13   for either manufacturers or distributors?

14              MR. DAVISON:  Objection.

15              THE WITNESS:  No.

16              His was more the business

17         aspect, running a company, building a

18         company.

19   QUESTIONS BY MR. LOESER:

20     Q.     If you turn to paragraph 92 --

21     A.     Excuse me, 92?

22     Q.     92.

23              -- you discuss the 2007 letter

24   from Joseph Rannazzisi and describe it as a

25   significant change in DEA's guidance with

1    respect to suspicious order monitoring.

2                  Do you see that?

3         A.     Yes.

4         Q.     What's your understanding of

5    why the DEA, in your view, changed its

6    approach?

7                  MR. DAVISON:  Objection.

8                  THE WITNESS:  I really don't

9         know, not being with DEA.  They made

10        this change.  There had to be a

11        reason, but I don't know what that

12        reason is.

13   QUESTIONS BY MR. LOESER:

14        Q.     You have no idea whether there

15   was a problem with diversion, for example,

16   that might have necessitated that change?

17        A.     I wouldn't --

18                 MR. DAVISON:  Objection.

19                 THE WITNESS:  I wouldn't know

20        what the actual facts were behind --

21        or details behind those letters.  I do

22        know it was a major change to the

23        industry.

24   QUESTIONS BY MR. LOESER:

25        Q.     And did you ask anyone at DEA

1    about the change?

2         A.    No.

3         Q.    Did you explore in any way why

4    the DEA would be shifting its focus?

5         A.    No.

6         Q.    Were you curious at all about

7    that?

8         A.    I was curious, but, you know,

9    inappropriate to call -- it's not appropriate

10   to call an agency and tell me -- tell me what

11   your reasoning was behind making this change.

12        Q.    You didn't observe any problems

13   with controlled substances during that time

14   frame that would suggest it was necessary to

15   do something different?

16            MR. DAVISON:  Objection.

17            THE WITNESS:  There was a, you

18        know, diversion abuse problem down at

19        the practitioner level, so there --

20        there had to be reasons, but I don't

21        know those reasons.

22   QUESTIONS BY MR. LOESER:

23        Q.    You audited all these

24   companies, distributors, manufacturers,

25   pharmacies, but you didn't observe any

```
 1    problems with diversion?
 2               MR. DAVISON:  Objection.
 3               THE WITNESS:  As I mentioned, I
 4         think this morning, I looked at -- we
 5         looked at the registrants from the
 6         perspective of are they meeting the
 7         regulatory requirements, and if we
 8         were aware of any new guides or
 9         something, we would discuss it with
10         them.
11    QUESTIONS BY MR. LOESER:
12         Q.    And how did this, what you're
13    calling a sea change from the DEA, impact the
14    guidance you gave your DEA registrant
15    clients?
16               MR. DAVISON:  Objection.
17               THE WITNESS:  Well, it was --
18         don't forget, for a number of years
19         DEA was accepting excessive order
20         reports, and now all of a sudden you
21         come out and tell the industry, we're
22         not going to accept them any longer.
23         And if we approved any systems in the
24         past, you know, we take that back, and
25         you have a responsibility to determine
```

```
 1          whether an order is suspicious or not.

 2               It's almost like becoming an

 3          investigator, saying, now, you're

 4          now the -- you're responsible for

 5          that, making that determination.  You

 6          go out and investigate, and just tell

 7          us when something's suspicious.

 8               So that's the change that came

 9          about.

10     QUESTIONS BY MR. LOESER:

11          Q.    And so that affected the

12     guidance you gave your clients?

13          A.    Not really.

14               MR. DAVISON:  Objection.

15               THE WITNESS:  But it affected

16          the -- what DEA was accepting from the

17          customers for that period of time.

18     QUESTIONS BY MR. LOESER:

19          Q.    Did you --

20          A.    Because the requirement for

21     reporting suspicious orders was always there.

22          Q.    And did you spread the word

23     about this change in the DEA's approach to

24     your clients?

25          A.    They spread it to us.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Now, we heard about it, but the

2 industry was sending us copies of the letters

3 and everything.

4   Q.  Okay.  Do you recall who sent

5 you copies of those letters?

6   A.  Oh, God, no, I don't recall.

7 The vast majority of the industry, our

8 clients.  Did you see this?  Yes, we saw it.

9   Q.  And when you received those

10 letters, what did you do to develop an

11 understanding of what they meant?

12   A.  By, you know, looking at the

13 letters themselves, the -- what the industry

14 was interpreting, what we interpreted it to

15 mean.  But, you know, it said basically we

16 don't -- you don't need to send us any more

17 excessive order reports.  We're not going to

18 accept them any longer.  This is a new

19 policy.  And anything we said in the past,

20 forget about and just, you know, move forward

21 on it.

22    Again, you know, none of this

23 is regulatory requirements.  It's not even a

24 policy.  Really, it's a guidance letter.

25    So that's why I said it's a sea

 1    change.  A major, major impact on the

 2    industry.

 3           Q.     If you look at paragraph 94 of

 4    your report, you state, "Second, the 2007 DEA

 5    letter articulated brand new guidance from

 6    DEA that registrants must conduct an

 7    independent analysis of suspicious orders

 8    prior to completing a sale."

 9                  Do you see that?

10           A.     Uh-huh.  Yes.

11           Q.     And is it your opinion that

12    prior to the DEA -- prior to 2007, the DEA

13    did not expect registrants to hold

14    potentially suspicious orders pending the

15    registrant's investigation of the order?

16           A.     I lost you after the word what

17    I expect, but --

18           Q.     Is it your opinion that prior

19    to 2007, the DEA did not expect registrants

20    to hold potentially suspicious orders pending

21    the registrant's investigation of the order?

22                  MR. DAVISON:  Objection.

23                  THE WITNESS:  Yeah, it was --

24           they were sending in excessive order

25           reports, but this letter clarified

1          that, hey, from now on, only send us

2          suspicious orders, what you made a

3          determination is suspicious.

4     QUESTIONS BY MR. LOESER:

5          Q.     And again, I want to be very

6     clear with my question, so I'll try and ask

7     it again.

8               Prior to 2007, is it your

9     opinion that the DEA did not expect

10    registrants to hold potentially suspicious

11    orders pending the registrant's investigation

12    of the order?

13              MR. DAVISON:  Objection.

14              THE WITNESS:  It appears that

15         way because they accepted excessive

16         order reports, you know, up until that

17         period the letter came out.  But

18         there's instances where some

19         companies, or a majority of companies,

20         are still reporting suspicious order

21         over and above this.

22    QUESTIONS BY MR. LOESER:

23         Q.     And I'm asking specifically

24    about holding the order pending the

25    investigation.  I just want to make sure I

1    understand what your view of the law was and

2    the requirements prior to 2007.

3         A.    Yeah.

4         Q.    Was it your view that the DEA

5    did not expect registrants to hold orders

6    pending their investigation of them?

7              MR. DAVISON:  Objection.  Asked

8         and answered yet again.

9              THE WITNESS:  Based upon what

10        DEA was accepting, it appears that

11        way.  But in addition, some companies

12        were going over and above this doing

13        due diligence, further due diligence,

14        and reporting suspicious orders.

15             But in meeting the regulatory

16        requirement, the industry was sending

17        these reports in, and DEA was

18        accepting them.  That's -- I think

19        that's why they came out with the

20        letter, to clarify that.

21   QUESTIONS BY MR. LOESER:

22        Q.    And was your guidance to your

23   clients in this time frame that they did not

24   need to hold orders that were flagged by

25   their systems pending their investigation of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the orders?

 2              MR. DAVISON:  Objection.

 3              THE WITNESS:  Our guidance, as

 4         I mentioned earlier, it would have

 5         been based upon here's the regulation,

 6         here's what's expected of you.  We

 7         understand, we know that DEA has been

 8         accepting these additional reports.

 9              That would have been our

10         expression to them or our guidance to

11         them.

12              When the 2007 letter came out,

13         we said, "Hey, you know, as you read,

14         the letters we have, this thing said

15         we don't want any more excessive order

16         reports.  Just make your

17         determination; ship us a suspicious

18         order."

19    QUESTIONS BY MR. LOESER:

20         Q.    And again, I'm asking about

21    whether they should hold the orders pending

22    the investigation.

23         A.    Okay.

24         Q.    And so you've described a

25    change where, before 2007, if I understand
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    your report correctly, you believe the DEA

 2    did not require registrants to hold orders

 3    pending investigation.

 4              But after 2007, is it your

 5    opinion that the DEA started requiring

 6    registrants to hold orders pending

 7    investigation?

 8         A.    Pending -- after 2000 --

 9              MR. DAVISON:  Objection.

10              Go ahead.

11              THE WITNESS:  The Agency --

12         basically what they're saying is, you

13         tell us only about suspicious orders,

14         and make a determination if the order

15         is suspicious.

16              Now, if they're asking me to

17         ship/don't ship, DEA said it's your --

18         if any guidance put out that DEA did,

19         was you make the determination whether

20         you ship or not ship.

21              Is that what you're asking?

22    QUESTIONS BY MR. LOESER:

23         Q.   I'm just asking whether it was

24    necessary to hold the order pending the

25    investigation.
```

```
1          A.      That's ship/don't ship.

2                  MR. DAVISON:  Objection.

3    QUESTIONS BY MR. LOESER:

4          Q.      Okay.  So you're saying that

5    the before 2007, DEA did not expect

6    registrants to hold the order pending

7    investigation, right?

8          A.      Like I said earlier, there's no

9    regulatory requirements you hold an order.

10   Just report a suspicious order.

11         Q.      So the answer to my question is

12   yes, prior to 2007, your view is the DEA did

13   not expect registrants to hold orders pending

14   investigation?

15         A.      Do they even expect that now?

16   They expect you to report suspicious orders.

17                 Now, if they've gone further

18   and said you're now responsible for some --

19   if there's diversion out there, so I would

20   assume then, yes, that's what they're

21   expecting now, that you're to make that

22   determination to ship/don't ship.  Otherwise,

23   they're going to tie you into the

24   investigation.

25         Q.      Before 2007, did you advise
```

1    your clients to hold orders pending their

2    investigation of them?

3                    MR. DAVISON:  Objection.  Asked

4           and answered.

5                    THE WITNESS:  Depending on the

6           details, the investigation, there are

7           orders.  Once it becomes suspicious,

8           the company has to make a

9           determination to ship/don't ship.

10                   We would advise our clients,

11          make sure you do good due diligence on

12          whether an order is suspicious or not.

13                   What I'm also saying is in that

14          period of time prior to 2011, DEA

15          accepted as part of that regulatory

16          requirement that you send -- that they

17          were sending in excessive order

18          reports and they accepted them.

19   QUESTIONS BY MR. LOESER:

20          Q.    Sir, I'm just trying to figure

21   out, you've talked about a sea change in

22   2007, and you've described what you referred

23   to as a sea change in your report.

24                   And what you describe is that

25   the DEA required registrants to hold orders

```
 1    pending investigation after 2007.

 2              So all I'm asking you is --

 3         A.    Yes.

 4         Q.    -- it your understanding that

 5    prior to 2007, did the DEA not expect

 6    registrants to hold orders pending their

 7    investigation?

 8              MR. DAVISON:  Objection.

 9              THE WITNESS:  Based upon the

10         letter, DEA now expected you to hold

11         the order before you complete the

12         sale.

13    QUESTIONS BY MR. LOESER:

14         Q.    Okay.

15         A.    Prior to that, DEA accepted the

16    excessive order reports that may have

17    included or not included suspicious orders.

18         Q.    And so before and after that

19    letter, how did your guidance change to your

20    clients with regard to whether they needed to

21    hold orders pending their investigation?

22              MR. DAVISON:  Objection.

23              THE WITNESS:  Our guidance

24         always was that based upon the

25         regulation, you determine if an order
```

```
 1          is suspicious, and if so, don't ship

 2          it.  You make a determination if it's

 3          suspicious or not.

 4               If you make a determination

 5          that it's suspicious, our guidance

 6          would have been to you, you'd better

 7          be very careful that this is not

 8          leading to diversion, and you may want

 9          to reconsider whether you ship an

10          order or not.

11               But a number of companies

12          didn't ship, or some companies didn't

13          ship.

14               I think I've clarified your

15          question.

16     QUESTIONS BY MR. LOESER:

17          Q.    When you worked for the DEA,

18     did you advise registrants that they needed

19     to hold orders pending their investigation of

20     whether they were suspicious?

21               MR. DAVISON:  All right.  I'm

22          going to instruct you not to provide

23          any nonpublic information.  So if

24          you're providing guidance to an

25          individual registrant that's not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          public, you don't have Touhy

 2          authorization from them.

 3               THE WITNESS:  I'm going to

 4          follow the advice of my counsel.

 5    QUESTIONS BY MR. LOESER:

 6          Q.    Was your guidance when you

 7    started working for BuzzeoPDMA with regard to

 8    whether to hold investigation -- hold orders

 9    pending investigation different than it was

10    when you worked for the DEA?

11               MR. DAVISON:  Objection.

12               THE WITNESS:  I'm only going to

13          mention when we were working with the

14          industry as consultants, and services

15          we provided, that our counsel, from a

16          regulatory perspective, would be to --

17          what we felt the regulations intended

18          for the industry to do.  So 1301.74(b)

19          would be, here's the regulation.

20          There's really no guidance -- there's

21          no guidance on it, there's no

22          standard.  You have to make a

23          determination to report a

24          suspicious -- whether an order is

25          suspicious, and if it's suspicious,
```

1          report it.

2                  You're then going to make a

3          determination whether to ship it or

4          not.  And that's your determination,

5          but you should be careful in case

6          it's -- the product is being diverted.

7                  So those are what we would say

8          to the industry.

9      QUESTIONS BY MR. LOESER:

10          Q.     And so this 2007 letter from

11     Rannazzisi did not change your advice or your

12     guidance regarding whether to be careful

13     about shipping orders flagged as suspicious?

14                 MR. DAVISON:  Objection.

15                 THE WITNESS:  It would change,

16          because for now we were saying to

17          them, look, DEA -- you put out

18          excessive order reports.  DEA accepted

19          it.  If you didn't get the hint to the

20          letter, you better stop doing that.

21                 Number two, all DEA wants you

22          to report is a suspicious order.

23                 And DEA is saying to you,

24          industry, you got to make that

25          determination whether it should be

```
 1          shipped or not, because they're very

 2          clear in here that suspicious

 3          orders -- they should do their review

 4          prior to completing the sale.

 5                  That was a sea change.

 6     QUESTIONS BY MR. LOESER:

 7          Q.    But it's always been your view

 8     that orders shouldn't be shipped until the

 9     investigation is complete, right?

10                  MR. DAVISON:  Objection.

11                  THE WITNESS:  You're taking a

12          chance if you ship an order that you

13          deem suspicious.

14     QUESTIONS BY MR. LOESER:

15          Q.    And so your guidance has always

16     been to your clients that that's not a good

17     idea?

18                  MR. DAVISON:  Objection.

19                  THE WITNESS:  Yeah, again,

20          depending on the details, the facts,

21          things like that.

22     QUESTIONS BY MR. LOESER:

23          Q.    All right.  If you look at note

24     127 of your report, and this is in the 2008,

25     2009 time period, you state, "Over time, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    group responsible for monitoring" --
 2         A.      Excuse me.  Which number?
 3         Q.      Footnote 127 on page 24.
 4         A.      127.
 5              MR. DAVISON:  Footnote.
 6              THE WITNESS:  Oh, footnote.
 7    Oh.
 8    QUESTIONS BY MR. LOESER:
 9         Q.      Page 24.
10         A.      Okay.  Number one oh --
11         Q.      127.
12         A.      Okay.
13         Q.      You state, "Over time, the
14    group responsible for monitoring shifted from
15    customer service managers trained by the
16    controlled substances compliance group to
17    trade compliance and then to controlled
18    substances compliance personnel.  While it
19    was not improper for a customer service
20    manager to perform the monitoring duties,
21    Mallinckrodt determined that it would be
22    better for monitoring to be conducted in
23    compliance."
24         A.      Just give me a minute.  Okay.
25         Q.      And I take it you reviewed some
```

1    information that's listed on your materials

2    considered list to provide this statement?

3            A.      Yes.

4            Q.      And what is your understanding

5    about why Mallinckrodt determined it would be

6    better for monitoring to be conducted in

7    compliance?

8            A.      Well, they were -- as the

9    program evolved and changes were continually

10   being made, it just felt that they had the

11   resources to put it in the compliance area

12   where it really -- where it belongs.

13           Q.      So it was purely a resource

14   determination?

15           A.      No, it's probably -- it's a

16   compliance consideration.  Since they were

17   making decisions anyway, they just felt that

18   it should be moved into that area.

19           Q.      Is there anything undesirable

20   about having salespeople involved in

21   compliance decisions?

22           A.      No.  As long as the compliance

23   people and legal are making the final

24   determinations, you want as many people

25   involved in the process.  So they're part of

```
 1    the -- have an understanding of what should

 2    or shouldn't be done.

 3              It's like security, you know,

 4    having security involved in the process but

 5    not running the program.

 6        Q.    And help me understand why it's

 7    better then not to have those salespeople

 8    involved.

 9              MR. DAVISON:  Objection.

10              THE WITNESS:  I don't know if

11         the word is "better."  It's just --

12         would decentralize the function.

13              As you gather more information,

14         as a program evolves, you begin to

15         look at -- you know, it's not the

16         function, but do we have it at the

17         right spot.  It's not that these

18         people didn't do a good job, but do we

19         have it in the right spot.  Where

20         should it be.

21              Companies are looking many

22         times, and I've been asked many -- the

23         question:  Should we put this function

24         in legal?  Should we put this function

25         in security?  Should we put this
```

```
1              function in sales and management?

2                    Depending on the company, you

3              put things where they would better

4              function.

5    QUESTIONS BY MR. LOESER:

6         Q.      And in all of your years of

7    auditing and understanding that you've

8    developed of the industry over time, do you

9    have any thought that having salespeople

10   involved in compliance decisions is

11   undesirable because salespeople have a

12   conflict?

13                   MR. DAVISON:  Objection.

14                   THE WITNESS:  You don't want

15             anybody outside of compliance and

16             legal making the decisions.  If we

17             talk about SOM, ship/don't ship,

18             that's where you want that process.

19                   And then you have legal and

20             compliance working closely together

21             from a regulatory perspective, from a

22             legal perspective.  Look, this is a --

23             we've made the determination it's

24             suspicious.  We don't want to ship it.

25             Legal and regulatory discuss that
```

```
 1              from -- like I said, from a legal and

 2              regulatory.

 3                   It's not undesirable.  You want

 4              as many -- you want as many

 5              operations, set of people, operations

 6              involved in the program you're

 7              running, especially in the compliance

 8              area, so that they're aware of what's

 9              responsible.  They're aware of what

10              they're looking -- that the company

11              requires you to look for.

12     QUESTIONS BY MR. LOESER:

13              Q.    Well, from what you've

14     described here, they reduced the number of

15     parties that were involved in the process,

16     right, because they eliminated the sales and

17     customer service people?

18                   MR. DAVISON:  Objection.

19                   THE WITNESS:  Well, they

20              were --

21     QUESTIONS BY MR. LOESER:

22              Q.    Isn't that what you describe?

23                   MR. DAVISON:  Objection.

24                   THE WITNESS:  It's -- they

25              eliminate sales.  They still were
```

1          involved in some role.  If they see

2          something -- there was training

3          programs on a regular basis.  Karen

4          Harper would run training programs for

5          them.  But the actual processing of

6          the order, from that perspective, they

7          put into compliance.

8    QUESTIONS BY MR. LOESER:

9          Q.    And can you give me any other

10   information about why what you described in

11   footnote 27 is better?

12              MR. DAVISON:  Objection.

13              THE WITNESS:  127?

14   QUESTIONS BY MR. LOESER:

15         Q.    Yeah, the footnote we just have

16   been reviewing.

17         A.    As I say here, in order --

18   after the guidance that -- DEA guidance in

19   revising their program, that they decided

20   that, you know, this would fit better in

21   order to meet that guidance that DEA was

22   putting out.  And that's what I say here.

23         Q.    So it was DEA guidance that

24   caused Mallinckrodt to eliminate customer

25   service and sales personnel from the

```
 1    compliance program?

 2              MR. DAVISON:  Objection.

 3              THE WITNESS:  I wouldn't say

 4         that.  I would say more or less as the

 5         program evolved, they wanted to

 6         centralize the program, which is

 7         customary in the industry.

 8              If you look back over the

 9         years, you handled things a certain

10         way.  Then as a program evolves, you

11         get more guidance, more programs

12         involved, more maybe technical support

13         from the company, things begin to

14         evolve, changes are made.

15              I've seen that in numerous

16         occasions.  It was in security.  Then

17         it's in compliance.

18    QUESTIONS BY MR. LOESER:

19         Q.    So it's your opinion that sales

20    and customer service people were not removed

21    by Mallinckrodt because there was a

22    recognition that having sales and customer

23    service involved in that process was

24    undesirable?

25              MR. DAVISON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LOESER:
 2         Q.    Was undesirable?
 3         A.    No.  No, not based upon that at
 4    all.
 5         Q.    Look at paragraph 112 in your
 6    report.
 7               At paragraph 112 you state, "It
 8    is my opinion that Mallinckrodt's suspicious
 9    order monitoring system was sufficient and
10    effective to detect and report suspicious
11    orders to DEA in the 2008 through 2009 time
12    period."
13               Did I read that correctly?
14         A.    Yes.
15         Q.    And so is it your opinion that
16    the Mallinckrodt SOM program from 2008
17    through 2009, in fact, detected all
18    suspicious orders received by Mallinckrodt?
19         A.    Yes.  What it was is they
20    enhanced the program.  They started a new
21    designation of peculiar orders.  The
22    intention was to hold orders until the
23    investigation was done.  Things could --
24    begun audits of, like as I put here, Sunrise.
25         Q.    And, sir, is it also your
```

Highly Confidential - Subject to Further Confidentiality Review

1    opinion that in the time period of 2008

2    through 2009, Mallinckrodt reported all

3    suspicious orders to the DEA?

4         A.    They put out the peculiar

5    report to DEA.

6         Q.    And in that report, they

7    identified all of the suspicious orders that

8    they had received?

9         A.    They identified suspicious

10   orders, and Mallinckrodt would do reviews of

11   those orders.

12        Q.    And in forming this opinion,

13   did you do any evaluation of the orders

14   received and shipped by Mallinckrodt during

15   this time period?

16        A.    What I looked at is the process

17   that was involved in it, the process of going

18   through excessive orders to peculiar reports

19   and how they were handled by the company.

20        Q.    But you did not look at any

21   actual orders; is that correct?

22        A.    No.  No.

23        Q.    And did you review how many

24   suspicious orders Mallinckrodt reported

25   relative to overall orders?

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MR. DAVISON:  Objection.

 2              THE WITNESS:  I think it

 3        probably -- over a period of time, and

 4        I don't recall the period of time, but

 5        probably -- I don't know.  They

 6        probably reported somewheres around

 7        ten.

 8   QUESTIONS BY MR. LOESER:

 9        Q.    And did you evaluate the number

10   that they reported relative to the total

11   number that they shipped?

12        A.    Based upon their customer base

13   they have, that doesn't surprise me at all.

14        Q.    And, sir, I'm asking if you

15   actually evaluated the numbers.

16              Did you look at the ratio of

17   flagged orders to shipped orders?

18              MR. DAVISON:  Objection.

19              THE WITNESS:  I looked at what

20        was -- what -- based upon the customer

21        base, the drugs, that -- you know,

22        whether 10 was sufficient or not.

23        Yes, 10 was sufficient.

24   QUESTIONS BY MR. LOESER:

25        Q.    So you looked at the total
```

Highly Confidential - Subject to Further Confidentiality Review

1    number.  You look at data that showed you the

2    total number of orders that Mallinckrodt

3    shipped?

4              MR. DAVISON:  Objection.

5              THE WITNESS:  No, I looked at

6         the types of clients they were dealing

7         with.

8    QUESTIONS BY MR. LOESER:

9         Q.    Okay.  So you didn't look at

10   any of the actual data for the orders?

11        A.    I looked at the only data that

12   was -- and I don't know -- data that was

13   shipped, like, to Sunrise and what they did

14   on that.

15             But overall, just looking at

16   the program, it was my professional opinion

17   that their program met the regulatory

18   requirements.

19             Number of reports does not

20   determine whether a program is compliant or

21   not.

22        Q.    Sir, if you look at

23   paragraph 117 of your report, you write that

24   "the only time that Mallinckrodt heard the

25   phrase 'know your customers' customers' from

1    DEA was in a one-off statement by a DEA

2    diversion group supervisor during a nonpublic

3    audit."

4                 Do you see that?

5         A.      Uh-huh.

6         Q.      How do you know that was a

7    one-off statement?

8         A.      Because I've never -- nobody

9    else in the industry heard it that I'm aware

10   of, and the DEA has put nothing out on that

11   during this period of time.

12        Q.      And did you review all of the

13   discovery in this case to see if that

14   statement was made elsewhere?

15        A.      And also there was -- Joe

16   Rannazzisi made a statement he wasn't aware

17   of "know your customer's customer" until he

18   retired.  And some of the other DEA people

19   made statements to that effect also.

20        Q.      And so, sir, did you review the

21   other discovery in this case, all of it, to

22   see if that -- if there's reference to

23   knowing your customer's customer elsewhere?

24        A.      I looked at the data that I had

25   available to me based upon my request and

```
 1    based upon statements I saw from DEA in some

 2    of that data and the regulations.  There's no

 3    requirement to know your customer's customer.

 4                 And during the period of this

 5    time as I sit here, DEA has given no further

 6    guidance to the industry.

 7         Q.    And did you see any other

 8    reference to knowing your customer's customer

 9    in any of the other materials listed on your

10    materials considered list?

11         A.    As I recall, I think one of the

12    plaintiffs' experts may have mentioned

13    something to that effect, and what they said

14    was is they had no idea that -- they had

15    never heard that statement before.

16         Q.    So you didn't see any reference

17    to that statement in the other discovery

18    produced by Mallinckrodt in this case?

19         A.    Well, just the depositions and

20    the reports I've seen.

21         Q.    Okay.  And so in the

22    depositions and reports, you didn't see any

23    other statements --

24         A.    No.

25         Q.    -- other than what you
```

1    mentioned?

2         A.    What I mention here and

3    comments that I mentioned in here about DEA.

4         Q.    And in paragraph 118, you

5    state, "I am not aware of any other DEA field

6    office making a similar statement during this

7    time period."

8              Do you see that?

9         A.    Yes.

10        Q.    And what did you -- what did

11   you do to investigate whether any other DEA

12   field office made similar statements during

13   this time period?

14        A.    Based upon our experience,

15   based upon comments of -- would have been

16   from industry, and then also based upon what

17   Joe said and some of the others, the

18   depositions.

19        Q.    All right.  Anything else?

20        A.    No.

21        Q.    If you look at paragraph 122 of

22   your report, you state, "I have come to

23   understand that there are significant

24   limitations regarding chargeback data that

25   make it ill-suited for use in the suspicious

1    order monitoring program."

2              Did I read that accurately?

3         A.    Yes.

4         Q.    And footnote 155 is a reference

5    to the Buthusiem report; is that right?

6         A.    Which report?

7         Q.    The Buthusiem?

8         A.    Yeah.

9         Q.    That's what you cite for that

10   statement?

11        A.    Yes.

12        Q.    So is that the source of the --

13   of what you reference as your understanding

14   that there are significant limitations?

15        A.    Also based upon my experience.

16        Q.    And what's your experience

17   that --

18        A.    Chargeback data, like I said,

19   was always a financial report over the years.

20   I wouldn't expect that anybody in the company

21   besides the financial people or maybe sales

22   and marketing would know about it.

23              It was used to -- as a --

24   depending on the service or trade, you know,

25   was it retail or was it hospital sales, and

1    that's how the program developed, from using

2    it to -- as part of an SOM program.  As I

3    said, it was after the fact.  And --

4          Q.    Is that unusual --

5          A.    -- it wasn't an order.  It

6    wasn't an order, but Mallinckrodt did use it

7    in one of their investigations or reviews and

8    then, you know, is using it today also.

9               And that's what DEA said, that

10   they had to stand -- they set the standard

11   for the rest of the industry.

12         Q.    Is it unusual to use

13   after-the-fact order data in a SOM program?

14              MR. DAVISON:  Objection.

15              THE WITNESS:  As we found here,

16         it wasn't intended for this purpose,

17         but it gave us some issues, possible

18         issues, as we said earlier, that DEA

19         may want to look at.

20   QUESTIONS BY MR. LOESER:

21         Q.    In your report after

22   paragraph 122, you have -- you list A through

23   D in which you describe the limitations on

24   chargeback data.

25              Are those --

```
 1          A.     So when we're looking at A

 2    through D --

 3          Q.     Yeah.

 4                 Are those items that you've

 5    drawn from the Buthusiem report?

 6          A.     Based on?

 7          Q.     The expert report that you cite

 8    for this.

 9          A.     Based upon what report?

10          Q.     The Buthusiem report.

11                 MR. DAVISON:  Buthusiem.

12                 MR. LOESER:  Is that how you

13          say it?

14                 MR. DAVISON:  Buthusiem.

15                 THE WITNESS:  Oh, yes.  Yes.  I

16          thought it was -- he was mentioning

17          some new report or something.  New

18          program.

19                 Yes.

20    QUESTIONS BY MR. LOESER:

21          Q.     Okay.  Do you know who

22    Mr. Buthusiem is?

23          A.     I don't know if I've ever asked

24    that question.  I think he's former DEA.

25          Q.     And prior to reading his
```

```
1    report, had you ever heard of him before?

2         A.    No.

3         Q.    Do you know anything about his

4    qualifications?

5         A.    No.

6               Even --

7         Q.    So is it your opinion that

8    chargeback data is not useful for identifying

9    suspicious orders or preventing diversion?

10              MR. DAVISON:  Objection.

11              THE WITNESS:  I think it's

12         sufficient for developing issues that

13         may warrant further review, but not

14         necessarily a suspicious order.

15   QUESTIONS BY MR. LOESER:

16        Q.    And explain so it's clear the

17   difference between an order for which there

18   are issues requiring further review and a

19   suspicious order.

20        A.    Well, I should say --

21              MR. DAVISON:  Objection.

22              THE WITNESS:  -- this is not an

23         order, it's an after-the-fact sale, I

24         meant to say.  So a chargeback, the

25         sale has already been consummated.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 And the company -- as I
 2        mentioned earlier, it has to do with
 3        the pricing, as I understand it.  And
 4        the company comes back and requests
 5        reimbursement for the price that they
 6        sold it to.  So it's after-the-fact
 7        sales.
 8                 So you may not get it, you
 9        know, for some period of time.  It
10        doesn't show, you know, like opioids,
11        nonopioids.
12                 So Mallinckrodt's program,
13        they'll look at it.  If it keys some
14        issue or something, maybe purchasing
15        from a number of distributors, maybe
16        having a lot of chargebacks with that
17        particular client -- customer, DEA's
18        made the determination -- Mallinckrodt
19        made the determination that we want to
20        tell the other distributors what's
21        happening here, and we want to tell
22        DEA.  We're not telling you it's a
23        suspicious order.  We're just telling
24        you it's something that you may want
25        to further review.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And then that's up to the DEA,
 2         and that's up to the other
 3         wholesalers.
 4   QUESTIONS BY MR. LOESER:
 5         Q.    Sir, you referred to orders
 6   that you described as having issues requiring
 7   further review, and what I'm asking you is if
 8   you could please explain to me the difference
 9   between an order for which there are issues
10   requiring further review and a suspicious
11   order.
12              MR. DAVISON:  Objection.
13              THE WITNESS:  A suspicious
14         order is an order, so you're looking
15         at it before it's shipped.
16              A chargeback is a financial
17         report where the distribution or the
18         sale has already been made.  The
19         product is out the door.  It's already
20         been made.  It's a financial -- it was
21         intended only as a financial report
22         based upon the level of trade.
23              So for pharmacy -- you're
24         shipping to a pharmacy.  And this
25         pharmacy supplying a hospital?  Is the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            pharmacy supplying -- and I'm just
 2            using this as an example -- patients?
 3                 Well, for the patients you may
 4            have one price; for the hospitals you
 5            may have another price.  This price,
 6            the hospital price, may be lower.  So
 7            the wholesaler is losing money on that
 8            sale, so they're asking the
 9            manufacturer to reimburse them for
10            this.
11                 So that -- as you -- as that
12            stuff accumulates -- and that's why in
13            the past nobody even understood what
14            the data was -- should be used from
15            either legal or security, from a
16            compliance perspective, for the
17            Controlled Substances Act.
18                 So it's always after the fact.
19            That's why I use the word "issues"
20            instead of "suspicious."  Because is
21            it really suspicious when I don't --
22            haven't really looked at it?
23                 All I know is that one example
24            would be this pharmacy is buying from
25            multiple distributors.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Well, the question is why.

 2              Well, there could be a lot of reasons.

 3              Therefore, it's after.

 4                    I'm going to tell my

 5              wholesalers, no more chargebacks for

 6              them.  I'm not going to reimburse you

 7              anything, and I'm reporting it to DEA.

 8         QUESTIONS BY MR. LOESER:

 9              Q.    So, sir, are you saying that a

10         manufacturer can't determine if an order is

11         suspicious with after-the-fact data?

12                    MR. DAVISON:  Objection.

13                    THE WITNESS:  Well, you keep

14              talking on orders, suspicious orders.

15                    If you want to talk about

16              orders, that would be what the

17              suspicious order monitoring program --

18         QUESTIONS BY MR. LOESER:

19              Q.    So when you use the phrase

20         "issues," you're never referring to an order

21         that hasn't already been shipped?

22              A.    I'm referring -- in this case

23         I'm referring to chargeback distributions.

24              Q.    Okay.

25              A.    Or chargebacks -- financial
```

Highly Confidential - Subject to Further Confidentiality Review

1    reimbursements.  That's what I'm referring

2    to.

3           Q.      If you look at paragraph 136 in

4    your report, you state, "It is my opinion

5    that Mallinckrodt's suspicious order

6    monitoring program was sufficient and

7    effective to detect and report suspicious

8    orders to DEA in the 2010 through 2011 time

9    period."

10           Did I read that correctly?

11           A.      Yes.  Yes.

12           Q.      So is it your opinion that in

13    this time period Mallinckrodt, in fact,

14    detected all suspicious orders that it

15    received?

16           A.      It's my opinion that

17    Mallinckrodt was reporting suspicious orders

18    to DEA.

19           Q.      And again, my question was

20    simply whether your opinion is that in this

21    2010 through 2011 time period, that

22    Mallinckrodt detected all suspicious orders

23    that it received.

24           A.      And my comment is Mallinckrodt

25    has reported suspicious orders to DEA.

1      Q.      Maybe my question isn't clear,

2   so I'll try again.

3              Is it your opinion that in the

4   2010 through 2011 time period, Mallinckrodt

5   detected all of the suspicious orders that it

6   received?

7      A.      And I'm stating that DEA {sic}

8   met the regulatory requirement and were

9   reporting suspicious orders to DEA.

10     Q.      Were there orders that were

11  suspicious that Mallinckrodt did not detect?

12     A.      I have no idea.

13     Q.      So do you have any --

14     A.      They -- and I would think the

15  company would have -- the companies, based

16  upon their systems in place, reporting

17  suspicious orders.

18              It's like any company.  If you

19  have a good system, they report suspicious

20  orders.

21     Q.      Well, what your opinion says

22  right here in this paragraph --

23     A.      Uh-huh.

24     Q.      -- is "the system was

25  sufficient and effective to detect and report

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious orders."

2              And what I'm asking you, is it

3    your opinion that Mallinckrodt, in fact,

4    detected all of the suspicious orders that it

5    received in that time period?

6         A.    And this is my opinion.

7         Q.    So the answer is yes?

8         A.    This is my opinion.  DEA --

9    whatever -- exactly what I said here.

10   "Mallinckrodt" -- my opinion.

11   "Mallinckrodt's suspicious order monitoring

12   system was sufficient and effective to detect

13   and report suspicious orders to DEA in the

14   2010-2011 time period."

15             That's my opinion.

16        Q.    And I'm asking you a question

17   based on that opinion.

18             And that question is:  Is it

19   your opinion that Mallinckrodt, in fact,

20   detected all suspicious orders that it

21   received?

22             MR. DAVISON:  Objection.

23        Argumentative.  You've asked it about

24        four times now.  Getting into

25        harassment here, Derek.
```

```
 1                THE WITNESS:  It's my opinion,

 2        as I stated to you, that

 3        Mallinckrodt's system reported

 4        suspicious orders to DEA in this time

 5        frame.

 6   QUESTIONS BY MR. LOESER:

 7        Q.    So you don't have an opinion on

 8   whether Mallinckrodt, in fact, detected all

 9   the suspicious orders it received?

10        A.    I do have an opinion.

11                MR. DAVISON:  Objection.

12                THE WITNESS:  I do have an

13        opinion.  And that's my opinion.

14   QUESTIONS BY MR. LOESER:

15        Q.    I'm not asking you about

16   whether there was a system that existed to

17   detect the orders.  I'm asking you if, in

18   fact, the system detected the orders.

19        A.    And I made a factual

20   statement --

21                MR. DAVISON:  Objection.

22                THE WITNESS:  -- that

23        Mallinckrodt reported suspicious

24        orders.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. LOESER:

 2          Q.    Did Mallinckrodt report all of

 3     the suspicious orders that it received in

 4     this time period?

 5                MR. DAVISON:  Objection.

 6                THE WITNESS:  Mallinckrodt has

 7          a program in place that allows them to

 8          report suspicious orders.  I wrote

 9          here:  "It is my opinion that

10          Mallinckrodt's suspicious order

11          monitoring system was sufficient and

12          effective to detect and report

13          suspicious orders to DEA in the

14          2010-2011 time period."

15     QUESTIONS BY MR. LOESER:

16          Q.    And does that mean that they,

17     in fact, reported all the suspicious orders

18     they received?

19                MR. DAVISON:  Objection.

20     QUESTIONS BY MR. LOESER:

21          Q.    I know they had a system, but

22     does that mean that they, in fact, detected

23     the orders and reported them?  That's all I'm

24     asking you.

25          A.    And what I'm telling you is
```

1    they had a system in place, and they reported

2    suspicious orders.

3          Q.    And the system was effective.

4    Does that mean that it reported all of the

5    suspicious orders?

6          A.    It means they reported --

7                MR. DAVISON:  Objection.

8                Go ahead.

9                THE WITNESS:  It means they

10        reported suspicious orders.

11   QUESTIONS BY MR. LOESER:

12         Q.    So maybe they reported some

13   suspicious orders?

14         A.    I didn't say that.  You said

15   that.

16                MR. DAVISON:  Objection.

17   QUESTIONS BY MR. LOESER:

18         Q.    Well, is that your opinion?

19         A.    My opinion is they reported

20   suspicious orders.

21         Q.    So you don't know whether they

22   reported some or all of the orders?

23                MR. DAVISON:  Objection.

24                THE WITNESS:  I do know, based

25        upon what I said here.  I don't know

1          what else to say.  They reported

2          suspicious orders.

3     QUESTIONS BY MR. LOESER:

4          Q.    It seems like a simple

5     question.  Did they report all of them or

6     some of them?

7               MR. DAVISON:  Objection.  He's

8          answered your question.

9               THE WITNESS:  It is my opinion

10          that Mallinckrodt's suspicious order

11          monitoring system was sufficient and

12          effective, sufficient and effective,

13          to detect and report suspicious orders

14          to the DEA in the 2010-2011 time

15          period.

16     QUESTIONS BY MR. LOESER:

17          Q.    In forming this opinion, did

18     you evaluate the orders received and shipped

19     by Mallinckrodt during this time period?

20          A.    I evaluated the documents that

21     you're aware of, the depositions, the

22     operating procedures I looked at, reports I

23     looked at, and I came to my decision that

24     Mallinckrodt's program met the regulatory

25     requirements.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so, sir, you did not review

2    the actual orders that Mallinckrodt received

3    in this time period; is that correct?

4    A.    No, I did -- not the orders.  I

5    looked at the process.

6    Q.    And, sir, if you look at

7    paragraph 147 of your report, you state, "It

8    is my opinion that Mallinckrodt's suspicious

9    order monitoring system was sufficient and

10   effective to detect and report suspicious

11   orders to DEA from 2012 through 2018."

12   A.    Correct.

13   Q.    So are you saying, sir, that

14   Mallinckrodt reported all the suspicious

15   orders that it received in that time period?

16   A.    Mallinckrodt's suspicious order

17   monitoring system was sufficient to detect --

18   was effective to detect and report suspicious

19   orders.  They reported the suspicious orders

20   that they identified.

21   Q.    Did they report all of the

22   orders?

23         MR. DAVISON:  Objection.

24         THE WITNESS:  They reported

25     every suspicious order.

1    QUESTIONS BY MR. LOESER:

2         Q.     Okay.  And how do you define

3    sufficient?

4         A.     Based upon my evaluation, the

5    program was able to detect and report

6    excessive orders.

7         Q.     And how do you define

8    effective?

9         A.     That they were reporting

10   suspicious orders.

11        Q.     And in forming this opinion for

12   the 2012 through 2018 time period, did you

13   review any of the orders that Mallinckrodt

14   actually received and shipped?

15        A.     When you're looking at the

16   process and the material, you don't have to

17   actually look at orders.  Because looking at

18   an individual order or a thousand orders or

19   something is not really going to tell you

20   whether something is suspicious or not.

21             So you're looking at the

22   process.  You have the process in place to

23   look at the orders to make a determination.

24             That's what I looked at.  I

25   looked at the regulation.  I looked at the

Highly Confidential - Subject to Further Confidentiality Review

1   guidance letters, industry experience, my

2   experience, to make that determination.

3          Q.      If you could turn to

4   paragraph 153 of your report.

5          A.      153, yes.

6          Q.      This is your opinion with

7   regard to the McCann and Keller

8   methodologies.

9                  Do you see that?

10         A.      Yes.

11         Q.      And why don't you take a

12  second -- or a minute to review that, and

13  I'll ask you a few questions about that

14  paragraph.

15         A.      Yes.

16         Q.      Have you had a chance to review

17  that paragraph?

18         A.      Yes.  Yes.  Thank you.

19         Q.      In paragraph 153, you claim

20  that the five methodologies utilized by

21  McCann and Keller are pulled from

22  Mr. Rafalski's expert report, and no reason

23  is given as to why any of these methodologies

24  would be appropriate for any particular

25  defendant; is that right?

```
1          A.      Correct.

2          Q.      And you've reviewed each of

3    these methodologies in detail?

4          A.      I reviewed the reports.

5          Q.      And your testimony is that

6    Mr. Rafalski does not identify why it would

7    be appropriate to utilize any of these

8    methodologies?

9          A.      Correct.

10         Q.      You also state in paragraph 154

11   that Mr. Rafalski, without any analysis,

12   simply adopts the analyses of both Dr. McCann

13   and Ms. Keller and contends that each of the

14   flagged orders is, in fact, suspicious; is

15   that correct?

16         A.      Where are you?  Let me read

17   154.

18         Q.      Okay.

19         A.      Okay.

20                 MR. LOESER:  So could you read

21            the question back, please?

22                 (Court Reporter read back

23            question.)

24                 THE WITNESS:  You want me to

25            respond to her question or...
```

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.    Her question is my question.

 3         A.    Okay.  Yeah.  I'm saying -- I

 4    was waiting if you were going to say anything

 5    else.

 6               Yes, what I state here.

 7         Q.    And you've read the Rafalski

 8    report?

 9         A.    Yes.

10         Q.    Did you read the entire report?

11         A.    Yes.

12         Q.    And you read the entire McCann

13    report?

14         A.    Yes.

15         Q.    And you read the entire Keller

16    report?

17         A.    Yes.

18         Q.    And you specifically --

19    according to the footnotes here, you

20    specifically reviewed certain portions of the

21    Rafalski report which you identify as -- in

22    footnotes 199 and 200; is that correct?

23               MR. DAVISON:  Objection.

24               THE WITNESS:  Yeah, I read the

25          Rafalski report.
```

```
 1    QUESTIONS BY MR. LOESER:

 2         Q.    Okay.  And so the references to

 3    page 40 and 41, what are you saying, that you

 4    in fact read the entire report?

 5         A.    I -- that report I read.

 6         Q.    And is your opinion about the

 7    Rafalski report based upon pages 40 and 41 of

 8    his report?

 9              MR. DAVISON:  Objection.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. LOESER:

12         Q.    Okay.  Is it based on any other

13    part of his report?

14         A.    I looked at the rest of the

15    report.  I don't recall now whether I used

16    some of that or not, but I did read the

17    entire report.  And out of that, I pulled out

18    what I thought was important.

19         Q.    And you also cite portions of

20    the Keller report and the McCann report; is

21    that correct?

22         A.    Yes.

23         Q.    And you provide particular page

24    citations for the portions that support your

25    opinion?
```

1    A.    Yes.

2    Q.    And are you aware of whether

3    other portions of those reports support your

4    opinion?

5    A.    This is what I looked at.

6    These are the -- that I pulled out of it,

7    that I got out of the reports that I thought

8    was important for what I was tasked to do.

9    Q.    Okay.  So you cited in this

10   section all of the portions of those reports

11   that you believe were relevant to your

12   opinion?

13   A.    To what I was saying here, but

14   I did read the entire reports.

15   Q.    And you didn't review David

16   Cutler's report; is that right?

17   A.    I'd have to go back here.  Did

18   I look at it or not?

19         I don't recall.  I'll have to

20   go back here and look.  There's so many

21   documents.

22   Q.    We can make this shorter.  As

23   we went through before, if a report is not

24   listed on the expert reports in your

25   materials considered --

1        A.      It's not listed?

2        Q.      If it's not listed, you didn't

3    review the report?

4        A.      I didn't review it, no.  No,

5    sir.

6        Q.      And if deposition transcripts

7    are not listed in the materials considered,

8    then you didn't review those depositions?

9        A.      I've only reviewed what's

10   mentioned in here.

11       Q.      And, sir, you're not offering

12   any opinion on what orders received by

13   Mallinckrodt were suspicious, are you?

14       A.      No, I'm just looking at the --

15   evaluating through what I read whether the

16   program was -- met the regulatory

17   requirements.

18       Q.      And you haven't conducted any

19   independent analysis of what orders should

20   not have been shipped by Mallinckrodt?

21       A.      No.

22       Q.      And you're not doing that for

23   any other defendant either?

24       A.      No.  I'm not involved with any

25   other defendant in this case.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And did you review the due
 2   diligence files that Mallinckrodt maintained
 3   for any of the orders that were flagged as
 4   suspicious?
 5          A.     I reviewed the files that I
 6   mentioned in my report.
 7          Q.     And no others?
 8          A.     No others.
 9          Q.     Sir, have you spoken to any of
10   the other experts for the defendants in this
11   case?
12          A.     No.
13          Q.     Is it your intention to appear
14   at trial in October in this case?
15          A.     Yes, it's my intention.
16          Q.     Have you requested any
17   information that you have not received from
18   Mallinckrodt's counsel?
19          A.     Anything I requested, I've
20   received.
21          Q.     And do you intend to conduct
22   any further research to support your
23   opinions?
24          A.     I don't know at this point.
25          Q.     Has something happened today
```

1    which would cause you to think you need to do

2    some further research?

3        A.    Not at this moment, no.

4        Q.    Have you prepared any

5    demonstrative exhibits that you intend to use

6    at trial?

7        A.    Not -- I don't know at this

8    point in time.

9        Q.    And if called by defendants

10   other than Mallinckrodt to come to trial to

11   testify about your prior consulting work for

12   the defendants, would you attend the trial

13   for that purpose?

14       A.    No.

15             MR. DAVISON:  Objection.

16             THE WITNESS:  I think -- I

17        don't know if there'd be a conflict or

18        even a perceived conflict which would

19        be -- no, my client is Ropes & Gray --

20        Mallinckrodt through Ropes & Gray.

21   QUESTIONS BY MR. LOESER:

22       Q.    And if plaintiffs called you as

23   a witness to testify about your other audits,

24   would you appear at trial and testify

25   regarding those audits?

```
 1              MR. DAVISON:  Objection.

 2              THE WITNESS:  For plaintiffs?

 3      No.

 4   QUESTIONS BY MR. LOESER:

 5      Q.    You would not?

 6      A.    No.

 7      Q.    Why not?

 8      A.    Why would I?

 9              MR. DAVISON:  Objection.

10              THE WITNESS:  For the

11      plaintiffs?

12              I can't ride both horses.

13   QUESTIONS BY MR. LOESER:

14      Q.    Now, sir, the analysis you

15   performed on Mallinckrodt's SOM program is

16   the same analysis you use when you perform

17   audits of DEA registrants, correct?

18      A.    Again, it depends on the

19   circumstances, depends on what the company --

20   the customer is asking us to do, you know,

21   whether they want one thing, focused on one

22   thing or they want the entire program looked

23   at.  So it really depends on the client.

24      Q.    Sure.

25              And but when you're asked --
```

```
 1    the approach you took to evaluating

 2    Mallinckrodt's SOM approach is the same

 3    approach, as you indicate in your report,

 4    when evaluating other DEA registrants' SOM

 5    programs; is that right?

 6         A.    What I used, the process I used

 7    here, if that's what a company was looking

 8    for, that's the way I would review it --

 9         Q.    And you've --

10         A.    -- evaluate it.

11         Q.    And you've been performing

12    these audits for DEA registrants' SOM

13    programs for over 30 years; is that right?

14         A.    2000.  1990.  Yeah.  Yeah,

15    close to 30 years.  Wow.

16         Q.    And notwithstanding performing

17    countless audits over a more than that

18    30-year time period, you have no recollection

19    at all of who you audited in this time

20    period?

21              MR. DAVISON:  Objection.

22              THE WITNESS:  53 years is a

23         long time, and to remember everything

24         that you've done, it's like looking --

25         if I looked at something today and I
```

1        did it 10, 20, 30, years ago, I'd say,

2        what are the details behind this.

3        It's difficult.

4            All I know is we reviewed a

5        number of companies -- a number of

6        registrants, I should say, throughout

7        the distribution chain.

8    QUESTIONS BY MR. LOESER:

9        Q.    And you have no recollection of

10   the specific results of any of the audits

11   you've done for other DEA registrants?

12       A.    I would probably remember some

13   of the companies.  A lot -- some of them

14   aren't in business any longer, through

15   acquisitions.  But actual reports and

16   everything?  I know there were reports, but

17   actually the details behind it or review it

18   or whatever, that would be difficult.

19       Q.    And you have no ability to

20   identify whether any of the defendants in

21   this case previously were clients of yours?

22       A.    We had a very large client

23   base.  We touched a lot of companies out -- a

24   lot of DEA registrants out there, so there

25   could be some defendants here that we did

Highly Confidential - Subject to Further Confidentiality Review

```
1    work for.
2         Q.    Can you identify who they are?
3              THE WITNESS:  Is there a
4         confidentiality --
5              MR. DAVISON:  You can answer
6         with respect to if they're defendants
7         that you recall in this litigation.
8              THE WITNESS:  So I can name
9         them?
10             MR. DAVISON:  If you recall and
11        they're defendants in this litigation,
12        you can name clients, if you remember.
13             THE WITNESS:  Even though I
14        have -- I don't know if we should step
15        out.  Even though I have a
16        confidentiality agreement with --
17             MR. DAVISON:  It's been ordered
18        you can name the companies that are
19        defendants in this litigation, if you
20        recall.
21             THE WITNESS:  Even it says if
22        we can't talk about it?
23             MR. DAVISON:  Can we take a
24        quick break?
25             VIDEOGRAPHER:  Off the record
```

1           at 5:33 p.m.

2            (Off the record at 5:33 p.m.)

3                VIDEOGRAPHER:  We're back on

4           the record at 5:41 p.m.

5      QUESTIONS BY MR. LOESER:

6           Q.    Mr. Buzzeo, we took a break for

7      you to confer with your counsel.

8                Are you now going to answer the

9      question and identify the companies?

10          A.    If I may.

11               As you know, over the years

12     I've worked for -- either myself or the

13     company, I've worked for a lot of clients.

14     And in that period of time we always had a

15     confidentiality agreement with those

16     companies.

17               Now, I know the judge has

18     ruled, I believe -- I don't understand the

19     whole thing -- that certain documents could

20     be released by the companies to the

21     attorneys.

22               Since I have these personal

23     agreements, unless the company -- I think to

24     protect myself, that the companies would have

25     to say, yep, you can answer the question,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identify them.  Because there are companies

 2    in this process that were clients of ours

 3    either currently or in the past.  I shouldn't

 4    say "currently" because I don't know -- or in

 5    the past.

 6              Unless you have -- if you have

 7    reports that you want me to look at that may

 8    have been made available from the companies,

 9    that's a different issue.  Otherwise, I want

10    the blessing of each individual company.

11         Q.    And, sir, are you going to ask

12    each company for permission to identify that

13    you provided an audit to them?

14         A.    I guess through counsel.

15         Q.    You intend to do that?

16         A.    I don't intend it unless I have

17    to.  It's -- but I would want to, you know,

18    say, yep, Ron, you can go ahead and do that.

19         Q.    And that's --

20         A.    Or at least -- the question

21    was, would I identify the companies.

22              And to identify them, I want

23    their blessing.

24         Q.    And so, sir, even if those

25    companies have produced in this case the
```

1    audit reports that you created for them, you

2    still would not be willing to identify them

3    for purposes of this deposition?

4              MR. DAVISON:  Objection.

5              THE WITNESS:  I would -- if

6         companies have made available, then --

7         you want to show me something, I'd

8         look at it.  I'm not guaranteeing I'd

9         remember the details behind it because

10        there's so many of them -- companies

11        that we work with and I work for.

12              But even to mention their

13        names, either as existing or past

14        clients, I want some waiver of the

15        confidentiality agreements that I have

16        with those companies.

17   QUESTIONS BY MR. LOESER:

18        Q.    And, sir, why is it so

19   important to you not to reveal which

20   companies you worked for in evaluating their

21   SOM programs?

22              MR. DAVISON:  Objection.  Asked

23        and answered.

24              THE WITNESS:  Because of the

25        confidentiality agreements either I

Highly Confidential - Subject to Further Confidentiality Review

```
 1          have or the company has.
 2     QUESTIONS BY MR. LOESER:
 3          Q.     And do you have copies of those
 4     confidentiality agreements?
 5          A.     No, I don't have any records
 6     anymore.
 7          Q.     And so do you know for a fact
 8     whether you have confidentiality agreements
 9     with all of the companies that you audited?
10          A.     I had confidentiality
11     agreements with everybody I worked with.
12               MR. LOESER:  So for counsel
13          involved in this who represent
14          entities for which Mr. Buzzeo has
15          provided audits, we'd request that the
16          confidentiality agreements be
17          produced.
18     QUESTIONS BY MR. LOESER:
19          Q.     So, sir, if I provided you with
20     a list of the defendants in this case, your
21     decision here today is that you would not
22     identify on that list which of the defendants
23     or companies for which you've provided SOM
24     program audits or evaluations?
25          A.     I feel that I'm bound by the
```

Highly Confidential - Subject to Further Confidentiality Review

1    confidentiality agreements and the work I

2    did for those -- with those possible

3    companies.

4         Q.    Mr. Buzzeo, could you please

5    tell the jury whether you have any actual or

6    potential conflicts of interest that prevent

7    you from providing an impartial opinion in

8    this case with regard to whether DEA

9    registrants engaged in conduct that violated

10   the CSA and its implementing regulations?

11        A.    You mean the jury?

12        Q.    I guess I'm just -- this

13   deposition is for the purpose of the trial,

14   case.

15        A.    Oh, okay.  I was wondering

16   where the jury came in.

17        Q.    The jury will be reviewing your

18   testimony.

19        A.    That I was aware of.  That I

20   was aware of.

21        Q.    So could you please tell the

22   jury whether you have any actual or potential

23   conflicts of interest that prevent you from

24   providing an impartial opinion in this case

25   with regard to whether any of the defendants

Highly Confidential - Subject to Further Confidentiality Review

```
 1    engaged in conduct that violated the CSA and

 2    its implementing regulations?

 3         A.    I don't believe I did.

 4              MR. LOESER:  We can go off the

 5         record.

 6              VIDEOGRAPHER:  Off the record

 7         at 5:46 p.m.

 8         (Off the record at 5:46 p.m.)

 9              VIDEOGRAPHER:  We're back on

10         the record at 5:56 p.m.

11              MR. LOESER:  I have no further

12         questions at this time.

13              MR. DAVISON:  I just have a

14         brief redirect.

15                   EXAMINATION

16    QUESTIONS BY MR. DAVISON:

17         Q.    Mr. Buzzeo, do you recall

18    testifying earlier today about reviewing

19    draft SOPs from prior to 2008?

20         A.    Yes, I do.

21         Q.    Is there anything you'd like to

22    say about the testimony?

23         A.    Yes.  I misspoke, and it was

24    actually from 2008 forward, not prior to

25    2008.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. DAVISON:  Thank you.  I
 2        have nothing further.
 3                  VIDEOGRAPHER:  Okay.  This
 4        concludes today's deposition.  The
 5        time is 5:57 p.m.  We're off the
 6        record.
 7        (Deposition concluded at 5:57 p.m.)
 8                   - - - - - - -
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3            I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Ronald Buzzeo, was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
              _Carrie A. Campbell_____
17    CARRIE A. CAMPBELL,
      NCRA Registered Diplomate Reporter
18    Certified Realtime Reporter
      Notary Public
19    Dated:  July 1, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Ronald W. Buzzeo, R.Ph.          DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                        ERRATA

 2                    - - - - - - -

 3     PAGE     LINE    CHANGE/REASON

 4     _____    _____   _____

 5     _____    _____   _____

 6     _____    _____   _____

 7     _____    _____   _____

 8     _____    _____   _____

 9     _____    _____   _____

10     _____    _____   _____

11     _____    _____   _____

12     _____    _____   _____

13     _____    _____   _____

14     _____    _____   _____

15     _____    _____   _____

16     _____    _____   _____

17     _____    _____   _____

18     _____    _____   _____

19     _____    _____   _____

20     _____    _____   _____

21     _____    _____   _____

22     _____    _____   _____

23     _____    _____   _____

24     _____    _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                     - - - - - - -

                    LAWYER'S NOTES

2                     - - - - - - -

3      PAGE    LINE

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25