Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - - - - - - - - - - - - - - - x

IN RE:  NATIONAL              :  HON. DAN A.

PRESCRIPTION OPIATE             POLSTER

LITIGATION                   :  MDL NO. 2804

APPLIES TO ALL CASES         :  NO. 1:17-MD-2804

- - - - - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


-  -  -

January, 17, 2019

-  -  -


        Videotaped deposition of CARLA CARTWRIGHT,

taken pursuant to notice, held at the law offices of

O'Melveny & Myers, LLP, 1625 Eye Street, N.W.,

Washington, D.C., beginning at 9:14 a.m., before

Misty Klapper, Registered Merit Reporter, Certified

Realtime Reporter and Notary Public in and for the

District of Columbia.

```
 1   APPEARANCES:
 2            DAVID I. ACKERMAN, ESQUIRE
              MOTLEY RICE LLC
 3            401 9th Street, N.W.
              Suite 1001
 4            Washington, D.C. 20004
              (202) 849-4962
 5            Email: dackerman@motleyrice.com
              COUNSEL FOR THE PLAINTIFFS
 6
 7            ROSS B. GALIN, ESQUIRE
              DESIRAE KRISLIE C. TONGCO, ESQUIRE
 8            O'MELVENY & MYERS LLP
              Times Square Tower
 9            7 Times Square
              New York, New York 10036-6537
10            (212) 326-4307
              Email: rgalin@omm.com
11                   dtongco@omm.com
              COUNSEL FOR THE DEFENDANTS JANSSEN,
12            JOHNSON & JOHNSON AND DEPONENT
13   TELEPHONIC APPEARANCES:
14            ANGEL TANG NAKAMURA, ESQUIRE
              ARNOLD & PORTER KAYE SCHOLER, LLP
15            777 South Figueroa Street
              44th Floor
16            Los Angeles, California 90017-5844
              (213) 243-4094
17            Email: angel.nakamura@arnoldporter.com
18                       and
19            ZENO HOUSTON, ESQUIRE
              ARNOLD & PORTER KAYE SCHOLER, LLP
20            250 West 55th Street
              New York, New York 10019-9710
21            (212) 836-7332
              Email: zeno.houston@arnoldporter.com
22            COUNSEL FOR THE DEFENDANTS ENDO HEALTH
              SOLUTIONS, ENDO PHARMACEUTICALS, INC. AND
23            PAR PHARMACEUTICAL COMPANIES, INC., f/k/a
              PAR PHARMACEUTICAL HOLDINGS, INC.
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 3

```
 1    TELEPHONIC APPEARANCES (CONTINUED):
 2              SAMANTHA L. ROCCHINO, ESQUIRE
              REED SMITH LLP
 3              Three Logan Square
              1717 Arch Street
 4              Suite 3100
              Philadelphia, Pennsylvania 19103
 5              (215) 851-8262
              Email: srocchino@reedsmith.com
 6              COUNSEL FOR THE DEFENDANT
              AMERISOURCEBERGEN
 7
 8              WEISS NUSRATY, ESQUIRE
              COVINGTON & BURLING LLP
 9              One CityCenter
              850 Tenth Street, N.W.
10              Washington, D.C. 20001-4956
              (202) 662-5703
11              Email: wnusraty@cov.com
              COUNSEL FOR THE DEFENDANT McKESSON
12              CORPORATION
13
              SOFIA MCDONALD, LAW CLERK
14              ROPES & GRAY LLP
              1211 Avenue of the Americas
15              New York, New York 10036
              (212) 596-9182
16              Email: Sofia.McDonald@ropesgray.com
              COUNSEL FOR THE DEFENDANT MALLINCKRODT
17              PHARMACEUTICALS
18
              PAIGE E. ZIELINSKI, ESQUIRE
19              JONES DAY
              555 California Street
20              26th Floor
              San Francisco, California 94104
21              (415) 875-5788
              Email: pzielinski@jonesday.com
22              COUNSEL FOR THE DEFENDANT WALMART
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 4

1    APPEARANCES (CONTINUED):

2    ALSO PRESENT:

3                    JENNA FORSTER, MOTLEY RICE, LLP

                     RAY MOORE, VIDEOGRAPHER

4

5

6

7

8

9                       C O N T E N T S

10   WITNESS:              EXAMINATION BY:           PAGE:

11   Carla Cartwright     Mr. Ackerman                 7

12                        Mr. Galin                  136

13

14

15

16                       E X H I B I T S

17   NO.:                 DESCRIPTION:               PAGE:

18   J&J

     Cartwright-1   Plaintiffs' Amended Notice

19                  of Oral Videotaped 30(b)6

                    Deposition of Carla Cartwright    23

20

     J&J

21   Cartwright-2   CS/Pain State Issues, 7/21/11,

                    Bates No. JAN-MS-00393142         52

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 5

```
 1           E X H I B I T S (continued):
 2    NO.:              DESCRIPTION:                 PAGE:
 3    Janssen
      Cartwright-3   E-mail chain dated 1/25/12,
 4                   Subjects: Position on PDMP
                     Programs and 2012 Pain
 5                   Meetings, Bates Nos.
                     JAN-MS-00943201 through
 6                   JAN-MS-00943204                    61
 7    Janssen
      Cartwright-4   E-mail, Thomson to Focella,
 8                   dated 2/1/02, Subject:
                     A day at the VA spa, Bates
 9                   No. JAN-MS-00492411                74
10    Janssen
      Cartwright-5   Draft Nucynta 2011 Business
11                   Plan, Advocacy Initiatives,
                     Bates No. JAN-MS-00409840          80
12
      Janssen
13    Cartwright-6   Advocacy/Quality/Policy/
                     Budget, Bates No.
14                   JAN-MS-00874627                    84
15    Janssen
      Cartwright-7   Nucynta Pharmacy Stocking
16                   National Manager's Meeting
                     December 2010 Pharmacy Plan,
17                   Bates No. JAN-MS-00339015          88
18    Janssen
      Cartwright-8   E-mail from Moskovitz to
19                   Vorsanger, dated 12/8/00
                     Subject: JCAHO Pain
20                   Management, Jean Gillespie
                     and Minutes and information
21                   from 10/19 call, Bates Nos.
                     JAN-MS-00654707 through
22                   JAN-MS-00654711                    94
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1              E X H I B I T S (continued):
 2    NO.:                DESCRIPTION:                PAGE:
      Janssen
 3    Cartwright-9    Janssen Pharmaceutica
                      Research Foundation
 4                    Record of FDA Contact
 5                    re: Duragesic, dated
                      9/15/00, Bates Nos.
 6                    JAN-MS-00479781 through
                      JAN-MS-00479783              106
 7
      Janssen
 8    Cartwright-10   Janssen Research Foundation
                      Record of FDA Contact re:
 9                    Duragesic, dated 12/18/00,
                      Bates No. JAN-MS-480543      109
10
      Janssen
11    Cartwright-11   Defendants Johnson & Johnson,
                      Janssen Pharmaceuticals, Inc.,
12                    Ortho-McNeil-Janssen
                      Pharmaceuticals, Inc. and
13                    Janssen Pharmaceutica, Inc.
                      Objections to Topics in
14                    Plaintiffs' Notice of
                      Videotaped 30(b)6 Depositions   116
15
      Janssen
16    Cartwright-12   E-mail, Singh to Kenny, et al.,
                      dated 11/19/10, Subject:
17                    SCG Managed Markets Conference
                      Call Recap, Bates Nos.
18                    JAN-MS-03000683 through
                      JAN-MS-03000684              119
19
      Janssen
20    Cartwright-13   E-mail chain between
                      Deem-Eshleman and Wickey,
21                    March 2011, Subject:
                      Prescribe Responsibly,
22                    Bates Nos. JAN-MS-00940860
                      through JAN-MS-00940861      131
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 7

```
 1                   P R O C E E D I N G S
 2                   VIDEO OPERATOR:  We are now on
 3        the record.  My name is Ray Moore.  I am a
 4        videographer for Golkow -- Golkow Litigation
 5        Services.  Today's date is January 17, 2019,
 6        and the time is 9:14 a.m.
 7                   This video deposition is being
 8        held in Washington, D.C. in the matter In Re:
 9        National Prescription Opiate Litigation for
10        the United States District Court for the
11        Northern District of Ohio, Eastern Division,
12        MDL Number 2804.
13                   The deponent is Carla
14        Cartwright.  Counsel will be noted on the
15        stenographic record.  The court reporter is
16        Misty Klapper and may now swear in the
17        witness.
18        Whereupon:
19                   CARLA CARTWRIGHT,
20        was called for examination, and, after being duly
21        sworn, was examined and testified as follows:
22         EXAMINATION BY COUNSEL FOR PLAINTIFFS
23                   BY MR. ACKERMAN:
24                   Q.    Good morning, Ms. Cartwright.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 8

1       We met off the record, but I am David Ackerman

2       of Motley Rice, and I'm representing the

3       plaintiffs in this action, plaintiffs'

4       executive committee and a couple of the

5       Track 1 bellwether plaintiffs.

6                   Have you ever had your

7       deposition taken before?

8           A.    I have not.

9           Q.    All right.  Well, this one

10      hopefully won't -- won't go too long, but let

11      me just explain what's going to happen.  I'm

12      sure your counsel has as well.

13                  So as you can see, we have a

14      court reporter here who is probably the most

15      talented person in the room, and she is

16      writing down everything that is said or -- or

17      typing down everything that is said.

18                  I'll be asking questions.  You,

19      hopefully, will be giving answers.  As

20      talented as the court reporter is, she can't

21      type when we speak over each other.  So the

22      first thing I ask is even though it may be

23      painfully obvious where my question is going,

24      try to let me finish the question before you

Highly Confidential - Subject to Further Confidentiality Review

Page 9

1        start your answer, just so the record is

2        clean.  And, similarly, I will try not to cut

3        off any of your answers; I will wait for you

4        to finish your answer before starting a -- a

5        new question.  If I do cut off one of your

6        answers, please let me know.

7                    Also -- and I noticed that you

8        just nodded your head -- although we are on

9        video, the -- the court reporter has to -- has

10       to write down verbal signals.  So if you can

11       answer with yes or no instead of nods or

12       shakes of the head -- or even um-hmm or uh-hum

13       can sometimes be difficult to figure out on a

14       transcript -- that would be helpful.  So

15       please try to answer yes or no.

16              A.     Yes.

17              Q.     All right.

18              A.     I will do so.

19              Q.     Sure.  Thank you.

20                    If at any time you don't

21       understand a question that I ask, please let

22       me know and I'll try to explain it.  If you do

23       answer a question, I will assume that you

24       understood the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1              A.    Yes.

2              Q.    All right.

3                    MR. GALIN:  Mr. Ackerman, just

4         before you start, just to be helpful to get a

5         roll call of who's on the phone, just so I

6         know who's on the phone today.  I mean, there

7         are people who are dialed in.

8                    MR. ACKERMAN:  Yeah.  I think

9         the -- the court reporter has that list.

10                    MR. GALIN:  Oh, okay.

11                    MR. ACKERMAN:  I -- I don't

12         necessarily want to do that on the record.

13                    MR. GALIN:  That's fine, so long

14         as I can get that list.

15                    MR. ACKERMAN:  I believe there

16         are four or five attorneys.

17                    MR. GALIN:  Okay.

18                    BY MR. ACKERMAN:

19              Q.    Any other ground rules.  If at

20         any time you want to clarify an answer that

21         you gave earlier or provide additional

22         information, just let me know and I'll give

23         you the opportunity to do that.

24              A.    Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     We won't be going very long

2     today, but if you do -- if you would like to

3     take a break, let us know and we can take a

4     break.  I'd just ask that we not take a break

5     while a question is pending.

6          A.     Thank you.  I can do that.

7          Q.     Sure.  Have you taken any

8     substance or medicine today that would affect

9     your ability to testify truthfully?

10          A.     I have not.

11          Q.     All right.  Are you currently

12     employed?

13          A.     I am.

14          Q.     And -- and I paused only because

15     I wasn't sure of the entity who employed you,

16     so that's my next question.

17          A.     Oh.

18          Q.     By whom are you employed?

19          A.     Johnson & Johnson.

20          Q.     Okay.  And what is your job

21     title?

22          A.     Director, global regulatory

23     affairs.  Sorry.  Director, global regulatory

24     policy.

Page 12

1                     MS. ZIELINSKI:  Can we go off

2          the record really quick?  I'm having a very

3          difficult time hearing the witness.  Is it

4          possible to move the phone closer?

5                     MR. ACKERMAN:  Yeah.  Let's go

6          off the record for a minute and we'll try to

7          fix that.

8                     VIDEO OPERATOR:  The time is now

9          9:18 a.m.  We're going off the record.

10                     (Thereupon, a brief recess was

11             taken.)

12                     VIDEO OPERATOR:  The time is now

13          9:20 a.m.  We're back on the record.

14                     BY MR. ACKERMAN:

15          Q.     Okay.  We'll do our best to

16          speak up so that everyone on the phone can

17          hear as well.

18                     Before the break you mentioned

19          that your current position is director of

20          global regulatory affairs; is that correct?

21          A.     I misspoke.  It's director,

22          global regulatory policy.

23          Q.     Got it, regulatory policy.

24                     And how long have you held that

Highly Confidential - Subject to Further Confidentiality Review

Page 13

1          position?

2                    A.     Since October of 2018.

3                    Q.     When did you join

4          Johnson & Johnson?

5                    A.     The fall of 2012.

6                    Q.     Okay.  So what positions have

7          you -- did you hold -- what position did you

8          hold at Johnson & Johnson prior to being

9          director of global regulatory policy?

10                   A.     Immediately prior I was a

11         director in federal affairs within the

12         government affairs and policy group.

13                   Q.     And for how long did you hold

14         that position?

15                   A.     Approximately two years.

16                   Q.     And prior to being director of

17         federal affairs, what position did you hold?

18                   A.     I was a director of global

19         regulatory policy and intelligence within our

20         pharmaceutical sector.

21                   Q.     Okay.  And for how long did you

22         hold that position?

23                   A.     Approximately four years.

24                   Q.     Was that the position you began

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1        in when you joined Johnson & Johnson?

2              A.      It was.

3              Q.      Prior to joining

4        Johnson & Johnson, were you employed somewhere

5        else?

6              A.      I was.

7              Q.      Where?

8              A.      The Food and Drug

9        Administration.

10             Q.      For how long were you at the

11       Food and Drug Administration?

12             A.      Five years.

13             Q.      And what job titles did you hold

14       there?

15             A.      I was an attorney in the office

16       of chief counsel the entire time --

17             Q.      Okay.

18             A.      -- I was there.

19             Q.      At the Food and Drug

20       Administration, did you have any particular

21       specialty or responsibilities?

22             A.      I did.  I was a regulatory

23       counsel focused on drug issues.  So we had

24       what was called a drugs team and I was on that

Highly Confidential - Subject to Further Confidentiality Review

Page 15

1    team.

2                    Q.      And when you say drug issues,

3    are you referring to prescription drugs?

4                    A.      Matters relating to the Center

5    for Drug Evaluation and Research.  So CDER was

6    essentially my client --

7                    Q.      Okay.

8                    A.      -- within FDA.

9                    Q.      And what is CDER?

10                   A.      CDER is the center that reviews

11   applications for drugs, mostly prescription

12   drugs, but they also oversee the

13   over-the-counter monograph and work on, you

14   know, ongoing regulatory issues related to

15   drugs and some biologics.

16                   Q.      Okay.  You mentioned when you

17   joined Johnson & Johnson you were director,

18   global regulatory policy and intelligence in

19   the pharmaceutical sector.

20                           Did -- did I write that down

21   correctly?

22                   A.      Yes.

23                   Q.      Okay.  What is the

24   pharmaceutical sector of Johnson & Johnson?

Highly Confidential - Subject to Further Confidentiality Review

Page 16

1           A.     Well, Johnson & Johnson is

2      comprised of three primary sectors.  There's

3      the consumer group, medical devices, and then

4      pharmaceuticals.

5           Q.     Okay.

6           A.     And I was -- I sat within the

7      pharmaceutical sector.

8           Q.     Are you familiar with an entity

9      called Janssen?

10          A.     Yes.

11          Q.     Okay.  And is Janssen a part of

12     Johnson & Johnson?

13          A.     It is.  It is the pharmaceutical

14     part of Johnson & Johnson.

15          Q.     Okay.  So Janssen would be

16     included within the pharmaceutical sector --

17          A.     Yes.

18          Q.     -- is that correct?

19          A.     Yes.

20          Q.     What were your job

21     responsibilities as director of global

22     regulatory policy and intelligence?

23          A.     I primarily focused on our -- on

24     our oncology business and worked on matters

Highly Confidential - Subject to Further Confidentiality Review

Page 17

1          relating to USFDA regulatory issues, did a lot

2          of work around combination products,

3          accelerated approvals, expedited pathways,

4          that kind of thing.

5                    Q.     Did you have any

6          responsibilities relative to Duragesic?

7                    A.     I did not.

8                    Q.     Okay.  Did you have any

9          responsibilities relative to Nucynta or

10         Nucynta ER?

11                   A.     I did not.

12                   Q.     Did you have any

13         responsibilities relative to any opioid

14         product manufactured or sold by Janssen?

15                   A.     I did not.

16                   Q.     In that first position, global

17         regulatory policy and intelligence, who did --

18         did you -- did you have a supervisor?

19                   A.     I did.

20                   Q.     And who was that?

21                   A.     David Dorsey.

22                   Q.     And what was Mr. Dorsey's title?

23                   A.     He was a senior director, head

24         of the Americas for the global regulatory

Highly Confidential - Subject to Further Confidentiality Review

1          policy and intelligence group.

2                    Q.     And did you have any direct

3          reports?

4                    A.     I did not.

5                    Q.     All right.  The next position

6          you said you held was director of federal

7          affairs?

8                    A.     Yes.

9                    Q.     And what were your job

10         responsibilities as director of federal

11         affairs?

12                   A.     I was, again, on a sort of

13         pharmaceutical sector team, so I was a

14         registered lobbyist working on pharmaceutical

15         issues.  I was primarily focused on our

16         immunology and oncology businesses and on

17         matters relating to FDA.

18                   Q.     Okay.  Did you -- as director of

19         federal affairs, did you have -- or did -- did

20         you have any responsibilities related to

21         Duragesic?

22                   A.     I did not.

23                   Q.     And did you, as a registered

24         lobbyist, do any lobbying on issues related to

Highly Confidential - Subject to Further Confidentiality Review

Page 19

1      Duragesic?

2                  A.      I did lobbying on issues related

3      to opioids generally.

4                  Q.      Okay.  And did you do any

5      lobbying on issues related to specifically

6      Nucynta or was it just on issues related to

7      opioids generally?

8                  A.      I only lobbied on issues related

9      to opioids generally.

10                 Q.      Got it.  And what were those

11     issues?

12                 A.      I lobbied on a bill that was

13     called the MOTHER Act -- Maternal Opioid

14     Treatment, Health, Education, and Recovery, I

15     believe -- and I also, you know, monitored and

16     tracked what ultimately became H.R. 6 and the

17     omnibus opioid bill that was passed and signed

18     into law last fall.

19                 Q.      Okay.  When was the MOTHER Act

20     introduced?

21                 A.      I believe it was first

22     introduced on the House side in -- I don't

23     recall the exact month, but I think in 2017.

24                 Q.      Okay.  Can you just describe

Page 20

1        generally the -- what the MOTHER Act provided

2        for?

3                A.      Yes.  It was focused on

4        providing a continuum of care for mothers and

5        infants who were exposed to opioids or

6        suffering from neonatal abstinence syndrome.

7                        So it called for implementation

8        of existing SAMHSA guidelines for the

9        treatment of infants who had been exposed to

10       opioids.  It called for better alignment of

11       how expectant women are -- manage pain.  It

12       called for SAMHSA to work with public/private

13       partnerships to address education and stigma

14       issues related to the use of opioids and just

15       generally sort of better coordination and

16       better dissemination of existing guidelines

17       around the use of opioids for pregnant and --

18       and women who might become pregnant.

19               Q.      Okay.  You said you were a

20       registered lobbyist.  For whom were you

21       registered?

22               A.      For Johnson & Johnson.

23               Q.      That's -- and what was

24       Johnson & Johnson's position with respect to

Highly Confidential - Subject to Further Confidentiality Review

Page 21

1             the MOTHER Act?

2                      A.      So we were supportive of it --

3                      Q.      Um-hmm (affirmative).

4                      A.      -- and we worked to develop it

5             with key stakeholders.

6                      Q.      Okay.  Were there provisions of

7             the MOTHER Act that Johnson & Johnson opposed?

8                      A.      No.

9                      Q.      With respect to H.R. 6, that's a

10            big bill, so I'm not going to ask you to

11            describe it generally.  But what was Janssen's

12            position with respect to H.R. 6?

13                     A.      Well, you said Janssen.  I

14            presume you mean --

15                     Q.      I mean -- I'm sorry.  I mean

16            Johnson & Johnson, yes.

17                     A.      So Johnson & Johnson was

18            supportive of the overall package and the idea

19            of legislative action on opioids.

20                     Q.      Were there provisions that

21            Johnson & Johnson did not support?

22                     A.      Well, as you said, it was a very

23            big bill with a lot of components.  But, no,

24            we were generally supportive of the entire

Highly Confidential - Subject to Further Confidentiality Review

1           package.

2                     Q.     Okay.

3                     A.     There were provisions we were

4           less, you know, engaged in or -- or less --

5           you know, not tracking as closely.

6                     Q.     Were there any provisions that

7           you -- I assume as a registered lobbyist in

8           Washington, D.C., you were lobbying Congress;

9           is that correct?

10                    A.     That's correct.

11                    Q.     Okay.  Were there any provisions

12          that you lobbied Congress and urged lawmakers

13          to vote against or to strike from the bill?

14                    A.     From H.R. 6?

15                    Q.     Yes.

16                    A.     No, there were not.

17                    Q.     All right.  And when I say

18          H.R. 6, I was -- I was using that to refer

19          also to the omnibus opioid bill.  Is that --

20          is that the way you were using it as well?

21                    A.     Yes, that is how I was using it.

22                    Q.     Okay.  Thank you.

23                           So, Ms. Cartwright, I believe

24          that -- or hopefully you are aware you are

Highly Confidential - Subject to Further Confidentiality Review

Page 23

1          here today as a corporate designee on behalf

2          of Johnson & Johnson and Janssen with respect

3          to certain topics.

4                    Is that your understanding?

5              A.    That is my understanding.

6              Q.    All right.  So let's mark the

7          Notice of Deposition first.

8                    (Thereupon, J&J-Cartwright

9                    Deposition Exhibit Number 1 was marked

10                   for identification.)

11                   MR. ACKERMAN:  I don't want to

12         do it around the camera.

13                   Ross, I don't know that there's

14         a good way to get this to you.

15                   MR. GALIN:  I appreciate it.

16                   MR. ACKERMAN:  Okay.  I've got

17         one more for you, too.  I'm going to use this

18         on the Elmo.

19                   We're going to go off the record

20         for a quick minute.

21                   VIDEO OPERATOR:  The time is now

22         9:32 a.m.  We're going off the record.

23                   (Thereupon, a brief recess was

24                   taken.)

Highly Confidential - Subject to Further Confidentiality Review

Page 24

1           VIDEO OPERATOR:  The time is now

2    9:35 a.m.  We're back on the record.

3           BY MR. ACKERMAN:

4           Q.    Okay.  Ms. Cartwright, the court

5    reporter has handed you Deposition Exhibit

6    Number 1, which is titled Plaintiffs' Amended

7    Notice of Oral Videotaped 30(b)6 Deposition of

8    Carla Cartwright.

9               Have you seen this document

10   before or -- or something similar?

11          A.    I have not.

12          Q.    Okay.  If you look at the second

13   paragraph on the page, it says, This

14   deposition will cover 30(b)6 topics 22(b), 25

15   and 26.

16               Do you see that sentence?

17          A.    I do.

18          Q.    Is that consistent with your

19   understanding of what you are here to

20   testify --

21          A.    It is.

22          Q.    -- regarding today?

23          A.    It is.

24          Q.    All right.  Excellent.

Page 25

1                     What did you do to prepare for

2         this deposition today?

3                A.     I worked with counsel and

4         reviewed documents and materials and spoke

5         with several colleagues.

6                Q.     Okay.  Let's work through each

7         of those.  Let's start with the last one

8         first, actually.

9                     When you say you spoke with

10        colleagues, who were the colleagues who you

11        spoke with?

12               A.     I spoke with Lauryl Jackson,

13        Andrea Masciale and Jennifer Thomas.

14               Q.     Okay.  And who is Lauryl

15        Jackson?

16               A.     Lauryl is a director in the

17        federal affairs group on -- focused on Janssen

18        Pharmaceutical issues.

19               Q.     Okay.  When did you speak with

20        Lauryl Jackson?

21               A.     I spoke with her a few times

22        over the last, I'd say, couple of weeks.

23               Q.     Okay.  About how many times did

24        you speak with her?

Page 26

1          A.     I can think of three

2     conversations.

3          Q.     When was the last conversation

4     you had with Lauryl Jackson in preparation for

5     this deposition?

6          A.     I think Tuesday of this week.

7          Q.     And how long was that

8     conversation?

9          A.     I believe it was between 30 and

10    45 minutes, perhaps.

11         Q.     Okay.  How long were the other

12    two conversations that you had with Lauryl

13    Jackson?

14         A.     I don't recall exactly.  I think

15    I might have had a, you know, 20-minute

16    conversation with her the week prior.  And

17    then I had spoken to her on a couple of

18    other -- you know, we work in the same

19    physical office --

20         Q.     Okay.

21         A.     -- so I've spoken to her on a

22    couple of other occasions when I'd had, you

23    know, questions as I was thinking of things as

24    I was preparing.

Highly Confidential - Subject to Further Confidentiality Review

Page 27

1          Q.     Got it.

2                 Generally, what topics were you

3     discussing with Lauryl Jackson to -- in order

4     to prepare for the deposition?

5          A.     I was talking to her about her

6     recollection of -- of advocacy efforts related

7     to opioids and pain.

8          Q.     Okay.  Was Lauryl Jackson

9     personally involved in those advocacy efforts?

10         A.     She was involved in some efforts

11    related to controlled substances generally.

12         Q.     Okay.  Which efforts was she

13    involved in?

14         A.     There was a -- I think it was a

15    bill passed to have DEA's scheduling of

16    controlled substances better align with the

17    timeline of FDA approval, and Lauryl was

18    involved in that effort.

19         Q.     Okay.  Were there any other -- I

20    assume you spoke to Lauryl about that effort?

21         A.     I did.

22         Q.     Did you speak to Lauryl about

23    any other advocacy efforts?

24         A.     I did ask her questions about

Page 28

1        other things.  She didn't have a lot of

2        involvement beyond that.

3               Q.     Okay.  What were the other

4        things that you asked her questions about?

5               A.     Just, you know, had she been

6        involved in, you know, advocacy and lobbying

7        related to opioids, related to pain, you know,

8        just generally in her time at J&J.

9               Q.     Okay.  How long had Lauryl

10       Jackson or has Lauryl Jackson been with J&J?

11              A.     I believe maybe 2009, 2010,

12       something like that.

13              Q.     Since 2009 --

14              A.     Since --

15              Q.     -- and 2010?

16              A.     Since 2009 or 2010, something

17       like that.

18              Q.     And you use J&J.  I use J&J.  I

19       think we both understand it to mean

20       Johnson & Johnson.  I just want to make sure

21       that's clear.

22              A.     Yes, that's my -- that's what I

23       mean and that's my understanding when you use

24       it.

Highly Confidential - Subject to Further Confidentiality Review

Page 29

1           Q.    Okay.  And when I use J&J,

2     because I do not work for Johnson and Johnson,

3     I'm using it to describe the umbrella of

4     companies that are subsidiaries or affiliates

5     of Johnson & Johnson, including Janssen

6     Pharmaceuticals.

7                 Is that the same way that you're

8     using it?

9           A.    It is.

10          Q.    Okay.  Great.

11                The next person you said you

12    spoke with was Andrea --

13          A.    Masciale.

14          Q.    Masciale.  Thank you.

15                And how many times did you speak

16    with Andrea Masciale?

17          A.    Well, again, she's someone I

18    work with regularly.

19          Q.    Um-hmm (affirmative).

20          A.    So I had spoken to her, you

21    know, multiple times once I learned I would be

22    a company witness.  Most recently I spoke with

23    her, I think, yesterday.

24          Q.    And I apologize.  When I -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    meant to say -- because that was a bad

2    question -- how many times did you speak with

3    her in preparation for this deposition?

4         A.    You know, I think, again,

5    because I -- I talk to her so regularly about

6    different things, I probably, you know, asked

7    her questions and talked to her, you know, two

8    or three, four times.

9         Q.    Okay.  What is Ms. Masciale's

10   title?

11        A.    She is the vice president of

12   global regulatory policy and analytics, I

13   believe.

14        Q.    All right.  How long has

15   Ms. Masciale been with Johnson & Johnson?

16        A.    So I believe she's been with the

17   company about 15 years, something around that

18   period.

19        Q.    And you may know this and

20   perhaps -- throughout that 15-year tenure, has

21   it always been in the global affairs or

22   advocacy/lobbying arena that you are in?

23        A.    So I know that she started in

24   Janssen in global regulatory policy and

Page 31

1        intelligence and that she was there for

2        several years, and then she moved to

3        government affairs and policy in a policy

4        role.

5                Q.      Okay.  How long did you speak

6        with Ms. Masciale yesterday?

7                A.      I'd say approximately

8        45 minutes.

9                Q.      And generally when you spoke

10       with Ms. Masciale, what were you asking

11       Ms. Masciale about?

12               A.      I was asking her about her

13       recollection of advocacy efforts related to

14       opioids --

15               Q.      Okay.

16               A.      -- and our work with trade

17       associations.

18               Q.      And was Ms. Masciale involved in

19       advocacy efforts related to opioids?

20               A.      Well, she was involved in some

21       policy -- you know, issues just sort of

22       generally related to things around, you know,

23       H.R. 6, the large opioids package that we've

24       talked about, and she was also involved in

Page 32

1       sort of monitoring the -- the landscape, I

2       would say, around opioids.

3               Q.      Okay.  And then the last person

4       is Jennifer Thomas.  What is Jennifer Thomas'

5       title?

6               A.      I believe she is a senior

7       manager.  She's within the federal affairs

8       group.  She is not a lobbyist.  And I'm --

9       she's -- she is essentially our political

10      action committee manager.  I'm not sure what

11      her exact title is.

12              Q.      And how long has Ms. Thomas been

13      with Johnson & Johnson?

14              A.      I'm not sure.  I would -- I

15      would think over five years, but I'm not sure.

16              Q.      Okay.  And when was the last

17      time you spoke with Ms. Thomas in preparation

18      for this deposition?

19              A.      Actually, I believe Ms. Thomas

20      has been with J&J since about 2013.

21              Q.      Okay.

22              A.      That sounds right to me, as I --

23      as I think about your first question.  And --

24      I'm sorry -- I lost the second question --

Page 33

1          Q.    That's fine.

2                When was the last time you spoke

3    with Ms. Thomas in preparation for this

4    deposition?

5          A.    I -- I spoke with her yesterday.

6          Q.    Okay.  And for how long?

7          A.    I spoke to her a couple of times

8    yesterday.  Probably, I don't know,

9    30 minutes, 45 minutes again.

10          Q.    And what did you discuss

11    generally with Ms. Thomas in terms of

12    preparing for this deposition?

13          A.    I spoke with her about our PhRMA

14    dues and I spoke with her about our campaign

15    donations and donations that we make to

16    various politicians.

17          Q.    Okay.  If you can estimate for

18    me, what's the total time you spent talking

19    with Ms. Masciale in preparation for the

20    deposition?

21          A.    I would guesstimate an hour and

22    a half or so --

23          Q.    Okay.

24          A.    -- total.

Page 34

1          Q.     And how about the -- the same

2     question for Ms. Jackson.

3          A.     Maybe an hour.

4          Q.     And what was the total time you

5     spent speaking with Ms. Thomas in preparation

6     for this deposition?

7          A.     I would guess another hour --

8          Q.     Okay.

9          A.     -- or so.

10         Q.     You mentioned that you worked

11    with counsel.  And I don't want to ask you

12    about communications between you and your

13    counsel, at least not yet.  We'll see if I

14    need to get there.  I don't think so.

15               But how much time did you spend

16    working with counsel in preparation for this

17    deposition?

18         A.     We met over the course of three

19    days for, you know, various time periods.

20         Q.     Okay.  How much time in total

21    did you spend?

22         A.     I would guess 20 hours, maybe a

23    little more.

24         Q.     The -- when you say over the

Highly Confidential - Subject to Further Confidentiality Review

Page 35

1          course of the three days, were they three

2          consecutive days?

3                    A.      They were not.

4                    Q.      Okay.  When was the last time

5          you met with counsel?

6                    A.      I met with him yesterday.  I

7          believe that's January 16th.

8                    Q.      Okay.  And -- and I'm -- I'm

9          saying in preparation for this deposition,

10         just to -- just to be clear.

11                   And then prior to yesterday --

12         I'm sorry.  Yesterday's meeting, was that in

13         person?

14                   A.      It was in person.

15                   Q.      Okay.  And when was the -- the

16         meeting before yesterday with counsel?

17                   A.      The day before.  So I think

18         that's January 15th.

19                   Q.      Okay.  That's Tuesday of this

20         week?

21                   A.      Yes.

22                   Q.      I'm trying to keep track.

23                   A.      I think that's right.

24                   Q.      And then you had mentioned three

Page 36

1      days.  So when was the first time that you met

2      with counsel in preparation for this

3      deposition?

4              A.     I met with them last week.

5              Q.     Okay.  When did you find out

6      that you would be testifying at this

7      deposition?

8              A.     I believe it was first raised

9      with me in October of last year.

10             Q.     Okay.  And then you mentioned

11     that you had reviewed documents in preparation

12     for the deposition.

13             A.     Yes.

14             Q.     Okay.  What was the -- how did

15     you determine what documents to review in

16     advance of the deposition?

17             A.     Well, I worked with counsel on,

18     you know, understanding the topics that I was

19     to speak to and then reviewing documents

20     related to those topics.

21             Q.     So counsel provided you with

22     documents to review; is that correct?

23             A.     Yes.

24             Q.     Did you on your own seek out any

Highly Confidential - Subject to Further Confidentiality Review

Page 37

1           additional documents to review in preparation

2           for the deposition?

3                A.     Yes.

4                Q.     And what were the documents that

5           you sought on your own?

6                A.     I had some E-mail files that I

7           also reviewed.

8                Q.     Those E-mail files, were they

9           your own E-mails?

10               A.     They were.

11               Q.     Okay.  And what -- what -- what

12          were you looking for in the E-mail files?

13               A.     I was looking -- just looking

14          back to reorient myself to some of the topics

15          that had come up in the course of work,

16          primarily with bio and pharma.

17               Q.     Okay.  Any topics in particular

18          that caused you to look at your own E-mails?

19               A.     No.

20               Q.     Okay.  Would you turn to page 2

21          of Exhibit 1.  And there's a paragraph at the

22          top and it says, Pursuant to Federal Rules of

23          Civil Procedure 30(b)(2) and 34, the deponent

24          should produce all documents which deponent

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1       has consulted or reviewed or plans to consult

2       in preparation for -- it says his, but it will

3       be her for this deposition -- for her

4       deposition and has relied upon or will rely

5       upon for testimony in this matter.

6                   Do you see that?

7           A.      I do.

8           Q.      Have you brought any documents

9       with you today for production that you

10      consulted or reviewed in connection with -- in

11      preparation for this deposition?

12          A.      I have not.

13          Q.      Okay.

14                  MR. ACKERMAN:  So to the extent

15      there are documents that have not already been

16      produced, Counsel, they should be produced.

17      And I think that would include the E-mail

18      files, because I don't believe Ms. Cartwright

19      is a document custodian in this case.

20                  MR. GALIN:  I understand.  My

21      understanding is that her documents from her

22      E-mails have been produced, but certainly we

23      will work with the witness and with our folks.

24      And if there are any that have not been

Page 39

1          produced, we will do so.

2                    MR. ACKERMAN:  Okay.  Thank you.

3                    BY MR. ACKERMAN:

4          Q.    Number 2 says, copies of all

5     curriculum vitae used or prepared by the

6     deponent within the preceding five years.

7                    Do you have a copy of your -- of

8     your CV or your resume?

9          A.    I do.

10         Q.    Excellent.  If you would pass

11    that over.

12                    MR. GALIN:  Do you want those

13    marked as exhibits or just passed over?

14                    MR. ACKERMAN:  You -- you can

15    just pass them over now.

16                    MR. GALIN:  Okay.

17                    MR. ACKERMAN:  I probably should

18    have asked for them first.  We could have

19    shortcut some testimony in the beginning.

20                    THE WITNESS:  Should I give a

21    copy to Misty?

22                    MR. GALIN:  Why don't you give

23    Misty a copy, yes, since we have an extra.

24                    THE WITNESS:  Okay.

Page 40

```
 1                      Mr. Ackerman --
 2                      MR. GALIN:  And you -- you
 3        don't -- that's for you.
 4                      THE WITNESS:  Do you need me --
 5                      MR. GALIN:  No.  He's got two.
 6        Why don't you keep that in case --
 7                      THE WITNESS:  This is me.  Oh,
 8        okay.
 9                      MR. GALIN:  -- he wants to ask
10        you questions.
11                      MR. ACKERMAN:  I've -- I've got
12        one.
13                      THE WITNESS:  Okay.
14                      MR. ACKERMAN:  We'll take a look
15        at this probably off the record and then --
16                      THE WITNESS:  Okay.
17                      MR. ACKERMAN:  -- we can
18        discuss.
19                      All right.  McKenn Nelson, I had
20        friends there.
21                      THE WITNESS:  Did you?
22                      MR. ACKERMAN:  Yes.  We'll --
23        we'll discuss that off the record as well.
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 41

1           BY MR. ACKERMAN:

2           Q.    Okay.  We can put this

3    deposition notice aside, and let's begin with

4    topic 22(b).

5                 Topic 22(b) is The nature and

6    scope of your -- and your, I believe, means

7    Johnson & Johnson here -- membership

8    participation in payments to and/or

9    communications with any -- well, with the

10   Pharmaceutical Research and Manufacturers

11   Association concerning opioids or opioid

12   products.

13                And I've -- I've shortcut that a

14   little bit, because 22 -- topic 22 involves

15   three separate entities, but you are only here

16   on behalf -- to testify with respect to the

17   Pharmaceutical Research and Manufacturers

18   Association; is that correct?

19           A.    That is my understanding.  And I

20   say PhRMA instead of that full name.

21           Q.    That was --

22           A.    So when I say PhRMA, that's the

23   name -- that's what I'm referring to.

24           Q.    Excellent.  That was my --

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1          A.     Okay.

2          Q.     -- next question.  So you --

3   you've already anticipated that one.

4               So what is PhRMA?

5          A.     PhRMA is a trade association of

6   innovative biopharmaceutical companies.

7          Q.     Okay.  I assume that J&J is a

8   member of PhRMA?

9          A.     It is a member.

10         Q.     And for how long has J&J been a

11  member of PhRMA?

12         A.     In my preparation we determined

13  that -- for as long as anyone I could ask

14  remembered.

15         Q.     Okay.

16         A.     So --

17         Q.     So that goes back at least --

18  I'd say at least 10 years?

19         A.     I think that's fair, yes.

20         Q.     Is it at least 20 years?

21         A.     I don't know, but I would

22  assume, yes.

23         Q.     Okay.  Do you know whether J&J

24  was a member of PhRMA in 1996?

Highly Confidential - Subject to Further Confidentiality Review

Page 43

```
 1                    A.    I -- I do not know for a fact,

 2          no.

 3                    Q.    And if you wanted to find that

 4          out, how would you find it out?

 5                    A.    I would -- probably -- I mean,

 6          given that I talked to colleagues and -- and

 7          don't know definitively, I guess maybe ask

 8          PhRMA.

 9                    Q.    I understand.

10                    Does J&J pay dues as part of its

11          membership to PhRMA?

12                    A.    Yes.

13                    Q.    Okay.  And at present, what are

14          the annual dues that J&J pays to PhRMA?

15                    A.    I believe they are upwards of

16          $30 million currently.

17                    Q.    Okay.  Has that number changed

18          over the course of Janssen's or J&J's

19          membership in PhRMA?

20                    A.    It is my understanding that that

21          amount has increased.

22                    Q.    All right.  Do you have an

23          understanding as to payments in prior years

24          that J&J made to PhRMA for dues?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 44

1          A.     I'm not sure I understand the

2     question.

3          Q.     Sure.  So I think we said it's

4     $30 million this year, is that correct, on an

5     annual basis?

6          A.     Well, it's more than 30 million

7     this year.

8          Q.     Okay.

9          A.     Yes.

10          Q.     More than 30 million.  I'm

11     sorry.  When I say this year, it's 2019.  So

12     are we talking about 30 million -- or more

13     than 30 million for 2019 or is it more than

14     30 million for -- for the year that just

15     passed, 2018?

16          A.     Thank you for clarifying.  I

17     meant more than 20 -- more than 30 million for

18     2018.

19          Q.     Okay.  And I've made that

20     mistake many times, so I wanted to -- I'm glad

21     we caught that one.

22                 So for 2018, does Janssen have

23     an understanding of what that money -- or how

24     PhRMA spends its dues or what its dues are --

Page 45

1        are designated for?

2                A.      Our understanding is that dues

3        go to a variety of different costs from, you

4        know, PhRMA's staff, which, you know, includes

5        lawyers and scientists and -- you know, they

6        have a -- a policy and science regulatory team

7        to lobbying to, you know, their overhead,

8        travel, all kinds of things.

9                Q.      Okay.  So are Janssen's payments

10       to PhRMA earmarked for specific purposes?

11                       MR. GALIN:  Objection to form.

12                       THE WITNESS:  Could you repeat

13       the question, please.

14                       BY MR. ACKERMAN:

15                Q.      Yeah, sure.  Let's see if I can

16       ask it differently.

17                       MR. GALIN:  It was just the

18       entity, Counsel.

19                       MR. ACKERMAN:  Ah.  All right.

20                       BY MR. ACKERMAN:

21                Q.      Are J&J's payments to PhRMA

22       designated for specific purposes?

23                A.      Based on my understanding, that

24       is not the case.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1          Q.     Okay.  In 2017, what were J&J's

2     total payments to PhRMA?

3          A.     I believe they were around

4     30 million.

5          Q.     Okay.  And how about 2016?

6          A.     I know that they have increased

7     over time, but do not know the exact amount

8     or -- you know, for 2016.

9          Q.     Okay.  Do you know the amounts

10     for any other years?

11          A.     I do not sitting here.

12          Q.     If you wanted to find out, who

13     would you ask?

14          A.     I would probably ask Jennifer

15     Thomas, and I guess we'd work with some

16     finance folks to get that.

17          Q.     Sure.  Does -- Janssen, I

18     assume, keeps records of its payments to --

19     I'm sorry.

20               J&J keeps records of its

21     payments to PhRMA?

22          A.     Yes, I believe so.

23          Q.     Do you know how much in total

24     J&J has paid to PhRMA throughout the course of

Highly Confidential - Subject to Further Confidentiality Review

Page 47

1          its membership?

2                    A.     I do not know that.

3                    Q.     All right.  Has J&J provided any

4          nonfinancial support to PhRMA?

5                         MR. GALIN:  Objection to form.

6                         THE WITNESS:  Can you clarify

7          what you mean by nonfinancial support?

8                         BY MR. ACKERMAN:

9                    Q.     Sure.  Has J&J provided PhRMA

10         with personnel or -- or resources or office

11         space or -- or, you know, marketing or -- or

12         anything that's not a direct payment but is --

13         could still be considered assistance?

14                        MR. GALIN:  Objection to form.

15                        THE WITNESS:  It's my

16         understanding that we work with PhRMA, so we

17         contribute, you know, in -- through activity

18         to -- you know, efforts that are, you know,

19         joint across the industry, but I'm not aware

20         of, you know, providing office space or, you

21         know, designated personnel or anything like

22         that.

23                        BY MR. ACKERMAN:

24                    Q.     Okay.  Are there individuals at

Highly Confidential - Subject to Further Confidentiality Review

Page 48

1          J&J who are designated to work with PhRMA or

2          whose job responsibilities include the

3          relationship with PhRMA?

4                    A.    So there are several people who

5          work with PhRMA.  There -- we have a member on

6          the boards.  There's a designated person who

7          staffs the board member.  And then throughout

8          the company there are people who serve on a

9          variety of different committees and working

10         groups and attend meetings and, you know,

11         participate and engage regularly.

12                   Q.    So who is the J&J member on the

13         board of PhRMA currently?

14                   A.    Joaquin Duato.

15                   Q.    How long has Joaquin Duato been

16         a member on the board of PhRMA for J&J?

17                   A.    I don't know exactly, but I -- I

18         would think at least the last threeish --

19         three or so years.

20                   Q.    For how long, approximately, has

21         J&J had a member on the board of PhRMA?

22                   A.    I do not know.

23                   Q.    You mentioned that there are

24         individuals who serve on various PhRMA

Page 49

1          committees or individuals at J&J that serve on

2          various PhRMA committees; is that right?

3                    A.    Yes.

4                    Q.    What are the committees that J&J

5          individuals participate in or sit on?

6                         MR. GALIN:  Objection to scope

7          and to form.

8                         THE WITNESS:  So I believe PhRMA

9          forms ad hoc committees and then disbands

10          them, you know, depending on different matters

11          and -- and things that are happening

12          externally.  So people serve on those.

13                         And then there are some standing

14          committees.  I believe there's a legal

15          committee that meets regularly.  There's a

16          group called Washington Reps that members of

17          the federal team sit on.  There was an abuse

18          prevention working group that I sat on.  There

19          are a variety of science and regulatory

20          committees.

21                         Those are just a few that come

22          to mind.

23                         BY MR. ACKERMAN:

24                    Q.    Does PhRMA have any

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1          committees -- currently, does PhRMA have any

2          committees that are tasked with matters

3          relating to opioids?

4                    A.      PhRMA does have an abuse

5          prevention working group --

6                    Q.      Okay.

7                    A.      -- yes.

8                    Q.      And who is the J&J member on

9          that committee?

10                   A.      I have been the member on that

11         committee.

12                   Q.      And how long have you been on

13         that committee?

14                   A.      Let's see.  Well, the committee

15         isn't currently really meeting regularly.  It

16         was -- but I would say two years or so.

17                   Q.      Okay.  Do you know when the

18         committee was formed?

19                   A.      I don't know exactly when it was

20         formed.  I know it was -- I -- I know when I

21         became involved.

22                   Q.      Okay.  And that was

23         approximately two years ago?

24                   A.      Yes.

Page 51

```
 1                    Q.    Was there a J&J member who was

 2            involved in that committee prior to you

 3            becoming involved?

 4                    A.    I'm not sure about that.

 5                    Q.    What PhRMA efforts has J&J

 6            participated in related to opioids?

 7                    MR. GALIN:  Objection to form.

 8                    THE WITNESS:  So we participated

 9            in the committee that I just mentioned, the

10            working group.  I believe there was also a --

11            a similar working group focused on state-level

12            issues and that someone participated in that.

13                    And, you know, we would, you

14            know, with PhRMA, monitor legislative

15            developments and activity around opioids.

16                    BY MR. ACKERMAN:

17                    Q.    Who from J&J participated in the

18            state-level issues working group that you

19            described?

20                    A.    I believe it was Bruce Colligen.

21            And for -- it may have also been Tom Warren at

22            some period.

23                    Q.    And what is Bruce Colligen's

24            title?
```

Page 52

1          A.    I believe he's an executive

2     director of policy.

3          Q.    And Tom Warren's title?

4          A.    I think he's a director of state

5     policy.

6          Q.    Okay.

7               MR. ACKERMAN:  All right.  Let's

8     mark this as Deposition Exhibit Number 2.

9                   (Thereupon, J&J-Cartwright

10                  Deposition Exhibit Number 2 was marked

11                  for identification.)

12               BY MR. ACKERMAN:

13          Q.    Ms. Cartwright, the court

14     reporter has handed you what has been marked

15     as Deposition Exhibit Number 2.

16               This is a document that was

17     produced in native form by Janssen at Bates

18     number JAN-MS-00393142.  We have included the

19     slip sheet as the first page of the document,

20     and then the native file in the manner that it

21     was produced was printed as the rest of the

22     document.

23               Take a moment to look at this

24     document and tell me if you have seen it

Page 53

1      before.

2              A.      I have not seen this document.

3      I -- I don't recall seeing this document

4      before.

5              Q.      Okay.  If you would turn sort of

6      midway through the document -- and it doesn't

7      have page numbers, so I -- I apologize, but

8      there is a page that begin -- that has the

9      title Examples of Successes.

10             A.      Okay.

11             Q.      And then underneath has a line

12     that says, PhRMA supports/actively lobbies PMP

13     for first time.

14                     Now, let me know when you've

15     located that page.

16             A.      I -- I have that page.

17             Q.      Okay.  Do you know what effort

18     is being described on this page?

19             A.      I do not.

20             Q.      Okay.  Do you know whether PhRMA

21     lobbied Georgia legislative or regulatory

22     entities with respect to their prescription

23     monitoring program?

24             A.      You know, I know that PhRMA does

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1        engage with states on legislative matters, but

2        I don't know, you know, about a specific

3        effort in Georgia.  You know, 50 states, it's

4        a lot to cover --

5                 Q.     I understand.

6                 A.     -- a lot for anyone to know,

7        so...

8                 Q.     The second bullet point says,

9        Law enacted with many of our desired

10       provisions.

11                      Do you see that?

12                A.     I do see that.

13                Q.     Do you know which provisions of

14       the law were desired by J&J or Janssen?

15                A.     I don't know that we were

16       engaged in this particular law in Georgia or,

17       you know, involved in this in any way.  I

18       mean, again, there's a lot of legislative

19       activity, a lot of states, and so I don't -- I

20       don't know -- I can't say that we were

21       involved at all to support or not support any

22       aspect of it.

23                Q.     Okay.  Are you familiar with a

24       J&J employee named Robyn Kohn, K-O-H-N?

Page 55

1            A.     I'm familiar with the name, yes.

2            Q.     Okay.  And who is Robyn Kohn?

3            A.     I believe that she is in the --

4    or was in the pain group.  I'm not sure about

5    currently what she's doing.

6            Q.     Is she still with

7    Johnson & Johnson?

8            A.     I'm not sure.

9            Q.     Okay.  Robyn Kohn is listed as

10   the custodian of this document, and that's

11   just why I --

12           A.     Okay.

13           Q.     -- mentioned the name.

14                  A couple of bullet points down

15   it says, Defeated 60 unit per Rx limit.

16                  Do you know what that refers to?

17           A.     I -- I don't.  I mean, I assume

18   it's just referring to 60 unit per

19   prescription limit, but I don't know --

20           Q.     Okay.

21           A.     -- what this is referring to.

22           Q.     And do you know whether Janssen

23   provided any input to PhRMA with respect to

24   that provision of a 60 unit per prescription

Highly Confidential - Subject to Further Confidentiality Review

Page 56

1          limit?

2                    A.      I do not know.  I know that we,

3          you know, support responsible limits as long

4          as they don't unnecessarily sort of impact

5          appropriate access, but I cannot speak to this

6          particular, you know, Georgia bill and -- and

7          the provisions of it.

8                    Q.      Okay.  Are you aware of any

9          PhRMA efforts in other states concerning --

10         let me -- I'm going to strike that.  I'm going

11         to ask that question a -- a -- a little better

12         way.

13                   Are you aware of any lobbying

14         efforts undertaken by PhRMA in any other

15         states concerning that state's prescription

16         monitoring program?

17                   MR. GALIN:  Objection to form.

18                   THE WITNESS:  I mean, I

19         certainly know that PhRMA is engaged in what's

20         happening in states with various, you know,

21         bills related to controlled substances and

22         opioids and things like that and has been

23         engaged in them, but I don't -- I'm -- I'm not

24         able to speak to PhRMA's activities or state

Highly Confidential - Subject to Further Confidentiality Review

Page 57

1      by state and bill by bill.

2                    BY MR. ACKERMAN:

3           Q.     Do you know whether PhRMA

4      lobbied the Ohio Legislature in connection

5      with the enactment of Ohio's prescription

6      monitoring program?

7           A.     I don't know how active PhRMA

8      was involved in that.

9           Q.     Do you know whether Janssen --

10     if PhRMA lobbied the Ohio Legislature in

11     connection with the enactment of Ohio's

12     prescription monitoring program, do you know

13     whether Janssen was involved in that effort?

14          A.     I just want to make sure I

15     understand.  You're talking about Ohio's

16     prescription monitoring program bill?

17          Q.     Correct.

18          A.     Okay.  I do not know, no.

19          Q.     Okay.  Has Janssen participated

20     in any PhRMA effort in any state in connection

21     with lobbying concerning enactment of that

22     state's prescription monitoring plan bill?

23          A.     I believe you asked have we

24     participated?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1             Q.    Yes.

2             A.    I just want to make sure I'm

3       understanding.

4             Q.    Yes.

5             A.    You know, we -- we are members

6       of PhRMA and we often participate in their

7       efforts, but I can't speak to, you know, what

8       we've done on any particular state bill.  And

9       there -- you know, there was a period, and

10      maybe still now, where there's so many bills

11      happening in any given state.  And so, you

12      know, there could be various iterations of a

13      bill.  I just -- I -- I can't speak to whether

14      we were engaged in, you know, a particular

15      bill by state.

16            Q.    If there was a specific bill

17      that we were asking about, who would you ask

18      to figure out whether Janssen was involved

19      in -- in the PhRMA efforts or participated

20      along with PhRMA in those lobbying efforts?

21            A.    I'd have to try to identify the

22      state government affairs person, you know,

23      responsible for that state and then see if,

24      you know, they were involved at that time

Page 59

1    period and -- and if they knew -- those people

2    do cover, you know, often three to four

3    states, and so our participation, you know,

4    really varies, depending on the issue and --

5    and significance to J&J and things like that.

6    So I'd have to talk to them to see if they

7    were really involved.

8         Q.    Okay.  The next bullet point

9    says, Defeated wholesaler reporting

10   requirement.

11        A.    Um-hmm (affirmative).

12        Q.    Do you know what that refers to?

13        A.    I do not, no.

14        Q.    Okay.  And the next bullet point

15   says, Includes balanced pain management

16   language.

17              Do you see that bullet point?

18        A.    I do.

19        Q.    Do you know what that refers to?

20        A.    I do not.

21        Q.    Okay.  If you flip a few pages

22   further in this document, there is a -- a

23   slide entitled Going Forward.  Let me know

24   when you've located that slide.  Take a minute

Page 60

1          to review it.

2                    A.     I see that slide.

3                    Q.     Okay.  The third bullet point

4          there says, Continue to support/engage with

5          PhRMA on PhRMA initiative and state PMP

6          lobbying.

7                    Do you see that bullet point?

8                    A.     I do.

9                    Q.     Do you know what involvement, if

10         any, Janssen had with PhRMA in connection with

11         state PMP lobbying?

12                   A.     I -- I don't, no.  I mean,

13         again, you know, we generally are members

14         and -- and support various efforts, but I

15         can't speak to this specific bullet and our

16         involvement.

17                   Q.     Okay.  We can put that one

18         aside.

19                   MR. ACKERMAN:  I'm going to mark

20         another exhibit.  I think this is Exhibit 3;

21         is that right?

22                   MR. GALIN:  Correct.

23                   MR. ACKERMAN:  Okay.

24

Page 61

1                    (Thereupon, J&J-Cartwright

2                    Deposition Exhibit Number 3 was marked

3                    for identification.)

4                         THE WITNESS:  Thank you.

5                         BY MR. ACKERMAN:

6              Q.    Ms. Cartwright, the court

7       reporter has handed you Deposition Exhibit 3,

8       which is a -- an E-mail, Bates-numbered

9       JAN-MS-00943201 through JAN-MS-00943204.

10                   Take a moment to review this

11      document and let me know when you've had a

12      chance to review it.

13             A.    Okay.

14             Q.    Okay.  Have you seen this E-mail

15      before?

16             A.    I do not believe that I have.

17             Q.    Okay.  I didn't think so,

18      because you're not on it, but --

19             A.    Um-hmm (affirmative).

20             Q.    -- since you are the designee,

21      you get the honor of being asked about it.

22                   So if you would turn to the

23      second page, please, there is an E-mail at the

24      bottom of the second page from Bruce Colligen.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1          And that's the same Bruce Colligen you already

2          testified to, correct?

3              A.    Yes.  I believe it is the same

4          Bruce Colligen.

5              Q.    Okay.  There's not another Bruce

6          Colligen that works at Johnson & Johnson, is

7          there?

8              A.    I mean, not that I'm aware of.

9          But there are over 100,000 employees, so...

10             Q.    I understand.  And then there is

11         a response to that E-mail from a Malcolm

12         Monaghan.

13             A.    Um-hmm (affirmative).

14             Q.    Do you see that?

15             A.    I do see that.

16             Q.    And hopefully I'm pronouncing

17         his name correctly, but who is Malcolm

18         Monaghan?

19             A.    I do not know Malcolm, who he

20         is.

21             Q.    Okay.  Mr. Colligen's E-mail

22         begins, The PhRMA state section will meet on

23         Friday for their regular call.  One item that

24         the section will vote on is the PDMP program

Page 63

1          position.  See communication below.

2                          Do you see that?

3                  A.    I do.

4                  Q.    Do you know what the PhRMA state

5          section is?

6                  A.    I believe that's a, you know,

7          regular standing PhRMA committee focused on

8          state issues.

9                  Q.    Okay.  And does Janssen

10         participate in meetings of that committee?

11                 A.    I believe that we do.

12                 Q.    Okay.  Who are the individual or

13         individuals who are the primary or have

14         primary responsibilities for involvement with

15         that committee?

16                 A.    Well, I'm sure it's changed over

17         time, but I would presume that Bruce has been

18         involved for some time period in that kind of

19         a committee for PhRMA.

20                 Q.    Okay.  Did you speak with

21         Mr. Colligen in preparation for this

22         deposition?

23                 A.    I did not.

24                 Q.    Okay.  So Mr. Monaghan replies

Highly Confidential - Subject to Further Confidentiality Review

Page 64

1          to this E-mail and says, We would support this

2          position with one caveat.  We want to ensure

3          that a patient that is not getting pain relief

4          and is seeing other physicians in search of

5          relief is not labeled a, quote, Doc Shopper,

6          unquote, simply because they have seen more

7          than one or two doctors in a specified period

8          of time.

9                    Do you see that?

10              A.    I do.

11              Q.    Okay.  Do you have an

12          understanding as to what a -- a doc -- what

13          doctor shopping is?

14              A.    I have a, you know, sort of

15          general sense, I think, from having heard that

16          used in media.

17              Q.    And what -- what is your general

18          sense?

19              A.    My general sense is that it's

20          someone who tries to see multiple doctors to

21          get more of a certain kind of medication.

22              Q.    Okay.  Why was Janssen concerned

23          about -- I'm sorry.

24                    Why was J&J concerned about laws

Highly Confidential - Subject to Further Confidentiality Review

Page 65

1          that were addressing doctor shopping?

2                    MR. GALIN:  Objection to form.

3                    THE WITNESS:  Well, I don't read

4          this as being concerned about laws that are

5          addressing doctor shopping.

6                    BY MR. ACKERMAN:

7               Q.    Um-hmm (affirmative).

8               A.    I read this -- you know, and

9          it's -- it's consistent with my understanding

10         of the J&J position, which is that while we

11         support laws and regulations that address

12         abuse and misuse, we also want to ensure that

13         patients have access to appropriate pain

14         management.

15                   And so I'm reading this as

16         saying they want to ensure that, you know, a

17         patient who isn't receiving relief and -- and

18         sees more than one doctor within a time period

19         is not necessarily labeled as such.

20              Q.    Okay.  Was it -- or is it

21         Janssen's position that a patient who sees

22         three doctors in search of an opioid in a

23         specified period of time is not doctor

24         shopping?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1                      MR. GALIN:  Objection to scope.

2                      THE WITNESS:  You know, I'm not

3           a medical professional.  I think as a member

4           of our government affairs and policy group, I

5           really, like my colleagues, would defer to our

6           clinical and medical affairs people to make

7           those kinds of calls.  And we, you know,

8           collaborate with them for their guidance on

9           those kinds of issues and then, with that

10          understanding, are, therefore, in a position

11          to advocate.  So I don't feel equipped to

12          answer that.

13                     BY MR. ACKERMAN:

14               Q.    Okay.  What input did Janssen

15          provide, if any, to the PhRMA state section

16          concerning the -- the issue identified in

17          Mr. Monaghan's E-mail regarding doctor

18          shopping?

19               A.    I don't know what specific

20          feedback was provided.

21               Q.    Do you know generally what

22          feedback was provided?

23               A.    I do not, no.

24               Q.    And if you wanted to find out,

Page 67

1          who would you ask?

2                  A.      I'd probably have to talk to

3          a -- a few people.  You know, I'd start with

4          the people on this E-mail, if they're still

5          members of the company, and kind of go from

6          there.

7                  Q.      So Bruce Colligen would be one

8          person who you'd probably ask; is that right?

9                  A.      I would --

10                 Q.      Okay.

11                 A.      -- yes.

12                 Q.      At the bottom of Mr. Monaghan's

13         E-mail, the last two sentences state, Finally,

14         we do support the PDMP process but would

15         prefer it not be housed in the DOJ within a

16         state.  We believe having the PDMP be

17         administered by the Board of Pharmacy is more

18         appropriate.  I guess those are the -- not

19         necessarily the final two sentences, but two

20         of the final three sentences.

21                 Do you see those two sentences?

22                 A.      I do.

23                 Q.      Okay.  Did Janssen provide any

24         input to PhRMA with respect to this point

Highly Confidential - Subject to Further Confidentiality Review

Page 68

1      that's raised in Mr. Monaghan's E-mail?

2              A.    I do not specifically know.

3              Q.    Okay.  Do you know whether other

4      pharmaceutical manufacturers or whether

5      PhRMA -- let me -- strike that.  Let me ask a

6      question.

7              Did -- do you know whether PhRMA

8      took the position that the PDMP process should

9      be housed in a board of pharmacy within a

10     state but not in the Department of Justice?

11             MR. GALIN:  Objection to scope.

12             THE WITNESS:  You know, I know

13     from my involvement with PhRMA that they

14     support PDMPs, but I don't know whether they

15     took a position on where within a state they

16     should be housed.

17             BY MR. ACKERMAN:

18             Q.    Okay.  Did Janssen participate

19     in any discussions during PhRMA meetings or

20     with PhRMA personnel regarding whether a PDMP

21     process should be housed in the Department of

22     Justice within a state or be administered by

23     the Board of Pharmacy?

24             A.    You know, based on -- on my

Highly Confidential - Subject to Further Confidentiality Review

Page 69

1          preparation, I'm just not equipped to answer

2          that.

3                    Q.    Okay.  Thank you.

4                          So I think we can move on to the

5          next topic, which is actually a -- a set of

6          subtopics.

7                          MR. GALIN:  I think -- we've

8          been going for about an hour.  I think the

9          witness -- if this is a logical time, sort of

10         changing, if we take just a brief five-minute

11         bio break.

12                         MR. ACKERMAN:  That's fine.  Why

13         don't -- why don't we take 10 minutes.  That's

14         fair.

15                         MR. GALIN:  That's probably more

16         realistic.

17                         MR. ACKERMAN:  Okay.  Let's go

18         off the record.

19                         VIDEO OPERATOR:  The time is now

20         10:23 a.m.  We're going off the record.

21                         (Thereupon, a brief recess was

22                    taken.)

23                         VIDEO OPERATOR:  The time is now

24         10:43 a.m.  We are back on the record.

Page 70

1                     BY MR. ACKERMAN:

2            Q.     Okay.  We are back on the

3       record, Ms. Cartwright, and I'm going to move

4       on to the next topic, which is topic 25.

5                     That reads, The nature and scope

6       of your opioid-related lobbying efforts or

7       governmental affairs activities, including

8       personnel and third parties involved in such

9       efforts or activities and donations or

10      payments made in connection with such efforts

11      or activities.  And then it lists -- basically

12      concerning, and then it lists (a) through (i),

13      which I have not counted up, but is probably

14      roughly about 10 different topics.

15                    I'll try to walk through each of

16      these topics.  Some of them I'll have more

17      questions than others.

18           A.     Okay.

19           Q.     But the first topic is DSM V.

20                    Are you familiar with DSM V?

21           A.     I am.

22           Q.     And what is DSM V?

23           A.     It's a -- like a taxonomy for

24      classifying medical conditions used by

Highly Confidential - Subject to Further Confidentiality Review

Page 71

1          physicians, sometimes for treatment

2          recommendations.

3                  Q.     Okay.  Did Janssen participate

4          in any lobbying efforts or governmental

5          affairs activities concerning DSM V?

6                  A.     No.  Based on our preparation,

7          we did not --

8                  Q.     Okay.

9                  A.     -- uncover any.

10                 Q.     And did Janssen make any

11         donations or payments in connection with any

12         activities related to DSM V?

13                 A.     No, not that we uncovered.

14                 Q.     All right.  Thank you.

15                        The next topic is Pain as the

16         5th Vital Sign.

17                        Do you have an understanding as

18         to what Pain as the 5th Vital Sign means?

19                 A.     I believe so.

20                 Q.     And what is that understanding?

21                 A.     Well, I think it refers to

22         assessing a patient's pain when they come into

23         a hospital or a physician's office in the same

24         way you look at their, you know, blood

Highly Confidential - Subject to Further Confidentiality Review

Page 72

1        pressure or temperature or breathing.

2               Q.    Was Pain as the 5th Vital Sign a

3        governmental initiative?

4               MR. GALIN:  Objection to scope.

5               THE WITNESS:  Can you help me

6        understand what you mean by governmental?

7               BY MR. ACKERMAN:

8               Q.    Sure.  Was it a concept that was

9        promoted by the federal or state government?

10              A.    I -- I really don't know.  It's

11       my understanding that it was adopted in some

12       guidelines and kind of went from there.

13              Q.    Okay.  Did Janssen -- I'm

14       sorry -- did J&J -- I'm going to -- I use

15       Janssen and J&J sort of interchangeably, so

16       I'll -- I will do my best to -- to say J&J for

17       purposes of this deposition.

18                    Did J&J engage in any lobbying

19       efforts or governmental affairs activities

20       related to promotion of Pain as the 5th Vital

21       Sign?

22              A.    No.  We had some involvement in

23       development of a monograph that I think

24       referred to looking at pain, but not anything

Highly Confidential - Subject to Further Confidentiality Review

Page 73

1          involving the pain as a fifth vital sign.

2               Q.     You say a monograph.  What do

3          you mean by a monograph?

4               A.     A guideline for -- you know,

5          best practices for how patients should be

6          assessed.

7               Q.     Did that monograph have a name

8          or a title?

9               A.     I believe there were a couple of

10         versions that were developed by the Joint

11         Commission on hospital accreditation, and

12         JAHCO is the acronym.

13              Q.     Yes.

14              A.     I'm sort of messing up the name.

15              Q.     We'll just call it the Joint

16         Commission.

17              A.     Okay.

18              Q.     And that's one of the topics.

19         We'll get to that one.

20              A.     Okay.

21              Q.     Okay.  Did Janssen partner with

22         any other organization in connection with

23         promoting Pain as the 5th Vital Sign?

24                     MR. GALIN:  Objection to form.

Page 74

1                    THE WITNESS:  Well, we, you

2          know, partnered with and worked with many

3          organizations and coalitions, but not

4          specifically in support of that.

5                    BY MR. ACKERMAN:

6          Q.    Okay.

7                    (Thereupon, J&J-Cartwright

8           Deposition Exhibit Number 4 was marked

9            for identification.)

10                   BY MR. ACKERMAN:

11         Q.    Ms. Cartwright, the court

12         reporter has handed you what's been marked as

13         Deposition Exhibit Number 4.  It is 4.  It is

14         a single-page document with the Bates number

15         JAN-MS-00492411.

16                   Take a moment to review this

17         document.  Let me know when you've had a

18         chance to review it.

19         A.    Okay.

20         Q.    Okay.  This is an E-mail dated

21         February 14th 2002 from Heather Thomson to

22         Anthony Focella.

23                   If you look at the -- well,

24         there's not clean line breaks between each of

Highly Confidential - Subject to Further Confidentiality Review

Page 75

1          the paragraphs, but there is a -- a paragraph

2          that begins with now that's about, oh, maybe a

3          third down the page.  And the sentence says,

4          Now, the VA nationally is gearing up to launch

5          the next phase of its pain management mandate.

6          As you recall, they started with the Pain as

7          the 5th Vital Sign initiative.

8                   Do you see that sentence?

9          A.     I do.

10         Q.     Okay.  Did Janssen have any

11         involvement with the VA, meaning the other

12         Veterans Administration, in connection with

13         the VA's Pain as the 5th Vital Sign

14         initiative?

15         A.     So we had involvement with the

16         VA, but I did not in my preparation and

17         conversations uncover anything that indicated

18         that it was specifically around the Pain as

19         the 5th Vital Sign.

20         Q.     Okay.  If you look a little bit

21         further down the page, there's a sentence that

22         begins, There are several ways.

23                   Do you see that?

24         A.     Um-hmm (affirmative).

Page 76

1          Q.     And it -- and it reads, There

2     are several ways we can continue to

3     collaborate with the VA as they move into the

4     treatment plans/reassessment phase of the

5     initiative.

6                Do you see that?

7          A.     I do.

8          Q.     And then a little bit further

9     down it says, I also do not know whether the

10    funding from the old grant is governed by our

11    current letter of agreement which stipulates

12    Janssen's role and how it is spent.

13                Do you see that sentence?

14         A.     I do.

15         Q.     Do you know whether the -- do

16    you know what old grant is -- they're -- being

17    referred to in this E-mail?

18         A.     I do not.

19         Q.     Do you know whether that grant

20    had anything to do with promotion of Pain as

21    the 5th Vital Sign at the Veterans

22    Administration?

23         A.     I am not familiar with that

24    grant and I'm not reading anything here that

Page 77

1      would lead me to believe that, but I don't

2      know.

3              Q.    Okay.  The -- the -- the first

4      sentence or the -- I guess it was the second

5      sentence that I read said, There are several

6      ways we can continue to collaborate with the

7      VA.

8              A.    Yes, I see that.

9              Q.    The collaboration that occurred

10     prior to this E-mail, did any of that

11     collaboration involve promotion of Pain as the

12     5th Vital Sign?

13             A.    It is my understanding that we

14     have never promoted Pain as the 5th Vital

15     Sign, generally speaking.  So I can't speak

16     to, you know, what was done in the prior

17     collaboration with the VA, but it's my

18     understanding that it did not involve Pain as

19     the 5th Vital Sign.

20             Q.    Okay.  You can put that document

21     aside.

22                   The next topic is just a

23     shorthand, lobbying efforts related to REMS

24     for opioid or opioid products.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1                    What is a -- a REMS?

2           A.      A REMS is a risk evaluation

3    mitigation strategy that FDA requires for

4    certain drug and medical products.

5           Q.      Okay.  And were there REMS in

6    place for J&J's opioid products?

7           A.      Yes.

8           Q.      Okay.

9           A.      Wait.  I'm sorry.  When you say

10   J&J's opioid products, can we clarify what

11   products you mean --

12          Q.      Sure.

13          A.      -- just to make sure I --

14          Q.      Were -- were -- was there a REMS

15   in place for -- for Nucynta and Nucynta ER?

16          A.      Yes.

17          Q.      Okay.  Was there a REMS in place

18   for Duragesic?

19          A.      Okay.

20                  MR. GALIN:  I think you --

21                  BY MR. ACKERMAN:

22          Q.      You have to speak.

23          A.      Oh, I'm sorry.  Yes.  Sorry.

24          Q.      All right.  Very good.

Highly Confidential - Subject to Further Confidentiality Review

Page 79

1              So generally, what lobbying

2       efforts or governmental activities did Janssen

3       participate in with respect -- if any, with

4       respect to REMS for those products?

5              A.     So J&J was involved in the

6       development and drafting of the opioid REMS

7       based on a request from FDA.  FDA asked all of

8       the sponsors to work together to develop

9       class-wide REMS and J&J acceded and -- and

10      participated and was involved in, you know,

11      committees and working groups in the -- in the

12      development of the REMS.

13             Q.     Were there particular

14      individuals at J&J who were responsible for

15      that effort?

16             A.     Yes.  I believe J&J's

17      participation was led by Susan Nicholson.  And

18      I think two of the other primary people were

19      our therapeutic area heads for safety and

20      medical affairs, Bruce Moskovitz and Gary

21      Vorsanger.

22             Q.     Okay.

23             A.     Yes.

24             Q.     What is Susan Nicholson's title?

Highly Confidential - Subject to Further Confidentiality Review

Page 80

1          A.     She's a medical doctor.  I think

2     her current title -- she's currently in the

3     office of the chief medical officer currently

4     responsible for women's health, but she's held

5     a variety of roles within J&J.

6          Q.     What was the time period that

7     J&J was involved with the development and

8     drafting of the opioid REMS?

9          A.     I believe the request from FDA

10    and the public meetings were around the 2009

11    time period and J&J was involved in an

12    industry working group during that time

13    period.  And then the REMS also required some

14    postmarketing requirement studies, and J&J was

15    involved in some of the studies as well.

16          Q.     Okay.  And the postmarketing

17    studies, was that also in the 2009 time

18    period?

19          A.     Well, they would have continued

20    from there.  So once the REMS was approved and

21    in place, then the -- I'm not sure how long

22    the trials went on.  Could have been several

23    years.

24          Q.     Okay.  Is there a record of any

Highly Confidential - Subject to Further Confidentiality Review

Page 81

1          donations or payments made by J&J in

2          connection with those efforts?

3                    A.     I'm sorry.  Payments to whom or?

4                    Q.     To anyone.

5                    MR. GALIN:  Objection to form.

6                    THE WITNESS:  We're not aware

7          of -- of any payments related to the opioid

8          REMS, no.

9                    MR. ACKERMAN:  Okay.  Let's go

10         to number --

11                    (Thereupon, J&J-Cartwright

12                 Deposition Exhibit Number 5 was marked

13                  for identification.)

14                    BY MR. ACKERMAN:

15                    Q.     Ms. Cartwright, the court

16         reporter has handed you Deposition Exhibit

17         Number 5, which is a document that was

18         produced by Janssen/J&J, in this action in

19         native form at the Bates number

20         JAN-MS-00409840.  As with the other document,

21         we've included the slip sheet as the first

22         page and then the native document behind that.

23                    Take a moment to review this

24         document.  Let me know if you have seen it

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1      before.

2                      A.      I have not seen this document.

3                      Q.      Okay.  The cover page of the

4       presentation of the file says Nucynta 2011

5       Business Plan Advocacy Initiatives.

6                      Do you see that?

7                      A.      I see that, and I see that it

8       also says it's a draft.

9                      Q.      Okay.  And I take it this is not

10      a document that you reviewed in preparation

11      for this deposition, right?

12                     A.      I looked at a lot of documents.

13      I don't believe I reviewed this one, though.

14                     Q.      Okay.  If you would turn to

15      page 3, please.  That's the -- it's got the

16      title Budget Activity at the top.

17                     A.      Okay.

18                     Q.      And about halfway down the page,

19      there is a line item for Opioid REMS Advocacy

20      Support.  And if you follow it across, it says

21      $1 million.

22                     Do you see that?

23                     A.      I do.

24                     Q.      Okay.  And at the bottom where

Page 83

1          it says Totals, it says -- the -- the second

2          total there says 1 million REMS.

3                         So do you know what those -- do

4          you know whether that $1 million was actually

5          paid that's reflected in this proposed budget?

6                    A.     I do not, no.

7                    Q.     Okay.  Do you know if that

8          $1 million had been paid, what the line

9          items -- strike that.  Let me ask a -- a

10         better question.

11                        The line item says, Opioid REMS

12         Advocacy Support.

13                   A.     Um-hmm (affirmative).

14                   Q.     What does that refer to?

15                   A.     So I don't know -- you know,

16         specifically I have not seen this document.  I

17         don't have any reason to, you know, know --

18         know whether, you know, this -- this -- this

19         draft, you know, maintained this, whether this

20         payment was made or anything like that.

21                        But, you know, advocacy support

22         could mean any number of things.  You know,

23         generally education, REMS were a new concept.

24         It was a really big undertaking for the

Highly Confidential - Subject to Further Confidentiality Review

Page 84

1      healthcare community.  Prescribers had to be

2      educated, trained and, in some cases,

3      certified.  And there was a lot of concern

4      about, you know, people being afraid of

5      dealing with REMS and things like that.

6              So I could imagine, based on,

7      you know, my understanding of other

8      educational efforts we've done for, you know,

9      new initiatives that it -- it could have

10     involved some of that kind of educational and

11     advocacy support, but I don't specifically

12     know, you know, this line item.

13         Q.    Okay.  If you -- let's put that

14     one -- that document aside.

15         A.    Okay.

16              (Thereupon, J&J-Cartwright

17           Deposition Exhibit Number 6 was marked

18           for identification.)

19              BY MR. ACKERMAN:

20         Q.    Ms. Cartwright, the court

21     reporter is handing you Deposition Exhibit

22     Number 6, which is a document produced to us

23     in native form at JAN-MS-008774627.

24              Take a moment to review this

Page 85

1          document.  Let me know when you've had a

2          chance to review it.

3                    You've had a chance to review

4          it?

5                    A.     I believe so.

6                    Q.     Okay.  Do you recognize this

7          document?

8                    A.     I do not.

9                    Q.     Okay.  Does the format of the

10         document look familiar to you?

11                   A.     It does not.

12                   Q.     About two-thirds or maybe

13         three-quarters of the way down the page,

14         there's a line item -- well, if you look in

15         the lower left-hand corner it says, 2010

16         Advocacy Budget, 1.5.

17                   A.     I see that.

18                   Q.     You see that?

19                   Does that -- does the term

20         advocacy budget have any meaning to you?

21                   A.     Not particularly, no.

22                   Q.     Okay.  About three-quarters of

23         the way down the page, there is a line for

24         Opioid REMS Advocacy Support.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1                    A.     I see that.

2                    Q.     And then next to it, it says,

3         Tufts Summit.

4                    A.     Um-hmm (affirmative).

5                    Q.     Do you know what the Tufts

6         Summit is?

7                    MR. GALIN:  Objection to scope.

8                    THE WITNESS:  I do not.

9                    BY MR. ACKERMAN:

10                   Q.     Okay.  All right.  Do you know

11        whether the Tufts Summit had anything to do

12        with the opioid REMS?

13                   A.     I mean, I know --

14                   MR. GALIN:  Objection to scope.

15                   THE WITNESS:  -- I -- I know

16        that the development of the opioid REMS was a

17        major undertaking, you know, rather onerous,

18        involving a lot of different sponsors and a

19        lot of very complicated issues and that, you

20        know, it took significant time and commitment

21        from, you know, multiple parties to kind of

22        bring it about.  But I don't specifically

23        know -- and I know there were multiple

24        meetings -- I'm -- is what -- I guess is what

Highly Confidential - Subject to Further Confidentiality Review

Page 87

1          I'm trying to say, but I don't specifically

2          know what the Tufts Summit was.

3                    BY MR. ACKERMAN:

4               Q.    Okay.  Underneath Tufts Summit

5          it says -- this document says, Local

6          Markets/Payor-facing Orgs/SG/HPAD.

7                    Do you see that line item?

8               A.    I do, yes.

9               Q.    Do you know whether that line

10         item relates to opioid REMS spending?

11                   MR. GALIN:  Objection to scope

12         and form.

13                   THE WITNESS:  You know, I don't.

14         I -- I know that HPAD -- you know, assuming

15         that this is a J&J or Janssen document --

16         refers to health policy advocacy directors.

17         You know, they're a group that does a lot of

18         education and advocacy outreach, but I don't

19         know whether this was related to the opioid

20         REMS or something else or -- you know, I can't

21         speak to specifically what this is.

22                   BY MR. ACKERMAN:

23              Q.    Okay.  Put that one aside.

24                   The next document that the court

Highly Confidential - Subject to Further Confidentiality Review

Page 88

1      reporter is --

2                    MR. ACKERMAN:  I apologize.  Go

3      ahead and mark the document.

4                        (Thereupon, J&J-Cartwright

5                    Deposition Exhibit Number 7 was marked

6                    for identification.)

7                    BY MR. ACKERMAN:

8          Q.     The next document that the court

9      reporter has handed you is marked Deposition

10     Exhibit Number 7.  And that is a -- another

11     file produced to us in native form at Bates

12     number JAN-MS-00339015.

13                    Take a moment to review the

14     document.  I -- it's a lengthy document.  I

15     can tell you the only page that I have

16     questions on is page 19.

17         A.     Okay.

18         Q.     If you need to review the whole

19     document you can, but if you can only focus on

20     19, that might save us some time.

21         A.     Not all of them are numbered.

22                    MR. GALIN:  No, but 19 does have

23     a number.  It looks like this (indicating).

24                    THE WITNESS:  Okay.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 89

```
1                    MR. ACKERMAN:  I don't know why
2        that is.
3                    THE WITNESS:  Oh, there is it
4        is.  Okay.  Okay.
5                    BY MR. ACKERMAN:
6        Q.    Okay.  You've -- you've had a
7        chance to review it?
8        A.    Well, at least page 19.
9        Q.    At least page 19?
10       A.    Yes.
11       Q.    And that's the only -- the
12       question I have is if you look at page 19,
13       there is a bullet point that says, Key
14       Investments.  And a table underneath that
15       bullet point in the third row says, REMS,
16       Advocacy, FED, Regional, State, and then cost
17       250K, which I assume means $250,000.
18                    Do you know what payments are
19       referred to in this -- in this table?
20       A.    You know, as I've said, I -- I
21       have an understanding as to generally how we
22       support education and advocacy efforts for new
23       initiatives.  So I would assume it's in
24       keeping with that kind of thing, you know, if
```

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1          these payments were actually even made, but I

2          don't know the specific payments.

3                  Q.    Okay.  All right.  You can put

4          that document aside.

5                        Topic 25(d) is lobbying efforts,

6          governmental affairs, donations or payments

7          made in connection with the rescheduling of

8          opioids or your opioid products from a

9          Schedule III narcotic to a Schedule II

10         narcotic.

11                       What, if any, lobbying efforts

12         or governmental affairs activities did J&J

13         undertake in connection with the rescheduling

14         of opioids or its opioids from a Schedule III

15         to a Schedule II narcotic?

16                       MR. GALIN:  Objection to form.

17                       THE WITNESS:  Based on our

18         efforts to prepare, we are not aware of any.

19                       BY MR. ACKERMAN:

20                 Q.    Okay.  We can move on to topic

21         (e), then, which is the nature and scope of

22         opioid-related lobbying efforts or

23         governmental affairs activities related to the

24         Joint Commission on Accreditation of

Highly Confidential - Subject to Further Confidentiality Review

Page 91

1          Healthcare Organizations.  And I -- this is

2          the -- I assume the organization you were

3          trying to refer to earlier?

4                    A.      It is.

5                    Q.      And informally I'm going to

6          refer to this organization as JCAHO.

7                    A.      I will do the same.

8                    Q.      That's -- that's perfect.  Yeah.

9          I just wanted to make sure you understood what

10         I was referring to.

11                   A.      Um-hmm (affirmative).

12                   Q.      What is JCAHO?

13                   A.      So it's an accreditation

14         organization for, you know, all kinds of

15         hospitals, and they provide guidelines and

16         best practices in addition.

17                   Q.      Has J&J participated in any

18         lobbying efforts or governmental affairs

19         activities related to JCAHO's pain standards

20         for hospital accreditation?

21                   A.      So it's my understanding that we

22         received a request from them to help support

23         development of the monograph and that we did

24         so.

Highly Confidential - Subject to Further Confidentiality Review

Page 92

1               Q.     And when was this request

2       received?

3               A.     I believe -- you know, at this

4       moment it's not coming to me.  I'll let you

5       know if I can pull it up --

6               Q.     Okay.

7               A.     -- that date.

8               Q.     Are there -- who were the

9       individuals involved with this effort?

10              A.     They were individuals from our

11      medical affairs group.

12              Q.     Do you know the names of any

13      Janssen employees specifically?

14              A.     I believe Bruce Moskovitz and

15      Gary Vorsanger may have been involved in this

16      as well.

17              Q.     Okay.  You said it was a -- a

18      request to support the development of a

19      monograph.

20                     Did that monograph have a title

21      or a name?

22              A.     I don't know the specific title.

23      I believe there was an initial monograph and

24      then a few years later a -- a follow-on.

Page 93

1                   Q.     Okay.  And what specifically did

2         that monograph address?

3                   A.     I -- I think it was related to

4         pain management specifically.

5                   Q.     I understand you didn't -- you

6         don't remember the date.

7                          Is this a recent effort or was

8         this earlier?

9                   A.     I -- I'm thinking early 2000s --

10                  Q.     Okay.

11                  A.     -- but don't recall the exact

12        year.

13                  Q.     It predated your joining J&J,

14        though; is that correct?

15                  A.     Yes.

16                  Q.     Okay.

17                  A.     That's my understanding.

18                  Q.     We're going to --

19                  MR. ACKERMAN:  Do we have a

20        stapler in here?

21                  MR. GALIN:  There's probably one

22        in the back left corner of that.

23                  MR. ACKERMAN:  So there are a

24        set of documents that were produced by Janssen

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1          as a family, and I want to make sure I keep

2          them together, hopefully in the right order,

3          so --

4                    MR. GALIN:  It seems like

5          there's a political joke to be made here.

6                    MR. ACKERMAN:  We will mark that

7          as the next exhibit.

8                         (Thereupon, J&J-Cartwright

9                    Deposition Exhibit Number 8 was marked

10                   for identification.)

11                   THE WITNESS:  Thank you.

12                   BY MR. ACKERMAN:

13         Q.    Ms. Cartwright, the court

14         reporter has handed you what is marked as

15         Exhibit Number 8.  It is a multi-page document

16         with Bates numbers JAN-MS-00654707 through

17         -711.  I'll note that two of the documents

18         that were attachments to this E-mail were

19         produced to us in native form, and so we've

20         included the slip sheet and the native files

21         in this document.

22                   Take a moment to review the

23         document.  Let me know when you've had a

24         chance to review it.

Page 95

1                        MR. ACKERMAN:  Counsel, I would

2          note that the page at 654708 is noted to be

3          withheld as not responsive.  I don't know

4          whether that's because it was -- I -- I don't

5          know why that is, but I'd ask you to look into

6          that.

7                        MR. GALIN:  I don't know why

8          that is either, but I will look into it as

9          well.

10                        MR. ACKERMAN:  Okay.  Thank you.

11                        MR. GALIN:  I'm just not -- I

12          just want to make sure I'm -- oh, okay.

13                        BY MR. ACKERMAN:

14             Q.     Have you reviewed it?

15             A.     At high level, yes.

16             Q.     Okay.  Sure.

17                        Have you seen this document

18          before?

19             A.     I believe I've seen parts of

20          this document.

21             Q.     Okay.  Which parts of the

22          document have you seen?

23             A.     I believe I've seen the last

24          page, 654711.

Page 96

1          Q.     Okay.  Is this -- if you turn

2     back to the first page, the subject matter of

3     this E-mail says, JCAHO pain management, Jean

4     Gillespie.

5                Is this E-mail referring to the

6     pain management project that you testified to

7     earlier?

8          A.     I believe so, yes.

9          Q.     Okay.  And the E-mail says or

10    appears to ask Gary Vorsanger to take the lead

11    on the project.

12               Did -- did Gary Vorsanger, in

13    fact, take the lead on this -- this project?

14         A.     I believe that's the case.

15         Q.     Okay.  Did Janssen provide any

16    financial support to JCAHO in connection with

17    the drafting or promotion of its pain

18    management standards?

19         A.     It's my understanding that we

20    did provide funding.

21         Q.     Okay.  When?

22         A.     So in preparing, I think it was

23    a little difficult for us to determine exactly

24    when and -- and over what time period, but I

Highly Confidential - Subject to Further Confidentiality Review

Page 97

1          believe in the early 2000s.

2                    Q.     Okay.  And approximate -- or do

3          you know how much funding was provided?

4                    A.     I believe it was 50,000, but I'm

5          not sure if that was just -- just that or --

6          or maybe there was another time period

7          involved, too.

8                    Q.     Okay.  Was the 50,000 in a

9          single payment or in multiple payments?

10                   A.     That I do not know.

11                   Q.     Okay.  Do you know -- okay.

12                          Other than Mr. Moskovitz and

13         Mr. Vorsanger, was anyone else at J&J involved

14         in this JCAHO pain management effort?

15                   A.     I believe some others who, you

16         know, might have reported to them or been --

17         you know, others in -- in medical affairs may

18         have had some involvement in, you know,

19         providing scientific input.

20                   Q.     Okay.  Specifically, do you know

21         who?

22                   A.     I do not.

23                   Q.     All right.  Why did J&J become

24         involved in increasing awareness of the JCAHO

Page 98

1        guidelines in pain -- pain management?

2                A.     Well, I believe that we feel

3        like it's important to ensure that people who

4        are suffering from pain have adequate access

5        to appropriate treatments and that education

6        is -- is a -- you know, a good thing in --

7        in -- in the different product areas and

8        disease areas where we work.

9                       And so it would not be, you

10       know, atypical for us to provide funding or,

11       you know, want to have a seat at the table

12       when something like this was sort of being

13       discussed and -- and proposed.

14               Q.    When you say adequate access to

15       appropriate treatments, does that include the

16       prescribing of Janssen -- or J&J's opioid

17       products?

18               A.     Well, it could, depending on the

19       decision of the appropriate, you know, medical

20       professional.

21               Q.    Okay.  Did the JCAHO guidelines

22       in pain management -- strike that.  Okay.

23                      Let's move on to the next topic,

24       which is 25(f).  And this is lobbying efforts

Page 99

1          or governmental affairs activities related to

2          the Medicare Modernization Act of 2003.

3                    Do you have an understanding as

4          to what the Medicare Modernization Act of 2003

5          is or was?

6          A.     I think I have a general

7          understanding.

8          Q.     And what is that understanding?

9          A.     That it was sort of the genesis

10         of Part D in the prescription drug benefit.

11         Q.     And did J&J engage in any

12         lobbying efforts or governmental affairs

13         activities in connection with the Medicare

14         Modernization Act of 2003?

15         A.     We did.

16         Q.     And what were those activities?

17         A.     Well, it was really a major

18         undertaking for our industry, and we were, you

19         know, focused on it at a variety of, I think,

20         sort of different, you know, levels, looking

21         at issues around negotiation, you know,

22         therapeutic area classification, how

23         formularies were put together.

24                    So we were, you know, looking at

Highly Confidential - Subject to Further Confidentiality Review

Page 100

1           the different policy issues that were raised

2           and, you know, actively engaged in -- in

3           support of it and -- and in ensuring that it

4           was designed, you know, in a way that would

5           work for the system.

6                 Q.    Okay.  Who were the individuals

7           at J&J who were involved in that effort?

8                 A.    I think it would have been a --

9           you know, a real cross section of our

10          government affairs and policy group.  So those

11          who were on the federal affairs team at the

12          time, as well as those involved in, you know,

13          policy.

14                Q.    Did J&J engage any outside

15          lobbyists in connection with that effort?

16                A.    Well, J&J maintains

17          relationships with several consultants who

18          lobby on our behalf on a number of issues.

19          They're, you know, on a retainer sort of

20          status, so they're -- I would presume, just

21          based on the way we normally operate, that

22          it's very likely that they could have also

23          been engaged in assisting in those efforts.

24                Q.    And who were the outside

Highly Confidential - Subject to Further Confidentiality Review

Page 101

1          consultants during this time period, 2003, who

2          would have -- or who did assist in the

3          lobbying efforts in connection with the

4          Medicare Modernization Act?

5                    A.      You know, I think that's

6          something we would have to try to pull

7          together for you.  You know, several of the

8          people who were around in 2003 are no longer

9          with the company.  So we did what we could to

10         talk to people, you know, were there -- who

11         were still in the company.  And I -- I think

12         we'd have to try to see if the -- you know, if

13         there's anyone who was still in the company

14         who would, you know, have known who the

15         lobbyists were at that time.

16                   Q.      Were any of -- were any of J&J's

17         lobbying efforts or -- or governmental affairs

18         activities in -- undertaken with respect to

19         this Medicare Modernization Act specific to

20         opioids?

21                   A.      I do not believe that was the

22         case.  I think we were generally focused on

23         the high level, you know, issues and design of

24         the -- of the program.

Page 102

1          Q.    Okay.  Were any of the efforts

2     specific to the treatment of pain generally?

3          A.    I do not believe so.

4          Q.    Okay.  Let's move on to topic

5     25(g), which is the lobbying efforts or

6     governmental affairs activities concerning

7     direct to consumer advertising regulations.

8     The first question is the broad one:

9               Has J&J engaged in any lobbying

10     efforts or governmental affairs activities

11     related to direct to consumer advertising

12     regulations?

13          A.    No, we have not, is my

14     understanding, engaged in lobbying around

15     that.

16          Q.    Any governmental affairs

17     activities?

18          A.    Well, we have to, you know,

19     liaise with the FDA about our own products and

20     our own advertising and things like that, but

21     I'm not aware of anything sort of broader

22     than -- than product-specific efforts and

23     activities.

24          Q.    In your preparation for the

Highly Confidential - Subject to Further Confidentiality Review

Page 103

1          deposition today, did you inquire into any

2          product-specific activities or efforts related

3          to direct to consumer regulations?

4                    A.     I did look at some

5          product-specific activity.

6                    Q.     Okay.  Were there any

7          product-specific activities that J&J undertook

8          in connection with Duragesic or Nucynta?

9                    A.     In my preparation, I did look at

10         some activity that we took around Duragesic

11         advertising.

12                   Q.     Okay.  And what was that

13         activity?

14                   A.     We reached out to FDA when we

15         determined that we thought it would make sense

16         to do some direct to consumer advertising and

17         asked, you know, for input on the appropriate

18         way to do that.  And I believe the

19         determination was to do print advertising

20         only, that that would be the best way to reach

21         the, you know, appropriate audience.

22                   Q.     Do you recall the approximate

23         time period when this occurred?

24                   A.     I mean, I don't.  I'm sorry.

Page 104

1           Q.    Okay.  The direct to consumer

2     advertising that J&J reached out to the FDA

3     concerning, did that advertising have a -- a

4     name or a -- a subject matter?  Strike the

5     subject matter.

6                 Did that advertising have a

7     name?

8           A.    Did the advertising have a name?

9     Not that I can recall.

10          Q.    Okay.  Was there any colloquial

11    name that it was referred to within J&J?

12                MR. GALIN:  Objection to form

13    and scope.

14                THE WITNESS:  Not that I'm aware

15    of.

16                BY MR. ACKERMAN:

17          Q.    Okay.  Are you aware of what the

18    ads were that J&J discussed with the FDA

19    concerning Duragesic?

20                MR. GALIN:  Objection to form

21    and scope.

22                THE WITNESS:  You know, I'm --

23    I'm not in marketing or advertising, so I'm

24    really just more familiar with what we did in

Highly Confidential - Subject to Further Confidentiality Review

Page 105

1              terms of outreach to FDA.  So I don't know any

2              specifics about, you know, the actual content

3              or -- or nature of the ads.

4                        BY MR. ACKERMAN:

5                   Q.    So the outreach to the FDA was

6              to ask about the ad; is that correct?

7                   A.    That's my understanding.

8                   Q.    Okay.  And so what questions

9              were asked?

10                  A.    Again, you know, not having real

11             background or expertise in that area, I

12             believe that they were, you know, informing

13             FDA that they were thinking about doing some

14             direct to consumer advertising and asking for

15             input on the proposed approach --

16                  Q.    Okay.

17                  A.    -- which was to do print ads.

18                  Q.    Was it a -- so what I'm trying

19             to get at here was, was it a proposed approach

20             or a specific proposed advertisement?

21                  A.    And that I do not know.

22                  Q.    Okay.  Ms. Cartwright, the --

23                        MR. ACKERMAN:  Well, mark it

24             first.

Page 106

```
 1                    (Thereupon, J&J-Cartwright

 2              Deposition Exhibit Number 9 was marked

 3              for identification.)

 4                    BY MR. ACKERMAN:

 5              Q.    Ms. Cartwright, the court

 6    reporter has handed you Deposition Exhibit

 7    Number 9, which is a multi-page document with

 8    the Bates numbers JAN-MS-00479781 through

 9    -783.

10                    Take a moment to review this

11    document.  Let me know if you've seen it

12    before.

13              A.    Okay.

14              Q.    Have you seen this document

15    before?

16              A.    I do not believe I have.

17              Q.    Okay.  This -- it's entitled

18    Record of FDA Contact.

19                    Do you know whether this

20    document concerns the direct to consumer

21    efforts that you had described earlier?

22              A.    I believe it does.

23              Q.    Okay.  Do you see under Key

24    Points the first point says, FDA expressed
```

Highly Confidential - Subject to Further Confidentiality Review

Page 107

```
 1          concerns that DTC advertising could result in

 2          increased serious adverse events due to

 3          inappropriate use or use by inexperienced

 4          physicians?

 5                    A.    I do.

 6                    Q.    Is it your understanding that

 7          that is a -- a point that the FDA communicated

 8          to Janssen?

 9                    MR. GALIN:  Objection to form.

10                    THE WITNESS:  I believe so.

11                    BY MR. ACKERMAN:

12                    Q.    Okay.  Now, at the top of the

13          first page of this document it says, Janssen

14          Pharmaceutica Research Foundation.

15                    Do you see that?

16                    A.    I do.

17                    Q.    And is Janssen Pharmaceutica

18          Research Foundation a subsidiary of J&J?

19                    A.    I'm actually not familiar with

20          that -- that name, Pharmaceutica Research

21          Foundation.

22                    Q.    Is Janssen generally a J&J

23          company?

24                    A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 108

1          Q.     Thanks.

2                 And I think I already asked

3      this, but do you know -- well, if you turn to

4      the last page of the document, the -- the very

5      last paragraph says, Regarding next steps, we

6      agreed we would revise the draft ad and

7      patient brief summary and resubmit.

8                 Do you see that sentence?

9          A.     I do.

10         Q.     Do you know whether Janssen did,

11     in fact, revise the draft ad and patient brief

12     summary and resubmit to the FDA?

13         A.     Based upon what I know about the

14     company, I'm -- I'm sure we did.

15         Q.     Okay.

16         A.     I would be shocked if we did

17     not.

18                MR. ACKERMAN:  So let's go with

19     22 as the next document.

20                BY MR. ACKERMAN:

21         Q.     And, again, you don't know

22     sitting here today what the draft ad was; is

23     that right?

24         A.     That is correct.

Page 109

1              (Thereupon, J&J-Cartwright

2              Deposition Exhibit Number 10 was marked

3              for identification.)

4              BY MR. ACKERMAN:

5              Q.    Ms. Cartwright, the court

6    reporter has handed you a document that has

7    been marked as Deposition Exhibit 10.  It's a

8    single-page document with the Bates number

9    JAN-MS-00480543.

10             Take a moment to review the

11   document.  Let me know when you've had a

12   chance to review it.

13             A.    Okay.  I've reviewed it.

14             Q.    Okay.  If you look at

15   Exhibit 9 -- I'll try to put them side by

16   side -- Exhibit 9 has a date of September 15th

17   2000; is that right?

18             A.    Yes.

19             Q.    And then Exhibit 10 has a date

20   of December 18th 2000.

21             Do you see that?

22             A.    Yes.

23             Q.    And then Exhibit 10 says, I

24   called Mark to let him know of our change in

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1          plans regarding Duragesic advertising.  I told

2          him that, following much internal discussion,

3          we had decided not to proceed with the Direct

4          to Consumer advertising campaign at this time.

5                    Do you see that note?

6          A.    I do.

7          Q.    And is this Exhibit 10 a record

8          of what J&J communicated to the Food and Drug

9          Administration?

10                    MR. GALIN:  Objection to form.

11                    THE WITNESS:  That's my

12          understanding, based on what I see.

13                    BY MR. ACKERMAN:

14          Q.    Okay.  You mentioned you had

15          believed that J&J had gone forward with the

16          print ad.

17          A.    No, what I meant was that I

18          would have -- I believed we would have revised

19          it before proceeding.

20          Q.    Okay.

21          A.    So it looks like we made a

22          decision not to continue the plan.  But I

23          meant I was -- based on what I read at the end

24          of Exhibit 9 and my understanding of just the

Highly Confidential - Subject to Further Confidentiality Review

Page 111

1          company and the way we operate that we would

2          not have proceeded without addressing FDA's

3          concerns.

4                    Q.    I -- I understand.

5                    A.    Okay.

6                    Q.    Thank you for clarifying.

7                          Do you know whether Janssen ever

8          published the direct to consumer campaign for

9          Duragesic?

10                   MR. GALIN:  Objection to scope

11         and form.

12                   THE WITNESS:  I do not know

13         whether we ever published any DTC ad for

14         Duragesic.  You know, it could have been a

15         different time period, different ad, you know,

16         beyond this one.  I'm not sure.

17                   BY MR. ACKERMAN:

18                   Q.    Okay.  All right.  Are you aware

19         of any other governmental activity or lobbying

20         effort that J&J engaged in concerning direct

21         to consumer advertising regulations?

22                   A.    No, I am not.

23                   Q.    Let's move on to topic 25(h),

24         which is lobbying efforts or governmental

Highly Confidential - Subject to Further Confidentiality Review

Page 112

1           affairs activities related to regulations

2           allowing the prescription of 90-day supplies

3           of opioids or Schedule II narcotics.

4                       And that, again, is another

5           topic that you are designated to testify on;

6           is that correct?

7                       A.    It is.

8                       Q.    All right.  What lobbying

9           efforts or governmental affairs activities, if

10          any, did J&J engage in concerning regulations

11          allowing the prescription of 90-day supplies

12          of opioids or Schedule II narcotics?

13                      A.    I am not aware of any.

14                      Q.    I think, if you looked at

15          Exhibit 3 earlier -- and we had discussed

16          this -- there was a reference to a -- a 60 --

17          a -- a 60-day prescription limit.  If you want

18          to pull it out, we can look at it.

19                      Oh, it's Exhibit 2.  My

20          apologies.  It was at the page that started

21          Examples of Successes.

22                      A.    Okay.

23                      Q.    And you can see there that

24          there's the reference to Defeated 60 unit per

Highly Confidential - Subject to Further Confidentiality Review

Page 113

1      Rx limit.

2              A.      But I'm reading this as a PhRMA

3      document --

4              Q.      Okay.

5              A.      -- or a PhRMA, you know, slide,

6      as I'm understanding this, and it's referring

7      to, you know, I presume what PhRMA has done.

8      But I do see that, Defeated 60-day.

9              Q.      And -- and -- and my question

10     is, are you aware of any efforts by J&J or

11     Janssen concerning a 60 unit per prescription

12     limit in -- provision in the Georgia PMP

13     legislation?

14             A.      You know, I'm aware of us

15     supporting appropriate restrictions and, you

16     know, things to prevent diversion and misuse

17     and abuse, but I'm not aware of this specific

18     Georgia bill.

19             Q.      Okay.  And that brings us to

20     topic 25(i), which is lobbying efforts or

21     governmental affairs activities related to

22     opioid or pain medication prescribing

23     guidelines.

24                     Again, that's another topic that

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1        you're designated to testify here on today?

2              A.     It is.

3              Q.     Okay.  And what lobbying efforts

4        or governmental activities, if any, has J&J

5        engaged in concerning opioid or pain

6        medication prescribing guidelines?

7              A.     You know, I'm aware of us being

8        supportive, you know, of things that restrict

9        use to avoid, you know, misuse and diversion

10       and things like that and -- you know, as long

11       as it's balanced with appropriate access.

12                    So generally I know that, you

13       know, that's been our position, both federal

14       and state level.

15             Q.     But in -- other than just

16       general support --

17             A.     Um-hmm (affirmative).

18             Q.     -- are there specific efforts or

19       activities that J&J has undertaken in

20       connection with opioid or pain medication

21       prescribing guidelines?

22                    MR. GALIN:  Objection to scope.

23                    THE WITNESS:  Not that I'm

24       specifically aware of, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 115

1          BY MR. ACKERMAN:

2          Q.     And just to be clear, are there

3     specific lobbying efforts or governmental

4     affairs activities that J&J has undertaken in

5     connection with opioid or pain medication

6     prescribing guidelines?

7               MR. GALIN:  Objection to scope.

8               MR. ACKERMAN:  Can I ask how

9     that's outside the scope?

10              MR. GALIN:  Just the inclusion

11    of pain, because I don't know if there have

12    been -- we prepared this witness, and my

13    understanding is the topic was on -- related

14    to your opioids.

15              And, as you may -- I'm sure

16    you're aware Johnson & Johnson has a larger

17    pain franchise, which includes, for example,

18    Tylenol with acetaminophen.  I just don't know

19    if there have been guidelines that we've

20    participated in nor have we prepared the

21    witness on any of those guidelines.

22              MR. ACKERMAN:  Okay.  Let's just

23    clarify this real quick.

24

Highly Confidential - Subject to Further Confidentiality Review

Page 116

1              (Thereupon, J&J-Cartwright

2              Deposition Exhibit Number 11 was marked

3              for identification.)

4          BY MR. ACKERMAN:

5          Q.     The court reporter has marked

6     Exhibit Number 11, which is a document

7     entitled Defendants Johnson & Johnson, Janssen

8     Pharmaceuticals, Inc., Ortho-McNeil-Janssen

9     Pharmaceuticals, Inc. and Janssen

10    Pharmaceutica, Inc. Objections to Topics in

11    Plaintiffs' Notice of Videotaped 30(b)6

12    Depositions.

13              And turn to page 23.  That's

14    where topic 25 is located.  And then 25(i)

15    says, Opioid or pain medication prescribing

16    guidelines.

17          MR. ACKERMAN:  So I just want to

18    clarify, is it your position that the witness

19    was only prepared with respect to opioid

20    prescribing guidelines?

21          MR. GALIN:  It's our position

22    that, consistent with our response to number

23    25, that we prepared the witness on pain

24    management involving opioids and opioids, not

Highly Confidential - Subject to Further Confidentiality Review

Page 117

1          every guideline that may not affect or be

2          impacted by this litigation.

3                    So, for example, I don't know

4          sitting here today -- and I'm assuming the

5          witness doesn't -- whether or not there was

6          topics involving the use of Tylenol, which in

7          theory, based on your topic, ignoring our

8          response, could be included.  But on topics

9          associated with opioids and pain guidelines

10         that considered opioids, we did prepare the

11         witness.

12                   MR. ACKERMAN:  So to the extent

13         there were guidelines that concerned opioids,

14         the witness was prepared on them --

15                   MR. GALIN:  Correct.

16                   MR. ACKERMAN:  -- is that --

17         that's -- okay.

18                   MR. GALIN:  Correct.

19                   MR. ACKERMAN:  All right.  Thank

20         you for -- all right.  I'm glad we clarified

21         that.

22                   BY MR. ACKERMAN:

23         Q.        So with that clarification -- I

24         don't remember whether I asked the question

Page 118

1      yet or not, but I'll -- we'll just do it again

2      and start over.

3                      Did J&J engage in any lobbying

4      efforts or governmental affairs activities in

5      connection with opioid or pain medication

6      prescribing guidelines that referenced or

7      related to opioids?

8              A.      And so beyond, you know, general

9      activity around, you know, opioids and

10     monitoring and tracking bills that might have

11     touched on, you know, prescribing -- you know,

12     requirements for prescribers and things like

13     that, no.

14             Q.      Okay.  You say -- you reference

15     monitoring and tracking bills.

16             A.      Um-hmm (affirmative).

17             Q.      Does that mean bills that are

18     introduced in -- does that include bills that

19     are introduced in state legislatures?

20             A.      Yes.  Sorry.  Yes.

21             Q.      And did Janssen engage -- did

22     J&J engage in any lobbying concerning bills

23     that were introduced in state legislatures?

24             A.      Well, any bills?

Highly Confidential - Subject to Further Confidentiality Review

Page 119

1           Q.    Well, I'm sorry.  Related to the

2     prescribing of opioids.

3           A.    So not -- we did not

4     specifically lobby around bills that were

5     related to prescribing guidelines, no.

6           Q.    Are there any other -- other

7     than specifically lobbying, are there other

8     governmental affairs activities that Janssen

9     engaged in in connection with bills that were

10     introduced in state legislatures concerning

11     prescribing of opioids?

12           A.    I'm sorry.  Can you repeat that?

13           Q.    Yeah, let me just give you the

14     document.  It's easier.

15           A.    Okay.

16                (Thereupon, J&J-Cartwright

17              Deposition Exhibit Number 12 was marked

18               for identification.)

19                THE WITNESS:  Thank you.  Okay.

20                BY MR. ACKERMAN:

21           Q.    The court reporter has handed

22     you what's been marked as Exhibit 12.  It is

23     an E-mail with the Bates number

24     JAN-MS-03000683.

Highly Confidential - Subject to Further Confidentiality Review

Page 120

1                    Take a moment to review this

2         document.  Let me know if you've seen it

3         before.

4                    A.    Okay.

5                    Q.    Okay.  Have you seen this

6         document before?

7                    A.    I have not.

8                    Q.    If you look at the bottom of the

9         first page, it says opioid -- oh, I'm sorry --

10        it says Ohio Prescription Drug Abuse Task

11        Force.

12                   Do you see that header?

13                   A.    I do.

14                   Q.    And then when you flip the page

15        over, there is a line that says -- it's the

16        third bullet point -- Gordon continues to work

17        with Zach, lobbyist to leverage an opportunity

18        to present nonbranded resources such as

19        Prescribe Responsibly to the Task Force.

20                   Do you see that?

21                   A.    I do.

22                   Q.    What is Prescribe Responsibly?

23                   A.    So I know that we, J&J, had sort

24        of nonbranded educational materials about the

Highly Confidential - Subject to Further Confidentiality Review

Page 121

1          safe use of -- of prescription products.  I

2          don't specifically know Prescribe Responsibly,

3          but I believe it may have been related to some

4          of those nonbranded educational materials.

5                    Q.    Okay.  Do you know whether J&J

6          or anyone acting on J&J's behalf presented

7          prescribe responsibly to the Ohio Prescription

8          Drug Abuse Task Force?

9                    A.    So I know that we do, when the

10         opportunity presents itself, try to educate

11         on, you know, different aspects of -- of our

12         products, including, you know, things like

13         responsible prescribing.  So I don't know

14         specifically whether, you know, this Ohio

15         Prescription Drug Abuse Task Force received

16         such a presentation, but I do know that that

17         is the kind of work that people within J&J

18         would do, to go out and try to educate about

19         those kinds of things.

20                   Q.    Sure.  And they are educating

21         individuals who hold positions in governments;

22         is that correct?

23                   A.    They could be.

24                   Q.    Is -- is that education run from

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1        the governmental affairs department of J&J?

2                A.      In many cases, yes.  But it

3        could -- you know, it's -- it's a very big

4        company with a lot of different components,

5        and so it could also be done by, you know, the

6        strategic customer group, for example, or, you

7        know, others besides government affairs and

8        policy.

9                Q.      So in Ohio, did J&J provide any

10       presentations to -- or educational

11       presentations to the Ohio Prescription Drug

12       Abuse Task Force?

13               A.      I know that we partnered with

14       the Ohio State Medical Association around

15       education around like a -- it was an Ohio bill

16       around pill mills.  So I know that there were

17       efforts in Ohio to provide education about,

18       you know, new requirements, new restrictions

19       and things like that.

20                      I don't specifically know, you

21       know, what this is referring to in, you know,

22       November of 2010 with the Ohio Prescription

23       Drug Abuse Task Force.

24               Q.      Can you describe -- you -- you

Highly Confidential - Subject to Further Confidentiality Review

Page 123

1       mentioned a partnership with the Ohio State

2       Medical Association.

3               A.      Um-hmm (affirmative).

4               Q.      What -- can you describe more

5       detail about that, please?

6               A.      So I -- I know you previously

7       asked me about an Ohio bill related to -- I

8       can't remember how you characterized it,

9       but -- but there was an Ohio bill that I think

10      of as like a pill mill bill that was, you

11      know, put in place to restrict and -- and

12      place some, you know, requirements around pain

13      clinics' prescribing practices to connect

14      prescribers up to a reporting system, things

15      like that.

16                      And I know that we partnered

17      with the Ohio State Medical Association and

18      another group to provide education, because

19      there was a concern that there would be, you

20      know, this unintended consequence of

21      prescribers thinking, you know, I'm going to

22      stop prescribing altogether, even when

23      appropriate, because of, you know, concerns

24      about these new requirements and restrictions.

Highly Confidential - Subject to Further Confidentiality Review

Page 124

1           I think there was even a potential fine of,

2           you know, $5,000 for prescribers.  So we

3           wanted to make sure that people, you know,

4           understood the restrictions and exactly, you

5           know, how they were in place, but you could

6           deal with them responsibly.

7                     So I know there were efforts

8           like that, but I don't know specifically what,

9           you know, this E-mail is referring to.

10          Q.     Those efforts that -- the

11          education that was provided was -- to whom was

12          that education provided?

13          A.     I'm not exactly sure the full

14          universe, but I believe it was targeted

15          towards prescribers and people in the

16          healthcare field.

17          Q.     Okay.  Did Janssen's partnership

18          with the Ohio State Medical Association

19          involve providing education to any individuals

20          in -- in the Ohio government?

21          A.     I don't specifically know, you

22          know, who was, you know, accessing the

23          educational materials.

24          Q.     Okay.  At J&J are there

Page 125

1          different individuals responsible for federal

2          government activities than are responsible for

3          state government activities?

4                    A.     Yes.

5                    Q.     And between the states, are

6          there -- are specific states assigned to

7          specific individuals?

8                    A.     Yes.

9                    Q.     Who is the governmental affairs

10         person at J&J who was assigned to Ohio efforts

11         in 2010?

12                   A.     I believe it was Richard Ponder.

13                   Q.     Is Richard Ponder still with the

14         company?

15                   A.     He is.

16                   Q.     And did you speak with Richard

17         Ponder in preparation for this deposition?

18                   A.     I know my counsel had multiple

19         conversations with him --

20                   Q.     Okay.

21                   A.     -- to aid my preparation.

22                   Q.     Did Mr. Ponder provide any

23         information regarding activities J&J

24         undertook, governmental activities J&J

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1          undertook in the state of Ohio?

2                    MR. GALIN:  Can we just -- can I

3          interject for just one second?

4                    MR. ACKERMAN:  Um-hmm

5          (affirmative).

6                    MR. GALIN:  I -- I -- I just --

7          you can tell me if you want me to dismiss the

8          witness for this or not, but I just want to

9          clarify that I think the witness may be

10         mistaken about something.  And so I -- I don't

11         want you to waste your time going down a

12         rabbit hole unnecessarily.

13                   MR. ACKERMAN:  Got it.

14                   MR. GALIN:  So I'm happy to

15         share that now, happy to share it --

16                   MR. ACKERMAN:  Why don't you go

17         ahead and share it now.

18                   MR. GALIN:  Okay.

19                   Mr. Ponder was not the

20         individual responsible for Ohio.  That's why I

21         think she confused your O states.  He was

22         Oklahoma.

23                   THE WITNESS:  Oh, I did.  I did.

24                   MR. GALIN:  And I have

Highly Confidential - Subject to Further Confidentiality Review

Page 127

1        represented Mr. Ponder in a deposition on

2        lobbying efforts in the state of Oklahoma, so

3        while I do have information on that, it is not

4        the information relevant to this and he was

5        not the person who we shared.

6                And, while we did provide the

7        witness and educated her on certain Ohio

8        activities and it's clear she can't remember

9        at the moment the name, I'm -- I'm sure you

10       have the documents with the name -- happy --

11       and follow up in a meet and confer to discuss

12       if you need names, but I just don't want you

13       to waste your time on the Ponder issue because

14       that's --

15                MR. ACKERMAN:  Okay.

16                MR. GALIN:  -- not the right

17       person.

18                MR. ACKERMAN:  Okay.

19                BY MR. ACKERMAN:

20          Q.    So what other activities did --

21       governmental activities did J&J undertake in

22       the state of Ohio?

23          A.    Just generally or?

24          Q.    In -- in connection with opioid

Highly Confidential - Subject to Further Confidentiality Review

Page 128

1          or pain medication prescribing.

2                    A.     So, you know, I'm aware of the

3          efforts around the -- the pill mill bill.  And

4          then I believe, as if -- with any state, you

5          know, just ongoing monitoring and tracking of

6          various bills and proposals that were, you

7          know, moving related to opioids.

8                    Q.     Okay.  Are you familiar with the

9          acronym OARRS?

10                   A.     I am.

11                   Q.     Okay.  What is OARRS?

12                   A.     I -- so I know it's the Ohio Rx

13         reporting system.  I'm going to -- I think I'm

14         missing another A.  I am not sure what the A

15         was, but it's something like that, right?

16                   Q.     Yeah.  It's -- I think -- I

17         think it's automated.

18                   A.     Okay.

19                   Q.     Right.

20                   A.     Okay.

21                   Q.     Did Janssen undertake any

22         governmental activities or lobbying in

23         connection with the legislation that

24         established the OARRS system?

Highly Confidential - Subject to Further Confidentiality Review

Page 129

1           A.     I believe that we provided some

2     comments for consideration on the language as

3     it was being -- being developed.

4           Q.     And who at Janssen provided

5     those comments?

6           A.     You know, I don't know who would

7     have formally sort of submitted them, but I

8     know that anytime anyone from government

9     affairs and policy is working on something

10    like that, they would consult, you know,

11    medical affairs, safety, you know, people

12    who've -- who've been clinicians or people in

13    our clinical group to get input on, you know,

14    how to make whatever, you know, system or

15    strategy most effective.

16          Q.     Let me ask the question a

17    different way.

18                 If I was looking for those

19    comments, how would I find them?

20          A.     I don't even know that they --

21                 MR. GALIN:  Objection.

22                 Go ahead.

23                 THE WITNESS:  Sorry.

24                 I -- I don't even necessarily

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1          know that they would have been written.  You

2          know, they might have been communicated in a

3          meeting orally, you know, so I think that

4          would be a -- a pretty big undertaking --

5                    BY MR. ACKERMAN:

6          Q.    Okay.

7          A.    -- given the time frame, but --

8          Q.    And who were the individuals at

9     J&J who were responsible for communicating

10    those comments, whether they be written or

11    oral?

12          A.    I don't know exactly who would

13    have been responsible.  I would start with

14    whoever was covering the state of Ohio for

15    that time period.

16          Q.    Okay.

17          A.    Whose name we've established I

18    do not recall.

19                    MR. ACKERMAN:  Counsel, if you

20    can just provide me with that name after the

21    deposition, I think that's fine.

22                    MR. GALIN:  Yes.

23                    MR. ACKERMAN:  All right.

24                    Let's take a break.

Highly Confidential - Subject to Further Confidentiality Review

Page 131

1                    VIDEO OPERATOR:  The time is now

2         11:57 a.m.  We're going off the record.

3                    (Thereupon, a brief recess was

4              taken.)

5                    VIDEO OPERATOR:  The time is now

6         12:16 p.m.  We are back on the record.

7                    MR. ACKERMAN:  Okay.  I'm going

8         to mark this one as the next exhibit number,

9         which I think is probably 12 or 13, but I've

10        lost count.

11                   MR. GALIN:  13, I believe.

12                   (Thereupon, J&J-Cartwright

13              Deposition Exhibit Number 13 was marked

14              for identification.)

15                   BY MR. ACKERMAN:

16             Q.    Ms. Cartwright, the court

17        reporter has handed you Deposition Exhibit 13,

18        which is an E-mail Bates-numbered

19        JAN-MS-00940860 to -861.

20                   Take a minute to look at this

21        document.  Let me know when you've had a

22        chance to review it.

23             A.    Sorry.

24             Q.    Oh.

Highly Confidential - Subject to Further Confidentiality Review

Page 132

```
 1              A.    I'm ready.

 2              Q.    You've reviewed it?

 3              A.    Yes.

 4              Q.    Okay.  Great.

 5              A.    Okay.

 6              Q.    So before the break you were

 7        talk -- you were testifying a little bit about

 8        the Ohio pill mill bill and we had a bit of

 9        confusion as to who was responsible for the

10        state of Ohio.  I think this document may help

11        us here.  The name at the top is Bert Wickey.

12                   Do you see that?

13              A.    I do.

14              Q.    And who is Mr. Wickey?

15              A.    He was an HPAD, so a health

16        policy and advocacy director in the strategic

17        customer group.

18              Q.    Okay.  And was Mr. Wickey the

19        individual at J&J who was responsible for

20        state governmental affairs for Ohio?

21              A.    I don't believe so, because the

22        strategic customer group is separate than

23        state government affairs --

24              Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 133

1               A.      -- but he may have had some

2       involvement in Ohio.

3               Q.      Understand.

4                       If you turn to the -- the second

5       page, the E-mail at the bottom is from

6       Kimberly Deem-Eshleman and it says, Bert, just

7       checking in to see if you got the Prescribe

8       Responsibly binder from Maury Sullivan and

9       when exactly is your meeting with the state of

10      Ohio?

11                      Do you see that?

12              A.      I do.

13              Q.      Are you aware whether Bert

14      Wickey actually met with individuals from the

15      state of Ohio?

16              A.      I'm not specifically aware.

17              Q.      Okay.

18              A.      I mean, I know we -- you know,

19      people in his type of role might meet with

20      people who work for the state, but I don't

21      know about the specific meeting that's being

22      discussed.

23              Q.      Okay.  Turning back to the --

24      the first page in the E-mail header, there's

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1          another name there, Gordon Rosenberry.

2                    Do you see it?

3          A.     Yes.

4          Q.     It looks like the last name in

5     the cc line.

6          A.     Yes, I do.

7          Q.     Do you know who Mr. Rosenberry

8     is?

9          A.     He is a member of the state

10    government affairs team.

11         Q.     Okay.  And was he the individual

12    with responsibility for Ohio state government

13    affairs?

14         A.     I'm not exactly certain,

15    particularly not in 2011.

16         Q.     Okay.  Thank you.

17                That concludes questioning with

18    respect to topic 25.  There is one topic left

19    for which you've been designated to testify,

20    but I think we may have already covered it, so

21    let's see what we can do.

22                Topic 26 is Your communications,

23    meetings, lobbying and/or government affairs

24    activities with CMS between 1999 and 2006

Highly Confidential - Subject to Further Confidentiality Review

Page 135

```
1          related to the development, design, approval
2          and implementation of the Medicare
3          Prescription Drug Benefit Program, Part D.
4                    And I truncated that a little,
5          but -- to try to cut out some of the legalese.
6                    You understand that that is a
7          topic on which you've been designated to
8          testify here today?
9          A.     I do.
10         Q.     Okay.  You already had
11         described, I believe generally, some of the
12         company's efforts with respect to Part D,
13         correct?
14         A.     Yes.
15         Q.     Were there any additional
16         efforts related to communications with CMS
17         regarding the development, design, approval
18         and implementation of the Part D program?
19         A.     I believe there would have been
20         additional, you know, outreach and meetings
21         and engagement with CMS, but on the same
22         topics we previously discussed.
23         Q.     Okay.
24         A.     So around, you know, formularies
```

Highly Confidential - Subject to Further Confidentiality Review

                                           Page 136
1        and therapeutic classes and things like that.
2               Q.     And, again, were any of the
3        communications or outreach to CMS related to
4        Part D specific to opioids?
5               A.     Not that I'm aware of.
6               Q.     Okay.  All right.  That is it.
7               MR. ACKERMAN:  I have no further
8        questions.
9               MR. GALIN:  I'm just going to
10       ask a couple of questions just for the sake of
11       clarifying the record a bit.
12              MR. ACKERMAN:  Do you want -- do
13       you want to switch seats?  Do --
14              MR. GALIN:  I'm okay staying
15       here if that's okay with you.
16              MR. ACKERMAN:  That's fine.
17              MR. GALIN:  I don't particularly
18       expect to take much time, but I just wanted --
19        EXAMINATION BY COUNSEL FOR DEFENDANTS
20           JANSSEN AND JOHNSON & JOHNSON
21               BY MR. GALIN:
22               Q.     Ms. Cartwright, I really just
23       wanted to ask really about -- earlier today
24       you testified when you were discussing your

Highly Confidential - Subject to Further Confidentiality Review

Page 137

1          prep that you spoke with several individuals,

2          including Jennifer Thomas, correct?

3               A.     Yes.

4               Q.     Okay.  And I believe when

5          Mr. Ackerman asked you why you testified -- or

6          what subjects, I should say, you discussed

7          PhRMA dues and donations; is that correct?

8               A.     Yes.

9               Q.     Okay.  Mr. Ackerman also asked

10         you about how you would go about figuring out

11         the amount of dues by year.

12                     Do you recall that?

13              A.     I do.

14              Q.     Is that something that you tried

15         to do in preparation for your deposition

16         today?

17              A.     Yes.  Ms. Thomas tried to pull

18         that information together, and it was

19         surprisingly complicated to figure out, I

20         think in part because there were multiple

21         systems, including reports back from PhRMA,

22         reports from her, looking at, you know, what

23         was paid quarterly and -- and -- and different

24         things.  And so it was surprisingly

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1     challenging to determine exactly -- the -- the

2     exact amount of dues we had paid for a

3     particular year.

4              And so Ms. Thomas, you know,

5     established from -- from her efforts that we,

6     you know, have paid over $30 million in 2018,

7     that, you know, prior to that it was around

8     $20 million, and it has, you know, continued

9     to increase.

10             Q.    Okay.  That's the only question.

11             MR. GALIN:  Those are the only

12     questions I had.  It was one question in

13     subparts.

14             MR. ACKERMAN:  Sure.

15             MR. GALIN:  That's -- that's all

16     I had.

17             VIDEO OPERATOR:  The time is now

18     12:24 p.m.  This concludes today's deposition.

19     We're going off the record.

20                 (Thereupon, signature having

21                  not been waived, at 12:24 p.m. the

22                  deposition concluded.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 139

1                    CERTIFICATE OF DEPONENT

2              I, Carla Cartwright, do hereby certify that

3         I have read the foregoing pages, 7 through 138,

4         inclusive, which contain a correct transcript of the

5         answers given by me to the questions propounded to me

6         herein, except for changes, if any, duly noted on the

7         enclosed errata sheet.

8

9

10             _____

                            WITNESS

11

12

13

14              Sworn and subscribed to before me this ___

15         day of _____, 2019.

16

17    My commission expires:              Notary Public:

18    _____              _____

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 140

1    CASE:  In Re:  National Prescription Opiate
            Litigation

2

     DEPOSITION OF:  Carla Cartwright

3

     TAKEN:  January 17, 2019

4

5    PAGE  LINE  ERROR          CORRECTION        REASON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                              _____

                                        Witness

24

Highly Confidential - Subject to Further Confidentiality Review

Page 141

1                    CERTIFICATE OF NOTARY

2                         I, MISTY KLAPPER, the officer

3          before whom the foregoing deposition was

4          taken, do hereby certify that the witness

5          whose testimony appears in the foregoing

6          deposition was duly sworn by me; that the

7          testimony of said witness was taken by me in

8          shorthand and thereafter reduced to

9          typewriting by me; that said deposition is a

10         true record of the testimony given by said

11         witness; that I am neither counsel for,

12         related to, nor employed by any of the parties

13         to the action in which this deposition was

14         taken; and, further, that I am not a relative

15         or employee of any attorney or counsel

16         employed by the parties hereto, nor

17         financially or otherwise interested in the

18         outcome of this action.

19                         _____

                           Misty Klapper

20                         Notary Public in and for

                           the District of Columbia

21

22

23

24