Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
     IN RE:  NATIONAL PRESCRIPTION      Case No. 1:17-MD-2804
 4   OPIATE LITIGATION                  MDL NO. 2804
                                        Hon. Dan A. Polster
 5   APPLIES TO ALL CASES
 6
     _ _ _ _ _ _ _ _ _ _ _ _ _ /
 7
 8        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
 9
         VIDEOTAPED
10   DEPOSITION OF: RICHARD CHAPMAN
11   DATE:          December 18, 2018
12   TIME:          9:37 a.m. to 3:04 p.m.
13
     PLACE:         201 North Franklin Street
14                  Suite 3400
                    Tampa, Florida
15
16   PURSUANT TO:   Notice by counsel for
                    Plaintiffs for purposes of
17                  discovery, use at trial
                    or such other purposes
18                  as are permitted under
                    the Ohio Rules
19                  of Civil Procedure
20   BEFORE:        LISA A. SIMONS-CLARK, RMR, CRR
                    Notary Public, State of
21                  Florida at Large
22
23
24
25
```

Page 2

```
1   APPEARANCES:
2     MARK P. PIFKO, ESQUIRE
       Baron & Budd, P.C.
3      15910 Ventura Boulevard, Suite 1600
       Encino, California 91436
4      (818) 839-2333
5     - and -
6     WILLIAM G. POWERS, ESQUIRE
       Baron & Budd, P.C.
7      600 New Hampshire Avenue NW
       The Watergate, Suite 10-A
8      Washington, DC 20037
       (202) 333-4562
9        Attorneys for Plaintiffs and PEC
10    ELISA P. McENROE, ESQUIRE
       Morgan Lewis & Bockius, LLP
11     170f Market Street
       Philadelphia, Pennsylvania 19103-2921
12     (215) 963-5917
13    - and -
14    KELLY A. MOORE, ESQUIRE
       JOHN M. MALOY, ESQUIRE
15     Morgan Lewis & Bockius, LLP
       101 Park Avenue
16     New York, New York 10178
       (212) 309-6612
17       Attorneys for Rite Aid and Richard Chapman
18    MICHAEL S. VITALE, ESQUIRE
       BakerHostetler
19     200 South Orange Avenue
       Orlando, Florida 32801
20     (407) 649-4083
         Attorney for Cardinal Health
21
      APPEARANCES VIA TELEPHONE AND STREAM
22
      GRETCHEN M. CALLAS, ESQUIRE
23     Jackson Kelly, PLLC
       500 Lee Street East, Suite 1600
24     Charleston, West Virginia 25301
       (304) 340-1169
25       Attorney for AmerisourceBergen
```

Page 3

```
1   APPEARANCES VIA TELEPHONE AND STREAM
2     DANIEL B. MULLEN, ESQUIRE
       Marcus & Shapira, LLP
3      301 Grant Street
       One Oxford Centre, 35th Floor
4      Pittsburgh, Pennsylvania 15219
       (412) 338-5202
5        Attorney for HBC Service Co.
6     JOANNE CACERES, ESQUIRE
       Jones Day
7      77 West Wacker
       Chicago, Illinois 60601
8      (312) 782-3939
         Attorney for Walmart
9
      ALEJANDRO BARRIENTOS, ESQUIRE
10     Covington & Burling, LLP
       One City Center
11     850 Tenth Street, NW
       Washington, DC 20001
12     (202) 662-6000
         Attorney for McKesson
13
      JOHN D. LOMBARDO, ESQUIRE
14     Arnold & Porter Kaye Scholer, LLP
       777 South Figueroa Street, Suite 4400
15     Los Angeles, California 90017
       (213) 243-4000
16       Attorney for Endo and Par
17    APPEARANCES VIA STREAM:
18    ALEXANDRA K. HUGHES, ESQUIRE
       Blasingame Burch Garrard Ashley, P.C.
19     440 College Avenue, Suite 320
       Athens, Georgia 30601
20     (706) 744-4135
21    NOAH RICH, ESQUIRE
       Baron & Budd, P.C.
22     600 New Hampshire Avenue, NW
       Washington, DC 20037
23     (202) 333-4562
24
25
```

Page 4

```
1
2     STREAMING APPEARANCES, CONTINUED
3     JAY LICHTER, ESQUIRE
       Baron & Budd, P.C.
4      15910 Ventura Boulevard, Suite 1600
       Encino, California 91436
5      (818) 839-2333
6     STERLING CLUFF, ESQUIRE
       Baron & Budd, P.C.
7      15910 Ventura Boulevard, Suite 1600
       Encino, California 91436
8      (813) 839-2333
9     SCOTT SIMMER, ESQUIRE
       Baron & Budd, P.C.
10     600 New Hampshire Avenue NW
       Washington, DC 20037
11     (202) 333-4562
12    EMMA KABOLI
       LITIGATION PARALEGAL
13     Baron & Budd, P.C.
14    GRETCHEN KEARNEY
       LITIGATION PARALEGAL
15     Baron & Budd, P.C.
16
17    ALSO PRESENT:
18    Jeff Fleming, the videographer
       Willow Ashlynn, Trial Tech
19
20                INDEX
21                           PAGE
      DIRECT EXAMINATION BY MR. PIFKO         7
22    CROSS-EXAMINATION BY MS. McENROE      194
      CERTIFICATE OF OATH              197
23    REPORTER'S CERTIFICATE           198
      ERRATA SHEET                     199
24
25
```

Page 5

```
1
2           INDEX, CONTINUED
3         (ATTACHED TO THE TRANSCRIPT)
4     EXHIBITS                    MARKED
5       RITE AID CHAPMAN 1 - Rite_Aid_OMDL_0020412        87
6       RITE AID CHAPMAN 2 - Rite_Aid_OMDL_0038075 to 77  113
7       RITE AID CHAPMAN 3 - Rite_Aid_OMDL_0014948 to 51  122
8       RITE AID CHAPMAN 4 - Rite_Aid_OMDL_0024619 to 622 129
9       RITE AID CHAPMAN 5 - Rite_Aid_OMDL_0024623 to 24636 134
10      RITE AID CHAPMAN 6 - Rite_Aid_OMDL_0040183        166
        RITE AID CHAPMAN 7 - Rite_Aid_OMDL_0040184 to 198 166
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| **Page 6** | **Page 8** |

Page 6

1     THE VIDEOGRAPHER: We are now on the record.
2 My name is Jeff Fleming. I'm a videographer for
3 Golkow Litigation Services. Today's date is
4 December 18, 2018. The time is 9:37 a.m.
5     This video deposition is being held in Tampa,
6 Florida, in the matter of National Prescription
7 Opiate Litigation, MDL No. 2084 (sic) for the
8 United States District Court for the Northern
9 District of Ohio, Eastern Division.
10     The deponent is Rick Chapman. Will counsel
11 please identify themselves for the record?
12     MR. PIFKO: Good morning. Mark Pifko on
13 behalf of Plaintiffs and the PEC from the law firm
14 of Baron & Budd.
15     MR. POWERS: Will Powers from Baron & Budd.
16     MS. McENROE: Good morning. Elisa McEnroe
17 from Morgan, Lewis & Bockius on behalf of Rite-Aid
18 and the witness; and together with me I have with
19 my colleague -- me and my colleague Kelly Moore
20 and John Maloy.
21     MR. VITALE: And Michael Vitale with the law
22 firm of BakerHostetler representing Cardinal
23 Health.
24     THE VIDEOGRAPHER: Do we need counsel on the
25 phone, too?

Page 7

1     MR. PIFKO: Who's at the end? Sorry. Oh,
2 that's --
3     MS. McENROE: That's my colleague, John Maloy.
4     MR. PIFKO: And anyone on the phone, can you
5 announce yourself, please?
6     MR. BARRIENTOS: Yes. Alejandro Barrientos
7 from Covington & Burling.
8     MS. CACERES: Joanne Caceres from Jones Day
9 representing Walmart.
10     MS. CALLAS: Gretchen Callas from Jackson
11 Kelly for AmerisourceBergen.
12     MR. LOMBARDO: John Lombardo with Arnold &
13 Porter for the Endo and Par defendants.
14     THE VIDEOGRAPHER: The court reporter is Lisa
15 Clark and will now swear in the witness.
16         RICHARD CHAPMAN,
17 the witness herein, being first duly sworn on oath, was
18 examined and deposed as follows:
19     THE WITNESS: I do.
20         DIRECT EXAMINATION
21 BY MR. PIFKO:
22     Q. Good morning, Mr. Chapman.
23     A. Good morning.
24     Q. My name is Mark Pifko. I represent the
25 plaintiffs in this matter. I'm going to be asking you

Page 8

1 some questions today.
2     A. Okay.
3     Q. Let's start by having you please state and
4 spell your name for the record.
5     A. My formal name is Richard Chapman.
6 R-i-c-h-a-r-d, C-h-a-p-m-a-n, and I normally go by
7 Rick.
8     Q. Okay. And you understand that you are here in
9 connection with a lawsuit concerning opioids; is that
10 correct?
11     A. I do.
12     Q. Okay. You work at Rite-Aid?
13     A. I did.
14     Q. What -- are you retired now?
15     A. I am.
16     Q. All right. Before we get started, I want to
17 go over some ground rules. I'm sure that in preparing
18 for the deposition your counsel went over them, but
19 let's just go over a couple of the high points before
20 we get started so we make sure we're all on the same
21 page here.
22     A. Okay.
23     Q. Okay. So you see we have a court reporter
24 here that's writing everything down that we're saying.
25 As a result of the fact that we're making a written

Page 9

1 record of the proceedings, we need to be careful about
2 how we say and do certain things that we might normally
3 do in a conversation.
4     So first, we need to make sure that you give
5 an audible response to any question instead of just
6 nodding your head or shrugging your shoulders.
7 Understood?
8     A. I do. I do understand.
9     Q. Okay. And then we need to be careful about
10 saying things like uh-huh or uh-uh, because when you
11 write it down, you can't really tell the difference,
12 even though I can hear the difference; but, when we see
13 the written record, we can't. So if you're trying to
14 say yes or no, just use something that's more clear.
15     A. I understand.
16     Q. Okay. You understand that you've just been
17 sworn in and you're under oath?
18     A. I do.
19     Q. And you understand that means that you could
20 be subject to criminal or civil penalties if you lie or
21 intentionally are misleading today?
22     A. I do.
23     MS. McENROE: Objection to form.
24     THE WITNESS: Oh.
25     MS. McENROE: You may answer.

Page 10

1      THE WITNESS: I do.
2  BY MR. PIFKO:
3      Q.   Okay.  And that's a good point to note, that
4  from time to time counsel may -- various counsel in
5  here or on the phone may assert an objection.  Unless
6  they instruct you not to answer, I'm still expecting an
7  answer to the question.  Okay?
8      A.   Okay.
9      Q.   And they'll be very clear if they're going to
10  be instructing you not to answer, I'm sure.  And then
11  I'm going to be asking you about some events in the
12  past.  I'm entitled to your best recollection or
13  estimate of what occurred in the past, but at the same
14  time, I don't want you to guess.
15      So if you have absolutely no memory or ability
16  to say anything, then, you know, you can say that; but,
17  if you can have some sort of memory and you can give
18  your best estimate or recollection, I'm entitled to
19  that.  Okay?
20      A.   I understand.
21      Q.   Okay.  And then if I ask you something and you
22  don't understand it, please let me know, and I'll try
23  to use language or rephrase the question in a way that
24  makes it so that you do understand.  Okay?
25      A.   Okay.

Page 11

1      Q.   But if you answer, I'm going to assume that
2  you do understand.  Okay?
3      A.   Okay.
4      Q.   All right.  So let's talk about your
5  employment with Rite-Aid.  You -- when did you retire
6  from Rite-Aid?
7      A.   I retired in July of 2015, and I did go back
8  to work for Rite-Aid for a -- for a temporary
9  assignment in 2016 and retired again or left again in
10  2017.
11      Q.   Okay.  When did you join Rite-Aid?
12      A.   In June of 2007.
13      Q.   Let's talk for a second about this temporary
14  employment that you had.  What -- do you remember
15  approximately the month when that started?
16      A.   November of 2016.
17      Q.   And then when did you end in 2017?
18      A.   October.
19      Q.   What was the nature of that work?
20      A.   It was as the -- I'm trying to recall the job
21  title because it was an odd -- it was, like,
22  coordinating director of supply chain or something like
23  that.  It was the position that had been held by my
24  former boss as senior VP of supply chain.
25      He had left the company, and they asked me to

Page 12

1  come back temporarily.
2      Q.   Did you -- so we're here in Tampa.  I assume
3  that's where you live now?
4      A.   I live in Madeira Beach, Florida --
5      Q.   Okay.
6      A.   -- which is in Pinellas County.
7      Q.   Okay.
8      A.   It's in the Bay Area here.
9      Q.   Okay.  So did you have to leave this area to
10  take that assignment in 2016 and 2017?
11      A.   I maintained a home here and had a temporary
12  housing basically, an apartment, in the -- in the Camp
13  Hill area.
14      Q.   Okay.  So you were physically located in Camp
15  Hill to perform the duties of that job?
16      A.   I was physically located in Camp Hill.
17      Q.   And then for your -- the time between June
18  2007 and July 2015, where were you physically located?
19      A.   In Camp Hill.  Again, we maintained a home
20  here, but I had a home in Camp Hill.
21      Q.   What did you do before you joined Rite-Aid?
22      A.   I worked for Eckerd Corporation and then for
23  Brooks Eckerd Corporation.
24      Q.   What was your tenure at the Eckerd
25  Corporation?

Page 13

1      A.   I started at Eckerd Corporation in December
2  1974.
3      Q.   And then there was some sort of corporate
4  transaction between Rite-Aid and Eckerd?
5      MS. McENROE:  Objection to form.  You may
6  answer.
7      THE WITNESS:  No, not between Rite-Aid and
8  Eckerd.  By the time that transaction took place,
9  Eckerd had been purchased by a company named
10  Brooks.  So the corporation was Brooks Eckerd at
11  that time.
12  BY MR. PIFKO:
13      Q.   Okay.  So do you have a memory of when the
14  transaction between Eckerd and Brooks occurred?
15      A.   2004, I believe.  The fall of 2004, I believe.
16      Q.   Okay.  And then there was a transaction
17  between Rite-Aid and Brooks, correct?
18      A.   Correct.
19      Q.   And what was the approximate time frame for
20  that?
21      A.   It closed in June of 2007.  That's when I
22  joined Rite-Aid.
23      Q.   Did your job responsibilities change in any
24  way when -- well, what's your understanding of what the
25  nature of the transaction was between Rite-Aid and

Highly Confidential – Subject to Further Confidentiality Review

Page 14

1 Brooks?
2    MS. McENROE: Objection. Form.
3    THE WITNESS: Rite-Aid purchased Brooks Eckerd
4  Corporation.
5 BY MR. PIFKO:
6  Q. Okay. So did -- when Rite-Aid purchased
7 Brooks Eckerd Corporation, did your job
8 responsibilities change in any way?
9  A. Yes.
10  Q. Okay. We'll -- we'll go through, I guess,
11 from the start of your time with the Eckerd
12 Corporation, the various positions that you held.
13  A. Okay.
14    MS. McENROE: Objection. Form. Calls for a
15  narrative.
16 BY MR. PIFKO:
17  Q. So you started at the Eckerd Corporation in
18 December 1974, correct?
19  A. Correct.
20  Q. What was your highest level of education at
21 that time?
22  A. Some college.
23  Q. Where did you attend college?
24  A. Carnegie Mellon University.
25  Q. When did you start going to Carnegie Mellon?

Page 15

1  A. 1973.
2  Q. And then did you stop attending courses when
3 you started working for the Eckerd Corporation?
4  A. No. No. I stopped courses at Carnegie Mellon
5 in December of 1973.
6  Q. Okay. Then about a year later you joined the
7 Eckerd Corporation?
8  A. Correct.
9  Q. Did you attend any college courses after you
10 joined the Eckerd Corporation?
11  A. I did.
12  Q. Okay. When was that?
13  A. Oh, various times. Multiple occurrences in,
14 gosh, the late '70s, the early '80s, and then I
15 completed my degree work in the early 2000s.
16  Q. So you have a degree from where?
17  A. Eckerd College.
18  Q. Okay. Is that affiliated with the
19 corporation?
20  A. No, it is not.
21  Q. Okay. Just a coincidence?
22  A. It -- it was Florida Presbyterian College, and
23 it received a significant endowment from Jack Eckerd,
24 who had founded the corporation, the Eckerd
25 Corporation --

Page 16

1  Q. Okay.
2  A. -- and so they renamed the college Eckerd
3 College because of the contribution that he had made.
4  Q. How long did you attend courses there?
5  A. It was an 18-month, perhaps, period, I would
6 say.
7  Q. Was that something you did while you were
8 working, or did you have to take time off from work to
9 do that?
10  A. While I was working.
11  Q. What was your final degree that you got from
12 Eckerd College?
13  A. Bachelor of Arts in Business.
14  Q. And you attended some courses before that as
15 well?
16  A. I did.
17  Q. Do you remember where?
18  A. Valencia Community College in Florida -- in
19 Orlando and St. Pete College in St. Petersburg.
20  Q. Did you get any degrees or certificates or
21 anything from those universities?
22  A. I did not.
23  Q. What was your first position at the Eckerd
24 Corporation?
25  A. I was temporary Christmas help at the Orlando

Page 17

1 photo lab.
2  Q. So I assume that was a very short-term
3 position?
4  A. The temporary part was.
5  Q. Okay. Then what did you do next?
6  A. Well, I worked -- continued to work in the
7 photo lab for a couple of years, and then I moved into
8 a distribution center that was also in Orlando.
9  Q. When did you start working at the distribution
10 center?
11  A. Late 1976, I believe.
12  Q. How long did you work there?
13  A. At that particular distribution center --
14 there was actually three different buildings or
15 distribution centers in Orlando and all in one complex,
16 and I worked among those three until 1980.
17  Q. Did you have a specific job -- the same job
18 title during that time period?
19  A. I did not.
20  Q. All right. Let's go through each of those.
21 When you first started working at the distribution
22 center, what was your job title?
23  A. I was -- I loaded trucks. My job title was a
24 Material Handler B.
25  Q. Okay. And how long did you have that

Page 18

1 position?
2    A.   Several months.  You know, less than a year I
3 would say, but several months.
4    Q.   And then what did you do?
5    A.   I became an order selector in the case goods
6 picking department.
7    Q.   What were your responsibilities as an order
8 selector?
9    A.   We got orders from the stores of the items
10 that they -- that they wanted or needed for
11 replenishment that were sent out in bulk quantities,
12 either in full cases or in very -- you know, the items
13 themselves were bulky.
14       We fulfilled those orders, confirmed that we
15 had picked the items and packed them for delivery to
16 the store.
17    Q.   Did you have any involvement in picking
18 controlled substances at that time?
19    A.   I did not.
20    Q.   And then what was your next position?
21    A.   I was a group leader, which is -- was a -- an
22 hourly lead position in one of the departments in the
23 distribution center.
24    Q.   What were your responsibilities as a group
25 leader?

Page 19

1    A.   To assign work to the associates in that
2 department, to maintain the flow of goods through the
3 distribution center.
4    Q.   Did you have any involvement with controlled
5 substances at that time?
6    A.   I did not.
7    Q.   So then in 1980 you stopped working at the
8 distribution center; is that correct?
9    A.   Correct.
10    Q.   And then where did you go?
11    A.   I moved to the Eckerd corporate office in
12 Largo, Florida.
13    Q.   What title did you take on then?
14    A.   I think the title was distribution systems
15 analyst, if I recall correctly.
16    Q.   What was your -- what were your
17 responsibilities?
18    A.   Eckerd was putting together a team.  They were
19 replacing their information systems that supported
20 accounting, merchandising, the distribution centers,
21 things of that nature; and Eckerd, as a part of that
22 project, put together a user team from each of the
23 functional areas so that -- and the assignment of that
24 user team was to help with testing, design, you know,
25 user -- human interface design and writing manuals and

Page 20

1 things of that nature, and so I was the representative
2 from distribution on that team.
3    Q.   How long did you do that?
4    A.   Until 1982, I believe.
5    Q.   In connection with that work, did you do
6 anything related to controlled substances?
7    A.   Nothing directly related to controlled
8 substances.  I mean, the systems that were being
9 designed ran the warehouses.  So, you know, that
10 ultimately involved controlled substances, but nothing
11 I directly did had anything to do with controlled
12 substances.
13    Q.   And then what was your next position?
14    A.   I was a supervisor in the Clearwater
15 distribution center.
16    Q.   What was your responsibility as a supervisor?
17    A.   You oversaw multiple departments within the
18 distribution center, hired and fired, you know, hired
19 and managed the workforce, made sure there was adequate
20 staffing, and again, maintain the flow of work through
21 the distribution center.
22    Q.   How long did you have that position?
23    A.   For just over a year.
24    Q.   So from approximately 1982 to 1983?
25    A.   Correct.

Page 21

1    Q.   And then what did you do?
2    A.   In 1983 I moved -- went to Hammond, Louisiana,
3 to help open a distribution center there.
4    Q.   How long did you work there?
5    A.   One year.
6    Q.   What types of responsibilities did you have
7 with respect to assisting them in opening that
8 distribution center?
9    A.   I was an operate -- I had been promoted from
10 supervisor to operations manager.  So I was responsible
11 for some of the -- I had multiple supervisors work for
12 me at that point.  So I was responsible for the
13 shipping and receiving departments and the support
14 functions within the distribution center, like the
15 forklift operations and things of that nature.
16    Q.   Did the people under you have responsibility
17 for shipping controlled substances?
18    A.   I was not responsible for the department that
19 selected and packed controlled substances, but the
20 trucks that were loaded did have controlled substances
21 on them.  So the forklift drivers, for instance, that
22 moved product would have moved controlled substances,
23 yes.
24    Q.   Okay.  Where did you go next?
25    A.   I then went to the Atlanta distribution

Page 22

1 center, which is actually in Newnan, Georgia, but we
2 commonly called it the Atlanta distribution center.
3    Q.   What was your responsibility there?
4    A.   I was also an operations manager, and so I was
5 over multiple departments, kind of similarly to in
6 Hammond, so --
7    Q.   Did you have any responsibility for controlled
8 substances there?
9    A.   I did have the pharmacy department in the
10 Newnan distribution center report to me as -- at one
11 time during that period of time that I worked for --
12    Q.   Okay.  What was the period of time that you
13 worked there?
14    A.   I was there from 1984 to 1989.
15    Q.   So some of the people under you were
16 responsible for picking controlled substances that
17 needed to be shipped to stores and fulfilling those
18 orders?
19        MS. McENROE:  Objection to form.  You may
20 answer.
21        THE WITNESS:  During a portion of that
22 five-year period -- we rotated responsibilities.
23 There were two operations managers, and we kind of
24 changed assignments; but during a portion of that
25 five-year period, yes, I was over the pharmacy

Page 23

1    area, and yes, there were associates within the
2    pharmacy area that were responsible for picking
3    and packing controlled substances to go to the
4    stores.
5 BY MR. PIFKO:
6    Q.   Of the time period from 1984 to 1989, what was
7 the portion that you had responsibility for the
8 pharmacy area?
9    A.   Probably two of those five years, I would say.
10    Q.   Okay.  Do you remember which of the -- of that
11 period, which two years?
12    A.   It was the latter part of that period, so --
13    Q.   So from 1987 to 1989?
14    A.   Yes.  Around that, I would say.
15    Q.   And then where did you go after 1989?
16    A.   I returned to the Eckerd corporate office in
17 Largo, Florida.
18    Q.   What did you do there?
19    A.   I think the job title was manager of
20 distribution systems and planning, if I recall
21 correctly; and the key responsibilities were the
22 budgeting and financial planning for the distribution
23 centers and to act as the liaison for systems
24 development and maintenance in the distribution
25 centers.

Page 24

1    Q.   How long did you have that position?
2    A.   Well, that direct position I probably had for
3 three years perhaps and then -- probably three years.
4    Q.   So in approximately 1992 you moved to another
5 position?
6    A.   Well, I -- I was promoted to a director level
7 position.  My boss left that position, so I was
8 promoted into his job.  So I still had the same
9 responsibilities, but my responsibilities then
10 expanded, so --
11    Q.   What was your title then?
12    A.   Director of distribution systems and planning,
13 I believe.
14    Q.   How long did you have that position?
15    A.   I was in that position through -- and it
16 ultimately got changed to be a senior director level
17 position, but I was in that position through the time
18 that Eckerd's was sold to Brooks.
19        So I was at the Eckerd corporate office until
20 that sale, that transaction was complete.
21    Q.   So that -- the Brooks and Eckerd transaction
22 occurred in 2004?
23    A.   Yes, I believe that's correct.
24    Q.   And then you had a change in responsibilities
25 at that time?

Page 25

1    A.   Yes.  Yes.
2    Q.   Okay.  So what -- what was your new position
3 in 2004?
4    A.   Well, it was -- I think the job title was just
5 changed to senior director of logistics, and I remained
6 part of the Brooks Eckerd corporate office team, I
7 guess; and I had largely the same responsibilities that
8 I had had prior and also -- also had responsibility for
9 some transportation functions.
10    Q.   How long did you have that position?
11    A.   Until the Rite-Aid/Brooks transaction.
12    Q.   That was in 2007?
13    A.   Yes.
14    Q.   So when Rite-Aid purchased the Brooks Eckerd
15 Corporation, you had a change in job responsibilities?
16    A.   I did.
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I did.
19 BY MR. PIFKO:
20    Q.   Okay.  What was your job then?
21    A.   I became the general manager of the
22 Philadelphia distribution center.
23    Q.   How long did you have that position?
24    A.   About 16 months.
25    Q.   So to sometime in 2009?

Page 26

1  A.  No, in 2008.
2  Q.  Okay.
3  A.  Yeah, it was like from June of 2007 till the
4  end of September of 2008, I think.
5  Q.  Okay.  What were your responsibilities as the
6  general manager for the Philadelphia distribution
7  center?
8  A.  It was overall responsibility for the
9  distribution center.  So, you know, managing it,
10  staffing it, ensuring that we served our store
11  customers in the way that we did, maintaining flow of
12  products, meeting the financial responsibilities,
13  things of that nature.
14  Q.  When you say "meeting the financial
15  responsibilities," what do you mean?
16  A.  Well, I mean, we had a budget that we were --
17  as any company does; and so I was, you know, part of my
18  job was to make plans and to put the budget together
19  and then to achieve those, so --
20  Q.  Were you the top -- as the general manager of
21  a distribution center, were you the top level person at
22  that distribution center?
23  A.  I --
24  MS. McENROE:  Objection to form.
25  THE WITNESS:  I was.

Page 27

1  BY MR. PIFKO:
2  Q.  So did you oversee people who had
3  responsibility for shipping controlled substances to
4  Rite-Aid pharmacies?
5  A.  I did not.
6  Q.  Okay.
7  A.  We did not have controlled substances in the
8  Philadelphia distribution center.
9  Q.  Okay.  What was your next position?
10  A.  I went to the Rite-Aid corporate office.
11  Q.  So that was sometime in 2008?
12  A.  Correct.
13  Q.  What was your job then?
14  A.  The job title was vice president of logistics.
15  Q.  How long did you hold that position?
16  A.  Until I retired in 2015.
17  Q.  Did you move through any iterations, like
18  senior vice president or anything like that or you
19  always stayed vice president?
20  MS. McENROE:  Objection to form.
21  THE WITNESS:  I stayed vice president.
22  BY MR. PIFKO:
23  Q.  What were your job responsibilities as the
24  vice president of logistics?
25  A.  During that time I was responsible for the --

Page 28

1  the -- a huge portion of the responsibility was
2  transportation related.  I was responsible for both
3  inbound and outbound transportation to the stores.
4  I also had responsibility for the financial
5  planning activity, for the safety programs and safety
6  management, system support, and regulatory compliance.
7  Q.  When you say "regulatory compliance," what do
8  you mean by that?
9  A.  I mean there was a member of my team that was
10  the person, the resource, that coordinated with the DCs
11  to make sure that we were in compliance with
12  regulations related to all pharmacy activities,
13  controlled substances, things of that nature.
14  That individual coordinated both -- it was
15  kind of a liaison between the distribution centers and
16  our corporate staff that acted as our subject matter
17  experts for that.
18  Q.  What's the title of that regulatory compliance
19  person?
20  A.  Director of -- it may have been director of
21  compliance.  I don't recall, you know, specifically.
22  Q.  During your tenure from 2008 to 2015, were
23  there multiple people that held that position?
24  A.  There were.
25  Q.  Do you remember any of their names?

Page 29

1  A.  The person in that position when I joined,
2  when I first went to the corporate office, was named
3  Kevin Mitchell.  Subsequent to Kevin leaving, those
4  responsibilities were taken over by Chris Belli, and
5  after Chris left, the responsibilities were taken over
6  by an individual by the name of Kevin Peterson; and, of
7  course, they changed dramatically because Rite-Aid quit
8  carrying pharmaceuticals in the distribution centers.
9  Q.  Do you know who Rite-Aid's primary supplier of
10  controlled substances was?
11  MS. McENROE:  Objection to form.
12  THE WITNESS:  I'm sure if you're talking about
13  in dollar value, it would have been McKesson.  If
14  you're talking about unit volume, I couldn't
15  answer that because, you know, such a large
16  proportion of the pharmacy product are generics,
17  and there's a number of generic manufacturers.
18  BY MR. PIFKO:
19  Q.  At various points in your tenure as vice
20  president of logistics, did Rite-Aid purchase
21  controlled substances directly from certain
22  manufacturers?
23  A.  I don't know the answer to that.
24  Q.  Okay.  So you know that they -- that Rite-Aid
25  purchased controlled substances and other

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 pharmaceutical products from McKesson?

2 A. I do know that we purchased from McKesson,

3 yes.

4 Q. And then you just testified that you believe

5 that -- you mentioned generics and that maybe there

6 were other suppliers?

7 A. There are other generic suppliers that we

8 purchased product from besides McKesson.

9 Q. Okay. Do you remember the names of any of

10 those?

11 A. You know, Teva is an example. I was not

12 involved in the purchasing side at all. So, you know,

13 our responsibility was more operational and executing

14 it in the distribution center. So I couldn't tell you,

15 quite honestly, who all of those were.

16 Q. Okay. And that's okay. I was just asking for

17 your best recollection, so --

18 A. Yeah.

19 Q. -- if you remembered any of the names, that's

20 all I'm asking.

21 A. As I said, Teva comes to mind. You know, I

22 can't remember any of the other ones explicitly --

23 specifically.

24 Q. Did you ever meet with anybody from Teva?

25 A. I did not.

Page 31

1 Q. How about McKesson, did you ever meet with

2 anyone from McKesson?

3 A. I was in meetings with McKesson about some

4 systems work later in my tenure there, but it wasn't

5 related to controlled substances. It was about a data

6 exchange basically, but -- but I never met with any of

7 them about purchasing or anything of that nature; but I

8 was -- I attended a meeting that -- that there were

9 McKesson people at.

10 Q. So you mentioned that, among the

11 responsibilities of the regulatory compliance person

12 who was one of the people who reported to you -- well,

13 first of all, that's correct, that the regulatory

14 compliance person reported to you when you were the

15 vice president of logistics?

16 MS. McENROE: Objection to form.

17 THE WITNESS: That's correct.

18 BY MR. PIFKO:

19 Q. Okay. And so I believe you testified earlier

20 that among those responsibilities that the regulatory

21 compliance person had was the Controlled Substances

22 Act, correct?

23 MS. McENROE: Objection to form.

24 THE WITNESS: What I said was that there --

25 that individual's responsibility was to act as a

Page 32

1 liaison and coordinate activity at the

2 distribution centers and to ensure compliance with

3 all regulations to use as a resource with the

4 folks in the corporate office.

5 BY MR. PIFKO:

6 Q. Okay. And what I'm trying to get at is if,

7 when you say all regulations, if you're aware if that

8 included the Controlled Substances Act?

9 A. I am aware of that, yes.

10 Q. Have you heard of the Controlled Substances

11 Act before?

12 A. Yes, I have.

13 Q. When do you believe was the first time you

14 heard that?

15 A. Many years ago. I -- I couldn't -- I'm sure I

16 was working for Eckerd's at the time, so --

17 Q. Do you have an understanding about what

18 diversion is?

19 MS. McENROE: Objection to form.

20 THE WITNESS: I do.

21 BY MR. PIFKO:

22 Q. Can you tell me what your understanding is?

23 A. Diversion is when product is taken out of the

24 supply chain when it's diverted from its intended

25 target, its intended destination, its intended

Page 33

1 customer, to someone else in the supply chain.

2 Q. Have you ever heard of the idea that someone

3 is a registrant under the Controlled Substances Act?

4 MS. McENROE: Objection to form.

5 THE WITNESS: I have.

6 BY MR. PIFKO:

7 Q. Did you understand, when you were vice

8 president of logistics, that Rite-Aid was a registrant

9 under the Controlled Substances Act?

10 A. I did.

11 Q. How did you come to have that understanding?

12 A. Well, the -- I'm familiar with the need for an

13 individual location to be a registrant, to have a DEA

14 registration number. So as a part of my knowledge in

15 working in the chain drug industry as long as I did, I

16 know that every store and every distribution center is

17 registered, and it has a DEA registration number.

18 Q. Have you ever heard of the phrase that a

19 registrant has a duty to maintain effective controls to

20 prevent diversion?

21 MS. McENROE: Objection to form.

22 THE WITNESS: I have heard that, yes.

23 BY MR. PIFKO:

24 Q. When you were VP of logistics, did you

25 understand that locations that -- where Rite-Aid held a

Page 34

1  registration, that they had duties to maintain
2  effective controls to prevent diversion?
3      MS. McENROE:  Objection to form.
4      THE WITNESS:  I do understand -- or did
5  understand that, yes.
6  BY MR. PIFKO:
7  Q.  Okay.  Are you familiar with the activities
8  that occurred at Rite-Aid locations to carry out that
9  duty --
10     MS. McENROE:  Objection.
11  BY MR. PIFKO:
12  Q.  -- to maintain effective controls to prevent
13  diversion?
14     MS. McENROE:  Object to form.
15     THE WITNESS:  I am familiar with -- with it,
16  yes.
17  BY MR. PIFKO:
18  Q.  What is your understanding of what activities
19  were taken by Rite-Aid during the period when you were
20  VP of logistics in connection with the duty to prevent
21  diversion?
22     MS. McENROE:  Object to the form.  Calls for a
23  narrative.  Can you break that down a little bit
24  more, Mr. Pifko?
25  BY MR. PIFKO:

Page 35

1  Q.  Do you understand the question?
2  A.  I -- I do.
3  Q.  Okay.  Can you give me an answer?
4      MS. McENROE:  Can you ask something a little
5  bit more specific?
6      MR. PIFKO:  Well, I'd like to hear his answer.
7      THE WITNESS:  I guess the first thing that I
8  would say is Rite-Aid is a closed system.
9  Rite-Aid shipped only to its own -- our
10  distribution centers only shipped to Rite-Aid
11  stores.
12     So as a part of that, in terms of ensuring
13  there was no diversion, we -- we knew both the
14  from and the -- you know, the origination and the
15  destination of every shipment was a Rite-Aid
16  location; and in terms of the quantity of those
17  orders, there were a variety of controls.
18     The orders were created not by a human.  They
19  were system created based on actual sales at a
20  store, actual scripts that were filled and product
21  that was consumed at a store.
22     So there wasn't a -- there wasn't a capability
23  of someone just to place an unusually large order
24  as a human to try to divert product.  Pharmacists
25  were able to modify those orders, but there was

Page 36

1  limitations on the pharmacist's ability to modify
2  those orders.
3      So again, there was very tight controls on the
4  orders that were placed that were sent to the
5  distribution centers.  Once it arrived at the
6  distribution center, we had kind of a couple of
7  things that were what I would characterize as a
8  kind of a last line of defense or a final step in
9  that.
10     We had a threshold above which no order would
11  be filled, and we also had given the assignment
12  and responsibility of the order fillers in the
13  controlled substance area, because they were
14  familiar with kind of the general flow and size of
15  orders, if they saw something they thought was
16  unusual, they had the authority to stop the order
17  and adjust and/or call the store to confirm
18  whether the order had been, you know, entered
19  correctly or created correctly, regardless of
20  whether it met or exceeded the threshold that I
21  mentioned.
22     So there was multiple components in place to
23  manage that and to ensure that no product was
24  diverted.
25  BY MR. PIFKO:

Page 37

1  Q.  Okay.  So let's -- let's break that out a
2  little bit, and then I also want to ask you just before
3  we do that, so you -- you held the -- I asked you to
4  provide that answer in the time period of when you were
5  VP of logistics, and so that was a fairly long time
6  period where you held that position.
7  A.  Yes.
8  Q.  So I want to ask you, was the explanation that
9  you just provided, was that the same process that was
10  used during your entire tenure as VP of logistics?
11  A.  To the best of my knowledge, it was.  I wasn't
12  responsible for the store ordering component of it, but
13  I know generally how it worked, but -- so to the best
14  of my knowledge, it was, yes.
15  Q.  Okay.  So let's unpack some of the different
16  issues that you talked about.  First, you said
17  something about -- you were talking about how -- the
18  way in which orders were placed at the store and how it
19  was based on product that was sold.  Can you -- do
20  you --
21  A.  Well, actually -- I'm sorry.
22     MS. McENROE:  Let him finish his question.
23     THE WITNESS:  I'm sorry.  Go ahead.
24  BY MR. PIFKO:
25  Q.  Okay.  Well, first of all, I just want to ask

Page 38

1  if you have familiarity with how the orders were placed
2  at a particular store.
3     MS. McENROE: Objection to form.
4     THE WITNESS: Okay. What I was going to say,
5     actually, the first thing I said was that Rite-Aid
6     was a closed system, that we only shipped to our
7     own stores. So certainly that -- there's an
8     inherent level of control there that perhaps other
9     shippers don't have. So that was the first thing
10    that I said.
11       In answer to your question, you're -- you're
12    asking how was the inventory managed at the store,
13    or can you clarify that?
14 BY MR. PIFKO:
15    Q. Yeah. And to be clear, I'm just asking about
16 controlled substances right now.
17    A. Okay. Can you repeat it then, please?
18    Q. Yeah. And then let's also -- let me ask
19 another foundational question. Are you familiar that
20 under Federal law there's a scheduling of controlled
21 substances?
22    A. I am.
23    Q. Okay. And you understand there's Schedule 1
24 through 5?
25    A. I am.

Page 39

1     Q. Okay. And do you have an understanding about
2  what the different levels are in the scheduling?
3     MS. McENROE: Objection to form.
4     THE WITNESS: Yes. I have an understanding
5     in -- and as you, I'm sure, know, Rite-Aid did not
6     ship Schedule 2 substances out of our distribution
7     centers.
8  BY MR. PIFKO:
9     Q. Okay. What's your understanding of the
10 differences in the scheduling? What's the difference
11 between, for example, something that's a Schedule 2
12 versus a Schedule 3?
13    MS. McENROE: Objection to form.
14    THE WITNESS: I -- my general understanding
15    would be, I would expect that it's more
16    susceptible to -- a Schedule 2 is more susceptible
17    to abuse than a Schedule 3, but I don't know that.
18    I'm not a pharmacist, so --
19 BY MR. PIFKO:
20    Q. Okay. And that's -- all I'm asking you today
21 is to give your best ability to answer. So just --
22    A. Okay.
23    Q. I'm not asking you to be an expert in
24 anything. If you know something, you tell me. If you
25 don't -- okay?

Page 40

1     A. Okay.
2     Q. So it's your understanding that a lower
3  numbered scheduled substance is more prone to abuse
4  than a higher number scheduled substance; is that
5  correct?
6     MS. McENROE: Objection to form.
7     THE WITNESS: That would be my impression,
8     yes.
9  BY MR. PIFKO:
10    Q. And then what's the basis for that
11 understanding?
12    A. The degree of control that's required for the
13 varying schedule levels and mandated by the DEA.
14    Q. Have you ever read DEA regulations concerning
15 handling of controlled substances?
16    A. I have.
17    Q. Okay. Have you ever read portions of the
18 Controlled Substances Act?
19    A. I may have. I -- I don't know for sure. I
20 can't say with certainty that I have. I know I have
21 read the CFR, some portions of that, so --
22    Q. What was the context in which you've read the
23 portions of the CFR?
24    A. When we've done work in distribution centers
25 to construct pharmacy areas and ensure that -- it was

Page 41

1  to ensure that the physical security aspects were met
2  properly.
3     Q. When you say "physical security," what do you
4  mean by that?
5     A. That it's kind of as a general statement, the
6  areas where you pick controlled substances have to be
7  contained within a cage, and there's, you know, some
8  specifications about the wire gauge and how big the
9  holes can be in the cage and things of that -- and the
10 fencing and things of that nature, so --
11    Q. So let's go back to the -- the placing of an
12 order.
13    A. Okay.
14    Q. When you were explaining to me the -- that
15 there were some sort of limitations on placing of
16 orders, I'd like you to explain that, your
17 understanding of how an order was placed at a pharmacy
18 for -- you said that Rite-Aid didn't ship -- or it
19 didn't distribute Schedule 2 substances, so let's just
20 talk about Schedule 3 substances.
21    A. Okay.
22    MS. McENROE: Objection to form.
23 BY MR. PIFKO:
24    Q. Let me just ask a better question. So my
25 question to you is, with respect to Schedule 3

Page 42

1  substances, do you understand how an order was placed
2  at a particular pharmacy location at a store to a
3  distribution center?
4       MS. McENROE: Objection to form.
5       THE WITNESS: My understanding is that for all
6  pharmacy products, it was a computerized ordering
7  system. They created an order based on the demand
8  for that item and the on-hand balance in -- in the
9  store; and the demand obviously is a function of
10  the sales or the -- and the use -- in the instance
11  of a pharmaceutical product, of its consumption
12  when filling scripts.
13      So it was a computerized algorithm that took
14  into account the on-hand balance and the rate of
15  sale for that product to calculate an efficient
16  order quantity.
17  BY MR. PIFKO:
18  Q.  Okay.  So there's a computer system at a
19  particular pharmacy location in the store.  Yes?
20  A.  Well, there's --
21      MS. McENROE: Objection to form.
22      THE WITNESS: I'm sorry.  There's a mainframe
23  that actually -- you know, the computer was not --
24  did not reside at a -- at an individual store,
25  so --

Page 43

1  BY MR. PIFKO:
2  Q.  Okay.
3  A.  But the store connected to the computer
4  system, yes.
5  Q.  Okay.  Is there a name for the software that
6  managed the ordering system, do you know?
7  A.  I would assume that there is, but I don't know
8  what it is.
9  Q.  Okay.
10  A.  So --
11  Q.  And it's your understanding that the mainframe
12  system was located somewhere centralized?
13  A.  Correct.
14  Q.  Okay.  And was that same system used for all
15  the Rite-Aid stores?
16  A.  That is my understanding, yes.
17  Q.  Do you know where -- physically where that
18  system was located?
19  A.  In Camp Hill, Pennsylvania, so -- or there --
20  in the greater Camp Hill area.  Maybe I should, you
21  know, be more precise with that, so --
22  Q.  Is there a department or division of the
23  company that was responsible for maintaining that
24  process?
25      MS. McENROE: Objection to form.

Page 44

1       THE WITNESS: There is and was an IT
2  department that was responsible for maintaining
3  both the hardware and the software.
4  BY MR. PIFKO:
5  Q.  And then just the IT department, is there any
6  other special name?
7  A.  No.  No.
8  Q.  So under this system, the computer, the
9  mainframe is looking at how much product is moving
10  through the store and seeing the rate at which product
11  is being taken off the shelves and comparing that to
12  the inventory on hand and then automatically putting in
13  an order so that you can ensure that the location has
14  enough product to fulfill the demand; is that correct?
15      MS. McENROE: Objection to form.
16      THE WITNESS: Yes.  The goal was to ensure
17  that we satisfied our customers.  I mean, it's
18  a -- it's -- you know, you can imagine it's -- the
19  key component of our business is to make sure that
20  we get the medications and the medicines in the
21  hands of our customers, so yes.
22  BY MR. PIFKO:
23  Q.  Okay.  So an order through that system gets
24  placed by a store to a distribution center, correct?
25  A.  Correct.

Page 45

1  Q.  And are you familiar with the process by which
2  an order is received at a distribution center?
3      MS. McENROE: Objection to form.
4      THE WITNESS: I am.
5  BY MR. PIFKO:
6  Q.  Okay.  And I want to be clear.  I know you
7  had -- you were a general manager of several
8  distribution centers.  I'm just talking about Schedule
9  3 controlled substances right now.  Okay?
10  A.  Okay.
11  Q.  So with respect to a Schedule 3 controlled
12  substance, when an order comes in to a distribution
13  center, how -- how does that happen?
14      MS. McENROE: Objection to form.
15      THE WITNESS: The distribution centers operate
16  on a type of software that's called -- the acronym
17  you will hear is a WMS.  It stands for Warehouse
18  Management System; and the warehouse management
19  system is what creates and manages orders, manages
20  receipts of goods in the receiving department, the
21  storage of product, you know, all of the various
22  facets of operating a distribution center.
23      So the order would be transmitted or would
24  move through the portion of the mainframe that
25  created the order into the Warehouse Management

Page 46

1    System for the particular distribution center
2    that -- that -- that serviced that store; and part
3    of the ware -- as part of the Warehouse Management
4    System, it would be routed to the pharmacy pick
5    area.
6    BY MR. PIFKO:
7    Q.   So is it correct that a specific distribution
8    center is responsible for all products at certain
9    specific stores?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  No, it is not.
12   BY MR. PIFKO:
13   Q.   Okay.  So let's explain that.  Is it possible,
14   within Rite-Aid systems, for more than one distribution
15   center to send product to a particular store?
16        MS. McENROE:  Objection to form.
17        THE WITNESS:  It is.
18   BY MR. PIFKO:
19   Q.   Are you familiar with the process of how an
20   order is sent to one distribution center or another?
21   A.   I am.
22   Q.   Okay.  What's your understanding of that?
23   A.   Rite-Aid kind of categorized products in -- in
24   big picture, and there's kind of three types of
25   products.  There were Rx products; there were what were

Page 47

1    called CP products for centralized products, and there
2    were front-end products; and every distribution center
3    stocked the front-end products.
4        A subset of the distribution centers stocked
5    the CP and the pharmacy products.  So a store that
6    would -- whose trucks originated at a DC that only
7    stocked front-end products, like the Philadelphia one
8    that I managed, got their CP and pharmacy products from
9    another distribution center.
10       That product was select -- the orders were
11   selected and picked and packed at the other
12   distribution center, sent to the front-end distribution
13   center.  So they would have been sent to Philadelphia,
14   and they would have been cross-docked and merged with
15   the product that Philadelphia picked for that store for
16   the load to be completed for delivery to the store.
17   Q.   So when you say -- you used the term
18   "cross-docked."  So that means -- so for -- let's talk
19   about the, as an example, the Philadelphia location.
20   So there's a truck that's going to go to a particular
21   store that's filled with what you would call front-end
22   product, correct?
23        MS. McENROE:  Objection to form.  Is there a
24        question there?  Yeah.
25   BY MR. PIFKO:

Page 48

1    Q.   Some front-end product from that distribution
2    center is placed on the loading dock to be put on a
3    truck to go to a particular store; is that correct?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  Product, yes.  Product from --
6        is selected by Philadelphia, which would be the
7        front-end product, would be put on the loading
8        dock, yes.
9    BY MR. PIFKO:
10   Q.   Okay.  And if a store that's fulfilled by the
11   Philadelphia center needs controlled substances and the
12   Philadelphia center doesn't provide that, that comes in
13   on another truck from another distribution center to
14   the Philadelphia distribution center; is that correct?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  That is correct.
17   BY MR. PIFKO:
18   Q.   Okay.  And so that pallet or pallets of goods
19   then is merged in with the other goods from the
20   Philadelphia center; is that correct?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  It's not quite that simple.
23   There is a -- in each of the distribution centers
24   there were what are called cross-dock cages that
25   were approved and inspected by the DEA, and the

Page 49

1    DEA approved our procedures around those
2    cross-dock cages.
3        So the product, when it came from the pharmacy
4    distribution center, didn't go to the loading
5    dock.  It went to the cross-dock cage, and it was
6    counted and tallied as it went into the cross-dock
7    cage; and then when it came out of the cross-dock
8    cage to go onto the outbound load, it was -- the
9    counts were verified, and so there was a final
10   count of totes that were put on out of the
11   cross-dock cage, you know, onto -- there was a
12   final count that was part of the loading manifest
13   for that final delivery.
14   BY MR. PIFKO:
15   Q.   Okay.  So when you have a distribution center
16   that doesn't provide its own controlled substances and
17   it has to get them from another distribution center,
18   all the controlled substances that come in are put in a
19   separate area until they're ultimately loaded on a
20   truck?
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  All of the pharmacy product, all
23   of it is --
24   BY MR. PIFKO:
25   Q.   Okay.

Page 50

1   A.  -- is in a -- was in a cross-dock cage.
2   Q.  Okay.
3   A.  Again, it was -- the entire process was
4   approved by the DEA.  They gave -- approved the
5   specifications when the cross-dock cages were
6   constructed, inspected, and approved them for use
7   before they were put into use.
8   Q.  So when an order is getting put on a truck,
9   there's -- there's some sort of manifest of what's
10  supposed to go into that truck?
11      MS. McENROE:  Objection to form.
12      THE WITNESS:  There is a -- are you -- are you
13  talking specifically about pharmacy products?
14  BY MR. PIFKO:
15  Q.  Well, in general, any products.  A truck is
16  going to go to a store.  How do you know what to put on
17  that truck?
18      MS. McENROE:  Objection to form.
19      THE WITNESS:  There are -- for the front-end
20  products, those are packed and palletized by
21  selectors in the front-end distribution center.
22  There was not necessarily a -- it depended on
23  the distribution center because they had different
24  systems at different locations; but there wasn't
25  necessarily, for front-end product, a specific

Page 51

1   tally that said, you know, you're getting 112
2   totes, you know, 68 boxes, things of that nature.
3       The way that operated is everything came
4   through the conveyor system to the shipping
5   department and was controlled -- there was a
6   mechanism to control that you knew when a wave of
7   stores were finished so that you knew you had all
8   the picks for that store and it was complete; but
9   there was not a tally, you know, a count of totes,
10  for example, of front-end product.
11      Now, pharmacy product, there absolutely was.
12  There was a specific count that was signed for
13  when the cross-dock DC, you know, came into the
14  cross-dock DC.  The counts were verified.  They
15  were verified when they were loaded onto the
16  truck, and they were signed for when they were
17  delivered to the store.
18  BY MR. PIFKO:
19  Q.  Okay.  And so when someone is loading that
20  onto the truck, there's some sort of indication that
21  you're supposed to go to the pharmacy cage and get
22  products?
23  A.  And they know how many totes --
24      MS. McENROE:  Objection to form.
25      THE WITNESS:  And they know how many totes

Page 52

1   they're supposed to get, correct.
2   BY MR. PIFKO:
3   Q.  Okay.  So they go and get that, and then as
4   they're loading the truck, they put that in there?
5   A.  Correct.
6   Q.  Let's back up to the actual pharmacy location
7   again.  So we talked about the automated system where
8   you have the computer that's monitoring
9   demand and product moving out of the store and checking
10  the inventory.  Do you recall that discussion?
11  A.  I do.
12      MS. McENROE:  Objection to form.
13  BY MR. PIFKO:
14  Q.  So do you have familiarity with how the
15  inventory is inputted into the -- at the pharmacy is
16  inputted into that computer system?
17      MS. McENROE:  Objection to form.
18      THE WITNESS:  I -- that wasn't my area of
19  responsibility.  I -- I -- my general
20  understanding is that the orders that were shipped
21  were received into the distribution -- into the
22  inventory of the store based on the projected
23  delivery date from the distribution center, but
24  I'm not an expert on that system.
25  BY MR. PIFKO:

Page 53

1   Q.  Okay.  But what I'm trying to understand is,
2   you said it's an algorithm that's sort of checking the
3   rate of products moving versus what's sitting on the
4   shelf in the pharmacy, correct?
5   A.  Correct.
6   Q.  And so what I'm trying to understand is, how
7   does the computer know what's sitting on the shelf, if
8   you know that?
9   A.  My understanding is that there -- we knew what
10  day a store was -- the delivery would take place for
11  that store.  We knew the contents of the pharmacy
12  totes, and we knew how many pharmacy totes that they
13  received -- or that were shipped to them.
14      On the day that the delivery took place to
15  that store, the pharmacy's -- my understanding is that
16  the pharmacy's inventory was updated with the contents
17  of those totes.
18  Q.  Okay.  So it's essentially automated updating
19  based on the materials that are coming in.  The
20  computer knows that 10 items came in, so it just adds
21  10 items to the known inventory; is that correct?
22      MS. McENROE:  Objection to form.
23      THE WITNESS:  That is my understanding.
24  BY MR. PIFKO:
25  Q.  Okay.  So then let's talk about how the orders

Page 54

1 came in to the distribution center again. For -- I
2 asked you and I kind of understood, but I think we can
3 get a clearer record.
4 With respect to Schedule 3 controlled
5 substances, when a specific pharmacy needs to fill
6 their inventory, does that order always get placed to
7 the same distribution center for pharmaceutical
8 products, or can it get bumped around to different
9 distribution centers?
10 MS. McENROE: Objection to form.
11 THE WITNESS: There is a fixed relationship
12 between a store and its servicing DC or DCs.
13 However, that can change over time; but at any
14 point in time, a store would only receive pharmacy
15 product from one Rite-Aid distribution center.
16 BY MR. PIFKO:
17 Q. Is it possible that if the distribution center
18 is out of a product that's ordered or low on it, that
19 that order could then be kicked over to another
20 distribution center?
21 MS. McENROE: Objection to form.
22 THE WITNESS: It was not. That was not our
23 process.
24 BY MR. PIFKO:
25 Q. Okay. And then I think I asked you this

Page 55

1 before, but do you know the name of the ordering
2 software that was used?
3 A. In the -- to create the store orders?
4 Q. Well, the computer system that facilitated the
5 ordering between the stores and the distribution
6 centers.
7 A. I don't. I -- no, I don't.
8 Q. You talked about a warehouse management
9 system. Do you recall saying that?
10 A. Yes.
11 Q. Okay. Is that just a generic name for a type
12 of software?
13 A. It is.
14 Q. Okay. That's not a specific company or --
15 A. No.
16 Q. -- brand or anything like that?
17 A. No, it is not.
18 Q. So an order gets placed into a distribution
19 center, and then that -- that distribution center
20 receives that via computer?
21 MS. McENROE: Objection to form.
22 THE WITNESS: Correct.
23 BY MR. PIFKO:
24 Q. And then is the order from a pharmacy, would
25 that contain a whole host of items that they might need

Page 56

1 at any particular time?
2 MS. McENROE: Objection to form.
3 THE WITNESS: It could. It would contain all
4 of the items that were part of the order that they
5 were expected to place on that day.
6 BY MR. PIFKO:
7 Q. So your understanding -- you understand that
8 in connection with the lawsuit, certain documents were
9 collected from Rite-Aid?
10 A. I do.
11 Q. Okay. And some of those included documents
12 from your E-mail. Do you understand that?
13 A. I do.
14 Q. Okay. So I've looked at some of those
15 documents. I've seen that some stores were called
16 weekly and some were called biweekly; is that correct?
17 A. Correct.
18 Q. Okay. And that means that a truck would come
19 to them weekly or biweekly; is that correct?
20 A. Correct.
21 Q. And so the automated system was set up to fill
22 orders as needed, either weekly or biweekly; is that
23 correct?
24 MS. McENROE: Objection to form.
25 THE WITNESS: To the best of my knowledge,

Page 57

1 yes.
2 BY MR. PIFKO:
3 Q. Okay. So an order that comes into the
4 distribution center contains all the various items the
5 store might need, either on a weekly or biweekly basis,
6 correct?
7 MS. McENROE: Objection to form.
8 THE WITNESS: Yes.
9 BY MR. PIFKO:
10 Q. Okay. And then there's -- you testified
11 earlier that there's different areas within the
12 distribution center where an order could be filled,
13 correct?
14 MS. McENROE: Objection to form.
15 THE WITNESS: Correct.
16 BY MR. PIFKO:
17 Q. And so one of those areas is pharmacy,
18 correct?
19 A. Correct.
20 Q. So when an order comes in from a location, is
21 it somehow then divided into, okay, these people need
22 to look at this portion of the order and these people
23 need to look at this portion of the order?
24 MS. McENROE: Objection to form.
25 THE WITNESS: The -- all of the items that the

Page 58

1 distribution center will select for -- would
2 select for a store, would fill for a store, have a
3 defined pick location within the distribution
4 center.
5     So the orders are broken out according to pick
6 locations, and so all of the orders that involve
7 pharmaceutical products would be broken out by the
8 pick locations that were assigned to those
9 pharmaceutical products and sent to the area to
10 pick pharmaceuticals.
11 BY MR. PIFKO:
12   Q.  When you say "sent to the area," does that
13 mean it's loaded onto a computer terminal in that area,
14 or is there a physical piece of paper that gets printed
15 out?  Are you familiar with that process?
16   A.  It's -- we used a system called pick-to-light.
17 So it was a computerized system and -- with a display
18 at each pick location that would tell you the quantity
19 to pick, and so it was sent to the pick-to-light
20 system.
21   Q.  So if you're an employee who's responsible for
22 fulfilling an order, is there a name for that type of
23 employee?
24     MS. McENROE:  Objection to form.
25     THE WITNESS:  It would be an order selector.

Page 59

1 I mean -- yes.
2 BY MR. PIFKO:
3   Q.  Okay.
4   A.  A pharmacy order selector, so --
5   Q.  So a Schedule 3 controlled substance order
6 comes in.  The order selector, they have to go to a
7 computer terminal and determine what orders they're
8 supposed to fill?
9     MS. McENROE:  Objection to form.
10     THE WITNESS:  The orders automatically load
11   into the pick-to -- or are automatically loaded
12   into the pick-to-light system.  So they're queued
13   up for the order selector, and so they would
14   basically just start with the first order that was
15   in the system for them, if that makes sense.
16 BY MR. PIFKO:
17   Q.  Yeah.  And I'm just trying to visualize.  So
18 I'm a worker in the distribution center.  Do I have a
19 handheld terminal, or I go to, like, a desk where
20 there's -- the orders are laid out for me?  How do I
21 know what I'm supposed to do?
22     MS. McENROE:  Objection to form.
23     THE WITNESS:  You go to a picking module, and
24   there are, in that picking module -- and by
25   "picking module" I mean a set of shelves that

Page 60

1 contain product.
2     On -- each of those shelves are subdivided
3 into pick locations that I -- as I mentioned
4 earlier that are defined for a specific product.
5 Each of those locations has a light in front of
6 it, an LED display that is intended to be able to
7 display the pick quantity for that skew for the
8 store that you're selecting; and then there's
9 another overall display for the order that you're
10 selecting.
11     So at the beginning of the pick area, you pick
12 up a tote, you'd scan the tote.  It would tell
13 you, okay, now you're on Order 1234567.  It knows
14 that that tote that you're using is associated
15 with that order, and it would light the lights for
16 you to go and pick the individual products.
17 BY MR. PIFKO:
18   Q.  Okay.  And then how -- are you familiar with
19 how the lights relate to quantity?
20   A.  The lights displayed the quantity, so --
21   Q.  Okay.  So --
22   A.  They would display two if you were to pick two
23 bottles.  They would display one if you were to pick
24 one.
25   Q.  Okay.  I thought you said something about

Page 61

1 color, did I mishear you, of the light?
2   A.  I don't recall saying that.
3   Q.  Okay.
4   A.  I said LED.  They were LED lights, yeah.
5   Q.  Okay.  So I'm an order filler.
6   A.  Order selector.
7   Q.  Okay.  I'm an order selector, and I type in
8 I'm going to fill pharmaceutical products for Store
9 12345 into the computer, and then it lights up all the
10 different boxes I need to go to to put into the tote?
11   A.  In effect.  I mean, you scan a tote to start
12 the order.  You go into the area.  An order is queued
13 up in the area that you're working in.  When you scan a
14 tote to start an order, it knows, okay, the order that
15 I have queued up on this display is the order for this
16 tote they're -- this individual is beginning to
17 work in.  So that's kind of the general.
18   Q.  Okay.  And then as I move down the aisle, I
19 see areas that are lit up, and it has a number next to
20 it?
21   A.  Correct.
22   Q.  And then there's a, like, a bin, like you
23 said, and I grab the number of items that are lit up on
24 the light and put it into the tote?
25   A.  Correct.  And then you'd press a button to

Page 62

1 confirm that you picked it, and it puts the -- the
2 display then goes away.
3    Q. And then when I've completed that, I put the
4 tote somewhere?
5    A. There's a --
6    MS. McENROE: Object to form.
7    THE WITNESS: There's a conveyor system that
8 takes the tote away from the pharmacy area.
9    MS. McENROE: Mr. Pifko, if we get to a good
10 time to stop for a break, we've been going about
11 an hour.
12    MR. PIFKO: Yeah. We can take a break right
13 now.
14    MS. McENROE: Great. Thank you.
15    MR. PIFKO: Thanks.
16    THE VIDEOGRAPHER: Off the record, 10:40 a.m.
17    (Brief recess was taken.)
18    THE VIDEOGRAPHER: On the record, 10:53 a.m.
19 BY MR. PIFKO:
20    Q. I forgot to ask you before we started: Have
21 you ever been deposed before?
22    A. I have not.
23    Q. All right. What did you do to prepare for
24 this deposition?
25    A. I had a telephone call with our attorneys last

Page 63

1 Monday and then had some meetings yesterday -- or met
2 with them yesterday.
3    Q. When was the -- and when you say your
4 attorneys, you mean the woman next to you?
5    A. Yeah. I mean John, Kelly, and Elisa, correct.
6    Q. Okay. When was the first time that you heard
7 you were going to be deposed in connection with this
8 case?
9    A. It was a few months ago. I couldn't tell you
10 the exact date, but it was some -- a few months ago.
11    Q. I talked to you earlier about documents and
12 the idea that certain documents were collected for the
13 litigation. Did you do anything to look and see if you
14 had any documents, aside from those that might be
15 maintained at the company?
16    A. You're asking did I check at home to see if
17 I --
18    Q. Yes.
19    A. I do not have any documents at home related to
20 my employment at Rite-Aid. The only -- let me correct
21 that. The only documents I have related to my
22 employment at Rite-Aid are related to my retirement.
23 You know, I have things about my 401(k).
24    Q. Nothing related to the case?
25    A. But nothing related to the case, no.

Page 64

1    Q. Okay. So let's go back to our discussion
2 about the order process.
3    A. Okay.
4    Q. Does the -- so this -- we talked about the
5 system where an order is placed with the pharmacy is
6 automated, correct?
7    A. Correct.
8    Q. Does the -- I keep forgetting the name of the
9 person -- the order -- I'm going to write it down.
10    A. Order selector.
11    Q. Order selector. Does the order selector have
12 any ability -- ability to deviate from the items that
13 the -- that the automated system is lighting up and
14 telling them to pick?
15    A. To add additional items? No.
16    Q. How about to subtract items?
17    A. They can -- they can adjust the quantity down
18 for an item. They can't delete an item from the
19 record; but, if they were unable to pick an item or, as
20 I mentioned earlier, we had controls in place involving
21 thresholds that couldn't be exceeded, if the order
22 quantity that initially came in exceeded that, they had
23 the ability to adjust the quantity down, but they
24 couldn't remove an item from the record, if that's your
25 question.

Page 65

1    Q. Okay. Well, let's -- let's talk about the --
2 more details of that. Okay?
3    A. Okay.
4    Q. So if an item -- I think what you just said,
5 if an item, if there's not enough of it in the
6 container when they go to pick it, that might be a
7 reason that they'd have to put less in there?
8    A. They could adjust an order down if we were out
9 of stock or, for some reason, unable to fill that item,
10 that order, yes.
11    Q. And then -- but -- okay. So that isn't really
12 up to them. It's just if they go to -- it says pick 10
13 items and there's only nine in there, that's all
14 they -- they just pick what they can and then they
15 write in the computer that it was out of stock?
16    MS. McENROE: Objection to form.
17    THE WITNESS: If -- if they're unable to
18 fulfill the entire order quantity on the
19 pick-to-light display, the module that is
20 underneath the pick location, there's an ability
21 for them to adjust down.
22    As I mentioned earlier, when they pick, if
23 they pick complete, they indicate they pick
24 complete, confirm it, and the light goes out. If
25 they pick less than complete, they reduce the

Page 66

1    quantity and confirm it, and the light goes out.
2    BY MR. PIFKO:
3    Q.  And then you mentioned that there are -- there
4    were order thresholds for controlled substances that
5    couldn't be exceeded, correct?
6    A.  There was an order threshold, yes, a single
7    value, yes.
8    Q.  Okay.  Are you familiar with the thresholds?
9        MS. McENROE:  Objection to form.
10       THE WITNESS:  I -- I am.
11   BY MR. PIFKO:
12   Q.  Did all the stores have the same threshold?
13       MS. McENROE:  Objection to form.
14       THE WITNESS:  It was generally true there was
15   a single threshold.  There were a very small
16   number of stores that, after evaluation and
17   analysis by our government affairs department,
18   were defined as exceptions and could get greater
19   quantities than the threshold; but there was a
20   process that they had to go through.
21       You know, the government affairs department
22   looked at the movement, the location of the store,
23   the movement of the items, the history, that type
24   of thing, and then an exception could be granted;
25   but there was a very, very small number of those

Page 67

1    exceptions.
2    BY MR. PIFKO:
3    Q.  Do you have a time frame on the exceptions?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  I'm not sure I understand the
6    question.
7    BY MR. PIFKO:
8    Q.  Okay.  So I'm asking, again, we took a break,
9    so I want to be clear about that.  I'm asking -- these
10   questions are about the time period when you were VP of
11   logistics.  Okay?
12   A.  Okay.
13   Q.  So you said that there was a very small number
14   of stores that had a higher threshold, correct?
15   A.  Correct.
16   Q.  Do you know the, roughly, the time periods
17   when those stores moved into a period when they had
18   this higher threshold?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  I do not.
21   BY MR. PIFKO:
22   Q.  But aside from that small handful, all stores
23   had the same threshold for controlled substances; is
24   that correct?
25       MS. McENROE:  Objection to form.

Page 68

1        THE WITNESS:  That is correct.
2    BY MR. PIFKO:
3    Q.  Let's talk about breaking out the thresholds a
4    little bit.  Do you have an understanding, were there
5    thresholds for different types of products?
6    A.  No.
7    Q.  Okay.  So all Schedule 3s at all stores, other
8    than this handful of stores, all had the same
9    threshold?
10   A.  Correct.
11   Q.  Do you know what the threshold was?
12   A.  I believe it was 5,000 dosage units.  So if it
13   was, you know, a bottle of a hundred, the quantity
14   would be 50.
15   Q.  And do you --
16   A.  I believe that's correct.
17   Q.  Do you have an understanding about how that
18   threshold was established?
19   A.  I do not.  That threshold was in place when I
20   joined Rite-Aid, so I -- I don't know the history of
21   that.  I -- I generally understand there was an
22   analysis done of order volumes and demand; but I -- as
23   I said, it was in place when I joined Rite-Aid, so I
24   don't have the details of how it was established.
25   Q.  And so if an order came in from the automated

Page 69

1    system that exceeded the threshold, the order selector,
2    how would they know that it exceeded the threshold?
3    A.  By what it displayed on the pick-to-light
4    module.
5    Q.  So the pick-to-light module would
6    automatically adjust down the order to meet the
7    threshold?
8    A.  No.  The order selector adjusted the order
9    down.
10   Q.  Okay.  So how did the order -- did the order
11   selector know what the threshold -- where a store was
12   in terms of a threshold and how the order needed to be
13   adjusted down?
14   A.  Well, again, using the example I just gave, if
15   the product was in bottles of a hundred, they would
16   know they couldn't bill more than 50, you know,
17   assuming that the threshold was 5,000, which I believe
18   it was, they couldn't bill more than 50.  So if an
19   order came in for 55, they would adjust it down to 50.
20   Q.  And then I think maybe some of my confusion
21   was, I needed to ask some more questions about the --
22   how the threshold works.  So the threshold, is that --
23   was that a weekly threshold?
24   A.  It was on the order that was received, so it
25   was on that order.  As you mentioned earlier, some

Page 70

1  stores were biweekly stores, so they only got product
2  every other week. So it was on the order.
3  Q. So the threshold was based on the period for
4  which an order would be filled for that store?
5  A. The threshold was per order, correct.
6  Q. And you said all the stores had 5,000?
7  A. That's my understanding, yes.
8  Q. What about for --
9  A. Except the exception stores that we mentioned,
10  so --
11  Q. So for a store that was biweekly, was there a
12  threshold half of 5,000 or their threshold was 5,000 as
13  well?
14  A. The threshold was 5,000 for all stores, to the
15  best of my knowledge, other than the exception stores
16  that went through a process to get an exception granted
17  through our government affairs department.
18  Q. And so that 5,000 was for a specific order,
19  correct?
20  MS. McENROE: Objection to form.
21  THE WITNESS: It was per order for that
22  particular -- in other words, you're looking at
23  the order today. You're not allowed to ship them
24  more than 5,000 units.
25  BY MR. PIFKO:

Page 71

1  Q. And so the order selectors were familiar with
2  that threshold because it was the same for all stores,
3  correct?
4  A. Absolutely. Yes. That's correct.
5  Q. And so if an order came in from an automated
6  system that exceeded that, they would know that when
7  they saw it, and then they would adjust it downward?
8  A. Correct.
9  Q. How would they go and adjust it downward?
10  A. The pick-to-light module that shows the order
11  quantity, there's a mechanism for adjusting the pick
12  down; and so they would adjust it down to whatever
13  quantity it was that they picked, and then they would
14  confirm that.
15  Q. And then they would just adjust it down so
16  that it was within the threshold?
17  A. So that it met the threshold. They would
18  adjust it to the threshold level.
19  Q. So if an order came in for 5,001 dosage units,
20  they would adjust it down to 5,000 dosage units?
21  MS. McENROE: Objection to form.
22  THE WITNESS: That's conceptually correct.
23  You know, the products are shipped in bottles of
24  50 or a hundred or what -- so you would -- I can't
25  imagine a circumstance you'd get an order for

Page 72

1  5,001, but you could get an order -- because the
2  orders were in units, in bottles that we shipped
3  or whatever the shipping container was.
4  So, you know, it wouldn't say 5 -- I guess my
5  point is, it wouldn't say 5,001. It would say 51
6  bottles, and they would know to adjust it to 50.
7  BY MR. PIFKO:
8  Q. Okay. And so they would adjust it down to the
9  next -- the closest you would get to 5,000, based on
10  the particular volume of a bottle?
11  A. Correct. They would adjust it to the
12  threshold that was established based on the quantity
13  that was packed in a bottle for that item, that's
14  correct.
15  Q. And then would they have to enter in some sort
16  of code into the system to note that the adjustment was
17  made for the purpose of lowering to the threshold?
18  A. They did not enter it into the pick-to-light
19  system. There was a -- a tracking mechanism where they
20  recorded that they adjusted it down; and they both kept
21  a file of those, an Excel file of those adjustments,
22  and also later sent those adjustments to the corporate
23  office.
24  Q. Was there also -- well, I guess maybe it's the
25  same file of orders that exceeded the threshold?

Page 73

1  MS. McENROE: Objection to form.
2  THE WITNESS: Orders that exceeded the
3  thresh -- if it exceeded the threshold, it would
4  have been adjusted, and it would have been
5  contained in the file I just described.
6  BY MR. PIFKO:
7  Q. And then where -- was there a name for that
8  file?
9  A. I'm sure there is, but I can't off the top of
10  my -- you know, that's a level of detail significantly
11  below what I was involved with; but I'm sure there was
12  a name for the file, but I couldn't tell you what it
13  was.
14  Q. Was someone -- you said it was -- ultimately
15  could be sent to corporate, correct?
16  A. Correct.
17  Q. But was there someone who, before it got sent
18  to corporate, who would be responsible for looking at
19  orders that were adjusted to threshold?
20  A. It was -- the process was that the picker
21  adjusted it and recorded it; and the manager, the
22  pharmacy manager, would review and confirm, you know,
23  so the pharmacy -- it was looked at by two people.
24  Both the picker and the pharmacy manager looked at the
25  adjustment that was made.

Page 74

1  Q. Do you have an understanding about the -- what
2  criteria the manager would be looking at when they're
3  looking at the adjustment? Why are they looking at it?
4      MS. McENROE: Objection to form.
5      THE WITNESS: The adjustments included both
6  adjustments that we're talking about, both
7  adjustments that simply exceeded the threshold;
8  but you'll recall that earlier I mentioned that
9  another leg of the controls that Rite-Aid had in
10 place was that the order selectors, who were kind
11 of familiar with the norms, that, you know, the
12 normal patterns of ordering, if they saw something
13 that was unusual, they had the wherewithal to kind
14 of raise their hand and stop and either adjust it
15 or call the -- if it was during the day, they'd
16 call the store to confirm the order quantity.
17     Even if it was below the threshold, there was
18 a check that was made for that. Those were also
19 contained in the same -- in the same list, so in
20 the same file.
21     So the manager was both, you know, confirming
22 that someone had properly recorded the adjustments
23 that were made because of the threshold but also
24 was reviewing what action, if any, was taken for
25 the ones that were adjusted below the threshold.

Page 75

1  BY MR. PIFKO:
2  Q. At some point you had responsibility for
3  getting the spreadsheets of these threshold
4  exceedances. Do you recall that?
5      MS. McENROE: Objection to form.
6      THE WITNESS: That came into the corporate
7      office in my department?
8  BY MR. PIFKO:
9  Q. Yes.
10 A. They came -- the adjustments that were made
11 came in to, you know, the regulatory individual that
12 worked for me, yes.
13 Q. And there was a period when one of those
14 people, maybe they left the company or something, and
15 it was -- those were sent directly to you?
16 A. There was. For the -- I think you're actually
17 talking about a subset of those adjustments, the ones
18 that were basically for the ARCOS reportable items.
19 Yes, those were sent to me.
20 Q. And that's what I'm getting at is, what was
21 your understanding of what was being sent to you at
22 that time?
23     MS. McENROE: Objection to form.
24     THE WITNESS: Well, again, there's -- there
25     was a file that contained all of the adjustments

Page 76

1  that were made, and then there was a file that
2  contained only the ARCOS reportable items.
3      The file that contains the ARCOS reportable
4  items was made to report the corresponding
5  corrections in the ARCOS file so that when it was
6  created -- when it was sent to the DEA, it
7  reflected the adjustment that was made at the
8  distribution center.
9  BY MR. PIFKO:
10 Q. And so we're talking about, to be clear, you
11 understand that as a registrant, among the duties
12 Rite-Aid had was to report certain types of products to
13 the ARCOS system; is that correct?
14     MS. McENROE: Objection to form.
15     THE WITNESS: I do understand that.
16 BY MR. PIFKO:
17 Q. Okay. And so when the spreadsheet was sent to
18 you, it was a subset of items that needed to be
19 reported to ARCOS; and, if I'm understanding you
20 correctly, you got that report so that you would make
21 sure the amount being reported into the ARCOS system
22 was the order actually filled, not the order actually
23 placed; is that correct?
24     MS. McENROE: Objection to form.
25     THE WITNESS: Well, let me restate it to make

Page 77

1  sure that this is being -- it was -- because you
2  said it was a subset of the ARCOS reportable
3  items. It was the -- the subset of the ARCOS
4  reportable items that had an adjustment, if that
5  makes sense.
6  BY MR. PIFKO:
7  Q. Okay.
8  A. So there was a file of all of the items that
9  were adjusted, many of which were not ARCOS reportable.
10 That was a file. There was a separate file that was a
11 subset of that first file that was only the ARCOS
12 reportable items.
13     That file was sent to be used to make -- to
14 adjust the quantities in the ARCOS file before it was
15 sent to the DEA. Does that make sense?
16 Q. Yes. So is there an automated system for
17 queuing up the orders that were going to be reported to
18 the ARCOS system?
19     MS. McENROE: Objection to form.
20     THE WITNESS: I believe you're asking was
21     there an automated process to create the ARCOS
22     file; is that correct?
23 BY MR. PIFKO:
24 Q. Yes.
25 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  Q.  Okay.  So the file would be created, but then
2  if order quantities had been adjusted through the
3  threshold system, someone would have to make sure that
4  they were appropriately reflected in the file that was
5  generated?
6  A.  Yes.  As I recall, the initial file contained
7  the original order quantity, not the quantity that was
8  ultimately shipped.  So again, as I recall, the
9  adjustment had to be made based on the files that were
10  sent by the distribution center.
11  Q.  Okay.  And then backing up, so there's a --
12  there's a file of these controlled substances that --
13  and you said if there's an adjustment downward for
14  threshold, that's put in the file; and then you said
15  that, on occasion, an order selector might decrease the
16  order, and that would have to be put in there as well?
17  MS. McENROE:  Objection to form.
18  THE WITNESS:  Correct.  They may decrease the
19  order, even though it did not exceed the thresh --
20  something that was within the threshold, but they
21  may have followed up with and found that the order
22  needed to be adjusted.
23  BY MR. PIFKO:
24  Q.  Was there -- are there codes in that system to
25  tell you why there's an adjustment being made?

Page 79

1  A.  You're saying in the pick-to-light system?
2  Q.  In the -- in the spreadsheet that's created.
3  You said -- hold on for a second.  So I believe you
4  said you don't remember the name of it; is that
5  correct?
6  A.  That is correct.
7  Q.  Okay.  So we can just call it, for purposes of
8  the deposition, the order adjustment spreadsheet.
9  Okay?
10  A.  Okay.
11  Q.  So in this order adjustment spreadsheet, is
12  there any sort of coding so you know that an order was
13  adjusted for a specific reason?
14  A.  I don't -- I guess I don't recall the file
15  specifically enough to say with certainty; but I would
16  guess there was something that indicated which ones
17  were adjusted because they exceeded the threshold and
18  maybe -- I know that -- I know that if they adjusted it
19  for a reason besides exceeding the threshold, they had
20  to indicate why.  So there was -- there was some
21  narrative or something in there about that.
22  Q.  Okay.  So that could be they made some one-off
23  adjustment after talking to the store, or it also could
24  be because there wasn't sufficient supply in the
25  warehouse?

Page 80

1  MS. McENROE:  Objection to form.
2  THE WITNESS:  It -- it could be either of
3  those.  It -- it would rarely be insufficient
4  supply because the system would not have -- if the
5  system knew we were -- you know, the system knows
6  the distribution center inventory as well.
7  So if the system, the Warehouse Management
8  System, did not show inventory to fulfill an
9  order, it would not have created one for the --
10  for the distribution center.
11  So it was possible that there would be an
12  inventory problem, or perhaps an item got
13  quarantined, for example.  So it showed in
14  inventory, but we shouldn't ship it, and they'd
15  have to adjust for that reason, but that was very
16  uncommon.
17  BY MR. PIFKO:
18  Q.  Are there any other reasons that an order
19  could be adjusted from the size of the order that came
20  in?
21  A.  I'm -- I'm sure there are.  I mean, again,
22  what typically would happen if they -- if they -- it
23  was below the threshold but it looked unusual or, you
24  know, they had any question at all, they would attempt
25  to call the store, and the store could tell them, you

Page 81

1  know, what they really intended to do.  Did they really
2  need that quantity?
3  Maybe they -- so I know, again, there was some
4  comments made about, Here's why I adjusted.  This is
5  what the store told me.  So I couldn't tell you what
6  all of those things were, but those would have been
7  based on conversations with the pharmacist at the
8  store.
9  Q.  And then that was going to be my next
10  question, was, so if there was a conversation with
11  somebody at the store, that would be documented in the
12  spreadsheet?
13  A.  Yes.
14  Q.  Do you -- are you familiar with any training
15  on Controlled Substances Act that order selectors may
16  have received?
17  A.  I'm not -- you know, let me first say that I
18  wasn't -- my area wasn't responsible for the operation
19  of the distribution centers.  So that wasn't directly
20  in my purview.  I know that their -- they were trained
21  on their responsibilities and what they were expected
22  to execute at the distribution center.
23  I don't know whether there was any training
24  that specifically mentioned the Controlled Substances
25  Act.  I know that it told them what we could and

Page 82

1  couldn't do and did and didn't do to make -- to ensure
2  that we complied with the Controlled Substances Act.
3    Q.  And just -- I think we kind of covered this,
4  but I just want to make sure we're clear.  Are you --
5  having been a former distribution center general
6  manager, are you familiar with the chain of management
7  and -- of employees at the distribution center?
8    A.  You're talking about the reporting structure
9  at the distribution center?
10   Q.  Yeah.
11   A.  Generally, yes.
12   Q.  Okay.  So an order selector, is that an hourly
13  position?
14   A.  Yes.
15   Q.  And is that a daytime position or a nighttime
16  position?
17   A.  There are order selectors -- we run a
18  multi-shift operation at almost all of the distribution
19  centers, so --
20   Q.  Okay.  So they can be both?
21   A.  They can be both.
22   Q.  So there's -- order selecting happens 24 hours
23  a day?
24   A.  It happens throughout the day.  The schedule
25  varies, depending on the specific distribution center.

Page 83

1  There typically is a window during that -- during that
2  24-hour day, there's a window where no order selecting
3  is being done for system maintenance and replenishment,
4  things of that nature; but, as a general statement, it
5  could happen throughout the day.
6    Q.  And who do the order selectors report to?
7    A.  They will generally report to a department
8  manager.  There's a pharmacy department manager.
9  There's also, in each pharmacy department, a DEA
10  coordinator who monitors the activities in the
11  controlled substance cage and all of the things related
12  to DEA, and they would be a resource for those
13  associates as well.
14   Q.  Is there a DEA coordinator on site during all
15  shifts or only during the day?
16   A.  There is not one on site during all shifts.
17  There is a DEA coordinator at the distribution center.
18  That person, as a part of their responsibility, may be
19  asked to work all shifts from time to time.
20   Q.  So that the order selector reports up to
21  the --
22   A.  To a department manager.
23   Q.  -- a department manager; and in the case of
24  controlled substances, is it the pharmacy department?
25   A.  Correct.

Page 84

1    Q.  And who does the pharmacy department manager
2  report to?
3    A.  They would generally report to an operations
4  manager.
5    Q.  And then they report to the general manager?
6    A.  That would be -- typically that would be the
7  case, yes.
8    Q.  Are you familiar -- so we talked about it a
9  little bit earlier.  We talked about the idea of
10  diversion.  Do you recall that?
11   A.  I do.
12   Q.  Okay.  Are you familiar with the idea of
13  suspicious order monitoring and reporting under the
14  Controlled Substances Act?
15      MS. McENROE:  Objection to form.
16      THE WITNESS:  I am.
17  BY MR. PIFKO:
18   Q.  Okay.  Are you aware of whether Rite-Aid had a
19  system in place to report suspicious orders to the DEA?
20   A.  Our process -- again, I've got to walk through
21  the process for creating the orders to ensure that the
22  orders are correct based on demand.  Then they are --
23  they arrive at the distribution center, and they are
24  then adjusted below that threshold and reviewed by the
25  associates as they pick them.

Page 85

1      If, in fact, we saw anything suspicious at
2  that point, our policy was, at the distribution center,
3  to contact the government affairs department, and they
4  would take care of any notification that took place.
5    Q.  Was there any system to report an order that
6  exceeded the threshold to the DEA?
7    A.  "Report an order that exceeded the threshold."
8  We -- are you asking whether we automatically reported
9  all orders that exceeded the threshold to the DEA?
10   Q.  Right.
11   A.  We did not.  The threshold was set -- in many
12  cases, the threshold was set as a level, again, as kind
13  of the last line of defense after the orders were
14  already created through these other systems and if
15  anything reduced it below what that legitimate expected
16  order would be.
17      So I don't believe -- they certainly -- we did
18  not report to the DEA every time we adjusted an order
19  based on a threshold.
20   Q.  Are you familiar with the criteria that were
21  used to decide whether to report an order to the DEA?
22   A.  All -- of my own knowledge, the only thing I
23  know is that they would report anything we were
24  concerned with to the government affairs department and
25  that they would then make the decision to report to the



Page 86

1    DEA.
2        Q.   Okay.  So let's talk about -- are you familiar
3    with criteria that would have led something to be
4    reported to the government affairs department?
5        A.   You know, I -- again, I can't -- I can't say
6    anything specific.  That's probably multiple levels
7    below what my, kind of, responsibilities were; but I
8    know that if, in fact, in the judgment of the order
9    selectors, the DEA coordinator, and the pharmacy
10   manager, there was a concern, they would contact the
11   government affairs department, so --
12       Q.   Do you know if there were any documented
13   procedures by which order selectors were told what
14   would lead something to be, quote, suspicious to be
15   reported to the government affairs department?
16       A.   I know that there were documented procedures
17   that were used to train the order selectors and what
18   they were supposed to do; and again, the order
19   selector, if they had a concern, they would bring it to
20   the attention of their, you know, their department
21   manager and the DEA -- and/or the DEA coordinator who
22   would ultimately make that contact to the government
23   affairs department, so --
24       Q.   Do you know the names of any of the people who
25   worked in the government affairs department?

Page 87

1        A.   Janet Hart is -- was our primary contact
2    that -- she was our, kind of, subject matter expert
3    that we used as a resource.
4        Q.   Anyone else?
5        A.   Typically we would -- certainly from my
6    perspective, my involvement, I would go to Janet with
7    any questions or any issues that I had, so --
8        Q.   To your recollection, Janet held that position
9    the entire time that you would have had any involvement
10   with anyone in government affairs?
11       A.   To the best of my knowledge, yes.
12       Q.   There wasn't anyone else that you can recall
13   ever having interacted with from government affairs?
14       A.   Well, there were other people I interacted
15   with from government affairs; but, if there was
16   anything that was related to the DEA, I interacted with
17   Janet.
18       Q.   Can I get some -- can we go off record for
19   just 2 seconds?
20            THE VIDEOGRAPHER:  Off the record, 11:22 a.m.
21            (Brief recess was taken.)
22            THE VIDEOGRAPHER:  On the record, 11:23 a.m.
23            (Rite-Aid Chapman Exhibit No. 1 was marked for
24   identification.)
25   BY MR. PIFKO:

Page 88

Page 89

2        Q.   Let's talk about the E-mail system for a
3    minute.  There were -- there was an old system and a
4    new system, or were there simultaneously two systems?
5        A.   There were simultaneously two systems.  You
6    know, for some period of time there were both, so --
7        Q.   Do you have an understanding about why that
8    was?
9        A.   Well, they were phasing out the old system.
10       Q.   Okay.
11       A.   The old system was called SYSM, and it was,
12   you know, it had many limitations.  It was a
13   mainframe-based system, but that was -- that was his ID
14   for that.
15       Q.   Okay.  And so then a new system was
16   instituted, and people got different E-mail addresses?
17       A.   When the new system was implemented, you got
18   an E-mail address that, you know, was basically your
19   name, you know, so --

Highly Confidential - Subject to Further Confidentiality Review



**Page 90**

**Page 91**

4    Q.   Have you ever attended one of those
5  conferences?
6    A.   I did when I worked for Eckerd's, but, you
7  know, this was prior to me working for Rite-Aid.
8  Probably in the late '90s I attended one.
9    Q.   So to your knowledge, Ron Buzzeo was putting
10  these on as far back as the late '90s?
11    A.   I believe that's when it was, the late '90s
12  when I attended one, yes.
13    Q.   Okay.  The one you attended was put on by
14  Ron Buzzeo?
15    A.   Yes.
16    Q.   And did you -- so Kevin, I believe his name
17  came up earlier.  He was the regulatory compliance
18  person, correct?
19    A.   Correct.  Kevin Mitchell.
20    Q.   Okay.  Do you recall the time period when he
21  held the regulatory compliance position?
22    A.   He was in that position when I came to the
23  corporate office in 2008, and I -- I couldn't tell you
24  exactly when he left.  I would say 2011 maybe, but I'm
25  not sure of the exact date.  2010, 2011, so --

**Page 92**

1    Q.   Are you familiar with the reasons why he left?
2    A.   I am not.
3    Q.   He left the company, or he left to have
4  another position within the company?
5    A.   He left the company.
6    Q.   Do you know where he went after?
7    A.   I do not.
8    Q.   So as the logistics manager, I believe you
9  said vice president of logistics, he reported to you?
10    A.   Correct.
11    Q.   Did you have authority to decide what
12  trainings to send people like him on?
13    A.   Not purely and independently.  I made
14  recommendations, but our policy was that I would have
15  to get the approval of my boss anytime I sent anyone to
16  conventions, conferences, you know, travel expenses or
17  something any company manages.  So I didn't have the
18  independent authority, but I had the authority to
19  recommend.
20    Q.   And who was your boss who had that approved --
21  final approval authority?
22    A.   Wilson Lester.
23    Q.   So did you recommend every year that someone
24  from your department attend one of Ron Buzzeo's
25  conference, conferences?

**Page 93**

1    A.   I -- I recommended multiple times.  I mean, I
2  don't know that I can, you know, authoritatively say I
3  recommended it every single year.  I don't recall that
4  that specifically, but I know I recommended it multiple
5  times and that folks both from the corporate office and
6  also from the distribution centers, the DEA coordinator
7  position that I mentioned, went.

21    Q.   Do you recall there being any specific gaps or
22  areas that you wanted to improve in the suspicious
23  order monitoring system at this time?
24    A.   I do not.
25    Q.   Do you recall making any changes to the system

Page 94

1  as a result of this discussion in 2009?
2     A.  I do not recall making any changes.
3     Q.  If there were changes, would you be aware of
4  them?
5     A.  I would expect to be, yes.
6     Q.  Do you recall there being changes to the
7  system at any time during your tenure?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  I do not.  You know, I will say
10    this:  When I joined Rite-Aid, I was quite
11    impressed by the process that they had in place to
12    manage controls when I first became involved with
13    it.  It was, you know, robust, multilevel.
14       So no, I -- I -- to the best of my knowledge,
15    that system that was in place remained in place
16    throughout the remainder of the time that Rite-Aid
17    shipped controlled substances.
18 BY MR. PIFKO:
19    Q.  Do you know if Mr. Mitchell brought any
20 paperwork back from the conference with him?
21    A.  I -- I don't recall that.
22    Q.  Do you --
23    A.  I don't recall.
24    Q.  Do you recall, at any time anyone attended one
25 of Mr. Buzzeo's conferences, them bringing back any

Page 95

1  materials they might have received from the conference?
2     A.  I don't specifically recall that, no.
3     Q.  When you attended one of Mr. Buzzeo's
4  conferences, do you recall receiving any materials?
5     A.  I would assume that I did, but it's -- you
6  know, it's long enough ago that I don't really
7  remember; but typically when you go to a conference,
8  there's some printed material that you get, so --
9     Q.  Do you know if materials from the conference
10 would have been maintained by your department or the
11 regulatory compliance department at any time?
12    A.  Again, I don't know that there were any
13 materials from the -- from the conference.  So I can't
14 answer that.  I -- I don't know what it was and, you
15 know, if there was anything.  So -- so I don't know the
16 answer to that question.
17    Q.  You said that you would have referred Kevin to
18 Janet Hart to have a discussion about any concerns he
19 had?
20    A.  Correct.  With -- with the thought that -- to
21 make sure that we compared whatever Ron described as an
22 issue with our current processes and if, after that,
23 Janet felt like there were any concerns, we would
24 certainly take steps to address them, so --
25    Q.  Do you recall having any discussions with

Page 96

1  Janet Hart about the suspicious order monitoring?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  Pursuant to this?
4  BY MR. PIFKO:
5     Q.  Yes.
6     A.  No.  I do not.  Again, this was one of
7  multiple areas of responsibility that I had.  So I
8  charged Kevin with that responsibility.  Kevin would
9  have had the discussion with Janet.  If there were any
10 issues, Kevin would have brought them back to me.  That
11 would have escalated it, and we would have had further
12 discussion with Janet; but no, I don't remember any
13 discussion with Janet as a result of this.
14    Q.  How about at any time, did you have a
15 discussion with Janet Hart about suspicious order
16 monitoring?
17    A.  Well, later in my tenure at Rite-Aid we looked
18 at automating some of the manual processes that I
19 described, you know, to increase the efficiency for
20 that; and so there was some work that was initiated to
21 potentially kick off a system project, and I did have
22 some conference -- some conversations probably with
23 Janet at that time.
24       Again, they would have been very limited at my
25 level when -- the period I'm talking about, Chris Belli

Page 97

1  was in place, and Chris Belli would have had, you know,
2  any detailed conversations with Janet about it; but I'm
3  sure we had some conversations then when we were
4  talking about automating some of this.
5     Q.  There's a document called a Project
6  Initiation.  Is that a form that you're familiar with?
7     A.  It is.
8     Q.  Okay.  And you recall corresponding with
9  people, including Janet and Chris, about the project
10 initiation?
11    A.  I do.  It's for the project I just
12 mentioned --
13    Q.  Right.
14    A.  -- that it was to automate some of these
15 manual processes that we had in place and to provide
16 some -- you know, the thought process of that project
17 was to take activities -- both to automate what was
18 going on at the distribution centers but also to take
19 activities that were being run by separate processes
20 and our loss prevention perhaps and government affairs
21 area and collect them all into one system.  So yes, I
22 do recall that.
23    Q.  To your knowledge, was that project ever
24 implemented?
25    A.  No, that project was never implemented.

Page 98

1    Q.  Do you know why it was not implemented?
2    A.  Well, ultimately Rite-Aid stopped shipping
3  controlled substances.  So there was work to evaluate
4  the project, to, you know, to scope out the work effort
5  for the project, to get it on the -- in the work queue,
6  you know, any -- I referred to the IT department.
7       All IT departments, I'm sure at every company
8  in America, has a backlog of projects to do.  So
9  there's a work queue that it would have to be entered
10  into, and there was work to kind of get it into that
11  work queue; and, as I recall, that was -- by the time
12  that was underway, it was shortly before we eliminated
13  shipping pharmacy.
14      So there would no longer have been a benefit,
15  truly, of automating a process that was already in
16  place and already sufficed as it stood, even if it was
17  a little less efficient than we liked it to be.
18   Q.  And what do you mean it was less efficient
19  than you would like it to be?
20   A.  Well, some of the manual steps that we -- I
21  talked about the order selectors having to write things
22  down and recording it in an Excel spreadsheet and
23  things of that nature.  The project kind of envisioned
24  that that could all be done online and would be
25  collected in one central database as opposed to being

Page 99

1  on an Excel spreadsheet, things of that nature, so --
2    Q.  Do you recall when the discussions first
3  started about this project?
4       MS. McENROE:  Objection to form.
5       THE WITNESS:  I -- I don't recall exactly.
6    I -- no.  My guess would be 2012 or '13; but, you
7       know, I'd have to go back and look at the
8       documents to confirm that, so --
9  BY MR. PIFKO:
10   Q.  Do you recall -- I believe that you were just
11  testifying about the process of implementing the
12  procedure and going through IT.  Do you recall that?
13   A.  Yes.
14   Q.  As one of those processes, you would have a --
15  some test sites where you would implement this program;
16  is that correct?
17   A.  Are you asking as a part of getting the
18  project approved or part of actually developing and
19  implementing the project?
20   Q.  Part of developing and implementing it.
21   A.  If we developed and implemented it, any IT
22  project, we would typically pilot it at, you know, one
23  or -- you know, one or two locations before
24  implementing it at all of the locations.
25   Q.  Do you recall the Liverpool distribution

Page 100

1  center being selected as one of the test sites for that
2  project?
3    A.  I -- I don't recall it.  You know, I don't
4  recall why we selected that, but it doesn't surprise me
5  that we would have selected Liverpool.
6    Q.  Where is the Liverpool distribution center?
7    A.  Near Syracuse, New York.
8    Q.  And do you have an understanding about the
9  geographic regions serviced by the Liverpool
10  distribution center?
11   A.  Generally, and again, as I mentioned earlier,
12  those service locations changed over time; but yeah, as
13  a general statement, I could say yes.
14   Q.  Do you know the states that were included
15  within the service area for the Liverpool distribution
16  center?
17   A.  At various times it would have included
18  obviously New York, some stores probably in
19  New Hampshire, Connecticut, you know, Western
20  Massachusetts, Northern Pennsylvania, probably the edge
21  of Ohio.
22      You know, I'm not -- you know, we -- that was
23  something that was managed based on distribution center
24  capacity; and, as I mentioned, that changed over time
25  as distribution centers closed and as Rite-Aid

Page 101

1  completed the integration of the Eckerd stores and
2  distribution centers.
3       So gosh, I -- you know, to me, at my level,
4  they were store numbers and volumes and transportation
5  needs.  It wasn't -- you know, it wasn't something that
6  I looked at in great detail, so --
7    Q.  Is there a document that tells you which
8  distribution centers served which stores at any given
9  time?
10   A.  There were -- there was a -- in the Rite-Aid
11  database, you know, there was a place where you
12  indicated who -- which distribution center serviced a
13  store for whatever period of time, and then when you
14  made a change, you made a change in that database.
15      So I'm sure that they could be extracted from
16  that.  Beyond that, there were -- you know, various
17  functional areas kept spreadsheets of, you know,
18  service areas and things of that nature, so --
19   Q.  You mentioned that you wouldn't be surprised
20  that the Liverpool distribution center would be
21  selected as a pilot location for the program, the
22  suspicious order monitoring automation program, what
23  you were just discussing.  Why did you say that?
24   A.  Well, Perryman is -- we only had pharmacy
25  products in four of the distribution centers:

Page 102

1 Tuscaloosa, Woodland on the West Coast, Liverpool, and
2 Perryman. We -- if we were going to pilot something,
3 you know, one of the considerations would be
4 geographical proximity to the corporate office in case,
5 you know, as you went and did some testing and
6 participated and things of that nature.
7     And although the Perryman distribution center
8 is actually closer to the corporate office, we would
9 tend to not pilot something at Perryman because it was
10 so large.
11    Perryman is -- was Rite-Aid's largest
12 distribution center by a significant, you know -- a
13 significant proportion. So, you know, when you're
14 piloting a new system, you probably don't want to go
15 into the biggest location that you have.
16    Q.  Are you familiar with the process by which --
17 we talked about how orders get placed by a store to the
18 distribution center. At some point a distribution
19 center runs low on supply. We talked about that a
20 little bit. Are you familiar with the process by which
21 a distribution center orders product?
22    A.  Generally, yes. That wasn't in my area of
23 responsibility; and just as a point of clarification,
24 the distribution center did not order product. There
25 was a functional department at the corporate office

Page 103

1 that managed the replenishment of goods into the
2 distribution centers.
3     Q.  Do you know if, similar to the way store
4 orders were made, if it was through an automated
5 system?
6     A.  It was.
7     Q.  Okay. So do you know if it's similar in
8 regards to the distribution center's computer system
9 would be monitoring the demand of items versus the
10 inventory and request to be refilled based on that?
11    A.  Yes. In broad strokes, that's correct. It
12 would look at the on-hand balance for an item; it would
13 look at the projected demand for an item. There was an
14 ability to adjust for seasonality.
15    You know, obviously some -- you know, you sell
16 more filler paper in June than you do in -- or June and
17 July as you're going back to school than you do later
18 in the year. So there's an ability to adjust for
19 seasonality.
20    So there was some -- some other controls or
21 adjustments that could be made in that -- in that, and
22 it also took into account lead time and required order
23 sizes. Some items you have to order -- you know, some
24 item you have to order by the pallet. Some items you
25 can order by the case type of thing, so --

Page 104

1     Q.  Do you know if that was the same computer
2 system used at the stores?
3     A.  No, it was not. There was a -- no, it was
4 not.
5     Q.  Do you know -- do you know the name of that
6 system?
7     A.  It was -- E3 was the vendor that it was
8 purchased through, so -- and again, I'm not -- that
9 wasn't my area of responsibility. I'm not an expert.
10 I, you know, kind of in general know conceptually how
11 it worked, but we've just about exhausted my knowledge
12 at this point.
13    Q.  There was someone at headquarters who was
14 responsible for that?
15    A.  There was a replenishment department that was
16 responsible for replenishing both front-end and
17 pharmacy orders into the distribution centers.
18    Q.  And so someone in the replenishment department
19 would be more familiar with the process than you?
20    A.  Yes.
21    MR. PIFKO:  We've been going about another
22 hour, and I think it's around noon, if you guys
23 want to take another break.
24    MS. McENROE:  So it's 11:45. We can break now
25 and take a short lunch or if you want to keep

Page 105

1 going for a little while and then break for lunch.
2    MR. VITALE:  Yeah, let's break for lunch now.
3    MR. PIFKO:  Let's take a short break now.
4    MS. McENROE:  So take a short break now and
5 then come back, yeah.
6    THE VIDEOGRAPHER:  Off the record at 11:45
7 a.m.
8    (Brief recess was taken.)
9    THE VIDEOGRAPHER:  On the record, 11:59 a.m.
10 BY MR. PIFKO:
11    Q.  Are you familiar with the audit process with
12 respect to DEA audits in the distribution centers?
13    A.  Generally --
14    MS. McENROE:  Objection to form.
15    THE WITNESS:  Generally, yes.
16 BY MR. PIFKO:
17    Q.  Was that something that you had familiarity
18 with when you were general manager of a distribution
19 center?
20    A.  If you're asking whether I had involvement
21 with it as a general manager, no, because we didn't
22 have a pharmacy department; but by the time I became a
23 general manager, you know, I had worked -- for Eckerd's
24 for 30 years, so we -- Eckerd had undergone DEA audits,
25 so I was generally familiar with it from that.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   And when you were VP of logistics, did you
2  have any high-level involvement with audits?
3    A.   With DEA audits?
4    Q.   Yes.
5    A.   Yes.  We were -- again, you know, my area was
6  a resource to the distribution center.  So when the DEA
7  came for an audit, they would let my area know; and, if
8  there were any -- you know, occasionally there were
9  reporting needs or things that they would need to have
10 run and data generated that my department would help
11 coordinate.
12      But yes, we -- we were always aware when there
13 was a DEA audit, and we got feedback at the end of
14 those audits and, you know, we were -- gosh, you know,
15 I was always pleased to see we did very well with those
16 DEA audits.
17   Q.   Do you know if, as part of the audit process,
18 the DEA evaluated the company's suspicious order
19 monitoring efforts?
20   A.   Actually, I know that they did an audit at the
21 Perryman distribution center, and at the conclusion of
22 that, in the exit discussion, they complimented us on
23 our process to manage suspicious orders or excessive
24 orders.  So yes, they did evaluate it as a part of
25 that.

Page 107

1    Q.   Do you know the rough time frame that that
2  occurred?
3    A.   Again, I'd say, you know, 2012, '13.  I -- you
4  know, it's been several years ago now, but I -- I know
5  that we had the audit and that occurred, so --
6    Q.   Do you recall who -- the names of the DEA
7  officers who conducted the audit?
8    A.   No, I wouldn't have been, you know, involved
9  again at that level.  We got -- we got feedback of the
10 results, but I -- I wasn't there when the audit took
11 place, and I wasn't there for the exit interview.  So
12 we got feedback from it, but I didn't participate; and
13 no, I don't know the names of the officers that were
14 involved in that.
15   Q.   During your tenure as VP of logistics, did you
16 ever meet with any DEA agents?
17   A.   I did.  Yes, I did.
18   Q.   Okay.  When was the first such occasion that
19 you met with DEA agents?
20   A.   There was only one occasion, as I recall, and
21 it was very early in my tenure in that position,
22 probably in 2009.  We actually visited the DEA's
23 headquarters in Washington.
24      You know, I described to you the cross-dock
25 process that we had where we had the cross-dock cages

Page 108

1  that were approved by the DEA for us to bring product
2  from a pharmacy DC and merge it with the orders at the
3  front-end DC.
4       We had to get permission from the DEA to
5  extend that process to the Eckerd DCs that were --
6  Rite-Aid already had permission from the DEA to do
7  that.  When the Eckerd acquisition took place and now
8  Rite-Aid owned the Eckerd DCs, you have to get explicit
9  permission at every location.
10      So we had to get permission from them to do
11 the cross-dock process, and so I was part of a group
12 that went to DEA headquarters in Washington and met
13 with them.  So that was the only time that I met with
14 any DEA agents, and that was the subject.
15   Q.   Do you remember the name of the agents that
16 you met with then?
17   A.   I do not.
18   Q.   To your knowledge, while you were at Rite-Aid,
19 was the company ever subject to any enforcement actions
20 by the DEA?
21   A.   Not that I know of.  I -- there's none that I
22 was aware of, so --
23   Q.   Let's talk about theft for a moment.  From
24 time to time would you have issues with theft?
25      MS. McENROE:  Objection to form.

Page 109

1       THE WITNESS:  You're talking about in general?
2   Certainly, there was product stolen from our
3   distribution centers.
4  BY MR. PIFKO:
5    Q.   And specifically with respect to controlled
6  substances.
7    A.   I don't ever remember there being an incident
8  that I was aware of where we had theft of any
9  controlled substances.  You know, the physical security
10 was much greater for those products.
11      The process by which the associates were
12 vetted and allowed to go into the cage and to
13 participate in that activity was higher.  They had a --
14 you know, a background, you know, investigation was
15 done and things of that nature.  So while we -- you
16 know, it would be disingenuous for me to say we never
17 had any front-end product stolen from a DC.
18      I'm -- I'm not aware of any incidents that --
19 certainly I'm not aware of where we had any controlled
20 substances stolen.
21   Q.   Pardon me.  We're having some technical
22 difficulties in locating the document.
23      While he's looking for that, are you familiar
24 with the idea of conducting due diligence on an order
25 that's deemed to be suspicious or potentially

Page 110

1  suspicious?
2      MS. McENROE: Objection to form.
3      THE WITNESS: I'm not sure exactly what you
4  mean by "due diligence." I know that we have a
5  responsibility as a registrant to take steps to
6  avoid diversion, you know, to ensure diversion
7  doesn't take place, and to also ensure suspicious
8  orders are not filled, and we don't take -- but if
9  you're -- I'm not sure exactly what you're
10  referring to by the phrase "due diligence" with
11  that.
12  BY MR. PIFKO:
13  Q. Are you familiar with the idea that if an
14  order is potentially suspicious, there's a duty to
15  investigate the order to alleviate those suspicions?
16      MS. McENROE: Objection to form.
17      THE WITNESS: Yes.
18  BY MR. PIFKO:
19  Q. To your knowledge, does Rite-Aid have a
20  process to -- when you were VP of logistics, did
21  Rite-Aid have a process to conduct such investigations?
22  A. When -- our responsibility in the distribution
23  centers would have -- would have been, if we identified
24  anything that we felt was a suspicious order, we would
25  have reported it to the government affairs department.

Page 111

1  They would have then worked with the loss prevention
2  department and us, if necessary, to do any
3  investigation.
4      I'm not aware of that ever -- I don't recall
5  that ever occurring. That's what would have taken
6  place.
7  Q. If you -- if there was such an investigation,
8  would you have been involved in it?
9      MS. McENROE: Objection to form.
10      THE WITNESS: Potentially, but not with
11  certainty.
12  BY MR. PIFKO:
13  Q. Is there a name of somebody within the
14  government affairs department who would be responsible
15  for heading up an investigation like that?
16  A. If we had identified something that we felt
17  was suspicious, we -- or potentially suspicious, we
18  would have contacted Janet Hart.
19  Q. Do you know if there would be any
20  documentation of a request for an investigation to
21  occur?
22      MS. McENROE: Objection to form.
23      THE WITNESS: I -- I don't know of that ever
24  taking place.
25  BY MR. PIFKO:

Page 112

1  Q. So you don't believe that there ever was a
2  request to conduct an investigation?
3  A. I -- no, I didn't say that. I said I'm not
4  aware of it ever taking place. I don't know.
5  Q. Okay.
6  A. It did not take place, to the best of my
7  knowledge.
8  Q. If an order was deemed to be potentially
9  suspicious, would that be documented anywhere?
10      MS. McENROE: Objection to form.
11      THE WITNESS: There would have been
12  communication to Janet Hart; and I'm sure, you
13  know, certainly based on the documents that were
14  able to be produced, I'm sure it would have been
15  documented in an E-mail or, you know, some
16  communication, so --
17  BY MR. PIFKO:
18  Q. Do you know if there was any sort of
19  spreadsheet or anything where those communications
20  would have been maintained?
21  A. I'm not aware of any spreadsheet; and again, I
22  don't -- I don't recall it ever taking place.
23  Q. All right. I'm handing you what's been marked
24  as Exhibit 2.
25      (Rite-Aid Chapman Exhibit No. 2 was marked for

Page 113

1  identification.)
2  BY MR. PIFKO:
3  Q. For the record, Exhibit 2 is a multipage
4  E-mail, Bates labeled Rite_Aid_OMDL_0038075 to 77.
5  Take a moment to review that, and let me know when
6  you're done.
7  A. Okay. Okay.
8  Q. All right. So this -- have you seen this
9  before?
10  A. I have.
11  Q. When was the last time you saw this?
12  A. Yesterday.
13  Q. And before seeing it yesterday, when was the
14  last time you saw it?
15  A. 2013.
16  Q. All right. The subject line of this series of
17  E-mails is Suspicious Order Monitoring Project.
18  Actually, it says 5046 - Suspicious Order Monitoring
19  Project. Do you see that?
20  A. I do.
21  Q. What is the Suspicious Order Monitoring
22  Project?
23  A. It was a project that was conceptualized to --
24  from the distribution center's perspective to replace
25  the manual activities that I mentioned to you, whereby



Page 114

1 we used -- we had a threshold and adjusted orders down
2 if they exceeded that threshold and then went through a
3 series of manual steps to record that action and report
4 it back to the corporate office.
5      It also included -- the -- the project that
6 was envisioned would have also included -- you know,
7 there's some reporting and monitoring activities that
8 took place in our loss prevention department that would
9 have been -- that were done as a separate -- you know,
10 in a separate process.
11      So it would have folded all of those processes
12 together so there would have been one place that
13 managed this, all of this activity and the reporting of
14 it; but from our perspective, the key to it was that it
15 was going to automate what was then a manual process.
16      Q.  So at the second -- so beginning on the second
17 page here -- well, there's an E-mail from you to
18 Chris Belli dated June 12th, 2013.  Do you see that?
19      A.  I do.
20      Q.  It says, Chris - Per our conversation, and
21 then you're forwarding something from Marcia.  Do you
22 see that?
23      A.  Yeah.
24      Q.  Who's Marcia, do you know?
25      A.  She was in our IT department, so she was

Page 115

1 assigned the responsibility of creating a project
2 initiation form for this, I believe, so that's --
3      Q.   And that was going to be my next question.
4 There's a template below.  It continues from the second
5 page to the third page.  Do you see that?
6      A.  Correct.
7      Q.  Do you know what that is?
8      A.  That's the -- those are screen prints, I
9 believe, of the system that is used to input the data
10 that then leads to a project initiation request.
11      Q.  Can you tell me generally what a project
12 initiation request is?
13      A.  Well, anytime the -- any of the functional
14 departments, one of the IT department -- in this
15 context, a project initiation request was anytime any
16 of the functional departments wanted the IT department
17 to do something that was not maintenance, that was not
18 fixing a problem, so you're initiating a new project,
19 there was a structured set of wickets that you went
20 through to document what the project was, to quantify
21 both hard and soft benefits from it, and then the IT
22 department would put together their costs for things of
23 that nature.
24      So it was -- it was -- it was all of the --
25 the project initiation form was basically the

Page 116

1 collection of the administrative steps to put together
2 the data that you would use to kick off a project.

Page 117

Highly Confidential - Subject to Further Confidentiality Review





Page 122

13        (Rite-Aid Chapman Exhibit No. 3 was marked for
14    identification.)
15    BY MR. PIFKO:
16        Q.  I'm handing you what's marked as Exhibit 3.
17    For the record, Exhibit 3 is a document Bates labeled
18    Rite_Aid_OMDL_0014948 through 51.  Please take a moment
19    to review that, and let me know when you're done.
20        A.  Okay.  Okay.
21        Q.  Have you seen this before?
22        A.  I have.
23        Q.  When was the last time you saw this document?
24        A.  Yesterday.
25        Q.  Prior to yesterday, when was the time before

Page 123

1    that that you saw it?
2        A.  2013.
3        Q.  Okay.  Can you tell me what this document
4    reflects?

Page 124

Page 125

Highly Confidential - Subject to Further Confidentiality Review



Page 126

Page 128

Page 127

Page 129

8       (Rite-Aid Chapman Exhibit No. 4 was marked for

9  identification.)

10  BY MR. PIFKO:

11      Q.  I'm handing you what's marked as Exhibit 4.

12      A.  Okay.

13      Q.  For the record, Exhibit 4 is a multiple page

14  E-mail Bates labeled Rite_Aid_OMDL_0024619 through 622.

15  Please take a moment to review this, and let me know

16  when you're done.

17      A.  Okay.

18      Q.  Have you seen this before?

19      A.  I have.

20      Q.  When was the last time you saw this?

21      A.  Yesterday.

22      Q.  Prior to yesterday, when was the last time you

23  saw it?

24      A.  2013.

25      Q.  So this is -- a following up on some of the



Page 130

1  discussion that was reflected in Exhibit 3.  Do you
2  agree?
3      A.  Yes.
4      Q.  Some of the same E-mails are below --
5      A.  Yes.
6      Q.  -- in Exhibit 4?
7      A.  Yes.

Page 134



18    (Rite-Aid Chapman Exhibit No. 5 was marked for
19  identification.)
20  BY MR. PIFKO:
21    Q.  I'm handing you what's marked as Exhibit 5.
22    A.  Okay.
23    Q.  For the record, Exhibit 5 is a document
24  entitled Project Initiation Document concerning Project
25  5046, which is Bates labeled Rite_Aid_OMDL_0024623

Page 135

1  through 24636.  So take a moment to review this, and
2  let me know when you're done.
3      MS. McENROE:  And while he's looking at that,
4    just really quick for the record, is this Exhibit
5    5 the attachment to Exhibit 6, do you know?
6      MR. PIFKO:  Yeah.  I was going to discuss that
7    with him, but yes.
8      MS. McENROE:  Okay.  But they were produced
9    that way together?
10      MR. PIFKO:  I believe that's correct.  The
11    Bates labels are consecutive.
12      MS. McENROE:  I'm sorry.  I said Exhibit 6.  I
13    meant Exhibit 4.
14      MR. PIFKO:  Exhibit 4.
15      MS. McENROE:  Yep.
16      MR. PIFKO:  Exhibit 4 ends at 0024622, and
17    Exhibit 5 begins at 24623.
18      MS. McENROE:  Thank you.
19      THE WITNESS:  Okay.
20  BY MR. PIFKO:
21    Q.  Have you seen this document before?
22    A.  I believe so.
23    Q.  Okay.  When was the last time you recall
24  seeing this document?
25    A.  Well, I saw -- the reason I said "I believe

Page 136

1  so" is I saw multiple iterations of this document as it
2  evolved yesterday, and I believe this was one of them,
3  so --

Page 137

Highly Confidential - Subject to Further Confidentiality Review





Page 142

Page 144

5     Q.  Let's stay on the same page of Exhibit 5 --
6     A.  Okay.
7     Q.  -- page 3.  Let me know when you're there.
8     A.  Okay.
9     Q.  All right.  There's a section called Project
10   Scope.  Do you see that?
11     A.  I do.
12     Q.  It mentions the Pharmacy Replenishment Order
13   Review application.  Do you see that?
14     A.  I do.
15     Q.  Do you know what that is?
16     A.  Again, I'm not an expert on the -- on the
17   systems that created the orders.  I believe that
18   that -- what that refers to is, in the pharmacy after
19   the system created the order, there was an application
20   where the order was presented to the pharmacist, and
21   the pharmacist was given the opportunity to, within
22   limitations, was given the opportunity to make
23   modifications to that order.
24     Q.  To your knowledge, is that something that was
25   in place the entire time that you were VP of logistics?

Page 143

Page 145

1     A.  I believe that it was.
2     Q.  Was that ever removed from the process?
3     A.  Not that I'm aware of.
4     Q.  And that was part of the process when you took
5   the position of VP of logistics?
6     A.  To the best of my knowledge it was.
7     Q.  Let's look down at the Project Scope section,
8   the third paragraph.  Tell me when you're there.
9     A.  I'm there.
10     Q.  Okay.  Can you read the first sentence for me?
11     A.  Various reporting will be available to
12   identify trends in over orderrides (sic), increased
13   volume of controlled substance ordering, and repeated
14   downward cycle counts.
15     Q.  Do you have an understanding of what that's
16   referring to?
17     A.  I do.
18     Q.  Can you tell me?
19     A.  It -- what it's talking about is -- and I'm
20   confident that there -- the goal in incorporating it in
21   this project was to replace things that were being
22   manually run on an ad hoc basis instead of being
23   contained within a given system, was the overrides were
24   what we described -- talked about earlier where a
25   pharmacist can, you know, update the order and change a

Page 146

1 quantity.
2     The increased volume of controlled substance
3 ordering, we just see if there was a trend where there
4 was a controlled substance ordering; and repeated
5 downward cycle counts, a cycle count refers to doing an
6 inventory verification of your on-hand balance and
7 physically counting what you have on hand and comparing
8 it to what the system shows that you have on hand.
9     So when it talks about repeated downward cycle
10 counts, it's if someone repeatedly changed the, in the
11 store, changed the on-hand balance to a lower number.
12     Q.  So when this talks about repeated downward
13 cycle counts, that's the situation where there's
14 repeated occasions of someone in the store lowering the
15 reported inventory at a particular location in the
16 computer system?
17     A.  That's what I would take this to mean, yes.
18     Q.  And did you understand that that was
19 reflective of any concern?
20     MS. McENROE:  Objection to form.
21     THE WITNESS:  I have -- I would have no idea.
22 This, you know -- no, I don't understand -- I do
23 not have any understanding specific to that, and I
24 probably wouldn't because this is talking about
25 management of the pharmacies in the stores that I

Page 147

1     didn't have any responsibilities for and wasn't
2     involved in.
3 BY MR. PIFKO:
4     Q.  Do you have an understanding about why that's
5 something that was being included in the reporting as
6 part of this project?
7     A.  I do.
8     Q.  Okay.  What's your understanding of that?
9     A.  Well, as mentioned earlier, the ordering
10 system takes into account the demand, which is driven
11 by your usage or your consumption of a product, and
12 your on-hand balance.
13     So if someone reduces the on-hand balance, it
14 will result in an increased order from the distribution
15 center.  So that's what this is referring to.
16     Q.  Okay.  And do you have an understanding about
17 why the company wanted to have reporting on that
18 parameter?
19     MS. McENROE:  Objection to form.
20     THE WITNESS:  Again, this isn't my area of
21 responsibility, but I'm -- I'm sure that they
22 would be interested in seeing if the same item was
23 adjusted down, thereby causing a -- an increase in
24 the inventory, in the shipments of that item to a
25 given store.

Page 148

1 BY MR. PIFKO:
2     Q.  You talked about a manual collection of
3 certain data.  Do you know if that -- that data was
4 collected manually prior to this?
5     A.  Of my own knowledge, no.  That wouldn't have
6 been -- this is referring to activities that would have
7 taken place in our loss prevention department.  So I
8 can tell you, you know, generally I'm quite confident
9 that they did a lot of reporting and analysis to ensure
10 that we were in compliance with everything we needed to
11 be in compliance with, but I wasn't involved in it, so
12 I can't speak authoritatively on exactly what they did.
13     Q.  How about identifying trends and order
14 overrides, are you aware of any manual reporting of
15 trends and order overrides that occurred prior to this
16 time?
17     A.  I know that they could and did generate
18 reports of manual overrides, controlled substances and
19 non-controlled substances, you know, other items as
20 well.  So I know that that took place, but again, that
21 wasn't part of my area of responsibility.
22     Q.  Do you know who within the company would have
23 received those reports?
24     A.  I -- I don't.  It would have been -- again,
25 this would have been a function of the loss prevention

Page 149

1 department, and they would have worked with store op --
2 store pharmacy operations in dealing with it, so --
3     Q.  How about increased volume of controlled
4 substances ordering, do you see that?
5     A.  I do.
6     Q.  Do you have an understanding that there was a
7 manual reporting of that type of information prior to
8 this time?
9     A.  I would expect that there was, so --
10     Q.  But you don't know either way?
11     A.  Again, that wasn't my area of responsibility,
12 so --
13     Q.  You've never seen a report concerning
14 increased volume of controlled substances ordering at a
15 particular store?
16     A.  I don't ever remember seeing a report of
17 increased volume of controlled substances ordering from
18 a particular store.
[remaining lines redacted]

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 158

Page 159

Page 160

Page 161

Highly Confidential - Subject to Further Confidentiality Review



Page 162

Page 164

Page 163

Page 165

12    Q.  Okay.  Thank you.  With that, we'll take a
13 little break for lunch.
14    A.  Okay.
15       THE VIDEOGRAPHER:  Off the record, 1:24 p.m.
16       (Luncheon recess.)
17       THE VIDEOGRAPHER:  On the record, 2:12 p.m.
18 BY MR. PIFKO:
19    Q.  Welcome back from the lunch break.  Before we
20 took a break, we were looking at Exhibit 5, if you'll
21 recall.
22    A.  Okay.
23    Q.  I want to direct your attention back to page 6
24 of Exhibit 5.  Specifically, the Bates label was 24628.
25 We were talking about data, whether data -- you were

1 aware if this type of data was being collected as of
2 this time and prior.  Do you recall that discussion?
3    A.  I do.
4    Q.  And I believe you testified that someone in
5 loss prevention -- or what was the other word you used
6 for that department?
7    A.  Asset protection.
8    Q.  Okay.  -- loss prevention or asset protection
9 would be the one responsible for collecting that type
10 of information.  Is that what you said?
11    A.  Yes.
12    Q.  Have you ever spoken with anybody from asset
13 protection or loss prevention about the data sets that
14 they collect --
15       MS. McENROE:  Objection to form.
16 BY MR. PIFKO:
17    Q.  -- concerning orders?
18    A.  I do not recall any specific conversations
19 about store orders with asset protection about the
20 processes they go through.
21    Q.  And you also testified that you've never seen
22 any reports with that type of data in it, correct?
23    A.  That's correct.
24    Q.  I'm going to hand you two documents at once,
25 but they're basically one document.

Page 166

1   MS. McENROE:  Mr. Pifko, are you marking them
2   together or separate?
3       MR. PIFKO:  I'll mark them separately.
4   They're not stapled, so --
5       (Rite-Aid Chapman Exhibit Nos. 6 and 7 were
6   marked for identification.)
7   BY MR. PIFKO:
8       Q.  I'm handing you what's marked as Exhibit 6 and
9   Exhibit 7, which was what was attached to Exhibit 6,
10  and I'll read the Bates labels into the record in just
11  a minute.  Here's 7.  Let the record reflect the
12  witness is reviewing Exhibit 7.
13      For the record, Exhibit 6 is a single page
14  E-mail Bates labeled Rite_Aid_OMDL_0040183, and Exhibit
15  7 is a multiple-page Project Initiation Document for
16  Project 0 -- 5046 Suspicious Order Monitoring, Bates
17  labeled Rite_Aid_OMDL_0040184 through 198.  So let me
18  know when you're done reviewing.
19      A.  Okay.  Okay.
20      Q.  Have you seen Exhibit 6 and 7 before?
21      A.  I have.
22      Q.  When was the last time you saw them?
23      A.  Well, I saw Exhibit 7 yesterday, I believe.
24  I -- I don't know that I saw this E-mail that it would
25  have been attached to, but obviously I saw both of them

Page 167

1   in 2013 as well.



Page 168

Page 169

18      Q.  Do you know who Dan Miller is?
19      A.  I do.
20      Q.  Who is he?
21      A.  He is currently -- well, he -- he's -- to the
22  best of my knowledge, he's still employed by Rite-Aid
23  and is in the government affairs department now.  He
24  was, at that point in time, I believe he was in
25  pharmacy operations, but he's a -- he's in the pharmacy

Page 170

1 department, so --
2 Q. Is there a pharmacy -- you mentioned the idea
3 of pharmacy operations earlier in deposition when we
4 were talking about distribution centers. Is there a
5 pharmacy operations department or division at the
6 corporate offices?
7     MS. McENROE: Objection to form.
8     THE WITNESS: Yes, there are -- there is a
9     form -- a pharmacy operations department, and I
10    may not be using the title that they use for their
11    department, but there is a department that serves
12    that function.
13 BY MR. PIFKO:
14 Q. Who was the head of that function when you
15 were VP of logistics?
16 A. Well, Dan -- it may have been Dan. I can't
17 swear to the exact reporting. I don't -- you know, I
18 mean, there's multiple levels of pharmacy
19 responsibilities that all report into the senior vice
20 president of pharmacy. So I -- I believe pharmacy
21 operations would have been Dan Miller at that point,
22 but I'm -- I -- I can't swear to that.
23 Q. Do you have an understanding of the type of
24 activities that are managed within the pharmacy
25 operations department?

Page 171

1 A. I'm familiar with at least some of them.
2 Q. Okay. Can you tell me the ones that you are
3 familiar with?
4 A. If there's an activity that involved
5 pharmacists at the store and needed coordination across
6 all divisions, typically the pharmacy operations
7 department would be -- would be the focal point --
8 would be the one that would initiate and manage those
9 changes.
10    So it's to manage, you know, pharmacy
11 activities commonly across all divisions and stores.
12 Q. If there is discipline against a pharmacist,
13 is that the division or department who would handle it?
14    MS. McENROE: Objection to form.
15    THE WITNESS: I don't know the answer to that,
16    in the sense that it wasn't my area of
17    responsibility, but I would expect that it would
18    be handled -- discipline of pharmacists would be
19    handled at the local level where a pharmacist
20    would have reported to a pharmacy district
21    manager, and a pharmacy district manager would
22    have responded -- reported to a pharmacy vice
23    president out in the field is what I would
24    anticipate would be the answer to that question;
25    but again, that isn't something I would have been

Page 172

1 involved in.
2 BY MR. PIFKO:
3 Q. So that's helpful. Can you explain the
4 hierarchy of the reporting structure for pharmacists?
5     MS. McENROE: Objection to form.
6     THE WITNESS: Typically, there was -- and let
7     me preface this by saying there are -- there have
8     been changes that took place, you know, to some
9     degree in the time that I worked for Rite-Aid; but
10    typically, there's a pharmacist -- you know, a
11    pharmacist in charge at a store.
12    That pharmacist or the pharmacy operation
13    reports to a pharmacy district manager. A -- or a
14    group of pharmacist stores reported to a pharmacy
15    district manager. A group of pharmacy district
16    managers reported to a pharmacy vice president and
17    then that reported in to the corporate office.
18 BY MR. PIFKO:
19 Q. And when you say the corporate offices, you
20 mean at Camp Hill?
21 A. I do mean at Camp Hill.
22 Q. Let's go to the next page of Exhibit 7. Do
23 you see there's a bunch of changes that are reflected
24 here as well?
25 A. I do.

Page 173

1 Q. Are you familiar with any of these changes?
2     MS. McENROE: Objection to form.
3     THE WITNESS: I -- I can read them, yes, so --
4     and I understand what they mean.
5 BY MR. PIFKO:



Highly Confidential - Subject to Further Confidentiality Review



Page 178

Page 180

Page 179

Page 181



Page 182

Page 184

Page 183

Page 185

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 192

Page 191

Page 193

19   BY MR. PIFKO:
20      Q.   We're going to take a short break.
21           MS. McENROE:  Sure.
22           THE VIDEOGRAPHER:  Off the record, 2:50 p.m.
23           (Brief recess was taken.)
24           THE VIDEOGRAPHER:  On the record, 3:02 p.m.
25           MS. McENROE:  Good afternoon.



Page 194

1      MR. PIFKO:  This is --

2      MS. McENROE:  Go ahead.  Sorry.

3      MR. PIFKO:  This is Mark from Plaintiffs'

4   counsel.  Pending any direct examination, I don't

5   have any further questions.

6           CROSS-EXAMINATION

7 BY MS. McENROE:

8      Q.  Good afternoon, Mr. Chapman.  My name is

9   Elisa McEnroe.  I'm counsel for Rite-Aid and here on

10   your behalf today.  Do you understand that?

11      A.  I do.

12      Q.  Okay.  I just have --

13      THE VIDEOGRAPHER:  Could you slide to your

14   right?

15      MS. McENROE:  Sure.  Is that good?

16      THE VIDEOGRAPHER:  Thank you.

17 BY MS. McENROE:

Page 195

Page 196

3      Q.  Counsel for Plaintiffs asked you a

4   hypothetical regarding oxy 30 just a couple minutes

5   ago.  Do you remember that?

6      A.  I do.

7      Q.  Is that an item that Rite-Aid ever

8   distributed?

9      A.  No.  You know, oxy 30 -- oxy is a C2, and I

10   think we've talked about this before, but Rite-Aid

11   never distributed Class 2 controlled substances.

12      Q.  Great.  Thank you.  I have no further

13   questions.

14      MR. PIFKO:  I'm good.

15      MS. McENROE:  Thank you for your time today.

16      MR. VITALE:  On behalf of Cardinal Health, I

17   don't have any questions.

18      THE VIDEOGRAPHER:  Anybody on the phone?

19      MS. McENROE:  I don't think so.

20      THE VIDEOGRAPHER:  Off the record, 3:04 p.m.

21      (Deposition concluded at 3:04 p.m.)

22

23

24

25

Page 197

1           CERTIFICATE OF OATH

2

3

4 STATE OF FLORIDA

5 COUNTY OF HILLSBOROUGH

6

7

8      I, Lisa A. Simons-Clark, RMR, CRR, Notary

9   Public, State of Florida, certify that RICK CHAPMAN

10   personally appeared before me on the 18th day of

11   December, 2018, and was duly sworn.

12

13      WITNESS my hand and official seal this ____ day of

14   December, 2018.

15

16      _____

17      Lisa A. Simons-Clark, RMR, CRR

18      Notary Public - State of Florida

19      My Commission Expires:  7/1/20

20      Commission No. GG 001980

21

22

23

24

25

Page 198

1                 REPORTER'S CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF PINELLAS
5
          I, Lisa A. Simons-Clark, Registered Merit
6  Reporter, Certified Realtime Reporter, certify that I
   was authorized to and did stenographically report the
7  deposition of RICHARD CHAPMAN; that a review of the
   transcript was requested; and that the transcript is a
8  true and complete record of my stenographic notes.
9
10          I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties,
11  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
12  financially interested in the action.
13
14          Dated this _____ day of December, 2018.
15
16
            _____
17              Lisa A. Simons-Clark, RMR, CRR
18
19
20
21
22
23
24
25

Page 199

1                    ERRATA SHEET
2       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3  IN RE:  National Prescription Opiate Litigation
        WITNESS:  RICHARD CHAPMAN
4       DATE OF DEPOSITION:  December 18, 2018
5  PAGE LINE   CHANGE                REASON
6  ____ ____   _____
7  ____ ____   _____
8  ____ ____   _____
9  ____ ____   _____
10 ____ ____   _____
11 ____ ____   _____
12 ____ ____   _____
13 ____ ____   _____
14 ____ ____   _____
15 ____ ____   _____
16 ____ ____   _____
17 ____ ____   _____
18 ____ ____   _____
19 ____ ____   _____
20
   Under penalties of perjury, I declare that I have read
21 the foregoing document and that the facts stated in it
   are true.
22
23
   _____
24 DATE          RICHARD CHAPMAN
25 Reporter:  Lisa A. Simons-Clark, RMR, CRR