1       IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF OHIO
3          EASTERN DIVISION
4             - - -
5

  IN RE:  NATIONAL     :  HON. DAN A.
6  PRESCRIPTION OPIATE   :  POLSTER
  LITIGATION         :
7                  :
  APPLIES TO ALL CASES  :  NO.
8                  :  1:17-MD-2804
                  :
9

10       - HIGHLY CONFIDENTIAL -

11  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12            - - -

13         January 10, 2019

14            - - -

15        Videotaped deposition of
  FRANK DEVLIN, taken pursuant to
16  notice, was held at the offices of
  Zuckerman Spaeder, LLP, 1800 M Street NW,
17  Suite 1000, Washington, D.C., beginning
  at 8:33 a.m., on the above date, before
18  Michelle L. Gray, a Registered
  Professional Reporter, Certified
19  Shorthand Reporter, Certified Realtime
  Reporter, and Notary Public.
20

21            - - -

22     GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax
23         deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
 3    BAKER & BAKER, PLLC
      BY:  WILLIAM C. BAKER, JR., ESQ.
 4    300 East Government Street
      Pensacola, Florida 32502
 5    (850) 433-0888
      Wcb850@gmail.com
 6    Smh@bakerlawemail.com
 7         - and -
 8    WEISMAN KENNEDY & BERRIS, LPA
      BY:  JAMES A. DeROCHE, ESQ.
 9    101 West Prospect Avenue, Suite 1600
      Midland Building
10    Cleveland, Ohio 44115
      (216) 696-7009
11    Jderoche@garson.com
      Representing the Plaintiffs
12
13    ZUCKERMAN SPAEDER, LLP
      BY:  ALEXANDRA W. MILLER, ESQ.
14    1800 M. Street NW, Suite 1000
      Washington, D.C. 20036
15    (202) 778-1845
      smiller@zuckerman.com
16    Representing the Defendant, CVS, and the
      Witness
17
18    WILLIAMS & CONNOLLY, LLP
      BY:  KATELYN ADAMS, ESQ.
19    725 12th Street, NW
      Washington, D.C. 20005
20    (202) 434-5148
      kadams@wc.com
21    Representing the Defendant, Cardinal
      Health
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC APPEARANCES:
 2

 3    MOTLEY RICE, LLC
      BY: MICHAEL ELSNER, ESQ.
      28 Bridgeside Boulevard
 4    Mount Pleasant, South Carolina 29464
      (843) 216-9373
 5    melsner@motleyrice.com
      Representing the Plaintiffs
 6

 7    JONES DAY
      BY:  CHRISTINE D. PROROK, ESQ.
 8    77 West Wacker Drive
      Chicago, Illinois 60601
 9    (312) 269-4113
      Cprorok@jonesday.com
10    Representing the Defendant, Walmart
11

12    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  ZENO HOUSTON, ESQ.
      250 West 55th Street
13    New York, New York 10019
      (212) 836-7332
14    Zeno.houston@arnoldporter.com
      Representing the Defendants, Endo Health
15    Solutions; Endo Pharmaceuticals, Inc.;
      Par Pharmaceutical Companies, Inc. f/k/a
16    Par Pharmaceutical Holdings, Inc.
17

18    JACKSON KELLY, PLLC
      BY:  JONATHAN L. ANDERSON, ESQ.
      500 Lee Street East
19    Suite 1600
      Charleston West Virginia 25301
20    (304) 340-1169
      Jlanderson@jacksonkelly.com
21    Representing the Defendant,
      AmerisourceBergen
22

23

24
```

```
 1    ALSO PRESENT:
 2    Stephanie Heckman, Paralegal
      (Baker & Baker, PLLC)
 3
 4    Justin L. Mann, Esq. (Law Clerk)
      (Ropes Gray - via telephone)
 5
 6    Amy Kennedy, Paralegal
      (Weisman Kennedy - via telephone))
 7
 8
      VIDEOTAPE TECHNICIAN:
 9    Dan Lawlor
10
      LITIGATION TECHNICIAN:
11    James Beall
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                           -  -  -
2                      I N D E X
3                           -  -  -
4

   Testimony of:
5

                      FRANK DEVLIN
6

7          By Mr. Baker                      14
8          By Mr. DeRoche                    384
9

10

11

                           -  -  -
12

                   E X H I B I T S
13

                           -  -  -
14

15     NO.              DESCRIPTION            PAGE
16

       CVS
17     Devlin-P-18      E-mail Thread          89
                        1/3/08
18                      Subject, New Rx
                        DEA SOP
19                      CVS-MDLT1-000025204-59
20     CVS
       Devlin-P-48      Controlled Drug        96
21                      DEA Standard
                        Operating Procedures
22                      Manual
                        CVS-MDLT1-000024877-41
23

24
```

```
 1                         -   -   -
 2                E X H I B I T S  (Cont'd.)
 3                         -   -   -
 4
 5     NO.               DESCRIPTION              PAGE
 6     CVS
       Devlin-P-53    E-mail, 10/8/12        343
 7                    Subject, Conference
                      Call Notes
 8                    CVS-MDLT1-000033579-81
 9     CVS
       Devlin-P-55    Business Idea          321
10                    Description
                      CVS-MDLT1-000034175-77
11
       CVS
12     Devlin-P-56    Memo, 8/13/10          212
                      Subject, Control
13                    Drug IRR Update
                      CVS-MDLT1-000034183
14
       CVS
15     Devlin-P-57    E-mail Thread          92
                      5/19/09
16                    Subject, Updated
                      DEA SOP
17                    CVS-MDLT1-000034234-35
18     CVS
       Devlin-P-64    Drug Fact Sheet        71
19                    Heroin
                      CVS-MDLT1-000055613-36
20
21     CVS
       Devlin-P-68    E-mail, 5/16/11        226
22                    Subject, Control
                      Drug Suspicious Order
23                    Monitoring
                      CVS-MDLT1-000057736-37
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.               DESCRIPTION              PAGE
 6    CVS
      Devlin-P-68A E-mail Thread              243
 7                 1/28/11
                   Subject, IRR
 8                 Narratives
                   CVS-MDLT1-000083966-71
 9
      CVS
10    Devlin-P-69  SOM Due Diligence          282
                   Guidance Document
11                 CVS-MDLT-000057741-43
12    CVS
      Devlin-P-70  E-mail, 8/25/10            109
13                 Subject, Control Drug
                   IRR Draft 3
14                 CVS-MDLT1-000057751-54
15    CVS
      Devlin-P-71  E-mail Thread              159
16                 3/14/11
                   Subject, IRR/SOM
17                 Retunement BSR_LOG
                   CVS-MDLT1-000057759
18                 CVS-MDLT1-000055834
19    CVS
      Devlin-P-81  E-mail Thread              137
20                 9/1/10
                   Subject, DEA
21                 Speaking Points
                   CVS-MDLT1-000075299-12
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.                DESCRIPTION              PAGE
 6    CVS
      Devlin-P-82    E-mail Thread           327
 7                   10/12/10
                     Subject, VBDC
 8                   Question
                     CVS-MDLT1-000075542
 9
      CVS
10    Devlin-P-92    E-mail Thread           331
                     11/29/12
11                   Subject, Privileged
                     And Confidential
12                   SOM Process Documentation
                     CVS-MDLT1-000083064-66
13
      CVS
14    Devlin-P-94    E-mail Thread           96
                     11/5/09
15                   Re:  11/10/09
                     CVS-MDLT-000087889-90
16
      CVS
17    Devlin-P-95    E-mail Thread           212
                     7/26/10
18                   Subject, SOM Update
                     CVS-MDLT1-000088522-34
19
      CVS
20    Devlin-P-97    E-mail, 8/28/10         114
                     Subject, DEA SOP
21                   8/25/10
                     CVS-MDLT1-000088956-25
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    CVS
      Devlin-P-98   E-mail Thread          102
 7                  8/23/10
                    Subject, DEA SOP
 8                  CVS-MDLT-000089188
 9    CVS
      Devlin-P-102  E-mail, 2/21/08         76
10                  Subject, DEA Letters
                    SOMs
11                  CVS-MDLT1-000091508-18
12    CVS
      Devlin-P-104  E-mail Thread           59
13                  1/18/13
                    Subject, 1/18/13
14                  CVS-MDLT1-000103329
15    CVS
      Devlin-P-106  E-mail Thread          356
16                  11/27/12
                    Subject, SOM Meeting
17                  11/27
                    CVS-MDLT1-000029867-68
18
      CVS
19    Devlin-P-130  LinkedIn Profile        26
                    Frank Devlin
20
      CVS
21    Devlin-P-131  CVS Health              29
                    Web Printout
22                  History
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5    NO.              DESCRIPTION              PAGE
 6    CVS
      Devlin-P-132 Distribution Center    38
 7                  ID XREF
                    CVS Caremark Suppliers
 8
 9    CVS
      Devlin-P-140 Suspicious Order       285
10                  Monitoring
                    For PSE/Control
11                  Drugs
                    8/27/10
12                  CVS-MDLT1-000061191-03
13    CVS
      Devlin-P-143 E-mail, 10/13/10       148
14                  Subject, LP Analyst
                    CVS-MDLT1-000104894-97
15
      CVS
16    Devlin-P-146 Letter, 3/22/07        196
                    Subject, Regulatory
17                  Consulting Services
                    (Buzzeo PDMA)
18                  CVS-MDLT1-00109199-06
19    CVS
      Devlin-P-150 E-mail Thread          200
20                  2/9/11
                    Subject, The CVS Retunement
21                  CVS-MDLT1-000061141-42
22    CVS
      Devlin-P-164 Chart, Native          323
23                  Document Yes, No, Code
                    (No Bates)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5      NO.              DESCRIPTION            PAGE
 6      CVS
        Devlin-P-200 Item Review               469
 7                   Reports
                     CVS-MDLT1-00001195-04
 8
        CVS
 9      Devlin-P-201 Item Review               426
                     Reports
10                   CVS-MDLT1-000100763-74
11      CVS
        Devlin-P-209 E-mail, 1/6/10            315
12                   Subject, Control Drug
                     IRR Issue Recap
13                   CVS-MDLT1-000110260
14      CVS
        Devlin-P-211 E-mail Thread             270
15                   2/24/10
                     Subject, Adjustment
16                   To the CVS SOM
                     CVS-MDLT1-000110434-36
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                        -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.
 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.
10

11   Stipulations

12   PAGE    LINE
     None.
13

     Questions Marked

14

     PAGE    LINE
15   None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are

2      now on the record.

3          My name is Dan Lawlor, I'm a

4      videographer with Golkow

5      Litigation Services.

6          Today's date is January 10,

7      2019, and the time is 8:33 a.m.

8          This video deposition is

9      being held in Washington, DC, in

10      the matter of National

11      Prescription Opiate litigation,

12      MDL Number 2804.

13          The deponent is Frank

14      Devlin.

15          Counsel will be noted on the

16      stenographic record.

17          The court reporter is

18      Michelle Gray and will now swear

19      in the witness.

20              -  -  -

21          ... FRANK DEVLIN,

22      having been first duly sworn, was

23      examined and testified as follows:

24              -  -  -

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION

 2                      -   -   -

 3    BY MR. BAKER:

 4          Q.    Please state your name.

 5          A.    Frank Devlin.

 6          Q.    Mr. Devlin, where do you

 7    live?

 8          A.    I live in Pocasset,

 9    Massachusetts.

10          Q.    What is your employment

11    right now?

12          A.    Excuse me?

13          Q.    Where are you employed right

14    now?

15          A.    I own my own consulting

16    company.

17          Q.    What's the name of the

18    company?

19          A.    Seashore Risk Management.

20          Q.    And what is the nature of

21    that business?

22          A.    It's a consulting firm

23    focusing on safety, OSHA compliance,

24    auditing, forklift training.
```

1    Q.    Are your customers corporate

2  customers?

3    A.    Yes.

4    Q.    Is CVS one of your

5  customers?

6    A.    No.

7    Q.    Have you courted CVS to be

8  one of your customers?

9          MS. MILLER:  Object to form.

10  BY MR. BAKER:

11    Q.    Have you tried to get CVS to

12  become one of your customers?

13          MS. MILLER:  Objection.

14  BY MR. BAKER:

15    Q.    Go ahead.

16    A.    No.

17    Q.    Have you made any contact

18  with CVS since leaving CVS in 2012?

19    A.    No.

20    Q.    What was the reason you left

21  CVS in 2012?

22    A.    A better employment

23  opportunity.

24    Q.    What was the better

Highly Confidential - Subject to Further Confidentiality Review

```
 1    employment opportunity?

 2         A.    Amazon.

 3         Q.    Is that where Mr. Burtner

 4    also went to work, Aaron Burtner?

 5         A.    Yes.

 6         Q.    Okay.  Did -- did you help

 7    Mr. Burtner get employed at Amazon?

 8              MS. MILLER:  Object to form.

 9    BY MR. BAKER:

10         Q.    Did you?

11              MS. MILLER:  Object.

12    BY MR. BAKER:

13         Q.    Go ahead.

14              Let me explain.  When the

15    attorney objects, she objects to form.

16    That doesn't mean you can't answer the

17    question.  It's just a technicality in

18    the rules of procedure where she says

19    object to form, so she preserves the

20    right to go to the judge and have the

21    question looked at by the judge to

22    determine if it's a properly phrased

23    question.  And -- but it doesn't mean you

24    don't answer the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              So if she instructs you not
2    to answer, that would be the only time
3    you wouldn't answer the question.  Fair
4    enough?
5              MS. MILLER:  And just,
6         Frank, that's correct.  I'm noting
7         my objections on the record.  You
8         may respond to the question unless
9         I instruct you not to answer.
10             THE WITNESS:  Okay.
11             Can you repeat the question?
12   BY MR. BAKER:
13        Q.    Yeah, many times during this
14   deposition counsel seated to your left
15   will say object to form.  That's her
16   right to do that.  That doesn't mean that
17   you don't answer the question.  It's just
18   noted on the record that she objected to
19   the question.  It doesn't necessarily
20   mean something's wrong with the question.
21   It's just she's preserving her right to
22   object at a later time.
23        A.    I understood.
24        Q.    Is that clear?
```

Highly Confidential - Subject to Further Confidentiality Review

1            All right.  So what, if any,

2    contact did you have with Mr. Burtner

3    before he came to work for Amazon, after

4    you left --

5        A.    Yes.

6        Q.    -- CVS, you went to Amazon,

7    right?

8        A.    That is correct.

9        Q.    In 2012.

10        A.    That is correct.

11        Q.    Okay.  What contact did you

12    have with Mr. Burtner after you left CVS

13    to go to Amazon?

14        A.    I reached out to Mr. Burtner

15    for possible employment opportunity with

16    Amazon.

17        Q.    When did you do -- okay.

18    When did you do that?

19            MS. MILLER:  Bill, would you

20        just give him a chance to answer?

21            MR. BAKER:  Sure.

22    BY MR. BAKER:

23        Q.    And I didn't mean to

24    overstep your answer, but you're --

1    you're kind of soft-spoken so I can't

2    tell when you're finished your answer.

3                    THE WITNESS:  Okay.

4                    MS. MILLER:  And, Frank,

5          give him time to complete his

6          question, please.

7    BY MR. BAKER:

8          Q.    Are you ready for the

9    question?

10         A.    Can you repeat your

11   question?

12         Q.    Okay.  The question is, when

13   did you reach out to Mr. Burtner for the

14   prospect of employment with Amazon when

15   you were at Amazon?

16         A.    It probably would have been

17   sometime in 2013.  I can't recall the

18   exact date.

19         Q.    All right.  And what was the

20   reason that you reached out to him?

21                   MS. MILLER:  Object to form.

22                   THE WITNESS:  I knew him and

23         I knew his capabilities.

24   BY MR. BAKER:

1    Q.    Do you know whether or not

2  he expressed anything to you about being

3  unhappy at CVS with his employment?

4            MS. MILLER:  Objection.

5            THE WITNESS:  No.

6            MS. MILLER:  Frank, just

7       give me a little time, stepping on

8       my objections.  Go ahead.

9  BY MR. BAKER:

10       Q.    Did Mr. Burtner express to

11  you any problems going on within the

12  morale of employees at CVS while he was

13  there?

14            MS. MILLER:  Object to form.

15  BY MR. BAKER:

16       Q.    Did he express that to you

17  at all?

18            MS. MILLER:  Object to form.

19            THE WITNESS:  No, not that I

20       can recall.

21  BY MR. BAKER:

22       Q.    How long did you work at

23  Amazon while Mr. Burtner was also at

24  Amazon?

1    A.    My employment at Amazon was

2    from beginning of November 2012 through

3    March of 2014.

4         Q.    I'm going to go through a

5    list of acronyms which are abbreviations

6    for words.  And I want to make sure

7    before we go into your deposition today

8    that when we use these acronyms, we're --

9    we're on the same page with respect to

10   these acronyms.

11              Okay?  Are you with me?  Do

12   you understand?

13        A.    I do.

14        Q.    Okay.  All right.  The first

15   acronym is SOM, can you tell us what SOM

16   stands for?

17        A.    I believe that's suspicious

18   order monitoring.

19        Q.    The next acronym is SOP, can

20   you tell us what SOP stands for?

21              MS. MILLER:  Object to form.

22              THE WITNESS:  I believe that

23        would be standard operating

24        procedure.

1  BY MR. BAKER:

2       Q.    I'm asking you these

3  questions in reference to how they were

4  used at CVS.  So that's the context of

5  the question.  So at CVS, SOP was

6  standard operating procedure, correct?

7              MS. MILLER:  Objection.

8              THE WITNESS:  I believe so.

9         I can't say 100 percent.  There

10        are a lot of -- a lot of

11        abbreviations, whether it was at

12        CVS or Amazon.  So sometimes they

13        tend to blend together.

14  BY MR. BAKER:

15       Q.    When we're talking about an

16  SOM SOP, would that be a suspicious order

17  monitoring standard of procedure at CVS

18  when you were there?

19              MS. MILLER:  Objection.

20              THE WITNESS:  No.

21  BY MR. BAKER:

22       Q.    Sir?  What's the answer?

23              MS. MILLER:  Go ahead.

24              THE WITNESS:  No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BAKER:
 2         Q.    What would an SOM SOP be?
 3               MS. MILLER:  Objection.
 4               THE WITNESS:  I believe it
 5         would be suspicious order
 6         monitoring standard operating
 7         procedure.
 8    BY MR. BAKER:
 9         Q.    Okay.  When you're talking
10    about a P&P, is that policy and
11    procedure?
12               MS. MILLER:  Objection.
13               THE WITNESS:  Can you repeat
14         that?
15    BY MR. BAKER:
16         Q.    P&P, is that policy and
17    procedure?
18               MS. MILLER:  Objection.
19               THE WITNESS:  I'd have to
20         see the context in how it's being
21         used.
22    BY MR. BAKER:
23         Q.    Okay.  DOJ, that's the
24    Department of Justice.  Are you familiar
```

1    with that?

2           A.    I've heard the terminology.

3           Q.    DEA.  Who is the DEA that

4    you know to exist in the context of your

5    employment when you worked there at CVS?

6           A.    That would be the Drug

7    Enforcement Agency.

8           Q.    FDA, who would that be in

9    the context of your employment at CVS

10   when you worked in the suspicious order

11   monitoring department?

12              MS. MILLER:  Objection.

13              MR. BAKER:  She objected.

14   BY MR. BAKER:

15          Q.    What does FDA mean to you?

16   Food and Drug Administration.  Do you

17   understand that?

18          A.    I've heard that term used,

19   yes.

20          Q.    Okay.  CVS, what does that

21   stand for?

22              MS. MILLER:  Objection.

23              THE WITNESS:  I've heard it

24          stand for a couple different

Highly Confidential - Subject to Further Confidentiality Review

1          terms.

2     BY MR. BAKER:

3          Q.     Tell me.

4          A.     For Consumer Value Stores.

5          Q.     Anything else?

6          A.     Also Convenience Value, and

7     I forget what the other S was.

8          Q.     C.F.R., Code of Federal

9     Regulation, are you familiar with that?

10         A.     Which one?

11         Q.     Are you familiar with the

12    concept of Code of Federal Regulation?

13    Are you familiar with that term?

14         A.     I've heard the term

15    "C.F.R.," yes.

16         Q.     CSA, Controlled Substances

17    Act, have you ever heard of that?

18              MS. MILLER:  Objection.

19              THE WITNESS:  I believe I

20         may have heard that, yes.

21    BY MR. BAKER:

22         Q.     Okay.  When you worked at

23    CVS, that was from May of 25 -- May of

24    2005 to October of 2012; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     No.

2      Q.     When did you work there?

3      A.     February 11th, 1991, through

4   the end of October 2012.

5      Q.     Do you have a LinkedIn page?

6      A.     Yes.

7      Q.     Let me show you what's been

8   marked as Plaintiff's Exhibit Number 130.

9             (Document marked for

10            identification as Exhibit

11            CVS-Devlin-P-130.)

12  BY MR. BAKER:

13     Q.     Is this your LinkedIn page

14  that you're looking at?

15     A.     I need to get my glasses.

16     Q.     Is that it?

17     A.     I need to look through it

18  first.  Appears to be, yes.

19     Q.     Okay.  On your LinkedIn

20  page, the second-to-last page, it has CVS

21  Health.

22            MR. BAKER:  Page forward,

23        please.

24  BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    At the top, it says here

2    that you were employed at CVS Health from

3    May 2005 to October 2012, seven years and

4    six months.  Did you enter that data in

5    your page?

6    A.    Yes.

7    Q.    Okay.  What was the reason

8    that you chose that time frame to tell

9    everybody that you were employed at CVS

10   Health as opposed to 1991 forward?

11              MS. MILLER:  Objection.

12              THE WITNESS:  Just from an

13       age standpoint.

14   BY MR. BAKER:

15   Q.    What do you mean an age

16   standpoint?

17   A.    Just there's no requirement

18   on LinkedIn as far as putting down exact

19   employment dates.

20   Q.    What happened in May of 2005

21   with respect to your employment that

22   causes you to choose that date?

23   A.    I believe at that point, and

24   not 100 percent sure that I probably

Highly Confidential - Subject to Further Confidentiality Review

1    would have been promoted to another level

2    in a director position.

3          Q.    What position were you

4    promoted to in May of 2005 at CVS Health?

5          A.    CVS had various levels of

6    director positions.

7          Q.    What was the position?

8          A.    It was a similar position to

9    what I was already doing.

10          Q.    What was the name of the

11    position?

12          A.    Director of logistics, loss

13    prevention.

14          Q.    Okay.  So at that point you

15    continued to work as director of

16    logistics, loss prevention from May 2005

17    to October 2012; is that right?

18          A.    Can you repeat that?

19          Q.    Did you work as director of

20    logistics, loss prevention from May 2005

21    to October 2012 at CVS Health?

22          A.    Yes.

23          Q.    Okay.  During that time, was

24    CVS known as CVS Health or CVS Caremark?

1           MS. MILLER:  Objection.

2           THE WITNESS:  They were

3      probably -- they've had so many

4      different names.  It could have

5      been CVS Caremark.

6  BY MR. BAKER:

7      Q.    Okay.

8           (Document marked for

9      identification as Exhibit

10      CVS-Devlin-P-131.)

11  BY MR. BAKER:

12      Q.    Let me show you Exhibit 131.

13  I'm trying to get an accurate history of

14  the names of the corporations within CVS

15  Health.  And I'd like to spend some time

16  doing that with you.

17           If you could turn -- this

18  comes from CVS Health's website.  And if

19  you turn to the area of 2001 through

20  2006.  Go about eight pages in.

21      A.    What was the date again?

22      Q.    2001 at the top of the page.

23  Do you see it?  Are you there?

24      A.    "CVS introduces ExtraCare

1    card"?

2         Q.    Correct.  Okay.  Go down to

3    2003.  It says, "CVS Caremark Rx and

4    AdvancePCS announce strategic

5    combination, creating a $23 billion

6    company."  Were you with them at the

7    time?

8              MS. MILLER:  Objection.

9    BY MR. BAKER:

10        Q.    Were you with CVS Caremark

11   at the time?

12             MS. MILLER:  Objection.

13             THE WITNESS:  I was employed

14        at CVS from February 11, 1991

15        through the end of October 2012.

16   BY MR. BAKER:

17        Q.    Okay.  So 2003 you would

18   have been employed by CVS Caremark?

19             MS. MILLER:  Objection.

20   BY MR. BAKER:

21        Q.    Yes?

22        A.    Yes.

23        Q.    Okay.  All right.  Then it

24   talks about in 2007, it says, "CVS" -- go

Highly Confidential - Subject to Further Confidentiality Review

1    to the next page.  It says, "CVS

2    Corporation and Caremark Rx, Inc.,

3    complete their transformative merger,

4    creating CVS Caremark, the nation's

5    premier integrated pharmacy services

6    provider."

7              Is that, to your knowledge,

8    when CVS became known as CVS Caremark?

9              MS. MILLER:  Objection.

10   BY MR. BAKER:

11        Q.   Or not?

12             MS. MILLER:  Objection.

13             THE WITNESS:  That's what

14        this document says.  I wouldn't

15        know that.

16   BY MR. BAKER:

17        Q.   Who was your employer in

18   2007 at CVS, which CVS entity?

19             MS. MILLER:  Objection.

20             THE WITNESS:  I just refer

21        to CVS as CVS.

22   BY MR. BAKER:

23        Q.   Okay.

24        A.   I didn't get -- I didn't get

1    kind of hung up as far as whether it's

2    CVS Pharmacy, CVS Distribution, CVS

3    Logistics, CVS Health, CVS Caremark.

4    It's CVS.

5            Q.    Okay.  Do you know when the

6    corporation became known as CVS Health?

7                  MS. MILLER:  Objection.

8                  THE WITNESS:  No.

9    BY MR. BAKER:

10           Q.    Okay.  Go to 2014, under the

11   history of the company.

12                 MS. MILLER:  Mr. Baker, just

13          a question about the document.

14                 Where was this obtained

15          from?

16                 MR. BAKER:  From the

17          website, CVS.com.  It says it

18          right there at the top.

19   BY MR. BAKER:

20           Q.    You see on the page under

21   2014, do you see that?  You're there.

22   2014.  Go to the next page.

23           A.    It's cut off.

24           Q.    Go to the next page.  Go

1    about a third of the way down the page.

2    It says, "CVS Caremark announces that its

3    corporate name has changed to CVS Health

4    to further reflect its broader commitment

5    to healthcare."

6              Do you see that?

7         A.    I do.

8         Q.    Okay.  Is that, to your

9    knowledge, when CVS Caremark became known

10   as CVS Health?

11             MS. MILLER:  Objection.

12             THE WITNESS:  I really

13        didn't pay attention to it.

14   BY MR. BAKER:

15        Q.    Okay.  Well, you list CVS

16   Health as your employer.  That's why I'm

17   wondering why you chose that name.  Is

18   that the last name that the company was

19   known as at the time that you left, or

20   did it become known as CVS Health after

21   you left?

22             MS. MILLER:  Objection.

23             THE WITNESS:  The LinkedIn

24        page, it's not -- the LinkedIn

1  page isn't, as far as I know it is

2  not a legal document.  And in

3  putting my history down, it's --

4  you try to keep current.  So it's

5  not a reflection of -- I didn't

6  get into -- again, I didn't get

7  into whether it's CVS, CVS

8  pharmacy, CVS Health.

9       When you update your

10  LinkedIn page, that comes up, it's

11  now referred to as CVS Health.

12  BY MR. BAKER:

13       Q.   Okay.  Let me explain.  I'm

14  not criticizing you for putting CVS

15  Health on there.  I just want know the

16  name of the company that paid you while

17  you worked there.  That's all I'm getting

18  at.  Okay.

19       So when you left in 2012,

20  was the company known as CVS Health or

21  CVS Caremark, or do you know?

22       MS. MILLER:  Objection --

23  objection.  Asked and answered.

24  BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Do you know?

2        A.    I believe I already answered

3   that.

4        Q.    Okay.  See, here is what I'm

5   asking you.  Do you know whether or not

6   the company name was CVS Caremark or CVS

7   Health when you left, do you know?

8   That's all I'm asking.

9              MS. MILLER:  Objection.

10        Asked and answered.

11             THE WITNESS:  No.

12   BY MR. BAKER:

13        Q.    Okay.  You don't know.

14   Okay.

15             So when you worked there as

16   director of logistics loss prevention,

17   how many -- or excuse me.  Where

18   physically were you located when you were

19   working as the director of logistics loss

20   prevention in 2005?

21        A.    2005.  My office may have

22   been in the Woonsocket distribution

23   center.

24        Q.    Where were you employed in

1    2006, where was your physical location?

2            A.    It still may have been in

3    the distribution center.  But I --

4            Q.    Okay.  How long did that

5    continue?

6            A.    Probably, I don't know, it

7    was 2007, 2008 I moved to the corporate

8    office which was just up the street.

9            Q.    Okay.  So -- and from 2008

10   all the way through the time that you

11   left in 2012, were you in the corporate

12   office in Woonsocket, Rhode Island?

13           A.    Yes.  Various -- various

14   locations.  I was 1 CVS Drive.  I was

15   also at the --

16           Q.    Let me show you what's

17   marked as Exhibit 130 --

18           A.    I didn't finish.

19           Q.    Yeah, go ahead.  I'm just

20   trying to move through this, because we

21   only have a certain amount of time to do

22   this.

23           A.    Okay.

24           Q.    I appreciate the fact that

Highly Confidential - Subject to Further Confidentiality Review

1    you're trying to be precise in your

2    answers, but if you drag it on beyond

3    what's necessary to answer the question,

4    it just makes us have to stay here that

5    much longer.  And I'd really like to move

6    through this for your benefit, to catch

7    your airplane this afternoon and for

8    everybody's benefit.  Okay?  I'm not

9    trying to be ugly to you.  I just want to

10   move through this.  Okay?

11        A.    All right.

12        Q.    So if we could do that, I'd

13   appreciate you doing that in the context

14   of your answer.

15        A.    Sure.

16        Q.    I know you're nervous.  It's

17   obvious from looking at you, but I'm not

18   trying to do anything other than ask you

19   straight questions and get straight

20   answers.  Is that fair?

21        A.    Okay.  I just want to make

22   sure I understand the question.

23        Q.    Sure.  If you -- if you

24   think I'm being unfair with you, tell me.

1    Okay?  But I'm trying to be very fair

2    with you in how I treat you --

3              A.    No, I understand --

4              Q.    -- and I want to be very

5    fair with you in terms of letting you

6    look at the documentation that I'm

7    looking at so you understand where I'm

8    coming from.  I'm just trying to get the

9    facts.  Is that -- is that clear?

10             A.    Yes, sir.

11             Q.    Okay.

12                   MS. MILLER:  And, Bill, just

13             give him a chance to answer the

14             question.

15                   MR. BAKER:  Sure.  Sure.

16                   (Document marked for

17             identification as Exhibit

18             CVS-Devlin-P-132.)

19    BY MR. BAKER:

20             Q.    This is marked as

21    Exhibit 132.  This is --

22             A.    If I just can go back, I

23    wanted to just discuss where my office

24    was located.

1    Q.    Sure.  Go ahead.

2    A.    I was 1 CVS Drive, and then

3  towards the end of my tenure we moved to

4  an office in Highland Drive which was in

5  Cumberland, Rhode Island.  But it was

6  part of the same office complex.

7    Q.    Okay.  But during the period

8  of time that you were employed at CVS

9  from 2005 to 2012 when you were in the

10  logistics loss prevention department as

11  the director, you were physically located

12  in Rhode Island, correct?

13    A.    Yes.  That's -- that's where

14  my mail would come to, but I -- yes.

15    Q.    Okay.  And that's where your

16  physical office was located; is that

17  right?

18    A.    Yes, sir.

19    Q.    All right.  I've handed you

20  Exhibit 132.  This is a distribution

21  center printout for CVS Health.  Can you

22  tell me when you worked there, when you

23  last left in 2012, approximately how many

24  distribution centers were there for CVS

1    Health across the United States?

2              MS. MILLER:  Objection.

3              THE WITNESS:  I'm sorry, can

4        you rephrase the question?

5    BY MR. BAKER:

6        Q.    When you last worked at CVS

7    in October of 2012, that's when you last

8    worked there, right?

9        A.    Yes, sir.

10       Q.    Okay.  How many distribution

11   centers were there for CVS?  And I'm

12   going to say CVS because there's so many

13   different CVS entities.

14       A.    Right.

15       Q.    So when I say CVS, you know

16   who I'm talking about, correct?

17       A.    Yes, sir.

18       Q.    Okay.  I'm talking about

19   your employer in 2012.

20             So how many distribution

21   centers were there at that time?

22       A.    I'd say, off the top of my

23   head, maybe about 20.

24       Q.    Okay.  And out of that 20,

Highly Confidential - Subject to Further Confidentiality Review

1  how many were licensed for distributing

2  narcotics?

3            MS. MILLER:  Objection.

4            THE WITNESS:  If you give me

5       a moment I can try to recall.

6            Maybe about eight.

7  BY MR. BAKER:

8       Q.   Okay.  Let's go through this

9  list.  We'll make sure I get all of them.

10 Okay?

11           Look on this list, and

12 you'll see -- you can see where it's

13 yellowed in on your screen.  Do you see

14 it on the screen?

15      A.   Yeah --

16      Q.   Okay.

17      A.   That's difficult for me to

18 read.

19      Q.   Okay.  We'll put --

20           MS. MILLER:  Mr. Baker, just

21      one moment.

22           MR. BAKER:  Sure.

23           MS. MILLER:  Can you tell us

24      the -- I notice there's no Bates

```
1    number on the document.

2         MR. BAKER:  This is an --

3         MS. MILLER:  Can you tell us

4    where this originated from?

5         MR. BAKER:  This is an

6    internet document from CVS.com.

7    And this is where I got it.  And I

8    want to make sure that he is able

9    to look at the yellowed-in version

10   on the screen.

11        You can pull the screen to

12   you.

13        MS. MILLER:  But, Mr. --

14   Mr. Baker, this is as of June --

15        MR. BAKER:  2014.

16        MS. MILLER:  Well, it says

17   June, it's dated June 14, 2018.

18        MR. BAKER:  Yeah, I'm going

19   to ask him which ones were in

20   existence when he was there.

21        MS. MILLER:  Okay.

22        MR. BAKER:  Okay?

23        THE WITNESS:  I have

24   distance glasses that I brought
```

1    with me.

2    BY MR. BAKER:

3        Q.   Okay.  Go ahead.  All right.

4    Let's go through it if we could.

5        A.   Can --

6        Q.   Sure.

7        A.   Do you want me to go get my

8    distance glasses?

9        Q.   No.  Just whatever you --

10    you can pull the screen right --

11            MS. MILLER:  Or the document

12        in front of you is the same

13        document on the screen.

14            THE WITNESS:  Okay.  Just

15        it's difficult for me to see the

16        yellow highlight.

17    BY MR. BAKER:

18        Q.   Are you ready?

19        A.   If I can pull the screen

20    closer.

21        Q.   Yes.

22            MS. MILLER:  And again,

23        Bill, your question is as of when

24        he left --

1            MR. BAKER:  Correct.

2            MS. MILLER:  -- in 2012?

3            MR. BAKER:  Correct.  We're

4       going to go through that.

5  BY MR. BAKER:

6       Q.   All right.  The first -- you

7  see where it says type Rx?  That's the

8  type of distribution center.  Do you see

9  that, that would be Rx licensed?

10      A.   Yes.

11      Q.   Okay.  All right.  The first

12 one is CR, which is Conroe, Texas; is

13 that correct?

14      A.   That was -- that was there,

15 yes.

16      Q.   All right.  Was that on

17 board in 2012?

18      A.   I believe so, yes.

19      Q.   All right.  The second one

20 is Ennis, Texas.  Do you see that?

21      A.   Yes, correct?

22      Q.   Was that on board as a

23 narcotics distribution center in 2012?

24      A.   Yes.

```
 1                    MS. MILLER:  Objection.
 2   BY MR. BAKER:
 3        Q.    What does Rx mean to you?
 4                    MS. MILLER:  Objection.
 5                    THE WITNESS:  Pharmacy.
 6   BY MR. BAKER:
 7        Q.    Okay.  All right.  So what
 8   do you call the type of licensing that
 9   these distribution centers have when they
10   are able to distribute narcotics, what do
11   you call that?
12                    MS. MILLER:  Objection.
13                    THE WITNESS:  I would call
14        it a DEA registered facility.
15   BY MR. BAKER:
16        Q.    Okay.  A DEA registered
17   facility is one that distributes -- that
18   has a license to distribute some form of
19   narcotics; is that right?
20                    MS. MILLER:  Objection.
21                    THE WITNESS:  It would be
22        Controls III through V, I believe.
23   BY MR. BAKER:
24        Q.    Okay.  Controlled Substances
```

1    III through V, correct?

2            A.    Right.

3            Q.    All right.  And you know

4    that certain controlled substances under

5    III were narcotics, meaning hydrocodone

6    combination products, correct?

7                 MS. MILLER:  Objection.

8    BY MR. BAKER:

9            Q.    You knew that?

10                MS. MILLER:  Objection.

11   BY MR. BAKER:

12           Q.    Right?

13                MS. MILLER:  Objection.

14                THE WITNESS:  Can you repeat

15       the question?

16   BY MR. BAKER:

17           Q.    Did you know that

18   hydrocodone combination products were

19   Schedule III under the FDA?

20                MS. MILLER:  Objection.

21   BY MR. BAKER:

22           Q.    Did you know that?

23                MS. MILLER:  Objection.

24   BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   Controlled substances.  If

2  they were Schedule III controlled

3  substances under the FDA scheduling, did

4  you know that?

5           MS. MILLER:  Objection.

6  BY MR. BAKER:

7       Q.   When you were there in 2012?

8           MS. MILLER:  Objection.

9           THE WITNESS:  At one point.

10 BY MR. BAKER:

11      Q.   Okay.  I know.  Did you know

12 that, is what I'm asking?

13          MS. MILLER:  Objection.

14          THE WITNESS:  Yes.

15 BY MR. BAKER:

16      Q.   Okay.  So let's move forward

17 in this list.  You have Florida, Vero

18 Beach, Florida.  Was that one of the

19 facilities that distributed narcotics?

20          MS. MILLER:  Objection.

21          THE WITNESS:  I would use

22     the term "controls."

23 BY MR. BAKER:

24      Q.   Okay.  With respect to the

1  next one, Indianapolis, Indiana, was that

2  one of the facilities, one of the

3  distribution centers for CVS that

4  distributed controlled substances?

5       A.    Yes.

6       Q.    Okay.  Kansas City, was that

7  on board when you were there or did that

8  open after you left?

9       A.    I'm not aware of Kansas

10 City.

11      Q.    Okay.  Move to the next

12 page.  New Jersey, which was Lumberton,

13 New Jersey.  Was that a controlled

14 substances distribution center for CVS

15 when you were there, in Lumberton, New

16 Jersey?

17      A.    Yes.

18      Q.    Orlando, Florida, was that a

19 controlled substances distribution center

20 when you were at CVS?

21      A.    Yes.

22      Q.    Knoxville, Tennessee, was

23 that a controlled substance distribution

24 center when you were at CVS?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      Patterson, California, was

3     that a controlled substance distribution

4     center when you were at CVS?

5          A.      Yes.

6          Q.      North Smithfield, Rhode

7     Island, was that a controlled substance

8     distribution center when you were at CVS?

9               MS. MILLER:   Mr. Baker, I'm

10          sorry, can you tell me where you

11          are in the document?

12               MR. BAKER:   About at the

13          bottom of Page 2.

14               MS. MILLER:   Okay.   Thank

15          you.

16               MR. BAKER:   Okay.

17               THE WITNESS:   Can you repeat

18          that?

19     BY MR. BAKER:

20          Q.      Patterson, California, was

21     that a controlled substances distribution

22     center when you were at CVS?

23          A.      Yeah, I believe so, yes.

24          Q.      Okay.   North Smithfield,

1    Rhode Island, was that a controlled

2    substances distribution center when you

3    were there at CVS?

4        A.    Yes.

5        Q.    Chemung, New York, was that

6    a controlled substance distribution

7    center for CVS when you were there?

8        A.    Yes.

9        Q.    Are you familiar with the

10   scheduling of controlled substances

11   through the Food and Drug Administration?

12            MS. MILLER:  Objection.

13            THE WITNESS:  I'm aware of

14            the scheduling.  I'm not -- I

15            really can't recall as far as what

16            might be a V, what might be a IV,

17            what might be a III, what might be

18            a II.

19   BY MR. BAKER:

20       Q.    Do you know, if you look

21   through that list that I just gave you of

22   the distribution centers, there's

23   different names of corporations that are

24   listed as the owners of those

Highly Confidential - Subject to Further Confidentiality Review

1   distribution centers.

2           Do you see that on that

3   list?

4           MS. MILLER:  Objection.

5   BY MR. BAKER:

6       Q.   Let's go through first,

7   okay.  If you start with Conroe, Texas.

8   Do you see that?

9       A.   I do see that.

10      Q.   Okay.  Do you see it says

11  the DC name is CVS Pharmacy, Inc.?  Do

12  you see that?

13      A.   I do.

14      Q.   Now, if you skip down to

15  Florida, the Vero Beach distribution

16  center, it says "CVS Vero, Florida

17  Distribution LLC."

18          Do you see that?

19      A.   Yes, sir.

20      Q.   Do you know why CVS names

21  these different facilities different

22  names instead of the same thing?

23      A.   No idea.

24          MS. MILLER:  Objection.

```
1    BY MR. BAKER:

2         Q.    Okay.  Look down below

3    there.  It says Indiana, CVS Indiana LLC.

4              Do you see that?

5         A.    Yes.

6         Q.    Do you know why that's named

7    CVS Indiana LLC as opposed to, for

8    instance, CVS Pharmacy, Inc., or CVS

9    Healthcare or CVS something else?  Do you

10   know why it's named that?

11             MS. MILLER:  Objection.

12             THE WITNESS:  No.

13   BY MR. BAKER:

14        Q.    Was there any strategy that

15   you're aware of at CVS for naming these

16   facilities different corporate names like

17   that?

18             MS. MILLER:  Objection.

19             THE WITNESS:  It wasn't my

20        responsibility.

21   BY MR. BAKER:

22        Q.    Okay.  If you look at the

23   Lumberton, New Jersey one on the second

24   page.  It lists that as owned by CVS
```

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmacy, Inc.

2            Do you see that?

3        A.    Yes.

4        Q.    Okay.  If you look at

5    Chemung, New York.  Look at the bottom of

6    Page 2.  It says it's owned by CVS Rx

7    Services, Inc.  Do you know why that

8    exists like that, as opposed to being

9    owned by CVS Pharmacy, Inc., or another

10   CVS entity?

11           MS. MILLER:  Objection.

12           THE WITNESS:  No.

13   BY MR. BAKER:

14       Q.    When you were working there

15   last, at CVS, in 2012, which CVS entity

16   issued your paycheck?

17       A.    I can't recall.  I had

18   direct deposit.

19       Q.    All right.  From the time

20   that you worked at CVS from 2005 to 2012

21   in the department of logistics loss

22   prevention, were you involved with the

23   suspicious order monitoring program of

24   CVS?

1    A.    First off, the department I

2    actually worked in would be the loss

3    prevention department.

4    Q.    I understand that.  My

5    question was, were you involved with the

6    suspicious order monitoring program?

7    A.    During a period of time,

8    Yes, I was.

9    Q.    Okay.  And did that start in

10    2008?

11    MS. MILLER:  Objection.

12    THE WITNESS:  No.  I believe

13    it would have been earlier than

14    that.

15    BY MR. BAKER:

16    Q.    Okay.  When did you first

17    start getting involved in the suspicious

18    order monitoring program at CVS?

19    A.    I believe it may have been

20    around 2007.

21    Q.    Okay.  Was that when you

22    were involved with the initial drafts of

23    the suspicious order monitoring policy

24    and procedure?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. MILLER:  Objection.

2              THE WITNESS:  Can you repeat

3      that, please?

4  BY MR. BAKER:

5      Q.    Was that when you started to

6  get involved with the suspicious order

7  monitoring policy and procedure drafts?

8              MS. MILLER:  Objection.

9              THE WITNESS:  I would have

10      been involved in that.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   BY MR. BAKER:

22          Q.    Okay.  During the time that

23   you were involved in loss prevention at

24   CVS, what sort of losses were you trying

1   to prevent?

2           MS. MILLER:  Objection.

3           THE WITNESS:  So job

4       responsibilities or?

5   BY MR. BAKER:

6       Q.    What were you trying to

7   prevent the loss of?

8       A.    The position was to protect

9   the, you know, people, assets --

10          Q.    At the time --

11          A.    -- of the company.

12          MS. MILLER:  If you can just

13      let him finish.  Thank you.

14  BY MR. BAKER:

15          Q.    As it relates to the

16  distribution of narcotics out of the

17  distribution centers, what was your

18  involvement with the suspicious order

19  monitoring process in relation to those

20  narcotics?

21          MS. MILLER:  Objection.

22          THE WITNESS:  I'm not sure I

23      understand your question.

24  BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2              MS. MILLER:  Objection.

3              MR. BAKER:  Pull up

4      Exhibit 64 please.

5              (Document marked for

6      identification as Exhibit

7      CVS-Devlin-P-64.)

8  BY MR. BAKER:

9      Q.    I'd like you to pull up

10 hydrocodone, which is the second page.

11     A.    Would I be able to take a

12 break?

13     Q.    Do you need to go to the

14 bathroom?

15     A.    I do.

16             MR. BAKER:  Okay.  Sure.  Go

17     ahead.

18             MS. MILLER:  Go off the

19     record.

20             THE VIDEOGRAPHER:  Going off

21     the record.  The time is 9:20.

22             (Short break.)

23             THE VIDEOGRAPHER:  We are

24     going back on record.  Beginning

1    of Media File Number 2.  The time

2    is 9:30.

3    BY MR. BAKER:

4         Q.   You have in front of you the

5    DEA drug fact sheet.

6              Do you see that?

7         A.   Yes, sir.

8         Q.   Okay.  It lists hydrocodone.

9    It says, "Hydrocodone is the most

10   frequently prescribed opioid in the

11   United States."

12             Do you see that?

13        A.   No.

14             MS. MILLER:  Bill, can you

15        direct him to a page?

16   BY MR. BAKER:

17        Q.   Okay.  Go to the second page

18   of your DEA drug fact sheet.  If you look

19   on the monitor, it's right in front of

20   you.

21             Do you see it?

22        A.   It's easier for me to look

23   at the paper.

24        Q.   Do you see where it says

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "hydrocodone" at the top?

 2         A.    Yes.

 3         Q.    Okay.  Do you see where it

 4    says, "Hydrocodone is the most frequently

 5    prescribed opioid in the United States

 6    and is associated with more drug abuse

 7    and diversion than any other illicit

 8    (sic) or illicit opioid."

 9              Do you see that?

10         A.    Yes.

11         Q.    Okay.  Did you know this

12    before it was read to you today by

13    looking at this DEA drug fact sheet?

14              MS. MILLER:  Objection.

15    BY MR. BAKER:

16         Q.    Did you know this?

17              MS. MILLER:  Objection.

18              THE WITNESS:  Hydrocodone,

19         per se, I'm not sure.

20    BY MR. BAKER:

21         Q.    Okay.  Did the distribution

22    centers over which you were the logistics

23    director -- director of logistics and

24    loss prevention, distribute hydrocodone
```

1    combination products?

2         A.    I believe so.

3         Q.    Okay.  Do you know those to

4    be opioids?

5              MS. MILLER:  Objection.

6              THE WITNESS:  Not at the

7         time.

8    BY MR. BAKER:

9         Q.    Okay.  Do you know it now?

10        A.    Now?

11        Q.    Do you know that now?

12        A.    After reading, seeing this,

13   yes.

14        Q.    Okay.  Have you ever heard

15   of the opioid crisis?

16        A.    I have recently heard of it,

17   yes.

18        Q.    Did you know about it to be

19   in existence which you were employed at

20   CVS?

21             MS. MILLER:  Objection.

22             THE WITNESS:  No.

23   BY MR. BAKER:

24        Q.    That was never discussed

1    with anybody at CVS, the opioid crisis or

2    the nature of the opioid crisis going on

3    from 2005 to 2012 when you were in loss

4    prevention logistics?

5            MS. MILLER:  Objection.

6    BY MR. BAKER:

7        Q.    That was never discussed?

8            MS. MILLER:  Objection.

9            THE WITNESS:  No, not that I

10   can recall.

11   BY MR. BAKER:

12       Q.    Did you ever attend any DEA

13   meetings of any type, any DEA conferences

14   of any type?

15       A.    Not that I can recall.

16       Q.    Did you ever attend any

17   training on the opioid crisis while you

18   were at CVS in logistics and loss

19   prevention?

20       A.    No, not that I recall.

21           MR. BAKER:  Okay.  Go to

22   Exhibit Number 58.

23           MS. MILLER:  I don't think

24   we have Exhibit 58.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BAKER:  Don't have 58?

2       Go to exhibit 102.

3              MS. MILLER:  Is that a new

4       exhibit, Bill?

5              MR. BAKER:  Yeah, Exhibit

6       102.

7              MS. MILLER:  Is that a new

8       one?

9              MR. BAKER:  Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



BY MR. BAKER:

       Q.    Okay.  Let's move forward.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8              MR. BAKER:  Okay.  I've been

9      going about an hour and a half

10     myself.  And I have not taken a

11     break.  So I'm going to take about

12     a five-minute break.

13             THE VIDEOGRAPHER:  We're

14     going off the record.  The time is

15     10:09.

16             (Short break.)

17             THE VIDEOGRAPHER:  We are

18     going back on record.  Beginning

19     of Media File 3.  The time is

20     10:20.

21  BY MR. BAKER:

22     Q.   Okay.  We're back on the

23  record looking at Exhibit Number 87,

24  which was the --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. MILLER:  Bill, you mean

 2          97?

 3     BY MR. BAKER:

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5    BY MR. BAKER:

6         Q.    Okay.  You know hydrocodone

7    combination products are narcotics.  I

8    showed you the drug fact sheets on that,

9    correct?

10               MS. MILLER:  Objection.

11   BY MR. BAKER:

12        Q.    You know that, don't you?

13               MS. MILLER:  Objection.

14               THE WITNESS:  After reading

15        the -- you know, according to that

16        fact sheet, that's what it's

17        classified as.

18   BY MR. BAKER:

19        Q.    And you know they're

20   opioids, correct?

21               MS. MILLER:  Objection.

22               THE WITNESS:  I mean --

23   BY MR. BAKER:

24        Q.    I mean, that's what it said.

Highly Confidential - Subject to Further Confidentiality Review

1    You just read it.

2              MS. MILLER:  Objection.

3              THE WITNESS:  Well, again,

4         according to the sheet you sent

5         me, yes.

6    BY MR. BAKER:

7         Q.   Well, listen, what color is

8    that pen right there?

9              MS. MILLER:  Objection.

10   BY MR. BAKER:

11        Q.   What color is it?

12             MS. MILLER:  Objection.

13             THE WITNESS:  You're not

14        going to buy this, but I am

15        color-blind.

16   BY MR. BAKER:

17        Q.   Okay.  Well, what's in this

18   glass right here?

19             MS. MILLER:  Objection.

20   BY MR. BAKER:

21        Q.   Does it look like water?

22             MS. MILLER:  Mr. Baker.

23   BY MR. BAKER:

24        Q.   See, I want to ask direct

1    questions and get direct answers.  But

2    every time I ask you a question, you kind

3    of, well, I don't remember, this, that.

4    I just want to know what the facts are.

5    Okay.  And I don't want to dance around

6    with you with questions and answers.  I

7    just want to know the facts.  Okay.  And

8    I'm not trying to ask you trick

9    questions.

10                So if you can answer my

11   questions directly, we can get through

12   this much smoother than what you're

13   allowing.  Okay?

14               MS. MILLER:  Bill, he's

15        answering your questions.

16   BY MR. BAKER:

17        Q.    So let me -- let me repeat

18   the question.  Let's go back.

19        A.    My -- my intention is to

20   answer your question, sir.

21        Q.    Okay.  You know, you know

22   that hydrocodone combination products are

23   opioids, correct?

24               MS. MILLER:  Objection.

1          Asked and answered.

2                THE WITNESS:  According to

3          the sheet you provided me, that's

4          what it states.

5    BY MR. BAKER:

6          Q.    Okay.  Did you know that a

7    hydrocodone combination product was an

8    opioid when you worked at CVS?

9          A.    I -- as I previously

10   testified, I would refer to it as a

11   control drug.

12         Q.    Okay.  Did you know it was

13   an opioid?

14         A.    No.

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2          Q.    It says, "Responsibilities.

3    DC Rx."  What is a DC Rx?

4          A.    I believe that would be DC

5    pharmacy.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BAKER:

2         Q.    Go ahead.

3              MS. MILLER:  Go ahead and

4         answer.

5              THE WITNESS:  That -- that

6         would be within the ballpark.

7    BY MR. BAKER:

8         Q.    Okay.  And do you know why

9    it was moved from a distribution

10   center-related program to Knoxville at

11   that time?

12             MS. MILLER:  Objection.

13        Asked and answered.

14   BY MR. BAKER:

15        Q.    Do you know?

16        A.    I believe I -- I had

17   mentioned from a -- you know, the

18   continuous evolution of the process and

19   from an operational efficiency

20   standpoint.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12    Q.    What was your involvement

13  with respect to the IRRs and the review

14  of the IRRs, if anything, while you were

15  at CVS?

16    A.    I was not involved in the

17  day-to-day review of the IRR.

18    Q.    What was your involvement

19  with respect to management of how many

20  people would review IRRs?

21    A.    I would be involved in the

22  decision as far as how many people would

23  review the IRR.

24    Q.    Okay.  And that was from

Highly Confidential - Subject to Further Confidentiality Review

1    what period to what period that you were

2    involved in making that decision?

3            A.    It would probably be from

4    the beginning of the process till I left.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15    Q.   Okay.  During the time that

16  you were there --

17          MR. BAKER:  Let's take a

18      break for just one second.  I've

19      got to --

20          MS. MILLER:  Can we actually

21      take -- I think we've been going

22      for a while.  Can we take a little

23      bit of a break?

24          MR. BAKER:  Okay.  Do you

Highly Confidential - Subject to Further Confidentiality Review

1    want to take a little bit of a

2    break?

3              MS. MILLER:  Yeah.

4              MR. BAKER:  Okay.

5              THE VIDEOGRAPHER:  Off the

6    record.  11:32.

7              (Short break.)

8              THE VIDEOGRAPHER:  Back on

9    record.  Beginning Media File

10   Number 5.  The time is 11:48.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24                MR. BAKER:  I think it's

1    time to break for lunch.  Do you

2    want to try to take, what,

3    30 minutes?

4            THE WITNESS:  Ten minutes?

5            MR. BAKER:  For lunch?

6            MS. MILLER:  No.  30 minutes

7    would be great.

8            THE VIDEOGRAPHER:  Off the

9    record.  The time is 12:29.

10           (Lunch break.)

11           THE VIDEOGRAPHER:  We're

12   going back on record.  Beginning

13   of Media File Number 6.  The time

14   is 1:14.

15  BY MR. BAKER:

16       Q.   Mr. Devlin, we just took a

17  lunch break, correct?

18       A.   Yes.

19

20

21

22

23

24



1

2

3

4

5

6

7

8

9

10

11

12        MR. BAKER:  Let me go off

13   record for just a second.

14        THE VIDEOGRAPHER:  We're

15   going off record.  The time is

16   1:15.

17        (Brief pause.)

18        THE VIDEOGRAPHER:  Going

19   back on record.  Beginning of

20   Media File Number 7.  The time is

21   1:17.

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1 ████████████████████████████

2        Q.    Okay.   Let's take a break

3   while we find that.

4             THE VIDEOGRAPHER:   Off

5        video, 2:07.

6             (Short break.)

7             THE VIDEOGRAPHER:   We are

8        going back on record.   Beginning

9        of Media File 8.  The time is

10        2:21.

11   BY MR. BAKER:

12        Q.    Pull Exhibit 81, please.

13   You have in front of you --

14             MS. MILLER:   Could you give

15        us one minute?

16             MR. BAKER:   Sure.

17             MS. MILLER:   Okay.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          Q.      Okay.   Next.

24                  MS. MILLER:  Can we take a

Highly Confidential - Subject to Further Confidentiality Review

1    quick break?  A quick --

2         MR. BAKER:  Somebody need to

3    go to the bathroom or --

4         MS. MILLER:  I would like to

5    if we could.

6         MR. BAKER:  Okay.  Go ahead.

7         THE VIDEOGRAPHER:  Going off

8    the record.  The time is 3:00 p.m.

9         (Short break.)

10         THE VIDEOGRAPHER:  We are

11    going back on the record.

12    Beginning of Media File 9.  The

13    time is 3:11.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



| | |
|---|---|
| 18 | MR. BAKER:  Okay.  I'm going |
| 19 | to take a break.  And I may pass |
| 20 | it over to my partner here, Jimmy |
| 21 | DeRoche.  Give me just a second to |
| 22 | review my notes. |
| 23 | MS. MILLER:  Can we -- |
| 24 | THE WITNESS:  Ten minutes or |

Highly Confidential - Subject to Further Confidentiality Review

1          so?

2                    MR. BAKER:  No, I just need,

3          like, two or three.  I mean, if

4          y'all need more than that -- I'm

5          just, you know, going to sit here

6          and take a look at my notes.

7                    THE WITNESS:  If you don't

8          mind, I'm going to take a couple

9          minutes.

10                   THE VIDEOGRAPHER:  Going off

11         the record.  The time is 3:33.

12                   (Short break.)

13                   THE VIDEOGRAPHER:  We are

14         going back on the record.

15         Beginning of Media File 10.  The

16         time is 3:43.

17                        -  -  -

18                   EXAMINATION

19                        -  -  -

20    BY MR. DeROCHE:

21         Q.    Mr. Devlin, my name is Jim

22    DeRoche.  I have some hopefully brief

23    follow-up questions for you.

24                   First of all, where do you

Highly Confidential - Subject to Further Confidentiality Review

1    reside now again?  I didn't hear that.

2         A.    I live in Pocasset, in

3    Massachusetts.

4         Q.    Okay.  Is that a suburb of

5    Boston of some sort?

6         A.    It's actually part of Cape

7    Cod.

8         Q.    A-ha.  Okay.

9               When did you come to

10   Washington?

11        A.    When did I come to

12   Washington?

13        Q.    Yeah.

14        A.    I arrived -- let's see,

15   today is Thursday, right?

16        Q.    Correct.

17        A.    Yeah, I arrived on Tuesday.

18        Q.    You arrived on Tuesday?

19        A.    Yes.

20        Q.    Okay.  And what were you

21   doing for -- since -- between Tuesday and

22   today?

23        A.    I had some --

24              MS. MILLER:  Objection.

1    BY MR. DeROCHE:

2         Q.    Excuse me?  I didn't hear

3    what you said.

4              MS. MILLER:  Go ahead.

5    BY MR. DeROCHE:

6         Q.    You can answer the question,

7    sir.

8         A.    I -- I had some prep time.

9         Q.    So you prepared for this

10   deposition?

11        A.    Yes.

12        Q.    Okay.  You met with lawyers

13   here at the office we're sitting in; is

14   that correct?

15        A.    Yes.

16        Q.    And you met on -- did you

17   meet on Tuesday or did you arrive late

18   Tuesday?

19        A.    Briefly Tuesday.

20        Q.    And then you met on

21   Wednesday as well, spent all day here?

22             MS. MILLER:  Objection.

23   BY MR. DeROCHE:

24        Q.    You can answer.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Most of the day.

2      Q.    Okay.  You looked at

3   documents?

4      A.    Some documents, yes.

5      Q.    Okay.  You have an

6   understanding of what this case is about,

7   correct?

8           MS. MILLER:  Objection.

9           THE WITNESS:  Not -- not in

10          any great detail.  I mean high

11          level.  High level, but there's a

12          lot more I don't know than I do

13          know.

14   BY MR. DeROCHE:

15      Q.    Sure.  I think that applies

16   to most of us.

17           When did you find out that

18   you were being deposed in connection with

19   this case?

20      A.    Early December maybe.

21      Q.    Okay.  So you've known for

22   approximately a month that your

23   deposition was going to be taken?

24      A.    About that, yeah.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Did you talk to any folks

2  from CVS who you used to work with, about

3  this deposition?

4      A.    No.

5      Q.    Other than the lawyers, have

6  you spoken to anybody else?

7      A.    My wife knows I'm here.

8      Q.    Other than her, no one else?

9      A.    My son and daughter know I'm

10  here.

11      Q.    Other than family, no

12  other -- no other individuals?

13      A.    That's about it.

14      Q.    Okay.  So you didn't try to

15  reach out to folks you used to work with,

16  like Ms. Hinkle or --

17      A.    No.

18      Q.    -- anybody else?

19      A.    No.

20      Q.    Judy Hughes?

21      A.    No.  No.

22      Q.    Do you stay in contact with

23  any people from CVS that you used to work

24  with?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Very few, but just an

2  occasional hello.  But not -- like I

3  really haven't seen people that I worked

4  with from CVS or -- so...

5      Q.    Did you leave on good terms

6  in your view?

7           MS. MILLER:  Objection.

8           THE WITNESS:  I mean I left

9      on my own.

10  BY MR. DeROCHE:

11      Q.    You don't have any animosity

12  towards CVS?

13           MS. MILLER:  Objection.

14           THE WITNESS:  No.  It was an

15      opportunity to be involved in a

16      lot of, you know, a lot of

17      responsibility and a lot of

18      project management work.  And I

19      think professionally it was a good

20      opportunity, and at the time a

21      better opportunity developed.

22  BY MR. DeROCHE:

23      Q.    Sure.  Do you have clients

24  in Washington DC that you came to see or

Highly Confidential - Subject to Further Confidentiality Review

1   did you just come for this deposition?

2        A.    I came for the deposition.

3        Q.    So since Tuesday, you

4   focused on this deposition that we're

5   having here today?

6        A.    I've gone and -- getting

7   back to the hotel room, I've done some

8   work for other clients.

9        Q.    Okay.  All right.  I want to

10  try to understand where logistics loss

11  prevention fit in the -- in the hierarchy

12  of CVS.  I don't think I understand that

13  at all.

14           So can you explain logistics

15  loss prevention and where it fit in, in

16  terms of -- of the structure at CVS?

17       A.    Sure.  I was -- so I was a

18  part of the overall loss prevention

19  department.  And there is a field loss

20  prevention department which would focus

21  on stores.  There was logistics loss

22  prevention which focused, supported

23  distribution centers.  There is also some

24  corporate support around loss prevention

Highly Confidential - Subject to Further Confidentiality Review

1  also.  And I believe there also was some

2  loss prevention support for some of the

3  Caremark mail order sites when I was

4  present.

5       Q.    Okay.  And so logistics loss

6  prevention focused primarily on the

7  distribution centers?

8       A.    That was -- that was a --

9  you know, a big component.  I also

10  provided some support to some of the

11  Caremark mail order sites from a safety

12  standpoint.

13       Q.    That was under loss --

14  logistics loss prevention as well?

15       A.    It was.

16       Q.    Other than the safety

17  that -- oversight that you may have

18  provided to the Caremark mail order

19  division, otherwise besides that, you did

20  focus on the distribution centers?

21       A.    That was my primary focus.

22  I mean I had a variety of

23  responsibilities during my career.

24  Some -- some retail, some corporate.  But

1    I always had the distribution centers as

2    a main part of what I was doing.

3         Q.    And when you took over as

4    director of logistics loss prevention,

5    were you sort of the top dog in the

6    logistics loss prevention department?

7         A.    I managed the department,

8    so...

9         Q.    And that was at least since

10   2005 you had held that position?

11        A.    Yeah, again as I testified

12   earlier, I mean there's typical --

13   typical corporate America.  I mean --

14        Q.    Sure.

15        A.    -- you can have same title

16   but different levels.

17        Q.    Great.

18        A.    So, you know, I was a

19   director level different in 2005 than say

20   a director level I was in, say, 2003.

21   But it was just a -- you know, it was

22   kind of an evolution as the company

23   continued to grow and even some of my

24   responsibilities grew.

1    Q.    So the director level that
2  you attained in 2005 was, was that the
3  highest level -- director level --
4    A.    No.
5    Q.    -- in logistics loss
6  prevention?
7           MS. MILLER:  Give him a
8       chance to finish his question,
9       please.
10          THE WITNESS:  Oh, sorry.
11 BY MR. DeROCHE:
12   Q.    Highest level in logistics
13 loss prevention.
14   A.    There are -- you know, I
15 guess I was the director of logistics,
16 loss prevention.  As far as my position
17 goes on the director level, I was
18 probably in the middle of the levels of
19 directors, like there could have -- you
20 know, there could have been another --
21 there could have been -- like I could
22 have attained another higher level of
23 director and still be in logistics, loss
24 prevention.

1    But there wasn't -- you

2  know, I certainly reported in to someone

3  else.  But that individual had, you know,

4  other responsibilities.

5       Q.    You reported to Judy Hughes,

6  I think you said; is that correct?

7       A.    Yes.

8       Q.    And was Ms. Hughes also

9  considered a director of logistics loss

10 prevention or did she have some other

11 title?

12      A.    I believe she was just

13 director of loss prevention.

14      Q.    Okay.  She was -- so

15 logistics loss prevention is a department

16 within loss prevention?

17      A.    It is.  It is.

18      Q.    She was at the loss

19 prevention level, as opposed to the

20 logistics loss prevention level?

21           MS. MILLER:  Frank, just

22      give him a chance --

23           MR. DeROCHE:  Yeah, sure.

24           MS. MILLER:  -- so you're

1       not stepping on him.

2    BY MR. DeROCHE:

3       Q.    Trying to get a distinction

4    so I understand.  So in terms of

5    directors of logistics, loss prevention,

6    you were -- you were the top person of

7    logistics, loss prevention as of 2005?

8            MS. MILLER:  Objection.

9    BY MR. DeROCHE:

10       Q.    Is that correct?

11       A.    My title was director of

12    logistics, loss prevention.

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8

9

10

11  BY MR. DeROCHE:

12          Q.    Sure.  I understand.

13  Everyone needs got a boss.

14          A.    Right.  And even -- you

15  know, and --

16          Q.    At least at home, but be

17  that as it may.

18          A.    Even, like, my business card

19  would say director of logistics loss

20  prevention.  You know, from a -- I guess

21  a budgetary payroll standpoint, it may

22  just say director loss prevention.

23  Director 1 or Director 2.  CVS was big --

24  changed, you know, grading systems and

1   whatnot so.

2          Q.     I understand it was a

3   multi-billion dollar company at the time

4   that you were there.  Probably even

5   bigger now.

6                MS. MILLER:  Objection.

7   BY MR. DeROCHE:

8          Q.     So there was many levels of

9   corporate structure, I would assume, that

10  you had to answer through?

11               MS. MILLER:  Objection.

12               THE WITNESS:  Can you repeat

13      that?

14  BY MR. DeROCHE:

15         Q.     Did you have -- let's put it

16  this way.  Logistics, loss prevention,

17  did you have a budget?

18         A.     Yes.

19         Q.     And you were ultimately

20  responsible for budget issues, I take it,

21  as the director?

22         A.     For my piece of the pie.

23         Q.     Right.

24         A.     The overall loss prevention

1    budget, I was tasked with managing that.

2            Q.    Okay.  You knew that at

3    least with respect to the Rx distribution

4    centers, that they had a license that was

5    issued by the Drug Enforcement Agency,

6    correct?

7            A.    Yes.

8            Q.    And were you responsible as

9    director of logistics, loss prevention in

10   ensuring that those licenses were

11   maintained?

12               MS. MILLER:  Objection.

13               THE WITNESS:  I'm not sure

14        quite what you mean by maintained.

15   BY MR. DeROCHE:

16           Q.    Excuse me?

17           A.    I'm not quite sure what you

18   mean by maintained.

19           Q.    That each of the -- each of

20   the Rx distribution centers continued to

21   be licensed by the Drug Enforcement

22   Agency to distribute controlled

23   substances.

24               MS. MILLER:  Objection.

1          THE WITNESS:  There was a --

2     you know, people responsible for

3     licensing and registration within

4     company.

5  BY MR. DeROCHE:

6     Q.   Okay.  So logistics loss

7  prevention didn't handle that?

8     A.   No.  Like if you, like to

9  renew a DEA license, I wouldn't be

10 involved in that.

11    Q.   Okay.  What about complying

12 with the conditions upon which that

13 license is issued?

14          MS. MILLER:  Objection.

15          THE WITNESS:  It could be

16     maybe certain components, but

17     not -- not full responsibility for

18     all of it.

19 BY MR. DeROCHE:

20    Q.   Okay.  The component -- one

21 of the components -- one of the

22 conditions, I like to call it, to the

23 license is that the distribution centers

24 design and maintain a system to identify

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders?

2              MS. MILLER:  Objection.

3    BY MR. DeROCHE:

4         Q.    You're aware of that, right?

5              MS. MILLER:  Objection.

6              THE WITNESS:  As per the --

7         yes.

8    BY MR. DeROCHE:

9         Q.    Okay.  And you understood

10   that there was, in fact, a division

11   within the DEA that was called the

12   department of diversion that focused on

13   the diversion of controlled drugs from

14   the legal use of those drugs.  You're

15   aware that there's a diversion

16   department?

17        A.    I wouldn't necessarily use

18   that term.  I mean, just -- to me, the

19   DEA was the DEA.

20        Q.    Well, they sent diversion

21   investigators at times to inspect --

22        A.    Right, right.

23        Q.    Right.  So you know --

24        A.    But we just -- we always

1    just said the DEA is here.

2           Q.    DEA is showing up, knocking

3    on the door?

4           A.    Right.  We didn't I guess

5    formally get into the exact title.  It

6    was just, the DEA is here.

7           Q.    And you understood that the

8    concern of DEA was that controlled

9    substances like hydrocodone combination

10   products not be diverted into street

11   drugs, for lack of a better term, right?

12           MS. MILLER:  Objection.

13   BY MR. DeROCHE:

14           Q.    You understood that, right?

15           MS. MILLER:  Objection.

16           THE WITNESS:  I mean, I

17           looked at my role to ensure the

18           safety and security of control

19           drugs, you know, upon receipt into

20           the distribution center, and then

21           to upon delivery to the CVS retail

22           store.

23   BY MR. DeROCHE:

24           Q.    Except the retails -- well,

1   part of the responsibility as you've been

2   talking about all day today, for a

3   distribution center, was to ensure that

4   orders were legitimate orders that

5   weren't going to lead to diversion.

6   You're aware of that?

7               MS. MILLER:  Objection.

8               THE WITNESS:  Again, I think

9         I spoke earlier.  I was protecting

10        the integrity, you know, from a

11        security, safety standpoint and to

12        ensure that they are, you know,

13        falling into the proper hands.

14  BY MR. DeROCHE:

15        Q.    Correct.  Because if they

16  fall into the -- not the proper hands,

17  again you have things like an epidemic of

18  opioid use of prescription drugs.

19              MS. MILLER:  Objection.

20  BY MR. DeROCHE:

21        Q.    And obviously you don't want

22  that, right?

23              MS. MILLER:  Objection.

24              THE WITNESS:  No.  I mean,

1    my -- my focus really was, you

2    know, during my time there, I

3    mean, it was, you know, preventing

4    theft.  I mean, that was, you

5    know -- as far as other terms or

6    whatnot, it was just, you know, we

7    discussed, you know, how to ensure

8    the safety and security of the

9    control drugs.

10   BY MR. DeROCHE:

11       Q.    I understand that, you know,

12   theft can be one component by which drugs

13   are diverted.  But you recognize, don't

14   you, and didn't you recognize at the

15   time, that diversion could occur through

16   other means besides theft?

17            MS. MILLER:  Objection.

18       Asked and answered.

19            THE WITNESS:  Ultimately,

20       it's theft.

21   BY MR. DeROCHE:

22       Q.    Even if the drugs are paid

23   for to CVS?

24            MS. MILLER:  Objection.

1          THE WITNESS:  I guess part

2      of it would be a case-by-case

3      basis.  You would have to look at

4      how was it paid for.  Was it, you

5      know, a legitimate prescription.

6      I mean, there's a lot -- a lot

7      goes into it.  I've always, you

8      know shied away from just blanket

9      statements.

10  BY MR. DeROCHE:

11      Q.    Sure.

12      A.    I mean, just -- each

13  situation, it's separate and, you know,

14  you have to evaluate the facts.

15      Q.    Sure.  There could be

16  varying ways through which drugs are

17  diverted besides theft.  You just

18  mentioned one, illegitimate prescription.

19  Even if it's brought in, filled, and the

20  full price is paid to CVS, that could be

21  an instance of diversion, just like if

22  someone stole it off the shelf.  You

23  agree with that, right?

24          MS. MILLER:  Objection.

1    THE WITNESS:  Again, I come

2    back to, you know, having -- I'm

3    responsible to protect the

4    controls and the safety and

5    security and make sure they fall

6    into the proper hands.  I mean,

7    that's -- that's the ultimate

8    goal.

9  BY MR. DeROCHE:

10    Q.    Right.  And that was one of

11  the conditions to the distribution

12  centers getting their license from the

13  DEA to distribute these drugs, is that

14  CVS played by the rules and did its part

15  to police and prevent diversion of those

16  drugs?

17    MS. MILLER:  Objection.

18  BY MR. DeROCHE:

19    Q.    You would agree, right?

20    A.    You know, I -- you know, I

21  guess when I was involved I was, you

22  know, certainly to ensure we were meeting

23  the requirements of the DEA regulations.

24  I mean that's -- that's what, you know,

1    my focus was always on.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13    Q.    Okay.  And in terms of the

14  use of the PDMR, was there any kind of

15  written policy that incorporated the PDMR

16  into any kind of system to identify

17  suspicious orders?

18    A.    I don't recall the PDMR

19  procedures.  It's not a system that I

20  used or I was familiar with, so I --

21    Q.    Your answer is no?

22    A.    I really couldn't answer

23  that.

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Are you familiar with

2     a gentleman named Terrence Dugger?

3          A.    Yes.

4          Q.    Okay.  And what was

5     Mr. Dugger?

6          A.    He was a loss prevention

7     manager.

8          Q.    At the Indianapolis DC?

9          A.    At the time, yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          MR. DeROCHE:  Let's go off

22      the record for one minute.

23          THE VIDEOGRAPHER:  Going off

24      the record.  The time is 5:38.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Short break.)

 2              THE VIDEOGRAPHER:  Going

 3     back on record.  Beginning of

 4     Media File Number 12.  The time is

 5     5:40.

 6              MR. DeROCHE:  Thank you for

 7     your time.  We have nothing

 8     further.

 9              THE VIDEOGRAPHER:  No

10     questions?

11              MS. MILLER:  No questions.

12     Thank you.

13              THE VIDEOGRAPHER:  This

14     concludes today's deposition.

15     We're going off the record.  The

16     time is 5:40.

17              (Excused.)

18              (Deposition concluded at

19     approximately 5:40 p.m.)

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, FRANK DEVLIN, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

            _____

12          MICHELLE L. GRAY,
            A Registered Professional
13          Reporter, Certified Shorthand
            Reporter, Certified Realtime
14          Reporter and Notary Public
            Dated:  January 15, 2019

15

16

17          (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1        –  –  –  –  –  –

       E  R  R  A  T  A

2        –  –  –  –  –  –

3

4    PAGE   LINE   CHANGE

5    \_\_\_\_\_   \_\_\_\_\_   _____

6      REASON:   _____

7    \_\_\_\_\_   \_\_\_\_\_   _____

8      REASON:   _____

9    \_\_\_\_\_   \_\_\_\_\_   _____

10      REASON:   _____

11    \_\_\_\_\_   \_\_\_\_\_   _____

12      REASON:   _____

13    \_\_\_\_\_   \_\_\_\_\_   _____

14      REASON:   _____

15    \_\_\_\_\_   \_\_\_\_\_   _____

16      REASON:   _____

17    \_\_\_\_\_   \_\_\_\_\_   _____

18      REASON:   _____

19    \_\_\_\_\_   \_\_\_\_\_   _____

20      REASON:   _____

21    \_\_\_\_\_   \_\_\_\_\_   _____

22      REASON:   _____

23    \_\_\_\_\_   \_\_\_\_\_   _____

24      REASON:   _____

Highly Confidential - Subject to Further Confidentiality Review

1

2         ACKNOWLEDGMENT OF DEPONENT

3

4             I,_____, do

5 hereby certify that I have read the

6 foregoing pages, 1 - 490, and that the

7 same is a correct transcription of the

8 answers given by me to the questions

9 therein propounded, except for the

10 corrections or changes in form or

11 substance, if any, noted in the attached

12 Errata Sheet.

13

14

15 _____

16 FRANK DEVLIN                 DATE

17

18

19 Subscribed and sworn

    to before me this

20 _____ day of _____, 20_____.

21 My commission expires:_____

22

    _____

23 Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```