1
2          IN THE UNITED STATES DISTRICT COURT
3           FOR THE NORTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
4                      -  -  -
5

    IN RE:  NATIONAL       :   HON. DAN A.
6   PRESCRIPTION OPIATE    :   POLSTER
    LITIGATION             :
7                          :
    APPLIES TO ALL CASES   :   NO.
8                          :   1:17-MD-2804
                           :
9

10          - HIGHLY CONFIDENTIAL -

    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

12                     -  -  -

                  January 15, 2019
13

14                     -  -  -

15              Videotaped deposition of
    KEITH FROST taken pursuant to notice, was
16  held at the offices of Morgan Lewis
    Bockius, 1701 Market Street,
17  Philadelphia, Pennsylvania beginning at
    9:30 a.m., on the above date, before
18  Michelle L. Gray, a Registered
    Professional Reporter, Certified
19  Shorthand Reporter, Certified Realtime
    Reporter, and Notary Public.
20

                       -  -  -
21

22          GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672
23             deps@golkow.com
24

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: STERLING CLUFF, ESQ.
Encino Plaza
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
(818) 839-2333
Scluff@baronbudd.com

- and -

BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN LEWIS & BOCKIUS, LLP
BY: JOHN P. LAVELLE, JR., ESQ.
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com
- and -
MORGAN LEWIS & BOCKIUS
BY: JOHN M. MALOY, ESQ.
101 Park Avenue
New York, New York 10178
(212) 309-6734
john.maloy@morganlewis.com
Representing the Defendant, Rite Aid of
Maryland and the Witness

Page 3

APPEARANCES: (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: DOUGLAS K. ROSENBLUM, ESQ.
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
Dkr@pietragallo.com
Representing the Defendant, Cardinal
Health

COVINGTON & BURLING, LLP
BY: J. ALEJANDRO BARRIENTOS, ESQ.
850 Tenth Street, NW
Suite 586N
Washington, D.C. 20001
(202) 662-5769
Abarrientos@cov.com
Representing the Defendant, McKesson
Corporation

Page 4

TELEPHONIC APPEARANCES:

JONES DAY
BY: CHRISTINE D. PROROK, ESQ.
77 West Wacker Drive
Chicago, Illinois 60601
(312) 269-4113
Cprorok@jonesday.com
Representing the Defendant, Walmart

ARNOLD & PORTER KAYE SCHOLER
BY: SEAN A. McCORMICK, ESQ.
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
(213) 243-4000
Sean.mccormick@arnoldporter.com
Representing the Defendants, Endo Health
Solutions; Endo Pharmaceuticals, Inc.;
Par Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

JACKSON KELLY, PALL
BY: ANGELA L. FREEL, ESQ.
221 NW Fifth Street
Evansville, Indiana 47708
(812) 422-9444
alfreel@jacksonkelly.com
Representing the Defendant,
Amerisource Bergen Drug Corporation

Page 5

APPEARANCES: (Cont'd.)

ALSO PRESENT:

Emma Kaboli, Paralegal
(Baron Budd - via telephone)

VIDEO TECHNICIAN:
Devyn Mulholland

LITIGATION TECHNICIAN:
Zach Hone

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1
2       - - -
3     I N D E X
4       - - -
5   Testimony of:
6
        KEITH FROST
7   By Mr. Cluff       12, 305
8   By Mr. Lavelle        286
9
10
11      - - -
12    E X H I B I T S
13      - - -
14  NO.      DESCRIPTION      PAGE
15  Rite Aid
    Frost-1    Performance     91
16         Management
           Annual Performance
17         Review
           FY2014 - Keith Frost
18         Rite_Aid_OMDL_0050596-25
19  Rite Aid
    Frost-2    E-mail, 5/20/11   151
20         Subject, Quarterly
           Sign Offs
21         Rite_Aid_OMDL_0013210-30
22
23
24

Page 7

1       - - -
2    E X H I B I T S (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION      PAGE
6   Rite Aid
    Frost-3    E-mail Thread    176
7          3/30/10
           Subject, Cage Access
8          Rite_Aid_OMDL_0023217
9   Rite Aid
    Frost-4    E-mail Thread    179
10         6/4/10
           Subject, Cage Access
11         Rite_Aid_OMDL_0023287
12  Rite Aid
    Frost-5    E-mail Thread    184
13         1/18/11
           Subject, Drug Diversion
14         Rite_Aid_OMDL_0012113-14
15  Rite Aid
    Frost-6    E-mail Thread    197
16         6/25/10
           Subject, DEA CFRs
17         Employers/Employees
           Rite_Aid_OMDL_0013963-68
18
    Rite Aid
19  Frost-7    E-mail Thread    203
           6/30/10
20         Subject, Cage Access
           Rite_Aid_OMDL_0011927-28
21
    Rite Aid
22  Frost-8    E-mail Thread    212
           8/9/10
23         Subject, Cage Access
           Rite_Aid_OMDL_0003533-34
24

Page 8

1       - - -
2    E X H I B I T S (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION      PAGE
6   Rite Aid
    Frost-9    E-mail Thread    220
7          2/20/12
           Subject, Cage Access
8          Rite_Aid_OMDL_0010825-26
9   Rite Aid
    Frost-10    E-mail Thread    227
10         3/31/10
           Subject, DEA Compliance
11         Rite_Aid_OMDL_0023456-57
12  Rite Aid
    Frost-11    E-mail Thread    236
13         5/5/10
           Subject, Late CD
14         Receipts
           Rite_Aid_OMDL_0010116-17
15
16  Rite Aid
    Frost-12    E-mail Thread    244
17         5/30/12
           Subject, Compliance
18         Violation
           Rite_Aid_OMDL_0029175-76
19  Rite Aid
    Frost-13    E-mail Thread    249
20         7/15/10
           Subject, Cage Product
21         In Trash
           Rite_Aid_OMDL_0013911-14
22
23
24

Page 9

1       - - -
2    E X H I B I T S (Cont'd.)
3       - - -
4
5   NO.      DESCRIPTION      PAGE
6   Rite Aid
    Frost-14    E-mail Thread    257
7          9/26/12
           Subject, CD Inventory
8          Rite_Aid_OMDL_0009662
9   Rite Aid
    Frost-15    E-mail, 1/22/13   269
10         Subject, CSA Checklist
           Rite_Aid_OMDL_0013234
11
    Rite Aid
12  Frost-16    E-mail Thread    277
           3/3/14
13         Subject, P&P Review
           Report Reaccreditation
14         Rite_Aid_OMDL_0015596-77
15  Rite Aid
    Frost-17    Notice of Inspection  287
16         Of Controlled Premises
           7/10/12
17         Rite_Aid_OMDL_0032621
18  Rite Aid
    Frost-18    E-mail, 7/11/12   290
19         Subject, Please Review
           DEA Audit July 11
20         Rite_Aid_OMDL_0012547-49
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              - - -
2      DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11  Stipulations
12  PAGE   LINE
   None.
13
14  Questions Marked
15  PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 11

```
1       THE VIDEOGRAPHER:  We are
2  now on the record.  My name is
3  Devyn Mulholland.  I'm a
4  videographer for Golkow Litigation
5  Services.
6       Today's date is
7  January 15th, 2019.  The time is
8  9:30 a.m.
9       This video deposition is
10  being held in Philadelphia,
11  Pennsylvania, in the matter of
12  National Prescription Opiate
13  Litigation.
14       The deponent is Keith Frost.
15  Counsel will be noted on the
16  stenographic record.  The court
17  reporter is Michelle Gray and will
18  now swear in the witness.
19              - - -
20       ... KEITH FROST, having been
21  first duly sworn, was examined and
22  testified as follows:
23              - - -
24       EXAMINATION
```

Page 12

```
1              - - -
2  BY MR. CLUFF:
3       Q.   Good morning, Mr. Frost.  My
4  name is Sterling Cluff.  I'm from a law
5  firm called Baron & Budd, and I represent
6  plaintiffs in this national opiate
7  litigation.  And I'll be taking your
8  deposition today.  My colleague next to
9  me is Will Powers, who's also with Baron
10  & Budd.  He will be assisting me.
11       And then you may have met
12  the other attorneys around the way.
13  They're all for defendants, except for
14  the trial tech who will be assisting me
15  as well.  Just so you know who all is in
16  the room.
17       So to start off, I'd like to
18  ask you if you've ever had your
19  deposition taken before?
20       A.   No, I haven't.
21       Q.   Okay.  Have you ever
22  testified in a trial at all?
23       A.   Yes.
24       Q.   Okay.  So -- and the trial I
```

Page 13

```
1  assume you were also placed under oath --
2       A.   Yes.
3       Q.   -- so you are familiar
4  with --
5       Okay.  Thank you.
6       MR. LAVELLE:  Just wait
7       until the question is finished
8       before you answer it.
9  BY MR. CLUFF:
10       Q.   Right.  So since you haven't
11  given a deposition before, I'd like to
12  lay down or discuss some sort of rules of
13  the road that we call admonitions.  One
14  of them, as your counsel just pointed
15  out, is that we try not to talk over each
16  other because we're trying to take down
17  an accurate written record of today's
18  proceedings.  So if you could, to the
19  best of your ability give me a chance to
20  finish my question.  I will do my best to
21  let you finish your answer.  And your
22  counsel at times today will be
23  interposing objections to my questions.
24  And we should both do our best to let him
```

Page 14

1 finish those before we speak as well.
2 Does that make sense?
3     A.   Yes.
4     Q.   Also because we are taking a
5 written record of the proceedings, we ask
6 that you, to the best of your ability,
7 give an audible answer rather than saying
8 "mm-hmm" or "unh-unh" or shaking your
9 head. Like "yes," "no," "I don't know"
10 or whatever you deem a more appropriate
11 answer to be. Does that make sense?
12     A.   Yes. And this is the
13 microphone here in front of me.
14     Q.   Yeah, that thing in front of
15 you does appear to be a microphone. That
16 is probably for the telephone though.
17 You've got a microphone on your shirt
18 which is recording you audibly as well.
19         As a reminder, when we take
20 breaks, be sure to take that off, so that
21 you don't walk out with it.
22         Since you're under oath, we
23 will understand today that the answers
24 that you're giving are the best

Page 15

1 recollection that you can give. In order
2 to make that a clear record for the
3 proceedings we ask that you not guess.
4         However at times I may ask
5 you questions to better explore your
6 recollection or your understanding. And
7 I may also at times ask you for an
8 approximation or an estimate. Do you
9 know the difference between an estimate
10 and an approximation or a guess?
11     A.   Yes.
12     Q.   Okay. We're going to be
13 covering a lot of information today that
14 may at times seem confusing to you. If
15 at any point in time you don't understand
16 my question, please ask me to clarify it.
17 If not, I will assume that you understood
18 the question. Does that make sense?
19     A.   Yes.
20     Q.   Okay. Is there any reason
21 today health-wise that you cannot give a
22 full and complete deposition?
23     A.   No.
24     Q.   Are you on any medication or

Page 16

1 under any medical treatment that would
2 prevent you from giving a full and
3 complete deposition today?
4     A.   No.
5     Q.   Are there any reasons that
6 your memory or recollection may be
7 impaired during today's deposition?
8     A.   No.
9     Q.   Okay. Do you understand why
10 you're here to be deposed today?
11     A.   Yes.
12     Q.   Okay. What is your
13 understanding?
14     A.   That there's a lawsuit
15 against some drug companies for the
16 opioid issues going on in the country.
17     Q.   I should also give you one
18 more clarification. At times I may ask
19 you questions that could potentially call
20 for an answer that is influenced or based
21 on conversations that you had with your
22 counsel today. If you believe that a
23 question I asked requires you to disclose
24 information or conversations that you had

Page 17

1 with your attorney, please let me know.
2 And your attorney will also object if he
3 feels that a question I asked asks for
4 what's called attorney/client privilege.
5 So I don't want you to disclose any
6 attorney/client privilege today.
7         Is that clear? Does that
8 make sense?
9     A.   Yes.
10     Q.   So going back to the reason
11 you're here to testify today. We
12 noticed -- we as plaintiffs noticed your
13 deposition in relation to a defendant in
14 this case, Rite Aid specifically.
15         Are you currently employed
16 by Rite Aid?
17     A.   Yes, I am.
18     Q.   And what position do you
19 hold at Rite Aid currently?
20     A.   I'm currently a department
21 manager of a department called
22 centralized products.
23     Q.   Okay. What does the
24 centralized products department do?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   They pick front -- what we
2  call other front-end items in the stores,
3  cosmetics, energy drinks, vitamins,
4  ethnic beauty care.  And we also manage
5  the pseudoephedrine control cage in the
6  building.
7    Q.   When you say they pick, what
8  do you mean they pick?
9    A.   Our associates get the items
10  and put them in packages or totes to send
11  to our customer stores.
12    Q.   So they're actually picking
13  the items out of some group of inventory
14  to be delivered to the stores?
15    A.   Yes, out of forward pick.
16    Q.   What's a forward pick?
17    A.   A forward pick is a location
18  where the product is loose in boxes or
19  sometimes it could be cases.  It's an
20  area where, when the orders download, a
21  light lights up.  It's called a
22  pick-to-light system.  And a number
23  appears.  And that's what the store wants
24  of that particular item in that

Page 19

1  particular location.  And the associate
2  goes to that location, look at the
3  number, and puts the item into the tote
4  or box, and then extinguishes the light,
5  and moves onto the next location for the
6  next item that the store wants.
7    Q.   This work that the
8  associates are doing, the picking work,
9  is that happening -- where is that
10  happening?
11    A.   Distribution center wide,
12  different departments have the same
13  Pick-to-Light system, it's just they have
14  different items to put into the boxes or
15  totes.
16         One department might have
17  shampoos and bleach.  We have cosmetics
18  and vitamins.  Another one might have
19  bulk cases that they're put into totes.
20    Q.   As a manager in this
21  department, are you assigned to a
22  specific location?
23    A.   My department covers
24  different locations to -- to parts of the

Page 20

1  building.  But being a manager in the
2  building, part of my responsibility is to
3  help other departments when I see it
4  necessary.  So we -- we are a global
5  system where we help each other out.  But
6  I'm mainly responsible for my centralized
7  products department.
8    Q.   Do you work at the Perryman
9  distribution center?
10    A.   Yes.
11    Q.   Have you always worked at
12  the Perryman distribution center?
13         MR. LAVELLE:  Object to
14    form.
15         THE WITNESS:  With Rite Aid,
16    yes.
17  BY MR. CLUFF:
18    Q.   So the work that you
19  oversee, other than you are a manager of
20  the centralized products, that is -- that
21  work is conducted at the Perryman
22  distribution center?
23    A.   Yes, it is.
24    Q.   How long have you held this

Page 21

1  position as manager of centralized
2  products?
3    A.   Well, this is like my second
4  tour of it.  Before I was an operations
5  manager of that, when it was -- included
6  pharmacy and our cigarettes department.
7  But that operations manager level has
8  been done away with a few years ago, so
9  now it's a department level position.
10  And so I've been doing this since 2010.
11    Q.   You mentioned that this is
12  your second tour as a manager of
13  centralized products.  And before that --
14  or -- or in between those tours maybe,
15  you were an operations manager of
16  pharmacy and cigarettes; is that correct?
17    A.   Yes, yes.
18    Q.   When did you hold the
19  position of operational manager over
20  pharmacy and cigarettes?
21    A.   It gets sort of complex.
22  When they first opened the building I was
23  night operations manager for four and a
24  half years.  And all the assistant

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 managers on nightshift from seven
2 departments, which included the pharmacy
3 department, all reported up to me. So
4 that was for four and a half years.
5        And then for another two
6 years as a department manager, I took
7 over the pharmacy department and
8 cigarettes.
9        Then after that, took over
10 other departments as Operations Region 1,
11 Region 2, our satellite facility and
12 shipping department for two years. Then
13 came back to pharmacy for two years as a
14 department manager for Rx, pharmacy, and
15 cigarettes for a year. And then after
16 that I went to the replenishment
17 department which controls all of the
18 drivers and the stockers in the building,
19 for a year and a half. And then came
20 back in 2010 till present to take over
21 the pharmacy and cigarettes and
22 centralized products department.
23    Q.   Is the -- the pharmacy and
24 cigarettes, is that a part of the

Page 23

1 centralized products department?
2    A.   No longer.
3    Q.   Was it at the time in 2010?
4    A.   Yes.
5    Q.   You gave me a lot of
6 information about different positions.
7 So I just kind of want to understand the
8 timeline here.
9        You said when they first
10 opened the building you were a night
11 operations manager for four and a half
12 years?
13    A.   Correct. Yes.
14    Q.   When you refer to the
15 building, do you mean the Perryman
16 distribution center?
17    A.   Yes.
18    Q.   Do you recall what -- when
19 that was?
20    A.   1998 in August is when we
21 started the nightshift, until March 2003.
22    Q.   So you held the position of
23 nightshift manager from '98 to 2003, is
24 that your recollection?

Page 24

1    A.   Mm-hmm, yes.
2    Q.   And during that time you
3 said all of the nightshift -- all the
4 assistant managers in the nightshift
5 reported to you, correct?
6    A.   Yes.
7    Q.   And you referred to seven
8 departments which included the pharmacy
9 department?
10    A.   Yes.
11    Q.   What were the seven
12 departments?
13    A.   Pharmacy, cigarettes,
14 centralized products, the
15 shipping/outbound department, inbound
16 department, Regional 1 department,
17 Region 2 department, and the
18 replenishment department, stocking and
19 driving.
20    Q.   Pharmacy and cigarettes is
21 one department, correct?
22    A.   We try to keep it together
23 like that because they both dealt with
24 compliance, state or federal issues. And

Page 25

1 we'd rather have that under one umbrella
2 as opposed to spreading it out.
3    Q.   You said after you were the
4 night manager, then you said for another
5 two years you were a department manager
6 over pharmacy and cigarettes?
7    A.   No. After the night
8 manager, which is end of February 2003,
9 beginning March 2003, I was operations
10 manager for pharmacy and cigarettes.
11    Q.   And how long did you hold
12 that position?
13    A.   Oh, that was for two years.
14    Q.   So sometime in 2005?
15    A.   Mm-hmm.
16        MR. LAVELLE: You -- you
17    need to give an audible answer
18    such as no --
19        THE WITNESS: I'm sorry.
20    2003 to 2005, yes.
21 BY MR. CLUFF:
22    Q.   I believe then you testified
23 that you went to the replenishment
24 department?

Page 26

1    A.   From 2005 to 2007 they put
2  me in charge of Region 1, Region 2,
3  outbound, and our satellite facility.
4  And that was for two years.
5    Q.   What's Region 1?
6    A.   It's, if you walk into our
7  stores, it's any -- a lot of -- shampoos,
8  candy bars, hair nets, nail clips,
9  bleach, a lot of different front-end
10  items.
11    Q.   What's Region 2?
12    A.   Region 2 is sort of like the
13  Region 1 except it's more bulk case.  We
14  have a lot of cases going out and very
15  large items, like your 2, 3-gallon kinds
16  of bleach, bulk kind of picking.
17  Non-conveyor belt kind of items that
18  people have to pick by hand on -- with
19  machinery and you can't put it on the
20  line to convey to our shipping
21  department.
22    Q.   What -- what other
23  responsibilities of the outbound
24  department and the satellite facility

Page 27

1  that you were managing?
2    A.   With the outbound department
3  we had to make sure that all of our
4  trailers were loaded properly and that --
5  for example, we talk about pharmacy and
6  control drugs, that everything was
7  brought over correctly, that all control
8  drugs and pharmacy packages and totes all
9  looked exactly the same per DEA
10  requirements so you can distinguish
11  between a legend drug or control drug.
12  And that any control drugs brought over
13  to the shipping area were properly being
14  held in control-type cages and handed out
15  and signed for properly to the different
16  trucks that went to our DCs properly.
17    Q.   And -- and what about the
18  responsibilities as a manager of the
19  satellite facility, what did that entail?
20    A.   I had a department manager
21  work over there.  And that was mainly a
22  seasonal facility.  When you have
23  harvest, garden, Christmas is a big one.
24  We don't have enough room in our main

Page 28

1  Perryman distribution center, so we had
2  to rent a facility to accommodate that.
3  Then that was one of those seasonal
4  things, so you get a lot of product for
5  like three or four months.  The season go
6  away, then you might get garden, tools
7  for a couple months.  So it was a
8  facility that the population of the
9  workers would go up and down as -- as the
10  year went along.
11    Q.   So what was the next
12  position that you held after 2007?
13    A.   After 2007 I came over to
14  pharmacy again for a year.  It was just
15  pharmacy and cigarettes at that time.
16  That's when they eliminated the
17  operations manager level for budgetary
18  reasons.  I was there for a year.
19    Q.   And what did you do after --
20  what was your next position after that?
21    A.   After that I took over the
22  replenishment department, and
23  replenishment entailed the drivers and
24  stockers, and I was there for a year and

Page 29

1  a half, till 2010.
2         And then I came back to
3  pharmacy and cigarettes in 2010, and
4  centralized products.
5    Q.   And those are the positions
6  you've held since 2010, correct, the
7  pharmacy and cigarettes and --
8    A.   Centralized products.
9    Q.   Yes.
10       MR. LAVELLE:  Please wait
11    until the question is finished
12    before you answer it.
13       THE WITNESS:  Okay.
14  BY MR. CLUFF:
15    Q.   Between 2010 and the
16  present, what years did you hold
17  managerial responsibilities for pharmacy
18  and cigarettes?
19    A.   2010 to now, so it's nine
20  years later, so far.
21    Q.   Were you a manager over
22  pharmacy and cigarettes for that entire
23  time period?
24    A.   2010 till now, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1     Q.   At what point between 2010
2 and the present were you a manager of the
3 centralized products?
4     A.   I am -- same, same period.
5     Q.   So those responsibilities
6 are sort of overlapping?
7     A.   Yes.
8     Q.   Understood.  Thank you.
9      During your time period with
10 Rite Aid, excuse me, have you been
11 responsible for managing the distribution
12 or -- or shipping of controlled
13 substances?
14     MR. LAVELLE:  Object to
15     form.
16     THE WITNESS:  Yes.  It came
17     under my purview.
18 BY MR. CLUFF:
19     Q.   In -- in what positions were
20 you responsible for overseeing the
21 distribution and shipping of controlled
22 substances?
23     A.   What positions?
24     Q.   Let me clarify.  At one

Page 31

1 point you discussed that, in your
2 experience, Rite Aid tried to keep the
3 pharmacy and cigarettes department
4 together because those both involved
5 compliance.
6     A.   Yes.
7     Q.   Did -- did your work in --
8 in those two departments involve
9 overseeing distribution or shipping of
10 controlled substances?
11     A.   Yes.
12     Q.   Are there any other
13 managerial positions that you held that
14 involved overseeing the shipment or
15 distribution of controlled substances?
16     A.   No.  Just operations manager
17 or department manager.
18     Q.   Do you recall which
19 controlled substances or which types of
20 controlled substances you were
21 responsible for?
22     A.   Yes.  Not all by name.  But
23 we only did III through V.
24     Q.   Do you recall if any of

Page 32

1 the -- let me back up.  When you say III
2 through V, do you mean those are the
3 schedules of controlled substances that
4 you were responsible for?
5     A.   Yes.
6     Q.   Do you recall if any of
7 those substances included prescription
8 opioids?
9     A.   No, I do not.
10     Q.   Do you recall if, during the
11 time period when you've worked at Rite
12 Aid, Rite Aid distributed or shipped
13 hydrocodone combination products?
14     A.   We shipped hydrocodones.
15     Q.   Would your work as a manager
16 have involved overseeing shipments of
17 hydrocodone?
18     A.   Yes.
19     Q.   Okay.  When you used the
20 word "compliance" to refer to the work
21 with the pharmacy and cigarette products,
22 what did you mean by compliance?
23     A.   Well, there's different -- I
24 mean, you have pharmacy, and you have

Page 33

1 cigarettes.  Which one are you asking
2 about?
3     Q.   Let's focus on pharmacy.
4     A.   Okay.  Pharmacy, we followed
5 all the regulations that were established
6 in the Code of Federal Regulations that
7 the DEA puts out.  And we also followed
8 the Maryland Pharmaceutical Appendum for
9 processing controlled drugs and other
10 pharmacy products.
11     Q.   When you refer to the
12 regulations that were established that
13 the DEA put out, what do you mean
14 specifically?
15     A.   Well, the Code of Federal
16 Regulations is -- specifies that before
17 you can handle any kind of controlled
18 substance, you have to have procedures
19 which account for the proper receiving of
20 items, make sure they're not counterfeit
21 and they're only coming from registered
22 DEA authority -- vendors, that you store
23 them properly, meaning that you inventory
24 them regularly and that you do not have

Page 34

1  expired products in a cage, that when you
2  pick them that you use correct order
3  picking procedures, that you ship it
4  correctly to the stores, and that you
5  properly have controls into the proper
6  shipment of controlled drugs, and you
7  have full accountability and inventory
8  control of all items.
9      Q.   During your tenure with Rite
10 Aid, while there was a pharmacy
11 department -- actually, let me ask this
12 other question.
13         Are you aware if Rite Aid at
14 any point stopped distributing or
15 shipping hydrocodone products?
16         MR. LAVELLE:  Object to
17     form.
18         THE WITNESS:  Rite Aid
19     stopped shipping any controlled
20     substances in 2014, September,
21     October time frame.  And that
22     include legend drugs as well.
23 BY MR. CLUFF:
24     Q.   Those are what legend drugs?

Page 35

1      A.   Over-the-counter drugs,
2  other prescription drugs that are not
3  controlled substances.
4      Q.   So Rite Aid stopped
5  distributing legend drugs in 2014 as
6  well?
7      A.   Yes.
8      Q.   Do you -- are you aware of
9  when Rite Aid began distributing
10 hydrocodone products?
11     A.   When you mean Rite Aid, are
12 you talking about the Perryman
13 distribution center or Rite Aid in
14 general?
15     Q.   Let's start with Rite Aid in
16 general.
17     A.   No.  It was -- when I -- I
18 was hired in 1998, and they had been
19 doing it a number of years.  So I don't
20 know when they started.
21     Q.   So when you were hired they
22 were already shipping hydrocodone
23 products?
24     A.   Yes.

Page 36

1      Q.   So when I ask questions
2  about those hydrocodone products then,
3  I'd like us to just understand that my
4  questions refer to that time period
5  before 2014 when Rite Aid stopped
6  distributing them.  Does that make sense?
7      A.   Yes.
8      Q.   So before Rite Aid stopped
9  distributing the hydrocodone products in
10 2014, did Rite Aid have in place policies
11 or procedures to address all of the
12 compliance work that you just described
13 to me?
14     A.   Yes.
15     Q.   The first one that you
16 mentioned earlier was making sure that
17 the products Rite Aid receives or ships
18 were not counterfeit.  Does that make
19 sense?
20         MR. LAVELLE:  Object to
21     form.
22         THE WITNESS:  Yes.
23 BY MR. CLUFF:
24     Q.   Or do you recall that at

Page 37

1  least?
2      A.   Yes.
3      Q.   Would you have been
4  responsible for implementing Rite Aid's
5  policies and procedures about that aspect
6  of compliance?
7      A.   I would be responsible to
8  make sure that we had policies and
9  procedures in place, that associates were
10 trained in executing those, and that we'd
11 have audits to make sure that the
12 associates were doing those correctly.
13     Q.   You mentioned a number of
14 other compliance activities.  We can go
15 look at that list, but I want to just ask
16 a broader question.  Were you responsible
17 for making sure that Rite Aid had
18 policies and procedures in place for all
19 of the compliance work that you
20 previously described?
21     A.   Yes.
22     Q.   You also mentioned associate
23 training.  Were you responsible for
24 associate training on all of the

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  compliance work that you previously
2  described?
3      A.   I was responsible -- I was
4  responsible for ensuring that training
5  was being conducted.  I was not an actual
6  trainer.
7      Q.   And then you also mentioned
8  audits.  Were you also responsible for
9  ensuring that compliance was audited?
10     A.   My responsibility as far as
11 doing audits was an internal thing,
12 ensure that quality was being done
13 correctly, that we were doing inventories
14 on schedule as per the Code of Federal
15 Regulations.  But we went beyond that and
16 did internal audits on our own.
17     Q.   The responsibility for
18 making sure that Rite Aid had policies
19 and procedures in place, associate
20 training, and audits, was that within
21 your managerial responsibilities from
22 1998 to 2014?
23     A.   Again, I wasn't there the
24 whole time, 1998 through -- I was there

Page 39

1  in 2003.  I can't comment on what
2  procedures and procedures were in place
3  before I got there in 20003.
4      Q.   Starting in 2003 you were
5  the manager at Perryman?
6      A.   Yes.
7      Q.   Okay.  So from 2003 to 2014,
8  was it part of your job responsibilities
9  for that entire time period to make sure
10 Rite Aid had policies and procedures in
11 place?
12     A.   Correct.
13     Q.   Okay.  And it was also part
14 of your job responsibilities to ensure
15 that associates were being trained?
16     A.   Yes.
17     Q.   And also part of your job
18 responsibilities to be overseeing or
19 ensuring that these internal audits were
20 conducted?
21     A.   Yes.
22     Q.   Is there anyone else
23 affiliated with the Rite Aid Perryman
24 distribution center that had

Page 40

1  responsibility for those -- those job
2  functions or responsibilities?
3          MR. LAVELLE:  Object to
4      form.
5          THE WITNESS:  Yes.
6  BY MR. CLUFF:
7      Q.   Who would that be?
8      A.   Any department managers that
9  would be working there, any assistant
10 managers that would have been working
11 there, the DEA coordinator, as well as
12 any leads that we had at the time.  Leads
13 would be our hourly paid supervisors.
14     Q.   What policies and procedures
15 did Rite Aid have in place between 2003
16 and 2014 to ensure that the controlled
17 substances they were distributing or
18 shipping were not counterfeit?
19     A.   Rite Aid had a policy that
20 the receiver, which happened to --
21 actually, the receiver was part of the
22 inbound department.  They worked in the
23 control cage.  They were required to have
24 a background check.  So they technically

Page 41

1  were assigned to that position, but they
2  weren't assigned to the pharmacy
3  department.  But all of the receivers
4  were trained to verify that any vendors
5  had the correct DEA number, that -- they
6  had -- they had ways of inspecting the
7  packaging to make sure that the verbiage
8  was correct, that they had a proper NDC
9  number and UPC number, that the dating
10 was correct, according to their packing
11 slip.
12     Q.   You also said that part of
13 the compliance work was ensuring that
14 product came from licensed DEA
15 registrants.  What policies and
16 procedures did Rite Aid have in place to
17 ensure that it was complying with that
18 part of its obligations?
19         MR. LAVELLE:  Object to
20     form.
21         THE WITNESS:  Well, that was
22     part of their policy and
23     procedure, that you had to go
24     through a series of steps to

Page 42

1  validate that the items were
2  coming from a DEA-approved vendor
3  and that -- I mean, we had
4  receiving -- standing operating
5  procedures, you know, an overview
6  on how to do it. But the
7  technical, exactly how to receive
8  it, you had to open up one case to
9  inspect each item from each case
10 to make sure that was correct and
11 dated properly.
12      I mean, there's series of
13 steps within each procedure that
14 they had to follow.
15 BY MR. CLUFF:
16  Q.  Was there a written policy
17 and procedure document that they had to
18 follow?
19  A.  They had an internal inbound
20 receiving document that explained to them
21 exactly how to receive a problem -- a
22 product, if there was any issues, that
23 they were supposed to call the pharmacy
24 buyer in corporate for anything that

Page 43

1  might have been out of the ordinary as
2  far as not meeting the NDC number or if
3  the quantity that they shipped was
4  different than what was on the packing
5  list. So yeah, there was all that.
6   Q.  You mentioned part of the
7  compliance work being that there was no
8  expired product?
9   A.  Yes.
10  Q.  That's just ensuring that
11 the product isn't past its use by date?
12  A.  That's correct, or it's
13 within a certain date of shipping. We
14 never received anything that was short
15 dated more than six months because you
16 didn't know when it was going to go out
17 to the stores.
18  Q.  You mentioned using correct
19 picking procedures. What policies and
20 procedures did Rite Aid have in place to
21 ensure correct picking procedures?
22  A.  Well all of associates --
23 the pick-to-light was uniform throughout
24 the whole building. So everybody, in the

Page 44

1  first three or four days, all were
2  trained on how to properly use that
3  system, because an associate in pharmacy
4  could be sent to Region 1, for example,
5  for the day or for a few hours if they
6  were short staffed or something.
7       So they are all trained on
8  how to properly put out the lights, short
9  down product, and have you within a
10 three-day time period.
11  Q.  What do you mean by short
12 down product?
13  A.  Meaning if a picker went to
14 a slot and that particular tote asked for
15 ten and there was nothing stocked in the
16 ten and they -- after they went around to
17 the back, there was nothing there for
18 them and there was only eight, they would
19 short it down to eight and only send
20 eight to the store. So that the store
21 wouldn't be billed for more than what
22 they were getting.
23  Q.  Were there ever instances
24 where an associate would go to pick a

Page 45

1  product and determine that even though
2  there was inventory -- there was
3  sufficient inventory available, that they
4  still were not going to completely fill
5  an order?
6       MR. LAVELLE:  Object to
7  form.
8       THE WITNESS:  I don't know.
9  Again, the question -- are you
10 talking about building-wide or are
11 you talking about
12 pharmacy-specific or --
13 BY MR. CLUFF:
14  Q.  Pharmacy specific.
15  A.  -- or control cage specific?
16  Q.  Well, let's -- let's start
17 with pharmacy specific. And I'll -- I'll
18 give you a little more clear explanation
19 kind of using what you described.
20  A.  Okay.
21  Q.  So let's say an associate is
22 told go -- go pick Product X in the
23 amount of ten.
24  A.  Right.

Page 46

1    Q.   And they get there and they
2  look at the order form and they say,
3  well, I can't fill that for ten, I have
4  to fill it for five, did that ever happen
5  in the pharmacy department?
6    A.   While I was controlling the
7  pharmacy department, that would not
8  happen.  First, the light would light for
9  a certain amount, and we were fortunate
10 during the time that we had -- we had our
11 own pharmacy stockers and drivers.  And
12 that's what was good about it, as opposed
13 to the other part of the building, when I
14 said I was the replenishment manager, the
15 front-end departments didn't have unique
16 stockers and drivers.  Pharmacy was the
17 only department in that whole building
18 that had it, that's why we had control
19 access into the whole pharmacy area in
20 general, that's legend, and then we had a
21 further access into the control cage.
22         So both places had their own
23 stockers and drivers to ensure that the
24 quality of the product being put in the

Page 47

1  slots was correct.  And that means
2  inventory, dating and all that.
3         So getting back to your
4  question, if somebody wanted -- needed
5  ten and there was only five, our
6  department was controlled enough that we
7  had leads and managers that would go look
8  for that product.  If it wasn't there,
9  we'd go to the storage location and pull
10 that product to satisfy the store's
11 needs.  And only if there was none left
12 in pharmacy would we short it down.
13   Q.   Okay.  And let's talk about
14 the controls now.  And I --
15   A.   It would have been the same
16 procedure for them.
17   Q.   Let me ask you a question
18 then.
19         So what was the normal
20 procedure for receiving an order from a
21 store for controlled substances?
22   A.   Again, the inbound receiving
23 clerk would receive the product.  Write
24 down exactly what they had.  Fill out

Page 48

1  their proper paperwork.  And attach a --
2  what we called a load ID to that
3  particular item's pallet, whatever
4  quantity it is, could be a whole pallet,
5  a couple cases, what have you, and then
6  another associate would take that, scan
7  that load ID and the system would tell
8  that driver where to locate that product.
9         So the product would be put
10 away into the storage rack or it may go
11 straight to the floor to pick -- to pick,
12 for an associate to send to a store when
13 asked.
14   Q.   When the -- the pickers in
15 the -- the control cage, when they
16 received an order did they -- or let me
17 ask you a foundational question.
18         Are you aware if Rite Aid
19 had thresholds for its stores related to
20 controlled substance products?
21   A.   There were thresholds
22 established throughout certain items when
23 it got -- were sent out a certain
24 quantity, no more than.

Page 49

1    Q.   What's your understanding of
2  a threshold?
3    A.   Threshold is that an
4  order -- a store should not order more
5  than their established threshold.  And we
6  would not send more than what the
7  established threshold was.
8    Q.   Do you have an understanding
9  of how the thresholds that you've
10 described were set at Rite Aid?
11   A.   I'm familiar with how it was
12 set.
13   Q.   Can you describe how they
14 were set?
15   A.   Janet Hart's team in
16 corporate would establish thresholds
17 based on sales of stores of certain
18 items.
19   Q.   Did you have any
20 participation in the establishment of
21 thresholds?
22   A.   No.
23   Q.   How do you understand that
24 Janet Hart's team set the thresholds?

Page 50

1  A.  They would communicate that
2 to us.
3  Q.  You said that thresholds
4 were established throughout certain items
5 and that that would result in only a
6 certain quantity being sent out, no more
7 than that.  Is that -- is that your
8 understanding?
9  MR. LAVELLE:  Object to
10 form.
11  THE WITNESS:  Yes.
12 BY MR. CLUFF:
13  Q.  When you say certain items,
14 are you referring to specific controlled
15 substances or some other products, do you
16 know?
17  A.  I'm only talking about the
18 control items in the control cage.
19  Q.  Okay.  Previously we talked
20 about hydrocodone products.  Were there
21 thresholds for hydrocodone products?
22  A.  Yes.
23  Q.  The pickers in the control
24 cage, did they have visibility into what

Page 51

1 the thresholds were for the hydrocodone
2 products?
3  A.  We had posted certain items
4 that stores habitually ordered a lot.
5 They would be posted throughout the
6 picking area for them not to exceed and
7 to report any excess -- any orders that
8 were above that amount to a lead or a
9 manager.
10  Q.  So if you can help me walk
11 through the process.  Let's -- let's go
12 back to the order picker in the control
13 cage.
14  So they receive a list of
15 items that they should be picking,
16 correct?
17  A.  No.
18  Q.  No.  Okay.  How does it work
19 for them then?
20  A.  We had different people
21 doing different things.
22  Q.  Okay.
23  A.  You had pickers that would
24 pull a tote, which the items would be

Page 52

1 picked into, to go to different bays or
2 zones or slots.  And as they scan the
3 tote's ID, now that tote ID belongs to a
4 store.  So that store wants X amount of
5 quantity dependent on what locations
6 items are.
7  So an associate would walk
8 to a location and might have eight.  So
9 they would put eight into the tote,
10 extinguish the -- the light, and go to
11 see if there's another location for that
12 store.
13  They might have only wanted
14 one item.  They might want a couple
15 items.  So they would go or push that
16 tote to the next zone to satisfy that
17 order.
18  We have another associate,
19 what we call the paperwork person, that
20 would print all the pick list IDs, what
21 we call green bar, which lists on
22 hardcopy all of the items that the store
23 ordered for that order.  They would match
24 that item numbers and tote number with

Page 53

1 the tote, and put that into the tote.
2 And it would also print a shipping label
3 to be placed on the lid of the tote after
4 matching the tote ID so that the
5 store's -- correct store was put on the
6 tote ID, matched the tote ID number, the
7 pick list that was supposed to -- that
8 matched the product that was in the tote
9 was in the tote, and then once the
10 picking was done, that tote would be
11 100 percent audited at one of our
12 auditing tables.  Each and every tote in
13 the control cage was 100 percent audited.
14  Q.  So it sounds like there
15 maybe are two stages in the packing
16 process.  The first is with the
17 associates that are actually taking the
18 totes and filling them using the
19 pack-light system, correct?
20  MR. LAVELLE:  Object to
21 form.
22  THE WITNESS:  Yes.
23 BY MR. CLUFF:
24  Q.  Okay.  So those associates

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 that are -- are filling totes using the
2 pack-light system, they don't have a list
3 of what items are being ordered for that
4 tote?
5          MR. LAVELLE:  Object to
6     form.
7          THE WITNESS:  No.  They
8     have, throughout the -- the
9     department we have a threshold of
10    no more than 5,000 units go to --
11    pills or units go to any
12    particular store.  So if they went
13    to a location and let's say it had
14    bottles of 500 pills in it, and
15    the thing lit up.  I don't know,
16    let's try to do the math.  500,
17    that would be 10.  If it's like
18    11, they would not send -- put 11
19    in the tote.  They would only put
20    10.
21 BY MR. CLUFF:
22    Q.   Okay.  I see you understand
23 kind of where I'm heading, kind of
24 understand what the -- the process is.

Page 55

1          So a tote picker would go to
2 a part of the store where the light lit
3 up, and let's say that light was for
4 hydrocodone products.  And we'll use your
5 example of a 500-pill bottle.  And let's
6 say the request was for 11, as you
7 suggested.
8          How would the -- the Rite
9 Aid associate who was filling the tote
10 know not to fill for more than 5,000
11 units?
12         MR. LAVELLE:  Object to
13    form.
14         THE WITNESS:  Because that
15    would be -- that would be the
16    threshold.
17 BY MR. CLUFF:
18    Q.   Okay.  How did the associate
19 know that that was the threshold?
20    A.   Because we had them
21 typewritten, no more than 10 of 500
22 bottles, no more of five, 100 bottles.
23 Because different items come in different
24 packaging at different times.  So we made

Page 56

1 sure, to avoid any mispicking even though
2 we did 100 percent audit, that an item
3 would be located that's not side by side.
4 In other words, you would not have a
5 package of 500-pill bottles next to a
6 package of 100-pill bottles, because if
7 somebody looked at the light, they could
8 mispick it and grab this by -- this many
9 by mistake, whatever.  We purposely
10 separated them so those kind of errors
11 wouldn't happen.
12         So then once that happened,
13 it goes to our audit table and then they
14 show everything that the store was
15 supposed to have ordered and what was
16 actually picked in the tote.  And
17 sometimes those were incorrect as well.
18 The store might have wanted only eight,
19 but the light might have lit up seven or
20 something.  So they would have to have
21 one more added to it.  But we'd call the
22 stores first.  Or if it lit up, they only
23 wanted 9, it could have loaded up 10.
24 The order sheet would say whether it was

Page 57

1 9 and we'd put the product back.
2          And then any associate that
3 made an error got a corrective action.
4    Q.   I want to stay with this
5 like, first phase which is the tote, the
6 tote filling --
7    A.   Okay.
8    Q.   -- the picking to fill the
9 totes.
10    A.   Mm-hmm.
11    Q.   I asked how the -- the
12 associates knew that there was a
13 5,000-unit threshold.  And you said that
14 we have them typewritten?
15    A.   Yes.
16    Q.   Earlier you mentioned that
17 there was something posted in the control
18 cage.  Is the typewritten thing you
19 mentioned the same as the thing you
20 mentioned that was posted?
21         MR. LAVELLE:  Object to
22    form.
23         THE WITNESS:  No.  Because I
24    think --

Highly Confidential - Subject to Further Confidentiality Review

Page 58

BY MR. CLUFF:

1 Q.   Hold on, let's -- let's --
2 let's do it so I don't lose track.  What
3 is the typewritten information that you
4 were talking about?
5 A.   The item, the threshold
6 items were typewritten and posted for the
7 number of items that we had.  And they
8 were -- the font was like 36-inch font --
9 font, posted in the control cage, for
10 certain stores could only get this amount
11 or might be able to get this amount.
12 The typewritten list that
13 I'm referring to is called a pick list ID
14 which is downloaded automatically through
15 the order system which shows everything
16 that a store ordered, and then when we
17 did a tote audit, when we would count how
18 many items, we'd indicate individually
19 how many items the store was actually
20 getting into that tote.
21 Q.   Okay.  So there was --
22 A.   That stayed -- that stayed
23 with the tote to the store, so when the

Page 59

1 pharmacist got it or whoever checked in
2 that tote at the store would have that
3 packing list to verify exactly what we
4 said we sent them they were getting.
5 Q.   So there was a pick list ID
6 that moved with the tote --
7 A.   Correct.
8 Q.   -- as it was filled?
9 A.   Yes.
10 Q.   Understood.
11 MR. LAVELLE:  Please wait
12 until the question is finished
13 before you answer.
14 THE WITNESS:  Thank you.
15 BY MR. CLUFF:
16 Q.   Okay.  And then there was
17 also a posted document that you said for
18 the products that -- the thresholds that
19 explained what the thresholds were?
20 A.   Yes.
21 Q.   Am I understanding that
22 correctly?
23 A.   Yes.
24 Q.   Okay.  So for example, if we

Page 60

1 are talking about hydrocodone products,
2 that would have been included on this
3 posted document?
4 A.   If they had a threshold
5 established, yes.
6 Q.   Do you know if there was a
7 threshold for hydrocodone products?
8 A.   I don't remember.
9 Q.   Do you remember which
10 products were subject to a 5,000 unit
11 threshold?
12 A.   All the products in here
13 except pseudoephedrine.  They were only
14 24.
15 Q.   So all product in the
16 control cages were subject to a
17 5,000-unit threshold?
18 A.   No more than 5,000 units.
19 Q.   So as a pick -- as a picking
20 associate who would fill the totes went
21 through, if they saw that a store's pick
22 list ID called for an order that would
23 exceed the 5,000-unit threshold, what
24 happened?

Page 61

1 A.   They, one, would not send
2 them.  They would short it to an amount
3 below that.  They would let either a lead
4 or an assistant manager know that the
5 store exceeded the amount allowed.  And
6 then that lead or assistant manager would
7 place a phone call to the store -- we
8 used a phone log -- to mention to the
9 store, "Do you realize that you ordered
10 this," or whatever the conversation was.
11 But they were only going to get the
12 allowable amount.
13 Q.   So when the picking
14 associate is going through filling the
15 tote, how would he or she know that an
16 order that they were looking at was going
17 to go over this 5,000-unit threshold?
18 A.   Well, they use math, like
19 the rest of us.  I mean, if you're only
20 allowed 5,000 and you have a package of
21 five bottles, you're not going to send
22 more than ten -- if the light lights up
23 at 11, you're only going to send ten.
24 The --

Page 62

1    Q.   Sorry.  I didn't mean to
2  interrupt you.  Go ahead.
3          The 5,000-unit threshold,
4  was that per week or per month?  Do you
5  know?
6    A.   I believe it was for per
7  order.
8    Q.   What would happen if a store
9  had two orders during a one-week period
10 that were both for the max of 5,000
11 units?
12   A.   Corporate would have had to
13 approve that order to -- that store to do
14 another order, or the point of sale in
15 the store might have been that they've
16 sold that based on the scripts.
17   Q.   And would that -- would that
18 order then have then been approved and
19 shipped?
20       MR. LAVELLE:  Object to
21 form.
22       THE WITNESS:  The only
23 orders approved would have been if
24 corporate allowed it for them to

Page 63

1  order a second -- second amount.
2  BY MR. CLUFF:
3    Q.   You say if the picking
4  associates saw an order that was over the
5  5,000-unit number they would have shorted
6  that order; is that correct?
7    A.   Yes.
8    Q.   And then they would have
9  informed their lead or assistant manager
10 of the over-order, essentially?
11   A.   Yes.
12   Q.   Do you know who the
13 people -- those leads or assistant
14 managers would have been between 2003 and
15 2014?
16       MR. LAVELLE:  Object to
17 form.
18       THE WITNESS:  You mean, like
19 names?
20 BY MR. CLUFF:
21   Q.   Yeah.
22   A.   I could come up -- I could
23 remember some names, not all names.
24   Q.   Do you remember -- which

Page 64

1  names do you remember?
2    A.   Marian Wood.
3    Q.   Anybody else?
4    A.   Kim Brown, Linda Stewart,
5  Debra Chase.  That's all I can recall
6  right now.  A lot of them left the
7  company since that time.
8    Q.   You said that when those
9  leads, those assistant managers received
10 a report of an order that went over the
11 5,000 units, they would -- they would
12 call the store; is that accurate?
13   A.   They would attempt to call
14 the store to verify their order, let them
15 know that their order exceeded it and
16 they were only going to get a certain
17 amount.
18   Q.   What was the purpose of that
19 phone call to the store?
20   A.   Well, so that the store knew
21 that they were only getting a certain
22 amount, that the order exceeded what the
23 authorized amount was to send to them,
24 and that -- we would let corporate know

Page 65

1  that they exceeded that amount.
2          And sometimes the stores
3  might have a new tech or something like
4  that, they could have mis-ordered it in
5  the first place.  But let the pharmacist
6  know if someone might have -- someone
7  might have made a mistake.
8    Q.   You mentioned that you would
9  let corporate know that the store
10 exceeded that amount.  Is that a
11 different phone call than the call to the
12 store?
13   A.   Yes.  Because if a store,
14 when we called the resolution, and they
15 said, oh, well we meant to say eight and
16 we said 18, we wouldn't use that call to
17 corporate on it.  But if the store
18 constantly made the same mistake over and
19 over, it may indicate maybe they weren't
20 trained or something like that.  So we
21 wanted to make sure corporate would know.
22   Q.   That was essentially a
23 quality control call to corporate to let
24 them know how the store was performing?

Page 66

1     MR. LAVELLE:  Object to
2   form.
3     THE WITNESS:  Yes.
4 BY MR. CLUFF:
5   Q.   What if an order came in at
6 the end of the day while a pharmacy or
7 store was closed, would you call that
8 store or how would you deal with that?
9     MR. LAVELLE:  Object to
10   form.
11     THE WITNESS:  What do you
12   mean come in at the end of the day
13   when the store is closed?  We had
14   a day shift and a night shift.  So
15   the orders are point of sale.
16   They come down through the system.
17   Night shift picks them.  And we
18   pick them during days.  That
19   wouldn't coincide with a pharmacy
20   being closed or anything.
21     If we couldn't get ahold of
22   the store, we would set that aside
23   and let the day shift DEA
24   coordinator or manager attempt to

Page 67

1   call the store if the store was
2   not open.
3 BY MR. CLUFF:
4   Q.   Going back to the overall
5 compliance duties that you discussed
6 earlier.  You mentioned ensuring that all
7 of the products at the distribution
8 center were stored properly.  Do you
9 recall that?
10   A.   Yes.
11   Q.   What responsibility did you
12 have for ensuring that Rite Aid's
13 products at Perryman were stored
14 properly?
15   A.   Temperature controlled
16 environment.  The whole pharmacy
17 department was temperature controlled,
18 sort of like an air conditioner.  They
19 all had to be stored in required
20 temperatures, 77 degrees, and that their
21 humidity was at such a level that was
22 acceptable throughout the summer months
23 and throughout the year.  And we had
24 numerous temperature recording and

Page 68

1 humidifier monitoring machines throughout
2 the whole pharmacy and control cage area.
3   Q.   How about security?  Were
4 you responsible for physical security of
5 the products at the Perryman center?
6     MR. LAVELLE:  Object to
7   form.
8     THE WITNESS:  I was
9   responsible to make sure that we
10   had the correct facility --
11   security items in place.  The
12   engineer make sure that the
13   control cage was built to standard
14   and the DEA approved everything
15   that we have in the facility.
16 BY MR. CLUFF:
17   Q.   One more follow-up for you
18 about the thresholds and the calls that
19 were placed about order changes.  You
20 mentioned that there would be calls to
21 corporate to let them know how a store
22 was ordering.  Do you recall that?
23   A.   Yes.
24   Q.   Do you know if there are any

Page 69

1 records or summaries of those phone
2 calls?
3   A.   We have records of what we
4 call the phone control log, where if an
5 associate thought the order was incorrect
6 for the store, that we'd write down the
7 store number, the quantity of the order,
8 and that we would call an associate who
9 we talked to, and a resolution.
10     Very rarely did we ever have
11 to -- and I don't even know if we ever
12 had to call corporate on a store going
13 out of pattern or ordering constantly
14 more than they were supposed to.  But
15 that was a procedure in place.
16   Q.   So this -- did you say full
17 control log or phone control log?
18   A.   Phone.
19     MR. CLUFF:  If we can get
20   that cleaned up on the record
21   after.  Okay.  Thanks.
22 BY MR. CLUFF:
23   Q.   So this phone control log,
24 that would be a record of the calls, for

1 example, to the stores when they went
2 over the 5,000-unit number?
3      A.   Or it could be below that
4 they normally ordered.  Some stores were
5 weekly deliveries.  Some were biweekly.
6 And these associates, very few -- hardly
7 any turnover.  So they knew stores that
8 we -- whether it was from West Virginia
9 whatever, certain patterns that the
10 stores always ordered this or that.
11      So if they were a biweekly
12 store and they ordered less than what
13 they normally order, we'd put that in
14 there and call them as well too to make
15 sure, "Hey, you ordered 13.  You ordered
16 15.  Is this a correct order?"
17      So there was a familiarity
18 with us and the store relationship
19 developing.
20      Q.   And the people who were
21 making those calls, that was the leads
22 and managers, correct?
23      A.   Yes.
24      Q.   And so there's a log of all

1 of those phone calls that occurred?
2      A.   There are numerous logs
3 throughout the years of those phone
4 calls.
5      Q.   So I was asking about the
6 calls to corporate about the stores to
7 see if there was a log of those calls
8 separate from this phone call log that
9 you just described.
10      Is there one?
11      MR. LAVELLE:  Object to
12      form.
13      THE WITNESS:  I don't recall
14      if there was a log for that or
15      not.  I think we would -- Marian
16      or somebody closer to it would
17      call corporate if we noticed that
18      a store ordered more than they
19      were supposed to.  And the store
20      would have -- might have responded
21      to Marian or whoever called, well,
22      we need this because of the sales.
23      Marian might have called Janet
24      Hart and said hey, this store said

1 that this quantity is not enough,
2 and then it would be up to Janet
3 Hart to make -- or her group to
4 determine whether, well, based on
5 sales maybe it should be increased
6 or no, it's not.
7      But they were the approval
8 authority for any kind of
9 thresholds or amounts shipped to
10 the stores.
11 BY MR. CLUFF:
12      Q.   You said based on sales
13 maybe it should be increased or no.  When
14 you say sales, do you mean the amount of
15 drugs that a Rite Aid store was
16 dispensing?
17      A.   Based on the sales of how
18 many scripts the stores had, I guess at
19 that time or what they were -- the
20 patients they had.  I mean I don't know
21 what all the metrics that Janet Hart and
22 them used for that.  I only know it's
23 based on point of sales that the store
24 was using.

1      Q.   So your understanding is
2 that -- that sales information was used
3 to understand whether a threshold should
4 be increased?
5      MR. LAVELLE:  Object to
6      form.
7      THE WITNESS:  As I
8      understand it, it might have been
9      part of it.
10 BY MR. CLUFF:
11      Q.   You -- you mentioned that
12 you almost never called corporate about a
13 store that was ordering over its
14 threshold, was that -- did I get that
15 right?
16      MR. LAVELLE:  Object to
17      form.
18      THE WITNESS:  I can't recall
19      a store -- I mean corporate being
20      called for that reason.
21 BY MR. CLUFF:
22      Q.   Do you recall corporate
23 being called for any other reason?
24      MR. LAVELLE:  Object to

Page 74

1    form.
2         THE WITNESS:  I don't
3    recall.  Again, I'm not physically
4    working in the control cage
5    24 hours.  Those are the people
6    that work there, the assistant
7    managers and the leads, and the
8    DEA coordinator.
9    BY MR. CLUFF:
10        Q.   So if we wanted to talk to
11   somebody about how often corporate was
12   called, it would be the leads or the
13   managers who were working in the cage?
14        A.   Or the DEA coordinator,
15   correct.
16        Q.   Are you aware if corporate
17   ever took action on a store that was
18   consistently ordering above its
19   threshold?
20        A.   I'm not aware of that.
21        Q.   Are you aware if corporate
22   ever took any action on a store that was
23   ordering consistently under its
24   threshold?

Page 75

1         A.   Again, not being corporate,
2    I don't know, I'm not aware of what they
3    did or did not do.
4         Q.   And you were -- when you
5    refer to corporate, is there a person
6    you're referring to at corporate who
7    would have been aware of that
8    information?
9         A.   Janet Hart.
10        Q.   Anybody else?
11        A.   No, that I'm aware of.
12        Q.   Okay.  I want to go back to
13   the storage issues we were talking about.
14   We've been going about an hour.  I
15   propose that we talk about this physical
16   security stuff for a second, and then we
17   can take a break, if that's all right
18   with you?
19        A.   I'm fine.
20        Q.   So going back to the
21   physical security.  You talked about
22   the -- the cages and making sure they
23   were built to the DEA's specs, do you
24   recall that?

Page 76

1         A.   Yes.
2         Q.   Okay.  Were you in charge of
3    ensuring that the -- the cage
4    construction complied with DEA
5    regulations?
6         A.   I was a manager in charge
7    that the DEA would only approve certain
8    cage construction.  The industrial
9    engineer on site would have been the
10   person that contracted the people to
11   build the cage to the DEA specifications,
12   and then DEA would come out, which they
13   did when we expanded the cage, to ensure
14   that it met their compliance.  The -- the
15   metal gauge on the fence, and that they
16   were close, and all of that.
17        Q.   So the -- the engineer would
18   have been responsible for building the
19   cage as -- as you stated, correct?
20        A.   He would have been
21   responsible for hiring the contractors to
22   build the cage to the specifications to
23   DEA, correct.
24        Q.   Are you aware that in

Page 77

1    order -- do you have any understanding
2    about whether or not Rite Aid was
3    required to obtain a registration from
4    the DEA to distribute controlled
5    substances?
6         MR. LAVELLE:  Object to
7    form.
8         THE WITNESS:  Yes, we always
9    have had that.
10   BY MR. CLUFF:
11        Q.   Are you aware whether Rite
12   Aid as a registrant was required to
13   provide effective controls against
14   diversion?
15        A.   Yes.  We always had
16   effective controls against diversion.
17        Q.   What's your understanding of
18   what diversion is?
19        A.   Diversion is any theft,
20   misappropriation, misuse of any pharmacy
21   items, which includes control drugs.
22   Not in -- we had procedures, a lot of
23   procedures in place to make sure that
24   didn't happen.  We had SOPs where each

Page 78

1 associate taking out the trash had to
2 have a lead or a manager inspect for any
3 loose bottles that might have fallen into
4 the trash or got caught up in the -- in
5 the plastic before throwing it away on
6 the conveyor line. Any instances of
7 bottles on -- on the floor, we reported
8 that to the leads and managers. Because
9 humans being humans, you pick something
10 up and drop it and then continue and not
11 really realize that you dropped it, or
12 what have you.
13          And we were real good at
14 that, because we, at the end of every
15 day, which we -- there's no requirement
16 anywhere, for both shifts, did a forward
17 pick inventory for everything. And we
18 weren't really -- we're not required to
19 do it. There's nothing in the federal
20 regulations for that. They don't require
21 biennial inventory or a annual inventory.
22 We did it daily, the forward picks.
23      Q.   What's a forward pick
24 inventory?

Page 79

1      A.   I mean if we go back to what
2 I explained to you what a forward pick
3 was, that's what the -- where the product
4 is, where the associates pick the product
5 out of the boxes and put in the totes.
6 Well, forward pick inventory is we
7 inventory every one of those pick slots
8 at the end of each shift to make sure
9 that it matches up, the system inventory
10 for it.
11          Then monthly we did storage
12 inventories as well.
13      Q.   When I asked you what your
14 understanding of diversion is, you said
15 that it was any theft, misappropriation,
16 misuse of any pharmacy items including
17 drugs.
18          Are you aware of any other
19 kind of diversion that Rite Aid was
20 required to prevent?
21          MR. LAVELLE:  Object to
22      form.
23          THE WITNESS:  Well,
24      over-ordering, excessive orders.

Page 80

1          That includes the shipping
2 department as well.  I mean, you
3 ship it, that's why I said when I
4 was in charge of the outbound
5 department, we were only delivered
6 control drugs, and it's strapped,
7 tote-tied, red totes to the
8 outbound shipping areas whether it
9 was to a crosswalk DC or to our
10 local stores, in an approved cage
11 that only trained associates, in
12 those cages in the outbound
13 department, would sign those totes
14 out to the truck right before it
15 was ready to depart for the
16 stores.
17 BY MR. CLUFF:
18      Q.   Are you aware of what a
19 suspicious order is?
20      A.   Yes.
21      Q.   What's your understanding of
22 the term "suspicious order"?
23      A.   Suspicious order would have
24 been, in my estimation, a gross amount of

Page 81

1 orders that the store, through -- break
2 its pattern, ordered more than it
3 normally does, a large amount above it,
4 or it could be less than, as far as that
5 goes as well.  And it does not -- it's
6 just not in sync of what a normal store
7 would have -- would do when they place an
8 order.
9      Q.   During your time as a
10 manager from 2003 to 2014, are you aware
11 of any suspicious orders being reported
12 by Rite Aid to the DEA?
13      A.   No, I'm not aware -- aware
14 of any of that.
15      Q.   Is that because it never
16 occurred?
17          MR. LAVELLE:  Object to
18      form.
19          THE WITNESS:  From my --
20      from my distribution center it
21      never occurred.
22 BY MR. CLUFF:
23      Q.   And when you say from your
24 distribution center it never occurred, do

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 you mean that your distribution center
2 never reported a suspicious order to the
3 DEA?
4     A.   Yes.
5     Q.   Are you aware of any
6 investigations of potentially suspicious
7 orders during the time period you were
8 the manager at Perryman between 2003 and
9 2014?
10          MR. LAVELLE:  Object to
11     form.
12          THE WITNESS:  Are you
13     referring to investigations of the
14     Perryman distribution center?
15 BY MR. CLUFF:
16     Q.   No.  My question was a
17 little more specific.
18          So are you aware, at
19 Perryman, if there was ever an
20 investigation about a potentially
21 suspicious order between 2003 and 2014?
22          MR. LAVELLE:  Object to
23     form.
24          THE WITNESS:  No, I'm not

Page 83

1     aware of that.
2 BY MR. CLUFF:
3     Q.    Is that because no
4 investigations were ever conducted?
5          MR. LAVELLE:  Object to
6     form.
7          THE WITNESS:  I'm not aware
8     of any investigation.
9 BY MR. CLUFF:
10     Q.   You used the term earlier
11 "excessive ordering."  What does that
12 term mean to you?
13     A.   Excessive ordering means
14 that a store is ordering a quantity that
15 they are not allowed to on a consistent
16 pattern over and over again.  And that
17 looks suspicious, that it's not in their
18 character based on our dealings with
19 them.
20     Q.   So excessive ordering in
21 your opinion looked suspicious?
22          MR. LAVELLE:  Object to
23     form.
24          THE WITNESS:  What -- what's

Page 84

1     the question?  Excessive ordering
2     looks suspicious, is that what the
3     question is?
4 BY MR. CLUFF:
5     Q.   Yeah.  Here is what you
6 said:  You said excessive ordering means
7 that a store is ordering a quantity that
8 they are not allowed to on a consistent
9 basis, and it looks suspicious.
10          So my question is, to just
11 understand your answer that, that to you,
12 excessive ordering looked suspicious?
13          MR. LAVELLE:  Object to
14     form.
15          THE WITNESS:  Well, I hope
16     we're not getting confused with
17     above the threshold.  Because a
18     store may order above threshold,
19     but that doesn't mean that it's,
20     in my opinion, a suspicious order.
21     It could be just a mistake.
22 BY MR. CLUFF:
23     Q.   Yeah, is that -- I'm sorry,
24 I didn't mean to talk over you.

Page 85

1          That -- that was not my
2 question.  My question was really just
3 based on -- on the answer you just gave,
4 which is that excessive ordering was a
5 pattern of a store consistently ordering
6 more than that it was allowed to, and
7 then I believe you said that that looks
8 suspicious.  So is it --
9     A.   It -- it could be
10 suspicious --
11          MR. LAVELLE:  Object to
12     form.  Wait till the question is
13     finished before you answer it,
14     sir.
15 BY MR. CLUFF:
16     Q.   And always make sure you
17 give your counsel an opportunity to
18 object.
19          But to go back to this
20 question that I had earlier about
21 excessive ordering.
22     A.   Mm-hmm.
23     Q.   I asked you, you know, what
24 your understanding of excessive ordering

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   was.  Do you recall that?
2       A.   Yes.
3       Q.   Okay.  And then we were
4   looking -- I was looking at your answer
5   on realtime.  We have a feed of the
6   transcript that comes out, so I was kind
7   of looking at what was transcribed of
8   your answer.
9           And you said that excessive
10  ordering was a store ordering over the
11  quantity consistently that they are
12  allowed to.  Is that how you understood
13  excessive ordering patterns?
14          MR. LAVELLE:  Object to
15      form.
16          THE WITNESS:  Yes.
17  BY MR. CLUFF:
18      Q.   And to you, was an excessive
19  ordering pattern, was that suspicious?
20          MR. LAVELLE:  Object to
21      form.
22          THE WITNESS:  What -- what
23      is the question, to me an
24      excessive ordering is suspicious,

Page 87

1       is that what you said?
2   BY MR. CLUFF:
3       Q.   An excessive ordering
4   pattern in your experience as a manager
5   from 2003 to 2014, did you believe that
6   was suspicious?
7           MR. LAVELLE:  Object to
8       form.
9           THE WITNESS:  Well, we
10      didn't have an instance, what you
11      just said.
12  BY MR. CLUFF:
13      Q.   What do you mean you didn't
14  have that instance?
15      A.   You said as a manager, based
16  on my experience, would excessive
17  ordering be suspicious.  Well, we didn't
18  have that pattern of excessive ordering.
19  And as a matter of fact, when we had the
20  DEA audit back in 2012, they were real
21  happy with our excessive ordering
22  monitoring system.  They walked through
23  the whole cage because they spent all day
24  there looking at how we picked all of our

Page 88

1   pick list IDs, all of our postings, our
2   control logs, how we audited 100 percent
3   of our totes.  And they were very, very
4   happy with the way we had our controls in
5   place, and they wished other places did
6   the same thing we did.
7           And they didn't see -- we
8   showed them the phone logs.  They said
9   you know, this is fine, you're keeping
10  track of anything.  And nothing looked
11  out of place to them.  That was the
12  second of four audits they had of our
13  facility.
14      Q.   When that DEA audit
15  occurred, did you tell them that you had
16  never reported a suspicious order from
17  the Perryman center?
18      A.   I don't recall that.
19          MR. CLUFF:  Let's take a
20      little bit of a break.
21          THE WITNESS:  Sure.
22          MR. CLUFF:  Maybe just five,
23      ten minutes.
24          THE VIDEOGRAPHER:  Off the

Page 89

1       record, 10:39 a.m.
2           (Short break.)
3           THE VIDEOGRAPHER:  We are
4       back on the record at 10:59 a.m.
5   BY MR. CLUFF:
6       Q.   Okay.  Mr. Frost, we're back
7   on the record, so you are under oath
8   again.
9           Before we broke we were
10  talking about excessive ordering
11  patterns.  Do you recall that?
12      A.   Yes.
13      Q.   Okay.  And you talked about
14  there were these, what you referred to as
15  phone call logs about orders from Rite
16  Aid stores that were -- were over the
17  5,000-unit mark.  Do you recall that?
18      A.   Yes.
19      Q.   Do you know if those --
20  those call logs were also referred to as
21  above average order call logs?
22      A.   No.  I don't know if they
23  were referred to that at all, like that.
24      Q.   Were they ever referred to

Page 90

1 as excessive order logs?
2    A.   Yes.
3    Q.   How about threshold logs?
4    A.   Yeah.  Same thing.
5    Q.   So if we -- if we looked at
6 one of those, those logs, that would be a
7 record of calls that were made about
8 orders that were deemed to be excessive?
9        MR. LAVELLE:  Object to
10       form.
11       THE WITNESS:  Above the
12       order threshold.
13 BY MR. CLUFF:
14    Q.   And then also excessive,
15 because they were above the order
16 threshold?
17    A.   Yeah, that's excessive,
18 above the threshold, more than required.
19    Q.   Yeah.  But none of those
20 orders would have been reported to the
21 DEA, right?
22    A.   No.
23    Q.   So as part of the litigation
24 Rite Aid produced a copy of what has been

Page 91

1 referred to as personnel files.  So I
2 have a copy here today that I'd like to
3 kind of walk through with you, and the
4 way that this works is that I put a
5 sticker on the copy that I give to you to
6 mark it as an exhibit number.
7        So I'm going to put that, so
8 that I don't mess up any of the text, I'm
9 going to put that at the top here.  We're
10 going to mark that Frost Exhibit 1.  So
11 I'm going to hand you that.  And then
12 later today if I end up referring back to
13 this document, I'll refer to it as
14 Exhibit 1.  Does that make sense?
15    A.   Sure.
16       (Document marked for
17       identification as Exhibit
18       Rite Aid-Frost-1.)
19 BY MR. CLUFF:
20    Q.   Okay.  So I don't know if
21 you've ever seen that before.  I have
22 some questions about it that I want to go
23 through with you.
24       You're free to familiarize

Page 92

1 yourself with it.  So if you'd like to do
2 that for a minute, go ahead.  If you want
3 me to just proceed with my questions, you
4 just let me know.
5        MS. FREEL:  Could you please
6        state the Bates number for the
7        record.
8        MR. CLUFF:  Yeah.  That was
9        really loud.  The Bates number
10       Rite_Aid_OMDL_0050596.  It's a
11       30-page -- wait.  Maybe I started
12       it one page short.
13       Yeah, 50596.  And the last
14       page ends at 50625.
15 BY MR. CLUFF:
16    Q.   Did you take a moment to
17 familiarize yourself with that,
18 Mr. Frost?
19    A.   Yes.



Page 93



Page 94

Page 96

Page 95

Page 97

Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 122

Page 124

Page 123

Page 125



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 138

Page 140

Page 139

Page 141





Highly Confidential - Subject to Further Confidentiality Review



Page 150

Page 152

Page 151

1    Q.   I want to talk about some
2  policies and procedures now.  You can set
3  that to the side.  I'll hand you a
4  document that we're going to mark as
5  Exhibit 2.
6        (Document marked for
7        identification as Exhibit
8        Rite Aid-Frost-2.)
9  BY MR. CLUFF:
10    Q.   It's a Rite Aid produced
11  document.  It's been marked as Rite
12  Aid -- Rite_Aid_OMDL_0013210, which is an
13  e-mail that has an attachment.  I've
14  included the attachment with the
15  document.
16        The attachment begins at the
17  same prefix ending in 0013211 through
18  0013230.

Page 153

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

Page 170



14  Q.   Did you ever interact with
15  anybody from Cardinal Health when you
16  were the manager at the Perryman
17  distribution center between 2003 and
18  2014?
19  A.   No.
20  Q.   You previously mentioned
21  McKesson.  Did you ever interact with
22  anybody from McKesson between 2003 to
23  2014?
24  A.   Just the on-site

Page 171

1  representative.
2  Q.   Do you recall who that would
3  have been?
4  A.   It was Todd.  I don't know
5  what his last name is.
6  Q.   Was there somebody at the
7  Perryman distribution center whose
8  responsibility it was to interact with
9  the McKesson employee?
10  A.   Well, the receiving
11  department.
12  Q.   But you don't recall who the
13  manager of that department was?
14      MR. LAVELLE:  Objection.
15  Asked and answered.
16      THE WITNESS:  We had
17      multiple managers.  No one in
18      particular.  It was just he was on
19      the floor while they were
20      receiving McKesson product.
21  BY MR. CLUFF:
22  Q.   Did you ever interact with
23  anybody from AmerisourceBergen between
24  2003 and 2014?

Page 172

1  A.   I don't remember anything
2  from AmerisourceBergen between 2003 and
3  2014.
4  Q.   Do you recall interacting
5  with any other wholesale distributors
6  between 2003 and 2014?
7  A.   No, I do not.
8  Q.   You can set that document
9  aside.
10      MR. LAVELLE:  Counsel, can
11  we take a break?
12      MR. CLUFF:  Yeah.
13      THE VIDEOGRAPHER:  Off the
14  record at 12:09 p.m.
15      - - -
16      (Lunch break.)
17      - - -
18  A F T E R N O O N   S E S S I O N
19      - - -
20      THE VIDEOGRAPHER:  We are
21  back on the record at 12:46 p.m.
22  BY MR. CLUFF:
23  Q.   Okay.  Welcome back from
24  lunch, Mr. Frost.  We're back on the

Page 173

1  record.  So you're -- you're under oath
2  again.
3      I want to go through some
4  more documents with you this afternoon.
5  One of the things that I'm curious about
6  is vault access or cage access for the
7  controlled products.  Is that something
8  that you understand?
9  A.   Yes.
10  Q.   Okay.  Would you refer to
11  the area where controlled substances were
12  stored as the vault or the cage or what
13  term would you use?
14      MR. LAVELLE:  Object to
15  form.
16      THE WITNESS:  The cage.
17  BY MR. CLUFF:
18  Q.   And was restricting or
19  granting access to the cage one of your
20  job responsibilities?
21  A.   Yes.
22  Q.   And that would have been
23  during the time that you were the
24  pharmacy manager from 2003 to 2014?

Highly Confidential - Subject to Further Confidentiality Review



Page 174

1     A.    Yes.
2     Q.    What was the process for
3  approving somebody to get access to the
4  cage?

Page 176

6     Q.    I'll hand you a document
7  that I marked as Frost Exhibit 3.
8        (Document marked for
9        identification as Exhibit
10       Rite Aid-Frost-3.)
11  BY MR. CLUFF:
12     Q.    It was produced with Bates
13  Number Rite_Aid_OMDL_0023217.

Page 175

Page 177

Page 178

Page 179

Page 180

Page 181



1    Rite Aid-Frost-4.)
2    BY MR. CLUFF:

20       Q.   I'm going to hand you a
21   document that was produced by Rite Aid.
22   Rite_Aid_OMDL_0023287.
23       (Document marked for
24   identification as Exhibit



Page 182

Page 183

Page 184

19    Q.   I'm going to hand you an
20  e-mail and attachment that we're going to
21  mark as Exhibit 5.
22        (Document marked for
23    identification as Exhibit
24    Rite Aid-Frost-5.)

Page 185

1  BY MR. CLUFF:
2      Q.   It's been produced as
3  Rite_Aid_OMDL_0012113.  And the
4  attachment is 0012114.
5        Do you see there the cover
6  document is an e-mail?
7      A.   Yes.





Page 190

Page 191

Page 192

Page 193

Case: 1:17-md-02804-DAP Doc #: 2173-19 Filed: 08/12/19 50 of 84. PageID #: 308522
Highly Confidential - Subject to Further Confidentiality Review



Page 194

Page 196

Page 195

Page 197

8   BY MR. CLUFF:
9       Q.   I'm going to hand you a copy
10  of a document that was produced by Rite
11  Aid Rite_Aid_OMDL_0013963 and the
12  attachment to that document which begins
13  at Rite_Aid_OMDL_0013967 to 0013968.
14          (Document marked for
15          identification as Exhibit
16          Rite Aid-Frost-6.)
17  BY MR. CLUFF:
18      Q.   Did you get a chance to
19  review that document?
20      A.   I did.

Highly Confidential - Subject to Further Confidentiality Review



Page 198

Page 200

Page 199

Page 201



Page 202

Page 204

Page 203

7        (Document marked for
8        identification as Exhibit
9        Rite Aid-Frost-7.)
10   BY MR. CLUFF:
11        Q.   Let me give you another
12   document.  We're going to mark it as
13   Exhibit 7.  It's been produced as
14   Rite_Aid_OMDL_0011927 to 0011928.

Page 205



Page 206

Page 208

Page 207

Page 209

Highly Confidential - Subject to Further Confidentiality Review



Page 210

Page 211

Page 212

9        (Document marked for
10    identification as Exhibit
11    Rite Aid-Frost-8.)
12 BY MR. CLUFF:
13    Q.   Okay.  I'm going to hand you
14 a two-page document that's been produced
15 by Rite Aid as Rite_Aid_OMDL_0003533 to
16 3534.  The second page is on the back of
17 the document.
18    A.   Okay.

Page 213



Highly Confidential - Subject to Further Confidentiality Review



Page 218

Page 220

Page 219

Page 221

17          (Document marked for
18      identification as Exhibit
19      Rite Aid-Frost-9.)
20  BY MR. CLUFF:
21      Q.   I'm going to hand you a copy
22  of a document produced by Rite Aid.  It's
23  a two-page e-mail chain beginning at
24  Rite_Aid_OMDL_001825, to 001826.

Highly Confidential - Subject to Further Confidentiality Review





Page 226

Page 228

Page 227

```
 4        (Document marked for
 5     identification as Exhibit
 6     Rite Aid-Frost-10.)
 7  BY MR. CLUFF:
 8     Q.   I'm going to hand you a copy
 9  of a document produced by Rite Aid --
10  Rite Aid as Rite_Aid_OMDL_0023456.  It's
11  a two-page document.
12     A.   Okay.
```

Page 229





Page 235

2       MR. CLUFF:  We've been going
3   about an hour.  Why don't we take
4   another break.
5       MR. LAVELLE:  Sure.
6       THE VIDEOGRAPHER:  Off
7   record at 1:42 p.m.
8       (Short break.)
9       HE VIDEOGRAPHER:  We are
10  back on the record at 2:00 p.m.
11  BY MR. CLUFF:
12  Q.   Okay.  We are back on the
13  record.  So you're back under oath,
14  Mr. Frost.
15  A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 238

Page 240

Page 239

Page 241



Page 242

Page 244

22    Q.   I'll show you another
23  document produced by Rite Aid as
24  Rite_Aid_OMDL_0029175.

Page 243

Page 245

1       (Document marked for
2    identification as Exhibit
3    Rite Aid-Frost-12.)
4       THE WITNESS:  Okay.
5  BY MR. CLUFF:



Page 246

Page 248

Page 247

Page 249

9       (Document marked for
10   identification as Exhibit
11   Rite Aid-Frost-13.)
12 BY MR. CLUFF:
13   Q.   I'm going to hand you a
14 document that we're going to mark
15 Exhibit 13.  It's Rite_Aid_OMDL_0013911,
16 and an e-mail attachment that has a
17 picture attached to that.  The entire
18 chain runs from 13911 to 13914.
19   A.   Okay.





Page 254

Page 256

Page 255

Page 257

        7      Q.   I'm going to hand you a
        8   document and a copy of the spreadsheet
        9   that was attached to it.
       10          (Document marked for
       11       identification as Exhibit
       12       Rite Aid-Frost-14.)
       13   BY MR. CLUFF:



Highly Confidential - Subject to Further Confidentiality Review



Page 262

Page 264

Page 263

Page 265



Page 266

Page 268

Page 267

Page 269

1    So I'm going to hand you a
2  document I'm going to mark as Exhibit 15.
3  It's been produced as
4  Rite_Aid_OMDL_0013234.
5        (Document marked for
6        identification as Exhibit
7        Rite Aid-Frost-15.)
8  BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review





Page 278

1     Q.  Okay.  I'm going to hand you
2 a copy of a document that was produced as
3 Rite_Aid_OMDL_0015596 to 0015598.  There
4 are two documents attached to that e-mail
5 which run from 0015599 to 0015677.



Page 280

Page 279

Page 281



Page 282

Page 284

Page 283

Page 285

9      Do you know what exception
10  reports are?
11      A.   Exception reports?
12      Q.   Yeah.
13      A.   No, I -- I don't know.  I
14  know the term, I don't really know which
15  particular reports exception reports
16  were.
17      Q.   Were you required to work
18  with exception reports as the manager of
19  pharmacy in Perryman?
20      A.   Like I said, I don't recall
21  the exception reports.
22      MR. CLUFF:  Let's take a
23      break for five minutes.  Let me
24      just look at my notes.  I think

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    I'm done.
2         THE VIDEOGRAPHER:  Off the
3    record at 2:51 p.m.
4         (Short break.)
5         THE VIDEOGRAPHER:  We are
6    back on the record at 2:58 p.m.
7         MR. CLUFF:  This is
8    plaintiff's counsel, Sterling
9    Cluff.  I'm not in the camera
10   because Mr. Lavelle and I have
11   switched seats.  I have no further
12   questioning today for Mr. Frost.
13        Mr. Lavelle, I understand,
14   has some redirect so he is going
15   to take the mic.
16        MR. LAVELLE:  Thank you.
17              - - -
18        EXAMINATION
19              - - -
20   BY MR. LAVELLE:
21        Q.   Good afternoon, Mr. Frost.
22        A.   Good afternoon.
23        Q.   You were asked some
24   questions earlier today by plaintiff's

Page 287

1    counsel Mr. Cluff, in which you
2    referenced a DEA audit in 2012.  Do you
3    recall that testimony, sir?
4         A.   Yes, I do.
5         Q.   Were you involved in the DEA
6    performing an audit of the Perryman
7    facility in 2012?
8         A.   Yes, I was.
9         Q.   What was your role with
10   respect to that audit?
11        A.   Well, it's -- I was
12   responsible for escorting the two DEA
13   inspectors through the whole control drug
14   division -- I mean, cage to show them
15   physically what we all did, and provide
16   any documents that the inspectors
17   required.
18        Q.   All right.  I'd like to mark
19   an exhibit please.
20        (Document marked for
21        identification as Exhibit
22        Rite Aid-Frost-17.)
23   BY MR. LAVELLE:
24        Q.   All right.  Mr. Frost, we've

Page 288

1    put in front of you what we marked as
2    Exhibit Frost 17.  Do you recognize this
3    document, sir?
4         A.   Yes, I do.
5         Q.   Can you tell us what it is?
6         A.   It's a document that the two
7    DEA inspectors presented to myself and to
8    general managers, matter of fact, that
9    there was a notice of inspection of
10   control premises, that they were going to
11   do an audit of our facility.
12        Q.   Do you see that there is a
13   date on this document?
14        A.   Yes; December 10, 2012.
15        Q.   December 10th, 2000 --
16        A.   I mean, sorry.  July 10,
17   2012.  Sorry.
18        Q.   Does looking at this
19   document, in particular, that date, help
20   you remember when the DEA came to the
21   Perryman facility in 2012?
22        A.   Yes.
23        Q.   When was that?
24        A.   10:50 in the morning.

Page 289

1         Q.   And what day?
2         A.   Oh, July 10, 2012.
3         Q.   Is your signature on this
4    document somewhere?
5         A.   Yes.
6         Q.   Where is your signature on
7    this document?
8         A.   Right next to Debra Chase's,
9    down in the bottom right.
10        Q.   Did the DEA tell you in
11   advance that they were coming?
12        A.   No.
13        Q.   Was it a surprise then?
14        A.   Yes.
15        Q.   Did you spend time with the
16   DEA in addressing whatever issues they
17   had during the audit?
18        A.   Yes.
19        Q.   Did you supply information
20   to the DEA?
21        A.   Yes.
22        Q.   Did they ask questions of
23   you?
24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Q.   Did they come back a second
2  day?
3    A.   Yes.
4    Q.   Were you involved in their
5  visit the second day?
6    A.   I was.
7    Q.   What did you do with the DEA
8  the second day they were there?
9    A.   Same as the first day, if
10 they wanted other documents that we had
11 to request from corporate or any
12 additional information, we would provide
13 them.  And then if they wanted to see the
14 control cage again.
15   Q.   Did you have occasion to
16 write up a memorandum summarizing what
17 happened when the DEA came for this
18 audit?
19   A.   Yes, I did.
20      MR. LAVELLE:  I'd like to
21   mark another exhibit then please.
22      (Document marked for
23   identification as Exhibit
24   Rite Aid-Frost-18.)

Page 291

1  BY MR. LAVELLE:
2    Q.   Mr. Frost, we've put in
3  front of you what we marked for
4  identification as Frost 18.  It appears
5  to be an e-mail plus a document attached
6  to it.  I want to ask you questions about
7  the e-mail first.
8    A.   Sure.
9    Q.   Do you recognize this
10 e-mail, sir?
11   A.   Yes, I do.
12   Q.   Did you write this e-mail?
13      MR. CLUFF:  Mr. Lavelle, not
14   to interrupt, but I don't know
15   that we got the Bates number on
16   the record for the counsel on the
17   phone.
18      MR. LAVELLE:  Okay.  I'm
19   sorry.  Very good point.  For
20   Frost-17, the Bates number was
21   Rite_Aid_OMDL_0032621.
22      For Frost-18, which is a
23   document I currently am discussing
24   with the witness, it's

Page 292

1    Rite_Aid_OMDL_0012547 through
2    2549.
3       Thank you, Mr. Cluff.
4  BY MR. LAVELLE:
5    Q.   So I think my question to
6  you, Mr. Frost, was did you send this
7  e-mail?
8    A.   I did.
9    Q.   And the subject line, can
10 you read that for us, please?
11   A.   "Please review DEA audit
12 July 11th."
13   Q.   Who did you send this e-mail
14 to?
15   A.   All my direct reports, the
16 DEA coordinator, and the DEA clerk.
17   Q.   And can you read for the
18 members of the jury who are viewing this
19 video, what you wrote in the text of your
20 e-mail?
21   A.   On this first page here?
22   Q.   Yes, please.
23   A.   "Great job, everyone, for
24 making this audit very successful.

Page 293

1  Please share with our associates."
2    Q.   Why did you send this e-mail
3  to the people you sent it to?
4    A.   I wanted them to be aware of
5  all of the areas that the DEA auditors
6  looked at.
7    Q.   And then we have an
8  attachment to this e-mail.  I'd like you
9  to turn to the second page of this
10 document.  It's got Bates Number 12548 on
11 it.  Do you recognize this document, sir?
12   A.   Yes.
13   Q.   Did you prepare this
14 document?
15   A.   I did.
16   Q.   When did you prepare this
17 document?
18   A.   On July 11th, after the
19 audit was completed.
20   Q.   Why did you prepare this
21 document?
22   A.   Well, I wanted all of the
23 addressees on the front of the document,
24 and I did send it to my corporate

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 office -- office as well, to let them
2 know a summary of all the items that the
3 inspectors looked at, and the results of
4 each item that they looked at.
5      Q.   All right.  Can you read for
6 the members of the jury viewing this
7 video what you wrote under Roman
8 Numeral I at the top of this memo?
9      A.   Roman Numeral I, "DC 10 DEA
10 audit results, no findings or
11 discrepancies, 100 percent
12 accountability."
13      Q.   What did you mean when you
14 wrote that, Mr. Frost?
15      A.   I meant that the DEA
16 inspectors can find nothing wrong or
17 inconsistent with how we operated the
18 control drug cage.
19      Q.   What did you mean by
20 100 percent accountability?
21      A.   That means every item that
22 we had stored, shipped, or received, we
23 could account for each and every item.
24      Q.   All right.  I just want to

Page 295

1 take you now through -- briefly what you
2 have under Roman Numeral II, the summary
3 of the audit.
4          Can you read for the members
5 of the jury what you wrote under Number 1
6 there, please?
7      A.   Yes.
8          "Two inspectors from the DEA
9 arrived yesterday at approximately
10 10:40 a.m. to conduct an unannounced
11 audit."
12      Q.   And was that correct at the
13 time that you wrote it?
14      A.   Yes.
15      Q.   What did you write on
16 Number 2?
17      A.   "On Tuesday they asked for
18 and received an organizational chart,
19 information on med turn, our reverse
20 distributor, which company does our drug
21 testing, which company handles our alarm
22 security, et cetera."
23      Q.   And then what do you have
24 under Number 3?

Page 296

1      A.   "On Tuesday we also
2 conducted a physical count of eight
3 control drug items in both the forward
4 pick and the storage location.
5 100 percent correct.  Today the
6 audits" -- "the auditors did an
7 accountability of wholesale years" --
8 "whole year's worth of receipts,
9 distribution, which is movement, and
10 adjustments of these same eight items,
11 period 2 July, 2011, to 10 July, 2012.
12 The results were 100 percent
13 accountability."
14      Q.   And that was accurate when
15 you wrote it?
16      A.   Yes.
17      Q.   You referred to in that
18 section a physical count of eight CD
19 items.  What are you referring to there?
20 What does that mean?
21      A.   The inspectors went in there
22 and said, "We want to look at these eight
23 control drug items, and we want to see
24 their storage, their receipts, the

Page 297

1 distribution, and counts of these items
2 in the control cage."
3      Q.   Did the DEA tell you in
4 advance which ones they were going to
5 pull?
6      A.   No.
7      Q.   Did they ask you to identify
8 which ones to look at?
9      A.   No.
10      Q.   They just randomly selected
11 some?
12      A.   Correct.  They just had a
13 list of items that we had in the control
14 cage, and they highlighted eight items
15 and said, "We want to see these items."
16      Q.   Is that typical of the way
17 the DEA would conduct an audit in your
18 experience?
19          MR. CLUFF:  Objection.
20 Calls for speculation.
21 BY MR. LAVELLE:
22      Q.   In your experience, is
23 that --
24      A.   Out of the four, they all

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  did it the same way.
2       Q.   Number 4, you write that
3  some more information about what the DEA
4  inspectors arrived and looked at,
5  correct?
6       A.   Yes.
7       Q.   What do you have listed
8  there -- it's a long list, and I won't
9  ask to you read them all.  But you have
10 Items A through N that the DEA inspectors
11 looked at.  What are those items?
12      A.   Looked at the control cage
13 alarm test for vault and entire cage
14 between us and checkpoint; provide copies
15 of all state and DC licenses, as well as
16 copy of the VAWD certificate; listed CD
17 vendors and addresses; the filing of any
18 thefts or losses that we might have
19 occurred for that whole year period;
20 looked at inventory results of the
21 biennial and annual inventory; went to
22 asset protection department to look at
23 the camera monitoring room to observe;
24 provided copy of CD pick list and receipt

Page 299

1  POs that we use for receiving; observe
2  the associates picking in the cage; and
3  observed the associates using the new
4  quality assurance stations to verify all
5  control drug picks.  And they liked the
6  fact that we were using technology to
7  reduce human error.
8       Q.   All right.  You mentioned
9  there under G, "File of thefts and losses
10 106s from July 1, 2011, to July 10,
11 2012."
12      A.   Correct.
13      Q.   What does that refer to?
14      A.   That would refer to any
15 items that we thought through the
16 receipt -- receipt process or any process
17 that we would have filed with the DEA
18 office, in the Baltimore office.
19      Q.   All right.  I next want to
20 turn to what you have under Roman Numeral
21 III on your memory.  Can you read that
22 for the members of the jury, please?
23      A.   "Shout out, both DEA
24 inspectors are very impressed and pleased

Page 300

1  to see that Rite Aid demonstrates its due
2  diligence by having an excellent
3  excessive order monitoring program.  They
4  mentioned that the DEA is taking a harder
5  look at all distributors to ensure that
6  order monitoring processes are in place
7  and effective."
8       Q.   Mr. Frost, what do you
9  recall about the discussions that you and
10 your colleagues had with the DEA
11 inspectors about the order monitoring
12 program during this audit?
13      A.   All right.  Well, what was
14 nice about it when I brought them to the
15 control cage, they saw that we had posted
16 quantities not to exceed the threshold
17 by.  And one at random -- just talked to
18 one of our pickers, asked them, "What do
19 you do if you notice that the light
20 lights up more than, for example, this
21 item has."  And the associate would
22 explain to him what they do, talk to a
23 lead, or a manager.
24           We went from there and

Page 301

1  explained the whole excessive order
2  monitoring process.  We took them to the
3  phone logbook, if we had to call the
4  store, and what the lead or manager would
5  do when they talk to the store, in other
6  words find a -- resolve the issue, "Why
7  did you order this?  You're only going to
8  get this amount."  Explain why we only
9  send them authorized quantity.  They
10 looked at our quality control purpose on
11 how we did 100 percent audit on each and
12 every tote and indicated any
13 discrepancies on there.  So if we had to
14 investigate a forward pick we could.
15           They were impressed with how
16 we did our daily inventories and how we
17 kept control of all of our totes that we
18 sent to the outbound area, by tote ID and
19 by store number and how if we ever on
20 occasion thought that we might have
21 overpicked a store, that we would
22 physically go to the trailers ourselves,
23 pull the totes off of the trailers before
24 they even went to the stores, and pop all

Page 302

1 the seals to investigate and do a tote
2 audit of those items that we were
3 sending.
4     Q.   Let me follow up on a couple
5 of those specific items.
6     A.   Sure.
7     Q.   Mr. Frost, did you discuss
8 with the DEA that there was a threshold
9 system in place?
10     A.   Yes.  Established by
11 corporate office.
12     Q.   And did you discuss with the
13 DEA during their audit in 2012 that the
14 limit for orders was 5,000 units?
15     A.   Yes.  We explained that
16 whole process and that's what they liked
17 about it too, that we had something
18 established from our headquarters.
19     Q.   Did you discuss with the DEA
20 inspectors that there were some stores
21 for which there was a different limit
22 than 5,000?
23     A.   Anything that was above the
24 threshold would have been approved.  Yes,

Page 303

1 we discussed it with them, and they were
2 approved only by our corporate offices.
3     Q.   Did you show the DEA
4 inspectors the excessive order logs?
5     A.   Yes.  We showed them all of
6 that.
7     Q.   Was there anything that the
8 DEA asked for relating to your order
9 monitoring program that you were not able
10 to provide them?
11     A.   Not that -- we were able to
12 provide them anything that they wanted to
13 see.
14     Q.   And what was the end result
15 of this review by the DEA, what did they
16 tell you?
17     MR. CLUFF:  Objection.
18 Calls for speculation.
19     THE WITNESS:  I can only go
20 by what I repeat down here, that
21 they were very happy that we had
22 an effective program, that
23 everybody understood how it
24 operated.

Page 304

1 BY MR. LAVELLE:
2     Q.   Did the DEA tell you that
3 you needed to make any changes in the
4 order monitoring program?
5     A.   They did not.
6     Q.   Now, at the end of this
7 audit, did the DEA give you anything else
8 to tell you that you had completed the
9 audit?
10     A.   No.  They don't give you any
11 findings or any recommendations.  They
12 don't give you any report at all, I
13 believe.
14     Q.   So the only document you
15 received from the DEA relating to this
16 audit was what we marked previously as
17 Frost 17; is that correct?
18     A.   Correct.  That's the only
19 document.  They just call -- at the end,
20 they'll summarize it, call the general
21 manager in there and say we find nothing,
22 and then leave.
23     MR. LAVELLE:  That's all I
24 have for you.  Thank you,

Page 305

1 Mr. Frost.
2     THE WITNESS:  You're
3 welcome.
4     MR. CLUFF:  Let me break
5 five minutes.  Not even five.  Two
6 minutes.
7     THE VIDEOGRAPHER:  Off the
8 record at 3:13 p.m.
9     (Short break.)
10     THE VIDEOGRAPHER:  We are
11 back on the record at 3:20 p.m.
12         - - -
13     EXAMINATION
14         - - -
15 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review



Page 306

Page 308

Page 307

Page 309

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 314

Page 316

Page 315

Page 317

Highly Confidential - Subject to Further Confidentiality Review



Page 318

Page 320

Page 319

Page 321



Highly Confidential - Subject to Further Confidentiality Review



Page 326

Page 327

15 BY MR. CLUFF:
16     Q.   Okay.
17         MR. CLUFF:  That's all I
18 got.
19         MR. LAVELLE:  No further
20 questions for the witness.
21         The witness reserves the
22 right to read and sign.
23         THE VIDEOGRAPHER:  This
24 concludes this deposition.  The

Page 328

1 time is 3:35 p.m.  We are off the
2 record.
3         (Excused.)
4         (Deposition concluded at
5 approximately 3:35 p.m.)

Page 329

1
2         CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
  witness was duly sworn by me and that the
6 deposition is a true record of the
  testimony given by the witness.
7
         It was requested before
8 completion of the deposition that the
  witness, KEITH FROST, have the
9 opportunity to read and sign the
  deposition transcript.
10
11
12 _____
  MICHELLE L. GRAY,
13 A Registered Professional
  Reporter, Certified Shorthand
14 Reporter, Certified Realtime
  Reporter and Notary Public
15 Dated:  January 18, 2019
16
17
18         (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 330

## INSTRUCTIONS TO WITNESS

1
2
3       Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8       After doing so, please sign
9  the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 331

1        - - - - - -
         E R R A T A
2        - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6     REASON: _____
7  ____  ____  _____
8     REASON: _____
9  ____  ____  _____
10     REASON: _____
11  ____  ____  _____
12     REASON: _____
13  ____  ____  _____
14     REASON: _____
15  ____  ____  _____
16     REASON: _____
17  ____  ____  _____
18     REASON: _____
19  ____  ____  _____
20     REASON: _____
21  ____  ____  _____
22     REASON: _____
23  ____  ____  _____
24     REASON: _____

Page 332

## ACKNOWLEDGMENT OF DEPONENT

1
2
3
4       I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 333, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  KEITH FROST              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 333

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____