```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                     -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                     -  -  -
            Friday, December 14, 2018
11                     -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                       -  -  -
14
                 Videotaped deposition of
15   ELIZABETH GARCIA, taken pursuant to
     notice, was held at the law offices of
16   Reed Smith LLP, Three Logan Square, 1717
     Arch Street, Suite 3100, Philadelphia,
17   Pennsylvania 19103, beginning at 9:49
     a.m., on the above date, before Amanda
18   Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
19
                       -  -  -
20
21
22
23          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: STERLING CLUFF, ESQUIRE
15910 Ventura Boulevard
#1600
Encino, California 91436
(818) 839-9698
Scluff@baronbudd.com
- and -
BY: WILLIAM POWERS, ESQUIRE
BY: NOAH RICH, ESQUIRE
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Nrich@baronbudd.com
Representing the Plaintiffs

REED SMITH LLP
BY: SHANNON E. MCCLURE, ESQUIRE
BY: JOSEPH J. MAHADY, ESQUIRE
BY: ROBERT A. NICHOLAS, ESQUIRE
Three Logan Square
1717 Arch Street
Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Smcclure@reedsmith.com
Jmahady@reedsmith.com
Rnicholas@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corporation

Page 3

APPEARANCES: (Continued)

JONES DAY
BY: RICHARD M. BRODSKY, ESQUIRE
150 West Jefferson Street
Suite 2100
Detroit, Michigan 48226
(313) 733-3939
Rbrodsky@jonesday.com
Representing the Defendant,
Walmart

COVINGTON & BURLING LLP
BY: KEVIN KELLY, ESQUIRE
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
Kkelly@cov.com
Representing the Defendant,
McKesson Corporation

WILLIAMS & CONNOLLY, LLP
BY: ANDREW C. MCBRIDE, ESQUIRE
725 Twelfth Street, NW
Washington, D.C. 20005
(202) 434-5000
Amcbride@wc.com
Representing the Defendant,
Cardinal Health

Page 4

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

BARON & BUDD, P.C.
BY: SCOTT SIMMER, ESQUIRE
GRETCHEN KEARNEY, OFFICE MANAGER
EMMA KABOLI, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Ssimmer@baronbudd.com
Representing the Plaintiffs

REED SMITH, LLP
BY: ANNE E. ROLLINS, ESQUIRE
BY: SAMANTHA L. ROCCHINO, ESQUIRE
Three Logan Square
1717 Arch Street
Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Arollins@reedsmith.com
Srocchino@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corporation

BLASINGAME, BURCH, GARRARD &
ASHLEY, P.C.
BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
Suite 320
Athens Georgia 30601
(706) 707-3497
Ahughes@bbga.com
Representing the Plaintiff

Page 5

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

ALLEGAERT BERGER & VOGEL LLP
BY: DAVID A. BERGER, ESQUIRE
111 Broadway
20th Floor
New York, New York 10006
(212) 571-0550
Dberger@abv.com
Representing the Defendant,
Rochester Drug Corporation

BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
Suite 600
500 Virginia Street East
Charleston West Virginia 25301
(304) 345-4222
Hcyrus@baileywyant.com
Representing the Defendant,
West Virginia Board of Pharmacy

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ANGELA R. VICARI, ESQUIRE
250 West 55th Street
New York, New York 10019
(212) 836-8000
Angela.vicari@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals

Page 6

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
4     CLARK MICHIE, LLP
      BY: CHRISTOPHER J. MICHIE, ESQUIRE
5     220 Alexander Street
      Princeton, New Jersey 08540
6     (609) 423-21426
      Chris.michie@clarkmichie.com
7     Representing the Defendant,
      Pernix Therapeutics Holdings
8
9
10    FOX ROTHSCHILD LLP
      BY: ZACHARY MARTIN, ESQUIRE
11    2700 Kelly Road
      Suite 300
12    Warrington, Pennsylvania 18976
      (215) 345-7500
13    Zmartin@foxrothschild.com
      Representing the Defendant,
14    Validus Pharmaceuticals LLC
15
16 ALSO PRESENT:
   Devyn Mulholland, Videographer
17
18
19
20
21
22
23
24

Page 7

1        - - -
2      I N D E X
3        - - -
4
   Testimony of: ELIZABETH GARCIA
5
6   By Mr. Cluff            12
7
8        - - -
9      E X H I B I T S
10       - - -
11 NO.     DESCRIPTION        PAGE
12 AmerisourceBergen-Garcia
   Exhibit-1    ABDCMDL00364827-830    19
13
14 AmerisourceBergen-Garcia
   Exhibit-2   LinkedIn Profile;
          Elizabeth Garcia       25
15
16 AmerisourceBergen-Garcia
   Exhibit-3    ABDCMDL00296978-981    109
17 AmerisourceBergen-Garcia
   Exhibit-4    ABDCMDL00333083-085    159
18
19 AmerisourceBergen-Garcia
   Exhibit-5    ABDCMDL00162348-399    166
20 AmerisourceBergen-Garcia
   Exhibit-6    ABDCMDL00364844-851    195
21
22 AmerisourceBergen-Garcia
   Exhibit-7    ABDCMDL00364861-864    235
23 AmerisourceBergen-Garcia
   Exhibit-8    ABDCMDL00141902-903    270
24

Page 8

1        - - -
2      E X H I B I T S
3        - - -
4  NO.     DESCRIPTION         PAGE
5  AmerisourceBergen-Garcia
   Exhibit-9    ABDCMDL00306522-525    279
6
   AmerisourceBergen-Garcia
7  Exhibit-10   ABDCMDL00282490       312
8  AmerisourceBergen-Garcia
   Exhibit-11   ABDCMDL00282491       312
9
   AmerisourceBergen-Garcia
10 Exhibit-12   United States Code -
          Section 823        395
11
   AmerisourceBergen-Garcia
12 Exhibit-13   Part 1301 - Section 1301.71;
          Security Requirements
13         Generally         409
14 AmerisourceBergen-Garcia
   Exhibit-14   Part 1301 - Section 1301.74;
15         Other Security Controls for
          Non-practitioners     419
16
   AmerisourceBergen-Garcia
17 Exhibit-15   WAGMDL00038287-288    437
18 AmerisourceBergen-Garcia
   Exhibit-16   ABDCMDL00296155-180   437
19
   AmerisourceBergen-Garcia
20 Exhibit-17   ABDCMDL00151721-726   453
21 AmerisourceBergen-Garcia
   Exhibit-18   TEVA_MDL_A_02664130-131   464
22
   AmerisourceBergen-Garcia
23 Exhibit-19   ABDCMDL00364852-856   470
24

Page 9

1        - - -
2      E X H I B I T S
3        - - -
4  NO.     DESCRIPTION         PAGE
5  AmerisourceBergen-Garcia
   Exhibit-20   ABDCMDL00364858       473
6
   AmerisourceBergen-Garcia
7  Exhibit-21   ABDCMDL00364857       482
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 10

1           - - -
2       DEPOSITION SUPPORT INDEX
3           - - -
4
5  Direction to Witness Not to Answer
6  Page  Line      Page Line      Page Line
7  44    22
8
9
10 Request for Production of Documents
11 Page Line    Page Line      Page Line
12 None
13
14
15 Stipulations
16 Page Line    Page Line      Page Line
17 11     1
18
19
20 Question Marked
21 Page Line    Page Line      Page Line
22 None
23
24

Page 11

1           - - -
2       (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9           - - -
10      VIDEO TECHNICIAN:  We are
11   now on the record.  My name is
12   Devyn Mulholland, I'm a
13   videographer for Golkow Litigation
14   Services.  Today's date is
15   December 14th, 2018.  The time is
16   9:49 a.m.
17      This video deposition is
18   being held in Philadelphia,
19   Pennsylvania in the matter of
20   National Prescription Opiate
21   Litigation.  The deponent is
22   Elizabeth Garcia.  Counsel will be
23   noted on the stenographic record.
24   The court reporter is Amanda

Page 12

1    Miller and will now swear in the
2    witness.
3           - - -
4       ELIZABETH GARCIA, after
5    having been duly sworn, was
6    examined and testified as follows:
7           - - -
8         EXAMINATION
9           - - -
10 BY MR. CLUFF:
11      Q.   Good morning, Liz.  I'm
12   sorry, do you go by Liz?
13      A.   Liz.
14      Q.   Is it okay if I call you Liz
15   today?
16      A.   (Witness nods.)
17      Q.   Thank you.
18         My name is Sterling.  We met
19   briefly just before we went on the
20   record.  I represent plaintiffs in this
21   case.  I'm taking your deposition today.
22         Before we get started, I
23   just wanted to learn whether or not
24   you've been deposed before?

Page 13

1       A.   No.
2       Q.   No, okay.
3          So I'm sure you had an
4    opportunity to prepare for today's
5    deposition with your lawyers.  I would
6    just caution you that nothing that you
7    discussed in that prep should be
8    discussed here today with me.
9          But I would like to go
10   through with some rules of the road for a
11   deposition so that we're kind of both
12   clear on what we're going to do today.
13         The first thing is that
14   everything that we're doing today is
15   being recorded by video and by the court
16   reporter here, transcribed.  And so we
17   have to do our best not to talk over each
18   other and to let everybody finish their
19   sentences and to speak clearly.
20         Does that make sense?
21      A.   That makes sense.
22      Q.   And because we're also on
23   video and the court reporter is trying to
24   hear what we're saying, we have to speak

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 audibly, to the best of our ability.  So
2 if you can, you know, project a little
3 bit so she doesn't have to get after us
4 today.
5     A.    Okay.
6     Q.    Okay.  We also -- you know,
7 we want to make sure today that
8 everything is clear for the record.  So
9 at different times during today's
10 deposition I might ask you a question, if
11 you don't understand my question, you can
12 let me know and I can rephrase it or I
13 can clarify what I'm asking.  But
14 otherwise I'll assume that you understood
15 my question if you answer it.
16         Does that make sense?
17     A.    It makes sense.
18     Q.    So we can agree that if you
19 have a question about my question, you're
20 going to ask me?
21     A.    Yes.
22     Q.    All right.  Good.
23         We also want to make sure
24 that you can give accurate and honest and

Page 15

1 complete testimony today.  So I normally
2 wouldn't ask you questions like this, but
3 are you taking any medication that would
4 affect your ability to give truthful
5 testimony?
6     A.    No.
7     Q.    Do you have any medical
8 conditions that might impair your ability
9 to give honest and complete testimony
10 today?
11     A.    No.
12     Q.    Okay.  Your counsel today,
13 Ms. McClure, is going to, at different
14 times, assert what are called objections.
15 I'm sure she discussed this with you.
16 She's entitled, under the law and the
17 deposition protocol, to make her
18 objections.  And we want to make sure she
19 gets a chance to.
20         So after I ask a question,
21 just a little pause, make sure she can
22 get her objection on the record, and then
23 you can proceed to answer.
24         I am entitled to an answer

Page 16

1 to my question despite Ms. McClure's
2 objections unless I rephrase or withdraw
3 my question or unless she instructs you
4 not to answer.
5         Does that make sense?
6     A.    That makes sense.
7     Q.    We're also going to be
8 discussing matters today that go back
9 quite a while in time.  So I understand
10 you might not have a perfect recollection
11 of the subject matter we're discussing.
12 But I would ask you not to guess, but I
13 am entitled to your best recollection or
14 your best estimate.
15         Does that make sense to you?
16     A.    That makes sense.
17     Q.    So just to clarify a guess
18 versus an estimate, like, you can
19 estimate how long this table is because
20 you've seen it before, but if you've
21 never seen the table before, I would ask
22 you not to guess at the length.
23         Does that make sense?
24     A.    Makes sense.

Page 17

1     Q.    There may be times when you
2 don't recall an answer.  I'm entitled to
3 see if there is information that might
4 refresh your recollection, whether that
5 be through documents or additional
6 questions.  So if I follow up on a
7 question where you say that you don't
8 know, just understand what I'm trying to
9 do is see if we can refresh your
10 recollection at all.
11         Does that make sense?
12     A.    Okay.
13     Q.    Okay.  I'd like to hand you
14 a document to get started today.  At
15 different points during today's
16 deposition, I'm going to hand you
17 documents that we're going to mark as
18 exhibits to your deposition.
19         And you're always entitled
20 to review the entirety of the document to
21 make sure that you understand it before I
22 question you about it.  So I'll always
23 give you that opportunity.
24         The only caveat I would give

Page 18

1 is that I understand you flew today -- or
2 you flew out from Colorado for today's
3 deposition. So I'm trying to be
4 conscious of your time and get us all out
5 of here as quickly as possible.
6         So if I can tell you that
7 there's only a portion of a document I'm
8 going to look at, I'm going to reference
9 that, and then you can determine whether
10 or not, after looking at that section,
11 whether you want to proceed having
12 reviewed it or if you need to review the
13 entire document.
14        Does that make sense?
15    A.   That makes sense.
16    Q.   Sometimes this goes faster
17 if we can just focus on a portion of a
18 document.
19        So I'm going to hand you the
20 first document for today, which we're
21 going to mark as Exhibit-1 to your
22 deposition. It is a document from your
23 personnel file that is Bates stamped
24 numbered ABDCMDL00364827.

Page 19

1             - - -
2         (Whereupon,
3         AmerisourceBergen-Garcia
4         Exhibit-1, ABDCMDL00364827-830,
5         was marked for identification.)
6             - - -
7 BY MR. CLUFF:
8    Q.   And we're going to talk
9 about this document a little bit more
10 today.
11        MS. MCCLURE: You get the
12 one with the stamp.
13 BY MR. CLUFF:
14    Q.   But for right now, I just
15 want to focus on, I believe it's the
16 second page of that document -- excuse
17 me, the third page.
18        You'll see down at the
19 bottom of the document, that says Page 3
20 of 4, and the Bates number on the third
21 page is ending in 0364829.
22        Do you see that?
23    A.   Yes.
24    Q.   Why don't you review that

Page 20

1 page and let me know when you've had a
2 chance to review it.
3    A.   Okay.
4    Q.   So you've had a chance to
5 familiarize yourself with that page?
6    A.   Yes.
7    Q.   We're going the talk about
8 this document more, so I'll give you
9 another chance to look at it later in its
10 entirety, but there's really only two
11 sections that I wanted to discuss right
12 now.
13        If you go back to the page
14 just before it, at the very top, do you
15 see -- and just so you're aware, there's
16 a screen in front of you that will show
17 the document that you're looking at in
18 realtime, and sometimes Zach, who is down
19 here at the end of the table next to me,
20 will highlight the portions of it that
21 I'm referencing so you can use both
22 resources.
23        At the top of the page there
24 it says, ABC Core Leadership

Page 21

1 Competencies, and there's a Roman Numeral
2 II in front of that?
3    A.   Yes.
4    Q.   And it appears that the
5 information on the next page, Page 3, are
6 comments.
7        Would those comments be
8 about the ABC core leadership
9 competencies?
10    A.   Yes, I believe so.
11    Q.   I want to direct your
12 attention to the last underlined
13 information there at the bottom of that
14 section. It's, Integrity and trust.
15        Do you see that?
16    A.   Yes.
17    Q.   It's also on the screen
18 there in front of you.
19        And these are comments that
20 you would have written, correct?
21    A.   Yes, correct.
22    Q.   And there you say, I am a
23 direct and truthful person and will
24 present the truth in an appropriate and

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 helpful manner.
2     A.   Correct.
3     Q.   Is that still true today?
4     A.   Yes.
5     Q.   And you continue and say, I
6 can be counted on to take personal
7 responsibility for whatever happens, even
8 if a mistake is made.
9         Right?
10    A.   Correct.
11    Q.   Is that still true today?
12    A.   Yes.
13    Q.   I want to direct your
14 attention to another section that's
15 midway up the page from there.
16        It says, Decision capability
17 and quality.
18        Do you see that?
19    A.   Yes.
20    Q.   Are these also comments that
21 you would have read -- I mean, you would
22 have written?
23    A.   Yes.
24    Q.   And it says there, I am a

Page 23

1 solid decision-maker, taking the time to
2 think through problems and examine the
3 facts before choosing a course of action.
4         Did I read that accurately?
5     A.   Yes.
6     Q.   And would you say that that
7 is still true today?
8     A.   Yes.
9     Q.   You continue and say that
10 your approach is generally methodical in
11 solving problems and you'll examine
12 situations from a variety of perspectives
13 before a final decision is made.
14        Do you see that?
15    A.   Yes.
16    Q.   Is that still true today?
17    A.   Yes.
18    Q.   I noted those two sections
19 because they stood out to me in your
20 file, and I just wanted to understand if
21 we can approach today's deposition within
22 that same framework?
23        MS. MCCLURE:  Objection.
24        THE WITNESS:  Okay.

Page 24

1 BY MR. CLUFF:
2     Q.   Okay.  So you intend to be
3 honest and appropriate and helpful today?
4     A.   Yes.
5     Q.   Do you intend to take
6 personal responsibility if we determine
7 that there were mistakes made in your job
8 performance?
9         MS. MCCLURE:  Continuing
10 objection.
11        THE WITNESS:  Yes.
12 BY MR. CLUFF:
13    Q.   And we'll -- do you intend
14 to carefully think through the problems
15 and examine the facts before making your
16 answers today?
17        MS. MCCLURE:  Continuing
18 objection.
19        THE WITNESS:  To the best of
20 my ability, yes.
21 BY MR. CLUFF:
22    Q.   Okay.  Thank you.  You can
23 set that aside.
24        Just as a helpful

Page 25

1 suggestion, at the bottom of that
2 document, you'll note that I put a
3 sticker that says Exhibit-1.  So later
4 during today's deposition I might refer
5 to exhibits as Exhibit-1.  If you can
6 kind of keep them in order, it makes it
7 easier for you.
8     A.   Okay.
9     Q.   So I'd like to hand you
10 another document.  We'll mark this as
11 Exhibit-2.
12        This is a copy from the
13 Internet, that I printed yesterday, last
14 night, of your LinkedIn profile.  I'd
15 like to give you a chance to read through
16 that.  We're going to go through this
17 document in its entirety.  So I want you
18 to go ahead and take your time to review
19 it.
20           - - -
21        (Whereupon,
22 AmerisourceBergen-Garcia
23 Exhibit-2, LinkedIn Profile;
24 Elizabeth Garcia, was marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    identification.)
2        - - -
3        MR. CLUFF:  I think I gave
4    you an extra copy.
5        THE WITNESS:  Okay.
6    BY MR. CLUFF:
7        Q.   So I want to start, do you
8    see on the first page there is some bold
9    text that says, Experience?
10       A.   Yes.
11       Q.   And underneath that it says,
12   Corporate investigator?
13       A.   Yes.
14       Q.   And underneath that it says,
15   AmerisourceBergen?
16       A.   Yes.
17       Q.   I note the dates there are
18   2012 to 2017.
19       A.   Correct.
20       Q.   Does that indicate that you
21   are no longer employed by
22   AmerisourceBergen?
23       A.   I am no longer employed by
24   AmerisourceBergen.

Page 27

1        Q.   Do you recall when you left
2    AmerisourceBergen?
3        A.   October 2017.
4        Q.   And what was the reason for
5    your departure from AmerisourceBergen?
6        A.   I needed a change.
7        Q.   Is there any particular
8    reason why you needed a change?
9        A.   I needed a break.  I was
10   burned out.
11       Q.   Why were you burned out?
12       A.   Just volume of work.
13       Q.   Any other reasons?
14       A.   I like to shake it up every
15   five years, for professional development.
16       Q.   Did you have any personality
17   conflicts with members of the diversion
18   control team at AmerisourceBergen that
19   prompted your departure?
20       A.   I did not get along with my
21   immediate supervisor.
22       Q.   And who was that?
23       A.   Eric Cherveny.
24       Q.   What was the reason for you

Page 28

1    two not getting along?
2        A.   Personality differences.
3        Q.   When you left
4    AmerisourceBergen, did you sign any
5    documents about your resignation?
6        A.   No.
7        Q.   I'm sorry, I should ask one
8    more question.
9        Did you resign?
10       A.   I resigned.
11       Q.   And did you give notice of
12   your resignation?
13       A.   I gave two weeks' notice.
14       Q.   Who did you give it to?
15       A.   David May.
16       Q.   Did you give it verbally or
17   in a written form?
18       A.   Verbally and written.
19       Q.   And how did you give it in
20   written form?
21       A.   I just said, my last day is
22   effective whatever date it was.
23       Q.   Was that by e-mail or
24   letter, or some other written form?

Page 29

1        A.   That was by e-mail, I
2    believe.
3        Q.   Did you, in your verbal or
4    written communications with David May
5    about your resignation, give him any
6    explanation about why you were leaving
7    the company?
8        A.   I just told him I needed a
9    change.
10       Q.   Did you discuss the fact
11   that you did not get along with Eric
12   Cherveny?
13       MS. MCCLURE:  Objection to
14   the form.
15       THE WITNESS:  He already
16   knew that.
17   BY MR. CLUFF:
18       Q.   So that's a good example.
19   Shannon is going to have objections and
20   that's appropriate.  Make sure to try to
21   give her a chance, if you can.
22       So I'm going to ask the
23   question, and we'll give her a chance to
24   object, and then you can give me your

Page 30

1 answer so that we get that clear.
2      Did you discuss the fact
3 that you did not get along with Eric
4 Cherveny when you told David May that you
5 were resigning?
6      MS. MCCLURE:  Objection to
7 form.
8      THE WITNESS:  He already
9 knew that.
10 BY MR. CLUFF:
11     Q.   Why did he know that
12 already?
13     A.   He knew we were having
14 issues.
15     Q.   How did he know?
16     A.   I don't know.
17     Q.   Had you previously advised
18 David May that you were not getting along
19 with your supervisor, Eric Cherveny?
20     A.   I don't recall.
21     Q.   Was it common knowledge at
22 AmerisourceBergen that you and Eric
23 Cherveny did not get along?
24      MS. MCCLURE:  Objection to

Page 31

1      form.
2      THE WITNESS:  I don't know.
3 BY MR. CLUFF:
4     Q.   Do you know whether Eric
5 Cherveny may have explained to David May
6 that the two of you were not getting
7 along?
8      MS. MCCLURE:  Objection to
9      form.
10      THE WITNESS:  I don't know.
11 BY MR. CLUFF:
12     Q.   Did you ever discuss with
13 anybody else at AmerisourceBergen the
14 fact that you were not getting along with
15 Eric Cherveny?
16     A.   I don't recall.
17     Q.   You didn't discuss it with
18 any other of the associates that you
19 worked with?
20     A.   I may have, but I don't
21 remember.
22     Q.   If you had discussed it with
23 other associates, who would it have been?
24      MS. MCCLURE:  Objection to

Page 32

1      form.
2      THE WITNESS:  Maybe Nikki
3      Seckinger.
4 BY MR. CLUFF:
5     Q.   Do you recall when that --
6 those conversations may have occurred?
7      MS. MCCLURE:  Objection to
8      form.  Assumes facts not in
9      evidence.
10      THE WITNESS:  I don't
11      recall.
12 BY MR. CLUFF:
13     Q.   How long did you work with
14 Nikki Seckinger?
15     A.   I believe 2015 to 2017.
16     Q.   Based on your experience
17 working with her, would you say that you
18 two worked closely together?
19      MS. MCCLURE:  Objection to
20      form.
21      THE WITNESS:  On numerous
22      projects.
23 BY MR. CLUFF:
24     Q.   Would you consider her to

Page 33

1 be, like, a work friend or a colleague?
2     A.   A colleague.
3      MS. MCCLURE:  Objection to
4      form.
5 BY MR. CLUFF:
6     Q.   What kind of information
7 about your personality conflict with Eric
8 Cherveny would you have shared with her,
9 based on your relationship?
10      MS. MCCLURE:  Objection to
11      form.  Speculation.  Assumes facts
12      not in evidence.  Foundation.
13      THE WITNESS:  I don't
14      recall.
15 BY MR. CLUFF:
16     Q.   Do you recall how long --
17 let me back up.  Strike that.
18      To the best of my ability,
19 I've been trying to call the situation
20 with Eric Cherveny, the two of you not
21 getting along.  I'd like to use some
22 shorter words to shorten my question.
23      Are you okay if I call that
24 a personality disagreement, or how would

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  you describe it?
2      A.   Personality disagreement.
3      Q.   Are you all right if I use
4  those words to describe your relationship
5  with Eric Cherveny?
6      A.   Yes.
7      Q.   How long would you say the
8  personality disagreement between you and
9  Eric Cherveny lasted?
10     A.   Two years.
11     Q.   And did those two years
12  coincide with him becoming your direct
13  supervisor?
14         MS. MCCLURE:  Objection to
15     form.
16         THE WITNESS:  He was my
17     direct supervisor at those times.
18  BY MR. CLUFF:
19     Q.   Did you have any personality
20  conflicts with him before he became your
21  direct supervisor?
22     A.   I didn't know him.
23     Q.   During the two years you
24  worked with Eric Cherveny, do you

Page 35

1  remember any particular examples where
2  the two of you did not get along?
3      A.   Just disagreements on
4  projects.
5      Q.   What kind of projects?
6      A.   Trainings, what they look
7  like.
8      Q.   And so what was the
9  substance of the disagreement?
10     A.   He saw it one way and I saw
11  it another way.
12     Q.   Did Eric Cherveny oversee
13  you in all of your job responsibilities,
14  or just training?
15     A.   All of my job
16  responsibilities.
17     Q.   Were there conflicts between
18  you -- or disagreements, excuse me,
19  between you and Eric Cherveny about other
20  aspects of your job responsibilities
21  besides training?
22         MS. MCCLURE:  Objection to
23     form.
24         THE WITNESS:  Repeat the

Page 36

1  question.
2  BY MR. CLUFF:
3      Q.   Sure.  You -- I'll rephrase
4  it.  We can kind of walk through it.
5         You previously discussed
6  that you and Eric Cherveny had a
7  personality disagreement about trainings;
8  and he wanted it one way and you wanted
9  it another.
10         Does that make sense?
11     A.   Yes.
12     Q.   Okay.  I'm curious about
13  your other job responsibilities.
14         Did you and Eric Cherveny
15  have any personality disagreements about
16  any of your other job responsibilities?
17     A.   I don't recall.
18     Q.   I may ask you later today,
19  when we talk about some of your job
20  responsibilities, whether you had
21  disagreements with Eric Cherveny.  If I
22  do, just understand that that's what I'm
23  asking about, is this sort of personality
24  disagreement topic.

Page 37

1         Does that make sense?
2      A.   Uh-huh.
3      Q.   So I want to go back to your
4  departure from AmerisourceBergen.
5         Do you understand that
6  you're here testifying today as a witness
7  because of your former employment with
8  AmerisourceBergen?
9      A.   I understand.
10     Q.   Do you have an
11  understanding, without disclosing your
12  discussions with counsel, about the
13  allegations in the lawsuit against
14  AmerisourceBergen?
15         MS. MCCLURE:  I'll just
16     counsel you to -- you can't
17     disclose any conversations that we
18     have had in preparation for your
19     deposition.  You can answer that
20     question yes or no.
21         THE WITNESS:  Repeat the
22     question.
23  BY MR. CLUFF:
24     Q.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    MR. CLUFF:  And, Shannon, go
2  ahead and please make the same
3  instruction, so we're clear.
4  BY MR. CLUFF:
5    Q.   I'm asking if you have an
6  understanding, outside of your
7  conversations with counsel, regarding the
8  allegations in the lawsuit against
9  AmerisourceBergen?
10    MS. MCCLURE:  Same
11  instruction, not to disclose
12  conversations with counsel.
13    THE WITNESS:  Yes.
14  BY MR. CLUFF:
15    Q.   Do you have an -- is that
16  understanding your own or is it derived
17  from information you gained from counsel;
18  yes or no?
19    A.   My own understanding.
20    Q.   Okay.  I'd like to
21  understand your understanding, then.
22    What do you understand to be
23  the allegations against
24  AmerisourceBergen?

Page 39

1    A.   That AmerisourceBergen is
2  partially responsible for the opioid
3  crisis.
4    Q.   Okay.  Do you understand why
5  AmerisourceBergen is alleged to have been
6  responsible for the opioid crisis?
7    MS. MCCLURE:  Objection to
8  form.
9    THE WITNESS:  Because
10  they're a distributor.
11  BY MR. CLUFF:
12    Q.   Are there any other reasons?
13    A.   No.
14    Q.   Your lawyers here today that
15  represent you -- let me ask you this
16  question:  The lawyers sitting next to
17  you today, do they represent you in this
18  deposition?
19    A.   Yes.
20    Q.   Are you aware that they also
21  represent AmerisourceBergen?
22    A.   Yes.
23    Q.   Are you paying the lawyers
24  that represent you today to represent you

Page 40

1  in this deposition?
2    MS. MCCLURE:  Objection to
3  form.
4    Do you want her to step out,
5  or do you want you and I to step
6  out?
7    MR. CLUFF:  You can make
8  your objection on the record.
9    MS. MCCLURE:  Objection to
10  getting into counsel/client
11  relationship, and I'm going to --
12    MR. CLUFF:  I'm not
13  exploring the counsel/client
14  relationship.  I'm just asking who
15  is paying who to represent.
16  That's not privileged.
17    MS. MCCLURE:  Hold on.
18  Okay.
19    MR. CLUFF:  So I'll restate
20  my question.
21  BY MR. CLUFF:
22    Q.   Are you paying the lawyers
23  that represent you today to represent you
24  in this deposition?

Page 41

1    A.   No.
2    Q.   Without disclosing any
3  conversations you had with the lawyers
4  that represent you about today's
5  deposition, do you know who is paying the
6  lawyers to represent you today?
7    MS. MCCLURE:  I'm going to
8  counsel the witness that to the
9  extent any understanding of that
10  is derived from conversations with
11  counsel, that she's instructed not
12  to answer.
13  BY MR. CLUFF:
14    Q.   You can answer my question,
15  subject to that limitation.
16    A.   I don't know.
17    Q.   You don't currently work for
18  AmerisourceBergen, right?
19    A.   Correct.
20    Q.   But you're here testifying
21  as an AmerisourceBergen witness?
22    A.   Correct.
23    MS. MCCLURE:  Objection to
24  form.

Page 42

BY MR. CLUFF:

Q. We all three talked over each other, so I'll apologize and we'll try to clean it up.

Is AmerisourceBergen paying you to testify today?

A. No.

Q. When you left AmerisourceBergen, did you have a job that you were accepting?

MS. MCCLURE: Objection to form.

THE WITNESS: No.

BY MR. CLUFF:

Q. Are you currently employed?

A. No.

Q. Have you received any compensation for being at today's deposition?

MS. MCCLURE: Objection to form.

THE WITNESS: No.

BY MR. CLUFF:

Q. I understand that you had to

Page 43

travel from Colorado to be here today.

Did you pay for your own travel expenses and lodging while you're here for this deposition?

A. No.

Q. Do you know who paid for your travel and lodging while you're here for the deposition?

MS. MCCLURE: Same instruction, that to the extent your understanding is derived from counsel, then you're instructed not to answer.

THE WITNESS: I don't know exactly who is paying it. I don't know.

BY MR. CLUFF:

Q. Do you recall when you -- how did you select the lawyers that are representing you today to defend you in this deposition?

MS. MCCLURE: Objection to form.

Hold on a moment.

Page 44

To the extent any of that -- any of your response to that question is derived from an understanding or information that you learned from counsel, then you're instructed not to answer.

THE WITNESS: I can't answer that.

BY MR. CLUFF:

Q. Okay. I'm going to ask you some additional foundation questions.

Did you reach out to Reed Smith and request that they represent you in today's deposition?

A. No.

MS. MCCLURE: Hold on.

Okay. You can answer.

BY MR. CLUFF:

Q. I believe you answered no, correct?

A. Correct.

Q. So you were first contacted by Reed Smith about representing you in today's deposition?

Page 45

MS. MCCLURE: Objection to form.

THE WITNESS: Yes.

BY MR. CLUFF:

Q. I mentioned earlier that I'm sure you met with your counsel to prepare for today's deposition. There's nothing wrong with that, but I'm entitled to understand the scope of your prep without understanding the substance of the prep.

Does that make sense?

A. It makes sense.

Q. Okay. So have you met with your counsel to prepare for today's deposition?

A. Yes.

Q. Do you recall how many times you met, in person, with counsel that are defending you today?

A. Three times.

Q. And do you recall how long each of those meetings was?

A. Three to five hours; three occasions.

Highly Confidential - Subject To Further Confidentiality Review

Page 46

1    Q.   Three occasions.
2         And were each of those
3    occasions between three and five hours?
4    A.   Yes.
5    Q.   Did you have additional
6    meetings with your counsel by phone?
7    A.   No.
8    Q.   So all of your preparation
9    was in person?
10   A.   Yes.
11   Q.   I want to go back to this
12   Exhibit-2 that's in front of you.  And I
13   want to turn back to, I believe it's the
14   third page there -- actually, start at
15   the second page at the very bottom, if
16   you can.
17        Do you see there's a
18   category there, Education, and underneath
19   that it says, Northeastern University?
20   A.   Yes.
21   Q.   If you continue on to the
22   fourth page, you can see there's
23   additional educational fields as well.
24   A.   Yes.

Page 47

1    Q.   Do you see that?
2         MR. CLUFF:  The third page,
3    please, Zach.
4    BY MR. CLUFF:
5    Q.   And so your education
6    appears to start at University of
7    Colorado; is that right?
8    A.   That's correct.
9    Q.   And what year did you
10   complete your degree at the University of
11   Colorado?
12   A.   1992.
13   Q.   And do you recall how long
14   you were enrolled at the University of
15   Colorado?
16   A.   Four years, I believe.
17   Q.   And did you attend the
18   University of Colorado at Boulder, or any
19   other specific school?
20   A.   At Boulder.
21   Q.   So CU Boulder?
22   A.   CU Boulder.
23   Q.   Is there any reason you
24   chose a degree in environmental biology?

Page 48

1         MS. MCCLURE:  Objection to
2    form.
3         THE WITNESS:  It was my
4    strength.
5    BY MR. CLUFF:
6    Q.   If you move up in the
7    education category, I see that you have a
8    degree, a Master's of science from Regis
9    University?
10   A.   Correct.
11   Q.   When did you obtain that
12   degree?
13   A.   2007.
14   Q.   Between 1992 and 2007, I
15   would presume that you were employed,
16   correct?
17   A.   Correct.
18   Q.   All right.  And is there a
19   reason why you chose a Master's in
20   organizational leadership and
21   development?
22        MS. MCCLURE:  Objection to
23   form.
24        THE WITNESS:  No.

Page 49

1    BY MR. CLUFF:
2    Q.   Is there anything in your
3    work experience that prompted you to seek
4    out a Master's degree in that field?
5    A.   I was working for Regis at
6    the time and it was free.
7    Q.   In what capacity were you
8    working for Regis?
9    A.   As a recruiter and assistant
10   director of marketing, enrollment.
11   Q.   Where is the Regis
12   University campus located?
13   A.   Denver.
14   Q.   And is that, like, a
15   physical campus, or is it more of an
16   online campus?
17   A.   It's a physical and online.
18   Q.   Did you complete your degree
19   at the physical location or online, or a
20   combination of both?
21   A.   A combination, I believe.
22   Q.   And how long did it take you
23   to complete your degree there?
24        MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  form.

2  THE WITNESS: Three or four

3  years.

4  BY MR. CLUFF:

5  Q.  Were you a full-time or

6  part-time student?

7  A.  I was a part-time.

8  Q.  Did obtaining that Master's

9  Degree further your career with Regis at

10  all?

11  MS. MCCLURE: Objection to

12  form.

13  THE WITNESS: I don't think

14  so.

15  BY MR. CLUFF:

16  Q.  You didn't receive any

17  promotions or pay raises because of the

18  Master's?

19  A.  No.

20  Q.  Now, if you look at the

21  bottom of Page 2 and the top of Page 3,

22  it looks like your next educational

23  activity is the Master's from

24  Northeastern.

Page 51

1  But I can tell you, from

2  having looked at this online, that, for

3  some reason, the printout cut out your

4  time at Quantico with the FBI.

5  Do you remember that?

6  A.  I do.

7  Q.  On the copy you have, either

8  at the bottom of 2 or top of 3, why don't

9  you write in what you did, just the place

10  you were and the location at Quantico, so

11  we can have that on the record?

12  MS. MCCLURE: Where Quantico

13  is?

14  MR. CLUFF: No, not where

15  Quantico is, just that she

16  received some training at

17  Quantico.

18  MS. MCCLURE: So you want

19  her to write with pen on this

20  document and write the word

21  "Quantico"?

22  MR. CLUFF: Well, I want her

23  to describe what she did at

24  Quantico.

Page 52

1  MS. MCCLURE: On the

2  document or verbally?

3  MR. CLUFF: On the document.

4  You can tell me verbally,

5  but then I'd like you to make a

6  note about it on the document just

7  so we have an accurate exhibit.

8  Does that make sense?

9  MS. MCCLURE: So she can

10  write she was at Quantico, if

11  you'd like. But I'm not going to

12  have her sit here and write on the

13  document about her time at

14  Quantico.

15  You can ask her verbally

16  about that.

17  MR. CLUFF: I'm not asking

18  her to write me a dissertation

19  about where she was at and what

20  she did. I just wanted, similar

21  to how it says Northeastern,

22  Master's of science, you can write

23  Federal Bureau of Investigations,

24  Quantico, and if you received any

Page 53

1  certifications or training.

2  That's all I'm looking for, so

3  that this document accurately

4  reflects your training.

5  Does that make sense?

6  THE WITNESS: It makes

7  sense.

8  MS. MCCLURE: So, for the

9  record, the witness has written,

10  FBI, Quantico, VA, for Virginia,

11  dash, diversion investigator, top

12  secret clearance.

13  BY MR. CLUFF:

14  Q.  So at some point in time,

15  you went to Quantico, Virginia, correct?

16  A.  Yes.

17  Q.  And did you obtain any

18  training in Quantico?

19  A.  Yes.

20  Q.  And who did you obtain that

21  training from?

22  A.  Individual? I don't recall.

23  Q.  Did you receive training

24  from an organization?

Page 54

1    A.   From DEA.
2    Q.   But that was at the FBI
3 headquarters in Quantico?
4    A.   Correct.
5         MS. MCCLURE:  Objection to
6    form.
7 BY MR. CLUFF:
8    Q.   And what time period was
9 that?
10   A.   2004, for four months.
11   Q.   And did you receive any
12 certifications or degrees while you were
13 there?
14   A.   Just a diploma, I believe,
15 for graduating from the training.
16   Q.   And what was the training
17 that you received the diploma for?
18   A.   Diversion investigator.
19   Q.   And that was for your work
20 at the DEA?
21   A.   Correct.
22   Q.   Okay.  So in terms of the
23 timeline, the training you received at
24 Quantico preceded the Master's you

Page 55

1 received at Regis University; is that
2 right?
3    A.   No.  The Master's was
4 started, I believe, in 2001.  Quantico
5 was kind of in between.  And then I
6 completed the Master's around 2006/2007.
7    Q.   Thank you for explaining
8 that timeline.  That's very helpful.
9         And at some point, moving to
10 Page 2 now, at the bottom, there's the
11 degree from Northeastern.  And that's a
12 Master's of science, regulatory affairs;
13 is that correct?
14   A.   Yes, that's correct.
15   Q.   And when did you obtain that
16 degree?
17   A.   2012.
18   Q.   Is there any reason why you
19 obtained that degree?
20        MS. MCCLURE:  Objection to
21   form.
22        THE WITNESS:  I just wanted
23   to make myself more knowledgeable
24   about regulatory affairs.

Page 56

1 BY MR. CLUFF:
2    Q.   Why did you want to make
3 yourself more knowledgeable about
4 regulatory affairs?
5    A.   So that maybe I could obtain
6 a position in that area.
7    Q.   "In that area" would be the
8 area of regulatory affairs?
9    A.   Correct.
10   Q.   Was there a specific
11 position you had your eye on?
12        MS. MCCLURE:  Objection to
13   form.
14        THE WITNESS:  No.
15 BY MR. CLUFF:
16   Q.   Was there any specific
17 industry in which you were interested in
18 joining?
19        MS. MCCLURE:  Objection to
20   form.
21        THE WITNESS:
22   Pharmaceuticals.
23 BY MR. CLUFF:
24   Q.   Why were you interested in

Page 57

1 joining pharmaceuticals?
2    A.   Because I had previous
3 exposure with DEA.
4    Q.   In your experience, did the
5 Master's of science and regulatory
6 affairs assist you in entering the
7 pharmaceuticals industry?
8        MS. MCCLURE:  Objection to
9   form.
10        THE WITNESS:  I don't know.
11 BY MR. CLUFF:
12   Q.   In your work experience in
13 the pharmaceutical industry, did your
14 Master's degree make you more qualified
15 or less qualified than your peers?
16        MS. MCCLURE:  Objection to
17   form.
18        THE WITNESS:  I don't know
19   what their qualifications were.
20 BY MR. CLUFF:
21   Q.   I want to continue up this
22 page and flip over to the first page.
23        We talked, again, earlier,
24 there's a bold heading, Experience.  And

Page 58

1 if you start at the bottom of Page 1 and
2 continue down to Page 2, it looks like
3 that is a description of your work
4 experience.
5           Does that look accurate?
6           MS. MCCLURE:  Objection to
7      form.
8           THE WITNESS:  Yes.
9 BY MR. CLUFF:
10      Q.   Okay.  Let's start with the
11 position at the bottom of Page 2.  It's
12 identified on that page as, Diversion
13 investigator, Drug Enforcement
14 Administration.
15           Do you see that on the page?
16      A.   Yes.
17      Q.   It's very faint on the copy,
18 it looks like, but it appears that you
19 worked there from 2004 to 2006?
20      A.   Correct.
21      Q.   Do you believe that's an
22 accurate statement of your work history
23 with the DEA?
24      A.   Yes.

Page 59

1      Q.   Earlier, when we discussed
2 your degree from CU Boulder, you said you
3 believed you graduated in 1992; is that
4 right?
5      A.   Yes.
6      Q.   Do you recall what work
7 history or any positions you held from
8 '92 to 2004?
9      A.   Various clerical positions,
10 Regis University as an online recruiter
11 and assistant director, followed by DEA.
12      Q.   The clerical positions, were
13 those with Regis?
14      A.   No.
15      Q.   Those were with a different
16 company?
17      A.   Correct.
18      Q.   What company was that?
19           MS. MCCLURE:  Objection to
20      form.
21           THE WITNESS:  One was Up
22      With People, and then a firm in
23      Denver for meeting planning.
24 BY MR. CLUFF:

Page 60

1      Q.   The company you mentioned,
2 Up With People, do you recall the time
3 period where you were with them?
4      A.   I believe '96 to '98.
5      Q.   Okay.  And how about the
6 firm in Denver that did the meeting
7 planning?
8      A.   '98.
9      Q.   Do you recall what you were
10 doing for employment prior to '96?
11      A.   I don't recall.
12      Q.   After 1998, do you recall
13 what you were doing for employment?
14      A.   I went to Regis.
15      Q.   And is that when you were
16 the online recruiter and assistant
17 director?
18      A.   Correct.
19      Q.   And what year -- what years
20 did you hold that position at Regis?
21      A.   Which positions?  Just both
22 positions?
23      Q.   I'm sorry.  Is that two
24 different positions?

Page 61

1      A.   Two different positions.
2      Q.   Which one did you obtain
3 first?
4      A.   The recruiting position.
5      Q.   And how long were you in
6 recruiting?
7      A.   1999 to 2002, I think.
8      Q.   And then you also mentioned
9 an assistant director position.
10      A.   Yes.
11      Q.   When did you become the
12 assistant director?
13      A.   I believe 2002 to 2004.
14      Q.   And you left the assistant
15 director position to join the DEA?
16      A.   Correct.
17      Q.   Did you go through an
18 application process to join the DEA?
19      A.   Yes.
20      Q.   What was that application
21 process like?
22           MS. MCCLURE:  Objection to
23      form.
24           THE WITNESS:  Apply,

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 interview, background
2 investigation, going to Quantico.
3 BY MR. CLUFF:
4 Q. Do you remember who you
5 interviewed with?
6 A. I don't recall.
7 Q. Do you recall if you had
8 more than one interview, or multiple
9 interviews?
10 A. I believe I had one
11 interview.
12 Q. Where was the interview, if
13 you recall?
14 A. Denver.
15 Q. You said a background
16 investigation.
17 Do you have any recollection
18 of who conducted the background
19 investigation?
20 A. I do not.
21 Q. You also mentioned going to
22 Quantico.
23 Was that part of the
24 application process?

Page 63

1 A. That was part of the
2 training after acceptance.
3 Q. So you obtained the
4 position, and then you went to Quantico
5 to receive training; is that accurate?
6 A. Correct.
7 Q. Do you remember what field
8 office of the DEA you joined when you
9 became a diversion investigator?
10 A. Los Angeles.
11 Q. And where were you stationed
12 while you worked for the DEA?
13 A. Los Angeles.
14 Q. Is that a correct
15 terminology, "stationed," or is there a
16 better terminology?
17 A. That's fine.
18 Q. Do you recall who you
19 reported to in Los Angeles when you
20 worked for the DEA?
21 A. I do not.
22 Q. Aside from the training at
23 Quantico, did you receive any other
24 training to conduct your job

Page 64

1 responsibilities as a diversion
2 investigator?
3 MS. MCCLURE: Objection to
4 form.
5 THE WITNESS: Just what we
6 were learning out in the field.
7 BY MR. CLUFF:
8 Q. During the four months at
9 Quantico, what kind of training did you
10 receive?
11 A. Audit training, computer
12 training and CIC. We learned about the
13 supply chain, closed system of
14 diversion -- or closed system of supply
15 chain. And the different classes of
16 business.
17 Q. You mentioned audit
18 training?
19 A. Yes.
20 Q. So aside from those
21 trainings that you just mentioned, was
22 there any other training you received at
23 Quantico?
24 A. I don't recall.

Page 65

1 Q. Do you recall the names of
2 any of your instructors while you were at
3 Quantico?
4 A. I do not.
5 Q. So you mentioned audit
6 training.
7 What kind of audit training
8 did you get?
9 A. Going into a place of
10 business and looking at records and
11 inventories.
12 Q. And how did that relate to
13 auditing?
14 A. Just making sure that the
15 records lined up with pill counts.
16 Q. And why would you, as a DEA
17 investigator, be auditing records and
18 pill counts?
19 MS. MCCLURE: Objection to
20 form.
21 THE WITNESS: That's just
22 part of the position.
23 BY MR. CLUFF:
24 Q. Is there any regulation

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 that, as a DEA agent, you would have been
2 enforcing or working under that would
3 have required you to audit records and
4 pill counts?
5        MS. MCCLURE:  Objection to
6    form.
7        THE WITNESS:  Just making
8    sure they're in compliance with
9    the regulations.
10 BY MR. CLUFF:
11    Q.    Which regulations?
12    A.    Whatever is outlined in 21
13 C.F.R. Part 1300.
14    Q.    Is that the group of
15 regulations that you were enforcing as a
16 DEA agent?
17    A.    Correct.
18    Q.    Are those also the
19 regulations that the companies you would
20 have been auditing were governed by?
21    A.    Correct.
22    Q.    Based on your experience --
23 let me clarify.
24        Based on your experience as

Page 67

1 an investigator, would 21 C.F.R. 1300 be
2 the group of regulations that governed
3 the companies you were auditing?
4    A.    Correct.
5    Q.    You also -- did you -- when
6 you were being trained on auditing, did
7 you ever receive training about how to
8 audit shipping records?
9        MS. MCCLURE:  Objection to
10    form.
11        THE WITNESS:  I don't
12    recall.
13 BY MR. CLUFF:
14    Q.    Do you ever recall, as a DEA
15 investigator, looking at shipping
16 records?
17    A.    I do not.
18    Q.    Are you familiar with the
19 term "ARCOS"?
20    A.    Yes.
21    Q.    What is your understanding
22 of ARCOS?
23    A.    ARCOS is purchases, made by
24 registrants, of Schedule I and II and

Page 68

1 III.
2    Q.    And did you receive any
3 training about ARCOS when you were a DEA
4 investigator?
5    A.    I don't recall.
6    Q.    You mentioned computer
7 training while you were at Quantico.
8        What kind of training did
9 you receive there?
10    A.    That was NCIC, the National
11 Crime Database.
12    Q.    So the computer training was
13 about NCIC, right?
14    A.    Correct.
15    Q.    And what training did you
16 receive about NCIC?
17    A.    Researching targets.
18    Q.    What do you mean when you
19 say "targets"?
20    A.    Researching possible
21 criminal activity.
22    Q.    Who would the criminals be
23 that you were targeting?
24        MS. MCCLURE:  Objection to

Page 69

1    form.
2        THE WITNESS:  Various
3    backgrounds.
4 BY MR. CLUFF:
5    Q.    What kind of backgrounds?
6    A.    Marijuana, cocaine
7 traffickers; drug traffickers.
8    Q.    You talked about being
9 trained on the classes of businesses?
10    A.    Yes.
11    Q.    What kinds of classes of
12 businesses were you trained about?
13    A.    Importers, exporters,
14 chemical manufacturers, distributors,
15 pharmacies.
16    Q.    How about just, like,
17 manufacturers in general that don't
18 necessarily make chemicals?
19        Does that make sense?
20    A.    Yes.
21        Yes.
22    Q.    So you mentioned importers,
23 exporters, chemical manufacturers,
24 distributors and pharmacies.  And we also

Page 70

1 mentioned manufacturers, you and I.
2        Were doctors ever a part of
3 the classes of businesses you were
4 trained on?
5     A.   No.
6     Q.   I want to circle back to the
7 NCIC training.  You mentioned targets.
8        Were importers ever targets
9 that you were trained about?
10    A.   I don't recall.
11    Q.   Were exporters ever targets
12 that you were trained about?
13    A.   I don't recall.
14    Q.   How about chemical
15 manufacturers, were those targets you
16 were trained about?
17    A.   Possibly, yes.
18    Q.   What training did you
19 receive about chemical manufacturers as
20 targets?
21    A.   If they were compliant with
22 List 1 and List 2 regulations.
23    Q.   What are the List 1 and List
24 2 regulations for chemical manufacturers?

Page 71

1     A.   I don't remember.
2     Q.   Do you have a general
3 recollection of why you would be
4 targeting chemical manufacturers for
5 compliance with List 1 and List 2
6 regulations?
7        MS. MCCLURE:  Objection to
8     form.
9        THE WITNESS:  Maybe one
10    chemical was pseudoephedrine at
11    the time.
12 BY MR. CLUFF:
13    Q.   So why would you be
14 targeting chemical manufacturers
15 regarding, for example, pseudoephedrine?
16    A.   Because meth labs were main
17 targets at that time.
18    Q.   And so why would you be
19 targeting chemical manufacturers about
20 pseudoephedrine?
21    MS. MCCLURE:  Objection to
22    form.
23        THE WITNESS:  Because it's a
24    key ingredient used to make meth.

Page 72

1 BY MR. CLUFF:
2     Q.   So were you trying to ensure
3 that they complied with the regulations
4 governing the manufacture of Sudafed?
5        MS. MCCLURE:  Objection to
6     form.
7        THE WITNESS:  Correct.
8 BY MR. CLUFF:
9     Q.   How about wholesale
10 distributors, were those ever targets
11 that you received training about?
12    A.   Generally.
13    Q.   What was the general
14 training you received about wholesale
15 distributors?
16    A.   Just regulations that
17 pertained to them.
18    Q.   Why were you being trained
19 about the regulations pertaining to
20 wholesale distributors as targets?
21        MS. MCCLURE:  Objection to
22    form.
23        THE WITNESS:  They weren't
24    necessarily targets, but it was

Page 73

1     part of our auditing function.
2 BY MR. CLUFF:
3     Q.   What was the auditing
4 function related to wholesale
5 distributors?
6     A.   Records, pill counts, make
7 sure things line up.
8     Q.   What kind of records are you
9 talking about?
10    A.   Inventories.  Are the
11 Schedule IIs separated from Schedule III,
12 IV and Vs?  Security.
13    Q.   How about shipping records?
14        MS. MCCLURE:  Objection to
15    form.  Asked and answered.
16        THE WITNESS:  I don't
17    recall.
18 BY MR. CLUFF:
19    Q.   How about ARCOS data about
20 wholesale distributors, did you receive
21 training about that?
22        MS. MCCLURE:  Objection to
23    form.  Asked and answered.
24        THE WITNESS:  In the field.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 BY MR. CLUFF:
2     Q.   But not at Quantico?
3     A.   I don't recall, but I don't
4 think so.
5     Q.   Did you, when you were at
6 Quantico, receive training about
7 suspicious order reports from the
8 wholesale distributors?
9     A.   No.
10     Q.   Did you receive training
11 about suspicious order reports from
12 wholesale distributors while you were in
13 the field?
14     A.   No.
15     Q.   Was that not part of your
16 job responsibilities?
17         MS. MCCLURE:  Objection to
18     form.
19         THE WITNESS:  I mean, it's a
20     regulation, so it was part of it,
21     I guess.
22 BY MR. CLUFF:
23     Q.   You just personally don't
24 recall receiving training about it?

Page 75

1     A.   That's correct.
2     Q.   Do you recall what training
3 you received about manufacturers?
4     A.   I do not.
5     Q.   Do you have any general
6 recollection?
7         MS. MCCLURE:  Objection to
8     form.  Asked and answered.
9         THE WITNESS:  Probably
10     records and for audits, and that's
11     it.
12 BY MR. CLUFF:
13     Q.   Do you recall what kind of
14 training you received about the records
15 to audits for manufacturers?
16     A.   Similar, probably, to
17 distributors.
18     Q.   So that would be -- I
19 remember -- or if you -- strike all that.
20         You mentioned records for
21 pill counts, correct?  Would that have
22 applied to the manufacturers?
23     A.   No.
24     Q.   How about, like, inventory

Page 76

1 training, would that have applied to
2 manufacturers?
3     A.   Inventory.
4     Q.   Separation of C-II from
5 C-III, IV and V, would that apply to
6 manufacturers?
7     A.   I believe so, yes.
8     Q.   How about suspicious order
9 reports for manufacturers?
10     A.   No.
11     Q.   And did you receive training
12 on any of those subjects in the field,
13 aside from when you were at Quantico?
14         MS. MCCLURE:  Objection to
15     form.
16         THE WITNESS:  Not training,
17     per se, we just went out in the
18     field and conducted those audits.
19 BY MR. CLUFF:
20     Q.   You also mentioned training
21 about pharmacies.
22         What training did you
23 receive about pharmacies?
24     A.   Again, records.

Page 77

1     Q.   What training about records
2 did you receive?
3     A.   Prescriptions, where they
4 separated from the -- the IIs were
5 separated from the III, IV and Vs, by
6 inventory.
7     Q.   What about suspicious order
8 reports, did you receive training about
9 that in relation to pharmacies?
10     A.   No.
11     Q.   Looking at Exhibit-2 again,
12 at the top there, it says -- you write,
13 Lead -- I'm sorry, would you have written
14 this LinkedIn profile?
15     A.   Yes.
16     Q.   So you write, Lead
17 investigator on civil and criminal cases
18 involving pharmaceutical drugs.
19         Do you recall what civil
20 cases you worked on that involved
21 pharmaceutical drugs?
22     A.   I do not.
23     Q.   Do you recall what criminal
24 cases -- I'll caution you that I

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  understand that there is a law
2  enforcement privilege. So I'm going to
3  ask you some questions about this
4  "criminal cases" language, but I don't
5  want you to divulge anything that would
6  compromise an ongoing criminal
7  investigation.
8         Do you understand?
9      A.  I understand.
10     Q.  Do you recall any criminal
11 cases that you worked on involving
12 pharmaceutical drugs?
13     A.  Maybe a doctor.
14     Q.  Do you recall, generally,
15 what the matter under investigation was?
16     A.  That she was writing
17 fraudulent prescriptions or prescriptions
18 without a medical purpose.
19     Q.  Would that have been in Los
20 Angeles?
21     A.  Yes.
22     Q.  Are you familiar with the
23 term "pill mill"?
24     A.  Yes.

Page 79

1      Q.  Do you know if this doctor
2  was part of a pill mill?
3      A.  I don't think so, but I
4  don't recall.
5      Q.  Are you familiar with a
6  criminal investigation about a pill mill
7  in Los Angeles ever?
8      A.  No.
9      Q.  Going back to civil cases,
10 do you recall being a lead investigator
11 on any civil cases involving a
12 pharmaceutical manufacturer?
13     A.  No.
14     Q.  How about a wholesale
15 distributor?
16     A.  No.
17     Q.  Do you recall any criminal
18 cases about pharmaceutical manufacturers?
19         MS. MCCLURE:  Objection.
20     Asked and answered.
21         THE WITNESS:  A chemical
22     manufacturer.
23 BY MR. CLUFF:
24     Q.  What chemical manufacturer?

Page 80

1      A.  I don't recall.
2      Q.  What was the general subject
3  matter under investigation?
4      A.  Recordkeeping.
5      Q.  And what was the
6  recordkeeping violation?
7      A.  They didn't have certain
8  information on their records.
9      Q.  Can you describe what kind
10 of information they had -- were missing?
11     A.  I don't remember.
12     Q.  Do you recall if it was
13 about a specific drug?
14     A.  I don't remember that.
15     Q.  You continue here on
16 Exhibit-2 and say that you conducted
17 regulatory audits of importers,
18 exporters, distributors, and
19 manufacturers of controlled substances;
20 is that correct?
21     A.  That's correct.
22     Q.  We previously talked about
23 the training you received about
24 importers, exporters, distributors and

Page 81

1  manufacturers.
2         Would you have been using
3  that training when you conducted these
4  regulatory audits?
5      A.  Correct.
6      Q.  Focusing on distributors,
7  what kind of regulatory audits would you
8  have conducted about distributors?
9      A.  Just that they were in
10 compliance with the regulations.
11     Q.  What regulations?
12     A.  The 21 C.F.R. 1300, Part
13 1300.
14     Q.  Do you recall which specific
15 recollections you would have been
16 investigating under Part 1300?
17     A.  Recordkeeping, security.
18     Q.  Anything else?
19     A.  Pill counts.
20     Q.  How about suspicious order
21 monitoring?
22     A.  No.
23     Q.  So you did not audit, in
24 your time at the DEA, suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 monitoring?
2    A.   No.
3    Q.   Was there somebody in the
4 Los Angeles office that you worked with
5 who was responsible for auditing
6 suspicious order reporting?
7    A.   I don't recall.
8    Q.   Do you recall the identity
9 of any distributors that you audited
10 while you were with the DEA?
11    A.   Cardinal Health and
12 AmerisourceBergen.
13    Q.   Do you recall the time
14 period when you audited Cardinal Health?
15    A.   I don't recall.  Within
16 those two years.
17    Q.   Do you recall if it was the
18 beginning, middle or end, generally, of
19 your time with the DEA?
20    A.   I'd say middle.
21    Q.   How about AmerisourceBergen,
22 do you recall when you audited
23 AmerisourceBergen?
24    A.   I don't recall.

Page 83

1    Q.   If you had to give me an
2 estimate, would you estimate that it was
3 the beginning, middle or end of your time
4 with the DEA that you audited
5 AmerisourceBergen?
6    A.   I'd say middle.
7    Q.   Do you recall what you were
8 auditing when you audited Cardinal
9 Health?
10    A.   Recordkeeping, pill counts,
11 security.
12    Q.   Do you recall the outcome of
13 the audit against Cardinal Health?
14    A.   I do not.
15    Q.   Based on your two years of
16 work with the Drug Enforcement
17 Administration, do you have a general
18 recollection if the audit against
19 Cardinal Health was a good audit or a bad
20 audit?
21        MS. MCCLURE:  Objection.
22        MR. MCBRIDE:  Objection.
23        MS. MCCLURE:  Asked and
24 answered.  Assumes facts not in

Page 84

1 evidence.  Foundation.
2        MR. CLUFF:  Hold on a
3 second.
4        You guys can object, but
5 let's try to not talk over each
6 other.  If we're going to do
7 that -- I'll also note the
8 deposition protocol, if Shannon
9 objects, her objection is
10 preserved for everybody.
11        MR. MCBRIDE:  I understand.
12 I --
13        MR. CLUFF:  I'm not going to
14 argue with you about it.  Let's
15 just all try to -- let's make sure
16 we don't talk over each other.
17        I'm going ask my question
18 again, let's let our counsel
19 object, and then we'll get an
20 answer.
21 BY MR. CLUFF:
22    Q.   Based on your two years of
23 working at the DEA, do you recall if the
24 outcome of the audit against Cardinal

Page 85

1 Health was a good audit or bad audit?
2        MS. MCCLURE:  Same
3 objection.  Form.  Assumes facts.
4 Foundation.
5        THE WITNESS:  I don't
6 recall.
7 BY MR. CLUFF:
8    Q.   Do you recall the name of
9 any individuals you interacted with at
10 Cardinal Health during that audit?
11    A.   No.
12    Q.   How about AmerisourceBergen,
13 do you recall the subject matter of the
14 audit when you conducted the audit of
15 AmerisourceBergen?
16    A.   A regulatory audit.
17    Q.   And what was -- what was the
18 regulatory audit?
19    A.   Records, security, pill
20 counts.
21    Q.   I forgot to ask a question.
22        Going back to the Cardinal
23 Health audit, do you recall the
24 location -- I'll back up.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Did you audit a distribution
2 center?
3    A.   Yes.
4    Q.   Okay.  Do you recall the
5 location of that distribution center?
6    A.   No.
7    Q.   Do you recall if it was
8 somewhere in the general Los Angeles
9 area?
10    A.   Yes.
11    Q.   Okay.  So AmerisourceBergen,
12 just to re-clarify, do you recall what
13 the subject matter of that regulatory
14 audit was again?
15    A.   Just --
16    MS. MCCLURE:  Objection.
17    Asked and answered.
18    THE WITNESS:  Just
19    regulatory assignment.
20 BY MR. CLUFF:
21    Q.   Was this, like, a routine
22 part of your job as a drug enforcement or
23 diversion investigator?
24    MS. MCCLURE:  Objection to

Page 87

1    form.
2    THE WITNESS:  It was a part
3    of our audit plan for the year.
4 BY MR. CLUFF:
5    Q.   And do you recall the
6 outcome of the audit of
7 AmerisourceBergen?
8    A.   It was clear.
9    Q.   Clear how?
10    A.   There were no findings that
11 I recall.
12    Q.   You previously told me that
13 you don't recall the findings of the
14 Cardinal Health audit.
15    Is there a reason you recall
16 the Amerisource findings as opposed to
17 the Cardinal Health findings?
18    MS. MCCLURE:  Objection.
19    form.
20    THE WITNESS:  No.
21 BY MR. CLUFF:
22    Q.   Did you do anything to
23 refresh your recollection regarding the
24 findings of the AmerisourceBergen

Page 88

1 audit --
2    MS. MCCLURE:  Objection to
3    form.
4 BY MR. CLUFF:
5    Q.   -- before today's
6 deposition?
7    A.   No.
8    Q.   Do you recall the name of
9 any people you spoke with at
10 AmerisourceBergen during that audit?
11    A.   The compliance manager,
12 Peter Knipe.
13    Q.   Did that audit occur at an
14 AmerisourceBergen distribution center?
15    A.   Yes.
16    Q.   Was Peter Knipe the head of
17 that distribution center?
18    MS. MCCLURE:  Objection to
19    form.
20    THE WITNESS:  He's the
21    compliance manager.
22 BY MR. CLUFF:
23    Q.   What is a compliance
24 manager?

Page 89

1    A.   They make sure that the DC
2 is in compliance with the regulations.
3    Q.   Does he work at the DC?
4    A.   He does.
5    Q.   I want to just clarify.  You
6 used the term "DC."
7    Does that stand for
8 distribution center?
9    A.   Yes.
10    Q.   Okay.  Thank you.
11    Did you speak with anybody
12 else at AmerisourceBergen during that
13 audit?
14    MS. MCCLURE:  Objection to
15    form.
16    THE WITNESS:  Not that I
17    recall.
18 BY MR. CLUFF:
19    Q.   Were you provided any
20 records by AmerisourceBergen during that
21 audit?
22    A.   I don't recall.
23    Q.   Do you recall looking at
24 shipping records while you were

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 conducting the audit of
2 AmerisourceBergen?
3         MS. MCCLURE:  Objection.
4     Asked and answered.
5         THE WITNESS:  I don't
6     recall.
7 BY MR. CLUFF:
8     Q.   Do you recall looking at any
9 suspicious order reports when you
10 conducted the audit of AmerisourceBergen?
11     A.   No.
12     Q.   Do you recall looking at any
13 excessive purchase orders when you
14 conducted the audit of AmerisourceBergen?
15         MS. MCCLURE:  Objection to
16     form.
17         THE WITNESS:  I don't
18     recall.
19 BY MR. CLUFF:
20     Q.   Do you recall discussing
21 AmerisourceBergen's suspicious order
22 monitoring policies during that audit?
23     A.   I don't recall.
24     Q.   During your time as a Drug

Page 91

1 Enforcement Administration diversion
2 investigator, did you ever form an
3 understanding of the suspicious order
4 monitoring policies or procedures of any
5 wholesale distributors?
6         MS. MCCLURE:  Objection to
7     form.
8         THE WITNESS:  Clarify,
9     please.  What?
10 BY MR. CLUFF:
11     Q.   Sure.
12         During the two years that
13 you worked for the DEA as a drug
14 investigator, did you form an
15 understanding of the suspicious order
16 monitoring policies or procedures of any
17 wholesale distributor?
18         MS. MCCLURE:  Objection to
19     form.
20         THE WITNESS:  No.
21 BY MR. CLUFF:
22     Q.   Did you ever conduct any
23 audits, that you can recall, of McKesson?
24         MR. KELLY:  Objection to

Page 92

1     form.
2         THE WITNESS:  I don't
3     recall.
4 BY MR. CLUFF:
5     Q.   How about manufacturers of
6 controlled substances; do you recall
7 conducting audits of any manufacturers of
8 controlled substances?
9     A.   I don't recall.  Just the
10 chemical manufacturers.
11     Q.   You continue on Exhibit-2,
12 and say, And manufacturers of -- of
13 manufacturers and distributors of List 1
14 chemicals.
15         Is that the chemicals like
16 pseudoephedrine that you were talking
17 about earlier?
18     A.   Yes.
19     Q.   That's a different class of
20 chemicals from, say, opioids, correct?
21     A.   Correct.
22     Q.   All right.  Opioids are not
23 List 1 chemicals, right?
24     A.   Correct.

Page 93

1     Q.   In your experience as an
2 employee of the Drug Enforcement
3 Administration, was there a difference
4 between a listed chemical and
5 pharmaceutical drugs like opioids?
6         MS. MCCLURE:  Objection to
7     form.
8         THE WITNESS:  Yes.
9 BY MR. CLUFF:
10     Q.   Did regulations about List 1
11 chemicals apply to opioids?
12         MS. MCCLURE:  Objection to
13     form.
14         THE WITNESS:  No.
15 BY MR. CLUFF:
16     Q.   So they were different
17 regulations?
18     A.   I believe so.
19     Q.   Were they subject to
20 different standards?
21         MS. MCCLURE:  Objection to
22     form.
23         THE WITNESS:  Different
24 regulations, yes.

Page 94

BY MR. CLUFF:

Q. So regulations that may be applied to List 1 chemicals did not apply to pharmaceutical drugs like opioids, correct?

A. Correct.

Q. All right. Are you aware of the DEA ever issuing guidance to manufacturers or distributors about List 1 chemicals?

MS. MCCLURE: Objection to form.

THE WITNESS: Not while I was there.

BY MR. CLUFF:

Q. You continue in Exhibit-2, and you say that you also analyzed pharmaceutical records to detect regulatory and criminal law violations.

Do you see that?

A. I do.

Q. What would be an example of a regulatory violation that you analyzed from pharmaceutical records?

Page 95

A. If they didn't have certain items on the record. So, for example, a prescription might be missing the doctor and the DEA number.

Q. So you said "certain items on the record."

Is the record that you're referring to there the prescription?

A. Prescription, for example.

Q. So one example would be, to paraphrase your testimony, an incomplete prescription?

MS. MCCLURE: Objection to form.

THE WITNESS: Correct.

BY MR. CLUFF:

Q. Are there any other examples of regulatory violations that you analyzed from pharmaceutical records?

A. If they were stored properly.

Q. How about ARCOS data? That's a pharmaceutical record, correct?

MS. MCCLURE: Objection to

Page 96

form.

THE WITNESS: Yes.

BY MR. CLUFF:

Q. Did you ever analyze ARCOS data to identify regulatory violations?

MS. MCCLURE: Objection to form.

THE WITNESS: Vaguely remember, yes.

BY MR. CLUFF:

Q. What would that analysis have been?

A. Just looking at the Schedule Is, IIs, IIIs.

Q. What were you doing when you looked at the Schedule Is, IIs and IIIs?

A. Who the supplier was.

Q. When you say "supplier," do you mean manufacturers or distributors?

MS. MCCLURE: Objection to the form.

THE WITNESS: Manufacturer -- well, I don't remember. Distributors and

Page 97

manufacturers.

BY MR. CLUFF:

Q. How about pharmacies?

A. I don't recall.

Q. So you do recall analyzing ARCOS data related to manufacturers and distributors?

MS. MCCLURE: Objection to form. Misstates the witness's prior testimony.

THE WITNESS: I do.

BY MR. CLUFF:

Q. What do you recall looking at when you reviewed the ARCOS data?

A. Who was ordering, what they were ordering, quantities.

Q. Why were you looking at that information?

A. Just as part of the regulatory process that we went through.

Q. What do you mean by that?

MS. MCCLURE: Objection to form.

THE WITNESS: Being able to

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    pull those records and just look
2    at them and analyze the pattern.
3  BY MR. CLUFF:
4    Q.   Why were you analyzing
5  patterns from ARCOS data?
6    A.   Just to see if there were
7  any spikes.
8    Q.   Why were you looking at
9  spikes?
10    A.   Well, just to see if the
11  patterns were consistent; if there were
12  spikes, there were spikes.
13    Q.   Is there any particular
14  reason why you were looking at spikes?
15    MS. MCCLURE:  Objection to
16    form.
17    THE WITNESS:  Just as a note
18    to see if it deviated from a
19    regular pattern.
20  BY MR. CLUFF:
21    Q.   What does deviating from a
22  regular pattern indicate, based on your
23  experience as a DEA investigator?
24    MS. MCCLURE:  Objection to

Page 99

1    form.
2    THE WITNESS:  Just that they
3    might have had a
4    larger-than-normal shipment.
5  BY MR. CLUFF:
6    Q.   Did it ever indicate that
7  there was potential diversion happening?
8    MS. MCCLURE:  Objection to
9    form.
10    THE WITNESS:  No.
11  BY MR. CLUFF:
12    Q.   Never?
13    A.   Not that I recall.
14    Q.   So spikes in ordering
15  patterns, based on your experience at the
16  DEA, did not indicate potential
17  diversion?
18    MS. MCCLURE:  Objection to
19    form.
20    THE WITNESS:  It may have,
21    it may not have.
22  BY MR. CLUFF:
23    Q.   Okay.  So it may have
24  indicated potential diversion?

Page 100

1    MS. MCCLURE:  Objection to
2    form.  Asked and answered.
3    Misstates the witness's prior
4    testimony.
5    THE WITNESS:  We don't know
6    that just looking at that order.
7  BY MR. CLUFF:
8    Q.   ARCOS data is reported by
9  the companies who engage in those
10  transactions, correct?
11    A.   Yes.
12    Q.   So, for example, if
13  Amerisource sells an order to a pharmacy,
14  as an example, they report that
15  transaction through the ARCOS process?
16    MS. MCCLURE:  Objection to
17    form.
18    THE WITNESS:  I believe so.
19  BY MR. CLUFF:
20    Q.   So the data you were
21  analyzing came from the companies that
22  you were investigating or auditing?
23    MS. MCCLURE:  Objection to
24    form.

Page 101

1    THE WITNESS:  It came from
2    the ARCOS database.
3  BY MR. CLUFF:
4    Q.   And it was put into the
5  ARCOS database by, for example,
6  registrants, correct?
7    MS. MCCLURE:  Objection to
8    form.
9    THE WITNESS:  Correct.
10  BY MR. CLUFF:
11    Q.   So when you, as a DEA
12  investigator, were analyzing the ARCOS
13  data to identify spikes and changes in
14  the ordering pattern, you would agree
15  that the companies who supplied that data
16  could have done the same analysis,
17  correct?
18    MS. MCCLURE:  Objection to
19    form.
20    THE WITNESS:  I don't know
21    what their process was.
22  BY MR. CLUFF:
23    Q.   But the data that you were
24  analyzing came from the registrants,

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 correct?
2          MS. MCCLURE: Objection to
3    form. Asked and answered.
4          THE WITNESS: Correct.
5          MR. CLUFF: Zach, can you
6    put 2 back up, please?
7 BY MR. CLUFF:
8    Q.   Going back to the
9 pharmaceutical records that you
10 identified there in Exhibit-2.
11          Did you ever -- would you
12 consider to be -- sorry, strike that.
13          Are you familiar with the
14 term "suspicious order report"?
15    A.   As a diversion investigator?
16    Q.   Yes.
17    A.   No.
18    Q.   You said you're familiar --
19 let's jump down.
20          Do you see that first bullet
21 point there? It says, Developed thorough
22 knowledge of Code of Federal Regulations.
23    A.   Uh-huh.
24    Q.   Do you see that?

Page 103

1          Are you aware of a federal
2 regulation that requires registrants to
3 identify and report suspicious orders of
4 controlled substances?
5    A.   There is a regulation --
6          MS. MCCLURE: Objection to
7    form.
8          You may answer.
9 BY MR. CLUFF:
10    Q.   Let me ask you again.
11          MR. CLUFF: Shannon, you can
12    assert your objection so we have a
13    clear record.
14 BY MR. CLUFF:
15    Q.   Are you aware of a federal
16 regulation that requires registrants to
17 identify and report suspicious orders of
18 controlled substances?
19          MS. MCCLURE: Objection to
20    form.
21          THE WITNESS: I'm aware of a
22    regulation that states that
23    registrants need to put policies
24    and procedures in place to guard

Page 104

1 against suspicious order
2 monitoring.
3          MS. MCCLURE: Sterling, when
4    you reach a point in the next
5    minute or so, we'd like to take a
6    break.
7          MR. CLUFF: Sure. I have
8    just a few questions here.
9 BY MR. CLUFF:
10    Q.   I want to jump ahead.
11          You worked at
12 AmerisourceBergen as an investigator for
13 approximately five years, correct?
14    A.   Correct.
15    Q.   Did you gain any
16 familiarity, or additional familiarity,
17 during that time, with ARCOS data?
18          MS. MCCLURE: Objection to
19    form.
20          THE WITNESS: No.
21          MR. CLUFF: Let's take a
22    break.
23          VIDEO TECHNICIAN: Off the
24 record at 11:01 a.m.

Page 105

1          - - -
2          (Whereupon, a brief recess
3    was taken.)
4          - - -
5          VIDEO TECHNICIAN: We're
6    back on the record at 11:16 a.m.
7 BY MR. CLUFF:
8    Q.   Ms. Garcia, we're back on
9 the record. I just want to remind you
10 that you're still under oath.
11          We talked earlier about what
12 we referred to as a personality
13 difference between you and Eric Cherveny.
14          Do you recall that?
15    A.   Yes.
16    Q.   At the time Mr. Cherveny
17 became your supervisor, were you aware of
18 the reason why he became your supervisor?
19          MS. MCCLURE: Objection to
20    form.
21          THE WITNESS: No.
22 BY MR. CLUFF:
23    Q.   Who was your supervisor
24 before Mr. Cherveny?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.    Ed Hazewski.
2    Q.    Do you recall why Mr.
3  Hazewski was no longer your trainer?
4        MS. MCCLURE:  Objection to
5    form.
6        THE WITNESS:  No.  I believe
7    he might have gotten a different
8    position.
9  BY MR. CLUFF:
10    Q.    What's that recollection
11  based on?
12        MS. MCCLURE:  Objection to
13    form.
14        THE WITNESS:  Just that he
15    had moved on to another position.
16  BY MR. CLUFF:
17    Q.    Did you find that transition
18  to be disconcerting as an employee at
19  AmerisourceBergen?
20        MS. MCCLURE:  Objection to
21    form.
22        THE WITNESS:  No.  Moves
23    happen all the time.
24  BY MR. CLUFF:

Page 107

1    Q.    Do you recall filling out a
2  survey that was disseminated by David May
3  in 2015?
4    A.    I don't know what you're
5  talking about.
6    Q.    If I use the term
7  "engagement survey," does that refresh
8  your recollection?
9    A.    That's company-wide.
10    Q.    What was the engagement
11  survey, do you recall?
12    A.    To outline what we were
13  doing as a unit and what our opinions
14  were on that.
15    Q.    When you say "as a unit,"
16  what unit are you referring to?
17    A.    The diversion control team.
18    Q.    And so the engagement survey
19  was a tool to outline what the diversion
20  control team was doing and your opinions
21  on that course of action?
22        MS. MCCLURE:  Objection to
23    form.
24        THE WITNESS:  From what I

Page 108

1    can recall.
2  BY MR. CLUFF:
3    Q.    Okay.  Do you recall
4  creating a document that you discussed
5  with David May about the engagement
6  survey?
7    A.    No.
8    Q.    If I showed you a copy of a
9  document that appears to be talking
10  points, would that refresh your
11  recollection?
12        MS. MCCLURE:  Objection to
13    form.
14        THE WITNESS:  It might.
15        MR. CLUFF:  I'd like to mark
16    as Exhibit-3 a copy of an e-mail
17    and an attachment, both of which
18    are marked confidential and
19    subject to the protective order.
20    I've combined them into one
21    document to preserve the unity of
22    the family.  The Bates numbers are
23    ABDCMDL00296978, that's the
24    e-mail.  The attachment begins at

Page 109

1    ABDCMDL00296979, and ends with
2    981.
3        - - -
4    (Whereupon,
5    AmerisourceBergen-Garcia
6    Exhibit-3, ABDCMDL00296978-981,
7    was marked for identification.)
8        - - -
9  BY MR. CLUFF:
10    Q.    Go ahead and take a moment
11  and review that.
12        And we're going to talk
13  about this document a little bit later
14  today, but if you look on the last page,
15  there's a letter -- Number 2, CSRA
16  department.  So I'm going to ask you a
17  few questions about that.
18        So you can review the whole
19  thing if you want, but if want to start
20  there and let me know if you want to
21  proceed about that, then you let me know.
22    A.    I'd like to read this whole
23  document.
24    Q.    It's your prerogative.

Page 110

1    A.   Okay.
2    Q.   Why don't we start at the
3 first page of this document.  Since
4 you've had a chance to review the
5 entirety of the document, let's just talk
6 about it while we're here.
7         Do you see at the top
8 there's a "from" line, it says, Garcia,
9 Elizabeth?
10   A.   Yes.
11   Q.   So would you agree with me
12 that this is an e-mail that you would
13 have sent?
14   A.   Yes.
15   Q.   That it came from you?
16   A.   Yes.
17   Q.   We had a comment on the
18 break that some people down at the other
19 end of the table are having a hard time
20 hearing you and I, so they politely asked
21 me if we could both speak up.  You can
22 talk to them later, I'm just the
23 messenger.
24        If you go down, there's a

Page 111

1 line that says, To:  May, David.
2         Do you know who David May
3 is?
4    A.   David May?  Yes.
5    Q.   Who is he?
6    A.   He is the vice president of
7 diversion control and security, I
8 believe.
9    Q.   Did you report directly to
10 him in November of 2015?
11   A.   No.
12   Q.   Who reported to him, if you
13 know?
14   A.   Eric Cherveny and Sharon
15 Hartman, I believe.
16   Q.   Who are Eric Cherveny and
17 Sharon Hartman?
18   A.   Eric Cherveny is the
19 director of the diversion control team.
20 And Sharon Hartman is the pharmaceutical
21 compliance director.
22   Q.   Did you report to Eric
23 Cherveny in November of 2015?
24   A.   Yes, I believe.

Page 112

1    Q.   And prior to the time, just
2 for a clear understanding, that you
3 reported to Eric Cherveny, you reported
4 to Ed Hazewski; is that correct?
5    A.   Prior to, yes.
6    Q.   Do you see the subject, it
7 says, Dave, talking points_engagement
8 survey2.docx?
9    A.   Yes.
10   Q.   And if you look down on the
11 next line, it says, Attachments, Dave
12 talking points_engagement survey 2.docx?
13   A.   Yes.
14   Q.   Do you have an
15 understanding, looking at this e-mail and
16 having reviewed the attachment, whether
17 these are talking points that you would
18 have drafted to discuss with David May?
19        MS. MCCLURE:  Objection to
20        form.
21        THE WITNESS:  He asked the
22        team, during a team call, I
23        believe, for talking points.
24 BY MR. CLUFF:

Page 113

1    Q.   So David May asked the team
2 for talking points during a call; is that
3 correct?
4    A.   Correct.
5    Q.   And what is the team you're
6 describing?
7    A.   The diversion control team.
8    Q.   And you're a member of the
9 diversion control team?
10   A.   I was.
11        MS. MCCLURE:  Objection to
12        form.
13 BY MR. CLUFF:
14   Q.   Okay.  In the subject and
15 the attachments, there's a reference to
16 engagement survey 2.
17        Do you recall what the
18 engagement survey was?
19   A.   I believe it was a
20 company-wide survey to kind of see what
21 people's thoughts were.
22   Q.   And when you say
23 "company-wide," do you mean all of
24 AmerisourceBergen?

Page 114

1 MS. MCCLURE: Objection to
2 form.
3 THE WITNESS: From what I
4 recall.
5 BY MR. CLUFF:
6 Q. And then the numeral 2, or
7 the number 2 at the end of the subject
8 and the attachment, do you have a
9 recollection of what that Number 2 stands
10 for?
11 A. I do not.
12 Q. Is it possible this was a
13 second version of this document?
14 MS. MCCLURE: Objection to
15 form. Asked and answered.
16 THE WITNESS: It's possible.
17 BY MR. CLUFF:
18 Q. Where would you have saved a
19 document like this when you were creating
20 it?
21 MS. MCCLURE: Objection to
22 form. Assumes facts not in
23 evidence.
24 THE WITNESS: Probably on my

Page 115

1 hard drive.
2 BY MR. CLUFF:
3 Q. Please turn the page.
4 Do you see at the top there
5 it says, Dave-engagement survey.
6 And that line is underlined?
7 A. Yes.
8 Q. So -- and then underneath
9 that, can you see there's very faint
10 text? There's two little subparagraphs,
11 and then there's a number after each one.
12 Can you see that?
13 A. Barely, yes.
14 Q. Yeah. It's kind of easier
15 to see on the screen, or maybe on the
16 paper in front of you, whichever one is
17 better.
18 MR. CLUFF: Maybe if you
19 shrink it down a little, Zach, so
20 it's not quite as pixilated.
21 Didn't get much better, I'm
22 sorry.
23 BY MR. CLUFF:
24 Q. If you can read these, it

Page 116

1 looks like the first one says, I feel
2 supported during organizational change at
3 AmerisourceBergen (change management).
4 And it looks like it's
5 either a 59 percent or 69 percent.
6 Can you make that out?
7 A. I can barely make that out.
8 Q. Do you have an
9 understanding, based on looking at this,
10 whether that would have been 59 percent
11 or 69 percent?
12 A. I can't say for sure. It's
13 very blurry.
14 Q. The next line down, maybe
15 you can tell me if I'm getting this
16 correctly. It says, At
17 AmerisourceBergen, there is open and
18 honest communication (communication).
19 And next to that, it looks
20 like there's a 58 or possibly a 56
21 percent.
22 A. I see that.
23 Q. Do you have a recollection
24 if these were the two questions that were

Page 117

1 on the engagement survey sent out by
2 David May in 2015?
3 A. I believe so.
4 Q. These numbers at the end, I
5 understand that they are hard to read,
6 but would those have been grades or
7 rankings that you gave for
8 AmerisourceBergen on these two questions?
9 MS. MCCLURE: Objection to
10 form.
11 THE WITNESS: I don't
12 believe that that was our ranking.
13 I think that was company-wide.
14 BY MR. CLUFF:
15 Q. So this would reflect a
16 company-wide ranking of how well
17 AmerisourceBergen was doing on these two
18 subjects?
19 MS. MCCLURE: Objection to
20 form.
21 THE WITNESS: I believe so.
22 BY MR. CLUFF:
23 Q. Stepping back a second.
24 You have a Bachelor's degree

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 and two Master's degrees, right?
2     A.   Correct.
3     Q.   So you're familiar with,
4 like, a grading system?
5         MS. MCCLURE:  Objection to
6     form.
7         THE WITNESS:  Correct.
8 BY MR. CLUFF:
9     Q.   All right.  59 and 58
10 percent, those are pretty low grades,
11 correct?
12        MS. MCCLURE:  Objection to
13    form.
14        THE WITNESS:  I don't know.
15        MS. MCCLURE:  Assumes facts
16    not in evidence.  Foundation.
17 BY MR. CLUFF:
18    Q.   Sorry.  We got talked over
19 there.  Your answer got talked over with
20 an objection.
21        You're familiar with a
22 grading scale, right, A, B, C, D?
23        MS. MCCLURE:  Objection to
24    form.

Page 119

1         THE WITNESS:  Yes.
2 BY MR. CLUFF:
3     Q.   If you got a 59 percent or a
4 58 percent on a test, would you consider
5 that to be a low grade?
6         MS. MCCLURE:  Objection to
7     form.  Misstates -- sorry.
8     Objection to form.  Foundation.
9     Assumes facts not in evidence.
10    Speculation.
11        THE WITNESS:  I can't say
12    for sure.
13 BY MR. CLUFF:
14    Q.   Okay.  But these numbers
15 reflect, based on your recollection of
16 participating in the engagement survey, a
17 company-wide assessment of
18 AmerisourceBergen's performance on these
19 two subjects, correct?
20        MS. MCCLURE:  Objection to
21    form.  Misstates prior testimony.
22    Foundation.  Facts not in
23    evidence.
24        THE WITNESS:  Restate the

Page 120

1 question, please.
2         MR. CLUFF:  Shannon, I'm
3 cool with you objecting, but your
4 objections are getting a little
5 voluminous.  And you made the same
6 objection, very voluminously,
7 twice.
8         The rules are pretty
9 straightforward.  You can just say
10 same objection.
11        MS. MCCLURE:  Sure.  Happy
12 to.
13 BY MR. CLUFF:
14    Q.   Going back, I asked you
15 about these numbers that are next to the
16 two questions.
17        Do you recall that?
18    A.   Yes.
19    Q.   And I asked you if they were
20 your grade of AmerisourceBergen's
21 performance on these two questions.
22        Do you recall that?
23    A.   Yes.
24    Q.   And do you recall telling me

Page 121

1 that you believed this was a company-wide
2 ranking?
3     A.   Yes.
4     Q.   Okay.  So these numbers
5 would reflect a company-wide ranking of
6 associates' view on AmerisourceBergen's
7 performance in relation to these two
8 questions; is that correct?
9         MS. MCCLURE:  Same litany of
10 objections from the last prior
11 question I objected to.
12        THE WITNESS:  I believe so,
13 yes.
14 BY MR. CLUFF:
15    Q.   So looking at the next
16 couple of pages, it looks like you have
17 created an outline of issues to discuss
18 with David May.
19        Is that -- would you agree
20 with that statement?
21    A.   He asked for our feedback on
22 these.
23    Q.   And in response to that
24 request, you created this document?

Page 122

1    A.   Yes.
2    Q.   And this was in 2015, so you
3  had been working for AmerisourceBergen,
4  at that point, roughly three years?
5    A.   Yes.
6    Q.   In 2015, did you feel like
7  you had developed a good working
8  knowledge of AmerisourceBergen's policies
9  and procedures?
10       MS. MCCLURE:  Objection.
11  Form.
12       THE WITNESS:  Some; some
13  not.
14  BY MR. CLUFF:
15    Q.   Did you feel like you had
16  developed a thorough understanding of the
17  corporate culture at AmerisourceBergen?
18       MS. MCCLURE:  Objection to
19  form.
20       THE WITNESS:  It's a huge
21  corporation, so no.
22  BY MR. CLUFF:
23    Q.   How about within the
24  diversion control team, did you feel like

Page 123

1  you had developed a good understanding of
2  the working culture within the diversion
3  control team?
4        MS. MCCLURE:  Objection.
5  Form.
6        THE WITNESS:  Generally
7  speaking, yes.
8  BY MR. CLUFF:
9    Q.   So on this -- the first page
10  of the memo, but it's the second page of
11  the document I handed you, there is a
12  heading that's underlined that says,
13  Communication.
14       Do you see that?
15    A.   I see that.
16    Q.   I want to look at 1A.  It
17  says, underneath, Communication with our
18  team.
19       Do you see that?
20    A.   I see that.
21    Q.   It says, Decisions seem to
22  be made without gathering feedback from
23  those who are impacted directly on a
24  day-to-day basis.

Page 124

1        Is that something you recall
2  about your working conditions on the
3  diversion control team?
4    A.   Yes.
5    Q.   Stepping down to 1D.
6        Do you see that, it says,
7  Communication to team regarding
8  completion of projects?
9    A.   Yes.
10    Q.   Under D, there's a small
11  Roman Numeral i, that says, Policy
12  documents, with a colon.
13       Do you see that?
14    A.   I see that.
15    Q.   There it says, Although
16  asked to provide input, there has been no
17  communication whether policy documents
18  were made final or not.
19       Do you see that?
20       MS. MCCLURE:  Those policy
21  documents.
22       MR. CLUFF:  Shannon, you can
23  make an objection.  But you don't
24  get to testify.

Page 125

1        MS. MCCLURE:  You don't get
2  to misstate a document.
3        MR. CLUFF:  Would you like
4  me to reread it?
5        MS. MCCLURE:  Sure.
6        MR. CLUFF:  You can make
7  that objection, you don't get to
8  testify on the deposition.
9        MS. MCCLURE:  Reread.
10  BY MR. CLUFF:
11    Q.   Should we read it again,
12  Liz?
13    A.   Yes.
14    Q.   Great.  It says, Policy
15  document, colon.
16       Do you see that?
17    A.   Yes.
18    Q.   Although asked to provide
19  input, there has been no communication
20  whether those policy documents were made
21  final or not.
22       Is it your recollection,
23  from working at AmerisourceBergen, that
24  often people were unclear about whether

Page 126

1 documents were made final or not?
2         MS. MCCLURE:  Objection.
3 Form.
4         THE WITNESS:  No.  I'm not
5 sure what policy documents I'm
6 referencing.
7 BY MR. CLUFF:
8     Q.   But here you do reference
9 policy documents, and there was a lack of
10 clarity about whether those policy
11 documents were final.
12         Would you agree?
13         MS. MCCLURE:  Form.
14         THE WITNESS:  I'm not sure.
15 BY MR. CLUFF:
16     Q.   You continue in that
17 paragraph, and you say, After researching
18 the ABC website-I was unable to locate
19 them and I'm not sure they were on there
20 to begin with.
21         So you were searching for
22 policy documents on ABC's website and you
23 were unable to find them, correct?
24     A.   We switched systems at that

Page 127

1 point, I believe.  And they may have been
2 on there and I just couldn't locate them.
3     Q.   Right.  So you were unable
4 to locate the policy documents you were
5 searching for, correct?
6     A.   Correct.
7     Q.   All right.  Stepping down to
8 E, it says, Provide positive feedback to
9 all team members.
10         And Roman Numeral I, you
11 say, Identify the strengths of each team
12 member and what he/she can contribute to
13 the team, while not displaying open
14 favoritism.
15         Did I read that correctly?
16     A.   You did.
17     Q.   Do you recall instances of
18 favoritism in the diversion control team?
19     A.   Well, as previously noted,
20 Eric and I had personality differences,
21 so he may have favored one person over
22 another.
23     Q.   Do you recall who he, in
24 your opinion, favored over another?

Page 128

1     A.   No.
2         MS. MCCLURE:  Objection.
3 Form.
4 BY MR. CLUFF:
5     Q.   But based on your experience
6 working with him, did you develop an
7 opinion that you were not his favorite?
8     A.   Our interactions were
9 limited.
10     Q.   Looking at Roman Numeral II
11 there, it's ii, it says, Communicating
12 effectively and providing encouragement
13 and support with approachable demeanor.
14 For example, if someone has a different
15 perspective regarding a decision and
16 provides a rationale for their
17 perspective, perhaps listening to the
18 rationale would go a long way to
19 encouraging that person to speak up in
20 future discussions, providing added value
21 to team efforts.
22         Do you recall expressing
23 different perspectives during
24 conversations with your diversion control

Page 129

1 teammates?
2     A.   Yes.
3     Q.   And those different
4 perspectives were about decisions?
5     A.   Or general feedback on
6 projects.
7     Q.   What kind of decisions do
8 you recall giving perspectives about?
9     A.   I don't recall.
10     Q.   What about general feedback
11 on projects do you receive -- do you
12 recall receiving?
13     A.   I believe I reference one of
14 those here.  A training document.
15     Q.   Can you tell me where you're
16 looking?
17     A.   I'm looking at 296981.
18     Q.   Okay.  So just for the
19 record, that's the last page of the
20 document.
21     A.   Yes.
22     Q.   Ending Bates number 296981.
23         And can you tell me what
24 section you're looking at, please, Liz?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   I'm looking at --
2    Q.   Is it small Roman Numeral i
3 at the top?
4    A.   Yes.
5    Q.   And what about that stands
6 out to you?
7         MS. MCCLURE:  Objection to
8    form.
9         THE WITNESS:  Eric and I saw
10    that differently, that project.
11 BY MR. CLUFF:
12    Q.   Let's read that.
13         It says, Example:  Training
14 of the DC personnel on the old and new
15 OMP program was challenging in terms of
16 how to accomplish the task.
17         What do you recall about the
18 challenges?
19    A.   How to approach it.
20    Q.   What was the difference in
21 how you were approaching the task?
22    A.   Verbal language, how to
23 present it verbally and visually.
24    Q.   Okay.  You continue there

Page 131

1 and say, Decision trees were discussed,
2 with the current version initially
3 rejected because it did not fit the
4 vision of management.
5         Did you draft the initial
6 version, or the current version?
7    A.   Myself and another
8 investigator did, yes.
9    Q.   Would that investigator have
10 been Nikki Seckinger?
11    A.   No.
12    Q.   Who would it have been?
13    A.   Lino Guerreiro.
14    Q.   Is his full name Marcelino
15 Guerreiro?
16    A.   Yes.
17    Q.   And people refer to him as
18 Lino?
19    A.   Yes.
20    Q.   Just to be clear, if we use
21 his name again.
22    A.   Okay.
23    Q.   You recall management
24 rejecting your initial version?

Page 132

1    A.   Yes.
2    Q.   You proceed and say, After
3 outlining the benefits of the current
4 decision tree versus the tree envisioned
5 by management, in this case, management
6 insisted on their decision tree because
7 of senior position within the company.
8         Do you recall if Eric
9 Cherveny insisted on his version just
10 because he was senior to you in the
11 company?
12         MS. MCCLURE:  Objection to
13    form.
14         THE WITNESS:  I vaguely
15    recall.
16 BY MR. CLUFF:
17    Q.   Do you recall any
18 merit-based reasons why he decided his
19 decision tree was better than yours?
20         MS. MCCLURE:  Objection to
21    form.
22         THE WITNESS:  No.
23 BY MR. CLUFF:
24    Q.   Looking at the last

Page 133

1 sentence, you say, Exchanges such as
2 these promote mistrust and are
3 counterproductive, at the expense of the
4 betterment of business processes
5 company-wide.
6         Do you see that?
7    A.   I see that.
8    Q.   So you mistrusted your
9 managers, is that what you're trying to
10 communicate here?
11         MS. MCCLURE:  Objection to
12    form.
13         THE WITNESS:  Not mistrust,
14    just a breakdown in communication.
15 BY MR. CLUFF:
16    Q.   But you would agree with me
17 you used the word "promote mistrust,"
18 correct?
19    A.   The words are there, yes.
20    Q.   All right.  What were the
21 decision trees for in this presentation
22 that you're discussing in this portion of
23 the document?
24    A.   For DC, distribution center,

Page 134

1 personnel training.
2  Q.  And what were the
3 training -- what was the purpose of the
4 training?
5  A.  The training was on
6 suspicious orders.
7  Q.  And what was the decision
8 tree designed to help the DC personnel
9 understand about suspicious orders?
10  MS. MCCLURE:  Objection.
11  Form.
12  THE WITNESS:  It was to
13  describe to them an order of
14  interest that would hit the
15  algorithm in the OMP program.
16 BY MR. CLUFF:
17  Q.  Was that a new OMP program?
18  A.  It was going to be, yes.
19  Q.  And the algorithm was a new
20 process at AmerisourceBergen, correct?
21  MS. MCCLURE:  Objection.
22  Form.
23  THE WITNESS:  Correct.
24 BY MR. CLUFF:

Page 135

1  Q.  Do you know whether
2 AmerisourceBergen used an algorithm, or
3 some other method of identifying
4 suspicious orders prior to 2015?
5  A.  They used an algorithm, as
6 far as I know.
7  Q.  You're not aware that they
8 used a threshold?
9  MS. MCCLURE:  Objection to
10  form.
11  THE WITNESS:  That's part of
12  the algorithm, I think.
13 BY MR. CLUFF:
14  Q.  Underneath that paragraph
15 that you read, small Roman Numeral i,
16 there's Roman Numeral IIi, it says,
17 Solution.
18  So this is a paragraph where
19 you're proposing a solution for the
20 problem of mistrusting managers; is that
21 correct?
22  MS. MCCLURE:  Objection to
23  form.
24  THE WITNESS:  A solution for

Page 136

1  better communication.
2 BY MR. CLUFF:
3  Q.  Okay.  Was the solution to
4 help avoid mistrust?
5  MS. MCCLURE:  Objection to
6  form.
7  THE WITNESS:  Just to have
8  open communication lines.
9 BY MR. CLUFF:
10  Q.  So the solution you propose
11 is, Acknowledgment must be made -- and
12 those three words are underlined -- that
13 the way ideas are communicated can be
14 more engaging without being
15 argumentative.
16  Did you feel that your
17 manager, Eric Cherveny, was argumentative
18 with you?
19  MS. MCCLURE:  Objection to
20  form.
21  THE WITNESS:  At times.
22 BY MR. CLUFF:
23  Q.  Do you recall times where he
24 was argumentative with you?

Page 137

1  A.  Not specifics, no.
2  Q.  Was he ever argumentative
3 with you about decisions related to your
4 job responsibilities?
5  A.  Not that I recall.
6  Q.  You continue in this
7 paragraph, and you say, In addition to
8 this, however, delegation of certain
9 tasks without micromanagement is a more
10 effective way to help forge more
11 confidence within the group.
12  Do you recall Eric Cherveny
13 micromanaging you?
14  MS. MCCLURE:  Objection to
15  form.
16  THE WITNESS:  At times, but
17  not overall he wasn't a
18  micromanager.
19 BY MR. CLUFF:
20  Q.  Is there another manager or
21 employee at AmerisourceBergen who was a
22 micromanager?
23  MS. MCCLURE:  Objection to
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  THE WITNESS:  Not that I
2  worked for.
3  BY MR. CLUFF:
4  Q.  Here you note that, Engaging
5  in this kind of behavior without
6  micromanagement will help forge more
7  confidence.
8  Would you agree that there
9  was a lack of confidence in management at
10  AmerisourceBergen?
11  MS. MCCLURE:  Objection to
12  form.
13  THE WITNESS:  I don't know.
14  You would have to ask them.
15  BY MR. CLUFF:
16  Q.  I'm asking you, because you
17  wrote, "help forge more confidence."
18  So without being
19  argumentative, I just want to clarify my
20  question.
21  Based on your working
22  experience with management at
23  AmerisourceBergen and as an employee
24  reporting to them, did you feel a lack of

Page 139

1  confidence in their leadership abilities?
2  MS. MCCLURE:  Objection to
3  form.
4  THE WITNESS:  Generally, no.
5  BY MR. CLUFF:
6  Q.  Okay.  Please look at Number
7  2 there, it says, CSRA department, on
8  that same page.
9  Do you see that?  And there
10  is a Subparagraph A that says, Whenever
11  changes are made organizationally, there
12  is an announcement made after the fact,
13  seemingly without much understanding as
14  to impact on associates.
15  Do you see that?
16  A.  I see that.
17  Q.  Can you remember any
18  examples where after-the-fact decisions
19  were made that impacted the associates?
20  A.  I don't recall.
21  Q.  If you look down in the next
22  lower case Roman Numeral i, it says,
23  Example.
24  Do you see that?

Page 140

1  A.  Yes.
2  Q.  So would this be an example
3  of something that was announced after the
4  fact that impacted associates?
5  MS. MCCLURE:  Objection to
6  form.
7  THE WITNESS:  Yes.
8  BY MR. CLUFF:
9  Q.  So you say, When the
10  director of diversion control decided to
11  move in another direction, all of a
12  sudden, a new person took his place
13  without warning to the associates who
14  would be under the new director.
15  So is the director of
16  diversion control that moved in another
17  direction, was that Ed Hazewski?
18  A.  Ed moved in another
19  direction, yes.
20  Q.  So this is an example of
21  something that was announced after the
22  fact that impacted associates, correct?
23  A.  Yes.
24  Q.  And the new director would

Page 141

1  have been Eric Cherveny; is that right?
2  A.  Yes.
3  Q.  So you continue in that
4  paragraph and say, Sudden shifts like
5  this create apprehension and potentially
6  a negative view of upper management and
7  how inside decisions are made.
8  Do you see that?
9  A.  I see that.
10  Q.  I want to look -- let's just
11  read the last two sentences.  I don't
12  want to leave anything out.
13  It says, Perhaps in this
14  case it was unavoidable, as job changes
15  are not made public while in the process.
16  Do you see that?
17  A.  I see that.
18  Q.  The next sentence you say,
19  However, it generated surprise and
20  resentment among some who would have
21  liked a chance to apply for the position.
22  Looking at this paragraph,
23  was it your understanding, working in the
24  diversion control team, that changes in

Highly Confidential - Subject To Further Confidentiality Review

Page 142

1 upper management created a negative view
2 of upper management?
3        MS. MCCLURE:  Objection to
4    form.
5        THE WITNESS:  That comment
6    was said at the DC level to me.
7    And I repeated it here.
8 BY MR. CLUFF:
9    Q.    So "at the DC level," that
10 means at the distribution center level?
11    A.    Yes.
12    Q.    And so employees at the DC
13 level had, based on what they reported to
14 you, a potentially negative view of upper
15 management; is that correct?
16        MS. MCCLURE:  Objection to
17    form.
18        THE WITNESS:  Potentially,
19    yes.
20 BY MR. CLUFF:
21    Q.    Okay.  And looking at the
22 last sentence, you say, It generated
23 surprise and resentment.
24        Do you recall examples of

Page 143

1 people feeling resentful about the sudden
2 change that was announced after the fact?
3    A.    No.
4    Q.    You also mention people who
5 would have liked to apply for the
6 position.
7        Do you know who wanted to
8 apply for that position?
9    A.    I do not.
10    Q.    Did you want to apply for
11 the position?
12    A.    No.
13    Q.    How did you feel about Eric
14 Cherveny becoming your new supervisor?
15    A.    Indifferent.
16    Q.    Before Eric Cherveny became
17 your supervisor, you worked for Ed
18 Hazewski for approximately three years,
19 correct?
20    A.    Correct.
21    Q.    Were you aware that Mr.
22 Hazewski had a law enforcement
23 background?
24    A.    Yes.

Page 144

1    Q.    As a former DEA
2 investigator, did you respect him for his
3 law enforcement background?
4    A.    Yes.
5    Q.    Were you aware if Mr.
6 Hazewski had any, you know, college or
7 postgraduate degrees?
8    A.    I'm not aware of that.
9    Q.    When Mr. Cherveny became
10 your supervisor, and through the two
11 years that you worked for him, did you
12 ever understand whether he had any law
13 enforcement background?
14    A.    I don't recall.
15    Q.    Do you know if he had any
16 law enforcement background?
17    A.    I don't recall.
18    Q.    Do you know if Mr. Cherveny
19 ever completed a college education?
20    A.    I don't know.
21    Q.    Would it concern you if you
22 learned that Mr. Cherveny had no college
23 education?
24        MS. MCCLURE:  Objection.

Page 145

1    Form.
2        THE WITNESS:  No.
3 BY MR. CLUFF:
4    Q.    Please turn to the second
5 page of this memo.  It's the third page
6 of the document.
7    A.    The second page?
8    Q.    Yes.  So it's one, two,
9 three from the beginning.
10        At the top, you'll see a
11 small Roman Numeral iii.
12    A.    Okay.
13    Q.    It says, Promoting the
14 continued advancement.
15    A.    Yes.
16    Q.    So there you write,
17 Promoting the continued advancement,
18 growth and development of the team
19 members through coaching, delegation and
20 other active management efforts, i.e.,
21 continuous constructive communication.
22        Do you see that?
23    A.    I see that.
24    Q.    Did you ever move up in the

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  company?
2      A.   No.
3      Q.   Did you feel like you
4  advanced, grew or developed as a member
5  of the team?
6          MS. MCCLURE:  Objection to
7  form.
8          Go ahead.
9          THE WITNESS:  I feel like I
10 grew.
11 BY MR. CLUFF:
12     Q.   But you just didn't advance?
13     A.   No.
14     Q.   In the five years you worked
15 at AmerisourceBergen, did you ever form
16 any opinions about why you didn't advance
17 at the company?
18     A.   No.
19     Q.   Did you see anybody else
20 advance at the company?
21     A.   The company, in general,
22 there are shifts all the time.
23     Q.   Let me clarify.  Shifts, I
24 think, is a little bit different.  I'm

Page 147

1  talking about advancement, like moving up
2  in responsibility.
3          Did you see anybody move up
4  in responsibility while you were there
5  for five years at AmerisourceBergen?
6      A.   Yes.
7      Q.   Who was that?
8      A.   Anthony Terrachi went from
9  Bruce Gundi's group, as an investigator,
10 to a director.
11     Q.   Do you have any
12 understanding of why he was promoted to a
13 director?
14     A.   No.
15     Q.   Did you apply for the
16 position of director, or were you
17 attempting to become a director, from a
18 diversion investigator?
19     A.   No.
20         MS. MCCLURE:  Objection.
21 BY MR. CLUFF:
22     Q.   Why not?
23     A.   Wait.  Restate the question.
24     Q.   Sure.

Page 148

1          Did you -- I asked two
2  questions at once, so I'll break them up.
3          Did you ever apply for the
4  position of director at
5  AmerisourceBergen?
6      A.   No.
7      Q.   Were you seeking to become a
8  director in AmerisourceBergen?
9      A.   No.
10     Q.   Why not?
11     A.   I didn't want to.
12     Q.   Looking at this document
13 again, it's letter F, it says, General
14 communication.
15         Do you see it says, General
16 communication, building common team
17 effort towards common mission.
18         And then in Subparagraph I
19 it says, Raids by the DEA-the team does
20 not hear about these unless asked to
21 gather records for subpoenas.
22         Do you recall instances of
23 raids by the DEA while you worked at
24 AmerisourceBergen?

Page 149

1          MS. MCCLURE:  Objection.
2  Form.
3          THE WITNESS:  Raids from the
4  media.
5  BY MR. CLUFF:
6      Q.   Okay.  What were those?
7      A.   Pharmacy raids.
8      Q.   What did you know about
9  pharmacy raids while you were working
10 with AmerisourceBergen?
11         MS. MCCLURE:  Objection to
12 form.
13         THE WITNESS:  After the
14 fact, that they happened.
15 BY MR. CLUFF:
16     Q.   Would you have been asked to
17 gather records for subpoenas in relation
18 to pharmacy raids?
19     A.   If they were an ABC
20 customer.
21     Q.   Would you also have been
22 asked to gather records for subpoenas if
23 DEA -- I mean, DEA agents raided
24 AmerisourceBergen facilities?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1       MS. MCCLURE: Objection to
2 form.
3       THE WITNESS: I don't know.
4 BY MR. CLUFF:
5     Q. You continue in that
6 paragraph and say, It would be helpful --
7 it would be useful for the team to be in
8 the loop regarding accounts that have
9 been closed or raided by the DEA or other
10 agencies, as it could help the team
11 identify other customers in the same
12 geographical area who may be at risk of
13 diversion.
14     Do you see that?
15     A. I see that.
16     Q. Did you have a concern that
17 the diversion control team didn't know
18 about customers that were being raided at
19 this time?
20       MS. MCCLURE: Objection.
21 Form.
22       THE WITNESS: Restate the
23 question, please.
24 BY MR. CLUFF:

Page 151

1     Q. Did you have concerns about
2 not knowing about DEA raids in relation
3 to diversion at this time?
4       MS. MCCLURE: Same
5 objection.
6       THE WITNESS: Yes.
7 BY MR. CLUFF:
8     Q. What were your concerns?
9     A. Just to know who they were
10 and what geographical area it was in.
11     Q. You make a reference to how
12 knowing this information could help the
13 team identify other customers in the same
14 geographical area who may be at risk of
15 diversion.
16     So I'm trying to understand
17 what you're writing there. If, say, a
18 pharmacy in Los Angeles got raided, would
19 that mean that other pharmacies in that
20 same location could potentially be at
21 risk for diversion?
22       MS. MCCLURE: Objection to
23 form.
24       THE WITNESS: That's hard to

Page 152

1 answer without looking at those
2 pharmacies.
3 BY MR. CLUFF:
4     Q. But it would have been
5 helpful to know what geographical area a
6 pharmacy got raided in, right?
7     A. To maybe focus.
8     Q. To help identify some that
9 could be at risk for diversion?
10     A. That could be, yes.
11     Q. And that was information
12 that was not communicated to the team,
13 correct?
14       MS. MCCLURE: Objection to
15 form.
16       THE WITNESS: It was
17 communicated after the fact.
18 BY MR. CLUFF:
19     Q. Looking down the page,
20 there's another underlined heading that
21 says, Change management.
22     Do you see that?
23     A. I see that.
24     Q. It says, Diversion control

Page 153

1 team.
2     Do you see that?
3     A. I see that.
4     Q. In A, it says, Policies and
5 procedures. There has been a steady
6 stream of decisions around policy that
7 has been made in the last nine months or
8 so, some of it clearly outlined and some
9 not as much.
10     Do you recall some unclear
11 policies and procedures that were being
12 implemented at AmerisourceBergen?
13       MS. MCCLURE: Objection to
14 form.
15       THE WITNESS: I don't
16 recall.
17 BY MR. CLUFF:
18     Q. But you wrote here that some
19 decisions around policies were not
20 clearly outlined, correct?
21       MS. MCCLURE: Objection to
22 form.
23       THE WITNESS: They were in
24 process.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

BY MR. CLUFF:

Q.   You continue in that paragraph, and say, In the instances where there is no clearcut decision that is reinforced by policy, it is left up to the discretion of the investigators to make day-to-day decisions that impact customers.

Do you see that?

A.   I see that.

Q.   You were an investigator at AmerisourceBergen, correct?

A.   Yes.

Q.   And you held that position continuously for five years?

A.   Yes.

Q.   And in 2015, you would have held that position for three years, correct?

A.   Correct.

Q.   So in your work as an investigator, would you agree with me, as you write here, that, in some instances, there were no clearcut decisions to

Page 155

reinforce -- that were reinforced by policy, right?

MS. MCCLURE:  Objection.

THE WITNESS:  Restate, please.

BY MR. CLUFF:

Q.   In your work as an investigator at AmerisourceBergen, oftentimes there were no clearcut -- there were instances where there was no clearcut decision that was reinforced by an AmerisourceBergen policy?

MS. MCCLURE:  Objection to form.

THE WITNESS:  I just -- I don't recall looking at the policy or what stage of draft it was in. I don't remember that.

BY MR. CLUFF:

Q.   But here, you would agree with me, that you write that, In the instances where there is no clearcut decision that is reinforced by policy, it is left up to the discretion of the

Page 156

investigator to make day-to-day decisions; is that right?

A.   That's right.  I'm asking for more guidance.

Q.   The next step down, it says, i, little Roman Numeral ii, Process changes.

It says, Example: 590s.

What's a 590?

A.   It's the questionnaire that a new and existing customer fills out as part of their due diligence file.

Q.   Were there different kinds of Form 590s for different customer classes at AmerisourceBergen?

MS. MCCLURE:  Objection to form.

MR. CLUFF:  Let me clarify.

BY MR. CLUFF:

Q.   So did, like, retail chain pharmacies have a different 590 than independent retail pharmacies?

MS. MCCLURE:  Objection to form.

Page 157

THE WITNESS:  No.  The questions were roughly the same.

BY MR. CLUFF:

Q.   Did AmerisourceBergen ever create an abbreviated Form 590 for retail chains?

MS. MCCLURE:  Objection. Form.

THE WITNESS:  It had the same pertinent information, other than ownership.

BY MR. CLUFF:

Q.   Did AmerisourceBergen ever make an exception for retail chain pharmacies on the way in which they collected due diligence on the Form 590?

MS. MCCLURE:  Objection. Form.

THE WITNESS:  No.

BY MR. CLUFF:

Q.   Never?

A.   No.

Q.   So is it your testimony here today, then, that AmerisourceBergen

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  followed the same policies and procedures
2  about gathering Form 590 information from
3  retail chains as independent retail
4  pharmacies?
5      MS. MCCLURE:  Objection to
6      form.
7      THE WITNESS:  Correct.
8  BY MR. CLUFF:
9      Q.   I'm going to hand you a copy
10 of a document that we're going to mark as
11 Exhibit-4 to your deposition.  Let me
12 describe it for the record, and then I'll
13 hand it to you.
14      It's a multipage e-mail, the
15 top e-mail on the first page is from
16 Garcia, Elizabeth to Tomkowitz, Joseph,
17 subject line:  Forward:  Costco CF-OMP
18 discussion with Jon McArthur.  The Bates
19 numbers are ABDCMDL00333083 to 333085.
20      MR. CLUFF:  Here is a copy
21      for you.
22          - - -
23      (Whereupon,
24      AmerisourceBergen-Garcia

Page 159

1      Exhibit-4, ABDCMDL00333083-085,
2      was marked for identification.)
3          - - -
4  BY MR. CLUFF:
5      Q.   Please take a moment to
6  refresh your recollection with that
7  document.
8      To help you out, Ms. Garcia,
9  the portion of the e-mail I'm going to
10 direct your attention to is the bottom of
11 the first page and the top of the second
12 page.
13      A.   Okay.
14      Q.   It looks like I'm missing a
15 page now.
16      MR. CLUFF:  Can you go to
17      the last page in the exhibit,
18      please, Zach?
19 BY MR. CLUFF:
20      Q.   Do you see there at the
21 bottom, Liz, the e-mail begins from Greg
22 Madsen, and it's to Greg Madsen and a
23 number of other people.  And the subject
24 line is, Costco CF-OMP discussion with

Page 160

1  Jon McArthur.
2      Do you see that?
3      A.   Yes.
4      Q.   What is Costco CF?
5      A.   Costco Central Fill.
6      Q.   Is that one of
7  AmerisourceBergen's customers?
8      A.   Costco is, yes.
9      Q.   Would you qualify them as,
10 like, a retail chain customer?
11      MS. MCCLURE:  Objection.
12      Form.
13      THE WITNESS:  This was the
14      Central Fill.  So yes.
15 BY MR. CLUFF:
16      Q.   And the rest of that subject
17 line is, OMP discussion with Jon
18 McArthur.
19      Do you have an understanding
20 of what that would refer to?
21      A.   Joe and I had discussions
22 with Jon McArthur of Costco outlining
23 that we wanted to collect due diligence
24 information, I believe.

Page 161

1      Q.   Who is "Joe" that you refer
2  to?
3      A.   Joe Tomkowitz.
4      Q.   So you and Joe Tomkowitz
5  discussed with Jon McArthur about due
6  diligence you wanted to collect.
7      Is that specifically from
8  Costco?
9      A.   Yes, from the Costco Central
10 Fill.
11      Q.   If you move up the e-mail
12 chain, it looks like there is a response,
13 it blends between the second and third
14 page, from Greg Madsen to Ed Hazewski.
15      Do you see that?  The bottom
16 of Page 2 and the top of Page 3.
17      A.   Yes.
18      Q.   And it looks like it says,
19 from Greg, Ed, Any more information come
20 out of this meeting with Costco about a
21 month ago?  Not sure who is handling
22 this, and let me know who is point on
23 this.
24      Do you see that?

Page 162

1    A.    I see that.
2    Q.    And then if you go up to the
3  bottom of Page 2, there's an e-mail from
4  Ed Hazewski to Greg Madsen, and a number
5  of other people, and now you're on the cc
6  line.
7        Do you see that?
8    A.    I see that.
9    Q.    And he says, Liz is the
10 point person.  She is off today.  But
11 I'll have her send an update.
12       Do you see that?
13   A.    I see that.
14   Q.    So if you go to the bottom
15 of the first page and the top of the
16 second page, there's an e-mail from you
17 to Greg Madsen.
18       Do you see that?
19   A.    I see that.
20   Q.    You start off, Hello, Greg
21 and Jon.
22       Correct?
23   A.    Yes.
24   Q.    Did you know Greg and Jon,

Page 163

1  obviously, by their first names?
2    A.    Yes.
3    Q.    And Jon is Jon McArthur at
4  Costco?
5    A.    Yes.
6    Q.    Do you know what his
7  position was?
8    A.    I do not.
9    Q.    Okay.  And you write to Greg
10 and Jon, you say, The last conversation
11 we had on July 25th, we discussed the
12 importance of gathering the 590
13 questionnaire demographic information
14 from our chain customers.
15       Do you see that?
16   A.    I see that.
17   Q.    So, again, Costco is one of
18 your chain customers, correct?
19   A.    Yes.
20   Q.    And are chain customers
21 different than independent retail
22 customers?
23   A.    No.  They're still in the
24 same class of retail.

Page 164

1    Q.    Okay.
2    A.    They're just more of them
3  under one ownership.
4    Q.    You continue and say, Given
5  the regulatory environment resulting from
6  the DEA/Walgreens action.
7        What was the DEA/Walgreens
8  action?
9    A.    DEA fined Walgreens for $80
10 million for records.
11   Q.    Do you recall when that fine
12 was?
13   A.    It might have been 2011,
14 2012, somewhere in there.
15   Q.    If I represented to you that
16 it was in the middle of 2013, would that
17 refresh your recollection?
18       MS. MCCLURE:  Objection.
19   Form.
20       THE WITNESS:  I don't
21   remember the exact date.
22 BY MR. CLUFF:
23   Q.    Okay.  I think it's
24 important that we get the date right, so

Page 165

1  I'm going to hand you another document.
2  It's a large document, I don't want to
3  waste your time on it.  I'm just going to
4  direct you to one slide so we can get a
5  little bit of clarity on this.
6        And we're going to mark this
7  as Exhibit-5, which is an e-mail Bates
8  marked 162348, that has attachments, one
9  of which is, CSRA summary-DEA briefing
10 Phoenix-05-16-17.ocx.  There's another
11 attachment which is, DEA presentation,
12 distributor briefing, Phoenix5-16-17-PDF.
13 The attachments to the e-mail run from
14 Bates numbers ABDCMDL00162349 to 162399.
15       The entirety of the e-mail
16 and both attachments have been marked as
17 confidential and subject to the
18 protective order.
19       I'll hand you your copy, Ms.
20 Garcia.
21       MR. CLUFF:  And then here
22   you go, counsel.
23       - - -
24       (Whereupon,

Page 166

1 AmerisourceBergen-Garcia
2 Exhibit-5, ABDCMDL00162348-399,
3 was marked for identification.)
4        - - -
5 BY MR. CLUFF:
6    Q.   So let me just help you.
7 Let's lay some foundation on this
8 document, really quick, Liz, and I'll
9 kind of walk you through it so we don't
10 waste anybody's time here today.
11        Do you see at the top
12 there's a "from" line and there you the
13 sender identified in the "from"?
14    A.   Yes.
15    Q.   And the recipient is
16 identified as David May in the "to" line;
17 is that correct?
18    A.   Yes.
19    Q.   So based on your
20 understanding of, you know, writing
21 e-mails at AmerisourceBergen, this
22 appears to be an e-mail you sent to David
23 May, right?
24    A.   Yes.

Page 167

1    Q.   Okay.  And you see the
2 subject, DEA briefing memo and
3 presentation?
4    A.   Yes.
5    Q.   Okay.  And then you see
6 there are -- there's an attachments line.
7 The first attachment is, CSRA summary-DEA
8 briefing Phoenix.
9        Do you see that?
10    A.   I see that.
11    Q.   Now, if you turn to the
12 first page and look at the next page in
13 the document, do you see that there is a
14 memo --
15    A.   I see that.
16    Q.   -- titled, DEA distributor
17 briefing-Phoenix, AZ.
18        Do you see that?
19    A.   I see that.
20    Q.   Would you agree this appears
21 to be the first attachment to this
22 e-mail?
23    A.   Yes.
24    Q.   So going back to the cover

Page 168

1 e-mail, there's a second attachment,
2 separated by a semicolon.
3        Do you see that?
4    A.   Yes.
5    Q.   It says, DEA presentation
6 distributor briefing Phoenix 5-16-17.
7        Do you see that?
8    A.   I see that.
9    Q.   So if you flip back three
10 pages, you'll see what appear to be
11 PowerPoint slides.
12        Do you see that?
13    A.   I see that.
14    Q.   And at the top it says,
15 Distributor initiative?
16    A.   Yes.
17    Q.   Did you attend a distributor
18 briefing in Phoenix in 2017?
19    A.   I did.
20    Q.   Does this appear to be the
21 slide presentation given by the DEA at
22 that briefing?
23    A.   Yes.
24    Q.   Okay.  So it appears that

Page 169

1 this is a true and correct copy of the
2 document that you e-mailed to David May?
3        MS. MCCLURE:  Objection.
4    Form.
5        THE WITNESS:  It appears
6    that way, yes.
7 BY MR. CLUFF:
8    Q.   Okay.  So these slides don't
9 have slide numbers on them, but we can
10 move through the document pretty easily
11 with the Bates numbers.
12    A.   Okay.
13    Q.   I just want to point out --
14 my apologies, it's such a long document,
15 and I may have given you the wrong one.
16        Set that aside.  I think I
17 gave you the wrong document.  That's my
18 fault, I apologize.
19        So let's go back to, I
20 believe it's Exhibit-4, which is the
21 e-mail between you and Mr. Tomkowitz at
22 the top.
23        Do you see that?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    Q.   So going back to this
2 portion you wrote in August of 2013, we
3 discussed at the end of that first
4 paragraph, you talked about the
5 DEA/Walgreens action, right?
6    A.   Yes.
7    Q.   And you said that there was
8 an $80 million fine against Walgreens?
9    A.   Yes.
10   Q.   Okay.  So you continue on,
11 on the next page, it says, As a
12 wholesaler/distributor and a DEA
13 registrant.
14       Do you see that paragraph?
15   A.   I see it.
16   Q.   You say, AmerisourceBergen
17 is mandated to know our customers.
18       Correct?
19   A.   Yes.
20   Q.   And you're talking about,
21 just in the subject of this e-mail, I
22 want to be clear, chain customers,
23 correct?
24       MS. MCCLURE:  Objection.

Page 171

1    Form.
2        THE WITNESS:  We're talking
3    about Costco Central Fill.
4 BY MR. CLUFF:
5    Q.   At the beginning of this
6 e-mail, you wrote, on August 26th, 2013,
7 you said, We discussed the importance of
8 gathering the 590 questionnaire
9 demographic information from our, quote,
10 chain customers.
11       Do you see that?
12   A.   Yes.
13   Q.   So here we're talking about
14 chain customers, of which Costco is one,
15 correct?
16       MS. MCCLURE:  Objection.
17   Form.
18       THE WITNESS:  Yes.
19 BY MR. CLUFF:
20   Q.   Okay.  So going back to the
21 top of the second page, you say, This
22 process normally begins with the
23 completion of a questionnaire that
24 contains compliance-related questions and

Page 172

1 information, prior to servicing the
2 pharmacy.
3        Do you see that?
4    A.   I see that.
5    Q.   So that's the normal
6 process, correct?
7    A.   Yes.
8    Q.   And you continue and say,
9 These forms are kept on file -- excuse
10 me, The forms are kept on file and serve
11 as the basis to satisfy our, quote, Know
12 Your Customer, closed quote, mandate and
13 as reference for future activity.
14       Do you see that?
15   A.   I see that.
16   Q.   So is it your understanding
17 that the 590s were part of the mandated
18 Know Your Customer requirement?
19       MS. MCCLURE:  Objection.
20   Form.
21       THE WITNESS:  That was an
22   internal ABC requirement.
23 BY MR. CLUFF:
24   Q.   You, here, refer to it as a

Page 173

1 Know Your Customer mandate.
2        It's your opinion that ABC
3 mandated the Know Your Customer
4 information?
5        MS. MCCLURE:  Objection to
6    form.
7        THE WITNESS:  DEA mandates
8    it, but there's no regulatory
9    statute.
10 BY MR. CLUFF:
11   Q.   But DEA mandates that
12 companies like AmerisourceBergen know
13 their customers, correct?
14       MS. MCCLURE:  Objection to
15   form.
16       THE WITNESS:  They suggest
17   that on their website.
18 BY MR. CLUFF:
19   Q.   I'm sorry, here you use the
20 word "mandate" but you just said
21 suggested.  So I'm just trying to
22 understand which it is.
23       Is it a mandate or a
24 suggestion?

Page 174

1    A.   It's not --
2         MS. MCCLURE:  Objection to
3    form.
4         THE WITNESS:  It's not a
5    regulatory requirement in the
6    statutes.
7    BY MR. CLUFF:
8    Q.   But here you write that it's
9    mandated.
10        So would you agree with me
11   here that in 2013, you believed that the
12   Know Your Customer information was
13   mandated?
14        MS. MCCLURE:  Objection.
15   Form.
16        THE WITNESS:  I just used
17   that word.
18   BY MR. CLUFF:
19   Q.   So you continue in the next
20   paragraph, Historically,
21   AmerisourceBergen has collected one
22   questionnaire for an entire chain of
23   stores.
24        Do you see that?

Page 175

1    A.   I see that.
2    Q.   So for independent retail
3    customers, did AmerisourceBergen obtain a
4    590 for each independent retail chain?
5         MS. MCCLURE:  Objection.
6    Form.
7         THE WITNESS:  That was
8    before my time.  I don't know.
9    BY MR. CLUFF:
10   Q.   In 2013, you worked at
11   AmerisourceBergen, correct --
12   A.   Yes.
13   Q.   -- excuse me, correct?
14        In 2013, was it
15   AmerisourceBergen's practice to collect a
16   590 for each independent retail pharmacy?
17        MS. MCCLURE:  Objection.
18   Form.
19        THE WITNESS:  For each
20   independent retail pharmacy, yes.
21   BY MR. CLUFF:
22   Q.   Okay.  And here you're
23   saying, Historically, AmerisourceBergen
24   has collected one questionnaire for an

Page 176

1    entire chain of stores.
2         Do you see that?
3    A.   I see that.
4    Q.   So that's different than the
5    way you're treating independent chains --
6    or independent pharmacies, correct?
7         MS. MCCLURE:  Objection to
8    form.
9         THE WITNESS:  I don't know
10   what the process was before I got
11   the chains.
12   BY MR. CLUFF:
13   Q.   Did somebody else write this
14   sentence for you?
15        MS. MCCLURE:  Objection to
16   form.  Argumentative.
17        THE WITNESS:  No.
18   BY MR. CLUFF:
19   Q.   But you write, Historically,
20   AmerisourceBergen has collected one
21   questionnaire for an entire chain of
22   stores.
23        Do you see that?
24   A.   I see that.

Page 177

1    Q.   Okay.  So did you form an
2    understanding about AmerisourceBergen's
3    historic practices as to chain
4    pharmacies?
5    A.   That was historically before
6    my time of getting chains.
7    Q.   Where did you get this
8    information from?
9    A.   I don't recall.
10   Q.   Did somebody else write it
11   for you?
12        MS. MCCLURE:  Objection to
13   form.  Asked and answered.
14   Argumentative.
15        THE WITNESS:  No.
16   BY MR. CLUFF:
17   Q.   So you wrote it from your
18   own personal knowledge, then?
19   A.   From my understanding, yes.
20   Q.   Okay.  Then you continue and
21   say, However, recent industry events and
22   government actions have caused
23   AmerisourceBergen to reevaluate the
24   process.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 So would you agree with me
2 that recent industry events and
3 government actions changed
4 AmerisourceBergen's policies and
5 procedures?
6 MS. MCCLURE: Objection to
7 form.
8 THE WITNESS: I don't know
9 if it was changed.
10 BY MR. CLUFF:
11 Q. How about reevaluated?
12 MS. MCCLURE: Objection to
13 form.
14 THE WITNESS: It may have
15 been reevaluated.
16 BY MR. CLUFF:
17 Q. Do you see where you said,
18 "caused AmerisourceBergen to reevaluate
19 this process"?
20 A. I see that.
21 Q. You don't disagree with that
22 statement today, do you?
23 MS. MCCLURE: Objection to
24 form.

Page 179

1 THE WITNESS: I wrote that
2 here. I don't know at the time.
3 BY MR. CLUFF:
4 Q. Who are some chain customers
5 that AmerisourceBergen did business with?
6 A. Walgreens, Sam's Club,
7 Publix.
8 Q. How about CVS?
9 A. Not to my knowledge.
10 Q. Rite Aid?
11 A. Not while I was there. I
12 don't think so.
13 Q. Let's look back at
14 Exhibit-5. My colleague here helped get
15 my mind right.
16 A. Okay.
17 Q. Okay. So looking at the
18 slides, if you can go to ABDCMDL00162394.
19 Once again, I'm only showing
20 you this slide so that we can get some
21 clarity on dates. I'm not going to ask
22 you anything about the substance of this
23 slide at all. I'm looking at the top slide
24 I'm looking at the top slide

Page 180

1 on the page. Go ahead and read that for
2 me.
3 A. The heading?
4 Q. Read the entire slide, so
5 you feel comfortable about it and let me
6 know?
7 MS. MCCLURE: To yourself,
8 you mean?
9 MR. CLUFF: Yes.
10 MS. MCCLURE: She thought
11 you meant --
12 THE WITNESS: I see that top
13 slide, yes.
14 BY MR. CLUFF:
15 Q. So I previously asked you if
16 you recalled when the Walgreens fine was.
17 Having reviewed that slide,
18 does it refresh your recollection about
19 when the fine was against Walgreens?
20 A. This is dated in 2013.
21 Q. Okay. And what's the month
22 and day?
23 A. June 1st -- or June 11th.
24 Q. Does that correct your

Page 181

1 recollection on when Walgreens would have
2 been fined?
3 MS. MCCLURE: Objection to
4 form.
5 THE WITNESS: Yes.
6 BY MR. CLUFF:
7 Q. Okay. So it appears, based
8 on that slide, that Walgreens was fined
9 at some point in the middle of 2013,
10 correct?
11 A. Yes.
12 Q. And looking at the first
13 paragraph there, it was a, quote,
14 Recordbreaking $80 million penalty to
15 resolve a U.S. Drug Enforcement
16 Administration investigation into the
17 company's dispensing practices in
18 Florida, correct?
19 MS. MCCLURE: Objection to
20 form.
21 THE WITNESS: I can see that
22 written there.
23 BY MR. CLUFF:
24 Q. Was Walgreens a customer of

Page 182

1 AmerisourceBergen at this time?
2     A.   I don't recall when they
3 onboarded.
4     Q.   Are you familiar with a
5 suspension of Cardinal Health's Lakeland
6 facilities in March of 2012?
7         MS. MCCLURE:  Objection to
8     form.
9         THE WITNESS:  I don't recall
10    that.
11 BY MR. CLUFF:
12    Q.   Do you recall that as a
13 result of Cardinal Health's suspension in
14 2012 AmerisourceBergen acquired Walgreens
15 as a customer?
16        MS. MCCLURE:  Objection.
17    Form.  Foundation.
18        THE WITNESS:  I don't
19    recall.
20 BY MR. CLUFF:
21    Q.   Do you have any
22 recollection, based on your time at
23 AmerisourceBergen -- strike that.
24        You worked at

Page 183

1 AmerisourceBergen for five years,
2 correct?
3     A.   Correct.
4         MS. MCCLURE:  Objection.
5     Asked and answered.
6 BY MR. CLUFF:
7     Q.   And during your time, I
8 believe you testified that you were
9 responsible for 590 chain due diligence;
10 is that correct?
11        MS. MCCLURE:  Objection.
12    Form.
13        THE WITNESS:  Yes.
14 BY MR. CLUFF:
15    Q.   Was that part of your job
16 responsibilities for the entirety of your
17 career at AmerisourceBergen?
18    A.   In part, yes.
19    Q.   You said "in part."
20        What do you mean by "in
21 part"?
22    A.   Some of those accounts were
23 transferred to other investigators.
24    Q.   Do you recall which accounts

Page 184

1 were transferred to other investigators?
2     A.   I do not.
3     Q.   But, generally, you were
4 responsible for some part of the chain
5 590 due diligence at AmerisourceBergen,
6 correct?
7     A.   Correct.
8     Q.   And that was throughout your
9 five-year career there?
10    A.   Yes.
11        MS. MCCLURE:  Objection.
12    Asked and answered.
13 BY MR. CLUFF:
14    Q.   So do you recall, your best
15 recollection, if Walgreens became a
16 customer of AmerisourceBergen at the
17 beginning, middle or end of the five
18 years you spent at AmerisourceBergen?
19    A.   Towards the beginning, I
20 believe.
21    Q.   So is that potentially 2012?
22        MS. MCCLURE:  Objection to
23    form.
24        THE WITNESS:  No, not that

Page 185

1 early.
2 BY MR. CLUFF:
3     Q.   How about early 2013?
4         MS. MCCLURE:  Objection.
5     Form.
6         THE WITNESS:  I believe
7     later in 2013.
8 BY MR. CLUFF:
9     Q.   Based on reading this slide
10 and your recollection as an investigator
11 at AmerisourceBergen, do you believe that
12 Walgreens became a customer before or
13 after you became aware of this fine?
14        MS. MCCLURE:  Objection.
15    Form.
16        THE WITNESS:  I don't
17    recall.
18 BY MR. CLUFF:
19    Q.   Okay.  Let's go back to
20 Exhibit-4, please.
21        I want to go back to the
22 second full paragraph on the second page
23 there.  The one that starts,
24 Historically.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    Do you see that?
2    A.   I see that.
3    Q.   We previously talked about
4 the fact that, you know, in the first and
5 second line, you say, Recent industry
6 events and government actions have caused
7 Amerisource to reevaluate the process.
8    Do you see that?
9    A.   Yes.
10    Q.   I'm just trying to give you
11 a point of reference in the document.
12    So you continue on the next
13 sentence and you say, In order to protect
14 our chain partners.
15    Do you see that?
16    A.   Yes.
17    Q.   We are undertaking a
18 comprehensive review of the due diligence
19 files for all of our chain customers.
20    Do you see that?
21    A.   I see that.
22    Q.   So would you agree with me
23 that in this sentence you state that, in
24 order to protect our --

Page 187

1 AmerisourceBergen -- chain partners,
2 Amerisource is undertaking a
3 comprehensive review of the due diligence
4 files for all chain customers; is that
5 accurate?
6    A.   Yes.
7    Q.   The next sentence, you say,
8 That process will begin with the
9 gathering of information outlined in the
10 attached questionnaire from each
11 individual chain customer.
12    Do you see that?
13    A.   I see that.
14    Q.   If you look at the first
15 page, there's nothing attached to this
16 version of the e-mail.
17    Do you see that?
18    MS. MCCLURE:  Objection to
19 form.
20    THE WITNESS:  It's at the
21 bottom of that e-mail.
22 BY MR. CLUFF:
23    Q.   Oh, okay.
24    A.   It's indicated.

Page 188

1    Q.   So there would have been a
2 document attached to that portion of that
3 e-mail?
4    A.   Correct.
5    Q.   ABC questionnaire
6 responses.xlsx?
7    A.   Yes.
8    Q.   And CSRA Form 590 retail
9 questionnaire_chain, correct?
10    A.   Correct.
11    Q.   So in the next sentence you
12 proceed, This process, in conjunction
13 with our order monitoring program and
14 ongoing review of customer purchases,
15 will go a long way towards our goal of
16 protecting the interests of our valued
17 customers and AmerisourceBergen.
18    Correct?
19    MS. MCCLURE:  Objection.
20 Misstates the document.
21    THE WITNESS:  Correct.
22    MR. CLUFF:  I'm sorry, what
23 was your objection, Shannon?
24    MS. MCCLURE:  That it

Page 189

1    misstates the document.
2 BY MR. CLUFF:
3    Q.   Ms. Garcia, do you feel that
4 I in any way misstated this document when
5 I read it word for word?
6    A.   You're mixing the order
7 monitoring program with what this
8 document is.
9    Q.   I'm curious.  I read this
10 sentence.  I'll read it again for you.
11    This process, in conjunction
12 with our order monitoring program and
13 ongoing review of customer purchases,
14 will go a long way towards our goal of
15 protecting the interests of our valued
16 customers and AmerisourceBergen.
17    Did I read that accurately?
18    A.   You did.
19    Q.   Okay.  I have a question for
20 you.
21    When you referenced the word
22 "our" in that sentence, does it mean
23 AmerisourceBergen?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    Q.   And we previously agreed
2  that this was an e-mail about chain
3  customers, correct?
4         MS. MCCLURE:  Objection.
5    Form.
6         THE WITNESS:  This is about
7    the Costco Central Fill.
8  BY MR. CLUFF:
9    Q.   Let's look at the first
10 e-mail again -- the first paragraph of
11 this e-mail, the one at the bottom of
12 Page 1.
13        MR. MAHADY:  Do you mean
14   Page 3?
15        MR. CLUFF:  Nope, I mean
16   Page 1.  The first paragraph of
17   the e-mail on the bottom of Page
18   1.
19 BY MR. CLUFF:
20   Q.   Do you see that?
21   A.   I see that.
22   Q.   It says, The last
23 conversation we had on July 25th, we
24 discussed the importance of gathering the

Page 191

1  590 questionnaire demographic information
2  from, quote, our chain customers, closed
3  quote.
4         Do you see that?
5    A.   I see that.
6    Q.   "Our" there, again, refers
7  to AmerisourceBergen, correct?
8    A.   Correct.
9    Q.   And we agreed that Costco
10 was one of AmerisourceBergen's chain
11 customers, correct?
12   A.   Correct.
13   Q.   Right.  And we previously
14 discussed that other chain customers
15 included, for example, Walgreens, right?
16   A.   Correct.
17        MS. MCCLURE:  Objection to
18   form.
19 BY MR. CLUFF:
20   Q.   So let's go back to the
21 middle paragraph in that e-mail on the
22 next page, the one that begins with,
23 Historically.
24        The last sentence, again,

Page 192

1  reads:  This process, in conjunction with
2  our order monitoring program and ongoing
3  review of customer purchases, will go a
4  long way towards our goal of protecting
5  the interests of our valued customers and
6  AmerisourceBergen.
7         So I'm going to -- two
8  foundational questions there.  "Our,"
9  again, refers to AmerisourceBergen,
10 correct?
11   A.   Correct.
12   Q.   Right.  And we previously
13 discussed that this e-mail is about chain
14 customers, like Costco and Walgreens,
15 correct?
16        MS. MCCLURE:  Objection.
17   Form.
18        THE WITNESS:  Correct.
19 BY MR. CLUFF:
20   Q.   Right.  Would you agree
21 there when you say "our valued
22 customers," you're referring to the chain
23 customers, correct?
24        MS. MCCLURE:  Objection.

Page 193

1    Form.
2         THE WITNESS:  I'm referring
3    to all of our customers.
4  BY MR. CLUFF:
5    Q.   So all of
6  AmerisourceBergen's customers are valued
7  customers; is that correct?
8    A.   That's correct.
9    Q.   Okay.  So AmerisourceBergen,
10 I'm going to quote you on this last line,
11 had a goal of protecting the interests of
12 its valued customers, correct?
13   A.   Correct.
14   Q.   Okay.
15        MR. CLUFF:  Is it 12:30?
16        MS. MCCLURE:  Please, God.
17        MR. CLUFF:  Why don't we
18   take a break?  We'll do a half
19   hour, 45 minutes for lunch.
20        VIDEO TECHNICIAN:  Off the
21   record at 12:26 p.m.
22        - - -
23        (Whereupon, a luncheon
24   recess was taken.)

Page 194

1           - - -
2           VIDEO TECHNICIAN:  We're
3    back on the record at 1:18 p.m.
4    BY MR. CLUFF:
5           Q.    Ms. Garcia, thank you for
6    coming back.  We're back on the record,
7    so just to remind you, you're still under
8    oath.
9           Do you understand that?
10          A.    Yes.
11          Q.    When we broke, we were going
12   through Exhibit-4, which is the e-mail
13   between you and Joe Tomkowitz about the
14   Costco Central Fill customer.
15          A.    Yes.
16          Q.    Okay.  So I just had one
17   follow-up question.
18          We talked, on Page 2, that
19   last sentence that ends, Our goal of
20   protecting the interests of our valued
21   customers and AmerisourceBergen.
22          Do you see that?
23          A.    I see that.
24          Q.    I have a tiny question for

Page 195

1    you.
2           This e-mail was written by
3    you in August of 2013, correct?
4           A.    Yes.
5           Q.    And that was roughly two
6    months after that slide we looked at
7    about the Walgreens penalty, correct?
8           A.    Correct.
9           Q.    Okay.  Thank you.  That's
10   all I had for you on that, so we can set
11   that aside for a second.
12          I'd like to hand you a copy
13   of your FY '16 performance evaluation.
14          - - -
15          (Whereupon,
16          AmerisourceBergen-Garcia
17          Exhibit-6, ABDCMDL00364844-851,
18          was marked for identification.)
19          - - -
20   BY MR. CLUFF:
21          Q.    I'll mark it as Exhibit-6.
22   I'll give you a chance to review that.
23          Some of the documents we'll
24   be talking about this afternoon, as I

Page 196

1    maybe mentioned to you earlier, are going
2    to be a little longer than I would
3    normally discuss with you.
4           I think it's important that
5    you have the opportunity to use them.  If
6    you're going to take a long time to read
7    them, so we can give you enough time, let
8    me know, and maybe we'll consider going
9    off the record so you can read them while
10   we're all sitting here waiting.
11          But I'd prefer not to just,
12   like, burn minutes in the depo if you're
13   amenable to that.
14          MS. MCCLURE:  We're not
15          going to agree to go off the
16          record.  She can read --
17          MR. CLUFF:  You don't have
18          to agree.
19   BY MR. CLUFF:
20          Q.    Maybe I can help you.
21          We can just lay some
22   foundation about this document, Liz, like
23   we've done with some others.
24          So looking at the top there,

Page 197

1    do you see that, Garcia, Elizabeth A., is
2    at the top left corner?
3           A.    Yes.
4           Q.    And that's obviously your
5    name, correct?
6           A.    Correct.
7           Q.    All right.  And in the top
8    right corner, it says, FY '16 performance
9    evaluation.
10          Do you see that?
11          A.    I see that.
12          Q.    And then do you see
13   underneath that, it says,
14   10/01/2015-09/30/2016?
15          A.    I see that.
16          Q.    Okay.  I just want to
17   establish your understanding about the
18   performance evaluation process at
19   AmerisourceBergen, beginning with the
20   time period.
21          So it looks like at
22   AmerisourceBergen you would have received
23   a performance evaluation in sort of the
24   third quarter of every year; does that

Page 198

1  seem accurate?
2      A.   Probably the fourth quarter.
3  The fiscal year starts --
4      Q.   I'm bad at math.
5      So fourth quarter sounds
6  accurate, right?
7      A.   Maybe.
8      Q.   It happened at the end of
9  the year, how about that?
10     A.   Correct.
11     Q.   Okay.  And the performance
12 evaluation would have been for work that
13 you completed in the prior year?
14     A.   Yes.
15     Q.   Okay.  And how did the
16 performance evaluation process work,
17 generally?
18     A.   So we would go in and add
19 our comments about our own performance,
20 and then followed by the supervisor.
21     Q.   Okay.  And this document in
22 front of you, based on the title, appears
23 to be a performance evaluation for fiscal
24 year 2016?

Page 199

1      A.   Yes.
2      Q.   Okay.  And if you look under
3  your name, there is a line that says,
4  Evaluated by Eric Cherveny.
5      Do you see that?
6      A.   I see that.
7      Q.   So would Eric Cherveny have
8  conducted this performance evaluation
9  with you?
10     A.   Yes.
11     Q.   All right.  And based on
12 your prior testimony, it's your
13 understanding that you would have been
14 provided a chance to make comments in
15 preparation for your evaluation, it
16 sounds like?
17     A.   Correct.
18     Q.   And then would you have gone
19 over those comments with Eric Cherveny?
20     A.   Yes.
21     Q.   Okay.  Do you know if he got
22 a chance to write comments before the two
23 of you would have gone over them?
24     MS. MCCLURE:  Objection to

Page 200

1  form.
2      THE WITNESS:  Yes.
3  BY MR. CLUFF:
4      Q.   Okay.  Did you ever look at
5  a document like this during a performance
6  evaluation?
7      MS. MCCLURE:  Objection to
8  form.
9      THE WITNESS:  Yes.
10 BY MR. CLUFF:
11     Q.   So have you seen this
12 document before, then?
13     A.   I have.
14     Q.   Okay.  You know, looking
15 through it, just generally, does it
16 appear to be a true and correct copy of a
17 document that you would have reviewed in
18 2016 with Eric Cherveny?
19     MS. MCCLURE:  Objection to
20 form.
21     THE WITNESS:  It appears to
22 be, yes.
23 BY MR. CLUFF:
24     Q.   So looking at the first

Page 201

1  page, there's a line that says, Overall
2  ratings and comments.
3      Do you see that?
4      A.   Overall evaluation?
5      Q.   I'm looking at overall
6  ratings and comments, just above manager.
7      A.   Got you.  Yes.
8      Q.   And then underneath that, it
9  says, Manager overall evaluation.
10     A.   Yes.
11     Q.   And so that would have been
12 Eric Cherveny's comments?
13     A.   Yes.
14     Q.   And then underneath that,
15 there's a line that says, Employee
16 overall evaluation.
17     Do you see that?
18     A.   I see that.
19     Q.   Are those your comments,
20 then?
21     A.   Yes.
22     Q.   Just stepping back for a
23 second, do you recall the 2016 year, in
24 terms of your work?

Page 202

1  MS. MCCLURE: Objection to
2  form.
3  THE WITNESS: Let's see,
4  that's fiscal year 2016.
5  Vaguely.
6  BY MR. CLUFF:
7  Q. Were you enjoying your work
8  at that point in time?
9  MS. MCCLURE: Objection to
10 form.
11 THE WITNESS: Yes.
12 BY MR. CLUFF:
13 Q. We previously talked about
14 personality disagreements between you and
15 Eric Cherveny.
16 By fiscal year 2016, had
17 those developed, or were they ongoing?
18 A. Those were ongoing off and
19 on.
20 Q. I want to start with your
21 comments under, Employee overall
22 evaluation.
23 Do you see that on the page?
24 A. I see that.

Page 203

1  Q. The first sentence, I'll
2  paraphrase it, it says that you believe
3  you're meeting core values and business
4  objectives.
5  Do you see that?
6  A. I see that.
7  Q. What were the core values,
8  as you understood them, at this time?
9  A. I don't recall.
10 Q. Do you have an understanding
11 today, just generally, of what
12 AmerisourceBergen's core values are?
13 MS. MCCLURE: Objection to
14 form.
15 THE WITNESS: I don't
16 recall.
17 BY MR. CLUFF:
18 Q. My question was a little
19 different. And I don't want to nitpick
20 with you, but I'm going to rephrase it so
21 we're both a little clearer.
22 I understand you don't
23 recall, in 2016, what the core values
24 are. But I'm curious if you have a

Page 204

1  general understanding, today as you sit
2  here, what AmerisourceBergen's core
3  values are?
4  MS. MCCLURE: Object to
5  form.
6  THE WITNESS: I don't
7  recall. Just ethical and
8  integrity.
9  BY MR. CLUFF:
10 Q. I could not quite hear you.
11 Did you say just ethical
12 integrity?
13 A. Being ethical and having
14 integrity.
15 Q. Being ethical and having
16 integrity?
17 A. Yep.
18 Q. You also mentioned business
19 objectives in that sentence.
20 Do you have a recollection,
21 in 2016, what AmerisourceBergen's
22 business objectives were?
23 A. I do not.
24 Q. Is AmerisourceBergen a

Page 205

1  for-profit company?
2  A. Yes.
3  Q. Do they make a profit from
4  distributing pharmaceutical drugs?
5  MS. MCCLURE: Objection to
6  form.
7  THE WITNESS: I assume so.
8  That's their business model.
9  BY MR. CLUFF:
10 Q. So would one of their
11 business objectives be to continue
12 profiting from the sale of pharmaceutical
13 drugs?
14 MS. MCCLURE: Objection to
15 form.
16 THE WITNESS: Yes.
17 BY MR. CLUFF:
18 Q. Did you ever have any
19 conversations with anybody at
20 AmerisourceBergen, at any time, about
21 AmerisourceBergen's profits or
22 performance as a business related to
23 pharmaceutical sales?
24 A. I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Q.   Let's look at the next
2 sentence in your overall comments.
3        It says, I do need to be
4 challenged in order to stay engaged and
5 am open to new assignments not mentioned
6 here.
7        Were you bored with your job
8 at AmerisourceBergen?
9        MS. MCCLURE:  Objection.
10       THE WITNESS:  No.
11 BY MR. CLUFF:
12    Q.   Did you feel like you were
13 not challenged in your job at
14 AmerisourceBergen?
15    A.   I was challenged in my job.
16    Q.   How come you wrote, I do
17 need to be challenged in order to stay
18 engaged?
19    A.   That's just me as a general
20 observation.
21    Q.   Were you starting to
22 disengage from AmerisourceBergen by
23 September 2016?
24       MS. MCCLURE:  Objection to

Page 207

1    form.
2        THE WITNESS:  Not that I
3    recall.
4 BY MR. CLUFF:
5    Q.   You mention, new assignments
6 not mentioned here.
7        Do you have any idea of what
8 new assignments you were looking for in
9 2016?
10       MS. MCCLURE:  Objection to
11   form.
12       THE WITNESS:  I don't recall
13   what I meant by that.
14 BY MR. CLUFF:
15    Q.   The next sentence you say, I
16 believe being able to fully learn more
17 about BOBJ -- that's B-O-B-J -- and how
18 to use it as a data pooling tool, i.e.,
19 building custom templates, reports, et
20 cetera, for subpoenas and other purposes
21 would be a welcome challenge.
22       Do you have a recollection
23 of what BOBJ was?
24    A.   BOBJ was a database.  It

Page 208

1 pulled from the SAP database and visually
2 presented data in a more simplified
3 visual manner that we could pull.  So
4 inquiries.
5    Q.   We've previously -- strike
6 that.
7        Did you know who was
8 responsible for creating the BOBJ
9 database that you've referred to?
10       MS. MCCLURE:  Objection to
11   form.
12       THE WITNESS:  No.
13 BY MR. CLUFF:
14    Q.   Was there anybody at
15 AmerisourceBergen who was the most expert
16 at dealing with the BOBJ database?
17    A.   For our team, I think it was
18 Lino.
19    Q.   So he would have been --
20 would he have been the person you went
21 to, to learn more about using BOBJ for
22 these tasks you described here?
23    A.   Yes.
24    Q.   Do you know how long he's

Page 209

1 been with AmerisourceBergen?
2    A.   I know he was a compliance
3 manager in New Jersey before he joined
4 our team, but I don't know how long.
5    Q.   Let's now look at Mr.
6 Cherveney's overall evaluations that's
7 over yours.
8        He gives you a rating, Fully
9 meets expectations.
10       And in the comment, the
11 first line is, Overall, this has been a
12 very challenging reporting cycle for Liz,
13 as well as the diversion control team as
14 a whole, on a number of fronts.
15       Do you see that?
16       Do you see that?
17    A.   I see that.
18    Q.   Do you recall 2016 being a
19 particularly challenging reporting year
20 for you?
21       MS. MCCLURE:  Objection to
22   form.
23       THE WITNESS:  I believe that
24   was the first full year of the new

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 revised OMP system.
2 BY MR. CLUFF:
3 Q. What was challenging about
4 the revised OMP system?
5 A. Just implementation and
6 training the divisions.
7 Q. Anything else?
8 A. A lot of volume with
9 projects. A lot of onboarding new
10 customers.
11 Q. Sorry. Did you finish your
12 answer?
13 A. Yes.
14 Q. Okay. What do you mean by
15 "a lot of volume with projects"?
16 A. A lot of 590s being -- that
17 are coming in, from what I remember.
18 Q. Are you familiar with the
19 distributor due diligence project at
20 AmerisourceBergen?
21 MS. MCCLURE: Objection to
22 form.
23 THE WITNESS: Vaguely.
24 BY MR. CLUFF:

Page 211

1 Q. Do you have a recollection
2 of what it is, or what it was?
3 A. No.
4 Q. Are you familiar with the
5 Form 590 project at AmerisourceBergen?
6 A. Yes.
7 Q. What was that?
8 A. That was collecting 590s
9 from new and existing customers.
10 Q. Do you recall why
11 AmerisourceBergen was collecting the
12 590s?
13 A. To complete a due diligence
14 file.
15 Q. So they were missing due
16 diligence files?
17 MS. MCCLURE: Objection to
18 form.
19 THE WITNESS: No. The due
20 diligence files existed, and there
21 were all kinds of documents in
22 there, but collecting the 590 was
23 just one piece.
24 BY MR. CLUFF:

Page 212

1 Q. Was there also some missing
2 information in Lawtrac associated with
3 the 590s?
4 MS. MCCLURE: Objection to
5 form.
6 THE WITNESS: In Lawtrac, if
7 those -- if the 590s were not in
8 there, then we were collecting
9 them.
10 BY MR. CLUFF:
11 Q. And is that one of the
12 projects you were working on in 2016?
13 A. I believe so, yes.
14 Q. When you left in 2017, was
15 that project completed?
16 A. I don't believe so.
17 Q. Do you know what percentage
18 of that project had been completed?
19 A. I do not.
20 Q. But as a general rule, the
21 due diligence files were incomplete,
22 right?
23 MS. MCCLURE: Objection to
24 form.

Page 213

1 THE WITNESS: It was an
2 ongoing process to collect forms.
3 BY MR. CLUFF:
4 Q. Collect forms that were
5 missing, correct?
6 MS. MCCLURE: Objection to
7 form.
8 THE WITNESS: Or other
9 business correspondence.
10 BY MR. CLUFF:
11 Q. But the 590 forms and the
12 other business correspondence that you
13 mentioned, those were missing from the
14 due diligence files?
15 MS. MCCLURE: Objection to
16 form.
17 THE WITNESS: Not
18 necessarily.
19 BY MR. CLUFF:
20 Q. What do you mean "not
21 necessarily"?
22 A. I mean, there could have
23 been other business forms in there, in
24 the file.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    Q.   So some business forms were
2 in the file, but some were missing,
3 correct?
4        MS. MCCLURE:  Objection to
5    form.
6        THE WITNESS:  Depending on
7    the customer.
8 BY MR. CLUFF:
9    Q.   So the answer is yes,
10 depending on the customer?
11       MS. MCCLURE:  Same
12    objection.
13       THE WITNESS:  Yes.
14 BY MR. CLUFF:
15    Q.   You also mentioned
16 onboarding new customers.
17       What customers do you recall
18 onboarding during that time?
19    A.   Too many to recall.
20    Q.   What kinds of categories of
21 customers were you onboarding?
22       MS. MCCLURE:  Objection to
23    form.
24       THE WITNESS:  All kinds of

Page 215

1    business models.
2 BY MR. CLUFF:
3    Q.   What are some examples of
4 different business models that
5 AmerisourceBergen onboards as customers?
6    A.   Hospitals, hospices,
7 independent pharmacies.
8    Q.   How about chain pharmacies?
9    A.   Chain pharmacies.
10    Q.   What's the process of
11 onboarding a customer look like?
12       MS. MCCLURE:  Objection to
13    form.
14       THE WITNESS:  A new
15    customer?  A new customer fills
16    out the 590 and gives us any other
17    pertinent information we ask for,
18    and then we put that in the file
19    and we verify that information.
20 BY MR. CLUFF:
21    Q.   What kind of other pertinent
22 information would we ask for?
23    A.   Copies of licenses, since we
24 only distribute to licensed customers.

Page 216

1    Q.   How about prescriber
2 information, did you ask for prescriber
3 information?
4    A.   On the 590 we did.
5    Q.   How about information
6 related to prescriptions written by
7 prescribers, did you ask for that?
8        MS. MCCLURE:  Objection to
9    form.
10       THE WITNESS:  Not for
11    specific prescriptions, no.
12 BY MR. CLUFF:
13    Q.   Is your answer that you
14 didn't obtain prescription information as
15 a part of the new customer onboarding?
16       MS. MCCLURE:  Objection to
17    form.
18       THE WITNESS:  That's
19    correct.
20 BY MR. CLUFF:
21    Q.   But did AmerisourceBergen
22 ever obtain prescription information as
23 part of its due diligence process?
24       MS. MCCLURE:  Objection to

Page 217

1    form.
2        THE WITNESS:  Not as part of
3    its due diligence process, no.
4 BY MR. CLUFF:
5    Q.   What's a pharmacy big
6 report?
7    A.   It's a dispensing data
8 report.
9    Q.   And is that a part of
10 AmerisourceBergen's due diligence
11 process?
12    A.   Only in special
13 circumstances.
14    Q.   But it is a part of the due
15 diligence process, correct?
16    A.   No, not as a regular thing.
17    Q.   I'm not qualifying between
18 regular or special circumstance.  I'm
19 talking about just the general due
20 diligence process that AmerisourceBergen
21 engages in.
22       Is a pharmacy big report a
23 part of the due diligence process?
24    A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1      MS. MCCLURE: Objection to
2   form.
3  BY MR. CLUFF:
4      Q.   What process is it a part
5  of?
6      A.   Special circumstances, more
7  for existing customers.
8      Q.   Okay.  What special
9  circumstances are you talking about?
10      A.   To double check and monitor
11  certain accounts, and to gather that
12  information as part of the file.
13      Q.   How would you identify these
14  certain accounts that you would be double
15  checking and monitoring?
16      A.   Just to monitor their
17  ordering programs and seeing if there
18  were any unusual purchases.
19      Q.   That sounds more like what
20  you were monitoring.  I'm asking how you
21  identified the accounts that you would be
22  monitoring.
23      Can you explain that to me?
24      MS. MCCLURE: Objection to

Page 219

1   form.
2      THE WITNESS:  Looking at my
3   region and seeing if anything
4   sticks out for any customer.
5  BY MR. CLUFF:
6      Q.   And what would stick out for
7  a customer that would make you want to
8  look for a pharmacy big report?
9      MS. MCCLURE: Objection to
10   form.
11      THE WITNESS:  Perhaps if --
12   let's see -- if they were ranked
13   high in that state, for example.
14  BY MR. CLUFF:
15      Q.   Ranked high for what?
16      A.   For whatever drug it was I
17  was looking at.
18      Q.   What are some examples of
19  drugs that you would have looked at?
20      A.   Hydrocodone, Oxycodone 30.
21      Q.   And are those drugs that
22  were particularly susceptible to
23  diversion?
24      MS. MCCLURE: Objection to

Page 220

1   form.
2      THE WITNESS:  Yes.
3  BY MR. CLUFF:
4      Q.   So if a customer in your
5  region stood out to you because of
6  purchases of those drugs, you would
7  potentially obtain a pharmacy big report?
8      MS. MCCLURE: Objection to
9   form.
10      THE WITNESS:  Depending on
11   the totality of the circumstances.
12   I mean, it might have been just a
13   one-off.
14  BY MR. CLUFF:
15      Q.   I've been saying pharmacy
16  big report, I've seen that abbreviated
17  PBR.
18      Are those the same thing?
19      A.   Yes.
20      Q.   Do you want to call them
21  PBR, or should we stay with pharmacy big
22  report?
23      A.   We can call it dispensing
24  data.

Page 221

1      Q.   But I've seen it referenced
2  in your documents as pharmacy big report.
3      A.   That's slang for a
4  dispensing report.
5      Q.   So when you obtained a PBR,
6  that included prescription data, correct?
7      MS. MCCLURE: Objection to
8   form.
9      THE WITNESS:  Yes.
10  BY MR. CLUFF:
11      Q.   It also included
12  de-identified patient data; is that
13  right?
14      A.   Yes.
15      Q.   Where did AmerisourceBergen
16  obtain de-identified patient data?
17      A.   Where did they obtain it?
18      Q.   Yes.
19      A.   We would ask the customer
20  for it directly, and they would assign
21  the de-identification.
22      Q.   Did the PBR, the pharmacy
23  big report, also tell you which doctors
24  were writing prescriptions on behalf --

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  that were being filled at
2  AmerisourceBergen customers?
3      MS. MCCLURE:  Objection to
4      form.
5      THE WITNESS:  They were
6      writing prescriptions for that
7      pharmacy, yes.
8  BY MR. CLUFF:
9      Q.  Well, I think they weren't
10 writing prescriptions for the pharmacy,
11 but they wrote scripts that got filled at
12 the pharmacy?
13     A.  Yes.
14     Q.  So if you pulled a PBR, you
15 could see, I'm just trying to understand
16 here, at any given pharmacy in your
17 region, what doctors were writing scripts
18 that got filled, correct?
19     MS. MCCLURE:  Objection to
20     form.
21     THE WITNESS:  Correct.
22 BY MR. CLUFF:
23     Q.  And then you could also see
24 de-identified patient data for who they

Page 223

1  wrote prescriptions to, correct?
2      A.  De-identified.  We didn't
3  know who those people were.
4      Q.  So it would be like patient
5  1, patient 2?
6      A.  Correct.
7      Q.  Understood.
8          And you used that as a part
9  of special circumstances when you would
10 look at customers in your region?
11     MS. MCCLURE:  Objection to
12     form.
13     THE WITNESS:  Correct.
14 BY MR. CLUFF:
15     Q.  Were you looking at those
16 two identified potential sources for
17 diversion?
18     MS. MCCLURE:  Objection to
19     form.
20     THE WITNESS:  Restate the
21     question.
22 BY MR. CLUFF:
23     Q.  Sure.
24         Were you looking at

Page 224

1  prescriber big reports as -- in order to
2  identify potential sources for diversion?
3      MS. MCCLURE:  Objection to
4      form.
5      THE WITNESS:  No.
6  BY MR. CLUFF:
7      Q.  Why were you looking at
8  them?
9      A.  For pattern and drug
10 combinations.
11     Q.  Aren't those red flags for
12 potential diversion?
13     MS. MCCLURE:  Objection to
14     form.
15     THE WITNESS:  Not
16     necessarily.
17 BY MR. CLUFF:
18     Q.  Are they a part of the
19 totality of circumstances that
20 AmerisourceBergen employees looked at in
21 order to identify potential diversion?
22     A.  It could be.
23     MS. MCCLURE:  Objection to
24     form.

Page 225

1  BY MR. CLUFF:
2      Q.  Please give your counsel
3  just a second.  I know, we're all, you
4  know, getting along.  Give her a second
5  just to object, so we can all be clear.
6          So just to kind of walk back
7  and make sure I understand.  If there was
8  a potential spike or a deviation from a
9  normal ordering pattern in your region,
10 you would potentially pull a prescriber
11 big report; is that correct?
12     MS. MCCLURE:  Objection to
13     form.  Misstates the witness's
14     testimony.
15     THE WITNESS:  Depends on
16     what it was.  Sometimes; not all
17     the time.
18 BY MR. CLUFF:
19     Q.  Are there any other reasons
20 why you would pull a prescriber big
21 report?
22     A.  No.
23     Q.  So those are basically the
24 instances in which you would pull the

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 report?
2        MS. MCCLURE:  Objection to
3    form.
4        THE WITNESS:  Correct.
5 BY MR. CLUFF:
6    Q.   Okay.  And we agreed that
7 changes in ordering pattern and deviation
8 from an old pattern are two of the things
9 that AmerisourceBergen employees look at
10 in order to identify potential diversion,
11 correct?
12        MS. MCCLURE:  Objection to
13    form.
14        THE WITNESS:  Restate that
15    question.
16 BY MR. CLUFF:
17    Q.   Sure.
18        I think AmerisourceBergen
19 takes a totality-of-the-circumstances
20 approach to identifying suspicious
21 orders; is that correct?
22        MS. MCCLURE:  Objection to
23    form.
24        THE WITNESS:  If something

Page 227

1    hits the algorithm, it's an order
2    of interest.  And then we have to
3    go in and look at it and decide if
4    it is unusual size, frequency or
5    pattern.
6 BY MR. CLUFF:
7    Q.   Right.  So unusual size,
8 frequency and pattern are part of the way
9 that AmerisourceBergen identifies
10 potentially suspicious orders; is that
11 what you're saying?
12        MS. MCCLURE:  Objection to
13    form.
14        THE WITNESS:  If it hits the
15    algorithm, it's an order of
16    interest.  And then we go in and
17    actually see, potentially, what's
18    happening with that order.
19 BY MR. CLUFF:
20    Q.   And you go through that
21 process to determine whether or not an
22 order that hit the algorithm is
23 suspicious, correct?
24    A.   Correct.

Page 228

1    Q.   So when that happens, you
2 sometimes pull a prescriber big -- a
3 pharmacy big report, correct?
4        MS. MCCLURE:  Objection to
5    form.
6        THE WITNESS:  Sorry,
7    restate.
8 BY MR. CLUFF:
9    Q.   You said when an order hits
10 OMP, then you look at the totality of the
11 circumstances to determine whether or not
12 an order of interest is of unusual size,
13 pattern and frequency.
14        Did I summarize that
15 correctly?
16        MS. MCCLURE:  Objection to
17    form.
18        THE WITNESS:  I think so.
19 BY MR. CLUFF:
20    Q.   Okay.  I'm not trying to
21 trick you.  I'm just trying to understand
22 the process.
23        And I asked if that was a
24 part of AmerisourceBergen's effort to

Page 229

1 identify suspicious orders from orders
2 that hit threshold; is that correct?
3        MS. MCCLURE:  Objection to
4    form.
5        THE WITNESS:  I think so.
6 BY MR. CLUFF:
7    Q.   And I'm trying to
8 understand, is that a situation in which
9 sometimes you would obtain a pharmacy big
10 report as part of your responsibilities?
11        MS. MCCLURE:  Same.
12        THE WITNESS:  A pharmacy big
13    report, you mean?
14 BY MR. CLUFF:
15    Q.   Yes.
16    A.   That could be one factor.
17    Q.   What are some other factors?
18    A.   Just looking at overall
19 pattern; geographically, where they're
20 at; what drugs they've ordered in the
21 last three months.
22    Q.   And that -- just so I
23 understand the content, that pharmacy big
24 report included prescriber data and

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  de-identified patient data, correct?
2      A.   Correct.
3      Q.   Let's go back to Exhibit-6,
4  I believe.
5          In the second sentence, you
6  write that -- excuse me, this is Eric
7  Cherveny -- Our team was tasked with
8  multiple projects to be completed in the
9  2017 performance cycle, while
10 simultaneously trying to learn and fully
11 utilize the revised OMP program, along
12 with analytical reporting associated with
13 it.
14         MR. CLUFF:  Do you have an
15 objection, Shannon?
16         MS. MCCLURE:  No, you
17 haven't asked a question, so I'm
18 waiting for the question.
19         MR. CLUFF:  Didn't get there
20 yet.
21         MS. MCCLURE:  Right.
22 BY MR. CLUFF:
23     Q.   Looking at that first
24 portion of the sentence, you identified

Page 231

1  being tasked with multiple projects to be
2  completed in the 2017 performance cycle.
3          Do you recall what those
4  were?
5          MS. MCCLURE:  Form.
6          THE WITNESS:  That could be
7  part of the 590 project.
8          What else?
9          I don't recall any other
10 projects.  I'm sure there were,
11 but I don't recall.
12 BY MR. CLUFF:
13     Q.   And then the next sentence,
14 it says, Liz did a commendable job in
15 supporting our team during this period
16 and played an important role as the DCT
17 training lead.
18         Do you see that?
19     A.   I see that.
20     Q.   The next sentence, because
21 Mr. Cherveny continues to praise you, he
22 says, She also consistently demonstrates
23 herself to be a very strong investigator
24 and is one of our more experienced team

Page 232

1  members.
2          Do you see that?
3      A.   I see that.
4      Q.   Do you feel like that was an
5  accurate statement, that you were a
6  strong investigator?
7      A.   Yes.

Page 233



Highly Confidential - Subject to Further Confidentiality Review



Page 234

Page 236

13      MR. BRODSKY:  Sterling, can
14  we get a Bates number for
15  Exhibit-6?
16      MR. CLUFF:  Yeah.  Sure.  I
17  thought I gave it at the
18  beginning.  It's ABDCMDL00364844.
19      MR. BRODSKY:  Thank you.
20      MR. CLUFF:  This one that
21  I'm going to hand her -- I'm going
22  to hand you, Ms. Garcia, is
23  Exhibit-7.  ABDCMDL00364861.
24          - - -

Page 235

1       (Whereupon,
2   AmerisourceBergen-Garcia
3   Exhibit-7, ABDCMDL00364861-864,
4   was marked for identification.)
5           - - -
6  BY MR. CLUFF:

Page 237

Highly Confidential - Subject to Further Confidentiality Review





Page 242

Page 244

Page 243

Page 245

10      Q.   You can set 7 aside.  I'm
11  done with that for now.
12      A.   7 aside?
13      Q.   Yes.  So let's go back to 6,
14  which is the FY '16 performance
15  evaluation.
16          MR. CLUFF:  For people on
17      the phone and down the way, it's,
18      the Bates number ABDCMDL00364844.
19  BY MR. CLUFF:
20      Q.   Down at the bottom of the
21  page, Ms. Garcia, there's a heading that
22  says, Business Objectives.
23          Do you see that?
24      A.   I see that.

Page 246

1  Q.  And there's some text under
2 there that says, Accountability:  I will
3 lead and collaborate where necessary to
4 accomplish tasks that will benefit team
5 success.
6      Is that something that you
7 would have written, or is that an
8 objective that was given to you?
9  A.  I believe I wrote that.
10  Q.  How did you identify that as
11 one of your business objectives?
12  A.  These were pre-done for us.
13 I think.
14      MR. CLUFF:  Hold on.
15       - - -
16      (Whereupon, a discussion off
17  the record occurred.)
18       - - -
19 BY MR. CLUFF:
20  Q.  Let's resume, Ms. Garcia.
21 Sorry about that.
22      Did you have a chance to
23 familiarize yourself a little bit more
24 with the document while we were listening

Page 247

1 to the phone ringing?
2  A.  Not really.
3  Q.  I don't blame you, it was
4 slightly distracting.  I don't want to
5 accuse Joe of distracting us, but it's on
6 the record now.
7      Looking back at business
8 objectives and the text after the word
9 "accountability."
10  A.  Yes.
11  Q.  Do you see -- I asked you,
12 is that something that you would have
13 identified as a business objective, or
14 was it identified for you as an
15 objective?
16  A.  I believe those were
17 identified for us.
18  Q.  And there's some text at the
19 bottom of that page and on the top of the
20 next page.
21      The text under the bold
22 accountability line, is that stuff that
23 you would have written?
24  A.  Below that bold text, yes.

Page 248

1  Q.  You identify, then, that the
2 DCP/OMP team -- can you tell me what
3 those letters stand for?
4  A.  The diversion control team,
5 I think that's a typo.  And then OMP is
6 order monitoring program.
7  Q.  All right.  So the diversion
8 control team/order monitoring program
9 team is a small unit that requires each
10 person to, quote, pull their weight,
11 closed quote, in order for necessary
12 daily tasks to be completed.
13      Does that sound right?
14  A.  Yes.
15  Q.  And then you said, These
16 tasks include onboarding customers,
17 monitoring orders, consumption reviews
18 and communicating effectively with other
19 departments.
20      What did you mean by
21 "onboarding customers"?
22  A.  Onboarding customers,
23 performing due diligence investigations
24 with the 590.

Page 249

1  Q.  Anything else involved in
2 that?
3  A.  No.  Just verifying that
4 information.
5  Q.  What about monitoring
6 orders, what were you doing there?
7  A.  Monitoring orders of
8 interest to see if they were potentially
9 suspicious.
10  Q.  How did you do that?
11  A.  It would hit the algorithm,
12 that's an order of interest.  And then
13 once a human being actually clicked on
14 that order, then we would look at who the
15 customer was, where they were located,
16 what they were ordering.
17  Q.  The next one is consumption
18 reviews.
19      What's a consumption review?
20  A.  A consumption review is
21 where a customer appeals to have their
22 thresholds adjusted.
23  Q.  Was that previously called a
24 threshold review at AmerisourceBergen?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1   A.   Yes.
2   Q.   So they are effectively the
3   same term, correct?
4       MS. MCCLURE:  Objection to
5   form.
6       THE WITNESS:  I don't know.
7   BY MR. CLUFF:
8   Q.   What would you do when you
9   received a consumption review?  What was
10  the process for either granting or
11  denying it?
12      MS. MCCLURE:  Objection to
13  form.  Compound.
14      THE WITNESS:  Just seeing
15      what the customer's needs were,
16      what their justification was, what
17      drug it was, and what they
18      anticipated they needed.
19  BY MR. CLUFF:
20  Q.   Okay.  Would you agree with
21  me that when you were reviewing a
22  consumption review, the goal was to
23  always maintain an entity as an ABC
24  customer?

Page 251

1       MS. MCCLURE:  Objection to
2       form.
3       THE WITNESS:  I don't think
4       that was the top objective.  We
5       were just looking at the appeal.
6   BY MR. CLUFF:
7   Q.   You note here that one of
8   the things you'll continue to be
9   accountable for, in relation to these job
10  tasks, was playing an integral role in
11  managing chain customers and strategic
12  accounts in terms of due diligence
13  information-gathering.
14      Do you see that?
15  A.   Is that at the top of the
16  next page?
17  Q.   No.  It's the top of the
18  second page.  It's one of the three
19  bullet points.
20  A.   Can you repeat, please?
21  Q.   Sure.
22      You identify three things
23  that you say you will be -- continue to
24  be accountable for, the top line on the

Page 252

1   second page.
2       And there are three bullet
3   points.  And one is, Play an integral
4   role in managing chain customers and
5   strategic accounts in terms of due
6   diligence information-gathering.
7       Does that seem right?
8   A.   Yes.
9   Q.   So you were one of the
10  people who was integral in managing
11  AmerisourceBergen's relationship with its
12  chain customers?
13      MS. MCCLURE:  Objection to
14      form.
15      THE WITNESS:  I was one of
16      those people, yes.
17  BY MR. CLUFF:
18  Q.   So when we talk about chain
19  customers, you're one of the best people
20  to talk to at AmerisourceBergen about
21  that topic, correct?
22      MS. MCCLURE:  Objection to
23      the form.
24      THE WITNESS:  No.  Only in

Page 253

1   terms of due diligence.
2   BY MR. CLUFF:
3   Q.   Okay.  But how due diligence
4   applied to chain customers, that was one
5   of your areas of expertise?
6       MS. MCCLURE:  Objection to
7       form.
8       THE WITNESS:  Just
9       collecting the data.
10  BY MR. CLUFF:
11  Q.   All right.  I want to move
12  down.
13      It looks here like there is
14  a heading for manager evaluation and
15  employee evaluation.
16  A.   Yes.
17  Q.   Do you see that?
18  A.   Uh-huh.
19  Q.   So I'm trying to understand
20  the process.
21      We previously talked about,
22  on the first page there was a business
23  objective identified for you, correct?
24  A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  Q.   And then you were given an
2  opportunity to include some review of
3  your own underneath that heading; is that
4  right?
5      A.   Yes.
6      Q.   And then what are the
7  employee evaluation and manager
8  evaluation sections of this form?
9      A.   Employee evaluation is me
10 evaluating myself.  And then manager is
11 Eric, Eric's evaluation.
12     Q.   I want to skip down to,
13 Completing targeted pharmacy visits as
14 assigned.
15         Do you see that bold
16 heading?
17     A.   Yes.
18     Q.   So would this business
19 objective have followed -- have followed
20 a similar pattern, where you were
21 provided an opportunity to include some
22 comments, and then both you and Eric
23 would have been able to include an
24 evaluation?

Page 255

1      A.   Yes.
2      Q.   Okay.  Pharmacy visits were,
3  historically during your time at
4  AmerisourceBergen, one area of your job
5  responsibilities, correct?
6      A.   Correct.
7      Q.   Would you say it was one of
8  your strongest assets as an employee at
9  AmerisourceBergen because of your
10 background with the DEA?
11     A.   Yes.
12         MS. MCCLURE:  Objection to
13     form.
14 BY MR. CLUFF:
15     Q.   So despite the fact that
16 they were one of your chief strengths,
17 that area of your responsibility was
18 significantly reduced, correct?
19         MS. MCCLURE:  Objection to
20     form.
21         THE WITNESS:  That's
22     correct.
23 BY MR. CLUFF:
24     Q.   If you look on the next

Page 256

1  page, it says that, Site visits serve not
2  only an inspection-type purpose but are
3  also an opportunity to gather
4  intelligence about the pharmacy
5  personnel, patients, business model,
6  dispensing activities, geography, and in
7  parenthesis you say, where the store is
8  located, and peer comparisons within a
9  certain mile radius.
10         So they were -- it appears
11 that they were a very important part of
12 your work as an investigator, correct?
13         MS. MCCLURE:  Objection to
14     form.
15         THE WITNESS:  During this
16     time period, it was reduced, but
17     yes.
18 BY MR. CLUFF:
19     Q.   So before the reduction, it
20 was an important part of your job
21 responsibilities?
22         MS. MCCLURE:  Objection to
23     form.
24         THE WITNESS:  Yes.

Page 257

1  BY MR. CLUFF:
2      Q.   You continue, you say, The
3  visits allow me to address any OMP
4  issues, business needs and/or any other
5  factors that may influence how ABC moves
6  forward with that entity, i.e., reducing
7  thresholds, cutting business ties, et
8  cetera.
9          Do you see that?
10     A.   I see that.
11     Q.   So site visits were a way in
12 which you, as an investigator, determined
13 how to address thresholds and whether to
14 cut business ties, correct?
15     A.   Correct.
16     Q.   But in 2016, those visits
17 were significantly reduced, correct?
18         MS. MCCLURE:  Objection to
19     form.
20         THE WITNESS:  We hired an
21     outside consultant, so those
22     visits continued.
23 BY MR. CLUFF:
24     Q.   But you -- your

Page 258

1 responsibility for them was significantly
2 reduced, right?
3     A.   Correct.
4     Q.   You continue and you say
5 that, in your opinion, this is the most
6 effective way to actually know our
7 customers, especially the high-risk ones,
8 in terms of validating or disproving that
9 we are seeing -- excuse me -- what we are
10 seeing in prior generated data for
11 high-risk controls.
12       Do you see that?
13     A.  I see that.
14     Q.   And, again, your
15 responsibility for this had been
16 significantly reduced, correct?
17       MS. MCCLURE: Objection to
18     form.
19       THE WITNESS: Reduced, but
20     passed on to the outside
21     consultant.
22 BY MR. CLUFF:
23     Q.   Again, your responsibilities
24 for this were significantly reduced?

Page 259

1       MS. MCCLURE: Same
2     objection.
3       THE WITNESS: Yes.
4 BY MR. CLUFF:
5     Q.   Okay. You continue, you
6 say, I am not afraid to have
7 uncomfortable discussions in person with
8 pharmacy personnel in order for both the
9 pharmacy and ABC to continue in
10 partnership.
11       Correct?
12     A.   That's what it states,
13 correct.
14     Q.   We previously discussed, I
15 believe, it was in Exhibit-4, that all of
16 AmerisourceBergen's customers are valued
17 customers, correct?
18       MS. MCCLURE: Objection to
19     form.
20       THE WITNESS: Potentially
21     correct.
22 BY MR. CLUFF:
23     Q.   Okay. Well, what is
24 potentially correct about that statement?

Page 260

1     A.   I mean, until we do due
2 diligence and all of the background
3 investigation, we don't know if they're
4 valuable or not.
5     Q.   Here you say, to continue in
6 partnership.
7       Did you consider your
8 customers to be business partners?
9       MS. MCCLURE: Objection to
10     form.
11       THE WITNESS: We were
12     providing a service that they
13     needed.
14 BY MR. CLUFF:
15     Q.   But here you use the
16 words -- you use the word "partnership."
17       So it was a business
18 partnership, correct?
19       MS. MCCLURE: Objection to
20     form.
21       THE WITNESS: I don't know.
22 BY MR. CLUFF:
23     Q.   But you wrote those words?
24     A.   I mean, I stated that here.

Page 261

1 But I don't know exactly what I meant.
2     Q.   You continue and say, If it
3 is necessary, these discussions could
4 lead to ABC action to terminate the
5 account, depending on what the visit
6 yields.
7       Do you recall visits that
8 led to ABC terminating an account?
9       MS. MCCLURE: Objection to
10     form.
11       THE WITNESS: Yes.
12 BY MR. CLUFF:
13     Q.   Do you ever recall instances
14 where you and Eric Cherveny or Ed
15 Hazewski disagreed on whether to
16 terminate an account?
17     A.   I don't recall.
18     Q.   What accounts do you recall
19 terminating?
20       MS. MCCLURE: Objection to
21     form.
22       THE WITNESS: An account out
23     in Las Vegas.
24 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Q.   Why did you terminate that
2  account?
3    A.   Joe and I visited that
4  location, and their records didn't match
5  up with what we had.
6    Q.   What was the name of that
7  location?
8    A.   I don't remember.
9    Q.   Do you recall if that
10  location was subject to a DEA raid?
11    A.   I don't recall.
12    Q.   Where would I look in
13  AmerisourceBergen's files to determine
14  when that specific location was cut off
15  by AmerisourceBergen?
16    A.   In their file.
17    Q.   Would it be on a do-not-ship
18  list?
19      MS. MCCLURE:  Objection to
20    form.
21      THE WITNESS:  Possibly.
22  BY MR. CLUFF:
23    Q.   If it were cut off by a DEA
24  raid, would that be reflected in their

Page 263

1  file?
2      MS. MCCLURE:  Objection to
3    form.
4      THE WITNESS:  It could be.
5  BY MR. CLUFF:
6    Q.   Do you recall any other
7  instances where you made a decision to
8  terminate an account?
9    A.   I don't recall.
10    Q.   So in your five years, you
11  recall one instance where you, as an
12  investigator, recommended the termination
13  of an account?
14      MS. MCCLURE:  Objection to
15    form.
16      THE WITNESS:  That's all I
17    recall right now.
18  BY MR. CLUFF:
19    Q.   I want to continue with the
20  rest of that sentence after the
21  semicolon, but I want to read it in its
22  entirety, so we can give it context and
23  I'm not accused of misrepresenting the
24  document.

Page 264

1      It says, If it is necessary,
2  these discussions could lead to ABC
3  action to terminate the account depending
4  on what the visit yields; however, the
5  goal is always to maintain the entity as
6  an ABC customer.
7      Do you see that?
8    A.   I see that.
9    Q.   So you worked at
10  AmerisourceBergen for five years,
11  correct?
12    A.   Correct.
13    Q.   And you were always a
14  diversion investigator at the time,
15  right, during those five years?
16    A.   I was an investigator, yes.
17    Q.   And part of -- pharmacy
18  investigations, that was your job, right?
19      MS. MCCLURE:  Objection to
20    form.
21      THE WITNESS:  That was me
22    and Joe and Kevin's job.
23  BY MR. CLUFF:
24    Q.   And it was something that

Page 265

1  you took pride in, you thought you were
2  really good at, correct?
3    A.   Correct.
4    Q.   And you identified it as one
5  of the most effective ways to actually
6  know your customers, right?
7    A.   Correct.
8    Q.   Especially the high-risk
9  customers, in terms of validating or
10  disproving, essentially, their
11  relationship with AmerisourceBergen?
12      MS. MCCLURE:  Objection to
13    form.
14      THE WITNESS:  Validating or
15    disproving whether they were a
16    good customer to do business with.
17  BY MR. CLUFF:
18    Q.   But then here at the end of
19  the sentence that you wrote, you say, The
20  goal is always to maintain the entity as
21  an ABC customer; is that correct?
22    A.   That's in good faith, yes.
23    Q.   Where is the word "good
24  faith" in that sentence?

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    MS. MCCLURE: Objection to
2  form.
3    THE WITNESS: I just added
4  that now.
5  BY MR. CLUFF:
6    Q.  So it's not in the document,
7  correct?
8    A.  No.
9    Q.  All right. When you worked
10 at AmerisourceBergen in your five years
11 as a diversion investigator, was this a
12 policy that was communicated to you by
13 your superiors?
14    MS. MCCLURE: Objection to
15  form.
16    THE WITNESS: Was what a
17  policy?
18 BY MR. CLUFF:
19    Q.  That the goal is always to
20 maintain the entity as an ABC customer?
21    A.  No. That's just me adding
22 that.
23    Q.  So you were operating in
24 isolation when you said the goal is to

Page 267

1  always maintain the entity as an ABC
2  customer?
3    MS. MCCLURE: Objection to
4  form.
5    THE WITNESS: That was my
6  positive spin on it.
7  BY MR. CLUFF:
8    Q.  Did you ever have
9  discussions with other investigators
10 about the principle that the goal is to
11 always maintain the entity as an ABC
12 customer?
13    A.  I don't recall.
14    Q.  Do you recall
15 AmerisourceBergen ever making exceptions
16 to the rules for any of its valued
17 business partners?
18    MS. MCCLURE: Objection to
19  form.
20    THE WITNESS: I don't
21  recall.
22 BY MR. CLUFF:
23    Q.  Okay. Do you recall ever
24 communicating thresholds to

Page 268

1  AmerisourceBergen customers?
2    MS. MCCLURE: Objection to
3  form.
4    THE WITNESS: Whether it was
5  approved or not, but not the
6  threshold amount or not the
7  thresholds itself.
8  BY MR. CLUFF:
9    Q.  I'm sorry, I'm not trying to
10 pick a fight with you. I don't really
11 understand your answer, so I'm going to
12 ask it again, and maybe we can clear it
13 up.
14    Do you recall ever
15 communicating thresholds to
16 AmerisourceBergen customers?
17    MS. MCCLURE: Objection.
18  Asked and answered.
19    THE WITNESS: No.
20 BY MR. CLUFF:
21    Q.  Do you know if
22 AmerisourceBergen was authorized to
23 communicate thresholds to customers?
24    MS. MCCLURE: Objection to

Page 269

1  form.
2    THE WITNESS: No.
3  BY MR. CLUFF:
4    Q.  If AmerisourceBergen
5  communicated a customer -- a threshold to
6  one of its customers, that would have
7  essentially circumvented the suspicious
8  order monitoring program, right?
9    MS. MCCLURE: Objection to
10  form.
11    THE WITNESS: Correct.
12 BY MR. CLUFF:
13    Q.  Do you ever recall telling
14 customers when they exceeded their
15 thresholds?
16    MS. MCCLURE: Objection to
17  form.
18    THE WITNESS: I don't
19  recall.
20 BY MR. CLUFF:
21    Q.  If AmerisourceBergen had
22 communicated to a customer when they were
23 exceeding thresholds, would that
24 circumvent the suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  monitoring program?
2         MS. MCCLURE:  Objection to
3  form.  Speculative.
4         THE WITNESS:  Yeah, I don't
5  want to speculate on that.  I
6  don't know.
7  BY MR. CLUFF:
8      Q.   Sure.  I'd like to hand you
9  a copy of a document, then.  This is
10 ABDCMDL00141902.
11            - - -
12        (Whereupon,
13        AmerisourceBergen-Garcia
14        Exhibit-8, ABDCMDL00141902-903,
15        was marked for identification.)
16            - - -
17 BY MR. CLUFF:
18     Q.   I'll give you a copy of
19 that.
20         I think -- can you tell me,
21 Liz, at the bottom it says, 8?
22     A.   Yes.
23     Q.   Is that correct?
24         Okay.  Thank you.  It's a

Page 271

1  two-page e-mail.  Please go ahead and
2  familiarize yourself with it.
3         I'm going to be just asking
4  you about the e-mail that's at the bottom
5  of the first page.  So I don't know if
6  you want to start there and then we can
7  work our way through it.
8      A.   Okay.  Hold on.
9         Okay.
10     Q.   Okay.  So let's just lay the
11 foundation for this e-mail here.
12         Do you see at the top of the
13 first page, it says, From Eric Cherveny
14 to Matthew McElfresh.  On the copy line
15 are David May and Elizabeth Garcia.
16         Do you see that?
17     A.   I see that.
18     Q.   And the subject matter is,
19 OMP reporting?
20     A.   I see that.
21     Q.   And if you look down at the
22 e-mail on the bottom of the page, it says
23 from Elizabeth Garcia to Matthew
24 McElfresh, Eric Cherveny and David May.

Page 272

1         Do you see that?
2      A.   I see that.
3      Q.   Have you had a chance to
4  review this e-mail?
5      A.   Yes.
6      Q.   I want to look at, actually,
7  the first e-mail on the chain, which is
8  on the second page at the bottom there.
9         It starts from Matthew
10 McElfresh, and it's to you and Eric
11 Cherveny.
12         Do you see that?
13     A.   I see that.
14     Q.   He says, Liz/ --  Eric, and
15 the question is -- Are we currently
16 providing any reporting to Walmart
17 regarding Sam's Club's OMP thresholds
18 being met?
19         First of all, what's Sam's
20 Club?
21         That's a question.  What's
22 Sam's Club?
23     A.   Sam's Club --
24         MR. BRODSKY:  Objection.

Page 273

1  BY MR. CLUFF:
2      Q.   What's Sam's Club?
3      A.   Sam's Club is a part of
4  Walmart, and some of them may have a
5  pharmacy entity within them.
6      Q.   When you say "part of
7  Walmart," what do you mean?
8      A.   Walmart, I believe, owns
9  Sam's Clubs.
10     Q.   Is Walmart one of your chain
11 customers, AmerisourceBergen's chain
12 customers?
13     A.   Walmart was not, but Sam's
14 Club was.
15     Q.   Why would you have been
16 reporting Sam's Club OMP thresholds to
17 Walmart?
18         MS. MCCLURE:  Objection to
19 form.
20         THE WITNESS:  We didn't
21 report Sam's Club's numbers to
22 Walmart.
23 BY MR. CLUFF:
24     Q.   The next question is, Do we

Page 274

1  provide any sort of reporting like that
2  for customers, or does the DEA view that
3  as colluding?
4         Do you know what Matthew
5  McElfresh is talking about there?
6         MS. MCCLURE:  Objection to
7     form.
8         MR. BRODSKY:  Objection.
9         THE WITNESS:  I don't know
10    what Matt is talking about there.
11 BY MR. CLUFF:
12    Q.   Do you have -- having
13 reviewed the document and having worked
14 at AmerisourceBergen, do you have a
15 general understanding of why he would be
16 asking if the DEA would view this
17 practice as colluding?
18        MS. MCCLURE:  Objection to
19    form.
20        MR. BRODSKY:  Objection.
21        THE WITNESS:  I don't know
22    why he would say that.
23 BY MR. CLUFF:
24    Q.   So he next explains that,

Page 275

1  Sam's is asking if we can notify someone
2  when Sam's accounts are hitting or
3  exceeding their thresholds.
4         Do you see that?
5     A.   I see that.
6     Q.   And do you recall responding
7  to this e-mail?
8     A.   I don't recall, but here it
9  is.
10    Q.   So it looks like the e-mail
11 at the bottom of the page there, that's
12 from you to Matthew McElfresh, that's
13 your response?
14    A.   Yes.
15    Q.   Okay.  Sitting here today,
16 you don't recall writing that?
17    A.   I do not.
18    Q.   That was in August 2017,
19 correct?
20    A.   Correct.
21    Q.   But looking at it, do you --
22 looking at this e-mail, do you believe
23 this is a true and correct copy of
24 something that was written and reviewed

Page 276

1  by you at the time?
2         MS. MCCLURE:  Objection to
3     form.
4         THE WITNESS:  Yes.
5  BY MR. CLUFF:
6     Q.   Okay.  So I want to look at
7  the text of your e-mail.
8         You start off by saying, Hi
9  Matt.
10        Do you see that?
11    A.   I see that.
12    Q.   And you write, We do not
13 report to any customer what their limits
14 are or whether they are exceeding those
15 limits or not, as it is against our
16 policy to do so.
17        Do you see that?
18    A.   I see that.
19    Q.   Okay.  So reporting to a
20 customer about what their limits are or
21 whether they exceeded those limits, the
22 word "limits" in that sentence, does that
23 refer to thresholds?
24        MS. MCCLURE:  Objection to

Page 277

1     form.
2         THE WITNESS:  Correct.
3  BY MR. CLUFF:
4     Q.   Do you recall any exceptions
5  to this statement, where
6  AmerisourceBergen told somebody what
7  their limits were or whether they
8  exceeded those limits?
9         MS. MCCLURE:  Objection to
10    form.
11        MR. BRODSKY:  Same
12    objection.
13        THE WITNESS:  No.
14 BY MR. CLUFF:
15    Q.   Okay.  You continue and you
16 say, In addition, that would be
17 circumventing our own suspicious order
18 monitoring program; therefore, all
19 threshold limits are not disclosed.
20        Do you see that?
21    A.   I see that.
22    Q.   Do you have any knowledge of
23 instances where AmerisourceBergen
24 informed people about thresholds or

Page 278

1  disclosed thresholds?
2       MS. MCCLURE:  Objection to
3  form.
4       THE WITNESS:  No.
5       MR. BRODSKY:  Same
6  objection.
7  BY MR. CLUFF:
8       Q.   Just looking at that
9  paragraph, I get that there's two
10  sentences, and so I don't want to overly
11  complicate this, though.
12       But looking at the first
13  sentences -- it looks like there are two
14  kinds of information we're talking about
15  here.  The first is what a customer's
16  limit is.
17       Does that make sense?
18       MS. MCCLURE:  Objection to
19  form.
20       THE WITNESS:  Correct.
21  BY MR. CLUFF:
22       Q.   And there's -- a second
23  piece of information is when they exceed
24  those limits?

Page 279

1       A.   That's what is written here.
2       Q.   And the reason you don't do
3  that is, as I understand it, it looks
4  like it's twofold.  First, it's against
5  policy.
6       Does that make sense?
7       A.   It makes sense.
8       Q.   And, second, because it
9  would circumvent the suspicious order
10  monitoring program?
11       A.   Correct.
12       MS. MCCLURE:  Objection to
13  form.
14  BY MR. CLUFF:
15       Q.   Okay.  All right.  Go ahead
16  and set Exhibit-8 aside for me.
17       I'm going to hand you a copy
18  of a document that's been produced,
19  ABDCMDL00306522.
20       - - -
21       (Whereupon,
22       AmerisourceBergen-Garcia
23       Exhibit-9, ABDCMDL00306522-525,
24       was marked for identification.)

Page 280

1       - - -
2  BY MR. CLUFF:
3       Q.   It's a multipage e-mail.
4       Go ahead and read the
5  entirety of the document so you can feel
6  familiar with it.
7       A.   I don't remember this,
8  but --
9       Q.   But have you had a chance to
10  look through it and kind of familiarize
11  yourself with it?
12       A.   A little bit, yes.
13       Q.   Let's start at the top.
14       The last e-mail in this
15  chain, which is the top e-mail on the
16  first page, it's from Sharon Hartman to a
17  number of ABC associates, it looks
18  like -- sorry, I said ABC, I meant
19  AmerisourceBergen.
20       You're included on the
21  addressee list, correct?
22       A.   Yes.
23       Q.   And do you see the subject
24  line says, Weekly OMP statistics?

Page 281

1       A.   Yes.
2       Q.   Do you recall, during your
3  time at AmerisourceBergen, that
4  AmerisourceBergen shared weekly OMP
5  statistics with Walgreens?
6       A.   Yes.
7       Q.   What are OMP statistics?
8       A.   Purchases and which
9  customers, which stores, might have hit
10  the OMP.
11       Q.   When you say "might have,"
12  did you tell Walgreens, like, hey, this
13  store might have hit their threshold or
14  that they actually hit?
15       MS. MCCLURE:  Objection to
16  form.
17       THE WITNESS:  They hit OMP.
18  BY MR. CLUFF:
19       Q.   So the weekly OMP
20  statistics, as I understand it from what
21  you just told me, was a report that
22  AmerisourceBergen gave to Walgreens about
23  which stores hit or exceeded their OMP
24  parameters, correct?

Page 282

1    A.   Which orders hit OMP, yes.
2    Q.   Was there any other data
3  included in those statistics that you
4  provided to Walgreens?
5    A.   I don't recall.
6    Q.   I had you set aside -- no,
7  never mind.
8        So continuing with what we
9  marked as Exhibit-9, if you look at the
10 very last page, there's an e-mail that
11 starts from Lino Guerreiro.  It goes to
12 Natasha Polster, Eric Stahmann, Patricia
13 Daugherty, Christopher Dymon, Edward
14 Bratton, Nick Leners.
15       Those are all in the "to"
16 line; is that correct?
17   A.   Yes.
18   Q.   Are those all Walgreens
19 employees?
20   A.   Yes.
21   Q.   So that seems to be accurate
22 with your recollection about providing
23 this data to Walgreens, correct?
24   A.   Correct.

Page 283

1    Q.   Was Walgreens one of
2  AmerisourceBergen's trusted business
3  partners?
4        MS. MCCLURE:  Objection to
5  form.
6        THE WITNESS:  Yes.
7  BY MR. CLUFF:
8    Q.   The date of this e-mail is
9  November 21, 2014, correct?
10   A.   That's correct.
11   Q.   That's a little over a year
12 after AmerisourceBergen -- I mean,
13 Walgreens paid the $80-million penalty we
14 talked about?
15   A.   Correct.
16   Q.   If you go up the chain here,
17 Sharon has some concerns.  She says, It
18 will be interesting to see how this
19 report's action column changes from
20 reject to approved next week, due to
21 changes in process.
22       Do you see that?
23   A.   I do not.  Where is it?
24   Q.   I'm sorry, it's the middle

Page 284

1  e-mail on the second-to-last page, the
2  one that ends in 6524.
3    A.   Okay.
4    Q.   It's on the screen in front
5  of you, too, just so you can see it.
6    A.   Okay.
7    Q.   Do you recall why Sharon
8  thought it would be interesting to see
9  how the report column changes?
10       MS. MCCLURE:  Objection to
11 form.
12       THE WITNESS:  I don't know
13 what she's talking about.
14 BY MR. CLUFF:
15   Q.   And then the next e-mail up,
16 the top of the same page, is from
17 Kimberly St. John.
18       Do you know who that is?
19   A.   She was our coordinator at
20 one point.
21   Q.   Was she also Chris
22 Zimmerman's executive assistant?
23   A.   She moved into that position
24 later.

Page 285

1    Q.   She writes, Walgreens'
2  orders from this morning were mostly way
3  over threshold or duplicates.
4        She continues, I'm not sure
5  how much that column will change, to be
6  honest.
7        Based on your experience as
8  a person who conducted due diligence for
9  chain pharmacies, do you have any
10 understanding as to why she did not
11 believe changes would be occurring?
12       MS. MCCLURE:  Object to the
13 form.
14       THE WITNESS:  I have no
15 idea.
16 BY MR. CLUFF:
17   Q.   Do you have any recollection
18 about Walgreens' orders being way over
19 the threshold?
20   A.   No.
21   Q.   Would it concern you that a
22 large chain pharmacy like Walgreens had
23 most of its orders be way over threshold?
24       MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    form.  Misstates the document.
2          THE WITNESS:  No.  Because
3      I'd need to look at it and see
4      what the issue was.
5    BY MR. CLUFF:
6      Q.    Is that another instance
7    where AmerisourceBergen would be
8    operating to protect its valued
9    customers?
10         MS. MCCLURE:  Objection to
11     form.
12         THE WITNESS:  No.
13   BY MR. CLUFF:
14     Q.    Would that be another
15   instance where AmerisourceBergen was
16   resolving issues in favor of keeping a
17   customer?
18         MS. MCCLURE:  Objection to
19     form.
20         THE WITNESS:  No.
21   BY MR. CLUFF:
22     Q.    But those orders were way
23   over threshold, according to Kimberly St.
24   John?

Page 287

1          MS. MCCLURE:  Objection to
2      form.
3          THE WITNESS:  It was just
4      pure investigation.
5    BY MR. CLUFF:
6      Q.    I'm sorry?  What was just
7    pure investigation?
8      A.    It's just looking at that
9    isolated order to see what the
10   circumstances were.
11     Q.    Let me back up and
12   understand something here.
13         Kimberly St. John says,
14   Walgreens' orders from this morning were
15   mostly way over threshold or duplicates.
16         And then you just explained
17   to me that something is just looking at
18   the isolated orders to see what the
19   circumstances were.
20         Could you explain that to
21   me?
22     A.    When we look at that order,
23   we're trying to determine what the
24   circumstances were, why that order hit

Page 288

1    OMP.
2      Q.    But as an objective fact,
3    Kimberly St. John states that Walgreens'
4    orders from this morning were mostly way
5    over threshold or duplicates, correct?
6          MS. MCCLURE:  Objection to
7      form.
8          THE WITNESS:  But I don't
9      know the context that she's
10     talking about.
11   BY MR. CLUFF:
12     Q.    Do you understand the
13   context of an order exceeding threshold?
14         MS. MCCLURE:  Objection to
15     form.
16         THE WITNESS:  Reclarify.
17   BY MR. CLUFF:
18     Q.    Sure.
19         Does AmerisourceBergen use
20   thresholds to identify orders of
21   interest?
22         MS. MCCLURE:  Objection to
23     form.  When?
24         THE WITNESS:  If it hits the

Page 289

1    algorithm.
2    BY MR. CLUFF:
3      Q.    Is the algorithm including a
4    threshold?
5          MS. MCCLURE:  Objection to
6      form.
7          THE WITNESS:  Yes.
8    BY MR. CLUFF:
9      Q.    And so what happens when an
10   order exceeds threshold?
11     A.    It hits the algorithm and
12   it's an order of interest, and then we go
13   in and look at it.
14     Q.    So you asked me what the
15   context was about exceeding threshold.
16         And I will tell you that
17   when I say "exceeding threshold," I
18   describe that process that you just
19   communicated to me.
20         And let's go back to
21   Kimberly St. John's e-mail.  And she
22   says, Walgreens' orders from this morning
23   were mostly way over threshold or
24   duplicates.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Do you see that?
2    A.   I see that.
3    Q.   So based on what you just
4 testified to me, is it your understanding
5 that, here, the orders would have
6 exceeded the threshold algorithm that you
7 just described?
8        MS. MCCLURE:  Objection to
9    form.
10       THE WITNESS:  I assume
11   that's what she's talking about.
12 BY MR. CLUFF:
13   Q.   And my follow-up question
14 is, is that a situation in which
15 AmerisourceBergen would have made
16 decisions to protect their business
17 partners?
18       MS. MCCLURE:  Objection to
19   form.
20       THE WITNESS:  I don't
21   understand the question.
22 BY MR. CLUFF:
23   Q.   I previously asked you if
24 Walgreens is a trusted business partner

Page 291

1 for AmerisourceBergen.
2    Do you recall that?
3    A.   Yes.
4    Q.   Right.  And would you agree
5 with me that they are?
6    A.   Yes.
7    Q.   We previously looked at the
8 e-mail that you wrote to Greg Madsen
9 about Costco, and you instructed him that
10 when you're looking at 590 due diligence,
11 you're always trying to protect your
12 valued customers.
13       Do you remember that?
14       MS. MCCLURE:  Objection to
15   form.
16       THE WITNESS:  Yes.
17 BY MR. CLUFF:
18   Q.   So you told me that when an
19 order exceeds threshold, as Kimberly St.
20 John describes in this e-mail, it goes
21 into a due diligence investigation; is
22 that correct?
23       MS. MCCLURE:  Objection to
24   form.

Page 292

1        THE WITNESS:  We look at
2    those orders, yes.
3 BY MR. CLUFF:
4    Q.   And my question is, when
5 you're looking at those orders, is
6 AmerisourceBergen trying to protect its
7 customers; yes or no?
8        MS. MCCLURE:  Objection to
9    form.  And you don't have to
10   answer yes or no.
11       THE WITNESS:  I don't want
12   to speculate on that.
13 BY MR. CLUFF:
14   Q.   I didn't ask you to
15 speculate.
16       Let's back up.  We'll lay
17 some foundation for this so you can kind
18 of see where I'm going.
19       You were a diversion
20 investigator for five years at
21 AmerisourceBergen, correct?
22   A.   Correct.
23   Q.   Part of your job
24 responsibilities were to investigate

Page 293

1 orders that exceeded threshold?
2    A.   Correct.
3    Q.   I believe you referred to
4 those as orders of interest.
5        Does that make sense?
6    A.   Orders of interest, yes.
7    Q.   Okay.  These orders here
8 that Kimberly St. John talks about that
9 exceed threshold, would you qualify those
10 as orders of interest?
11   A.   They hit the algorithm, yes.
12   Q.   And so they needed to be
13 investigated, correct?
14   A.   Correct.
15   Q.   All right.  I'm just asking
16 you, in your process, as a diversion
17 investigator that investigated orders of
18 interest that exceeded threshold, like
19 these identified here by Walgreens,
20 whether you investigated those in a way
21 that protected your customer's interests?
22       MS. MCCLURE:  Objection to
23   form.
24       THE WITNESS:  No.  It's just

Page 294

1    an isolated order that hit the
2    algorithm that we're looking at.
3    That doesn't mean we told them
4    what their threshold amounts were,
5    or anything else.
6    BY MR. CLUFF:
7        Q.   I'm just asking, when you
8    were investigating these orders, did you
9    do so in a way to protect your customers?
10       MS. MCCLURE:  Objection to
11   form.  Asked and answered.
12       THE WITNESS:  No.  It's just
13   an action that they did to
14   replenish their inventories.
15   BY MR. CLUFF:
16       Q.   Okay.  When we looked
17   through Exhibit-7, I believe, we talked
18   about that decisions were made always in
19   order to keep a customer as an
20   AmerisourceBergen customer.
21       Do you recall that?
22       MS. MCCLURE:  Objection to
23   form.  Mischaracterizes the
24   document.  Misstates the witness's

Page 295

1    prior testimony.
2        THE WITNESS:  That's what I
3    stated.
4    BY MR. CLUFF:
5        Q.   Okay.  When you, as an
6    investigator, reviewed orders like this
7    that exceeded threshold, did you do so in
8    a way to maintain ABC customers?
9        MS. MCCLURE:  Objection to
10   form.
11       THE WITNESS:  It wasn't to
12   protect them.  It was to look at
13   the order, regardless.
14       MS. MCCLURE:  Can we take a
15   break in a moment?
16       MR. CLUFF:  We'll break when
17   I'm ready to break, unless Liz
18   needs a break.
19       THE WITNESS:  I'll take a
20   break.
21       MR. CLUFF:  Let's take a
22   break.
23       VIDEO TECHNICIAN:  Off the
24   record at 2:31 p.m.

Page 296

1            - - -
2        (Whereupon, a brief recess
3    was taken.)
4            - - -
5        VIDEO TECHNICIAN:  We're
6    back on the record at 2:49 p.m.
7    BY MR. CLUFF:
8        Q.   Ms. Garcia, we recently took
9    a break.  We're back on the record now.
10   So you understand that you're still under
11   oath?
12       A.   Yes.
13       Q.   Okay.  So let's go back to
14   Exhibit-9, the one we were just talking
15   about.  That's the e-mail with the
16   subject line, Weekly OMP statistics.
17       Do you see that?
18       A.   I see that.
19       Q.   And we were on the third
20   page, and we were looking at Kimberly St.
21   John's e-mail at the top there.
22       Do you see that?
23       A.   I see that.
24       Q.   I want to flip to the front

Page 297

1    one more page, which ends in 6523.  At
2    the top there, there's an e-mail that you
3    write.
4        Do you see it?
5        A.   I see that.
6        Q.   Okay.  And if you recall
7    from the discussion prior to your e-mail,
8    I'm going to paraphrase, but the
9    discussion was, orders from Walgreens
10   that were exceeding thresholds.
11       Do you think that is a fair
12   summary?
13       A.   Yes.
14       Q.   Okay.  Do you recall that --
15   or what do you recall about Walgreens'
16   ordering patterns while you were an
17   employee of AmerisourceBergen?
18       MS. MCCLURE:  Objection to
19   form.
20       THE WITNESS:  They ebbed and
21   flowed.
22   BY MR. CLUFF:
23       Q.   Do you have any recollection
24   about them, you know, having a pattern of

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  exceeding their thresholds?
2      MS. MCCLURE: Objection to
3  form.
4      THE WITNESS: I don't
5  recall.
6  BY MR. CLUFF:
7      Q.  Do you feel like you
8  personally, as an employee of
9  AmerisourceBergen, had a close working
10 relationship with Walgreens?
11     MS. MCCLURE: Objection to
12 form.
13     THE WITNESS: I had a good
14     relationship with Walgreens, yes.
15 BY MR. CLUFF:
16     Q.  What do you mean when you
17 say you had a "good" working relationship
18 with Walgreens?
19     MS. MCCLURE: Objection to
20 form.
21     THE WITNESS: I communicated
22     with the WAG integrity team, who
23     are my counterparts at Walgreens.
24 BY MR. CLUFF:

Page 299

1      Q.  So when you say they were
2  "your counterparts," could you describe
3  what that means?
4      A.  They were investigators
5  also.
6      Q.  And what were they
7  investigating?
8      A.  They monitored their own
9  accounts.
10     Q.  Was there a special or
11 unique relationship between the diversion
12 control team and the WAG team?
13     MS. MCCLURE: Objection to
14 form.
15     THE WITNESS: We were
16     counterparts for our respective
17     businesses.
18 BY MR. CLUFF:
19     Q.  Was there any communication
20 between the diversion control team and
21 the WAG integrity team if a Walgreens'
22 order exceeded thresholds?
23     MS. MCCLURE: Objection to
24     form.

Page 300

1      THE WITNESS: If we saw
2  something unusual, we would call
3  it to their attention.
4  BY MR. CLUFF:
5      Q.  What happened after you
6  called it to their attention?
7      MS. MCCLURE: Objection to
8  form.
9      THE WITNESS: I don't know
10     what they did.
11 BY MR. CLUFF:
12     Q.  Would AmerisourceBergen ever
13 take action on an order that exceeded
14 threshold without talking to the WAG
15 integrity team?
16     MS. MCCLURE: Objection to
17     form.
18     THE WITNESS: Generally, no.
19 BY MR. CLUFF:
20     Q.  I've been saying WAG
21 integrity team.
22     I'm using the abbreviation,
23 W-A-G, do you know that to mean
24 Walgreens?

Page 301

1      A.  Yes.
2      Q.  I'll clear that up in the
3  future. I just wanted to be on the same
4  page.
5      So you said that, generally,
6  no, Amerisource didn't take action on
7  orders that exceeded threshold without
8  talking to Walgreens, right?
9      A.  Correct.
10     Q.  So what happened after, in
11 your experience, AmerisourceBergen
12 communicated to Walgreens about an order
13 that exceeded threshold?
14     MS. MCCLURE: Objection to
15     form.
16     THE WITNESS: I don't know
17     what action they took on their
18     end.
19 BY MR. CLUFF:
20     Q.  Did you receive any
21 communications back from the Walgreens
22 integrity team at that point?
23     MS. MCCLURE: Objection to
24     form.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1     THE WITNESS: Either at that
2   point or in the future, once they
3   resolved the issue.
4 BY MR. CLUFF:
5     Q. What do you mean by
6 "resolved the issue"?
7     A. Whether that is a legitimate
8 need for their patients or not, that
9 order.
10     Q. And what would happen if
11 Walgreens determined that an order was
12 not for the legitimate needs of a
13 patient --
14     MS. MCCLURE: Objection to
15   form.
16 BY MR. CLUFF:
17     Q. -- at AmerisourceBergen;
18 would the order be cancelled?
19     A. They would indicate, please
20 cancel.
21     Q. At that point, would you
22 cancel the order?
23     MS. MCCLURE: Objection to
24   form.

Page 303

1     THE WITNESS: Yes.
2 BY MR. CLUFF:
3     Q. And when I say "you," I mean
4 AmerisourceBergen.
5     After you cancelled the
6 order, would you report that to the DEA?
7     MS. MCCLURE: Objection to
8   form.
9     THE WITNESS: Yes. Unless
10   it was human error or something
11   like that.
12 BY MR. CLUFF:
13     Q. I want to look now again
14 back to Exhibit-9.
15     The second page, your e-mail
16 in the top part of the page is the one
17 dated November 21, 2014.
18     You say, I agree that action
19 needs to be taken on Walgreens -- which
20 is abbreviated, WAG's -- part to make
21 sure that -- ensure they do not order
22 large amounts over threshold.
23     Do you see that?
24     A. I see that.

Page 304

1     Q. In 2014, reading this
2 sentence, do you have a recollection that
3 Walgreens was ordering over threshold by
4 large amounts?
5     MS. MCCLURE: Objection to
6   form.
7     THE WITNESS: I don't
8   recall.
9 BY MR. CLUFF:
10     Q. But that's what you wrote,
11 correct?
12     MS. MCCLURE: Objection to
13   form.
14     THE WITNESS: That's what I
15   wrote.
16 BY MR. CLUFF:
17     Q. You say here that you agreed
18 with Kim that there won't be much change
19 on Walgreens' part.
20     Do you see that?
21     A. I see that.
22     Q. Do you have a recollection
23 today of why you believed that Walgreens
24 would not change their ordering patterns?

Page 305

1     A. I don't know the context,
2 no.
3     Q. You've read this e-mail,
4 right?
5     A. I have.
6     Q. You had an opportunity to
7 review it?
8     A. Let me look at what I wrote.
9   Okay.
10     Q. You say -- you agree with
11 Kim that there won't be much change in
12 Walgreens' ordering patterns.
13     Do you recall what that
14 conclusion was based on?
15     MS. MCCLURE: Objection to
16   form. Asked and answered.
17     THE WITNESS: I don't
18   recall.
19 BY MR. CLUFF:
20     Q. In the next sentence you
21 say, Their solution -- I'm assuming that
22 means Walgreens, right?
23     A. Correct.
24     Q. So Walgreens' solution will

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 be to raise the threshold, which means
2 I'll continue to receive many reviews on
3 a daily basis.
4         Reading that sentence, is it
5 your recollection that you were receiving
6 many reviews on a daily basis from
7 Walgreens that were over threshold?
8     A.   They were appealing their
9 threshold amounts.
10     Q.   So they were appealing their
11 threshold amounts on a daily basis?
12         MS. MCCLURE:  Objection to
13     form.
14         THE WITNESS:  Because we
15     were -- we were trying to sync our
16     system with theirs, and there was
17     a glitch that didn't allow that to
18     happen.  So they would appeal the
19     threshold amounts.
20 BY MR. CLUFF:
21     Q.   When we looked at your
22 LinkedIn profile and you described the
23 work you've done at AmerisourceBergen and
24 DEA, I believe you described yourself as

Page 307

1 having a thorough knowledge of the
2 regulations.
3         Does that make sense?
4     A.   Makes sense.
5     Q.   Are you aware of a
6 regulation that allows a distributor and
7 its customer to sync their order
8 monitoring systems?
9         MS. MCCLURE:  Objection to
10     form.
11         THE WITNESS:  That's just
12     general business acumen, I guess.
13 BY MR. CLUFF:
14     Q.   Is that a part of the
15 partnership that Amerisource had with
16 Walgreens?
17         MS. MCCLURE:  Objection to
18     form.
19         THE WITNESS:  I don't know.
20 BY MR. CLUFF:
21     Q.   What does it mean to you
22 when you say the words "sync" the two
23 systems?
24     A.   They were on a different

Page 308

1 platform than ours.  So they would have,
2 I think, visibility, in the future, of an
3 order that might hit OMP on their end.  I
4 don't know.
5     Q.   When you say "visibility,"
6 do you mean into AmerisourceBergen's
7 system?
8     A.   No.  It's a platform that
9 the stores themselves order from and then
10 we see it on our side, from what I
11 recall.
12     Q.   So AmerisourceBergen had
13 visibility into Walgreens' system?
14         MS. MCCLURE:  Objection to
15     form.
16         THE WITNESS:  No.  Sorry.
17     I'm not --
18 BY MR. CLUFF:
19     Q.   I'm just trying to
20 understand.
21     A.   I'm not explaining that
22 right.
23         The stores have a platform
24 that they would order from, or that the

Page 309

1 system automatically orders from.
2     Q.   Let's stop right there.
3 Let's understand that portion, because it
4 seems like we've got some steps along the
5 way.
6         Walgreens stores had a
7 system that they ordered controlled
8 substances from, from Walgreens, like,
9 central; is that what you're saying?
10         MS. MCCLURE:  Objection.
11         THE WITNESS:  I think so.
12 BY MR. CLUFF:
13     Q.   Okay.  And then what
14 happened next?
15     A.   And then that order gets
16 transmitted over to SAP, which was our
17 system.
18         So they don't have
19 visibility to our system and we don't
20 have visibility to theirs, but they were
21 two different platforms.
22     Q.   So when you say sync the
23 system, do you mean something like
24 helping the two systems communicate with

Page 310

1 each other?
2        MS. MCCLURE:  Objection to
3    form.
4        THE WITNESS:  Yes.
5 BY MR. CLUFF:
6    Q.   Did --
7    A.   Communicate but not visible,
8 sorry.
9    Q.   No.  Finish your answer.  Go
10 ahead.
11    A.   No, that's all.
12    Q.   So your answer was
13 communicate but not visible.
14        Do you mean not have
15 visibility between the two?
16    A.   Correct.
17    Q.   Understood.
18        Did Amerisource sync its
19 system with any other customers?
20        MS. MCCLURE:  Objection to
21    form.
22        THE WITNESS:  I don't know.
23 BY MR. CLUFF:
24    Q.   So based on your

Page 311

1 understanding, this may be just a
2 Walgreens-only kind of deal?
3        MS. MCCLURE:  Objection to
4    form.  Misstates the witness's
5    prior testimony.
6        THE WITNESS:  I don't know.
7 BY MR. CLUFF:
8    Q.   Okay.  So if you recall, we
9 got to this e-mail because I asked you if
10 AmerisourceBergen ever communicated
11 thresholds -- or when customers exceeded
12 thresholds.
13        Do you recall that?
14    A.   Yes.
15    Q.   I think that was Exhibit-8,
16 if you want to put it back in front of
17 you.
18        So I'm going to give you two
19 documents.  And they've previously been
20 admitted as exhibits in the deposition of
21 Mr. Hazewski.
22        And I'm going to give you
23 the first one.  And just for clarity, I'm
24 going to put another number on it, even

Page 312

1 though it's already got a number on it.
2 But for your deposition, we're going to
3 refer to this e-mail as Exhibit-10.
4        - - -
5        (Whereupon,
6    AmerisourceBergen-Garcia
7    Exhibit-10, ABDCMDL00282490, was
8    marked for identification.)
9        - - -
10 BY MR. CLUFF:
11    Q.   And then I'm going to give
12 you a document to put behind it that
13 we're going to mark as Exhibit-11.
14        - - -
15        (Whereupon,
16    AmerisourceBergen-Garcia
17    Exhibit-11, ABDCMDL00282491, was
18    marked for identification.)
19        - - -
20        MR. CLUFF:  So let me give
21    you this.  And while you're
22    familiarizing yourself, I'll
23    collect my thoughts.
24        MS. MCCLURE:  It's a little

Page 313

1    small.
2        MR. CLUFF:  Shannon, this is
3    one of the ones we discussed
4    before we went on the record
5    today, where I have a copy of the
6    native file that I can blow up so
7    it's easier for all of us to look
8    at.
9        MS. MCCLURE:  I mean, this
10    is visible to me.
11        Can you see it?
12        THE WITNESS:  Pretty much.
13        MR. CLUFF:  So what I can
14    do, Ms. Garcia, is I can have him
15    load that spreadsheet up on the
16    screen for us all to look at.
17 BY MR. CLUFF:
18    Q.   But let me -- let me make a
19 record right here.
20        So the cover e-mail, which
21 we marked as Exhibit-10, is Bates
22 numbered ABDCMDL00282490.
23        MR. CLUFF:  And for the
24    trial tech, that's Document 49.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

BY MR. CLUFF:

Q. The spreadsheet, which is an attachment to the e-mail, which we marked as Exhibit-11, that's the one in your right hand there, that is marked as ABDCMDL00282491.

MR. CLUFF: And that's, for the trial tech, marked as Exhibit-50.

I will note that the cover e-mail is marked as, confidential subject to the protective order. For purposes of the deposition, we will designate -- or we will agree with counsel that the spreadsheet is maintaining the same designation.

BY MR. CLUFF:

Q. So why don't you look at that cover e-mail and the attachment, please, Ms. Garcia.

A. Okay.

Q. So let's look at the cover e-mail, which we marked as Exhibit-10.

Page 315

Do you have that?

A. Okay.

Q. That's an e-mail from Ed Hazewski.

Do you see that he is the sender in the "from" line, right?

A. Uh-huh.

Q. And then if you look at the "to" line, it looks like there are a number of Walgreens e-mail addresses there?

A. Yes.

Q. Are those people that you would have communicated with in your work with Walgreens?

A. Yes. That's the WAG integrity team.

Q. And then you see there's a subject line that says, Data?

A. Yes.

Q. And the attachment is, WAG orders held.xlsx, correct?

A. Correct.

Q. And then -- so this is Ed

Page 316

writing. And he says, Team WAG -- or team Walgreens -- find attached some data that I believe could be the basis for a part of our discussion. Briefly, the first tab is all WAG locations that had C-II order lines flagged by the OMP, sorted largest (most lines) to smallest. We can discuss further tomorrow.

So my question is, looking at this document, do you have a general understanding that the attachment would have been data provided by AmerisourceBergen to Walgreens?

A. Yes.

Q. And that the data that was provided was C-II order lines flagged by the OMP, correct?

A. Correct.

You need a magnifying glass.

MR. CLUFF: Zach, can you put the spreadsheet up, the PDF, please? And can you blow it up as big as possible so Ms. Garcia can look at it a little bit better?

Page 317

Not much better. It's marginally better.

BY MR. CLUFF:

Q. So based on Ed's e-mail, it looks like the spreadsheet that was attached would have had multiple tabs, correct?

Looking at the e-mail, he says, The first tab.

A. I guess that's implied. I don't see that here, though.

Q. He says, on his sentence, on the Exhibit-10, second sentence, Briefly, the first tab is all Walgreens locations that had C-II order lines flagged by the OMP.

A. Okay.

Q. Okay. So looking at this exhibit --

MR. CLUFF: Can you show me the bottom left-hand corner of the document, Zach?

BY MR. CLUFF:

Q. Do you see down there in the

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 very bottom left-hand corner, there's a
2 note -- I'm trying to blow it up on my
3 screen, too, so I can see it.
4        A.   ABDC -- what's that say?
5        Q.   Down in the bottom
6 right-hand corner, it says, Activity for
7 March totals.
8            Do you see that?
9        A.   Yes.
10       Q.   If you look up at the very
11 top left corner, where the chart starts,
12 there is a column that says, DC.
13            Do you see that?
14       A.   I see that.
15       Q.   Would that have stood for
16 distribution center?
17       A.   Yes.
18       Q.   And then the next chart
19 over, there's a column that says, DEA
20 number?
21       A.   Correct.
22       Q.   Would that be a DEA number
23 of a customer?
24            MS. MCCLURE:  Objection to

Page 319

1     form.
2            THE WITNESS:  I don't know
3     if that's referencing the DC or
4     the customer.
5 BY MR. CLUFF:
6        Q.   Okay.  Going over one more,
7 there's a column that says, Customer
8 number.
9            Do you see that?
10       A.   Okay.
11       Q.   Would that have been the
12 Walgreens -- excuse me, the
13 AmerisourceBergen customer or that
14 customer's DEA number?
15       A.   The customer number is an
16 internal number that's on the ABC side.
17       Q.   In the next column over, it
18 says, Customer name?
19       A.   Yes.
20       Q.   Do you see that?
21            And if you kind of flip
22 through this, this document, you'll see
23 that they are all Walgreens, correct?
24       A.   I see that, yes.

Page 320

1        Q.   Moving over one more,
2 there's a column that says, Address.
3            Do you see that?
4        A.   I see that.
5        Q.   And next to that is, State.
6            Do you see that?
7        A.   (Witness nods.)
8        Q.   Pursuant to one of the
9 orders in this case, I'm supposed to ask
10 you questions primarily about Ohio
11 jurisdictions.
12            So I took the native
13 document that was attached to that
14 e-mail, and I sorted it only for Ohio.
15            So if you flip through that
16 document, you will see that the state is
17 only Ohio.
18            Do you see that?
19       A.   I see that.
20       Q.   Okay.  So the RX license
21 number, do you see that?
22       A.   I do.
23       Q.   Do you know what that is?
24       A.   That might be their license

Page 321

1 number at the state level.
2        Q.   And then looking next column
3 over, it says, Order date.
4            What is that?
5        A.   When they placed the order.
6        Q.   And then the next column
7 over, that is, Sales order number.
8            Do you see that?
9        A.   I see that.
10       Q.   What is that number?
11       A.   That's the order number, I
12 believe, that's generated by the SAP
13 system.
14       Q.   So, so far, if we track this
15 chart across, we're looking at DEA number
16 for Walgreens customers.
17            And from that, we're able to
18 identify an order date and an order
19 number, correct?
20       A.   Yes.
21       Q.   And the next column over,
22 the heading is, Line.
23            Do you see that?
24       A.   I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 Q. Is that the number of lines
2 that would have been included on an
3 order?
4 A. I don't know. I believe so.
5 Q. Okay. If you look at the
6 column, OMP family, do you see that?
7 A. Yes.
8 Q. What would that -- what
9 would that column have reflected in the
10 chart?
11 A. That was the two-letter
12 acronym for -- or abbreviation for a
13 drug.
14 Q. So looking down at OX,
15 that's purple, what would that be?
16 A. Oxycodone.
17 Q. Do you have an understanding
18 of what BO is at the top of that chart?
19 A. Buprenorphine.
20 Q. How about LA?
21 A. Some kind of a liquid. I
22 don't remember.
23 Q. But, generally, you
24 understand that if we looked at the OMP

Page 323

1 family column here, we can determine what
2 kind of drug was being ordered?
3 A. Yes.
4 Q. Maybe it's more appropriate,
5 if I misspoke, to call them drug families
6 were being ordered?
7 A. Yes.
8 Q. If you go over one more
9 column, it says, Item number, correct?
10 A. Correct.
11 Q. What is an item number?
12 A. That's the sku, I believe,
13 for that particular item.
14 Q. Forgive my lay
15 misunderstanding, what's a sku? Is it an
16 abbreviation?
17 A. It's a number assigned to
18 different drug products.
19 Q. Like a S-K-U?
20 A. Yes.
21 Q. The next column over is,
22 Material description.
23 Do you see that?
24 A. I see that.

Page 324

1 Q. So that the sort of, like,
2 long-form description of the drug that
3 was contained in the OMP family
4 abbreviation?
5 A. Yes.
6 Q. So if we're looking at that
7 column, for example, we see Suboxone,
8 Oxycodone, OxyContin.
9 Do you see that all that?
10 A. I do.
11 Q. So those drug families would
12 correspond back to the OMP category?
13 A. Yes.
14 Q. If you scroll over to the
15 next column, it says, NDC.
16 What is NDC?
17 A. You know, I don't know. I
18 forget.
19 Q. Looking over at the next
20 column, do you see that category is
21 called, Threshold?
22 A. I do.
23 Q. Would that category have
24 been the threshold for this drug family

Page 325

1 or OMP family?
2 MS. MCCLURE: Objection to
3 form.
4 THE WITNESS: It appears to
5 be, yes.
6 BY MR. CLUFF:
7 Q. So, for example, in the
8 first line -- let me ask one more
9 question.
10 Is this number, so looking
11 at ███ in the first column, the first
12 row, would that be dosage units?
13 A. Yes.
14 MS. MCCLURE: Objection to
15 form.
16 BY MR. CLUFF:
17 Q. So that would be ███
18 dosage units of Suboxone, if you can look
19 at it across there?
20 A. Yes.
21 Q. Okay. Continuing over to
22 the right, it looks like there's a column
23 that says, Override.
24 What is that column?

Highly Confidential - Subject to Further Confidentiality Review



Page 326

1    A.   That's the threshold
2  adjustment.
3    Q.   So in this chart, thus far,
4  we, in the last two columns, have
5  identified that thresholds were
6  identified in this document and threshold
7  increases or modifications were
8  identified?
9         MS. MCCLURE:  Objection to
10        form.
11        THE WITNESS:  In this
12        document, yes.
13  BY MR. CLUFF:
14    Q.   The next line over says,
15  Consumed.
16        What is that?
17    A.   That's how much they ordered
18  in a 30-day period.
19    Q.   And then what's the order
20  quantity?
21    A.   That particular order, how
22  much they ordered.
23    Q.   So looking at -- let's just
24  stay on that first line.

Page 327

1         MR. CLUFF:  Zach, if you can
2         back out just a little bit to show
3         the material description all the
4         way through the order quantity.
5         Perfect.
6  BY MR. CLUFF:
7    Q.   Do you see on the top line
8  there, the material description is
9  Suboxone?
10    A.   Yes.
11    Q.   And if we go across, we see
12  the threshold is ███, right?
13    A.   Yes.
14    Q.   And you said that consumed
15  meant they had consumed that much in a
16  30-day period, right?
17    A.   A rolling 30-day period.
18    Q.   So when this order occurred,
19  if I'm reading this chart correctly, they
20  were ███ units over their threshold; is
21  that right?
22        MS. MCCLURE:  Objection to
23        form.
24  BY MR. CLUFF:

Page 328

1    Q.   I'm just trying to
2  understand how to read this chart,
3  really.
4    A.   Right.
5    Q.   Okay.  And then they placed
6  another order for ███ dosage units?
7    A.   Yes.
8    Q.   So they were already over
9  threshold, and then they continued to
10  order, right?
11        MS. MCCLURE:  Objection to
12        form.
13        THE WITNESS:  If it rolls
14        off after the 30-day, that number
15        might go -- might decrease, and
16        then this new order comes on.
17  BY MR. CLUFF:
18    Q.   Which number might decrease?
19    A.   Sorry.  The consumed.
20    Q.   So you're talking about the
21  process of orders coming in and out;
22  sometimes the 30-day consumed number
23  might drop and allow for a subsequent
24  order to be fulfilled.  Is that what

Page 329

1  you're saying?
2    A.   Correct.
3    Q.   But on the date that this
4  order was processed, they were already
5  ███ over their 30-day allotment, right?
6    A.   That's a snapshot.
7    Q.   Well, on that snapshot of a
8  day, they were ███ units over just for
9  that order of Suboxone, right?
10    A.   Correct.
11    Q.   If you go down to the third
12  line, it says, OXYCOD/APAP/5/325
13  milligrams.
14        Do you see that?
15    A.   I see that.
16    Q.   And if we go over, the
17  threshold is ███ dosage units.
18        Do you see that?
19    A.   I see that.
20    Q.   And they order -- their
21  30-day consumption was ███ dosage
22  units; is that right?
23    A.   I see it.
24    Q.   I'm not good at math, but

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 the consumed is over the threshold,
2 correct?
3    A.   Correct.
4    Q.   And then they ordered
5 another ███ dosage units of Oxycodone
6 APAP?
7    A.   Correct.
8    Q.   Let's go to the next column
9 over that says, Status.
10       Do you see that?
11   A.   I see that.
12   Q.   Do you see the abbreviation
13 CSX?
14   A.   Yes.
15   Q.   Do you know what that means?
16   A.   I believe that was release.
17   Q.   So continuing over, the next
18 column says, Status date.
19       Would that be the date on
20 which the status was changed?
21       MS. MCCLURE:  Objection to
22   form.
23       THE WITNESS:  I don't
24   remember what that is.

Page 331

1 BY MR. CLUFF:
2    Q.   Moving over to the next,
3 there's a column that says, OMP freeform
4 text.
5        Do you see that?
6    A.   I see that.
7    Q.   It says, Comments -- in the
8 first column, it says, Comments added by
9 A008710 at 18.37.44 on date 03/03/2001.
10       Do you have any idea what
11 that means?
12   A.   Comments added by whoever
13 employee number that is, at that time,
14 military time, on that date.
15   Q.   So that's 1800 hours, 37
16 minutes and 44 seconds?
17   A.   Yes.
18   Q.   That's roughly, like, 6:30;
19 is that right?
20   A.   Eastern Time.
21   Q.   And A008710 would have been
22 someone's employee number?
23   A.   Yes.
24   Q.   Do you know who it was, off

Page 332

1 the top of your head?
2    A.   No.
3    Q.   Where could I find a list of
4 everybody's employee numbers at
5 AmerisourceBergen?
6    A.   I don't know.
7    Q.   Do you have any idea where
8 that would have been kept?
9    A.   No.
10   Q.   Do you know what your
11 employee ID number was?
12   A.   No, I don't remember.
13   Q.   Okay.  Let's go over to the
14 next two columns.
15       Do you see, Overage in DUs?
16   A.   Yes.
17   Q.   And I think on the version
18 that you're looking at, which is in
19 color, there is some red highlighting and
20 red text; is that right?
21   A.   Yes.
22   Q.   Okay.  And so overage in
23 DUs, does "DU" stands for dosage units?
24   A.   Dosage units, yes.

Page 333

1    Q.   So remember earlier we
2 talked about consumed being over the
3 threshold for that first row, and I asked
4 you if they were ███ over the
5 threshold?
6        Do you remember that
7 question?
8    A.   Yes.
9    Q.   And here it says, Overage in
10 dosage units.  It says, ███?
11   A.   Correct.
12   Q.   And next to that it says,
13 Percentage over.
14       Do you see that?
15   A.   Yes.
16   Q.   Or, Overage percentage.
17   A.   Yes.
18   Q.   █ percent, right?
19   A.   Yes.
20   Q.   So going back to Exhibit-10,
21 which is the e-mail from Ed Hazewski.
22   A.   Okay.
23   Q.   And it's sent to Walgreens,
24 correct?

Page 334

1    A.    It's sent to the integrity
2  team.
3    Q.    The Walgreens integrity
4  team?
5    A.    Yes.
6    Q.    And then when we looked at
7  Exhibit-11, that's the spreadsheet,
8  right?
9    A.    Yes.
10    Q.    Would you agree with me that
11  it discloses what Walgreens thresholds
12  are for various OMP families?
13        MS. MCCLURE:  Objection to
14    form.
15        THE WITNESS:  To the
16    Walgreens integrity team only.
17  BY MR. CLUFF:
18    Q.    How do you know what
19  happened with this document after it was
20  sent to the Walgreens integrity team?
21    A.    I don't know.
22    Q.    Okay.  So you'll agree with
23  me that, at a minimum, it was sent to the
24  Walgreens integrity team, right?

Page 335

1    A.    Correct.
2    Q.    And it showed them what the
3  threshold was for the Walgreens stores,
4  correct?
5        MS. MCCLURE:  Objection to
6    form.
7        THE WITNESS:  That normally
8    did not happen.  That was
9    corrected later on.
10  BY MR. CLUFF:
11    Q.    I appreciate that
12  explanation.  But my question is a little
13  bit more simple.
14        This is an Excel spreadsheet
15  that was transmitted to the Walgreens
16  integrity team, right?
17    A.    Correct.
18    Q.    And it provided the
19  Walgreens integrity team with an
20  order-by-order analysis of the thresholds
21  for various OMP families, correct?
22    A.    On this document, correct.
23    Q.    It also showed them the
24  override for those thresholds, correct?

Page 336

1    A.    It did.
2    Q.    It showed them how much they
3  had consumed on their 30-day rolling
4  threshold, correct?
5    A.    Correct.
6    Q.    It showed them the order
7  that went over threshold, right?
8        MS. MCCLURE:  Objection to
9    form.
10        THE WITNESS:  Correct.
11  BY MR. CLUFF:
12    Q.    It showed them the
13  percentage over in dosage units as well,
14  correct?
15    A.    Correct.
16    Q.    Okay.  I'm going to have you
17  go back to Exhibit-8 and the e-mail you
18  wrote to Matthew McElfresh.
19        Do you see that?
20    A.    I see that.
21    Q.    You see in the first line,
22  it says, We do not report to any customer
23  what their limits are?
24        Do you see that?

Page 337

1    A.    I see that.
2    Q.    In the Walgreens document we
3  just looked at, AmerisourceBergen told
4  the Walgreens integrity team what their
5  limits are, correct?
6        MS. MCCLURE:  Objection to
7    form.
8        THE WITNESS:  That's what
9    Lino pulled.
10  BY MR. CLUFF:
11    Q.    And that's what was sent by
12  Ed Hazewski to the Walgreens integrity
13  team, correct?
14    A.    Correct.
15    Q.    You also say, We do not
16  report to any customer whether they are
17  exceeding those limits.
18        Do you see that?
19        I cut a piece of that
20  sentence out, but do you understand the
21  point that I'm making?
22    A.    Yes.
23    Q.    In the spreadsheet we just
24  looked at, that was sent by Ed Hazewski

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 to the Walgreens integrity team, you
2 would agree that AmerisourceBergen told
3 Walgreens whether they exceeded their
4 limits, correct?
5     MS. MCCLURE: Objection to
6     form.
7     THE WITNESS: This was an
8     anomaly. But yes.
9 BY MR. CLUFF:
10     Q. Just to be clear, the
11 spreadsheet that Ed Hazewski sent to the
12 Walgreens integrity team disclosed to
13 them whether they exceeded their limits,
14 correct?
15     MS. MCCLURE: Objection to
16     form. Asked and answered.
17     THE WITNESS: In this
18     instance, yes.
19 BY MR. CLUFF:
20     Q. The end of your sentence
21 says, It is against our policy to do so.
22     So you would agree with me
23 that when Ed Hazewski sent that
24 spreadsheet to Walgreens, it violated

Page 339

1 AmerisourceBergen policy, correct?
2     MS. MCCLURE: Objection to
3     form.
4     THE WITNESS: Restate the
5     question.
6 BY MR. CLUFF:
7     Q. Sure.
8     Your e-mail, the sentence
9 here, ends by saying, It is against our
10 policy to do so -- meaning against our
11 policy to report to a customer their
12 limits or when they exceed those limits.
13     My question is, when Ed
14 Hazewski sent that spreadsheet to
15 Walgreens, the integrity team, he was
16 violating AmerisourceBergen policy,
17 correct?
18     MS. MCCLURE: Objection to
19     form.
20     THE WITNESS: He sent it to
21     the integrity team. When I'm
22     talking about customer, I'm
23     talking about the individual
24     independent pharmacy customer and

Page 340

1 that individual store.
2 BY MR. CLUFF:
3     Q. Are you looking at Exhibit-8
4 with me?
5     A. 8, yes.
6     Q. If you look at your first
7 e-mail -- or the first e-mail from
8 Matthew McElfresh, he asks you a question
9 about Walmart in relation to Sam's Club.
10     Do you see that?
11     A. I see that.
12     Q. He says, I report into
13 Walmart regarding Sam's Club's OMP
14 thresholds being met.
15     Do you see that?
16     A. I see that.
17     Q. You previously described to
18 me Sam's Club as a chain pharmacy; is
19 that accurate?
20     A. That's accurate.
21     Q. So when you write this
22 e-mail on August 22, 2017 to Matthew
23 McElfresh, you're discussing a chain
24 pharmacy, for example, Sam's Club,

Page 341

1 correct?
2     A. Correct.
3     Q. And you say, quote, We do
4 not report to any customer what their
5 limits are or whether they are exceeding
6 those limits or not, as it is against our
7 policy to do so.
8     Correct?
9     A. Correct.
10     Q. Do you see anywhere in that
11 sentence where you say anything about
12 independent pharmacies versus chain
13 pharmacies?
14     MS. MCCLURE: Objection to
15     form.
16     THE WITNESS: No, I don't
17     reference an independent store.
18 BY MR. CLUFF:
19     Q. In fact, in the beginning of
20 that sentence, you say, We do not report
21 to any customer.
22     Do you see that?
23     A. I see that.
24     Q. Walgreens is a customer,

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  correct?  Is an AmerisourceBergen
2  customer, correct?
3      A.   Correct.
4      Q.   So they would fall within
5  the definition, presumably, of "any
6  customer"?
7          MS. MCCLURE:  Objection to
8      form.
9          THE WITNESS:  Walgreens is a
10     special circumstance.  They have
11     counterparts on the integrity team
12     that we share this data with.
13 BY MR. CLUFF:
14     Q.   I previously asked you if
15 you ever created -- if AmerisourceBergen
16 ever created exceptions for chain
17 pharmacies like Walgreens, and I believe
18 you told me no.
19         Now you've just told me that
20 this Walgreens situation is a special
21 circumstance.  I want to advise you that
22 I personally believe that those are
23 conflicting statements, and I am not
24 going to make a big deal about it.  But I

Page 343

1  do want to make sure we get clear
2  testimony today.
3          In fact, when we met -- when
4  we began meeting this morning, I showed
5  you a copy of your first performance
6  review, where you identified yourself as
7  a truthful person.  So I would like it if
8  we could really get some clear, truthful
9  testimony on this subject here, okay?
10         MS. MCCLURE:  Object to the
11     implication that you're not.  And
12     objection to the speech.
13         Is there a question you have
14     for the witness?
15 BY MR. CLUFF:
16     Q.   So, Liz, I just want to ask
17 some really simple questions, and we'll
18 walk through this, and then we'll
19 understand, okay?
20         Is Walgreens one of
21 AmerisourceBergen's customers?
22     A.   Yes.
23     Q.   So --
24         MS. MCCLURE:  Objection.

Page 344

1  Asked and answered many times.
2          You may answer again.
3          MR. CLUFF:  She already
4  answered.  Thank you, Shannon,
5  your speaking objections are
6  noted.  We'd like you to truncate
7  them and make the same objection
8  briefly if you can.
9          I'm trying to get a clean
10 line of testimony here, and your
11 speaking objections are
12 interrupting it.
13         MS. MCCLURE:  You're asking
14 the same question over and over
15 again.
16         MR. CLUFF:  I'm allowed to
17 ask the same question, because she
18 previously contradicted an answer
19 now.
20         So I'm just trying to get a
21 clear line of testimony.  If you'd
22 like to have her conflicting
23 testimony used to impeach her own
24 testimony later in the deposition,

Page 345

1  we can do that.  Otherwise, I'd
2  like to get a clear record from
3  her about why they were
4  shipping -- giving threshold
5  information and threshold overages
6  to Walgreens.
7          MS. MCCLURE:  Continuing
8  objection to the speech.  Ask your
9  questions of the witness.  I'm
10 going to continue to object to
11 this line of questioning as having
12 been asked and answered.
13         MR. CLUFF:  You have a
14 standing objection now to this
15 line of questioning.
16         MS. MCCLURE:  Thanks.
17         MR. CLUFF:  It's noted.  So
18 you can just reiterate same
19 objection all the way through and
20 we'll note that it is the same
21 objection you've made here now
22 voluminously as a speaking
23 objection.
24 BY MR. CLUFF:

Highly Confidential - Subject To Further Confidentiality Review

Page 346

1  Q.  So, Ms. Garcia --
2      MS. MCCLURE:  The only
3  reason I'm obligated to make that
4  same objection is because you're
5  asking the witness questions over
6  and over again.
7  BY MR. CLUFF:
8  Q.  Ms. Garcia, looking at
9  Exhibit-8, is Walgreens one of
10 AmerisourceBergen's customers?
11     MS. MCCLURE:  Same
12 objection.
13     THE WITNESS:  Yes.
14 BY MR. CLUFF:
15 Q.  You write here, in
16 Exhibit-8, on August 22nd, We do not
17 report to any customer what their limits
18 are or whether they are exceeding those
19 limits or not, as it is against our
20 policy to do so.
21     My question, having read
22 that sentence, is, was Walgreens one of
23 AmerisourceBergen's, quote, any
24 customers, closed quote?

Page 347

1      MS. MCCLURE:  Same
2  objection.
3      THE WITNESS:  Walgreens is a
4  customer.
5  BY MR. CLUFF:
6  Q.  Okay.  So according to your
7  statements in this e-mail, you would
8  agree with me that telling what -- a
9  customer what their limits is or whether
10 they are exceeding those limits is
11 against AmerisourceBergen policy,
12 correct?
13     MS. MCCLURE:  Same
14 objection.  Form.
15     THE WITNESS:  Correct.
16 BY MR. CLUFF:
17 Q.  All right.  So going back to
18 Exhibit-10 and 11, that's the e-mail from
19 Ed Hazewski to the Walgreens integrity
20 team.
21     Again, Walgreens is a
22 customer of AmerisourceBergen, correct?
23     MS. MCCLURE:  Objection.
24 Asked and answered.  Same

Page 348

1  objection.
2      THE WITNESS:  Correct.
3  BY MR. CLUFF:
4  Q.  And Mr. Hazewski shares with
5  the Walgreens integrity team an Excel
6  spreadsheet, correct?
7      MS. MCCLURE:  Objection.
8  Asked and answered.
9      THE WITNESS:  Correct.
10 BY MR. CLUFF:
11 Q.  And in that spreadsheet, as
12 we just discussed -- we went through
13 every single column in that spreadsheet,
14 didn't we?
15 A.  Yes.
16 Q.  We saw that the spreadsheet
17 contains a clear description of what the
18 threshold is.
19     You can see it there on the
20 screen in front of you.
21     MS. MCCLURE:  Objection.
22 Asked and answered.
23 BY MR. CLUFF:
24 Q.  Right?

Page 349

1  A.  Yes.
2  Q.  It tells you what the
3  override is, correct?
4  A.  Correct.
5      MS. MCCLURE:  Objection.
6  Asked and answered.
7  BY MR. CLUFF:
8  Q.  It tells how much they've
9  consumed when they made an order, right?
10     MS. MCCLURE:  Same
11 objection.
12     THE WITNESS:  Correct.
13 BY MR. CLUFF:
14 Q.  And then all the way over to
15 the right, it tells you the exact number
16 of dosage units that that order went
17 over, correct?
18     MS. MCCLURE:  Same.
19     THE WITNESS:  Correct.
20 BY MR. CLUFF:
21 Q.  And the percentage over,
22 correct?
23     MS. MCCLURE:  Same.
24     THE WITNESS:  Correct.

Page 350

1 BY MR. CLUFF:
2 Q. Okay. So going back to
3 Exhibit-8, when Mr. Hazewski sent that
4 Excel spreadsheet to the Walgreens
5 integrity team, it was against policy to
6 do so, correct?
7 MS. MCCLURE: Objection.
8 Form.
9 THE WITNESS: Restate.
10 Sorry.
11 BY MR. CLUFF:
12 Q. When Mr. Hazewski sent that
13 spreadsheet to the Walgreens integrity
14 team, it was against policy to do so?
15 MS. MCCLURE: Same
16 objection. Form.
17 THE WITNESS: No. Because
18 he sent it to the Walgreens
19 integrity team, who are our
20 counterparts at Walgreens.
21 BY MR. CLUFF:
22 Q. Can you show me in this
23 e-mail where it says anything about, but
24 you can do it if you send it to an

Page 351

1 integrity team?
2 MS. MCCLURE: Objection.
3 Argumentative.
4 THE WITNESS: It's not on
5 here.
6 BY MR. CLUFF:
7 Q. Okay. So that qualification
8 you just made is nowhere in this
9 document, correct?
10 MS. MCCLURE: Objection.
11 Asked and answered.
12 THE WITNESS: Not in this
13 document.
14 BY MR. CLUFF:
15 Q. All right. So just to
16 recap, that spreadsheet had thresholds
17 and how much the customer was over the
18 threshold, correct?
19 MS. MCCLURE: Objection.
20 Same objection. Asked and
21 answered.
22 THE WITNESS: I see
23 thresholds, yes.
24 BY MR. CLUFF:

Page 352

1 Q. And you see how they
2 exceeded those thresholds, too, correct?
3 MS. MCCLURE: Same
4 objection.
5 THE WITNESS: I see that.
6 BY MR. CLUFF:
7 Q. Now, back to Exhibit-8.
8 In the next sentence, you
9 write, That would be circumventing our
10 own suspicious order monitoring program.
11 MS. MCCLURE: Objection.
12 Same.
13 BY MR. CLUFF:
14 Q. Right? That's what you
15 wrote?
16 MS. MCCLURE: Same.
17 THE WITNESS: I wrote that,
18 yes.
19 BY MR. CLUFF:
20 Q. Okay. Great. Thank you.
21 You can put those aside. I'm done with
22 them.
23 MR. MAHADY: Sterling, one
24 quick thing, just so the record is

Page 353

1 clear because you guys zoomed on
2 it. The date down there --
3 MR. CLUFF: Yes, that's the
4 date that we would have created it
5 from the native file.
6 MR. MAHADY: That's what I
7 though. Just wanted to make that
8 clear. 2018, that's the print
9 date.
10 BY MR. CLUFF:
11 Q. Liz, if you could -- excuse
12 me, Ms. Garcia, pick up Exhibit-5.
13 We previously discussed -- I
14 believe you testified that you attended a
15 DEA distributor briefing in Phoenix in
16 2017.
17 Do you recall that?
18 A. Correct.
19 Q. If you turn back a few pages
20 to the beginning of the slides, do you
21 see the page that begins with, The
22 distributor initiative.
23 A. Yes.
24 Q. At the bottom of that slide,

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 it says, August 2005 to the present.
2        In August 2005, you would
3 have been working at the DEA in Los
4 Angeles, correct?
5     A.   Correct.
6     Q.   Do you recall any discussion
7 within the DEA, at that point in time,
8 about the distributor initiative?
9     A.   No.
10    Q.   There's a note here about
11 briefings to 104 firms with 314
12 registrations.
13       Did you ever participate in
14 any of those briefings?
15       MS. MCCLURE:  Objection.
16       THE WITNESS:  No.
17 BY MR. CLUFF:
18    Q.   Looking down at the next
19 page, this says, Briefing overview.
20       Do you see that?
21    A.   I see that.
22    Q.   The first bullet point is,
23 The prescription drug abuse epidemic.
24    A.   I see that.

Page 355

1     Q.   Do you recall what the DEA
2 discussed under that bullet point, or
3 about that bullet point?
4     A.   They may have given an
5 overview.
6     Q.   I'm going to ask you some
7 questions about this document that your
8 counsel may have discussed with you.  I
9 just want to be really careful that I
10 don't want you to disclose anything that
11 your counsel would have talked to you
12 about or that you would have learned
13 about from your time as an active
14 investigator with the DEA.
15       So I'm just --
16 understanding your -- I want to ask
17 questions about your understanding of
18 this document from when you were there
19 and as you were working as a diversion
20 investigator at AmerisourceBergen.
21       Does that make sense?
22       MS. MCCLURE:  From both time
23 periods?  Her time at --
24       THE WITNESS:  Makes sense.

Page 356

1       MS. MCCLURE:  I'm just
2 clarifying.
3       MR. CLUFF:  I might ask her
4 if she has an understanding about
5 something here based on her work
6 at DEA.  But I want to be careful
7 that you don't give me anything
8 that would violate the law
9 enforcement privilege.
10       Does that make sense?
11       THE WITNESS:  That makes
12 sense.
13       MR. CLUFF:  So nothing that
14 would compromise an investigation
15 or disclose information about an
16 ongoing investigation.
17 BY MR. CLUFF:
18    Q.   So the second bullet point
19 on that slide is, The closed system of
20 distribution.
21       Do you know what that means?
22    A.   That's the supply chain.
23    Q.   What do you mean by "the
24 supply chain"?

Page 357

1     A.   Manufacturers, distributors,
2 importers, chemical manufacturers.
3     Q.   What does it mean to have a
4 closed system of distribution?
5     A.   Going from one point to
6 another point and not going outside that
7 system.
8     Q.   You do see the third bullet
9 point that says, Your responsibilities?
10    A.   Yes.
11    Q.   Do you see it?
12       Second one is, Know Your
13 Customers.
14       Do you see that?
15    A.   Yes.
16    Q.   Is that the same Know Your
17 Customer information that we discussed
18 earlier was mandated by the DEA?
19       MS. MCCLURE:  Objection to
20 the form.
21       THE WITNESS:  I believe so.
22 BY MR. CLUFF:
23    Q.   And you see the next point
24 down is, Red flags.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 Do you see that?
2 A. I see that.
3 Q. What are red flags?
4 A. Red flags as they pertain to
5 diversion.
6 Q. What are they?
7 MS. MCCLURE: Objection to
8 the form.
9 THE WITNESS: High cash
10 payments, lines out the door at
11 the pharmacy, those types of
12 things.
13 BY MR. CLUFF:
14 Q. Would a high percentage of
15 controlled substances to noncontrols be a
16 red flag?
17 A. Possibly.
18 Q. How about deviations from an
19 ordering pattern, would that be a red
20 flag?
21 MS. MCCLURE: Objection.
22 THE WITNESS: It depends on
23 the totality of the circumstances.
24 BY MR. CLUFF:

Page 359

1 Q. But is it one of the
2 potential red flags?
3 MS. MCCLURE: Objection to
4 form.
5 THE WITNESS: In the whole,
6 maybe.
7 BY MR. CLUFF:
8 Q. How about orders of unusual
9 size, would that be one of the overall
10 red flags that AmerisourceBergen, a
11 registrant, should have been looking at?
12 MS. MCCLURE: Objection to
13 form.
14 THE WITNESS: We looked at
15 orders of interest. And then once
16 we looked at the order, then we
17 would look at the drug and the
18 amounts and that type of thing.
19 BY MR. CLUFF:
20 Q. How did the red flags play
21 into that process you just described?
22 MS. MCCLURE: Objection to
23 the form.
24 THE WITNESS: It didn't.

Page 360

1 BY MR. CLUFF:
2 Q. So if an order exceeded
3 threshold and it became an order of
4 interest, AmerisourceBergen didn't look
5 at red flags?
6 MS. MCCLURE: Objection to
7 form.
8 THE WITNESS: Only with the
9 totality of the circumstances, if
10 a deeper dive was required.
11 BY MR. CLUFF:
12 Q. So unless AmerisourceBergen
13 decided to do a deep dive on an order of
14 interest, they didn't look at red flags;
15 is that what you're saying?
16 MS. MCCLURE: Objection to
17 form.
18 THE WITNESS: Red flags were
19 looked at, at the due diligence
20 investigation stage.
21 BY MR. CLUFF:
22 Q. What stage was that?
23 A. When they onboarded with
24 ABC.

Page 361

1 Q. So let me just understand
2 the process, then.
3 A customer comes -- tries to
4 come on board with ABDC, right? And
5 there's a due diligence investigation to
6 evaluate whether they should be taken on
7 as a customer?
8 A. Correct.
9 Q. Okay. And part of that was
10 the 590s, right?
11 A. Correct.
12 Q. And during that due
13 diligence investigation, Amerisource
14 looked at red flags; is that what you
15 just said?
16 MS. MCCLURE: Objection to
17 form.
18 THE WITNESS: Red flags
19 could include disciplinary action,
20 prior, for, maybe, excessive
21 purchases or diversion of drugs or
22 something.
23 BY MR. CLUFF:
24 Q. And then we'll continue this

Page 362

1 hypothetical, or just line of
2 understanding that if a customer was
3 approved for service by
4 AmerisourceBergen, they could begin
5 purchasing controlled substances,
6 correct?
7        MS. MCCLURE:  Objection to
8    form.
9        THE WITNESS:  Yes.
10 BY MR. CLUFF:
11    Q.    And sometimes orders may
12 have exceeded parameters and become
13 orders of interest; is that right?
14    A.    They would hit the algorithm
15 and be orders of interest.
16    Q.    And part of the algorithm
17 was the thresholds, right?
18        MS. MCCLURE:  Objection to
19    form.
20        THE WITNESS:  It was in
21    relation to, yes.
22 BY MR. CLUFF:
23    Q.    You were involved in the
24 rollout of the revised OMP system, right?

Page 363

1    A.    Yes.
2    Q.    Prior to the review of
3 the -- or the rollout of the OMP system,
4 Amerisource used, exclusively, a 300
5 percent threshold, right?
6        MS. MCCLURE:  Objection to
7    the form.
8        THE WITNESS:  I don't
9    recall.
10 BY MR. CLUFF:
11    Q.    Okay.  But so, an order
12 becomes an order of interest because it
13 hits the parameters, correct?
14    A.    Correct.
15    Q.    And then what I'm trying to
16 understand is, do you look at red flags
17 at that point in time?
18        MS. MCCLURE:  Objection.
19        THE WITNESS:  It's an order
20    of interest.  So haven't opened it
21    yet.
22 BY MR. CLUFF:
23    Q.    What do you do with it then?
24    A.    It stays in the queue until

Page 364

1 we get to it.
2    Q.    What happens when you get to
3 it?
4    A.    When you get to it, you look
5 at the order and the totality of the
6 circumstances.
7    Q.    What are the totality of the
8 circumstances?
9    A.    Looking at what the drug is,
10 who the customer is, customer type, that
11 type of thing.
12    Q.    So at that point in time,
13 you're not looking at red flags anymore?
14        MS. MCCLURE:  Objection to
15    form.
16        THE WITNESS:  You're looking
17    at using tools to look at that
18    order and ascertain if it is
19    suspicious or not.
20 BY MR. CLUFF:
21    Q.    What are the tools that you
22 would look at -- look at that order and
23 ascertain whether or not it's suspicious?
24        MS. MCCLURE:  Object to

Page 365

1    form.
2        THE WITNESS:  Dashboards.
3 BY MR. CLUFF:
4    Q.    Is that the BOBJ topic we
5 discussed earlier?
6        MS. MCCLURE:  Objection.
7        THE WITNESS:  That could be
8    one of them.
9 BY MR. CLUFF:
10    Q.    Are there other dashboards?
11    A.    There were.
12    Q.    Were there, like, tear
13 sheets?
14    A.    I don't know if that was the
15 term.  Just dashboards.
16    Q.    I'm not trying to argue with
17 you about it.  I'm just trying to
18 understand what's in and what's out at
19 what different point of the analysis.
20        So it sounds like you were
21 looking at a lot of information.  But I
22 haven't heard you mention red flags when
23 you were reviewing orders of interest.
24        So my question is, did you

Page 366

1 or did you not look at orders of interest
2 when you were reviewing -- did you or did
3 you not look at red flags when you were
4 reviewing orders of interest?
5       MS. MCCLURE:  Objection to
6 form.
7       THE WITNESS:  We did look
8 for red flags to see if there was
9 anything that would be there.
10 BY MR. CLUFF:
11      Q.   When you were reviewing
12 orders of interest?
13      A.   When we were looking at the
14 order, yes.
15      Q.   Turn with me to Page
16 ABDCMDL00162354.
17       Do you see the top there, it
18 says, Public health epidemic?
19      A.   Yes.
20      Q.   It's 2000 to 2015.  And it
21 continues, Over 550,000 unintentional
22 drug overdose deaths in the U.S.
23       Do you see that?
24      A.   I see that.

Page 367

1      Q.   In 2015, 52,404 drug-related
2 overdose deaths.
3       Do you see that?
4      A.   I see that.
5      Q.   Can you please pick up
6 Exhibit-4 and turn to the second page?
7       There, at the top of the
8 page, that's the e-mail where you used
9 the language, quote, Towards our goal of
10 protecting the interests of our valued
11 customers and AmerisourceBergen.
12       Do you see that?
13      A.   Is that in the second
14 paragraph?
15      Q.   Yes.
16      A.   I see that, yes.
17      Q.   That e-mail was written in
18 2013, correct?
19      A.   Yes.  Correct.
20      Q.   That's the same time period
21 during which the DEA identified 550,000
22 unintentional overdoses between 2000 and
23 2015?
24      A.   Yes.

Page 368

1      Q.   Okay.  You can set that
2 aside.
3       Can you pick up Exhibits-10
4 and 11, please?
5       Just looking at Exhibit-10,
6 that's the e-mail where Ed Hazewski sent
7 the threshold information to the
8 Walgreens integrity team, correct?
9      A.   Correct.
10      Q.   That's dated 2014, correct?
11      A.   Correct.
12      Q.   We agreed earlier that
13 sharing threshold information and when
14 orders exceed threshold not only violates
15 ABC policy, it circumvents OMP; is that
16 right?
17       MS. MCCLURE:  Objection to
18 the form.  Misstates the witness's
19 prior testimony.
20       THE WITNESS:  What did I
21 say?  I don't remember.
22 BY MR. CLUFF:
23      Q.   It's Exhibit-8.
24       So Exhibit-8 is the e-mail

Page 369

1 where you write to Matthew McElfresh, and
2 you say that, Reporting to any customer
3 their limits or whether they're exceeding
4 limits or not is against our policy.  In
5 addition, that would be circumventing our
6 own suspicious order monitoring program.
7       Right?
8       MS. MCCLURE:  Objection.  Is
9 there a question?
10       MR. CLUFF:  I'm just
11 understanding.
12 BY MR. CLUFF:
13      Q.   That's what you said,
14 correct?
15       MS. MCCLURE:  Objection to
16 form.
17       THE WITNESS:  That's stated.
18 BY MR. CLUFF:
19      Q.   So in Exhibit-10, when Ed
20 sends that spreadsheet, he's violating
21 policy and circumventing the suspicious
22 order monitoring program, correct?
23       MS. MCCLURE:  Objection to
24 the form.  Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 Misstates the witness's prior
2 testimony.
3 THE WITNESS: I don't know.
4 BY MR. CLUFF:
5 Q. But he sent that e-mail in
6 2014, right?
7 A. Correct.
8 MS. MCCLURE: Objection to
9 form. Asked and answered.
10 BY MR. CLUFF:
11 Q. That's during that same time
12 period where the DEA identified 550,000
13 unintentional drug overdoses between 2000
14 and 2015, correct?
15 MS. MCCLURE: Objection to
16 the form.
17 THE WITNESS: During the
18 same time period, yes.
19 BY MR. CLUFF:
20 Q. Please pick up Exhibit-6.
21 It's the 2016 performance evaluation.
22 A. Okay.
23 Q. You do you see on the second
24 page there, it talks about targeted

Page 371

1 pharmacy visits as assigned?
2 A. Where are you?
3 Q. Second page, at the bottom,
4 it says, Completed target visits --
5 completed targeted pharmacy visits.
6 A. Yes.
7 Q. And when we talked about
8 this document, we then looked at the
9 third page to look at your comments
10 that -- on the far right column.
11 Do you see that?
12 A. I see that.
13 Q. And at the bottom there, you
14 say, However, the goal is to always
15 maintain the entity as an ABC customer.
16 Do you see that?
17 MS. MCCLURE: Objection.
18 Asked and answered.
19 THE WITNESS: I see that.
20 BY MR. CLUFF:
21 Q. Okay. And this performance
22 evaluation was between October 2015 and
23 November 2016, correct?
24 A. Correct.

Page 372

1 Q. So that's right around the
2 end of the period where the DEA
3 identified 550,000 unintentional drug
4 overdose deaths between 2000 and 2015,
5 correct?
6 MS. MCCLURE: Object to
7 form.
8 THE WITNESS: It's around
9 the same time period.
10 BY MR. CLUFF:
11 Q. Okay. I want to go back a
12 couple of pages. There's a slide that
13 says, Compliance with CSA. It's on Page
14 162352.
15 It's in Exhibit-5, I'm
16 sorry.
17 A. Exhibit what?
18 Q. Exhibit-5, the large
19 PowerPoint from the DEA.
20 A. Okay.
21 MS. MCCLURE: Exhibit-5, you
22 said?
23 MR. CLUFF: Yes.
24 MR. MAHADY: You said the

Page 373

1 page ending in 352.
2 MR. CLUFF: Yes. You have
3 the benefit of stapled copies.
4 Mine are all loose, so I keep
5 misplacing pages.
6 352, the bottom slide says,
7 Compliance with the CSA.
8 THE WITNESS: Okay.
9 BY MR. CLUFF:
10 Q. Do you see that?
11 A. Yes.
12 Q. In that slide, it looks like
13 there's some underlining, or is that
14 maybe just in my copy?
15 MR. MAHADY: I don't see
16 underlining.
17 MS. MCCLURE: No
18 underlining.
19 MR. CLUFF: I underlined
20 some in my copy, we won't talk
21 about that.
22 BY MR. CLUFF:
23 Q. Let's move on to the next
24 page. There is a pop quiz. Do you see

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 that?
2       It says, What is the most
3 prescribed prescription drug in the
4 United States?
5       A.   Yes.
6       Q.   Did you circle B or did I
7 circle B?
8       A.   I believe I did.
9       Q.   Is there any reason why you
10 circled hydrocodone?
11       A.   Because that was the answer.
12       Q.   Did you know that was the
13 answer before the DEA revealed it in the
14 next slide?
15       A.   Yes.
16       Q.   How were you aware of that
17 information?
18       A.   Just based on knowledge.
19       Q.   If you move forward a few
20 pages, there's a page that ends in
21 162357.  The top slide says, National
22 overdose deaths.  The bottom slide says,
23 Opioid involvement in benzodiazepine
24 overdose.

Page 375

1       Do you see that?
2       A.   I see that.
3       Q.   There's some notes in the
4 column next to it that look like they
5 say, BD plus opioid, and then there's a
6 star.
7       Are those your notes?
8       A.   Those are my notes.
9       Q.   What did you mean to
10 communicate with those notes to yourself?
11       MS. MCCLURE:  Objection to
12       the form.
13       THE WITNESS:  BD plus
14       opioid -- I don't remember if this
15       was just to write a note to myself
16       indicating what was said on this
17       slide so I could come back to it
18       later.  I don't know if I assigned
19       a meaning to it.
20 BY MR. CLUFF:
21       Q.   Okay.  Would you move
22 forward, please, a few slides, a few
23 pages, to the page that ends 162359, the
24 top slide reads, Prescription opioid

Page 376

1 analgesic poisoning deaths.
2       Do you see that?
3       A.   I see that.
4       Q.   Underneath that, it says,
5 Opioid involved drug poisoning death
6 rates by state, 1999.
7       Do you see that?
8       A.   Yes.
9       Q.   There's a note next to it
10 that says, 2003.
11       Do you know what that note
12 is?
13       A.   I don't remember.
14       MR. CLUFF:  Staying on that
15       page, but zooming out, please,
16       Zach, so we can see the entire
17       page.
18 BY MR. CLUFF:
19       Q.   The next slide says,
20 Prescription opioid analgesic poisoning
21 deaths.
22       So it's the same heading,
23 right?
24       A.   Yes.

Page 377

1       Q.   But underneath that, the
2 bottom slide says, Opioid involved drug
3 poisoning deaths by state, 2013.
4       Do you see that?
5       A.   I see that.
6       Q.   In the bottom right-hand
7 corner of both slides, it looks like
8 there's a color key, or a color
9 reference.
10       Do you see that?
11       A.   I see that.
12       Q.   So it looks like the darker
13 it gets, the worse the deaths get,
14 correct, or the higher the deaths get?
15       MS. MCCLURE:  Objection to
16       form.
17       THE WITNESS:  That's what it
18       appears, I think.
19 BY MR. CLUFF:
20       Q.   You worked in the West
21 Region when you were at
22 AmerisourceBergen, correct?
23       MS. MCCLURE:  Objection.
24       Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    THE WITNESS:  In the
2  beginning, yes.
3  BY MR. CLUFF:
4    Q.   And where did you work at
5  the end?
6    A.   The Midwest.
7    Q.   What states were included in
8  the Midwest?
9    A.   Texas, Missouri.
10    Q.   Any others?  How about
11  Oklahoma?
12    A.   Nebraska, Kansas.
13    Oklahoma reported to the
14  Dallas DC.
15    And Utah, I think.
16    Q.   Utah?
17    A.   Yeah, he put Utah in.
18    Q.   I have some family from
19  Utah.  Let's use that.
20    At the top chart, it looks
21  like in the state of Utah, which is right
22  there in the Midwest, it looks like it
23  says 4.0.
24    Can you see that?

Page 379

1    A.   Barely.
2    Q.   The quality on that image is
3  really grainy.  It's better on the paper,
4  I think.
5    Maybe it's a 6.0?
6    MS. MCCLURE:  I'm not sure.
7  BY MR. CLUFF:
8    Q.   How about this, we'll just
9  look at the color.
10    It's gray, correct?
11    A.   I guess so.
12    MS. MCCLURE:  They're all
13  gray.
14  BY MR. CLUFF:
15    Q.   Let's look at the bottom
16  chart.
17    Do you see that?  The great
18  state of Utah.
19    A.   Yes.
20    Q.   It's a white 15.2 in the
21  middle, and that state is now black,
22  correct?
23    A.   Correct.
24    Q.   So just looking at these two

Page 380

1  charts, you were there, you were
2  listening to the DEA talk, did they have
3  any comments to you about the increase in
4  overdose deaths between '99 and 2013?
5    A.   They just noted it in the
6  presentation.
7    Q.   Looking at these two maps
8  overall, would you agree that,
9  nationwide, opioid overdose deaths
10  increased?
11    A.   Drug poisoning death rates.
12    That's what it appears.
13    Q.   Let's move to
14  ABDCMDL00162363.  It's a few pages back
15  in the presentation.
16    The top slide says,
17  Nationwide reported deaths.  The bottom
18  one says, Number of distributor thefts
19  nationwide.
20    A.   Okay.
21    Q.   There's a note there in the
22  margins that says, Internal, with a
23  little line to the other, slash, other,
24  2,695 thefts.

Page 381

1    Do you see that?
2    A.   I see that.
3    Q.   What does that mean?
4    A.   I would think that's
5  internal to -- internal thefts of
6  whatever business it is.
7    Q.   So do you have any
8  understanding of what an internal theft
9  might be?
10    A.   Someone in the warehouse,
11  maybe, that would take something.
12    Q.   But it would be a theft from
13  within a company's own premises, right,
14  not one between two companies?
15    MS. MCCLURE:  Objection to
16  form.
17    THE WITNESS:  I guess so,
18  yes.
19  BY MR. CLUFF:
20    Q.   So that's different than
21  lost in transit, which is over to the
22  left side of that slide?
23    A.   Correct.
24    Q.   I want to have you move back

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1  a couple more slides to 162366.
2        The top slide says, Deaths
3  related to pharmaceutical controlled
4  substances.
5        Do you see that?
6    A.  I see that.
7    Q.  The one in the middle, it's
8  Prince Roger Nelson.
9        Do you see that?
10   A.  I see that.
11   Q.  Apparently, underneath
12 there, there's a parenthetical that says
13 Fentanyl.
14       Do you know if Prince died
15 of a Fentanyl overdose?
16       MS. MCCLURE:  Objection to
17   form.
18       THE WITNESS:  That's what
19   was reported in the media.
20 BY MR. CLUFF:
21   Q.  Did you ever hear anything
22 about concerns that AmerisourceBergen
23 might have supplied the pharmacy that
24 dispensed Fentanyl to Prince?

Page 383

1        MS. MCCLURE:  Objection to
2    form.
3        THE WITNESS:  No.
4  BY MR. CLUFF:
5    Q.  Turning to the next page,
6  ABDCMDL00162367.
7        Top slide says, Our youth.
8        Do you see that?
9    A.  Uh-huh.
10   Q.  Next to that slide, does
11 that appear to be notes that you would
12 have written?
13   A.  Yes.
14   Q.  You wrote, what looks like
15 to me, it says, Pharm parties, quote,
16 grab a spoon, closed quote?
17   A.  Yes.
18   Q.  Do you remember what the DEA
19 was communicating with this slide?
20   A.  I don't recall, other than
21 they were saying that there is parties
22 that people go to and they put
23 pharmaceuticals in a bowl or something.
24 I don't remember.

Page 384

1    Q.  Move back a couple of pages
2  to 162369.  The top slide appears to be a
3  Drug Enforcement Administration
4  announcement from the Detroit News.
5        Do you see that?
6    A.  I see that.
7    Q.  At the top of the slide
8  there's a note that says, Read.
9        Are those your notes?
10   A.  That's my note.
11   Q.  Were you making a note to
12 yourself that you should read this
13 article?
14   A.  Probably.
15   Q.  Do you ever end up reading
16 it, do you recall?
17   A.  I don't remember.
18   Q.  There's also an arrow in the
19 margin that appears to be pointing to a
20 syntax that says, Chasing the Dragon
21 documentary.
22       Do you see that?
23   A.  I see that.
24   Q.  What was that arrow for?

Page 385

1    A.  I don't remember.
2    Q.  I want to look down at the
3  bottom slide on that same page.
4        It says, Increase in
5  overdose deaths, Arizona.
6        Was Arizona a part of your
7  region when you were assigned the West
8  Region?
9    A.  In the beginning it might
10 have been.
11   Q.  The title there says, Data:
12 Arizona heroin, prescription drug
13 overdoses escalating.
14       Do you see that?
15   A.  I see that.
16   Q.  Do you see the date on that
17 article is March 2016?
18   A.  I see that.
19   Q.  Would you have been
20 responsible for that region at that
21 period of time?
22   A.  I don't believe so, no.
23   Q.  Do you know who would have
24 been responsible for that region?

Page 386

1    A.  I don't remember.
2    Q.  Please continue in this
3 document to the page that ends in 162371.
4       Do you see that?
5    A.  Yes.
6    Q.  At the bottom there, it
7 looks like there's a slide that says,
8 Closed system of distribution.
9       Do you see that?
10   A.  I see that.
11   Q.  And there's some arrows that
12 go in a circle.
13      Do you see that?
14   A.  Yes.
15   Q.  All right.  Do you know what
16 a feedback loop is?
17      MS. MCCLURE:  Objection to
18   form.
19 BY MR. CLUFF:
20   Q.  So let me give you an
21 example.
22      When I was younger, there
23 was this graphic that people used to
24 describe the benefits of recycling.  And

Page 387

1 it had a triangle like that and every
2 side of the triangle had an arrow that
3 led to the next side of the triangle and
4 it says reduce, recycle, reuse.
5      Remember that?
6      That's a feedback loop.  I'm
7 going to call that a feedback loop, okay?
8      MS. MCCLURE:  Objection.
9      THE WITNESS:  Okay.
10 BY MR. CLUFF:
11   Q.  Do you understand the
12 concept of a feedback loop, that every
13 part of it continues to feed the cycle?
14      MS. MCCLURE:  Objection to
15   the form.
16      THE WITNESS:  Yes.
17 BY MR. CLUFF:
18   Q.  Okay.  Looking at this page,
19 I don't know if this is a feedback loop
20 or not, but I'm just trying to
21 understand, looking at this, these arrows
22 here on the bottom slide, appearing on
23 the left, there's an arrow that says,
24 Foreign manufacture.

Page 388

1      Do you see that?
2    A.  I see that.
3    Q.  Do you have any recollection
4 of why that is lighter than some of the
5 other arrows?
6      MS. MCCLURE:  Objection to
7   form.
8      THE WITNESS:  I don't.
9 BY MR. CLUFF:
10   Q.  Okay.  And then it goes to
11 an importer; is that right?
12   A.  Yes.
13   Q.  And a manufacturer, correct?
14   A.  Yes.
15   Q.  And then to the
16 distributors?
17   A.  Yes.
18   Q.  Then to the practitioner,
19 pharmacy, hospital, clinics?
20   A.  Yes.
21   Q.  Are those all examples of
22 customers?
23   A.  Yes.
24   Q.  Okay.  And then there's an

Page 389

1 arrow that goes to the patient, correct?
2   A.  Yes.
3   Q.  And then there's this arrow
4 with a question mark.
5      Do you see that?
6   A.  Yes.
7   Q.  Do you recall anything about
8 this slide?
9   A.  I don't recall.
10   Q.  All right.  Flip to the next
11 page.  So 162372.
12      Do you see that?
13   A.  Yes.
14   Q.  The top says, Closed system
15 of distribution, correct?
16   A.  Correct.
17   Q.  All right.  Do you see on
18 the right-hand side where it says,
19 Registration?
20   A.  Yes.
21   Q.  You worked at the DEA for
22 two years, correct?
23   A.  Correct.
24   Q.  And when you were at the

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1  DEA, you developed a thorough
2  understanding of the rules and
3  regulations, correct?
4      A.   Correct.
5      Q.   Okay.  How would you
6  describe AmerisourceBergen's regulatory
7  obligation as a registrant?
8          MS. MCCLURE:  Objection to
9      form.
10         THE WITNESS:
11     AmerisourceBergen met their
12     regulatory obligations as outlined
13     by the CSA, Controlled Substance
14     Act.
15 BY MR. CLUFF:
16     Q.   I appreciate that
17 explanation.  But not to quibble with
18 you, that wasn't the question that I
19 asked.  So I'm going to make it a little
20 bit more clear, because maybe it was
21 poorly worded.
22         Do you understand the
23 regulatory obligations or duties of a
24 registrant under the Controlled

Page 391

1  Substances Act?
2      A.   Can you restate, please?
3      Q.   Sure.
4          Do you understand the
5  regulatory obligations or duties of a
6  registrant under the Controlled
7  Substances Act?
8          MS. MCCLURE:  Objection to
9      form.
10         THE WITNESS:  They are
11     outlined in the 21 C.F.R. Part
12     1300.
13 BY MR. CLUFF:
14     Q.   So do you have an
15 understanding of them?
16         MS. MCCLURE:  Objection to
17     form.
18         THE WITNESS:  General.
19 BY MR. CLUFF:
20     Q.   What's your general
21 understanding?
22         MS. MCCLURE:  Objection to
23     form.
24         THE WITNESS:  Recordkeeping

Page 392

1  requirements, security, those
2  types of things.
3  BY MR. CLUFF:
4      Q.   Anything else?
5          MS. MCCLURE:  Objection to
6      form.
7          THE WITNESS:  Quotas.
8  BY MR. CLUFF:
9      Q.   What's the quota -- what's
10 the quota requirement?
11         MS. MCCLURE:  Objection to
12     form.
13         THE WITNESS:  Headquarters
14     makes that establishment.
15 BY MR. CLUFF:
16     Q.   And does the quota, does
17 that apply to distributors and
18 manufacturers, just manufacturers, just
19 distributors?  Do you know?
20     A.   Just manufacturers, I
21 believe.
22     Q.   So their manufacturing is
23 subject to a quota, is that what you're
24 telling me?

Page 393

1      A.   I think so.
2      Q.   Just as a foundational
3  issue, both manufacturers and
4  distributors are registrants under the
5  CSA, correct?
6      A.   Correct.
7      Q.   And when I use the term
8  "CSA," I'm referring to the Controlled
9  Substances Act.
10         Do you understand that?
11     A.   Yes.
12     Q.   Okay.  So I asked you what
13 the -- what you understood to be the
14 duties or obligations of a registrant
15 under the CSRA?
16         And I'm looking at your
17 testimony here.  And you said,
18 recordkeeping requirements, security,
19 those types of things.  And then I asked
20 if there was anything else, and you said
21 quotas.
22         So aside from those, do you
23 know any other duties or responsibilities
24 that a registrant has under the

Page 394

1 Controlled Substances Act?
2          MS. MCCLURE: Objection to
3 form.
4          THE WITNESS: Well, right
5 under here it says, Effective
6 controls, 21 C.F.R. 1301.71.
7 BY MR. CLUFF:
8     Q.   Okay. So is that another
9 one of the duties that a registrant has
10 under the Controlled Substances Act?
11          MS. MCCLURE: Objection to
12 form.
13          THE WITNESS: Yes.
14 BY MR. CLUFF:
15     Q.   I want to hand you a copy of
16 a printout of Section 823 of the
17 Controlled Substances Act that I obtained
18 from the DEA's website.
19          We're going to mark it as
20 Exhibit-12. I'm not trying to -- just so
21 you understand what we are going to do,
22 or what I want to do. I don't want to
23 argue with you about what the duties are
24 or are not, I just want to understand the

Page 395

1 scope of what is contained in the CSA and
2 the scope -- and the federal regulations.
3          Does that make sense?
4     A.   Yes.
5          MS. MCCLURE: Objection to
6 form.
7                 - - -
8          (Whereupon,
9 AmerisourceBergen-Garcia
10 Exhibit-12, United States Code -
11 Section 823, was marked for
12 identification.)
13                 - - -
14 BY MR. CLUFF:
15     Q.   So I'm going to ask you a
16 question, or some questions about Section
17 823, Subsections A and B.
18          Do you see that?
19     A.   I see that.
20     Q.   Why don't you read those two
21 sections, and let me know when you've had
22 a chance to digest them.
23     A.   Okay.
24     Q.   So at the top there, you can

Page 396

1 see on the screen, it says, Section 823.
2 There's those two little squiggly S
3 circle with a hole in the middle, that's
4 a section abbreviation that lawyers like
5 to use. It says, Registration
6 requirements next to it.
7          And if you look at A and B,
8 those headings are basically the same,
9 except manufacturers and distributors are
10 there, right?
11          So it refers to
12 manufacturers of controlled substances
13 and distributors of controlled
14 substances, correct?
15          MS. MCCLURE: Objection to
16 form.
17          THE WITNESS: I see that.
18 BY MR. CLUFF:
19     Q.   Okay. And then looking at
20 the first line of the paragraph, under A,
21 it says, The Attorney General shall
22 register an applicant to manufacture
23 controlled substances.
24          Do you see that?

Page 397

1     A.   I see that.
2     Q.   And I'd like to compare that
3 to the first line of the paragraph under
4 B, it says, The Attorney General shall
5 register an applicant to distribute
6 a controlled substance in Schedule I or II.
7          Do you see that?
8     A.   I see that.
9     Q.   Okay. And then I want you
10 to look at Subparagraph 1, under A.
11          It says, Maintenance of
12 effective controls against diversion of
13 particular controlled substances.
14          Do you see that?
15     A.   I see that.
16     Q.   Okay. And then under B,
17 Subparagraph 1, it says, Maintenance of
18 effective controls against diversion of
19 particular controlled substances.
20          Do you see that?
21     A.   I see that.
22     Q.   Okay. So both manufacturers
23 and distributors have, as a part of their
24 registration requirement, this language

Page 398

1 about maintaining effective controls
2 against diversion.
3        Do you agree with that
4 statement?
5        MS. MCCLURE:  Mr. Cluff, to
6 the extent you're asking this
7 witness questions about what a
8 statute says, I object, in light
9 of the fact that this witness is
10 not an expert, not an attorney.
11 She's here in a fact witness
12 capacity.
13        So if you're asking her to
14 read what the document says, she's
15 obviously capable of reading and
16 can do that.
17 BY MR. CLUFF:
18    Q.   Ms. Garcia, you worked at
19 the DEA for two years, correct?
20    A.   Correct.
21    Q.   And before you took your
22 job, or as part of accepting your job at
23 the DEA, you attended a four-month
24 training at Quantico, correct?

Page 399

1    A.   Correct.
2    Q.   That's with the FBI, right?
3        MS. MCCLURE:  Objection to
4 form.
5 BY MR. CLUFF:
6    Q.   I'm just trying to
7 understand.
8        Is that right?
9    A.   At the academy for DEA, yes.
10   Q.   Okay.  And while you were
11 there, I'm going to use your words from
12 your LinkedIn profile, we can pull it
13 back up if you want to, but I'm just
14 trying to understand your experience.
15   A.   Go ahead.
16   Q.   You said you developed a
17 thorough knowledge of the Code of Federal
18 Regulations.
19        And I'm just trying to
20 understand your knowledge of the Code of
21 Federal Regulations, okay?
22        So I've read to you two
23 sections of 21 U.S.C. 823, which, as you
24 and I have discussed, refers to

Page 400

1 registration requirements.
2        All I'm asking you to say,
3 and you can say it yes or no, and if you
4 don't understand, that's fine, but does
5 Subparagraph 1 for the manufacturers and
6 Subparagraph 1 for the distributors
7 contain identical language about
8 effective control against diversion of
9 particular controlled substances?
10        MS. MCCLURE:  Standing
11 objection to this line of
12 questioning, to the extent any
13 testimony is being elicited from
14 the witness that is in -- or
15 purporting to be or seeking
16 testimony in an expert witness
17 capacity.  This witness --
18        MR. CLUFF:  Shannon, this is
19 a ridiculous objection.  I didn't
20 ask for her expert testimony.  I
21 asked her about her
22 understanding --
23        MS. MCCLURE:  I wasn't
24 finished talking.

Page 401

1        MR. CLUFF:  -- of Code of
2 Regulations -- I know, but I'm
3 upset now.  You've done -- look
4 how long your objection is on the
5 transcript.  It's so long.  And
6 doesn't even make sense.
7        I asked her a foundational
8 question about her knowledge of
9 the Controlled Substances Act --
10        MS. MCCLURE:  And again --
11        MR. CLUFF:  -- and her
12 knowledge of the Code of Federal
13 Regulations.  And I'm now asking
14 her a question about her
15 understanding of those rules and
16 regulations, as a former DEA
17 investigator, where she worked for
18 two years, and claimed that she
19 developed a thorough understanding
20 of those rules and regulations.
21        I'm not calling for an
22 expert opinion.  I'm asking about
23 her lay witness understanding of
24 the rules and regulations that

Page 402

1 she, as an auditor at the DEA,
2 worked with.
3       Make your objection.  But
4 it's ridiculous.
5       MS. MCCLURE:  Are you done?
6       MR. CLUFF:  Yes.
7       MS. MCCLURE:  I did not
8 interrupt you intentionally.
9       MR. CLUFF:  Thank you, I
10 appreciate that.
11       MS. MCCLURE:  And I would
12 like to point out the fact that
13 you are continually interrupting
14 me.  Therefore, in light of the
15 fact that I let you make that
16 speech, I'm now going to respond.
17 And I would appreciate it if you
18 did not continue to interrupt me.
19       This witness is here
20 exclusively in a fact witness
21 capacity.  You have previously
22 recognized, in the course of this
23 deposition, the law enforcement
24 privilege.  You've previously

Page 403

1 recognized the fact that while she
2 is previously a DEA diversion
3 investigator, she cannot, and I
4 suspect that you would agree with
5 this, cannot be giving expert
6 testimony or testimony on behalf
7 of the DEA.
8       You have not given the DEA
9 any Touhy notice for this
10 deposition.  I assume you are not
11 attempting to violate Touhy by
12 asking questions of this witness
13 that would do that.
14       She is here exclusively in a
15 fact witness capacity.  She is not
16 an attorney and you cannot ask her
17 to apply laws, rules, regulations
18 to conduct of any distributor or
19 AmerisourceBergen.
20       MR. CLUFF:  Is that the
21 entirety of your objection?
22       MS. MCCLURE:  At this point,
23 that is the entirety of my
24 objection.

Page 404

1       And I would like to note
2 that I have a standing objection
3 to anything that you intend to ask
4 this witness about Garcia-12.
5       And in light of the fact
6 that you object to the length of
7 my objections, I will simply note
8 after every question that you
9 asked, that all of my prior
10 objections that we've now stated
11 in the last two to three
12 minutes -- that I've stated in the
13 last two to three minutes on the
14 record, when I say "same
15 objection" to every line of
16 questioning that you have here,
17 that will incorporate that.
18       Do we have that agreement?
19       MR. CLUFF:  Yes.
20       I will note, just for the
21 record, that you were telling me
22 that she's not an attorney and I
23 cannot ask her to apply laws,
24 rules, regulations to conduct of

Page 405

1 any distributor or
2 AmerisourceBergen.
3       I do not intend to.  So you
4 can maintain your objection if you
5 want to, but all I'm asking her is
6 if she, as a former DEA
7 investigator, who worked at the
8 DEA for two years, can look at
9 this statute that I've read to
10 her, that I provided for her on a
11 giant screen, and I've given her a
12 copy of, whether Subparagraph 1 of
13 823(a) reads that, The Attorney
14 General shall register an
15 applicant to manufacture a
16 controlled substance.  That's the
17 first line of that paragraph.
18 BY MR. CLUFF:
19       Q.  Do you see that under A?
20       A.  I see that.
21       Q.  And then in 1, it says,
22 Maintenance of effective controls against
23 diversion of a particular controlled
24 substance.

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1    Do you see that?
2    A.  I see that.
3    Q.   Based on your work at the
4  DEA, did you develop an understanding
5  that as part of a manufacturer's
6  registration, they needed to maintain
7  effective controls against diversion of
8  particular controlled substances?
9    MS. MCCLURE:  Standing
10  objections.
11    THE WITNESS:  Yes.
12  BY MR. CLUFF:
13    Q.   Looking at 823(d), which is
14  down there, it's highlighted on the
15  screen in front of you.
16    The first line reads, The
17  Attorney General shall register an
18  applicant to distribute a controlled
19  substance, Schedule I or II.
20    Do you see that?
21    A.  I see that.
22    Q.   And down in 1, it says,
23  Maintenance of effective controls against
24  diversion of particular controlled

Page 407

1  substances into other-than-legitimate
2  medical, scientific and industrial
3  channels.
4    Do you see that?
5    A.  I see that.
6    Q.   In your two years working at
7  the DEA, did you develop an understanding
8  of whether distributors were required to
9  maintain effective controls against
10  diversion of particular controlled
11  substances?
12    MS. MCCLURE:  Standing
13  objection.
14    THE WITNESS:  Generally,
15  yes.
16  BY MR. CLUFF:
17    Q.   Okay.  Based on your work at
18  the DEA, did you develop an understanding
19  that the duties of registrants, whether
20  they be manufacturers or distributors,
21  contained the same duty to maintain
22  effective controls against diversion of
23  particular controlled substances?
24    MS. MCCLURE:  Same.

Page 408

1  Standing.
2    THE WITNESS:  Sorry.
3  Restate.
4  BY MR. CLUFF:
5    Q.   Sure.
6    Based on your work at the
7  DEA, did you develop an understanding
8  that manufacturers and distributors both
9  have a duty to maintain effective
10  controls against diversion of particular
11  controlled substances?
12    MS. MCCLURE:  Standing
13  objection.
14    THE WITNESS:  A general
15  understanding, yes.
16  BY MR. CLUFF:
17    Q.   Yes.  Okay.  Thank you.
18    So looking back at
19  Exhibit-5, which is the DEA PowerPoint,
20  you noted that the slide on Page 162372
21  references 21 C.F.R. 1301.71(A).
22    Do you see that?
23    A.  Yes.
24    Q.   I'd like to hand you a copy

Page 409

1  of 1301.71(A).
2    MR. CLUFF:  Shannon, Ms.
3    McClure, we can maintain the same
4    agreement about this document if
5    you would like to, as we have with
6    Garcia-12.  And we can maintain
7    your standing objection.
8    MS. MCCLURE:  Great.
9    Thanks.
10    - - -
11    (Whereupon,
12    AmerisourceBergen-Garcia
13    Exhibit-13, Part 1301 - Section
14    1301.71; Security Requirements
15    generally, was marked for
16    identification.)
17    - - -
18  BY MR. CLUFF:
19    Q.   I'd like to ask you some
20  questions about 1301.71(A).  That's the
21  first subparagraph there.
22    Feel free to read that and
23  let me know when you've had a chance to
24  digest it.

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1    A.    You said A and B?
2    Q.    No, just A.
3          So you had a chance to look
4  at A?
5    A.    Yes.
6    Q.    So let's look at 5, but keep
7  13 next to it.  So 5, it says, Effective
8  controls.
9          Do you see that?
10         And then underneath, it
11 says, 21 C.F.R., there's the section
12 symbol, 1301.71(A), colon.
13         Do you see that?
14   A.    I see that on the slide.
15   Q.    Yes, it's on the slide.  And
16 next to it on the slide, you have a star.
17         Do you see that?
18   A.    I see that.
19   Q.    Do you recall why you put a
20 star next to it?
21   A.    I don't.
22   Q.    Looking at it today, do you
23 have any estimate on why you would have
24 put a star next to it?

Page 411

1          MS. MCCLURE:  Objection to
2    the form.  Asked and answered.
3          THE WITNESS:  No.
4  BY MR. CLUFF:
5    Q.    Let's look at the text in
6  the slide.  It says, All applicants and
7  registrants shall provide, underline,
8  effective, underline, controls,
9  underline, and, underline, procedures to
10 guard against theft and diversion of
11 controlled substances.
12         Did I get that accurately?
13   A.    Yes.
14   Q.    Now, looking at Garcia-13,
15 which is I believe right by your right
16 hand, Paragraph A.
17         Do you see the first line
18 says, All applicants and registrants
19 shall provide effective controls and
20 procedures to guard against theft and
21 diversion of controlled substances?
22         Do you see that?
23   A.    I see that.
24   Q.    So I'm just looking at the

Page 412

1  slide and at the regulation.
2          It looks like the slide is a
3  quote from the regulation, would you
4  agree?
5          MS. MCCLURE:  Objection to
6    form.  Standing.
7          THE WITNESS:  Yes.
8  BY MR. CLUFF:
9    Q.    Do you recall, attending
10 this conference, what the DEA discussed
11 in relation to 21 C.F.R. 1301.71(A)?
12         MS. MCCLURE:  Objection to
13   form.  Asked and answered.
14         THE WITNESS:  They just
15   touched on it with everything
16   else.
17 BY MR. CLUFF:
18   Q.    When you worked at the DEA,
19 did you form an understanding as to who
20 issued registrations to manufacturers and
21 distributors?
22   A.    Yes.
23   Q.    Based on your work at the
24 DEA, again, without disclosing anything

Page 413

1  that's protected by the law enforcement
2  privilege, did you form an understanding
3  of what the DEA looked at in order to
4  determine whether a registrant -- or
5  whether an entity should receive a
6  registration?
7    A.    We looked at the security
8  requirements and the building.  And I
9  don't remember anything else.
10   Q.    Why don't you turn the page
11 for me?
12   A.    Which page?
13   Q.    The page in 5, the big
14 PowerPoint presentation.  The next page,
15 the top slide says, Effective controls.
16 Again, there's 21 C.F.R. 1301.71.
17         I've been asking questions
18 about your experience with these
19 regulations during your time with the
20 DEA.
21         I just want to ask a
22 foundational question.  Did you develop
23 any additional understanding of these
24 regulations during your work as an

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1 investigator for AmerisourceBergen?  And
2 you can answer that yes or no if you want
3 to, because as I said, it's just a
4 foundational question.
5        MS. MCCLURE:  Objection to
6    form.
7        THE WITNESS:  No.  I didn't
8    reference the exact regulation
9    regularly, no.
10 BY MR. CLUFF:
11    Q.    Did you ever receive any
12 training, when you were at
13 AmerisourceBergen, on the rules and
14 regulations that governed
15 AmerisourceBergen's registration?
16    A.    I don't recall.
17    Q.    Okay.  So, then, for now,
18 we'll just limit it to your experience
19 with these regulations from your work at
20 the DEA.
21    A.    Okay.
22    Q.    Looking at the top slide on
23 Exhibit-5, it says, Effective controls,
24 21 C.F.R. 1301.71.

Page 415

1        Do you see that?
2    A.    71(A), yes.
3    Q.    And there it reads, In order
4 to determine whether a registrant has
5 provided effective controls against
6 diversion, the administrator shall use
7 the security requirements set forth in
8 sections 1301.72 -- and I'll note that
9 there are two section symbols, and I have
10 referred to that as sections,
11 1301.72-1301.76, as standards for the,
12 underlined, physical security controls
13 and, underline, and, begin underline,
14 operating procedures and, underline,
15 necessary to prevent diversion.
16        Do you see that?
17    A.    I see that.
18    Q.    So previously we've talked
19 about a number of issues, and I heard you
20 use the word, we would look at the
21 security requirements.
22        Do you recall that idea?
23    A.    Yes.
24    Q.    So when you're talking about

Page 416

1 the security requirements, is it the same
2 security requirements that are identified
3 on this slide?
4    A.    I believe so, yes.
5    Q.    So that's Sections 1301.72
6 to 1301.76?
7    A.    I believe that's where they
8 are.
9    Q.    Okay.  Do you recall, when
10 you were a diversion investigator, ever
11 reviewing 1301 to 1301.76?
12        MS. MCCLURE:  Objection to
13    form.
14        MR. CLUFF:  That was a bad
15    question.  Let me withdraw it.
16 BY MR. CLUFF:
17    Q.    Do you recall, when you were
18 a diversion investigator for the DEA,
19 reviewing Sections 1301.71 to 1301.74?
20    A.    Vaguely going to the
21 business, yes.
22    Q.    What do you mean "going to
23 the business"?
24    A.    So if they were applying for

Page 417

1 a DEA license, looking at what controls
2 they had in place.
3    Q.    And when you say "what
4 controls" in place, what kind of controls
5 do you mean?
6    A.    Security, physical security.
7    Q.    And that would have been the
8 security controls identified in 1301.71?
9        MS. MCCLURE:  Objection to
10    form.
11        THE WITNESS:  1301.72 to
12    1301.76.
13 BY MR. CLUFF:
14    Q.    And that's the -- that's the
15 security controls identified in Section A
16 of 1301.71, correct?
17        MS. MCCLURE:  Objection to
18    form.
19        THE WITNESS:  I'd have to
20    look at the regulation.  I don't
21    know.
22 BY MR. CLUFF:
23    Q.    Okay.  It's right there to
24 your right.

Page 418

1    We previously looked at that
2  first sentence that talks about, All
3  applicants and registrants shall provide.
4    Do you see that?
5    A.  I see that.
6    Q.  And the next sentence says,
7  In order to determine whether a
8  registrant -- registrant has provided
9  effective controls against diversion, the
10 administrator shall use the security
11 requirements set forth in SEC
12 S.1301.72-1301.76 as standards for the
13 physical security controls and operating
14 procedures necessary to prevent
15 diversion.
16    Do you see that?
17    A.  I see that.
18    Q.  So are those the security
19 requirements you would have reviewed on
20 the way to evaluate a potential
21 registrant's registration?
22    A.  Do you have a copy of
23 1301.72 and 76?
24    Q.  I have a copy of 1302.74,

Page 419

1  which is one of the ones in there.
2    I can hand that to you, if
3  you'd like it.
4    A.  If you can, that would be
5  great.
6    Q.  Sure.
7        - - -
8    (Whereupon,
9    AmerisourceBergen-Garcia
10   Exhibit-14, Part 1301 - Section
11   1301.74; Other Security Controls
12   for Non-practitioners, was marked
13   for identification.)
14        - - -
15 BY MR. CLUFF:
16   Q.  For the record, I'm marking
17 as Exhibit-14 a copy of 21 C.F.R. 1301.74
18 that was obtained from the DEA diversion
19 website.
20    So, Liz, I just want to give
21 you a foundational question to set up
22 some further questions, and then I'll
23 give you a chance to look at this.
24    So in 1301.71, it identified

Page 420

1  security requirements -- or you
2  identified security requirements as
3  1301.72 to 1301.76.
4    And this is 1301.74, which
5  would have been one of the security
6  requirements, correct?
7    A.  That's what it appears to be
8  here.
9    Q.  Okay.  So I just want to ask
10 you some questions about Sections A and
11 B.  So you can go ahead and look at
12 those.
13    A.  On which exhibit?  I'm
14 sorry.
15    Q.  14, which is 1301.74.
16    A.  Okay.  A and B?
17    Q.  Yep.
18    MS. MCCLURE:  We've been
19 going for an hour and-a-half.
20    MR. CLUFF:  I was going to
21 say, just a few more questions,
22 and then I would love for us all
23 to take a break.
24    THE WITNESS:  My eyes are

Page 421

1  getting cross-eyed.  Can we take a
2  break, please?
3    MR. CLUFF:  Sure.  We can
4  take a break.
5    THE WITNESS:  Thank you.
6    VIDEO TECHNICIAN:  Off the
7  record at 4:19 p.m.
8        - - -
9    (Whereupon, a brief recess
10   was taken.)
11        - - -
12    VIDEO TECHNICIAN:  We're
13 back on the record at 4:38 p.m.
14 BY MR. CLUFF:
15   Q.  Ms. Garcia, we're back on
16 the record.  You're still under oath.
17    Let's take 12, 13 and 14 and
18 put them to the side.  We'll take
19 Exhibit-5 and put that to the side.  And
20 let's forget they ever existed.
21    I have some quick questions
22 about some interactions that
23 AmerisourceBergen had with Walgreens.
24 And I've got some e-mails that we can go

Page 422

1 through to kind of just touch on it
2 pretty quickly. I'll do my best to get
3 to the point as quickly as possible and
4 ask the cleanest questions I can.
5     MR. CLUFF: Is there an
6 attorney for Walgreens here? Is
7 there an attorney for Walgreens on
8 the phone?
9     I have a document here in my
10 list of exhibits that is
11 WAGMDL00038287, it's written by
12 Kimberly St. John from
13 AmerisourceBergen, recipients
14 include a number of individuals.
15 Ms. Garcia is the second person on
16 the list. Under the CMO, because
17 Ms. Garcia would have received the
18 e-mail, she can view it, even
19 though it's marked confidential.
20     Is there an attorney for
21 Walgreens on the phone or in
22 person?
23 BY MR. CLUFF:
24     Q.   Before I show you this, Liz,

Page 423

1 I want to talk to you a bit.
2     You previously identified a
3 term, you said the Walgreens integrity
4 team.
5     Do you know who that was?
6     MS. MCCLURE: Objection to
7 form.
8 BY MR. CLUFF:
9     Q.   Let he me back up.
10     Can you describe what the
11 Walgreens integrity team was to me?
12     A.   They are our counterparts at
13 Walgreens.
14     Q.   Do you recall receiving
15 correspondence from the Walgreens
16 integrity team?
17     A.   Yes.
18     Q.   Was that a part of your job
19 at AmerisourceBergen, was to communicate
20 with the Walgreens integrity team?
21     A.   Yes.
22     Q.   Did you do so by phone?
23     A.   Yes.
24     Q.   And by e-mail?

Page 424

1     A.   Yes.
2     Q.   Do you recall having
3 telephonic meetings with the Walgreens
4 integrity team?
5     A.   Yes, on occasion.
6     Q.   Are you aware, in your work
7 at AmerisourceBergen, about any issues
8 with hydrocodone being rescheduled at
9 all?
10     A.   I don't recall.
11     Q.   Are you aware if hydrocodone
12 was rescheduled from Schedule II to
13 Schedule III?
14     MS. MCCLURE: Objection to
15 form.
16     THE WITNESS: I believe
17 hydrocodone was rescheduled from
18 III to II.
19 BY MR. CLUFF:
20     Q.   Okay. Oh, I said it
21 backwards, didn't I? I said II to III.
22     Do you recall, during 2014,
23 having any meetings with the Walgreens
24 integrity team regarding the rescheduling

Page 425

1 of hydrocodone?
2     A.   I don't recall.
3     Q.   Is that something that you
4 would have discussed with Walgreens
5 during your time period there?
6     MS. MCCLURE: Objection to
7 form. Speculation.
8     THE WITNESS: We may have.
9 BY MR. CLUFF:
10     Q.   If -- you were responsible
11 for working with the chain pharmacies at
12 AmerisourceBergen, correct?
13     MS. MCCLURE: Objection to
14 form.
15     THE WITNESS: Correct.
16 BY MR. CLUFF:
17     Q.   So that was part of the
18 scope of your job responsibilities?
19     A.   Part.
20     Q.   If there was a meeting with
21 the Walgreens integrity team about the
22 hydrocodone rescheduling, would you
23 generally have been included in such a
24 meeting?

Page 426

1 MS. MCCLURE: Objection to
2 form.
3 THE WITNESS: If there was
4 such a meeting.
5 MR. CLUFF: I believe I've
6 laid a sufficient foundation to
7 establish that Ms. Garcia would
8 have received this document and
9 would have participated in the
10 meeting that it describes. So I'm
11 going to use this document.
12 Shannon, I understand that
13 you may want to interpose an
14 objection. Go ahead and state
15 that for the record, but I'm going
16 to move forward.
17 MS. MCCLURE: Can I see the
18 document?
19 MR. CLUFF: Sure. I'm going
20 to give this to your counsel
21 first, before I give it to you,
22 okay?
23 MS. MCCLURE: Yep. Okay.
24 MR. CLUFF: Okay. Here is

Page 427

1 your copy.
2 MS. MCCLURE: For the
3 record, Ms. Garcia is included as
4 a recipient to the e-mail dated
5 9/2/2014. The e-mail originated
6 with an AmerisourceBergen e-mail
7 address and went to a number of
8 AmerisourceBergen and Walgreens
9 personnel. And the Bates label is
10 WAGMDL00038287.
11 BY MR. CLUFF:
12 Q. Ms. Garcia, this is a really
13 simple document. Let's just first
14 establish, as your counsel helped us
15 here, who it's from and how you may have
16 received it.
17 Do you see up at the top
18 left-hand corner there's a line that
19 says, Appointment? It's above the black
20 line on the first page.
21 A. I see that.
22 Q. And it says, From Kimberly
23 St. John.
24 I believe that you

Page 428

1 previously identified her as somebody
2 that you worked with, correct?
3 A. Yes.
4 Q. Who was she again?
5 A. She was our coordinator.
6 Q. Would she have regularly
7 coordinated meetings on behalf of
8 AmerisourceBergen?
9 A. I think so.
10 Q. Okay. Looking at the "to"
11 line, it looks like she sent to herself
12 and then you're listed as the second
13 recipient, Garcia, Elizabeth, right?
14 A. Yes.
15 Q. And if we go down the line
16 of recipients, there are some additional
17 AmerisourceBergen employees.
18 Do you see that?
19 A. I see that, yes.
20 Q. And it looks like midway
21 down that list, it starts with, M. Hayes,
22 and if you go in, the next addressee is
23 Jeff.Price@Walgreens.com?
24 Do you recognize that name?

Page 429

1 A. Sorry, where are you?
2 Q. Right there on the screen.
3 He highlighted just Jeff.Price.
4 A. I don't remember.
5 Q. How about Odell Morgan; do
6 you recognize Odell Morgan?
7 A. I don't recall.
8 Q. How about Natasha Polster?
9 A. Natasha was part of the
10 integrity team.
11 Q. Eric Stahmann?
12 A. Integrity team.
13 Q. Patricia Daugherty?
14 A. Integrity.
15 Q. Christopher Dymon?
16 A. Integrity.
17 Q. So, generally, looking at
18 the list of Walgreens recipients, it
19 seems like this appointment was sent to
20 the Walgreens integrity team, correct?
21 A. Yes, correct.
22 Q. If you look at the subject
23 down there, it says, Hydrocodone
24 rescheduling.

Page 430

1    A.   Okay.
2    Q.   And it looks like there's a
3 location.  It says, Dial-in,
4 1-800-315-5963.
5         Do you see that?
6    A.   I see that.
7    Q.   Does that refresh your
8 recollection that maybe this e-mail is
9 about a meeting with the Walgreens
10 integrity team about the hydrocodone
11 rescheduling?
12   A.   That is what it appears to
13 be.
14   Q.   Do you see in the attachment
15 column, or row, there it says, ABC HC
16 C2.doc?
17   A.   I see that.
18   Q.   Do you have any idea what
19 the abbreviation "ABC" stands for?
20   A.   AmerisourceBergen.
21   Q.   Okay.  How about HC, what
22 does that stand for?
23   A.   I don't know what that would
24 be.

Page 431

1    Q.   Could it be hydrocodone?
2        MS. MCCLURE:  Objection to
3 form.
4 BY MR. CLUFF:
5    Q.   If you know.
6    A.   I guess it could be.
7    Q.   How about C-II, what does
8 that stand for?
9    A.   That could be Schedule II.
10   Q.   Okay.  Let's turn to the
11 next page.
12       The next page is Bates
13 marked WAGMDL00038288.  This would have
14 been the attachment to the parent e-mail.
15       It looks like there's a
16 blank in the "to" line.
17       Do you see that?
18   A.   Yes.
19   Q.   But it's from Tahsa Polster
20 and Denman Murray.
21       Are those members of the
22 Walgreens integrity team?
23   A.   Yes.  Denman was, I think,
24 the IT guy on the integrity team.

Page 432

1    Q.   But he was part of the
2 integrity team?
3    A.   I think so.
4    Q.   And then the date is
5 September 3, 2014?
6    A.   Yes.
7    Q.   All right.  The subject line
8 is, ABC/WAG hydrocodone schedule change
9 plan.
10       Do you see that?
11   A.   I see that.
12   Q.   Looking at this document and
13 the subject line, do you have any
14 understanding about what this document
15 was about?
16   A.   Let me review.
17       Okay.
18   Q.   So having reviewed this
19 page, did you form an understanding of
20 what this document -- or this meeting was
21 about?
22   A.   This may be about the two
23 systems being able to talk to each other.
24   Q.   Previously, I think we

Page 433

1 talked about syncing the ABC and
2 Walgreens integrity team systems.
3        Is that --
4        MS. MCCLURE:  Objection to
5 form.
6 BY MR. CLUFF:
7    Q.   Is that what you're
8 referring to here?
9    A.   The pharmacy ordering system
10 and our SAP system.
11   Q.   Okay.  So let's go down the
12 list and see.
13       Do you see that there are
14 these bold underlines, I'd refer to them
15 as headings?
16       Do you see that?
17   A.   I see that.
18   Q.   Do you understand that these
19 would have been discussion points during
20 the meeting between ABC and the Walgreens
21 integrity team?
22       MS. MCCLURE:  Objection to
23 form.
24       THE WITNESS:  That's my

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1 understanding.
2 BY MR. CLUFF:
3    Q.   The first one is, Hydro
4 inventory availability.
5       Do you see that?
6    A.   I see that.
7    Q.   And then the next bullet
8 point underneath it is, Allocations.
9       Do you know what an
10 allocation refers to?
11    A.   Allocations are from the
12 manufacturing side.  I don't recall.
13    Q.   The next bullet point says,
14 MFG supply-interruptions, C-II yearly
15 allotment.  There appears to be Roman
16 Numeral II next to the C.
17       Do you understand what that
18 is?
19    A.   I think that might be in
20 regards to allocations.
21    Q.   Were there concerns about
22 interruptions of supply from the
23 manufacturers in 2014?
24    A.   I don't recall.

Page 435

1    Q.   Under the heading,
2 Distribution, the second bullet point
3 says, Moving ordering daily to weekly.
4       Do you understand what that
5 was about?
6    A.   I think that was syncing the
7 two systems electronically, or
8 technologically.
9    Q.   Prior to this, was Walgreens
10 ordering on a daily basis as opposed to a
11 weekly basis?
12    A.   I don't know what they were
13 doing on their end.
14    Q.   Under the heading, OMP, the
15 first bullet point, again, Moving
16 ordering daily to weekly.
17       So that was -- was that
18 discussed twice?
19       MS. MCCLURE:  Objection to
20 form.
21       THE WITNESS:  I don't know.
22 It may have been, I don't know.
23 BY MR. CLUFF:
24    Q.   The last bullet point under

Page 436

1 OMP is listed as, Is using family class
2 going to work for hydro?
3       Do you recall why that was a
4 question?
5    A.   I don't recall.
6    Q.   At the bottom it says, bold
7 underline, Threshold limits.
8       Do you see that?
9    A.   I see that.
10    Q.   So would that indicate that
11 there was a conversation between
12 AmerisourceBergen and the Walgreens
13 integrity team about threshold limits?
14       MS. MCCLURE:  Objection to
15 form.
16       THE WITNESS:  Threshold
17 limits may be as part of the
18 algorithm.  I don't know.
19 BY MR. CLUFF:
20    Q.   So you would have discussed
21 threshold limits as part of the algorithm
22 system with the Walgreens integrity team?
23    A.   I don't recall.
24    Q.   The next bullet point down

Page 437

1 says, Will OMP limits change.
2       Do you see that?
3    A.   I see that.
4    Q.   Do you recall if there was
5 any discussion with the Walgreens
6 integrity team about changing OMP limits?
7    A.   I don't recall.
8    Q.   Okay.  We can set that
9 aside.
10       - - -
11       (Whereupon,
12       AmerisourceBergen-Garcia
13       Exhibit-15, WAGMDL00038287-288,
14       was marked for identification.)
15       - - -
16       (Whereupon,
17       AmerisourceBergen-Garcia
18       Exhibit-16, ABDCMDL00296155-180,
19       was marked for identification.)
20       - - -
21 BY MR. CLUFF:
22    Q.   I'd like to hand you a copy
23 of a document that is an e-mail with an
24 attachment.  I will tell you, I do not

Highly Confidential - Subject to Further Confidentiality Review

---

Page 438

1 plan to ask you any questions about the
2 attachment, because it's large.
3         But I would like to discuss
4 the e-mail with you, which is one page.
5 So the document is Bates stamped
6 ABDCMDL00296155 is the cover e-mail. The
7 attachment begins with ABDCMDL00296156.
8         Go ahead and familiarize
9 yourself with that first page, which is
10 the e-mail. If you'd like to look at the
11 attachment, you may, but, again, I'm not
12 going to ask you any questions about it.
13     A.    Okay.
14     Q.    Down at the bottom of this
15 first page, you'll see in the "from"
16 line, it says, Zimmerman, Chris.
17         Do you know who that is?
18     A.    Chris is the compliance
19 officer.
20     Q.    And --
21     A.    Chief compliance officer.
22     Q.    I'm sorry, you said the
23 chief compliance officer? Okay.
24         Did you work with him on any

---

Page 439

1 kind of a regular basis at
2 AmerisourceBergen?
3         MS. MCCLURE: Objection to
4     form.
5         THE WITNESS: Not on a
6     regular basis, no.
7 BY MR. CLUFF:
8     Q.    You see the subject line --
9 or excuse me, the "to" line includes May,
10 David; Hazewski, Edward; and Sharon
11 Hartman.
12         Do you see that?
13     A.    I see that.
14     Q.    Do you know -- you worked
15 with them at AmerisourceBergen, correct?
16     A.    Correct.
17     Q.    I believe, at the time, you
18 stated that Ed Hazewski would have been
19 your direct supervisor?
20     A.    March 2014. He may have
21 been.
22     Q.    At this time, was Sharon
23 Hartman also one of your supervisors?
24     A.    No.

---

Page 440

1     Q.    The "cc" line that says,
2 Mays, Steve.
3         Do you know who Steve Mays
4 is?
5     A.    Steve Mays is the senior
6 director of regulatory affairs. I don't
7 remember.
8     Q.    Did you report to him at
9 all?
10     A.    No.
11     Q.    Did you report to him at all
12 in 2014?
13     A.    No.
14     Q.    Okay. In the text of the
15 e-mail from Chris to that group it says,
16 I met with David Neu.
17         I want to stop there and ask
18 if you know who David Neu is?
19     A.    David Neu was on the
20 executive lead team for ABC. I don't
21 remember his title.
22     Q.    Do you recall if he had any
23 specific focus area or specialty in his
24 work with AmerisourceBergen?

---

Page 441

1         MS. MCCLURE: Objection to
2     form.
3         THE WITNESS: I don't know.
4     I never worked with him.
5 BY MR. CLUFF:
6     Q.    It says, I met with David
7 Neu this morning and he wanted me to send
8 him an e-mail, a out -- it's probably a
9 typo for about, right?
10     A.    Uh-huh.
11         MS. MCCLURE: Object to
12     form.
13 BY MR. CLUFF:
14     Q.    I'm just asking, do you
15 think a, space, out is a typo for about?
16         MS. MCCLURE: Same.
17         THE WITNESS: Probably.
18 BY MR. CLUFF:
19     Q.    Okay. So, I met with David
20 Neu this morning and he wanted me to send
21 him an e-mail about our order monitoring
22 program with respect to WAG.
23         Does "WAG" there stand for
24 Walgreens?

---

Page 442

1    A.   Yes.
2    Q.   Okay.  He continues and
3 says, WAG execs are concerned with DEA
4 and want our perspective on their program
5 and the environment going forward.
6        In that sentence does "WAG"
7 again refer to Walgreens?
8    A.   Walgreens, yes.
9    Q.   Skipping down, Chris says,
10 Ed, can you outline our approach to WAG
11 and the WAG people you deal with.  How
12 often and when you meet, and anything
13 else I should relay to Dave, or
14 suggestions of any improvements.
15        Do you see that?
16    A.   I see that.
17    Q.   Okay.  And bumping up to the
18 top -- or, excuse me, one e-mail up, Ed
19 Hazewski forwards you that e-mail and
20 includes Marcelino Guerreiro.
21        Do you see that?
22    A.   I see that.
23    Q.   It says, Read below and
24 let's discuss.  Would like to provide

Page 443

1 some data but want to keep it basic and
2 easily understood.  Let me know your
3 availability for a call.
4        Do you see that?
5    A.   I see that.
6    Q.   Do you recall discussing
7 Chris Zimmerman's e-mail with Mr.
8 Hazewski?
9    A.   No, not at all.
10    Q.   Do you have any
11 understanding, reading this e-mail here
12 today, about why Chris -- or Mr.
13 Zimmerman wanted to give David Neu this
14 information?
15    A.   I don't know why.
16    Q.   Did you -- do you recall
17 asking Mr. Hazewski why this project was
18 going on?
19    A.   No.
20    Q.   Looking at your e-mail at
21 the top -- and you send it to Ed Hazewski
22 and Marcelino Guerreiro.
23        Do you see that?
24    A.   I see that.

Page 444

1    Q.   Subject line is, Re, WAG
2 DEA.
3        "WAG" there, again, refers
4 to Walgreens?
5    A.   Yes.
6    Q.   Does DEA refer to the Drug
7 Enforcement Administration?
8    A.   Yes.
9    Q.   Okay.  And the attachments
10 are Ron Buzzeo_FDLI_current_February
11 2014-MC_SOM.
12        Do you see that?
13    A.   I see that.
14    Q.   Reading that, do you have
15 any idea what that document was, or
16 recollection?
17    A.   I have no recollection.
18    Q.   Looking at your e-mail to Ed
19 you say, I've attached a PowerPoint
20 presentation -- abbreviated as PPT -- I
21 found from Buzzeo dated Feb. 2014
22 regarding SOM.
23        Do you see that?
24    A.   I see that.

Page 445

1    Q.   Does that refresh your
2 recollection on what that attachment
3 might be?
4    A.   No.
5    Q.   Do you have any idea who
6 Buzzeo is, or what Buzzeo is?
7    A.   I don't remember exactly
8 what that is, no.
9    Q.   You say, Note Slide Number
10 13, suspicious order monitoring
11 program-five key elements as a starting
12 point to evaluate WAG's program.
13        Does "WAG" still refer to
14 Walgreens there?
15    A.   Yes.
16    Q.   Does this refresh your
17 recollection that you were being asked to
18 evaluate Walgreens' program at the time?
19        MS. MCCLURE:  Objection.
20    Form.
21        THE WITNESS:  That's what it
22    appears to be.
23 BY MR. CLUFF:
24    Q.   Okay.  Do you know if

Page 446

1 AmerisourceBergen was being asked to
2 evaluate Walgreens' program by Walgreens?
3        MS. MCCLURE:  Object to
4    form.
5        THE WITNESS:  Sorry,
6    clarify.
7 BY MR. CLUFF:
8    Q.   Sure.
9        Do you know if Walgreens
10 asked AmerisourceBergen to do this
11 evaluation?
12    A.   I don't recall.
13    Q.   Do you have any recollection
14 about whether AmerisourceBergen
15 voluntarily decided to evaluate
16 Walgreens' program?
17        MS. MCCLURE:  Objection to
18    form.
19        THE WITNESS:  I don't
20    recall.
21 BY MR. CLUFF:
22    Q.   You say, For example, they
23 have submitted to us the information for
24 the 590; however, do they have a separate

Page 447

1 questionnaire that they use to conduct
2 routine due diligence on their stores or
3 when they are acquiring new businesses?
4        Did you ever get answers to
5 those questions?
6    A.   I think they had a separate
7 questionnaire, but it was a confidential
8 document that nobody saw, from what I
9 recall.
10    Q.   When you say "nobody saw"
11 it, do you mean AmerisourceBergen never
12 saw it as well?
13    A.   They may not have.  I don't
14 remember.
15    Q.   And then the next sentence
16 is, Process to clear orders besides
17 looking at item number and quantity.
18        Did you get an answer to
19 that question?
20    A.   I don't remember.
21    Q.   Okay.  I sort of
22 overpromised and said I would not ask you
23 questions about the slides, but why don't
24 we look at Number 13, which is the slide

Page 448

1 you reference in your e-mail.
2        If you flip back in the
3 document, that slide ends at 296168.
4    A.   Okay.
5    Q.   Just starting at the top
6 there, the heading is, Suspicious Order
7 Monitoring-Five Key Elements.
8        Do you see that?
9    A.   I see that.
10    Q.   Do you have any
11 recollection, reviewing this slide, what
12 this was about?
13    A.   I don't recall this.  But
14 it's related to this top e-mail here.
15    Q.   Okay.  Looking down at the
16 five key elements, do you see the first
17 one is, A defensible SOM model?
18    A.   I see that.
19    Q.   Do you understand "SOM" to
20 stand for suspicious order monitoring?
21    A.   Yes.
22    Q.   Okay.  So would that be one
23 key element of a suspicious order
24 monitoring program?

Page 449

1        MS. MCCLURE:  Objection to
2    form.
3        THE WITNESS:  Identifies
4    orders -- that's the definition of
5    a suspicious order.
6 BY MR. CLUFF:
7    Q.   Okay.  The next one down is,
8 Appropriate due diligence and Know Your
9 Customer activities.
10        Would you agree that's an
11 element of a suspicious order monitoring
12 program, or a key element of it?
13        MS. MCCLURE:  Objection to
14    form.
15        THE WITNESS:  That's an
16    element of due diligence and Know
17    Your Customer.
18 BY MR. CLUFF:
19    Q.   How about, Appropriate
20 review and/or investigations of pended
21 orders, would you agree that's a key
22 element of a suspicious order monitoring
23 program?
24        MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 450

```
 1   form.
 2        THE WITNESS:  Pended orders
 3   would be orders of interest if
 4   they hit the algorithm.
 5   BY MR. CLUFF:
 6   Q.   So appropriate review and/or
 7   investigations of pended orders would be
 8   a key element of a suspicious order
 9   monitoring program?
10        MS. MCCLURE:  Objection to
11   form.
12        THE WITNESS:  We don't know
13   until we actually look at it.
14   BY MR. CLUFF:
15   Q.   Okay.  But you have to
16   review them, if they hit parameters,
17   right, to determine whether or not
18   they're suspicious?
19   A.   If they're potentially
20   suspicious.
21        MS. MCCLURE:  Same.
22   BY MR. CLUFF:
23   Q.   At the bottom -- excuse me,
24   the next one down, says, Clear,
```

Page 451

```
 1   comprehensive SOM SOPs.
 2        And we previously discussed
 3   that "SOM" stands for suspicious order
 4   monitoring, right?
 5   A.   Correct.
 6   Q.   Do you understand if "SOP"
 7   stands for standard operating procedures?
 8   A.   I believe so, yes.
 9   Q.   So would you agree that
10   clear, comprehensive standard operating
11   procedures are a key element of the
12   suspicious order monitoring program?
13        MS. MCCLURE:  Objection to
14   form.
15        THE WITNESS:  It could be a
16   training document.
17   BY MR. CLUFF:
18   Q.   But having clear,
19   comprehensive training documents is a
20   part of -- is a key element of a
21   suspicious order monitoring program,
22   correct?
23        MS. MCCLURE:  Objection to
24   form.
```

Page 452

```
 1        THE WITNESS:  Yes, I guess.
 2   BY MR. CLUFF:
 3   Q.   Okay.  Now I'm done with
 4   that document.
 5        MR. CLUFF:  Is there a Teva
 6   lawyer here?  Teva?  Teva?
 7   BY MR. CLUFF:
 8   Q.   Previously, we were
 9   discussing Walgreens and the sharing of
10   information regarding thresholds.
11        Do you recall that?
12   A.   I recall that.
13   Q.   I don't want to rehash that
14   conversation, I promise.
15        But one of the things that
16   got us on to that conversation is I asked
17   you if AmerisourceBergen ever created
18   exceptions for Walgreens.
19        Do you recall that?
20   A.   Yes.
21   Q.   I'd like to hand you a copy
22   of Exhibit-17.
23          - - -
24        (Whereupon,
```

Page 453

```
 1   AmerisourceBergen-Garcia
 2   Exhibit-17, ABDCMDL00151721-726,
 3   was marked for identification.)
 4          - - -
 5   BY MR. CLUFF:
 6   Q.   It's an e-mail chain dated
 7   -- ABDCMDL00151721.
 8        Please feel free to
 9   familiarize yourself with it.  It looks
10   like there's also an attachment, which
11   would have been a second e-mail.
12        MS. MCCLURE:  Is that
13   attachment part of this?
14        MR. CLUFF:  I do not believe
15   it is part of this.
16   BY MR. CLUFF:
17   Q.   So I don't have you wasting
18   your time reading a whole long document
19   that I'm not going to ask you questions
20   about.
21        I'm looking at the second
22   page, there's an e-mail from Degnan,
23   Nancy, to Eric Cherveny.  And then
24   there's a response from Eric Cherveny to
```

Page 454

1 that e-mail. And my questions are about
2 those two.
3        You can feel free to read
4 the entire thing if you want to, but you
5 let me know when you're ready.
6    A.   Okay.
7    Q.   So in that e-mail on Page
8 151722, Nancy Degnan -- do you know who
9 that is?
10   A.   I don't know who that is.
11   Q.   If you look down at the
12 bottom of her e-mail, it identifies her
13 as a knowledge developer. And there are
14 two Roman Numerals next to it.
15       Do you see that?
16   A.   I see that.
17   Q.   Does that refresh your
18 recollection about who she is?
19   A.   I have no idea who she is.
20   Q.   Okay. She asks, Hi, Eric.
21 I reached out to the service delivery
22 team (Sara Dalyan and Kate Harper) to
23 determine if Kaiser will also be an
24 exception in the OMP process currently

Page 455

1 published. I wanted to identify any
2 other differences to the existing process
3 before updating the article.
4        Do you see that?
5    A.   I see that.
6    Q.   And then if you turn to the
7 first page of this chain, Eric Cherveny
8 responds to her at the very bottom.
9        Do you see that?
10   A.   I see that.
11   Q.   You see you're copied on
12 that e-mail in the "cc" line?
13   A.   Yes.
14   Q.   And he writes, Nancy,
15 Walgreens is the only exception to the
16 customer review form. All other
17 customers and chains will submit the
18 consumption review as per current policy.
19       Do you see that?
20   A.   I see that.
21   Q.   Does this refresh your
22 recollection that AmerisourceBergen
23 created exceptions to its policies and
24 procedures for Walgreens?

Page 456

1        MS. MCCLURE: Objection to
2 form.
3        THE WITNESS: We didn't
4 create policy and procedure
5 exceptions. The Walgreens
6 integrity team, I, believe, wanted
7 to receive threshold reviews
8 directly and not for individual
9 stores -- or from individual
10 stores.
11 BY MR. CLUFF:
12   Q.   Just to be clear, it says,
13 Walgreens is the only exception to the
14 consumption review form. All other
15 customers and chains will submit the
16 consumption review as per current policy.
17       So was there a current
18 policy in place regarding consumption
19 reviews in 2015?
20   A.   I believe so.
21   Q.   Okay. And then Walgreens
22 was an exception to that rule, correct?
23       MS. MCCLURE: Objection to
24 the form. Asked and answered.

Page 457

1        THE WITNESS: They were not
2 an exception to the rule. It was
3 how and who those consumption
4 reviews would be submitted to.
5 BY MR. CLUFF:
6    Q.   But how and to whom those
7 consumption reviews would be submitted
8 was an exception to the policy, correct?
9        MS. MCCLURE: Objection to
10 the form. Asked and answered.
11       THE WITNESS: No. The
12 consumption review form was to go
13 through the WAG integrity team;
14 whereas with other customers and
15 other chains, it could be
16 submitted directly to our system.
17 BY MR. CLUFF:
18   Q.   So let me just understand.
19       There was a policy in place
20 in 2015, correct?
21   A.   I think so.
22   Q.   Okay. And you said, with
23 other customers and other chains, a
24 consumption review form -- you used the

Page 458

1 word "it," but I believe you meant
2 consumption review form -- could be
3 submitted directly to our system.
4           Did I get that right?
5           MS. MCCLURE:  Objection.
6     Asked and answered.
7           THE WITNESS:  Correct.
8 BY MR. CLUFF:
9     Q.    Okay.  And was that the
10 policy?
11          MS. MCCLURE:  Objection.
12    Asked and answered.
13          THE WITNESS:  I don't know
14    if that was in written format.
15 BY MR. CLUFF:
16    Q.    Was that the general
17 procedure that you understood to be the
18 way it worked?
19          MS. MCCLURE:  Objection.
20    Form.
21          THE WITNESS:  I believe so.
22          MS. MCCLURE:  Asked and
23    answered.
24 BY MR. CLUFF:

Page 459

1     Q.    Just give the answer a
2 second so Shannon can get her objection
3 in.  Thanks.
4           Okay.  So Walgreens didn't
5 go through that same procedure, did they?
6           MS. MCCLURE:  Objection.
7     Asked and answered.  Form.
8           THE WITNESS:  They -- the
9     individual stores from Walgreens
10    would submit a consumption review
11    form to the WAG integrity team,
12    and then the WAG integrity team
13    would go to the system.
14 BY MR. CLUFF:
15    Q.    What's "the system" you're
16 referring to?
17    A.    Our -- I think it was
18 Salesforce where the consumption reviews
19 are kept.
20    Q.    So that's a different
21 process than a regular customer would go
22 through, correct?
23          MS. MCCLURE:  Objection to
24    form.  Asked and answered.

Page 460

1           THE WITNESS:  Because
2     Walgreens has the integrity team,
3     they wanted to go through the
4     integrity team.
5 BY MR. CLUFF:
6     Q.    So because Walgreens had an
7 integrity team, AmerisourceBergen gave
8 them a different process than other
9 customers, is that what you're saying?
10          MS. MCCLURE:  Objection.
11    Asked and answered numerous times.
12    You're becoming argumentative.
13          THE WITNESS:  Sorry,
14    restate.
15 BY MR. CLUFF:
16    Q.    Sure.
17          Because Walgreens had an
18 integrity team, AmerisourceBergen gave
19 them a different process than other
20 customers for submitting consumption
21 reviews?
22          MS. MCCLURE:  Same
23    objection.
24          THE WITNESS:  No.  Walgreens

Page 461

1     insisted that they wanted to have
2     visibility to those consumption
3     reviews and that they would submit
4     those to the system like everyone
5     else.
6 BY MR. CLUFF:
7     Q.    And then however you want to
8 qualify that process, Eric Cherveny
9 writes and says, Walgreens is the only
10 exception to the consumption review form.
11          Do you see that?
12    A.    I see that.
13    Q.    Okay.  Let's move on.
14          MR. CLUFF:  Is counsel for
15    Teva on the phone or present in
16    the room?
17 BY MR. CLUFF:
18    Q.    Ms. Garcia, do you recall
19 working with a man named Joseph
20 Tomkowitz?
21    A.    Yes.
22    Q.    Do you recall working with
23 Ed Hazewski?
24    A.    Yes.

Page 462

1    Q.   Are you aware that Joseph
2  Tomkowitz left AmerisourceBergen and went
3  to Teva?
4    A.   Yes.
5    Q.   Did you communicate or
6  correspond with Mr. Tomkowitz after he
7  left AmerisourceBergen?
8    A.   On occasion.
9    Q.   Do you recall communicating
10 with him about past Walgreens hospital
11 locations?
12   A.   I don't recall that.
13   Q.   Do you recall any
14 investigation that you conducted, during
15 your time at AmerisourceBergen, about a
16 location for Walgreens in Beth Israel,
17 New York?
18   A.   I don't recall.
19   Q.   Do you recall ever
20 discussing that location with Mr.
21 Tomkowitz?
22   A.   I don't recall.
23   MR. CLUFF:  Shannon, why
24 don't you look at that before I

Page 463

1  hand it to her?
2    For the record, I'm handing
3  counsel a copy of a document
4  produced by Teva, subject to a
5  confidential designation.
6  Teva_MDL_A_02664130.
7    Ms. Garcia is copied on
8  every aspect of this chain.  In
9  fact, she replies to Mr. Tomkowitz
10 at one point on the chain.
11 Because she's a recipient and
12 author of the document, despite
13 the confidentiality designation,
14 this e-mail allows me to -- the
15 protective order allows me to use
16 it with her.  I'm having counsel
17 for Amerisource review it and
18 determine that she agrees with my
19 analysis.
20   MS. MCCLURE:  I'm not
21 agreeing or disagreeing with the
22 analysis.  I will say that Ms.
23 Garcia is copied on each of the
24 embedded e-mails within this

Page 464

1  chain.
2    MR. CLUFF:  And she authors
3  the second-to-the-last in the
4  chain, or second to the last
5  e-mail on the first page.
6    MS. MCCLURE:  Yep.  I agree
7  that that is an accurate
8  representation of the document,
9  that Ms. Garcia sent one of the
10 e-mails in this chain.
11   MR. CLUFF:  Okay.  I'd like
12 to mark it as Exhibit-18 to Ms.
13 Garcia's deposition.
14     - - -
15   (Whereupon,
16 AmerisourceBergen-Garcia
17 Exhibit-18,
18 TEVA_MDL_A_02664130-131, was
19 marked for identification.)
20     - - -
21   MR. CLUFF:  I'll give you a
22 sticker, you have all the copies.
23   MS. MCCLURE:  Oh, I have all
24 the copies?

Page 465

1    MR. CLUFF:  Yes.
2  BY MR. CLUFF:
3    Q.   This is really a one-page
4  e-mail chain, Ms. Garcia.  I just want to
5  cover some basics about your recollection
6  of this.  Let's start at the bottom of
7  the first page.
8    You see there it's from
9  Joseph Tomkowitz@Joseph Tomkowitz --
10 Joseph.tomkowitz@tevaPharm.
11   Do you see that?
12   A.   I see that.
13   Q.   And he writes to Mr.
14 Hazewski and to yourself on July 8th,
15 2014.
16   You see the subject line
17 there is, Walgreens Beth Israel, New
18 York?
19   A.   I see that.



Page 466



BY MR. CLUFF:

Q.   Okay.  Is there something about this document to you that makes you believe it might have been before your

Page 467

time?

A.   I don't know.

Q.   Okay.  Let's look at the second page.

There's -- can you see there's a website address at the top there?

A.   Yes.

Q.   So looking at the beginning of that website address, it looks like it says New York.cbslocal.

From that, can you determine whether or not you think this is from, you know, a news organization?

MS. MCCLURE:  Objection to form.

THE WITNESS:  It appears to be from a news organization.

BY MR. CLUFF:

Q.   And then if you continue, it looks like there's a date, 2014/07/08.

Do you see that?

A.   I see that.

Q.   And it continues and says --

Page 468

I'm going to not read the dashes to save everybody some time and the pain of my voice, but it says, Beth Israel's ex-pharmacy director accused of stealing nearly 200,000 Oxycodone pills.

Do you see that?

A.   I see that.

MR. CLUFF:  Do you want to double check my zeros, Shannon?

MS. MCCLURE:  I did.  I'm all over it.

MR. CLUFF:  My eyes are waning, too.

BY MR. CLUFF:

Q.   So going back to the first page, Joe writes, When we first met with Tasha and her group, this was one I asked them about.

Reading that, do you have any recollection about discussing this pharmacy or the pharmacist with Walgreens?

A.   The "we" in this sentence is him and Ed.

Page 469

Q.   What do you base that statement on?

A.   Because I wasn't there.

Q.   How do you know you weren't there?

A.   They met with Walgreens in Chicago once, I remember that.

Q.   Why do you believe this meeting occurred in Chicago?

A.   Because Tasha hadn't been out to ABC, as far as I knew.

Q.   Okay.  We can set that aside, then.

I just have maybe three or four more documents.  Do you want to take another quick break, or do you want to power through?

A.   Let's go through.

Q.   We're going to give you another break, too, after I wrap up and your lawyers are going to decide whether or not they want to do further questioning.  But I'll get this done quick.

Page 470

1      What I'm going to do is hand
2 you my copy of this document that is
3 clean. I'm going to keep the bad copy,
4 and I am going to give all these other
5 counsel on the other side bad copies,
6 too.
7      But this document is a copy
8 of an earnings report from 2012 to 2013.
9 It's Bates marked ABDCMDL00364852.
10       - - -
11     (Whereupon,
12     AmerisourceBergen-Garcia
13     Exhibit-19, ABDCMDL00364852-856,
14     was marked for identification.)
15       - - -
16 BY MR. CLUFF:
17    Q. Is this -- I'll represent to
18 you that this is a printout of an Excel
19 spreadsheet that was given to me by your
20 counsel.
21     Is this something you would
22 have ever seen before in your work in
23 AmerisourceBergen?
24    A. I don't remember.

Page 471

1    Q. Were you generally aware of
2 your salary and payment history while you
3 were at AmerisourceBergen?
4    A. General.
5    Q. If you look on the second
6 page from the very back, there are some
7 dates at the top left corner. One is
8 11/23/2012.
9     Do you see that?
10    A. Sorry, which corner?
11    Q. The top left corner in the
12 column with the dates in it.
13     MS. MCCLURE: What page?
14     MR. CLUFF: The second from
15    the back page.
16     THE WITNESS: Oh, the second
17    from the back. Sorry.
18     The earnings report dates?
19 BY MR. CLUFF:
20    Q. Yes.
21    A. Okay.
22    Q. So do you see, if you kind
23 of tab over in the columns, there's an
24 entry that says, Nondiscretionary bonus

Page 472

1 next to a numeral █████████
2    A. I see that.
3    Q. Do you recall receiving a
4 bonus in 2012?
5    A. I don't recall.
6    Q. You had only been at the
7 company for a few months by this time in
8 November of 2012, correct?
9    A. Yes.
10    Q. Okay. Do you recall what
11 bonuses were based on in the diversion
12 control team at AmerisourceBergen?
13    A. No. I think it was just a
14 general company bonus.
15    Q. Okay. You can set that
16 aside.
17     I'll hand you another
18 document. This is another printout.
19 This one didn't get a name, but it was
20 produced as ABDCMDL00364858.
21       - - -
22     (Whereupon,
23     AmerisourceBergen-Garcia
24     Exhibit-20, ABDCMDL00364858, was

Page 473

1    marked for identification.)
2       - - -
3 BY MR. CLUFF:
4    Q. Go ahead and look at that
5 for a second.
6     Do you see on the top left
7 corner it says, Pay change history?
8    A. Yes.
9    Q. Have you ever seen a
10 document like this in your work history
11 at AmerisourceBergen?
12    A. I don't recall.
13     MS. MCCLURE: Sterling, for
14    the record, I'm going to note that
15    there does not appear to be a
16    confidentiality designation on
17    this. However, in light of the
18    fact that I believe this was
19    produced in native, I would just
20    request that the highly
21    confidential designation that
22    originally accompanied this
23    document, given the fact that it
24    includes compensation-related

Page 474

1  history, is maintained for
2  purposes of Exhibit-20.
3      MR. CLUFF:  Sure.  I don't
4  remember if you guys gave me this
5  in native and PDF or just in
6  native.  But I'm happy to agree
7  that this should be designated as
8  confidential.
9      MS. MCCLURE:  Highly
10  confidential.
11      MR. CLUFF:  Sure.
12      MS. MCCLURE:  Thank you.
13  BY MR. CLUFF:
14      Q.   So, Liz, looking at the left
15  side of this page, do you see there's an
16  effective date?
17      A.   Yes.
18      Q.   And if you look down at the
19  bottom of the effective date, it looks
20  like that says, June 11, 2012?
21      A.   Yes.
22      Q.   And there's an ad hoc
23  compensation change.
24          Do you recall what that was

Page 475

1  about?
2      A.   No.
3      Q.   I think June 11, 2012 was
4  your hire date with AmerisourceBergen.
5          Does that sound right?
6      A.   Yes.
7      Q.   So that would have been your
8  beginning salary?
9      A.   Yes.
10      Q.   And going up the date column
11  there, it looks like the next entry is a
12  November 3rd, 2013.
13          Do you see that?
14      A.   I see that.
15      Q.   Moving over one column, it
16  says, Ad hoc compensation change.
17          Do you see that?
18      A.   I see that.
19      Q.   And the next column over, in
20  the column, Reason -- do you see that?
21      A.   Yes.
22      Q.   -- it says, Request
23  compensation change, with a little arrow
24  key, adjustment, little arrow key, merit.

Page 476

1          Do you see that?
2      A.   I see that.
3      Q.   And it looks like your
4  salary goes from ████ to ████.
5          Do you see that?
6      A.   I see that.
7      Q.   Do you remember getting a
8  merits-based compensation change in 2013?
9      A.   Vaguely.
10      Q.   Do you know what was
11  involved in determining whether to give
12  an associate at Amerisource a
13  merits-based adjustment to their
14  compensation?
15      A.   I would assume performance.
16      Q.   So looking at this, is it --
17  based on your experience at Amerisource,
18  your supervisors believed that your
19  performance warranted a merit-based
20  increase to your compensation?
21      A.   I guess so.
22      Q.   I don't want to belabor the
23  point here, but if you look at all the
24  columns under, Reason, starting at the

Page 477

1  very top, it says, Merit process
2  adjustment; one down it says, Merit
3  process adjustment; one more down, it
4  says, Adjustment, little arrow key,
5  merit.
6          Do you see that?
7      A.   Yes.
8      Q.   So it looks like you
9  received, for every full year that you
10  worked at AmerisourceBergen, a merit
11  adjustment to your compensation, correct?
12      A.   Correct.
13      Q.   And so those would have been
14  based on, you know, meritorious
15  performance at AmerisourceBergen?
16      A.   It appears so.
17      Q.   Do you know what about your
18  performance at AmerisourceBergen
19  warranted a merits-based adjustment?
20      A.   I don't know what metrics
21  they used.
22      Q.   You had a performance review
23  every year at AmerisourceBergen, correct?
24      A.   Yes.

Page 478

1    Q.   Did they ever discuss with
2  you why they were giving you a
3  merits-based compensation increase?
4    A.   I don't recall those
5  conversations.
6    Q.   You can set that aside.
7       MS. MCCLURE:  So, Mr.
8    Sterling, can I just write the
9    words "highly confidential" on
10   here?
11      MR. CLUFF:  Yes, do it.
12 BY MR. CLUFF:
13   Q.   Was any part of your
14 performance or your compensation based on
15 your ability to onboard customers at
16 AmerisourceBergen?
17      MS. MCCLURE:  Objection to
18   form.
19      THE WITNESS:  No.
20 BY MR. CLUFF:
21   Q.   Was any part of your
22 compensation based on your ability to
23 complete due diligence on behalf of
24 customers that wanted to become

Page 479

1  AmerisourceBergen customers?
2       MS. MCCLURE:  Objection to
3    form.
4       THE WITNESS:  No.
5  BY MR. CLUFF:
6    Q.   Earlier I asked you whether
7  you knew what was considered in
8  determining a merits-based performance
9  increase -- or compensation increase and
10 you told me you were not aware.
11      I've just given you two
12 examples, and you told me those were not
13 included.  Is there some reason, based on
14 your recollection, that you know those
15 were not included?
16      MS. MCCLURE:  Objection to
17   form.
18      THE WITNESS:  Those were
19   never part of our salary base.
20 BY MR. CLUFF:
21   Q.   Part of your job
22 responsibility was conducting due
23 diligence for the chain pharmacies,
24 correct?

Page 480

1    A.   Correct.
2    Q.   We previously reviewed that
3  that was something that you took great
4  pride in, correct?
5       MS. MCCLURE:  Objection to
6    form.
7       THE WITNESS:  It was just
8    part of my duties.
9  BY MR. CLUFF:
10   Q.   We also discussed that part
11 of your job duties was to perform
12 investigations of pharmacies, correct?
13   A.   How do you mean?
14   Q.   I think we discussed, in
15 your 2016 performance evaluation, that
16 you, as part of your job responsibilities
17 prior to 2016, went on site visits to
18 pharmacies?
19   A.   Site visits, yes.
20   Q.   I was calling them
21 investigations.
22      Is site visits a better
23 word?
24   A.   Yes.

Page 481

1    Q.   Happy to use that.
2       And that you referenced site
3  visits as an important tool to determine
4  whether or not Amerisource should
5  continue its relationship with a
6  customer, among other things, correct?
7       MS. MCCLURE:  Objection to
8    form.  Asked and answered.
9       THE WITNESS:  Yes.
10 BY MR. CLUFF:
11   Q.   Did any of your work in
12 conducting site visits on behalf of
13 AmerisourceBergen contribute to the
14 merits-based increase you received during
15 your tenure at Amerisource?
16   A.   No.
17   Q.   How about the Form 590 due
18 diligence for chain customers, did that
19 affect your compensation?
20   A.   No.
21   Q.   I'm going to give you one
22 last document, and then we'll take a
23 break.  I'll keep my small copy and you
24 can have the big copy.

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1           - - -
2          (Whereupon,
3     AmerisourceBergen-Garcia
4     Exhibit-21, ABDCMDL00364857, was
5     marked for identification.) S
6           - - -
7          MR. CLUFF:  Zach, I believe
8     this is Document Number 10.
9          This is a native spreadsheet
10    that we printed.  It probably was
11    marked previously as highly
12    confidential pursuant to the
13    protective order.
14         Shannon, if you'd like to
15    write that on the witness's copy,
16    I'm happy to have you do so.  It
17    was produced to plaintiffs as
18    ABDCMDL00364857.
19 BY MR. CLUFF:
20    Q.   Ms. Garcia, would you have
21 ever seen this kind of a document during
22 your time as an employee of
23 AmerisourceBergen?
24    A.   No.  It doesn't look

Page 483

1 familiar.
2    Q.   Okay.  I'm going to
3 represent to you that this is a record of
4 your payment history.
5    A.   Okay.
6    Q.   If you look in the middle of
7 the first page, you'll see a column that
8 starts with period.  And if you look
9 under that, there are some dates ranges,
10 followed by a parenthesis that says,
11 Payroll:  Bi-weekly.
12         Do you see that?
13    A.   Are you on Page 2?
14    Q.   No, I'm on Page 1.
15    A.   Sorry.  Period, got you.
16    Q.   And if you look over to the
17 right, you can see that it says, Earned.
18 At the top of the column, it says,
19 Associate bonus plan.  Underneath that,
20 it says, PTO USA.  Under that, it says,
21 Salary.
22         So looking at this -- and if
23 you look at the earnings column, does it
24 appear to you to be a record of the

Page 484

1 payments you would have received from
2 AmerisourceBergen during your employment?
3    A.   I believe so, yes.
4    Q.   At the top there, there's a
5 date, 11/24/2017, which is the payment
6 date or reversal date.
7         Do you see that?
8    A.   Yes.
9    Q.   And if you go all the way
10 over to the earnings, there's an entry
11 that says, █████████.
12         Do you see that?
13    A.   I see that.
14    Q.   When did you leave
15 AmerisourceBergen, if you can recall?
16    A.   October 2017.
17    Q.   So this payment, which
18 reflects an associate bonus plan payment,
19 was made to you after you left
20 AmerisourceBergen?
21         MS. MCCLURE:  Objection to
22    form.
23         THE WITNESS:  Possibly.
24 BY MR. CLUFF:

Page 485

1    Q.   So the date is definitely
2 after the date that you just referred to
3 as your separation date, correct?
4    A.   Got you.  Yes.
5    Q.   So that payment would have
6 been received after you left?
7    A.   Yes.
8    Q.   Okay.  Do you recall why you
9 received a bonus from AmerisourceBergen
10 after you left the company?
11    A.   Bonuses were on a fiscal
12 year basis.  So October 1st was the
13 last -- was the beginning of the next
14 fiscal year.
15         So this was actually bonus
16 from the previous year.
17    Q.   Okay.  So you received a
18 bonus for the fiscal year prior that
19 concluded prior to your departure, is
20 what you're telling me?
21    A.   Yes.
22    Q.   Do you recall what the bonus
23 was calculated on?
24         MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    form.
2        THE WITNESS:  No.
3    BY MR. CLUFF:
4        Q.   What were the performance
5    metrics, if you can recall, on how
6    bonuses were calculated?
7        A.   I don't know that
8    information.
9        Q.   If you look down at the very
10   bottom of the page, there's another line
11   in the earned category that says,
12   Associate bonus plan.  The date there is,
13   11/25/2016.  The amount listed in the
14   earnings column says, ███████.
15       Do you see that?
16       A.   I see that.
17       Q.   So that's a bonus that would
18   have been earned for work conducted in
19   the prior fiscal year?
20       A.   Yes.

Page 487

5        Q.   So in 2016, I know we
6    discussed that you had a performance
7    review.
8        And so I'm curious if,
9    during that performance review, Mr.
10   Cherveny discussed with you the reasons
11   why you were receiving a bonus?
12       A.   No, I don't recall.
13       Q.   Okay.  If you flip the page
14   and look down at the bottom again, this
15   is now Page 2, the two bottom entries in
16   that highlighted yellow column -- by the
17   way, for the record, the yellow column
18   was highlighted in the version that was
19   produced to us.  So we didn't make any
20   changes to this.
21       It's a nice, helpful
22   reference, though.
23       At the bottom of the yellow
24   column it says, Associate bonus plan.

Page 488

1    The date is, 11/27/15.  The earned amount
2    is, ████████, correct?
3        A.   I see that, yes.
4        Q.   Do you see underneath that,
5    it says, Discretionary bonus-accrued?
6        A.   Yes.
7        Q.   The date is also 11/27/2015,
8    right?
9        A.   Yes.
10       Q.   And the amount is, ██████?
11       A.   Yes.
12       Q.   Do you have any recollection
13   on how associates at AmerisourceBergen
14   accrued bonuses?
15       A.   I have no idea.
16       MS. MCCLURE:  Objection.
17       Asked and answered.
18   BY MR. CLUFF:
19       Q.   Let's do that again.
20       MR. CLUFF:  And you can have
21       your objection, Shannon.
22   BY MR. CLUFF:
23       Q.   Do you have any recollection
24   on how associates at AmerisourceBergen

Page 489

1    accrued bonuses?
2        MS. MCCLURE:  Objection.
3        Asked and answered.
4        THE WITNESS:  I have no
5        idea.
6    BY MR. CLUFF:
7        Q.   Okay.  Do you recall
8    discussing this accrued bonus with your
9    supervisor in 2015?
10       A.   I don't recall.
11       Q.   How about the associate
12   bonus plan payment, do you recall
13   discussing the basis for that payment
14   from your supervisor?
15       A.   I don't recall.
16       Q.   On Page 3, at the bottom of
17   the yellow column again, there's an
18   associate bonus plan payment.  The date,
19   1/28/2014.  The amount, ████████.
20       Do you see that?
21       A.   I see that.
22       Q.   Any recollection about that?
23       A.   No.
24       Q.   Okay.  Flip the page one

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1 last time.
2         There, at the top of the
3 column, there's a discretionary
4 bonus-accrued.  The amount is, ▒▒▒▒
5 The date is, 9/23/2014.
6         Do you see that?
7     A.   I see that.
8     Q.   Do you have any recollection
9 of that bonus payment?
10     A.   I do not.
11     Q.   Okay.
12         MR. CLUFF:  Let's take a
13 break.  That's all the questions
14 I've got for right now.  But let
15 me double check my notes to see if
16 there's anything I want to
17 follow-up on.
18         VIDEO TECHNICIAN:  Off the
19 record at 5:35 p.m.
20         - - -
21         (Whereupon, a brief recess
22 was taken.)
23         - - -
24         VIDEO TECHNICIAN:  We're

Page 491

1 back on the record at 5:40 p.m.
2         MR. CLUFF:  Ms. Garcia,
3 just, like, three or four more
4 questions.  I'm just -- I'm not
5 sure if we covered this at the
6 very beginning.
7 BY MR. CLUFF:
8     Q.   When you left
9 AmerisourceBergen, I remember you talking
10 about that, at the time, you had been
11 having personality disagreements with
12 Eric Cherveny; is that right?
13     A.   Correct.
14     Q.   And I remember you saying
15 that he was your direct supervisor at the
16 time?
17     A.   Correct.
18     Q.   Did you have any sort of,
19 like, a fear or an apprehension, at the
20 time you left, that you were going to be
21 fired because of the disagreements you
22 had with Eric Cherveny?
23     A.   No.
24         MS. MCCLURE:  Objection.

Page 492

1     Form.
2 BY MR. CLUFF:
3     Q.   Sorry.  What was your answer
4 again?
5     A.   No.

Page 493

24         MR. CLUFF:  That's all the



Page 494

1   questions I have.
2       MS. MCCLURE:  I have no
3   questions.  Anyone in the room or
4   on the phone?
5       MR. CLUFF:  I guess we
6   should ask.  Anyone at the end of
7   table?  Bob?
8       VIDEO TECHNICIAN:  This
9   concludes today's deposition.  The
10  time is 5:42 p.m.  We are off the
11  record.
12          - - -
13      (Whereupon, the deposition
14  concluded at 5:42 p.m.)
15          - - -
16
17
18
19
20
21
22
23
24

Page 495

1           CERTIFICATE
2
3
4       I HEREBY CERTIFY that the
5   witness was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
        Amanda Maslynsky-Miller
11      Certified Realtime Reporter
        Dated:  December 16, 2018
12
13
14
15
16
17      (The foregoing certification
18  of this transcript does not apply to any
19  reproduction of the same by any means,
20  unless under the direct control and/or
21  supervision of the certifying reporter.)
22
23
24

Page 496

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8       After doing so, please sign
9   the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 497

1         - - - - - -
            E R R A T A
2         - - - - - -
3   PAGE  LINE  CHANGE/REASON
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1
2   ACKNOWLEDGMENT OF DEPONENT

3   I,_____, do
    hereby certify that I have read the
    foregoing pages, 1 - 495, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7
8   _____
    ELIZABETH GARCIA          DATE
9
10
    Subscribed and sworn
11  to before me this
    _____ day of _____, 20____.
12
    My commission expires:_____
13
14  _____
    Notary Public
15
16
17
18
19
20
21
22
23
24

Page 499

1       LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____