Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF OHIO

3                EASTERN DIVISION

4

            ~~~~~~~~~~~~~~~~~~~~

5

6   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION

7                            Case No. 17-md-2804

8                            Judge Dan Aaron
    This document relates to:      Polster

9

    The County of Cuyahoga v. Purdue

10  Pharma L.P., et al.
    Case No. 18-OP-45090

11

12             ~~~~~~~~~~~~~~~~~~~~

13          Videotaped deposition of
                DONALD GEROME

14

15            November 14, 2018

16                9:01 a.m.

17

18

19               Taken at:

20          Kelley & Ferraro, LLP

21        950 Main Avenue, Suite 1300

22            Cleveland, Ohio

23

24

25       Renee L. Pellegrino, RPR, CLR

```
                                          Page 2

 1   APPEARANCES:
 2   On behalf of Cuyahoga County:
         Napoli Shkolnik PLLC
 3       SALVATORE C. BADALA, ESQ.
         360 Lexington Avenue
 4       New York, New York  10017
         (844) 230-7676
 5       sbadala@napolilaw.com
             - and -
 6       Plevin & Gallucci
         FRANK GALLUCCI, III, ESQ.
 7       ROBIN WILSON, ESQ.
         55 Public Square
 8       Suite 2222
         Cleveland, Ohio  44113-1901
 9       (216) 861-0804
         fgallucci@pglawyer.com
10       rwilson@pglawyer.com
11   On behalf of Walmart, Inc.:
         Jones Day
12       CHRISTOPHER M. McLAUGHLIN, ESQ.
         North Point, 901 Lakeside Avenue
13       Cleveland, Ohio  44114-1190
         (216) 586-3939
14       cmmclaughlin@jonesday.com
15   On behalf of Endo Pharmaceuticals, Inc., Endo
     Health Solutions, Inc., Par Pharmaceuticals,
16   Inc. and Par Pharmaceutical Companies, Inc.:
         Arnold & Porter, Kaye Scholer LLP
17       SAMUEL LONERGAN, ESQ.
         250 West 55th Street
18       New York, New York  10019-9710
         (212) 836-8000
19       samuel.lonergan@arnoldporter.com
20
                         ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES, CONT'D:
 2   On behalf of AmerisourceBergen Drug Corporation:
         (Via Veritext Virtual Stream)
 3       Reed Smith LLP
         JAMES A. PETKUN, ESQ.
 4       Three Logan Square
         1717 Arch Street - Suite 3100
 5       Philadelphia, Pennsylvania  19103
         (215) 851-8100
 6       jpetkun@reedsmith.com
 7   On behalf of Cardinal Health:
         Williams & Connolly
 8       WILL HAWKINS, ESQ.
         725 Twelfth Street, N.W.
 9       Washington, D.C.  20005
         (202) 434-5421
10       whawkins@wc.com
11   On behalf of McKesson Corporation:
         Covington & Burling LLP
12       BENJAMIN C. BLOCK, ESQ.
         JOHN W. ZIPP, ESQ.
13       One CityCenter
         850 Tenth Street, NW
14       Washington, D.C.  20001-4956
         (202) 662-2000
15       bblock@cov.com
         jzipp@cov.com
16
     On behalf of Mallinckrodt:
17       (Via Telephone and Veritext Virtual Stream)
         Ropes & Gray
18       HAYDEN MILLER, ESQ.
         1211 Avenue of the Americas
19       New York, New York  10036-8704
         (212) 695-9000
20       hayden.miller@ropesgray.com
21
22
                        ~ ~ ~ ~ ~
23
24
25
```

Page 4

1    APPEARANCES, CONT'D:

2    On behalf of Teva Pharmaceuticals:
         (Via Telephone and Veritext Virtual Stream)
3        Morgan, Lewis & Bockius LLP
         LIZA B. FLEMING, ESQ.
4        1701 Market Street
         Philadelphia, Pennsylvania  19103-2921
5        (215) 963-5000
         liza.fleming@morganlewis.com
6

7    ALSO PRESENT:  Kurt Henschel, Videographer

8
                        ~ ~ ~ ~ ~
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    TRANSCRIPT INDEX

2

3     APPEARANCES ....................................2

4     INDEX OF EXHIBITS ..............................6

5     INDEX OF OBJECTIONS ............................7

6

7     EXAMINATION OF DONALD GEROME:

8     BY MR. BLOCK ..................................12

9     BY MR. LONERGAN .............................219

10    BY MR. MCLAUGHLIN ...........................231

11

12    AFTERNOON SESSION ...........................164

13

14    REPORTER'S CERTIFICATE ......................238

15

16    EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

1               INDEX OF EXHIBITS

2

3    Number            Description            Marked

4

5    Exhibit 1    Cuyahoga County Sheriff's       61
                  Department Organizational Chart

6

     Exhibit 2    E-Mail String Beginning Bates   150
7                 Number CUYAH_00018717

8    Exhibit 3    Cuyahoga County Sheriff's       164
                  Department 2015 Annual Report

9

     Exhibit 4    Cuyahoga County Sheriff's       168
10                Department 2016 Annual Report

11   Exhibit 5    Cuyahoga County Sheriff's       171
                  Department Newsletter dated

12                April 2017 Beginning Bates
                  Number CUYAH_000118584

13

     Exhibit 6    E-Mail String Beginning Bates   185
14                Number CUYAH_000118362

15   Exhibit 7    2017-2018 Cuyahoga County       217
                  Strategic Plan Project List -

16                Community Safety and Protection

17

18

19

20

21

22

23

24

25

1                   INDEX OF OBJECTIONS
2
3    Objection ......................................14
     Objection ......................................17
4    Objection ......................................21
     Objection ......................................22
5    Objection ......................................24
     Objection ......................................25
6    Objection ......................................26
     Objection ......................................32
7    Objection ......................................34
     Objection ......................................35
8    Objection ......................................36
     Objection ......................................38
9    Objection ......................................39
     Objection ......................................41
10   Objection ......................................41
     Objection ......................................43
11   Objection ......................................44
     Objection ......................................44
12   Objection ......................................44
     Objection ......................................48
13   Objection ......................................48
     Objection ......................................49
14   Objection ......................................50
     Objection ......................................51
15   Objection ......................................52
     Objection ......................................52
16   Objection ......................................55
     Objection ......................................56
17   Objection ......................................59
     Objection ......................................64
18   Objection ......................................66
     Objection ......................................69
19   Objection ......................................69
     Objection ......................................70
20   Objection ......................................70
     Objection ......................................73
21   Objection ......................................73
     Objection ......................................82
22   Objection ......................................90
     Objection ......................................93
23   Objection ......................................103
     Objection ......................................103
24   Objection ......................................107
     Objection ......................................108
25   Objection ......................................111

1                    INDEX OF OBJECTIONS, CONT'D
2
3       Objection ....................................112
        Objection ....................................113
4       Objection ....................................113
        Objection ....................................114
5       Objection ....................................114
        Objection ....................................116
6       Objection ....................................116
        Objection ....................................121
7       Objection ....................................131
        Objection ....................................131
8       Objection ....................................131
        Objection ....................................131
9       Objection ....................................132
        Objection ....................................135
10      Objection ....................................139
        Objection ....................................141
11      Objection ....................................142
        Objection ....................................142
12      Objection ....................................145
        Objection ....................................145
13      Objection ....................................145
        Objection ....................................145
14      Objection ....................................146
        Objection ....................................146
15      Objection ....................................146
        Objection ....................................147
16      Objection ....................................148
        Objection ....................................148
17      Objection ....................................149
        Objection ....................................149
18      Objection ....................................152
        Objection ....................................153
19      Objection ....................................153
        Objection ....................................153
20      Objection ....................................153
        Objection ....................................154
21      Objection ....................................155
        Objection ....................................155
22      Objection ....................................157
        Objection ....................................158
23      Objection ....................................158
        Objection ....................................159
24      Objection ....................................159
        Objection ....................................160
25      Objection ....................................160

1                    INDEX OF OBJECTIONS, CONT'D
2
3    Objection ....................................162
     Objection ....................................162
4    Objection ....................................173
     Objection ....................................174
5    Objection ....................................175
     Objection ....................................175
6    Objection ....................................176
     Objection ....................................177
7    Objection ....................................177
     Objection ....................................179
8    Objection ....................................180
     Objection ....................................182
9    Objection ....................................183
     Objection ....................................189
10   Objection ....................................189
     Objection ....................................191
11   Objection ....................................194
     Objection ....................................195
12   Objection ....................................195
     Objection ....................................196
13   Objection ....................................196
     Objection ....................................197
14   Objection ....................................197
     Objection ....................................199
15   Objection ....................................200
     Objection ....................................201
16   Objection ....................................202
     Objection ....................................203
17   Objection ....................................203
     Objection ....................................204
18   Objection ....................................204
     Objection ....................................204
19   Objection ....................................204
     Objection ....................................205
20   Objection ....................................205
     Objection ....................................206
21   Objection ....................................206
     Objection ....................................207
22   Objection ....................................207
     Objection ....................................207
23   Objection ....................................208
     Objection ....................................208
24   Objection ....................................208
     Objection ....................................209
25   Objection ....................................209

1          INDEX OF OBJECTIONS, CONT'D
2
3     Objection ....................................209
      Objection ....................................210
4     Objection ....................................210
      Objection ....................................210
5     Objection ....................................211
      Objection ....................................211
6     Objection ....................................212
      Objection ....................................212
7     Objection ....................................215
      Objection ....................................217
8     Objection ....................................220
      Objection ....................................220
9     Objection ....................................220
      Objection....................................220
10    Objection ....................................221
      Objection ....................................221
11    Objection ....................................222
      Objection ....................................222
12    Objection ....................................222
      Objection ....................................222
13    Objection ....................................223
      Objection ....................................223
14    Objection ....................................225
      Objection ....................................225
15    Objection ....................................226
      Objection ....................................226
16    Objection ....................................227
      Objection ....................................227
17    Objection ....................................227
      Objection ....................................227
18    Objection ....................................228
      Objection ....................................228
19    Objection ....................................229
      Objection ....................................229
20    Objection ....................................229
      Objection ....................................230
21    Objection ....................................232
22
23
24
25

Page 11

```
1              THE VIDEOGRAPHER:  We're on the
2    record at 9:01.  Today's date is November 14th,
3    2018.  This is the matter of National
4    Prescription Opiate Litigation.  We're here in
5    Cleveland, Ohio.
6              Would counsel please identify
7    themselves for the record?
8              MR. BLOCK:  Did you guys start?
9              MR. BADALA:  Salvatore Badala,
10   Napoli Shkolnik, for the Plaintiff.
11             MR. GALLUCCI:  Frank Gallucci,
12   Plevin & Gallucci, for Plaintiff, Cuyahoga
13   County.
14             MS. WILSON:  Robin Wilson, of
15   counsel, Plevin & Gallucci, on behalf of
16   Plaintiff, Cuyahoga County.
17             MR. BLOCK:  Good morning.  Ben Block
18   and John Zipp of Covington & Burling LLP on
19   behalf of McKesson Corporation.
20             MR. LONERGAN:  Sam Lonergan with
21   Arnold & Porter, Kaye Scholer, on behalf of
22   Defendants Endo and Par.
23             MR. McLAUGHLIN:  Chris McLaughlin
24   from Jones Day on behalf of Walmart.
25             MR. HAWKINS:  Will Hawkins from
```

1    William & Connolly on behalf of Cardinal Health.

2              MR. BLOCK:  Is there anyone on the

3    phone?

4              MR. MILLER:  Hayden Miller, Ropes &

5    Gray, on behalf of Mallinckrodt.

6              MR. BLOCK:  Anybody else?  All those

7    not present, say aye.  Okay.

8              THE VIDEOGRAPHER:  The witness may

9    be sworn.

10        DONALD GEROME, of lawful age, called for

11   examination, as provided by the Federal Rules

12   of Civil Procedure, being by me first duly

13   sworn, as hereinafter certified, deposed and

14   said as follows:

15             EXAMINATION OF DONALD GEROME

16   BY MR. BLOCK:

17        Q.   Good morning.  Could you please

18   state your full name for the record?

19        A.   Yes.  Donald Gerome.  Last name is

20   spelled G-e-r-o-m-e.

21        Q.   And what is your -- where do you

22   work?

23        A.   Right now I work for the Cuyahoga

24   County Sheriff's Department as a captain.

25        Q.   What is the business address where

Page 13

1  you work?

2       A.     1215 West 3rd, Cleveland, Ohio,

3  44113.

4       Q.     And where do you live?

5       A.     I live in Mayfield Heights, which is

6  a suburb of Cleveland.

7       Q.     And, Captain Gerome, you understand

8  that you're under oath, the same oath that would

9  apply as if you were testifying in a court of

10  law?

11      A.     Yes, I do.

12      Q.     And is there any reason that you

13  can't give truthful testimony today?

14      A.     No, there's not.

15      Q.     Have you testified at a deposition

16  before?

17      A.     No, I've not.

18      Q.     Have you testified in court before?

19      A.     Yes, I have.

20      Q.     How many times?

21      A.     A handful of times.  I'm not sure

22  how many.

23      Q.     In what types of matters have you

24  testified?

25      A.     Some had to deal with drug offenses,

Page 14

1    and there was a couple of OVIs, operating

2    vehicle, influence.

3         Q.    When is the first time you testified

4    in court?

5         A.    As a detective or as law

6    enforcement?

7         Q.    Ever.

8         A.    Oh, ever.  I don't remember the

9    exact year.

10        Q.    Have you ever testified in court

11   other than in your role as a law enforcement

12   officer?

13        A.    No.

14        Q.    All right.  So do you remember

15   roughly when your first testimony would have

16   been?

17             MR. BADALA:  Objection to form.

18        Q.    '90s, 2000s?

19        A.    I came in law enforcement in 2001,

20   so it was probably early 2000s.

21        Q.    And did you do anything to prepare

22   for your deposition today?

23        A.    Yes, I did.

24        Q.    What did you do?

25        A.    I met with the attorneys yesterday.

1        Q.    With whom did you meet?

2        A.    Sal, Frank.

3        Q.    Okay.  Anybody else present?

4        A.    I forget his name.  There was

5    another attorney there.

6        Q.    Okay.  And how long was the meeting?

7        A.    Approximately three hours.

8        Q.    Did you review any documents?

9        A.    Yes.

10       Q.    Did you review any documents that

11   helped refresh your recollection of events?

12       A.    No.

13       Q.    All right.  Do you recall how many

14   documents you reviewed?

15       A.    No.

16       Q.    Types of documents that you

17   reviewed?

18       A.    Some e-mails.

19       Q.    Anything else?

20       A.    No.

21       Q.    Have you talked to anyone else in

22   terms of preparing for this deposition?

23       A.    For preparation, no.  I did advise

24   my supervisor and my subordinate where I'd be

25   today.

1          Q.     Who is your supervisor?

2          A.     Chief George Taylor.

3          Q.     Is he the --

4          A.     He's deputy chief.

5          Q.     -- deputy chief?  Okay.

6          A.     Or chief deputy.  I'm sorry.  Yeah.

7          Q.     And we'll have to -- I'll have to

8   work on it, too.  We'll have to do our best not

9   to talk over one another.

10         A.     Okay.  Sorry about that.

11         Q.     No.  You're good.

12                And who is your subordinate?

13         A.     Lieutenant Miguel Caraballo.

14         Q.     Have you ever -- we talked about

15  testimony in court.  Have you ever testified

16  before an administrative body of any sort?

17         A.     I've testified in administrative

18  hearings for the department.

19         Q.     In what sorts of manner?

20         A.     Disciplinary hearings.

21         Q.     Where a member of the force is

22  subject to discipline for something?

23         A.     Was removed from his position and

24  was getting the job back or trying to get his

25  job back.

Page 17

```
 1          Q.     How many times have you testified in
 2     those sorts of things?
 3          A.     Two, I believe.
 4          Q.     Have you ever testified before any
 5     legislative body of the state, city or county,
 6     like a city council, county board, state
 7     legislature, anything like that?
 8                 MR. BADALA:  Objection to form.
 9          A.     I've been in front of city -- or
10     county council.  I don't know if you call it
11     testifying.
12          Q.     Okay.  What have you -- what have
13     you been in front of city council about?
14          A.     Well, county.
15          Q.     Excuse me.  County council.
16          A.     Requesting maybe some equipment,
17     something like that.
18          Q.     Have you ever been in front of
19     county council asking for or talking about
20     anything related to opioids?
21          A.     No, I have not.
22          Q.     All right.  Where are you from
23     originally?
24          A.     I grew up in South Euclid.
25          Q.     And could you -- did you go to
```

1    college?

2         A.    No, I did not.

3         Q.    And when did you join the sheriff's

4    department?

5         A.    Originally I was hired as a

6    correction officer in 1995.  I put myself

7    through the Ohio Police Academy and became a

8    deputy sheriff in 2001.

9         Q.    So from 1995 through 2001 you worked

10   as a corrections officer?

11        A.    Yes.

12        Q.    And what were your responsibilities

13   there?

14        A.    As corrections?

15        Q.    Yes.

16        A.    Supervising the inmates.

17              Then I moved on to what they call a

18   specialty area, which is booking inmates in,

19   releasing, stuff like that.

20        Q.    And then how did it -- what did you

21   have to do to become a member of the --

22        A.    Law enforcement?

23        Q.    Thank you.

24        A.    There's a -- police academy

25   basically.  I went part-time police academy

                                                    Page 19

1   through Tri-C.

2          Q.     Tri-C stands for what?

3          A.     I'm sorry.

4          Q.     That's fine.

5          A.     Cuyahoga County Community College.

6          Q.     Okay.  Sorry.  And so how long did

7   that --

8          A.     That was about six months.

9          Q.     All right.  And you obviously

10  graduated there?

11         A.     Yes.

12         Q.     And so then you say you became a law

13  enforcement officer in 2001?

14         A.     Yes.

15         Q.     And what was your -- did you have a

16  rank?

17         A.     Deputy sheriff.

18         Q.     Okay.  And what is your current

19  rank?

20         A.     Captain.

21         Q.     That's higher than deputy sheriff?

22         A.     Yes, it is.

23         Q.     All right.  And what have been the

24  various ranks you've held between deputy sheriff

25  to captain?

Page 20

1        A.     In 2007 I was promoted to sergeant,

2   in 2014 I was promoted to lieutenant, and in May

3   of 2016 I was promoted to captain.

4        Q.     Have you received law enforcement

5   training other than through the -- did you call

6   it a boot camp?

7        A.     The police academy.

8        Q.     The policy academy.  Thank you.

9        A.     It's -- the Ohio Peace Officer

10  Training Academy is the official name of it.

11             I'm sorry.  Repeat the question,

12  please.

13       Q.     Do you have law enforcement training

14  other than through the peace officer academy?

15       A.     Yes.  Yes, I do.

16       Q.     Please describe that for me.

17       A.     There's various training throughout

18  my career I've been to, whether it's been at

19  schools or online courses, what they offer now.

20             If I could just start off, I went

21  through the DEA basic narcotic investigation

22  school, which was a three-day school.

23       Q.     When did you do that?

24       A.     Back in 2000 -- around 2005.

25       Q.     Why did you do that?

Page 21

```
 1        A.     I was assigned to the narcotic
 2   division within our department.
 3        Q.     All right.  And I cut you off.  So
 4   you did the DEA course?
 5        A.     Yeah.
 6        Q.     What other courses have you done?
 7        A.     You know, I don't remember every
 8   course, but we have continuous training in our
 9   department.  Most recently I went through first
10   aid training, the trauma training, scenario
11   training.  It's continuous.  Every year
12   basically you're training.  Like I said, the
13   Attorney General offers classes online.  It's
14   called EOPOTA, electronic training, that you can
15   just pull up on your computer and get certified
16   in various things.
17        Q.     Other than the DEA course, have you
18   taken any training courses that focused on
19   narcotics?
20             MR. BADALA:  Objection to form.
21        A.     I don't remember any more.
22        Q.     As a corrections officer, did you
23   have any involvement with any narcotic-related
24   issues?
25             MR. BADALA:  Objection to form.
```

Page 22

1           A.    No.

2           Q.    Do you know as -- for example, when

3   you were a corrections officer, do you know

4   if -- was that at the county jail?  Where did

5   you work?

6           A.    Yes.  It was for the same

7   department, Cuyahoga County Sheriff's

8   Department.

9           Q.    So how long are the people who are

10  in that facility -- how long are they in for?

11          A.    It depends.  They could be there for

12  a day.  They could be there up until their

13  trial, which could be a year.  There's no set

14  time frame where they have to leave.

15          Q.    But that's a facility for

16  pre-sentencing?

17          A.    Pre-sentencing, and then there were

18  some sentenced prisoners from the municipal

19  courts.

20          Q.    Do you know whether or not -- would

21  you call them inmates at the --

22          A.    Correct.  Yeah.

23          Q.    Okay.  Do you know whether or not

24  inmates at that facility could receive

25  prescription opioid medication?

Page 23

1        A.    They received medication.  I don't

2   know what it was.

3        Q.    You didn't have any involvement in

4   that?

5        A.    No.  You just basically supervised

6   them taking their medications; don't do anything

7   with the nurse or anything like that.

8        Q.    Do you have any training in

9   medicine?

10       A.    No.

11       Q.    Do you have any training in

12   pharmacies, pharmaceuticals?

13       A.    No, I do not.

14       Q.    When you became a deputy sheriff in

15   2001, what were your responsibilities?

16       A.    Originally was assigned to our

17   patrol division, which dealt with security of

18   the county buildings.  We transported inmates

19   from the jail to medical appointments, other

20   jail facilities, prisons.  Basically responded

21   to anything that, you know, we were called on.

22       Q.    Did you have any involvement in

23   narcotics-related offenses or suspected offenses

24   as a deputy sheriff?

25              MR. BADALA:  Objection to form.

Page 24

1        A.    Before I was assigned to narcotics?

2        Q.    Sure.

3        A.    I don't remember, but I'm sure I

4    wrote a marijuana ticket or something.  I don't

5    remember.

6        Q.    Okay.  And you said you got assigned

7    to the narcotics division in -- is it the

8    narcotics division?  Is that right?

9        A.    Yes.

10       Q.    In 2005?

11       A.    Yes.

12       Q.    Did you volunteer for that?  Were

13   you volunteered for it?  How did that come to

14   be?

15       A.    No.  With our department, they put a

16   posting out when there's openings, and I applied

17   for the position.

18       Q.    Why did you apply?

19       A.    To -- to get out of the patrol

20   division I guess, to expand my career.

21       Q.    Who -- did you have to go through an

22   interview process?

23       A.    At the time, no.  You just submitted

24   a request form.

25       Q.    When you joined the narcotics

Page 25

1   division, I guess, first of all, how many -- how

2   big was the narcotics division?  How many people

3   were involved in it?

4          A.    I don't remember the exact number.

5          Q.    Hundreds?

6                MR. BADALA:  Objection to form.

7          A.    No, there wasn't hundreds.

8          Q.    More than a dozen?

9          A.    Probably close to a dozen maybe.

10         Q.    Okay.  Who was your supervisor or to

11  whom did you report?

12         A.    I reported -- my immediate

13  supervisor was a sergeant at the time, Miguel

14  Caraballo.

15         Q.    And who -- did you have any

16  subordinates?

17         A.    No.  I was still a deputy sheriff in

18  that division.

19         Q.    Do you know how long Sergeant

20  Caraballo had been with the sheriff's

21  department?

22         A.    He came on in 1997.

23         Q.    Okay.  What were your

24  responsibilities as -- were you still a deputy

25  sheriff, just a deputy sheriff in the narcotics

Page 26

1   division?

2           A.      Yes.

3           Q.      What were your responsibilities in

4   that role?

5           A.      We would act on complaints that came

6   in, drug complaints.  We would patrol certain

7   areas we knew narcotics was available, just, you

8   know, street level stuff.

9           Q.      What sorts of areas would you

10  patrol?

11          A.      Mainly downtown -- or not downtown.

12  The Cleveland areas.

13          Q.      And what were you looking for there?

14          A.      Narcotic activity, drug dealers on

15  the corner, something like that.

16          Q.      What kind of drugs?

17          A.      We dealt mainly with marijuana,

18  cocaine.

19          Q.      Anything else?

20          A.      That was our main --

21          Q.      Okay.  Did you have -- during this

22  time did you do any -- do you remember doing any

23  work around prescription medications?

24              MR. BADALA:  Objection to form.

25          A.      No, I don't.

```
                                              Page 27
 1          Q.     Do you know who Sergeant -- is it
 2    Cabalero (phonetic) --
 3          A.     Caraballo.
 4          Q.     I knew it didn't sound right.  Do
 5    you know, to whom did Sergeant Caraballo report
 6    at that time?
 7          A.     I think it was Lieutenant Mike
 8    Jackson, I believe, was our supervisor.
 9          Q.     Is Lieutenant Jackson still with the
10    sheriff's department?
11          A.     No, he's not.
12          Q.     Do you know where he went?
13          A.     No, I don't.
14          Q.     Did he retire or --
15          A.     Resigned.
16          Q.     Okay.  Do you know when that was?
17          A.     No, I don't remember the exact --
18          Q.     Or why he resigned?
19          A.     He was under an investigation for
20    stealing money.
21          Q.     From the sheriff's department?
22          A.     Yes.
23          Q.     How long were you a deputy sheriff
24    in the narcotic division?
25          A.     Approximately two years.  I was
```

Page 28

1   promoted in March of 2007.

2          Q.     Promoted to sergeant?

3          A.     Yes.

4          Q.     And when you were promoted to

5   sergeant, to whom were you -- were you still in

6   the narcotics division?

7          A.     No, I was not.

8          Q.     Where did you go to?

9          A.     I moved back to the patrol division

10  and oversaw that.

11         Q.     Was that by request?

12         A.     No.  That was told.

13         Q.     So congratulations, you have a

14  promotion, and now you get to go back to doing

15  what you did before?

16         A.     Yes.

17         Q.     All right.  To whom did you report?

18         A.     At the time it was Lieutenant -- I

19  don't remember her name, Lieutenant Millsap.  I

20  don't recall her first name.  If you give me a

21  second, I can think of it.  Ethel Millsap maybe.

22         Q.     Okay.  And how long were you a

23  sergeant in the patrol division?

24         A.     I don't remember the exact amount of

25  time.  I know I moved to what we call our sex

Page 29

1    offender unit after that.

2         Q.    Roughly?  Do you remember roughly

3    when that occurred?

4         A.    Maybe a year or two.

5         Q.    Okay.  And what were your

6    responsibilities in the sex offender unit?

7         A.    The sheriff's department has

8    registered sex offenders come in on a daily

9    basis.  We have a tier system for sex offenders

10   here in Ohio.  So I oversaw that division.

11            We also do what we call

12   verifications on sex offenders, where deputies

13   will go out and knock on the offender's door,

14   make sure that's where they're living,

15   investigate if they're not living there.

16            We also had two detectives that were

17   assigned to if a person is not living where

18   they're at or they're not reporting, to file

19   charges against them.

20            And at the time we also had a small

21   team that went out and executed warrants.

22        Q.    And how long were you in that

23   division?

24        A.    Probably a couple years.

25        Q.    Okay.  What was the next position?

1      A.    Unfortunately, it was -- they

2  abolished the rank of sergeant, so I went back

3  to being a deputy sheriff, probably 2010 maybe

4  or '11.

5      Q.    When you say "they abolished the

6  rank of sergeant," who is "they"?

7      A.    The sheriff at the time did.

8      Q.    Do you know why?

9      A.    I -- pretty sure it's because we

10  were unionizing.

11      Q.    Okay.  Are you in the union now?

12      A.    Currently, no, I'm not.

13      Q.    Okay.  Have you ever been in a

14  union?

15      A.    Yes.

16      Q.    From -- what was the union?

17      A.    The OPBA.

18      Q.    Ohio --

19      A.    Patrolman's Benevolent Association.

20      Q.    Okay.  And -- wait.  I think I can

21  figure this out.  You can't be in that union now

22  because you're a captain?

23      A.    Yeah.  I'm in a classified position,

24  correct.

25      Q.    Okay.  So when did you stop being a

Page 31

1  member of the OPBA?

2       A.    When I was promoted to captain.

3       Q.    Okay.  So you were in it when you

4  were lieutenant?

5       A.    Yes, I was.

6       Q.    All right.  I got a friend who's on

7  the D.C. force and now he's the GC of the union,

8  so I talked about this at a volleyball game.  I

9  learned a little bit about it.  Probably off

10 topic, though.

11           Let's see.  Going back to when you

12 were -- when you went back to the patrol

13 division in, roughly, 2007, when you were

14 promoted to sergeant, did you have any

15 involvement with any narcotics-related activity

16 from that point?

17      A.    I don't remember that, sir.

18      Q.    Okay.  Who was in charge of the

19 narcotics division in 2007?

20      A.    Probably still Sergeant Miguel

21 Caraballo.

22      Q.    And was he still reporting to

23 Lieutenant Jackson, was it?

24      A.    I believe so, yes.

25      Q.    Okay.  And I guess when is the next

1    time in your career that you had -- that you had

2    involvement with narcotics-related activity that

3    you remember?

4                MR. BADALA:  Objection to form.

5          A.    I don't remember every case I've

6    been involved with with narcotics.  Like I said,

7    it could have been me writing a marijuana

8    ticket.  I don't want to, you know, not be

9    truthful about that.  So I don't know, but my

10   next step as far as supervising would have been

11   when I was promoted to lieutenant.

12         Q.    In 2014?

13         A.    Yes.

14         Q.    Okay.  So tell me about that.  What

15   were you assigned to do when you were promoted

16   to lieutenant?

17         A.    First I was overseeing the uniform

18   division, which included our patrol division and

19   our courts division, and then, after a couple

20   months, was assigned to oversee the narcotics

21   division.

22         Q.    To whom did you report when you were

23   a lieutenant?

24         A.    Captain Don Michalosky.

25         Q.    Is Captain Michalosky still with the

1   department?

2          A.    No, he's not.

3          Q.    Where did he go?

4          A.    He retired and he works for the

5   Metro Hospital Police Department.

6          Q.    Okay.  Do you know what he does for

7   them?

8          A.    He's a captain there.

9          Q.    When you were assigned to the

10  narcotics division, who -- did you take over

11  from someone?

12         A.    I took over at the time -- he was

13  now Lieutenant Caraballo.

14         Q.    Okay.

15         A.    He was promoted before me as

16  lieutenant.

17         Q.    So where did he go?

18         A.    He took over the uniform patrol.

19         Q.    You guys just switched?

20         A.    Kind of flip-flopped, yes.

21         Q.    By request or --

22         A.    No.  It was told to us.

23         Q.    Okay.  Do you know why they swapped

24  it, switched it around?

25         A.    It was just to get a feel -- I don't

Page 34

1   think he was ever in charge of a patrol unit and

2   it was just to get more well rounded, I guess.

3        Q.    Which is the bigger unit, the patrol

4   unit or the narcotics unit?

5        A.    Manpower-wise, the patrol unit, or

6   they call it the uniform personnel, because you

7   got our courts divisions as well.

8        Q.    How many folks are in that unit?

9        A.    You'd have to give me a second.  I'm

10  trying to add it up in my head.

11       Q.    Sure.

12       A.    I'll give you an answer here.

13       Q.    Take your time.

14       A.    Probably between 80 and a hundred

15  uniform deputies.

16       Q.    And when you became -- as a

17  lieutenant, when you were assigned to the

18  narcotics division, how many officers were in

19  that division?

20       A.    Offhand, I don't know.

21       Q.    Are we still in the neighborhood of

22  a dozen or so?

23            MR. BADALA:  Objection to form.

24       A.    Probably somewhere around that, yes.

25       Q.    Okay.  What was your -- what were

Page 35

1    your responsibilities as the -- well, as a

2    lieutenant assigned to the narcotics division,

3    did you have other responsibilities besides

4    narcotics?

5         A.    Yes, I did.

6         Q.    What were the other ones?

7         A.    I oversaw our warrant unit, which is

8    basically what it says, guys go out and look for

9    people that have warrants in the county, and I

10   also oversaw what's our impact unit, which is

11   kind of a vice unit.  It's a catchall.  They do,

12   you know, anywhere from traffic enforcement to

13   prostitution stings, stuff like that.  So those

14   were the other units I was overseeing as well as

15   our evidence.

16        Q.    So as a lieutenant, I guess what

17   percentage of your time was spent dealing with

18   narcotics-related issues as opposed to the other

19   issues under your -- that you were in charge of?

20             MR. BADALA:  Objection to form.

21        A.    They were all pretty busy.  You

22   know, I'd probably say it's -- it was probably

23   equal across the board.

24        Q.    Did you have a mandate to prioritize

25   one of the jobs over the other or do them all

1   well?

2           MR. BADALA:  Objection to form.

3       A.    I try not --

4           MR. BADALA:  Just give me a second.

5           THE WITNESS:  I'm sorry.

6       A.    I tried not to neglect any of them,

7   to be honest with you.

8       Q.    And -- sorry.  You were reporting to

9   Captain Mich --

10      A.    Michalosky.  Please don't ask me to

11  spell it.

12      Q.    I won't.

13          Did that ever change?  Did you ever

14  report to someone else when you were lieutenant?

15      A.    When he retired, I think I reported

16  to the sheriff, I think, yeah.

17      Q.    Was it Sheriff Pinkney?

18      A.    Yes.

19      Q.    Okay.  And then --

20      A.    I'm sorry.  Sheriff Bova I believe

21  it was at the time.

22      Q.    Sheriff who?

23      A.    Bova.

24      Q.    How do you spell that one?

25      A.    B-o-v-a.

Page 37

1      Q.    Okay.  And do you remember when

2  Captain Michalosky retired?

3      A.    Not the exact year.  A couple years.

4      Q.    You're currently a captain in the

5  sheriff's department?

6      A.    Yes.

7      Q.    Are you still overseeing the

8  narcotics division?

9      A.    Yes.

10      Q.    Was there ever a time from whenever

11  it was in 2014 that you were assigned to the

12  narcotics division up till today where you have

13  not had some sort of responsibility over the

14  narcotics division?

15      A.    No.  That's -- I've always been

16  overseeing that.

17      Q.    Okay.  Going back -- let's go back

18  to when you were in the narcotics division in

19  2005 through 2007.  What were -- did you enjoy

20  being in the narcotics division?

21      A.    Yes, I did.

22      Q.    What did you like about it?

23      A.    The action, I guess if you call it

24  that, the everyday investigations that we

25  conducted.  It was -- it was exciting.

1     Q.    And the mission back then was to --

2  what was the mission of the narcotics division

3  in 2005 to '07?

4     A.    Curtail -- drug enforcement, that

5  was our goal.

6     Q.    And when you were doing that, how

7  did you know -- who, if anyone, told you where

8  to go, what to look for, how to do

9  investigations?

10             MR. BADALA:  Object to form.

11     A.    Usually when any person enters a new

12  unit, they'll pair you up with someone that's

13  been in that unit before, so kind of a training

14  officer takes you under their wing.

15     Q.    Who was your training officer?

16     A.    I think I was assigned to Detective

17  Nelson.

18     Q.    Is -- you said detective.  Is that a

19  different rank?

20     A.    No.  It's just when you -- if you

21  get into our detective bureau, our narcotics

22  division, you get the cool name of detective, I

23  guess it is.

24     Q.    Have you ever had the title of

25  detective?

Page 39

1          A.     You could say that, yes.

2          Q.     When?

3          A.     In the narcotics division.

4          Q.     So in 2005 you were both deputy

5    sheriff and detective?

6          A.     It's the same thing.  You're always

7    a deputy sheriff.  I'm still a deputy sheriff

8    today.  Just different titles.

9          Q.     And when you became lieutenant, when

10   you were the -- when you were promoted to

11   lieutenant and assigned to the narcotics

12   division, did that make you the head of the

13   narcotics division?

14         A.     I was one of the supervisors.  I was

15   still reporting to a captain, which reports to a

16   chief, which reports to the sheriff.

17         Q.     Okay.  But the captain, Captain

18   Michalosky, presumably had other things that he

19   was also responsible for overseeing?

20         A.     Yes.

21         Q.     Were you the most senior person most

22   focused on narcotics when you were the

23   lieutenant?

24              MR. BADALA:  Objection to form.

25         Q.     It's a bad question.  I'll withdraw

Page 40

1   it.  That was probably incomprehensible.

2               What were your -- what was the

3   mission of the narcotics division in 2014, when

4   you were -- when you were assigned to it as a

5   lieutenant?

6        A.    When I got in the division, there

7   was some changes.  The focus was more on

8   overdoses and prescription pills.  We had

9   started -- before I came into the unit, our

10  detectives responded to overdoses within the

11  county.  And then there was also a program set

12  up, it was called our drop box pill pickup

13  program.  So I was brought up to speed on those.

14       Q.    Did you have any involvement with

15  overdoses and overdose investigations in the

16  2005 to '07 time frame?

17       A.    I did not respond to any overdoses,

18  no.

19       Q.    Do you know whether others on the

20  narcotics division did?

21       A.    I don't remember any of them doing

22  it, no.

23       Q.    That was something, though, that the

24  narcotics division was doing when you became the

25  lieutenant in 2014?

Page 41

1          A.    Yes.

2          Q.    And so do you know when that had

3     started, "that" being responding to overdoses

4     being part of the responsibilities?

5          A.    The exact time, no, I don't know.

6          Q.    Is that something that has been

7     going on for several years?

8               MR. BADALA:  Objection to form.

9          A.    I'm not sure about the drop box

10    program, but I believe they were responding to

11    the overdoses.

12         Q.    Overdoses on what?

13         A.    Any suspected drug overdose they

14    respond to.

15         Q.    And was there a particular drug or

16    type of drugs that you were -- that you were

17    seeing prevalent overdoses from?

18              MR. BADALA:  Objection to form.

19         A.    It was mainly heroin overdoses.

20         Q.    Anything else?

21         A.    You know, you really wouldn't know

22    until you either got on scene or you got, you

23    know, the report back from the medical examiner.

24         Q.    Okay.  How many captains are there

25    in the Cuyahoga County Sheriff's Department?

Page 42

1          A.     There's only two of us.

2          Q.     Okay.  And to whom do you report

3      today?  You told me Deputy Taylor?

4          A.     Yes, Chief Deputy George Taylor.

5          Q.     Okay.  And between Captain

6      Michalosky and Chief Deputy Taylor, are there

7      others that you've reported to in between there?

8      I think you said maybe there was a brief --

9      there was a period of time when you were

10     reporting to Sheriff Bova?

11         A.     Are you talking about when I was a

12     lieutenant or --

13         Q.     Sure.  Let's start with lieutenant.

14         A.     Okay.  When Captain Michalosky

15     retired, actually, I reported to -- it was Chief

16     Pinkney, who is now the sheriff.

17         Q.     Was he the chief deputy at the time?

18         A.     He was the chief deputy at the time.

19     Sheriff Bova moved on to another position and

20     Chief Pinkney took over the sheriff's spot.  At

21     that time we did not have a chief, so I reported

22     right to the sheriff.

23         Q.     So to Sheriff Bova, then for a while

24     to Sheriff Pinkney.  And then where did Chief

25     Deputy Taylor come from?

Page 43

1              MR. BADALA:  Objection to form.

2         Q.    I mean, presumably his parents.  Was

3    he in the sheriff's department?

4         A.    No.  He was with the county, with

5    our safety department.

6         Q.    Okay.  And when did he come on

7    board?

8         A.    2016, I believe.  It's been a couple

9    years.

10         Q.    When you were promoted to captain,

11    then did someone get promoted to lieutenant or

12    to run the --

13         A.    Yes.

14         Q.    To oversee the narcotics division?

15         A.    Yes.

16         Q.    Who was that?

17         A.    Lieutenant Eugene Sharpe.

18         Q.    And how long has Lieutenant -- is he

19    still with the department?

20         A.    Yes.  Yes, he is.

21         Q.    How long has Lieutenant Sharpe been

22    with the sheriff's department?

23         A.    His whole career?

24         Q.    If you know.

25         A.    He's been there longer than I have.

Page 44

1    I don't know the exact hire date.

2         Q.    When you were a lieutenant in the

3    narcotics division, was he a sergeant in that --

4    was he in your division when you were the

5    lieutenant?

6              MR. BADALA:  Objection to form.

7         A.    He was a sergeant in charge of the

8    warrant unit, yes.

9         Q.    And so then he moved up and over --

10        A.    I moved and he -- right.

11        Q.    Have you personally -- Captain

12   Gerome, have you ever had any responsibility

13   relating to policy setting within the sheriff's

14   department in terms of policies related to drug

15   enforcement or responding to drug incidents?

16             MR. BADALA:  Objection to form.

17        A.    No, not as far as responding.  No.

18        Q.    How about in terms of strategy,

19   setting strategies or priorities for

20   investigating drug-related offenses?

21             MR. BADALA:  Objection to form.

22        A.    We've -- I've had conversations with

23   supervisors in the unit on the best way to -- it

24   was mostly managing schedules of the detectives

25   that would respond to the overdoses.

Page 45

1          Q.     When you say the supervisors in the

2     unit, who are you including?

3          A.     Lieutenant Sharpe at the time, and

4     then the immediate supervisor would have been

5     probably Sergeant Monteleone or Sergeant Hirko.

6          Q.     Do you have any responsibility --

7     have you ever had any responsibility within the

8     sheriff's department related to the department's

9     budget?

10          A.     There is some responsibility there.

11          Q.     Describe that for me, please.

12          A.     Purchase orders, you know, daily

13     purchase orders that might come through, office

14     supplies, stuff like that, needs a captain to

15     sign off on.

16          Q.     Okay.  Anything else related to the

17     budget?

18          A.     Any big expenditures, usually -- I

19     usually discuss with the chief on equipment or

20     anything like that.

21          Q.     Anything else?

22          A.     I get the update with our fiscal,

23     head of our fiscal department, as to how we're

24     doing with the budget.

25          Q.     Who is that?  Who is the head of the

Page 46

1    fiscal department?

2         A.    Donna Kaleal.

3         Q.    And how long has -- Ms. Kaleal?

4         A.    Yes.

5         Q.    Does she have a rank or is she --

6         A.    I don't know what her exact title --

7    head of fiscal department I guess is her title.

8    I don't know when she started with the sheriff's

9    department.  She's been the head since I can

10   remember when I was a lieutenant.

11        Q.    Okay.  How do -- I guess could you

12   describe for me your responsibilities since

13   you've been a captain as it relates to the

14   narcotics division?

15        A.    Yeah.  It's overseeing, making sure

16   the guys have the proper -- the equipment they

17   need, the resources that they need to, you know,

18   operate on a daily basis.  I brief -- a

19   lieutenant briefs me on what's going on, and if

20   there's anything, you know, out of the ordinary

21   or if we have search warrants coming up or

22   something like that.  So the day-to-day

23   operation, that's delegated down.

24        Q.    In terms of the resources, are there

25   any -- do you have -- do you have adequate

1  resources for the narcotics division?

2       A.    No.

3       Q.    Why do you say that?

4       A.    Right now we have six detectives.

5  As I've stated before, back in 2005 we had about

6  12.  And we've taken on as a department a lot of

7  other operations.  So we have to get our

8  staffing levels up more.  And I'd like to put

9  more in our narcotics division.

10      Q.    Have you requested adding folks to

11 the narcotics division?

12      A.    Yes.

13      Q.    How do you do that?  Who do you ask?

14      A.    Conversations with the chief, always

15 going over our personnel.

16      Q.    And why haven't you gotten anybody

17 else yet?

18      A.    Basically our staffing level at the

19 moment is down from where we should be.

20      Q.    Do you know why that is?  Why is

21 that, I guess?

22      A.    We have high standards, so when we

23 do get applicants, some of them don't make it.

24      Q.    So it's a lack of qualified

25 personnel as opposed to budget constraints?

Page 48

1              MR. BADALA:  Objection to form.

2         A.    It's -- it's a little bit of both, I

3    guess.

4         Q.    Okay.  Well, have you -- do you

5    have -- does the narcotics division have

6    adequate funding to carry out its mission?

7              MR. BADALA:  Objection to form.

8         A.    I don't know.  I don't know.

9         Q.    Okay.  You don't know one way or the

10   other?

11        A.    No.

12        Q.    When you were a lieutenant, did

13   the -- a lieutenant overseeing the narcotics

14   division, did you have enough detectives?

15        A.    No.  I mean, as a supervisor, you

16   always want more to do more.

17        Q.    Did you request more detectives when

18   you were a lieutenant?

19        A.    I don't remember, but -- I don't

20   know.

21        Q.    Okay.  How about other than more

22   detectives; are there any resources that the

23   narcotics division is lacking to be effective in

24   accomplishing its mission?

25              MR. BADALA:  Objection to form.

1      A.    Well, there's always the latest

2  technology that comes out that you'd like to --

3  you know, you'd like to get them, but again,

4  it's geared to budget and money and stuff like

5  that.

6      Q.    Could you give me some examples of

7  new technology that you would want but haven't

8  been able to --

9      A.    Well, they make some cameras that

10 you can purchase now, pole cameras, stuff like

11 that, pole like on a telephone pole, stuff like

12 that.  There's devices they make now that, if

13 you have an informant going to do a drug

14 purchase for you, it could be a little credit

15 card, it could be any small little -- instead of

16 the wiring up technique that was used in the

17 past.  I'm just -- you know, just like I said,

18 latest technology.  Something is coming out new

19 all the time.

20     Q.    How do you -- we were talking about

21 your responsibilities, and you said that it's

22 delegated down in terms of, I'm assuming, the

23 day-to-day investigations.  How do you stay

24 abreast of what the folks in the narcotics

25 division are doing?

Page 50

1        A.     The lieutenant briefs me on it
2    almost daily.
3        Q.     In what format?
4        A.     He comes in my office.
5        Q.     Okay.  Does he -- does he ever give
6    you pieces of paper that list what they're
7    doing?
8               MR. BADALA:  Objection to form.
9        A.     No.
10       Q.     Ever?
11       A.     No.
12       Q.     Okay.  Any other way in which you're
13   aware of what the folks in the division are
14   doing besides the lieutenant briefing you?
15       A.     If there is an operation, say a
16   search warrant, for example, and he's not -- or
17   he is either going on it or he's not available
18   to come to my office or I'm not available at the
19   office, he will send me a quick e-mail or
20   something like that, or, you know, a quick text
21   or something like that.
22       Q.     All right.  Do you use e-mail in
23   your job?
24       A.     Yes.
25       Q.     Okay.  And how many e-mail addresses

```
                                              Page 51

 1   do you have?

 2              MR.  BADALA:   Objection to form.

 3        A.    For the job?

 4        Q.    Sure.  Yes.

 5        A.    Just the one.

 6        Q.    Okay.  What is that?

 7        A.    My e-mail address?

 8        Q.    Yes.

 9        A.    It's Dgerome@cuyahogacounty.us.

10        Q.    And you mentioned texts.  So do you

11   use text messages in your job?

12        A.    Yes.

13        Q.    And is that a sheriff -- is it on

14   your personal phone or sheriff department issued

15   phone or both?

16        A.    I have two phones.  Yeah, both.

17        Q.    Okay.  One is personal, one is

18   sheriff's department?

19        A.    Yeah.  I have -- yeah.  I have an

20   issued phone and a personal phone.  I use them

21   both for work.

22        Q.    Okay.  And you do both e-mail and

23   text messages from the phone?

24        A.    Yes.

25        Q.    Phones?
```

Page 52

1          A.     Yes.

2          Q.     Okay.  Do you know whether those --

3    both of those phones were searched in connection

4    with production of documents in this case?

5               MR. BADALA:  Objection to form.

6          A.     I don't know.

7          Q.     Did anybody ever tell you they

8    needed your phone for purposes of looking for

9    documents in this case?

10         A.     No.

11         Q.     And how about your computer; do you

12   know if anybody ever came and looked -- do you

13   have a computer in your office?

14         A.     Yes.

15         Q.     And does that contain documents,

16   information you use for work?

17              MR. BADALA:  Objection to form.

18         A.     Yes.

19         Q.     All right.  Do you know whether that

20   computer was ever searched for responsive --

21         A.     I don't know.  Nobody ever came in

22   with me being present there and looked for

23   anything.

24         Q.     Did you ever -- were you ever made

25   aware of any obligation to preserve documents

1   related to this -- that could be relevant to

2   this litigation?

3          A.    Yes.

4          Q.    Okay.  When was that?

5          A.    I don't remember the exact time.

6          Q.    All right.  By the way, do you know

7   what the lawsuit that you're here testifying in

8   today is about?

9          A.    I have an idea, yes.

10         Q.    What's your understanding?

11         A.    The county is suing the medical

12  companies for the opioid crisis that we're

13  facing today.

14         Q.    What do you mean by "the opioid

15  crisis that we're facing today"?  What does that

16  mean to you?

17         A.    To me that means, like I said, our

18  department investigates overdoses, which is

19  usually related back to that the deceased were

20  at one time addicted to pills.

21         Q.    Why do you say that?

22         A.    Based on interviews we've conducted

23  with family members, stuff like that, when we

24  respond to these scenes, that's -- it usually

25  relates back to that.

Page 54

1          Q.     Have you read the complaint?

2          A.     No, I have not.

3          Q.     You have probably more important

4     things to do.

5                 Have you spoken to anyone other than

6     lawyers for the county about this lawsuit?

7          A.     Yes.

8          Q.     To whom?

9          A.     George Taylor, chief.

10         Q.     Okay.  What did you and Chief Taylor

11    talk about related to the lawsuit?

12         A.     Basically what I referred to before,

13    is that I was meeting with the attorneys

14    yesterday and the deposition hearing today.

15         Q.     Okay.  Anything else that you talked

16    about?

17         A.     No.

18         Q.     Did he ask you any questions?

19         A.     No.

20         Q.     Did you ask him any questions?

21         A.     No.

22         Q.     All right.  You referred to -- in

23    your answer to the opioid crisis.  What do you

24    understand an opioid to be?

25         A.     My definition of it?

Page 55

1          Q.     Sure.  Yeah.

2          A.     A drug that's addictive and helps

3    relieve pain.

4          Q.     What, if any, drugs are you

5    including within the category of opioids?

6          A.     I would include heroin, fentanyl,

7    hydrocodone, oxycodone, morphine.  And I don't

8    know all the particular names for everything,

9    but --

10         Q.     And then -- so that description, if

11   I understood it correctly, that would include

12   both medications that are FDA-approved

13   prescription medications and illegal narcotics;

14   is that right?

15              MR. BADALA:  Objection to form.

16         Q.     For example, is heroin a -- I'm not

17   aware of heroin that you can get by a

18   prescription.

19         A.     Neither am I.

20         Q.     Okay.  So it's got -- that category

21   of opioids has both prescription medications,

22   and I don't know what you want to --

23         A.     Illegal, illicit drug.  That's my

24   understanding of it, yes.

25         Q.     Okay.  Have you ever received any

1  training that's specific to opioids of any --

2  any sort of opioid and any sort of training?

3          MR. BADALA:  Objection to form.

4      A.   I have had what I referred to

5  before, online training.  Some of it dealt with

6  prescription and other drugs.  I've also had

7  online training in OARRS.  So yeah.

8      Q.   When did you do the -- when did you

9  do this online training?

10     A.   It's -- I don't remember the exact

11  times.  The OARRS training came up this past

12  year.

13     Q.   Okay.  What is OARRS?

14     A.   The Ohio -- Ohio Automated

15  Prescription Reporting System, I think it is.

16     Q.   Okay.  What does it do or what is --

17  what does OARRS do?

18     A.   From what I remember from the

19  training, it's a database that keeps track of

20  people's prescriptions that, on the law

21  enforcement end, you could look up -- if you're

22  investigating an active case, you can look up

23  and get information from it.

24     Q.   Is that something you've ever done

25  when investigating a case?

Page 57

1          A.     No, I've never done that.

2          Q.     Do you know whether anyone in the

3     sheriff's department has used OARRS before?

4          A.     No, I do not know.

5          Q.     Do you know whether the department

6     has access to the OARRS database?

7          A.     I'm not aware of anyone having

8     access in the sheriff's department.

9          Q.     Okay.  Why did you get the training

10    on the OARRS database?

11         A.     We do have a task force officer

12    assigned to DEA.  I don't know if he has access

13    or not, but that is probably the reason why I

14    was looking it up.

15         Q.     How long was the -- do you remember,

16    how long was the course?

17         A.     It's probably no more than 15

18    minutes, 20 minutes tops.

19         Q.     Is it a live lecture or is it --

20         A.     No.  It's slides with a narrator.

21         Q.     Who's the task force officer -- did

22    you say assigned to DEA?

23         A.     Yes.

24         Q.     Who is that?

25         A.     We have two deputies assigned to

Page 58

1    DEA.  One is John Gioitta, and we just recently

2    assigned another detective there, Doug Jopek.

3         Q.    What does that mean, that they're

4    assigned to DEA?

5         A.    In our department we have requests

6    for outside agencies with assistance, so we like

7    to call them -- they call them task forces, and

8    they request the sheriff's department for a

9    couple bodies to help out, and we've given them

10   two bodies from our department.

11        Q.    So are they physically working out

12   of DEA's offices?

13        A.    Yes.

14        Q.    Do you know what they're doing?

15        A.    On a day-to-day basis, I don't know

16   every day what they're doing, but they're kind

17   of assigned the same type of work our narcotics

18   does.

19             One is not street level narcotics,

20   but when you get that -- climb that ladder to

21   drug cartels and stuff, I think they're more

22   heavily involved with that.

23             And then the other one is assigned

24   to -- I think it's prescription investigations.

25        Q.    Are drug cartels a problem in

Page 59

1    Cuyahoga County?

2              MR. BADALA:  Objection to form.

3         A.    I have not encountered any, so I

4    don't know.

5         Q.    Okay.  But you have one of your --

6    one of your officers is assigned to a DEA task

7    force dealing with drug cartels?

8         A.    Yes.

9         Q.    How long has that been the case?

10   When did -- how long have you had someone from

11   the sheriff's department on that DEA task force?

12        A.    As long as I can remember.  I'm not

13   sure.  Before I even got in the unit we've had

14   people assigned over there.

15        Q.    Have you ever had any interactions

16   with DEA?

17        A.    Yes.

18        Q.    Describe that for me, please.

19        A.    Talking to their officer in charge

20   or agent in charge.  We spoke numerous times

21   about how, you know, they're doing over there

22   and making sure they're doing what's requested

23   of them.

24        Q.    Making sure that your people on

25   their task force are doing a good job?

Page 60

1          A.     Yeah, that they're happy with them.

2     Yeah.

3          Q.     Anything else that you've -- any

4     other discussions you've had with DEA?

5          A.     No.  We kind of make -- you know,

6     just normal conversations about helping out each

7     other, you know.  Whatever they need, we'll

8     offer them help, our resources, and it goes vice

9     versa.

10         Q.     Who's the DEA agent in charge?

11         A.     Keith Martin is the one I talk to.

12         Q.     How long has he been the DEA agent

13    in charge?

14         A.     Since I can remember.  A couple

15    years maybe.  I don't know.

16         Q.     Was he someone you talked to when

17    you were a lieutenant?

18         A.     I did, yes.

19         Q.     I want to ask you a few questions --

20    a few more questions about how the sheriff's

21    department is organized, and I'm going to see if

22    it helps or hurts to use an org chart.

23                    -   -   -   -   -

24                (Thereupon, Gerome Deposition

25                Exhibit 1, Cuyahoga County Sheriff's

Page 61

1                Department Organizational Chart, was

2                marked for purposes of

3                identification.)

4                     -    -    -    -    -

5                MR. BLOCK:  So, for the record --

6      how are we doing the numbers, just like --

7                MR. BADALA:  They haven't done

8      witness name.  You guys have just been doing 1.

9      But you're free to do whatever you want.

10          Q.    Gerome 1, a one-page document

11     entitled "Cuyahoga County Sheriff's Department."

12     There's a date of October 2017 in the bottom

13     right corner, Bates labeled CUYAH 12077.

14                Captain Gerome, have you seen this

15     before?

16          A.    Yes.

17          Q.    What is this document?

18          A.    It's an organization chart for

19     our -- the sheriff's department.

20          Q.    Okay.  Is this -- is this an

21     accurate description of the organization of the

22     sheriff's department as of today?

23          A.    This was October -- I'd have to look

24     it over for a minute here.

25          Q.    Sure.

Page 62

1          A.    Okay.  I'm sorry.  What was the
2    question?
3          Q.    Whether this -- does this accurately
4    depict how the sheriff's department is organized
5    today?
6          A.    Yes, it is, except a couple of the
7    names I think have gone on to other things.
8          Q.    Okay.  And focusing now just on
9    everything that falls under your name, so you
10   are still a captain in the sheriff's department?
11         A.    Yes.
12         Q.    And Lieutenant Caraballo and
13   Lieutenant Sharpe are still reporting to you?
14         A.    At the moment Lieutenant Sharpe is
15   on medical leave.
16         Q.    He's on medical leave?
17         A.    Yes.
18         Q.    Is there somebody filling his
19   responsibilities?
20         A.    I have delegated some of his areas
21   to Lieutenant Caraballo and Lieutenant Smith,
22   and then I've took over some of the other direct
23   responsibilities.
24         Q.    Okay.  As it pertains to narcotics
25   or drug-related issues, to whom --

Page 63

1          A.    I'm overseeing that right now.

2          Q.    Sort of directly?

3          A.    Yes.

4          Q.    Okay.  Within the responsibilities

5     that ordinarily would fall under Lieutenant

6     Sharpe, what is -- what is encompassed within

7     narcotics -- is it narcotics and K9 or is it

8     narcotics K9, one separate unit?

9          A.    It's narcotics and K9.  We have a

10    couple of K9 dogs assigned to narcotics.

11         Q.    All right.  And what's the -- what

12    are the principal responsibilities of the

13    narcotics K9 unit?

14         A.    We have one assigned to the post

15    office task force.  It's basically drug

16    detection with K9s.  The other one is assigned

17    not only with us but with homeland security.

18         Q.    I think we've talked about the

19    narcotics division.  I'm trying to get a sense

20    of which, if any, of these other units within

21    the sheriff's department also touches on

22    narcotics-related issues.  So SWAT, I think I

23    know what SWAT is.  It's probably not quite like

24    the show on TV.

25         A.    I've never seen the show.

Page 64

1          Q.    I haven't either.  They advertise it

2     during football games.

3                Does the SWAT unit have any

4     responsibilities related to drug issues?

5                MR. BADALA:  Objection to form.

6          A.    I guess they do.  If there's a

7     search warrant, they'll conduct the initial, I

8     guess, entering the home, make sure it's secure

9     before our detectives go in.

10         Q.    How big is the SWAT unit?

11         A.    I think we have 15, 16 members.

12         Q.    Then next, under Lieutenant Sharpe,

13    is task forces.

14         A.    Yes.

15         Q.    What's encompassed within task

16    forces?

17         A.    We have, as we mentioned, two

18    officers assigned to DEA.  We have a deputy

19    assigned to HIDTA, which is another drug task

20    force.  High Intensity Drug Trafficking Area I

21    believe is the correct title of it.  We have

22    another detective, a deputy, assigned to NOLETF,

23    which is the Northeast Ohio Law Enforcement Task

24    Force.  I mentioned the two K9s.  And let me see

25    if -- and we do have a deputy assigned to --

Page 65

1   with homeland security, and they do some

2   narcotics investigations.

3        Q.    Who is -- I'm sorry.

4        A.    No.

5        Q.    Anything else within task force?

6        A.    No.  I believe that's it as far as

7   that falls under narcotics task forces.

8        Q.    You told us who was the two assigned

9   to DEA.  Who's assigned to HIDTA?

10       A.    HIDTA.

11       Q.    H-I-D-T-A, is that right?

12       A.    Yes.  Ben Meder.

13       Q.    And how long has he been there?

14       A.    When I became a lieutenant, he was

15  there, so I don't know how long before then he

16  was assigned.  So it's been a couple years.

17       Q.    Do you know -- how, if at all, do

18  you know what he's doing over there?

19       A.    As of right now, I don't have daily

20  contact with him, so I don't know.

21       Q.    Okay.  Is there any -- is there any

22  sort of strategic communication between the

23  sheriff's department and that task force in

24  terms of making sure you aren't duplicating

25  efforts or getting in each other's way or

Page 66

1   anything like that?

2           MR. BADALA:  Objection to form.

3       A.    There's constant communication with

4   our -- the supervisor sergeant from narcotics

5   and the detectives assigned to each area or each

6   task force.  There's also -- HIDTA created a

7   deconfliction database, so if you are looking at

8   a suspect or investigating something, you can

9   look in that database, see if anyone else is

10  looking into the same thing.

11      Q.    That's something that you have

12  access to at the sheriff's department, that

13  database?

14      A.    If I wanted to, yes, I could have

15  access to it.

16      Q.    Or folks within the narcotics

17  division have access to it?

18      A.    Yes.

19      Q.    Who's assigned to the NOLETF?

20      A.    Mark Batone.

21      Q.    How long has he been there?

22      A.    The same deal.  He was there before

23  I even became a lieutenant in the division.

24      Q.    Okay.  And who's assigned to

25  homeland security?

Page 67

1        A.      Anthony Edelman.

2        Q.      And going back to -- is it Deputy

3   Batone?

4        A.      Deputy, yes.

5        Q.      Okay.  How do you know what he's

6   doing with that task force?

7        A.      It's the same thing with the deputy

8   from HIDTA.  The supervisor, the sergeant of the

9   unit has contact with him and their supervisors

10  over there.

11        Q.      Okay.  And who's the sergeant in

12  your unit that you're referring to?

13        A.      Currently right now, Sergeant Hirko.

14        Q.      Okay.  Same sergeant, Hirko --

15  Deputy Meder and Deputy Batone would report

16  occasionally to Sergeant Hirko as to what

17  they're doing?

18        A.      Yes.

19        Q.      All right.  How about for Deputy

20  Edelman at homeland security?  How, if at all,

21  do you know what he's up to over there?

22        A.      Same thing.  He reports to Sergeant

23  Hirko as well.

24        Q.      Okay.  Are there any of the other

25  units underneath -- well, starting with under

1  your block as captain -- that have involvement

2  with narcotics-related issues, besides -- we

3  talked about SWAT, we talked about task force

4  and we talked about narcotics K9.

5        A.    Our impact unit, which is a vice

6  unit, does come in contact with drug activity, I

7  guess you could say.

8        Q.    Who is in charge of the impact unit?

9        A.    Sergeant Kozub is the immediate

10  supervisor.

11        Q.    Okay.  What's the primary mission of

12  the impact unit?

13        A.    They're, I guess you can call it, a

14  catchall for the department.  Like I said

15  before, they can do anything from assisting --

16  if you have a festival in your hometown, they'll

17  help with security for that, all the way up to

18  prostitution stings.  They've done traffic

19  enforcement.  They have assisted other agencies

20  with whatever they need.  They're kind of -- if

21  you call the county and want some assistance or

22  resources, we ask those guys -- we task those

23  guys with doing it.

24        Q.    Who within the sheriff's department

25  sets the priorities for the impact unit?

1          MR. BADALA:  Objection to form.

2      A.    I think it's a discussion between

3  the sergeant and it used to be Lieutenant

4  Sharpe.

5      Q.    Okay.  Any other of these units that

6  have involvement with narcotics-related issues?

7          MR. BADALA:  Objection to form.

8      A.    Well, the drop box, which is

9  incorrect.  It falls under Lieutenant Sharpe,

10  too.  But you see that under Lieutenant Smith.

11  They have involvement.

12      Q.    Could you briefly describe for us

13  what the drop box unit -- is it a unit or --

14      A.    We have -- it falls under the

15  evidence sergeant, but we have guys that are

16  assigned to our evidence that do what we call

17  the pill pickup program, so the drop box program

18  throughout the county.  We have what looks like

19  a little mailbox called a drop box for

20  prescription pills, unwanted, people can drop

21  off.  They're located at the -- usually the

22  police stations, so they're monitored.  And we

23  have deputies assigned to go pick up the pills

24  from these drop boxes on a daily basis.

25      Q.    Where do the pills go when they're

1    collected?

2         A.    We store them in our evidence room

3    and then we destroy them.

4         Q.    What kind of pills get dropped off?

5         A.    All types of pills.  I don't know.

6    I mean, exactly the type?

7         Q.    Yes.

8         A.    Mostly prescription bottles.

9         Q.    But all kinds of prescriptions --

10              MR. BADALA:  Objection to form.

11        Q.    -- or what kinds of prescriptions?

12        A.    I have not gone through them.

13        Q.    When did the drop box program start,

14   if you know?

15        A.    I don't know.  It was there when I

16   became lieutenant.

17        Q.    Okay.  Outside of -- are there other

18   units within the sheriff's department that have

19   involvement with narcotics-related issues?

20              MR. BADALA:  Objection to form.

21        A.    I mean, I think any law enforcement

22   has come across narcotics issues, whether it be

23   somebody having something on them, either

24   entering a courthouse or, you know, a traffic

25   stop, something like that, but the people that

Page 71

1  specifically investigate it are the ones we

2  covered.

3         Q.    Okay.  There's also medical director

4  on here.  What does the medical director for the

5  sheriff's department do?

6         A.    That's the jail medical director.

7  He oversees the medical dispensary stuff inside

8  the jail.

9         Q.    Okay.  And the director of nursing,

10  that's also for the jail?

11         A.    Correct.  And Marcus is no longer

12  there.

13         Q.    Okay.  All right.  Great.

14              MR. BLOCK:  Why don't we take a

15  break, if that's all right.

16              MR. BADALA:  Sure.

17              THE VIDEOGRAPHER:  Off the record,

18  10:02.

19                    (Recess had.)

20              THE VIDEOGRAPHER:  On the record,

21  10:16.

22  BY MR. BLOCK:

23         Q.    Captain Gerome, I want to go back to

24  when you were promoted to lieutenant and then

25  assigned -- assignments were switched and you

Page 72

```
 1   were going to be going back to the narcotics
 2   division as one of your responsibilities, so
 3   that's 2014 at some point; is that right?
 4         A.    Yes.
 5         Q.    Okay.  Did you get a -- did you get
 6   any sort of briefing from anyone when you
 7   were -- now the narcotics division was falling
 8   under your supervision, as to what the narcotics
 9   division was doing and how it was operating?
10         A.    Yes.
11         Q.    From whom?
12         A.    Lieutenant Caraballo, who I was
13   switching places with.
14         Q.    All right.  How did that -- did you
15   get anything in writing in terms of what was
16   going on?
17         A.    No.
18         Q.    Just a face to face.  How long did
19   that take?
20         A.    I don't -- I think he probably
21   updated me on what was going on and, I mean, we
22   keep in contact.  It's not like he was assigned,
23   you know, somewhere I couldn't get a hold of
24   him, but the meeting, I don't remember how long
25   that lasted.
```

1      Q.    Does the sheriff's department have
2   any manuals of any sort that relate to how to
3   conduct a narcotic-related investigation?
4      A.    No, not that I'm aware of.
5      Q.    If I replace the word "manual" with
6   document, any piece of paper whatsoever that
7   relates to how to conduct a narcotics-related
8   investigation?
9              MR. BADALA:  Objection to form.
10     A.    Okay.  I'm -- I'm not sure I
11  understand that.
12     Q.    Sure.
13             Are there any documents at all
14  within the sheriff's department that deal with
15  how to conduct a narcotics-related
16  investigation?
17             MR. BADALA:  Objection to form.
18     A.    Not that I'm aware of, no.
19     Q.    Do you know how many employees there
20  are within the sheriff's department?
21     A.    No, I don't.
22     Q.    Okay.  We were talking about the
23  number of folks in the narcotics division and
24  you also testified a little earlier about your
25  thoughts that there should be more detectives

1  assigned to the narcotics division.

2          Do you remember that?

3      A.    Yes.

4      Q.    When you were talking about the

5  number of people within the narcotics division,

6  were you including within that count folks like

7  Detective Batone, who's assigned somewhere else?

8      A.    No.  I was specifically talking

9  about the detectives assigned in our division,

10  not task force officers, correct.

11          Q.    I'm sorry?

12      A.    Not the task force officers.

13          Q.    You would count them separately?

14      A.    I do.

15          Q.    Okay.  Does your department -- with

16  respect to narcotics-related investigations,

17  does the sheriff's department interact at all

18  with the Cleveland Police Department?

19      A.    Yes.

20          Q.    How so?

21      A.    Again, deconflicting is what we call

22  it, and I guess if they need resources, we

23  provide them with the resources.  If we need

24  something, they'll help us out.

25          Q.    Deconflicting, how do you do that?

Page 75

1          A.    I mentioned the database that was

2     set up by HIDTA.  Also, you know, detectives can

3     call each other.

4          Q.    Do you have -- is there a

5     counterpart of yours at the Cleveland Police

6     Department in terms of having oversight for

7     narcotics-related investigations?

8          A.    Counterpart, yeah.  I have -- I talk

9     to Commander Gary Gingell, who oversees a lot of

10    their units as well.

11         Q.    What do you and Commander Gingell --

12         A.    It's pronounced -- everyone says it

13    different.  It's G-i-n-g-e-l-l.  So Gingell.

14    I've heard him be called jingles before.

15         Q.    To his face?

16         A.    Well, I haven't, but -- no.

17         Q.    What do you and he talk about?

18         A.    He's also in charge of SWAT over

19    there, so we go over resources for SWAT, and

20    then we also discuss, you know, how they're

21    handling their overdoses and stuff as well.

22         Q.    Is that all -- do you guys ever

23    trade e-mails on these subjects?

24         A.    I've -- he's part of an e-mail chain

25    with the medical examiner, so I've seen some of

Page 76

1   his responses.

2          Q.    Outside of that, do you guys e-mail

3   ever directly, one on one, you to Commander G?

4          A.    We might have, probably just either

5   helping them out with an event or SWAT or

6   something like that.  Yeah, I'm sure there's

7   e-mails in there with me and him.

8          Q.    Are there any other local law

9   enforcement agencies that you, at the sheriff's

10  department, interact with as it relates to

11  narcotics investigations?

12         A.    Me personally or our -- our

13  narcotics unit?

14         Q.    Both.

15         A.    Okay.

16         Q.    Or either, I guess.

17         A.    I've had a phone call or e-mail

18  conversations with some chiefs about our

19  overdose responses.  Our detectives that respond

20  to the overdoses, they have a rapport with

21  agencies because they're responding to their

22  jurisdictions in conducting an investigation for

23  them or assisting with it, too.

24         Q.    What chiefs do you recall having

25  conversations with, communications with?

Page 77

1      A.    Geez.  The recent one I can remember

2  is Chief -- don't ask me how to spell this

3  either -- Scharschmidt from Parma Heights.  We

4  talked about the investigations in his city.

5           There -- I can't remember the name.

6  There was a Parma -- I believe it was a captain

7  for Parma Police Department.  We discussed their

8  role and our role in the investigations.

9           I think those are the most -- the

10 ones I can remember.

11      Q.    What was being investigated in Parma

12 Heights?

13      A.    We -- he -- I think he just became

14 chief.  I think he was a captain.  He had called

15 and asked, you know, how it all works as far as

16 us coming out and conducting an investigation if

17 there was a suspected drug overdose.  I just

18 explained to him the procedure that we use as

19 far as calling out and detectives arriving on

20 scene and what they should do as a local

21 department to secure the scene.

22           And then I think we had one there,

23 and we did respond, but he -- he advised me at a

24 later time, I think on the phone, that they're

25 going to handle their investigations themselves,

1    just keep it within their jurisdiction.  And I

2    think that was the last conversation I had with

3    him.

4         Q.    Meaning that he didn't want the

5    sheriff's department coming to any future

6    overdose scenes in the City of Parma Heights?

7         A.    He said his detectives were going to

8    handle the scenes.

9         Q.    Okay.  Well, let's talk about --

10   let's talk about those -- this would be "the

11   scene" being the scene of an overdose?

12        A.    Yes.

13        Q.    Do you remember specifically, this

14   one in Parma Heights, what the person had

15   overdosed on?

16        A.    No, I do not.

17        Q.    Okay.  I guess, does it -- is it the

18   same general procedure that's followed

19   regardless of the type of overdose?  You don't

20   know when you get the call what someone has

21   overdosed on, I assume, generally, usually?

22        A.    The only -- there might be some

23   limited information in the alerts that are sent

24   out, but no.  The detectives won't know until

25   they actually get there and survey the scene and

1  see what's going on.

2       Q.    So let's walk through that process.

3             First of all, how does the sheriff's

4  department know -- how are you made aware that

5  there's an overdose or a potential overdose that

6  needs investigating?

7       A.    So within Cuyahoga County, we

8  respond to certain municipalities, townships,

9  not all of them.  Some like to do their own.  So

10  if there is a suspected drug overdose, the local

11  police department will notify the medical

12  examiner.  If it's -- a medical examiner will

13  put out an alert to -- there's a list of people

14  on the e-mail chain -- advising them that we

15  have a possible drug overdose.  They'll give the

16  location, usually the age, gender of the person

17  involved, and then maybe a brief thing if there

18  is suspected drugs on scene or anything like

19  that.

20             Our detectives are all on that alert

21  as well as the supervisors.  So in certain

22  jurisdictions, we are responsible for going and

23  helping out.  We have detectives that are on

24  call for that, and they are assigned, you know,

25  vehicles to respond to that scene.

Page 80

1           The locals are -- we kind of treat

2    it as a homicide scene now.  So they secure the

3    scene like a normal homicide, with the tape and

4    everything like that, and our detectives will

5    show up and take over from there.

6           Q.    Let me ask you a few follow-ups on

7    that.

8           First of all, how long has this been

9    something that the sheriff's department has been

10   responding to?

11          A.    It was before I came -- became a

12   lieutenant, so I don't know the exact date it

13   started, but --

14          Q.    And are we talking responding only

15   if there's been a -- I'm sorry.  Is an

16   overdose -- is this always a fatality that

17   you're describing?

18          A.    Lately, yes.  Those are the ones we

19   respond to, yes.  They're deceased.

20          Q.    Okay.  Are there ever times where

21   you respond to an overdose where the person is

22   not -- ends up not dying from the overdose?

23          A.    Yeah.  It has happened in the past.

24   We call it non-fatal.  And with that, it's

25   usually the agency will probably request our

1    assistance.  If it's a smaller agency that

2    doesn't have the resources, they'll reach out to

3    us for assistance.  But yes, it has happened.

4         Q.    And then you said a detective from

5    the narcotics division, I suppose, goes to the

6    scene?

7         A.    We assign two detectives to go.

8         Q.    Two.  Okay.  Why two?

9         A.    There's multiple things to be done.

10   Sometimes even the supervisor will show up if

11   needed.  There are certain responsibilities they

12   have at the scene.

13        Q.    And what are the detectives supposed

14   to do at the scene?  What's their mission

15   basically?

16        A.    Collect evidence, photograph the

17   scene, interview any witnesses, gain whatever

18   intelligence they can from whatever neighbors,

19   family members, friends, whoever they -- you

20   know, whatever information they can get on the

21   scene, and they'll start their investigation

22   from there.

23        Q.    What are they investigating?

24        A.    Our main objective is to find out

25   who was -- sold the drugs to this individual and

Page 82

1    try to go after them.

2         Q.    Is there -- is there a standard --

3    is there some sort of -- is there a checklist

4    that the detectives have for when they're on

5    scene, here are the -- here's what we need to

6    look for or the questions we need to ask?

7              MR. BADALA:  Objection to form.

8         A.    I'm not aware of a document or a

9    checklist that -- they may have one of their

10   own.  I don't think there's an official one that

11   was put out, but I think, like I said, they may

12   have something on their own they go off of.

13        Q.    Is there any reporting obligation

14   that the detectives who respond on the scene

15   have?  Do they have to write a report of what

16   they observed?

17        A.    Yes, absolutely.  Yes.

18        Q.    Okay.  Is that report -- is that on

19   a form or they can write it on a cocktail napkin

20   if they want?

21        A.    No.  We have a report management

22   system now, so everything is documented on that.

23        Q.    What's the name of the management

24   system?

25        A.    TAC, T-A-C.

Page 83

1          Q.     What's that stand for?

2          A.     I don't know.

3          Q.     That's an electronic system?

4          A.     Yeah.  It's a system that's used by

5    most agencies here in Cuyahoga County and

6    Northeast Ohio.

7          Q.     When you say "most agencies," who

8    are you including?

9          A.     Police departments.  I don't have

10   the exact names of them, but I think within

11   Cuyahoga County the majority of them use this

12   system.

13         Q.     How long has TAC been -- how long

14   has it been the TAC system that this information

15   has been put into?

16         A.     For our department?

17         Q.     Yes.

18         A.     We introduced it this past year, I

19   think January -- I'd say December, January is

20   when we went live with it.

21         Q.     How were the reports collected prior

22   to TAC?

23         A.     There's another database.  It's

24   called Crime.  And that's linked to the

25   prosecutors.  And, again, a lot of agencies have

Page 84

1    that as well.  And the Crime links up with our

2    TAC system, so it linked up with other people's

3    TAC system.  But that was our main database for

4    report writing and stuff like that.

5          Q.    Okay.  Any other databases prior to

6    Crime that you remember in terms of where the

7    narcotics folks would report what they found on

8    the scene?

9          A.    I think most detectives kept their

10   own file folders, stuff like that.

11         Q.    Have you ever been a detective

12   responding to an overdose scene?

13         A.    No, I have not.

14         Q.    Have you ever submitted a report

15   related to an overdose scene?

16         A.    No, I have not.

17         Q.    Okay.  That's -- those are the

18   detectives in the field, so to speak, I guess

19   that are doing it?

20         A.    Yeah.  Our detectives that are on

21   call, or if it happened now, one of our guys on

22   duty would respond to it.

23         Q.    What are the detectives trained

24   to -- what are they trained to look for at the

25   crime scene?  I'm sorry.  At the scene.  It's

Page 85

1    considered a crime scene, I take it?

2         A.    Yeah.  We consider it a homicide

3    scene based on what we found in the past about

4    overdoses and people selling these drugs.

5              And I'm sorry.  The question?

6         Q.    What are they trained to look for?

7         A.    Any sorts of evidence.  It could be

8    anywhere from a plastic baggie.  A crucial piece

9    now is a cell phone.  We try to get those.  If

10   there's drug paraphernalia.  Anything that could

11   be considered, you know, evidence these days.

12        Q.    In terms of, I guess, part of what

13   they're supposed to do is interview witnesses or

14   potential witnesses; is that right?

15        A.    Yes.  If there's -- obviously

16   somebody found the person.  If it wasn't law

17   enforcement doing a welfare check, they'll try

18   to interview those people.  If there's family

19   members present or someone has knowledge of the

20   person, stuff like that, try to interview them.

21        Q.    What are they asking the people that

22   they're interviewing?

23        A.    Just about, you know, their past.

24   If they seen anything out of the ordinary, if

25   they have a drug history, if this happened

Page 86

1   before.  Just trying to get to know who the

2   decedent is and, you know, try to get a little

3   background on that.

4        Q.    And that information, whatever

5   information they glean from those interviews, is

6   included as part of the report that gets

7   submitted into the Crime or, now, TAC database;

8   is that right?

9        A.    I'd have to review specific reports.

10  I think it's more of a feel who they're dealing

11  with, where to go with the investigations.  I

12  don't know if they exactly include the history

13  of that person because you're going off of

14  witness statements.  You know, you don't have

15  anything official until the medical examiner

16  comes out with what happened.

17       Q.    Is there any requirement that, let's

18  say -- a lot of these scenes the response ends

19  up being a heroin overdose; is that right?

20       A.    I'm sorry.  Could you repeat that?

21       Q.    Heroin overdose scenes, is that --

22       A.    Yes, we've investigated those.  Yes.

23  Correct.

24       Q.    So is there any requirement for a

25  detective who goes to a heroin overdose scene --

Page 87

1    are they required to ask -- try to ascertain

2    from whoever they interview whether that -- the

3    person who overdosed on the heroin has ever in

4    their life before taken a prescription opioid?

5           A.    That's something they can ask, yeah.

6    I'm not sure I'm following your question.

7           Q.    My question is, are they required

8    to?

9           A.    Are they required to?

10          Q.    Yes.

11          A.    No.

12          Q.    Are they trained to ask that

13   question?

14          A.    I think any detective investigating,

15   it's something you kind of want to know.

16   Specific training, you know, our detectives have

17   gone to interview interrogation school, stuff

18   like that.  So I don't know if that was brought

19   up or not.

20          Q.    You don't know one way or the other?

21          A.    No, I don't.

22          Q.    All right.  I guess what happens --

23   what happens next?  So the officer goes --

24   sorry.  The detectives --

25          A.    Yes.

1        Q.    Do they file two separate reports?

2   You said that there are two detectives that go

3   to the scene.

4        A.    No.  It will be a lead detective who

5   will do the actual reporting writing, and the

6   other one might submit a supplement report on

7   what they did.

8        Q.    Okay.  What happens next in terms of

9   the investigation?

10       A.    Are you talking about the scene

11  itself or from --

12       Q.    Sure.  Let's start with the scene

13  itself.

14       A.    Securing the scene, photographs.

15  You know, I might have left this out.  The

16  medical examiner comes and collects the body.

17  So, you know, anything like evidence on the

18  body.  In Ohio here, the medical examiner is the

19  only one that has the right to search the body

20  unless they're in your presence.  So after the

21  scene is secure, interviews are done, and

22  they'll leave.

23       Q.    Okay.  What happens next?

24       A.    It depends on what was collected and

25  what information you obtained.  A lot of it --

Page 89

1   information, with the cell phone technology, we

2   can get a search warrant for cell phones and try

3   to see who the person has been contacting.  We

4   try to get information from whoever, if there's

5   someone to interview on scene, if they know

6   anybody, names, hanging out with, associates,

7   stuff like that.  Just trying to obtain

8   information to try to get the person that caused

9   this.

10          Q.    What happens next in terms of the

11   investigation?

12          A.    Some investigations, like I said, it

13   could turn into you finding out who the person

14   was, the drug dealer.  Some investigations, you

15   might not have anything to go on, and those

16   will, you know, sit until -- for information,

17   only until you can get some more information.

18   Obviously you wait for the medical examiner's

19   report to come back to tell you exactly what it

20   was.

21          Q.    Do you know how many -- how many

22   arrests has the sheriff's department made based

23   out of investigations from overdose scenes, if

24   you know?

25          A.    No, not offhand I don't know.

1          Q.    Have there been arrests made as a

2     result of investigations into overdose scenes?

3          A.    We -- as a matter of fact, last

4     week -- it made the papers -- they arrested a

5     guy that was selling fentanyl and heroin.

6          Q.    Where?  Here in Cuyahoga County?

7          A.    Yes.

8          Q.    That was someone -- who arrested

9     him, someone in the sheriff's department?

10         A.    Yeah.  My detectives arrested him.

11         Q.    Okay.  And this was a guy who was

12    selling -- where was he getting the heroin?

13         A.    I don't know where he got the heroin

14    from.

15         Q.    Okay.  And the fentanyl that he was

16    getting, was that like illicit fentanyl as

17    opposed to it wasn't prescription?

18              MR. BADALA:  Objection to form.

19         Q.    Was it prescription fentanyl that he

20    was selling?

21         A.    We don't know where he got the

22    fentanyl.

23         Q.    Do you know what form the fentanyl

24    was in?  Was it a pill, patch?

25         A.    It was powder.

Page 91

1          Q.     Powder.  All right.

2                 And how did it -- how were the

3    people in your department able to find this guy

4    and arrest him?

5          A.     I'm not familiar with the exact

6    circumstances that led them to the search

7    warrant.  I was briefed on that.  It was from an

8    overdose scene that they investigated, and an

9    important piece of evidence they were looking

10   for was his phone -- they did get the phone --

11   and trying to link that to the deceased

12   overdose.

13         Q.     The person that was arrested was --

14   is it a he?

15         A.     He, yes.

16         Q.     Was he a doctor?

17         A.     No.  I'm sorry.  Not that I'm aware

18   of.

19         Q.     Okay.  Did he work at a pharmacy?

20         A.     I don't know where he worked.

21         Q.     Or a distributor?

22         A.     Again, I don't know his background.

23         Q.     Okay.  Do you know where he was

24   arrested?

25         A.     Yes.

1          Q.     Where?

2          A.     It was an apartment in Rocky River.

3          Q.     Does the sheriff's department keep

4   track of the number of arrests that are made for

5   drug offenses, I guess?  Would this be an arrest

6   for a drug offense, this guy who was arrested?

7          A.     Yes.

8          Q.     Okay.  Do you keep track of the

9   number of folks that the sheriff's department

10  arrests for those kind of offenses?

11         A.     Statistics for drug arrests in the

12  unit?

13         Q.     Yes.

14         A.     Yes, there are statistics.

15         Q.     Who keeps those?

16         A.     It's probably usually the

17  supervisor, immediate supervisor of the unit.

18         Q.     So that would be?

19         A.     The sergeant.

20         Q.     Oh, the sergeant, okay.  Remind me

21  who the sergeant is.

22         A.     Right now it's Sergeant Hirko.

23         Q.     Hirko.  All right.

24                Have I asked you -- have you ever

25  served on any task force related to narcotics?

1          A.     No.

2          Q.     And if I say "narcotics," in your

3     mind would that include like -- you testified

4     earlier that prescription drugs are something

5     you're looking into.  Would you include those

6     within narcotics?  I didn't mean to be excluding

7     them.

8          A.     Yes.

9          Q.     Okay.  Have you -- has the sheriff's

10     department ever responded to an overdose where

11     the person overdosed on prescription narcotics?

12          A.     I'm not aware of every toxicology

13     report that we've responded to, so I don't know.

14          Q.     Are you aware of any arrests the

15     sheriff's department has made that stemmed out

16     of an investigation of someone who overdosed on

17     prescription narcotics?

18               MR. BADALA:  Objection to form.

19          A.     No, I'm not aware.  I don't know.

20          Q.     Okay.  Do you know whether the

21     sheriff's department has ever investigated any

22     physicians relating to prescription narcotics?

23          A.     Since I've been in the unit, I was

24     never briefed on those, investigating

25     physicians.

1          Q.    Same question, investigated any

2     pharmacies?

3          A.    Same answer.  Not that I'm aware of

4     since I've been in charge.

5          Q.    And same question, investigated any

6     distributors?

7          A.    Again, not that I'm aware of since I

8     took over.

9          Q.    And investigated any manufacturers

10    of prescription medications?

11         A.    Not that I'm aware of since I've

12    been in charge of the unit.

13         Q.    Let's see.  The alert that triggers

14    the scene investigation, that comes from the

15    county medical examiner; is that right?

16         A.    Yes.

17         Q.    Is that Mr. Shannon?

18         A.    He works for the medical examiner.

19    I'm not sure if he's the actual one sending the

20    alert.  I don't know who actually the person

21    typing in the alert is, but it comes from their

22    office.

23         Q.    All right.  So is that the only way

24    the alert gets to the sheriff's department is

25    through the e-mail?

1      A.    It's e-mail, and you can set it up

2  so you receive a text as well.

3      Q.    Okay.  So I guess you guys have to

4  be checking your phones and e-mails frequently?

5      A.    Well, you hear it.  I mean, you hear

6  it go off.

7      Q.    Does it have a special alarm

8  associated with it as opposed -- you know, like

9  sometimes you get an Amber alert and your phone

10  goes nuts.

11      A.    It probably depends how you set up

12  your phone.  Mine is just a regular text like

13  any other text that comes through.

14      Q.    All right.  And is there a protocol

15  within the sheriff's department for making sure

16  that -- it sounds like a lot of people are

17  getting the e-mail.  How do you know -- how does

18  it get decided, okay, you two men or women are

19  the ones tasked with responding to the scene?

20      A.    So in our department we have it set

21  up where the detectives that are on duty during

22  the day will respond to it.  We also have two

23  detectives that are -- works a different shift.

24  They're an afternoon shift until the nighttime.

25  And then we have detectives, the same ones or it

Page 96

1   can vary, depending on, you know, vacation and

2   stuff, that are on call to respond to that, and

3   that's -- it's a 24/7 operation for us.

4        Q.    I can't remember -- sorry -- if I

5   finished asking you the question I intended to.

6   I jumped around.  Have you ever served on any

7   task force -- task forces relating to narcotics?

8        A.    No, I have not.

9        Q.    Have we -- we talked about some of

10  the sheriffs -- the deputy sheriffs who are

11  assigned to other task forces.  I want to make

12  sure we've exhausted that list.  Are you

13  familiar with something called -- let me strike

14  everything I just said and ask a different

15  question.

16           Are you familiar with something

17  called the Cuyahoga County Opiate Task Force?

18       A.    Yes.

19       Q.    What is that?

20       A.    Well, the sheriff's department is

21  part of that.  I've been to some meetings on

22  behalf of the sheriff.  And that's just

23  department heads within Cuyahoga County coming

24  together, meeting.  I want to say it's like once

25  or -- a month or once every couple months, and

Page 97

1   just discussing the resources and what's being

2   done or what can be done to put an end to the

3   opiate epidemic, I guess.

4        Q.    How long has that task force been in

5   place?

6        A.    Since about -- when I was promoted

7   as lieutenant it was in place.

8        Q.    Okay.  Do you know how much further

9   before that?

10        A.    No, I don't.

11        Q.    When is the first -- are these

12   in-person meetings?  Does the task force have

13   in-person meetings?

14        A.    Yes.

15        Q.    Where do they do those?

16        A.    The ones I attended, which was a

17   couple, at the Federal Building.

18        Q.    Okay.  Is there -- does someone

19   chair the meeting?  Is there a head of that task

20   force?

21        A.    The one I -- yeah.  There's --

22   there's the U.S. Attorney's Office.  Her name is

23   Carole Rendon.  The ones I was at, she was

24   involved.  She chaired it.

25        Q.    Did you actively participate in --

Page 98

1    have you actively participated in any of these

2    meetings, where you got up and -- I don't know

3    if you stand up, but you said here are my

4    thoughts or here's something I have to report?

5              A.    I don't remember standing up giving

6    a briefing on anything.  Usually introductions

7    are made in case there's somebody there that

8    hasn't been there before.  They give you a brief

9    briefing on what, you know, the events they're

10   about to talk about and the events that were

11   talked about at the last meeting.  Like I said,

12   Gary Gingell from Cleveland Police is there, and

13   there's some other -- a couple judges attend it.

14             Q.    Is there anybody from DEA?

15             A.    Yes.  Keith Martin has attended it

16   before.  So it's -- there's a little agenda.

17   And then there's civilians, you know, with

18   certain programs that attend it as well.  So

19   it's just -- it's a roundabout table talking

20   about -- we can bring up anything you want,

21   whatever to try to end this.

22             Q.    Can you remember any discussions

23   at -- from these opiate task force meetings

24   where prescription opioids have been the

25   subject?

Page 99

1        A.    I don't remember specifics from the

2    meeting, but it's talked about.

3        Q.    What do you remember being talked

4    about, if anything, relating to prescription

5    medications?

6        A.    Probably treatment for individuals,

7    I think, was discussed.

8        Q.    What do you mean by that?

9        A.    The judges usually brought up

10   treatment for individuals that come in their

11   courtroom that are charged with either

12   prescriptions or heroin or stuff that's related

13   to overdoses.

14       Q.    And when you say "treatment," what

15   do you mean?

16       A.    Rehab.  You know, their drug

17   addiction treatment.

18       Q.    Got it.

19             Anything else -- any other

20   discussions that you can remember from these

21   opiate task force meetings relating to

22   prescription medications?

23       A.    I haven't attended one in a while,

24   so not that I remember.

25       Q.    Is there someone from the sheriff's

1   department who -- who is the principal person

2   who normally goes to the opiate -- the opiate

3   task force meetings?

4        A.    The sheriff is usually invited, and

5   like I said, I would represent him.  The chief

6   has gone to a couple, I believe.

7        Q.    Have you ever been asked by the

8   chief for a briefing -- the chief said, "I'm

9   going to this task force meeting, anything I

10  should be aware of," like getting input from you

11  before he goes to the meeting?

12       A.    No, he's never asked me that.

13       Q.    Same question for the sherriff.  Has

14  he ever asked you for input?

15       A.    No.

16       Q.    Do you know whether the sheriff's

17  department provides any information to the task

18  force?

19       A.    I have never provided information.

20  I don't know if they have when they've attended.

21       Q.    Do you get -- you said you get an

22  agenda.  For the times you participated, there

23  was an agenda?

24       A.    Yes.

25       Q.    Was that something you got in

1  advance?

2          A.    Yes.

3          Q.    And are there minutes?  Do you get

4  minutes of the meetings afterward?

5          A.    I don't think there is minutes.

6  It's a pretty generic agenda of what was talked

7  about at, I think, the last meeting, what they

8  want to talk about at this meeting.

9          Q.    And how about within -- shifting

10 gears a little bit, staying on the topics of

11 minutes, and we can look at them in a little

12 bit, but I've seen some minutes of sheriff's

13 department meetings.  Have you ever seen minutes

14 of meetings just within your sheriff's

15 department about -- I'll finish the question

16 there.

17         A.    No.  Go ahead.

18         Q.    That was the question.  Have you

19 ever seen minutes?

20         A.    Yes, I have.

21         Q.    All right.  Who -- do you know who

22 prepares those?

23         A.    The sheriff's secretary, when we

24 have a staff meeting, takes care of those.

25         Q.    Okay.  How often do you have staff

```
                                           Page 102
 1    meetings?
 2         A.    Once a month.
 3               Within the sheriff's department?
 4         Q.    Yes.
 5         A.    Yeah, once a month.
 6         Q.    Okay.  And how long -- who -- to
 7    what rank -- what ranks attend the staff
 8    meetings?
 9         A.    On the law enforcement end, there's
10    actually two staff meetings.  One is a law
11    enforcement staff meeting and then there's an
12    all staff meeting.  The all staff meeting is the
13    one we're referring to where they take the
14    minutes.  In law enforcement it's lieutenants
15    and above attend it.
16         Q.    Are there minutes kept of the law
17    enforcement meetings?
18         A.    No.
19         Q.    Are there agendas submitted ahead of
20    time?
21         A.    No.
22         Q.    Are there any pieces of paper
23    whatsoever related to the law enforcement staff
24    meetings?
25         A.    No.
```

1        Q.    All right.  And you said that the
2   all staff meetings are once a month?
3        A.    Yes.
4        Q.    Is it a set -- it's always the
5   second Tuesday of every --
6        A.    It's -- yeah, it is -- I don't
7   remember what day it is.  I think it's usually
8   on a Wednesday, so I think it's the first
9   Wednesday of every month.
10        Q.    All right.  And is there an agenda
11   sent around ahead of time?
12        A.    No.
13        Q.    Are you expected to -- how do you
14   know what, if anything, you're supposed to cover
15   at the staff meeting?
16              MR. BADALA:  Objection to form.
17        A.    I guess it's up to the supervisor to
18   just give updates on what's going on.
19        Q.    So let's -- the all staff meetings,
20   can you recall any all staff meeting at the
21   sheriff's department where prescription
22   medications were discussed?
23              MR. BADALA:  Objection to form.
24        A.    I don't remember.
25        Q.    And how about law enforcement staff

1    meetings; can you remember any law enforcement

2    staff meeting where prescription medications

3    were discussed?

4         A.    No, I don't remember.

5         Q.    Okay.  And have you gone to -- you

6    said the law enforcement staff meetings were

7    lieutenant and above.  So have you regularly

8    participated in those since you were promoted to

9    lieutenant?

10        A.    Yes.

11        Q.    All right.  On the drop box program,

12   does that -- I guess who, if anybody -- do they

13   inventory what is turned in in the drop boxes?

14        A.    Inventory it?

15        Q.    Yes.

16        A.    As far as marking what pills or --

17   no.  They weigh it.  That's about all they do.

18        Q.    And how is it -- how is that

19   material destroyed?

20        A.    There's several ways we get -- do

21   it.  We used to take it to Charter Steel, which

22   is a steel mill, and they used to burn it for

23   us.  They no longer do that.  We have a company

24   called Ross Disposal we've taken it to.  They're

25   located, I think, at the Elyria/Lorain area.

Page 105

1    I'm not sure if you're familiar with the area.

2         Q.    Yes.

3         A.    They'll dispose it.  And then now

4    currently, the DEA -- we're turning it over to

5    the DEA.  I think it's set up for like two or

6    three times a year we're going to turn

7    everything over to them and let them destroy it.

8         Q.    Do you have any involvement with the

9    High Intensity Drug Trafficking Area Task Force?

10        A.    Me personally?

11        Q.    Yes.

12        A.    We have a detective assigned to it,

13   so I guess if I oversee the narcotics division,

14   that it flows up the chain, yeah.

15        Q.    What do you understand the mission

16   or the purpose of that task force to be?

17        A.    They mainly deal with interdictions.

18   It could be hotel interdictions.  And I think

19   that's their -- you know, that's what they do.

20        Q.    What do you mean by interdiction?

21        A.    Hotel or motel interdictions.  If we

22   get complaints from either hotel management or

23   citizens, wherever, of any drug activity going

24   on inside the hotel or motel, they'll set up on

25   it and investigate it.

```
 1        Q.    Okay.  Is there a lead agency within
 2   that task force, to your understanding?
 3        A.    I believe Cleveland Police
 4   Department leads that.
 5        Q.    Okay.  Do you know what -- is there
 6   a principal drug or type of drugs that that task
 7   force is focused on?
 8        A.    No.  All drugs.  I don't know that
 9   they specify one or not.
10        Q.    Marijuana?
11        A.    It could be.
12        Q.    Cocaine?
13        A.    Could be, yes.
14        Q.    Would that include prescription
15   medications?
16        A.    It would be whatever they came
17   across.  Just like any other law enforcement,
18   something illegal, they act on it.
19        Q.    All right.  Have you ever personally
20   arrested anybody for any offense related to
21   prescription medications?
22        A.    Not that I remember, no.
23        Q.    Have you ever arrested anybody
24   related to -- for an offense related to
25   marijuana?
```

1     A.    Yes.

2     Q.    Cocaine?

3     A.    Yes.

4     Q.    Heroin?

5     A.    Yes.

6     Q.    Fentanyl?

7     A.    No.

8     Q.    The cocaine, marijuana, heroin

9  arrest, was that when you were -- when did you

10  make those arrests?

11          MR. BADALA:  Objection to form.

12     A.    During my time in narcotics, but as

13  far as marijuana, that's kind of throughout your

14  career, and probably cocaine and stuff like

15  that.  It's throughout your career as law

16  enforcement.  I can't give you specific dates or

17  times, but it's occurred over time.

18     Q.    Okay.  Are you familiar with

19  something called STANCE, Standing Together

20  Against Neighborhood Crime Everyday?

21     A.    Yes.

22     Q.    Do you have any -- what is that?

23     A.    Again, it's the department heads get

24  together.  I've -- have not attended one of

25  those so I don't know what's discussed in those.

1      Q.    Okay.  Are you -- do you have any --
2  does the sheriff's department participate in
3  STANCE?
4      A.    Yes.  I believe the chief or sheriff
5  attend those, or the other captain.  I have not.
6      Q.    Do you know whether STANCE has
7  anything to do with narcotics?
8            MR. BADALA:  Objection to form.
9      A.    I have not attended a meeting, so I
10  don't know.
11      Q.    All right.  To your understanding,
12  it's either the sheriff or the deputy who would
13  represent the sheriff's department at STANCE
14  meetings?
15      A.    From what I understand, it's the
16  sheriff, Chief Deputy Taylor, or the other
17  captain, Captain Peters, would have attended one
18  of those.  I have not.
19      Q.    Okay.  Do you -- have you ever
20  served on the Cuyahoga County Drug Board Court
21  Advisory Board?
22      A.    Have I served on it?
23      Q.    Yes.
24      A.    No.
25      Q.    Would it surprise you if you were

1    listed on their listing of the advisory board?

2    Let me -- I'll back up.

3              Do you know what the drug court,

4    county drug court does?

5         A.    Yeah.  The term you used kind of

6    confused me.  What did you call it?  I'm sorry.

7         Q.    I called it the county drug court

8    advisory board.

9         A.    Okay.  It's just referred to as drug

10   court.  That's why it kind of confused me.

11        Q.    Fair enough.  I'm really not trying

12   to trick you.

13             Do you have any involvement with the

14   drug court?

15        A.    Right now, no.

16        Q.    Have you ever?

17        A.    Yes.

18        Q.    Describe for me your involvement

19   with the drug court.

20        A.    I can't remember what year.  It was

21   after I was a lieutenant in charge of the

22   uniform courts division.  The judges requested a

23   couple of our deputy sheriff's that work in the

24   courtrooms to specifically work their

25   courtrooms, which they were in charge of, you

1   know, drug court obviously.

2        Q.    Yes.

3        A.    We gave them -- we gave them two

4   deputies we felt would do the best job for them

5   and assigned them to that.

6        Q.    What were the judges looking for?

7        A.    Someone that would talk to the

8   offenders, maybe go check on them.  Kind of --

9   whatever kind of the judge requested that they

10  wanted -- that they would do.

11       Q.    Okay.  And so are there currently

12  deputies from the sheriff's department who are

13  what, assigned to the drug court or is part of

14  their responsibilities?

15       A.    Since I'm not in charge of courts

16  anymore, I don't know if they still have

17  deputies assigned to that or not.

18       Q.    When you were assigned to courts, is

19  that court security -- I'm looking at the org

20  chart, Exhibit 1.  Which group would that be?

21       A.    I'm just making sure it's not called

22  something else here.

23       Q.    Sure.

24       A.    Yeah, it would be court security.

25       Q.    Okay.  When you were in charge of

Page 111

1  court security, the people you identified as the

2  ones who would be good for that role, were they

3  affiliated with the narcotics division?

4         A.    No.

5         Q.    Is there any -- any coordination at

6  all between the court security and the narcotics

7  division?  I mean, did the court security people

8  learn anything in that role that could be

9  helpful to the narcotics division in its

10  operations?

11             MR. BADALA:  Objection to form.

12        A.    I'm not aware they had

13  communications with each other.  I don't know.

14        Q.    Okay.  So how long were you involved

15  with the drug court?

16        A.    When I was promoted to captain, so

17  it was a couple of years.

18        Q.    Okay.  Did you ever go to meetings

19  related to the drug court, whether they were

20  officially called an advisory board or something

21  else?

22        A.    No, I did not.

23        Q.    All right.  Have you heard of

24  something called the Heroin and Opioid Action

25  Plan Committee?

Page 112

1          A.     No.

2          Q.     We'll come back to that.

3                 Do you know, the folks -- so does

4     the sheriff's department get any funding that's

5     related to having members of the sheriff's

6     department that are assigned to task forces?

7          A.     I'm sure the overtime that the task

8     force officers can accrue are paid for by those

9     agencies up to a certain limit.  I don't know if

10    that answers the question or not.

11         Q.     That helps, yes.

12         A.     As far as grants for them to be on

13    these task forces, I'm not aware -- the

14    sheriff's department, we pay their salaries,

15    their regular salaries.

16         Q.     Does the sheriff's department have

17    any other expenditures other than the salaries

18    of the people participating in the task force

19    relating to the operations of the task force?

20                MR. BADALA:  Objection to form.

21         A.     We're still responsible for

22    equipment, their gun, ammunition, vest, any type

23    of equipment that the normal officer would need.

24    We're still responsible for all that.

25         Q.     Okay.  Anything else?

Page 113

```
 1        A.     Not that I can think of.
 2        Q.     Okay.  Do you know whether the
 3   sheriff's department ever gets any funds that
 4   relate in some way to money or property that any
 5   of these task forces are able to seize or obtain
 6   by forfeiture as a result of their
 7   investigations?
 8              MR. BADALA:  Objection to form.
 9        A.     Yes.  We do receive part of any
10   seizures.
11        Q.     Okay.  Do you know how much in any
12   particular year?
13        A.     No.
14        Q.     Who would know the answer to that?
15        A.     Our fiscal head, Donna.
16        Q.     Donna.  That's Donna Kaleal?
17        A.     Yes.
18        Q.     Okay.  Does the -- are you aware of
19   any grants of any sort that the sheriff's
20   department, the Cuyahoga County Sheriff's
21   Department, have received that relate at all to
22   narcotics?
23              MR. BADALA:  Objection to form.
24        A.     No.  I'm -- not firsthand knowledge,
25   no.
```

Page 114

1          Q.    Okay.  Secondhand knowledge?
2          A.    I would imagine something -- there
3    might be a grant for the medical staff in the
4    jail.  I don't know.
5          Q.    And how about grants related to the
6    investigation of drug offenses?  Does the
7    sheriff's department receive any state funding
8    for that?
9          A.    Not that I'm aware of.
10          Q.    Okay.  And how about federal
11    funding?
12          A.    Not that I'm aware of.
13          Q.    Okay.  Does the sheriff's department
14    itself seize -- ever seize money or other
15    property in connection with drug-related
16    investigations?
17                MR. BADALA:  Objection to form.
18          A.    Yes.
19          Q.    And does that -- the proceeds of any
20    of those forfeitures, do those go back into the
21    sheriff's department budget then?
22                MR. BADALA:  Objection to form.
23          A.    Yes.
24          Q.    Okay.  Do you know what the
25    magnitude is of those -- the value of those

Page 115

1    seizures or forfeitures?

2         A.    I don't understand that question.

3         Q.    I'm trying to figure out how much

4    money the sheriff's department makes, for lack

5    of a better term, as a result of its operations

6    which lead to forfeitures and seizure of money

7    and other things.

8         A.    I get briefed on what's in the

9    accounts that we have.  Anytime there's a

10   deposit, a forfeiture deposit into our -- the

11   law enforcement trust fund is what it's called,

12   the sergeant in charge of our evidence and

13   forfeitures will include me in an e-mail

14   stating, you know, how much was put in there.

15        Q.    All right.  Do you know what the

16   approximate balance of that fund is?

17        A.    No.  I have not been briefed lately

18   on it.

19        Q.    Who is the sergeant that's in charge

20   of that?

21        A.    Sergeant Devlin is in charge of our

22   evidence/forfeiture.

23        Q.    What's that fund used for?

24        A.    Training, equipment is the main two.

25   Sometimes out-of-town training.  It pays for

Page 116

1   flights, stuff like that.

2        Q.    Okay.  Do you know where -- where

3   does the sheriff's department -- where does the

4   money to fund the sheriff's department's

5   operations come from?

6        A.    The complete -- the whole sheriff's

7   department?

8        Q.    Sure.

9        A.    Okay.  We're budgeted through the

10  county for that.

11       Q.    Okay.  And then within the

12  sheriff's -- is there a budget within a budget

13  for the sheriff's department specific to

14  narcotics?

15            MR. BADALA:  Objection to form.

16       A.    No.

17       Q.    Or to the narcotics division?

18       A.    No.

19       Q.    How, if at all -- are there any

20  sub-groups within the sheriff's department that

21  have budget allocations that roll up into the,

22  you know, budget for the entire department?

23            MR. BADALA:  Objection to form.

24       A.    As you see on the org chart, there's

25  several divisions.

Page 117

1         Q.    Yes.

2         A.    I don't know if there's a budget

3    allocated for each division.  That would be a

4    question for fiscal, so --

5         Q.    Does the law enforcement division

6    have a budget within the sheriff's department

7    overall budget?

8         A.    I'm not aware how -- how she keeps

9    track of each division.

10        Q.    Do you have to ever submit any

11   financial information to Ms. Kaleal?

12        A.    No.

13             MR. BADALA:  Good time to take a

14   five-minute break?

15             MR. BLOCK:  Yes.  Sure.

16             THE VIDEOGRAPHER:  Off the record,

17   11:07.

18                   (Recess had.)

19             THE VIDEOGRAPHER:  On the record,

20   11:22.

21   BY MR. BLOCK:

22        Q.    Captain Gerome, you had mentioned,

23   when you were talking about the narcotics

24   division responding to overdose scenes, that

25   there are some jurisdictions where, I guess, the

1  sheriff's department is invited, and there are

2  others which have said they want to handle it on

3  their own.  So what are -- take it either way,

4  but I'm just trying to figure out what that

5  dividing line is.  What jurisdictions are

6  sheriff's department folks responding to

7  overdose scenes in now?  Or if it's easier --

8          A.    It's probably easier to go the other

9  way with it because there's, I think, 58

10 municipalities, townships.  I have a hard time

11 naming all 50 something of them that we do

12 respond to.

13          The main ones that we don't respond

14 to is the Cleveland -- the City of Cleveland.

15 They handle their own investigations.  Another

16 couple large ones is the Lakewood Police

17 Department, the Parma Police Department, Parma

18 Heights now, that I think I mentioned before.

19 Westlake Police Department handles their own.

20 And then there's a few smaller suburbs on the

21 east side who have kind of banded together, come

22 up with their own little mini task force.  I

23 don't know the acronym that they call

24 themselves, but it's like the Mayfield, Mayfield

25 Heights, Gates Mills community out there, which

Page 119

1    they've come together and they'll investigate

2    their own.

3              I'm sure I'm missing one or two, but

4    those are the ones that stand out right now.

5         Q.    Thank you.

6              And has that -- you mentioned Parma

7    Heights is a relatively new addition to that

8    list.  The others, has that been the case since

9    you were a lieutenant?

10        A.    When I took over the division,

11   those -- they were still handling theirs.

12        Q.    Okay.  We talked about one thing the

13   detectives do on the scene is they interview

14   folks.  I assume that's -- that they can only

15   interview people if there are people there on

16   the scene.  What, if anything -- what, if any,

17   interviews are done in a situation in which

18   there's no one to interview at the scene?  Do

19   they go back and try to find folks to talk to?

20   Do they do follow-up interviews after the

21   on-the-scene investigation, if that makes sense?

22        A.    Yeah.  I mean, identifying the

23   bodies is important, first of all.  With the

24   help of the medical examiner, we'll do that.  I

25   mean, every scene is different.  If the case is

1   where there's nobody and maybe it was a welfare

2   check or something like that, where the police

3   found them, you know, interviewing neighbors,

4   trying to get -- you know, see if they can get a

5   hold of family members.  We always try to get a

6   hold of family members to do a notification as

7   well.  So, you know, follow-up would be

8   interviewing them and seeing what they know or

9   they don't know.  But in those cases, those are

10  the tough ones to solve if there aren't people

11  that we could talk to.

12       Q.    If there's an interview done, you

13  know, a day, a week after the scene, how does

14  that get -- how does that information get into

15  the file for that case?  Is there a supplemental

16  report that's submitted into Crime or, now, TAC?

17       A.    There could be a supplement report

18  depending on what information is given.  If it's

19  someone giving, you know, sort of acting as an

20  informant or something like that, you know,

21  we'll withhold some of the names, stuff like

22  that.

23       Q.    Sure.

24       A.    But yeah, that will be in a

25  supplement report if it helps in the

Page 121

1   investigation.

2        Q.    Is each investigation assigned a
3   different -- some sort of unique case number or
4   otherwise within your systems?

5        A.    No.  Our TAC system is just one
6   after another case number.

7        Q.    I guess I'll show you how much I
8   don't know about police investigative work.  But
9   if you respond to an overdose on -- if the
10  detectives respond to an overdose on Elm Street,
11  you know, in August, does that get a case -- you
12  know, that's case number 12 is the Elm Street
13  August overdose or -- so that if things happen
14  later, that they can trace back to it, all the
15  information gets collected associated with a
16  particular case, or does it just go into the
17  system chronologically?

18             MR. BADALA:  Objection to form.

19       A.    The case numbers are generated
20  chronologically, but if you do punch in an
21  address, a certain address, it will pop up
22  whatever -- whoever else might have entered
23  information on that location.

24       Q.    Okay.  I see.

25             We talked about the Crime database

1    and the TAC database.  Are there any other

2    databases in which information related to the

3    sheriff's department, narcotics investigations,

4    is input?

5          A.    I don't know if you consider it a

6    database.  We have spreadsheets where we keep

7    our -- track of our drop box program and our

8    heroin -- our drug overdose investigations.

9          Q.    What is in -- related to the drug

10   overdose investigations, what sort of

11   information is on this spreadsheet?

12         A.    It will give the address, the

13   decedent's name, case number, date it was

14   assigned.  It will have the detectives' names

15   that were assigned to it.  And there is a

16   comment section on -- either you can put input,

17   evidence taken, or if the report -- if the

18   medical examiner's report was given back.  It's

19   just maybe something that might have stood out

20   you can put in under the comments field.

21         Q.    Who maintains that spreadsheet

22   within the department?

23         A.    Right now, the -- each detective is

24   responsible for adding that information if

25   they're the lead detective responding to the

Page 123

1    scene.

2         Q.    As I understood your testimony, it's

3    one common spreadsheet that everyone in the

4    department has access to and each person puts a

5    row in if they're doing a case, or did I get

6    that wrong?

7         A.    The spreadsheet is not accessible by

8    everybody in the department.  It's for

9    supervisors and the narcotics division.

10             And I'm sorry.  What was the second

11   part of your question?

12        Q.    I was trying to figure out who

13   maintains it.

14        A.    The detectives -- like I said, the

15   detectives that are lead investigators will

16   update, and it's the supervisor, the sergeant's

17   responsibility, to make sure that that

18   information is being inputted.

19        Q.    Okay.  Who is -- is it on a shared

20   drive, somebody's computer?  If I wanted to go

21   today and get a copy of it, where would I go?

22        A.    It's on a shared drive.

23        Q.    Okay.  And do you know whether that

24   shared drive was searched in connection with

25   providing responsive documents for this

Page 124

1    litigation?

2         A.    I do not know.

3         Q.    Do you know what the file name is or

4    what it's called, this spreadsheet?

5         A.    I believe it's "Heroin Overdoses."

6         Q.    You mentioned it's heroin overdoses.

7    So is that -- is it a subset of the overdoses

8    that you're investigating or does any overdose

9    go onto the heroin overdose spreadsheet?

10        A.    Every overdose that we respond to.

11   That's just the name it was given.

12        Q.    And is that because the majority of

13   the overdoses turn out to be heroin or --

14        A.    I didn't come up with the name.  I

15   couldn't answer that.

16        Q.    Did that spreadsheet exist when you,

17   as a lieutenant, went over to the narcotics

18   division?

19        A.    They had some form.  I believe they

20   had some form of documentation they were keeping

21   on -- I preferred it to be on a spreadsheet so

22   it's more accessible to the supervisors and

23   myself.

24        Q.    And what's the purpose of having it

25   in the spreadsheet?  What, if anything, do you

Page 125

1   do with the spreadsheet?

2        A.    Statistics.  It's how we keep track.

3        Q.    Keep track of?

4        A.    The overdose we've -- our department

5   responds to.

6        Q.    Okay.  And who -- who, if at all, do

7   you report that info to?

8        A.    I view it.  There's always requests

9   for it.

10       Q.    Okay.

11       A.    So, you know -- I don't know.  I'd

12  have to go through all -- if it's public record,

13  because there's active investigations, but I

14  just -- it's just something I thought it's a

15  good idea to start keeping track of when I was

16  assigned there.

17       Q.    How many overdose -- how many

18  overdoses were on that spreadsheet, do you know,

19  for like -- for the last year, for 2017?

20       A.    2017, I believe we had over 70,

21  around that figure; 73 I think it was, something

22  like that.

23       Q.    And the overdoses on this

24  spreadsheet, would those only be overdoses to

25  which members of the county sheriff's department

1   responded to the scene?  In other words, it

2   wouldn't include overdoses in Parma Heights, if

3   they weren't asking you to --

4          A.    No.  It's strictly our department.

5          Q.    Okay.  How about calendar year 2018?

6   Do you know how many there have been thus far?

7          A.    I think we're up to a little over

8   50; 51, 52.

9          Q.    How about for 2016, if -- did you

10  have the spreadsheet in 2016?

11         A.    Yes.  It's -- yes.

12         Q.    Do you remember how many?

13         A.    I'm sorry.  I don't.

14         Q.    Do you know if it was more or less

15  than 2017?

16         A.    No, I don't know.

17         Q.    Is there a column in -- is there a

18  field somewhere in the spreadsheet that

19  identifies the drug or drugs on which the person

20  overdosed?

21         A.    I think there's a toxicology report,

22  yes or no, if you got it back yet, but again,

23  that's something with our record management

24  system.  We -- our new system that we keep track

25  of, that information gets inputted into there.

1          Q.    What system -- was that TAC?

2          A.    Yeah.  Yeah.  And, I mean, the

3    medical examiner's, you know, toxicology report

4    would come back.

5          Q.    Are there any other -- so we talked

6    about TAC and Crime and then this spreadsheet.

7    Are there any other databases in which

8    information related to these overdose

9    investigations is stored?

10         A.    Not that I'm aware of.  I don't know

11   if detectives have their own folders they keep

12   track of.

13         Q.    Have you heard of something called a

14   Law Enforcement -- LEADS, Law Enforcement

15   Automated Data System?

16         A.    Yes.

17         Q.    Is that something that the sheriff's

18   department has?

19         A.    Yes.

20         Q.    What kind of information is in

21   LEADS?

22         A.    LEADS is a database where you can

23   look up information basically on anyone that has

24   an Ohio identification, a driver's license, ID

25   card.  I think almost all law enforcement

1   divisions in Ohio have it.  Like I said, you can

2   look up -- if you make a traffic stop, that's

3   something that some of our deputies are

4   certified in and they can do it manually on the

5   mobile data terminal or they can call it into

6   our dispatch and they'll run it for you.

7          Q.    And what will -- what kind of info

8   will LEADS then give you about the individual

9   that you're running the inquiry on?

10         A.    Basically, the first thing that

11  comes up is their driving information.  The

12  stuff that's on your driver's license appears,

13  including a picture.  Your driving status,

14  whether you have a valid license or not.  I do

15  believe -- and I haven't been on it in a

16  while -- that your traffic information, past

17  traffic information for a certain amount of

18  years, will pop up.  If you have a warrant or

19  not.  Outstanding warrants will pop up.

20  Nowadays carry and conceal license will pop up

21  on it.  And that's all I can remember.

22         Q.    Anything -- can you get -- does

23  LEADS -- are you able to query LEADS to get any

24  sort of drug-related, crime-specific information

25  about --

1      A.    Yeah.  You would have to -- a

2  request -- what's called a CCH, criminal

3  history, and then you would get that person's

4  history.

5      Q.    Okay.  And I think you said you, at

6  the sheriff's department -- the sheriff's

7  department has access to LEADS?

8      A.    Some deputies are LEADS certified

9  and they can get that access on their own with a

10  LEADS terminal, but if not, our dispatchers in

11  our radio room are all certified in LEADS and

12  they can get that information for you and get

13  that to you.

14      Q.    Okay.  How about something called a

15  Law Enforcement Records Management System or

16  LERMS; does the sheriff's department have such a

17  thing?

18      A.    No, we do not.

19      Q.    Okay.  Do you know what -- are you

20  familiar with LERMS?

21      A.    I believe that's the Cleveland

22  Police database that they use.  Just like we use

23  our TAC, they use that.

24      Q.    Do you know whether the -- can the

25  Cleveland Police -- is there anyone at the

1  Cleveland Police Department that can look and

2  see what you guys have going on in TAC, you

3  know, log in or have access to?

4          A.     No, they can't.

5          Q.     All right.  And can you, at the

6  sheriff's department, log in to LERMS and

7  compare notes on what the Cleveland Police are

8  doing?

9          A.     No, not unless each agency creates

10  an account for that person.

11          Q.     Are you aware, does anyone at the

12  sheriff's department have access to the

13  Cleveland --

14          A.     I'm not aware of anyone, no.

15          Q.     Are you familiar with something

16  called the ARCOS database?

17          A.     Can you spell that?

18          Q.     I think it stands for Automation of

19  Reports and Consolidated Order System.

20          A.     I'm not familiar with that.

21          Q.     All right.  Then I think you've

22  answered my next question, but do you know

23  whether anyone at the sheriff's department has

24  access to the ARCOS database?

25                  MR. BADALA:  Objection to form.

Page 131

1          A.     I don't know.

2          Q.     All right.  You spoke -- you

3    testified earlier about the OARRS database, the

4    Ohio Automated RX Reporting System?

5          A.     Yes, sir.

6          Q.     And -- I can't remember if you told

7    me -- does anyone within the sheriff's

8    department have access to OARRS data?

9               MR. BADALA:  Objection to form.

10         A.     I'm not aware of anyone having that.

11         Q.     Okay.  Have you ever requested that

12   the sheriff's department get access to the OARRS

13   database?

14         A.     I have not requested it, no.

15         Q.     All right.  Do you know whether any

16   OARRS data has ever been shared with the

17   sheriff's department?

18              MR. BADALA:  Objection to form.

19         A.     I'm not aware if it has or not.

20         Q.     Do you have a view as to whether

21   information that's -- that OARRS tracks could be

22   helpful to the sheriff's department in terms of

23   narcotics investigations?

24              MR. BADALA:  Objection to form.

25         A.     In my view -- at our department, any

Page 132

1   type of tips or investigation that deals with
2   prescriptions, we usually turn that over to our
3   task force officer at the DEA.
4          Q.    What do you mean by that?  Give me
5   an example of a tip that relates to
6   prescriptions.
7                MR. BADALA:  Objection to form.
8          A.    I'm not aware of any tips that we
9   have received from prescriptions.  I'm not aware
10  of every tip that comes in.
11         Q.    I'm not trying to have you blab
12  secrets about pending investigations or
13  anything.  You testified, though, that if you
14  got info related to prescriptions, you would
15  turn it over to the task force member at the
16  DEA?
17         A.    Correct.
18         Q.    And I was just trying to figure out,
19  are you talking about like if there was -- if
20  there was a report that -- I don't know -- a
21  doctor was writing scripts for medications that
22  he really wasn't intending to have a medical
23  purpose, that's something you would turn over to
24  DEA?
25         A.    Yes.

1          Q.    Okay.  Has that -- has that been

2     your practice since you've been involved with

3     the narcotics division?

4          A.    I just think it's something that

5     specifically they investigate and that's why

6     he's over there.

7          Q.    Okay.

8          A.    I don't have -- I'm not aware of the

9     tips or anyone -- or us passing on those cases

10    to them.

11         Q.    Okay.  But if you got such a tip,

12    that's where you would direct it?

13         A.    Yeah.  The sergeant would probably

14    follow up with that, give that to the officer.

15         Q.    Okay.  Have you -- have you heard

16    of -- did I ask you about LEADS?  I did ask you

17    about LEADS.

18              How about the Ohio Law Enforcement

19    Gateway, or OHLEG, O-H-L-E-G?

20         A.    Yes.

21         Q.    Are you familiar with that?

22         A.    Yes, sir.

23         Q.    What kind of information is in

24    OHLEG?

25         A.    A little bit of the same information

1    from LEADS.  It's a database where you look

2    up -- you can put someone's -- whatever

3    identifier they have, name, date of birth,

4    Social Security Number.  And the same thing will

5    populate.  It will give information, driver's

6    license, driving status.  It would also give you

7    a background on his driving history.  There's

8    also other information on that, including the

9    training that I referred to earlier with the

10   online training.  We call it EOPATA.  And then

11   there's other stuff it puts out for information

12   for officers on it.

13        Q.    Does the sheriff's department have

14   access to the OHLEG gateway?

15        A.    Yes.

16        Q.    Is that something that folks within

17   the narcotics division ever use or access in

18   connection with their responsibilities?

19        A.    Yes.

20        Q.    How about the Ohio Incident-Based

21   Reporting System?  Are you familiar with that,

22   OIBRS?

23        A.    Yes, I'm familiar with it.

24        Q.    What is that?

25        A.    Now that we have our TAC RMS system,

1   it's kind of a stat keeping for the state.  If

2   you have a certain type of investigation,

3   there's little check blocks.  That information

4   will go to the state and they'll have that

5   statistics.  I think it keeps track of

6   statistics each law enforcement department is

7   working on.  An example could be how many

8   domestic violence cases are there in Ohio, stuff

9   like that.

10          Q.    Does your TAC system feed into the

11  OIBRS?

12          A.    Yes.

13              MR. BADALA:  Objection to form.

14          Q.    And do you ever -- do folks at the

15  sheriff's department ever use OIBRS in

16  connection with their work in investigating

17  drug-related -- doing drug-related

18  investigations?

19          A.    I don't know.  I don't know.

20          Q.    How about something called either

21  CRIS or C-R-I-S, the Cuyahoga Regional

22  Information System?  Are you familiar with this?

23          A.    Yes, I am.

24          Q.    What is that?

25          A.    That has kind of gone away.  I

1    really can't speak that much on it.  That's --

2    I'm not familiar with it as far as it's still in

3    use.  I don't even know if it's still in use.  I

4    think it was a gateway between LEADS and

5    Cuyahoga County, but I'm not that familiar with

6    it.

7         Q.    When did it go away?

8         A.    The past couple years.

9         Q.    So when do you remember --

10        A.    I should rephrase that.  I don't

11   know if it's went away or not, but you don't

12   hear about it, and I don't know anyone in our

13   department that uses it or it's still in use.

14        Q.    Did anyone at the sheriff's

15   department ever use it?

16        A.    I'm not familiar with what it did so

17   I don't -- I couldn't answer that.

18        Q.    Okay.  We have a lot of databases,

19   but let me ask you, the Regional Enterprise Data

20   Sharing System or REDSS, are you familiar with

21   that?

22        A.    That kind of took over for CRIS.

23        Q.    Okay.

24        A.    And that's where it's kind of

25   confusing.  I don't know where they're at, that

Page 137

1   stage, over there.

2        Q.    Is that something that the sheriff's

3   department has access to, the REDSS database?

4        A.    I'm not aware.  I'm sure we do, but

5   I'm not aware of anyone that does.

6        Q.    All right.  TipSoft, have you heard

7   of TipSoft?

8        A.    I believe that's our Crime Stoppers

9   database.  I don't know if that's still in

10  existence or not.  I'd have to check up on that.

11       Q.    Okay.  Do you know, does the

12  sheriff's department ever get tips about

13  narcotics-related activity?

14       A.    Yes.

15       Q.    And how does that happen?  How do

16  you get -- how do you get LEADS or tips?

17       A.    There's a new format with Crime

18  Stopper.  Well, for the department, it could be

19  a variety of ways we get tips versus our Crime

20  Stoppers program.  And that's electronically

21  sent to the supervisor of whatever area that

22  it -- the tip deals with.  We get tips through

23  our website, our e-mail.  There could be phone

24  calls, anonymous calls, or people give their

25  names, called in.  So all sorts of new ways to

Page 138

1  get tips.  And then we also -- we just came out

2  with a sheriff's app where you can submit a tip

3  as well.

4         Q.    Is there anyone within the sheriff's

5  department that's responsible for collecting and

6  keeping a record of all the tips that are coming

7  in, like do you have a -- is there someone who

8  keeps a log of everything that's been --

9         A.    Statistically, no.  I think the only

10 one that does is the Crime Stoppers division.

11 The other tips that come in, I don't -- there's

12 no stats kept on them.  They're just sent to the

13 individual department that deals with it.

14        Q.    Who -- which person or department

15 functions as the switchboard operator to figure

16 out, okay, I got this tip, I need to make sure

17 that someone in narcotics knows about it versus

18 someone in warrants or -- who does that?

19        A.    We -- we have a detective, Jamie

20 Bonnette, that does that.  He gets the tips

21 through e-mail and he'll send them to the

22 appropriate supervisor.

23        Q.    Okay.  Is that his principal -- he

24 or she?

25        A.    He.

Page 139

1          Q.     Is that his principal job?

2          A.     No.

3          Q.     Okay.  I mean, do you get -- do you

4    know if you get lots of tips a day or it's

5    like --

6                 MR. BADALA:  Objection to form.

7          A.     I don't know.

8          Q.     Okay.  Are you familiar with the

9    Ohio Local Law Enforcement Information Sharing

10   Network?

11         A.     You read it.  I'm looking.  I'm

12   trying to think of the acronym.

13         Q.     OLLEISN, something like that.

14         A.     I've heard of it, yes.  I'm not

15   familiar with it.

16         Q.     Okay.  Is that something you've ever

17   used?

18         A.     I don't know.

19         Q.     Do you know whether the sheriff's

20   department uses it?

21         A.     I don't know.

22         Q.     How about the -- we talked about the

23   HIDTA before.

24         A.     Yes.

25         Q.     Are you familiar with a Case

1   Explorer Opiate Database that HIDTA has?

2          A.     Yes.

3          Q.     All right.  What is that?

4          A.     I mentioned before, it's kind of a

5   deconfliction database, and that's for

6   investigative purposes.  Our detectives will use

7   it as a tool to try to deconflict and see if

8   someone else has a suspect, same area, or same

9   street, or something like that.  You can enter

10  any information you want into that.  You can

11  enter the victim's name.  You can enter the

12  suspect's name.  You can enter an address into

13  it.  And it's just information sharing with the

14  law enforcement agencies.

15         Q.     Can you just explain a little bit

16  more about what would happen next if someone at

17  the sheriff's office, I guess, puts a victim's

18  name in and it gets a hit in the HIDTA database?

19  What happens?  What do you do?

20         A.     It's probably not so much of a

21  victim's name, but if you have a suspect you

22  believe is involved in one of these fatal

23  overdoses --

24         Q.     Yes.

25         A.     -- and another detective from

1   another agency or something has that same

2   suspect, again, it's information sharing, try

3   to, you know, locate that back to the suspect

4   that sold that fatal dose.

5           Q.    So what is supposed -- what, if

6   anything, is the deputy in the sheriff's

7   office -- sorry.  Let me back up.  Can you, from

8   the sheriff's office, query the HIDTA --

9           A.    HIDTA, yes.

10          Q.    -- HIDTA database?

11          A.    We have detectives that have access

12  to it, yes.

13          Q.    And are your folks supposed to

14  access -- double-check the HIDTA database every

15  time they're focusing in on a suspect from one

16  of these overdose investigations?

17              MR. BADALA:  Objection to form.

18          A.    It's a tool for all law enforcement.

19  We advise them to put that information in and

20  try to gain -- you know, if you're working an

21  investigation, and see what else -- if someone

22  else is working the same thing.  Like I said,

23  it's information sharing.

24          Q.    So in a circumstance in which

25  someone looks to see if there's something in

1    HIDTA about a suspect and there is, what is

2    supposed to happen next, if anything, in terms

3    of sharing the information or coordinating the

4    efforts?

5              MR. BADALA:  Objection to form.

6        A.    Well, if you have the same suspect,

7    you're going to contact them and see what kind

8    of information they have on this person.

9        Q.    Okay.

10       A.    They may have been investigating an

11   overdose that happened in their jurisdiction,

12   basically deconflicting, and then also I believe

13   it shows maps of where overdoses have been

14   occurring just for crime stat purposes and

15   deconflicting and information sharing.

16       Q.    Does the sheriff's department put

17   any information into HIDTA?  In other words, are

18   you -- I understand that you can look to see

19   whether that task force is doing work

20   investigating someone.  Can that task force look

21   and see if you're doing work -- how would they

22   know if your deputies are investigating the same

23   person?

24             MR. BADALA:  Objection to form.

25       A.    I have never used the database.

1  I've been to -- I don't want to say a training,

2  but when it first rolled it, what they said it

3  can and can't do.  My understanding is if you

4  query an address or a person's name or something

5  like that, if that person or address has been

6  entered into the database, that will show up and

7  then you can go take it from there.

8      Q.    And I'm trying to figure out whether

9  the people in the -- your people who are doing

10  investigations, are they supposed to be kind of

11  putting any information into HIDTA so that

12  others would know that they're working on the

13  case?

14      A.    Yeah.  When this first rolled out,

15  the detectives were instructed to use this

16  database on every -- not just overdoses, but

17  heroin or pills, any type of investigation that

18  dealt -- that might link back to the overdose

19  epidemic.  Any type of that information should

20  be put into that system, because it was created

21  just for the information sharing amongst

22  departments.  When we started off, each agency

23  was kind of doing their own thing, and then the

24  department heads got together and said, hey, can

25  we -- could you guys create a database where we

1  could share information and hopefully put a dent

2  into this.

3       Q.    Do you know whether your TAC system

4  feeds into or can be accessed by the HIDTA?

5       A.    No.

6       Q.    Don't know or it can't be?

7       A.    I don't think it can be, no.

8       Q.    Okay.  Who's the subject matter

9  expert at the sheriff's department about the

10 HIDTA database?

11      A.    Expert?  I don't -- I don't know if

12 we have an expert.

13      Q.    Do you have somebody who's the

14 lead -- you said you got somebody who was

15 trained up on the database?

16      A.    Each detective in our narcotics

17 division as well as task forces went through a

18 training with it.

19      Q.    Okay.  Let's talk a little bit about

20 some of the -- hopefully, the successes that you

21 all have had at the sheriff's department in your

22 efforts in this area, narcotics.

23           I guess the first question, though,

24 is, during your law enforcement career has there

25 ever been a time when drug abuse was not a

Page 145

1    problem facing Cuyahoga County?

2              MR. BADALA:  Objection to form.

3         Q.   Drug abuse of any sort.

4              MR. BADALA:  Same objection.

5         A.   I don't know.  I don't know how to

6    answer that.

7         Q.   Okay.

8         A.   I don't know.

9         Q.   Well, what -- do you consider drug

10   abuse to be a problem for Cuyahoga County?

11             MR. BADALA:  Objection to form.

12        A.   I don't know.

13        Q.   What -- since you've been -- well,

14   when you were a detective in the narcotics

15   division, what -- are there any investigations,

16   arrests, results that you're particularly proud

17   of that either you personally or the division

18   was able to attain?

19             MR. BADALA:  Objection to form.

20        A.   I don't know if proud is the term.

21   I guess some satisfaction in arresting somebody

22   and -- you know, for conducting illegal activity

23   is kind of rewarding.  That's why we get into

24   the field.  But it's -- I think most officers,

25   it's their job.  You know, that's why they

Page 146

1  signed up.

2      Q.    Well, I guess --

3      A.    Not for the glory.

4      Q.    Probably not for the pay.

5      A.    Right.

6      Q.    But back -- back to that.  Are there

7  particular, then, arrests that you were involved

8  with when you were a detective that were

9  particularly satisfying -- I don't know --

10  particularly -- yeah, I'll just stop the

11  question there.

12          MR. BADALA:  Objection to form.

13      A.    I don't remember.  I don't remember

14  anything that -- standing out, no.

15      Q.    Any -- I guess I'll try it

16  different.  Any, you know, significant drug

17  busts that you made during that time?

18          MR. BADALA:  Objection to form.

19      Q.    Whether that was number of people,

20  amount of drugs, anything like that.

21          MR. BADALA:  Same objection.

22      A.    I don't remember.

23      Q.    Okay.  Well, how about, then, moving

24  forward, starting with your time as a lieutenant

25  going forward; are there any -- any

1    investigations or -- investigations, arrests

2    where -- that stand out to you as being

3    particularly satisfying in making a --

4    particularly satisfying?

5              MR. BADALA:  Objection to form.

6         A.    I don't remember any standing out to

7    the point where -- that I could -- you know, I

8    don't remember any standing out.

9         Q.    Okay.  If the -- is there a priority

10   within the narcotics division today in terms of

11   the type of narcotic activity that you're trying

12   to curtail?

13        A.    Yes.

14        Q.    What's the top priority?

15        A.    When I talk to the lieutenants and

16   the sergeants, our priority is the overdoses,

17   getting back to what's causing the overdoses.

18              When you talk to -- when you go to

19   these overdoses and the guys brief me on it, and

20   when you talk to the families, there's always

21   closure, they want something done.  So I

22   guess -- I can't speak for them -- I'm sure they

23   get some satisfaction if they do trace that back

24   to the person that sold that lethal drug or --

25   you know, give them closure, I guess.

1        Q.    And in that regard, is there --

2    within all of the different types of drugs that

3    are out there, is there -- my sense was -- I may

4    have this wrong.  I think I read it in one of

5    the opiate task force reports or something --

6    that heroin was one of the principal overdose

7    causes.  Is heroin a focus of the narcotics

8    division?

9        A.    Heroin, fentanyl, the beginning

10   opiate pills.  I think that all goes hand in

11   hand when you conduct some of these

12   investigations.  My guys told me, speaking to

13   families and stuff like that, they didn't start

14   off with just heroin.  So I think it all goes

15   hand in hand.

16       Q.    Where is the heroin -- the people

17   who are overdosing on heroin in Cuyahoga County,

18   where does the heroin come from; do you know?

19             MR. BADALA:  Objection to form.

20       Q.    How is it getting to Cuyahoga

21   County?

22             MR. BADALA:  Same objection.

23       A.    I don't know.  I don't know.  I

24   couldn't answer that.

25       Q.    Same question for the fentanyl?

Page 149

1            MR. BADALA:  Objection to form.

2        A.    Again, I don't know.

3        Q.    Okay.  And same question for the

4   prescription medications?

5            MR. BADALA:  Objection to form.

6        A.    Just based on the interviews you

7   conduct, it's -- it's coming from usually some

8   type of injury they had had in the past, and I

9   guess that stems into the illegal drugs.

10        Q.    Are the folks who are investigating

11   these overdose scenes -- are they supposed -- do

12   they ask whether the victim, the decedent, used

13   alcohol?

14        A.    I think they -- I mean, I can't

15   speak for what they're exactly saying, but I

16   think they inquire about their past, whether it

17   be alcohol, drug abuse or anything that can help

18   out with the investigation.  Sometimes that

19   information is offered, especially if it's a

20   family member that you're talking to.  They'll

21   let you know.

22        Q.    Did they ask about, like, nicotine

23   addiction?

24        A.    It's possible.

25        Q.    You don't know one way or the other?

Page 150

1        A.      I don't know.

2        Q.      Okay.

3                        -     -     -     -     -

4                (Thereupon, Gerome Deposition

5                Exhibit 2, E-Mail String Beginning

6                Bates Number CUYAH_00018717, was

7                marked for purposes of

8                identification.)

9                        -     -     -     -     -

10       Q.      Captain, take a minute to look at

11  this.  I'll preview for you.  I had asked you

12  earlier about -- if you knew about something

13  called the Heroin and Opioid Action Plan

14  Committee.

15       A.      Okay.

16       Q.      I'm going to describe this for the

17  record.  Please take a look at it.  Not a lot of

18  text, a lot of e-mails.  But this Gerome Exhibit

19  2 is an e-mail chain from -- the most recent in

20  time of which was from Hugh Shannon on August

21  5th, 2016 to a whole bunch of people.  It bears

22  Bates label CUYAH 118717 through 719, and, sir,

23  you're included at least in the first e-mail 14

24  lines down right before Captain Michalosky.

25       A.      Okay.

1      Q.    Let me know when you've had a chance
2   to look at this.  My question is going to be
3   whether this triggers any memories for you about
4   what the Heroin and Opioid Action Plan Committee
5   is.
6          A.    Okay.
7          Q.    So does that trigger any memory
8   bells about a heroin -- sorry, Heroin and Opioid
9   Action Plan Committee?
10         A.    Yes, it does.
11         Q.    Okay.  What is -- what is that
12  committee?
13         A.    I think -- I might have referred to
14  it with Carole Rendon heading up the committee.
15  I don't know if that's the same name that we
16  discussed before or not, but this is what I was
17  referring to, that she was at the U.S.
18  Attorney's Office.  We used to meet.
19         Q.    Used to meet?
20         A.    Well, I've attended meetings on
21  behalf of the sheriff.
22         Q.    Okay.
23         A.    I think we referenced it earlier.
24         Q.    Yes.  Do you remember how many
25  meetings that you attended?

Page 152

1          A.     I don't remember.

2          Q.     This is something different, though,

3    from the county opiate task force or -- is that

4    right, if you know?

5          A.     I'd want to say they're either very

6    similar or it's the same group, just a different

7    name.

8          Q.     And the first e-mail references from

9    Mr. Shannon -- do you know Mr. Shannon, Hugh

10   Shannon?

11         A.     Yes, I do.

12         Q.     Where does he work?

13         A.     The medical examiner's office.

14         Q.     Okay.  Is he a doctor; do you know?

15         A.     I don't know.

16         Q.     His e-mail to everyone from August

17   of 2016, the last sentence says, "At this time,

18   nothing out of the ordinary has been detected by

19   our labs other than the deadly heroin and

20   fentanyl and combinations we have been seeing."

21              Do you have an understanding as to

22   what the reference to "deadly heroin and

23   fentanyl and combinations" --

24              MR. BADALA:  Objection to form.

25         Q.     -- is?

1                    MR. BADALA:  Objection to form.

2          A.    I'm sorry.  Could you repeat it?

3    Are you asking me to interpret what he's saying?

4          Q.    No.  I'm trying not to do that, so

5    we can set the sentence aside.

6                    Are you personally aware of any

7    issues, overdose issues, associated with heroin

8    and fentanyl combinations?

9                    MR. BADALA:  Objection to form.

10         A.    Well, that's what -- I mean, our

11   detectives have investigated those.

12         Q.    Okay.  Is that -- has that been

13   increasing or decreasing in frequency over time,

14   that --

15                   MR. BADALA:  Objection.

16         Q.    -- the overdose being a result of

17   some sort of heroin and fentanyl combination?

18                   MR. BADALA:  Objection to form.

19         A.    I'm not sure I understand the

20   question you just asked.  If it's -- I'm not

21   sure I understand that.

22         Q.    Do you -- do you know whether

23   there's been a change at all in the trend --

24   in -- a trend change in terms of what people are

25   overdosing on in Cuyahoga County?

Page 154

1          MR. BADALA:  Objection to form.

2      A.    I'm not aware of the trend change,

3   no.

4      Q.    Okay.  So -- okay.  Fair enough.

5          Do you view Cuyahoga County as

6   having -- there being a problem in Cuyahoga

7   County with respect to prescription --

8   prescription opioid abuse?

9      A.    Yes.

10      Q.    Okay.  When did that start?

11      A.    The actual abuse or when --

12      Q.    When did it become a problem?

13      A.    Well, I think this past year it's

14   come out in the media as far as the attorney

15   general, president and the county executive

16   saying, hey, we have an epidemic problem here.

17   But, again, I refer back to when I became

18   lieutenant of the narcotics division and the

19   programs that were put in place that, you know,

20   there was -- there was the need for these

21   programs.

22      Q.    And you became a lieutenant in 2014?

23      A.    Yes, sir.

24      Q.    And the programs that were -- there

25   were programs that were in place that predated

Page 155

1   your becoming a lieutenant?

2        A.    Yes.

3        Q.    All right.  What do you believe the

4   cause of the -- well, do you believe that there

5   is an opioid epidemic in Cuyahoga County?

6             MR. BADALA:  Objection to form.

7        A.    Yes.

8        Q.    What -- what are the parts of that

9   opioid epidemic or what are you including within

10  that?

11            MR. BADALA:  Objection to form.

12       A.    I'm speaking to detectives that

13  respond to these overdoses.  I think I mentioned

14  before a lot of these are traced back to

15  prescription opioids, and I think that the same

16  underlying story is that when these people --

17  and I hate to just refer to them as "these

18  people," but when they can't get those

19  prescription drugs anymore, that they turn to

20  the street drug, heroin, fentanyl, whatever can

21  satisfy that craving they have.  A lot of young

22  kids have been affected by this, too.

23            So detectives, you know, they tell

24  me about the stories.  Parents.  We have parents

25  that call the office, want updates on the

1    investigation.  They want some type of closure.

2    They want to know if something is being done

3    about, you know, why their son, daughter,

4    whatever loved one, is dead due to this, so --

5    I'm sorry if I didn't answer the question, but

6    --

7           Q.    That's helpful.  So I want to make

8    sure I understand, though.  It sounds like

9    you're including within the opioid epidemic --

10   you're including the use and abuse of heroin as

11   part of that epidemic.

12          A.    Well, I think it all ties in.  Like

13   I stated, if you can no longer get the

14   prescription medication that you're craving,

15   you're going to find a way to satisfy that

16   craving through heroin, fentanyl, illegal drugs.

17          Q.    Have you ever -- have you ever

18   personally talked to any of those family

19   members?

20          A.    I've talked with members on the

21   phone before, yes.

22          Q.    And when you say they want closure,

23   what -- has a family member ever communicated to

24   you that he or she wants closure related to a

25   family member who overdosed?

Page 157

1          A.     Yes.

2          Q.     And what do they -- when they say

3     they want closure, what are they -- are they

4     asking you specifically to do something, arrest

5     somebody?

6                MR. BADALA:  Objection to form.

7          A.     You know, it's a judgment on what

8     they're referring to.  We try to -- I think if

9     they're referring to the person that sold them

10    these drugs, that could be closure.  So, you

11    know, that's the way I see it.

12         Q.     Family members that you've talked

13    to, have they ever asked you specifically, "Do

14    you have any leads on who sold my son or

15    daughter the heroin"?

16         A.     Correct.  Yes, they've asked that.

17         Q.     Have any of these family members

18    ever asked you anything related to prescription

19    drugs?

20         A.     Yeah.  I think they've mentioned --

21    I don't remember every conversation I've had

22    with family members.

23         Q.     Do you remember any specific

24    conversation --

25                MR. BADALA:  Hold on.

1          Were you finished with your answer?

2          THE WITNESS:  No.  I was just going

3    to elaborate a little bit.

4          Q.    Please.

5          A.    Yeah.  I don't remember every

6    conversation I've had with every family member,

7    but they -- whenever you have a family member,

8    they like to tell you the background of their

9    loved one that died, so that conversation has

10   come up before as far as prescription

11   medication.

12         Q.    Has a family member ever asked you

13   to do anything related to prescription

14   medications?

15         MR. BADALA:  Objection to form.

16         A.    Not that I remember, no.

17         Q.    Are there any other causes -- is the

18   only cause -- am I understanding your testimony

19   correctly that the only cause -- you think the

20   only thing that causes heroin use is prior use

21   of prescription medications?

22         MR. BADALA:  Objection to form.

23         A.    I can't say it's a hundred percent

24   the only cause, no.

25         Q.    Okay.  What are other causes of

Page 159

1   heroin use?

2              MR. BADALA:  Objection to form.

3        A.    I don't know.  I'm not a heroin user

4   so I can't answer why people do it.

5        Q.    All right.  Well, is that something

6   you've done any -- received any training or done

7   any study of?

8              MR. BADALA:  Objection to form.

9        A.    No, I haven't.

10       Q.    Same question with respect to

11  fentanyl.  Have you done -- received any

12  training on why people use fentanyl?

13       A.    Training, no.

14       Q.    Have you done any studies as to why

15  people use fentanyl?

16       A.    No, I have not.

17             MR. BLOCK:  We'll go a little

18  further and then break for lunch, just a few

19  more minutes here.

20       Q.    Have you ever heard of the term

21  "diversion" as it relates to prescription

22  opioids?

23       A.    I'm not familiar with that, no.

24       Q.    Okay.  Have you -- has the sheriff's

25  department ever investigated -- to your

Page 160

1   knowledge, ever investigated theft of

2   prescription opioids, whether, you know, taken

3   from somebody's house, from a doctor's office,

4   from a pharmacy?

5           MR. BADALA:  Objection to form.

6      A.   I don't remember it, no.

7      Q.   All right.  How about investigating

8   people forging prescriptions?

9      A.   Not that I'm aware of, no.

10     Q.   Pill sharing, so someone who had a

11  prescription for a prescription opioid who was

12  sharing it with friends or family?

13          MR. BADALA:  Objection to form.

14     A.   Not that I remember, but -- I can go

15  back.  I think -- we have had people enter the

16  building, our county buildings, with

17  prescription pills on them that aren't --

18  doesn't have their name on them, so there are

19  some investigations that have taken place or

20  charges -- I don't know specifics of it, but I

21  know that has happened within our department.

22     Q.   If that's happened, which unit

23  within the department is responsible for

24  investigating that?

25     A.   It could be as simple as the person

1  that found it.  They can do that case on their

2  own.  But that has happened.

3          Q.    Do you know whether the department

4  has ever arrested anyone for -- in connection

5  with -- are you familiar with the term "doctor

6  shopping"?

7          A.    Yes.

8          Q.    All right.  Do you know whether the

9  sheriff's department has ever made any arrests

10 of anybody who was -- because they were doctor

11 shopping?

12         A.    I was not briefed on that, but

13 again, we kind of -- if we get a tip or have

14 information on that, we turn that over to our

15 DEA task force.

16         Q.    Are you familiar with -- have you

17 heard the term "pill mill"?

18         A.    I've heard the term.

19         Q.    What do you understand that to mean?

20         A.    I don't know.  To be honest with

21 you, I don't know.

22         Q.    Have you ever heard of about either,

23 like, pharmacies that had a reputation for being

24 a place where people could go to get liberal

25 supply of opioid medication, prescription

Page 162

1  opioids?

2          MR. BADALA:  Objection to form.

3      A.    You'd have to repeat that.  I'm

4  sorry.  I didn't catch all that.

5      Q.    Okay.  Well, you said you've heard

6  the term "pill mill."  Where have you heard

7  that?

8      A.    Probably media, something like that.

9  It's not something I looked up or anything like

10  that.  I just --

11     Q.    Has the sheriff's department ever

12  investigated any business, building, where,

13  like, people seem to be going in -- of whatever

14  sort it was, people seem to be going in and

15  coming out with prescription medications?

16     A.    I'm not aware of any investigations

17  that happened like that, no.

18     Q.    Are you aware of any such a building

19  anywhere within the limits of Cuyahoga County at

20  any point in time?

21          MR. BADALA:  Objection to form.

22     A.    I don't know.

23     Q.    You don't know one way or the other?

24     A.    Right.

25          MR. BLOCK:  Why don't we take our

1    lunch break now.

2                    THE VIDEOGRAPHER:  Off the record,

3    12:14.

4

5                    (Luncheon recess taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  -   -   -   -   -

 2              (Thereupon, Gerome Deposition

 3              Exhibit 3, Cuyahoga County Sheriff's

 4              Department 2015 Annual Report, was

 5              marked for purposes of

 6              identification.)

 7                  -   -   -   -   -

 8          THE VIDEOGRAPHER:  On the record,

 9    12:55:

10                  -  -  -  -

11              AFTERNOON SESSION

12      CONTINUED EXAMINATION OF DONALD GEROME

13    BY MR. BLOCK:

14          Q.   Captain Gerome, Exhibit 3 is a

15    document entitled "Cuyahoga County Sheriff's

16    Department Annual Report," the 2015 annual

17    report.  It has -- it bears Bates label CUYAH

18    120708 through 120760.

19              Have you seen the sheriff's

20    department annual reports before?

21          A.   Yes, sir.

22          Q.   And I want to -- of course I just

23    lost it, but I want to focus on page -- the page

24    with your name on it, which is -- it's got Bates

25    number 120745 at the bottom.  Let me know when
```

1   you're there.

2          A.    Okay.

3          Q.    Yes, we're on the same one that --

4   the heading at the top of the page is "CCSD

5   Package Interdiction Team."  Is that the page

6   you're on?

7          A.    Yes, sir.

8          Q.    Okay.  Did you -- it's got your name

9   at the bottom?

10         A.    Yes, it does.

11         Q.    All right.  So did you provide the

12  information that's reflected on this page for

13  inclusion in the annual report?

14         A.    I provided this information to the

15  sheriff's secretary, who puts this all together.

16         Q.    Okay.  So I just want to go through

17  and make -- see if I can understand what's being

18  reported here.

19              Under -- it's got a bunch of numbers

20  for 2015 totals.  The -- one of which is

21  arrests, and then it says -- if I'm following it

22  across -- 13?

23         A.    Yes, sir.

24         Q.    All right.  What -- 13 arrests of

25  what, or for what?

1          A.    Can I just read the top section real

2     quick since this was a couple years ago?  I just

3     want to make sure I'm looking at it right.

4          Q.    Yes.

5          A.    Okay.  I'm sorry.

6          Q.    I think it says 13 arrests.

7          A.    Yes, sir.

8          Q.    And what would be included in the --

9     arrests for what?

10         A.    This list is -- was -- I think I

11    mentioned him, Detective Twombly, who is a K9

12    detective -- I think I mentioned the K9 unit --

13    works with the postal inspector.  This

14    information comes from him and his unit.  And

15    the 13 arrests are probably the arrests he had

16    for 2015.

17         Q.    Okay.  Let me just -- I want to make

18    sure that's right because I want to jump down.

19    There's a line for heroin overdoses.

20              Do you see that?

21         A.    Yes, sir.

22         Q.    And it says 44, if I'm following it

23    correctly across, or is it -- yeah, I think so.

24    Yeah, so 44 heroin overdoses?

25         A.    Yes.

1    Q.    Okay.  Do you know where that

2    information comes from?  That's not -- that

3    didn't -- is that limited to what the K9 officer

4    saw?

5    A.    I don't know where he got that

6    information, but no, that wouldn't be just the

7    K9 officer responding to that.

8    Q.    Okay.  And how about beneath it, it

9    says, "Interviews, 66."  Do you know what is

10   intended to be encompassed within that category?

11   A.    That's probably interviews, field

12   interviews he conducted.

13   Q.    Okay.  So then we go up to -- from

14   heroin overdoses, it says "pills" and then the

15   number is 77.  77 what?

16   A.    I don't remember what that number

17   stood for.

18   Q.    Okay.  The same question with

19   respect to heroin.  It says 30 is the number.

20   Do you know 30 what?

21   A.    No, I don't remember.

22   Q.    All right.  So let's look at -- tell

23   me again, before I hand you this one, what was

24   the name of the deputy, the sergeant?

25   A.    That supplied this information to

Page 168

1   me?

2          Q.     Yes.

3          A.     I'm pretty sure it was Deputy Mike

4   Twombly, T-w-o-m-b-l-y, and he's our K9

5   detective assigned to the postal inspector's

6   office.

7          Q.     All right.  And do you recall

8   providing any information to the -- for the

9   annual report related to the operations of the

10  larger narcotics division?

11         A.     Do I -- I'm sorry.  Do I recall

12  giving any?

13         Q.     Yes.

14         A.     I don't recall it, but if I was the

15  lieutenant at the time, I probably did.

16                      -    -    -    -    -

17                  (Thereupon, Gerome Deposition

18                  Exhibit 4, Cuyahoga County Sheriff's

19                  Department 2016 Annual Report, was

20                  marked for purposes of

21                  identification.)

22                      -    -    -    -    -

23         Q.     So Gerome Exhibit 4 is the Cuyahoga

24  County Sheriff's Department 2016 annual report,

25  bears the Bates number CUYAH 121572 through

```
                                    Page 169
 1   121804, and there's a similar page.  I want to
 2   specifically ask you about the page 121789,
 3   which has 2016 totals for categories similar to
 4   what we looked at on the prior.
 5           A.    Okay.
 6           Q.    And this says that Lieutenant Sharpe
 7   submitted it.  Do you know whether this -- do
 8   you know what the data on this page -- where it
 9   comes from?
10           A.    Again, this is probably provided by
11   Detective Twombly.
12           Q.    Okay.  And for heroin overdoses, it
13   looks like -- it looks like it's 75 -- well,
14   wait.  Is that right, 75, heroin overdoses?
15           A.    Yes.
16           Q.    Is it 75 or 66?  I can't tell.
17           A.    It's 75.
18           Q.    75, okay.  That's -- does that sound
19   about right to you in terms of the number of
20   overdoses that the narcotics unit investigated
21   in 2016?
22           A.    It's probably accurate, yeah.
23           Q.    Okay.  Do you know whether there's a
24   2017 annual report?
25           A.    There should be, yes.
```

1          Q.     Okay.  Have you seen it?

2          A.     The annual reports are e-mailed out.

3     I'm not sure if I got that e-mail or not or if I

4     looked at it.

5          Q.     On the next page -- well, it doesn't

6     matter.  Do you know Sergeant Monteleone?

7          A.     Monteleone, yes, sir.

8          Q.     Monteleone.  Who is he?

9          A.     Sergeant with the department.  Right

10    now he's in charge of our warrant unit.

11         Q.     Okay.  Has he ever worked in the

12    narcotics unit?

13         A.     Yes.

14         Q.     When was that?

15         A.     As a supervisor or just in general?

16    He was -- when I was -- back in 2005, he was a

17    detective in the unit.  He was also assigned to

18    a task force, if I remember correctly.  I don't

19    know if he was a -- I don't remember if he was a

20    direct supervisor of the narcotic division.  I

21    know he was in it as our evidence sergeant.  He

22    may have had maybe dual assignments at the time.

23    I'm sorry.  If you give me a second.  I'm just

24    trying to remember.

25         Q.     Yeah.

                                        Page 171

1          A.    I think he was -- when I made

2    lieutenant, he was one of the sergeants in

3    charge of the narcotics division --

4          Q.    Okay.

5          A.    -- if I remember correctly, yeah.

6          Q.    Okay.  Great.  Then I was going to

7    mark this as Gerome 5.

8                    -    -    -    -    -

9                (Thereupon, Gerome Deposition

10               Exhibit 5, Cuyahoga County Sheriff's

11               Department Newsletter dated April

12               2017 Beginning Bates Number

13               CUYAH_000118584, was marked for

14               purposes of identification.)

15                   -    -    -    -    -

16         Q.    Please take a minute to look at

17   this.  I'm -- just so you know, I'm focused on

18   the article or story on the second page entitled

19   "Fighting an Epidemic."

20         A.    Okay.

21         Q.    But I'll note for the record, Gerome

22   4 is a -- Gerome 5 am I on -- thank you -- is a

23   document entitled "Cuyahoga County Sheriff's

24   Department Newsletter," April '17.  It has the

25   Bates label CUYAH 118584 through 118585.  Let me

                                        Page 172

1    know when you've had a chance to read that.

2            A.    Oh, okay.  Sure.

3                  Okay.

4            Q.    By the way, are you familiar with

5    the sheriff's newsletter?

6            A.    Yes, sir.

7            Q.    Does it come out monthly?

8            A.    Quarterly.

9            Q.    Quarterly, okay.  Who's in charge of

10   it in terms of the content that goes into it?

11           A.    Again, the information I think is

12   submitted to his secretary, Tara, and then she

13   puts it all together.

14           Q.    And who gets a copy of the

15   newsletter?

16           A.    Everyone in the sheriff's department

17   can get a copy, yeah, anyone that has -- or

18   wants it.

19           Q.    Okay.  Do you know if they circulate

20   it outside of the department?

21           A.    That, I don't know.  I don't know.

22           Q.    Do you know whether -- in April of

23   2017 whether Sergeant Monteleone was -- had any

24   responsibilities with the narcotics unit?

25           A.    I want to say he was in charge of

Page 173

1    our evidence at that time.

2         Q.    And did you get a chance to read his

3    article, the "Fighting an Epidemic"?

4         A.    Before it was submitted to Tara

5    or --

6         Q.    Sure.

7         A.    I'm sorry.  Go ahead.

8         Q.    I meant sitting here -- did you get

9    a chance to look at it when I handed you the

10   exhibit?

11        A.    Yes.

12        Q.    Okay.  Did you see anything

13   erroneous in his article?

14             MR. BADALA:  Objection to form.

15        A.    I don't know about erroneous.  Maybe

16   misleading with the 14 overdoses.

17        Q.    What's misleading about that?

18        A.    Well, in a sense -- he said

19   responded to 14 overdoses in 2017.  He maybe

20   should have clarified it with the first quarter

21   of 2017 that they responded to that.  That might

22   be a little bit misleading.

23        Q.    Sure.

24        A.    I'm sorry.  What was the original

25   question?

Page 174

1        Q.    Whether you saw any errors in what

2   he said.

3        A.    No, I don't believe there were any

4   errors.

5        Q.    Do you know how it is that he came

6   to contribute this piece to the newsletter?

7              MR. BADALA:  Objection to form.

8        A.    I think Tara sometimes sends out

9   e-mails to different units within the sheriff's

10  department, asking to submit a story or

11  something like that, and -- I don't know --

12  maybe she reached out to him and -- I don't know

13  if she reached out to me and I forwarded it to

14  him or not, but somehow it got to him to put a

15  story together.

16       Q.    Okay.  All right.  Great.  Well,

17  also, under "New Hires" it says there was a new

18  pharmacist.  What's the pharmacist do for the

19  sheriff's department?

20       A.    They would be inside the jail.

21       Q.    Okay.  Do you know whether the jail

22  pharmacy orders prescription opioid medications?

23       A.    Not firsthand, no, I don't know.

24       Q.    You talked a little bit before the

25  lunch break about conversations you think you

Page 175

1   may have had with family members of overdose

2   victims.  Do you remember that?

3        A.    Yes, sir.

4        Q.    How many of those conversations do

5   you think you've had?

6             MR. BADALA:  Objection to form.

7        A.    I don't know.  I don't know a number

8   offhand.

9        Q.    I mean, are we talking more than a

10  handful of times?

11            MR. BADALA:  Objection to form.

12       A.    What's a handful?

13       Q.    Five, I guess.

14       A.    Probably around that, five.

15       Q.    Okay.  Around that?

16       A.    Probably, yes, sir.

17       Q.    Okay.  And did you take any notes

18  for any of these conversations?

19       A.    I may have written down their names

20  or whatever, just to follow up with -- you know,

21  with the detectives are doing or something like

22  that, but -- so yeah, I guess.  Yes.

23       Q.    Do you remember the names of any of

24  the folks you talked with?

25       A.    No, sir.

Page 176

1      Q.    When was the most recent

2  conversation?

3      A.    I don't remember.

4      Q.    Was it -- have you had --

5      A.    It hasn't been -- I'm sorry.  Finish

6  your question, please.

7      Q.    Have you had a conversation with

8  someone this year?

9      A.    I don't remember.

10     Q.    Did you have a conversation -- were

11  any of these conversations in 2017?

12     A.    I don't remember specific dates.  It

13  could have been.

14     Q.    Were any of these conversations when

15  you were a lieutenant?

16     A.    I don't remember.

17     Q.    How long were -- were the

18  conversations?

19          MR. BADALA:  Objection to form.

20     A.    For the most part, it would be a

21  couple minutes, nothing more.

22     Q.    Did you make any recording of the

23  conversations?

24     A.    No, sir.

25     Q.    Thank you.

Page 177

1             Have you ever heard of a
2    Dr. Feldman, who was charged in 2006 with
3    trafficking opioids through his medical clinics?
4         A.    No, sir.
5         Q.    Does that ring a bell to you?
6         A.    No, it does not.
7         Q.    Okay.  See if this helps at all.  As
8    I understand, the doctor then was on trial in
9    2008 and committed suicide while the trial was
10   going on.  Does that ring a bell at all?
11        A.    No, sir.
12        Q.    Have you -- do you know whether the
13   sheriff's department has ever received a tip
14   that someone was trafficking, selling,
15   distributing otherwise prescription medications?
16             MR. BADALA:  Objection to form.
17        A.    I think we discussed that.  I'm not
18   aware of any specific tip coming in like that.
19        Q.    Okay.  And if there were -- if the
20   sheriff's department had gotten such a tip that
21   somebody was involved with trafficking
22   prescription medications, where would -- who
23   would have that been directed to?
24             MR. BADALA:  Objection to form.
25        A.    The tip itself?

1        Q.     Yes.

2        A.     It depends how the tip came in.  It

3   would have -- like I said before, if it's a

4   Crime Stopper tip or it comes in through our

5   website, it would be directed to the supervisor

6   of the unit, narcotics unit at the time.

7        Q.     Okay.

8        A.     And that type of tip that we

9   discussed earlier would be probably forwarded to

10  the DEA task force.

11       Q.     Okay.  Have you ever had any

12  interactions with the State of Ohio Medical

13  Board?

14       A.     Not that I remember, no.

15       Q.     Did you see the story on Channel 7

16  recently about the medical board and whether the

17  medical board was -- you know, should have been

18  following up on doctors who were overprescribing

19  prescription opioids?

20       A.     I don't know what Channel 7 is.

21       Q.     I thought it was Channel 7.

22       A.     But regardless, no, I don't.

23       Q.     What is Fox here locally?

24       A.     Fox is 8.

25       Q.     All right.  So maybe it was Channel

Page 179

1   8.   Have you seen a news story recently about

2   the medical board, the Ohio State Medical Board?

3        A.    No, I don't remember seeing that

4   story.

5        Q.    Okay.  Have you ever had any

6   interactions with anyone at the Ohio Board of

7   Pharmacy?

8        A.    No, I have not.

9        Q.    Do you know whether anyone at the

10  sheriff's department has ever had interactions

11  with the Ohio Board of Pharmacy relating to

12  issues around opioids?

13       A.    I don't know.

14       Q.    And same question -- I should ask

15  whether you know whether anyone at the sheriff's

16  department has ever had any interactions with

17  the medical board regarding opioids?

18       A.    I don't know.

19       Q.    Are you aware of any pharmacies that

20  sold opioids or provided opioids improperly to

21  anybody in Cuyahoga County?

22            MR. BADALA:  Objection to form.

23       A.    I'm not aware of, no.

24       Q.    Are you aware of any -- I may have

25  asked you this before.  I apologize if I did --

Page 180

1   of any investigations by the Cuyahoga Sheriff's

2   Department into prescription forgeries?

3              MR. BADALA:  Objection to form.

4        A.    I'm not aware of any ongoing

5   investigations involving that, no.

6        Q.    Did you say "ongoing"?

7        A.    Or past investigation, ongoing and

8   past.

9        Q.    Okay.  And within the sheriff's

10  department, which branch or department would

11  that -- if there were such investigations, who

12  would that fall under?  Would that be something

13  narcotics would do?

14       A.    Again, narcotics would take the

15  initial complaint and probably turn that over to

16  our task force officer.

17       Q.    Okay.  The DEA task force officer?

18       A.    Yes.

19       Q.    All right.  Has it been the same

20  person at the DEA -- who's at the DEA now?

21       A.    We have two detectives.  Detective

22  John Gioitta and Detective Doug Jopek, and they

23  -- Doug Jopek has been recently assigned.  We

24  had an agent there that resigned, took another

25  job.  And then John Gioitta has been there

Page 181

1   approximately, I think, two years.

2        Q.    Who was there before Detective

3   Jeoeta?

4        A.    Detective Lou Scibelli, or Deputy

5   Lou Scibelli now.

6        Q.    All right.  Is Deputy Scibelli still

7   with the sheriff's department?

8        A.    Yes, he is.

9        Q.    What's he doing now?

10       A.    He's assigned to the uniform

11  division courts.  I don't know specifically what

12  courts it is, but the courts division.

13       Q.    Do you know how long he was with the

14  DEA task force?

15       A.    He was assigned there when I got

16  into narcotics in 2014.  I don't know his exact

17  date he moved over there.

18       Q.    Do you know if there had been

19  someone there with DEA before him?

20       A.    That, I don't know.  I think we had

21  someone in the DEA since I've started with the

22  sheriff's department, but I don't know if it was

23  him or someone else.

24       Q.    I was -- so I was going to also go

25  back -- in the '05 to '07 time frame, when you

1    were in the narcotics division, do you remember,

2    was there someone who was technically in the

3    narcotics division but was on assignment to the

4    DEA at that time?

5         A.    Yes.

6         Q.    Do you remember who it was?

7         A.    It was now Sergeant Hirko.

8         Q.    Okay.  Any of these folks who have

9    been assigned to the DEA task force, have they

10   ever given a -- have they ever talked to the

11   rest of the people in the division about what it

12   is they either do or did over there?

13            MR. BADALA:  Objection to form.

14       A.    Yes.  I mean, if I understand

15   your -- yeah, there's constant communication.

16   There's -- we help them out, they help us out,

17   resources, manpower.  If there's a search

18   warrant, we'll ask them to assist if they have

19   the manpower; and vice versa, if they have a

20   search warrant, our guys are available.

21       Q.    Can you think of any, you know,

22   ideas or suggestions that someone has made to

23   the sheriff's department based on, you know,

24   hey, DEA had this great idea or technique of X,

25   we should try that in our own investigations?

Page 183

1          A.    Not that I remember.

2          Q.    Okay.  Vice versa, where you guys

3    came up with something good that the -- your

4    person at the DEA task force brought to the task

5    force's attention, said we should really be

6    trying this program or this technique?

7                MR. BADALA:  Objection to form.

8          A.    Not that I remember.

9          Q.    Does the sheriff's department do

10   anything to -- do anything at all related to

11   internet sale of opioid medications, monitor,

12   investigate, anything like that?

13         A.    I'm not sure I understand that

14   question.

15         Q.    Is the ordering of prescription

16   opioids over the internet -- is that something

17   that the sheriff's department has any

18   involvement in?

19         A.    I'm not aware of any of our guys

20   investigating that or prior investigating that.

21         Q.    Have you heard of a suspicious --

22   have you heard of the phrase "suspicious order"

23   as it relates to prescription opioids?

24         A.    I can -- I've never heard of it, but

25   it's kind of self --

Page 184

1     Q.    I'm sorry.  Do you know whether

2  anyone at the sheriff's department has ever been

3  involved with any investigations into any

4  pharmacy related to suspicious orders of

5  opioids?

6     A.    No.  Again, I think anything that

7  would come in like that, we'd turn over to the

8  DEA.

9     Q.    Same question, anybody at the

10  sheriff's department involved with any

11  investigation into any distributor related to

12  suspicious orders of opioids?

13     A.    Not that I'm aware of.

14     Q.    All right.  And any investigation

15  into any manufacturer regarding suspicious

16  orders of opioids?

17     A.    Not that I'm aware of.

18     Q.    Can we go to -- can I get tab 2,

19  please?

20              -   -   -   -   -

21              (Thereupon, Gerome Deposition

22              Exhibit 6, E-Mail String Beginning

23              Bates Number CUYAH_000118362, was

24              marked for purposes of

25              identification.)

Page 185

```
 1                   -   -   -   -   -
 2        Q.    While you're taking a minute to
 3   look -- while you're reviewing this, Captain
 4   Gerome, I'll state for the record that Gerome
 5   Exhibit 6 is an e-mail chain, most recent of
 6   which was September 5th, 2016 from Thomas Gilson
 7   to a whole bunch of people, bears the Bates
 8   numbers CUYAH 118362 through 63.  And I am
 9   pretty sure I can find your name in the
10   distribution list here if I hunt for it.  Yes.
11   I think I see your name, sir, four lines up from
12   the bottom in the -- in the most recent e-mail
13   in the chain.
14        A.    Yes, sir, I see it.
15        Q.    Okay.  And I think a similar
16   position in the lower down e-mail chain.
17              So is this an e-mail, you, you know,
18   I guess received in the ordinary course of
19   business back in 2016?
20        A.    Okay.  I'm sorry.  Can you repeat
21   that?
22        Q.    Is this an e-mail that you received
23   in the ordinary course of business back in
24   September of 2016?
25        A.    The -- I guess the second page is
```

1   the alert that comes out, just explaining the

2   whole thing here, that -- with the reported by

3   Parma Police Department, that's the alert that

4   is sent out via e-mail to everyone on this list,

5   and then the -- and then the sentence that I

6   think you're referring to is a -- just from

7   Dr. Gilson commenting on the alert, I guess.

8          Q.    Okay.  So let's break that up and

9   I'll ask a few follow-up questions.

10               Who is Dr. Gilson?

11         A.    Dr. Gilson is the medical examiner

12  of Cuyahoga County.

13         Q.    Okay.  How long has he been the

14  medical examiner?

15         A.    Sir, I don't know that answer.

16         Q.    Was he the medical examiner when you

17  were the lieutenant?

18         A.    Yes, I believe so.

19         Q.    Okay.  And then you said that the --

20  I guess it's the initial e-mail in the chain you

21  referred to as "the alert."  Is that --

22         A.    Yeah.  I think we spoke briefly on

23  it.  An alert goes out to our detectives,

24  myself, supervisors, announcing a heroine

25  overdose, or -- I'm sorry, a suspected heroin

Page 187

1    overdose scene.  That's what you're looking at

2    on the second page.  That's the information

3    that's provided.

4         Q.    And where it says "XX2016-03490,"

5    does that -- what does that number code refer

6    to?

7         A.    I don't know.  That comes from the

8    medical examiners.

9         Q.    Okay.  Is that something that you

10   use or apply?

11        A.    No, it's not.

12        Q.    Do you know --

13        A.    Well, can I backtrack?

14        Q.    Please.

15        A.    I don't know if detectives actually

16   use this to relate the heroine overdose medical

17   examiner case number to our case number.  So

18   they may.  I don't know.

19        Q.    Do you know whether someone from the

20   county sheriff's office responded to this scene?

21        A.    It's most likely not based on it

22   was -- looked like it happened in Parma.

23        Q.    Okay.  But this is the type of alert

24   that you were describing earlier, that if it

25   were somewhere within a jurisdiction where, I

```
 1   guess, you hadn't been uninvited, the sheriff's
 2   department would send two detectives to respond
 3   to the scene?
 4        A.    I don't know if the term "uninvited"
 5   is correct, but, yeah, this is an agency that
 6   handles their own overdose scenes.
 7        Q.    Okay.  All right.  Got it.
 8              And then in the top e-mail
 9   Dr. Gilson is commenting in his second sentence,
10   it says, "Might be carfentanil."  Do you know
11   what carfentanil is?
12        A.    Yes, sir.
13        Q.    What's carfentanil?
14        A.    From my understanding, it's a form
15   of fentanyl, but I don't know how many times
16   stronger, used basically with animals as a
17   sedative, pain reliever, something like that.
18        Q.    And there are people overdosing on
19   that now?
20        A.    Yes, sir.
21        Q.    Where is -- do you know, how are
22   they getting the carfentanil?
23        A.    I don't know that, sir.
24        Q.    Do you know where it's coming from?
25              MR. BLOCK:  Objection to form.
```

Page 189

1        A.     No, I don't.

2        Q.     Is that something that the sheriff's

3    department is working on investigating, trying

4    to figure out how and where the carfentanil is

5    coming from?

6              MR. BADALA:  Objection to form.

7        A.     I think any time you open an

8    investigation, you want to try to find out as

9    much information about it as possible.  I don't

10   know if there's any leads into where it comes

11   from or not.

12       Q.     Do you know whether the sheriff's

13   department has made any arrests related to the

14   distribution of carfentanil?

15       A.     I'm not aware of arrests with

16   carfentanil involved.

17       Q.     Okay.  Are there -- I don't want you

18   to comment on the substance, but are there

19   active investigations currently into -- related

20   to carfentanil distribution by the sheriff's

21   department?

22       A.     I don't know.

23       Q.     Dr. Gilson's first sentence has a

24   reference to the -- that most have had -- well,

25   let me see.  I can skip that.  Let's go to the

Page 190

1    scene alert.

2         A.    On page 2?

3         Q.    Yes.  It talks about the -- 29Y/O.

4    That's years old?

5         A.    Yes, sir.

6         Q.    And WF, white female?

7         A.    Yes.

8         Q.    She was found dead in the -- found

9    on bathroom floor expired at Bar 30, and then it

10   goes on to say "with drug paraphernalia next to

11   her."

12            In your experience, what is drug

13   paraphernalia?  What does that term include?

14        A.    That can include a needle, syringe,

15   baggies, any way to -- I'm trying to think of --

16        Q.    Anything else come to mind for

17   paraphernalia?

18            A.    It could be a pill -- a pill bottle.

19        Q.    If the person -- would you expect --

20   you're familiar with these -- what do you call

21   these, scene alerts?  What should we refer to --

22        A.    Heroin scene alerts, I guess, yeah.

23        Q.    Okay.  In your -- do the heroin --

24   if there were prescription opioids found at the

25   scene of one of these instances that resulted in

Page 191

1    an alert, does the alert normally state that?

2           A.    I'd have to look back on all the

3    alerts that came out.  I don't know specifically

4    if it does or not.

5           Q.    All right.  Are you familiar with --

6    do you get a copy of the -- do you get any

7    regular reports from the medical examiner -- do

8    you get reports from the medical examiner --

9    sorry.  Let me try to spit this question out.

10          How often do you get reports from

11   the medical examiner, the sheriff's department

12   get reports from the medical examiner as they

13   pertain to overdoses?

14          MR. BADALA:  Objection to form.

15          A.    Hugh Shannon usually sends out maybe

16   something once a week updating, I guess,

17   statistics they keep at the medical examiner's

18   office.

19          Q.    And when he sends something out, is

20   that by e-mail?

21          A.    By e-mail.

22          Q.    And does it have an attachment or is

23   it just sort of text of an e-mail?

24          A.    Sometimes there's an attachment with

25   the stats involved.  Sometimes it's as simple as

Page 192

1   the e-mail stating six fatalities since last

2   weekend, no toxicology.  It could state

3   anything.

4        Q.    What do you do at the sheriff's

5   department, do with that information, if

6   anything?

7        A.    I forward that to our detectives and

8   our supervisor of the department, Sergeant

9   Hirko.

10       Q.    Sure.  What does Sergeant Hirko do

11  with it?

12       A.    I don't know.  I don't know.  It's

13  information sharing.  Most of them are on this

14  e-mail as well.  So just making sure they get

15  it.

16       Q.    Have you heard of Project DAWN?  I

17  think DAWN stands for deaths avoided with

18  naloxone.

19       A.    Yes, sir.

20       Q.    What is Project DAWN?

21       A.    I wasn't involved in the start-up of

22  it, but my understanding is it's the

23  distribution of Narcan to first responders.

24       Q.    Are there -- is there anyone within

25  the sheriff's department who's considered a

Page 193

1   first responder?

2          A.    Yes, sir.

3          Q.    Who would that be?

4          A.    We all are.

5          Q.    Okay.  So -- does anyone within the

6   sheriff's department carry -- is that the right

7   word -- naloxone?

8          A.    We do distribute it.  It's not a

9   policy we're required to carry it, but we do

10  hand it out.  It's optional for them.

11         Q.    Does the department -- does the

12  sheriff's department provide training to its

13  personnel on how to use naloxone?

14         A.    The training -- again, you can

15  receive that training on the Attorney General's

16  website.  It's probably a 15, 20-minute

17  presentation, and you do get a certification for

18  it, so we make sure before we distribute the

19  Narcan that they have that certification.

20         Q.    How does the department get the

21  Narcan?  Where does it come from?

22         A.    The board of health supplied us, I

23  think, with initial -- I don't know how many,

24  but the board of health has been supplying us.

25         Q.    Do you know whether the department

Page 194

1   has to pay for the Narcan?

2        A.    No, we don't.  No, we have not paid.

3   The shipment I remember that we got, I don't

4   believe we paid anything.  It was free.

5        Q.    Are there any sort of reports kept

6   by the department in terms of how many times

7   someone at the department has used a Narcan kit?

8   Is it a kit?

9        A.    It's -- yeah, you can call it a kit.

10       Q.    Okay.

11       A.    I don't think we've kept statistics

12  on that.  I know of a couple instances that we

13  have saved lives.  We've had, you know, stories

14  in the media, stuff like that.  So I hear

15  stories about it, but as far as stats kept, it's

16  probably something we should start doing since

17  it's happening more often.

18       Q.    Is abuse -- abuse of fentanyl a

19  problem in Cuyahoga County?

20              MR. BADALA:  Objection to form.

21       A.    Abuse of fentanyl, I don't know.  I

22  don't know.  I think it goes hand in hand with

23  heroin, pills.  I think they all go hand in

24  hand.

25       Q.    What about carfentanil?

Page 195

1      A.    Yes, sir.  Yeah.  I think it all

2  ties together.

3      Q.    Are you aware of any reports or

4  information that at least some of the fentanyl

5  that's getting to folks in Cuyahoga County is

6  coming from China?  Have you ever heard that?

7            MR. BADALA:  Objection to form.

8      A.    I don't have firsthand knowledge as

9  far as our investigations are concerned.  I have

10  read articles and through media mentioning

11  fentanyl coming from China.

12      Q.    Okay.

13            Are you aware of any reports about

14  Mexican drug trafficking cartel operations in

15  Cuyahoga County?

16      A.    During some of the meetings I've

17  attended, we have -- the FBI has and the DEA has

18  briefed on some cartels that they may be

19  investigating.  As far as our department, we --

20  we are not investigating drug cartels.

21      Q.    Agree or disagree with the following

22  statement: Pills and heroin arrive in the county

23  through large, difficult to untangle networks.

24            MR. BADALA:  Objection to form.

25      A.    Agree or disagree?

1          Q.     Yes.

2          A.     Can you read that again?

3          Q.     Sure.

4                 Pills and heroin arrive in the

5     county through large, difficult to untangle

6     networks.

7                 MR. BADALA:  Objection to form.

8          A.     I don't know if it's an agree or

9     disagree answer.

10         Q.     I don't know.  Could be a third

11    choice.

12         A.     I mean, can you repeat it one more

13    time?

14         Q.     Sure.

15                Pills and heroin arrive in the

16    county through large, difficult to untangle

17    networks.

18                MR. BADALA:  Objection to form.

19         A.     I probably disagree.

20         Q.     And why?

21         A.     It could be one form.  There's all

22    different forms that illicit drugs come in,

23    prescription drugs come in.  I don't know.  I

24    can't pinpoint it.

25         Q.     Do you have a -- do you know one way

1   or the other whether the networks by which the

2   drugs are coming into Cuyahoga County have

3   changed over time?

4            MR. BADALA:  Objection to form.

5       A.   Which drugs are we referring to?

6       Q.   So have there been changes for any

7   drugs in terms of -- any type of drugs in terms

8   of how they've -- how they're getting into

9   Cuyahoga County?

10           MR. BADALA:  Objection to form.

11      A.   I don't think there's a change, no.

12  I'm not sure I understand that question

13  completely.

14      Q.   Well, let's see.  Was there -- was

15  there heroin in Cuyahoga County when you were a

16  deputy in the narcotics unit back in 2005?

17      A.   Yes.

18      Q.   All right.  And did you have any

19  understanding back then as to where that heroin

20  was coming from?

21      A.   I mean, you read reports that are

22  put out by DEA, the federal government, stuff

23  like that.  That's kind of high-level stuff

24  that, you know, as part of narcotics, more

25  street level, so you hear about it, but we

Page 198

1    didn't actively investigate any of that.

2         Q.    Whose role or job did you view it as

3    to actively investigate, I guess, the

4    importation of the heroin into the county?

5         A.    Well, there's always officers'

6    interdiction.  I don't think it's particularly

7    assigned to one agency.  Again, I think it goes

8    back to information sharing and resources that

9    are available.  That's probably something that

10   we'd ask the DEA or the FBI or some federal

11   agency to help out with.

12        Q.    And has your understanding changed

13   at all in terms of the way in which heroin is

14   ending up in the -- being used by people in

15   Cuyahoga County from 2005 to today?

16        A.    Yeah.  We see a lot more today,

17   based on, I think, the conversations we had

18   before, where it's linked to the prescription

19   opioids and people craving when they can't get

20   those opioids anymore.

21        Q.    When you say "see a lot more,"

22   you're seeing more heroin being distributed than

23   back in 2005; is that what you're saying?

24        A.    Yeah.  We investigate a lot more

25   cases involving heroin, fentanyl.

1      Q.    How about in terms of you

2  included -- or you mentioned prescription

3  opioids before.  Do you have any understanding

4  into the various ways in which people who are

5  using prescription opioids obtain those

6  medications?

7      A.    Prescriptions, I --

8      Q.    Is there anyone -- do you have any

9  knowledge whether there's anyone in Cuyahoga

10 County who's used a prescription opioid who's

11 obtained the opioid other than through a

12 prescription from a doctor?

13           MR. BADALA:  Objection to form.

14     A.    Not firsthand knowledge.  I'm not an

15 investigator.  I'd have to ask our detectives if

16 they're actively investigating any of that.

17     Q.    Okay.  How about in any of the work

18 you've done with any of these task forces or

19 meetings?  Do you have any understanding as to

20 the various ways in which people get access to

21 what we've been calling prescription opioids?

22     A.    Well, I think you touched on it

23 before with not only prescribing it, but the

24 illegal prescriptions people try to obtain, the

25 theft.  That's one of the reasons we have that

Page 200

1    drop box program, so people can get rid of the

2    prescription opioids that they are not using

3    anymore, so there's no chance of theft or

4    getting out of their hands.

5              Doctor shopping, I believe you

6    mentioned that term.

7              So those are just some other ways I

8    think.

9         Q.    And do you have any sense, you

10   personally, you know, in terms of percentages or

11   relative frequency, the extent to which somebody

12   uses a prescription opioid through a

13   prescription written by a doctor for a medical

14   condition versus any of those other improper

15   ways?

16             MR. BADALA:  Objection to form.

17        A.    I don't have percentages.

18        Q.    Okay.  Have you ever heard of

19   something called Bromadol?

20        A.    Have I heard of the --

21        Q.    Yes.

22        A.    No.

23        Q.    Or how about cyclopropylfentanyl?

24        A.    No.

25        Q.    Have you heard of mixtures of

1   fentanyl and cocaine?  Is that something you've

2   seen in Cuyahoga County?

3          A.    Yes, sir.

4          Q.    And -- okay.  Do you know how common

5   or frequent that is?

6          A.    I see the reports that the medical

7   examiner sends out sometimes, but I don't have a

8   -- how prevalent it is.

9          Q.    In terms of the person who would

10  have the best knowledge of the data at least for

11  overdose victims, would that be the medical

12  examiner, in terms of number of people and what

13  it -- what they overdosed on?

14         A.    Yes.

15         Q.    Okay.  And that would be Dr. Gilson?

16         A.    Yes, sir.

17         Q.    All right.  Has your department --

18  do you know whether the sheriff's department has

19  ever encountered any counterfeit pills?  And by

20  that I mean, you know, something that looks like

21  a prescription medication but isn't, in fact,

22  you know, manufactured by someone with an FDA

23  license but is designed to look like it was?

24              MR. BADALA:  Objection to form.

25         A.    I'm not familiar with any specific

Page 202

1   cases, but I wouldn't put it past it that we've

2   come across that.

3       Q.   Would you agree that those who are

4   trafficking in narcotics are very creative in

5   terms of the ways in which they obtain, package

6   and distribute the narcotics?

7           MR. BADALA:  Objection to form.

8       A.   I'd agree, yeah, they are creative.

9       Q.   Are you aware -- does your

10  department track -- or if I were trying to

11  figure out from the sheriff's department, would

12  I be able to -- is there something I could look

13  at to figure out how many arrests the sheriff's

14  department had made of someone who was

15  trafficking in heroin as opposed to someone who

16  was selling OxyContin?

17      A.   With our new RMS system, I don't

18  know if you can query a certain type of arrest.

19  I'm not that knowledgeable about what the system

20  can and can't do since it's new.  I'm not aware

21  of any spreadsheet or statistic keeping that

22  separated, what type of arrests we've had in the

23  narcotics division.

24      Q.   When you said the new system, is

25  that TRAC or what were you --

Page 203

```
 1          A.    TAC.
 2          Q.    TAC.  Excuse me.  Yes.
 3                Do you know -- do you know who or
 4     what Allergan is?
 5          A.    No, sir.
 6          Q.    All right.  So do you have any view
 7     on whether Allergan is -- has any responsibility
 8     for the opioid epidemic in Cuyahoga County?
 9                MR. BADALA:  Objection to form.
10          A.    No, I don't know.
11          Q.    Are you familiar with Cardinal
12     Health?
13          A.    I'm not familiar with them, no.
14          Q.    Do you have any view as to whether
15     Cardinal Health has any responsibility for the
16     opioid problem in Cuyahoga County?
17                MR. BADALA:  Objection to form.
18          A.    I don't know.
19          Q.    Walmart, are you familiar with
20     Walmart?
21          A.    The Walmart that I can shop at every
22     day, then yes, I am familiar with Walmart.
23          Q.    Okay.  Does Walmart have any -- in
24     your view, have any responsibility for the
25     opioid problem in Cuyahoga County?
```

Page 204

1           MR. BADALA:  Objection to form.

2       A.    I don't know.

3       Q.    Have you heard of Actavis Pharma?

4       A.    No.

5       Q.    Do you have a view as to whether

6  Actavis Pharma has any responsibility for the

7  opioid problem in Cuyahoga County?

8           MR. BADALA:  Objection to form.

9       A.    I don't know.

10      Q.    Insys, do you know what -- who or

11  what Insys is?

12      A.    No, sir.

13      Q.    Do you know whether Insys has any

14  responsibility for the opioid problem in

15  Cuyahoga County?

16          MR. BADALA:  Objection to form.

17      A.    I don't know.

18      Q.    Watson Pharmaceuticals?

19      A.    No, sir.

20      Q.    Do you have a view as to whether

21  Watson Pharmaceuticals has any responsibility

22  for the opioid problem in Cuyahoga County?

23          MR. BADALA:  Objection to form.

24      A.    I don't know.

25      Q.    Purdue Pharma, are you familiar with

Page 205

1    Purdue Pharma?

2         A.    I don't believe so, no.

3         Q.    Okay.  Do you have any view as to

4    whether Purdue Pharma has any responsibility for

5    the opioid problem in Cuyahoga County?

6              MR. BADALA:  Objection to form.

7         A.    I don't know.

8         Q.    Cephalon, are you familiar with

9    Cephalon?

10        A.    I think I've heard of that company,

11   but not familiar with it.

12        Q.    Okay.  Do you have a view as to

13   whether Cephalon has any responsibility for the

14   opioid problem in Cuyahoga County?

15             MR. BADALA:  Objection to form.

16        A.    I don't know.

17        Q.    Noramco, are you familiar with

18   Noramco?

19        A.    No, sir.

20        Q.    Do you have any view as to whether

21   Noramco has any responsibility for the opioid

22   problem in Cuyahoga County?

23        A.    I don't know.

24        Q.    AmerisourceBergen, are you familiar

25   with AmerisourceBergen?

1       A.    Never heard of them.

2       Q.    Sometimes ABDC I think it's called.

3       A.    Never heard of them.

4       Q.    All right.  Do you have any view as

5 to whether AmerisourceBergen has any

6 responsibility for the opioid problem in

7 Cuyahoga County?

8            MR. BADALA:  Objection to form.

9       A.    I don't know if they do, sir.

10      Q.    How about Johnson & Johnson; are you

11 familiar with that company?

12      A.    If they make baby powder.  I don't

13 know if that's the same one or not.  If it is,

14 then yeah, I'm familiar.

15      Q.    And Janssen, have you heard of

16 Janssen?

17      A.    No.

18      Q.    The pharmaceutical company?

19      A.    No.

20      Q.    And do you have a view as to whether

21 Johnson & Johnson and/or Janssen have any

22 responsibility for the opioid problem in

23 Cuyahoga County?

24            MR. BADALA:  Objection to form.

25      A.    I don't know what they do, sir.

Page 207

1          Q.    How about McKesson; are you familiar
2     with McKesson?
3          A.    No.
4          Q.    And do you have a view as to whether
5     McKesson has any responsibility for the opioid
6     problem in Cuyahoga County?
7               MR. BADALA:  Objection to form.
8          A.    Again, I don't know what they do.
9          Q.    H.D. Smith, have you heard of H.D.
10    Smith?
11         A.    No, sir.
12         Q.    And do you have a view as to whether
13    H.D. Smith has any responsibility for the opioid
14    problem in Cuyahoga County?
15              MR. BADALA:  Objection to form.
16         A.    I don't know.
17         Q.    Don't worry.  I don't have too many
18    more of these.
19              Walgreens?
20         A.    Yes, I've heard of Walgreens.
21         Q.    All right.  Do you have a view as to
22    whether Walgreens has any responsibility for the
23    opioid problem in Cuyahoga County?
24              MR. BADALA:  Objection to form.
25         A.    I don't know.

1          Q.     CVS?

2          A.     I've heard of CVS, yes.

3          Q.     Do you have a view as to whether CVS

4     has any responsibility for the opioid problem in

5     Cuyahoga County?

6               MR. BADALA:  Objection to form.

7          A.     I don't know.

8          Q.     Okay.  Rite-Aid, are you familiar

9     with Rite-Aid?

10         A.     Yes, I'm familiar.

11         Q.     In your view, does Rite-Aid have any

12    responsibility for the opioid problem in

13    Cuyahoga County?

14              MR. BADALA:  Objection to form.

15         A.     I don't know.

16         Q.     Mallinckrodt.  Hopefully I

17    pronounced that close to correct.  Are you

18    familiar with Mallinckrodt?

19         A.     No, I'm not.

20         Q.     And do you have a view as to whether

21    Mallinckrodt has any responsibility for the

22    opioid problem in Cuyahoga County?

23              MR. BADALA:  Objection to form.

24         A.     I don't know.

25         Q.     Endo Pharmaceuticals, do you know

1  Endo?

2      A.    No, sir.

3      Q.    And do you have a view as to whether

4  Endo Pharmaceuticals has any responsibility for

5  the opioid problem in Cuyahoga County?

6          MR. BADALA:  Objection to form.

7      A.    I don't know.

8      Q.    Health Mart Systems?

9      A.    No, sir.

10      Q.    And do you have a view as to whether

11  Health Mart Systems has any responsibility for

12  the opioid problem in Cuyahoga County?

13          MR. BADALA:  Objection to form.

14      A.    No, I don't know, sir.

15      Q.    Teva Pharmaceuticals?

16      A.    No.

17      Q.    And do you have a view as to whether

18  Teva Pharmaceuticals has any responsibility for

19  the opioid problem in Cuyahoga County?

20          MR. BADALA:  Objection to form.

21      A.    I don't know, sir.

22      Q.    How about the federal government;

23  does the federal government have any

24  responsibility for the opioid problem in

25  Cuyahoga County?

```
                                               Page 210

 1              MR. BADALA:  Objection to form.

 2       A.    I don't know, sir.

 3       Q.    The state government, State of Ohio?

 4              MR. BADALA:  Objection to form.

 5       A.    Have I heard of them?

 6       Q.    Yes.

 7       A.    Yes.

 8       Q.    Go Bucks.

 9              And does the State of Ohio have any

10  responsibility for the opioid problem in

11  Cuyahoga County?

12              MR. BADALA:  Objection to form.

13       A.    I don't know.

14              MR. BLOCK:  Why don't we take a

15  break.

16              MR. BADALA:  Yes.  Great.

17              THE VIDEOGRAPHER:  Off the record,

18  1:50.

19                   (Recess had.)

20              THE VIDEOGRAPHER:  On the record,

21  2:06.

22  BY MR. BLOCK:

23       Q.    Captain Gerome, we were talking

24  about different entities and whether they have

25  any responsibility for the opioid problem in
```

```
                                        Page 211
 1   Cuyahoga County.
 2              Would -- in your view, do the people
 3   who are selling heroin and fentanyl to others in
 4   Cuyahoga County -- do they have responsibility
 5   for the opioid problem in Cuyahoga County?
 6              MR. BADALA:  Objection to form.
 7       A.    I think there's a certain level of
 8   responsibility.  It's illegal activity.  But I
 9   think the market is created for them to take
10   advantage of it.  Like I think I referred to it
11   before, is people coming off prescription
12   medications are still craving it, and this is
13   where they turn towards, and drug dealers are
14   just -- it's open season for them to make some
15   money.
16       Q.    And could we agree that wherever the
17   drug dealers are getting their drugs from, that
18   whoever is supplying them with the drugs also
19   has some responsibility for the opioid problem
20   in Cuyahoga County?
21              MR. BADALA:  Objection to form.
22       A.    Well, yeah, they have to take
23   responsibility.  It's illegal activity, and
24   that's what we investigate.
25       Q.    Do you believe that -- do you have a
```

Page 212

1  view as to whether doctors who have written
2  prescriptions for prescription opioids have any
3  responsibility for the opioid problem in
4  Cuyahoga County?
5           MR. BADALA:  Objection to form.
6      A.   Do doctors have -- can you repeat
7  that, please?
8      Q.   Yes.
9           Doctors who have written
10  prescriptions to patients for prescription
11  opioids, do they have any responsibility for the
12  opioid problem in Cuyahoga County?
13           MR. BADALA:  Objection to form.
14      A.   I don't know.  I mean, I think
15  they're -- they have their patient's best
16  interest in mind.  You know, they're just -- the
17  patient is asking for something and they're
18  helping them.  Whether they know they're giving
19  them the medication, if it's becoming addictive,
20  one pill, 20 pills, I don't know.  I don't know.
21      Q.   Is there a drug abuse response team
22  within the sheriff's department?
23      A.   I don't know if we've called our
24  detectives that are on call to respond to
25  overdoses, if that's another title we gave them.

Page 213

1    That could be.

2         Q.    If there was anything within the

3    sheriff's department --

4         A.    Yeah.  It would be within our

5    narcotic division, the detectives that I spoke

6    on.

7         Q.    Okay.  Have you had any -- any

8    friends or family members who have had addiction

9    to prescription opioids?

10        A.    Will you repeat that, please?

11        Q.    Yes.

12              Whether you -- any friends or family

13   members of yours have dealt with addiction to

14   prescription opioids.

15        A.    I've had family members that have

16   died of overdoses.

17        Q.    How many family members?

18        A.    Two cousins.

19        Q.    Are they -- live here in the

20   Cuyahoga County area?

21        A.    One did; one did not.

22        Q.    And when did they die?

23        A.    The exact years, I don't know.  It's

24   been a while.

25        Q.    Sorry.  Like in the -- roughly?  In

```
                                              Page 214

 1    the 2000s?

 2            A.     Yeah, it's been in the 2000s.

 3            Q.     Okay.

 4            A.     Roughly maybe seven to ten years.

 5            Q.     And what -- if I may ask, what did

 6    they overdose on?

 7            A.     That, I don't know.

 8            Q.     Okay.  Do you know whether any

 9    arrests were made in connection with either of

10    the --

11            A.     I never followed up with it.  No.

12            Q.     Any other personal connections to --

13            A.     We've had members of our department,

14    a particular friend of mine, another deputy, his

15    daughter overdosed.  It was not fatal.  It was

16    non-fatal.  But he -- discussions with him.  He

17    went through a lot.  And that journey began with

18    prescription medication as well.

19            Q.     What did the daughter overdose on?

20            A.     That, I don't remember.

21            Q.     When was this?

22            A.     Probably three, four years ago.

23            Q.     Before I go to this one, forgive me

24    if I haven't asked you this -- forgive me if I

25    did ask you this before, but is there -- can you
```

Page 215

1    think of any expenditures that the Cuyahoga

2    County Sheriff's Department has that are

3    directly and exclusively related to narcotics or

4    narcotics investigations?

5              MR. BADALA:  Objection to form.

6         A.    Well, we developed staffing for the

7    drop box pill program.  That's something we've

8    never had before.  I consider that an

9    expenditure; salary, hours, vehicles, mileage,

10   stuff like that.  The two detectives on call to

11   respond to these overdoses, they have now in

12   their contract on-call pay, something they never

13   had before.

14        Q.    Is that something the union

15   negotiated for them?

16        A.    Absolutely, yes.

17              As well as the sergeants receive the

18   on-call pay.

19              Can you repeat it again?  I'm sorry.

20   Expenditures I believe you said.

21        Q.    Yes, that are sort of solely and

22   exclusively related to narcotics, narcotics

23   investigations.

24        A.    Those would be a couple I can think

25   of offhand.

1        Q.    Anything else?

2        A.    I think I stated before, something

3   like equipment, special equipment maybe, type of

4   gloves or -- sometimes they go to these

5   overdoses, they put the full suit on, if there

6   is suspected fentanyl or something like that.

7   So I guess little expenditures like that would

8   add up.  Vehicles.  Like I said, for the guys on

9   call, they take home vehicles now, but -- I'm

10  sure I'm missing some things, but that's the

11  best I can think of right now.

12       Q.    Are there any other departments

13  within the sheriff's -- any other groups within

14  the sheriff's department that are on call?

15       A.    We have a sergeant in charge of

16  our -- it's a human trafficking task force.

17  He's on call.

18       Q.    Anybody else?

19       A.    That's receiving pay, no.  That --

20  let me think real quick.  We do have -- now I

21  put a sergeant on call for death -- or use of

22  force death investigations for the City of

23  Cleveland for taking over their investigations

24  if they use deadly force, so he's on call to

25  respond to that.

1    Q.    Does he have a car or use a car for

2  that?

3    A.    Yes, he does.

4    Q.    Okay.  And same for the human

5  trafficking person that is on call, do they have

6  a car?

7    A.    They have one that's not a -- that's

8  not our expenditure.  It's the Attorney

9  General's Office supplied those vehicles.

10    Q.    Do you know whether the sheriff's

11  department has ever applied for any grants

12  related to narcotics -- narcotics

13  investigations?

14         MR. BADALA:  Objection to form.

15    A.    I don't remember any, no.

16              -    -    -    -    -

17         (Thereupon, Gerome Deposition

18         Exhibit 7, 2017-2018 Cuyahoga County

19         Strategic Plan Project List -

20         Community Safety and Protection, was

21         marked for purposes of

22         identification.)

23              -    -    -    -    -

24    Q.    Gerome Exhibit 7 is a one-page

25  document entitled "2017 through 2018 Cuyahoga

1   County Strategic Plan Project List - Community

2   Safety and Protection."  This was -- the Bates

3   number associated with this document, I'm not

4   sure why it didn't print out.

5                    MR. BLOCK:  Did you give them with

6   double sides?

7                    MR. BADALA:  Ours was not.

8                    MR. BLOCK:  I only wanted to ask

9   about the first page of it anyway.

10                   MR. BADALA:  I just want to let you

11  know his exhibit doesn't have it either.

12       Q.    Okay.  So I've got you the first

13  page of what was -- the Bates number associated

14  with this was 121911, CUYAH_121911.

15                   MR. BADALA:  It's probably a native.

16  That's probably why.

17       Q.    And the question is whether you are

18  familiar with this document, Captain Gerome.

19       A.    I don't remember reviewing this

20  document, no.

21       Q.    Okay.  Do you know who created it?

22       A.    No, I do not.

23       Q.    Then you can put that aside.

24                   Anything you need to correct in

25  terms of your testimony of any of the questions

1  that I've asked you?

2      A.    Not that I remember, no.

3           MR. BLOCK:  Okay.  I will pass the

4  baton to one of my colleagues here representing

5  one of the other parties in the case.

6           Thank you, sir, for your time.

7           THE WITNESS:  Thank you.

8           EXAMINATION OF DONALD GEROME

9  BY MR. LONERGAN:

10     Q.    Captain Gerome, I introduced myself

11  at the outset of your deposition, but I'll do it

12  again.  I'm Sam Lonergan.  I'm with the law firm

13  of Arnold & Porter, Kaye Scholer, and in this

14  litigation I represent two pharmaceutical

15  manufacturers, Endo and Par.

16     A.    Okay.

17     Q.    I'm going to do my best not to ask

18  any questions that are duplicative of what Ben

19  just asked you, but, frankly, you just were

20  asked and answered a lot of questions so I can't

21  make any guarantees.

22           To the best of your understanding,

23  are prescription opioids, which we've been

24  talking about today, approved for use by the

25  Food & Drug Administration?

```
 1              MR. BADALA:  Objection to form.
 2       A.    I don't know.
 3       Q.    Do you know whether prescription
 4   opioids have a medically approved use?
 5              MR. BADALA:  Objection to form.
 6       A.    Can you repeat that, please?
 7       Q.    Sure.  I'll ask a better question.
 8              Do you know whether prescription
 9   opioids have a medical use or medical uses that
10   have been approved by the FDA?
11       A.    Wasn't that your first question?  I
12   don't know that.  I didn't know that one.
13       Q.    Do you know why doctors prescribe
14   prescription opioids to patients?
15              MR. BADALA:  Objection to form.
16       A.    No, I don't know why they do.
17       Q.    Have you ever heard of a doctor
18   prescribing a prescription opioid to a patient
19   post-surgery?
20       A.    Yes.
21       Q.    Which patient?
22              MR. BADALA:  Objection to form.
23       A.    If --
24              MR. BADALA:  I can tell you not to
25   identify -- are you asking for the name of the
```

Page 221

1   person that was prescribed?

2            MR. LONERGAN:  I'm asking what he's

3   referring to.

4            MR. BADALA:  I would just tell you

5   not to give the person's name.  I mean, there's

6   HIPAA laws and that's why --

7        Q.    Are you able to answer my question

8   without providing a person's name?

9        A.    No, I'm not.

10       Q.    Okay.  Have you ever heard of a

11  situation where a doctor prescribed a

12  prescription opioid for a person with end-stage

13  cancer?

14       A.    I don't know.

15       Q.    Are you aware of that being an

16  approved medical use for prescription opioids?

17           MR. BADALA:  Objection to form.

18       A.    No, I don't know, sir.

19       Q.    Would you agree that a physician

20  would be in the best position to make a

21  determination as to whether a patient should

22  receive a prescription opioid?

23           MR. BADALA:  Objection to form.

24       A.    Can you repeat that, please?

25       Q.    Sure.

```
 1              Do you agree that a physician would
 2    be in the best position to make a determination
 3    as to whether a patient should receive a
 4    prescription opioid?
 5              MR. BADALA:  Objection to form.
 6         A.   Sir, I don't know that.
 7         Q.   Do you believe that a physician
 8    would be in the best position to evaluate a
 9    patient's medical needs?
10              MR. BADALA:  Objection to form.
11         A.   Yes, sir.
12         Q.   And do you believe that a physician
13    would be in the best position to evaluate the
14    risks associated with prescribing a medication
15    to a patient?
16              MR. BADALA:  Objection to form.
17         A.   I don't know that, sir.
18         Q.   Do you agree that prescription
19    opioids can be beneficial to a patient when used
20    properly?
21              MR. BADALA:  Objection to form.
22         A.   I don't know that, sir.
23         Q.   You testified earlier today about
24    your belief about a connection between
25    prescription opioids and heroin and fentanyl
```

Page 223

1    overdoses, correct?

2         A.    Yes, sir.

3         Q.    And I believe you testified that

4    your belief was based in large part on

5    conversations that you had had with certain

6    families.  Do you recall that testimony?

7         A.    I recall that as well as speaking to

8    some of the detectives that respond to these.

9         Q.    With respect to the families that

10   you were talking to, which opioids or

11   prescription opioids were those people taking?

12        A.    Sir, I don't know.

13        Q.    With respect to any conversations

14   you've had with anybody concerning the

15   connection between prescription opioids and

16   heroin and fentanyl use, which prescription

17   opioids are you referring to?

18             MR. BADALA:  Objection to form.

19        A.    There's no specific that I'm

20   referring to.

21        Q.    You just lump them all in one group

22   together?

23             MR. BADALA:  Objection to form.

24        A.    Yes, sir.

25        Q.    With respect to the families that

Page 224

1  you said -- you testified you spoke to about

2  prescription opioid use, why were the people

3  taking the prescription opioids?

4        A.    I don't remember the conversation as

5  to if they explained that or not.

6        Q.    Was it a situation where the patient

7  had been prescribed a prescription opioid and

8  was using it consistent with the doctor's orders

9  or was it a situation where the person had gone

10  out and obtained a prescription opioid through

11  some illicit means?

12              MR. BADALA:  Objection to form.

13        A.    Again, I don't remember the -- the

14  exact conversation I had with them.

15        Q.    Is that answer that you don't know

16  the answer or you only remember certain aspects?

17        A.    I mean, I remember some of the phone

18  calls.  I don't remember all the phone calls.  I

19  don't remember the specifics of us discussing if

20  it was prescribed medication or not prescribed

21  medication, so --

22        Q.    And is that true with respect to all

23  the conversations you had with families

24  concerning prescription opioid uses?

25        A.    Yes.  Yes, sir.

Page 225

1          Q.    I believe you previously testified

2    that you had no recollection of your department

3    ever investigating a patient who was using a

4    prescription opioid in a manner that was

5    consistent with how it had been prescribed by a

6    doctor; is that correct?

7          A.    That was a long question.  Can you

8    please repeat that?

9          Q.    I don't know if I can, actually.

10               I believe you previously testified

11   that you have no recollection of your department

12   investigating a patient who was using a

13   prescription opioid in a manner that was

14   consistent with the way it had been prescribed

15   by a doctor, correct?

16               MR. BADALA:  Objection to form.

17         A.    No, I'm not aware of that, if it

18   was -- if they were using it correctly, I don't

19   know why we would investigate that.

20         Q.    Do you consider over-prescribing of

21   opioids by doctors to be a cause of heroin or

22   fentanyl use?

23               MR. BADALA:  Objection to form.

24         A.    I'm not familiar with them

25   over-prescribing medication.  I've never

1    investigated a doctor for doing that.

2         Q.    To the best of your knowledge, has

3    your department ever investigated any doctor for

4    over-prescribing prescription opioids?

5         A.    No, sir, not that I'm aware of.

6         Q.    Are you able to identify a single

7    script that -- strike that.

8              Are you able to identify any

9    instances where a doctor wrote a prescription

10   for an opioid to a Cuyahoga County resident that

11   was not medically necessary?

12             MR. BADALA:  Objection to form.

13        A.    Can you repeat that, sir?  I don't

14   want to answer that incorrectly.

15        Q.    You're putting me to the test.

16        A.    I just want to get it right.  That's

17   all.

18        Q.    Are you able to identify a single

19   instance where a physician prescribed an opioid

20   to a Cuyahoga County resident and the

21   prescription was not medically necessary?

22             MR. BADALA:  Objection to form.

23        A.    No, I can't identify that.  No.

24        Q.    As a general matter, you understand

25   what a package insert or a warning label is for

```
                                            Page 227
 1   any prescription drug, correct?
 2           MR. BADALA:  Objection to form.
 3       A.    Yes.
 4       Q.    Have you ever had cause to review or
 5   look at a warning label for any prescription
 6   opioid?
 7           MR. BADALA:  Objection to form.
 8       A.    No, I have not.
 9       Q.    Are you aware that the warning label
10   or package insert for prescription opioids
11   identify side effects associated with the use of
12   a prescription opioid?
13           MR. BADALA:  Objection to form.
14       A.    I'm not aware of what's on the
15   bottle, sir.
16       Q.    Are you aware that the warning label
17   and package inserts for prescription opioids
18   identify addiction as a possible side effect for
19   the use of prescription opioids?
20           MR. BADALA:  Objection to form.
21       A.    No, sir, I didn't know that.
22       Q.    Are you aware that the FDA approves
23   the language that's contained in the warning
24   labels and package inserts for prescription
25   opioids?
```

Page 228

1          A.      I'm not aware of that, sir.

2                  MR. BADALA:  Objection to form.

3          Q.      Are you aware of any instance where

4     any physician prescribed any prescription opioid

5     to any Cuyahoga County resident where the

6     physician had not previously read the warning

7     label or package insert before prescribing the

8     drug?

9          A.      No, I'm not aware of that instance.

10         Q.      Are you aware of any instance where

11    any physician prescribed any prescription opioid

12    to any Cuyahoga County resident where the

13    physician did not understand the risks and

14    benefits of prescribing the opioid to the

15    patient?

16                 MR. BADALA:  Objection to form.

17         A.      That, I don't know, sir.

18         Q.      Have you or your department ever

19    investigated the sales practices of any

20    prescription opioid manufacturer?

21         A.      As I stated before, I'm not aware of

22    us ever investigating that.

23         Q.      I apologize if that was duplicative.

24                 As you sit here today, do you have

25    any reason to believe that any opioid

Page 229

1    manufacturer's sales representative ever made

2    any inaccurate or misleading statements to

3    physicians who prescribe opioids to patients?

4              MR. BADALA:  Objection to form.

5         A.    Can you repeat that, please, the

6    first part of that?

7         Q.    Sure.

8              As you sit here today, do you have

9    any reason to believe that any sales

10   representative for an opioid manufacturer made

11   any inaccurate or misleading statements to a

12   physician who prescribes opioids?

13             MR. BADALA:  Objection to form.

14        A.    I'm not aware of that.  No, sir.

15        Q.    Are you aware of any instance where

16   a pharmaceutical sales representative for an

17   opioid manufacturer made a statement that was

18   inconsistent with the product's warning label or

19   package insert?

20             MR. BADALA:  Objection to form.

21        A.    I'm not aware of that, sir.

22        Q.    Are you able to identify a single

23   doctor who ever prescribed a prescription opioid

24   to a Cuyahoga County resident who relied on a

25   sales representative's improper marketing as the

                                        Page 230

1    basis for prescribing a product to the Cuyahoga

2    County resident?

3              MR. BADALA:  Objection to form.

4         A.    I'm not aware of that.

5         Q.    Sir, a few moments ago you

6    referenced personal -- your personal experiences

7    with prescription opioids, and I believe you

8    testified that two of your cousins had passed

9    away as a result of an overdose and one of your

10   friend's daughters; isn't that correct?

11        A.    The friend's daughter did not pass

12   away.  It was a non-fatal.

13        Q.    Were your cousins' overdoses -- did

14   they overdose on prescription opioids?

15        A.    Sir, I don't -- I didn't follow up

16   in how they overdosed.

17        Q.    Do you know if your cousins' initial

18   use of opioids was through prescription opioids?

19        A.    I don't know if I stated that they

20   took prescription or they were addicted to

21   opioids.  I just stated that I know two people

22   that were -- who overdosed.  I don't know what

23   it was from, so I don't know.

24        Q.    And so, then, is it fair to say that

25   you don't know if your cousins had initially

Page 231

1    started out using prescription opioids?

2         A.    Yes, it's fair to say.  I don't

3    know.

4              MR. LONERGAN:  I told you I'd be

5    quick.

6              THE WITNESS:  Thank you.

7              MR. LONERGAN:  Thank you for your

8    time.

9         EXAMINATION OF DONALD GEROME

10   BY MR. MCLAUGHLIN:

11        Q.    Captain Gerome, thanks for your

12   patience today.  I only have a few questions for

13   you.

14        A.    Sure.

15        Q.    I introduced myself earlier.  My

16   name is Chris McLaughlin.  I represent Walmart.

17              Were you aware before today that the

18   county had sued Walmart as a part of this

19   litigation?

20        A.    Not specifically Walmart, no.

21        Q.    Do you have any personal knowledge

22   as to why the county sued Walmart?

23        A.    No, I don't.

24        Q.    Do you have any personal knowledge

25   as to why the county sued CVS, Rite-Aid and

Page 232

1   Walgreens?

2          A.     No, I don't.

3          Q.     Can you personally point to any

4   specific conduct by Walmart, CVS, Rite-Aid or

5   Walgreens related to opioids that caused harm to

6   the county?

7                 MR. BADALA:  Objection to form.

8          A.     No, sir, I can't.

9          Q.     I believe you testified that as part

10  of your training for -- at the sheriff's office,

11  that you took some training on first aid and

12  trauma; is that right?

13         A.     Yes, sir.

14         Q.     Besides that training, do you have

15  any other medical training?

16         A.     The first aid training, the trauma,

17  and then the -- I guess if you called -- the

18  Narcan training that I spoke of, if you want to

19  consider that medical training, that would

20  probably be it, too.

21         Q.     And that's the web-based training

22  you took on the AG's website?

23         A.     Yes, sir.

24         Q.     Do you have any training or

25  expertise in toxicology?

1          A.      No, sir.

2          Q.      Do you have any training or

3     expertise in the diagnosis or treatment of

4     addiction or substance abuse?

5          A.      No, sir.

6          Q.      So you would not be qualified to say

7     one way or another whether somebody was addicted

8     to a substance or not, correct?

9          A.      No, sir.

10          Q.      That is correct?

11          A.      No.  Can you repeat that?

12          Q.      Sure.

13          A.      I'll try to answer it right.

14          Q.      You would not be qualified to say --

15          A.      No, I would not be qualified.

16          Q.      -- one way or another as to whether

17     somebody was addicted to a substance, correct?

18          A.      No, I wouldn't be qualified,

19     correct.

20          Q.      Captain, you testified that

21     currently you are not an investigator; is that

22     right?

23          A.      Correct.

24          Q.      And when was the last time you

25     actually served in the role of an investigator,

Page 234

1  where you were actively involved in

2  investigations?

3       A.    It's -- with a concern to narcotics

4  investigations or any investigations?

5       Q.    Narcotics.

6       A.    Narcotics.  As an investigator, it's

7  been a long time.  I can't remember the last

8  time.

9       Q.    More than ten years?

10      A.    As a lead investigator, probably,

11  yes.

12      Q.    And I believe you also testified

13  that you personally have never responded to a

14  drug overdose scene; is that right?

15      A.    No, sir.  I don't think I testified.

16  I have been to a scene before.

17      Q.    How many times?

18      A.    Once.

19      Q.    And when was that?

20      A.    When I first got into the unit

21  probably in 2014, when I became a lieutenant, I

22  responded to one.

23      Q.    Were you the lead investigator?

24      A.    No, I was not.

25      Q.    Okay.  Have you -- so have you ever

Page 235

1  personally investigated the drug use history of

2  any overdose victim for which the sheriff's

3  office has responded to a scene?

4        A.    No, I have not.

5              MR. McLAUGHLIN:  I have no further

6  questions.  Thank you, sir.

7              THE WITNESS:  Thank you.

8              MR. BADALA:  Anyone else in the

9  room?  How about on the phone?  Do you have any

10 questions on the phone?  Is anyone even on the

11 phone?

12             Let's just take two minutes.  Let me

13 see if I have anything.

14             THE VIDEOGRAPHER:  Off the record,

15 2:34.

16                  (Recess had.)

17             THE VIDEOGRAPHER:  On the record,

18 2:38.

19             MR. BADALA:  So I don't have any

20 further questions, or any questions at all.

21             MR. BLOCK:  So I'll just say again,

22 on behalf of everyone here, thank you, Captain

23 Gerome, for your time.  This concludes the

24 deposition, subject to, it does sound like

25 there's some additional documents that we think

Page 236

1    should have been produced in advance.  If we

2    get -- if additional documents are forthcoming

3    that we think there are questions on, I will

4    leave it open for the purposes of asking

5    questions about that -- those documents.

6            MR. BADALA:  Yeah.  Like I said a

7    few times, send us a letter with a request that

8    it applies to; we'll look at it, consider it and

9    we'll discuss it further.

10           MR. BLOCK:  Thank you, sir.

11           THE VIDEOGRAPHER:  Off the record,

12   2:39.

13

14        (Deposition concluded at 2:39 p.m.)

15                   - - - - -

16

17

18

19

20

21

22

23

24

25

Page 237

1    Whereupon, counsel was requested to give

2    instruction regarding the witness' review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to

7    the applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 238

1                REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                           ) SS:

4     County of Cuyahoga.   )

5

6            I, Renee L. Pellegrino, a Notary Public

7     within and for the State of Ohio, duly

8     commissioned and qualified, do hereby certify

9     that the within named witness, DONALD GEROME, was by

10    me first duly sworn to testify the truth, the whole

11    truth and nothing but the truth in the cause

12    aforesaid; that the testimony then given by the

13    above referenced witness was by me reduced to

14    stenotypy in the presence of said witness;

15    afterwards transcribed, and that the foregoing is a

16    true and correct transcription of the testimony so

17    given by the above referenced witness.

18            I do further certify that this

19    deposition was taken at the time and place in the

20    foregoing caption specified and was completed

21    without adjournment.

22

23

24

25

Page 239

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto set

6    my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 19th day of November, 2018.

8

9

10

11          *Renee L. Pellegrino*

12

13   Renee L. Pellegrino, Notary Public

14   within and for the State of Ohio

15

16   My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

```
                                                       Page 240

 1                          Veritext Legal Solutions
                               1100 Superior Ave
 2                                 Suite 1820
                              Cleveland, Ohio 44114
 3                             Phone: 216-523-1313
 4
     November 19, 2018
 5
     To: SALVATORE C. BADALA
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3109191
 8
     Witness:  Donald Gerome          Deposition Date:  11/14/2018
 9
10   Dear Sir/Madam:
11
     The deposition transcript taken in the above-referenced
12
     matter, with the reading and signing having not been
13
     expressly waived, has been completed and is available
14
     for review and signature.  Please call our office to
15
     make arrangements for a convenient location to
16
     accomplish this or if you prefer a certified transcript
17
     can be purchased.
18
19   If the errata is not returned within thirty days of your
20   receipt of this letter, the reading and signing will be
21   deemed waived.
22
23   Sincerely,
24   Production Department
25
     NO NOTARY REQUIRED IN CA
```

Page 241

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3109191
 3  CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 11/14/2018
 4  WITNESS' NAME: Donald Gerome
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8
    _____      _____
 9  Date                       Donald Gerome
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Page 242

```
1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 3109191
3     CASE NAME: In Re: National Prescription Opiate Litigation v.
      DATE OF DEPOSITION: 11/14/2018
4     WITNESS' NAME: Donald Gerome
5          In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7          I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8     well as the reason(s) for the change(s).
9          I request that these changes be entered
      as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____        _____
      Date                        Donald Gerome
14
           Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22    this _____ day of_____, 20_____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date
```

Page 243

1                    ERRATA SHEET

              VERITEXT LEGAL SOLUTIONS MIDWEST

2                ASSIGNMENT NO: 11/14/2018

3    PAGE/LINE(S) /        CHANGE        /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____      _____

20   Date                      Donald Gerome

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23             _____

              Notary Public

24

              _____

25   Commission Expiration Date

| & |
|---|
| **&** 1:20 2:6,16 3:7 3:11,17 4:3 11:12 11:15,18,21 12:1,4 206:10,21 219:13 219:25 |

| 0 |
|---|
| **000118362** 6:14 184:23 |
| **000118584** 6:12 171:13 |
| **00018717** 6:7 150:6 |
| **05** 181:25 |
| **07** 38:3 40:16 181:25 |

| 1 |
|---|
| **1** 6:5 60:25 61:8 61:10 110:20 |
| **10017** 2:4 |
| **10019-9710** 2:18 |
| **10036-8704** 3:19 |
| **103** 7:23,23 |
| **107** 7:24 |
| **108** 7:24 |
| **10:02** 71:18 |
| **10:16** 71:21 |
| **11** 30:4 |
| **11/14/2018** 240:8 241:3 242:3 243:2 |
| **1100** 240:1 |
| **111** 7:25 |
| **112** 8:3 |
| **113** 8:3,4 |
| **114** 8:4,5 |
| **116** 8:5,6 |
| **118362** 185:8 |
| **118584** 171:25 |
| **118585** 171:25 |

**118717** 150:22
**11:07** 117:17
**11:22** 117:20
**12** 5:8 47:6 121:12 239:16
**120708** 164:18
**120745** 164:25
**120760** 164:18
**12077** 61:13
**121** 8:6
**1211** 3:18
**1215** 13:2
**121572** 168:25
**121789** 169:2
**121804** 169:1
**121911** 218:14,14
**12:14** 163:3
**12:55** 164:9
**13** 165:22,24 166:6 166:15
**1300** 1:21
**131** 8:7,7,8,8
**132** 8:9
**135** 8:9
**139** 8:10
**14** 1:15 7:3 150:23 173:16,19
**141** 8:10
**142** 8:11,11
**145** 8:12,12,13,13
**146** 8:14,14,15
**147** 8:15
**148** 8:16,16
**149** 8:17,17
**14th** 11:2
**15** 57:17 64:11 193:16
**150** 6:6
**152** 8:18
**153** 8:18,19,19,20

**154** 8:20
**155** 8:21,21
**157** 8:22
**158** 8:22,23
**159** 8:23,24
**16** 64:11
**160** 8:24,25
**162** 9:3,3
**164** 5:12 6:8
**168** 6:9
**17** 1:7 7:3 171:24
**1701** 4:4
**171** 6:11
**1717** 3:4
**173** 9:4
**174** 9:4
**175** 9:5,5
**176** 9:6
**177** 9:6,7
**179** 9:7
**18** 1:10
**180** 9:8
**182** 9:8
**1820** 240:2
**183** 9:9
**185** 6:13
**189** 9:9,10
**19** 240:4
**191** 9:10
**19103** 3:5
**19103-2921** 4:4
**194** 9:11
**195** 9:11,12
**196** 9:12,13
**197** 9:13,14
**199** 9:14
**1995** 18:6,9
**1997** 25:22
**19th** 239:7
**1:50** 210:18

| 2 |
|---|
| **2** 5:3 6:6 150:5,19 184:18 190:2 |
| **20** 57:18 193:16 212:20 241:16 242:22 243:22 |
| **200** 9:15 |
| **2000** 20:24 |
| **20001-4956** 3:14 |
| **20005** 3:9 |
| **2000s** 14:18,20 214:1,2 |
| **2001** 14:19 18:8,9 19:13 23:15 |
| **2005** 20:24 24:10 37:19 38:3 39:4 40:16 47:5 170:16 197:16 198:15,23 |
| **2006** 177:2 |
| **2007** 20:1 28:1 31:13,19 37:19 |
| **2008** 177:9 |
| **201** 9:15 |
| **2010** 30:3 |
| **2014** 20:2 32:12 37:11 40:3,25 72:3 154:22 181:16 234:21 |
| **2015** 6:8 164:4,16 165:20 166:16 |
| **2016** 6:10 20:3 43:8 126:9,10 150:21 152:17 168:19,24 169:3 169:21 185:6,19 185:24 |
| **2017** 6:12 61:12 125:19,20 126:15 169:24 171:12 172:23 173:19,21 176:11 217:25 |

**2017-2018** 6:15
217:18
**2018** 1:15 11:3
126:5 217:25
239:7 240:4
**202** 3:9,14 9:16
**2020** 239:16
**203** 9:16,17
**204** 9:17,18,18,19
**205** 9:19,20
**206** 9:20,21
**207** 9:21,22,22
**208** 9:23,23,24
**209** 9:24,25 10:3
**21** 7:4
**210** 10:3,4,4
**211** 10:5,5
**212** 2:18 3:19 10:6
10:6
**215** 3:5 4:5 10:7
**216** 2:9,13
**216-523-1313**
240:3
**217** 6:15 10:7
**219** 5:9
**22** 7:4
**220** 10:8,8,9,9
**221** 10:10,10
**222** 10:11,11,12,12
**2222** 2:8
**2227** 239:12
**223** 10:13,13
**225** 10:14,14
**226** 10:15,15
**227** 10:16,16,17,17
**228** 10:18,18
**229** 10:19,19,20
**230** 10:20
**230-7676** 2:4
**231** 5:10

**232** 10:21
**238** 5:14
**24** 7:5
**24/7** 96:3
**25** 7:5
**250** 2:17
**26** 7:6
**2804** 1:6,7
**29y** 190:3
**2:06** 210:21
**2:34** 235:15
**2:38** 235:18
**2:39** 236:12,14

**3**
**3** 6:8 164:3,14
**30** 167:19,20 190:9
**3100** 3:4
**3109191** 240:7
241:2 242:2
**32** 7:6
**34** 7:7
**35** 7:7
**36** 7:8
**360** 2:3
**38** 7:8
**39** 7:9
**3rd** 13:2

**4**
**4** 6:9 168:18,23
171:22
**41** 7:9,10
**43** 7:10
**434-5421** 3:9
**44** 7:11,11,12
166:22,24
**44113** 13:3
**44113-1901** 2:8
**44114** 240:2
**44114-1190** 2:13

**45090** 1:10
**48** 7:12,13
**49** 7:13

**5**
**5** 6:11 171:7,10,22
**50** 7:14 118:11
126:8
**51** 7:14 126:8
**52** 7:15,15 126:8
**55** 2:7 7:16
**55th** 2:17
**56** 7:16
**58** 118:9
**586-3939** 2:13
**59** 7:17
**5th** 150:21 185:6

**6**
**6** 5:4 6:13 184:22
185:5
**61** 6:5
**63** 185:8
**64** 7:17
**66** 7:18 167:9
169:16
**662-2000** 3:14
**69** 7:18,19
**695-9000** 3:19

**7**
**7** 5:5 6:15 178:15
178:20,21 217:18
217:24
**70** 7:19,20 125:20
**719** 150:22
**725** 3:8
**73** 7:20,21 125:21
**75** 169:13,14,16,17
169:18
**77** 167:15,15

**8**
**8** 178:24 179:1
**80** 34:14
**82** 7:21
**836-8000** 2:18
**844** 2:4
**850** 3:13
**851-8100** 3:5
**861-0804** 2:9

**9**
**90** 7:22
**901** 2:12
**90s** 14:18
**93** 7:22
**950** 1:21
**963-5000** 4:5
**9:01** 1:16 11:2

**a**
**a.m.** 1:16
**aaron** 1:8
**abdc** 206:2
**able** 49:8 91:3
113:5 128:23
145:18 202:12
221:7 226:6,8,18
229:22
**abolished** 30:2,5
**abreast** 49:24
**absolutely** 82:17
215:16
**abuse** 144:25
145:3,10 149:17
154:8,11 156:10
194:18,18,21
212:21 233:4
**academy** 18:7,24
18:25 20:7,8,10,14
**access** 57:6,8,12
66:12,15,17 123:4
129:7,9 130:3,12

130:24 131:8,12
134:14,17 137:3
141:11,14 199:20
**accessed** 144:4
**accessible** 123:7
124:22
**accomplish** 240:16
**accomplishing**
48:24
**account** 130:10
**accounts** 115:9
**accrue** 112:8
**accurate** 61:21
169:22
**accurately** 62:3
**acknowledge**
241:11 242:16
**acronym** 118:23
139:12
**act** 26:5 106:18
241:14 242:20
**actavis** 204:3,6
**acting** 120:19
**action** 37:23
111:24 150:13
151:4,9 239:4
**active** 56:22
125:13 189:19
**actively** 97:25
98:1 198:1,3
199:16 234:1
**activity** 26:14
31:15 32:2 68:6
105:23 137:13
145:22 147:11
211:8,23
**actual** 88:5 94:19
154:11
**add** 34:10 216:8
**addicted** 53:20
230:20 233:7,17

**addiction** 99:17
149:23 213:8,13
227:18 233:4
**addictive** 55:2
212:19
**adding** 47:10
122:24
**addition** 119:7
**additional** 235:25
236:2
**address** 12:25
51:7 121:21,21
122:12 140:12
143:4,5
**addresses** 50:25
**adequate** 46:25
48:6
**adjournment**
238:21
**administration**
219:25
**administrative**
16:16,17
**advance** 101:1
236:1
**advantage** 211:10
**advertise** 64:1
**advise** 15:23
141:19
**advised** 77:23
**advising** 79:14
**advisory** 108:21
109:1,8 111:20
**affiliated** 111:3
**affixed** 239:6
241:15 242:21
**aforesaid** 238:12
**afternoon** 5:12
95:24 164:11
**afterward** 101:4

**ag's** 232:22
**age** 12:10 79:16
**agencies** 58:6
68:19 76:9,21
83:5,7,25 112:9
140:14
**agency** 80:25 81:1
106:1 130:9 141:1
143:22 188:5
198:7,11
**agenda** 98:16
100:22,23 101:6
103:10
**agendas** 102:19
**agent** 59:20 60:10
60:12 180:24
**ago** 166:2 214:22
230:5
**agree** 195:21,25
196:8 202:3,8
211:16 221:19
222:1,18
**ahead** 101:17
102:19 103:11
173:7
**aid** 21:10 208:8,9
208:11 231:25
232:4,11,16
**al** 1:10
**alarm** 95:7
**alcohol** 149:13,17
**alert** 79:13,20
94:13,20,21,24
95:9 186:1,3,7,21
186:23 187:23
190:1 191:1,1
**alerts** 78:23
190:21,22 191:3
**allergan** 203:4,7
**allocated** 117:3

**allocations** 116:21
**amber** 95:9
**americas** 3:18
**amerisourceberg...**
3:2 205:24,25
206:5
**ammunition**
112:22
**amount** 28:24
128:17 146:20
**animals** 188:16
**announcing**
186:24
**annual** 6:8,10
164:4,16,16,20
165:13 168:9,19
168:24 169:24
170:2
**anonymous**
137:24
**answer** 34:12
54:23 94:3 113:14
124:15 136:17
145:6 148:24
156:5 158:1 159:4
186:15 196:9
221:7 224:15,16
226:14 233:13
**answered** 130:22
219:20
**answers** 112:10
**anthony** 67:1
**anybody** 12:6 15:3
47:16 52:7,12
89:6 98:14 104:12
106:20,23 161:10
179:21 184:9
216:18 223:14
**anymore** 110:16
155:19 198:20
200:3

anytime 115:9
anyway 218:9
apartment 92:2
apologize 179:25
228:23
app 138:2
appear 241:11
242:15
appearances 2:1
3:1 4:1 5:3
appears 128:12
appended 242:11
242:18
applicable 237:7
applicants 47:23
applied 24:16
217:11
applies 236:8
apply 13:9 24:18
187:10
appointments
23:19
appropriate
138:22
approved 55:12
219:24 220:4,10
221:16
approves 227:22
approximate
115:16
approximately
15:7 27:25 181:1
april 6:12 171:11
171:24 172:22
arch 3:4
arcos 130:16,24
area 18:18 64:20
66:5 104:25 105:1
105:9 137:21
140:8 144:22
213:20

areas 26:7,9,12
62:20
arnold 2:16 11:21
219:13
arnoldporter.com
2:19
arrangements
240:15
arrest 91:4 92:5
107:9 157:4
202:18
arrested 90:4,8,10
91:13,24 92:6
106:20,23 161:4
arresting 145:21
arrests 89:22 90:1
92:4,10,11 93:14
107:10 145:16
146:7 147:1 161:9
165:21,24 166:6,9
166:15,15 189:13
189:15 202:13,22
214:9
arrive 195:22
196:4,15
arriving 77:19
article 171:18
173:3,13
articles 195:10
ascertain 87:1
aside 153:5 218:23
asked 77:15 92:24
100:7,12,14
150:11 153:20
157:13,16,18
158:12 179:25
214:24 219:1,19
219:20
asking 17:19
85:21 96:5 126:3
153:3 157:4

174:10 212:17
220:25 221:2
236:4
aspects 224:16
assign 81:7
assigned 21:1
23:16 24:1,6
29:17 32:15,20
33:9 34:17 35:2
37:11 38:16 39:11
40:4 57:12,22,25
58:2,4,17,23 59:6
59:14 63:10,14,16
64:18,19,22,25
65:8,9,16 66:5,19
66:24 69:16,23
71:25 72:22 74:1
74:7,9 79:24
96:11 105:12
110:5,13,17,18
112:6 121:2
122:14,15 125:16
168:5 170:17
180:23 181:10,15
182:9 198:7
assignment 182:3
241:2 242:2 243:2
assignments 71:25
170:22
assist 182:18
assistance 58:6
68:21 81:1,3
assisted 68:19
assisting 68:15
76:23
associated 95:8
121:15 153:7
218:3,13 222:14
227:11
associates 89:6

association 30:19
assume 78:21
119:14
assuming 49:22
attached 242:7
attachment
191:22,24
attain 145:18
attend 98:13,18
102:7,15 108:5
attended 97:16
98:15 99:23
100:20 107:24
108:9,17 151:20
151:25 195:17
attention 183:5
attorney 15:5
21:13 154:14
193:15 217:8
239:2
attorney's 97:22
151:18
attorneys 14:25
54:13
august 121:11,13
150:20 152:16
authorize 242:11
automated 56:14
127:15 131:4
automation
130:18
available 26:7
50:17,18 182:20
198:9 240:13
ave 240:1
avenue 1:21 2:3,12
3:18
avoided 192:17
aware 50:13 52:25
55:17 57:7 73:4
73:18 79:4 82:8

91:17 93:12,14,19
94:3,7,11 100:10
111:12 112:13
113:18 114:9,12
117:8 127:10
130:11,14 131:10
131:19 132:8,9
133:8 137:4,5
153:6 154:2 160:9
162:16,18 177:18
179:19,23,24
180:4 183:19
184:13,17 189:15
195:3,13 202:9,20
221:15 225:17
226:5 227:9,14,16
227:22 228:1,3,9
228:10,21 229:14
229:15,21 230:4
231:17

**aye**  12:7

**b**

**b**  4:3 36:25 168:4
**baby**  206:12
**back**  16:24,25
20:24 28:9,14
30:2 31:11,12
37:17,17 38:1
41:23 47:5 53:19
53:25 67:2 71:23
72:1 89:19 109:2
112:2 114:20
119:19 121:14
122:18 126:22
127:4 141:3,7
143:18 146:6,6
147:17,23 154:17
155:14 160:15
170:16 181:25
185:19,23 191:2
197:16,19 198:8

198:23
**background**  86:3
91:22 134:7 158:8
**backtrack**  187:13
**bad**  39:25
**badala**  2:3 11:9,9
14:17 17:8 21:20
21:25 23:25 25:6
26:24 32:4 34:23
35:20 36:2,4
38:10 39:24 41:8
41:18 43:1 44:6
44:16,21 48:1,7,25
50:8 51:2 52:5,17
55:15 56:3 59:2
61:7 64:5 66:2
69:1,7 70:10,20
71:16 73:9,17
82:7 90:18 93:18
103:16,23 107:11
108:8 111:11
112:20 113:8,23
114:17,22 116:15
116:23 117:13
121:18 130:25
131:9,18,24 132:7
135:13 139:6
141:17 142:5,24
145:2,4,11,19
146:12,18,21
147:5 148:19,22
149:1,5 152:24
153:1,9,15,18
154:1 155:6,11
157:6,25 158:15
158:22 159:2,8
160:5,13 162:2,21
173:14 174:7
175:6,11 176:19
177:16,24 179:22
180:3 182:13

183:7 189:6
191:14 194:20
195:7,24 196:7,18
197:4,10 199:13
200:16 201:24
202:7 203:9,17
204:1,8,16,23
205:6,15 206:8,24
207:7,15,24 208:6
208:14,23 209:6
209:13,20 210:1,4
210:12,16 211:6
211:21 212:5,13
215:5 217:14
218:7,10,15 220:1
220:5,15,22,24
221:4,17,23 222:5
222:10,16,21
223:18,23 224:12
225:16,23 226:12
226:22 227:2,7,13
227:20 228:2,16
229:4,13,20 230:3
232:7 235:8,19
236:6 240:5
**baggie**  85:8
**baggies**  190:15
**balance**  115:16
**banded**  118:21
**bar**  190:9
**based**  53:22 85:3
89:22 134:20
149:6 182:23
187:21 198:17
223:4 232:21
**basic**  20:21
**basically**  18:25
21:12 23:5,20
35:8 47:18 54:12
63:15 81:15
127:23 128:10

142:12 188:16
**basis**  29:9 46:18
58:15 69:24 230:1
**bates**  6:6,12,13
61:13 150:6,22
164:17,24 168:25
171:12,25 184:23
185:7 218:2,13
**bathroom**  190:9
**baton**  219:4
**batone**  66:20 67:3
67:15 74:7
**bblock**  3:15
**bears**  150:21
164:17 168:25
185:7
**becoming**  155:1
212:19
**began**  214:17
**beginning**  6:6,12
6:13 148:9 150:5
171:12 184:22
**behalf**  2:2,11,15
3:2,7,11,16 4:2
11:15,19,21,24
12:1,5 96:22
151:21 235:22
**belief**  222:24
223:4
**believe**  17:3 27:8
31:24 36:20 41:10
43:8 64:21 65:6
77:6 100:6 106:3
108:4 124:5,19
125:20 128:15
129:21 137:8
140:22 142:12
155:3,4 174:3
186:18 194:4
200:5 205:2
211:25 215:20

222:7,12 223:3
225:1,10 228:25
229:9 230:7 232:9
234:12
**bell** 177:5,10
**bells** 151:8
**ben** 11:17 65:12
219:18
**beneath** 167:8
**beneficial** 222:19
**benefits** 228:14
**benevolent** 30:19
**benjamin** 3:12
**best** 16:8 44:23
110:4 201:10
212:15 216:11
219:17,22 221:20
222:2,8,13 226:2
**better** 115:5 220:7
**big** 25:2 45:18
64:10
**bigger** 34:3
**birth** 134:3
**bit** 31:9 48:2
101:10,12 133:25
140:15 144:19
158:3 173:22
174:24
**blab** 132:11
**block** 3:12 5:8
11:8,17,17 12:2,6
12:16 61:5 68:1
71:14,22 117:15
117:21 159:17
162:25 164:13
188:25 210:14,22
218:5,8 219:3
235:21 236:10
**blocks** 135:3
**board** 17:6 35:23
43:7 108:20,21

109:1,8 111:20
178:13,16,17
179:2,2,6,11,17
193:22,24
**bockius** 4:3
**bodies** 58:9,10
119:23
**body** 16:16 17:5
88:16,18,19
**bonnette** 138:20
**booking** 18:18
**boot** 20:6
**bottle** 190:18
227:15
**bottles** 70:8
**bottom** 61:12
164:25 165:9
185:12
**bova** 36:20,23
42:10,19,23
**box** 40:12 41:9
69:8,13,17,19
70:13 104:11
122:7 200:1 215:7
**boxes** 69:24
104:13
**branch** 180:10
**break** 71:15
117:14 159:18
163:1 174:25
186:8 210:15
**brief** 42:8 46:18
79:17 98:8 147:19
**briefed** 91:7 93:24
115:8,17 161:12
195:18
**briefing** 50:14
72:6 98:6,9 100:8
**briefly** 69:12
186:22

**briefs** 46:19 50:1
**bring** 98:20
**bromadol** 200:19
**brought** 40:13
87:18 99:9 183:4
**bucks** 210:8
**budget** 45:9,17,24
47:25 49:4 114:21
116:12,12,21,22
117:2,6,7
**budgeted** 116:9
**building** 97:17
160:16 162:12,18
**buildings** 23:18
160:16
**bunch** 150:21
165:19 185:7
**bureau** 38:21
**burling** 3:11 11:18
**burn** 104:22
**business** 12:25
162:12 185:19,23
**busts** 146:17
**busy** 35:21

## c

**c** 2:3 3:12 19:1,2
82:25 135:21
240:5
**ca** 240:25
**cabalero** 27:2
**calendar** 126:5
**call** 17:10 18:17
20:5 22:21 28:25
29:11 34:6 37:23
58:7,7 68:13,21
69:16 74:21 75:3
76:17 78:20 79:24
80:24 84:21 96:2
109:6 118:23
128:5 134:10
155:25 190:20

194:9 212:24
215:10,12,18
216:9,14,17,21,24
217:5 240:14
**called** 12:10 21:14
23:21 40:12 69:19
75:14 77:14 83:24
96:13,17 104:24
107:19 109:7
110:21 111:20,24
115:11 124:4
127:13 129:2,14
130:16 135:20
137:25 150:13
200:19 206:2
212:23 232:17
**calling** 77:19
199:21
**calls** 137:24,24
224:18,18
**cameras** 49:9,10
**camp** 20:6
**cancer** 221:13
**captain** 12:24 13:7
19:20,25 20:3
30:22 31:2 32:24
32:25 33:8 36:9
37:2,4 39:15,17,17
42:5,14 43:10
44:11 45:14 46:13
61:14 62:10 68:1
71:23 77:6,14
108:5,17,17
111:16 117:22
150:10,24 164:14
185:3 210:23
218:18 219:10
231:11 233:20
235:22
**captains** 41:24

**caption** 238:20
**car** 217:1,1,6
**caraballo** 16:13
25:14,20 27:3,5
31:21 33:13 62:12
62:21 72:12
**card** 49:15 127:25
**cardinal** 3:7 12:1
203:11,15
**care** 101:24
**career** 20:18 24:20
32:1 43:23 107:14
107:15 144:24
**carfentanil** 188:10
188:11,13,22
189:4,14,16,20
194:25
**carole** 97:23
151:14
**carry** 48:6 128:20
193:6,9
**cartel** 195:14
**cartels** 58:21,25
59:7 195:18,20
**case** 1:7,10 32:5
52:4,9 56:22,25
59:9 98:7 119:8
119:25 120:15
121:3,6,11,12,16
121:19 122:13
123:5 139:25
143:13 161:1
187:17,17 219:5
240:6 241:3 242:3
**cases** 120:9 133:9
135:8 198:25
202:1
**catch** 162:4
**catchall** 35:11
68:14

**categories** 169:3
**category** 55:5,20
167:10
**cause** 155:4
158:18,19,24
225:21 227:4
238:11
**caused** 89:8 232:5
**causes** 148:7
158:17,20,25
**causing** 147:17
**cch** 129:2
**ccsd** 165:4
**cell** 85:9 89:1,2
**cephalon** 205:8,9
205:13
**certain** 26:6 79:8
79:21 81:11 98:18
112:9 121:21
128:17 135:2
202:18 211:7
223:5 224:16
**certificate** 5:14
238:1 242:11
**certification**
193:17,19 241:1
242:1
**certified** 12:13
21:15 128:4 129:8
129:11 240:16
**certify** 238:8,18
239:1
**chain** 75:24 79:14
105:14 150:19
185:5,13,16
186:20
**chair** 97:19
**chaired** 97:24
**chance** 151:1
172:1 173:2,9
200:3

**change** 36:13
153:23,24 154:2
197:11 242:8
243:3
**changed** 197:3
198:12
**changes** 40:7
197:6 241:7 242:7
242:9
**channel** 178:15,20
178:21,25
**charge** 31:18 34:1
35:19 44:7 59:19
59:20 60:10,13
68:8 75:18 94:4
94:12 109:21,25
110:15,25 115:12
115:19,21 170:10
171:3 172:9,25
216:15
**charged** 99:11
177:2
**charges** 29:19
160:20
**chart** 6:5 60:22
61:1,18 110:20
116:24
**charter** 104:21
**check** 85:17 110:8
120:2 135:3
137:10 141:14
**checking** 95:4
**checklist** 82:3,9
**chief** 16:2,4,5,6
39:16 42:4,6,15,17
42:18,20,21,24
45:19 47:14 54:9
54:10 77:2,14
100:5,8,8 108:4,16
**chiefs** 76:18,24

**china** 195:6,11
**choice** 196:11
**chris** 11:23 231:16
**christopher** 2:12
**chronologically**
121:17,20
**circulate** 172:19
**circumstance**
141:24
**circumstances**
91:6
**citizens** 105:23
**city** 17:5,6,9,13
77:4 78:6 118:14
216:22
**citycenter** 3:13
**civil** 12:12 237:3,7
241:5 242:5
**civilians** 98:17
**clarified** 173:20
**classes** 21:13
**classified** 30:23
**cleveland** 1:22 2:8
2:13 11:5 13:2,6
26:12 74:18 75:5
98:12 106:3
118:14,14 129:21
129:25 130:1,7,13
216:23 239:7
240:2
**climb** 58:20
**clinics** 177:3
**close** 25:9 208:17
**closure** 147:21,25
156:1,22,24 157:3
157:10
**clr** 1:25
**cmmclaughlin**
2:14
**cocaine** 26:18
106:12 107:2,8,14

[cocaine - correct]

201:1
cocktail 82:19
code 187:5
colleagues 219:4
collect 81:16
collected 70:1
83:21 88:24
121:15
collecting 138:5
collects 88:16
college 18:1 19:5
column 126:17
combination
153:17
combinations
152:20,23 153:8
come 24:13 29:8
42:25 43:6 45:13
50:18 68:6 70:22
89:19 99:10 112:2
116:5 118:21
119:1 124:14
127:4 138:11
148:18 154:14
158:10 172:7
184:7 190:16
193:21 196:22,23
202:2
comes 49:2 50:4
86:16 88:16 94:14
94:21 95:13
128:11 132:10
166:14 167:2
169:9 178:4 186:1
187:7 189:10
coming 46:21
49:18 77:16 78:5
96:23 138:6 149:7
162:15 177:18
188:24 189:5
195:6,11 197:2,20

211:11
commander 75:9
75:11 76:3
comment 122:16
189:18
commenting 186:7
188:9
comments 122:20
commission
239:16 241:19
242:25 243:25
commissioned
238:8
committed 177:9
committee 111:25
150:14 151:4,9,12
151:14
common 123:3
201:4
communicated
156:23
communication
65:22 66:3 182:15
communications
76:25 111:13
community 6:16
19:5 118:25
217:20 218:1
companies 2:16
53:12
company 104:23
205:10 206:11,18
compare 130:7
complaint 54:1
180:15
complaints 26:5,6
105:22
complete 116:6
completed 238:20
240:13

completely 197:13
computer 21:15
52:11,13,20
123:20
conceal 128:20
concern 234:3
concerned 195:9
concerning 223:14
224:24
concluded 236:14
concludes 235:23
condition 200:14
conduct 64:7 73:3
73:7,15 148:11
149:7 232:4
conducted 37:25
53:22 167:12
conducting 76:22
77:16 145:22
confused 109:6,10
confusing 136:25
congratulations
28:13
connection 52:3
114:15 123:24
134:18 135:16
161:4 214:9
222:24 223:15
connections
214:12
connolly 3:7 12:1
consider 85:2
122:5 145:9 215:8
225:20 232:19
236:8
considered 85:1
85:11 192:25
consistent 224:8
225:5,14
consolidated
130:19

constant 66:3
182:15
constraints 47:25
cont'd 3:1 4:1 8:1
9:1 10:1
contact 65:20 67:9
68:6 72:22 142:7
contacting 89:3
contain 52:15
contained 227:23
content 172:10
continued 164:12
continuous 21:8
21:11
contract 215:12
contribute 174:6
convenient 240:15
conversation 78:2
157:21,24 158:6,9
176:2,7,10 224:4
224:14
conversations
44:22 47:14 60:6
76:18,25 174:25
175:4,18 176:11
176:14,18,23
198:17 223:5,13
224:23
cool 38:22
coordinating
142:3
coordination
111:5
copy 123:21
172:14,17 191:6
corner 26:15
61:13
corporation 3:2
3:11 11:19
correct 22:22
30:24 64:21 71:11

74:10 86:23 132:17 157:16 188:5 208:17 218:24 223:1 225:6,15 227:1 230:10 233:8,10 233:17,19,23 238:16

**correction** 18:6

**corrections** 18:10 18:14 21:22 22:3 242:17

**correctly** 55:11 158:19 166:23 170:18 171:5 225:18

**council** 17:6,10,13 17:15,19

**counsel** 11:6,15 237:1,10 239:2

**count** 74:6,13

**counterfeit** 201:19

**counterpart** 75:5 75:8

**county** 1:9 2:2 6:5 6:8,9,11,15 11:13 11:16 12:24 17:5 17:6,10,14,15,19 19:5 22:4,7 23:18 35:9 40:11 41:25 43:4 53:11 54:6 59:1 60:25 61:11 68:21 69:18 79:7 83:5,11 90:6 94:15 96:17,23 108:20 109:4,7 113:20 116:10 125:25 136:5 145:1,10 148:17 148:21 152:3 153:25 154:5,7,15

155:5 160:16 162:19 164:3,15 168:18,24 171:10 171:23 179:21 186:12 187:20 194:19 195:5,15 195:22 196:5,16 197:2,9,15 198:4 198:15 199:10 201:2 203:8,16,25 204:7,15,22 205:5 205:14,22 206:7 206:23 207:6,14 207:23 208:5,13 208:22 209:5,12 209:19,25 210:11 211:1,4,5,20 212:4 212:12 213:20 215:2 217:18 218:1 226:10,20 228:5,12 229:24 230:2 231:18,22 231:25 232:6 238:4 241:10 242:15

**couple** 14:1 29:24 32:19 37:3 43:8 58:9 60:14 62:6 63:10 65:16 96:25 97:17 98:13 100:6 109:23 111:17 118:16 136:8 166:2 176:21 194:12 215:24

**course** 21:4,8,17 57:16 164:22 185:18,23

**courses** 20:19 21:6 21:18

**court** 1:1 5:16 13:9,18 14:4,10

16:15 108:20 109:3,4,7,10,14,19 110:1,13,19,24 111:1,6,7,15,19 241:7

**courthouse** 70:24

**courtroom** 99:11

**courtrooms** 109:24,25

**courts** 22:19 32:19 34:7 109:22 110:15,18 181:11 181:12,12

**cousins** 213:18 230:8,13,17,25

**cov.com** 3:15,15

**cover** 103:14

**covered** 71:2

**covington** 3:11 11:18

**craving** 155:21 156:14,16 198:19 211:12

**create** 143:25

**created** 66:6 143:20 211:9 218:21

**creates** 130:9

**creative** 202:4,8

**credit** 49:14

**crime** 83:24 84:1,6 84:25 85:1 86:7 107:20 120:16 121:25 127:6 128:24 137:8,17 137:19 138:10 142:14 178:4

**criminal** 129:2

**cris** 135:21 136:22

**crisis** 53:12,15 54:23

**crucial** 85:8

**current** 19:18

**currently** 30:12 37:4 67:13 105:4 110:11 189:19 233:21

**curtail** 38:4 147:12

**custody** 5:16

**cut** 21:3

**cuyah** 6:7,12,14 61:13 150:6,22 164:17 168:25 171:13,25 184:23 185:8 218:14

**cuyahoga** 1:9 2:2 6:5,8,9,11,15 11:12,16 12:23 19:5 22:7 41:25 59:1 60:25 61:11 79:7 83:5,11 90:6 96:17,23 108:20 113:20 135:21 136:5 145:1,10 148:17,20 153:25 154:5,6 155:5 162:19 164:3,15 168:18,23 171:10 171:23 179:21 180:1 186:12 194:19 195:5,15 197:2,9,15 198:15 199:9 201:2 203:8 203:16,25 204:7 204:15,22 205:5 205:14,22 206:7 206:23 207:6,14 207:23 208:5,13 208:22 209:5,12 209:19,25 210:11 211:1,4,5,20 212:4

212:12 213:20 215:1 217:18,25 226:10,20 228:5 228:12 229:24 230:1 238:4

**cuyahogacounty...** 51:9

**cvs** 208:1,2,3 231:25 232:4

**cyclopropylfent...** 200:23

**d**

**d** 65:11

**d.c.** 3:9,14 31:7

**daily** 29:8 45:12 46:18 50:2 65:19 69:24

**dan** 1:8

**data** 127:15 128:5 131:8,16 136:19 169:8 201:10

**database** 56:19 57:6,10 66:7,9,13 75:1 83:23 84:3 86:7 121:25 122:1 122:6 127:22 129:22 130:16,24 131:3,13 134:1 137:3,9 140:1,5,18 141:10,14 142:25 143:6,16,25 144:10,15

**databases** 84:5 122:2 127:7 136:18

**date** 11:2 44:1 61:12 80:12 122:13 134:3 181:17 237:11 240:8 241:3,9,19 242:3,13,25

243:20,25

**dated** 6:11 171:11

**dates** 107:16 176:12

**daughter** 156:3 157:15 214:15,19 230:11

**daughters** 230:10

**dawn** 192:16,17 192:20

**day** 2:11 11:24 20:22 22:12 46:22 46:22 49:23,23 58:15,15,16 95:22 103:7 120:13 139:4 203:22 239:7 241:16 242:22 243:22

**days** 85:11 240:19

**dea** 20:21 21:4,17 57:12,22 58:1,4 59:6,11,16 60:4,10 60:12 64:18 65:9 98:14 105:4,5 132:3,16,24 161:15 178:10 180:17,20,20 181:14,19,21 182:4,9,24 183:4 184:8 195:17 197:22 198:10

**dea's** 58:12

**dead** 156:4 190:8

**deadly** 152:19,22 216:24

**deal** 13:25 66:22 73:14 105:17

**dealer** 89:14

**dealers** 26:14 211:13,17

**dealing** 35:17 59:7 86:10

**deals** 132:1 137:22 138:13

**dealt** 23:17 26:17 56:5 143:18 213:13

**dear** 240:10

**death** 216:21,22

**deaths** 192:17

**deceased** 53:19 80:19 91:11

**decedent** 86:2 149:12

**decedent's** 122:13

**december** 83:19

**decided** 95:18

**deconflict** 140:7

**deconflicting** 74:21,25 142:12 142:15

**deconfliction** 66:7 140:5

**decreasing** 153:13

**deed** 241:14 242:20

**deemed** 240:21

**defendants** 11:22

**definition** 54:25

**delegated** 46:23 49:22 62:20

**delivery** 237:9,11

**dent** 144:1

**department** 6:5,8 6:10,11 12:24 16:18 18:4 21:2,9 22:7,8 24:15 25:21 27:10,21 29:7 33:1,5 37:5 41:25 43:3,5,19,22 44:14 45:8,23

46:1,7,9 47:6 51:14,18 53:18 57:3,5,8 58:5,8,10 59:11 60:21 61:1 61:11,19,22 62:4 62:10 63:21 65:23 66:12 68:14,24 70:18 71:5 73:1 73:14,20 74:15,17 74:18 75:6 76:10 77:7,21 78:5 79:4 79:11 80:9 83:16 89:22 90:9 91:3 92:3,9 93:10,15,21 94:24 95:15,20 96:20,23 100:1,17 101:13,15 102:3 103:21 106:4 107:23 108:2,13 110:12 112:4,6,14 112:16 113:3,20 113:21 114:7,13 114:21 115:4 116:3,7,13,20,22 117:6 118:1,6,17 118:17,19 122:3 122:22 123:4,8 125:4,25 126:4 127:18 129:6,7,16 130:1,6,12,23 131:8,12,17,22,25 134:13 135:6,15 136:13,15 137:3 137:12,18 138:5 138:13,14 139:20 142:16 143:24 144:9,21 159:25 160:21,23 161:3,9 162:11 164:4,16 164:20 168:19,24 170:9 171:11,24

172:16,20 174:10
174:19 177:13,20
179:10,16 180:2
180:10,10 181:7
181:22 182:23
183:9,17 184:2,10
186:3 188:2 189:3
189:13,21 191:11
192:5,8,25 193:6
193:11,12,20,25
194:6,7 195:19
201:17,18 202:10
202:11,14 212:22
213:3 214:13
215:2 216:14
217:11 225:2,11
226:3 228:18
240:24
**department's** 45:8
116:4
**departments** 83:9
143:22 216:12
**depending** 96:1
120:18
**depends** 22:11
88:24 95:11 178:2
**depict** 62:4
**deposed** 12:13
**deposit** 115:10,10
**deposition** 1:13
13:15 14:22 15:22
54:14 60:24 150:4
164:2 168:17
171:9 184:21
217:17 219:11
235:24 236:14
238:19 240:8,11
241:1,3 242:1,3
**deputies** 29:12
34:15 57:25 69:23
110:4,12,17 128:3

129:8 142:22
**deputy** 16:4,5,6
18:8 19:17,21,24
23:14,24 25:17,24
25:25 27:23 30:3
39:4,7,7 42:3,4,6
42:17,18,25 64:18
64:22,25 67:2,4,7
67:15,15,19 96:10
108:12,16 109:23
141:6 167:24
168:3 181:4,6
197:16 214:14
**describe** 20:16
45:11 46:12 59:18
69:12 109:18
150:16
**describing** 80:17
187:24
**description** 6:3
55:10 61:21
**designed** 201:23
**destroy** 70:3 105:7
**destroyed** 104:19
**detected** 152:18
**detection** 63:16
**detective** 14:5
38:16,18,21,22,25
39:5 58:2 64:22
74:7 81:4 84:11
86:25 87:14 88:4
105:12 122:23,25
138:19 140:25
144:16 145:14
146:8 166:11,12
168:5 169:11
170:17 180:21,22
181:2,4
**detectives** 29:16
40:10 44:24 47:4
48:14,17,22 64:9

66:5 73:25 74:9
75:2 76:19 77:19
78:7,24 79:20,23
80:4 81:7,13 82:4
82:14 84:9,18,20
84:23 87:16,24
88:2 90:10 95:21
95:23,25 119:13
121:10 122:14
123:14,15 127:11
140:6 141:11
143:15 153:11
155:12,23 175:21
180:21 186:23
187:15 188:2
192:7 199:15
212:24 213:5
215:10 223:8
**determination**
221:21 222:2
**developed** 215:6
**devices** 49:12
**devlin** 115:21
**dgerome** 51:9
**diagnosis** 233:3
**die** 213:22
**died** 158:9 213:16
**different** 38:19
39:8 75:13 95:23
96:14 119:25
121:3 146:16
148:2 152:2,6
174:9 196:22
210:24
**difficult** 195:23
196:5,16
**direct** 62:22
133:12 170:20
**directed** 177:23
178:5

**directly** 63:2 76:3
215:3
**director** 71:3,4,6,9
**disagree** 195:21
195:25 196:9,19
**disciplinary** 16:20
**discipline** 16:22
**discuss** 45:19
75:20 236:9
**discussed** 77:7
99:7 103:22 104:3
107:25 151:16
177:17 178:9
**discussing** 97:1
224:19
**discussion** 69:2
**discussions** 60:4
98:22 99:20
214:16
**dispatch** 128:6
**dispatchers**
129:10
**dispensary** 71:7
**disposal** 104:24
**dispose** 105:3
**distribute** 193:8
193:18 202:6
**distributed** 198:22
**distributing**
177:15
**distribution**
185:10 189:14,20
192:23
**distributor** 91:21
184:11
**distributors** 94:6
**district** 1:1,2
**diversion** 159:21
**dividing** 118:5
**division** 1:3 21:2
23:17 24:7,8,20

25:1,2,18 26:1
27:24 28:6,9,23
29:10,23 31:13,19
32:18,18,19,21
33:10 34:18,19
35:2 37:8,12,14,18
37:20 38:2,22
39:3,12,13 40:3,6
40:20,24 43:14
44:3,4 46:14 47:1
47:9,11 48:5,14,23
49:25 50:13 63:19
66:17,23 72:2,7,9
73:23 74:1,5,9
81:5 105:13
109:22 111:3,7,9
116:17 117:3,5,9
117:24 119:10
123:9 124:18
133:3 134:17
138:10 144:17
145:15,17 147:10
148:8 154:18
168:10 170:20
171:3 181:11,12
182:1,3,11 202:23
213:5
**divisions** 34:7
116:25 128:1
**doctor** 91:16
132:21 152:14
161:5,10 177:8
199:12 200:5,13
220:17 221:11
225:6,15 226:1,3,9
229:23
**doctor's** 160:3
224:8
**doctors** 178:18
212:1,6,9 220:13
225:21

**document** 1:8
61:10,17 73:6
82:8 164:15
171:23 217:25
218:3,18,20
**documentation**
124:20
**documented** 82:22
**documents** 15:8
15:10,14,16 52:4,9
52:15,25 73:13
123:25 235:25
236:2,5
**dogs** 63:10
**doing** 26:22 28:14
38:6 40:21,24
45:24 49:25 50:7
50:14 58:14,16
59:21,22,25 61:6,8
65:18 67:6,17
68:23 72:9 84:19
85:17 123:5 130:8
135:17 142:19,21
143:9,23 175:21
181:9 194:16
226:1
**domestic** 135:8
**don** 32:24
**donald** 1:13 5:7
12:10,15,19
164:12 219:8
231:9 238:9 240:8
241:4,9 242:4,13
243:20
**donna** 46:2 113:15
113:16,16
**door** 29:13
**dose** 141:4
**double** 141:14
218:6

**doug** 58:2 180:22
180:23
**downtown** 26:11
26:11
**dozen** 25:8,9 34:22
**dr** 177:2 186:7,10
186:11 188:9
189:23 201:15
**drive** 123:20,22,24
**driver's** 127:24
128:12 134:5
**driving** 128:11,13
134:6,7
**drop** 40:12 41:9
69:8,13,17,19,20
69:24 70:13
104:11,13 122:7
200:1 215:7
**dropped** 70:4
**drug** 3:2 13:25
26:6,14 38:4
41:13,15 44:14,15
44:20 49:13 55:2
55:23 58:21,25
59:7 62:25 63:15
64:4,19,20 68:6
77:17 79:10,15
85:10,25 89:14
92:5,6,11 99:16
105:9,23 106:6
108:20 109:3,4,7,9
109:14,19 110:1
110:13 111:15,19
114:6,15 122:8,9
126:19 128:24
135:17,17 144:25
145:3,9 146:16
147:24 149:17
155:20 190:10,12
195:14,20 211:13
211:17 212:21

219:25 227:1
228:8 234:14
235:1
**drugs** 26:16 41:16
55:4 56:6 79:18
81:25 85:4 93:4
106:6,8 126:19
146:20 148:2
149:9 155:19
156:16 157:10,19
196:22,23 197:2,5
197:7,7 211:17,18
**dual** 170:22
**due** 156:4
**duly** 12:12 238:7
238:10
**duplicating** 65:24
**duplicative** 219:18
228:23
**duty** 84:22 95:21
**dying** 80:22

**e**

**e** 6:6,13 12:20,20
15:18 50:19,22,25
51:7,22 75:13,23
75:24 76:2,7,17
79:14 94:25 95:1
95:4,17 115:13
133:19 137:23
138:21 150:5,18
150:19,23 152:8
152:16 170:2,3
174:9 184:22
185:5,12,16,17,22
186:4,20 188:8
191:20,21,23
192:1,14
**earlier** 73:24 93:4
131:3 134:9
150:12 151:23
178:9 187:24

222:23 231:15
early 14:20
easier 118:7,8
east 118:21
eastern 1:3
edelman 67:1,20
effect 227:18
effective 48:23
effects 227:11
efforts 65:25
  142:4 144:22
either 41:22 50:17
  64:1 70:23 76:4
  76:16 77:3 99:11
  105:22 108:12
  118:3 122:16
  135:20 145:17
  152:5 161:22
  182:12 214:9
  218:11 239:2
elaborate 158:3
electronic 21:14
  83:3
electronically
  137:20
elm 121:10,12
elyria 104:25
employees 73:19
encompassed 63:6
  64:15 167:10
encountered 59:3
  201:19
endo 2:15,15
  11:22 208:25
  209:1,4 219:15
ends 80:22 86:18
enforcement 14:6
  14:11,19 18:22
  19:13 20:4,13
  35:12 38:4 44:15
  56:21 64:23 68:19

70:21 76:9 85:17
  102:9,11,14,17,23
  103:25 104:1,6
  106:17 107:16
  115:11 117:5
  127:14,14,25
  129:15 133:18
  135:6 139:9
  140:14 141:18
  144:24
enjoy 37:19
enter 140:9,11,11
  140:12 160:15
entered 121:22
  143:6 242:9
entering 64:8
  70:24
enterprise 136:19
enters 38:11
entire 116:22
  241:5 242:5
entities 210:24
entitled 61:11
  164:15 171:18,23
  217:25
eopata 134:10
eopota 21:14
epidemic 97:3
  143:19 154:16
  155:5,9 156:9,11
  171:19 173:3
  203:8
equal 35:23
equipment 17:16
  45:19 46:16
  112:22,23 115:24
  216:3,3
errata 240:19
  242:7,10,18 243:1
erroneous 173:13
  173:15

errors 174:1,4
especially 149:19
esq 2:3,6,7,12,17
  3:3,8,12,12,18 4:3
et 1:10
ethel 28:21
euclid 17:24
eugene 43:17
evaluate 222:8,13
event 76:5 239:3
events 15:11 98:9
  98:10
everybody 123:8
everyday 37:24
  107:20
evidence 35:15
  69:15,16 70:2
  81:16 85:7,11
  88:17 91:9 115:12
  115:22 122:17
  170:21 173:1
exact 14:9 25:4
  27:17 28:24 37:3
  41:5 44:1 46:6
  53:5 56:10 80:12
  83:10 91:5 181:16
  213:23 224:14
exactly 70:6 86:12
  89:19 149:15
examination 5:7
  12:11,15 164:12
  219:8 231:9
examiner 41:23
  75:25 79:12,12
  86:15 88:16,18
  94:15,18 119:24
  186:11,14,16
  187:17 191:7,8,11
  191:12 201:7,12
examiner's 89:18
  122:18 127:3

152:13 191:17
examiners 187:8
example 22:2
  50:16 55:16 132:5
  135:7
examples 49:6
exciting 37:25
excluding 93:6
exclusively 215:3
  215:22
excuse 17:15
  203:2
executed 29:21
  242:10
execution 241:14
  242:19
executive 154:15
exhausted 96:12
exhibit 5:16 6:5,6
  6:8,9,11,13,15
  60:25 110:20
  150:5,18 164:3,14
  168:18,23 171:10
  173:10 184:22
  185:5 217:18,24
  218:11
exhibits 5:4 6:1
exist 124:16
existence 137:10
expand 24:20
expect 190:19
expected 103:13
expenditure 215:9
  217:8
expenditures
  45:18 112:17
  215:1,20 216:7
experience 190:12
experiences 230:6
expert 144:9,11,12

**expertise** 232:25
233:3
**expiration** 241:19
242:25 243:25
**expired** 190:9
**expires** 239:16
**explain** 140:15
**explained** 77:18
224:5
**explaining** 186:1
**explorer** 140:1
**expressly** 240:13
**extent** 200:11

**f**

**face** 72:18,18
75:15
**facilities** 23:20
**facility** 22:10,15
22:24
**facing** 53:13,15
145:1
**fact** 90:3 201:21
**fair** 109:11 154:4
230:24 231:2
**fall** 63:5 180:12
**falling** 72:7
**falls** 62:9 65:7
69:9,14
**familiar** 91:5
96:13,16 105:1
107:18 129:20
130:15,20 133:21
134:21,23 135:22
136:2,5,16,20
139:8,15,25
159:23 161:5,16
172:4 190:20
191:5 201:25
203:11,13,19,22
204:25 205:8,11
205:17,24 206:11

206:14 207:1
208:8,10,18
218:18 225:24
**families** 147:20
148:13 223:6,9,25
224:23
**family** 53:23 81:19
85:18 120:5,6
149:20 156:18,23
156:25 157:12,17
157:22 158:6,7,12
160:12 175:1
213:8,12,15,17
**far** 32:10 44:17
65:6 77:15,19
104:16 107:13
112:12 126:6
136:2 154:14
158:10 194:15
195:9,19
**fatal** 80:24 140:22
141:4 214:15,16
230:12
**fatalities** 192:1
**fatality** 80:16
**fbi** 195:17 198:10
**fda** 55:12 201:22
220:10 227:22
**federal** 12:11
97:17 114:10
197:22 198:10
209:22,23
**feed** 135:10
**feeds** 144:4
**feel** 33:25 86:10
**feldman** 177:2
**felt** 110:4
**female** 190:6
**fentanyl** 55:6 90:5
90:15,16,19,22,23
107:6 148:9,25

152:20,23 153:8
153:17 155:20
156:16 159:11,12
159:15 188:15
194:18,21 195:4
195:11 198:25
201:1 211:3 216:6
222:25 223:16
225:22
**ferraro** 1:20
**festival** 68:16
**fgallucci** 2:9
**field** 84:18 122:20
126:18 145:24
167:11
**fighting** 171:19
173:3
**figure** 30:21 115:3
118:4 123:12
125:21 132:18
138:15 143:8
189:4 202:11,13
**file** 29:18 84:10
88:1 120:15 124:3
**filling** 62:18
**financial** 117:11
**find** 81:24 91:3
119:19 156:15
185:9 189:8
**finding** 89:13
**fine** 19:4
**finish** 101:15
176:5
**finished** 96:5
158:1
**firm** 219:12
**first** 12:12 14:3,15
21:9 25:1 28:20
32:17 79:3 80:8
97:11 103:8
119:23 128:10

143:2,14 144:23
150:23 152:8
173:20 189:23
192:23 193:1
218:9,12 220:11
229:6 232:11,16
234:20 238:10
**firsthand** 113:24
174:23 195:8
199:14
**fiscal** 45:22,23
46:1,7 113:15
117:4
**five** 117:14 175:13
175:14
**fleming** 4:3
**flights** 116:1
**flip** 33:20
**floor** 190:9
**flopped** 33:20
**flows** 105:14
**focus** 40:7 148:7
164:23
**focused** 21:18
39:22 106:7
171:17
**focusing** 62:8
141:15
**folders** 84:10
127:11
**folks** 34:8 47:10
49:24 50:13 66:16
73:23 74:6 84:7
92:9 112:3 118:6
119:14,19 134:16
135:14 141:13
149:10 175:24
182:8 195:5
**follow** 80:6 119:20
120:7 133:14
175:20 186:9

230:15
**followed** 78:18
214:11
**following** 87:6
165:21 166:22
178:18 195:21
**follows** 12:14
**food** 219:25
**football** 64:2
**force** 16:21 31:7
57:11,21 59:7,11
59:25 63:15 64:20
64:24 65:5,23
66:6 67:6 68:3
74:10,12 92:25
96:7,17 97:4,12,20
98:23 99:21 100:3
100:9,18 105:9,16
106:2,7 112:8,18
112:19 118:22
132:3,15 142:19
142:20 148:5
152:3 161:15
170:18 178:10
180:16,17 181:14
182:9 183:4
216:16,22,24
**force's** 183:5
**forces** 58:7 64:13
64:16 65:7 96:7
96:11 112:6,13
113:5 144:17
199:18
**foregoing** 238:15
238:20 241:13
242:18
**forfeiture** 113:6
115:10,22
**forfeitures** 114:20
115:1,6,13

**forgeries** 180:2
**forget** 15:4
**forging** 160:8
**forgive** 214:23,24
**form** 14:17 17:8
21:20,25 23:25
24:24 25:6 26:24
32:4 34:23 35:20
36:2 38:10 39:24
41:8,18 43:1 44:6
44:16,21 48:1,7,25
50:8 51:2 52:5,17
55:15 56:3 59:2
64:5 66:2 69:1,17
70:10,20 73:9,17
82:7,19 90:18,23
93:18 103:16,23
107:11 108:8
111:11 112:20
113:8,23 114:17
114:22 116:15,23
121:18 124:19,20
130:25 131:9,18
131:24 132:7
135:13 139:6
141:17 142:5,24
145:2,11,19
146:12,18 147:5
148:19 149:1,5
152:24 153:1,9,18
154:1 155:6,11
157:6 158:15,22
159:2,8 160:5,13
162:2,21 173:14
174:7 175:6,11
176:19 177:16,24
179:22 180:3
182:13 183:7
188:14,25 189:6
191:14 194:20
195:7,24 196:7,18

196:21 197:4,10
199:13 200:16
201:24 202:7
203:9,17 204:1,8
204:16,23 205:6
205:15 206:8,24
207:7,15,24 208:6
208:14,23 209:6
209:13,20 210:1,4
210:12 211:6,21
212:5,13 215:5
217:14 220:1,5,15
220:22 221:17,23
222:5,10,16,21
223:18,23 224:12
225:16,23 226:12
226:22 227:2,7,13
227:20 228:2,16
229:4,13,20 230:3
232:7
**format** 50:3
137:17
**forms** 196:22
**forthcoming** 236:2
**forward** 146:24,25
192:7
**forwarded** 174:13
178:9
**found** 84:7 85:3,16
120:3 161:1 190:8
190:8,24
**four** 185:11
214:22
**fox** 178:23,24
**frame** 22:14 40:16
181:25
**frank** 2:6 11:11
15:2
**frankly** 219:19
**free** 61:9 194:4
241:14 242:20

**frequency** 153:13
200:11
**frequent** 201:5
**frequently** 95:4
**friend** 31:6 214:14
**friend's** 230:10,11
**friends** 81:19
160:12 213:8,12
**front** 17:9,13,18
**full** 12:18 216:5
**functions** 138:15
**fund** 115:11,16,23
116:4
**funding** 48:6
112:4 114:7,11
**funds** 113:3
**further** 97:8
159:18 235:5,20
236:9 238:18
239:1
**future** 78:5

**g**

**g** 12:20 75:13,13
76:3 133:19
**gain** 81:17 141:20
**gallucci** 2:6,6
11:11,11,12,15
**game** 31:8
**games** 64:2
**gary** 75:9 98:12
**gates** 118:25
**gateway** 133:19
134:14 136:4
**gc** 31:7
**geared** 49:4
**gears** 101:10
**geez** 77:1
**gender** 79:16
**general** 21:13
78:18 154:15
170:15 226:24

**general's** 193:15
217:9
**generally** 78:21
**generated** 121:19
**generic** 101:6
**george** 16:2 42:4
54:9
**gerome** 1:13 5:7
12:10,15,19 13:7
44:12 60:24 61:10
61:14 71:23
117:22 150:4,18
164:2,12,14
168:17,23 171:7,9
171:21,22 184:21
185:4,4 210:23
217:17,24 218:18
219:8,10 231:9,11
235:23 238:9
240:8 241:4,9
242:4,13 243:20
**getting** 16:24
65:25 90:12,16
95:17 100:10
147:17 148:20
188:22 195:5
197:8 200:4
211:17
**gilson** 185:6 186:7
186:10,11 188:9
201:15
**gilson's** 189:23
**gingell** 75:9,11,13
98:12
**gioitta** 58:1 180:22
180:25
**give** 13:13 28:20
34:9,12 36:4 49:6
50:5 79:15 98:8
103:18 107:16
122:12 128:8

132:4 133:14
134:5,6 137:24
147:25 170:23
218:5 221:5 237:1
237:10
**given** 58:9 120:18
122:18 124:11
182:10 238:12,17
**giving** 98:5 120:19
168:12 212:18
**glean** 86:5
**glory** 146:3
**gloves** 216:4
**go** 17:25 24:21
28:8,14 29:13
33:3,17 35:8
37:17 38:8 64:9
69:23,25 71:23
75:19 81:7 82:1
82:12 86:11 88:2
89:15 95:6 101:17
110:8 111:18
114:20 118:8
119:19 121:16
123:20,21 124:9
125:12 135:4
136:7 143:7
147:18 159:17
160:14 161:24
165:16 167:13
173:7 181:24
184:18 189:25
194:23 210:8
214:23 216:4
**goal** 38:5
**goes** 60:8 81:5
86:25 87:23 95:10
100:2,11 148:10
148:14 172:10
186:23 190:10
194:22 198:7

**going** 31:11 37:17
41:7 46:19 47:15
49:13 50:17 60:21
67:2 72:1,1,16,21
77:25 78:7 79:1
79:22 86:13 100:9
103:18 105:6,23
130:2 142:7
146:25 150:16
151:2 156:15
158:2 162:13,14
171:6 177:10
181:24 219:17
**good** 11:17 12:17
16:11 59:25 111:2
117:13 125:15
183:3
**gotten** 47:16
177:20
**government**
197:22 209:22,23
210:3
**graduated** 19:10
**grant** 114:3
**grants** 112:12
113:19 114:5
217:11
**gray** 3:17 12:5
**great** 71:13 171:6
174:16 182:24
210:16
**grew** 17:24
**group** 110:20
152:6 223:21
**groups** 116:20
216:13
**guarantees** 219:21
**guess** 24:20 25:1
31:25 34:2 35:16
37:23 38:23 46:7
46:11 47:21 48:3

64:6,8 68:7,13
74:22 76:16 78:17
84:18 85:12 87:22
92:5 95:3 97:3
103:17 104:12
105:13 117:25
121:7 140:17
144:23 145:21
146:2,15 147:22
147:25 149:9
175:13,22 185:18
185:25 186:7,20
188:1 190:22
191:16 198:3
216:7 232:17
**gun** 112:22
**guy** 90:5,11 91:3
92:6
**guys** 11:8 33:19
35:8 46:16 61:8
68:22,23 69:15
75:22 76:2 84:21
95:3 130:2 143:25
147:19 148:12
182:20 183:2,19
216:8

| h |
|---|

**h** 65:11 133:19
**h.d.** 207:9,9,13
**hand** 148:10,11,15
148:15 167:23
193:10 194:22,22
194:23,24 239:6
**handed** 173:9
**handful** 13:21
175:10,12
**handle** 77:25 78:8
118:2,15
**handles** 118:19
188:6

**handling** 75:21
119:11
**hands** 200:4
**hanging** 89:6
**happen** 121:13
137:15 140:16
142:2
**happened** 80:23
81:3 84:21 85:25
86:16 142:11
160:21,22 161:2
162:17 187:22
**happening** 194:17
**happens** 87:22,23
88:8,23 89:10
140:19
**happy** 60:1
**hard** 118:10
**harm** 232:5
**hate** 155:17
**hawkins** 3:8 11:25
11:25
**hayden** 3:18 12:4
**hayden.miller**
3:20
**he'll** 138:21
**head** 34:10 39:12
45:23,25 46:7,9
97:19 113:15
**heading** 151:14
165:4
**heads** 96:23
107:23 143:24
**health** 2:15 3:7
12:1 193:22,24
203:12,15 209:8
209:11
**hear** 95:5,5 136:12
194:14 197:25
**heard** 75:14
111:23 127:13

133:15 137:6
139:14 159:20
161:17,18,22
162:5,6 177:1
183:21,22,24
192:16 195:6
200:18,20,25
204:3 205:10
206:1,3,15 207:9
207:20 208:2
210:5 220:17
221:10
**hearing** 54:14
**hearings** 16:18,20
**heavily** 58:22
**heights** 13:5 77:3
77:12 78:6,14
118:18,25 119:7
126:2
**held** 19:24
**help** 58:9 60:8
68:17 74:24
119:24 149:17
182:16,16 198:11
**helped** 15:11
**helpful** 111:9
131:22 156:7
**helping** 60:6 76:5
79:23 212:18
**helps** 55:2 60:22
112:11 120:25
177:7
**henschel** 4:7
**hereinafter** 12:13
**hereunto** 239:5
**heroin** 41:19 55:6
55:16,17 86:19,21
86:25 87:3 90:5
90:12,13 99:12
107:4,8 111:24
122:8 124:5,6,9,13

143:17 148:6,7,9
148:14,16,17,18
150:13 151:4,8,8
152:19,22 153:7
153:17 155:20
156:10,16 157:15
158:20 159:1,3
166:19,24 167:14
167:19 169:12,14
186:25 190:22,23
194:23 195:22
196:4,15 197:15
197:19 198:4,13
198:22,25 202:15
211:3 222:25
223:16 225:21
**heroine** 186:24
187:16
**hey** 143:24 154:16
182:24
**hidta** 64:19 65:9
65:10 66:6 67:8
75:2 139:23 140:1
140:18 141:8,9,10
141:14 142:1,17
143:11 144:4,10
**high** 47:22 64:20
105:9 197:23
**higher** 19:21
**hipaa** 221:6
**hire** 44:1
**hired** 18:5
**hires** 174:17
**hirko** 45:5 67:13
67:14,16,23 92:22
92:23 182:7 192:9
192:10
**history** 85:25
86:12 129:3,4
134:7 235:1

**hit** 140:18
**hold** 72:23 120:5,6
157:25
**home** 64:8 216:9
**homeland** 63:17
65:1 66:25 67:20
**hometown** 68:16
**homicide** 80:2,3
85:2
**honest** 36:7
161:20
**hopefully** 144:1,20
208:16
**hospital** 33:5
**hotel** 105:18,21,22
105:24
**hours** 15:7 215:9
**house** 160:3
**hugh** 150:20 152:9
191:15
**human** 216:16
217:4
**hundred** 34:14
158:23
**hundreds** 25:5,7
**hunt** 185:10
**hurts** 60:22
**hydrocodone** 55:7

**i**

**idea** 53:9 125:15
182:24
**ideas** 182:22
**identification** 61:3
127:24 150:8
164:6 168:21
171:14 184:25
217:22
**identified** 111:1
**identifier** 134:3
**identifies** 126:19

**identify** 11:6
220:25 226:6,8,18
226:23 227:11,18
229:22
**identifying** 119:22
**iii** 2:6
**illegal** 55:13,23
106:18 145:22
149:9 156:16
199:24 211:8,23
**illicit** 55:23 90:16
196:22 224:11
**imagine** 114:2
**immediate** 25:12
45:4 68:9 92:17
**impact** 35:10 68:5
68:8,12,25
**important** 54:3
91:9 119:23
**importation** 198:4
**improper** 200:14
229:25
**improperly**
179:20
**inaccurate** 229:2
229:11
**incident** 134:20
**incidents** 44:15
**include** 55:6,11
86:12 93:3,5
106:14 115:13
126:2 190:13,14
**included** 32:18
86:6 150:23 166:8
199:2
**including** 45:2
55:5 74:6 83:8
128:13 134:8
155:9 156:9,10
**inclusion** 165:13

**incomprehensible**
40:1
**inconsistent**
229:18
**incorporated**
242:12
**incorrect** 69:9
**incorrectly** 226:14
**increasing** 153:13
**index** 5:1,4,5 6:1
7:1 8:1 9:1 10:1
**individual** 81:25
128:8 138:13
**individuals** 99:6
99:10
**influence** 14:2
**info** 125:7 128:7
132:14
**informant** 49:13
120:20
**information** 52:16
56:23 78:23 81:20
83:14 86:4,5
88:25 89:1,4,8,16
89:17 100:17,19
117:11 120:14,18
121:15,23 122:2
122:11,24 123:18
126:25 127:8,20
127:23 128:11,16
128:17,24 129:12
131:21 133:23,25
134:5,8,11 135:3
135:22 139:9
140:10,13 141:2
141:19,23 142:3,8
142:15,17 143:11
143:19,21 144:1
149:19 161:14
165:12,14 166:14
167:2,6,25 168:8

172:11 187:2
189:9 192:5,13
195:4 198:8
**initial** 64:7 180:15
186:20 193:23
230:17
**initially** 230:25
**injury** 149:8
**inmates** 18:16,18
22:21,24 23:18
**input** 100:10,14
122:4,16
**inputted** 123:18
126:25
**inquire** 149:16
**inquiry** 128:9
**insert** 226:25
227:10 228:7
229:19
**inserts** 227:17,24
**inside** 71:7 105:24
174:20
**inspector** 166:13
**inspector's** 168:5
**instance** 226:19
228:3,9,10 229:15
**instances** 190:25
194:12 226:9
**instructed** 143:15
**instruction** 237:2
237:10
**insys** 204:10,11,13
**intelligence** 81:18
**intended** 96:5
167:10
**intending** 132:22
**intensity** 64:20
105:9
**interact** 74:17
76:10

**interactions** 59:15
178:12 179:6,10
179:16
**interdiction**
105:20 165:5
198:6
**interdictions**
105:17,18,21
**interest** 212:16
**interested** 239:3
**internet** 183:11,16
**interpret** 153:3
**interrogation**
87:17
**interview** 24:22
81:17 85:13,18,20
87:2,17 89:5
119:13,15,18
120:12
**interviewing**
85:22 120:3,8
**interviews** 53:22
86:5 88:21 119:17
119:20 149:6
167:9,11,12
**introduced** 83:18
219:10 231:15
**introductions** 98:6
**inventory** 104:13
104:14
**investigate** 29:15
71:1 105:25 119:1
133:5 183:12
198:1,3,24 211:24
225:19
**investigated** 77:11
86:22 91:8 93:21
94:1,5,9 153:11
159:25 160:1
162:12 169:20
226:1,3 228:19

235:1
**investigates** 53:18
**investigating**
44:20 56:22,25
66:8 79:6 81:23
87:14 93:24 124:8
135:16 142:10,20
142:22 149:10
160:7,24 183:20
183:20 189:3
195:19,20 199:16
225:3,12 228:22
**investigation**
20:21 27:19 73:3
73:8,16 76:22
77:16 81:21 88:9
89:11 93:16 94:14
114:6 119:21
121:1,2 132:1
135:2 141:21
143:17 149:18
156:1 180:7
184:11,14 189:8
**investigations**
37:24 38:9 40:15
49:23 58:24 65:2
74:16 75:7 76:11
77:4,8,25 86:11
89:12,14,23 90:2
113:7 114:16
118:15 122:3,8,10
125:13 127:9
131:23 132:12
135:18 141:16
143:10 145:15
147:1,1 148:12
160:19 162:16
180:1,5,11 182:25
184:3 189:19
195:9 215:4,23
216:22,23 217:13

234:2,4,4
**investigative**
121:8 140:6
**investigator**
199:15 233:21,25
234:6,10,23
**investigators**
123:15
**invited** 100:4
118:1
**involved** 25:3 32:6
58:22 79:17 97:24
111:14 133:2
140:22 146:7
177:21 184:3,10
189:16 191:25
192:21 234:1
**involvement** 21:23
23:3,22 31:15
32:2 40:14 68:1
69:6,11 70:19
105:8 109:13,18
183:18
**involving** 180:5
198:25
**issued** 51:14,20
**issues** 21:24 35:18
35:19 62:25 63:22
64:4 68:2 69:6
70:19,22 153:7,7
179:12

**j**

**jackson** 27:8,9
31:23
**jail** 22:4 23:19,20
71:6,8,10 114:4
174:20,21
**james** 3:3
**jamie** 138:19
**janssen** 206:15,16
206:21

**january** 83:19,19
**jeoeta** 181:3
**jingles** 75:14
**job** 16:24,25 50:23
51:3,11 59:25
110:4 139:1
145:25 180:25
198:2
**jobs** 35:25
**john** 3:12 11:18
58:1 180:22,25
**johnson** 206:10,10
206:21,21
**join** 18:3
**joined** 24:25
**jones** 2:11 11:24
**jonesday.com**
2:14
**jopek** 58:2 180:22
180:23
**journey** 214:17
**jpetkun** 3:6
**judge** 1:8 110:9
**judges** 98:13 99:9
109:22 110:6
**judgment** 157:7
**jump** 166:18
**jumped** 96:6
**jurisdiction** 78:1
142:11 187:25
**jurisdictions**
76:22 79:22
117:25 118:5
**jzipp** 3:15

**k**

**k9** 63:7,8,9,10,13
68:4 166:11,12
167:3,7 168:4
**k9s** 63:16 64:24
**kaleal** 46:2,3
113:16 117:11

**kaye** 2:16 11:21
219:13
**keep** 72:22 78:1
92:3,8 122:6
125:2,3 126:24
127:11 191:17
**keeping** 124:20
125:15 135:1
138:6 202:21
**keeps** 56:19 92:15
117:8 135:5 138:8
**keith** 60:11 98:15
**kelley** 1:20
**kept** 84:9 102:16
138:12 194:5,11
194:15
**kids** 155:22
**kind** 26:16 33:20
35:11 38:13 58:16
60:5 68:20 70:4
80:1 87:15 92:10
107:13 109:5,10
110:8,9 118:21
127:20 128:7
133:23 135:1,25
136:22,24 140:4
142:7 143:10,23
145:23 161:13
183:25 197:23
**kinds** 70:9,11
**kit** 194:7,8,9
**knew** 26:7 27:4
150:12
**knock** 29:13
**know** 17:10 21:7
22:2,3,20,23 23:2
23:21 25:19 26:8
27:1,5,12,16 28:25
30:8 32:8,9 33:6
33:23 34:20 35:12
35:22 38:7 40:19

| | | | |
|---|---|---|---|
| 41:2,5,21,21,23 | 130:3,22 131:1,15 | 201:4,18,20,22 | **labeled** 61:13 |
| 43:24 44:1 45:12 | 132:20 135:19,19 | 202:18 203:3,3,10 | **labels** 227:24 |
| 46:6,8,17,20 47:20 | 136:3,11,12,25 | 203:18 204:2,9,10 | **labs** 152:19 |
| 48:8,8,9,20 49:3 | 137:9,11 139:4,7 | 204:13,17,24 | **lack** 47:24 115:4 |
| 49:17 50:20 52:2 | 139:18,19,21 | 205:7,16,23 206:9 | **lacking** 48:23 |
| 52:6,12,19,21 53:6 | 141:3,20 142:22 | 206:13,25 207:8 | **ladder** 58:20 |
| 55:8,22 57:2,4,5 | 143:12 144:3,6,11 | 207:16,25 208:7 | **lakeside** 2:12 |
| 57:12 58:14,15 | 145:5,5,8,12,20,22 | 208:15,24,25 | **lakewood** 118:16 |
| 59:4,21 60:5,7,15 | 145:25 146:9,16 | 209:7,14,21 210:2 | **language** 227:23 |
| 63:23 65:15,17,18 | 147:7,25 148:18 | 210:13 212:14,16 | **large** 118:16 |
| 65:20 67:5,21 | 148:23,23 149:2 | 212:18,20,20,23 | 195:23 196:5,16 |
| 70:5,14,15,24 | 149:21,25 150:1 | 213:23 214:7,8 | 223:4 |
| 72:23 73:19 75:2 | 151:1,15 152:4,9 | 217:10 218:11,21 | **larger** 168:10 |
| 75:20 77:15 78:20 | 152:14,15 153:22 | 220:2,3,8,12,12,13 | **lasted** 72:25 |
| 78:24 79:4,24 | 154:19 155:23 | 220:16 221:14,18 | **lately** 80:18 |
| 80:12 81:20 83:2 | 156:2,3 157:7,11 | 222:6,17,22 | 115:17 |
| 85:11,23 86:1,2,12 | 159:3 160:2,20,21 | 223:12 224:15 | **latest** 49:1,18 |
| 86:14 87:15,16,18 | 161:3,8,20,21 | 225:9,19 227:21 | **law** 13:10 14:5,11 |
| 87:20 88:15,17 | 162:22,23 164:25 | 228:17 230:17,19 | 14:19 18:22 19:12 |
| 89:5,16,21,24,25 | 167:1,5,9,20 169:7 | 230:21,22,23,25 | 20:4,13 56:20 |
| 90:13,21,23 91:20 | 169:8,23 170:6,19 | 231:3 | 64:23 70:21 76:8 |
| 91:22,23 93:13,19 | 170:21 171:17 | **knowledge** 85:19 | 85:16 102:9,10,14 |
| 93:20 94:20 95:8 | 172:1,19,21,21,22 | 113:24 114:1 | 102:16,23 103:25 |
| 95:17 96:1 97:8 | 173:15 174:5,11 | 160:1 195:8 199:9 | 104:1,6 106:17 |
| 98:2,9,17 99:16 | 174:12,21,23 | 199:14 201:10 | 107:15 115:11 |
| 100:16,20 101:21 | 175:7,7,20 177:12 | 226:2 231:21,24 | 117:5 127:14,14 |
| 103:14 105:19 | 178:17,20 179:9 | **knowledgeable** | 127:25 129:15 |
| 106:5,8 107:25 | 179:13,15,18 | 202:19 | 133:18 135:6 |
| 108:6,10 109:3 | 181:11,13,16,18 | **knows** 138:17 | 139:9 140:14 |
| 110:1,16 111:13 | 181:20,22 182:21 | **kozub** 68:9 | 141:18 144:24 |
| 112:3,9 113:2,11 | 182:23 184:1 | **kurt** 4:7 | 219:12 |
| 113:14 114:4,24 | 185:17 186:15 | **l** | **lawful** 12:10 |
| 115:14,15 116:2 | 187:7,12,15,18,19 | **l** 1:25 75:13,13 | **laws** 221:6 |
| 116:22 117:2 | 188:4,10,15,21,23 | 133:19 168:4 | **lawsuit** 53:7 54:6 |
| 118:23 120:3,4,7,8 | 188:24 189:10,12 | 238:6 239:13 | 54:11 |
| 120:9,13,19,20 | 189:22 191:3 | **l.p.** 1:10 | **lawyers** 54:6 |
| 121:8,11,12 122:5 | 192:12,12 193:23 | **label** 150:22 | **lead** 88:4 106:1 |
| 123:23 124:2,3 | 193:25 194:12,13 | 164:17 171:25 | 115:6 122:25 |
| 125:11,11,18 | 194:21,22 196:8 | 226:25 227:5,9,16 | 123:15 144:14 |
| 126:6,14,16 127:3 | 196:10,23,25 | 228:7 229:18 | 234:10,23 |
| 127:10 129:19,24 | 197:24 200:10 | | |

**leads** 106:4 127:14
  127:21,22 128:8
  128:23,23 129:7,8
  129:10,11 133:16
  133:17 134:1
  136:4 137:16
  157:11 189:10
**learn** 111:8
**learned** 31:9
**leave** 22:14 62:15
  62:16 88:22 236:4
**lecture** 57:19
**led** 91:6
**left** 88:15
**legal** 240:1 243:1
**legislative** 17:5
**legislature** 17:7
**lerms** 129:16,20
  130:6
**lethal** 147:24
**letter** 236:7
  240:20
**level** 26:8 47:18
  58:19 197:23,25
  211:7
**levels** 47:8
**lewis** 4:3
**lexington** 2:3
**liberal** 161:24
**license** 127:24
  128:12,14,20
  134:6 201:23
**lieutenant** 16:13
  20:2 27:7,9 28:18
  28:19 31:4,23
  32:11,16,23 33:13
  33:16 34:17 35:2
  35:16 36:14 39:9
  39:11,23 40:5,25
  42:12,13 43:11,17
  43:18,21 44:2,5

45:3 46:10,19
  48:12,13,18 50:1
  50:14 60:17 62:12
  62:13,14,21,21
  63:5 64:12 65:14
  66:23 69:3,9,10
  70:16 71:24 72:12
  80:12 97:7 104:7
  104:9 109:21
  119:9 124:17
  146:24 154:18,22
  155:1 168:15
  169:6 171:2
  176:15 186:17
  234:21
**lieutenants** 102:14
  147:15
**life** 87:4
**limit** 112:9
**limited** 78:23
  167:3
**limits** 162:19
**line** 118:5 166:19
  242:7 243:3
**lines** 150:24
  185:11
**link** 91:11 143:18
**linked** 83:24 84:2
  198:18
**links** 84:1
**list** 6:15 50:6
  79:13 96:12 119:8
  166:10 185:10
  186:4 217:19
  218:1
**listed** 109:1 242:7
  242:17
**listing** 109:1 242:7
**litigation** 1:6 11:4
  53:2 124:1 219:14
  231:19 240:6

241:3 242:3
**little** 31:9 48:2
  49:14,15 69:19
  73:24 86:2 98:16
  101:10,11 118:22
  126:7 133:25
  135:3 140:15
  144:19 158:3
  159:17 173:22
  174:24 216:7
**live** 13:4,5 57:19
  83:20 213:19
**lives** 194:13
**living** 29:14,15,17
**liza** 4:3
**liza.fleming** 4:5
**llp** 1:20 2:16 3:3
  3:11 4:3 11:18
**local** 76:8 77:20
  79:10 139:9
**locally** 178:23
**locals** 80:1
**locate** 141:3
**located** 69:21
  104:25
**location** 79:16
  121:23 240:15
**log** 130:3,6 138:8
**logan** 3:4
**lonergan** 2:17 5:9
  11:20,20 219:9,12
  221:2 231:4,7
**long** 15:6 19:6
  22:9,10 25:19
  27:23 28:22 29:22
  43:18,21 46:3
  57:15,16 59:9,10
  59:12 60:12 65:13
  65:15 66:21 72:18
  72:24 80:8 83:13
  83:13 97:4 102:6

111:14 176:17
  181:13 186:13
  225:7 234:7
**longer** 43:25 71:11
  104:23 156:13
**look** 35:8 38:8
  56:21,22 61:23
  66:9 82:6 84:24
  85:6 101:11
  127:23 128:2
  130:1 134:1
  142:18,20 150:10
  150:17 151:2
  167:22 171:16
  173:9 185:3 191:2
  201:23 202:12
  227:5 236:8
**looked** 52:12,22
  162:9 169:4 170:4
  187:22
**looking** 26:13 52:8
  57:14 66:7,10
  91:9 93:5 110:6
  110:19 139:11
  166:3 187:1
**looks** 69:18 141:25
  169:13,13 201:20
**lorain** 104:25
**lost** 164:23
**lot** 47:6 75:9 83:25
  86:18 88:25 95:16
  136:18 150:17,18
  155:14,21 198:16
  198:21,24 214:17
  219:20
**lots** 139:4
**lou** 181:4,5
**loved** 156:4 158:9
**lower** 185:16
**lump** 223:21

**lunch** 159:18
163:1 174:25
**luncheon** 163:5

**m**

**m** 2:12 12:20
168:4
**madam** 240:10
**magnitude** 114:25
**mail** 6:6,13 50:19
50:22,25 51:7,22
75:24 76:2,17
79:14 94:25 95:1
95:17 115:13
137:23 138:21
150:5,19,23 152:8
152:16 170:3
184:22 185:5,12
185:16,17,22
186:4,20 188:8
191:20,21,23
192:1,14
**mailbox** 69:19
**mailed** 170:2
**mails** 15:18 75:23
76:7 95:4 150:18
174:9
**main** 1:21 26:20
81:24 84:3 115:24
118:13
**maintains** 122:21
123:13
**majority** 83:11
124:12
**making** 46:15
59:22,24 65:24
95:15 110:21
147:3 192:14
**mallinckrodt** 3:16
12:5 208:16,18,21
**management**
82:21,23 105:22

126:23 129:15
**managing** 44:24
**mandate** 35:24
**manner** 16:19
225:4,13
**manpower** 34:5
182:17,19
**manual** 73:5
**manually** 128:4
**manuals** 73:2
**manufactured**
201:22
**manufacturer**
184:15 228:20
229:10,17
**manufacturer's**
229:1
**manufacturers**
94:9 219:15
**maps** 142:13
**march** 28:1
**marcus** 71:11
**marijuana** 24:4
26:17 32:7 106:10
106:25 107:8,13
**mark** 66:20 171:7
**marked** 6:3 61:2
150:7 164:5
168:20 171:13
184:24 217:21
**market** 4:4 211:9
**marketing** 229:25
**marking** 104:16
**mart** 209:8,11
**martin** 60:11
98:15
**material** 104:19
**matter** 11:3 90:3
144:8 170:6
226:24 240:12

**matters** 13:23
**mayfield** 13:5
118:24,24
**mckesson** 3:11
11:19 207:1,2,5
**mclaughlin** 2:12
5:10 11:23,23
231:10,16 235:5
**md** 1:7
**mdl** 1:6
**mean** 43:2 48:15
53:14,16 58:3
70:6,21 72:21
93:6 95:5 99:8,15
105:20 111:7
119:22,25 127:2
132:4 139:3
149:14 153:10
161:19 175:9
182:14 196:12
197:21 201:20
212:14 221:5
224:17
**meaning** 78:4
**means** 53:17
224:11
**meant** 173:8
**meder** 65:12 67:15
**media** 154:14
162:8 194:14
195:10
**medical** 23:19
41:23 53:11 62:15
62:16 71:3,4,6,7
75:25 79:11,12
86:15 88:16,18
89:18 94:15,18
114:3 119:24
122:18 127:3
132:22 152:13
177:3 178:12,16

178:17 179:2,2,17
186:11,14,16
187:8,16 191:7,8
191:11,12,17
200:13 201:6,11
220:9,9 221:16
222:9 232:15,19
**medically** 220:4
226:11,21
**medication** 22:25
23:1 156:14
158:11 161:25
201:21 212:19
214:18 222:14
224:20,21 225:25
**medications** 23:6
26:23 55:12,13,21
94:10 99:5,22
103:22 104:2
106:15,21 132:21
149:4 158:14,21
162:15 174:22
177:15,22 183:11
199:6 211:12
**medicine** 23:9
**meet** 15:1 151:18
151:19
**meeting** 15:6
54:13 72:24 96:24
97:19 98:11 99:2
100:9,11 101:7,8
101:24 102:11,12
102:12 103:15,20
104:2 108:9
**meetings** 96:21
97:12,13 98:2,23
99:21 100:3 101:4
101:13,14 102:1,8
102:10,17,24
103:2,19 104:1,6
108:14 111:18

151:20,25 195:16
199:19
**member** 16:21
18:21 31:1 132:15
149:20 156:23,25
158:6,7,12
**members** 53:23
64:11 81:19 85:19
112:5 120:5,6
125:25 156:19,20
157:12,17,22
175:1 213:8,13,15
213:17 214:13
**memories** 151:3
**memory** 151:7
**men** 95:18
**mentioned** 51:10
64:17,24 75:1
117:22 118:18
119:6 124:6 140:4
155:13 157:20
166:11,12 199:2
200:6
**mentioning**
195:10
**messages** 51:11,23
**met** 14:25
**metro** 33:5
**mexican** 195:14
**mich** 36:9
**michalosky** 32:24
32:25 36:10 37:2
39:18 42:6,14
150:24
**midwest** 243:1
**miguel** 16:13
25:13 31:20
**mike** 27:7 168:3
**mileage** 215:9
**mill** 104:22 161:17
162:6

**miller** 3:18 12:4,4
**mills** 118:25
**millsap** 28:19,21
**mind** 93:3 190:16
212:16
**mine** 95:12 214:14
**mini** 118:22
**minute** 61:24
117:14 150:10
171:16 185:2
193:16
**minutes** 57:18,18
101:3,4,5,11,12,13
101:19 102:14,16
159:19 176:21
235:12
**misleading** 173:16
173:17,22 229:2
229:11
**missing** 119:3
216:10
**mission** 38:1,2
40:3 48:6,24
68:11 81:14
105:15
**mixtures** 200:25
**mobile** 128:5
**moment** 47:19
62:14
**moments** 230:5
**money** 27:20 49:4
113:4 114:14
115:4,6 116:4
211:15
**monitor** 183:11
**monitored** 69:22
**monteleone** 45:5
170:6,7,8 172:23
**month** 96:25
102:2,5 103:2,9

**monthly** 172:7
**months** 19:8 32:20
96:25
**morgan** 4:3
**morganlewis.com**
4:5
**morning** 11:17
12:17
**morphine** 55:7
**motel** 105:21,24
**moved** 18:17 28:9
28:25 42:19 44:9
44:10 181:17
**moving** 146:23
**multiple** 81:9
**municipal** 22:18
**municipalities**
79:8 118:10

**n**

**n** 75:13
**n.w.** 3:8
**naloxone** 192:18
193:7,13
**name** 12:18,19
15:4 20:10 28:19
28:20 38:22 61:8
62:9 77:5 82:23
97:22 122:13
124:3,11,14 134:3
140:11,12,18,21
143:4 151:15
152:7 160:18
164:24 165:8
167:24 185:9,11
220:25 221:5,8
231:16 240:6
241:3,4,15 242:3,4
242:21
**named** 238:9
**names** 55:8 62:7
83:10 89:6 120:21

122:14 137:25
175:19,23
**naming** 118:11
**napkin** 82:19
**napoli** 2:2 11:10
**napolilaw.com** 2:5
**narcan** 192:23
193:19,21 194:1,7
232:18
**narcotic** 20:21
21:1,23 26:14
27:24 73:3 147:11
170:20 213:5
**narcotics** 21:19
23:23 24:1,7,8,25
25:2,25 26:7 28:6
31:15,19 32:2,6,20
33:10 34:4,18
35:2,4,18 37:8,12
37:14,18,20 38:2
38:21 39:3,11,13
39:22 40:3,20,24
43:14 44:3 46:14
47:1,9,11 48:5,13
48:23 49:24 55:13
58:17,19 62:24
63:7,7,8,9,10,13
63:19,22 65:2,7
66:4,16 68:2,4
69:6 70:19,22
72:1,7,8 73:7,15
73:23 74:1,5,16
75:7 76:11,13
81:5 84:7 92:25
93:2,6,11,17,22
96:7 105:13
107:12 108:7
111:3,6,9 113:22
116:14,17 117:23
122:3 123:9
124:17 131:23

133:3 134:17
137:13 138:17
144:16,22 145:14
147:10 148:7
154:18 168:10
169:20 170:12
171:3 172:24
178:6 180:13,14
181:16 182:1,3
197:16,24 202:4,6
202:23 215:3,4,22
215:22 217:12,12
234:3,5,6
**narrator** 57:20
**national** 1:6 11:3
240:6 241:3 242:3
**native** 218:15
**necessary** 226:11
226:21
**need** 46:17,17 60:7
68:20 74:22,23
82:5,6 112:23
138:16 154:20
218:24
**needed** 52:8 81:11
**needle** 190:14
**needs** 45:14 79:6
222:9
**neglect** 36:6
**negotiated** 215:15
**neighborhood**
34:21 107:20
**neighbors** 81:18
120:3
**neither** 55:19
**nelson** 38:17
**network** 139:10
**networks** 195:23
196:6,17 197:1
**never** 57:1 63:25
93:24 100:12,19

142:25 183:24
206:1,3 214:11
215:8,12 225:25
234:13
**new** 2:4,4,18,18
3:19,19 38:11
49:7,18 119:7
126:24 137:17,25
174:17,17 202:17
202:20,24
**news** 179:1
**newsletter** 6:11
171:11,24 172:5
172:15 174:6
**nicotine** 149:22
**nighttime** 95:24
**noletf** 64:22 66:19
**non** 80:24 214:16
230:12
**noramco** 205:17
205:18,21
**normal** 60:6 80:3
112:23
**normally** 100:2
191:1
**north** 2:12
**northeast** 64:23
83:6
**northern** 1:2
**notary** 238:6
239:13 240:25
241:10,18 242:15
242:23 243:23
**note** 171:21
**notes** 130:7 175:17
**notification** 120:6
**notify** 79:11
**november** 1:15
11:2 239:7 240:4
**nowadays** 128:20

**number** 6:3,7,12
6:14 25:4 73:23
74:5 92:4,9 121:3
121:6,12 122:13
134:4 146:19
150:6 164:25
167:15,16,19
168:25 169:19
171:12 175:7
184:23 187:5,17
187:17 201:12
218:3,13 240:7
**numbers** 61:6
121:19 165:19
185:8 242:7
**numerous** 59:20
**nurse** 23:7
**nursing** 71:9
**nuts** 95:10
**nw** 3:13

**o**

**o** 12:20 36:25
133:19 168:4
190:3
**oarrs** 56:7,11,13
56:17 57:3,6,10
131:3,8,12,16,21
**oath** 13:8,8
**object** 38:10
**objection** 7:3,3,4,4
7:5,5,6,6,7,7,8,8,9
7:9,10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17
7:17,18,18,19,19
7:20,20,21,21,22
7:22,23,23,24,24
7:25 8:3,3,4,4,5,5
8:6,6,7,7,8,8,9,9
8:10,10,11,11,12
8:12,13,13,14,14

8:15,15,16,16,17
8:17,18,18,19,19
8:20,20,21,21,22
8:22,23,23,24,24
8:25 9:3,3,4,4,5,5
9:6,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24
9:25 10:3,3,4,4,5,5
10:6,6,7,7,8,8,9,9
10:10,10,11,11,12
10:12,13,13,14,14
10:15,15,16,16,17
10:17,18,18,19,19
10:20,20,21 14:17
17:8 21:20,25
23:25 25:6 26:24
32:4 34:23 35:20
36:2 39:24 41:8
41:18 43:1 44:6
44:16,21 48:1,7,25
50:8 51:2 52:5,17
55:15 56:3 59:2
64:5 66:2 69:1,7
70:10,20 73:9,17
82:7 90:18 93:18
103:16,23 107:11
108:8 111:11
112:20 113:8,23
114:17,22 116:15
116:23 121:18
130:25 131:9,18
131:24 132:7
135:13 139:6
141:17 142:5,24
145:2,4,11,19
146:12,18,21

147:5 148:19,22
149:1,5 152:24
153:1,9,15,18
154:1 155:6,11
157:6 158:15,22
159:2,8 160:5,13
162:2,21 173:14
174:7 175:6,11
176:19 177:16,24
179:22 180:3
182:13 183:7
188:25 189:6
191:14 194:20
195:7,24 196:7,18
197:4,10 199:13
200:16 201:24
202:7 203:9,17
204:1,8,16,23
205:6,15 206:8,24
207:7,15,24 208:6
208:14,23 209:6
209:13,20 210:1,4
210:12 211:6,21
212:5,13 215:5
217:14 220:1,5,15
220:22 221:17,23
222:5,10,16,21
223:18,23 224:12
225:16,23 226:12
226:22 227:2,7,13
227:20 228:2,16
229:4,13,20 230:3
232:7
**objections**  5:5 7:1
8:1 9:1 10:1
**objective**  81:24
**obligation**  52:25
82:13
**observed**  82:16
**obtain**  89:7 113:5
199:5,24 202:5

**obtained**  88:25
199:11 224:10
**obviously**  19:9
85:15 89:18 110:1
**occasionally**  67:16
**occurred**  29:3
107:17
**occurring**  142:14
**october**  61:12,23
239:16
**offender**  29:1,6
**offender's**  29:13
**offenders**  29:8,9
29:12 110:8
**offense**  92:6
106:20,24
**offenses**  13:25
23:23,23 44:20
92:5,10 114:6
**offer**  20:19 60:8
**offered**  149:19
**offers**  21:13
**offhand**  34:20
89:25 175:8
215:25
**office**  45:13 50:4
50:18,19 52:13
63:15 94:22 97:22
140:17 141:7,8
151:18 152:13
155:25 160:3
168:6 187:20
191:18 217:9
232:10 235:3
239:6 240:14
**officer**  14:12 18:6
18:10 19:13 20:9
20:14 21:22 22:3
38:14,15 57:11,21
59:19 87:23
112:23 132:3

133:14 167:3,7
180:16,17
**officers**  34:18 59:6
64:18 74:10,12
112:8 134:12
145:24 198:5
**offices**  58:12
**official**  20:10
82:10 86:15
241:15 242:21
**officially**  111:20
**oh**  14:8 92:20
172:2
**ohio**  1:2,22 2:8,13
11:5 13:2 18:7
20:9 29:10 30:18
56:14,14 64:23
83:6 88:18 127:24
128:1 131:4
133:18 134:20
135:8 139:9
178:12 179:2,6,11
210:3,9 238:2,7
239:7,14 240:2
**ohleg**  133:19,24
134:14
**oibrs**  134:22
135:11,15
**okay**  12:7 15:3,6
16:5,10 17:12
19:6,18 22:23
24:6 25:10,23
26:21 27:16 28:22
29:5,25 30:11,13
30:20,25 31:3,18
31:25 32:14 33:6
33:14,23 34:25
36:19 37:1,17
39:17 41:24 42:2
42:5,14 43:6
45:16 46:11 48:4

48:9,21 50:5,12,25
51:6,17,22 52:2
53:4 54:10,15
55:20,25 56:13,16
57:9 59:5 61:20
62:1,8,24 63:4
65:21 66:24 67:5
67:11,14,24 68:11
69:5 70:17 71:3,9
71:13 72:5 73:10
73:22 74:15 76:15
78:9,17 80:20
81:8 82:18 84:5
84:17 88:8,23
90:11,15 91:19,23
92:8,20 93:9,20
95:3,18 97:8,18
101:25 102:6
104:5 106:1,5
107:18 108:1,19
109:9 110:11,25
111:14,18 112:25
113:2,11,18 114:1
114:10,13,24
116:2,9,11 119:12
121:24 123:19,23
125:6,10 126:5
129:5,14,19
131:11 133:1,7,11
133:15 136:18,23
137:11 138:16,23
139:3,8,16 142:9
144:8,19 145:7
146:23 147:9
149:3 150:2,15,25
151:6,11,22
152:14 153:12
154:4,4,10 158:25
159:24 162:5
165:2,8,16 166:5
166:17 167:1,8,13

**[okay - overdoses]** Page 26

167:18 169:5,12
169:18,23 170:1
170:11 171:4,6,20
172:2,3,9,19
173:12 174:16,21
175:15,17 177:7
177:19 178:7,11
179:5 180:9,17
182:8 183:2
185:15,20 186:8
186:13,19 187:9
187:23 188:7
189:17 190:23
193:5 194:10
195:12 199:17
200:18 201:4,15
203:23 205:3,12
208:8 213:7 214:3
214:8 217:4
218:12,21 219:3
219:16 221:10
234:25
**old** 190:4
**olleisn** 139:13
**once** 96:24,25
102:2,5 103:2
191:16 234:18
**ones** 35:6 71:1
77:10 80:18 95:19
95:25 97:16,23
111:2 118:13,16
119:4 120:10
**ongoing** 180:4,6,7
**online** 20:19 21:13
56:5,7,9 134:10
**op** 1:10
**opba** 30:17 31:1
**open** 189:7 211:14
236:4
**openings** 24:16

**operate** 46:18
**operating** 14:1
72:9
**operation** 46:23
50:15 96:3
**operations** 47:7
111:10 112:19
115:5 116:5 168:9
195:14
**operator** 138:15
**opiate** 1:6 11:4
96:17 97:3 98:23
99:21 100:2,2
140:1 148:5,10
152:3 240:6 241:3
242:3
**opioid** 22:25 53:12
53:14 54:23,24
56:2 87:4 111:24
150:13 151:4,8
154:8 155:5,9
156:9 160:11
161:25 174:22
183:11 199:10,11
200:12 203:8,16
203:25 204:7,14
204:22 205:5,14
205:21 206:6,22
207:5,13,23 208:4
208:12,22 209:5
209:12,19,24
210:10,25 211:5
211:19 212:3,12
220:18 221:12,22
222:4 224:2,7,10
224:24 225:4,13
226:10,19 227:6
227:12 228:4,11
228:14,20,25
229:10,17,23

**opioids** 17:20 55:5
55:21 56:1 98:24
155:15 159:22
160:2 162:1 177:3
178:19 179:12,17
179:20,20 183:16
183:23 184:5,12
184:16 190:24
198:19,20 199:3,5
199:21 200:2
212:2,11 213:9,14
219:23 220:4,9,14
221:16 222:19,25
223:10,11,15,17
224:3 225:21
226:4 227:10,17
227:19,25 229:3
229:12 230:7,14
230:18,18,21
231:1 232:5
**opposed** 35:18
47:25 90:17 95:8
202:15
**optional** 193:10
**order** 130:19
183:22
**ordering** 183:15
**orders** 45:12,13
174:22 184:4,12
184:16 224:8
**ordinarily** 63:5
**ordinary** 46:20
85:24 152:18
185:18,23
**org** 60:22 110:19
116:24
**organization**
61:18,21
**organizational** 6:5
61:1

**organized** 60:21
62:4
**original** 173:24
**originally** 17:23
18:5 23:16
**outset** 219:11
**outside** 58:6 70:17
76:2 172:20
**outstanding**
128:19
**overall** 117:7
**overdose** 40:15
41:13 76:19 77:17
78:6,11,19 79:5,5
79:10,15 80:16,21
80:22 84:12,15
86:19,21,25 89:23
90:2 91:8,12
93:10 117:24
118:7 121:9,10,13
122:8,10 124:8,9
124:10 125:4,17
127:8 141:16
142:11 143:18
148:6 149:11
153:7,16 175:1
186:25 187:1,16
188:6 201:11
214:6,19 230:9,14
234:14 235:2
**overdosed** 78:15
78:21 87:3 93:11
93:16 126:20
156:25 201:13
214:15 230:16,22
**overdoses** 40:8,10
40:15,17 41:3,11
41:12,17,19 44:25
53:18 75:21 76:20
85:4 99:13 124:5
124:6,7,13 125:18

125:23,24 126:2
140:23 142:13
143:16 147:16,17
147:19 155:13
166:19,24 167:14
169:12,14,20
173:16,19 191:13
212:25 213:16
215:11 216:5
223:1 230:13
**overdosing** 148:17
153:25 188:18
**overprescribing**
178:18
**oversaw** 28:10
29:10 35:7,10
**oversee** 32:20
43:14 105:13
**overseeing** 32:17
35:14 37:7,16
39:19 46:15 48:13
63:1
**oversees** 71:7 75:9
**oversight** 75:6
**overtime** 112:7
**ovis** 14:1
**oxycodone** 55:7
**oxycontin** 202:16

**p**

**p.m.** 236:14
**package** 165:5
202:5 226:25
227:10,17,24
228:7 229:19
**page** 61:10 164:23
164:23 165:4,5,12
169:1,2,8 170:5
171:18 185:25
187:2 190:2
217:24 218:9,13
242:7 243:3

**paid** 112:8 194:2,4
**pain** 55:3 188:17
**pair** 38:12
**paper** 50:6 73:6
102:22
**papers** 90:4
**par** 2:15,16 11:22
219:15
**paraphernalia**
85:10 190:10,13
190:17
**parents** 43:2
155:24,24
**parma** 77:3,6,7,11
78:6,14 118:17,17
119:6 126:2 186:3
187:22
**part** 18:25 41:4
75:24 85:12 86:6
96:21 110:13
113:9 123:11
156:11 176:20
197:24 223:4
229:6 231:18
232:9 242:9
**participate** 97:25
108:2
**participated** 98:1
100:22 104:8
**participating**
112:18
**particular** 41:15
55:8 113:12
121:16 146:7
214:14
**particularly**
145:16 146:9,10
147:3,4 198:6
**parties** 219:5
**parts** 155:8

**party** 239:2
**pass** 219:3 230:11
**passed** 230:8
**passing** 133:9
**patch** 90:24
**patience** 231:12
**patient** 212:17
220:18,21 221:21
222:3,15,19 224:6
225:3,12 228:15
**patient's** 212:15
222:9
**patients** 212:10
220:14 229:3
**patrol** 23:17 24:19
26:6,10 28:9,23
31:12 32:18 33:18
34:1,3,5
**patrolman's** 30:19
**pay** 112:14 146:4
194:1 215:12,18
216:19
**pays** 115:25
**peace** 20:9,14
**pellegrino** 1:25
238:6 239:13
**pending** 132:12
**pennsylvania** 3:5
4:4
**people** 22:9 25:2
35:9 59:14,24
69:20 70:25 74:5
79:13 85:4,18,21
91:3 95:16 111:1
111:7 112:18
119:15,15 120:10
137:24 143:9,9
146:19 148:16
150:21 153:24
155:16,18 159:4
159:12,15 160:8

160:15 161:24
162:13,14 182:11
185:7 188:18
198:14,19 199:4
199:20,24 200:1
201:12 211:2,11
223:11 224:2
230:21
**people's** 56:20
84:2
**percent** 158:23
**percentage** 35:17
**percentages**
200:10,17
**period** 42:9
**person** 29:17
38:11 39:21 78:14
79:16 80:21 85:16
85:20 86:13 87:3
89:3,8,13 91:13
93:11 94:20 97:12
97:13 100:1 123:4
126:19 130:10
138:14 142:8,23
143:5 147:24
157:9 160:25
180:20 183:4
190:19 201:9
217:5 221:1,12
224:9
**person's** 129:3
143:4 221:5,8
**personal** 51:14,17
51:20 214:12
230:6,6 231:21,24
**personally** 44:11
76:12 105:10
106:19 145:17
153:6 156:18
200:10 232:3
234:13 235:1

241:11 242:15
**personnel** 34:6
47:15,25 193:13
**pertain** 191:13
**pertains** 62:24
**peters** 108:17
**petkun** 3:3
**pglawyer.com** 2:9
2:10
**pharma** 1:10
204:3,6,25 205:1,4
**pharmaceutical**
2:16 206:18
219:17 229:16
**pharmaceuticals**
2:15,15 4:2 23:12
204:18,21 208:25
209:4,15,18
**pharmacies** 23:12
94:2 161:23
179:19
**pharmacist**
174:18,18
**pharmacy** 91:19
160:4 174:22
179:7,11 184:4
**philadelphia** 3:5
4:4
**phone** 12:3 51:14
51:15,20,20,23
52:8 76:17 77:24
85:9 89:1 91:10
91:10 95:9,12
137:23 156:21
224:17,18 235:9
235:10,11 240:3
**phones** 51:16,25
52:3 89:2 95:4
**phonetic** 27:2
**photograph** 81:16

**photographs**
88:14
**phrase** 183:22
**physically** 58:11
**physician** 221:19
222:1,7,12 226:19
228:4,6,11,13
229:12
**physicians** 93:22
93:25 229:3
**pick** 69:23
**pickup** 40:12
69:17
**picture** 128:13
**piece** 73:6 85:8
91:9 174:6
**pieces** 50:6 102:22
**pill** 40:12 69:17
90:24 160:10
161:17 162:6
190:18,18 212:20
215:7
**pills** 40:8 53:20
69:20,23,25 70:4,5
104:16 143:17
148:10 160:17
167:14 194:23
195:22 196:4,15
201:19 212:20
**pinkney** 36:17
42:16,20,24
**pinpoint** 196:24
**place** 97:5,7
154:19,25 160:19
161:24 238:19
**places** 72:13
**plaintiff** 11:10,12
11:16
**plan** 6:15 111:25
150:13 151:4,9
217:19 218:1

**plastic** 85:8
**please** 11:6 12:17
20:12,16 36:10
45:11 59:18
150:17 158:4
171:16 176:6
184:19 187:14
212:7 213:10
220:6 221:24
225:8 229:5
240:14
**plevin** 2:6 11:12
11:15
**pllc** 2:2
**point** 2:12 31:16
72:3 147:7 162:20
232:3
**pole** 49:10,11,11
**police** 18:7,24,25
20:7 33:5 69:22
74:18 75:5 77:7
79:11 83:9 98:12
106:3 118:16,17
118:19 120:2
121:8 129:22,25
130:1,7 186:3
**policies** 44:14
**policy** 20:8 44:13
193:9
**polster** 1:8
**pop** 121:21 128:18
128:19,20
**populate** 134:5
**porter** 2:16 11:21
219:13
**position** 16:23
24:17 29:25 30:23
42:19 185:16
221:20 222:2,8,13
**possible** 79:15
149:24 189:9

227:18
**post** 63:14 220:19
**postal** 166:13
168:5
**posting** 24:16
**potential** 79:5
85:14
**powder** 90:25 91:1
206:12
**practice** 133:2
**practices** 228:19
**pre** 22:16,17
**predated** 154:25
**prefer** 240:16
**preferred** 124:21
**preparation** 15:23
**prepare** 14:21
**prepares** 101:22
**preparing** 15:22
**prescribe** 220:13
229:3
**prescribed** 221:1
221:11 224:7,20
224:20 225:5,14
226:19 228:4,11
229:23
**prescribes** 229:12
**prescribing**
199:23 220:18
222:14 225:20,25
226:4 228:7,14
230:1
**prescription** 1:6
11:4 22:25 26:23
40:8 55:13,18,21
56:6,15 58:24
69:20 70:8 87:4
90:17,19 93:4,11
93:17,22 94:10
98:24 99:4,22
103:21 104:2

106:14,21 149:4
154:7,8 155:15,19
156:14 157:18
158:10,13,21
159:21 160:2,11
160:11,17 161:25
162:15 174:22
177:15,22 178:19
180:2 183:15,23
190:24 196:23
198:18 199:2,5,10
199:12,21 200:2
200:12,13 201:21
211:11 212:2,10
213:9,14 214:18
219:23 220:3,8,14
220:18 221:12,16
221:22 222:4,18
222:25 223:11,15
223:16 224:2,3,7
224:10,24 225:4
225:13 226:4,9,21
227:1,5,10,12,17
227:19,24 228:4
228:11,20 229:23
230:7,14,18,20
231:1 240:6 241:3
242:3
**prescriptions**
56:20 70:9,11
99:12 132:2,6,9,14
160:8 199:7,24
212:2,10
**presence** 88:20
238:14
**present** 4:7 12:7
15:3 52:22 85:19
**presentation**
193:17
**preserve** 52:25

**president** 154:15
**presumably** 39:18
43:2
**pretty** 30:9 35:21
101:6 168:3 185:9
**prevalent** 41:17
201:8
**preview** 150:11
**previously** 225:1
225:10 228:6
**primary** 68:11
**principal** 63:12
100:1 106:6
138:23 139:1
148:6
**print** 218:4
**prior** 83:21 84:5
158:20 169:4
183:20
**priorities** 44:19
68:25
**prioritize** 35:24
**priority** 147:9,14
147:16
**prisoners** 22:18
**prisons** 23:20
**probably** 14:20
25:9 29:24 30:3
31:9,20 34:14,24
35:22,22 40:1
45:5 54:3 57:13
57:17 63:23 72:20
76:4 80:25 92:16
95:11 99:6 107:14
118:8 133:13
140:20 146:4
162:8 166:15
167:11 168:15
169:10,22 175:14
175:16 178:9
180:15 193:16

194:16 196:19
198:9 214:22
218:15,16 232:20
234:10,21
**problem** 58:25
145:1,10 154:6,12
154:16 194:19
203:16,25 204:7
204:14,22 205:5
205:14,22 206:6
206:22 207:6,14
207:23 208:4,12
208:22 209:5,12
209:19,24 210:10
210:25 211:5,19
212:3,12
**procedure** 12:12
77:18 78:18 237:7
241:5 242:5
**proceeds** 114:19
**process** 24:22 79:2
**produced** 236:1
**product** 230:1
**product's** 229:18
**production** 52:4
240:24
**program** 40:11,13
41:10 69:17,17
70:13 104:11
122:7 137:20
183:6 200:1 215:7
**programs** 98:18
154:19,21,24,25
**project** 6:15
192:16,20 217:19
218:1
**promoted** 20:1,2,3
28:1,2,4 31:2,14
32:11,15 33:15
39:10 43:10,11
71:24 97:6 104:8

111:16
**promotion** 28:14
**pronounced** 75:12
208:17
**proper** 46:16
**properly** 222:20
**property** 113:4
114:15
**prosecutors** 83:25
**prostitution** 35:13
68:18
**protection** 6:16
217:20 218:2
**protocol** 95:14
**proud** 145:16,20
**provide** 74:23
165:11 193:12
**provided** 12:11
100:19 165:14
169:10 179:20
187:3
**provides** 100:17
**providing** 123:25
168:8 221:8
**public** 2:7 125:12
238:6 239:13
241:10,18 242:15
242:23 243:23
**pull** 21:15
**punch** 121:20
**purchase** 45:12,13
49:10,14
**purchased** 240:17
**purdue** 1:9 204:25
205:1,4
**purpose** 105:16
124:24 132:23
**purposes** 52:8
61:2 140:6 142:14
150:7 164:5
168:20 171:14

184:24 217:21
236:4
**pursuant** 237:3,6
**put** 18:6 24:15
47:8 79:13 82:11
83:15 97:2 115:14
122:16,20 134:2
141:19 142:16
143:20 144:1
154:19 174:14
197:22 202:1
216:5,21 218:23
**puts** 123:4 134:11
140:17 165:15
172:13
**putting** 143:11
226:15

**q**

**qualified** 47:24
233:6,14,15,18
238:8
**quarter** 173:20
**quarterly** 172:8,9
**query** 128:23
141:8 143:4
202:18
**question** 20:11
39:25 62:2 85:5
87:6,7,13 94:1,5
96:5,15 100:13
101:15,18 112:10
115:2 117:4
123:11 130:22
144:23 146:11
148:25 149:3
151:2 153:20
156:5 159:10
167:18 173:25
176:6 179:14
183:14 184:9
191:9 197:12

218:17 220:7,11
221:7 225:7
**questions** 54:18,20
60:19,20 82:6
186:9 218:25
219:18,20 231:12
235:6,10,20,20
236:3,5
**quick** 50:19,20
166:2 216:20
231:5
**quite** 63:23

**r**

**r** 12:20 135:21
**radio** 129:11
**rank** 19:16,19
30:2,6 38:19 46:5
102:7
**ranks** 19:24 102:7
**rapport** 76:20
**reach** 81:2
**reached** 174:12,13
**read** 54:1 139:11
148:4 166:1 172:1
173:2 195:10
196:2 197:21
228:6 241:5,6,12
242:5,6,17
**reading** 240:12,20
**real** 166:1 216:20
**really** 41:21
109:11 132:22
136:1 183:5
**reason** 13:12
57:13 228:25
229:9 242:8 243:3
**reasons** 199:25
**recall** 15:13 28:20
76:24 103:20
168:7,11,14 223:6
223:7

**receipt** 240:20
**receive** 22:24 95:2
113:9 114:7
193:15 215:17
221:22 222:3
**received** 20:4 23:1
55:25 113:21
132:9 159:6,11
177:13 185:18,22
**receiving** 216:19
**recess** 71:19
117:18 163:5
210:19 235:16
**recollection** 15:11
225:2,11
**record** 11:2,7
12:18 61:5 71:17
71:20 117:16,19
125:12 126:23
138:6 150:17
163:2 164:8
171:21 185:4
210:17,20 235:14
235:17 236:11
242:9
**recording** 176:22
**records** 129:15
**redss** 136:20 137:3
**reduced** 238:13
**reed** 3:3
**reedsmith.com**
3:6
**refer** 154:17
155:17 187:5
190:21
**reference** 152:22
189:24 240:7
241:2 242:2
**referenced** 151:23
230:6 238:13,17
240:11 241:11

242:15
**references** 152:8
**referred** 54:12,22
56:4 109:9 134:9
151:13 186:21
211:10
**referring** 67:12
102:13 151:17
157:8,9 186:6
197:5 221:3
223:17,20
**reflected** 165:12
**refresh** 15:11
**regard** 148:1
**regarding** 179:17
184:15 237:2,11
**regardless** 78:19
178:22
**regional** 135:21
136:19
**registered** 29:8
**regular** 95:12
112:15 191:7
**regularly** 104:7
**rehab** 99:16
**relate** 73:2 113:4
113:21 187:16
**related** 17:20
21:23 23:23 31:15
32:2 35:18 44:14
44:20 45:8,16
53:1,19 54:11
62:25 63:22 64:4
68:2 69:6 70:19
73:3,7,15 74:16
75:7 84:15 92:25
99:12 102:23
106:20,24,24
111:19 112:5
114:5,15 122:2,9
127:8 128:24

132:14 135:17,17
137:13 156:24
157:18 158:13
168:9 183:10
184:4,11 189:13
189:19 215:3,22
217:12 232:5
**relates** 1:8 46:13
53:25 73:7 76:10
132:5 159:21
183:23
**relating** 44:13
93:22 96:7 99:4
99:21 112:19
179:11
**relative** 200:11
239:2
**relatively** 119:7
**releasing** 18:19
**relevant** 53:1
**relied** 229:24
**relieve** 55:3
**reliever** 188:17
**remember** 14:8,14
21:7,21 24:3,5
25:4 26:22 27:17
28:19,24 29:2
31:17 32:3,5 37:1
40:21 46:10 48:19
53:5 56:10,18
57:15 59:12 60:14
72:24 74:2 77:1,5
77:10 78:13 84:6
96:4 98:5,22 99:1
99:3,20,24 103:7
103:24 104:1,4
106:22 109:20
126:12 128:21
131:6 136:9
146:13,13,22
147:6,8 151:24

152:1 157:21,23
158:5,16 160:6,14
167:16,21 170:18
170:19,24 171:5
175:2,23 176:3,9
176:12,16 178:14
179:3 182:1,6
183:1,8 194:3
214:20 217:15
218:19 219:2
224:4,13,16,17,18
224:19 234:7
**remind** 92:20
**removed** 16:23
**rendon** 97:23
151:14
**renee** 1:25 238:6
239:13
**repeat** 20:11 86:20
153:2 162:3
185:20 196:12
212:6 213:10
215:19 220:6
221:24 225:8
226:13 229:5
233:11
**rephrase** 136:10
**replace** 73:5
**report** 6:8,10
25:11 27:5 28:17
32:22 36:14 41:23
42:2 67:15 82:15
82:18,21 84:4,7,14
86:6 88:6 89:19
93:13 98:4 120:16
120:17,25 122:17
122:18 125:7
126:21 127:3
132:20 164:4,16
164:17 165:13
168:9,19,24

169:24
**reported** 25:12
36:15 42:7,15,21
165:18 186:2
**reporter** 5:16
241:7
**reporter's** 5:14
238:1
**reporting** 29:18
31:22 36:8 39:15
42:10 56:15 62:13
82:13 88:5 131:4
134:21
**reports** 39:15,16
67:22 83:21 86:9
88:1 130:19 148:5
164:20 170:2
191:7,8,10,12
194:5 195:3,13
197:21 201:6
**represent** 100:5
108:13 219:14
231:16
**representative**
229:1,10,16
**representative's**
229:25
**representing**
219:4
**reputation** 161:23
**request** 24:24
28:11 33:21 48:17
58:8 80:25 129:2
236:7 242:9,11
**requested** 47:10
59:22 109:22
110:9 131:11,14
237:1,6,10
**requesting** 17:16
**requests** 58:5
125:8

**required** 87:1,7,9
193:9 240:25
**requirement**
86:17,24
**resident** 226:10,20
228:5,12 229:24
230:2
**resigned** 27:15,18
180:24
**resources** 46:17
46:24 47:1 48:22
60:8 68:22 74:22
74:23 75:19 81:2
97:1 182:17 198:8
**respect** 74:16
154:7 159:10
167:19 223:9,13
223:25 224:22
**respond** 40:17
41:14 44:25 53:24
76:19 77:23 79:8
79:25 80:19,21
82:14 84:22 95:22
96:2 118:12,13
121:9,10 124:10
155:13 188:2
212:24 215:11
216:25 223:8
**responded** 23:20
40:10 93:10,13
126:1 173:19,21
187:20 234:13,22
235:3
**responder** 193:1
**responders** 192:23
**responding** 41:3
41:10 44:15,17
76:21 80:10,14
84:12 95:19
117:24 118:6
122:25 167:7

responds 125:5
response 86:18
212:21
responses 76:1,19
responsibilities
18:12 23:15 25:24
26:3 29:6 35:1,3
41:4 46:12 49:21
62:19,23 63:4,12
64:4 72:2 81:11
110:14 134:18
172:24
responsibility
37:11 44:12 45:6
45:7,10 123:17
203:7,15,24 204:6
204:14,21 205:4
205:13,21 206:6
206:22 207:5,13
207:22 208:4,12
208:21 209:4,11
209:18,24 210:10
210:25 211:4,8,19
211:23 212:3,11
responsible 39:19
79:22 112:21,24
122:24 138:5
160:23
responsive 52:20
123:25
rest 182:11
result 90:2 113:6
115:5 153:16
230:9
resulted 190:25
results 145:16
retained 5:16
retire 27:14
retired 33:4 36:15
37:2 42:15

returned 240:19
review 15:8,10
86:9 227:4 237:2
237:6 240:14
241:1 242:1
reviewed 15:14,17
reviewing 185:3
218:19
rewarding 145:23
rid 200:1
right 12:23 14:14
15:13 17:22 19:9
19:23 21:3 24:8
27:4 28:17 31:6
42:22 44:10 47:4
50:22 52:19 53:6
54:22 55:14 61:13
63:1,11 65:11,19
67:13,19 71:13,15
72:3,14 85:14
86:8,19 87:22
88:19 91:1 92:22
92:23 94:15,23
95:14 101:21
103:1,10 104:11
106:19 108:11
109:15 111:23
115:15 119:4
122:23 130:5,21
131:2,15 137:6
140:3 146:5
150:24 152:4
155:3 159:5 160:7
161:8 162:24
165:11,24 166:3
166:18 167:22
168:7 169:14,19
170:9 174:16
178:25 180:19
181:6 184:14
188:7 191:5 193:6

197:18 201:17
203:6 206:4
207:21 216:11
226:16 232:12
233:13,22 234:14
ring 177:5,10
risks 222:14
228:13
rite 208:8,9,11
231:25 232:4
river 92:2
rms 134:25 202:17
robin 2:7 11:14
rocky 92:2
role 14:11 26:4
77:8,8 111:2,8
198:2 233:25
roll 116:21
rolled 143:2,14
room 70:2 129:11
235:9
ropes 3:17 12:4
ropesgray.com
3:20
ross 104:24
roughly 14:15
29:2,2 31:13
213:25 214:4
roundabout 98:19
rounded 34:2
row 123:5
rpr 1:25
rules 12:11 237:3
237:7 241:5 242:5
run 43:12 128:6
running 128:9
rwilson 2:10
rx 131:4

**s**

s 135:21 242:8,8
243:3
safety 6:16 43:5
217:20 218:2
sal 15:2
salaries 112:14,15
112:17
salary 215:9
sale 183:11
sales 228:19 229:1
229:9,16,25
salvatore 2:3 11:9
240:5
sam 11:20 219:12
samuel 2:17
samuel.longergan
2:19
satisfaction
145:21 147:23
satisfy 155:21
156:15
satisfying 146:9
147:3,4
saved 194:13
saw 167:4 174:1
saying 149:15
153:3 154:16
198:23
says 35:8 75:12
152:17 165:21
166:6,22 167:9,14
167:19 169:6
174:17 187:4
188:10
sbadala 2:5
scenario 21:10
scene 41:22 77:20
77:21 78:11,11,25
79:18,25 80:2,3
81:6,12,14,17,21

82:5,14 84:8,12,15
84:25,25 85:1,3
86:25 88:3,10,12
88:14,21 89:5
91:8 94:14 95:19
119:13,16,18,21
119:25 120:13
123:1 126:1 187:1
187:20 188:3
190:1,21,22,25
234:14,16 235:3
**scenes** 53:24 78:6
78:8 86:18,21
89:23 90:2 117:24
118:7 149:11
188:6
**scharschmidt** 77:3
**schedules** 44:24
**scholer** 2:16 11:21
219:13
**school** 20:22,22
87:17
**schools** 20:19
**scibelli** 181:4,5,6
**script** 226:7
**scripts** 132:21
**seal** 239:6 241:15
242:21
**search** 46:21
50:16 64:7 88:19
89:2 91:6 182:17
182:20
**searched** 52:3,20
123:24
**season** 211:14
**second** 28:21 34:9
36:4 103:5 123:10
170:23 171:18
185:25 187:2
188:9

**secondhand** 114:1
**secretary** 101:23
165:15 172:12
**secrets** 132:12
**section** 122:16
166:1
**secure** 64:8 77:21
80:2 88:21
**securing** 88:14
**security** 23:17
63:17 65:1 66:25
67:20 68:17
110:19,24 111:1,6
111:7 134:4
**sedative** 188:17
**see** 31:11 60:21
64:24 66:9 69:10
79:1 89:3 94:13
116:24 120:4
121:24 130:2
140:7 141:21,25
142:7,18,21
157:11 165:17
166:20 173:12
177:7 178:15
185:11,14 189:25
197:14 198:16,21
201:6 235:13
**seeing** 41:17 120:8
152:20 179:3
198:22
**seen** 61:14 63:25
75:25 85:24
101:12,13,19
164:19 170:1
179:1 201:2
**seize** 113:5 114:14
114:14
**seizure** 115:6
**seizures** 113:10
115:1

**self** 183:25
**selling** 85:4 90:5
90:12,20 177:14
202:16 211:3
**send** 50:19 138:21
188:2 236:7
**sending** 94:19
**sends** 174:8
191:15,19 201:7
**senior** 39:21
**sense** 63:19 119:21
148:3 173:18
200:9
**sent** 78:23 103:11
137:21 138:12
186:4
**sentence** 152:17
153:5 186:5 188:9
189:23
**sentenced** 22:18
**sentencing** 22:16
22:17
**separate** 63:8 88:1
**separated** 202:22
**separately** 74:13
**september** 185:6
185:24
**sergeant** 20:1
25:13,19 27:1,5
28:2,5,23 30:2,6
31:14,20 44:3,7
45:5,5 66:4 67:8
67:11,13,14,16,22
68:9 69:3,15
92:19,20,21,22
115:12,19,21
133:13 167:24
170:6,9,21 172:23
182:7 192:8,10
216:15,21

**sergeant's** 123:16
**sergeants** 147:16
171:2 215:17
**served** 92:25 96:6
108:20,22 233:25
**session** 5:12
164:11
**set** 22:13 40:11
75:2 95:1,11,20
103:4 105:5,24
153:5 239:5
**sets** 68:25
**setting** 44:13,19
**seven** 214:4
**sex** 28:25 29:6,8,9
29:12
**shannon** 94:17
150:20 152:9,9,10
191:15
**share** 144:1
**shared** 123:19,22
123:24 131:16
**sharing** 136:20
139:9 140:13
141:2,23 142:3,15
143:21 160:10,12
192:13 198:8
**sharpe** 43:17,21
45:3 62:13,14
63:6 64:12 69:4,9
169:6
**sheet** 242:7,10,18
243:1
**sheriff** 18:8 19:17
19:21,24 23:14,24
25:17,25,25 27:23
30:3,7 36:16,17,20
36:22 39:5,7,7,16
42:10,16,19,22,23
42:24 51:13,14
96:22 100:4 108:4

108:12,16 151:21
**sheriff's**  6:5,8,9,11
  12:24 18:3 22:7
  25:20 27:10,21
  29:7 37:5 41:25
  42:20 43:3,22
  44:13 45:8 46:8
  51:18 57:3,8 58:8
  59:11 60:20,25
  61:11,19,22 62:4
  62:10 63:21 65:23
  66:12 68:24 70:18
  71:5 73:1,14,20
  74:17 76:9 78:5
  79:3 80:9 89:22
  90:9 92:3,9 93:9
  93:15,21 94:24
  95:15 96:20 99:25
  100:16 101:12,14
  101:23 102:3
  103:21 108:2,13
  109:23 110:12
  112:4,5,14,16
  113:3,19,20 114:7
  114:13,21 115:4
  116:3,4,6,12,13,20
  117:6 118:1,6
  122:3 125:25
  127:17 129:6,6,16
  130:6,12,23 131:7
  131:12,17,22
  134:13 135:15
  136:14 137:2,12
  138:2,4 139:19
  140:17 141:6,8
  142:16 144:9,21
  159:24 161:9
  162:11 164:3,15
  164:19 165:15
  168:18,24 171:10
  171:23 172:5,16

174:9,19 177:13
  177:20 179:10,15
  180:1,9 181:7,22
  182:23 183:9,17
  184:2,10 187:20
  188:1 189:2,12,20
  191:11 192:4,25
  193:6,12 201:18
  202:11,13 212:22
  213:3 215:2
  216:13,14 217:10
  232:10 235:2
**sheriffs**  96:10,10
**sherriff**  100:13
**shift**  95:23,24
**shifting**  101:9
**shipment**  194:3
**shkolnik**  2:2 11:10
**shop**  203:21
**shopping**  161:6,11
  200:5
**show**  63:24,25
  80:5 81:10 121:7
  143:6
**shows**  142:13
**side**  118:21 227:11
  227:18
**sides**  218:6
**sign**  45:15
**signature**  237:5
  239:12 240:14
**signed**  146:1
  241:13 242:18
**significant**  146:16
**signing**  240:12,20
**similar**  152:6
  169:1,3 185:15
**simple**  160:25
  191:25
**sincerely**  240:23

**single**  226:6,18
  229:22
**sir**  31:17 131:5
  133:22 150:22
  154:23 164:21
  165:7,23 166:7,21
  170:7 172:6 175:3
  175:16,25 176:24
  177:4,11 185:11
  185:14 186:15
  188:12,20,23
  190:5 192:19
  193:2 195:1 201:3
  201:16 203:5
  204:12,19 205:19
  206:9,25 207:11
  209:2,9,14,21
  210:2 219:6
  221:18 222:6,11
  222:17,22 223:2
  223:12,24 224:25
  226:5,13 227:15
  227:21 228:1,17
  229:14,21 230:5
  230:15 232:8,13
  232:23 233:1,5,9
  234:15 235:6
  236:10 240:10
**sit**  89:16 228:24
  229:8
**sitting**  173:8
**situation**  119:17
  221:11 224:6,9
**six**  19:8 47:4 192:1
**skip**  189:25
**slides**  57:20
**small**  29:20 49:15
**smaller**  81:1
  118:20
**smith**  3:3 62:21
  69:10 207:9,10,13

**social**  134:4
**sold**  81:25 141:4
  147:24 157:9,14
  179:20
**solely**  215:21
**solutions**  2:15
  240:1 243:1
**solve**  120:10
**somebody**  62:18
  70:23 85:16 98:7
  144:13,14 145:21
  157:5 177:21
  200:11 233:7,17
**somebody's**
  123:20 160:3
**someone's**  134:2
**son**  156:3 157:14
**sorry**  16:6,10 19:3
  19:6 20:11 36:5,8
  36:20 62:1 65:3
  74:11 80:15 84:25
  85:5 86:20 87:24
  91:17 96:4 109:6
  123:10 126:13
  141:7 151:8 153:2
  156:5 162:4 166:5
  168:11 170:23
  173:7,24 176:5
  184:1 185:20
  186:25 191:9
  213:25 215:19
**sort**  16:16 37:13
  56:2,2 63:2 65:22
  72:6 73:2 82:3
  113:19 120:19
  121:3 122:10
  128:24 145:3
  153:17 162:14
  191:23 194:5
  215:21

**sorts** 16:19 17:2 26:9 85:7 137:25
**sound** 27:4 169:18 235:24
**sounds** 95:16 156:8
**south** 17:24
**speak** 84:18 136:1 147:22 149:15
**speaking** 148:12 155:12 223:7
**special** 95:7 216:3
**specialty** 18:18
**specific** 56:1 86:9 87:16 107:16 116:13 128:24 157:23 176:12 177:18 201:25 223:19 232:4
**specifically** 71:1 74:8 78:13 109:24 133:5 157:4,13 169:2 181:11 191:3 231:20
**specifics** 99:1 160:20 224:19
**specified** 238:20
**specify** 106:9
**speed** 40:13
**spell** 36:11,24 77:2 130:17
**spelled** 12:20
**spent** 35:17
**spit** 191:9
**spoke** 59:20 131:2 186:22 213:5 224:1 232:18
**spoken** 54:5
**spot** 42:20
**spreadsheet** 122:11,21 123:3,7

**spreadsheets** 122:6
**square** 2:7 3:4
**ss** 238:3
**staff** 101:24,25 102:7,10,11,12,12 102:23 103:2,15 103:19,20,25 104:2,6 114:3
**staffing** 47:8,18 215:6
**stage** 137:1 221:12
**stance** 107:19 108:3,6,13
**stand** 83:1 98:3 119:4 147:2
**standard** 82:2
**standards** 47:22
**standing** 98:5 107:19 146:14 147:6,8
**stands** 19:2 130:18 192:17
**start** 11:8 20:20 42:13 70:13 81:21 88:12 125:15 148:13 154:10 192:21 194:16
**started** 40:9 41:3 46:8 80:13 143:22 181:21 231:1
**starting** 67:25 146:24
**stat** 135:1 142:14
**state** 12:18 17:5,6 114:7 135:1,4 178:12 179:2

**185:4 191:1 192:2 210:3,3,9 238:2,7 239:14 241:10 242:15
**stated** 47:5 156:13 216:2 228:21 230:19,21
**statement** 195:22 229:17 241:13,14 242:19,19
**statements** 86:14 229:2,11
**states** 1:1
**stating** 115:14 192:1
**stations** 69:22
**statistic** 202:21
**statistically** 138:9
**statistics** 92:11,14 125:2 135:5,6 191:17 194:11
**stats** 138:12 191:25 194:15
**status** 128:13 134:6
**stay** 49:23
**staying** 101:10
**stealing** 27:20
**steel** 104:21,22
**stemmed** 93:15
**stems** 149:9
**stenotypy** 238:14
**step** 32:10
**stings** 35:13 68:18
**stood** 122:19 167:17
**stop** 30:25 70:25 128:2 146:10
**stopper** 137:18 178:4

**stoppers** 137:8,20 138:10
**store** 70:2
**stored** 127:9
**stories** 155:24 194:13,15
**story** 155:16 171:18 174:10,15 178:15 179:1,4
**strategic** 6:15 65:22 217:19 218:1
**strategies** 44:19
**strategy** 44:18
**stream** 3:2,17 4:2
**street** 2:17 3:4,8 3:13 4:4 26:8 58:19 121:10,12 140:9 155:20 197:25
**strictly** 126:4
**strike** 96:13 226:7
**string** 6:6,13 150:5 184:22
**stronger** 188:16
**studies** 159:14
**study** 159:7
**stuff** 18:19 26:8 35:13 45:14 49:4 49:10,11 53:23 58:21 71:7 75:21 84:4,10 85:20 87:17 89:7 96:2 99:12 107:14 116:1 120:21 128:12 134:11 135:8 148:13 194:14 197:22,23 215:10
**sub** 116:20

subject 16:22
98:25 144:8
235:24
subjects 75:23
submit 88:6
117:10 138:2
174:10
submitted 24:23
84:14 86:7 102:19
120:16 169:7
172:12 173:4
subordinate 15:24
16:12
subordinates
25:16
subscribed 241:10
242:14 243:21
subset 124:7
substance 189:18
233:4,8,17
suburb 13:6
suburbs 118:20
successes 144:20
sued 231:18,22,25
suggestions
182:22
suicide 177:9
suing 53:11
suit 216:5
suite 1:21 2:8 3:4
240:2
superior 240:1
supervised 23:5
supervising 18:16
32:10
supervision 72:8
supervisor 15:24
16:1 25:10,13
27:8 45:4 48:15
66:4 67:8 68:10
81:10 92:17,17

103:17 123:16
137:21 138:22
170:15,20 178:5
192:8
supervisors 39:14
44:23 45:1 67:9
79:21 123:9
124:22 186:24
supplement 88:6
120:17,25
supplemental
120:15
supplied 167:25
193:22 217:9
supplies 45:14
supply 161:25
supplying 193:24
211:18
suppose 81:5
supposed 81:13
85:13 103:14
141:5,13 142:2
143:10 149:11
sure 13:21 24:2,3
29:14 30:9 34:11
41:9 42:13 46:15
51:4 55:1 59:13
59:22,24 61:25
64:8 65:24 71:16
73:10,12 76:6
87:6 88:12 94:19
95:15 96:12 105:1
110:21,23 112:7
116:8 117:15
119:3 120:23
123:17 137:4
138:16 147:22
153:19,21 156:8
166:3,18 168:3
170:3 172:2 173:6
173:23 183:13

185:9 192:10,14
193:18 196:3,14
197:12 216:10
218:4 220:7
221:25 229:7
231:14 233:12
surgery 220:19
surprise 108:25
survey 78:25
suspect 66:8 140:8
140:21 141:2,3,15
142:1,6
suspect's 140:12
suspected 23:23
41:13 77:17 79:10
79:18 186:25
216:6
suspicious 183:21
183:22 184:4,12
184:15
swapped 33:23
swat 63:22,23 64:3
64:10 68:3 75:18
75:19 76:5
switchboard
138:15
switched 33:19,24
71:25
switching 72:13
sworn 12:9,13
238:10 241:10,13
242:14,18 243:21
syringe 190:14
system 29:9 56:15
82:22,24 83:3,4,12
83:14 84:2,3
121:5,17 126:24
126:24 127:1,15
129:15 130:19
131:4 134:21,25
135:10,22 136:20

143:20 144:3
202:17,19,24
systems 121:4
209:8,11

---

**t**

t 65:11 82:25
168:4
tab 184:18
table 98:19
tac 82:25 83:13,14
83:22 84:2,3 86:7
120:16 121:5
122:1 127:1,6
129:23 130:2
134:25 135:10
144:3 203:1,2
take 33:10 34:13
71:14 72:19 80:5
85:1 102:13
104:21 117:13
118:3 143:7
150:10,17 162:25
171:16 175:17
180:14 210:14
211:9,22 216:9
235:12
taken 1:19 21:18
47:6 87:4 104:24
122:17 160:2,19
163:5 238:19
240:11
takes 38:14 101:24
talk 16:9 54:11
60:11 75:8,17
78:9,10 98:10
101:8 110:7
119:19 120:11
144:19 147:15,18
147:20
talked 15:21 16:14
31:8 54:15 60:16

63:18 68:3,3,4
77:4 96:9 98:11
99:2,3 101:6
119:12 121:25
127:5 139:22
156:18,20 157:12
174:24 175:24
182:10

**talking** 17:19
42:11 49:20 59:19
73:22 74:4,8
80:14 88:10 98:19
117:23 132:19
149:20 175:9
210:23 219:24
223:10

**talks** 190:3

**tape** 80:3

**tara** 172:12 173:4
174:8

**task** 57:11,21 58:7
59:6,11,25 63:15
64:13,15,19,23
65:5,7,23 66:6
67:6 68:3,22
74:10,12 92:25
96:7,7,11,17 97:4
97:12,19 98:23
99:21 100:3,9,17
105:9,16 106:2,6
112:6,7,13,18,19
113:5 118:22
132:3,15 142:19
142:20 144:17
148:5 152:3
161:15 170:18
178:10 180:16,17
181:14 182:9
183:4,4 199:18
216:16

**tasked** 95:19

**taylor** 16:2 42:3,4
42:6,25 54:9,10
108:16

**team** 29:21 165:5
212:21

**technically** 182:2

**technique** 49:16
182:24 183:6

**technology** 49:2,7
49:18 89:1

**telephone** 3:17 4:2
49:11

**tell** 32:14 52:7
89:19 155:23
158:8 167:22
169:16 220:24
221:4

**ten** 214:4 234:9

**tenth** 3:13

**term** 109:5 115:5
145:20 159:20
161:5,17,18 162:6
188:4 190:13
200:6

**terminal** 128:5
129:10

**terms** 15:22 44:14
44:18 46:24 49:22
65:24 72:15 75:6
84:6 85:12 88:8
89:10 131:22
142:2 147:10
153:24 169:19
172:10 194:6
197:7,7 198:13
199:1 200:10
201:9,12 202:5
218:25

**test** 226:15

**testified** 13:15,18
13:24 14:3,10
16:15,17 17:1,4
73:24 93:3 131:3
132:13 222:23
223:3 224:1 225:1
225:10 230:8
232:9 233:20
234:12,15

**testify** 238:10

**testifying** 13:9
17:11 53:7

**testimony** 13:13
14:15 16:15 123:2
158:18 218:25
223:6 238:12,16
241:6,7 242:6,9,12

**teva** 4:2 209:15,18

**text** 50:20 51:11
51:23 95:2,12,13
150:18 191:23

**texts** 51:10

**thank** 18:23 20:8
119:5 171:22
176:25 219:6,7
231:6,7 235:6,7,22
236:10

**thanks** 231:11

**theft** 160:1 199:25
200:3

**theirs** 119:11

**thing** 39:6 66:10
67:7,22 79:17
119:12 128:10
129:17 134:4
141:22 143:23
158:20 186:2

**things** 17:2 21:16
39:18 54:4 62:7
81:9 115:7 121:13
216:10

**think** 27:7 28:21
30:20 34:1 36:15
36:16 38:16 42:8
56:15 58:21,24
62:7 63:18,22
64:11 69:2 70:21
72:20 77:9,13,14
77:22,24 78:2
82:10,11 83:10,19
84:9 86:10 87:14
99:7 101:5,7
103:7,8 104:25
105:5,18 113:1
118:9,18 125:21
126:7,21 127:25
129:5 130:18,21
133:4 135:5 136:4
138:9 139:12
144:7 145:24
148:4,10,14
149:14,16 151:13
151:23 154:13
155:13,15 156:12
157:8,20 158:19
160:15 166:6,10
166:12,23 171:1
172:11 174:8,25
175:5 177:17
181:1,20 182:21
184:6 185:11,15
186:6,22 189:7
190:15 192:17
193:23 194:11,22
194:23 195:1
197:11 198:6,7,17
199:22 200:8
205:10 206:2
211:7,9,10 212:14
215:1,24 216:2,11
216:20 234:15
235:25 236:3

**third** 196:10
**thirty** 240:19
**thomas** 185:6
**thought** 125:14
  178:21
**thoughts** 73:25
  98:4
**three** 3:4 15:7
  20:22 105:6
  214:22
**ticket** 24:4 32:8
**tier** 29:9
**ties** 156:12 195:2
**till** 37:12
**time** 14:3 18:25
  22:14 24:23 25:13
  26:22 27:6 28:18
  28:25 29:20 30:7
  32:1 33:12 34:13
  35:17 36:21 37:10
  40:16 41:5 42:9
  42:17,18,21 45:3
  49:19 53:5,20
  77:24 102:20
  103:11 107:12,17
  117:13 118:10
  141:15 144:25
  146:17,24 150:20
  152:17 153:13
  162:20 168:15
  170:22 173:1
  178:6 181:25
  182:4 189:7
  196:13 197:3
  219:6 231:8
  233:24 234:7,8
  235:23 238:19
**times** 13:20,21
  17:1 56:11 59:20
  80:20 100:22
  105:6 107:17

  175:10 188:15
  194:6 234:17
  236:7
**tip** 132:5,10
  133:11 137:22
  138:2,16 161:13
  177:13,18,20,25
  178:2,4,8
**tips** 132:1,8 133:9
  137:12,16,19,22
  138:1,6,11,20
  139:4
**tipsoft** 137:6,7
**title** 38:24 46:6,7
  64:21 212:25
**titles** 39:8
**today** 13:13 14:22
  15:25 37:12 39:8
  42:3 53:8,13,15
  54:14 61:22 62:5
  123:21 147:10
  198:15,16 219:24
  222:23 228:24
  229:8 231:12,17
**today's** 11:2
**told** 28:12 33:22
  38:7 42:3 65:8
  131:6 148:12
  231:4
**tool** 140:7 141:18
**top** 147:14 165:4
  166:1 188:8
**topic** 31:10
**topics** 101:10
**tops** 57:18
**totals** 165:20
  169:3
**touched** 199:22
**touches** 63:21
**tough** 120:10

**town** 115:25
**townships** 79:8
  118:10
**toxicology** 93:12
  126:21 127:3
  192:2 232:25
**trac** 202:25
**trace** 121:14
  147:23
**traced** 155:14
**track** 56:19 92:4,8
  117:9 122:7 125:2
  125:3,15 126:24
  127:12 135:5
  202:10
**tracks** 131:21
**trade** 75:23
**traffic** 35:12 68:18
  70:24 128:2,16,17
**trafficking** 64:20
  105:9 177:3,14,21
  195:14 202:4,15
  216:16 217:5
**trained** 84:23,24
  85:6 87:12 144:15
**training** 20:5,10
  20:13,17 21:8,10
  21:10,11,12,14,18
  23:8,11 38:13,15
  56:1,2,5,7,9,11,19
  57:9 87:16 115:24
  115:25 134:9,10
  143:1 144:18
  159:6,12,13
  193:12,14,15
  232:10,11,14,15
  232:16,18,19,21
  232:24 233:2
**transcribed**
  238:15 241:7

**transcript** 5:1
  237:3,6,9,11
  240:11,16 241:5
  241:12 242:5,11
  242:17
**transcription**
  238:16
**transported** 23:18
**trauma** 21:10
  232:12,16
**treat** 80:1
**treatment** 99:6,10
  99:14,17 233:3
**trend** 153:23,24
  154:2
**tri** 19:1,2
**trial** 22:13 177:8,9
**trick** 109:12
**tried** 36:6
**trigger** 151:7
**triggers** 94:13
  151:3
**true** 224:22
  238:16
**trust** 115:11
**truth** 238:10,11,11
**truthful** 13:13
  32:9
**try** 36:3 82:1 85:9
  85:17,20 86:2
  87:1 89:2,4,8
  98:21 119:19
  120:5 140:7 141:2
  141:20 146:15
  157:8 182:25
  189:8 191:9
  199:24 233:13
**trying** 16:24 34:10
  63:19 86:1 89:7
  91:11 109:11
  115:3 118:4 120:4

123:12 132:11,18
139:12 143:8
147:11 153:4
170:24 183:6
189:3 190:15
202:10
tuesday 103:5
turn 89:13 105:6
124:13 132:2,15
132:23 155:19
161:14 180:15
184:7 211:13
turned 104:13
turning 105:4
tv 63:24
twelfth 3:8
two 17:3 27:25
29:4,16 42:1
51:16 57:25 58:10
64:17,24 65:8
81:7,8,8 88:1,2
95:18,22 102:10
105:5 110:3
115:24 119:3
180:21 181:1
188:2 213:18
215:10 219:14
230:8,21 235:12
twombly 166:11
168:4 169:11
type 41:16 58:17
70:6 78:19 106:6
112:22 132:1
135:2 143:17,19
147:11 149:8
156:1 178:8
187:23 197:7
202:18,22 216:3
types 13:23 15:16
70:5 148:2

typing 94:21

**u**

u.s. 97:22 151:17
underlying 155:16
underneath 67:25
understand 13:7
54:24 73:11
105:15 108:15
115:2 142:18
153:19,21 156:8
161:19 165:17
177:8 182:14
183:13 197:12
226:24 228:13
understanding
53:10 55:24 106:2
108:11 143:3
152:21 158:18
188:14 192:22
197:19 198:12
199:3,19 219:22
understood 55:11
123:2
unfortunately
30:1
uniform 32:17
33:18 34:6,15
109:22 181:10
uninvited 188:1,4
union 30:11,14,16
30:21 31:7 215:14
unionizing 30:10
unique 121:3
unit 29:1,6 34:1,3
34:4,4,5,8 35:7,10
35:11 38:12,13
40:9 44:8,23 45:2
59:13 63:8,13
64:3,10 67:9,12
68:5,6,8,12,25
69:13,13 76:13

92:12,17 93:23
94:12 160:22
166:12,14 169:20
170:10,12,17
172:24 178:6,6
197:16 234:20
united 1:1
units 35:14 63:20
67:25 69:5 70:18
75:10 174:9
untangle 195:23
196:5,16
unwanted 69:20
update 45:22
123:16
updated 72:21
updates 103:18
155:25
updating 191:16
ups 80:6
use 50:22 51:11,20
52:16 60:22 77:18
83:11 129:22,22
129:23 134:17
135:15 136:3,3,13
136:15 140:6
143:15 156:10
158:20,20 159:1
159:12,15 187:10
187:16 193:13
216:21,24 217:1
219:24 220:4,9
221:16 223:16
224:2 225:22
227:11,19 230:18
235:1
user 159:3
uses 136:13
139:20 200:12
220:9 224:24

usually 38:11
45:18,19 53:19,24
69:21 78:21 79:16
80:25 92:16 98:6
99:9 100:4 103:7
132:2 149:7
191:15

**v**

v 1:9 36:25 240:6
241:3 242:3
vacation 96:1
valid 128:14
value 114:25
variety 137:19
various 19:24
20:17 21:16 199:4
199:20
vary 96:1
vehicle 14:2
vehicles 79:25
215:9 216:8,9
217:9
verifications 29:12
veritext 3:2,17 4:2
240:1,7 243:1
versa 60:9 182:19
183:2
versus 137:19
138:17 200:14
vest 112:22
vice 35:11 60:8
68:5 182:19 183:2
victim 149:12
235:2
victim's 140:11,17
140:21
victims 175:2
201:11
videographer 4:7
11:1 12:8 71:17
71:20 117:16,19

[videographer - yeah]                                                Page 40

163:2 164:8
210:17,20 235:14
235:17 236:11
**videotaped** 1:13
**view** 125:8 131:20
131:25 154:5
198:2 203:6,14,24
204:5,20 205:3,12
205:20 206:4,20
207:4,12,21 208:3
208:11,20 209:3
209:10,17 211:2
212:1
**violence** 135:8
**virtual** 3:2,17 4:2
**volleyball** 31:8
**volunteer** 24:12
**volunteered** 24:13

**w**

**w** 3:12 168:4
**wait** 30:20 89:18
169:14
**waived** 240:13,21
**walgreens** 207:19
207:20,22 232:1,5
**walk** 79:2
**walmart** 2:11
11:24 203:19,20
203:21,22,23
231:16,18,20,22
232:4
**want** 32:8 48:16
49:7 55:22 60:19
61:9 68:21 71:23
78:4 82:20 87:15
96:11,24 98:20
101:8 118:2
140:10 143:1
147:21 152:5
155:25 156:1,2,7
156:22 157:3

164:22,23 165:16
166:3,17,18 169:1
172:25 189:8,17
218:10 226:14,16
232:18
**wanted** 66:14
110:10 123:20
218:8
**wants** 156:24
172:18
**warning** 226:25
227:5,9,16,23
228:6 229:18
**warrant** 35:7 44:8
50:16 64:7 89:2
91:7 128:18
170:10 182:18,20
**warrants** 29:21
35:9 46:21 128:19
138:18
**washington** 3:9,14
**watson** 204:18,21
**way** 44:23 48:9
50:12 53:6 65:25
68:17 87:20 94:23
113:4 118:3,9
149:25 156:15
157:11 162:23
172:4 190:15
196:25 198:13
225:14 233:7,16
**ways** 104:20
137:19,25 199:4
199:20 200:7,15
202:5
**wc.com** 3:10
**we've** 44:22 47:6
53:22 58:9 59:13
63:18 86:22 93:13
96:12 104:24
125:4 194:11,13

199:21 202:1,22
212:23 214:13
215:7 219:23
**web** 232:21
**website** 137:23
178:5 193:16
232:22
**wednesday** 103:8
103:9
**week** 90:4 120:13
191:16
**weekend** 192:2
**weigh** 104:17
**welfare** 85:17
120:1
**went** 18:25 20:20
21:9 27:12 29:21
30:2 31:12 83:20
124:17 136:11
144:17 214:17
**west** 2:17 13:2
**westlake** 118:19
**wf** 190:6
**whatsoever** 73:6
102:23
**whawkins** 3:10
**whereof** 239:5
**white** 190:6
**william** 12:1
**williams** 3:7
**wilson** 2:7 11:14
11:14
**wing** 38:14
**wiring** 49:16
**wise** 34:5
**withdraw** 39:25
**withhold** 120:21
**witness** 12:8 36:5
61:8 86:14 158:2
219:7 231:6 235:7
237:2 238:9,13,14

238:17 239:5
240:8 241:1,4,11
242:1,4,15
**witnesses** 81:17
85:13,14
**women** 95:18
**word** 73:5 193:7
**words** 126:1
142:17
**work** 12:22,23
13:1 16:8 22:5
26:23 51:21 52:16
58:17 91:19
109:23,24 121:8
135:16 142:19,21
152:12 199:17
**worked** 18:9 91:20
170:11
**working** 58:11
135:7 141:20,22
143:12 189:3
**works** 33:4 77:15
94:18 95:23
166:13
**worry** 207:17
**write** 82:15,19
**writing** 32:7 72:15
84:4 88:5 132:21
**written** 175:19
200:13 212:1,9
**wrong** 123:6 148:4
**wrote** 24:4 226:9

**x**

**x** 182:24
**xx2016-03490**
187:4

**y**

**y** 168:4
**yeah** 16:6 21:5
22:22 30:23 36:16

| 46:15 51:16,19,19 | **z** |
| 55:1 56:7 60:1,2 | **zipp**  3:12 11:18 |
| 75:8 76:6 80:23 | |
| 83:4 84:20 85:2 | |
| 87:5 90:10 97:21 | |
| 102:5 103:6 | |
| 105:14 109:5 | |
| 110:24 119:22 | |
| 120:24 127:2,2 | |
| 129:1 133:13 | |
| 143:14 146:10 | |
| 157:20 158:5 | |
| 166:23,24 169:22 | |
| 170:25 171:5 | |
| 172:17 175:22 | |
| 182:15 186:22 | |
| 188:5 190:22 | |
| 194:9 195:1 | |
| 198:16,24 202:8 | |
| 206:14 211:22 | |
| 213:4 214:2 236:6 | |
| **year**  14:9 21:11 | |
| 22:13 29:4 37:3 | |
| 56:12 83:18 105:6 | |
| 109:20 113:12 | |
| 125:19 126:5 | |
| 154:13 176:8 | |
| **years**  27:25 29:24 | |
| 37:3 41:7 43:9 | |
| 60:15 65:16 | |
| 111:17 128:18 | |
| 136:8 166:2 181:1 | |
| 190:4 213:23 | |
| 214:4,22 234:9 | |
| **yesterday**  14:25 | |
| 54:14 | |
| **york**  2:4,4,18,18 | |
| 3:19,19 | |
| **young**  155:21 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.