Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

      IN RE:  NATIONAL PRESCRIPTION     ) No. 17-md-2804

 4    OPIATE LITIGATION NO. 2804        )

                                        )

 5    APPLIES TO ALL CASES              ) Hon. Dan A. Polster

                                        )

 6

 7          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 8                  CONFIDENTIALITY REVIEW

 9

               VIDEO DEPOSITION OF JOHN GILLIES

10

                     February 8, 2019

11                      9:04 a.m.

12

13

14

             Reporter:  John Arndt, CSR, CCR, RDR, CRR

15                 CSR No. 084-004605

                     CCR No. 1186

16

17

18

19

20

21

22

23

24
```

Page 2

1    DEPOSITION OF JOHN GILLIES produced,
sworn, and examined on February 8, 2019, at Bryan Cave
2  Leighton Paisner LLP, 211 North Broadway, Suite 3600,
in the City of St. Louis, State of Missouri, before
3  John Arndt, a Certified Shorthand Reporter and
Certified Court Reporter.
4
5          APPEARANCES OF COUNSEL
6  On Behalf of Plaintiffs:
Keller Rohrback LLP
7    1201 Third Avenue, Suite 3200
Seattle, WA  98101
8    (206) 623-1900
BY:  MR. DAVID J. KO
9    dko@kellerrohrback.com
MR. DEAN KAWAMOTO
10   dkawamoto@kellerrohrback.com
MS. ALISON GAFFNEY
11
On Behalf of Tennessee Action:
12   Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue, Suite 200
13   Nashville, TN  37203
(615) 254-8801
14   BY:  MS. TRICIA HERZFELD
triciah@bsjfirm.com
15
On Behalf of AmerisourceBergen:
16   Reed Smith LLP
136 Main Street, Suite 250
17   Princeton, NJ  08540
(609) 514-5959
18   BY:  MS. SHANA E. RUSSO
srusso@reedsmith.com
19   (present via speakerphone)
20  On Behalf of Walmart:
Jones Day
21   325 John H. McConnell Boulevard, Suite 600
Columbus, OH  43215
22   (614) 469-3939
BY:  MS. BRANDY H. RANJAN
23   branjan@jonesday.com
24

Page 3

1          APPEARANCES OF COUNSEL (CONTINUED)
2
On Behalf of Cardinal Health:
3    Armstrong Teasdale, LLP
7700 Forsyth Boulevard, Suite 1800
4    St. Louis, MO  63105
(314) 552-6672
5    BY:  MS. SARAH E. HARMON
sharmon@armstrongteasdale.com
6
On Behalf of Mallinckrodt, SpecGX LLC, and John
7  Gillies:
Ropes & Gray LLP
8    800 Boylston Street
Boston, MA  02199
9    (617) 951-7000
BY:  MR. ANDREW O'CONNOR
10   andrew.o'connor@ropesgray.com
MR. JOSH GOLDSTEIN
11   joshua.goldstein@ropesgray.com
12
Also present:  James Arndt, videographer
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          INDEX OF INTERROGATION
2  Examination by Mr. Kawamoto          Page 11
Examination by Ms. Herzfeld          Page 208
3
4          INDEX OF EXHIBITS
5
Exhibit Mallinckrodt-Gillies-033          Page 14
6  (Notice of deposition)
7  Exhibit Mallinckrodt-Gillies-034          Page 15
(John V. Gillies biography)
8  (MNK-T1_0005138849)
9  Exhibit Mallinckrodt-Gillies-035          Page 23
(E-mail chain)
10  (MNK-T1_0000449492 - MNK-T1_0000449493)
11  Exhibit Mallinckrodt-Gillies-036          Page 40
(E-mail message with attachment)
12  (MNK-T1_0000559192 - MNK-T1_0000559194)
13  Exhibit Mallinckrodt-Gillies-037          Page 45
(E-mail chain with attachment)
14  (MNK-T1_0000265441)
15  Exhibit Mallinckrodt-Gillies-038
(Skipped)
16
Exhibit Mallinckrodt-Gillies-039
17  (Skipped)
18  Exhibit Mallinckrodt-Gillies-040          Page 49
(FBI press release)
19
Exhibit Mallinckrodt-Gillies-041          Page 57
20  (E-mail chain)
(MNK-T1_565408)
21
Exhibit Mallinckrodt-Gillies-042          Page 60
22  (E-mail chain)
(MNK-T1_563396)
23
24

Page 5

1          INDEX OF EXHIBITS (CONTINUED)
2
Exhibit Mallinckrodt-Gillies-043          Page 65
3  (Collaborating Against Diversion
And Abuse:  A Manufacturer's
4  Perspective)
(MNK-T1_0002360550)
5
Exhibit Mallinckrodt-Gillies-044          Page 72
6  (E-mail chain)
(MNK-T1_0005650749 - MNK-T1_0005650750)
7
Exhibit Mallinckrodt-Gillies-045          Page 76
8  (E-mail chain with attachment)
(MNK-T1_0007898862 - MNK-T1_0007898864)
9
Exhibit Mallinckrodt-Gillies-046          Page 86
10  (Exalgo Utilization)
11  Exhibit Mallinckrodt-Gillies-047          Page 98
(08/06/12 memo to file)
12  (MNK-T1_0002359481 - MNK-T1_0002359482)
13  Exhibit Mallinckrodt-Gillies-048          Page 108
(E-mail chain)
14  (MNK-T1_0000562387 - MNK-T1_0000562390)
15  Exhibit Mallinckrodt-Gillies-049          Page 117
(Chargeback data)
16  (MNK-T1_0000264292)
17  Exhibit Mallinckrodt-Gillies-050          Page 128
(Chargeback data)
18  (MNK-T1_0000264291)
19  Exhibit Mallinckrodt-Gillies-051          Page 135
(E-mail chain)
20  (MNK-T1_0000290601 - MNK-T1_0000290603)
21  Exhibit Mallinckrodt-Gillies-052          Page 141
(E-mail chain)
22  (MAL-MI 000015271 - MAL-MI 000015273)
23  Exhibit Mallinckrodt-Gillies-053          Page 142
(E-mail chain)
24  (MNK-T1_0000290580 - MNK-T1_0000290582)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-054          Page 151
(E-mail chain)
(MNK-T1_0003028219 - MNK-T1_0003028220)

Exhibit Mallinckrodt-Gillies-055          Page 156
(E-mail chain)
(MNK-T1_0000307120 - MNK-T1_0000307121)

Exhibit Mallinckrodt-Gillies-056          Page 161
(E-mail chain)
(MNK-T1_0000307203 - MNK-T1_0000307207)

Exhibit Mallinckrodt-Gillies-057          Page 167
(E-mail chain with attachment)
(MNK-T1_0000290041 - MNK-T1_0000290053)

Exhibit Mallinckrodt-Gillies-058          Page 175
(Controlled Substance Quota and
Suspicious Order Monitoring Overview)
(MNK-T1_0000463862 - MNK-T1_0000463887)

Exhibit Mallinckrodt-Gillies-059          Page 178
(U.S. Government Accountability Office
Follow Up Questions for Mallinckrodt)
(MNK-T1_0006619631 - MNK-T1_0006619645)

Exhibit Mallinckrodt-Gillies-060          Page 180
(Quota shortages document)
(MNK-T1_0004813611)

Exhibit Mallinckrodt-Gillies-061          Page 183
(E-mail chain)
(MNK-T1_0006056192)

Exhibit Mallinckrodt-Gillies-062          Page 184
(E-mail chain)
(MNK-T1_0001807112 - MNK-T1_0001807114)

Exhibit Mallinckrodt-Gillies-063          Page 186
(E-mail chain with attachment)
(MNK-T1_0008449627 - MNK-T1_0008449639)

Exhibit Mallinckrodt-Gillies-064          Page 213
(E-mail message with attachment)
(MNK-TNSTA04437892 - MNK-TNSTA04437892)

Page 7

INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-065          Page 221
(E-mail message)
(MNK-TNSTA00269511 - MNK-TNSTA00269514)

Exhibit Mallinckrodt-Gillies-066          Page 222
(E-mail chain)
(MNK-TNSTA01925259 - MNK-TNSTA01925261)

Exhibit Mallinckrodt-Gillies-067          Page 226
(E-mail chain)
(MNK-TNSTA01925080 - MNK-TNSTA01925081)

Exhibit Mallinckrodt-Gillies-068          Page 228
(E-mail message)
(MNK-T1_0006968471 - MNK-T1_0006968472)

Exhibit Mallinckrodt-Gillies-069          Page 229
(E-mail message)
(MNK-TNSTA01924343 - MNK-TNSTA01924345)

Exhibit Mallinckrodt-Gillies-070          Page 231
(Oxycodone IR 30mg tables
Per Capita.xlsx)
(MNK-TNSTA00564007 - MNK-TNSTA00564006)

Exhibit Mallinckrodt-Gillies-071          Page 234
(E-mail message)
(MNK-T1_0008575579 - MNK-T1_0008575580)

Exhibit Mallinckrodt-Gillies-072          Page 249
(E-mail message with attachment)
(MNK-T1_0008503696)

Exhibit Mallinckrodt-Gillies-073          Page 252
(E-mail message with attachment)
(MNK-TNSTA04437510 - MNK-TNSTA04437515)

Exhibit Mallinckrodt-Gillies-074          Page 264
(Pharmacy Information Sheet)
(MNK-TNSTA05349729 - MNK-TNSTA05349730)

Exhibit Mallinckrodt-Gillies-075          Page 267
(E-mail message with attachment)
(MNK-TNSTA04437502)

Page 8

INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-076          Page 269
(Food City Prescribers.xlsx)
(MNK-TNSTA00611710)

Exhibit Mallinckrodt-Gillies-077          Page 270
(E-mail chain)
(MNK-T1_0004209703 - MNK-T1_0004209709)

Exhibit Mallinckrodt-Gillies-078          Page 273
(E-mail message with attachment)
(MNK-T1_0008583088 - MNK-T1_0008583089)

Exhibit Mallinckrodt-Gillies-079          Page 277
(Pharmacy Information Sheet)
(MNK-TNSTA04421577 - MNK-TNSTA04421578)

Exhibit Mallinckrodt-Gillies-080          Page 278
(E-mail chain with attachment)
(MNK-TNSTA01925202)

Exhibit Mallinckrodt-Gillies-081          Page 280
(HydroApap 10s Shp to Sold via
By mo Jan2015-Dec2015 323 APAP
Run 1-15-16.xlsx)
(MNK-T1_0007717730)

Exhibit Mallinckrodt-Gillies-082          Page 286
(Oxy 15 and 30 Ship to and Sold via
By mo Jan 2016-Dec2016merg run
1-15-17.xlsx)
(MNK-TNSTA02127175)

Exhibit Mallinckrodt-Gillies-083          Page 291
(DEA press release)

Exhibit Mallinckrodt-Gillies-084          Page 294
(IMS data - top 1000.xlsx)
(MNK-T1_0005947295)

Exhibit Mallinckrodt-Gillies-085          Page 295
(E-mail message with attachment)
(MNK-TNSTA01923830

Page 9

INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-086          Page 297
(Temporary Restraining Order)

Exhibit Mallinckrodt-Gillies-087          Page 298
(Prescription Drug Prosecutions)
(MNK-TNSTA00607255 - MNK-TNSTA00607313)

(Exhibits are attached.)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 10

1    THE VIDEOGRAPHER: We are now on the
2 record. My name is James Arndt. I'm a videographer
3 for Golkow Litigation Services. Today's date is
4 February 8th, 2019, and the time is 9:04 AM. This
5 video deposition is being held in St. Louis, Missouri,
6 in the matter of the National Prescription Opiate
7 Litigation for the United States District Court for the
8 Northern District of Ohio, Eastern Division. The
9 deponent is John Gillies. Will counsel please identify
10 themselves?
11    MR. KAWAMOTO: Dean Kawamoto, Keller
12 Rohrback, for the plaintiffs.
13    MS. GAFFNEY: Alison Gaffney from Keller
14 Rohrback for the plaintiffs.
15    MS. HERZFELD: Tricia Herzfeld,
16 Branstetter, Stranch & Jennings, for the Tennessee
17 plaintiffs.
18    MS. HARMON: Sarah Harmon with Armstrong
19 Teasdale for Cardinal Health, Inc.
20    MS. RANJAN: Brandy Ranjan with Jones Day
21 for Walmart.
22    MR. GOLDSTEIN: Joshua Goldstein, Ropes &
23 Gray, for the witness, Mallinckrodt LLC, and SpecGX
24 LLC.

---

Page 11

1    MR. O'CONNOR: Andrew O'Connor from Ropes
2 & Gray for the witness, Mallinckrodt LLC, and SpecGX.
3    THE VIDEOGRAPHER: Will counsel present by
4 phone please identify themselves?
5    All right. The court reporter is John
6 Arndt and he will now swear in the witness.
7
8    The witness, JOHN GILLIES, first having been
9 duly sworn, testified as follows:
10    EXAMINATION
11 BY MR. KAWAMOTO:
12    Q. Mr. Gillies, thank you for returning
13 today.
14    A. Yes.
15    Q. I appreciate your time. Now, yesterday
16 you were testifying in your capacity as a 30(b)6
17 designee for Mallinckrodt. Do you understand that?
18    A. Yes.
19    Q. And today you're going to be testifying in
20 your personal capacity. Do you understand that?
21    A. Yes.
22    Q. And do you understand the difference
23 between testifying in your 30(b)6 capacity and your
24 personal capacity?

---

Page 12

1    A. Yes.
2    Q. And what is that difference?
3    A. So yesterday I was a corporation witness
4 and today I'm testifying to what I know.
5    Q. Okay. I think that's fair enough.
6    A. Okay.
7    Q. With respect to your testimony today, so
8 your personal deposition, what did you do to prepare
9 for this deposition?
10    A. So similar to yesterday. Spent time with
11 legal counsel.
12    Q. And approximately how much time did you
13 spend with legal counsel?
14    A. In the course of preparing for my
15 deposition -- same as yesterday. Would have been four
16 meetings in person and one videoconference, and that
17 was -- in-person ones were about approximately eight
18 hours each and the videoconference was four hours.
19    Q. And just to be clear, that's essentially
20 the aggregate time, the prep for both deps? Is that
21 fair?
22    A. That's correct. Uh-huh.
23    Q. Did you review any documents in
24 preparation for your personal deposition?

---

Page 13

1    A. No.
2    Q. And I think you indicated yesterday that
3 you did review some of the pleadings in this case. Is
4 that accurate?
5    A. That's correct.
6    Q. And you spoke with Ms. Harper; is that
7 accurate?
8    A. That is.
9    Q. Did you speak with anyone else in
10 preparation for your deposition other than counsel and
11 Ms. Harper?
12    A. No.
13    Q. And your counsel today, Mr. O'Connor
14 and -- I'm sorry -- Josh -- are with Ropes & Gray. Are
15 you paying them?
16    A. No.
17    Q. Do you know if Mallinckrodt is paying
18 them?
19    A. I believe Mallinckrodt's paying them.
20    MR. KAWAMOTO: So I'd like to mark as
21 exhibit -- excuse me. This is now going to be Exhibit
22 33, and I guess I'd like to state for the record
23 Gillies Exhibits 1 through 32 are in relation to the
24 30(b)6, and Exhibits 33 onward are going to be in

---

Page 14

1  relation to your personal deposition.
2      [Exhibit Mallinckrodt-Gillies-033
3      marked for identification.]
4  BY MR. KAWAMOTO:
5      Q.  So this is Exhibit 33.  So Mr. Gillies,
6  have you seen this document before?
7      A.  No.
8      Q.  So I'd like to direct your attention to
9  Page 5.  And Page 5 has two requests for production.
10  The first is all documents, including electronic data
11  and e-mail, in your possession related in any way to
12  any defendant's manufacture, marketing, sale,
13  distribution, suspicious order monitoring, and lobbying
14  efforts in connection with its opioid business.
15      Do you have any documents in your personal
16  possession as distinct from at your office or on your
17  work computer that would fall into this category?
18      A.  Not in my personal possession, no.
19      Q.  And I think that you indicated that you
20  didn't consult any documents in preparation for your
21  personal deposition?
22      A.  That's correct.
23      Q.  Do you have a Mallinckrodt-issued cell
24  phone?

Page 15

1      A.  I do.
2      Q.  And the company pays for the service and
3  the phone?
4      A.  Yes.
5      Q.  Do you send any texts related to your
6  work?
7      A.  I believe I have.
8      Q.  Do you recall who you texted with?
9      A.  No.
10      Q.  Do you recall how often you would send
11  text messages?
12      A.  Infrequently.
13      Q.  But occasionally you have sent text
14  messages in connection with your work?
15      A.  Correct.
16      Q.  Do you recall the nature of those
17  messages?
18      A.  Typically meetings, texts -- I'm running
19  late for a meeting or I'll be there in 10 minutes.
20  That's the typical text that I would send.
21      Q.  Okay.  Thank you.  So you can put that
22  aside.  This is Gillies Exhibit 34.
23      [Exhibit Mallinckrodt-Gillies-034
24      marked for identification.]

Page 16

1      A.  Thank you.
2      Q.  So Mr. Gillies, I've handed you a document
3  that's Bates-numbered MNK-T1_5138849, and it appears to
4  be either a press release or a biography statement for
5  you.
6      Have you ever seen this document before?
7      A.  Yes.
8      Q.  What is this document?
9      A.  This would be my bio.
10      Q.  And why was -- I assume this was created
11  by Mallinckrodt.  Is that correct?
12      A.  I would have prepared the first, second,
13  third, fourth, and fifth paragraphs.  The final one
14  would have been inserted by Mallinckrodt.
15      Q.  And why did you create this for
16  Mallinckrodt?
17      A.  I was requested to prepare a bio.
18      Q.  And do you know what they did with this
19  bio?
20      A.  No, not exactly.
21      Q.  But presumably they would have shared this
22  information with people either within the company or
23  outside of the company; is that fair?
24      A.  That would be my understanding.

Page 17

1      Q.  Now, is it fair to say you were hired by
2  Mallinckrodt based on your law enforcement background?
3      MR. O'CONNOR:  Objection to form.
4      A.  That's my belief.
5  BY MR. KAWAMOTO:
6      Q.  And part of this background was your
7  experience with prescription drug investigations, is it
8  not?
9      A.  Yes.
10      Q.  And is it fair to say that Mallinckrodt
11  expects you to apply your law enforcement experience to
12  your responsibilities as a vice-president for global
13  security?
14      A.  Were they --
15      MR. O'CONNOR:  Objection to form.
16      A.  Were they relying on my law enforcement
17  experience?  I'm sorry.  Is that your question?  I just
18  want to make sure.
19  BY MR. KAWAMOTO:
20      Q.  Well, no.  My question is a little
21  different.
22      A.  Okay.
23      Q.  Which is -- I mean, is it your
24  understanding that Mallinckrodt expects you to apply

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  your experience from law enforcement, the insights you
2  have, your experience over 29 years, in carrying out
3  your responsibilities as the director or the
4  vice-president for global security?
5      A.   I believe --
6          MR. O'CONNOR:  Same objection.
7      A.   I believe that they would rely on my
8  experience over my career.
9  BY MR. KAWAMOTO:
10     Q.   Now, I imagine in your position and during
11 your tenure you are probably privy to a fair amount of
12 confidential government information with respect to
13 government investigations and activities.  Is that a
14 fair statement?
15     A.   Yes.
16     Q.   And I assume you didn't share or discuss
17 this information with your current employer or your
18 colleagues.  Is that accurate?
19     A.   That's correct.
20     Q.   But that certainly doesn't prohibit you
21 from sharing your insights based on your extensive
22 experience with your colleagues?
23         MR. O'CONNOR:  Objection to form.
24     A.   Correct.

Page 19

1  BY MR. KAWAMOTO:
2      Q.   And so just so we're clear, I don't have
3  any -- I don't want to get you in trouble.  I'm not
4  interested in asking --
5      A.   Well, I appreciate that.
6      Q.   Thank you.  I'm not interested in asking
7  you about confidential information.  I don't want you
8  to divulge or disclose any secrets, and to the degree
9  that you believe my questions are inadvertently doing
10 that, I'm happy to rephrase or narrow them.
11     A.   Okay.
12     Q.   But that being said, I do think it's fair
13 and I do intend to question you on your opinions and
14 your views based on what is 29 years of experience in
15 law enforcement, because I believe that -- I mean,
16 Mallinckrodt certainly expects you to rely on that
17 experience, and that's part of how you're carrying out
18 your job with them.  So there's no question there.  I
19 just did want to make that statement.
20         MR. O'CONNOR:  That's understood.  And Mr.
21 Gillies is ready to answer questions fairly put to him.
22 Where I would just note for the record is that Touhy
23 regulations prohibit him from speaking to any
24 information he gained in the course of his public

Page 20

1  duties or his official duties.
2          MR. KAWAMOTO:  Uh-huh.
3          MR. O'CONNOR:  So we'll be taking these
4  questions as they come.
5          MR. KAWAMOTO:  Okay.
6  BY MR. KAWAMOTO:
7      Q.   So Mr. Gillies, why did you leave the FBI?
8      A.   For personal family reasons.
9      Q.   And why did you join Mallinckrodt?
10     A.   It was an opportunity to get into the
11 corporate security field, and a friend told me about an
12 opening, and I applied.
13     Q.   And did you know anything about
14 Mallinckrodt or did you have any impressions about
15 Mallinckrodt before you joined the company?
16     A.   I can't answer that question.
17     Q.   Let's -- well, so let's try -- well, let's
18 move on then.  When did you first become aware of an
19 opioid crisis in the United States?
20         MR. O'CONNOR:  Objection to form.
21     A.   During my time in Florida between 2009 and
22 2012.
23 BY MR. KAWAMOTO:
24     Q.   And do you recall when between 2009 and

Page 21

1  2012 you gained this awareness?
2      A.   I do not know an exact date.
3      Q.   In your opinion, what are the causes of
4  this crisis?
5          MR. O'CONNOR:  Objection to form.
6      A.   The illicit drug trade, unscrupulous
7  doctors.  A very liberal business practice in Florida
8  where anybody could open a clinic.
9  BY MR. KAWAMOTO:
10     Q.   Is there anything else?
11     A.   Not that I can think of right now.
12     Q.   Now, when --
13         THE VIDEOGRAPHER:  I think your microphone
14 fell off.
15         MR. KAWAMOTO:  Oh, I'm sorry.
16     [Discussion off the record.]
17         THE VIDEOGRAPHER:  We are going off the
18 record at 9:17 AM.
19     [Discussion off the record.]
20         THE VIDEOGRAPHER:  We are back on the
21 record at 9:17 AM.
22 BY MR. KAWAMOTO:
23     Q.   So Mr. Gillies, you identified three
24 causes -- the illicit drug trade, unscrupulous doctors,

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  and then liberal business practices in Florida. With
2  respect to the illicit drug trade, what do you mean by
3  that?
4       A.   Outside the legal prescribing for a
5  medical purpose.
6       Q.   And are you familiar with the term
7  diversion?
8       A.   I am.
9       Q.   What does diversion mean to you?
10      A.   Yeah. So again, diverting outside the
11 legitimate supply chain, whether it's for medical,
12 scientific use.
13      Q.   And this would be diverting opioid
14 products outside of the legitimate supply chain; is
15 that correct?
16      A.   Yes.
17      Q.   And when you say unscrupulous doctors,
18 what do you mean by that?
19      A.   Doctors who are prescribing for not a
20 legitimate medical purpose.
21      Q.   And then you said the liberal business
22 practices in Florida. Could you describe what you mean
23 by that?
24      A.   Sure. So in Florida anybody could open up

Page 23

1  a clinic. They didn't have to be a medical
2  professional. Eventually Florida closed that loophole,
3  and I think that was a good step in reducing the
4  problem.
5       Q.   So I'd like to show you a document or I'd
6  like to hand you Exhibit 35.
7            [Exhibit Mallinckrodt-Gillies-035
8            marked for identification.]
9       Q.   For the record, this is a document that
10 was used in a prior deposition, so it's Exhibit 7 from
11 the Neely deposition. The Bates number MNK-T1_449492.
12           And to provide some context, sir, this
13 e-mail identifies I think what you would call various
14 red flags, and so I want to ask you about those red
15 flags and get your understanding of them. I guess I'm
16 focusing now on the e-mail at the very bottom from Kate
17 Muhlenkamp to Victor Borelli dated July 12th, 2010.
18           Do you see that e-mail?
19      A.   Yes.
20      Q.   And it says, Victor, per our conversation
21 regarding KeySource and the proposed vault program, we
22 are not planning to proceed for the following reasons.
23 Do you know who Key -- or do you know what KeySource
24 was?

Page 24

1       A.   They were a distributor.
2       Q.   And do you know what happened to
3  KeySource?
4       A.   Not in my personal knowledge.
5       Q.   Well, would you agree with me that
6  KeySource had its license I think revoked by the DEA?
7  Is that an accurate statement?
8       A.   I don't know that in my personal
9  knowledge.
10      Q.   Well, so when you say you don't know that
11 in your personal knowledge, what do you mean by that?
12      A.   Sure. I learned things in my preparation
13 for my testimony yesterday.
14      Q.   So it is your understanding, though, that
15 KeySource had its license revoked by the DEA? Is
16 that --
17      A.   Yes.
18      Q.   And there's a reference to KeySource and
19 the proposed vault program. Do you know what the vault
20 program was?
21      A.   I do not.
22      Q.   So the e-mail goes down and it identifies
23 various reasons that KeySource is not going to be, I
24 guess, admitted into the vault program, and the first

Page 25

1  is rolling 12 months versus prior rolling 12 months.
2            Do you see that bullet point?
3       A.   I do. Yes.
4       Q.   Could you read that into the record for
5  me?
6       A.   Rolling 12 months versus prior rolling 12
7  months sales are plus 99 percent. Rolling 12 months
8  versus prior rolling 12-month sales in Florida are plus
9  1,364 percent.
10      Q.   So what this bullet point indicates is
11 that KeySource's distribution to Florida has increased
12 by over 1,300 percent. Is that fair?
13      A.   I mean, I don't know that.
14      Q.   Well, but that's what the e-mail says?
15      A.   That's what this line says.
16      Q.   And if in fact that is accurate, would you
17 agree that that's a cause for concern?
18           MR. O'CONNOR: Objection to form.
19      A.   So other than what's written right here I
20 don't know what they're talking about, so I don't want
21 to comment on something that I don't know anything
22 about.
23 BY MR. KAWAMOTO:
24      Q.   Well, taking a step back. If you had a

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  distributor or if Mallinckrodt was doing business with
2  a distributor and the distributor's increase in sales
3  in Florida increased by 1,300 percent over a 12-month
4  period, would that be a red flag for you?
5      MR. O'CONNOR:  Objection to form.
6      A.   So now you're asking me a hypothetical and
7  I don't feel comfortable answering the hypothetical.
8  BY MR. KAWAMOTO:
9      Q.   Well, but I mean, I'm asking based on your
10  general -- based on your experience and your work and
11  your responsibilities and your role as the director for
12  global security, if there's -- I mean, if there's a
13  distributor and that distributor's sales into Florida
14  increased by 1,300 percent over a 12-month period, in
15  your opinion, isn't that cause for concern?
16      MR. O'CONNOR:  Objection to form.
17      A.   So I would know -- I would want to ask
18  other questions.
19  BY MR. KAWAMOTO:
20      Q.   And what would those questions be?
21      A.   I mean, that would be -- I'd want to know
22  why there was an increase.  Were there any valid
23  reasons for the increase?
24      Q.   So if someone came to you and asked for

Page 27

1  your approval to continue to ship to this distributor,
2  these are -- one of the questions you'd ask before
3  granting that approval was, what are the reasons for
4  the increase?  Is that fair?
5      A.   Yes.
6      Q.   Are there any other questions?
7      A.   I mean, there might be.  I mean, I'd want
8  to know all the circumstances around this, not just
9  reading one line of something that I don't know
10  anything about.
11      Q.   But you would agree that a significant --
12  strike that.  You would agree that a substantial
13  increase of sales into Florida would be a red flag that
14  merits further review; is that fair?
15      MR. O'CONNOR:  Objection.
16      A.   I'd certainly want to know more
17  information, yes.
18  BY MR. KAWAMOTO:
19      Q.   So the second bullet point that's at the
20  top of Bates number 449493 --
21      Do you see that?
22      A.   Yes.
23      Q.   Could you please read that into the
24  record?

Page 28

1      A.   KMI sold $8.8 million in net sales for the
2  past 12 months of which 78 percent is oxycodone IR.
3  For the past three months that percentage has increased
4  to 100 percent.
5      Q.   And so would you agree that a distributor
6  that is selling primarily oxycodone is a cause for
7  concern?
8      MR. O'CONNOR:  Objection to form.
9      A.   Again, I don't know the distributor.  I
10  don't know what products -- whether this is the only
11  product.  So it's hard for me to answer that question.
12  BY MR. KAWAMOTO:
13      Q.   Well, but if 78 percent of the sales of a
14  distributor is oxycodone, so you know the product and
15  you know the percentage, isn't that a red flag?
16      MR. O'CONNOR:  Objection to form.
17      A.   Not necessarily.  I'd need to know more
18  details.  I mean, 78 percent of what?  What's that
19  number?  And is this -- did they have two products and
20  now they only have one product and that caused it to go
21  from 78 to 100 percent?  There's a lot of additional
22  information I would need that I don't have by reading
23  this one bullet point.
24  BY MR. KAWAMOTO:

Page 29

1      Q.   Well, but if a distributor's only product
2  that it was selling, let's say, was oxycodone, wouldn't
3  that be of great concern to you?
4      MR. O'CONNOR:  Objection to form.
5      A.   Not necessarily.
6  BY MR. KAWAMOTO:
7      Q.   So you don't have any concerns with
8  distributors that only sell oxycodone and no other
9  pharmaceutical products?
10      MR. O'CONNOR:  Objection to form.
11      A.   I would just need more information on
12  whatever research was done on the business and what
13  their business model is and what goes from there.
14  BY MR. KAWAMOTO:
15      Q.   Well, and when you say you would need
16  other research or other information -- I guess here's
17  my question.  What information or research would
18  alleviate your concerns with a distributor that only
19  sells oxycodone?
20      A.   So at this point I don't know.  I would
21  have to see what the business model was and what they
22  were doing and what 78 percent of what number is and
23  what's 100 percent of what number, and 100 percent of
24  100 tablets going into Florida wouldn't necessarily be

Page 30

1  a concern to me. 100 percent of an extremely large
2  number might raise a red flag.
3      So all I'm saying is that I have
4  incomplete information here to make an educated opinion
5  without having more information, but that's all I'm
6  trying to say.
7      Q.  Well, if you were designing a suspicious
8  order monitoring program, though, and part of that
9  program was to scrutinize Mallinckrodt's customers,
10  isn't one of the things you would look at the amount of
11  oxycodone that that customer is purchasing from
12  Mallinckrodt and the percentage of -- what percentage
13  that oxycodone is relative to the other products
14  they're purchasing?
15      MR. O'CONNOR:  Objection to form.
16  BY MR. KAWAMOTO:
17      Q.  Wouldn't you agree that's an important
18  consideration?
19      MR. O'CONNOR:  Same objection.
20      A.  Well, again, if I'm speaking from
21  Mallinckrodt's standpoint, we sell controlled
22  substances that -- the question and the red flag that's
23  raised typically by the DEA is the distributor to a
24  pharmacy, and not necessarily from a manufacturer to a

Page 31

1  distributor.
2      So I have incomplete information here to
3  make an educated decision on that without knowing what
4  these additional numbers are or what they mean and --
5  BY MR. KAWAMOTO:
6      Q.  Okay.  Well -- let's see.  But as you sit
7  here today, you don't have any concerns with
8  distributors that sell that -- well, strike that.  As
9  you sit here today, you wouldn't have any concerns with
10  a distributor that was selling -- that was purchasing
11  78 percent of its product as oxycodone?
12      MR. O'CONNOR:  Objection to form.
13  BY MR. KAWAMOTO:
14      Q.  That wouldn't raise any red flags to you?
15  That's my only question.
16      A.  So --
17      MR. O'CONNOR:  Same objection.
18      A.  Okay.  And what I've answered before is,
19  based on reading this line that says 78 percent, I
20  would just need a little more information -- that's all
21  I'm saying -- before I would make that decision.  I
22  wouldn't just say automatically that something is a red
23  flag.
24  BY MR. KAWAMOTO:

Page 32

1      Q.  But it would prompt further inquiry; is
2  that correct?
3      A.  Yes.  Yes.
4      Q.  So can you read the third -- the second
5  bullet point from the top for me?
6      A.  Sure.  Of KMI's total oxycodone IR sales
7  for the past 12 months, 94 percent of them have gone
8  through the State of Florida.
9      Q.  Would you agree that a distributor that is
10  selling 94 percent of its oxycodone products into
11  Florida is a red flag?
12      MR. O'CONNOR:  Objection to form.
13      A.  I think my answer's going to be similar.
14  I would need to know more information to make that
15  decision.
16  BY MR. KAWAMOTO:
17      Q.  And what is the additional information you
18  would need?
19      A.  I would want to know what the other pieces
20  of business are, and in this case it says have gone
21  through the State of Florida -- and I don't know what
22  that means, through the State of Florida.  So did it
23  get shipped into Florida and then out of Florida?  I
24  mean, I just --

Page 33

1      Q.  Well, let's --
2      A.  As I read this line, I just have other
3  questions that if this was coming to me, that I would
4  want the information before I would just automatically
5  say this is a red flag.
6      Q.  Okay.  So let's say then that 94 percent
7  of them -- I understand the ambiguity in the language.
8      A.  Uh-huh.
9      Q.  Let's say 94 percent of them are going to
10  the State of Florida.
11      A.  Okay.
12      Q.  So we're not talking through.  We're
13  going -- we're talking to the State of Florida.
14      A.  Okay.
15      Q.  So you've got a distributor -- its total
16  oxycodone IR sales for the past 12 months, 94 percent
17  of it goes to the State of Florida?
18      A.  Okay.
19      Q.  Isn't that a cause for concern?
20      MR. O'CONNOR:  Objection to form.
21      A.  Again, it could be depending on -- what's
22  94 percent of what?  I don't know what 94 percent is
23  other than it says 94 percent of oxycodone IR sales.
24  What does that number look like?

Page 34

BY MR. KAWAMOTO:

1 BY MR. KAWAMOTO:

2     Q.   And when you say what does that number

3 look like, are you referring to the absolute volume?

4     A.   Yes. I mean --

5     Q.   So 20,000 volumes --

6     A.   -- that's certainly one of the things

7 that I'm looking for, yeah, compared to 100 bottles.

8 94 percent of 100 bottles. That's what I'm trying to

9 explain, is that I have incomplete information here

10 based on the one bullet point to make an educated

11 decision to just say that's automatically a red flag.

12     Q.   And so if they were shipping thousands of

13 bottles, not 100 bottles, but thousands of bottles,

14 would that be a red flag?

15     A.   It could be.

16     MR. O'CONNOR: Objection to form.

17 BY MR. KAWAMOTO:

18     Q.   And to be clear, when we're talking about

19 red flags, what I mean by a red flag is a condition or

20 a fact or information that would prompt additional

21 scrutiny and review. So I'm not -- when I say a red

22 flag, I'm not saying that it means you automatically

23 don't ship; right? I did want to make that clear.

24     A.   Okay. Okay.

Page 35

1     Q.   So do you under --

2     A.   Thank you. I appreciate that.

3     Q.   Okay.

4     A.   And then I think my responses were

5 indicative of that, that I would be asking for

6 additional information.

7     Q.   Okay. And can you read the last bullet

8 point?

9     A.   Is it the one that starts oxycodone --

10     Q.   Yes.

11     A.   Okay. Thank you. Oxycodone IR sales

12 represent, to our total Mallinckrodt portfolio, 23

13 percent to total net sales. Oxycodone IR sales are

14 almost 100 percent to KMI net sales.

15     Q.   So 100 percent of what Mallinckrodt sells

16 to KMI is oxycodone. Would you agree that that's a red

17 flag?

18     A.   Again, not necessarily. If this is the

19 only product they're buying from us and they're buying

20 other products from other manufacturers -- again, these

21 are -- as I go down these bullet points, they raise

22 additional questions that I would want to have more

23 information on. Okay.

24     Q.   Well, and so if you define a red flag as

Page 36

1 an indica -- a condition that requires additional

2 information --

3     A.   I would want additional information on

4 this, yes.

5     Q.   Now, do you see the paragraph underneath

6 the bullet points?

7     A.   The one starting with given?

8     Q.   Yes.

9     A.   Okay.

10     Q.   Can you read that into the record?

11     A.   Sure. Given the DEA's situation in

12 Florida and the fact that KeySource is so heavily

13 indexed in the State of Florida, we do not want to do

14 anything that might be perceived as driving oxycodone

15 sales in the state.

16     Secondly, because they are so heavily

17 indexed in oxycodone sales and those sales are so

18 heavily indexed in the State of Florida, is this really

19 a sustainable trend for them?

20     Q.   Okay. Thank you. So you would agree that

21 it is improper for a manufacturer to drive oxycodone

22 sales in a state, would you not?

23     MR. O'CONNOR: Objection to form.

24     A.   So again, I would want additional

Page 37

1 information on whether products are going to a

2 distributor center and then going off from there or

3 whether they're going into a particular state directly.

4 BY MR. KAWAMOTO:

5     Q.   And forgive me. I want to make sure I

6 understand your answer. So in the distribution center

7 scenario, there's a distribution center in Florida and

8 then from there it gets shipped out? Or what do you

9 mean by a distribution --

10     MR. O'CONNOR: Object --

11 BY MR. KAWAMOTO:

12     Q.   Well, strike that. What do you mean by a

13 distribution center?

14     A.   A location where our product gets shipped

15 to.

16     Q.   And so --

17     A.   So we ship -- in this case, Mallinckrodt

18 would ship from a -- their manufacturing to a

19 distributor's distribution center. May or may not be

20 in the state that you might be referencing here or

21 that's referenced here.

22     Q.   So -- but if Mallinckrodt is shipping -- I

23 mean, if Mallinckrodt is driving oxycodone sales into

24 the State of Florida, why does it make a difference

Page 38

1 whether those sales are going to a distribution center
2 in Florida to be distributed into the state versus to
3 indirect customers? I don't understand what the
4 distinction is you're drawing.
5 MR. O'CONNOR: Objection to form.
6 A. So the distribution center could be
7 outside the State of Florida. That's what I meant.
8 BY MR. KAWAMOTO:
9 Q. Okay. So -- I'm sorry. Go ahead.
10 A. So I'm going to see it going into that
11 state where the distribution center is.
12 Q. Understood.
13 A. Okay.
14 Q. But as a general matter, you would agree
15 that it is a -- it would be a problem, it would be
16 improper for Mallinckrodt to be driving oxycodone sales
17 into the State of Florida given the issues in Florida
18 with oxycodone; correct?
19 MR. O'CONNOR: Objection to form.
20 A. So I don't know what Mallinckrodt was
21 thinking here when this comment's being made.
22 BY MR. KAWAMOTO:
23 Q. But I'm just asking as sort of a factual
24 matter. So I'm not asking you to interpret or try to

Page 39

1 tell me what the person that wrote this was thinking.
2 I'm just saying as a factual matter, if -- it would be
3 improper for Mallinckrodt to drive sales into the State
4 of Florida?
5 MR. O'CONNOR: Objection to form.
6 A. I don't know that without having
7 additional information.
8 BY MR. KAWAMOTO:
9 Q. So what additional information would --
10 well, strike that. You previously indicated that one
11 of the causes of the opioid crisis were the liberal
12 business practices in Florida; is that correct?
13 A. That's correct.
14 Q. And why were those liberal business
15 practices a problem?
16 A. Because anybody could open a clinic.
17 Q. And those liberal business practices
18 didn't just impact Florida? They impacted other states
19 as well, did they not?
20 MR. O'CONNOR: Objection to form.
21 A. I can't answer that.
22 BY MR. KAWAMOTO:
23 Q. So you have no understanding of the fact
24 that people would come from out of state into Florida

Page 40

1 to purchase opioid products?
2 A. I know where my knowledge comes from.
3 Q. But I'm just --
4 A. From my previous employer.
5 Q. Well, but I'm not asking you for
6 confidential information or detailed information.
7 A. Okay.
8 Q. I'm just saying that given the press
9 and the -- well, given the widespread press coverage of
10 Florida, which I mean, you as well as other people
11 understand, isn't it common knowledge that people go
12 into Florida to buy drugs because of the liberal
13 business practices and then they take those drugs out
14 of Florida?
15 A. Thank you.
16 Q. Is that generally understood, sir?
17 A. Thank you. That's a different question,
18 and the answer is yes.
19 Q. So I'm handing you what's marked as
20 Exhibit 36.
21 [Exhibit Mallinckrodt-Gillies-036
22 marked for identification.]
23 Q. And this is a prior exhibit from the Neely
24 deposition, Mallinckrodt Exhibit 14. Bates number is

Page 41

1 MNK-T1_559192. And it's an e-mail with various
2 attachments. I want to -- I'm going to focus my
3 questioning on the cover e-mail.
4 A. Okay. Okay.
5 Q. So to provide some context for this
6 e-mail -- do you know who H.D. Smith is or what H.D.
7 Smith is?
8 A. They're a distributor.
9 Q. And they are a customer of Mallinckrodt,
10 are they not?
11 A. Correct.
12 Q. And so H.D. Smith identified a list of
13 pharmacies that they were no longer willing to do
14 business with. Is that fair? I think that's in the --
15 A. Is that in the attachment, or --
16 Q. Well, no. Well, the list of pharmacies is
17 the attachment.
18 A. Okay.
19 Q. But the second paragraph of the e-mail
20 indicates that H.D. Smith has identified various
21 pharmacies that they're not doing business with.
22 A. Okay.
23 Q. Is that a fair statement?
24 A. Yes.

Page 42

1    Q.   And they identified these pharmacies based
2  on the various bullet points towards the bottom of the
3  page.
4          Do you see those?
5    A.   Yes.
6    Q.   The first one is -- I believe it's
7  Schedule II ratio to normal nonscheduled product
8  orders.
9          Do you see that?
10   A.   Yes.
11   Q.   And then the second bullet point is if the
12 pharmacy was closed door, servicing just physicians.
13         Do you see that?
14   A.   Yes.
15   Q.   And the third bullet point is large
16 pharmacies with excess orders?
17   A.   Yes.
18   Q.   Fourth is no physician sales?
19   A.   Yes.
20   Q.   And fifth is pharmacy secondary supplier
21 relations?
22   A.   Correct.
23   Q.   Do those factors make sense as screens for
24 pharmacies?

Page 43

1          MR. O'CONNOR:  Objection to form.
2    A.   For the distributor, yes.
3  BY MR. KAWAMOTO:
4    Q.   And so based on applying these screens,
5  H.D. Smith identified a list of pharmacies that they
6  were essentially cutting off.  Would you be concerned
7  as the director, the vice-president of global security
8  for Mallinckrodt, if one of your other customers, one
9  of your other distributors, was still servicing the
10 pharmacies that H.D. Smith had cut off?
11         MR. O'CONNOR:  Objection to form.
12   A.   Can you repeat your question?
13 BY MR. KAWAMOTO:
14   Q.   Sure.
15   A.   I want to make sure I understand it
16 completely.
17         MR. KAWAMOTO:  Okay.  Well, do you want
18 to -- can you just reread the question?
19         [The pending question was read by the
20 reporter.]
21   A.   It would -- I would want to know
22 additional information.
23 BY MR. KAWAMOTO:
24   Q.   And what additional information would you

Page 44

1  want to know, sir?
2    A.   I'd want to know whether any of my other
3  customers were servicing these pharmacies to begin
4  with.
5    Q.   And if it turns out that one of your other
6  customers was in fact servicing some of these
7  pharmacies, that would be a cause of concern, would it
8  not?
9          MR. O'CONNOR:  Objection to form.
10   A.   So that's a hypothetical in here because I
11 don't know that, but it is some information that I
12 would like to know, and then I can go from there.
13 BY MR. KAWAMOTO:
14   Q.   And where would you go from there?
15   A.   I would see what the business relationship
16 was, what, if any, of our products were going there.
17   Q.   But you would have used this information
18 in this list to undertake a further review of your
19 other distributors' customers; is that fair?
20         MR. O'CONNOR:  Objection to form.
21   A.   I wouldn't know whether any of these
22 customers are customers of any of the other
23 distributors without doing some additional research.
24 BY MR. KAWAMOTO:

Page 45

1    Q.   But given this list and given this
2  information, you would do some additional research,
3  would you not?
4    A.   I would.
5    Q.   I'd like to hand you Exhibit 37.
6          [Exhibit Mallinckrodt-Gillies-037
7          marked for identification.]
8    Q.   Now, this is another prior exhibit.  It's
9  Mallinckrodt 15 from Ms. Neely's deposition, Bates
10 number is MNK-T1_265441.  And my questions relate to
11 the top e-mail, sir.
12   A.   Okay.  Okay.
13   Q.   And so this is -- this e-mail is an e-mail
14 from Ms. Muhlenkamp to Mr. Rausch.  Do you know either
15 of those individuals?
16   A.   I do not.
17   Q.   And Ms. Muhlenkamp says it appeared to me
18 that they were picking up some of the business that was
19 left open by Sunrise and Harvard.
20         Do you see that sentence?  It's in the
21 middle of the paragraph.
22   A.   Yes.
23   Q.   Do you know who Sunrise and Harvard were?
24   A.   I believe they were distributors.

Page 46

1    Q.   And do you know what happened to them?
2    A.   They both had their licenses suspended.
3    Q.   And then can you read the remainder of the
4 paragraph starting from then?
5    A.   Then I looked at where their sales
6 increase was coming from -- for example, pharmacies,
7 clinics, doctors, et cetera -- as I was concerned that
8 they might be picking up the portion of Sunrise's and
9 Harvard's business that we wanted to stay away from --
10 for example, doctors and pain clinics.  All of their
11 sales are going through independent retail.
12    Q.   And so would you agree that doctors and
13 pain clinics present a heightened risk of diversion?
14        MR. O'CONNOR:  Objection to form.
15    A.   Pain clinics, yes.
16 BY MR. KAWAMOTO:
17    Q.   And what are -- what do you mean by pain
18 clinics?  What's your understanding of a pain clinic?
19    A.   Pain clinics' purpose is to service
20 patients who have various pain ailments.
21    Q.   And so if a distributor customer of
22 Mallinckrodt was primarily selling to pain clinics,
23 that would be a cause of concern for you, would it not?
24        MR. O'CONNOR:  Objection to form.

Page 47

1    A.   So I mean, that's a hypothetical.  I have
2 no knowledge of this transaction.  It's not the only
3 factor, so as in previous situations, I'd want to know
4 additional information.
5 BY MR. KAWAMOTO:
6    Q.   And I understand it's not the only factor,
7 but it is certainly an important factor, is it not?
8        MR. O'CONNOR:  Objection.
9    A.   Well, I don't know.  Not all pain clinics
10 are involved in the illicit drug trade, so I would want
11 to know more information.
12 BY MR. KAWAMOTO:
13    Q.   So it would certainly be a red flag, then,
14 in the sense that they would prompt you to get
15 addition -- to do additional research and
16 investigation?
17    A.   It would cause me to want to do additional
18 research and investigation, yes.
19    Q.   And one of the things that you would want
20 to know is, for Mallinckrodt's customers, which of
21 those are primarily shipping to pain clinics?  Is that
22 fair?
23        MR. O'CONNOR:  Objection to form.
24    A.   From Mallinckrodt's perspective, we're not

Page 48

1 going to know that because our customers are the
2 distributors.
3 BY MR. KAWAMOTO:
4    Q.   Though you could ask the distributors who
5 their customers are, could you not?
6    A.   I believe we could.
7    Q.   And based on the chargeback data, which I
8 believe was discussed yesterday --
9    A.   Uh-huh.
10    Q.   -- that would also indicate to you who
11 the distributors' customers were?
12    A.   If we ran chargeback data for those
13 pharmacies that -- for those distributors who had
14 chargebacks and products went to those pharmacies -- we
15 could see that then, yes.
16    Q.   Yes.  And so the information is certainly
17 available for you to get a sense of which of your
18 distributor customers are shipping primarily to pain
19 clinics; correct?
20        MR. O'CONNOR:  Objection to form.
21    A.   If the pain clinics were selling medicine
22 at the clinic.
23 BY MR. KAWAMOTO:
24    Q.   And that is information that you believe

Page 49

1 should be considered, is it not?
2        MR. O'CONNOR:  Objection to form.
3    A.   Yes.
4        MR. KAWAMOTO:  So for the record, I'm
5 going to skip Exhibit 38.  And my apologies, but I
6 think we're going to do these out of order.  So this is
7 Exhibit 40, and then we'll go back to Exhibit 39.
8        [Exhibit Mallinckrodt-Gillies-040
9        marked for identification.]
10    A.   So I apologize, but is there any way you
11 could throw this up on the screen?
12 BY MR. KAWAMOTO:
13    Q.   Oh, sure.  Absolutely.
14    A.   Even for my glasses this is kind of small.
15        MR. KAWAMOTO:  Actually, Andrew, could I
16 get one of the clean copies back?
17        MR. O'CONNOR:  Yeah.
18        MR. KAWAMOTO:  Okay.  Thank you.  And --
19    A.   Thanks.
20 BY MR. KAWAMOTO:
21    Q.   And so this is a press release put out by
22 the Department of Justice -- and actually, I believe
23 it's the FBI -- relating to an indictment in Florida.
24 Is that correct, sir?

Page 50

1    A.    So this is -- just to be clear for the
2  record, this is a press release put out by the U.S.
3  Attorney's office and it appears that it's on the FBI
4  website.
5    Q.    Okay.  Fair enough.  But this is put out
6  by the U.S. Attorney's office, so I mean, it's put out
7  by the Department of Justice?
8    A.    That's correct.
9    Q.    And so, sir, I wanted to direct you to the
10 statement at the very bottom, which I believe is your
11 statement.
12       Do you see that, sir?
13   A.    Yes.
14   Q.    So could you please read that into the
15 record?
16   A.    The significance of today's takedown is
17 that we have dismantled the nation's largest criminal
18 organization involved in the illegal distribution of
19 painkillers, said special agent in charge for FBI Miami
20 Gillies.  Up until today, efforts focused on the demand
21 by targeting individual users.  Today we attacked the
22 source and choked off the supply.
23   Q.    And that is an accurate statement, is it
24 not?

Page 51

1    A.    It's on that press release, yes.
2    Q.    And then going up to the top, can you
3  please read the portion that I just highlighted?
4    A.    Researchers from the Centers For Disease
5  Control and Prevention report that Schedule II
6  prescription painkillers like oxycodone today cause
7  more drug overdose deaths than cocaine and heroin
8  combined.  Oxycodone and other Schedule II drugs have a
9  high potential for abuse and can be crushed and snorted
10 or dissolved and injected to get an immediate high.
11 This abuse can lead to addiction, overdose, and
12 sometimes death.
13   Q.    And that is an accurate statement, is it
14 not, sir?
15       MR. O'CONNOR:  I'm going to object.  You
16 can answer to the extent that you can do so without
17 revealing information related to the course of your
18 official duties.
19   A.    Yes.
20 BY MR. KAWAMOTO:
21   Q.    Then -- okay.  Can you please read that
22 highlighted portion, sir?
23   A.    U.S. Attorney Ferrer stated these
24 defendants showed a callous disregard for the

Page 52

1  well-being of their patients and the value of human
2  life.  For years they distributed oxycodone and other
3  controlled substances without regard to medical need,
4  without individual treatment plans, and without
5  physical examinations.  Like all drug traffickers, they
6  focused solely on making money and staying out of jail.
7    Q.    And that is an accurate distribution, is
8  it not?
9        MR. O'CONNOR:  Again, I'll object on Touhy
10 grounds, and you can answer to the extent you can do so
11 without revealing information related to the course of
12 your official duties.
13   A.    Then in this case I can't answer that
14 question.
15 BY MR. KAWAMOTO:
16   Q.    Okay.  Taking a step back.  I mean, these
17 press -- this press release was put out by the U.S.
18 Attorney's office; correct?
19   A.    Correct.
20   Q.    And there is presumably a process to
21 ensure that the statements in it are accurate, is it
22 not?
23       MR. O'CONNOR:  Touhy objection there, too.
24 You can answer only to the extent you can do so without

Page 53

1  revealing information obtained in the course of your
2  official duties.
3    A.    Then I can't answer that question.
4  BY MR. KAWAMOTO:
5    Q.    Well, would you agree that the Department
6  of Justice does not put out press releases that are
7  false?
8    A.    Yes.
9        MR. O'CONNOR:  Same objection.
10   A.    But that one I'll answer.  Yes.
11 BY MR. KAWAMOTO:
12   Q.    So can you please read that paragraph?
13   A.    So I'm sorry.  What are we looking at
14 here?
15   Q.    We're looking at the second page of the --
16   A.    Of that same document?
17   Q.    Yeah, same document.
18   A.    Oh, okay.  I'm sorry.
19   Q.    First page.
20   A.    All right.
21   Q.    And this is just on the back page.  Here
22 you go.
23   A.    The indictment also charges Steven
24 Goodman, who was the owner of a pharmaceutical

Page 54

1 wholesaler, Medical Arts, Inc., with participation in
2 the racketeering criminal -- Count 1. Under federal
3 law, Medical Arts, Inc., was required to report to the
4 DEA suspicious orders of controlled substances.
5     Suspicious orders include orders of
6 unusual size and frequency and orders deviating
7 substantially from normal patterns. DEA notified
8 Medical Arts, Inc., that the defendants' clinics
9 appeared to be operating as illegal pill mills.
10     Notwithstanding such notice, Medical Arts
11 continued to supply the defendants' clinics with
12 probably one million dosages of oxycodone and conspired
13 to obstruct a governmental investigation into the
14 clinics.
15     Q.   And that is an accurate statement of the
16 allegations in the indictment, is it not?
17     MR. O'CONNOR:  I'm going to object again
18 on Touhy grounds and make a standing objection to the
19 extent any question calls for information that Mr.
20 Gillies learned in the course of his official duties.
21 Again, you can answer to the extent that you can do so
22 without revealing information that you learned through
23 your work at the FBI.
24 BY MR. KAWAMOTO:

Page 55

1     Q.   Well, let me try to rephrase this.
2     A.   Okay.
3     Q.   It is your understanding that Steven
4 Goodman was charged, is it not?
5     MR. O'CONNOR:  Same objection.
6     A.   Yes.
7 BY MR. KAWAMOTO:
8     Q.   And he was the owner of Medical Arts, was
9 he not?
10     MR. O'CONNOR:  Same objection. To the
11 extent you learned the information through the course
12 of your official duties, you do not have to answer the
13 question.
14     A.   So I'm not going to answer that question.
15 BY MR. KAWAMOTO:
16     Q.   Okay. But Medical Arts was charged; is
17 that correct?
18     MR. O'CONNOR:  Same objection.
19     A.   I'm sorry. I can't see what the --
20 BY MR. KAWAMOTO:
21     Q.   Oh, I'm sorry. Yeah.
22     A.   Yeah.
23     Q.   I'm just putting up that paragraph.
24     A.   Okay. There you go. Okay. Thanks. I

Page 56

1 don't know reading from that.
2     Q.   So let's try this. Can you please read
3 the section that I just highlighted?
4     A.   According to the indictment, by 2010 the
5 complicit doctors were allegedly examining close to 500
6 patients each day at just one clinic, American Pain
7 Clinic. In fact, from July 2008 through March 2010,
8 approximately 66,871 prescriptions were allegedly
9 filled from American Pain Clinic.
10     Of the prescriptions filled at American
11 Pain Clinic, approximately 90 percent -- 96 percent
12 were for either oxycodone or alprazolam. Moreover,
13 about 80 percent of the prescriptions filled at
14 American Pain Clinic were for individuals who listed an
15 address outside of Florida.
16     Q.   Do you have any reason to believe this
17 statement is inaccurate, sir?
18     A.   No.
19     Q.   And could you please read this paragraph
20 that I just highlighted up there?
21     A.   According to the indictment, the
22 defendants operated the clinics as pill mills that
23 offered patients prescriptions for oxycodone and other
24 controlled substances without any legitimate medical

Page 57

1 purpose and outside the usual course of professional
2 medical practice.
3     Consequently, individuals, including
4 addicts and traffickers, seeking to buy large
5 quantities of oxycodone and other controlled substances
6 would travel from as far as Tennessee, Ohio, Kentucky,
7 West Virginia, and elsewhere to obtain prescriptions at
8 the defendants' clinics.
9     Business was such that the defendants
10 hired security guards to attempt to control the fights
11 and arguments that would often erupt between patients
12 waiting in the clinic lobbies for their physical
13 examinations or prescriptions.
14     Q.   And you don't have any reason to believe
15 that that statement is inaccurate, sir?
16     A.   No.
17     Q.   Thank you. So I'm handing you Exhibit 41,
18 sir.
19     [Exhibit Mallinckrodt-Gillies-041
20     marked for identification.]
21     A.   Thank you.
22     Q.   There you go. And I'm sorry, sir. Could
23 I see that back real quickly?
24     A.   Sure. Yeah.

Page 58

1    Q.   I just want to make sure -- okay.  Here
2  you go.  Okay.  So I just handed you a document that's
3  Bates-numbered MNK-T1_565408.  Now, sir, you will
4  recall that we had just reviewed a press release that
5  referenced Mr. Goodman and Medical Arts.
6         Do you recall that, sir?
7    A.   Yes.
8    Q.   Did you know that Medical Arts was a
9  customer of -- well, strike that.  Did you know that
10 Medical Arts had contacted Mallinckrodt?
11   A.   No.
12   Q.   Would you have any concerns with
13 Mallinckrodt products being sent to, shipped to Medical
14 Arts?
15        MR. O'CONNOR:  Objection to form.
16   A.   So with that question I'll tell you that
17 the press release was in 2011 and this e-mail is dated
18 2008, so it's -- so I don't know that I would have --
19 any questions I can't answer.  I wasn't -- I have no
20 knowledge of this.
21 BY MR. KAWAMOTO:
22   Q.   Do you see in the middle e-mail of the
23 document it's from John Adams to Lois Cahill and
24 Michael Gunning?  It's dated August 7th, 2008.

Page 59

1    A.   Yes.
2    Q.   And do you see the last -- or last phrase
3  of the first paragraph?  Can you read that into the
4  record?
5    A.   Is it the "we can"?
6    Q.   Yes.
7    A.   Okay.  We can accelerate, but the product
8  he wants is oxycodone.
9    Q.   And so -- hold on.  So I want you to hold
10 onto that exhibit, and then I have another exhibit --
11   A.   Okay.
12   Q.    -- that I'd like to provide you as well.
13        MR. O'CONNOR:  Counsel, just to note that
14 these are handwritten Bates numbers.
15        MR. KAWAMOTO:  Yes.
16        MR. O'CONNOR:  And I'm wondering, is this
17 the complete document as produced, or --
18        MR. KAWAMOTO:  That is the complete
19 document as produced.  When I printed it, the Bates
20 number didn't print, so that's my effort to track it.
21        MR. O'CONNOR:  Fair enough.
22        MR. KAWAMOTO:  For the record, we skipped
23 39 or we're going to do that exhibit out of order.
24 BY MR. KAWAMOTO:

Page 60

1    Q.   Okay.  So this is now Exhibit 42.
2        [Exhibit Mallinckrodt-Gillies-042
3        marked for identification.]
4    Q.   This is a document Bates-numbered
5  MNK-T1_563396.  And sir, I'm going to focus your
6  attention on the bottom e-mail.
7    A.   Okay.
8    Q.   So actually, can you read the first or the
9  first two sentences of that bottom e-mail into the
10 record?
11   A.   Attached are the sales to Medical Arts.  I
12 spoke to the gentleman and he said he sold the product
13 to one customer only, South Florida Pain Management.
14   Q.   Okay.
15   A.   There will be -- oh.
16   Q.   So -- and I mean, so if you could look at
17 Exhibit -- I believe it's 42 -- along -- in conjunction
18 with Exhibit 41, you'll see that these are within a
19 month of each other.  You have a customer, Medical
20 Arts, that only wants oxycodone and is only selling its
21 product -- he apparently only sells his product to one
22 customer, South Florida Pain Management.  Given those
23 two pieces of information, wouldn't you agree that this
24 raises a red flag for you?

Page 61

1        MR. O'CONNOR:  Objection to form.
2    A.   So I don't know anything about the details
3  of either of these e-mails, so I would be speculating
4  on answering that question without knowing more
5  information.
6  BY MR. KAWAMOTO:
7    Q.   Well, what more information would you
8  need?  What more information would you want to know?
9    A.   I mean, I don't know.  I'm not involved in
10 this transaction.  I don't have any knowledge of this
11 transaction.  So I don't know what I don't know to ask
12 in this situation what other information I may or may
13 not need, because I wasn't involved in it and I don't
14 have any knowledge of this transaction.
15   Q.   Well, but let's go over what Mallinckrodt
16 does know based on these e-mails.  You've got Medical
17 Arts and you've got Mr. Goodman.  This is Mr. -- I
18 mean, Medical Arts is essentially a distributor because
19 it's got its own customer that it's shipping to.  Do
20 you agree that that's information Mallinckrodt has?
21        MR. O'CONNOR:  Objection to form.
22 BY MR. KAWAMOTO:
23   Q.   This is based on Exhibit 42.
24   A.   That's what it appears to be.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1      Q.   So the first piece of information is you
2   have Medical Arts that is essentially a distributor and
3   they've got one customer only that is South Florida
4   Pain Management.
5            Second piece of information is the only
6   product he wants is oxycodone.  Doesn't that raise a
7   red flag, sir?
8            MR. O'CONNOR:  Objection to form.
9      A.   Again, if this is something Mallinckrodt
10  knows, I don't know that.
11  BY MR. KAWAMOTO:
12     Q.   Well, I'm not sure I -- I mean, these are
13  internal Mallinckrodt e-mails, so this is information
14  that the company has access to.
15     A.   But I have no information on either of
16  these e-mails in my personal knowledge to be commenting
17  on things without having more information, so -- and I
18  don't know what I don't know with two e-mails.
19     Q.   Well, I understand that, sir.
20     A.   Okay.
21     Q.   But my question is only whether these
22  conditions should have triggered a red flag in a
23  reasonable anti-diversion program?
24            MR. O'CONNOR:  Objection to form.

Page 63

1   BY MR. KAWAMOTO:
2      Q.   And so the first piece of information you
3   have is you're dealing with a distributor and he sells
4   products to one customer in Florida, South Florida Pain
5   Management, which is a pain clinic, is it not?
6      A.   I can assume that it is by the title.
7      Q.   So you've got one -- you've got a
8   distributor that is selling product to only one
9   customer, a pain clinic in Florida, and the only
10  product he wants is oxycodone.  Doesn't that raise a
11  red flag for you, sir?
12            MR. O'CONNOR:  Objection to form.
13     A.   Okay.  I don't know what other information
14  Mallinckrodt has on this overall transaction.
15  BY MR. KAWAMOTO:
16     Q.   Well, on the assumption that this is the
17  information they have and they don't have any other
18  information relating to Mr. Goodman and Medical Arts
19  pharmacies, isn't this information sufficient to cause
20  concern?
21     A.   I don't know --
22            MR. O'CONNOR:  Objection to form.
23     A.   I don't know what they were thinking at
24  that time, so I can't respond to that.

Page 64

1   BY MR. KAWAMOTO:
2      Q.   And --
3      A.   I don't have any knowledge of it.  That's
4   why I'm struggling here.
5      Q.   Well, and when say you don't know what
6   they were thinking, you mean you don't know what
7   Mallinckrodt was thinking?
8      A.   That's correct.  I'm sorry.  I don't know
9   what was going on back on this time frame from
10  Mallinckrodt's perspective or what other information
11  that they may or may not have had.  So --
12     Q.   But sir, if you were in your position, if
13  you were the vice-president of global security and this
14  was a fact pattern presented to you, wouldn't you have
15  investigated further?
16     A.   So --
17            MR. O'CONNOR:  Objection to form.
18     A.   It's a hypothetical, and I don't like
19  answering hypotheticals, but I believe that I
20  previously answered that I wanted additional
21  information, so I'll tell you I would want additional
22  information.
23            MR. O'CONNOR:  We've been going about an
24  hour, 10.  Should we take a break?

Page 65

1            MR. KAWAMOTO:  Sure.
2            THE VIDEOGRAPHER:  We are going off the
3   record at 10:14 AM.
4            [A brief recess was taken.]
5            THE VIDEOGRAPHER:  We are back on the
6   record at 10:29 AM.
7   BY MR. KAWAMOTO:
8      Q.   So Mr. Gillies, I'd like to hand you an
9   exhibit that is 43.
10           [Exhibit Mallinckrodt-Gillies-043
11           marked for identification.]
12     Q.   For the record, it was produced to us in
13  native format, but the Bates number is MNK-T1_2360550,
14  and this is a PowerPoint.  So Mr. Gillies, I've handed
15  you a PowerPoint entitled collaborating against
16  diversion and abuse, a manufacturer's perspective.  And
17  it's dated July 9th, 2014.
18           Do you see that, sir?
19     A.   Yes.
20     Q.   Are you familiar with this PowerPoint?
21     A.   I believe I've seen at least portions of
22  it.
23     Q.   And then if you turn to Page 24, sir.  It
24  says direct assistance to law enforcement?

Page 66

1    A.   Yes.
2    Q.   And I think the second arrow is John
3  Gillies, director of global security.  So that's a
4  reference to you, sir, isn't it?
5    A.   Yes.
6    Q.   So I'd like to direct your attention to
7  Page 21 of this PowerPoint.  Well, actually, it's --
8  okay.  And do you see the first arrow?  It says Florida
9  is no longer the epicenter?
10   A.   Yes.
11   Q.   What does that mean?
12   A.   My understanding of this is that Florida
13 is no longer the center of whatever they're referring
14 to in the diversion here.
15   Q.   And I believe previously you referenced
16 Florida's lax business practices and the fact that
17 those loopholes were plugged; is that correct?
18        MR. O'CONNOR:  Objection.  Form.
19   A.   They put policies into place that made it
20 much more difficult to open the businesses up, yes.
21 BY MR. KAWAMOTO:
22   Q.   And I believe you previously testified
23 that that had a positive effect on the diversion
24 situation in Florida?

Page 67

1    A.   It did.
2    Q.   And so Florida is no longer the epicenter.
3  The next bullet point is trends become even more
4  important.  Do you know what that is a reference to?
5    A.   I'm sorry.  I do not.
6    Q.   The third bullet point is recent DEA
7  distributor conference, Tennessee, Kentucky, Texas,
8  California, Ohio, and Missouri.  Do you see that?
9    A.   I do.
10   Q.   Now, with respect to Florida no longer
11 being an epicenter because it has, I guess, modified or
12 fixed its lax business practices -- one of the
13 consequences of that is that activity is going to shift
14 elsewhere; isn't that correct, sir?
15        MR. O'CONNOR:  Objection to form.
16   A.   It could.
17 BY MR. KAWAMOTO:
18   Q.   And the places that it could shift to
19 would be Tennessee, Kentucky, Texas, California, Ohio,
20 and Missouri; correct?
21   A.   I don't know that.
22   Q.   Well, what do you understand the reference
23 to those states to be?
24   A.   That wasn't actually what I was thinking,

Page 68

1  so I don't know what that means then.
2    Q.   Well, my apologies.  What were you
3  thinking?
4    A.   I was thinking that that's where DEA
5  distributor conferences were held recently.
6    Q.   Do you recall going to any conferences in
7  those states?
8    A.   Not me.
9    Q.   Now, for the states listed, are you aware
10 of concerns with respect to diversion of opioid
11 products in those states?
12        MR. O'CONNOR:  Objection to form.
13   A.   Some of them.
14 BY MR. KAWAMOTO:
15   Q.   Which ones?
16   A.   Tennessee and Kentucky.
17   Q.   What about Ohio?
18   A.   No.
19   Q.   What about Missouri?
20   A.   No.
21   Q.   Now, when you say no, are you indicating
22 that diversion wasn't a problem or you're just not
23 aware if diversion was a problem?
24   A.   I was not aware.  I thought that's what

Page 69

1  your question was.  And I'm not aware of Missouri
2  having that problem.
3    Q.   Now, the next bullet point is we look at
4  IMS data to create heat maps.  Do you understand what
5  that is in reference to?
6    A.   Yes.
7    Q.   What is it?
8    A.   So Mallinckrodt looked at IMS data to look
9  for areas in the country where there were high
10 concentrations of certain products.
11   Q.   And what would be the significance of that
12 to Mallinckrodt?  Well, strike that.
13        What would be the significance of high
14 concentrations of certain products in certain areas?
15        MR. O'CONNOR:  Objection to form.
16   A.   So it would tell us where the products
17 were going, and then as part of our anti-diversion
18 efforts, this was one of the factors that we started to
19 consider.
20 BY MR. KAWAMOTO:
21   Q.   And so is it fair to say that these heat
22 maps would -- well, strike that.  Is it fair to say
23 that these heat maps potentially identified areas of
24 increased diversion activity?

Page 70

1      MR. O'CONNOR: Objection to form.
2      A.   The potential was there.
3  BY MR. KAWAMOTO:
4      Q.   And then if you turn to Page 22.  This --
5  I believe this is a heat map, is it not?
6      A.   That's what it appears to be.
7      Q.   And it's a heat map that's based on
8  oxycodone IR 30 milligrams; is that correct?
9      A.   Yes.
10     Q.   Why create a heat map of that product?
11     A.   It's one of the products that Mallinckrodt
12 sells and was identified to us by the DEA.
13     Q.   Now, when you say identified to us by the
14 DEA, what do you mean by that?
15     A.   As having the potential for diversion.
16     Q.   And I take it the red areas are I guess
17 the hotter parts of the heat map?  Is that the idea?
18     A.   That's --
19     MR. O'CONNOR: Objection to form.
20     A.   That's my understanding.
21 BY MR. KAWAMOTO:
22     Q.   And then can you turn to Page 23?  This is
23 hydrocodone combos, 10-milligram tablets per capita.
24 What is -- why create a heat map for hydrocodone

Page 71

1  combos?  Or strike that.
2      Why create a heat map of hydrocodone
3  combos of 10 milligrams?
4      A.   Again, we sell the product and DEA
5  identified that to me as a potential problem for
6  diversion.
7      Q.   Did Mallinckrodt direct or -- well, strike
8  that.  Did Mallinckrodt pay particular attention to the
9  oxy 30 product with respect to its anti-diversion
10 efforts?
11     MR. O'CONNOR: Objection to form.
12     A.   Yes.
13 BY MR. KAWAMOTO:
14     Q.   Did it pay particular attention to the
15 hydrocodone combos 10-milligram product?
16     MR. O'CONNOR: Same objection.
17     A.   Yes.
18 BY MR. KAWAMOTO:
19     Q.   Were there other products that
20 Mallinckrodt was focused on with respect to
21 anti-diversion efforts?
22     MR. O'CONNOR: Objection to form.
23     A.   I mean, these were the main ones.  We
24 might have looked at some others, but these are the two

Page 72

1  main ones that I recall.
2  BY MR. KAWAMOTO:
3      Q.   Okay.  You can put that aside.  Okay.  So
4  this is Gillies Exhibit 44.
5      [Exhibit Mallinckrodt-Gillies-044
6      marked for identification.]
7      Q.   This is an e-mail chain.  It bears a Bates
8  Number MNK-T1_5650749.
9      And sir, I'm going to start my questioning
10 with the very bottom e-mail on the back page.
11     A.   Okay.
12     Q.   Sir, who is Derek Siegle?
13     A.   He's the executive director of the Ohio
14 HIDTA and a former colleague of mine.
15     Q.   And what is Ohio HIDTA?
16     A.   It's the high-intensity drug trafficking
17 group that Derek was in charge of.
18     Q.   And when you say high-intensity drug
19 trafficking group, what do you mean by that?
20     A.   That's a DEA-designated group that pulls
21 law enforcement together to address drug concerns.
22     Q.   And some of these concerns would relate to
23 prescription opioids, would they not?
24     A.   Could, yes.

Page 73

1      Q.   Now, not every state is an HIDTA, is it?
2      A.   I don't believe every state has its own
3  HIDTA.  Some are combined HIDTAs.
4      Q.   And within each state, there's a focus on
5  particular counties, is there not?
6      A.   Well --
7      MR. O'CONNOR: Objection.  I'm going to --
8  on Touhy grounds.  I'm going to remind the witness to
9  answer only to the extent he can do so based on
10 information he did not obtain through his official
11 business with the FBI.
12     A.   I don't know that.
13 BY MR. KAWAMOTO:
14     Q.   So why were you reaching out to Mr. --
15 well, why were you reaching out to the Ohio HIDTA?
16     A.   Because I was looking for a speaker for
17 our anti-diversion industry working group meeting that
18 was coming up.
19     Q.   Did you -- did Mallinckrodt work with the
20 Ohio HIDTA?
21     A.   No.
22     Q.   Do you know what the factors are for
23 designating an HIDTA?
24     MR. O'CONNOR: Same objection as to Touhy.

Page 74

1    A.   I don't think I'm going to be able to
2  answer that one then.
3  BY MR. KAWAMOTO:
4    Q.   Well, so HIDTA stands for high-intensity
5  drug trafficking area; correct?
6    A.   That's correct.
7    Q.   And this would in the context of opioids
8  suggest an increased concern with diversion, would it
9  not?
10       MR. O'CONNOR:  Objection to form.
11   A.   This e-mail between me and Derek?
12  BY MR. KAWAMOTO:
13   Q.   Well, no, not the e-mail.
14   A.   I'm sorry.
15   Q.   I'm just saying the concept of the HIDTA,
16  so sort of taking a step back from this e-mail.
17   A.   Oh, okay.
18   Q.   The HIDTA stands for a high-intensity drug
19  trafficking area; correct?
20   A.   Correct.
21   Q.   And in the context of opioids, that would
22  indicate an increased concern with diversion, would it
23  not?
24       MR. O'CONNOR:  Objection to form.

Page 75

1    A.   I don't know if HIDTA is addressing that.
2  BY MR. KAWAMOTO:
3    Q.   Well, but you are asking for an HIDTA
4  guest speaker in connection with your anti-diversion
5  activities; right?
6    A.   That's correct.
7    Q.   So clearly HIDTA addresses prescription
8  opioid abuse?
9    A.   They could.
10       MR. O'CONNOR:  Objection to form.
11   A.   Yes.
12  BY MR. KAWAMOTO:
13   Q.   And isn't it fair to say that the fact
14  that Ohio has been designated as a HIDTA suggests an
15  increased concern with prescription opioids?
16       MR. O'CONNOR:  Objection to form.
17   A.   No.  They probably had the HIDTA
18  designation previous to that when they were looking at
19  cocaine, heroin, whatever.
20  BY MR. KAWAMOTO:
21   Q.   Well, would you --
22   A.   I don't think the HIDTA was created just
23  for opioids.
24   Q.   Well, would you agree that Ohio does have

Page 76

1  a concern with prescription opioid products?
2        MR. O'CONNOR:  Objection to form.
3    A.   That's my understanding.
4  BY MR. KAWAMOTO:
5    Q.   And that prescription opioids are being
6  diverted in Ohio, are they not?
7        MS. RANJAN:  Object to form.
8    A.   Yeah, I don't know that.
9  BY MR. KAWAMOTO:
10   Q.   Are prescription opioids being abused in
11  Ohio?
12       MR. O'CONNOR:  Objection to form.
13   A.   I don't know that either.
14  BY MR. KAWAMOTO:
15   Q.   So you can put that aside.
16   A.   Okay.
17   Q.   So this is Exhibit 45.
18       [Exhibit Mallinckrodt-Gillies-045
19       marked for identification.]
20   Q.   So this is an e-mail chain and it has
21  Bates numbers MNK-T1_7898862.  And I'd like to focus
22  your attention on the e-mails on the first page.
23   A.   Okay.
24   Q.   So in the middle of the page there's an

Page 77

1  e-mail from Julie Milford to Jacob Longenecker CCing
2  Jennifer Buist and Jennifer Terp.  Who is Julie
3  Milford?
4    A.   She was an analyst at Mallinckrodt.
5    Q.   And what was her -- what analysis did she
6  carry out?
7    A.   She would run the heat map data for us.
8    Q.   And in the e-mail above that Jennifer
9  sends an e-mail to you saying these heat maps are
10  oxycodone-specific.
11       Do you see that?
12   A.   Yes.
13   Q.   Did you regularly receive these heat maps?
14       MR. O'CONNOR:  Objection to form.
15   A.   Define regularly.
16  BY MR. KAWAMOTO:
17   Q.   Well, did you receive heat maps for
18  oxycodone?
19   A.   Yes.
20   Q.   Why?
21   A.   As I previously stated, looking for areas
22  in the country where there were pockets of the products
23  going.
24   Q.   Do you know if these heat maps were shared

Page 78

1  with other members of the SOM team?
2      A.   Yes.
3      Q.   And what did Mallinckrodt do with this
4  analysis?
5      A.   One of the things that we did is we would
6  pull chargeback information and look to see if there
7  were any of our products going to these areas and if
8  there was any cause for concern.
9      Q.   And so I'd like to direct your attention
10 to the PowerPoint that's an attachment to this cover
11 e-mail.  It was produced to us in native format,
12 though, but the Bates number is MNK-T1_7898864.  So
13 the -- I guess the second slide says MNK geographical
14 patterns are similar to the rest of the market.
15     A.   Okay.
16     Q.   Do you understand what that means?
17     A.   So I believe that Mallinckrodt's products
18 are going to these areas are the similar -- are similar
19 to amounts from other manufacturers.
20     Q.   And what is the significance of that
21 finding or that pattern?
22          MR. O'CONNOR:  Objection to form.
23     A.   Consistency.
24 BY MR. KAWAMOTO:

Page 79

1      Q.   Well, so let me rephrase that question.
2      A.   Okay.
3      Q.   Why would one care that -- or why would
4  Mallinckrodt care that the geographical patterns --
5  that its geographical patterns -- I assume we're
6  talking about distribution patterns.
7           Why would Mallinckrodt care that its
8  geographical distribution patterns were similar to the
9  rest of the market?
10          MR. O'CONNOR:  Objection to form.
11     A.   I don't know the answer to that question.
12 BY MR. KAWAMOTO:
13     Q.   So the second one is there is a
14 concentration of volume in the Pacific northwest, and I
15 believe that's a reference to five milligrams
16 oxycodone.  Is that correct?
17     A.   That's my understanding.
18     Q.   And what is the significance of that
19 pattern or that finding?
20          MR. O'CONNOR:  Objection to form.
21     A.   So we see that there's -- as I've stated
22 previously, there's a higher concentration of our
23 product going into that area, and then similar, it
24 appears that other manufacturers have a concentration

Page 80

1  of their product going into the northwest also.
2  BY MR. KAWAMOTO:
3      Q.   And so if Mallinckrodt's distribution
4  pattern were to differ from other manufacturers, would
5  that be significant?
6           MR. O'CONNOR:  Objection.  Form.
7      A.   Not necessarily.
8  BY MR. KAWAMOTO:
9      Q.   Now, you said that you would pull
10 chargeback data based on these heat maps.  Is that
11 accurate?
12     A.   Yes.
13     Q.   So I mean, I guess would you -- would this
14 tell you to pull chargeback data for five milligram oxy
15 from the Pacific northwest?  Or I'm just trying to
16 understand how these heat maps were used.
17          MR. O'CONNOR:  Objection to form.
18     A.   Yes.  So we could run chargeback data for
19 any of the pharmacies getting our products -- in this
20 case, in the Pacific northwest -- to see whether there
21 were any issues that we might want to further address.
22 BY MR. KAWAMOTO:
23     Q.   And the next slide is -- it says
24 10-milligram patterns are similar to other strengths,

Page 81

1  though for Mallinckrodt -- I guess Mallinckrodt doesn't
2  make a 10-milligram product.  Is that why the map is
3  blank?
4      A.   So I'm only familiar with five, 15, and
5  30.  Doesn't mean that Mallinckrodt didn't make a 10.
6  Might not have sold a lot of that product, though.  So
7  I don't want to state that there was no Mallinckrodt 10
8  because there might have been.
9      Q.   But it would seem that Mallinckrodt did
10 not make much of it, given this heat map, so --
11     A.   It didn't sell --
12     Q.   Didn't sell much of it?
13     A.   Yes.  Uh-huh.
14     Q.   But it's got the 10 milligrams for other
15 manufacturers and it says 10-milligram patterns are
16 similar to other strengths.
17          Do you know what the significance of that
18 finding is?
19          MR. O'CONNOR:  Objection to form.
20     A.   Only that -- similar to the five mgs, the
21 areas that are getting the 10 mgs are similar, and I
22 believe that's what they're referring to here.
23 BY MR. KAWAMOTO:
24     Q.   Now, why would Mallinckrodt care if it

Page 82

1 wasn't selling much of the 10 milligrams?
2     MR. O'CONNOR: Objection to form.
3     A.   We were looking at all the products within
4 this area, within the oxycodone five, 10s, 20s, 30s,
5 15s, to see if there was any changes in the patterns
6 between the various five, 10, 15, 20, 30 mgs.
7 BY MR. KAWAMOTO:
8     Q.   And what would -- well, I guess what I'm
9 confused about is -- so you're looking at all of the
10 different products --
11     A.   Uh-huh.
12     Q.   -- including ones that Mallinckrodt may
13 not sell very much of.  What -- how does that
14 information relate to diversion?  Why did you care
15 about this as the director or vice-president of global
16 security?
17     A.   Yeah.  Sure.
18     MR. O'CONNOR: Objection to form.
19     A.   As part of our anti-diversion efforts, we
20 were trying to see if -- as I stated previously, if
21 there were areas in the country where there were high
22 concentrations of products being sold, whether the
23 potential for diversion existed.
24 BY MR. KAWAMOTO:

Page 83

1     Q.   And so for the next slide there's a
2 concentration of 15-milligram tablets along east coast
3 and parts of the west coast.  So do you see that?
4     A.   Yes.
5     Q.   And so the way this would have been used
6 would have been to run chargeback data for the areas of
7 concentration on the east coast and the west coast?
8     A.   I would say for those pocket areas where
9 there seem to be a high concentration.
10     Q.   And so if there were pocket areas in Ohio,
11 that would have also been -- I mean, that would have
12 also been a focus of chargeback data?
13     MR. O'CONNOR: Objection to form.
14     A.   Could have been.
15 BY MR. KAWAMOTO:
16     Q.   Now, the next slide is KVK manufactures a
17 large majority of 20-milligram tablets, which are
18 scattered across the nation in a similar pattern to
19 other strengths.  Do you know what KVK is?
20     A.   I believe they're a manufacturer.
21     Q.   And why was Mallinckrodt focused on KVK?
22     A.   I'm sorry.  I do not know.
23     MR. O'CONNOR: Objection to form.
24 BY MR. KAWAMOTO:

Page 84

1     Q.   Now, the next, I guess, section is -- it's
2 a per capita heat map.  Do you understand what the
3 difference is between a per capita heat map and the
4 volume heat map?
5     A.   I believe I do.
6     Q.   And what is that difference?
7     A.   So now we're looking at populations in
8 those areas.
9     Q.   And is this -- when you say looking at
10 populations, is this the number of individuals
11 consuming oxycodone?  Is that what you mean by per
12 capita, or --
13     MR. O'CONNOR: Objection to form.
14     A.   That's my understanding.
15 BY MR. KAWAMOTO:
16     Q.   And so what would this per capita heat map
17 tell you that a volume heat map wouldn't?
18     A.   Volume is showing the volume of product
19 that's going in there and the per capita is showing you
20 the -- potentially the number of people that might be
21 utilizing it.
22     Q.   And how would Mallinckrodt have used this
23 data that it gathered from the per capita e-mails?
24     A.   So it was part of our anti-diversion

Page 85

1 efforts.  It's just another pointer for us to look at.
2     Q.   And similar to the volume, would this have
3 been a way to focus a chargeback analysis?
4     MR. O'CONNOR: Objection to form.
5     A.   Looking at all these pointers would permit
6 us to focus in on areas.
7 BY MR. KAWAMOTO:
8     Q.   Now, if you turn to -- I believe it's the
9 third slide in for the per capita heat maps.  It says
10 the 10-milligram tablet has normal dispensing patterns
11 compared to other strengths.
12     Do you see that slide?
13     A.   Yes.
14     Q.   Do you know what is meant by normal
15 dispensing patterns?
16     A.   Sorry.  I do not.
17     Q.   And so you don't know what an abnormal
18 dispensing pattern would be?
19     MR. O'CONNOR: Objection to form.
20     A.   Correct.
21     MR. KAWAMOTO: You can put that aside.
22 Okay.  Can we go off the record really briefly?
23     THE VIDEOGRAPHER: Sure.  We are going off
24 the record at 10:59 AM.

Page 86

1    [Discussion off the record.]
2    THE VIDEOGRAPHER: We are back on the
3 record at 11:00 AM.
4 BY MR. KAWAMOTO:
5    Q.   Okay. So Mr. Gillies, I'm going to hand
6 you a -- I'm going to hand you Exhibit 46.
7    [Exhibit Mallinckrodt-Gillies-046
8    marked for identification.]
9    Q.   As I indicated, this is a document that
10 was produced to us in native format by Mallinckrodt.
11 When we take a break, I will provide the Bates number
12 for it, and I believe it's also been used as an exhibit
13 in other depositions.
14    A.   Okay.
15    Q.   And it's actually -- the PowerPoint has
16 two sections. I'm going to focus your attention on the
17 section entitled national use of opioids heat maps of
18 units through cash transactions. That starts on Page
19 7.
20    A.   Okay.
21    Q.   Now, this is another PowerPoint or another
22 presentation that was another analysis that was
23 prepared by Julie Milford.
24    Mr. Gillies, are you familiar with this

Page 87

1 PowerPoint?
2    A.   I am not.
3    Q.   You don't recall ever seeing it before?
4    A.   Never.
5    Q.   Were you aware that she did an analysis on
6 heat maps of units through cash transactions?
7    MR. O'CONNOR: Objection to form.
8    A.   I believe I recall her doing one.
9 BY MR. KAWAMOTO:
10    Q.   But you don't recall ever seeing this
11 presentation?
12    A.   No, I don't believe I've ever seen this
13 one.
14    Q.   Do you recall seeing a similar
15 presentation on this data?
16    MR. O'CONNOR: Objection to form.
17    A.   No.
18 BY MR. KAWAMOTO:
19    Q.   Now, if you turn to Page 8, it says
20 methodology. It says -- the first bullet point is
21 combined all IMS Xponent Plantrak cash prescriptions in
22 the last two years by prescribing the physician's
23 three-digit ZIP code.
24    Do you understand what that is a reference

Page 88

1 to, sir?
2    A.   I mean, other than what it says there.
3 That would be my only understanding -- what I'm reading
4 there.
5    Q.   Now, underneath it there's a bullet point
6 that says product basket included therapies and
7 strengths known to be highly abused, as well as Exalgo.
8    Do you know how this list was created?
9    A.   I do not.
10    Q.   And when it says highly abused, do you
11 know how that determination was made?
12    A.   I do not.
13    Q.   Would you agree that the products listed
14 underneath this bullet point are highly abused?
15    MR. O'CONNOR: Objection to form.
16    A.   I could only address the ones that I would
17 be aware of.
18 BY MR. KAWAMOTO:
19    Q.   And for -- well, which ones are you aware
20 of?
21    A.   The hydro 10/325s and the oxy 30s.
22    Q.   Are there any other products that you knew
23 to be highly abused that were not included on this --
24 that are not included on this list?

Page 89

1    MR. O'CONNOR: Objection to form.
2    A.   Those are the two main ones that I was
3 familiar with.
4 BY MR. KAWAMOTO:
5    Q.   So you weren't familiar with oxycodone 15
6 as being a highly-abused product?
7    MR. O'CONNOR: Objection to form.
8    A.   That's my understanding.
9 BY MR. KAWAMOTO:
10    Q.   And other than -- so other than the 10/325
11 hydro/APP and the 30-milligram oxycodone, you weren't
12 aware that any of these other products were highly
13 abused?
14    MR. O'CONNOR: Objection to form.
15    A.   That's right. I'm just not familiar with
16 all of these, so --
17 BY MR. KAWAMOTO:
18    Q.   Now, why focus on cash transactions?
19    MR. O'CONNOR: Objection to form.
20    A.   It would be one of the areas that you
21 would look at, if a pharmacy was doing a lot of
22 prescriptions for cash.
23 BY MR. KAWAMOTO:
24    Q.   And that would be an indication of

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  diversion?

2      MR. O'CONNOR:  Objection to form.

3      A.  Could be.  So again, it's just another one

4  of those pointers that you're looking at.  Doesn't mean

5  that it is, but it could be.

6  BY MR. KAWAMOTO:

7      Q.  And so do you see Page 10 of the

8  PowerPoint?

9      A.  Yes.

10     Q.  It says four critical danger spots, three

11 of which are in Kentucky near the West Virginia border.

12     Do you see that?

13     A.  Yes.

14     Q.  Did you have an understanding of -- did

15 you have an understanding that Kentucky and West

16 Virginia were at an increased risk of diversion?

17     MR. O'CONNOR:  Objection to form.

18     A.  At which time?

19 BY MR. KAWAMOTO:

20     Q.  At any time?

21     A.  Yes.

22     Q.  And what time periods are you referring to

23 or what time periods are you aware of?

24     A.  So my reference for Kentucky would be

Page 91

1  earlier and West Virginia would be later, so Kentucky

2  in that early time frame from joining Mallinckrodt and

3  West Virginia a few years later.

4      Q.  So Kentucky would have been the two

5  thousand -- around 2012?

6      A.  Yeah, 2012-2013 time frame, and then West

7  Virginia in 2014-2015 time frame.

8      Q.  Now, if you turn to the next page, it's

9  Page 11.  It says two danger zones in Kentucky, just

10 for this one product in two strengths alone.  Hotspots

11 near Las Vegas, in Texas, Alaska, and Alabama.

12     Do you see that?

13     A.  Yes.

14     Q.  Were you aware of -- were you aware of

15 diversion concerns or abuse concerns in Texas, Alaska,

16 or Alabama?

17     MR. O'CONNOR:  Objection to form.

18     A.  Texas, Alaska, no.  Alabama approximately

19 in the 2015 time frame.

20 BY MR. KAWAMOTO:

21     Q.  Then it says none in Florida, but it says

22 California, Texas, Idaho, Oklahoma, and I believe

23 Mississippi also have a large portion of warm spots.

24 So I think you just answered regarding Texas.  What

Page 92

1  about California, Idaho, Oklahoma, or Mississippi?

2      MR. O'CONNOR:  Objection to form.

3      A.  No Idaho, Oklahoma, Mississippi.  Knew

4  that there were some high-concentration areas in

5  California, but not aware of diversion.

6  BY MR. KAWAMOTO:

7      Q.  And so when you say high-concentration

8  areas, what are you referring to?

9      A.  I'm referring to the heat map showing that

10 there was pockets within California that hydro products

11 were the primary drug being prescribed.

12     Q.  Did you do anything to investigate those

13 pockets in California?

14     MR. O'CONNOR:  Objection to form.

15     A.  We did look at pharmacies in California.

16 BY MR. KAWAMOTO:

17     Q.  So turning to Page 12.  It says many warm

18 and hotspots in Florida, but limited across the rest of

19 the country.  Shows geographical differences in

20 potential abuse patterns.  Do you know what that means?

21     A.  I'm not really sure what this -- what

22 that's referencing.

23     Q.  And I notice it says one can also follow

24 the Oxy Express, Highway 75, and see all the cool spots

Page 93

1  that pop up along the highway known to be used by

2  drug-seekers traveling for pills, according to the DEA.

3      Are you familiar with the term Oxy

4  Express?

5      A.  Yes.

6      Q.  And what is the Oxy Express?

7      A.  Drug-seekers along the I-75 corridor.

8      Q.  And the Oxy Express connects all of those

9  states -- I mean, it starts in Florida and it goes up,

10 does it not?

11     A.  Yes.

12     MR. O'CONNOR:  Objection to form.

13 BY MR. KAWAMOTO:

14     Q.  So turning to Page 15.  And it says

15 Kentucky critical spot facts.  Over 23 million tablets

16 were prescribed since March 2010 -- and my apologies.

17 I'm reading from the PowerPoint.  Over 23 million

18 tablets were prescribed since March 2010 in an area

19 with a total population of 3.1 million.  Total supply

20 of dispensed tablets is enough to give every person in

21 the population almost eight tablets.

22     Were you aware of that information?

23     A.  No.

24     Q.  31 percent of all tablets were paid with

Page 94

1 cash.

2        Were you aware of that information?

3    A.   No.

4    Q.   The top critical zone in the country had
5 33 percent of all cash tablets prescribed by one
6 physician.

7        Were you aware of that?

8    A.   No.

9    Q.   In general, the prescribing habits of many
10 physicians in the area most likely attract
11 out-of-county drug-seekers.

12        So assuming the above bullet points are
13 accurate, would you agree with that conclusion?

14        MR. O'CONNOR:  Objection to form.

15    A.   I don't know what this is referencing.

16 BY MR. KAWAMOTO:

17    Q.   Sure.

18    A.   Can we blow up the bottom of that?

19    Q.   Sure.

20    A.   To know what it says, or --

21    Q.   Do you mean the --

22    A.   The source.

23    Q.   The source?

24    A.   Yeah, yeah, yeah.

Page 95

1        MS. KAWAMOTO:  Yeah.  So actually, can we
2 zoom in on that?

3        THE VIDEOGRAPHER:  I think that's the
4 closest it'll go.

5    A.   That's okay.

6 BY MR. KAWAMOTO:

7    Q.   Oh, okay.  So I'm reading it into the
8 record.  It's source IMS Xponent Plantrak, and then it
9 gives a website.

10    A.   Okay.

11    Q.   I think the website is to the reference of
12 the physician getting busted.

13    A.   Okay.  So your question?

14    Q.   Yeah.  So my question is, given this data
15 that you've got 23 million tablets being prescribed in
16 a population with 3.1 million people, you've got 31
17 percent of all tablets being paid for with cash, and
18 you've got a top critical zone in the country that had
19 33 percent of all cash tablets being prescribed by one
20 physician, doesn't that -- would you agree with the
21 conclusion that in general the prescribing habits of
22 many physicians in the area most likely attract
23 out-of-county drug-seekers?

24        MR. O'CONNOR:  Objection to form.

Page 96

1    A.   So I don't know that, but the high
2 indication of cash would indicate that people are,
3 logically, paying cash for their scripts when typically
4 people would use insurance.

5 BY MR. KAWAMOTO:

6    Q.   Well --

7    A.   So it's certainly a key indicator.

8    Q.   And we had -- you had previously talked
9 about -- so this PowerPoint, I believe, is -- so I'm
10 trying to see if there's a date on it.  It's certainly
11 going to be after 2012, given the data.  You had
12 previously indicated that, as Florida cracked down on
13 its business practices, the, I guess, epicenter or
14 these -- the focus moved elsewhere.

15        Wouldn't this be an example of that?

16        MR. O'CONNOR:  Objection to form.

17    A.   I mean, I don't know that.  So
18 unfortunately, I'm unfamiliar with this document and
19 the exact time frame.  March 2010 to what?  So I would
20 need to know a little more information what the exact
21 time frame that this covers to give you an educated
22 answer on that.

23 BY MR. KAWAMOTO:

24    Q.   But you would agree that this data

Page 97

1 suggests a serious concern with diversion in Kentucky,
2 would it not?

3        MR. O'CONNOR:  Objection to form.

4    A.   It's certainly a data point to look at.

5 BY MR. KAWAMOTO:

6    Q.   So turning to Slide Seven -- or Page 17.
7 This slide is entitled hotspot and critical spot
8 trends.  And the bullet underneath it is, in the
9 nation's hot and critical spots, notable usage shifts
10 recently occurred.  Oxycodone HCL tablets decreased in
11 percentage usage, while hydrocodone/APP, Dilaudid,
12 methadone, and oxycodone/APP -- APAP -- increased.  Do
13 you see that?

14    A.   I do.

15    Q.   Do you understand what that is a reference
16 to?

17    A.   I don't.

18    Q.   But it would stand to reason that if one
19 drug becomes a focus of regulatory attention, demand
20 and consumption is going to shift to other drugs, would
21 it not?

22        MR. O'CONNOR:  Objection to form.

23    A.   It could.

24 BY MR. KAWAMOTO:

Page 98

1    Q.   Okay.  Thank you.  You can put that aside.
2    A.   Okay.
3    Q.   So I'm handing you what's marked as
4  Exhibit 47.
5       [Exhibit Mallinckrodt-Gillies-047
6       marked for identification.]
7    A.   Okay.
8    Q.   This is -- this document bears a Bates
9  number MNK-T1_2359481.
10      Mr. Gillies, do you recognize this
11 document?
12   A.   Yes.
13   Q.   What is this document?
14   A.   It's a summary of a meeting I had with DEA
15 in Albany.
16   Q.   And was it your practice to transcribe
17 your meetings?
18   A.   Yes.
19   Q.   Did you transcribe all of your meetings,
20 or only certain ones?
21   A.   If there was pertinent information that
22 was discussed.
23   Q.   And would that have been a general
24 practice, or was it one that you applied only to your

Page 99

1  meetings with DEA?
2       MR. O'CONNOR:  Objection to form.
3    A.   General practice.
4  BY MR. KAWAMOTO:
5    Q.   And so -- well, you've worked at
6  Mallinckrodt for seven years now; is that correct?
7    A.   So since June of 2012.
8    Q.   So around seven years?  So you must have
9  hundreds of these memos; is that fair?
10      MR. O'CONNOR:  Objection to form.
11   A.   No, I wouldn't necessarily have had
12 hundreds of meetings with the DEA.
13 BY MR. KAWAMOTO:
14   Q.   Well, but you wouldn't just transcribe DEA
15 meetings?  You would transcribe any important meeting?
16 Is that fair, or did I misunderstand?
17      MR. O'CONNOR:  Object --
18   A.   I would have reports of conversations with
19 pharmacies.
20 BY MR. KAWAMOTO:
21   Q.   Would you also have memorialized reports
22 of conversations with colleagues that contained
23 important information?
24      MR. O'CONNOR:  Objection to form.

Page 100

1    A.   No, not necessarily.
2  BY MR. KAWAMOTO:
3    Q.   So these would have been -- I mean,
4  reports of conversations with people outside of
5  Mallinckrodt?
6    A.   Yes.
7    Q.   So the top paragraph -- well, strike that.
8    A.   Uh-huh.
9    Q.   So this memorializes or transcribes a
10 meeting you had with DEA Albany; is that correct?
11   A.   That's correct.
12   Q.   And it's with Susan Baker, Heather White,
13 and Cristina Russo?
14   A.   Correct.
15   Q.   And Number 1 is -- well, actually, can you
16 read Number 1 into the record?
17   A.   Sure.  DEA does not provide guidance on
18 what numbers any company should use as a baseline in
19 its suspicious order monitoring.  Baker and White
20 stated that they did not know where Mallinckrodt came
21 up with their numbers as a baseline for oxy, but it was
22 not from DEA.  Therefore, they added they would provide
23 no guidance on hydrocodone.  It was up to the company
24 to know its customers.

Page 101

1    Q.   And do you recall this conversation?
2    A.   Yes.
3    Q.   And so what is the context of this
4  conversation?
5    A.   So we learned from DEA that there were --
6  the average amount of hydrocodone going into a
7  certain -- to the average pharmacy was X, so I was
8  discussing that number with them.  And they said DEA
9  doesn't know where it came up with the number and there
10 is no baseline -- I don't know that baseline was
11 mine -- but the numbers that we got was from DEA
12 telling us what the average pharmacy sold as it related
13 to hydrocodone.
14   Q.   And DEA didn't -- at least these DEA
15 employees didn't know where that number came from?  Is
16 that the upshot?
17   A.   That's what they claimed, yes.
18   Q.   And how did DEA convey the average number
19 to you?  Was it in a phone conversation, an e-mail?
20   A.   So it was in some of their presentations.
21 And I found these numbers out on the internet.
22   Q.   So you found the presentations containing
23 the numbers on the internet?
24   A.   That's correct.  DEA presentations.

Page 102

1    Q.   Turning to Point 3, the suspicious order
2    monitoring paragraph.
3         Do you recall that part of the
4    conversation?
5    A.   I do not.
6    Q.   And then Point 4, legislation.
7    A.   Uh-huh.
8    Q.   Can you read that into the record?
9    A.   Sure.  4, legislation, little A.
10   Q.   Yes.
11   A.   Moving hydrocodone from a Schedule III to
12   a Schedule II -- Baker advised that she knew what was
13   going to take place, but could not share the
14   information at this time.  DEA was advised that
15   Mallinckrodt was preparing for when the change takes
16   place, not if it does.
17   Q.   And this is moving hydrocodone from II to
18   III?  I'm sorry.  From III to II?
19   A.   III to II.  That's correct.  So we were
20   moving forward.  So the consideration was that they
21   were going to move hydro from III to II.
22   Q.   And that would have triggered additional
23   steps with respect to the manufacture and sale of
24   hydrocodone?

Page 103

1         MR. O'CONNOR:  Objection to form.
2    A.   So --
3    BY MR. KAWAMOTO:
4    Q.   Sorry.  Go ahead.
5    A.   I don't know to your question, but I'll
6    tell you what it was.
7    Q.   Sure.
8    A.   Which was I had a security concern,
9    because now I would have to move product from a cage to
10   a vault.  So I was conveying to them that we were
11   taking the steps already to build the space to have the
12   vault if they converted IIIs to IIs so that I could
13   have the product safely and securely held.  And I was
14   doing proactive on that.
15        So if they had left it as a III, I would
16   have spent money getting the vault ready and the space
17   ready for this product and it wouldn't have gone in
18   there.  But once it went to a II, I was prepared to
19   move.
20   Q.   Understood.
21   A.   Okay.
22   Q.   And do you have an understanding of why
23   DEA wanted to or why DEA moved hydrocodone from III to
24   II?

Page 104

1    A.   I don't as we sit here.
2    Q.   Other than this conversation regarding the
3    steps Mallinckrodt was taking in anticipation of moving
4    III to II, did you have any other conversations with
5    DEA regarding the movement of hydrocodone from III to
6    II?
7    A.   I did not.
8    Q.   Do you know if anyone else at Mallinckrodt
9    had those conversations?
10   A.   I do not.
11   Q.   Do you know what Mallinckrodt's position
12   was in terms of moving hydrocodone from Schedule III to
13   Schedule II?
14   A.   I do not.
15   Q.   Now, Para -- or Point 5 references
16   organizational changes, and D -- it says DEA was
17   previously advised of the organizational changes within
18   Mallinckrodt's security, but a few questions remained.
19        What are the organizational changes that
20   are being referenced there?
21   A.   Me.  So this -- I came on in June.  This
22   is my first actual meeting with DEA in Albany.
23   Q.   And it references a few questions remain.
24   What were those questions?

Page 105

1    A.   Yeah, so I think they had a few questions
2    of me whether there would be any changes at the Hobart
3    facility, and as I go on to explain, no organizational
4    changes that would affect them directly at this point.
5    Their POCs would continue to be Eileen and Rich, and
6    clearly if they had any in -- anything that they wanted
7    to discuss, that they could reach out to me.
8    Q.   Now, it also says from a corporate
9    standpoint, communications would come from Don Lohman.
10   Do you know Don?
11   A.   Yes.
12   Q.   And they noted a significant increase in
13   communications from Don.  Why was there a significant
14   increase in communications from Don?
15   A.   We were engaged with our anti-diversion
16   efforts, and we kept DEA informed on everything that we
17   were doing.
18   Q.   And was that Don's responsibility to do
19   that?
20   A.   He took the responsibility as part of the
21   SOM team.
22   Q.   So -- well, strike that.  So was there a
23   reason that you were having increasing communications
24   coming from Don as opposed to increasing communications

Page 106

1  coming from Rich or Eileen?
2       Why have Don be the communicator as
3  opposed to the established POCs, which are Rich and
4  Eileen?
5       MR. O'CONNOR: Objection to form.
6    A.  So I'll answer that question this way,
7  that we were making enhancements to our SOM program. I
8  believe Don had previously communicated the fact that
9  there was a change in the organizational structure, and
10  they noted that there was an increase in communication
11  coming from Don. I don't know what all those
12  communications were. And anything beyond that might be
13  privileged.
14  BY MR. KAWAMOTO:
15    Q.  Well, were there any concerns with the
16  communications from Rich and Eileen to the DEA?
17    A.  No.
18    Q.  Were there any concerns with the job that
19  Rich or Eileen -- well, strike that. Let me separate
20  this. Were there any concerns with Rich's performance?
21       MR. O'CONNOR: Objection to form.
22    A.  No.
23  BY MR. KAWAMOTO:
24    Q.  Did you ever have any concerns with Rich's

Page 107

1  performance?
2       MR. O'CONNOR: Objection to form.
3    A.  Yes.
4  BY MR. KAWAMOTO:
5    Q.  What were those concerns?
6    A.  I felt he was spending more time on his
7  other responsibilities and I wanted him to spend more
8  time on the security.
9    Q.  And what were the other responsibilities
10  that he was spending his time on? Do you know?
11    A.  He had a responsibility for the facility's
12  personnel and EHS, environmental health and safety
13  issues, and he had a security staff, and he felt that
14  the security staff was handling all the security needs
15  of the facility, and I thought he was wearing too many
16  hats.
17    Q.  Did you ever have any concerns with
18  Eileen's performance?
19       MR. O'CONNOR: Objection.
20    A.  No.
21  BY MR. KAWAMOTO:
22    Q.  Do you know if anyone else ever had any
23  concerns with Eileen's performance?
24       MR. O'CONNOR: Objection.

Page 108

1    A.  No.
2       MR. O'CONNOR: Counsel, can we take a
3  short break now so we can have lunch --
4       MR. KAWAMOTO: Sure.
5       MR. O'CONNOR: -- right after the next
6  one?
7       MR. KAWAMOTO: Okay. That's fine.
8       THE VIDEOGRAPHER: We are going off the
9  record at 11:31 AM.
10       [A brief recess was taken.]
11       THE VIDEOGRAPHER: We are back on the
12  record at 11:41 AM.
13  BY MR. KAWAMOTO:
14    Q.  Okay. So Mr. Gillies, I'm handing you
15  what's marked as Exhibit 48. What -- I'm sorry. Let
16  me -- I'll hand that copy to you and then this copy to
17  your counsel.
18       [Exhibit Mallinckrodt-Gillies-048
19       marked for identification.]
20    Q.  So this is a prior deposition -- a prior
21  exhibit from another deposition that's Borelli -- it's
22  Exhibit 32 to the Borelli deposition, and the Bates
23  number here is MNK-T1_562387. And I'd like to start
24  with the very e-mail on the back. Okay.

Page 109

1       So this is an e-mail from Ms. Heather
2  Goodman to David Irwin, and David Irwin is a
3  Mallinckrodt employee. I believe he was an account
4  manager. And she says, Dave, I spoke with my aunt and
5  the independent pharmacy she chose is Dane Drugs, 6495
6  East Broad Street, Columbus, Ohio, 43213, and then
7  she's got the phone number for the pharmacy.
8       Her monthly prescription is 1,500
9  oxycodone 15 milligrams. We have not contacted the
10  pharmacy to let them know this is happening yet. In
11  addition, as soon as we know that this arrangement is
12  set up, Aunt Sandra will call her doctor and have him
13  call in the script for her. Please let us know how
14  you'd like to proceed.
15       Dave, as I said, I can't tell you how much
16  this means to me. You're doing a really good thing
17  here. I've copied my aunt, Sandra Morrow, on this
18  e-mail so she's in the loop. Okay.
19       So do you see that e-mail, sir?
20    A.  Yes.
21    Q.  And did I read that accurately?
22    A.  Yes.
23    Q.  So to recap, Ms. Goodman is asking Mr.
24  Irwin to send 1,500 oxycodone 15 milligrams -- or 1,500

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  of Mallinckrodt's 15-milligram tablets to this pharmacy
2  in Ohio for her aunt. Then the next e-mail that I'd
3  like to direct your attention to is the one on top of
4  Bates Number 562389. It's from Kate Muhlenkamp to Dave
5  Irwin.
6         Do you see that?
7      A.  Yes.
8      Q.  And she says I've spoken with Victor and
9  he thinks he can make this happen -- two cases a month
10 to the below pharmacy. He is working on it and we
11 should have an answer shortly. Thanks, Kate.
12        Did you ever meet -- or I'm sorry. Strike
13 that. I believe you already indicated that you don't
14 know Kate Muhlenkamp.
15     A.  That's correct. I don't.
16     Q.  Do you know Dave Irwin?
17     A.  I do not.
18     Q.  What about Victor Borelli?
19     A.  No.
20     Q.  What about John Adams?
21     A.  No.
22     Q.  Then there's another e-mail in the middle
23 of the page for -- on Bates Page 562388. The date is
24 April 10th, 2009, 9:58 AM. It's from Dave Irwin to

Page 111

1  Victor Borelli and Kate Muhlenkamp.
2         Do you see that?
3      A.  Yes.
4      Q.  And it says I'm sure I'll be talking to
5  Heather Goodman later today so I can clarify this --
6         [Interruption by the reporter.]
7      Q.  -- but I did the math in my head late
8  yesterday and this equates to 50 tablets per day. Is
9  that even possible?
10        So I think is it -- well, did I read that
11 correctly?
12     A.  Yes.
13     Q.  And then the very top e-mail on the first
14 page from Kate to Victor and Dave CCing John Adams
15 says, Vic, thank you for all your work on this. I
16 worked with Sarah and we are shipping to KeySource.
17 The order should ship to them on Monday. Thanks, Kate.
18        Do you see that?
19     A.  Yes.
20     Q.  So to recap, you have Heather Goodman, who
21 I believe used to work at Cardinal Health, get in touch
22 with Mallinckrodt and essentially ask for 1,500
23 oxycodone tablets to be shipped to her aunt to a
24 particular pharmacy in Columbus, Ohio, and

Page 112

1  Mallinckrodt, presumably working through a distributor,
2  arranged to have the pills shipped to this pharmacy in
3  Ohio.
4         Is that a fair --
5         MR. O'CONNOR: Object to form.
6  By MR. KAWAMOTO:
7      Q.  -- fair summary of this e-mail chain?
8      A.  Shipped to the distributor who would get
9  it to the pharmacy.
10     Q.  Yes.
11     A.  Okay.
12     Q.  So with that correction, is that a fair
13 statement?
14     A.  I mean, what you read is what was
15 contained in this -- this e-mail chain.
16     Q.  And the pills did in fact ship, according
17 to Kate's e-mail?
18        MR. O'CONNOR: Objection to form.
19 BY MR. KAWAMOTO:
20     Q.  Is that correct?
21     A.  It said we are shipping --
22     Q.  Yes.
23     A.  -- to KeySource. Yes.
24     Q.  Do you have any concerns with this

Page 113

1  transaction?
2         MR. O'CONNOR: Objection to form.
3  BY MR. KAWAMOTO:
4      Q.  As the head of -- as the director of
5  security?
6      A.  I have no idea of any other circumstances
7  around this, so I'm not going to be able to speak to
8  it. I don't know anything else about it. What you
9  read was what the words on these e-mails said.
10     Q.  Well, do you see anything in this e-mail
11 chain that indicates that Ms. Goodman had any authority
12 to order OxyContin for her aunt?
13        MR. O'CONNOR: Objection to form.
14     A.  Again, I don't know what's missing, what
15 other data I don't have, to make an informed decision.
16 So I see what's in these e-mails, but I don't have
17 enough information to make a decision.
18 BY MR. KAWAMOTO:
19     Q.  Well, if this inquiry had come to you,
20 sir, would you have simply shipped the drugs or would
21 you have made further inquiries?
22     A.  So that's a hypothetical and I'm not going
23 to address the hypothetical. I'm already telling you I
24 need additional information because I don't know what

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  any of this means.
2      Q.   So what is the additional information you
3  need?
4      A.   Well, I'm not a doctor.  We didn't read
5  all the e-mails in here.  I don't know.  Was it
6  corrected on whether it is 50 tablets a day?  Was there
7  a .0 missing here?  Was there two .0s missing here?  I
8  don't know what the total number actually turned out to
9  be.  I'd like to know what that number --
10     Q.   Well, if the total number turned out to be
11 1,500 oxycodone pills --
12     A.   Again, I don't know -- over a month, I
13 don't know what the patient's medical condition is.  I
14 don't know what the doctor's trying to achieve here.
15 There's a lot of information I don't know, so I'm
16 hesitant to speculate on all the stuff that I don't
17 know with this particular patient.
18     Q.   But you would agree that the 1,500
19 oxycodone seems like a large amount?
20         MR. O'CONNOR:  Objection to form.
21     A.   Again, I don't -- I'm not a doctor.  I
22 don't know whether that is a large amount or not.
23 BY MR. KAWAMOTO:
24     Q.   But it's not certainly something you would

Page 115

1  have inquired about; correct?
2      A.   I would have asked additional information.
3      Q.   And this additional information would have
4  included more additional information regarding Aunt
5  Sandra, I take it?
6      A.   And again, I wouldn't have violated
7  somebody's HIPAA rights and stuff, but I would have
8  wanted to have known more that -- whatever could be
9  shared as far as a medical condition or verifying what
10 the actual number is, and I would have wanted a lot
11 more information.
12     Q.   And would you agree that this request
13 without this additional information certainly raises at
14 least the potential that there could be diversion?
15         MR. O'CONNOR:  Objection to form.
16     A.   I don't know that.
17 BY MR. KAWAMOTO:
18     Q.   But this situation in your view certainly
19 warranted additional inquiry?
20     A.   Yes.
21     Q.   And additional inquiry beyond what is
22 captured in this e-mail chain; correct?
23     A.   Yes, and I don't know what other
24 information they had.

Page 116

1      Q.   So if this is the only information they
2  had, this e-mail chain is it for this order, then
3  shipping this order would have been of concern to you,
4  would it not?
5          MR. O'CONNOR:  Objection to form.
6      A.   That's not what I said.  My testimony is
7  that I would want additional information.
8  BY MR. KAWAMOTO:
9      Q.   And in the absence of that information,
10 you would have had concerns about shipping this order,
11 sir?
12         MR. O'CONNOR:  Objection to form.
13     A.   So I don't know what other additional
14 information they had.  I would want additional
15 information.
16 BY MR. KAWAMOTO:
17     Q.   Well, I understand that, but I guess let
18 me rephrase my question.  If there was no additional
19 information, if they didn't -- if no additional
20 information was provided beyond what's captured in this
21 e-mail chain, you would have concerns with shipping
22 this order?  Isn't that a fair statement?
23         MR. O'CONNOR:  Objection.  The question's
24 been asked and answered.

Page 117

1      A.   So again, that's a hypothetical.  I don't
2  know what other information they did have, so I don't
3  want to comment on a hypothetical that may not be
4  accurate.  So --
5  BY MR. KAWAMOTO:
6      Q.   But they certainly should have had more
7  information than what's in this e-mail chain, sir;
8  correct?
9          MR. O'CONNOR:  Objection.  Asked and
10 answered.
11     A.   I would have asked for more information.
12 BY MR. KAWAMOTO:
13     Q.   Okay.  So this is now Gillies Exhibit 49.
14         [Exhibit Mallinckrodt-Gillies-049
15         marked for identification.]
16     Q.   And so to provide an explanation for this
17 exhibit, this is -- this was used as a prior exhibit in
18 the Borelli deposition.  It's Exhibit 11.  This is a --
19 essentially a snapshot of chargeback data that
20 Mallinckrodt has produced to us and that we have used
21 to isolate and focus on a specific distributor and a
22 specific end user.  I guess to start with, when I use
23 the term end user, do you know what that means?
24     A.   No, I'd ask you for clarification.

Page 118

1    Q.   Okay.  So Mallinckrodt has a customer --
2  let's say a distributor -- and the distributor's
3  customer is the customer's customer.  Is that
4  terminology you're familiar with?
5    A.   So the distributor's customer, the
6  pharmacy --
7    Q.   Yes.
8    A.   -- would be our customer's customer then
9  if it was our product going to that pharmacy.
10   Q.   Yes.  Exactly.
11   A.   Okay.  We're on the same page.
12   Q.   And another way to I think describe or
13 refer to a customer's customer could be an end user.
14   A.   Okay.
15   Q.   Is that a term you've ever heard?
16   A.   No, but I'll --
17   Q.   What about --
18   A.   I can follow you.
19   Q.   What about indirect customer?  Is that a
20 term that you're familiar with?  Well, strike that.
21      Let me ask this.  How do you refer to your
22 customers' customers?
23   A.   Downstream registrant.
24   Q.   Downstream registrant?

Page 119

1    A.   Uh-huh.
2    Q.   Okay.  I will try to use that.
3    A.   Okay.
4    Q.   So this is a snap sheet -- a snapshot of a
5  distributor and a downstream registrant that's
6  receiving Mallinckrodt products.  And so you can see
7  from the product description on the second page that
8  this product is oxycodone.
9       So do you see that under the column
10 product description?
11   A.   Yes.
12   Q.   It's oxycodone, it's oxy 15 and oxy 30s?
13   A.   Yes.
14   Q.   Then the downstream registrant is Barry
15 Schultz.
16      Do you see that?
17   A.   Yes.
18   Q.   And then it's being sold via First
19 Veterinary Supply or the Harvard Drug Group doing
20 business as First Veterinary Supply.
21      Do you see that?
22   A.   Yes.
23   Q.   Are you familiar with Dr. Schultz?
24   A.   I'm familiar in preparing for --

Page 120

1    Q.   This deposition?
2    A.   The one yesterday.
3    Q.   But you are aware that Mr. Schultz is
4  serving a lengthy prison sentence?
5    A.   That's my understanding.
6    Q.   Are you aware of the Harvard Drug Group --
7  Harvard Drug Company?
8    A.   From preparing my testimony for yesterday.
9    Q.   And so you're aware that they are a
10 distributor that had its license revoked?
11   A.   I believe I testified to that earlier
12 today, yes.
13   Q.   So the Harvard Drug Group is doing
14 business as the First Veterinary Supply Company and you
15 have a doctor that is getting oxycodone from the First
16 Veterinary Supply Company.  Can you think of any reason
17 for a medical doctor to be getting oxy from a vet
18 supply company?
19      MR. O'CONNOR:  Objection to form.
20   A.   So I don't know anything about this --
21 these transactions, but is this a corporate holding
22 company?  I mean --
23 BY MR. KAWAMOTO:
24   Q.   Well, it's doing business as First

Page 121

1  Veterinary Supply Company, so it is -- it's a vet
2  supply company.
3      MR. O'CONNOR:  Objection to form.
4    A.   Are there other aspects of business that
5  this company does?
6  BY MR. KAWAMOTO:
7    Q.   Well, I'm not sure.  What do you mean by
8  other aspects of business?
9    A.   Well, you said it was a veterinary supply
10 company.  They're a DEA registrant, so the DEA gave
11 them a license to distribute drugs, so -- maybe my bad.
12 Maybe I misunderstand what you're asking me.
13   Q.   Well, isn't it a red flag that you got a
14 doctor that's getting oxycodone from a vet supply
15 company?
16      MR. O'CONNOR:  Objection to form.
17   A.   So I'm unfamiliar with these transactions.
18 I would have wanted to know what Harvard Drug's
19 corporate entity, this First Veterinary Supply --
20 there's nothing wrong with that corporate entity having
21 Harvard Drug underneath it because the DEA gave them a
22 registration.  So the DEA would have looked at this
23 prior to them giving the registration.  I mean, that's
24 my understanding.  So I'm sorry if I'm not answering

Page 122

1 your question. Maybe I'm still not understanding it,
2 so --
3 BY MR. KAWAMOTO:
4     Q.   Well, does the DEA give -- well, vets have
5 the ability to prescribe opioid products; correct?
6     A.   They do.
7     Q.   And they're also subject to regulation
8 because they're prescribing opioid products?
9     A.   Correct.
10    Q.   And vet supply companies -- well -- strike
11 that.  Vet supply companies would have a legitimate
12 business purpose in supplying a vet with opioids for
13 use in that vet's practice, would they not?
14    A.   As an aspect of the business.  Is that the
15 complete business?  So again, I'm going to ask -- I
16 need a lot more information than what's contained here.
17 So I've got a DEA registrant providing product to a
18 medical doctor who's a DEA registrant, and I don't know
19 the corporate holding company.  I don't know what other
20 interests this corporation has.  So I would want to
21 know what that is.  But I would think that the DEA
22 looked at that because they gave them a registration.
23 So a holding company?  I don't see an issue with that.
24    Q.   Are the registrations given to veterinary

Page 123

1 supply companies different than the registrations given
2 to distributors that distribute to MDs?
3     A.   So I don't know whether this is one and
4 the same or whether there's different -- again, I'm
5 lacking all the information to make an informed
6 decision on this.
7     Q.   Well, and what additional information
8 would you need specifically?
9     A.   Well, based on your question, I want to
10 know is this company doing business as First Veterinary
11 Supply -- is that the corporate entity with Harvard
12 Drug underneath it?  I mean, is Harvard Drug First
13 Veterinary Supply?  Are they one and the same?  I'd
14 want to know, are there two different registrations --
15 DEA registrations here?  I don't know that.  So there's
16 a lot of information that I would want to know.
17         But if Harvard Drug and First Veterinary
18 Supply are one and the same and the DEA gave them a
19 registration, I don't see an issue with the company --
20 holding company -- that's my term here because I don't
21 know what they are -- but the holding company is called
22 First Veterinary Supply.
23    Q.   And do you know if the registration given
24 to vets differs from the registration given to doctors?

Page 124

1     A.   I do not know that.  I don't know.
2     Q.   Do you know if the registration given to
3 veterinary supply companies differs from the
4 registration given to pharmacies providing human drugs?
5     A.   So again, I don't know what their
6 registration says.  Is it for human drugs and
7 veterinarian?  Is it just human drugs?  I don't know.
8 So if that's a corporate holding name, I don't think
9 there's a big deal with that, because DEA certainly
10 didn't give it any concern when they gave Harvard Drug
11 the registration.
12    Q.   Well, but the fact that you are shipping
13 product to someone that has a DEA registration isn't
14 sufficient to comply with your requirements under the
15 Controlled Substances Act, is it, sir?
16         MR. O'CONNOR:  Objection to form.
17    A.   Sure, it is.
18 BY MR. KAWAMOTO:
19    Q.   So the only thing you need to worry about
20 is whether or not the person you're shipping to has a
21 DEA registration?  So long as they have a DEA
22 registration, nothing else matters?  Is that --
23         MR. O'CONNOR:  Objection to form.
24    A.   No, that's not my testimony.  That's not

Page 125

1 what I said.  But what I'm telling you is one of the
2 things we're going to verify is whether there's a
3 legitimate DEA registration, and then under our SOM
4 program and stuff, we're going to run -- for each order
5 that comes to us, we'll run our algorithm and see if
6 there's anything that hits our peculiar/unusual order
7 report.
8         So I mean, there's other steps that we
9 take in our anti-diversion efforts.  So again, I
10 apologize.  I understand your question to be, do I have
11 a problem with this company name, d/b/a First
12 Veterinary Supply, supplying to this doctor?  And I
13 don't if the DEA has given them -- and again, whether
14 Harvard Drug and the veterinary supply are the same --
15 one and the same -- and the DEA registration -- I mean,
16 we'll know that in our due diligence with Harvard Drug.
17 So I don't -- no, I don't see a problem with that
18 corporate name as long as we verify the other things.
19 BY MR. KAWAMOTO:
20    Q.   Do you know if vets prescribe oxy?
21    A.   I believe they do.
22    Q.   And what is that based on, sir?
23    A.   It's on my belief that I had read
24 somewhere at some time that there are oxy products

Page 126

1 given to veterinarians.

2    Q.  If it turns out that oxycodone is not

3 prescribed by vets --

4    A.  Okay.

5    Q.  -- because it's a human drug, would that

6 cause concerns?

7    MR. O'CONNOR:  Objection to form.

8    A.  In this instance?

9 BY MR. KAWAMOTO:

10    Q.  Well, in this instance or as a general

11 matter.

12    A.  Oh, okay.  So we're off -- this is just a

13 general question?

14    Q.  Well, the general question is, you have a

15 medical doctor that is ordering oxycodone from a

16 veterinary supply company.  Doesn't that raise concerns

17 for you?

18    MR. O'CONNOR:  Objection to form.

19    A.  All right.  So I'm just going to go back

20 to -- I need more information then.

21 BY MR. KAWAMOTO:

22    Q.  So --

23    A.  Is this only a veterinary supply company,

24 or is it Harvard Drug, the distributor?  So the name in

Page 127

1 and of itself for a corporation does not cause me any

2 concern.

3    Q.  Well, this is all information you would

4 have sought from Harvard Drug before continuing to ship

5 them product; correct?

6    A.  Based on your questioning, I would want

7 additional information -- based on your line of

8 questioning, I would want additional information on

9 whether Harvard Drug only supplies to veterinarians.

10 Then we would go from there.

11    Q.  And if Mallinckrodt didn't go out and get

12 this additional information, you would agree that's a

13 problem, isn't it, sir?

14    MR. O'CONNOR:  Objection to form.

15    A.  So that's a hypothetical.  I don't know

16 what information Mallinckrodt has in these transactions

17 that would or would not have raised any other issues.

18 BY MR. KAWAMOTO:

19    Q.  Well, but, sir, my question to you is,

20 you've indicated that these are all circumstances in

21 which you would have gone out and gathered additional

22 information.

23    A.  Based on your line of questioning --

24    Q.  Based on my line of questioning.

Page 128

1    A.  -- I would want additional information.

2    Q.  Yes.

3    A.  And then I just answered this last

4 question, which was I don't know whether Mallinckrodt

5 has that information or not.

6    Q.  I understand that.

7    A.  Okay.  Okay.

8    Q.  And what I'm saying to you is if

9 Mallinckrodt in fact does not have that information, if

10 they did not go out to gather it, isn't that a cause of

11 concern?

12    MR. O'CONNOR:  Objection to form.

13    A.  And as I just stated, that's a

14 hypothetical. I don't know whether they do or they

15 don't, and then the hypothetical comes after that, if

16 they don't, then what?  So I would tell you that I

17 would want additional information based on your line of

18 questioning.

19 BY MR. KAWAMOTO:

20    Q.  So actually, keep that -- keep this

21 exhibit up.

22    A.  Okay.

23    Q.  So -- so this is Exhibit 50.

24    [Exhibit Mallinckrodt-Gillies-050

Page 129

1    marked for identification.]

2    MR. KAWAMOTO:  And I'm going to hand this

3 to you, Andrew.

4 BY MR. KAWAMOTO:

5    Q.  And I'll put it up on the --

6    A.  Thank you very much.

7    Q.  Put it up on the screen.  This is

8 essentially the same -- a similar spreadsheet to what I

9 just showed you.  My apologies that this one has small

10 paper and the other one had bigger one.

11    A.  No, you're good.  I appreciate you putting

12 it up there.

13    Q.  And so -- now, the thing I wanted to flag

14 about this spreadsheet -- and let me first get it into

15 the record.  So this is previously used in another

16 deposition. It's Exhibit 10 to the Borelli deposition

17 and it's an excerpt of the chargeback data focusing on

18 distributor and downstream registrant -- the same

19 downstream registrant which would be Mr. Schultz.  So

20 do you see the ship-to customer name?

21    A.  I do.

22    Q.  So the downstream registrant is Dr.

23 Schultz again.  Do you see the product description,

24 which is oxy 15 and oxy 30?

Page 130

1    A.   Yes.

2    Q.   And then this time the distributor is

3  Sunrise Wholesale.  Do you see that?

4    A.   I do.

5    Q.   So this one is Exhibit 50.  The other one

6  was Exhibit 49.  They indicate that Dr. Schultz is

7  going out and gathering oxy 15 and oxy 30 from two

8  different distributors.  Is it of concern to you when a

9  downstream registrant is gathering product from

10  multiple distributors?

11        MR. O'CONNOR:  Objection to form.

12    A.   The fact that you get product from

13  multiple distributors doesn't make it wrong, but it

14  would be something that I would look at.

15  BY MR. KAWAMOTO:

16    Q.   And why would you look at that?

17    A.   I'd want to see the volume of products

18  going to that downstream registrant to ensure that we

19  had a full handle on what was occurring.  So the fact

20  that there's multiple distributors doesn't necessarily

21  make it a problem, but it is -- it would be a pointer

22  for me to do further research.

23    Q.   And part of the reason you'd want to do

24  further research is that this could be a potential

Page 131

1  effort to get around screens on or -- well, to get

2  around the potential limits on product; isn't it true?

3        MR. O'CONNOR:  Object --

4  BY MR. KAWAMOTO:

5    Q.   Isn't that one possibility?

6        MR. O'CONNOR:  Objection to form.

7    A.   I don't know that in this situation, but

8  certainly it would be something that I would be looking

9  for.

10        MR. KAWAMOTO:  So Andrew, do you want to

11  break for lunch now?

12        MR. O'CONNOR:  Sure.  Does that sound

13  good?

14        MR. KAWAMOTO:  It's 12:11.  Okay.

15        MR. O'CONNOR:  Good.

16        MR. KAWAMOTO:  So why don't we do that?

17        THE VIDEOGRAPHER:  We are going off the

18  record at 12:10 PM.

19        [A recess was taken.]

20        THE VIDEOGRAPHER:  We are back on the

21  record at 1:14 PM.

22  BY MR. KAWAMOTO:

23    Q.   So I need to put a Bates number in the

24  record.  It's for Exhibit 46, and the Bates number here

Page 132

1  is MNK-T1_2694677.  And actually, I do have two

2  follow-up questions on this.  So Mr. Gillies, I believe

3  you testified that you were aware of this analysis, but

4  you had never seen this PowerPoint or received this

5  data.  Is that accurate?

6    A.   No, I have not seen this, but -- or these

7  types of slides and stuff -- but I'm familiar with

8  similar analysis on these heat map-type things.

9    Q.   So you're familiar with the cash

10  transaction heat maps?

11    A.   No, I'm familiar with heat map -- I'm

12  familiar with heat maps.  I believe my testimony was

13  that I had seen a cash one on one occasion.  Other than

14  that, I'm not familiar with any of these slides.

15  Specifically I have not seen these slides.  Okay.

16    Q.   And the data, though, that's being

17  captured in the slide -- for example, the data relating

18  to Kentucky, the data relating to the critical spots --

19  were you -- had you been provided with that data?

20        MR. O'CONNOR:  Objection to form.

21    A.   From other things that I had done, not

22  from this presentation.

23  BY MR. KAWAMOTO:

24    Q.   And when you say from other things,

Page 133

1  though, was this from Mallinckrodt, or was this from

2  either other employment or other context?

3    A.   Mallinckrodt.

4    Q.   So in -- when you say other things from

5  Mallinckrodt, what do you mean by that?

6    A.   I mean just there's other information that

7  I would have learned while employed by Mallinckrodt

8  that Kentucky was a state that had some issues.  But I

9  had never seen these slides before, so I thought your

10  question was, were you familiar with Kentucky?  Yeah.

11        I think you asked me some other states.  I

12  don't know if it was part of this one.  And some states

13  I am familiar with, some I'm not, but -- so when I said

14  that I was familiar, I'm familiar with the heat map

15  concept.  I may have seen one cash one, but I'm not

16  familiar with any of these slides.

17        And then on Page 11 there were some other

18  states that are listed, and we went through those

19  states, and I told you some that I was familiar with

20  and others not.

21    Q.   And when you say you had not seen these

22  slides, I take it that you hadn't seen slides similar

23  to these, either?

24        MR. O'CONNOR:  Objection to form.

Page 134

1  BY MR. KAWAMOTO:
2     Q.   So it's -- in other words, I'm trying to
3  understand whether it's you haven't seen this
4  particular version but you might have seen another
5  version or you haven't seen this document or a -- one
6  similar to it at all?
7          MR. O'CONNOR:  Objection.
8     A.   That's correct.
9  BY MR. KAWAMOTO:
10    Q.   Okay.  Thank you.
11    A.   But I am familiar with the heat map
12 concept.
13    Q.   Understood.
14    A.   Okay.  I just -- thank you.
15    Q.   So do you know why this presentation was
16 prepared?
17    A.   I do not.
18    Q.   Wouldn't you have expected to receive this
19 presentation or one similar to it given the relevance
20 and importance to the anti-diversion activities?
21    A.   So --
22         MR. O'CONNOR:  Objection to form.
23    A.   I don't know the date of this, so I don't
24 whether I would have been or not, but I wasn't.

Page 135

1  BY MR. KAWAMOTO:
2     Q.   So I'd like to mark this as Exhibit -- so
3  this is going to be Exhibit 51.
4          [Exhibit Mallinckrodt-Gillies-051
5          marked for identification.]
6          MR. KAWAMOTO:  And Andrew, I have copies
7  for you as well.
8  BY MR. KAWAMOTO:
9     Q.   So this is a prior exhibit that was used
10 in the deposition of Bill Ratliff as Exhibit Number 30.
11 There's a Bates Number MNK-T1_290601.  And this is an
12 e-mail chain, and I'd like to direct your -- I'm going
13 to start from the very end e-mail on Page 290603.
14         So to provide some context, this is
15 Sunrise Wholesale, who I believe we've referenced
16 previously, and they are -- at this time they are
17 interested in becoming a new account for Mallinckrodt.
18 And so the account manager is Mr. Victor Borelli, and
19 he sends an e-mail to Brenda Rehkop and essentially
20 asking her or asking to -- indicating that this is
21 going to be a new account.  And Brenda responds,
22 Sunrise has sent in three 222 forms.
23         Do you see that e-mail?  It's at the top
24 of --

Page 136

1     A.   So this is the second --
2     Q.   The second e-mail.
3     A.   Okay.
4     Q.   Yes.  Okay.  So could you please read that
5  e-mail into the record?  It's relatively short.
6     A.   So this is from Brenda --
7     Q.   Yes.
8     A.   -- Rehkop to Victor Borelli, CCed Cathy
9  Stewart and Connie Gregory.  Tuesday, May 20th, 2008.
10 Subject is Sunrise Wholesale.  Victor, Sunrise has sent
11 in three 222 forms this week for C-II products.  They
12 are not including a PO at the 222 forms and this can
13 become confusing.  We must have a hard copy PO with the
14 NDC numbers specified.  This will eliminate any need
15 for CS to guess which product is being ordered.  Please
16 let them know and they can call me if further
17 explanation is needed.  The 222 forms total $195,000.
18 I have put the latest and largest order on hold.  It is
19 also waiting to be allocated -- that it is also waiting
20 to be allocated, in parentheses -- till I hear from
21 you.  Were you expecting Sunrise to place such a large
22 order?  And do they really want 2,520 bottles of
23 oxycodone HLC 30MG tabs USP, 100 count each?  Please
24 advise ASAP.

Page 137

1     Q.   And then turning to the bottom e-mail on
2  the first page, it's an e-mail from Rhonda Hart to
3  Brenda Rehkop, Victor Borelli, and Connie Gregory.  Do
4  you see that?
5     A.   Yes.
6     Q.   And this e-mail says that their credit
7  limit is $35,000.  If the order is $195,000, it will
8  need approval from upper management before it can be
9  released.  I do not see the order out on credit hold as
10 of yet.  It will go through the approval process once
11 it hits credit hold.  If you need anything else, please
12 let me know.
13         Did I read that correctly?
14    A.   Yes.
15    Q.   So what we have here is Sunrise is a new
16 account and their initial order is for 2,520 bottles of
17 oxy 30.  And one of the -- one -- well, Brenda Rehkop
18 has a question as to whether they really need that
19 volume of oxy, and Rhonda is noting that, I think
20 because of the size of the company and the fact that
21 it's a new customer, their credit limit is $35,000 and
22 the order is $195,000.  Is that an accurate description
23 of these e-mails thus far?
24         MR. O'CONNOR:  Objection to form.

Page 138

1    A.   Yes.  Of those two e-mails.
2    BY MR. KAWAMOTO:
3    Q.   Then the e-mail above that is from Brenda
4  Rehkop to Rhonda Hart, Victor Borelli, Connie Gregory,
5  CCing Susan Marlatt and Cathy Stewart?
6         And do you know who Rhonda Hart is?
7    A.   I do not.
8    Q.   Do you know Connie Gregory?
9    A.   I do not.
10   Q.   What about Brenda Rehkop?
11   A.   No.
12   Q.   Susan Marlatt?
13   A.   No.
14   Q.   Cathy Stewart?
15   A.   I know who she is from my preparation
16  yesterday.
17   Q.   But you never worked with Cathy?
18   A.   Correct.
19   Q.   So the e-mail from Brenda is, I have is
20  order on H3 hold and it will not be released until Bill
21  Ratliff, director of security/DEA, has approved.  At
22  that time I will notify Connie and Rhonda in credit.
23        Do you know what an H3 hold is?
24   A.   I do not.

Page 139

1    Q.   Do you know who Bill Ratliff is?
2    A.   I do.
3    Q.   Who is he?
4    A.   He was my predecessor.
5    Q.   Have you ever spoken to him?
6    A.   There was a few-day transition when I came
7  on board and Bill was leaving the company.
8    Q.   So Cathy Stewart then writes an e-mail
9  above, to further muddy the waters, see Rhonda Hart's
10  comment below.  And then Bill writes at the top -- his
11  e-mail is to Karen Harper, who you work with; correct?
12   A.   Correct.
13   Q.   Says, Karen, seems to be a lot of product
14  for the first order, especially in light of new
15  customer status and credit limit.  Do you know if they
16  completed the D & B?
17        My understanding is that -- well, D & B is
18  a reference to Dun & Bradstreet; is that fair?
19   A.   That's my understanding.
20   Q.   What would the Dun & Bradstreet report
21  tell you about this new customer?  Why run a Dun &
22  Bradstreet report?
23        MR. O'CONNOR:  Objection to form.
24   A.   So as part of our new customer, we would

Page 140

1  run the credit report through D & B.
2  BY MR. KAWAMOTO:
3    Q.   And the credit report simply tells you
4  about the creditworthiness of the business, does it
5  not?
6    A.   Yes.
7    Q.   So what relevance or what importance does
8  that have with respect to concerns about the size of
9  the order or the risk of diversion?
10        MR. O'CONNOR:  Objection to form.
11   A.   So I don't know what else is contained
12  here.  I mean, I agree with the words that you read,
13  but the Dun & Bradstreet credit is one of the steps in
14  the process that we do for new customers.
15  BY MR. KAWAMOTO:
16   Q.   But it's fair to say that as -- based on
17  this e-mail chain, there are concerns being expressed
18  by both Mr. Ratliff and Ms. Rehkop regarding the size
19  of the order; is that fair?
20        MR. O'CONNOR:  Objection to form.
21   A.   They're highlighting that, yes.
22  BY MR. KAWAMOTO:
23   Q.   So I'd now like to hand you Gillies
24  Exhibit 52.

Page 141

1        [Exhibit Mallinckrodt-Gillies-052
2        marked for identification.]
3    Q.   This is another exhibit from the Ratliff
4  deposition.  It's Ratliff Exhibit 31.  And this is
5  another e-mail chain, some of which I think was
6  captured in the previous e-mail chain, but I wanted to
7  note for you the very top e-mail from Karen Harper to
8  Bill Ratliff.  Do you see that?
9    A.   On Page 1?
10   Q.   On Page 1?
11   A.   Yes.
12   Q.   Okay.  So Karen writes to Bill, I have
13  placed a call to Sue Marlatt, a credit manager who is
14  also working on our suspicious order monitoring team,
15  to ask her for a better interpretation of the Dun &
16  Bradstreet and gave her my cell number.  Rhonda has
17  been dealing with this account and reports to Sue.
18        Rhonda indicated that their D & B results
19  show an extremely small company.  Sunrise has a
20  two-screen informational webpage and a contact-us
21  e-mail screen.  E-mail address is @yahoo.com, so it
22  doesn't look like a very big company there either.
23  Webpage says established in 2003, so that would be five
24  years ago.

Page 142

1    So does this information tell you -- well,
2 does this information alleviate any concerns that one
3 might have regarding the size of their initial order?
4        MR. O'CONNOR:  Objection to form.
5    A.   So I don't know if this alleviated any of
6 their concerns.
7 BY MR. KAWAMOTO:
8    Q.   But you would agree that the information
9 that has come into Mallinckrodt thus far -- well,
10 strike that.  So the current situation, though, is that
11 you have a new customer, Sunrise, that is increase --
12 that is ordering what has been indicated or identified
13 as a large order.  This company has -- is an extremely
14 small company with a two-screen informational webpage
15 and a yahoo.com e-mail address.  Is that fair?
16        MR. O'CONNOR:  Objection to form.
17    A.   That's what contained in this e-mail.
18 BY MR. KAWAMOTO:
19    Q.   So I'd like to provide you with Gillies
20 Exhibit 53.
21        [Exhibit Mallinckrodt-Gillies-053
22        marked for identification.]
23    Q.   This is another Ratliff exhibit.  This is
24 Ratliff Exhibit 32 and it bears a Bates number

Page 143

1 MNK-T1_290580.  So this e-mail chain indicates the
2 results of the Dun & Bradstreet report.  And then do
3 you see the e-mail from Mr. Ratliff to Karen Harper in
4 the middle of the page?
5    A.   Which page?
6    Q.   The middle of the very first page.
7    A.   Oh.
8    Q.   290580.
9    A.   Okay.
10    Q.   He says, this should be your decision
11 based on the credit checks.  If they are qualified,
12 Karen and I don't need to make the decision.  This will
13 become easier as we go.  Have a good weekend.
14        And Cathy's e-mail above that is, I
15 interpret Bill's response as we have to wait for Karen
16 to authorize.
17        And this is Bill's response at the top.
18 Sorry for not being more clear.  This is a new customer
19 that has clear credit references.  The salesman has not
20 raised any issues of substance; therefore, this should
21 be approved in the normal course of business, not by
22 Karen or me.  If I have missed something please let me
23 know.
24        Do you see that?

Page 144

1    A.   Yes.
2    Q.   So based on these three e-mails, you have
3 a new customer, Sunrise, that is ordering a large
4 amount of oxy 30 that we've discussed as a product of
5 heightened interest or heightened concern for DEA.  It
6 is a very small company.  It's got a $35,000 credit
7 limit and they're ordering $195,000.  It's got a
8 Yahoo -- @yahoo.com e-mail address.  It's got two web
9 screens, and it was started five years ago.  Given this
10 information, wouldn't you have concerns about shipping
11 2,520 bottles of oxy to this company?
12        MR. O'CONNOR:  Objection to form.
13    A.   So I wasn't involved in this.  Through the
14 e-mails that you read, which were not all the e-mails
15 on these pages, I don't know what other due diligence
16 they did that came up with the conclusion that Bill
17 said that this isn't for Karen or I, so you guys are
18 good to make the decision.
19        Again, I don't know what I don't know or
20 what they do know, so I'll stick with the consistent
21 theme.  I would want to know what other information
22 they may have gathered to come up with the decision
23 they made on this new customer.
24 BY MR. KAWAMOTO:

Page 145

1    Q.   And the additional information that you
2 would have wanted to see gathered -- well, strike that.
3 What is the additional information that you think would
4 have been helpful for you in terms of evaluating this
5 decision?
6    A.   Yeah, I would want to know what other due
7 diligence they had undertaken and what the decisions
8 they were making as to the credit limits and such.
9    Q.   Do you think it would have been important
10 to understand who Sunrise's customers were?
11        MR. O'CONNOR:  Objection to form.
12    A.   No.  For us it would be more important to
13 know who Sunrise was because that's our customer.
14 BY MR. KAWAMOTO:
15    Q.   Well, but, sir, if Sunrise is primarily
16 supplying oxy to pain clinics, would that be relevant
17 information?
18        MR. O'CONNOR:  Objection to form.
19    A.   It could be.
20 BY MR. KAWAMOTO:
21    Q.   If the primary product or if the only
22 product Sunrise is ordering from Mallinckrodt is oxy,
23 wouldn't that be relevant information?
24        MR. O'CONNOR:  Objection to form.

Page 146

1    A.   It's certainly information to consider,
2    but --
3    BY MR. KAWAMOTO:
4    Q.   Well -- I'm sorry.  Go ahead.
5    A.   Yeah.  What other products are they
6    ordering?  What other products?  Do they have any other
7    manufacturers that they're getting products from?  I
8    mean, as a new customer, go through and do the due
9    diligence.
10        I'm sure we verified that they had a valid
11   DEA registration.  They're doing the D & B credit
12   report.  So those are some of the pieces of information
13   that they're making their decision on.
14        And in this case, I don't know what other
15   information came to any of these parties that worked
16   for Mallinckrodt that made them comfortable to ship the
17   product because the record's unclear -- right -- which
18   is why it's tough for me to speculate on this.
19        So the record's unclear what other
20   information they came up with that led them to release
21   the order, but I'm sure there was something because
22   they were raising concerns and they were doing their
23   due diligence, and this is what I would have expected
24   from them.  Unfortunately, as in some of the other

Page 147

1    cases, I don't have the complete picture.  So --
2    Q.   Well, you -- oh, I'm sorry.
3    A.   Based on the e-mails you read, I would
4    want some additional information.  Might be information
5    that they obtained --
6    Q.   But you would --
7    A.   -- to make that decision.
8    Q.   But you would expect them to gather
9    additional information than what's in this -- the
10   record of these three e-mails; is that fair?
11   A.   I would expect that there would be
12   additional information that's not contained in these
13   e-mails that led them to make the decision to release
14   this order.  I'm sorry.  Did I answer your question,
15   or --
16   Q.   Yeah.
17   A.   Okay.
18   Q.   And so for the top e-mail where Bill
19   Ratliff says, sorry for not being more clear, this is a
20   new customer that has clear credit references, and the
21   salesman has not raised any issues of substance;
22   therefore, this should be approved in the normal course
23   of business, not by Karen or me.
24        If the only thing he is going on, given

Page 148

1    the size of the order and the nature of the order, is
2    that it's -- there are clear credit references and the
3    salesman hasn't raised any issues of substance, that
4    would not be adequate due diligence in your view?
5        MR. O'CONNOR:  Objection to form.
6    A.   Well, again, I don't know what other,
7    so -- I speculated a few minutes ago that they would
8    have verified that there was a valid DEA registration
9    in addition to doing the D & B.
10        And so again, I can't as I sit here now
11   look at these e-mails and tell you what other due
12   diligence steps they took, but I am comfortable saying
13   that they were comfortable that there was no issue at
14   the time they set up this account to release that
15   order.
16   BY MR. KAWAMOTO:
17   Q.   Well, they were clearly comfortable
18   because they released the order, but with respect to
19   the additional due diligence, the state of the record
20   is they may have done more due diligence or they may or
21   may not have; is that fair?
22   A.   Yeah, the record is unclear to that.
23   Yeah.
24   Q.   Now, Bill's e-mail says the salesman has

Page 149

1    not raised any issues of substance.  In your opinion,
2    is it appropriate to rely on the salesmen to determine
3    whether or not an order is appropriate to ship?
4        MR. O'CONNOR:  Objection to form.
5    A.   So the salesmen are trained -- take a step
6    back.  The salespersons are trained to assist DEA
7    compliance who provides them training on things to look
8    for for them to be suspicious about as they're looking
9    at new customers.  So I guess the answer to your
10   question is not usual that they would get some feedback
11   from a salesperson.
12   BY MR. KAWAMOTO:
13   Q.   But that feedback -- well, strike that.
14   The fact that the salesman is comfortable shipping the
15   order doesn't end the inquiry, though; correct?  It
16   is -- that's not an adequate basis -- namely, the
17   salesman thinks it's okay, so we're going to ship?  You
18   still need to conduct your due diligence or compliance
19   to satisfy itself that this order is appropriate; is
20   that correct?
21        MR. O'CONNOR:  Objection to form.
22   A.   So we know from this that they did some of
23   the due diligence, but the record's unclear to what
24   extent there was other due diligence that was conducted

Page 150

1 in opening up this new customer.

2 BY MR. KAWAMOTO:

3    Q.   And if they elected not to conduct that

4 other due diligence because they were just going to

5 rely on the salesman, that would be improper?

6        MR. O'CONNOR:  Objection to form.

7    A.   So that's a hypothetical.  They didn't

8 just rely on the salesperson.  I mean, they ran the

9 credit report, and I would have to speculate on whether

10 they did some of the other steps.

11       So I'm not going to address the

12 hypothetical because I don't know what the additional

13 information or due diligence that they did because the

14 records are unclear, but from the wording in this

15 e-mail, Bill had no objections to releasing it.  So --

16 BY MR. KAWAMOTO:

17   Q.   Well, but if all he's going on is a clear

18 credit reference and the salesman hasn't raised any

19 issues of substance, that doesn't -- that wouldn't

20 provide all of the additional information that is

21 needed to make a thorough evaluation decision; is that

22 fair?

23       MR. O'CONNOR:  Objection --

24 BY MR. KAWAMOTO:

Page 151

1    Q.   There is additional information that may

2 or may not have been gathered because the record is

3 unclear on that, but there is additional information

4 that you at least would have wanted in making this

5 decision?

6        MR. O'CONNOR:  Objection to form.  Asked

7 and answered.

8    A.   Because the record's unclear what other

9 steps, I would want some additional information.

10 BY MR. KAWAMOTO:

11   Q.   So this is now going to be Gillies Exhibit

12 54.

13       [Exhibit Mallinckrodt-Gillies-054

14       marked for identification.]

15   A.   Do you want me to read this, or --

16   Q.   Well, so I'm just --

17   A.   Oh, okay.

18   Q.   My question relates to the very top e-mail

19 from Cathy Stewart to Mr. Ratliff and Ms. Harper that

20 says, FYI, the customer service reps all state --

21       [Interruption by the reporter.]

22   Q.   FYI, the customer service reps all state

23 that Victor will tell them anything they want to hear

24 just so he can get the sale.  Do you see that?

Page 152

1    A.   I see that.

2    Q.   And Victor is the account manager for this

3 Sunrise account.  Do you understand that?

4        MR. O'CONNOR:  Objection to form.

5    A.   I'm sorry.  I don't know what Victor's

6 role is on this.

7 BY MR. KAWAMOTO:

8    Q.   Well, have you -- I'm sorry.

9    A.   Yeah.

10   Q.   If you look at the back page of this

11 document --

12   A.   Okay.

13   Q.    -- the very last e-mail.

14   A.   Okay.

15   Q.   This is the e-mail from Victor Borelli to

16 Brenda.

17   A.   Okay.

18   Q.   So he's the account manager for this new

19 account.

20   A.   Okay.

21   Q.   Do you see that?

22   A.   Let me read it real quick.

23   Q.   Sure.

24   A.   So he's -- so his e-mail says he's a

Page 153

1 national account manager, and he's asking Brenda who's

2 going to be the customer service manager for this new

3 account?

4    Q.   Yes.

5    A.   Is that --- I understand --

6    Q.   Yeah.

7    A.   Okay.  Okay.

8    Q.   Victor Borelli is a national account

9 manager, so he is one of the people that will be --

10 that will be the interface between Mallinckrodt and the

11 customers -- in this case, Sunrise Wholesale.

12   A.   Okay.

13   Q.   And the very top e-mail is a reference to

14 Victor.

15   A.   Okay.

16   Q.   And Cathy Stewart, who is in the

17 customer -- I believe in the customer service

18 department -- is telling Bill and Karen, FYI, the

19 customer service reps all state that Victor, who is the

20 national account manager for Sunrise, will tell them

21 anything they want to hear just so he can get the sale?

22       MR. O'CONNOR:  Objection to form.

23   A.   That's what it says here.

24 BY MR. KAWAMOTO:

Highly Confidential - Subject to Further Confidentiality Review

| Page 154 |
|---|

1     Q.   So you have the national account manager

2  and one of the people presumably that Mr. Ratliff and

3  Mr. Harper are relying on and they're being told that

4  he will say anything he wants just to get the sale.  In

5  light of that, don't you feel -- I mean, shouldn't some

6  additional due diligence have been done into this

7  customer given the concerns raised about Victor?

8          MR. O'CONNOR:  Objection to form.

9     A.   So I don't know what other due diligence

10 was done in this matter, so I would tell you I would

11 want additional information.

12 BY MR. KAWAMOTO:

13    Q.   And would you agree that it is a cause for

14 concern when you have a national account manager that

15 is willing to say anything just so he can get the sale

16 of a controlled substance?

17         MR. O'CONNOR:  Objection.  Form.

18    A.   I don't even know what that references or

19 what they're meaning by saying will tell them anything.

20 I'm a little unclear on who them is and then what the

21 anything would be, which is why I'd have some follow-up

22 questions.

23 BY MR. KAWAMOTO:

24    Q.   Well, but I mean, isn't this e-mail

| Page 155 |
|---|

1  indicating that Victor's information is not necessarily

2  reliable and he's going to say what he needs to say so

3  he can get the sale through, and in this case the sale

4  is oxy 30?

5          MR. O'CONNOR:  Objection to form.

6     A.   Okay.  I don't know that.  So I see what's

7  here and I would ask additional questions to answer the

8  questions that I have as I read this now.

9  BY MR. KAWAMOTO:

10    Q.   And what are those questions?

11    A.   As I stated, I want to know who them is.

12 I want to know what anything is and what that means.

13 And then depending on what the answer to those

14 questions are, I may have additional questions based on

15 that.

16         But once again, the record is unclear,

17 but -- and your question -- I can't say that because I

18 don't know what other due diligence they did that made

19 them comfortable with releasing the order to this new

20 customer.

21    Q.   But you would not have just ignored the

22 e-mail, would you?

23         MR. O'CONNOR:  Objection to form.

24    A.   I would not have.

| Page 156 |
|---|

1  BY MR. KAWAMOTO:

2     Q.   So this is Gillies Exhibit 55.

3          [Exhibit Mallinckrodt-Gillies-055

4          marked for identification.]

5     A.   Okay.

6     Q.   And why don't you take a minute to review

7  the e-mail, sir?  It's not that long.

8     A.   Okay.

9     Q.   I'm happy to put it on the overhead if

10 that's --

11    A.   I think the glasses will work.

12    Q.   Yeah.

13    A.   This is just a little bigger, so -- thank

14 you.  Okay.

15    Q.   So this is an e-mail and it's dated

16 November 14th, 2008, so it is, I think, seven months

17 after the previous e-mails that we saw relating to

18 Sunrise.  This is an e-mail regarding Sunrise and it's

19 indicating that, beginning in January, Sunrise is going

20 to increase its monthly sale or its monthly demand for

21 oxy 30 from 2,500 or 2,520 bottles to 12,000 bottles

22 and is going to add to that 3,000 bottles of oxy 15.

23 Do you see that?

24    A.   I didn't see the increase part in here, so

| Page 157 |
|---|

1  I think I got lost.

2     Q.   Sure.  Well, if you look at Exhibit -- I

3  believe it's --

4     A.   Okay.  So it's not in this e-mail.

5     Q.   It's not in this e-mail?

6     A.   It's from a different e-mail.

7     Q.   Yes.

8     A.   Okay.

9     Q.   The prior exhibits we looked at.

10    A.   All right.  I thought you were reading

11 from here and I had missed that, so I couldn't find it.

12    Q.   Fair enough.

13    A.   So it's not in this e-mail?

14    Q.   Yes.

15    A.   Okay.  I just wanted to make sure I'm on

16 the same page with you.  Okay.  I'm sorry.  Could you

17 repeat your question?

18    Q.   Sure.  So do you recall that the prior

19 exhibits that you reviewed, the initial order from

20 Sunrise was 2,520 bottles of oxy 30?  Do you recall

21 that?

22    A.   Yes.

23    Q.   So in this new e-mail and those prior

24 e-mails were all from May of -- June of 2008.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    A.  Okay.

2    Q.  This new e-mail, which is from November of

3 2008, indicates that in January of 2009, Sunrise's

4 orders are going to increase from 2,520 bottles to

5 12,000 bottles and then from -- and they're going to

6 add 3,000 bottles of oxy 15.  Do you see that?

7    A.  I see that.

8    Q.  So these are significant increases in

9 their ordering or their --

10      MR. O'CONNOR:  Objection.

11 BY MR. KAWAMOTO:

12    Q.  Well, strike that.  You would agree that

13 these are significant increases in their orders?

14      MR. O'CONNOR:  Objection to form.

15    A.  So in the text part of this e-mail on

16 November 14th, it says that their sales have been

17 increasing each month, so I'm not comfortable going

18 with the leap from May or June time frame where there

19 were 2,520 bottles to say that the next jump would be

20 12,000.

21      What I have missing here is whether their

22 sales -- the number of bottles they were receiving had

23 increased in the previous six months.  So I see that

24 when they started they had 2,000 and in January they'll

Page 159

1 have 12,000, but I'm missing information on what those

2 intervening months might look like.

3 BY MR. KAWAMOTO:

4    Q.  Fair enough.

5    A.  Just to be fair.  Okay.  Okay.

6    Q.  So -- sure.  So it starts at 2,520, in

7 January it's going to be 12,000, but you don't know the

8 rate of increase, so --

9    A.  That's right.  So that's their projection

10 in January and then here they said that the sales have

11 been increasing, so I don't know what those intervening

12 months look like.

13    Q.  But nevertheless, the volume that they are

14 now ordering in January of 12,000 bottles of oxy 30 is

15 a significant quantity, isn't it, sir?

16      MR. O'CONNOR:  Objection.

17    A.  Again, I don't know that without knowing

18 the growth of the business, and so I'm missing that

19 piece to answer your question, so I don't know that it

20 is depending on the growth of this business.

21 BY MR. KAWAMOTO:

22    Q.  Well, but to increase from 2,520 to 12,000

23 over the course of nine months -- I mean, I understand

24 that you don't know what the rate of increase was and

Page 160

1 whether it was a smooth increase or whether it was a --

2 there were ups and downs, but nevertheless, when you

3 look at the two end points and the time period, that is

4 still a significant increase, is it not?

5      MR. O'CONNOR:  Objection to form.

6    A.  If everything else remained the same, but

7 it said they had brought on new customers, new

8 contracts, and so their business was growing -- so --

9 BY MR. KAWAMOTO:

10    Q.  And to be clear, the person telling them

11 this is Victor Borelli, who was the subject of the

12 prior e-mail raising issues at least from Cathy Stewart

13 as to whether he was willing language to say anything

14 to get a sale?

15      MR. O'CONNOR:  Objection.

16 BY MR. KAWAMOTO:

17    Q.  Do you recall that?

18      MR. O'CONNOR:  Objection to form.

19    A.  I do, and I don't know what Bill and Karen

20 did to resolve the issue on that one.  I told you that

21 I would have wanted more information.  I don't know

22 whether they asked and got more information.

23      And here, once again, I'm asking for more

24 information because I do know from what's in there that

Page 161

1 there's new customers, contacts -- contacts.  I may

2 have said contracts earlier.  I'm sorry.  New

3 customers, contacts, et cetera.

4      So I would want to know what that all

5 looks like, and I can't say that that's a significant

6 increase because I don't know whether it is or it isn't

7 if their business tripled or quadrupled in that

8 six-month period.

9 BY MR. KAWAMOTO:

10    Q.  But you would have taken additional

11 steps -- or strike that.  You would have gathered

12 additional information regarding this increase;

13 correct?

14    A.  I would have asked additional questions,

15 yes.

16    Q.  And you would have attempted to verify

17 some of the information in Mr. Borelli's e-mail, would

18 you not?

19      MR. O'CONNOR:  Objection to form.

20    A.  Yes.

21 BY MR. KAWAMOTO:

22    Q.  So this is now going to be Gillies Exhibit

23 56.

24      [Exhibit Mallinckrodt-Gillies-056

Page 162

1    marked for identification.]
2    Q.    So this is another prior exhibit. It's
3 Mallinckrodt Ratliff Number 35. Bates number is
4 MNK-T1_307203. And I'd like to direct your attention
5 to the second-to-last page, which is 307206.
6    A.    I'm sorry. Do you want me to read that
7 entire page, or --
8    Q.    Oh, no. Just -- I mean -- why don't you
9 review the e-mails to familiarize yourself with the
10 content?
11    A.    Okay. Do you want me to keep going or
12 just stick to this page?
13    Q.    Well, why don't you also review the page
14 in front of it? So 307205.
15    A.    Okay. Okay.
16    Q.    So the very initial e-mail on page Bates
17 Number 307207 is an e-mail from Pete Kleissle to Bill
18 Ratliff and Karen Harper. Based on your work at
19 Mallinckrodt, do you know who Pete Kleissle is?
20    A.    He's with the DEA in St. Louis.
21    Q.    And do you meet or talk to Mr. Kleissle in
22 your current position?
23    A.    I do not.
24    Q.    Have you ever communicated with him on

Page 163

1 behalf of Mallinckrodt?
2    A.    I do not believe he's in the St. Louis
3 office any longer and I have no recollection of ever
4 meeting with him.
5    Q.    So his -- I want to direct your attention
6 to the e-mail in the middle of the page on 307206.
7    A.    Yes.
8    Q.    And can you read that e-mail into the
9 record? It starts with the DEA diversion group.
10    A.    Yes. So this is from Bill Ratliff to John
11 Adams, Karen Harper, and Victor Borelli, Pete Kleissle,
12 oxy investigation. The DEA diversion group supervisor
13 recommended that we audit Sunrise as soon as possible.
14 Please let me know the best way to accomplish this.
15 Please give me a call to discuss.
16    Q.    While working at Mallinckrodt, have you
17 ever received a call from the DEA telling you to audit
18 a customer?
19    A.    No.
20    Q.    So this is a fairly unusual occurrence, is
21 it not?
22         MR. O'CONNOR: Objection to form.
23    A.    Back then I don't know whether it was an
24 unusual, but I haven't received any call during my time

Page 164

1 at Mallinckrodt.
2 BY MR. KAWAMOTO:
3    Q.    And your time, I mean, spans seven years?
4 It's from 2012 to 2019; correct, sir?
5    A.    Yes, two thousand -- June 2002 to the
6 present.
7    Q.    And I take it had you received a call like
8 that, that would be a cause of concern, would it not?
9         MR. O'CONNOR: Objection to form.
10    A.    I would have spoken -- I would have --
11 speaken -- I would have spoken to Pete Kleissle and
12 asked what his concerns were, and if he's telling me
13 that I should audit Sunrise, I would have audited
14 Sunrise.
15 BY MR. KAWAMOTO:
16    Q.    And that audit would have been a
17 relatively thorough one; correct?
18         MR. O'CONNOR: Objection to form.
19 BY MR. KAWAMOTO:
20    Q.    Well, strike that. That audit would have
21 been a thorough one; correct?
22         MR. O'CONNOR: Objection to form.
23    A.    My audit would have been thorough.
24 BY MR. KAWAMOTO:

Page 165

1    Q.    Then if you turn -- then turn to the next
2 page of 307205. Do you see the middle e-mail from
3 Karen Harper to Bill Ratliff?
4    A.    Yes.
5    Q.    And the subject of that is Pete Kleissle
6 oxy investigation. Do you see that?
7    A.    Correct.
8    Q.    Could you read into the record Karen's
9 e-mail? It's not very long.
10    A.    Bill, I know that we don't want to make
11 this audit -- in quotes -- "a cast of thousands" --
12 close quotes -- dot dot dot -- and assume the scope of
13 audit review will be at a fairly high security and
14 compliance level. Question mark. I don't know
15 anything about the chargeback system -- dot dot dot --
16 which is how we detected which physician --
17 physicians/pain clinics are receiving our product
18 through Sunrise.
19    Q.    Do you know what she means when she says
20 that the audit will be at a high security and com --
21 will be at a fairly high security and compliance level?
22    A.    I do not.
23    Q.    Do you know what type -- well, do you know
24 what types of audits Mallinckrodt conducted of its

Page 166

1 customers during this time period?
2    A.   I do not.
3    Q.   Would you agree that it is concerning that
4 physicians and pain clinics are receiving Mallinckrodt
5 products through Sunrise in its distributor capacity?
6         MR. O'CONNOR:  Objection to form.
7    A.   Again, I don't know what's going on to let
8 you know whether I had -- I would have had a concern,
9 outside of what I previously testified to.
10 BY MR. KAWAMOTO:
11    Q.   Well, as part of the audit of Sunrise,
12 would you have inquired into who Sunrise's customers
13 were, given the call you just received from the DEA?
14    A.   So somewhat of what I want to answer here
15 I learned from my prep yesterday, and in Karen's e-mail
16 it says she doesn't know anything about the chargeback
17 system, but that's what they used to identify
18 physicians and pain clinics receiving products, so it
19 appears that they did look or at least have the -- some
20 of the customers of Sunrise.
21    Q.   Well, I --
22    A.   Was that your question?
23    Q.   Let me rephrase the question, then.
24    A.   Okay.

Page 167

1    Q.   As part of the audit -- well, strike that.
2 I understand from this e-mail that it appears that they
3 have some information about Sunrise's customers, which
4 are physicians and pain clinics, or some of them are
5 physicians and pain clinics.
6         My question is, as part of this audit,
7 wouldn't you have wanted to know and wouldn't you have
8 wanted to gather information regarding how Sunrise was
9 vetting its customers and what Sunrise was doing to
10 ensure that these physicians and pain clinics were
11 legitimate -- essentially legitimate parts of the
12 supply chain as opposed to being pill mills?
13         MR. O'CONNOR:  Objection to form.
14    A.   So in this audit I don't know what they
15 did.  If I were to audit, I would ask that question.
16 BY MR. KAWAMOTO:
17    Q.   So this is Gillies Exhibit 57.
18         [Exhibit Mallinckrodt-Gillies-057
19         marked for identification.]
20    Q.   So this is a cover e-mail and an
21 attachment.  So this is a cover e-mail that's from a
22 prior deposition.  It's Mr. Ratliff's deposition.  It's
23 Exhibit 38.  The Bates number is MNK-T1_290041, and
24 it's an e-mail and an attachment.

Page 168

1         The -- well, do you know what this
2 document is, sir?
3    A.   I do not.
4    Q.   The cover e-mail indicates that this
5 is -- or the subject matter -- or the subject line
6 indicates that this is a Sunrise chargeback summary.
7         Do you see that, sir?
8    A.   Yes.
9    Q.   And then if you look at the attachment, it
10 appears to be a list of -- I think you --
11    A.   Any chance you can blow that up for me?
12    Q.   Oh, yeah.  Sorry.  Sorry.
13    A.   I can't read it.
14    Q.   Understood.  So why don't we go -- let's
15 see.  Hold on.  Do you see that?
16    A.   Yes.
17    Q.   Okay.  So these are -- I believe you refer
18 to them as indirect registrants.  Is that fair?
19         MR. O'CONNOR:  Objection to form.
20    A.   These are downstream registrants?
21 BY MR. KAWAMOTO:
22    Q.   I'm sorry.  Downstream registrants.
23    A.   Okay.  Okay.
24    Q.   Okay.  And then do you see the number of

Page 169

1 orders?
2    A.   Yes.
3    Q.   And do you see the total quantity in
4 equivalent API?
5    A.   Yes.
6    Q.   And do you know what that -- what is API?
7    A.   The -- I forget what the A stands for.
8 So --
9    Q.   Is it active pharmaceutical --
10    A.   Active pharmaceutical.  Yeah.
11    Q.   And so that is -- I take it that is a
12 common measure in terms of volume of product?
13         MR. O'CONNOR:  Objection to form.
14    A.   So that is what our St. Louis bulk
15 manufacturing -- they deal in the API and Hobart deals
16 in the procurement tablet, so when I see API I think of
17 our St. Louis facility and -- for that volume weight.
18 BY MR. KAWAMOTO:
19    Q.   And then if you look at Ms. Stewart's
20 cover e-mail, do you see the bottom paragraph?
21    A.   Yes.
22    Q.   So the lowest quantity ordered in
23 milligrams of oxy is 5,400 and the highest is
24 equivalent to 12.6 kilograms of oxy.  Okay.

Page 170

1      And then do you see the very top e-mail?
2 It says here's the other file. The doctor in question
3 is in Column CX.
4    A.  I'm sorry. Where are you now?
5    Q.  I'm sorry. The very top e-mail.
6    A.  Okay. There you go. Okay. Okay.
7    Q.  So when you turn to Column CX -- I'll put
8 this up. So for the record, the blue markings are
9 mine.
10    A.  Okay.
11    Q.  But the highlighting is in the document.
12    A.  Okay.
13    Q.  Okay? So do you see the highlighting at
14 CX? And that's Dr. Schultz.
15    A.  Okay.
16    Q.  Do you recall Mr. Schultz from our
17 previous discussions?
18    A.  Yes.
19    Q.  And he's currently in prison; correct?
20    A.  Yes.
21    Q.  That's your understanding? And his volume
22 is 612,000 API. Do you see that?
23    A.  Can you move over to Line 3? Just --
24    Q.  Sure.

Page 171

1    A.  Oh, there is nothing on Line 3. Okay.
2 So --
3    Q.  But if you turn back to the very
4 beginning -- flip back to that. The beginning of the
5 spreadsheet. You can see the --
6    A.  Okay. Yeah. Thank you.
7    Q.  -- total quantity in API.
8    A.  Yeah. Yeah.
9    Q.  So as part of your audit, one of the
10 individuals that they were focusing on or that you
11 would have focused on would have been Dr. Schultz? Is
12 that accurate?
13      MR. O'CONNOR: Objection to form.
14    A.  So I believe they already focused in on
15 Dr. Schultz from the law enforcement request.
16 BY MR. KAWAMOTO:
17    Q.  Now, do you see Column DB that I've
18 circled?
19    A.  Yes.
20    Q.  Do you see the volume for Dr. Smith?
21    A.  Yes.
22    Q.  So that's going to be 3,974,000 API. Do
23 you see that?
24    A.  I see that.

Page 172

1    Q.  Isn't that someone else you would have
2 focused on due to his volume?
3      MR. O'CONNOR: Objection to form.
4    A.  So I don't know who they focused on. Just
5 like in the other e-mails, I don't know all the work
6 that they did in due diligence, but if compared to Dr.
7 Schultz, I would have asked some questions about that
8 customer of Sunrise.
9 BY MR. KAWAMOTO:
10    Q.  And do you see Column CS?
11    A.  I do.
12    Q.  And that's Dr. Rodriguez -- I'm going
13 to -- I apologize for the mispronunciation.
14    A.  That's fine. I know which one you're
15 referring to.
16    Q.  Iznaga?
17    A.  Yes.
18    Q.  And do you see that volume?
19    A.  Yes.
20    Q.  It's 8,487,000.
21    A.  Yes.
22    Q.  Would you have focused or would you have
23 asked questions about that doctor?
24      MR. O'CONNOR: Objection to form.

Page 173

1    A.  Yeah. So I don't know whether they did or
2 not, but I would. 
3 BY MR. KAWAMOTO:
4    Q.  And CT one -- or Column -- I'm sorry --
5 Column CT is Dr. Rabinsky. He's at 2.6 million. Would
6 you have asked questions about him?
7    A.  Again, I don't know whether they did, but
8 I would.
9    Q.  One over, Column CU is Dr. Rincon. He's
10 at 3.6 million. Would you have asked questions about
11 Dr. Rincon?
12    A.  I don't know whether they did, but I
13 would.
14    Q.  Dr. Shook, who is right next to Dr.
15 Schultz, Column CW, is at 12.59 million. Would you
16 have asked questions about Dr. Shook?
17    A.  So I don't know what they did, but I would
18 ask a question.
19    Q.  And what questions would you have asked
20 about Dr. Shook?
21    A.  So if these are downstream registrants, I
22 would have asked questions about these customers'
23 product, what Sunrise knew about their -- I would have
24 asked questions to see what Sunrise knew about these

Page 174

1  customers.  I would have wanted to see what's in their
2  due diligence files if they were willing to share it
3  with me.
4      Q.   And if they weren't willing to share it
5  with you, wouldn't that have raised concerns in terms
6  of supplying Sunrise with product?
7      MR. O'CONNOR:  Objection to form.
8      A.   Yeah, I mean, we're getting into
9  hypotheticals here.  Everything -- I would need to know
10  more information so the reason that -- again, I don't
11  know what Bill and the audit team did, but I know that
12  I would want to ask more information to figure out
13  what's going on here.
14  BY MR. KAWAMOTO:
15      MR. KAWAMOTO:  So why don't we take a
16  quick five-minute break?
17      MR. O'CONNOR:  Sure.
18      THE VIDEOGRAPHER:  We are going off the
19  record at 2:16 PM.
20      [A brief recess was taken.]
21      THE VIDEOGRAPHER:  We are back on the
22  record at 2:30 PM.
23  BY MR. KAWAMOTO:
24      Q.   Okay.  Mr. Gillies, I'd like to hand you

Page 175

1  Exhibit 58.  Here we go.
2      [Exhibit Mallinckrodt-Gillies-058
3      marked for identification.]
4      Q.   So this is a PowerPoint Bates-numbered
5  MNK-T1_463862, and the title is controlled substances
6  quota and suspicious order monitoring overview.  Mr.
7  Gillies, are you familiar with this PowerPoint?
8      A.   No.
9      Q.   Are you familiar with the quota system and
10  Mallinckrodt's, I guess, application process for that
11  system?
12      A.   I reviewed it for my testimony yesterday.
13      Q.   So if you turn to Page 5.  If you could
14  review that slide for me.
15      A.   Okay.
16      Q.   And is this an accurate description of the
17  current system in place at Mallinckrodt regarding
18  quotas?
19      A.   To the best of my understanding.
20      Q.   And then if you turn the page for the
21  manufacturing quota details.  And -- well, actually, I
22  mean, it may speed things up to -- my questions on this
23  PowerPoint relate to Slides 5, 6, 7, 8 -- I mean, up to
24  Page 12.

Page 176

1      And the question is, based on your
2  understanding, is this an accurate description and
3  depiction of the quota system?
4      MR. O'CONNOR:  Objection.
5  BY MR. KAWAMOTO:
6      Q.   And so rather -- I mean, I think rather
7  than go through and ask you sort of line-by-line -- to
8  the degree this is not an accurate description of the
9  quota system, could you please identify for me the
10  statements that you believe are inaccurate?
11      A.   Okay.  As I continue reading this --
12      Q.   Sure.
13      A.   Is 9 applicable?  Because I'm struggling
14  just to see the names in there and stuff, so --
15      Q.   No.
16      A.   Okay.
17      Q.   I mean, that's just a DEA org chart in
18  2011.
19      A.   Okay.
20      Q.   So I suspect it may have changed.
21      A.   All right.  I'm sorry.  What was the end
22  page again?
23      Q.   Page 12.
24      A.   Yeah.  Okay.

Page 177

1      Q.   So have you had a chance to review those
2  slide on Pages 5 through 12?
3      A.   Yes.
4      Q.   So with the exception of Page 9, which is
5  the org chart, did you identify any statements or
6  sections that you believe are inaccurate?
7      A.   So 9 and 11 were the org charts that --
8      Q.   Okay.  Sure 9, 11.  No problem.
9      A.   But the rest of it, from my understanding,
10  appears accurate.
11      Q.   And then if you could turn to Chart
12  thir -- or Slide 13.  Directing your attention to the
13  quantity requested, you'll see that oxycodone is the
14  highest quantity requested at 16,400, followed by
15  hydrocodone at 15,700, and then methadone at 9,345.  Do
16  you see that, sir?
17      A.   And the hydrocodone 15,700?
18      Q.   Yes.
19      A.   Okay.  I may have misunderstood.  Okay.
20  So I see the oxy, the hydrocodone, and the methadone.
21  Yes.
22      Q.   So oxycodone is the largest quantity
23  requested; is that correct?
24      A.   According to this document.

Page 178

1    Q.   And in terms of sort of a trend over time,
2  has that historically been the case, meaning
3  Mallinckrodt's largest request is for oxycodone?
4    A.   I have no idea.
5    Q.   For the time period that you've been with
6  Mallinckrodt, so from 2012 to 2019, has oxycodone been
7  the largest request in terms of the quota?
8    A.   I don't know that. I'm not involved in
9  the quota process, so I don't know what those numbers
10 look like.
11   Q.   And so you don't know if the ranking of
12 oxy, hydro, and then methadone has sort of remained at
13 one, two, three or whether it's shifted over time?
14   A.   Correct. I don't know what that picture
15 looks like.
16   Q.   So you can put that aside. Okay. This is
17 Gillies 59.
18       [Exhibit Mallinckrodt-Gillies-059
19       marked for identification.]
20   Q.   So this is a Bates number of
21 MNK-T1_6619631, and my questions relate to the section
22 on supplemental requests, which starts at Bates Number
23 6619638 and goes through 6619640.
24   A.   Okay.

Page 179

1    Q.   So what is a supplemental quota request,
2  sir?
3    A.   So again, I'm not involved in the quota
4  process, so I don't want to misstate what the
5  supplemental is.
6    Q.   Well, is it your understanding that it is
7  a request that's made throughout the year for increased
8  quota?
9    A.   We do have the ability to request quota
10 throughout the year.
11   Q.   And this chart on Pages 6619638 going
12 through 6619640 -- this is essentially just a tally of
13 the number of times that you have submitted a
14 supplemental increase; is that accurate?
15       MR. O'CONNOR: Objection to form.
16   A.   For these years that's what it appears to
17 be.
18 BY MR. KAWAMOTO:
19   Q.   And so generally, depending on the
20 product, you will request an increase between one and
21 two or three times; is that fair?
22       MR. O'CONNOR: Objection to form.
23   A.   I think it's going to depend on the year.
24 So --

Page 180

1  BY MR. KAWAMOTO:
2    Q.   Well, and that was going to be my next
3  question.
4    A.   Okay.
5    Q.   Which is, does the -- is the information
6  contained in these charts reflective of Mallinckrodt's
7  historical supplemental quota increase requests, or are
8  they unusual or outliers in terms of the overall
9  pattern?
10       MR. O'CONNOR: Objection to form.
11   A.   So I don't know if they're unusual because
12 I'm not involved in the process of quota to say whether
13 having one supplemental request or two or even three is
14 unusual.
15 BY MR. KAWAMOTO:
16   Q.   You can put that aside. So this is
17 Gillies Exhibit 60.
18       [Exhibit Mallinckrodt-Gillies-060
19       marked for identification.]
20   Q.   Bates number is MNK-T1_4813611. You
21 should read as much of this document as you feel you
22 need to, but my questions are going to relate to the
23 last sentence of each paragraph, which discusses the
24 financial impact.

Page 181

1    A.   Okay. Okay.
2    Q.   So there is a reference in this document
3  to quota shortages. Do you see that?
4    A.   Yes.
5    Q.   What is a quota shortage?
6    A.   So in my understanding, DEA sets the quota
7  for a particular product, and then requests for quota
8  come in, we do one for manufacturing and one for
9  procurement, and then the DEA fills those. And if you
10 don't get the requested amount that you ask for, there
11 would be a shortage. That's my understanding.
12   Q.   And that shortage has a financial impact
13 on Mallinckrodt; correct?
14   A.   Based on what's in this document, if they
15 can't meet customer demands.
16   Q.   So the inability or the DEA's decision not
17 to increase Mallinckrodt's quota will cost Mallinckrodt
18 money?
19       MR. O'CONNOR: Objection to form.
20 BY MR. KAWAMOTO:
21   Q.   Is that fair?
22   A.   I don't -- I'm uncomfortable the way you
23 phrased that question. It's not increase it, but not
24 provide us what we're asking for from the quota. Is

Page 182

1 that fair?

2    Q.   That's fair.

3    A.   Okay.

4    Q.   And the result of that, though, is that it

5 will cost Mallinckrodt money?

6         MR. O'CONNOR:  Objection to form.

7    A.   That's what this document indicates.

8 BY MR. KAWAMOTO:

9    Q.   And so Mallinckrodt has a financial

10 incentive to seek to increase -- to seek to maximize

11 its quota, does it not?

12        MR. O'CONNOR:  Objection to form.

13   A.   According to this document, based on

14 customer demands, which is how the quota is going to be

15 prepared.

16 BY MR. KAWAMOTO:

17   Q.   Now, you indicated that the quota is based

18 on customer demand, or the quota request is based on

19 customer demand.  Is that accurate?

20   A.   I believe that was the terminology used in

21 here, but that's what I said.

22   Q.   Do you know if data from the SOM program

23 is ever used to assess -- well, strike that.  Do you

24 know if data from Mallinckrodt's SOM program plays a

Page 183

1 role in the quota requests that Mallinckrodt submits to

2 the DEA?

3         MR. O'CONNOR:  Objection to form.

4    A.   I'm not involved in the quota process, so

5 I don't know the answer to that question.

6 BY MR. KAWAMOTO:

7    Q.   Oh, one follow-up question.  Who is

8 involved in the quota process?

9    A.   Karen Harper.

10   Q.   And has she ever asked you for any SOM

11 information for use in the quota process?

12   A.   No.

13   Q.   So this is Gillies Exhibit 61.

14        [Exhibit Mallinckrodt-Gillies-061

15        marked for identification.]

16   Q.   It bears a Bates number 6056192, and this

17 document essentially lays out two formulas for use in

18 connection with the quota for hydromorphone, or at

19 least that's my understanding.  Mr. Gillies, do you

20 have any knowledge of the formulas that are used by

21 Mallinckrodt to determine how much quota to request?

22   A.   I do not.

23   Q.   So in that case, you can put that document

24 aside.  So this is Gillies number -- Exhibit 62.

Page 184

1         [Exhibit Mallinckrodt-Gillies-062

2         marked for identification.]

3    Q.   This is an e-mail chain from Margaret

4 Keating to Jennifer Buist CCing Karen Harper.  I

5 believe we -- I believe you know who Jennifer -- is it

6 "byoost" or "bust"?

7    A.   "Byoo-ist."

8    Q.   "Byoo-ist"?

9    A.   Uh-huh.

10   Q.   What was her responsibility at

11 Mallinckrodt?

12   A.   She was the S1 analyst.

13   Q.   And my questions relate to the top three

14 e-mails.  So the middle one is from Margaret Keating to

15 Jennifer Buist and Karen.  Do you know who Margaret

16 Keating is?

17   A.   I do not.

18   Q.   She says to -- she writes to Jennifer,

19 thank you very much.  I have another question, if you

20 don't mind.  Have you seen a trend of hydromorphone

21 being prescribed instead of the oxycodone?  Margaret.

22        Jennifer's response is, Margaret, the

23 short answer is no.  While we don't track hydromorphone

24 the same way as oxycodone from an SOM perspective, we

Page 185

1 have not seen any increases in trends which would

2 warrant concern.

3         What does she mean by, we don't track

4 hydromorphone in the same way as hydrocodone from an

5 SOM perspective?

6    A.   I don't know what Jen's referring to

7 there.

8    Q.   Is it your understanding from an SOM

9 perspective that you would track hydromorphone the same

10 way as oxycodone?

11        MR. O'CONNOR:  Objection to form.

12   A.   No.

13 BY MR. KAWAMOTO:

14   Q.   So what are the differences?

15   A.   Well, in our SOM program we have the

16 tiers, and in that first tier for the big three

17 distributors and H.D. Smith, it was oxy 15s and oxy

18 30s.

19        And then Tier 2 were -- and this is my

20 understanding -- and Tier 2 is the other

21 distributors -- all of their products, and then the big

22 three and H.D. Smith's other products.

23   Q.   And what was the reason for tracking

24 hydromorphone differently than the way you would track

Page 186

1  oxycodone?  What was the basis for doing so?
2      MR. O'CONNOR:  Objection to form.
3      A.  So it's my belief that the oxy 15s and oxy
4  30s were more subject to diversion.
5  BY MR. KAWAMOTO:
6      Q.  So this is Gillies Exhibit 63.
7      [Exhibit Mallinckrodt-Gillies-063
8      marked for identification.]
9      Q.  So this is an e-mail and attachment.  The
10 e-mail chain is from Derek Naten and J. Craig Burton.
11 Do you know who Derek Naten is?
12     A.  I do.
13     Q.  Who is he?
14     A.  He's part of our governmental affairs
15 department.
16     Q.  And who is Craig Burton?
17     A.  I'm not familiar with that name.
18     Q.  Now, if you turn to the attachments
19 starting on Bates Number 8449630.  These appear to be
20 notes of meetings with either senators or
21 representatives and their staff.  Do you see that?
22     A.  Yes.
23     Q.  And you're identified in some but not all
24 of these minutes.  Do you see that?

Page 187

1      A.  Yes.
2      Q.  And the meetings that you're involved with
3  appear to occur on September 4th and September 5th.
4  Well, why don't you take a minute to quickly review
5  these notes.
6      A.  Okay.  Okay.
7      Q.  So these are minutes of meetings on
8  September 4th and September 5th.  Do you recall these
9  meetings?
10     A.  I do.
11     Q.  What do you recall about them?
12     A.  First of all, they were with the staffers
13 of these elected officials.  We are meeting with them
14 to tell about Mallinckrodt's efforts in their
15 locations.  It looks like the New York officials
16 because of our Hobart facility and the Missouri
17 officials because of our presence in the St. Louis
18 area.
19     Q.  And when you say Mallinckrodt's efforts --
20 efforts in what regard?
21     A.  So from my effort I was talking about
22 Mallinckrodt's efforts in our support of law
23 enforcement through our placebo program, through our
24 program with providing pill take back boxes, and other

Page 188

1  efforts that we had ongoing in support of law
2  enforcement.
3      Q.  And are these what you could characterize
4  as anti-diversion efforts?
5      A.  Yes.
6      Q.  Do you know how the senators and -- or do
7  you know how the staff members for the senators and
8  representatives were selected -- well, strike that.
9      Do you know how the offices -- do you know
10 how you selected which offices to meet with?
11     A.  So again, I believe the offices were
12 selected by our governmental affairs, and it had to do
13 with -- the New York politicians were selected because
14 we have our Hobart facility in New York, and the
15 Missouri senator was -- his office was selected because
16 we have our production facility and our offices in the
17 St. Louis area.
18     Q.  And what was the purpose of these
19 meetings?
20     A.  I think just to educate them on what
21 Mallinckrodt was doing, reminding them that we did have
22 manufacturing facilities and personnel in their
23 territories, and I'm pretty sure we offered them the
24 opportunity to come and inspect the facilities if they

Page 189

1  would like to, answered any questions that they might
2  have had.
3      Q.  So if you turn to the first page of this
4  document, Bates Number 8449627.  The very top e-mail
5  from Craig Burton says okay, attached is what I'm going
6  to send to Meredith and Peter for inoculation
7  discussion.  Any other changes you suggest?
8      Do you know who Meredith is?
9      A.  She would be -- this would be Meredith
10 Fisher, and she was in charge of our communications
11 department.
12     Q.  And who's Peter?  Or do you know who Peter
13 is?
14     A.  I'd have to speculate, so I'm not 100
15 percent sure.
16     Q.  And the references to inoculation
17 discussion, what did -- have you ever heard that term
18 before?
19     A.  No.
20     Q.  Do you know what that means?
21     A.  I do not.
22     Q.  If you turn the page to -- this is Bates
23 Number 8449629.  So it's after the chart.
24      There's -- in the middle of the page

Page 190

1 there's a paragraph that starts inoculation one,
2 defined as having briefed on investigation and Hobart
3 inspection. Do you see that?
4    A.   Yes.
5    Q.   Do you know what investigation is being
6 referenced there?
7    A.   I believe that referred to a DEA
8 investigation.
9    Q.   And what was the nature of that
10 investigation?
11    A.   I'm not sure.
12    Q.   And what's the Hobart inspection?
13    A.   So I believe that to be the DEA inspection
14 of our Hobart facility.
15    Q.   Could the investigation be a reference to
16 the investigation that culminated in the memorandum of
17 understanding between Mallinckrodt and the DOJ?
18    A.   Yeah, I don't know that to be the case.
19    Q.   If you look at the chart on the previous
20 page, so Bates Number 8449628, you'll see there are
21 columns member, initial meeting, inoculation one,
22 inoculation two, and DEA notice.
23       Do you know what the reference to DEA
24 notice is?

Page 191

1    A.   I do not.
2    Q.   If you turn to Bates Number 8449631. This
3 is a September 4th meeting with the Energy and Commerce
4 Committee majority staff, and the notes indicate that
5 you attended.
6    A.   Uh-huh.
7    Q.   Do you recall that meeting?
8    A.   Yes.
9    Q.   At the very bottom of the last paragraph,
10 it says while not yet finalized, the next hearing may
11 look closely at how collaboration might be improved at
12 all levels, what makes a good prescriber education
13 program, and how patients need to be considered and, in
14 quotes, unharmed in whatever steps they take. Do you
15 see that?
16    A.   Yes.
17    Q.   What does the reference to good prescriber
18 education program mean?
19    A.   So the -- this was educating prescribers
20 about the -- it's my understanding this was educating
21 prescribers about the proper use and of opioid
22 prescribing.
23    Q.   And when it says patients need to be
24 considered and unharmed in whatever steps they take,

Page 192

1 what does unharmed mean?
2    A.   So I believe that -- that the product was
3 available for legitimate patients who needed it. So to
4 stem any diversion to the illicit market, but make sure
5 that the medicine was still available for the patients
6 that needed it. That's my belief of what that was.
7    Q.   And so is this a concern with patient
8 access to opioid products?
9    A.   That was a concern that patients were
10 voicing.
11    Q.   And -- oh, I'm sorry. Go ahead.
12    A.   Yeah. That they were -- they weren't
13 being able to get their scripts filled at their
14 pharmacies.
15    Q.   And was this a concern that Mallinckrodt
16 shared?
17    A.   This was a discussion that came from the
18 committee member that started the discussion, is my
19 recollection.
20    Q.   Did Mallinckrodt ever take any action to
21 attempt to prevent or stop legislative efforts that
22 would limit patient access to opioid products?
23       MR. O'CONNOR:  Objection to form.
24    A.   I'm unaware of any legislative action.

Page 193

1 BY MR. KAWAMOTO:
2    Q.   Are you aware of any other actions that
3 Mallinckrodt took to prevent or stop legislative
4 efforts that would limit patient access to opioid
5 products?
6    A.   No.
7       MR. O'CONNOR:  Objection to form.
8 BY MR. KAWAMOTO:
9    Q.   So turning to Bates Number 8449637. On
10 the fourth paragraph down, it starts with staff was
11 very interested as John Gillies detailed Mallinckrodt's
12 many efforts. Do you see that?
13    A.   Yes.
14    Q.   So the second-to-last sentence states John
15 discussed the DEA inspection and preempted most
16 possible questions in his explanation.
17       Do you know what that's a reference to?
18    A.   So I discussed with them the inspection
19 that took place by the DEA at our Hobart facility. I
20 believe I was pretty detailed in what I was explaining
21 to them as what took place.
22       And then I would have to speculate on that
23 second half, that because I had given such a detailed
24 explanation to them that it limited the questions that

Page 194

1  they possibly had.

2      Q.   And with respect to the DEA inspection

3  that took place at the Hobart facility, did DEA have

4  concerns based on that inspection?

5          MR. O'CONNOR:  Objection to form.

6      A.   The DEA did, yes.

7  BY MR. KAWAMOTO:

8      Q.   And what were their concerns?

9      A.   They had some recordkeeping concerns at

10 that facility.  They stated that they had some security

11 concerns.  Some of it was misunderstanding in

12 terminology.  So as they went through the inspection

13 and even into later time frames, had to further explain

14 some of those differences in interpretations.

15     Q.   And in terms of terminology, can you

16 provide an example?  What do you mean by terminology?

17     A.   Yeah, I can.  So there was a security

18 report that stated that a tablet was found in the

19 washroom, so they were concerned that there was a

20 tablet in the washroom that they believed to be the

21 bathroom, and the washroom is our cleaning room.

22         So when they dismantle at the end of a run

23 and clean all the equipment, they take the equipment

24 into the washroom.  Not a bathroom, but a cleaning

Page 195

1  room.

2          So if there are any tablets or anything

3  that are stuck up in the equipment and stuff, that's a

4  normal process.  Any that would come out in the

5  cleaning process get gathered up and then put back into

6  the total batch record to account for the total

7  production line.

8          So they were concerned that there was a

9  tablet found in the bathroom -- in the washroom that

10 they believed was the bathroom, and wanted to know how

11 a tablet could get into the washroom they thought was a

12 bathroom.

13     Q.   Understood.

14     A.   Okay.

15     Q.   Do you recall any other meetings that you

16 had with congressional staff during your time at

17 Mallinckrodt?

18     A.   No.

19     Q.   So these September 4th and 5th meetings

20 are, to the best of your recollection, the only time

21 you've done these briefings for congressional staff

22 people?

23     A.   That's my understanding.

24     Q.   So why do these briefings after this

Page 196

1  particular investigation?  Because it sounds like you

2  haven't done them after subsequent investigations.

3          MR. O'CONNOR:  Objection --

4  BY MR. KAWAMOTO:

5      Q.   Or sorry.  Let me rephrase that.

6          Why do these briefings after this

7  particular inspection?  Because it sounds like you

8  haven't done these after other DEA inspections, and I

9  assume the DEA conducts regular inspections of your

10 facilities.

11         MR. O'CONNOR:  Objection to form.

12     A.   Yes.

13 BY MR. KAWAMOTO:

14     Q.   So what -- I'm sorry.  Go ahead.

15     A.   Yes, they do the regular inspections.  I

16 don't know what generated setting up these meetings.

17         MR. KAWAMOTO:  So I think I'm almost done.

18 Why don't we take a short break and I'll see if I have

19 anything else.

20         MR. O'CONNOR:  Sure.

21         THE VIDEOGRAPHER:  We are going off the

22 record at 3:18 PM.

23         [A brief recess was taken.]

24         THE VIDEOGRAPHER:  We are back on the

Page 197

1  record at 3:30 PM.

2  BY MR. KAWAMOTO:

3      Q.   Okay.  So Mr. Gillies, I just have a few

4  more questions relating to pharmacy review, and then

5  we're done.

6      A.   Okay.

7      Q.   So Mallinckrodt currently has a pharmacy

8  review program?

9          MR. O'CONNOR:  Objection to form.

10 BY MR. KAWAMOTO:

11     Q.   Well, strike that.  Let me rephrase that.

12         Mallinckrodt currently reviews pharmacies?

13         MR. O'CONNOR:  Objection to form.

14     A.   We review chargeback information for

15 pharmacies, and then we look at the numbers that the

16 pharmacies are requesting.

17 BY MR. KAWAMOTO:

18     Q.   And then based on that chargeback data and

19 that review, do you also audit certain pharmacies?

20     A.   We can.

21     Q.   And that program is still in effect?  It's

22 in effect currently?

23     A.   It is.

24         MR. O'CONNOR:  Objection to form.

Page 198

BY MR. KAWAMOTO:

1  Q.  When did you -- do you know when
2  Mallinckrodt first started auditing pharmacies?  Well,
3  strike that.
4      Do you know when Mallinckrodt first
5  started using the chargeback data to review pharmacies?
6      MR. O'CONNOR:  Objection to form.
7      A.  It was sometime after -- it's my belief it
8  was sometime after July 2010.
9  BY MR. KAWAMOTO:
10     Q.  And -- oh, I'm sorry.  Go ahead.
11     A.  I'm sorry.  I'm just trying to get my
12 timeline here straight.
13     Q.  Sure.
14     A.  The first time would have been in that
15 Sunrise matter.  That was July of 2009.  Then as far as
16 its anti-diversion efforts, I'm thinking it was July
17 2010, but I'm not 100 percent sure on that date.
18     Q.  And you indicated that it's -- the
19 decision whether to audit -- well, I'm sorry.  My
20 previous question was about chargebacks.
21     So when did Mallinckrodt start auditing
22 pharmacies based on the chargeback data?  Was that also
23 July of 2010?

Page 199

1      A.  I don't know that they were using the
2  chargeback data, and I don't know that they went out
3  and started looking at the pharmacies right after that,
4  but it was at some point after that July time frame.
5      Q.  July of 2010?
6      A.  Again, that's my recollection.
7      Q.  And you indicated that the chargeback data
8  was used to identify pharmacies to audit.  Are there
9  other factors that go into the decision on whether or
10 not to audit a pharmacy, other than the chargeback
11 data?
12     A.  So there is -- there's other reasons that
13 a pharmacy could come to my attention, which would be a
14 media report that a law enforcement action took place
15 at a particular pharmacy.  I had set up Google keyword
16 searches.
17     I was going into the DEA website and going
18 into their press office and reviewing press releases
19 for anything that appeared to be related to diversion
20 of products from pharmacies.  Not necessarily
21 Mallinckrodt's products, just diversion of products
22 from pharmacies.
23     I also go out to the U.S. Attorney's
24 office if I became aware of a particular case to see if

Page 200

1  there was any data in the U.S. Attorney's office press
2  releases that might get me more information.
3      Sometimes the U.S. Attorney's office would
4  have a link to like the indictment or potentially
5  information which might contain some information that
6  was useful to me.
7      Q.  Did you ever get data from the
8  distributors as to pharmacies that you should audit?
9      A.  So we collaborated with the distributors,
10 and we would share information with them on pharmacies
11 that potentially could be of some concern to us, and
12 we'd walk through with them as part of our
13 anti-diversion efforts why we have certain concerns,
14 what we're seeing, and then discuss with them any due
15 diligence that they had on their customer that might
16 alleviate those concerns.
17     Q.  And did any of the distributors ever come
18 to you and provide you with a list or identify certain
19 pharmacies that they had concerns with?
20     MR. O'CONNOR:  Objection to form.
21     A.  So the distributors would share pharmacies
22 with us also.
23 BY MR. KAWAMOTO:
24     Q.  Now, you indicated that the pharmacy

Page 201

1  review program is ongoing?
2      A.  It is.
3      Q.  Have there been changes over time between
4  when the pharmacy review program first started and its
5  current form?
6      A.  It's pretty similar.  There might have
7  been an enhancement or two after I came on board.
8      Q.  And do you have a rough estimate of how
9  many pharmacies have been blocked as a result of this
10 review program?
11     MR. O'CONNOR:  Objection to form.
12     A.  So I know the information was provided to
13 you, but it's my recollection that approximately 264 or
14 so pharmacies have been restricted.
15 BY MR. KAWAMOTO:
16     Q.  Do you have any sense of the geo -- well,
17 the geographic areas that these pharmacies are in?
18     A.  Not as I sit here right now, but I do know
19 the information was provided to you.
20     Q.  Did you ever have any concerns about the
21 distributors and whether they were doing an adequate
22 job of reviewing their pharmacies?
23     MR. O'CONNOR:  Objection to form.
24     A.  I personally did not.  I felt that they

Page 202

1 were good collaborative partners with us when we'd
2 raise issues with them, and we would talk some things
3 through in the couple instances where they couldn't see
4 some of our concerns. And so I'd advise them that I
5 was going to go do an onsite, and they agreed to go
6 with me, and we went, and I got a feel for this
7 pharmacy.
8          I didn't get the sense that there was
9 diversion going on, but through that process I did
10 identify a prescriber that was the top prescriber at
11 each of these pharmacies I was going to. And these
12 pharmacies were 50, 60-plus miles apart.
13          So while I didn't have major problems with
14 these pharmacies I was looking at, I did have a problem
15 that I may have uncovered a prescriber during these
16 pharmacy reviews that should have a further look.
17 BY MR. KAWAMOTO:
18     Q.   And do you recall roughly what time period
19 this occurred in?
20     A.   This would have been in fall of 2012, is
21 my recollection.
22     Q.   And what did Mallinckrodt do with this
23 information regarding the prescriber?
24     A.   Yeah. So when I came back -- so the first

Page 203

1 thing I had was that this prescriber was the top
2 prescriber at each of these pharmacies I went to, so I
3 came back and I asked the analysts to run IMS data to
4 see if there was anything from that.
5          And from that analysis, this prescriber
6 turned out to be a high prescriber of opioids, and I
7 contacted the DEA.
8     Q.   And did they prosecute the prescriber?
9     A.   So I met with the DEA, shared the
10 information with them. I know they went to the
11 pharmacies, reminded them of their corresponding
12 responsibilities. I don't know what else they
13 discussed with them. And they wouldn't share with me,
14 but I got the impression they wanted him prosecuted,
15 and the matter sat at the U.S. Attorney's office.
16 That's my understanding.
17          So a year -- approximately a year later,
18 ran the numbers for the pharmacies again of the
19 approximate five, six, seven pharmacies that I had
20 looked at. I looked at those pharmacies again to see
21 any changes, and only one of those pharmacies caused me
22 concern.
23          So contacted the distributor, talked it
24 over. They weren't seeing what I was seeing, that they

Page 204

1 were having any issues, and I told them I was going to
2 go do another onsite. They joined me.
3          And during that time -- because from a
4 Mallinckrodt perspective, we had seen our product to
5 this pharmacy, going like this (indicating), so that
6 caused me concern that at one point we were here and
7 now we're here.
8          And in this case, the distributor didn't
9 alleviate my concerns, so I went to do another onsite,
10 and at that point I'm talking to the pharmacist on my
11 security reviews. I'll look at their security and
12 other things.
13          And then there was a question that I
14 asked, because the pharmacist was like I don't know why
15 you're here. And I said, well, your ordering of
16 Mallinckrodt product is going straight up, and I have
17 to get -- and his explanation was, well, that's easy.
18 We switched manufacturers.
19          And you could see the light start going
20 off over the distributor's head. The reason they
21 hadn't seen any change -- because the numbers for them
22 were the same. It was just a flat line to them. But
23 for us it went like this (indicating), so it was a
24 concern. But the overall numbers that the pharmacy had

Page 205

1 were similar from year to year. It's just that our
2 product -- so that's just an example of how I felt the
3 distributor collaborated. We discussed it. When my
4 concerns couldn't be alleviated, we went and did
5 onsites.
6          And in one instance, the pharmacies didn't
7 cause me a lot of concern, but through those onsites I
8 did identify a prescriber who turned out to be a very,
9 very high prescriber.
10     Q.   And did you identify any other -- and this
11 was in 2012. After that, did you identify any other
12 prescribers in a similar fashion?
13     A.   So if we got prescriber information during
14 the time that I had IMS data available, I could run
15 their names to see whether they were high prescribers
16 or not. But at the same time, if I got a prescriber's
17 name -- I was doing internet searches to see if there
18 was anything I could see.
19          I would go to the medical board, see if
20 there were any disciplinary records that would cause me
21 concern. I would go out to the HHS OIG website to see
22 if any of these doctors were blocked from doing
23 business with the government. Again, just looking for
24 avenues to give me as full a picture as I could have.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1      Sometimes the prescribers were not high
2   prescribers. Some were prescribers that were dealing
3   with hospice or cancer patients and stuff. So -- but
4   there were some prescribers that caused me some
5   concerns. I shared that with the distributors. That
6   was shared with pharmacies, and the pharmacies would
7   restrict taking prescriptions from those prescribers.
8      Q. And you start -- I mean, you did this from
9   2012 to the present; is that correct?
10     A. That's correct.
11     Q. So this would be in your view an example
12  of appropriate due diligence; is that right?
13        MR. O'CONNOR: Objection to form.
14     A. As I testified before, I don't know what
15  they did, but this is part of the process that I
16  operate under and the questions that I would ask.
17        So when I see a one-line thing about some
18  comments that seem vague or innocuous to me, there are
19  some words in there I don't know what they mean, I'm
20  going to follow up on those words, and same here. If I
21  get some doctors who are prescribing for a particular
22  pharmacy, I'm going to go out and see what the
23  available information out there is.
24        Sometimes I would find disciplinary

Page 207

1   actions at the medical board, and depending on what
2   those infractions were, my concerns would go up or
3   down, depending on what I would find.
4        If a particular prescriber was blocked
5   from doing business with the government, the government
6   usually has a reason for doing that, and that would
7   cause me concern. And that information would be
8   shared, and we move on.
9        And so from the distributor personnel that
10  I dealt with, I felt them very collaborative, open.
11  And so with the relationships we had, I thought things
12  were good.
13  BY MR. KAWAMOTO:
14     Q. And have any of the distributors that you
15  dealt with ever had their licenses revoked?
16     A. Not that I dealt with. At least not that
17  I'm aware of.
18        MR. KAWAMOTO: Okay. Okay. Thank you for
19  your time.
20     A. Thank you.
21        MR. KAWAMOTO: No further questions.
22        THE VIDEOGRAPHER: We are going off the
23  record at 3:49 PM.
24        [A brief recess was taken.]

Page 208

1        THE VIDEOGRAPHER: We are back on the
2   record at 3:57 PM.
3           EXAMINATION
4   BY MS. HERZFELD:
5      Q. Okay. Mr. Gillies, how are you doing this
6   afternoon?
7      A. Good.
8      Q. We met yesterday, but I will remind you
9   that I am Tricia Herzfeld representing the Tennessee
10  plaintiffs today. Okay?
11     A. Okay.
12     Q. Okay. We're just going to go through some
13  questions, and I know we got people trying to catch a
14  flight, so I'll try to go quickly, but we know how that
15  will go.
16        MS. HERZFELD: I just want to lodge our
17  standing objection for failure to comply with the MDL
18  protocol that has also been entered and established
19  in Dunaway (ph) cases and reserve our rights for this
20  deposition.
21        MR. O'CONNOR: And we would respond with
22  our usual objection to your objection.
23        MS. HERZFELD: Okay.
24  BY MS. HERZFELD:

Page 209

1      Q. Mr. Gillies, last night between your
2   30(b)(6) deposition and your fact witness deposition
3   today, did you do any Tennessee-specific preparation?
4      A. No.
5      Q. Did you speak with your counsel at all?
6      A. About what?
7      Q. About your testimony.
8        MR. O'CONNOR: You can answer yes or no to
9   whether you spoke, but otherwise I'd object on
10  attorney-client privilege grounds.
11     A. Okay. Yes.
12  BY MS. HERZFELD:
13     Q. Did you speak with your counsel at all?
14     A. Yes.
15     Q. And did you meet with him about your
16  testimony today?
17        MR. O'CONNOR: Again, I'm going to object
18  on attorney-client privilege grounds.
19  BY MS. HERZFELD:
20     Q. Did you have an additional meeting with
21  your attorney last night after the 30(b)(6) deposition?
22     A. No.
23     Q. Did you have a telephone call with your
24  attorney after the 30(b)(6) deposition?

Page 210

1   A.  No.

2   Q.  Did you speak with your attorney after the

3 30(b)(6) deposition last night?

4   A.  Yes.

5   Q.  And for how long?

6   A.  Two minutes.

7   Q.  And this morning -- did you speak with

8 your attorney at all this morning prior to your

9 deposition today?

10   A.  Yes.

11   Q.  For about how long?

12   A.  Two minutes.

13   Q.  Okay.  Very good.  Okay.  And have you

14 ever been to Tennessee, Mr. Gillies?

15   A.  Yes.

16   Q.  For business?

17   A.  Business and pleasure.

18   Q.  And for business, was that during your

19 time with the FBI or during your time at Mallinckrodt?

20   A.  Mallinckrodt.

21   Q.  How many times have you been to Tennessee

22 for Mallinckrodt?

23   A.  A couple.

24   Q.  And what was the nature of your work

Page 211

1 there?

2   A.  I went down to inspect the FedEx facility.

3   Q.  Did you find any deficiencies?

4   MR. O'CONNOR:  Objection to form.

5   A.  No.

6 BY MS. HERZFELD:

7   Q.  And what year was that?

8   A.  I believe the first time was -- and I'm

9 guessing, but I think the first time was in 2013 and

10 the second time was 2014 or 2015.

11   Q.  And both of those visits were to the FedEx

12 facility outside of Memphis?

13   A.  Yes.

14   Q.  And have you been to any other place in

15 Tennessee for business with Mallinckrodt?

16   A.  Not that I can recall.

17   Q.  Have you ever done any pharmacy -- onsite

18 pharmacy visits in Tennessee?

19   A.  No.

20   Q.  Have you ever heard of Mallinckrodt

21 opioids being called blues?

22   A.  Yes.

23   Q.  What does blues mean to you?

24   A.  That's the color of our oxycodone 30s.

Page 212

1   Q.  And do you know who uses the term blues?

2   MR. O'CONNOR:  Objection to form.  I'm

3 going to object on Touhy grounds, and to the extent you

4 can answer that based on your time at Mallinckrodt, go

5 ahead.

6   A.  I'm not going to be able to answer that

7 question then.

8 BY MS. HERZFELD:

9   Q.  At Mallinckrodt did you ever have any

10 discussions with anybody about the street name for

11 Mallinckrodt oxy 30s being blues?

12   A.  I don't recall that.

13   Q.  What about M's?

14   A.  No.

15   Q.  Do you know if M's is a street term for

16 Mallinckrodt oxycodone?

17   A.  I have not heard that.

18   Q.  So I just want to make sure I understand

19 your testimony.  You do know what blues mean, but you

20 can't tell me where you learned it because that's a

21 Touhy objection; right?

22   A.  Correct.

23   Q.  But during your time at Mallinckrodt, you

24 never heard anybody use the term blues?

Page 213

1   A.  I don't recall that I did.

2   Q.  We're going to go through a series of

3 documents.  I'm going to try to get through them with

4 you pretty quickly.  I'm going to hand you what's been

5 marked as Gillies Exhibit 64.

6   [Exhibit Mallinckrodt-Gillies-064

7   marked for identification.]

8   A.  Okay.

9   MS. HERZFELD:  Okay.  For those on the

10 phone, it's MNK_TNSTA4437892.  E-mail with multiple

11 page attachments.

12 BY MS. HERZFELD:

13   Q.  Okay.  Have you had an opportunity to look

14 at this document, sir?  The front page.

15   A.  Oh.  Yes.

16   Q.  And looking at this front page, does it

17 appear to be an e-mail that was sent from Jennifer --

18 how do you say it?

19   A.  Buist.

20   Q.  Buist to you and Gail Tetzlaff?

21   A.  Tetzlaff.  Uh-huh.

22   Q.  Is that what that looks like to you, sir?

23   A.  Yes.

24   Q.  And it was sent on July 10th, 2014?

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A.   Correct.

2    Q.   And you would have received this e-mail in

3 the course of your ordinary business at Mallinckrodt;

4 is that correct?

5    A.   That's my understanding.

6    Q.   And if you'll go and look with me here at

7 the first page of the attachment.  It says state

8 ranking, hydrocodone, January through September 2013.

9 Do you see that?

10    A.   Yes.

11    Q.   And could you tell me what rank Tennessee

12 is?

13    A.   Number 3.

14    Q.   If you'll flip to the next page for me,

15 sir.  And the title of this is oxycodone, January

16 through December 2013, state ranking.

17         Could you look at Number 9 for me?

18    A.   Yeah.

19    Q.   And which state is ranked the ninth?

20    A.   Tennessee.

21    Q.   Okay.  Flip to the next page for me.

22 State ranking, oxymorphone, January through December

23 2013.

24         Which state -- which number and state

Page 215

1 rankings is Tennessee?

2    A.   Two.

3    Q.   And then on the last page it's state

4 rankings for hydromorphone, January through December

5 2013.

6         And can you look at 22 there for me, sir?

7    A.   Yes.

8    Q.   Which state is ranked 22?

9    A.   Tennessee.

10    Q.   Okay.  Great.  You can set that aside.

11 Okay.  And actually, if you'll pick it back up again.

12         Did you request that PowerPoint from Mrs.

13 Buist, Ms. Buist?

14    A.   I don't recall that I requested it.

15    Q.   Did you monitor the various Mallinckrodt

16 products used by state rankings as part of your job as

17 director of security or vice-president of security?

18    A.   So did I ever use this information?  Yes.

19    Q.   Did you have these reports created for

20 your review?

21    A.   These aren't our reports.

22    Q.   Did you receive information about state

23 rankings for the various opioid products routinely as

24 part of your position as director or vice-president of

Page 216

1 security at Mallinckrodt?

2         MR. O'CONNOR:  Objection to form.

3    A.   So we would look for this information

4 whenever it became available.

5 BY MS. HERZFELD:

6    Q.   And so would that be yearly or quarterly?

7    A.   Whenever it became available.  So -- it

8 wasn't annual.

9    Q.   Do you know if it was more often than

10 annual or less often than annual?

11    A.   Less.

12    Q.   Less?

13    A.   Uh-huh.

14    Q.   Do you have any idea roughly how often

15 this information became available to you?

16    A.   Whenever it'd become available, but it

17 would not be updated annually that was for public

18 consumption that I could locate.

19    Q.   And did you consider it important to be

20 monitoring various opioid rankings by state?

21         MR. O'CONNOR:  Objection to form.

22    A.   So I found this information could be

23 useful to us.  Uh-huh.

24 BY MS. HERZFELD:

Page 217

1    Q.   Okay.  How so?

2    A.   I could look at the state rankings, I

3 could take the number of pharmacies in each of these

4 states, I could kind of get an average of what that

5 pharmacy looks like.  Again, just as another tool

6 trying to figure out if there was any diversion.

7    Q.   And you talked about earlier about the

8 high-intensity drug trafficking areas.  Do you recall

9 that testimony?

10    A.   Yes.

11    Q.   Are you aware of the Appalachian

12 high-intensity drug trafficking area?

13    A.   I am not.

14    Q.   So to your knowledge, Mallinckrodt never

15 did any work with the Appalachian highway --

16 Appalachian high-intensity drug trafficking area?

17    A.   Not that I'm aware of.

18    Q.   Would you agree that the opioid abuse

19 epidemic is more severe in some areas of the country

20 than in others?

21         MR. O'CONNOR:  Objection to form.

22    A.   Yes.

23 BY MS. HERZFELD:

24    Q.   In which areas of the country would you

Page 218

1 say it's more severe?

2 　　　MS. RANJAN: Objection. Form.

3 　　A. I'm not going to be able --

4 　　　MS. HERZFELD: I'm going to object to your

5 objection. Who do you represent?

6 　　　MS. RANJAN: I represent Walmart.

7 　　　MS. HERZFELD: Yeah, Walmart is not a

8 party in our case, so we're going to object to any

9 objections by anybody that's not a party in our case

10 and hasn't cross-noticed this deposition.

11 　　　MS. RANJAN: Okay.

12 　　　MS. HERZFELD: You can object, but I'm

13 going to object to your objections.

14 　　　MR. O'CONNOR: Object to form.

15 　　　MS. HERZFELD: That's fine, too.

16 BY MS. HERZFELD:

17 　　Q. Okay. The question was --

18 　　A. Thank you.

19 　　Q. -- which areas of the country would you

20 say it is more severe?

21 　　A. So I don't know where it's more severe,

22 but my testimony is that I know that there are some

23 areas where it appears to be.

24 　　Q. Do you know the Appalachian region of the

Page 219

1 country to be particularly affected by the opioid abuse

2 epidemic?

3 　　　MR. O'CONNOR: Objection to form.

4 　　A. So could you tell me -- is that the

5 eastern part of Tennessee?

6 BY MS. HERZFELD:

7 　　Q. The Appalachian region.

8 　　A. So --

9 　　Q. Kentucky, West Virginia, Ohio.

10 　　A. Oh, I'm sorry. I thought you were talking

11 about Tennessee.

12 　　Q. I'm sorry. Kentucky, West Virginia,

13 Tennessee. Yeah.

14 　　A. Okay. That's why I was a little confused.

15 I know that some of those states, I think as I

16 testified earlier -- I believe my testimony earlier was

17 that I was aware of Kentucky.

18 　　Q. And were you aware of there being a

19 particular problem in Tennessee?

20 　　A. I was --

21 　　　MR. O'CONNOR: Objection. Form.

22 　　A. My recollection is that there was an area

23 in eastern Tennessee that might have had a problem.

24 BY MS. HERZFELD:

Page 220

1 　　Q. And you were a member of the suspicious

2 ordering team; is that correct?

3 　　A. Suspicious order monitoring team.

4 　　Q. Sorry. Yes, sir. Okay. And were there

5 ever any specific states that were discussed at those

6 suspicious order monitoring team meetings for having

7 particularly concerning opioid abuse rates?

8 　　　MR. O'CONNOR: Objection to form.

9 　　A. No.

10 BY MS. HERZFELD:

11 　　Q. What about Florida?

12 　　　MR. O'CONNOR: Same objection.

13 　　A. When I joined Mallinckrodt, I don't

14 believe that that was an issue.

15 BY MS. HERZFELD:

16 　　Q. So to your knowledge, was Tennessee ever

17 discussed as a state of concern for abuse or diversion

18 of Mallinckrodt during those -- of Mallinckrodt

19 products during those suspicious order monitoring team

20 meetings?

21 　　　MR. O'CONNOR: Objection to form.

22 　　A. I don't recall that.

23 BY MS. HERZFELD:

24 　　Q. And did Mallinckrodt's anti-diversion

Page 221

1 programs or efforts treat different geographical areas

2 differently in any way?

3 　　A. Not that I'm aware of.

4 　　Q. I'm going to hand you what we'll mark as

5 Gillies Exhibit 65.

6 　　　[Exhibit Mallinckrodt-Gillies-065

7 　　　marked for identification.]

8 　　　MS. HERZFELD: For those on the phone,

9 it's MNK_TNSTA00269511 through 514.

10 BY MS. HERZFELD:

11 　　Q. Do you recognize this document, sir?

12 　　A. I recognize the document.

13 　　Q. And does this appear to be an e-mail from

14 the National Prescription Drug Abuse Summit sent to you

15 on July 25th, 2013?

16 　　A. Yes.

17 　　Q. And does this -- is this an e-mail that

18 you received in the course of your ordinary business?

19 　　A. Yes.

20 　　Q. Looking at this e-mail, can you read the

21 headline for me under where it says National

22 Prescription Drug Abuse Summit, starting bad milestone?

23 　　A. Bad milestone. 350th baby born in 2013 in

24 Tennessee dependent on drugs.

Page 222

1    Q.   And did you read this article at the time
2 that you received it?
3    A.   I don't recall reading that article.
4    Q.   Is this one of those Google alerts you had
5 set up?
6    A.   No.
7    Q.   Where did you get this e-mail from?
8    A.   It came from the summit as potential
9 registration to attend the summit.
10   Q.   And did you attend that summit?
11   A.   I attended one, and this one is in
12 Georgia, and I just don't have a recollection of going
13 to Georgia.
14   Q.   Okay.  Okay.  You can put that one aside.
15 I'm going to hand you what we will mark as Gillies
16 Exhibit 66.
17       [Exhibit Mallinckrodt-Gillies-066
18       marked for identification.]
19   Q.   Does this appear to be a Google alert you
20 would have received to your e-mail, sir?
21   A.   Yes.
22   Q.   And was it sent August 30th, 2014?
23   A.   Yes.
24   Q.   And was it received in the course of your

Page 223

1 ordinary business?
2    A.   Yes.
3    Q.   If you could read the third alert down for
4 me, what the headline is.
5    A.   Prescription drug abuse situation in
6 Tennessee.
7    Q.   And then what does it say after that?
8 Abuse of --
9    A.   Abuse of prescription opioids, i.e., pain
10 medications, is the Number 1 drug problem for
11 Tennesseans receiving publicly funded assistance for.
12   Q.   And this is one of the Google alerts you
13 talked about before?
14   A.   Yes.
15   Q.   And you set that up with certain keywords?
16   A.   Correct.
17   Q.   And why did you create the Google alerts?
18   A.   To identify for me stories that may lead
19 to give me some pointers for potential diversion.
20   Q.   And if you could go back with me to
21 Exhibit 65, the one about the summit.
22   A.   Uh-huh.
23   Q.   When you received that e-mail about the
24 350th baby being born in Tennessee with neonatal

Page 224

1 abstinence syndrome, did Mallinckrodt do -- take any
2 action based on receiving that e-mail?
3        MR. O'CONNOR:  Objection to form.
4    A.   So again, I don't have any recollection of
5 reading this article, and I don't have a recollection
6 as we sit here that I went to this summit in Georgia.
7 BY MS. HERZFELD:
8    Q.   But you agree with me that that e-mail
9 certainly has information about it, about a certain
10 number of babies being born in Tennessee dependent on
11 prescription medication; is that right?
12   A.   I don't know -- I think this was
13 information that was probably going to be discussed at
14 the summit, as I sit here now.
15   Q.   And you didn't go -- you said you don't
16 think you went to the --
17   A.   I do not -- I only went to one, and as we
18 sit here now my recollection was that I did not go to
19 Georgia.
20   Q.   But based on the information about these
21 babies being born, do you know if Mallinckrodt took any
22 steps to investigate what was going on in Tennessee
23 with babies being born dependent on opioids?
24   A.   I do not.

Page 225

1        MR. O'CONNOR:  Objection to form.
2 BY MS. HERZFELD:
3    Q.   If you could go back to Number 66 for me.
4 We just went through that Google alert.
5        Based on the information about the
6 prescription drug abuse epidemic costing Tennessee
7 taxpayers -- specifically I think the dateline there is
8 Roane County, Tennessee.
9    A.   I'm sorry.  Where are you?
10   Q.   I'm sorry.  On Number 66.
11   A.   Okay.
12   Q.   The Google alert?
13   A.   Yes.
14   Q.   Okay.  And if you look at the Google alert
15 there, it talks about the prescription drug abuse --
16 right -- article titled prescription drug abuse
17 epidemic costing Tennessee taxpayers.  Do you see where
18 I'm at?
19   A.   Oh, okay.
20   Q.   Yes?
21   A.   No, not there yet.  Is it on Page 2 or 3,
22 or am I missing it, or --
23   Q.   No, no, sir, it's a part we already talked
24 about.  It's just the third one down.

Page 226

1    A.    Oh, it says prescription drug abuse
2  situation in Tennessee.
3    Q.    Yes, sir.
4    A.    Okay.
5    Q.    And then it says abuse prescription pain
6  medications Number 1 drug problem for Tennesseans
7  receiving publicly funded assistance for -- that's what
8  you read before.  Is that correct?
9    A.    Yes.
10    Q.    And so going through that article, getting
11  that notification, did Mallinckrodt take any action in
12  Tennessee in reaction to being notified of that
13  article?
14    A.    Not that I'm aware of.
15    Q.    I'm going to hand you what we'll mark as
16  Gillies Exhibit 67.
17        [Exhibit Mallinckrodt-Gillies-067
18        marked for identification.]
19    Q.    Okay, sir.  Does this appear to be another
20  Google alert --
21    A.    Yes.
22    Q.     -- sent to your e-mail address?  And it
23  was sent January 23rd, 2015?
24    A.    Yes.

Page 227

1    Q.    And do you believe that you received this
2  e-mail in the course of your ordinary business?
3    A.    Yes.
4    Q.    And in this Google alert, if you'll look
5  at the very first headline there.  If you could read
6  that for me, please.
7    A.    Prescription drug abuse epidemic costing
8  Tennessee taxpayers.
9    Q.    And here's the one where I have the
10  dateline.  My apologies.
11    A.    Okay.
12    Q.    And what is the dateline there?  Where
13  does it say that article is coming from?
14    A.    WBIR TV.
15    Q.    And then the location under that?
16    A.    Roane County.
17    Q.    And have you ever been to Roane County?
18    A.    Not that I can recall.
19    Q.    And then could you read the next line for
20  me please?
21    A.    Health officials say prescription drug
22  abuse in Tennessee is an epidemic and taxpayers are
23  shouldering much of the burden.
24    Q.    And based on receiving this e-mail did

Page 228

1  Mallinckrodt take any steps to investigate the
2  prescription drug abuse epidemic in Tennessee?
3        MR. O'CONNOR:  Objection to form.
4    A.    Not that I'm aware of.
5  BY MS. HERZFELD:
6    Q.    You can set that one aside.  I'll hand you
7  what we'll mark as Gillies Exhibit 68.
8        [Exhibit Mallinckrodt-Gillies-68
9        marked for identification.]
10    Q.    Sir, does this appear to be one of those
11  Google alert e-mails sent to your e-mail address March
12  25th, 2013?
13    A.    Yes.
14    Q.    Do you believe that you received this
15  e-mail in the course of your ordinary business at
16  Mallinckrodt?
17    A.    Yes.
18    Q.    I'm looking at this one.  If you could
19  look at the first one for me, please.  What is the
20  title of the first?
21    A.    The problems with prescription drug
22  addiction.
23    Q.    And what is the publication?
24    A.    The Chattanoogan.

Page 229

1    Q.    And if you could read what's written
2  there, please?
3    A.    In Tennessee today we have a major problem
4  with prescription drug addiction, particularly when
5  powerful opioid pain relievers are concerned.
6    Q.    And after you received this e-mail, did
7  Mallinckrodt take any steps to investigate the major
8  problem with prescription drug addiction, particularly
9  with powerful opioid pain relievers?
10    A.    Not that I'm aware of.
11        MR. O'CONNOR:  Objection to form.
12  BY MS. HERZFELD:
13    Q.    In Tennessee?
14        THE REPORTER:  I'm sorry.  What was your
15  answer?
16    A.    Not that I'm aware of.
17  BY MS. HERZFELD:
18    Q.    Okay.  Hand you what we'll mark as Gillies
19  Exhibit 69.
20        [Exhibit Mallinckrodt-Gillies-069
21        marked for identification.]
22    Q.    Does this also appear to be another Google
23  alert sent to your e-mail address dated November 29th,
24  2016?

Page 230

1    A.   Yes.
2    Q.   Do you believe you received this e-mail in
3 the course of your ordinary business at Mallinckrodt?
4    A.   Yes.
5    Q.   And if you could read for me, please, on
6 the second page, the very last one.
7    A.   Prescription pill abuse tops tobacco use.
8    Q.   And underneath that?
9    A.   WVLT.
10    Q.   And underneath that?
11    A.   The number of overdose deaths in Tennessee
12 is climbing, and now Tennessee is Number 2 in the
13 nation for opioid abuse.
14    Q.   And after receiving this information, did
15 Mallinckrodt take any steps to investigate Tennessee
16 being the Number 2 in the nation for opioid abuse?
17        MR. O'CONNOR:  Objection to form.
18    A.   Not that I'm aware of.
19 BY MS. HERZFELD:
20    Q.   What about -- did Mallinckrodt take any
21 steps after receiving this information to investigate
22 the fact that the number of overdose deaths in
23 Tennessee is climbing?
24        MR. O'CONNOR:  Objection to form.

Page 231

1    A.   Not that I'm aware of.
2 BY MS. HERZFELD:
3    Q.   You can set that aside for me, please.
4 And I'll mark this next one at Gillies Exhibit 70.
5        [Exhibit Mallinckrodt-Gillies-070
6        marked for identification.]
7    Q.   And turn, I think, to the last page, sir.
8    A.   Did you mean to give me two copies, or --
9    Q.   Probably not.
10    A.   Okay.
11    Q.   What is the title of this document I've
12 handed you, sir?
13    A.   Oxycodone IR 30mg tablets per capita.
14    Q.   And do you recognize this as a heat map?
15    A.   That's what it appears to be.
16    Q.   And it looks like red is indicative of the
17 highest number for this heat map; is that correct?
18    A.   Correct.
19    Q.   And do you see an area that's particularly
20 red in Tennessee?
21        MR. O'CONNOR:  Objection to form.
22    A.   That is the eastern part of Tennessee?  Do
23 I have the right (indicating) -- is that --
24 BY MS. HERZFELD:

Page 232

1    Q.   That is Tennessee.  Yes, sir.
2    A.   Okay.  Very good.
3    Q.   And the eastern part of Tennessee appears
4 red to you, does it not?
5    A.   It does.
6    Q.   And then the middle part of Tennessee has
7 got some kind of orangy; is that right?
8    A.   That's what it looks like.
9        MR. O'CONNOR:  Objection to form.
10 BY MS. HERZFELD:
11    Q.   And then it kind of goes blue as you go
12 west; is that right?
13    A.   Correct.
14    Q.   And based on the information contained in
15 this heat map, did Mallinckrodt restrict the amount of
16 opioids that could be shipped to Tennessee?
17    A.   Not that I'm aware.
18    Q.   Based on the information contained in this
19 heat map, were any of the information obtained in the
20 Google alerts that we just went through -- did
21 Mallinckrodt give pharmacies in Tennessee any closer
22 scrutiny?
23        MR. O'CONNOR:  Objection to form.
24    A.   Not that I can determine from this map.

Page 233

1 BY MS. HERZFELD:
2    Q.   You can set that aside for me, sir.  Okay.
3 I'm sorry, if you could put it back.
4    A.   Sure.
5    Q.   Based on that information contained within
6 that heat map, did Mallinckrodt take any particular
7 actions towards Tennessee to try to investigate opioid
8 abuse or diversion issues?
9        MR. O'CONNOR:  Objection to form.
10    A.   So I don't know without the additional
11 information whether we would have looked at any
12 pharmacies in the eastern part of Tennessee.
13 BY MS. HERZFELD:
14    Q.   So we can talk about specific pharmacies
15 in a couple of minutes.
16    A.   Okay.
17    Q.   But I guess my question is, based on that
18 heat map showing a particular concentration in east
19 Tennessee, did that prompt Mallinckrodt to take any
20 specific action in investigating pharmacies in east
21 Tennessee?
22    A.   And I don't know.
23    Q.   I'm going to hand you what we've marked as
24 Gillies Exhibit 71.

Page 234

1     [Exhibit Mallinckrodt-Gillies-071
2     marked for identification.]
3     Q.   This looks like an e-mail sent from
4 Heather McKenzie to you, copying Karen Harper, dated
5 March 13th, 2017; is that correct?
6     A.   Yes.
7     Q.   Do you believe you received this e-mail in
8 the course of your ordinary business at Mallinckrodt?
9     A.   Yes.
10     Q.   And who is Heather McKenzie?
11     A.   Heather replaced Jen Buist.
12     Q.   And do you know roughly what year?
13     A.   I believe my testimony yesterday was that
14 Jen left in 2015, 2016 time frame.
15     Q.   And looking at this e-mail, it looks like
16 this is Mallinckrodt chargeback information for Clay
17 County, Kentucky; is that right?
18          MR. O'CONNOR:  Objection to form.
19     A.   So that's the subject line, so I have no
20 reason to doubt that.
21 BY MS. HERZFELD:
22     Q.   What do you think this e-mail is?
23     A.   Again, it says MNK chargebacks located in
24 Clay County, Kentucky.

Page 235

1     Q.   And do you know why it is that
2 Mallinckrodt was looking at Clay County, Kentucky,
3 chargeback numbers?
4     A.   I mean, part of our anti-diversion
5 efforts.
6     Q.   And what about looking at these county
7 numbers was part of your anti-diversion efforts?
8     A.   Well, as we sit here I don't know why this
9 was generated, but we do look at chargeback data as
10 part of our anti-diversion efforts, so that's what I'm
11 thinking it is.
12     Q.   And in this specific one it says that
13 there are eight ZIP codes in Clay County, and then all
14 the information is pulled by those ZIP codes, it
15 appears, in that first graph.  Is that right?
16     A.   Yes.
17     Q.   And so you, as in Mallinckrodt, has the
18 ability to look at chargeback data by county; is that
19 right?
20          MR. O'CONNOR:  Objection to form.
21     A.   I don't know if we can or can't.
22 BY MS. HERZFELD:
23     Q.   What does it appear that this first box is
24 for you here?

Page 236

1     A.   The one that says Clay County, Kentucky?
2     Q.   Yes.
3     A.   Covers eight ZIP codes?
4     Q.   Yes, sir.
5     A.   Okay.  So what this appears to me is that
6 Heather probably went out to determine how many ZIP
7 codes were in that area.
8     Q.   In that county?
9     A.   I'm sorry.  In that county.
10     Q.   And so my question is pretty simple.
11          So therefore, Mallinckrodt had the ability
12 to look at chargeback data by ZIP code within a county,
13 according to what she's done here?
14          MR. O'CONNOR:  Objection to form.
15     A.   So my answer is the same.  I don't know
16 that.
17 BY MS. HERZFELD:
18     Q.   You agree with me that that's what has
19 been done in this area?
20          MR. O'CONNOR:  Same objection.
21     A.   What I see is that she pulled the ZIP
22 codes for that county.
23 BY MS. HERZFELD:
24     Q.   And so when she did that, then the next

Page 237

1 thing that she looked at, right, is population?  Do you
2 see population on that first chart?
3     A.   Yes.
4     Q.   And so you've got ZIP codes and
5 populations for a particular county, Clay County,
6 Kentucky; is that right?
7     A.   That's what in this box.
8     Q.   And then if you go down, there's a map,
9 and the map shows -- what does it purport to show
10 there?
11     A.   I don't know what it shows.
12     Q.   What does it say in the key?
13     A.   Doses per thousand residents.
14     Q.   And then there's different colors; is that
15 right?
16     A.   There's different shadings.
17     Q.   And then those shades correspond with
18 different areas of the map ahead of it; is that right?
19 Is that what this shows?
20     A.   Oh, I'm sorry.  Are you talking about the
21 box down below that?
22     Q.   Yes.
23     A.   Yes.
24     Q.   And then if you go below that, you see

Page 238

1 hydrocodone APAP 10/325. Do you see where I'm at?
2    A.    Yes.
3    Q.    And then what does it show there?
4    A.    Ship to customer. Ship to customer
5 name -- is that what you're looking at?
6    Q.    Yes, sir.
7    A.    Okay.
8    Q.    And then it also says sold via parent
9 customer name at the bottom; right? I'm sorry, at the
10 end?
11    A.    Oh, the last box, sold via parent customer
12 name.
13    Q.    So you've got the distributor and the
14 pharmacy for hydrocodone APAPs; is that right? She's
15 broken that information down?
16    A.    Yes.
17    Q.    And then also for oxycodone 15 milligrams;
18 is that right?
19    A.    Yes.
20    Q.    And then if you look at the next one,
21 oxycodone 30 milligrams; is that correct?
22    A.    Yes.
23    Q.    And then looking at that, you've got the
24 distributors and the pharmacies for each of those

Page 239

1 products; is that correct?
2    A.    Yes.
3    Q.    So in this e-mail, Heather McKenzie has
4 broken down Clay County by ZIP code, population, doses
5 per thousand residents, three different Mallinckrodt
6 products, distributor, and pharmacy.
7        Is that what's contained within this
8 e-mail?
9        MR. O'CONNOR: Objection to form.
10    A.    That information is in here.
11 BY MS. HERZFELD:
12    Q.    Do you know if you requested this
13 information from Ms. McKenzie?
14    A.    I don't recall requesting that
15 information.
16    Q.    Do you recall ever receiving another
17 e-mail like this from anyone -- Ms. McKenzie or anyone
18 else?
19        MR. O'CONNOR: Objection to form.
20    A.    I don't have any recollection of it,
21 but --
22 BY MS. HERZFELD:
23    Q.    In your time as head of security or
24 vice-president of security at Mallinckrodt, did you

Page 240

1 routinely review this type of information per county?
2        MR. O'CONNOR: Objection to form.
3    A.    What's listed on this document?
4 BY MS. HERZFELD:
5    Q.    Yes, sir.
6    A.    No.
7    Q.    I'm trying to figure out if this was
8 per -- this is an example of one type of report that
9 had been sent time and time again or if this is a
10 one-off. Do you know?
11    A.    I do not.
12    Q.    So you don't recognize the information
13 contained within this report as information that was
14 requested and reported to you routinely?
15        MR. O'CONNOR: Objection to form.
16    A.    So I mean, there appears to be some
17 information that's missing from this, so to the bottom
18 half, some of that information looks familiar to me,
19 but the top half looks less familiar to me.
20 BY MS. HERZFELD:
21    Q.    And when you were monitoring parts of the
22 country in part of your diversion efforts, did you
23 monitor by county?
24        MR. O'CONNOR: Objection to form.

Page 241

1    A.    That's not my recollection.
2 BY MS. HERZFELD:
3    Q.    So when you say that's not your
4 recollection, you mean --
5    A.    I mean no.
6    Q.    And you talked -- you can set that aside.
7 You talked with Mr. Kawamoto a little bit before about
8 reviews of pharmacies.
9    A.    Yes.
10    Q.    And if I -- if my notes on your testimony
11 are correct, you said things you would look at is
12 chargeback data; is that right?
13        MR. O'CONNOR: Objection to form.
14    A.    Yes.
15 BY MS. HERZFELD:
16    Q.    As well as Google keyword searches?
17    A.    Yes.
18    Q.    And then you said going to the DEA website
19 and U.S. Attorney's websites?
20    A.    Yes.
21    Q.    And sometimes you'd look at those
22 indictments if there were links?
23    A.    Correct.
24    Q.    And you collaborated with distributors?

Page 242

1    A.  Correct.
2    Q.  Were there any other activities that you
3  would take -- strike that.
4        Is there any other information that you
5  would look at that would cause you to review a
6  pharmacy, other than what you've already testified to?
7        MS. RANJAN:  Objection to form.
8    A.  I previously testified also that I would
9  look at the HHS OIG website.
10 BY MS. HERZFELD:
11   Q.  You're right.  You did say that.  Okay.
12 Anything else?
13   A.  Not that I can think of right now.
14   Q.  And I think you also said that that
15 pharmacy review process has been substantially the same
16 since you got there, but you might have made a couple
17 tweaks.  Is that right?
18       MR. O'CONNOR:  Objection to form.
19   A.  A couple of enhancements potentially, yes.
20 BY MS. HERZFELD:
21   Q.  And do you recall what any of those
22 enhancements were?
23   A.  One was -- I think our SOM meetings were
24 approximately once a month, and we used to wait till we

Page 243

1  came together at that meeting to discuss restricting a
2  pharmacy.
3        And if I had information before that, I
4  just sped the process up and would push the information
5  out that I felt that this pharmacy should be
6  restricted.  Instead of waiting the month, we'd just
7  restrict them sooner.
8    Q.  Any other changes that -- or enhancements,
9  as you said?
10   A.  That's the one I can think of off the top
11 of my head.
12   Q.  And when you were talking to Mr. Kawamoto
13 before about that physician that you had discovered,
14 the prescriber you had discovered when reviewing the
15 pharmacies --
16   A.  Yes.
17   Q.  -- would that have been in Tennessee?
18   A.  It was in Missouri.
19   Q.  Do you recall the name of the doctor?
20   A.  I do not.
21   Q.  So you went through some of the
22 information you would look at that might cause you to
23 trigger a pharmacy review.  We just went through that;
24 is that right?

Page 244

1    A.  Correct.
2        MR. O'CONNOR:  Objection.
3  BY MS. HERZFELD:
4    Q.  When making a determination if a pharmacy
5  review would be triggered, did you use geographic
6  severity of the opioid epidemic?
7        MR. O'CONNOR:  Objection to form.
8    A.  We'd run chargeback information and see if
9  any pharmacies across the country hit certain criteria,
10 and that would be our starting process.
11 BY MS. HERZFELD:
12   Q.  But would you weight a state or region
13 that you knew was particularly impacted with opioid
14 abuse -- would you weight that -- would that as a
15 factor be enough for you to start a pharmacy review?
16       MR. O'CONNOR:  Objection to form.
17   A.  Not until I had a pharmacy to review.
18 Yes.
19 BY MS. HERZFELD:
20   Q.  And so would that be the same for straight
21 population numbers as well -- prescriptions per
22 population?
23       MR. O'CONNOR:  Objection to form.
24   A.  That's correct.

Page 245

1  BY MS. HERZFELD:
2    Q.  And what about individual order size of a
3  pharmacy standing alone?  Would that be enough to
4  trigger a pharmacy review?
5        MR. O'CONNOR:  Objection to form.
6        MS. RANJAN:  Objection to form.
7    A.  Again, our customers are the distributors,
8  so I'm not getting any orders from the pharmacy that I
9  can look at without waiting for the chargeback data to
10 come in.
11 BY MS. HERZFELD:
12   Q.  And when you looked at that chargeback
13 data, would an order number alone be enough for you to
14 start a pharmacy review?
15       MR. O'CONNOR:  Objection to form.
16   A.  Depends on what that number was.
17 BY MS. HERZFELD:
18   Q.  And did you have a policy as to what
19 number would be sufficient to start a chargeback
20 review -- I mean, I'm sorry -- a pharmacy review?
21       MR. O'CONNOR:  Objection to form.
22   A.  So there is a formula that we have, and
23 any pharmacies that would be above what that is
24 would -- that would start the process.

Page 246

BY MS. HERZFELD:

1. Q. Would that be the [redacted]
formula that was discussed earlier?

A. No.

Q. What's the formula?

A. I can't quote it to you, but there's one for oxycodone and there is one for hydrocodone, and -- similar to that, it's the amount of product purchased over a certain period of time.

Q. And --

A. And if it exceeded those numbers, then it would hit our report to take a look at.

Q. And where could I find that formula?

A. It's in one of our procedures.

Q. And so I want to make sure I understand you correctly. So the number which would trigger a pharmacy review for the numbers you were seeing on chargeback would be different than the formula that you have for distributors?

A. Yeah, so our customers are the distributors.

Q. Right.

A. So we had our SOM review on those peculiar and unusual reports to those algorithms, and then you

Page 247

have the distributors' customers are the pharmacies, so when we would get that information, we would look at the chargeback numbers and then apply the formula that we have up against those chargebacks to see whether we needed to look further at a particular pharmacy.

Q. And that formula is different than the algorithm you've talked about earlier?

A. Yes.

Q. And you just don't remember what it is as we sit here today?

A. I'm sorry. As we sit here I just don't know all the numbers.

Q. Do you know what policy it would be contained within?

A. I don't recall the policy, but I know that there is a policy that's contained in.

Q. Would you also look at prescribers' prescribing habits when determining whether to do a pharmacy review?

MR. O'CONNOR: Objection to form.

A. So if I was doing a pharmacy review and I had prescriber information. I rarely had prescriber information.

BY MS. HERZFELD:

Page 248

Q. So you wouldn't have prescriber information on its own that would cause you to do a pharmacy review?

MR. O'CONNOR: Objection to form.

A. That's correct. But through my Google alerts, if I became aware of certain doctors and then I had a doctor that came to my attention, then I would have that information.

BY MS. HERZFELD:

Q. And when you're doing the Google alerts or looking at the press releases that we talked about, those are typically alerting you to people who have already been raided or had some sort of law enforcement interaction; is that right?

MR. O'CONNOR: Objection to form.

A. That's right.

BY MS. HERZFELD:

Q. So it's after an event's been taken generally?

MR. O'CONNOR: Objection to form.

A. It's just like the chargeback information. It's the available information that we have.

BY MS. HERZFELD:

Q. I'm going to hand you what we're going to

Page 249

mark as Gillies Exhibit 72.

[Exhibit Mallinckrodt-Gillies-072 marked for identification.]

Q. Does this appear to be an e-mail sent from Jennifer Buist to you on September 6th, 2012?

A. Yes.

Q. And did you receive this e-mail in the ordinary course of your business at Mallinckrodt?

A. I believe I did.

Q. And what is the subject line?

A. Tennessee and Utah hydro 10mg through June 2012.

Q. And if you'll flip to the attachment submitted to you. Do you recognize what this -- strike that.

Do you know what this sheet looks to be, what this attachment looks to be?

A. Can you blow it up for me?

Q. Oh, yeah. Sure. Do you recognize that to be chargeback data, sir?

A. That's what it looks like to me.

Q. And do you know why Mallinckrodt was looking at numbers for hydrocodone for Tennessee and Utah in 2012?

Page 250

1    A.   I think I testified that I had a
2 conversation with the DEA that told me that hydrocodone
3 might be being abused also.
4    Q.   And based on this information, did
5 Mallinckrodt to your knowledge take any action to
6 prevent the abuse or diversion of hydrocodone in
7 Tennessee?
8         MR. O'CONNOR:  Objection to form.
9    A.   Can we slide this over here just a little?
10 BY MS. HERZFELD:
11   Q.   Uh-huh.
12   A.   No, that's -- right there.  Okay.
13   Q.   Want me to state my question again?
14   A.   Yes.
15   Q.   Okay.  Based on the information contained
16 within this chargeback data, did Mallinckrodt to your
17 knowledge take any action to prevent the diversion of
18 hydrocodone in Tennessee?
19        MR. O'CONNOR:  Objection to form.
20   A.   So in our anti-diversion program, we would
21 have looked at pharmacies that came to our attention
22 from these chargeback reports, so if there was a
23 Tennessee pharmacy that came to our attention that we
24 looked at, then yes.

Page 251

1 BY MS. HERZFELD:
2    Q.   So I'll submit to you, sir, that this
3 chargeback data that has been sorted is all for
4 Tennessee.
5    A.   Okay.
6    Q.   Can you think of any particular pharmacies
7 that you investigated based on this information?
8    A.   Not as I sit here right now.
9    Q.   And did you take any actions statewide for
10 hydrocodone abuse or diversion in Tennessee based on
11 this chargeback information?
12   A.   Like -- what do you mean by action?
13   Q.   Did you do anything about Tennessee and
14 the hydrocodone problem?
15        MR. O'CONNOR:  Objection to form.
16   A.   So our SOM program is a national program,
17 and we would have looked at any pharmacy in Tennessee
18 that came to our attention.
19 BY MS. HERZFELD:
20   Q.   But as you sit here today, you can't think
21 of any particular pharmacy?
22   A.   That's correct.
23   Q.   And you didn't do anything for Tennessee
24 as a whole differently than any other state during your

Page 252

1 SOM program?
2         MR. O'CONNOR:  Objection to form.
3    A.   That's correct.
4 BY MS. HERZFELD:
5    Q.   Okay.  I'm going to hand you what we'll
6 mark as Gillies Exhibit 73.
7         [Exhibit Mallinckrodt-Gillies-073
8         marked for identification.]
9    Q.   Does this appear to be an e-mail sent from
10 Jennifer Buist to Gail Tetzlaff, you, and Eileen
11 Spaulding on February 26th, 2013?
12   A.   Yes.
13   Q.   And do you believe that you received this
14 e-mail in the course of your ordinary business?
15   A.   Yes.
16   Q.   And looking to the second page there -- is
17 this a pharmacy information sheet?
18   A.   Yes.
19   Q.   And who is Bill Mahoney?
20   A.   It's my understanding that Bill worked for
21 McKesson.
22   Q.   Do you recall anything about this Star
23 Discount Pharmacy in Huntsville, Alabama?
24   A.   No.

Page 253

1    Q.   Do you know how Star Discount Pharmacy in
2 Huntsville, Alabama, was selected for review?
3    A.   I do not.  I'd have to speculate.
4    Q.   And if you'll look down at the bottom,
5 where it says due diligence.
6    A.   Yes.
7    Q.   It says top prescribers identified, yes or
8 no?  And what does it say here?
9    A.   Yes.
10   Q.   If so, background checks.  And it says?
11   A.   Yes.
12   Q.   And then it lists the names of the
13 different providers; is that right?
14   A.   Yes.
15   Q.   And so it's Shelinder Aggarwal, clear,
16 Mahoney has visited, pain management background in
17 anesthesiology.  Is that right?
18   A.   Yes.
19   Q.   And then it says Mark Murphy.  What does
20 it say next to him?
21   A.   Clear.
22   Q.   And do you know what clear means?
23   A.   That means that there was no disciplinary
24 action against them.

Page 254

1 Q. Do you know if there was any other
2 investigation of those high prescribers?
3 A. Yes.
4 Q. What was it?
5 A. At some point I ran their names through
6 IMS data.
7 Q. Everyone who's identified as the top
8 prescriber in these pharmacy information sheets --
9 would you run them through IMS data?
10 A. Typically.
11 Q. And what would be the purpose of doing
12 that?
13 A. To see whether they were high opioid
14 prescribers.
15 Q. And if they were, what would that cause
16 you to do, if anything?
17 A. Ask questions.
18 Q. What types of questions?
19 A. Whether the distributor was aware that
20 these prescribers were high opioid prescribers, and I
21 couldn't tell them what the number was because we had a
22 contract with IMS, but I could tell them that -- are
23 you aware that these guys are high prescribers?
24 Q. Were high prescribers of opioid products a

Page 255

1 concern for you for potential diversion?
2 MR. O'CONNOR: Objection to form.
3 A. Didn't mean that they were, but it was a
4 concern.
5 BY MS. HERZFELD:
6 Q. If you'll look with me at the last page of
7 this e-mail. It's also a pharmacy information sheet
8 for Propst Discount Drugs in Huntsville, Alabama; is
9 that right?
10 A. Yes.
11 Q. And if you'll look down with me at the
12 bottom, it has high prescribers at the bottom of this
13 one as well; is that right?
14 A. Yes.
15 Q. And it has four individuals specifically
16 here, Mark Murphy. It says Mark Murphy is clear; is
17 that right?
18 A. Yes.
19 Q. As you sit here today, do you have any
20 information about Mark Murphy?
21 A. My recollection is he was one of the top
22 prescribers of opioids in the country.
23 Q. That stands out to you, yes?
24 MR. O'CONNOR: Objection to form.

Page 256

1 A. Yes.
2 BY MS. HERZFELD:
3 Q. And did you ever do any individual
4 investigation of Mark Murphy?
5 MR. O'CONNOR: Objection to form.
6 A. Personally, no.
7 BY MS. HERZFELD:
8 Q. Do you know if anyone else did?
9 A. I provided the names to the DEA.
10 Q. And when did you provide the name of Mark
11 Murphy to the DEA?
12 A. I don't recall the exact date, but it
13 would have been sometime right after I learned that
14 they were high prescribers.
15 Q. Do you recall what year?
16 A. I'd have to speculate. So I'm sorry, I
17 don't know.
18 Q. Do you think it was in the last two years?
19 A. I think it was before that.
20 Q. And would there be documentation of your
21 call to the DEA in your records?
22 A. Maybe.
23 Q. Did you also review the call list for the
24 branded products that Mallinckrodt had?

Page 257

1 MR. O'CONNOR: Objection to form.
2 A. No.
3 BY MS. HERZFELD:
4 Q. So do you know who was on a target list to
5 be called for those branded products -- Exalgo,
6 Xartemis?
7 A. No.
8 MR. O'CONNOR: Objection to form.
9 BY MS. HERZFELD:
10 Q. And what, if anything, did the DEA do, if
11 you know, regarding your call of Mark Murphy?
12 A. I do not know.
13 Q. And what made you decide to call the DEA
14 about Mark Murphy?
15 A. He was a high prescriber and I was
16 concerned.
17 Q. Was there --
18 A. I wanted to make sure that they were aware
19 that this guy was a high prescriber.
20 Q. Was there anything other than the fact
21 that he was a high prescriber that made you call the
22 DEA?
23 A. He was a high prescriber, and I was
24 concerned, and I called the DEA.

Page 258

1    Q.   Were there any other factors that you had,
2  or just the sheer volume?
3    A.   Sheer volume.
4    Q.   And did you alert anyone in law
5  enforcement in Alabama to your concerns about Dr.
6  Murphy?
7    A.   Yes.
8    Q.   Okay.  Who?
9    A.   It was the DEA in Alabama.
10   Q.   The -- I'm sorry.  I should back up.
11  State law enforcement in Alabama, like the local
12  district attorney, local police department -- did you
13  tell anybody local in Alabama about your concerns about
14  Mr. Murphy other than the DEA in Alabama?
15   A.   No.
16   Q.   What about the state board of medical
17  licensing in Alabama?  Did you raise your concerns with
18  them?
19   A.   No.
20   Q.   Do you know if Dr. Murphy still practices
21  in Alabama?
22   A.   I don't believe he does.
23   Q.   Where do you believe he practices now, if
24  you know?

Page 259

1    A.   I don't believe he practices.
2    Q.   Would it surprise you to know that he has
3  a clinic in Tennessee?
4    A.   Oh, does he?
5    Q.   Would that surprise you?
6    A.   Yes.
7    Q.   You didn't know that?
8    A.   Did I know that currently?
9    Q.   Yes, sir.
10   A.   I hope I don't have him mixed up with
11  somebody else, but I'm pretty sure I thought he was a
12  high prescriber.
13   Q.   So to your knowledge, did you ever
14  communicate with any Tennessee law enforcement about
15  your concerns about Mark Murphy being a high
16  prescriber?
17   A.   No.
18   Q.   And how would you review IMS data to look
19  at prescriber practices?
20   A.   I'd have the analyst run the information,
21  and she would get the updated information, provide it
22  to me, and then I could just search names.
23   Q.   And how often would you have that IMS data
24  run by the analyst?

Page 260

1    A.   So my recollection is it might have been
2  updated once a year, so when it was run I would use the
3  data that was available to me for that time until it
4  was updated.
5    Q.   And did you start that practice when you
6  joined Mallinckrodt in 2012?
7    A.   Yes.
8    Q.   And do you continue that practice today?
9    A.   No.
10   Q.   When did you stop?
11   A.   Like some of our other anti-diversion
12  efforts, we looked for all available information within
13  the company, and in this case the business unit that
14  was purchasing that information stopped purchasing the
15  information, and I no longer had access to it.
16   Q.   And do you know what year that was?
17   A.   2014 is my recollection.
18   Q.   And do you know -- when you say the
19  business unit, who is the business unit?
20   A.   I'm sorry.  I don't know which part of the
21  business at Mallinckrodt was purchasing that
22  information or for what purpose, but in my research I
23  found that they had this information, so I looked to
24  see whether I could use it.

Page 261

1    Q.   And do you know why they stopped
2  purchasing that information?
3    A.   I think that part of the business closed.
4    Q.   And then after you no longer had access to
5  that IMS health data, did you continue to monitor
6  prescribers' prescribing habits?
7        MR. O'CONNOR:  Objection to form.
8    A.   Yes.
9  BY MS. HERZFELD:
10   Q.   And how did you do that without the IMS
11  health data?
12   A.   Yeah.  So once again, I would go to the
13  medical boards, see if there was any disciplinary
14  action.  I'd do internet searches to see if there was
15  anything that was out there about these prescribers.
16   Q.   But as we talked about before, a lot of
17  that stuff was kind of after something had
18  happened; is that right?
19   A.   That's correct.
20   Q.   And with the IMS health data, that gave
21  you more real-time information; is that right?
22       MR. O'CONNOR:  Objection to form.
23   A.   Again, it was -- like the chargeback data,
24  it was retroactive, looking at a certain period of

Page 262

1  time, but like the chargeback data and our
2  anti-diversion efforts, I utilized it.
3  BY MS. HERZFELD:
4      Q.  And would you say that that IMS data would
5  help you predict, rightfully or wrongfully, whether a
6  high prescriber might be engaged in diversion?
7          MR. O'CONNOR:  Objection to form.
8      A.  Yeah, it was just -- it was another tool.
9  BY MS. HERZFELD:
10     Q.  So you don't know anything about the
11 target list for the brand side of Mallinckrodt; is that
12 right?
13     A.  I do not.
14         MR. O'CONNOR:  Objection to form.
15 BY MS. HERZFELD:
16     Q.  Do you know if you had a counterpart on
17 the branded side of Mallinckrodt that would have
18 consulted on those target lists?
19     A.  No.
20     Q.  You were director of security or
21 vice-president of security for the whole company; is
22 that right?
23     A.  That's correct.
24     Q.  But it wasn't within your job duties or

Page 263

1  responsibilities to review those target lists from the
2  branded side?
3          MR. O'CONNOR:  Objection to form.
4      A.  It was not.
5          MR. O'CONNOR:  We're at about an hour.
6  Should we take a quick break, or are you about done?
7          MS. HERZFELD:  Sure, we can take a break.
8  A break's fine.  It gives me a minute to go through my
9  documents.
10         THE VIDEOGRAPHER:  We are going off the
11 record at 5:00 PM.
12         [A brief recess was taken.]
13         THE VIDEOGRAPHER:  We are back on the
14 record at 5:07 PM.
15 BY MS. HERZFELD:
16     Q.  Okay, Mr. Gillies.  We're back on the
17 record.  I just have a couple more my questions about
18 the conversation we were having about Dr. Murphy before
19 we took a break; okay?
20     A.  Okay.
21     Q.  At the time that you had your concerns
22 about Dr. Murphy, did you go to any of the pharmacies
23 around Dr. Murphy and express your concerns to them
24 that they shouldn't be filling his prescriptions?

Page 264

1          MR. O'CONNOR:  Objection to form.
2      A.  No.
3  BY MS. HERZFELD:
4      Q.  I'm handing you what's been marked as
5  Gillies Exhibit 74.
6          [Exhibit Mallinckrodt-Gillies-074
7          marked for identification.]
8      Q.  Okay.  What does this appear to be to you,
9  sir?
10     A.  Pharmacy information sheet.
11     Q.  And when is it dated?
12     A.  October 16th, 2012.
13     Q.  And who's the distributor?
14     A.  AmerisourceBergen.
15     Q.  And what's the name of the pharmacy?
16     A.  Food City.
17     Q.  And it's the Food City in Seymour,
18 Tennessee; is that right?
19     A.  Correct.
20     Q.  And this was prepared by Ed Hazewski.  Do
21 you know?
22     A.  "Ha-zoo-ski."
23     Q.  "Has-woo-ski"?
24     A.  "Ha-zoo-ski."

Page 265

1      Q.  "Ha-zoo-ski."  Okay.  And do you know Mr.
2  Hazewski?
3      A.  Yes.
4      Q.  And do you know where he worked?
5      A.  He worked for AmerisourceBergen.
6      Q.  And if you'll flip with me to the second
7  page.  Is this another pharmacy information sheet?
8      A.  Yes.
9      Q.  And is this one also prepared by Mr.
10 Hazewski?
11     A.  Yes.
12     Q.  And is this also of a Food City?
13     A.  Yes.
14     Q.  But this one's in Knoxville, Tennessee,
15 according to this document; is that correct?
16     A.  Correct.
17     Q.  And if you'll go down to me at the bottom
18 here where it says physical location description.
19 Could you read that for me?
20     A.  As of November 15th, 2012, ABC will no
21 longer be servicing any Food City accounts.  FC Buying
22 Group, parentheses, Topco, close parentheses, leaving
23 ABC, may not be related to SOM but could be.
24     Q.  Do you know what that means -- FC Buying

Page 266

1 Group, Topco, leaving ABC?
2    A. I do not know what that means.
3    Q. May not be related to SOM but could be.
4 Do you know what that means?
5    A. I don't.
6    Q. Did you do any follow-up to figure out
7 what that meant?
8    A. We would have talked to Mr. Hazewski about
9 this pharmacy.
10    Q. And looking at this pharmacy information
11 sheet, it doesn't show anything in the due diligence
12 section; is that right?
13    A. Yes.
14    Q. So is this pharmacy information sheet
15 incomplete?
16       MR. O'CONNOR: Objection to form.
17    A. The information's not there. We would
18 have -- if we had any concerns, we would have asked
19 when the last site visit was. So -- okay.
20 BY MS. HERZFELD:
21    Q. And do you know why ABC determined that it
22 would no longer be supplying Food City?
23       MR. O'CONNOR: Objection to form.
24    A. So I interpreted in that note at the

Page 267

1 bottom that they were leaving Amerisource.
2 BY MS. HERZFELD:
3    Q. But you don't know why?
4    A. I don't know why, no. I'm sorry.
5    Q. And when it says related to SOM, what do
6 you take SOM to mean?
7    A. Suspicious order monitoring.
8    Q. And based on that information from
9 AmerisourceBergen in this pharmacy information sheet,
10 do you know if Mallinckrodt did any investigation of
11 Food City in Tennessee?
12       MR. O'CONNOR: Objection to form.
13    A. No, but we would have asked Mr. Hazewski
14 about what that comment related to.
15 BY MS. HERZFELD:
16    Q. And do you know what the follow-up was on
17 that?
18    A. I don't recall.
19    Q. You can set that aside. I'm handing you
20 what's marked as Gillies 75.
21       [Exhibit Mallinckrodt-Gillies-075
22       marked for identification.]
23    Q. Does this appear to be an e-mail sent from
24 Jennifer Buist to you and Bill de Gutierrez-Mahoney on

Page 268

1 July 25th, 2013?
2    A. So the e-mail was July 22nd, and I think
3 the second piece might be a meeting schedule.
4    Q. And do you recall the meeting at all?
5    A. No.
6    Q. Do you recall -- it says the subject here
7 is called to discuss Food City Pharmacy?
8    A. Right.
9    Q. Do you have any memory of what occurred on
10 that telephone call?
11    A. That I do not.
12    Q. If you'll look with me at the third page.
13 It looks like the beginning of an e-mail exchange. At
14 the very top, it's from Bill de Gutierrez-Mahoney to
15 Jennifer Buist. Do you see where it's at?
16    A. Yes.
17    Q. It says Jen, we've suspended controlled
18 deliveries to this store effective 6-21. Do you know
19 what that means?
20    A. That they stopped servicing the -- that
21 store for controlled substances.
22    Q. But you don't know why?
23    A. As we sit here, no.
24    Q. You can set that aside.

Page 269

1    A. Okay.
2    Q. I'll hand you what we'll mark as Gillies
3 76.
4       [Exhibit Mallinckrodt-Gillies-076
5       marked for identification.]
6    Q. If you'll look at the very first page.
7 What is the file name of this document?
8    A. It says the file name, Food City
9 prescribers.
10    Q. If you'll go ahead and look -- take a look
11 at it for me. Do you know if you requested this
12 information?
13    A. It would have been part of our
14 anti-diversion efforts when we had prescribers that
15 would get this information.
16    Q. And what do you know about the four
17 prescribers that are on this list?
18    A. They appear to be fairly high prescribers.
19    Q. And did you do any additional
20 investigation of any of these prescribers on this list?
21    A. Not that I can recall while I sit here.
22    Q. You can set that aside. Have you ever
23 heard of a place called the Bearden Clinic in
24 Knoxville?

Page 270

1    A.   It's not familiar to me while I'm sitting
2  here.
3    Q.   I'll hand you what's been marked as
4  Gillies Exhibit 77.
5       [Exhibit Mallinckrodt-Gillies-077
6       marked for identification.]
7    Q.   Do you recognize this as an e-mail sent
8  from Jennifer Buist to you on August 26th, 2013?
9    A.   Yes.
10   Q.   And do you believe you received this
11 e-mail in the course of your ordinary business at
12 Mallinckrodt?
13   A.   Yes.
14   Q.   It's a quite extensive e-mail.  Do you
15 know who Joe Lumpkin was?
16   A.   I believe I worked for McKesson.
17   Q.   You'll take some time to review it from
18 the back forward, and then I'll ask you a couple
19 questions about it.
20   A.   Okay.  Okay.  Yes.
21   Q.   Okay.  Does it look like this is an e-mail
22 exchange between Jennifer Buist and Joe Lumpkin that
23 was then forwarded on to you?
24   A.   Yes.

Page 271

1    Q.   So starting at the back, on the third
2  page.  Okay.  So you're going back and forth here.
3    A.   I'm sorry.  Which page are you on?
4    Q.   Look at Page -- the one that ends 9707.
5    A.   Yeah.
6    Q.   At the top here, Jennifer says Joe, we can
7  fill in the statistical portion during our call, but it
8  would be of great help to have the prescribers' names
9  prior to our meeting.  Is that possible?  Jen.  Do you
10 see where I have that?
11   A.   Yes.
12   Q.   And then flip with me to the page that's
13 9706.
14   A.   Yes.
15   Q.   And then you see what Joe Lumpkin says
16 here?
17   A.   Yes.
18   Q.   What does he say?
19   A.   He says sorry, no, we have modified our
20 processes, and we do not obtain prescriber names
21 anymore.
22   Q.   So then Jennifer responds will you be able
23 provide relevant data information as per the PIS's.  Is
24 that pharmacy information sheet?

Page 272

1    A.   Yes.
2    Q.   Minus the prescribers during our call for
3  the four pharmacies.  You see where I'm at?
4    A.   Yes.
5    Q.   And then if you switch to the next page
6  that starts 9705, Joe then writes back at the bottom of
7  the page to Jen.  It starts Jen, unfortunately, no.  Do
8  you see that where I'm at?
9    A.   Yes.
10   Q.   And then he says this is not a top
11 priority for me at the moment, and I would suggest that
12 we probably need to cancel the call until I have time
13 to research the info.  Did I read that correctly?
14   A.   Yes.
15   Q.   So in this e-mail it looks like McKesson
16 informed Mallinckrodt that it would no longer be
17 checking on prescriber names.  Was that your
18 understanding?
19   A.   Yeah, it says that they would no longer
20 obtain prescriber names.
21   Q.   And do you know if they ever started -- if
22 they ever restarted -- strike that.  Do you know if
23 McKesson started again to -- strike that.  Do you know
24 if that was true?  Did they stop providing you with

Page 273

1  prescriber names?
2       MR. O'CONNOR:  Objection to form.
3    A.   As I testified previously, rarely did we
4  get prescriber names, so he said they were stopping.  I
5  believe them to have stopped.
6  BY MS. HERZFELD:
7    Q.   And did Mallinckrodt do anything in
8  response to that notification from McKesson?
9    A.   No.
10   Q.   Did Mallinckrodt then begin checking on
11 all of McKesson's pharmacies' prescribers?
12      MR. O'CONNOR:  Objection to form.
13   A.   I wouldn't know who their prescribers are.
14 BY MS. HERZFELD:
15   Q.   Okay.  Okay, you can set that aside.  I'll
16 hand you what we'll mark as Gillies Exhibit 78.
17      [Exhibit Mallinckrodt-Gillies-078
18      marked for identification.]
19   Q.   Does this appear to be an e-mail sent from
20 Jennifer Buist to you February 5th, 2014?
21   A.   Yes.
22   Q.   And do you believe you received this
23 e-mail in the course of your ordinary business at
24 Mallinckrodt?

Page 274

1  A.  Yes.

2  Q.  And it says -- the subject is e-mailing

3 Food City oxy 30 PIS, 12 2013.  Is that right?

4  A.  Yes.

5  Q.  So if you'll look with me at the second

6 page, does this appear to be a pharmacy information

7 sheet for the Food City location in Seymour, Tennessee?

8  A.  Yes.

9  Q.  And what is the date?

10  A.  February 5th, 2014.

11  Q.  And the distributor here is who?

12  A.  McKesson.

13  Q.  And it's prepared by?

14  A.  Tom McDonald.

15  Q.  And so this is not the distributor that we

16 had in the last pharmacy information sheet for Food

17 City; is that right?

18  A.  It is not.

19  Q.  Before it was AmerisourceBergen?

20  A.  That's correct.

21  Q.  And now it's McKesson?

22  A.  Correct.

23  Q.  So then if you'll -- let go down to the

24 due diligence area.  Do you see if there's anything

Page 275

1 filled out in the due diligence area on the bottom of

2 that page?

3  A.  It's blank.

4  Q.  And what about current status -- that

5 block?  Is anything filled out there?

6  A.  It's blank.

7  Q.  And statistics, all volumes based on

8 tablets.  It looks like percentage of controlled

9 substances noncontrolled substances -- that's

10 filled in.  What does it say?

11  A.  45 percent.

12  Q.  What about volume of controlled substances

13 tablets per month approximately?

14  A.  14,500.

15  Q.  Oh, okay, you're looking down volume of

16 oxycodone family.  Okay.  I see where you're at.

17  A.  I'm sorry.  Where are you at?

18  Q.  That's okay.  I was just looking at the

19 one that was up below the 45 percent.  Okay.  And then

20 what about where it says percentage of cash sales

21 versus noncash sales as reported by the pharmacy?  Do

22 you see anything there?

23  A.  No.

24  Q.  So would you say that this pharmacy

Page 276

1 information sheet is complete?

2  A.  The document is incomplete, but there are

3 questions we would have asked.

4  Q.  Do you know what the answers are to those

5 questions?

6  A.  Not as we sit here, no.

7  Q.  Is there a place where I could locate the

8 answers to those questions in documents at

9 Mallinckrodt?

10  A.  Possibly.

11  Q.  Do you know -- where would I look?

12  A.  Look for this Food City.

13  Q.  Would you have had like handwritten notes?

14  A.  Yes.

15  Q.  Is that -- okay.  Okay.  Flip with me to

16 the next page.  Okay.  This is also a pharmacy

17 information sheet for Seymour, Tennessee, the Food

18 City, filled out by Tom McDonald, 2-5-14.  Do you see

19 that?

20  A.  Yes.

21  Q.  And then down at the bottom, do you --

22  MR. O'CONNOR:  Counsel, sorry, I'm just

23 going to interrupt for a minute.  This appears to be

24 from a different production, a different Bates number.

Page 277

1 Does this --

2  MS. HERZFELD:  Huh.

3  MR. O'CONNOR:  -- purport to be an

4 attachment or --

5  MS. HERZFELD:  That's a really good

6 question.  I guess that one's not.  We can make it a

7 separate one if you want, a separate exhibit.

8  MR. O'CONNOR:  So --

9  MS. HERZFELD:  Oh, you know what?  I think

10 it probably just got stuck.  Let me make it a separate

11 exhibit.  Good catch.

12  MR. O'CONNOR:  79?

13  MS. HERZFELD:  79.

14  [Exhibit Mallinckrodt-Gillies-079

15  marked for identification.]

16 BY MS. HERZFELD:

17  Q.  Okay.  Looking at 79, if you could read

18 for me what it says for physical location and

19 description down at the bottom.

20  A.  February 5th, 2014.  Pharmacy owned by a

21 company called KVAT, parentheses, part of Topco, close

22 parentheses.  Pharmacy services pain clinics.  Food

23 City is self-warehoused, parentheses, buys controlled

24 substances from McKesson, buys some noncontrolleds

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 directly from manufacturer, close parentheses.

2 Q. And is there anything about that

3 information that would have caused you concern for

4 potential diversion by Food City?

5 MR. O'CONNOR: Objection to form.

6 A. Not as I sit here that I can see.

7 BY MS. HERZFELD:

8 Q. I'm going to hand you this next exhibit.

9 It's a little unwieldy, but we had to print it out

10 legal. Okay. This is Gillies Exhibit 80.

11 [Exhibit Mallinckrodt-Gillies-080

12 marked for identification.]

13 Q. Does this appear to be an e-mail sent from

14 Jennifer Buist to you dated June 30th, 2014?

15 A. Yes.

16 Q. And the subject is MCK pharmacy review.

17 Do you know what MCK is?

18 A. McKesson.

19 Q. And do you believe you received this

20 e-mail in the course of your ordinary business at

21 Mallinckrodt?

22 A. Yes.

23 Q. And if you'll flip with me to the

24 attachment. What is the title of the attachment? Do

Page 279

1 you see the title at the very top?

2 A. I can't read it.

3 Q. Okay. I'll pop it in here for you.

4 Sorry. It's really tiny.

5 A. Can you get that any bigger, or is that

6 the best we can do?

7 THE VIDEOGRAPHER: That's the best we

8 have.

9 Q. Okay. So McKesson top oxycodone 30 mg

10 pharmacies.

11 BY MS. HERZFELD:

12 Q. As of?

13 A. July -- I can't --

14 Q. 2012?

15 A. 2012. Okay.

16 Q. And did you request this information from

17 Jennifer?

18 A. So it was prepared as part of our

19 anti-diversion efforts.

20 Q. And do you believe it was kept in the

21 course of ordinary business at Mallinckrodt?

22 A. Yes.

23 Q. You can set that aside. Okay. So during

24 your time at Mallinckrodt, you've been -- you've become

Page 280

1 familiar with chargeback data; is that right?

2 A. Yes.

3 Q. Oh, I had one more follow-up question.

4 I'm sorry. I'm going to skip back for one second. I

5 think I had asked you before if you had ever done a

6 pharmacy site visit in Tennessee, and you had said that

7 you had not. Is that right?

8 A. Correct.

9 Q. Do you know if anyone at Mallinckrodt had

10 ever done a pharmacy site visit in Tennessee?

11 A. I don't know.

12 Q. As you sit here today you can't think of

13 any?

14 A. I cannot.

15 Q. And moving back along. Okay. So you said

16 you were familiar with chargeback data; is that

17 correct?

18 A. Yes.

19 Q. Okay. Handing you Gillies Exhibit 81.

20 [Exhibit Mallinckrodt-Gillies-081

21 marked for identification.]

22 Q. I'll submit to you, sir, that this was

23 data that was provided to us in discovery. We've

24 modified it to show just Tennessee. Could you read the

Page 281

1 file name for me at the top of this document?

2 A. Hydro APAP 10s, shipped to sold, via by

3 month, January 2015 to December 2015, 325 APAP run on

4 1-15-2016.

5 Q. And if I understood your testimony

6 correctly earlier, the reason chargeback data was run

7 on hydro APAP 10s was because the DEA indicated to you

8 that they were subject to potential abuse and

9 diversion; is that right?

10 MR. O'CONNOR: Objection to form.

11 A. To the diversion. I don't know that they

12 used the word abuse.

13 BY MS. HERZFELD:

14 Q. Okay. To diversion? Okay. And looking

15 at this, if you'll look on the first page for me. Does

16 this appear to be chargeback data reports to you, sir?

17 A. Okay. Any chance you could blow that up

18 for me?

19 Q. Oh, sure. I'm going to show you mine

20 actually which is better because it's got some

21 highlighting.

22 A. Okay.

23 Q. Might make it easier. Okay. Does this

24 look like a chargeback -- a general chargeback report

Page 282

1  to you?
2      A.   Yeah.  Can you start from there?
3      Q.   Here?
4      A.   Yeah.
5      Q.   Uh-huh.
6      A.   Thank you.
7      Q.   Uh-huh.
8      A.   Then go across.
9      Q.   Uh-huh.
10     A.   Yeah.  Yeah, perfect.  Thank you.
11     Q.   Can you see it at all?
12     A.   Yes.
13     Q.   So do you recognize that as a chargeback
14 report?
15     A.   That's what it appears to be.
16     Q.   And so the highlighted one that I have
17 here, which is not highlighted on the exhibit, but
18 Number 666.  Do you see that one here?
19     A.   Yes.
20     Q.   And that's Bradley Drug Company?
21     A.   Yes.
22     Q.   And I want to make sure I'm reading this
23 correctly.  So that's at 5208 Charlotte Avenue in
24 Nashville, Tennessee, and then it shows that the

Page 283

1  distributor there is McKesson Drug; is that correct?
2      THE VIDEOGRAPHER:  It's just off the
3  screen.
4  BY MS. HERZFELD:
5      Q.   Oh, it's just off the screen.  Sorry.
6      A.   Yes.
7      Q.   And then it shows here -- this is the
8  number of -- it says -- gosh, I can't even see.  I
9  can't see.
10     A.   Yeah.  So it's going to be -- so what do
11 you want to look at?  So you've got month 12 being
12 December 2015, month 11 November 2015, month 10 --
13     Q.   Okay.  And so that's the number of units
14 that were shipped of hydro APAP -- Mallinckrodt hydro
15 APAP to Bradley drugs --
16     MR. O'CONNOR:  We can't see anything.
17 BY MS. HERZFELD:
18     Q.   You can't see it anymore?  According to
19 this chargeback data for this year; is that right?
20     A.   I'm sorry.  What was your question again?
21     Q.   Sure.  I'm trying to figure out what it
22 shows.  So this chart --
23     A.   Yeah.  So this is chargeback information
24 over this 12-month period for that pharmacy.

Page 284

1      Q.   And so that would show the shipments of
2  Mallinckrodt hydro APAP 10s that went to that pharmacy
3  that they received chargeback data for; is that
4  correct?
5      A.   Correct.
6      Q.   And so in this case it's 131,400 for
7  Bradley Drugs; is that correct?
8      A.   Correct.
9      Q.   And so would that be the same for this
10 entire chart?  That's how I should read it?
11     MR. O'CONNOR:  Objection to form.
12     A.   Yes.
13 BY MS. HERZFELD:
14     Q.   So looking at this next page -- let me
15 just give you another example, which I'm sure you can't
16 see so I'll try to do a better job.  This is Line 1609,
17 and it shows Rite Aid Number 2494.  Oops.  Do you see
18 that?
19     A.   Yes.
20     Q.   And that is located on Gainesboro Highway
21 in Celina, Tennessee.  Do you see that?
22     A.   Yes.
23     Q.   And so this would show, if I'm reading it
24 correctly, that's the distributor for this Rite Aid

Page 285

1  in Celina, Tennessee, is McKesson Drug; is that right?
2      A.   Correct.  Uh-huh.
3      Q.   And then this would show the monthly
4  chargebacks for Mallinckrodt hydro APAP 10s that were
5  sent to this pharmacy in Celina, Tennessee, for an
6  entire year; is that correct?
7      MR. O'CONNOR:  Objection to form.
8      A.   Correct.
9  BY MS. HERZFELD:
10     Q.   And then for the total for 12 months can
11 you read it there for me?
12     A.   87,000.
13     Q.   Have you ever been to Celina, Tennessee,
14 sir?
15     A.   I don't think so.
16     Q.   Have you ever heard of Celina, Tennessee?
17     A.   I would have heard it from reviewing these
18 reports.
19     Q.   But other than that, do you have any
20 independent memory of discussing Celina, Tennessee?
21     A.   I do not.
22     Q.   Did you hear anything about Geraldo Rivera
23 going to Celina, Tennessee, recently?
24     A.   No.

Page 286

1   Q.   Did you ever watch Geraldo Rivera?
2   A.   No.
3   Q.   Do you follow him on Twitter?
4   A.   No.
5   Q.   Okay.  You can set that aside for me,
6   please.  Okay.  Okay, sir.  I'm going to mark this next
7   one at Gillies Exhibit 82.
8        [Exhibit Mallinckrodt-Gillies-082
9        marked for identification.]
10  Q.   Okay, sir.  Do you also recognize this as
11  chargeback data?
12  A.   That's what it appears to be.
13  Q.   And I will submit to you that we've sorted
14  the chargeback data that was provided to us by state,
15  so here you only have Tennessee.
16  A.   Okay.
17  Q.   Okay?  So for this first one -- and you
18  can see my highlights.  I'm not worried about it.
19  We'll look up here.  This is chargeback data for
20  Mallinckrodt oxy 15s from January 2016 through December
21  of 2016.  Is that what it says?
22  A.   It does.
23  Q.   If you'll flip with me to the next page
24  here.  Does this chargeback data show that -- where am

Page 287

1   I?  Here at Line 133.
2   A.   Yes.
3   Q.   That Food City in Seymour, Tennessee,
4   through the distributor McKesson, received 31,500 oxy
5   15 pills during that year -- the units of measure?
6   A.   Yes.
7   Q.   And then looking down here, 342, that is
8   Riggs Drug in Powell, Tennessee.  Do you see that?
9   A.   Yes.
10  Q.   And does that show that through
11  distributor Cardinal Health, Riggs Drug received 17,800
12  pills; is that right?
13  A.   Yes.
14  Q.   Is that pills or bottles?
15  A.   Tablets.
16  Q.   Tablets?  Okay.  And if you'll look for me
17  at the one labeled 530.  Sir, does that show that the
18  Riggs Drug in La Follette, Tennessee, through
19  distributor Cardinal Health, received 13,800 tablets?
20  A.   Yes.
21  Q.   And then 729, we have Riggs Drug of
22  Jacksboro.
23       THE VIDEOGRAPHER:  A little off the
24  screen.

Page 288

1   BY MS. HERZFELD:
2   Q.   Am I off the screen?  Riggs Drug of
3   Jacksboro --
4   A.   That's all right.  I'm --
5   Q.   You can see it?
6   A.   Two glasses, so --
7   Q.   There you go.  Okay.  So the Riggs Drug in
8   Jacksboro, Tennessee.  Do you see that?
9   A.   Yes.
10  Q.   And the distributor is Cardinal Health?
11  A.   Yes.
12  Q.   And they received 11,300 tablets of oxy
13  15s during that year; is that right?
14  A.   Correct.
15  Q.   Just a couple more.  If you'll switch with
16  me to the next page.  Okay.  The one that's 4026.  Dale
17  Hollow Healthmart Pharmacy in Celina, Tennessee.  Do
18  you see that?
19  A.   Yes.
20  Q.   Distributor is AmerisourceBergen?
21  A.   Yes.
22  Q.   And they shipped  2,900 tablets during
23  that year; is that right?
24  A.   Yes.

Page 289

1   Q.   Now, if you'll flip with me halfway
2   through, we have the sheet for the oxy 30s.  And we'll
3   submit to you that this has also been modified to show
4   just Tennessee.  So this is the same; right?  It's the
5   chargeback data from January 2016 to December 2016 for
6   oxy 30s modified to show Tennessee.
7   A.   Okay.
8   Q.   Okay.  Starting again.  Okay.  The second
9   line here, 371.  Does that show that the Bradley Drug
10  Company in Nashville through McKesson received 45,100
11  tablets of oxy 30?
12  A.   Yes.
13  Q.   Go down to Number 1737.  Mac's Pharmacy of
14  Knoxville, Tennessee, through Cardinal Health received
15  23,300 tablets; is that right?
16  A.   Yes.
17  Q.   Number 2785.  Riggs Drug of La Follette,
18  Tennessee, 17,800 tablets through its distributor,
19  Cardinal Health; is that right?
20  A.   Yes.
21  Q.   Disney Pharmacy Services, Number 3174.
22  A.   Okay.
23  Q.   Okay?  In Powell, Tennessee, received
24  16,600 oxy 30 tablets through McKesson; is that right?

Page 290

1  A.  Yes.
2  Q.  And then down at the bottom here, 3801,
3 Lowe's Drug in Maryville, Tennessee, received 14,500
4 oxy 30 tablets during that year through its
5 distributor, Cardinal Health; is that right?
6  A.  Yes.
7  Q.  If you'll switch with me to the next page.
8 The one at 4335.  Riggs Drug in Powell, Tennessee,
9 through Cardinal Health, 12,900 tablets of oxy 30
10 during this year from Cardinal Health; is that correct?
11  A.  Yes.
12  Q.  And also at 5014.  Riggs Drug, Jacksboro,
13 Tennessee, through Cardinal Health, 11,500 tablets; is
14 that right?
15  A.  Yes.
16  Q.  Switch with me to the next.  If you'll go
17 to Line 7938.  Anderson Hometown Pharmacy in Celina,
18 Tennessee, through McKesson, 7,400 tablets.  Does that
19 look correct?
20  A.  Yes.
21  Q.  Then if you'll switch with me to the page
22 that's marked Page 5 at the bottom, two pages later.
23 Number 13872, Dale Hollow Healthmart Pharmacy in
24 Celina, Tennessee, through AmerisourceBergen, 3,600

Page 291

1 tablets of oxy 30 during the calendar year 2016.  Do
2 you see that?
3  A.  Yes.
4  Q.  And that's correct?  This would indicate
5 the chargeback data that was processed for those
6 shipments; is that correct?
7  A.  Correct.
8  Q.  You can set that aside, please.  Okay.
9 We'll mark this as Gillies 83.
10      [Exhibit Mallinckrodt-Gillies-083
11      marked for identification.]
12  Q.  Sir, you said earlier that you reviewed
13 different press releases from the federal government to
14 look for different enforcement information as part of
15 your job; is that correct?
16  A.  Yes, that's one of the things I do.
17  Q.  Have you seen this one?
18  A.  As we sit here now, I don't know.
19  Q.  What does this appear to be to you?
20  A.  A DEA press release.
21  Q.  And what is the date?
22  A.  August 28th, 2018.
23  Q.  And if you could read the title for me,
24 please?

Page 292

1  A.  DEA investigators seeking answers in small
2 Tennessee town.
3  Q.  And the next line?
4  A.  Rural Clay County pharmacies' 2017
5 purchases from distributors totaled more than one
6 million pills.
7  Q.  Do you know what the population is of
8 Celina, Tennessee?
9  A.  I do not.
10  Q.  And so the -- where does it say that the
11 location of this press release is?  The date line right
12 there?
13  A.  Celina?  Is that what you're asking me?
14  Q.  Yes, sir.
15  A.  Oh, okay.
16  Q.  Celina, Tennessee?  Could you read that
17 first paragraph to me?
18  A.  DEA investors this week conducted an
19 investigation in several pharmacy locations in the Clay
20 County, Tennessee, town of Celina following an inquiry
21 into irregular patterns of pill purchases from drug
22 distribution companies.  DEA is now investigating
23 possible criminal activity involving the illicit
24 diversion of controlled prescription pharmaceuticals at

Page 293

1 each of the pharmacies in question.
2      According to sales data, these pharmacies
3 purchased nearly one-and-a-half million pills in 2017,
4 a number not typically reflective of a rural area such
5 as Clay County.  As the nationwide opioid epidemic
6 continues to ravage many parts of the country, DEA is
7 increasingly utilizing its investigative and regulatory
8 resources to aggressively pursue illicit pill diversion
9 at multiple levels in the supply chain that have helped
10 contribute to record overdose deaths.
11  Q.  Okay.  You can stop there.  Okay.  And you
12 weren't aware of this, sir?
13  A.  I said as I sit here now --
14      MR. O'CONNOR:  Objection to form.
15  A.  -- I don't recall whether I read this or
16 not.
17 BY MS. HERZFELD:
18  Q.  Did you ever do any investigation of Clay
19 County, Tennessee, for suspected diversion of
20 Mallinckrodt opioids?
21      MR. O'CONNOR:  Objection to form.
22  A.  No.
23 BY MS. HERZFELD:
24  Q.  Any particular pharmacies in Clay County,

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 Tennessee, that you recall investigating for potential
2 diversion?
3    A.   I don't know as I sit here.
4    Q.   Do you know how many Tennessee pharmacies
5 have ever been put on Mallinckrodt's chargeback
6 restriction list?
7    A.   I do not.
8         MS. HERZFELD:  Okay.  Can we take a break
9 real quick?
10        THE VIDEOGRAPHER:  We are going off the
11 record at 5:48 PM.
12        [A brief recess was taken.]
13        THE VIDEOGRAPHER:  We are back on the
14 record at 6:00 PM.
15 BY MS. HERZFELD:
16    Q.   Okay.  I'm going to hand you what's marked
17 as Gillies Exhibit 84.
18        [Exhibit Mallinckrodt-Gillies-084
19         marked for identification.]
20    Q.   We'll submit to you that we modified this
21 just to show Tennessee.  If you'll flip to -- or I'm
22 sorry.  The file name here is IMS data top 1,000 XLSX;
23 is that correct?
24    A.   Yes.

Page 295

1    Q.   And if you'll flip to the next page for
2 me.  Does that appear to be the type of IMS data you
3 and I were talking about before?
4    A.   Yes.
5    Q.   And the year on the front page of this --
6 it says year created, September 16, 2013?
7    A.   Correct.
8    Q.   And I think you said you think they cut
9 off the ability to get this information in 2014?
10        MR. O'CONNOR:  Objection to form.
11    A.   That's my understanding.
12 BY MS. HERZFELD:
13    Q.   You can set that one aside.  Okay.  I'll
14 do this next one.  Gillies Exhibit 85.
15        [Exhibit Mallinckrodt-Gillies-085
16         marked for identification.]
17    Q.   Take a look at that.  Does this appear to
18 be an e-mail from Jennifer Buist?
19    A.   Buist.
20    Q.   Buist.  Buist.  I can't I can't say that
21 one.
22    A.   "Byoo-ist."
23    Q.   "Byoo-ist."
24    A.   There you go.

Page 296

1    Q.   Sent January 10th, 2014, to you and Gail?
2    A.   Yes.
3    Q.   And you believe you received this in the
4 ordinary course of your business at Mallinckrodt?
5    A.   Yes.
6    Q.   And the subject is SOM team hyphen MNK XAR
7 target list 1-7-14.  Do you see that?
8    A.   1-7-14.  Yes.
9    Q.   And does MNK stand for Mallinckrodt?
10    A.   It does.
11    Q.   And XAR -- does that stand for Xartemis?
12    A.   I don't know if it does -- anything else
13 in this document, because I can't read it.
14    Q.   Okay.  It doesn't -- I don't think it says
15 one way or the other.  Okay.  If you were to receive a
16 list like this and it was a target list of doctors that
17 were being targeted for sales of the branded
18 Mallinckrodt products and those -- any of those doctors
19 were also doctors that you had flagged as being a
20 potential concern through your review of IMS health
21 data, would that be problematic to you?
22        MR. O'CONNOR:  Objection to form.
23    A.   It would be something that we would pass
24 on, yes.

Page 297

1 BY MS. HERZFELD:
2    Q.   Okay.  You can set that aside.  We were
3 talking earlier about Celina, Tennessee.  Do you
4 remember our conversations about Celina?
5    A.   Yes.
6    Q.   Are you aware that about 24 hours ago, a
7 federal judge issued a temporary restraining order
8 against two pharmacies in Celina, preventing them from
9 distributing any controlled substances?
10        MR. O'CONNOR:  Object.
11    A.   No.
12 BY MS. HERZFELD:
13    Q.   Okay.  I'm going to hand you what's been
14 marked as Exhibit 86.
15        [Exhibit Mallinckrodt-Gillies-086
16         marked for identification.]
17        MS. HERZFELD:  I only have one copy, guys.
18 Sorry.
19        THE VIDEOGRAPHER:  Do you want to pull it
20 back up?
21        MS. HERZFELD:  Can you see it?
22 BY MS. HERZFELD:
23    Q.   Okay.  Looking at this document, it
24 appears that this temporary restraining order was

Page 298

1 granted against Oakley Pharmacy, doing business as Dale
2 Hollow Pharmacy, and Clay County Xpress Pharmacy in
3 Celina, Tennessee. Do you recall any investigations
4 that Mallinckrodt did of Oakley Pharmacy, Dale Hollow
5 Pharmacy, or Clay County Xpress Pharmacy?
6 　　　MR. O'CONNOR: Objection to form.
7 　　A. Not as I sit here right now.
8 BY MS. HERZFELD:
9 　　Q. Does the name Thomas Weie mean anything to
10 you?
11 　　A. It does not.
12 　　Q. Have you ever heard of a federal judge
13 enjoining a pharmacy from being able to dispense
14 controlled substances?
15 　　A. I'm not familiar with that.
16 　　Q. You can set that aside. We went through
17 this PowerPoint yesterday during your 30(b)(6). I'm
18 going to mark it again just so we have it as an exhibit
19 in this deposition. I think these are my last
20 questions for you. Mark this as Gillies Exhibit 87.
21 　　　[Exhibit Mallinckrodt-Gillies-087
22 　　　marked for identification.]
23 　　Q. Do you recall our conversations about this
24 PowerPoint yesterday in your 30(b)(6)?

Page 299

1 　　A. Yes.
2 　　Q. So if you will flip with me to the page
3 here that ends 7279. Okay. In this PowerPoint that
4 was presented at this DEA conference, one of the slides
5 here that I have you looking at, 7279 -- can you read
6 the title there for me, please?
7 　　A. Intent.
8 　　Q. Yes. Okay. And can you read for me what
9 the slide says, sir?
10 　　A. Number 1, next. I want to explain
11 something about proving a defendant's state of mind.
12 　　Q. Okay.
13 　　A. Two, ordinarily, there's no way that a
14 defendant's state of mind can be proved directly,
15 because no one can read another person's mind and tell
16 what that person is thinking. Three, but a defendant's
17 state of mind can be proved indirectly from the
18 surrounding circumstances. This includes things like
19 what the defendant said, what the defendant did, how
20 the defendant acted, and any other facts or
21 circumstances in evidence that show what was in the
22 defendant's mind.
23 　　　Number 4. You may also consider the
24 natural and probable results of any acts that the

Page 300

1 defendant knowingly did, in brackets, or did not do,
2 close brackets, and whether it is reasonable to
3 conclude that the defendant intended those results.
4 This, of course, is all for you to decide.
5 　　Q. And then the citation at the bottom?
6 　　A. Sixth Circuit pattern jury instructions
7 2.08.
8 　　Q. And based on your law enforcement
9 experience and your time at Mallinckrodt, do you agree
10 with this definition of intent?
11 　　　MR. O'CONNOR: Objection to form.
12 　　A. No.
13 BY MS. HERZFELD:
14 　　Q. What do you disagree with?
15 　　　MR. O'CONNOR: Objection to form.
16 　　A. So in my Mallinckrodt experience, I
17 have -- these are the words on this document that
18 somebody's saying. So in my Mallinckrodt experience I
19 have no experience with this. Okay.
20 BY MS. HERZFELD:
21 　　Q. So based on your law enforcement
22 experience, would you agree with this definition of
23 intent?
24 　　　MR. O'CONNOR: Objection. Touhy grounds.

Page 301

1 You can answer only to the extent that you're speaking
2 as to information you did not gain in the course of
3 your official duties.
4 　　A. So I'm not going to be able to answer that
5 question.
6 BY MS. HERZFELD:
7 　　Q. You can't answer what you believe the
8 definition -- if this definition of intent is correct
9 because of an objection on Touhy?
10 　　A. No, that I answered from a Mallinckrodt,
11 standpoint that I --
12 　　Q. You?
13 　　A. That I -- that that's a no, and then --
14 and then, yeah, so I'm going to be able to answer that
15 question.
16 　　Q. So when you said from a Mallinckrodt
17 standpoint that's a no, what do you mean? From a
18 Mallinckrodt standpoint, the information you gained at
19 Mallinckrodt --
20 　　A. So.
21 　　Q. I'm going to back up.
22 　　A. I've received no information while I've
23 been at Mallinckrodt on this intent piece, so I'm
24 unable to speak to this as a result of that.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q.   But today you're in your fact witness
2  capacity, and so my question is you as a person, Mr.
3  Gillies --
4    A.   Okay.
5    Q.   -- do you agree that this is an
6  appropriate definition of intent?
7    A.   Okay.  So that --
8         MR. O'CONNOR:  Objection to form.
9    A.   That's a separate question now.
10 BY MS. HERZFELD:
11   Q.   Okay.
12   A.   Because previously you asked me about
13 Mallinckrodt.
14   Q.   Yeah.
15   A.   And then you asked me about my law
16 enforcement.
17   Q.   Yeah.
18   A.   So --
19        MR. O'CONNOR:  Same objection.
20   A.   So I have no opinion on what's written
21 here.
22 BY MS. HERZFELD:
23   Q.   And do you know what criminal jury pattern
24 instructions are for?

Page 303

1         MR. O'CONNOR:  Objection.  Just Touhy.
2  Same instruction.
3    A.   Yes.
4  BY MS. HERZFELD:
5    Q.   And what is the purpose of a criminal jury
6  instruction to your knowledge?
7         MR. O'CONNOR:  Object to form.
8    A.   Something that's given to the jury.
9  BY MS. HERZFELD:
10   Q.   To help them make a decision?
11   A.   Yes.
12        MS. RANJAN:  Object to form.
13        MS. HERZFELD:  Okay.  I'm objecting to
14 your objection, but I've already stated that.
15 BY MS. HERZFELD:
16   Q.   Okay.  Go to the next one, please.
17   A.   I'm sorry.  What?
18   Q.   The next one, the next page.
19   A.   Oh, okay.
20   Q.   Could you read the title for me, please?
21   A.   Deliberate ignorance.
22   Q.   Can you read then read what it says?
23   A.   No one can avoid a responsibility for a
24 crime by deliberately ignoring the obvious.  If you are

Page 304

1  convinced that the defendant deliberately ignored a
2  high probability that the drugs were being illegally
3  distributed, then you may find that he had knowledge of
4  the crime.
5         But to find this, you must be convinced
6  beyond a reasonable doubt that the defendant was aware
7  of a probability that drugs were being illegal
8  distributed and that the defendant deliberately closed
9  his eyes to what was obvious.  Carelessness or
10 negligence or foolishness on his part is not the same
11 as knowledge and is not enough to convict.
12   Q.   Do you agree with this statement?
13        MR. O'CONNOR:  Objection.  Form.
14   A.   So -- I mean, I have no opinion on what
15 the court was providing in this jury instruction.
16 BY MS. HERZFELD:
17   Q.   And do you believe that deliberate
18 ignorance is something that exists?
19        MR. O'CONNOR:  Objection to form.
20   A.   I don't know.
21 BY MS. HERZFELD:
22   Q.   Have there ever -- have you ever had any
23 discussions with anyone at Mallinckrodt about
24 deliberate ignorance?

Page 305

1    A.   No.
2         MS. HERZFELD:  And -- okay.  Okay.  You
3  can set that aside.  We'll just take one minute.  I'm
4  going to review my notes.  I might be done.
5         THE VIDEOGRAPHER:  Do you want to go off
6  the record?
7         MS. HERZFELD:  Yes, please.
8         THE VIDEOGRAPHER:  We are going off the
9  record at 6:13 PM.
10        [A brief recess was taken.]
11        THE VIDEOGRAPHER:  We are back on the
12 record at 6:14 PM.
13        MS. HERZFELD:  Okay.  I don't have any
14 more questions for you at this time.
15        THE WITNESS:  Thank you.
16        MR. O'CONNOR:  No questions.
17        THE VIDEOGRAPHER:  We are going off the
18 record at 6:14 PM.
19
20        [SIGNATURE RESERVED.]
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 306

CERTIFICATE

1

2

3    I, JOHN ARNDT, a Certified Shorthand

4 Reporter and Certified Court Reporter, do hereby

5 certify that prior to the commencement of the

6 examination, JOHN GILLIES was sworn by me to testify

7 the truth, the whole truth and nothing but the truth.

8    I DO FURTHER CERTIFY that the foregoing is a

9 true and accurate transcript of the proceedings as

10 taken stenographically by and before me at the time,

11 place and on the date hereinbefore set forth.

12    I DO FURTHER CERTIFY that I am neither a

13 relative nor employee nor attorney nor counsel of any

14 of the parties to this action, and that I am neither a

15 relative nor employee of such attorney or counsel, and

16 that I am not financially interested in this action.

17

18

19    _____

20    JOHN ARNDT, CSR, CCR, RDR, CRR

21    CSR No. 084-004605

22    CCR No. 1186

23

24

Page 307

1

2    I, JOHN GILLIES, the witness herein,

3 having read the foregoing testimony of the pages of

4 this deposition, do hereby certify it to be a true and

5 correct transcript, subject to the corrections, if any,

6 shown on the attached page.

7

8

9

10    _____

11    JOHN GILLIES

12

13

14 Sworn and subscribed to before me,

15 This _____ day of _____, 201_.

16

17

18 _____

19    Notary Public

20

21

22

23

24

Page 308

DEPOSITION ERRATA SHEET

1

2

3 Page No._____Line No._____Change to:_____

4 _____

5 Reason for change:_____

6 Page No._____Line No._____Change to:_____

7 _____

8 Reason for change:_____

9 Page No._____Line No._____Change to:_____

10 _____

11 Reason for change:_____

12 Page No._____Line No._____Change to:_____

13 _____

14 Reason for change:_____

15 Page No._____Line No._____Change to:_____

16 _____

17 Reason for change:_____

18 Page No._____Line No._____Change to:_____

19 _____

20 Reason for change:_____

21

22 SIGNATURE:_____DATE:_____

23    JOHN GILLIES

24