1    IN THE UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF OHIO

3      EASTERN DIVISION

4

      ~~~~~~~~~~~~~~~~~~~~

5

6  IN RE:  NATIONAL PRESCRIPTION  MDL No. 2804

  OPIATE LITIGATION

7          Case No. 17-md-2804

8          Judge Dan Aaron

  This document relates to:  Polster

9

  The County of Cuyahoga v. Purdue

10  Pharma L.P., et al.

  Case No. 18-OP-45090

11

12     ~~~~~~~~~~~~~~~~~~~~

13    Videotaped deposition of

     THOMAS GILSON, M.D.

14      30(b)(6)

15

16     January 14, 2019

      9:07 a.m.

17

18

19      Taken at:

20   Climaco, Wilcox, Peca & Garofoli

21    55 Public Square, Suite 1950

22     Cleveland, Ohio

23

24

25   Renee L. Pellegrino, RPR, CLR

Page 2

```
 1   APPEARANCES:
 2   On behalf of Cuyahoga County:
         Napoli Shkolnik PLLC
 3       SALVATORE BADALA, ESQ.
         360 Lexington Avenue
 4       New York, New York  10017
         (844) 230-7676
 5       sbadala@napolilaw.com
              - and -
 6       Plevin & Gallucci
         FRANK GALLUCCI, ESQ.
 7       55 Public Square
         Suite 2222
 8       Cleveland, Ohio  44113-1901
         (216) 861-0804
 9       fgallucci@pglawyer.com
10   On behalf the City of Cleveland:
         Zashin & Rich
11       AMI J. PATEL, ESQ.
         950 Main Avenue, Fourth Floor
12       Cleveland, Ohio  44113
         (216) 696-4441
13       ajp@zrlaw.com
14   On behalf of Walmart, Inc.:
         Jones Day
15       EDWARD M. CARTER, ESQ.
         BRANDY H. RANJAN, ESQ.
16       325 John H. McConnell Boulevard
         Suite 600
17       Columbus, Ohio  43215-2673
         (614) 469-3939
18       ecarter@jonesday.com
         branjan@jonesday.com
19
     On behalf of McKesson Corporation:
20       Covington & Burling LLP
         ASEEM PADUKONE, ESQ.
21       One Front Street
         San Francisco, California  94111-5356
22       (415) 591-6000
         apadukone@cov.com
23
24                       ~ ~ ~ ~ ~
25
```

```
                                              Page 3
 1    APPEARANCES, CONT'D:
 2    On behalf of AmerisourceBergen Drug Corporation:
          Reed Smith LLP
 3        STEVEN J. BORANIAN, ESQ.
          LUKE PORTER, ESQ. (Via Telephone and Veritext
 4        Virtual Stream)
          101 Second Street
 5        Suite 1800
          San Francisco, California  94105
 6        (415) 659-5980
          sboranian@reedsmith.com
 7        lporter@reedsmith.com
             - and -
 8        Jackson Kelly PLLC
          SANDRA K. ZERRUSEN, ESQ.
 9        50 South Main Street
          Suite 201
10        Akron, Ohio  44308
          (330) 252-9060
11        skzerussen@jacksonkelly.com
12    On behalf of Purdue Pharma, L.P.:
          Dechert LLP
13        MARK S. CHEFFO, ESQ.
          Three Bryant Park, 1095 Avenue of the Americas
14        New York, New York  10036-6796
          (212) 698-3814
15        mark.cheffo@dechert.com
           - and -
16        Dechert LLP
          SARA D. ROITMAN, ESQ.
17        35 West Wacker Drive
          Suite 3400
18        Chicago, Illinois  20005
          (312) 646-5857
19        sara.roitman@wc.com
20    On behalf of Cardinal Health:
          (Via Telephone)
21        Williams & Connolly LLP
          J. ANDREW KEYES, ESQ.
22        725 Twelfth Street NW
          Washington, D.C.  20005
23        (202) 434-5584
          akeyes@wc.com
24
25                        ~ ~ ~ ~ ~
```

```
 1   APPEARANCES, CONT'D:
 2   On behalf of Teva Pharmaceuticals:
         (Via Telephone)
 3       Morgan, Lewis & Bockius LLP
         ALYSE FISCHER, ESQ.
 4       77 West Wacker Drive
         Chicago, Illinois  60601-5094
 5       (312) 324-1107
         alyse.fischer@morganlewis.com
 6
     On behalf of Discount Drug Mart:
 7       (Via Telephone)
         Cavitch Familo & Durkin
 8       CHIP ERB, ESQ.
         1300 East Ninth Street, 20th Floor
 9       Cleveland, Ohio  44114
         (216) 621-7860
10       lwerb@cavitch.com
11   On behalf of H.D. Smith:
         (Via Telephone)
12       Barnes & Thornburg
         WILLIAM PADGETT, ESQ.
13       11 South Meridian Street
         Indianapolis, Indiana  46204-3535
14       (317) 231-7353
         william.padgett@btlaw.com
15
     On behalf of Endo Pharmaceuticals, Inc., Endo
16   Health Solutions, Inc., Par Pharmaceuticals,
     Inc. and Par Pharmaceutical Companies, Inc.:
17       Baker & Hostetler
         RUTH HARTMAN, ESQ.
18       127 Public Square, Suite 2000
         Cleveland, Ohio  44114-1214
19       (216) 621-0200
         rhartman@bakerlaw.com
20
21                       ~ ~ ~ ~ ~
22
23
24
25
```

Page 5

1   APPEARANCES, CONT'D:

2   On behalf of Johnson & Johnson and Janssen
    Pharmaceuticals, Inc.:

3       Tucker Ellis LLP
        ERICA M. JAMES, ESQ.

4       950 Main Avenue, Suite 1100
        Cleveland, Ohio  44113-7213

5       (216) 592-5000
        erica.james@tuckerellis.com

6

7   ALSO PRESENT:  Shaun Crum, Videographer

8
                        ~ ~ ~ ~ ~
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    TRANSCRIPT INDEX

2

3    APPEARANCES ....................................2

4    INDEX OF EXHIBITS ..............................7

5    INDEX OF OBJECTIONS ...........................9

6

7    EXAMINATION OF THOMAS GILSON, M.D.:

8    BY MR. CHEFFO .................................20

9    BY MR. BORANIAN ..............................183

10   BY MR. CARTER ................................284

11   BY MS. ROITMAN ...............................344

12   BY MR. BADALA ................................354

13

14   AFTERNOON SESSION ............................183

15

16   REPORTER'S CERTIFICATE .......................358

17

18   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS
 2
 3    Number            Description              Marked
 4
 5    Exhibit 1    Third Amended Notice of          29
                   Videotaped 30(b)(6) Deposition
 6                 of the County of Cuyahoga
 7    Exhibit 2    Plaintiff's The County of        66
                   Cuyahoga, Ohio and State of Ohio
 8                 Ex Rel, Prosecuting Attorney of
                   Cuyahoga County, Michael C.
 9                 O'Malley's Amended Responses to
                   the Manufacturer Defendants' and
10                 National Retail Pharmacy
                   Defendants' First Set of
11                 Interrogatories, with Attached
                   Spreadsheets
12
      Exhibit 3    Plaintiffs The City of           84
13                 Cleveland, County of Cuyahoga,
                   County of Summit and City of
14                 Akron's Supplemental Amended
                   Responses and Objections to the
15                 Manufacturer Defendants' First
                   Set of Interrogatories,
16                 Submitted Pursuant to Discovery
                   Ruling No. 13
17
      Exhibit 7    Handwritten Notes               127
18
      Exhibit 8    Handwritten Notes               127
19
      Exhibit 9    E-Mail String, Beginning Bates  234
20                 Number CUYAH_001709118 -  Marked
                   Confidential
21
      Exhibit 10   Article Entitled "The Cuyahoga  240
22                 County Heroin Epidemic"
23    Exhibit 11   Document Entitled "Overdose      244
                   Deaths in Cuyahoga County,"
24                 Beginning Bates Number
                   CUYAH_001397330
25
```

1                    INDEX OF EXHIBITS, CONT'D

2

3    Exhibit 12    Document Entitled "Opioid Crisis 248
                   Response:  Examining Overdose
4                  Deaths at Cuyahoga County
                   Medical Examiner's Office," with
5                  Attached Sheet Bates Numbered
                   CUYAH_001684555 - Marked
6                  Confidential
7    Exhibit 13    Document Entitled "Ohio          263
                   Department of Health, Ohio's
8                  Prescription Drug Overdose
                   Epidemic:  Epidemiology,
9                  Contributing Factors and Ongoing
                   Prevention Efforts," Beginning
10                 Bates Number CUYAH_001547662 -
                   Marked Confidential

11

     Exhibit 14    Binder                           343
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              INDEX OF OBJECTIONS
2

3    Objection .....................................26
     Objection .....................................31
4    Objection .....................................32
     Objection .....................................33
5    Objection .....................................34
     Objection .....................................34
6    Objection .....................................35
     Objection .....................................36
7    Objection .....................................37
     Objection .....................................37
8    Objection .....................................38
     Objection .....................................39
9    Objection .....................................40
     Objection .....................................40
10   Objection .....................................40
     Objection .....................................41
11   Objection .....................................41
     Objection .....................................42
12   Objection .....................................43
     Objection .....................................44
13   Objection .....................................45
     Objection .....................................45
14   Objection .....................................45
     Objection .....................................46
15   Objection .....................................47
     Objection .....................................47
16   Objection .....................................47
     Objection .....................................48
17   Objection .....................................49
     Objection .....................................49
18   Objection .....................................49
     Objection .....................................50
19   Objection .....................................50
     Objection .....................................50
20   Objection .....................................51
     Objection .....................................51
21   Objection .....................................52
     Objection.....................................53
22   Objection .....................................53
     Objection .....................................54
23   Objection .....................................54
     Objection .....................................56
24   Objection .....................................57
     Objection .....................................57
25   Objection .....................................57

1                  INDEX OF OBJECTIONS, CONT'D
2

3    Objection ....................................58
     Objection ....................................60
4    Objection ....................................60
     Objection ....................................61
5    Objection ....................................62
     Objection ....................................62
6    Objection ....................................63
     Objection ....................................63
7    Objection ....................................64
     Objection ....................................68
8    Objection ....................................71
     Objection ....................................71
9    Objection ....................................72
     Objection ....................................72
10   Objection ....................................73
     Objection ....................................74
11   Objection ....................................75
     Objection ....................................75
12   Objection ....................................76
     Objection ....................................76
13   Objection ....................................76
     Objection ....................................76
14   Objection ....................................77
     Objection ....................................77
15   Objection ....................................78
     Objection ....................................78
16   Objection ....................................79
     Objection ....................................79
17   Objection ....................................80
     Objection ....................................80
18   Objection ....................................80
     Objection ....................................81
19   Objection ....................................81
     Objection ....................................85
20   Objection ....................................86
     Objection ....................................86
21   Objection ....................................86
     Objection ....................................86
22   Objection ....................................86
     Objection ....................................87
23   Objection ....................................87
     Objection ....................................87
24   Objection ....................................88
     Objection ....................................88
25   Objection ....................................88

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ....................................89
     Objection ....................................89
4    Objection ....................................89
     Objection ....................................89
5    Objection ....................................90
     Objection ....................................91
6    Objection ....................................91
     Objection ....................................92
7    Objection ....................................93
     Objection ....................................95
8    Objection ....................................95
     Objection ....................................95
9    Objection ....................................96
     Objection ....................................96
10   Objection ....................................96
     Objection ....................................97
11   Objection ....................................97
     Objection ....................................97
12   Objection ....................................98
     Objection ....................................98
13   Objection ....................................98
     Objection ....................................99
14   Objection ....................................99
     Objection ....................................99
15   Objection ...................................100
     Objection ...................................100
16   Objection ...................................101
     Objection ...................................102
17   Objection ...................................102
     Objection ...................................103
18   Objection ...................................103
     Objection ...................................104
19   Objection ...................................104
     Objection ...................................104
20   Objection ...................................105
     Objection ...................................105
21   Objection ...................................105
     Objection ...................................106
22   Objection ...................................107
     Objection ...................................107
23   Objection ...................................108
     Objection ...................................108
24   Objection ...................................109
     Objection ...................................109
25   Objection ...................................110

1              INDEX OF OBJECTIONS, CONT'D
2
3    Objection ...................................110
     Objection ...................................111
4    Objection ...................................112
     Objection ...................................112
5    Objection ...................................113
     Objection ...................................113
6    Objection ...................................114
     Objection ...................................114
7    Objection ...................................116
     Objection ...................................117
8    Objection ...................................117
     Objection ...................................118
9    Objection ...................................118
     Objection ...................................118
10   Objection ...................................120
     Objection ...................................120
11   Objection ...................................121
     Objection ...................................122
12   Objection ...................................123
     Objection ...................................124
13   Objection ...................................124
     Objection ...................................124
14   Objection ...................................125
     Objection ...................................125
15   Objection ...................................126
     Objection ...................................129
16   Objection ...................................130
     Objection ...................................130
17   Objection ...................................131
     Objection ...................................131
18   Objection ...................................132
     Objection ...................................132
19   Objection ...................................133
     Objection ...................................133
20   Objection ...................................134
     Objection ...................................134
21   Objection ...................................135
     Objection ...................................135
22   Objection ...................................135
     Objection ...................................136
23   Objection ...................................136
     Objection ...................................137
24   Objection ...................................137
     Objection ...................................138
25   Objection ...................................139

1              INDEX OF OBJECTIONS, CONT'D
2
3    Objection ...................................139
     Objection ...................................141
4    Objection ...................................142
     Objection ...................................144
5    Objection ...................................145
     Objection ...................................147
6    Objection ...................................147
     Objection ...................................148
7    Objection ...................................149
     Objection ...................................150
8    Objection ...................................150
     Objection ...................................151
9    Objection ...................................151
     Objection ...................................152
10   Objection ...................................152
     Objection ...................................152
11   Objection ...................................153
     Objection ...................................153
12   Objection ...................................154
     Objection ...................................154
13   Objection ...................................155
     Objection ...................................157
14   Objection ...................................158
     Objection ...................................159
15   Objection ...................................160
     Objection ...................................160
16   Objection ...................................161
     Objection ...................................162
17   Objection ...................................164
     Objection ...................................164
18   Objection ...................................165
     Objection ...................................166
19   Objection ...................................166
     Objection ...................................168
20   Objection ...................................173
     Objection ...................................173
21   Objection ...................................176
     Objection ...................................176
22   Objection ...................................176
     Objection ...................................177
23   Objection ...................................179
     Objection ...................................181
24   Objection ...................................185
     Objection ...................................185
25   Objection ...................................186

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ....................................186
     Objection ....................................186
4    Objection ....................................187
     Objection ....................................187
5    Objection ....................................188
     Objection ....................................189
6    Objection ....................................189
     Objection ....................................191
7    Objection ....................................193
     Objection ....................................194
8    Objection ....................................194
     Objection ....................................195
9    Objection ....................................195
     Objection ....................................195
10   Objection ....................................196
     Objection ....................................196
11   Objection ....................................196
     Objection ....................................200
12   Objection ....................................200
     Objection ....................................201
13   Objection ....................................202
     Objection ....................................205
14   Objection ....................................205
     Objection ....................................209
15   Objection ....................................210
     Objection ....................................210
16   Objection ....................................211
     Objection ....................................211
17   Objection ....................................212
     Objection ....................................216
18   Objection ....................................217
     Objection ....................................218
19   Objection ....................................218
     Objection ....................................219
20   Objection ....................................219
     Objection ....................................221
21   Objection ....................................221
     Objection ....................................221
22   Objection ....................................222
     Objection ....................................224
23   Objection ....................................224
     Objection ....................................225
24   Objection ....................................225
     Objection ....................................226
25   Objection ....................................228

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ...................................236
     Objection ...................................236
4    Objection ...................................237
     Objection ...................................237
5    Objection ...................................237
     Objection ...................................238
6    Objection ...................................239
     Objection ...................................239
7    Objection...................................240
     Objection ...................................245
8    Objection ...................................257
     Objection ...................................259
9    Objection ...................................264
     Objection ...................................265
10   Objection ...................................266
     Objection ...................................267
11   Objection ...................................267
     Objection ...................................268
12   Objection ...................................269
     Objection ...................................269
13   Objection ...................................270
     Objection ...................................270
14   Objection ...................................271
     Objection ...................................271
15   Objection ...................................271
     Objection ...................................272
16   Objection ...................................273
     Objection ...................................275
17   Objection ...................................278
     Objection ...................................279
18   Objection ...................................279
     Objection ...................................279
19   Objection ...................................279
     Objection ...................................280
20   Objection ...................................280
     Objection ...................................281
21   Objection ...................................281
     Objection ...................................282
22   Objection ...................................282
     Objection ...................................284
23   Objection ...................................285
     Objection ...................................287
24   Objection ...................................288
     Objection ...................................289
25   Objection ...................................290

1           INDEX OF OBJECTIONS, CONT'D

2

3   Objection ....................................290
    Objection ....................................294
4   Objection ....................................295
    Objection ....................................296
5   Objection ....................................296
    Objection ....................................298
6   Objection ....................................298
    Objection ....................................299
7   Objection ....................................300
    Objection ....................................301
8   Objection ....................................303
    Objection ....................................303
9   Objection ....................................304
    Objection ....................................306
10  Objection ....................................306
    Objection ....................................307
11  Objection ....................................307
    Objection ....................................308
12  Objection ....................................308
    Objection ....................................309
13  Objection ....................................312
    Objection ....................................313
14  Objection ....................................313
    Objection ....................................316
15  Objection ....................................316
    Objection ....................................316
16  Objection ....................................317
    Objection ....................................318
17  Objection ....................................318
    Objection ....................................318
18  Objection ....................................319
    Objection ....................................319
19  Objection ....................................319
    Objection ....................................320
20  Objection ....................................320
    Objection ....................................320
21  Objection ....................................323
    Objection ....................................324
22  Objection ....................................325
    Objection ....................................325
23  Objection ....................................326
    Objection ....................................326
24  Objection ....................................333
    Objection ....................................333
25  Objection ....................................334

1                INDEX OF OBJECTIONS, CONT'D
2

3    Objection ....................................336
     Objection ....................................336
4    Objection ....................................336
     Objection ....................................337
5    Objection ....................................337
     Objection ....................................338
6    Objection ....................................338
     Objection ....................................339
7    Objection ....................................339
     Objection ....................................340
8    Objection ....................................340
     Objection ....................................340
9    Objection ....................................340
     Objection ....................................341
10   Objection ....................................341
     Objection ....................................342
11   Objection ....................................349
     Objection ....................................352
12   Objection ....................................353
       Objection ..................................47
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE VIDEOGRAPHER:  The date is

2    January 14th, 2019.  We are on the record at

3    9:07 a.m.  This is the deposition of Thomas

4    Gilson in the matter of In Re: National

5    Prescription Opiate Litigation, in the United

6    States District Court, Northern District of

7    Ohio, Eastern Division.

8          Will counsel please state

9    appearances for the record?

10          MR. BADALA:  Salvatore Badala for

11    the Plaintiff, Cuyahoga County.

12          MR. GALLUCCI:  Frank Gallucci for

13    Plaintiff, Cuyahoga County.

14          MS. PATEL:  Ami Patel, for

15    Plaintiff, City of Cleveland.

16          MS. JAMES:  Erica James, Tucker

17    Ellis, for Janssen Pharmaceuticals and Johnson &

18    Johnson.

19          MR. PADUKONE:  Aseem Padukone,

20    Covington & Burling, on behalf of McKesson

21    Corporation.

22          MS. HARTMAN:  Ruth Hartman, Baker

23    Hostetler, on behalf of the Endo Defendants.

24          MS. RANJAN:  Brandy Ranjan from

25    Jones Day on behalf of Walmart.

1            MR. CARTER:  Ed Carter for Walmart.

2            MS. ZERRUSEN:  Sandy Zerrusen,

3    Jackson Kelly, on behalf of AmerisourceBergen.

4            MR. BORANIAN:  Steven Boranian from

5    Reed Smith for Defendant AmerisourceBergen.

6            MS. ROITMAN:  Sara Roitman from

7    Dechert on behalf of Purdue.

8            MR. CHEFFO:  Mark Cheffo, also from

9    Dechert, for Purdue.

10            THE VIDEOGRAPHER:  Will counsel on

11    the phone please state appearances for the

12    record?

13            MR. PADGETT:  Bill Padgett on behalf

14    of Defendant H.D. Smith.

15            MR. KEYES:  Andrew Keyes on behalf

16    of Cardinal Health.

17            MS. FISCHER:  Alyse Fischer, Morgan

18    Lewis, on behalf of the Teva Defendants.

19            MR. PORTER:  Luke Porter with Reed

20    Smith on behalf of AmerisourceBergen.

21            MR. ERB:  Chip Erb of Cavitch on

22    behalf of Discount Drug Mart.

23            MR. CHEFFO:  Anybody else?

24            THE VIDEOGRAPHER:  Will the court

25    reporter please swear in the witness?

Page 20

1          MR. BADALA: I'm sorry. Before you

2     do that, is Ms. Rendon on the phone? I assume

3     not. We just have a standing objection to

4     Ms. Rendon's participation in this matter and

5     Baker Hostetler as well.

6          MS. HARTMAN: Just so you know, Endo

7     Defendants want their client to have counsel

8     here and we know your objection but we're here.

9          MR. BADALA: That's fine.

10         THOMAS GILSON, M.D., of lawful

11    age, called for examination, as provided by

12    the Federal Rules of Civil Procedure, being

13    by me first duly sworn, as hereinafter

14    certified, deposed and said as follows:

15         EXAMINATION OF THOMAS GILSON, M.D.

16    BY MR. CHEFFO:

17         Q.    Good morning, Doctor.

18               You understand you're under oath

19    today?

20         A.    Yes, I do.

21         Q.    You've been deposed before?

22         A.    Yes, I have.

23         Q.    And you understand that you've been

24    designated today as what we call a 30(b)(6) or a

25    corporate designee?

Page 21

1          A.     Yes, I do.

2          Q.     And you understand that that means

3     that you're testifying on behalf of the county?

4          A.     Cuyahoga County, yes, I do.

5          Q.     Great.  Thank you.

6                 Would you be good enough to tell us

7     what you did in connection with your preparation

8     today?  And I don't want you to tell me any

9     conversations you had with your lawyers, but you

10    can tell me if you met with lawyers, what you

11    reviewed and what else you may or may not have

12    done.

13         A.     I did meet with attorneys today.

14    Pardon me.  I met with attorneys prior to today.

15    I reviewed case material in the medical

16    examiner's office.  I also reviewed case

17    material with regard to the Division of Child

18    and Family Services.  I discussed information

19    with the previous coroner.  I also discussed

20    information with other county officials with

21    regard to the impact of the opioid crisis on

22    their agencies.  I would say in preparation, in

23    general, we've been dealing with the crisis now

24    for a number of years and I've done a lot of

25    preparation in an indirect way ready for today.

1      Q.    Well, about how many hours did you
2    spend preparing for the deposition and your
3    topics today?
4      A.    All those seven years.
5      Q.    Well, you didn't know that you were
6    going to be deposed today seven years ago, did
7    you?
8      A.    I hope not.  No.
9      Q.    When did you first learn that you
10   were going to be a corporate designee in this
11   deposition?
12     A.    It was a few months ago.  I couldn't
13   give you an exact answer how many hours.
14   Several I can say.
15     Q.    Several?
16     A.    Several.
17     Q.    Like five, ten?
18     A.    No.  I'd say probably closer to 35
19   to 40.
20     Q.    For all the topics?
21     A.    For all those topics, yes.
22     Q.    And what specific documents did you
23   review from the case materials and the various
24   coroner information on the divisions in
25   connection with your preparing for the

Page 23

1   deposition today?

2          A.     I reviewed materials in association

3   with the medical examiner's website, other

4   things that were available from task forces.  I

5   also reviewed, as I mentioned, things from the

6   Division of Child and Family Services, medical

7   literature, internet searches.

8          Q.     And I guess what I'm trying to just

9   find -- if you can help us out, Doctor, a little

10  more specificity.  Did you keep track of

11  anything?  Did you make copies of anything you

12  reviewed?

13         A.     I did not, no, not specifically.

14         Q.     Was there anything that was reviewed

15  that was not publicly available?

16         A.     To the best of my knowledge,

17  everything that I reviewed was publicly

18  available.

19         Q.     Were they things that you reviewed

20  of your own volition or were they anything that

21  was provided to you?

22         A.     Primarily things of my own volition.

23  I don't think anything was provided to me

24  separately.

25         Q.     And did you print anything out or

Page 24

1   did you review everything online?

2        A.    More online.  I mean, our website is

3   online and I can access things through that.

4        Q.    And who else did you talk to in

5   connection with your preparation for the various

6   topics that you're going to testify about today?

7        A.    I would have spoken to Dr. Elizabeth

8   Balraj, who was the previous coroner.  I spoke

9   to Hugh Shannon, who was the administrator,

10  chief of operations, in my office.  I spoke to

11  Tamara Chapman in the Department of Child and

12  Family Services, in addition to David Merriman,

13  who is the director of health and human

14  services.  I spoke to Commander Gingell in the

15  Cleveland Police Department in preparation for

16  today.  I spoke to Keith Martin, who is in the

17  Drug Enforcement Agency.  I also spoke to Derek

18  Siegel, who is the director of the High

19  Intensity Drug Trafficking Area for Ohio.

20  Nobody else is coming to mind.

21       Q.    Okay.  And you probably know from

22  your experience and you have good lawyers -- I'm

23  sure they've told you as well -- but if during

24  the course of the deposition something pops up

25  into your mind, oh, I remember speaking to him,

Page 25

1    it's perfectly appropriate for you to amend your

2    response and let us know if that does happen.

3          A.    Sure.

4                Oh, I'm sorry.  I can add two

5    people.  I spoke to Vince Caraffi, who was the

6    injury prevention program head at the Board of

7    Health in Cuyahoga County and he was also the

8    head of the opiate task force for the County

9    Board of Health.  And I also spoke to Dr. Joan

10   Papp, who is an emergency room physician at your

11   county hospital, MetroHealth Medical Center.

12   She is also the medical director of Project

13   DAWN, our Deaths Avoided With Naloxone program.

14         Q.    Project --

15         A.    DAWN.

16         Q.    -- DAWN.

17               Did you take any notes during these

18   interviews or conversations?

19         A.    Nothing I retained.

20         Q.    Well, did you take notes during the

21   time?

22         A.    I might have scribbled things on

23   pads, but I don't have them now.

24         Q.    Where are they?

25         A.    I threw them away.

Page 26

1          Q.      You weren't asked to retain those?

2          A.      Nobody asked me to retain them, no.

3          Q.      Why would you throw them away?

4          A.      They are just really things to

5    refresh my memory, but once I had gotten things

6    in my head, I didn't feel I needed them anymore.

7          Q.      And you're certain that all of your

8    notes are -- have been destroyed?

9                  MR. BADALA:  Objection to form.

10         A.      I don't know where they would be.  I

11   mean, if they're in the Cleveland trash dump

12   somewhere I guess, but I don't have access to

13   them anymore.

14         Q.      And you took notes during each of

15   these calls?

16         A.      I took notes I recall when I was

17   talking to the folks at the Division of Child

18   and Family Services, Mr. Caraffi and Dr. Papp.

19   They're the only ones I remember taking notes

20   with.

21         Q.      Did you bring any documents with you

22   today?

23         A.      I brought a binder, which was made

24   available to me by counsel.

25         Q.      Do you know what's in it?

Page 27

1          A.     Yes, I do.

2                 There is a copy of my declaration

3      with regard to Carole Rendon.  There is a copy

4      of the corrected complaint, second amended

5      corrected complaint, with a list of the

6      Defendants.  There is information that was

7      generated from my office that was shared with

8      counsel already.  Our monthly report.  This is

9      dated from June 1st, 2018.  We've done

10     subsequent reports, but certainly this was the

11     most up to date that was furnished at that time.

12     The other ones, if you're interested in

13     obtaining them, were -- recent copy are

14     available on our website, and that would be

15     going up to January of this year.  This is a

16     copy of the third amended notice of a videotaped

17     deposition.  And that is in regard to the topics

18     for the deposition that I was asked to prepare

19     for today.  This is an organizational chart for

20     Cuyahoga County for my reference.  And last is a

21     letter to Special Master David R. Cohen, and I

22     believe this is a correspondence about the

23     interrogatories.

24          Q.     Is that from Linda Singer?

25          A.     Pardon me?

Page 28

1          Q.    Is that a Linda Singer letter?

2          A.    Linda Singer, that's it.

3          Q.    Okay.  Did I see some handwritten

4    notes in the very beginning?

5          A.    Yes, you did.

6          Q.    And are those your notes?

7          A.    These are my notes, yes.

8          Q.    Okay.  Well, we may come back to

9    that, but let's -- so other than what you've

10   told us, Doctor -- you've spoken to the folks

11   that you've identified, you looked at some

12   publicly available information, you met with

13   your lawyers -- did you do anything else to

14   prepare for giving testimony here on behalf of

15   Cuyahoga?

16         A.    No.  I think I reviewed my articles

17   that I've written on this as well and

18   presentations and things like that, but I

19   believe those were made available already as

20   well.

21                    -   -   -   -   -

22              (Thereupon, Gilson Deposition

23              Exhibit 1, Third Amended Notice of

24              Videotaped 30(b)(6) Deposition of

25              the County of Cuyahoga, was marked

1           for purposes of identification.)

2                   -   -   -   -   -

3      Q.    Okay.  So this is what I think you

4  probably have already, Doctor.  This is just a

5  copy of the notice of deposition.  So as you

6  know, there's a number of topics, and I'm going

7  to be covering a number of them, Doctor, and my

8  colleagues are going to be covering them.  We

9  have a limited period of time, so I'm going to

10  ask you to do your best to try to answer the

11  questions that I ask.  Obviously if they're not

12  clear, you should let me know if you don't

13  understand them, but what we're going to try and

14  do, because these are relatively targeted, is

15  kind of focus on these specific areas within the

16  limited time we have --

17      A.    Sure.

18      Q.    -- just to give you a little bit of

19  a roadmap.

20           I'd also like to maybe just start

21  with number -- topic 34.  Do you see that?  It's

22  listed on page 4.

23      A.    Yes.

24      Q.    So of the individuals that you

25  mentioned, did you speak with any of them

Page 30

1   specifically with respect to 34?

2        A.    If I could just take a second to

3   refresh myself with the topic.  I did speak to

4   the individual from the department -- Drug

5   Enforcement Agency about ARCOS data.

6        Q.    Was that someone that you listed

7   already or somebody else?

8        A.    Keith Martin.

9        Q.    Okay.  And how long did you speak to

10  Mr. Martin for?

11       A.    Maybe no more than five minutes.

12       Q.    Did you do anything else to prepare

13  for topic 34?

14       A.    I discussed it with counsel when we

15  were preparing.

16       Q.    Anything else?

17       A.    Not that I remember, no.

18       Q.    So who are the individuals and

19  entities other than Defendants, if any, who

20  Cuyahoga County believes caused or contributed

21  to the opioid crisis in Cuyahoga County?

22       A.    Cuyahoga County believes that the

23  opioid crisis in our county is directly

24  responsible to the Defendants and does not

25  mention any others.

Page 31

1      Q.     I think that doesn't answer my

2   question.

3      A.     There are no others.

4      Q.     So you -- it's Cuyahoga's testimony

5   that there are no other individuals or entities

6   anywhere in the world other than the Defendants

7   who caused or contributed to the opioid crisis?

8   Is that your testimony?

9            MR. BADALA:  Objection to form.

10     A.     It's the testimony of Cuyahoga

11  County that there are other individuals involved

12  but their responsibility is ultimately referable

13  back to the Defendants.

14     Q.     And that's not answering my

15  question, Doctor.

16            You spoke with --

17     A.     I'm sorry.  I'm trying the best I

18  can.

19     Q.     Okay.  One of the topics was to

20  identify the entities and individuals, other

21  than Defendants, who Cuyahoga County, as a

22  non-expert, believes caused or contributed to

23  the opioid crisis in the Cuyahoga geographic

24  entity -- area.  Excuse me.  And I'm just trying

25  to understand, as you sit here today on behalf

Page 32

1    of Cuyahoga, if you could tell me any

2    individuals or entities, other than the

3    Defendants, that Cuyahoga County believes caused

4    or contributed to --

5              MR. BADALA:  Objection to form.

6    Asked and answered.

7         A.    Cuyahoga County does not identify

8    any additional individuals other than the

9    Defendants who caused the opioid epidemic in the

10   county.

11        Q.    What about contributed to?

12        A.    Again, referable back to the

13   Defendants, so that we have not named anybody

14   separately other than the Defendants.

15        Q.    Has Cuyahoga County looked at the

16   ARCOS data?

17        A.    Cuyahoga County does not have access

18   to the ARCOS data, and as such, we have never

19   been able to review it.

20        Q.    How do you know that Cuyahoga County

21   doesn't have access to it?

22        A.    Based on my discussions with

23   Mr. Martin from the Drug Enforcement Agency, who

24   oversees the ARCOS data, Cuyahoga County would

25   not have access to that data.

1          Q.     That includes currently today?

2          A.     As of today.

3          Q.     And if you had access, would you

4     look at it?

5          A.     As it was relevant to the opioid

6     crisis, it certainly would have been something

7     we would have considered looking at, sure.

8          Q.     If you had access to it for the last

9     three or four months, it's certainly something

10    important to Cuyahoga County to look at, right?

11              MR. BADALA:  Objection to form.

12         A.     I think it's relevant in terms of --

13    as I understand ARCOS data, it's distribution

14    of -- quantifications of distributions of drugs

15    into Cuyahoga County, and I think that that

16    would be something that would be potentially

17    relevant to our efforts to address the opioid

18    crisis.

19              I think, you know, at this point in

20    the opioid crisis we're also looking at an

21    evolution from the original problem with opioid

22    pain relievers to heroin and fentanyl, but I

23    think the information from a county standpoint

24    would still be potentially helpful.

25         Q.     And as you understand it, the county

Page 34

1    hasn't had access and hasn't looked at any of
2    the ARCOS data even to today?
3              MR. BADALA:  Objection to form.
4         A.    I am not aware of any access the
5    county has to ARCOS data, and based on my
6    discussion with the Drug Enforcement
7    Administration representative with whom I spoke,
8    the county does not have access to ARCOS data.
9         Q.    And when did you speak with
10   Mr. Miller -- Mr. Martin?  Excuse me.
11        A.    I spoke with him on Friday.
12        Q.    Just to see if we could just make
13   sure that we're on the same page, Doctor, so
14   it's the county's position that if a doctor
15   prescribed unlawfully a number of prescriptions
16   to patients solely for his or her economic gain,
17   not for any medical purpose, would that have
18   contributed to the opioid crisis?
19             MR. BADALA:  Objection to form.
20        A.    Yes, it would have.
21        Q.    And if a Mexican cartel had shipped
22   illegal synthetic fentanyl into the geographic
23   boundary of Cuyahoga County, would that have
24   contributed to the opioid crisis?
25        A.    Yes, it would have.

Page 35

1          Q.     And if a -- do you know what a pill
2     mill is?
3          A.     In a general sense.
4          Q.     If there was a pill mill operating
5     in Cuyahoga County, would that have contributed
6     to the opioid crisis?
7          A.     Just so we're on the same page,
8     because it sounded similar to your initial
9     question, I would define a pill mill as an
10    illegal operation with a doctor dispensing drugs
11    without establishing a doctor/patient
12    relationship, essentially for profit, and these
13    were frequently operations that would be cash
14    only, very few questions asked, and I think, you
15    know, they were not reputable in any sense.
16         Q.     And that's -- I would adopt that
17    definition, Doctor.
18         A.     You can use that one.
19         Q.     Okay.  So when I talk about a pill
20    mill, I'm talking about kind of people who are
21    doing things for non-medically appropriate uses
22    to essentially create economic gain for
23    themselves at the expense of patients or others.
24              MR. BADALA:  Objection to form.
25         A.     Yes, that would have contributed,

1    and I think it's still in this way referable

2    back to the Defendants.

3         Q.    Well, has anybody -- have you

4    identified any of those, any pill mills, any

5    doctors who engaged in illegal conduct, any drug

6    gang or other drug activity?

7              MR. BADALA:  Objection to form.

8         A.    The county has.  I couldn't, as I

9    sit here today, give you names of those

10   individuals.  The pill mill was something that

11   wasn't as prevalent in this area as it was in

12   the southern part of the state, but we were

13   certainly aware of them and there were pain

14   clinics or things like that here.

15        Q.    So you're not suggesting that none

16   of that ever happened in Cuyahoga County?

17        A.    Oh, no, certainly not.  Certainly

18   not.

19        Q.    And all of those things contributed

20   to the opioid crisis in Cuyahoga County,

21   correct?

22        A.    That would be the county's opinion,

23   yes.

24        Q.    And then the question here is,

25   Doctor, identify them.  Who are they?

Page 37

1          A.    I would have to refer to the
2     prosecutor, who's also a witness, in terms of
3     Defendants who were identified and prosecuted.
4          Q.    But I thought you just told me that
5     none of those people did cause or contribute, so
6     I'm a little confused.  Did they cause or
7     contribute or did they not?
8               MR. BADALA:  Objection to form.
9          A.    Oh, no.  I'm sorry.  I said that
10    they -- their actions contributed, but
11    ultimately I think their actions are referable
12    back to the Defendants.
13         Q.    Well, that's not my question.  My
14    question is if their -- let's start with their
15    actions.  You might have a view, a personal view
16    as to whether it's attributable, but what we're
17    trying to find out is the identification of
18    those individuals.  Are you prepared to tell us
19    the identification of even one of those improper
20    doctors or pill mills or drug conduct?
21              MR. BADALA:  Objection to form.
22         A.    The only one I can think of off the
23    top of my head was an organization -- I believe
24    it was called the Northeast Ohio Pain Clinic.
25         Q.    So are they one of the individuals

Page 38

1    or entities that caused or contributed to the

2    opioid crisis?

3              MR. BADALA:  Objection to form.

4         A.    Again, I think they had a

5    contribution in being an illicit source of

6    opioid pain reliever, sure.

7         Q.    And anyone else?

8         A.    Again, I have to say I would have to

9    defer to the prosecutor who they identified in

10   prosecutions as overprescribing in their work.

11   We wouldn't have directly investigated some of

12   these things through my agency or many others

13   and the prosecutor would be the best source of

14   information there.

15        Q.    I understand, Doctor.  As we

16   discussed, you're here testifying on behalf of

17   the county, right?

18        A.    That's right.

19        Q.    Did you talk to the prosecutor?

20        A.    I spoke with James Gutierrez in

21   the -- oh, there's another one.  James Gutierrez

22   in the prosecutor's office.

23        Q.    Did you ask him to identify any of

24   the people that he prosecuted?

25        A.    I did not.  I asked him in a general

Page 39

1   way the impact of the opioid crisis on
2   prosecutions.
3        Q.    Did you ask anyone, in sum or
4   substance, hey, I have to respond to topic 34
5   and identify entities or individuals, can you
6   give me some of those names?
7        A.    As I say, I spoke with the
8   individuals I spoke with, and -- in attempting
9   to identify those individuals and entities, it's
10  the county's position that while there may have
11  been intermediary steps in diversion and those
12  kind of issues, all of the responsibility for
13  the opioid crisis is referable back to the
14  Defendants.
15       Q.    Even if a drug cartel shipped in
16  illicit fentanyl from Mexico, that's the
17  responsibility of the Defendants?
18            MR. BADALA:  Objection to form.
19       A.    Yes, because there would be no need
20  to ship fentanyl to this area if there wasn't a
21  drug-addicted population, and the drug-addicted
22  population is referable back to the opioid pain
23  relievers and the actions of the Defendants.
24       Q.    So is it your testimony -- is it
25  Cuyahoga's testimony that every person who is

Page 40

1    drug addicted in Cuyahoga County ultimately took

2    a prescription opioid medicine?

3         A.    No, that would not be Cuyahoga

4    County's position.

5         Q.    Okay.  Are there people who never

6    had prescription opioids who are addicted?

7              MR. BADALA:  Objection to form.

8         A.    As far as I know, yes.

9         Q.    Can you identify any person or

10   prescription, or can the county, and directly

11   relate it to any alleged improper conduct or

12   omission or misrepresentation by any of the

13   Defendants?

14             MR. BADALA:  Objection to form.

15   Outside the scope.

16        A.    Could we just reference which topic?

17        Q.    It's in the interrogatories, but --

18             MR. BADALA:  Same objection.

19        A.    The county identified claims for

20   opiates that were not for cancer patients, were

21   high dose, that is more than 120 medical

22   morphine equivalents, and patients who were

23   diagnosed with a substance use disorder, and

24   patients who, by definition, had been grievously

25   hurt by their prescription.  That's in reference

Page 41

1    to Exhibit 6 in my folder.

2          Q.    And we're going to get to Exhibit 6,

3    but with respect to any of those, can you

4    identify any specific conduct and tie it to any

5    specific prescription or patient?  Do you have

6    any of that data or information here today?

7                MR. BADALA:  Objection to form.

8    Outside the scope.

9          A.    I think this is, again, in reference

10   to the interrogatories that were -- data was

11   provided to counsel, reviewed with experts, and

12   that was made available in response to

13   interrogatories.  I don't have that with me

14   beyond that.

15         Q.    Not my question, Doctor.

16               With respect to any alleged addicted

17   person -- let's start with that -- do you have

18   any information that their addiction -- can you

19   identify any person -- is relatable to any

20   conduct, action or omission of any Defendant?

21               MR. BADALA:  Objection to form.

22   Outside the scope.  Asked and answered.

23         A.    Sorry.  I missed your question.  Do

24   I have any information --

25         Q.    As to any person who you believe is

Page 42

1   addicted in the county, that that addiction was

2   caused by any specific representation, omission

3   or misrepresentation by a Defendant; if so, who

4   and what was the statement or omission.

5                MR. BADALA:  Objection to form.

6   Outside the scope.  Asked and answered.

7        A.    I mean, we have people who are

8   addicted, and going back and looking at their

9   prescription drug monitoring data, had lengthy

10  records there and subsequently went on to die of

11  heroin or fentanyl overdose, and, you know, I

12  think that they're, initially in the first wave

13  of the epidemic, in the heroin phase, that's

14  approximately 80 percent or so of our

15  population, so while I don't think everybody who

16  is addicted to drugs in Cuyahoga County had some

17  antecedent effect or, you know, cause with the

18  opioid pain relievers, a substantial percentage

19  had contact with opioid pain relievers.

20       Q.    And you know that how?

21       A.    That was based on the review of the

22  Ohio Automated RX Reporting System, which is our

23  prescription drug monitoring program.  That was

24  started in 2006 to track prescriptions of

25  controlled substances throughout the State of

1  Ohio, and we obtained access to that and

2  retrospectively reviewed our heroin overdoses,

3  2012, '13, actually going forward, and we

4  included our fentanyl overdoses more recently to

5  identify previous prescriptions received by

6  those individuals.

7        Q.   Let's go back to 34 for a minute,

8  Doctor.  So other than the one -- you named one

9  pill mill.  What was that?

10        A.   The Northeast Ohio Pain Clinic.  I

11  don't remember its exact name, but something

12  like that.  We participated in reviewing some

13  records for that.

14        Q.   Other than that Northeast Ohio Pain

15  Clinic, can you give the names of any specific

16  individual or entity in response to topic 34?

17             MR. BADALA:  Objection to form.

18        A.    I cannot give specific names.  They

19  are available through the county and I would

20  have to refer to the county prosecutor as a

21  better source of that information.

22        Q.   So the prosecutor has them, you're

23  just not prepared to tell me what they are right

24  now?

25             MR. BADALA:  Objection to form.

Page 44

1          A.      Yes.
2          Q.      Did you talk to anybody else?
3          A.      They're coming to me, but I have to
4    say --
5          Q.      In connection with 34.
6          A.      Not as I remember.
7          Q.      And is it your -- let me see if I
8    make sure we're clear on this.  Is it the
9    county's testimony that even to the extent that
10   there's any contribution of anybody or entity
11   other than Defendants, ultimately every single
12   one of those instances relates back to the
13   Defendants' conduct?  Is that your testimony?
14         A.      Which instances are we talking
15   about?
16         Q.      Well, I'm talking about 34, right?
17         A.      Right.  I -- I'm just asking the
18   identification and -- entities of individuals
19   other than the Defendant who contributed or
20   caused?  Is that the instances you're talking
21   about?
22         Q.      Here's what I'm trying to
23   understand.  I want to leave this but I want to
24   make sure that we're on the same page here.
25         A.      Yeah.  Yeah.  Sure.

Page 45

1          Q.    You've told me you can't identify

2    anybody, but you've also then said there may be

3    some individuals or entities out there that are

4    somehow in the chain, if you will, but their

5    conduct is somehow relatable ultimately to the

6    manufacturers.  Did I get that right?

7                MR. BADALA:  Objection to form.

8          A.    Yes, you did.

9          Q.    Okay.  And is there anybody out

10   there in the chain whose conduct is not in some

11   way, in the county's view, relatable to any of

12   the Defendants?

13               MR. BADALA:  Objection to form.

14         A.    I think ultimately the county would

15   say no, there is not anybody out there whose

16   conduct is not referable back to the Defendants.

17         Q.    And you're not aware and you can't

18   tell me anybody in the chain, whether they were

19   relatable to the Defendants' conduct or not,

20   right?

21               MR. BADALA:  Objection to form.

22         A.    Other than the one I mentioned, I

23   can't give you specific names, no.

24         Q.    Are you aware of any?

25         A.    I know there were prosecutions of

Page 46

1    doctors who were overprescribing based on my

2    discussion with the prosecutor, but the names of

3    those individuals or entities I do not know.

4        Q.    Did some of them go to jail?

5        A.    I would hope so, but I don't know

6    for sure.

7        Q.    Did they lose their licenses?

8        A.    Again, I would hope so, but I don't

9    know the result of that.  That isn't something I

10   have access to right now.

11       Q.    And you would hope so, I take it,

12   because your understanding of those doctors were

13   that they were engaging in improper conduct that

14   was not in the best interest of their patients,

15   right?

16            MR. BADALA:  Objection to form.

17   Outside the scope.

18       A.    I would have hoped so because this

19   county is in the midst of a terrible crisis that

20   I think those actions contribute to.

21       Q.    "Those actions" meaning the criminal

22   conduct of doctors?

23       A.    The overprescribing and the flooding

24   of our county with pain medication, yes.

25       Q.    By doctors, right?

Page 47

1                    MR. BADALA:  Objection to form.

2          A.     By the prescribers, yes.

3          Q.     And you believe those people should

4     be punished, I take it?

5                    MR. BADALA:  Objection to form.

6     Outside the scope.

7          A.     Yes.

8          Q.     And they should lose their licenses?

9                    MR. BADALA:  Objection to form.

10    Outside the scope.

11         Q.     Go ahead.

12         A.     They broke the law.  Yeah, I think

13    they should be punished for that, as anybody who

14    breaks the law should get some consequence.

15         Q.     And if a doctor broke the law and

16    improperly prescribed, they should be punished

17    and perhaps lose their license and perhaps go to

18    jail, correct?

19                   MR. BADALA:  Objection to form.

20    Outside the scope.

21         A.     I think that's a decision the county

22    would support.

23         Q.     And you believe that if they engaged

24    in illegal conduct such that they should lose

25    their license or go to jail, that somehow one of

Page 48

1  the Defendants is ultimately responsible for

2  that?

3        A.    Yes.

4        Q.    Why is that?

5        A.    These operations did not spring up

6  in a vacuum.  The overprescribing of pain

7  medication in a pill mill was to address an

8  addicted population, and that addicted

9  population is the byproduct of overprescribing

10  and over-distribution of pain medication.  So

11  the pill mill, while those activities are

12  illegal and I certainly would say contribute,

13  are ultimately referable back to an addicted

14  population that was created by the actions of

15  the Defendant.

16        Q.    The doctor wrote the prescription,

17  right, in a pill mill?

18              MR. BADALA:  Objection to form.

19  Outside the scope.

20        A.    The doctor in the pill mill had to

21  write the prescription, yes.

22        Q.    And that's the illegal conduct,

23  right?

24              MR. BADALA:  Objection to form.

25  Outside the scope.

Page 49

1              A.     I think, you know, in speaking with

2     the prosecutor, they would say, you know, there

3     were, you know, some legitimate patients in the

4     pill mills and some illegitimate patients, and

5     certainly the ones who were receiving

6     diverted -- receiving prescriptions for

7     illegitimate purposes or under improper means,

8     those are the ones that are breaking the law.

9              Q.     So even in a pill mill, some of them

10    were legitimate, some of them were illegitimate?

11              MR. BADALA:  Objection to form.

12    Outside the scope.

13              A.     That was my understanding based on

14    discussion with the county prosecutor's

15    representative, yes.

16              Q.     And if a doctor was punished or

17    prosecuted, it was because he or she engaged in

18    knowingly willfully wrong conduct, right?

19              MR. BADALA:  Objection to form.

20    Outside the scope.

21              A.     I would think so, yeah, sure.

22              Q.     And are you aware of any statement,

23    misrepresentation and conduct that led any of

24    those doctors -- by the Defendants that led any

25    of those doctors to engage in illegal conduct?

1            MR. BADALA:  Objection to form.

2    Outside the scope.

3        Q.    Any specifics?

4        A.    Statements by the Defendants?

5        Q.    Right, that led to someone engaging

6    in illegal prescribing conduct.

7            MR. BADALA:  Objection to form.

8    Outside the scope.

9        A.    I think it's the misrepresentations

10   of the Defendants that create the addicted

11   population.  They don't specifically recruit

12   people to run a pill mill, but as they create

13   the addicted population and that generates the

14   pill mill, I would say then those statements are

15   relevant.

16       Q.    Let's just talk about the doctors

17   who wrote those prescriptions.  Do you have any

18   information about any statements made to any of

19   those doctors that caused them to engage in

20   illegal conduct?

21           MR. BADALA:  Objection to form.

22   Outside the scope.

23       A.    I don't believe the county does, no.

24       Q.    And what could any of the Defendants

25   have done to prevent the Mexican drug cartel

1    from making and trafficking and sending illicit

2    fentanyl to the county?  Are you aware of any

3    steps?

4                    MR. BADALA:  Objection to form.

5    Outside the scope.

6         A.    Could have avoided creating an

7    addicted population in the first place.

8         Q.    An addicted population, you've

9    mentioned that many times.  I understand your

10   point on that.  What I'm talking about is the

11   conduct of others, right, of doctors right now

12   and the cartel.  Let's talk about that.  Do you

13   have any information as to what any of the

14   Defendants could have done to prevent any of

15   those illegal conduct by Mexican drug cartels?

16                    MR. BADALA:  Objection to form.

17   Asked and answered.  Outside the scope.

18        A.    If the addicted population was not

19   created, there would not have been a market for

20   the Mexican drug cartel.

21        Q.    Does the addicted population --

22   well, strike that.

23                    Other than what we've talked about,

24   can you identify any specific individual or

25   entity in connection with 34, topic 34?

                                          Page 52

1              MR. BADALA:  Objection to form.

2        A.    I think I've answered everybody I

3   can, sir.

4        Q.    Let's look at topic 9, the factors

5   that the county as a non-expert believe affect

6   the prescribing practices for prescription

7   opioids in your community other than the conduct

8   of Defendants.

9              Do you see that?

10       A.    Yes.

11       Q.    Who did you talk to in order to be

12  able to testify about that?

13       A.    Mr. Shannon, in my office, and I

14  would have described that, and then based -- in

15  the medical examiner's office -- I'm sorry.  I'm

16  just trying to get up to speed again with this.

17  I read it.  And I don't want to take up a lot of

18  your time.  Some of this would be related to my

19  discussion with Dr. Papp as well at the county

20  hospital.

21       Q.    Okay.  So let me just ask you, then,

22  an open-ended question that hopefully you can

23  help us with.  What are the factors that you as

24  a non-expert, the county as a non-expert,

25  believe affected prescribing physicians for

1    prescription opioids in Cuyahoga County other
2    than the conduct of any Defendant?
3          A.    It is, again, the county's opinion
4    that ultimately those actions are all referable
5    back to the Defendants, and there's nothing --
6    there are intermediate steps, but ultimately
7    they're referable back to the Defendants.
8          Q.    And can you identify -- are you able
9    to parse out any conduct by any Defendant?
10               MR. BADALA:  Objection to form.
11   Outside the scope.
12         A.    Yes, I am.  We are.  The county, as
13   you know.
14         Q.    So the answer essentially to 9 is
15   there are none?
16               MR. BADALA:  Objection to form.
17         A.    Other than the Defendant or actions
18   referable back to the Defendant.
19         Q.    Well, that's not what it says.  It
20   says -- let's not rewrite the interrogatory.  It
21   says, "Other than the conduct of any Defendant."
22   Are there any factors, even one, that the county
23   believes affected prescribing practices for
24   prescription opioids other than the conduct of
25   any Defendant?  Are there any, yes or no?

1              MR. BADALA:  Objection to form.

2    Asked and answered.

3         A.    On behalf of the county, I'd have to

4    say again that there are intermediates, but

5    ultimately the answer to that would be no,

6    excepting those intermediates; that all of the

7    actions around the prescribing are referable

8    back to the Defendants.

9         Q.    So tell me all the intermediates.

10             MR. BADALA:  Objection to form.

11        A.    If we look at the heroin-addicted

12   population, again, 80 percent or so of these

13   individuals in Cuyahoga County, give or take --

14   I mean, you use national data coupled with local

15   data to say that that addicted population

16   started their addiction with opioid pain

17   relievers.

18             Now, if you would say does one of

19   the Defendants run a drug cartel in Mexico, I

20   think we would all agree the answer to that is

21   no.  But at the time the opioid crisis evolved

22   from a more opioid pain reliever to a heroin

23   phase, again, with these folks having their

24   antecedent addiction to opioid pain relievers in

25   large measure, the availability of heroin at

Page 55

1    that point was an inducement to the cartels to

2    start to sell that here, and because of less

3    availability of narcotics, potential

4    reformulations of the prescription pain

5    relievers, costs of the prescription pain

6    relievers, any other potential factors, heroin

7    started to become a crisis in our county, but

8    the actions of heroin, or the genesis of the

9    heroin addiction is referable back to the opioid

10   pain relievers.

11        Q.    I'm going to move to strike.  I

12   asked you specifically, Doctor, what the

13   intermediates are.  One is, in that answer I

14   think you just gave us, cartels; they're an

15   intermediary, right?

16        A.    Sure.

17        Q.    Who else?

18        A.    The addicted population I guess are

19   intermediaries in that they are now engaged in

20   drug-seeking behavior.

21        Q.    Who else?

22        A.    In that model, I think that just

23   describes kind of the chain from the cartel.

24   You know, there's obviously distribution points

25   between cartel, dealer, and things like that.

1          Q.     Be specific as you could, please,

2     Doctor.

3               MR. BADALA:  Objection to form.

4          A.     Well, a cartel would basically

5     oversee an operation that potentially would have

6     local distribution points, regional distribution

7     points.  A lot of our drugs, for example, could

8     have come through Columbus, Detroit, Chicago,

9     New York, there, and ultimately come down to

10    people distributing those drugs locally.  I

11    guess they would be intermediate points.  They

12    just kind of lump the cartel as the distribution

13    system there.

14               And then the sale of the heroin,

15    which, as I indicated, it's really not something

16    that is being manufactured or distributed by the

17    Defendants, but as we look at how this

18    population was initially created, that is

19    referable back to the actions of the Defendants.

20          Q.     Now, I'm going to go back and we're

21    going to read number 9 again because I think

22    we've gotten a little off topic, but let me just

23    ask you a few questions here.

24               So the intermediaries are the people

25    in the cartel and illegal drug distribution

1  chains; is that fair?

2          MR. BADALA:  Objection to form.

3      A.    I think so, sure.

4      Q.    And you can't tell me any of the

5  names of those people, right?

6      A.    Thankfully not, not.

7      Q.    What about doctors who engaged in

8  illegal conduct; are they intermediaries in the

9  chain?

10          MR. BADALA:  Objection to form.

11     A.    The illegal conduct, as I just want

12  to be clear, is the pill mill type doctor?

13     Q.    Yes.

14     A.    Yes.  I'd say they're part of the

15  intermediary, too.

16     Q.    What about healthcare policies that

17  encouraged doctors to write prescriptions for

18  opioids as opposed to other therapies?

19          MR. BADALA:  Objection to form.

20     A.    They could contribute in some way as

21  well.

22     Q.    Could a lack of focus or funding or

23  attention by governments also contribute?

24     A.    I'd have to say in a theoretical

25  sense, it's certainly possible.

Page 58

1          Q.     Now let's get back to number 9.  It
2     says, The factors that you, as an expert {sic},
3     believe affected prescribing practices, right?
4     Do you see that, prescribing practices for
5     prescription opioids in your community rather
6     than the conduct of the Defendant.  Do you see
7     that?
8          A.     Yes, I do.
9          Q.     I take it you would not tell me
10    that, in response to number 9, the drug cartels
11    would be one that you would list, would you?
12         A.     No.
13         Q.     So let's focus on number 9.  What
14    are the factors in response to number 9?
15              MR. BADALA:  Objection to form.
16    Asked and answered.
17         A.     The factors that affected
18    prescribing practices were, in the early part of
19    the crisis, the advertisements that were
20    indicating that the opioid pain relievers were
21    either not addictive or had tremendously low
22    addiction potential with very little evidence.
23    The influence of regulatory policies with
24    lobbying efforts that were, again, referable
25    back to Defendants.

1          Q.    Doctor, I'm sorry to interrupt you,

2    and I apologize, but it says other than the

3    conduct of the Defendants.  Do you see that?

4          A.    I do, you know, but --

5          Q.    So is there --

6                MR. BADALA:  Hold on.  Let him

7    finish.

8                MR. CHEFFO:  Well, I didn't ask a

9    question yet.

10                MR. BADALA:  He was still talking

11    before moving on to the next one.

12          Q.    Go ahead.

13          A.    Thanks.  I'm sorry if I'm not clear,

14    but it's the county's position that ultimately

15    all of the things that affect those prescribing

16    factors are referable back to the Defendants.

17          Q.    And if that's the case, Doctor, all

18    you have to tell me, then, is just I have none,

19    right.  I don't need the whole long answer.  I

20    want to just make sure, before I move to the

21    next topic, are there any -- let's make sure

22    we're clear on this.  Are there any factors that

23    the county, as a non-expert, believe affected

24    prescribing practices for prescription opioids

25    in Cuyahoga County other than the conduct of any

1  of the Defendants?

2          MR. BADALA:  Objection to form.

3  Asked and answered.

4      A.  I guess it's hard because what I am

5  saying to you, and I hope I'm clear, and I'm

6  sorry if I'm not, it is the county's position

7  that everything is referable back to the

8  Defendants, but there are chains, there's

9  degrees of separation.  But I would say, in

10 answer to your question, if you need a one-word

11 answer, the county says no, there are no other

12 folks who are ultimately responsible other than

13 the Defendants.

14     Q.  And I'm not trying to limit you to a

15 one-word answer, but are there any factors --

16 this is different.  Are there any factors

17 relatable to that affected prescribing practices

18 other than the conduct of Defendants?

19         MR. BADALA:  Objection to form.

20 Asked and answered.

21     A.  No.

22     Q.  And do you know if the county

23 employed an economist to analyze the motivating

24 factors for illicit drug markets?  Are you aware

25 of any work that was done in that regard?

```
 1            MR. BADALA:  Objection to form.
 2  Also, I instruct you not to answer if you
 3  learned this through counsel in any way.
 4       A.    I'm not sure I understand the
 5  question, actually.
 6            MR. BADALA:  Also, outside the
 7  scope.
 8       Q.    Do you know when the first year the
 9  Mexican drug cartel sent product into this
10  county?
11       A.    I don't think the county would know
12  that.
13       Q.    You don't know, though?
14       A.    I don't know and I don't think the
15  county would.  I don't think that's really
16  something we would be able to know given the
17  illegal and surreptitious nature of that kind of
18  distribution.
19       Q.    So before we leave 9, there is no --
20  there are no factors that you can testify to
21  today, right?  In fact, the county believes that
22  there are no other factors?
23            MR. BADALA:  Objection.  Asked and
24  answered.
25       A.    Ultimately, the county's position is
```

Page 62

1    that the factors are all referable back to the

2    Defendants.

3         Q.    That may be the county's position,

4    but I want you to read 9 and tell me if there

5    are no other factors, because it doesn't say

6    ultimately.  It says, "Other than the conduct of

7    any Defendant."

8              MR. BADALA:  Objection.  Asked and

9    answered.

10        A.    I don't know how else to answer

11   that.  The county would say there were

12   intermediate steps, but ultimately the conduct

13   of the Defendants is responsible for the

14   prescribing practices.

15        Q.    Okay.  Is the county's testimony and

16   position that all prescriptions of opioids for

17   chronic pain in Cuyahoga were written in

18   reliance on misrepresentations and omissions and

19   wrongdoing of Defendants?

20             MR. BADALA:  Objection to form.

21             Which topic are we looking at?

22             MR. CHEFFO:  It's a general question

23   first.

24             MR. BADALA:  Outside the scope.

25        A.    The county doesn't have an opinion

Page 63

1   on the medical appropriateness of prescriptions
2   written for opioid pain relievers in association
3   with all chronic pain patients.
4              MR. CHEFFO:  I'm sorry.  Can you
5   read that back to me, please?
6                   (Record read.)
7        Q.    Does it have a position on the
8   appropriateness of opioid therapy in connection
9   with any chronic pain patients?
10             MR. BADALA:  Objection to form.
11  Outside the scope.
12       A.    The county doesn't have an opinion
13  on appropriateness of therapy.  That's, I think,
14  referred to experts.
15       Q.    So the county has not taken a
16  position, as you know it, as to whether any
17  prescription for any chronic pain patient is
18  appropriate or not?
19             MR. BADALA:  Objection to form.
20  Outside the scope.
21       A.    As I understood your question,
22  you're asking about all prescriptions, which I
23  think the question would not offer an opinion.
24  The overprescribing in the setting of chronic
25  pain is certainly a factor the county recognizes

Page 64

1    as a potential -- or not a potential; as a

2    source of the opioid epidemic.

3          Q.    But with respect to taking a

4    position on all chronic therapies -- I'm sorry.

5    Strike that.

6                In connection with taking a position

7    about all prescriptions for opioid medicines for

8    chronic therapies, the county is not taking a

9    position on that?

10               MR. BADALA:  Objection to form.

11         A.    No, it is not.

12         Q.    Let us -- you did some work in

13    connection with certain interrogatory responses

14    in connection with preparing for today, did you

15    not?

16         A.    No, not that I'm aware of.  I mean

17    --

18         Q.    Did you look at any charts --

19         A.    The data was certainly available to

20    everybody, but --

21         Q.    Did you look at any charts or

22    printouts of prescription drug data?

23         A.    I mean, I've reviewed the Ohio

24    Automated RX Recovery System in my capacity as

25    the medical examiner in association with the

Page 65

1  fatalities that were passing through our office.

2  That wasn't in preparation for today

3  specifically.

4        Q.    Well, the interrogatory responses to

5  interrogatory 6, 7 and 10, did you look at

6  those?

7        A.    No.  They weren't on my scope of --

8  or 6 was, I guess.  7 and 10 --

9        Q.    They're encompassed within the

10  Special Master's order, but tell us what you did

11  for 6.

12        A.    The county collected claims data

13  from third parties, such as Medical Mutual of

14  Ohio, which was the healthcare carrier for the

15  county; Bureau of Workers' Compensation, which

16  is the state workman's compensation board; and

17  CVS, which oversees -- CVS Pharmacy, which

18  oversees our prescription planning for the

19  county, and turned that data over to its

20  attorneys, and the attorneys then worked with

21  experts to respond to the interrogatories.  So

22  we furnished the claims data to attorneys, and

23  then it was reviewed with experts to respond to

24  the interrogatories.  I was not among the

25  experts who were consulted on that.

Page 66

1          Q.    And did you see a spreadsheet that
2     was produced that had 500 prescriptions on it?
3          A.    I'm aware that there were 500 -- I
4     thought it was 500 patients who were identified
5     who met the criteria that I mentioned
6     previously.  Beyond that, that's as much as I'm
7     familiar with that.
8                    -    -    -    -    -
9                 (Thereupon, Gilson Deposition
10                Exhibit 2, Plaintiff's The County of
11                Cuyahoga, Ohio and State of Ohio Ex
12                Rel, Prosecuting Attorney of
13                Cuyahoga County, Michael C.
14                O'Malley's Amended Responses to the
15                Manufacturer Defendants' and
16                National Retail Pharmacy Defendants'
17                First Set of Interrogatories, with
18                Attached Spreadsheets, was marked
19                for purposes of identification.)
20                    -    -    -    -    -
21          Q.    Okay.  What was the criteria --
22     let's be more specific.  We've marked this as 2.
23     This is Exhibit 2.
24                MR. BADALA:  Mark, we're on topic 6
25     but interrogatory 6?  I'm just trying to keep

1   track.

2              MR. CHEFFO:  No.  It is a little

3   confusing.

4              MS. ROITMAN:  So we're going to be

5   on topic 4, 5 and 6.

6              MR. BADALA:  Just so it's clear.

7   Okay.

8        Q.    Are you prepared to talk about

9   topics 4, 5 and 6, Doctor?

10       A.    Just to generally state the county's

11  position, yes.

12       Q.    What did you do to prepare yourself

13  for topics 4, 5 and 6?

14       A.    I discussed them with counsel and

15  they responded to the interrogatories, which I

16  didn't do much preparation beyond the turning --

17  the county turning over data to our attorneys

18  and then that being reviewed with experts to

19  respond to the interrogatories.

20       Q.    I'm talking about your preparation,

21  so one of the things you did was you met with

22  your lawyers, right?

23       A.    Yes.

24       Q.    Did you meet with anybody else in

25  connection with those topics?

1      A.      No, I did not.

2      Q.      Did you review any documents?

3      A.      No, I did not.

4      Q.      And how much time did you spend

5   meeting with your lawyers in connection with

6   those topics?

7      A.      Oh.  Well, we met over a couple of

8   days, and, I mean, topics were coming and going.

9   Our total meeting time I would say is probably

10   about 10 to 12 hours.  Some portion of that.  I

11   couldn't be more specific.  We did not spend a

12   lot of time on these, as the responses to

13   interrogatories were generated in consultation

14   with the experts.  So this was going to just

15   have a reply that they were furnished and that

16   that was the county's response, what was in the

17   interrogatories.

18      Q.      I'm sorry.  Is it your testimony you

19   don't have much to add other than what's in the

20   interrogatories?

21           MR. BADALA:  Objection to form.

22      A.      That's correct.

23      Q.      Okay.  Well, let's -- let's ask you

24   to take a look at what we've marked as

25   Exhibit -- it's Exhibit 2.

Page 69

1            MR. GALLUCCI:  Which one is 2?

2            MR. CHEFFO:  It's the whole thing.

3       Q.    Have you seen that before, Doctor?

4       A.    I have not seen this document

5  before, no.  At least I'm not --

6       Q.    So with respect to any of the names

7  or prescriptions in these charts, do you have

8  any information about the criteria that was used

9  in responding to interrogatory 6?

10       A.    The claims were identified for

11  opioids that were not for cancer patients, were

12  high dose, that is 120 medical morphine

13  equivalents or higher, which are far more

14  dangerous, and for patients with diagnosed

15  substance use disorder.

16       Q.    Is that for the interrogatory 6

17  response or is that for more than that, or do

18  you know?

19       A.    It was -- I think the criteria were

20  spelled out in interrogatory -- or in topic

21  number 4, but as it related back to number 4,

22  it's the reply for number 6.

23       Q.    So those three criteria, not for

24  cancer patients, above 20 milligrams --

25       A.    120.

Page 70

1        Q.     120.   Excuse me.   Thank you for
2    that.
3        A.     Morphine medical equivalents.
4        Q.     So we'll just call it MME.
5        A.     MME, yes.
6        Q.     And then there is also a requirement
7    on the criteria that they are -- had been
8    diagnosed with an opioid abuse disorder?
9        A.     Diagnosed substance use disorder,
10   yes.
11       Q.     Substance use disorder.
12       A.     I think in some places that will
13   also be spelled out as substance abuse disorder.
14   The nomenclature is kind of in flux I think in
15   trying to avoid the stigmatization of addicts.
16       Q.     Do you know who created those
17   criteria?
18       A.     I do not.
19       Q.     So is it -- are there any other
20   criteria that were used?
21       A.     That's the extent of my knowledge as
22   to the county of the criteria that were used to
23   identify the claims.
24       Q.     Do you know if anyone at the county
25   set those criteria?

Page 71

1              MR. BADALA:  Objection to form.

2     Outside the scope.

3         A.    That, I do not know.

4         Q.    And do you know what -- what

5     information or databases were queried in order

6     to generate the 500 list?

7         A.    These criteria and then third-party

8     claims data was collected from Medical Mutual of

9     Ohio, Workman's Compensation and CVS, as they

10    had their relationship to the county.  Beyond

11    that, I do not know what other entities were

12    queried for claims data.

13        Q.    Who actually did the work of

14    querying it?  Was it the county or was it

15    somebody else?

16             MR. BADALA:  Objection to form.

17    Outside the scope.

18        A.    I believe the county collected the

19    claims data, but the analysis beyond that, to

20    respond to the interrogatories, was with

21    attorneys with experts.

22        Q.    Okay.  And I think you told us you

23    never saw Exhibit 2 before, right?

24             MR. BADALA:  Objection to form.

25    Mischaracterizes testimony.

Page 72

1          Q.    Did you see Exhibit 2 before?

2          A.    I don't remember seeing this, no, I

3    myself.  I mean, the county, I can't necessarily

4    say that they did not see it.  Myself, I did not

5    see it.

6          Q.    Okay.  In the response to

7    interrogatory 6, the county identified Exhibit

8    A.  Do you see this big document here?

9          A.    This one (indicating)?

10         Q.    Yes.

11         A.    Yes.

12         Q.    Have you seen that exhibit before?

13               MR. BADALA:  Objection to form.

14         A.    Can you give me a second to not give

15    a quick off-the-cuff answer?

16               No, I have not seen that before.

17         Q.    And is it your understanding that in

18    order -- so let me strike that.

19               You just identified for us three

20    criteria, right, the one -- over 120 MME,

21    substance disorder, and not for cancer, right?

22         A.    And a diagnosed substance use/abuse

23    disorder, yes.

24         Q.    That was one of the three, right?

25    It was diagnosed --

1           A.    Oh, I'm sorry.  You said that first

2    --

3           Q.    I may have said it backwards, but it

4    was not for a cancer patient, above 120 MME --

5           A.    Which would be considered dangerous,

6    and then identified substance abuse disorder.

7           Q.    Okay.  And what -- what were those

8    criteria used for?

9                 MR. BADALA:  Objection to form.

10   Outside the scope.

11          A.    I think identification of claims

12   data, as I understand it.

13          Q.    Identification of certain claims.

14   Did you understand it that those were the

15   criteria that were used to generate Exhibit A?

16          A.    You know, I don't know Exhibit A, so

17   I'm reluctant to give an answer on that.  These

18   were the criteria that were identified to

19   identify the claims -- they were spelled out to

20   identify the claims.  Being unfamiliar with this

21   document, if these are the claims that were

22   passed by the county, then these were the

23   criteria that were used for that.  Not knowing

24   the document, I'm reluctant to go further than

25   that.

1      Q.    What I'm just trying to understand,

2    you gave us those three criteria.  What did you

3    understand those criteria were going to be used

4    for?

5      A.    As I understood it, there was a

6    population of 500 patients who were identified

7    to be a representative of harms that the county

8    had claimed, and then the claims data for those

9    individuals were identified using those three

10   criteria.

11     Q.    So you thought that there were an

12   effort to identify 500 individuals and there

13   were these criteria and those criteria generated

14   the 500 individuals?

15     A.    That's my understanding of that,

16   yes.

17     Q.    Were you aware of any prescriptions

18   that were also identified?

19            MR. BADALA:  Objection to form.

20   Outside the scope.

21     A.    My understanding of this topic is

22   that the 500 number identified patients, not

23   prescriptions.  I mean, prescriptions obviously

24   were attached to the patients, but they were

25   patients who were identified, not specific

Page 75

1    prescriptions.

2         Q.    And you've never seen any

3    information or list of the actual 500 patients

4    or prescriptions, have you?

5         A.    No, I have not.

6         Q.    Do you understand that a list was

7    prepared?

8         A.    Yes, I do understand that.

9         Q.    And is it your understanding that

10   every one of the patients or prescriptions on

11   the list meets these three criteria?

12              MR. BADALA:  Objection to form.

13   Outside the scope.

14        A.    I mean, that's my understanding of

15   the criteria that were agreed to to select the

16   patients who were the 500 patients.

17        Q.    So in order to identify the patients

18   or prescriptions, they had to meet all of these

19   three criteria; is that right?

20        A.    That's my understanding, yes.

21        Q.    Did they have to meet any other

22   criteria?

23              MR. BADALA:  Objection to form.

24   Asked and answered.

25        A.    Not that I'm aware of, no.

Page 76

1          Q.    And how was it determined that the

2     patient received opioid therapy for non-cancer

3     use?

4               MR. BADALA:  Objection to form.

5     Outside the scope.

6          A.    As I say, I can't give you personal

7     knowledge on that.  I would think from a review

8     of medical records.

9          Q.    Do you know?

10              MR. BADALA:  Same objection.

11         A.    I don't know for certain.

12         Q.    Do you know at all?

13              MR. BADALA:  Same objections.

14         A.    No.  They were identified as not

15    being cancer patients.  The criteria, how that

16    was arrived at, I do not know.

17         Q.    Not how it was arrived at, but how

18    it was determined.  Do you know how they

19    determined whether -- if a person or

20    prescription was on the list, how it was for a

21    non-cancer patient or diagnosis?  Do you have

22    any information at all?

23              MR. BADALA:  Objection to form.

24         A.    No, I do not have separate

25    information on that.

Page 77

1      Q.     Did you talk to anybody about that?

2      A.     No, I did not.

3      Q.     Did you -- do you have any

4  information how it was determined that a

5  prescription was above 120 MME?

6              MR. BADALA:  Objection to form.

7  Outside the scope.

8      A.     Other than a review of pharmacy or

9  medical record data, I'm giving you my best

10  opinion as an individual, but how the county

11  came to that, I do not have specific information

12  for it.

13      Q.     And I appreciate that.  I don't want

14  you to guess or speculate.  I think your lawyers

15  would agree with me.  Do you have any personal

16  knowledge, through either your own knowledge or

17  from any work that you've done to prepare for

18  the deposition, as to how it was determined that

19  a prescription or patient received above 120

20  MME?

21              MR. BADALA:  Objection to form.

22  Outside the scope.

23      A.     Other than what I've said, you know,

24  a review of medical records would seem to

25  furnish that.  I don't know.

Page 78

1          Q.    Did you talk to anyone who reviewed

2    medical records?

3          A.    No, I did not.

4          Q.    Do you know that they reviewed

5    medical records?

6                MR. BADALA:  Objection to form.

7          A.    No.  I was just giving you my

8    best --

9          Q.    Guess?

10         A.    I think informed guess.  There's

11   only so many ways you can get this kind of

12   information, so --

13         Q.    But you don't know how they did it?

14         A.    But I do not know the methodology

15   exactly.

16         Q.    And you don't know what the QC

17   process was, if any, do you?

18               MR. BADALA:  Objection to form.

19   Outside the scope.

20         A.    No, I do not.

21         Q.    And did -- was there -- and the

22   third criteria that you said was the substance

23   abuse disorder?

24         A.    Yes.

25         Q.    Do you know how they determined if

1    somebody had a substance abuse disorder?

2              MR. BADALA:  Objection to form.

3    Outside the scope.

4         A.   I'm aware that criteria are spelled

5    out for that diagnosis.  How they came to

6    that -- any application of this criteria, I do

7    not know.

8         Q.   Do you know what criteria they used?

9    Was it the DSM-5 criteria?

10             MR. BADALA:  Objection to form.

11   Outside the scope.

12        A.   You're grazing into a lot of

13   medicine I don't remember, but I don't know what

14   criteria were used.

15        Q.   I thought you told me that you did

16   know what the criteria for substance abuse

17   disorder was.

18        A.   I don't believe I said that.  I said

19   there are criteria.  I'm aware of the diagnosis,

20   but I don't know them personally.

21        Q.   There's a diagnosis of substance

22   abuse disorder?

23        A.   I believe so, yeah.

24        Q.   And are you familiar what those

25   criteria are?

Page 80

1              MR. BADALA:  Objection to form.

2    Outside the scope.

3         A.    No, I'm not.

4         Q.    And are you aware of any criteria

5    that was used to identify over 120 MME?

6              MR. BADALA:  Objection to form.

7    Outside the scope.

8         A.    I didn't understand your question.

9         Q.    You told us one of the criteria was

10   over 120 MME, I take it, per daily use; is that

11   right?

12        A.    Medical morphine equivalents for

13   daily use.

14        Q.    For daily use.

15             Can you be more specific about how

16   that was defined and how it was identified?

17             MR. BADALA:  Objection to form.

18   Outside the scope.

19        A.    I'm aware of standard definitions

20   for -- that they exist for medical morphine

21   equivalents.  What was used here, I cannot

22   honestly say I know for certain.

23        Q.    In fact, you don't know at all, do

24   you --

25             MR. BADALA:  Objection to form.

1          A.    Don't know at all.

2          Q.    -- how any of these criteria were

3     used or developed or applied, because you didn't

4     ask anybody, did you?

5               MR. BADALA:  Objection to form.

6     Outside the scope.

7          A.    No.  I was told these had been

8     answered in interrogatories.

9          Q.    Did you understand that one of the

10    topics you were going to be -- or several of the

11    topics was the criteria that were going to be

12    used, that were used, in connection with

13    responding to the interrogatories?

14         A.    I was aware of the topics and these

15    are the answers that I have to give on behalf of

16    the county.

17              MR. BADALA:  So we're going over

18    about an hour now.  Is it a good time to take a

19    break?

20              MR. CHEFFO:  Yes.  Sure.

21              THE VIDEOGRAPHER:  Off the record at

22    10:16 a.m.

23                   (Recess had.)

24              THE VIDEOGRAPHER:  Back on the

25    record at 10:38 a.m.

1          A.    May I make a correction on the

2    record before we start?

3               I said I had destroyed notes of

4    conversations with three individuals.  I was

5    able to locate notes that I did keep and I'll

6    provide them to counsel.

7               MR. BADALA:  We'll review them and

8    make sure that they don't have any

9    communications.

10         Q.    Where are they?

11         A.    They were in a case file I have on

12   this.

13         Q.    In your office?

14         A.    I brought them here with me today.

15         Q.    So they're not in the landfill?

16         A.    Pardon me?

17         Q.    They're not in the landfill?

18         A.    One might be.  I can say that they

19   mentioned the three individuals, Dr. Papp and

20   Vince Caraffi.  I found those notes.  The other

21   one, with Tamara Chapman from DCFS, I had on a

22   phone -- list of phone numbers, was just taking

23   messages, and I'm quite certain I threw that one

24   away.  So that might be in the landfill.

25               I can tell you the points on that

Page 83

1    were that, when I spoke with her, the number of

2    custody cases that DCFS had seen had risen over

3    the time of the opiate crisis, the number of

4    toxicology positive infants had risen over the

5    time of the opioid crisis, and that it was her

6    impression that that was related to the opioid

7    crisis.

8                MR. CHEFFO:  I'm going to move to

9    strike that.

10               MR. BADALA:  We'd object to that

11   motion to strike.

12               MR. CHEFFO:  And at the break I

13   would call for those notes, since you have them

14   here, produced to us, because otherwise, we're

15   going to reserve our rights to continue this

16   30(b)(6) when I get the notes.  So you can take

17   it under advisement.  I don't want to quibble

18   with you, but I think that would be the most

19   efficient way to deal with it.

20        Q.    So, Doctor, any other clarifications

21   before we start?

22        A.    No.  That's the only one.  Sorry

23   about that.

24                   -   -   -   -   -

25               (Thereupon, Gilson Deposition

Page 84

```
 1                    Exhibit 3, Plaintiffs The City of
 2                    Cleveland, County of Cuyahoga,
 3                    County of Summit and City of Akron's
 4                    Supplemental Amended Responses and
 5                    Objections to the Manufacturer
 6                    Defendants' First Set of
 7                    Interrogatories, Submitted Pursuant
 8                    to Discovery Ruling No. 13, was
 9                    marked for purposes of
10                    identification.)
11                         -    -    -    -    -
12        Q.    Let me show you Exhibit 3.  Have you
13   seen this document before, Doctor?
14        A.    No, I have not.
15        Q.    Would you look at page 5, please?  I
16   asked you a question earlier, and this may look
17   or sound familiar to you, Doctor, but let me
18   kind of ask you the question.  The second full
19   paragraph, do you see where it says, "Subject to
20   and without waiving"?
21        A.    Oh, I'm sorry.  I'm on 6.
22        Q.    I'm on 5.
23        A.    Yes.
24        Q.    "Subject to and without waiving the
25   foregoing objections and limitations, Bellwether
```

Page 85

1  Plaintiffs contend that all prescriptions of

2  opioids for chronic pain in the Bellwether

3  jurisdictions were in reliance on the

4  misrepresentation, omissions, and wrongdoing

5  alleged in their complaints."

6            Do you see that?

7       A.    Yes, I do.

8       Q.    And you testified earlier that

9  that's not the county's position; is that right?

10            MR. BADALA:  Objection to form.

11       A.    I think the prescriptions for

12  chronic pain were based on misrepresentations,

13  but whether they actually were written for

14  people with legitimate chronic pain is a

15  separate issue, and whether they were

16  efficacious short term for that is a separate

17  issue.

18       Q.    Is this right or wrong?

19       A.    I would say it's right.

20       Q.    So it is Cuyahoga County's position

21  that all prescriptions of opioids for chronic

22  pain in Cuyahoga were written in reliance on the

23  misrepresentations, omissions, and wrongdoing

24  alleged in the complaint?

25            MR. BADALA:  Objection to form.

Page 86

1         A.    Yes.

2         Q.    Every single one?

3               MR. BADALA:  Objection to form.

4   Asked and answered.

5         A.    Yes.

6         Q.    Going back to when?

7               MR. BADALA:  Objection to form.

8   Outside the scope.

9         A.    I was told the -- for any time frame

10  that we were going back to was 1995 for the

11  litigation.

12        Q.    How was chronic pain defined?

13              MR. BADALA:  Objection to form.

14  Outside the scope.

15        A.    I think in the usual way.  I don't

16  know that I have a specific definition for it on

17  behalf of the county.

18        Q.    How was it defined here in the

19  responses?

20              MR. BADALA:  Objection to form.

21        A.    I don't have a specific answer on

22  behalf of the county of the definition of that.

23        Q.    Well, you've told me the statement

24  was true, so how do you know if it's true or not

25  if you can't define chronic pain?

Page 87

1             MR. BADALA:  Objection to form.

2   Outside the scope.

3        A.    The opioids were prescribed for

4   chronic pain.  That's the way I read that as a

5   whole block there.

6        Q.    And do you know what definition --

7   what's your definition for chronic pain?

8             MR. BADALA:  Objection to form.

9   Outside the scope.

10        A.    I don't believe the county has a

11   specific definition for chronic pain.  It would

12   have been referred to experts.

13        Q.    Do you have one?

14             MR. BADALA:  Objection to form.

15   Outside the scope.

16        A.    Me personally?  Nothing more than I

17   would say my layman's definition.  I don't have

18   a specific medical definition of chronic pain.

19        Q.    What steps were taken to verify that

20   every single prescription written in Cuyahoga

21   for chronic pain for opioids since 1995 was done

22   so in reliance on misrepresentations, omissions

23   and wrongdoing by the Defendants?

24             MR. BADALA:  Objection to form.

25   Outside the scope.

1          A.     I'm sorry.  Your question again?

2          Q.     What steps were taken to verify that

3     every prescription written since 1995 for an

4     opioid medicine for chronic pain was done so in

5     reliance on misrepresentations, omissions, and

6     wrongdoing by the Defendants?

7                MR. BADALA:  Objection to form.

8     Outside the scope.

9          A.     The county collected the claims data

10    from the third parties and then it was turned

11    over to attorneys and experts for review.

12         Q.     Was one of the criteria whether a

13    doctor was visited by a sales rep?

14                MR. BADALA:  Objection to form.

15    Asked and answered.

16         A.     The criteria that were applied to

17    identify the claims were that they were not for

18    cancer patients, were high dose, higher than 120

19    medical morphine equivalents, or for patients

20    diagnosed with substance abuse -- and for

21    patients diagnosed with substance abuse

22    disorder.  I don't see any reference in the

23    criteria specifically to visits from

24    pharmaceutical representatives.

25         Q.     Are there any criteria related to

1   any conduct on behalf of any of the Defendants?

2            MR. BADALA:  Objection to form.

3   Outside the scope.

4        A.    The criteria that I enumerated here

5   are the ones that were used to identify the

6   claims.

7        Q.    Do any of them relate to any conduct

8   by any Defendant?

9            MR. BADALA:  Objection to form.

10  Outside the scope.

11       A.    Do the claims have?

12       Q.    Do the criteria?

13            MR. BADALA:  Objection to form.

14       A.    I'm not understanding your question.

15  I'm sorry.

16       Q.    Do these relate to any criteria --

17  do any of the criteria relate to any conduct or

18  acts or omissions of any of the Defendants?

19            MR. BADALA:  Objection to form.

20  Outside the scope.

21       A.    I think the criteria are clear

22  enough, and then -- I'm sorry.  Your question is

23  just confusing me.

24       Q.    So one of the criteria is not for

25  cancer pain, right?

Page 90

1          A.    Yes.

2          Q.    But you've just told me that if

3    there was an opioid prescription for chronic

4    pain for cancer patients, that was in reliance

5    on misrepresentations, omissions and wrongdoing

6    of Defendants, right?

7          A.    Yes.

8          Q.    So which criteria applies?  Does

9    it --

10         A.    Cancer pain is viewed separately

11   from chronic pain.  That's terminal care,

12   hospice care type of pain.

13         Q.    I'm talking about the statement on

14   paragraph 5, page 5, paragraph 2, that you just

15   told me was accurate.  It doesn't carve out

16   cancer pain, does it?

17         A.    No.  It says, "chronic pain."

18         Q.    So is it accurate not carving out

19   cancer pain?

20              MR. BADALA:  Objection to form.

21         A.    Cancer pain is considered different

22   than chronic pain.

23         Q.    It's your testimony that you can't

24   have -- a cancer patient can't have chronic

25   pain?

Page 91

1              MR. BADALA:  Objection to form.

2    Outside the scope.

3         A.    No.  I think that, you know, they're

4    as eligible for chronic pain as anyone else, but

5    the cancer pain that they would receive opioid

6    pain relievers for was terminal pain and not

7    chronic in the conventional sense of the

8    understanding of that word.

9         Q.    So you don't think pain for cancer

10   patients is included in the statement on page 5?

11             MR. BADALA:  Objection to form.

12   Outside the scope.

13        A.    That's my understanding, yes.

14        Q.    So let's see if we can make sure

15   that we're on the same page.  So with respect to

16   Exhibit 2, that was in response to

17   interrogatories 7 and 10; is that your

18   understanding?

19        A.    This exhibit (indicating)?

20        Q.    Yes.

21        A.    I thought was in response to

22   interrogatories -- or, I'm sorry.  Maybe I'm

23   confusing topics with interrogatories.  I

24   thought these were generated in response to

25   topics 4, 5, 6 and 19.

```
                                                    Page 92
 1          Q.    So that response to 4, 5 and 6 and
 2    19, Exhibit 2, right?
 3          A.    Topics 4, 5, 6 and 19.  That's my
 4    understanding, yes.
 5          Q.    The interrogatory 6 asks Plaintiffs
 6    to, among other things, identify and describe
 7    500 prescriptions of opioids that were written
 8    in Plaintiff's jurisdiction, here Cuyahoga, in
 9    reliance on any alleged misrepresentations,
10    omission or other wrongdoing; is that right?
11          MR. BADALA:  Objection to form.
12    Outside the scope.
13          A.    I'm sorry.  I don't know where
14    you're at.
15          Q.    It's in Exhibit 3 on page 1.  Do you
16    see on page 1, Identify and describe 500
17    prescriptions of opioids that were written in
18    reliance on any alleged misrepresentations or
19    other wrongdoing by any Defendant?  Do you see
20    that?
21          A.    Yes, I do.
22          MR. BADALA:  Just for the record,
23    there's more beyond that in the interrogatory.
24          MR. CHEFFO:  Right, and there is.
25          Q.    And it also basically -- in addition
```

Page 93

1   to other things, Plaintiffs were asked to

2   provide various details, including the physician

3   who wrote the prescription, the specific

4   misrepresentation, the specific person

5   associated with Defendants who made the alleged

6   misrepresentation.  Do you see that?

7          A.    Yes, I do.  That's further down on

8   the page.

9          Q.    And in order to respond, the

10  Plaintiffs referred back and the county referred

11  back to Exhibit A, which is that large printout

12  that I just showed you.

13         A.    This one here (indicating).

14         Q.    Right.

15         A.    Okay.

16         Q.    And you've never seen that before

17  today?

18               MR. BADALA:  Objection to form.

19         A.    No, I have not.

20         Q.    And if you look at page 14 of

21  Exhibit 3 -- if you look at the last paragraph

22  on page 14 of Exhibit 3, in the first sentence,

23  kind of midway through, it says, "Bellwether

24  Plaintiffs contend that each prescription in the

25  previously-provided Exhibit A was the result of

Page 94

1    Manufacturer Defendants' deceptive marketing."

2          A.    I'm sorry.

3          Q.    It's right down here, Doctor

4    (indicating).

5          A.    Okay, right down at the bottom.

6    Okay.

7          Q.    You've told us about three criteria?

8          A.    Yes.

9          Q.    Are those the only three criteria

10   that you're aware of for topics 4, 5, 7 and 19

11   or for topics -- interrogatories 6, 7 and 10?

12              MR. BADALA:  I think you have them

13   mixed up again, Mark.

14         Q.    Well, irrespective of the topics or

15   the interrogatories.

16         A.    4, 5, 6, 19, my understanding is

17   that the county collected the claims data based

18   on these criteria, turned them over to our

19   attorneys, and they were consulted with experts

20   and those were used to answer the

21   interrogatories.  The county didn't have any

22   further involvement with the interpretation of

23   that.

24         Q.    And with respect to any of the

25   topics that are the subject of Exhibit A, are

Page 95

1  those the only three criteria, is just what I'm

2  trying to find out, or were there other

3  criteria?

4           MR. BADALA:  Objection to form.

5  Asked and answered.

6       A.    That's my understanding, is those

7  are the three criteria.  I am not aware of any

8  others that were used.

9       Q.    Was a requirement that a

10 prescription be written by a doctor who engaged

11 in unlawful conduct or was prosecuted -- was

12 that one of the criteria that you were aware of?

13          MR. BADALA:  Objection to form.

14 Asked and answered.

15      A.    That criteria is not spelled out in

16 what I have.

17      Q.    And it was not a criteria that a

18 prescription be written for something other than

19 chronic pain, correct?

20          MR. BADALA:  Objection to form.

21      A.    It was a criteria that they were not

22 cancer patients.

23      Q.    So the answer to my question is yes,

24 the criteria was not to find prescriptions that

25 were not written for chronic pain?

Page 96

1          A.     Double negatives.

2                 MR. BADALA:  Objection to form.

3          Q.     Chronic pain was not a criteria, was

4     it?

5          A.     For selection, no.

6          Q.     In connection with identifying any

7     of the individuals or prescriptions on Exhibit

8     A, did Cuyahoga County or anyone at its behest

9     talk to any doctors?

10                MR. BADALA:  Objection to form.

11    Outside the scope.

12         A.     The county submitted the claims data

13    to our attorneys and they consulted with

14    experts.  I don't know the specific experts.

15    And that was the basis of the answers to the

16    interrogatories.

17         Q.     Do you know if anyone spoke to

18    individual doctors or patients on Exhibit A?

19                MR. BADALA:  Objection to form.

20    Outside the scope.  Asked and answered.

21         A.     The only expert I was aware of was

22    Rawlings, but other than that, I don't know what

23    experts were consulted.

24         Q.     Doctor, my question is not that.  I

25    didn't ask that question.  I asked you if you're

1    aware of whether anyone, including experts or

2    others, spoke with any of the doctors or

3    patients on Exhibit A.

4           A.    Oh, I'm sorry.  Now I understand.

5                 MR. BADALA:  Same objection.

6    Objection to form.  Outside the scope.  Asked

7    and answered.

8           A.    Once we turned the data over, I'm

9    not aware of what the experts did beyond that to

10   form the answers to the interrogatories.

11          Q.    Are you aware of any -- if anyone,

12   experts or others, spoke to any doctors or

13   patients listed on Exhibit A?

14                MR. BADALA:  Objection to form.

15   Outside the scope.

16          A.    I am not aware of that.

17          Q.    Are you aware of whether anyone

18   reviewed, as part of the criteria, any call

19   notes for sales reps in connection with the

20   individuals or prescriptions on Exhibit A?

21                MR. BADALA:  Objection to form.

22   Outside the scope.

23          A.    The county wouldn't be aware of

24   that.  After things were turned over to the

25   attorneys, they consulted with experts, and that

1   wasn't part of the county's process anymore.

2        Q.    So is the answer no?

3              MR. BADALA:  Objection to form.

4        A.    I'm not aware.

5        Q.    Did you ask anyone that question?

6              MR. BADALA:  Objection to form.

7   Outside the scope.

8        A.    I don't know.

9        Q.    You don't know if you asked?

10       A.    Me personally or the county?

11       Q.    I'm asking you, you the county, you

12  as the representative.  In connection with your

13  work and your preparation, did you ask anyone if

14  anyone had spoken to a doctor or a patient in

15  connection with the preparation of Exhibit A?

16             MR. BADALA:  Objection to form.

17  Outside the scope.  Asked and answered.

18       A.    Again, when we finished collecting

19  claims data, it was referred over to attorneys,

20  who consulted with experts to formulate

21  responses.  The process that was involved to

22  generate those responses the county does not

23  know.

24       Q.    So in terms of the three criteria

25  that you talked about, do you know who came up

```
 1   with those criteria?  Was it the county or
 2   somebody else?
 3              MR. BADALA:  Objection to form.
 4   Outside the scope.
 5        A.    I do not know.
 6        Q.    Do you know how any of those
 7   criteria were applied in practice?
 8              MR. BADALA:  Objection to form.
 9   Outside the scope.
10        A.    In the selection of claims?
11        Q.    Yes.
12        A.    They were the basis for identifying
13   the claims for opiates that would be referred to
14   our attorneys.
15        Q.    But do you know how they were
16   actually applied?  I think we talked about this
17   a little bit earlier.
18              MR. BADALA:  Objection to form.
19   Outside the scope.
20        A.    They were applied -- I'm sorry.
21        Q.    Let's do it again, Doctor.
22              You don't know how any claims
23   information was determined whether it was for a
24   non-cancer patient or not, do you?
25              MR. BADALA:  Objection to form.
```

Page 100

```
 1   Outside the scope.
 2         A.     How they identified that this was
 3   not a cancer patient?
 4         Q.     Yes.
 5         A.     That, I do not know the criteria
 6   that they used.
 7         Q.     And you don't know how they applied
 8   the criteria of above 120 MME, do you?
 9                MR. BADALA:  Objection to form.
10   Outside the scope.
11                MR. CHEFFO:  I'm not going to argue
12   with you.  How could that possibly be outside
13   the scope?  You can say it every single time.
14   It doesn't make it true.
15                MR. BADALA:  Are you asking for my
16   view or --
17                MR. CHEFFO:  No.  I'm just saying I
18   think it's becoming abusive.  This is specific
19   within it.  You can do it, but we'll take it up
20   with the Special Master.
21                MR. BADALA:  It's just that he
22   rewrote it that it's what's the criteria, not
23   how it was applied but what is the criteria.
24   That's what it says.  He's giving you the
25   criteria.
```

1           MR. CHEFFO:  And if that's your
2   position, that that's what you think that a
3   deposition in good faith is supposed to be
4   about, I welcome that.
5           MR. BADALA:  That's how Special
6   Master Cohen --
7           MR. CHEFFO:  We'll take that up with
8   him very clearly, if you think that's what --
9           MR. BADALA:  It's Exhibit B in your
10  notice.  It's right there.
11          MR. CHEFFO:  That's good.  I can
12  read it, too.
13      Q.   So do you know how the criteria for
14  above 120 MME was applied?
15          MR. BADALA:  Objection to form.
16  Outside the scope.
17      A.   120 MME has a specific definition.
18  I would think that was what was applied.  How
19  the criteria was created I do not know other
20  than that would be a dangerous level of
21  prescription opioids on a daily basis.
22      Q.   Do doctors -- are they able to
23  prescribe in Cuyahoga County today over 120 MME?
24          MR. BADALA:  Objection to form.
25  Outside the scope.

Page 102

1      A.    I don't honestly know the county
2  would know that.
3      Q.    Do you prescribe --
4      A.    I'm not a prescriber.
5           MR. BADALA:  Were you done with your
6  answer?
7           THE WITNESS:  Yeah.
8      Q.    So you're not a prescriber, are you?
9      A.    No.
10      Q.    You said a few times it's dangerous.
11  Have you ever prescribed opioids?
12      A.    Yes, I have.
13      Q.    When?
14      A.    Back in my training as a surgical
15  resident.
16      Q.    Was that decades ago?
17      A.    Early 1990s.
18      Q.    Can doctors in Cuyahoga County today
19  lawfully --
20      A.    Late 1980s.  I'm sorry.
21      Q.    Can doctors lawfully prescribe
22  opioid medicines above 120 MME?
23           MR. BADALA:  Objection to form.
24  Outside the scope.
25      A.    I believe the state has set out

1   criteria with which I am not familiar regarding

2   prescribing of opiates.  As I understand them,

3   as the county, those would be specifically with

4   regard to duration, and I don't know that there

5   was a specific MME cap placed on them.  I just

6   don't know.

7        Q.    Is the answer to my question yes or

8   no?  Can a doctor prescribe 120 MME or more

9   today in Cuyahoga County lawfully?

10              MR. BADALA:  Objection to form.

11   Outside the scope.

12        A.    It's regulated by the state, so I

13   can't tell you that I remember the criteria, so

14   my answer, not yes or no, is I don't know.

15        Q.    Well, you would assume if it was

16   dangerous, then the county wouldn't allow it;

17   isn't that right?

18              MR. BADALA:  Objection to form.

19   Outside the scope.

20        A.    I think the criteria that we're

21   placed out by the Board of Pharmacy, Board of

22   Medicine and the governor were to caution about

23   the use of excessive opioids.  I don't think

24   that they spelled out necessarily that it was

25   impossible to do this.  They said you could not

Page 104

1    prescribe -- or you needed to use the Board of

2    Pharmacy database beyond seven days.  I don't

3    know if they put an MME on that.  And then you

4    were expected to check the Board of Pharmacy

5    database, the Prescription Drug Monitoring

6    Program, every 90 days thereafter if you were

7    continuing to prescribe opioids.

8              So I think they're not, as I

9    understand it, saying it's absolutely forbidden,

10   but it is a practice that needs to be more

11   closely monitored.

12        Q.    Do you hold yourself out as an

13   expert in opioids?

14              MR. BADALA:  Objection to form.

15   Outside the scope.

16        A.    In some aspects of it, sure.

17        Q.    Which aspects?

18              MR. BADALA:  Objection to form.

19   Outside the scope.

20        A.    The opioid crisis.

21        Q.    Are you an expert in opioid efficacy

22   in prescribing?

23              MR. BADALA:  Objection to form.

24   Outside the scope.

25        A.    Again, as the county, I wouldn't

Page 105

1   answer myself an expert in that.

2        Q.    When is the last time you read a

3   label for an opioid product?

4             MR. BADALA:  Objection to form.

5   Outside the scope.

6        A.    Me personally --

7        Q.    Yes.

8        A.    -- or the county?

9        Q.    No.  You.

10       A.    Label for an opioid product, I don't

11  remember.

12       Q.    Was it in the last decade?

13            MR. BADALA:  Objection to form.

14  Outside the scope.

15       A.    I don't remember.  Might have been.

16       Q.    And with respect to substance abuse

17  disorder, do you know how that criteria was

18  applied?

19            MR. BADALA:  Objection to form.

20  Outside the scope.

21       A.    No.  Beyond the county submission of

22  the claims data, I don't know how that criteria

23  was applied.

24       Q.    Do you know if any determination was

25  made as to whether any of the individuals or

1  prescriptions on Exhibit A received a medically

2  unnecessary opioid prescription?

3      A.   The county doesn't have a position

4  on whether these were medically unnecessary.

5      Q.   What about medically inappropriate?

6           MR. BADALA:  Objection to form.

7      A.   The county used these criteria to

8  identify the claims that were submitted and

9  doesn't express opinions on medically

10 inappropriate or medically -- the interpretation

11 of a medical opinion.

12     Q.   Can you look at Exhibit 2, please,

13 Doctor, page 5?  There's not page numbers on

14 this one.

15     A.   I can count them.  Would this be 1

16 or is this 1 here (indicating)?

17     Q.   I don't know.  It's --

18     A.   That's very helpful.  Okay.  Just so

19 we're literally on the same page, this page

20 (indicating)?

21     Q.   Exactly.  Exactly.

22     A.   Sure.

23     Q.   And I'm going to just direct your

24 attention to the answer section, second sentence

25 there.  I'll read it to save your voice, but it

Page 107

1    says, "Bellwether Plaintiffs contend that each
2    prescription identified in Exhibit A" -- that's
3    that big chart in front of you -- was
4    unauthorized, medically unnecessary, ineffective
5    or harmful."
6              Do you see that?
7    A.    Yes.
8    Q.    And you just told us that the county
9    doesn't have a position on whether something is
10   medically unnecessary or unauthorized, right?
11   A.    May have been ineffective or
12   harmful, but --
13   Q.    So the county does not have a
14   position about whether something is medically
15   unnecessary or unauthorized, right?
16            MR. BADALA:  Objection to form.
17   A.    I think what they say here is that
18   the prescriptions identified there are
19   unauthorized, medically unnecessary, ineffective
20   or harmful.
21   Q.    So is that right or wrong?  Does the
22   county have a position or not?
23            MR. BADALA:  Objection to form.
24   A.    The county does have this position.
25   Q.    Didn't you say exactly the opposite

1   30 seconds ago?

2            MR. BADALA:  Objection to form.

3   Mischaracterizes the testimony.

4        A.    As I understood your question, you

5   were asking me separate parts of these, and the

6   conjunction here is "or," which means one or all

7   of these.  So the county doesn't necessarily

8   have an opinion that a specific prescription was

9   medically unnecessary.  It may have been

10  harmful.  It may have been unauthorized.

11       Q.    But does it have a position that any

12  of them were -- let's start with unauthorized?

13  And if so, show me which ones.

14           MR. BADALA:  Objection to form.

15  Outside the scope.

16       A.    It is the position that

17  prescriptions identified in Exhibit A were

18  unauthorized.

19       Q.    Which ones?

20       A.    Again, the county collected the data

21  and referred it to experts for further

22  interpretation of it.

23       Q.    What's the basis for that statement

24  that they were unauthorized?

25           MR. BADALA:  Objection to form.

1  Outside the scope.

2      A.    That they were either, you know,

3  prescribed to someone with a pain disorder or

4  higher.  I don't know the criteria that were

5  applied to make that decision.

6      Q.    That wasn't one of the criteria,

7  right?

8           MR. BADALA:  Objection to form.

9      A.    Pardon me?

10     Q.    That wasn't one of the three

11  criteria, right?

12     A.    What's that?

13     Q.    That something was unauthorized.

14     A.    No.  These are the criteria again

15  for -- not for cancer patients, high dose, or

16  for patients with a diagnosis of substance use

17  disorder.

18     Q.    Well, let's talk about each of these

19  then, since you told me they now -- it is the

20  policy.

21           If -- what is the criteria for a

22  prescription identified as Exhibit A,

23  unauthorized?  How do we know which one is?

24  What's the criteria?

25     A.    I don't personally know.  That was

1   collected data which was submitted to the

2   attorneys based on these criteria, and the

3   experts reviewed that for unauthorized --

4        Q.    Well, no.  It says here that they

5   were unauthorized.  Someone had to make -- use

6   certain criteria.  That's what you're here to

7   talk about is the criteria used in connection

8   with these interrogatory responses, and I want

9   to know for each one of these what the criteria

10  is in order to determine whether something was

11  unauthorized.  Do you know?

12             MR. BADALA:  Objection to form.

13  Asked and answered.

14       A.    That's not what the county was

15  doing.  That was what was referred to the

16  attorneys with consultation with experts.

17       Q.    So the answer is you don't have any

18  idea what criteria was used to determine whether

19  or not something was unauthorized, right?

20             MR. BADALA:  Objection to form.

21       A.    That would have been a decision from

22  the experts' review.

23       Q.    That's not my question, Doctor.

24             As you sit here today under oath,

25  testifying on behalf of the county, do you have

Page 111

1   any idea whatsoever what criteria was used with

2   respect to making a determination whether a

3   prescription was unauthorized?

4               MR. BADALA:  Objection to form.

5        A.    No, I do not.  The criteria that

6   were used for the claims that were reviewed are

7   what I've previously enumerated, but the

8   criteria that were used by the experts, I do not

9   have that.

10       Q.    Do you know this is used by the

11  experts or this is an answer in an interrogatory

12  that you're supposed to testify about?  That's

13  why I'm confused.  You keep saying experts.

14  What experts?

15       A.    We submitted claims data as the

16  county to our attorneys and they consulted with

17  experts to generate responses to the

18  interrogatories.  The county did not

19  specifically generate those responses, though

20  they signed off on them.

21       Q.    Okay.  We'll talk about that in a

22  few minutes, but your deposition here, one of

23  the topics is about the criteria used for the

24  prescriptions that are on that big chart there,

25  right, and in the interrogatory responses it

Page 112

1  refers us back to those -- those prescriptions,

2  right.  And I think we've covered unauthorized.

3  You told me you have no idea what the criteria

4  is for determining whether a prescription is

5  unauthorized or not, correct?

6            MR. BADALA:  Objection to form.

7       A.    I don't know what the criteria were

8  that were applied to the unauthorized because

9  that would have been the consultation with the

10 experts.

11      Q.    So the answer, again, is you don't

12 know, right?

13            MR. BADALA:  Objection to form.

14      A.    The county does not know.

15      Q.    And you did not ask anybody, did

16 you?

17      A.    We didn't ask anybody what?

18      Q.    Did you ask anyone in your

19 preparation for your deposition today, Doctor,

20 hey, what are the criteria for determining

21 whether something is unauthorized or not?  Did

22 that subject matter come up, yes or no?

23      A.    No.  That was, again, a topic that

24 was addressed when these were referred to the

25 attorneys in consultation with their experts.

1      Q.    And I take it if you went through

2  any of those prescriptions in that whole list,

3  you couldn't tell me which ones were

4  unauthorized because you don't know what the

5  criteria are; is that fair?

6            MR. BADALA:  Objection to form.

7      A.    I could not specifically look

8  through this because it wasn't my expert area to

9  tell you which of these were unauthorized or

10 medically unnecessary or ineffective or harmful.

11 I don't know the criteria that were applied by

12 the consultation -- the experts that our

13 attorneys consulted with.

14     Q.    What criteria were used to determine

15 whether a prescription was medically

16 unnecessary?

17            MR. BADALA:  Objection to form.

18     Q.    Do you know?

19     A.    Again, they were referred to the

20 experts and that was their criteria.  The county

21 did not have a separate criteria other than

22 their --

23     Q.    Move to strike.

24            I'm going to ask you again, Doctor.

25 What criteria were used to determine whether it

Page 114

1    was something medically unnecessary?  Do you

2    know or do you not know?

3                MR. BADALA:  Objection to form.

4         A.    Again, I do not know as a

5    representative of the county because those were

6    referred to counsel for consultation with

7    experts in that area.

8         Q.    So you can't testify about the

9    criteria as you sit here today, fair?

10               MR. BADALA:  Objection to form.

11        A.    I cannot.

12        Q.    And you didn't ask anybody about the

13   criteria for medically unnecessary prescriptions

14   before coming here to testify, did you?

15        A.    No, I did not.

16        Q.    And you did not ask anyone about the

17   criteria for what makes a prescription that's on

18   Exhibit A ineffective or not, what the criteria

19   are, correct?

20        A.    I'm sorry.  I lost my page.

21        Q.    Are you with me?

22        A.    I'm not because I was trying to go

23   back.

24        Q.    It's on 5.  It's with those names.

25        A.    My apology.  I'm sorry.  I just lost

Page 115

1   my place.

2        Q.    That's fine.

3              Same questions for ineffective.  I

4   can do it again for you.

5        A.    Would you, please?  I'm sorry.

6        Q.    Sure.

7              You did not ask anyone what the

8   criteria was to determine whether -- criteria

9   were with respect to whether a prescription on

10  Exhibit A was ineffective, right?

11       A.    No.  That was the referral that we

12  made to the attorneys for the consultation with

13  an expert who could make a decision on that, but

14  the county did not specifically identify the

15  medically unnecessary or any of the other three

16  there.

17       Q.    And not only didn't identify, you

18  can't tell me what they are, can you?

19       A.    As the county, no, I cannot tell you

20  the criteria that were applied there.

21       Q.    You said they referred those to the

22  experts?

23       A.    Right.

24       Q.    So can you give me a list of all the

25  experts you talked to to find out what those

                                                  Page 116

1    criteria were?

2              MR.  BADALA:   Objection to form.

3         A.    I'm only aware that the county made

4    me aware that there was a Rawlings who was used.

5    I don't know what other experts were used and I

6    did not speak to any myself personally.  I am

7    not sure about other members of the county.

8         Q.    How much time did you spend speaking

9    to Rawlings?

10        A.    I didn't personally speak to

11   Rawlings.  I just became aware that they were an

12   expert that was being used.

13        Q.    But you knew that they were one of

14   the entities that was actually making these

15   determinations, right?

16        A.    I just learned that, yes.

17        Q.    And you didn't talk to them?

18        A.    I just learned it this morning.  I

19   don't know that I would have talked to them, but

20   I certainly didn't have the opportunity to talk

21   to them in preparation for today.

22        Q.    And the same would be true for

23   harmful.  You can't tell us what criteria were

24   used to determine whether a prescription that's

25   listed on Exhibit A was harmful, right?

1      A.    No.  Again, these were things that

2    the county turned over to its attorneys in

3    consultation with experts who would be able to

4    address that criteria.

5      Q.    Did you talk to any of the experts

6    about what was harmful?

7      A.    Same answer.  I mean, I'm aware only

8    of Rawlings as an expert, but I just found out

9    about that.  I did not speak to any specific

10   experts.  I didn't know of them.  And once the

11   county made the referral in that direction, we

12   didn't pursue that further.  That was a topic

13   for expert review.

14     Q.    So if I asked you to look through

15   any of those -- any of those names or

16   prescriptions in Exhibit A and said tell me

17   which ones were ineffective, you couldn't do

18   that, could you?

19           MR. BADALA:  Objection to form.

20   Outside the scope.

21     A.    No, I could not.

22     Q.    I couldn't do it either, could I?

23           MR. BADALA:  Objection to form.

24     A.    I would hope not.  Maybe you have

25   hidden talents I don't know about.  But no, I

Page 118

1    could not.

2         Q.    All right.  The only way we would be

3    able to do that is if we actually knew what

4    criteria were applied, correct?

5              MR. BADALA:  Objection to form.

6         A.    Right.  The experts would have

7    applied their criteria.

8         Q.    And unless we know what the criteria

9    is, we can't actually understand which ones are

10   ineffective, which ones are harmful, which ones

11   are medically unnecessary, right?

12             MR. BADALA:  Objection to form.

13        A.    That's my understanding of that,

14   yes.

15        Q.    And you don't have that information

16   for us today, do you?

17             MR. BADALA:  Objection to form.

18   Mischaracterizes testimony.

19        A.    I do not have that information.

20        Q.    Is it your understanding or

21   testimony on behalf of the county that Rawlings

22   is an expert?

23        A.    I just know of their name and that

24   that was a group that was reviewing it.  I'd

25   have to say that we relied on our attorneys to

1   identify the expert in that case.

2       Q.    Let me ask you this, Doctor:  Tell

3   me everything you know about Rawlings, what you

4   think they are, what they do.  It sounds like

5   you just learned about them this morning.

6       A.    I just learned about them, so

7   honestly, I don't know really much at all about

8   them.

9       Q.    What's the extent of your knowledge?

10      A.    That they were an entity -- I don't

11  even know if it's a person, a group -- who were

12  consulted by our attorneys to provide expert

13  input into the prescriptions that were reviewed,

14  with the purpose of responding to the

15  interrogatories.

16      Q.    So at least in terms of those

17  criteria that we talked about, the three, in

18  order to make it on the list, is it your

19  understanding that they had to satisfy all three

20  of those criteria?

21      A.    The -- just were not a cancer

22  patient, high dose -- I'll summarize --

23  diagnosed substance use disorder?

24      Q.    Yes, sir.

25      A.    Yes, that was the criteria to

1   identify claims.

2        Q.    And they may have had other

3   criteria, but that was ancillary to what the

4   search criteria were; is that right?

5        A.    They may have had other conditions,

6   I would say, but they did not have other

7   criteria that were being applied.  These were

8   the three criteria used to select the -- to

9   identify the claims.

10       Q.    So it wasn't -- at least in

11  selecting those claims, it was not part of the

12  process to determine whether any doctor who

13  wrote a prescription received information from a

14  manufacturer of opioids, correct?

15              MR. BADALA:  Objection to form.

16       A.    That's not spelled out in the

17  criteria that were used to identify the claims.

18       Q.    And it's not part of the criteria

19  that a doctor who wrote any of those

20  prescriptions was prosecuted or was under

21  investigation for improper conduct, correct?

22              MR. BADALA:  Objection to form.

23       A.    The criteria are the three that I

24  mentioned.  Specifically whether a doctor had

25  visits from a representative of the

1   pharmaceutical industry, whether they were

2   prosecuted, those were not independent criteria

3   for the identification of claims.

4        Q.    And I think you said this, Doctor,

5   but just sometimes I mishear, so let me make

6   sure.  They actually have to satisfy all three

7   of those, not any one of those three criteria,

8   in order to make it on the list, right?

9        A.    That's my understanding, yes.

10       Q.    In terms of -- you said earlier that

11  there may have been other conditions.  Am I

12  correct that you're just saying due to just the

13  way people see doctors or get conditions, they

14  may have had a host of different conditions or

15  illnesses, but that wasn't a factor in

16  determining whether they were going to be on the

17  list or not other than the fact that it was not

18  for cancer pain, right?

19            MR. BADALA:  Objection to form.

20       A.    These were the criteria that were

21  used to identify the claims that we submitted to

22  our attorneys, and I think, if I remember what I

23  said, you know, these individuals could have had

24  other conditions, but these were the criteria

25  that were used to identify the claims we

Page 122

1    submitted to our attorneys.

2         Q.    Okay.  And just to make sure we're

3    clear, so those are the only three criteria,

4    right?

5         A.    Yes.

6         Q.    You're not aware of how they came

7    about or who devised them, right?

8         A.    I did not devise them and I do not

9    know who devised them, yes.

10        Q.    And no one in the course of your

11   preparation told you who was responsible for

12   those criteria, right?

13        A.    No, they did not.

14        Q.    And you don't know how they were

15   implemented in terms of kind of matching up

16   those criteria to actual claims and information,

17   right?  Someone else did that work, right?

18             MR. BADALA:  Objection to form.

19   Outside the scope.

20        A.    I -- as I tried to say earlier,

21   certainly in other definitions of these that

22   could have been applied, but the specific

23   application of those, I do not know for certain.

24        Q.    And even with respect to something

25   that seems clear, like it says not for cancer

Page 123

1  pain, do you see that?

2       A.    Not for cancer patients.

3       Q.    Cancer patients, right.  So does

4  that mean somebody -- do you know -- whether --

5  is currently having an acute problem from cancer

6  or do you know whether it would include people

7  who have cancer in remission?

8            MR. BADALA:  Objection to form.

9       A.    They were not cancer patients.  I

10  don't know if it was specifically they had a

11  history of cancer or if it was whether they had

12  an active cancer.  Again, I can give you my

13  opinion as an individual, but I don't want to

14  speak for the county, that it would not have

15  been people who had a history with cancer

16  because it wouldn't be an active problem.

17       Q.    But the point of what we're talking

18  about at least on this is we're trying to

19  understand the criteria used to generate Exhibit

20  A, and I think what you're telling me is you

21  don't know, even with respect to cancer, whether

22  they were trying to find people who were not

23  active cancer patients or whether they excluded

24  anyone who never had cancer?  You just don't

25  know the answer, right?

1              MR. BADALA:  Objection to form.
2         A.    I don't know for certain.
3         Q.    You couldn't go through any of the
4    list in front of you in Exhibit A and tell me
5    categorically all these people never had cancer,
6    could you?
7         A.    It would be pretty good if I could
8    do that.  I don't think so.  As I would
9    understand, cancer patient would be an active
10   problem, but I can't say that for certain.
11        Q.    In order to understand that, you
12   would want to see how it was defined and what
13   exact criteria was used, right, because then
14   that would help you understand how the selection
15   process worked?
16             MR. BADALA:  Objection to form.
17        A.    It would be helpful, yes.
18        Q.    It would be essential, wouldn't it?
19             MR. BADALA:  Objection to form.
20        A.    As I say, I don't know that I could
21   tell you how the identification was made not for
22   cancer patients, but I do know that the claims
23   were identified with that criteria.  I just
24   don't, as I sit here, have the capacity to tell
25   you how they ruled out the patients who did have

Page 125

1    cancer.

2         Q.    And substance abuse disorder, does

3    that include people who ever had a diagnosis or

4    is it people who are currently in treatment for

5    substance abuse disorder or is it people who

6    have a family history for substance abuse

7    disorder?  Do you know?

8              MR. BADALA:  Objection to form.

9         A.    I don't know the definition.  I

10   could give you my impression, but I don't know

11   that that's really representing the county.

12        Q.    I'm only asking -- you know, you're

13   here to testify on behalf of the county as to

14   what those criteria mean.  And other than what

15   you've told me, you can't tell me whether

16   individuals who previously had a substance abuse

17   disorder or currently had a substance abuse

18   disorder or have a family history of substance

19   abuse disorder are encompassed within that

20   criteria; is that fair?

21             MR. BADALA:  Objection to form.

22        A.    Fair.

23        Q.    And even as to the 120 MME, you

24   can't tell me whether that includes people who

25   are downwardly titrating or tapering, whether

Page 126

1  it's used for methadone, whether it's used for

2  some other opioid therapy to help addiction, you

3  just don't know, right?

4           MR. BADALA:  Objection to form.

5       A.    It's 120 MME.  I don't know what

6  direction the person would have been in in their

7  treatment or what specific medication would have

8  been used other than it would have a correlate

9  as an MME.

10       Q.    Do you know as to any of the people

11  whether the prescription was manufactured or

12  distributed by one of the Defendants in this

13  case?

14       A.    I don't know that for certain.

15           MR. CHEFFO:  Can we take a short

16  break?

17           MR. BADALA:  Yes.

18           THE VIDEOGRAPHER:  Off the record at

19  11:23.

20               (Recess had.)

21               -   -   -   -   -

22           (Thereupon, Gilson Deposition

23           Exhibit 7, Handwritten Notes, was

24           marked for purposes of

25           identification.)

```
                                            Page 127

 1                  -   -   -   -   -

 2              (Thereupon, Gilson Deposition

 3              Exhibit 8, Handwritten Notes, was

 4              marked for purposes of

 5              identification.)

 6                  -   -   -   -   -

 7              THE VIDEOGRAPHER:  Back on the

 8     record at 11:48 a.m.

 9          A.    If I could, another clarification

10     into the record.

11              In our last area, I was looking at

12     Exhibit 2 on the break, where you had asked me

13     about how we had defined unauthorized, medically

14     unnecessary, ineffective or harmful.  And I did

15     not have a chance to review the entire page

16     there, but I believe the answers to those

17     questions are here in the continuation, and I'd

18     like to read those into the record, that "The

19     basis for assertion that these prescriptions

20     were medically unnecessary is that the

21     healthcare providers listed below and in Exhibit

22     A were prosecuted or the subject of disciplinary

23     actions for their illegal or improper

24     prescribing of opioids, for example, without

25     examining patients or determining whether they
```

1   had conditions or diagnoses appropriately

2   treated with opioids or prescribing dangerously

3   high dosages of opioids."  I won't read the list

4   of the people who were prosecuted, but I think

5   that spells out the criteria that were used as

6   medically unnecessary.

7          The next paragraph below the last

8   guy's name is the criteria that were used to say

9   that these were ineffective.  The "Bellwether

10  Plaintiffs further contend that prescriptions or

11  reformulated OxyContin, Hysingla ER, Opana ER,

12  Exalgo, and Xartemis XR listed in Exhibit A were

13  ineffective in that they did not prevent

14  tampering, were not actually abuse-deterrent,

15  and did not prevent oral abuse, despite the

16  manufacturers' representations to the contrary."

17         And, lastly, "Bellwether Plaintiffs

18  further contend that by misrepresenting the

19  risks, benefits, and superiority of opioids,

20  particularly for use long-term and at high

21  doses, including, but not limited to, through

22  sales visits, continued medical education and

23  speaker programs, publications and websites, and

24  treatment guidelines, Manufacturer Defendants

25  deprived prescribers and patients of the ability

1    to make informed choices about whether, when and

2    which opioids to use -- to prescribe and use,

3    for how long, and at what doses.  Though

4    Defendants do not define 'unauthorized,'

5    'medically unnecessary,' or 'harmful,'

6    Bellwether Plaintiffs contend that Defendants'

7    misstatements regarding the benefits and very

8    significant risks of opioids and the

9    redefinition of the standard of care to include

10   opioids rendered the prescriptions unauthorized,

11   unnecessary and harmful in that they were

12   prescribed and taken without full and accurate

13   information."

14        Q.    You met with the lawyers on the

15   break?

16        A.    Yes, I did.

17        Q.    You know we've discussed for a few

18   hours now various criteria, and you told me, I

19   think, probably at least a half a dozen times,

20   if not more, that there are three only.  Do you

21   remember that testimony?

22        A.    Yes, I do.

23              MR. BADALA:  Objection to form.

24        Q.    So is that still true?

25        A.    These were the criteria that were

Page 130

1    identified -- that were used to identify the

2    claims, and then what I was just reading are the

3    bases for the contention that these were

4    unauthorized, medically unnecessary, et cetera,

5    harmful.

6         Q.    Did you know any of that information

7    before about 20 minutes ago?

8              MR. BADALA:  Objection to form.

9              I instruct you not to disclose any

10   conversations you might have had with the

11   attorneys.  It's pretty clear in the deposition

12   protocol.

13        Q.    You can answer.

14        A.    I read them at the break because I

15   was unable to kind of read beyond that

16   statement, and that's when I found the terms and

17   just wanted to clarify them.

18        Q.    So do all those terms apply to all

19   of the prescriptions and individuals?

20             MR. BADALA:  Objection to form.

21        A.    The terms are -- the criteria for

22   those terms are spelled out in the answer to the

23   interrogatory as it relates back to topic 6.

24        Q.    If I ask you questions about this,

25   other than what's in the interrogatory response,

1    do you have any personal knowledge or have you

2    done any preparation to respond to any of those

3    questions?

4                MR. BADALA:  Objection to form.

5    Asked and answered.

6         A.    I've reviewed a lot of, you know,

7    papers and forms.  I can't tell you I remember

8    everything.  As I say, I didn't remember if I

9    saw this before.  I don't think I did, but --

10        Q.    But, Doctor, we've spent a few hours

11   now and I've asked you many, many times about

12   criteria, so are those new criteria that we need

13   to go back and talk to you about, or did -- the

14   criteria that you've been telling me about for

15   two hours, do they still apply?

16                MR. BADALA:  Objection to form.

17        A.    As I said when I clarified the

18   record, on reviewing these, I came to understand

19   how those terms were used.  When we spoke

20   before, I didn't have that information, as I

21   hadn't read the entire page there, but I think

22   it clarified the questions you were asking me.

23        Q.    Let me ask you some questions about

24   it then.

25                Does that mean that all of the

Page 132

1   prescriptions were written by one of these

2   doctors listed in the exhibit; do you know?

3           MR. BADALA:  Objection to form.

4   Document speaks for itself.

5       A.    As I understood what I just read,

6   the criteria, namely, that they were

7   medically -- let me just go back and read it.

8   Give me a second.

9       Q.    So you're only going to be able to

10  answer my questions by reading the

11  interrogatories; is that right?

12          MR. BADALA:  Objection to form.

13      A.    I would like to give you a good

14  answer, so I'd like to read them.

15          Exhibit A was unauthorized,

16  medically unnecessary, or ineffective or

17  harmful, and then the next sentence is the basis

18  for the assertion that these were medically

19  unnecessary is because of these healthcare

20  providers in Exhibit A being prosecuted or

21  disciplined.

22      Q.    So does that mean that every

23  prescription on the list was written by one of

24  those doctors?

25      A.    I would --

1            MR. BADALA:  Objection to form.

2    Outside the scope.

3        A.    I would interpret that as the

4    medically unnecessary ones that we talked about.

5    Remember, it's the OARRS, so they don't all have

6    to be all four, but this was the definition used

7    for medically unnecessary.

8        Q.    And you can't tell me what the

9    criteria are as to whether something is

10   medically unnecessary other than you telling me

11   that it was written by one of these doctors,

12   right?

13            MR. BADALA:  Objection to form.

14       A.    Well, and these doctors were

15   prosecuted or subject to disciplinary action.

16       Q.    Which prescriptions did they write

17   on the list; do you know?

18       A.    On this list?

19       Q.    Yes.

20       A.    I believe the prescribers are

21   listed.  I don't want to take up your time

22   trying to find each name there.

23       Q.    Okay.  So a criteria for medically

24   unnecessary is that they were written by one of

25   these doctors?

1      A.    Right.  "The basis for the assertion

2  that these prescriptions were medically

3  unnecessary is that the healthcare providers

4  listed below were prosecuted or the subject of

5  disciplinary action for their illegal or

6  improper prescribing of opioids."

7      Q.    Did you talk to anybody about any of

8  the circumstances for any of the prosecutions or

9  any of the prescriptions?

10          MR. BADALA:  Objection to form.

11  Outside the scope.

12      A.    I spoke with a prosecutor about

13  prosecutions in general, but I did not

14  specifically talk about any of these individuals

15  named here in the interrogatory.

16      Q.    Do you know whether all of their

17  prescriptions were determined to be medically

18  unnecessary or only certain prescriptions --

19          MR. BADALA:  Objection to form.

20      Q.    -- in determining the criteria?

21      A.    I would just point back that they

22  were prosecuted for improper prescribing of

23  opioids.

24      Q.    But if they wrote a prescription --

25          MR. BADALA:  Were you done with your

Page 135

1   answer?

2               THE WITNESS:  No, I was not.  Could

3   I finish?

4               MR. BADALA:  Finish your answer.

5         A.    It doesn't, as I read this,

6   specifically say every prescription, but that

7   they were prosecuted for improper prescribing of

8   opioids.  It doesn't specify whether every

9   prescription they wrote was improper or whether

10  some were.  That's not how I'm reading that.

11        Q.    Well, is there any way for us to

12  differentiate?

13              MR. BADALA:  Objection to form.

14        Q.    How would we know whether this

15  includes prescriptions before they were

16  prosecuted or after they were prosecuted?

17              MR. BADALA:  Objection to form.

18        A.    I think these prescriptions are the

19  ones that they are being prosecuted for.

20        Q.    Do you know?

21        A.    That's my reading of this.

22        Q.    Do you know?

23              MR. BADALA:  Objection to form.

24        A.    That's my understanding.

25        Q.    And your understanding is based on

1   reading this for the first time 15 minutes ago?

2              MR. BADALA:  Objection.

3   Mischaracterizes testimony.

4       A.   As I said, I've read a lot of

5   things.  I don't remember reading this.  So my

6   best answer to you is I remember reading it, you

7   know, within the last half hour, but I don't

8   know if I saw that before.

9       Q.   So were all of the prescriptions

10  written on Exhibit A written by the doctors

11  listed in this response?

12             MR. BADALA:  Objection to form.

13  Outside the scope.

14      A.    As I understand it, the ones that

15  were defined as medically unnecessary were

16  written by these individuals.  There are other

17  criteria in the topic, as I read it, which is

18  unauthorized, medically unnecessary, ineffective

19  or harmful, so I would say that the ones that

20  were written by these, the claim, as I

21  understand it, is that they were medically

22  unnecessary.

23      Q.   Let's go then one by one.

24             So medically unnecessary.  Are there

25  any other criteria other than they were written

Page 137

1    by one of these doctors?

2          A.    I have to go back to what it says,

3    that the basis for the assertion they were

4    medically unnecessary is that these doctors were

5    prosecuted or subject to disciplinary actions

6    for illegal or improper prescribing.

7          Q.    Any other criteria?

8          A.    Not that I'm seeing here.  I mean,

9    I'm relying on this document.

10         Q.    You didn't do any work to answer

11   that question, did you?

12               MR. BADALA:  Objection to form.

13   Mischaracterizes testimony.

14         A.    This would have been something our

15   experts would have identified as medically

16   unnecessary.

17         Q.    And I just want to go through each

18   one.  We have limited time.

19               For medically unnecessary, is it

20   your testimony the only criteria that you're

21   aware of is that it was written by one of these

22   doctors?

23               MR. BADALA:  Objection to form.

24   Mischaracterizes testimony.

25         A.    Who were prosecuted or disciplined

Page 138

1    for their activities.

2         Q.    What about ineffective?

3         A.    Ineffective I think is defined

4    further down in the paragraph just below Jerome

5    Yokiel, Bellwether Plaintiffs further contend

6    that prescriptions of reformulated OxyContin,

7    Hysingla ER, Opana ER, Exalgo ER {sic} and

8    Xartemis ER {sic} listed in Exhibit A were

9    ineffective in that they did not prevent

10   tampering, were not actually abuse-deterrent,

11   and did not prevent oral abuse despite

12   Manufacturers' representations to the contrary.

13        Q.    Other than reading those responses,

14   do you have any independent knowledge, based on

15   any work that you did or people that you talked

16   to, in connection with the criteria used for

17   whether something was unauthorized, medically

18   unnecessary, ineffective or harmful?

19             MR. BADALA:  Objection to form.

20        A.    I know that some of these

21   formulations with which I am familiar were not

22   abuse-deterrent formulations.

23        Q.    That's not my question.

24             Other than reading from that

25   document that you saw 15 minutes ago, do you

1    have independent knowledge, based on your review

2    as a 30(b)(6) witness, of whether prescriptions

3    were unauthorized, medically unnecessary,

4    ineffective or harmful?

5              MR. BADALA:  Objection to form.

6         A.   I'm sorry.  I thought I answered

7    your question in that using the criteria, that

8    these were actually abuse deterrent.  I am

9    familiar, as an individual and a representative

10   of the county, that certain formulations here

11   are not abuse-deterrent formulations.

12        Q.   So if they're not abuse-deterrent

13   formulations, what does that mean?

14        A.   Plaintiffs further contend that the

15   prescription of reformulated drugs were

16   ineffective in that they do not prevent

17   tampering, were not actually abuse-deterrent, et

18   cetera.

19        Q.   So if there were prescriptions on

20   the list that were not written by any of these

21   doctors, does that mean that they're medically

22   necessary?

23             MR. BADALA:  Objection to form.

24   Outside the scope.

25        A.   I did not conduct the expert review

Page 140

1    of this, so I can't speak to that.

2         Q.    So if you look at Exhibit 2, there's

3    not doctors listed for every one.  Do you know

4    that?  Do you know or not, Doctor?

5         A.    You know, this is an incredibly long

6    document, and I have to tell you I don't know.

7         Q.    Okay.

8         A.    I don't know that that's untrue.  I

9    don't know that that's true.  I haven't had the

10   time to review this.  And I don't want to get

11   into what I initially brought back, again, of

12   saying I reviewed a document that I didn't have

13   the time to review and tell you that no, there's

14   not a prescriber listed for everything here.  I

15   do not know.

16        Q.    So there's a list of -- this is

17   Exhibit B.  It's in there.  Do you see this?

18             MS. ROITMAN:  It's in the back of

19   Exhibit 2.

20             MR. BADALA:  Oh, behind the big

21   spreadsheet?

22             MS. ROITMAN:  Yes.

23             MR. BADALA:  All the way back.  Go

24   back to the 8 and a half by 11.

25        Q.    So in connection with topic 19 and

1   interrogatory 7, you refer to this document.  Do

2   you know what this is?

3          A.    I have not seen this before.

4          Q.    Do you know what the criteria are

5   for any of the people who are on this list?

6          A.    It says that they all died from an

7   overdose death so far as -- if you'll give me

8   time to read through to the end.

9          Q.    Do you know what substances were

10  certified --

11         A.    I'm sorry.  Just give me a second,

12  please.

13         Q.    Sure.

14         A.    Okay.  I'm sorry.

15         Q.    Do you know what substances were

16  certified as the cause of death?

17              MR. BADALA:  Objection to form.

18         A.    For all of these?

19         Q.    Yes.

20         A.    I don't know what the death

21  certificates read.

22         Q.    Or any of them, right?  You don't

23  know?

24         A.    I don't have that information, no.

25         Q.    Do you know whether these people had

Page 142

1    a diagnosis of opioid use disorder?

2              MR. BADALA:  Objection to form.

3         A.    Are these the claims that were

4    referred, because that was one of the criteria

5    that we used for referrals?

6         Q.    Well, you're here to tell me,

7    Doctor.

8         A.    Again, I have to say, you know, I

9    read a lot of documents.  I don't know if these

10   are the names -- some of these are from Summit

11   County, which I don't speak for.  I can't tell

12   you, you know, again, if all of these folks had

13   a diagnosis of substance use disorder and --

14        Q.    I guess what I'm trying to find --

15   this is in response to topic 19, "The criteria

16   used by Plaintiffs to identify individuals who

17   overdosed on, or became addicted to,

18   prescription opioids in Plaintiff's geographic

19   area."  Do you see that?

20             MR. BADALA:  I think you're

21   referring to the depo notice.

22             MR. CHEFFO:  Yes.

23             MR. BADALA:  He's referring to this

24   Exhibit 1.

25             THE WITNESS:  Okay.

1          Q.     And in response to that, we received

2     this document, right?  The first few pages talk

3     about Summit, but if you go to the third and

4     fourth page, or fifth page, it's Cuyahoga.

5          A.     Right.

6          Q.     So, as the topic says, could you

7     tell us what criteria were used to identify

8     these individuals?

9          A.     The criteria that we used to

10    identify claims for opioids were, again, not

11    cancer patients, higher dose, higher than 120

12    MME, and patients with a diagnosed substance use

13    disorder.

14         Q.     But this is different.  This is --

15    again, you have to read the paragraph.  It says,

16    "The criteria used by Plaintiffs to identify

17    individuals who overdosed on, or became addicted

18    to, prescription opioids."  That's why there's

19    individual people listed here.  Are you telling

20    me that that's the same criteria?

21         A.     Those were the criteria used for the

22    response to the interrogatory.

23         Q.     To this, B?

24         A.     Again, I don't recognize this list

25    right off the top of my head, but if this is the

1  list of individuals in that 500 claims, those

2  were the criteria that were used, the three that

3  I mentioned.

4      Q.    In the overdose deaths?

5      A.    Pardon?

6      Q.    Overdose deaths.  Does that criteria

7  apply -- are those the only three criteria that

8  apply to the overdose deaths that are

9  articulated in topic 19?

10      A.    The claims that were identified all

11  have those three criteria.

12      Q.    What about the overdose deaths?

13      A.    If they were identified as claims by

14  the county, then they would have met those

15  criteria.

16      Q.    Putting aside whether they were

17  claims or not, what's the criteria for the

18  individuals who were on Exhibit B?

19          MR. BADALA:  Objection to form.

20  Asked and answered.

21      Q.    Do you know anything other than the

22  three criteria you've been telling us about this

23  morning?

24      A.    No.  Those were the criteria that I

25  was told were used to identify claims.

Page 145

1          Q.     And individuals?

2          A.     And to identify individuals or --

3     yeah, individuals, I guess prescriptions or

4     individuals.

5          Q.     And people who overdosed?

6          A.     I'm out in the weeds a little with

7     what you're saying.

8          Q.     Really, Doctor?  Maybe I'm not doing

9     a good job about it.  What does 19 say?  Can you

10    just read that out loud?

11         A.     "The criteria used by Plaintiffs to

12    identify individuals who overdosed on, or became

13    addicted to, prescription opioids in the

14    Plaintiff's geographic area."

15         Q.     That's all I want to know is what's

16    the criteria.

17         A.     How did we identify the overdose

18    deaths or the ones who became addicted to

19    prescription opioids?

20         Q.     Either.

21              MR. BADALA:  Objection to form.

22         A.     The overdose deaths are, you know,

23    searchable in the database either in our office

24    or in Summit County, and those overdose deaths

25    would meet these criteria.

Page 146

1          Q.     What criteria?

2          A.     The three criteria we keep

3   mentioning.

4          Q.     Oh, they would?  The overdose deaths

5   would all meet those criteria?

6          A.     If they were submitted for claims,

7   identified claims --

8          Q.     Putting aside claims; a separate

9   issue, overdose and addiction.  What are the

10  criteria for determining whether someone made it

11  on the list that we've been looking at?  Do you

12  know?

13             THE WITNESS:  Can I take a break?  I

14  have to tinkle really.  I'll be right back,

15  though.

16             THE VIDEOGRAPHER:  Off the record at

17  12:08 p.m.

18                  (Recess had.)

19             THE VIDEOGRAPHER:  Back on the

20  report at 12:11 p.m.

21          A.     Much obliged.  That was a necessary

22  break.

23          Q.     Understood.

24             We've talked a lot about claims data

25  and you've told me that there are three criteria

Page 147

1   only, right?  Correct?

2        A.     Right.

3        Q.     I'm going to put that aside.  Then

4   there were some interrogatories and topics that

5   talked about people who overdosed and people who

6   became addicted.

7        A.     Okay.  Right.  That's topic 19.

8        Q.     Is it fair to say -- you didn't do

9   any preparation for that topic, did you?

10              MR. BADALA:  Objection to form.

11       A.     Other than to familiarize myself

12  with the criteria and that they were submitted

13  to attorneys from the county for review in

14  consultation with experts to generate lists that

15  were provided to answer these interrogatories,

16  no, I did not actively participate.

17       Q.     No.  No.  I'm not asking if you

18  actively participated at all.  So I'm just

19  trying to find out -- you said you know the

20  criteria.  What are the criteria to determine if

21  somebody should be on a list for either being

22  opioid addicted or an overdose death

23  attributable to opioids?

24              MR. BADALA:  Objection to form.

25       Q.     Do you know?

1          A.    Overdose deaths -- I mean, I don't

2    know how Summit County works.  In our office we

3    would define those as deaths with a death

4    certificate including an opioid on it.

5          Q.    Is that the criteria that was used?

6          A.    That, I do not know.  Again, I think

7    this was something that was generated by experts

8    in response --

9          Q.    No.  Doctor, it says -- Doctor, I'm

10   asking about the criteria, and if you -- let's

11   not -- you know, if you don't know, all you have

12   to do is just say, "I'm not prepared, I don't

13   know the answer."  If you do know, I'm not

14   asking you about experts or anybody else who

15   looked at it.  I'm just asking, I think, a very

16   fair question, which is, do you know what

17   criteria were used in order to determine if

18   somebody made it on this list as an overdose

19   death?  Yes or no.  Do you have personal

20   knowledge of that?

21               MR. BADALA:  Objection to form.

22   Asked and answered.

23         A.    Right now, no, I do not.

24         Q.    Okay.  And the same would be true

25   for somebody who was addicted who made it on

1   this list; you do not know what criteria were

2   used, correct?

3                MR.  BADALA:   Which list?   I'm sorry.

4   Which list are you referring to?

5                MR.  CHEFFO:   On the -- the list of

6   people who were opioid addicted.

7                MR.  BADALA:   We're talking about B?

8                MR.  CHEFFO:   Yes.

9                MR.  BADALA:   Exhibit B.

10       Q.      Do you know, Doctor?

11       A.      Again, my information is that the

12  500 patients who were identified, and I do not

13  know if that includes this group, were

14  identified with those criteria, the three

15  criteria which I keep mentioning.

16       Q.      Do you know anything about people

17  who were identified as being addicted?

18                MR.  BADALA:   Objection to form.

19       A.      If they were on that list of 500, I

20  would say they had -- these criteria applied to

21  them.

22       Q.      You're sure of that?

23       A.      The list of 500?

24       Q.      That's your testimony under oath,

25  that if they were on the list of addicted, those

Page 150

1   three apply?  Because if it's yes, we'll move
2   on.  Is that your testimony?
3              MR. BADALA:  Objection to form.
4   Outside the scope.
5        A.    The claims data that was submitted
6   to the attorneys --
7        Q.    I'm not talking about claims data.
8        A.    -- included those three criteria.
9        Q.    I'm talking about people who were
10  listed as opioid addicted.  Are those the
11  criteria that were used to determine whether
12  they were opioid addicted?
13             MR. BADALA:  Objection to form.
14       A.    I don't know that I understand what
15  you're asking me.
16       Q.    What don't you understand?
17       A.    The interrogatories spelled out --
18  or I was told there were criteria here, that the
19  county provided patients with this name -- with
20  the names based on whether they had -- did not
21  have -- were not cancer patients, had a high
22  dose, or -- and -- not or, and they were
23  diagnosed with a substance use disorder.  Those
24  claims, which would include addicted and
25  overdose deaths, were referred over to our

1   attorneys for consultation with experts, and

2   that's the basis of these responses.  And I do

3   not know, to answer you, what criteria the

4   experts used, but if they were drawing that from

5   our claims data, these folks would have met

6   those three criteria.

7          Q.    So is it your testimony there may

8   have been other criteria that's used?

9              MR. BADALA:  Objection to form.

10  Misstates his testimony.

11         A.    I think I've answered that before,

12  that these are the three criteria that were

13  used.

14         Q.    That's it?

15         A.    There may be other conditions, as I

16  say, but criteria were these.

17         Q.    And you think that if they meet

18  those criteria, you could determine whether

19  someone was -- I mean, how would you even know

20  if they were dead based on those criteria?

21             MR. BADALA:  Objection to form.

22         A.    I don't think you would.

23         Q.    You wouldn't, would you?

24         A.    No.

25         Q.    How would you know if they were

Page 152

1    addicted?  You wouldn't know that either, would

2    you?

3                 MR. BADALA:  Objection to form.

4         A.    Solely on these three criteria?

5         Q.    Right.

6         A.    This, again, is a basis for

7    selection, and that's what we refer from the

8    county.  Beyond that, you know, you would have

9    to do a consultation to determine those

10   questions you asked.

11        Q.    You would have to look at other

12   criteria, right?

13                MR. BADALA:  Objection to form.

14        A.    I don't know what went into the

15   experts' determinations of this.

16        Q.    You don't even know if there were

17   experts who made these determinations, do you?

18                MR. BADALA:  Objection to form.

19        A.    I was informed that when the county

20   turned over its list of 500 names to the

21   attorneys, that they would be consulting with

22   experts to determine claims data and share

23   that --

24        Q.    And what happened?

25        A.    -- and in response to the

Page 153

1   interrogatories.

2          Q.    And what happened after that, what

3   criteria, who was consulted, how it was applied,

4   you have no information, do you?

5               MR. BADALA:  Objection to form.

6   Misstates testimony.

7          A.    Unless we're going back to Exhibit

8   2, with the things about what constituted

9   medically unnecessary, harmful -- I forget the

10  other two -- those are spelled out in this

11  document.

12         Q.    Can you tell me everything that the

13  Plaintiffs did, if anything, to identify whether

14  prescribers who wrote any of the prescriptions

15  on Exhibit A relied in any way on anything any

16  Defendant did or said?

17              MR. BADALA:  Objection to form.

18              Are you talking about Cuyahoga

19  County?  You said Plaintiffs.

20              MR. CHEFFO:  Yes, Cuyahoga County,

21  sure.

22         A.    Sorry.

23         Q.    Tell me everything that Cuyahoga

24  County did, if anything, to determine whether

25  prescribers who wrote the prescriptions on

Page 154

1   Exhibit A relied in any way on anything any

2   Defendant ever did or said.

3                  MR. BADALA:  Objection to form.

4        A.    I don't know.  I mean, I don't know

5   what wasn't covered in the investigation of the

6   prosecutions of the medically unauthorized

7   folks, so --

8        Q.    And just before we leave this, with

9   respect to interrogatories -- I'm sorry.  With

10  respect to topics 19 and 4, are you aware of any

11  other criteria that were used in order to

12  determine any of who those claims or individuals

13  were or is it just the three we've been talking

14  about?

15                 MR. BADALA:  Objection to form.

16  Mischaracterizes testimony.

17       A.    The basis for the claims were the

18  three criteria that I applied.  Those were the

19  claims that were submitted to the attorneys for

20  review.

21       Q.    Topic 3 you've also been designated

22  on.  I want to see if we can cover it briefly.

23  "Plaintiffs' knowledge of:  (a) concerns or

24  complaints made to them and by them about any

25  promotion, marketing or educational activities

Page 155

1   with respect to prescription opioids within or

2   relating to Plaintiff's geographic area; and

3   actions taken by them or others in response to

4   those concerns."

5           Do you see that?

6       A.   Yes, I do.

7       Q.   Are you prepared to testify about

8   that?

9       A.   Yes, I am.

10      Q.   Okay.  What knowledge does Cuyahoga

11  have about concerns or complaints made to it or

12  by it about any promotion, marketing or

13  educational activities?

14          MR. BADALA:  Objection to form.

15      A.   The county itself would not receive

16  the complaints of physicians.  They would be

17  more state functions, Board of Pharmacy, Board

18  of Medicine.  I can say that as part of our

19  county's response to the opioid epidemic, I

20  spoke at all of our major institutions as a

21  representative of the county, our hospital

22  organizations -- there are three in Cuyahoga

23  County, the Cleveland Clinic, University

24  Hospital, which is affiliated with Case Western,

25  and MetroHealth Medical Center -- about issues

Page 156

1    because we were becoming concerned about the

2    role of prescription opioids in the creation of

3    our heroin crisis and subsequent fentanyl

4    crisis.

5                   At those educational activities or

6    town halls or things like that, I frequently

7    spoke to physicians, who conveyed to me -- if

8    they were older, they said they were concerned

9    about the safety of these drugs and were

10   reassured that the addiction potential of opioid

11   prescription pain relievers was low, less than 1

12   percent.  In speaking to younger physicians,

13   they were told that the inadequate treatment of

14   pain would be something they might be subject to

15   discipline for and that they would not run the

16   risk of addicting patients to opioids if they

17   had not controlled their pain.

18                  So I think those were statements

19   that were misrepresentations of the actual harm

20   that the opioids could potentially cause, and

21   those are complaints I'm hearing from

22   communities.  That's anecdotally I realize, but

23   it was such a consistent thing whenever I spoke

24   to prescribers.

25                  Q.    I move to strike.

1          Let's see if we can just focus on
2     the topic that's actually listed there, Doctor.
3     "Plaintiff's knowledge of concerns or complaints
4     made to them or by them about promotion,
5     marketing, or educational activities with
6     respect to prescription opioids within or
7     related to Plaintiff's geographic area."
8          Do you see that?
9          A.    Um-hum.
10         Q.    Giving me some level of specificity,
11    are you aware of any specific complaints or
12    concerns that were raised to you or to the
13    county responding specifically to the wording of
14    topic 3?
15         MR. BADALA:  Objection to form.
16    Asked and answered.
17         A.    As I said, the concerns were being
18    expressed to me in the course of educational
19    activities and they did relate to marketing and
20    the promotion of these drugs as being not
21    potentially significantly addictive.
22         Q.    When?  When did you first hear
23    those?
24         MR. BADALA:  Objection to form.
25    Outside of the scope.

1          A.    I could not give you a specific

2     date.  I had town hall and multiple meetings in

3     which I believe were furnished educational

4     activities with physicians specifically to

5     address the heroin crisis, but also to start to

6     share information that we had gleaned from the

7     prescription monitoring program, OARRS, in our

8     state, that indicated that there was a

9     substantial concern that the heroin-addicted

10    population was progressing from an opioid pain

11    reliever addicted population, and that was when

12    I would hear the concerns because there were

13    concerns about overprescribing and a setup for

14    heroin addiction or fentanyl addiction and they

15    were expressed to me at those town halls.

16         Q.    And I'm going to move to strike and

17    we're going to have to ask for more time.  I

18    asked you very specifically when and you've

19    given me kind of a speech.

20         A.    2013.

21         Q.    Okay.  Thank you.

22         A.    That's when I started my town halls.

23         Q.    It's very simple.

24         A.    It would have continued to the

25    present.

1    Q.    So I'm asking -- bite size pieces --
2    2013 is the first time that you did your town
3    halls and that's when you heard complaints,
4    fair?
5    A.    That's the first time I, as an agent
6    of the county, became aware of it, and I think
7    that that's the first time, you know, that I am
8    aware that people were expressing those concerns
9    about addiction.
10    Q.    And so is the answer that the
11    county's first time that it had concerns or
12    complaints in response to topic 3 was in 2013
13    based on your investigation and work in
14    preparation for this deposition?  Is that fair?
15         MR. BADALA:  Objection to form.
16    A.    Let me just reread that.
17         With the understanding that we would
18    not have -- I'm not representing the state, who
19    may have received those complaints.  That's the
20    first I'm aware of the county understanding
21    that.  So around 2013.
22    Q.    There's no -- is it really your
23    testimony there's no ability for the county to
24    receive a complaint by a consumer or another
25    doctor or a public citizen to one of the various

Page 160

1  people in town -- in county government?
2              MR. BADALA:  Objection to form.
3        A.    The appropriate mechanism for those
4  investigations would be at the state level.  Can
5  somebody from the county receive those, that's
6  certainly possible.  Local law enforcement
7  could, who also are not county employees.  We
8  have our sheriff.  And they may have received
9  those as well, but the actual complaints and
10 concerns, as I know them to be a county
11 function, are probably the date I mentioned.
12       Q.    Other than the individual complaints
13 that you heard of when you were having these
14 anecdotal conversations, did you identify any
15 database or any people who maintained those or
16 any complaints about pharmaceutical or other
17 Defendant conduct or marketing activities?
18             MR. BADALA:  Objection to form.
19       A.    Not as I remember the county level.
20       Q.    And that's -- as part of your
21 preparation for today, you did a full and fair
22 analysis of whether there were any concerns or
23 complaints maintained by the county, fair?
24       A.    Yes, I did.
25       Q.    And your testimony is you didn't

Page 161

1  find any?

2       A.   I could not find anything within the

3  county that I would say were fulfilling this,

4  but as I say, whether there were complaints made

5  from the county up to the state, that, I did not

6  investigate.

7       Q.   Now, you also were --

8       A.   Or to federal.  I guess they could

9  also possibly --

10      Q.   Why didn't you investigate those?

11           MR. BADALA:  Objection to form.

12      A.   The regulation of medicine in the

13  state of Ohio is at the state level, and the

14  regulation of complaints about doctors'

15  practices and things like that would seem to be

16  more appropriate at the state level.  The county

17  doesn't have a specific mechanism to investigate

18  those complaints to the best of my knowledge.

19      Q.   But you just told me that the county

20  may have made a referral to the state or the

21  Feds because those are the right people, and

22  that's exactly what this calls for, right?  It

23  says, "Concerns or complaints made to them or by

24  them," meaning Cuyahoga County.  Do you see

25  that?

1          A.     Yes, I do.

2          Q.     And the answer may be the same, but

3     I just want to make sure we're on the same page.

4     Did you do any work to identify whether the

5     county ever made a complaint or expressed any

6     concerns to any federal agency or any statewide

7     agency with respect to promotional, marketing or

8     educational activities concerning prescription

9     opioids?

10          A.     Not that I know of.

11          Q.     And it's your testimony that the

12     state is actually the agency that's best

13     empowered to handle those types of complaints?

14          A.     The state would investigate

15     overprescribing through the Board of Pharmacy,

16     medical practices through the Board of Medicine.

17     That would be the more appropriate people to

18     address that.

19          Q.     And you're not aware of whether

20     anybody in the entire Cuyahoga County system

21     made a complaint or a referral to any of those

22     state agencies, are you?

23               MR. BADALA:  Objection to form.

24          A.     I know the prosecutor, in my

25     discussions with him, talked about prescribings

1    of, you know, doctors over, you know, the time

2    frame for the lawsuit, and, you know, those

3    people could have, you know, or should have been

4    referred to the Board of Pharmacy or Board of

5    Medicine.

6         Q.    But you'd be speculating?  Do you

7    know?

8         A.    What's that?

9         Q.    Do you know whether they did or not

10   or are you speculating?

11        A.    Well, I think the other piece of it,

12   not to evade your question, is that there would

13   be opportunities, based on my discussion with

14   the prosecutor, where information would be

15   filtered back to them from those state agencies

16   as well.

17        Q.    I understand.

18              And you understand, Doctor, today is

19   just my opportunity to try and just probe for

20   information and get it, which I don't have.

21        A.    I think that's great and I hope I'm

22   being helpful.

23        Q.    So these are very simple questions.

24              Are you aware of any facts in which

25   the state made a referral or a complaint

Page 164

1    regarding pharmaceutical or defense advertising

2    or marketing information to a state or federal

3    agency?  Do you have any specific --

4              MR. BADALA:  Objection.  Outside the

5    scope.

6         A.    Whether the county did?

7         Q.    Yes.

8         A.    No, I do not.

9         Q.    And do you have any information

10   whether the county made any of those inquiries

11   or concerns and expressed them to any federal

12   agency?

13        A.    Before the time we're talking about?

14        Q.    Any time.  That's what this calls

15   for.

16             MR. BADALA:  Objection to form.

17        A.    I think when we identified, through

18   the Poison Death Review Committee, through our

19   task forces, that there was a role for the

20   prescription opiates in the subsequent evolution

21   into heroin and fentanyl addiction, there were

22   representatives on the task forces at the

23   federal level, at state level, and that

24   information would have been passed up to them.

25             We as a county would have -- when we

Page 165

1    identified people who were doctor shopping based
2    on that review, we went back and looked at all
3    of their prescribing as far as we could with our
4    prescription drug monitoring program for
5    overdose deaths.  If we identified doctor
6    shopping, which we defined as five or more
7    prescribers within a one-year period, we would
8    refer that back to the Board of Pharmacy, "we"
9    being the medical examiner's office.
10              I also know, based on conversations
11   with the Division of Child and Family Services,
12   there were also instances -- I don't have
13   specifics that I could share with you, and I
14   don't know if the county would have them, but
15   when they became aware of what looked like -- I
16   remember the term -- my contact used "fishy
17   prescriptions," they would also be referred to
18   the state for further investigation.
19        Q.    Are fishy prescriptions -- do they
20   contribute to the opioid crisis?
21              MR. BADALA:  Objection to form.
22        A.    I think, sure.  You know, if they're
23   not going to be, you know, something that's
24   legitimate -- you know, anything I think that
25   puts more drugs into the system, especially by

1   an illegal means, has the potential to

2   contribute to the opioid crisis.

3        Q.    And do you know whether any of those

4   fishy prescriptions are on the list in front of

5   you?

6        A.    They were child and family services,

7   so I don't know really.  That was an anecdotal

8   recollection.

9        Q.    Does doctor shopping lead to and

10  contribute to the opioid crisis?

11            MR. BADALA:  Objection to form.

12            Which topic are we on?

13            MR. CHEFFO:  General questions.

14       Q.    You can answer.

15            MR. BADALA:  Outside the scope.

16       A.    Does doctor shopping contribute to

17  the opioid crisis?

18            MR. BADALA:  Objection to form.

19       A.    I think that that's a well

20  recognized form of diversion of pharmaceuticals.

21       Q.    You presented us with some

22  handwritten notes just a little while ago.  Do

23  you have a copy in front of you?

24       A.    I do not.

25            MR. CHEFFO:  Let's mark them.  Have

                                             Page 167

1    we marked them yet?

2                MR. BADALA:  Yes.  We have 7 and 8.

3         Q.    What are these, Doctor?

4         A.    Oh, when we talked earlier, we had

5    said was there anybody who I had talked to about

6    -- in preparation for today, and these are two

7    of the conversations I had where I took notes

8    actually.  And I think I mentioned the third

9    one, which I'm quite confident I threw away.  I

10   wasn't at the time remembering that I had kept

11   these.  They were just preserved, so I produced

12   them.

13               But anyway, one is -- Exhibit 7 is

14   my notes when I talked to Joan Papp, who was the

15   doctor at MetroHealth Medical Center who was the

16   principal founder of our Deaths Avoided With

17   Naloxone program, naloxone being the antidote to

18   potentially reverse an opioid overdose.

19               And the other one was Vince Caraffi,

20   and that's C-a-r-a-f-f-i, and he was -- he is

21   still the injury prevention program supervisor

22   at the County Board of Health and he was also

23   the chair of the County Board of Health opiate

24   task force.

25               There was a second task force which

Page 168

1    both of these folks participated in.  If I say

2    task force, this is the Board of Health task

3    force.  The other one was housed in the -- or

4    chaired by the U.S. Attorney, initially Steve

5    Dettelbach, then Carole Rendon, and now Justin

6    Herdman, our succession of U.S. Attorneys.

7    Sorry I went on.

8        Q.    I'm trying not to cut you off, but

9    I'm asking very specific questions here.

10             Have you ever been media trained?

11             MR. BADALA:  Objection.  Outside the

12   scope.

13       A.    No.  Am I good?

14       Q.    You're looking at the camera a lot.

15       A.    Well, that -- I have been trained to

16   talk to the jury.

17       Q.    Oh, okay.

18             You only took notes for three

19   people?

20       A.    Yes.

21       Q.    And are these the complete notes

22   from the two that you provided or are there

23   anything missing?

24       A.    No.  This is everything.

25       Q.    In fact, when you told us that these

1    were somewhere in a landfill, they were in your

2    bag back in your room probably?

3           A.    Yes.  One was in a landfill.

4           Q.    But these two, where were they?

5           A.    These were in a file in my bag.

6           Q.    In your bag.

7                 When was the last time you looked at

8    them before right now?

9           A.    I just wrote them I think within the

10   last week or two, so within the last week or

11   two.

12               MR. CHEFFO:  Okay.  I think I'm just

13   about done.  Just give me about two minutes.

14               MR. BADALA:  Yes.  Do you want to go

15   off the record?

16               MR. CHEFFO:  Yes.  Let's go off the

17   record for a minute.

18               THE VIDEOGRAPHER:  Off the record at

19   12:35 p.m.

20                      (Recess had.)

21               THE VIDEOGRAPHER:  Back on the

22   record at 12:46 p.m.

23   BY MR. CHEFFO:

24          Q.    Before I ask you questions, Doctor,

25   some of this is, frankly, illegible.  And I

Page 170

1    don't want to quibble.  I appreciate we have it

2    now.

3         A.    I'm a doctor.  I can read it all, or

4    most of it I should say.  Some of it I can't

5    even read.

6         Q.    At some point we may just ask you to

7    do it because it's just really hard to do, but

8    I'm not going to ask you to do it at this

9    minute.  I'll see if we can decipher it over

10   lunch.

11            Before we leave topic 3, I did just

12   want to ask you -- there's a part B here.  Now,

13   you told us that the only information -- tell me

14   if this is correct -- that you had of kind of

15   claims or complaints was some anecdotal

16   information that you obtained during some town

17   hall meetings starting in 2013.  Is that fair?

18        A.    I'd characterize it more as these

19   were talks that were specifically towards the

20   medical communities, so they were more formal I

21   think than -- we did a lot of town halls, too,

22   but these were -- those concerns that I

23   expressed were more expressed to me when I was

24   in that forum where I was doing the grand rounds

25   or something like that.

1          Q.    And then the topic 3 has B.  It

2    talks about the actions taken by Cuyahoga County

3    in response to those concerns or complaints.  So

4    in your preparation, can you tell us all the

5    things -- so when you heard those things, I

6    assume there was a litany of things that you or

7    the county did.

8          A.    Sure.

9                I think, you know -- I have to

10   stress that at the time that I'm doing these,

11   you know, grand rounds, town halls, we have a

12   heroin epidemic and we have not really

13   established its link back to prescription drugs

14   at that point definitively.  That's why we

15   needed to go back and do the OARRS data.  I'm

16   sharing what I'm seeing because it's concerning

17   to me, but I don't think it would represent the

18   county to say that we had established that link.

19   So I am presenting data about heroin, I'm

20   collecting their anecdotal information and, at

21   the same time, in the medical examiner's office

22   we are going back to do reviews of the heroin

23   fatalities with specific things that we're

24   looking at in addition to demographic

25   information, just, you know, age, race, sex.

1    We're looking at things like where did the
2    person live, where -- what was their level of
3    education, was there anything that might have
4    predisposed them in terms of a job to develop a
5    heroin addiction.  And the last one that I want
6    to stress, because it's relevant to this, is we
7    were looking at the role that prescription
8    opioids might have played in generating a heroin
9    crisis.  We've had heroin epidemics in Cuyahoga
10   County before the prescription drug problem.  So
11   we were really trying to collect good data to
12   make that association.
13        Q.   Again, Doctor, my question is really
14   a little bit different.
15        A.   I'm sorry.
16        Q.   It's just basically you told us that
17   you had some anecdotal information, and B says
18   the actions taken by the county in response to
19   those.  I know you told me -- let me ask you a
20   few follow-ups.
21             You said you were hearing this and
22   collecting.  Did you memorialize this?  Did you
23   put this in a file?  Did you take notes on any
24   of this?
25             MR. BADALA:  Objection to form.

Page 173

1          A.     These complaints as I'm hearing
2     them?
3          Q.     Yes.
4          A.     No.   They were mostly conversations
5     I would have after these meetings.  I have a
6     record in our statistical report of where I was
7     speaking, but the actual person who came up to
8     me, I didn't ask them their name.  If I knew it,
9     I knew it.  If I didn't -- and writing down any
10    memos about that, I didn't do that.
11         Q.     So the answer is no, you have no
12    written record of any of that, right?
13         A.     No.
14         Q.     Have you identified any written
15    record of anybody in the county that
16    memorialized a complaint or concern about
17    promotion, marketing or educational activities
18    with respect to prescription opioids?
19              MR. BADALA:  Objection to form.
20         A.     Again, you know, I don't have the
21    access to the state data where those complaints
22    would have been made, but within the county we
23    don't have really a reporting structure like
24    that that I'm aware of and I didn't find any
25    evidence of those complaints being filed at the

Page 174

1    county level.

2          Q.    And with respect to those specific

3    concerns or complaints that you were told

4    anecdotally, are there actions that the county

5    took or steps taken?

6          A.    Not to be unresponsive, but what I

7    was saying before about --

8          Q.    When someone starts an answer "not

9    to be unresponsive," I know what's coming, so I

10   would kind of maybe ask you to try to be

11   responsive.

12         A.    Well, what I want to say is doing

13   those look-backs on our heroin overdoses into

14   the prescription database was my way of

15   responding to the concerns that these folks had

16   about overprescribing based on misinformation

17   about the safety of these drugs.  And, you know,

18   the other piece of anecdotal information that

19   I'm hearing, and this would be at town halls in

20   addition to other places, and I think there was

21   also a national concern that we were really one

22   of the first counties to recognize is that

23   people are going from the opioid pain relievers

24   to heroin, and I think the only way we could

25   really go back and look at that with decedent

```
                                            Page 175
 1   data as a county was to go back and look at our
 2   decedents, our drug overdoses, and establish
 3   that link that they had to the --
 4        Q.    Doctor, I'm going to have to move to
 5   strike.  We're going to have to ask for more
 6   time because this is not even remotely
 7   responsive.
 8             MR. BADALA:  That was -- he just
 9   said that in response to that, that's what they
10   did.  They started looking at the data.
11             MR. CHEFFO:  I'm getting an entire
12   speech about the heroin --
13             MR. BADALA:  You are completely
14   incorrect.  That is completely responsive.
15        Q.    Is there anything that the county
16   did in response to any of these anecdotal
17   complaints other than what you've just told us?
18        A.    The county hospital, after they
19   initiated Project DAWN, opened an office of
20   opioid affairs to monitor prescribing within the
21   county hospital, and that was with follow-up to
22   people who might have been overprescribing, and,
23   you know, to just look at that and potentially
24   try to steer them towards less prescribing.
25        Q.    Anything else?
```

```
                                      Page 176
 1        A.    Let me just read the question one
 2   more time.
 3             Not that I can think of.  It's a
 4   very pervasive problem, as I think you know, and
 5   whether there were more concerns or complaints
 6   I'm not thinking of, I don't want to shut the
 7   door on it, but I would just say that's the best
 8   I can think of now.
 9        Q.    Does the county still reimburse for
10   opioids?
11             MR. BADALA:  Objection to form.
12   Outside the scope.
13        A.    I'm not sure I understand.
14        Q.    Does the county still reimburse for
15   opioid medicines for people for which it funds?
16             MR. BADALA:  Objection to form.
17   Outside the scope.
18        Q.    Do you know?
19             MR. BADALA:  Same objections.
20        A.    I don't know that.  I would say, you
21   know, the jail or someplace like that, but most
22   of that -- I mean, we did the Medicaid expansion
23   in Ohio, so I would think most of that would be
24   reimbursed by federal.  I honestly don't know.
25        Q.    Have you seen any information or
```

1    memoranda of any interviews with any healthcare

2    providers who wrote any of the prescriptions in

3    connection with Exhibit A?

4                MR. BADALA:  Objection to form.

5    Outside the scope.

6            A.    No, I have not.

7            Q.    And I think the last kind of

8    question or area, you mentioned -- I just want

9    to follow up.  You testified that when you heard

10   these anecdotal reports, you went back and you

11   checked OARRS data, perhaps amongst others, in

12   connection with your database of overdose

13   deaths.  Did I get that right?

14           A.    Right.  We were cross-checking our

15   heroin overdoses against the OARRS database.  We

16   would also, I should say -- and I think this

17   started about 2014 or '15.  We were sending

18   lists of our prescription opioid deaths

19   quarterly to the Ohio Department of Health as

20   part of a grant, but the specific checks we were

21   doing in the office that I mentioned were on the

22   heroin overdose population.

23           Q.    And you were looking for what?

24           A.    Well, there was, again, the

25   anecdotal evidence that we may be seeing a

1   transition from prescription opiates to heroin.

2   We had a spike in heroin mortality, and the

3   function of going back to look at that was to

4   firm up to our satisfaction that this was, in

5   fact, the relationship.  I think the data to

6   inform that was critical because, you know,

7   policies get into trouble when you have

8   inadequate data, and I think that this was

9   really something that we wanted to be sure we

10  were right on.

11        Q.    Did the county conduct any studies

12  to assess the potential impact of pharmaceutical

13  marketing on prescribing practices in Cuyahoga?

14        A.    The county itself, I don't -- not

15  that I know of.

16        Q.    Any neighboring counties that you're

17  aware of?

18        A.    Marketing practices -- I'm sorry.

19  Read it one more time.

20        Q.    Sure.

21              Did the county conduct any studies

22  to assess the potential impact of pharmaceutical

23  marketing on prescribing practices or did a

24  neighboring county?

25        A.    You know, I'll say no because I

1    think there were reports that I read about, you

2    know, how did this opioid crisis, you know,

3    start, and they would point to things like, you

4    know, marketing practices.  But the county

5    specifically studying that, that -- I don't know

6    of anything specific research-wise.

7            Q.    If someone has an overdose death of

8    heroin, can you determine whether they ever had

9    a prescription opioid?

10                MR. BADALA:  Objection to form.

11           Q.    A lawful prescription opioid.

12                MR. BADALA:  Outside the scope.

13           A.    What we were doing going back into

14   the OARRS file was to find if they had the

15   prescription.

16           Q.    That's what you were trying to do is

17   find out if they had a lawful prescription?

18           A.    Right.

19           Q.    And for how long did you go back?

20           A.    Well, I shouldn't say -- I don't

21   know that they were lawful.  Whether they had a

22   prescription for opioid pain relievers.  Whether

23   they were diverted or, you know, pill mill, that

24   I couldn't tell.

25           Q.    So what would it show, though?  It

1   would show a prescription from a pharmacy?

2        A.    You know, our access to that

3   database evolved over time, so originally -- oh,

4   one other person I spoke to in preparation was

5   the head of the OARRS, Chad Garner.  But our

6   access to this actually predated his becoming

7   the head of that.

8              We reached back to them because of

9   the concern that the prescription opioids might

10  be creating that drug-addicted population who

11  eventually move on to heroin; and when we

12  originally requested that access, because I

13  don't have a DEA number, I'm not writing

14  prescriptions for opioids, I could not actually

15  get access as a prescriber, so what they did,

16  and it's part of OARRS' mission, is they'll

17  support public health initiatives to, you know,

18  ultimately respond to responsible opioid

19  prescribing.  They gave us de-identified data.

20             So what I could tell from that was

21  the overdose victim -- those were the names we

22  supplied, what they had been prescribed, but

23  what I could not see was who was doing the

24  prescribing.  So it became hard for us to do

25  anything about doctor shopping or really a lot

Page 181

1  of things that would have been specific about

2  diversion at a prescriber level.

3            In, I want to say, about June of

4  2013, we get law enforcement access to the

5  opioid -- pardon me, the OARRS, the Ohio

6  Automated Reporting RX System, and at that point

7  I can start to go back and look at physicians

8  specifically and prescribers.

9            So initially the -- pardon me --

10  2012 data was just aggregated.  I could tell,

11  geez, a lot of these folks have prescriptions,

12  but I couldn't really get a good handle on what

13  was going on at a deeper level of, you know,

14  where is the diversion occurring, and there were

15  very lengthy reports at that time.

16       Q.   Are you aware of any studies that

17  were done by either Cleveland or Summit that

18  showed that well over 90 percent of the doctors

19  who responded indicated that they were not

20  influenced by pharmaceutical marketing?  Does

21  that ring a bell to you?

22            MR. BADALA:  Objection to form.

23       A.   Not a study I'm familiar with.

24       Q.   Over 90 percent?

25       A.   I'm not familiar with any study

Page 182

1    along those lines.

2         Q.    And the last question, I think I

3    promise, is, of the three criteria, the

4    substance abuse disorder -- we talked about that

5    earlier.

6         A.    Yeah.  Sure.

7         Q.    Other than saying that's a criteria,

8    can you tell us anything more about how that's

9    defined, whether that's used -- something from

10   the DSM-4 or 5 or something else, or is that the

11   extent of your knowledge?

12        A.    That's the extent of my knowledge.

13   As I think I said earlier, there's criteria for

14   that diagnosis.  I don't know if they were

15   specifically applied in identifying that

16   population or which criteria were.

17             MR. CHEFFO:  Okay.  Let's take a

18   lunch break.

19             THE VIDEOGRAPHER:  Off the record at

20   1 o'clock p.m.

21

22             (Luncheon recess had.)

23

24

25

Page 183

1          THE VIDEOGRAPHER:  Back on the

2    record at 1:38 p.m.

3                   - - - - -

4              AFTERNOON SESSION

5        EXAMINATION OF THOMAS GILSON, M.D.

6    BY MR. BORANIAN:

7        Q.    Good afternoon, Dr. Gilson.  I'm

8    Steven Boranian.

9              You understand you're here

10   testifying as a representative of the county,

11   correct?

12       A.    Yes, I do.

13       Q.    So I'm going to question you on some

14   topics different from this morning's

15   questioning, although there may be some modest

16   overlap.  I'm going to read off those topics and

17   please, Doctor, tell me if you understand that

18   you are testifying for the county on these

19   particular topics.

20              The first is topic number 2,

21   "Diversion of prescription opioids in

22   Plaintiff's geographic area."

23       A.    Yes, I do.  That was one of the ones

24   that I was prepared to respond to as well.

25       Q.    The next is topic number 15, "The

Page 184

1   investigation of doctors, pharmacists,

2   pharmacies, clinics, 'pill mills,' or hospitals

3   in Plaintiff's geographic area for diversion of

4   prescription opioids or the improper prescribing

5   of opioids."

6           Is that one?

7       A.    Yes.

8       Q.    The next is, "Plaintiff's knowledge

9   of and access to data concerning prescription

10  opioid manufacturing, prescribing, distribution,

11  or dispensing."  Is that one, Doctor?

12      A.    Topic 27 for me, right?

13      Q.    Correct.

14      A.    Okay.  Yes.

15      Q.    The next is topic 28, "The policies

16  regarding the Ohio Board of Pharmacy's OARRS

17  database."  Is that one?

18      A.    Yes.

19      Q.    And then, finally, for my portion of

20  this deposition, topic number 30, "What efforts,

21  if any, Plaintiffs made to influence the DEA's

22  quota-setting process; and what actions, if any,

23  Plaintiffs took in response to the DEA's setting

24  of quotas."  Is that one of yours, Doctor?

25      A.    Yes, it is, sir.

Page 185

1        Q.      Excellent.  Thank you.

2              Let me ask you a few questions about

3    the prescription drug supply chain and diversion

4    of prescription drugs.

5              Do you understand or do you have an

6    understanding of the prescription drug supply

7    chain?

8        A.      In a general way.

9        Q.      So prescription drugs go from a

10   prescription drug manufacturer to pharmacies or

11   healthcare facilities, there's usually a

12   wholesaler or distributor involved, and then the

13   drugs are prescribed to patients or dispensed to

14   patients who hold valid prescriptions, true?

15             MR. BADALA:  Objection to form.

16             Sorry, Steve.  Is this topic 2?

17             MR. BORANIAN:  Correct.

18             MR. BADALA:  I'm going to also

19   object to outside the scope.

20       A.      Right.  As I understand your

21   question, they would be receiving --

22       Q.      My question is this:  Does what I

23   just said match your understanding of the

24   prescription drug supply chain?

25             MR. BADALA:  Same objections.

Page 186

1          A.     Could you read it back quick?

2          Q.     Let me do it again for you.

3          A.     Sure.   Thank you.

4          Q.     A prescription drug manufacturer

5     supplies prescription drugs to a pharmacy or

6     healthcare facility, there's usually a

7     distributor or wholesaler involved, and drugs

8     are then dispensed to patients who hold valid

9     prescriptions.  Does that match your

10    understanding as a physician of the prescription

11    drug supply chain?

12              MR. BADALA:  Objection to form.

13    Outside the scope.

14         A.     As a physician, yes.  In this

15    county, I would say yes.

16         Q.     And are you familiar with the

17    concept known as a closed supply chain?

18              MR. BADALA:  Same objection.

19         A.     No, I'm not.

20         Q.     So within that whole process, from

21    manufacturer to the patient, product should

22    neither enter nor exit the supply chain, and

23    that's what we mean by a closed supply chain.

24    Is that clear, Doctor?

25              MR. BADALA:  Objection to form.

Page 187

1          A.     Got it.  Okay.

2          Q.     So if a product is channeled or

3     provided to someone outside the supply chain for

4     a non-legitimate medical purpose, is that known

5     as drug diversion?

6          A.     I could see that.  I usually think

7     of it as kind of the improper use of medication

8     for non-therapeutic use, but I think we're

9     saying the same thing.

10          Q.     Would that be your definition of

11     drug diversion, what you just said?

12          A.     It would be one I would be willing

13     to work with, sure.

14          Q.     Is drug diversion a crime?

15          MR. BADALA:  Objection to form.

16     Outside the scope.

17          A.     I believe so.

18          Q.     When a licensed manufacturer or

19     distributor ships a prescription opioid to

20     another licensed entity for legal sale, is that

21     considered drug diversion?

22          A.     When a licensed manufacturer ships

23     it to a distributor, no, I don't think so.

24          Q.     What percentage of prescription

25     opioid abuse in the county stems from opioids

1 that have been diverted?

2          MR. BADALA:  Objection to form.

3 Outside the scope.

4      A.    I think, you know, the data I can

5 look at evolves over time.  The best number I

6 can give you is from an Ohio Department of

7 Health report from 2010, which estimated, using

8 their methodology, that somewhere about 20 to 23

9 percent of the overdoses that were being seen

10 were associated with diverted prescription

11 medication.

12          I don't know that we've actually

13 looked at the percentage of diversion because

14 the crisis, as it's evolved, has really gone to

15 a point where we're not talking about the

16 diversion of legal substances so much as an

17 evolution into illegal substances.

18      Q.    And that's the prevalence you're

19 currently seeing with heroin and fentanyl,

20 correct?

21      A.    Right.  That's where our opioid

22 crisis is now as of -- probably since about

23 2011, 2012.  It wasn't that the opioid pain

24 reliever aspect of it and mortality associated

25 with it went away.  It's just that the rise in

Page 189

1    what's been driving mortality more since those
2    years I mentioned has been the illicit drugs.
3        Q.    But it's fair to say that the aspect
4    associated with opioid pain relievers has
5    plateaued or diminished since 2011?
6            MR. BADALA:  Objection to form.
7    Outside the scope.
8        A.    It bounces around, but it appears to
9    have plateaued after rising, yes.
10        Q.    In about 2011, right?
11            MR. BADALA:  Objection to form.
12    Outside the scope.
13        A.    Sure.  Okay.
14        Q.    Now, the Ohio Department of Health
15    report that you just referenced, is that
16    statewide data or is that -- well, strike that.
17            What geographic scope does that data
18    cover?
19        A.    It was divided into regional
20    reports, so there wasn't really any
21    county-specific data that I can point to in it.
22    I do know at one point around that time the Ohio
23    Department of Health identified different
24    counties that they thought were having a problem
25    with opioid pain relievers.  Most of them were

Page 190

1    in the southern part of the state, though
2    Cuyahoga County was one of those counties as
3    well.
4         Q.    Now, you've said the county has not
5    really tracked the percentage related to
6    diverted opioids, but has the county ever
7    collected any information from which that
8    percentage could be calculated on a countywide
9    basis?
10        A.    I would think that would be more at
11   a state level.  I'm not aware of anything at the
12   county level that I could think of off the top
13   of my head.  The prescribing information would
14   be more state level, so OARRS and things like
15   that, which would have the pharmacies
16   responding, would be more state -- might drill
17   down into the county, but I don't know that.
18   The county itself would not collect that data to
19   the best of my knowledge.
20        Q.    Let me ask you about how diversion
21   occurs.  When a patient gives or sells his or
22   her medication to someone else, that's drug
23   diversion, true?
24        A.    I'd consider that, sure.
25        Q.    If a doctor intentionally

1  overprescribes medication without establishing a

2  doctor/patient relationship and without a valid

3  medical purpose, is that drug diversion?

4          A.    I think I would consider that the

5  same, yes.

6          Q.    When a drug user or consumer steals

7  prescription drugs from another patient, is that

8  drug diversion?

9          A.    Yes.  They weren't -- they're

10  outside their intended recipient.

11          Q.    Is doctor shopping a well-known form

12  of diversion?

13              MR. BADALA:  Objection to form.

14          A.    I would consider that it's within

15  the intent to obtain multiple prescriptions.

16          Q.    And doctor shopping is defined as

17  you defined earlier today, correct?

18          A.    That's the definition I use.  I know

19  that some other individuals, when I talk, we use

20  slightly different variations, but that was

21  actually one our task force or our Poison Death

22  Review Committee received from the medical

23  director of our alcohol, drug abuse and mental

24  health services department, so that's the one

25  we've used since inception.

1          Q.    Do you agree that almost all
2     prescription drug diversion occurs after
3     prescription drugs have been dispensed to
4     patients?
5          A.    I wouldn't know.  I mean, I am
6     certainly aware of instances where it has been
7     dispensed to the patient and instances where
8     somebody may overmedicate themselves or they're
9     selling drugs or they're potentially just having
10    leftover drugs that somebody has access to, but
11    I wouldn't know that I would say the majority
12    would be that.  I wouldn't have an opinion on
13    it.
14         Q.    So those are all examples of drug
15    diversion that occur?
16         A.    At a patient level.
17         Q.    At a patient level.  Very well.
18               Can you give me any examples of
19    diversion that occur before drugs have been
20    dispensed to patients?
21         A.    I think the overprescribing, the
22    pill mill scenario, the robbery of a pharmacy,
23    the influx of large amounts of drugs beyond the
24    population density would be indications to me of
25    diversion.

Page 193

1      Q.   Can you identify any examples of
2  drugs being stolen from pharmacies in Cuyahoga
3  County?
4      A.   I am aware of that phenomenon
5  happening, but I don't have specifics I could
6  share with you.
7      Q.   And when a doctor intentionally
8  overprescribes prescription drugs, the diversion
9  occurs after the drugs have been dispensed to a
10  patient in that example, true?
11      A.   Okay.  I can see your point.
12      Q.   And when a drug distributor
13  distributes drugs lawfully to a pharmacy and
14  those drugs are then dispensed to a patient and
15  then diverted to another, that occurs after the
16  product has been dispensed to patients, true?
17      A.   Sure.  I would say so.
18      Q.   Has the county ever investigated any
19  pharmaceutical distributor or manufacturer for
20  drug diversion?
21          MR. BADALA:  Objection to form.
22      A.   When we filed the lawsuit, I know
23  they were named as defendants.
24      Q.   Sure.
25          Other than this lawsuit, has the

1    county ever investigated any pharmaceutical

2    distributor or manufacturer for drug diversion?

3              MR. BADALA:  Objection to form.

4    Outside the scope.

5         A.    Not that I know of.

6         Q.    Had the county ever considered doing

7    that before it filed this lawsuit?

8         A.    I know there were concerns about

9    just how many opioids there were in our county.

10   Whether it was discussed, you know, to look at

11   distribution, manufacturing, marketing and

12   things like that -- there were a lot of

13   discussions with different task forces how that

14   could have been done, but to the best of my

15   knowledge, they didn't get beyond the discussion

16   phase.

17        Q.    Has the county ever investigated any

18   of the Defendants in this case for drug

19   diversion other than filing this lawsuit?

20             MR. BADALA:  Objection to form.

21   Outside the scope.

22        A.    Let me just review all the

23   Defendants.  I know we were investigating

24   prescribers more than the actual distribution

25   companies.  I'd have to say prior to the filing

1  of the lawsuit, I'm not aware of any specific

2  county initiatives to investigate the

3  pharmaceutical or distribution companies that

4  are mentioned here.

5       Q.    Are you aware of any instance where

6  any of the Defendants in this lawsuit sold or

7  distributed prescription opioids outside the

8  closed supply chain?

9            MR. BADALA:  Objection to form.

10  Outside the scope.

11       A.    Not that I'm aware of.

12       Q.    Now, when a patient fills a

13  legitimate and valid prescription, can any of

14  the Defendants in this lawsuit stop that patient

15  from reselling their pills?

16            MR. BADALA:  Objection to form.

17  Outside the scope.

18       A.    I don't see how they could.

19       Q.    Can any of the Defendants stop that

20  patient from sharing his or her medication with

21  someone else?

22            MR. BADALA:  Same objections.

23       A.    Again, I don't see how they could do

24  that.

25       Q.    Do any of the Defendants in this

Page 196

1    lawsuit have any power to arrest people engaged

2    in drug diversion?

3                MR. BADALA:  Objection to form.

4    Outside the scope.

5         A.    I don't know of any arrests.

6         Q.    So along those same lines, would any

7    of the Defendants have -- do any of the

8    Defendants have any power to revoke any

9    professional licenses, such as doctors or

10   pharmacists?

11               MR. BADALA:  Objection to form.

12   Outside the scope.

13        A.    Not that I know of.

14        Q.    Would those be issues addressed by

15   law enforcement and other regulators?

16               MR. BADALA:  Objection to form.

17   Outside the scope.

18        A.    They would be investigations by law

19   enforcement, I would think, and oversight by

20   regulatory boards, in our case in the state, not

21   at the county level.

22        Q.    Has the county ever reported doctors

23   to the State Medical Board for suspected

24   diversion of controlled substances?

25        A.    Yes.

Page 197

1      Q.    In your office, the medical examiner
2   has done that, right?
3      A.    Yes, we have.  I would say they were
4   reported to the Board of Pharmacy under the
5   criteria that I mentioned this morning.  If we
6   saw high dosages that were being given by a
7   doctor or if we saw that an individual had
8   received the doctor shopping -- met the doctor
9   shopping criteria, we would refer that
10  individual, the overdose victim, to Board of
11  Pharmacy.
12           I'm also aware that the Division of
13  Child and Family Services also had some similar
14  anecdotal things, which I do not have specifics
15  for, but also made reports about concerns about
16  diversion of drugs.
17           There were, obviously, prosecutions
18  of doctors who were diverting drugs through the
19  prosecutor's office.
20     Q.    And the prosecution was at the
21  county level, correct?
22     A.    No.  Actually, there were
23  prosecutions of diversion or individuals -- you
24  know, in terms of county, there were federal
25  prosecutions, especially as the opioid crisis

Page 198

1   evolved to the point where we were seeing more

2   of the heroin and fentanyl deaths.  And I

3   specifically met with Carole Rendon about

4   strategies on those prosecutions.  So I would

5   say that there were death specification

6   discussions that we had with the Federal

7   Department of Justice and, you know, those

8   sentencing guidelines were certainly discussed

9   in our U.S. Attorney's task force because they

10  can tend to be significantly longer sentences

11  for individuals.

12      Q.    Let me ask you about the medical

13  examiner office's reports to the medical board

14  for investigation.  When did the office first do

15  that?

16      A.    We started to collect the data from

17  the Board of Pharmacy in 2012, but that was

18  de-identified, so we couldn't really find out

19  who was prescribing.

20            When we did our Poison Death Review

21  Committee in 2013, that's when we started to

22  identify doctor shoppers.  At that point about

23  36 percent of our heroin overdose deaths -- and

24  it would have been in 2013 we would have started

25  those reports, and would have continued into

1    2014 as well, and other years.  I mean, we

2    haven't stopped some of these efforts, but that

3    would have been the start of that.

4        Q.    So you reported certain doctors to

5    the medical board in 2014.  Have you done it in

6    subsequent years?

7        A.    Yes.

8        Q.    And in what years have you done it

9    since 2014?

10        A.    I think every year until the

11   present.

12        Q.    And have any suspensions --

13        A.    You know, let me take that back

14   because with this magnitude of the crisis, we

15   fell behind in terms of our, you know, ability

16   to check OARRS data and we just finished 2016's

17   data.  We did 2015.  2014, 2015, 2012, those

18   dates I would be willing to say with certainty

19   we did the reports, 2016 to say we just

20   finished.  And the specific look we were doing

21   there was with fentanyl.  Whether those have

22   been reported, I'm not certain enough to say

23   that that actually has happened.  It would be

24   our intention to do so.

25        Q.    And, to be clear, those are reports

Page 200

1   of doctors to the medical board, true?

2        A.    Board of Pharmacy, yes.  The Board

3   of Pharmacy will oversee that aspect of the

4   investigation.  We will refer decedents to them

5   for further evaluation and investigation.

6        Q.    So have you ever referred a doctor

7   to the medical board for overprescribing or for

8   drug diversion?

9        A.    Our practice would be to report to

10  the Board of Pharmacy.  I don't know to what

11  extent they would coordinate with the medical

12  board.

13       Q.    Have any suspensions or prosecutions

14  resulted from your reporting of particular

15  physicians to -- we'll just stick to the state?

16            MR. BADALA:  Objection to form.

17       A.    I'm not aware, once we referred

18  them, what the consequences of those

19  investigations were.

20       Q.    So, to your knowledge, there have

21  been no consequences; is that right?

22            MR. BADALA:  Objection to form.

23       A.    -- be disappointed in that, but we

24  referred them to the appropriate investigative

25  agency; and as I mentioned earlier, the county

1   prosecutor has also participated in prosecutions

2   of pill mill doctors and things like that as

3   well.

4          Q.    But you don't know if there's been

5   any result from your reporting of doctors to the

6   medical board or the board of pharmacy, right?

7                MR. BADALA:  Objection to form.

8   Outside the scope.

9          A.    No, I don't.

10         Q.    Have there been other times when the

11  county has suspected diversion that you haven't

12  already described to me?

13         A.    As I mentioned, the diversion

14  concerns that would be expressed with the

15  Division of Child and Family Services in the

16  course of custodial placement, investigation of

17  children who were born with positive toxicology,

18  my discussions with them were that they would

19  report, again, instances to the Board of

20  Pharmacy and that they would refer them, again,

21  for investigation beyond their capacity.

22         Q.    So you've not made any reports,

23  then, directly to any state agency other than

24  the Board of Pharmacy; is that correct?

25                MR. BADALA:  Objection to form.

Page 202

1          A.    I cannot speak for the whole county,

2     so I don't know where those referrals were from

3     the Division of Child and Family Services -- the

4     appropriate agency at the state level to receive

5     those complaints, as the county understands it,

6     is the Board of Pharmacy, but whether

7     individuals made those referrals to other

8     places, including the Board of Medicine, which

9     would certainly be somebody overseeing medical

10    practitioners' conduct, may have happened.  I

11    don't know for certain whether it did or did

12    not.

13          Q.    Are you aware of any referrals to

14    the dental board?

15          A.    No, I am not.

16          Q.    Are you aware of any referrals to

17    the nursing board?

18          A.    No.

19               I should back up with the dentists.

20    There are certain medical dentists, doctor of

21    medical dentistry, and they may have been on our

22    reports and I don't know about them, but

23    specifically that I knew this was a dentist and

24    we made a referral, that I can't say.

25          Q.    Have you ever reported anything or

Page 203

1    has the county ever reported anything to the

2    veterinary medical licensing board?

3          A.    Not that I know of.

4          Q.    Has the county ever notified any of

5    the Defendants of any suspected drug diversion?

6          A.    I mean, we've shared things, data,

7    that the county has collected with folks like --

8    I know CVS Pharmacy has, you know, agreed to

9    sell naloxone without a prescription.  We would

10   have made that effort to all of the pharmacies

11   locally in response to the drug epidemic, which

12   is an outgrowth of the diversion I think.  So

13   that would have been something.

14         Q.    My question is, have you ever

15   reported --

16               MR. BADALA:  Were you done with your

17   answer?

18         Q.    I thought you were done.  I'm sorry.

19               MR. BADALA:  Only if you're done.

20         A.    I think that, you know, those

21   entities were probably the ones we had contact

22   with.  We did not, to the best of my knowledge,

23   reach back to the manufacturers.  I don't know

24   to what extent the local task forces or anybody

25   would have spoken to distributors.  I do not

Page 204

1    know that.

2         Q.    Are you aware of any instance where

3    the county reported a specific suspicion of drug

4    diversion to any of the Defendants in this case?

5         A.    Seeing it from that perspective, I

6    explained how we've been trying to kind of work

7    with our pharmacies to address the overdose

8    crisis.  Those are people we have communicated

9    with.  To specifically address diversion at the

10   county level to any of the Defendants, including

11   those pharmacies, that would not have been

12   something we would have done.  I think we may

13   have done that further upstream through pharmacy

14   again, Board of Pharmacy.

15         We did -- I take that back, too.

16   One year we did -- for 2014 we tracked pharmacy

17   data to see if there was specific pharmacies

18   that were being identified as frequent sources

19   or multiple sources of diversion.  So if we used

20   the same paradigm, it was kind of if we had five

21   pharmacies that were being used by an individual

22   within a one-year period, we did report that to

23   the Board of Pharmacy in addition to the doctor

24   shopper prescribers.

25         Q.    Were there occasions when the county

Page 205

1    suspected diversion but made no report to

2    anyone?

3              MR. BADALA:  Objection to form.

4         A.    I don't know.  None that I know of.

5         Q.    Are there instances in which the

6    county is aware that drug diversion is occurring

7    and that it continues to occur today?

8              MR. BADALA:  Objection to form.

9    Outside the scope.

10        A.    I think we continue to run our OARRS

11   reports at the medical examiner's office on our

12   decedents and we have, you know, continued to

13   find doctor shoppers up into, you know, recent

14   years.  We, again, you know, make those

15   referrals and tend to make those referrals.  So

16   I would say that, you know, the number of doctor

17   shoppers has not gone down to zero, so we're

18   still aware of diversion and reporting it.

19              And one of the benefits, I would

20   say, of, you know, the evolution of our

21   prescription drug monitoring program, in

22   association with other states developing these

23   in response to diversion, is that we are now

24   able to identify people who can cross state

25   lines more easily to identify doctor shopping in

1  that capacity, so that if they were not

2  necessarily doctor shopping in Cuyahoga County,

3  we might be able to identify them through going

4  to Pennsylvania or West Virginia or someplace

5  like that.

6       Q.    When did the county first become

7  aware that drug diversion was occurring within

8  the county?

9       A.    You know, that's a hard question to

10  answer because I think at some level drug

11  diversion has gone on for a very long time.  So,

12  you know, there were people who would write

13  prescriptions for codeine back in the 1970s

14  during that heroin epidemic that I've been told

15  about.  There were, you know, diversions that

16  were going on, you know, back in the 1980s per

17  the prosecutor's discussion with me.  I would

18  say with regard to this crisis, we started back

19  in the opioid prescription phase to track

20  oxycodone in terms of mortality in the medical

21  examiner, then coroner's office, back in 1998.

22  So I would say, you know, diversion has a broad

23  definition, and it probably has gone on for a

24  very long time, whether somebody is giving

25  somebody a pill because they complained of

Page 207

```
 1   something.  But diversion on the scale that we,
 2   you know -- it's getting that attention in the
 3   prosecutions, I would say the prosecutor related
 4   to me that their prosecution stepped up in the
 5   late 1990s and through the 2000s.
 6        Q.    Is the county aware of diversion
 7   occurring outside the county that has an impact
 8   within the county?
 9        A.    I would suspect that, you know, the
10   pill mills and other places certainly have an
11   impact.  The fact that we see doctor shopping in
12   jurisdictions outside of Cuyahoga County with
13   individuals dying here I think would tend to
14   indicate that there is a diversion problem
15   outside of Cuyahoga County as well.
16        Q.    And where is that occurring?
17        A.    Where is what occurring?
18        Q.    So if there's diversion occurring
19   outside of Cuyahoga County, as you've described,
20   that has an impact within the county, where is
21   that diversion occurring?
22        A.    Well, the doctor shopping, as I
23   mentioned, could be other counties.  It could
24   be, as I mentioned, recently other states that
25   we've been able to look at.  And the diversion
```

1  by its nature is somewhat clandestine, so may

2  not be able to provide solid evidence of it, but

3  I think there were suspicions where the pill

4  mills were more prevalent in the southern part

5  of the state, that they may have contributed to

6  pills coming up to our county as well.

7       Q.    And what is the basis for what you

8  just told me?  In other words, what information

9  are you relying on to describe this drug

10  diversion occurring outside of the county?

11       A.    Primarily discussions with law

12  enforcement who would have been present at task

13  force meetings.  They would be both local law

14  enforcement, state law enforcement, state

15  representatives, and including our, you know,

16  federal partners with regards to diversion of

17  drugs into our area.  Again, I'd have to point

18  back to the two task forces, the Board of Health

19  one with Vince Caraffi and then the U.S.

20  Attorneys with Steve Dettelbach and Carole

21  Rendon.

22       Q.    Does the county keep any records or

23  statistics of the source of diverted drugs that

24  have an impact within the county?

25       A.    I'm not sure I understand your

Page 209

1  question.  Do they keep a record of diverted

2  drugs that would produce overdoses, fatalities?

3        Q.    Sure.  So let me ask it again.

4              You've described you've heard from

5  law enforcement professionals in connection with

6  task forces that drug diversion outside the

7  county might be having an impact within the

8  county.  Does the county have any record of that

9  happening?  If I wanted to look for documents

10  reflecting that dynamic, what would the county

11  have, if anything?

12             MR. BADALA:  Objection to form.

13  Outside the scope.

14        A.    Well, it's probably more of a local

15  law enforcement function, so the county wouldn't

16  have those records individually.  They would be

17  a local law enforcement.  That said, the

18  sheriff's department provides local law

19  enforcement for some of the smaller

20  municipalities in our county and they may have

21  that data.  I am not aware of that.

22        Q.    Are you aware of any data tracking

23  the source, the geographic source of diverted

24  drugs that made their way into Cuyahoga County?

25             MR. BADALA:  Objection to form.

Page 210

1    Outside the scope.

2         A.    Am I aware -- sorry.  I was looking

3    out the window, but am I aware of --

4         Q.    Are you aware of any data which

5    would reflect the geographic source of diverted

6    drugs that have an impact within the county?

7              MR. BADALA:  Same objections.

8         A.    Well, sure.  I mean, you know, more

9    recently with the fentanyl epidemic, we were

10   quite aware from medical examiner investigations

11   that some of those, you know, drugs were coming

12   from China.  There were, you know, reports of

13   individuals trafficking drugs from Mexico into

14   this area along our interstates.

15             In terms of diverted drugs and the

16   source there, you mean the opioid prescription

17   pain medication.  That I'm not as aware as --

18   having as clear identification of a source on

19   that.

20        Q.    So the examples of drugs being

21   imported from China and Mexico, those have to do

22   with the illicit shipment of drugs, correct?

23        A.    Which the county would maintain is

24   an extension of the opioid crisis.  They are

25   illicit drugs, yes.

1      Q.    And so that does not fall within the

2   definition of drug diversion, does it?

3             MR. BADALA:  Objection to form.

4      Q.    You may think that they're related,

5   but those are not diverted drugs, are they?

6      A.    Fentanyl is a Schedule 2 drug and

7   it's being diverted into this country.

8      Q.    But our definition of drug diversion

9   is when a drug leaves the closed supply chain

10  for an illegitimate medical purpose.  So illicit

11  drugs, they're never within the closed supply

12  chain; the use of illicit drugs is not drug

13  diversion, is it?

14            MR. BADALA:  Objection to form.

15     A.    No.  I think the consequence of the

16  opioid pain relievers creates this climate where

17  we see a heroin crisis and a fentanyl crisis,

18  though, so I don't think it's completely a

19  stretch to go back and say that the diversion

20  and overprescribing that was done prior to the

21  crises is completely separate from the crisis we

22  deal with now.

23     Q.    I understand your opinion on that.

24  I'm not asking you now whether they're

25  completely separate.  What I'm asking is, is the

1  supply of illicit fentanyl from Mexico drug

2  diversion?

3          MR. BADALA:  Objection to form.

4  Asked and answered.

5      A.    Within your definition of that

6  closed chain, no.

7      Q.    And the same is true for illicit

8  fentanyl from China, correct?

9      A.    Within the closed chain, again,

10  that's true.

11      Q.    Do you have any information or

12  data -- does the county have any information or

13  data suggesting that diverted drugs from Florida

14  are making their way into Ohio?

15      A.    It would be anecdotal, talking to

16  law enforcement.  And I believe at the time I

17  had those conversations, Florida had not enacted

18  pill mill legislation, so our pill mill

19  legislation in Ohio came in 2011, and I think

20  there were adjacent states, including Florida,

21  who did not enact that legislation until later,

22  and it was again through discussions with law

23  enforcement that I was made aware, as a county

24  agent in the medical examiner's office, as with

25  the task forces which have county representation

1    as well as other partners, that there were drugs

2    that were being brought from other jurisdictions

3    into Ohio and into Cuyahoga County.

4        Q.    And what has the county done to --

5    if anything, to interdict that flow of drugs

6    into the county?

7        A.    Those would be law enforcement

8    things.  I mean, we have, as a county, designed

9    protocols for the investigation of drug-related

10   deaths, and they were shared with local law

11   enforcement as well as our sheriff for training,

12   and we would basically instruct them -- I mean,

13   it was developed in conjunction with law

14   enforcement processing a death scene, which the

15   medical examiner's office would notify them

16   about, so that should these cases come to

17   prosecution in the future, the evidence that

18   would be needed to facilitate that would be more

19   acceptable than if you were trying to start that

20   investigation as much as months afterwards when

21   the death was finally ruled.

22            In terms of other means of, you

23   know, trying to minimize diversion, the county

24   sheriff's office instituted a drug drop box

25   program that would enable people who had

Page 214

1   medications in their medicine cabinets, opioid

2   pain relievers --

3        Q.    Let me cut you off there, Doctor.

4   The question was what has the county done to

5   interdict drugs, the flow of drugs, from outside

6   the county, and I think you've answered the

7   question.  Is there anything else you wanted to

8   add to that?

9        A.    I would like to think that -- and

10  it's your time and I really am very sensitive to

11  that, but I'd like to say that, you know, that

12  diversion out of the medicine cabinets that I

13  was just mentioning about by reports that were

14  more on a national level was a very significant

15  problem.  We introduced in Cuyahoga County, with

16  the support of our sheriff, who was a county

17  official, drug drop boxes, drug take-back --

18       Q.    Doctor, the question pending is, has

19  the county done anything to interdict the flow,

20  which the county is claiming, the flow of drugs

21  from other states.  If you finished answering,

22  then I'll ask you another question.

23       A.    Oh, I thought you wanted me to go on

24  about what I was talking about.

25       Q.    I wanted you to answer the question.

Page 215

1        A.      Sure.

2        Q.      Okay.  Thank you.

3                Has the county dealt with law

4    enforcement in other places like Florida to

5    interdict the flow of drugs into the county if

6    the county is claiming that's happening?

7        A.      Again, I would say a lot of that

8    might be local law enforcement the county would

9    not be aware of.  With regard to task forces and

10   federal partners, I would say that we are

11   sharing information through them, Department of

12   Justice, Drug Enforcement Agency, and I would

13   say that that would be a means of, you know, a

14   more global approach than just our region.

15       Q.      Let me ask you about the

16   investigation of drug diversion, and these

17   topics somewhat overlap, Doctor.

18       A.      Which topic are we on?

19       Q.      We're on topic 15, but again,

20   they're not so neatly contained.

21               Which county agency or agencies are

22   responsible for investigating drug diversion?

23       A.      Well, I think our sheriff, as a law

24   enforcement agency, would do that, but primarily

25   the investigation of diversion would be local

Page 216

1   law enforcement.

2        Q.     Referring to the City of Cleveland,

3   right?

4        A.     Pardon me?

5        Q.     Referring to cities, right, when you

6   say "local law enforcement"?

7        A.     Cities, yeah.  It would not be

8   necessarily a county.  But I have to stress the

9   county sheriff provides that service to some of

10  the smaller counties that otherwise could not

11  afford it.  So they would do some investigation.

12  Investigation would also be done at the level of

13  the prosecutor's office, though that may be

14  significantly overlapping with local law

15  enforcement.

16       Q.     Which county agency or agencies are

17  responsible for investigating the

18  overprescription of opioid medicines?

19            MR. BADALA:  Objection to form.

20       A.     That would be a state function.  I

21  mean, the investigation of overprescribing would

22  be a Board of Pharmacy issue and we would report

23  things there as we detected them for further

24  investigation, but beyond that, that would be

25  something that would have been more handled at a

1    state level -- or a federal level, I mean, if

2    you know, there was some issue of that, and

3    sharing information across multiple partners.

4         Q.    Does the county collaborate with

5    state or federal agencies in that effort?

6         A.    Our task forces have representation

7    from local, county, state and federal level

8    people, so we would be sharing that information.

9         Q.    Is that collaboration formalized in

10   writing, in a memorandum of understanding or any

11   other writing?

12              MR. BADALA:  Objection to form.

13        A.    These committees were formed.  I

14   mean, the U.S. Attorney's committee keeps

15   minutes, has monthly meetings, and would address

16   these kinds of topics.  We would share things

17   like that.  I had a personal meeting with Carole

18   Rendon to discuss strategies about drug

19   prosecutions and mixed intoxications.  I mean,

20   some of those things we have done.  Some of them

21   may not be documented as well.

22        Q.    So you've told me about the

23   referrals that the county has made to state

24   authorities.  How many cases of drug diversion

25   has the county itself investigated?

1      A.    That may be something the prosecutor
2   could tell you better than I.
3      Q.    Do you know how many county
4   investigations have resulted in disciplinary
5   proceedings or criminal charges?
6           MR. BADALA:  Objection to form.
7   Outside the scope.
8      A.    I'd have to say, again, you know,
9   the disciplinary process for pharmacies or
10  prescribers would have occurred outside of the
11  county's framework.  It would be a state
12  function.
13     Q.    But you mentioned the county
14  prosecutors.  I'll ask you again.  Do you know
15  how many county investigations have resulted in
16  criminal charges?
17          MR. BADALA:  Objection to form.
18     A.    I'd have to say again the county
19  prosecutor is in a better position to answer
20  that than I am.
21     Q.    Has there been diversion occurring
22  that the county has not investigated?
23     A.    I guess there's diversions they
24  don't know about.
25     Q.    Other than not knowing, is there any

Page 219

1   reason the county hasn't investigated diversion

2   more?

3              MR. BADALA:  Objection to form.

4        A.    Not that I know of.

5        Q.    Has the county dedicated resources

6   specifically to the investigation of drug

7   diversion?

8        A.    Through the sheriff's office, again,

9   as a local law enforcement agency I'd have to

10  say, but again, a lot of these investigations do

11  not start at the county level.  They start with

12  local law enforcement.

13       Q.    And are you aware of any local law

14  enforcement, including the county sheriff,

15  dedicating resources specifically to the

16  investigation of drug diversion?

17             MR. BADALA:  Objection to form.

18  Outside the scope.

19       A.    I don't know.  I want to say that I

20  anecdotally heard that Cleveland -- the City of

21  Cleveland had done that, but I don't know that

22  for certain.  They had a narcotics unit, and I

23  believe they were investigating diversion as

24  part of their duties, but it's outside the scope

25  of what I know for certain.

Page 220

1          Q.    And that's a local law enforcement
2     function, not a county function, true?
3          A.    Exactly.  Right.  Cleveland is their
4     biggest city, but it's not under the county's
5     direction.
6          Q.    So how many cases related to the use
7     of illegal opioids has the county investigated,
8     including heroin and fentanyl?
9          A.    Tough question.  I can tell you how
10    many fatalities we've had.  How many overdoses
11    potentially --
12         Q.    I'm --
13         A.    -- I couldn't give a specific answer
14    because that's one of the challenges we faced,
15    in terms of identifying impacts of illegal
16    opioids, is if we try to track emergency room
17    data, they're not always coded appropriately or
18    they may be coded as something different.  So I
19    think that would be a very tough number to
20    actually get in terms of the impact of illegal
21    opioids and what might have been followed up on,
22    what might not have.  I don't know.
23         Q.    So the answer is in the end you
24    don't know, right?
25         A.    Give me your question again.  I

Page 221

1   really feel like I'm not helping, but I want to.

2        Q.    How many cases relating to illegal

3   opioids, including heroin and fentanyl and

4   carfentanil and others, has the county

5   investigated?

6             MR. BADALA:  Objection to form.

7   Outside the scope.

8        A.    I'd have to say I don't know and I

9   don't know if it's knowable.

10       Q.    Do county agencies prescribe

11  opioids?

12            MR. BADALA:  Objection to form.

13  Outside the scope.

14       A.    I know opioids are prescribed at the

15  jail as part of the medical treatment.  I

16  believe the jail is staffed by MetroHealth

17  Medical Center for care.  Other than that, I

18  don't know that they're prescribing opioids.

19       Q.    Do county-affiliated hospitals or

20  healthcare facilities prescribe opioids?

21            MR. BADALA:  Same objections.

22       A.    Our county-affiliated hospital is

23  the MetroHealth Medical Center, so it would be

24  the same one that services the jail.  It's a

25  large hospital.  They would prescribe opioids

Page 222

1    for certain.

2         Q.    And has the county ever investigated

3    diversion that might be occurring in connection

4    with patients being treated by county

5    representatives, either in the jail or at the

6    hospital?

7              MR. BADALA:  Objection to form.

8    Outside the scope.

9         A.    I do know that the MetroHealth

10   Medical Center initiated an office of opioid

11   safety, and one of the functions of that would

12   be to investigate prescribing practices within

13   the county hospital, within MetroHealth Medical

14   Center, and then there would be a loop

15   potentially closing back on individuals who were

16   identified who might have been overprescribing

17   or felt to be overprescribing outside of the

18   basic, you know, metrics that they were using.

19   I don't know what those metrics are, but there

20   was definitely feedback in that office of opioid

21   safety to the prescribers within that system,

22   and they would be the prescribers in the jail as

23   well because they oversee the jail -- healthcare

24   service at the jail.  They don't oversee the

25   whole jail.  And I think, you know, that office

Page 223

1   of opioid safety would also be overseeing those

2   physicians as well.

3        Q.    Have there been any criminal charges

4   or disciplinary proceedings arising from that

5   investigation?

6        A.    I do not know.

7        Q.    Are you familiar with the ARCOS

8   database, Doctor?

9        A.    In a very general way.

10        Q.    Are you aware that ARCOS is a

11   database through which distributors and

12   manufacturers report controlled substances

13   transactions to the DEA?

14        A.    Yes.

15        Q.    Have you ever -- has the county ever

16   had access to the ARCOS data?

17        A.    No.  I know recently the county's

18   attorneys received information related to the

19   ARCOS database, but the county itself has no

20   direct access to that.

21        Q.    So you're aware that the county,

22   through its attorneys, was granted access to

23   ARCOS data in 2018, but the county itself has

24   not seen those data; is that what you're saying?

25        A.    That's -- that's correct.

Page 224

1      Q.    Has the county ever asked for ARCOS
2   data at any time?
3            MR. BADALA:  Objection to form.
4      A.    In my discussion with the DEA
5   representative, he said that that access would
6   never have occurred, so I don't think we ever
7   asked.
8      Q.    That conversation occurring last
9   Friday, true?
10     A.    Yeah, but, you know, I sit on the
11  task force with this fellow and he was certainly
12  aware of their database, I was aware of it, and
13  it was never volunteered because we could not
14  access it.
15     Q.    So you have interfaced with DEA?
16     A.    Absolutely.
17     Q.    And during that time have you ever
18  asked for access to ARCOS data?
19           MR. BADALA:  Objection to form.
20     A.    I guess no because we knew we
21  weren't going to get it.
22     Q.    Well -- but if the county is
23  concerned with drug diversion and the abuse of
24  drugs, wouldn't that information be useful to
25  you?

1          MR.  BADALA:  Objection to form.

2      A.    Absolutely.  Yes, it would have been

3  very helpful.

4      Q.    But you never asked DEA about it,

5  did you?

6      A.    Because we knew that we weren't

7  going to have -- or they never made it any

8  clearer to us that it was not something we as a

9  county would have access to.

10     Q.    They never offered, right?

11     A.    They never offered.

12     Q.    And you never asked, right?

13         MR.  BADALA:  Objection to form.

14     A.    No.  I guess because we just didn't

15  think that that was going to happen.

16     Q.    Are you familiar with the term

17  "suspicious order report"?

18     A.    No.

19     Q.    Is the county familiar with the

20  requirements that DEA registrants have for

21  reporting suspicious orders of controlled

22  substances to the DEA?

23     A.    In a general way, yes.

24     Q.    Has the county ever seen a

25  suspicious order report?

1          A.     To the best of my knowledge, no.

2          Q.     Has the county ever asked DEA for

3     information or access to suspicious order

4     reports?

5          A.     We have not, but again, my

6     understanding is that that wouldn't be something

7     that would be granted to the county, so we

8     didn't ask.

9          Q.     The answer is you didn't ask, true?

10         A.     We did not ask.

11         Q.     So if the county, again, was

12    concerned or is concerned with diversion and

13    abuse of controlled substances, wouldn't that

14    information have been useful to the county?

15                MR. BADALA:  Objection to form.

16         A.     Sure would have, yeah.

17         Q.     Now, we've talked quite a lot

18    already about the OARRS database, right?

19         A.     Yes.

20         Q.     Let me ask you flat out, Doctor.

21    What is the OARRS database?

22         A.     It's a prescription drug monitoring

23    program that's operated at the state level, and

24    in Ohio we call it OARRS.  It has other names in

25    different states.

Page 227

1              The function of it is to provide a
2    database of prescribed controlled substances.
3    The OARRS database was formed in 2006,
4    legislation I think enabled it in 2005, and then
5    it became operational towards the end of 2006.
6    It was formed at least in response to Kentucky
7    forming a prescription drug monitoring system
8    and a concern that Kentucky residents were
9    coming to Ohio, where we were not monitoring
10   these things, for drug -- obtaining drugs.
11             So data started to be collected, and
12   then, going forward, pharmacies would enter the
13   data from prescribing information into OARRS,
14   and then that could be accessed by prescribers,
15   law enforcement, and I believe distributors at
16   different levels, partly if there was an active
17   investigation.
18        Q.    What do you base that understanding
19   on, that the distributors had access to the
20   OARRS data?
21        A.    It's my recollection of my
22   conversation with the director of OARRS.  Or
23   maybe it was at a pharmacy level.  I don't
24   remember.  I don't want to be dogmatic about
25   that.  I don't recall.

1          Q.    So you don't recall why you just
2     said that distributors had access to OARRS data?
3          A.    Well, I was thinking distributor
4     pharmacists, the pharmacies.
5          Q.    Okay.  I just wanted to clear that
6     up.
7          A.    Distributors -- I'd have to say I
8     don't remember that detail.
9          Q.    So the OARRS system has information
10    on all outpatient prescriptions for controlled
11    substances and other -- a few other drugs,
12    right?
13         A.    When it started, the data that was
14    entered was from pharmacies, and then in 2011
15    there were requirements to enter data from
16    medications that were being dispensed from
17    prescriber's offices, so they wouldn't
18    necessarily have gotten into a pharmacy.
19         Q.    And then drug wholesalers were also
20    required to submit information to the OARRS
21    database, true?
22              MR. BADALA:  Objection to form.
23         A.    I'd have to say I believe so, but I
24    don't remember.  I know that it was pharmacy
25    data.

Page 229

1          Q.     OARRS has been a helpful tool in

2     identifying drug diversion, right?

3          A.     I said it.  So did the prosecutor.

4     Yes, it has.

5          Q.     Has the county ever used OARRS data?

6          A.     We've used it at the medical

7     examiner's office extensively.

8          Q.     Let's start with that.  So how has

9     the medical examiner's office used OARRS data?

10          A.     We especially used it when we became

11     aware of the heroin crisis in our county, and

12     what we were trying to do at that point was to

13     see if what we were hearing anecdotally, that

14     this represented a shift from the prescription

15     pain medications to the illicit heroin was

16     referable back to the prescribing practices of

17     these individuals who had died of heroin

18     overdose.  So, as I said, we started to collect

19     that data in a de-identified form in 2012.  We

20     continued until we got full access in 2013, and

21     we continue to collect the data and have that

22     access with the idea of trying to stay relevant

23     as our crisis evolves, so that -- now heroin,

24     and we've evolved to fentanyl, and those still

25     have very high rates of OARRS files being

                                                    Page 230

1   created.  They've received prescription opioids.

2        Q.    So we've talked a little bit about

3   that, the data analysis you've done.  Is there

4   any other use of OARRS data?  For example, when

5   you have a subject, a decedent, does the office

6   do anything with OARRS data in connection with

7   that decedent?

8        A.    I mean, you know, as I mentioned

9   before, if we see multiple prescribers, we will

10  start to alert investigative agencies about

11  that.

12       Q.    Do you try to pull an OARRS file for

13  every decedent, Doctor?

14       A.    We have tried to pull an OARRS file

15  for every heroin overdose from 2012 forward and

16  for every fentanyl overdose, and that started

17  actually when the fentanyl part of the crisis

18  got worse, which was 2015.

19       Q.    Let's look through some documents

20  and try to nail down this a little bit, Doctor.

21  I'm going to mark this as the next in order.

22            THE WITNESS:  Would this be a good

23  time for a break?

24            MR. BADALA:  Yeah.  We've been going

25  about an hour.  Let's take a five-minute break.

```
                                    Page 231

 1              MR. BORANIAN:  Okay.

 2              THE VIDEOGRAPHER:  Off the record at

 3     2:33 p.m.

 4                    (Recess had.)

 5              THE VIDEOGRAPHER:  Back on the

 6     record at 2:49 p.m.

 7     BY MR. BORANIAN:

 8         Q.    Dr. Gilson, you've made reference a

 9     couple of times to a task force or task forces

10     --

11         A.    There are two essentially in our

12     county, yes.

13         Q.    -- including one involving Attorney

14     Carole Rendon.  Can you tell me who else is on

15     those two task forces?

16         A.    We would be, the county, the medical

17     examiner's office.  City of Cleveland would have

18     their public health -- or health department

19     individuals, as well as police department.  The

20     County Board of Health would have representation

21     there, individuals from MetroHealth Medical

22     Center, Dr. Papp from Project DAWN.  Cleveland

23     Clinic would have a representative I'm certain.

24     There were individuals from the governor's

25     office and the State Attorney General's office
```

Page 232

1   who were present.  I can't say they were always
2   at every meeting, but they certainly were
3   represented there.  Individuals from the
4   treatment and recovery community sober houses
5   and those individuals.
6           I'm sort of running around the table
7   in my head who might be sitting there, and I may
8   have overlooked somebody, but that's a good
9   starting list, I would guess.
10       Q.   Have you covered both task forces
11  you referred to?
12       A.   Thinking more of the U.S. Attorney's
13  with Carole, but I would say there was a lot of
14  overlap between the two, and that the health
15  department was more Cuyahoga County, so the City
16  of Cleveland's health department was not there.
17  There would be presentations from different
18  people, too, like community groups that were
19  trying to address, you know, interventions,
20  educational strategies.  That would have been
21  more likely at the Board of Health, but there
22  were also, you know, individuals who were
23  representing education at the U.S. Attorney's
24  task force as well.
25       Q.   Were there any private citizens as

Page 233

1    members of either of those task forces?

2          A.    I think the individuals in the

3    recovery community were essentially there as

4    private citizens.  I mean, they were, you know,

5    representing that viewpoint, which is very

6    valuable to us.  But in terms of just an

7    at-large member from the county, that I don't

8    think we had.

9          Q.    And I should have asked you this

10   first, but can you please name for us the two

11   task forces?

12         A.    I call them, and I hope this will be

13   clear enough -- I don't know what their formal

14   names are as I sit here, but the Cuyahoga County

15   Board of Health task force, which was in the

16   injury prevention program at the Board of

17   Health.  That's Vince Caraffi, who is the one

18   that chaired that up until recently.  He stepped

19   down, and April Vince is in charge of that

20   coordination now.

21              The second one was the U.S.

22   Attorney's task force, which I mentioned, and

23   that was convened with Steve Dettelbach, who was

24   our U.S. Attorney at the time it started, and he

25   had called our summit at the Cleveland Clinic at

Page 234

1   the end of 2013.  Steve Dettelbach was replaced

2   by Carole Rendon, who was our U.S. Attorney.

3          Q.    I think you've answered the

4   question, Doctor.

5                MR. BADALA:  Were you done answering

6   the question?

7          Q.    The question was what were the two

8   task forces, and you've now named two task

9   forces.

10         A.    Oh, okay.

11                    -    -    -    -    -

12               (Thereupon, Gilson Deposition

13               Exhibit 9, E-Mail String, Beginning

14               Bates Number CUYAH_001709118 -

15               Marked Confidential, was marked for

16               purposes of identification.)

17                    -    -    -    -    -

18         Q.    Let me direct your attention to

19   Exhibit 9, Dr. Gilson.  Is this an e-mail

20   exchange in February 2013 between you and

21   someone named Rose and an attorney at the Board

22   of Pharmacy named Danna Droz?

23         A.    Yes.

24         Q.    If you go to the second page on the

25   back of the document there, Danna Droz writes in

Page 235

1    the second paragraph, "In talking with

2    Dr. Gilson, he wants to obtain data on persons

3    who died sometime in the past for research

4    purposes.  His right to obtain identified data

5    is limited to persons with whom he is currently

6    involved.  So he may request an OARRS report

7    during the process of an autopsy or death

8    investigation.  He cannot request retrospective

9    data even though he could have requested it at

10   the time of death."

11             Is that what it says, Doctor?

12        A.    That's my understanding of it, yes.

13   Could I finish reading it just for a second?

14        Q.    Are you finished, Doctor?

15        A.    Give me just a second.

16        Q.    Just look at me when you're done.

17        A.    Okay.

18        Q.    So in February of 2013 you had

19   access to OARRS for any subject that was

20   currently under investigation in your office,

21   true?

22        A.    That's what this reads, yes.

23        Q.    And that was true even before 2013,

24   right; that is, you had access to OARRS reports

25   for individuals who you were investigating in

Page 236

1    your office, true?

2         A.    We had aggregate data that was

3    supplied by the Board of Pharmacy through OARRS

4    for 2012.  We were not granted full access to

5    that data.

6         Q.    Well, did you -- I'm not asking

7    about full access to aggregated data.  I'm

8    asking about access to an OARRS report for a

9    subject being investigated in the medical

10   examiner's office.  You had access to those

11   reports for the individuals you were

12   investigating even prior to 2013, right?

13               MR. BADALA:  Objection to form.

14        A.    We had incomplete access to those

15   individuals.

16        Q.    If an individual died in 2010 and

17   was under investigation in your office, you had

18   access to that individual's OARRS report, true?

19               MR. BADALA:  Objection to form.

20        A.    Again, I would say not the full

21   report, but we had access to some of their OARRS

22   report, yes.

23        Q.    You had access to that individual's

24   prescription history, right?

25               MR. BADALA:  Objection to form.

Page 237

1          A.    We had access to the prescription
2    history, but not to the prescriber information,
3    yes.
4          Q.    And that's true since the inception
5    of OARRS in 2006, you had that particular
6    access, right?
7               MR. BADALA:  Objection to form.
8          A.    I requested access to OARRS.  I
9    don't believe the agency, the coroner's office,
10   had that access.  I don't know that they pursued
11   it or if they were even aware of it.  I became
12   aware of it and that's when I started to pursue
13   it.
14         Q.    Whether the office was aware of it
15   prior to 2012, the office could have requested
16   and could have received an OARRS report for an
17   individual it was investigating as early as
18   inception of the program, true?
19               MR. BADALA:  Objection to form.
20         A.    I can't answer that because I had a
21   lot of difficulty myself obtaining that access.
22         Q.    Well, when you asked for access,
23   they told you that you can have access for an
24   individual during the process of an autopsy,
25   right?  That's what they told you, right?

```
                                          Page 238
 1          A.     That's what this says here, but --
 2          Q.     And that access was available to you
 3   since the inception of the program, you just
 4   never asked, right?
 5              MR. BADALA:  Objection to form.
 6          A.     I was obtaining this, you know,
 7   trying to reach out to get this for a period of
 8   time before this and not getting a lot of
 9   headway with it.
10              In 2017 the Board of Pharmacy
11   actually created a special designation based on
12   discussions that we were having around this for
13   coroners and medical examiners to guarantee they
14   would have access.  A lot of the coroners in
15   Ohio are elected physicians who are not trained,
16   like me, to be death investigators, so they
17   could access OARRS through their own DEA license
18   because they were prescribers.  I could not
19   because I did not have a DEA license, and as I
20   tried to go into this to obtain the access, my
21   recollection, as the medical examiner, an agent
22   of the county, was that that was difficult
23   because I was not treating people with opioids.
24          Q.     You keep saying when you obtained
25   access, Doctor.  As a matter of fact, the
```

1    medical examiner's office has always had access

2    to OARRS and to an OARRS report, including

3    prescribing history, for as long as OARRS has

4    been in inception; is that right?

5              MR. BADALA:  Objection to form.

6         Q.    You may not have had access to

7    retrospective de-identified data before you

8    asked in 2013, but, like we said, in 2010 or

9    2008, if you had a subject you were

10   investigating, you could get that person's

11   prescription history, true?

12             MR. BADALA:  Objection to form.

13        A.    I don't think that was actually my

14   experience in 2011 when I started the process.

15        Q.    Did you ask before 2013?

16        A.    Yes, I did.

17        Q.    What did you ask for before 2013?

18        A.    I wanted access to the OARRS

19   database to see if we could establish the

20   relationship between the 2000 -- pardon me, the

21   heroin epidemic and the prescribing practices of

22   those decedents before they died.

23        Q.    And had you ever -- before placing

24   that request in 2012, had you ever requested an

25   OARRS report for an individual you were

Page 240

1   investigating?

2              MR. BADALA:  Objection to form.

3         A.    No.

4         Q.    So you mentioned, Doctor, that you

5   had eventually received de-identified data?

6         A.    Yes, I did.

7                    -   -   -   -   -

8              (Thereupon, Gilson Deposition

9              Exhibit 10, Article Entitled "The

10             Cuyahoga County Heroin Epidemic,"

11             was marked for purposes of

12             identification.)

13                   -   -   -   -   -

14        Q.    And let me show you Exhibit 10,

15   which is an article you published in 2014, and

16   this article describes de-identified data --

17   analysis of de-identified data for 2012

18   fatalities; is that right?

19        A.    What page are you at?

20        Q.    Just take a look at the abstract.

21   It says in the third paragraph, "The medical

22   examiner's office conducted a retrospective

23   analysis of 2012 fatalities to identify

24   potential risk factors and intervention points."

25   That's the de-identified data you received from

Page 241

1   OARRS, true?

2        A.    The OARRS data is part of that.  We

3   were identifying a lot of different things in

4   terms of what we were looking at here to try to

5   see if we could identify intervention points.

6   The OARRS data at that time, as I say, was

7   de-identified and incomplete, but we mentioned

8   it as much as it was helpful and relevant to the

9   investigation, retrospective investigation of

10  these fatalities.

11       Q.    So Exhibit 10 is an article that you

12  published, right?

13       A.    Yes, it is.

14       Q.    And it's titled "The Cuyahoga County

15  Heroin Epidemic," right?

16       A.    Yes, it is.

17       Q.    This article reports on your

18  analysis of 161 heroin-related deaths in 2012,

19  true?

20       A.    Yes.  We actually excluded one of

21  them because it was a stillborn and our feeling

22  was that that really wasn't relevant to the

23  population we wanted to look at.

24       Q.    And one of the observations that you

25  made was that a prescription for legal

1  controlled substances was noted in 64 percent of

2  deaths associated with heroin, true?

3       A.    What page are you on?  It sounds

4  familiar to me.

5       Q.    The abstract, the beginning of the

6  abstract.

7       A.    I'm sorry.  Yes, that's right.

8       Q.    And that's based on that

9  de-identified 2012 OARRS data, right?

10       A.    Yes.

11       Q.    Now, I've seen this number 64

12  percent in other documents that relate to you

13  and your office.  When we see that number, 64

14  percent who had a prescription for legal

15  controlled substances, that number comes from

16  the analysis of the 2012 de-identified OARRS

17  data, right?

18       A.    Yes.

19       Q.    Now, once you started taking

20  advantage of your access to OARRS in 2013, did

21  you start gathering data prospectively for

22  individuals who the office was investigating?

23       A.    We would, in the death review

24  committee, wait a period of a few months for

25  final certification of deaths, and while we were

Page 243

1   doing that process, we would collect an OARRS

2   file on them.  So, in that sense, it's

3   retrospective, we're looking back at their

4   prescription history.

5          Q.     Okay.  Fair enough.

6          A.     Prospectively we're recruiting

7   people, but we're looking retrospectively at

8   their prescription histories.

9          Q.     My question is, going forward from

10  2013, you were collecting OARRS reports for each

11  of your subjects, right?

12         A.     Right.  And at that time, around

13  mid-year, we did get the final access to the

14  prescribers in addition to the drugs that were

15  being prescribed.

16         Q.     And have you collected that

17  information from OARRS for each of your subjects

18  since 2013 up until today?

19         A.     We're trying.  As I said before, you

20  know, just the burden of the extent of the

21  crisis, we have fallen behind on that, so we

22  have --

23         Q.     And --

24         A.     If I could finish.

25         Q.     Sure.

Page 244

1     A.    We have collected and analyzed data
2  on heroin overdoses through 2016.  We recently
3  got a grant for an employee to finish up the
4  work on additional OARRS examination, and we
5  started to look retrospectively at the fentanyl
6  overdose data in 2016, when it became a
7  substantially larger problem.
8              -  -  -  -  -
9            (Thereupon, Gilson Deposition
10           Exhibit 11, Document Entitled
11           "Overdose Deaths in Cuyahoga
12           County," Beginning Bates Number
13           CUYAH_001397330, was marked for
14           purposes of identification.)
15             -  -  -  -  -
16     Q.    This is Exhibit 11, Dr. Gilson.  And
17  this cover sheet is merely to note the Bates
18  number, which is Cuyahoga 001397330.  The
19  document starts on the second page, Doctor.  And
20  this appears to be a set of slides with your
21  name on the first page.
22            Doctor, what is this document?
23     A.    It looks like a -- I don't remember
24  which talk it was, but a talk I put together
25  to -- I don't know who the audience was for it.

Page 245

1    I didn't specify.  A talk of mine, though.

2         Q.    I'm trying to figure out when you

3    did this.  It might help to look at the fifth

4    page of the presentation.  There's a chart there

5    that reflects some 2014 data.  So would it be

6    fair to date this in 2015?

7              MR. BADALA:  Objection to form.

8         A.    Probably, yes.  I would not put it

9    any earlier than 2014, and it looks like we have

10   completed data for 2014, so I would say it was

11   into 2015, because you wouldn't have had that

12   data until actually 2015.

13        Q.    If you go to the eighth page of the

14   presentation, that's entitled "Heroin Epidemic."

15   It looks like that, Doctor (indicating).

16        A.    Let me just get there.

17              Okay.

18        Q.    It refers to a 2012 retrospective

19   review, and that's the same review that we just

20   went over in Exhibit 10, the article you wrote,

21   right?

22        A.    This is the review that we did at

23   the medical examiner's office using only our

24   data, and we did not have primary sources of

25   information.  That would have been in the 2013

Page 246

1   review.  So this paper mentions some things from

2   2013, but I think the gist of the bulk of it is

3   about the 2012 review that we did in the office.

4           Q.    The paper referring to Exhibit 10,

5   right?

6           A.    Exhibit 10, yes.

7           Q.    Okay.  Fair enough.

8               The next bullet point there under

9   the Heroin Epidemic title is "2013 prospective

10  review of heroin mortality done with ME staff,"

11  et cetera, et cetera, right?

12          A.    Right.  We assembled people within

13  the room at the ME's office in a committee that

14  I called together to review that data, and the

15  goal was -- for example, in law enforcement we

16  had the sheriffs there, a county officer.  He

17  had a representative who could provide

18  information to us, partly on arrests but mostly

19  on incarceration data, because what we were

20  trying to do in this was to identify

21  intervention points, and one of the risk factors

22  for fatal overdose was somebody who was coming

23  out of incarceration or a treatment facility.

24  So that was kind of the makeup of this.

25          Q.    So if you go to the next page, we're

1    talking about a set of 194 overdose fatalities,

2    right?

3          A.    Right.

4          Q.    And that's 2013, right?

5          A.    Right.

6          Q.    And then if you go three more pages,

7    it says, "PDR Findings."  It looks like that

8    (indicating).

9          A.    Yes.

10         Q.    It says here 73 percent of heroin

11   overdose victims had a file with OARRS, right?

12         A.    Right.  About three-fourths.

13         Q.    Now, we've also seen that number, 73

14   percent, in other documents associated with you

15   or your office.  And when we see that, 73

16   percent of heroin overdoses who had an OARRS

17   file, that refers to this 2013 data set, right?

18         A.    Right.

19               MR. BORANIAN:  I'm told the phone

20   isn't working.  I'm not sure what to do about

21   that.

22               MR. GALLUCCI:  I think that's

23   probably from before when we heard it right

24   before we took a break.

25               MR. BORANIAN:  Okay.  Let's take a

Page 248

1  break, but if you could indulge me, don't go

2  away, Doctor.

3            THE VIDEOGRAPHER:  Off the record at

4  3:09 p.m.

5                 (Short recess had.)

6            THE VIDEOGRAPHER:  Back on the

7  record at 3:10 p.m.

8  BY MR. BORANIAN:

9       Q.    This is Exhibit 12.  Oops.  I marked

10  the wrong one.  Hang on.

11                 -   -   -   -   -

12            (Thereupon, Gilson Deposition

13            Exhibit 12, Document Entitled

14            "Opioid Crisis Response:  Examining

15            Overdose Deaths at Cuyahoga County

16            Medical Examiner's Office," with

17            Attached Sheet Bates Numbered

18            CUYAH_001684555 - Marked

19            Confidential, was marked for

20            purposes of identification.)

21                 -   -   -   -   -

22       Q.    This is Exhibit 12, Dr. Gilson.

23  This appears to be a presentation, or maybe a

24  poster, with your name on it, along with

25  Dr. Deo.  Can you tell us what this is, Doctor?

Page 249

1          A.    I'm not completely certain, but I
2    think this was a poster that Dr. Deo, who is a
3    student at the Case Western School of Public
4    Health, produced based on research he was doing
5    at our office.
6          Q.    So it's entitled "Opioid Crisis
7    Response:  Examining Overdose Deaths at Cuyahoga
8    County Medical Examiner's Office," with a Bates
9    number noted on the second page as 001684555,
10   and if you look over at the far right column,
11   Doctor, it says, "OARRS Data, Fentanyl Overdose
12   Deaths February 2017," right?
13         A.    Right.
14         Q.    Is this part of the analysis of
15   fentanyl deaths in connection with OARRS that
16   you've described before?
17         A.    Yes.
18         Q.    It says, "55 fentanyl overdose
19   deaths in February 2017," right?
20         A.    That was one of the worst months in
21   Cuyahoga County, yes.
22         Q.    And the fourth bullet point says
23   that 41 out of 55 had an OARRS file, right?
24         A.    That's correct.
25         Q.    That's about 80 percent, right?

Page 250

1          A.     Yes.

2          Q.     Now, you've mentioned earlier in the

3     deposition that same number, 80 percent.  Is

4     this the source for your citation of the 80

5     percent figure?

6          A.     No.

7          Q.     Okay.  Has the medical examiner's

8     office done any analysis of fentanyl overdose

9     deaths other than what's represented here on

10    Exhibit 12?

11         A.     Yes, we have.

12         Q.     What is the source of your stated

13    opinion that 80 percent of fentanyl deaths have

14    a history of prescription medication?

15         A.     It's this information.  I thought

16    you said 80 percent of our opioid deaths, heroin

17    deaths.

18         Q.     Maybe I misspoke.  I'm sorry,

19    Doctor.  I haven't looked at the transcript, but

20    I think you said earlier today that 80 percent

21    of fentanyl deaths have a recent history or a

22    history of a prescription drug prescription,

23    right?

24         A.     No.  What I said earlier today was

25    that approximately 80 percent of the heroin

Page 251

1    overdose deaths that we had in that phase of the

2    crisis had an OARRS file, and that was the 73

3    percent that I'm referencing here.

4          Q.    Okay.  So that's where I'm confused

5    then.  Okay.  So what I was seeing for heroin

6    deaths is 64 percent based on the 2012

7    retrospective data.

8          A.    Sure.

9          Q.    I have seen 73 percent based on the

10   194 cases in 2013.  Doctor, where do you get 80

11   percent of heroin-related deaths have an OARRS

12   file?

13         A.    Sure.

14               My estimate, if I might say, is that

15   we estimated approximately 80 percent of the

16   heroin overdose victims had a history of

17   receiving prescription pain relievers.  I take

18   that from this data, the 73 percent.  And I'm

19   not parsing that for, you know, this is closer

20   to what I want.

21               The 2012 data, where the 66 percent

22   came from, was actually limited in the time of

23   look-back because we had delay in getting access

24   to OARRS to do the look-back.  So some of the

25   look-backs we did on heroin overdoses in 2012

Page 252

1    were as short as six months and, at the longest,

2    18 months.  So I thought that number -- and this

3    was one of the reasons I wanted to continue to

4    collect the data -- was potentially an

5    underestimate.

6              When I saw this number, this still

7    actually represents, to some extent, a, you

8    know, initial period look-back of about two

9    years for virtually all of these cases in 2013.

10   That was a better look-back period.

11         Q.    Let me stop you there.  When you say

12   "this number," which number?

13         A.    73 percent.

14         Q.    Okay.  Continue.

15         A.    Is better data, and that's really

16   what we were striving to get to see if we could

17   tie the heroin crisis back to opioid pain

18   relievers.

19              At the time we were collecting this

20   data, there was really very little, other than

21   anecdotal reports, to say this heroin phase of

22   the crisis represented a transition.

23              In 2013 substance abuse and mental

24   health services published a bulletin, where they

25   had gone back and talked to actual heroin users

                                                      Page 253

1    and said, "How did you get started abusing

2    opioids," and that number was 79.5 percent, 80

3    percent of those addicts said I started using

4    opioid pain relievers.  And when they looked the

5    other direction, most of the people who were

6    abusing opioid pain relievers said no, I never

7    started with heroin, I'm abusing this substance.

8                 So when I saw that number in

9    conjunction with this -- and this is again as

10   more data is becoming involved -- that's where I

11   draw that number of about 80 percent of our

12   addicted population come from that transition.

13   I can't talk to the people after they died to

14   ask them how did you get started, but somebody

15   did that, we didn't duplicate that effort, but

16   we used this data as a support to that to say,

17   listen, almost 80 percent of our overdoses have

18   been using prescription opioids, some of them

19   with very long track records and, in fact, you

20   know, that number is very close to what's being

21   quoted from the interviews with the living

22   individuals who are abusing heroin currently.

23          Q.    The 80 percent, then, comes from a

24   bulletin that you read, right?

25          A.    From the substance abuse and mental

Page 254

1    health services.

2          Q.      Have you reviewed the data upon

3    which they base that bulletin?

4          A.      Yes, I did.

5          Q.      And what form did that data take?

6          A.      They're interviewing heroin addicts,

7    current heroin addicts, with the question that I

8    said, you know, how did you get started abusing

9    opioids, and 80 percent, 79.5 percent said that

10   they had started abusing prescription

11   medications.

12         Q.      Did those interviews take into

13   account whether those individuals had a

14   prescription for the opioid that they say they

15   initiated with?

16         A.      They talked about non-medical pain

17   reliever use.  I do not know that I remember

18   enough detail to say whether they had, in fact,

19   obtained those legally or by diversion.

20         Q.      So you can't tell from those data

21   whether the use of prescription opioids was

22   legal or illegal for that population, true?

23         A.      I don't remember exactly the -- what

24   that metric was.

25                 The other thing I wanted to add --

                                        Page 255

1          Q.    They didn't ask about that in their
2     survey, did they?
3          A.    Pardon?
4                MR. BADALA:  Were you done?
5          Q.    They didn't ask about that in their
6     survey, did they?
7          A.    Could I finish the previous thought,
8     though?
9          Q.    Sure.
10         A.    The other thing I wanted to add
11    about that study is they did a ten-year
12    look-back.  Basically they wouldn't trust the
13    addict's memory beyond ten years, so they were
14    looking back further than we were with our data.
15    So I thought that might have explained some of
16    the smaller discrepancy, the 73 percent versus
17    the 79 percent, but statistically they were very
18    close.
19         Q.    In what form was that data provided
20    to you?
21         A.    What data was that?
22         Q.    The data that supported the bulletin
23    that you reviewed.  You said you reviewed the
24    data.  In what form was it?
25         A.    I reviewed the bulletin.  I didn't

Page 256

1  go back to review the original research data.  I
2  didn't understand you if that was what you were
3  saying.
4        Q.    Okay.  My question was if you had
5  reviewed the data, so I'll ask again.
6              Did you review the original research
7  data for that bulletin?
8              MR. BADALA:  Objection to form.
9  Outside the scope.
10       A.    No.  I reviewed the bulletin and the
11 methods that were spelled out in it.
12             MR. BADALA:  Do you have to take a
13 break or anything?
14             THE WITNESS:  Sure.  Okay.
15             MR. BADALA:  Why don't we take a
16 five-minute break.
17             THE VIDEOGRAPHER:  Off the record at
18 3:19 p.m.
19                  (Recess had.)
20             THE VIDEOGRAPHER:  Back on the
21 record at 3:26 p.m.
22 BY MR. BORANIAN:
23       Q.    So, Dr. Gilson, we've been
24 discussing the investigation of diversion and
25 overprescription and the use of the OARRS

Page 257

1    database.  Has the county made any other uses of

2    the OARRS database beyond what we've already

3    discussed?

4              MR. BADALA:  Objection to form.

5         Q.    Not just your office, the whole

6    county.

7         A.    We're obviously sharing our data at

8    these task forces, including the data that we've

9    gleaned from OARRS -- by "we" in this case, I'm

10   putting on my medical examiner hat -- and

11   impacts that could have on law enforcement,

12   prosecutions, things like that.  I can't

13   necessarily quantitate, but the collaborative

14   effort that we created I think with this data

15   and pointing it back towards opioid pain

16   relievers I think is kind of a ripple effect of

17   using the OARRS system.

18             Specifics in terms of using the

19   OARRS system, I'm aware some jurisdictions use

20   it to identify doctors to sign death

21   certificates.  We have not done that.

22        Q.    Do you know who the OARRS

23   registrants are within the county, people who

24   actually have an OARRS access set of

25   credentials?

Page 258

1       A.    Within the county itself?

2       Q.    Yes.

3       A.    As county representatives or just

4  the whole county?

5       Q.    As representatives of the county,

6  for example, the sheriff's office or protective

7  services or the medical examiner.

8       A.    I would know that the physicians at

9  the county hospital would all have OARRS access

10  because that was actually part of an initiative

11  in 2015, to have all of the medical

12  practitioners have access to OARRS, and then I

13  think the pharmacists are similar, that they

14  have to have access, so I would think pharmacy

15  personnel at our county hospital would have

16  that; jail, by extension, as we covered that,

17  would have access.  And we in the medical

18  examiner's office.  The sheriff, unless it's

19  through a law enforcement, which I'm not aware

20  of -- I don't know if they do or do not.  Other

21  law enforcement agencies I believe do, but

22  they're not county representatives.

23       Q.    Does the county sheriff ever

24  directly access the OARRS database?

25       A.    I do not know.  I don't know.  As I

Page 259

1   said, they have access.  They can have access

2   through law enforcement.

3        Q.    So other than your office, are you

4   aware of any other county office that makes

5   direct access to the OARRS database?

6        A.    Oh, I'm sorry if I wasn't clear.

7   The county hospital has to have that access with

8   its practitioners and its pharmacy.

9        Q.    Anyone else?  Any other agencies?

10       A.    Can I look at the org chart?  I

11  can't see anybody here I could say with

12  certainty has access.

13       Q.    Is there any database or central

14  file system for cases investigating drug

15  diversion?

16            MR. BADALA:  Objection to form.

17       A.    At the county level or --

18       Q.    Yes.

19       A.    Unless it's in the county

20  prosecutor's office, I'm not aware of one.  I

21  know they have a unit who would be investigating

22  cases for prosecution, but otherwise, most of

23  the investigation of diversion and things like

24  that I think would be at a state level.

25       Q.    Is there any central database or

Page 260

1   file system for county investigations of

2   overprescribing of medicine?

3          A.     Again, at our county hospital, with

4   the office of opioid affairs that was opened,

5   they review prescribing practices with opioid

6   pain relievers with the idea of addressing

7   apparent overprescribing with practitioners that

8   they identify.

9          Q.     When a physician is under

10  investigation for participating in illegal

11  diversion, does the county take steps to stop

12  the behavior during the investigation?

13         A.     Are we talking -- I'm a little

14  confused -- pill mill scenario or something like

15  that or --

16         Q.     Yeah, any doctor under

17  investigation, whether a county employee or

18  someone running a pill mill, someone running a

19  pain clinic.  If that doctor is under

20  investigation, does the county take any steps to

21  stop the illegal activity while the

22  investigation is going on?

23         A.     I mean, ultimately they would arrest

24  them, I guess, if they were founded in the

25  evidence collection period.  I guess until you

1  really know that it's a crime --

2       Q.    Short of arresting somebody, is

3  anything done to stop the behavior that is under

4  investigation?

5       A.    If I can go back to the county

6  hospital, the example with the office of opioid

7  affairs there, yes, they are liaisoned with --

8  through the medical staff and the practices are

9  described.  And I don't think it's an immediate

10 you're doing the wrong thing so much as they

11 require an explanation, and if that explanation

12 isn't satisfactory, then they're remediated to,

13 you know, prescribing practices, maybe

14 reacquaintance with CDC prescribing guidelines

15 from 2016 or something like that as a basis.

16      Q.    Now, Doctor, I'm also going to ask

17 you about topic number 27, which is "Knowledge

18 of and access to data concerning prescription

19 opioid manufacturing, prescribing, distribution,

20 or dispensing."  We've already gone through

21 ARCOS and OARRS and a few others.  I'm not going

22 to repeat that.

23           So here's my question, Doctor:  Are

24 there other databases that the county could use

25 to gain information about the manufacturing,

Page 262

1  prescribing, distribution or dispensing of

2  opioids?

3       A.    I just want to say, for clarity, we

4  do not have access to the ARCOS database, so we

5  could not access that.

6            And then OARRS is really the best

7  access that I know of we have for data

8  concerning at least dispensing and distribution.

9  Manufacture, we don't have any independent

10  access to that.  And prescribing obviously does

11  come through the OARRS database.

12       Q.    Do you have any access to any

13  databases from the Department of Health?

14       A.    We are in task forces with the

15  Department of Health, and if I understand,

16  county department of health or state department

17  of health, city department of health?

18       Q.    Well, I was referring to the state

19  department of health, so let's start with that.

20  Do they have any databases that you have access

21  to regarding the manufacture and distribution,

22  dispensing, et cetera, of opioids?

23       A.    I don't know where the Board of

24  Pharmacy sits, if that sits in the Department of

25  Health, but we maintain that relationship with

Page 263

1    Department of Health through our task forces.  I

2    don't have any databases I could steer you

3    towards about those topics.

4         Q.    I'm going to mark this as the next

5    exhibit, which is number 12.  And this is a

6    relatively long one, Doctor, but my question is

7    going to be specific.  This is a document that

8    appears to have -- we're at 13.

9                        -   -   -   -   -

10                   (Thereupon, Gilson Deposition

11                   Exhibit 13, Document Entitled "Ohio

12                   Department of Health, Ohio's

13                   Prescription Drug Overdose Epidemic:

14                   Epidemiology, Contributing Factors

15                   and Ongoing Prevention Efforts,"

16                   Beginning Bates Number

17                   CUYAH_001547662 - Marked

18                   Confidential, was marked for

19                   purposes of identification.)

20                        -   -   -   -   -

21                   MR. BORANIAN:  Can you mark that

22    number 13, Doctor, or Sal?

23                   Thanks.

24         Q.    This is a document that's Bates

25    label is 001547662.  It's dated April 17, 2014

Page 264

1   and it's authored purportedly by the Ohio

2   Department of Health.  It has a number of

3   statistics and bullet points in it.  On page 12,

4   for example, it has numbers for unintentional

5   drug overdoses.  On pages 30, 31 and 32 there's

6   some statistics purporting to identify how this

7   occurred.  The document is entitled "Ohio's

8   Prescription Drug Overdose Epidemic."

9              My question is, do you know where

10  these data came from?

11       A.    There's a lot of data in this.

12  Could you be a little more specific?

13       Q.    Well, let's start with the chart

14  that I identified, the one on page 12,

15  unintentional drug overdoses.  Do you know where

16  these data came from?

17              MR. BADALA:  Objection to form.

18  Outside the scope.

19       A.    They list their data sources at the

20  bottom of the page.

21       Q.    Okay.  And so does the county have

22  access to these same data sources?

23       A.    I don't know if we have access to

24  the Wonder data, or if that's pushed downward

25  towards state departments of health.  That's a

Page 265

1    CDC function and they tend to collaborate more

2    with state departments of health.  I don't think

3    there would have been any impediment to us

4    necessarily getting that from the Department of

5    Health, but it might not have come directly to

6    us.  The Office of Vital Statistics we

7    contribute towards.  And, again, that

8    information gets tabulated.  It takes a very

9    long time, though, for death certificate data to

10   get tabulated just because of an inherent lag

11   that can be sometimes up to two years behind

12   real time.

13        Q.    So the Office of Vital Statistics is

14   listed as a source on many of these slides.

15   Just to clarify, does the county have access --

16   I know you contribute to that database, but does

17   the county have access to that database?

18             MR. BADALA:  Objection to form.

19        A.    To search that database?

20        Q.    Yes.

21        A.    I don't know.  I certainly would see

22   no reason we couldn't query the Ohio Department

23   of Health for that.

24        Q.    Are you familiar with SAMHSA data,

25   S-A-M-H-S-A, data?

Page 266

1       A.      I had mentioned SAMHSA earlier, yes.

2       Q.      What is that data?

3       A.      That's the Substance Abuse and

4    Mental Health Services Administration.  That's a

5    federal entity that pretty much tracks what its

6    name says, substance abuse and mental health

7    services.

8       Q.      Does the county have access to that

9    data?

10              MR. BADALA:  Objection to form.

11      A.      Through their publications.  I don't

12   know -- again, I don't know if we have direct

13   access to their data or if we rely on their

14   publications and data that they might push down

15   toward the Department of Health.  A lot of times

16   the federal data comes down to the Department of

17   Health, not down to our county level.

18      Q.      Does the county have access to the

19   child and protective service database that the

20   state runs known as SACWIS, S-A-C-W-I-S?

21      A.      Which page are we on?

22      Q.      We're on data.

23      A.      Which topic?

24      Q.      Let me read it to you.  "Plaintiff's

25   knowledge of and access to data concerning

```
1    prescription opioid manufacturing, prescribing,
2    distribution, or dispensing."
3            A.    And we're talking about child and
4    family service data from the state?
5            Q.    Yes.
6            A.    I don't know if we have access to
7    that data.
8            Q.    Do you have access to any law
9    enforcement databases, such as the LERMs
10   database for the City of Cleveland?
11               MR. BADALA:  Objection to form.
12   Outside the scope.
13           A.    As a county, the sheriff has access
14   to law enforcement databases; as an entity, law
15   enforcement within the county.
16           Q.    You have access to the medical
17   examiner office's data, true?
18           A.    Yes, I would hope so.
19           Q.    Do you have access to data from
20   other jurisdictions, such as the federal
21   government, other than ARCOS, states, cities or
22   counties?
23               MR. BADALA:  Objection to form.
24   Outside the scope.
25           A.    Both informally and by participation
```

```
 1   in national efforts.  Informally I've certainly
 2   reached out to colleagues in different areas,
 3   Summit County being one; the New England states,
 4   where I spent a decent part of my career; New
 5   York City; participation in national
 6   organizations around prescription drug
 7   monitoring.  I've presented at two of those
 8   meetings in 2017 and 2018 as they were trying to
 9   kind of formulate policies, best policies.  I
10   kind of left both meetings with Mr. Garner, the
11   director of OARRS, thinking we had it probably
12   better than a lot of other states.
13               So I'm aware of efforts by other
14   states, if that's answering your question.
15       Q.    Is the county aware of any data
16   concerning the manufacturing, prescribing,
17   distribution or dispensing of opioids other than
18   what we've already discussed?
19       A.    To the best of my knowledge, I've
20   covered everything I think I can.
21       Q.    Okay.  Does the county have access
22   to any additional data that we haven't already
23   discussed?
24               MR. BADALA:  Objection to form.
25       A.    Let me just read the topic.
```

1            I mean, in participation in national

2    meetings and other things like that, I would

3    become aware of opioid prescribing and, you

4    know, mortality as it impacted other areas in

5    the country, and colleagues, as I said, from

6    previous jurisdictions where I've worked or just

7    know, and I've had discussions with them along

8    those lines.

9         Q.    Do some of the Defendants in this

10   lawsuit submit data to the ARCOS database?

11            MR. BADALA:  Objection to form.

12   Outside the scope.

13        A.    I believe that the distributors are

14   required to submit data to the ARCOS database

15   and to monitor potentially suspicious activity

16   with distribution.  That's my very cursory

17   knowledge of the ARCOS database.

18        Q.    Does any Defendant have access to

19   data, to ARCOS data, other than what it itself

20   submitted?

21            MR. BADALA:  Objection to form.

22   Outside the scope.

23        A.    I honestly don't know.

24        Q.    Do some of the Defendants in this

25   case submit data to ARCOS?

Page 270

1              MR. BADALA:  Objection to form.

2      Outside the scope.

3          A.    As I understand the ARCOS system,

4      and again, I wouldn't say I or the county would

5      be expert in that given that we have no access,

6      my understanding of how that database works

7      is --

8          Q.    I was asking about OARRS.  Did I say

9      ARCOS?

10         A.    You said ARCOS.

11         Q.    Strike that.

12             MR. BADALA:  I think you keep mixing

13     them up.

14             MR. BORANIAN:  No.  Just that one

15     time.

16         Q.    Do some of the Defendants in this

17     case submit data to OARRS?

18             MR. BADALA:  Same objection.

19         A.    I think the pharmacies that I see

20     listed as Defendants would be submitting data to

21     OARRS.  We previously talked about the

22     distributors, and I don't know to what extent

23     they're required to submit information to OARRS.

24     I just honestly don't know that.  I'd have to

25     check that.  But the pharmacies are the source

Page 271

1  of the information for a lot of the OARRS

2  database.

3       Q.    Does any Defendant in this case have

4  access to data other than what it submitted to

5  OARRS?

6            MR. BADALA:  Objection to form.

7  Outside the scope.

8       A.    I'm sorry.  That's a question that's

9  just broad.  Do they have access to what kind of

10 data.

11      Q.    So, for example, if my client is a

12 distributor.  It submits wholesale data to

13 OARRS.  Does my client have access to any data

14 in OARRS other than what itself submitted?

15           MR. BADALA:  Objection to form.

16      A.    I do not know what kind of access

17 the distributors have if they submit data to

18 OARRS.  I'd have to say that's something the

19 state would be better to answer than I.

20      Q.    Okay.  Fair enough.

21           To your knowledge, distributors like

22 my client don't have access to OARRS like you

23 do, true?

24           MR. BADALA:  Objection to form.

25      A.    We have a specialized medical

Page 272

1   examiner/coroner access, which no, you would not

2   have.  What we can pull out of OARRS with that

3   access, I don't know how that would relate, just

4   not knowing what sort of access the wholesalers

5   or the distributors would have to OARRS.

6        Q.    Do any of the Defendants in this

7   case have access to suspicious order reports

8   submitted by other entities?

9              MR. BADALA:  Objection to form.

10       A.    The suspicious order report, as I

11  understand it, is a DEA reporting about quantity

12  of drugs that were put into an area that seemed

13  excessive.  That's my understanding of it.  And

14  I don't know that any entity in the county has

15  access to those.

16       Q.    Do Defendants have access to

17  those --

18       A.    Oh, do the Defendants?

19       Q.    -- other than the ones that they

20  themselves submitted?

21       A.    I don't know the workings of that

22  system.

23       Q.    Do Defendants have access to any of

24  the other databases we've reviewed today?

25       A.    I don't know.

Page 273

1                MR. BADALA:  Objection to form.

2        A.    I honestly just don't know.

3        Q.    Doctor, topic 28 is "The policies

4    regarding the Ohio Board of Pharmacy's OARRS

5    database."

6                Doctor, what policies -- let's start

7    with written policies.  What written policies

8    does the county have relating to the OARRS

9    database?

10       A.    The OARRS is a state database.  I

11   don't know that we have any specific county

12   policies regarding it.  The county hospital, as

13   I mentioned, would have to have its

14   practitioners registered with OARRS, and to

15   check under specific circumstances for

16   prescribing pain medication, so any prescription

17   lasting over seven days, any continued pain

18   medication therapy that would extend beyond 90

19   days has to be revisited every 90 days.  And

20   that would apply, again, to the medical services

21   provided in the jail.

22       Q.    Those are state regulations, right?

23       A.    Right.  I mean, we have to comply at

24   the county level with the state legislations.

25       Q.    And OARRS is now mandatory, right?

Page 274

1          A.     OARRS checks, except in that setting

2      of like immediate post-therapy, the seven-day

3      window, is mandatory to be checked.  And

4      dentists do not get an exception for that.

5      That's only physicians.

6          Q.     And that became mandatory for

7      physicians in 2015?

8          A.     April 2015.

9          Q.     And for pharmacies in 2016, right?

10         A.     That's my best understanding of it.

11     I talked with the head of OARRS and he said some

12     of those things are vague, but that's a fair

13     estimate.

14         Q.     So it was nine to ten years before

15     it became mandatory?

16         A.     OARRS was started in 2006.  The

17     reporting by the pharmacies about the controlled

18     substances was mandatory.  The checks on it did

19     not go into place until 2015, I think we just

20     said, so about nine years.

21         Q.     And for pharmacies in 2016, right?

22         A.     Or the pharmacies.

23         Q.     Okay.  Could that have been done

24     sooner?

25         A.     I think that, you know, the

Page 275

1   legislation regarding the practice of medicine

2   is always a touchy topic.  And could it have

3   been done sooner?  I guess it could have.  I

4   wouldn't really know, you know, enough to say

5   how that could have been enacted.

6        Q.    Did the county do anything in those

7   intervening nine or ten years to make it

8   mandatory for physicians and pharmacies in the

9   county to report to OARRS --

10             MR. BADALA:  Objection to form.

11   Outside the scope.

12        Q.    -- or to check OARRS?

13        A.    The county did not.  Again, the

14   oversight of prescribing is a state function, so

15   it would not have really been something the

16   county I think would have addressed.

17        Q.    Are you aware of any policies or

18   practices that specifically address when a

19   county agency or employee can or should access

20   data through OARRS?

21        A.    I don't know the specifics regarding

22   the county hospital and their prescribers.  I

23   know they have to adhere to the state

24   guidelines, as we mentioned, and whether they

25   implemented any of those guidelines earlier than

Page 276

1    that -- I believe in the emergency department at

2    the MetroHealth Medical Center they did

3    implement the check on OARRS for any narcotic

4    prescription earlier than 2015.

5         Q.   How about in law enforcement?  Were

6    there any policies -- are there any policies or

7    procedures in the county law enforcement

8    agencies that address when those employees can

9    or should access data through OARRS?

10        A.   Again, most of our law enforcement

11   investigation of diversion, which OARRS would be

12   beneficial for, would be done at a local level.

13   So I don't know to what extent the sheriff has

14   done that or has access to it.

15        Q.   How about any other agency, whether

16   it's protective services or the county

17   department of health; do they have written

18   policies or procedures which specify when an

19   employee can or should access data through

20   OARRS?

21        A.   They wouldn't have access to OARRS

22   because they're not prescribers, law

23   enforcement, or, obviously, pharmacies.  So no,

24   I -- I would expect they do not because they

25   don't have access to it.

1      Q.    And how about the medical examiner's
2  office; do you have policies, written policies
3  which address when your employees can or should
4  access data through OARRS?
5      A.    I don't know if we have them in
6  writing, to be honest with you, but we have used
7  the OARRS database for different data mining in
8  regard to especially our linkage of the
9  heroin-addicted population back to the opioid
10 pain relievers, and the fentanyl-addicted
11 population back to the opioid pain relievers as
12 well.  But written policies, I would think that
13 if we had them, they should have been shared by
14 counsel, but I don't know that I can tell you
15 that for certain.
16     Q.    And we have already covered, haven't
17 we, the data mining that you've done with the
18 OARRS database?
19     A.    I feel like we have, but I'd
20 certainly be willing to help you answer any
21 questions you might want to ask.
22     Q.    Now, you first requested OARRS data
23 in 2013.  Are you aware of any effort to -- by
24 anyone in the county to use the OARRS database
25 for the purpose of detecting and stopping drug

Page 278

1    diversion before 2013?

2         A.    Using the OARRS database?

3         Q.    Yes.

4              MR. BADALA:  Objection to form.

5         A.    In the course of investigations that

6    the prosecutor would address, I would expect --

7    again, this is local law enforcement, but our

8    prosecutor will be ultimately prosecuting those

9    cases.  They would have accessed OARRS for that

10   purpose.

11             And when I spoke with James

12   Gutierrez, he was also, like me, saying that

13   OARRS was a great tool for them in prosecutions.

14        Q.    Did the county use OARRS for

15   prosecutions prior to 2013?

16        A.    Yes.

17        Q.    And when was the first time the

18   county used OARRS for prosecution?

19        A.    I'd have to defer to the

20   prosecutor's office on that.  I do not know the

21   date.

22        Q.    In the end, OARRS is a very useful

23   tool for both law enforcement and public health,

24   right?

25             MR. BADALA:  Objection to form.

1   Outside the scope.

2         A.    I find it very useful in my capacity

3   as a public health officer.

4         Q.    And it would be more difficult to

5   detect and address diversion, drug diversion, if

6   that didn't exist, right?

7               MR. BADALA:  Objection to form.

8   Outside the scope.

9         Q.    Strike that.

10              It would be more difficult to detect

11  and address drug diversion if you didn't have

12  access to those data, right?

13              MR. BADALA:  Objection to form.

14  Outside the scope.

15        A.    Detect or investigate, I don't -- I

16  certainly would say it might be -- it's a great

17  tool to facilitate investigation.  The detection

18  of it and getting started with it might be

19  painfully obvious in some situations.

20        Q.    And the investigation would be more

21  difficult without access to those data, right?

22              MR. BADALA:  Objection to form.

23  Outside the scope.

24        A.    Which topic -- are we still on

25  data -- I'm sorry -- or are we back to OARRS?

Page 280

1          Q.    We're talking about policies and

2     procedures that relate to the OARRS database,

3     but I'm following up on OARRS generally.  The

4     question is, would the investigation of drug

5     diversion be more difficult without the OARRS

6     database?

7                    MR. BADALA:  Objection to form.

8          Q.    Without access to the OARRS

9     database?

10                    MR. BADALA:  Outside the scope.

11          A.    I would say, you know, again, the

12     investigation of drug diversion is primarily

13     much more of a local law enforcement function.

14     Again, our sheriff could be participating in,

15     and certainly, as I said, our prosecutor was

16     able to say that the OARRS database was very

17     helpful in the prosecution of diversions, but

18     the identification of diversion, I would have to

19     say from a county standpoint that's probably

20     more something that local law enforcement is

21     doing.

22          Q.    Would the investigation of drug

23     diversion be more difficult without access to

24     the OARRS database?

25                    MR. BADALA:  Objection to form.

```
                                          Page 281
 1   Asked and answered.  Outside the scope.
 2         A.    I'd have to say it's a great tool to
 3   do investigations on prescribing, and if we've
 4   already mentioned those prescribing practices
 5   that result in diversion, yes, the OARRS
 6   database certainly would be helpful to identify
 7   them.
 8         Q.    You're not going to answer, are you,
 9   Doctor?
10               MR. BADALA:  Objection.
11         Q.    Could I ask you again?
12         A.    I didn't hear what you said, sir.
13         Q.    Forget it.
14               Okay, topic 30, "What efforts, if
15   any, Plaintiffs made to influence the DEA's
16   quota-setting process; and what actions, if any,
17   Plaintiffs took in response to the DEA setting
18   of quotas."
19               Doctor, is the county aware that the
20   DEA sets quotas with respect to Schedule 1 and 2
21   controlled substances?
22         A.    I wasn't aware Schedule 1 they set
23   quotas on.  Those are illegal drugs.
24         Q.    Is the county aware -- fine.  Is the
25   county aware that the DEA sets quotas with
```

1  respect to any controlled substances?

2       A.    The Schedule 2 drugs are the ones

3  that are potentially addictive.  Heroin is a

4  Schedule 1, as I understand, so there better not

5  be any quota setting by the DEA on that.

6       Q.    Is the county aware that the DEA

7  sets quotas with respect to controlled

8  substances?

9       A.    I think in a general way they are,

10 yes.

11      Q.    And when did it become aware of

12 that?

13      A.    I honestly don't know.

14      Q.    What is -- well, strike that.

15            Do you know what the aggregate

16 production quota is?

17      A.    No, I do not.

18            MR. BADALA:  Objection to form.

19      Q.    Does the county know how the

20 aggregate production quota is calculated?

21            MR. BADALA:  Objection to form.

22 Outside the scope.

23      A.    I don't know the answer to that.

24      Q.    Has the county ever made any

25 comments or objections to the aggregate

Page 283

1   production quota?

2          A.      None that I'm aware of.

3          Q.      Has the county ever provided any

4   input into that quota?

5          A.      Again, in my discussions with our

6   DEA liaison to the opiate task force, the

7   Attorney General's task force especially, that

8   input isn't sought from DEA and we don't

9   influence their quota-setting process.

10         Q.      And that same goes for the

11  manufacturing quota?

12         A.      If that's part of the DEA's

13  quota-setting process, we don't influence that.

14         Q.      And how about the procurement quota?

15         A.      I'm assuming you're telling me

16  genuine parts of that process, but we have no

17  influence on them.

18         Q.      No input at all, right?

19         A.      Pardon me?

20         Q.      No input into that at all, right?

21         A.      I would only say, you know, as we

22  share this data, that our office, as the medical

23  examiner's office, and then these other task

24  force pieces of data, are being shared, that's

25  obviously something that we're sharing with

                                        Page 284

1    federal partners.  To what extent that has any

2    influence, I have no idea, if it has any at all.

3         Q.    Has the county ever become aware of

4    any of the quotas in any year?

5         A.    No.

6         Q.    And the county has not reacted to

7    any of those quotas in any year?

8              MR. BADALA:  Objection.  Outside the

9    scope.

10        A.    Not knowing them, we could not react

11   to them.

12              MR. BORANIAN:  Let's take a break.

13              THE VIDEOGRAPHER:  Off the record at

14   3:59 p.m.

15                   (Recess had.)

16              THE VIDEOGRAPHER:  Back on the

17   record at 4:13 p.m.

18          EXAMINATION OF THOMAS GILSON, M.D.

19   BY MR. CARTER:

20        Q.    Good afternoon, Doctor.

21        A.    Hi, Mr. Carter.

22        Q.    Yes.  You just got my name.  I'm Ed

23   Carter.  I've got some questions for you this

24   afternoon, okay?

25        A.    Yeah.  Sure.

Page 285

1          Q.     With respect to the SAMHSA bulletin

2     that you mentioned, what was the date of that?

3                MR. BADALA:  Objection to form.

4          A.     It was, I believe, August 2013.

5          Q.     And SAMHSA, by its nature, was not

6     compiling Cuyahoga County-specific data, was it?

7     It was national data, right?

8          A.     Yes, that's correct.

9          Q.     You were also asked a question

10    earlier whether the county ever reported

11    diversion to the Defendants, and you mentioned a

12    request to CVS and pharmacies to provide

13    naloxone without a prescription.  Do you recall

14    that testimony?

15         A.     It came through a task force.  I

16    don't remember the exact wording I said, but as

17    we were trying to blanket the community with

18    naloxone, that was one of the interventions that

19    was recommended, yes.

20         Q.     And that's one of the interventions

21    that was requested from the task force to the

22    pharmacies, correct?

23         A.     That's my understanding of that,

24    yes.

25         Q.     And in response to that, the

Page 286

1    pharmacies did make naloxone available without
2    prescription, correct?
3         A.    Yes, they did.  Or at least I know
4    that certain ones did, but I know that in
5    general that was a very positive response.
6         Q.    Are you aware of any that refused
7    that request?
8         A.    I don't know that I know if anybody
9    did refuse or not.
10        Q.    I want to ask you about topic 18.
11              You were designated as a witness for
12   the county to testify on topic 18, correct?
13        A.    Yes, I am.
14        Q.    What did you do to prepare to
15   respond to questions about topic 18?
16        A.    I reviewed medical examiner data
17   with regard to overdose deaths as they related
18   to these medications and drugs listed here.  I
19   also reviewed the drug chemistry data, the
20   seized drug data in the forensic crime
21   laboratory.  And I think that's -- those are my
22   biggest pieces of that.
23        Q.    How far back did you review the ME
24   data?
25        A.    2006.

Page 287

1          Q.     And how far back did you review the

2     seized drug data?

3          A.     Through 2017.

4          Q.     So 2017 was as far back as you went?

5          A.     Yes.

6          Q.     Okay.  Anything else to prepare on

7     topic 18?  Did you talk to anyone specifically

8     about topic 18?

9          A.     I discussed things with Mr. Shannon

10    in my office, about trends and things, as we

11    recalled them, and our memories were pretty

12    similar on those things.

13         Q.     Anyone else?

14         A.     Specifically on these topics, I

15    don't remember, but I think that's everybody.

16         Q.     You agree --

17         A.     That's my preparation.  I should say

18    there's one person.  That's everybody.

19         Q.     Sure.

20                You agree many illegal drugs have

21    been abused in Cuyahoga County?

22                MR. BADALA:  Objection to form.

23         A.     Over the course of its history?

24         Q.     Over the course of the time period

25    relevant to this lawsuit.

```
                                          Page 288
 1              MR.  BADALA:  Objection to form.
 2              THE  COURT  REPORTER:  I'm sorry?  Did
 3     you say --
 4              THE  WITNESS:  Sure.  I said yes.
 5         Q.    Cocaine is one of those drugs that's
 6     been abused in the county, correct?
 7         A.    Yes.  In fact, in 2006 that was
 8     actually the highest cause of drug overdose
 9     mortality.
10         Q.    Methamphetamine has been abused in
11     the county?
12         A.    We issued an alert actually earlier
13     in 2018, about almost a year ago, to notice that
14     there was an upsurge in methamphetamine.  It's
15     not a drug we see terribly frequently in our
16     county, but -- there were months in 2018 where
17     we did, but it's really not a major player in
18     what gets seized, and certainly not in our death
19     data.
20         Q.    If it's not a major player, why did
21     the county release an alert?
22         A.    Oh.  Well, I think that was the
23     responsible thing to do when we saw a big uptick
24     in the number of seizures.  Methamphetamine is
25     not a drug that is without its problems.  It
```

1  certainly has issues in the southern part of

2  Ohio.  It's not just been a big factor in the

3  Cuyahoga County experience.

4      Q.  In the alert did it say anything

5  describing the extent to which meth was a

6  problem in the county?  Did it say

7  methamphetamine is not a real problem here but

8  we're issuing an alert?

9      A.  I don't remember the exact wording

10  of the alert, but I would certainly say,

11  Mr. Carter, it did not say it wasn't a problem.

12  Any of these drugs are problems, and the fact

13  that we were seeing more of it and issuing an

14  alert, it certainly wasn't the intention of the

15  medical examiner's officer or crime laboratory

16  to downplay that.  We were issuing the alert

17  because we were concerned.

18      Q.  Is marijuana an illegal drug that's

19  been abused in the county?

20      MR. BADALA:  Objection to form.

21      A.  Well, it's a legal substance now in

22  Ohio.  I think the details are being worked out

23  now about distribution.  But for the time frame

24  that we're talking about, most of that time it

25  was an illegal drug.

Page 290

1        Q.    And during that time period when it

2    was classified as an illegal drug was it abused

3    in the county?

4              MR. BADALA:  Objection to form.

5        A.    Yes.

6        Q.    What about synthetic marijuana; was

7    that abused in the county?

8              MR. BADALA:  Objection to form.

9        A.    You know, I saw this question, and I

10   would define synthetic marijuana as having a lot

11   of overlap with spice and bath salts, and that's

12   how I would answer your question, which is that

13   we did have spice, bath salts, synthetic

14   marijuana.  How you described them as a problem,

15   probably for about a year.  And we were seizing

16   lots of them.  They were scheduled in Ohio, and

17   I want to say this is about 2013, and largely

18   vanished after that scheduling.  We saw very few

19   of them being submitted to the laboratory.

20   Those numbers dropped off dramatically.

21              And in terms of mortality from the

22   synthetic cannabinoids, very, very rare.  We did

23   research in the office and presented that on

24   MDPV, which I would have to look up what those

25   letters stand for.  I think it's methyl -- I'd

Page 291

1   have to look them up, but we didn't see a lot of
2   mortality associated with them.  And in my
3   discussions with Dr. Papp, who's an emergency
4   room physician, they weren't also something that
5   was really dominating the picture in the
6   emergency rooms either.  Opioids are, far and
7   away, dominating this picture in terms of what's
8   being seized and certainly what's being, you
9   know, a source of mortality.
10        Q.    So lumping those together, synthetic
11   marijuana, spice, bath salts, those substances
12   were abused in the county with a focus around
13   2013, correct?
14        A.    That's my best recollection.
15        Q.    What about amphetamines; have
16   amphetamines been abused in Cuyahoga County?
17        A.    I think, you know, most of that is
18   referable back to methamphetamine, and when
19   methamphetamine is broken down in the body, it
20   goes to amphetamine.  So a lot of our toxicology
21   positive testing on that -- for example, in
22   2016, we had 15 overdose deaths with
23   methamphetamine -- 16 overdoses with
24   methamphetamine detected, 15 with amphetamine
25   detected, so it's a little bit harder to tease

Page 292

1   out what is just amphetamine versus

2   methamphetamine because of the relationship they

3   have in the breakdown in the body.

4       Q.    As a result of that chemical

5   relationship, is it possible that the

6   methamphetamine overdose deaths are

7   underreported?

8       A.    Meaning, I guess, if I understand

9   you correctly, could we have something reported

10  as an amphetamine death and that actually being

11  methamphetamine --

12      Q.    Correct.

13      A.    -- and it would have been

14  misidentified?  I suppose that's certainly a

15  possibility.  I would add, too, parenthetically,

16  in 2017 most of our methamphetamine deaths were

17  in association with fentanyl and it was about 24

18  deaths, so the numbers aren't large, and it's

19  sort of one of those things I think that

20  fentanyl has a general trend in our county of

21  pulling up a lot of other drugs.  So

22  methamphetamine, cocaine, heroin all got pulled

23  up in 2016 when fentanyl really took off.  And

24  in analyzing that data, especially with cocaine

25  and heroin, the change wasn't due to increases

```
 1    in isolated cocaine and heroin mortality.  It
 2    was due to mixtures.  Methamphetamine, being as
 3    small as it is, we didn't do that analysis.
 4         Q.    And the fentanyl that you referenced
 5    pulling things up, that's illicit manufactured
 6    fentanyl that you described earlier, correct?
 7         A.    That's -- that's our best
 8    understanding of that, yes.
 9         Q.    What about benzodiazepines; have
10    they been abused in Cuyahoga County?
11         A.    Yes, they have.
12         Q.    K2, has that been abused in the
13    county?
14         A.    K2 is another one of the synthetic
15    cannabinoids, so I would sort of lump it under
16    the answer that I gave there.
17         Q.    You would answer it the same way
18    that you did with respect to spice, bath salts?
19         A.    Right, and the synthetic
20    cannabinoids, that sort of cluster, the
21    cathinones and other things.  That was a trend
22    that we saw for a period of time, and mostly it
23    came under that heading of bath salts, but these
24    were other names for that.
25         Q.    What about hallucinogens?  Has
```

Page 294

1   ectasy and has LSD -- have those been abused in

2   the county?

3          A.    We don't see a lot of LSD in the

4   county, at least in the mortality data or

5   particularly in the seizure data.  I would

6   hesitate to say, especially over this time

7   frame, that that number is zero, but again I

8   would emphasize it's a very small participant.

9   And in and of itself, LSD is not a fatal

10  substance in overdose.  It probably would prompt

11  more visits to the emergency department, and,

12  again, based on my discussions with an emergency

13  room physician at one of our three healthcare

14  systems, it's not the player that the opioids

15  are.

16         Q.    And with respect to drug abuse, the

17  county recognizes drug abuse that does not

18  result in an overdose death, correct?

19              MR. BADALA:  Objection to form.

20         Q.    So, for example, with LSD, you can

21  have people abusing the drug whether or not they

22  overdose and die on it, correct?

23         A.    Right.  We don't have, for example,

24  a lot of deaths from marijuana.  In fact, we

25  don't have any deaths from marijuana by itself.

1  The benzodiazepines by themselves very
2  infrequently to vanishingly rare cause death by
3  themselves.  Alcohol.  Opioids, yes, they're
4  very much present there, but by themselves, not
5  a particularly toxic compound.
6      Q.    What about PCP?  Has that been
7  abused in the county?
8      A.    We have a certain number of seizures
9  with PCP every month.  It's probably similar to
10 oxycodone seizures, maybe about 10 to 25 a
11 month.
12     Q.    Is PCP a major player?
13           MR. BADALA:  Objection to form.
14     A.    I wouldn't consider it anywhere near
15 the scope of fentanyl and heroin, and I would
16 not, if I was handicapping the race, say in any
17 way that it's a major player.  I wouldn't list
18 any of these except for the cocaine as a major
19 player.
20     Q.    And every one of these drugs that we
21 just went through that are listed here in topic
22 18, cocaine, methamphetamine, marijuana, the
23 synthetics, amphetamines, benzodiazepine,
24 ectasy, LSD and PCP, every one of those has
25 caused addictions in the county, correct?

Page 296

1              MR. BADALA:  Objection to form.

2      Outside the scope.

3          A.    You know, I don't want to voice an

4      opinion as to what constitutes addiction for

5      some of these substances because I don't know

6      and I don't think it's very clearly defined.

7      There are addictions to cocaine and

8      methamphetamine.  Are there addictions to the

9      synthetic cannabinoids?  I don't know how

10     clearly defined that is.  Are there addictions

11     to LSD versus abuse of it?  That, I don't know.

12     I don't think it's clear and I don't think the

13     county would say all of these can be potentially

14     addictive substances.

15         Q.    So to put a fine point on it,

16     sitting here today, does the county consider

17     each of those substances to be an addictive

18     substance?

19             MR. BADALA:  Objection to form.

20     Outside the scope.

21         A.    The --

22         Q.    Hold on one second so I can cure the

23     objection if it's valid.

24             MR. CARTER:  How is that outside the

25     scope of the use and abuse of controlled or

Page 297

1    regulated substances?

2              MR. BADALA:  It just asked about

3    Plaintiff's knowledge and the actions taken.

4    You're taking it much further than that.  You're

5    asking if it constitutes addiction.  I don't see

6    the word "addiction."

7              MR. CARTER:  So are you stipulating

8    for this case that abuse is not related to

9    addiction?

10             MR. BADALA:  I'm reading the topics

11   that you wrote clearly, but you're reading

12   something completely different it seems like.

13             MR. CARTER:  If the position is

14   abuse does not equal addiction, then that will

15   streamline my questions.  Are you saying abuse

16   is not addiction?

17             MR. BADALA:  You wrote the topics.

18   I'm reading exactly how you wrote it.

19             MR. CARTER:  So I'll reask my

20   question the same way then because I'm not

21   worried about the objection.

22        Q.   Does the county consider each of

23   those drugs on the list to be an addictive drug?

24             MR. BADALA:  Same objections.

25   Outside the scope.

Page 298

1          A.     No, because abuse does not equal

2     addiction.

3          Q.     Has the county seen reports of

4     minors using and abusing every one of these

5     substances on the list?

6          A.     I don't know that I could drill that

7     specifically into the data; that I know a lot of

8     the charges around these would, again, be things

9     that would be investigated by local law

10    enforcement, and that data wouldn't be furnished

11    necessarily to the county.

12         Q.     From the county's perspective, is

13    drug abuse by minors a significant issue that

14    they're concerned in addressing and preventing?

15             MR. BADALA:  Objection to form.

16         A.     Of course.  I mean, nobody wants to

17    see kids suffer.  They don't like to see anybody

18    suffer from drug use and abuse, but if you were

19    asking me, you know, are there specific

20    initiatives, I believe there are.  We certainly

21    have tried with the opioid crisis to establish a

22    presence in our school systems to do education

23    on that.  I know we're not talking about the

24    opioids here, but -- no.  I'd have to say it's

25    such an obvious question.  Any abuse by a child

1  would be a source of concern to the county.

2       Q.    And given the county's concern about

3  children abusing drugs, do you understand the

4  rates or prevalence of children abusing the

5  drugs in this list?

6       A.    There's data that's collected from

7  federal groups, like the behavioral risk factor

8  surveys, that our County Board of Health would

9  be more familiar with than I.  To the extent

10 that goes down to the county level, I would have

11 to defer to them on that.  That's a somewhat

12 separate entity from us as the county.

13      Q.    Of the drugs on this list, which one

14 of them is most frequently abused by minors

15 under 18?

16      A.    I don't think the county could give

17 you an answer on that.

18      Q.    Has the use and abuse of the

19 substances identified in topic 18 -- has every

20 one of those caused the county to incur costs?

21           MR. BADALA:  Objection to form.

22 Outside the scope.

23      A.    To the extent, obviously, that we

24 have, you know, treatment programs for

25 individuals abusing drugs, the county certainly

Page 300

1    would be incurring costs.  We have an alcohol,

2    drug addiction and mental health services agency

3    in the county.  It's separate from -- it's

4    legally separate from county government, but

5    they certainly are a group we collaborate with

6    on the task force and are incurring costs around

7    this.

8              The other thing I would say is, you

9    know, to the extent that these are people who

10   wind up in our county hospital, they would also

11   be incurring costs.  Maybe they're reimbursed,

12   maybe they're not, but I would say they

13   certainly would probably cost the county money.

14   There hasn't been, I think, a dramatic

15   escalation in any of these that I am aware of

16   over the time frame, but at a baseline they

17   certainly cost the county money.

18        Q.    When you say there hasn't been a

19   dramatic escalation, what was the baseline cost

20   that the county incurred related to the use and

21   abuse of the substances in topic 18 in 2015?

22              MR. BADALA:  Objection to form.

23   Outside the scope.

24        A.    I don't have an answer to that

25   question.  I did not come across that number in

Page 301

1    my research on cost to the county on that.  As I
2    said, some of the costs that I mentioned are
3    outside of the county, and that the ADAMHS --
4    that's our alcohol, drug addiction and mental
5    health services -- is a separate entity and
6    their budget is separate from the county.
7            Q.    Is there any year from 1995 through
8    to 2018 for which you could quantify the costs
9    related to the use and abuse of the topic 18
10   substances?
11           MR. BADALA:  Objection to form.
12   Outside the scope.
13           A.    No.
14           Q.    Given that inability, do you stand
15   by your testimony that those costs have not
16   escalated over time?
17           A.    No.  I didn't say the costs didn't
18   escalate.  I'm sorry if I wasn't clear.  The
19   mortality that we see with these drugs
20   especially, and the emergency room visits that
21   we see with these drugs, are not significantly
22   changed over time.  I will make an exception
23   about cocaine and heroin, but in general, those
24   numbers haven't changed.  So the treatments that
25   are in place for them were not, to the best of

Page 302

1   my knowledge, changing, because there wasn't an

2   increase in the problems these were causing with

3   the opioid epidemic.  Some of these things

4   certainly would have the effect of the opioids

5   pushing a lot of things that were less prevalent

6   out.

7             So, for example, in our drug court,

8   which started in 2007, at the time it

9   started, per the presiding judge there, most of

10  the cases they were hearing at that time were

11  cocaine related, and over time they've evolved

12  to almost exclusively opioids, to the point that

13  the county had to incur the cost of setting up a

14  separate docket for drug court.

15            We had cases in place where there

16  was a START program, which is a program that

17  brings children and parents of addicted children

18  in contact with people in recovery, and that

19  was, again, primarily driven by cocaine, but as

20  the opioid crisis has worsened, the focus has

21  come again towards opioids.  We don't ignore the

22  cocaine population, but there's only so much the

23  county has money to do and we have to treat as

24  many of these folks as we can.

25            MR. CARTER:  I'll move to strike

Page 303

1    everything after the portion of the response

2    where it said, "in general those numbers haven't

3    changed"?

4              MR. BADALA:  Just note my objection.

5              MR. CARTER:  You object to my motion

6    to strike; is that what you're saying?

7              MR. BADALA:  Yes.

8              MR. CARTER:  Okay.

9         Q.   Do any of the Defendants in this

10   case -- have they ever made, sold, marketed or

11   distributed any of the drugs identified in topic

12   18?

13             MR. BADALA:  Objection to form.

14   Outside the scope.

15        A.   Many of these drugs are illegal, so

16   I wouldn't consider them controlled substances.

17   Cocaine and amphetamine and benzodiazepines are

18   legal Schedule 2 -- I think cocaine --

19   medications.  I do not know whether these are

20   manufactured or distributed by the Defendants.

21        Q.   Does the cocaine -- excuse me.

22   Strike that.  Does the county link the use and

23   abuse of the drugs in topic 18 to any specific

24   Defendant?

25             MR. BADALA:  Objection to form.

Page 304

1    Outside the scope.

2         A.    I don't think so.

3         Q.    Does Cuyahoga County have a cocaine

4    epidemic?

5         A.    No.  I mean, if I can qualify that

6    and explain.  If you look at our mortality data,

7    which somebody was kind enough to give me -- on

8    the chart this would be Exhibit 11.  Cocaine is

9    shown here from 2006 to 2014, and the mortality

10   hasn't changed dramatically over that period of

11   time.  I can tell you that in 2015 that was also

12   true, and in 2016, when we looked at that data,

13   cocaine deaths nearly doubled in the county,

14   from about 100 to over 200.  But when we

15   filtered out the impact of mixtures on the

16   cocaine data, what we saw was that, in fact,

17   cocaine had actually remained flat in isolation;

18   in other words, cocaine without fentanyl hadn't

19   really changed, but the fentanyl had pulled that

20   curve up.  That was also similar for heroin.

21        Q.    Is it possible that Cuyahoga County

22   residents intended to abuse cocaine and,

23   instead, ended up getting a mixture of cocaine

24   laced with illicit fentanyl?

25        A.    I think that's a true statement.

Page 305

1          Q.    The same with respect to meth; are

2     there examples where people may have intended to

3     use meth but instead got meth that was laced

4     with other substances, such as illicit fentanyl?

5          A.    I can only say these are

6     possibilities.  I can't get inside the mind of

7     what people were intending to abuse with regard

8     to your question about cocaine.  Traditionally,

9     that was a drug that we saw much more prevalent

10    in the African-American community and did not

11    see a lot of fentanyl or heroin or opioid pain

12    overdoses in the community.  With that rise that

13    I described, though, in 2016, we started to see

14    a rise -- actually, it went back to 2015 -- in

15    African-American fentanyl mortality, and it was

16    our concern at that time that the mixture was

17    pulling up that group.

18               On the other hand, the percentage of

19    African-American cocaine deaths relative to

20    other races declined because the mixture of

21    cocaine in the fentanyl distribution was also

22    showing up in the people intending to purchase

23    fentanyl.

24               So I can't be specific, especially

25    with a small subset like methamphetamine, what

Page 306

1   they were intending to purchase and what they

2   got.

3          Q.    How does the county define an

4   epidemic?

5               MR. BADALA:  Objection to form.

6   Outside the scope.

7          A.    With the standard definition, which

8   is an elevated prevalence of a disease beyond

9   its baseline in a community.

10         Q.    So when you were talking about

11  cocaine and the doubling of deaths between, I

12  think it was -- you said it was 2015 and 2016?

13         A.    Right.  Yes.

14         Q.    So do you consider that doubling a

15  cocaine epidemic?

16              MR. BADALA:  Objection to form.

17  Outside the scope.

18         A.    No, for the reason that I am -- that

19  I mentioned, which is that when you factor out

20  the opioid contribution to that elevation, it's

21  not at an increased incidence over baseline.

22         Q.    Would you consider the number of

23  deaths in 2016 where cocaine was adjudicated and

24  certified as the cause of death, is that a

25  crisis for Cuyahoga County?

Page 307

1              MR. BADALA:  Objection to form.

2    Outside the scope.

3         A.    I mean, we were in the midst of an

4    opioid crisis before that.  Certainly there was

5    an acute worsening in 2016 that was driven by --

6    primarily by fentanyl.  That's the position of

7    the county.  The fact that cocaine was pulled

8    back up with that, heroin was pulled back up

9    with that doesn't negate the contribution of

10   fentanyl to that part of the crisis.

11        Q.    So I'm trying to understand, with

12   respect to cocaine specifically, does the county

13   consider itself to be in the middle of a cocaine

14   crisis?

15             MR. BADALA:  Objection to form.

16   Outside the scope.

17        A.    We're in the middle of a drug

18   crisis.  I mean, is cocaine up from where it

19   was, yes, and I think the strategy is all of the

20   above with the drugs.  But if you're asking me

21   is the elevation in cocaine significant relative

22   to the elevation of the opioids, I would say

23   that it's less, because what our data shows in

24   the mortality data is that the elevation in the

25   cocaine is, unfortunately, being pulled up by

1    fentanyl.

2         Q.    So before the cocaine doubled

3    between '15 and '16, that previous baseline

4    level of cocaine abuse and death, do you

5    consider -- does the county consider the 2014

6    level of cocaine abuse and use to be a crisis in

7    and of itself?

8              MR. BADALA:  Objection to form.

9    Outside the scope.

10        A.    It's an area of concern.  If you're

11   asking me is it a crisis because it's acutely

12   worsened, the answer to that is no.

13        Q.    So my question is if -- well, how

14   many deaths were there in 2014 caused by

15   cocaine?

16        A.    I can check.  124.

17        Q.    Does Cuyahoga County consider 124

18   deaths to be a crisis?

19             MR. BADALA:  Objection to form.

20        A.    I'm sorry.  You know, we're not

21   turning our back on these folks.  All of these

22   things are sad, that these people are dying, and

23   I think, you know, the overshadowing of this

24   crisis by heroin, fentanyl is just more tragic,

25   but if you're asking me are these folks any less

Page 309

1    valuable or something, like no.  That's not a

2    position.  The county is concerned about all of

3    our citizens, and these 124 folks who died of a

4    cocaine overdose are just as much, you know,

5    missed by their people as the hundreds who died

6    of a fentanyl or heroin overdose.

7         Q.    So from the county's perspective,

8    the 124 deaths in 2014, the county would

9    consider those to be a crisis for cocaine?

10              MR. BADALA:  Objection to form.

11   Outside the scope.

12        A.    I mean, as you use the term

13   "crisis," I think of that in terms of the

14   epidemic, and that is not part of the epidemic,

15   but it's a source of great concern.  We don't

16   like to see our citizens die of any drug

17   overdose, but -- maybe we're parsing over words,

18   but, you know, the crisis is really the opioids,

19   it's not the cocaine here, but that doesn't mean

20   that it's not a source of tremendous concern.

21        Q.    What did Cuyahoga County do in 2014

22   or the years that followed to address the use

23   and abuse of cocaine that resulted in 124 deaths

24   in 2014?

25        A.    The county would have continued its

Page 310

1   drug treatment services.  The county would have

2   made available things like the START program to

3   those parents.  It wasn't like we exclusively,

4   you know, excluded them.  So we would connect

5   those parents with cocaine issues, with, you

6   know, a mentor in recovery.  The county would

7   have responded to separate families where there

8   potentially was an issue that wasn't resolvable

9   with cocaine.  I think the county, you know,

10  continued its treatment efforts.  Drug court

11  didn't shut cocaine people out.  It's just that

12  the docket became much more tilted towards

13  opioids.

14          Q.    Is that everything you can identify

15  sitting here today the county did in response to

16  the cocaine use and abuse in 2014?

17          A.    If I can look at our organizational

18  chart again.

19                During that time period, around

20  2013, 2014, the sheriff's office instituted

21  strike forces.  They were supposed to supplement

22  local law enforcement so that they could address

23  any multitude of issues.  So it could have been

24  in part, you know, drug trafficking.  Re-entry

25  programs obviously were making efforts to

1   reintegrate cocaine addicts.  Workforce

2   development.  Prosecutions of drug dealers by

3   our county prosecutor.  The creation of drug

4   court for the treatment of drug addicts in lieu

5   of incarceration, provision of mental and

6   medical health services in the county jail.

7          Q.   Does the county --

8          A.   There's a lot of things --

9          Q.   I'm sorry.

10         A.   I'm sorry.  I just wanted to sort of

11  close it.

12              This problem touches so many levels

13  of our community, and I think, you know,

14  interventions for some of these things are not

15  necessarily just we shut the door on everything

16  except the opioids.  We're trying to deal with

17  all of them, and I don't want to say that I

18  could be exhaustive.  I think as I run through

19  our org chart, there's a lot of things I can see

20  there.

21         Q.   From the county's perspective, is

22  the use and abuse of methamphetamine at crisis

23  level?

24              MR. BADALA:  Objection to form.

25  Outside the scope.

Page 312

1          A.     Again, you know, with what I've said

2     about crisis, I would say no, it hasn't really

3     escalated to the comparabilities of like being

4     similar to heroin or, especially now, fentanyl.

5          Q.     Has the county done everything in

6     its power to combat the abuse of the illegal

7     drugs identified in topic 18?

8          A.     I think the county has made

9     significant investments to do that.  I think if

10    you ask me are there more things we wish we

11    could do, we do.  But there's -- you know, as

12    much as we can do, I really feel, especially our

13    models of collaboration, cooperation -- they're

14    national models now, and I do feel that this has

15    really been a very exemplary response to this

16    crisis, both this one and the opioid crisis

17    especially.

18         Q.     You talked earlier in the day about

19    Mexican cartels and China with respect to

20    illicit fentanyl.  Do you recall that topic

21    generally?

22         A.     I remember mentioning China, and I

23    think the person who was asking me at the time

24    mentioned Mexico, and that's part of the story I

25    think as well.

1      Q.    Do you agree that the importation of

2   heroin and illicit fentanyl from other countries

3   into the county could be considered an act of

4   terrorism?

5               MR. BADALA:  Objection to form.

6   Outside the scope.

7               Which topic are we on?

8               MR. CARTER:  We're on 34.

9               MR. BADALA:  If you could just

10  indicate that.

11      A.    I think I made that statement.

12      Q.    You've made that statement.  I'm

13  asking does the county agree with it.

14      A.    I wouldn't want to necessarily put

15  that as the county's position.  It's a personal

16  opinion.  I don't know that I have independent

17  confirmation to say that.

18      Q.    Okay.  In terms of the drivers of

19  the rapid increase in mortality in the county

20  from 2010 through to today, do you agree that

21  it's been heroin, illicit fentanyl, fentanyl

22  analogs and cocaine since 2010?

23               MR. BADALA:  Objection to form.

24      A.    Sure.  I mean, I think that, you

25  know, you can look at this page from Exhibit 13,

1   which goes up to 2012.  Here's our crack

2   cocaine.  There's our prescription opioids.

3   Here's the heroin phase.  And if you want to go

4   back to our own charts and graphs, the fentanyl

5   phase was even worse than the heroin escalation.

6   The analogs of fentanyl that we saw,

7   carfentanil, the elephant tranquilizer, those

8   other drugs, all caused significant rises in

9   mortality, and like the opioid pain relievers,

10  heroin, fentanyl, they are illicit opioids that

11  act on the same mechanism in the brain that the

12  opioid pain relievers do.

13      Q.    So I think we're on the same page,

14  but just to be clear then, from 2010 through to

15  today the primary drivers of the increase in

16  mortality in the county have been heroin,

17  illicit fentanyl, fentanyl analogs and cocaine,

18  true?

19      A.    Again, I'd have to put the caveat

20  with cocaine that, by itself, it hasn't

21  dramatically changed, and that the changes that

22  we see in cocaine can be reasonably attributed

23  to fentanyl, as can the changes after 2016 with

24  heroin, but heroin, in the time frame you

25  mentioned, is a significant game changer from

Page 315

1   2012, 2011 onward.

2        Q.    I want to follow up on some

3   questions on topic 19.  You talked about the

4   criteria.  I'm not going to go through all that

5   again, but I want to focus on the criteria, the

6   third one you identified, people that have been

7   diagnosed with an opioid use disorder, okay?

8             How does the county define an opioid

9   use disorder?

10       A.    The county identified that in

11  consultation with experts beyond what I'm

12  prepared to talk about today.

13       Q.    So sitting here today, can you give

14  me a scientific or a layperson definition that

15  the county used to define opioid use disorder or

16  did you defer to the experts on that?

17       A.    I believe we deferred to the experts

18  on that.

19       Q.    Related, does the county have an

20  official working definition of addiction that it

21  used to identify individuals in response to

22  Exhibit A and Exhibit B that are part of

23  Deposition Exhibit 2?

24       A.    I'm not aware of a working

25  definition the county has for addiction.

Page 316

1      Q.    Do you agree that a diagnosis of

2  addiction is a medical task?

3            MR. BADALA:  Objection to form.

4      A.    I mean, the addiction has a

5  definition in medicine.

6      Q.    And there are physicians who provide

7  medical diagnoses of addiction, correct?

8            MR. BADALA:  Objection to form.

9  Outside the scope.

10     A.    I don't know if I would say

11 addiction versus substance use or abuse

12 disorder.  It's an area of medicine, the

13 terminology of which I am not familiar and I

14 would not think the county would have an opinion

15 on.

16     Q.    Do you know whether there are ICD-10

17 codes to define a substance use disorder?

18           MR. BADALA:  Objection to form.

19 Outside the scope.

20     A.    ICD-10?

21     Q.    Yes.

22     A.    I don't think the county knows that.

23 I don't know it myself.

24     Q.    Do you know what ICD codes refer to

25 generally?

                                           Page 317

1          A.     Sure.   Sure do.   I do I should say.

2    The county may not, but the International

3    Classification of Diseases.   As their agent, I

4    would be able to inform them of that.

5          Q.     Do you agree that, from a medical

6    perspective, it's inappropriate to assume a use

7    disorder or an addiction, however you want to

8    use that term -- you would need to look at an

9    individual case, an individual resident story to

10   arrive at a conclusion of a use disorder or

11   addiction, right?

12              MR. BADALA:   Objection to form.

13   Outside the scope.

14         A.     Yeah.   That's a medical diagnosis

15   again and I don't think the county would express

16   anything about the appropriateness of

17   misclassifying that.

18         Q.     So the county has never -- well, the

19   county has never used its medical examiner data

20   or any other data set that it creates and

21   assigned classification of a use disorder or an

22   addiction based on looking at that data set,

23   correct?   That's nothing the county has ever

24   done before?

25              MR. BADALA:   Objection to form.

Page 318

1        A.      The medical examiner data would not
2    arrive at those diagnoses.  The alcohol, drug
3    addiction and mental health services of the
4    county would arrive at diagnoses like that.  The
5    hospital could arrive at diagnoses like that.
6    Does the county itself, you know, oversee that
7    diagnosis?  No.
8        Q.      You agree that all use -- substance
9    use disorders can be treated, correct?
10               MR. BADALA:  Objection to form.
11   Outside the scope.
12       A.      That's a question outside my area of
13   expertise.
14       Q.      So you do not know whether the
15   county is able to treat substance use disorders
16   for any substance they might classify?
17               MR. BADALA:  Objection to form.
18   Outside the scope.
19       A.      As I understood your question, all
20   substance use disorders being treatable, I don't
21   know that that's something that I could say the
22   county has an opinion on.
23       Q.      What about, does the county agree
24   that, with appropriate support, all addicted
25   individuals can make a recovery?

                                              Page 319

1            MR. BADALA:  Objection to form.

2     Outside the scope.

3        A.    I think the county would like to

4     give all those addicted individuals that

5     opportunity.  Whether or not they can recover

6     would be beyond really the scope of the county's

7     ability to predict that.

8        Q.    Do you agree that there are a number

9     of people who take prescription opioids and do

10    not develop an opioid use disorder?

11           MR. BADALA:  Objection to form.

12    Outside the scope.

13       A.    Again, without having a definition

14    of an opioid use disorder, I could only say that

15    the long-term use of opioids would be expected

16    over time to create dependence on them and

17    physical withdrawal symptoms when they were

18    removed.  Whether that moves into addiction or

19    not, I couldn't really say.

20       Q.    Do you agree there are a number of

21    people who take prescription opioids and never

22    go on to break the law?

23           MR. BADALA:  Objection to form.

24    Outside the scope.

25       A.    I would sure hope so.

1          Q.     Are there people who have an opioid

2    use disorder from prescription opioids who do

3    not go on to use illegal narcotics?

4               MR. BADALA:  Objection to form.

5    Outside the scope.

6               Which topic are we on?

7               MR. CARTER:  Topic 19, "The criteria

8    used to identify individuals who overdosed on,

9    or became addicted to, prescription opioids."

10              MR. BADALA:  Objection to form.

11   Outside the scope.

12         A.     Now you guys made me lose the

13   question.

14         Q.     Sure.

15              The question was, are there people

16   who have an opioid use disorder from

17   prescription opioids who nonetheless do not go

18   on to use illegal narcotics?

19              MR. BADALA:  Same objections.

20         A.     I think national data would support

21   that and probably local data, that there were

22   people prescribed who did not go on to become

23   addicted.

24         Q.     With respect to topic 19, has the

25   county itself vetted or confirmed any individual

Page 321

1   diagnosis of an opioid use disorder?

2        A.    That information was submitted to

3   the experts for their interpretation.  The

4   county did not independently vet those experts.

5   They were referred to our attorneys and they

6   consulted with the experts.

7        Q.    In connection with compiling the

8   individuals identified on Exhibit A, did the

9   county conduct any interviews of those

10  individuals?

11       A.    We identified claims data with the

12  criteria that I've mentioned, and that was

13  submitted through to our attorneys, and then

14  they conferred with experts and responded to the

15  interrogatories.  To my knowledge, the county

16  did not conduct independent interviews after

17  that referral.

18       Q.    After that information was referred

19  to the attorneys and the experts, do you know if

20  the attorneys or the experts interviewed the

21  individuals listed on Exhibit 2, sub-Exhibit A?

22  It's the oversized printout.

23       A.    It's the big one, right?

24       Q.    Yes.

25             MR. BADALA:  And I would just

1  instruct you, if you learned about any

2  conversations through the attorney, not to

3  disclose those.

4        Q.    So it's the oversized one?

5        A.    The big kahuna.

6        Q.    So I'll ask a simpler question.

7              Sitting here today as the

8  representative of the county, do you know

9  whether anyone whose name appears on Exhibit A

10 has been interviewed in connection with their

11 identification on that chart?

12       A.    Again, that would have been referred

13 to the attorneys in consultation with experts on

14 behalf of the county.  To the best of my

15 knowledge, there was no follow-up interviews

16 conducted to the experts' opinions.

17       Q.    To the extent the DSM-5 definition

18 of an opioid use disorder was employed, do you

19 know, for the individuals on Exhibit A,

20 whether -- what severity of an opioid use

21 disorder they were found to have had?

22       A.    To the extent that we're not

23 familiar with the criteria used, I wouldn't want

24 to speculate on DSM-5 criteria and whether they

25 were employed.

Page 323

1          Q.    For everyone listed on Exhibit A, do
2    you know when in time they first developed any
3    kind of substance abuse disorder?
4          A.    All I can say is the patients were
5    diagnosed with a substance use disorder.  The
6    timing, based on the documents I have in front
7    of me, which were provided by our attorneys and
8    experts, don't specify, to my examination of
9    them, a date when they developed the diagnosis
10   -- when they developed the disorder or were
11   diagnosed with it.  They may be two different
12   dates, as I'm sure you know.
13         Q.    For any of the individuals listed on
14   Exhibit A, do you know whether they are
15   currently diagnosed with an opioid use disorder
16   or whether they are in some stage of remission?
17              MR. BADALA:  Objection to form.
18         A.    I can speak, as the county's medical
19   examiner, that once diagnosed with an opioid use
20   disorder, my understanding is that diagnosis
21   remains, whether it's in remission or not.
22         Q.    And my question is, do you know
23   whether any of them are in remission such that
24   the diagnostic code would include that modifier?
25         A.    I don't know that the diagnostic

Page 324

1   code includes that modifier, so I can't answer

2   your question.

3        Q.    Do you know for any of the

4   individuals on Exhibit A what the first drug was

5   that they abused?

6        A.    That may be known, but as I say, we

7   just identified the patients and referred them

8   to counsel for consultation with experts.

9   Whether they identified that in the course of

10  their investigation, I do not know if they

11  identified what initial drug they first used.

12       Q.    For the individuals listed on

13  Exhibit A, can you identify any specific name of

14  a person whose first drug of abuse was a

15  prescription opioid?

16            MR. BADALA:  Objection to form.

17  Outside the scope.

18       A.    It's getting a little bit late.  I'm

19  just getting a little fuzzy.  Could you read

20  that back?

21       Q.    Sure.  Happy to.

22            Of the individuals listed on Exhibit

23  A, can you identify any individual for which

24  their first drug of abuse was a prescription

25  opioid?

Page 325

1            MR. BADALA:  Objection to form.

2    Outside the scope.

3        A.    The county cannot.  We referred

4    these for the consultation with the experts, and

5    that may be something uncovered in their

6    consultation, but from our standpoint, we did

7    not go further than that to identify first drug

8    used or anything from the county's standpoint.

9        Q.    Who on Exhibit A was arrested, if

10   anyone?

11           MR. BADALA:  Objection to form.

12   Outside the scope.

13       A.    I don't know who was arrested there.

14   We didn't really explore that when we made the

15   referrals.  We just identified people who did

16   not have cancer, who were receiving high doses

17   of opioids, and who were diagnosed with a

18   substance use disorder, but we did not include

19   criteria for arrests.

20       Q.    Who on Exhibit A doctor shopped?

21       A.    Again, when the county submitted the

22   claims data, that was as far as we went in terms

23   of that investigation, and the doctor shopping

24   may have come to light with the consultation

25   with experts and review of records, but we are

Page 326

1    not aware of that.

2          Q.    Who on Exhibit A pharmacy shopped?

3          A.    I'd have to say the same answer to

4    that.

5          Q.    Do you know what any individual on

6    Exhibit A understood about the risks of using

7    prescription opioids?

8                MR. BADALA:  Objection to form.

9    Outside the scope.

10         A.    I don't understand your question.

11   Could you rephrase it?

12         Q.    Sure.

13               For any of the individuals listed on

14   Exhibit A do you know what any of them

15   individually understood about the health risks

16   associated with using prescription opioids?

17         A.    The county would not know that.

18         Q.    Okay.  Do you know about any

19   conversations that any individual on Exhibit A

20   had with their doctor or pharmacist?

21               MR. BADALA:  Objection to form.

22   Outside the scope.

23         A.    Again, we submitted the names, the

24   500 names, with the criteria that I've spelled

25   out, and beyond that, I really am not in a

Page 327

1   position to state more for the county's

2   involvement.

3          Q.    Sitting here today, do you know

4   whether any individual on Exhibit A actually

5   overdosed on an opioid?

6          A.    I do not.

7          Q.    All right.  Home stretch.

8                Exhibit B to Exhibit 2.  It's the

9   one at the very back.  If you turn a couple

10  pages in to page 5, that's where it starts with

11  Cuyahoga instead of Summit.  Are you with me?

12         A.    Yes, I am.

13         Q.    So for anyone on Exhibit B, do you

14  know what substance was certified as their cause

15  of death?

16         A.    The causes of death are not listed

17  on this sheet.

18         Q.    Does the county know which of these

19  individuals on Exhibit B had multiple substances

20  certified as the cause of death?

21         A.    As I sit here, I can't answer that

22  question, but that information could be

23  obtained.

24         Q.    Does the county know which of these

25  individuals, if any, had prescription opioids

Page 328

1   identified as the cause of death?

2        A.   We would send prescription opioid

3   overdose data to the Ohio Department of Health

4   on a quarterly basis.  I believe that started in

5   2014 based on grant funding.  So that database

6   could be cross-checked with this, but as I sit

7   here today, I don't have that information.

8        Q.   So sitting here today, you can't

9   point me to any of these individuals on page 5,

10  6 or 7 and tell me specifically which ones had a

11  prescription opioid identified as their cause of

12  death?

13       A.   No.  As I say, the information is

14  available based on what we, I believe, referred

15  to Defendants in information that was sent to

16  the Ohio Department of Health, but these

17  individuals, I can't run through the list and

18  pick out names and tell you this one died from

19  prescription opioids.  I can't -- I can't do

20  that today.

21       Q.   To the extent individuals on Exhibit

22  B did have prescription opioids identified in

23  their cause of death, do you know which ones

24  obtained those legally pursuant to a

25  prescription?

Page 329

1          A.    I don't know if that would be
2     knowable, so I don't -- I'd have to say the
3     county would say we don't know.
4          Q.    For anyone on Exhibit B with an
5     overdose attributable to a prescription opioid,
6     can you tell me whether it was obtained legally
7     or illegally?
8          A.    I thought that was the question I
9     just answered.  I'm sorry.
10         Q.    I just wanted to make sure I was on
11    the same page with you.
12              So do you know -- I think I asked
13    you if you knew if it was legal, so I'm asking
14    all together, both sides, can you tell me one
15    way or the other whether anyone on here with a
16    death that was attributable to a prescription
17    opioid, whether that was obtained legally or
18    illegally?
19         A.    I cannot tell you that.  I don't
20    know whether these prescription opioid deaths
21    would have been legal or, as I said, whether we
22    can actually track that through our database
23    because of the potential legal -- obtaining
24    something legally in another jurisdiction that
25    we don't have access to.

Page 330

1      Q.    From the medical examiner's
2   perspective, there's no data or ability at the
3   medical examiner level to posthumously diagnose
4   an opioid use disorder, is there?
5      A.    We would have to rely, in the course
6   of a death investigation, whether the individual
7   came to our office with that diagnosis, but in
8   terms of an anatomical examination or laboratory
9   testing, I'm not aware of anything that
10  facilitates that diagnosis.
11     Q.    Has the county's medical examiner
12  ever diagnosed -- made a primary diagnosis of an
13  opioid use disorder in a case that it was
14  investigating?
15     A.    We may list it as a diagnosis in our
16  investigation, but as I say, that would have
17  been uncovered in the course of a historical
18  review, not from the actual physical examination
19  of an individual.
20     Q.    For the individuals listed on
21  Exhibit B, do you know which ones, if any, were
22  arrested?
23     A.    Again, I don't know if that
24  information is available, but I do not know it
25  as I sit here today.

Page 331

1        Q.    Was anyone on Exhibit B involved in

2    doctor shopping?

3        A.    I would have to go back to the

4    database.  Again, information might be

5    available, but I don't honestly know that I

6    could point to a specific name on this list and

7    tell you that was a doctor shopper.

8        Q.    Who on Exhibit B pharmacy shopped?

9        A.    I'd have to answer the same way.

10   That information may be available but I do not

11   have it with me today in preparation for

12   testimony.

13       Q.    Who on Exhibit B diverted

14   prescription opioids?

15       A.    That may be a very tough question to

16   answer, actually, because if they weren't

17   caught, nobody would probably know that, so I

18   couldn't -- I don't think anybody could give you

19   an answer to that question in completion.  There

20   may be records of prosecutions within the county

21   for some of these folks diverting, but I don't

22   think I would be able to say whether they would

23   be exhaustive given the surreptitious nature of

24   that activity.

25       Q.    Is the county able to say

1  conclusively for every person listed on Exhibit

2  B that but for their use of prescription

3  opioids --

4          THE WITNESS:  I'm sorry.  Could we

5  take a break?  My daughter was supposed to be

6  picked up at 5:30 and I want to make sure my

7  wife knows I won't be doing that today.

8          MR. CARTER:  Sure.  Absolutely.  I

9  only have three questions left, but you can take

10 a break.

11          THE WITNESS:  I'll be right back.  I

12 just have to call her.

13          MR. CARTER:  That's fine.  We'll go

14 off the record.

15          THE VIDEOGRAPHER:  Off the record at

16 5:08 p.m.

17              (Short recess had.)

18          THE VIDEOGRAPHER:  Back on the

19 record at 5:10 p.m.

20 BY MR. CARTER:

21     Q.    Is the county prepared to say

22 conclusively for every person listed on Exhibit

23 B that but for their use of prescription

24 opioids, they would not have overdosed and died

25 when they did?

1          A.     As I say --

2                 MR. BADALA:  Objection to form.

3          A.     As I say, these were identified with

4     criteria.  Not having their causes of death in

5     front of me, I do not know what they died from.

6     We do, as a county, support and state that

7     individuals who died from opioid pain relievers,

8     in addition to heroin and fentanyl, in large

9     measure, are referable back to the opiate pain

10    reliever use in this county, but I don't know

11    the causes of death on these individuals other

12    than they overdosed, and not knowing specifics

13    on that, I just know that they have a substance

14    use disorder, but I don't know the substances

15    and I don't think I should offer an opinion

16    without that information.

17         Q.     So I asked you about every person on

18    the list.  Let me ask any person on the list.

19    For any person on that list is the county able

20    to tell me that but for their use of

21    prescription opioids, they would not have

22    overdosed and died when they did?

23                MR. BADALA:  Objection to form.

24         A.     Again, lacking their cause of death,

25    I can only point to the criteria that were used

Page 334

1   to select this list, but I don't know that I

2   could specifically answer your question beyond

3   that.

4           Q.      With respect to some of the

5   questions I asked you in terms of doctor

6   shopping arrests, pharmacy shopping, whether

7   they diverted, were any of those factors

8   considered in compiling the list of individuals

9   on Exhibit B?

10          A.      We identified the claims, as I said,

11  for the opioids on the basis that they did not

12  have -- they were not cancer patients, they were

13  receiving high dose, which we defined as 120

14  medical morphine equivalents or higher, and that

15  they had a diagnosis of a substance use

16  disorder.  Beyond that, I cannot characterize

17  them further in terms of arrests or other

18  things.

19          Q.      With respect to the folks on Exhibit

20  B, who on there had a dose of over 120 MME?

21              MR. BADALA:  Objection to form.

22  Outside the scope.

23          A.      As I understand it, these criteria

24  were applied to the individuals on that list of

25  500 that were provided, and they met all three

Page 335

1    of these criteria.

2         Q.    So you believe everyone on Exhibit B

3    met all three of those criteria?

4         A.    I am not familiar enough with

5    Exhibit B, but if they are taken from the claims

6    data, then they would have met those three

7    criteria.

8         Q.    Does Exhibit B include all

9    prescription-related opioid deaths that the

10   county has experienced during the time frame or

11   is it some subset?

12        A.    It's got to be a subset.  There just

13   aren't enough names on there for all the opioid

14   deaths that we've had.

15        Q.    My question was prescription opioid

16   related, so would you give the same answer to

17   that?  So does Exhibit B contain all

18   prescription opioid deaths that the county has

19   experienced?

20        A.    Give me a second to think on that.

21              That would be impossible given the

22   number here.  There's more prescription opioid

23   deaths in the county than these names here.

24        Q.    Can you attribute any Cuyahoga

25   County resident's death to the specific conduct

Page 336

1   of a specific Defendant?

2             MR. BADALA:  Objection to form.

3   Outside the scope.

4        A.    The opioid crisis has its genesis in

5   the prescribing practices that were facilitated

6   by the Defendants, and, to that extent, the

7   opioid deaths, in large measure, are the

8   responsibility of the actions of the Defendants.

9   That's the position of the county.

10       Q.    Can you link any specific conduct to

11  any individual's death?

12            MR. BADALA:  Objection to form.

13  Outside the scope.

14       A.    Any specific conduct --

15       Q.    Of the Defendants to an individual's

16  death.

17            MR. BADALA:  Same objections.

18       A.    The misrepresentation of the

19  addiction potential of the compounds, the large

20  distribution of drugs into the county, the

21  efforts to create formulations that were not --

22  I shouldn't say not tamper resistant.  The

23  efforts to create guidelines for prescribing and

24  lobbying efforts around those.  A lot of -- I

25  can't think of everything necessarily in one

Page 337

1    swoop, but the actions of the Defendants are --
2    in the counties have been responsible for the
3    deaths -- the creation of the opioid crisis and
4    the deaths that we're seeing.
5           Q.    Which individual on Exhibit B died
6    as a result of a misrepresentation of the
7    addictive potential of the compounds?
8           MR. BADALA:  Objection to form.
9    Outside the scope.
10          A.    I think again I have to say that
11   with regard to Exhibit B, I do not have causes
12   of death as to substances and I wouldn't want to
13   hazard a guess as to what information would be
14   relevant to your question.
15          Q.    Which individual on Exhibit B died
16   as a result of the large distribution of drugs
17   into the county?
18          MR. BADALA:  Objection to form.
19   Outside the scope.
20          A.    To point to a specific one, I could
21   not do.
22          Q.    Which individual on Exhibit B died
23   as a result of efforts to create guidelines for
24   prescribing and/or lobbying efforts around
25   those?

1           MR. BADALA:  Objection to form.

2   Outside the scope.

3       A.    I'd have to say, again, I can't

4   point to specific ones.  I don't know their

5   causes of death.  And not knowing that, I can't

6   go further on characterizing them.

7       Q.    With respect to the

8   misrepresentation of the addictive potential of

9   the compounds, the large distribution into the

10  county, and the lobbying efforts, which specific

11  Defendants engaged in that conduct that you

12  believe was causal of any death?

13          MR. BADALA:  Objection to form.

14  Outside the scope.

15      A.    Which topic are we on now?

16      Q.    On topic 19 and 34 and 2 and 18 and

17  probably others.

18          MR. BADALA:  So is it your position

19  that this applies to all those topics, this

20  question?

21          MR. CARTER:  Yes.  The ones that I

22  just mentioned, yes.

23      A.    And one more time.  I'm sorry.

24      Q.    So which Defendants, sitting here

25  today, does the county identify as engaging in

1    the specific conduct that you just mentioned

2    related to the death of anyone on Exhibit B?

3                MR. BADALA:  Objection to form.

4    Outside the scope.

5         A.    The county identifies all of the

6    Defendants.  That was why we filed the lawsuit.

7    And the specifics of these individuals I regret

8    I don't have, but the county's position is that

9    all of the Defendants are ultimately responsible

10   for this creation of this drug-addicted

11   population.

12        Q.    So for any individual on Exhibit B,

13   can you link their death to any specific

14   Defendant?

15               MR. BADALA:  Objection to form.

16   Outside the scope.  Asked and answered.

17        A.    As I understand the individuals on

18   B, the county identified them and referred them

19   for -- to our attorneys for expert analysis.

20   The county doesn't have a position on what you

21   had asked me.

22        Q.    And then my last question, can you

23   identify any Defendant named in the lawsuit who

24   could have prevented the county's opioid crisis?

25               MR. BADALA:  Objection to form.

www.veritext.com                                          888-391-3376

```
                                              Page 340
 1    Outside the scope.
 2                 Which topic are we on?
 3                 MR. CARTER:  Topic 34.
 4                 MR. BADALA:  Objection to form.
 5    Outside the scope.
 6          A.   So if I understand your question,
 7    you're asking me to identify which of the
 8    Defendants we believe caused or contributed to
 9    the opioid crisis in our geographic area.
10          Q.   No.  I'm asking the flip of that.
11    My question is, can you identify any Defendant
12    who could have prevented Cuyahoga County's
13    opioid crisis?
14                 MR. BADALA:  Objection to form.
15    Outside the scope.
16          A.   Yes.  All of them.
17          Q.   And how could they have prevented
18    it?
19                 MR. BADALA:  Same objections.
20          A.   By not creating that culture of
21    undertreatment of pain, by not encouraging the
22    overprescribing of pain medications, by not
23    misrepresenting the addictive potential of those
24    medications.  The things that have been spelled
25    out before I think in terms of the actions of
```

Page 341

1  the Defendants that contributed to the opioid

2  crisis, with pain relievers initially and

3  subsequently transitioning into the opioid

4  crisis as we saw it with heroin and fentanyl and

5  the analogs of fentanyl.

6      Q.    With respect to the mortality data

7  that you have, what was the mortality

8  attributable to illegal drugs for 2017 --

9          MR. BADALA:  Objection to form.

10     Q.    -- or whatever year you have in

11  front of you?  In Exhibit 11, what's the last

12  year?  That's the yellow one that's at the top.

13     A.    The last year on here is 2014.

14     Q.    Okay.  Then let's do it without a

15  specific number.  What could any Defendant have

16  done to prevent the deaths in 2017 in Cuyahoga

17  County that your office determined were caused

18  by heroin, illicit fentanyl, fentanyl analogs,

19  carfentanil or cocaine?

20          MR. BADALA:  Objection to form.

21          You said '14 and then you said '17.

22          MR. CARTER:  I did.  So this

23  question is 2017.  I was trying to give him a

24  reference point to a number.  I was trying to

25  wrap up since we're at the end of the day.  So

Page 342

1   I'll ask it again to be clear.

2        Q.   I understand you don't have a

3   specific number of deaths in front of you, but

4   there were deaths in 2017 in Cuyahoga County

5   that were attributable to heroin, illicit

6   fentanyl, carfentanil, fentanyl analogs and

7   cocaine.  Each of those substances represented

8   at least one death in 2017, correct?

9        A.   Yes.  Illicit fentanyl, I'd sort of

10  just say that our testing can't distinguish

11  diverted fentanyl from illicitly manufactured

12  fentanyl, but our general impression is that

13  most of those deaths were attributable to

14  illicitly manufactured fentanyl.

15       Q.   So whatever the number was

16  attributable to that combination of illegal

17  drugs that I just mentioned, what -- can you

18  identify any Defendant who could have prevented

19  those deaths in 2017?

20            MR. BADALA:  Objection to form.

21  Beyond the scope.

22       A.   Again, all the Defendants could have

23  prevented that situation.

24       Q.   So all the Defendants could have

25  prevented every single illicit drug death from

Page 343

1  those substances I just mentioned in 2017?

2          A.    I don't think it would be the

3  county's position on every one, but most of

4  them, yes.

5          Q.    Can you identify a percentage?

6          A.    I'd have to look closer at that.  I

7  don't know.

8                MR. CARTER:  Okay.  And then just as

9  an administrative clean-up, I'd like to mark the

10  binder that the witness brought with him today

11  as whatever the next number is.  I think it's

12  14.

13                MS. RANJAN:  That one has the notes

14  on it, doesn't it?

15                THE WITNESS:  This one has my notes.

16                MR. BADALA:  You can mark that one.

17                MR. CARTER:  We'll handle the

18  logistics of --

19                MR. BADALA:  That's okay.

20                     -   -   -   -   -

21                (Thereupon, Gilson Deposition

22                Exhibit 14, Binder, was marked for

23                purposes of identification.)

24                     -   -   -   -   -

25                MR. CARTER:  If we could go off the

Page 344

1  record.  I think we're done, but just a quick

2  caucus.

3              THE VIDEOGRAPHER:  Off the record at

4  5:22 p.m.

5                    (Recess had.)

6              THE VIDEOGRAPHER:  Back on the

7  record at 5:35 p.m.

8          EXAMINATION OF THOMAS GILSON, M.D.

9  BY MS. ROITMAN:

10      Q.    Good evening, Mr. Gilson, or

11  Dr. Gilson.  I'm Sara Roitman from Purdue.  I

12  introduced myself to you earlier.  I just have a

13  few more questions for you.

14              MS. ROITMAN:  Before we begin, I

15  think we have a housekeeping administrative

16  point.  Exhibits 4, 5 and 6 were premarked but

17  they were not introduced into the record.  I

18  think that's the consensus of everyone for

19  clarity sake.  Thank you.

20      Q.    Dr. Gilson, I'd like to talk about

21  topic 4, and topic 4 is -- includes the criteria

22  that Plaintiffs used to identify the information

23  required by the interrogatories at issue in

24  discovery ruling number 5, and for your

25  reference, those interrogatories at issue, the

```
                                            Page 345
 1   ones I'm going to talk about, are manufacturers'
 2   interrogatories 6, 7 and 10, specifically, the
 3   Plaintiffs' response to number 6, which was
 4   marked as Exhibit 3 today.  And it's -- to
 5   orient you, it's the December 31st, 2018
 6   response to interrogatory 6.
 7        A.    I have Exhibit 3.
 8        Q.    So, Dr. Gilson, to orient you, the
 9   exhibit that we have been referring to today as
10   Exhibit 2, I believe, that giant Excel
11   spreadsheet --
12        A.    This one, yes.
13        Q.    -- that was -- Plaintiffs referred
14   to that in their response to interrogatory 6
15   when they were identifying 500 alleged
16   prescriptions that were written in reliance of
17   Manufacturer Defendants' alleged misstatement.
18   I appreciate that you have testified numerous
19   times today that you didn't see Exhibit 2 or
20   that spreadsheet prior to today, and so I'm
21   just --
22        A.    I'm going to say I don't remember
23   seeing them.
24             MR. BADALA:  Object to that
25   characterization.
```

1        Q.     Fair enough.

2               What I'm going to ask you really is

3    just strictly the criteria that the county used

4    when responding to interrogatory number 6.

5               So did any of the criteria that the

6    county used in responding to interrogatory 6

7    include determining whether a doctor on that

8    Excel spreadsheet was ever visited by a sales

9    representative?

10              MR. BADALA:  She's talking about

11   Exhibit 3.

12       A.    This would be page -- I remember the

13   list was there.

14       Q.    I can tell you it's not -- it is --

15   what I'm trying to figure out is the criteria

16   that was used for identifying the prescriptions

17   listed on that giant Excel spreadsheet, the 500

18   prescriptions.

19       A.    I just want to refresh my memory.

20   So it says in Exhibit 2, on the page with the

21   doctors' names, that the "Bellwether Plaintiffs

22   further contend that, by misrepresenting the

23   risks, benefits, and superiority of opioids,

24   particularly for use long-term and at high

25   doses, including, but not limited to, through

Page 347

1   sales visits, continuing medical education and
2   speaker programs, publications and websites, and
3   treatment guidelines, Manufacturer Defendants
4   deprived prescribers and patients of the ability
5   to make informed choices about whether, when and
6   which opioids to prescribe and use, for how
7   long, and at what doses."  So it mentions sales
8   visits in that.  I don't know specifically, of
9   the doctors who were listed, which ones had a
10  sales visit.
11          Q.    Doctor, I don't want to interrupt
12  you, but I do want you to answer my question.
13  It's getting late, and I think all of us want to
14  get out of here and get you out of here.  That
15  wasn't my question.  My question was, in coming
16  up with the prescriptions that are identified in
17  Exhibit 2, that big Excel spreadsheet, which was
18  provided in response to interrogatory 6, did the
19  criteria that Plaintiffs used to come up with
20  the prescriptions on that list include any
21  criteria to determine whether any of the
22  prescribers on that list had ever been visited
23  by a sales representative?
24          A.    The criteria that I have harkened
25  back to that were used to create the list where

                                        Page 348

1   they were not cancer patients, they were high

2   dose, that is greater than 120 morphine --

3   medical morphine equivalents or higher, and

4   patients who were diagnosed with a substance

5   abuse disorder.

6           Q.    And so would the answer to my

7   question be no?

8           A.    But I think they were saying -- at

9   least the prescriptions identified in Exhibit A

10  was unauthorized, medically unnecessary,

11  ineffective, or harmful, and then further down

12  on that page they identify that the

13  misrepresentation was unnecessary and harmful,

14  do not -- but that the sales visits are included

15  in some of the misrepresentations.

16          Q.    Doctor, I'm going to move to strike.

17  I need you to answer my question.

18          A.    I'm trying to, ma'am.  I'm very

19  sorry.

20          Q.    So if you can focus on what I'm

21  asking.

22                Did the criteria that Plaintiffs

23  used to come up with the prescriptions on that

24  list, did it include determining whether or not

25  any of those doctors had been visited by a sales

Page 349

1    representative?

2            MR. BADALA:  Objection to form.

3    Asked --

4        Q.    The answer should be yes or no.

5        A.    I've tried to answer it as best I

6    can from the response from the interrogatory.

7    Whether that was a separate criteria, that's not

8    my understanding.

9        Q.    For the record, you're not -- the

10   response that you're reading from there is not

11   in response to interrogatory 6.  It's in

12   response to interrogatory 7 or interrogatory 10.

13   My question is focused on interrogatory 6.  If

14   you're not going to answer my questions, I am

15   going to have to request more time.  I assure

16   you we are all trying to get out of here, so --

17   was there any separate criteria that was used

18   besides the three criteria that you've

19   identified, non-cancer, high dose opioids in

20   your words, and patients identified with an

21   opioid use disorder?  Were any other criteria

22   used for coming up with the prescriptions on

23   Exhibit A?

24       A.    That's how we identified the claims.

25       Q.    So the rest of my questions should

Page 350

1   be fairly simple for you to answer.  Would any

2   of the criteria include whether any of those

3   doctors were visited by a sales representative?

4          A.     These criteria do not include that.

5          Q.     Do any of the criteria include being

6   visited by one of the Manufacturer Defendants'

7   sales representatives?

8          A.     Not the criteria that were used.

9          Q.     Did any of the criteria used pertain

10  to whether or not any of the physicians on that

11  list ever attended a continuing medical

12  education program that was sponsored by any of

13  the Manufacturer Defendants?

14         A.     Not listed in my list of criteria.

15         Q.     Did the criteria include ever --

16  whether any of those doctors ever had attended a

17  continuing medical --

18         A.     I think I finally understand where

19  we're differing.  These are --

20         Q.     Please let me finish my question.

21         A.     Oh, sure.  Absolutely.

22         Q.     Did the criteria that you used

23  include if they ever attended any sort of

24  continuing medical education program at all

25  relating to opioids?

1        A.    No.   I think what I'm saying, if I

2    could answer where I think we might be on

3    different purposes, is I think that things I was

4    describing were characterizations of the

5    prescriptions, but the claims that we submitted

6    to attorneys were based on these criteria.

7        Q.    Again -- and this may be an issue

8    that you just have not read that response before

9    today and why it has been somewhat frustrating

10   to get accurate kind of answers to our questions

11   on this -- what are you referring to there isn't

12   the response to interrogatory number 6 that I'm

13   asking about.  It's in response to a completely

14   different interrogatory, 7 and 10.  So if you

15   could just stay with me and answer my questions,

16   I think we would all be grateful for it.

17              MR. BADALA:  I think part of the

18   problem is you're telling him to look at 2 when

19   you're talking about 3.

20              MS. ROITMAN:  No.  For the record,

21   he's, on his own volition, reading a different

22   exhibit that we're not talking about.

23              MR. BADALA:  I get it, but you keep

24   saying back to the prescriptions in Exhibit 2.

25   Exhibit 3 is what you're talking about.  So we

1    can put 2 to the side and he can look at 3.  I

2    think that's the confusion.

3                MS. ROITMAN:  The confusion is

4    Exhibit 2, which is that big list of -- that

5    huge Excel spreadsheet, that is what I'm

6    referring to.  Plaintiffs -- you referred to

7    that big list when they were responding to

8    interrogatory 6.

9                MR. BADALA:  So that's where I think

10   the confusion is.  He is now looking at that.

11   If he can look at Exhibit 3, then I think that's

12   more helpful.

13        Q.   So we can call it 2A if you want.  I

14   think part of the problem is --

15                MR. BADALA:  I think that's going to

16   mess up the record a little bit.

17        A.      -- is you have not looked at these

18   responses before today and you're not familiar

19   with them.

20                MR. BADALA:  I'm going to object to

21   that characterization.  That's not been his

22   testimony.

23                MS. ROITMAN:  You can object all you

24   want.

25        Q.   Let's go back to my questions.

Page 353

1          A.    Sure.

2          Q.    Did any of the criteria that were

3    used to come up with the prescriptions that were

4    identified in that big Excel spreadsheet include

5    trying to figure out if any of the doctors on

6    there had had any specific contact with one of

7    the Manufacturing Defendants?

8          A.    In coming up with a list, no.

9          Q.    Any criteria -- was there any

10   criteria that was used for determining why any

11   of the doctors on that big exhibit, Excel

12   spreadsheet, prescribed the opioids to the

13   patients listed there?

14         A.    I think some of them were the ones

15   who were prosecuted, so they were identified by

16   that.

17         Q.    So is that a different criteria that

18   you're saying you were using?

19              MR. BADALA:  Objection to form.

20   Asked and answered.

21         A.    I am not following your question.

22   I'm sorry.

23         Q.    I'm trying to -- you've identified

24   the three criteria that were used.  I'm trying

25   to figure out if there are any other criteria

1    that were used to identify the people on Exhibit

2    2A.

3         A.    Oh, I thought you were talking about

4    the doctors.  No.  The claims for the opioids

5    are the three criteria that I mentioned.

6              MS. ROITMAN:  Thank you.  I have no

7    further questions.

8              THE WITNESS:  Thanks.

9              MR. BADALA:  Anyone else in the room

10   have any questions?  Anyone on the phone have

11   any questions?

12             I just have a few questions.

13             MS. ROITMAN:  Can we just go off the

14   record quickly?

15             THE VIDEOGRAPHER:  Off the record at

16   5:45 p.m.

17                  (Recess had.)

18             THE VIDEOGRAPHER:  Back on the

19   record at 5:47 p.m.

20        EXAMINATION OF THOMAS GILSON, M.D.

21   BY MR. BADALA:

22        Q.    Dr. Gilson, I just have a couple of

23   follow-up questions from your deposition today.

24             You mentioned earlier that you took

25   some notes during your conversation with Tamara

                                        Page 355

1   Chapman.  Do you recall that?

2        A.    Yes, I do.

3        Q.    Can you describe those notes for me?

4        A.    I was having a phone conversation.

5   I wrote them on a piece of paper no bigger than

6   two-by-two inches, and they -- the points I

7   wrote down were that they were seeing an

8   increase in the number of custody cases at DCSF,

9   which is where Ms. Chapman is employed, an

10  increase in the number of positive toxicology

11  bursts, and that she indicated that it was her

12  impression that was related to opioids.

13            MR. BADALA:  I have no further

14  questions.

15            MR. CARTER:  Nothing further.

16            MR. BORANIAN:  Nothing for me.

17            MR. BADALA:  Anyone on the phone?

18            And I just want to note one thing

19  for the record.  Plaintiffs did serve amended

20  responses and objections to the 30(b)(6)

21  deposition.  Those weren't included, but by

22  reference, we refer to our responses and

23  objections.

24            THE VIDEOGRAPHER:  Off the record at

25  5:48 p.m.

Page 356

1

2          (Deposition concluded at 5:48 p.m.)

3                    - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 357

1  Whereupon, counsel was requested to give

2  instruction regarding the witness' review of

3  the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6  Transcript review was requested pursuant to

7  the applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 358

1                REPORTER'S CERTIFICATE
2    The State of Ohio,    )
3                          ) SS:
4    County of Cuyahoga.   )
5
6             I, Renee L. Pellegrino, a Notary Public
7    within and for the State of Ohio, duly
8    commissioned and qualified, do hereby certify
9    that the within named witness, THOMAS GILSON, M.D.,
10   was by me first duly sworn to testify the truth, the
11   whole truth and nothing but the truth in the cause
12   aforesaid; that the testimony then given by the
13   above referenced witness was by me reduced to
14   stenotypy in the presence of said witness;
15   afterwards transcribed, and that the foregoing is a
16   true and correct transcription of the testimony so
17   given by the above referenced witness.
18             I do further certify that this
19   deposition was taken at the time and place in the
20   foregoing caption specified and was completed
21   without adjournment.
22
23
24
25

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto set

6    my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 15th day of January, 2019.

8

9

10

11

12

13    Renee L. Pellegrino, Notary Public

14    within and for the State of Ohio

15

16    My commission expires October 12, 2020.

17

18

19

20

21

22

23

24

25

Page 360

1                    Veritext Legal Solutions
                          1100 Superior Ave
2                             Suite 1820
                        Cleveland, Ohio 44114
3                       Phone: 216-523-1313
4
    January 15, 2019
5
    To: SALVATORE BADALA
6
    Case Name: In Re: National Prescription Opiate Litigation v.
7
    Veritext Reference Number: 3191875
8
    Witness:  Thomas Gilson, M.D.        Deposition Date:  1/14/2019
9
10  Dear Sir/Madam:
11
    The deposition transcript taken in the above-referenced
12
    matter, with the reading and signing having not been
13
    expressly waived, has been completed and is available
14
    for review and signature.  Please call our office to
15
    make arrangements for a convenient location to
16
    accomplish this or if you prefer a certified transcript
17
    can be purchased.
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived.
22
23  Sincerely,
24  Production Department
25
    NO NOTARY REQUIRED IN CA

Page 361

1                     DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3191875
3   CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 1/14/2019
4   WITNESS' NAME: Thomas Gilson, M.D.
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                         Thomas Gilson, M.D.
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25

Page 362

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3191875
3   CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 1/14/2019
4   WITNESS' NAME: Thomas Gilson, M.D.
5          In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7          I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9          I request that these changes be entered
    as part of the record of my testimony.
10

11         I have executed the Errata Sheet, as well
    as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Thomas Gilson, M.D.
14

15         Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22  this _____ day of_____, 20____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date
```

Veritext Legal Solutions

Page 363

1                        ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                    ASSIGNMENT NO: 1/14/2019
3    PAGE/LINE(S) /          CHANGE          /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____        _____
20   Date                        Thomas Gilson, M.D.
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                       _____
                         Notary Public
24

                         _____
25                       Commission Expiration Date

| & |
| --- |
| **&**   1:20 2:6,10,20 3:21 4:3,7,12,17 5:2 18:17,20 |

| 0 |
| --- |
| **001397330**   7:24 244:13,18 |
| **001547662**   8:10 263:17,25 |
| **001684555**   8:5 248:18 249:9 |
| **001709118**   7:20 234:14 |

| 1 |
| --- |
| **1**   7:5 28:23 92:15 92:16 106:15,16 142:24 156:11 182:20 281:20,22 282:4 |
| **1/14/2019**   360:8 361:3 362:3 363:2 |
| **10**   7:21 65:5,8 68:10 91:17 94:11 240:9,14 241:11 245:20 246:4,6 295:10 316:16,20 345:2 349:12 351:14 |
| **100**   11:15,15 304:14 |
| **10017**   2:4 |
| **10036-6796**   3:14 |
| **101**   3:4 11:16 |
| **102**   11:16,17 |
| **103**   11:17,18 |
| **104**   11:18,19,19 |
| **105**   11:20,20,21 |
| **106**   11:21 |
| **107**   11:22,22 |

**108**   11:23,23
**109**   11:24,24
**1095**   3:13
**10:16**   81:22
**10:38**   81:25
**11**   4:13 7:23 140:24 244:10,16 304:8 341:11
**110**   11:25 12:3
**1100**   5:4 360:1
**111**   12:3
**112**   12:4,4
**113**   12:5,5
**114**   12:6,6
**116**   12:7
**117**   12:7,8
**118**   12:8,9,9
**11:23**   126:19
**11:48**   127:8
**12**   8:3 68:10 248:9 248:13,22 250:10 263:5 264:3,14 359:16
**120**   12:10,10 40:21 69:12,25 70:1 72:20 73:4 77:5 77:19 80:5,10 88:18 100:8 101:14,17,23 102:22 103:8 125:23 126:5 143:11 334:13,20 348:2
**121**   12:11
**122**   12:11
**123**   12:12
**124**   12:12,13,13 308:16,17 309:3,8 309:23
**125**   12:14,14

**126**   12:15
**127**   4:18 7:17,18
**129**   12:15
**12:08**   146:17
**12:11**   146:20
**12:35**   169:19
**12:46**   169:22
**13**   7:16 8:7 43:3 84:8 263:8,11,22 313:25
**130**   12:16,16
**1300**   4:8
**131**   12:17,17
**132**   12:18,18
**133**   12:19,19
**134**   12:20,20
**135**   12:21,21,22
**136**   12:22,23
**137**   12:23,24
**138**   12:24
**139**   12:25 13:3
**14**   1:16 8:11 93:20 93:22 341:21 343:12,22
**141**   13:3
**142**   13:4
**144**   13:4
**145**   13:5
**147**   13:5,6
**148**   13:6
**149**   13:7
**14th**   18:2
**15**   136:1 138:25 177:17 183:25 215:19 291:22,24 308:3 360:4
**150**   13:7,8
**151**   13:8,9
**152**   13:9,10,10
**153**   13:11,11

**154**   13:12,12
**155**   13:13
**157**   13:13
**158**   13:14
**159**   13:14
**15th**   359:7
**16**   291:23 308:3
**160**   13:15,15
**161**   13:16 241:18
**162**   13:16
**164**   13:17,17
**165**   13:18
**166**   13:18,19
**168**   13:19
**17**   1:7 263:25 341:21
**173**   13:20,20
**176**   13:21,21,22
**177**   13:22
**179**   13:23
**18**   1:10 252:2 286:10,12,15 287:7,8 295:22 299:15,19 300:21 301:9 303:12,23 312:7 338:16
**1800**   3:5
**181**   13:23
**1820**   360:2
**183**   6:9,14
**185**   13:24,24
**186**   13:25 14:3,3
**187**   14:4,4
**188**   14:5
**189**   14:5,6
**19**   91:25 92:2,3 94:10,16 140:25 142:15 144:9 145:9 147:7 154:10 315:3 320:7,24 338:16

**191**  14:6
**193**  14:7
**194**  14:7,8 247:1
251:10
**195**  14:8,9,9
**1950**  1:21
**196**  14:10,10,11
**1970s**  206:13
**1980s**  102:20
206:16
**1990s**  102:17
207:5
**1995**  86:10 87:21
88:3 301:7
**1998**  206:21
**1:38**  183:2
**1st**  27:9

**2**

**2**  6:3 7:7 66:10,22
66:23 68:25 69:1
71:23 72:1 90:14
91:16 92:2 106:12
127:12 140:2,19
153:8 183:20
185:16 211:6
281:20 282:2
303:18 315:23
321:21 327:8
338:16 345:10,19
346:20 347:17
351:18,24 352:1,4
**20**  6:8 69:24 130:7
188:8 361:16
362:22 363:22
**200**  14:11,12
304:14
**2000**  4:18 239:20
**20005**  3:18,22
**2000s**  207:5
**2005**  227:4

**2006**  42:24 227:3,5
237:5 274:16
286:25 288:7
304:9
**2007**  302:8
**2008**  239:9
**201**  3:9 14:12
**2010**  188:7 236:16
239:8 313:20,22
314:14
**2011**  188:23 189:5
189:10 212:19
228:14 239:14
315:1
**2012**  43:3 181:10
188:23 198:17
199:17 229:19
230:15 236:4
237:15 239:24
240:17,23 241:18
242:9,16 245:18
246:3 251:6,21,25
314:1 315:1
**2013**  158:20 159:2
159:12,21 170:17
181:4 198:21,24
229:20 234:1,20
235:18,23 236:12
239:8,15,17
242:20 243:10,18
245:25 246:2,9
247:4,17 251:10
252:9,23 277:23
278:1,15 285:4
290:17 291:13
310:20
**2014**  177:17 199:1
199:5,9,17 204:16
240:15 245:5,9,10
263:25 304:9
308:5,14 309:8,21

309:24 310:16,20
328:5 341:13
**2015**  199:17,17
230:18 245:6,11
245:12 258:11
274:7,8,19 276:4
300:21 304:11
305:14 306:12
**2016**  199:19 244:2
244:6 261:15
274:9,21 291:22
292:23 304:12
305:13 306:12,23
307:5 314:23
**2016's**  199:16
**2017**  238:10
249:12,19 268:8
287:3,4 292:16
341:8,16,23 342:4
342:8,19 343:1
**2018**  27:9 223:23
268:8 288:13,16
301:8 345:5
**2019**  1:16 18:2
359:7 360:4
**202**  3:23 14:13
**2020**  359:16
**205**  14:13,14
**209**  14:14
**20th**  4:8
**210**  14:15,15
**211**  14:16,16
**212**  3:14 14:17
**216**  2:8,12 4:9,19
5:5 14:17
**216-523-1313**
360:3
**217**  14:18
**218**  14:18,19
**219**  14:19,20

**221**  14:20,21,21
**222**  14:22
**2222**  2:7
**2227**  359:12
**224**  14:22,23
**225**  14:23,24
**226**  14:24
**228**  14:25
**23**  188:8
**230-7676**  2:4
**231-7353**  4:14
**234**  7:19
**236**  15:3,3
**237**  15:4,4,5
**238**  15:5
**239**  15:6,6
**24**  292:17
**240**  7:21 15:7
**244**  7:23
**245**  15:7
**248**  8:3
**25**  295:10
**252-9060**  3:10
**257**  15:8
**259**  15:8
**26**  9:3
**263**  8:7
**264**  15:9
**265**  15:9
**266**  15:10
**267**  15:10,11
**268**  15:11
**269**  15:12,12
**27**  184:12 261:17
**270**  15:13,13
**271**  15:14,14,15
**272**  15:15
**273**  15:16
**275**  15:16
**278**  15:17

| | |
|---|---|
| **279** 15:17,18,19 | **308** 16:11,12 |
| **28** 184:15 273:3 | **309** 16:12 |
| **280** 15:19,20 | **31** 9:3 264:5 |
| **2804** 1:6,7 | **312** 3:18 4:5 16:13 |
| **281** 15:20,21 | **313** 16:13,14 |
| **282** 15:21,22 | **316** 16:14,15,15 |
| **284** 6:10 15:22 | **317** 4:14 16:16 |
| **285** 15:23 | **318** 16:16,17,17 |
| **287** 15:23 | **319** 16:18,18,19 |
| **288** 15:24 | **3191875** 360:7 |
| **289** 15:24 | 361:2 362:2 |
| **29** 7:5 | **31st** 345:5 |
| **290** 15:25 16:3 | **32** 9:4 264:5 |
| **294** 16:3 | **320** 16:19,20,20 |
| **295** 16:4 | **323** 16:21 |
| **296** 16:4,5 | **324** 16:21 |
| **298** 16:5,6 | **324-1107** 4:5 |
| **299** 16:6 | **325** 2:16 16:22,22 |
| **2:33** 231:3 | **326** 16:23,23 |
| **2:49** 231:6 | **33** 9:4 |
| **2a** 352:13 354:2 | **330** 3:10 |

**3**

**3** 7:12 84:1,12 92:15 93:21,22 154:21 157:14 159:12 170:11 171:1 345:4,7 346:11 351:19,25 352:1,11
**30** 1:14 7:5 20:24 28:24 83:16 108:1 139:2 184:20 264:5 281:14 355:20
**300** 16:7
**301** 16:7
**303** 16:8,8
**304** 16:9
**306** 16:9,10
**307** 16:10,11

**333** 16:24,24
**334** 16:25
**336** 17:3,3,4
**337** 17:4,5
**338** 17:5,6
**339** 17:6,7
**34** 9:5,5 29:21 30:1,13 39:4 43:7 43:16 44:5,16 51:25,25 313:8 338:16 340:3
**340** 17:7,8,8,9
**3400** 3:17
**341** 17:9,10
**342** 17:10
**343** 8:11
**344** 6:11
**349** 17:11
**35** 3:17 9:6 22:18

**352** 17:11
**353** 17:12
**354** 6:12
**358** 6:16
**36** 9:6 198:23
**360** 2:3
**37** 9:7,7
**38** 9:8
**39** 9:8
**3:09** 248:4
**3:10** 248:7
**3:19** 256:18
**3:26** 256:21
**3:59** 284:14

**4**

**4** 29:22 67:5,9,13 69:21,21 91:25 92:1,3 94:10,16 154:10 182:10 344:16,21,21
**40** 9:9,9,10 22:19
**41** 9:10,11 249:23
**415** 2:22 3:6
**42** 9:11
**43** 9:12
**43215-2673** 2:17
**434-5584** 3:23
**44** 9:12
**44113** 2:12
**44113-1901** 2:8
**44113-7213** 5:4
**44114** 4:9 360:2
**44114-1214** 4:18
**44308** 3:10
**45** 9:13,13,14
**45090** 1:10
**46** 9:14
**46204-3535** 4:13
**469-3939** 2:17
**47** 9:15,15,16 17:12

**48** 9:16
**49** 9:17,17,18
**4:13** 284:17

**5**

**5** 67:5,9,13 79:9 84:15,22 90:14,14 91:10,25 92:1,3 94:10,16 106:13 114:24 182:10 322:17,24 327:10 328:9 344:16,24
**50** 3:9 9:18,19,19
**500** 66:2,3,4 71:6 74:6,12,14,22 75:3 75:16 92:7,16 144:1 149:12,19 149:23 152:20 326:24 334:25 345:15 346:17
**51** 9:20,20
**52** 9:21
**53** 9:21,22
**54** 9:22,23
**55** 1:21 2:7 249:18 249:23
**56** 9:23
**57** 9:24,24,25
**58** 10:3
**591-6000** 2:22
**592-5000** 5:5
**5:08** 332:16
**5:10** 332:19
**5:22** 344:4
**5:30** 332:6
**5:35** 344:7
**5:45** 354:16
**5:47** 354:19
**5:48** 355:25 356:2

**6**

**6** 1:14 7:5 20:24
28:24 41:1,2 65:5
65:8,11 66:24,25
67:5,9,13 69:9,16
69:22 72:7 83:16
84:21 91:25 92:1
92:3,5 94:11,16
130:23 139:2
328:10 344:16
345:2,3,6,14 346:4
346:6 347:18
349:11,13 351:12
352:8 355:20
**60** 10:3,4
**600** 2:16
**60601-5094** 4:4
**61** 10:4
**614** 2:17
**62** 10:5,5
**621-0200** 4:19
**621-7860** 4:9
**63** 10:6,6
**64** 10:7 242:1,11
242:13 251:6
**646-5857** 3:18
**659-5980** 3:6
**66** 7:7 251:21
**68** 10:7
**696-4441** 2:12
**698-3814** 3:14

**7**

**7** 6:4 7:17 65:5,8
91:17 94:10,11
126:23 141:1
167:2,13 328:10
345:2 349:12
351:14
**71** 10:8,8

**72** 10:9,9
**725** 3:22
**73** 10:10 247:10,13
247:15 251:2,9,18
252:13 255:16
**74** 10:10
**75** 10:11,11
**76** 10:12,12,13,13
**77** 4:4 10:14,14
**78** 10:15,15
**79** 10:16,16 255:17
**79.5** 253:2 254:9

**8**

**8** 7:18 127:3
140:24 167:2
**80** 10:17,17,18
42:14 54:12
249:25 250:3,4,13
250:16,20,25
251:10,15 253:2
253:11,17,23
254:9
**81** 10:18,19
**84** 7:12
**844** 2:4
**85** 10:19
**86** 10:20,20,21,21
10:22
**861-0804** 2:8
**87** 10:22,23,23
**88** 10:24,24,25
**89** 11:3,3,4,4

**9**

**9** 6:5 7:19 52:4
53:14 56:21 58:1
58:10,13,14 61:19
62:4 234:13,19
**90** 11:5 104:6
181:18,24 273:18
273:19

**91** 11:5,6
**92** 11:6
**93** 11:7
**94105** 3:5
**94111-5356** 2:21
**95** 11:7,8,8
**950** 2:11 5:4
**96** 11:9,9,10
**97** 11:10,11,11
**98** 11:12,12,13
**99** 11:13,14,14
**9:07** 1:16 18:3

**a**

**a.m.** 1:16 18:3
81:22,25 127:8
**aaron** 1:8
**ability** 128:25
159:23 199:15
319:7 330:2 347:4
**able** 32:19 52:12
53:8 61:16 82:5
101:22 117:3
118:3 132:9
205:24 206:3
207:25 208:2
280:16 317:4
318:15 331:22,25
333:19
**absolutely** 104:9
224:16 225:2
332:8 350:21
**abstract** 240:20
242:5,6
**abuse** 70:8,13
72:22 73:6 78:23
79:1,16,22 88:20
88:21 105:16
125:2,5,6,16,17,19
128:14,15 138:10
138:11,22 139:8
139:11,12,17

182:4 187:25
191:23 224:23
226:13 252:23
253:25 266:3,6
294:16,17 296:11
296:25 297:8,14
297:15 298:1,13
298:18,25 299:18
300:21 301:9
303:23 304:22
305:7 308:4,6
309:23 310:16
311:22 312:6
316:11 323:3
324:14,24 348:5
**abused** 287:21
288:6,10 289:19
290:2,7 291:12,16
293:10,12 294:1
295:7 299:14
324:5
**abusing** 253:1,6,7
253:22 254:8,10
294:21 298:4
299:3,4,25
**abusive** 100:18
**acceptable** 213:19
**access** 24:3 26:12
32:17,21,25 33:3,8
34:1,4,8 43:1
46:10 173:21
180:2,6,12,15
181:4 184:9
192:10 223:16,20
223:22 224:5,14
224:18 225:9
226:3 227:19
228:2 229:20,22
235:19,24 236:4,7
236:8,10,14,18,21
236:23 237:1,6,8

237:10,21,22,23
238:2,14,17,20,25
239:1,6,18 242:20
243:13 251:23
257:24 258:9,12
258:14,17,24
259:1,1,5,7,12
261:18 262:4,5,7
262:10,12,20
264:22,23 265:15
265:17 266:8,13
266:18,25 267:6,8
267:13,16,19
268:21 269:18
270:5 271:4,9,13
271:16,22 272:1,3
272:4,7,15,16,23
275:19 276:9,14
276:19,21,25
277:4 279:12,21
280:8,23 329:25
**accessed** 227:14
278:9
**accomplish** 360:16
**account** 254:13
**accurate** 90:15,18
129:12 351:10
**acknowledge**
361:11 362:16
**act** 313:3 314:11
361:14 362:20
**action** 41:20
133:15 134:5
359:4
**actions** 37:10,11
37:15 39:23 46:20
46:21 48:14 53:4
53:17 54:7 55:8
56:19 127:23
137:5 155:3 171:2
172:18 174:4

184:22 281:16
297:3 336:8 337:1
340:25
**active** 123:12,16
123:23 124:9
227:16
**actively** 147:16,18
**activities** 48:11
138:1 154:25
155:13 156:5
157:5,19 158:4
160:17 162:8
173:17
**activity** 36:6
260:21 269:15
331:24
**acts** 89:18
**actual** 75:3 122:16
156:19 160:9
173:7 194:24
252:25 330:18
**acute** 123:5 307:5
**acutely** 308:11
**adamhs** 301:3
**add** 25:4 68:19
214:8 254:25
255:10 292:15
**addict's** 255:13
**addicted** 39:21,21
40:1,6 41:16 42:1
42:8,16 48:8,8,13
50:10,13 51:7,8,18
51:21 54:11,15
55:18 142:17
143:17 145:13,18
147:6,22 148:25
149:6,17,25
150:10,12,24
152:1 158:9,11
180:10 253:12
277:9,10 302:17

318:24 319:4
320:9,23 339:10
**addicting** 156:16
**addiction** 41:18
42:1 54:16,24
55:9 58:22 126:2
146:9 156:10
158:14,14 159:9
164:21 172:5
296:4 297:5,6,9,14
297:16 298:2
300:2 301:4
315:20,25 316:2,4
316:7,11 317:7,11
317:22 318:3
319:18 336:19
**addictions** 295:25
296:7,8,10
**addictive** 58:21
157:21 282:3
296:14,17 297:23
337:7 338:8
340:23
**addicts** 70:15
253:3 254:6,7
311:1,4
**addition** 24:12
92:25 171:24
174:20 204:23
243:14 333:8
**additional** 32:8
244:4 268:22
**address** 33:17
48:7 117:4 158:5
162:18 204:7,9
217:15 232:19
275:18 276:8
277:3 278:6 279:5
279:11 309:22
310:22

**addressed** 112:24
196:14 275:16
**addressing** 260:6
298:14
**adhere** 275:23
**adjacent** 212:20
**adjournment**
358:21
**adjudicated**
306:23
**administration**
34:7 266:4
**administrative**
343:9 344:15
**administrator**
24:9
**adopt** 35:16
**advantage** 242:20
**advertisements**
58:19
**advertising** 164:1
**advisement** 83:17
**affairs** 175:20
260:4 261:7
**affect** 52:5 59:15
**affiliated** 155:24
221:19,22
**affixed** 359:6
361:15 362:21
**afford** 216:11
**aforesaid** 358:12
**african** 305:10,15
305:19
**afternoon** 6:14
183:4,7 284:20,24
**age** 20:11 171:25
**agencies** 21:22
162:22 163:15
215:21 216:16
217:5 221:10
230:10 258:21

[agencies - appear]

Page 6

259:9 276:8
**agency** 24:17 30:5
32:23 38:12 162:6
162:7,12 164:3,12
200:25 201:23
202:4 215:12,21
215:24 216:16
219:9 237:9
275:19 276:15
300:2
**agent** 159:5
212:24 238:21
317:3
**aggregate** 236:2
282:15,20,25
**aggregated** 181:10
236:7
**ago** 22:6,12 102:16
108:1 130:7 136:1
138:25 166:22
288:13
**agree** 54:20 77:15
192:1 287:16,20
313:1,13,20 316:1
317:5 318:8,23
319:8,20
**agreed** 75:15
203:8
**ahead** 47:11 59:12
**ajp** 2:13
**akeyes** 3:23
**akron** 3:10
**akron's** 7:14 84:3
**al** 1:10
**alcohol** 191:23
295:3 300:1 301:4
318:2
**alert** 230:10
288:12,21 289:4,8
289:10,14,16

**alleged** 40:11
41:16 85:5,24
92:9,18 93:5
345:15,17
**allow** 103:16
**alyse** 4:3 19:17
**alyse.fischer** 4:5
**amend** 25:1
**amended** 7:5,9,14
27:4,16 28:23
66:14 84:4 355:19
**american** 305:10
305:15,19
**americas** 3:13
**amerisourceberg...**
3:2 19:3,5,20
**ami** 2:11 18:14
**amounts** 192:23
**amphetamine**
291:20,24 292:1
292:10 303:17
**amphetamines**
291:15,16 295:23
**analogs** 313:22
314:6,17 341:5,18
342:6
**analysis** 71:19
160:22 230:3
240:17,23 241:18
242:16 249:14
250:8 293:3
339:19
**analyze** 60:23
**analyzed** 244:1
**analyzing** 292:24
**anatomical** 330:8
**ancillary** 120:3
**andrew** 3:21 19:15
**anecdotal** 160:14
166:7 170:15
171:20 172:17

174:18 175:16
177:10,25 197:14
212:15 252:21
**anecdotally**
156:22 174:4
219:20 229:13
**answer** 22:13
29:10 31:1 53:14
54:5,20 55:13
59:19 60:10,11,15
61:2 62:10 72:15
73:17 86:21 94:20
95:23 98:2 102:6
103:7,14 105:1
106:24 110:17
111:11 112:11
117:7 123:25
130:13,22 132:10
132:14 135:1,4
136:6 137:10
147:15 148:13
151:3 159:10
162:2 166:14
173:11 174:8
203:17 206:10
214:25 218:19
220:13,23 226:9
237:20 271:19
277:20 281:8
282:23 290:12
293:16,17 299:17
300:24 308:12
324:1 326:3
327:21 331:9,16
331:19 334:2
335:16 347:12
348:6,17 349:4,5
349:14 350:1
351:2,15
**answered** 32:6
41:22 42:6 51:17

52:2 54:2 58:16
60:3,20 61:24
62:9 75:24 81:8
86:4 88:15 95:5
95:14 96:20 97:7
98:17 110:13
131:5 139:6
144:20 148:22
151:11 157:16
212:4 214:6 234:3
281:1 329:9
339:16 353:20
**answering** 31:14
214:21 234:5
268:14
**answers** 81:15
96:15 97:10
127:16 351:10
**antecedent** 42:17
54:24
**antidote** 167:17
**anybody** 19:23
32:13 36:3 44:2
44:10 45:2,9,15,18
47:13 67:24 77:1
81:4 112:15,17
114:12 134:7
148:14 162:20
167:5 173:15
203:24 259:11
286:8 298:17
331:18
**anymore** 26:6,13
98:1
**anyway** 167:13
**apadukone** 2:22
**apologize** 59:2
**apology** 114:25
**apparent** 260:7
**appear** 361:11
362:15

**appearances** 2:1
3:1 4:1 5:1 6:3
18:9 19:11
**appears** 189:8
244:20 248:23
263:8 322:9
**appended** 362:11
362:18
**applicable** 357:7
**application** 79:6
122:23
**applied** 81:3 88:16
99:7,16,20 100:7
100:23 101:14,18
105:18,23 109:5
112:8 113:11
115:20 118:4,7
120:7 122:22
149:20 153:3
154:18 182:15
334:24
**applies** 90:8
338:19
**apply** 130:18
131:15 144:7,8
150:1 273:20
**appreciate** 77:13
170:1 345:18
**approach** 215:14
**appropriate** 25:1
35:21 63:18 160:3
161:16 162:17
200:24 202:4
318:24
**appropriately**
128:1 220:17
**appropriateness**
63:1,8,13 317:16
**approximately**
42:14 250:25
251:15

**april** 233:19
263:25 274:8
**arcos** 30:5 32:16
32:18,24 33:13
34:2,5,8 223:7,10
223:16,19,23
224:1,18 261:21
262:4 267:21
269:10,14,17,19
269:25 270:3,9,10
**area** 24:19 31:24
36:11 39:20 113:8
114:7 127:11
142:19 145:14
155:2 157:7 177:8
183:22 184:3
208:17 210:14
272:12 308:10
316:12 318:12
340:9
**areas** 29:15 268:2
269:4
**argue** 100:11
**arising** 223:4
**arrangements**
360:15
**arrest** 196:1
260:23
**arrested** 325:9,13
330:22
**arresting** 261:2
**arrests** 196:5
246:18 325:19
334:6,17
**arrive** 317:10
318:2,4,5
**arrived** 76:16,17
**article** 7:21 240:9
240:15,16 241:11
241:17 245:20

**articles** 28:16
**articulated** 144:9
**aseem** 2:20 18:19
**aside** 144:16 146:8
147:3
**asked** 26:1,2 27:18
32:6 35:14 38:25
41:22 42:6 51:17
54:2 55:12 58:16
60:3,20 61:23
62:8 75:24 84:16
86:4 88:15 93:1
95:5,14 96:20,25
97:6 98:9,17
110:13 117:14
127:12 131:5,11
144:20 148:22
152:10 157:16
158:18 212:4
224:1,7,18 225:4
225:12 226:2
233:9 237:22
238:4 239:8 281:1
285:9 297:2
329:12 333:17
334:5 339:16,21
349:3 353:20
**asking** 44:17
63:22 98:11
100:15 108:5
125:12 131:22
147:17 148:10,14
148:15 150:15
159:1 168:9
211:24,25 236:6,8
270:8 297:5
298:19 307:20
308:11,25 312:23
313:13 329:13
340:7,10 348:21
351:13

**asks** 92:5
**aspect** 188:24
189:3 200:3
**aspects** 104:16,17
**assembled** 246:12
**assertion** 127:19
132:18 134:1
137:3
**assess** 178:12,22
**assigned** 317:21
**assignment** 361:2
362:2 363:2
**associated** 93:5
188:10,24 189:4
242:2 247:14
291:2 326:16
**association** 23:2
63:2 64:25 172:12
205:22 292:17
**assume** 20:2
103:15 171:6
317:6
**assuming** 283:15
**assure** 349:15
**attached** 7:11 8:5
66:18 74:24
248:17 362:7
**attempting** 39:8
**attended** 350:11
350:16,23
**attention** 57:23
106:24 207:2
234:18
**attorney** 7:8 66:12
168:4 231:13,25
233:24 234:2,21
283:7 322:2 359:2
**attorney's** 198:9
217:14 232:12,23
233:22

**attorneys** 21:13,14
65:20,20,22 67:17
71:21 88:11 94:19
96:13 97:25 98:19
99:14 110:2,16
111:16 112:25
113:13 115:12
117:2 118:25
119:12 121:22
122:1 130:11
147:13 150:6
151:1 152:21
154:19 168:6
208:20 223:18,22
321:5,13,19,20
322:13 323:7
339:19 351:6
**attributable** 37:16
147:23 329:5,16
341:8 342:5,13,16
**attribute** 335:24
**attributed** 314:22
**audience** 244:25
**august** 285:4
**authored** 264:1
**authorities** 217:24
**authorize** 362:11
**automated** 42:22
64:24 181:6
**autopsy** 235:7
237:24
**availability** 54:25
55:3
**available** 23:4,15
23:18 26:24 27:14
28:12,19 41:12
43:19 64:19 238:2
286:1 310:2
328:14 330:24
331:5,10 360:13

**ave** 360:1
**avenue** 2:3,11 3:13
5:4
**avoid** 70:15
**avoided** 25:13
51:6 167:16
**aware** 34:4 36:13
45:17,24 49:22
51:2 60:24 64:16
66:3 74:17 75:25
79:4,19 80:4,19
81:14 94:10 95:7
95:12 96:21 97:1
97:9,11,16,17,23
98:4 116:3,4,11
117:7 122:6
137:21 154:10
157:11 159:6,8,20
162:19 163:24
165:15 173:24
178:17 181:16
190:11 192:6
193:4 195:1,5,11
197:12 200:17
202:13,16 204:2
205:6,18 206:7
207:6 209:21,22
210:2,3,4,10,17
212:23 215:9
219:13 223:10,21
224:12,12 229:11
237:11,12,14
257:19 258:19
259:4,20 268:13
268:15 269:3
275:17 277:23
281:19,22,24,25
282:6,11 283:2
284:3 286:6
300:15 315:24
326:1 330:9

**b**

**b** 1:14 7:5 20:24
28:24 83:16 101:9
139:2 140:17
143:23 144:18
149:7,9 170:12
171:1 172:17
315:22 327:8,13
327:19 328:22
329:4 330:21
331:1,8,13 332:2
332:23 334:9,20
335:2,5,8,17 337:5
337:11,15,22
339:2,12,18
355:20
**back** 28:8 31:13
32:12 36:2 37:12
39:13,22 42:8
43:7 44:12 45:16
48:13 53:5,7,18
54:8 55:9 56:19
56:20 58:1,25
59:16 60:7 62:1
63:5 69:21 81:24
86:6,10 93:10,11
102:14 112:1
114:23 127:7
130:23 131:13
132:7 134:21
137:2 140:11,18
140:23,24 146:14
146:19 153:7
163:15 165:2,8
169:2,21 171:13
171:15,22 174:25
175:1 177:10
178:3 179:13,19
180:8 181:7 183:1
186:1 199:13
202:19 203:23

204:15 206:13,16
206:18,21 208:18
211:19 214:17
222:15 229:16
231:5 234:25
243:3 248:6
251:23,24 252:8
252:10,17,25
255:12,14 256:1
256:20 257:15
261:5 277:9,11
279:25 284:16
286:23 287:1,4
291:18 305:14
307:8,8 308:21
314:4 324:20
327:9 331:3
332:11,18 333:9
344:6 347:25
351:24 352:25
354:18
**backs** 174:13
251:25
**backwards** 73:3
**badala** 2:3 6:12
18:10,10 20:1,9
26:9 31:9 32:5
33:11 34:3,19
35:24 36:7 37:8
37:21 38:3 39:18
40:7,14,18 41:7,21
42:5 43:17,25
45:7,13,21 46:16
47:1,5,9,19 48:18
48:24 49:11,19
50:1,7,21 51:4,16
52:1 53:10,16
54:1,10 56:3 57:2
57:10,19 58:15
59:6,10 60:2,19
61:1,6,23 62:8,20

62:24 63:10,19
64:10 66:24 67:6
68:21 71:1,16,24
72:13 73:9 74:19
75:12,23 76:4,10
76:13,23 77:6,21
78:6,18 79:2,10
80:1,6,17,25 81:5
81:17 82:7 83:10
85:10,25 86:3,7,13
86:20 87:1,8,14,24
88:7,14 89:2,9,13
89:19 90:20 91:1
91:11 92:11,22
93:18 94:12 95:4
95:13,20 96:2,10
96:19 97:5,14,21
98:3,6,16 99:3,8
99:18,25 100:9,15
100:21 101:5,9,15
101:24 102:5,23
103:10,18 104:14
104:18,23 105:4
105:13,19 106:6
107:16,23 108:2
108:14,25 109:8
110:12,20 111:4
112:6,13 113:6,17
114:3,10 116:2
117:19,23 118:5
118:12,17 120:15
120:22 121:19
122:18 123:8
124:1,16,19 125:8
125:21 126:4,17
129:23 130:8,20
131:4,16 132:3,12
133:1,13 134:10
134:19,25 135:4
135:13,17,23
136:2,12 137:12

137:23 138:19
139:5,23 140:20
140:23 141:17
142:2,20,23
144:19 145:21
147:10,24 148:21
149:3,7,9,18 150:3
150:13 151:9,21
152:3,13,18 153:5
153:17 154:3,15
155:14 157:15,24
159:15 160:2,18
161:11 162:23
164:4,16 165:21
166:11,15,18
167:2 168:11
169:14 172:25
173:19 175:8,13
176:11,16,19
177:4 179:10,12
181:22 185:15,18
185:25 186:12,18
186:25 187:15
188:2 189:6,11
191:13 193:21
194:3,20 195:9,16
195:22 196:3,11
196:16 200:16,22
201:7,25 203:16
203:19 205:3,8
209:12,25 210:7
211:3,14 212:3
216:19 217:12
218:6,17 219:3,17
221:6,12,21 222:7
224:3,19 225:1,13
226:15 228:22
230:24 234:5
236:13,19,25
237:7,19 238:5
239:5,12 240:2

245:7 255:4 256:8
256:12,15 257:4
259:16 264:17
265:18 266:10
267:11,23 268:24
269:11,21 270:1
270:12,18 271:6
271:15,24 272:9
273:1 275:10
278:4,25 279:7,13
279:22 280:7,10
280:25 281:10
282:18,21 284:8
285:3 287:22
288:1 289:20
290:4,8 294:19
295:13 296:1,19
297:2,10,17,24
298:15 299:21
300:22 301:11
303:4,7,13,25
306:5,16 307:1,15
308:8,19 309:10
311:24 313:5,9,23
316:3,8,18 317:12
317:25 318:10,17
319:1,11,23 320:4
320:10,19 321:25
323:17 324:16
325:1,11 326:8,21
333:2,23 334:21
336:2,12,17 337:8
337:18 338:1,13
338:18 339:3,15
339:25 340:4,14
340:19 341:9,20
342:20 343:16,19
345:24 346:10
349:2 351:17,23
352:9,15,20
353:19 354:9,21

355:13,17 360:5
**bag** 169:2,5,6
**baker** 4:17 18:22
20:5
**bakerlaw.com**
4:19
**balraj** 24:8
**barnes** 4:12
**base** 227:18 254:3
**based** 32:22 34:5
42:21 46:1 49:13
52:14 85:12 94:17
110:2 135:25
138:14 139:1
150:20 151:20
159:13 163:13
165:1,10 174:16
238:11 242:8
249:4 251:6,9
294:12 317:22
323:6 328:5,14
351:6
**baseline** 300:16,19
306:9,21 308:3
**bases** 130:3
**basic** 222:18
**basically** 56:4
92:25 172:16
213:12 255:12
**basis** 96:15 99:12
101:21 108:23
127:19 132:17
134:1 137:3 151:2
152:6 154:17
190:9 208:7
261:15 328:4
334:11
**bates** 7:19,24 8:5
8:10 234:14
244:12,17 248:17
249:8 263:16,24

**[bath - brought]**

**bath** 290:11,13 291:11 293:18,23
**becoming** 100:18 156:1 180:6 253:10
**beginning** 7:19,24 8:9 28:4 234:13 242:5 244:12 263:16
**behalf** 2:2,10,14 2:19 3:2,12,20 4:2 4:6,11,15 5:2 18:20,23,25 19:3,7 19:13,15,18,20,22 21:3 28:14 31:25 38:16 54:3 81:15 86:17,22 89:1 110:25 118:21 125:13 322:14
**behavior** 55:20 260:12 261:3
**behavioral** 299:7
**behest** 96:8
**believe** 27:22 28:19 37:23 41:25 47:3,23 50:23 52:5,25 58:3 59:23 71:18 79:18 79:23 87:10 102:25 127:16 133:20 158:3 187:17 212:16 219:23 221:16 227:15 228:23 237:9 258:21 269:13 276:1 285:4 298:20 315:17 328:4,14 335:2 338:12 340:8 345:10

**believes** 30:20,22 31:22 32:3 53:23 61:21
**bell** 181:21
**bellwether** 84:25 85:2 93:23 107:1 128:9,17 129:6 138:5 346:21
**beneficial** 276:12
**benefits** 128:19 129:7 205:19 346:23
**benzodiazepine** 295:23
**benzodiazepines** 293:9 295:1 303:17
**best** 23:16 29:10 31:17 38:13 46:14 77:9 78:8 136:6 161:18 162:12 176:7 188:5 190:19 194:14 203:22 226:1 262:6 268:9,19 274:10 291:14 293:7 301:25 322:14 349:5
**better** 43:21 218:2 218:19 252:10,15 268:12 271:19 282:4
**beyond** 41:14 66:6 67:16 71:10,19 92:23 97:9 104:2 105:21 130:15 152:8 192:23 194:15 201:21 216:24 255:13 257:2 273:18 306:8 315:11

319:6 326:25 334:2,16 342:21
**big** 72:8 107:3 111:24 140:20 288:23 289:2 321:23 322:5 347:17 352:4,7 353:4,11
**bigger** 355:5
**biggest** 220:4 286:22
**bill** 19:13
**binder** 8:11 26:23 343:10,22
**bit** 29:18 99:17 172:14 230:2,20 291:25 324:18 352:16
**bite** 159:1
**blanket** 285:17
**block** 87:5
**board** 25:6,9 65:16 103:21,21 104:1,4 155:17,17 162:15,16 163:4,4 165:8 167:22,23 168:2 184:16 196:23 197:4,10 198:13,17 199:5 200:1,2,2,7,10,12 201:6,6,19,24 202:6,8,14,17 203:2 204:14,23 208:18 216:22 231:20 232:21 233:15,16 234:21 236:3 238:10 262:23 273:4 299:8
**boards** 196:20

**bockius** 4:3
**body** 291:19 292:3
**boranian** 3:3 6:9 19:4,4 183:6,8 185:17 231:1,7 247:19,25 248:8 256:22 263:21 270:14 284:12 355:16
**born** 201:17
**bottom** 94:5 264:20
**boulevard** 2:16
**bounces** 189:8
**boundary** 34:23
**box** 213:24
**boxes** 214:17
**brain** 314:11
**brandy** 2:15 18:24
**branjan** 2:18
**break** 81:19 83:12 126:16 127:12 129:15 130:14 146:13,22 182:18 230:23,25 247:24 248:1 256:13,16 284:12 319:22 332:5,10
**breakdown** 292:3
**breaking** 49:8
**breaks** 47:14
**briefly** 154:22
**bring** 26:21
**brings** 302:17
**broad** 206:22 271:9
**broke** 47:12,15
**broken** 291:19
**brought** 26:23 82:14 140:11 213:2 343:10

**bryant** 3:13
**btlaw.com** 4:14
**budget** 301:6
**bulk** 246:2
**bullet** 246:8
  249:22 264:3
**bulletin** 252:24
  253:24 254:3
  255:22,25 256:7
  256:10 285:1
**burden** 243:20
**bureau** 65:15
**burling** 2:20 18:20
**bursts** 355:11
**byproduct** 48:9

**c**

**c** 7:8 66:13 167:20
  266:20
**ca** 360:25
**cabinets** 214:1,12
**calculated** 190:8
  282:20
**california** 2:21 3:5
**call** 20:24 70:4
  83:13 97:18
  226:24 233:12
  332:12 352:13
  360:14
**called** 20:11 37:24
  233:25 246:14
**calls** 26:15 161:22
  164:14
**camera** 168:14
**cancer** 40:20
  69:11,24 72:21
  73:4 76:2,15,21
  88:18 89:25 90:4
  90:10,16,19,21,24
  91:5,9 95:22
  99:24 100:3
  109:15 119:21

121:18 122:25
123:2,3,5,7,9,11
123:12,15,21,23
123:24 124:5,9,22
125:1 143:11
150:21 325:16
334:12 348:1
349:19
**cannabinoids**
  290:22 293:15,20
  296:9
**cap** 103:5
**capacity** 64:24
  124:24 201:21
  206:1 279:2
**caption** 358:20
**caraffi** 25:5 26:18
  82:20 167:19
  208:19 233:17
**cardinal** 3:20
  19:16
**care** 90:11,12
  129:9 221:17
**career** 268:4
**carfentanil** 221:4
  314:7 341:19
  342:6
**carole** 27:3 168:5
  198:3 208:20
  217:17 231:14
  232:13 234:2
**carrier** 65:14
**cartel** 34:21 39:15
  50:25 51:12,20
  54:19 55:23,25
  56:4,12,25 61:9
**cartels** 51:15 55:1
  55:14 58:10
  312:19
**carter** 2:15 6:10
  19:1,1 284:19,21

284:23 289:11
296:24 297:7,13
297:19 302:25
303:5,8 313:8
320:7 332:8,13,20
338:21 340:3
341:22 343:8,17
343:25 355:15
**carve** 90:15
**carving** 90:18
**case** 1:7,10 21:15
  21:16 22:23 59:17
  82:11 119:1
  126:13 155:24
  194:18 196:20
  204:4 249:3 257:9
  269:25 270:17
  271:3 272:7 297:8
  303:10 317:9
  330:13 360:6
  361:3 362:3
**cases** 83:2 213:16
  217:24 220:6
  221:2 251:10
  252:9 259:14,22
  278:9 302:10,15
  355:8
**cash** 35:13
**categorically**
  124:5
**cathinones** 293:21
**caucus** 344:2
**caught** 331:17
**causal** 338:12
**cause** 37:5,6 42:17
  141:16 156:20
  288:8 295:2
  306:24 327:14,20
  328:1,11,23
  333:24 358:11

**caused** 30:20 31:7
  31:22 32:3,9 38:1
  42:2 44:20 50:19
  295:25 299:20
  308:14 314:8
  340:8 341:17
**causes** 327:16
  333:4,11 337:11
  338:5
**causing** 302:2
**caution** 103:22
**caveat** 314:19
**cavitch** 4:7 19:21
**cavitch.com** 4:10
**cdc** 261:14 265:1
**center** 25:11
  155:25 167:15
  221:17,23 222:10
  222:14 231:22
  276:2
**central** 259:13,25
**certain** 26:7 64:13
  73:13 76:11 80:22
  82:23 110:6
  122:23 124:2,10
  126:14 134:18
  139:10 199:4,22
  202:11,20 219:22
  219:25 222:1
  231:23 249:1
  277:15 286:4
  295:8
**certainly** 27:10
  33:6,9 36:13,17,17
  48:12 49:5 57:25
  63:25 64:19
  116:20 122:21
  160:6 192:6 198:8
  202:9 207:10
  224:11 232:2
  265:21 268:1

277:20 279:16
280:15 281:6
288:18 289:1,10
289:14 291:8
292:14 298:20
299:25 300:5,13
300:17 302:4
307:4
**certainty** 199:18
259:12
**certificate** 6:16
148:4 265:9 358:1
362:11
**certificates** 141:21
257:21
**certification**
242:25 361:1
362:1
**certified** 20:14
141:10,16 306:24
327:14,20 360:16
**certify** 358:8,18
359:1
**cetera** 130:4
139:18 246:11,11
262:22
**chad** 180:5
**chain** 45:4,10,18
55:23 57:9 185:3
185:7,24 186:11
186:17,22,23
187:3 195:8 211:9
211:12 212:6,9
**chains** 57:1 60:8
**chair** 167:23
**chaired** 168:4
233:18
**challenges** 220:14
**chance** 127:15
**change** 292:25
362:8 363:3

**changed** 301:22
301:24 303:3
304:10,19 314:21
**changer** 314:25
**changes** 314:21,23
361:7 362:7,9
**changing** 302:1
**channeled** 187:2
**chapman** 24:11
82:21 355:1,9
**characterization**
345:25 352:21
**characterizations**
351:4
**characterize**
170:18 334:16
**characterizing**
338:6
**charge** 233:19
**charges** 218:5,16
223:3 298:8
**chart** 27:19 107:3
111:24 245:4
259:10 264:13
304:8 310:18
311:19 322:11
**charts** 64:18,21
69:7 314:4
**check** 104:4
199:16 270:25
273:15 275:12
276:3 308:16
**checked** 177:11
274:3 328:6
**checking** 177:14
**checks** 177:20
274:1,18
**cheffo** 3:13 6:8
19:8,8,23 20:16
59:8 62:22 63:4
67:2 69:2 81:20

83:8,12 92:24
100:11,17 101:1,7
101:11 126:15
142:22 149:5,8
153:20 166:13,25
169:12,16,23
175:11 182:17
**chemical** 292:4
**chemistry** 286:19
**chicago** 3:18 4:4
56:8
**chief** 24:10
**child** 21:17 23:6
24:11 26:17
165:11 166:6
197:13 201:15
202:3 266:19
267:3 298:25
**children** 201:17
299:3,4 302:17,17
**china** 210:12,21
212:8 312:19,22
**chip** 4:8 19:21
**choices** 129:1
347:5
**chronic** 62:17 63:3
63:9,17,24 64:4,8
85:2,12,14,21
86:12,25 87:4,7,11
87:18,21 88:4
90:3,11,17,22,24
91:4,7 95:19,25
96:3
**circumstances**
134:8 273:15
**citation** 250:4
**cities** 216:5,7
267:21
**citizen** 159:25
**citizens** 232:25
233:4 309:3,16

**city** 2:10 7:12,13
18:15 84:1,3
216:2 219:20
220:4 231:17
232:15 262:17
267:10 268:5
**civil** 20:12 357:3,7
361:5 362:5
**claim** 136:20
**claimed** 74:8
**claiming** 214:20
215:6
**claims** 40:19 65:12
65:22 69:10 70:23
71:8,12,19 73:11
73:13,19,20,21
74:8 88:9,17 89:6
89:11 94:17 96:12
98:19 99:10,13,22
105:22 106:8
111:6,15 120:1,9
120:11,17 121:3
121:21,25 122:16
124:22 130:2
142:3 143:10
144:1,10,13,17,25
146:6,7,8,24 150:5
150:7,24 151:5
152:22 154:12,17
154:19 170:15
321:11 325:22
334:10 335:5
349:24 351:5
354:4
**clandestine** 208:1
**clarification** 127:9
**clarifications**
83:20
**clarified** 131:17
131:22

clarify 130:17
265:15
clarity 262:3
344:19
classification
317:3,21
classified 290:2
classify 318:16
clean 343:9
clear 29:12 44:8
57:12 59:13,22
60:5 67:6 89:21
122:3,25 130:11
186:24 199:25
210:18 228:5
233:13 259:6
296:12 301:18
314:14 342:1
clearer 225:8
clearly 101:8
296:6,10 297:11
cleveland 1:22 2:8
2:10,12 4:9,18 5:4
7:13 18:15 24:15
26:11 84:2 155:23
181:17 216:2
219:20,21 220:3
231:17,22 233:25
267:10 359:7
360:2
cleveland's 232:16
client 20:7 271:11
271:13,22
climaco 1:20
climate 211:16
clinic 37:24 43:10
43:15 155:23
231:23 233:25
260:19
clinics 36:14 184:2

close 253:20
255:18 311:11
closed 186:17,23
195:8 211:9,11
212:6,9
closely 104:11
closer 22:18
251:19 343:6
closing 222:15
clr 1:25
cluster 293:20
cocaine 288:5
292:22,24 293:1
295:18,22 296:7
301:23 302:11,19
302:22 303:17,18
303:21 304:3,8,13
304:16,17,18,22
304:23 305:8,19
305:21 306:11,15
306:23 307:7,12
307:13,18,21,25
308:2,4,6,15 309:4
309:9,19,23 310:5
310:9,11,16 311:1
313:22 314:2,17
314:20,22 341:19
342:7
code 323:24 324:1
coded 220:17,18
codeine 206:13
codes 316:17,24
cohen 27:21 101:6
collaborate 217:4
265:1 300:5
collaboration
217:9 312:13
collaborative
257:13
colleagues 29:8
268:2 269:5

collect 172:11
190:18 198:16
229:18,21 243:1
252:4
collected 65:12
71:8,18 88:9
94:17 108:20
110:1 190:7 203:7
227:11 243:16
244:1 299:6
collecting 98:18
171:20 172:22
243:10 252:19
collection 260:25
columbus 2:17
56:8
column 249:10
combat 312:6
combination
342:16
come 28:8 56:8,9
112:22 213:16
253:12 262:11
265:5 300:25
302:21 325:24
347:19 348:23
353:3
comes 242:15
253:23 266:16
coming 24:20 44:3
68:8 114:14 174:9
208:6 210:11
227:9 246:22
347:15 349:22
353:8
commander 24:14
comments 282:25
commission
359:16 361:19
362:25 363:25

commissioned
358:8
committee 164:18
191:22 198:21
217:14 242:24
246:13
committees
217:13
communicated
204:8
communications
82:9
communities
156:22 170:20
community 52:7
58:5 232:4,18
233:3 285:17
305:10,12 306:9
311:13
companies 4:16
194:25 195:3
comparabilities
312:3
compensation
65:15,16 71:9
compiling 285:6
321:7 334:8
complained
206:25
complaint 27:4,5
85:24 159:24
162:5,21 163:25
173:16
complaints 85:5
154:24 155:11,16
156:21 157:3,11
159:3,12,19 160:9
160:12,16,23
161:4,14,18,23
162:13 170:15
171:3 173:1,21,25

174:3 175:17
176:5 202:5
**complete** 168:21
**completed** 245:10
358:20 360:13
**completely** 175:13
175:14 211:18,21
211:25 249:1
297:12 351:13
**completion** 331:19
**comply** 273:23
**compound** 295:5
**compounds**
336:19 337:7
338:9
**concept** 186:17
**concern** 158:9
173:16 174:21
180:9 227:8 299:1
299:2 305:16
308:10 309:15,20
**concerned** 156:1,8
224:23 226:12,12
289:17 298:14
309:2
**concerning** 162:8
171:16 184:9
261:18 262:8
266:25 268:16
**concerns** 154:23
155:4,11 157:3,12
157:17 158:12,13
159:8,11 160:10
160:22 161:23
162:6 164:11
170:22 171:3
174:3,15 176:5
194:8 197:15
201:14
**concluded** 356:2

**conclusion** 317:10
**conclusively** 332:1
332:22
**conditions** 120:5
121:11,13,14,24
128:1 151:15
**conduct** 36:5
37:20 40:11 41:4
41:20 44:13 45:5
45:10,16,19 46:13
46:22 47:24 48:22
49:18,23,25 50:6
50:20 51:11,15
52:7 53:2,9,21,24
57:8,11 58:6 59:3
59:25 60:18 62:6
62:12 89:1,7,17
95:11 120:21
139:25 160:17
178:11,21 202:10
321:9,16 335:25
336:10,14 338:11
339:1
**conducted** 240:22
322:16
**conferred** 321:14
**confident** 167:9
**confidential** 7:20
8:6,10 234:15
248:19 263:18
**confirmation**
313:17
**confirmed** 320:25
**confused** 37:6
111:13 251:4
260:14
**confusing** 67:3
89:23 91:23
**confusion** 352:2,3
352:10

**conjunction** 108:6
213:13 253:9
**connect** 310:4
**connection** 21:7
22:25 24:5 44:5
51:25 63:8 64:6
64:13,14 67:25
68:5 81:12 96:6
97:19 98:12,15
110:7 138:16
140:25 177:3,12
209:5 222:3 230:6
249:15 321:7
322:10
**connolly** 3:21
**consensus** 344:18
**consequence**
47:14 211:15
**consequences**
200:18,21
**consider** 190:24
191:4,14 295:14
296:16 297:22
303:16 306:14,22
307:13 308:5,5,17
309:9
**considered** 33:7
73:5 90:21 187:21
194:6 313:3 334:8
**consistent** 156:23
**constituted** 153:8
**constitutes** 296:4
297:5
**consultation** 68:13
110:16 112:9,25
113:12 114:6
115:12 117:3
147:14 151:1
152:9 315:11
322:13 324:8
325:4,6,24

**consulted** 65:25
94:19 96:13,23
97:25 98:20
111:16 113:13
119:12 153:3
321:6
**consulting** 152:21
**consumer** 159:24
191:6
**cont'd** 3:1 4:1 5:1
8:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1
**contact** 42:19
165:16 203:21
302:18 353:6
**contain** 335:17
**contained** 215:20
**contend** 85:1
93:24 107:1
128:10,18 129:6
138:5 139:14
346:22
**contention** 130:3
**continuation**
127:17
**continue** 83:15
205:10 229:21
252:3,14
**continued** 128:22
158:24 198:25
205:12 229:20
273:17 309:25
310:10
**continues** 205:7
**continuing** 104:7
347:1 350:11,17
350:24
**contrary** 128:16
138:12

**contribute** 37:5,7
46:20 48:12 57:20
57:23 165:20
166:2,10,16 265:7
265:16
**contributed** 30:20
31:7,22 32:4,11
34:18,24 35:5,25
36:19 37:10 38:1
44:19 208:5 340:8
341:1
**contributing** 8:9
263:14
**contribution** 38:5
44:10 306:20
307:9
**controlled** 42:25
156:17 196:24
223:12 225:21
226:13 227:2
228:10 242:1,15
274:17 281:21
282:1,7 296:25
303:16
**convened** 233:23
**convenient** 360:15
**conventional** 91:7
**conversation**
224:8 227:22
354:25 355:4
**conversations**
21:9 25:18 82:4
130:10 160:14
165:10 167:7
173:4 212:17
322:2 326:19
**conveyed** 156:7
**cooperation**
312:13
**coordinate** 200:11

**coordination**
233:20
**copies** 23:11
**copy** 27:2,3,13,16
29:5 166:23
**coroner** 21:19
22:24 24:8 272:1
**coroner's** 206:21
237:9
**coroners** 238:13
238:14
**corporate** 20:25
22:10
**corporation** 2:19
3:2 18:21
**correct** 36:21
47:18 68:22 95:19
112:5 114:19
118:4 120:14,21
121:12 147:1
149:2 170:14
183:11 184:13
185:17 188:20
191:17 197:21
201:24 210:22
212:8 223:25
249:24 285:8,22
286:2,12 288:6
291:13 292:12
293:6 294:18,22
295:25 316:7
317:23 318:9
342:8 358:16
**corrected** 27:4,5
**correction** 82:1
**corrections** 362:17
**correctly** 292:9
**correlate** 126:8
**correspondence**
27:22

**cost** 300:13,17,19
301:1 302:13
**costs** 55:5 299:20
300:1,6,11 301:2,8
301:15,17
**counsel** 18:8 19:10
20:7 26:24 27:8
30:14 41:11 61:3
67:14 82:6 114:6
277:14 324:8
357:1,10 359:2
**count** 106:15
**counties** 174:22
178:16 189:24
190:2 207:23
216:10 267:22
337:2
**countries** 313:2
**country** 211:7
269:5
**county** 1:9 2:2 7:6
7:7,8,13,13,22,23
8:4 18:11,13 21:3
21:4,20 25:7,8,11
27:20 28:25 30:20
30:21,22,23 31:11
31:21 32:3,7,10,15
32:17,20,24 33:10
33:15,23,25 34:5,8
34:23 35:5 36:8
36:16,20 38:17
40:1,10,19 42:1,16
43:19,20 45:14
46:19,24 47:21
49:14 50:23 51:2
52:5,19,24 53:1,12
53:22 54:3,13
55:7 59:23,25
60:11,22 61:10,11
61:15,21 62:11,25
63:12,15,25 64:8

65:12,15,19 66:10
66:13 67:17 70:22
70:24 71:10,14,18
72:3,7 73:22 74:7
77:10 81:16 84:2
84:3 86:17,22
87:10 88:9 93:10
94:17,21 96:8,12
97:23 98:10,11,22
99:1 101:23 102:1
102:18 103:3,9,16
104:25 105:8,21
106:3,7 107:8,13
107:22,24 108:7
108:20 110:14,25
111:16,18 112:14
113:20 114:5
115:14,19 116:3,7
117:2,11 118:21
123:14 125:11,13
139:10 142:11
144:14 145:24
147:13 148:2
150:19 152:8,19
153:19,20,24
155:15,21,23
157:13 159:6,20
159:23 160:1,5,7
160:10,19,23
161:3,5,16,19,24
162:5,20 164:6,10
164:25 165:14
167:22,23 171:2,7
171:18 172:10,18
173:15,22 174:1,4
175:1,15,18,21
176:9,14 178:11
178:14,21,24
179:4 183:10,18
186:15 187:25
189:21 190:2,4,6

190:12,17,18
193:3,18 194:1,6,9
194:17 195:2
196:21,22 197:21
197:24 200:25
201:11 202:1,5
203:1,4,7 204:3,10
204:25 205:6
206:2,6,8 207:6,7
207:8,12,15,19,20
208:6,10,22,24
209:7,8,8,10,15,20
209:24 210:6,23
212:12,23,25
213:3,4,6,8,23
214:4,6,15,16,19
214:20 215:3,5,6,8
215:21 216:8,9,16
217:4,7,23,25
218:3,13,15,18,22
219:1,5,11,14
220:2,7 221:4,10
221:19,22 222:2,4
222:13 223:15,19
223:21,23 224:1
224:22 225:9,19
225:24 226:2,7,11
226:14 229:5,11
231:12,16,20
232:15 233:7,14
238:22 240:10
241:14 244:12
246:16 248:15
249:8,21 257:1,6
257:23 258:1,3,4,5
258:9,15,22,23
259:4,7,17,19
260:1,3,11,17,20
261:5,24 262:16
264:21 265:15,17
266:8,17,18

267:13,15 268:3
268:15,21 270:4
272:14 273:8,11
273:12,24 275:6,9
275:13,16,19,22
276:7,16 277:24
278:14,18 280:19
281:19,24,25
282:6,19,24 283:3
284:3,6 285:6,10
286:12 287:21
288:6,11,16,21
289:3,6,19 290:3,7
291:12,16 292:20
293:10,13 294:2,4
294:17 295:7,25
296:13,16 297:22
298:3,11 299:1,8
299:10,12,16,20
299:25 300:3,4,10
300:13,17,20
301:1,3,6 302:13
302:23 303:22
304:3,13,21 306:3
306:25 307:7,12
308:5,17 309:2,8
309:21,25 310:1,6
310:9,15 311:3,6,7
312:5,8 313:3,13
313:19 314:16
315:8,10,15,19,25
316:14,22 317:2
317:15,18,19,23
318:4,6,15,22,23
319:3 320:25
321:4,9,15 322:8
322:14 325:3,21
326:17 327:18,24
329:3 331:20,25
332:21 333:6,10
333:19 335:10,18

335:23,25 336:9
336:20 337:17
338:10,25 339:5
339:18,20 341:17
342:4 346:3,6
358:4 361:10
362:15
**county's** 34:14
36:22 39:10 40:4
44:9 45:11 53:3
59:14 60:6 61:25
62:3,15 67:10
68:16 85:9,20
98:1 155:19
159:11 218:11
220:4 223:17
298:12 299:2
309:7 311:21
313:15 319:6
323:18 325:8
327:1 330:11
339:8,24 340:12
343:3
**countywide** 190:8
**couple** 68:7 231:9
327:9 354:22
**coupled** 54:14
**course** 24:24
122:10 157:18
201:16 278:5
287:23,24 298:16
324:9 330:5,17
**court** 1:1 6:18
18:6 19:24 288:2
302:7,14 310:10
311:4 361:7
**cov.com** 2:22
**cover** 154:22
189:18 244:17
**covered** 112:2
154:5 232:10

258:16 268:20
277:16
**covering** 29:7,8
**covington** 2:20
18:20
**crack** 314:1
**create** 35:22 50:10
50:12 319:16
336:21,23 337:23
347:25
**created** 48:14
51:19 56:18 70:16
101:19 230:1
238:11 257:14
**creates** 211:16
317:20
**creating** 51:6
180:10 340:20
**creation** 156:2
311:3 337:3
339:10
**credentials** 257:25
**crime** 187:14
261:1 286:20
289:15
**criminal** 46:21
218:5,16 223:3
**crises** 211:21
**crisis** 8:3 21:21,23
30:21,23 31:7,23
33:6,18,20 34:18
34:24 35:6 36:20
38:2 39:1,13
46:19 54:21 55:7
58:19 83:3,5,7
104:20 156:3,4
158:5 165:20
166:2,10,17 172:9
179:2 188:14,22
197:25 199:14
204:8 206:18

210:24 211:17,17
211:21 229:11,23
230:17 243:21
248:14 249:6
251:2 252:17,22
298:21 302:20
306:25 307:4,10
307:14,18 308:6
308:11,18,24
309:9,13,18
311:22 312:2,16
312:16 336:4
337:3 339:24
340:9,13 341:2,4
**criteria** 66:5,21
69:8,19,23 70:7,17
70:20,22,25 71:7
72:20 73:8,15,18
73:23 74:2,3,10,13
74:13 75:11,15,19
75:22 76:15 78:22
79:4,6,8,9,14,16
79:19,25 80:4,9
81:2,11 88:12,16
88:23,25 89:4,12
89:16,17,21,24
90:8 94:7,9,18
95:1,3,7,12,15,17
95:21,24 96:3
97:18 98:24 99:1
99:7 100:5,8,22,23
100:25 101:13,19
103:1,13,20
105:17,22 106:7
109:4,6,11,14,21
109:24 110:2,6,7,9
110:18 111:1,5,8
111:23 112:3,7,20
113:5,11,14,20,21
113:25 114:9,13
114:17,18 115:8,8

115:20 116:1,23
117:4 118:4,7,8
119:17,20,25
120:3,4,7,8,17,18
120:23 121:2,7,20
121:24 122:3,12
122:16 123:19
124:13,23 125:14
125:20 128:5,8
129:18,25 130:21
131:12,12,14
132:6 133:9,23
134:20 136:17,25
137:7,20 138:16
139:7 141:4 142:4
142:15 143:7,9,16
143:20,21 144:2,6
144:7,11,15,17,22
144:24 145:11,16
145:25 146:1,2,5
146:10,25 147:12
147:20,20 148:5
148:10,17 149:1
149:14,15,20
150:8,11,18 151:3
151:6,8,12,16,18
151:20 152:4,12
153:3 154:11,18
182:3,7,13,16
197:5,9 315:4,5
320:7 321:12
322:23,24 325:19
326:24 333:4,25
334:23 335:1,3,7
344:21 346:3,5,15
347:19,21,24
348:22 349:7,17
349:18,21 350:2,4
350:5,8,9,14,15,22
351:6 353:2,9,10
353:17,24,25

354:5
**critical** 178:6
**cross** 177:14
205:24 328:6
**crum** 5:7
**cuff** 72:15
**culture** 340:20
**cure** 296:22
**current** 254:7
**currently** 33:1
123:5 125:4,17
188:19 235:5,20
253:22 323:15
**cursory** 269:16
**curve** 304:20
**custodial** 201:16
**custody** 6:18 83:2
355:8
**cut** 168:8 214:3
**cuyah** 7:20,24 8:5
8:10 234:14
244:13 248:18
263:17
**cuyahoga** 1:9 2:2
7:6,7,8,13,21,23
8:4 18:11,13 21:4
25:7 27:20 28:15
28:25 30:20,21,22
31:10,21,23 32:1,3
32:7,15,17,20,24
33:10,15 34:23
35:5 36:16,20
40:1,3 42:16 53:1
54:13 59:25 62:17
66:11,13 84:2
85:20,22 87:20
92:8 96:8 101:23
102:18 103:9
143:4 153:18,20
153:23 155:10,22
161:24 162:20

171:2 172:9
178:13 190:2
193:2 206:2
207:12,15,19
209:24 213:3
214:15 232:15
233:14 240:10
241:14 244:11,18
248:15 249:7,21
285:6 287:21
289:3 291:16
293:10 304:3,21
306:25 308:17
309:21 327:11
335:24 340:12
341:16 342:4
358:4
**cuyahoga's** 31:4
39:25
**cvs** 65:17,17 71:9
203:8 285:12

**d**

**d** 3:16
**d.c.** 3:22
**daily** 80:10,13,14
101:21
**dan** 1:8
**dangerous** 69:14
73:5 101:20
102:10 103:16
**dangerously** 128:2
**danna** 234:22,25
**data** 30:5 32:16,18
32:24,25 33:13
34:2,5,8 41:6,10
42:9 54:14,15
64:19,22 65:12,19
65:22 67:17 71:8
71:12,19 73:12
74:8 77:9 88:9
94:17 96:12 97:8

98:19 105:22
108:20 110:1
111:15 146:24
150:5,7 151:5
152:22 171:15,19
172:11 173:21
175:1,10 177:11
178:5,8 180:19
181:10 184:9
188:4 189:16,17
189:21 190:18
198:16 199:16,17
203:6 204:17
209:21,22 210:4
212:12,13 220:17
223:16,23,24
224:2,18 227:11
227:13,20 228:2
228:13,15,25
229:5,9,19,21
230:3,4,6 235:2,4
235:9 236:2,5,7
239:7 240:5,16,17
240:25 241:2,6
242:9,17,21 244:1
244:6 245:5,10,12
245:24 246:14,19
247:17 249:11
251:7,18,21 252:4
252:15,20 253:10
253:16 254:2,5,20
255:14,19,21,22
255:24 256:1,5,7
257:7,8,14 261:18
262:7 264:10,11
264:16,19,22,24
265:9,24,25 266:2
266:9,13,14,16,22
266:25 267:4,7,17
267:19 268:15,22
269:10,14,19,19

269:25 270:17,20
271:4,10,12,13,17
275:20 276:9,19
277:4,7,17,22
279:12,21,25
283:22,24 285:6,7
286:16,19,20,24
287:2 288:19
292:24 294:4,5
298:7,10 299:6
304:6,12,16
307:23,24 317:19
317:20,22 318:1
320:20,21 321:11
325:22 328:3
330:2 335:6 341:6
**database** 104:2,5
145:23 160:15
174:14 177:12,15
180:3 184:17
223:8,11,19
224:12 226:18,21
227:2,3 228:21
239:19 257:1,2
258:24 259:5,13
259:25 262:4,11
265:16,17,19
266:19 267:10
269:10,14,17
270:6 271:2 273:5
273:9,10 277:7,18
277:24 278:2
280:2,6,9,16,24
281:6 328:5
329:22 331:4
**databases** 71:5
261:24 262:13,20
263:2 267:9,14
272:24
**date** 18:1 27:11
158:2 160:11

245:6 278:21
285:2 323:9
357:11 360:8
361:3,9,19 362:3
362:13,25 363:20
363:25
**dated** 27:9 263:25
**dates** 199:18
323:12
**daughter** 332:5
**david** 24:12 27:21
**dawn** 25:13,15,16
175:19 231:22
**day** 2:14 18:25
274:2 312:18
341:25 359:7
361:16 362:22
363:22
**days** 68:8 104:2,6
273:17,19,19
360:19
**dcfs** 82:21 83:2
**dcsf** 355:8
**de** 180:19 198:18
229:19 239:7
240:5,16,17,25
241:7 242:9,16
**dea** 180:13 223:13
224:4,15 225:4,20
225:22 226:2
238:17,19 272:11
281:17,20,25
282:5,6 283:6,8
**dea's** 184:21,23
281:15 283:12
**dead** 151:20
**deal** 83:19 211:22
311:16
**dealer** 55:25
**dealers** 311:2

**dealing** 21:23
**dealt** 215:3
**dear** 360:10
**death** 141:7,16,20
147:22 148:3,19
164:18 179:7
191:21 198:5,20
213:14,21 235:7
235:10 238:16
242:23 257:20
265:9 288:18
292:10 294:18
295:2 306:24
308:4 327:15,16
327:20 328:1,12
328:23 329:16
330:6 333:4,11,24
335:25 336:11,16
337:12 338:5,12
339:2,13 342:8,25
**deaths** 7:23 8:4
25:13 144:4,6,8,12
145:18,22,24
146:4 148:1,3
150:25 165:5
167:16 177:13,18
198:2,23 213:10
241:18 242:2,25
244:11 248:15
249:7,12,15,19
250:9,13,16,17,21
251:1,6,11 286:17
291:22 292:6,16
292:18 294:24,25
304:13 305:19
306:11,23 308:14
308:18 309:8,23
329:20 335:9,14
335:18,23 336:7
337:3,4 341:16
342:3,4,13,19

**decade** 105:12

**decades** 102:16

**decedent** 174:25
230:5,7,13

**decedents** 175:2
200:4 205:12
239:22

**december** 345:5

**decent** 268:4

**deceptive** 94:1

**dechert** 3:12,16
19:7,9

**dechert.com** 3:15

**decipher** 170:9

**decision** 47:21
109:5 110:21
115:13

**declaration** 27:2

**declined** 305:20

**dedicated** 219:5

**dedicating** 219:15

**deed** 361:14
362:20

**deemed** 360:21

**deeper** 181:13

**defendant** 19:5,14
41:20 42:3 44:19
48:15 53:2,9,17,18
53:21,25 58:6
62:7 89:8 92:19
153:16 154:2
160:17 269:18
271:3 303:24
336:1 339:14,23
340:11 341:15
342:18

**defendants** 7:9,10
7:15 18:23 19:18
20:7 27:6 30:19
30:24 31:6,13,21
32:3,9,13,14 36:2

37:3,12 39:14,17
39:23 40:13 44:11
44:13 45:12,16,19
48:1 49:24 50:4
50:10,24 51:14
52:8 53:5,7 54:8
54:19 56:17,19
58:25 59:3,16
60:1,8,13,18 62:2
62:13,19 66:15,16
84:6 87:23 88:6
89:1,18 90:6 93:5
94:1 126:12
128:24 129:4,6
193:23 194:18,23
195:6,14,19,25
196:7,8 203:5
204:4,10 269:9,24
270:16,20 272:6
272:16,18,23
285:11 303:9,20
328:15 336:6,8,15
337:1 338:11,24
339:6,9 340:8
341:1 342:22,24
345:17 347:3
350:6,13 353:7

**defense** 164:1

**defer** 38:9 278:19
299:11 315:16

**deferred** 315:17

**define** 35:9 86:25
129:4 148:3
290:10 306:3
315:8,15 316:17

**defined** 80:16
86:12,18 124:12
127:13 136:15
138:3 165:6 182:9
191:16,17 296:6
296:10 334:13

**definitely** 222:20

**definition** 35:17
40:24 86:16,22
87:6,7,11,17,18
101:17 125:9
133:6 187:10
191:18 206:23
211:2,8 212:5
306:7 315:14,20
315:25 316:5
319:13 322:17

**definitions** 80:19
122:21

**definitively**
171:14

**degrees** 60:9

**delay** 251:23

**delivery** 357:9,11

**demographic**
171:24

**density** 192:24

**dental** 202:14

**dentist** 202:23

**dentistry** 202:21

**dentists** 202:19,20
274:4

**deo** 248:25 249:2

**department** 8:7
24:11,15 30:4
177:19 188:6
189:14,23 191:24
198:7 209:18
215:11 231:18,19
232:15,16 262:13
262:15,16,16,17
262:19,24 263:1
263:12 264:2
265:4,22 266:15
266:16 276:1,17
294:11 328:3,16
360:24

**departments**
264:25 265:2

**dependence**
319:16

**depo** 142:21

**deposed** 20:14,21
22:6

**deposition** 1:13
7:5 18:3 22:2,11
23:1 24:24 27:17
27:18 28:22,24
29:5 66:9 77:18
83:25 101:3
111:22 112:19
126:22 127:2
130:11 159:14
184:20 234:12
240:8 244:9
248:12 250:3
263:10 315:23
343:21 354:23
355:21 356:2
358:19 360:8,11
361:1,3 362:1,3

**deprived** 128:25
347:4

**derek** 24:17

**describe** 92:6,16
208:9 355:3

**described** 52:14
201:12 207:19
209:4 249:16
261:9 290:14
293:6 305:13

**describes** 55:23
240:16

**describing** 289:5
351:4

**description** 7:3

**designated** 20:24
154:21 286:11

designation
238:11
designed 213:8
designee 20:25
22:10
despite 128:15
138:11
destroyed 26:8
82:3
detail 228:8
254:18
details 93:2
289:22
detect 279:5,10,15
detected 216:23
291:24,25
detecting 277:25
detection 279:17
determination
105:24 111:2
determinations
116:15 152:15,17
determine 110:10
110:18 113:14,25
115:8 116:24
120:12 147:20
148:17 150:11
151:18 152:9,22
153:24 154:12
179:8 347:21
determined 76:1
76:18,19 77:4,18
78:25 99:23
134:17 341:17
determining 112:4
112:20 121:16
127:25 134:20
146:10 346:7
348:24 353:10
deterrent 128:14
138:10,22 139:8

139:11,12,17
detroit 56:8
dettelbach 168:5
208:20 233:23
234:1
develop 172:4
319:10
developed 81:3
213:13 323:2,9,10
developing 205:22
development
311:2
devise 122:8
devised 122:7,9
diagnose 330:3
diagnosed 40:23
69:14 70:8,9
72:22,25 88:20,21
119:23 143:12
150:23 315:7
323:5,11,15,19
325:17 330:12
348:4
diagnoses 128:1
316:7 318:2,4,5
diagnosis 76:21
79:5,19,21 109:16
125:3 142:1,13
182:14 316:1
317:14 318:7
321:1 323:9,20
330:7,10,12,15
334:15
diagnostic 323:24
323:25
die 42:10 294:22
309:16
died 141:6 229:17
235:3 236:16
239:22 253:13
309:3,5 328:18

332:24 333:5,7,22
337:5,15,22
different 60:16
90:21 121:14
143:14 172:14
183:14 189:23
191:20 194:13
220:18 226:25
227:16 232:17
241:3 268:2 277:7
297:12 323:11
351:3,14,21
353:17
differentiate
135:12
differing 350:19
difficult 238:22
279:4,10,21 280:5
280:23
difficulty 237:21
diminished 189:5
direct 106:23
223:20 234:18
259:5 266:12
direction 117:11
126:6 220:5 253:5
directly 30:23
38:11 40:10
201:23 258:24
265:5
director 24:13,18
25:12 191:23
227:22 268:11
disappointed
200:23
disciplinary
127:22 133:15
134:5 137:5 218:4
218:9 223:4
discipline 156:15

disciplined 132:21
137:25
disclose 130:9
322:3
discount 4:6 19:22
discovery 7:16
84:8 344:24
discrepancy
255:16
discuss 217:18
discussed 21:18,19
30:14 38:16 67:14
129:17 194:10
198:8 257:3
268:18,23 287:9
discussing 256:24
discussion 34:6
46:2 49:14 52:19
163:13 194:15
206:17 224:4
discussions 32:22
162:25 194:13
198:6 201:18
208:11 212:22
238:12 269:7
283:5 291:3
294:12
disease 306:8
diseases 317:3
disorder 40:23
69:15 70:8,9,11,13
72:21,23 73:6
78:23 79:1,17,22
88:22 105:17
109:3,17 119:23
125:2,5,7,17,18,19
142:1,13 143:13
150:23 182:4
315:7,9,15 316:12
316:17 317:7,10
317:21 319:10,14

320:2,16 321:1
322:18,21 323:3,5
323:10,15,20
325:18 330:4,13
333:14 334:16
348:5 349:21
**disorders** 318:9,15
318:20
**dispensed** 185:13
186:8 192:3,7,20
193:9,14,16
228:16
**dispensing** 35:10
184:11 261:20
262:1,8,22 267:2
268:17
**distinguish** 342:10
**distributed** 56:16
126:12 195:7
303:11,20
**distributes** 193:13
**distributing** 56:10
**distribution** 33:13
48:10 55:24 56:6
56:6,12,25 61:18
184:10 194:11,24
195:3 261:19
262:1,8,21 267:2
268:17 269:16
289:23 305:21
336:20 337:16
338:9
**distributions**
33:14
**distributor** 185:12
186:7 187:19,23
193:12,19 194:2
228:3 271:12
**distributors**
203:25 223:11
227:15,19 228:2,7

269:13 270:22
271:17,21 272:5
**district** 1:1,2 18:6
18:6
**diversion** 39:11
166:20 181:2,14
183:21 184:3
185:3 187:5,11,14
187:21 188:13,16
190:20,23 191:3,8
191:12 192:2,15
192:19,25 193:8
193:20 194:2,19
196:2,24 197:16
197:23 200:8
201:11,13 203:5
203:12 204:4,9,19
205:1,6,18,23
206:7,11,22 207:1
207:6,14,18,21,25
208:10,16 209:6
211:2,8,13,19
212:2 213:23
214:12 215:16,22
215:25 217:24
218:21 219:1,7,16
219:23 222:3
224:23 226:12
229:2 254:19
256:24 259:15,23
260:11 276:11
278:1 279:5,5,11
280:5,12,18,23
281:5 285:11
**diversions** 206:15
218:23 280:17
**diverted** 49:6
179:23 188:1,10
190:6 193:15
208:23 209:1,23
210:5,15 211:5,7

212:13 331:13
334:7 342:11
**diverting** 197:18
331:21
**divided** 189:19
**division** 1:3 18:7
21:17 23:6 26:17
165:11 197:12
201:15 202:3
**divisions** 22:24
**docket** 302:14
310:12
**doctor** 20:17 23:9
28:10 29:4,7
31:15 34:13,14
35:10,11,17 36:25
38:15 41:15 43:8
47:15 48:16,20
49:16 55:12 56:2
57:12 59:1,17
67:9 69:3 83:20
84:13,17 88:13
94:3 95:10 96:24
98:14 99:21 103:8
106:13 110:23
112:19 113:24
119:2 120:12,19
120:24 121:4
131:10 140:4
142:7 145:8 148:9
148:9 149:10
157:2 159:25
163:18 165:1,5
166:9,16 167:3,15
169:24 170:3
172:13 175:4
180:25 183:17
184:11,24 186:24
190:25 191:2,11
191:16 193:7
197:7,8,8 198:22

200:6 202:20
204:23 205:13,16
205:25 206:2
207:11,22 214:3
214:18 215:17
223:8 226:20
230:13,20 234:4
235:11,14 238:25
240:4 244:19,22
245:15 248:2,25
249:11 250:19
251:10 260:16,19
261:16,23 263:6
263:22 273:3,6
281:9,19 284:20
325:20,23 326:20
331:2,7 334:5
346:7 347:11
348:16
**doctors** 36:5 37:20
46:1,12,22,25
49:24,25 50:16,19
51:11 57:7,17
96:9,18 97:2,12
101:22 102:18,21
121:13 132:2,24
133:11,14,25
136:10 137:1,4,22
139:21 140:3
161:14 163:1
181:18 184:1
196:9,22 197:18
199:4 200:1 201:2
201:5 257:20
346:21 347:9
348:25 350:3,16
353:5,11 354:4
**document** 1:8 7:23
8:3,7 69:4 72:8
73:21,24 84:13
132:4 137:9

138:25 140:6,12
141:1 143:2
153:11 234:25
244:10,19,22
248:13 263:7,11
263:24 264:7
**documented**
217:21
**documents** 22:22
26:21 68:2 142:9
209:9 230:19
242:12 247:14
323:6
**dogmatic** 227:24
**doing** 35:21
110:15 145:8
170:24 171:10
174:12 177:21
179:13 180:23
194:6 199:20
243:1 249:4
261:10 280:21
332:7
**dominating** 291:5
291:7
**door** 176:7 311:15
**dosages** 128:3
197:6
**dose** 40:21 69:12
88:18 109:15
119:22 143:11
150:22 334:13,20
348:2 349:19
**doses** 128:21
129:3 325:16
346:25 347:7
**double** 96:1
**doubled** 304:13
308:2
**doubling** 306:11
306:14

**downplay** 289:16
**downward** 264:24
**downwardly**
125:25
**dozen** 129:19
**dr** 24:7 25:9 26:18
52:19 82:19 183:7
231:8,22 234:19
235:2 244:16
248:22,25 249:2
256:23 291:3
344:11,20 345:8
354:22
**dramatic** 300:14
300:19
**dramatically**
290:20 304:10
314:21
**draw** 253:11
**drawing** 151:4
**drill** 190:16 298:6
**drive** 3:17 4:4
**driven** 302:19
307:5
**drivers** 313:18
314:15
**driving** 189:1
**drop** 213:24
214:17
**dropped** 290:20
**droz** 234:22,25
**drug** 3:2 4:6 8:8
19:22 24:17,19
30:4 32:23 34:6
36:5,6 37:20
39:15,21,21 40:1
42:9,23 50:25
51:15,20 54:19
55:20 56:25 58:10
60:24 61:9 64:22
104:5 165:4

172:10 175:2
180:10 185:3,6,10
185:24 186:4,11
187:5,11,14,21
190:22 191:3,6,8
191:23 192:2,14
193:12,20 194:2
194:18 196:2
200:8 203:5,11
204:3 205:6,21
206:7,10 208:9
209:6 211:2,6,8,9
211:12 212:1
213:9,24 214:17
214:17 215:12,16
215:22 217:18,24
219:6,16 224:23
226:22 227:7,10
228:19 229:2
250:22 259:14
263:13 264:5,8,15
268:6 277:25
279:5,11 280:4,12
280:22 286:19,20
287:2 288:8,15,25
289:18,25 290:2
294:16,17,21
297:23 298:13,18
300:2 301:4 302:7
302:14 305:9
307:17 309:16
310:1,10,24 311:2
311:3,4 318:2
324:4,11,14,24
325:7 339:10
342:25
**drugs** 33:14 35:10
42:16 56:7,10
139:15 156:9
157:20 165:25
171:13 174:17

185:4,9,13 186:5,7
189:2 191:7 192:3
192:9,10,19,23
193:2,8,9,13,14
197:16,18 208:17
208:23 209:2,24
210:6,11,13,15,20
210:22,25 211:5
211:11,12 212:13
213:1,5 214:5,5,20
215:5 224:24
227:10 228:11
243:14 272:12
281:23 282:2
286:18 287:20
288:5 289:12
292:21 295:20
297:23 299:3,5,13
299:25 301:19,21
303:11,15,23
307:20 312:7
314:8 336:20
337:16 341:8
342:17
**dsm** 79:9 182:10
322:17,24
**due** 121:12 292:25
293:2
**duly** 20:13 358:7
358:10
**dump** 26:11
**duplicate** 253:15
**duration** 103:4
**durkin** 4:7
**duties** 219:24
**dying** 207:13
308:22
**dynamic** 209:10

**e**

e  7:19 234:13,19
**earlier**  84:16 85:8
  99:17 121:10
  122:20 167:4
  182:5,13 191:17
  200:25 245:9
  250:2,20,24 266:1
  275:25 276:4
  285:10 288:12
  293:6 312:18
  344:12 354:24
**early**  58:18 102:17
  237:17
**easily**  205:25
**east**  4:8
**eastern**  1:3 18:7
**ecarter**  2:18
**economic**  34:16
  35:22
**economist**  60:23
**ectasy**  294:1
  295:24
**ed**  19:1 284:22
**education**  128:22
  172:3 232:23
  298:22 347:1
  350:12,24
**educational**
  154:25 155:13
  156:5 157:5,18
  158:3 162:8
  173:17 232:20
**edward**  2:15
**effect**  42:17
  257:16 302:4
**efficacious**  85:16
**efficacy**  104:21
**efficient**  83:19
**effort**  74:12
  203:10 217:5

253:15 257:14
  277:23
**efforts**  8:9 33:17
  58:24 184:20
  199:2 263:15
  268:1,13 281:14
  310:10,25 336:21
  336:23,24 337:23
  337:24 338:10
**eighth**  245:13
**either**  58:21 77:16
  109:2 117:22
  145:20,23 147:21
  152:1 181:17
  222:5 233:1 291:6
  359:2
**elected**  238:15
**elephant**  314:7
**elevated**  306:8
**elevation**  306:20
  307:21,22,24
**eligible**  91:4
**elizabeth**  24:7
**ellis**  5:3 18:17
**emergency**  25:10
  220:16 276:1
  291:3,6 294:11,12
  301:20
**emphasize**  294:8
**employed**  60:23
  322:18,25 355:9
**employee**  244:3
  260:17 275:19
  276:19
**employees**  160:7
  276:8 277:3
**empowered**
  162:13
**enable**  213:25
**enabled**  227:4

**enact**  212:21
**enacted**  212:17
  275:5
**encompassed**  65:9
  125:19
**encouraged**  57:17
**encouraging**
  340:21
**ended**  52:22
  304:23
**endo**  4:15,15
  18:23 20:6
**enforcement**
  24:17 30:5 32:23
  34:6 160:6 181:4
  196:15,19 208:12
  208:14,14 209:5
  209:15,17,19
  212:16,23 213:7
  213:11,14 215:4,8
  215:12,24 216:1,6
  216:15 219:9,12
  219:14 220:1
  227:15 246:15
  257:11 258:19,21
  259:2 267:9,14,15
  276:5,7,10,23
  278:7,23 280:13
  280:20 298:10
  310:22
**engage**  49:25
  50:19
**engaged**  36:5
  47:23 49:17 55:19
  57:7 95:10 196:1
  338:11
**engaging**  46:13
  50:5 338:25
**england**  268:3
**enter**  186:22
  227:12 228:15

**entered**  228:14
  362:9
**entire**  127:15
  131:21 162:20
  175:11 361:5
  362:5
**entities**  30:19 31:5
  31:20 32:2 38:1
  39:5,9 44:18 45:3
  46:3 71:11 116:14
  203:21 272:8
**entitled**  7:21,23
  8:3,7 240:9
  244:10 245:14
  248:13 249:6
  263:11 264:7
**entity**  31:24 43:16
  44:10 51:25
  119:10 187:20
  266:5 267:14
  272:14 299:12
  301:5
**entry**  310:24
**enumerated**  89:4
  111:7
**epidemic**  7:22 8:8
  32:9 42:13 64:2
  155:19 171:12
  203:11 206:14
  210:9 239:21
  240:10 241:15
  245:14 246:9
  263:13 264:8
  302:3 304:4 306:4
  306:15 309:14,14
**epidemics**  172:9
**epidemiology**  8:8
  263:14
**equal**  297:14
  298:1

**equivalents** 40:22 69:13 70:3 80:12 80:21 88:19 334:14 348:3
**er** 128:11,11 138:7 138:7,7,8
**erb** 4:8 19:21,21
**erica** 5:3 18:16
**erica.james** 5:5
**errata** 360:19 362:7,10,18 363:1
**escalate** 301:18
**escalated** 301:16 312:3
**escalation** 300:15 300:19 314:5
**especially** 165:25 197:25 229:10 277:8 283:7 292:24 294:6 301:20 305:24 312:4,12,17
**esq** 2:3,6,11,15,15 2:20 3:3,3,8,13,16 3:21 4:3,8,12,17 5:3
**essential** 124:18
**essentially** 35:12 35:22 53:14 231:11 233:3
**establish** 175:2 239:19 298:21
**established** 171:13 171:18
**establishing** 35:11 191:1
**estimate** 251:14 274:13
**estimated** 188:7 251:15

**et** 1:10 130:4 139:17 246:11,11 262:22
**evade** 163:12
**evaluation** 200:5
**evening** 344:10
**event** 359:3
**eventually** 180:11 240:5
**everybody** 42:15 52:2 64:20 287:15 287:18
**evidence** 58:22 173:25 177:25 208:2 213:17 260:25
**evolution** 33:21 164:20 188:17 205:20
**evolved** 54:21 180:3 188:14 198:1 229:24 302:11
**evolves** 188:5 229:23
**ex** 7:8 66:11
**exact** 22:13 43:11 124:13 285:16 289:9
**exactly** 78:15 106:21,21 107:25 161:22 220:3 254:23 297:18
**exalgo** 128:12 138:7
**examination** 6:7 20:11,15 183:5 244:4 284:18 323:8 330:8,18 344:8 354:20

**examiner** 64:25 197:1 198:13 206:21 210:10 238:21 257:10 258:7 267:17 272:1 286:16 317:19 318:1 323:19 330:3,11
**examiner's** 8:4 21:16 23:3 52:15 165:9 171:21 205:11 212:24 213:15 229:7,9 231:17 236:10 239:1 240:22 245:23 248:16 249:8 250:7 258:18 277:1 283:23 289:15 330:1
**examiners** 238:13
**examining** 8:3 127:25 248:14 249:7
**example** 56:7 127:24 193:10 230:4 246:15 258:6 261:6 264:4 271:11 291:21 294:20,23 302:7
**examples** 192:14 192:18 193:1 210:20 305:2
**excel** 345:10 346:8 346:17 347:17 352:5 353:4,11
**excellent** 185:1
**excepting** 54:6
**exception** 274:4 301:22

**excessive** 103:23 272:13
**exchange** 234:20
**excluded** 123:23 241:20 310:4
**exclusively** 302:12 310:3
**excuse** 31:24 34:10 70:1 303:21
**executed** 362:10
**execution** 361:14 362:19
**exemplary** 312:15
**exhaustive** 311:18 331:23
**exhibit** 6:18 7:5,7 7:12,17,18,19,21 7:23 8:3,7,11 28:23 41:1,2 66:10,23 68:25,25 71:23 72:1,7,12 73:15,16 84:1,12 91:16,19 92:2,15 93:11,21,22,25 94:25 96:7,18 97:3,13,20 98:15 101:9 106:1,12 107:2 108:17 109:22 114:18 115:10 116:25 117:16 123:19 124:4 126:23 127:3,12,21 128:12 132:2,15 132:20 136:10 138:8 140:2,17,19 142:24 144:18 149:9 153:7,15 154:1 167:13 177:3 234:13,19 240:9,14 241:11

244:10,16 245:20
246:4,6 248:9,13
248:22 250:10
263:5,11 304:8
313:25 315:22,22
315:23 321:8,21
321:21 322:9,19
323:1,14 324:4,13
324:22 325:9,20
326:2,6,14,19
327:4,8,8,13,19
328:21 329:4
330:21 331:1,8,13
332:1,22 334:9,19
335:2,5,8,17 337:5
337:11,15,22
339:2,12 341:11
343:22 345:4,7,9
345:10,19 346:11
346:20 347:17
348:9 349:23
351:22,24,25
352:4,11 353:11
354:1
**exhibits** 6:4 7:1
8:1 344:16
**exist** 80:20 279:6
**exit** 186:22
**expansion** 176:22
**expect** 276:24
278:6
**expected** 104:4
319:15
**expense** 35:23
**experience** 24:22
239:14 289:3
**experienced**
335:10,19
**expert** 31:22 52:5
52:24,24 58:2
59:23 96:21

104:13,21 105:1
113:8 115:13
116:12 117:8,13
118:22 119:1,12
139:25 270:5
339:19
**expertise** 318:13
**experts** 41:11
63:14 65:21,23,25
67:18 68:14 71:21
87:12 88:11 94:19
96:14,14,23 97:1,9
97:12,25 98:20
108:21 110:3,16
110:22 111:8,11
111:13,14,17
112:10,25 113:12
113:20 114:7
115:22,25 116:5
117:3,5,10 118:6
137:15 147:14
148:7,14 151:1,4
152:15,17,22
315:11,16,17
321:3,4,6,14,19,20
322:13,16 323:8
324:8 325:4,25
**expiration** 361:19
362:25 363:25
**expires** 359:16
**explain** 304:6
**explained** 204:6
255:15
**explanation**
261:11,11
**explore** 325:14
**express** 106:9
317:15
**expressed** 157:18
158:15 162:5
164:11 170:23,23

201:14
**expressing** 159:8
**expressly** 360:13
**extend** 273:18
**extension** 210:24
258:16
**extensively** 229:7
**extent** 44:9 70:21
119:9 182:11,12
200:11 203:24
243:20 252:7
270:22 276:13
284:1 289:5 299:9
299:23 300:9
322:17,22 328:21
336:6

**f**

**f** 167:20,20
**faced** 220:14
**facilitate** 213:18
279:17
**facilitated** 336:5
**facilitates** 330:10
**facilities** 185:11
221:20
**facility** 186:6
246:23
**fact** 61:21 80:23
121:17 168:25
178:5 207:11
238:25 253:19
254:18 288:7
289:12 294:24
304:16 307:7
**factor** 63:25
121:15 289:2
299:7 306:19
**factors** 8:9 52:4,23
53:22 55:6 58:2
58:14,17 59:16,22
60:15,16,24 61:20

61:22 62:1,5
240:24 246:21
263:14 334:7
**facts** 163:24
**fair** 57:1 113:5
114:9 125:20,22
147:8 148:16
159:4,14 160:21
160:23 170:17
189:3 243:5 245:6
246:7 271:20
274:12 346:1
**fairly** 350:1
**faith** 101:3
**fall** 211:1
**fallen** 243:21
**familiar** 66:7
79:24 84:17 103:1
138:21 139:9
181:23,25 186:16
223:7 225:16,19
242:4 265:24
299:9 316:13
322:23 335:4
352:18
**familiarize** 147:11
**families** 310:7
**familo** 4:7
**family** 21:18 23:6
24:12 26:18 125:6
125:18 165:11
166:6 197:13
201:15 202:3
267:4
**far** 40:8 69:13
141:7 165:3
249:10 286:23
287:1,4 291:6
325:22
**fatal** 246:22 294:9

**fatalities** 65:1
171:23 209:2
220:10 240:18,23
241:10 247:1
**february** 234:20
235:18 249:12,19
**federal** 20:12
161:8 162:6 164:2
164:11,23 176:24
197:24 198:6
208:16 215:10
217:1,5,7 266:5,16
267:20 284:1
299:7
**feds** 161:21
**feedback** 222:20
**feel** 26:6 221:1
277:19 312:12,14
**feeling** 241:21
**fell** 199:15
**fellow** 224:11
**felt** 222:17
**fentanyl** 33:22
34:22 39:16,20
42:11 43:4 51:2
156:3 158:14
164:21 188:19
198:2 199:21
210:9 211:6,17
212:1,8 220:8
221:3 229:24
230:16,17 244:5
249:11,15,18
250:8,13,21
277:10 292:17,20
292:23 293:4,6
295:15 304:18,19
304:24 305:4,11
305:15,21,23
307:6,10 308:1,24
309:6 312:4,20

313:2,21,21 314:4
314:6,10,17,17,23
333:8 341:4,5,18
341:18 342:6,6,9
342:11,12,14
**fgallucci** 2:9
**fifth** 143:4 245:3
**figure** 245:2 250:5
346:15 353:5,25
**file** 82:11 169:5
172:23 179:14
230:12,14 243:2
247:11,17 249:23
251:2,12 259:14
260:1
**filed** 173:25
193:22 194:7
339:6
**files** 229:25
**filing** 194:19,25
**fills** 195:12
**filtered** 163:15
304:15
**final** 242:25
243:13
**finally** 184:19
213:21 350:18
**find** 23:9 37:17
95:2,24 115:25
123:22 133:22
142:14 147:19
161:1,2 173:24
179:14,17 198:18
205:13 279:2
**findings** 247:7
**fine** 20:9 115:2
281:24 296:15
332:13
**finish** 59:7 135:3,4
235:13 243:24
244:3 255:7

350:20
**finished** 98:18
199:16,20 214:21
235:14
**firm** 178:4
**first** 7:10,15 20:13
22:9 42:12 51:7
61:8 62:23 66:17
73:1 84:6 93:22
136:1 143:2
157:22 159:2,5,7
159:11,20 174:22
183:20 198:14
206:6 233:10
244:21 277:22
278:17 323:2
324:4,11,14,24
325:7 358:10
**fischer** 4:3 19:17
19:17
**fishy** 165:16,19
166:4
**five** 22:17 30:11
165:6 204:20
230:25 256:16
**flat** 226:20 304:17
**flip** 340:10
**flooding** 46:23
**floor** 2:11 4:8
**florida** 212:13,17
212:20 215:4
**flow** 213:5 214:5
214:19,20 215:5
**flux** 70:14
**focus** 29:15 57:22
58:13 157:1
291:12 302:20
315:5 348:20
**focused** 349:13
**folder** 41:1

**folks** 26:17 28:10
54:23 60:12
142:12 151:5
154:7 168:1
174:15 181:11
203:7 302:24
308:21,25 309:3
331:21 334:19
**follow** 172:20
175:21 177:9
315:2 322:15
354:23
**followed** 220:21
309:22
**following** 280:3
353:21
**follows** 20:14
**forbidden** 104:9
**force** 25:8 167:24
167:25 168:2,3
191:21 198:9
208:13 224:11
231:9 232:24
233:15,22 283:6,7
283:24 285:15,21
300:6
**forces** 23:4 164:19
164:22 194:13
203:24 208:18
209:6 212:25
215:9 217:6 231:9
231:15 232:10
233:1,11 234:8,9
257:8 262:14
263:1 310:21
**foregoing** 84:25
358:15,20 361:13
362:18
**forensic** 286:20
**forget** 153:9
281:13

**[form - fulfilling]** Page 27

**form** 26:9 31:9
32:5 33:11 34:3
34:19 35:24 36:7
37:8,21 38:3
39:18 40:7,14
41:7,21 42:5
43:17,25 45:7,13
45:21 46:16 47:1
47:5,9,19 48:18,24
49:11,19 50:1,7,21
51:4,16 52:1
53:10,16 54:1,10
56:3 57:2,10,19
58:15 60:2,19
61:1 62:20 63:10
63:19 64:10 68:21
71:1,16,24 72:13
73:9 74:19 75:12
75:23 76:4,23
77:6,21 78:6,18
79:2,10 80:1,6,17
80:25 81:5 85:10
85:25 86:3,7,13,20
87:1,8,14,24 88:7
88:14 89:2,9,13,19
90:20 91:1,11
92:11 93:18 95:4
95:13,20 96:2,10
96:19 97:6,10,14
97:21 98:3,6,16
99:3,8,18,25 100:9
101:15,24 102:23
103:10,18 104:14
104:18,23 105:4
105:13,19 106:6
107:16,23 108:2
108:14,25 109:8
110:12,20 111:4
112:6,13 113:6,17
114:3,10 116:2
117:19,23 118:5

118:12,17 120:15
120:22 121:19
122:18 123:8
124:1,16,19 125:8
125:21 126:4
129:23 130:8,20
131:4,16 132:3,12
133:1,13 134:10
134:19 135:13,17
135:23 136:12
137:12,23 138:19
139:5,23 141:17
142:2 144:19
145:21 147:10,24
148:21 149:18
150:3,13 151:9,21
152:3,13,18 153:5
153:17 154:3,15
155:14 157:15,24
159:15 160:2,18
161:11 162:23
164:16 165:21
166:11,18,20
172:25 173:19
176:11,16 177:4
179:10 181:22
185:15 186:12,25
187:15 188:2
189:6,11 191:11
191:13 193:21
194:3,20 195:9,16
196:3,11,16
200:16,22 201:7
201:25 205:3,8
209:12,25 211:3
211:14 212:3
216:19 217:12
218:6,17 219:3,17
221:6,12 222:7
224:3,19 225:1,13
226:15 228:22

229:19 236:13,19
236:25 237:7,19
238:5 239:5,12
240:2 245:7 254:5
255:19,24 256:8
257:4 259:16
264:17 265:18
266:10 267:11,23
268:24 269:11,21
270:1 271:6,15,24
272:9 273:1
275:10 278:4,25
279:7,13,22 280:7
280:25 282:18,21
285:3 287:22
288:1 289:20
290:4,8 294:19
295:13 296:1,19
298:15 299:21
300:22 301:11
303:13,25 306:5
306:16 307:1,15
308:8,19 309:10
311:24 313:5,23
316:3,8,18 317:12
317:25 318:10,17
319:1,11,23 320:4
320:10 323:17
324:16 325:1,11
326:8,21 333:2,23
334:21 336:2,12
337:8,18 338:1,13
339:3,15,25 340:4
340:14 341:9,20
342:20 349:2
353:19
**formal** 170:20
233:13
**formalized** 217:9
**formed** 217:13
227:3,6

**forming** 227:7
**forms** 131:7
**formulate** 98:20
268:9
**formulations**
138:21,22 139:10
139:11,13 336:21
**forum** 170:24
**forward** 43:3
227:12 230:15
243:9
**found** 82:20 117:8
130:16 322:21
**founded** 260:24
**founder** 167:16
**four** 33:9 133:6
**fourth** 2:11 143:4
249:22
**fourths** 247:12
**frame** 86:9 163:2
289:23 294:7
300:16 314:24
335:10
**framework**
218:11
**francisco** 2:21 3:5
**frank** 2:6 18:12
**frankly** 169:25
**free** 361:14 362:20
**frequent** 204:18
**frequently** 35:13
156:6 288:15
299:14
**friday** 34:11 224:9
**front** 2:21 107:3
124:4 166:4,23
323:6 333:5
341:11 342:3
**frustrating** 351:9
**fulfilling** 161:3

**full** 84:18 129:12
160:21 229:20
236:4,7,20
**function** 160:11
178:3 209:15
216:20 218:12
220:2,2 227:1
265:1 275:14
280:13
**functions** 155:17
222:11
**funding** 57:22
328:5
**funds** 176:15
**furnish** 77:25
**furnished** 27:11
65:22 68:15 158:3
298:10
**further** 73:24 93:7
94:22 108:21
117:12 128:10,18
138:4,5 139:14
165:18 200:5
204:13 216:23
255:14 297:4
325:7 334:17
338:6 346:22
348:11 354:7
355:13,15 358:18
359:1
**future** 213:17
**fuzzy** 324:19

**g**

**gain** 34:16 35:22
261:25
**gallucci** 2:6,6
18:12,12 69:1
247:22
**game** 314:25
**gang** 36:6

**garner** 180:5
268:10
**garofoli** 1:20
**gathering** 242:21
**geez** 181:11
**general** 21:23 35:3
38:25 62:22
134:13 166:13
185:8 223:9
225:23 282:9
286:5 292:20
301:23 303:2
342:12
**general's** 231:25
283:7
**generally** 67:10
280:3 312:21
316:25
**generate** 71:6
73:15 98:22
111:17,19 123:19
147:14
**generated** 27:7
68:13 74:13 91:24
148:7
**generates** 50:13
**generating** 172:8
**genesis** 55:8 336:4
**genuine** 283:16
**geographic** 31:23
34:22 142:18
145:14 155:2
157:7 183:22
184:3 189:17
209:23 210:5
340:9
**getting** 175:11
207:2 238:8
251:23 265:4
279:18 304:23
324:18,19 347:13

**giant** 345:10
346:17
**gilson** 1:13 6:7
18:4 20:10,15
28:22 66:9 83:25
126:22 127:2
183:5,7 231:8
234:12,19 235:2
240:8 244:9,16
248:12,22 256:23
263:10 284:18
343:21 344:8,10
344:11,20 345:8
354:20,22 358:9
360:8 361:4,9
362:4,13 363:20
**gingell** 24:14
**gist** 246:2
**give** 22:13 29:18
36:9 39:6 43:15
43:18 45:23 54:13
72:14,14 73:17
76:6 81:15 115:24
123:12 125:10
132:8,13 141:7,11
158:1 169:13
188:6 192:18
220:13,25 235:15
299:16 304:7
315:13 319:4
331:18 335:16,20
341:23 357:1,10
**given** 61:16
158:19 197:6
270:5 299:2
301:14 331:23
335:21 358:12,17
**gives** 190:21
**giving** 28:14 77:9
78:7 100:24
157:10 206:24

**gleaned** 158:6
257:9
**global** 215:14
**go** 43:7 46:4 47:11
47:17,25 56:20
59:12 73:24
114:22 124:3
131:13 132:7
136:23 137:2,17
140:23 143:3
169:14,16 171:15
174:25 175:1
179:19 181:7
185:9 211:19
214:23 234:24
238:20 245:13
246:25 247:6
248:1 256:1 261:5
274:19 314:3
315:4 319:22
320:3,17,22 325:7
331:3 332:13
338:6 343:25
352:25 354:13
**goal** 246:15
**goes** 283:10
291:20 299:10
314:1
**going** 22:6,10 24:6
27:15 29:6,8,9,13
41:2 42:8 43:3
55:11 56:20,21
67:4 68:8,14 74:3
81:10,11,17 83:8
83:15 86:6,10
100:11 106:23
113:24 121:16
132:9 147:3 153:7
158:16,17 165:23
170:8 171:22
174:23 175:4,5

178:3 179:13
181:13 183:13,16
185:18 206:3,16
224:21 225:7,15
227:12 230:21,24
243:9 260:22
261:16,21 263:4,7
281:8 315:4 345:1
345:22 346:2
348:16 349:14,15
352:15,20
**good** 20:17 21:6
24:22 81:18 101:3
101:11 124:7
132:13 145:9
168:13 172:11
181:12 183:7
230:22 232:8
284:20 344:10
**gotten** 26:5 56:22
228:18
**government** 160:1
267:21 300:4
**governments**
57:23
**governor** 103:22
**governor's** 231:24
**grand** 170:24
171:11
**grant** 177:20
244:3 328:5
**granted** 223:22
226:7 236:4
**graphs** 314:4
**grateful** 351:16
**grazing** 79:12
**great** 21:5 163:21
278:13 279:16
281:2 309:15
**greater** 348:2

**grievously** 40:24
**group** 118:24
119:11 149:13
300:5 305:17
**groups** 232:18
299:7
**guarantee** 238:13
**guess** 23:8 26:12
55:18 56:11 60:4
65:8 77:14 78:9
78:10 142:14
145:3 161:8
218:23 224:20
225:14 232:9
260:24,25 275:3
292:8 337:13
**guidelines** 128:24
198:8 261:14
275:24,25 336:23
337:23 347:3
**gutierrez** 38:20,21
278:12
**guy's** 128:8
**guys** 320:12

**h**

**h** 2:15,16 265:25
**h.d.** 4:11 19:14
**half** 129:19 136:7
140:24
**hall** 158:2 170:17
**halls** 156:6 158:15
158:22 159:3
170:21 171:11
174:19
**hallucinogens**
293:25
**hand** 305:18 359:6
**handicapping**
295:16
**handle** 162:13
181:12 343:17

**handled** 216:25
**handwritten** 7:17
7:18 28:3 126:23
127:3 166:22
**hang** 248:10
**happen** 25:2
225:15
**happened** 36:16
152:24 153:2
199:23 202:10
**happening** 193:5
209:9 215:6
**happy** 324:21
**hard** 60:4 170:7
180:24 206:9
**harder** 291:25
**harkened** 347:24
**harm** 156:19
**harmful** 107:5,12
107:20 108:10
113:10 116:23,25
117:6 118:10
127:14 129:5,11
130:5 132:17
136:19 138:18
139:4 153:9
348:11,13
**harms** 74:7
**hartman** 4:17
18:22,22 20:6
**hat** 257:10
**hazard** 337:13
**head** 25:6,8 26:6
37:23 143:25
180:5,7 190:13
232:7 274:11
**heading** 293:23
**headway** 238:9
**health** 3:20 4:16
8:7 19:16 24:13
25:7,9 167:22,23

168:2 177:19
180:17 188:7
189:14,23 191:24
208:18 231:18,18
231:20 232:14,16
232:21 233:15,17
249:4 252:24
254:1 262:13,15
262:16,17,17,19
262:25 263:1,12
264:2,25 265:2,5
265:23 266:4,6,15
266:17 276:17
278:23 279:3
299:8 300:2 301:5
311:6 318:3
326:15 328:3,16
**healthcare** 57:16
65:14 127:21
132:19 134:3
177:1 185:11
186:6 221:20
222:23 294:13
**hear** 157:22
158:12 281:12
**heard** 159:3
160:13 171:5
177:9 209:4
219:20 247:23
**hearing** 156:21
172:21 173:1
174:19 229:13
302:10
**help** 23:9 52:23
124:14 126:2
245:3 277:20
**helpful** 33:24
106:18 124:17
163:22 225:3
229:1 241:8
280:17 281:6

352:12
**helping** 221:1
**herdman** 168:6
**hereinafter** 20:13
**hereunto** 359:5
**heroin** 7:22 33:22
42:11,13 43:2
54:11,22,25 55:6,8
55:9 56:14 156:3
158:5,9,14 164:21
171:12,19,22
172:5,8,9 174:13
174:24 175:12
177:15,22 178:1,2
179:8 180:11
188:19 198:2,23
206:14 211:17
220:8 221:3
229:11,15,17,23
230:15 239:21
240:10 241:15,18
242:2 244:2
245:14 246:9,10
247:10,16 250:16
250:25 251:5,11
251:16,25 252:17
252:21,25 253:7
253:22 254:6,7
277:9 282:3
292:22,25 293:1
295:15 301:23
304:20 305:11
307:8 308:24
309:6 312:4 313:2
313:21 314:3,5,10
314:16,24,24
333:8 341:4,18
342:5
**hesitate** 294:6
**hey** 39:4 112:20

**hi** 284:21
**hidden** 117:25
**high** 24:18 40:21
69:12 88:18
109:15 119:22
128:3,20 150:21
197:6 229:25
325:16 334:13
346:24 348:1
349:19
**higher** 69:13
88:18 109:4
143:11,11 334:14
348:3
**highest** 288:8
**historical** 330:17
**histories** 243:8
**history** 123:11,15
125:6,18 236:24
237:2 239:3,11
243:4 250:14,21
250:22 251:16
287:23
**hold** 59:6 104:12
185:14 186:8
296:22
**home** 327:7
**honest** 277:6
**honestly** 80:22
102:1 119:7
176:24 269:23
270:24 273:2
282:13 331:5
**hope** 22:8 46:5,8
46:11 60:5 117:24
163:21 233:12
267:18 319:25
**hoped** 46:18
**hopefully** 52:22
**hospice** 90:12

**hospital** 25:11
52:20 155:21,24
175:18,21 221:22
221:25 222:6,13
258:9,15 259:7
260:3 261:6
273:12 275:22
300:10 318:5
**hospitals** 184:2
221:19
**host** 121:14
**hostetler** 4:17
18:23 20:5
**hour** 81:18 136:7
230:25
**hours** 22:1,13
68:10 129:18
131:10,15
**housed** 168:3
**housekeeping**
344:15
**houses** 232:4
**huge** 352:5
**hugh** 24:9
**hum** 157:9
**human** 24:13
**hundreds** 309:5
**hurt** 40:25
**hysingla** 128:11
138:7

**i**

**icd** 316:16,20,24
**idea** 110:18 111:1
112:3 229:22
260:6 284:2
**identification** 29:1
37:17,19 44:18
66:19 73:11,13
84:10 121:3
124:21 126:25
127:5 210:18

234:16 240:12
244:14 248:20
263:19 280:18
322:11 343:23
**identified** 28:11
36:4 37:3 38:9
40:19 66:4 69:10
72:7,19 73:6,18
74:6,9,18,22,25
76:14 80:16 100:2
107:2,18 108:17
109:22 124:23
130:1 137:15
144:10,13 146:7
149:12,14,17
164:17 165:1,5
173:14 180:19
189:23 198:18
204:18 222:16
229:19 235:4
239:7 240:5,16,17
240:25 241:7
242:9,16 264:14
299:19 303:11
312:7 315:6,10
321:8,11 324:7,9
324:11 325:15
328:1,11,22 333:3
334:10 339:18
347:16 348:9
349:19,20,24
353:4,15,23
**identifies** 339:5
**identify** 31:20
32:7 36:25 38:23
39:5,9 40:9 41:4
41:19 43:5 45:1
51:24 53:8 70:23
73:19,20 74:12
75:17 80:5 88:17
89:5 92:6,16

106:8 115:14,17
119:1 120:1,9,17
121:21,25 130:1
142:16 143:7,10
143:16 144:25
145:2,12,17
153:13 160:14
162:4 193:1
198:22 205:24,25
206:3 240:23
241:5 246:20
257:20 260:8
264:6 281:6
310:14 315:21
320:8 324:13,23
325:7 338:25
339:23 340:7,11
342:18 343:5
344:22 348:12
354:1
**identifying** 96:6
99:12 182:15
220:15 229:2
241:3 345:15
346:16
**ignore** 302:21
**illegal** 34:22 35:10
36:5 47:24 48:12
48:22 49:25 50:6
50:20 51:15 56:25
57:8,11 61:17
127:23 134:5
137:6 166:1
188:17 220:7,15
220:20 221:2
254:22 260:10,21
281:23 287:20
289:18,25 290:2
303:15 312:6
320:3,18 341:8
342:16

**illegally** 329:7,18
**illegible** 169:25
**illegitimate** 49:4,7
49:10 211:10
**illicit** 38:5 39:16
51:1 60:24 189:2
210:22,25 211:10
211:12 212:1,7
229:15 293:5
304:24 305:4
312:20 313:2,21
314:10,17 341:18
342:5,9,25
**illicitly** 342:11,14
**illinois** 3:18 4:4
**illnesses** 121:15
**immediate** 261:9
274:2
**impact** 21:21 39:1
178:12,22 207:7
207:11,20 208:24
209:7 210:6
220:20 304:15
**impacted** 269:4
**impacts** 220:15
257:11
**impediment** 265:3
**implement** 276:3
**implemented**
122:15 275:25
**important** 33:10
**importation** 313:1
**imported** 210:21
**impossible** 103:25
335:21
**impression** 83:6
125:10 342:12
355:12
**improper** 37:19
40:11 46:13 49:7
120:21 127:23

134:6,22 135:7,9
137:6 184:4 187:7
**improperly** 47:16
**inability** 301:14
**inadequate** 156:13
178:8
**inappropriate**
106:5,10 317:6
**incarceration**
246:19,23 311:5
**inception** 191:25
237:4,18 238:3
239:4
**inches** 355:6
**incidence** 306:21
**include** 123:6
125:3 129:9
150:24 323:24
325:18 335:8
346:7 347:20
348:24 350:2,4,5
350:15,23 353:4
**included** 43:4
91:10 150:8
348:14 355:21
**includes** 33:1
125:24 135:15
149:13 324:1
344:21
**including** 93:2
97:1 128:21 148:4
202:8 204:10
208:15 212:20
219:14 220:8
221:3 231:13
239:2 257:8
346:25
**incomplete** 236:14
241:7
**incorporated**
362:12

**incorrect** 175:14
**increase** 302:2
313:19 314:15
355:8,10
**increased** 306:21
**increases** 292:25
**incredibly** 140:5
**incur** 299:20
302:13
**incurred** 300:20
**incurring** 300:1,6
300:11
**independent** 121:2
138:14 139:1
262:9 313:16
321:16
**independently**
321:4
**index** 6:1,4,5 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
**indiana** 4:13
**indianapolis** 4:13
**indicate** 207:14
313:10
**indicated** 56:15
158:8 181:19
355:11
**indicating** 58:20
72:9 91:19 93:13
94:4 106:16,20
245:15 247:8
**indications** 192:24
**indirect** 21:25
**individual** 30:4
43:16 51:24 77:10
96:18 123:13
139:9 143:19
160:12 197:7,10
204:21 236:16

237:17,24 239:25
317:9,9 320:25
324:23 326:5,19
327:4 330:6,19
337:5,15,22
339:12
**individual's**
236:18,23 336:11
336:15
**individually**
209:16 326:15
**individuals** 29:24
30:18 31:5,11,20
32:2,8 36:10
37:18,25 39:5,8,9
43:6 44:18 45:3
46:3 54:13 74:9
74:12,14 82:4,19
96:7 97:20 105:25
121:23 125:16
130:19 134:14
136:16 142:16
143:8,17 144:1,18
145:1,2,3,4,12
154:12 191:19
197:23 198:11
202:7 207:13
210:13 222:15
229:17 231:19,21
231:24 232:3,5,22
233:2 235:25
236:11,15 242:22
253:22 254:13
299:25 315:21
318:25 319:4
320:8 321:8,10,21
322:19 323:13
324:4,12,22
326:13 327:19,25
328:9,17,21
330:20 333:7,11

334:8,24 339:7,17
**inducement** 55:1
**indulge** 248:1
**industry** 121:1
**ineffective** 107:4
107:11,19 113:10
114:18 115:3,10
117:17 118:10
127:14 128:9,13
132:16 136:18
138:2,3,9,18 139:4
139:16 348:11
**infants** 83:4
**influence** 58:23
184:21 281:15
283:9,13,17 284:2
**influenced** 181:20
**influx** 192:23
**inform** 178:6
317:4
**informally** 267:25
268:1
**information** 21:18
21:20 22:24 27:6
28:12 33:23 38:14
41:6,18,24 43:21
50:18 51:13 69:8
71:5 75:3 76:22
76:25 77:4,11
78:12 99:23
118:15,19 120:13
122:16 129:13
130:6 131:20
141:24 149:11
153:4 158:6
163:14,20 164:2,9
164:24 170:13,16
171:20,25 172:17
174:18 176:25
190:7,13 208:8
212:11,12 215:11

217:3,8 223:18
224:24 226:3,14
227:13 228:9,20
237:2 243:17
245:25 246:18
250:15 261:25
265:8 270:23
271:1 321:2,18
327:22 328:7,13
328:15 330:24
331:4,10 333:16
337:13 344:22
**informed** 78:10
129:1 152:19
347:5
**infrequently**
295:2
**inherent** 265:10
**initial** 35:8 252:8
324:11
**initially** 42:12
56:18 140:11
168:4 181:9 341:2
**initiated** 175:19
222:10 254:15
**initiative** 258:10
**initiatives** 180:17
195:2 298:20
**injury** 25:6 167:21
233:16
**input** 119:13
283:4,8,18,20
**inquiries** 164:10
**inside** 305:6
**instance** 195:5
204:2
**instances** 44:12,14
44:20 165:12
192:6,7 201:19
205:5

**instituted** 213:24
310:20
**institutions** 155:20
**instruct** 61:2
130:9 213:12
322:1
**instruction** 357:2
357:10
**intended** 191:10
304:22 305:2
**intending** 305:7
305:22 306:1
**intensity** 24:19
**intent** 191:15
**intention** 199:24
289:14
**intentionally**
190:25 193:7
**interdict** 213:5
214:5,19 215:5
**interest** 46:14
**interested** 27:12
359:3
**interfaced** 224:15
**intermediaries**
55:19 56:24 57:8
**intermediary**
39:11 55:15 57:15
**intermediate** 53:6
56:11 62:12
**intermediates**
54:4,6,9 55:13
**international**
317:2
**internet** 23:7
**interpret** 133:3
**interpretation**
94:22 106:10
108:22 321:3
**interrogatories**
7:11,15 27:23

40:17 41:10,13
65:21,24 66:17
67:15,19 68:13,17
68:20 71:20 81:8
81:13 84:7 91:17
91:22,23 94:11,15
94:21 96:16 97:10
111:18 119:15
132:11 147:4,15
150:17 153:1
154:9 321:15
344:23,25 345:2
**interrogatory**
53:20 64:13 65:4
65:5 66:25 69:9
69:16,20 72:7
92:5,23 110:8
111:11,25 130:23
130:25 134:15
141:1 143:22
345:6,14 346:4,6
347:18 349:6,11
349:12,12,13
351:12,14 352:8
**interrupt** 59:1
347:11
**interstates** 210:14
**intervening** 275:7
**intervention**
240:24 241:5
246:21
**interventions**
232:19 285:18,20
311:14
**interviewed**
321:20 322:10
**interviewing**
254:6
**interviews** 25:18
177:1 253:21
254:12 321:9,16

322:15
**intoxications**
217:19
**introduced** 214:15
344:12,17
**investigate** 161:6
161:10,17 162:14
195:2 222:12
279:15
**investigated** 38:11
193:18 194:1,17
217:25 218:22
219:1 220:7 221:5
222:2 236:9 298:9
**investigating**
194:23 215:22
216:17 219:23
235:25 236:12
237:17 239:10
240:1 242:22
259:14,21 330:14
**investigation**
120:21 154:5
159:13 165:18
184:1 198:14
200:4,5 201:16,21
213:9,20 215:16
215:25 216:11,12
216:21,24 219:6
219:16 223:5
227:17 235:8,20
236:17 241:9,9
256:24 259:23
260:10,12,17,20
260:22 261:4
276:11 279:17,20
280:4,12,22
324:10 325:23
330:6,16
**investigations**
160:4 196:18

200:19 210:10
218:4,15 219:10
260:1 278:5 281:3
**investigative**
200:24 230:10
**investigators**
238:16
**investments** 312:9
**involved** 31:11
98:21 185:12
186:7 235:6
253:10 331:1
**involvement** 94:22
327:2
**involving** 231:13
**irrespective** 94:14
**isolated** 293:1
**isolation** 304:17
**issue** 85:15,17
146:9 216:22
217:2 298:13
310:8 344:23,25
351:7
**issued** 288:12
**issues** 39:12
155:25 196:14
289:1 310:5,23
**issuing** 289:8,13
289:16

**j**

**j** 2:11 3:3,21
**jackson** 3:8 19:3
**jacksonkelly.com**
3:11
**jail** 46:4 47:18,25
176:21 221:15,16
221:24 222:5,22
222:23,24,25
258:16 273:21
311:6

**james** 5:3 18:16,16
38:20,21 278:11
**janssen** 5:2 18:17
**january** 1:16 18:2
27:15 359:7 360:4
**jerome** 138:4
**joan** 25:9 167:14
**job** 145:9 172:4
**john** 2:16
**johnson** 5:2,2
18:17,18
**jones** 2:14 18:25
**jonesday.com**
2:18,18
**judge** 1:8 302:9
**june** 27:9 181:3
**jurisdiction** 92:8
329:24
**jurisdictions** 85:3
207:12 213:2
257:19 267:20
269:6
**jury** 168:16
**justice** 198:7
215:12
**justin** 168:5

**k**

**k** 3:8
**k2** 293:12,14
**kahuna** 322:5
**keep** 23:10 66:25
82:5 111:13 146:2
149:15 208:22
209:1 238:24
270:12 351:23
**keeps** 217:14
**keith** 24:16 30:8
**kelly** 3:8 19:3
**kentucky** 227:6,8
**kept** 167:10

**keyes** 3:21 19:15
19:15
**kids** 298:17
**kind** 29:15 35:20
39:12 55:23 56:12
61:17 70:14 78:11
84:18 93:23
122:15 130:15
158:19 170:14
174:10 177:7
187:7 204:6,20
246:24 257:16
268:9,10 271:9,16
304:7 323:3
351:10
**kinds** 217:16
**knew** 116:13
118:3 173:8,9
202:23 224:20
225:6 329:13
**know** 20:6,8 22:5
24:21 25:2 26:10
26:25 29:6,12
32:20 33:19 35:1
35:15 40:8 42:11
42:17,20 45:25
46:3,5,9 49:1,2,3
53:13 55:24 59:4
60:22 61:8,11,13
61:14,16 62:10
63:16 69:18 70:16
70:24 71:3,4,11
73:16,16 76:9,11
76:12,16,18 77:23
77:25 78:4,13,14
78:16,25 79:7,8,13
79:16,20 80:22,23
81:1 86:16,24
87:6 91:3 92:13
96:14,17,22 98:8,9
98:23,25 99:5,6,15

99:22 100:5,7
101:13,19 102:1,2
103:4,6,14 104:3
105:17,22,24
106:17 109:2,4,23
109:25 110:9,11
111:10 112:7,12
112:14 113:4,11
113:18 114:2,2,4
116:5,19 117:10
117:25 118:8,23
119:3,7,11 121:23
122:9,14,23 123:4
123:6,10,21,25
124:2,20,22 125:7
125:9,10,12 126:3
126:5,10,14
129:17 130:6
131:6 132:2
133:17 134:16
135:14,20,22
136:7,8 138:20
140:3,4,5,6,8,9,15
141:2,4,9,15,20,23
141:25 142:8,9,12
144:21 145:15,22
146:12 147:19,25
148:2,6,11,11,13
148:13,16 149:1
149:10,13,16
150:14 151:3,19
151:25 152:1,8,14
152:16 154:4,4
159:7 160:10
162:10,24 163:1,1
163:2,3,7,9 165:10
165:14,22,23,24
166:3,7 171:9,11
171:25 172:19
173:20 174:9,17
175:23 176:4,18

176:20,21,24
178:6,15,25 179:2
179:2,4,5,21,23
180:2,17 181:13
182:14 188:4,12
189:22 190:17
191:18 192:5,11
193:22 194:5,8,10
194:23 196:5,13
197:24 198:7
199:13,15 200:10
201:4 202:2,11,22
203:3,8,8,20,23
204:1 205:4,4,12
205:13,14,16,20
206:9,12,15,16,22
207:2,9 208:15
210:8,11,12
213:23 214:11
215:13 217:2
218:3,8,14,24
219:4,19,21,25
220:22,24 221:8,9
221:14,18 222:9
222:18,19,25
223:6,17 224:10
228:24 230:8
232:19,22 233:4
233:13 237:10
238:6 243:20
244:25 251:19
252:8 253:20
254:8,17 257:22
258:8,20,25,25
259:21 261:1,13
262:7,23 264:9,15
264:23 265:16,21
266:12,12 267:6
269:4,7,23 270:22
270:24 271:16
272:3,14,21,25

273:2,11 274:25
275:4,4,21,23
276:13 277:5,14
278:20 280:11
282:13,15,19,23
283:21 286:3,4,8,8
290:9 291:9,17
296:3,5,9,11 298:6
298:7,19,23
299:24 300:9
303:19 308:20,23
309:4,18 310:4,6,9
310:24 311:13
312:1,11 313:16
313:25 316:10,16
316:23,24 318:6
318:14,21 321:19
322:8,19 323:2,12
323:14,22,25
324:3,10 325:13
326:5,14,17,18
327:3,14,18,24
328:23 329:1,3,12
329:20 330:21,23
330:24 331:5,17
333:5,10,13,14
334:1 338:4 343:7
347:8
**knowable** 221:9
329:2
**knowing** 73:23
218:25 272:4
284:10 333:12
338:5
**knowingly** 49:18
**knowledge** 23:16
70:21 76:7 77:16
77:16 119:9 131:1
138:14 139:1
148:20 154:23
155:10 157:3

161:18 182:11,12
184:8 190:19
194:15 200:20
203:22 226:1
261:17 266:25
268:19 269:17
271:21 297:3
302:1 321:15
322:15
**known** 186:17
187:4 191:11
266:20 324:6
**knows** 316:22
332:7

**l**

**l** 1:25 358:6
359:13
**l.p.** 1:10 3:12
**label** 105:3,10
263:25
**laboratory** 286:21
289:15 290:19
330:8
**laced** 304:24 305:3
**lack** 57:22
**lacking** 333:24
**lag** 265:10
**landfill** 82:15,17
82:24 169:1,3
**large** 54:25 93:11
192:23 221:25
233:7 292:18
333:8 336:7,19
337:16 338:9
**largely** 290:17
**larger** 244:7
**lasting** 273:17
**lastly** 128:17
**late** 102:20 207:5
324:18 347:13

**law** 47:12,14,15
49:8 160:6 181:4
196:15,18 208:11
208:13,14 209:5
209:15,17,18
212:16,22 213:7
213:10,13 215:3,8
215:23 216:1,6,14
219:9,12,13 220:1
227:15 246:15
257:11 258:19,21
259:2 267:8,14,14
276:5,7,10,22
278:7,23 280:13
280:20 298:9
310:22 319:22
**lawful** 20:10
179:11,17,21
**lawfully** 102:19,21
103:9 193:13
**lawsuit** 163:2
193:22,25 194:7
194:19 195:1,6,14
196:1 269:10
287:25 339:6,23
**lawyers** 21:9,10
24:22 28:13 67:22
68:5 77:14 129:14
**layman's** 87:17
**layperson** 315:14
**lead** 166:9
**learn** 22:9
**learned** 61:3
116:16,18 119:5,6
322:1
**leave** 44:23 61:19
154:8 170:11
**leaves** 211:9
**led** 49:23,24 50:5
**left** 268:10 332:9

**leftover** 192:10
**legal** 187:20
188:16 241:25
242:14 254:22
289:21 303:18
329:13,21,23
360:1 363:1
**legally** 254:19
300:4 328:24
329:6,17,24
**legislation** 212:18
212:19,21 227:4
275:1
**legislations** 273:24
**legitimate** 49:3,10
85:14 165:24
187:4 195:13
**lengthy** 42:9
181:15
**lerms** 267:9
**letter** 27:21 28:1
360:20
**letters** 290:25
**level** 101:20
157:10 160:4,19
161:13,16 164:23
164:23 172:2
174:1 181:2,13
190:11,12,14
192:16,17 196:21
197:21 202:4
204:10 206:10
214:14 216:12
217:1,1,7 219:11
226:23 227:23
259:17,24 266:17
273:24 276:12
299:10 308:4,6
311:23 330:3
**levels** 227:16
311:12

**lewis** 4:3 19:18
**lexington** 2:3
**liaison** 283:6
**liaisoned** 261:7
**license** 47:17,25
238:17,19
**licensed** 187:18,20
187:22
**licenses** 46:7 47:8
196:9
**licensing** 203:2
**lieu** 311:4
**light** 325:24
**limit** 60:14
**limitations** 84:25
**limited** 29:9,16
128:21 137:18
235:5 251:22
346:25
**linda** 27:24 28:1,2
**line** 362:7 363:3
**lines** 182:1 196:6
205:25 269:8
**link** 171:13,18
175:3 303:22
336:10 339:13
**linkage** 277:8
**list** 27:5 58:11
71:6 75:3,6,11
76:20 82:22 113:2
115:24 119:18
121:8,17 124:4
128:3 132:23
133:17,18 139:20
140:16 141:5
143:24 144:1
146:11 147:21
148:18 149:1,3,4,5
149:19,23,25
152:20 166:4
232:9 264:19

295:17 297:23
298:5 299:5,13
328:17 330:15
331:6 333:18,18
333:19 334:1,8,24
346:13 347:20,22
347:25 348:24
350:11,14 352:4,7
353:8
**listed** 29:22 30:6
97:13 116:25
127:21 128:12
132:2 133:21
134:4 136:11
138:8 140:3,14
143:19 150:10
157:2 265:14
270:20 286:18
295:21 321:21
323:1,13 324:12
324:22 326:13
327:16 330:20
332:1,22 346:17
347:9 350:14
353:13 362:7,17
**listen** 253:17
**listing** 362:7
**lists** 147:14 177:18
**litany** 171:6
**literally** 106:19
**literature** 23:7
**litigation** 1:6 18:5
86:11 360:6 361:3
362:3
**little** 23:9 29:18
37:6 56:22 58:22
67:2 99:17 145:6
166:22 172:14
230:2,20 252:20
260:13 264:12
291:25 324:18,19

352:16
**live** 172:2
**living** 253:21
**llp** 2:20 3:2,12,16
3:21 4:3 5:3
**lobbying** 58:24
336:24 337:24
338:10
**local** 54:14 56:6
160:6 203:24
208:13 209:14,17
209:18 213:10
215:8,25 216:6,14
217:7 219:9,12,13
220:1 276:12
278:7 280:13,20
298:9 310:22
320:21
**locally** 56:10
203:11
**locate** 82:5
**location** 360:15
**logistics** 343:18
**long** 30:9 59:19
128:20 129:3
140:5 179:19
206:11,24 239:3
253:19 263:6
265:9 319:15
346:24 347:7
**longer** 198:10
**longest** 252:1
**look** 33:4,10 52:4
54:11 56:17 64:18
64:21 65:5 68:24
84:15,16 93:20,21
106:12 113:7
117:14 140:2
152:11 174:13,25
175:1,23 178:3
181:7 188:5

194:10 199:20
207:25 209:9
230:19 235:16
240:20 241:23
244:5 245:3
249:10 251:23,24
251:25 252:8,10
255:12 259:10
290:24 291:1
304:6 310:17
313:25 317:8
343:6 351:18
352:1,11
**looked** 28:11
32:15 34:1 148:15
165:2,15 169:7
188:13 250:19
253:4 304:12
352:17
**looking** 33:7,20
42:8 62:21 127:11
146:11 168:14
171:24 172:1,7
175:10 177:23
210:2 241:4 243:3
243:7 255:14
317:22 352:10
**looks** 244:23 245:9
245:15 247:7
**loop** 222:14
**lose** 46:7 47:8,17
47:24 320:12
**lost** 114:20,25
**lot** 21:24 52:17
56:7 68:12 79:12
131:6 136:4 142:9
146:24 168:14
170:21 180:25
181:11 194:12
215:7 219:10
226:17 232:13

237:21 238:8,14
241:3 264:11
266:15 268:12
271:1 290:10
291:1,20 292:21
294:3,24 298:7
302:5 305:11
311:8,19 336:24
**lots** 290:16
**loud** 145:10
**low** 58:21 156:11
**lporter** 3:7
**lsd** 294:1,3,9,20
295:24 296:11
**luke** 3:3 19:19
**lump** 56:12 293:15
**lumping** 291:10
**lunch** 170:10
182:18
**luncheon** 182:22
**lwerb** 4:10

**m**

**m** 2:15 5:3 265:25
**m.d.** 1:13 6:7
20:10,15 183:5
284:18 344:8
354:20 358:9
360:8 361:4,9
362:4,13 363:20
**ma'am** 348:18
**madam** 360:10
**magnitude** 199:14
**mail** 7:19 234:13
234:19
**main** 2:11 3:9 5:4
**maintain** 210:23
262:25
**maintained**
160:15,23
**major** 155:20
288:17,20 295:12

295:17,18
**majority** 192:11
**makeup** 246:24
**making** 51:1 111:2
116:14 212:14
310:25
**mandatory** 273:25
274:3,6,15,18
275:8
**manufacture**
262:9,21
**manufactured**
56:16 126:11
293:5 303:20
342:11,14
**manufacturer** 7:9
7:15 66:15 84:5
94:1 120:14
128:24 185:10
186:4,21 187:18
187:22 193:19
194:2 345:17
347:3 350:6,13
**manufacturers**
45:6 128:16
138:12 203:23
223:12 345:1
**manufacturing**
184:10 194:11
261:19,25 267:1
268:16 283:11
353:7
**marijuana** 289:18
290:6,10,14
291:11 294:24,25
295:22
**mark** 3:13 19:8
66:24 94:13
166:25 230:21
263:4,21 343:9,16

**mark.cheffo** 3:15
**marked** 7:3,20 8:5
8:10 28:25 66:18
66:22 68:24 84:9
126:24 127:4
167:1 234:15,15
240:11 244:13
248:9,18,19
263:17,18 343:22
345:4
**market** 51:19
**marketed** 303:10
**marketing** 94:1
154:25 155:12
157:5,19 160:17
162:7 164:2
173:17 178:13,18
178:23 179:4
181:20 194:11
**markets** 60:24
**mart** 4:6 19:22
**martin** 24:16 30:8
30:10 32:23 34:10
**master** 27:21
100:20 101:6
**master's** 65:10
**match** 185:23
186:9
**matching** 122:15
**material** 21:15,17
**materials** 22:23
23:2
**matter** 18:4 20:4
112:22 238:25
360:12
**mcconnell** 2:16
**mckesson** 2:19
18:20
**md** 1:7
**mdl** 1:6

**mdpv** 290:24
**me's** 246:13
**mean** 24:2 26:11
42:7 54:14 64:16
64:23 68:8 72:3
74:23 75:14 117:7
123:4 125:14
131:25 132:22
137:8 139:13,21
148:1 151:19
154:4 176:22
186:23 192:5
199:1 203:6 210:8
210:16 213:8,12
216:21 217:1,14
217:19 230:8
233:4 260:23
269:1 273:23
298:16 304:5
307:3,18 309:12
309:19 313:24
316:4
**meaning** 46:21
161:24 292:8
**means** 21:2 49:7
108:6 166:1
213:22 215:13
**measure** 54:25
333:9 336:7
**mechanism** 160:3
161:17 314:11
**media** 168:10
**medicaid** 176:22
**medical** 8:4 21:15
23:3,6 25:11,12
34:17 40:21 52:15
63:1 64:25 65:13
69:12 70:3 71:8
76:8 77:9,24 78:2
78:5 80:12,20
87:18 88:19

106:11 128:22
155:25 162:16
165:9 167:15
170:20 171:21
187:4 191:3,22
196:23 197:1
198:12,13 199:5
200:1,7,11 201:6
202:9,20,21 203:2
205:11 206:20
210:10 211:10
212:24 213:15
221:15,17,23
222:10,13 229:6,9
231:16,21 236:9
238:13,21 239:1
240:21 245:23
248:16 249:8
250:7 254:16
257:10 258:7,11
258:17 261:8
267:16 271:25
273:20 276:2
277:1 283:22
286:16 289:15
311:6 316:2,7
317:5,14,19 318:1
323:18 330:1,3,11
334:14 347:1
348:3 350:11,17
350:24
**medically** 35:21
106:1,4,5,9,10
107:4,10,14,19
108:9 113:10,15
114:1,13 115:15
118:11 127:13,20
128:6 129:5 130:4
132:7,16,18 133:4
133:7,10,23 134:2
134:17 136:15,18

136:21,24 137:4
137:15,19 138:17
139:3,21 153:9
154:6 348:10
**medication** 46:24
48:7,10 126:7
187:7 188:11
190:22 191:1
195:20 210:17
250:14 273:16,18
**medications** 214:1
228:16 229:15
254:11 286:18
303:19 340:22,24
**medicine** 40:2
79:13 88:4 103:22
155:18 161:12
162:16 163:5
202:8 214:1,12
260:2 275:1 316:5
316:12
**medicines** 64:7
102:22 176:15
216:18
**meet** 21:13 67:24
75:18,21 145:25
146:5 151:17
**meeting** 68:5,9
217:17 232:2
**meetings** 158:2
170:17 173:5
208:13 217:15
268:8,10 269:2
**meets** 75:11
**member** 233:7
**members** 116:7
233:1
**memoranda** 177:1
**memorandum**
217:10

**memorialize**
172:22
**memorialized**
173:16
**memories** 287:11
**memory** 26:5
255:13 346:19
**memos** 173:10
**mental** 191:23
252:23 253:25
266:4,6 300:2
301:4 311:5 318:3
**mention** 30:25
**mentioned** 23:5
29:25 45:22 51:9
66:5 82:19 120:24
144:3 160:11
167:8 177:8,21
189:2 195:4 197:5
200:25 201:13
207:23,24 218:13
230:8 233:22
240:4 241:7 250:2
266:1 273:13
275:24 281:4
285:2,11 301:2
306:19 312:24
314:25 321:12
338:22 339:1
342:17 343:1
354:5,24
**mentioning** 146:3
149:15 214:13
312:22
**mentions** 246:1
347:7
**mentor** 310:6
**merely** 244:17
**meridian** 4:13
**merriman** 24:12

**mess** 352:16
**messages** 82:23
**met** 21:10,14
28:12 66:5 67:21
68:7 129:14
144:14 151:5
197:8 198:3
334:25 335:3,6
**meth** 289:5 305:1
305:3,3
**methadone** 126:1
**methamphetamine**
288:10,14,24
289:7 291:18,19
291:23,24 292:2,6
292:11,16,22
293:2 295:22
296:8 305:25
311:22
**methodology**
78:14 188:8
**methods** 256:11
**methyl** 290:25
**metric** 254:24
**metrics** 222:18,19
**metrohealth** 25:11
155:25 167:15
221:16,23 222:9
222:13 231:21
276:2
**mexican** 34:21
50:25 51:15,20
61:9 312:19
**mexico** 39:16
54:19 210:13,21
212:1 312:24
**michael** 7:8 66:13
**mid** 243:13
**middle** 307:13,17
**midst** 46:19 307:3

**midway** 93:23
**midwest** 363:1
**mill** 35:2,4,9,20
36:10 43:9 48:7
48:11,17,20 49:9
50:12,14 57:12
179:23 192:22
201:2 212:18,18
260:14,18
**miller** 34:10
**milligrams** 69:24
**mills** 36:4 37:20
49:4 184:2 207:10
208:4
**mind** 24:20,25
305:6
**mine** 245:1
**minimize** 213:23
**mining** 277:7,17
**minors** 298:4,13
299:14
**minute** 43:7
169:17 170:9
230:25 256:16
**minutes** 30:11
111:22 130:7
136:1 138:25
169:13 217:15
**mischaracterizes**
71:25 108:3
118:18 136:3
137:13,24 154:16
**misclassifying**
317:17
**mishear** 121:5
**misidentified**
292:14
**misinformation**
174:16
**misrepresentation**
40:12 42:3 49:23

85:4 93:4,6
336:18 337:6
338:8 348:13
**misrepresentatio...**
50:9 62:18 85:12
85:23 87:22 88:5
90:5 92:9,18
156:19 348:15
**misrepresenting**
128:18 340:23
346:22
**missed** 41:23
309:5
**missing** 168:23
**mission** 180:16
**misspoke** 250:18
**misstatement**
345:17
**misstatements**
129:7
**misstates** 151:10
153:6
**mixed** 94:13
217:19
**mixing** 270:12
**mixture** 304:23
305:16,20
**mixtures** 293:2
304:15
**mme** 70:4,5 72:20
73:4 77:5,20 80:5
80:10 100:8
101:14,17,23
102:22 103:5,8
104:3 125:23
126:5,9 143:12
334:20
**model** 55:22
**models** 312:13,14
**modest** 183:15

**modifier** 323:24
324:1
**money** 300:13,17
302:23
**monitor** 175:20
269:15
**monitored** 104:11
**monitoring** 42:9
42:23 104:5 158:7
165:4 205:21
226:22 227:7,9
268:7
**month** 295:9,11
**monthly** 27:8
217:15
**months** 22:12 33:9
213:20 242:24
249:20 252:1,2
288:16
**morgan** 4:3 19:17
**morganlewis.com**
4:5
**morning** 20:17
116:18 119:5
144:23 197:5
**morning's** 183:14
**morphine** 40:22
69:12 70:3 80:12
80:20 88:19
334:14 348:2,3
**mortality** 178:2
188:24 189:1
206:20 246:10
269:4 288:9
290:21 291:2,9
293:1 294:4
301:19 304:6,9
305:15 307:24
313:19 314:9,16
341:6,7

**motion** 83:11
303:5
**motivating** 60:23
**move** 55:11 59:20
83:8 113:23 150:1
156:25 158:16
175:4 180:11
302:25 348:16
**moves** 319:18
**moving** 59:11
**multiple** 158:2
191:15 204:19
217:3 230:9
327:19
**multitude** 310:23
**municipalities**
209:20
**mutual** 65:13 71:8

**n**

**nail** 230:20
**naloxone** 25:13
167:17,17 203:9
285:13,18 286:1
**name** 43:11
118:23 128:8
133:22 150:19
173:8 233:10
244:21 248:24
266:6 284:22
322:9 324:13
331:6 360:6 361:3
361:4,15 362:3,4
362:21
**named** 32:13 43:8
134:15 193:23
234:8,21,22
339:23 358:9
**names** 36:9 39:6
43:15,18 45:23
46:2 57:5 69:6
114:24 117:15

142:10 150:20
152:20 180:21
226:24 233:14
293:24 326:23,24
328:18 335:13,23
346:21
**napoli** 2:2
**napolilaw.com** 2:5
**narcotic** 276:3
**narcotics** 55:3
219:22 320:3,18
**national** 1:6 7:10
18:4 54:14 66:16
174:21 214:14
268:1,5 269:1
285:7 312:14
320:20 360:6
361:3 362:3
**nature** 61:17
208:1 285:5
331:23
**near** 295:14
**nearly** 304:13
**neatly** 215:20
**necessarily** 72:3
103:24 108:7
206:2 216:8
228:18 257:13
265:4 298:11
311:15 313:14
336:25
**necessary** 139:22
146:21
**need** 39:19 59:19
60:10 131:12
317:8 348:17
**needed** 26:6 104:1
171:15 213:18
**needs** 104:10
**negate** 307:9

negatives 96:1
neighboring
178:16,24
neither 186:22
never 32:18 40:5
71:23 75:2 93:16
123:24 124:5
211:11 224:6,13
225:4,7,10,11,12
238:4 253:6
317:18,19 319:21
new 2:4,4 3:14,14
56:9 131:12 268:3
268:4
nine 274:14,20
275:7
ninth 4:8
nomenclature
70:14
non 31:22 35:21
52:5,24,24 59:23
76:2,21 99:24
187:4,8 254:16
349:19
northeast 37:24
43:10,14
northern 1:2 18:6
notary 358:6
359:13 360:25
361:10,18 362:15
362:23 363:23
note 244:17 303:4
355:18
noted 242:1 249:9
notes 7:17,18
25:17,20 26:8,14
26:16,19 28:4,6,7
82:3,5,20 83:13,16
97:19 126:23
127:3 166:22
167:7,14 168:18

168:21 172:23
343:13,15 354:25
355:3
notice 7:5 27:16
28:23 29:5 101:10
142:21 288:13
notified 203:4
notify 213:15
number 7:3,20,24
8:10 21:24 29:6,7
29:21 34:15 56:21
58:1,10,13,14
69:21,21,22 74:22
83:1,3 180:13
183:20,25 184:20
188:5 205:16
220:19 234:14
242:11,13,15
244:12,18 247:13
249:9 250:3 252:2
252:6,12,12 253:2
253:8,11,20
261:17 263:5,16
263:22 264:2
288:24 294:7
295:8 300:25
306:22 319:8,20
335:22 341:15,24
342:3,15 343:11
344:24 345:3
346:4 351:12
355:8,10 360:7
numbered 8:5
248:17
numbers 82:22
106:13 264:4
290:20 292:18
301:24 303:2
362:7
numerous 345:18

nursing 202:17
nw 3:22

o

o'clock 182:20
o'malley's 7:9
66:14
oarrs 133:5 158:7
171:15 177:11,15
179:14 180:5,16
181:5 184:16
190:14 199:16
205:10 226:18,21
226:24 227:3,13
227:20,22 228:2,9
228:20 229:1,5,9
229:25 230:4,6,12
230:14 235:6,19
235:24 236:3,8,18
236:21 237:5,8,16
238:17 239:2,2,3
239:18,25 241:1,2
241:6 242:9,16,20
243:1,10,17 244:4
247:11,16 249:11
249:15,23 251:2
251:11,24 256:25
257:2,9,17,19,22
257:24 258:9,12
258:24 259:5
261:21 262:6,11
268:11 270:8,17
270:21,23 271:1,5
271:13,14,18,22
272:2,5 273:4,8,10
273:14,25 274:1
274:11,16 275:9
275:12,20 276:3,9
276:11,20,21
277:4,7,18,22,24
278:2,9,13,14,18
278:22 279:25

280:2,3,5,8,16,24
281:5
oath 20:18 110:24
149:24
object 83:10
185:19 303:5
345:24 352:20,23
objection 9:3,3,4,4
9:5,5,6,6,7,7,8,8,9
9:9,10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24
9:25 10:3,3,4,4,5,5
10:6,6,7,7,8,8,9,9
10:10,10,11,11,12
10:12,13,13,14,14
10:15,15,16,16,17
10:17,18,18,19,19
10:20,20,21,21,22
10:22,23,23,24,24
10:25 11:3,3,4,4,5
11:5,6,6,7,7,8,8,9
11:9,10,10,11,11
11:12,12,13,13,14
11:14,15,15,16,16
11:17,17,18,18,19
11:19,20,20,21,21
11:22,22,23,23,24
11:24,25 12:3,3,4
12:4,5,5,6,6,7,7,8
12:8,9,9,10,10,11
12:11,12,12,13,13
12:14,14,15,15,16
12:16,17,17,18,18
12:19,19,20,20,21
12:21,22,22,23,23
12:24,24,25 13:3,3
13:4,4,5,5,6,6,7,7

| | | | |
|---|---|---|---|
| 13:8,8,9,9,10,10 | 45:21 46:16 47:1 | 133:1,13 134:10 | 269:11,21 270:1 |
| 13:11,11,12,12,13 | 47:5,9,19 48:18,24 | 134:19 135:13,17 | 270:18 271:6,15 |
| 13:13,14,14,15,15 | 49:11,19 50:1,7,21 | 135:23 136:2,12 | 271:24 272:9 |
| 13:16,16,17,17,18 | 51:4,16 52:1 | 137:12,23 138:19 | 273:1 275:10 |
| 13:18,19,19,20,20 | 53:10,16 54:1,10 | 139:5,23 141:17 | 278:4,25 279:7,13 |
| 13:21,21,22,22,23 | 56:3 57:2,10,19 | 142:2 144:19 | 279:22 280:7,25 |
| 13:23,24,24,25 | 58:15 60:2,19 | 145:21 147:10,24 | 281:10 282:18,21 |
| 14:3,3,4,4,5,5,6,6 | 61:1,23 62:8,20 | 148:21 149:18 | 284:8 285:3 |
| 14:7,7,8,8,9,9,10 | 63:10,19 64:10 | 150:3,13 151:9,21 | 287:22 288:1 |
| 14:10,11,11,12,12 | 68:21 71:1,16,24 | 152:3,13,18 153:5 | 289:20 290:4,8 |
| 14:13,13,14,14,15 | 72:13 73:9 74:19 | 153:17 154:3,15 | 294:19 295:13 |
| 14:15,16,16,17,17 | 75:12,23 76:4,10 | 155:14 157:15,24 | 296:1,19,23 |
| 14:18,18,19,19,20 | 76:23 77:6,21 | 159:15 160:2,18 | 297:21 298:15 |
| 14:20,21,21,22,22 | 78:6,18 79:2,10 | 161:11 162:23 | 299:21 300:22 |
| 14:23,23,24,24,25 | 80:1,6,17,25 81:5 | 164:4,16 165:21 | 301:11 303:4,13 |
| 15:3,3,4,4,5,5,6,6 | 85:10,25 86:3,7,13 | 166:11,18 168:11 | 303:25 306:5,16 |
| 15:7,7,8,8,9,9,10 | 86:20 87:1,8,14,24 | 172:25 173:19 | 307:1,15 308:8,19 |
| 15:10,11,11,12,12 | 88:7,14 89:2,9,13 | 176:11,16 177:4 | 309:10 311:24 |
| 15:13,13,14,14,15 | 89:19 90:20 91:1 | 179:10 181:22 | 313:5,23 316:3,8 |
| 15:15,16,16,17,17 | 91:11 92:11 93:18 | 185:15 186:12,18 | 316:18 317:12,25 |
| 15:18,18,19,19,20 | 95:4,13,20 96:2,10 | 186:25 187:15 | 318:10,17 319:1 |
| 15:20,21,21,22,22 | 96:19 97:5,6,14,21 | 188:2 189:6,11 | 319:11,23 320:4 |
| 15:23,23,24,24,25 | 98:3,6,16 99:3,8 | 191:13 193:21 | 320:10 323:17 |
| 16:3,3,4,4,5,5,6,6 | 99:18,25 100:9 | 194:3,20 195:9,16 | 324:16 325:1,11 |
| 16:7,7,8,8,9,9,10 | 101:15,24 102:23 | 196:3,11,16 | 326:8,21 333:2,23 |
| 16:10,11,11,12,12 | 103:10,18 104:14 | 200:16,22 201:7 | 334:21 336:2,12 |
| 16:13,13,14,14,15 | 104:18,23 105:4 | 201:25 205:3,8 | 337:8,18 338:1,13 |
| 16:15,16,16,17,17 | 105:13,19 106:6 | 209:12,25 211:3 | 339:3,15,25 340:4 |
| 16:18,18,19,19,20 | 107:16,23 108:2 | 211:14 212:3 | 340:14 341:9,20 |
| 16:20,21,21,22,22 | 108:14,25 109:8 | 216:19 217:12 | 342:20 349:2 |
| 16:23,23,24,24,25 | 110:12,20 111:4 | 218:6,17 219:3,17 | 353:19 |
| 17:3,3,4,4,5,5,6,6 | 112:6,13 113:6,17 | 221:6,12 222:7 | **objections**  6:5 |
| 17:7,7,8,8,9,9,10 | 114:3,10 116:2 | 224:3,19 225:1,13 | 7:14 9:1 10:1 11:1 |
| 17:10,11,11,12,12 | 117:19,23 118:5 | 226:15 228:22 | 12:1 13:1 14:1 |
| 20:3,8 26:9 31:9 | 118:12,17 120:15 | 236:13,19,25 | 15:1 16:1 17:1 |
| 32:5 33:11 34:3 | 120:22 121:19 | 237:7,19 238:5 | 76:13 84:5,25 |
| 34:19 35:24 36:7 | 122:18 123:8 | 239:5,12 240:2 | 176:19 185:25 |
| 37:8,21 38:3 | 124:1,16,19 125:8 | 245:7 256:8 257:4 | 195:22 210:7 |
| 39:18 40:7,14,18 | 125:21 126:4 | 259:16 264:17 | 221:21 282:25 |
| 41:7,21 42:5 | 129:23 130:8,20 | 265:18 266:10 | 297:24 320:19 |
| 43:17,25 45:7,13 | 131:4,16 132:3,12 | 267:11,23 268:24 | 336:17 340:19 |

355:20,23
obliged 146:21
observations
  241:24
obtain 191:15
  235:2,4 238:20
obtained 43:1
  170:16 238:24
  254:19 327:23
  328:24 329:6,17
obtaining 27:13
  227:10 237:21
  238:6 329:23
obvious 279:19
  298:25
obviously 29:11
  55:24 74:23
  197:17 257:7
  262:10 276:23
  283:25 299:23
  310:25
occasions 204:25
occur 192:15,19
  205:7
occurred 218:10
  224:6 264:7
occurring 181:14
  205:6 206:7 207:7
  207:16,17,18,21
  208:10 218:21
  222:3 224:8
occurs 190:21
  192:2 193:9,15
october 359:16
offer 63:23 333:15
offered 225:10,11
office 8:4 21:16
  24:10 27:7 38:22
  52:13,15 65:1
  82:13 145:23
  148:2 165:9

171:21 175:19
177:21 197:1,19
198:14 205:11
206:21 212:24
213:15,24 216:13
219:8 222:10,20
222:25 229:7,9
230:5 231:17,25
231:25 235:20
236:1,10,17 237:9
237:14,15 239:1
240:22 242:13,22
245:23 246:3,13
247:15 248:16
249:5,8 250:8
257:5 258:6,18
259:3,4,20 260:4
261:6 265:6,13
277:2 278:20
283:22,23 287:10
290:23 310:20
330:7 341:17
359:6 360:14
office's 198:13
  267:17
officer 246:16
  279:3 289:15
offices 228:17
official 214:17
  315:20 361:15
  362:21
officials 21:20
oh 24:25 25:4
  36:17 37:9 38:21
  68:7 73:1 84:21
  97:4 140:20 146:4
  167:4 168:17
  180:3 214:23
  234:10 259:6
  272:18 288:22
  350:21 354:3

ohio 1:2,22 2:8,12
  2:17 3:10 4:9,18
  5:4 7:7,7 8:7 18:7
  24:19 37:24 42:22
  43:1,10,14 64:23
  65:14 66:11,11
  71:9 161:13
  176:23 177:19
  181:5 184:16
  188:6 189:14,22
  212:14,19 213:3
  226:24 227:9
  238:15 263:11
  264:1 265:22
  273:4 289:2,22
  290:16 328:3,16
  358:2,7 359:7,14
  360:2
ohio's 8:7 263:12
  264:7
okay 24:21 28:3,8
  29:3 30:9 31:19
  35:19 40:5 45:9
  52:21 62:15 66:21
  67:7 68:23 71:22
  72:6 73:7 93:15
  94:5,6 106:18
  111:21 122:2
  133:23 140:7
  141:14 142:25
  147:7 148:24
  155:10 158:21
  168:17 169:12
  182:17 184:14
  187:1 189:13
  193:11 215:2
  228:5 231:1
  234:10 235:17
  243:5 245:17
  246:7 247:25
  250:7 251:4,5

252:14 256:4,14
264:21 268:21
271:20 274:23
281:14 284:24
287:6 303:8
313:18 315:7
326:18 341:14
343:8,19
older 156:8
omission 40:12
  41:20 42:2,4
  92:10
omissions 62:18
  85:4,23 87:22
  88:5 89:18 90:5
once 26:5 97:8
  117:10 200:17
  242:19 323:19
ones 26:19 27:12
  49:5,8 89:5
  108:13,19 113:3
  117:17 118:9,10
  118:10 133:4
  135:19 136:14,19
  145:18 183:23
  203:21 272:19
  282:2 286:4
  328:10,23 330:21
  338:4,21 345:1
  347:9 353:14
ongoing 8:9
  263:15
online 24:1,2,3
onward 315:1
oops 248:9
op 1:10
opana 128:11
  138:7
open 52:22
opened 175:19
  260:4

**operated** 226:23
**operating** 35:4
**operation** 35:10 56:5
**operational** 227:5
**operations** 24:10 35:13 48:5
**opiate** 1:6 18:5 25:8 83:3 167:23 283:6 333:9 360:6 361:3 362:3
**opiates** 40:20 99:13 103:2 164:20 178:1
**opinion** 36:22 53:3 62:25 63:12,23 77:10 106:11 108:8 123:13 192:12 211:23 250:13 296:4 313:16 316:14 318:22 333:15
**opinions** 106:9 322:16
**opioid** 8:3 21:21 30:21,23 31:7,23 32:9 33:5,17,20,21 34:18,24 35:6 36:20 38:2,6 39:1 39:13,22 40:2 42:18,19 54:16,21 54:22,24 55:9 58:20 63:2,8 64:2 64:7 70:8 76:2 83:5,6 88:4 90:3 91:5 102:22 104:20,21 105:3 105:10 106:2 126:2 142:1 147:22 148:4 149:6 150:10,12 155:19 156:10 158:10 165:20 166:2,10,17 167:18 174:23 175:20 176:15 177:18 179:2,9,11 179:22 180:18 181:5 184:10 187:19,25 188:21 188:23 189:4,25 197:25 206:19 210:16,24 211:16 214:1 216:18 222:10,20 223:1 248:14 249:6 250:16 252:17 253:4,6 254:14 257:15 260:4,5 261:6,19 267:1 269:3 277:9,11 298:21 302:3,20 305:11 306:20 307:4 312:16 314:9,12 315:7,8 315:15 319:10,14 320:1,16 321:1 322:18,20 323:15 323:19 324:15,25 327:5 328:2,11 329:5,17,20 330:4 330:13 333:7 335:9,13,15,18,22 336:4,7 337:3 339:24 340:9,13 341:1,3 349:21
**opioids** 40:6 52:7 53:1,24 57:18 58:5 59:24 62:16 69:11 85:2,21 87:3,21 92:7,17 101:21 102:11 103:23 104:7,13 120:14 127:24 128:2,3,19 129:2,8 129:10 134:6,23 135:8 142:18 143:10,18 145:13 145:19 147:23 155:1 156:2,16,20 157:6 162:9 172:8 173:18 176:10 180:9,14 183:21 184:4,5 187:25 190:6 194:9 195:7 220:7,16,21 221:3 221:11,14,18,20 221:25 230:1 238:23 253:2,18 254:9,21 262:2,22 268:17 291:6 294:14 295:3 298:24 302:4,12 302:21 307:22 309:18 310:13 311:16 314:2,10 319:9,15,21 320:2 320:9,17 325:17 326:7,16 327:25 328:19,22 331:14 332:3,24 333:21 334:11 346:23 347:6 349:19 350:25 353:12 354:4 355:12
**opportunities** 163:13
**opportunity** 116:20 163:19 319:5
**opposed** 57:18
**opposite** 107:25
**oral** 128:15 138:11
**order** 52:11 65:10 71:5 72:18 75:17 93:9 110:10 119:18 121:8 124:11 148:17 154:11 225:17,25 226:3 230:21 272:7,10
**orders** 225:21
**org** 259:10 311:19
**organization** 37:23
**organizational** 27:19 310:17
**organizations** 155:22 268:6
**orient** 345:5,8
**original** 33:21 256:1,6
**originally** 180:3 180:12
**outgrowth** 203:12
**outpatient** 228:10
**outside** 40:15 41:8 41:22 42:6 46:17 47:6,10,20 48:19 48:25 49:12,20 50:2,8,22 51:5,17 53:11 61:6 62:24 63:11,20 71:2,17 73:10 74:20 75:13 76:5 77:7,22 78:19 79:3,11 80:2,7,18 81:6 86:8,14 87:2,9,15 87:25 88:8 89:3 89:10,20 91:2,12 92:12 96:11,20 97:6,15,22 98:7,17 99:4,9,19 100:1,10

100:12 101:16,25
102:24 103:11,19
104:15,19,24
105:5,14,20
108:15 109:1
117:20 122:19
133:2 134:11
136:13 139:24
150:4 157:25
164:4 166:15
168:11 176:12,17
177:5 179:12
185:19 186:13
187:3,16 188:3
189:7,12 191:10
194:4,21 195:7,10
195:17 196:4,12
196:17 201:8
205:9 207:7,12,15
207:19 208:10
209:6,13 210:1
214:5 218:7,10
219:18,24 221:7
221:13 222:8,17
256:9 264:18
267:12,24 269:12
269:22 270:2
271:7 275:11
279:1,8,14,23
280:10 281:1
282:22 284:8
296:2,20,24
297:25 299:22
300:23 301:3,12
303:14 304:1
306:6,17 307:2,16
308:9 309:11
311:25 313:6
316:9,19 317:13
318:11,12,18
319:2,12,24 320:5

320:11 324:17
325:2,12 326:9,22
334:22 336:3,13
337:9,19 338:2,14
339:4,16 340:1,5
340:15
**overdose** 7:23 8:3
8:8 42:11 141:7
144:4,6,8,12
145:17,22,24
146:4,9 147:22
148:1,18 150:25
165:5 167:18
177:12,22 179:7
180:21 197:10
198:23 204:7
229:18 230:15,16
244:6,11 246:22
247:1,11 248:15
249:7,11,18 250:8
251:1,16 263:13
264:8 286:17
288:8 291:22
292:6 294:10,18
294:22 309:4,6,17
328:3 329:5
**overdosed** 142:17
143:17 145:5,12
147:5 320:8 327:5
332:24 333:12,22
**overdoses** 43:2,4
174:13 175:2
177:15 188:9
209:2 220:10
244:2 247:16
251:25 253:17
264:5,15 291:23
305:12
**overlap** 183:16
215:17 232:14
290:11

**overlapping**
216:14
**overlooked** 232:8
**overmedicate**
192:8
**overprescribes**
191:1 193:8
**overprescribing**
38:10 46:1,23
48:6,9 63:24
158:13 162:15
174:16 175:22
192:21 200:7
211:20 216:21
222:16,17 260:2,7
340:22
**overprescription**
216:18 256:25
**oversee** 56:5 200:3
222:23,24 318:6
**overseeing** 202:9
223:1
**oversees** 32:24
65:17,18
**overshadowing**
308:23
**oversight** 196:19
275:14
**oversized** 321:22
322:4
**oxycodone** 206:20
295:10
**oxycontin** 128:11
138:6

**p**

**p.m.** 146:17,20
169:19,22 182:20
183:2 231:3,6
248:4,7 256:18,21
284:14,17 332:16
332:19 344:4,7

354:16,19 355:25
356:2
**padgett** 4:12 19:13
19:13
**pads** 25:23
**padukone** 2:20
18:19,19
**page** 29:22 34:13
35:7 44:24 84:15
90:14 91:10,15
92:15,16 93:8,20
93:22 106:13,13
106:19,19 114:20
127:15 131:21
143:4,4 162:3
234:24 240:19
242:3 244:19,21
245:4,13 246:25
249:9 264:3,14,20
266:21 313:25
314:13 327:10
328:9 329:11
346:12,20 348:12
362:7 363:3
**pages** 143:2 247:6
264:5 327:10
**pain** 33:22 36:13
37:24 38:6 39:22
42:18,19 43:10,14
46:24 48:6,10
54:16,22,24 55:4,5
55:10 58:20 62:17
63:2,3,9,17,25
85:2,12,14,22
86:12,25 87:4,7,11
87:18,21 88:4
89:25 90:4,10,11
90:12,16,17,19,21
90:22,25 91:4,5,6
91:6,9 95:19,25
96:3 109:3 121:18

123:1 156:11,14
156:17 158:10
174:23 179:22
188:23 189:4,25
210:17 211:16
214:2 229:15
251:17 252:17
253:4,6 254:16
257:15 260:6,19
273:16,17 277:10
277:11 305:11
314:9,12 333:7,9
340:21,22 341:2
**painfully** 279:19
**paper** 246:1,4
355:5
**papers** 131:7
**papp** 25:10 26:18
52:19 82:19
167:14 231:22
291:3
**par** 4:16,16
**paradigm** 204:20
**paragraph** 84:19
90:14,14 93:21
128:7 138:4
143:15 235:1
240:21
**pardon** 21:14
27:25 82:16 109:9
144:5 181:5,9
216:4 239:20
255:3 283:19
**parenthetically**
292:15
**parents** 302:17
310:3,5
**park** 3:13
**parse** 53:9
**parsing** 251:19
309:17

**part** 36:12 57:14
58:18 97:18 98:1
120:11,18 155:18
160:20 170:12
177:20 180:16
190:1 208:4
219:24 221:15
230:17 241:2
249:14 258:10
268:4 283:12
289:1 307:10
309:14 310:24
312:24 315:22
351:17 352:14
362:9
**participant** 294:8
**participate** 147:16
**participated** 43:12
147:18 168:1
201:1
**participating**
260:10 280:14
**participation** 20:4
267:25 268:5
269:1
**particular** 183:19
200:14 237:5
**particularly**
128:20 294:5
295:5 346:24
**parties** 65:13
88:10
**partly** 227:16
246:18
**partners** 208:16
213:1 215:10
217:3 284:1
**parts** 108:5 283:16
**party** 71:7 359:2
**passed** 73:22
164:24

**passing** 65:1
**patel** 2:11 18:14
18:14
**patient** 35:11 41:5
63:17 73:4 76:2
76:21 77:19 90:24
98:14 99:24 100:3
119:22 124:9
186:21 190:21
191:2,7 192:7,16
192:17 193:10,14
195:12,14,20
**patients** 34:16
35:23 40:20,22,24
46:14 49:3,4 63:3
63:9 66:4 69:11
69:14,24 74:6,22
74:24,25 75:3,10
75:16,16,17 76:15
88:18,19,21 90:4
91:10 95:22 96:18
97:3,13 109:15,16
123:2,3,9,23
124:22,25 127:25
128:25 143:11,12
149:12 150:19,21
156:16 185:13,14
186:8 192:4,20
193:16 222:4
323:4 324:7
334:12 347:4
348:1,4 349:20
353:13
**pcp** 295:6,9,12,24
**pdr** 247:7
**peca** 1:20
**pellegrino** 1:25
358:6 359:13
**pending** 214:18
**pennsylvania**
206:4

**people** 25:5 35:20
37:5 38:24 40:5
42:7 47:3 50:12
56:10,24 57:5
85:14 121:13
123:6,15,22 124:5
125:3,4,5,24
126:10 128:4
138:15 141:5,25
143:19 145:5
147:5,5 149:6,16
150:9 159:8 160:1
160:15 161:21
162:17 163:3
165:1 168:19
174:23 175:22
176:15 196:1
204:8 205:24
206:12 213:25
217:8 232:18
238:23 243:7
246:12 253:5,13
257:23 294:21
300:9 302:18
305:2,7,22 308:22
309:5 310:11
315:6 319:9,21
320:1,15,22
325:15 354:1
**percent** 42:14
54:12 156:12
181:18,24 188:9
198:23 242:1,12
242:14 247:10,14
247:16 249:25
250:3,5,13,16,20
250:25 251:3,6,9
251:11,15,18,21
252:13 253:2,3,11
253:17,23 254:9,9
255:16,17

[percentage - pllc]

**percentage** 42:18
187:24 188:13
190:5,8 305:18
343:5
**perfectly** 25:1
**period** 29:9 165:7
204:22 238:7
242:24 252:8,10
260:25 287:24
290:1 293:22
304:10 310:19
**person** 39:25 40:9
41:17,19,25 76:19
93:4 119:11 126:6
172:2 173:7 180:4
287:18 312:23
324:14 332:1,22
333:17,18,19
**person's** 239:10
**personal** 37:15
76:6 77:15 131:1
148:19 217:17
313:15
**personally** 79:20
87:16 98:10 105:6
109:25 116:6,10
361:11 362:15
**personnel** 258:15
**persons** 235:2,5
**perspective** 204:5
298:12 309:7
311:21 317:6
330:2
**pertain** 350:9
**pervasive** 176:4
**pglawyer.com** 2:9
**pharma** 1:10 3:12
**pharmaceutical**
4:16 88:24 121:1
160:16 164:1
178:12,22 181:20

193:19 194:1
195:3
**pharmaceuticals**
4:2,15,16 5:2
18:17 166:20
**pharmacies** 184:2
185:10 190:15
193:2 203:10
204:7,11,17,21
218:9 227:12
228:4,14 270:19
270:25 274:9,17
274:21,22 275:8
276:23 285:12,22
286:1
**pharmacist**
326:20
**pharmacists** 184:1
196:10 228:4
258:13
**pharmacy** 7:10
65:17 66:16 77:8
103:21 104:2,4
155:17 162:15
163:4 165:8 180:1
186:5 192:22
193:13 197:4,11
198:17 200:2,3,10
201:6,20,24 202:6
203:8 204:13,14
204:16,23 216:22
227:23 228:18,24
234:22 236:3
238:10 258:14
259:8 262:24
326:2 331:8 334:6
**pharmacy's**
184:16 273:4
**phase** 42:13 54:23
194:16 206:19
251:1 252:21

314:3,5
**phenomenon**
193:4
**phone** 19:11 20:2
82:22,22 247:19
354:10 355:4,17
360:3
**physical** 319:17
330:18
**physician** 25:10
93:2 186:10,14
260:9 291:4
294:13
**physicians** 52:25
155:16 156:7,12
158:4 181:7
200:15 223:2
238:15 258:8
274:5,7 275:8
316:6 350:10
**pick** 328:18
**picked** 332:6
**picture** 291:5,7
**piece** 163:11
174:18 355:5
**pieces** 159:1
283:24 286:22
**pill** 35:1,4,9,19
36:4,10 37:20
43:9 48:7,11,17,20
49:4,9 50:12,14
57:12 179:23
184:2 192:22
201:2 206:25
207:10 208:3
212:18,18 260:14
260:18
**pills** 195:15 208:6
**place** 51:7 115:1
274:19 301:25
302:15 358:19

**placed** 103:5,21
**placement** 201:16
**places** 70:12
174:20 202:8
207:10 215:4
**placing** 239:23
**plaintiff** 18:11,13
18:15
**plaintiff's** 7:7
66:10 92:8 142:18
145:14 155:2
157:3,7 183:22
184:3,8 266:24
297:3
**plaintiffs** 7:12
84:1 85:1 92:5
93:1,10,24 107:1
128:10,17 129:6
138:5 139:14
142:16 143:16
145:11 153:13,19
154:23 184:21,23
281:15,17 344:22
345:3,13 346:21
347:19 348:22
352:6 355:19
**planning** 65:18
**plateaued** 189:5,9
**played** 172:8
**player** 288:17,20
294:14 295:12,17
295:19
**please** 18:8 19:11
19:25 56:1 63:5
84:15 106:12
115:5 141:12
183:17 233:10
350:20 360:14
**plevin** 2:6
**pllc** 2:2 3:8

**point** 33:19 51:10
55:1 123:17
134:21 170:6
171:14 179:3
181:6 188:15
189:21,22 193:11
198:1,22 208:17
229:12 246:8
249:22 296:15
302:12 328:9
331:6 333:25
337:20 338:4
341:24 344:16
**pointing** 257:15
**points** 55:24 56:6
56:7,11 82:25
240:24 241:5
246:21 264:3
355:6
**poison** 164:18
191:21 198:20
**police** 24:15
231:19
**policies** 57:16
58:23 178:7
184:15 268:9,9
273:3,6,7,7,12
275:17 276:6,6,18
277:2,2,12 280:1
**policy** 109:20
**polster** 1:8
**pops** 24:24
**population** 39:21
39:22 42:15 48:8
48:9,14 50:11,13
51:7,8,18,21 54:12
54:15 55:18 56:18
74:6 158:10,11
177:22 180:10
182:16 192:24
241:23 253:12

**254:22 277:9,11
302:22 339:11
porter** 3:3 19:19
19:19
**portion** 68:10
184:19 303:1
**position** 34:14
39:10 40:4 59:14
60:6 61:25 62:3
62:16 63:7,16
64:4,6,9 67:11
85:9,20 101:2
106:3 107:9,14,22
107:24 108:11,16
218:19 297:13
307:6 309:2
313:15 327:1
336:9 338:18
339:8,20 343:3
**positive** 83:4
201:17 286:5
291:21 355:10
**possibilities** 305:6
**possibility** 292:15
**possible** 57:25
160:6 292:5
304:21
**possibly** 100:12
161:9
**post** 274:2
**poster** 248:24
249:2
**posthumously**
330:3
**potential** 55:3,6
58:22 64:1,1
156:10 166:1
178:12,22 240:24
329:23 336:19
337:7 338:8
340:23

**potentially** 33:16
33:24 56:5 156:20
157:21 167:18
175:23 192:9
220:11 222:15
252:4 269:15
282:3 296:13
310:8
**power** 196:1,8
312:6
**practice** 99:7
104:10 200:9
275:1
**practices** 52:6
53:23 58:3,4,18
59:24 60:17 62:14
161:15 162:16
178:13,18,23
179:4 222:12
229:16 239:21
260:5 261:8,13
275:18 281:4
336:5
**practitioners**
202:10 258:12
259:8 260:7
273:14
**predated** 180:6
**predict** 319:7
**predisposed** 172:4
**prefer** 360:16
**premarked** 344:16
**preparation** 21:7
21:22,25 24:5,15
65:2 67:16,20
98:13,15 112:19
116:21 122:11
131:2 147:9
159:14 160:21
167:6 171:4 180:4
287:17 331:11

**prepare** 27:18
28:14 30:12 67:12
77:17 286:14
287:6
**prepared** 37:18
43:23 67:8 75:7
148:12 155:7
183:24 315:12
332:21
**preparing** 22:2,25
30:15 64:14
**prescribe** 101:23
102:3,21 103:8
104:1,7 129:2
221:10,20,25
347:6
**prescribed** 34:15
47:16 87:3 102:11
109:3 129:12
180:22 185:13
221:14 227:2
243:15 320:22
353:12
**prescriber** 102:4,8
140:14 180:15
181:2 237:2
**prescriber's**
228:17
**prescribers** 47:2
128:25 133:20
153:14,25 156:24
165:7 181:8
194:24 204:24
218:10 222:21,22
227:14 230:9
238:18 243:14
275:22 276:22
347:4,22
**prescribing** 50:6
52:6,25 53:23
54:7 58:3,4,18

59:15,24 60:17
62:14 103:2
104:22 127:24
128:2 134:6,22
135:7 137:6 165:3
175:20,24 178:13
178:23 180:19,24
184:4,10 190:13
198:19 221:18
222:12 227:13
229:16 239:3,21
260:5 261:13,14
261:19 262:1,10
267:1 268:16
269:3 273:16
275:14 281:3,4
336:5,23 337:24
**prescribings**
162:25
**prescription**   1:6
8:8 18:5 40:2,6,10
40:25 41:5 42:9
42:23 48:16,21
52:6 53:1,24 55:4
55:5 58:5 59:24
63:17 64:22 65:18
76:20 77:5,19
87:20 88:3 90:3
93:3,24 95:10,18
101:21 104:5
106:2 107:2 108:8
109:22 111:3
112:4 113:15
114:17 115:9
116:24 120:13
126:11 132:23
134:24 135:6,9
139:15 142:18
143:18 145:13,19
155:1 156:2,11
157:6 158:7 162:8

164:20 165:4
171:13 172:7,10
173:18 174:14
177:18 178:1
179:9,11,15,17,22
180:1,9 183:21
184:4,9 185:3,4,6
185:9,10,24 186:4
186:5,10 187:19
187:24 188:10
191:7 192:2,3
193:8 195:7,13
203:9 205:21
206:19 210:16
226:22 227:7
229:14 230:1
236:24 237:1
239:11 241:25
242:14 243:4,8
250:14,22,22
251:17 253:18
254:10,14,21
261:18 263:13
264:8 267:1 268:6
273:16 276:4
285:13 286:2
314:2 319:9,21
320:2,9,17 324:15
324:24 326:7,16
327:25 328:2,11
328:19,22,25
329:5,16,20
331:14 332:2,23
333:21 335:9,15
335:18,22 360:6
361:3 362:3
**prescriptions**
34:15 42:24 43:5
49:6 50:17 57:17
62:16 63:1,22
64:7 66:2 69:7

74:17,23,23 75:1,4
75:10,18 85:1,11
85:21 92:7,17
95:24 96:7 97:20
106:1 107:18
108:17 111:24
112:1 113:2
114:13 117:16
119:13 120:20
127:19 128:10
129:10 130:19
132:1 133:16
134:2,9,17,18
135:15,18 136:9
138:6 139:2,19
145:3 153:14,25
165:17,19 166:4
177:2 180:14
181:11 185:14
186:9 191:15
206:13 228:10
345:16 346:16,18
347:16,20 348:9
348:23 349:22
351:5,24 353:3
**presence**   298:22
358:14
**present**   5:7 158:25
199:11 208:12
232:1 295:4
**presentation**
245:4,14 248:23
**presentations**
28:18 232:17
**presented**   166:21
268:7 290:23
**presenting**   171:19
**preserved**   167:11
**presiding**   302:9
**pretty**   124:7
130:11 266:5

287:11
**prevalence**   188:18
299:4 306:8
**prevalent**   36:11
208:4 302:5 305:9
**prevent**   50:25
51:14 128:13,15
138:9,11 139:16
341:16
**prevented**   339:24
340:12,17 342:18
342:23,25
**preventing**   298:14
**prevention**   8:9
25:6 167:21
233:16 263:15
**previous**   21:19
24:8 43:5 255:7
269:6 308:3
**previously**   66:6
93:25 111:7
125:16 270:21
**primarily**   23:22
208:11 215:24
280:12 302:19
307:6
**primary**   245:24
314:15 330:12
**principal**   167:16
**print**   23:25
**printout**   93:11
321:22
**printouts**   64:22
**prior**   21:14 194:25
211:20 236:12
237:15 278:15
345:20
**private**   232:25
233:4
**probably**   22:18
24:21 29:4 68:9

129:19 160:11
169:2 188:22
203:21 206:23
209:14 245:8
247:23 268:11
280:19 290:15
294:10 295:9
300:13 320:21
331:17 338:17
**probe** 163:19
**problem** 33:21
123:5,16 124:10
172:10 176:4
189:24 207:14
214:15 244:7
289:6,7,11 290:14
311:12 351:18
352:14
**problems** 288:25
289:12 302:2
**procedure** 20:12
357:7 361:5 362:5
**procedures** 276:7
276:18 280:2
**proceedings** 218:5
223:4
**process** 78:17 98:1
98:21 120:12
124:15 184:22
186:20 218:9
235:7 237:24
239:14 243:1
281:16 283:9,13
283:16
**processing** 213:14
**procurement**
283:14
**produce** 209:2
**produced** 66:2
83:14 167:11
249:4

**product** 61:9
105:3,10 186:21
187:2 193:16
**production** 282:16
282:20 283:1
360:24
**professional** 196:9
**professionals**
209:5
**profit** 35:12
**program** 25:6,13
42:23 104:6 158:7
165:4 167:17,21
205:21 213:25
226:23 233:16
237:18 238:3
302:16,16 310:2
350:12,24
**programs** 128:23
299:24 310:25
347:2
**progressing**
158:10
**project** 25:12,14
175:19 231:22
**promise** 182:3
**promotion** 154:25
155:12 157:4,20
173:17
**promotional** 162:7
**prompt** 294:10
**prosecuted** 37:3
38:24 49:17 95:11
120:20 121:2
127:22 128:4
132:20 133:15
134:4,22 135:7,16
135:16,19 137:5
137:25 353:15
**prosecuting** 7:8
66:12 278:8

**prosecution**
197:20 207:4
213:17 259:22
278:18 280:17
**prosecutions**
38:10 39:2 45:25
134:8,13 154:6
197:17,23,25
198:4 200:13
201:1 207:3
217:19 257:12
278:13,15 311:2
331:20
**prosecutor** 37:2
38:9,13,19 43:20
43:22 46:2 49:2
134:12 162:24
163:14 201:1
207:3 218:1,19
229:3 278:6,8
280:15 311:3
**prosecutor's** 38:22
49:14 197:19
206:17 216:13
259:20 278:20
**prosecutors**
218:14
**prospective** 246:9
**prospectively**
242:21 243:6
**protective** 258:6
266:19 276:16
**protocol** 130:12
**protocols** 213:9
**provide** 82:6 93:2
119:12 208:2
227:1 246:17
285:12 316:6
**provided** 20:11
23:21,23 41:11
93:25 147:15

150:19 168:22
187:3 255:19
273:21 283:3
323:7 334:25
347:18
**providers** 127:21
132:20 134:3
177:2
**provides** 209:18
216:9
**provision** 311:5
**public** 1:21 2:7
4:18 159:25
180:17 231:18
249:3 278:23
279:3 358:6
359:13 361:10,18
362:15,23 363:23
**publications**
128:23 266:11,14
347:2
**publicly** 23:15,17
28:12
**published** 240:15
241:12 252:24
**pull** 230:12,14
272:2
**pulled** 292:22
304:19 307:7,8,25
**pulling** 292:21
293:5 305:17
**punished** 47:4,13
47:16 49:16
**purchase** 305:22
306:1
**purchased** 360:17
**purdue** 1:9 3:12
19:7,9 344:11
**purportedly** 264:1
**purporting** 264:6

**purpose** 34:17
119:14 187:4
191:3 211:10
277:25 278:10
**purposes** 29:1
49:7 66:19 84:9
126:24 127:4
234:16 235:4
240:11 244:14
248:20 263:19
343:23 351:3
**pursuant** 7:16
84:7 328:24 357:3
357:6
**pursue** 117:12
237:12
**pursued** 237:10
**push** 266:14
**pushed** 264:24
**pushing** 302:5
**put** 104:3 147:3
172:23 244:24
245:8 272:12
296:15 313:14
314:19 352:1
**puts** 165:25
**putting** 144:16
146:8 257:10

**q**

**qc** 78:16
**qualified** 358:8
**qualify** 304:5
**quantifications**
33:14
**quantify** 301:8
**quantitate** 257:13
**quantity** 272:11
**quarterly** 177:19
328:4
**queried** 71:5,12

**query** 265:22
**querying** 71:14
**question** 31:2,15
35:9 36:24 37:13
37:14 41:15,23
52:22 59:9 60:10
61:5 62:22 63:21
63:23 80:8 84:16
84:18 88:1 89:14
89:22 95:23 96:24
96:25 98:5 103:7
108:4 110:23
137:11 138:23
139:7 148:16
163:12 172:13
176:1 177:8 182:2
183:13 185:21,22
203:14 206:9
209:1 214:4,7,18
214:22,25 220:9
220:25 234:4,6,7
243:9 254:7 256:4
261:23 263:6
264:9 268:14
271:8 280:4 285:9
290:9,12 297:20
298:25 300:25
305:8 308:13
318:12,19 320:13
320:15 322:6
323:22 324:2
326:10 327:22
329:8 331:15,19
334:2 335:15
337:14 338:20
339:22 340:6,11
341:23 347:12,15
347:15 348:7,17
349:13 350:20
353:21

**questioning**
183:15
**questions** 29:11
35:14 56:23 115:3
127:17 130:24
131:3,22,23
132:10 152:10
163:23 166:13
168:9 169:24
185:2 277:21
284:23 286:15
297:15 315:3
332:9 334:5
344:13 349:14,25
351:10,15 352:25
354:7,10,11,12,23
355:14
**quibble** 83:17
170:1
**quick** 72:15 186:1
344:1
**quickly** 354:14
**quite** 82:23 167:9
210:10 226:17
**quota** 184:22
281:16 282:5,16
282:20 283:1,4,9
283:11,13,14
**quotas** 184:24
281:18,20,23,25
282:7 284:4,7
**quoted** 253:21

**r**

**r** 27:21 167:20
**race** 171:25
295:16
**races** 305:20
**raised** 157:12
**ranjan** 2:15 18:24
18:24 343:13

**rapid** 313:19
**rare** 290:22 295:2
**rates** 229:25 299:4
**rawlings** 96:22
116:4,9,11 117:8
118:21 119:3
**reach** 203:23
238:7
**reached** 180:8
268:2
**reacquaintance**
261:14
**react** 284:10
**reacted** 284:6
**read** 52:17 56:21
62:4 63:5,6 87:4
101:12 105:2
106:25 127:18
128:3 130:14,15
131:21 132:5,7,14
135:5 136:4,17
141:8,21 142:9
143:15 145:10
170:3,5 176:1
178:19 179:1
183:16 186:1
253:24 266:24
268:25 324:19
351:8 361:5,6,12
362:5,6,17
**reading** 130:2
132:10 135:10,21
136:1,5,6 138:13
138:24 235:13
297:10,11,18
349:10 351:21
360:12,20
**reads** 235:22
**ready** 21:25
**real** 265:12 289:7

**[realize - refresh]**

**realize** 156:22
**really** 26:4 56:15
  61:15 119:7
  125:11 145:8
  146:14 159:22
  166:7 170:7
  171:12 172:11,13
  173:23 174:21,25
  178:9 180:25
  181:12 188:14
  189:20 190:5
  198:18 214:10
  221:1 241:22
  252:15,20 261:1
  262:6 275:4,15
  288:17 291:5
  292:23 304:19
  309:18 312:2,12
  312:15 319:6,19
  325:14 326:25
  346:2
**reask** 297:19
**reason** 219:1
  265:22 306:18
  362:8 363:3
**reasonably** 314:22
**reasons** 252:3
**reassured** 156:10
**recall** 26:16
  227:25 228:1
  285:13 312:20
  355:1
**recalled** 287:11
**receipt** 360:20
**receive** 91:5
  155:15 159:24
  160:5 202:4
**received** 43:5 76:2
  77:19 106:1
  120:13 143:1
  159:19 160:8

191:22 197:8
  223:18 230:1
  237:16 240:5,25
**receiving** 49:5,6
  185:21 251:17
  325:16 334:13
**recess** 81:23
  126:20 146:18
  169:20 182:22
  231:4 248:5
  256:19 284:15
  332:17 344:5
  354:17
**recipient** 191:10
**recognize** 143:24
  174:22
**recognized** 166:20
**recognizes** 63:25
  294:17
**recollection** 166:8
  227:21 238:21
  291:14
**recommended**
  285:19
**record** 18:2,9
  19:12 63:6 77:9
  81:21,25 82:2
  92:22 126:18
  127:8,10,18
  131:18 146:16
  169:15,17,18,22
  173:6,12,15
  182:19 183:2
  209:1,8 231:2,6
  248:3,7 256:17,21
  284:13,17 332:14
  332:15,19 344:1,3
  344:7,17 349:9
  351:20 352:16
  354:14,15,19
  355:19,24 362:9

**records** 42:10
  43:13 76:8 77:24
  78:2,5 208:22
  209:16 253:19
  325:25 331:20
**recover** 319:5
**recovery** 64:24
  232:4 233:3
  302:18 310:6
  318:25
**recruit** 50:11
**recruiting** 243:6
**redefinition** 129:9
**reduced** 358:13
**reed** 3:2 19:5,19
**reedsmith.com**
  3:6,7
**refer** 37:1 43:20
  141:1 152:7 165:8
  197:9 200:4
  201:20 316:24
  355:22
**referable** 31:12
  32:12 36:1 37:11
  39:13,22 45:16
  48:13 53:4,7,18
  54:7 55:9 56:19
  58:24 59:16 60:7
  62:1 229:16
  291:18 333:9
**reference** 27:20
  40:16,25 41:9
  88:22 231:8
  341:24 344:25
  355:22 360:7
  361:2 362:2
**referenced** 189:15
  293:4 358:13,17
  360:11 361:11
  362:15

**referencing** 251:3
**referral** 115:11
  117:11 161:20
  162:21 163:25
  202:24 321:17
**referrals** 142:5
  202:2,7,13,16
  205:15,15 217:23
  325:15
**referred** 63:14
  87:12 93:10,10
  98:19 99:13
  108:21 110:15
  112:24 113:19
  114:6 115:21
  142:4 150:25
  163:4 165:17
  200:6,17,24
  232:11 321:5,18
  322:12 324:7
  325:3 328:14
  339:18 345:13
  352:6
**referring** 142:21
  142:23 149:4
  216:2,5 246:4
  262:18 345:9
  351:11 352:6
**refers** 112:1
  245:18 247:17
**reflect** 210:5
**reflecting** 209:10
**reflects** 245:5
**reformulated**
  128:11 138:6
  139:15
**reformulations**
  55:4
**refresh** 26:5 30:3
  346:19

**refuse** 286:9
**refused** 286:6
**regard** 21:17,21
　27:3,17 60:25
　103:4 206:18
　215:9 277:8
　286:17 305:7
　337:11
**regarding** 103:1
　129:7 164:1
　184:16 262:21
　273:4,12 275:1,21
　357:2,11
**regards** 208:16
**region** 215:14
**regional** 56:6
　189:19
**registered** 273:14
**registrants** 225:20
　257:23
**regret** 339:7
**regulated** 103:12
　297:1
**regulation** 161:12
　161:14
**regulations** 273:22
**regulators** 196:15
**regulatory** 58:23
　196:20
**reimburse** 176:9
　176:14
**reimbursed**
　176:24 300:11
**reintegrate** 311:1
**rel** 7:8 66:12
**relatable** 41:19
　45:5,11,19 60:17
**relate** 40:11 89:7
　89:16,17 157:19
　242:12 272:3
　280:2

**related** 52:18
　69:21 83:6 88:25
　157:7 190:5 207:3
　211:4 213:9 220:6
　223:18 241:18
　251:11 286:17
　297:8 300:20
　301:9 302:11
　315:19 335:9,16
　339:2 355:12
**relates** 1:8 44:12
　130:23
**relating** 155:2
　221:2 273:8
　350:25
**relationship** 35:12
　71:10 178:5 191:2
　239:20 262:25
　292:2,5
**relative** 305:19
　307:21 359:2
**relatively** 29:14
　263:6
**release** 288:21
**relevant** 33:5,12
　33:17 50:15 172:6
　229:22 241:8,22
　287:25 337:14
**reliance** 62:18
　85:3,22 87:22
　88:5 90:4 92:9,18
　345:16
**relied** 118:25
　153:15 154:1
**reliever** 38:6
　54:22 158:11
　188:24 254:17
　333:10
**relievers** 33:22
　39:23 42:18,19
　54:17,24 55:5,6,10

58:20 63:2 91:6
　156:11 174:23
　179:22 189:4,25
　211:16 214:2
　251:17 252:18
　253:4,6 257:16
　260:6 277:10,11
　314:9,12 333:7
　341:2
**reluctant** 73:17,24
**rely** 266:13 330:5
**relying** 137:9
　208:9
**remained** 304:17
**remains** 323:21
**remediated**
　261:12
**remember** 24:25
　26:19 30:17 43:11
　44:6 72:2 79:13
　103:13 105:11,15
　121:22 129:21
　131:7,8 133:5
　136:5,6 160:19
　165:16 227:24
　228:8,24 244:23
　254:17,23 285:16
　287:15 289:9
　312:22 345:22
　346:12
**remembering**
　167:10
**remission** 123:7
　323:16,21,23
**remotely** 175:6
**removed** 319:18
**rendered** 129:10
**rendon** 20:2 27:3
　168:5 198:3
　208:21 217:18
　231:14 234:2

**rendon's** 20:4
**renee** 1:25 358:6
　359:13
**rep** 88:13
**repeat** 261:22
**rephrase** 326:11
**replaced** 234:1
**reply** 68:15 69:22
**report** 27:8 146:20
　173:6 188:7
　189:15 200:9
　201:19 204:22
　205:1 216:22
　223:12 225:17,25
　235:6 236:8,18,21
　236:22 237:16
　239:2,25 272:10
　275:9
**reported** 196:22
　197:4 199:4,22
　202:25 203:1,15
　204:3 285:10
　292:9
**reporter** 6:18
　19:25 288:2 361:7
**reporter's** 6:16
　358:1
**reporting** 42:22
　173:23 181:6
　200:14 201:5
　205:18 225:21
　272:11 274:17
**reports** 27:10
　177:10 179:1
　181:15 189:20
　197:15 198:13,25
　199:19,25 201:22
　202:22 205:11
　210:12 214:13
　226:4 235:24
　236:11 241:17

243:10 252:21
272:7 298:3
**represent** 171:17
**representation**
42:2 212:25 217:6
231:20
**representations**
128:16 138:12
**representative**
34:7 49:15 74:7
98:12 114:5
120:25 139:9
155:21 183:10
224:5 231:23
246:17 322:8
346:9 347:23
349:1 350:3
**representatives**
88:24 164:22
208:15 222:5
258:3,5,22 350:7
**represented**
229:14 232:3
250:9 252:22
342:7
**representing**
125:11 159:18
232:23 233:5
**represents** 252:7
**reps** 97:19
**reputable** 35:15
**request** 235:6,8
239:24 285:12
286:7 349:15
362:9,11
**requested** 180:12
235:9 237:8,15
239:24 277:22
285:21 357:1,6,10
**require** 261:11

**required** 228:20
269:14 270:23
344:23 360:25
**requirement** 70:6
95:9
**requirements**
225:20 228:15
**reread** 159:16
**research** 179:6
235:3 249:4 256:1
256:6 290:23
301:1
**reselling** 195:15
**reserve** 83:15
**resident** 102:15
317:9
**resident's** 335:25
**residents** 227:8
304:22
**resistant** 336:22
**resolvable** 310:8
**resources** 219:5
219:15
**respect** 30:1 41:3
41:16 64:3 69:6
91:15 94:24
105:16 111:2
115:9 122:24
123:21 154:9,10
155:1 157:6 162:7
173:18 174:2
281:20 282:1,7
285:1 293:18
294:16 305:1
307:12 312:19
320:24 334:4,19
338:7 341:6
**respond** 39:4
65:21,23 67:19
71:20 93:9 131:2
180:18 183:24

286:15
**responded** 67:15
181:19 310:7
321:14
**responding** 69:9
81:13 119:14
157:13 174:15
190:16 346:4,6
352:7
**response** 8:3 25:2
41:12 43:16 58:10
58:14 68:16 69:17
72:6 91:16,21,24
92:1 130:25
136:11 142:15
143:1,22 148:8
152:25 155:3,19
159:12 171:3
172:18 175:9,16
184:23 203:11
205:23 227:6
248:14 249:7
281:17 285:25
286:5 303:1
310:15 312:15
315:21 345:3,6,14
347:18 349:6,10
349:11,12 351:8
351:12,13
**responses** 7:9,14
64:13 65:4 66:14
68:12 84:4 86:19
98:21,22 110:8
111:17,19,25
138:13 151:2
352:18 355:20,22
**responsibility**
31:12 39:12,17
336:8
**responsible** 30:24
48:1 60:12 62:13

122:11 180:18
215:22 216:17
288:23 337:2
339:9
**responsive** 174:11
175:7,14
**rest** 349:25
**result** 46:9 93:25
201:5 281:5 292:4
294:18 337:6,16
337:23
**resulted** 200:14
218:4,15 309:23
**retail** 7:10 66:16
**retain** 26:1,2
**retained** 6:18
25:19
**retrospective**
235:8 239:7
240:22 241:9
243:3 245:18
251:7
**retrospectively**
43:2 243:7 244:5
**returned** 360:19
**reverse** 167:18
**review** 22:23 24:1
32:19 42:21 68:2
76:7 77:8,24 82:7
88:11 110:22
117:13 127:15
139:1,25 140:10
140:13 147:13
154:20 164:18
165:2 191:22
194:22 198:20
242:23 245:19,19
245:22 246:1,3,10
246:14 256:1,6
260:5 286:23
287:1 325:25

330:18 357:2,6
360:14 361:1
362:1
**reviewed** 21:11,15
21:16 23:2,5,12,14
23:17,19 28:16
41:11 43:2 64:23
65:23 67:18 78:1
78:4 97:18 110:3
111:6 119:13
131:6 140:12
254:2 255:23,23
255:25 256:5,10
272:24 286:16,19
**reviewing** 43:12
118:24 131:18
**reviews** 171:22
**revisited** 273:19
**revoke** 196:8
**rewrite** 53:20
**rewrote** 100:22
**rhartman** 4:19
**rich** 2:10
**right** 33:10 38:17
38:18 43:23 44:16
44:17 45:6,20
46:10,15,25 48:17
48:23 49:18 50:5
51:11,11 55:15
57:5 58:3 59:19
61:21 67:22 71:23
72:20,21,24 75:19
80:11 85:9,18,19
89:25 90:6 92:2
92:10,24 93:14
94:3,5 101:10
103:17 107:10,15
107:21 109:7,11
110:19 111:25
112:2,12 115:10
115:23 116:15,25

118:2,6,11 120:4
121:8,18 122:4,7
122:12,17,17
123:3,25 124:13
126:3 132:11
133:12 134:1
141:22 143:2,5,25
146:14 147:1,2,7
148:23 152:5,12
161:21,22 169:8
173:12 177:13,14
178:10 179:18
184:12 185:20
188:21 189:10
197:2 200:21
201:6 216:3,5
220:3,24 225:10
225:12 226:18
228:12 229:2
235:4,24 236:12
236:24 237:6,25
237:25 238:4
239:4 240:18
241:12,15 242:7,9
242:17 243:11,12
245:21 246:5,11
246:12 247:2,3,4,5
247:11,12,17,18
247:23 249:10,12
249:13,19,23,25
250:23 253:24
273:22,23,25
274:9,21 278:24
279:6,12,21
283:18,20 285:7
293:19 294:23
306:13 317:11
321:23 327:7
332:11
**rights** 83:15

**ring** 181:21
**ripple** 257:16
**rise** 188:25 305:12
305:14
**risen** 83:2,4
**rises** 314:8
**rising** 189:9
**risk** 156:16 240:24
246:21 299:7
**risks** 128:19 129:8
326:6,15 346:23
**roadmap** 29:19
**robbery** 192:22
**roitman** 3:16 6:11
19:6,6 67:4
140:18,22 344:9
344:11,14 351:20
352:3,23 354:6,13
**role** 156:2 164:19
172:7
**room** 25:10 169:2
220:16 246:13
291:4 294:13
301:20 354:9
**rooms** 291:6
**rose** 234:21
**rounds** 170:24
171:11
**rpr** 1:25
**ruled** 124:25
213:21
**rules** 20:12 357:3
357:7 361:5 362:5
**ruling** 7:16 84:8
344:24
**run** 50:12 54:19
156:15 205:10
311:18 328:17
**running** 232:6
260:18,18

**runs** 266:20
**ruth** 4:17 18:22
**rx** 42:22 64:24
181:6

**s**

**s** 3:13 265:25,25
266:20,20 362:8,8
363:3
**sacwis** 266:20
**sad** 308:22
**safety** 156:9
174:17 222:11,21
223:1
**sake** 344:19
**sal** 263:22
**sale** 56:14 187:20
**sales** 88:13 97:19
128:22 346:8
347:1,7,10,23
348:14,25 350:3,7
**salts** 290:11,13
291:11 293:18,23
**salvatore** 2:3
18:10 360:5
**samhsa** 265:24
266:1 285:1,5
**san** 2:21 3:5
**sandra** 3:8
**sandy** 19:2
**sara** 3:16 19:6
344:11
**sara.roitman** 3:19
**satisfaction** 178:4
**satisfactory**
261:12
**satisfy** 119:19
121:6
**save** 106:25
**saw** 71:23 131:9
136:8 138:25
197:6,7 252:6

253:8 288:23
290:9,18 293:22
304:16 305:9
314:6 341:4
**saying** 60:5 100:17
104:9 111:13
121:12 140:12
145:7 174:7 182:7
187:9 223:24
238:24 256:3
278:12 297:15
303:6 348:8 351:1
351:24 353:18
**says** 53:19,20,21
58:2 59:2 60:11
62:6 84:19 90:17
93:23 100:24
107:1 110:4
122:25 137:2
141:6 143:6,15
148:9 161:23
172:17 235:11
238:1 240:21
247:7,10 249:11
249:18,22 266:6
346:20
**sbadala** 2:5
**sboranian** 3:6
**scale** 207:1
**scenario** 192:22
260:14
**scene** 213:14
**schedule** 211:6
281:20,22 282:2,4
303:18
**scheduled** 290:16
**scheduling** 290:18
**school** 249:3
298:22
**scientific** 315:14

**scope** 40:15 41:8
41:22 42:6 46:17
47:6,10,20 48:19
48:25 49:12,20
50:2,8,22 51:5,17
53:11 61:7 62:24
63:11,20 65:7
71:2,17 73:10
74:20 75:13 76:5
77:7,22 78:19
79:3,11 80:2,7,18
81:6 86:8,14 87:2
87:9,15,25 88:8
89:3,10,20 91:2,12
92:12 96:11,20
97:6,15,22 98:7,17
99:4,9,19 100:1,10
100:13 101:16,25
102:24 103:11,19
104:15,19,24
105:5,14,20
108:15 109:1
117:20 122:19
133:2 134:11
136:13 139:24
150:4 157:25
164:5 166:15
168:12 176:12,17
177:5 179:12
185:19 186:13
187:16 188:3
189:7,12,17 194:4
194:21 195:10,17
196:4,12,17 201:8
205:9 209:13
210:1 218:7
219:18,24 221:7
221:13 222:8
256:9 264:18
267:12,24 269:12
269:22 270:2

271:7 275:11
279:1,8,14,23
280:10 281:1
282:22 284:9
295:15 296:2,20
296:25 297:25
299:22 300:23
301:12 303:14
304:1 306:6,17
307:2,16 308:9
309:11 311:25
313:6 316:9,19
317:13 318:11,18
319:2,6,12,24
320:5,11 324:17
325:2,12 326:9,22
334:22 336:3,13
337:9,19 338:2,14
339:4,16 340:1,5
340:15 342:21
**scribbled** 25:22
**seal** 359:6 361:15
362:21
**search** 120:4
265:19
**searchable** 145:23
**searches** 23:7
**second** 3:4 27:4
30:2 72:14 84:18
106:24 132:8
141:11 167:25
233:21 234:24
235:1,13,15
244:19 249:9
296:22 335:20
**seconds** 108:1
**section** 106:24
**see** 28:3 29:21
34:12 44:7 52:9
58:4,6 59:3 66:1
72:1,4,5,8 84:19

85:6 88:22 91:14
92:16,19 93:6
107:6 121:13
123:1 124:12
140:17 142:19
154:22 155:5
157:1,8 161:24
170:9 180:23
187:6 193:11
195:18,23 204:17
207:11 211:17
229:13 230:9
239:19 241:5
242:13 247:15
252:16 259:11
265:21 270:19
288:15 291:1
294:3 297:5
298:17,17 301:19
301:21 305:11,13
309:16 311:19
314:22 345:19
**seeing** 72:2 137:8
171:16 177:25
188:19 198:1
204:5 251:5
289:13 337:4
345:23 355:7
**seeking** 55:20
**seen** 69:3,4 72:12
72:16 75:2 83:2
84:13 93:16 141:3
176:25 188:9
223:24 225:24
242:11 247:13
251:9 298:3
**seized** 286:20
287:2 288:18
291:8
**seizing** 290:15

seizure  294:5
seizures  288:24
  295:8,10
select  75:15 120:8
  334:1
selecting  120:11
selection  96:5
  99:10 124:14
  152:7
sell  55:2 203:9
selling  192:9
sells  190:21
send  328:2
sending  51:1
  177:17
sense  35:3,15
  57:25 91:7 243:2
sensitive  214:10
sent  61:9 328:15
sentence  93:22
  106:24 132:17
sentences  198:10
sentencing  198:8
separate  76:24
  85:15,16 108:5
  113:21 146:8
  211:21,25 299:12
  300:3,4 301:5,6
  302:14 310:7
  349:7,17
separately  23:24
  32:14 90:10
separation  60:9
serve  355:19
service  216:9
  222:24 266:19
  267:4
services  21:18
  23:6 24:12,14
  26:18 165:11
  166:6 191:24

197:13 201:15
  202:3 221:24
  252:24 254:1
  258:7 266:4,7
  273:20 276:16
  300:2 301:5 310:1
  311:6 318:3
session  6:14 183:4
set  7:10,15 66:17
  70:25 84:6 102:25
  244:20 247:1,17
  257:24 281:22
  317:20,22 359:5
sets  281:20,25
  282:7
setting  63:24
  184:22,23 274:1
  281:16,17 282:5
  283:9,13 302:13
setup  158:13
seven  22:4,6 104:2
  273:17 274:2
severity  322:20
sex  171:25
shannon  24:9
  52:13 287:9
share  152:22
  158:6 165:13
  193:6 217:16
  283:22
shared  27:7 203:6
  213:10 277:13
  283:24
sharing  171:16
  195:20 215:11
  217:3,8 257:7
  283:25
shaun  5:7
sheet  8:5 244:17
  248:17 327:17
  362:7,10,18 363:1

sheriff  160:8
  213:11 214:16
  215:23 216:9
  219:14 258:18,23
  267:13 276:13
  280:14
sheriff's  209:18
  213:24 219:8
  258:6 310:20
sheriffs  246:16
shift  229:14
ship  39:20
shipment  210:22
shipped  34:21
  39:15
ships  187:19,22
shkolnik  2:2
shopped  325:20
  326:2 331:8
shopper  204:24
  331:7
shoppers  198:22
  205:13,17
shopping  165:1,6
  166:9,16 180:25
  191:11,16 197:8,9
  205:25 206:2
  207:11,22 325:23
  331:2 334:6,6
short  85:16 126:15
  248:5 252:1 261:2
  332:17
show  84:12 108:13
  179:25 180:1
  240:14
showed  93:12
  181:18
showing  305:22
shown  304:9
shows  307:23

shut  176:6 310:11
  311:15
sic  58:2 138:7,8
side  352:1
sides  329:14
siegel  24:18
sign  257:20
signature  357:5
  359:12 360:14
signed  111:20
  361:13 362:18
significant  129:8
  214:14 298:13
  307:21 312:9
  314:8,25
significantly
  157:21 198:10
  216:14 301:21
signing  360:12,20
similar  35:8
  197:13 258:13
  287:12 295:9
  304:20 312:4
simple  158:23
  163:23 350:1
simpler  322:6
sincerely  360:23
singer  27:24 28:1
  28:2
single  44:11 86:2
  87:20 100:13
  342:25
sir  52:3 119:24
  184:25 281:12
  360:10
sit  31:25 36:9
  110:24 114:9
  124:24 224:10
  233:14 327:21
  328:6 330:25

**sits**  262:24,24
**sitting**  232:7
  296:16 310:15
  315:13 322:7
  327:3 328:8
  338:24
**situation**  342:23
**situations**  279:19
**six**  252:1
**size**  159:1
**skzerussen**  3:11
**slides**  244:20
  265:14
**slightly**  191:20
**small**  293:3 294:8
  305:25
**smaller**  209:19
  216:10 255:16
**smith**  3:2 4:11
  19:5,14,20
**sober**  232:4
**sold**  195:6 303:10
**solely**  34:16 152:4
**solid**  208:2
**solutions**  4:16
  360:1 363:1
**somebody**  30:7
  71:15 79:1 99:2
  123:4 147:21
  148:18,25 160:5
  192:8,10 202:9
  206:24,25 232:8
  246:22 253:14
  261:2 304:7
**someplace**  176:21
  206:4
**somewhat**  208:1
  215:17 299:11
  351:9
**sooner**  274:24
  275:3

**sorry**  20:1 25:4
  31:17 37:9 41:23
  52:15 59:1,13
  60:6 63:4 64:4
  68:18 73:1 83:22
  84:21 88:1 89:15
  89:22 91:22 92:13
  94:2 97:4 99:20
  102:20 114:20,25
  115:5 139:6
  141:11,14 149:3
  153:22 154:9
  168:7 172:15
  178:18 185:16
  203:18 210:2
  242:7 250:18
  259:6 271:8
  279:25 288:2
  301:18 308:20
  311:9,10 329:9
  332:4 338:23
  348:19 353:22
**sort**  232:6 272:4
  292:19 293:15,20
  311:10 342:9
  350:23
**sought**  283:8
**sound**  84:17
**sounded**  35:8
**sounds**  119:4
  242:3
**source**  38:5,13
  43:21 64:2 208:23
  209:23,23 210:5
  210:16,18 250:4
  250:12 265:14
  270:25 291:9
  299:1 309:15,20
**sources**  204:18,19
  245:24 264:19,22

**south**  3:9 4:13
**southern**  36:12
  190:1 208:4 289:1
**speak**  29:25 30:3,9
  34:9 116:6,10
  117:9 123:14
  140:1 142:11
  202:1 323:18
**speaker**  128:23
  347:2
**speaking**  24:25
  49:1 116:8 156:12
  173:7
**speaks**  132:4
**special**  27:21
  65:10 100:20
  101:5 238:11
**specialized**  271:25
**specific**  22:22
  29:15 41:4,5 42:2
  43:15,18 45:23
  51:24 56:1 66:22
  68:11 74:25 77:11
  80:15 86:16,21
  87:11,18 93:3,4
  96:14 100:18
  101:17 103:5
  108:8 117:9
  122:22 126:7
  157:11 158:1
  161:17 164:3
  168:9 171:23
  174:2 177:20
  179:6 181:1
  189:21 195:1
  199:20 204:3,17
  220:13 263:7
  264:12 273:11,15
  285:6 298:19
  303:23 305:24
  324:13 331:6

  335:25 336:1,10
  336:14 337:20
  338:4,10 339:1,13
  341:15 342:3
  353:6
**specifically**  23:13
  30:1 50:11 55:12
  65:3 88:23 103:3
  111:19 113:7
  115:14 120:24
  123:10 134:14
  135:6 157:13
  158:4,18 170:19
  179:5 181:8
  182:15 198:3
  202:23 204:9
  219:6,15 275:18
  287:7,14 298:7
  307:12 328:10
  334:2 345:2 347:8
**specification**
  198:5
**specificity**  23:10
  157:10
**specifics**  50:3
  165:13 193:5
  197:14 257:18
  275:21 333:12
  339:7
**specified**  358:20
**specify**  135:8
  245:1 276:18
  323:8
**speculate**  77:14
  322:24
**speculating**  163:6
  163:10
**speech**  158:19
  175:12
**speed**  52:16

**[spelled - strike]**

**spelled** 69:20
70:13 73:19 79:4
95:15 103:24
120:16 130:22
150:17 153:10
256:11 326:24
340:24
**spells** 128:5
**spend** 22:2 68:4,11
116:8
**spent** 131:10
268:4
**spice** 290:11,13
291:11 293:18
**spike** 178:2
**spoke** 24:8,10,14
24:16,17 25:5,9
31:16 34:7,11
38:20 39:7,8 83:1
96:17 97:2,12
131:19 134:12
155:20 156:7,23
180:4 278:11
**spoken** 24:7 28:10
98:14 203:25
**sponsored** 350:12
**spreadsheet** 66:1
140:21 345:11,20
346:8,17 347:17
352:5 353:4,12
**spreadsheets** 7:11
66:18
**spring** 48:5
**square** 1:21 2:7
4:18
**ss** 358:3
**staff** 246:10 261:8
**staffed** 221:16
**stage** 323:16
**stand** 290:25
301:14

**standard** 80:19
129:9 306:7
**standing** 20:3
**standpoint** 33:23
280:19 325:6,8
**start** 29:20 37:14
41:17 55:2 82:2
83:21 108:12
158:5 179:3 181:7
199:3 213:19
219:11,11 229:8
230:10 242:21
262:19 264:13
273:6 302:16
310:2
**started** 42:24
54:16 55:7 158:22
175:10 177:17
198:16,21,24
206:18 227:11
228:13 229:18
230:16 233:24
237:12 239:14
242:19 244:5
253:1,3,7,14 254:8
254:10 274:16
279:18 302:8,9
305:13 328:4
**starting** 170:17
232:9
**starts** 174:8
244:19 327:10
**state** 7:7 18:8
19:11 36:12 42:25
65:16 66:11 67:10
102:25 103:12
155:17 158:8
159:18 160:4
161:5,13,13,16,20
162:12,14,22
163:15,25 164:2

164:23 165:18
173:21 190:1,11
190:14,16 196:20
196:23 200:15
201:23 202:4
205:24 208:5,14
208:14 216:20
217:1,5,7,23
218:11 226:23
231:25 259:24
262:16,18 264:25
265:2 266:20
267:4 271:19
273:10,22,24
275:14,23 327:1
333:6 358:2,7
359:14 361:10
362:15
**stated** 250:12
**statement** 42:4
49:22 86:23 90:13
91:10 108:23
130:16 304:25
313:11,12 361:13
361:14 362:19,19
**statements** 50:4
50:14,18 156:18
**states** 1:1 18:6
205:22 207:24
212:20 214:21
226:25 267:21
268:3,12,14
**statewide** 162:6
189:16
**statistical** 173:6
**statistically**
255:17
**statistics** 208:23
264:3,6 265:6,13
**stay** 229:22 351:15

**steals** 191:6
**steer** 175:24 263:2
**stems** 187:25
**stenotypy** 358:14
**stepped** 207:4
233:18
**steps** 39:11 51:3
53:6 62:12 87:19
88:2 174:5 260:11
260:20
**steve** 168:4 185:16
208:20 233:23
234:1
**steven** 3:3 19:4
183:8
**stick** 200:15
**stigmatization**
70:15
**stillborn** 241:21
**stipulating** 297:7
**stolen** 193:2
**stop** 195:14,19
252:11 260:11,21
261:3
**stopped** 199:2
**stopping** 277:25
**story** 312:24 317:9
**strategies** 198:4
217:18 232:20
**strategy** 307:19
**stream** 3:4
**streamline** 297:15
**street** 2:21 3:4,9
3:22 4:8,13
**stress** 171:10
172:6 216:8
**stretch** 211:19
327:7
**strictly** 346:3
**strike** 51:22 55:11
64:5 72:18 83:9

**[strike - suspected]** Page 59

83:11 113:23
156:25 158:16
175:5 189:16
270:11 279:9
282:14 302:25
303:6,22 310:21
348:16
**string** 7:19 234:13
**striving** 252:16
**structure** 173:23
**student** 249:3
**studies** 178:11,21
181:16
**study** 181:23,25
255:11
**studying** 179:5
**sub** 321:21
**subject** 84:19,24
94:25 112:22
127:22 133:15
134:4 137:5
156:14 230:5
235:19 236:9
239:9
**subjects** 243:11,17
**submission** 105:21
**submit** 228:20
269:10,14,25
270:17,23 271:17
**submits** 271:12
**submitted** 7:16
84:7 96:12 106:8
110:1 111:15
121:21 122:1
146:6 147:12
150:5 154:19
269:20 271:4,14
272:8,20 290:19
321:2,13 325:21
326:23 351:5

**submitting** 270:20
**subscribed** 361:10
362:14 363:21
**subsequent** 27:10
156:3 164:20
199:6
**subsequently**
42:10 341:3
**subset** 305:25
335:11,12
**substance** 39:4
40:23 69:15 70:9
70:11,13 72:21,22
73:6 78:22 79:1
79:16,21 88:20,21
105:16 109:16
119:23 125:2,5,6
125:16,17,18
142:13 143:12
150:23 182:4
252:23 253:7,25
266:3,6 289:21
294:10 296:18
316:11,17 318:8
318:15,16,20
323:3,5 325:18
327:14 333:13
334:15 348:4
**substances** 42:25
141:9,15 188:16
188:17 196:24
223:12 225:22
226:13 227:2
228:11 242:1,15
274:18 281:21
282:1,8 291:11
296:5,14,17 297:1
298:5 299:19
300:21 301:10
303:16 305:4
327:19 333:14

337:12 342:7
343:1
**substantial** 42:18
158:9
**substantially**
244:7
**succession** 168:6
**suffer** 298:17,18
**suggesting** 36:15
212:13
**suite** 1:21 2:7,16
3:5,9,17 4:18 5:4
360:2
**sum** 39:3
**summarize** 119:22
**summit** 7:13 84:3
142:10 143:3
145:24 148:2
181:17 233:25
268:3 327:11
**superior** 360:1
**superiority** 128:19
346:23
**supervisor** 167:21
**supplement**
310:21
**supplemental** 7:14
84:4
**supplied** 180:22
236:3
**supplies** 186:5
**supply** 185:3,6,24
186:11,17,22,23
187:3 195:8 211:9
211:11 212:1
**support** 47:22
180:17 214:16
253:16 318:24
320:20 333:6
**supported** 255:22

**suppose** 292:14
**supposed** 101:3
111:12 310:21
332:5
**sure** 24:23 25:3
29:17 33:7 34:13
38:6 44:8,24,25
46:6 49:21 55:16
57:3 59:20,21
61:4 81:20 82:8
91:14 104:16
106:22 115:6
116:7 121:6 122:2
141:13 149:22
153:21 162:3
165:22 171:8
176:13 178:9,20
182:6 186:3
187:13 189:13
190:24 193:17,24
208:25 209:3
210:8 215:1
226:16 243:25
247:20 251:8,13
255:9 256:14
284:25 287:19
288:4 313:24
317:1,1 319:25
320:14 323:12
324:21 326:12
329:10 332:6,8
350:21 353:1
**surgical** 102:14
**surreptitious**
61:17 331:23
**survey** 255:2,6
**surveys** 299:8
**suspect** 207:9
**suspected** 196:23
201:11 203:5
205:1

**suspensions**
199:12 200:13
**suspicion** 204:3
**suspicions** 208:3
**suspicious** 225:17
225:21,25 226:3
269:15 272:7,10
**swear** 19:25
**swoop** 337:1
**sworn** 20:13
358:10 361:10,13
362:14,18 363:21
**symptoms** 319:17
**synthetic** 34:22
290:6,10,13,22
291:10 293:14,19
296:9
**synthetics** 295:23
**system** 42:22
56:13 64:24
162:20 165:25
181:6 222:21
227:7 228:9
257:17,19 259:14
260:1 270:3
272:22
**systems** 294:14
298:22

**t**

**table** 232:6
**tabulated** 265:8
265:10
**take** 25:17,20 30:2
46:11 47:4 52:17
54:13 58:9 68:24
80:10 81:18 83:16
100:19 101:7
113:1 126:15
133:21 146:13
172:23 182:17
199:13 204:15

214:17 230:25
240:20 247:25
251:17 254:5,12
256:12,15 260:11
260:20 284:12
319:9,21 332:5,9
**taken** 1:19 63:15
87:19 88:2 129:12
155:3 171:2
172:18 174:5
297:3 335:5
358:19 360:11
**takes** 265:8
**talents** 117:25
**talk** 24:4 35:19
38:19 44:2 50:16
51:12 52:11 67:8
77:1 78:1 96:9
109:18 110:7
111:21 116:17,20
117:5 131:13
134:7,14 143:2
168:16 191:19
244:24,24 245:1
253:13 287:7
315:12 344:20
345:1
**talked** 51:23 98:25
99:16 115:25
116:19 119:17
133:4 138:15
146:24 147:5
162:25 167:4,5,14
182:4 226:17
230:2 252:25
254:16 270:21
274:11 312:18
315:3
**talking** 26:17
35:20 44:14,16,20
51:10 59:10 67:20

90:13 123:17
149:7 150:7,9
153:18 154:13
164:13 188:15
212:15 214:24
235:1 247:1
260:13 267:3
280:1 289:24
298:23 306:10
346:10 351:19,22
351:25 354:3
**talks** 170:19 171:2
**tamara** 24:11
82:21 354:25
**tamper** 336:22
**tampering** 128:14
138:10 139:17
**tapering** 125:25
**targeted** 29:14
**task** 23:4 25:8
164:19,22 167:24
167:25 168:2,2
191:21 194:13
198:9 203:24
208:12,18 209:6
212:25 215:9
217:6 224:11
231:9,9,15 232:10
232:24 233:1,11
233:15,22 234:8,8
257:8 262:14
263:1 283:6,7,23
285:15,21 300:6
316:2
**tease** 291:25
**telephone** 3:3,20
4:2,7,11
**tell** 21:6,8,10 32:1
37:18 43:23 45:18
54:9 57:4 58:9
59:18 62:4 65:10

82:25 103:13
113:3,9 115:18,19
116:23 117:16
119:2 124:4,21,24
125:15,24 131:7
133:8 140:6,13
142:6,11 143:7
153:12,23 170:13
171:4 179:24
180:20 181:10
182:8 183:17
218:2 220:9
231:14 248:25
254:20 277:14
304:11 328:10,18
329:6,14,19 331:7
333:20 346:14
**telling** 123:20
131:14 133:10
143:19 144:22
283:15 351:18
**ten** 22:17 255:11
255:13 274:14
275:7
**tend** 198:10
205:15 207:13
265:1
**term** 85:16 128:20
165:16 225:16
309:12 317:8
319:15 346:24
**terminal** 90:11
91:6
**terminology**
316:13
**terms** 33:12 37:2
98:24 119:16
121:10 122:15
130:16,18,21,22
131:19 172:4
197:24 199:15

206:20 210:15
213:22 220:15,20
233:6 241:4
257:18 290:21
291:7 309:13
313:18 325:22
330:8 334:5,17
340:25
**terrible**  46:19
**terribly**  288:15
**terrorism**  313:4
**testified**  85:8
  177:9 345:18
**testify**  24:6 52:12
  61:20 111:12
  114:8,14 125:13
  155:7 286:12
  358:10
**testifying**  21:3
  38:16 110:25
  183:10,18
**testimony**  28:14
  31:4,8,10 39:24,25
  44:9,13 62:15
  68:18 71:25 90:23
  108:3 118:18,21
  129:21 136:3
  137:13,20,24
  149:24 150:2
  151:7,10 153:6
  154:16 159:23
  160:25 162:11
  285:14 301:15
  331:12 352:22
  358:12,16 361:6,7
  362:6,9,12
**testing**  291:21
  330:9 342:10
**teva**  4:2 19:18
**thank**  21:5 70:1
  158:21 185:1

186:3 215:2
  344:19 354:6
**thankfully**  57:6
**thanks**  59:13
  263:23 354:8
**theoretical**  57:24
**therapeutic**  187:8
**therapies**  57:18
  64:4,8
**therapy**  63:8,13
  76:2 126:2 273:18
  274:2
**thing**  69:2 156:23
  187:9 254:25
  255:10 261:10
  288:23 300:8
  355:18
**things**  23:4,5,19
  23:22 24:3 25:22
  26:4,5 28:18
  35:21 36:14,19
  38:12 55:25 59:15
  67:21 92:6 93:1
  97:24 117:1 136:5
  153:8 156:6
  161:15 171:5,5,6
  171:23 172:1
  179:3 181:1
  190:14 194:12
  197:14 201:2
  203:6 213:8
  216:23 217:16,20
  227:10 241:3
  246:1 257:12
  259:23 269:2
  274:12 287:9,10
  287:12 292:19
  293:5,21 298:8
  302:3,5 308:22
  310:2 311:8,14,19
  312:10 334:18

340:24 351:3
**think**  23:23 28:16
  29:3 31:1 33:12
  33:15,19,23 35:14
  36:1 37:11,22
  38:4 41:9 42:12
  42:15 45:14 46:20
  47:12,21 49:1,21
  50:9 52:2 54:20
  55:14,22 56:21
  57:3 61:11,14,15
  63:13,23 69:19
  70:12,14 71:22
  73:11 76:7 77:14
  78:10 83:18 85:11
  86:15 89:21 91:3
  91:9 94:12 99:16
  100:18 101:2,8,18
  103:20,23 104:8
  107:17 112:2
  119:4 121:4,22
  123:20 124:8
  128:4 129:19
  131:9,21 135:18
  138:3 142:20
  148:6,15 151:11
  151:17,22 156:18
  159:6 163:11,21
  164:17 165:22,24
  166:19 167:8
  169:9,12 170:21
  171:9,17 174:20
  174:24 176:3,4,8
  176:23 177:7,16
  178:5,8 179:1
  182:2,13 187:6,8
  187:23 188:4
  190:10,12 191:4
  192:21 196:19
  199:10 203:12,20
  204:12 205:10

206:10 207:13
  208:3 211:4,15,18
  212:19 214:6,9
  215:23 220:19
  222:25 224:6
  225:15 227:4
  233:2,8 234:3
  239:13 246:2
  247:22 249:2
  250:20 257:14,16
  258:13,14 259:24
  261:9 265:2
  268:20 270:12,19
  274:19,25 275:16
  277:12 282:9
  286:21 287:15
  288:22 289:22
  290:25 291:17
  292:19 296:6,12
  296:12 299:16
  300:14 303:18
  304:2,25 306:12
  307:19 308:23
  309:13 310:9
  311:13,18 312:8,9
  312:23,25 313:11
  313:24 314:13
  316:14,22 317:15
  319:3 320:20
  329:12 331:18,22
  333:15 335:20
  336:25 337:10
  340:25 343:2,11
  344:1,15,18
  347:13 348:8
  350:18 351:1,2,3
  351:16,17 352:2,9
  352:11,14,15
  353:14
**thinking**  176:6
  228:3 232:12

| | | | |
|---|---|---|---|
| 268:11 | **threw** 25:25 82:23 | 266:15 345:19 | 174:3 175:17 |
| **third** 7:5 27:16 | 167:9 | **timing** 323:6 | 206:14 208:8 |
| 28:23 65:13 71:7 | **throw** 26:3 | **tinkle** 146:14 | 217:22 237:23,25 |
| 78:22 88:10 143:3 | **tie** 41:4 252:17 | **title** 246:9 | 247:19 |
| 167:8 240:21 | **tilted** 310:12 | **titled** 241:14 | **tool** 229:1 278:13 |
| 315:6 | **time** 25:21 27:11 | **titrating** 125:25 | 278:23 279:17 |
| **thirty** 360:19 | 29:9,16 52:18 | **today** 20:19,24 | 281:2 |
| **thomas** 1:13 6:7 | 54:21 68:4,9,12 | 21:8,13,14,25 22:3 | **top** 37:23 143:25 |
| 18:3 20:10,15 | 81:18 83:3,5 86:9 | 22:6 23:1 24:6,16 | 190:12 341:12 |
| 183:5 284:18 | 100:13 105:2 | 26:22 27:19 31:25 | **topic** 29:21 30:3 |
| 344:8 354:20 | 116:8 133:21 | 33:1,2 34:2 36:9 | 30:13 39:4 40:16 |
| 358:9 360:8 361:4 | 136:1 137:18 | 41:6 61:21 64:14 | 43:16 51:25 52:4 |
| 361:9 362:4,13 | 140:10,13 141:8 | 65:2 82:14 93:17 | 56:22 59:21 62:21 |
| 363:20 | 158:17 159:2,5,7 | 101:23 102:18 | 66:24 67:5 69:20 |
| **thornburg** 4:12 | 159:11 163:1 | 103:9 110:24 | 74:21 112:23 |
| **thought** 37:4 66:4 | 164:13,14 167:10 | 112:19 114:9 | 117:12 130:23 |
| 74:11 79:15 91:21 | 169:7 171:10,21 | 116:21 118:16 | 136:17 140:25 |
| 91:24 139:6 | 175:6 176:2 | 160:21 163:18 | 142:15 143:6 |
| 189:24 203:18 | 178:19 180:3 | 167:6 191:17 | 144:9 147:7,9 |
| 214:23 250:15 | 181:15 188:5 | 205:7 243:18 | 154:21 157:2,14 |
| 252:2 255:7,15 | 189:22 206:11,24 | 250:20,24 272:24 | 159:12 166:12 |
| 329:8 354:3 | 212:16 214:10 | 296:16 310:15 | 170:11 171:1 |
| **three** 3:13 33:9 | 224:2,17 230:23 | 313:20 314:15 | 183:20,25 184:12 |
| 69:23 72:19,24 | 233:24 235:10 | 315:12,13 322:7 | 184:15,20 185:16 |
| 74:2,9 75:11,19 | 238:8 241:6 | 327:3 328:7,8,20 | 215:18,19 261:17 |
| 82:4,19 94:7,9 | 243:12 251:22 | 330:25 331:11 | 266:23 268:25 |
| 95:1,7 98:24 | 252:19 265:9,12 | 332:7 338:25 | 273:3 275:2 |
| 109:10 115:15 | 270:15 278:17 | 343:10 345:4,9,19 | 279:24 281:14 |
| 119:17,19 120:8 | 287:24 289:23,24 | 345:20 351:9 | 286:10,12,15 |
| 120:23 121:6,7 | 290:1 293:22 | 352:18 354:23 | 287:7,8 295:21 |
| 122:3 129:20 | 294:6 300:16 | **told** 24:23 28:10 | 299:19 300:21 |
| 144:2,7,11,22 | 301:16,22 302:8 | 37:4 45:1 71:22 | 301:9 303:11,23 |
| 146:2,25 149:14 | 302:10,11 304:11 | 79:15 80:9 81:7 | 312:7,20 313:7 |
| 150:1,8 151:6,12 | 305:16 310:19 | 86:9,23 90:2,15 | 315:3 320:6,7,24 |
| 152:4 154:13,18 | 312:23 314:24 | 94:7 107:8 109:19 | 338:15,16 340:2,3 |
| 155:22 168:18 | 319:16 323:2 | 112:3 122:11 | 344:21,21 |
| 182:3 247:6,12 | 335:10 338:23 | 125:15 129:18 | **topics** 22:3,20,21 |
| 294:13 332:9 | 349:15 358:19 | 144:25 146:25 | 24:6 27:17 29:6 |
| 334:25 335:3,6 | **times** 51:9 102:10 | 150:18 156:13 | 31:19 67:9,13,25 |
| 349:18 353:24 | 129:19 131:11 | 161:19 168:25 | 68:6,8 81:10,11,14 |
| 354:5 | 201:10 231:9 | 170:13 172:16,19 | 91:23,25 92:3 |

94:10,11,14,25
111:23 147:4
154:10 183:14,16
183:19 215:17
217:16 263:3
287:14 297:10,17
338:19
**total**  68:9
**touches**  311:12
**touchy**  275:2
**tough**  220:9,19
331:15
**town**  156:6 158:2
158:15,22 159:2
160:1 170:16,21
171:11 174:19
**toxic**  295:5
**toxicology**  83:4
201:17 291:20
355:10
**track**  23:10 42:24
67:1 206:19
220:16 253:19
329:22
**tracked**  190:5
204:16
**tracking**  209:22
**tracks**  266:5
**traditionally**
305:8
**trafficking**  24:19
51:1 210:13
310:24
**tragic**  308:24
**trained**  168:10,15
238:15
**training**  102:14
213:11
**tranquilizer**  314:7
**transactions**
223:13

**transcribed**
358:15 361:7
**transcript**  6:1
250:19 357:3,6,9
357:11 360:11,16
361:5,12 362:5,11
362:17
**transcription**
358:16
**transition**  178:1
252:22 253:12
**transitioning**
341:3
**trash**  26:11
**treat**  302:23
318:15
**treatable**  318:20
**treated**  128:2
222:4 318:9
**treating**  238:23
**treatment**  125:4
126:7 128:24
156:13 221:15
232:4 246:23
299:24 310:1,10
311:4 347:3
**treatments**  301:24
**tremendous**
309:20
**tremendously**
58:21
**trend**  292:20
293:21
**trends**  287:10
**tried**  122:20
230:14 238:20
298:21 349:5
**trouble**  178:7
**true**  86:24,24
100:14 116:22
129:24 140:9

148:24 185:14
190:23 193:10,16
200:1 212:7,10
220:2 224:9 226:9
228:21 235:21,23
236:1,18 237:4,18
239:11 241:1,19
242:2 254:22
267:17 271:23
304:12,25 314:18
358:16
**trust**  255:12
**truth**  358:10,11,11
**try**  29:10,13
163:19 174:10
175:24 220:16
230:12,20 241:4
**trying**  23:8 31:17
31:24 37:17 44:22
52:16 60:14 66:25
70:15 74:1 95:2
114:22 123:18,22
133:22 142:14
147:19 168:8
172:11 179:16
204:6 213:19,23
229:12,22 232:19
238:7 243:19
245:2 246:20
268:8 285:17
307:11 311:16
341:23,24 346:15
348:18 349:16
353:5,23,24
**tucker**  5:3 18:16
**tuckerellis.com**
5:5
**turn**  327:9
**turned**  65:19
88:10 94:18 97:8
97:24 117:2

152:20
**turning**  67:16,17
308:21
**twelfth**  3:22
**two**  25:4 131:15
153:10 167:6
168:22 169:4,10
169:11,13 208:18
231:11,15 232:14
233:10 234:7,8
252:8 265:11
268:7 323:11
355:6,6
**type**  57:12 90:12
**types**  162:13

| u |
| --- |

**u.s.**  168:4,6 198:9
208:19 217:14
232:12,23 233:21
233:24 234:2
**ultimately**  31:12
37:11 40:1 44:11
45:5,14 48:1,13
53:4,6 54:5 56:9
59:14 60:12 61:25
62:6,12 180:18
260:23 278:8
339:9
**um**  157:9
**unable**  130:15
**unauthorized**
107:4,10,15,19
108:10,12,18,24
109:13,23 110:3,5
110:11,19 111:3
112:2,5,8,21 113:4
113:9 127:13
129:4,10 130:4
132:15 136:18
138:17 139:3
154:6 348:10

**uncovered** 325:5
330:17
**underestimate**
252:5
**underreported**
292:7
**understand** 20:18
20:23 21:2 29:13
31:25 33:13,25
38:15 44:23 51:9
61:4 73:12,14
74:1,3 75:6,8 80:8
81:9 97:4 103:2
104:9 118:9
123:19 124:9,11
124:14 131:18
136:14,21 150:14
150:16 163:17,18
176:13 183:9,17
185:5,20 208:25
211:23 256:2
262:15 270:3
272:11 282:4
292:8 299:3
307:11 326:10
334:23 339:17
340:6 342:2
350:18
**understanding**
46:12 49:13 72:17
74:15,21 75:9,14
75:20 89:14 91:8
91:13,18 92:4
94:16 95:6 118:13
118:20 119:19
121:9 135:24,25
159:17,20 185:6
185:23 186:10
217:10 226:6
227:18 235:12
270:6 272:13

274:10 285:23
293:8 323:20
349:8
**understands** 202:5
**understood** 63:21
74:5 108:4 132:5
146:23 318:19
326:6,15
**undertreatment**
340:21
**unfamiliar** 73:20
**unfortunately**
307:25
**unintentional**
264:4,15
**unit** 219:22 259:21
**united** 1:1 18:5
**university** 155:23
**unlawful** 95:11
**unlawfully** 34:15
**unnecessary** 106:2
106:4 107:4,10,15
107:19 108:9
113:10,16 114:1
114:13 115:15
118:11 127:14,20
128:6 129:5,11
130:4 132:16,19
133:4,7,10,24
134:3,18 136:15
136:18,22,24
137:4,16,19
138:18 139:3
153:9 348:10,13
**unresponsive**
174:6,9
**untrue** 140:8
**ups** 172:20
**upstream** 204:13
**upsurge** 288:14

**uptick** 288:23
**use** 35:18 40:23
54:14 69:15 70:9
70:11 72:22 76:3
80:10,13,14
103:23 104:1
109:16 110:5
119:23 128:20
129:2,2 142:1,13
143:12 150:23
187:7,8 191:18,19
211:12 220:6
230:4 254:17,21
256:25 257:19
261:24 277:24
278:14 296:25
298:18 299:18
300:20 301:9
303:22 305:3
308:6 309:12,22
310:16 311:22
315:7,9,15 316:11
316:17 317:6,8,10
317:21 318:8,9,15
318:20 319:10,14
319:15 320:2,3,16
320:18 321:1
322:18,20 323:5
323:15,19 325:18
330:4,13 332:2,23
333:10,14,20
334:15 346:24
347:6 349:21
**useful** 224:24
226:14 278:22
279:2
**user** 191:6
**users** 252:25
**uses** 35:21 257:1
**usual** 86:15

**usually** 185:11
186:6 187:6

**v**

**v** 1:9 360:6 361:3
362:3
**vacuum** 48:6
**vague** 274:12
**valid** 185:14 186:8
191:2 195:13
296:23
**valuable** 233:6
309:1
**vanished** 290:18
**vanishingly** 295:2
**variations** 191:20
**various** 22:23 24:5
93:2 129:18
159:25
**verify** 87:19 88:2
**veritext** 3:3 360:1
360:7 363:1
**versus** 255:16
292:1 296:11
316:11
**vet** 321:4
**veterinary** 203:2
**vetted** 320:25
**victim** 180:21
197:10
**victims** 247:11
251:16
**videographer** 5:7
18:1 19:10,24
81:21,24 126:18
127:7 146:16,19
169:18,21 182:19
183:1 231:2,5
248:3,6 256:17,20
284:13,16 332:15
332:18 344:3,6
354:15,18 355:24

videotaped  1:13
7:5 27:16 28:24
view  37:15,15
45:11 100:16
viewed  90:10
viewpoint  233:5
vince  25:5 82:20
167:19 208:19
233:17,19
virginia  206:4
virtual  3:4
virtually  252:9
visit  347:10
visited  88:13
346:8 347:22
348:25 350:3,6
visits  88:23 120:25
128:22 294:11
301:20 347:1,8
348:14
vital  265:6,13
voice  106:25 296:3
volition  23:20,22
351:21
volunteered
224:13

w

w  266:20
wacker  3:17 4:4
wait  242:24
waived  360:13,21
waiving  84:20,24
walmart  2:14
18:25 19:1
want  20:7 21:8
44:23,23 52:17
57:11 59:20 62:4
77:13 83:17 110:8
123:13 124:12
133:21 137:17
140:10 145:15

154:22 162:3
169:14 170:1,12
172:5 174:12
176:6 177:8 181:3
219:19 221:1
227:24 251:20
262:3 277:21
286:10 290:17
296:3 311:17
313:14 314:3
315:2,5 317:7
322:23 332:6
337:12 346:19
347:11,12,13
352:13,24 355:18
wanted  130:17
178:9 209:9 214:7
214:23,25 228:5
239:18 241:23
252:3 254:25
255:10 311:10
329:10
wants  235:2
298:16
washington  3:22
wave  42:12
way  21:25 36:1
39:1 45:11 57:20
61:3 83:19 86:15
87:4 118:2 121:13
135:11 140:23
153:15 154:1
174:14,24 185:8
209:24 212:14
223:9 225:23
282:9 293:17
295:17 297:20
329:15 331:9
ways  78:11
wc.com  3:19,23

we've  21:23 27:9
51:23 56:22 66:22
68:24 112:2
129:17 131:10
146:11,24 154:13
172:9 188:12
191:25 203:6
204:6 207:25
220:10 226:17
229:6,24 230:2,24
247:13 256:23
257:2,8 261:20
268:18 272:24
281:3 335:14
website  23:3 24:2
27:14
websites  128:23
347:2
weeds  145:6
week  169:10,10
welcome  101:4
went  42:10 113:1
152:14 165:2
168:7 177:10
188:25 245:20
287:4 295:21
305:14 325:22
west  3:17 4:4
206:4
western  155:24
249:3
whatsoever  111:1
whereof  359:5
wholesale  271:12
wholesaler  185:12
186:7
wholesalers
228:19 272:4
wife  332:7
wilcox  1:20

willfully  49:18
william  4:12
william.padgett
4:14
williams  3:21
willing  187:12
199:18 277:20
wind  300:10
window  210:3
274:3
wise  179:6
wish  312:10
withdrawal
319:17
witness  19:25 37:2
102:7 135:2 139:2
142:25 146:13
230:22 256:14
286:11 288:4
332:4,11 343:10
343:15 354:8
357:2 358:9,13,14
358:17 359:5
360:8 361:1,4,11
362:1,4,15
wonder  264:24
word  60:10,15
91:8 297:6
wording  157:13
285:16 289:9
words  208:8
304:18 309:17
349:20
work  38:10 60:25
64:12 71:13 77:17
98:13 122:17
137:10 138:15
159:13 162:4
187:13 204:6
244:4

[worked - zrlaw.com]                                                              Page 66

worked  65:20
  124:15 269:6
  289:22
workers  65:15
workforce  311:1
working  247:20
  315:20,24
workings  272:21
workman's  65:16
  71:9
works  148:2 270:6
world  31:6
worried  297:21
worse  230:18
  314:5
worsened  302:20
  308:12
worsening  307:5
worst  249:20
wrap  341:25
write  48:21 57:17
  133:16 206:12
writes  234:25
writing  173:9
  180:13 217:10,11
  277:6
written  28:17
  62:17 63:2 85:13
  85:22 87:20 88:3
  92:7,17 95:10,18
  95:25 132:1,23
  133:11,24 136:10
  136:10,16,20,25
  137:21 139:20
  173:12,14 273:7,7
  276:17 277:2,12
  345:16
wrong  49:18 85:18
  107:21 248:10
  261:10

wrongdoing  62:19
  85:4,23 87:23
  88:6 90:5 92:10
  92:19
wrote  48:16 50:17
  93:3 120:13,19
  134:24 135:9
  153:14,25 169:9
  177:2 245:20
  297:11,17,18
  355:5,7

x

xartemis  128:12
  138:8
xr  128:12

y

yeah  44:25,25
  47:12 49:21 79:23
  102:7 145:3 182:6
  216:7 224:10
  226:16 230:24
  260:16 284:25
  317:14
year  27:15 61:8
  165:7 199:10
  204:16,22 243:13
  255:11 284:4,7
  288:13 290:15
  301:7 341:10,12
  341:13
years  21:24 22:4,6
  189:2 199:1,6,8
  205:14 252:9
  255:13 265:11
  274:14,20 275:7
  309:22
yellow  341:12
yokiel  138:5
york  2:4,4 3:14,14
  56:9 268:5

younger  156:12

z

zashin  2:10
zero  205:17 294:7
zerrusen  3:8 19:2
  19:2
zrlaw.com  2:13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.