1

1              UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4                        - - -

5    IN RE:  NATIONAL           :
     PRESCRIPTION               :  MDL No. 2804
6    OPIATE LITIGATION          :
     _____:  Case No.
7                               :  1:17-MD-2804
     THIS DOCUMENT RELATES      :
8    TO ALL CASES               :  Hon. Dan A. Polster

9                        - - -

10               Wednesday, May 29, 2019

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW

12                        - - -

13        Videotaped deposition of  MATTHEW C. GREIMEL,

14   held at the offices of Marcus & Shapira LLP,  One

15   Oxford Center, 301 Grant Street, Suite 3500,

16   Pittsburgh, Pennsylvania  15219, commencing at 9:10

17   a.m., on the above date, before Carol A. Kirk,

18   Registered Merit Reporter and Notary Public.

19

20                        - - -

21

22          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                deps@golkow.com

24

25

2

1                    A P P E A R A N C E S:

2    On behalf of the Plaintiffs:

3            MORGAN & MORGAN
             BY:  JAMES YOUNG, ESQUIRE
4                  jyoung@forthepeople.com
             76 South Laura Street, Suite 1100
5            Jacksonville, Florida  32202
             601-261-2220

6

7    On behalf of HBC:

8            MARCUS & SHAPIRA LLP
             BY:  JOSHUA A. KOBRIN, ESQUIRE
9                  kobrin@marcus-shapira.com
                   ROBERT M. BARNES, ESQUIRE
10                 rbarnes@marcus-shapira.com
             One Oxford Center, 35th Floor
11           301 Grant Street
             Pittsburgh, Pennsylvania  15219-6401
12           412-338-3345

13

     On behalf of AmerisourceBergen Corporation:
14
             REED SMITH LLP
15           BY:  BRIAN T. HIMMEL, ESQUIRE
                   bhimmel@reedsmith.com
16           225 Fifth Avenue
             Pittsburgh, Pennsylvania  15222
17           412-288-3131

18

19   On behalf of Endo Pharmaceuticals, Inc.,
     Endo Health Solutions, Inc., and Par Pharmaceutical
20   Companies, Inc. (Via Teleconference):

21           ARNOLD & PORTER KAYE SCHOLER, LLP
             BY:  ALLISON GARDNER, ESQUIRE
22                 allison.gardner@arnoldporter.com
             601 Massachusetts Avenue, NW
23           Washington, DC  20001
             202-942-5150

24

25

3

```
 1    On behalf of HD Smith (Via Teleconference):

 2           BARNES & THORNBURG LLP
              BY:  ALYSSA HUGHES, ESQUIRE
 3                 alyssa.hughes@btlaw.com
              11 South Meridian Street
 4            Indianapolis, Indiana  46204
              317-261-7881
 5

 6    On behalf of Johnson & Johnson and
      Janssen Pharmaceuticals (Via Teleconference):
 7
              O'MELVENY & MYERS LLP
 8            BY:  TRISHA PARIKH, ESQUIRE
                   tparikh@omm.com
 9            Two Embarcadero Center, 28th Floor
              San Francisco, California  94111
10            415-984-8952

11
      On behalf of McKesson (Via Teleconference):
12
              COVINGTON & BURLING LLP
13            BY:  ALISON DICIURCIO, ESQUIRE
                   adiciurcio@cov.com
14            One CityCenter
              850 Tenth Street, NW
15            Washington, DC  20001
              202-662-5353
16

17    On behalf of Henry Schein (Via Teleconference):

18            LOCKE LORD LLP
              BY:  SARAH LANCASTER, ESQUIRE
19                 slancaster@lockelord.com
              600 Congress Avenue, Suite 2200
20            Austin, Texas  78701
              512-305-4700
21

22

23

24

25
```

4

1   On behalf of Discount Drug Mart (Via Teleconference):

2       CAVITCH FAMILO & DURKIN CO. LPA
         BY:  ROBERT WEST, ESQUIRE
3           rwest@cavitch.com
         1300 East Ninth Street, 20th Floor
4       Cleveland, Ohio  44114
         216-621-7860

5

6   On behalf of Walgreens (Via Teleconference):

7       BARTLIT BECK LLP
         BY:  LESTER C. HOUTZ, ESQUIRE
8           lester.houtz@bartlitbeck.com
         1801 Wewatta Street, Suite 1200
9       Denver, Colorado  80202
         303-592-3177
10

11  On behalf of Purdue Pharma (Via Teleconference):

12      DECHERT LLP
        BY:  DANA MARTIN, ESQUIRE
13          dana.martin@dechert.com
         35 West Wacker Drive, Suite 3400
14       Chicago, Illinois  60601
        312-646-5824
15

16

17  ALSO PRESENT:

18     David Lane, Videographer

19

20                - - -

21

22

23

24

25

5

1          VIDEOTAPED DEPOSITION OF MATTHEW C. GREIMEL

2                    INDEX TO EXAMINATION

3     WITNESS                                    PAGE

4     MATTHEW C. GREIMEL

5          CROSS-EXAMINATION BY MR. YOUNG:          8

6

1       VIDEOTAPED DEPOSITION OF MATTHEW C. GREIMEL

2                    INDEX TO EXHIBITS

3    HBC-GREIMEL      DESCRIPTION                      PAGE

4    Greimel 1        Plaintiffs' Notice of Oral       10
                      Videotaped Expert Deposition of
5                     Matthew Greimel

6    Greimel 2        Expert Report of Matthew C.      13
                      Greimel
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                        - - -

2               P R O C E E D I N G S

3                        - - -

4          THE VIDEOGRAPHER:  We're now on

5      the record.

6            My name is David Lane,

7      videographer, for Golkow Litigation

8      Services.  Today's date is May 29, 2019,

9      and our time is 9:10 a.m.

10           This deposition is taking place in

11      Pittsburgh, Pennsylvania, in the matter

12      of National Opiate Litigation MDL.  Our

13      deponent today is Matthew Greimel.

14           Counsel will be noted on the

15      stenographic record.

16           Our court reporter today is

17      Carol Kirk, and will now swear in the

18      witness.

19           (Witness sworn.)

20          THE VIDEOGRAPHER:  People on the

21      phone, if you could just mute yourself

22      on your end so we don't get any

23      interference.  I appreciate it.  Thank

24      you very much.

25          MR. YOUNG:  And, Carol, did you

8

```
 1            want to take their appearances just

 2            through an e-mail to you, or do you want

 3            them to tell you now?

 4                 THE COURT REPORTER:  E-mail.

 5                 MR. YOUNG:  Okay.

 6                      - - -

 7                 MATTHEW C. GREIMEL

 8    being by me first duly sworn, as hereinafter

 9    certified, deposes and says as follows:

10                 CROSS-EXAMINATION

11    BY MR. YOUNG:

12       Q.    Good morning, Mr. Greimel.

13       A.    Good morning.

14       Q.    As we mentioned before we started,

15    my name is James Young from Morgan & Morgan on

16    behalf of the Plaintiffs in this case.  And I'm

17    going to be here taking your deposition this

18    morning.

19                 I assume, given your background,

20    in law enforcement, you've given deposition

21    testimony before?

22       A.    Not specifically deposition, but

23    I've testified in all state superior court,

24    federal court, court of appeals, I guess

25    different kinds of suppression hearings, grand
```

9

```
 1    jury.  I've testified plenty of times.  Just not
 2    in a specific deposition.
 3            Q.    So one of the things about
 4    deposition testimony is it's just human nature
 5    for us to, you know, talk over each other and
 6    sort of, you know, give queues, like you're
 7    nodding your head now.  That normally wouldn't
 8    be captured in the record.  We do have a
 9    videographer here that's capturing the video of
10    it.  But it is important that you, you know,
11    wait for the question to be asked and then
12    answer it in a verbal way, so not just nodding
13    of your head.
14            A.    Yes.
15            Q.    There may be times today when your
16    counsel or counsel on the phone object.
17    Traditionally they'll object to the form of my
18    question.  That doesn't mean you shouldn't
19    answer.  Unless they instruct you not to answer
20    it, you're here to give us answers.
21                 Some of my questions may not make
22    sense to you.  My wife tells me that all the
23    time, you know, I ask silly questions.  And if
24    it doesn't make sense to you, let me know and
25    I'll try to ask it in a way that does makes
```

1     sense.  I'll clarify it.  I'll try to be really

2     direct and candid with you today and ask you to

3     do the same.

4              If you need to take a break at any

5     time, I'm certainly happy to do that.  I'm not

6     here to punish you or keep us here all day, as I

7     mentioned at the outset.  We'll try and keep it

8     as brief as possible and keep you as comfortable

9     as possible.  If you want to use the bathroom or

10    get water, whatever, happy to do that.

11             Any questions before we jump --

12        A.    No.

13        Q.    Okay.

14        A.    Thank you.

15                    - - -

16        (Greimel Deposition Exhibit 1 marked.)

17                    - - -

18        Q.    So I'm going to show you really

19    today, I think, only two exhibits, one being the

20    notice of this deposition.  The other being your

21    report, which I'm sure you're familiar with.

22             So the first thing I'm going to

23    show you is today's notice of taking the

24    deposition.  I'm sure you've seen this.

25        A.    Yeah.

1          Q.    And I just ask you to take a look,

2    really, at the attachment to that Exhibit A.

3    And I just want to start off by asking you

4    whether you've brought any documents or

5    materials responsive to Number 1 on Exhibit A.

6    And those would be things that you reviewed

7    since the date of your report that were not

8    identified in your report.  So additional

9    materials.

10              MR. KOBRIN:  And I may want to --

11         if you're okay with me just stating, I

12         wanted to make a statement at the

13         beginning.

14              MR. YOUNG:  Sure.

15              MR. KOBRIN:  There's one

16         deposition transcript that we weren't

17         sure if he reviewed before or after, but

18         it's not in the report, which is the

19         Bencivengo deposition transcript.

20              MR. YOUNG:  Okay.

21              MR. KOBRIN:  And then some of the

22         things, we realize are cited in the

23         footnotes, but we didn't get them in the

24         appendix, but everything else is cited

25         in some form pursuant to footnote

1          number 1.

2               MR. YOUNG:  Okay.  Good

3          clarification.

4     BY MR. YOUNG:

5          Q.    So as I understand it from your

6     counsel, some of the materials that you relied

7     on, but did not specifically disclose, are

8     embedded in the footnotes or referenced --

9          A.    Yes.

10         Q.    -- in your report?

11         A.    Yes.

12         Q.    Anything other than these things

13    that we've described that you've relied upon or

14    that you intend to rely upon in your testimony

15    at trial?

16         A.    Everything that I've relied upon

17    was stuff I've already reviewed.

18         Q.    Okay.  And did you bring with you

19    today an itemization of the hours you've spent,

20    the compensation paid or to be paid for your

21    work in this matter?

22         A.    I don't have an exact itemization,

23    but I can --

24         Q.    But one could be obtained --

25         A.    Yes.  One could be obtained, yes.

1          Q.    -- through counsel?

2                MR. KOBRIN:  Yeah, and we're going

3          to take the position as, I'm sure you

4          imagine, other defendants have taken in

5          this case.  But that said, you can ask

6          him questions about his time or --

7                MR. YOUNG:  Sure.

8                MR. KOBRIN:  -- or his rates.

9     BY MR. YOUNG:

10         Q.    And, finally, a copy of your most

11    recent CV or resum .  I know that there's one

12    attached to your report.

13                Are there any supplements or

14    updates since --

15         A.    No.  That's --

16         Q.    -- a few weeks ago?

17         A.    That's the most recent that I

18    have.

19         Q.    Okay.

20                         - - -

21         (Greimel Deposition Exhibit 2 marked.)

22                         - - -

23         Q.    And we'll begin by talking about

24    your resum .  So I'll go ahead and hand you what

25    has been marked as Plaintiffs' Exhibit 2, which

                                                                        14

1    is your report.

2                    I'm sure you're very familiar with

3    it.

4         A.    I've seen it once or twice.

5         Q.    So I want to direct your attention

6    to I think it's Exhibit A of your report, which

7    is your resum .

8         A.    Defendants' A, yes.

9         Q.    So let's just start, I guess, at

10   the top.

11                   You received a BA in psychology

12   from Rutgers in 1997; is that correct?

13        A.    Correct.

14        Q.    Did you begin your studies at

15   Rutgers majoring in psychology?

16        A.    No, I actually started at NJIT in

17   civil engineering.

18                   (Reporter clarification.)

19        A.    I started at NJIT, New Jersey

20   Institute of Technology, in civil engineering,

21   but it really -- as I went along, I didn't want

22   to do that for the rest of my life.

23                   My whole family is in

24   construction, and my father is an architect.  I

25   was very good at it, but it's just -- I couldn't

1    see myself doing that for the rest of my life.

2              So I transferred across the

3    street, which Rutgers was directly across the

4    street.  In fact, you could take courses from

5    either one, if you're enrolled and wanted to

6    take courses from the other.

7              So I did that.  Took courses and

8    eventually transferred over and received a BA in

9    psychology from Rutgers.

10        Q.    Was it your intention when you

11   graduated to pursue a career in psychology?

12        A.    No.  I was thinking about -- I did

13   a lot of criminal psychology at first.  I guess

14   I watched "Silence of the Lambs" too many times,

15   and I wanted to become a profiler, FBI serial

16   killer profiler.  But I went into law

17   enforcement.  I just -- I was working with the

18   FBI a bunch of times.  I decided the DEA was a

19   better fit.

20        Q.    Did you ever consider attending

21   law school and becoming an attorney?

22        A.    Actually, we were talking about

23   this yesterday.  I was -- I was a lot of times

24   working with the assistant U.S. attorneys.  They

25   impressed me, and I did like what they were

16

```
 1   doing, so I was -- I was thinking about that.

 2   Now that I retired young, I guess I could go

 3   back to law school and do that, but I'm not

 4   sure.

 5           Q.    Do you recall -- this is a shot in

 6   the dark.

 7           Do you recall your GPA when you

 8   graduated from Rutgers?

 9           A.    Oh, it was a 3-point -- I don't

10   remember if it was a 3.5 or 3.6.  Something like

11   3-point -- mid 3s, maybe 3.4 or 3.6 range.  I

12   forget.

13           Q.    That's pretty impressive.  I

14   couldn't recall mine, so I'm just curious.

15           Okay.  So after you graduated

16   Rutgers in 1997, what were your plans upon

17   graduation?  Just to seek a job out in the world

18   somewhere?

19           A.    I was already working with the

20   City of Newark in the mayor's office.  And

21   before that, I did an internship with Senator

22   Frank Lautenberg.  I did -- I was interested in

23   politics to a point, or at least I liked

24   government.  So I -- I was working in at least

25   municipal government at that point.  But I
```

1   always did have that urge to go into law

2   enforcement and at one point the military also,

3   but ...

4            Q.    But you never pursued a career in

5   the military or enlisted in the military?

6            A.    No.  No, I didn't.  I just --

7   timing, I think, was the deal with that, that I

8   did not.

9            Q.    When did you begin your job as

10   a -- in the mayoral administration in the City

11   of Newark?

12           A.    I started working as a mayor's

13   aide in -- I think first I was an intern for a

14   day, and then they switched and hired me over as

15   a mayor's aide after a day.  And I was -- let's

16   see.  That was March of -- I think it was 1996

17   or something, or 1997, 1997.

18           Q.    So in your resum , you have a date

19   of May '97, and I don't know if that refreshes

20   your recollection.

21           A.    Okay.  That could be it.  May '97

22   then.

23               MR. KOBRIN:  You could use your

24           resum .

25               THE WITNESS:  Yeah, that's true.

18

1        I should -- I should actually refer --

2    BY MR. YOUNG:

3        Q.   Yeah, and specifically that last

4    page of your resum  is where I'm looking.

5        A.   Yeah, exactly, May '97.

6        Q.   Did you begin an internship or

7    your job as the mayor's aide a day later prior

8    to graduating Rutgers or after graduating

9    Rutgers?

10        A.   I was already working there.

11        Q.   Okay.  So prior to graduating?

12        A.   Just prior.

13        Q.   Do you recall your salary as a

14    mayor's aide?

15        A.   I started as an intern, so they

16    were paying me as an intern, so it was, like, I

17    think, $30,000.  And then -- and then it went

18    up.  After they made me a mayor's aide, I think

19    I was around 45, 50 thousand dollars, which for

20    a kid right out of college isn't that bad.

21        Q.   And how did you find this job as

22    a -- as a mayor's aide?  I know you mentioned

23    you were an intern.  Is that how you found the

24    job?

25        A.   No.  I was driving back from my

19

```
 1    internship with Senator Lautenberg's office, and

 2    I saw the mayor of Newark with the CEO of

 3    Prudential walking into -- they were building

 4    the Prudential Center, or the NJ PAC, the

 5    performing arts center, in Newark.

 6                  So I kind of stopped and

 7    introduced myself.  Took a tour with the mayor

 8    and Art Ryan, who was the CEO of Prudential, of

 9    the performing arts center, which was under

10    construction.  And the mayor liked me and wanted

11    me to work for him as an intern.  As I said,

12    worked for one day as an intern, and then they

13    hired me full time as an aide.

14            Q.    Did Senator Lautenberg make a

15    recommendation for you to the mayor?

16            A.    I don't know if he did.  I never

17    asked him to.  I would hardly see

18    Senator Lautenberg.  He'd stop into the office,

19    go to his office specifically and leave.  We'd

20    rarely see him.

21            Q.    And how did you get the position

22    with Senator Lautenberg?

23            A.    I went to his office one day,

24    which was in Newark, and asked if they had any

25    internships.
```

1          Q.    Okay.  And who was the mayor at

2    that time?

3          A.    Sharpe James.

4          Q.    Was he the -- I guess you were a

5    mayor's aide for one year.  It was always for

6    Mayor James?

7          A.    Yes.

8          Q.    Okay.  And he was a longstanding

9    mayor --

10          A.    He was a mayor for, like,

11    30 years, or something to that effect.

12          Q.    Did you during your time as a

13    mayor's aide ever have occasion to work on any

14    pharmaceutical or drug policy issues?

15          A.    No.  I mainly worked -- I was a

16    liaison between the police and fire departments

17    for the City of Newark for the mayor.  I would

18    call either the police director or the fire

19    director and go over different issues that

20    different, I guess, civic leaders had in areas

21    regarding crime or buildings that were -- needed

22    to be taken down because they're fire hazards,

23    or just different policy issues, but nothing

24    specific regarding pharmaceutical.

25          Q.    How about illicit street drugs?

1    Anything --

2          A.    Yes.  I mean, a lot of the

3    complaints were in regards to drug dealing.

4          Q.    And you mentioned you split time

5    between the -- or oversaw both the police and

6    the fire departments.  Did you have any

7    background or training with regard to

8    supervising police or fire departments?

9                MR. KOBRIN:  Object to form.

10         A.    No, I didn't at that point.  I was

11   a -- just basically graduated college.

12         Q.    Did you receive any specific

13   training or support in order to oversee the

14   Newark police and fire departments while you

15   were a mayor's aide?

16         A.    I wasn't in charge of them.  I was

17   just more of a liaison that would tell them or

18   speak with the different department heads as to

19   issues that they should look into.  I wouldn't

20   tell them, "Send 20 police officers to this

21   location and set up a command post" or anything.

22         Q.    I understand.

23               Okay.  So how long were you a

24   mayor's aide for Mayor Sharpe?  On your resum ,

25   it says to July '98.  Is that accurate?

1          A.    That's -- that's right.  It's just

2    a little bit over a year.

3          Q.    Okay.  And you, I take it from

4    your resum , transitioned to a different job in

5    the City of Newark?

6          A.    Yes.

7          Q.    Give me the background on that.

8    How did you transition?  Did you -- did somebody

9    approach you about another job, or did you seek

10   out another job?

11         A.    Well, the mayor wanted me to do

12   what interested me, and what interested me were

13   the police and fire department.  And at that

14   point I did a lot of work with the police

15   department, so I spoke to the mayor and I spoke

16   to the police director to see if there's any

17   position that I could assist and get more

18   exposure.  And that's when I went over to the

19   police department.

20         Q.    The position, the title, you have

21   on your resum  is assistant deputy director,

22   administrative officer, police spokesman.

23         A.    Yes.

24         Q.    Is that three different positions

25   over time, or was that --

23

        1           A.    It's -- it was a conglomeration of

        2    positions at the same time that they gave me all

        3    the titles for.  I worked countless hours every

        4    day on all those things.  And a lot of them had

        5    major overlap.

        6           Q.    I want to talk specifically about

        7    serving as the police spokesman.  Did you have

        8    any studies at Rutgers or really anywhere else

        9    that were focused on the duties attendant to

       10    being a police spokesman?  In other words,

       11    public relations courses or journalism courses?

       12           A.    Well, I took -- I took a lot of

       13    literature courses that dealt -- I have taken

       14    journalism courses, and there was -- when I was

       15    a mayor's aide, another thing I did a lot was

       16    interacting with the media.  So I had a lot of

       17    on-the-job training.

       18           Q.    And do you recall -- the tenure

       19    you have on your resum  is July '98 to

       20    January 2000.  During that limited time period

       21    as a police spokesman, did you have occasion to

       22    handle any media coverage relating to

       23    pharmaceutical drugs or opioids specifically?

       24           A.    No.  The main problem in Newark

       25    regarding any drug was more the illicit

24

1    narcotics, the street drugs.

2          Q.    Do you recall any significant

3    arrests or indictments that related to your work

4    during that time in the City of Newark relating

5    to pharmaceuticals or opioids?

6          A.    No.

7          Q.    So who was your supervisor -- was

8    your supervisor at the Newark Police Department

9    a law enforcement person or an administrative

10   person?

11         A.    Law enforcement person.

12         Q.    And what was that person's name

13   and title?

14         A.    At the time the deputy director of

15   the police department, Rocco Malanga, he was --

16   I worked directly underneath him.  He headed the

17   police department's office of community affairs

18   and public relations.

19         Q.    Okay.  So that -- that's why I

20   asked about administrative versus law

21   enforcement.  That sounds like more of an

22   administrative job than a law enforcement job.

23         A.    Oh, yes.

24         Q.    Okay.

25         A.    Yeah, I was not a law enforcement

25

1    officer at that point.

2         Q.    Yes.  And your supervisor was also

3    not a law enforcement --

4         A.    He was a law -- he was a police

5    officer who was elevated to that -- it's an

6    administrative position.

7         Q.    Okay.

8         A.    But he was a law enforcement

9    officer.

10        Q.    I see.

11             In your resum , it says that you

12   assisted -- during this tenure in your career,

13   you "assisted in the creation, instituting, and

14   restructuring of, among other things, the Drug

15   Abuse Resistance Education or DARE program."

16             Can you give us a little bit of

17   background about the DARE program and what you

18   did there?

19        A.    The DARE -- the DARE program was

20   underneath our public relations department,

21   community affairs.  It was an ongoing program,

22   which is a national program aimed at school-aged

23   children to keep them away from drugs, give them

24   other options, tell them, you know, that drugs

25   are bad and the evils of drugs, and a lot of

26

1    education.  So I helped beef up that area of the

2    police department.

3            Q.    Did the DARE program cover

4    prescription drugs as well as illegal drugs, or

5    was it exclusively focused on illegal or illicit

6    drugs?

7            A.    At that time, it was primarily

8    illegal illicit drugs.

9            Q.    During this tenure, this July '98

10   to January 2000, did you receive any type of

11   specialized training or instruction or education

12   about the dangers of prescription drugs or

13   prescription drug abuse?

14           A.    At that time prescription drug

15   abuse wasn't a main topic.  It was the illicit

16   street drugs that were -- at least the main

17   issue in the City of Newark.

18           Q.    Okay.  And I take it from your

19   resum , you left that position in January of

20   2000 to join the fire department.  Tell me about

21   what led to that decision to leave the Newark PD

22   and join the fire department.

23           A.    I did a lot of work with the

24   emergency management department within the fire

25   department, and I liked that position.  I liked

1    what they did.  I liked the impact, being able

2    to help people dealing with disasters.  So I

3    switched over to that position.

4              I was just trying to get exposure,

5    trying to learn new things.  My overall career

6    goal was to go into law enforcement, but I

7    wanted to get well rounded.

8         Q.    And there was an opportunity to go

9    to the fire department to, I guess, get well

10   rounded.  Is that your --

11        A.    Yes.  And I really enjoyed the

12   emergency management job.

13        Q.    Okay.  And I noted -- I had to

14   think to myself the timing of 9/11.  You

15   actually left there in August of 2001, just a

16   month before 9/11.

17        A.    Just a month before.  And I was in

18   the academy during 9/11.  We actually saw the

19   buildings go down while we were doing a PT in

20   Branch Brook Park.

21        Q.    Wow.  The job duties that you

22   had -- I guess you were at the Newark Fire

23   Department from January 2000 to August 2001.

24   The job duties that you had there, were they

25   similar in scope to what you did at the police

1    department previously?

2           A.    No.  This was a lot more hands-on,

3    running emergency management-type situations and

4    disasters within the city, anything from major

5    fires to chemical leaks to small plane crashes

6    or anything to that nature.

7           Q.    Do you recall your supervisor's

8    name and title for that job?

9           A.    The overall commander of emergency

10   management was Robert Swales.

11          Q.    And his title was commander?

12          A.    He was the -- coordinator of

13   emergency management was his exact title.

14          Q.    Okay.  Do you recall your salary?

15          A.    At that time I was probably around

16   $70,000.

17          Q.    And I didn't ask, but do you

18   recall your salary while you were at the police

19   department as assistant deputy director?

20          A.    Around $60,000.

21          Q.    So in August of 2001, what led you

22   to leave the Newark Fire Department?

23          A.    I was offered a -- I took the

24   police test earlier that year, and I was offered

25   a position within the Newark Police Department

29

1    based on my score.

2            Q.    And on your resum , you have the

3    time period August 2001 to September 2005, and

4    the position description is police

5    officer/detective.  I take that to mean that you

6    didn't start out as a detective but became one

7    during that time?

8            A.    Yes, correct.

9            Q.    Okay.  When did you become a

10   detective?

11           A.    Let's see.  In 2004, March of

12   2004.  That was the March.

13           Q.    Okay.

14           A.    Yeah, March 2004.

15           Q.    Is that a separate test that you

16   have to take to become a detective?

17           A.    No.  It's an appointment in the

18   City of Newark.

19           Q.    Is that typical for local police

20   departments?

21                 MR. KOBRIN:  Object to form.

22           Q.    If you know.

23           A.    A lot of departments, it's an

24   appointment.  I know New York PD, it's a -- you

25   have to take a test.  It's a whole other -- I

30

1    think LAPD also.

2         Q.    From TV shows, I've always heard,

3    you know, "You have to pass your detective's

4    test."  That's my base of knowledge, so ...

5              Okay.  So just to walk through a

6    little bit about your tenure with the Newark PD.

7    So you started in August of 2001, and you say

8    here that you were the academy platoon leader

9    responsible for 60 recruits.

10             Explain to me a little bit about

11   what the academy platoon leader does.

12        A.    I was a platoon leader.  Since

13   there's 120 recruits, there's two platoon

14   leaders.  You would have squad leaders, six

15   squad leaders, because each -- you divided it

16   into six teams of ten.  And then you would be

17   basically the liaison between the academy staff

18   and the recruits.

19             So if they wanted a specific thing

20   done, they tell you, and you'd figure out how to

21   do it.  And then you'd delegate it to your squad

22   leaders, tell them what to do, and then they'd

23   tell their personnel to do it.

24        Q.    I see.  So it's part of the

25   hierarchy of the recruits?

31

1          A.    Yes.

2          Q.    You were the upper echelon of the

3    hierarchy?

4          A.    Yes.

5          Q.    And it says you received the

6    instructor's award.  What is the instructor's

7    award given for?

8          A.    The number one recruit overall.

9          Q.    And you graduated the police

10   academy in December of 2001; is that right?

11         A.    Correct.

12         Q.    And you began -- and this is --

13   obviously, I'm just taking it from your resum .

14   You began in the patrol division, east district,

15   in 2001.  You stayed there until March of 2004,

16   right?

17         A.    Let's see.  Yes.  Correct.

18         Q.    Okay.  What's the -- the

19   designation "east district."  How many districts

20   are there?

21         A.    At that time there's four

22   districts.

23         Q.    Are they compass points; east,

24   west, south --

25         A.    Yeah, exactly.  It's based upon --

32

```
 1            Q.    And you were a uniformed patrol

 2     officer at that time?

 3            A.    Started off as uniformed patrol

 4     officer for about six months.  And then they

 5     made my partner and I plain clothes street

 6     crimes because we were, I guess, doing a good

 7     job.

 8            Q.    Okay.  While you were in this

 9     patrol division, east district, did you have

10     occasion to work on any cases involving

11     prescription drugs or specifically opioids?

12            A.    It's -- I mean, not like real

13     investigations.  But you'd start -- we'd start

14     coming across people with a couple of diverted

15     pills here and there.

16            Q.    There's another item under here

17     I'm curious about.  It says you were the captain

18     of the team that participated on The Today Show,

19     America's bravest and finest competition.  I've

20     not heard of what.  What's that about?

21            A.    That was the summer after 9/11.

22     It was -- they had teams from across the

23     country.  They wanted two policemen, two

24     firemen, one of which had to be a female.  And

25     we competed in this obstacle course challenge.
```

1          Q.    I do remember this.

2          A.    And we were the -- we made it to

3    semifinals, so ...

4          Q.    Okay.  Did your appearance air on

5    national TV?

6          A.    Yes, it did.

7          Q.    Oh, that's pretty cool.

8                Okay.  So in March of 2004, you,

9    it looks like, transitioned to what's called

10   Neighborhood Enforcement Stabilization Task

11   Force.  What exactly is that?

12         A.    It was a task force that was

13   targeting the most violent areas in the City of

14   Newark.  And at the time it was primarily in the

15   west district.  It was kind of -- it was a crime

16   suppression kind of detail.

17         Q.    And that's a very brief period,

18   just March to April of '04.

19         A.    Yes.

20         Q.    Was that just a limited duration

21   of the task force, or was it just your

22   participation?

23         A.    That's when -- because before, I

24   said March, but it was really April.  April was

25   when I was promoted to detective.  So that's why

34

```
 1    I -- I was promoted to detective, and then I was

 2    assigned to criminal investigations bureau and

 3    loaned out to the DEA as a task force officer.

 4         Q.    Okay.  And I want to understand

 5    that.  So you were an employee of the Newark

 6    Police Department, but they had a collaboration

 7    with the DEA to give them officers?

 8         A.    Yes.  That's -- that's a program

 9    within the DEA.  They have -- and several other

10    federal agencies.  They accept police officers,

11    detectives from other departments to help

12    supplement their manpower, and also give them

13    expertise in certain areas that the department

14    might not necessarily have.

15         Q.    But at all times, you were an

16    employee and paid by the Newark Police

17    Department, not the federal government?

18         A.    Correct.  Although they reimbursed

19    for some overtime, I think.

20         Q.    Did they give you a car?

21         A.    Yes.

22         Q.    The DEA?

23         A.    The DEA did give me an Enterprise

24    rental car.

25              MR. KOBRIN:  Object to form.
```

35

1              When you said "at all times," you

2         just mean during this period where he

3         was actually working for the Newark

4         Police Department --

5              MR. YOUNG:  Yes.

6              MR. KOBRIN:  -- not when he later

7         worked for the DEA?

8              MR. YOUNG:  Yes.  Sorry.

9              THE WITNESS:  Good point.

10  BY MR. YOUNG:

11        Q.    Okay.  So you're on loan to the

12  DEA.  And I note in your resum  during this time

13  period, you received a number of awards.  We

14  don't need to go through them all, but kudos to

15  you.  It looks like you had a stellar career --

16        A.    Thank you.

17        Q.    -- with the Newark Police

18  Department.

19              Did you ever have any complaints

20  taken out against you or investigations into

21  your actions as a police officer?  During this

22  time, by the way.

23        A.    During the 2001, 2005?  It's a

24  general thing within Newark that people make

25  complaints.  Nothing was ever sustained, because

36

```
1    it was all fabricated complaints.  They usually
2    did that to, like, "Oh, you arrested me" or
3    you -- like, we locked them up and get their
4    stash of drugs and their gun and all that.  It
5    was a way of retribution a lot of times.  But
6    they'd make some things saying we stole money or
7    beat them up or ...
8            Q.    Do you recall how many of those
9    types of complaints you received during this
10   tenure?
11           A.    Not many.  And they were all
12   non-sustained.
13           Q.    Was there ever any -- I'll call it
14   Internal Affairs.  It might be Office of
15   Professional Responsibility.  Different
16   departments call it different things.
17                 Any of those internal
18   investigations done into your work for the
19   Newark Police Department at this time?
20           A.    Well, they have to investigate
21   every and all allegations made, but everything
22   was non-sustained.
23           Q.    Okay.  I guess that was -- yeah,
24   my question was whether there was more than a
25   cursory investigation, a deeper dive.
```

37

```
 1            A.    No.  Once -- once they -- they'll
 2    fully investigate everything to the point where
 3    they know that it's either a real allegation or
 4    not.
 5            Q.    And from this point,
 6    September 2005 going all the way back to when
 7    you were a mayor's aide, were you ever the
 8    subject of litigation, a civil suit, or any kind
 9    of criminal investigation, anything like that?
10            A.    No.
11            MR. KOBRIN:  Object to form.
12            A.    No.  No, I was not.
13            Q.    Okay.  So September 2005, you
14    transitioned over to the DEA to begin a 13-year
15    career as a DEA special agent.  You also in your
16    resum  say "supervisor."
17            At what point in time did you
18    become a supervisor for the DEA?
19            A.    I was usually the senior agent in
20    the group behind the group supervisor.  So I was
21    supervisor many times.  Whenever the supervisor
22    is out on vacation, the senior agent becomes the
23    supervisor, or I was also loaned out to
24    different task forces at different times where
25    I'd supervise the task force.
```

38

1          Q.    I see.  So "supervisor" isn't a

2     job title.  It's more a --

3          A.    No.  The actual titles that we'd

4     have, if you go for the promotion, would be

5     group supervisor.  So I was an acting group

6     supervisor or supervisor of different task

7     forces that I was on loan to.

8          Q.    Got it.

9              Okay.  So tell me about the

10    transition you make to the DEA.  You were at

11    Newark PD on loan to the DEA, and then in

12    September 2005, transitioned fully to work for

13    the DEA.  How does that happen?

14         A.    While I was on loan to the DEA,

15    the special agent in charge and a couple of the

16    assistant special agents in charge sat me down

17    and spoke to me, talked to me about joining the

18    DEA.  They thought that I'd make a good agent,

19    that I should join.

20              So I agreed, and I -- you have to

21    go through a whole application process.  I put

22    in an application, which is a whole background

23    check.  You have to do a psychological exam, a

24    polygraph, a physical fitness test, a physical,

25    written test.

39

1          And after I went through the

2    entire process, I was slotted into a basic agent

3    class down at Quantico in September of 2005.

4          Q.    Had you previously applied to be a

5    special agent?  Gone through that process you

6    just described?

7          A.    No.  It was just that one time,

8    and I was hired.

9          Q.    When you are hired by the DEA, is

10   there a particular focus or designation that

11   they give you to say, "Okay.  You're going to

12   work on this type of activity the DEA

13   investigates" versus other types of activity?

14          Does that make sense?  Did you

15   have -- did you have a focus or a specialty when

16   you first started?

17          A.    Not really.  You come out of the

18   academy as a special agent, and you're expected

19   to be able to investigate all drug crimes,

20   anything underneath Title 21.

21          Q.    The DEA also has something called

22   Office of Diversion Control, I think.

23          A.    Yes.

24          Q.    Did you work for them?

25          A.    I worked with them many times.  I

1   was never officially assigned to a diversion

2   group, but we were all expected to work

3   diversion cases as special agents.

4           Q.    Okay.  But would you say that your

5   primary responsibilities during your career with

6   the DEA were on the criminal side of drug

7   investigations?

8           A.    Most of the cases I did work were

9   more on the --

10              MR. KOBRIN:  Object to form on

11          that.

12              Go ahead.

13          A.    Most of the cases were more on the

14  illicit drugs, the cartels, the gangs, violence.

15  But I had several dozen -- a couple dozen cases

16  that were diversion cases as well.

17          Q.    And the diversion cases were

18  criminal in nature as well, right?

19          A.    Yes.

20          Q.    They were not administrative

21  functions of the Office of Diversion Control,

22  right?

23          A.    No.  Agents do criminal

24  investigations.

25          Q.    Are there employees of the DEA

41

1    that do more administrative functions like

2    inspections of pharmaceutical facilities?

3         A.    Correct.  That would be a

4    diversion investigator.

5         Q.    So they're not a special agent?

6         A.    No, they're not.

7         Q.    Is there a hierarchy within DEA

8    such that special agents look down upon

9    diversion investigators?

10        A.    We don't look down on them, but

11   there is a hierarchy that we are -- even if you

12   look at the organizational chart, we are above

13   them.

14              Like, let's say that I was

15   assigned to a diversion group.  I would -- and

16   there's ten people in the group.  They have it

17   all based upon seniority.  You're given a

18   designation.  I was usually -- the boss would be

19   01.  The senior agent would be 02.

20              Now, going to a diversion group,

21   there could have been a diversion investigator

22   that's been there for 30 years.  I could be a

23   brand-new agent coming out of the academy, and

24   let's say it was a three-person group, it would

25   01 the supervisor.  I'd automatically become the

42

1   02 above the person that's been doing it for

2   30 years because the investigator is not the

3   same distinction.

4       Q.    Sure.

5             Are there other positions within

6   the DEA besides those two that you just

7   described, the investigator and special agent

8   within that hierarchy?

9       A.    There's --

10      Q.    There's a whole bunch?

11      A.    There's a -- I mean, you have

12  demand reduction.  You have all different

13  civilian-type positions.

14      Q.    And you were always a special

15  agent or supervisor during your tenure, no other

16  position?

17      A.    No.  Once you're a special agent,

18  you're a special agent.  Even if you go up the

19  ranks, you're still -- an 1811 is what the exact

20  designation is.

21      Q.    Is that a reference to a

22  federal --

23      A.    Federal code.  Everything is

24  numbered and has codes and ...

25      Q.    Do investigators for diversion

43

```
 1    control carry firearms?

 2           A.    No.  They don't carry firearms,

 3    handcuffs.  They can't make arrests.

 4           Q.    Gotcha.

 5                 Okay.  So you mentioned that you

 6    had worked at least a dozen diversion-type

 7    cases.  I want to talk about those, if we could.

 8                 Do you recall the first instance

 9    in which you were assigned to work a case

10    involving diversion?

11           A.    I've worked a couple dozen,

12    actually.  But within probably the second year

13    that I was an agent, I was --

14                 MR. KOBRIN:  I just want to warn

15           you not to get too much into details of

16           your investigations or any ongoing

17           investigations or information that would

18           be confidential in nature.

19                 Sorry to interrupt.

20                 MR. YOUNG:  Yeah, sure.

21           A.    So, in general, I was assigned.  I

22    was helping one of the diversion groups with a

23    case by my second year as an agent.  That was

24    probably the first one.

25           Q.    And certainly without revealing
```

44

1    any, you know, confidential details, what were

2    the circumstances of that investigation, if you

3    recall?  Was it pharmaceutical manufacturer

4    diversion from a warehouse?  Was it from a

5    wholesaler?  Was it from a retailer?  You know,

6    what was the -- what was the nature of the

7    diversion?

8            A.    Retailer doctor.

9            Q.    And was it involving opioids?

10           A.    Yes.

11           Q.    Was it in New Jersey?

12           A.    Yes.

13           Q.    Was all of your work done in

14   New Jersey, or did you have a broader area than

15   that?

16           A.    Go anywhere in the country,

17   technically anywhere in the world that we have

18   an office.  I've -- I've had cases that have

19   gone to Europe, to Mexico.  A lot of -- a lot of

20   things we do have overlap into New York City.

21   So we do a lot in New York City.  Some stuff

22   goes to Philadelphia, Washington, Maryland, a

23   lot of the contiguous states of New Jersey.

24           Q.    So I assume that there are DEA

25   special agents in those cities you just

45

 1   described, like New York and Philadelphia.  How

 2   do you determine who works a case when it

 3   originates in New Jersey but it has a connection

 4   to New York?

 5          A.    It would be -- if it started in

 6   New Jersey and the base is in New Jersey and we

 7   started the case, it will be our case.

 8               Now, we could -- we could even

 9   deal with the U.S. Attorney's Office, let's say,

10   Southern District of New York in Manhattan if it

11   happened in Manhattan.  We would interface with

12   that office as a New Jersey agent because we had

13   jurisdiction throughout the entire country.

14               So, I mean, if we needed help from

15   the office, like additional manpower or, "Hey,

16   can you -- we're in Jersey right now.  We know

17   that something is happening on 52nd Street.  Can

18   you send a couple cars out to get an eyeball on

19   it or do a little surveillance, follow that guy

20   around for us while we're trying to get over

21   there."

22               So, I mean, there's a lot of

23   collaboration between offices, but generally if

24   an office starts a case and has a nexus to

25   another location, we would follow it through

1    unless it was -- like the nexus was to LA, so

2    it's not really feasible for us to go from

3    Jersey to LA.  So we'd give all -- we'd probably

4    go and meet with the agents in LA, give them

5    everything that we have, say, "Hey, these are

6    the guys that you guys should be watching."  We

7    might both go up on wiretaps, do a collaborative

8    effort that way.

9           Q.    Okay.  And specifically with

10   regard to diversion cases, did those cases

11   originate from the Office of Diversion Control

12   or from the special agent side, or is it just a

13   mix?

14          A.    Well, there's special agents in

15   the Office of Diversion Control.

16          Q.    I should clarify.

17                How did you -- let's just take the

18   first instance you recall working on a diversion

19   case.  How did that case originate?

20                MR. KOBRIN:  And, again, same

21          warning regarding confidential

22          information.

23          Q.    Yeah.  And I'm not looking for

24   confidential information.  I'm really looking at

25   "We got a call from diversion control about a

47

```
1    suspicious physician or a suspicious pharmacy,"

2    like how the case comes to light.

3           A.    That one was an informant.

4           Q.    So an informant that you all were

5    working with at the Newark DEA said, "Hey,

6    there's this shady doctor or this shady

7    pharmacy," something like that?

8           A.    Something like that.  I won't

9    really --

10          Q.    Okay.  How about the other

11   instances?  I think you mentioned a couple dozen

12   of diversion cases.  What are the other

13   originations of those cases?

14          A.    A lot of them were informants.  In

15   fact, most, if not all.  But I think a couple of

16   them were from other offices sending these

17   like -- like I said, like how we'd work with LA,

18   stuff like that.

19          Q.    Did you ever work a diversion case

20   that originated as a result of an inspection of

21   a registrant of either a manufacturer or

22   distributor or a dispenser of controlled

23   substances?

24          A.    Not that I know of.

25          Q.    Have you ever conducted
```

48

1    inspections of registrants during your tenure

2    with the DEA?

3          A.    That's not generally what a

4    special agent does.

5          Q.    Have you received training to

6    conduct the inspections, if you were asked to

7    conduct an inspection?

8          A.    I would be able to do one.

9          Q.    You've witnessed inspections of

10   registrants performed by others in the DEA?

11          MR. KOBRIN:  Object to form.

12          A.    I haven't had to go out and do

13   inspections, so I wouldn't have witnessed it.

14   But any -- any agent would be expected, if asked

15   to go do an inspection of a registrant, to be

16   able to do it.

17          Q.    When you transitioned from Newark

18   PD to the DEA, what was your starting salary

19   with the DEA?

20          A.    Let's see.  The salary went down

21   to -- at the academy, I think it was 46,000.

22   And then as soon as you graduate, you get the

23   availability pay, so it went up another 10,000.

24   So mid 50s.

25          Q.    So you took a pay cut to join the

49

1    DEA?

2         A.    Yes.  I was -- with overtime in

3    Newark PD as a detective, I was probably making

4    around 90- to 100,000 dollars every year.

5         Q.    So I have to ask.  Why the move?

6    Was it just long-term career advancement?

7         A.    I really liked the job working

8    with the DEA.  I thought that their mission was

9    excellent.  The people I worked with, the

10   training.  It was all around -- it fit.  It was

11   a good fit.

12              MR. KOBRIN:  You liked the

13         Enterprise car.

14        A.    The Enterprise car was the best.

15        Q.    Call that a G ride, right?

16        A.    Well, the rental car -- oh, man.

17   Yeah, I got some really good G rides in the

18   beginning.  You get the best.

19        Q.    Did you ever get any seized

20   vehicles to drive?  I've always seen that on TV

21   and movies.

22        A.    I was never given one.  Although,

23   I've seized vehicles.  But we had a couple that

24   were made into undercover cars.  Like we had a

25   couple high-end cars that they put cameras in

50

1     and trackers and shut off -- engine shutoff

2     switches and all kinds of interesting stuff.

3              Q.    I think there's the TV show "Bait

4     Car."

5              A.    Yeah.  Ours didn't have the locks.

6     It was -- we had ones with traps in them, the

7     concealed compartment.  They had a lot of

8     interesting -- all kinds -- I mean, I can't

9     really -- yeah, I was right at -- I was right at

10    the level.  Yeah.

11             Q.    So tell me about your salary

12    increases over time at the DEA and sort of what

13    triggers them.  Is it just tenure, or are there

14    promotions that happen or --

15             A.    There are promotions.  Every year

16    within your first several years, your -- I

17    started as a GS-9 level.  Which as a DEA agent,

18    you start as a GS-7 or a GS-9.  To get a GS-9,

19    you either have to have a master's or police

20    detective experience, something -- something

21    that sets you apart from your average person.

22                   So I started as a 9, which means

23    that within a year of my graduation, I was

24    eligible for a promotion to an 11.  Don't ask me

25    why they skipped 10.

51

```
1                    FBI agents start at 10 for some
2    reason, but -- but it's based upon performance.
3    Your boss has to sign off saying that you met
4    all the different requirements.  So I was
5    promoted to 11 after the first year.  The next
6    year would be a 12.  Same criteria.  Then after
7    a 12, when you're in grade, you can put in for
8    the promotion to senior agent.
9                    So within three years, if you
10   start off as 9, you can become a senior agent, a
11   13, but you have to put in a whole packet
12   proving that you deserve to be a senior agent.
13                   You have to put in at least
14   three -- when I did it, at least three different
15   big cases, complex investigations, wiretaps, all
16   that kind of stuff.  And it has to be approved
17   by your boss, the assistant special agent in
18   charge of division, the special agent in charge
19   of division, and then headquarters has to
20   approve it.  So it's --
21           Q.    And did you, in fact, achieve
22   that?
23           A.    I got it.  It's called an "early
24   promotion."  So within three years, I was a 13.
25           Q.    And what was the pay at that point
```

52

```
 1    then when you were a GS-13?
 2           A.    I was -- it was back to around
 3    what I was making as a Newark police officer.
 4           Q.    And the benefits with the federal
 5    government under the DEA, were they better than,
 6    the same as, or worse than the Newark PD
 7    benefits?
 8           A.    Overall, worse.  The -- I just
 9    remember being -- Newark police officer, my
10    medical benefits, I really didn't have any
11    copays, could go anywhere.
12                 I'll tell you, just being a
13    recently retired person from the federal
14    government, for an injury, the -- which you have
15    to fight for your pension.  It's -- if I went
16    out as a police officer, I would have gotten
17    two-thirds pay tax free.  So it's a lot -- a lot
18    lower with the federal government.  So overall
19    the benefits aren't as good.
20           Q.    Are you in the Federal Employees
21    Pension Program, or are you in a 401(k)?
22           A.    If you're under the FERS system,
23    your pension is based upon three different
24    factors.  It would be a percentage of your pay
25    based upon years worked, and then you are
```

53

1    eligible for Social Security.  You don't have to

2    wait until you're 67 or whatever your age would

3    have been.  And you -- there's a 401(k).  It's

4    called a Thrift Savings Plan.  The government

5    will put in up to 5 percent matching.  But I

6    always maxed it out every year.

7           Q.    And I do want to talk about your

8    retirement from the government, but we'll just

9    pause that for a moment while we work

10   chronologically through this.

11              During your 13 years as a special

12   agent in New Jersey, did you receive any

13   complaints or were you the subject of any

14   investigations that were looked into by Internal

15   Affairs or OPR or any of those types of

16   entities?

17          A.    I know that one guy made a

18   complaint against my whole squad saying we used

19   excessive force, which was unfounded.  That's --

20   I think that was the only complaint over the

21   entire -- my entire tenure.

22          Q.    Were you ever a defendant in

23   litigation, either civil or criminal litigation,

24   during that time?

25          A.    I've had -- there was a couple of

54

1    lawsuits that came up that were -- that were

2    thrown out.

3          Q.    Okay.  Let's -- how many total

4    lawsuits were there?

5          A.    I think two.  Two maybe.

6          Q.    And what was the nature of the

7    first one, if you recall?

8          A.    Something about improper arrest or

9    something to that effect.

10         Q.    And this is one, I assume, where

11   the DEA represented you?  You didn't have to

12   obtain your own counsel?

13         A.    Oh, correct.

14         Q.    And that was just dismissed?

15         A.    I had a warrant from a federal

16   judge to lock the guy up, so there was probable

17   cause.

18         Q.    And how about the second one?

19         A.    It's the same --

20         Q.    Same kind of thing?

21         A.    -- thing.

22         Q.    Were you ever the subject of a

23   deprivation of civil rights or a 1983 action?

24               MR. KOBRIN:  Object to form.

25         A.    No, just voluntary lawsuits.

1          Q.    How about civil lawsuits where

2     someone sued you for something outside the DEA?

3               MR. KOBRIN:  Having nothing to do

4          with his DEA work?  Just general?

5               MR. YOUNG:  Yeah, just in general.

6          A.    No.

7               MR. KOBRIN:  Object to form.

8          A.    Never.

9          Q.    You're lucky.

10         A.    Life's not over yet.

11         Q.    That's true.

12              Okay.  So you received during your

13    tenure with the DEA a number of commendations

14    and awards and things like that.  I think you

15    list some of them on your resum .

16              Are any of the awards that you

17    received -- and I'm using "awards" in the

18    broadest sense.  It might be recognition or

19    commendation or -- you know, I'm trying to think

20    of other words to describe the kudos and

21    attaboys that you may have received.

22              Were any of those related to work

23    that relates in any way to your engagement in

24    this case?  So, in other words, work that

25    informs your opinions that are referenced in

1    your report or that you may testify at trial in

2    this matter?

3                    MR. KOBRIN:  Object to form.

4         Q.    Do you understand my question?

5         A.    No.  Can you rephrase it?

6         Q.    It was long-winded and convoluted.

7               I'm trying to determine if any of

8    the great things that you did at the DEA relate

9    to the opinions that you're proffering in this

10   case.  So, in other words, did you win an award

11   for a diversion case involving opioids in

12   New Jersey and you did such a great job in that

13   case that it's relevant to, you know, your

14   opinions and testimony in this case?

15                   MR. KOBRIN:  Object to form.

16        A.    I'd say most of my outstanding

17   performance awards had some of my work that I

18   did in diversion cases included within that.

19   It's an overall award that you get for your

20   year's -- that year's work, whether or not you

21   did a good job.  And some of those years, you

22   know, one of the major cases I might have worked

23   was a diversion case, so that -- so, yes, based

24   on your question.

25        Q.    Okay.  It says you received two

57

1    commendations from the New Jersey Narcotics

2    Enforcement Officers Association for heading

3    extremely impactful investigations against

4    violent organizations.

5                    Would either of those

6    commendations involve diversion work?

7            A.    No.  Most of your diversion people

8    were not violent.  They're doctors, pharmacists,

9    or whatever.  Those were gang investigations,

10   wiretaps.

11           Q.    The other one that is specifically

12   mentioned is the U.S. Attorney's award for

13   outstanding investigation.

14                    Do you know if that particular

15   investigation related to diversion work?

16           A.    That was a heroin mill.

17           Q.    So opioids of a type, but illicit

18   opioids?

19           A.    Yes.

20           Q.    You would agree with that?

21           A.    Yes, it's an opiate.  I mean, most

22   of my work has been either technically all

23   opiates, except for, I think, one cocaine job

24   and one meth job.  All the rest have been some

25   form of opiates.

1          Q.    And who was the U.S. attorney, if

2     you recall, that -- at the time that gave you

3     that award?  Was that Chris Christie?

4          A.    No, no.  That was right after him.

5          Q.    That's the only one I know, so ...

6          A.    Fishman.  Yeah, Chris Christie was

7     the U.S. attorney right before and then became

8     the governor.  It was -- Paul Fishman was the

9     U.S. attorney.

10          Q.    The other things that you have

11     listed on your resum  here under the bullet

12     points, do any of them particularly stand out to

13     you as being relevant or impactful for purposes

14     of your value as an expert in this case?

15               MR. KOBRIN:  Object to form.

16          A.    I mean, they're all

17     investigatory-type positions, so ...

18          Q.    So --

19          A.    For the most part, except for a

20     couple collateral jobs.

21          Q.    So let's start with the first

22     bullet point.  It says "Primary responsibility

23     is to make arrests and seize assets relative to

24     federal-level drug investigations targeting

25     narcoterrorists, gangs, and other violent drug

1     trafficking organizations and individuals."

2              Is there a particular aspect of

3     that description that is applicable or relevant

4     to your expertise in this case?

5          A.   Just the federal-level drug

6     investigation part.  The other -- your diversion

7     cases don't usually involve narcoterrorists, but

8     some gangs do distribute the diverted

9     prescription drugs.

10         Q.   The next bullet point has a couple

11    of different organizations; HIDTA task forces,

12    mobile enforcement team, high impact team,

13    CeaseFire, Newark gang investigations, and

14    Newark violence reduction task force.

15              Any of those task forces have a

16    particular focus or relevancy on prescription

17    drug diversion?

18         A.   The HIDTA task force basically --

19    it goes after all -- or whatever is a problem

20    within that area.  So we did do diversion cases

21    within the HIDTA task force.  The mobile

22    enforcement team, we were in Camden.

23         Q.   And let me just stop you.

24              The HIDTA task force diversion

25    cases that you did, those were criminal cases

1    that you and special agents worked to begin

2    prosecution -- or to refer prosecutions,

3    criminal prosecutions, to people, right?

4              MR. KOBRIN:  Object to form.

5         A.    Special agents -- also we worked

6    with diversion investigators and task force

7    officers.  But, yes, it's for criminal

8    prosecution.

9         Q.    Did any of the work that you did

10   with the HIDTA task force relate to

11   noncriminal -- I'm not sure if you refer to that

12   as administrative or civil in nature, but the

13   noncriminal side of diversion control?

14        A.    No.  Agents do criminal

15   investigations.

16        Q.    Okay.  How about the mobile

17   enforcement team?

18        A.    That was targeting, at the time,

19   Camden.  Camden was the most violent city in the

20   country.  We targeted a couple of their top

21   problems and issues, most of which was crack

22   cocaine, but there was heroin and there was some

23   prescription pills along with the gang that was

24   distributing drugs on the street.

25        Q.    I take it that any of the work

61

```
 1    that the mobile enforcement team did would have
 2    been criminal in nature also?
 3            A.    Yes.
 4            Q.    The high impact team.  Describe
 5    that for us.
 6            A.    That was another focused on an
 7    area between Newark and Irvington, that there
 8    was a lot of different crime-ridden
 9    neighborhoods impacted by all types of drugs and
10    violence, and they just wanted proactive
11    investigations done.
12            Q.    Again, criminal work?
13            A.    All criminal.
14            Q.    CeaseFire?
15            A.    CeaseFire was similar, but that
16    was -- that was more violent-type drug/gun-type
17    cases.
18            Q.    Okay.  Newark gang investigations.
19    That's sort of self-describing.  It involved the
20    gangs of Newark?
21            A.    Gangs.  But they did do some --
22    they were selling oxycodones and OxyContins.
23            Q.    And so as part of your work
24    relating to the OxyContin and oxycodone
25    trafficking by the Newark gangs, did you have
```

62

1    occasion to investigate any of the defendants in

2    this case?

3              MR. KOBRIN:  Object to form.  I'm

4         not sure he knows who all the defendants

5         are in this case.

6              THE WITNESS:  Yeah.

7              MR. KOBRIN:  And I don't think I

8         would want to identify it to that level

9         just in the interest of not revealing

10        any confidential information if he was

11        involved in anything.

12   BY MR. YOUNG:

13        Q.    Would the work from the Newark

14   gang investigations be pending at this point in

15   time?  Is there any of the things that you

16   worked on that are still pending, or are they

17   all closed investigations?

18        A.    There could be some pending.  I'm

19   not exactly sure.

20        Q.    Yeah.  And so I don't want to know

21   about any pending investigations, but certainly

22   closed investigations that are historical in

23   nature.

24             MR. KOBRIN:  Unless they were

25        confidential in nature.  I just don't

63

1           want him to cross the line.  Even if it

2           was closed, if it was never public, I

3           don't want him to reveal any nonpublic

4           information.

5    BY MR. YOUNG:

6           Q.    Do you recall whether or not you

7    investigated any wholesalers or distributors

8    during your Newark gang investigation's

9    OxyContin or oxycodone work?

10          A.    There's no wholesalers or

11   distributors in Newark.

12          Q.    How about manufacturers?  Do you

13   recall whether manufacturers were the subject of

14   any of that work?

15          A.    There's no manufacturers in Newark

16   either.

17          Q.    Okay.  So the last one is the

18   Newark violence reduction task force.  Describe

19   what the -- I mean, it's somewhat

20   self-descriptive.  It's intended to reduce

21   violence, but what was the geographic and

22   subject matter focus of that?

23          A.    Basically the -- a lot of the same

24   areas as the CeaseFire and high impact team

25   areas, in the same areas as the Newark gang

64

```
 1    investigations usually worked.  It's just these

 2    drug, crime-ridden areas within Newark that just

 3    needed some help.  So we tried to do any

 4    proactive measures that we could to help those

 5    neighborhoods.

 6         Q.    Were there any noncriminal aspects

 7    to the work that you did there?

 8              MR. KOBRIN:  Object to form.

 9         A.    No.  I only do criminal

10    investigations.

11         Q.    Okay.

12              MR. KOBRIN:  We're pushing about

13         an hour.  Do you want to take a break at

14         some point?  Is this a good time?

15              MR. YOUNG:  Yeah.  Let's just blow

16         through these last bullets point and

17         then we'll take a break.  Just 10 more

18         minutes.  Are you okay?  If you need a

19         break now, it's --

20              MR. KOBRIN:  Do you want to take a

21         break, or do you want to -- it's up to

22         you.

23              THE WITNESS:  If we just have a

24         couple more, that's fine.

25              MR. YOUNG:  Yeah, 10 minutes more
```

65

1          on this section, tops.

2     BY MR. YOUNG:

3          Q.    So the next bullet point is

4     "Special agent and acting group supervisor for

5     the asset removal group."  It says, "In charge

6     of overseeing the investigation, prosecution,

7     and adjudication of all criminal assets in the

8     New Jersey division of the DEA."

9               Can you in layman's terms explain

10    to us what that group did, what you did there?

11         A.    Any and all things seized, except

12    for drugs or, you know, actual evidence like

13    that.  Any assets seized, which would be cars,

14    bank accounts, crypto currency, Learjets, gold

15    bullion, whatever, would go through this group,

16    and we would interface with the U.S. Attorney's

17    Office and the Asset Forfeiture Division.

18         Q.    Did any of the assets involved

19    there relate to registrants under the Controlled

20    Substances Act?

21         A.    Yes.

22         Q.    Give us some examples of ones that

23    you recall.

24               MR. KOBRIN:  And, again, same

25               warning.  Don't reveal any confidential

66

1        information regarding ongoing

2        investigations or nonpublic information.

3              THE WITNESS:  Okay.

4        A.    Many vehicles, houses, bank

5   accounts.

6        Q.    When I say "who," I really mean

7   what type of registrant; a pharmacy, a

8   distributor, a manufacturer?

9        A.    Pharmacies, doctors.

10       Q.    Any wholesaler or distributor

11  subjects or defendants in those forfeitures?

12       A.    No.  It's -- basically all the

13  investigation that I've seen regarding drug

14  diversion has been from independent pharmacies

15  in Newark, Internet pharmacies, and bad, dirty

16  doctors.

17       Q.    Did you ever have occasion during

18  your tenure with the DEA to investigate

19  nonindependent pharmacies for diversion?

20       A.    None of them ever came up.  It was

21  always independent pharmacies, and then there

22  was ties to Internet pharmacies, but it was

23  always independents.  Never had any problems

24  with any of the chain pharmacies.

25       Q.    And that's you personally.  Are

67

```
1    you aware whether or not anyone in the
2    New Jersey DEA had occasion to investigate any
3    nonindependent or national retail pharmacies?
4              MR. KOBRIN:  Object to form.
5         A.    I worked a lot with the
6    different -- especially in asset forfeiture, we
7    had to work with the different diversion
8    investigators or agents that were doing
9    diversion cases, and everything was from doctors
10   and independent pharmacies.
11        Q.    Okay.  The other -- a few bullet
12   points here.  One is "Member and supervisor of
13   the DEA special response team."  I take it none
14   of the special response team work that you did
15   relates in any way to diversion?
16        A.    Well, it's basically a SWAT team,
17   but we did assist at a couple different
18   diversion arrests.
19        Q.    Oh.  So SWAT -- special response
20   team or the SWAT team was involved in arrests of
21   physicians or pharmacies, independent
22   pharmacies, I think, are the two that you
23   identified, during your tenure?
24        A.    I can't really think of specific
25   cases, but there was need on a couple of times
```

68

```
 1    for that kind of response.

 2            Q.    Do you know who was supplying the

 3    individuals that were the subject of those

 4    arrests?  In other words, the source of their

 5    pills?

 6                  MR. KOBRIN:  Same warning

 7            regarding confidential information or

 8            nonpublic information.

 9            A.    Yeah, a lot of those are part of

10    ongoing.  Are you asking if it came from

11    different manufacturers or distributors or --

12            Q.    Yes.

13            A.    Yeah, I can't -- that's -- those

14    are all -- a lot of those are ongoing.

15            Q.    As part of your investigation,

16    would that have been something that you would

17    look into to see how they were getting their

18    supply of the pills?

19            A.    Yes.  Our -- that's a huge thing

20    in our training, is you always try to go up, up

21    the chain, always.

22            Q.    And did you ever work a case which

23    went up the chain and identified a licensed

24    distributor or registrant's distributor as a

25    target of a criminal investigation?
```

69

```
 1              MR. KOBRIN:  Object to form.

 2              Same warning.  And if you answer,

 3         just answer generally.  Don't get into

 4         specifics.

 5         A.    Yes.

 6         Q.    Do you recall how many occasions

 7    you identified a licensed distributor as a

 8    potential defendant or target of such an

 9    investigation?

10         A.    One -- one comes to mind.  It's

11    not generally -- it doesn't generally happen.

12         Q.    What types of investigative

13    tools -- well, that's getting into a different

14    area we'll get into it in a second.  Let's blow

15    through these bullet points and take a break.

16              Okay.  You also say you were a

17    class counselor and instructor for the Basic

18    Agent Class 201 in Quantico.  I assume there's

19    some aspects of that that touch on diversion?

20         A.    Yes.  Every basic agent class is

21    trained in diversion, and I -- a lot of the

22    counselors would have to sit in with them on

23    different instruction that they were getting.

24    And they basically got a refresher course again

25    on diversion.
```

70

```
 1              Q.    The next one is that you were the
 2      "DEA designee and team leader for special agent
 3      personnel to provide law enforcement assistance
 4      during domestic national disasters."
 5              Were you chosen to be that
 6      designee because of your background at the
 7      Newark PD and fire department?
 8              A.    I think the emergency management
 9      had a lot to do with it and the fact that I was
10      a team leader on SRT.
11                    MR. YOUNG:  Okay.  And I think
12              that's basically the bullet points.
13              Underneath that is just the
14              commendations that you had, which I
15              think we've already talked about.
16                    So this is as good a time as any
17              to take a break.
18                    THE VIDEOGRAPHER:  Going off the
19              record at 10:18 a.m.
20                    (Recess taken.)
21                    THE VIDEOGRAPHER:  We're back on
22              the record at 10:45 a.m.
23      BY MR. YOUNG:
24              Q.    So when we left off, we had just
25      gone through the bullet list within your CV
```

1    under your DEA experience.  And I wanted to

2    circle back to something, which is your

3    departure from the DEA.  And I think you

4    mentioned in your prior testimony that you had

5    an injury, or -- I think it was an injury, you

6    said.

7              A.    Yeah, medical.

8              Q.    Tell us about the nature of that.

9              A.    Basically most of my spine is

10   titanium at this point, so ...

11             Q.    Was this an accident?

12             A.    A combination of all kinds of

13   things over the years.  Excessive wear and tear

14   and a couple injuries at the DEA.

15             Q.    Were there job-related injury

16   claims that you made against the DEA under,

17   like, workers' compensation?

18             A.    One of the times I just went to

19   the hospital that day.  And then I was a young

20   agent.  I just kept going back to work with a

21   concussion.  But it just caused more -- over the

22   years got worse and worse from that injury.

23   And, of course, at this time I tried to reopen

24   the claim to get surgery, and they -- they just

25   deny it.  So I just went through insurance.

1           Q.    Have you thought about hiring a

2    law firm to handle that?

3                 MR. BARNES:  Do you do workers'

4           comp?

5           A.    You do?  There you go.

6           Q.    What was the accident that caused

7    the original concussion or incident?

8           A.    That would be the -- the neck

9    injury would be -- it was during an arrest, an

10   accident in a surveillance vehicle.

11          Q.    A car accident?

12          A.    Kind of.  It was -- I didn't hit

13   anything.  It was basically getting thrown into

14   the roof of a van based on hitting a bump at a

15   high speed.

16          Q.    And you suffered a concussion in

17   that accident?

18          A.    I smashed my head on the ceiling

19   very hard.

20          Q.    Did you also suffer a spine

21   injury?

22          A.    I wouldn't doubt that that --

23   that's according to the neurosurgeon with the

24   neck injuries that I had to have fusions for,

25   based on.

73

```
 1              Q.    Did you miss time from work after
 2     that accident?
 3              A.    The actual accident?  As I stated,
 4     I went to the hospital that day, and I just --
 5     it was my case.  We just did a major takedown,
 6     so I just kept going back to work.
 7              Q.    So you just went to the hospital
 8     and you were released the same day?
 9              A.    Yes.
10              Q.    And you went right back to work?
11              A.    Made sure I didn't have a brain
12     bleed or something.
13              Q.    Okay.  And did you have any other
14     workplace accidents or incidents that caused you
15     injury in which you sought medical treatment?
16              A.    Just I had another incident where
17     I hit my head, but I didn't get treatment.  I
18     guess a couple years later is when, between
19     these incidents, I ended up having to get neck
20     surgery.
21              Q.    Did you miss time from work in
22     order to get your neck surgery?  I assume that
23     you did, but --
24              A.    Oh, yeah.  It was for all the
25     different surgeries.  I had four spinal fusions,
```

74

```
 1    lumbar reconstruction.  I was out for months.

 2    Went through all my -- all my sick time,

 3    vacation time.

 4         Q.   Do you know approximately how much

 5    time from work you missed as a result of this

 6    injury?

 7         A.   I'm not exactly sure how many --

 8    because I had four different surgeries.  Each

 9    one I'd be out -- one I did back to back.  So

10    even while I was out, though, I was still doing

11    work-related stuff from home.  So I don't

12    know -- even though I put in for sick time or

13    whatever, I would still follow up, get calls

14    from the U.S. Attorney's Office on different

15    cases or whatever.  So even though I was out, I

16    was still working to a point.  But, I mean,

17    recovery from a spinal fusion would be at least

18    a couple months.

19         Q.   What was the date of the first

20    spinal fusion surgery?

21         A.   Let me see.  That was probably --

22    I think it was January of 2011.  I'm not exactly

23    sure.

24         Q.   I won't hold you to it.  I was

25    just trying to figure out within the chronology
```

75

```
 1    of your tenure with the DEA, if it was at the

 2    end or the beginning or what.

 3                 And you mentioned, I think, that

 4    you had several surgeries following that?

 5         A.    I had three more fusions.

 6         Q.    Do you recall the dates,

 7    approximately, or times frames of those?

 8         A.    One was early 2013, and then the

 9    last two were back to back in early 2016.

10         Q.    When you returned to work from

11    those surgeries, did you return in a light-duty

12    capacity, or were you back to full speed?

13                 MR. KOBRIN:  Object to form.

14         A.    Depending on the time, I'd -- you

15    know, I'd go back to work, right back to my

16    group and pick up my duties.  Then as the

17    surgeries went on, after my fourth surgery, I

18    went back -- I helped instruct a little bit and

19    then went back again.

20         Q.    The work that you did in bullet

21    point 2 of the DEA section of your resum , those

22    task forces, was all of that work done prior to

23    your spine surgery in 2011, or did you do any of

24    that kind of task force work after your first

25    spine surgery?
```

76

```
 1              MR. KOBRIN:  Object to form.

 2         A.    The HIDTA task force I did from

 3    the beginning of my career.  Mobile enforcement

 4    team -- 2011 I was in the mobile enforcement

 5    team.  And then all the other ones were after.

 6         Q.    After.  Okay.

 7              Were there physical limitations

 8    that your physicians placed on you with regard

 9    to what you could do at work?

10         A.    Maybe for the first couple weeks

11    don't try to go all out kind of things.  And

12    then -- and then you're back.  When you're back,

13    you're back.  That's it.

14         Q.    You never felt like you were

15    limited -- that your spinal fusion limited your

16    ability to perform your job?

17         A.    I -- I never thought it did.

18         Q.    Okay.  So tell me how all these

19    injuries culminate to a departure from the DEA.

20    What made you decide to take retirement?

21         A.    Well, after that many surgeries,

22    it's -- and the fact that I -- you know, I'm

23    part of the SRT and all these other things, and

24    doing the general job as an agent is pretty -- a

25    lot of wear and tear.  So it's -- my doctor kept
```

77

1    recommending, you know, "If you keep going,

2    you'll have to have surgery number 5."  So it

3    was time.

4            Q.    When did you make that decision?

5    I note in your resum  it says November 2018 is

6    your last tenure with the DEA, but I assume you

7    had sort of sought the paperwork and the

8    approval to do this before then?

9            A.    Only -- I guess I spoke to my boss

10   and basically only did it a couple months

11   beforehand.  And then right now -- after you go

12   out, you have to apply for your pension.  So I'm

13   in the middle of that process now.

14           Q.    Your departure from the DEA was

15   due entirely or only partly to your injury?  In

16   other words, were you leaving the DEA to go

17   pursue other interests, or was it that you

18   couldn't continue in your job because of your

19   injuries?

20           A.    It was all based upon the injury.

21   I just didn't want to have surgery number 5.

22           Q.    But you also decided to pursue a

23   career as an expert witness, at least your

24   resum  depicts.  In the same month, November of

25   2018, you began working as a law enforcement

78

```
 1    expert witness?

 2                MR. KOBRIN:  Object to form.

 3         Q.    Is that accurate?

 4         A.    Well, I started looking into it at

 5    that point.  So I didn't get my first case in

 6    November of '18.

 7         Q.    But you did begin holding yourself

 8    out in November of '18 as a law enforcement

 9    expert witness?

10         A.    Let's see.  Yeah, I think I

11    contacted some -- my wife's an expert witness as

12    a nurse, so ...

13         Q.    Okay.  Did you market yourself in

14    November of '18 to outsiders as an expert

15    witness?

16         A.    I've never self-marketed myself,

17    except for maybe on my LinkedIn page or

18    whatever.  But besides that, it would -- TASA is

19    an expert witness group that refers cases, and I

20    registered with TASA.

21         Q.    Did you have to pay money to do

22    that, or is it just a --

23         A.    No.  You just -- you just have to

24    show that you have expertise, prove that you

25    have expertise.  And they do background checks
```

79

1    on you.  They check your education, your work

2    background.  And then after they do whatever

3    they do to be able to verify that you are who

4    you say you are and have the expertise that you

5    do, then they -- they would then market you or

6    try to plug you into cases that would fit.

7          Q.    Do you recall when you updated or

8    modified your LinkedIn page to reflect your

9    seeking work as an expert witness?

10         A.    Probably early 2019 sometime.

11         Q.    So not November or December of

12   '18?

13         A.    No, no.

14         Q.    Okay.  Did anybody help you?  For

15   example, your wife, did she give you some input

16   on what would look good on your LinkedIn page?

17         A.    No, no.

18         Q.    You just did it on your own?

19         A.    Just did all that on my own.  Did

20   my resum  on my own.

21         Q.    The areas of expertise that are

22   depicted on your resum , on page 1 of your

23   resum , beginning with "active shooter response

24   and training" and ending with "witness," are

25   those reflected in your LinkedIn page or bio?

1    A. I think -- I'm not sure if I have

2 all these on -- I might say "see resum " or -- I

3 have "Resum  Attached" at the bottom.  You could

4 go click on a resum  at the bottom, I think.  I

5 think.  I don't know.  I haven't done anything

6 with it, no.

7    Q. I won't hold you to it.  I know

8 LinkedIn can recommend some areas, and I didn't

9 know if these came from LinkedIn or these were

10 developed by yourself.

11    A. No.  These are things that I have

12 training and expertise in.  I've taken courses

13 or certifications or ...

14    Q. How many engagements have you had

15 as an expert since leaving the DEA?

16    A. Three.

17    Q. Including this one?

18    A. Yes.

19    Q. So two other ones?

20    A. Correct.

21    Q. Okay.  Let's talk about those.

22    When was the first one?

23    A. It was probably, I think, January

24 of 2019, this year.

25    Q. Okay.  So -- and who was that

81

1   with?  If you can reveal.  I don't know if these

2   are confidential.

3         A.    There's still -- they're still

4   ongoing as far as I know, those cases.

5         Q.    Okay.  So I'd just ask you to --

6         A.    One is.

7         Q.    -- generalize the engagement, so

8   the type of industry sector that retained your

9   services.

10        A.    It was basically -- let's see.

11  They are both gang-type, expert witness-type

12  cases.

13        Q.    And are you supporting the

14  prosecution or the defense?

15        A.    Let's see.  Both of those are

16  defense.

17        Q.    So is it a law firm that engaged

18  you?

19        A.    It's a small -- like a

20  single-person law firm.

21        Q.    A lawyer?

22        A.    A lawyer, yes.

23        Q.    Who was representing some

24  individuals accused of gang-related crimes?

25        A.    Kind -- it's not -- they were not

82

```
 1    accused of gang -- each case was they were

 2    victims of gangs, and one guy was facing

 3    deportation.  But this one is over, so ...  He

 4    couldn't go back to his country because he was

 5    targeted by the criminal organization in his

 6    country to -- for injury or death.  So they

 7    needed expertise as to the way organized crime

 8    and gangs work.

 9         Q.    Do you know if the DEA is

10    supporting the prosecution of those cases?

11              MR. KOBRIN:  Object to form.

12         A.    No, they're not.

13         Q.    Do you view any conflict in

14    serving as an expert in cases in which the DEA

15    is on the other side of the case?

16         A.    No.  The one --

17              MR. KOBRIN:  Object to form.

18              THE WITNESS:  I'm sorry.

19              MR. KOBRIN:  I don't think he's

20         ever -- he said there aren't any cases

21         where the DEA is on the other side.

22         Just a clarification.

23    BY MR. YOUNG:

24         Q.    Yeah.  Should that situation occur

25    in the future, if someone were to engage you as
```

83

```
 1    an expert in a case in which the DEA was the

 2    agency on the other side prosecuting the case or

 3    supporting the prosecution for the

 4    U.S. Attorney's Office, would that be an

 5    exclusionary factor for you?  In other words, a

 6    conflict that would keep you from taking that

 7    engagement.

 8            A.    Yes.  We have to -- we have to

 9    contact the counsel even as -- division counsel

10    regarding cases that we do, or the lawyers

11    contact the DEA itself.

12            Q.    Other than your three engagements

13    as a law enforcement expert witness, are you

14    engaged in other means of employment at this

15    point in time?

16            A.    No.

17            Q.    So when you're not working in one

18    of those three capacities, those engagements,

19    how do you spend your time?

20            A.    Well, I like to go to the gym.  I

21    walk my dog, do things around the house.

22            Q.    Do you do any additional

23    coursework or studies relating to your expert

24    witness practice?

25            A.    I'm looking into different things
```

84

1    I can take or maybe advanced college courses.

2           Q.    I think you mentioned earlier

3    potentially law school.

4           A.    I was thinking about that.  Who

5    knows.  It might happen.

6                 MR. KOBRIN:  I think you mentioned

7           it.  I don't know if he was thinking

8           about it.

9           Q.    Since leaving the DEA, have you

10   attended any type of courses or done any

11   self-study in order to support your expert

12   witness business?

13          A.    No.  I've only been retired for a

14   few months.

15          Q.    You mentioned in your resum  that

16   you hold a top secret clearance.  Did you -- was

17   that a function of being a special agent with

18   the DEA?

19          A.    Yes.  You have to be able to

20   attain and hold a top secret clearance to be a

21   DEA agent.

22          Q.    And how does that work?  Do you

23   keep that after you retire?

24          A.    It's every five years you get

25   recertified.  I was certified in 2016.  So I'd

85

 1    have it through 2021.  But, I mean, I'm not,

 2    obviously, working in that capacity, so ...

 3            Q.    Is that something that you could

 4    use, though, as an expert witness?  Does your

 5    top secret clearance give you an ability to look

 6    at information that a normal person like me, for

 7    example, wouldn't be able to look at?

 8                 MR. KOBRIN:  Object to form.

 9            A.    No.

10            Q.    So you --

11            A.    No.

12            Q.    -- need to be a special agent with

13    the DEA or --

14            A.    You have to be working for law

15    enforcement and have that top secret clearance

16    to be able to utilize any kind of database that

17    would be granted by having that clearance.

18    After you're no longer an active agent, you

19    don't have access to those.

20            Q.    You also say you were trained by

21    the Spartan Group in dignitary protection.

22                 What's the Spartan Group?

23            A.    It's a group of former special

24    forces guys that have classes on self-defense,

25    firearms, and actual dignitary protection, how

86

```
1    to move high-value targets and protect

2    personnel.

3            Q.    When did you do that training?

4            A.    That was probably late '90s,

5    almost 20 years ago.

6            Q.    So where were you working at the

7    time you received that training?

8            A.    I was at the police department.

9    It was something I did because I wanted to do

10   it.

11           Q.    This was not part of your job with

12   the Newark Police Department?  This was a side

13   thing that you did?

14           A.    It's a side thing, but the people

15   in the Newark Police Department who went to the

16   dignitary protection detail squad went through

17   that training, and I took several weeks off and

18   did it on my own.

19           Q.    Did you ever do any moonlighting

20   or side work in dignitary protection or security

21   detail?

22           A.    As a police officer, we did

23   security work.  I've done security work for

24   PSE&G, utility company.

25                 (Reporter clarification.)
```

87

```
 1              A.    PSE&G.  It's a utility company in

 2      New Jersey.

 3              Q.    Other than that, while you were at

 4      the police department, have you ever done any

 5      other type of, you know, side work or

 6      moonlighting as a dignitary protection or

 7      security?

 8              A.    Let's see.  I might have done a

 9      security -- helping do security at a location

10      for Watkins Truck.  Helped a -- one guy couldn't

11      show up for his shift one day, so I covered for

12      him as a police officer.  I mean, it's just

13      security work.

14              Q.    Did you ever work on a security

15      detail for Mayor James?

16              A.    No.

17              Q.    When you were at the Newark PD,

18      either as the assistant deputy director or as an

19      officer, did you ever do any work with the

20      mayor's office at all?

21              A.    After I became a police officer,

22      no.

23              Q.    How about in a personal capacity?

24      Did you ever -- were you ever involved in any of

25      the mayoral campaigns that Mayor James had?
```

88

```
1              MR. KOBRIN:  Object to form.
2         A.    Briefly in one campaign, except
3    for -- I worked midnights, so I really wasn't
4    able to help that much.
5         Q.    There's not a lot of campaigning
6    happening at midnight?
7         A.    Well, that's when I worked.  You
8    can't campaign while you work, but I was
9    sleeping most of the day.
10        Q.    I gotcha.
11              Was there a point in time when
12   Mayor James was accused of misusing police
13   personnel to support his campaign?  Are you
14   familiar with that?
15              MR. KOBRIN:  Object to form.
16        A.    I remember -- I think some of his
17   protection detail got in -- something with
18   credit cards and his girlfriend or something
19   like that.  That was after I -- I was no longer
20   with the mayor's office, but I was with the
21   police department, and I remember seeing that in
22   the paper.
23        Q.    Did that -- based on your brief
24   tenure with the mayor of a little over a year,
25   did that surprise you to learn that he was under
```

89

```
 1    investigation?

 2              MR. KOBRIN:  Object to form.

 3         A.    There was always rumors.  You'd

 4    always hear it.  I mean, you always heard that

 5    the FBI was trying to investigate him for 20,

 6    30 years or something.

 7         Q.    As an aside, I don't know if you

 8    know, but Mayor James is actually from

 9    Jacksonville, Florida.

10         A.    Oh, really?

11         Q.    Yeah.

12              MR. BARNES:  That explains

13         everything.

14         Q.    Yeah, it was very newsworthy when

15    he was indicted.

16         A.    I'm sure.  I'm sure.

17              MR. KOBRIN:  He's not a native son

18         of Newark.

19              MR. YOUNG:  No, no.  He's a

20         Floridian.

21    BY MR. YOUNG:

22         Q.    Okay.  A few other things.  Let me

23    see.  I had a list of things I wanted to make

24    sure I hit with you.

25              Do you know -- talking about your
```

1   engagement on this case, I think you had listed

2   in your report your hourly rate.  But just for

3   the record, what's the hourly rate that you're

4   charging the client in this matter?

5           A.    It's $200 an hour for review and

6   $250 an hour for deposition.

7           Q.    And how --

8                 MR. KOBRIN:  Just for clarity, I'm

9           not actually sure, but I think -- he

10          mentioned TASA.  They might have a

11          higher charge to the law firm than that.

12          There might be a slightly higher charge

13          that we receive.  I thought I would let

14          you know that.

15                MR. YOUNG:  That's a good point.

16                MR. KOBRIN:  Yeah.

17  BY MR. YOUNG:

18          Q.    Is your engagement here through

19  TASA?

20          A.    Yes.  My understanding is they

21  charge on top of my fee.

22          Q.    Gotcha.

23          A.    So whatever is being billed would

24  be my fee plus their fee.

25          Q.    Understood.  But TASA pays you --

91

```
 1    I assume you're an independent contractor for

 2    TASA?  You get a 1099 from them?

 3            A.    Yes, I do.

 4            Q.    And do you know how much they've

 5    paid you to date?

 6            A.    To date, they've paid -- around

 7    $20,000 is what they've paid.

 8            Q.    So in my simple lawyer math mind,

 9    I say 200 an hour and $20,000, meaning that you

10    did 100 hours of work?

11            A.    That's what I've gotten paid for.

12            Q.    Okay.  You may have done more work

13    that you haven't gotten paid for yet?

14            A.    Correct.

15            Q.    And you obviously anticipate being

16    paid for your time here today?

17            A.    Yes.

18            Q.    Who keeps track of your time?  Do

19    you have a third party or an outside person, or

20    do you do it yourself?

21            A.    I do it myself.  I write down each

22    day what I do, what hours, and then submit that

23    to TASA, and they do all the billing.

24            Q.    Okay.  Does TASA ever audit your

25    bills or give you feedback to say, "Hey, you
```

1    shouldn't -- you should round this up" or "round

2    this down" or "this is too much time" or "too

3    little time"?

4              A.    TASA just --

5              Q.    Does whatever you bill?

6              A.    Whatever I send, that's what they

7    forward.

8              Q.    So TASA prepares your invoices and

9    sends them to the clients?

10             A.    Yes.

11             Q.    Is that true for all three

12   engagements?

13             A.    Yes.  Because I've never

14   advertised.

15             Q.    With regard to your personal

16   financial interests, do you have any financial

17   interest in HBC?

18             A.    No, I do not.

19             Q.    Or Giant Eagle to the extent

20   that's a distinguishing entity?

21             A.    No, I do not.

22             Q.    You've never been employed by them

23   separately?

24             A.    No.

25             Q.    In the outset, I asked you about

93

```
 1    prior deposition testimony, and you had a litany

 2    of prior instances in which you've offered your

 3    testimony, including grand juries and other

 4    things.  I just want to walk back through those

 5    again just so I can get a sense of the breadth

 6    and scope of where you've testified and in what

 7    types of matters.

 8                   So, first, are all the matters

 9    that you're referring to criminal in nature?

10         A.    Yes.

11         Q.    You've never testified before a

12    congressional or a legislative body like the

13    New Jersey House of Representatives or

14    New Jersey Senate -- I don't know if they have

15    both houses there, but --

16         A.    They do, but no.

17         Q.    Okay.  How about the United States

18    Congress?  Have you ever appeared before

19    Congress?

20         A.    No, I haven't.

21         Q.    Have you ever offered any written

22    testimony that, to your knowledge, has been

23    submitted to Congress or proffered in

24    congressional testimony?  Maybe in one of your

25    cases, one of your investigations?
```

94

```
 1              A.    Not that I know of.

 2              Q.    Okay.  So grand juries.  How many

 3     grand juries have you appeared before, if you

 4     recall?

 5              A.    Federal or state?

 6              Q.    Let's start with federal.  Is it

 7     hundreds?

 8                    MR. KOBRIN:  You can give an

 9              estimate, if you need to.

10              Q.    Yeah, I'm not trying to pin you

11     down.  I'm just trying to get a --

12              A.    It's a lot.  I mean, it's

13     probably, I'd say, at least 100.

14              Q.    Okay.  And state?

15              A.    At least -- I mean, a lot during

16     that time period, too.  It wasn't many years,

17     but it was a lot.  At least 100.

18              Q.    The work that you did with the

19     DEA, would all of that -- I shouldn't put it

20     that way.  But did most of the work that you did

21     there go to a federal grand jury as opposed to a

22     state grand jury, or were there also state grand

23     jury cases that you worked on during your time

24     at the DEA?

25              A.    While I was at the DEA, basically
```

95

```
1    all -- I don't really remember any state grand
2    jury -- testifying in state grand jury.  It was
3    all federal grand jury.
4         Q.    Okay.
5         A.    We always want to go with a
6    federal case being a federal agency.
7         Q.    So your state grand jury
8    experience would be limited to the time that you
9    were a Newark Police Department detective?
10        A.    I was very busy.
11        Q.    Okay.  Did any of the testimony
12   that you proffered to state grand juries involve
13   violations of the state or federal Controlled
14   Substances Act?
15             MR. BARNES:  I'm going to
16             interpose an objection.  I'm a former
17             AUSA, and I want to remind the witness
18             of grand jury secrecy rules.  You're not
19             to disclose anything that occurred in
20             any way before a federal or state grand
21             jury.
22        Q.    Yeah.  And I'm not looking for the
23   meat of the matter.  I'm simply looking to know
24   whether or not any of the testimony you
25   proffered related to violations of the state or
```

96

1    federal CSA.

2              MR. BARNES:  Again, that would

3         disclose grand jury material.

4              MR. YOUNG:  You're instructing him

5         not to answer?

6              MR. BARNES:  Yes, I am.

7              MR. YOUNG:  Okay.

8              MR. KOBRIN:  Just as to grand

9         jury.  So you can go on to other things

10        related to investigations, but things

11        behind the doors of a grand jury.

12   BY MR. YOUNG:

13        Q.    Yeah.  So the cases that you

14   worked which went to the grand jury that

15   resulted in convictions or plea deals that are

16   now closed, did any of those involve violations

17   of the state or federal Controlled Substances

18   Act?

19              And, again, I don't want to know

20   about the grand jury testimony.  I want to know

21   about the cases that you worked that resulted in

22   convictions or plea deals.

23        A.    Going to state grand jury or

24   federal grand jury?

25        Q.    State.

97

```
 1              A.   It wouldn't -- none of the state

 2    stuff would have federal acts.

 3              Q.   And I don't know if New Jersey has

 4    a state controlled substances law like Florida

 5    and other states do.

 6              A.   No.  It's just drug law.

 7              Q.   Okay.  So with regard to the

 8    federal grand juries -- again, I don't want to

 9    know anything you proffered to the federal grand

10    jury.  I simply want to know, of those cases

11    that resulted in convictions or plea deals, did

12    any of those involve violations of the CSA, or

13    Controlled Substances Act?

14              A.   Regarding grand jury testimony, I

15    testified in --

16              MR. KOBRIN:  Again, just talk

17         generally about the cases, the federal

18         cases.  I think the grand jury can be

19         taken out of it, if that's okay.

20              MR. YOUNG:  Yeah.  It's probably

21         the cleaner way to do it.

22    BY MR. YOUNG:

23              Q.   So disregard grand juries.

24              A.   Okay.

25              Q.   Of the cases that you worked that
```

98

1    resulted in convictions or plea deals while at

2    the DEA, how many of those, if you recall,

3    involved violations of the federal Controlled

4    Substances Act?

5            A.    At least a couple dozen.

6            Q.    And those would be the same cases

7    that you referred to earlier as the diversion

8    cases?

9            A.    Yes.  That's what we want, all CSA

10   stuff.  We just in general call it "diversion

11   cases."

12           Q.    Were there any non-diversion cases

13   that you worked on at the DEA that involved

14   violations of the CSA?

15           A.    Yes.

16           Q.    Okay.  What are those instances?

17               MR. KOBRIN:  And, again, same

18           warning regarding confidential nonpublic

19           information.

20           A.    Regarding the instances?  I can't

21   really -- a lot of them are ongoing-type cases,

22   so I -- I mean, we kind of briefly touched on

23   this earlier regarding -- in general the cases

24   regarding the independent pharmacies and the

25   doctors, the dirty doctors.  Those were in

99

1    general what the cases were, and there was about

2    a couple dozen of them.

3         Q.   Are there dirty doctor, as you

4    described it, cases that you can talk about that

5    the matters are closed and no longer pending?

6         A.   I'm not sure, because -- I mean, I

7    don't know if they've closed while -- I mean, I

8    haven't been gone that long, but some could have

9    closed while I have been gone.  Some might still

10   be going on.

11        Q.   Your tenure with the DEA began in

12   2005, some 14 years ago.

13             Do you recall in 2005 or 2006

14   working on any dirty doctor cases at the DEA?

15        A.   Within a couple years of being an

16   agent, I was working -- I'm going to say the

17   first one was -- it was an independent pharmacy.

18        Q.   And just -- I understand there's

19   some limitations.  You don't want to get into

20   the confidential nature of these kinds of cases.

21             But generally, when you say an

22   independent pharmacy case that you worked on,

23   describe for me the type of conduct that such a

24   pharmacy would engage in that would rise to the

25   level of criminality for the DEA to investigate.

1           MR. KOBRIN:  Object to form.

2           A.    In general, a pharmacy that we

3    would have information is basically doling out

4    opiates at -- fake prescriptions or with no

5    checks, or they're not -- you know, they're not,

6    you know, living up to their end of the CSA or

7    CFRs or anything, so super-high volumes that

8    just aren't commensurate with what they should

9    be doing based on the size of the store.

10          Q.    Did you receive some specialized

11   training to give you insight into some of the

12   factors that you just described, like the

13   relationship of the size of the store to the

14   volume of the sales of controlled substances?

15   How did you know to make sense of the relevance

16   of the size of the store compared to the size of

17   the sales volume?

18          MR. KOBRIN:  Object to form.

19          A.    We received training in general --

20   I mean, that area is pretty broad in the CFR,

21   but it's -- a lot of it is through experience

22   after the training or with working with

23   different investigators that have been doing it

24   for years, or other agents.

25          Q.    When you say "investigators," do

1    you mean people from the Office of Diversion

2    Control?

3           A.    Yes.  Within each office, division

4    office, there are diversion investigators.

5           Q.    So when you first began working on

6    cases involving diversion, were you -- I'm going

7    to say "trained."  I don't know what the right

8    term of art is in law enforcement, but I would

9    call it trained by those investigators or

10   instructed or kind of read in by the

11   instructors, or was there some other way that

12   you learned how to do a diversion case?

13                MR. KOBRIN:  Object to form.

14          A.    Well, you learn how to do an

15   investigation at the academy.  Investigation is

16   investigation, whether it's a diversion

17   investigation, an investigation into money

18   laundering, investigation into Pablo Escobar.

19   Investigation is investigation.  They all

20   basically do the same kind of steps to do it.

21                So I was doing investigations with

22   the DEA before I became an agent.  So I was

23   trained with on-the-job training.  And then I

24   went to the academy and they trained me even

25   further.  And then you come out of the academy

1    and you're placed with another agent, senior

2    agent, who trains you even more.

3              And then you -- basically, you

4    learn something new every day.  And through

5    experience of other people, you learn things

6    regarding the matters you're talking about,

7    regarding volumes of a store or different

8    specifics.

9         Q.    So how did you find out what the

10   volume of sales was from a given suspicious

11   pharmacy?  Where do you get that information?

12             MR. KOBRIN:  Object to form.

13        A.    That was -- I can't -- I can't --

14   in general, where can you get that?

15             MR. KOBRIN:  I'm going to warn you

16        again, don't give away any kind of

17        investigative techniques that are

18        otherwise not public.

19        Q.    Are there investigative techniques

20   regarding the sales volume of pharmacies that

21   are nonpublic?

22             MR. KOBRIN:  That's a "yes" or

23        "no."

24        A.    Well, I mean, there's databases

25   that are utilized.

1          Q.     Let me simplify it.

2                 Was the source of information that

3     you used to determine the sales volume of

4     particular pharmacies the ARCOS database?

5          A.     I -- I specifically -- mine came

6     from other ways.  It wasn't the ARCOS database.

7          Q.     These other ways that you're

8     describing, are these nonpublic things that you

9     can't describe?

10         A.     It's not -- it's not any database.

11         Q.     Okay.  So you -- I think you

12    testified earlier that in most of these

13    diversion cases, an informant is what led you to

14    open the investigation and begin the

15    investigation, right?

16         A.     That's used a lot.  Some

17    investigations come through informants,

18    cooperating defendants, or other law enforcement

19    agencies giving you the lead.

20         Q.     Were any of the informants able to

21    give you sales volume information about these

22    suspicious pharmacies or physicians?

23         A.     They can't give exact information

24    like -- like the ARCOS database that you

25    mentioned earlier, but you could -- you could go

```
 1    yourself to, let's say, a pharmacy and see a

 2    line around the corner and all day long, and

 3    it's just abnormal.  Then you'd investigate from

 4    there.

 5              I mean, investigation has a whole

 6    bunch of parts.  You know, you have to build

 7    your probable cause.  So you add, you know,

 8    that's -- that's -- you know, that's not --

 9    doesn't look right, and then this doesn't look

10    right.

11              And then you might use other

12    techniques to gain information, you know, and

13    you start adding everything together, and then,

14    you know, you form your investigation and you go

15    further.

16         Q.   Why would a line of people around

17    the corner outside a pharmacy be suspicious

18    or -- I can't remember the word that you used,

19    but --

20         A.   Well, if they're all obviously

21    high, then it's pretty suspicious.

22         Q.   How do you know if the people are

23    high?

24         A.   That's through a lot of training

25    and experience I've had.  If you're an
```

```
 1   inner-city police officer for a bunch of years,

 2   you could tell if someone is high or not.

 3          Q.    Could you drive up to any pharmacy

 4   and if there was a line outside, would you be

 5   able to, in light of your skills and experience

 6   and training, discern that the customers waiting

 7   in line were drug-seeking customers?

 8               MR. KOBRIN:  Object to form.

 9          A.    I mean, if they're basically in a

10   zombie-like stupor and falling over like certain

11   pharmacies that we've investigated, then, yes,

12   you can tell.  You can't tell every person who's

13   a drug seeker just by looking at them.  But

14   there are some obvious signs for people who are

15   hardcore addicts.

16          Q.    Are there other what I would call

17   "indicia" or symptoms of suspicion for a

18   pharmacy other than the line out the door?  What

19   are the other things you would look for to

20   identify a suspicious pharmacy?

21               MR. KOBRIN:  Object to form, and

22               the same warning as earlier regarding

23               investigative techniques.

24          A.    Yeah.  I don't know if I can get

25   into a lot of that because it's a lot of stuff
```

```
 1    they teach down at Quantico that they don't

 2    really want us describing.

 3              Q.    I understand.

 4                    Would a high prevalence of

 5    out-of-state license plates be a warning sign or

 6    an indicia of suspicion to you at a pharmacy?

 7                    MR. KOBRIN:  Object to form.

 8              A.    Sure.  That would be another thing

 9    that you can key on.

10              Q.    Why is that?

11              A.    Because usually you don't travel

12    out of state to go to a pharmacy if -- basically

13    every place has a neighborhood pharmacy, at

14    least one.

15              Q.    What about a high percentage of --

16    not necessarily out-of-state license plates, but

17    prescriptions coming from out of state, so the

18    people may be from in state but the

19    prescriptions may be from another state?  Would

20    that be a symptom to you?

21                    MR. KOBRIN:  Object to form.

22              A.    It could be indicative, but the

23    person could also be on vacation.  I mean,

24    it's -- as I said, with an investigation, you

25    have to kind of look at everything and then form
```

1   an opinion based upon everything you see.  You

2   know, each thing builds on the next.  But that

3   would be something that you'd look at.

4          Q.    Did you ever assess the percentage

5   of controlled substances as a function of the

6   total number of prescriptions for a given

7   pharmacy that you were investigating?

8                 MR. KOBRIN:  Object to form.

9          Q.    In other words, a pharmacy

10  dispenses lots of drugs, not just controlleds,

11  right?  When you were doing your investigations

12  into diversion, did you consider that as a

13  factor, that it had a high ratio or percentage

14  of controlleds among all prescriptions?

15         A.    A high ratio of controlleds

16  compared to everything else?

17         Q.    Yes.

18         A.    That's not necessarily -- it can

19  be indicative, but that doesn't necessarily mean

20  anything.  As long as there's valid

21  prescriptions, then that's just -- it could be

22  right next to a pain clinic.  So, you know, you

23  don't know.

24                 But it all depends on, as I said,

25  the circumstances.  And I wouldn't necessary --

1    when we're doing a diversion investigation,

2    we're looking for diversion.  So we go right at

3    what's being diverted and prove whether or not

4    it was or not and go from there.

5         Q.    So my question was simply whether

6    or not that was a factor that you considered in

7    any of your investigations into diversion, the

8    percentage or the ratio of controlleds to total

9    prescriptions.  Is that not something you ever

10   looked at?

11        A.    That wasn't something that was

12   germane to any of the cases I did.

13        Q.    How about the percentage of

14   customers who pay in cash?  Would that be

15   relevant to a diversion investigation?

16        A.    That would be a flag for a

17   pharmacist.

18        Q.    Is that something that you looked

19   at or considered in any of your diversion

20   investigations, the number of cash-pay

21   customers?

22        A.    Not necessarily.  It was more

23   making sure that there was legitimate

24   prescriptions and controls in place, but that --

25   that would be a flag that a pharmacist should

109

1    look into.

2         Q.    Are there guidelines that the DEA

3    uses, if you know, as to what an acceptable

4    percentage of cash-pay prescriptions would be?

5         A.    I don't know.

6         Q.    There's not like a Mendoza Line of

7    cash pay?

8         A.    There might be.  That's just --

9    wouldn't be germane to what I'm doing, really,

10   so ...

11        Q.    Okay.  How about the prevalence of

12   a single prescriber among all controlled

13   prescriptions for a given pharmacy?  In other

14   words, if a pharmacy has a lot of controlleds

15   going out the door and they're all related to a

16   single provider, would that be a sign of some

17   suspicion for you?

18        A.    That -- that would definitely be

19   something we would look at.

20        Q.    Is that something that you did

21   look at or consider in any of the diversion

22   investigations you conducted at the DEA?

23        A.    It did come into some cases

24   regarding doctors and pharmacies.

25        Q.    And in your experience, have you

1    found close relationships between doctors and

2    pharmacies in the cases in which you've

3    investigated diversion?

4            So in your diversion cases which

5    involved bad pharmacies, did you find that those

6    pharmacies had close relationships with, you

7    know, the big writing prescribers?  And,

8    correspondingly, when you were investigating bad

9    doctors, did you find that those doctors had

10   particular cozy relationships with particular

11   pharmacies?

12           MR. KOBRIN:  Object to form.

13       A.    Yes, that does come into play.

14   There's a lot of relationships between dirty

15   doctors and dirty independent pharmacies.

16       Q.    And I know we touched on this

17   before, but I just want to make sure I cover it.

18           Did you -- in the two dozen or so

19   diversion cases you've mentioned, did you ever

20   investigate to determine whether or not the

21   supplier of the pharmacy, or to the extent that

22   there were physicians dispensing an office in

23   New Jersey -- I don't know if that ever happened

24   here or not, but it did in Florida -- that the

25   supplier of the pills to your targets was

1    complying with their obligations under the law?

2              MR. KOBRIN:  Object to form.

3         A.    That information would be sent to

4    different officers or agencies -- I mean,

5    different offices to follow up on.

6         Q.    Which offices would that go to?

7         A.    It could go to the Office of

8    Diversion Control.  It could go to -- if we

9    found out that it was being shipped from Ohio,

10   we might call the Ohio office, "Hey, we got this

11   at a pharmacy.  You might want to look into this

12   distributor, or at least make sure that their

13   controlleds are proper at least regarding this

14   pharmacy."

15        Q.    Are there any other federal

16   agencies besides the Office of Diversion Control

17   within DEA that you would, I would just say,

18   share information with or report your suspicion

19   of a bad supplier or a supplier that wasn't

20   complying with its regulatory obligations?

21             MR. KOBRIN:  Object to form.

22        A.    Within DEA, it would be -- it

23   might be the main headquarters office, or it

24   could be -- that would be the Office of

25   Diversion Control so that they could funnel it

```
 1    out to -- it might be an agent or a diversion

 2    team investigator agent that is investigating

 3    that specific person or distributor or whatever,

 4    and then that would be information for them in

 5    their case.

 6            Q.    But that's not something that a

 7    non-diversion control special agent would look

 8    into?

 9            A.    Anyone who would have a case on

10    that specific entity that we found information

11    on.  Because, as I said, all agents -- agents

12    have cases in diversion.  Whether you're in a

13    diversion group or a non-diversion group, you

14    still have diversion cases.

15                So I might -- I might be somewhere

16    and I have a case on some manufacturer, and I

17    would get leads from other offices, "Hey, I got

18    this.  I arrested this person, and it's coming

19    back to your target."

20            Q.    So a manufacturer could be

21    investigated by special agents within the DEA

22    outside of the Office of Diversion Control?

23            A.    Agents can investigate any --

24            Q.    Okay.

25            A.    -- anyone and anything that -- as
```

```
 1    long as it's within our scope.
 2            Q.   Do you know during your tenure
 3    with the DEA whether or not any non-diversion
 4    control special agents investigated any
 5    manufacturers?  I don't need to know the
 6    manufacturers' names.  Just generally.
 7                 MR. KOBRIN:  To the extent that it
 8            wouldn't violate any nonpublic
 9            information or release any confidential
10            information.
11            A.   Any investigation that's done is
12    going to be done by an agent.  It's criminal.
13            Q.   Yeah.
14            A.   Which would be diversion.  So
15    anything that's diversion is going to be
16    criminal, and it's going to be handled by an
17    agent.  So I don't know specifically -- I don't
18    have -- I'm not -- I'm not down in operations or
19    anything in headquarters, so I don't know who
20    has what case.
21            Q.   And I guess what I'm trying to
22    discern is where the sort of front of the house
23    and back of the house are separated.  And my
24    understanding until today was that manufacturers
25    and distributors were investigated by the Office
```

114

1    of Diversion Control, that they had the primary

2    oversight for those entities.

3           A.    That's their primary focus, but

4    any agent can do the investigation.  In fact,

5    once it's criminal, it has to be done by an

6    agent, whether that's an agent that works

7    specifically under the umbrella -- because it's

8    one house.  We're just one house.  It's not

9    really split --

10          Q.    Yeah.

11          A.    -- because we overlap.  One day I

12   could be in HIDTA Group 1.  Next day I could be

13   in Tactical Diversion Squad 7.  You know,

14   it's -- and you're expected to jump out of that

15   group and run in in that group and go.

16          Q.    I gotcha.

17                But you personally have not had

18   occasion to investigate a manufacturer for

19   diversion, right?

20                MR. KOBRIN:  Same warning.

21          A.    Well, the most I could say is a

22   lead was sent on a case regarding a

23   manufacturer.

24          Q.    A lead was sent to you, or you

25   sent a lead to someone?

115

```
 1              A.    A lead sent to someone else.

 2              Q.    Yeah.  And that's sort of my

 3     point, is there's someone else who's supposed to

 4     do those investigations, right?

 5                    MR. KOBRIN:  Object to form.

 6              A.    Well, if there's a major

 7     manufacturer in Jersey and I happen to get good

 8     information, I could open the case and I could

 9     be the person getting the leads from Ohio, from

10     Jacksonville, Florida, from wherever.  So I mean

11     it's ...

12              Q.    Sure.  And I understand that you

13     can, that that is a possibility under the ambit

14     of the regulations and authority that the DEA

15     has generally.

16                    But I'm asking more practically.

17     When information is produced that suggests a

18     violation of the CSA by a manufacturer, which

19     entity or which arm of the DEA is the one that

20     investigates that?  Is it the special agents

21     that are doing criminal investigations, or is it

22     the Office of Diversion Control?

23                    MR. KOBRIN:  Object to form.

24              Asked and answered.

25              A.    Basically whoever got the
```

116

 1    information.  Whoever has the case open.

 2             Q.    So in a hypothetical, if you

 3    received information from an informant that a

 4    New Jersey-based manufacturer -- we'll call them

 5    Drug Corp -- that Drug Corp was overshipping and

 6    not complying with the CSA, that's something

 7    that you would take on yourself and you would

 8    investigate?

 9             MR. KOBRIN:  Object to form.

10             Q.    Yes?

11             A.    Yes.  It's not -- like, if you're

12    trying -- we don't have to give it to, let's

13    say, Diversion Group 4 or something like that.

14             Q.    Right.

15             Again, my question isn't whether

16    you have to or not, but what the protocol is,

17    right?  Like what the reality would suggest.

18             A.    The reality with the DEA is if you

19    come up with the information and you're starting

20    a case, that no one else is using that specific

21    target or is targeting that specific entity,

22    whether it's a manufacturer, distributor,

23    pharmacist, doctor, it's your case.

24             Q.    Okay.

25             A.    It doesn't matter whether you're

117

 1   in whatever group.

 2        Q.    I asked you about you conducting

 3   investigations into manufacturers for CSA

 4   violations.  I think I previously asked you, but

 5   I just want to clarify.

 6             Did you have occasion to

 7   investigate violations of the CSA by

 8   distributors?

 9             MR. KOBRIN:  Object to form.

10             Same warning.

11        A.    I mean, it's -- it was another

12   thing with the lead going somewhere, because I

13   didn't have the open case on that.  That's about

14   as much as I can say.

15        Q.    Okay.  Back to your resum  just

16   briefly.

17             You list these expert areas.  It

18   says, "My expertise is in the following areas."

19   And, again, it goes "active shooter" through

20   "witness."

21             Which areas within here would you

22   say relate to the work that you did in this

23   case?

24        A.    Anything with drug investigations.

25        Q.    Okay.  So there's -- beginning at

1    DEA is where drugs start, right after that.

2                So would drug abuse be part of the

3    work that you did in this case?

4        A.    A lot of the diverted drugs go to

5    the abusers, so technically, yes.

6        Q.    Okay.  Drug enforcement?

7        A.    Yes.

8        Q.    Drug identification?

9        A.    That's -- I mean, to know the

10   difference between the different opiates, to

11   that extent.

12       Q.    That didn't form part of the work

13   that -- or opinions that you rendered in this

14   case?

15       A.    To the point that you need to know

16   about opiates, opioids, Schedule II,

17   Schedule III.  So --

18       Q.    And then --

19            MR. KOBRIN:  He's saying it did.

20            And your question was it didn't, so I

21            think -- I'll object to form, but I just

22            wanted to set the record straight that

23            he suggests it did inform his expertise

24            in this case.

25            MR. YOUNG:  Yeah.  With the caveat

1          that it was -- he provided.

2    BY MR. YOUNG:

3          Q.    The next one is drug

4    investigations?

5          A.    Yes.

6          Q.    And that has a parenthetical

7    following it which says "domestic and

8    international."

9               Is there anything international

10   drug investigation-related that you did

11   involving this case?

12         A.    In this case, no.

13         Q.    Drug trafficking.  Does that

14   describe part of the work that you did in this

15   case?

16         A.    No.

17         Q.    Smuggling?

18         A.    No.

19         Q.    Okay.  If you want to take a

20   minute and just look.  I didn't see any other

21   ones in here that were relevant.

22              Oh, I'm sorry.  There is one.

23   Pharmaceutical diversion in the Ps.  It's done

24   alphabetical.

25         A.    Yeah.  Yes.  The answer to that

120

1   would be "yes."  Yes, it would.

2          Q.    Okay.  Let me just take a quick

3   look at my little cheat sheet and make sure I've

4   got all my little boxes checked.

5               Do you recall the approximate date

6   in which you were retained -- and I don't know

7   if that was -- if you got a notice through TASA

8   or an e-mail or something, but when you were

9   actually retained as an expert in this case?

10         A.    In March, early March, probably

11  second week of March.

12         Q.    And do you know how many total

13  hours -- I know we talked about 100 hours that

14  have been paid so far.

15              Do you know how many total hours

16  you've put in on this case?

17         A.    It's approximately -- there's a

18  lot of records, a lot of depositions.  I'm a

19  one-man crew.  Probably in the area of

20  400 hours, a significant amount of hours.

21         Q.    You have outstanding bills to TASA

22  for the other 300?

23         A.    Yes.

24         Q.    Any sense in terms of forecasting

25  the future how much additional time you plan to

1    put into this engagement?

2          A.    After the deposition, I mean,

3    unless I'm needed for something else.

4          Q.    So there's no continuing

5    engagement after today's deposition with the

6    exception of trial testimony?

7          A.    As far as I know.

8          Q.    And just to clarify again, you

9    were engaged through TASA.  You had no prior

10   relationship or knowledge of either the

11   defendant who engaged you or the law firms that

12   are representing them?

13         A.    No, I didn't.

14         Q.    How did you come up with your rate

15   of 200 an hour?  Did your wife give you any

16   input in that?

17              MR. KOBRIN:  Object to form.

18         A.    I think I kind of looked on the

19   Internet for general ranges.  I spoke to people

20   in TASA as to what the witnesses with my

21   experience might charge.

22              Since I was a beginner, at least

23   this specific -- even though I have a multitude

24   of experience, but just starting off as an

25   expert witness, I started my rate at the low

122

```
 1    end.

 2            Q.    Do you plan on raising it sometime

 3    soon?  After this case maybe?

 4                 MR. KOBRIN:  Object to form.

 5            A.    It would be nice, yeah.

 6            Q.    Depending on the outcome?

 7                 MR. KOBRIN:  Object to form.

 8                 MR. YOUNG:  Withdrawn.  Withdrawn.

 9          Just a joke.

10                 MR. KOBRIN:  Don't answer that.

11                 MR. YOUNG:  Just a joke.

12    BY MR. YOUNG:

13            Q.    How about professional

14    organizations?  Other than TASA, which is, I

15    guess, a network to engage you, are you a member

16    of any type of expert witness organizations?

17            A.    No, I'm not.

18            Q.    How about retired law enforcement

19    organizations?

20            A.    At one time I was a member of the

21    Fraternal Order of Police.

22            Q.    Not currently?

23            A.    Not currently.  I mean, that was

24    when I was a Newark police officer.  Because a

25    federal agency can't have a union.  Apparently
```

123

 1     it's a -- against the law for us to have a

 2     union.  But I -- so I retained my membership

 3     with them, but then as the years went on, there

 4     was no reason to.

 5             Q.    And I noticed you're wearing a

 6     lapel pin today.  Is that a DEA agent badge?

 7             A.    Well, it's the agent badge.  It's

 8     the Survivor Benefit Fund.  It's basically a

 9     fund that goes for the families of agents killed

10     in the line of duty.

11             Q.    Do you -- I know you mentioned on

12     your resum  that you do quite a bit of volunteer

13     work.  Is that one of the entities that you do

14     volunteer work for?

15             A.    No.  I do local things around

16     where I live.

17             Q.    Do you have a different CV that

18     you use or that you put out to the public to

19     market yourself other than the one that you've

20     shared with us today?

21             A.    No.  This is the only one I have.

22             Q.    Okay.

23             A.    Should I do a new one?

24             Q.    Home stretch here, I promise.

25                   When you were engaged through

124

```
 1    TASA, walk me through the process of that

 2    engagement.  You received, what, an e-mail from

 3    them or a phone call?

 4         A.    I received an e-mail asking to

 5    give them a call.  I called them up.  They

 6    briefly described what the case was, asked if I

 7    had -- you know, if I thought that that would be

 8    a case that I'd be able to help with or be able

 9    to work on or have any expertise with.

10              I said, "Yes."  Then my name was

11    then forwarded to the law firm, and then I was

12    contacted by them, the law firm.  Bob, actually.

13    And then they spoke to me, and basically

14    interviewed my background, and then --

15              MR. KOBRIN:  Don't get too much

16         into your communications that would have

17         led to the information in forming your

18         report.

19              THE WITNESS:  Okay.

20    BY MR. YOUNG:

21         Q.    How many times did you speak to

22    the law firm?  Just the one?

23         A.    Before I was retained?

24         Q.    Yes.

25         A.    Once on the phone, and then I came
```

1    out to meet with them so that they could -- a

2    bunch of different lawyers spoke to me to make

3    sure that I had the proper expertise.

4           Q.    Was that here in Pittsburgh?

5           A.    I think I was sitting in that seat

6    (indicating).

7           Q.    It was in this room that we're in

8    now?

9           A.    Yes.

10          Q.    Okay.  Other than this law firm,

11   have you spoken to other law firms about your

12   engagement in this case?

13          A.    I haven't talked to anyone else

14   regarding this case besides my lawyers here and

15   you right now.

16          Q.    Have you spoken to any employees

17   for the defendant who you're opining on their

18   behalf?

19          A.    No.

20          Q.    Did you propose a scope of

21   services to the law firm, or did they propose a

22   scope of services to you?

23                MR. KOBRIN:  Object to form.

24          Q.    Do you know what I mean by "scope

25   of services"?

1          A.     Well, they had me explain my

2     entire background, my experience.  And then they

3     made a determination amongst themselves as to

4     whether or not my experience and expertise would

5     actually be good enough for the case to be an

6     expert or not.

7          Q.     But in terms of your approach to

8     this engagement, what you did and how you built

9     your report, did you propose that to the law

10    firm, or did the law firm propose that to you?

11              MR. KOBRIN:  Object to form.

12         A.     How I did my report?

13         Q.     Well, how you went about your work

14    in this case, right?  Obviously you weren't

15    involved in the case to begin with, so you

16    didn't know what information there was out

17    there, right?

18         A.     Oh, correct.  Yes.

19         Q.     So they provided you with

20    information?

21         A.     A lot of information, yes.

22         Q.     How much information would you say

23    you've reviewed in page count, if you could

24    estimate?

25         A.     I can't tell you how many

127

```
 1    thousands of pages.  They give me all the --
 2    basically everything in the back here,
 3    everything in the back.  It's full depositions,
 4    two-day depositions, and, you know, video
 5    depositions, and then all the different manuals
 6    and -- you know, the stuff that's listed in the
 7    back.  There's a lot of records.
 8            Q.    And you're referring to, I
 9    believe, Appendix B to Exhibit 2 of your
10    deposition?
11            A.    Correct.
12            Q.    That's the list of the materials
13    that you relied upon in forming your report?
14            A.    Correct.
15            Q.    Section 2, "Documents Produced in
16    This Litigation," the first item there is called
17    the "Diversion Investigators Manual."
18                  You reviewed that in preparation
19    for your report, right?
20            A.    Correct.
21                  MR. KOBRIN:  Object to form.
22            Q.    Is that the first time that you
23    reviewed that "Diversion Investigators Manual"?
24            A.    I've seen the manual before.
25            Q.    When you say "seen" it, you mean
```

128

```
 1    you've read it, or just seen it on someone's

 2    desk?

 3         A.    I haven't read it -- I didn't read

 4    it cover to cover, but I reviewed parts of it.

 5    Plus, after a while, the DEA went to electronic

 6    forms, so you really -- if you needed any

 7    information regarding anything that's either out

 8    of the diversion manual, agent manual,

 9    operations manual, you type it into the Internet

10    search, and it would come up with whatever, and

11    it would be right on your screen.  So you really

12    didn't need the manuals after that.

13         Q.    But when you referred to the

14    physical manual, not the electronic version,

15    what -- to the extent you recall, what were the

16    occasions which caused you to consult the

17    "Diversion Investigators Manual"?  Were those

18    diversion investigations you were working on?

19              MR. KOBRIN:  Object to form.

20         A.    Basically since I was expected to

21    be able to do diversion cases, I -- you know,

22    it's always good to be as well rounded as you

23    can.  So I'd review different manuals and see if

24    there's any updates, because the manuals would

25    be updated.  There's always new things coming
```

1    out, things to look for.  I really can't get

2    into what's -- a lot of stuff is redacted.  I

3    can't really talk about it.

4            Q.    So did you have access to a

5    physical copy of the "Diversion Investigators

6    Manual" at your workplace?

7            A.    I could -- I could have gotten one

8    in hand at any time if I wanted, but it's a lot

9    easier on the computer.

10           Q.    Yeah.

11                 So before you had the computer

12   access, there was a sort of binder or manual

13   that was available for you to use?

14           A.    I think they just gave that out

15   of -- they always gave those out.  It was always

16   on the intranet system since the day I was even

17   a task force officer.  You could look stuff up.

18           Q.    How about number 2, "Legal

19   guidance on reporting suspicious orders pursuant

20   to 21 CFR 1301"?  Had you seen that before this

21   engagement?

22           A.    That specific memorandum, no, I

23   did not.

24           Q.    Okay.  How about the "Chemical

25   Handler's Manual" dated January 2004?  Is that

1    something that you've previously seen?

2            A.    I saw a "Chemical Handler's

3    Manual" back when I was in emergency management,

4    because we had a lot of different things that we

5    had to deal with in emergency management

6    regarding chemicals.  But a lot of that

7    "Chemical Handler's Manual" from 2004 would have

8    been after, because that's a revision, and

9    that's more about Sudafed and making meth and

10   all that.

11           Q.    Okay.  Subchapter 514 "Quotas,"

12   types of quotas, that looks like it also cites

13   to the "Diversion Investigators Manual."  Is

14   that something that you would have seen before?

15           A.    I knew about quotas, but I didn't

16   specifically see that, no.

17           Q.    How about the next one,

18   Chapter 51, "Policy and Interpretations"?

19           A.    Same thing.

20           Q.    Okay.

21           A.    I mean, I knew about quotas,

22   but ...

23           Q.    I assume number 6, same thing.

24   Quotas again?

25           A.    Exactly.

1          Q.     How about number 7,

2    Appendix 5311A, "Requirements to Report

3    Suspicious Orders"?  Was that the first time you

4    had seen that appendix?

5          A.     That specific appendix, yes.  But

6    we knew according to the CFR, that you had to

7    report suspicious orders; 106 form, DEA

8    Form 106.

9          Q.     And the next one, it seems to be a

10   subset of that.  So I assume same answer?

11         A.     Yes.

12         Q.     And 9 and 10 seem to be similar in

13   their scope.  It's coming from the "Diversion

14   Investigators Manual."  These are the 5126,

15   "Requirement to Report Suspicious Orders."

16              Was this the first occasion that

17   you had to look at those specific documents?

18         A.     These specific ones.  I know I've

19   probably seen versions of them in the electronic

20   form, though.  But, I mean, a lot of this stuff

21   that we dealt with was actual diversion.

22   Suspicious orders aren't necessarily diversion.

23   So it's -- you know, when we got to it, it was

24   most likely a diversion-type criminal matter.

25         Q.     You also have some statutory and

132

```
1    regulatory materials that you reference at the
2    end.  Were these -- let's take the first one,
3    21 CFR 1301.71.  Is that something that you
4    would have reviewed during your time and tenure
5    with the DEA?
6            A.    In general, you're supposed to
7    know about the security requirements.
8            Q.    Yeah.  I just wasn't sure, you
9    know, if -- those are sort of the laws that
10   you're investigating.  I didn't know to what
11   extent you're actually going and reading the
12   laws, you know.
13           A.    You're expected --
14                 MR. KOBRIN:  Object to form.
15           A.    You're expected to know them.  So
16   you should at least review them.
17           Q.    The same with Section 801?
18           A.    Yeah, 21 USC, yes.  It's 801.
19           Q.    So after your -- jumping back to
20   your leaving the DEA, after your first surgery,
21   your first spinal fusion, did the follow-up care
22   involve prescription opioids for pain relief?
23           A.    After surgery, yeah.
24           Q.    Do you remember the particular
25   brand and dosage of the prescription you
```

1    received?

2              MR. KOBRIN:  Object to form.  This

3         is well beyond the scope.

4         Q.   Go ahead.

5         A.   The exact brand and dosage?  I

6    know it's --

7         Q.   If you recall.  If you don't

8    recall ...

9         A.   I know it was probably -- I don't

10   really remember.  I mean, that was six --

11   probably Percocets or something.  I'm not

12   exactly sure.

13        Q.   Do you know where you got the

14   prescription filled?

15             MR. KOBRIN:  Object to form.  Same

16        objection.

17        A.   CVS Pharmacy.

18        Q.   Is that where you typically get

19   your prescriptions filled?

20        A.   Either there or the Wegmans

21   Pharmacy -- they're right by my house.

22        Q.   And you mentioned that you had

23   several surgeries.  Did you receive follow-up

24   prescriptions for opioids for pain control after

25   each of those surgeries?

134

```
 1                    MR. KOBRIN:  Object to form.

 2          A.    For -- yeah, you always -- each

 3   surgery they gave at least a prescription for

 4   some form of pain medication.

 5          Q.    You're not currently taking pain

 6   medication?

 7          A.    Not -- no.

 8          Q.    But you are in some level of pain

 9   from your back surgeries?

10          A.    It hurts right now, yeah.

11          Q.    You've never faced any personal

12   addiction issues with opioids, have you?

13          A.    No, I have not.

14          Q.    How about any family members?  Any

15   family members --

16                    MR. KOBRIN:  Object to form.

17          Q.    -- face any addiction issues?

18          A.    With opioids, no.

19          Q.    As part of your volunteer work,

20   you mentioned a bunch of charitable

21   organizations.  Anything relating to opioids or

22   addiction in your charitable work?

23          A.    No.

24          Q.    You know, like church-based groups

25   or things like that?
```

1        A.    No.  It's like Monmouth County

2    SPCA.

3              (Reporter clarification.)

4        A.    Monmouth County SPCA.  I like

5    animals.

6              MR. YOUNG:  Let me take a look at

7         my notes real quick, and I think that

8         will wrap it up.  Yeah, let's go off.

9              THE VIDEOGRAPHER:  Going off the

10        record at 11:55 a.m.

11             (Recess taken.)

12             THE VIDEOGRAPHER:  We're back on

13        the record at 12:02 p.m.

14    BY MR. YOUNG:

15        Q.    So just a few things to follow up

16    on, and then we'll wrap up.

17             Do you have any plans currently to

18    use demonstratives if you were to testify at

19    trial?  Do you know what I mean by

20    "demonstratives"?  Poster boards or a PowerPoint

21    presentation, anything outside of your report?

22        A.    I don't have any prepared.

23        Q.    Okay.  Page 2 of your report,

24    which is Exhibit 2 to your deposition, has a

25    summary of your conclusions, and they're

136

```
 1    lettered A through E.  We don't necessarily have

 2    to read through or walk through them now.

 3                But as you sit here today, are all

 4    of these opinions still your opinions, or have

 5    you changed or modified your opinions in any

 6    way?

 7         A.    No.  These are still my opinions.

 8         Q.    And the basis for your opinion is

 9    found either in the report that you've prepared

10    or in the supporting materials that you've

11    referenced and nowhere else, right?

12         A.    Or my experience and training.

13         Q.    Sure.  Which isn't specifically

14    listed, but, yeah, that's one of the things --

15         A.    I guess it's in the actual resum ,

16    CV, so ...

17         Q.    You have no corrections to make of

18    your report?  Any inaccuracies or recently

19    discovered -- I think your counsel mentioned --

20                MR. KOBRIN:  Yeah, I was going to

21         say.

22         Q.    -- one missing reference to maybe

23    an Endo deposition?

24                MR. KOBRIN:  The Bencivengo

25         deposition is not in the --
```

```
 1                (Reporter clarification.)

 2                MR. KOBRIN:  The Bencivengo --

 3           Fred Bencivengo's deposition is not

 4           listed, and I think there are two

 5           depositions which Mr. Greimel cited in

 6           his footnotes but are not included in

 7           the --

 8                MR. YOUNG:  Okay.

 9                MR. KOBRIN:  So pursuant to

10           footnote 1, everything he has relied on

11           is cited in the report or included in

12           the appendix.  But just because there

13           were some redundancy between them, I

14           wanted to flag that some of the things

15           in the footnotes are not in the

16           appendix.

17    BY MR. YOUNG:

18           Q.    And have you formed any opinions

19    about other experts in this litigation to the

20    extent that you've reviewed their reports?

21           A.    I've seen some plaintiff expert

22    reports.  I mean, I didn't really -- I didn't

23    comment on them in my report.  I knew that there

24    were some reports that were being produced by

25    defense witnesses, which I listed the names of
```

138

```
 1    the individuals.
 2           Q.    Did you have personal knowledge of
 3    any of the other experts who have been
 4    identified in this litigation; for example, some
 5    of the DEA experts?
 6                MR. KOBRIN:  Object to form.
 7           A.    I don't know any of them
 8    personally, no.
 9           Q.    You don't have any opinions about
10    any of the experts on a personal nature?
11           A.    No.
12           Q.    If you didn't know them,
13    obviously --
14           A.    No.
15           Q.    I had to ask.
16                Have you ever heard of any of the
17    Plaintiffs' DEA experts prior to your engagement
18    in this case?
19           A.    No, I haven't.  We're a small
20    agency but big enough that you don't really know
21    everyone, so ...
22           Q.    How about any of the Defendants'
23    experts who may have worked at the DEA?  Had you
24    ever heard of any of them prior to your
25    engagement in this case?
```

1             MR. KOBRIN:  Object to form.

2        A.    None of the experts, no.

3        Q.    Okay.  Are you aware of any facts

4   that would influence or change your opinions as

5   found in your report here, as you sit here

6   today?

7        A.    No.  I'm not aware of anything

8   that would change my opinion, no.

9        Q.    Do you feel that your review of

10  any additional materials would impact or change

11  your conclusions drawn in your report in any

12  way?

13            MR. KOBRIN:  Object to form.

14       A.    I'd be happy to review anything.

15  And obviously if it did, I would do so.  But I

16  don't know of anything at this point that would

17  even do that.

18       Q.    Yeah, and I should clarify.

19  Really what I mean is, when you were drafting

20  your report, did you think to yourself, "I wish

21  I had document X or, you know, access to other

22  information in order to make these conclusions"?

23            MR. KOBRIN:  Object to form.

24       A.    If there was anything that I

25  thought I might need, I did ask counsel, and

140

 1    they provided it.

 2           Q.    What are those things that you

 3    asked for?

 4                 MR. KOBRIN:  Object to form.

 5                 Don't get into specific

 6           conversations.  If you want to say

 7           generally.

 8           A.    In general, just some documents

 9    regarding some of the -- let's see here.  I

10    don't remember which documents right offhand.

11           Q.    While you're thinking through

12    that, let me ask my question in a different way.

13                 As you were reviewing some of

14    these materials, did you see something

15    referenced in the materials that was not

16    provided to you?  For example, in a deposition

17    transcript, you may see a reference to a

18    particular statute or a particular form or

19    whatever, and that material was not provided to

20    you.  Did you have occasion to reach out to

21    counsel to ask for those materials?

22           A.    Well, regarding, I guess,

23    depositions, because different people would be

24    talking about a specific person in a deposition,

25    and, you know, they weren't flooding me with,

141

```
 1    "Here's 30 depositions right now."  They'd

 2    give -- "Do you have, let's say, Walter Durr's

 3    deposition?"

 4              "Yes.  Here, we'll send it to

 5    you."

 6              So, you know, like that kind of

 7    stuff.

 8         Q.    So you would see a name referenced

 9    in a particular deposition and ask to get the

10    deposition of that person?

11         A.    Yes.

12         Q.    Okay.  Other than that, were there

13    other -- I would call them "reference

14    materials," but non-deposition transcripts that

15    you sought out to help form your opinions in

16    this case?

17         A.    Nothing I specifically sought out.

18    It know that it was basically I wanted to see

19    depositions to see what this one specific person

20    said, if it contradicted or if it went in line

21    with what evidence they were talking about

22    basing their -- whatever they're saying on.

23         Q.    The items listed under "Documents

24    Produced in This Litigation," there's -- under

25    the DEA "Diversion Investigator Manual" section,
```

1    were all of these materials provided to you, or

2    did you request any of them?

3            A.    They were provided to me as

4    reference.

5            Q.    How about the next section,

6    "Written Discovery"?  Was that provided to you,

7    or did you request it?

8            A.    It was provided.

9            Q.    And under "Pleadings," was that

10   provided to you, all those pleadings?

11           A.    Yes.

12           Q.    And same with "Discovery Rulings"?

13           A.    Yes, they were.

14           Q.    And how about "Statutory and

15   Regulatory Materials"?

16           A.    They were, but, I mean, I've had

17   access to those.

18           Q.    Sure.  But you didn't specifically

19   ask for item 1, 2, or 3 on this list?  You were

20   actually provided those, not at your request?

21           A.    I think they were -- at first they

22   were provided.

23           Q.    Okay.  And I think you -- I

24   understand you're new to the expert witness

25   industry, but I just want to make sure I have

143

1   this.

2            What's the degree of certainty

3   that you have on your opinions?  How confident

4   are you?

5        A.    I'm extremely confident.

6        Q.    And if you reviewed in tomorrow's

7   paper, for example, or saw a documentary on TV

8   or received some new information through any

9   source whatsoever that substantially changed or

10  modified your opinions as expressed in this

11  report, would you notify your counsel of that?

12            MR. KOBRIN:  Object to form.

13       A.    Of course I would.

14            MR. YOUNG:  That's all the

15       questions I have for you.  Thanks very

16       much.

17            THE WITNESS:  Okay.

18            MR. KOBRIN:  Thank you.  I think

19       we're all set.

20            THE VIDEOGRAPHER:  This ends

21       today's deposition.  We're going off the

22       record at 12:11 p.m.

23            (Signature not waived.)

24                 - - -

25         Thereupon, at 12:11 p.m., on Wednesday, May

144

1    29, 2019, the deposition was concluded.

2                        - - -

145

```
1                        CERTIFICATE

2

3

4

5          I, MATTHEW C. GREIMEL, do hereby certify

6     that I have read the foregoing transcript of my

7     cross-examination given on May 29, 2019; that together

8     with the correction page attached hereto noting

9     changes in form or substance, if any, it is true and

10    correct.

11                     _____
                          MATTHEW C. GREIMEL
12

13          I do hereby certify that the foregoing

14    transcript of the cross-examination of MATTHEW C.

15    GREIMEL was submitted to the witness for reading and

16    signing; that after he had stated to the undersigned

17    Notary Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2019.

20
                       _____
21                       NOTARY PUBLIC

22

23    My Commission Expires:

24    _____, _____.

25
```

146

1                              CERTIFICATE

2

3

4           I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public. do hereby certify
5   that the within-named MATTHEW C. GREIMEL was

6   by me first duly sworn to testify to the truth, the
    whole truth, and nothing but the truth in the cause
7   aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
8   witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
9   deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).

13

14

15

16

17

18                            _____
                              CAROL A. KIRK, RMR
19

20  My Commission Expires:  April 9, 2022.

21                              - - -

22

23

24

25

147

```
1                    DEPOSITION ERRATA SHEET

2        I, MATTHEW C. GREIMEL, have read the transcript
         of my deposition taken on the 29th day of May 2019, or
3        the same has been read to me.  I request that the
         following changes be entered upon the record for the
4        reasons so indicated.  I have signed the signature
         and authorize you to attach the same to the
5        original transcript.

6        Page  Line  Correction or Change and Reason:

7        ____  ____  _____

8        ____  ____  _____

9        ____  ____  _____

10       ____  ____  _____

11       ____  ____  _____

12       ____  ____  _____

13       ____  ____  _____

14       ____  ____  _____

15       ____  ____  _____

16       ____  ____  _____

17       ____  ____  _____

18       ____  ____  _____

19       ____  ____  _____

20       ____  ____  _____

21       ____  ____  _____

22       ____  ____  _____

23       ____  ____  _____

24       Date _____ Signature _____

25
```