Page 1

1          IN THE UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4
                 ~~~~~~~~~~~~~~~~~~~~
5
6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION
7                                 Case No. 17-md-2804
8                                 Judge Dan Aaron
      This document relates to:      Polster
9
      The County of Summit, Ohio, et al.
10    v. Purdue Pharma L.P., et al.
11    Case No. 1:18-OP-45090 (N.D. Ohio)
12
                 ~~~~~~~~~~~~~~~~~~~~
13
                 Videotaped deposition of
14                    GARY GUENTHER
15
                    October 16, 2018
16                      9:03 a.m.
17
18
19                     Taken at:
20             Brennan, Manna & Diamond
21              75 East Market Street
22                   Akron, Ohio
23
24
25          Renee L. Pellegrino, RPR, CLR

```
                                                    Page 2
 1   APPEARANCES:
 2
     On behalf of Summit County and City of Akron:
 3      Motley Rice
        ANNE McGINNESS KEARSE, ESQ.
 4      KRISTEN M. HERMIZ, ESQ.
        28 Bridgeside Boulevard
 5      Mt. Pleasant, South Carolina  29464
        (843) 216-9343
 6      akearse@motleyrice.com
        kristenmhermiz@motleyrice.com
 7
     On behalf of Walmart, Inc.:
 8      Jones Day
        EDWARD M. CARTER, ESQ.
 9      BRANDY H. RANJAN, ESQ.
        325 John H. McConnell Boulevard
10      Suite 600
        Columbus, Ohio  43215-5017
11      (614) 469-3939
        emcarter@jonesday.com
12      branjan@jonesday.com
13   On behalf of Mallinckrodt:
        (Via Virtual Veritext Stream)
14      Ropes & Gray
        FEIFEI (ANDREA) REN, ESQ.
15      1211 Avenue of the Americas
        New York, New York  10036-8704
16      (212) 596-9000
        andrea.ren@ropesgray.com
17
     On behalf of Purdue Pharma L.P., Purdue Pharma,
18   Inc. and The Purdue Frederick Company:
        Dechert LLP
19      DEBRA D. O'GORMAN, ESQ.
        1095 Avenue of the Americas
20      New York, New York  10036-6797
        (212) 698-3500
21      debra.ogorman@dechert.com
22                      ~ ~ ~ ~ ~
23
24
25
```

Page 3

```
 1   APPEARANCES, CONT'D:
 2
     On behalf of Endo Pharmaceuticals, Inc., Endo
 3   Health Solutions, Inc., Par Pharmaceuticals,
     Inc. and Par Pharmaceutical Companies, Inc.:
 4       (Via Telephone and Virtual Veritext Stream)
         Arnold & Porter,
 5       ERIC SHAPLAND, ESQ.
         44th Floor
 6       777 South Figueroa
         Los Angeles, California  90017-5844
 7       (213) 243-400000
         eric.shapland@aporter.com
 8
     On behalf of Prescription Supply, Inc.:
 9       Pelini, Campbell & Williams
         GIANNA M. CALZOLA-HELMICK, ESQ.
10       Bretton Commons, Suite 400
         8040 Cleveland Avenue NW
11       North Canton, Ohio  44720
         (330) 305-6400
12       giannac@pelini-law.com
13   On behalf of McKesson Corporation:
         (Via Telephone)
14       Covington & Burling LLP
         PATRICK R. CAREY, ESQ.
15       One Front Street
         San Francisco, California  94111-5356
16       (415) 591-6000
         pcarey@cov.com
17
     On behalf of Allergan Finance, LLC:
18       Kirkland Ellis LLP
         (Via Telephone and Veritext Virtual Stream)
19       PAUL WEEKS, ESQ.
         655 Fifteenth Street, N.W.
20       Washington, D.C.  20005-5793
         (202) 879-5000
21       paul.weeks@kirkland.com
22
23                       ~ ~ ~ ~ ~
24
25
```

```
                                              Page 4
 1    APPEARANCES, CONT'D
 2
      On behalf of HBC Service Company:
 3        (Via Telephone and Veritext Virtual Stream)
          Marcus & Shapira
 4        JAMES F. ROSENBERG, ESQ.
          One Oxford Centre, 35th Floor
 5        301 Grant Street
          Pittsburgh, Pennsylvania  15219-6401
 6        (412) 471-3490
          rosenberg@marcus-shapira.com
 7
      On behalf of Cardinal Health:
 8        Williams & Connolly
          BRADLEY MASTERS, ESQ.
 9        725 Twelfth Street, N.W.
          Washington, D.C.  20005
10        (202) 434-5421
          wmasters@wc.com
11
      On behalf of Johnson & Johnson and Janssen
12    Pharmaceuticals, Inc.:
          Tucker Ellis LLP
13        ZACHARY ADAMS, ESQ.
          950 Main Avenue
14        Suite 1100
          Cleveland, Ohio  44113-7213
15        (216) 592-5000
          zachary.adams@tuckerellis.com
16
17                      ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25
```

1   APPEARANCES, CONT'D:

2

On behalf of AmerisourceBergen Drug Corporation:

3       Jackson Kelly
        A.L. EMCH, ESQ.

4       1600 Laidley Tower
        Charleston, West Virginia  25322

5       (304) 340-1172
        aemch@jacksonkelly.com

6           - and -
        Jackson Kelly

7       SANDRA K. ZERRUSEN, ESQ.
        50 South Main Street

8       Suite 201
        Akron, Ohio  44308

9       (330) 252-9060
        skzerrusen@jacksonkelly.com

10

11  ALSO PRESENT:   Jim Torok, Videographer

12                  Nick Cummings

13

14                      ~ ~ ~ ~ ~

15

16

17

18

19

20

21

22

23

24

25

1              TRANSCRIPT INDEX

2

3      APPEARANCES ..................................... 2

4      INDEX OF EXHIBITS ............................... 7

5      INDEX OF OBJECTIONS ............................. 9

6

7      EXAMINATION OF GARY GUENTHER:

8      BY MR. CARTER ................................. 15

9      BY MS. O'GORMAN ............................. 261

10     BY MR. EMCH ................................. 283

11     BY MR. CARTER ............................... 333

12     BY MS. HERMIZ ............................... 342

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS
2
3        Number              Description              Marked
4
5     Exhibit 1    County of Summit Department of     118
                   Medical Examiner Organizational
6                  Chart Beginning Bates Number
                   SUMMIT_000003815
7
      Exhibit 2    E-Mail from Tracy Guenther to      169
8                  Gary Guenther dated April 19,
                   2016 Beginning Bates Number
9                  SUMMIT_000201548
10    Exhibit 3    The Columbus Dispatch Article      186
                   Titled "Ohio Had More Than 4,000
11                 Overdose Deaths in 2016"
12    Exhibit 4    E-Mail from Lisa Kohler to Gary    202
                   Guenther dated September 14,
13                 2017 Beginning Bates Number
                   SUMMIT_000201288
14
      Exhibit 5    E-Mail String with Attachments     206
15                 Beginning Bates Number
                   SUMMIT_000202094
16
      Exhibit 6    E-Mail String                      229
17
      Exhibit 7    E-Mail String Beginning Bates      233
18                 Stamp SUMMIT_000201499
19    Exhibit 8    E-Mail String Beginning Bates      236
                   Number SUMMIT_000201174
20
      Exhibit 9    E-Mail String Beginning Bates      241
21                 Number SUMMIT_000201177
22    Exhibit 10   E-Mail String Bates Numbered       244
                   SUMMIT_000028708
23
      Exhibit 11   Investigator Manual Table of       248
24                 Contents, Revised September
                   2009, Beginning Bates Number
25                 SUMMIT_001011269

1                 INDEX OF EXHIBITS, CONT'D
2

3    Exhibit 12    Investigator Manual Table of      250
                   Contents, Revised May 2016,
4                  Beginning Bates Number
                   SUMMIT_001128715
5
     Exhibit 13    E-Mail String Beginning Bates     254
6                  Number SUMMIT_000099406
7    Exhibit 14    Information Handbook Office of     258
                   the Medical Examiner County of
8                  Summit Beginning Bates Number
                   SUMMIT_000201655
9
     Exhibit 15    Information Handbook County of     260
10                 Summit Medical Examiner
                   Beginning Bates Number
11                 SUMMIT_000099204
12   Exhibit 16    Office of Medical Examiner Drug    289
                   & Medication Listing Bates
13                 Numbered SUMMIT_000192655
14   Exhibit 17    County of Summit Office of the     289
                   Medical Examiner Medication
15                 Listing Bates Numbered
                   SUMMIT_001560061
16
     Exhibit 18    Ohio Automated Rx Reporting       295
17                 System Listing Beginning Bates
                   Number  SUMMIT 000204634
18
     Exhibit 19    Ohio Automated Rx Reporting       295
19                 System Listing Beginning Bates
                   Number  SUMMIT_000203007
20
     Exhibit 20    E-Mail String Beginning Bates     333
21                 Number SUMMIT_000092858
22
23
24
25

1                    INDEX OF OBJECTIONS

2

3     Objection .....................................31
      Objection .....................................35
4     Objection .....................................36
      Objection .....................................39
5     Objection .....................................54
      Objection .....................................62
6     Objection .....................................63
      Objection .....................................66
7     Objection .....................................67
      Objection .....................................68
8     Objection .....................................69
      Objection .....................................69
9     Objection .....................................72
      Objection .....................................76
10    Objection .....................................78
      Objection .....................................80
11    Objection .....................................82
      Objection .....................................86
12    Objection .....................................89
      Objection .....................................90
13    Objection .....................................91
      Objection .....................................93
14    Objection .....................................94
      Objection .....................................96
15    Objection .....................................99
      Objection ....................................101
16    Objection ....................................102
      Objection ....................................102
17    Objection ....................................103
      Objection ....................................103
18    Objection ....................................104
      Objection ....................................104
19    Objection ....................................104
      Objection ....................................105
20    Objection ....................................107
      Objection ....................................110
21    Objection ....................................111
      Objection ....................................112
22    Objection ....................................113
      Objection ....................................113
23    Objection ....................................114
      Objection ....................................114
24    Objection ....................................115
      Objection ....................................115
25    Objection ....................................116

```
 1            INDEX OF OBJECTIONS, CONT'D
 2
 3    Objection ....................................116
      Objection ....................................146
 4    Objection ....................................153
      Objection ....................................160
 5    Objection ....................................161
      Objection ....................................161
 6    Objection ....................................167
      Objection ....................................168
 7    Objection ....................................172
      Objection ....................................178
 8    Objection ....................................181
      Objection ....................................183
 9    Objection ....................................184
      Objection ....................................185
10    Objection ....................................185
      Objection ....................................186
11    Objection ....................................188
      Objection ....................................189
12    Objection ....................................190
      Objection ....................................193
13    Objection ....................................194
      Objection ....................................194
14    Objection ....................................195
      Objection ....................................198
15    Objection ....................................200
      Objection ....................................201
16    Objection ....................................201
      Objection ....................................201
17    Objection ....................................203
      Objection ....................................205
18    Objection ....................................215
      Objection ....................................217
19    Objection ....................................224
      Objection ....................................228
20    Objection ....................................232
      Objection ....................................239
21    Objection ....................................240
      Objection ....................................240
22    Objection ....................................240
      Objection ....................................240
23    Objection ....................................243
      Objection ....................................253
24    Objection ....................................254
      Objection ....................................264
25    Objection ....................................264
```

1              INDEX OF OBJECTIONS, CONT'D
2
3    Objection ...................................264
     Objection ...................................265
4    Objection ...................................265
     Objection ...................................268
5    Objection ...................................271
     Objection ...................................272
6    Objection ...................................274
     Objection ...................................276
7    Objection ...................................277
     Objection ...................................277
8    Objection ...................................280
     Objection ...................................280
9    Objection ...................................280
     Objection ...................................281
10   Objection ...................................286
     Objection ...................................286
11   Objection ...................................287
     Objection ...................................288
12   Objection ...................................288
     Objection ...................................294
13   Objection ...................................297
     Objection ...................................299
14   Objection ...................................300
     Objection ...................................301
15   Objection ...................................301
     Objection ...................................304
16   Objection ...................................304
     Objection ...................................305
17   Objection ...................................306
     Objection ...................................306
18   Objection ...................................311
     Objection ...................................313
19   Objection ...................................316
     Objection ...................................317
20   Objection ...................................318
     Objection ...................................319
21   Objection ...................................321
     Objection ...................................321
22   Objection ...................................322
     Objection ...................................324
23   Objection ...................................324
     Objection ...................................327
24   Objection ...................................327
     Objection ...................................329
25   Objection ...................................330

Page 12

1            INDEX OF OBJECTIONS, CONT'D

2

3   Objection ..................................330

    Objection ..................................338

4   Objection ..................................339

    Objection ..................................340

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE  VIDEOGRAPHER:   On  the  record.

2   Today's  date  is  October  16th,  2018.   It  is

3   approximately  9:03  a.m.   We  are  here  to  take  the

4   videotaped  deposition  of  Mr.  Gary  Guenther  in

5   the  National  Prescription  Opiate  Litigation,  MDL

6   Number  2804,  Case  Number  17-md-2804,  to  be  heard

7   in  the  United  States  District  Court,  Northern

8   District  of  Ohio,  Eastern  Division.

9            If  counsel  would  please  state  their

10  name  for  the  record.

11           MS.  KEARSE:   Anne  Kearse,  Summit

12  County  and  Akron,  City  of  Akron.

13           MS.  HERMIZ:   Kristen  Hermiz  with

14  Motley  Rice  on  behalf  of  the  County  of  Summit

15  and  the  City  of  Akron.

16           MR.  CARTER:   Any  Plaintiffs  on  the

17  phone?

18           Okay.   Ed  Carter  with  Jones  Day  for

19  Walmart.

20           MS.  RANJAN:   Brandy  Ranjan  with

21  Jones  Day  for  Walmart.

22           MR.  EMCH:   Al  Emch  and  Sandra

23  Zerrusen,  Jackson  Kelly,  for  AmerisourceBergen

24  Drug  Corporation.

25           MS.  O'GORMAN:   Debra  O'Gorman  from

Page 14

1   Dechert for the Purdue Defendants.

2           MS. CALZOLA-HELMICK:  Gianna

3   Calzola-Helmick, Pelini Campbell & Williams, on

4   behalf of Prescription Supply, Inc.

5           MR. ADAMS:  Zach Adams from Tucker

6   Ellis on behalf of J&J and Janssen

7   Pharmaceuticals.

8           MR. MASTERS:  Brad Masters from

9   Williams & Connolly on behalf of Cardinal

10  Health.

11          MR. CARTER:  That's everyone on the

12  room -- or, excuse me, everyone in the room.

13  Anyone on the phone appearing?

14          MR. SHAPLAND:  Eric Shapland, Arnold

15  & Porter, on behalf of the Endo and Par entity

16  Defendants.

17          MR. ROSENBERG:  James Rosenberg,

18  Marcus & Shapira, Pittsburgh, for HBC.

19          MR. CAREY:  Patrick Carey, Covington

20  & Burling, for McKesson Corporation.

21          MR. WEEKS:  Paul Weeks with Kirkland

22  & Ellis on behalf of Allergan Finance.

23          MR. CARTER:  All right.  I think

24  that's everyone.

25       GARY GUENTHER, of lawful age, called for

1  examination, as provided by the Federal Rules

2  of Civil Procedure, being by me first duly sworn,

3  as hereinafter certified, deposed and said as

4  follows:

5              EXAMINATION OF GARY GUENTHER

6  BY MR. CARTER:

7      Q.    Good morning, sir.

8      A.    Good morning.

9      Q.    We met before the deposition.  My

10  name is Ed Carter.  I have some questions for

11  you today.

12              Will you state your name for the

13  record?

14      A.    Gary Guenther.

15      Q.    And what is your current employment.

16      A.    I'm the chief investigator with the

17  Summit County Medical Examiner's Office.

18      Q.    You've been with that office since

19  1988, correct?

20      A.    Yes, sir.

21      Q.    Would you provide your residential

22  address, please?

23      A.    801 Meadow View Drive, Canal Fulton,

24  Ohio.

25      Q.    And that's here in Summit County?

```
                                          Page 16

 1          A.      Stark County.

 2          Q.      Stark County.

 3                  Have you had your deposition taken

 4     before?

 5          A.      No.

 6          Q.      Let's go over a couple ground rules

 7     that will hopefully make today more comfortable

 8     for you.

 9                  As you can see, we have a court

10     reporter.  She types down the official record,

11     and so she can only take down the words that we

12     say.  Gestures and uh-huhs and unh-unhs, those

13     kind of things, are harder for her, so let's try

14     to speak and speak clearly if we can.  All

15     right?

16          A.      Yes, sir.

17          Q.      She can also do her job more easily

18     if we only speak one at a time.  So will you do

19     your best to let me finish my question?

20          A.      Yes.

21          Q.      And I'll do my best to let you

22     finish an answer.  If I inadvertently speak over

23     you, please let me know that you're not done and

24     we'll try to avoid that.  Okay?

25          A.      Okay.
```

1          Q.      It's not a marathon.  I want you to

2     be comfortable during this process.  If at any

3     point you need a break for any reason, will you

4     let me know?

5          A.      Yes.

6          Q.      You know, if it's in the middle of a

7     question, if you're comfortable, we'll try to

8     answer it, but, you know, if you want to take a

9     break every five minutes, it may not be

10    efficient, but if that's what you need to get

11    through, we'll do it.  Okay?

12         A.      Okay.

13         Q.      And I'll try to pay attention, you

14    know, every hour or so and see if you need one

15    if you don't mention it yourself.  Okay?

16         A.      Okay.

17         Q.      If at any point you don't understand

18    my question or want some kind of clarification,

19    will you ask me for that?

20         A.      Yes.

21         Q.      Are you taking any medication that

22    would prevent you from being able to testify

23    accurately today?

24         A.      No.

25         Q.      Anything -- any memory impairment

```
                                      Page 18
  1    that you're aware of?

  2         A.    No.

  3         Q.    Okay.

  4            (Thereupon, Nick Cummings entered

  5                 the conference room.)

  6            MS. KEARSE:  Nick Cummings from my

  7    office, a paralegal in my office.

  8            MR. CARTER:  No problem.

  9         Q.    So what, if anything, did you do to

 10    prepare for your deposition today?

 11         A.    I met with my attorneys.

 12         Q.    And I'm going to ask a couple of

 13    follow-up questions about that, but I want to

 14    caution you up front.  I am not entitled to

 15    learn any conversation you had with your

 16    attorneys.

 17         A.    Okay.

 18         Q.    And I don't want to know.  So when I

 19    ask you follow-up questions, don't at any point

 20    divulge the content of any discussion you had

 21    with your attorneys for this case, okay?

 22         A.    Okay.

 23         Q.    And your attorney will counsel you

 24    to that as well, I'm sure.

 25                 One other background point that I
```

1    should note.  There may be times when I ask a

2    poor question, and counsel will provide an

3    objection.  So it's another reason to kind of

4    pause after I finish my question in case your

5    attorney wants to put an objection on the

6    record, and once she's done that, unless she

7    instructs you not to answer, then you can go

8    ahead and answer the question.  Okay?

9          A.    Yes, sir.

10          Q.    Other than meeting with your

11    attorneys, did you do any independent

12    preparation for this deposition?

13          A.    No, sir.

14          Q.    Did you speak with anyone other than

15    your attorneys in preparation for this

16    deposition?

17          A.    No, sir.

18          Q.    Are you aware that Dr. Kohler, the

19    Summit County medical examiner, has already been

20    deposed in this case?

21          A.    Yes.

22          Q.    Did you talk to Dr. Kohler about her

23    deposition?

24          A.    No.

25          Q.    Have you independently reviewed a

Page 20

```
 1    transcript of her deposition?
 2          A.    No.
 3          Q.    In terms of meeting with your
 4    attorneys, how many times did you meet in
 5    preparation for this deposition?
 6          A.    Two to three times.
 7          Q.    Do you recall when the first meeting
 8    was preparing for the deposition?
 9          A.    Don't recall offhand.  It had to be
10    a couple months ago.
11          Q.    Do you recall how long it lasted?
12          A.    The first meeting, probably hour and
13    a half.
14          Q.    And was there anyone present other
15    than you and the attorneys?
16          A.    No.
17          Q.    When did the second meeting occur?
18          A.    I can't recall the dates.
19          Q.    Do you know whether it was in the
20    month of October?
21          A.    We met once in October.
22          Q.    And was that the third meeting?
23          A.    Yes.
24          Q.    Okay.  So the second meeting was
25    sometime in between the two?
```

Page 21

```
 1          A.     Yes.
 2          Q.     All right.  Do you remember how long
 3   the second meeting lasted?
 4          A.     About two and a half hours.
 5          Q.     And what about the October meeting?
 6          A.     I would say an hour and a half, two
 7   hours.
 8          Q.     Do you remember when in October that
 9   meeting was, the last one?
10          A.     Had to be at the very beginning of
11   October.
12          Q.     At the second or the third meeting,
13   was there anyone present other than you and
14   attorneys?
15          A.     No.
16          Q.     We've been doing okay so far, but
17   sometimes I'm going to ask a question and it's
18   obvious to you where I'm headed.  Just try
19   really hard to let me finish.
20          A.     Okay.
21          Q.     All right.  I've asked you about
22   meetings with attorneys to prepare for this
23   deposition.  Did you meet with the attorneys any
24   other time unrelated to this specific
25   deposition?
```

1          A.    No.

2          Q.    Again, I don't want to know about

3    the content of any documents, but during the

4    course of your three meetings did you review

5    documents with the attorneys?

6          A.    Yes.

7          Q.    Did the documents that you reviewed

8    refresh your recollection on any of the topics

9    related to your performance of your job duties?

10         A.    Yes.

11         Q.    Okay.  In terms of the topics where

12   your recollection was refreshed -- I don't want

13   to know about the documents, but on what topics

14   was your recollection refreshed?

15         A.    The drug protocols for drug deaths.

16         Q.    The protocols for investigating drug

17   deaths?

18         A.    Yes.

19         Q.    And what about the protocols was it

20   that you needed refreshed on?

21         A.    Well, it's just to go over, review

22   what the protocols --

23         Q.    Any other topic where you recall

24   refreshing your recollection about the --

25   relative to your job performance?

Page 23

```
 1        A.    Most of it was just going over what
 2   we, as the medical examiner's office, does.
 3        Q.    So it was just refreshing generally
 4   your job responsibilities and policies?
 5        A.    Yes.
 6        Q.    Okay.  In terms of the three
 7   meetings that you recall sitting here today, did
 8   you review documents at each of those three
 9   meetings?
10        A.    At least two of them.
11        Q.    Okay.  Have you attended any large
12   group meetings presented by plaintiffs'
13   attorneys relative to opioid litigation?
14        A.    No.
15        Q.    So you haven't attended any kind of
16   information session?
17        A.    No.
18        Q.    Have you seen Summit County's
19   complaint?
20        A.    No.
21        Q.    That's the document that kind of
22   forms the basis of this lawsuit.
23        A.    No.
24        Q.    All right.  Have you seen any of the
25   written discovery responses that Summit County
```

Page 24

1   has prepared?

2        A.    No.

3        Q.    To your knowledge, have you

4   participated in the preparation of any discovery

5   responses?

6        A.    No.

7        Q.    When was the first time that you

8   learned about the existence of this lawsuit?

9        A.    Probably once it was filed, I

10  believe the -- I saw it in the paper, the county

11  executive -- there was an article in the paper.

12       Q.    Was that the Akron Beacon Journal?

13       A.    Yes.

14       Q.    When you saw that article, did

15  you -- what was your reaction?

16       A.    I had no, you know -- okay.  I

17  didn't think much of it at the time.

18       Q.    Okay.  Did you follow up with anyone

19  at the medical examiner's office to discuss the

20  pendency of the lawsuit?

21       A.    No.

22       Q.    So it sounds like you didn't have

23  much of a reaction one way or the other?

24       A.    No.  No.

25       Q.    Did you have an opinion about the

Page 25

1    lawsuit?

2         A.    No.

3         Q.    Sitting here today, do you have an

4    opinion about the lawsuit?

5         A.    No.

6         Q.    I asked you earlier if you've ever

7    been deposed before.  We covered that.  Have you

8    ever testified in a court of law?

9         A.    Yes.

10        Q.    Tell me how many times you've done

11   that.

12        A.    Probably four or five times.

13        Q.    And what was the context of those

14   instances where you testified in a court?

15        A.    One was an infant homicide case that

16   I was the investigator on.

17              Prior to starting at the Summit

18   County Medical Examiner's Office, back in 1987 I

19   was an undercover drug agent for MEDWAY, which

20   is a drug enforcement agency over in Wayne

21   County, and I testified in some drug cases and

22   also some -- as a result of those things, I

23   testified several times for child custody.

24        Q.    Okay.  So is it correct that the

25   only time you testified in connection with your

Page 26

1   duties at the Summit County Medical Examiner's
2   office was in that child homicide case?
3          A.     Correct.
4          Q.     The other ones were during that
5   time -- so you worked for MEDWAY from
6   approximately '86 to '88?
7          A.     '87.
8          Q.     So the other opportunities for you
9   to testify were during that time period?
10         A.     Yes, sir.
11         Q.     Have you ever testified in any
12  administrative disciplinary hearings?
13         A.     I mean, I've been included in, you
14  know, counseling employees at the office, but
15  it's just in-house.
16         Q.     Sure.  And what -- to make it a
17  little more clear, what I'm focused on now is
18  times when you were under oath.
19         A.     No.
20         Q.     Okay.
21         A.     No.
22         Q.     In the course of your employment and
23  with your various leadership positions at the
24  Summit County Medical Examiner, you're involved
25  in HR, correct?

Page 27

1           A.    A little bit.  The county has their

2      own human resource department.

3           Q.    But you have been involved in

4      performance reviews of subordinates?

5           A.    Yes.

6           Q.    And if someone in your department

7      needs constructive criticism, that's something

8      you provide?

9           A.    Either myself or Dr. Kohler.

10           Q.    And if they do a good job, you could

11      share that message as well?

12           A.    Yes.

13           Q.    Have you ever served as an expert

14      witness?

15           A.    No.

16           Q.    You indicated you learned about the

17      lawsuit when you saw a newspaper article about

18      it.  At any point between that newspaper article

19      and today did you receive an instruction to

20      retain documents?

21           A.    Yes.

22           Q.    Do you recall when you received

23      that?

24           A.    I can't recall the exact date.

25           Q.    Do you know whether it was in this

```
                                            Page 28
 1   year?
 2        A.    I would say beginning of the year,
 3   late last year.
 4        Q.    And that reminds me.  That's another
 5   point in terms of the deposition, just so you're
 6   comfortable with it.  Some things you're going
 7   to know with certainty.  Other things you won't.
 8   It doesn't help Plaintiffs, it doesn't help us
 9   if you just guess.
10        A.    Okay.
11        Q.    So I don't want you to guess at any
12   point.
13        A.    Okay.
14        Q.    There will be times where we're
15   trying to estimate as best we can.  If you're
16   estimating and my question isn't clear, will you
17   let me know that it's an estimate?
18        A.    Okay.
19        Q.    But if you think -- don't think you
20   have to guess in response to my questions, okay?
21        A.    Okay.
22        Q.    All right.  When you received the
23   notification to retain materials, did you comply
24   with it?
25        A.    Yes.
```

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 29

```
 1        Q.    And were you asked to separately go
 2   out and collect documents?
 3        A.    The general notice was not to delete
 4   or -- or, you know, get rid of any records.
 5        Q.    And so from the time -- is it
 6   accurate, then, that from the time you received
 7   that notice, that you did not delete any
 8   relevant e-mails --
 9        A.    Yes, sir.
10        Q.    -- or documents from the performance
11   of your duties?
12        A.    Yes, sir.
13        Q.    Do you maintain drafts of the
14   investigation worksheets?  And this is -- we
15   were talking about retention.  I want to make it
16   clear, the time period.  I'm asking the broader
17   question first.
18             During your time at the department,
19   do you guys maintain drafts of the investigation
20   worksheets?
21        A.    Yes.
22        Q.    Okay.  Has the process for
23   completing investigation worksheets changed
24   during your 30 years?
25        A.    No.
```

1        Q.     Will you explain for me how that

2   process works?

3        A.     When an investigator takes the

4   initial call, they fill out what we call the

5   investigator worksheet.  That is like our

6   working copy to go off of.  Those are maintained

7   in the case file.  Once the investigator has all

8   their pertinent information off that, they then

9   type up a final report of investigation.

10       Q.     When the final report is typed up,

11  are the original notes retained or are they

12  destroyed?

13       A.     The investigative worksheet is

14  maintained in the case file until -- yeah,

15  they're maintained in the -- as part of the

16  file.

17       Q.     How long does the office retain case

18  files?

19       A.     At some point they are purged and

20  placed on -- copied onto microfilm.  A lot of

21  times it depends on how much storage we have in

22  our Jeter system where we keep our files.

23       Q.     In terms of the specifics as far as

24  timing, when that happens, that's not something

25  you're familiar with, fair?

1          A.    Fair.

2          Q.    Okay.  In terms of investigator

3    manuals, the informational handbooks that are

4    available to the public, and any training

5    materials within your function at the medical

6    examiner's office, do those materials, prior to

7    2000, do they exist?

8               MS. HERMIZ:  Objection to form.

9          Q.    Let me reask the question.

10              Are you aware of copies of the

11    investigator manual that predates 2000?

12         A.    No.

13         Q.    Are you aware of any copies of the

14    handbook that predate 2000?

15         A.    The information handbook?

16         Q.    Yes.

17         A.    No.

18         Q.    Are you aware of any kind of field

19    training aids for the investigators from prior

20    to 2000 that exist?

21         A.    I mean, we have manuals on death

22    investigation, books on death investigations at

23    the office.  Some of them are like training

24    guides.  I'm not sure if they predated 2000.

25         Q.    Let me ask it this way to make sure

Page 32

1    I'm fair to you.

2          A.    Okay.

3          Q.    When was the first time you recall

4    using a formal Summit County medical examiner's

5    investigative handbook?

6          A.    Handbook?

7          Q.    Or, excuse me, manual.  Because you

8    have the investigator's manual and the

9    information handbook, correct?

10         A.    Correct.

11         Q.    Currently?  That's the terminology

12   for currently?

13         A.    Yes.

14         Q.    Okay.  So focusing on the manual

15   side, when was the first time you recall there

16   being a formal manual?

17         A.    I can't recall.

18         Q.    Was there one when you started?

19         A.    I don't believe so.  I can't say for

20   sure.  That was 30 years ago.

21         Q.    That's fair.

22               Will you walk me through your

23   positions at the medical examiner's office from

24   1988 through to today?

25         A.    In 1988, when I was hired in, I was

```
 1   hired in as a photographer, and I did that for
 2   several years.  I can't give you exact dates --
 3        Q.    Okay.
 4        A.    -- when I changed positions.  I did
 5   that for several years.  Then we got rid of that
 6   position, that position was eliminated, and
 7   the -- basically, the investigators did all the
 8   photography.  You know, each investigator had a
 9   camera.  They'd go to the scene.  They took
10   their own photos.
11        Q.    May I interrupt you for a second
12   about the photographer?
13        A.    Sure.
14        Q.    I can assume what a photographer
15   does.  What were the responsibilities during
16   your time for several years as a photographer?
17        A.    Way back in those days, it was, you
18   know, film, so, you know, I developed and -- all
19   the film.  I was on call, so anytime like a
20   homicide or a high-profile case came in, I was
21   called out to do the photography on those cases.
22   Then I did the photography during -- at the
23   autopsy examinations, if there was photography
24   to be done.
25        Q.    How many photographers were on the
```

1   department staff at that time?

2        A.    Just -- just one.

3        Q.    So you were the on-call for all of

4   those instances that you described?

5        A.    Yes.

6        Q.    Did you have any training or

7   background in photography?

8        A.    I took some courses in college.

9        Q.    All right.  After that position was

10  eliminated, what was your next position in the

11  office?

12       A.    I was then a forensic investigator.

13       Q.    And what were the additional

14  responsibilities that were put on your plate

15  with that new title?

16       A.    Like I said, the -- at the time all

17  the photography duties were then given to all

18  the investigators, so the investigators did

19  their own photography at death scenes, and the

20  daytime investigators would sit through the

21  autopsies, if needed, for photography and --

22  during the autopsies.

23            Being an investigator, you know, you

24  go to death scenes, take death calls over the

25  telephone from, like, hospitals, nursing homes.

Page 35

1    You're dealing with families, communicating with
2    families.  You're kind of in charge of the
3    deceased's property if no family is there.
4         Q.    Do you interact with law
5    enforcement?
6         A.    Yes.
7         Q.    Can you provide an overview of what
8    those interactions would be in the ordinary
9    case?
10             MS. HERMIZ:  Objection to form.
11        Q.    And that's a fair point, because you
12   deal with a number of different types of cases,
13   correct?
14        A.    Correct.
15        Q.    What would those interactions be in
16   a homicide case?
17        A.    Once the investigator is at the
18   scene -- now I'm talking, you know, when there's
19   a death scene, because it's kind of different if
20   a person would die, say, several days later
21   after, you know, being shot or stabbed.
22             When we're on scene, we, you know,
23   kind of process the scene, take photographs.
24   We're there sometimes during interviews with
25   witnesses.  We kind of go over evidence with,

1    you know, what our office needs, what law

2    enforcement needs, kind of work hand-in-hand

3    with them, and then we kind of work together

4    making sure notification is made to the legal

5    next of kin.

6         Q.    When you mentioned a moment ago that

7    you're present for interviews, are you referring

8    to witness interviews the Akron PD is taking?

9         A.    Sometimes, yes.

10        Q.    Are there instances where you

11   conduct your own interviews on scene?

12        A.    On scene?  Usually if there's, like,

13   family that's on scene, we'll talk to them

14   sometimes on our own, just explaining the

15   process, what's going to take place moving

16   forward.

17        Q.    And in the example that we've been

18   talking about where it's a -- you're on a death

19   scene and there's a suspicion of homicide, in

20   that instance where you're talking to the family

21   members about the process, do you ever talk to

22   them about what happened, or do you leave that

23   in the first instance to the law enforcement?

24              MS. HERMIZ:  Objection to form.

25        Q.    Do you understand my question?

1          A.    Yes.

2          Q.    Okay.

3          A.    Usually we do not go into details

4    about -- we leave that up to the detectives

5    because, you know, a lot of times, you know,

6    we're not sure what's going to jeopardize their

7    case, you know, so we don't want to tell too

8    much to the -- to the families.

9          Q.    In terms of the case that's

10   suspected as an accidental death --

11         A.    Okay.

12         Q.    -- sometimes law enforcement is on

13   the scene, right?

14         A.    A lot of times, yes.

15         Q.    In those instances where it's a

16   suspected accidental death and you're there at

17   the same time as law enforcement, what

18   interactions would you have with law enforcement

19   in that type of case?

20         A.    Well, there's several types of, you

21   know, accidental deaths.  It depends on what

22   type of case it is.

23         Q.    Will you walk me through those

24   different types?

25         A.    You know, there's traffic accidents,

Page 38

1   so usually we're dealing with the police on, you

2   know, what happened; again, dealing with the

3   deceased's families, getting them notified.

4            And then you have, you know,

5   work-related deaths of a person that dies out on

6   a job scene.  Usually with police, we're getting

7   basic background information.  Then we're

8   dealing more with, you know, OSHA on

9   work-related deaths than we are law enforcement.

10           Overdose deaths, we, you know -- we

11  interact with law enforcement, especially with,

12  you know, what evidence they need, what evidence

13  we need, talking to families, getting a little

14  bit of background, notifying families.

15       Q.    In terms of the conversations you

16  have on scene with next of kin --

17       A.    Okay.

18       Q.    -- do those conversations always get

19  noted and reported in your investigative case

20  file?

21       A.    Yes.  I'll take notes when I'm, you

22  know, talking to families, so those will be

23  included in the -- on the worksheet, then later

24  in the final report.

25       Q.    And I understand there may be

1  circumstances where, if you're explaining how

2  the process works, you may not write a

3  transcript of everything you told them?

4        A.    Right.  Right.

5        Q.    Whereas if you're taking a

6  statement, you may record more detail, correct?

7        A.    Right.

8        Q.    But in either situation, would there

9  be a note in the case file that you interacted

10  with next of kin?

11        A.    Yes.

12        Q.    And why is that the practice?

13              MS. HERMIZ:  Objection to form.

14        A.    You know, it's our job to make sure

15  the next of kin is notified.  So usually the

16  families can tell us, you know, the background

17  of that deceased person.  They know that person

18  more than I do, so to get a little bit of

19  background, we talk to the next of kin.  Even if

20  they don't know the exact information that we

21  need, they can sometimes lead us in the right

22  directions to do follow-ups.

23        Q.    I want to go back to what got us

24  down this topic of conversation, which was your

25  recollection of using investigative manuals.

Page 40

1          Did there come a point in time where

2     you played a role in revising or creating the

3     investigative manual?

4          A.    Dr. Kohler --

5          Q.    That's something Dr. Kohler does?

6          A.    -- does, and probably the previous

7     medical examiner.

8          Q.    Okay.  So is it accurate to say,

9     then, that you personally have not drafted or

10    revised the protocols --

11         A.    She probably did it, sent it to me

12    and said, "Hey, do you see anything that needs

13    to be corrected or adjusted"?

14         Q.    Okay.  Sitting here today, do you

15    have a recollection of any instance where you

16    had to correct Dr. Kohler?

17         A.    No.

18         Q.    Okay.  Do you recall any instance

19    where you corrected her predecessor?

20         A.    No.

21         Q.    Okay.  We also mentioned an

22    information handbook.  Do you recall whether

23    there was a document like that when you started

24    at the department?

25         A.    No.

Page 41

1          Q.    No, you don't recall?

2          A.    I don't -- I don't recall.

3          Q.    All right.  Back to a walk-through

4    of your positions.

5                How long were you a forensic

6    investigator?

7          A.    It's easier if I walk backwards.

8                I became chief investigator 2008,

9    2009, somewhere in that period.  Prior to

10   becoming chief investigator, I was an

11   investigator supervisor, probably did that three

12   to four years.

13         Q.    Before that were you then a line

14   investigator?

15         A.    Then, regular investigator, yes.

16               So, you know, it's probably been 15

17   years that I was --

18         Q.    During the course of your time with

19   the Summit County Medical Examiner's Office,

20   have you ever been disciplined?

21         A.    No.

22         Q.    Are you aware of any complaints that

23   have ever been filed against you?

24         A.    You know, I've had complaints that

25   -- you know, like, I would be at a death scene,

Page 42

1    and families call in and complain because, like,

2    I'll have the body removed from the death scene

3    before, you know, they were able to see the

4    person.

5           Q.    In that example, were you following

6    office protocol?

7           A.    Yes.

8           Q.    Okay.  And so maybe they didn't

9    understand the process?

10          A.    Correct.

11          Q.    Other than those kinds of examples,

12   are you aware of any formal complaints?

13          A.    No.

14          Q.    Why was it that you left your prior

15   position as an undercover drug enforcement agent

16   to join the medical examiner's office?

17          A.    When I was doing the undercover drug

18   narcotics, you know, I worked a lot with

19   informants.  About three or four months during

20   that time, I had an undercover apartment up in

21   the city of Brunswick.  I actually had an

22   informant living with me.  You know, I did a lot

23   of the work in the bars and that, so, you know,

24   it got to be almost, you know, four or five

25   nights out of the week I was living in bars.  It

Page 43

1    just wore me down.  I was getting burned out.

2          Q.    In terms of your background, you

3    have an Associate's degree in law enforcement

4    from Clark State here in Akron?

5          A.    It was Clark Technical College at

6    the time, but it's now Clark -- Clark State.

7    That's in Springfield, Ohio, which is down by

8    Dayton.

9          Q.    Okay.  And then you completed Ohio

10   Peace Officer Police Academy?

11         A.    While I was going through getting

12   the Associate's degree, I also went through the

13   police academy.

14         Q.    All right.  Any other education or

15   specialized training after high school?

16         A.    After high school?  I got the --

17         Q.    We discussed those.  And so any

18   other post-high school education or training?

19         A.    You know, when I first moved up this

20   way, which was when I started with MEDWAY, the

21   goal was to finish -- get a four-year degree at

22   the University of Akron, but with the hours that

23   I was working, it just didn't -- I was able to

24   take a few more classes, but --

25         Q.    Was there a focus or an area of

```
 1   education that you were interested in pursuing
 2   at that time?
 3        A.    I was going after a technical
 4   education degree.
 5        Q.    And you mentioned when you moved up
 6   here to work with MEDWAY -- are you from the
 7   Springfield area?
 8        A.    Yes.  I grew up in Springfield.
 9        Q.    Okay.  And did you come up here for
10   work?
11        A.    Yes.  Work and school, but --
12        Q.    Right.  Have you had any specialized
13   education courses in the area of medicine?
14        A.    No.
15        Q.    Do you have board certifications in
16   any area?
17        A.    We're -- I'm board certified through
18   the American Board of Medicolegal Death Invest
19   -- too many letters there.
20        Q.    So you're certified through the
21   American Board of Medicolegal Death
22   Investigators?
23        A.    Correct.
24        Q.    And when did you obtain that
25   certification?
```

Page 45

```
 1          A.     I've renewed -- I want to say at
 2     least 15 years ago.
 3          Q.     And what was required to obtain that
 4     certification?
 5          A.     To be able to sit for the exam, you
 6     have to have so many hours working in a medical
 7     examiner's/coroner's system doing
 8     investigations.  So, you know, there's a
 9     checklist that Dr. Kohler had to, you know, sign
10     off on, saying that, you know, you've done these
11     certain things.
12              Once that's done, you sit for an
13     exam.  I believe it was like a four-hour exam.
14     Then -- and it's broken into, I think, four or
15     five different sections, so you had to pass each
16     section.  If you happen to fail a section or
17     two, they give you a second chance to retake
18     that.  And then once you pass all the sections,
19     you're certified.
20          Q.     So you passed all the sections?
21          A.     Yes.
22          Q.     First time?
23          A.     I had to retake one section.
24          Q.     Okay.  And then in terms of
25     recertifying, do you have to take the exam
```

Page 46

1    again?

2          A.    No.  No.  Only if -- you know, we're

3    required to have, like, 45, 50 hours of

4    continuing education every five years.  Now, if

5    you have a lapse in that, they'll make you

6    retake the exam.

7          Q.    So it's an incentive to stay

8    current?

9          A.    Yes.

10         Q.    What types of -- can you give me an

11   example of a continuing education topic?

12         A.    Usually, like, every year the State

13   of Ohio -- the Ohio Coroners Association has a

14   regional meeting where they have speakers come

15   in on different topics and talk.

16               You can go to -- like St. Louis has

17   a death investigation 40-hour class, basic and

18   advanced.

19         Q.    Have you participated in that?

20         A.    I went to St. Louis for the week.

21   Then, at the end of the week, that's when I took

22   my test.

23         Q.    Your exam?

24         A.    Yeah.

25         Q.    Have you ever taught a continuing

Page 47

1    education unit?

2         A.    Years and years ago -- it had to be

3    within the first ten years -- I did a three-hour

4    course that I gave on forensic radiology to

5    x-ray techs for their continuing ed.

6         Q.    Do you have training in radiology?

7         A.    On the job.

8         Q.    On the job, okay.

9              Any other -- any other continuing

10   education classes that you have presented that

11   you can recall?

12        A.    No.

13        Q.    Other than that certification

14   through the board we've been discussing, are

15   there any other licenses, certifications,

16   accreditations that you hold?

17        A.    No.

18        Q.    Okay.  Are there any in your area

19   that are available that you have not pursued?

20        A.    Classes to take?

21        Q.    And that's fair, because it was a

22   couple different things.

23              Are there any licenses or

24   certifications that are available that you have

25   not pursued?

Page 48

1    A.    No.
2    Q.    I asked you about medical training.
3  Do you consider yourself an expert in
4  toxicology?
5    A.    No.
6    Q.    Pathology?
7    A.    No.
8    Q.    Do you have any expertise in
9  pharmacy?
10   A.    No.
11   Q.    Are you a member of any professional
12  organizations?
13   A.    No.
14   Q.    Are you a member of any of Summit
15  County's various boards and organizations, such
16  as the ADM board?
17   A.    No.  I'm a -- I'm on the board of
18  directors for Victim's Assistance Program.
19   Q.    Okay.  And what is that
20  organization?
21   A.    They help victims of crime and that,
22  like they have advocates that will show up on
23  death scenes to help -- help families through
24  the process.  They have advocates that will take
25  the victims -- you know, like somebody gets

1  murdered, they'll stick with that person's

2  family and all the way through the court

3  process.

4       Q.    How long have you been involved with

5  that organization?

6       A.    You know, I've -- I've been on the

7  board of directors for going on three years now,

8  but I've dealt with them, you know, through work

9  for, I mean, God, as long as I think I've been

10  there because, you know, they'll be at death

11  scenes to help with families and stuff like

12  that.

13       Q.    So that organization, the Victim's

14  Assistance Program, that's been an organization

15  that provides that service as long as you can

16  remember?

17       A.    Correct.

18       Q.    And then your direct involvement has

19  been about three years?

20       A.    Yes, sir.

21       Q.    Any other professional associations

22  or Summit County groups that you're a part of?

23       A.    No.

24       Q.    Are there any task forces that

25  Summit County set up that you're a member of?

1          A.    No.

2          Q.    Other than the continuing education

3    program that you've described, are there any

4    other presentations that you've given to public

5    groups about -- you know, within the context of

6    your job as a chief forensic investigator?

7          A.    Yeah.  I'll go out and give -- you

8    know, I give -- it's kind of slowed down

9    recently, but I've given talks to, like, high

10   school students just on forensic background.

11         Q.    Let's try this way.

12         A.    Okay.

13         Q.    Identify the different groups that

14   you've spoken to and then I'll follow up based

15   on those different types of presentations.

16               So one is to students, you've talked

17   to high school students.

18         A.    Students.

19         Q.    Any other groups that you've

20   presented to?

21         A.    Insurance groups.  They have -- I

22   forget what it's called -- the National Night

23   Out of crime victims they have once a year.

24   They set up in different neighborhoods.  I've

25   done that.

1      Q.    Kind of like a take back the
2  neighborhood event?
3      A.    Yeah.
4            Police Explorers.
5      Q.    What's that?
6      A.    Like, Akron will have a group of
7  high school kids that are interested in going
8  into, you know, law enforcement as a career, so
9  they'll have them come down.
10           I've given talks to, like, Victim's
11  Assistance personnel.
12     Q.    Any other groups that come to mind?
13     A.    Not offhand.  I'm sure there's --
14  there's more.
15     Q.    Okay.  If at some point during the
16  course of the deposition it pops in your head,
17  will you let me know?
18     A.    Yes.
19     Q.    Even if it's not what we're talking
20  about.
21     A.    Okay.
22     Q.    Thank you.
23           So when you talk to the high school
24  students, what's the topic that you present on?
25     A.    Usually it's just an overall of our

Page 52

1   office, forensics, death scene investigations.

2       Q.    Is it a context kind of like a

3   career day, like this is an area that you could

4   go into --

5       A.    Yes.  Yes.

6       Q.    -- and this is what we do generally?

7       A.    Correct.

8       Q.    Okay.  Have you talked to high

9   school students about issues related to opioids?

10      A.    I gave an opioid presentation up at

11  Revere, and it was kind of a mixture of

12  students, parents.  It was like a panel.

13      Q.    Do you recall when that was?

14      A.    Not offhand, no, I can't recall.

15      Q.    Do you recall whether it was in the

16  last year?

17      A.    No.  It was --

18      Q.    Prior to that?

19      A.    -- prior to that.

20      Q.    Was it during the time where you

21  were the chief investigator?

22      A.    Yes.

23      Q.    Other than --

24      A.    I want to say 2015, 2016,

25  somewhere --

1          Q.    And that's just an estimate?

2          A.    That's just an estimate.

3          Q.    Do you recall who else was on the

4    panel with you?

5          A.    I know there was an officer from

6    Richfield, there was a pharmacist, and I think

7    there was a parent or parents that lost somebody

8    in their family.

9          Q.    And do you recall the circumstances

10   of that particular family's loss?

11         A.    Other than it was an overdose.

12         Q.    Do you recall what the overdose was

13   on?

14         A.    No.

15         Q.    Any other details about that case

16   you remember?

17         A.    No.

18         Q.    Was that a case that you personally

19   had investigated?

20         A.    No.

21         Q.    Do you remember what role you played

22   in that panel presentation?

23         A.    I think mainly it was just giving

24   stats and, you know, what we were seeing at the

25   time, you know, how many cases we were seeing,

1  what we were seeing an uptick in.

2      Q.    And what were you seeing an uptick

3  in in that 2015-2016 time frame?

4      A.    It was starting to tick up with the

5  heroin, fentanyl, fentanyl analogs.

6      Q.    And then was it 4th of July, 2016,

7  when carfentanil appeared?

8      A.    Yes.

9           MS. HERMIZ:  Objection to form.

10          THE WITNESS:  Sorry.

11      A.    That's what I recall, you know.

12      Q.    In terms of panel presentations,

13  like the one at Revere, any other times where

14  you were talking to an audience that included

15  high schoolers where the focus of the discussion

16  was opioid-related?

17      A.    No.  I -- the only other

18  presentations opioid related was to the

19  insurance.

20      Q.    Okay.  So you anticipated one of my

21  areas.  So in terms of the Victim's Assistance

22  or the Police Explorers, is it fair to say,

23  whatever those presentations were, they didn't

24  focus on opioids?

25      A.    A lot of times with those groups,

Page 55

1    they'll come to the office, I'll give a talk on
2    the overall function of our office, what we do,
3    then usually give them a quick tour of the labs,
4    autopsy suites.  So it wasn't, you know,
5    specifically on opiates, those presentations.
6           Q.    Understood.
7                 In terms of the insurance
8    presentations, you indicated you've -- you've
9    given presentations that focused on opiates to
10   those audiences, correct?
11          A.    Yes.
12          Q.    Have you given more than one to that
13   type of audience that would have focused on
14   opiates?
15          A.    It was two.
16          Q.    Two.
17                Did you give other presentations to
18   that group that were unrelated to opiates?
19          A.    No.
20          Q.    So is it accurate, then, that in
21   terms of that audience, an insurance audience,
22   you've only ever given two presentations?
23          A.    Yes.
24          Q.    Okay.  Do you recall when those were
25   in terms of year?

Page 56

1          A.    I want to say 2017.

2          Q.    And so in terms of helping you place

3    these, would it have been after the Revere

4    presentation, to the best of your recollection?

5          A.    Yes.

6          Q.    And were they -- were the two

7    presentations to an insurance audience, was it

8    the same group both times?

9          A.    No.

10          Q.    Were they close together in terms of

11    the timing of those presentations?

12          A.    I believe they were within, like,

13    six months of each other.

14          Q.    Okay.  All right.  What were the two

15    insurance groups you presented to?

16          A.    I can't recall.

17          Q.    How did those come about?  How did

18    those presentations get set up?

19          A.    Usually they call.  I believe it

20    was, you know -- they had -- their group has

21    monthly meetings and they have different

22    speakers come in, you know, and rotate, so

23    they -- I'm sure I got a phone call that said,

24    hey, would you be willing to come in and speak

25    since, you know, opioids were big at the time,

Page 57

1   you know.

2          Q.    Did you use a PowerPoint?

3          A.    Yes.

4          Q.    Did you use the same PowerPoint for

5   both?

6          A.    Yes.

7          Q.    And we'll discuss those slides

8   later.

9                During your part of the presentation

10  was there any other presenter who was going at

11  the same time?

12         A.    No.

13         Q.    Okay.

14         A.    Those were only -- like, one was a

15  dinner meeting and another one was a lunch

16  meeting, so, you know, they were short.

17         Q.    They were short?

18         A.    Less than an hour.

19         Q.    Did you make it through your slides

20  both times?

21         A.    Yes.

22         Q.    In terms of those slides, were they

23  something that you created independently or did

24  you do that in connection with Dr. Kohler's

25  slides?

1      A.    With Dr. Kohler's.  Usually, when we

2   do presentations, just not on opiates, but on

3   all presentations, you know, there will be a

4   presentation and you'll go through it and say,

5   oh, I can use this for this presentation and

6   pull it out.  So there's a lot of sharing.

7      Q.    As the head of the office, does

8   Dr. Kohler approve your participation in public

9   presentations --

10     A.    Yes.

11     Q.    -- on behalf of the office?

12     A.    Yes.

13     Q.    You've been doing a really good job.

14  Sometimes you know exactly what my question is.

15  It's a hard process.  Just try to let me finish.

16  It will make it easier for the court reporter.

17  But it hasn't been a problem.  I just want to

18  let you know going forward.  Okay?

19          All right.  Switching gears a little

20  bit, in terms of this lawsuit, do you know who

21  the Defendants are?

22     A.    Personally, no.

23     Q.    Do you know the names of any of the

24  Defendants?

25     A.    No.

```
                                              Page 59
 1         Q.     Do you have a personal understanding
 2   of any of the allegations that Summit County is
 3   bringing against the Defendants in these cases?
 4         A.     To be honest, I haven't even read
 5   the complaint, so I don't even know what the --
 6         Q.     So you don't know what the
 7   allegations are?
 8         A.     Right.
 9         Q.     Have you had any professional
10   training in the area of addiction or substance
11   abuse?
12         A.     No.
13         Q.     Do you consider yourself an expert
14   in addiction?
15         A.     No.
16         Q.     Do you consider yourself an expert
17   in substance abuse?
18         A.     No.
19         Q.     Have you had any training in
20   counseling or psychology?
21         A.     No.
22         Q.     Do you consider yourself an expert
23   in psychiatry?
24         A.     No.
25         Q.     Do you consider yourself an expert
```

Page 60

1    on public health policy?

2         A.    No.

3         Q.    Do you consider yourself an expert

4    on pain management?

5         A.    No.

6         Q.    Do you consider yourself an expert

7    on the sufficiency of medication warning labels?

8         A.    No.

9         Q.    Do you consider yourself an expert

10   on the proper prescription and use of opioid

11   medications?

12        A.    No.

13        Q.    Do you consider yourself an expert

14   on the causes of addictions to substances?

15        A.    No.

16        Q.    In terms of what we were discussing

17   a moment ago in the Revere presentation and how

18   you were seeing an increase in the volume of

19   heroin cases, fentanyl cases, and I think you

20   said fentanyl analogs; is that correct?

21        A.    Yes.

22        Q.    In terms of those increases, do you

23   have any expertise as to the causes of those

24   increases?

25        A.    What caused?

Page 61

1        Q.    Yes.

2        A.    You know, I -- talking with police

3    officers, you know, we do a lot with, like,

4    Akron narcotics, those guys, you know.  In 2016,

5    apparently, the heroin and fentanyl was being

6    shipped from -- from China, Mexico, and it was

7    cheap.  That's when it --

8        Q.    Is that what you heard from law

9    enforcement?

10        A.    Correct.

11        Q.    Other than hearing other

12    professionals that you were working with, did

13    you have any independent expertise --

14        A.    No.

15        Q.    In terms of -- try and let me

16    finish.  I'll just reask it.

17        A.    Okay.

18        Q.    Other than what you heard from law

19    enforcement, do you have any independent

20    expertise in terms of identifying the causes of

21    that increase?

22        A.    No.

23        Q.    In terms of what you heard from the

24    law enforcement professionals that you were

25    working with in the course of your duties, other

Page 62

1    than increase in those kind of foreign, cheap

2    shipments that would raise the supply of heroin

3    and the fentanyl analogs, anything else that you

4    heard the law enforcement officials identify as

5    a cause to you?

6              MS. HERMIZ:  Objection to form.

7         A.    Of why heroin and, like, fentanyl

8    became so popular?

9         Q.    Yes.  When you were -- when you

10   heard, in the course of your work, conversations

11   with law enforcement officials about the

12   increase in heroin and fentanyl and fentanyl

13   analogs, is there any other cause that they

14   identified for you?

15        A.    Prior to that, 2015, 2016, when we

16   started seeing the spikes, you know, there was

17   apparently some laws that were changed about

18   reporting of, like, opiate painkillers and that.

19   You know, physicians had to report to -- what is

20   it -- the OARRS website.  So prescriptions, in

21   effect, were getting harder to obtain.  That's

22   when, you know, I was told heroin and the

23   fentanyl kind of came in and took its place.

24        Q.    Okay.  In terms -- you mentioned

25   OARRS.  And for the court reporter, that's

Page 63

1    O-A-R-R-S?

2         A.    Right.

3         Q.    Have you ever used that database?

4         A.    I've seen reports.  At our office

5    only the doctors can log in to that system and

6    look at -- look at reports.

7         Q.    So you're not authorized to search

8    the system or generate the reports?

9         A.    Correct.

10        Q.    But you've seen reports that

11   Dr. Kohler and Dr. Sterbenz have run?

12        A.    Yes.

13        Q.    How often have you seen reports that

14   one of the physicians have run?

15        A.    I want to say multiple, multiple

16   times.

17        Q.    More than ten times?

18        A.    Yes.

19        Q.    Okay.  When you view those, do those

20   reports make it into the case file?

21             MS. HERMIZ:  Objection to form.

22        A.    Sometimes.

23        Q.    What are the -- what's the context

24   in which you would see one of those reports?

25        A.    You mean what type of case would I

1    see those reports on?

2         Q.    Is there any type of case, other

3    than an accidental overdose death, where you

4    would see one of those reports?

5         A.    There's been other cases, like a

6    sudden death, that I'll see a report on.

7         Q.    Okay.  And -- go ahead.  Were you

8    finished with your answer?

9         A.    Well, the problem is, you know,

10   we've seen overdoses from, you know, teenagers

11   all the way up to people in their 70s, so, you

12   know, you can have a person, you know, mid-60s,

13   70s, that's got extensive, you know, medical

14   history, enough that would explain a death, but,

15   you know, with the huge spike in overdoses over

16   the last several years, you just don't know.  So

17   a lot of times, you know, I think docs will run

18   those reports just to see if, you know, is this

19   person a long-time -- you know, have

20   prescriptions for opiate use.

21        Q.    Are you -- you mentioned an age

22   range that you've encountered.  Are you

23   generally familiar with the statistics that your

24   office publishes?

25        A.    I look at -- you know, I have access

Page 65

```
 1    to them, I look at them.  Usually going over

 2    stats, the biggest -- you know, when I get calls

 3    from -- whether it be media or, you know, people

 4    doing research on drug overdoses, usually

 5    they'll just call in and ask for numbers.  So I

 6    really don't look.

 7         Q.    When those public inquiries occur,

 8    are those directed to you?  Do you field those?

 9         A.    The majority of the time.

10         Q.    And we'll come back to that later.

11              What I wanted to ask generally, in

12    terms of ages, would you agree, based on your

13    experience and access to the statistics, that 80

14    percent of the overdose deaths that involve an

15    opiate of some kind in Summit County involve

16    persons 25 or older?

17         A.    Yes.

18         Q.    Now, a moment ago you were talking

19    about some regulations changed, and, as you

20    said -- I think you said it was harder to get

21    prescriptions.  Was that information that you

22    independently were aware of in the course of

23    your work, or was that something you heard from

24    law enforcement?

25         A.    From law enforcement, and, you know,
```


```
1    I'm sure I've read it or heard about it on the
2    news.
3         Q.    Do you consider yourself an expert
4    in the regulations concerning the availability
5    of prescription opioids?
6         A.    No.
7         Q.    Okay.  Is that something you've ever
8    had -- is that something you've ever studied?
9         A.    No.
10        Q.    Do you have any familiarity with
11   what those regulations are and how they may have
12   changed over time?
13        A.    No.
14        Q.    In terms of conversations with law
15   enforcement, when they referenced it, do you
16   even know any of the specific laws or
17   regulations that they were referencing?
18        A.    No.
19        Q.    In terms of prescriptions -- in
20   terms of hearing that prescriptions were harder
21   to come by, any personal information, based on
22   your time on the job, into the availability of
23   prescriptions in Summit County?
24             MS. HERMIZ:  Objection to form.
25        Q.    I'm talking prescriptions for
```

Page 67

1  opioids.

2              So let me ask it this way.

3      A.    Okay.

4      Q.    Other than hearing that anecdotally

5  from the police, any personal knowledge where

6  you've seen that for yourself in terms of

7  prescription opioids being harder to come by?

8              MS. HERMIZ:  Objection to form.

9      A.    I can tell you what I've seen over

10  the past several years.

11              Prior to 2015 it was not uncommon

12  for a death investigator to go to a scene and

13  bring back multiple prescription bottles,

14  whether they be empty or, you know, had

15  medication in them.  That was the majority of

16  the evidence that was brought back to our

17  office.

18              Since late 2015, 2016 to current I

19  rarely see prescription medications, you know,

20  come through our office.  It's mainly, you know,

21  syringes, bindles, spoons.  So, you know, from

22  that standpoint, we're seeing a lot less actual

23  prescriptions come through our office, but it's

24  converted over to, like I said, the syringes and

25  the powders and the burnt spoons.

1      Q.    So from 2015, continuing on through

2  2016, 2017, and the ten months of this year,

3  it's rare for your office to see prescription

4  opioid bottles or evidence come back?

5      A.    I'm saying I'm seeing a lot, lot

6  less than previous -- prior to that time.

7      Q.    Okay.  And the overwhelming majority

8  of the types of evidence that you see come back

9  in that same time period are the syringes, the

10  bindles, spoons?

11            MS. HERMIZ:  Objection to form.

12      A.    Yes.

13      Q.    And with respect to the things that

14  you see in 2015 through to today, the vast

15  majority would be what we could describe as

16  illicit drug use?

17      A.    Yes, sir.

18      Q.    Do you have any expertise in terms

19  of the causes for that change between

20  prescription opioids and the illicit drugs in

21  terms of what you've seen more frequently?

22      A.    Like I said, I think it's, you know,

23  the cost, the availability of those drugs.

24      Q.    Now, you mentioned prior to 2015 you

25  would find and bring back into evidence

```
 1   prescription pill bottles, some that were empty,
 2   some that weren't, correct?
 3        A.    Correct.
 4        Q.    What was the frequency where the
 5   prescription bottle matched the identity of the
 6   victim versus it was written for someone else?
 7             MS. HERMIZ:  Objection to form.
 8        Q.    Let me ask it this way:  Did you
 9   ever see circumstances where you would take back
10   into evidence a prescription pill bottle that
11   didn't match the identity of the victim?
12        A.    I have seen it.  Not very often.
13        Q.    In the cases where you would find
14   evidence of prescription pill use on the scene,
15   do you know the extent to which those pills were
16   used as directed?
17             MS. HERMIZ:  Objection to form.
18        A.    No.
19        Q.    Did you see cases where you found
20   evidence of prescription pills being crushed or
21   altered?
22        A.    I've been on death scenes before
23   where, you know, I've seen on a mirror crushed
24   pills.  Now, what those were, you know, I
25   couldn't tell you.
```

1      Q.    When you find substances on a scene,
2   do you -- are you responsible for identifying
3   them, or do you send them to toxicology, or is
4   it a mixture?
5      A.    It's a mixture.  You know, law
6   enforcement nowadays are -- are going after the
7   sellers or providers of those drugs.  So, you
8   know, they're doing a lot of DNA, touch DNA
9   testing, sending stuff off to the lab for DNA,
10  touch DNA and other tests.  So it all depends on
11  what's at the scene is what we'll bring back or
12  what the police, law enforcement agency, will
13  take.
14          If we bring it back, it goes -- you
15  know, most of the time it will go back to our
16  toxicologist, who will, you know, run the tests
17  to determine, you know, what drug that powder
18  was.
19     Q.    Are there certain substances, based
20  on your experience, that you're comfortable
21  identifying in the field?
22     A.    You know, if I find a loose pill, I
23  can bring it back, and there's those websites
24  where you can look up the numbers and the shapes
25  and the colors; but if I have any doubt, it goes

1   back to the toxicologist.

2          Q.     Can you identify meth in the field?

3          A.     I can't, no.

4          Q.     Heroin?

5          A.     No.

6          Q.     Fentanyl analogs?

7          A.     No.

8          Q.     Cocaine?

9          A.     No.

10                Now, while on scene, police -- law

11  enforcement has those, you know, presumptive

12  kits that they can test powder at the scene, and

13  if it changes colors, you know, this is what it

14  is, but I can't personally.

15         Q.     So in that situation, if you're on

16  the scene with Akron PD, you would rely on their

17  kit in terms of an initial indicator of what it

18  is?

19         A.     Yeah.  That's a presumptive test.

20  It's still got to be confirmed either by, you

21  know, BCI or, you know, our toxicologist.

22         Q.     And -- this is a broad question --

23  when you find evidence of substance use at a

24  scene, whether it's a prescription pill, some,

25  you know, powder that needs to be identified,

Page 72

1    alcohol, anything that you would collect as

2    evidence, does the presence of that item on

3    scene equal a cause of death or a manner of

4    death determination?

5              MS. HERMIZ:  Objection to form.

6         A.   It's a suspicion that that's the

7    cause of death.  The exam and the testing of,

8    you know, the deceased's blood, urine by a

9    toxicologist to see if the presence of those --

10   of illicit drugs or, you know, prescription

11   drugs in their system is present --

12        Q.   So it's -- it's context, it's an

13   indicator of a way -- of a path you should run

14   down, but is it accurate to say that its

15   presence in and of itself doesn't lead to a

16   formal conclusion from the office without

17   further rundown?

18        A.   No.  It gives you a high suspicion

19   that it possibly could be an overdose, but

20   again, further testing -- once the exam is done,

21   further testing of those samples got to either

22   confirm it or, you know, it's not present.

23        Q.   Right.

24             So in terms of the official

25   pronouncements from the Summit County Medical

Page 73

1    Examiner's Office, there's a decision as to both

2    the manner of death and cause of death, correct?

3            A.    Yes.

4            Q.    Do you, as chief forensic

5    investigator, make the determination as to

6    manner of death or cause of death?

7            A.    No.

8            Q.    Do you make recommendations to

9    Dr. Kohler and Dr. Sterbenz?

10           A.    We will gather information at the

11   scene whereby ordering certain records, getting

12   certain police reports and that; we will gather

13   that information for them and provide that for

14   them, and the doctors are the ones that will

15   determine the cause and manner of death.

16           Q.    Do you have any expertise in

17   statistics?

18           A.    No.

19           Q.    Any expertise in accounting?

20           A.    No.

21           Q.    Expertise in marketing for consumer

22   products?

23           A.    No.

24           Q.    Have you ever calculated the costs

25   to the field investigation unit attributable to

Page 74

1  opioids?

2       A.    No.

3       Q.    Have you ever prepared a budget for

4  the office?

5       A.    No.

6       Q.    In terms of the office, of the

7  medical examiner's budget process, do you play

8  any role in it?

9       A.    No.

10       Q.    Does your forensic investigation --

11  can I call it a unit --

12       A.    That's fine.

13       Q.    -- or division?  Okay.  Does your

14  unit have a separate budget within the medical

15  examiner's office, to your knowledge?

16       A.    To my knowledge, no.  There's -- you

17  know, I know there's -- what do you call it --

18  subtitles, you know, a special budget for, like,

19  supplies, line items for, you know, salaries.

20       Q.    Sure.

21       A.    Contract services.

22       Q.    In terms of the specifics of the

23  budget and how that process works, is it fair to

24  say you're not the person I should talk to?

25       A.    No.

Page 75

1        Q.    Okay.  Have you consulted or made
2    requests to Dr. Kohler in terms of additional
3    resources that your unit needs?
4        A.    Usually, when we're running low, the
5    investigators will, you know, leave a note on my
6    desk or whatever that says, hey, we need these
7    supplies, we're running low.  I take that and go
8    to the administrator, business administrator,
9    Denice, and say, hey, we need this -- these
10   items.
11       Q.    Okay.  Other than being a
12   messenger --
13       A.    That's right.
14       Q.    -- do you have any involvement in
15   terms of how much that costs, or do you ever
16   request, you know, we need a hundred
17   highlighters or --
18       A.    No.
19       Q.    Is it ever that specific?
20       A.    No.
21       Q.    And in terms of requests for
22   resources, have you ever made -- communicated
23   additional needs for your unit specifically as a
24   result of opioid overdoses?
25              MS. HERMIZ:  Objection to form.

Page 76

1          A.    I can tell you for a fact that we've
2    had to order, you know, especially since 2016 --
3    you know, like our body removal service.  We
4    have a body removal service that we have a
5    contract with, that, you know, for this amount,
6    for this many bodies.  That amount had to be
7    doubled because of the amount of cases that were
8    coming through our office.  So, you know, I know
9    that, you know, we've had to buy extra body
10   bags.  So I know we've had to order more, you
11   know, supplies than normal; but the cost, I have
12   -- I have no idea.
13          Q.    So in terms of the specific
14   supplies, you mentioned body bags.  Is there
15   anything else, any other cost -- well, I don't
16   want to use the word "cost" and confuse it, so
17   let me start over.
18          Other than body bags, is there any
19   other supply or resource that you recall
20   requesting that you would attribute to an
21   increase in opiate overdoses?
22          A.    From the investigator side of it,
23   I've known there was -- our overtime budget
24   increased, manhours.
25          Q.    The manhours.  Do you know what that

Page 77

1    equates to in terms of dollars?

2         A.    No.

3         Q.    That's where your knowledge stops?

4         A.    Yes.

5         Q.    Okay.  Do you know the amount of

6    hours it increased by?

7         A.    No.  No.

8         Q.    And in terms of -- you said body

9    bags, overtime hours.  Any other resources or

10   supplies that have increased, to your knowledge,

11   as a result of opiate overdoses?

12        A.    No.  I'm sure they had some supply

13   issues in the morgue that, you know, went up.

14   I'm sure --

15        Q.    Let me just -- I don't want to

16   interrupt your answer entirely, but is the

17   morgue part of your unit?

18        A.    No.

19        Q.    Okay.  And so, for my purposes, I

20   want to focus on things kind of in your lane, so

21   to speak.  So, in your unit, anything other than

22   overtime and body bags?

23        A.    No.

24        Q.    Okay.  And with respect to that

25   increase in overtime hours and body bags, is the

Page 78

1    time frame for both of those increases 2015 to
2    current?
3          A.    Yes.
4          Q.    And, to the best of your knowledge,
5    is the increase in body bags and overtime hours
6    a result of those heroin, fentanyl, fentanyl
7    analog and carfentanil deaths?
8                MS. HERMIZ:  Objection to form.
9          A.    Those played a big part of that.
10         Q.    What -- do you agree there's been a
11   decrease in the number of prescription opioid
12   deaths that your office has seen since 2015?
13         A.    Yes.
14         Q.    And while those prescription deaths
15   have been going down, those illicit opioid
16   deaths have gone up?
17         A.    Yes.
18               MR. CARTER:  We've been going, if
19   this counter is right, about an hour and a half.
20   Are you good to continue?  Would you like to
21   take a comfort break?
22               THE WITNESS:  I would like to take a
23   break.
24               MR. CARTER:  Okay.  So that time I
25   flagged it for you.  You don't need to wait.  So

Page 79

1    if you feel at any time that you want a break,

2    interrupt me and say, hey, now's a good time,

3    okay?

4                  THE WITNESS:  Okay.

5                  MR. CARTER:  We'll go off the

6    record.

7                  THE VIDEOGRAPHER:  Off the record,

8    10:31.

9                       (Recess had.)

10                 THE VIDEOGRAPHER:  We're back on the

11   record, 10:44 a.m.

12   BY MR. CARTER:

13        Q.    Are you okay to continue?

14        A.    Yes.

15        Q.    Okay.  Good.

16              I want to follow up on some

17   questions about prescriptions.

18              Do you have any -- any opinions

19   regarding the prescribing habits of any

20   particular doctor in Summit County?

21        A.    Personally, no.  I've known a few

22   that, you know, have lost their license and that

23   because --

24        Q.    All right.  We'll take it step by

25   step.

Page 80

1           Do you consider yourself an expert
2    or do you have any -- any specialized knowledge
3    in assessing the medical necessity or
4    appropriateness of any prescription?
5           A.    No.
6           Q.    In terms of applying that to an
7    individual, in terms of whether a particular
8    individual had an appropriate prescription or
9    not, is that something you have expertise in?
10          A.    No.
11          Q.    In terms of making an assessment
12   regarding whether a doctor's practice is
13   medically appropriate or not, is that something
14   you have expertise in?
15          A.    No.
16          Q.    You mentioned, am I correct, you've
17   heard anecdotal evidence of doctors losing their
18   license --
19          MS. HERMIZ:  Objection to form.
20          Q.    -- is that correct?
21          A.    Yes.  Yes.
22          Q.    Do you know the names of any doctors
23   sitting here today?
24          A.    One was Dr. Harper.
25          Q.    What was the last name?

Page 81

```
 1          A.     Harper.
 2          Q.     Okay.  Any others?
 3          A.     Dr. Bressi.  Those are the two that
 4   I can remember.  I'm sure there's, you know, a
 5   couple more, but --
 6          Q.     Okay.  In terms of Dr. Harper, did
 7   you play any role in Dr. Harper losing his
 8   license?
 9          A.     I don't make that determination.
10          Q.     Did you report Dr. Harper to any of
11   the governing boards?
12          A.     Personally, no.
13          Q.     Did you -- so when -- what is the
14   time frame, to the best of your knowledge, when
15   Dr. Harper lost his license?
16          A.     It's been several years ago.
17          Q.     Do you know the details that led to
18   him losing his license?
19          A.     No.
20          Q.     How do you know that Dr. Harper lost
21   his license?
22          A.     We get involved through our office,
23   you know, through records requests.  The state
24   board of pharmacy, state medical board will come
25   in and request, you know, records for certain
```

1    individuals that have passed away.  You know,

2    then you talk with those investigators from

3    those agencies and, you know, they tell you,

4    hey, we're looking at such-and-such a doctor,

5    we'd like to, you know, get these records on

6    these certain individuals that passed away.

7    Then you just read follow-ups from, you know --

8    in the newspaper and that, you know, so --

9         Q.    So do you know whether you actually

10   received records requests related to Dr. Harper?

11        A.    Yes.

12        Q.    Okay.  And did you provide those

13   records?

14        A.    Yes.

15        Q.    What's the procedure or office

16   protocol for providing those types of records?

17             MS. HERMIZ:  Objection to form.

18        Q.    Are there any steps you have to go

19   through?

20        A.    Usually it's a written request where

21   they come in and -- and, you know, back then we

22   would just put it on a piece of paper, you know,

23   so-and-so from the state pharmacy board, for

24   example, came in and got the investigation

25   report and autopsy report, and those are stuck

1   in -- in the case file.

2                Within the past year they've went to

3   more of a computer system for records requests.

4        Q.    In order to provide the records in

5   response, are there any consents or approvals

6   that your office has to obtain?

7        A.    The final investigation report, the

8   autopsy report, and included in the autopsy

9   reports is the toxicology report, those are

10  public record.  So unless it's a homicide that

11  hasn't been cleared through the courts, all

12  those can be released, you know.  If I die and

13  you just walked into our office and say, hey, I

14  want the reports on, you know, Gary Guenther, as

15  long as it's not a homicide, they would provide

16  those to you.

17       Q.    But in terms of medical records, if

18  you, in this example, had been a patient of

19  Dr. Harper's and I was requesting Dr. Harper's

20  medical records for you, would that be

21  different?

22       A.    Family, legal next of kin, is, you

23  know, allowed to have those records.  So,

24  usually, you know, families will hire a law firm

25  to represent them, and when that law firm orders

Page 84

1   records, they'll usually have the consent

2   release form signed by the, you know, legal next

3   of kin.  Other than that, it takes a subpoena.

4        Q.    And do you recall what -- what body

5   or organization was investigating Dr. Harper?

6        A.    It had to either be the state

7   pharmacy board or medical.

8        Q.    Sitting here today, do you recall

9   which?

10       A.    No.

11       Q.    Did they recall {sic} patient

12   medical records that --

13       A.    I can't.

14       Q.    Let me just finish real quick.

15       A.    Okay.

16       Q.    Did they request patient medical

17   records for case files that involved Dr. Harper?

18       A.    I -- I don't recall.  That's been

19   several, several years ago.

20       Q.    All right.  Do you recall whether

21   your office provided material in response to

22   inquiries related to Dr. Harper?

23       A.    I know for a fact we gave, you know,

24   autopsy investigation reports.

25       Q.    Whether -- do you know whether there

Page 85

```
 1   were additional patient medical records

 2   provided?

 3       A.    That, I don't recall.

 4       Q.    All right.  Do you recall whether

 5   there were any cases that related to Dr. Harper

 6   where your office -- where Dr. Kohler or

 7   Dr. Sterbenz had identified prescription opioids

 8   as a cause of death for the patient?

 9       A.    I -- I don't remember individual

10   cases.

11       Q.    Okay.  And even without providing

12   the name, do you know whether there was any case

13   where Dr. Harper was involved and there was an

14   outcome with an overdose death attributed to

15   prescription opioids?

16       A.    Like was he convicted of causing the

17   death?

18       Q.    What I'm asking you is, do you know

19   whether there was any case where the Summit

20   County medical examiner ruled an individual's

21   death as a death caused by prescription opioids

22   and in that case there were Dr. Harper

23   prescriptions?

24       A.    I can't say for a hundred percent

25   sure.
```

Page 86

1        Q.    Okay.  Switching to Dr. Bressi, what

2    do you recall in terms of Dr. Bressi losing his

3    license?

4        A.    I know, again, the state medical

5    board and, I believe it was the pharmacy board,

6    were looking into him.  Just by reading articles

7    in the paper, I think there was -- the

8    newspapers -- if the newspapers were right,

9    there was other issues besides, you know, the

10   prescriptions that he was involved with.

11       Q.    What other issues did you read

12   about?

13       A.    I think some mis -- how do you say

14   it -- misconduct with patients.

15       Q.    Was that patient misconduct related

16   to prescription opioids?

17            MS. HERMIZ:  Objection to form.

18       A.    I have no idea.

19       Q.    Okay.  Do you recall whether any

20   of -- whether any group requested records from

21   your office related to Dr. Bressi?

22       A.    Other than the two, you know --

23       Q.    Other than what?

24       A.    Probably the state medical board and

25   the --

Page 87

1          Q.    Okay.  And so --

2          A.    And I'm not sure if -- you know, if

3   it was one or both or --

4          Q.    Understand.

5                Regardless of which one, you believe

6   that one of them would have made records

7   requests to your office in connection with --

8          A.    Yes.

9          Q.    -- Dr. Bressi?

10         A.    Yes.

11         Q.    Okay.  Do you know whether they

12  requested medical records or the public record

13  autopsy report?

14         A.    I know they requested the public

15  record part of it, the investigation autopsy and

16  toxicology report.  I cannot say for a hundred

17  percent sure about the records.

18         Q.    Okay.  In the case of Dr. Bressi,

19  are you -- do you know whether there was a case

20  handled by Summit County Medical Examiner's

21  Office where the determination was an overdose

22  attributable to prescription opioids where the

23  case included prescriptions from Dr. Bressi?

24         A.    I can't recall names, but I do

25  recall several cases that, you know, he was the

Page 88

1    treating physician on people that died from

2    opiate overdoses.

3         Q.    And do you recall what opioids he

4    was prescribing?

5         A.    No.  His specialty was -- he ran a

6    pain clinic -- I do know that -- at the time.

7         Q.    Do you know the time frame at issue?

8         A.    I want to say it's been over five

9    years, five plus years.

10        Q.    That's your best estimate?

11        A.    That's my best estimate.  It's been

12    a while.

13        Q.    Any other details about the

14    Dr. Bressi case that you recall?

15        A.    No.

16        Q.    In terms of specific doctors, is it

17    accurate that Dr. Harper and Dr. Bressi are the

18    only two that you can recall sitting here so

19    far?

20        A.    I'm sure there was others, but those

21    are the two that --

22        Q.    Those are the names?

23        A.    Those are the names that stick out.

24        Q.    If the name of another doctor comes

25    to mind at some point during the deposition,

Page 89

1    will you let me know?

2         A.    Sure.

3         Q.    And other than your office providing

4    the public records in response to Dr. Harper and

5    Dr. Bressi, are you aware of any circumstance

6    where your office evaluated the appropriateness

7    of any prescriptions that those doctors wrote?

8              MS. HERMIZ:  Objection to form.

9         Q.    Let me ask it this way:  Does it

10   fall within your job function to evaluate and

11   pass judgment on whether a victim's

12   prescriptions were or were not appropriate?

13        A.    That's not our -- that doesn't fall

14   under our jobs.

15        Q.    Okay.

16        A.    We're not medical doctors, so --

17        Q.    Understood.

18             In the course of your 30 years on

19   the job -- and I understand that part of that

20   time is just as a photographer.

21        A.    Right.

22        Q.    But in the course of your entire

23   time with the department, have you ever passed a

24   judgment as to whether a particular prescription

25   was medically appropriate or not?

```
                                         Page 90

 1              MS. HERMIZ:  Objection to form.

 2       A.    No.

 3       Q.    Sitting here today, can you identify

 4  any prescription written in a case that you

 5  investigated that you can say was not

 6  appropriate?

 7       A.    Again, I'm not a doctor.  I don't

 8  prescribe.  You know, there's times you say to

 9  yourself, you know, why is this person getting

10  so many, I mean, a prescription for, you know,

11  180, say, rather than the thing, but that's not

12  my job to say why, or to say good or right.

13       Q.    Okay.  Understood.

14              So, in that situation, if you

15  encountered a prescription where your reaction

16  was why is this person getting this many pills,

17  what follow-up steps would you take in the

18  course of your investigative job?

19              Let me ask it this way:  As part of

20  your protocol, would you have to take follow-up

21  steps if you looked at something and thought,

22  eh, why would this person get 180?  Would there

23  be steps to take?

24       A.    Other than, you know, ordering

25  medical records on that patient -- and, again,
```

1    even, you know, on non-opiate overdose cases,

2    you know, sons or, you know, an elderly person

3    dies, we're always going to order medical

4    records if there's some available.  So other

5    than ordering medical records -- again, that's

6    not my determination.  Maybe Dr. Kohler or, you

7    know, Dr. Sterbenz, who has a medical

8    background, you know, can justify or say whether

9    or not, you know, that was good; but when it

10   comes to prescriptions, I'm a layperson.

11        Q.   So what's the percentage of cases

12   where you find -- and this is broader than

13   opiates, okay?

14        A.   Okay.

15        Q.   What's the percentage of cases, when

16   you're investigating an accidental death and you

17   find evidence of a prescription of any

18   medication, where you would then order medical

19   records?

20             MS. HERMIZ:  Objection to form.

21        A.   If it's a case of ours -- it don't

22   matter what type of case -- and the person is

23   being treated by a -- has a primary care

24   physician, we will usually always order records

25   from that primary care physician.

1           If a person doesn't have a primary

2    care physician, which there are a lot, but

3    family says, oh, they always go to Akron City

4    Hospital if, you know, they're sick or

5    something, we'll order those records.

6           Q.    So when you arrive on scene in any

7    case, if you find evidence, whether it's a

8    prescription note or a prescription bottle of

9    some kind, or someone on the scene, next of kin,

10   tells you something like you just described, if

11   you find evidence that points you in the

12   direction of some kind of medical care, the

13   protocol is to run that down and request

14   records?

15          A.    Yes.

16          Q.    If there isn't that context

17   available kind of in plain view or in the course

18   of a conversation with someone on site, do you

19   run searches through any source to try to find

20   who their medical provider was, to check

21   insurance records or anything like that, to run

22   it down on your own?

23          A.    I know the doctors will sometimes

24   run those OARRS reports that, you know, they'll

25   give you -- on those reports they'll give you

 1   the list of medication and who prescribed it.
 2   You know, the doctor will come and say, hey,
 3   check with such-and-such doctor to see if any
 4   records are available.  I know investigators
 5   will come back and just, you know, call the
 6   medical records department of all the local
 7   hospitals to see if any records are available.
 8          Q.    In that example, is that kind of
 9   like a cold call situation?
10          A.    Yes.  Yes.
11          Q.    Where they'll call to different
12   sources and just run the name to see if there's
13   a hit?
14          A.    Right.
15          Q.    In terms of the OARRS reports, do
16   the doctors at Summit County Medical Examiner's
17   Office run those for every patient who comes in,
18   or are they only made when there's something
19   suspicious?
20                MS. HERMIZ:  Objection to form.
21          A.    I can say they don't run them on
22   everybody, so --
23          Q.    Do you -- I'm sorry.  I didn't mean
24   to talk over you.  Were you done with your
25   answer?

Page 94

1          A.    So I can't say for sure, you know,
2     who they run them on and who they don't.
3          Q.    All right.  Following up on that, do
4     you ever make the request or a recommendation to
5     Dr. Kohler or Dr. Sterbenz, hey, for this
6     patient you should run an OARRS report?
7          A.    No.
8          Q.    And in terms of whatever criteria
9     they use, is it fair to say that's not within
10     your scope?
11          A.    Again, we don't have access to it,
12     so we, as investigators, cannot run those
13     reports.
14          Q.    And is it your understanding that
15     whenever they do run a report, a copy of that
16     report makes its way to you in the investigative
17     file?
18               MS. HERMIZ:  Objection to form.
19          A.    Not always.
20          Q.    Not always, okay.
21               So you only receive it if a report
22     is run and they have a follow-up lead that they
23     want you to run down?
24          A.    Correct.
25          Q.    Okay.  So back to your example of a

1    case where, in your layperson's opinion, you

2    think, hey, this is a large quantity of a

3    prescription, have you ever tried to, you know,

4    independently run down pharmacy records or

5    interview the doctor?

6         A.    No.

7         Q.    Have you ever interviewed a doctor

8    based on something you found in the

9    investigation that raised a question?

10        A.    You know, a lot of times, when a

11   person has a primary care physician, we will --

12   the investigator will call that office.  And

13   there are times when, you know, we only talk to

14   the nurse, or whoever is in the office, and we

15   order the records through them at first, say,

16   hey, we'll be ordering records.  There are times

17   where we actually talk to the actual doctor and

18   will ask, you know, what happened, what were the

19   circumstances, and, you know, they'll give you a

20   rundown of the history and what they know of the

21   patient verbally, and then you'll, as a

22   follow-up, say, I'll be sending a request for

23   your records.

24        Q.    In the course of that type of

25   interaction, is your role to kind of -- it's not

Page 96

1    observe and report, but kind of engage and

2    report, or do you actually ask probing questions

3    about specific medical judgments that they've

4    made?

5              MS. HERMIZ:  Objection to form.

6         Q.    Do you understand my question?

7         A.    Like --

8         Q.    Well, let me ask it this way:  When

9    you interact with those doctors, if you're

10   following up on a file, is that an interaction

11   where you're fact-finding and getting the

12   details of the medical care, or does it also

13   include questions where you're asking them why

14   they did something?

15        A.    No.  I'm not a doctor, so, you know,

16   I --

17        Q.    So is it accurate --

18        A.    It's accurate to say I, you know --

19   I don't have the medical background in that, you

20   know, to ask a physician, who's got an M.D.

21   license, you know, why did you do that, you

22   know.

23        Q.    So when you have those follow-up

24   calls with someone in a physician's office,

25   whether it's the doctor or the nurse, is it fair

Page 97

1   to say you're finding out the what and not the
2   why?
3         A.    Correct.
4               Now, there are times -- and it's
5   mainly on, like, inpatient hospital deaths,
6   where there's surgeries involved and that, like,
7   after the exam Dr. Sterbenz will have one of the
8   investigators follow up with, you know, the
9   surgeon, hey, you know, did you happen to cut
10  through, you know, a bullet hole while you were
11  doing the thoracotomy or whatever.  Direct
12  questions like that sometimes we'll call up just
13  to ask, but not about medical care.
14        Q.    And not about why a particular
15  medication was prescribed --
16        A.    Correct.
17        Q.    -- as opposed to a different one?
18        A.    Correct.
19        Q.    You provided that example of a large
20  number of pills.  Is that a specific example
21  that you recall where someone had 150
22  prescribed, or were you just using that as an
23  example?
24        A.    An example.
25        Q.    Okay.  In one of those cases -- I

1    think I know the answer to this, but just let me

2    get through it.  In one of those cases where you

3    saw a number of pills prescribed that, in your

4    layperson's opinion, was a high one, did you

5    ever -- or would you ever ask the doctor why

6    this amount?

7            A.    No.

8            Q.    Is that a conversation you would

9    have with Dr. Kohler or Dr. Sterbenz, say, why

10   was this patient given this number?

11           A.    You know, in passing, you might come

12   back -- when you come back from a scene, you

13   verbally tell whatever doc is on call that week,

14   making the decisions, you'll come back and

15   verbally tell them, hey, you know, I got, you

16   know, a 50-some-year-old male that's got a

17   history of -- and give them the circumstances.

18   Sometimes in passing you'll say, you know, I

19   found a prescription bottle that was, you know,

20   prescribed two weeks ago for 180, you know,

21   oxycodone, or whatever drug, and that's

22   basically the extent of it.

23           Q.    Other than that hypothetical

24   example, any other specific interaction that you

25   recall with Dr. -- with whoever was on call in

Page 99

1    terms of commenting on the appropriateness of

2    that prescription?

3         A.    No.

4         Q.    Okay.  In the course of your

5    investigation, if you saw a case where there was

6    a prescription that you considered to be large,

7    as a layperson, would you -- would you take any

8    follow-up in terms of, you know, talking to

9    family members or any other follow-up to run

10   down the quantity of that prescription?

11               MS. HERMIZ:  Objection to form.

12        A.    No, other than getting the medical

13   records to document it.

14        Q.    Okay.  So you would just --

15        A.    Yeah.

16        Q.    -- note what was on the scene --

17        A.    Yes.

18        Q.    -- make the standard medical records

19   requests --

20        A.    Yes.

21        Q.    -- and then leave that to the

22   doctors?

23        A.    Yes.

24        Q.    Okay.  In terms of physicians in

25   Summit County, do you have any information

Page 100

1    regarding any interactions, if any, Summit

2    County physicians had with any of the Defendants

3    in this case?

4         A.    No.

5         Q.    Do you know whether any physician in

6    Summit County, in fact, interacted with any

7    defendant in this case?

8         A.    Not to my knowledge.

9         Q.    Do you know whether any defendant --

10   excuse me.  I'll start the question over.

11              Do you know whether any physician in

12   Summit County ever made a medical care decision

13   based on anything any of the Defendants ever

14   said?

15        A.    No.

16        Q.    Do you know if any physician in

17   Summit County ever changed a patient's protocol

18   based on anything any Defendant in this case

19   said?

20        A.    No.

21        Q.    Do you know if any physician in

22   Summit County ever relied on representations

23   from any Defendant in this case in identifying

24   which medications to prescribe to their

25   patients?

                                        Page 101

1          A.     No.

2          Q.     In the course of running down your

3    investigative files, have you ever determined

4    that one of the Defendants in this case caused

5    the death of a person in Summit County?

6               MS. HERMIZ:  Objection to form.

7          A.     No.

8          Q.     Have you ever come to the conclusion

9    that any Defendant in this case improperly

10   filled a prescription in Summit County?

11         A.     No.

12         Q.     Have you ever come to the conclusion

13   that any Defendant in this case had opioids

14   improperly secured or stolen from their

15   possession?

16         A.     No.  I don't even know who the

17   Defendants are, so --

18         Q.     Okay.  So these are easy questions

19   for you.

20         A.     Yeah.

21         Q.     Okay.  In terms of, putting the

22   Defendants aside, any information or knowledge

23   as to why any physician in Summit County

24   prescribed opioids to any particular patient --

25               MS. HERMIZ:  Objection to form.

1      A.    I'm not a doctor.  I don't
2  prescribe.  So, you know --
3      Q.    So that's outside of your area?
4      A.    That's outside of my area.
5      Q.    Okay.  With respect to any case file
6  that you've seen where an individual overdosed
7  on illicit drugs, do you have any opinion as to
8  what caused them to use illicit drugs?
9           MS. HERMIZ:  Objection to form.
10     A.    How they became addicted?
11     Q.    Well, let me ask it this way:  With
12  respect to any case, have you ever made a
13  medical determination that the patient was
14  addicted?
15     A.    Only by talking to family members.
16     Q.    And in terms of -- so in that
17  context, have you ever personally diagnosed
18  someone as addicted?
19     A.    No.
20     Q.    And so when you referenced talking
21  to family members, are you talking about
22  situations where the family members would
23  describe the person as an addict?
24     A.    Yes.
25     Q.    And so you would note that in the

Page 103

1   file?

2          A.    Correct.

3          Q.    Is that the kind of information

4   that, if you received it from family members,

5   would always make it into the file?

6                MS. HERMIZ:  Objection to form.

7          A.    Yes.

8          Q.    So in terms of best practice, if you

9   were investigating me --

10         A.    I'm sure, yes.

11         Q.    If you were investigating me and my

12  family member said, he was addicted, that's

13  something that you would want to put in my file?

14         A.    Correct.

15         Q.    Other than reporting -- well, strike

16  that.

17                When you would hear anecdotally from

18  a family member that their deceased was addicted

19  to some substance, would you -- would you

20  question their description, or is that something

21  you would note without questioning?

22                MS. HERMIZ:  Objection to form.

23         A.    When talking to families, you know,

24  you got some families that willingly talk and

25  give the background.  On the other hand, we have

1    other families, you know, that, you know, my

2    son, daughter died of an overdose, that's a

3    stigma, I don't want -- you know, and they'll

4    deny that that person ever had a problem.  So

5    you got two, you know, things that we usually

6    hear.  One family knew nothing about it, or at

7    least they say they don't, and others that will,

8    you know, give you the whole background.

9         Q.    In your experience at the

10   department, you've seen cases where people have

11   had accidental overdoses and they weren't

12   addicted, correct?

13            MS. HERMIZ:  Objection to form.

14        Q.    People can overdose on any number of

15   substances?

16            MS. HERMIZ:  Objection to form.

17        A.    Yes.  You can overdose on

18   everything.

19        Q.    And not everyone who overdoses is

20   addicted, fair?

21            MS. HERMIZ:  Objection to form.

22        A.    I can't make that diagnosis of

23   addiction.  I can't.

24        Q.    All right.  And, likewise, when you

25   have one of those families that's more

1    forthcoming and wants to talk to you about

2    things, have you ever had a situation where

3    they -- where you question -- where they would

4    say, for example, John was addicted, and you

5    would say, based on the fact presentation, I

6    disagree with them, he was not addicted?  Is

7    that your role?

8         A.    I don't have the educational

9    background to say whether or not somebody is

10   addicted or not.

11        Q.    So regardless of --

12        A.    Yeah.

13        Q.    All right.  Understood.

14             So putting that -- putting that

15   aside, getting back to the question that got us

16   on this exchange, in your role as chief forensic

17   investigator, was there any time, when you're

18   investigating a case in Summit County and there

19   was an overdose of illicit drugs, where you

20   formed an opinion as to why they were using that

21   drug?

22             MS. HERMIZ:  Objection to form.

23        A.    No.

24        Q.    You would treat that case just like

25   any other case, you would collect the facts, you

1    would --

2         A.    Yes.

3         Q.    -- take the statements if there were

4    any, you would put it in the report, and you

5    would leave those conclusions to medical

6    professionals?

7         A.    Correct.

8         Q.    Same question with respect to

9    prescription opioids.  Any case, in your tenure

10   in Summit County, where you saw evidence that

11   suggested an overdose on prescription opioids

12   where you formed an opinion as to why that

13   person was using that substance?

14        A.    Usually if they're getting

15   prescriptions, it's documented in medical

16   records of why, you know.  Usually there's, you

17   know, a diagnosis, you have chronic back pain

18   or, you know --

19        Q.    Sure.

20        A.    -- a work related injury.  It

21   explains why they were on the opiates.

22        Q.    So you would collect --

23        A.    Right.

24        Q.    As we've described, you would

25   collect the context and the information

1 available in the medical records, from the

2 family statements --

3      A.    Right.

4      Q.    -- that would be what it is?

5      A.    Yes.

6      Q.    Separate from that, was there ever a

7 case where you formed an opinion synthesizing

8 that material and concluded they were using

9 these prescription medications because of X or

10 Y?

11           MS. HERMIZ:  Objection to form.

12      A.    No.

13      Q.    Like illicit substances, you would

14 leave that to Dr. Kohler --

15      A.    Yes.

16      Q.    -- Dr. Sterbenz?  I think you

17 answered before I finished.

18      A.    Yes.

19      Q.    Okay.  Have you ever published any

20 articles in a newspaper or a medical journal?

21      A.    Published?  No.

22      Q.    Okay.  Have you ever written any

23 articles dealing with opioids?

24      A.    No.

25      Q.    Have you ever written any papers or

Page 108

1    position statements about opioids?

2        A.    No.

3        Q.    Have you ever been asked by any

4    public health organization to contribute to a

5    research report or a policy report related to

6    opioids?

7        A.    You know, other than people calling

8    in and asking for, you know, how many deaths

9    have you had during a certain period of time,

10   that's it.

11       Q.    And that's an important distinction.

12   So you've mentioned, and I think we talked about

13   it earlier, you field media inquiries?

14       A.    Yes.

15       Q.    And sometimes you may be asked to

16   comment on a news story, correct?

17       A.    Yes.

18       Q.    Or provide public records that

19   someone is going to use for a story they're

20   writing, correct?

21       A.    Correct.

22       Q.    So putting that aside, has a

23   government group, like the Centers for Disease

24   Control or the FDA or the Office of the United

25   States Surgeon General, ever reached out to you,

1   as a result of your professional experience, and

2   asked you to contribute to some report they were

3   writing?

4          A.    No.

5          Q.    Do you agree, based on your

6   experience in the field, that Summit County is

7   currently dealing with a heroin epidemic?

8          A.    I think things are starting to

9   change.  2015, 2016, 2017, we had huge increases

10  in the number of deaths that we had from, you

11  know, the heroin and fentanyl.  Talking with our

12  toxicologist and seeing things, cases getting

13  signed out today, we're seeing a lot more

14  methamphetamines, coke and pure fentanyl, not

15  your analog.  I mean, you still get them here

16  and there, but not like 2015, '16, '17.

17         Q.    The pure fentanyl that you're seeing

18  today, is that illicit?

19         A.    Most of the evidence we bring back,

20  I want to say yes, because it's in powder form

21  and bindles and that.  You know, from past

22  experience, I'm used to seeing fentanyl, you

23  know, the patches on the cancer patients and

24  that.  That's where I'm used to seeing it, you

25  know.

Page 110

1        Q.    So when you see legal or
2   prescription fentanyl in the course of your
3   work, it's been not in the overdose context but
4   in a cancer treatment patient, a hospital
5   setting predominantly?
6              MS. HERMIZ:  Objection to form.
7        A.    I can't give you names, but I know
8   we've had cases that come through as overdoses
9   where you do an exam and find that -- you know,
10  you'll find one of those patches in the stomach.
11  So I've seen those patches used, you know, in
12  overdose deaths before.
13       Q.    And so I understand that you've seen
14  it.  I'm just trying to figure out if it's
15  something you can make a generalization about.
16  If it's not, tell me.  But is it generally true
17  that the majority of overdoses that your office
18  determines are attributable to fentanyl over the
19  course of your career has been illicit or
20  illegal fentanyl --
21       A.    Yes.
22       Q.    -- and fentanyl analogs?
23       A.    Yes, especially in the most recent
24  years.
25       Q.    Okay.  Currently, still seeing

Page 111

1    carfentanil?
2           A.    We are seeing it but not like 2016.
3    That would be more questions to ask the
4    toxicologist.
5           Q.    Are you seeing any other illegal
6    drugs currently in a high enough volume that
7    they're notable to you?
8                 MS. HERMIZ:  Objection to form.
9           A.    I'm seeing cocaine a lot more.
10          Q.    What I was trying to do was build an
11   exhaustive list.  So you mentioned that -- I
12   wrote down methamphetamine, coke and pure
13   fentanyl.
14          A.    Yes.
15          Q.    Are those kind of the big -- the
16   three most prevalent substances you've seen?
17          A.    It seems to be, yes.
18          Q.    So going back to my question about a
19   heroin epidemic, if I asked you that question,
20   whether Summit County was dealing with a heroin
21   epidemic in 2015, what would you say?
22          A.    That was a big uptick in cases.
23          Q.    Was Summit County dealing with a
24   heroin epidemic in 2016?
25          A.    Yes.

1      Q.    Was Summit County dealing with a

2   heroin epidemic in 2017?

3      A.    Yes.

4      Q.    Was Summit County dealing with an

5   illicit fentanyl epidemic in 2015?

6      A.    I think, starting in 2015, we saw a

7   huge increase in the fentanyl and heroin deaths,

8   so we did see a big uptick in cases.

9      Q.    With respect to fentanyl and

10  fentanyl analogs in 2015, would you consider it

11  epidemic -- would you consider epidemic an

12  appropriate description?

13          MS. HERMIZ:  Objection to form.

14     A.    I think we first saw the first

15  analog, which I believe was carfentanil --

16  again, you'd have to ask the toxicologist, but

17  carfentanil I can remember hitting the 4th of

18  July weekend in 2016, I believe it was.

19     Q.    So for 2016, would it be accurate to

20  say Summit County was dealing with a fentanyl

21  epidemic?

22     A.    Yes.

23     Q.    2017?

24     A.    Yes.

25     Q.    With respect to fentanyl, what about

Page 113

1    2018?

2         A.    There is still a large amount of

3    people dying from fentanyl overdoses.

4         Q.    I sensed you were shying away from

5    the epidemic label, so let me ask you a broader

6    question.  Maybe it will short-circuit some

7    follow-up.

8              In 2018 is there any substance that

9    you've seen leading to overdose deaths in Summit

10   County that you would think is appropriate to

11   describe as an epidemic?

12             MS. HERMIZ:  Objection to form.

13        A.    I think in pure numbers that we'll

14   see, we are still, you know, going to be -- have

15   elevated numbers, high numbers.  They're not

16   going to be like 2016, where we had roughly 340,

17   60 deaths from overdoses, but the numbers are

18   still high, but they ain't at those peak levels

19   that we had in 2016.

20        Q.    So is it fair to say that you think

21   Summit County, at least where we find ourselves

22   in 2018, has made progress in combating or

23   reducing those numbers of overdose deaths?

24             MS. HERMIZ:  Objection to form.

25        A.    If you go by the numbers probably

1    that we have today, we are down from 2016, but

2    I've learned, through the years, it only takes

3    one bad shipment to hit the area, and then we're

4    back at ground zero.

5         Q.    And in terms of the numbers that

6    you've seen so far in 2018, would you

7    characterize any of those substances as part of

8    an epidemic for Summit County?

9         A.    I think cocaine and methamphetamine

10   is seen in large quantities, of those two drugs.

11        Q.    So in 2018 you think Summit County

12   is dealing with a methamphetamine epidemic?

13             MS. HERMIZ:  Objection to form.

14        A.    I think those drugs are more

15   prevalent in today's -- 2018 than they were in

16   previous years.

17        Q.    Was Summit County dealing with a

18   methamphetamine epidemic in 2017?

19             MS. HERMIZ:  Same objection.

20        A.    I don't think we had the numbers

21   that we do today.

22        Q.    What about cocaine; was there a

23   cocaine epidemic in 2017 in Summit County?

24        A.    Again, I don't know the numbers.

25        Q.    Okay.

1      A.     All I can say is there's been an

2  increase in 2018, you know.  For the past, you

3  know, three years, everybody has been focused on

4  heroin and, you know, the carfentanils.  That's

5  what makes the news.  So everybody is focused on

6  that and you kind of put the other drugs in the

7  back of your -- you know, in the rearview

8  mirror, because you're -- keep getting asked on

9  those two drugs, so you kind of stay up on the

10 heroin and fentanyl.

11     Q.     Based on what you've told me so far,

12 is it the case that 2015 stands out during your

13 career as a year where there was a notable

14 increase in the number of overdose deaths?

15          MS. HERMIZ:  Objection to form.

16     A.     That's when we started seeing the

17 uptick.  2016 is the year that stands out that

18 we got hit really hard.

19     Q.     So, in hindsight, 2015 was the start

20 of the pattern, but 2016 was the peak?

21     A.     Yes.

22          MS. HERMIZ:  Objection to form.

23     Q.     In the course of your 30-year tenure

24 with the department, have you seen anything like

25 2016 in any prior year?

```
                                              Page 116
 1          A.     No.

 2          Q.     Prior to 2015, which was the start

 3   of it, and 2016, is there any -- any prior year

 4   where you would describe Summit County's

 5   experience as dealing with an epidemic?

 6              MS. HERMIZ:  Objection to form.

 7          A.     No.

 8          Q.     And that would be true for any

 9   substance.  So in your 30 years at Summit

10   County, the first time that you witnessed what

11   you would describe as an epidemic that the

12   county was confronting was what you've described

13   in 2015?

14              MS. HERMIZ:  Same objection.

15          Q.     Is that correct?

16          A.     Yes.

17          Q.     Okay.  Switching gears, have you --

18   and these are just for background.  I don't mean

19   to intrude, and I will ask the fewest number of

20   questions possible, okay?

21          A.     Okay.

22          Q.     Have you ever had experience with a

23   prescription opioid, personal?

24          A.     Have I used?

25          Q.     Have you used.
```

Page 117

1          A.    I've had multiple surgeries, yes.
2          Q.    Have you ever had a problem with
3     prescription opioid abuse personally?
4          A.    No.
5          Q.    Has anyone in your immediate family
6     had a problem with prescription opioid abuse?
7          A.    No.
8          Q.    Have you ever sued a drug
9     manufacturer or a pharmacy or a drug distributor
10    in a personal suit on behalf of yourself?
11         A.    No.
12         Q.    Has anyone in your family ever had
13    such a suit?
14         A.    No.
15         Q.    Have you ever been a plaintiff in a
16    personal injury case?
17         A.    No.
18         Q.    Switching topics again -- we're
19    still -- are you good to go for a little bit
20    before we break for lunch?
21         A.    Yes.
22         Q.    Okay.  I'd like to mark as an
23    exhibit an organizational chart from your
24    department.
25                    -   -   -   -   -

Page 118

1              (Thereupon, Deposition Exhibit 1,

2              County of Summit Department of

3              Medical Examiner Organizational

4              Chart Beginning Bates Number

5              SUMMIT_000003815, was marked for

6              purposes of identification.)

7                      -   -   -   -   -

8        A.    Okay.

9        Q.    And we'll make this Exhibit 1 to

10   your deposition.  And so the way the process is

11   going to work, when I mark documents as

12   exhibits, I'm going to give a copy to your

13   attorney first.  I'm going to mark a copy that

14   I'll give you.  It's going to have the court

15   reporter's sticker on it.  She's going to track

16   these, because she keeps the official record, so

17   don't walk away with the stickered copy or I'll

18   get in trouble.

19       A.    Okay.

20       Q.    So, Mr. Guenther, have you had a

21   minute to review the organizational chart that's

22   in front of you and marked as Exhibit 1?

23             MS. HERMIZ:  Is this just the first

24   page you're having him look at or the whole

25   Exhibit 1?

1          Q.    Let me talk about that for

2    background.  On this one, I was going to ask you

3    about the first page.

4          A.    Okay.

5          Q.    It's your right, and I would

6    encourage you, if there is something you haven't

7    seen or something you want to take time to

8    review, you are -- you have an open invitation

9    to review any document I hand you in as much

10   detail as you think is appropriate to answer the

11   question.  In the interest of time and paper,

12   sometimes I'll direct you to a particular part.

13   I've tried to include the full version of things

14   as they were produced.  I don't know necessarily

15   how they exist in your files.  All I have is

16   what we received from Plaintiffs.

17         A.    Okay.

18         Q.    So that's why sometimes there may be

19   something in an exhibit that I'm not

20   particularly interested in.

21         A.    Okay.

22         Q.    But if at any point -- you know,

23   there's no trick question in this -- if you want

24   to look at an exhibit, please do, take that

25   time, and I will give you that time whenever you

1   need it.  Okay?

2            So my question about this one is, is

3   this organizational chart, in terms of the

4   people that are on there, is that current --

5        A.    No.

6        Q.    -- because I know this is an older

7   version?

8        A.    There's several people on this chart

9   that no longer work at the medical examiner's

10  office.

11       Q.    And to make this easier for record

12  purposes, could you -- I'm going to hand you a

13  pen.  Could you just cross out, and tell me who

14  you're crossing out, the people that are no

15  longer with the department?

16       A.    Okay.

17            Deputy medical examiner, Dorothy

18  Dean; morgue attendant, Charles Vincent;

19  forensic investigator, David Rosa; Mike Halas.

20            MR. CARTER:  That's H-a-l-a-s.

21       A.    Administrator, Bob Davis; secretary,

22  Jean Hudson; and software analyst, Patrick

23  Gillespie.

24       Q.    So those individuals are no longer

25  with the department?

Page 121

1          A.     Correct.

2          Q.     Okay.  Let me focus on the structure

3    then.

4          A.     I'm sorry.  I crossed names off as I

5    was going.

6          Q.     That's fine.

7          A.     Okay.

8          Q.     That's what I asked you to do.  You

9    don't have to apologize.

10         A.     Okay.

11         Q.     You followed my instruction.

12         A.     Okay.

13         Q.     On this version of the organization

14   chart that we've marked as Exhibit 2 -- excuse

15   me, Exhibit 1.  It's in tab 2.  I referred to

16   the wrong thing.  So Exhibit 1.  Do you

17   currently have an investigator supervisor?

18         A.     Yes.

19         Q.     And what is their name?

20         A.     Amy Schaefer.

21         Q.     And Ms. Schaefer went into that role

22   in 2016 or 2017?

23         A.     I'm not sure of the exact date.

24         Q.     Was it in that time frame?

25         A.     I believe so, yes.

                                                  Page 122

1           Q.      Okay.  And is that still the kind of
2    direct lieutenant position under you?
3           A.      Yes.
4           Q.      And is the structure of your unit
5    still the same as indicated on this chart, where
6    there's you, an investigator supervisor, and
7    then a group of forensic investigators?
8           A.      Yes.
9           Q.      Is there anyone else in the Summit
10   County Medical Examiner's Office who reports
11   through your chain of command?
12          A.      No.
13          Q.      What is the current number of
14   forensic investigators you have on staff?
15          A.      Not including Amy or myself, there's
16   seven.
17          Q.      Can I have my pen back?
18          A.      Oh, sorry.
19          Q.      No.  It's okay.  Thank you.
20                  And how many investigators did you
21   have on staff, not including you and Amy, last
22   year?
23          A.      I can't -- I know -- I want to say
24   2015, '16, and '17, we were short-staffed.
25   There was times where we were getting by with

1  five investigators, sometimes even four.  We

2  went through that period where we'd hire

3  somebody, get them trained, then they would

4  leave, and we probably went through three or

5  four investigators like that.

6        Q.    All right.  I want to follow up on

7  that.

8              Other than what you just indicated,

9  2015, 2016, and 2017, any other year during your

10  tenure where you recall being short-staffed in

11  terms of the investigative unit?

12       A.    No.

13       Q.    With respect to -- I want to -- I'm

14  going to start by breaking those up by year.

15  If, in response, there are generalizations that

16  apply to all those years, you can let me know.

17             In 2015 how -- how short were you?

18  How many were you down?

19       A.    At least one.

20       Q.    So you say "at least one."  What

21  would the maximum be?

22       A.    You know, it seemed like we were

23  always short at least one, and, you know, over

24  the past several years, we could be down as many

25  as three, so one to three investigators over the

Page 124

1    last, you know, three years, four years.

2         Q.    So my first question was 2015, but

3    based on your answer --

4         A.    Yeah.

5         Q.    -- you would say a range of one to

6    three for 2015, '16, '17?

7         A.    Yeah.

8         Q.    Are you currently understaffed?

9         A.    We are fully staffed.  It's been

10   less than a year, so our youngest person with

11   the least amount of seniority has still got less

12   than a year under her belt.

13        Q.    So the first time that you remember

14   being understaffed in 2015, what were the

15   reasons that -- well, strike that, because I've

16   shifted to another question.

17             You said it felt like you were

18   training people, you would get them ready to go,

19   and then they would leave.  When you were

20   understaffed, were you losing and having trouble

21   retaining the newer employees, or did you lose

22   senior employees that had been with you for a

23   long time?

24        A.    I want to say -- like Dave Rosa, who

25   is on this chart, I want to say he left in 2015.

Page 125

1  He retired and went to Puerto Rico.
2       Q.    So his departure was in the ordinary
3  course?
4       A.    Yeah.
5            You know, when I first was hired in,
6  you know, usually the turnover rate to become an
7  investigator -- well, to become an investigator
8  was very slim, because the turnover rate was
9  non-existent when I first started.  I mean, it
10  was somebody had to either -- you know, were 65,
11  70 years old and had to retire or somebody would
12  get sick and have to retire before a job opening
13  came open.  These days, you know, we've had
14  them -- had them hire a person, get them
15  trained, then, you know, they get a job at BCI.
16  We had one that left for BCI.
17       Q.    And what's BCI stand for?
18       A.    That's the Bureau of Criminal
19  Investigation, the State Crime Lab.
20            We've had them leave because, you
21  know, the volume -- they couldn't -- the stress
22  was getting to them, so they left and went back
23  home.
24       Q.    On that issue, were those all recent
25  hires, where they got on the job, had the quick

Page 126

1    experience and realized it wasn't the kind of
2    job they thought it would be?
3         A.    Right.
4         Q.    Did you have any turnover in 2015,
5    '16, '17 with long-time employees who burned
6    out, so to speak?
7         A.    No.  Like I said, Dave was the last
8    one to leave, and his mom was already in Puerto
9    Rico so he went to Puerto Rico.
10        Q.    In terms of timing, is that -- is
11   Dave's departure when you first had a staffing
12   problem in that you had a hard time getting
13   someone to replace him and stick with it?
14        A.    Actually, hiring somebody was the
15   easy part.  Retaining them was the hard part.
16        Q.    So you haven't had difficulty
17   searching and finding applicants to come in the
18   door?
19        A.    Right.
20        Q.    But getting them to stick has been a
21   problem?
22        A.    Yes.
23        Q.    And so you mentioned -- I was
24   starting to write down a list -- some would
25   leave to go to BCI and others would leave

1  because they would burn out --
2        A.    Yeah.
3        Q.    -- they decided it wasn't the job
4  they wanted?
5        A.    Yeah.
6        Q.    Any other reasons?
7        A.    One was, you know, travel time.
8        Q.    Were they new parents or --
9        A.    He lived up in one of the suburbs of
10 Cleveland, so actually he -- he's working for
11 the Cuyahoga County Medical Examiner's Office.
12       Q.    So he was confused by the map when
13 he applied at Summit?
14       A.    Yeah.
15       Q.    Any salary issues?
16       A.    It's much improved since the last
17 contract, which was signed like a year and a
18 half ago, but prior to that, salary -- I think
19 that's what enticed somebody to go to BCI was
20 they could offer, at the time, a lot more than
21 what we could offer.
22       Q.    With respect to the new employees
23 that left in that 2015-2017 time period, can you
24 ballpark how many people you're talking about
25 that you hired, trained and then didn't stay?

1          A.     At least four.

2          Q.     Four.  Would it have been as many as

3    ten?

4          A.     No.

5          Q.     So four is a good estimate?

6          A.     Yes.

7          Q.     And so during that time period, what

8    were the circumstances where you would have been

9    down as many as three?

10         A.     Personnel-wise, we might not have

11   been down three, but usually when we hire a

12   person, it takes probably a good -- closer to

13   three months to the point where they're able to

14   work by themselves independently.  So it's not

15   like, you know -- even though we had six

16   investigators, maybe one of them was still in

17   training and they couldn't, you know -- they had

18   to work with somebody, so --

19         Q.     So the person who was mentoring

20   them, so to speak --

21         A.     Right.

22         Q.     -- would have a drop in their own

23   efficiency --

24         A.     Right.

25         Q.     -- because they've got additional

Page 129

1   weight?

2          A.    Right.

3          Q.    And so -- all right.  So you would

4   have a hard time getting through that training

5   period where then the person that was training

6   them could get back to their full capacity?

7          A.    Right.

8                And just to give you an idea, say

9   I'm an investigator.  I quit today.  It's

10  usually going to take the county at least, by

11  the time the interview process is over and

12  everything, over two months before I physically

13  have my replacement in my office.  Then you got

14  to train that person another close to three

15  months before they can function on their own.

16  So we're talking about, you know -- by the time

17  somebody quits -- six months before somebody is

18  actually able to cover a shift by themselves.

19         Q.    Would new recruits have any required

20  training before they would show up in your

21  office?

22         A.    Most of our recent hires have at

23  least a Bachelor's degree.  Most of them are

24  straight from some college, have at least a

25  Bachelor's degree.  I got several that's got

```
                                          Page 130

 1    Master's degrees in, like, forensic science

 2    background, so they got the -- I call it the

 3    book knowledge.  It's just --

 4         Q.    But there isn't -- there isn't a

 5    county training program or --

 6         A.    No.

 7         Q.    -- a medical examiner boot camp --

 8         A.    No.

 9         Q.    -- or anything?

10               Okay.  And then you said that you

11    train them up once they arrive, correct?

12         A.    Correct.

13         Q.    What -- give me an overview of the

14    training program that you provide when -- I come

15    in as a new recruit.  What can I expect?

16         A.    Okay.

17               Usually, you know, you're going to

18    be placed on day shift, and Amy does -- she's

19    great at training.  My patience is gone.  So Amy

20    does most of the training.  And usually the

21    investigator, at first, will just get to know

22    the office and kind of the procedures that we

23    have.  They'll listen to another investigator

24    take phone death calls, like in-patient hospital

25    death calls and that.  They'll go to the death
```

Page 131

1   scenes with an investigator, at first just to

2   observe and watch how things are done.

3                And as time goes on, you know, you

4   give them a little bit more responsibility at

5   each death scene that you go to.  So, you know,

6   the first couple, you might just go and watch.

7   The second one, or third or fourth one, you

8   might go and do the photography.  And you just

9   add on more and more responsibilities as you go

10  on.

11       Q.    In approximately three months, in

12  the standard course, a recruit is able to then

13  go out on a shift by themselves?

14       A.    Yeah.  Now, I've had people come in

15  that's had law enforcement background, like

16  being a previous police officer somewhere, and

17  it's taken less time.  The biggest -- biggest

18  learning curve that the new investigator has is

19  learning the medical terminology and that,

20  because, you know, you get these hospital

21  doctors or nurses calling in death reports and

22  they're using those long medical words and that.

23  It takes a while to get used to being able to

24  write those down and know what the meanings are.

25       Q.    Sure.

Page 132

1              In that time period where you were

2    short-staffed, were there any investigators that

3    you had to fire because of performance issues?

4         A.    Yes.

5         Q.    How many times did that happen?

6         A.    Just once.

7         Q.    And what was the performance issue

8    with that person?

9         A.    Dr. Kohler kind of handled that,

10   but, you know, from my standpoint, it was report

11   writing, documenting things properly.  I mean,

12   he'd have reports where, you know, they were all

13   being reviewed because he was still on his

14   probation period, but he would have, like, a

15   death scene in Stow, but he would have, like,

16   the Akron Fire Department responding, so he

17   would get names and that mixed up.

18              And he had a hard time dealing -- it

19   was hard for him to talk to families.  I mean,

20   that's not the easiest job in the world,

21   especially -- you know, that's the worst day of

22   their lives and they're trying to answer

23   questions and that, or making death

24   notifications.

25         Q.    How long --

Page 133

1          A.     It never gets easy.

2          Q.     I'm sorry.  I didn't mean to

3    interrupt.

4                 How long was that gentleman with the

5    department before he was let go?

6          A.     I want to say four, five months, if

7    not even six.  I'm not sure.

8          Q.     Did he ever make it beyond the

9    probationary period?

10         A.     No.

11         Q.     In terms of probationary period, do

12   you refer to -- is that a formal term of art,

13   where until they're able to go out on their own,

14   they're a probationary investigator?

15         A.     Yeah.  Usually, yeah.

16         Q.     Okay.  When a probationary

17   investigator completes the write-ups for the

18   unit, does it note -- you know, when they sign a

19   report, do they sign something as like, you

20   know, probationary or pending?

21         A.     No.

22         Q.     You just know that they are

23   probationary?

24         A.     Yes.

25         Q.     What was that individual's name who

```
                                            Page 134
 1   you had to let go?
 2        A.    Clarence -- what was his last name?
 3        Q.    Dorsey?
 4        A.    Dorsey, who was a police officer for
 5   30-some years with Akron.
 6        Q.    Okay.  So for whatever reason, he
 7   had a hard time transitioning --
 8        A.    Yeah.
 9        Q.    -- to your line of work?
10        A.    Yes.
11             MR. CARTER:  It's a little bit
12   before noon.  I'm happy to keep going, or we can
13   break for lunch.
14             THE WITNESS:  Let's take a break.
15             MR. CARTER:  Take a break, all
16   right.  We're going to go off the record.
17             THE VIDEOGRAPHER:  Off the record,
18   11:56.
19
20             (Luncheon recess taken.)
21
22
23
24
25
```

Page 135

1

2              THE VIDEOGRAPHER:  On the record.

3      The time is 12:19.

4                     - - - - -

5                  AFTERNOON SESSION

6        CONTINUED EXAMINATION OF GARY GUENTHER

7      BY MR. CARTER:

8          Q.    Did you have an okay lunch?

9          A.    Yes.

10         Q.    Ready to continue?

11         A.    It's nap time.

12         Q.    I know you're kidding, but if you

13     need a break for any reason, or if you get

14     uncomfortable, let me know, okay?

15         A.    Okay.

16         Q.    All right.  Picking up where we left

17     off, talking about some of the staffing in your

18     department over the years, what's a typical

19     workload on an hourly basis for the

20     investigators in your department?

21         A.    It changes daily.  I mean, there's

22     days where an investigator will come in during

23     an eight-hour shift and just take a few death

24     calls over the telephone, not have to go out

25     anywhere, no scene work to do.  There's been

1  other times -- other days, you know, you're

2  working a shift and you've got, you know, two,

3  three, four scenes in one -- one shift.  So it

4  varies from day to day.

5      Q.    In terms of hours, and just the

6  normal requirement, what -- how many shifts do

7  you have?  And then I'll follow up in terms of

8  how many hours they last and what a typical

9  workweek looks like in terms of number of hours.

10      So the first question is, how many

11  shifts do you organize the investigators into?

12      A.    The investigators have three shifts.

13      Q.    And what are those shifts?

14      A.    We just changed them.  11 p.m. to 7

15  in the morning, then 7 to 3, then 3 to 11.

16      Q.    So three eight-hour shifts?

17      A.    Yes, sir.

18      Q.    When was it that you made that

19  change to the current division?

20      A.    It's been within the past year.

21      Q.    Prior to that, what was the shift

22  arrangement?

23      A.    It was still three shifts, but it

24  was moved up an hour, so it was, like, 8 to 4, 4

25  to midnight, midnight to 8.

                                              Page 137

1          Q.    And how long was it the 8 to 4, 4 to

2    midnight --

3          A.    As long as I can remember.

4          Q.    So sitting here today, to your best

5    recollection, there are only -- there have

6    always been three eight-hour shifts and you're

7    just now in the second version?

8          A.    Yes.

9          Q.    So for a typical investigator -- so

10   putting aside you as chief.  I'll come to you

11   next.

12         A.    Okay.

13         Q.    For one of the just basic forensic

14   investigators, how many shifts do they work a

15   week?

16         A.    They work five days, unless they,

17   you know, call off sick or take vacation time.

18   So everybody is scheduled five eight-hour shifts

19   out of seven days.

20         Q.    So it's a 40-hour workweek?

21         A.    Yes.

22         Q.    And if for some reason they do more

23   than that, that's when overtime is triggered?

24         A.    Yes.

25         Q.    Okay.  How are the shifts

Page 138

1   distributed in terms of the five-day workweek?

2   If I'm one of your investigators, do I -- well,

3   what do you call them?  So what's the 11 to 7

4   overnight shift?

5        A.    I call them night shift, day shift,

6   and afternoon shift.

7        Q.    Okay.  So then how do you spread out

8   night, afternoon and overnight shift in terms of

9   a normal week?  Could someone work different

10  shifts in one week, or do you work the same

11  shift for a week?

12       A.    Amy does the schedules, but normally

13  day shift and afternoon -- or day shift and

14  night shift usually -- there's two investigators

15  on each shift, and we got one that kind of goes

16  in between day and afternoons, swing shift I

17  call it, which we just started since we're full

18  time.  But night shift and day shift, both

19  investigators work Monday, Tuesday, Wednesday.

20  One is off Thursday, Friday, the other one works

21  Thursday Friday, and the one that was off

22  Thursday, Friday works the weekend.  And usually

23  they alternate weekends off.

24       Q.    Is there anyone that is constantly

25  on the overnight shift?

1          A.    It's bid per the union contract each

2     year, and it goes by seniority.  So the person

3     with the most seniority gets first choice, so

4     usually midnight shifts -- well, I got one

5     that's been -- he enjoys it.  He's been there

6     over 20 years.  But usually the midnight shift

7     is low man or woman on the totem pole.

8          Q.    So the shifts all pay the same?

9          A.    Except for afternoons and midnights,

10    the actual salaries are the same, but you get a

11    shift differential of, like, 30 cents per hour

12    for working the afternoon, midnight shifts.

13         Q.    All right.  When folks come in for

14    their shift, do they punch a timecard, is there

15    an hour log?  How do you track --

16         A.    We got a Kronos system, so they

17    swipe their card.

18         Q.    How long have you had that system?

19         A.    I want to say close to ten years.  I

20    believe.  I'm not sure on dates --

21         Q.    Sure.

22         A.    -- but it's been --

23         Q.    Have you had --

24         A.    -- a while.

25         Q.    I'm sorry.  I didn't mean to talk

1    over you.

2              Have you had it the entire time that

3    you've been chief?

4         A.    No.  Well, I believe so, yes.

5         Q.    Prior to the Kronos system coming

6    in, how was it tracked?

7         A.    Basically, it was the honor system.

8    You showed up on your shift and stayed your

9    shift.  You worked over.  You turned in the

10   slip.

11        Q.    So prior to that there wasn't an

12   old-fashioned punch card?

13        A.    No.  No.

14        Q.    Do you keep the time records from

15   1995 to 2000, or do you -- do you know what

16   period --

17        A.    Downtown might have it.  I don't

18   have those.

19        Q.    Is that something you oversee in the

20   course of your role as chief in terms of --

21        A.    Everything now is through the Kronos

22   system, so it's all -- I mean, it's on the

23   computer, so --

24        Q.    As chief, do you have to approve

25   overtime requests?

1          A.     Yes, but there has been occasions
2     I'd go to Dr. Kohler and say, hey, you know,
3     so-and-so is going out sick or going to be out
4     sick for X amount of days, he's scheduled to
5     work by himself these days.  Is it okay to offer
6     up overtime for those shifts?  So stuff like
7     that I will get approval from doc, Dr. Kohler.
8          Q.     On those occasions do you recall an
9     instance where Dr. Kohler refused to approve it?
10         A.     No.
11         Q.     So she defers to you in terms of
12    what the need is for your unit?
13         A.     Yes.
14         Q.     What are your current shift
15    obligations?
16         A.     Mine, Monday through Friday, usually
17    7:30 a.m. to 4 p.m.
18         Q.     Do you go out and do scene
19    investigations still?
20         A.     Yes, but not like -- not the volume
21    that a regular investigator --
22         Q.     Did you go to that lower volume
23    level at the time that you became chief?
24         A.     You know, a regular investigator,
25    I'd say I handled, you know, 150 cases a year, a

1    hundred cases.

2         Q.    Is that typical for a regular

3    forensic investigator?

4         A.    Yes.  Some do -- it depends on what

5    shift.  Midnights, you know, you get your more

6    traumatic type deaths, homicides and that, on

7    midnight shift, but you don't get the volume,

8    the numbers that you usually do on afternoons

9    and day shift.  So you're up here as an

10   investigator.  Then I went to investigator

11   supervisor.  It dropped off some because I was

12   doing more of your administrative-type stuff.

13   Then when I became chief investigator, it even

14   dropped more.

15        Q.    All right.  So as chief

16   investigator, what are the circumstances where

17   you would personally go out into the field on

18   site?

19        A.    There are times, like this past

20   Saturday, I covered day shift.  My day shift

21   investigator had a death in his family, so he

22   called off at the last minute and I couldn't

23   find an investigator to cover, so I covered it.

24        Q.    So one circumstance is you pitch in

25   if there's a need --

Page 143

1      A.    Yes.

2      Q.    -- and someone else can't cover it?

3            Are there other circumstances where

4  you would come in?

5      A.    Oh, yeah.  If -- if I'm working and

6  say I've got two regular investigators there, or

7  just one, if it's on a Thursday, and they're out

8  on a death scene and another call comes in, I'll

9  take those calls.

10     Q.    So other than kind of pinch-hitting

11  when you're the only one manning the station --

12     A.    Right.

13     Q.    -- are there times where a case is

14  complex or unique, where you come in because

15  you're the most experienced, or is it really

16  just a need-based coverage?

17     A.    It's just a need base.  Like, I've

18  done it in the past where an investigator has

19  questions on one of their cases, or if it's a

20  big case, I'll go to the death scene and maybe

21  assist, but I won't -- you know, that

22  investigator is still taking the case.

23     Q.    Okay.  So you never can think of a

24  situation when you were chief where you had an

25  investigator available and assigned but where

1  you took the case away because --

2         A.    Right.

3         Q.    -- it was a certain type of case --

4         A.    Right.

5         Q.    -- that you needed to handle?

6         A.    Right.

7         Q.    That's never happened?

8         A.    No.

9         Q.    Okay.  In terms of jurisdiction of

10  the office -- and we discussed some of this with

11  Dr. Kohler, so I won't go through it all with

12  you, but just some general points.  Not every

13  death in Summit County falls within the

14  jurisdiction of the medical examiner's office,

15  correct?

16         A.    Correct.

17         Q.    And of the set that does fall

18  within, when those -- when a death is reported,

19  who answers the phone at the office?

20         A.    If it's when the office is open,

21  like day shift, the secretaries would answer the

22  phone.

23         Q.    Okay.  What if it's overnight?

24         A.    From -- the office technically

25  closes at 4, so 4 p.m. to 7:30 the next morning

Page 145

1   it's only staffed by investigators.

2        Q.    So if a call comes in, it would be

3   answered by an investigator --

4        A.    An investigator.

5        Q.    -- when it's not normal business

6   hours?

7        A.    Right.  Now --

8        Q.    Go ahead.

9        A.    -- there are times like -- I know a

10  couple of investigators, like if they're working

11  by themselves on midnight, they get a call, say

12  a homicide, so they go to the death scene; while

13  they're out, sometimes they'll transfer the

14  phones to the sheriff's office, have them

15  answer, and get in touch with them only in cases

16  of emergencies.  Like if, while they're out, a

17  hospital calls in to report a death, they're not

18  going anywhere, so the sheriff's office usually

19  will tell them, hey, let me get your name and

20  number; when he gets back to the office, he'll

21  call you back.

22       Q.    And that scenario is one that is

23  provided for in the manual, right?

24       A.    Yes.

25       Q.    There are guidelines as to what

                                                    Page 146

1    employees are supposed to do if they're the

2    person on call and gets called into the field?

3          A.    Right.

4          Q.    And one of those is to tell people

5    where they are and --

6          A.    Right.

7          Q.    -- leave contact information,

8    correct?

9          A.    Yes.

10         Q.    So during normal business hours a

11   call comes in, fielded by one of the

12   secretaries; does it immediately go from the

13   secretary to one of the investigators?

14         A.    Right.

15         Q.    For the cases where the office

16   accepts jurisdiction --

17         A.    Okay.

18         Q.    -- even for those cases, there is

19   not an on-scene visit for every one of those, is

20   there?

21              MS. HERMIZ:  Objection to form.

22         Q.    Let me reask it in a less negative

23   way.

24              Do you send a scene investigator to

25   every case that the Summit County Medical

1  Examiner's Office accepts jurisdiction?

2       A.    If they die outside of a facility?

3       Q.    Yes.

4       A.    Yes.

5       Q.    Okay.  So every time they don't die

6  in a hospital or a medical care facility --

7       A.    If it's a case, or suspected case,

8  one of the investigators will go.

9       Q.    And so if someone dies and they're

10  not in a facility, it's never the case where

11  police or fire or some other first responder

12  would transfer the body before an investigator

13  from your unit has made it there?

14       A.    Correct.

15             Now, there might have been an

16  exception somewhere along the road at one time,

17  but 99.9 percent of the time, an investigator

18  has got to go to a scene and do a scene

19  investigation if the case sounds like it's

20  falling underneath our jurisdiction.

21       Q.    And they go out there while the body

22  is still there?

23       A.    Correct.

24       Q.    Okay.  In terms of -- switching

25  gears a little bit, we talked about that one

1  gentleman, Mr. Dorsey, who you had to let go.

2  Have you ever had a situation where you had to

3  discipline someone in the unit because they were

4  mishandling evidence or personal property that

5  was collected on the scene?

6        A.    No.

7        Q.    So you've never had a situation

8  where, you know, cash or some kind of personal

9  property that was unclaimed by next of kin,

10  where that was misused?

11       A.    No.

12       Q.    And you haven't had a situation

13  where --

14       A.    Not that I'm aware of.

15       Q.    Understood.  That's a limit to all

16  your answers.

17            You haven't had a situation where

18  narcotics have been taken from an employee out

19  of custody?

20       A.    No.

21       Q.    Have you ever had a situation where,

22  not because it went to some employee, but where

23  you've lost track of scene evidence that was

24  collected, where it just gets misplaced?

25       A.    No.

1    Q.    What do you do -- I saw in the

2  manual the procedures for maintaining and then

3  eventually distributing property, unclaimed

4  property, how that process works.  What do you

5  do with medications that were collected once

6  they've been handled in terms of any toxicology

7  testing?  How do you dispose of them?

8    A.    Once -- you know, once the

9  toxicologists say no need to -- so they're

10  originally locked up in the investigator area.

11  There's a file cabinet with padlocks that --

12  they lock them up there.

13    Q.    Are they key padlocks or code?

14    A.    Key.

15    Q.    Who has the key?

16    A.    Just the investigator.

17    Q.    So you and the people in your

18  department --

19    A.    Right.

20    Q.    -- all have access to that?

21    A.    Right.

22    Q.    All right.  Please continue.  Then

23  what do they do?

24    A.    Once all that's done, I will take

25  that evidence, log them into the computer

1  system, and they're locked up in a back storage
2  room inside of a locked cage.  Six months after
3  the date or the case has been signed out, so,
4  you know, signs out a case today that had
5  prescriptions, six months from now, I can get a
6  court order.  Then I turn those prescription
7  drugs over to Akron Police, and they do the
8  destruction.
9        Q.    And so before you transfer custody,
10  you always have to get a court order?
11        A.    Yes.  For the prescriptions, yes.
12        Q.    What about for the illegal drugs?
13        A.    For the powders, syringes and that
14  type of stuff, yes.
15        Q.    Court order?
16        A.    Court order, yeah.
17        Q.    And they go to the same locked file
18  cabinet?
19        A.    Yes.
20        Q.    Have you -- I'm sorry.  Go ahead.
21        A.    But for the sake of things, I
22  usually do two, you know -- get rid of
23  evidence -- get two court orders per year, so
24  one towards the beginning of the year and one
25  towards the end of the year, so I do it usually

Page 151

1   twice a year.

2        Q.    So you do a couple big sweeps --

3        A.    Yeah.

4        Q.    -- instead of every six months when

5   something comes due?

6        A.    Yeah.

7        Q.    Have you ever had someone outside

8   the office steal something from the cabinet?

9        A.    Not that I'm aware of.  Not to my

10  knowledge.

11       Q.    Has anyone ever done an audit of the

12  medical examiner's office and told you that you

13  need to do, you know, a different procedure for

14  the storage and safekeeping of those narcotics?

15       A.    The county has a division, the

16  internal audit divisions, and they audit not

17  just our office but all offices, and go over

18  procedures and that, so they've been in a couple

19  times.

20       Q.    Are you aware of any changes that

21  they've required with respect to the custody and

22  secure-keeping of narcotics?

23       A.    Somewhat better counts, because say

24  if I go to a death scene, I bring back, say, ten

25  prescription bottles of miscellaneous pills.  So

1    we got a form to fill out each time

2    prescriptions are brought back, you know, that

3    lists where it was filled, how many, who

4    prescribed it and so forth; so, you know, you'll

5    have the original amount prescribed, say 30, and

6    then how many left, so you got to count how many

7    pills are in there.  A lot of times, you know,

8    especially on afternoons and midnights, you

9    bring back several bottles of prescriptions and

10   you're counting and the phone rings, so you're

11   in the middle of a count and the phone rings,

12   and you take that phone call.  If it's a death,

13   it could be ten minutes on the phone, or, you

14   know, if it's family calling in, it could be

15   five minutes or so.  Then you go back and start

16   that count again where you thought you left off.

17          So, you know, they just kind of

18   said, watch your counts, and maybe sometimes two

19   people count, which is nearly impossible,

20   because sometimes you only got one person.

21          Q.    So you remember the audit committee

22   has -- has made suggestions --

23          A.    Right.

24          Q.    -- to increase the accuracy of your

25   inventory?

Page 153

1          A.     Yeah.

2                 MS. HERMIZ:  Objection to form.

3          Q.     Any other recommendations that come

4     to mind?

5          A.     No.

6          Q.     Have you had the same, you know,

7     padlock procedure during the time that you've

8     been there?

9          A.     No.  We got these -- when did we

10    move?  I want to say mid to -- '96, '97 we moved

11    into the facility we're at now from an older

12    building, so we put the file cabinet up in the

13    investigator's area, so, you know, things like

14    that changed when we made the move.

15         Q.     So that's been in place for about 20

16    years --

17         A.     Yes.

18         Q.     -- and change?

19         A.     Yes.

20         Q.     Prior to that what was the system,

21    if you remember?

22         A.     At the time I think it was just give

23    it to the chief investigator and he locked it

24    up, at the time.

25         Q.     And you weren't the chief at the

Page 154

1    time?
2         A.    No.   No.   And I think that was
3    before we even had computers, so back -- when I
4    first started, it was all stuff done up by
5    typewriter or handwritten.   So I'm not even sure
6    of the procedure, because you couldn't log it
7    into the computer database back then, so I'm not
8    sure what --
9         Q.    In terms of the database, what
10   database system does the office use in terms of
11   things that you interact with as the chief
12   investigator?
13        A.    Just so you know, this database was
14   made in-house, so it's kind of built from
15   within, and the person who developed it is
16   retired.
17        Q.    Was that Mr. Gillespie?
18        A.    Yeah.
19              You got your case database system,
20   where you look up a name or a case and get the
21   demographics.   You get the tox results, if
22   they're in there.   You can look at the autopsy
23   protocol, the investigation report, and -- so
24   that one I use.
25        Q.    Do all your field investigators have

1   access to that?

2          A.     Yes.

3          Q.     Do they all use it?

4          A.     To look up cases, yes.

5          Q.     What other databases do you use?

6          A.     So that database only has cases in

7   it.  I call it the red book database, which

8   every death that's reported should be logged

9   into that.  It just gives the date, name of the

10  person, time of -- where they died at and time

11  of pronouncement.  And, you know, there's boxes

12  you check off, autopsy, referral, which means

13  not a case, case, scene visit.  Then there's the

14  statistics, which shows your stats for the year

15  for whatever number of dates you punch in.

16         Q.     That's all in the red book, what you

17  call the red book database?

18         A.     No.  This is -- the stats is --

19         Q.     Is separate?

20         A.     That you can actually get off from

21  the case database system.

22         Q.     Okay.  Sorry.  You lost me.  See,

23  there's --

24         A.     You can get stats from the case

25  database system.

Page 156

1          Q.    You can?

2          A.    Yes.

3          Q.    Is there another source to get

4     statistics?

5          A.    No.

6          Q.    Okay.  So when you said the red book

7     database, that's the case database?

8          A.    Yeah, but it also shows referrals,

9     and that's just a log of who's called, what

10    deaths have been reported.

11         Q.    Okay.  So within that same database,

12    there are other ways you can query it to pull

13    statistics?

14         A.    In the case database there's a

15    button that says "statistics," so I hit that

16    button --

17         Q.    So it's very user friendly?

18         A.    Yes -- punch in the date or dates,

19    and you ask what limited questions -- you know,

20    what types of cases.

21         Q.    So it's able to search the

22    database --

23         A.    Yeah.

24         Q.    -- and produce statistics?

25               Okay.  Do your investigators have

1   access to the statistics function in that case

2   database?

3          A.    I want to say yes, they have that

4   function, but they -- I don't know if they use

5   it.

6          Q.    And I think as you indicated before

7   lunch, if there is a public or a media inquiry

8   for statistics, that's something that you field

9   as opposed to your line investigators typically?

10         A.    Yeah.  Myself or Dr. Kohler, or even

11  sometimes Amy will field those.

12         Q.    All right.  Prior to Mr. Gillespie

13  building the case database, what did you use?

14  Was there a red book?  Is that why it's called

15  the red book case database?

16         A.    We had an old -- old ledger books

17  that the secretaries filled in.  One was labeled

18  homicide.  One was labeled accidental.  So as

19  doctors were finalizing cases, they'd go to --

20  you know, if it was ruled a homicide, they would

21  go to a homicide book and put the information

22  down.  So it was all -- before the database,

23  there was a lot of physically looking at stuff

24  in books.

25         Q.    There was no statistics button?

1        A.    No.

2        Q.    When did the database come into

3    place, to the best of your recollection?

4        A.    I want to say mid-'90s, but, you

5    know, like stats wasn't added until at a later

6    point.  I can't tell you when, but that stats

7    button that I like wasn't added until, you know,

8    later on in the process.

9        Q.    So it was improved and updated over

10   the years?

11       A.    Yes.

12       Q.    Okay.  All right.  Other than that

13   case database, are there any other manual or

14   electronic databases that you access in the

15   course of your work?

16       A.    You know, I got a section where you

17   can look up numbers for, like, police

18   departments or fire departments, hospital

19   numbers and that.

20       Q.    And separate than the internet?

21       A.    Yeah.  It's -- call it the phone

22   database.

23       Q.    Appropriately named.

24       A.    Yeah.

25       Q.    And then there's that Kronos system

1  we talked about?

2        A.    Right.

3        Q.    Any other electronic databases that

4  you use?

5        A.    Not that I can recall.

6        Q.    When was the last time you

7  personally looked at the statistics for overdose

8  deaths?

9        A.    Oh, God.  A month or two ago.

10       Q.    Do you remember -- what was the

11  reason you did it?

12       A.    Somebody asked how many suicides

13  we've had and if we've had more suicides than

14  overdoses this year.

15       Q.    Do you remember who asked?

16       A.    No.

17       Q.    Do you remember what the answer was?

18       A.    At the time we were running neck and

19  neck I think, suicides and overdoses.

20       Q.    Okay.  Was that unusual in terms of

21  the volume of suicides?

22       A.    Suicides seemed to be on the uptick

23  in the past year.

24       Q.    In terms of procedure for

25  designating something as a suicide versus an

1   accidental overdose, and I think I know the

2   answer based on earlier, but let me just ask you

3   -- so here's my question.  Do you make

4   recommendations or suggestions to the attending

5   doctors as to whether something is a suicide or

6   an accidental overdose?

7        A.    The investigator will go out and

8   gather all the information, you know, records

9   and so forth, and gather information at the

10  scene.  I'm sure the investigators relay their

11  opinions to whatever doctor when they run the

12  case by them, but, ultimately, it's up to

13  Dr. Kohler or Dr. Sterbenz to make that

14  determination what the manner of death is.

15       Q.    In terms of office protocols, given

16  the stigma associated with suicide, is it fair

17  to say suicide deaths are not overreported?

18            MS. HERMIZ:  Objection to form.

19       A.    I don't know what you mean by

20  overreported.

21       Q.    Sure.

22            If there's a close call, is the --

23  is the protocol to err on the side of calling

24  something a suicide or calling something an

25  accidental death?

1              MS. HERMIZ:  Same objection.

2       A.     To rule it a suicide, Dr. Kohler, I

3  believe, has got to have greater than a certain

4  percentage of, yes, this is a suicide.  If a

5  case doesn't meet that threshold, she's got two

6  options, and usually that's either rule it

7  accidental or undetermined.

8       Q.     Okay.

9       A.     And that's what I've -- I can go by

10 from what I've seen in the past, but again,

11 that's the doctor's -- the doctor's call.

12      Q.     So you're not aware of, in your

13 experience, a situation where the evidence from

14 the investigator's perspective was inconclusive

15 but then you saw the final report come down from

16 Dr. Kohler or Dr. Sterbenz and it said suicide?

17 You don't remember a case like that?

18             MS. HERMIZ:  Objection to form.

19      A.     Not offhand, no.

20      Q.     Okay.  In terms of your training and

21 background, do you have any background in the

22 manufacture of prescription opioids?

23      A.     No.

24      Q.     Any background or understanding of

25 the role of a drug distributor as it pertains to

Page 162

1    prescription opioids?

2         A.    No.

3         Q.    Any background or training in the

4    role of a pharmacist filling prescriptions for

5    opioids?

6         A.    No.

7         Q.    We've talked about OARRS and how the

8    doctors have access to that.  Have you ever

9    heard of a database called ARCOS?

10        A.    ARCOS?  No.

11        Q.    It stands for Automated Reports and

12   Consolidated Ordering System.

13        A.    No.

14        Q.    So that's nothing you're familiar

15   with --

16        A.    No.

17        Q.    -- or nothing you've ever used?

18        A.    That's one I've never seen.

19        Q.    Okay.  In the course of your

20   investigation, when you come across evidence of

21   a prescription, have you ever run medical record

22   searches for surrounding states?  Have you ever

23   checked Pennsylvania, Michigan, Indiana, West

24   Virginia, Kentucky?

25        A.    I'm sure there's been cases where,

Page 163

1   you know, we go to a scene, find a deceased

2   person, and find out that, you know, that person

3   has only been living there for, you know, a

4   short amount of time and found out previously

5   they lived in, say, you know, one of the

6   surrounding states.  Find a city.  I'm sure

7   we've made phone calls to, like, the local

8   hospital and that to see --

9        Q.    So putting aside a situation where

10  there's some obvious context clue that points in

11  the direction of Pennsylvania, for example --

12       A.    Right.

13       Q.    -- since that's the closest to this

14  area, you know, someone who just moved here from

15  Pennsylvania, if it's just a regular

16  prescription opioid case in Summit County, would

17  you run Pennsylvania records to see if they had

18  prescriptions from Pennsylvania?

19       A.    What I can see happening on a case

20  like that is you got the prescription, you'll

21  have the name of the prescriber on that script,

22  so we'll call up that physician who prescribed

23  that and order records from that office.

24       Q.    And then that process is what we

25  talked about before lunch in terms of you would

1  call, request records and --

2       A.    You know, sometimes they say, hey,

3  yeah, that's fine, just send us something in

4  writing, and we fax over a request.  Sometimes

5  you talk to them, you know, hey, I'd like

6  records on Jane Smith.  Oh, sure.  What's your

7  fax number?  And they'll send them right over.

8       Q.    But you wouldn't do one of those

9  cold calls where you said you would check with,

10  you know, area hospitals?

11      A.    Yeah.

12      Q.    You would never check Erie,

13  Pennsylvania?

14      A.    No.

15      Q.    Okay.

16      A.    At least I wouldn't.

17      Q.    All right.  Are you familiar with

18  the National Academy of Medical Examiners?

19      A.    NAME?

20      Q.    Yes.

21      A.    Yes.

22      Q.    Do you -- how do their guidelines

23  impact your role as chief forensic investigator,

24  if at all?

25      A.    I got to make sure the investigators

Page 165

1   maintain -- at least the majority of them

2   maintain their ABDMI {sic} certification.  Most

3   of that is -- a lot of it is records -- yeah,

4   procedures and records and that, that, you know,

5   Dr. Kohler -- and at the time when we first got

6   certified, Dr. Dean was at our office.  They did

7   all the work with NAME.

8               So from an investigator standpoint,

9   you know, we might have been told, hey, we need

10  to do this because -- to maintain our

11  certification with NAME, but that's the extent

12  of it.

13       Q.    Do you recall any situation where

14  one of the attending physicians told you, we

15  need to change some aspect of our investigative

16  protocol, not a licensing thing, but we need to

17  actually do it a different way to follow a NAME

18  guideline?

19       A.    I can't recall that.

20       Q.    Okay.  Do you have any understanding

21  as to how narcotics are classified by the

22  federal government?

23       A.    No.

24       Q.    So in terms of what's a controlled

25  substance, that's not your area?

1          A.     That's not my area.

2          Q.     Okay.  Other than the situations you

3   described before lunch where, you know, a board

4   of medicine or a board of pharmacy may request

5   public records from your office, other than

6   that, have you had any interaction with the

7   board of pharmacy in Ohio?

8          A.     No.

9          Q.     Have you ever referred a physician

10   or a pharmacy to the Ohio Board of Pharmacy?

11          A.     Me personally, no.

12          Q.     Have any of your investigators, to

13   your knowledge, made such a report?

14          A.     Not to my knowledge.

15          Q.     Have you had any interactions with

16   the Ohio Board of Medicine other than them

17   asking for public records from your office?

18          A.     No.  Usually how we come in contact

19   with those agencies is they initiate the contact

20   with us.

21          Q.     They want something from you?

22          A.     We don't go out and, you know -- to

23   them.  They usually come to us with requests.

24          Q.     So during your time you've never

25   referred a physician or a medical --

Page 167

1          A.    No.

2          Q.    -- provider to the Ohio Board of

3    Medicine?

4          A.    No.

5          Q.    And, to your knowledge, none of your

6    line investigators have?

7          A.    No.

8                THE VIDEOGRAPHER:  Can we take a

9    break so I can change the video real quick?

10               MR. CARTER:  Of course.

11               THE VIDEOGRAPHER:  Going off the

12   record at 1:37.

13                    (Recess had.)

14               THE VIDEOGRAPHER:  We're back on the

15   record, 1:42.

16   BY MR. CARTER:

17         Q.    Switching gears again, a general

18   question.  Do you believe that opioids should be

19   eliminated and not available for prescription?

20               MS. HERMIZ:  Objection to form.

21         A.    No.  I believe there are people that

22   legitimately need, you know, opiate pain relief.

23         Q.    So fair to say you agree that

24   residents of Summit County should have access to

25   prescription opioids for pain management through

```
                                        Page 168

 1   doctors and pharmacies?

 2              MS. HERMIZ:  Same objection.

 3        A.    For medical needs, yes.

 4        Q.    Okay.

 5              MS. KEARSE:  And I'll just remind

 6   counsel, we are here as a fact witness, so we've

 7   given a lot of leeway, but this is a fact

 8   witness deposition, not necessarily for his

 9   opinions based on the county's position on

10   things.

11        Q.    And, as you indicated, you

12   personally have been prescribed and used

13   prescription opioids, correct?

14        A.    Yes.

15        Q.    I want to go through a couple of

16   additional exhibits, so we're going to mark the

17   next exhibit as Exhibit 2.

18                    -   -   -   -   -

19              (Thereupon, Deposition Exhibit 2,

20              E-Mail from Tracy Guenther to Gary

21              Guenther dated April 19, 2016

22              Beginning Bates Number

23              SUMMIT_000201548, was marked for

24              purposes of identification.)

25                    -   -   -   -   -
```

```
                                          Page 169
 1              MR. CARTER:  Do you want another
 2      copy, Anne?
 3              MS. KEARSE:  Yes.
 4         Q.    All right.  I have marked as Exhibit
 5      2 an e-mail chain with an attachment.  The Bates
 6      number for production is SUMMIT_000201548.  And
 7      while I'm doing that, let me, just to make
 8      everyone's life easier on the record, Exhibit 1
 9      that was previously marked is SUMMIT_000003815
10      through 3825.  And Exhibit 2, the Bates continue
11      two pages, ending in 201550.
12              Mr. Guenther, have you seen what
13      I've marked as Exhibit 2 before?
14         A.    Yes.
15         Q.    Okay.  And this appears to be an
16      e-mail.  Is that your wife?
17         A.    That's my wife.
18         Q.    So she's transmitting to you an
19      attachment that's a paper, correct?
20         A.    Probably typed this at home on the
21      home computer, because that's her home e-mail.
22         Q.    Okay.  And we'll get there.  I'm
23      just going to go through some real basic stuff.
24         A.    Okay.
25         Q.    The date on this is April 19th,
```

Page 170

1  2016, on the e-mail, correct?

2        A.    Yes.

3        Q.    All right.  And so, then, page 2 of

4  the exhibit is an attachment that is indicated

5  in the e-mail as your paper.  So can you

6  describe for me, what is this page 2 document?

7        A.    I know exactly what this is from.

8  This is -- when I sat on that panel up at Revere

9  High School, this is the -- kind of a

10 presentation outline that I used.

11       Q.    Okay.  Which was one of my follow-up

12 questions I hadn't gotten to.  So this gives us

13 the timeline --

14       A.    Yes.

15       Q.    -- in terms of when that Revere

16 presentation was?

17       A.    Yes.

18       Q.    And you prepared this before the

19 presentation to guide --

20       A.    Right.

21       Q.    -- your content, correct?

22       A.    Yes.

23       Q.    Did you actually read this, or was

24 this just a set of notes as talking points?

25       A.    I think I read this.

1          Q.     Okay.  Is there any other context in

2     which this paper by you has been presented?  And

3     what I mean by that is, did you use this for any

4     of those other presentations?

5          A.     I don't believe so.

6          Q.     Okay.  When you created this --

7          A.     I --

8          Q.     I'm sorry.  Go ahead.

9          A.     I might have taken some of these

10    numbers, like these stats up here, and used

11    them.

12         Q.     They might have been in your

13    PowerPoint --

14         A.     Yeah.

15         Q.     -- that you used later?

16         A.     Yeah.

17         Q.     Did anyone help you prepare this

18    one-page document?

19         A.     Like, I know -- I have no idea how

20    much these drugs cost, so I'm sure I talked to

21    one of the Akron narc guys to get this number,

22    dollar amount for, you know, a kilo of fentanyl.

23         Q.     And so you're referencing, in the

24    fourth paragraph, there are some information --

25    some sentences that describe the street cost of

Page 172

1    heroin or fentanyl, so that would have been

2    something you would have consulted APD?

3           A.    Right.

4           Q.    Any other source that you recall

5    consulting with in terms of putting this

6    together?

7           A.    You know, I'm sure I talked to

8    Steve, who's our toxicologist --

9           Q.    Mr. Perch?

10          A.    Mr. Perch.

11          Q.    You don't have to call him

12   Mr. Perch.

13          A.    -- about, you know, the potency of

14   these -- these drugs.

15          Q.    Okay.  Anyone else?

16          A.    No.

17          Q.    In terms of putting it all together,

18   is the actual combination of this information --

19   is that exclusively your work?

20                MS. HERMIZ:  Objection to form.

21          Q.    Let me ask it this way:  Did anyone

22   tell you what to write?

23          A.    No.

24          Q.    Did anyone tell you what you needed

25   to say to the students at Revere?

1           A.      No.

2           Q.      And you got input in terms of the

3    street cost --

4           A.      Right.

5           Q.      -- and some stuff from Mr. Perch?

6           A.      Stats.

7           Q.      Other than consulting them in terms

8    of putting it together in this format and with

9    this language, is that your work?

10          A.      Like I said, I did this at home.

11          Q.      Do you know how long this took you

12   to put together?

13          A.      You know, I probably did a little

14   bit one night and took a day off or two.  It

15   depends on what sports the girls were playing at

16   the time and how busy I was with them.

17          Q.      All right --

18          A.      Usually I could put something

19   together in a -- you know, three, four hours

20   max.  Something like this, probably, you know, a

21   good two hours or so, getting it all together.

22   Usually, I like to write up a rough draft and

23   then do a final, put it together.

24          Q.      Do you know if you had a rough draft

25   for this document?

Page 174

1          A.    I'm sure I had, like, notes
2     scribbled down.
3          Q.    Is that something that you would
4     have retained a copy of?
5          A.    No.
6          Q.    Okay.  All right.  So in the first
7     paragraph -- I'm going to look at the second
8     page of your write-up.  It says, on the third
9     line, "In 2013 the Summit County Medical
10    Examiner's Office investigated 99 total overdose
11    deaths."  Do you see that?
12         A.    Yes.
13         Q.    Did I read that correctly?
14         A.    Yes.
15         Q.    Okay.  "Of those 60 were heroin
16    and/or fentanyl overdoses."  Did I read that
17    correctly?
18         A.    Yes.
19         Q.    So if we do the math, that means 60
20    of the 99 deaths investigated by the Summit
21    County Medical Examiner's Office, in terms of
22    overdoses, were attributable to some combination
23    of heroin and fentanyl?
24         A.    Correct.
25         Q.    You continue, "In 2014 the number of

Page 175

1   drug overdose deaths increased to 144, which

2   included 104 heroin and/or fentanyl overdoses."

3   Did I read that correctly?

4          A.    Yes.

5          Q.    So for that year, 104 out of 144

6   overdose deaths were some combination of heroin

7   and fentanyl, correct?

8          A.    Yes.

9          Q.    All right.  It continues, "In 2015

10  the number of drug overdoses increased yet again

11  to 213 overdose deaths which included 153 heroin

12  and/or fentanyl deaths."

13              So for 2015, it was 153 out of 213

14  that were from heroin or fentanyl, correct?

15         A.    Yes.

16         Q.    Then you noted, "As we continue into

17  2016, the numbers are relatively the same or

18  slightly above 2015 totals.  According to the

19  CDC, in 2014 they reported that the State of

20  Ohio recorded 2,744 overdose deaths."

21              Did I read that correctly?

22         A.    Yes.

23         Q.    And then it says, "Only the State of

24  California had more," and then it lists 4,521.

25              In terms of overdose deaths in 2014

1    in that CDC data set, do you know how many of

2    the statewide total were from heroin or

3    fentanyl?

4            A.    No.

5            Q.    Do you know what percentage were

6    from heroin or fentanyl?

7            A.    No.

8            Q.    Then in the second paragraph, you

9    end the second paragraph with an anecdote.  It

10   says, "We have had a father and son die together

11   while doing heroin."  Do you see that?

12           A.    Yes.

13           Q.    Do you recall when that happened?

14           A.    I want to say 20 -- no.  I'm not

15   sure of the exact date.  It wasn't my case.  I

16   can tell you it happened in the Kenmore area of

17   Akron, though.

18           Q.    All right.  And that was my next

19   question.  That wasn't a case that you

20   personally investigated?

21           A.    No.

22           Q.    Why did you include that reference

23   in your presentation to the students and parents

24   at Revere?

25           A.    Just to show it affects, you know,

1   entire families, you know, and it's kind of

2   young and old, the range there.

3          Q.     And when we talk about the "it," and

4   that "it" affects families and the range, here

5   you're talking about heroin, correct?

6          A.     Drug overdoses, yes.

7          Q.     And specifically heroin, right?

8          A.     Yes.

9          Q.     You continue, "These statistics that

10  I just talked about are just the overdose

11  deaths.  There are many more victims that

12  overdose and don't die.  The victims that

13  overdose but don't die are usually found soon

14  after using the drug heroin and/or fentanyl and

15  given the drug Narcan, which reverses the effect

16  of opioids (heroin/fentanyl.)"

17             Did I read that correctly?

18      A.     Yes.

19      Q.     Is that a true statement?

20      A.     Again, I got those numbers probably

21  from -- the Akron Police Department tracks --

22      Q.     And there are lots of overdose

23  victims who do not die but were saved by Narcan,

24  correct?

25      A.     Correct.

1      Q.    And in your experience, in 2015 and

2  '16 and '17, the majority of the people who

3  avoided death, who were saved by Narcan, were

4  being saved from a heroin or a fentanyl or a

5  fentanyl analog overdose, true?

6           MS. HERMIZ:  Objection to form.

7      A.    I -- I can say that the Summit

8  County Health Department keeps a dashboard on

9  their website that shows a daily count of how

10  many people were being treated in the emergency

11  departments of the county, within the county.

12  It's safe to say a lot more have been treated in

13  the emergency rooms than actually have died.

14  Those numbers that they report are much higher

15  than, you know, the individuals that actually

16  die from overdoses.

17      Q.    So when you were reporting this

18  information and sharing it with the students at

19  Revere about Narcan reversing the effects of

20  opioids, (heroin/fentanyl), you were getting

21  that from the county-wide data?

22      A.    That and -- well, administered 623

23  doses, that's just the fire department.  That --

24  that came from one of the detectives.  I got

25  that number from probably one of the detectives

                                                    Page 179

1    through Akron because they keep track of those

2    numbers also.

3         Q.    Okay.  And so then the next sentence

4    actually provides a specific number of doses

5    that EMS administered, correct?

6         A.    Correct.  And, like I said, I

7    probably got that number from -- one of the

8    detectives got it for me.

9         Q.    Because responding to overdoses that

10   are not fatal is not within your jurisdiction?

11        A.    Correct.

12        Q.    The next paragraph says, "Heroin and

13   fentanyl are drugs that are being brought to the

14   United States from other countries.  For

15   example, fentanyl is mainly purchased from China

16   and Ukraine via the internet."

17             Did I read that correctly?

18        A.    Yes.

19        Q.    And I think you mentioned before

20   lunch, another source is Mexico, correct?

21        A.    Correct.

22        Q.    It continues, "Fentanyl is estimated

23   to be 40 times more potent than heroin.

24   Additionally, it is being reported as being 80

25   times more potent than morphine."

1              Did I read that correctly?

2        A.    Yes.

3        Q.    Then it has that information about

4   costs, where -- the costs of those and how they

5   can be cut up by drug dealers, correct?

6        A.    Yes.

7        Q.    "As we continue to fight this drug

8   epidemic, we must realize it's affecting all of

9   us directly or indirectly.  Most of our crimes,

10  such as burglaries and robberies, can be

11  attributed to drug abuse."

12            What's the source of that

13  information?

14       A.    What, the suicides you said?

15       Q.    I hadn't gotten to that line.

16       A.    Oh, okay.

17       Q.    Just the burglaries and robberies.

18  The second sentence, "Most of our crimes."

19       A.    Talking to the police.

20       Q.    Talking to the police?

21       A.    Yeah.

22       Q.    And are you talking about crimes

23  associated with burglaries and robberies in

24  connection with heroin and fentanyl and fentanyl

25  analogs, and I guess --

```
                                          Page 181

 1         A.    You know, not just those two drugs,

 2    but, you know, probably all drugs in general.

 3         Q.    Okay.  So it would also include

 4    cocaine?

 5               MS. HERMIZ:  Objection to form.

 6         A.    Yes.  Any drug, including

 7    prescription drugs, you know.  You hear from the

 8    streets that, you know, back in the day, you

 9    know, say a typical Percocet pill cost you 20

10    bucks -- I'm just throwing out numbers -- but

11    now, you know, since there's less out on the

12    streets and that, that price has quadrupled, so,

13    you know, I'm getting from the police, you know,

14    these people with addictions and that need to

15    feed their addictions and going out at all costs

16    to be able to buy their --

17         Q.    And that's all information that

18    you're getting secondhand from police?

19         A.    Police.  And I've known that from

20    talking to family members who admit that, you

21    know, he -- my son, who had an addiction, stole

22    all my jewelry, my wedding band, my wedding

23    rings, and pawned them for drug money.  You get

24    it from the families.

25         Q.    So you've -- over the course of your
```

Page 182

1    work, you've heard descriptions from family
2    members and police of individuals in Summit
3    County engaging in criminal activity relative to
4    narcotics of all kinds?
5         A.    Right.
6         Q.    In the course of your work or before
7    then, when was the first time that you
8    understood that there were risks associated with
9    prescription opioids?
10        A.    Prior to, I want to say, 2013, '14,
11   if you go back and look at our stats, most of
12   our overdoses were prescription-type overdoses.
13   That was the majority of them, you know.  Ten
14   years ago, you bring up heroin, I bet our office
15   was lucky to see, you know, less than a handful
16   of heroin deaths.  The majority of them, like I
17   said, were prescription overdoses.  2014, '15
18   and that, that started to really switch over to
19   the illicit drugs.
20        Q.    When we're talking about overdose
21   deaths -- this is just a definitional question
22   -- how do you classify deaths from alcohol
23   intoxication?
24        A.    I can't recall how they -- I know --
25   some of them have been natural deaths I know.

Page 183

1       Q.    Okay.  Have you had cases of alcohol

2   poisoning?

3       A.    Over the years, I'm sure.

4       Q.    Okay.  Is alcohol -- so you don't

5   know whether it's classified as an overdose

6   death or if it's treated separately?

7            MS. HERMIZ:  Objection to form.

8       A.    I can't say for a hundred percent

9   sure.

10      Q.    Okay.  With respect to -- well, let

11  me back up.

12           So to the best of your ability to

13  estimate, do you know when it was that you

14  understood that there were risks of addiction

15  associated with prescription opioids?

16      A.    No.  I knew people were dying from

17  it.

18      Q.    And when was the first --

19      A.    I mean, it goes way back to when --

20  my first years, I mean, you saw -- drug overdose

21  deaths have been around as long as I have.

22      Q.    So you've -- once you switched from

23  photographer to an investigator, you know, so in

24  the late '80s, you've seen -- well, I guess you

25  said it was several years, you weren't sure?

Page 184

1          A.     Right.

2          Q.     So as long as you've been in the

3     medical examiner's office, you've understood

4     that prescription opioids could cause death?

5          A.     Yes.

6          Q.     In terms of the stats that you saw,

7     let's say, from -- let's say all the way up to

8     2015, so from the time you entered the

9     department until 2015, among the prescription

10    opioid overdose deaths that you saw, do you know

11    what percentage of those were cases in which the

12    individual used the medication as prescribed?

13              MS. HERMIZ:  Objection to form.

14         A.     No.

15         Q.     Do you know if there were any cases

16    from 1988 until 2015 where Summit County saw an

17    overdose death where a patient was using the

18    medication, using a prescription opioid as

19    prescribed?

20         A.     Were they using it as prescribed?

21         Q.     Yes.  Any case where you remember an

22    investigation where you found a patient using it

23    as prescribed and then one of the attending

24    physicians said overdose death.

25              MS. HERMIZ:  Objection to form.

Page 185

1          A.      I can't recall.

2          Q.      Okay.  Have you seen cases where

3     people overdosed on prescription opioids by not

4     using them as prescribed?

5               MS. HERMIZ:  Same objection.

6          A.      I've had overdose deaths of people

7     that, say, were prescribed a bottle of whatever

8     prescription, Oxycontin, Percocet or whatever,

9     and you look at the date and say it was filled

10    yesterday.  The person dies the next day, you go

11    there and the bottle is empty.  So I would

12    assume it's safe to say that person took more

13    than what was actually prescribed -- I mean,

14    instructed to take, you know, obviously didn't

15    take two pills every four hours, took the whole

16    bottle.

17         Q.      That's my question.  You've seen

18    cases where people took more than they were

19    prescribed?

20         A.      Correct.

21         Q.      And you've seen cases where people

22    died because they altered the medication, they

23    crushed it and inhaled it, for example?

24         A.      Snorted it, yes.

25         Q.      You've seen cases where they've

Page 186

1  mixed it, against medical advice, with other

2  substances?

3          MS. HERMIZ:  Objection to form.

4      A.    I've seen cases where the final tox

5  report comes through and there's more than, you

6  know -- there might be the drug itself and a

7  high amount of alcohol, which, you know, I think

8  every adult should know you don't mix -- I mean,

9  you don't need to be a doctor to say don't mix,

10 you know, oxycodone or Oxycontin with alcohol.

11     Q.    Sure.  Okay.  We'll go to another

12 exhibit.

13              -    -    -    -    -

14         (Thereupon, Deposition Exhibit 3,

15         The Columbus Dispatch Article Titled

16         "Ohio Had More Than 4,000 Overdose

17         Deaths in 2016", was marked for

18         purposes of identification.)

19              -    -    -    -    -

20     Q.    Mr. Guenther, I have marked as

21 Exhibit 3 an article from the Columbus Dispatch.

22 And if you turn to -- well, it's dated August

23 1st, 2018, correct --

24     A.    Right.

25     Q.    -- in terms of the printout on the

1   upper left of the page?

2        A.   Okay.

3        Q.   The article itself, according to the

4   headline, is posted May 28th, 2017.  Do you see

5   that?

6        A.   Yes.

7        Q.   Okay.  The headline is, "Columbus

8   Dispatch, Newspaper:  Ohio Had More Than 4,000

9   Overdose Deaths In 2016."  Do you see that?

10       A.   Yes.

11       Q.   You're quoted in this article,

12  correct?

13       A.   Yes.

14       Q.   Do you recall the media

15  communication that led to this article?

16       A.   I'm sure it was one of many calls I

17  got.

18       Q.   Have you ever read this article in

19  its entirety?

20       A.   I might have looked at it briefly

21  when it first came out online.

22       Q.   So you're referenced in this second

23  page.  It says, "In Akron's Summit County,

24  nearly half of its 308 overdose deaths last year

25  were attributed to the use of carfentanil, a

1    powerful opioid that's supposed to be used as a

2    tranquilizer for large animals.  Gary Guenther,

3    an investigator for the Summit County Medical

4    Examiner's Office, said addicts clamor to get

5    the lethal drug when they hear it's on the

6    streets."

7              Did I read that correctly?

8        A.   Yes.

9        Q.   And then there's a quote attributed

10   to you that says, "It doesn't make any sense."

11   Do you see that?

12       A.   Yes.

13       Q.   So is it your -- is that an accurate

14   statistic in terms of Summit County and the

15   attribution of the percentage deaths

16   attributable to carfentanil?

17             MS. HERMIZ:  Objection to form.

18       A.   In 2016, that's probably an

19   accurate --

20       Q.   That would have been something you

21   just probably pushed the statistics button?

22       A.   Yes.

23       Q.   Okay.

24       A.   Or talked to Steve Perch.

25       Q.   Or talked to Mr. Perch.

```
                                    Page 189
 1              And, from your perspective, people
 2   seeking out carfentanil doesn't make any sense?
 3              MS. HERMIZ:  Objection to form.
 4        A.    Yes.
 5        Q.    And it's true, even though you're
 6   not a toxicologist, you're aware, from your
 7   experience, that even a very small quantity of
 8   carfentanil is lethal to a human, correct?
 9        A.    Yes.
10        Q.    That's something I think you noted
11   in your PowerPoint presentation, correct?
12        A.    Correct.
13        Q.    Okay.  When -- we've talked about
14   July of 2016, when you recall Summit County
15   first seeing carfentanil.  How did your office
16   first identify carfentanil?
17        A.    I got this secondhand from
18   Mr. Perch.  Akron saw a huge spike in overdose
19   -- not necessarily deaths but overdose cases.
20   And they didn't know what they were dealing
21   with.  Akron Police, the way I understood it,
22   brought samples down to Mr. Perch, and at that
23   time Mr. Perch ran the test and, you know, at
24   that time confirmed it was carfentanil.
25        Q.    In terms of the specific tests, like
```

1   what the capacity was at your office's lab

2   versus reference labs, are those details that

3   would be best directed to Mr. Perch?

4        A.    Yes.

5        Q.    Okay.  As a -- as a field

6   investigator, do you have any recollection of

7   seeing carfentanil on runs before it was

8   identified -- before you knew what you were

9   dealing with?

10            MS. HERMIZ:  Objection to form.

11       A.    No.  I didn't know what carfentanil

12   was.

13       Q.    Okay.  And so the first -- I'm

14   correct that the first time your office was able

15   to identify it was after some kind of toxicology

16   protocol?

17       A.    Yes.

18       Q.    Once Mr. Perch identified it, were

19   there any procedural changes or updates for you

20   and your field investigation unit to -- to deal

21   with to identify carfentanil?

22       A.    You know, I've been there, like I

23   said, 30 plus years.  I go to a death scene.  I

24   see a baggie of white powder or tannish color

25   powder or whatever.  By just looking at it, I

1  cannot tell you what that substance is.  So it

2  needs testing before I can -- and I can tell you

3  a lot of what we've been seeing, you know, over

4  the last four or five years, it's just not one

5  drug, it's drugs that are -- it's a combination

6  of drugs that are mixed in.  So it's just not,

7  say, carfentanil, or just heroin; it's a

8  combination.

9          Q.    So the powders that you're seeing

10  now are combinations of illegal synthetics?

11         A.    Right.

12         Q.    Okay.

13         A.    And from a precaution standpoint,

14  you know, once we knew how potent this was and

15  you saw, you know, on the news and newspapers

16  of, you know, emergency room nurses getting

17  overdose symptoms and paramedics or police on

18  the scene getting symptoms, we made sure to

19  advise our investigators, hey, make sure, when

20  you're handling this stuff, to wear gloves and

21  at least a mask.

22         Q.    In terms of employee safety, was --

23  did the protocols always provide for gloves and

24  masks --

25         A.    Yes.

Page 192

1          Q.     -- when handling narcotics?

2          A.     Yeah.  And that's common sense.

3          Q.     It's common sense.

4          A.     Especially if -- I mean, if there

5     are body fluids and that around.

6          Q.     Was there a need for a reminder to

7     follow best practices when carfentanil came

8     around --

9          A.     Yes.

10          Q.     -- because people were maybe a

11     little lax?

12          A.     Yes.  And, at that point, once we

13     were dealing with -- we actually -- Dr. Kohler

14     and, I think, Denice, our business -- got

15     trained, and we got Narcan kits from the health

16     department there at the office, because

17     Mr. Perch is dealing with those powders all the

18     time, the investigators are dealing with those

19     powders all the time, and, you know, we never

20     know who's walking in from the outside into our

21     office to get information.  You know, a lot of

22     times, addiction, you know, is just not the

23     deceased person, but there's other family

24     members or friends that are addicted.  So you

25     don't know, you know, what's going to walk

1    through our front door.

2         Q.    Since the office has started

3    carrying Narcan doses, have you guys ever had to

4    use one?

5         A.    No.

6         Q.    Okay.  Any other employee safety

7    measures that were put in place as a result of

8    carfentanil?

9         A.    No.

10        Q.    Prior to what we've talked about

11   with 2015 forward, prior to that time period,

12   did the office ever put into place any kind of

13   new protocol specifically as a result of

14   prescription opioid overdoses?

15             MS. HERMIZ:  Objection to form.

16        A.    Not that I can recall.

17        Q.    And from 2015 through to today, are

18   you aware of any specific policy the office has

19   put in place as a result of prescription opioid

20   overdoses?

21        A.    Prescriptions, no, nothing new.

22        Q.    When you first heard about

23   carfentanil and its presence in Summit County,

24   what was your reaction?

25             MS. HERMIZ:  Objection to form.

1        A.     First reaction was why would anybody

2   do this.

3        Q.     Any other kind of immediate

4   reaction?

5        A.     No.

6        Q.     We've talked about the types of

7   information that you collect during the course

8   of your forensic investigations.  I want to ask

9   you about a different kind of information.

10              Do you, in the course of your

11  investigation, come to learn what any of the

12  decedents understood about the risks of opioid

13  use?

14              MS. HERMIZ:  Objection to form.

15       A.     That's not a question we would

16  typically ask.

17       Q.     Likewise, do you learn what they

18  understood or thought about addiction to

19  opioids?

20       A.     No.

21       Q.     Do you know the details of any

22  conversation they had with -- if they had a

23  prescription opioid, what conversation they

24  would have had with the prescribing doctor?

25              MS. HERMIZ:  Objection to form.

Page 195

1          A.    The only information we would get,

2    normally, when dealing specifically with opiate

3    overdoses is sometimes family would offer, you

4    know, he hurt his back, you know, 20 years ago

5    and has been seeing a doctor and has been

6    prescribed these medications ever since, or, you

7    know, this all started when so-and-so got a

8    football injury in high school or college and

9    this all started.  But a lot of times, we don't

10   go that far back in our -- I mean, we're looking

11   for the cause and manner of death.  We're not

12   looking how things got started.  I mean, you

13   could go back years probably in a lot of these

14   cases and it started, you know, years and years

15   prior to them dying.

16         Q.    And in terms of the specific causes

17   and what got started, that's going to be a

18   situation specific to each individual, fair?

19         A.    That's a fair statement.

20         Q.    Everyone's got a different story?

21         A.    Yes.

22         Q.    And the scope of your investigation

23   is what you just described; you're trying to

24   figure out the information that your attending

25   physicians need to make a call on the manner and

1    cause of death, correct?

2         A.    Yes.

3         Q.    You're not setting out to create a

4    biography of their substance use history, are

5    you?

6         A.    Correct.

7         Q.    So in terms of what the original

8    doctor who prescribed a medication may have told

9    them about the risks or uses of that medication,

10   that's not information that would come within

11   the scope of your investigation?

12        A.    No.  Whether or not that individual

13   had a back injury 30 years ago is, from my

14   standpoint, when causing -- when determining the

15   cause and manner of death, gathering information

16   from that, you know, that's irrelevant what

17   happened 20 years ago.

18        Q.    Okay.  And in terms of your

19   standpoint and what you're trying to find out,

20   you don't get into, you know, what conversations

21   they may have had at a pharmacy in terms of, you

22   know, warnings about drug interactions; anything

23   like that is beyond what you're trying to find

24   out?

25        A.    Right.

Page 197

1        Q.    You don't consider that --

2        A.    And most of the time when we're on

3   scene, you know, the person who knows is now

4   dead, so you can't ask them, so, you know, a lot

5   of the stuff that we get is secondhand, either

6   by an immediate family member, mom or dad or,

7   you know, siblings -- you know, they might tell

8   you, well, he hangs out with so-and-so, here's

9   his name and number, you can give him a call, he

10  might know more information than we do.

11       Q.    If you get that, do you make the

12  call?

13       A.    Yes, usually.

14       Q.    All right.  But in terms of specific

15  conversations with medical professionals about

16  the warnings of a prescription and -- that's not

17  something you consider relevant?

18       A.    No.

19       Q.    Okay.  In terms of -- are you good

20  to continue?

21       A.    Yes.

22       Q.    Okay.  I think we've been clear, but

23  just to make sure we're on the same page because

24  we've used a couple different terms, do you

25  understand that if we talk about opiates or

1    opioids, there's a broad category that includes

2    both legal and illegal substances?

3          A.    Correct.

4          Q.    Okay.  And we've been

5    differentiating between legal prescriptions and

6    then illegal, the heroin, the fentanyl analogs,

7    correct?

8          A.    Yes, sir.

9          Q.    In terms of some of the supply needs

10   that you talked about earlier, the body bags and

11   overtime, or whatnot, is it -- with respect to

12   those, have you ever tried to differentiate

13   between increases as a result of legal

14   prescription opioids versus illegal?

15               MS. HERMIZ:  Objection to form.

16         A.    No.  It's caseload.

17         Q.    Okay.

18         A.    If we go from one year handling, you

19   know, 450 cases a year and we all of a sudden

20   jump to 700 plus, all I know is there is

21   adjustments that need to be made from a supply

22   and demand standpoint.

23         Q.    And so in terms of caseload, kind of

24   common sense, it costs more in terms of

25   resources and strain on your department to

1   process 700 cases than it does to process 400?

2        A.    Correct.

3        Q.    Okay.  So it's not the case that the

4   cost of a prescription opioid overdose is

5   different than the cost of a carfentanil

6   overdose?

7        A.    Correct.

8        Q.    But if you have five carfentanil

9   overdoses, that costs more than one prescription

10  overdose just in terms of the number of cases?

11       A.    Yeah.  And you can ask Mr. Perch.

12  Most of the prescription overdoses, you know, he

13  can handle in-house, those he can test for.

14  It's when you get into the fentanyl analogs and

15  that where his machines -- he's unable to test

16  for those below a certain point, so, you know,

17  he's got to use reference labs and that, send

18  out samples for confirmation.

19       Q.    So in addition to caseload, with

20  respect to illicit opioid overdoses, when you're

21  dealing with various synthetics, they're more

22  exotic --

23       A.    Right.

24       Q.    -- and they can also have reference

25  lab costs?

Page 200

1          A.     Yes.

2          Q.     Okay.  Sitting here today, are you

3    able to identify any increased demands for your

4    department that were caused by pharmaceutical

5    manufacturers?

6               MS. HERMIZ:  Objection to form.

7          A.     I can say, because of the overdoses,

8    the large increases that we've had, we've, you

9    know -- like our removal company, body removal,

10   you know, went from a $25,000 a year contract up

11   to $50,000, and it's -- and we've never had that

12   issue before until the spike in drug overdoses.

13         Q.     And that's the spike you're talking

14   about in 2015?

15         A.     2015 and --

16         Q.     And forward?

17         A.     Correct.

18         Q.     And so let me make sure --

19         A.     I mean, we've never had to buy extra

20   body bags, you know.  Usually, you buy whatever,

21   400 cases, you need, and all of a sudden you're

22   doing 700, you know, and if you look at the

23   stats, it's due to increase of drug overdoses.

24         Q.     Right.  And so my question -- let me

25   ask it again, just to make sure you're tracking.

Page 201

1   Are you able to identify specific costs that

2   your department has incurred as a result of

3   something done by a drug manufacturer?

4           MS. HERMIZ:  Same objection.

5       A.    It's from the drugs.  It's not from

6   the manufacturer.

7       Q.    Okay.  Are you able to identify

8   specific costs that your department has incurred

9   that have increased as a result of something

10  that a pharmaceutical distributor has done?

11          MS. HERMIZ:  Same objection.

12      A.    No.

13      Q.    Are you able to identify specific

14  costs that your department has incurred that

15  have increased as a result of something that a

16  retail pharmacy has done?

17          MS. HERMIZ:  Same objection.

18      A.    No.

19      Q.    I'd like to mark another exhibit.

20                  -   -   -   -   -

21          (Thereupon, Deposition Exhibit 4,

22          E-Mail from Lisa Kohler to Gary

23          Guenther dated September 14, 2017

24          Beginning Bates Number

25          SUMMIT_000201288, was marked for

1                purposes of identification.)

2                    -    -    -    -    -

3        Q.    And this will be Exhibit 4.  Just

4   for record purposes, it's Bates 000201288

5   through ending Bates number 294.

6             And so my first question, once

7   you've had a chance to thumb through Exhibit 4,

8   is, have you ever seen this before?

9        A.    Yes.

10        Q.    Did you contribute any product to

11   preparing it?

12        A.    No.  Dr. Kohler and Denice put this

13   together.

14        Q.    Okay.  And the cover page is an

15   e-mail from September 14th, 2017, where

16   Dr. Kohler transmits it to you, correct?

17        A.    Correct.

18        Q.    When you received this, what, if

19   anything, did you do with it?

20        A.    I'm sure you have it.  I used a lot

21   of these stats in that PowerPoint presentation.

22        Q.    Did you request Dr. Kohler to send

23   this to you?

24        A.    You know, I might have asked, hey, I

25   got to do a presentation.  Do you have any, you

Page 203

1   know, information that I could use?

2        Q.    So other than utilizing this

3   document to pull some statistics for your own

4   presentation --

5        A.    Right.

6        Q.    -- have you ever created something

7   like this yourself?

8        A.    No.

9        Q.    Prior to this presentation being

10  sent to you, are you aware of any earlier

11  versions of this?

12       A.    Not that I'm aware of.

13       Q.    In the 30 years where you were at

14  the department prior to this, did you ever --

15  you know, was there a 2016 version or a 2005

16  version?

17            MS. HERMIZ:  Objection to form.

18       A.    You know, prior to me being in

19  administration, you know, being a regular

20  investigator, I would not typically see things

21  like this or, you know, my investigators now

22  that are under me would not know what this is.

23  They probably wouldn't see it.  So as being kind

24  of lower in -- outside of administration, I

25  wouldn't normally see that.  So I couldn't say

1    what happened before.

2         Q.    All right.  I think I track you.

3    Tell me if this is right.  Before you were the

4    chief of the forensic investigation unit, you

5    don't think you would have had any reason to see

6    something like this if it existed?

7         A.    Right.

8         Q.    Sitting here today, you don't know

9    one way or the other whether something like this

10   existed --

11        A.    Correct.

12        Q.    -- before you were chief?

13        A.    Correct.

14        Q.    During the time period where you

15   were the chief of the unit, are you aware of any

16   reports like this prior to this one?

17        A.    No.

18        Q.    And in your administrative role

19   during your tenure as chief, you do think you

20   would see something like that if it existed?

21        A.    Yes.

22        Q.    Do you know why Dr. Kohler put this

23   together with Ms. DiNapoli?

24        A.    I can't say for a hundred percent

25   sure.  I would think that, you know, at the

Page 205

1  beginning of a year we're given a budget and I'm

2  sure with the added supplies and salaries and

3  the overruns that have occurred with testing and

4  all that, I'm sure Denice or Dr. Kohler had to

5  go back to council and ask for additional funds.

6      Q.    Do you know whether --

7      A.    I don't --

8      Q.    Go ahead.

9      A.    Go ahead.  I don't know if, like,

10 Dr. Kohler needed this for -- I think she's

11 involved with an opiate task force, so I don't

12 know if she would have had to pull those numbers

13 for a group like that.  I don't know.

14     Q.    Okay.  Do you know whether this

15 litigation had anything to do with it?

16          MS. HERMIZ:  Objection to form.

17     A.    I have no idea.

18          THE WITNESS:  Sorry.

19          MS. HERMIZ:  That's okay.

20     Q.    I'd like to mark Exhibit 5.

21               -   -   -   -   -

22          (Thereupon, Deposition Exhibit 5,

23          E-Mail String with Attachments

24          Beginning Bates Number

25          SUMMIT_000202094, was marked for

1              purposes of identification.)

2                    -   -   -   -   -

3       Q.    So what I have marked as Exhibit 5

4  is a composite that starts with Bates

5  SUMMIT_000202094, continuing through 096.  Then

6  there is a page, a transmittal e-mail, that is

7  SUMMIT_000202092, and then there is a PowerPoint

8  presentation that was produced in native format

9  so it does not have Bates pages.

10             The first page of the PowerPoint is

11  titled "Summit County and the Opiate Epidemic,

12  Gary Guenther, Chief Investigator," and then the

13  last page is a slide that says, "Opiate Task

14  Force."  It has a graphic of a gentleman with a

15  magnifying glass in the upper right corner, and

16  there are three bullets below that.

17             So, Mr. Guenther, I've handed you

18  what I've marked as Exhibit 5, and my first

19  question is take a look at it and let me know if

20  you've seen that before.

21       A.    Yes.

22       Q.    And we talked at a couple points

23  about the PowerPoint you presented to a couple

24  insurance presentations.  This is that

25  PowerPoint, correct?

1        A.    Yes.

2        Q.    And so the first couple pages of

3   Exhibit 5 are e-mail correspondence where you

4   and some folks from one of the insurance groups

5   were talking about logistics, how many people

6   are going to be there, you know, timing, and you

7   identified that you had a PowerPoint, correct?

8        A.    Yes.

9        Q.    All right.  And so I want to ask you

10  about the specific PowerPoint presentation

11  that's in Exhibit 5.

12             And so this is a presentation that

13  you put together yourself, correct?

14        A.    I put it together, but I also

15  borrowed slides from previous presentations

16  that, like, Dr. Kohler might have done.

17        Q.    So every -- it's not the case -- and

18  we'll talk about the individual slides, but you

19  did not personally create every slide in here;

20  you borrowed from other presentations, but this

21  kind of packaging is your work?

22        A.    Yes, with the help of a secretary,

23  because I'm computer illiterate.

24        Q.    Okay.  Did you mechanically put

25  together any of these slides, or did you direct

```
                                               Page 208
 1   them and leave the actual creation to the
 2   secretary?
 3        A.    Yes.
 4        Q.    I asked kind of a compound question
 5   and you answered it okay, but it was a bad
 6   question.
 7              Did you leave the actual preparation
 8   to the secretary in terms of creating the
 9   individual slides that you didn't borrow from
10   another one?
11        A.    I was able to do the slides.  They
12   kind of adjusted the photos and that on the --
13        Q.    So you took a stab --
14        A.    Yes.
15        Q.    -- and then it was polished by a
16   secretary?
17        A.    Yes.
18        Q.    Okay.  All right.  The statistics on
19   the second slide, do you recall where these came
20   from?
21        A.    You know, I want to say that was
22   just a previous exhibit that you showed me
23   from --
24        Q.    All right.  Slide 3 is a picture of
25   some kind of database that shows drug overdose
```

Page 209

1    emergency department visits.  Do you see that?

2         A.    Yes.

3         Q.    What -- what database or interface

4    is this pulled from?

5         A.    I got that from -- that was

6    department of -- Summit County Department of

7    Health.  They got a dashboard on their website,

8    and this was, like, the people that go to the

9    emergency rooms, that they keep track of being

10   treated by overdoses.  I don't know how they

11   compile these numbers, but you can see they

12   break them down by the number, you know, of

13   their zip codes.

14        Q.    They break it down a bunch of

15   different ways?

16        A.    Yeah.  How they compile that

17   information -- I just brought this slide to show

18   how many people were being treated.

19        Q.    This is not from -- I'm sorry.  I

20   didn't mean to talk over you.  Were you done?

21        A.    Well, these are people that, for the

22   most part, actually did not come through our

23   office, did not die.  These are people who were

24   treated in the emergency departments.

25        Q.    And so that answers my next

Page 210

1    question, which is, this isn't your in-house

2    medical examiner database, correct?

3         A.    Correct.

4         Q.    Okay.  All right.  The next day,

5    this photograph, where did that come from?

6         A.    This was not one of our cases.  This

7    was shown on the news.

8         Q.    That was my next question.  This was

9    not a couple that overdosed in Summit County,

10   correct?

11        A.    Correct.

12        Q.    Why did you include this non-Summit

13   County photo in your presentation?

14        A.    It just shows, you know, you have

15   two parents or guardians of a child that

16   overdosed and are unresponsive in the car while

17   they have a child, obviously a toddler, sitting

18   in the car seat in the back seat.

19        Q.    In this photo that was reported on

20   the news, do you know what these two individuals

21   overdosed on?

22        A.    I can't say for sure.  The media at

23   the time reported it as a heroin overdose.  But,

24   you know, that's the case with a lot of cases.

25   Most people say it's a heroin overdose, but in

Page 211

1   reality it's either a fentanyl or one of the

2   fentanyl analogs or a combination of all of

3   them.

4        Q.    Okay.  The next page, where did this

5   data come from?  Is this the chart that we just

6   saw from Dr. Kohler?

7        A.    Yes.

8        Q.    And the reference in the paragraph

9   above, at the top of the slide, says, in the

10  second sentence, "This coincided with a time

11  when staffing was low, December 2015 through

12  June 2017, resulting in greater strain on

13  already stretched resources."  And then there's

14  a hyperlink citation.

15            Do you see that?

16       A.    Yes.

17       Q.    And this is the staffing issue that

18  we talked about before lunch, correct?

19       A.    Not only with the investigators,

20  but, as we are now, we were short a pathologist

21  at the time, too.

22       Q.    Right.

23       A.    So, you know, we were overwhelmed,

24  so we got other forensic pathologists that would

25  be willing to come to our office and, say,

1    spend -- are you available to do autopsies on

2    these three days, and I think they got paid per

3    autopsy, whatever they had set up with --

4         Q.    Because Dr. Dean left the office?

5         A.    Correct.

6         Q.    In terms of procedure, autopsies are

7    supposed to be witnessed, correct?

8         A.    Not always.  We kind of -- when we

9    got -- let me put it this way.  Before we became

10   short-staffed in the investigator section,

11   usually there was an investigator back there

12   taking notes for the physicians and staying --

13   and doing the photography, if need be, during

14   the -- when we were fully staffed.  Then we got

15   overwhelmed as our caseload got larger and

16   larger.  The doctors got new tablets, where they

17   can do all their notes back there in the autopsy

18   suites, so Dr. Kohler said, you know,

19   investigators, you know -- there came a point

20   where we were always walking out, taking phone

21   calls or taking death calls, during an autopsy,

22   so Dr. Kohler finally said, just stay up front.

23        Q.    What's the current protocol?  Are

24   autopsies witnessed?

25        A.    I mean, if the doctor requests,

Page 213

1    somebody will go back, especially like on

2    homicides where you're taking -- collecting, you

3    know, evidence, you know, such as nail clippings

4    and taking x-rays and so forth.

5              Q.    So they're currently witnessed only

6    if the doctor requests?

7              A.    Yes.  Usually on just sudden deaths,

8    you know, accidental deaths; those usually are

9    not witnessed.

10             Q.    Now, in terms of the bottom of the

11   page, there's a chart that talks about autopsy

12   count and bodies in morgues.  There's a line for

13   out of county autopsies.

14                   Do you see that?

15             A.    Yes.

16             Q.    Did you, in your department, ever do

17   out of county scene investigations?

18             A.    No.

19             Q.    So your fieldwork was always limited

20   to proper Summit jurisdiction cases?

21             A.    Yes.

22             Q.    You don't loan out to municipalities

23   outside the county?

24             A.    No.

25             Q.    Okay.

1      A.    I think we got agreements in case

2  of, like, a disaster.  I think we got

3  agreements, like, with Portage County

4  investigators, hey, if something happens in

5  Summit County and we need you, we could call you

6  over and you come and vice versa.

7      Q.    But in terms of anything you've ever

8  experienced --

9      A.    But with just regular caseloads, no,

10  we don't go back and forth.

11      Q.    All right.  Let's go a couple more

12  slides to the graphic that has some statues of

13  family members.

14          Where does this slide come from?

15      A.    Dr. Kohler did this slide.

16      Q.    And do you know what she was

17  depicting here?

18      A.    This just shows that we had one

19  investigator that had three separate overdose

20  deaths at different times and it was all the

21  same family.

22      Q.    Okay.  Do you remember the name of

23  the family?

24      A.    No.

25      Q.    Did that case make an impact on the

Page 215

1   department?

2            MS. HERMIZ:   Objection to form.

3       Q.    Let me ask it this way:  Did that

4   case have an impact on you?

5       A.     Not this case, but I have cases

6   where I would go to a death scene and it was a

7   young female that died of an overdose, and two

8   months or three months later I went to another

9   house for a male that overdosed, and when I

10  walked into that house, you know, that

11  crossed -- crosses your mind when you say, I've

12  known these people from somewhere, where was it.

13  And, you know, when I finally went to talk to

14  them, they said, we remember you from his

15  sister.

16            So, yes, I've had, you know, where a

17  parent would have a child die one month, then --

18  and another one die, you know, several months

19  later.  You know, not just overdoses; all

20  deaths, when talking to family, takes a toll on

21  you.  Part of our job as investigators is to

22  make sure next of kin is notified.  Nobody likes

23  knocking on doors at 3:00 in the morning to go

24  tell some parent that their child died earlier

25  that night.  That takes a toll on you.

1           And from the standpoint of

2    overdoses, you know, part of me feels bad for

3    these parents.  The part that gets stressful is,

4    you know, you go from talking to -- as I'm

5    talking to everybody -- going from talking to,

6    you know, 400 families a year, now you're almost

7    doubling it with the same amount of people, and

8    that gets stressful at times for -- for anybody.

9         Q.    I want to take some of those things

10   individually.

11              In terms of you and the job stress

12   of talking to family members of folks who have

13   passed, have you ever had to seek out HR

14   resources or counseling to deal with the job?

15        A.    No.

16        Q.    In terms of the case that you

17   mentioned where you called upon the -- you

18   investigated a case and then later had the

19   decedent's brother, do you remember what the

20   lady who you investigated overdosed on?

21        A.    I can't remember what drug.

22        Q.    Do you remember the year she

23   overdosed?

24        A.    Not exactly.

25        Q.    Would it have been after the 2015

Page 217

1    increase?

2          A.    I want to say '14, '15, somewhere

3    around there.

4          Q.    Do you remember what her brother

5    overdosed on?

6          A.    No.

7          Q.    Sitting here today, do you know

8    whether either one of those cases had anything

9    to do with prescription opioids?

10         A.    I can't recall.

11         Q.    Okay.  In terms of the job

12   generally, whether you're dealing with an

13   overdose, whether you're notifying next of kin

14   about an overdose, or whether you're notifying

15   them about a traffic accident, is the challenge

16   of that conversation generally the same?

17              MS. HERMIZ:  Objection to form.

18         A.    You know, I'm sure every

19   investigator has their own way of doing it,

20   whatever is comfortable for them.  You know,

21   when I first started, I can still vividly

22   remember my first time notifying a family, and

23   it was up at the Cuyahoga Falls Hospital.  Back

24   then, all bodies went to a hospital to be

25   legally pronounced, so you called families to a

Page 218

1    hospital, which made it easier, because there

2    were nurses and doctors around it all.  So you

3    had that 45 minutes to say, oh, what am I going

4    to tell this poor family, you know.  So you get

5    it all in your head and you walk out and your

6    mind goes blank.  I've learned over the years be

7    quick and be direct and no beating around the

8    bush.  That's the easiest for everybody.

9         Q.    And so regardless of what the manner

10   or cause of death is, that's always a tough

11   conversation --

12        A.    Yes.

13        Q.    -- from your perspective?  And

14   that's one of the challenges of the job

15   generally?

16        A.    Yes.

17        Q.    In terms of this specific case, you

18   indicated you weren't the investigator --

19        A.    No.

20        Q.    -- right?

21              The facts that are reported on

22   this -- on this slide, it looks like the first

23   date was a November 23rd, 2015, fentanyl

24   overdose, correct?

25        A.    Yes.

Page 219

1        Q.    Other than what's reported on this

2   slide, do you have any -- any details or

3   recollection of the circumstances regarding his

4   overdose?

5        A.    No.

6        Q.    Do you know whether prescription

7   opioids had anything to do with his substance

8   use history?

9        A.    His history, no.

10        Q.    Or his overdose?

11        A.    No.

12        Q.    If he had died of an Oxycontin

13   overdose, that would be indicated here instead

14   of fentanyl, correct?

15        A.    If it was strictly, you know -- if

16   it was strictly oxycodone overdose, listed on

17   the death certificate would be an oxycodone

18   overdose.  They word it different if there's

19   multiple drugs found in the system.

20        Q.    Sure.

21             And on this slide -- you indicated

22   Dr. Kohler prepared this -- it lists the

23   33-year-old man as dying from a fentanyl

24   overdose, correct?

25        A.    Yes.

```
                                         Page 220
 1          Q.    All right.  The second family member
 2     is listed as February 3rd of 2016, correct?
 3          A.    Yes.
 4          Q.    And this was a 32-year-old, and it
 5     says it's the brother, dying from opiates and
 6     benzos after eight days in hospital.  Do you see
 7     that?
 8          A.    Yes.
 9          Q.    What's benzos?
10          A.    Benzodiazepines.  There's probably
11     multiple subcategories of those.  It's probably
12     best to ask Mr. Perch.
13          Q.    And in terms of the graphic that's
14     beside it with the -- there's a number 1, number
15     2 and a number 3, and it looks like 1 and 2 are
16     on the kids and number 3 is the father --
17          A.    Correct.
18          Q.    -- at least on that graphic,
19     correct?
20                Now, you agree, though, it's not the
21     case, despite the graphic, where these were
22     young children dying, correct?
23          A.    I mean, I consider 33, 32 too young
24     these days.
25          Q.    Sure.  But it's not a toddler?
```

Page 221

1          A.      No, it's not a ten-year-old.

2          Q.      Okay.  And so you didn't talk to

3     Dr. Kohler as to why she selected that graphic?

4          A.      No.

5          Q.      And it wasn't one you picked out?

6          A.      No.

7          Q.      Okay.  Then the July 1st, 2016

8     entry, that's the father at age 53 and it's

9     listed as a carfentanil overdose?

10         A.      Yes.

11         Q.      Any information as to whether

12    prescription opioids played any role in the

13    father's death?

14         A.      No.  It looks like just illicit

15    carfentanil.

16         Q.      And then down in the bottom right,

17    there's a -- it says number 4, and it says

18    there's a 56-year-old sister, aunt, died in

19    September of 2016 from carfentanil and cocaine

20    overdose, correct?

21         A.      Correct.

22         Q.      Any information as to whether

23    prescription opioids played any role in her

24    overdose?

25         A.      No.  Just a listing of carfentanil

 1   and cocaine.

 2        Q.    Now, continuing with your slide

 3   deck, where do these pictures on the next slide

 4   come from?

 5        A.    These are all Summit County cases,

 6   different ones, that you just pick out different

 7   scene photos.  I couldn't tell you the names of

 8   any of these people.

 9        Q.    Is this a slide Dr. Kohler

10   prepared --

11        A.    Yes.

12        Q.    -- or one you prepared?  Okay.

13        A.    I might have added one or two.

14        Q.    Sitting here now, do you recall who

15   selected which photos?

16        A.    No.

17        Q.    Do you know whether any one of these

18   photos depicts a prescription overdose?

19        A.    Possibly that top left-hand one,

20   because there's pills.

21        Q.    There's pills in that top photo --

22        A.    Yeah.

23        Q.    -- along with some cash that looks

24   like it's arranged.  Do you know, is that an

25   actual scene photo or is that some kind of --

```
                                          Page 223
 1        A.    I think that was an actual scene.
 2        Q.    Okay.  Do you know what the
 3   substance that's put out in lines that are
 4   unused is?
 5        A.    No.
 6        Q.    All right.  Looking at the next
 7   page, there's a slide, it says, "April 8, 2016,
 8   Ohio teen Andrew Frye found dead after shooting
 9   heroin with his mother."  Do you -- where did
10   this slide come from?
11        A.    That was one of our scene photos.
12        Q.    Okay.  And is this something that
13   Dr. Kohler made --
14        A.    Yes.
15        Q.    -- or you made?
16              Did you investigate the Frye case?
17        A.    No.
18        Q.    Did you play any role in the
19   preparation of that file?
20        A.    No.
21        Q.    Other than -- well, from the reports
22   and chat around the office, are you familiar
23   with the Frye case?
24        A.    Yes.
25        Q.    What do you recall about the Frye
```

1  case?

2        A.    His mother and, actually,

3  grandmother, took him to the motel -- I think it

4  was close to his birthday, for like a

5  birthday -- so he can swim and that.

6  Apparently, his mother and grandmother were

7  using, let's say, heroin, and the boy wanted to

8  use it, and I remember reading the comments that

9  they had made or told the police was, you know,

10  if you're going to do it, go in the bathroom and

11  shut the door, I don't want to watch you

12  shooting up.  So apparently he went in and used

13  it and came out, laid in bed, and the next thing

14  you know --

15        Q.    And so -- so Andrew Frye passed away

16  in 2016 from overdosing on illegal either heroin

17  or some kind of fentanyl?

18        A.    Right.

19        Q.    Did that case take a toll on the

20  department?

21            MS. HERMIZ:  Objection to form.

22        A.    I don't want to say toll.  I think

23  there was a lot of frustration with, you know,

24  how can a parent, you know, allow their kid, you

25  know, to do something like that.  It's one thing

                                                    Page 225

1    if a parent wants to do it, but to allow your

2    child to do something like that is beyond me.

3         Q.    Sure.

4               Flipping two slides from that,

5    there's one that has a penny and an elephant and

6    it talks about carfentanil?

7         A.    Right.

8         Q.    Is this a slide you prepared?

9         A.    Yes.

10        Q.    And what does this slide illustrate?

11        A.    Basically shows the -- the small

12   amount needed to cause death when using

13   carfentanil.

14        Q.    All right.  The next slide, this is

15   a quote attributed to someone from Cincinnati,

16   correct?

17        A.    Correct.

18        Q.    Is this some of the context that

19   relates to the comment in that Dispatch article

20   where you said it doesn't make any sense?

21        A.    Yes.

22        Q.    Are you aware of any Summit

23   County -- any similar comment from --

24        A.    Well, you hear some of these stories

25   from -- you know, a lot of times we'll get, say,

1   an overdose of a victim and you're talking to

2   the friends who they live with or whatever, who

3   are also addicts, and they give you the story,

4   well, you know, they were always asking for the

5   stuff so-and-so was selling because it was

6   really potent, so, you know, you took it as,

7   well, that's one of the analogs probably mixed

8   in there, that's why it's so good.  They were

9   always seeking out those types of deals so they

10  could get their fix.

11       Q.    When you would get information like

12  that about so-and-so dealer, would you refer

13  that to law enforcement?

14       A.    Yes.

15             A lot of times, you know, when it

16  comes to evidence and that -- you know, a lot of

17  times cell phones these days, you know, most

18  everything that the police needs are in those

19  cell phones, so, you know, a lot of times

20  like -- there are times when narcotics is tied

21  up where only patrol will show up and take an

22  incident report, and we'll do most of the

23  photography or all the photography and that at

24  the crime scene and take all the evidence.  So,

25  a lot of times when we get, like, cell phones,

1  we can look -- if we can get in them, look at

2  text messages and that, and if there's something

3  there, we can call up the police and say, hey,

4  you might want to take this phone because, you

5  know, I think everything for your case is in

6  these text messages.

7         Q.    Okay.  Going to the next slide, it

8  says, "Opiate Challenges."  What's the graphic

9  on the bottom right depicting?

10        A.    Bottom right, the gentleman with the

11 computer?

12        Q.    Yeah.  It looks like he's got --

13        A.    It was just showing -- that would be

14 like our business administrator pulling out

15 hair, trying to -- where is all this money going

16 to come from, how we going to pay for all this.

17        Q.    Okay.  And then it lists resources,

18 personnel costs and changing drug chemistries,

19 identifying responsible chemical, correct?

20        A.    Correct.

21        Q.    All right.  That's it with that

22 exhibit.

23             MR. CARTER:  Let's take a quick

24 break.  I'm just going to organize a little bit

25 and try to move this as efficiently as possible.

```
                                           Page 228
 1              THE VIDEOGRAPHER:  Off the record,
 2     2:59.
 3                   (Recess had.)
 4              THE VIDEOGRAPHER:  We're back on the
 5     record, 3:18.
 6     BY MR. CARTER:
 7         Q.   Mr. Guenther, if you would open
 8     Exhibit 5 back up and go to the page that was
 9     right after where we finished.  It says,
10     "Synthetic Opiates."
11              MS. KEARSE:  I thought you said you
12     were done with this exhibit.
13              MR. CARTER:  I was.  I was wrong.
14         Q.   So the bottom entry on that page
15     says, "U47700."  What's that?
16         A.   It's fentanyl analog.
17         Q.   And is there anything remarkable
18     about the way in which it's presented?
19              MS. HERMIZ:  Objection to form.
20         Q.   Let me ask it this way:  What does
21     it look like?
22         A.   I have no idea.  I'm sure it comes
23     in a powder form.
24         Q.   So I'd like to mark as Exhibit 6 --
25         A.   Are we done with 5?
```

```
                                          Page 229
 1          Q.     Yes.
 2                      -    -    -    -    -
 3                 (Thereupon, Deposition Exhibit 6,
 4                 E-Mail String, was marked for
 5                 purposes of identification.)
 6                      -    -    -    -    -
 7          Q.     Okay.  What I've marked as Exhibit 6
 8   is a two-page e-mail chain with three pages of
 9   attachments.  The chain at the top is an April
10   13th, 2016 e-mail from Steve Perch to a Michael
11   Velten.
12          A.     Okay.
13          Q.     All right.  And you see -- you see,
14   in that e-mail chain there's a substance listed
15   in the subject line that says, "U-47700 opioid."
16   Do you see that?  It's in the subject line of
17   the e-mail on the first page.
18          A.     Yes.
19          Q.     Okay.  And then it says, "Mimicking
20   Oxycodone."  Do you see that?
21          A.     Yes.
22          Q.     Okay.  And then there are some -- on
23   the second page it says, "Good afternoon, the
24   Lorain County Sheriff's Office recovered the
25   attached pills during a recent arrest.  The
```

Page 230

1    pills mimic a 30 milligram, A 215 oxycodone
2    hydrochloride.  The substance of these pills is
3    not oxycodone hydrochloride, rather the research
4    chemical (RC) U-47700.  The Lorain County
5    Crime/Drug Lab is the first in the nation to
6    identify and confiscate these U-47700 pills, as
7    per DEA Diversion Control Unit.  U-47700 is
8    seven and a half times stronger than morphine.
9    This information is being passed for situational
10   awareness."
11              Do you see that?
12       A.    Yes.
13              MS. HERMIZ:  I'm just going to
14   object for the record.  Foundation.  He's not
15   even on this e-mail.
16              MR. CARTER:  Okay.  So a foundation
17   objection?
18              MS. HERMIZ:  Sure.
19              MR. CARTER:  Okay.
20       Q.    So you see these photos that are
21   depicted?
22       A.    Yes.
23       Q.    Okay.  Do you -- have you, in the
24   course of your investigations, ever come across
25   pills that the office determined were U-47700

Page 231

1    mimicking oxycodone?

2         A.    Not that I'm aware of.

3         Q.    Do you know -- have you talked to

4    Mr. Perch about being on the lookout for

5    U-47700?

6         A.    Usually, either when I -- I see

7    something and it's usually, you know, from a

8    newspaper article or something, some certain

9    area of the county is seeing a certain drug or

10   chemical, you know, I might go back in the

11   morning and say, hey, Steve, did you see in this

12   article they're finding such-and-such a drug.

13   Have we seen it?  And Steve will -- also, Steve

14   talks to -- he knows all the people that run the

15   different crime labs throughout the state and

16   probably outside the state.  So he's always

17   communicating back and forth with those

18   toxicologists to get information, so --

19        Q.    As a general matter, when you see a

20   pill up at a scene, and you collect it as

21   evidence, you can look at it online or, you

22   know, try to find some kind of match, something

23   that looks like it, but at the end of the day

24   it's up to the toxicologist to identify what

25   specific substance?

Page 232

1          A.     Right.

2          Q.     Because you can have situations

3   where substances mimic other substances?

4          A.     Correct.

5          Q.     Have you seen illegal drugs mimic

6   the appearance of a legal substance?

7                 MS. HERMIZ:  Objection to form.

8          A.     I don't remember ever seeing it.

9          Q.     Okay.

10         A.     Mr. Perch might be able to answer

11   that question better.

12         Q.     All right.  You can put that aside.

13         A.     Okay.

14         Q.     In the course of your 30 years, have

15   you ever reached out to a retail pharmacy to

16   talk about ways that they could play a role in

17   dealing with overdoses that Summit County was

18   seeing?

19         A.     No.

20         Q.     Have you ever reached out to a drug

21   distributor to discuss overdoses in Summit

22   County?

23         A.     No.

24         Q.     Have you ever reached out to a drug

25   manufacturer to discuss opiate overdoses in

Page 233

1   Summit County?

2         A.    No.

3         Q.    All right.  I'd like to mark as

4   exhibit -- where are we, Exhibit 7?

5                     -   -   -   -   -

6             (Thereupon, Deposition Exhibit 7,

7             E-Mail String Beginning Bates Stamp

8             SUMMIT_000201499, was marked for

9             purposes of identification.)

10                    -   -   -   -   -

11        Q.    Exhibit 7 is Bates number

12  SUMMIT_000201499 through 501, and then there's a

13  native file that has a couple graphics as the

14  last page, but does not have a production Bates

15  number.

16            All right.  Mr. Guenther, Exhibit

17  27 -- or, excuse me, Exhibit 7 includes -- at

18  the top, it's an e-mail from Dr. Kohler to

19  Alyssa Schmitt, and then you're copied, correct?

20        A.    Correct.

21        Q.    Do you know who Ms. Schmitt is?

22        A.    Offhand, no.

23        Q.    Okay.  Now, according to this e-mail

24  chain, at the very end it says she's a

25  reporter -- you know, she's an intern for a TV

                                        Page 234

1    station and a reporter for a Kent State

2    periodical.  Do you see that on the last page

3    under her e-mail heading?

4         A.    Yes.

5         Q.    Okay.  And then she indicates in the

6    e-mail, October 6th, at 4:09 p.m. to Dr. Kohler,

7    subject line, "Summit County Heroin Death Rate,

8    Good afternoon Dr. Kohler.  I'm working on a

9    project for Channel 3 about heroin and other

10   drugs.  I want to find a data on deaths in

11   Summit County for just heroin, fentanyl and then

12   a count of deaths by a combination of drugs for

13   this year and also last year if you have that

14   data."

15             Do you see that?

16        A.    Yes.

17        Q.    And then Dr. Kohler responds -- and

18   this is before she copies you.  She says, "We do

19   not have up-to-date numbers to provide you.  We

20   continue to see a regular influx of overdose

21   deaths at a rate of 1 to 4 OD deaths most days.

22   Since the July 4th weekend we have seen at least

23   75 carfentanil overdose deaths.  The vast

24   majority of the overdose deaths are due to

25   fentanyl and fentanyl analogs but we continue to

Page 235

1   see cocaine, methamphetamine and heroin in the

2   mix of drugs identified."

3              Did I read that correctly?

4       A.    Yes.

5       Q.    And then at the end of the chain,

6   where you're -- then you get copied, and then

7   Dr. Kohler transmits a data chart that says,

8   "Here is the data that I compiled for the past

9   five years."  Do you see that, in that top

10  e-mail?

11      A.    Okay.  Okay.

12      Q.    And then that last page is a chart

13  of the data that Dr. Kohler provided, correct?

14      A.    Correct.

15      Q.    All right.  And is Dr. Kohler's

16  response to Ms. Schmitt summarizing the

17  carfentanil overdose deaths and the fentanyl and

18  fentanyl analogs -- that's all consistent with

19  what we described earlier today?

20      A.    Yes.

21      Q.    And what you observed firsthand in

22  the investigations at that time period, correct?

23      A.    Correct.

24      Q.    Okay.  I'd like to look at an e-mail

25  from you -- we're going to mark it as Exhibit 8.

```
                                          Page 236
 1                    -   -   -   -   -
 2              (Thereupon, Deposition Exhibit 8,
 3              E-Mail String Beginning Bates Number
 4              SUMMIT_000201174, was marked for
 5              purposes of identification.)
 6                    -   -   -   -   -
 7        Q.    I made this a composite exhibit.  It
 8   has three different e-mails in it.  We're going
 9   to put them together in the interest of time.
10   The Bates pages for Exhibit 8 are
11   SUMMIT_000201174, page 2 is 000028691, and page
12   3 is 000201173.  Take a look at that, and we'll
13   just go from front to back.
14              The first page is an e-mail from
15   Dennis, and I'll spell his last name,
16   C-a-u-c-h-o-n, from a group, according to his
17   e-mail address, Harm Reduction Ohio.
18              Do you see that?
19        A.    Yes, sir.
20        Q.    Do you know who that gentleman is?
21        A.    No.  I can tell you he calls in
22   every -- periodically to get our overdose
23   numbers.  Personally, I do not know him.
24        Q.    He's one of those examples of
25   someone in the public or the media making a
```

1    request for information from your office?

2         A.    Correct.

3         Q.    And that's one of those things that

4    you would field?

5         A.    Correct.

6         Q.    So he wrote to you in February of

7    this year and says, "The preliminary report you

8    sent a couple weeks ago has only one overdose

9    death in December and three in November.  Are

10   those numbers still valid?  If so, an amazing

11   decline in overdoses.  Some other counties

12   appear to have had sharp drops in the second

13   half of 2017, too."

14              Did I read that correctly?

15        A.    Correct.

16        Q.    Okay.  And do you remember your

17   response to him and whether that data that you

18   had was correct in terms of the preliminary

19   report?

20        A.    I can tell you what I do.  I go into

21   the database with him, punch in the dates --

22   usually it's, say, January 1st through December

23   31st -- pull up all overdoses confirmed, which

24   means, you know, overdose was the cause of

25   death.  I e-mail that to him.  And that's

Page 238

1   basically -- then sometimes follow up with

2   questions that reference those -- those that I

3   send him.

4         Q.    So you -- you take the requests,

5   you've put in the parameters, and you

6   mechanically generate and transmit the data?

7         A.    Right.

8         Q.    Page 2, from the same gentleman, the

9   same day, a couple minutes later, almost an hour

10  later.  He says, "Thanks.  Can you send the

11  report for 2016?  The drop in overdoses in the

12  last few months is breathtaking and I'd like to

13  be able to explain this breath of good news."

14  And then you responded about an hour later,

15  "There are several 2017 cases still not signed

16  out.  Here is a list of presumed overdoses."

17  Correct?

18        A.    Correct.

19        Q.    And that's an example of you

20  responding to the data, correct?

21        A.    Yes.

22        Q.    All right.  Then on the last page,

23  also from that same day, he writes, "This makes

24  me smile (only a couple hundred overdose

25  deaths.)  Thanks for the data."  And then the

Page 239

1    response, it says, "It looks like from every" --

2    or, excuse me, "It looks like from reviewing the

3    numbers, we still have roughly 100 less overdose

4    deaths in 2017."

5              Did I read that correctly?

6        A.    Correct.

7        Q.    All right.  Do you have any

8    explanation for the decrease in overdose deaths

9    that the office has seen?

10             MS. HERMIZ:  Objection to form.

11       A.    I can tell you what my opinion is,

12   and that's the availability of Narcan.  It

13   doesn't mean there's not overdoses going on.  It

14   just means that they're being treated in

15   emergency rooms or by paramedics and not dying.

16       Q.    Have you pulled data from Summit

17   County EMS or the fire or the police to confirm

18   that theory?

19       A.    I haven't.

20             I think, over in the past month or

21   two, I've been on the health department website

22   and briefly looked at that.

23             I know the Beacon Journal puts out

24   an article once a week about the people -- the

25   number of people and their ages being treated in

                                           Page 240

1    emergency rooms during that -- that week.

2           Q.    Okay.  In the course of your time

3    with the department, have you ever sourced a

4    prescription opioid death to a particular drug

5    manufacturer?

6           A.    No.

7                 MS. HERMIZ:  Objection to form.

8           Q.    In the course of your time at the

9    department, have you ever sourced a particular

10   prescription opioid death to a particular drug

11   distributor?

12                MS. HERMIZ:  Same objection.

13          A.    No.

14          Q.    During the course of your time have

15   you ever sourced a prescription opioid death to

16   a particular retail pharmacy?

17                MS. HERMIZ:  Same objection.

18          A.    No.

19          Q.    In terms of the database, have there

20   ever been times when there were glitches or

21   problems in terms of the data that would be

22   output when you guys would run the statistics

23   queries?

24                MS. HERMIZ:  Objection to form.

25          A.    I've known requests have come in --

1   you know, that database is set up for only

2   certain information, usually case numbers;

3   usually names aren't associated with it, and so

4   forth.  So requests have come in where, you

5   know, I don't know how to fill that request

6   because it needs a different query.  So like

7   Denice will call IT, explain what we need, and

8   go from there.  I can't recall it ever, you

9   know, printing out misinformation.  It's all

10  been we've needed different information than

11  what was originally on that database.

12        Q.    I'm going to mark as Exhibit 9

13  another example of an e-mail exchange between

14  you and that gentleman that we just saw in the

15  last exhibit --

16        A.    Okay.

17        Q.    -- from 2018.

18                 -   -   -   -   -

19              (Thereupon, Deposition Exhibit 9,

20              E-Mail String Beginning Bates Number

21              SUMMIT_000201177, was marked for

22              purposes of identification.)

23                 -   -   -   -   -

24        Q.    Exhibit 9 is Bates SUMMIT_000201177,

25  1175 and then 2035.

1            So on the first page of Exhibit 9

2    Mr. Cauchon e-mailed you, on February 10th of

3    2018, subject line, "2017 Drug OD."  He wrote,

4    "A question on the overdose list you forwarded

5    January 9th.  What does it mean when cause of

6    death has different drug info than the

7    toxicology results?  For example, in this one

8    cause of death cites carfentanil, heroin and

9    methadone while toxicology lists only

10   carfentanil.  Thanks."

11           And so, in response to that, it

12   looks like on page 2 you indicated, if we go the

13   second e-mail from the top, "I will have to look

14   at the case on Monday."

15           Do you see that?

16        A.    Yeah.

17        Q.    And then he responds to you, "You

18   shouldn't be working.  I just used that as an

19   example.  There are many cases where it says,

20   for example, cause of death, meth and fentanyl

21   but toxicology only gives one drug.  I thought

22   it might be because the toxicology entry doesn't

23   always list every drug found.  But maybe not.

24   Perhaps the toxicology entry is the correct one

25   and it turns out, for example, that meth wasn't

Page 243

1    involved."

2            And then you responded a couple days

3    later, "I looked at that case and actually all

4    three of the drugs were present on the tox

5    report."

6            So in terms of -- well, first of

7    all, do you remember this exchange, having

8    now --

9        A.    Briefly, yeah.

10       Q.    -- looked at the e-mail?

11           So is that a problem with the

12   database in terms of the data that it spits out

13   and whether it lists everything that's in the

14   case file or on the tox report?

15           MS. HERMIZ:  Objection to form.

16       A.    I know the tox reports will be

17   listed, the drugs found.  You know, I think it's

18   safe to say most forensic pathologists -- I

19   mean, there's not a certain way you sign on a

20   death certificate.  You could put -- they can

21   word it however they want.  So, yeah, I'm not

22   sure why that is.  And, again, I probably would

23   have went back and asked Steve.  That's more of

24   a question for Steve or Dr. Kohler on something

25   like that.

1          Q.    Okay.  Let's take a look at another

2    one.  We're going to mark this as Exhibit 10.

3    This is a one-page e-mail, SUMMIT_000028708.

4                    -   -   -   -   -

5                 (Thereupon, Deposition Exhibit 10,

6                 E-Mail String Bates Numbered

7                 SUMMIT_000028708, was marked for

8                 purposes of identification.)

9                    -   -   -   -   -

10         Q.    And you see, on the bottom of the

11   page, Dr. Kohler is writing to a Stephen Byrne

12   from Summit, Ohio.  Who's Stephen Byrne?

13         A.    That is -- I think he's from the

14   county IT department.

15         Q.    And she copied you and Ms. DiNapoli,

16   correct?

17         A.    Okay.  Yes.

18         Q.    It says, "Database Questions."

19   Dr. Kohler wrote, "Stephen, I am not sure where

20   the issue is in our database, but we continue to

21   get requests for numbers of overdoses and when

22   we ask the database for the number of presumed

23   cases, we are getting only about 30 to 40, which

24   I know is not reflective for the year.  I do not

25   know if it is a problem with the database, a

1    problem with data entry or just that we are

2    behind on processing our cases.  It appears that

3    the other major counties are able to provide

4    relatively up-to-date information, but we are

5    struggling.  Do you have any insight as to

6    whether or not the issue is related to the

7    database itself or other external issues?"

8            Did I read that correctly?

9        A.    You read it correctly.

10       Q.    And then Mr. Byrne responds, "Part

11   of the issue is unfortunately the way the query

12   was set up and how the database is deployed.  We

13   don't have a clear answer for this yet, but we

14   are working on it.  One answer is to adjust the

15   deployment of the database.  This will take some

16   time to put together but doable.  As for getting

17   the right amount of data back on the query, we

18   will look into this right away."

19           Did I read that correctly?

20       A.    Yes.

21       Q.    Do you recall whether this issue was

22   resolved to the medical examiner office's

23   satisfaction?

24       A.    It had to be because I haven't heard

25   any complaints.

Page 246

1        Q.    Since that time?

2        A.    Since recently.

3        Q.    In terms of the details of -- go

4    ahead.

5        A.    Part of the problem with the way the

6    database was set up, we were getting a bunch of

7    requests for, say, heroin deaths.  Well, the

8    question came up, what happens to those deaths

9    where there's heroin and cocaine or heroin and

10   fentanyl.  Is it classified as a heroin death?

11   Is it classified as a fentanyl death?  So, you

12   know, actually, it's a combination of both.

13            So when they call in and just -- I'm

14   to the point now where you'll call in and ask

15   for, say, heroin deaths.  Well, do you want just

16   straight heroin, or do you want where heroin is

17   mixed with, you know, another -- like

18   carfentanil or fentanyl.  So I'm to the point

19   now where I just hit the "all overdose" buttons

20   and let them figure out, you know, what's a

21   heroin overdose and what's another type of

22   overdose, you know.  I'm not going to, you know,

23   in 2016, go through 360-some cases to figure out

24   which ones are heroin overdoses and which

25   ones -- so that was part of the problem with the

Page 247

1   database, people were asking specifically how

2   many heroin overdoses do you have.  Well --

3        Q.    In terms of inquiries into the

4   database, before you had the electronic system,

5   what would you do if you got -- let me ask, did

6   you get questions about the number of overdoses

7   in 2000?

8        A.    I'm -- I'm sure we got media

9   inquiries.  I'm not sure -- that was before my

10  time, before I handled news media.  I'm sure the

11  investigator, chief investigator did at the

12  time.  A lot of times it would -- the response I

13  know would be, we'll get back with you.  Then

14  he'd go get those books that we kept before the

15  computers, and we would find information that

16  way to give it to him.

17       Q.    Okay.  I want to show you a couple

18  documents that we talked about earlier and make

19  sure that we've identified them correctly and

20  that I understand their role in your job.

21                 -    -    -    -    -

22             (Thereupon, Deposition Exhibit 11,

23             Investigator Manual Table of

24             Contents, Revised September 2009,

25             Beginning Bates Number

1           SUMMIT_001011269, was marked for

2           purposes of identification.)

3               -   -   -   -   -

4      Q.    So I've marked as Exhibit 11 what I

5  understand from the title is the "Investigator

6  Manual" as of September 2009.

7      A.    Yes, sir.

8      Q.    Is that correct?

9      A.    Yes.

10      Q.    The Bates number, for the record, is

11  001011269 through 11327.

12           When you came to the department --

13  well, strike that.

14           This manual was subsequently

15  revised, correct?

16      A.    Yes.

17      Q.    What's the current version that you

18  use?

19      A.    The most recent.

20      Q.    Fair.

21           Do you recall when the most recent

22  version --

23      A.    No.

24      Q.    -- went into effect?

25      A.    And, actually, it needs updated, but

Page 249

1   we are in the process of getting a new case
2   management system, so we are holding off until
3   that system is implemented.
4           Q.    Do you know what's going to change
5   about the new case management system?
6           A.    It's going to be our new case
7   database system.
8           Q.    Are there any non-technical aspects
9   of those changes that you understand in terms of
10  the new database and why you're going to it?
11          A.    I think it's just for better
12  tracking case management.
13          Q.    Did you play any role in the process
14  of recommending the need for a new database?
15          A.    No.
16          Q.    Any role in making requests for what
17  a new database should include?
18          A.    They've asked my opinions on the --
19  the -- as they're setting up the programs,
20  what's needed for investigators, and I put in a
21  little bit of input.  Amy has done most of the
22  work for this new system.
23          Q.    Do you remember any requests that
24  you made for your department?
25          A.    Just contacts for, like, you know,

Page 250

1    police and fire and, you know, hospitals.

2         Q.    So merging the directory with the

3    database?

4         A.    Yes.

5         Q.    Anything else you remember?

6         A.    If I'm not mistaken, this program is

7    going to be a one-shop, so track our evidence,

8    track -- I mean, everything is going to be

9    tracked through this new data system, case data

10   system.

11                    -    -    -    -    -

12               (Thereupon, Deposition Exhibit 12,

13               Investigator Manual Table of

14               Contents, Revised May 2016,

15               Beginning Bates Number

16               SUMMIT_001128715, was marked for

17               purposes of identification.)

18                    -    -    -    -    -

19         Q.    I'm going to hand you what I've

20   marked as Exhibit 12.  This is SUMMIT_001128715

21   through 28775.  What's Exhibit 12?

22         A.    This is a revised copy of the

23   investigator manual.

24         Q.    Effective?

25         A.    May 2016.

1        Q.     Is this the current version?

2        A.     That's the current version.

3        Q.     You said that there is -- you're due

4    for another revision.  What needs to be changed

5    from this version?

6        A.     I think the way we track evidence in

7    that and sign in -- minor stuff on protocol is

8    going to change with regards to signing in

9    evidence and so forth.

10       Q.     Okay.  I've got a couple questions

11   about the changes between the 2016 version and

12   the 2019 version.  So --

13       A.     Where we at?

14       Q.     -- if you turn to Bates -- so the

15   Bates numbers are those little tiny numbers at

16   the bottom of the page.

17       A.     So which --

18       Q.     Exhibit 12, so the one on your

19   right, if you look at Exhibit 12 --

20       A.     Okay.

21       Q.     I'm not going to make you do a side

22   by side.

23       A.     Okay.

24       Q.     I've got a couple things I just want

25   to ask you about.

Page 252

1          A.      Okay.

2          Q.      So in Exhibit 12, if you turn to

3    Bates page -- the one that ends in 7138.  It's

4    about halfway through the document, and it

5    should, at the top of the page, have a

6    subsection G --

7          A.      Okay.

8          Q.      -- that talks about past medical

9    history of the decedent.  Do you see that?

10         A.      "The second paragraph should provide

11   the pertinent past medical history of the

12   decedent."

13         Q.      Okay.  So this page and the page

14   that follows and the first half of the page

15   after that are all new editions to the 2016

16   version of the manual.  Do you -- did you play

17   any role in the creation of this content on

18   these two and a half pages of --

19         A.      This is basically examples how --

20   Dr. Sterbenz is a stickler on final

21   investigation reports.  This is a guide by him

22   of what needs to be included in those final

23   investigation reports.

24         Q.      So these additions to the manual

25   were then laid out by Dr. Sterbenz?

```
                                      Page 253
 1              MS. HERMIZ:  Objection to form.
 2        Q.    This is what --
 3        A.    I'm sure he sat down with
 4   Dr. Kohler, and Dr. Kohler --
 5        Q.    Okay.  Did you sign off on these?
 6        A.    Dr. Kohler issues these.  I don't --
 7   yeah.  Like I said before, she'll send me a --
 8   before she puts it out, she'll send either
 9   myself and Amy and say, hey, do you see anything
10   that needs changed or any corrections?
11        Q.    Okay.  If you turn to Bates page
12   756, do you see there's a heading in the middle
13   of the page that says, "Prescription
14   Medication"?
15        A.    Yes.
16        Q.    And then at the end of that section,
17   if we turn to the next page, under item number
18   11, it says, "All medication brought into the
19   office during an investigation will be entered
20   into the electronic drug database maintained by
21   the chief investigator."
22              You see that, right?
23        A.    Yes.
24        Q.    We talked about that earlier,
25   correct?
```

1        A.     Correct.

2        Q.     Was this added to the manual as part

3   of that Summit County audit that you talked

4   about?

5               MS. HERMIZ:  Objection to form.

6        A.     I can't for sure say.  I believe so.

7        Q.     A couple other things I want to show

8   you.  So we are up to Exhibit 13.

9                    -   -   -   -   -

10               (Thereupon, Deposition Exhibit 13,

11               E-Mail String Beginning Bates Number

12               SUMMIT_000099406, was marked for

13               purposes of identification.)

14                    -   -   -   -   -

15        Q.     Exhibit 13 is Bates

16   SUMMIT_000099406.  Have you seen this before,

17   this e-mail chain?

18        A.     That had to be when we were audited

19   back in 2013.

20        Q.     And it includes some correspondence

21   between you and a couple of different folks in

22   the department, correct?

23        A.     Right.

24        Q.     And it says -- the subject line is

25   "Flow Charts for Decedent Inventory," correct,

1    is the subject line of the e-mail?

2         A.    Yes.

3         Q.    All right.  And then attached to

4    this e-mail are a couple pages of flow charts,

5    correct?

6         A.    Correct.

7         Q.    Are these flow charts the current

8    protocols in terms of the chain of custody of

9    the materials that are referenced at the title

10   of each flow chart?

11        A.    Yes, but I can tell you, like for

12   guns, I don't accept guns anymore.  I make law

13   enforcement take those.

14        Q.    So let's go through -- so the first

15   chart that's in the e-mail has an X-4 at the top

16   right --

17        A.    Okay.

18        Q.    -- and it says, "Summit County

19   Executive Office, Medical Examiner, Decedent

20   Inventory, Collection/Storage of Physical

21   Evidence," correct?

22        A.    Correct.

23        Q.    That's the current protocol in terms

24   of chain of custody of physical evidence for the

25   department?

1          A.     Yes.

2          Q.     Now, in the e-mail chain it

3     references some comments and revisions that you

4     made to this.  Do you know, from looking at the

5     face of Exhibit 13, what changes you made?

6          A.     No.  I can't tell you.

7          Q.     Okay.  On page -- the next page of

8     the flow charts, X-1, it says, "Collection and

9     Storage of Guns."  You just indicated a moment

10    ago you no longer accept them?

11         A.     Correct.

12         Q.     When did that change?

13         A.     I can't remember a year, but it's

14    been several years.

15         Q.     Do you remember what changes you

16    made to this flow chart?

17         A.     No.

18         Q.     The next flow chart, X-2, says,

19    "Collection/Storage of Drugs."  Is this the

20    current protocol for the collection and storage

21    of drugs?

22         A.     Yes.

23         Q.     Do you recall the changes that you

24    made to this flow chart referenced in the

25    e-mail?

Page 257

1          A.    No.

2          Q.    With respect to these flow charts

3     that I've shown you so far and that are marked

4     as Exhibit 13, are you aware of draft versions

5     or prior versions that exist?

6          A.    No.

7          Q.    Okay.  All right.  Then the last

8     flow chart, X-3, says, "Collection/Storage of

9     Personal Property."  Do you see that?

10         A.    Yes.

11         Q.    Is this the current chain of custody

12    protocol for the collection and storage of

13    personal property?

14         A.    I think the only change that was

15    made is we talked to probate, you know, and said

16    $500 is too small of an amount or we're going to

17    be down at your office every day bringing

18    property down, so we got permission to raise

19    that, doubled it to like a thousand dollars, so

20    --

21         Q.    Do you remember when that change

22    went into effect?

23         A.    That had to be a couple years ago.

24         Q.    Okay.  Two more exhibits I want to

25    show you.

1            THE VIDEOGRAPHER:  Can I can change

2    the video at this point?

3            MR. CARTER:  Sure.  I've got four

4    minutes, but I defer to you.

5            THE VIDEOGRAPHER:  We need to change

6    it.

7            MR. CARTER:  We need to change it.

8    Okay.  We'll change it.

9            THE VIDEOGRAPHER:  Off the record.

10               (Recess had.)

11            THE VIDEOGRAPHER:  We're back on the

12    record, 4:02.

13               -   -   -   -   -

14            (Thereupon, Deposition Exhibit 14,

15            Information Handbook Office of the

16            Medical Examiner County of Summit

17            Beginning Bates Number

18            SUMMIT_000201655, was marked for

19            purposes of identification.)

20               -   -   -   -   -

21    BY MR. CARTER:

22        Q.    All right, Mr. Guenther.  I've

23    marked as Exhibit 14 the Information Handbook,

24    Office of the Medical Examiner, County of

25    Summit, issued February 2006, Bates numbered

                                             Page 259

1    SUMMIT_000201655 through 669.  I hand that to

2    you.

3              Do you recognize that document?

4         A.    Yes.

5         Q.    And within this information handbook

6    it includes, among other things, a section of

7    frequently asked questions, things that the

8    public might want to know about when bodies are

9    released, when autopsies are performed, how to

10   interact with the investigators, correct?

11        A.    Correct.

12        Q.    Have you provided comments or

13   revisions to this handbook over the years?

14        A.    I have not personally.

15        Q.    Okay.  To your knowledge, is the

16   handbook an accurate recitation of how your

17   office works?

18        A.    Yes.

19                    -   -   -   -   -

20              (Thereupon, Deposition Exhibit 15,

21              Information Handbook County of

22              Summit Medical Examiner Beginning

23              Bates Number SUMMIT_000099204, was

24              marked for purposes of

25              identification.)

```
                                      Page 260

 1                 -   -   -   -   -
 2        Q.    I'd like to show you Exhibit 15,
 3   which is a more recent version of the same
 4   general document.  It's the Information
 5   Handbook, County of Summit Medical Examiner,
 6   revised August of 2014, Bates Summit_000099204
 7   through 220.
 8             Mr. Guenther, have you seen that
 9   before?
10        A.    Yes.
11        Q.    Is that the current edition of the
12   office's information handbook to the best of
13   your knowledge?
14        A.    Yes.
15        Q.    Okay.  Are you aware of whether
16   there is a new one in the works?
17        A.    Not to my understanding, no, I don't
18   believe so.
19             MR. CARTER:  All right.  In the
20   interest of time at this point, I'm going to
21   hand over the examination to counsel for some of
22   the other Defendants.  It was a pleasure meeting
23   you and thank you for answering my questions.
24             THE WITNESS:  Okay.
25             THE VIDEOGRAPHER:  Off the record.
```

1              (Short recess had.)

2              THE VIDEOGRAPHER:  We're back on the

3    record, 4:06.

4              EXAMINATION OF GARY GUENTHER

5    BY MS. O'GORMAN:

6         Q.    Good afternoon, Mr. Guenther.  My

7    name is Debra O'Gorman and I represent Purdue in

8    the lawsuit that was brought by the county.

9              I'm just going to ask you some

10   follow-up questions, some of which will be just

11   to cover up some areas that were covered by

12   Mr. Carter and a few other questions that I

13   would like to ask you.

14             You mentioned during your testimony

15   that there's an HR person responsible for the

16   medical examiner's office?

17        A.    Yes.

18        Q.    Who is that?

19        A.    Summit County has their own human

20   resource department that's located in the Pry

21   Building, which is on South Main.  I know Steve

22   Krier is one of them.  There's, like, three of

23   them.  We got one main one.  Then if she's

24   unavailable, you know, there's a list of, like,

25   two others that fall under our department.

Page 262

1       Q.    And how do those HR employees

2   interact with the medical examiner's department?

3       A.    Usually if there's a discipline

4   problem with an employee, you know, Dr. Kohler

5   will contact them.  The most I've dealt with

6   them is during the hiring process they sit in on

7   all the interviews.  They screen the applicants

8   before, you know, they get to -- to us.  So

9   they're there through the whole interview and

10  hiring process for us.

11      Q.    Okay.  You spoke earlier in your

12  deposition about taking death calls.  Who are

13  those calls coming in from?

14      A.    If they're -- excuse me.  We get

15  death calls from hospitals, so usually -- and in

16  the hospital it's usually one of the medical

17  residents or a nurse that reports the death to

18  us.  Sometimes, you know, if they die during a

19  surgery, the surgeon will call quickly.

20  Usually -- from Children's Hospital it's usually

21  the doctors that -- attendings that call and

22  report to us.

23           If a person dies outside of a

24  facility, say at home or a traffic crash or

25  whatever, the majority of the time it's the

1  paramedic on scene that will call and give us

2  the basic information, or sometimes law

3  enforcement.  It depends on what jurisdiction.

4      Q.    Okay.  And you mentioned when a call

5  comes in, a worksheet is prepared.  Is that a

6  paper document currently?

7      A.    Yes.

8      Q.    And is it filled out by hand?

9      A.    Some investigators -- I fill all --

10  all mine out by hand.  I'm old school.  I do

11  it -- some of them will write it down on a

12  notepad, then they get the form saved on their

13  computer and just fill in the blanks, then typed

14  in there on the computer, and then print it out.

15      Q.    And then you mentioned that the

16  worksheet is maintained in a case file?

17      A.    Yes.

18      Q.    Is that a paper file?

19      A.    Yes.

20      Q.    Are those paper files ever scanned

21  and stored as a part of an electronic file?

22      A.    Eventually, when we run out of

23  storage or space at the medical examiner's

24  office and we need more space, we'll purge the

25  old, old files.  Most of the time when we

Page 264

1   purge -- you know, everything in a homicide case

2   is kept.  On other cases, you know, we'll purge

3   the -- everything except for what we produced,

4   like medical records, police reports.  We'll

5   purge those.  Or you shred those reports and

6   just put on disc what we have maintained.

7           Q.    Do you know for what period of

8   time -- are you still currently shredding

9   certain files --

10                  MS. HERMIZ:  Objection to form.

11          Q.    -- in the office?

12          A.    Once they get purged --

13          Q.    And what time period are files being

14  purged from, what dates?

15                  MS. HERMIZ:  Objection to form.

16          A.    It all depends on when it gets full.

17          Q.    Do you know the last date for which

18  files were purged?

19          A.    I want to say they're -- they're

20  older than eight, ten years; older than -- you

21  know, 2010, 2011 and older might be purged.

22          Q.    Okay.  Do you recall the last time

23  the purging process took place?

24                  MS. HERMIZ:  Objection to form.

25          A.    No.

Page 265

1          Q.     Have you ever been asked to stop
2     purging files?
3               MS. HERMIZ:  Objection to form.
4          A.     Have I ever been asked to -- well,
5     when we run out of room, I have no option.
6          Q.     You mentioned something about a
7     Jeter system.  What is that?
8          A.     It's just like a file system where
9     all your case files go in.  It's something on
10    wheels where you can put cases going in from
11    both sides.
12         Q.     Okay.
13         A.     And it's all wheels, and there's,
14    like, four or five of them that you can put --
15         Q.     It's been a while since I've seen
16    one, but I do know what you're talking about.
17              You also mentioned that you have
18    certain manuals in the office.  Are those paper
19    books or looseleaf binders?  What are those
20    manuals that you had?
21         A.     Manuals?
22              MS. HERMIZ:  Objection to form.
23         Q.     You said you had manuals and books
24    on death investigations.
25         A.     Usually those are books.

Page 266

1          Q.     Are they textbooks?

2          A.     Textbooks.

3          Q.     Are they books -- are they manuals

4    created by your office?

5          A.     No.  Usually -- I know there's one

6    from Dr. Spitz, who is a renowned forensic

7    pathologist that handles high-profile cases.

8    He's got a -- a death investigation manual,

9    handbook, manual, hard back that's out.  And

10   DiMaio was another one that's got several books

11   out.  You know, we just got it for, you know,

12   resource information.

13         Q.     Is that something that you, as an

14   investigator, will review?

15         A.     I've reviewed them in the past.  You

16   know, we get interns that come in, and all our

17   new hires will -- will read those, and we give

18   the interns those books also to review.

19         Q.     Do you have interns in the

20   investigation department?

21         A.     Every once in a while.

22         Q.     Under what circumstances do you

23   bring an intern in?

24         A.     Right now, downtown sends them and

25   takes somebody, senior administration, under --

1  Ms. Shapiro assigns them.  Usually they're --
2  they're college students that need so many hours
3  of internship.
4      Q.   Okay.  Now, when an investigator
5  goes to a death scene, you mentioned that notes
6  are taken.  Where are those notes maintained?
7      A.   Some people take their notes --
8  take, like, a blank investigation form and write
9  all their notes, scribble on that.  Personally,
10  I take one of those, like, reporter notebooks,
11  small notebooks, and take my notes on that.  And
12  once I get back, I transfer those notes onto the
13  investigation form.  I know I keep those in an
14  envelope in a case file, you know.  Once it's
15  transcribed onto the initial or final worksheet,
16  the investigators probably discard their --
17  their scribbled notes and that.
18      Q.   Is it your practice to discard your
19  handwritten notes?
20      A.   If they've already been transcribed
21  onto the worksheet.
22      Q.   How long is a typical death
23  investigation from the investigator's
24  perspective?
25          MS. HERMIZ:  Objection to form.

Page 268

1        A.    How -- I mean, that's hard to -- it

2    depends on when you get all your records in.

3    Sometimes, you know, records can be delayed

4    getting to you for some reason, problems on the

5    other side obtaining those records.  So, you

6    know, that might delay an investigator, you

7    know, a week or two before they can write their

8    final report until they get those records.

9    Usually the -- the doctor, Dr. Kohler, prefers

10   the investigator to have their final

11   investigation report written within, you know,

12   six weeks, four to six weeks from the date of

13   death.

14            Now, there are some times, like I

15   said, when records are delayed.  Sometimes we're

16   held up by other agencies, they're not completed

17   with their investigation.  So, you know, some of

18   those cases can take a lot longer.

19        Q.    When you request medical records, do

20   you need written permission from the next of kin

21   --

22        A.    No.

23        Q.    -- or anybody else?

24        A.    No.

25            Some of the facilities that we order

1    from will request written, you know -- a written

2    authorization from us to release those from what

3    we want.  You know, I've called a doctor's

4    office in the past, you know -- some of these

5    doctors and their staff I know because I've been

6    doing this for 30 years -- hey, so-and-so died.

7    You know, I need records on that person.  Oh,

8    sure.  What's your number?  I'll send them right

9    over.  So it all depends on where you're getting

10   them from, whether or not they need written --

11        Q.    And when is it determined that the

12   investigation is complete?  How is that decision

13   made?

14        A.    Well, a case is not completed until

15   Dr. Kohler -- once the investigator's part of it

16   is done, then it gets turned in and eventually

17   goes to the doctor that did the exam, whether it

18   be Dr. Kohler or Dr. Sterbenz right now.  They

19   might be waiting on more toxicology tests.  They

20   might need to review histology.  So, you know, I

21   tell families now for a case to be completed,

22   it's usually running about 14 to 16 weeks from

23   the date of death before you can obtain a

24   report.  And things have changed now.  I mean,

25   talk about toxicology, with the analogs and

                                        Page 270

1    that, we've had -- we've had to send out to

2    outside forensic labs, so it's out of our hands

3    when we get those results, so --

4         Q.    And that could add to the time

5    period it would take?

6         A.    Right.

7         Q.    Okay.  Now, you mentioned that some

8    of your investigators work the night shift.  Do

9    they have assistance in follow-up during the

10   daytime hours if they are unable to reach

11   hospitals --

12        A.    Yes.

13        Q.    -- or other people that they might

14   need?

15        A.    Yes.  They shift investigators.  You

16   know, for the most part Monday through Friday I

17   have at least two daytime investigators working,

18   plus there's myself and Amy, who's the

19   investigator supervisor.  So technically there's

20   four of us there.  So one of us will follow up

21   ordering records for a case if need be.  And the

22   night investigators are good.  You know, when

23   you walk in in the morning, it's, hey, Gary, I

24   need this, this and this on this case, can you

25   make sure somebody orders it for me?

1          Q.     Will the other investigators assist

2     with interviews for those night investigators if

3     they can't reach whoever they need to speak to

4     --

5          A.     Right.

6          Q.     -- during the nighttime hours?

7          A.     Yes.  A lot of time it's follow-up

8     with family, maybe trying to get more

9     information.  We'll contact those people during

10    the day.

11         Q.     You mentioned in your testimony that

12    law enforcement has been going after sellers of

13    drugs.  Do you know since when that has been the

14    case?

15                MS. HERMIZ:  Objection to form.

16         A.     I think they've always -- I mean,

17    even when I was a drug agent, we went after drug

18    dealers.  I think they've gone after these

19    sellers more hard when deaths are involved and

20    charging them with the manslaughter charges and

21    all that.  I think they really started pushing

22    that in, you know, 2013, '14, '15.

23         Q.     And has your office assisted law

24    enforcement in those efforts?

25         A.     We've helped gather information,

Page 272

1    but, you know, we don't do criminal

2    investigations.  I mean, my investigators aren't

3    allowed to go out and make arrests or anything.

4    But there's been times where, you know, say I'm

5    close to a family and they, you know, always

6    call me for info.  One of the detectives will

7    call over and say, hey, can you find this out

8    for me when you talk to so-and-so.  Sure.

9         Q.    You mentioned that property can be

10   given by the medical examiner's office to the

11   police department; is that right?  So you

12   mentioned giving a phone to the police

13   department?

14        A.    Yeah.  And at that point it's

15   considered evidence from my standpoint, so yeah,

16   we can turn that over.

17        Q.    And how is that process done?

18              MS. HERMIZ:  Objection to form.

19        Q.    In other words, do you wait for the

20   police to ask you for the evidence or do you

21   just decide --

22        A.    Sometimes -- sometimes when we're at

23   the scene, we're there at the same time as the

24   narcotic detectives, so, you know, right there

25   they'll say, hey, we want to take the phone,

1  okay.  We need to take the powder or syringe

2  with us.  So we work hand in hand.  And usually

3  what happens is, you know, when they're not at

4  the scene, say it happens on a Saturday, they'll

5  call in Monday and say, hey, what does the death

6  of this person look like, and if it's an

7  overdose, hey, do you have any evidence or

8  property, like cell phones there, that we can

9  pick up.  That's how that goes.  Yeah.  Sure.

10  We'll sign it over to you.

11       Q.   Will you also turn over any samples

12  that were collected from the scenes?

13       A.   At times we've given, yes.

14       Q.   And would it be typical to give over

15  everything that was collected or just some of

16  it?

17       A.   If it's been to the point where it's

18  packaged up and sealed and I've taken it back to

19  the cage, I don't open envelopes.  They get

20  whatever is in there, everything or nothing.

21       Q.   You mentioned in your response to

22  some earlier testimony that you have identified

23  prescription drugs based on their physical

24  appearance and looking at charts available on

25  the internet.

                                              Page 274

1                 Do you recall that testimony?

2          A.    Yes.

3          Q.    Do you ever send what you believe to

4    be prescription drugs to a toxicology lab for

5    testing?

6          A.    I think there's been times where

7    Mr. Perch will do the testing and he's gotten

8    results that weren't expected, so he'll come up

9    and look at the -- the pills or whatever

10   evidence we brought back and possibly test

11   those.

12         Q.    So if you identify a pill, based on

13   physical appearance, as being a prescription

14   drug, do you do -- on your own do anything more

15   with that?

16         A.    No.

17         Q.    You just assume it's the

18   prescription drug that it looks like?

19               MS. HERMIZ:  Objection to form.

20         A.    Yes.

21         Q.    We talked a little bit about this

22   new database that is going to be coming to

23   replace the old database.  Do you recall that?

24   Yes?

25         A.    Yes.

Page 275

1         Q.    Do you know if the new system has a

2   name?

3         A.    Forensic Advantage, I believe.

4         Q.    And is that something that is

5   commercially available?

6         A.    Yes.

7         Q.    And the system in place now was

8   custom built by Mr. Gillespie?

9         A.    Yep.

10        Q.    Does that system have some

11  limitations?

12        A.    Yes.

13        Q.    And what are some of those

14  limitations?

15        A.    From my understanding, is that all

16  our forms will be located within this Forensic

17  Advantage.  Now we're at the -- with our system

18  now, we got forms here, forms there.  You know,

19  you just got to know where to go get them.  So

20  everything is going to be combined into one

21  system.  We can track evidence, we can track

22  property, you know, all the notes on the case.

23        Q.    Will this Forensic Advantage take

24  the place of paper files?

25              MS. HERMIZ:  Objection to form.

1      A.    That, I'm not sure.

2      Q.    And do you know what the process

3 will be to turn over the data from the existing

4 system into the new one?

5      A.    Haven't crossed that bridge yet.

6      Q.    Is there somebody who's in charge of

7 this database project?

8      A.    Probably the IT department, Summit

9 County.

10     Q.    Do you know who specifically that

11 might be?

12     A.    No.

13     Q.    When did Dr. Sterbenz join the

14 medical examiner's department?

15     A.    I want to say early 2000s, early to

16 mid-2000s, so he's probably been there 15 plus

17 years, I would imagine.

18     Q.    You mentioned that Dr. Sterbenz

19 requested some changes to the investigator's

20 manual regarding the past medical history of the

21 decedent.  Do you remember that?

22     A.    Yes.

23     Q.    Was he unhappy with the

24 investigative reports in any way?

25          MS. HERMIZ:  Objection to form.

1      A.   He's very particular how they're --
2  they're written, and the order that, you know,
3  all reports come in, so he wanted to make it
4  more consistent.  Instead of having, you know,
5  seven investigators write seven different
6  reports and different styles and that, he wanted
7  to kind of make it uniform so all the
8  investigation final reports are kind of --
9  follow the same format.
10     Q.   Was he dissatisfied with the level
11 of detail in the investigative reports to your
12 knowledge?
13          MS. HERMIZ:  Objection to form.
14     A.   Not to my knowledge.
15     Q.   Okay.  Now, shifting focus a bit,
16 you have no expertise in the development of
17 pharmaceutical drugs; is that right?
18     A.   No.
19     Q.   And you've never worked for a
20 pharmaceutical company?
21     A.   No, ma'am.
22     Q.   And you have no expertise regarding
23 pharmaceutical marketing, correct?
24     A.   No.
25     Q.   Do you have any knowledge regarding

1   how prescription opiate medications are

2   marketed?

3        A.   No, other than the commercials you

4   see on TV.

5        Q.   Are you familiar with sales calls by

6   pharmaceutical companies to doctors' offices?

7        A.   You know, my wife works currently in

8   an eye doctor's office and previously in a

9   plastic surgeon's office, so, you know, reps

10  would come in all the time, but me personally,

11  no.

12       Q.   You've never participated in any

13  such calls?

14       A.   No.

15       Q.   Okay.  And I take it you have no

16  expertise on the impact of any such sales calls

17  on the prescribing of opioids in Summit County?

18       A.   No.

19       Q.   And you have no expertise in the

20  regulation of prescription drugs by the FDA,

21  correct?

22       A.   Correct.

23       Q.   And you have no expertise in

24  pharmaceutical labeling, correct?

25       A.   Correct.

Page 279

1          Q.     Have you ever undertaken to review

2     the labeling for any opioid medication?

3          A.     To review the labels?

4          Q.     Right.

5          A.     When I go to a death scene, when we

6     fill out our log, we're looking at the labels,

7     see who prescribed, where it was filled, you

8     know, the amount and so forth.

9          Q.     You're talking about the label on

10    the prescription bottle --

11         A.     Yeah.

12         Q.     -- correct?

13         A.     Correct.

14         Q.     When I said "label" -- and I realize

15    this isn't the usual use of the term -- I meant

16    the prescribing information, that long piece of

17    paper that sometimes comes with the box and the

18    prescription.

19         A.     No.

20         Q.     So I take it, then, that you can't

21    provide an opinion on the sufficiency of any

22    opioid medication label?

23         A.     No.

24         Q.     Or the warnings provided on that

25    label?

Page 280

1         A.     Correct.

2         Q.     Are you aware that drug labels

3    include information about the risks of

4    pharmaceutical products?

5              MS. HERMIZ:  Objection to form.

6         A.     I've seen the warning labels like,

7    you know, while taking this medication, don't

8    drive or drink, and that's about the extent of

9    it.

10        Q.     Do you generally agree that a doctor

11   is responsible for becoming familiar with the

12   medications that he or she prescribes?

13             MS. HERMIZ:  Objection to form.

14        A.     I'm not a physician.  I don't -- you

15   know --

16        Q.     So you would leave it to doctors to

17   determine what drugs are appropriate for a

18   particular patient?

19        A.     Correct.

20             MS. HERMIZ:  Objection to form.

21        Q.     Have you ever had occasion to

22   contact a manufacturer of opioid medications as

23   part of your investigation of a death?

24        A.     No.

25        Q.     Are you aware of any public

Page 281

1  statements made by any opioid manufacturers?

2       A.    No.

3       Q.    Are you aware of any efforts taken

4  by opioid manufacturers to address the opioid

5  crisis?

6            MS. HERMIZ:  Objection to form.

7       A.    You know, only what you see on

8  the -- bits and pieces on the news, you know.

9  That's about the extent of my knowledge.

10      Q.    And you've never reached out to any

11 manufacturer to seek assistance --

12      A.    No.

13      Q.    -- on behalf of Summit County?

14            As part of your investigation, do

15 you look into the criminal background of

16 decedents?

17      A.    There are times when people die

18 either alone or with a non-relative, like in a

19 house with a girlfriend or a friend that we'll

20 do positive IDs on.  Most of the time what we'll

21 do is get on the computer and look up -- go

22 through the clerk of courts and look up the name

23 and see if there's any criminal history to see

24 if there's any prints on file.

25            So a lot of our cases, yes, the

Page 282

1    investigators will look them up and see, you

2    know, what they've been arrested for or should

3    there be prints, so we get prints.

4         Q.    If it's a situation where you don't

5    need prints, are you looking up the criminal

6    record?

7         A.    There's times, yes.

8         Q.    Under what circumstances would you

9    do that?

10        A.    Just, you know, it's public

11   knowledge, so you just go to see -- you know,

12   especially the last several years.  You don't

13   put it past anybody dying from an overdose.  I

14   can have a 70-year-old with extensive medical

15   history that would explain his death, but I've

16   seen those same 70-year-olds that die in a place

17   where there's, you know, crack pipes and

18   syringes and that, and you bring them in and you

19   got 70-year-olds that die from overdoses.  So

20   you're looking to see, you know, what kind of

21   background they have.

22        Q.    So you want to see if those

23   individuals are known to the criminal justice

24   system?

25        A.    Correct, and, if so, what type of

Page 283

1   cases, you know, have they been charged -- you

2   know, if you look at a person in their 50s, 60s,

3   and they've got multiple arrests for, you know,

4   drug paraphernalia or drugs, you know, you

5   better look at, you know, could this possibly be

6   a drug overdose type death.

7               MS. O'GORMAN:  I don't have anything

8   further.  Thank you.

9               MS. HERMIZ:  Do you want to take a

10  break now?

11              THE WITNESS:  Could I use the

12  restroom?

13              MS. HERMIZ:  Could we take a

14  five-minute break right now?

15              THE VIDEOGRAPHER:  Off the record,

16  4:35.

17                   (Recess had.)

18              THE VIDEOGRAPHER:  We're back on the

19  record, 4:40.

20            EXAMINATION OF GARY GUENTHER

21  BY MR. EMCH:

22       Q.    Do you prefer to be called Gary or

23  Mr. Guenther or do you care?

24       A.    I don't care.

25       Q.    All right.  Well, I'm Al and I'm

Page 284

1    going to ask a few questions.  It should only

2    take two or three or four hours.  I don't know

3    how much.  As long as you're buying supper,

4    we'll go at it.

5              Let's talk a little bit of

6    terminology.

7         A.    Okay.

8         Q.    When Dr. Kohler testified, I asked

9    her a few questions about this, and I just want

10   to make sure we understand the terminology that

11   we're using and we're using it the same way,

12   okay?

13        A.    Okay.

14        Q.    What is your definition of

15   prescription opioid?  And I see you're thinking.

16        A.    Painkiller.

17        Q.    Painkiller, okay.

18              Can we agree that a prescription

19   opioid is an opioid painkiller that is available

20   legally only through a prescription?

21        A.    Yes.

22        Q.    Do you agree with that?  You said

23   yes?

24        A.    Yes.

25        Q.    Okay.  Now, I asked Dr. Kohler, I

Page 285

1    think, the question as to whether or not she

2    distinguished between the words "opiate" and

3    "opioid," and she said, I think, that they were

4    kind of used interchangeably in the office.

5                    Do you agree with that?

6          A.    I agree with that.

7          Q.    Do you know that there is a

8    difference between an opiate and an opioid?

9          A.    I've been told, but I don't

10   remember.

11         Q.    Do you know that heroin is an

12   opiate?

13         A.    Okay.

14         Q.    I mean, I really want to know if you

15   know that.

16         A.    Yes.

17         Q.    And it's also an opioid.

18         A.    Okay.

19         Q.    Now, again, I'm not trying to

20   suggest anything.  I just want to know what your

21   understanding is.

22         A.    I've always clumped them together,

23   everything opiates.

24         Q.    Do you understand that heroin is

25   not -- well, do you understand that oxycodone

1   and hydrocodone, for example, are not opiates?

2              MS. HERMIZ:  Objection to form.

3       Q.    Do you know that?

4       A.    No.

5       Q.    Do you know they're opioids?

6              MS. HERMIZ:  Objection to form.

7       A.    No.

8       Q.    You don't know if hydrocodone and

9   oxycodone are classified as opioids?

10      A.    I can -- my thought process, it's an

11  opiate.

12      Q.    Okay.  All right.  For purposes

13  today, we'll use whatever terminology you want.

14      A.    Opiates, okay.

15      Q.    But to you does the term "opiate"

16  cover heroin?

17      A.    To me, yes.

18      Q.    Fentanyl?

19      A.    Yes.

20      Q.    Oxycodone?

21      A.    Yes.

22      Q.    Hydrocodone?

23      A.    Yes.

24      Q.    Can heroin be obtained through a

25  prescription, if you know?

```
                                              Page 287
 1        A.    Heroin, no.
 2        Q.    Because it's an illegal substance?
 3        A.    Yes, sir.
 4        Q.    And of course on fentanyl we've
 5   talked a little bit and you've distinguished
 6   between fentanyl by prescription and illegal
 7   fentanyl --
 8        A.    Yes.
 9        Q.    -- that you described, right?
10        A.    Yes.
11        Q.    You understand the distinction
12   there?
13        A.    Yes.
14        Q.    And fentanyl analogs --
15        A.    Yes.
16        Q.    -- there are a lot of those?
17              MS. HERMIZ:  Objection to form.
18        A.    I don't know exact -- there's
19   multiple, put it that way.
20        Q.    Technical terms, a lot but multiple.
21        A.    Yes.
22        Q.    And fentanyl analogs, there's been
23   many of them, they've shifted; every time you
24   figure out one of them, another one starts being
25   made?
```

1              MS. HERMIZ:  Objection to form.

2         A.    Yes.

3         Q.    Right?  And understand I want to

4    know things that you are able to testify about

5    because of your experience and your background

6    in doing your job, right?

7         A.    Yes.

8         Q.    As Mr. Carter said in the beginning,

9    no guessing, we're not interested in guessing,

10   all right?

11        A.    Okay.

12        Q.    So -- now, in the world of

13   prescription opioids and -- or prescription

14   opiates, using the terms interchangeably, you've

15   said, of course, that heroin cannot be obtained

16   through a prescription, right?

17        A.    Correct.

18        Q.    And is it true, too, based upon your

19   experience, that things that we know can be

20   obtained through prescription are also obtained

21   illegally?

22             MS. HERMIZ:  Objection to form.

23        Q.    Do you understand my question?

24        A.    A person -- I believe I understand

25   it.  A person that is not prescribed a

Page 289

1    prescription medication like, say, oxycodone or

2    Oxycontin, for example, can obtain those

3    illegally on the streets.

4                      -    -    -    -    -

5                 (Thereupon, Deposition Exhibit 16,

6                 Office of Medical Examiner Drug &

7                 Medication Listing Bates Numbered

8                 SUMMIT_000192655, was marked for

9                 purposes of identification.)

10                     -    -    -    -    -

11                (Thereupon, Deposition Exhibit 17,

12                County of Summit Office of the

13                Medical Examiner Medication Listing

14                Bates Numbered SUMMIT_001560061, was

15                marked for purposes of

16                identification.)

17                     -    -    -    -    -

18         Q.     All right.  Let me hand you what has

19    been -- have been marked as Exhibits 16 and 17.

20         A.     Okay.

21         Q.     And tell me if you can identify --

22    now, some of these exhibits, I want you to know,

23    Gary, I'm not giving them to you because I have

24    specific questions about what's on them.  I'm

25    really interested in the form.

Page 290

1          A.    Okay.

2          Q.    And I have some general questions

3    about the form.

4                So Exhibit 16 and 17, do you

5    recognize those?

6          A.    Yes.  They're drug logs.

7          Q.    You call it a drug log?

8          A.    Prescription drug.

9          Q.    All right.  Now, is one of those a

10   form that is currently in use?

11         A.    Actually, it depends on what

12   investigator types them up.  Both of these forms

13   are currently -- some investigators have this

14   form, which is Exhibit 17, and some have Exhibit

15   16.

16         Q.    Okay.  So one might find either of

17   these forms?

18         A.    Correct.

19         Q.    All right.  When you came in 1988,

20   was one or both of these forms in use at that

21   time?

22         A.    Back in '88 I believe Exhibit 16

23   was.

24         Q.    So in your entire history as an

25   investigator or chief investigator, one or --

1    one or both of these forms has been in use?

2          A.    Yes.

3          Q.    What's the purpose of the form?

4          A.    To give an inventory of -- of the

5    prescriptions that deceased person had, gives

6    counts.  I also enter these -- once I take them

7    out of the -- the investigator that handles the

8    case types these -- these up and does the

9    counts.  I then pull them from the file cabinet,

10   give them a D number, meaning drugs.  I enter

11   all these drugs in the system under the case

12   number and name, and eventually those go on the

13   court order to get rid of.

14         Q.    But basically that form is a form

15   that is filled out by an investigator who has

16   gone to a scene, who has found at the scene

17   prescription drugs or prescription labels or

18   prescription bottles?

19         A.    These are prescriptions that were

20   brought back to our office from the scene.

21         Q.    All right.  And, again, both of

22   these forms serve that same purpose?

23         A.    Yes, sir.

24         Q.    And am I correct that the protocols

25   that have been in place since 1988 that you

Page 292

1    follow in the medical examiner's office in
2    Summit County, the protocols require that the
3    investigator, who goes to the scene, to look for
4    this evidence?
5            A.    Yes.
6            Q.    I mean, if there's any suspicion at
7    all that a drug may have been involved, then you
8    are going to inspect and look at the scene in
9    order to find, if you can, anything that
10   indicates a prescription?
11           A.    Yes.
12           Q.    And you'll note it on this form?
13           A.    Correct.
14           Q.    One of these forms.
15                 And the information is
16   self-explanatory.  It calls for basically the
17   information you get off a label, which talks
18   about what the drug is and what the dosage is
19   and how often it's supposed to be taken and that
20   sort of thing, right?
21           A.    Yes.
22           Q.    On this form, or whichever one of
23   these forms that you're using, does the
24   investigator also log -- let's say you had a
25   baggie full of pills of various kinds.  Is that

1   logged on here?

2        A.    Sometimes it will be listed at the

3   bottom or a different evidence sheet, a baggie

4   containing, you know, a hundred miscellaneous

5   pills.

6        Q.    But you wouldn't be able to tell

7   from a baggie whether or not those pills came

8   via a prescription?

9        A.    No.

10       Q.    Now, do you also log prescriptions

11  on these forms that you find at the scene that

12  were written to a different individual, not to

13  the patient or the deceased?

14       A.    There have been times where I've had

15  cases where I'll bring back -- mistakenly take

16  like the wife's medication, and what I usually

17  do at that time is, you know, make note that we

18  had it, then type up a receipt and receipt it

19  back to the wife since it's in her name.

20       Q.    All right.  What if anecdotal

21  evidence that you get from somebody at the scene

22  is that the deceased may have, for one reason or

23  another, been taking that medication?  Could

24  that cause you to leave it on the form or not or

25  would that be in the investigation report?

                                            Page 294

1          A.      That could be in the investigation

2    report.

3          Q.      It wouldn't go on the form?

4          A.      Not if we didn't bring it back.

5          Q.      All right.   This form has been in

6    use -- one of these forms or both of them have

7    been in use since 1988.   Would I be correct that

8    if -- and this form goes in the autopsy file,

9    correct?

10         A.      The case file, yes.

11         Q.      All right.   So if we look at an

12   autopsy case file and it does not contain one of

13   these forms, then may we conclude and should we

14   conclude that the investigator found no

15   prescription or prescription drugs at the scene

16   for the patient?

17              MS. HERMIZ:   Objection to form.

18         A.      Or it could mean the police

19   department took them.

20         Q.      Well -- took the drugs?

21         A.      Yeah.

22         Q.      In which case that should be in the

23   investigator's report, correct?

24         A.      Correct.

25                       -   -   -   -   -

```
 1              (Thereupon, Deposition Exhibit 18,

 2              Ohio Automated Rx Reporting System

 3              Listing Beginning Bates Number

 4              SUMMIT 000204634, was marked for

 5              purposes of identification.)

 6                   -   -   -   -   -

 7              (Thereupon, Deposition Exhibit 19,

 8              Ohio Automated Rx Reporting System

 9              Listing Beginning Bates Number

10              SUMMIT_000203007, was marked for

11              purposes of identification.)

12                   -   -   -   -   -

13         Q.    All right.  Let me hand you what had

14    been marked as Exhibits 18 and 19 and ask if you

15    can identify that.  And I'll say again now --

16              MR. EMCH:  Let me ask.  Anne, these

17    do have people listed on them and their

18    information.  Do you want this part of the

19    deposition treated as confidential?

20              MS. KEARSE:  Yes, please.

21              MR. EMCH:  Court reporter, will you

22    do that?  The discussion about these four

23    exhibits should be confidential and marked such?

24              Is that okay, Anne?

25              MS. KEARSE:  Yes.
```

                                        Page 296

1              MR. EMCH:  All right.

2         Q.    Can you tell us again what these two

3    forms are, 18 and 19?

4         A.    They're OARRS, Ohio Automatic

5    Prescription Reporting System.

6         Q.    Do you know when your office began

7    to be able to obtain reports from OARRS?

8         A.    No.

9         Q.    Do you think Dr. Sterbenz will know

10   that?

11        A.    Probably Dr. Sterbenz or Dr. Kohler.

12   Investigators don't have -- we cannot log onto

13   this system and pull these reports.  At our

14   office it's got to be one of the docs.

15        Q.    Do you have any understanding of

16   what one obtains from the OARRS report?  I mean,

17   have you seen them, looked at them?

18        A.    I've seen these reports before, and

19   it shows, you know, a name with prescriptions

20   that were -- were prescribed, and what date they

21   were filled and so forth, and who prescribed

22   those -- those medications.

23        Q.    And the pharmacy where they were

24   filled?

25        A.    Yes.

1          Q.     And the quantity and the days?

2          A.     Yes.

3          Q.     Pretty full information --

4          A.     Correct.

5          Q.     -- about the drug and the

6    prescription involved?

7                 MS. HERMIZ:  Objection to form.

8          A.     Correct.

9          Q.     Now, do these reports -- I noticed,

10   I think, on both of these that I've handed you

11   that they go back a couple of years.  Do you

12   know if that is the standard search or the

13   ability to search?  Do you have any information

14   about that?

15         A.     I have no idea.

16         Q.     And these are done for the patient

17   or the deceased; is that right?

18         A.     Yes.

19         Q.     Okay.  Now, are there times when you

20   get -- in your experience -- when I say you, I

21   mean -- let me back up.  Strike that.

22                You're the chief investigator now

23   and have been since when?

24         A.     Probably '08, '09.

25         Q.     '08 or '09.  The older you get, the

Page 298

1   more the dates --

2          A.    I know.

3          Q.    Okay.  Do you -- as the chief

4   investigator, do you do fewer investigations or

5   more or the same amount as the others or what?

6          A.    I get out to death scenes a lot less

7   now than I did.

8          Q.    Do you look at the investigation

9   reports that are done by your investigators?  Do

10  you see them generally, look at a lot of them,

11  look at all of them?  Describe what, if

12  anything, you do as far as looking at your

13  investigator's reports.

14         A.    Usually when -- the first thing we

15  do when we get in in the morning is go over all

16  the -- the reports, our cases that we have, see

17  what follow-up needs to be done.  You know, at

18  our office the investigators do, like, x-rays.

19  Do any x-rays need done?  If we got bodies that

20  need identified, you know, we got to start

21  looking for, hey, does the person have any

22  x-rays at one of the hospitals we can order.  So

23  yes, there's cases that are reviewed.

24             Now, we also -- when an investigator

25  takes -- like I call it a referral.  It's not a

Page 299

1   case -- a death that is reported to us and not

2   taken in as a case.  The doctor on call reviews

3   all those reports also.

4        Q.    All right.  So is it fair to say at

5   least since you've been chief investigator in

6   '08 or '09, that you have some familiarity with

7   all of the investigator reports that are done in

8   the ME's -- were done in the ME's office?

9        A.    Yes.

10       Q.    So you've got a pretty broad

11  knowledge of what those folks are finding out

12  out there in the field, right?

13       A.    Yes.

14       Q.    Now, are there times when you may

15  have anecdotal information about a patient

16  having had access to a prescription opioid?

17            MS. HERMIZ:  Objection to form.

18       Q.    And by access, I mean not legally,

19  not through a prescription.  Do you have

20  anecdotal information that the person took his

21  wife's whole bottle?

22       A.    You know, we'll get information from

23  talking to either family or close associates of

24  that individual, and at times they'll say, oh,

25  you know, he buys them on the streets.

Page 300

1      Q.    Right.

2            And in those instances, buys them on

3   the streets, took his wife's medication, which

4   is not his --

5      A.    Right.  So verbally you get history

6   back at times on those types of cases.

7      Q.    In those instances we just

8   described, that person would have obtained those

9   prescription opioids illegally?

10     A.    Yes.

11     Q.    Now, one -- this is kind of a

12  database question, and I'll have some others

13  about that, but if you can't exactly answer it

14  -- but one cannot tell by looking at a report

15  from the database whether or not something that

16  could be a prescription opioid, like oxycodone

17  or hydrocodone, was obtained through a

18  prescription or not?  You can't tell from the

19  database report?

20           MS. HERMIZ:  Objection to form.

21     A.    If you find it anywhere, it's going

22  to be in the investigation worksheet or the

23  final investigation report.

24     Q.    Which is in the autopsy file?

25     A.    Correct.  Our investigative file,

Page 301

1   yeah.

2        Q.    So if one goes to the investigative

3   file, with respect to an autopsy or a drug

4   overdose death that names something that could

5   be a prescription opioid, okay --

6        A.    Okay.

7        Q.    -- if one goes to the autopsy report

8   and does not find one of these forms, Exhibits

9   16, 17, 18 or 19, that indicates a prescription

10  for oxycodone for that individual patient, then

11  should we correctly conclude that that patient

12  must have obtained that substance illegally?

13            MS. HERMIZ:  Objection to form.

14       A.    No.

15       Q.    If there were any evidence at all of

16  a prescription for that person, it would be in

17  the autopsy file; is that correct?

18            MS. HERMIZ:  Objection to form.

19       A.    If it was located.

20       Q.    If there's any evidence to indicate

21  that the person had a prescription for the

22  substance, it would be indicated in the file; is

23  that correct?

24       A.    Yes.

25       Q.    If it's not indicated in the file,

1  am I correct that it would mean that you did not

2  find any evidence to indicate that the person

3  had a prescription for that substance?

4          A.    I'll word it this way:  Just because

5  we don't find evidence or a prescription bottle

6  or loose pills of, say, Oxycontin at the scene

7  doesn't mean that person wasn't taking that

8  prescription medication.  We can order medical

9  records and it can be documented in medical

10  records that they are currently being prescribed

11  certain medications.

12          Q.    And that would be in the report,

13  wouldn't it?

14          A.    That would fall under medical

15  history usually in --

16          Q.    That would be in the medical

17  records, which you also, as a matter of

18  protocol, obtain, correct?

19          A.    Correct.

20          Q.    And you obtain some medical history,

21  correct?

22          A.    Correct.

23          Q.    And you talk to a prescribing

24  physician, correct?

25          A.    Correct.

Page 303

1          Q.    Now, let me ask you again.  If none

2      of those sources that you go to gives any

3      indication or evidence that the person was

4      taking a prescription medication through a

5      prescription, then one would conclude that they

6      were finding it, getting it and taking it

7      illegally; is that correct?

8          A.    That's what you would assume, yes.

9          Q.    All right.  But you can't tell that

10     unless you look at the whole autopsy file,

11     right?

12         A.    Right.

13         Q.    Now, I've actually looked at a lot

14     of autopsy files, and I'll ask you this

15     question.  If you can't answer it, you know, you

16     can't.  But the stories are all different in

17     these files; each patient is very different, and

18     the context in which that patient died is always

19     different.  Do you agree with that?

20         A.    Every case is unique, yes.

21         Q.    I mean, they can't be slimmed down

22     and categorized and put into some general

23     category.  To understand them, you need to look

24     at the autopsy file and get the context?

25         A.    Yes.

Page 304

1          Q.    Do you agree with that?

2               MS. HERMIZ:  Objection to form.

3          A.    I think every individual, whether

4    they're dead or alive, has a unique story behind

5    that individual.

6          Q.    Now, your investigators, do you

7    always go to the scene?  Is it always a scene

8    visit or --

9          A.    Our protocol, unless there's some,

10   you know, unique situation, any time a person

11   dies outside of a facility and it falls under

12   our jurisdiction, an investigator is required to

13   go.

14         Q.    Okay.  The reason I ask the question

15   is I have seen some things in the file, probably

16   in an exhibit somewhere, that I could find that

17   describes discussions to be had over the

18   telephone and questions to be asked over the

19   telephone.  And, again, I'm just wondering --

20   and I'm not suggesting the answer is any

21   different, but if it's a suspected drug

22   overdose, you would almost always, but routinely

23   always go to the scene --

24               MS. HERMIZ:  Objection to form.

25         Q.    -- correct?

Page 305

1          A.     Yes.

2          Q.     Okay.  Now, you've talked a little

3   bit about interviews that are done by your

4   investigator, by you, of family members or

5   friends or partners or whatever at the scene,

6   anecdotal evidence.

7               Do you do any follow-up of any kind

8   with respect to anecdotal evidence?  Is it --

9   and I'm not suggesting this is right or wrong,

10  but is it, for your purposes, taken at face

11  value?

12               MS. HERMIZ:  Objection to form.

13          A.     From past experience, I know a lot

14  of people aren't truthful these days.  That's a

15  given.  You take what you get at scenes as a

16  grain of salt, you know.

17          Q.     So if somebody says it, you're going

18  to write it down but you're not vouching for its

19  accuracy --

20          A.     Correct.

21          Q.     -- or whatever?

22          A.     Correct.

23               Now, we will do follow-ups.  If I

24  talk to mom and dad and they say, you know, Joe

25  spent all his time with so-and-so, you need to

Page 306

1   call, you know, Tom to get more information, and

2   they'll give you the number, sure, we'll follow

3   up with that individual.

4          Q.    Okay.  Let me ask you again.  Your

5   experience in -- both in your own investigations

6   over time and as being familiar in general with

7   the investigation that all your investigators

8   are doing, is it common for drug overdose death

9   patients to -- is it common -- I'll use that

10  word -- you can change my word if it's more

11  accurate -- to suffer from some kind of mental

12  illness?

13              MS. HERMIZ:  Objection.

14         Q.    Is that something common?

15              MS. HERMIZ:  Objection to form.

16         A.    I have noticed a great number.  If

17  you look at the case file, you'll find medical

18  records that, yes, a lot of them have a

19  psychiatric background.

20         Q.    Depression?

21         A.    Including depression.

22         Q.    Let's move a little bit to the

23  database.

24              Now, Patrick Gillespie --

25         A.    Yes.

Page 307

1      Q.    -- was he the guy that was your

2   database person for a long time?

3      A.    He was our IT guy.

4      Q.    How long was he that person?

5      A.    He started out as a -- as a morgue

6   assistant in back, then moved up to

7   investigator, then investigator supervisor.  So

8   while he was working, he went to school and got

9   some type of degree in computers and that.  So

10  he talked Dr. Kohler and the county into

11  creating this IT position for the office.  And,

12  you know, I think he retired two years ago, two,

13  three years ago.  He was probably in that

14  position for at least, I want to say, seven,

15  six, seven years at least.

16     Q.    Was he involved in creating what we

17  keep referring to as the database?

18     A.    Yes, sir.

19     Q.    He really was the guy who started

20  that?

21     A.    Yep.

22     Q.    Is he still around?

23     A.    Yes.  I mean, he still lives in --

24     Q.    He's retired, right?

25     A.    Yeah, he's retired, but he's still

Page 308

```
 1  alive.
 2       Q.    Do you know where he is?  Is he
 3  reachable?
 4            MR. EMCH:  Anne, if we wanted to
 5  depose Mr. Gillespie, is that somebody you could
 6  --
 7            MS. KEARSE:  I haven't gotten the
 8  request.  I'll take any request that you make
 9  under advisement.
10            MR. EMCH:  I understand.  You don't
11  know now if you could or not.
12            MS. KEARSE:  I have no idea until
13  I'm asked.
14       Q.    Do you know where Mr. Gillespie can
15  be contacted today?
16       A.    I know he's in the area still.  I've
17  seen him out and about.
18            MS. KEARSE:  And make it a formal
19  request in a letter so we can keep track of it
20  versus a deposition request.  You would ask the
21  same.
22            MR. EMCH:  Even though I didn't
23  request it.
24            MS. KEARSE:  Right.  And I'm not
25  going to find them if you haven't requested
```

Page 309

1    them.

2          A.    If he has the same contact

3    information that he had when he was there, he

4    was probably on an old employee list sheet.

5          Q.    Hopefully he's moved to Florida or

6    Charleston.

7                Who has the position currently?

8          A.    Nobody in-house.  It all goes

9    through the county's IT department.  The county

10   has a department that was created several years

11   ago that's just IT, and I think they got, like,

12   20 employees under that department.

13         Q.    All right.  Now, we've had a good

14   bit of testimony and discussion about getting

15   things out of the database.

16         A.    Right.

17         Q.    Now, during the time that -- after

18   Patrick created the database, during all of that

19   time has the county or has the medical

20   examiner's office used the same -- I'll use the

21   word categorizations for their -- for their

22   autopsies and for their deaths?  By

23   categorization I mean I know one is drug

24   overdose and there's one for falls and there are

25   some others.

Page 310

1          A.    Correct.

2          Q.    Has it always, in your experience,

3    had those categories?

4          A.    Yes.

5          Q.    And they've not changed, I don't

6    think, right?

7          A.    Correct.

8          Q.    All right.  So one of those

9    categories is drug overdose?

10         A.    Yes.

11         Q.    I'm trying to get a clear feeling

12   for when you go in, you, or one of your

13   investigators or someone, to pull out

14   information, what it is that you put in there,

15   or what it is you put into the request or the

16   search.  Do you know what I'm talking about?  I

17   haven't gotten to the question yet.  I'm just

18   making sure I can see --

19         A.    Okay.

20         Q.    I think you know what I'm talking

21   about.

22         A.    Okay.

23         Q.    You talked about a button that you

24   could hit that was for statistics, correct?

25         A.    Uh-huh.

1    Q.    It's not exactly that easy, is it?

2  You have to talk to someone or put something in

3  there that --

4    A.    That takes me to the form.  From

5  there it gives me a list of options, and at the

6  top there's places where you put in "to" to

7  "from," so meaning, say, you called me and want

8  all 2016, so I'll put January 1st, 2016 through

9  December 31st, 2016, go down to the options that

10 I want and click on those.

11   Q.    Check them off?

12   A.    Check them off.

13   Q.    All right.  Now, if one of the

14 options is a category, like drug overdose --

15   A.    Okay.

16   Q.    All right.  So say you go January

17 1st, 2016 to December 31st, 2016 drug overdose,

18 are you going to get all of the database entries

19 that are categorized as drug overdoses for that

20 year?

21        MS. HERMIZ:  Objection to form.

22   A.    There's two sections, one that's

23 completed --

24   Q.    Right.

25   A.    -- and one that's presumed.  The

Page 312

1   completed ones had been ruled on by

2   Dr. Kohler --

3        Q.    Right.

4        A.    -- that say drug overdose.  The

5   presumed one is toxicology has entered into the

6   system and, you know, there's enough there --

7   it's, you know, for our sake going to be ruled

8   an overdose, but they haven't officially --

9   haven't officially been ruled on yet.

10       Q.    How long does it normally take for

11  the presumed to move into the --

12       A.    It depends on how backed up the --

13       Q.    A year?

14       A.    -- the doctor --

15       Q.    A year?

16       A.    No.

17       Q.    Not a year?

18       A.    No.

19       Q.    Usually less than a year, okay.

20       A.    Our goal is to have death

21  certificates signed by name, requirements,

22  within 190 days.

23       Q.    Okay.

24       A.    And if not, even sooner than that.

25  It could be even sooner than that.

1        Q.    And they usually, in your
2   experience, do pretty well with that?
3        A.    Not since we're short a doctor.  We
4   have gotten behind.
5        Q.    Are you short a doctor now?
6        A.    Yes.
7        Q.    Is that Dorothy Dean that left you
8   short?
9        A.    Dr. Dean left, we hired another one,
10  and that doctor has since left.
11       Q.    Other than the one doctor down, are
12  you fully staffed?
13       A.    Yes.
14       Q.    Do you have pretty much the
15  resources that you need now, except for the one
16  doctor that you're lacking?
17            MS. HERMIZ:  Objection to form.
18       A.    You know, there's always times where
19  you wish you had an extra secretary or an extra
20  person in this department, but technically,
21  other than a doctor, we're fully staffed.
22       Q.    And you're looking for the doctor?
23       A.    They have technically hired a doctor
24  is my understanding, but she's in her forensic
25  training right now.

Page 314

1         Q.    So you're close to being fully

2    staffed if that doctor comes on board?

3         A.    July 2019.

4         Q.    Okay.  So back to the database

5    again.

6               If I want all of the drug overdose

7    categories --

8         A.    Okay.

9         Q.    -- and I'm going to get the

10   completed and the presumed --

11        A.    Okay.

12        Q.    And if we are long enough out, I

13   should get all of them, right?

14        A.    Right.

15        Q.    Okay.

16        A.    Now, if you call me, say, the first

17   week of January and you want the previous year's

18   total overdoses, I'm sure there's going to be

19   cases that Steve has not finished yet and tox

20   has not done.

21        Q.    Okay.  With those caveats that we've

22   talked about, though, if I go into the database

23   and I look for drug overdose deaths --

24        A.    Okay.

25        Q.    -- for a particular year, say it's

1  two or three years ago, I should expect to get
2  all of the drug overdose deaths?
3          A.    You should expect.
4          Q.    All right.  I want you to look at
5  Exhibit Number 2.
6          A.    Exhibit Number 2, okay.
7          Q.    Let's take a look.  I think you'll
8  remember it.  Do you remember that?
9          A.    I remember this, yes.
10         Q.    And your cover e-mail there is dated
11 19 April 2016, correct?
12         A.    Correct.
13         Q.    And we went over some of this.  I'm
14 trying not to duplicate questions.  I will tell
15 you my hearing is not very good.  Sometimes I
16 don't -- you're soft spoken.
17               Now, this report that you did -- I
18 think you indicated that you thought you did it
19 from home?
20         A.    The final, yeah.  I probably did
21 this on my computer at home and sent the e-mail
22 to my work e-mail and printed it off at work.
23         Q.    All right.  Now, the data that's
24 talked about in the first paragraph up here --
25         A.    Okay.

Page 316

1          Q.    -- you've got -- you quote data for

2     2013, 2014 and 2015, and then you're going into

3     2016, right?

4          A.    Correct.

5          Q.    This was done April of 2016.  By

6     that time were the 2015 -- was that information,

7     do you think, final?

8               MS. HERMIZ:  Objection to form.

9          Q.    Likely final or do you know?

10         A.    I think we were slightly ahead of --

11    if I remember correctly, we were slightly ahead

12    of that, which means cases weren't finalized

13    when those numbers --

14         Q.    So these stats are about drug

15    overdose deaths.  Did you search the database to

16    get those?

17         A.    Yes.

18         Q.    All right.  And would that be a time

19    when you're saying -- like 99 total overdose

20    deaths in 2013, is that something that you would

21    have checked the year 2013, January 1st, to the

22    end of the year --

23         A.    Yeah.

24         Q.    -- and drug overdose?

25         A.    Correct.

1          Q.    So you would get all of the drug

2     overdoses?

3          A.    Correct.

4          Q.    Would that number be final?

5          A.    From 2013?

6          Q.    Yes.

7          A.    It should be.

8          Q.    And what about 2014?

9          A.    Yeah.  We're in 2016.  Yes.  '15 --

10         Q.    Well, '15 might not be, but 2013 and

11    '14 should be final, right?

12         A.    Should be.

13         Q.    Now, did you check -- strike that.

14               You had testified earlier, and, of

15    course, this document that you're preparing

16    talks about the heroin/fentanyl epidemic, right?

17         A.    Yes.

18         Q.    And the heroin/fentanyl epidemic

19    that you're describing here actually reaches

20    back to 2013; do you agree?

21               MS. HERMIZ:  Objection to form.

22         A.    I think we started seeing a slight

23    uptick in '14, '15, but then it really hit in

24    the second half of 2016, when the -- that's when

25    the numbers really started coming in.

1       Q.    Well, the 2013 figures, the 60 out

2   of 99, which is pretty easy, that's a little

3   more than 60 percent, right?

4       A.    Correct.

5       Q.    2014 numbers, 104 of 144, by my

6   math, is 72.2 percent; and 2015, 153 of 213, is

7   about 71.8 percent.  Do all three of those

8   percentages indicate a heroin/fentanyl epidemic

9   in your mind?

10      A.    I don't know what you consider an

11  epidemic.  We've had a steady incline of cases.

12  Is there a problem?  Yes.  So -- but what's the

13  definition of epidemic?  We had a big problem,

14  yes.

15      Q.    And you're using the phrase when

16  you're describing this in your paper; is that

17  right?

18      A.    I mean, I consider the epidemic is,

19  you know, a lot more cases than what we can

20  handle at times.

21      Q.    And mostly attributable to heroin

22  and fentanyl?

23            MS. HERMIZ:  Objection to form.

24      A.    Yes.

25      Q.    All right.  Now, did you check back

Page 319

1    on statistics for 2011 or 2012 or 2010?

2         A.    No, but I can remember prior years

3    they were pretty consistent, you know, 90 to

4    100, 110, right in that range.

5         Q.    But my question is, in preparing

6    your paper, did you check back on drug overdose

7    deaths and the percentage of fentanyl/heroin in

8    the years 2012 and 2011, for example?

9         A.    No.

10        Q.    All right.  Now, is this -- is what

11   you're reporting here and talking about in the

12   paper, Gary, is that something that only you

13   were aware of or is this something that was

14   known and talked about, to your knowledge, in

15   your office, in the medical examiner's office?

16             MS. HERMIZ:  Objection to form.

17        A.    I mean, when we're in the middle of

18   getting all these deaths, yes, we sit down like

19   around the lunch break room table, eat lunch,

20   talk about it.  Steve will come up to us, sit

21   down in the office and talk about what he's --

22   you know, just -- in general conversations bring

23   up certain topics, reference the drug problems,

24   the issues that we're having.

25        Q.    Were you getting media inquiries

Page 320

1   about this at the time?

2          A.    Usually the media inquiries that I

3   received were basically about numbers, and every

4   once in a while they would ask about the -- you

5   know, they'd ask a question, well, what age

6   group are you seeing, and you give them a broad

7   age group, mid 20s to 40s.  Are they mostly male

8   or females?  Well, off the top of my head, from

9   what I've seen come in, it looks like -- you

10  know, I can't give you exact numbers, but it

11  looks like there's more males than females.

12  Whites versus blacks.  But usually it's the

13  numbers they were interested in.

14         Q.    And on the media inquiries, you

15  said, I think, that you handle a lot of those?

16         A.    Yes.

17         Q.    And we said media inquiries, but all

18  kinds of inquiries that you might get from media

19  or from organizations or from the department of

20  health or anybody who might have an inquiry

21  about drug overdoses or something like that; did

22  you customarily get those, or a lot of them, as

23  chief investigator?

24         A.    I got a lot of them.

25         Q.    All right.  And did you get them --

Page 321

1    I think you indicated in previous testimony that

2    you began to get those and handle a lot of those

3    as early as 2000?

4              MS. HERMIZ:  Objection to form.

5         A.    Yes, when I became chief of

6    investigation.

7         Q.    Okay.

8         A.    Well, probably mid-2003, '04 I was

9    -- you know, became the investigator supervisor,

10   so I handled that stuff when the chief

11   investigator was out or off.  Then once I became

12   the chief investigator, 2008, 2009, somewhere in

13   there, you know, that's when you start really

14   handling the inquiries.

15        Q.    And what were the inquiries that you

16   got about back in that early 2000 time frame?

17             MS. HERMIZ:  Objection to form.

18        Q.    What were they asking about?

19        A.    Most of the inquiries were on

20   certain cases that we had that made the media;

21   you know, what's the results of the autopsy on

22   so-and-so that was shot last night or you got

23   the name of the victim that was shot last night.

24   Most of it is media -- about incidents, you

25   know, that occurred over the night before.

Page 322

1      Q.    Is it fair to say, Gary, that the
2  media's upticked interest in drug overdose
3  problems, epidemic, whatever you want to call
4  it, really came about about the same time, 2013,
5  2014, 2015?
6            MS. HERMIZ:  Objection to form.
7      A.    Yes.
8      Q.    I'd like you to look at Exhibit 12.
9  No.  I'm sorry.  Exhibit 5.
10     A.    5?
11     Q.    5, yeah.  It's your presentation,
12  slide presentation.
13            Now, Exhibit 2 that we just went
14  through, Gary, was done in April of 2016.
15     A.    Okay.
16     Q.    And Exhibit 5 that we're looking at
17  now was done in September of 2017; is that
18  right?  You have the cover e-mail on that.
19     A.    Yeah.  Those -- Dr. Kohler pulled
20  those numbers.
21     Q.    Am I right about the date?  Exhibit
22  5 was done in September 2017; is that right?
23     A.    Right.
24     Q.    Now, going to the second page of
25  your presentation, "Number of Overdose

```
                                       Page 323
 1    Deaths" --
 2            A.    Okay.
 3            Q.    -- did you get those or did somebody
 4    else get those?
 5            A.    Dr. Kohler gave those --
 6            Q.    Gave those to you?
 7            A.    Yep.
 8            Q.    And did she, if you know, or if you
 9    believe you know, obtain that information from
10    the database, as we're now calling it?
11            A.    I can't say for sure.
12            Q.    Let's assume for a moment that she
13    did.
14            A.    Okay.
15            Q.    I notice the numbers for 2013 and
16    2014 for total overdose deaths.  Do you see
17    that?  This is on the second page of the
18    presentation.
19            A.    Yes.
20            Q.    Now, in Exhibit 2 you found 99
21    overdose deaths.
22            A.    Okay.
23            Q.    And on this slide it's 109.  Do you
24    see that?
25            A.    Yes.
```

```
                                         Page 324

 1          Q.     And in 2014 you found 144 and on

 2    this slide for 2014 it's 156.  Do you see that?

 3          A.     Yep.

 4          Q.     Now, do you have any explanation --

 5          A.     I can't explain that, no.

 6          Q.     Would it be -- and I'll say unusual,

 7    in your experience, for the number of drug

 8    overdose deaths this long after 2013 and 2014 to

 9    climb?

10          MS. HERMIZ:  Objection to form.

11          A.     The only thing -- yeah.  I can't

12    explain it.  I don't know.  I don't know where

13    Dr. Kohler got her numbers.  Like I said, I take

14    these calls sitting at my desk.  I usually go

15    turn around while I'm on the phone, hit the --

16    get in the case database and look up the numbers

17    that way.  Whatever is there I report.

18          Q.     Okay.  We've talked some about

19    fentanyl.

20          A.     Okay.

21          Q.     When -- in your experience, when did

22    fentanyl start to show up in drug overdose

23    autopsy investigations?

24          MS. HERMIZ:  Objection to form.

25          A.     I think we've always had, like I
```

Page 325

1    said, and I've seen cases from years and years

2    ago where, you know, they do an autopsy and find

3    a fentanyl patch that the person chewed or find

4    somebody dead at the scene that's got the patch

5    still in their mouth, you know.  I want to say

6    I'm sure those cases were fentanyl overdoses.

7    But it really started becoming, you know --

8          Q.    In this 2013, '14, '15, '16 time

9    frame?

10         A.    Yes.  I mean, it's not like we never

11   had them prior to those years.  We've had them

12   before, but I can't give you the numbers.

13         Q.    All right.  I'm going to jump around

14   maybe just a little bit here, and I'm just

15   looking at my notes to see if I have anything

16   more.

17               When you go to a scene

18   investigation, do you have a role in securing

19   that scene normally?  Let's say the police are

20   not there.  Do you have a role in making sure

21   the scene is secure and that evidence is

22   preserved and that sort of thing?

23         A.    Well, if -- police are almost 99.9

24   percent of the time there when our investigator

25   gets there.  Once we're done collecting our

Page 326

1   evidence and that, if family is still on scene,

2   we release the, you know, residence or whatever

3   back to that person and give them the keys.

4   There's only been a few instances where we had

5   to, you know, secure the scene more than a day.

6   Those were on, like, homicide type cases.

7          Q.     All right.

8                 Now, illegal substances --

9          A.     Okay.

10         Q.     We've talked a little bit about

11   illegal or illicit substances.

12         A.     Okay.

13         Q.     Your report, Exhibit Number 2, talks

14   about illegal fentanyl, especially coming in

15   from China, is that right?  Is that your

16   information, a lot of it?

17         A.     Yes.

18         Q.     And do you know, from your

19   experience and your interaction with law

20   enforcement, that illegal fentanyl can even be

21   purchased over the internet and delivered to

22   somebody's home from China?

23         A.     To your front door.

24         Q.     And you've already described, too,

25   that your information is that one of the reasons

Page 327

1    that fentanyl is now so popular is because it's
2    not very expensive; is that correct?
3         A.    Correct.
4         Q.    And it's extremely powerful?
5         A.    Correct.
6         Q.    Does that make it attractive for
7    people who are addicted?
8              MS. HERMIZ:  Objection to form.
9         Q.    If you have personal experience --
10        A.    I've had secondhand knowledge
11   talking to survivors, whether it's boyfriend,
12   girlfriend, spouse or mother or father, you
13   know, or their close associates who are also
14   addicted, say, you know, yes, they want the
15   powerful, high-potent stuff, it's the better
16   high.
17        Q.    Even individuals who may be aware
18   that people die --
19        A.    Yes.
20        Q.    -- from fentanyl?  Just because of
21   the high.
22              There's a -- do you use the term
23   "addict" and "addicted"?
24              MS. HERMIZ:  Objection to form.
25        A.    When referring to those people,

Page 328

1    according to medical records, you use, you know,

2    either addiction or addicted to whatever is

3    documented in, like, medical records or whatever

4    the family tells you.

5         Q.    Are you -- are you, meaning you and

6    the ME's office here in Summit County -- are you

7    gravitating toward the use of other terms, like

8    substance use disorder or do you still use the

9    terms "addict" and "addicted"?

10        A.    Usually whatever is documented in

11   medical records, the way it's worded in medical

12   records.  You know, if it's documented in there,

13   we use kind of the same terminology as those

14   records state.  When talking to family members

15   or whatever, if they say they're, you know -- it

16   depends on how they say it.  Sometimes when they

17   say he's got a substance abuse problem, you'll

18   write that down, or they say he's been addicted

19   for, you know, years and has been in multiple

20   rehabs, you document it that way.  So it all

21   depends how it's presented to you.

22        Q.    Okay.  Back on illicit drugs,

23   illegal drugs.  And I'll include in this

24   prescription drugs that are obtained illegally.

25        A.    Okay.

Page 329

1       Q.    In your experience, in the

2    information that comes to you, are prescription

3    opioids sold on the black market, if you know

4    what I mean?

5              MS. HERMIZ:  Objection to form.

6       Q.    Drug dealers?

7       A.    Yes.

8       Q.    People who are in the business,

9    illegal business of obtaining somehow drugs and

10   selling them illegally?

11      A.    Yes.

12      Q.    And that includes cocaine?

13      A.    Yes.

14      Q.    Heroin?

15      A.    Yes.

16      Q.    Methamphetamine?

17      A.    Yes.

18      Q.    And prescription opioids?

19      A.    Yes.

20      Q.    Muscle relaxants?

21      A.    (Witness nodding head

22   affirmatively.)

23      Q.    Benzodiazepines?  You're shaking

24   your head, right?

25      A.    Anything that you abuse can be

Page 330

1    bought.

2         Q.    On the black market?

3         A.    On the black market, from past

4    experiences, yes.

5         Q.    Do you have any idea yourself or any

6    way to estimate how many or how much of the

7    substances that your office sees that have been

8    abused and have caused an overdose death were

9    obtained on the black market?

10        A.    I mean, it's safe to say that any

11   heroin, cocaine is all black market.  I mean,

12   it's all sold illegally.

13        Q.    And I think you've testified

14   already, as have others, that in this fentanyl

15   epidemic stage, that's illegal so it's obtained

16   illegally?

17             MS. HERMIZ:  Objection to form.

18        A.    You can have legal prescriptions for

19   fentanyl, but you can also get it illegally.

20        Q.    And probably cheaper?

21        A.    Probably.

22             MS. HERMIZ:  Objection to form.

23        A.    And can't say for sure, but most

24   likely cheaper, yes.

25        Q.    You talked about, I think, the

Page 331

1    police using a DNA touch --

2         A.    Right.

3         Q.    -- test of some kind?

4              Is that something that they use to

5    try to identify a black market, illegal --

6         A.    The supplier.  They're going after

7    the supplier.

8         Q.    Of drugs, right?

9         A.    Right.

10        Q.    So they can now do something like

11   that, and if they have other evidence or

12   something comparative, they can go --

13        A.    So what they do is if I die and I'm

14   suspected of -- and they found powder that they

15   want to do DNA testing on, the baggie or bindle,

16   whatever, they will come down after my exam and

17   request my known DNA sample.  Then they will

18   take that, along with the samples, up to the

19   crime lab for DNA testing.

20        Q.    And you've seen this done and worked

21   to identify --

22        A.    I haven't seen the actual testing

23   done.

24        Q.    Oh, okay.  But you understand it --

25        A.    But I released samples to them for

Page 332

1    that purpose.

2              MR. EMCH:  All right.  I think

3    there's 15 minutes left.  I think we'll take

4    just a short break and see if any of the group

5    here has -- unless --

6              THE VIDEOGRAPHER:  Off the record,

7    5:32.

8                   (Recess had.)

9              THE VIDEOGRAPHER:  We're back on the

10   record, 5:57.

11             MR. CARTER:  I wanted to note, by

12   agreement of counsel, pursuant to the protective

13   order that's in place, I manually altered

14   Exhibits 16, 17, 18 and 19.  We used a Sharpie

15   to black out and redact the personal identifying

16   information for the patients referenced in those

17   particular file documents.  We understand that

18   there's a protocol that's, you know, in place

19   and in the process of being worked out to

20   protect this information for distribution during

21   the course of these depositions, and while

22   that's getting sorted out on a separate track,

23   we just wanted to handle this expeditiously for

24   purposes of this deposition.  It doesn't

25   prejudice whatever the procedure is going

Page 333

1   forward in other depositions.  That was just the

2   fix that counsel here agreed to so that we could

3   proceed with this one and things not getting out

4   with the transcript.

5            MS. KEARSE:  And I appreciate it.

6   It's our understanding these are not public

7   record documents.  These are medical records

8   with prescriptions and names on them so they're

9   treated differently than public record

10  documents.

11           FURTHER EXAMINATION OF GARY GUENTHER

12  BY MR. CARTER:

13       Q.    All right, Mr. Guenther.  I've got

14  one more exhibit to show you.

15                      -   -   -   -   -

16           (Thereupon, Deposition Exhibit 20,

17           E-Mail String Beginning Bates Number

18           SUMMIT_000092858, was marked for

19           purposes of identification.)

20                      -   -   -   -   -

21       Q.    It's been marked as Exhibit 20.

22  Now, this is an e-mail from Dr. Kohler that

23  attaches a working document that is a list of

24  questions for you and the investigators to use.

25           Have you seen this document before?

1        A.    No, I have not seen this.  This

2   looks like stuff that has been added to the

3   investigator manual.

4        Q.    Okay.  And so we asked Dr. Kohler

5   about this during her deposition.  She e-mailed

6   the other, at the time, physicians in the

7   office, January 26, 2011, to Dorothy Dean, who

8   we discussed is no longer with the department,

9   and Dr. Sterbenz, and says, "Dorothy and George,

10  here is the document that I started for the

11  investigators.  The goal is to put down the

12  types of information that we feel are important

13  to particular types of investigation and to

14  provide a brief explanation as to why it is

15  important.  What I am sending is just a starting

16  point.  Please add to it -- or, excuse me,

17  please add to it and improve what is there and

18  then we can distribute it to the investigators.

19  I believe that if they understand the rationale

20  behind why we are asking for the information,

21  they will more quickly embrace the concept of

22  including it."

23              Did I read that correctly?

24        A.    Yes.

25        Q.    I want to ask you about the content

Page 335

1    of the section on overdose deaths, which is page

2    2 of Exhibit 20.  You see at the bottom of the

3    page where it says, "Overdose Deaths" in bold?

4         A.    Yes.

5         Q.    Under "Medication History, what

6    types of medications was this person prescribed,

7    by whom and for what ailment?  Are the suspected

8    OD drugs ones that were prescribed for the

9    victim or for the family members or friends?

10   How did the decedent obtain the medication?  If

11   the person is prescribed the meds, how compliant

12   have they been on this regimen?  Has the

13   physician documented concerns of abuse?  How

14   long have they been taking the medication?  Some

15   medications can require increasing doses over

16   time due to tolerance.  Some can become

17   problematic in situations where there is

18   declining health and the kidneys or liver no

19   longer process the medication efficiently."

20              Did I read that correctly?

21        A.    Yes.

22        Q.    Are those the types of questions

23   that the attending physicians in your department

24   have instructed you and your investigators to

25   ask in dealing with medication issues in an

Page 336

1    overdose death?

2         A.    I think it's just reinforcing it

3    because I can remember asking these type of

4    questions way before --

5         Q.    2011?

6         A.    -- 2011.

7         Q.    Are there any --

8         A.    And --

9         Q.    I'm sorry.  Go ahead.

10        A.    And not all this information can be

11   obtained.  It's an attempt.  And most of it is

12   going to be obtained through finding out who

13   the -- you know, what doctor and getting those

14   records, and everything will be documented in

15   those records.

16        Q.    Sure.

17        A.    Some of the stuff you'll never know.

18   Either the family doesn't know or they're not

19   forthcoming.  So there's some of the stuff that

20   on certain cases we'll never know.

21        Q.    In some cases the best you can do is

22   ask the question?

23        A.    Yes.

24        Q.    You don't control whether or what

25   kind of response?

1      A.    Correct.

2      Q.    Are there any questions in this

3  "Medication History" section that I just read to

4  you that you've never asked?

5      A.    You know, it's something that's -- I

6  don't ask because, you know, I don't know -- it

7  would be obtained through medical records and

8  that would be some medications can require

9  increasing doses due to tolerance levels.

10      Q.    So is that something you would leave

11  to the doctors in terms of --

12      A.    Yes.

13      Q.    -- analyzing medical records?

14      A.    I might get the medical records that

15  document it, but it's the doctor's

16  responsibility to interpret those records.

17      Q.    So you've never evaluated a

18  patient's tolerance?

19      A.    No.

20      Q.    You've never asked family members

21  about a tolerance progression?

22      A.    No.

23      Q.    Okay.  And in terms of the other

24  questions in that description that you would

25  ask, is it fair to say that during the course of

Page 338

1   the time that you've been an investigator, or

2   the chief investigator, that you would seek out

3   that other type of information, and if it was

4   available, it would be in the file?

5            MS. HERMIZ:  Objection to form.

6       A.    Correct.

7       Q.    And so if it's not in the file, that

8   means you either didn't get a response or there

9   wasn't someone to ask?

10      A.    Yes, sir.

11      Q.    All right.  The last section of

12  overdose deaths says, "Illicit Drug Use."  I

13  want to read that to you.  "What type of drug

14  does this person usually use and how do they

15  administer it?  Have they had medical treatment

16  related to drug use or incarceration related to

17  drug use?  Are they involved now or have they

18  been involved in drug rehab or with agencies

19  such as community services or methadone

20  programs?"

21           Did I read that correctly?

22      A.    Yes.

23      Q.    Are those all questions that you

24  have asked during the course of your work with

25  the department?

                                                    Page 339

1          A.    Yes.

2          Q.    So there's nothing on that list

3    that --

4          A.    That jumps out and -- no.

5          Q.    Okay.  And fair to say that if you

6    received responses or information that would

7    answer those questions, it would be included in

8    the case file?

9          A.    Correct.

10          Q.    There's no other place where you

11   would have the answer to, for example, the first

12   question, what type of drug does this person

13   usually use and how do they administer it?  If

14   you had that information, the only place --

15   well, it would be in the case file?

16               MS. HERMIZ:  Objection to form.

17          A.    It would probably be documented on

18   one of the investigation -- either the

19   preliminary investigation report or the final,

20   if not both.

21          Q.    Okay.  One final question.

22               When you get information, you know,

23   in the course of interviewing family members and

24   friends, and they tell you something about a

25   particular case, do you undertake any efforts

Page 340

1    to -- to corroborate or disprove that

2    information or do you just note it in the file?

3              MS. HERMIZ:  Objection to form.

4         A.    We have done follow-ups.  Sometimes

5    a lot of the concerns that, say, a family member

6    would have about a certain death is something

7    that, you know, we can't handle, so it's going

8    as far as, you know, getting ahold of one of the

9    detectives that have -- you know, that's in

10   charge of the case that can do criminal

11   investigations and can help that person with.

12   So it's getting those connected.  So yeah, we do

13   follow up with families that call and have

14   questions.

15        Q.    So if someone says to you they have

16   been -- they have been fighting on and off

17   heroin for three years, what would you do, if

18   anything, to run that down to see if they, in

19   fact, have been using heroin for three years, or

20   would something like that --

21        A.    Ask -- ask that person, you know,

22   has that person ever been treated, like an

23   emergency room; has that person ever been to

24   rehab because of that.  You know, you try to

25   track it down there.  And if they say no, you

                                              Page 341

1   are just going by that person's word.

2         Q.    So in some instances you can't

3   independently prove what they're saying, you

4   just have to rely on what they tell you?

5         A.    Yes.

6         Q.    Okay.  And then you leave the

7   ultimate judgment based on that data to the

8   attending physicians?

9         A.    Correct.

10        Q.    Do you interact with the Summit

11  County Medical Examiner's Office in your role as

12  an investigator?  Do you ever cross-pollinate

13  with Summit County investigators?

14        A.    I work for Summit County.

15        Q.    That's why you were looking at me so

16  strangely.  It was a trick question.  Sorry for

17  that.

18              Do you ever interact with Cuyahoga

19  County?

20        A.    I go up there for, like, regional

21  coroners' meetings.  I know I send a lot of

22  our -- they started like a three-day and a

23  five-day advanced death investigation school

24  that we can get credit -- continuing ed hours

25  for, so -- it's close.  So, in that respect,

Page 342

1    that's about it from an investigative

2    standpoint.

3              Now, I'm sure Steve Perch

4    communicates with, like, their toxicology lab,

5    and they interact much more than what the

6    investigators --

7         Q.    And so just in terms of your

8    function and your unit, you don't work out cases

9    with Cuyahoga resources?

10        A.    No.

11             MR. CARTER:  Now for real, no

12   further questions.  Thank you.

13             THE WITNESS:  Okay.

14             EXAMINATION OF GARY GUENTHER

15   BY MS. HERMIZ:

16        Q.    Gary, thank you for bearing with us.

17   I know it's been a long day.  I just have a few

18   follow-up questions for you to clear up some

19   confusion from the record.

20             Counsel for Purdue asked you a few

21   questions about some of your -- whether you

22   shredded some documents or purged documents and

23   how often you did that.  I just want to ask you,

24   is there a formal document retention policy that

25   the Summit County Medical Examiner's Office has?

Page 343

1          A.     Yes.

2          Q.     So your questions {sic} to Purdue's

3   counsel about shredding or purging any sort of

4   documents, was that in compliance with the

5   document retention policy that your office has?

6          A.     Yes.

7          Q.     Okay.  And you talked earlier in the

8   deposition with counsel about receiving a letter

9   in connection with this litigation about not

10  destroying documents; is that correct?

11         A.     Correct.

12         Q.     Okay.  And since you received that

13  letter that relates to this litigation, have you

14  purged or shredded any documents that have to

15  do -- or since you received that letter?

16         A.     No.

17                MS. HERMIZ:  Okay.  I have no

18  further questions for you.  Thank you for your

19  time.

20                MR. CARTER:  Nothing further from

21  the defense.

22                THE VIDEOGRAPHER:  Off the record,

23  6:09.

24                (Deposition concluded at 6:09 p.m.)

25                       - - - - -

Page 344

1   Whereupon, counsel was requested to give instruction

2   regarding the witness' review of the transcript

3   pursuant to the Civil Rules.

4

5                    SIGNATURE:

6   Transcript review was requested pursuant to the

7   applicable Rules of Civil Procedure.

8

9                    TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction regarding

11  delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 345

1                    REPORTER'S CERTIFICATE
2    The State of Ohio,    )
3                          ) SS:
4    County of Cuyahoga.   )
5
6           I, Renee L. Pellegrino, a Notary Public
7    within and for the State of Ohio, duly commissioned
8    and qualified, do hereby certify that the within
9    named witness, GARY GUENTHER, was by me first duly
10   sworn to testify the truth, the whole truth and
11   nothing but the truth in the cause aforesaid; that
12   the testimony then given by the above referenced
13   witness was by me reduced to stenotypy in the
14   presence of said witness; afterwards transcribed,
15   and that the foregoing is a true and correct
16   transcription of the testimony so given by the above
17   referenced witness.
18          I do further certify that this deposition
19   was taken at the time and place in the foregoing
20   caption specified and was completed without
21   adjournment.
22
23
24
25

Page 346

1              I do further certify that I am not a

2    relative, counsel or attorney for either party, or

3    otherwise interested in the event of this action.

4              IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my seal of office at Cleveland,

6    Ohio, on this 19th day of October, 2018.

7

8

9

10

11

12   Renee L. Pellegrino, Notary Public

13   within and for the State of Ohio

14

15   My commission expires October 12, 2020.

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 347
 1                      Veritext Legal Solutions
                           1100 Superior Ave
 2                            Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
      October 19, 2018
 5
      To: Kristen M. Hermitz
 6
      Case Name: In Re: National Prescription Opiate Litigation v.
 7
      Veritext Reference Number: 3058682
 8
      Witness:  Gary Guenther        Deposition Date:  10/16/2018
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3058682
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 10/16/2018
4   WITNESS' NAME: Gary Guenther
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____          _____
9   Date                              Gary Guenther
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12

         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15

         I have affixed my name and official seal
16

    this _____ day of_____, 20_____.
17

                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

   ASSIGNMENT REFERENCE NO: 3058682
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 10/16/2018
4  WITNESS' NAME: Gary Guenther
5          In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7          I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9          I request that these changes be entered
   as part of the record of my testimony.
10

           I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____        _____
   Date                          Gary Guenther
14

           Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22 this _____ day of_____, 20_____.
23         _____
                   Notary Public
24
           _____
25                 Commission Expiration Date

1             ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 10/16/2018
3   PAGE/LINE(S) /       CHANGE        /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____    _____
20  Date                        Gary Guenther
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23          _____
            Notary Public
24

            _____
25          Commission Expiration Date

**[& - 1988]**                                                           Page 1

| & |
|---|
| **&**   1:20 2:14 3:4,9 3:14 4:3,8,11 8:12 14:3,9,15,18,20,22 289:6 |

| **0** |
|---|
| **000003815**   7:6 118:5 169:9 |
| **000028691**   236:11 |
| **000028708**   7:22 244:3,7 |
| **000092858**   8:21 333:18 |
| **000099204**   8:11 259:23 260:6 |
| **000099406**   8:6 254:12,16 |
| **000192655**   8:13 289:8 |
| **000201173**   236:12 |
| **000201174**   7:19 236:4,11 |
| **000201177**   7:21 241:21,24 |
| **000201288**   7:13 201:25 202:4 |
| **000201499**   7:18 233:8,12 |
| **000201548**   7:9 168:23 169:6 |
| **000201655**   8:8 258:18 259:1 |
| **000202092**   206:7 |
| **000202094**   7:15 205:25 206:5 |
| **000203007**   8:19 295:10 |
| **000204634**   8:17 295:4 |

**001011269**   7:25 248:1,11
**001128715**   8:4 250:16,20
**001560061**   8:15 289:14
**04**   321:8
**08**   297:24,25 299:6
**09**   297:24,25 299:6
**096**   206:5

| **1** |
|---|
| **1**   7:5 118:1,9,22,25 121:15,16 169:8 220:14,15 234:21 256:8 |
| **10**   7:22 244:2,5 |
| **10/16/2018**   347:8 348:3 349:3 350:2 |
| **100**   239:3 319:4 |
| **10036-6797**   2:20 |
| **10036-8704**   2:15 |
| **101**   9:15 |
| **102**   9:16,16 |
| **103**   9:17,17 |
| **104**   9:18,18,19 175:2,5 318:5 |
| **105**   9:19 |
| **107**   9:20 |
| **109**   323:23 |
| **1095**   2:19 |
| **10:31**   79:8 |
| **10:44**   79:11 |
| **10th**   242:2 |
| **11**   7:23 136:14,15 138:3 247:22 248:4 253:18 |
| **110**   9:20 319:4 |
| **1100**   4:14 347:1 |
| **111**   9:21 |
| **112**   9:21 |

**113**   9:22,22
**11327**   248:11
**114**   9:23,23
**115**   9:24,24
**116**   9:25 10:3
**1175**   241:25
**118**   7:5
**11:56**   134:18
**12**   8:3 250:12,20 250:21 251:18,19 252:2 322:8 346:15
**1211**   2:15
**12:19**   135:3
**13**   8:5 254:8,10,15 256:5 257:4
**13th**   229:10
**14**   7:12 8:7 182:10 201:23 217:2 258:14,23 269:22 271:22 317:11,23 325:8
**144**   175:1,5 318:5 324:1
**146**   10:3
**14th**   202:15
**15**   6:8 8:9 41:16 45:2 182:17 217:2 259:20 260:2 271:22 276:16 317:9,10,23 325:8 332:3
**150**   97:21 141:25
**15219-6401**   4:5
**153**   10:4 175:11,13 318:6
**156**   324:2
**16**   1:15 8:12 109:16 122:24 124:6 126:5 178:2 269:22 289:5,19

**290**:4,15,22 301:9 325:8 332:14
**160**   10:4
**1600**   5:4
**161**   10:5,5
**167**   10:6
**168**   10:6
**169**   7:7
**16th**   13:2
**17**   1:7 8:14 13:6 109:16 122:24 124:6 126:5 178:2 289:11,19 290:4 290:14 301:9 332:14
**172**   10:7
**178**   10:7
**18**   8:16 295:1,14 296:3 301:9 332:14
**180**   90:11,22 98:20
**181**   10:8
**1820**   347:2
**183**   10:8
**184**   10:9
**185**   10:9,10
**186**   7:10 10:10
**188**   10:11
**189**   10:11
**19**   7:8 8:18 168:21 295:7,14 296:3 301:9 315:11 332:14 347:4
**190**   10:12 312:22
**193**   10:12
**194**   10:13,13
**195**   10:14
**198**   10:14
**1987**   25:18
**1988**   15:19 32:24 32:25 184:16

**[1988 - 271]**                                   Page 2

290:19 291:25 294:7
**1995** 140:15
**19th** 169:25 346:6
**1:18** 1:11
**1:37** 167:12
**1:42** 167:15
**1st** 186:23 221:7 237:22 311:8,17 316:21

**2**

**2** 6:3 7:7 121:14 121:15 168:17,19 169:5,10,13 170:3 170:6 220:15,15 236:11 238:8 242:12 256:18 315:5,6 322:13 323:20 326:13 335:2
**2,744** 175:20
**20** 8:20 139:6 153:15 176:14 181:9 195:4 196:17 309:12 333:16,21 335:2 348:16 349:22 350:22
**200** 10:15
**2000** 31:7,11,14,20 31:24 140:15 247:7 321:3,16
**20005** 4:9
**20005-5793** 3:20
**2000s** 276:15,16
**2003** 321:8
**2005** 203:15
**2006** 258:25
**2008** 41:8 321:12
**2009** 7:24 41:9 247:24 248:6

321:12
**201** 5:8 10:15,16 10:16
**2010** 264:21 319:1
**2011** 264:21 319:1 319:8 334:7 336:5 336:6
**2012** 319:1,8
**2013** 174:9 182:10 254:19 271:22 316:2,20,21 317:5 317:10,20 318:1 322:4 323:15 324:8 325:8
**2014** 174:25 175:19,25 182:17 260:6 316:2 317:8 318:5 322:5 323:16 324:1,2,8
**2015** 52:24 62:15 67:11,18 68:1,14 68:24 78:1,12 109:9,16 111:21 112:5,6,10 115:12 115:19 116:2,13 122:24 123:9,17 124:2,6,14,25 126:4 175:9,13,18 178:1 184:8,9,16 193:11,17 200:14 200:15 211:11 216:25 218:23 316:2,6 318:6 322:5
**2015-2016** 54:3
**2015-2017** 127:23
**201550** 169:11
**2016** 7:8,11 8:3 52:24 54:6 61:4 62:15 67:18 68:2 76:2 109:9 111:2

111:24 112:18,19 113:16,19 114:1 115:17,20,25 116:3 121:22 123:9 168:21 170:1 175:17 186:17 187:9 188:18 189:14 203:15 220:2 221:7,19 223:7 224:16 229:10 238:11 246:23 250:14,25 251:11 252:15 311:8,8,9 311:17,17 315:11 316:3,5 317:9,24 322:14
**2017** 7:13 56:1 68:2 109:9 112:2 112:23 114:18,23 121:22 123:9 187:4 201:23 202:15 211:12 237:13 238:15 239:4 242:3 322:17,22
**2018** 1:15 13:2 113:1,8,22 114:6 114:11,15 115:2 186:23 241:17 242:3 346:6 347:4
**2019** 251:12 314:3
**202** 3:20 4:10 7:12
**2020** 346:15
**203** 10:17
**2035** 241:25
**205** 10:17
**206** 7:14
**20s** 320:7
**212** 2:16,20

**213** 3:7 175:11,13 318:6
**215** 10:18 230:1
**216** 4:15
**216-523-1313** 347:3
**216-9343** 2:5
**217** 10:18
**220** 260:7
**2227** 346:11
**224** 10:19
**228** 10:19
**229** 7:16
**232** 10:20
**233** 7:17
**236** 7:19
**239** 10:20
**23rd** 218:23
**240** 10:21,21,22,22
**241** 7:20
**243** 10:23
**243-400000** 3:7
**244** 7:22
**248** 7:23
**25** 65:16
**25,000** 200:10
**250** 8:3
**252-9060** 5:9
**253** 10:23
**25322** 5:4
**254** 8:5 10:24
**258** 8:7
**26** 334:7
**260** 8:9
**261** 6:9
**264** 10:24,25 11:3
**265** 11:3,4
**268** 11:4
**27** 233:17
**271** 11:5

**272** 11:5
**274** 11:6
**276** 11:6
**277** 11:7,7
**28** 2:4
**280** 11:8,8,9
**2804** 1:6,7 13:6,6
**281** 11:9
**283** 6:10
**286** 11:10,10
**287** 11:11
**28775** 250:21
**288** 11:11,12
**289** 8:12,14
**28th** 187:4
**294** 11:12 202:5
**29464** 2:5
**295** 8:16,18
**297** 11:13
**299** 11:13
**2:59** 228:2

**3**

**3** 7:10 136:15,15
  186:14,21 208:24
  220:15,16 234:9
  236:12 257:8
**30** 29:24 32:20
  89:18 115:23
  116:9 134:5
  139:11 152:5
  190:23 196:13
  203:13 230:1
  232:14 244:23
  269:6
**300** 11:14
**301** 4:5 11:14,15
**304** 5:5 11:15,16
**305** 11:16
**305-6400** 3:11
**3058682** 347:7
  348:2 349:2

**306** 11:17,17
**308** 187:24
**31** 9:3
**311** 11:18
**313** 11:18
**316** 11:19
**317** 11:19
**318** 11:20
**319** 11:20
**31st** 237:23 311:9
  311:17
**32** 220:4,23
**321** 11:21,21
**322** 11:22
**324** 11:22,23
**325** 2:9
**327** 11:23,24
**329** 11:24
**33** 219:23 220:23
**330** 3:11 5:9 11:25
  12:3
**333** 6:11 8:20
**338** 12:3
**339** 12:4
**340** 12:4 113:16
**340-1172** 5:5
**342** 6:12
**35** 9:3
**35th** 4:4
**36** 9:4
**360** 246:23
**3825** 169:10
**39** 9:4
**3:00** 215:23
**3:18** 228:5
**3rd** 220:2

**4**

**4** 7:12 136:24,24
  137:1,1 141:17
  144:25,25 201:21
  202:3,7 221:17

234:21 255:15
**4,000** 7:10 186:16
  187:8
**4,521** 175:24
**40** 46:17 137:20
  179:23 244:23
**400** 3:10 199:1
  200:21 216:6
**40s** 320:7
**412** 4:6
**415** 3:16
**43215-5017** 2:10
**434-5421** 4:10
**44113-7213** 4:14
**44114** 347:2
**44308** 5:8
**44720** 3:11
**44th** 3:5
**45** 46:3 218:3
**450** 198:19
**45090** 1:11
**469-3939** 2:11
**471-3490** 4:6
**47700** 229:15
  230:4,6,7,25 231:5
**4:02** 258:12
**4:06** 261:3
**4:09** 234:6
**4:35** 283:16
**4:40** 283:19
**4th** 54:6 112:17
  234:22

**5**

**5** 7:14 205:20,22
  206:3,18 207:3,11
  228:8,25 322:9,10
  322:11,16,22
**50** 5:7 46:3 98:16
**50,000** 200:11
**500** 257:16

**501** 233:12
**50s** 283:2
**53** 221:8
**54** 9:5
**56** 221:18
**591-6000** 3:16
**592-5000** 4:15
**596-9000** 2:16
**5:32** 332:7
**5:57** 332:10

**6**

**6** 7:16 228:24
  229:3,7
**60** 113:17 174:15
  174:19 318:1,3
**600** 2:10
**60s** 64:12 283:2
**614** 2:11
**62** 9:5
**623** 178:22
**63** 9:6
**65** 125:10
**655** 3:19
**66** 9:6
**669** 259:1
**67** 9:7
**68** 9:7
**69** 9:8,8
**698-3500** 2:20
**6:09** 343:23,24
**6th** 234:6

**7**

**7** 6:4 7:17 136:14
  136:15 138:3
  233:4,6,11,17
**70** 125:11 282:14
  282:16,19
**700** 198:20 199:1
  200:22

**70s** 64:11,13
**71.8** 318:7
**7138** 252:3
**72** 9:9
**72.2** 318:6
**725** 4:9
**75** 1:21 234:23
**756** 253:12
**76** 9:9
**777** 3:6
**78** 9:10
**7:30** 141:17
  144:25

**8**

**8** 7:19 136:24,25
  137:1 223:7
  235:25 236:2,10
**80** 9:10 65:13
  179:24
**801** 15:23
**8040** 3:10
**80s** 183:24
**82** 9:11
**843** 2:5
**86** 9:11 26:6
**87** 26:7
**879-5000** 3:20
**88** 26:6 290:22
**89** 9:12

**9**

**9** 6:5 7:20 241:12
  241:19,24 242:1
**90** 9:12 319:3
**90017-5844** 3:6
**90s** 158:4
**91** 9:13
**93** 9:13
**94** 9:14
**94111-5356** 3:15

**950** 4:13
**96** 9:14 153:10
**97** 153:10
**99** 9:15 174:10,20
  316:19 318:2
  323:20
**99.9** 147:17 325:23
**9:03** 1:16 13:3
**9th** 242:5

**a**

**a.l.** 5:3
**a.m.** 1:16 13:3
  79:11 141:17
**aaron** 1:8
**abdmi** 165:2
**ability** 183:12
  297:13
**able** 17:22 42:3
  43:23 45:5 128:13
  129:18 131:12,23
  133:13 156:21
  181:16 190:14
  200:3 201:1,7,13
  208:11 232:10
  238:13 245:3
  288:4 293:6 296:7
**abuse** 59:11,17
  117:3,6 180:11
  328:17 329:25
  335:13
**abused** 330:8
**academy** 43:10,13
  164:18
**accept** 255:12
  256:10
**accepts** 146:16
  147:1
**access** 64:25 65:13
  94:11 149:20
  155:1 157:1
  158:14 162:8

167:24 299:16,18
**accident** 217:15
**accidental** 37:10
  37:16,21 64:3
  91:16 104:11
  157:18 160:1,6,25
  161:7 213:8
**accidents** 37:25
**accounting** 73:19
**accreditations**
  47:16
**accuracy** 152:24
  305:19
**accurate** 29:6 40:8
  55:20 72:14 88:17
  96:17,18 112:19
  188:13,19 259:16
  306:11
**accurately** 17:23
**acknowledge**
  348:11 349:16
**act** 348:14 349:20
**action** 346:3
**activity** 182:3
**actual** 67:22 95:17
  139:10 172:18
  208:1,7 222:25
  223:1 331:22
**adams** 4:13 14:5,5
**add** 131:9 270:4
  334:16,17
**added** 158:5,7
  205:2 222:13
  254:2 334:2
**addict** 102:23
  327:23 328:9
**addicted** 102:10
  102:14,18 103:12
  103:18 104:12,20
  105:4,6,10 192:24
  327:7,14,23 328:2

328:9,18
**addiction** 59:10,14
  104:23 181:21
  183:14 192:22
  194:18 328:2
**addictions** 60:14
  181:14,15
**addicts** 188:4
  226:3
**addition** 199:19
**additional** 34:13
  75:2,23 85:1
  128:25 168:16
  205:5
**additionally**
  179:24
**additions** 252:24
**address** 15:22
  236:17 281:4
  347:15
**adjournment**
  345:21
**adjust** 245:14
**adjusted** 40:13
  208:12
**adjustments**
  198:21
**adm** 48:16
**administer** 338:15
  339:13
**administered**
  178:22 179:5
**administration**
  203:19,24 266:25
**administrative**
  26:12 142:12
  204:18
**administrator**
  75:8,8 120:21
  227:14

[admit - apparently]

admit 181:20
adult 186:8
advanced 46:18
341:23
advantage 275:3
275:17,23
advice 186:1
advise 191:19
advisement 308:9
advocates 48:22
48:24
aemch 5:5
affirmatively
329:22
affixed 346:5
348:15 349:21
aforesaid 345:11
afternoon 135:5
138:6,8,13 139:12
229:23 234:8
261:6
afternoons 138:16
139:9 142:8 152:8
age 14:25 64:21
221:8 320:5,7
agencies 82:3
166:19 268:16
338:18
agency 25:20
70:12
agent 25:19 42:15
271:17
ages 65:12 239:25
ago 20:10 32:20
36:6 45:2 47:2
60:17 65:18 81:16
84:19 98:20
127:18 159:9
182:14 195:4
196:13,17 237:8
256:10 257:23

307:12,13 309:11
315:1 325:2
agree 65:12 78:10
109:5 167:23
220:20 280:10
284:18,22 285:5,6
303:19 304:1
317:20
agreed 333:2
agreement 332:12
agreements 214:1
214:3
ahead 19:8 64:7
145:8 150:20
171:8 205:8,9
246:4 316:10,11
336:9
ahold 340:8
aids 31:19
ailment 335:7
ain't 113:18
akearse 2:6
akron 1:22 2:2 5:8
13:12,12,15 24:12
36:8 43:4,22 51:6
61:4 71:16 92:3
132:16 134:5
150:7 171:21
176:17 177:21
179:1 189:18,21
akron's 187:23
al 1:9,10 13:22
283:25
alcohol 72:1
182:22 183:1,4
186:7,10
alive 304:4 308:1
allegations 59:2,7
allergan 3:17
14:22

allow 224:24
225:1
allowed 83:23
272:3
altered 69:21
185:22 332:13
alternate 138:23
alyssa 233:19
amazing 237:10
american 44:18,21
americas 2:15,19
amerisourceberg...
5:2 13:23
amount 76:5,6,7
77:5 98:6 113:2
124:11 141:4
152:5 163:4
171:22 186:7
216:7 225:12
245:17 257:16
279:8 298:5
amy 121:20
122:15,21 130:18
130:19 138:12
157:11 249:21
253:9 270:18
analog 78:7
109:15 112:15
178:5 228:16
analogs 54:5 60:20
62:3,13 71:6
110:22 112:10
180:25 198:6
199:14 211:2
226:7 234:25
235:18 269:25
287:14,22
analyst 120:22
analyzing 337:13
andrea 2:14

andrea.ren 2:16
andrew 223:8
224:15
anecdotal 80:17
293:20 299:15,20
305:6,8
anecdotally 67:4
103:17
anecdote 176:9
angeles 3:6
animals 188:2
anne 2:3 13:11
169:2 295:16,24
308:4
answer 16:22 17:8
19:7,8 64:8 77:16
93:25 98:1 119:10
124:3 132:22
144:21 145:15
159:17 160:2
232:10 245:13,14
300:13 303:15
304:20 339:7,11
answered 107:17
145:3 208:5
answering 260:23
answers 144:19
148:16 209:25
anticipated 54:20
anybody 194:1
216:8 268:23
282:13 320:20
anymore 255:12
anytime 33:19
apartment 42:20
apd 172:2
apologize 121:9
aporter.com 3:7
apparently 61:5
62:17 224:6,12

**appear** 237:12 348:11 349:15
**appearance** 232:6 273:24 274:13
**appearances** 2:1 3:1 4:1 5:1 6:3
**appeared** 54:7
**appearing** 14:13
**appears** 169:15 245:2
**appended** 349:11 349:18
**applicable** 344:7
**applicants** 126:17 262:7
**applied** 127:13
**apply** 123:16
**applying** 80:6
**appreciate** 333:5
**appropriate** 80:8 80:13 89:12,25 90:6 112:12 113:10 119:10 280:17
**appropriately** 158:23
**appropriateness** 80:4 89:6 99:1
**approval** 141:7
**approvals** 83:5
**approve** 58:8 140:24 141:9
**approximately** 13:3 26:6 131:11
**april** 7:8 168:21 169:25 223:7 229:9 315:11 316:5 322:14
**arcos** 162:9,10
**area** 43:25 44:7,13 44:16 47:18 52:3

59:10 102:3,4 114:3 149:10 153:13 163:14 164:10 165:25 166:1 176:16 231:9 308:16
**areas** 54:21 261:11
**arnold** 3:4 14:14
**arranged** 222:24
**arrangement** 136:22
**arrest** 229:25
**arrested** 282:2
**arrests** 272:3 283:3
**arrive** 92:6 130:11
**art** 133:12
**article** 7:10 24:11 24:14 27:17,18 186:15,21 187:3 187:11,15,18 225:19 231:8,12 239:24
**articles** 86:6 107:20,23
**aside** 101:22 105:15 108:22 137:10 163:9 232:12
**asked** 21:21 25:6 29:1 48:2 108:3 108:15 109:2 111:19 115:8 121:8 159:12,15 202:24 208:4 243:23 249:18 259:7 265:1,4 284:8,25 304:18 308:13 334:4 337:4,20 338:24

342:20
**asking** 29:16 85:18 96:13 108:8 166:17 226:4 247:1 321:18 334:20 336:3
**aspect** 165:15
**aspects** 249:8
**assessing** 80:3
**assessment** 80:11
**assigned** 143:25
**assignment** 348:2 349:2 350:2
**assigns** 267:1
**assist** 143:21 271:1
**assistance** 48:18 49:14 51:11 54:21 270:9 281:11
**assistant** 307:6
**assisted** 271:23
**associate's** 43:3,12
**associated** 160:16 180:23 182:8 183:15 241:3
**associates** 299:23 327:13
**association** 46:13
**associations** 49:21
**assume** 33:14 185:12 274:17 303:8 323:12
**attached** 229:25 255:3 349:7
**attaches** 333:23
**attachment** 169:5 169:19 170:4
**attachments** 7:14 205:23 229:9
**attempt** 336:11

**attendant** 120:18
**attended** 23:11,15
**attending** 160:4 165:14 184:23 195:24 335:23 341:8
**attendings** 262:21
**attention** 17:13
**attorney** 18:23 19:5 118:13 346:2
**attorneys** 18:11,16 18:21 19:11,15 20:4,15 21:14,22 21:23 22:5 23:13
**attractive** 327:6
**attributable** 73:25 87:22 110:18 174:22 188:16 318:21
**attribute** 76:20
**attributed** 85:14 180:11 187:25 188:9 225:15
**attribution** 188:15
**audience** 54:14 55:13,21,21 56:7
**audiences** 55:10
**audit** 151:11,16,16 152:21 254:3
**audited** 254:18
**august** 186:22 260:6
**aunt** 221:18
**authorization** 269:2
**authorize** 349:11
**authorized** 63:7
**automated** 8:16 8:18 162:11 295:2 295:8

**automatic** 296:4

**autopsies** 34:21,22
212:1,6,24 213:13
259:9 309:22

**autopsy** 33:23
55:4 82:25 83:8,8
84:24 87:13,15
154:22 155:12
212:3,17,21
213:11 294:8,12
300:24 301:3,7,17
303:10,14,24
321:21 324:23
325:2

**availability** 66:4
66:22 68:23
239:12

**available** 31:4
47:19,24 91:4
92:17 93:4,7
107:1 143:25
167:19 212:1
273:24 275:5
284:19 338:4

**ave** 347:1

**avenue** 2:15,19
3:10 4:13

**avoid** 16:24

**avoided** 178:3

**aware** 18:1 19:18
31:10,13,18 41:22
42:12 65:22 89:5
148:14 151:9,20
161:12 189:6
193:18 203:10,12
204:15 225:22
231:2 257:4
260:15 280:2,25
281:3 319:13
327:17

**awareness** 230:10

**b**

**bachelor's** 129:23
129:25

**back** 25:18 33:17
39:23 41:3 51:1
65:10 67:13,16
68:4,8,25 69:9
70:11,14,15,23
71:1 79:10 82:21
93:5 94:25 98:12
98:12,14 105:15
106:17 109:19
111:18 114:4
115:7 122:17
125:22 129:6
145:20,21 150:1
151:24 152:2,9,15
154:3,7 167:14
181:8 182:11
183:11,19 195:4
195:10,13 196:13
205:5 210:18
212:11,17 213:1
214:10 217:23
228:4,8 231:10,17
236:13 243:23
245:17 247:13
254:19 258:11
261:2 266:9
267:12 273:18
274:10 283:18
290:22 291:20
293:15,19 294:4
297:11,21 300:6
307:6 314:4
317:20 318:25
319:6 321:16
326:3 328:22
332:9 347:15

**backed** 312:12

**background** 18:25
34:7 38:7,14
39:16,19 43:2
50:10 91:8 96:19
103:25 104:8
105:9 116:18
119:2 130:2
131:15 161:21,21
161:24 162:3
281:15 282:21
288:5 306:19

**backwards** 41:7

**bad** 114:3 208:5
216:2

**baggie** 190:24
292:25 293:3,7
331:15

**bags** 76:10,14,18
77:9,22,25 78:5
198:10 200:20

**ballpark** 127:24

**band** 181:22

**bars** 42:23,25

**base** 143:17

**based** 50:14 65:12
66:21 70:19 95:8
100:13,18 105:5
109:5 115:11
124:3 143:16
160:2 168:9
273:23 274:12
288:18 341:7

**basic** 38:7 46:17
137:13 169:23
263:2

**basically** 33:7
98:22 140:7
225:11 238:1
252:19 291:14
292:16 320:3

**basis** 23:22 135:19

**bates** 7:6,8,13,15
7:17,19,20,22,24
8:4,5,8,10,12,15
8:17,19,20 118:4
168:22 169:5,10
201:24 202:4,5
205:24 206:4,9
233:7,11,14 236:3
236:10 241:20,24
244:6 247:25
248:10 250:15
251:14,15 252:3
253:11 254:11,15
258:17,25 259:23
260:6 289:7,14
295:3,9 333:17

**bathroom** 224:10

**bci** 71:21 125:15
125:16,17 126:25
127:19

**beacon** 24:12
239:23

**bearing** 342:16

**beating** 218:7

**becoming** 41:10
280:11 325:7

**bed** 224:13

**began** 296:6 321:2

**beginning** 7:6,8,13
7:15,17,19,20,24
8:4,5,8,10,17,19
8:20 21:10 28:2
118:4 150:24
168:22 201:24
205:1,24 233:7
236:3 241:20
247:25 250:15
254:11 258:17
259:22 288:8
295:3,9 333:17

**behalf** 2:2,7,13,17
3:2,8,13,17 4:2,7
4:11 5:2 13:14
14:4,6,9,15,22
58:11 117:10
281:13
**believe** 24:10
32:19 45:13 56:12
56:19 86:5 87:5
112:15,18 121:25
139:20 140:4
161:3 167:18,21
171:5 254:6
260:18 274:3
275:3 288:24
290:22 323:9
334:19
**belt** 124:12
**benzodiazepines**
220:10 329:23
**benzos** 220:6,9
**best** 16:19,21
28:15 56:4 78:4
81:14 88:10,11
103:13 137:4 158:3
183:12 190:3
192:7 220:12
260:12 336:21
**bet** 182:14
**better** 151:23
232:11 249:11
283:5 327:15
**beyond** 133:8
196:23 225:2
**bid** 139:1
**big** 56:25 78:9
111:15,22 112:8
143:20 151:2
318:13
**biggest** 65:2
131:17,17

**binders** 265:19
**bindle** 331:15
**bindles** 67:21
68:10 109:21
**biography** 196:4
**birthday** 224:4,5
**bit** 27:1 38:14
39:18 58:20
117:19 131:4
134:11 147:25
173:14 227:24
249:21 274:21
277:15 284:5
287:5 305:3
306:22 309:14
325:14 326:10
**bits** 281:8
**black** 329:3 330:2
330:3,9,11 331:5
332:15
**blacks** 320:12
**blank** 218:6 267:8
**blanks** 263:13
**blood** 72:8
**board** 44:15,17,18
44:21 47:14 48:16
48:17 49:7 81:24
81:24 82:23 84:7
86:5,5,24 166:3,4
166:7,10,16 167:2
314:2
**boards** 48:15
81:11
**bob** 120:21
**bodies** 76:6 213:12
217:24 259:8
298:19
**body** 42:2 76:3,4,9
76:14,18 77:8,22
77:25 78:5 84:4
147:12,21 192:5

198:10 200:9,20
**bold** 335:3
**book** 130:3 155:7
155:16,17 156:6
157:14,15,21
**books** 31:22
157:16,24 247:14
265:19,23,25
266:3,10,18
**boot** 130:7
**borrow** 208:9
**borrowed** 207:15
207:20
**bottle** 69:5,10 92:8
98:19 185:7,11,16
279:10 299:21
302:5
**bottles** 67:13 68:4
69:1 151:25 152:9
291:18
**bottom** 213:10
221:16 227:9,10
228:14 244:10
251:16 293:3
335:2
**bought** 330:1
**boulevard** 2:4,9
**box** 279:17
**boxes** 155:11
**boy** 224:7
**boyfriend** 327:11
**brad** 14:8
**bradley** 4:8
**brandy** 2:9 13:20
**branjan** 2:12
**break** 17:3,9 78:21
78:23 79:1 117:20
134:13,14,15
135:13 167:9
209:12,14 227:24
283:10,14 319:19

332:4
**breaking** 123:14
**breath** 238:13
**breathtaking**
238:12
**brennan** 1:20
**bressi** 81:3 86:1,2
86:21 87:9,18,23
88:14,17 89:5
**bretton** 3:10
**bridge** 276:5
**bridgeside** 2:4
**brief** 334:14
**briefly** 187:20
239:22 243:9
**bring** 67:13 68:25
70:11,14,23
109:19 151:24
152:9 182:14
266:23 282:18
293:15 294:4
319:22
**bringing** 59:3
257:17
**broad** 71:22 198:1
299:10 320:6
**broader** 29:16
91:12 113:5
**broken** 45:14
**brother** 216:19
217:4 220:5
**brought** 67:16
152:2 179:13
189:22 209:17
253:18 261:8
274:10 291:20
**brunswick** 42:21
**bucks** 181:10
**budget** 74:3,7,14
74:18,23 76:23
205:1

build 111:10
building 153:12
  157:13 261:21
built 154:14 275:8
bullet 97:10
bullets 206:16
bunch 209:14
  246:6
bureau 125:18
burglaries 180:10
  180:17,23
burling 3:14 14:20
burn 127:1
burned 43:1 126:5
burnt 67:25
bush 218:8
business 75:8
  145:5 146:10
  192:14 227:14
  329:8,9
busy 173:16
button 156:15,16
  157:25 158:7
  188:21 310:23
buttons 246:19
buy 76:9 181:16
  200:19,20
buying 284:3
buys 299:25 300:2
byrne 244:11,12
  245:10

c

c 236:16,16
ca 347:25
cabinet 149:11
  150:18 151:8
  153:12 291:9
cage 150:2 273:19
calculated 73:24
california 3:6,15
  175:24

call 30:4,4 33:19
  34:3 42:1 56:19
  56:23 65:5 74:11
  74:17 93:5,9,11
  95:12 97:12 98:13
  98:25 130:2
  137:17 138:3,5,17
  143:8 145:2,11,21
  146:2,11 152:12
  155:7,17 158:21
  160:22 161:11
  163:22 164:1
  172:11 195:25
  197:9,12 214:5
  227:3 241:7
  246:13,14 262:19
  262:21 263:1,4
  272:6,7 273:5
  290:7 298:25
  299:2 306:1
  314:16 322:3
  340:13
called 14:25 33:21
  50:22 142:22
  146:2 156:9
  157:14 162:9
  216:17 217:25
  269:3 283:22
  311:7
calling 108:7
  131:21 152:14
  160:23,24 323:10
calls 34:24 65:2
  96:24 130:24,25
  135:24 143:9
  145:17 163:7
  164:9 187:16
  212:21,21 236:21
  262:12,13,15
  278:5,13,16
  292:16 324:14

calzola 3:9 14:2,3
camera 33:9
camp 130:7
campbell 3:9 14:3
canal 15:23
cancer 109:23
  110:4
canton 3:11
capacity 129:6
  190:1
caption 345:20
car 210:16,18
card 139:17
  140:12
cardinal 4:7 14:9
care 91:23,25 92:2
  92:12 95:11 96:12
  97:13 100:12
  147:6 283:23,24
career 51:8 52:3
  110:19 115:13
carey 3:14 14:19
  14:19
carfentanil 54:7
  78:7 111:1 112:15
  112:17 187:25
  188:16 189:2,8,15
  189:16,24 190:7
  190:11,21 191:7
  192:7 193:8,23
  199:5,8 221:9,15
  221:19,25 225:6
  225:13 234:23
  235:17 242:8,10
  246:18
carfentanils 115:4
carolina 2:5
carrying 193:3
carter 2:8 6:8,11
  13:16,18 14:11,23
  15:6,10 18:8

78:18,24 79:5,12
  120:20 134:11,15
  135:7 167:10,16
  169:1 227:23
  228:6,13 230:16
  230:19 258:3,7,21
  260:19 261:12
  288:8 332:11
  333:12 342:11
  343:20
case 1:7,11 13:6
  18:21 19:4,20
  25:15 26:2 30:7
  30:14,17 33:20
  35:9,16 37:7,9,19
  37:22 38:19 39:9
  53:15,18 63:20,25
  64:2 83:1 84:17
  85:12,19,22 87:18
  87:19,23 88:14
  90:4 91:21,22
  92:7 95:1 99:5
  100:3,7,18,23
  101:4,9,13 102:5
  102:12 105:18,24
  105:25 106:9
  107:7 115:12
  117:16 143:13,20
  143:22 144:1,3
  146:25 147:7,7,10
  147:19 150:3,4
  154:19,20 155:13
  155:13,21,24
  156:7,14 157:1,13
  157:15 158:13
  160:12 161:5,17
  163:16,19 176:15
  176:19 184:21
  199:3 207:17
  210:24 214:1,25
  215:4,5 216:16,18

218:17 220:21
223:16,23 224:1
224:19 227:5
241:2 242:14
243:3,14 249:1,5,6
249:12 250:9
263:16 264:1
265:9 267:14
269:14,21 270:21
270:24 271:14
275:22 291:8,11
294:10,12,22
299:1,2 303:20
306:17 324:16
339:8,15,25
340:10 347:6
348:3 349:3
**caseload** 198:16
198:23 199:19
212:15
**caseloads** 214:9
**cases** 25:21 33:21
35:12 53:25 59:3
60:19,19 64:5
69:13,19 76:7
85:5,10 87:25
91:1,11,15 97:25
98:2 104:10
109:12 110:8
111:22 112:8
141:25 142:1
143:19 145:15
146:15,18 155:4,6
156:20 157:19
162:25 183:1
184:11,15 185:2
185:18,21,25
186:4 189:19
195:14 198:19
199:1,10 200:21
210:6,24 213:20

215:5 217:8 222:5
238:15 242:19
244:23 245:2
246:23 264:2
265:10 266:7
268:18 281:25
283:1 293:15
298:16,23 300:6
314:19 316:12
318:11,19 321:20
325:1,6 326:6
336:20,21 342:8
**cash** 148:8 222:23
**categories** 310:3,9
314:7
**categorization**
309:23
**categorizations**
309:21
**categorized**
303:22 311:19
**category** 198:1
303:23 311:14
**cauchon** 242:2
**cause** 62:5,13 72:3
72:7 73:2,6,15
85:8 184:4 195:11
196:1,15 218:10
225:12 237:24
242:5,8,20 293:24
345:11
**caused** 60:25
85:21 101:4 102:8
200:4 330:8
**causes** 60:14,23
61:20 68:19
195:16
**causing** 85:16
196:14
**caution** 18:14

**caveats** 314:21
**cdc** 175:19 176:1
**cell** 226:17,19,25
273:8
**centers** 108:23
**centre** 4:4
**cents** 139:11
**certain** 45:11
70:19 73:11,12
81:25 82:6 108:9
144:3 161:3
199:16 231:8,9
241:2 243:19
264:9 265:18
302:11 319:23
321:20 336:20
340:6
**certainty** 28:7
**certificate** 219:17
243:20 345:1
349:11
**certificates** 312:21
**certification** 44:25
45:4 47:13 165:2
165:11 348:1
349:1
**certifications**
44:15 47:15,24
**certified** 15:3
44:17,20 45:19
165:6
**certify** 345:8,18
346:1
**chain** 122:11
169:5 229:8,9,14
233:24 235:5
254:17 255:8,24
256:2 257:11
**challenge** 217:15
**challenges** 218:14
227:8

**chance** 45:17
202:7
**change** 68:19
109:9 136:19
153:18 165:15
167:9 249:4 251:8
256:12 257:14,21
258:1,5,7,8 306:10
347:13,14 349:8
350:3
**changed** 29:23
33:4 62:17 65:19
66:12 100:17
136:14 153:14
251:4 253:10
269:24 310:5
**changes** 71:13
135:21 151:20
190:19 249:9
251:11 256:5,15
256:23 276:19
347:12 348:7
349:7,9
**changing** 227:18
**channel** 234:9
**characterize** 114:7
**charge** 35:2 276:6
340:10
**charged** 283:1
**charges** 271:20
**charging** 271:20
**charles** 120:18
**charleston** 5:4
309:6
**chart** 7:6 117:23
118:4,21 120:3,8
121:14 122:5
124:25 211:5
213:11 235:7,12
255:10,15 256:16
256:18,24 257:8

**charts** 254:25
255:4,7 256:8
257:2 273:24
**chat** 223:22
**cheap** 61:7 62:1
**cheaper** 330:20,24
**check** 92:20 93:3
155:12 164:9,12
311:11,12 317:13
318:25 319:6
**checked** 162:23
316:21
**checklist** 45:9
**chemical** 227:19
230:4 231:10
**chemistries**
227:18
**chewed** 325:3
**chief** 15:16 41:8
41:10 50:6 52:21
73:4 105:16
137:10 140:3,20
140:24 141:23
142:13,15 143:24
153:23,25 154:11
164:23 204:4,12
204:15,19 206:12
247:11 253:21
290:25 297:22
298:3 299:5
320:23 321:5,10
321:12 338:2
**child** 25:23 26:2
210:15,17 215:17
215:24 225:2
**children** 220:22
**children's** 262:20
**china** 61:6 179:15
326:15,22
**choice** 139:3

**chronic** 106:17
**cincinnati** 225:15
**circuit** 113:6
**circumstance** 89:5
142:24
**circumstances**
39:1 53:9 69:9
95:19 98:17 128:8
142:16 143:3
219:3 266:22
282:8
**citation** 211:14
**cites** 242:8
**city** 2:2 13:12,15
42:21 92:3 163:6
**civil** 15:2 344:3,7
348:5 349:5
**clamor** 188:4
**clarence** 134:2
**clarification** 17:18
**clark** 43:4,5,6,6
**class** 46:17
**classes** 43:24
47:10,20
**classified** 165:21
183:5 246:10,11
286:9
**classify** 182:22
**clear** 26:17 28:16
29:16 197:22
245:13 310:11
342:18
**cleared** 83:11
**clearly** 16:14
**clerk** 281:22
**cleveland** 3:10
4:14 127:10 346:5
347:2
**click** 311:10
**climb** 324:9

**clinic** 88:6
**clippings** 213:3
**close** 56:10 129:14
139:19 160:22
224:4 272:5
299:23 314:1
327:13 341:25
**closer** 128:12
**closes** 144:25
**closest** 163:13
**clr** 1:25
**clue** 163:10
**clumped** 285:22
**cocaine** 71:8 111:9
114:9,22,23 181:4
221:19 222:1
235:1 246:9
329:12 330:11
**code** 149:13
**codes** 209:13
**coincided** 211:10
**coke** 109:14
111:12
**cold** 93:9 164:9
**collect** 29:2 72:1
105:25 106:22,25
194:7 231:20
**collected** 148:5,24
149:5 273:12,15
**collecting** 213:2
325:25
**collection** 255:20
256:8,19,20 257:8
257:12
**college** 34:8 43:5
129:24 195:8
267:2
**color** 190:24
**colors** 70:25 71:13
**columbus** 2:10
7:10 186:15,21

187:7
**combating** 113:22
**combination**
172:18 174:22
175:6 191:5,8
211:2 234:12
246:12
**combinations**
191:10
**combined** 275:20
**come** 40:1 44:9
46:14 51:9,12
55:1 56:17,22,24
65:10 66:21 67:7
67:20,23 68:4,8
81:24 82:21 93:2
93:5 98:11,12,14
101:8,12 110:8
126:17 130:14
131:14 135:22
137:10 139:13
143:4,14 153:3
158:2 161:15
162:20 166:18,23
194:11 196:10
209:22 210:5
211:5,25 214:6,14
222:4 223:10
227:16 230:24
240:25 241:4
266:16 274:8
277:3 278:10
319:20 320:9
331:16
**comes** 88:24 91:10
93:17 143:8 145:2
146:11 151:5
186:5 226:16
228:22 263:5
279:17 314:2
329:2

comfort 78:21
comfortable 16:7
 17:2,7 28:6 70:20
 217:20
coming 76:8 140:5
 262:13 274:22
 317:25 326:14
command 122:11
comment 108:16
 225:19,23
commenting 99:1
comments 224:8
 256:3 259:12
commercially
 275:5
commercials
 278:3
commission
 346:15 348:19
 349:25 350:25
commissioned
 345:7
committee 152:21
common 192:2,3
 198:24 306:8,9,14
commons 3:10
communicated
 75:22
communicates
 342:4
communicating
 35:1 231:17
communication
 187:15
community
 338:19
companies 3:3
 278:6
company 2:18 4:2
 200:9 277:20

comparative
 331:12
compile 209:11,16
compiled 235:8
complain 42:1
complaint 23:19
 59:5
complaints 41:22
 41:24 42:12
 245:25
complete 269:12
completed 43:9
 268:16 269:14,21
 311:23 312:1
 314:10 345:20
 347:15
completes 133:17
completing 29:23
complex 143:14
compliance 343:4
compliant 335:11
comply 28:23
composite 206:4
 236:7
compound 208:4
computer 83:3
 140:23 149:25
 154:7 169:21
 207:23 227:11
 263:13,14 281:21
 315:21
computers 154:3
 247:15 307:9
concept 334:21
concerning 66:4
concerns 335:13
 340:5
conclude 294:13
 294:14 301:11
 303:5

concluded 107:8
 343:24
conclusion 72:16
 101:8,12
conclusions 106:5
conduct 36:11
conference 18:5
confidential
 295:19,23
confirm 72:22
 239:17
confirmation
 199:18
confirmed 71:20
 189:24 237:23
confiscate 230:6
confronting
 116:12
confuse 76:16
confused 127:12
confusion 342:19
connected 340:12
connection 25:25
 57:24 87:7 180:24
 343:9
connolly 4:8 14:9
consent 84:1
consents 83:5
consider 48:3
 59:13,16,22,25
 60:3,6,9,13 66:3
 80:1 112:10,11
 197:1,17 220:23
 318:10,18
considered 99:6
 272:15
consistent 235:18
 277:4 319:3
consolidated
 162:12

constantly 138:24
constructive 27:7
consulted 75:1
 172:2
consulting 172:5
 173:7
consumer 73:21
cont'd 3:1 4:1 5:1
 8:1 10:1 11:1 12:1
contact 146:7
 166:18,19 262:5
 271:9 280:22
 309:2
contacted 308:15
contacts 249:25
contain 294:12
containing 293:4
content 18:20 22:3
 170:21 252:17
 334:25
contents 7:24 8:3
 247:24 250:14
context 25:13 50:5
 52:2 63:23 72:12
 92:16 102:17
 106:25 110:3
 163:10 171:1
 225:18 303:18,24
continue 78:20
 79:13 135:10
 149:22 169:10
 174:25 175:16
 177:9 180:7
 197:20 234:20,25
 244:20
continued 135:6
continues 175:9
 179:22
continuing 46:4
 46:11,25 47:5,9
 50:2 68:1 206:5

222:2 341:24
**contract** 74:21
76:5 127:17 139:1
200:10
**contribute** 108:4
109:2 202:10
**control** 108:24
230:7 336:24
**controlled** 165:24
**conversation**
18:15 39:24 92:18
98:8 194:22,23
217:16 218:11
**conversations**
38:15,18 62:10
66:14 196:20
197:15 319:22
**converted** 67:24
**convicted** 85:16
**copied** 30:20
233:19 235:6
244:15
**copies** 31:10,13
234:18
**copy** 30:6 94:15
118:12,13,17
169:2 174:4
250:22
**corner** 206:15
**coroner's** 45:7
**coroners** 46:13
341:21
**corporation** 3:13
5:2 13:24 14:20
**correct** 15:19
25:24 26:3,25
32:9,10 35:13,14
39:6 40:16 42:10
44:23 49:17 52:7
55:10 60:20 61:10
63:9 69:2,3 73:2

80:16,20 94:24
97:3,16,18 103:2
103:14 104:12
106:7 108:16,20
108:21 116:15
121:1 130:11,12
144:15,16 146:8
147:14,23 168:13
169:19 170:1,21
174:24 175:7,14
177:5,24,25 179:5
179:6,11,20,21
180:5 185:20
186:23 187:12
189:8,11,12
190:14 196:1,6
198:3,7 199:2,7
200:17 202:16,17
204:11,13 206:25
207:7,13 210:2,3
210:10,11 211:18
212:5,7 218:24
219:14,24 220:2
220:17,19,22
221:20,21 225:16
225:17 227:19,20
232:4 233:19,20
235:13,14,22,23
237:2,5,15,18
238:17,18,20
239:6 242:24
244:16 248:8,15
253:25 254:1,22
254:25 255:5,6,21
255:22 256:11
259:10,11 277:23
278:21,22,24,25
279:12,13 280:1
280:19 282:25
288:17 290:18
291:24 292:13

294:7,9,23,24
297:4,8 300:25
301:17,23 302:1
302:18,19,21,22
302:24,25 303:7
304:25 305:20,22
310:1,7,24 315:11
315:12 316:4,25
317:3 318:4 327:2
327:3,5 337:1
338:6 339:9 341:9
343:10,11 345:15
**corrected** 40:13
40:19
**corrections** 253:10
347:12 349:17
**correctly** 174:13
174:17 175:3,21
177:17 179:17
180:1 188:7 235:3
237:14 239:5
245:8,9,19 247:19
301:11 316:11
334:23 335:20
338:21
**correspondence**
207:3 254:20
**corroborate** 340:1
**cost** 68:23 76:11
76:15,16 171:20
171:25 173:3
181:9 199:4,5
**costs** 73:24 75:15
180:4,4 181:15
198:24 199:9,25
201:1,8,14 227:18
**council** 205:5
**counsel** 13:9 18:23
19:2 168:6 260:21
332:12 333:2
342:20 343:3,8

344:1,10 346:2
**counseling** 26:14
59:20 216:14
**count** 152:6,11,16
152:19 178:9
213:12 234:12
**counter** 78:19
**counties** 237:11
245:3
**counting** 152:10
**countries** 179:14
**counts** 151:23
152:18 291:6,9
**county** 1:9 2:2 7:5
8:7,9,14 13:12,14
15:17,25 16:1,2
19:19 23:25 24:10
25:18,21 26:1,24
27:1 32:4 41:19
49:22,25 59:2
65:15 66:23 72:25
79:20 85:20 87:20
93:16 99:25 100:2
100:6,12,17,22
101:5,10,23
105:18 106:10
109:6 111:20,23
112:1,4,20 113:10
113:21 114:8,11
114:17,23 116:10
116:12 118:2
122:10 127:11
129:10 130:5
144:13 146:25
151:15 163:16
167:24 174:9,21
178:8,11,11,21
182:3 184:16
187:23 188:3,14
189:14 193:23
206:11 209:6

210:9,13 213:13
213:17,23 214:3,5
222:5 225:23
229:24 230:4
231:9 232:17,22
233:1 234:7,11
239:17 244:14
254:3 255:18
258:16,24 259:21
260:5 261:8,19
276:9 278:17
281:13 289:12
292:2 307:10
309:9,19 328:6
341:11,13,14,19
342:25 345:4
348:10 349:15
**county's** 23:18
48:15 116:4 168:9
309:9
**couple** 16:6 18:12
20:10 47:22 81:5
131:6 145:10
151:2,18 168:15
197:24 206:22,23
207:2 210:9
214:11 233:13
237:8 238:9,24
243:2 247:17
251:10,24 254:7
254:21 255:4
257:23 297:11
**course** 22:4 26:22
41:18 47:4 51:16
61:25 62:10 65:22
89:18,22 90:18
92:17 95:24 99:4
101:2 110:2,19
115:23 125:3
131:12 140:20
158:15 162:19

167:10 181:25
182:6 194:7,10
230:24 232:14
240:2,8,14 287:4
288:15 317:15
332:21 337:25
338:24 339:23
**courses** 34:8 44:13
**court** 1:1 13:7
16:9 25:8,14 49:2
58:16 62:25
118:14 150:6,10
150:15,16,23
291:13 295:21
348:7
**courts** 83:11
281:22
**cov.com** 3:16
**cover** 129:18
142:23 143:2
202:14 261:11
286:16 315:10
322:18
**coverage** 143:16
**covered** 25:7
142:20,23 261:11
**covington** 3:14
14:19
**crack** 282:17
**crash** 262:24
**create** 196:3
207:19
**created** 57:23
171:6 203:6 266:4
309:10,18
**creating** 40:2
208:8 307:11,16
**creation** 208:1
252:17
**credit** 341:24

**crime** 48:21 50:23
125:19 226:24
230:5 231:15
331:19
**crimes** 180:9,18
180:22
**criminal** 125:18
182:3 272:1
281:15,23 282:5
282:23 340:10
**crisis** 281:5
**criteria** 94:8
**criticism** 27:7
**cross** 120:13
341:12
**crossed** 121:4
215:11 276:5
**crosses** 215:11
**crossing** 120:14
**crushed** 69:20,23
185:23
**cummings** 5:12
18:4,6
**current** 15:15 46:8
67:18 78:2 120:4
122:13 136:19
141:14 212:23
248:17 251:1,2
255:7,23 256:20
257:11 260:11
**currently** 32:11,12
109:7 110:25
111:6 121:17
124:8 213:5 263:6
264:8 278:7
290:10,13 302:10
309:7
**curve** 131:18
**custody** 25:23
148:19 150:9
151:21 255:8,24

257:11
**custom** 275:8
**customarily**
320:22
**cut** 97:9 180:5
**cuyahoga** 127:11
217:23 341:18
342:9 345:4

**d**

**d** 2:19 291:10
**d.c.** 3:20 4:9
**dad** 197:6 305:24
**daily** 135:21 178:9
**dan** 1:8
**dashboard** 178:8
209:7
**data** 176:1 178:21
211:5 234:10,14
235:7,8,13 237:17
238:6,20,25
239:16 240:21
243:12 245:1,17
250:9,9 276:3
315:23 316:1
341:7
**database** 63:3
154:7,9,10,13,19
155:6,7,17,21,25
156:7,7,11,14,22
157:2,13,15,22
158:2,13,22 162:9
208:25 209:3
210:2 237:21
240:19 241:1,11
243:12 244:18,20
244:22,25 245:7
245:12,15 246:6
247:1,4 249:7,10
249:14,17 250:3
253:20 274:22,23
276:7 300:12,15

**[database - dechert]** Page 15

300:19 306:23
307:2,17 309:15
309:18 311:18
314:4,22 316:15
323:10 324:16
**databases** 155:5
158:14 159:3
**date** 13:2 27:24
121:23 150:3
155:9 156:18
169:25 176:15
185:9 218:23
234:19 245:4
264:17 268:12
269:23 296:20
322:21 344:11
347:8 348:3,9,19
349:3,13,25
350:20,25
**dated** 7:8,12
168:21 186:22
201:23 315:10
**dates** 20:18 33:2
139:20 155:15
156:18 237:21
264:14 298:1
**daughter** 104:2
**dave** 124:24 126:7
**dave's** 126:11
**david** 120:19
**davis** 120:21
**day** 2:8 13:18,21
52:3 130:18
132:21 136:4,4
138:1,5,13,13,16
138:18 142:9,20
142:20 144:21
173:14 181:8
185:10 210:4
231:23 238:9,23
257:17 271:10

326:5 341:22,23
342:17 346:6
348:16 349:22
350:22
**days** 33:17 35:20
125:13 135:22
136:1 137:16,19
141:4,5 212:2
220:6,24 226:17
234:21 243:2
297:1 305:14
312:22 347:18
**daytime** 34:20
270:10,17
**dayton** 43:8
**dea** 230:7
**dead** 197:4 223:8
304:4 325:4
**deal** 35:12 190:20
216:14
**dealer** 226:12
**dealers** 180:5
271:18 329:6
**dealing** 35:1 38:1
38:2,8 107:23
109:7 111:20,23
112:1,4,20 114:12
114:17 116:5
132:18 189:20
190:9 192:13,17
192:18 195:2
199:21 217:12
232:17 335:25
**deals** 226:9
**dealt** 49:8 262:5
**dean** 120:18 165:6
212:4 313:7,9
334:7
**dear** 347:10
**death** 31:21,22
34:19,24,24 35:19

36:18 37:10,16
41:25 42:2 44:18
44:21 46:17 48:23
49:10 52:1 64:3,6
64:14 67:12 69:22
72:3,4,7 73:2,2,6,6
73:15 85:8,14,17
85:21,21 91:16
101:5 130:24,25
130:25 131:5,21
132:15,23 135:23
142:21 143:8,20
144:13,18 145:12
145:17 151:24
152:12 155:8
160:14,25 178:3
183:6 184:4,17,24
190:23 195:11
196:1,15 212:21
215:6 218:10
219:17 221:13
225:12 234:7
237:9,25 240:4,10
240:15 242:6,8,20
243:20 246:10,11
262:12,15,17
265:24 266:8
267:5,22 268:13
269:23 273:5
279:5 280:23
282:15 283:6
298:6 299:1 301:4
306:8 312:20
330:8 336:1 340:6
341:23
**deaths** 7:11 22:15
22:17 37:21 38:5
38:9,10 65:14
78:7,12,14,16 97:5
108:8 109:10
110:12 112:7

113:9,17,23
115:14 142:6
156:10 159:8
160:17 174:11,20
175:1,6,11,12,20
175:25 177:11
182:16,21,22,25
183:21 184:10
185:6 186:17
187:9,24 188:15
189:19 213:7,8
214:20 215:20
234:10,12,21,21
234:23,24 235:17
238:25 239:4,8
246:7,8,15 271:19
309:22 314:23
315:2 316:15,20
319:7,18 323:1,16
323:21 324:8
335:1,3 338:12
**debra** 2:19 13:25
261:7
**debra.ogorman**
2:21
**deceased** 39:17
103:18 163:1
192:23 291:5
293:13,22 297:17
**deceased's** 35:3
38:3 72:8
**decedent** 252:9,12
254:25 255:19
276:21 335:10
**decedent's** 216:19
**decedents** 194:12
281:16
**december** 211:11
237:9,22 311:9,17
**dechert** 2:18 14:1

[dechert.com - developed]                                                        Page 16

dechert.com  2:21
decide  272:21
decided  127:3
decision  73:1
  100:12 269:12
decisions  98:14
deck  222:3
decline  237:11
declining  335:18
decrease  78:11
  239:8
deed  348:14
  349:20
deemed  347:19
defendant  100:7,9
  100:18,23 101:9
  101:13
defendants  14:1
  14:16 58:21,24
  59:3 100:2,13
  101:4,17,22
  260:22
defense  343:21
defer  258:4
defers  141:11
definition  284:14
  318:13
definitional
  182:21
degree  43:3,12,21
  44:4 129:23,25
  307:9
degrees  130:1
delay  268:6
delayed  268:3,15
delete  29:3,7
delivered  326:21
delivery  344:9,11
demand  198:22
demands  200:3

demographics
  154:21
denice  75:9 192:14
  202:12 205:4
  241:7
dennis  236:15
deny  104:4
department  7:5
  27:2,6 29:18 34:1
  40:24 89:23 93:6
  104:10 115:24
  117:24 118:2
  120:15,25 132:16
  133:5 135:18,20
  149:18 177:21
  178:8,23 184:9
  192:16 198:25
  200:4 201:2,8,14
  203:14 209:1,6,6
  213:16 215:1
  224:20 239:21
  240:3,9 244:14
  248:12 249:24
  254:22 255:25
  261:20,25 262:2
  266:20 272:11,13
  276:8,14 294:19
  309:9,10,12
  313:20 320:19
  334:8 335:23
  338:25 347:22
departments
  158:18,18 178:11
  209:24
departure  125:2
  126:11
depends  30:21
  37:21 70:10 142:4
  173:15 263:3
  264:16 268:2
  269:9 290:11

312:12 328:16,21
depicted  230:21
depicting  214:17
  227:9
depicts  222:18
deployed  245:12
deployment
  245:15
depose  308:5
deposed  15:3
  19:20 25:7
deposition  1:13
  13:4 15:9 16:3
  18:10 19:12,16,23
  20:1,5,8 21:23,25
  28:5 51:16 88:25
  118:1,10 168:8,19
  186:14 201:21
  205:22 229:3
  233:6 236:2
  241:19 244:5
  247:22 250:12
  254:10 258:14
  259:20 262:12
  289:5,11 295:1,7
  295:19 308:20
  332:24 333:16
  334:5 343:8,24
  345:18 347:8,11
  348:1,3 349:1,3
depositions  332:21
  333:1
depression  306:20
  306:21
deputy  120:17
describe  68:15
  102:23 113:11
  116:4,11 170:6
  171:25 298:11
described  34:4
  50:3 92:10 106:24

116:12 166:3
  195:23 235:19
  287:9 300:8
  326:24
describes  304:17
describing  317:19
  318:16
description  7:3
  103:20 112:12
  337:24
descriptions  182:1
designating
  159:25
desk  75:6 324:14
despite  220:21
destroyed  30:12
destroying  343:10
destruction  150:8
detail  39:6 119:10
  277:11
details  37:3 53:15
  81:17 88:13 96:12
  190:2 194:21
  219:2 246:3
detectives  37:4
  178:24,25 179:8
  272:6,24 340:9
determination
  72:4 73:5 81:9
  87:21 91:6 102:13
  160:14
determine  70:17
  73:15 280:17
determined  101:3
  230:25 269:11
determines  110:18
determining
  196:14
developed  33:18
  154:15

development
277:16
diagnosed 102:17
diagnosis 104:22
106:17
diamond 1:20
die 35:20 83:12
147:2,5 176:10
177:12,13,23
178:16 209:23
215:17,18 262:18
281:17 282:16,19
327:18 331:13
died 88:1 104:2
155:10 178:13
185:22 215:7,24
219:12 221:18
269:6 303:18
dies 38:5 91:3
147:9 185:10
262:23 304:11
difference 285:8
different 35:12,19
37:24 45:15 46:15
47:22 50:13,15,24
56:21 83:21 93:11
97:17 138:9
151:13 165:17
194:9 195:20
197:24 199:5
209:15 214:20
219:18 222:6,6
231:15 236:8
241:6,10 242:6
254:21 277:5,6
293:3,12 303:16
303:17,19 304:21
differential 139:11
differentiate
198:12

differentiating
198:5
differently 333:9
difficulty 126:16
dimaio 266:10
dinapoli 204:23
244:15
dinner 57:15
direct 49:18 97:11
119:12 122:2
207:25 218:7
directed 65:8
69:16 190:3
direction 92:12
163:11
directions 39:22
directly 180:9
directors 48:18
49:7
directory 250:2
disagree 105:6
disaster 214:2
disc 264:6
discard 267:16,18
disciplinary 26:12
discipline 148:3
262:3
disciplined 41:20
discovery 23:25
24:4
discuss 24:19 57:7
232:21,25
discussed 43:17
144:10 334:8
discussing 47:14
60:16
discussion 18:20
54:15 295:22
309:14
discussions 304:17

disease 108:23
disorder 328:8
dispatch 7:10
186:15,21 187:8
225:19
dispose 149:7
disprove 340:1
dissatisfied 277:10
distinction 108:11
287:11
distinguished
285:2 287:5
distribute 334:18
distributed 138:1
distributing 149:3
distribution
332:20
distributor 117:9
161:25 201:10
232:21 240:11
district 1:1,2 13:7
13:8
diversion 230:7
division 1:3 13:8
74:13 136:19
151:15
divisions 151:16
divulge 18:20
dna 70:8,8,9,10
331:1,15,17,19
doable 245:16
doc 98:13 141:7
docs 64:17 296:14
doctor 79:20 82:4
88:24 90:7 93:2,3
95:5,7,17 96:15,25
98:5 102:1 160:11
186:9 194:24
195:5 196:8
212:25 213:6
268:9 269:17

280:10 299:2
312:14 313:3,5,10
313:11,16,21,22
313:23 314:2
336:13
doctor's 80:12
161:11,11 269:3
278:8 337:15
doctors 63:5 73:14
80:17,22 88:16
89:7,16 92:23
93:16 96:9 99:22
131:21 157:19
160:5 162:8 168:1
212:16 218:2
262:21 269:5
278:6 280:16
337:11
document 1:8
23:21 40:23 99:13
119:9 170:6
171:18 173:25
203:3 252:4 259:3
260:4 263:6
317:15 328:20
333:23,25 334:10
337:15 342:24
343:5
documented
106:15 302:9
328:3,10,12
335:13 336:14
339:17
documenting
132:11
documents 22:3,5
22:7,13 23:8
27:20 29:2,10
118:11 247:18
332:17 333:7,10
342:22,22 343:4

343:10,14
**doing** 21:16 42:17
45:7 58:13 65:4
70:8 97:11 142:12
169:7 176:11
200:22 212:13
217:19 269:6
288:6 306:8
**dollar** 171:22
**dollars** 77:1
257:19
**door** 126:18 193:1
224:11 326:23
**doors** 215:23
**dorothy** 120:17
313:7 334:7,9
**dorsey** 134:3,4
148:1
**dosage** 292:18
**doses** 178:23
179:4 193:3
335:15 337:9
**doubled** 76:7
257:19
**doubling** 216:7
**doubt** 70:25
**downtown** 140:17
266:24
**dr** 19:18,22 27:9
40:4,5,16 45:9
57:24 58:1,8
63:11,11 73:9,9
75:2 80:24 81:3,6
81:7,10,15,20
82:10 83:19,19
84:5,17,22 85:5,6
85:7,13,22 86:1,2
86:21 87:9,18,23
88:14,17,17 89:4,5
91:6,7 94:5,5 97:7
98:9,9,25 107:14

107:16 132:9
141:2,7,9 144:11
157:10 160:13,13
161:2,16,16 165:5
165:6 192:13
202:12,16,22
204:22 205:4,10
207:16 211:6
212:4,18,22
214:15 219:22
221:3 222:9
223:13 233:18
234:6,8,17 235:7
235:13,15 243:24
244:11,19 252:20
252:25 253:4,4,6
262:4 266:6 268:9
269:15,18,18
276:13,18 284:8
284:25 296:9,11
296:11 307:10
312:2 313:9
322:19 323:5
324:13 333:22
334:4,9
**draft** 173:22,24
257:4
**drafted** 40:9
**drafts** 29:13,19
**drink** 280:8
**drive** 15:23 280:8
**drop** 128:22
238:11
**dropped** 142:11
142:14
**drops** 237:12
**drug** 5:2 8:12
13:24 22:15,15,16
25:19,20,21 42:15
42:17 65:4 68:16
70:17 98:21

105:21 117:8,9
161:25 175:1,10
177:6,14,15 180:5
180:7,11 181:6,23
183:20 186:6
188:5 191:5
196:22 200:12,23
201:3 208:25
216:21 227:18
230:5 231:9,12
232:20,24 240:4
240:10 242:3,6,21
242:23 253:20
271:17,17 274:14
274:18 280:2
283:4,6 289:6
290:6,7,8 292:7,18
297:5 301:3
304:21 306:8
309:23 310:9
311:14,17,19
312:4 314:6,23
315:2 316:14,24
317:1 319:6,23
320:21 322:2
324:7,22 329:6
338:12,13,16,17
338:18 339:12
**drugs** 68:20,23
70:7 72:10,11
102:7,8 105:19
111:6 114:10,14
115:6,9 150:7,12
171:20 172:14
179:13 181:1,2,7
182:19 191:5,6
201:5 219:19
232:5 234:10,12
235:2 243:4,17
256:19,21 271:13
273:23 274:4

277:17 278:20
280:17 283:4
291:10,11,17
294:15,20 328:22
328:23,24 329:9
331:8 335:8
**due** 151:5 200:23
234:24 251:3
335:16 337:9
**duly** 15:2 345:7,9
**duplicate** 315:14
**duties** 22:9 26:1
29:11 34:17 61:25
**dying** 113:3
183:16 195:15
219:23 220:5,22
239:15 282:13

---

**e**

**e** 7:7,12,14,16,17
7:19,20,22 8:5,20
29:8 168:20 169:5
169:16,21 170:1,5
201:22 202:15
205:23 206:6
207:3 229:4,8,10
229:14,17 230:15
233:7,18,23 234:3
234:6 235:10,24
236:3,8,14,17
237:25 241:13,20
242:2,13 243:10
244:3,6 254:11,17
255:1,4,15 256:2
256:25 315:10,21
315:22 322:18
333:17,22 334:5
**earlier** 25:6
108:13 160:2
198:10 203:10
215:24 235:19
247:18 253:24

262:11 273:22
317:14 343:7
**early** 276:15,15
321:3,16
**easier** 41:7 58:16
120:11 169:8
218:1
**easiest** 132:20
218:8
**easily** 16:17
**east** 1:21
**eastern** 1:3 13:8
**easy** 101:18
126:15 133:1
311:1 318:2
**eat** 319:19
**ed** 13:18 15:10
47:5 341:24
**edition** 260:11
**editions** 252:15
**education** 43:14
43:18 44:1,4,13
46:4,11 47:1,10
50:2
**educational** 105:8
**edward** 2:8
**effect** 62:21
177:15 248:24
257:22
**effective** 250:24
**effects** 178:19
**efficiency** 128:23
**efficient** 17:10
**efficiently** 227:25
335:19
**efforts** 271:24
281:3 339:25
**eh** 90:22
**eight** 135:23
136:16 137:6,18
220:6 264:20

**either** 27:9 39:8
71:20 72:21 84:6
125:10 161:6
197:5 211:1 217:8
224:16 231:6
253:8 281:18
290:16 299:23
328:2 336:18
338:8 339:18
346:2
**elderly** 91:2
**electronic** 158:14
159:3 247:4
253:20 263:21
**elephant** 225:5
**elevated** 113:15
**eliminated** 33:6
34:10 167:19
**ellis** 3:18 4:12 14:6
14:22
**email** 347:17
**embrace** 334:21
**emcarter** 2:11
**emch** 5:3 6:10
13:22,22 283:21
295:16,21 296:1
308:4,10,22 332:2
**emergencies**
145:16
**emergency** 178:10
178:13 191:16
209:1,9,24 239:15
240:1 340:23
**employee** 148:18
148:22 191:22
193:6 262:4 309:4
**employees** 26:14
124:21,22 126:5
127:22 146:1
262:1 309:12

**employment** 15:15
26:22
**empty** 67:14 69:1
185:11
**ems** 179:5 239:17
**enclosed** 347:11
**encountered** 64:22
90:15
**encourage** 119:6
**endo** 3:2,2 14:15
**ends** 252:3
**enforcement**
25:20 35:5 36:2
36:23 37:12,17,18
38:9,11 42:15
43:3 51:8 61:9,19
61:24 62:4,11
65:24,25 66:15
70:6,12 71:11
131:15 226:13
255:13 263:3
271:12,24 326:20
**engage** 96:1
**engaging** 182:3
**enjoys** 139:5
**enter** 291:6,10
**entered** 18:4 184:8
253:19 312:5
349:9
**enticed** 127:19
**entire** 89:22 140:2
177:1 290:24
348:5 349:5
**entirely** 77:16
**entirety** 187:19
**entitled** 18:14
**entity** 14:15
**entries** 311:18
**entry** 221:8
228:14 242:22,24
245:1

**envelope** 267:14
**envelopes** 273:19
**epidemic** 109:7
111:19,21,24
112:2,5,11,11,21
113:5,11 114:8,12
114:18,23 116:5
116:11 180:8
206:11 317:16,18
318:8,11,13,18
322:3 330:15
**equal** 72:3
**equates** 77:1
**eric** 3:5 14:14
**eric.shapland** 3:7
**erie** 164:12
**err** 160:23
**errata** 347:13,18
349:7,10,18 350:1
**especially** 38:11
76:2 110:23
132:21 152:8
192:4 213:1
282:12 326:14
**esq** 2:3,4,8,9,14,19
3:5,9,14,19 4:4,8
4:13 5:3,7
**estimate** 28:15,17
53:1,2 88:10,11
128:5 183:13
330:6
**estimated** 179:22
**estimating** 28:16
**et** 1:9,10
**evaluate** 89:10
**evaluated** 89:6
337:17
**event** 51:2 346:3
**eventually** 149:3
263:22 269:16
291:12

**everybody** 93:22
115:3,5 137:18
216:5 218:8
**everyone's** 169:8
195:20
**evidence** 35:25
38:12,12 67:16
68:4,8,25 69:10,14
69:20 71:23 72:2
80:17 91:17 92:7
92:11 106:10
109:19 148:4,23
149:25 150:23
161:13 162:20
213:3 226:16,24
231:21 250:7
251:6,9 255:21,24
272:15,20 273:7
274:10 275:21
292:4 293:3,21
301:15,20 302:2,5
303:3 305:6,8
325:21 326:1
331:11
**exact** 27:24 33:2
39:20 121:23
176:15 287:18
320:10
**exactly** 58:14
170:7 216:24
300:13 311:1
**exam** 45:5,13,13
45:25 46:6,23
72:7,20 97:7
110:9 269:17
331:16
**examination** 6:7
15:1,5 135:6
260:21 261:4
283:20 333:11
342:14

**examinations**
33:23
**examiner** 7:5 8:7
8:10,12,14 19:19
26:24 40:7 85:20
118:3 120:17
130:7 210:2
245:22 255:19
258:16,24 259:22
260:5 289:6,13
**examiner's** 15:17
23:2 24:19 25:18
26:1 31:6 32:4,23
41:19 42:16 45:7
73:1 74:7,15
87:20 93:16 120:9
122:10 127:11
144:14 147:1
151:12 174:10,21
184:3 188:4
261:16 262:2
263:23 272:10
276:14 292:1
309:20 319:15
341:11 342:25
**examiners** 164:18
**example** 36:17
42:5 46:11 82:24
83:18 93:8 94:25
97:19,20,23,24
98:24 105:4
163:11 179:15
185:23 238:19
241:13 242:7,19
242:20,25 286:1
289:2 319:8
339:11
**examples** 42:11
236:24 252:19
**exception** 147:16

**exchange** 105:16
241:13 243:7
**exclusively** 172:19
**excuse** 14:12 32:7
100:10 121:14
233:17 239:2
262:14 334:16
**executed** 349:10
**execution** 348:14
349:19
**executive** 24:11
255:19
**exhaustive** 111:11
**exhibit** 7:5,7,10,12
7:14,16,17,19,20
7:22,23 8:3,5,7,9
8:12,14,16,18,20
117:23 118:1,9,22
118:25 119:19,24
121:14,15,16
168:17,17,19
169:4,8,10,13
170:4 186:12,14
186:21 201:19,21
202:3,7 205:20,22
206:3,18 207:3,11
208:22 227:22
228:8,12,24 229:3
229:7 233:4,4,6,11
233:16,17 235:25
236:2,7,10 241:12
241:15,19,24
242:1 244:2,5
247:22 248:4
250:12,20,21
251:18,19 252:2
254:8,10,15 256:5
257:4 258:14,23
259:20 260:2
289:5,11 290:4,14
290:14,22 295:1,7

304:16 315:5,6
322:8,9,13,16,21
323:20 326:13
333:14,16,21
335:2
**exhibits** 6:4 7:1
8:1 118:12 168:16
257:24 289:19,22
295:14,23 301:8
332:14
**exist** 31:7,20
119:15 257:5
**existed** 204:6,10
204:20
**existence** 24:8
**existent** 125:9
**existing** 276:3
**exotic** 199:22
**expect** 130:15
315:1,3
**expected** 274:8
**expeditiously**
332:23
**expensive** 327:2
**experience** 65:13
70:20 104:9 109:1
109:6,22 116:5,22
126:1 161:13
178:1 189:7 288:5
288:19 297:20
305:13 306:5
310:2 313:2 324:7
324:21 326:19
327:9 329:1
**experienced**
143:15 214:8
**experiences** 330:4
**expert** 27:13 48:3
59:13,16,22,25
60:3,6,9,13 66:3
80:1

**expertise** 48:8
60:23 61:13,20
68:18 73:16,19,21
80:9,14 277:16,22
278:16,19,23
**expiration** 348:19
349:25 350:25
**expires** 346:15
**explain** 30:1 64:14
238:13 241:7
282:15 324:5,12
**explaining** 36:14
39:1
**explains** 106:21
**explanation** 239:8
324:4 334:14
**explanatory**
292:16
**explorers** 51:4
54:22
**extensive** 64:13
282:14
**extent** 69:15 98:22
165:11 280:8
281:9
**external** 245:7
**extra** 76:9 200:19
313:19,19
**extremely** 327:4
**eye** 278:8

**f**

**f** 4:4
**face** 256:5 305:10
**facilities** 268:25
**facility** 147:2,6,10
153:11 262:24
304:11
**fact** 76:1 84:23
96:11 100:6 105:5
168:6,7 340:19

**facts** 105:25
218:21
**fail** 45:16
**fair** 30:25 31:1
32:1,21 35:11
47:21 54:22 74:23
94:9 96:25 104:20
113:20 160:16
167:23 195:18,19
248:20 299:4
322:1 337:25
339:5
**fall** 89:10,13
144:17 261:25
302:14
**falling** 147:20
**falls** 144:13
217:23 304:11
309:24
**familiar** 30:25
64:23 162:14
164:17 223:22
278:5 280:11
306:6
**familiarity** 66:10
299:6
**families** 35:1,2
37:8 38:3,13,14,22
39:16 42:1 48:23
49:11 83:24
103:23,24 104:1
104:25 132:19
177:1,4 181:24
216:6 217:25
269:21 340:13
**family** 35:3 36:13
36:20 49:2 53:8
83:22 92:3 99:9
102:15,21,22
103:4,12,18 104:6
107:2 117:5,12

142:21 152:14
181:20 182:1
192:23 195:3
197:6 214:13,21
214:23 215:20
216:12 217:22
218:4 220:1 271:8
272:5 299:23
305:4 326:1 328:4
328:14 335:9
336:18 337:20
339:23 340:5
**family's** 53:10
**far** 21:16 30:23
88:19 114:6
115:11 195:10
257:3 298:12
340:8
**fashioned** 140:12
**fatal** 179:10
**father** 176:10
220:16 221:8
327:12
**father's** 221:13
**fax** 164:4,7
**fda** 108:24 278:20
**february** 220:2
237:6 242:2
258:25
**federal** 15:1
165:22
**feed** 181:15
**feel** 79:1 334:12
**feeling** 310:11
**feels** 216:2
**feifei** 2:14
**felt** 124:17
**female** 215:7
**females** 320:8,11
**fentanyl** 54:5,5
60:19,20 61:5

62:3,7,12,12,23
71:6 78:6,6
109:11,14,17,22
110:2,18,20,22
111:13 112:5,7,9
112:10,20,25
113:3 115:10
171:22 172:1
174:16,23 175:2,7
175:12,14 176:3,6
177:14,16 178:4,5
178:20 179:13,15
179:22 180:24,24
198:6 199:14
211:1,2 218:23
219:14,23 224:17
228:16 234:11,25
234:25 235:17,18
242:20 246:10,11
246:18 286:18
287:4,6,7,14,22
317:16,18 318:8
318:22 319:7
324:19,22 325:3,6
326:14,20 327:1
327:20 330:14,19
**fewer** 298:4
**fewest** 116:19
**field** 31:18 65:8
70:21 71:2 73:25
108:13 109:6
142:17 146:2
154:25 157:8,11
190:5,20 237:4
299:12
**fielded** 146:11
**fieldwork** 213:19
**fifteenth** 3:19
**fight** 180:7
**fighting** 340:16

**figueroa** 3:6
**figure** 110:14
195:24 246:20,23
287:24
**figures** 318:1
**file** 30:7,14,16
38:20 39:9 63:20
83:1 94:17 96:10
102:5 103:1,5,13
149:11 150:17
153:12 223:19
233:13 243:14
263:16,18,21
265:8 267:14
281:24 291:9
294:8,10,12
300:24,25 301:3
301:17,22,25
303:10,24 304:15
306:17 332:17
338:4,7 339:8,15
340:2
**filed** 24:9 41:23
**files** 30:18,22
84:17 101:3
119:15 263:20,25
264:9,13,18 265:2
265:9 275:24
303:14,17
**fill** 30:4 152:1
241:5 263:9,13
279:6
**filled** 101:10 152:3
157:17 185:9
263:8 279:7
291:15 296:21,24
**filling** 162:4
**film** 33:18,19
**final** 30:9,10 38:24
83:7 161:15
173:23 186:4

252:20,22 267:15
268:8,10 277:8
300:23 315:20
316:7,9 317:4,11
339:19,21
**finalized** 316:12
**finalizing** 157:19
**finally** 212:22
215:13
**finance** 3:17 14:22
**find** 68:25 69:13
70:1,22 71:23
91:12,17 92:7,11
92:19 110:9,10
113:21 142:23
163:1,2,6 196:19
196:23 231:22
234:10 247:15
272:7 290:16
292:9 293:11
300:21 301:8
302:2,5 304:16
306:17 308:25
325:2,3 347:11
**finding** 96:11 97:1
126:17 231:12
299:11 303:6
336:12
**fine** 74:12 121:6
164:3
**finish** 16:19,22
19:4 21:19 43:21
58:15 61:16 84:14
**finished** 64:8
107:17 228:9
314:19
**fire** 132:3,16
147:11 158:18
178:23 239:17
250:1

**firm** 83:24,25
**first** 15:2 20:7,12
24:7 29:17 32:3
32:15 36:23 43:19
45:22 47:3 95:15
112:14,14 116:10
118:13,23 119:3
124:2,13 125:5,9
126:11 130:21
131:1,6 136:10
139:3 147:11
154:4 165:5 174:6
182:7 183:18,20
187:21 189:15,16
190:13,14 193:22
194:1 202:6
206:10,18 207:2
217:21,22 218:22
229:17 230:5
236:14 242:1
243:6 252:14
255:14 298:14
314:16 315:24
339:11 345:9
**firsthand** 235:21
**five** 17:9 25:12
42:24 45:15 46:4
88:8,9 123:1
133:6 137:16,18
138:1 152:15
191:4 199:8 235:9
265:14 283:14
341:23
**fix** 226:10 333:2
**flagged** 78:25
**flipping** 225:4
**floor** 3:5 4:4
**florida** 309:5
**flow** 254:25 255:4
255:7,10 256:8,16
256:18,24 257:2,8

**fluids** 192:5
**focus** 43:25 54:15
54:24 77:20 121:2
277:15
**focused** 26:17 55:9
55:13 115:3,5
**focusing** 32:14
**folks** 139:13 207:4
216:12 254:21
299:11
**follow** 18:13,19
24:18 39:22 50:14
79:16 82:7 90:17
90:20 94:22 95:22
96:23 97:8 99:8,9
113:7 123:6 136:7
165:17 170:11
192:7 238:1
261:10 270:9,20
271:7 277:9 292:1
298:17 305:7,23
306:2 340:4,13
342:18
**followed** 121:11
**following** 42:5
94:3 96:10
**follows** 15:4
252:14
**football** 195:8
**force** 205:11
206:14
**forces** 49:24
**foregoing** 345:15
345:19 348:13
349:18
**foreign** 62:1
**forensic** 34:12
41:5 47:4 50:6,10
73:4 74:10 105:16
120:19 122:7,14
130:1 137:13

142:3 164:23
194:8 204:4
211:24 243:18
266:6 270:2 275:3
275:16,23 313:24
**forensics** 52:1
**forget** 50:22
**form** 31:8 35:10
36:24 39:13 54:9
62:6 63:21 66:24
67:8 68:11 69:7
69:17 72:5 75:25
78:8 80:19 82:17
84:2 86:17 89:8
90:1 91:20 93:20
94:18 96:5 99:11
101:6,25 102:9
103:6,22 104:13
104:16,21 105:22
107:11 109:20
110:6 111:8
112:13 113:12,24
114:13 115:15,22
116:6 146:21
152:1 153:2
160:18 161:18
167:20 172:20
178:6 181:5 183:7
184:13,25 186:3
188:17 189:3
190:10 193:15,25
194:14,25 198:15
200:6 203:17
205:16 215:2
217:17 224:21
228:19,23 232:7
239:10 240:7,24
243:15 253:1
254:5 263:12
264:10,15,24
265:3,22 267:8,13

267:25 271:15
272:18 274:19
275:25 276:25
277:13 280:5,13
280:20 281:6
286:2,6 287:17
288:1,22 289:25
290:3,10,14 291:3
291:14,14 292:12
292:22 293:24
294:3,5,8,17 297:7
299:17 300:20
301:13,18 304:2
304:24 305:12
306:15 311:4,21
313:17 316:8
317:21 318:23
319:16 321:4,17
322:6 324:10,24
327:8,24 329:5
330:17,22 338:5
339:16 340:3
**formal** 32:4,16
42:12 72:16
133:12 308:18
342:24
**format** 173:8
206:8 277:9
**formed** 105:20
106:12 107:7
**forms** 23:22
275:16,18,18
290:12,17,20
291:1,22 292:14
292:23 293:11
294:6,13 296:3
301:8
**forth** 152:4 160:9
213:4 214:10
231:17 241:4
251:9 279:8

296:21
**forthcoming** 105:1
336:19
**forward** 36:16
58:18 193:11
200:16 333:1
347:15
**forwarded** 242:4
**found** 69:19 95:8
98:19 163:4
177:13 184:22
219:19 223:8
242:23 243:17
291:16 294:14
323:20 324:1
331:14
**foundation** 230:14
230:16
**four** 25:12 41:12
42:19,24 43:21
45:13,14 123:1,5
124:1 128:1,2,5
133:6 136:3
173:19 185:15
191:4 258:3
265:14 268:12
270:20 284:2
295:22
**fourth** 131:7
171:24
**frame** 54:3 78:1
81:14 88:7 121:24
321:16 325:9
**francisco** 3:15
**frederick** 2:18
**free** 348:14 349:20
**frequency** 69:4
**frequently** 68:21
259:7
**friday** 138:20,21
138:22 141:16

270:16
**friend** 281:19
**friendly** 156:17
**friends** 192:24
226:2 305:5 335:9
339:24
**front** 3:15 18:14
118:22 193:1
212:22 236:13
326:23
**frustration** 224:23
**frye** 223:8,16,23
223:25 224:15
**full** 119:13 129:6
138:17 264:16
292:25 297:3
**fully** 124:9 212:14
313:12,21 314:1
**fulton** 15:23
**function** 31:5 55:2
89:10 129:15
157:1,4 342:8
**funds** 205:5
**further** 72:17,20
72:21 283:8
333:11 342:12
343:18,20 345:18
346:1

**g**

**g** 252:6
**gary** 1:14 6:7 7:8
7:12 13:4 14:25
15:5,14 83:14
135:6 168:20
188:2 201:22
206:12 261:4
270:23 283:20,22
289:23 319:12
322:1,14 333:11
342:14,16 345:9
347:8 348:4,9

349:4,13 350:20
**gather** 73:10,12
160:8,9 271:25
**gathering** 196:15
**gears** 58:19
116:17 147:25
167:17
**general** 29:3
108:25 144:12
167:17 181:2
231:19 260:4
290:2 303:22
306:6 319:22
**generalization**
110:15
**generalizations**
123:15
**generally** 23:3
52:6 64:23 65:11
110:16 217:12,16
218:15 280:10
298:10
**generate** 63:8
238:6
**gentleman** 133:4
148:1 206:14
227:10 236:20
238:8 241:14
**george** 334:9
**gestures** 16:12
**getting** 38:3,6,13
43:1,11 62:21
73:11 90:9,16
96:11 99:12
105:15 106:14
109:12 115:8
122:25 125:22
126:12,20 129:4
173:21 178:20
181:13,18 191:16
191:18 244:23

245:16 246:6
249:1 268:4 269:9
303:6 309:14
319:18,25 332:22
333:3 336:13
340:8,12
**gianna** 3:9 14:2
**giannac** 3:12
**gillespie** 120:23
154:17 157:12
275:8 306:24
308:5,14
**girlfriend** 281:19
327:12
**girls** 173:15
**give** 33:2 45:17
46:10 50:7,8 55:1
55:3,17 92:25,25
95:19 98:17
103:25 104:8
110:7 118:12,14
119:25 129:8
130:13 131:4
153:22 197:9
226:3 247:16
263:1 266:17
273:14 291:4,10
306:2 320:6,10
325:12 326:3
344:1,10
**given** 34:17 50:4,9
51:10 55:9,12,22
98:10 160:15
168:7 177:15
205:1 272:10
273:13 305:15
345:12,16
**gives** 72:18 155:9
170:12 242:21
291:5 303:2 311:5

**giving** 53:23
272:12 289:23
**glass** 206:15
**glitches** 240:20
**gloves** 191:20,23
**go** 16:6 19:7 22:21
29:1 30:6 33:9
34:24 35:25 37:3
39:23 46:16 50:7
52:4 58:4 64:7
67:12 70:15 75:7
79:5 82:18 92:3
113:25 117:19
124:18 126:25
127:19 130:25
131:5,6,8,9,13
133:5,13 134:1,16
135:24 141:2,18
141:22 142:17
143:20 144:11
145:8,12 146:12
147:8,18,21 148:1
150:17,20 151:17
151:24 152:15
157:19,21 160:7
161:9 163:1
166:22 168:15
169:23 171:8
182:11 185:10
186:11 190:23
195:10,13 198:18
205:5,8,9 209:8
213:1 214:10,11
215:6,23 216:4
224:10 228:8
231:10 236:13
237:20 241:8
242:12 246:3,23
247:14 255:14
265:9 272:3
275:19 279:5

281:21 282:11
284:4 291:12
294:3 297:11
298:15 303:2
304:7,13,23
310:12 311:9,16
314:22 324:14
325:17 331:12
336:9 341:20
**goal** 43:21 312:20
334:11
**god** 49:9 159:9
**goes** 70:14,25
131:3 138:15
139:2 183:19
218:6 267:5
269:17 273:9
292:3 294:8 301:2
301:7 309:8
**going** 18:12 21:17
23:1 28:6 36:15
37:6 43:11 44:3
49:7 51:7 57:10
58:18 65:1 70:6
78:15,18 91:3
108:19 111:18
113:14,16 118:11
118:12,13,14,15
119:2 120:12
121:5 123:14
129:10 130:17
134:12,16 141:3,3
145:18 167:11
168:16 169:23
174:7 181:15
192:25 195:17
207:6 216:5 218:3
224:10 227:7,15
227:16,24 230:13
235:25 236:8
239:13 241:12

244:2 246:22
249:4,6,10 250:7,8
250:19 251:8,21
257:16 260:20
261:9 265:10
271:12 274:22
275:20 284:1
292:8 300:21
305:17 308:25
311:18 312:7
314:9,18 316:2
322:24 325:13
331:6 332:25
336:12 340:7
341:1
**good** 15:7,8 27:10
58:13 78:20 79:2
79:15 90:12 91:9
117:19 128:5,12
173:21 197:19
226:8 229:23
234:8 238:13
261:6 270:22
309:13 315:15
**gotten** 170:12
180:15 274:7
308:7 310:17
313:4
**governing** 81:11
**government**
108:23 165:22
**grain** 305:16
**grandmother**
224:3,6
**grant** 4:5
**graphic** 206:14
214:12 220:13,18
220:21 221:3
227:8
**graphics** 233:13

**gravitating** 328:7
**gray** 2:14
**great** 130:19
306:16
**greater** 161:3
211:12
**grew** 44:8
**ground** 16:6 114:4
**group** 23:12 51:6
55:18 56:8,20
86:20 108:23
122:7 205:13
236:16 320:6,7
332:4
**groups** 49:22 50:5
50:13,19,21 51:12
54:25 56:15 207:4
**guardians** 210:15
**guenther** 1:14 6:7
7:7,8,12 13:4
14:25 15:5,14
83:14 118:20
135:6 168:20,21
169:12 186:20
188:2 201:23
206:12,17 228:7
233:16 258:22
260:8 261:4,6
283:20,23 333:11
333:13 342:14
345:9 347:8 348:4
348:9 349:4,13
350:20
**guess** 28:9,11,20
180:25 183:24
**guessing** 288:9,9
**guide** 170:19
252:21
**guideline** 165:18
**guidelines** 145:25
164:22

**guides** 31:24
**guns** 255:12,12
256:9
**guy** 307:1,3,19
**guys** 29:19 61:4
171:21 193:3
240:22

**h**

**h** 2:9,9 120:20
236:16
**habits** 79:19
**hair** 227:15
**halas** 120:19
**half** 20:13 21:4,6
78:19 127:18
187:24 230:8
237:13 252:14,18
317:24
**halfway** 252:4
**hand** 36:2,2
103:25 119:9
120:12 222:19
250:19 259:1
260:21 263:8,10
273:2,2 289:18
295:13 346:5
**handbook** 8:7,9
31:14,15 32:5,6,9
40:22 258:15,23
259:5,13,16,21
260:5,12 266:9
**handbooks** 31:3
**handed** 206:17
297:10
**handful** 182:15
**handle** 144:5
199:13 318:20
320:15 321:2
332:23 340:7
**handled** 87:20
132:9 141:25

149:6 247:10
321:10
**handles** 266:7
291:7
**handling** 191:20
192:1 198:18
321:14
**hands** 270:2
**handwritten**
154:5 267:19
**hangs** 197:8
**happen** 45:16 97:9
132:5
**happened** 36:22
38:2 95:18 144:7
176:13,16 196:17
204:1
**happening** 163:19
**happens** 30:24
214:4 246:8 273:3
273:4
**happy** 134:12
**hard** 21:19 58:15
115:18 126:12,15
129:4 132:18,19
134:7 266:9 268:1
271:19
**harder** 16:13
62:21 65:20 66:20
67:7
**harm** 236:17
**harper** 80:24 81:1
81:6,7,10,15,20
82:10 84:5,17,22
85:5,13,22 88:17
89:4
**harper's** 83:19,19
**hbc** 4:2 14:18
**he'll** 145:20 274:8
**head** 51:16 58:7
218:5 320:8

329:21,24
headed 21:18
heading 234:3
253:12
headline 187:4,7
health 3:3 4:7
14:10 60:1 108:4
178:8 192:15
209:7 239:21
320:20 335:18
hear 103:17 104:6
181:7 188:5
225:24
heard 13:6 61:8,18
61:23 62:4,10
65:23 66:1 80:17
162:9 182:1
193:22 245:24
hearing 61:11
66:20 67:4 315:15
hearings 26:12
held 268:16
helmick 3:9 14:2,3
help 28:8,8 48:21
48:23,23 49:11
171:17 207:22
340:11
helped 271:25
helping 56:2
hereinafter 15:3
hereunto 346:4
hermitz 347:5
hermiz 2:4 6:12
13:13,13 31:8
35:10 36:24 39:13
54:9 62:6 63:21
66:24 67:8 68:11
69:7,17 72:5
75:25 78:8 80:19
82:17 86:17 89:8
90:1 91:20 93:20

94:18 96:5 99:11
101:6,25 102:9
103:6,22 104:13
104:16,21 105:22
107:11 110:6
111:8 112:13
113:12,24 114:13
114:19 115:15,22
116:6,14 118:23
146:21 153:2
160:18 161:1,18
167:20 168:2
172:20 178:6
181:5 183:7
184:13,25 185:5
186:3 188:17
189:3 190:10
193:15,25 194:14
194:25 198:15
200:6 201:4,11,17
203:17 205:16,19
215:2 217:17
224:21 228:19
230:13,18 232:7
239:10 240:7,12
240:17,24 243:15
253:1 254:5
264:10,15,24
265:3,22 267:25
271:15 272:18
274:19 275:25
276:25 277:13
280:5,13,20 281:6
283:9,13 286:2,6
287:17 288:1,22
294:17 297:7
299:17 300:20
301:13,18 304:2
304:24 305:12
306:13,15 311:21
313:17 316:8

317:21 318:23
319:16 321:4,17
322:6 324:10,24
327:8,24 329:5
330:17,22 338:5
339:16 340:3
342:15 343:17
heroin 54:5 60:19
61:5 62:2,7,12,22
71:4 78:6 109:7
109:11 111:19,20
111:24 112:2,7
115:4,10 172:1
174:15,23 175:2,6
175:11,14 176:2,6
176:11 177:5,7,14
177:16 178:4,20
179:12,23 180:24
182:14,16 191:7
198:6 210:23,25
223:9 224:7,16
234:7,9,11 235:1
242:8 246:7,9,9,10
246:15,16,16,21
246:24 247:2
285:11,24 286:16
286:24 287:1
288:15 317:16,18
318:8,21 319:7
329:14 330:11
340:17,19
hey 40:12 56:24
75:6,9 79:2 82:4
83:13 93:2 94:5
95:2,16 97:9
98:15 141:2
145:19 164:2,5
165:9 191:19
202:24 214:4
227:3 231:11
253:9 269:6

270:23 272:7,25
273:5,7 298:21
high 33:20 43:15
43:16,18 50:9,17
51:7,23 52:8
54:15 72:18 98:4
111:6 113:15,18
170:9 186:7 195:8
266:7 327:15,16
327:21
higher 178:14
highlighters 75:17
hindsight 115:19
hire 83:24 123:2
125:14 128:11
hired 32:25 33:1
125:5 127:25
313:9,23
hires 125:25
129:22 266:17
hiring 126:14
262:6,10
histology 269:20
history 64:14
95:20 98:17 196:4
219:8,9 252:9,11
276:20 281:23
282:15 290:24
300:5 302:15,20
335:5 337:3
hit 93:13 114:3
115:18 156:15
246:19 310:24
317:23 324:15
hitting 112:17
143:10
hold 47:16
holding 249:2
hole 97:10
home 125:23
169:20,21,21

173:10 262:24 315:19,21 326:22

**homes** 34:25

**homicide** 25:15 26:2 33:20 35:16 36:19 83:10,15 145:12 157:18,20 157:21 264:1 326:6

**homicides** 142:6 213:2

**honest** 59:4

**honor** 140:7

**hopefully** 16:7 309:5

**hospital** 92:4 97:5 110:4 130:24 131:20 145:17 147:6 158:18 163:8 217:23,24 218:1 220:6 262:16,20

**hospitals** 34:25 93:7 164:10 250:1 262:15 270:11 298:22

**hour** 17:14 20:12 21:6 45:13 46:17 47:3 57:18 78:19 135:23 136:16,24 137:6,18,20 139:11,15 238:9 238:14

**hourly** 135:19

**hours** 21:4,7 43:22 45:6 46:3 77:6,9 77:25 78:5 136:5 136:8,9 145:6 146:10 173:19,21 185:15 267:2 270:10 271:6

284:2 341:24

**house** 26:15 154:14 199:13 210:1 215:9,10 281:19 309:8

**hr** 26:25 216:13 261:15 262:1

**hudson** 120:22

**huge** 64:15 109:9 112:7 189:18

**huh** 310:25

**huhs** 16:12

**human** 27:2 189:8 261:19

**hundred** 75:16 85:24 87:16 142:1 183:8 204:24 238:24 293:4

**hurt** 195:4

**hydrochloride** 230:2,3

**hydrocodone** 286:1,8,22 300:17

**hyperlink** 211:14

**hypothetical** 98:23

---

### i

**idea** 76:12 86:18 129:8 171:19 205:17 228:22 297:15 308:12 330:5

**identification** 118:6 168:24 186:18 202:1 206:1 229:5 233:9 236:5 241:22 244:8 248:2 250:17 254:13 258:19 259:25 289:9,16 295:5,11

333:19

**identified** 62:14 71:25 85:7 190:8 190:18 207:7 235:2 247:19 273:22 298:20

**identify** 50:13 62:4 71:2 90:3 189:16 190:15,21 200:3 201:1,7,13 230:6 231:24 274:12 289:21 295:15 331:5,21

**identifying** 61:20 70:2,21 100:23 227:19 332:15

**identity** 69:5,11

**ids** 281:20

**illegal** 110:20 111:5 150:12 191:10 198:2,6,14 224:16 232:5 287:2,6 326:8,11 326:14,20 328:23 329:9 330:15 331:5

**illegally** 288:21 289:3 300:9 301:12 303:7 328:24 329:10 330:12,16,19

**illicit** 68:16,20 72:10 78:15 102:7 102:8 105:19 107:13 109:18 110:19 112:5 182:19 199:20 221:14 326:11 328:22 338:12

**illiterate** 207:23

**illness** 306:12

**illustrate** 225:10

**imagine** 276:17

**immediate** 117:5 194:3 197:6

**immediately** 146:12

**impact** 164:23 214:25 215:4 278:16

**impairment** 17:25

**implemented** 249:3

**important** 108:11 334:12,15

**impossible** 152:19

**improperly** 101:9 101:14

**improve** 334:17

**improved** 127:16 158:9

**inadvertently** 16:22

**incarceration** 338:16

**incentive** 46:7

**incident** 226:22

**incidents** 321:24

**incline** 318:11

**include** 96:13 119:13 176:22 181:3 210:12 249:17 280:3 328:23

**included** 26:13 38:23 54:14 83:8 87:23 175:2,11 252:22 339:7 347:13

**includes** 198:1 233:17 254:20

259:6 329:12
**including** 122:15
122:21 181:6
306:21 334:22
**inconclusive**
161:14
**incorporated**
349:12
**increase** 60:18
61:21 62:1,12
76:21 77:25 78:5
112:7 115:2,14
152:24 200:23
217:1
**increased** 76:24
77:6,10 175:1,10
200:3 201:9,15
**increases** 60:22,24
78:1 109:9 198:13
200:8
**increasing** 335:15
337:9
**incurred** 201:2,8
201:14
**independent** 19:11
61:13,19
**independently**
19:25 57:23 65:22
95:4 128:14 341:3
**index** 6:1,4,5 7:1
8:1 9:1 10:1 11:1
12:1
**indiana** 162:23
**indicate** 301:20
302:2 318:8
**indicated** 27:16
55:8 122:5 123:8
157:6 168:11
170:4 218:18
219:13,21 242:12
256:9 301:22,25

315:18 321:1
**indicates** 234:5
292:10 301:9
**indicating** 347:13
**indication** 303:3
**indicator** 71:17
72:13
**indirectly** 180:9
**individual** 80:7,8
85:9 102:6 184:12
195:18 196:12
207:18 208:9
293:12 299:24
301:10 304:3,5
306:3
**individual's** 85:20
133:25
**individually**
216:10
**individuals** 82:1,6
120:24 178:15
182:2 210:20
282:23 327:17
**infant** 25:15
**influx** 234:20
**info** 242:6 272:6
**informant** 42:22
**informants** 42:19
**information** 8:7,9
23:16 30:8 31:15
32:9 38:7 39:20
40:22 65:21 66:21
73:10,13 99:25
101:22 103:3
106:25 146:7
157:21 160:8,9
171:24 172:18
178:18 180:3,13
181:17 192:21
194:7,9 195:1,24
196:10,15 197:10

203:1 209:17
221:11,22 226:11
230:9 231:18
237:1 241:2,10
245:4 247:15
258:15,23 259:5
259:21 260:4,12
263:2 266:12
271:9,25 279:16
280:3 292:15,17
295:18 297:3,13
299:15,20,22
306:1 309:3
310:14 316:6
323:9 326:16,25
329:2 332:16,20
334:12,20 336:10
338:3 339:6,14,22
340:2
**informational**
31:3
**inhaled** 185:23
**initial** 30:4 71:17
267:15
**initiate** 166:19
**injury** 106:20
117:16 195:8
196:13
**inpatient** 97:5
**input** 173:2
249:21
**inquiries** 65:7
84:22 108:13
247:3,9 319:25
320:2,14,17,18
321:14,15,19
**inquiry** 157:7
320:20
**inside** 150:2
**insight** 245:5

**inspect** 292:8
**instance** 36:20,23
40:15,18 141:9
**instances** 25:14
34:4 36:10 37:15
300:2,7 326:4
341:2
**instructed** 185:14
335:24
**instruction** 27:19
121:11 344:1,10
**instructs** 19:7
**insurance** 50:21
54:19 55:7,21
56:7,15 92:21
206:24 207:4
**interact** 35:4
38:11 96:9 154:11
259:10 262:2
341:10,18 342:5
**interacted** 39:9
100:6
**interaction** 95:25
96:10 98:24 166:6
326:19
**interactions** 35:8
35:15 37:18 100:1
166:15 196:22
**interchangeably**
285:4 288:14
**interest** 119:11
236:9 260:20
322:2
**interested** 44:1
51:7 119:20 288:9
289:25 320:13
346:3
**interface** 209:3
**intern** 233:25
266:23

**internal** 151:16
**internet** 158:20
179:16 273:25
326:21
**interns** 266:16,18
266:19
**internship** 267:3
**interpret** 337:16
**interrupt** 33:11
77:16 79:2 133:3
**interview** 95:5
129:11 262:9
**interviewed** 95:7
**interviewing**
339:23
**interviews** 35:24
36:7,8,11 262:7
271:2 305:3
**intoxication**
182:23
**intrude** 116:19
**inventory** 152:25
254:25 255:20
291:4
**invest** 44:18
**investigate** 223:16
**investigated** 53:19
90:5 174:10,20
176:20 216:18,20
**investigating**
22:16 84:5 91:16
103:9,11 105:18
**investigation**
29:14,19,23 30:9
31:22 46:17 73:25
74:10 82:24 83:7
84:24 87:15 95:9
99:5 125:19
147:19 154:23
162:20 184:22
190:20 194:11

195:22 196:11
204:4 252:21,23
253:19 266:8,20
267:8,13,23
268:11,17 269:12
277:8 280:23
281:14 293:25
294:1 298:8
300:22,23 306:7
321:6 325:18
334:13 339:18,19
341:23
**investigations**
31:22 45:8 52:1
141:19 194:8
213:17 230:24
235:22 265:24
272:2 298:4 306:5
324:23 340:11
**investigative**
30:13 32:5 38:19
39:25 40:3 90:18
94:16 101:3
123:11 165:15
276:24 277:11
300:25 301:2
342:1
**investigator** 7:23
8:3 15:16 25:16
30:3,5,7 31:2,11
33:8 34:12,23
35:17 41:6,8,10,11
41:14,15 50:6
52:21 67:12 73:5
76:22 95:12
105:17 120:19
121:17 122:6
125:7,7 129:9
130:21,23 131:1
131:18 133:14,17
135:22 137:9

141:21,24 142:3
142:10,10,13,16
142:21,23 143:18
143:22,25 145:3,4
146:24 147:12,17
149:10,16 153:23
154:12 160:7
164:23 165:8
183:23 188:3
190:6 203:20
206:12 212:10,11
214:19 217:19
218:18 247:11,11
247:23 248:5
250:13,23 253:21
266:14 267:4
268:6,10 270:19
290:12,25,25
291:7,15 292:3,24
294:14 297:22
298:4,24 299:5,7
304:12 305:4
307:7,7 320:23
321:9,11,12
325:24 334:3
338:1,2 341:12
**investigator's** 32:8
153:13 161:14
267:23 269:15
276:19 294:23
298:13
**investigators**
31:19 33:7 34:18
34:18,20 44:22
75:5 82:2 93:4
94:12 97:8 122:7
122:14,20 123:1,5
123:25 128:16
132:2 135:20
136:11,12 137:14
138:2,14,19 143:6

145:1,10 146:13
147:8 154:25
156:25 157:9
160:10 164:25
166:12 167:6
191:19 192:18
203:21 211:19
212:19 214:4
215:21 249:20
259:10 263:9
267:16 270:8,15
270:17,22 271:1,2
272:2 277:5 282:1
290:13 296:12
298:9,18 304:6
306:7 310:13
333:24 334:11,18
335:24 341:13
342:6
**invitation** 119:8
**involve** 65:14,15
**involved** 26:24
27:3 49:4 81:22
84:17 85:13 86:10
97:6 205:11 243:1
271:19 292:7
297:6 307:16
338:17,18
**involvement** 49:18
75:14
**irrelevant** 196:16
**issue** 88:7 125:24
132:7 200:12
211:17 244:20
245:6,11,21
**issued** 258:25
**issues** 52:9 77:13
86:9,11 127:15
132:3 245:7 253:6
319:24 335:25

**item** 72:2 253:17
**items** 74:19 75:10

**j**

**j&j** 14:6
**jackson** 5:3,6
  13:23
**jacksonkelly.com**
  5:5,9
**james** 4:4 14:17
**jane** 164:6
**janssen** 4:11 14:6
**january** 237:22
  242:5 311:8,16
  314:17 316:21
  334:7
**jean** 120:22
**jeopardize** 37:6
**jeter** 30:22 265:7
**jewelry** 181:22
**jim** 5:11
**job** 16:17 22:9,25
  23:4 27:10 38:6
  39:14 47:7,8 50:6
  58:13 66:22 89:10
  89:19 90:12,18
  125:12,15,25
  126:2 127:3
  132:20 215:21
  216:11,14 217:11
  218:14 247:20
  288:6
**jobs** 89:14
**joe** 305:24
**john** 2:9 105:4
**johnson** 4:11,11
**join** 42:16 276:13
**jones** 2:8 13:18,21
**jonesday.com**
  2:11,12
**journal** 24:12
  107:20 239:23

**judge** 1:8
**judgment** 89:11
  89:24 341:7
**judgments** 96:3
**july** 54:6 112:18
  189:14 221:7
  234:22 314:3
**jump** 198:20
  325:13
**jumps** 339:4
**june** 211:12
**jurisdiction** 144:9
  144:14 146:16
  147:1,20 179:10
  213:20 263:3
  304:12
**justice** 282:23
**justify** 91:8

**k**

**k** 5:7
**kearse** 2:3 13:11
  13:11 18:6 168:5
  169:3 228:11
  295:20,25 308:7
  308:12,18,24
  333:5
**keep** 30:22 115:8
  134:12 140:14
  179:1 209:9
  267:13 307:17
  308:19
**keeping** 151:22
**keeps** 118:16
  178:8
**kelly** 5:3,6 13:23
**kenmore** 176:16
**kent** 234:1
**kentucky** 162:24
**kept** 247:14 264:2
**key** 149:13,14,15

**keys** 326:3
**kid** 224:24
**kidding** 135:12
**kidneys** 335:18
**kids** 51:7 220:16
**kilo** 171:22
**kin** 36:5 38:16
  39:10,15,19 83:22
  84:3 92:9 148:9
  215:22 217:13
  268:20
**kind** 16:13 17:18
  19:3 23:15,21
  31:18 35:2,19,23
  35:25 36:2,3 50:8
  51:1 52:2,11 62:1
  62:23 65:15 77:20
  92:9,12,17 93:8
  95:25 96:1 103:3
  111:15 115:6,9
  122:1 126:1
  130:22 132:9
  138:15 143:10
  148:8 152:17
  154:14 170:9
  177:1 190:15
  193:12 194:3,9
  198:23 203:23
  207:21 208:4,12
  208:25 212:8
  222:25 224:17
  231:22 277:7,8
  282:20 285:4
  300:11 305:7
  306:11 328:13
  331:3 336:25
**kinds** 42:11 182:4
  292:25 320:18
**kirkland** 3:18
  14:21

**kirkland.com** 3:21
**kit** 71:17
**kits** 71:12 192:15
**knew** 104:6
  183:16 190:8
  191:14
**knocking** 215:23
**know** 16:23 17:4,6
  17:8,14 18:18
  20:19 22:2,13
  24:16 26:14 27:25
  28:7,17 29:4 33:8
  33:18,18 34:23
  35:18,21,22 36:1
  37:5,5,7,21,25
  38:2,4,8,10,12,22
  39:14,16,17,20
  41:16,24,25 42:3
  42:18,22,23,24
  43:19 45:8,9,10
  46:2 48:25 49:6,8
  49:10 50:5,8 51:8
  51:17 53:5,24,25
  54:11 55:4 56:20
  56:22,25 57:1,16
  58:3,14,18,20,23
  59:5,6 61:2,3,4
  62:16,19,22 64:9
  64:10,12,12,13,15
  64:16,17,18,19,25
  65:2,3,25 66:16
  67:14,19,20,21
  68:22 69:15,23,24
  70:5,8,15,16,17,22
  71:11,13,21,21,25
  72:8,10,22 74:17
  74:17,18,19 75:5
  75:16 76:2,3,5,8,8
  76:9,10,11,25 77:5
  77:13 79:22 80:22
  81:4,17,20,23,25

| | | | |
|---|---|---|---|
| 82:1,3,5,7,8,9,21 | 155:11 156:19 | 224:9,14,23,24,25 | 310:16,20 312:6,7 |
| 82:22 83:12,14,23 | 157:4,20 158:5,7 | 225:25 226:4,6,15 | 313:18 316:9 |
| 83:24 84:2,23,23 | 158:16 160:1,8,19 | 226:16,17,19 | 318:10,19 319:3 |
| 84:25 85:12,18 | 163:1,2,3,5,14 | 227:5 231:3,7,10 | 319:22 320:5,10 |
| 86:4,9,22 87:2,11 | 164:2,5,10 165:4,9 | 231:22 233:21,25 | 321:9,13,21,25 |
| 87:14,19,25 88:6,7 | 166:3,22 167:22 | 236:20,23 237:24 | 323:8,9 324:12,12 |
| 89:1 90:8,9,10,24 | 170:7 171:19,22 | 239:23 241:1,5,5,9 | 325:2,5,7 326:2,5 |
| 91:1,2,2,7,8,9 92:4 | 172:7,13 173:11 | 243:16,17 244:24 | 326:18 327:13,14 |
| 92:23,24 93:2,4,5 | 173:13,19,20,24 | 244:25 246:12,17 | 328:1,12,15,19 |
| 94:1 95:3,10,13,18 | 176:1,5,25 177:1 | 246:20,22,22 | 329:3 332:18 |
| 95:19,20 96:15,18 | 178:15 181:1,2,7,8 | 247:13 249:4,25 | 336:13,17,18,20 |
| 96:20,21,22 97:8,9 | 181:9,11,13,13,21 | 250:1 256:4 | 337:5,6,6 339:22 |
| 97:10 98:1,11,15 | 182:13,15,24,25 | 257:15 259:8 | 340:7,8,9,21,24 |
| 98:16,18,19,20 | 183:5,13,23 | 261:21,24 262:4,8 | 341:21 342:17 |
| 99:8 100:5,9,11,16 | 184:10,15 185:14 | 262:18 264:1,2,7 | **knowledge** 24:3 |
| 100:21 101:16 | 186:6,7,8,10 | 264:17,21 265:16 | 67:5 74:15,16 |
| 102:2 103:23 | 189:20,23 190:11 | 266:5,11,11,16 | 77:3,10 78:4 80:2 |
| 104:1,1,3,5,8 | 190:22 191:3,14 | 267:13,14 268:3,6 | 81:14 100:8 |
| 106:16,17,18 | 191:15,16 192:19 | 268:7,11,17 269:1 | 101:22 130:3 |
| 108:7,8 109:11,21 | 192:20,21,22,25 | 269:3,4,5,7,20 | 151:10 166:13,14 |
| 109:23,25 110:7,9 | 192:25 194:21 | 270:16,22 271:13 | 167:5 259:15 |
| 110:11 113:14 | 195:4,4,7,14 | 271:22 272:1,4,5 | 260:13 277:12,14 |
| 114:24 115:2,3,4,7 | 196:16,20,22 | 272:24 273:3 | 277:25 281:9 |
| 119:14,22 120:6 | 197:3,4,7,7,10 | 275:1,18,19,22 | 282:11 299:11 |
| 122:23 123:16,22 | 198:19,20 199:12 | 276:2,10 277:2,4 | 319:14 327:10 |
| 123:23 124:1 | 199:16 200:9,10 | 278:7,9 279:8 | **known** 76:23 |
| 125:5,6,10,13,15 | 200:20,22 202:24 | 280:7,15 281:7,8 | 79:21 181:19 |
| 125:21 127:7 | 203:1,15,18,19,21 | 282:2,10,11,17,20 | 215:12 240:25 |
| 128:15,17 129:16 | 203:22 204:8,22 | 283:1,2,3,4,5 | 282:23 319:14 |
| 130:17,21 131:3,5 | 204:25 205:6,9,12 | 284:2 285:7,11,14 | 331:17 |
| 131:20,24 132:10 | 205:13,14 206:19 | 285:15,20 286:3,5 | **knows** 197:3 |
| 132:12,21 133:18 | 207:6 208:21 | 286:8,25 287:18 | 231:14 |
| 133:20,22 135:12 | 209:10,12 210:14 | 288:4,19 289:22 | **kohler** 7:12 19:18 |
| 135:14 136:1,2 | 210:20,24 211:23 | 293:4,17 296:6,9 | 19:22 27:9 40:4,5 |
| 137:17 140:15 | 212:18,19 213:3,3 | 296:19 297:12 | 40:16 45:9 58:8 |
| 141:2,24,25 142:5 | 213:8 214:16 | 298:2,17,20 | 63:11 73:9 75:2 |
| 143:21 145:9 | 215:10,13,16,18 | 299:22,25 303:15 | 85:6 91:6 94:5 |
| 148:8 149:8 150:4 | 215:19 216:2,4,6 | 304:10 305:13,16 | 98:9 107:14 132:9 |
| 150:22 151:13 | 217:7,18,20 218:4 | 305:24 306:1 | 141:2,7,9 144:11 |
| 152:2,4,7,14,17 | 219:6,15 222:17 | 307:12 308:2,11 | 157:10 160:13 |
| 153:6,13 154:13 | 222:24 223:2 | 308:14,16 309:23 | 161:2,16 165:5 |

192:13 201:22
202:12,16,22
204:22 205:4,10
207:16 211:6
212:18,22 214:15
219:22 221:3
222:9 223:13
233:18 234:6,8,17
235:7,13 243:24
244:11,19 253:4,4
253:6 262:4 268:9
269:15,18 284:8
284:25 296:11
307:10 312:2
322:19 323:5
324:13 333:22
334:4
**kohler's** 57:24
58:1 235:15
**krier** 261:22
**kristen** 2:4 13:13
347:5
**kristenmhermiz**
2:6
**kronos** 139:16
140:5,21 158:25

**l**

**l** 1:25 120:20
345:6 346:12
**l.p.** 1:10 2:17
**lab** 70:9 125:19
190:1 199:25
230:5 274:4
331:19 342:4
**label** 113:5 279:9
279:14,22,25
292:17
**labeled** 157:17,18
**labeling** 278:24
279:2

**labels** 60:7 279:3,6
280:2,6 291:17
**labs** 55:3 190:2
199:17 231:15
270:2
**lacking** 313:16
**lady** 216:20
**laid** 224:13 252:25
**laidley** 5:4
**lane** 77:20
**language** 173:9
**lapse** 46:5
**large** 23:11 95:2
97:19 99:6 113:2
114:10 188:2
200:8
**larger** 212:15,16
**lasted** 20:11 21:3
**late** 28:3 67:18
183:24
**law** 25:8 35:4 36:1
36:23 37:12,17,18
38:9,11 43:3 51:8
61:8,18,24 62:4,11
65:24,25 66:14
70:5,12 71:10
83:24,25 131:15
226:13 255:12
263:2 271:12,23
326:19
**law.com** 3:12
**lawful** 14:25
**laws** 62:17 66:16
**lawsuit** 23:22 24:8
24:20 25:1,4
27:17 58:20 261:8
**lax** 192:11
**layperson** 91:10
99:7
**layperson's** 95:1
98:4

**lead** 39:21 72:15
94:22
**leadership** 26:23
**leading** 113:9
**learn** 18:15 194:11
194:17
**learned** 24:8 27:16
114:2 218:6
**learning** 131:18
131:19
**leave** 36:22 37:4
75:5 99:21 106:5
107:14 123:4
124:19 125:20
126:8,25,25 146:7
208:1,7 280:16
293:24 337:10
341:6
**led** 81:17 187:15
**ledger** 157:16
**leeway** 168:7
**left** 42:14 124:25
125:16,22 127:23
135:16 152:6,16
187:1 212:4
222:19 313:7,9,10
332:3
**legal** 36:4 83:22
84:2 110:1 198:2
198:5,13 232:6
330:18 347:1
350:1
**legally** 217:25
284:20 299:18
**legitimately**
167:22
**lethal** 188:5 189:8
**letter** 308:19
343:8,13,15
347:19

**letters** 44:19
**level** 141:23
277:10
**levels** 113:18
337:9
**license** 79:22
80:18 81:8,15,18
81:21 86:3 96:21
**licenses** 47:15,23
**licensing** 165:16
**lieutenant** 122:2
**life** 169:8
**likes** 215:22
**likewise** 104:24
194:17
**limit** 148:15
**limitations** 275:11
275:14
**limited** 156:19
213:19
**line** 41:13 74:19
134:9 157:9 167:6
174:9 180:15
213:12 229:15,16
234:7 242:3
254:24 255:1
347:13 349:7
350:3
**lines** 223:3
**lisa** 7:12 201:22
**list** 93:1 111:11
126:24 238:16
242:4,23 261:24
309:4 311:5
333:23 339:2
**listed** 219:16
220:2 221:9
229:14 243:17
293:2 295:17
349:7,17

**listen** 130:23
**listing** 8:12,15,17
  8:19 221:25 289:7
  289:13 295:3,9
  349:7
**lists** 152:3 175:24
  219:22 227:17
  242:9 243:13
**litigation** 1:6 13:5
  23:13 205:15
  343:9,13 347:6
  348:3 349:3
**little** 26:17 27:1
  38:13 39:18 58:19
  117:19 131:4
  134:11 147:25
  173:13 192:11
  227:24 249:21
  251:15 274:21
  284:5 287:5 305:2
  306:22 318:2
  325:14 326:10
**live** 226:2
**lived** 127:9 163:5
**liver** 335:18
**lives** 132:22
  307:23
**living** 42:22,25
  163:3
**llc** 3:17
**llp** 2:18 3:14,18
  4:12
**loan** 213:22
**local** 93:6 163:7
**located** 261:20
  275:16 301:19
**lock** 149:12
**locked** 149:10
  150:1,2,17 153:23
**log** 63:5 139:15
  149:25 154:6

156:9 279:6 290:7
  292:24 293:10
  296:12
**logged** 155:8
  293:1
**logistics** 207:5
**logs** 290:6
**long** 20:11 21:2
  30:17 41:5 49:4,9
  49:15 64:19 83:15
  124:23 126:5
  131:22 132:25
  133:4 137:1,3
  139:18 173:11
  183:21 184:2
  267:22 279:16
  284:3 307:2,4
  312:10 314:12
  324:8 335:14
  342:17
**longer** 120:9,15,24
  256:10 268:18
  334:8 335:19
**look** 63:6,6 64:25
  65:1,6 70:24
  118:24 119:24
  154:20,22 155:4
  158:17 174:7
  182:11 185:9
  200:22 206:19
  227:1,1 228:21
  231:21 235:24
  236:12 242:13
  244:1 245:18
  251:19 273:6
  274:9 281:15,21
  281:22 282:1
  283:2,5 292:3,8
  294:11 298:8,10
  298:11 303:10,23
  306:17 314:23

315:4,7 322:8
  324:16
**looked** 90:21
  159:7 187:20
  239:22 243:3,10
  296:17 303:13
**looking** 82:4 86:6
  157:23 190:25
  195:10,12 223:6
  256:4 273:24
  279:6 282:5,20
  298:12,21 300:14
  313:22 322:16
  325:15 341:15
**lookout** 231:4
**looks** 136:9 218:22
  220:15 221:14
  222:23 227:12
  231:23 239:1,2
  242:12 274:18
  320:9,11 334:2
**loose** 70:22 302:6
**looseleaf** 265:19
**lorain** 229:24
  230:4
**los** 3:6
**lose** 124:21
**losing** 80:17 81:7
  81:18 86:2 124:20
**loss** 53:10
**lost** 53:7 79:22
  81:15,20 148:23
  155:22
**lot** 30:20 37:5,14
  42:18,22 54:25
  58:6 61:3 64:17
  67:22 68:5,5 70:8
  92:2 95:10 109:13
  111:9 127:20
  152:7 157:23
  165:3 168:7

178:12 191:3
  192:21 195:9,13
  197:4 202:20
  210:24 224:23
  225:25 226:15,16
  226:19,25 247:12
  268:18 271:7
  281:25 287:16,20
  298:6,10 303:13
  305:13 306:18
  318:19 320:15,22
  320:24 321:2
  326:16 340:5
  341:21
**lots** 177:22
**louis** 46:16,20
**low** 75:4,7 139:7
  211:11
**lower** 141:22
  203:24
**lucky** 182:15
**lunch** 57:15
  117:20 134:13
  135:8 157:7
  163:25 166:3
  179:20 211:18
  319:19,19
**luncheon** 134:20

**m**

**m** 2:4,8 3:9 347:5
**m.d.** 96:20
**ma'am** 277:21
**machines** 199:15
**madam** 347:10
**magnifying**
  206:15
**mail** 7:7,12,14,16
  7:17,19,20,22 8:5
  8:20 168:20 169:5
  169:16,21 170:1,5
  201:22 202:15

205:23 206:6
207:3 229:4,8,10
229:14,17 230:15
233:7,18,23 234:3
234:6 235:10,24
236:3,14,17
237:25 241:13,20
242:13 243:10
244:3,6 254:11,17
255:1,4,15 256:2
256:25 315:10,21
315:22 322:18
333:17,22
**mailed** 242:2
334:5
**mails** 29:8 236:8
**main** 4:13 5:7
261:21,23
**maintain** 29:13,19
165:1,2,10
**maintained** 30:6
30:14,15 253:20
263:16 264:6
267:6
**maintaining** 149:2
**major** 245:3
**majority** 65:9
67:15 68:7,15
110:17 165:1
178:2 182:13,16
234:24 262:25
**making** 36:4 80:11
98:14 132:23
236:25 249:16
310:18 325:20
**male** 98:16 215:9
320:7
**males** 320:11
**mallinckrodt** 2:13
**man** 139:7 219:23

**management** 60:4
167:25 249:2,5,12
**manhours** 76:24
76:25
**manna** 1:20
**manner** 72:3 73:2
73:6,15 160:14
195:11,25 196:15
218:9
**manning** 143:11
**manslaughter**
271:20
**manual** 7:23 8:3
31:11 32:7,8,14,16
40:3 145:23 149:2
158:13 247:23
248:6,14 250:13
250:23 252:16,24
254:2 266:8,9
276:20 334:3
**manually** 332:13
**manuals** 31:3,21
39:25 265:18,20
265:21,23 266:3
**manufacture**
161:22
**manufacturer**
117:9 201:3,6
232:25 240:5
280:22 281:11
**manufacturers**
200:5 281:1,4
**map** 127:12
**marathon** 17:1
**marcus** 4:3,6
14:18
**mark** 117:22
118:11,13 168:16
201:19 205:20
228:24 233:3
235:25 241:12

244:2
**marked** 7:3 118:5
118:22 121:14
168:23 169:4,9,13
186:17,20 201:25
205:25 206:3,18
229:4,7 233:8
236:4 241:21
244:7 248:1,4
250:16,20 254:12
257:3 258:18,23
259:24 289:8,15
289:19 295:4,10
295:14,23 333:18
333:21
**market** 1:21 329:3
330:2,3,9,11 331:5
**marketed** 278:2
**marketing** 73:21
277:23
**mask** 191:21
**masks** 191:24
**master's** 130:1
**masters** 4:8 14:8,8
**match** 69:11
231:22
**matched** 69:5
**material** 84:21
107:8
**materials** 28:23
31:5,6 255:9
**math** 174:19 318:6
**matter** 91:22
231:19 302:17
**max** 173:20
**maximum** 123:21
**mcconnell** 2:9
**mcginness** 2:3
**mckesson** 3:13
14:20

**md** 1:7 13:6
**mdl** 1:6 13:5
**me's** 299:8,8 328:6
**meadow** 15:23
**mean** 26:13 31:21
49:9 63:25 90:10
93:23 109:15
116:18 125:9
132:11,19 133:2
135:21 139:25
140:22 160:19
171:3 183:19,20
185:13 186:8
192:4 195:10,12
200:19 209:20
212:25 220:23
239:13 242:5
243:19 250:8
268:1 269:24
271:16 272:2
285:14 292:6
294:18 296:16
297:21 299:18
302:1,7 303:21
307:23 309:23
318:18 319:17
325:10 329:4
330:10,11
**meaning** 291:10
311:7 328:5
**meanings** 131:24
**means** 155:12
174:19 237:24
239:14 316:12
338:8
**meant** 279:15
**measures** 193:7
**mechanically**
207:24 238:6
**media** 65:3 108:13
157:7 187:14

210:22 236:25
247:8,10 319:25
320:2,14,17,18
321:20,24
**media's** 322:2
**medical** 7:5 8:7,10
8:12,14 15:17
19:19 23:2 24:19
25:18 26:1,24
31:5 32:4,23 40:7
41:19 42:16 45:6
48:2 64:13 72:25
74:7,14 80:3
81:24 83:17,20
84:7,12,16 85:1,20
86:4,24 87:12,20
89:16 90:25 91:3
91:5,7,18 92:12,20
93:6,16 96:3,12,19
97:13 99:12,18
100:12 102:13
106:5,15 107:1,20
118:3 120:9,17
122:10 127:11
130:7 131:19,22
144:14 146:25
147:6 151:12
162:21 164:18
166:25 168:3
174:9,21 184:3
186:1 188:3
197:15 210:2
245:22 252:8,11
255:19 258:16,24
259:22 260:5
261:16 262:2,16
263:23 264:4
268:19 272:10
276:14,20 282:14
289:6,13 292:1
302:8,9,14,16,20

306:17 309:19
319:15 328:1,3,11
328:11 333:7
337:7,13,14
338:15 341:11
342:25
**medically** 80:13
89:25
**medication** 8:12
8:14 17:21 60:7
67:15 91:18 93:1
97:15 184:12,18
185:22 196:8,9
253:14,18 279:2
279:22 280:7
289:1,7,13 293:16
293:23 300:3
302:8 303:4 335:5
335:10,14,19,25
337:3
**medications** 60:11
67:19 100:24
107:9 149:5 195:6
278:1 280:12,22
296:22 302:11
335:6,15 337:8
**medicine** 44:13
166:4,16 167:3
**medicolegal** 44:18
44:21
**meds** 335:11
**medway** 25:19
26:5 43:20 44:6
**meet** 20:4 21:23
161:5
**meeting** 19:10
20:3,7,12,17,22,24
21:3,5,9,12 46:14
57:15,16 260:22
**meetings** 21:22
22:4 23:7,9,12

56:21 341:21
**member** 48:11,14
49:25 103:12,18
197:6 220:1 340:5
**members** 36:21
99:9 102:15,21,22
103:4 181:20
182:2 192:24
214:13 216:12
305:4 328:14
335:9 337:20
339:23
**memory** 17:25
**mental** 306:11
**mention** 17:15
**mentioned** 36:6
40:21 44:5 62:24
64:21 68:24 76:14
80:16 108:12
111:11 126:23
179:19 216:17
261:14 263:4,15
265:6,17 267:5
270:7 271:11
272:9,12 273:21
276:18
**mentoring** 128:19
**merging** 250:2
**message** 27:11
**messages** 227:2,6
**messenger** 75:12
**met** 15:9 18:11
20:21
**meth** 71:2 242:20
242:25
**methadone** 242:9
338:19
**methamphetamine**
111:12 114:9,12
114:18 235:1
329:16

**methamphetami...**
109:14
**mexico** 61:6
179:20
**michael** 229:10
**michigan** 162:23
**microfilm** 30:20
**mid** 64:12 153:10
158:4 276:16
320:7 321:8
**middle** 17:6
152:11 253:12
319:17
**midnight** 136:25
136:25 137:2
139:4,6,12 142:7
145:11
**midnights** 139:9
142:5 152:8
**midwest** 347:17
350:1
**mike** 120:19
**milligram** 230:1
**mimic** 230:1 232:3
232:5
**mimicking** 229:19
231:1
**mind** 51:12 88:25
153:4 215:11
218:6 318:9
**mine** 141:16
263:10
**minor** 251:7
**minute** 118:21
142:22 283:14
**minutes** 17:9
152:13,15 218:3
238:9 258:4 332:3
**mirror** 69:23
115:8

**mis** 86:13
**miscellaneous**
 151:25 293:4
**misconduct** 86:14
 86:15
**mishandling** 148:4
**misinformation**
 241:9
**misplaced** 148:24
**mistaken** 250:6
**mistakenly** 293:15
**misused** 148:10
**mix** 186:8,9 235:2
**mixed** 132:17
 186:1 191:6 226:7
 246:17
**mixture** 52:11
 70:4,5
**mom** 126:8 197:6
 305:24
**moment** 36:6
 60:17 65:18 256:9
 323:12
**monday** 138:19
 141:16 242:14
 270:16 273:5
**money** 181:23
 227:15
**month** 20:20
 159:9 215:17
 239:20
**monthly** 56:21
**months** 20:10
 42:19 56:13 68:2
 128:13 129:12,15
 129:17 131:11
 133:6 150:2,5
 151:4 215:8,8,18
 238:12
**morgue** 77:13,17
 120:18 307:5

**morgues** 213:12
**morning** 15:7,8
 136:15 144:25
 215:23 231:11
 270:23 298:15
**morphine** 179:25
 230:8
**motel** 224:3
**mother** 223:9
 224:2,6 327:12
**motley** 2:3 13:14
**motleyrice.com**
 2:6,6
**mouth** 325:5
**move** 153:10,14
 227:25 306:22
 312:11
**moved** 43:19 44:5
 136:24 153:10
 163:14 307:6
 309:5
**moving** 36:15
**mt** 2:5
**multiple** 63:15,15
 67:13 117:1
 219:19 220:11
 283:3 287:19,20
 328:19
**municipalities**
 213:22
**murdered** 49:1
**muscle** 329:20

**n**

**n** 236:16
**n.d.** 1:11
**n.w.** 3:19 4:9
**nail** 213:3
**name** 13:10 15:10
 15:12 80:25 85:12
 88:24 93:12
 121:19 133:25

 134:2 145:19
 154:20 155:9
 163:21 164:19
 165:7,11,17 197:9
 214:22 236:15
 261:7 275:2
 281:22 291:12
 293:19 296:19
 312:21 321:23
 347:6 348:3,4,15
 349:3,4,21
**named** 158:23
 345:9
**names** 58:23 80:22
 87:24 88:22,23
 110:7 121:4
 132:17 222:7
 241:3 301:4 333:8
**nap** 135:11
**narc** 171:21
**narcan** 177:15,23
 178:3,19 192:15
 193:3 239:12
**narcotic** 272:24
**narcotics** 42:18
 61:4 148:18
 151:14,22 165:21
 182:4 192:1
 226:20
**nation** 230:5
**national** 1:6 13:5
 50:22 164:18
 347:6 348:3 349:3
**native** 206:8
 233:13
**natural** 182:25
**nearly** 152:19
 187:24
**necessarily** 119:14
 168:8 189:19

**necessity** 80:3
**neck** 159:18,19
**need** 17:3,10,14
 38:12,13 39:21
 75:6,9,16 78:25
 120:1 135:13
 141:12 142:25
 143:16,17 149:9
 151:13 165:9,15
 165:16 167:22
 181:14 186:9
 192:6 195:25
 198:21 200:21
 212:13 214:5
 241:7 249:14
 258:5,7 263:24
 267:2 268:20
 269:7,10,20
 270:14,21,24
 271:3 273:1 282:5
 298:19,20 303:23
 305:25 313:15
**needed** 22:20
 34:21 144:5
 172:24 205:10
 225:12 241:10
 249:20
**needs** 27:7 36:1,2
 40:12 71:25 75:3
 75:23 168:3 191:2
 198:9 226:18
 241:6 248:25
 251:4 252:22
 253:10 298:17
**negative** 146:22
**neighborhood**
 51:2
**neighborhoods**
 50:24
**never** 133:1
 143:23 144:7

147:10 148:7
162:18 164:12
166:24 192:19
200:11,19 277:19
278:12 281:10
325:10 336:17,20
337:4,17,20
**new** 2:15,15,20,20
34:15 127:8,22
129:19 130:15
131:18 193:13,21
212:16 249:1,5,6
249:10,14,17,22
250:9 252:15
260:16 266:17
274:22 275:1
276:4
**newer** 124:21
**news** 66:2 108:16
115:5 191:15
210:7,20 238:13
247:10 281:8
**newspaper** 27:17
27:18 82:8 107:20
187:8 231:8
**newspapers** 86:8,8
191:15
**nick** 5:12 18:4,6
**night** 50:22 138:5
138:8,14,18
173:14 215:25
270:8,22 271:2
321:22,23,25
**nights** 42:25
**nighttime** 271:6
**nodding** 329:21
**non** 91:1 125:9
210:12 249:8
281:18
**noon** 134:12

**normal** 76:11
136:6 138:9 145:5
146:10
**normally** 138:12
195:2 203:25
312:10 325:19
**north** 3:11
**northern** 1:2 13:7
**notable** 111:7
115:13
**notarized** 347:14
**notary** 345:6
346:12 347:25
348:10,18 349:15
349:23 350:23
**note** 19:1 39:9
75:5 92:8 99:16
102:25 103:21
133:18 292:12
293:17 332:11
340:2 347:12
**notebooks** 267:10
267:11
**noted** 38:19
175:16 189:10
**notepad** 263:12
**notes** 30:11 38:21
170:24 174:1
212:12,17 267:5,6
267:7,9,11,12,17
267:19 275:22
325:15
**notice** 29:3,7
323:15
**noticed** 297:9
306:16
**notification** 28:23
36:4
**notifications**
132:24

**notified** 38:3
39:15 215:22
**notifying** 38:14
217:13,14,22
**november** 218:23
237:9
**now's** 79:2
**nowadays** 70:6
**number** 7:3,6,8,13
7:15,19,21,24 8:4
8:6,8,10,17,19,21
13:6,6 35:12
78:11 97:20 98:3
98:10 104:14
109:10 115:14
116:19 118:4
122:13 136:9
145:20 155:15
164:7 168:22
169:6 171:21
174:25 175:10
178:25 179:4,7
197:9 199:10
201:24 202:5
205:24 209:12
220:14,14,15,16
221:17 233:11,15
236:3 239:25
241:20 244:22
247:6,25 248:10
250:15 253:17
254:11 258:17
259:23 269:8
291:10,12 295:3,9
306:2,16 315:5,6
317:4 322:25
324:7 326:13
333:17 347:7,13
**numbered** 7:22
8:13,15 244:6
258:25 289:7,14

**numbers** 65:5
70:24 113:13,15
113:15,17,23,25
114:5,20,24 142:8
158:17,19 171:10
175:17 177:20
178:14 179:2
181:10 205:12
209:11 234:19
236:23 237:10
239:3 241:2
244:21 251:15,15
316:13 317:25
318:5 320:3,10,13
322:20 323:15
324:13,16 325:12
349:7
**nurse** 95:14 96:25
262:17
**nurses** 131:21
191:16 218:2
**nursing** 34:25
**nw** 3:10

**o**

**o** 63:1 236:16
**o'gorman** 2:19 6:9
13:25,25 261:5,7
283:7
**oarrs** 62:20,25
92:24 93:15 94:6
162:7 296:4,7,16
**oath** 26:18
**object** 230:14
**objection** 9:3,3,4,4
9:5,5,6,6,7,7,8,8,9
9:9,10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24

9:25 10:3,3,4,4,5,5
10:6,6,7,7,8,8,9,9
10:10,10,11,11,12
10:12,13,13,14,14
10:15,15,16,16,17
10:17,18,18,19,19
10:20,20,21,21,22
10:22,23,23,24,24
10:25 11:3,3,4,4,5
11:5,6,6,7,7,8,8,9
11:9,10,10,11,11
11:12,12,13,13,14
11:14,15,15,16,16
11:17,17,18,18,19
11:19,20,20,21,21
11:22,22,23,23,24
11:24,25 12:3,3,4
12:4 19:3,5 31:8
35:10 36:24 39:13
54:9 62:6 63:21
66:24 67:8 68:11
69:7,17 72:5
75:25 78:8 80:19
82:17 86:17 89:8
90:1 91:20 93:20
94:18 96:5 99:11
101:6,25 102:9
103:6,22 104:13
104:16,21 105:22
107:11 110:6
111:8 112:13
113:12,24 114:13
114:19 115:15,22
116:6,14 146:21
153:2 160:18
161:1,18 167:20
168:2 172:20
178:6 181:5 183:7
184:13,25 185:5
186:3 188:17
189:3 190:10

193:15,25 194:14
194:25 198:15
200:6 201:4,11,17
203:17 205:16
215:2 217:17
224:21 228:19
230:17 232:7
239:10 240:7,12
240:17,24 243:15
253:1 254:5
264:10,15,24
265:3,22 267:25
271:15 272:18
274:19 275:25
276:25 277:13
280:5,13,20 281:6
286:2,6 287:17
288:1,22 294:17
297:7 299:17
300:20 301:13,18
304:2,24 305:12
306:13,15 311:21
313:17 316:8
317:21 318:23
319:16 321:4,17
322:6 324:10,24
327:8,24 329:5
330:17,22 338:5
339:16 340:3
**objections** 6:5 9:1
10:1 11:1 12:1
**obligations** 141:15
**observe** 96:1
131:2
**observed** 235:21
**obtain** 44:24 45:3
62:21 83:6 269:23
289:2 296:7
302:18,20 323:9
335:10

**obtained** 286:24
288:15,20,20
300:8,17 301:12
328:24 330:9,15
336:11,12 337:7
**obtaining** 268:5
329:9
**obtains** 296:16
**obvious** 21:18
163:10
**obviously** 185:14
210:17
**occasion** 280:21
**occasions** 141:1,8
**occur** 20:17 65:7
**occurred** 205:3
321:25
**october** 1:15 13:2
20:20,21 21:5,8,11
234:6 346:6,15
347:4
**od** 234:21 242:3
335:8
**offer** 127:20,21
141:5 195:3
**offhand** 20:9
51:13 52:14
161:19 233:22
**office** 8:7,12,14
15:17,18 18:7,7
23:2 24:19 25:18
26:2,14 30:17
31:6,23 32:23
34:11 36:1 41:19
42:6,16 52:1 55:1
55:2 58:7,11 63:4
64:24 67:17,20,23
68:3 72:16 73:1
74:4,6,15 76:8
78:12 81:22 82:15
83:6,13 84:21

85:6 86:21 87:7
87:21 89:3,6
93:17 95:12,14
96:24 108:24
110:17 120:10
122:10 127:11
129:13,21 130:22
144:10,14,19,20
144:24 145:14,18
145:20 146:15
147:1 151:8,12,17
154:10 160:15
163:23 165:6
166:5,17 174:10
174:21 182:14
184:3 188:4
189:15 190:14
192:16,21 193:2
193:12,18 209:23
211:25 212:4
223:22 229:24
230:25 237:1
239:9 253:19
255:19 257:17
258:15,24 259:17
261:16 263:24
264:11 265:18
266:4 269:4
271:23 272:10
278:8,9 285:4
289:6,12 291:20
292:1 296:6,14
298:18 299:8
307:11 309:20
319:15,15,21
328:6 330:7 334:7
341:11 342:25
343:5 346:5
**office's** 190:1
245:22 260:12

| | | | |
|---|---|---|---|
| **officer** 43:10 53:5 | 47:8,18 48:19 | 189:13 190:5,13 | 323:2,14,22 |
| 131:16 134:4 | 50:12 51:15,21 | 191:12 193:6 | 324:18,20 326:9 |
| **officers** 61:3 | 52:8 54:20 55:24 | 196:18 197:19,22 | 326:12 328:22,25 |
| **offices** 151:17 | 56:14 57:13 58:18 | 198:4,17 199:3 | 331:24 334:4 |
| 278:6 | 61:17 62:24 63:19 | 200:2 201:7 | 337:23 339:5,21 |
| **official** 16:10 | 64:7 66:7 67:3 | 202:14 205:14,19 | 341:6 342:13 |
| 72:24 118:16 | 68:7 74:13 75:1 | 207:24 208:5,18 | 343:7,12,17 |
| 348:15 349:21 | 75:11 77:5,19,24 | 210:4 211:4 | **old** 98:16 125:11 |
| **officially** 312:8,9 | 78:24 79:3,4,13,15 | 213:25 214:22 | 140:12 157:16,16 |
| **officials** 62:4,11 | 81:2,6 82:12 | 217:11 221:2,7 | 177:2 219:23 |
| **oh** 58:5 92:3 | 84:15 85:11 86:1 | 222:12 223:2,12 | 220:4 221:1,18 |
| 122:18 143:5 | 86:19 87:1,11,18 | 227:7,17 229:7,12 | 263:10,25,25 |
| 159:9 164:6 | 89:15 90:13 91:13 | 229:19,22 230:16 | 274:23 282:14 |
| 180:16 218:3 | 91:14 94:20,25 | 230:19,23 232:9 | 309:4 |
| 269:7 299:24 | 97:25 99:4,14,24 | 232:13 233:23 | **older** 65:16 120:6 |
| 331:24 | 101:18,21 102:5 | 234:5 235:11,11 | 153:11 264:20,20 |
| **ohio** 1:2,9,11,22 | 107:19,22 110:25 | 235:24 237:16 | 264:21 297:25 |
| 2:10 3:11 4:14 5:8 | 114:25 116:17,20 | 240:2 241:16 | **olds** 282:16,19 |
| 7:10 8:16,18 13:8 | 116:21 117:22 | 244:1,17 247:17 | **once** 19:6 20:21 |
| 15:24 43:7,9 | 118:8,19 119:4,17 | 251:10,20,23 | 24:9 30:7 35:17 |
| 46:13,13 166:7,10 | 119:21 120:1,16 | 252:1,7,13 253:5 | 45:12,18 50:23 |
| 166:16 167:2 | 121:2,7,10,12 | 253:11 255:17 | 72:20 130:11 |
| 175:20 186:16 | 122:1,19 130:10 | 256:7 257:7,24 | 132:6 149:5,8,8,24 |
| 187:8 223:8 | 130:16 133:16 | 258:8 259:15 | 183:22 190:18 |
| 236:17 244:12 | 134:6 135:8,14,15 | 260:15,24 262:11 | 191:14 192:12 |
| 295:2,8 296:4 | 137:12,25 138:7 | 263:4 264:22 | 202:6 239:24 |
| 345:2,7 346:6,13 | 141:5 143:23 | 265:12 267:4 | 264:12 266:21 |
| 347:2 | 144:9,23 146:17 | 270:7 273:1 | 267:12,14 269:15 |
| **okay** 13:18 16:24 | 147:5,24 155:22 | 277:15 278:15 | 291:6 320:4 |
| 16:25 17:11,12,15 | 156:6,11,25 | 284:7,12,13,17,25 | 321:11 325:25 |
| 17:16 18:3,17,21 | 158:12 159:20 | 285:13,18 286:12 | **ones** 26:4 73:14 |
| 18:22 19:8 20:24 | 161:8,20 162:19 | 286:14 288:11 | 222:6 246:24,25 |
| 21:16,20 22:11 | 164:15 165:20 | 289:20 290:1,16 | 312:1 335:8 |
| 23:6,11 24:16,18 | 166:2 168:4 | 295:24 297:19 | **online** 187:21 |
| 25:24 26:20 28:10 | 169:15,22,24 | 298:3 301:5,6 | 231:21 |
| 28:13,18,20,21 | 170:11 171:1,6 | 304:14 305:2 | **op** 1:11 |
| 29:22 31:2 32:2 | 172:15 174:6,15 | 306:4 310:19,22 | **open** 119:8 125:13 |
| 32:14 33:3 37:2 | 179:3 180:16 | 311:15 312:19,23 | 144:20 228:7 |
| 37:11 38:17 40:8 | 181:3 183:1,4,10 | 314:4,8,11,15,21 | 273:19 |
| 40:14,18,21 42:8 | 185:2 186:11 | 314:24 315:6,25 | **opening** 125:12 |
| 43:9 44:9 45:24 | 187:2,7 188:23 | 321:7 322:15 | |

**opiate** 1:6 13:5
62:18 64:20 65:15
76:21 77:11 88:2
91:1 167:22 195:2
205:11 206:11,13
227:8 232:25
278:1 285:2,8,12
286:11,15 347:6
348:3 349:3
**opiates** 55:5,9,14
55:18 58:2 91:13
106:21 197:25
220:5 228:10
285:23 286:1,14
288:14
**opinion** 24:25 25:4
95:1 98:4 102:7
105:20 106:12
107:7 239:11
279:21
**opinions** 79:18
160:11 168:9
249:18
**opioid** 23:13 52:10
54:16,18 60:10
68:4 75:24 78:11
78:15 116:23
117:3,6 163:16
184:10,18 188:1
193:14,19 194:12
194:23 199:4,20
229:15 240:4,10
240:15 279:2,22
280:22 281:1,4,4
284:15,19,19
285:3,8,17 299:16
300:16 301:5
**opioids** 52:9 54:24
56:25 66:5 67:1,7
68:20 74:1 85:7
85:15,21 86:16

87:22 88:3 101:13
101:24 106:9,11
107:23 108:1,6
161:22 162:1,5
167:18,25 168:13
177:16 178:20
182:9 183:15
184:4 185:3
194:19 198:1,14
217:9 219:7
221:12,23 278:17
286:5,9 288:13
300:9 329:3,18
**opportunities** 26:8
**opposed** 97:17
157:9
**option** 265:5
**options** 161:6
311:5,9,14
**order** 76:2,10 83:4
91:3,18,24 92:5
95:15 150:6,10,15
150:16 163:23
268:25 277:2
291:13 292:9
298:22 302:8
332:13
**ordering** 73:11
90:24 91:5 95:16
162:12 270:21
**orders** 83:25
150:23 270:25
**ordinary** 35:8
125:2
**organization**
48:20 49:5,13,14
84:5 108:4 121:13
**organizational** 7:5
117:23 118:3,21
120:3

**organizations**
48:12,15 320:19
**organize** 136:11
227:24
**original** 30:11
152:5 196:7
**originally** 149:10
241:11
**osha** 38:8
**outcome** 85:14
**outline** 170:10
**output** 240:22
**outside** 102:3,4
147:2 151:7
192:20 203:24
213:23 231:16
262:23 270:2
304:11
**overall** 51:25 55:2
**overdose** 7:11
38:10 53:11,12
64:3 65:14 72:19
85:14 87:21 91:1
104:2,14,17
105:19 106:11
110:3,12 113:9,23
115:14 159:7
160:1,6 174:10
175:1,6,11,20,25
177:10,12,13,22
178:5 182:20
183:5,20 184:10
184:17,24 185:6
186:16 187:9,24
189:18,19 191:17
199:4,6,10 208:25
210:23,25 214:19
215:7 217:13,14
218:24 219:4,10
219:13,16,18,24
221:9,20,24

222:18 226:1
234:20,23,24
235:17 236:22
237:8,24 238:24
239:3,8 242:4
246:19,21,22
273:7 282:13
283:6 301:4
304:22 306:8
309:24 310:9
311:14,17 312:4,8
314:6,23 315:2
316:15,19,24
319:6 322:2,25
323:16,21 324:8
324:22 330:8
335:1,3 336:1
338:12
**overdosed** 102:6
185:3 210:9,16,21
215:9 216:20,23
217:5
**overdoses** 64:10
64:15 65:4 75:24
76:21 77:11 88:2
104:11,19 110:8
110:17 113:3,17
159:14,19 174:16
174:22 175:2,10
177:6 178:16
179:9 182:12,12
182:17 193:14,20
195:3 199:9,12,20
200:7,12,23
209:10 215:19
216:2 232:17,21
232:25 237:11,23
238:11,16 239:13
244:21 246:24
247:2,6 282:19
311:19 314:18

Page 41

317:2 320:21
325:6
overdosing 224:16
overnight 138:4,8
138:25 144:23
overreported
160:17,20
overruns 205:3
oversee 140:19
overtime 76:23
77:9,22,25 78:5
137:23 140:25
141:6 198:11
overview 35:7
130:13
overwhelmed
211:23 212:15
overwhelming
68:7
oxford 4:4
oxycodone 98:21
186:10 219:16,17
229:20 230:1,3
231:1 285:25
286:9,20 289:1
300:16 301:10
oxycontin 185:8
186:10 219:12
289:2 302:6

p

p.m. 136:14
141:17 144:25
234:6 343:24
packaged 273:18
packaging 207:21
padlock 153:7
padlocks 149:11
149:13
page 118:24 119:3
170:3,6 171:18
174:8 187:1,23

197:23 202:14
206:6,10,13 211:4
213:11 223:7
228:8,14 229:8,17
229:23 233:14
234:2 235:12
236:11,11,14
238:8,22 242:1,12
244:3,11 251:16
252:3,5,13,13,14
253:11,13,17
256:7,7 322:24
323:17 335:1,3
347:13,15 349:7
350:3
pages 169:11
206:9 207:2 229:8
236:10 252:18
255:4
paid 212:2
pain 60:4 88:6
106:17 167:22,25
painkiller 284:16
284:17,19
painkillers 62:18
panel 52:12 53:4
53:22 54:12 170:8
paper 24:10,11
82:22 86:7 119:11
169:19 170:5
171:2 263:6,18,20
265:18 275:24
279:17 318:16
319:6,12
papers 107:25
par 3:3,3 14:15
paragraph 171:24
174:7 176:8,9
179:12 211:8
252:10 315:24

paralegal 18:7
paramedic 263:1
paramedics
191:17 239:15
parameters 238:5
paraphernalia
283:4
parent 53:7
215:17,24 224:24
225:1
parents 52:12 53:7
127:8 176:23
210:15 216:3
part 30:15 49:22
57:9 77:17 78:9
87:15 89:19 90:19
114:7 119:12
126:15,15 209:22
215:21 216:2,3
245:10 246:5,25
254:2 263:21
269:15 270:16
280:23 281:14
295:18 349:9
participated 24:4
46:19 278:12
participation 58:8
particular 53:10
79:20 80:7 89:24
97:14 101:24
119:12 240:4,9,10
240:16 277:1
280:18 314:25
332:17 334:13
339:25
particularly
119:20
partners 305:5
party 346:2
pass 45:15,18
89:11

passed 45:20 82:1
82:6 89:23 216:13
224:15 230:9
passing 98:11,18
patch 325:3,4
patches 109:23
110:10,11
path 72:13
pathologist 211:20
266:7
pathologists
211:24 243:18
pathology 48:6
patience 130:19
patient 83:18
84:11,16 85:1,8
86:15 90:25 93:17
94:6 95:21 98:10
101:24 102:13
110:4 130:24
184:17,22 280:18
293:13 294:16
297:16 299:15
301:10,11 303:17
303:18
patient's 100:17
337:18
patients 86:14
100:25 109:23
306:9 332:16
patrick 3:14 14:19
120:22 306:24
309:18
patrol 226:21
pattern 115:20
paul 3:19 14:21
paul.weeks 3:21
pause 19:4
pawned 181:23
pay 17:13 139:8
227:16

pcarey 3:16
pd 36:8 71:16
peace 43:10
peak 113:18
  115:20
pelini 3:9,12 14:3
pellegrino 1:25
  345:6 346:12
pen 120:13 122:17
pendency 24:20
pending 133:20
pennsylvania 4:5
  162:23 163:11,15
  163:17,18 164:13
penny 225:5
people 64:11 65:3
  88:1 104:10,14
  108:7 113:3 120:4
  120:8,14 124:18
  127:24 131:14
  146:4 149:17
  152:19 167:21
  178:2,10 181:14
  183:16 185:3,6,18
  185:21 189:1
  192:10 207:5
  209:8,18,21,23
  210:25 215:12
  216:7 222:8
  231:14 239:24,25
  247:1 267:7
  270:13 271:9
  281:17 295:17
  305:14 327:7,18
  327:25 329:8
percent 65:14
  85:24 87:17
  147:17 183:8
  204:24 318:3,6,7
  325:24

percentage 91:11
  91:15 161:4 176:5
  184:11 188:15
  319:7
percentages 318:8
perch 172:9,10,12
  173:5 188:24,25
  189:18,22,23
  190:3,18 192:17
  199:11 220:12
  229:10 231:4
  232:10 274:7
  342:3
percocet 181:9
  185:8
performance 22:9
  22:25 27:4 29:10
  132:3,7
performed 259:9
period 26:9 29:16
  41:9 68:9 108:9
  123:2 127:23
  128:7 129:5 132:1
  132:14 133:9,11
  140:16 193:11
  204:14 235:22
  264:7,13 270:5
periodical 234:2
periodically
  236:22
permission 257:18
  268:20
person 35:20 38:5
  39:17,17 42:4
  64:12,19 74:24
  90:9,16,22 91:2,22
  92:1 95:11 101:5
  102:23 104:4
  106:13 124:10
  125:14 128:12,19
  129:5,14 132:8

139:2 146:2
152:20 154:15
155:10 163:2,2
185:10,12 192:23
197:3 261:15
262:23 269:7
273:6 283:2
288:24,25 291:5
298:21 299:20
300:8 301:16,21
302:2,7 303:3
304:10 307:2,4
313:20 325:3
326:3 335:6,11
338:14 339:12
340:11,21,22,23
person's 49:1
  341:1
personal 59:1
  66:21 67:5 116:23
  117:10,16 148:4,8
  257:9,13 327:9
  332:15
personally 40:9
  53:18 58:22 71:14
  79:21 81:12
  102:17 117:3
  142:17 159:7
  166:11 168:12
  176:20 207:19
  236:23 259:14
  267:9 278:10
  348:11 349:15
personnel 51:11
  128:10 227:18
persons 65:16
perspective
  161:14 189:1
  218:13 267:24
pertains 161:25

pertinent 30:8
  252:11
pharma 1:10 2:17
  2:17
pharmaceutical
  3:3 200:4 201:10
  277:17,20,23
  278:6,24 280:4
pharmaceuticals
  3:2,3 4:12 14:7
pharmacies 168:1
pharmacist 53:6
  162:4
pharmacy 48:9
  81:24 82:23 84:7
  86:5 95:4 117:9
  166:4,7,10,10
  196:21 201:16
  232:15 240:16
  296:23
phone 13:17 14:13
  56:23 130:24
  144:19,22 152:10
  152:11,12,13
  158:21 163:7
  212:20 227:4
  272:12,25 324:15
  347:3
phones 145:14
  226:17,19,25
  273:8
photo 210:13,19
  222:21,25
photograph 210:5
photographer
  33:1,12,14,16
  89:20 183:23
photographers
  33:25
photographs
  35:23

photography 33:8
33:21,22,23 34:7
34:17,19,21 131:8
212:13 226:23,23
photos 33:10
208:12 222:7,15
222:18 223:11
230:20
phrase 318:15
physical 255:20,24
273:23 274:13
physically 129:12
157:23
physician 88:1
91:24,25 92:2
95:11 96:20 100:5
100:11,16,21
101:23 163:22
166:9,25 280:14
302:24 335:13
physician's 96:24
physicians 62:19
63:14 99:24 100:2
165:14 184:24
195:25 212:12
334:6 335:23
341:8
pick 222:6 273:9
picked 221:5
picking 135:16
picture 208:24
pictures 222:3
piece 82:22 279:16
pieces 281:8
pill 69:1,10,14
70:22 71:24 181:9
231:20 274:12
pills 69:15,20,24
90:16 97:20 98:3
151:25 152:7
185:15 222:20,21

229:25 230:1,2,6
230:25 274:9
292:25 293:5,7
302:6
pinch 143:10
pipes 282:17
pitch 142:24
pittsburgh 4:5
14:18
place 36:15 56:2
62:23 153:15
158:3 193:7,12,19
264:23 275:7,24
282:16 291:25
332:13,18 339:10
339:14 345:19
placed 30:20
130:18
places 311:6
plain 92:17
plaintiff 117:15
plaintiffs 13:16
23:12 28:8 119:16
plastic 278:9
plate 34:14
play 74:7 81:7
223:18 232:16
249:13 252:16
played 40:2 53:21
78:9 221:12,23
playing 173:15
pleasant 2:5
please 13:9 15:22
16:23 119:24
149:22 295:20
334:16,17 347:11
347:11
pleasure 260:22
plus 88:9 190:23
198:20 270:18
276:16

point 17:3,17
18:19,25 27:18
28:5,12 30:19
35:11 40:1 51:15
88:25 119:22
128:13 158:6
192:12 199:16
212:19 246:14,18
258:2 260:20
272:14 273:17
334:16
points 92:11
144:12 163:10
170:24 206:22
poisoning 183:2
pole 139:7
police 38:1,6 43:10
43:13 51:4 54:22
61:2 67:5 70:12
71:10 73:12
131:16 134:4
147:11 150:7
158:17 177:21
180:19,20 181:13
181:18,19 182:2
189:21 191:17
224:9 226:18
227:3 239:17
250:1 264:4
272:11,12,20
294:18 325:19,23
331:1
policies 23:4
policy 60:1 108:5
193:18 342:24
343:5
polished 208:15
pollinate 341:12
polster 1:8
poor 19:2 218:4

pops 51:16
popular 62:8
327:1
portage 214:3
porter 3:4 14:15
position 33:6,6
34:9,10 42:15
108:1 122:2 168:9
307:11,14 309:7
positions 26:23
32:23 33:4 41:4
positive 281:20
possession 101:15
possible 116:20
227:25
possibly 72:19
222:19 274:10
283:5
post 43:18
posted 187:4
potency 172:13
potent 179:23,25
191:14 226:6
327:15
powder 70:17
71:12,25 109:20
190:24,25 228:23
273:1 331:14
powders 67:25
150:13 191:9
192:17,19
powerful 188:1
327:4,15
powerpoint 57:2,4
171:13 189:11
202:21 206:7,10
206:23,25 207:7
207:10
practice 39:12
80:12 103:8
267:18

practices 192:7
precaution 191:13
predate 31:14
predated 31:24
predates 31:11
predecessor 40:19
predominantly
  110:5
prefer 283:22
prefers 268:9
prejudice 332:25
preliminary 237:7
  237:18 339:19
preparation 19:12
  19:15 20:5 24:4
  208:7 223:19
prepare 18:10
  21:22 171:17
prepared 24:1
  74:3 170:18
  219:22 222:10,12
  225:8 263:5
preparing 20:8
  202:11 317:15
  319:5
prescribe 90:8
  100:24 102:2
prescribed 93:1
  97:15,22 98:3,20
  101:24 152:4,5
  163:22 168:12
  184:12,19,20,23
  185:4,7,13,19
  195:6 196:8 279:7
  288:25 296:20,21
  302:10 335:6,8,11
prescriber 163:21
prescribes 280:12
prescribing 79:19
  88:4 194:24
  278:17 279:16

302:23
prescription 1:6
  3:8 13:5 14:4
  60:10 66:5 67:7
  67:13,19 68:3,20
  69:1,5,10,14,20
  71:24 72:10 78:11
  78:14 80:4,8 85:7
  85:15,21 86:16
  87:22 89:24 90:4
  90:10,15 91:17
  92:8,8 95:3 98:19
  99:2,6,10 101:10
  106:9,11 107:9
  110:2 116:23
  117:3,6 150:6
  151:25 161:22
  162:1,21 163:16
  163:20 167:19,25
  168:13 181:7
  182:9,12,17
  183:15 184:4,9,18
  185:3,8 193:14,19
  194:23 197:16
  198:14 199:4,9,12
  217:9 219:6
  221:12,23 222:18
  240:4,10,15
  253:13 273:23
  274:4,13,18 278:1
  278:20 279:10,18
  284:15,18,20
  286:25 287:6
  288:13,13,16,20
  289:1 290:8
  291:17,17,18
  292:10 293:8
  294:15,15 296:5
  297:6 299:16,19
  300:9,16,18 301:5
  301:9,16,21 302:3

302:5,8 303:4,5
  328:24 329:2,18
  347:6 348:3 349:3
prescriptions
  62:20 64:20 65:21
  66:19,20,23,25
  67:23 79:17 85:23
  86:10 87:23 89:7
  89:12 91:10
  106:15 150:5,11
  152:2,9 162:4
  163:18 193:21
  198:5 291:5,19
  293:10 296:19
  330:18 333:8
presence 72:2,9,15
  193:23 345:14
present 5:11 20:14
  21:13 36:7 51:24
  72:11,22 243:4
presentation
  52:10 53:22 56:4
  57:9 58:4,5 60:17
  105:5 170:10,16
  170:19 176:23
  189:11 202:21,25
  203:4,9 206:8
  207:10,12 210:13
  322:11,12,25
  323:18
presentations 50:4
  50:15 54:12,18,23
  55:5,8,9,17,22
  56:7,11,18 58:2,3
  58:9 171:4 206:24
  207:15,20
presented 23:12
  47:10 50:20 56:15
  171:2 206:23
  228:18 328:21

presenter 57:10
preserved 325:22
presumed 238:16
  244:22 311:25
  312:5,11 314:10
presumptive
  71:11,19
pretty 297:3
  299:10 313:2,14
  318:2 319:3
prevalent 111:16
  114:15
prevent 17:22
previous 40:6 68:6
  114:16 131:16
  207:15 208:22
  314:17 321:1
previously 163:4
  169:9 278:8
price 181:12
primary 91:23,25
  92:1 95:11
print 263:14
printed 315:22
printing 241:9
printout 186:25
prints 281:24
  282:3,3,5
prior 25:17 31:6
  31:19 41:9 42:14
  52:18,19 62:15
  67:11 68:6,24
  115:25 116:2,3
  127:18 136:21
  140:5,11 153:20
  157:12 182:10
  193:10,11 195:15
  203:9,14,18
  204:16 257:5
  319:2 325:11

**probably** 20:12
24:9 25:12 40:6
40:11 41:11,16
86:24 113:25
123:4 128:12
169:20 173:13,20
177:20 178:25
179:7 181:2
188:18,21 195:13
203:23 220:10,11
226:7 231:16
243:22 267:16
276:8,16 296:11
297:24 304:15
307:13 309:4
315:20 321:8
330:20,21 339:17
**probate** 257:15
**probation** 132:14
**probationary**
133:9,11,14,16,20
133:23
**probing** 96:2
**problem** 18:8
58:17 64:9 104:4
117:2,6 126:12,21
243:11 244:25
245:1 246:5,25
262:4 318:12,13
328:17
**problematic**
335:17
**problems** 240:21
268:4 319:23
322:3
**procedural** 190:19
**procedure** 15:2
82:15 151:13
153:7 154:6
159:24 212:6
332:25 344:7

348:5 349:5
**procedures** 130:22
149:2 151:18
165:4
**proceed** 333:3
**process** 17:2 29:22
30:2 35:23 36:15
36:21 39:2 42:9
48:24 49:3 58:15
74:7,23 118:10
129:11 149:4
158:8 163:24
199:1,1 249:1,13
262:6,10 264:23
272:17 276:2
286:10 332:19
335:19
**processing** 245:2
**produce** 156:24
**produced** 119:14
206:8 264:3
**product** 202:10
**production** 169:6
233:14 347:15,17
347:22
**products** 73:22
280:4
**professional** 48:11
49:21 59:9 109:1
**professionals**
61:12,24 106:6
197:15
**profile** 33:20
266:7
**program** 48:18
49:14 50:3 130:5
130:14 250:6
**programs** 249:19
338:20
**progress** 113:22

**progression**
337:21
**project** 234:9
276:7
**pronounced**
217:25
**pronouncement**
155:11
**pronouncements**
72:25
**proper** 60:10
213:20
**properly** 132:11
**property** 35:3
148:4,9 149:3,4
257:9,13,18 272:9
273:8 275:22
**protect** 332:20
**protective** 332:12
**protocol** 42:6
82:16 90:20 92:13
100:17 154:23
160:23 165:16
190:16 193:13
212:23 251:7
255:23 256:20
257:12 302:18
304:9 332:18
**protocols** 22:15,16
22:19,22 40:10
160:15 191:23
255:8 291:24
292:2
**prove** 341:3
**provide** 15:21
19:2 27:8 35:7
73:13 82:12 83:4
83:15 108:18
130:14 191:23
234:19 245:3
252:10 279:21

334:14
**provided** 15:1
84:21 85:2 97:19
145:23 235:13
259:12 279:24
**provider** 92:20
167:2
**providers** 70:7
**provides** 49:15
179:4
**providing** 82:16
85:11 89:3
**pry** 261:20
**psychiatric** 306:19
**psychiatry** 59:23
**psychology** 59:20
**public** 31:4 50:4
58:8 60:1 65:7
83:10 87:12,14
89:4 108:4,18
157:7 166:5,17
236:25 259:8
280:25 282:10
333:6,9 345:6
346:12 348:10,18
349:15,23 350:23
**published** 107:19
107:21
**publishes** 64:24
**puerto** 125:1
126:8,9
**pull** 58:6 156:12
203:3 205:12
237:23 291:9
296:13 310:13
**pulled** 209:4
239:16 322:19
**pulling** 227:14
**punch** 139:14
140:12 155:15
156:18 237:21

**[purchased - reading]** Page 46

**purchased** 179:15
326:21
**purdue** 1:10 2:17
2:17,18 14:1
261:7 342:20
**purdue's** 343:2
**pure** 109:14,17
111:12 113:13
**purge** 263:24
264:1,2,5
**purged** 30:19
264:12,14,18,21
342:22 343:14
**purging** 264:23
265:2 343:3
**purpose** 291:3,22
332:1
**purposes** 77:19
118:6 120:12
168:24 186:18
202:1,4 206:1
229:5 233:9 236:5
241:22 244:8
248:2 250:17
254:13 258:19
259:24 286:12
289:9,15 295:5,11
305:10 332:24
333:19
**pursuant** 332:12
344:3,6
**pursued** 47:19,25
**pursuing** 44:1
**pushed** 188:21
**pushing** 271:21
**put** 19:5 34:14
82:22 103:13
106:4 115:6
153:12 157:21
173:12,18,23
193:7,12,19

202:12 204:22
207:13,14,24
212:9 223:3
232:12 236:9
238:5 243:20
245:16 249:20
264:6 265:10,14
282:13 287:19
303:22 310:14,15
311:2,6,8 334:11
**puts** 239:23 253:8
**putting** 101:21
105:14,14 108:22
137:10 163:9
172:5,17 173:8

**q**

**quadrupled**
181:12
**qualified** 345:8
**quantities** 114:10
**quantity** 95:2
99:10 189:7 297:1
**queries** 240:23
**query** 156:12
241:6 245:11,17
**question** 16:19
17:7,18 19:2,4,8
21:17 28:16 29:17
31:9 36:25 58:14
71:22 95:9 96:6
100:10 103:20
105:3,15 106:8
111:18,19 113:6
119:11,23 120:2
124:2,16 136:10
160:3 167:18
176:19 182:21
185:17 194:15
200:24 202:6
206:19 208:4,6
210:1,8 232:11

242:4 243:24
246:8 285:1
288:23 300:12
303:15 304:14
310:17 319:5
320:5 336:22
339:12,21 341:16
**questioning**
103:21
**questions** 15:10
18:13,19 28:20
79:17 96:2,13
97:12 101:18
111:3 116:20
132:23 143:19
156:19 170:12
238:2 244:18
247:6 251:10
259:7 260:23
261:10,12 284:1,9
289:24 290:2
304:18 315:14
333:24 335:22
336:4 337:2,24
338:23 339:7
340:14 342:12,18
342:21 343:2,18
**quick** 55:3 84:14
125:25 167:9
218:7 227:23
**quickly** 262:19
334:21
**quit** 129:9
**quits** 129:17
**quote** 188:9
225:15 316:1
**quoted** 187:11

**r**

**r** 3:14 63:1,1
**radiology** 47:4,6

**raise** 62:2 257:18
**raised** 95:9
**ran** 88:5 189:23
**range** 64:22 124:5
177:2,4 319:4
**ranjan** 2:9 13:20
13:20
**rare** 68:3
**rarely** 67:19
**rate** 125:6,8 234:7
234:21
**rationale** 334:19
**ray** 47:5
**rays** 213:4 298:18
298:19,22
**rc** 230:4
**reach** 270:10
271:3
**reachable** 308:3
**reached** 108:25
232:15,20,24
281:10
**reaches** 317:19
**reaction** 24:15,23
90:15 193:24
194:1,4
**read** 59:4 66:1
82:7 86:11 170:23
170:25 174:13,16
175:3,21 177:17
179:17 180:1
187:18 188:7
235:3 237:14
239:5 245:8,9,19
266:17 334:23
335:20 337:3
338:13,21 348:5,6
348:12 349:5,6,17
**reading** 86:6
224:8 347:19

**ready** 124:18
135:10
**real** 84:14 167:9
169:23 342:11
**reality** 211:1
**realize** 180:8
279:14
**realized** 126:1
**really** 21:19 58:13
65:6 115:18
143:15 182:18
226:6 271:21
285:14 289:25
307:19 317:23,25
321:13 322:4
325:7
**rearview** 115:7
**reask** 31:9 61:16
146:22
**reason** 17:3 19:3
134:6 135:13
137:22 159:11
204:5 268:4
293:22 304:14
347:14 349:8
350:3
**reasons** 124:15
127:6 326:25
**recall** 20:7,9,11,18
22:23 23:7 27:22
27:24 32:3,15,17
40:18,22 41:1,2
47:11 52:13,14,15
53:3,9,12 54:11
55:24 56:16 76:19
84:4,8,11,18,20
85:3,4 86:2,19
87:24,25 88:3,14
88:18 97:21 98:25
123:10 141:8
159:5 165:13,19

172:4 176:13
182:24 185:1
187:14 189:14
193:16 208:19
217:10 222:14
223:25 241:8
245:21 248:21
256:23 264:22
274:1,23
**receipt** 293:18,18
347:18
**receive** 27:19
94:21
**received** 27:22
28:22 29:6 82:10
103:4 119:16
202:18 320:3
339:6 343:12,15
**receiving** 343:8
**recertifying** 45:25
**recess** 79:9 134:20
167:13 228:3
258:10 261:1
283:17 332:8
**recitation** 259:16
**recognize** 259:3
290:5
**recollection** 22:8
22:12,14,24 39:25
40:15 56:4 137:5
158:3 190:6 219:3
**recommendation**
94:4
**recommendations**
73:8 153:3 160:4
**recommending**
249:14
**record** 13:1,10
15:13 16:10 19:6
39:6 79:6,7,11
83:10 87:12,15

118:16 120:11
134:16,17 135:2
162:21 167:12,15
169:8 202:4 228:1
228:5 230:14
248:10 258:9,12
260:25 261:3
282:6 283:15,19
332:6,10 333:7,9
342:19 343:22
349:9
**recorded** 175:20
**records** 29:4 73:11
81:23,25 82:5,10
82:13,16 83:3,4,17
83:20,23 84:1,12
84:17 85:1 86:20
87:6,12,17 89:4
90:25 91:4,5,19,24
92:5,14,21 93:4,6
93:7 95:4,15,16,23
99:13,18 106:16
107:1 108:18
140:14 160:8
163:17,23 164:1,6
165:3,4 166:5,17
264:4 268:2,3,5,8
268:15,19 269:7
270:21 302:9,10
302:17 306:18
328:1,3,11,12,14
333:7 336:14,15
337:7,13,14,16
**recovered** 229:24
**recruit** 130:15
131:12
**recruits** 129:19
**red** 155:7,16,17
156:6 157:14,15
**redact** 332:15

**reduced** 345:13
**reducing** 113:23
**reduction** 236:17
**refer** 133:12
226:12
**reference** 176:22
190:2 199:17,24
211:8 238:2
319:23 347:7
348:2 349:2
**referenced** 66:15
102:20 187:22
255:9 256:24
332:16 345:12,17
348:11 349:15
**references** 256:3
**referencing** 66:17
171:23
**referral** 155:12
298:25
**referrals** 156:8
**referred** 121:15
166:9,25
**referring** 36:7
307:17 327:25
**reflective** 244:24
**refresh** 22:8
**refreshed** 22:12
22:14,20
**refreshing** 22:24
23:3
**refused** 141:9
**regarding** 79:19
80:12 100:1 219:3
276:20 277:22,25
344:2,10
**regardless** 87:5
105:11 218:9
**regards** 251:8
**regimen** 335:12

**regional** 46:14
341:20

**regular** 41:15
141:21,24 142:2
143:6 163:15
203:19 214:9
234:20

**regulation** 278:20

**regulations** 65:19
66:4,11,17

**rehab** 338:18
340:24

**rehabs** 328:20

**reinforcing** 336:2

**related** 22:9 38:5,9
52:9 54:16,18
82:10 84:22 85:5
86:15,21 106:20
108:5 245:6
338:16,16

**relates** 1:8 225:19
343:13

**relative** 22:25
23:13 182:3
281:18 346:2

**relatively** 175:17
245:4

**relaxants** 329:20

**relay** 160:10

**release** 84:2 269:2
326:2

**released** 83:12
259:9 331:25

**relevant** 29:8
197:17

**relied** 100:22

**relief** 167:22

**rely** 71:16 341:4

**remarkable**
228:17

**remember** 21:2,8
49:16 53:16,21
81:4 85:9 112:17
124:13 137:3
152:21 153:21
159:10,15,17
161:17 184:21
214:22 215:14
216:19,21,22
217:4,22 224:8
232:8 237:16
243:7 249:23
250:5 256:13,15
257:21 276:21
285:10 315:8,8,9
316:11 319:2
336:3

**remind** 168:5

**reminder** 192:6

**reminds** 28:4

**removal** 76:3,4
200:9,9

**removed** 42:2

**ren** 2:14

**renee** 1:25 345:6
346:12

**renewed** 45:1

**renowned** 266:6

**replace** 126:13
274:23

**replacement**
129:13

**report** 30:9,10
38:24 62:19 64:6
81:10 82:25,25
83:7,8,9 87:13,16
94:6,15,16,21 96:1
96:2 106:4 108:5
108:5 109:2
132:10 133:19
145:17 154:23

161:15 166:13
178:14 186:5
226:22 237:7,19
238:11 243:5,14
262:22 268:8,11
269:24 293:25
294:2,23 296:16
300:14,19,23
301:7 302:12
315:17 324:17
326:13 339:19

**reported** 38:19
144:18 155:8
156:10 175:19
179:24 210:19,23
218:21 219:1
299:1

**reporter** 16:10
58:16 62:25
233:25 234:1
267:10 295:21
348:7

**reporter's** 118:15
345:1

**reporting** 8:16,18
62:18 103:15
178:17 295:2,8
296:5 319:11

**reports** 63:4,6,8
63:10,13,20,24
64:1,4,18 73:12
83:9,14 84:24
92:24,25 93:15
94:13 122:10
162:11 204:16
223:21 243:16
252:21,23 262:17
264:4,5 276:24
277:3,6,8,11 296:7
296:13,18 297:9

298:9,13,16 299:3
299:7

**represent** 83:25
261:7

**representations**
100:22

**reps** 278:9

**request** 75:16
81:25 82:20 84:16
92:13 94:4 95:22
164:1,4 166:4
202:22 237:1
241:5 268:19
269:1 308:8,8,19
308:20,23 310:15
331:17 349:9,11

**requested** 86:20
87:12,14 276:19
308:25 344:1,6,10

**requesting** 76:20
83:19

**requests** 75:2,21
81:23 82:10 83:3
87:7 99:19 140:25
166:23 212:25
213:6 238:4
240:25 241:4
244:21 246:7
249:16,23

**require** 292:2
335:15 337:8

**required** 45:3 46:3
129:19 151:21
304:12 347:25

**requirement**
136:6

**requirements**
312:21

**research** 65:4
108:5 230:3

**residence** 326:2
**residential** 15:21
**residents** 167:24
  262:17
**resolved** 245:22
**resource** 27:2
  76:19 261:20
  266:12
**resources** 75:3,22
  77:9 198:25
  211:13 216:14
  227:17 313:15
  342:9
**respect** 68:13
  77:24 102:5,12
  106:8 112:9,25
  123:13 127:22
  151:21 183:10
  198:11 199:20
  257:2 301:3 305:8
  341:25
**responded** 238:14
  243:2
**responder** 147:11
**responding** 132:16
  179:9 238:20
**responds** 234:17
  242:17 245:10
**response** 28:20
  83:5 84:21 89:4
  123:15 235:16
  237:17 239:1
  242:11 247:12
  273:21 336:25
  338:8
**responses** 23:25
  24:5 339:6
**responsibilities**
  23:4 33:15 34:14
  131:9

**responsibility**
  131:4 337:16
**responsible** 70:2
  227:19 261:15
  280:11
**restroom** 283:12
**result** 25:22 75:24
  77:11 78:6 109:1
  193:7,13,19
  198:13 201:2,9,15
**resulting** 211:12
**results** 154:21
  242:7 270:3 274:8
  321:21
**retail** 201:16
  232:15 240:16
**retain** 27:20 28:23
  30:17
**retained** 30:11
  174:4
**retaining** 124:21
  126:15
**retake** 45:17,23
  46:6
**retention** 29:15
  342:24 343:5
**retire** 125:11,12
**retired** 125:1
  154:16 307:12,24
  307:25
**returned** 347:18
**revere** 52:11 54:13
  56:3 60:17 170:8
  170:15 172:25
  176:24 178:19
**reverses** 177:15
**reversing** 178:19
**review** 22:4,21
  23:8 118:21 119:8
  119:9 266:14,18
  269:20 279:1,3

  344:2,6 347:12
  348:1 349:1
**reviewed** 19:25
  22:7 132:13
  266:15 298:23
**reviewing** 239:2
**reviews** 27:4 299:2
**revised** 7:24 8:3
  40:10 247:24
  248:15 250:14,22
  260:6
**revising** 40:2
**revision** 251:4
**revisions** 256:3
  259:13
**rice** 2:3 13:14
**richfield** 53:6
**rico** 125:1 126:9,9
**rid** 29:4 33:5
  150:22 291:13
**right** 14:23 16:15
  21:2,21 23:24
  28:22 34:9 37:13
  39:4,4,7,21 41:3
  43:14 44:12 56:14
  58:19 59:8 63:2
  72:23 75:13 78:19
  79:24 84:20 85:4
  86:8 89:21 90:12
  93:14 94:3 104:24
  105:13 106:23
  107:3 119:5 123:6
  126:3,19 128:21
  128:24 129:2,3,7
  134:16 135:16
  139:13 142:15
  143:12 144:2,4,6
  145:7,23 146:3,6
  146:14 149:19,21
  149:22 152:23
  157:12 158:12

  159:2 163:12
  164:7,17 169:4
  170:3,20 172:3
  173:4,17 174:6
  175:9 176:18
  177:7 182:5 184:1
  186:24 191:11
  196:25 197:14
  199:23 200:24
  203:5 204:2,3,7
  206:15 207:9
  208:18,24 210:4
  211:22 214:11
  218:20 220:1
  221:16 223:6
  224:18 225:7,14
  227:9,10,21 228:9
  229:13 232:1,12
  233:3,16 235:15
  238:7,22 239:7
  245:17,18 251:19
  253:22 254:23
  255:3,16 257:7
  258:22 260:19
  266:24 269:8,18
  270:6 271:5
  272:11,24 277:17
  279:4 283:14,25
  286:12 287:9
  288:3,6,10,16
  289:18 290:9,19
  291:21 292:20
  293:20 294:5,11
  295:13 296:1
  297:17 299:4,12
  300:1,5 303:9,11
  303:12 305:9
  307:24 308:24
  309:13,16 310:6,8
  311:13,16,24
  312:3 313:25

[right - scenes]

314:13,14 315:4
315:23 316:3,18
317:11,16 318:3
318:17,25 319:4
319:10 320:25
322:18,21,22,23
325:13 326:7,15
329:24 331:2,8,9
332:2 333:13
338:11
**rings**  152:10,11
181:23
**risks**  182:8 183:14
194:12 196:9
280:3
**road**  147:16
**robberies**  180:10
180:17,23
**role**  40:2 53:21
74:8 81:7 95:25
105:7,16 121:21
140:20 161:25
162:4 164:23
204:18 221:12,23
223:18 232:16
247:20 249:13,16
252:17 325:18,20
341:11
**room**  14:12,12
18:5 150:2 191:16
265:5 319:19
340:23
**rooms**  178:13
209:9 239:15
240:1
**ropes**  2:14
**ropesgray.com**
2:16
**rosa**  120:19
124:24

**rosenberg**  4:4,6
14:17,17
**rotate**  56:22
**rough**  173:22,24
**roughly**  113:16
239:3
**routinely**  304:22
**rpr**  1:25
**rule**  161:2,6
**ruled**  85:20
157:20 312:1,7,9
**rules**  15:1 16:6
344:3,7 348:5
349:5
**run**  63:11,14
64:17 70:16 72:13
92:13,19,21,24
93:12,17,21 94:2,6
94:12,15,22,23
95:4 99:9 160:11
162:21 163:17
231:14 240:22
263:22 265:5
340:18
**rundown**  72:17
95:20
**running**  75:4,7
101:2 159:18
269:22
**runs**  190:7
**rx**  8:16,18 295:2,8

**s**

**s**  63:1 120:20
347:15 349:8,8
350:3
**safe**  178:12 185:12
243:18 330:10
**safekeeping**
151:14
**safety**  191:22
193:6

**sake**  150:21 312:7
**salaries**  74:19
139:10 205:2
**salary**  127:15,18
**sales**  278:5,16
**salt**  305:16
**sample**  331:17
**samples**  72:21
189:22 199:18
273:11 331:18,25
**san**  3:15
**sandra**  5:7 13:22
**sat**  170:8 253:3
**satisfaction**
245:23
**saturday**  142:20
273:4
**saved**  177:23
178:3,4 263:12
**saw**  24:10,14
27:17 98:3 99:5
106:10 112:6,14
149:1 161:15
183:20 184:6,10
184:16 189:18
191:15 211:6
241:14
**saying**  45:10 68:5
316:19 341:3
**says**  75:6 92:3
156:15 174:8
175:23 176:10
179:12 187:23
188:10 206:13
211:9 220:5
221:17,17 223:7
227:8 228:9,15
229:15,19,23
233:24 234:18
235:7 237:7
238:10 239:1

242:19 244:18
253:13,18 254:24
255:18 256:8,18
257:8 305:17
334:9 335:3
338:12 340:15
**scanned**  263:20
**scenario**  145:22
**scene**  33:9 35:18
35:19,22,23 36:11
36:12,13,19 37:13
38:6,16 41:25
42:2 52:1 67:12
69:14 70:1,11
71:10,12,16,24
72:3 73:11 92:6,9
98:12 99:16 131:5
132:15 135:25
141:18 143:8,20
145:12 146:19,24
147:18,18 148:5
148:23 151:24
155:13 160:10
163:1 190:23
191:18 197:3
213:17 215:6
222:7,25 223:1,11
226:24 231:20
263:1 267:5
272:23 273:4
279:5 291:16,16
291:20 292:3,8
293:11,21 294:15
302:6 304:7,7,23
305:5 325:4,17,19
325:21 326:1,5
**scenes**  34:19,24
48:23 49:11 69:22
131:1 136:3
273:12 298:6
305:15

schaefer 121:20 121:21
scheduled 137:18 141:4
schedules 138:12
schmitt 233:19,21 235:16
school 43:15,16,18 44:11 50:10,17 51:7,23 52:9 170:9 195:8 263:10 307:8 341:23
schoolers 54:15
science 130:1
scope 94:10 195:22 196:11
screen 262:7
scribble 267:9
scribbled 174:2 267:17
script 163:21
seal 346:5 348:15 349:21
sealed 273:18
search 63:7 156:21 297:12,13 310:16 316:15
searches 92:19 162:22
searching 126:17
seat 210:18,18
second 20:17,24 21:3,12 33:11 45:17 131:7 137:7 174:7 176:8,9 180:18 187:22 208:19 211:10 220:1 229:23 237:12 242:13 252:10 317:24

322:24 323:17
secondhand 181:18 189:17 197:5 327:10
secretaries 144:21 146:12 157:17
secretary 120:21 146:13 207:22 208:2,8,16 313:19
section 45:16,16 45:23 158:16 212:10 253:16 259:6 335:1 337:3 338:11
sections 45:15,18 45:20 311:22
secure 151:22 325:21 326:5
secured 101:14
securing 325:18
see 16:9 17:14 40:12 42:3 63:24 64:1,4,6,18 67:19 68:3,8,14 69:9,19 72:9 93:3,7,12 110:1 112:8 113:14 155:22 163:8,17,19 174:11 176:11 182:15 187:4,9 188:11 190:24 203:20,23,25 204:5,20 209:1,11 211:15 213:14 220:6 229:13,13 229:16,20 230:11 230:20 231:6,11 231:19 234:2,15 234:20 235:1,9 236:18 242:15 244:10 252:9

253:9,12,22 257:9 278:4 279:7 281:7 281:23,23 282:1 282:11,20,22 284:15 298:10,16 310:18 323:16,24 324:2 325:15 332:4 335:2 340:18
seeing 53:24,25 54:1,2 60:18 62:16 67:22 68:5 109:12,13,17,22 109:24 110:25 111:2,5,9 115:16 189:15 190:7 191:3,9 195:5 231:9 232:8,18 317:22 320:6
seek 216:13 281:11 338:2
seeking 189:2 226:9
seen 23:18,24 63:4 63:10,13 64:10 67:6,9 68:21 69:12,23 78:12 102:6 104:10 110:11,13 111:16 113:9 114:6,10 115:24 119:7 161:10 162:18 169:12 183:24 185:2,17,21,25 186:4 202:8 206:20 231:13 232:5 234:22 239:9 254:16 260:8 265:15 280:6 282:16 296:17,18 304:15

308:17 320:9 325:1 331:20,22 333:25 334:1
sees 330:7
selected 221:3 222:15
self 292:16
sellers 70:7 271:12 271:19
selling 226:5 329:10
send 70:3 146:24 164:3,7 199:17 202:22 238:3,10 253:7,8 269:8 270:1 274:3 341:21
sending 70:9 95:22 334:15
sends 266:24
senior 124:22 266:25
seniority 124:11 139:2,3
sense 188:10 189:2 192:2,3 198:24 225:20
sensed 113:4
sent 40:11 203:10 237:8 315:21
sentence 179:3 180:18 211:10
sentences 171:25
separate 74:14 107:6 155:19 158:20 214:19 332:22
separately 29:1 183:6
september 7:12,24 201:23 202:15

221:19 247:24
248:6 322:17,22
**serve** 291:22
**served** 27:13
**service** 4:2 49:15
76:3,4
**services** 74:21
338:19
**session** 23:16
135:5
**set** 49:25 50:24
56:18 144:17
170:24 176:1
212:3 241:1
245:12 246:6
346:4
**setting** 110:5
196:3 249:19
**seven** 122:16
137:19 230:8
277:5,5 307:14,15
**shaking** 329:23
**shapes** 70:24
**shapira** 4:3 14:18
**shapira.com** 4:6
**shapiro** 267:1
**shapland** 3:5
14:14,14
**share** 27:11
**sharing** 58:6
178:18
**sharp** 237:12
**sharpie** 332:14
**she'll** 253:7,8
**sheet** 293:3 309:4
347:13 349:7,10
349:18 350:1
**sheriff's** 145:14,18
229:24
**shift** 129:18
130:18 131:13

135:23 136:2,3,21
138:4,5,5,6,8,11
138:13,13,14,15
138:16,18,18,25
139:6,11,14 140:8
140:9 141:14
142:5,7,9,20,20
144:21 270:8,15
**shifted** 124:16
287:23
**shifting** 277:15
**shifts** 136:6,11,12
136:13,16,23
137:6,14,18,25
138:10 139:4,8,12
141:6
**shipment** 114:3
**shipments** 62:2
**shipped** 61:6
**shooting** 223:8
224:12
**shop** 250:7
**short** 57:16,17
113:6 122:24
123:10,17,23
132:2 163:4
211:20 212:10
261:1 313:3,5,8
332:4
**shot** 35:21 321:22
321:23
**show** 48:22 129:20
176:25 209:17
226:21 247:17
254:7 257:25
260:2 324:22
333:14
**showed** 140:8
208:22
**showing** 227:13

**shown** 210:7 257:3
347:16
**shows** 155:14
156:8 178:9
208:25 210:14
214:18 225:11
296:19
**shred** 264:5
**shredded** 342:22
343:14
**shredding** 264:8
343:3
**shut** 224:11
**shying** 113:4
**siblings** 197:7
**sic** 84:11 165:2
343:2
**sick** 92:4 125:12
137:17 141:3,4
**side** 32:15 76:22
160:23 251:21,22
268:5
**sides** 265:11
**sign** 45:9 133:18
133:19 243:19
251:7 253:5
273:10
**signature** 344:5
346:11 347:14
**signed** 84:2 109:13
127:17 150:3
238:15 312:21
348:13 349:18
**signing** 251:8
347:19
**signs** 150:4
**similar** 225:23
**sincerely** 347:21
**sir** 15:7,20 16:16
19:9,13,17 26:10
29:9,12 49:20

68:17 136:17
198:8 236:19
248:7 287:3
291:23 307:18
338:10 347:10
**sister** 215:15
221:18
**sit** 34:20 45:5,12
262:6 319:18,20
**site** 92:18 142:18
**sitting** 23:7 25:3
40:14 80:23 84:8
88:18 90:3 137:4
200:2 204:8
210:17 217:7
222:14 324:14
**situation** 39:8
71:15 90:14 93:9
105:2 143:24
148:2,7,12,17,21
161:13 163:9
165:13 195:18
282:4 304:10
**situational** 230:9
**situations** 102:22
166:2 232:2
335:17
**six** 56:13 128:15
129:17 133:7
150:2,5 151:4
268:12,12 307:15
**skzerrusen** 5:9
**slide** 206:13
207:19 208:19,24
209:17 211:9
214:14,15 218:22
219:2,21 222:2,3,9
223:7,10 225:8,10
225:14 227:7
322:12 323:23
324:2

**slides** 57:7,19,22
  57:25 207:15,18
  207:25 208:9,11
  214:12 225:4
**slight** 317:22
**slightly** 175:18
  316:10,11
**slim** 125:8
**slimmed** 303:21
**slip** 140:10
**slowed** 50:8
**small** 189:7
  225:11 257:16
  267:11
**smile** 238:24
**smith** 164:6
**snorted** 185:24
**soft** 315:16
**software** 120:22
**sold** 329:3 330:12
**solutions** 3:3
  347:1 350:1
**somebody** 48:25
  53:7 105:9 123:3
  125:10,11 126:14
  127:19 128:18
  129:17,17 159:12
  213:1 266:25
  270:25 276:6
  293:21 305:17
  308:5 323:3 325:4
**somebody's**
  326:22
**somewhat** 151:23
**son** 104:2 176:10
  181:21
**sons** 91:2
**soon** 177:13
**sooner** 312:24,25
**sorry** 54:10 93:23
  121:4 122:18

133:2 139:25
  150:20 155:22
  171:8 205:18
  209:19 322:9
  336:9 341:16
**sort** 292:20 325:22
  343:3
**sorted** 332:22
**sounds** 24:22
  147:19
**source** 92:19
  156:3 172:4
  179:20 180:12
**sourced** 240:3,9
  240:15
**sources** 93:12
  303:2
**south** 2:5 3:6 5:7
  261:21
**space** 263:23,24
**speak** 16:14,14,18
  16:22 19:14 56:24
  77:21 126:6
  128:20 271:3
**speakers** 46:14
  56:22
**special** 74:18
**specialized** 43:15
  44:12 80:2
**specialty** 88:5
**specific** 21:24
  66:16 75:19 76:13
  88:16 96:3 97:20
  98:24 179:4
  189:25 193:18
  195:16,18 197:14
  201:1,8,13 207:10
  218:17 231:25
  289:24
**specifically** 55:5
  75:23 177:7

193:13 195:2
  247:1 276:10
**specifics** 30:23
  74:22
**specified** 345:20
**spell** 236:15
**spend** 212:1
**spent** 305:25
**spike** 64:15 189:18
  200:12,13
**spikes** 62:16
**spits** 243:12
**spitz** 266:6
**spoke** 262:11
**spoken** 50:14
  315:16
**spoons** 67:21,25
  68:10
**sports** 173:15
**spouse** 327:12
**spread** 138:7
**springfield** 43:7
  44:7,8
**ss** 345:3
**st** 46:16,20
**stab** 208:13
**stabbed** 35:21
**staff** 34:1 122:14
  122:21 269:5
**staffed** 122:24
  123:10 124:9
  132:2 145:1
  212:10,14 313:12
  313:21 314:2
**staffing** 126:11
  135:17 211:11,17
**stage** 330:15
**stamp** 7:18 233:7
**stand** 125:17
**standard** 99:18
  131:12 297:12

**standpoint** 67:22
  132:10 165:8
  191:13 196:14,19
  198:22 216:1
  272:15 342:2
**stands** 115:12,17
  162:11
**stark** 16:1,2
**start** 76:17 100:10
  115:19 116:2
  123:14 152:15
  298:20 321:13
  324:22
**started** 32:18
  40:23 43:20 62:16
  115:16 125:9
  138:17 154:4
  182:18 193:2
  195:7,9,12,14,17
  217:21 271:21
  307:5,19 317:22
  317:25 325:7
  334:10 341:22
**starting** 25:17
  54:4 109:8 112:6
  126:24 334:15
**starts** 206:4
  287:24
**state** 13:9 15:12
  43:4,6 46:12
  81:23,24 82:23
  84:6 86:4,24
  125:19 175:19,23
  231:15,16 234:1
  328:14 345:2,7
  346:13 348:10
  349:15
**statement** 39:6
  177:19 195:19
  348:13,14 349:19
  349:19

statements 106:3
107:2 108:1 281:1
states 1:1 13:7
108:25 162:22
163:6 179:14
statewide 176:2
station 143:11
234:1
statistic 188:14
statistics 64:23
65:13 73:17
155:14 156:4,13
156:15,24 157:1,8
157:25 159:7
177:9 188:21
203:3 208:18
240:22 310:24
319:1
stats 53:24 65:2
155:14,18,24
158:5,6 171:10
173:6 182:11
184:6 200:23
202:21 316:14
statues 214:12
stay 46:7 115:9
127:25 212:22
stayed 140:8
staying 212:12
steady 318:11
steal 151:8
stenotypy 345:13
step 79:24,25
stephen 244:11,12
244:19
steps 82:18 90:17
90:21,23
sterbenz 63:11
73:9 85:7 91:7
94:5 97:7 98:9
107:16 160:13

161:16 252:20,25
269:18 276:13,18
296:9,11 334:9
steve 172:8 188:24
229:10 231:11,13
231:13 243:23,24
261:21 314:19
319:20 342:3
stick 49:1 88:23
126:13,20
sticker 118:15
stickered 118:17
stickler 252:20
stigma 104:3
160:16
stole 181:21
stolen 101:14
stomach 110:10
stop 265:1
stops 77:3
storage 30:21
150:1 151:14
255:20 256:9,19
256:20 257:8,12
263:23
stored 263:21
stories 225:24
303:16
story 108:16,19
195:20 226:3
304:4
stow 132:15
straight 129:24
246:16
strain 198:25
211:12
strangely 341:16
stream 2:13 3:4,18
4:3
street 1:21 3:15,19
4:5,9 5:7 171:25

173:3
streets 181:8,12
188:6 289:3
299:25 300:3
stress 125:21
216:11
stressful 216:3,8
stretched 211:13
strictly 219:15,16
strike 103:15
124:15 248:13
297:21 317:13
string 7:14,16,17
7:19,20,22 8:5,20
205:23 229:4
233:7 236:3
241:20 244:6
254:11 333:17
stronger 230:8
structure 121:2
122:4
struggling 245:5
stuck 82:25
students 50:10,16
50:17,18 51:24
52:9,12 172:25
176:23 178:18
267:2
studied 66:8
stuff 49:11 70:9
141:6 142:12
150:14 154:4
157:23 169:23
173:5 191:20
197:5 226:5 251:7
321:10 327:15
334:2 336:17,19
styles 277:6
subcategories
220:11

subject 229:15,16
234:7 242:3
254:24 255:1
subordinates 27:4
subpoena 84:3
subscribed 348:10
349:14 350:21
subsection 252:6
subsequently
248:14
substance 59:10
59:17 71:23
103:19 106:13
113:8 116:9
165:25 191:1
196:4 219:7 223:3
229:14 230:2
231:25 232:6
287:2 301:12,22
302:3 328:8,17
substances 60:14
70:1,19 104:15
107:13 111:16
114:7 186:2 198:2
232:3,3 326:8,11
330:7
subtitles 74:18
suburbs 127:9
sudden 64:6
198:19 200:21
213:7
sued 117:8
suffer 306:11
sufficiency 60:7
279:21
suggest 285:20
suggested 106:11
suggesting 304:20
305:9
suggestions
152:22 160:4

**suicide** 159:25
160:5,16,17,24
161:2,4,16
**suicides** 159:12,13
159:19,21,22
180:14
**suit** 117:10,13
**suite** 2:10 3:10
4:14 5:8 347:2
**suites** 55:4 212:18
**summarizing**
235:16
**summit** 1:9 2:2 7:5
7:6,9,13,15,18,19
7:21,22,25 8:4,6,8
8:8,10,11,13,14,15
8:17,19,21 13:11
13:14 15:17,25
19:19 23:18,25
25:17 26:1,24
32:4 41:19 48:14
49:22,25 59:2
65:15 66:23 72:25
79:20 85:19 87:20
93:16 99:25 100:1
100:6,12,17,22
101:5,10,23
105:18 106:10
109:6 111:20,23
112:1,4,20 113:9
113:21 114:8,11
114:17,23 116:4,9
118:2,5 122:9
127:13 144:13
146:25 163:16
167:24 168:23
169:6,9 174:9,20
178:7 182:2
184:16 187:23
188:3,14 189:14
193:23 201:25

205:25 206:5,7,11
209:6 210:9,12
213:20 214:5
222:5 225:22
232:17,21 233:1,8
233:12 234:7,11
236:4,11 239:16
241:21,24 244:3,7
244:12 248:1
250:16,20 254:3
254:12,16 255:18
258:16,18,25
259:1,22,23 260:5
260:6 261:19
276:8 278:17
281:13 289:8,12
289:14 292:2
295:4,10 328:6
333:18 341:10,13
341:14 342:25
**superior** 347:1
**supervisor** 41:11
121:17 122:6
142:11 270:19
307:7 321:9
**supper** 284:3
**supplier** 331:6,7
**supplies** 74:19
75:7 76:11,14
77:10 205:2
**supply** 3:8 14:4
62:2 76:19 77:12
198:9,21
**supposed** 146:1
188:1 212:7
292:19
**sure** 18:24 26:16
31:24,25 32:20
33:13 36:4 37:6
39:14 51:13 56:23
66:1 74:20 77:12

77:14 81:4 85:25
87:2,17 88:20
89:2 94:1 103:10
106:19 121:23
131:25 133:7
139:20,21 154:5,8
160:10,21 162:25
163:6 164:6,25
171:20 172:7
174:1 176:15
183:3,9,25 186:11
187:16 191:18,19
197:23 200:18,25
202:20 204:25
205:2,4 210:22
215:22 217:18
219:20 220:25
225:3 228:22
230:18 243:22
244:19 247:8,9,10
247:19 253:3
254:6 258:3 269:8
270:25 272:8
273:9 276:1
284:10 306:2
310:18 314:18
323:11 325:6,20
330:23 336:16
342:3
**surgeon** 97:9
108:25 262:19
**surgeon's** 278:9
**surgeries** 97:6
117:1
**surgery** 262:19
**surrounding**
162:22 163:6
**survivors** 327:11
**suspected** 37:10
37:16 147:7
304:21 331:14

335:7
**suspicion** 36:19
72:6,18 292:6
**suspicious** 93:19
**sweeps** 151:2
**swim** 224:5
**swing** 138:16
**swipe** 139:17
**switch** 182:18
**switched** 183:22
**switching** 58:19
86:1 116:17
117:18 147:24
167:17
**sworn** 15:2 345:10
348:10,13 349:14
349:18 350:21
**symptoms** 191:17
191:18
**synthesizing** 107:7
**synthetic** 228:10
**synthetics** 191:10
199:21
**syringe** 273:1
**syringes** 67:21,24
68:9 150:13
282:18
**system** 8:17,19
30:22 45:7 63:5,8
72:11 83:3 139:16
139:18 140:5,7,22
150:1 153:20
154:10,19 155:21
155:25 158:25
162:12 219:19
247:4 249:2,3,5,7
249:22 250:9,10
265:7,8 275:1,7,10
275:17,21 276:4
282:24 291:11
295:2,8 296:5,13

312:6

**t**

**tab** 121:15
**table** 7:23 8:3
247:23 250:13
319:19
**tablets** 212:16
**take** 13:3 16:11
17:8 34:24 35:23
36:15 38:21 43:24
45:25 47:20 48:24
51:1 69:9 70:13
75:7 78:21,22
79:24 90:17,20,23
99:7 106:3 119:7
119:24 129:10
130:24 134:14,15
135:23 137:17
143:9 149:24
152:12 167:8
185:14,15 206:19
216:9 224:19
226:21,24 227:4
227:23 236:12
238:4 244:1
245:15 255:13
267:7,8,10,11
268:18 270:5
272:25 273:1
275:23 278:15
279:20 283:9,13
284:2 291:6
293:15 305:15
308:8 312:10
315:7 324:13
331:18 332:3
**taken** 1:19 16:3
131:17 134:20
148:18 171:9
267:6 273:18
281:3 292:19

299:2 305:10
345:19
**takes** 30:3 84:3
114:2 128:12
131:23 215:20,25
266:25 298:25
311:4
**talk** 19:22 36:13
36:21 39:19 46:15
51:23 55:1 74:24
82:2 93:24 95:13
95:17 103:24
105:1 119:1
132:19 139:25
164:5 177:3
197:25 207:18
209:20 215:13
221:2 232:16
269:25 272:8
284:5 302:23
305:24 311:2
319:20,21
**talked** 50:16 52:8
108:12 147:25
159:1 162:7
163:25 171:20
172:7 177:10
188:24,25 189:13
193:10 194:6
198:10 206:22
211:18 231:3
247:18 253:24
254:3 257:15
274:21 287:5
305:2 307:10
310:23 314:22
315:24 319:14
324:18 326:10
330:25 343:7
**talking** 29:15
35:18 36:18,20

38:13,22 51:19
54:14 61:2 65:18
66:25 99:8 102:15
102:20,21 103:23
109:11 127:24
129:16 135:17
170:24 177:5
180:19,20,22
181:20 182:20
200:13 207:5
215:20 216:4,5,5
216:12 226:1
265:16 279:9
299:23 310:16,20
319:11 327:11
328:14
**talks** 50:9 51:10
213:11 225:6
231:14 252:8
292:17 317:16
326:13
**tannish** 190:24
**task** 49:24 205:11
206:13
**taught** 46:25
**technical** 43:5
44:3 249:8 287:20
**technically** 144:24
270:19 313:20,23
**techs** 47:5
**teen** 223:8
**teenagers** 64:10
**telephone** 3:4,13
3:18 4:3 34:25
135:24 304:18,19
**tell** 25:10 37:7
39:16 67:9 69:25
76:1 82:3 98:13
98:15 110:16
120:13 145:19
146:4 158:6

172:22,24 176:16
191:1,2 197:7
204:3 215:24
218:4 222:7
236:21 237:20
239:11 255:11
256:6 269:21
289:21 293:6
296:2 300:14,18
303:9 315:14
339:24 341:4
**tells** 92:10 328:4
**ten** 47:3 63:17
68:2 128:3 139:19
151:24 152:13
182:13 221:1
264:20
**tenure** 106:9
115:23 123:10
204:19
**term** 133:12
279:15 286:15
327:22
**terminology** 32:11
131:19 284:6,10
286:13 328:13
**terms** 20:3 22:11
23:6 28:5 30:23
31:2 37:9 38:15
43:2 45:24 54:12
54:21 55:7,21,25
56:2,10 57:22
58:20 60:16,22
61:15,20,23 62:24
65:12 66:14,19,20
67:6 68:18,21
71:17 72:24 74:6
74:22 75:2,15,21
76:13 77:1,8 80:6
80:7,11 81:6
83:17 86:2 88:16

93:15 94:8 99:1,8
99:24 101:21
102:16 103:8
114:5 120:3
123:11 126:10
133:11 136:5,7,9
138:1,8 140:20
141:11 144:9
147:24 149:6
154:9,10 159:20
159:24 160:15
161:20 163:25
165:24 170:15
172:5,17 173:2,7
174:21 175:25
184:6 186:25
188:14 189:25
191:22 195:16
196:7,18,21
197:14,19,24
198:9,23,24
199:10 208:8
212:6 213:10
214:7 216:11,16
217:11 218:17
220:13 237:18
240:19,21 243:6
243:12 246:3
247:3 249:9 255:8
255:23 287:20
288:14 328:7,9
337:11,23 342:7
**test** 46:22 71:12,19
189:23 199:13,15
274:10 331:3
**testified** 25:8,14
25:21,23,25 26:11
284:8 317:14
330:13
**testify** 17:22 26:9
288:4 345:10

**testimony** 261:14
271:11 273:22
274:1 309:14
321:1 345:12,16
348:6,7 349:6,9,12
**testing** 70:9 72:7
72:20,21 149:7
191:2 205:3 274:5
274:7 331:15,19
331:22
**tests** 70:10,16
189:25 269:19
**text** 227:2,6
**textbooks** 266:1,2
**thank** 51:22
122:19 260:23
283:8 342:12,16
343:18
**thanks** 238:10,25
242:10
**theory** 239:18
**thing** 90:11 121:16
165:16 224:13,25
292:20 298:14
324:11 325:22
**things** 16:13 25:22
28:6,7 45:11
47:22 68:13 77:20
104:5 105:2 109:8
109:12 119:13
131:2 132:11
150:21 153:13
154:11 168:10
195:12 203:20
216:9 237:3
251:24 254:7
259:6,7 269:24
288:4,19 304:15
309:15 333:3
**think** 14:23 24:17
28:19,19 45:14

49:9 53:6,23
60:19 64:17 65:20
68:22 86:7,13
95:2 98:1 107:16
108:12 109:8
112:6,14 113:10
113:13,20 114:9
114:11,14,20
119:10 127:18
143:23 153:22
154:2 157:6
159:19 160:1
170:25 179:19
186:7 189:10
192:14 197:22
204:2,5,19,25
205:10 212:2
214:1,2 223:1
224:3,22 227:5
239:20 243:17
244:13 249:11
251:6 257:14
271:16,18,21
274:6 285:1,3
296:9 297:10
304:3 307:12
309:11 310:6,20
315:7,18 316:7,10
317:22 320:15
321:1 324:25
330:13,25 332:2,3
336:2
**thinking** 284:15
**third** 20:22 21:12
131:7 174:8
**thirty** 347:18
**thoracotomy**
97:11
**thought** 90:21
126:2 152:16
194:18 228:11

242:21 286:10
315:18
**thousand** 257:19
**three** 20:6 22:4
23:6,8 41:11
42:19 47:3 49:7
49:19 111:16
115:3 123:4,25,25
124:1,6 128:9,11
128:13 129:14
131:11 136:3,12
136:16,23 137:6
173:19 206:16
212:2 214:19
215:8 229:8 236:8
237:9 243:4
261:22 284:2
307:13 315:1
318:7 340:17,19
341:22
**threshold** 161:5
**throwing** 181:10
**thumb** 202:7
**thursday** 138:20
138:21,22 143:7
**tick** 54:4
**tied** 226:20
**time** 16:18 21:24
24:7,17 25:25
26:5,9 29:5,6,16
29:18 32:3,15
33:16 34:1,16
37:17 40:1 41:18
42:20 43:6 44:2
45:22 52:20 53:25
54:3 56:25 57:11
64:19 65:9 66:12
66:22 68:6,9
70:15 78:1,24
79:1,2 81:14 88:6
88:7 89:20,23

105:17 108:9
116:10 119:7,11
119:25,25 121:24
124:13,23 126:5
126:12 127:7,20
127:23 128:7
129:4,11,16 131:3
131:17 132:1,18
134:7 135:3,11
137:17 138:18
140:2,14 141:23
147:5,16,17 152:1
153:7,22,24 154:1
155:10,10 159:6
159:18 163:4
165:5 166:24
173:16 182:7
184:8 189:23,24
190:14 192:18,19
193:11 197:2
204:14 210:23
211:10,21 217:22
235:22 236:9
240:2,8,14 245:16
246:1 247:10,12
260:20 262:25
263:25 264:8,13
264:22 270:4
271:7 272:23
278:10 281:20
287:23 290:21
293:17 304:10
305:25 306:6
307:2 309:17,19
316:6,18 320:1
321:16 322:4
325:8,24 334:6
335:16 338:1
343:19 345:19
**timecard** 139:14

**timeline** 170:13
**times** 19:1 20:4,6
25:10,12,23 26:18
28:14 30:21 37:5
37:14 54:13,25
56:8 57:20 63:16
63:17 64:17 90:8
95:10,13,16 97:4
122:25 132:5
136:1 142:19
143:13 145:9
151:19 152:7
179:23,25 192:22
195:9 214:20
216:8 225:25
226:15,17,19,20
226:25 230:8
240:20 247:12
268:14 272:4
273:13 274:6
281:17 282:7
293:14 297:19
299:14,24 300:6
313:18 318:20
**timing** 30:24
56:11 126:10
207:6
**tiny** 251:15
**title** 34:15 248:5
255:9
**titled** 7:10 186:15
206:11
**today** 15:11 16:7
17:23 18:10 23:7
25:3 27:19 32:24
40:14 68:14 80:23
84:8 90:3 109:13
109:18 114:1,21
129:9 137:4 150:4
193:17 200:2
204:8 217:7

235:19 286:13
308:15
**today's** 13:2
114:15
**toddler** 210:17
220:25
**told** 39:3 62:22
115:11 151:12
165:9,14 196:8
224:9 285:9
**tolerance** 335:16
337:9,18,21
**toll** 215:20,25
224:19,22
**tom** 306:1
**top** 211:9 222:19
222:21 229:9
233:18 235:9
242:13 252:5
255:15 311:6
320:8
**topic** 22:23 39:24
46:11 51:24
**topics** 22:8,11,13
46:15 117:18
319:23
**torok** 5:11
**total** 174:10 176:2
314:18 316:19
323:16
**totals** 175:18
**totem** 139:7
**touch** 70:8,10
145:15 331:1
**tough** 218:10
**tour** 55:3
**tower** 5:4
**tox** 154:21 186:4
243:4,14,16
314:19

**toxicologist** 70:16
71:1,21 72:9
109:12 111:4
112:16 172:8
189:6 231:24
**toxicologists** 149:9
231:18
**toxicology** 48:4
70:3 83:9 87:16
149:6 190:15
242:7,9,21,22,24
269:19,25 274:4
312:5 342:4
**track** 118:15
139:15 148:23
179:1 204:2 209:9
250:7,8 251:6
275:21,21 308:19
332:22 340:25
**tracked** 140:6
250:9
**tracking** 200:25
249:12
**tracks** 177:21
**tracy** 7:7 168:20
**traffic** 37:25
217:15 262:24
**train** 129:14
130:11
**trained** 123:3
125:15 127:25
192:15
**training** 31:4,19
31:23 34:6 43:15
43:18 47:6 48:2
59:10,19 124:18
128:17 129:4,5,20
130:5,14,19,20
161:20 162:3
313:25

tranquilizer 188:2
transcribed
267:15,20 345:14
348:7
transcript 6:1
20:1 39:3 333:4
344:2,6,9,11
347:11,12 348:5
348:12 349:5,11
349:17
transcription
345:16
transfer 145:13
147:12 150:9
267:12
transitioning
134:7
transmit 238:6
transmits 202:16
235:7
transmittal 206:6
transmitting
169:18
traumatic 142:6
travel 127:7
treat 105:24
treated 91:23
178:10,12 183:6
209:10,18,24
239:14,25 295:19
333:9 340:22
treating 88:1
treatment 110:4
338:15
trick 119:23
341:16
tried 95:3 119:13
198:12
triggered 137:23
trouble 118:18
124:20

true 110:16 116:8
177:19 178:5
189:5 288:18
345:15
truth 345:10,10,11
truthful 305:14
try 16:13,24 17:7
17:13 21:18 50:11
58:15 61:15 92:19
227:25 231:22
331:5 340:24
trying 28:15
110:14 111:10
132:22 195:23
196:19,23 227:15
271:8 285:19
310:11 315:14
tucker 4:12 14:5
tuckerellis.com
4:15
tuesday 138:19
turn 150:6 186:22
251:14 252:2
253:11,17 272:16
273:11 276:3
324:15
turned 140:9
269:16
turnover 125:6,8
126:4
turns 242:25
tv 233:25 278:4
twelfth 4:9
twice 151:1
two 20:6,25 21:4,6
23:10 45:17 55:15
55:16,22 56:6,14
81:3 86:22 88:18
88:21 98:20 104:5
114:10 115:9
129:12 136:2

138:14 143:6
150:22,23 152:18
159:9 161:5
169:11 173:14,21
181:1 185:15
210:15,20 215:7
222:13 225:4
229:8 239:21
252:18 257:24
261:25 268:7
270:17 284:2
296:2 307:12,12
311:22 315:1
type 30:9 37:19,22
55:15 63:25 64:2
91:22 95:24 142:6
142:12 144:3
150:14 182:12
246:21 282:25
283:6 293:18
307:9 326:6 336:3
338:3,13 339:12
typed 30:10
169:20 263:13
types 16:10 35:12
37:20,24 46:10
50:15 68:8 82:16
156:20 194:6
226:9 290:12
291:8 300:6
334:12,13 335:6
335:22
typewriter 154:5
typical 135:18
136:8 137:9 142:2
181:9 267:22
273:14
typically 157:9
194:16 203:20

**u**

u 229:15 230:4,6,7
230:25 231:5
236:16
u47700 228:15
uh 16:12 310:25
ukraine 179:16
ultimate 341:7
ultimately 160:12
unable 199:15
270:10
unavailable
261:24
unclaimed 148:9
149:3
uncomfortable
135:14
uncommon 67:11
undercover 25:19
42:15,17,20
underneath
147:20
understaffed
124:8,14,20
understand 17:17
36:25 38:25 42:9
87:4 89:19 96:6
110:13 197:25
247:20 248:5
249:9 284:10
285:24,25 287:11
288:3,23,24
303:23 308:10
331:24 332:17
334:19
understanding
59:1 94:14 161:24
165:20 260:17
275:15 285:21
296:15 313:24
333:6

[understood - visits]

understood 55:6
89:17 90:13
105:13 148:15
182:8 183:14
184:3 189:21
194:12,18
undertake 339:25
undertaken 279:1
undetermined
161:7
unfortunately
245:11
unh 16:12
unhappy 276:23
unhs 16:12
uniform 277:7
union 139:1
unique 143:14
303:20 304:4,10
unit 47:1 73:25
74:11,14 75:3,23
77:17,21 122:4
123:11 133:18
141:12 147:13
148:3 190:20
204:4,15 230:7
342:8
united 1:1 13:7
108:24 179:14
university 43:22
unrelated 21:24
55:18
unresponsive
210:16
unused 223:4
unusual 159:20
324:6
updated 158:9
248:25
updates 190:19

upper 187:1
206:15
ups 39:22 82:7
133:17 305:23
340:4
uptick 54:1,2
111:22 112:8
115:17 159:22
317:23
upticked 322:2
urine 72:8
use 57:2,4 58:5
60:10 64:20 68:16
69:14 71:23 76:16
94:9 102:8 108:19
154:10,24 155:3,5
157:4,13 159:4
171:3 187:25
193:4 194:13
196:4 199:17
203:1 219:8 224:8
248:18 279:15
283:11 286:13
290:10,20 291:1
294:6,7 306:9
309:20 327:22
328:1,7,8,8,13
331:4 333:24
338:12,14,16,17
339:13
user 156:17
uses 196:9
usual 279:15
usually 36:12 37:3
38:1,6 39:15
46:12 51:25 55:3
56:19 58:1 65:1,4
75:4 82:20 83:24
84:1 91:24 104:5
106:14,16 125:6
128:11 129:10

130:17,20 133:15
138:14,22 139:4,6
141:16 142:8
145:18 150:22,25
161:6 166:18,23
173:18,22 177:13
197:13 200:20
212:11 213:7,8
231:6,7 237:22
241:2,3 262:3,15
262:16,20,20
265:25 266:5
267:1 268:9
269:22 273:2
293:16 298:14
302:15 312:19
313:1 320:2,12
324:14 328:10
338:14 339:13
utilizing 203:2

**v**

v 1:10 347:6
vacation 137:17
valid 237:10
value 305:11
varies 136:4
various 26:23
48:15 199:21
292:25
vast 68:14 234:23
velten 229:11
verbally 95:21
98:13,15 300:5
veritext 2:13 3:4
3:18 4:3 347:1,7
350:1
veritext.com
347:17
versa 214:6
version 119:13
120:7 121:13

137:7 203:15,16
248:17,22 251:1,2
251:5,11,12
252:16 260:3
versions 203:11
257:4,5
versus 69:6 159:25
190:2 198:14
308:20 320:12
vice 214:6
victim 69:6,11
226:1 321:23
335:9
victim's 48:18
49:13 51:10 54:21
89:11
victims 48:21,25
50:23 177:11,12
177:23
video 167:9 258:2
videographer 5:11
13:1 79:7,10
134:17 135:2
167:8,11,14 228:1
228:4 258:1,5,9,11
260:25 261:2
283:15,18 332:6,9
343:22
videotaped 1:13
13:4
view 15:23 63:19
92:17
vincent 120:18
virginia 5:4
162:24
virtual 2:13 3:4,18
4:3
visit 146:19
155:13 304:8
visits 209:1

vividly   217:21
volume   60:18
   111:6 125:21
   141:20,22 142:7
   159:21
vouching   305:18

**w**

wait   78:25 272:19
waiting   269:19
waived   347:19
walk   32:22 37:23
   41:3,7 118:17
   192:25 218:5
   270:23
walked   83:13
   215:10
walking   192:20
   212:20
walmart   2:7 13:19
   13:21
want   17:1,8,18
   18:13,18 22:2,12
   28:11 29:15 37:7
   39:23 45:1 52:24
   56:1 58:17 63:15
   76:16 77:15,20
   79:1,16 83:14
   88:8 94:23 103:13
   104:3 109:20
   119:7,23 122:23
   123:6,13 124:24
   124:25 133:6
   139:19 153:10
   157:3 158:4
   166:21 168:15
   169:1 176:14
   182:10 194:8
   207:9 208:21
   216:9 217:2
   224:11,22 227:4
   234:10 243:21

246:15,16 247:17
251:24 254:7
257:24 259:8
264:19 269:3
272:25 276:15
282:22 283:9
284:9 285:14,20
286:13 288:3
289:22 295:18
307:14 311:7,10
314:6,17 315:4
322:3 325:5
327:14 331:15
334:25 338:13
342:23
wanted   65:11
   127:4 224:7 277:3
   277:6 308:4
   332:11,23
wants   19:5 105:1
   225:1
warning   60:7
   280:6
warnings   196:22
   197:16 279:24
washington   3:20
   4:9
watch   131:2,6
   152:18 224:11
way   24:23 31:25
   33:17 43:20 49:2
   50:11 64:11 67:2
   69:8 72:13 89:9
   90:19 94:16 96:8
   102:11 118:10
   146:23 165:17
   172:21 183:19
   184:7 189:21
   204:9 212:9 215:3
   217:19 228:18,20
   243:19 245:11

246:5 247:16
251:6 276:24
284:11 287:19
302:4 324:17
328:11,20 330:6
336:4
wayne   25:20
ways   156:12
   209:15 232:16
wc.com   4:10
we've   21:16 36:17
   47:14 64:10 76:1
   76:9,10 78:18
   106:24 110:8
   121:14 125:13,20
   159:13,13 162:7
   163:7 168:6
   189:13 191:3
   193:10 194:6
   197:22,24 198:4
   200:8,8,11,19
   241:10 247:19
   270:1,1 271:25
   273:13 287:4
   309:13 314:21
   318:11 324:18,25
   325:11 326:10
wear   191:20
website   62:20
   178:9 209:7
   239:21
websites   70:23
wedding   181:22
   181:22
wednesday   138:19
week   42:25 46:20
   46:21 98:13
   137:15 138:9,10
   138:11 239:24
   240:1 268:7
   314:17

weekend   112:18
   138:22 234:22
weekends   138:23
weeks   3:19 14:21
   14:21 98:20 237:8
   268:12,12 269:22
weight   129:1
went   43:12 46:20
   77:13 83:2 121:21
   123:2,4 125:1,22
   126:9 142:10
   148:22 200:10
   215:8,13 217:24
   224:12 243:23
   248:24 257:22
   271:17 307:8
   315:13 322:13
west   5:4 162:23
whatnot   198:11
wheels   265:10,13
whereof   346:4
whichever   292:22
white   190:24
whites   320:12
wide   178:21
wife   169:16,17
   278:7 293:19
wife's   293:16
   299:21 300:3
williams   3:9 4:8
   14:3,9
willing   56:24
   211:25
willingly   103:24
wise   128:10
wish   313:19
witness   27:14 36:8
   54:10 78:22 79:4
   134:14 168:6,8
   205:18 260:24
   283:11 329:21

342:13 344:2
345:9,13,14,17
346:4 347:8,11
348:1,4,11 349:1,4
349:15
**witnessed**  116:10
212:7,24 213:5,9
**witnesses**  35:25
**witness'**  347:14
**wmasters**  4:10
**woman**  139:7
**wondering**  304:19
**word**  76:16 219:18
243:21 302:4
306:10,10 309:21
341:1
**worded**  328:11
**words**  16:11
131:22 272:19
285:2
**wore**  43:1
**work**  36:2,3 38:5,9
42:23 44:6,10,11
49:8 62:10 65:23
106:20 110:3
118:11 120:9
128:14,18 134:9
135:25 137:14,16
138:9,10,19 141:5
158:15 165:7
172:19 173:9
182:1,6 207:21
249:22 270:8
273:2 315:22,22
338:24 341:14
342:8
**worked**  26:5 42:18
140:9 277:19
331:20 332:19
**working**  30:6
43:23 45:6 61:12

61:25 127:10
136:2 139:12
143:5 145:10
234:8 242:18
245:14 270:17
307:8 333:23
**workload**  135:19
**works**  30:2 39:2
74:23 138:20,22
149:4 259:17
260:16 278:7
**worksheet**  30:5,13
38:23 263:5,16
267:15,21 300:22
**worksheets**  29:14
29:20,23
**workweek**  136:9
137:20 138:1
**world**  132:20
288:12
**worst**  132:21
**write**  39:2 126:24
131:24 133:17
172:22 173:22
174:8 263:11
267:8 268:7 277:5
305:18 328:18
**writes**  238:23
**writing**  108:20
109:3 132:11
164:4 244:11
**written**  23:25 69:6
82:20 90:4 107:22
107:25 268:11,20
269:1,1,10 277:2
293:12
**wrong**  121:16
228:13 305:9
**wrote**  89:7 111:12
237:6 242:3
244:19

| x |
| --- |
| **x**  47:5 107:9 141:4 |
| 213:4 255:15 |
| 256:8,18 257:8 |
| 298:18,19,22 |

| y |
| --- |

**y**  107:10
**yeah**  30:14 46:24
50:7 51:3 71:19
99:15 101:20
105:12 124:4,7
125:4 127:2,5,14
131:14 133:15,15
134:8 143:5
150:16 151:3,6
153:1 154:18
156:8,23 157:10
158:21,24 164:3
164:11 165:3
171:14,16 180:21
192:2 199:11
209:16 222:22
227:12 242:16
243:9,21 253:7
272:14,15 273:9
279:11 294:21
301:1 307:25
315:20 316:23
317:9 322:11,19
324:11 340:12
**year**  28:1,2,3
43:21 46:12 50:23
52:16 55:25 68:2
83:2 98:16 115:13
115:17,23,25
116:3 122:22
123:9,14 124:10
124:12 127:17
136:20 139:2
141:25 150:23,24

150:25 151:1
155:14 159:14,23
175:5 187:24
198:18,19 200:10
205:1 216:6,22
219:23 220:4
221:1,18 234:13
234:13 237:7
244:24 256:13
282:14,16,19
311:20 312:13,15
312:17,19 314:25
316:21,22
**year's**  314:17
**years**  29:24 32:20
33:2,5,16 41:12,17
45:2 46:4 47:2,2,3
49:7,19 64:16
67:10 81:16 84:19
88:9,9 89:18
110:24 114:2,16
115:3 116:9
123:16,24 124:1,1
125:11 134:5
135:18 139:6,19
153:16 158:10
182:14 183:3,20
183:25 190:23
191:4 195:4,13,14
195:14 196:13,17
203:13 218:6
232:14 235:9
256:14 257:23
259:13 264:20
269:6 276:17
282:12 297:11
307:12,13,15
309:10 315:1
319:2,8 325:1,1,11
328:19 340:17,19

Page 63

**yep**  275:9 307:21
  323:7 324:3
**yesterday**  185:10
**york**  2:15,15,20,20
**young**  177:2 215:7
  220:22,23
**youngest**  124:10

**z**

**zach**  14:5
**zachary**  4:13
**zachary.adams**
  4:15
**zero**  114:4
**zerrusen**  5:7 13:23
**zip**  209:13

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.