```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     |   Judge Dan Aaron Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                      TUESDAY, JANUARY 22, 2019
14
                             - - -
15
            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                   CONFIDENTIALITY REVIEW
17
                             - - -
18
            Videotaped deposition of EMILY HALL, held at
19      Foley & Lardner LLP, One Biscayne Tower, 2
        Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:15 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, Certified
        Court Reporter.
22                           - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

```
 1    APPEARANCES:

 2    WEITZ & LUXENBERG

      BY:  ADAM L. STOLTZ, ESQUIRE

 3         JOSEPHINE A. REINA, ESQUIRE

      700 Broadway

 4    New York, New York 10003

      (212) 558-1310

 5    astoltz@weitzlux.com

      jreina@weitzlux.com

 6    Representing the Plaintiffs

 7

 8    FOLEY & LARDNER LLP

      BY:  KATY E. KOSKI, ESQUIRE

 9    111 Huntington Avenue

      Boston, Massachusetts 02199

10    (617) 342-4000

      kkoski@foley.com

11    Representing Anda, Inc., and the witness

12

13    REED SMITH LLP

      BY:  CRISTINA CÁRDENAS, ESQUIRE

14    1001 Brickell Bay Drive, Suite 900

      Miami, Florida 33131

15    (786) 747-0207

      ccardenas@reedsmith.com

16    Representing AmerisourceBergen Corporation and

      AmerisourceBergen Drug Corporation

17

18

19

20

21

22

23

24
```

```
 1      APPEARANCES VIA TELEPHONE AND STREAM:
 2      JONES DAY
        BY:  NICHOLAS HODGES, ESQUIRE
 3      4655 Executive Drive, Suite 1500
        San Diego, California 92121-3134
 4      (858) 314-1200
        nhodges@jonesday.com
 5      Representing Walmart
 6
        ARNOLD & PORTER
 7      BY:  WREDE SMITH, ESQUIRE
        601 Massachusetts Avenue, NW
 8      Washington, DC 20001-3743
        (202) 942-5000
 9      wrede.smith@arnoldporter.com
        Representing Endo Health Solutions Inc., Endo
10      Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
        Par Pharmaceutical Companies, Inc.,
11      (f/k/a Par Pharmaceutical Holdings, Inc.)
12
        COVINGTON & BURLING LLP
13      BY:  REBECCA G. VAN TASSELL, ESQUIRE
        1999 Avenue of the Stars
14      Los Angeles, California 90067-4643
        (424) 332-4768
15      rvantassell@cov.com
        Representing McKesson Corporation
16
17      KIRKLAND & ELLIS
        BY:  TUCKER HUNTER, ESQUIRE
18      300 North LaSalle Drive
        Chicago, Illinois 60654
19      (312) 862-2000
        tucker.hunter@kirkland.com
20      Representing Allergan Finance LLC
21
22    ALSO PRESENT:
23      ANTHONY BARBARO, Videographer
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
 2                   I N D E X
 3                        - - -
 4  Testimony of:  EMILY HALL                      PAGE
 5      DIRECT EXAMINATION BY MR. STOLTZ...............  8
 6
 7
 8                  E X H I B I T S
 9                (Attached to Transcript)
10    EMILY HALL DEPOSITION EXHIBITS                PAGE
11  Anda - Hall    Notice of Videotaped Deposition of   10
    Exhibit 1      Emily Schultz
12
    Anda - Hall    Anda, Incorporated - Anda Overview   40
13  Exhibit 2      - Bates Numbered
                   Anda_Opioids_MDL_0000570926 to
14                 Anda_Opioids_MDL_0000570944
15  Anda - Hall    July 29, 2013 E-mail - Subject:      77
    Exhibit 3      EPIC & IPA NJ - Required
16                 Information - Bates Numbered
                   Anda_Opioids_MDL_0000711634
17
    Anda - Hall    Standard Operating Procedure -       87
18  Exhibit 4      Suspicious Order Monitoring - Bates
                   Numbered
19                 Anda_Opioids_MDL_0000140495 to
                   Anda_Opioids_MDL_0000140497
20
    Anda - Hall    E-mail Chain - Subject:  Remedy -    100
21  Exhibit 5      Control Requests - Bates Numbered
                   Anda_Opioids_MDL_0000133286 to
22                 Anda_Opioids_MDL_0000133287
23
24
```

```
 1                    E X H I B I T S
 2    EMILY HALL DEPOSITION EXHIBITS                    PAGE
 3   Anda - Hall    December 15, 2016 E-mail - Subject:  114
     Exhibit 6      Bucket - Bates Numbered
 4                  Anda_Opioids_MDL_0000147166 to
                    Anda_Opioids_MDL_0000147167
 5
     Anda - Hall    E-mail Chain - Subject:  Acct        121
 6   Exhibit 7      #499221 - Bates Numbered
                    Anda_Opioids_MDL_0000137399
 7
     Anda - Hall    November 27, 2012 E-mail - Subject:  135
 8   Exhibit 8      Presentation - Bates Numbered
                    Anda_Opioids_MDL_0000132591
 9
     Anda - Hall    August 22, 2016 E-mail - Subject:    147
10   Exhibit 9      SOMS - Held Orders - Bates Numbered
                    Anda_Opioids_MDL_0000141492
11
     Anda - Hall    February 16, 2017 E-mail - Subject:  153
12   Exhibit 10     Wegman Oxycodone Order - Bates
                    Numbered
13                  Anda_Opioids_MDL_0000149556 to
                    Anda_Opioids_MDL_0000149558
14
     Anda - Hall    E-mail Chain - Subject:  Suspicious  163
15   Exhibit 11     Customer's Cut Off - Bates Numbered
                    Anda_Opioids_MDL_0000134998
16
     Anda - Hall    E-mail Chain - Subject:  Naltrexone  173
17   Exhibit 12     Tablet - Bates Numbered
                    Anda_Opioids_MDL_0000136972 to
18                  Anda_Opioids_MDL_0000136974
19   Anda - Hall    March 7, 2012 E-mail - Subject:  RA  187
     Exhibit 13     - Top 100 Products for Top 100
20                  Stores Review (Combined with Misc
                    Random Research) and Attachment -
21                  Bates Numbered
                    Anda_Opioids_MDL_0000081549 to
22                  Anda_Opioids_MDL_0000081587
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2     EMILY HALL DEPOSITION EXHIBITS                   PAGE
 3     Anda - Hall    E-mail Chain - Subject:  Please   202
       Exhibit 14     Review This Before I Send to
 4                    DEA...Thanks - Bates Numbered
                      Anda_Opioids_MDL_0000132608 to
 5                    Anda_Opioids_MDL_0000132609
 6     Anda - Hall    Personnel File of Emily Hall -    212
       Exhibit 15     Bates Numbered
 7                    Anda_Hall_Personnel_001 to
                      Anda_Hall_Personnel_017
 8
       Anda - Hall    E-mail Chain - Subject:  802433 - 219
 9     Exhibit 16     Drug Store Columbus Ohio - Bates
                      Numbered
10                    Anda_Opioids_MDL_0000136372 to
                      Anda_Opioids_MDL_0000136373
11
       Anda - Hall    E-mail Chain - Subject:  Need Info 223
12     Exhibit 17     - Bates Numbered
                      Anda_Opioids_MDL_0000133103 to
13                    Anda_Opioids_MDL_0000133105
14     Anda - Hall    E-mail Chain - Subject:  EPIC     229
       Exhibit 18     Account - 210466 - Requesting
15                    Control Limit Increase - Bates
                      Numbered
16                    Anda_Opioids_MDL_0000313264 to
                      Anda_Opioids_MDL_0000313269
17
       Anda - Hall    E-mail Chain - Subject:  Questions 241
18     Exhibit 19     Regarding Compliance Decisions -
                      Bates Numbered
19                    Anda_Opioids_MDL_0000150162 to
                      Anda_Opioids_MDL_0000150163
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Anthony Barbaro.  I'm a videographer

 4      for Golkow Litigation Services.  Today's date is

 5      January 22nd, 2019, and the time is 9:15 a.m.

 6              This video deposition is being held at

 7      2 South Biscayne Boulevard, Suite 1900, in Miami,

 8      Florida 33131, In Re:  The National Prescription

 9      Opioid Litigation for the United States District

10      Court, Northern District of Ohio, Eastern

11      Division.  The deponent is Emily Hall.

12              Counsel, would you now please identify

13      yourselves for the record.

14              MR. STOLTZ:  Adam Stoltz for the plaintiffs.

15              MS. KOSKI:  Katy Koski for Anda, Inc., and

16      the witness.

17              MS. CARDENAS:  Cristina Cardenas for

18      AmerisourceBergen from Reed Smith.

19              THE VIDEOGRAPHER:  Counsel on the phone?

20              MR. SMITH:  This is Reed Smith from Arnold &

21      Porter representing Endo & Par.

22              MR. HUNTER:  This is Tucker Hunter, Kirkland

23      & Ellis, on behalf of Allergan Finance, LLC.

24              MR. HODGES:  This is Nick Hodges from Jones
```

1       Day on behalf of Walmart.

2              MS. VAN TASSELL:  This is Rebecca Van Tassell

3       from Covington & Burling on behalf of McKesson.

4              THE VIDEOGRAPHER:  The court reporter today

5       is Kelly Lawton, and she will now swear in the

6       witness.

7              THE COURT REPORTER:  Ma'am, would you please

8       raise your right hand.

9              Do you swear or affirm the testimony you're

10      about to give will be the truth, the whole truth,

11      and nothing but the truth?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT REPORTER:  Thank you.

14             EMILY HALL, called as a witness by the

15      Plaintiffs, having been first duly sworn, testified

16      as follows:

17                     DIRECT EXAMINATION

18      BY MR. STOLTZ:

19      Q.    So, Emily, what is your current occupation?

20      A.    I am the senior manager of DEA compliance.

21      Q.    And what is DEA compliance?

22      A.    Currently, my role is not directly related to

23      DEA compliance.  I oversee all of our licensures for

24      all of our facilities as well as our customers and

```
 1     our vendors.

 2          Q.   And when you say "licensure," are you

 3     referring to a license to distribute controlled

 4     substances?  Or licensure how?

 5               MS. KOSKI:  Object to form.

 6               THE WITNESS:  State licensure, DEA licensure,

 7          controlled substance licenses.  So I make sure

 8          that our customers are licensed appropriately.  I

 9          make sure our facilities are licensed

10          appropriately, and our vendors.

11     BY MR. STOLTZ:

12          Q.   And in that capacity, you're familiar with

13     both federal and state regulations?

14          A.   Yes, sir.

15          Q.   Okay.  If there's ever a question I ask and

16     you don't understand it, feel free to let me know.

17          A.   Okay.

18          Q.   If you don't tell me that you don't

19     understand, I'm going to assume that you do

20     understand.

21          A.   Okay.

22          Q.   Have you ever testified in a deposition or at

23     trial?

24          A.   No, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.    Okay.

2            MR. STOLTZ:  I'd like to show you what should

3      be marked as Exhibit 1.

4            (Anda - Hall Exhibit 1 was marked for

5      identification.)

6            THE WITNESS:  This one is for me?

7            MS. KOSKI:  Yes.  Actually, I didn't get one.

8      We'll figure it out together.

9      BY MR. STOLTZ:

10     Q.    And you can take your time reading it, but

11     have you seen this document before?

12     A.    No, sir.

13     Q.    Okay.  Do you see the second paragraph where

14     it says Ms. Schultz is requested to produce on or

15     before January 22nd, 2019, copies of all documents,

16     data, or information reviewed in connection with

17     preparation for this deposition?

18     A.    Yes, sir.

19     Q.    Did you bring any documents with you in

20     response to this document?

21           MS. KOSKI:  You can answer that question.

22           THE WITNESS:  No, sir.

23     BY MR. STOLTZ:

24     Q.    Did you review any documents prior to this
```

```
 1   deposition?

 2        A.   Yes, sir.

 3        Q.   Were those documents deposition or trial

 4   testimony?

 5             MS. KOSKI:  I'm going to object and instruct

 6        you not to answer.

 7             You are not entitled to inquire about the

 8        documents -- the substance of the documents she

 9        reviewed in preparation for the deposition.

10             MR. STOLTZ:  Okay.

11   BY MR. STOLTZ:

12        Q.   And I apologize if I already asked this, but

13   did you look in your own personal files to find any

14   documents that might be relevant to this litigation

15   prior to this deposition?

16        A.   No, sir.

17        Q.   Did you meet with your attorneys prior to

18   this deposition?

19        A.   Yes, sir.

20        Q.   And was that in person or by phone?

21        A.   In person.

22        Q.   And how many times did you meet with your

23   attorneys?

24        A.   One time.
```

```
 1        Q.   And how long was that?

 2        A.   A few hours.

 3        Q.   If you had to guess, how many hours?

 4        A.   Five.

 5        Q.   Okay.  And who was present?

 6        A.   Katy and James.

 7        Q.   Did you speak to anyone else prior to this

 8   deposition?

 9             MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11        Q.   Did you speak to anyone else prior to this

12   deposition in regards to this litigation?

13             MS. KOSKI:  Object to form.

14             THE WITNESS:  No.

15   BY MR. STOLTZ:

16        Q.   You can answer the question.

17        A.   No, sir.  Sorry.

18        Q.   Are you being reimbursed by your employer for

19   your expenses in connection with this deposition?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  No, sir.

22   BY MR. STOLTZ:

23        Q.   You're not being paid for your time here?

24             MS. KOSKI:  Object to form.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  Salary.  I'm a salaried

 2      employee.

 3      BY MR. STOLTZ:

 4         Q.   Have you ever received compensation from Anda

 5      or Allergan as a speaker at an event?

 6                 MS. KOSKI:  Object to form.

 7                 THE WITNESS:  No, sir.

 8      BY MR. STOLTZ:

 9         Q.   I'd like to ask you about your educational

10      background, if you would please briefly describe your

11      educational background after high school.

12         A.   I attended Broward College for two years.

13         Q.   Okay.  And did you graduate from Broward

14      College?

15         A.   No, sir.

16         Q.   What did you study while you were there?

17         A.   I studied general associates.

18         Q.   Okay.  Would you describe your employment

19      background after Broward College?

20         A.   I'm sorry, could you repeat the question?

21         Q.   Can you describe your employment background

22      after leaving Broward College?

23         A.   I worked for Target for a few years.  I moved

24      to Hallmark.  And then I went into Anda, and I have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    been working for Anda for 15 years.

 2         Q.   Okay.  And you started work -- when did you

 3    start working for Anda?

 4         A.   In June of 2004.

 5         Q.   And what was your position in 2004?

 6         A.   I started out as a warehouse clerk, and then

 7    shortly after that in 2004, I moved into a compliance

 8    clerk role.

 9         Q.   Okay.  And what are the duties of a warehouse

10    clerk?

11         A.   Picking, packing, shipping, helping with the

12    operations, getting product out the door.

13         Q.   Okay.  Does that involve actual moving boxes

14    around?

15         A.   Yes, sir.

16         Q.   Okay.  And then you shifted to a compliance

17    clerk.  How did the duties of compliance clerk differ

18    from that of warehouse clerk?

19         A.   So I started working as a compliance clerk,

20    and my main responsibilities was licensure.  So

21    validating our customers' licensure so that they were

22    set up in our systems appropriately enough that they

23    were eligible to order if you were eligible to order.

24         Q.   Just, when you say "eligible to order," just
```

```
 1     eligible to order pharmaceutical products in general?

 2          A.   Yes, based on their state and DEA licenses.

 3          Q.   Okay.  And how would you validate a

 4     customer's licensure?

 5          A.   So we would go out at that time to the state

 6     portal and validate directly through each state.

 7          Q.   What is a state portal?

 8          A.   So each state, almost every state has a

 9     website that you can go to for validation.  So you

10     can go to that website on their board of pharmacy or

11     medical board website and validate to make sure that

12     they are active, that they are a good expiration

13     date, what their address is.

14          Q.   And back in 2004, most states had such a

15     portal?

16          A.   Yes, sir.

17          Q.   What would happen if a state didn't have a

18     portal?

19          A.   We would call them.  Make a call direct in to

20     the board.

21          Q.   The board?

22          A.   The individual boards.  So board of pharmacy,

23     medical board, depending on whatever -- whatever the

24     customer falls under.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  So for pharmacy, that would be the

2    board of pharmacy?

3        A.    Yes, sir.

4        Q.    Okay.  And if it was a doctor, that would be

5    a different board?

6        A.    Medical board.

7        Q.    Okay.  So as a compliance clerk, you would

8    ensure that the licensure for customers of Anda were

9    valid?

10       A.    Yes.

11       Q.    Was there anything else you would do as a

12   compliance clerk?

13       A.    At that time, that was my main

14   responsibilities.

15       Q.    Okay.  After working as a compliance clerk,

16   what was your position?

17       A.    I moved to a senior role, and then, from

18   there, I was a registration analyst.

19       Q.    Okay.  And just going back to your time as a

20   compliance clerk, you would be working -- were you

21   working in a particular warehouse?

22           MS. KOSKI:  Object to form.

23   BY MR. STOLTZ:

24       Q.    As a compliance clerk, did you have -- when

Highly Confidential - Subject to Further Confidentiality Review

```
1    it came to ensuring licenses for customers of Anda,

2    did you do that for a particular region?

3        A.   No.

4             MS. KOSKI:  Object to form.

5             THE WITNESS:  All of our customers.

6    BY MR. STOLTZ:

7        Q.   Okay.  Did you -- what was your business

8    address at that time?

9        A.   The place that I worked?

10       Q.   Yes.

11       A.   2915 Weston Road, Weston, Florida.

12       Q.   Okay.  So, as a compliance clerk, you were

13   working in the main office, or were you working in

14   the warehouse itself?

15       A.   That building houses both, so --

16       Q.   Okay.

17       A.   -- it's both a warehouse and office.

18       Q.   Okay.  And then, in 2007, you got -- you

19   changed position to senior compliance coordinator; is

20   that correct?

21       A.   Yes, sir.

22       Q.   And as a senior compliance coordinator, how

23   did your duties change from being a compliance clerk?

24       A.   Took on a few different roles.  Managed the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pedigree and temperature monitoring in our facility,

 2    but continued with licensure.

 3         Q.   And what was that?  Managed the what?  You

 4    said you managed the temperature monitoring, and what

 5    was the second thing?

 6         A.   Pedigree.

 7         Q.   Okay.  What is pedigree?

 8         A.   So at one time there was around 30 or so

 9    states that had different requirements on pedigrees,

10    so passing pedigree, and Florida was one of those.

11    So for us to pass product to certain wholesalers, we

12    would have to pass pedigree on that product, showing

13    lot and where it came from, who we purchased it from.

14         Q.   And were there also requirements for

15    temperature and humidity?

16         A.   Yes, sir.

17         Q.   Was that state by state?

18         A.   State.

19         Q.   Okay.  Just the state of Florida?

20         A.   Yes, sir.

21         Q.   Okay.  And from there -- let's go back.

22              As senior compliance coordinator, the

23    compliance referred to complying with state

24    regulations as far as pedigree and temperature and
```

```
 1    humidity?

 2            MS. KOSKI:  Object to form.

 3            It's okay.

 4            THE WITNESS:  As well as licensure.

 5    BY MR. STOLTZ:

 6       Q.   Okay.  As well as licensure.  Were there

 7    any -- did you manage a team when it came to -- to

 8    keeping track of licensure?

 9            MS. KOSKI:  Object to form.

10            THE WITNESS:  Not at that time.

11    BY MR. STOLTZ:

12       Q.   Did you know of anyone else who helped in

13    maintaining licensure records?

14            MS. KOSKI:  Object to form.

15            THE WITNESS:  Can you restate that?

16            MR. STOLTZ:  Sure.

17    BY MR. STOLTZ:

18       Q.   Were you the only person at Anda that

19    maintained licensure records?

20       A.   No, sir.

21       Q.   Who else maintained licensure records?

22       A.   Specific names?

23       Q.   Sure.

24       A.   There was the Cynthia Mendoza,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Sandra Bautista, and Vivian Harvey.

2        Q.    And were they all senior compliance

3    coordinators or --

4        A.    I believe only one was.

5        Q.    How did you split up maintaining licensure

6    records?

7        A.    Mostly it was shift-driven, so I worked a

8    later shift than the other people on the team.  So

9    when I came in, we had shifts on e-mails and shifts

10   on opportunities to work.

11       Q.    And how did you ensure that the licensures --

12   or, excuse me, the licenses were accurate and

13   up-to-date?

14           MS. KOSKI:  Object to form.

15           THE WITNESS:  We would go to the individual

16       boards to verify their -- validate their license.

17   BY MR. STOLTZ:

18       Q.    And how frequently would you update the

19   licensure records?

20       A.    At expiration, depending on when their board

21   expires them, but sometimes throughout on an audit

22   basis.

23       Q.    When -- under what circumstances were audits

24   performed?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Just random audits.

2    Q.    Okay.  Those audits were completely random?

3    A.    Yes, sir.

4    Q.    What was your next position at Anda?

5    A.    I believe it was registration analyst.

6    Q.    And what is a registration analyst?

7    A.    At that point, I took on managing our

8    licensure for our facilities, so making sure our

9    three facilities were licensed.

10    Q.    When you refer to facility, what are you

11    referring to specifically?

12    A.    We have three facilities, entities, and two

13    of them are distribution centers, and one of them is

14    a broker facility.

15    Q.    What's a broker facility?

16    A.    Sales center.

17    Q.    So like a call center?

18    A.    Yes, sir.

19    Q.    What were your other responsibilities as a

20    registration analyst?

21    A.    SOPs, making sure that they were up-to-date,

22    and as well as licensure for our customers.  So I

23    never lost that responsibility.

24    Q.    And when you refer to SOPs, are you referring

Highly Confidential - Subject to Further Confidentiality Review

1    to standard operating procedures?

2         A.   Yes, sir.

3         Q.   And what kind of standard operating

4    procedures did you maintain?

5         A.   So we're required as a wholesale distributor

6    to have up-to-date standard operating procedures on

7    all of our distribution activities as well as

8    compliance activities.

9         Q.   And who else worked with you in maintaining

10   standard operating procedures with respect to

11   compliance and distribution?

12            MS. KOSKI:  Object to form.

13            THE WITNESS:  My manager.

14   BY MR. STOLTZ:

15        Q.   And who was your manager?

16        A.   Michael Cochrane.

17        Q.   What is involved in maintaining a standard

18   operating procedure?

19            MS. KOSKI:  Object to form.

20            THE WITNESS:  Can you be --

21            MR. STOLTZ:  Sure.

22   BY MR. STOLTZ:

23        Q.   Did you draft the standard operating

24   procedure?

```
 1        A.   At that time, no, sir.

 2        Q.   So what's involved -- what was your

 3    responsibilities with respect to the standard

 4    operating procedures at that time?

 5        A.   Maintaining, making sure -- partnering with

 6    the respective areas to make sure that they were

 7    up-to-date, and grabbing the correct information.

 8        Q.   Okay.  When you say maintaining, does that

 9    just mean keep making sure it's not destroyed?  What

10    is involved with maintaining a standard operating

11    procedure?

12        A.   Reviewing.  Making sure that we are reviewing

13    it on an annual basis.

14        Q.   What is the purpose of reviewing a standard

15    operating procedure?

16             MS. KOSKI:  Object to form.

17             THE WITNESS:  We have requirements on a state

18        level to have and house standard operating

19        procedures.

20    BY MR. STOLTZ:

21        Q.   And were those requirements -- did those

22    requirements change while you were in that position?

23             MS. KOSKI:  Object to form.

24             THE WITNESS:  Can you clarify what --
```

```
 1              MR. STOLTZ:  Sure.

 2              THE VIDEOGRAPHER:  I'm sorry to interrupt.

 3         They are saying they can't hear you guys.  If you

 4         guys can speak up a little louder, just because

 5         the webcam has to pick you up, too.  I'm sorry.

 6              MR. STOLTZ:  Okay.

 7              MS. KOSKI:  No problem.  Maybe if I push this

 8         up a little higher.

 9    BY MR. STOLTZ:

10         Q.  So would you agree that the purpose of

11    reviewing the standard operating procedures on an

12    annual basis was to ensure that Anda was in

13    compliance with state and federal regulations?

14              MS. KOSKI:  Object to form.

15              THE WITNESS:  No, sir.

16    BY MR. STOLTZ:

17         Q.  So why were the standard operating procedures

18    reviewed on an annual basis?

19         A.  To make sure that Anda was following their

20    own procedures.

21         Q.  So how could you ensure that Anda was

22    following its own procedures?

23         A.  So when you're reviewing and validating on an

24    annual basis, you are partnering with the person that
```

Highly Confidential - Subject to Further Confidentiality Review

1    is actually doing that process and making sure that

2    they are following that, and if anything has changed,

3    then we need to update the document.

4         Q.   What are some changes, just for an example?

5              MS. KOSKI:  Object to form.

6              Are you asking her to pick any random SOP and

7         give an example of a change?

8    BY MR. STOLTZ:

9         Q.   So when it comes to a compliance SOP, for

10   example, you said that you make sure that Anda is

11   following that SOP, and if anything has changed, we

12   need to update the document.

13             What do you -- what do you mean by "anything

14   has changed"?  Could that refer to state or federal

15   regulations, or is that referring to other type of

16   changes?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  It would be a change

19        internally.  So if A plus B is no longer

20        equalling C, we need to make sure we document

21        that.

22   BY MR. STOLTZ:

23        Q.   Okay.  So can you just give an example of an

24   internal change that would require --

```
 1        A.    So, for example, for receiving SOP where a

 2    receiving clerk passes a document to a receiving

 3    analyst and now that document does not -- no longer

 4    goes past the analyst, the receiving clerk manages

 5    it, that would be an example of a change.

 6        Q.    And then from registration analyst, it looks

 7    like you became manager of regulatory compliance?

 8        A.    Yes, sir.

 9        Q.    How did the position differ from your

10    position as a registration analyst?

11        A.    I still managed our licensure for our

12    facility as well as our customers, but now I had some

13    direct reports under me at that point.

14        Q.    And who are those people?  Who are those

15    district reports?

16        A.    The same names that I said earlier:  Vivian

17    Harvey, Sandra Bautista, and Cynthia Mendoza.

18        Q.    So the only difference as a manager of

19    regulatory compliance was that you had direct

20    reports?  Or were there additional responsibilities

21    on top of maintaining accurate licenses for your

22    customers and for Anda?

23            MS. KOSKI:  Object to form.

24    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. STOLTZ:

 2          Q.   Did your responsibilities change at all when

 3     you became manager of regulatory compliance?

 4          A.   The core of my responsibilities did not

 5     change.

 6          Q.   Okay.  And what is regulatory compliance?

 7          A.   Making sure that we are monitoring and

 8     following state and federal regulations regarding

 9     licensure or so on.

10          Q.   What's "so on"?

11          A.   Federal regulations, changes in the

12     environment.

13          Q.   What do you mean by changes in the

14     environment?

15          A.   When there's a change in the regulations,

16     monitoring them.

17          Q.   When you refer to regulations, are you

18     referring specifically to licensing requirements?

19          A.   Yes, sir.

20          Q.   At any point in your position as manager of

21     regulatory compliance were you -- were you monitoring

22     for suspicious orders by customers of Anda?

23          A.   Yes, sir.

24               MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. STOLTZ:

2        Q.   Is that -- is that separate from maintaining

3    licensure?

4        A.   Yes, sir.

5        Q.   So in addition to making sure everyone's

6    licenses were up-to-date, you also monitored for

7    suspicious orders?

8        A.   Yes, sir.

9        Q.   Okay.  So was there anything else in

10   regulatory compliance that you would -- are there any

11   other responsibilities other than maintaining

12   licensure and ensuring -- ensuring that there are no

13   suspicious orders delivered by Anda?

14           MS. KOSKI:  Object to form.

15           THE WITNESS:  I'm not clear.

16   BY MR. STOLTZ:

17       Q.   Okay.  Sure.

18           What were your responsibilities with regard

19   to monitoring suspicious orders?

20           MS. KOSKI:  Object to form.

21           The objection is as to time, if you care.

22           MR. STOLTZ:  Sure.

23   BY MR. STOLTZ:

24       Q.   At any point before becoming manager of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regulatory compliance, would you have been involved

 2    in monitoring for suspicious orders?

 3        A.   No, sir.

 4        Q.   When you became manager of regulatory

 5    compliance, is that when you started to monitor for

 6    suspicious orders?

 7        A.   Yes, sir.

 8        Q.   Okay.  And did you receive any training in

 9    what a suspicious order might look like?

10        A.   Yes.

11             MS. KOSKI:  Object to form.

12    BY MR. STOLTZ:

13        Q.   And what type of training was that?

14        A.   I received internal training as well as

15    industry training.

16        Q.   Okay.  The industry training, when did that

17    occur?

18        A.   I would say around 2009.

19        Q.   Do you recall what organization put on that

20    training?

21        A.   Yes, sir.

22        Q.   And what was the name of that organization?

23        A.   DEA.

24        Q.   Okay.  Did anyone else come to that training?
```

```
 1              MS. KOSKI:  Object to form.

 2   BY MR. STOLTZ:

 3      Q.   Did anyone else -- any other representatives

 4   from Anda -- were any other representatives of Anda

 5   in attendance at that training?

 6      A.   Yes, sir.

 7      Q.   And who were the individuals?

 8      A.   Miguel Palma.

 9      Q.   And what was his position at Anda?

10      A.   I don't know his exact title, but he was a

11   manager for controlled substances in the warehouse.

12      Q.   And why is it that Anda sent you to learn

13   about suspicious orders in 2009?

14              MS. KOSKI:  Object to form.

15              THE WITNESS:  To gain some industry

16      knowledge.

17   BY MR. STOLTZ:

18      Q.   But that wasn't a part of your -- was that

19   part of your job description in 2009?

20      A.   Not specifically attending DEA conferences.

21      Q.   Were you monitoring for suspicious orders in

22   2009?

23      A.   Not me specifically.

24      Q.   Who was?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I can't say for certain.

 2        Q.    Would it have been the individual you

 3   mentioned?  Miguel Palma?

 4        A.    Miguel Palma?  I can't say.

 5        Q.    So in 2009, Anda sent you and Miguel Palma to

 6   learn about monitoring suspicious orders and what

 7   suspicious orders looked like.

 8              Is that accurate?

 9              MS. KOSKI:  Object to form.

10              THE WITNESS:  No, that's not what I said.

11   BY MR. STOLTZ:

12        Q.    Okay.  What did you say?

13              MS. KOSKI:  Object to form.

14              You can answer.

15              THE WITNESS:  I attended a DEA conference.

16   BY MR. STOLTZ:

17        Q.    And did Anda send you to that DEA conference?

18        A.    Yes, sir.

19        Q.    And what was the subject matter?

20        A.    There was various different courses.

21        Q.    And what were the various different courses?

22        A.    Overall, the DEA regulations.  There was our

23   goals, 222 forms, talked about quota.  Those were the

24   topics I can remember off the top of my head.
```

1      Q.   Do you recall that -- them speaking about

2    suspicious orders?

3      A.   I can't recall.

4      Q.   So in 2009, you can't recall whether or not

5    the DEA training included references to suspicious

6    orders?

7      A.   Correct.

8      Q.   They didn't refer to what a suspicious order

9    might look like?

10     A.   I don't recall.

11     Q.   Okay.  What was Miguel Palma's position at

12   Anda?

13          MS. KOSKI:  Objection.

14          THE WITNESS:  Like I stated before, I don't

15      know his exact title, but he was a manager of

16      controls in the warehouse.

17   BY MR. STOLTZ:

18     Q.   And do you recall how long the training was?

19     A.   Three days, I believe.

20     Q.   Do you remember where it occurred?

21     A.   It was in Tampa, Florida.

22     Q.   Was it a requirement that Anda send a

23   representative to the industry training?

24          MS. KOSKI:  Object to form.

```
 1                THE WITNESS:  I do not know.

 2   BY MR. STOLTZ:

 3        Q.   How shortly after becoming a registration

 4   analyst did you attend that DEA training?

 5        A.   I couldn't say for certain.

 6        Q.   So earlier on in the deposition, you said you

 7   received training on what a suspicious order might

 8   look like, but then you said that you don't recall

 9   whether or not you received training as to what a

10   suspicious order looked like.

11                Did you -- did you recall remembering --

12   excuse me.

13                Did you, in fact, receive training on what a

14   suspicious order looked like, or did you not?

15                MS. KOSKI:  Object to form.

16                THE WITNESS:  I don't believe that I said

17        that I never received suspicious orders training.

18   BY MR. STOLTZ:

19        Q.   In reference to the DEA training in 2009, you

20   said that you had received training as to what a

21   suspicious order looks like.  That's the same meeting

22   that -- we're talking about the same meeting?

23        A.   No, sir.

24        Q.   There are two different industry -- there was
```

```
 1     two different training sessions in 2009?

 2         A.   No, sir.

 3         Q.   So I'm just trying to understand.  There was

 4     just the one three-day training in Tampa, Florida,

 5     that was put on by the DEA?

 6         A.   In 2009, yes.

 7         Q.   In 2009?

 8         A.   I believe it was 2009, yes, sir.

 9         Q.   And you went to that meeting with Miguel

10     Palma?

11         A.   Yes, sir.

12         Q.   Okay.  And when you said that you received

13     training as to what a suspicious order looks like,

14     what were you referring to?

15         A.   Our -- our electronic monitoring is a -- I

16     had -- internal training on that from my manager.  It

17     was a leadership training, internal.

18         Q.   And that was in addition to the training you

19     received at the DEA training in Tampa?

20         A.   Yes, sir.

21         Q.   And that training --

22         A.   That didn't occur in 2009.

23         Q.   Okay.  And when did the -- when did the

24     internal training occur?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    That was around 2010.

 2       Q.    Okay.  And was that training formalized, or

 3   was that sort of more of an informal mentorship

 4   relationship?

 5             MS. KOSKI:  Object to form.

 6             THE WITNESS:  Can you clarify?

 7   BY MR. STOLTZ:

 8       Q.    Did you receive formal training in 2010 as to

 9   what you referred to as your electronic system?

10       A.    Our monitoring system, yes, sir.

11       Q.    How long was that training?

12       A.    It was ongoing.

13       Q.    And who trained you?

14       A.    The management of compliance at that time.

15       Q.    And who was that individual?

16       A.    Michael Cochrane and Patrick Cochrane.

17       Q.    And when you say your monitoring system, what

18   was the name of that system?

19             MS. KOSKI:  Object to form.

20             THE WITNESS:  Our electronic monitoring -- so

21        it was a monitoring system where you were

22        collecting information, due diligence, looking at

23        customers.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.    Okay.  What -- was there -- how did you refer

 3    to that monitoring system internally at Anda?

 4        A.    A monitoring system.

 5        Q.    All right.  So when did you receive -- you

 6    said you received that training on the electronic

 7    monitoring system in 2010?

 8        A.    Yes, sir.

 9        Q.    Okay.  Was -- was that monitoring system --

10    did you use that in your day-to-day -- in your

11    day-to-day responsibilities?

12            MS. KOSKI:  Object to form.

13            THE WITNESS:  Part of.

14    BY MR. STOLTZ:

15        Q.    So when you said you didn't monitor for

16    suspicious orders until 2011, did you mean 2010?

17            MS. KOSKI:  Object to form.

18            THE WITNESS:  I don't recall saying 2011.

19    BY MR. STOLTZ:

20        Q.    So when is it that it was part of your job to

21    monitor for suspicious orders?

22        A.    2010.

23        Q.    And that's when you were a registration

24    analyst or when you were manager of regulatory
```

1    compliance?

2        A.   At that time manager of regulatory

3    compliance.

4        Q.   So is it fair to say that your main

5    responsibilities as a manager of regulatory

6    compliance were to monitor licensure activities,

7    monitor trends as far as state and federal

8    regulation, and also monitor for suspicious orders?

9        A.   Yes, sir.

10       Q.   Why does Anda have a regulatory compliance

11   department?

12           MS. KOSKI:   Object to form.

13   BY MR. STOLTZ:

14       Q.   In your understanding, why does Anda have a

15   regulatory compliance department?

16       A.   To make sure that we are following state and

17   federal.

18       Q.   State and federal regulations?

19       A.   Oh, I'm sorry, yes.  I said it in my head.

20       Q.   So as manager of regulatory compliance, were

21   you the manager of the entire regulatory department

22   at Anda?

23       A.   No, sir.

24       Q.   And that was Michael Cochrane?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   Yes, sir.

 2         Q.   How did your position differ from that of

 3    Robert Brown?

 4              MS. KOSKI:  Object to form.

 5              THE WITNESS:  Can you please clarify?

 6              MR. STOLTZ:  Sure.

 7    BY MR. STOLTZ:

 8         Q.   What was Robert Brown's position at Anda?

 9         A.   He was the, I believe, associate director of

10    DEA compliance.  I'm sorry, I don't remember his

11    exact title.

12         Q.   Sure.

13              And how did you guys -- how did you and

14    Robert Brown manage the regulatory department?  Did

15    your responsibilities differ in any way?

16              MS. KOSKI:  Object to form.

17              THE WITNESS:  When?

18              MR. STOLTZ:  In 2011.

19              THE WITNESS:  I'm sorry, I'm not clear what

20         the question is.

21              MR. STOLTZ:  Sure.

22    BY MR. STOLTZ:

23         Q.   I'm just trying to get an idea of, I guess,

24    the organizational sort of top-down structure of the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    regulatory department, and it's my understanding that

 2    Michael Cochrane was the head of the regulatory

 3    department.

 4         Is that accurate?

 5    A.   Yes, sir.

 6    Q.   And underneath him was yourself and

 7    Robert Brown?

 8    A.   Yes, sir.  That was not 2011.  That was 2012,

 9    Robert Brown came on board.

10    Q.   Okay.  Do you know why Robert Brown came on

11    board?

12         MS. KOSKI:  Object to form.

13         THE WITNESS:  I'm not sure.

14    BY MR. STOLTZ:

15    Q.   Okay.  Did you have different, I guess,

16    direct reports, or did you share direct reports?

17         MS. KOSKI:  Object to form.

18         THE WITNESS:  I'm not clear on what you're

19         asking me.

20    BY MR. STOLTZ:

21    Q.   So you testified earlier that Cynthia Mendoza

22    and other individuals would report to you directly.

23    Were those the same individuals that would report to

24    Robert Brown, or did you have different folks that

1    would report to you?

2         A.   There was -- he had a separate team.

3         Q.   Okay.  What were -- how did the

4    responsibilities of your team differ from the

5    responsibilities of his?

6         A.   So my team managed licensure as well as those

7    other few things that we talked about:  SOPs,

8    temperature, pedigree.  His team managed the DEA.

9         Q.   Your team didn't manage -- when you say his

10   team managed DEA, what do you mean?

11        A.   DEA compliance.

12        Q.   Did your team manage DEA compliance?

13        A.   No, sir.

14        Q.   Did Sandra Bautista manage DEA compliance?

15        A.   No, sir.

16        Q.   Cynthia Mendoza, did she?

17        A.   No, sir.

18        Q.   Did Natasha Jean-Charles manage DEA

19   compliance?

20        A.   No, sir.

21        Q.   I'm going to show you what is marked as

22   Exhibit 2.

23             (Anda - Hall Exhibit 2 was marked for

24   identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STOLTZ:  I apologize for the awkward
 2       stapling.
 3              MS. KOSKI:  I think you might have put the
 4       sticker on the back.
 5              MR. STOLTZ:  No, it's just funky.  Well, did
 6       I?  Well, either way.
 7              MS. KOSKI:  Do you want me to fix the sticker
 8       so it's on the front page?
 9              MR. STOLTZ:  Yes.  Thank you.
10              Exhibit 2 is bearing Bates numbers 000570944
11       to 570926.
12       BY MR. STOLTZ:
13         Q.   Do you recognize this document?
14         A.   No, sir.
15         Q.   I'd like to -- you to refer to the page
16       bearing Bates number 570934.
17              MS. VAN TASSELL:  Excuse me.  This is Rebecca
18       Van Tassell for McKesson.
19              Could you state the prefix for those numbers?
20              MR. STOLTZ:  Sure.
21       Anda_Opioids_MDL_000570934.
22              MS. VAN TASSELL:  Thank you.
23              MR. STOLTZ:  In the future I'll just refer to
24       the prefix in the event that it's not
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Anda_Opioids_MDL.

2     BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review

```
4       Q.   So when you testified earlier that your

5  direct reports didn't deal with DEA compliance, what

6  did you mean by that?

7       A.   They only -- only DEA they at this time

8  touched was DEA's registrations.

9       Q.   And DEA registrations refers to DEA licenses?

10      A.   Yes, sir.

11      Q.   And those -- they in no way ever dealt with

12  suspicious order monitoring?

13           MS. KOSKI:  Object to form.

14  BY MR. STOLTZ:

15      Q.   Did they -- did they ever, any of your direct

16  reports, have any involvement in suspicious

17  monitoring, or were they only -- were they only

18  dealing with controlled substances as it related to

19  license -- licensure?

20      A.   Yes, sir.

21      Q.   You mentioned that in 2011 part of your

22  responsibilities included monitoring for suspicious

23  orders.  Were you doing that on your own, or did your

24  direct reports also contribute to monitoring for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    suspicious orders?

 2             MS. KOSKI:  Object to form.

 3             THE WITNESS:  No.

 4    BY MR. STOLTZ:

 5        Q.  Let me rephrase the question.

 6             You mentioned that in 2011 that part of your

 7    responsibilities were monitoring for suspicious

 8    orders.

 9             Is that accurate?

10        A.  Yes, sir.

11        Q.  Were any of your direct reports involved with

12    monitoring suspicious orders?

13        A.  No, sir.

14        Q.  So when their positions refer to senior DEA

15    compliance clerk, the DEA compliance is referring to

16    what?

17        A.  It's more of a standard.  So you're fitting

18    into a form.  A title is fitting into a form, but

19    they did not have any oversight -- just that it's

20    just a title.

21        Q.  Sure.

22             Did they have any involvement whatsoever in,

23    I guess, standard operating procedure with regards to

24    monitoring for suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No, sir.

 2        Q.   What was your involvement in monitoring for

 3   suspicious orders?

 4             MS. KOSKI:  Object to form.

 5   BY MR. STOLTZ:

 6        Q.   How did you monitor for suspicious orders?

 7             MS. KOSKI:  Object to form.

 8             THE WITNESS:  Can you please verify?

 9             MR. STOLTZ:  Sure.

10   BY MR. STOLTZ:

11        Q.   In 2011, part of your responsibilities were

12   monitoring for suspicious orders.  What does that

13   mean?

14        A.   Doing due diligence on our customers.

15        Q.   What type of due diligence?

16        A.   Dispensing data -- collecting dispensing

17   data, collecting customer questionnaires, reviewing

18   them, looking at their location and geographics.

19        Q.   And did anyone -- did you -- did you do the

20   due diligence?

21        A.   Yes, sir.

22        Q.   So would you collect dispensing data?

23        A.   Yes, sir.

24        Q.   And you would collect questionnaires?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes, sir.

 2        Q.   Would you review the questionnaires?

 3        A.   Yes, sir.

 4        Q.   And you would review the location?

 5        A.   Yes, sir.

 6        Q.   And the geographics?

 7        A.   Yes, sir.

 8        Q.   Did anyone underneath you, specifically

 9   Sandra Bautista, Cynthia Mendoza, Natasha

10   Jean-Charles, did they also collect dispensing data?

11        A.   No, sir.

12        Q.   Would they collect questionnaires?

13        A.   No, sir.

14        Q.   Would they ever review the questionnaires?

15        A.   No, sir.  They had no involvement.

16        Q.   They had no involvement.

17             So what was -- in what way would you -- I

18   guess --

19             Would you specifically collect the dispensing

20   data?

21             MS. KOSKI:  Object to form.

22   BY MR. STOLTZ:

23        Q.   Who would collect dispensing data?

24             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Can you please clarify?

 2                MS. KOSKI:  You're asking a name of a person?

 3                MR. STOLTZ:  I'm trying to understand if she

 4        was out collecting dispensing data or if someone

 5        was sending the dispensing data to her.

 6                THE WITNESS:  Requesting it from our

 7        customers.

 8    BY MR. STOLTZ:

 9        Q.   Okay.  You would directly request the data

10    from customers?

11        A.   Myself or a field sales representative.

12        Q.   Okay.  And when it came to, say, like a

13    national chain, how would you go about requesting

14    dispensing data?

15        A.   Request it from the sales rep.

16        Q.   Okay.  Who would be -- was -- wouldn't -- who

17    was in charge of -- who was the point of contact for

18    retail chain pharmacies?

19                MS. KOSKI:  Object to form.

20                THE WITNESS:  Can you please clarify?

21    BY MR. STOLTZ:

22        Q.   You mentioned a sales rep would collect the

23    dispensing data when you needed it for a customer.

24                What type of customers did Anda have?
```

```
 1        A.    Retail pharmacies, hospice, long-term care

 2    pharmacies, closed-door, just to name a few.

 3        Q.    And does that also include, like, smaller

 4    individually owned pharmacies?

 5        A.    Yes, sir.

 6        Q.    Were the sales reps -- who were the sales

 7    reps for the national retail chains?  Were those the

 8    same folks that would be sales reps for individual

 9    pharmacies?

10            MS. KOSKI:  Object to form.

11            THE WITNESS:  No, sir.

12    BY MR. STOLTZ:

13        Q.    Okay.  Were they in a different department?

14        A.    Yes, sir.

15        Q.    When you said dispensing data, what does that

16    mean?

17        A.    Dispensing data is a format that can be

18    pulled from a pharmacy showing what they have done in

19    an X amount of time frame.

20        Q.    What they have done as far as?

21        A.    Dispensed.

22        Q.    Okay.  And did -- what was the purpose of

23    asking for dispensing data?

24            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2         Q.   Why did you ask for dispensing data?

 3         A.   To see the big picture of the pharmacy.

 4         Q.   And why did you need to see the big picture

 5    of the pharmacy?

 6         A.   To understand if it's a pharmacy that we

 7    choose to do business with.

 8         Q.   What are some reasons why you would choose

 9    not to do business with a pharmacy?

10              MS. KOSKI:  Object to form.

11    BY MR. STOLTZ:

12         Q.   Whose -- whose decision was it to -- who

13    decided whether or not Anda wanted to do business

14    with a pharmacy?

15         A.   The compliance department.

16         Q.   Was that your department?

17         A.   Yes, sir.

18         Q.   Did you decide whether or not a particular

19    pharmacy was a pharmacy that Anda wanted to do

20    business with?

21              MS. KOSKI:  Object to form.

22              THE WITNESS:  Can you please clarify?

23    BY MR. STOLTZ:

24         Q.   In your position as the manager of regulatory
```

1    compliance, was it part of your job responsibilities

2    to decide whether or not a particular pharmacy was a

3    pharmacy that Anda wanted to do business with?

4        A.   Yes, sir.

5        Q.   What are some of the factors involved in that

6    decision?

7        A.   Reviewing a customer's due diligence -- I

8    mean, excuse me.

9            Reviewing the due diligence of a customer,

10   including dispensing data, customer questionnaires,

11   the geographics.

12       Q.   And did you ever decide a particular pharmacy

13   was not a pharmacy that Anda wanted to do business

14   with?

15           MS. KOSKI:  Object to form.

16           THE WITNESS:  Can you please clarify?

17   BY MR. STOLTZ:

18       Q.   Was there ever a time when you decided that a

19   particular customer of Anda was not a pharmacy that

20   Anda wanted to do business with?

21       A.   Yes, sir.

22       Q.   Do you remember any of those occasions?

23       A.   Not specifically.

24       Q.   Can you think of an example?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, sir.

 2        Q.    Why -- do you recall -- why would Anda not

 3   want to do business with a particular pharmacy based

 4   on due diligence?

 5              MS. KOSKI:  Object to form.

 6              THE WITNESS:  Can you please clarify?

 7   BY MR. STOLTZ:

 8        Q.    You referenced looking at the particular

 9   factors when deciding whether or not a customer was a

10   customer that Anda wanted, and that included

11   dispensing data, the contents of a customer

12   questionnaire, and/or the geographics.

13              When it comes to dispensing data, what type

14   of dispensing data would indicate that a customer was

15   not a customer that Anda wanted to do business with?

16        A.    Top products, opioids on the top products,

17   bad mix, not a good -- not a good variety.

18        Q.    What is a bad mix?

19        A.    Not a good variety of products.

20        Q.    Were those the only factors?

21        A.    Part of it.

22        Q.    Were there other factors?

23        A.    That's all I can think of right now.

24        Q.    So dispensing data would reveal whether or
```

Highly Confidential - Subject to Further Confidentiality Review

1    not opioids or controlled substances were a large

2    portion of that pharmacy's business?

3        A.    Yes, sir.

4        Q.    And if -- and if a pharmacy's business --

5    if -- excuse me.

6            If the proportion of a pharmacy's business --

7    or excuse me.

8            If a large proportion of a pharmacy's

9    dispensed drugs were controlled substances, that

10   would be a factor in deciding whether or not Anda

11   wanted to do business with them?

12       A.    Part of the decision, yes.

13       Q.    Do you recall what proportion would make you

14   not take them as a customer?

15            MS. KOSKI:  Object to form.

16   BY MR. STOLTZ:

17       Q.    What portion of -- how much opioids compared

18   to their other products dispensed would a pharmacy

19   have to dispense in order for Anda not to want to do

20   business with?

21       A.    There's no set number.  It varies on each

22   situation specific to that pharmacy or customer.

23       Q.    What type of situations would justify a

24   relatively large portion of opioids compared to other

```
 1    products dispensed?

 2        A.    Depending on where they are located.  Like I

 3    said before, how their questionnaire, what shows on

 4    the questionnaire, their geographics, what is their

 5    type of business.

 6        Q.    So a retail -- would that standard ever get

 7    applied differently depending on whether or not a

 8    pharmacy was a large chain or whether it was an

 9    individual pharmacy?

10        A.    No, sir.

11        Q.    But you did mention that that was a

12    subjective determination, right?

13              MS. KOSKI:  Object to form.

14              THE WITNESS:  I'm not clear.

15    BY MR. STOLTZ:

16        Q.    So when it came to reviewing due diligence,

17    specifically dispensing data, there were situations

18    in which a relatively large -- a pharmacy that was

19    dispensing a relatively large amount of opioids

20    compared to other drugs dispensed, there would be

21    reasons why that would be justified?

22              MS. KOSKI:  Object to form.

23              THE WITNESS:  I don't have specifics in front

24        of me.  I would have to --
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. STOLTZ:

2        Q.   Well, hypothetically, as manager of the

3    regulatory department, what are the types of

4    instances that would justify a pharmacy dispensing a

5    large amount of opioids compared to other products?

6        A.   I'm sorry, I wouldn't be able to say.  It's

7    more of a big picture.

8        Q.   Okay.  Big picture, so --

9            MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11       Q.   So looking at the big picture, what are some

12   instances in which a large amount of opioids

13   dispensed compared to other products, looking at the

14   big picture, what are some just general reasons why

15   that wouldn't be alarming for Anda?

16           MS. KOSKI:  Object to form.

17           THE WITNESS:  Can you please clarify?

18           MR. STOLTZ:  Sure.

19   BY MR. STOLTZ:

20       Q.   When a pharmacy is dispensing a large amount

21   of opioids compared to other products dispensed, that

22   wouldn't necessarily mean that a -- that it was a

23   customer that Anda didn't want to do business with,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

 1                MS. KOSKI:  Object to form.

 2                THE WITNESS:  Correct.

 3    BY MR. STOLTZ:

 4        Q.   And what are some of the factors in deciding

 5    whether or not -- all right.

 6                So let's say there's Pharmacy A and B, and

 7    both of them -- 50 percent of the products that both

 8    of them dispense are opioids.  Or less.  Let's say

 9    20 percent.

10                Are there instances in which one pharmacy

11    could be -- are there instances in which Anda would

12    not want to do business with one as opposed to the

13    other?

14        A.   So depending on geographics, their

15    speciality, also who -- who's their primary,

16    understanding, like I said, the bigger picture of the

17    customer.  Dispensing data is not like the end-all.

18    It's like a bigger picture of all the facts.

19        Q.   Sure.

20                When you said who's their primary, what does

21    that mean?

22        A.   Their primary wholesaler.

23        Q.   And how would knowing who their primary

24    wholesaler affect the determination?

1      A.    Well, it's an understanding, because Anda is

2    a secondary, so -- we're a secondary wholesaler.

3    Understanding who is their primary relationship with.

4      Q.    How would that matter?

5      A.    It's knowing your customer, understanding who

6    they are, who they do business with.

7      Q.    So how would -- how would who their primary

8    distributor -- how would knowing who their primary

9    distributor affects that determination?

10          MS. KOSKI:   Object to form.

11   BY MR. STOLTZ:

12     Q.    Why does knowing who their primary

13   distributor matter when it comes to dispensing

14   controlled substances to a customer of Anda?

15     A.    It's not specific.  It's more of

16   understanding who they are and what they're -- who

17   they are doing business with overall.

18     Q.    Right.

19     A.    And understanding who that business core is.

20     Q.    So part of due diligence is collecting data

21   on a customer, right?

22     A.    Yes, sir.

23     Q.    And the purpose of having that data is to

24   determine whether or not that customer is a customer

Highly Confidential - Subject to Further Confidentiality Review

1    that Anda wants?

2        A.   Yes, sir.

3        Q.   How is knowing who their primary

4    distributor -- how does that help Anda or yourself as

5    the manager of regulatory compliance, how does that

6    help you determine whether or not a customer is a

7    customer you want to keep as opposed to refuse to

8    dispense controlled substances to them, for example?

9        A.   So understanding if they have more than one

10   primary, if they have other secondaries,

11   understanding where we fit in their big picture of

12   their business.

13       Q.   Is it a situations where a pharmacy would

14   have more than one primary?

15       A.   Possibly.

16       Q.   If a customer were to have more than one

17   primary, how would that affect Anda's decision to

18   continue to dispense controlled substances to that

19   customer?

20            MS. KOSKI:  Object to form.

21            THE WITNESS:  Can you please clarify?

22            MR. STOLTZ:  Sure.

23   BY MR. STOLTZ:

24       Q.   You mentioned that it would be important to

Highly Confidential – Subject to Further Confidentiality Review

```
 1   understand whether or not a pharmacy had more than

 2   one primary, if there are other secondaries, just so

 3   Anda could understand where it fit as far as

 4   dispensing controlled substances to that customer.

 5        Why was it important to know where Anda fit

 6   as far as dispensing controlled substances to a

 7   particular customer?

 8        A.   To understand who they are or who they are

 9   doing business with and where we fall in that -- in

10   that picture.

11        Q.   Right, I understand that, that you want to

12   know who they are and who they are doing business

13   with.  But -- and that's why you asked those

14   questions.

15        But why is it important to know who they are

16   and who they are doing business with?

17        A.   So that we know who our customers are.

18        Q.   What other factors were involved in knowing

19   who your customer is other than who else is selling

20   to them?

21        A.   Dispensing data, questionnaire, geographics.

22        Q.   Was it important to know who a primary

23   distributor was in order to -- would you ever contact

24   the primary distributor?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    Not me specifically.

 2      Q.    Would someone at Anda ever contact a primary

 3  distributor?

 4      A.    I don't know.

 5      Q.    What is a secondary distributor?

 6      A.    We're filling out-of-stocks.  When a primary

 7  is out of stock and we have the product, we fulfill

 8  the orders for them.

 9      Q.    Did you ever follow up with a primary

10  distributor to figure out why they were out of stock?

11            MS. KOSKI:  Object to form.

12            THE WITNESS:  Not me specifically.

13  BY MR. STOLTZ:

14      Q.    But someone at Anda would do that?

15      A.    I can't say for certain.

16      Q.    Why is it important to know your customer?

17            MS. KOSKI:  Object to form.

18  BY MR. STOLTZ:

19      Q.    As part of regulatory compliance, what does

20  knowing your customer have to do with regulatory

21  compliance?

22      A.    Providing a bigger picture on if we want to

23  do business with a specific customer or not.

24      Q.    What does -- how does deciding whether or not

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you want to do business with a specific customer or

 2    not, how does that relate to regulatory compliance?

 3         A.   I'm not clear.

 4         Q.   Why would the regulatory compliance

 5    department be making decisions as to who Anda wants

 6    to do business with?

 7         A.   Licensing requirements.

 8         Q.   Any other requirements?

 9         A.   I'm sorry, I'm not clear.

10         Q.   Was knowing your customer part of ensuring

11    that Anda did not ship suspicious orders?

12              MS. KOSKI:  Object to form.

13              THE WITNESS:  I'm still not clear.  I'm

14         sorry.

15    BY MR. STOLTZ:

16         Q.   You said knowing your customer is important

17    to the regulatory compliance department because of

18    licensing requirements, correct?

19         A.   Yes, sir.

20         Q.   So isn't checking licensing requirements --

21    doesn't that just require going to the state portal

22    and making sure everything is up-to-date?

23         A.   Sure, yes.  That was part of my

24    responsibilities.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   So understanding whether or not a pharmacy is
 2   licensed to order controlled substances would not
 3   require knowing what their dispensing data looked
 4   like?
 5      A.   I'm sorry, I'm not clear.
 6      Q.   So part of knowing your customer is
 7   understanding their dispensing data, having them
 8   answer questionnaires, geographics, understanding who
 9   their primary distributor is, whether Anda is the
10   secondary distributor, if there are other secondary
11   distributors, other primary distributors.
12           How does any of that relate to licensure?
13      A.   I'm sorry, I thought we were talking about my
14   responsibilities.
15           So I'm not clear.
16      Q.   We're talking about why Anda would ask
17   certain questions or why the regulatory department
18   was in charge of knowing a customer.  You mentioned
19   that knowing the customer is important for licensing
20   requirements.
21           I'm asking why it is that things like
22   geographics, who the primary supplier is, dispensing
23   data, what or how does any of that have to do with
24   licensing requirements?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   DEA requirements.  I'm sorry.  I didn't

 2  understand what your question was.

 3      Q.   Okay.  What are those DEA requirements?

 4      A.   Knowing your customer.

 5      Q.   And why was it important to know your

 6  customer?

 7      A.   To understand the big picture of the

 8  customer, what they're doing, what their speciality

 9  is, who they're -- who they are doing business with.

10      Q.   And it's your understanding that it's a DEA

11  regulation to understand the big picture of the

12  customer, including what they are doing, what their

13  speciality is, and who they are doing business with?

14           MS. KOSKI:  Object to form.

15           You can answer.

16           THE WITNESS:  Knowing your customer, and

17      knowing is being part of it.

18  BY MR. STOLTZ:

19      Q.   So knowing your customer is a DEA

20  requirement?

21           MS. KOSKI:  Object to form.

22  BY MR. STOLTZ:

23      Q.   DEA regulation?

24           MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You are asking her what the lot is?

 2              MR. STOLTZ:  No.  I'm asking her why the

 3         DEA -- excuse me -- the manager of regulatory

 4         compliance and the folks -- the DEA compliance

 5         managers were concerned with knowing their

 6         customer and if that was part of their

 7         understanding as far as complying with DEA

 8         requirements.

 9              MS. KOSKI:  You can answer.

10              THE WITNESS:  Yes, sir.

11    BY MR. STOLTZ:

12         Q.   And that related to monitoring suspicious

13    orders as well?

14         A.   Yes, sir.

15         Q.   How could knowing your customer help you

16    monitor suspicious orders?

17         A.   So if an order is only suspicious with a big

18    picture, looking at -- excuse me, is not suspicious

19    when you look at the big picture of a customer, and

20    all those other things with knowing your customer

21    plays a role in that.

22         Q.   So how would knowing who a primary

23    distributor is relate to a determination as to

24    whether an order is suspicious or not?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not a determination.  Just a factor.

 2        Q.    How is it a factor?

 3        A.    Just one part of the puzzle.  If we are the

 4   secondary, who is their primary?  Just -- just an

 5   understanding of who the customer is.  It's just one

 6   factor of the big picture.

 7        Q.    And how would that factor -- how could that

 8   factor influence a determination?

 9              I'm just trying to understand how it's

10   relevant who the primary distributor is in

11   determining whether an order is suspicious or not.

12        A.    Like I said, that is only one factor.  So

13   it's just one field of --

14        Q.    Of course.

15        A.    -- of review.

16        Q.    But each one of those factors is part of a

17   determination as to whether an order is suspicious or

18   not.

19              Is that accurate?

20        A.    Yes, sir.

21        Q.    So then how does the primary distributor

22   factor into that determination?

23        A.    I don't know.

24        Q.    Don't you make the decisions as to whether or
```

Highly Confidential - Subject to Further Confidentiality Review

1    not a customer is one that Anda wants to do business

2    with?

3         A.    At that time, yes.

4         Q.    So how would who the primary distributor is

5    factor into your decision?

6         A.    I don't know.

7         Q.    How would geographics factor into your

8    decision?

9         A.    Understanding how many people are in that

10   area, how many different pharmacies are in that area,

11   just getting a better under -- a better view of

12   what's happening in that location.

13        Q.    And how would dispensing data factor into

14   that decision?

15        A.    Understanding what they're dispensing.

16        Q.    And that would include understanding the

17   portion of their dispensed drugs that were controlled

18   substances?

19        A.    Yes.

20        Q.    Were there any other things you would look

21   for in dispensing data to determine whether or not an

22   order was suspicious?

23             MS. KOSKI:  Object to form.

24             THE WITNESS:  Could you please clarify?

```
 1              MR. STOLTZ:  Sure.

 2   BY MR. STOLTZ:

 3       Q.   You testified earlier that the purpose of

 4   asking for dispensing data was to better understand

 5   what portion of that pharmacy's business related to

 6   dispensing opioid products compared to the other

 7   products they dispensed.

 8            Were there any other reasons why you asked

 9   for dispensing data other than for understanding that

10   proportional relationship?

11       A.   Yes.  Knowing your customer, yes.

12       Q.   So just knowing how much they dispensed in

13   general?

14       A.   Overall.  So noncontrols as well.  Just what

15   is their mix, what are they doing, how much is going

16   out in a specific time frame.

17       Q.   Okay.  And typically, how -- as a secondary

18   distributor -- as a secondary distributor, did you

19   ask for -- how did you have dispensing data for a

20   pharmacy?

21            MS. KOSKI:  Object to form.

22            THE WITNESS:  Can you clarify?

23   BY MR. STOLTZ:

24       Q.   How did you collect dispensing data for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Anda's customers?
 2        A.   Request it.  So we either compliance or sales
 3    representative requested it.
 4        Q.   Okay.  And they would provide to you their
 5    full dispensing data over a period of time?
 6        A.   Yes, sir.
 7        Q.   Typically what -- what period of time did you
 8    ask for?
 9        A.   I believe it was three months at the time.
10        Q.   Three months?
11             And was it always three months?
12        A.   I can't be certain.
13        Q.   When -- when do you remember that it was
14    three months for sure?
15        A.   I believe it was 2011, 2012.
16        Q.   Three months of dispensing data?
17        A.   I believe so.
18        Q.   Was that usually like the previous three
19    months?
20        A.   Yes, sir.
21        Q.   Okay.  In your position as the manager of
22    regulatory compliance, if Anda got a new customer or
23    if there was a customer that had previously ordered
24    controlled substances, how would you determine
```

Highly Confidential - Subject to Further Confidentiality Review

1    whether or not to supply controlled substances to

2    that pharmacy?

3           MS. KOSKI:  Object to form.

4           THE WITNESS:  Can you clarify?

5           MR. STOLTZ:  Sure.

6    BY MR. STOLTZ:

7       Q.   Did regulatory compliance -- did the

8    regulatory compliance department ever make a

9    determination as to whether -- excuse me.

10          Was it part of Anda's standard operating

11   procedure to collect -- to know your customer prior

12   to ever dispensing controlled substances to a

13   customer?

14          MS. KOSKI:  Object to form.

15          THE WITNESS:  Can you please clarify?

16   BY MR. STOLTZ:

17      Q.   At what point did -- excuse me.

18          If a pharmacy contacted Anda and had not

19   previously ordered controlled substances from Anda or

20   had never previously ordered any substances from

21   Anda, would that customer be able to buy controlled

22   substances from Anda?

23          MS. KOSKI:  Object to form.

24          THE WITNESS:  No, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   If that customer wanted to buy controlled

 3    substances from Anda, how would they go about doing

 4    that?

 5        A.   They would request -- the sales rep or

 6    compliance would request for a customer questionnaire

 7    and dispensing data to be filled out for review.

 8        Q.   And who would review that?

 9             MS. KOSKI:  Object to form.

10    BY MR. STOLTZ:

11        Q.   Would you review the customer questionnaire

12    and dispensing data?

13        A.   Yes, sir.

14        Q.   And based on that, you would decide whether

15    or not to supply controlled substances to that

16    customer?

17        A.   Yes, sir.

18        Q.   Would you -- after you decided to supply

19    controlled substances to a customer, were they

20    limited in the amount of controlled substances they

21    could order from Anda?

22        A.   Yes, sir.

23        Q.   And what was that limit?

24             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It would vary.

 2    BY MR. STOLTZ:

 3        Q.   What would it vary on?

 4        A.   So the basic -- base -- excuse me -- base

 5    limits would be a thousand -- set at a thousand.  If

 6    they were approved and they had just gone through the

 7    approval process and were approved, in fact,

 8    approved, they would get a base of a thousand -- a

 9    thousand units for each family, minus oxycodone and

10    methadone.

11        Q.   So oxycodone and methadone wouldn't factor

12    into the thousand units?

13        A.   No, sir.

14        Q.   How much oxycodone or methadone could they

15    order?

16        A.   Zero.

17        Q.   Zero.

18             So after a new customer came to Anda and they

19    wanted to order controlled substances, they would be

20    allowed a thousand units for each family but that

21    wouldn't include methadone and oxycodone?  They

22    wouldn't be able to order that?

23        A.   Yes, sir.

24        Q.   What would they have to do to order oxycodone
```

1    or methadone?

2        A.   They would have to do a specific request

3    requesting those products.  Those were not just

4    given.

5        Q.   Okay.  And do you know why oxycodone and

6    methadone weren't included in the thousand-unit

7    limit?

8        A.   To have more security, basically, on those

9    specific products and a tighter understanding of

10   who's purchasing them from us.

11           MS. KOSKI:  Someone on the phone, can you

12       mute?  We can hear a lot of paper shuffles.

13           Thank you.

14   BY MR. STOLTZ:

15       Q.   Were oxycodone or methadone treated

16   differently with respect to DEA regulations than

17   other controlled substances?

18           MS. KOSKI:  Object to form.

19   BY MR. STOLTZ:

20       Q.   Are oxycodone or methadone, are they

21   Controlled II substances?

22       A.   Yes, sir.

23       Q.   Why did Anda treat them differently than

24   other Controlled II substances?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Higher abuse rate for those two specific

 2   products.

 3      Q.   When did oxycodone or methadone start being

 4   treated differently by Anda?

 5      A.   I believe from my knowledge it was around

 6   that time, 2011-ish time -- 2010.  Excuse me, 2010 to

 7   2011, sorry.

 8      Q.   And who made that decision?  Do you recall?

 9      A.   Compliance management.

10      Q.   Would that have been you?

11      A.   Michael Cochrane.

12      Q.   Was there ever a time where other drugs were

13   treated differently, other controlled substances were

14   treated different than others, specifically opioids?

15           MS. KOSKI:  Object to form.

16           THE WITNESS?  Can you please clarify?

17           MR. STOLTZ:  Sure.

18   BY MR. STOLTZ:

19      Q.   Starting around 2011-ish time, we know that

20   oxycodone and methadone were not included in the

21   initial thousand-unit limit.

22           Was there ever a time after 2011 where more

23   Controlled II substances or Controlled III substances

24   were added to that list of oxycodone and methadone
```

```
 1    as -- as more prone to abuse?

 2        A.   I don't know the exact year but compliance

 3    management made restrictions on fentanyl as well.

 4        Q.   And was that the same restriction, just that

 5    it wouldn't be included in the initial thousand?

 6        A.   Yes, sir.

 7        Q.   Do you know if Controlled III opioids were

 8    subject to the thousand -- thousand-unit limit?

 9        A.   Controlled II.  Opioids are in Schedule II.

10        Q.   Sure.

11             Before drugs like hydrocodone or other

12    combination products were Controlled II -- excuse me.

13             When you say family, a thousand units per

14    product family, what is a family?

15        A.   A chemical family.

16        Q.   Okay.  And when hydrocodone products were

17    Schedule III, was that part of the opioid chemical

18    family?

19        A.   That was before my time.

20        Q.   Do you recall when hydrocodone products were

21    Schedule III?

22        A.   Prior to 2010.

23        Q.   So can you just sort of take me through the

24    process of -- I don't know how you would refer to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it -- take me through the process of, you know, when

 2    an initial customer comes to Anda, how the -- how

 3    it's decided whether or not that customer is eligible

 4    to order controlled substances.

 5            Was there a standard operating procedure with

 6    respect to that process?

 7        A.   Yes, sir.

 8        Q.   What was it?

 9        A.   The review of the dispensing data -- well,

10    requesting, right.  So once it's requested and we

11    received it, it's a review of dispensing data,

12    questionnaire; like I had said before, the

13    geographics.

14        Q.   And all of that data was collected prior to

15    allowing a customer to order controls?

16        A.   Yes, sir.

17        Q.   Was that always the case?

18            MS. KOSKI:  Object to form.

19            THE WITNESS:  Can you please clarify?

20    BY MR. STOLTZ:

21        Q.   Before allowing a customer to order controls,

22    they were required to send in the dispensing data and

23    answer questionnaires.

24            What else were they required to send in?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Dispensing data, questionnaires, and in some

 2    cases we would request for pictures.

 3        Q.    Pictures of what?

 4        A.    Of the pharmacy.

 5        Q.    Why are pictures of the pharmacy relevant?

 6        A.    To understand the location, see how -- what

 7    it looked like on the inside if we couldn't retrieve

 8    them online.

 9        Q.    Okay.  Would you ever do a site visit?

10        A.    No, sir, not me specifically.

11        Q.    Would someone in one of your direct contacts

12    do site visits?

13            MS. KOSKI:  Object to form.

14    BY MR. STOLTZ:

15        Q.    Or, excuse me, direct reports?

16        A.    Direct report, no, sir.

17        Q.    Who would go on site visits?

18        A.    There has been compliance leadership that has

19    gone on site visits.

20        Q.    And why -- why were -- why only sometimes

21    would site visits be conducted?

22            MS. KOSKI:  Object to form.

23            THE WITNESS:  I don't know.

24    ///
```

```
 1    BY MR. STOLTZ:

 2         Q.    Okay.  Was there ever an instance where

 3    customers were allowed to buy controlled substances

 4    while you were the manager of regulatory compliance

 5    prior to providing questionnaires, diligence reports,

 6    or dispensing data?

 7               MS. KOSKI:  Object to form.

 8               THE WITNESS:  Not that I'm aware of.

 9    BY MR. STOLTZ:

10         Q.    What was EPIC?

11         A.    EPIC is a buying group.

12         Q.    What is a buying group?

13         A.    They are a group of -- specifically, that's a

14    group of pharmacies that get together and have a

15    special pricing plan for going through this EPIC

16    group.

17         Q.    So would those mostly be individual, small

18    pharmacies?

19         A.    Yes, sir.

20         Q.    So they would sort of band together in order

21    to get better prices?

22         A.    Yes, sir.

23         Q.    Is it kind of like a buyer's club?

24               MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                 THE WITNESS:  I don't know.

  2    BY MR. STOLTZ:

  3        Q.   Like the movie Dallas Buyers Club?  Matthew

  4    McConaughey?

  5             All right.

  6        A.   I do like Matthew McConaughey, though.

  7        Q.   Sure.

  8             How many stores in EPIC?

  9        A.   Oh, I don't know.

 10        Q.   But it could be more than 50?

 11        A.   I'm sorry, I do not have that answer.

 12        Q.   What about IPA NJ?  Was that also a buyers

 13    group?

 14        A.   I believe so, but I don't have specifics on

 15    them.

 16        Q.   I'm going to show you what's been marked as

 17    Exhibit 3.

 18             (Anda - Hall Exhibit 3 was marked for

 19    identification.)

 20             MR. STOLTZ:  Bearing Bates Number 711634.

 21             THE WITNESS:  Thank you.

 22    BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12    Q.   So earlier you said it was important to get

13    dispensing data, questionnaires, geographics on a

14    customer in order to determine whether or not they

15    were eligible to purchase controls from Anda.

16         Is that accurate?

17    A.   Yes, sir.

18    Q.   So were there instances where customers were

19    able to buy a high volume of controls prior to

20    providing the necessary information to regulatory

21    compliance?

22         MS. KOSKI:  Object to form; asked and

23    answered.

24         You can answer.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. STOLTZ:

2        Q.   Were buying groups treated differently by

3    regulatory compliance than individual pharmacies?

4        A.   No, sir.

Highly Confidential - Subject to Further Confidentiality Review



12     Q.   Was it no longer your responsibility to know

13  your customer and monitor for suspicious orders after

14  2015 -- or after 2012?

15     A.   Mine specifically, yes.

16     Q.   When did that responsibility change?

17     A.   Robert Brown -- when Robert Brown was

18  onboarded, he had some training time, and then he

19  took over that area.

20     Q.   Why were you included on this e-mail?

21     A.   Just maybe an FYI.  I can't say for certain.

22     Q.   So after Robert Brown was hired, you had no

23  involvement in monitoring suspicious orders or

24  collecting dispensing data or other factors or

Highly Confidential - Subject to Further Confidentiality Review

1    deciding -- excuse me.

2          After Robert Brown was hired, did you have --

3    did you review dispensing data?

4          MS. KOSKI:  Object to form.

5    BY MR. STOLTZ:

6      Q.   Did you review dispensing data for

7    customers -- for new customers that wanted to be

8    eligible for ordering controlled substances from Anda

9    after Robert Brown was hired?

10     A.   There might have been a period while he was

11   in training, but after that, no.  My responsibilities

12   went back to my full-time licensure.

13     Q.   And how else did your responsibilities as

14   manager of regulatory compliance change after

15   Robert Brown was hired?

16     A.   I went back to my original role of licensure.

Highly Confidential - Subject to Further Confidentiality Review



23          MS. KOSKI:  When you get to a good stopping

24     point, I think we have been going for about two

1          hours.  I'm not rushing you now, but if now is

2          good.

3                  MR. STOLTZ:  Now is good.

4                  THE VIDEOGRAPHER:  The time is 11:03 a.m.

5          We're going off the record.

6                  (Recess from 11:03 until 11:15 a.m.)

7                  THE VIDEOGRAPHER:  The time is 11:15 a.m.  We

8          are now back on the record.

9      BY MR. STOLTZ:

10         Q.   So the DEA regulations that Anda was

11     complying with -- regulatory compliance was in charge

12     of making sure Anda complied with, did that include

13     laws under the Controlled Substance Act?

14                 MS. KOSKI:  Object to form.

15                 THE WITNESS:  Can you please clarify?

16     BY MR. STOLTZ:

17         Q.   Did Anda have a duty to report suspicious

18     orders under the Controlled Substance Act?

19                 MS. KOSKI:  Object to form.

20                 I'll instruct you not to answer.

21                 That's outside the special master's

22         limitation on questions regarding that.

23                 You don't have to answer that question.

24     ///

1    BY MR. STOLTZ:

2        Q.    So when was it that you stopped being

3    responsible for monitoring suspicious orders or

4    maintaining due diligence files, for example?

5        A.    Me specifically, once Robert got on board in

6    2012, he had a training period.  And once he was

7    situated, I -- I stopped.

8        Q.    Did you have standard operating procedures

9    for suspicious order monitoring?

10            MS. KOSKI:  Object to form.

11            THE WITNESS:  We had SOPs for -- we have SOPs

12        for knowing your customer, yes.

13    BY MR. STOLTZ:

14        Q.    And you had SOPs for the new customer set-up

15    process with regard to controls eligibility?

16        A.    Yes, sir.

17        Q.    And you also had SOPs for increasing that

18    limit of a thousand units --

19        A.    Yes, sir.

20        Q.    -- of controlled substances?

21            And SOPs for reviewing suspicious orders?

22        A.    It was an all-inclusive SOP, I believe.

23        Q.    Okay.  I'm going to show you what's been

24    marked as Exhibit 4.

Highly Confidential - Subject to Further Confidentiality Review

```
1            (Anda - Hall Exhibit 4 was marked for

2     identification.)

3     BY MR. STOLTZ:

4         Q.    Does this document look familiar to you?

5         A.    Yes, sir.

6            MR. STOLTZ:  Excuse me.  The Bates Number is

7     140495.

8     BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review

```
3        Q.    And is it your testimony that you were not

4   involved in suspicious order monitoring after

5   Robert Brown was hired by Anda?

6        A.    I stated earlier I partner with the

7   individual groups to make sure that the SOPs are

8   up-to-date on an annual basis.
```

```
15   BY MR. STOLTZ:

16        Q.    And is it your testimony that he was in

17   charge of suspicious order monitoring once he was

18   hired?

19        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
10        Q.    And that includes making changes to the SOP

11    itself up to February 2015?

12        A.    When applicable, yes, sir.

13        Q.    So is it fair to say that you were involved

14    with suspicious order monitoring at least until

15    February of 2015?

16            MS. KOSKI:  Object to form.

17            THE WITNESS:  The SOP.

18    BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



24          Q.    So Michael Cochrane, the executive director

```
 1    of regulatory compliance; Robert Brown, the director

 2    of compliance; and yourself, the manager of

 3    regulatory compliance, would annually review the

 4    standard operating procedure with respect to

 5    suspicious order monitoring?

 6         A.   Yes, sir.

 7         Q.   What, if any, measures did Anda put in place

 8    to prevent the diversion of opioids other than

 9    monitoring suspicious orders?

10              MS. KOSKI:  Object to form.

11              THE WITNESS:  The due diligence beforehand,

12         setting up the customer.

13    BY MR. STOLTZ:

14         Q.   Would that also include reporting suspicious

15    activity to the DEA?

16              MS. KOSKI:  Object to form.

17              THE WITNESS:  Can you please clarify?

18    BY MR. STOLTZ:

19         Q.   Would Anda ever report suspicious orders,

20    orders of interest, to the DEA for the purpose of

21    preventing diversion?

22         A.   Yes, sir.

23         Q.   Do you recall if anyone at Anda or yourself

24    reported a suspicious order or an order of interest
```

 1    to the DEA for the purpose of preventing diversion?

 2              MS. KOSKI:  Object to form.

 3              THE WITNESS:  Yes, sir.

 4    BY MR. STOLTZ:

 5         Q.   Can you recall specific instances?

 6         A.   No, sir.

 7         Q.   Would you agree that suspicious orders

 8    indicate that diversion may be taking place?

 9              MS. KOSKI:  Object to form.

10              THE WITNESS:  Can you please clarify?

11    BY MR. STOLTZ:

12         Q.   Would you agree that suspicious orders, like

13    suspiciously large orders or orders that deviate from

14    their dispensing patterns, would indicate that

15    diversion is taking place?

16              MS. KOSKI:  Object to form.

17    BY MR. STOLTZ:

18         Q.   The diversion of opioid products?

19              MS. KOSKI:  Same objection.

20              THE WITNESS:  Possibly.

21    BY MR. STOLTZ:

22         Q.   Would you agree that one of the purposes of

23    Anda's suspicious order monitoring policy was to

24    prevent or minimize diversion?

```
 1        A.    Yes.

 2        Q.    Would you agree that signs of diversion can

 3   be observed through dispensing data?

 4              MS. KOSKI:  Object to form.

 5              THE WITNESS:  Possibly.

 6   BY MR. STOLTZ:

 7        Q.    Would you agree that a failure to collect

 8   data could lead to diversion?

 9              MS. KOSKI:  Object to form.

10              THE WITNESS:  Can you please clarify?

11   BY MR. STOLTZ:

12        Q.    Would you agree that the failure to collect

13   dispensing data, questionnaire, or other data

14   required by Anda before making a sale of opioids, do

15   you agree that the lack of that data could cause Anda

16   to ship suspicious orders and contribute to

17   diversion?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  Possibly.

20   BY MR. STOLTZ:

21        Q.    When Anda collected dispensing data, did it

22   collect that on a rolling basis or was that only

23   when -- when Anda collected dispensing data, what

24   instances would Anda collect dispensing data for
```

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances?

2        A.    The policy states for new customers.

3        Q.    What about when a customer wanted to order

4    more controlled substances than was allowed by Anda?

5        A.    Possibly, yes.

6        Q.    Typically, how many months would Anda ask for

7    dispensing data?

8        A.    I believe when -- 2011, 2012, I believe it

9    was about a three-month period.

10       Q.    Would you agree that on order -- orders of

11   unusual frequency would indicate that diversion was

12   taking place?

13           MS. KOSKI:  Object to form.

14           THE WITNESS:  Not necessarily.

15   BY MR. STOLTZ:

16       Q.    Would you agree it's possible?

17       A.    Possible.

18       Q.    Would you agree that three months of

19   dispensing data is not enough dispensing data to see

20   unusually -- let me rephrase that.

21           As a manager of regulatory compliance, were

22   you able to determine whether or not an order

23   deviated from their standard averages as far as

24   dispensing data, could you determine a deviation with

1    only three months of dispensing data?

2              MS. KOSKI:  Object to form.

3              THE WITNESS:  Can you please clarify?

4    BY MR. STOLTZ:

5       Q.   How could you determine whether or not an

6    order was unusual if you only had three months of

7    dispensing data?

8       A.   There was an algorithm built to determine.

9       Q.   And that algorithm was based on the three

10   months of dispensing data?

11      A.   No.  The algorithm is based on the customer,

12   and then there's some -- it might even be in this

13   SOP, some -- some criteria that stops an order.  And

14   one of those being unusual frequency.

15      Q.   And the data that was input into that

16   algorithm would include three months of dispensing

17   data?

18      A.   No, sir.

19      Q.   What would be inputted into the algorithm?

20      A.   As a secondary, the data of that customer

21   doing business with Anda.

22      Q.   So Anda -- so after Anda approved the

23   customer to order controlled substances from it, it

24   would no longer look at the three months dispensing

Highly Confidential - Subject to Further Confidentiality Review

```
 1    data from when it was initially approved.  At that

 2    point, it would rely on the data of what Anda itself

 3    had dispensed to that customer?

 4            MS. KOSKI:  Object to form.

 5            THE WITNESS:  Not necessarily.

 6    BY MR. STOLTZ:

 7       Q.   What else would it rely on?

 8            MS. KOSKI:  Object to form.

 9            You can answer, if you can answer.

10            THE WITNESS:  Can you clarify, please?

11            MR. STOLTZ:  Sure.

12            THE WITNESS:  Thanks.

13    BY MR. STOLTZ:

14       Q.   So you said as a secondary, the data of what

15    would be inputted into the algorithm would be -- as a

16    secondary, the data of what would be inputted into

17    the algorithm that customer doing business with Anda.

18            So just correct me if I'm wrong, but my

19    understanding of that statement is that in order to

20    determine whether a particular order was unusual, the

21    algorithm would look at the entirety of the history

22    and course of conduct, business with that particular

23    customer, and Anda?

24       A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   As a secondary distributor, how could Anda

2    ever know the aggregate amount of opioids that a

3    customer was ordering from other sources?

4         MS. KOSKI:  Object to form.

5         THE WITNESS:  The dispensing data.

6    BY MR. STOLTZ:

7    Q.   The three months of dispensing data or was --

8    was the aggregate dispensing data for customers

9    collected throughout a course of business with Anda,

10   or was that only at the initial stage of deciding

11   whether or not they were eligible for controls?

12        MS. KOSKI:  Object to form.

13        THE WITNESS:  Can you please clarify?

14        MR. STOLTZ:  Sure.

15   BY MR. STOLTZ:

16   Q.   Did Anda collect aggregate -- collect the

17   aggregate dispensing data of its customers,

18   specifically customers that used Anda as a secondary

19   distributor?

20   A.   Yes, sir.

21   Q.   So Anda was aware of the full amount of what

22   a -- Anda would know exactly how much a customer had

23   dispensed in opioids over every month that that

24   customer had been allowed to order opioids from Anda?

```
 1            MS. KOSKI:  Object to form.

 2            THE WITNESS:  I'm sorry, I'm still not clear.

 3            MR. STOLTZ:  Sure.

 4   BY MR. STOLTZ:

 5       Q.   So on one hand we have Anda knowing what it

 6   dispenses to a customer, right, and that data is

 7   filtered through an algorithm in order to determine

 8   whether or not an order is suspicious.

 9            Is that accurate?

10       A.   Yes, sir.

11       Q.   And that data was only what Anda was

12   distributing to a particular customer.

13            Is that accurate?

14       A.   Yes, sir.

15       Q.   So would Anda know -- did Anda continue to

16   collect the aggregate amount -- so what a customer

17   was getting from a primary distributor, would it know

18   what it was getting from a primary distributor as

19   well as what Anda was distributing to that customer?

20       A.   Correct.  The dispensing data.

21       Q.   And it would have that data for every month

22   that Anda had -- was doing -- was distributing

23   controlled substances to that customer?

24            MS. KOSKI:  Object to form.
```

```
 1              THE WITNESS:  No.

 2   BY MR. STOLTZ:

 3       Q.   How many months?

 4       A.   As I stated, I think at that time we

 5   requested around three months, but it varied based on

 6   customer.

 7       Q.   Okay.  So past -- past the three months that

 8   you would collect, Anda wouldn't continue to ask

 9   those customers for their -- the entirety of their

10   dispensing data, or was there ever a time -- past the

11   initial three months of dispensing data that was

12   requested, was there an instance where Anda would

13   ever ask for aggregate data as to the total amount of

14   opioids that were being ordered both from Anda and

15   from primary distributors?

16       A.   Yes, sir.

17       Q.   And when did that occur?

18       A.   So at initial as well as -- it varies per

19   customer, but sometimes if a customer was coming for

20   an increase and the data was older or it's been

21   awhile since we had some fresh data, we would

22   request.

23       Q.   But until that time, until a customer asks

24   for an increase, Anda wouldn't know how much it had
```

Highly Confidential – Subject to Further Confidentiality Review

1    ordered from its primary distributor in the month

2    prior?

3         A.   Can you please clarify?

4         Q.   Sure.

5              Unless a customer asks for an increase, Anda

6    wouldn't check to see how much that customer was

7    dispensing in aggregate, specifically opioids?

8         A.   Dispensing data as well as our internal

9    system allowing us to capture what they were doing

10   with Anda.

11        Q.   But that dispensing data wouldn't be

12   up-to-date.  It would be from when they initially

13   became eligible to buy controls?

14        A.    Initially when they became eligible and as

15   well as in situations we would request further

16   dispensing data.

17        Q.   And one of those situations would be when

18   they would ask for an increase in how much they could

19   order?

20        A.   Possibly, yes.

21             (Anda - Hall Exhibit 5 was marked for

22   identification.)

23   BY MR. STOLTZ:

24        Q.   I'm showing you what's been marked as

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 5.

 2       A.   Okay.
```

```
23       Q.   And if a customer of Anda wanted to increase

24    its limits on controlled substances or increase the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    limits that Anda imposed upon that customer, what was

 2    the -- what was the process for that?

 3         A.   We set up a process for the task management,

 4    remedy, so this internal system that's called Remedy.

 5         Q.   So would the customer contact their sales rep

 6    and ask for an increase?

 7         A.   Yes, sir.

 8         Q.   And then what would that sales rep do?

 9         A.   Submit a task in Remedy.

10         Q.   And who would review that?

11         A.   The DEA analyst.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

2      Q.   Do they request that data throughout the

3   relationship -- does Anda have every month of

4   aggregate dispensing data for all its customers that

5   are eligibles for controls?

6      A.   No, sir.

7      Q.   Does Anda only ask for aggregate data when a

8   customer has asked for an increase in their control

9   limit?

10     A.   No, sir.

11     Q.   Are there other instances in which Anda asks

12  a customer for aggregate dispensing volume?

13     A.   New customer.

14     Q.   Is that the only instance in which Anda asks

15  for aggregate dispensing data at to volume of opioids

16  dispensed?

17          MS. KOSKI:  Object to form.

18          THE WITNESS:  I can't say a hundred percent

19     that that would be the only two reasons.

20  BY MR. STOLTZ:

21     Q.   Do you know of any other reasons why Anda

22  would have -- would request the aggregate volume of

23  dispensed controls?

24     A.   Not off the top of my head.

```
 1      Q.   Is it true that sales was frustrated that

 2   whenever they asked for an increase in the control

 3   limit, not only would that control limit be denied,

 4   but regulatory compliance would decide that that

 5   customer was not a customer that Anda wanted to do

 6   business with?

 7           MS. KOSKI:  Object to form.

 8           THE WITNESS:  I can't say what their feeling

 9       was, but I can say that compliance was the final

10       deciding factor if Anda was going to do business

11       with -- controlled business with a customer.

12   BY MR. STOLTZ:

13      Q.   Wouldn't you agree that prior to that

14   increase -- would you agree that had Anda had that

15   aggregate data, aggregate volume of controls being

16   dispensed -- if Anda had collected aggregate

17   dispensing data prior to an increase request, isn't

18   it true that many of these customers would have been

19   shut off from buying controls?

20           MS. KOSKI:  Object to form.

21           THE WITNESS:  I can't say that.

22   BY MR. STOLTZ:

23      Q.   But can you say that customers often were

24   shut off from controls when aggregate dispensing data
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was supplied to Anda?

 2        A.   At times, yes.

 3        Q.   And if that data had been available prior to

 4    that time, they would have been cut off from controls

 5    then, right?

 6             MS. KOSKI:  Object to form.

 7             THE WITNESS:  I can't say.

 8    BY MR. STOLTZ:

 9        Q.   When someone in sales had a question of -- a

10    question about regulatory compliance, would they

11    often come to you?

12        A.   Possibly, yes.

13        Q.   And are requests for an increase in

14    controlled substance limits -- are those called

15    opportunities?

16        A.   Remedy is where the opportunity lies.  It's

17    just a task management.

18        Q.   Did Anda ever conduct any audits of its own

19    suspicious order monitoring policies?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  Can you please clarify?

22    BY MR. STOLTZ:

23        Q.   Did Anda ever contract with outside third

24    parties in order to determine the effectiveness of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their suspicious order monitoring policies?

 2              MS. KOSKI:  Object to form.

 3              THE WITNESS:  I can't say for certain.

 4         Q.   Were you ever provided any incentive to

 5    identify suspicious orders?

 6              MS. KOSKI:  Object to form.

 7              THE WITNESS:  Can you please clarify?

 8    BY MR. STOLTZ:

 9         Q.   Did Anda ever incentivize you to find

10    suspicious orders?

11              MS. KOSKI:  Object to form.

12    BY MR. STOLTZ:

13         Q.   Were you ever -- did you receive a bonus from

14    Anda?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  Yes.

17    BY MR. STOLTZ:

18         Q.   And what was your bonus based on?

19         A.   My bonus was based on my performance for the

20    previous year.

21         Q.   And was part of your performance identifying

22    suspicious orders?

23              MS. KOSKI:  Object to form.

24              THE WITNESS:  At one time, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2         Q.   Do you know if Anda has ever been penalized

 3    by state or federal entities relating to its

 4    monitoring or reporting related to controlled

 5    substances?

 6              MS. KOSKI:  Object to form.  Calls for

 7         conclusion of law.

 8              If you know as a matter of fact, you can

 9         answer the question.  You can answer if you know

10         as a matter of fact.

11              THE WITNESS:  I don't know as a matter of

12         fact, no.

13    BY MR. STOLTZ:

14         Q.   Would you agree that once opioids are

15    diverted, there's no way to control or even determine

16    where they will end up geographically?

17              MS. KOSKI:  Object to form.

18              THE WITNESS:  I can't say for certain.

19    BY MR. STOLTZ:

20         Q.   Isn't it possible that a pharmacy

21    over-ordering -- isn't it possible that a large --

22    unusually large order of opioids sent to one state

23    could easily end up diverted to another state?

24              MS. KOSKI:  Object to form.
```

```
 1                 Are you asking her a hypothetical?

 2                 MR. STOLTZ:  Yes.

 3                 MS. KOSKI:  About whether something is

 4          possible or not?

 5                 MR. STOLTZ:  Sure.

 6     BY MR. STOLTZ:

 7          Q.   Would you agree that -- how about this.

 8                 Would you agree that Anda can't control or

 9     even determine where -- where pills that it has

10     shipped -- opioids that are shipped -- it doesn't

11     have control or can't determine where those opioids

12     wind up?

13                 MS. KOSKI:  Object to form.

14                 THE WITNESS:  That's why it's important for

15          us to know who our customer is.

16     BY MR. STOLTZ:

17          Q.   So you would agree?

18                 MS. KOSKI:  Object to form.

19                 THE WITNESS:  I don't -- can you please

20          clarify?

21     BY MR. STOLTZ:

22          Q.   Would you agree that Anda -- in a large order

23     by Anda -- wouldn't you agree that Anda doesn't

24     have -- hold on.
```

```
 1              Would you agree that Anda's profits increase

 2    with the volume of drugs supplied to pharmacies?

 3              MS. KOSKI:  Object to form.

 4              THE WITNESS:  Yes.

 5    BY MR. STOLTZ:

 6       Q.   If a suspicious order is held, what happens

 7    next?

 8              MS. KOSKI:  Object to form.

 9              THE WITNESS:  A review of that customer

10       occurs.

11    BY MR. STOLTZ:

12       Q.   What are the consequences of that review?

13              MS. KOSKI:  Object to form.

14              THE WITNESS:  Clarify, please.

15    BY MR. STOLTZ:

16       Q.   What is the purpose of reviewing that

17    customer?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  To make sure that this is an

20       order that we want to ship to this customer.

21    BY MR. STOLTZ:

22       Q.   And if you decide that that is an order that

23    you do not want to ship, then what happens?

24       A.   Hypothetically, I mean, the policy is to
```

Highly Confidential - Subject to Further Confidentiality Review

 1    report it and cut the customer off.

 2        Q.   So the policy -- after a suspicious order is

 3    held for review and ultimately is not shipped, the

 4    policy is to report it?  Who do you report it to?

 5        A.   To the local DEA offices.

 6        Q.   And when you report that suspicious order, do

 7    you report just the customer, or is it the order

 8    itself?  How does that work?

 9             MS. KOSKI:  Object to form.

10             THE WITNESS:  It varies.

11    BY MR. STOLTZ:

12        Q.   What does it vary on?

13        A.   If there is an order to report, we report the

14    order.  If there's only a customer to report, we

15    would report the customer.

16        Q.   In what type of instances would -- do you

17    report an order as opposed to a customer that ordered

18    it?

19             MS. KOSKI:  Object to form.

20             THE WITNESS:  Can you please clarify?

21    BY MR. STOLTZ:

22        Q.   Well you said that either you report the

23    customer or you report the order itself.  I'm just

24    asking:  What type of scenario would you report the

1    order and not the customer?

2        A.    No, I'm sorry.  To clarify, the order will

3    always come over -- will always get reported with a

4    customer, yes.

5        Q.    What other type of customers did Anda have --

6    or what other -- what other types of customer did

7    Anda distribute opioids to?

8            MS. KOSKI:  Object to form.

9    BY MR. STOLTZ:

10       Q.    Other than pharmacies, who did Anda

11   distribute opioids to?

12           MS. KOSKI:  Object to form.

13           THE WITNESS:  Can you please clarify?

14   BY MR. STOLTZ:

15       Q.    Anda distributed drugs to pharmacies, retail

16   chains.  What other types of customers?

17       A.    In this time frame, the majority was all

18   pharmacies, whether it was an independent or --

19   excuse me -- retail, closed door, open door.

20       Q.    Okay.  Would Anda ever distribute to other

21   wholesalers or distributors?

22           MS. KOSKI:  Object to form.

23           THE WITNESS:  I believe after -- around this

24       time, there may have been one other wholesaler,

Highly Confidential - Subject to Further Confidentiality Review

```
 1        but our practice was not to distribute to

 2        wholesalers.

 3   BY MR. STOLTZ:

 4        Q.   When you decided that a customer is one that

 5   Anda no longer wanted to do business with, did you

 6   report that customer to the DEA?

 7        A.   Yes, sir.

 8        Q.   Was that always the policy while you were in

 9   charge of making those type of decisions?  Until

10   Robert Brown was hired?

11        A.   Yes, sir.

12        Q.   Who was responsible for reporting suspicious

13   orders to the DEA?

14        A.   Compliance.

15        Q.   And that was your department?

16        A.   Yes, sir.

17        Q.   I'm going to show you what's been marked as

18   Exhibit 6.

19             (Anda - Hall Exhibit 6 was marked for

20   identification.)

21             MR. STOLTZ:  Bearing the Bates Number of

22        147166.

23   BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    So a limit is what a customer is granted,

 2   right?  This is your limit.  You can't go over this

 3   limit when we talked about 1,000-unit family limit.

 4              This is an algorithm.  So if they place an

 5   order within that 1,000 family unit, let's say one

 6   piece of something, and it gets flagged based on this

 7   algorithm, any of these steps, that is now considered

 8   a suspicious order in the bucket.  Bucket.

 9        Q.    And then that bucket would be referred to the

10   DEA?  If a customer's order got put in the bucket,

11   that bucket is being sent to the DEA, or is it being

12   sent somewhere else?

13        A.    No.  This is an internal bucket to review

14   suspicious orders.

15        Q.    So a customer would have to order more than

16   eight times its average in order for that order to be

17   held?

18        A.    No.  So you take the whole -- the whole

19   line -- you take the DEA quantity for that month.  So

20   everything they did for that month, times it by the

21   six-month -- I mean, excuse me, divide it by the

22   six-month time frame, and then you multiply that by

23   the multiplier.

24        Q.    So would it be possible for -- so if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    somebody -- if somebody ordered past their limit --

 2    let's say their limit is 5,000 units.  If a customer

 3    tried to order 6,000 units, is that a suspicious

 4    order?

 5        A.   A customer cannot order past their limit.

 6        Q.   Okay.  And if they attempt to order past

 7    their limit, what happens then?

 8        A.   They can't.

 9        Q.   Does that ever get reported in any system?

10        A.   No.

11        Q.   Does that order ever get referred to the DEA

12    as suspicious?

13        A.   Not that I'm aware of.

14        Q.   What is the purpose of the control limit?

15        A.   It's a comfort level for us to give them a

16    specific quantity for a family based on when we set

17    them up and we did the review on them.

18        Q.   Is the control limit mechanism in which Anda

19    can avoid shipping suspicious orders?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  Can you please clarify?

22    BY MR. STOLTZ:

23        Q.   Is the control limit purpose to avoid

24    shipping suspicious orders to customers?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No, sir.

 2        Q.   It's the control -- so it's your testimony

 3   that the control limit that's imposed upon Anda's

 4   customers, specifically related to controlled

 5   substances, is entirely separate and apart from the

 6   suspicious order monitoring system?

 7             MS. KOSKI:  Object to form.  It

 8        mischaracterizes testimony.

 9             You can answer if you can answer it.  You can

10        let him know if you can't.

11   BY MR. STOLTZ:

12        Q.   Anda doesn't want to ship suspicious orders,

13   right?

14        A.   Yes.

15        Q.   And part of that reason is because, if it

16   does, it can contribute to diversion?

17        A.   Yes, sir.

18        Q.   And another reason would be that it could

19   have fines imposed?

20             MS. KOSKI:  Object to form.

21   BY MR. STOLTZ:

22        Q.   And part of regulatory compliance's job is to

23   avoid situations where Anda is contributing to the

24   diversion of opioids, right?
```

```
 1        A.    Putting the company at risk, yes, sir.

 2        Q.    And one way to put the company at risk would

 3   be to -- to contribute to diversion?

 4              MS. KOSKI:  Object to form.

 5   BY MR. STOLTZ:

 6        Q.    One way to put the company at risk would be

 7   to accidentally ship suspicious orders.

 8              Is that accurate?

 9        A.    Possibly, yes, sir.

10        Q.    Is the purpose behind the control limit

11   imposed by Anda upon its customers to avoid getting

12   Anda into -- to avoid putting the company at risk?

13        A.    That's part of, yes, sir.

14        Q.    And how are those limits decided upon?

15        A.    At new account setup, we have a standard

16   setup limit for basic retail pharmacies that are of a

17   certain size.  But if anything, from there, if

18   there's a greater volume or a bigger pharmacy, then

19   we can review individually.

20        Q.    So if a mom-and-pop pharmacy has a limit of

21   1,000 units and they are within that limit for as

22   long as Anda's been doing business with them, all of

23   a sudden that pharmacy orders 100,000 units, they

24   wouldn't be able to get that from Anda?
```

```
 1        A.    Correct.

 2        Q.    Would that be a suspicious order?

 3              MS. KOSKI:  Object to form.

 4              THE WITNESS:  No.  The limit is set.  So they

 5        cannot go past that limit unless it's requested.

 6    BY MR. STOLTZ:

 7        Q.    Right.  I understand why the limit is set.

 8    The limit is set to prevent pharmacies from ordering

 9    more than their limit, correct?

10        A.    If they attempted -- if they had a 1,000

11    limit family and they attempted to order 100,000,

12    they would not be able to.

13        Q.    They would not be able to?

14        A.    They have a hard stop, yes.

15        Q.    And that would not be reported to the DEA?

16        A.    No.

17        Q.    I'm going to show you what's been marked as

18    Exhibit 7.

19              (Anda - Hall Exhibit 7 was marked for

20    identification.)

21              MR. STOLTZ:  Bates number 137399.

22    BY MR. STOLTZ:

23        Q.    Do you recognize this e-mail from Mary Barber

24    to you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, sir.

 2        Q.    But this is an e-mail from Mary Barber to

 3   you?

 4        A.    It appears that way.

 5        Q.    And this was sent on -- in August of 2013?

 6        A.    Yes, sir.

 7        Q.    And Mary Barber is a DEA compliance analyst,

 8   right?

 9        A.    Yes, sir.

10        Q.    Was she one of your -- did she direct -- did

11   she report directly to you?

12        A.    No, sir.

13        Q.    She asks you -- what does she ask you to do

14   in -- excuse me.

15              She says to you and Sabrina Solis and Latoya

16   Samuels, she says:  New account.  Control is denied.

17   DD on file.  Customer 499221, Staywell Pharmacy.

18   Located in Tampa, Florida.

19              She then sends a follow-up e-mail to you less

20   than an hour later, saying:  Please do not report

21   this account.

22              Did you have the final say on whether or not

23   to report an account or an order to the DEA?

24              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1              THE WITNESS:  Can you please clarify?

  2   BY MR. STOLTZ:

  3      Q.   You testified earlier that once a customer

  4   made a suspicious order, that would be referred to

  5   the DEA, right?

  6      A.   Yes, sir.

  7      Q.   Was that an automatic process, or would you

  8   have the autonomy to decide whether or not to report

  9   that suspicious order?

 10              MS. KOSKI:  Object to form.  Mischaracterizes

 11       the document.

 12   BY MR. STOLTZ:

 13      Q.   Was reporting suspicious orders to the DEA --

 14   was that an automatic process?

 15      A.   No, sir.

 16      Q.   Would you decide whether or not you wanted to

 17   report a suspicious order to the DEA?

 18              MS. KOSKI:  Same objection.

 19              You can answer.

 20              THE WITNESS:  At this time, no.  The analyst

 21       would make the determination.

 22   BY MR. STOLTZ:

 23      Q.   Why would she send this to you?

 24              MS. KOSKI:  Object to form.
```

1    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review



```
 8        Q.   Was it the standard operating procedure for a

 9   DEA compliance analyst, at least in 2013 or up to

10   2013, to tell you whether or not something should be

11   reported?

12        A.   There was a report that would get submitted,

13   and everyone would funnel it through that specific

14   person.  Maybe at that time it was me.  I can't say

15   for certain.

16        Q.   Do you recall the name of that report, if it

17   had a standard name or a format?

18        A.   I believe the report is called Customer

19   Cutoff.

20        Q.   And that Customer Cutoff Report, that

21   would -- or might have come through you, up through

22   2013?

23        A.   Yes, sir.  Around 2010 until -- I'm not sure

24   the end time, but probably around this time.
```

1      Q.    And you would decide whether or not to send

2    that report to the DEA?

3      A.    No, sir.

4      Q.    Did the person who had that job of getting

5    the Customer Cutoff Report, would they have that

6    decision as to whether or not to report it to the

7    DEA?

8      A.    The analyst would make the final

9    determination.

10      Q.    And at this point you may have been an

11    analyst?

12      A.    No, sir.

13      Q.    But you may have been the person making the

14    decision at this point?

15      A.    No, sir.  The analyst, Mary Barber.

16      Q.    You just testified that, you know, when I

17    asked you, and that Customer Cutoff Report, that

18    would come through you up until 2013?  And you said,

19    yes, sir, around 2010 until -- I'm not sure.

20            So at one point it was your responsibility to

21    send or not send a cutoff -- a Customer Cutoff Report

22    to the DEA?

23      A.    The file at one point was sent by me.  The

24    analyst would make the final determination.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  I just want you to know lunch is

2        available whenever you want to stop.

3              MR. STOLTZ:  Yeah.  Sure.  Let's take lunch.

4              MS. KOSKI:  You want to do it now?

5              MR. STOLTZ:  Yeah.

6              THE VIDEOGRAPHER:  The time is now 12:27.  We

7        are going off the record.

8              (Recess from 12:27 until 1:18 p.m.)

9              THE VIDEOGRAPHER:  The time is 1:18 p.m.  We

10       are now back on the record.

11   BY MR. STOLTZ:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14      Q.    Deleted orders get reported to the DEA?

15      A.    Yes, sir.

16      Q.    Okay.  And this is the -- are you aware of

17   another standard operating procedure with regards to

18   suspicious order monitoring?

19      A.    I believe there is a newer version.

Highly Confidential - Subject to Further Confidentiality Review



14        Q.   Okay.  When it comes to a situation where

15    there's a promotion for a controlled substance, those

16    aren't indefinite promotions, are they?  Those are

17    usually limited time offers?

18             MS. KOSKI:  Object to form.

19             THE WITNESS:  As far as I am aware, when I

20        was in this role, I was not aware of any

21        promotions.

22    BY MR. STOLTZ:

23        Q.   Okay.

24        A.   So I can't answer that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So if there was a reason to release a hold

 2   or -- and I know it doesn't pertain to this

 3   document -- but increase the limit for a customer on

 4   a limited basis, for example, a promotion that Anda

 5   was offering, would that increase and their limits

 6   also be limited to that time period?  Or would that

 7   continue on indefinitely?

 8        MS. KOSKI:  Object to form.

 9        THE WITNESS:  I can't say, because I was not

10   aware of any promotions.  So I don't know.

11   BY MR. STOLTZ:

12        Q.   Was there ever a time when limits would be

13   lowered?

14        MS. KOSKI:  Object to form.

15        THE WITNESS:  Possibly.  I can't say for

16   certain.

17   BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



```
16          MR. STOLTZ:  The PowerPoint showed up a

17     couple times in her custodial file, and this is

18     the one I have.  But let me just . . .

19          MS. KOSKI:  It's your deposition.  I just

20     want to be clear that to the extent there's

21     content in the e-mail, it's not necessarily

22     reflected in this attachment.

23          MR. STOLTZ:  Okay.  I think in context it

24     will make a little bit more sense.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review



16          MS. KOSKI:  I'm going to object to preserve

17     the record that they are not sequential Bates

18     numbers.  So we don't know if it actually refers

19     to that PowerPoint.

20          MR. STOLTZ:  Okay.

21     BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

15      Q.   Here's the PowerPoint with the sequential

16    Bates.

17            (Conferring with counsel.)

18            MS. KOSKI:  You printed in native.  That's

19        what it is.

20            MR. STOLTZ:  Well, I'll be happy to provide

21        it with the Bates numbers on the bottom, but the

22        Bates numbers for the PowerPoint are also 132598.

23    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19      Q.   And did you ever report a suspicious

20   customer?

21      A.   Yes, sir.

22      Q.   At what point did it change to reporting a

23   suspicious order?

24      A.   I can't say for certain.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   But it did at some point change to reporting

2   suspicious orders?

3    A.   It was a multiple.  I spoke about this

4   earlier where it is -- I'm sorry -- suspicious

5   customer or a suspicious order.

6    Q.   So there is instances in which Anda would

7   report a suspicious order and other instances in

8   which they would report a suspicious customer?

9    A.   Yes, sir.

10    Q.   I think we went over this as well, but

11   when -- if -- if a customer made a suspicious order

12   and that order was held by Anda and ultimately not

13   released by Anda, how is it that that customer

14   wouldn't also be suspicious, just the order itself

15   would be?

16    A.   Well, it would.  As I stated earlier, you're

17   still -- we would still submit the customer

18   information.  It would just have, along with it, an

19   order -- specific order tied to it.

20    Q.   So, in 2012, you would just give the DEA a

21   suspicious customer without reference to a particular

22   order?

23    A.   We were doing all of our validation up front

24   with the customers.  So we were basically fielding

Highly Confidential - Subject to Further Confidentiality Review

```
 1    off who we wanted to do business with prior to them

 2    becoming a customer and becoming -- having suspicious

 3    orders.

 4         Q.   So by doing your validation up front -- I'm

 5    just trying to understand what's changed.

 6              By doing your validation up front, you were

 7    able to avoid having any suspicious orders?

 8         A.   We were still monitoring orders, but they

 9    were orders of interest, not suspicious orders.

10         Q.   Orders of interest?

11         A.   Yes, sir.

12         Q.   Were there any other levels of, like,

13    particular orders or strange orders?  Just orders of

14    interest and then suspicious?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  Yes, sir.

17    BY MR. STOLTZ:

18         Q.   How many different tiers of suspicion were

19    there?

20              MS. KOSKI:  Object to form.

21    BY MR. STOLTZ:

22         Q.   Were there other tiers of suspicion --

23    suspicious orders?

24         A.   All orders are orders of interest until they
```

1     become suspicious.

Highly Confidential - Subject to Further Confidentiality Review



14        Q.    Do you have an algorithm for capturing

15    suspicious orders?

16        A.    Orders of interest can become a suspicious

17    order.  So after you review it and it -- if things

18    don't check out, then it becomes a suspicious order.

19        Q.    So the algorithm identifies what could be

20    suspicious orders, but they can't be deemed -- they

21    can't be deemed suspicious until someone -- someone

22    finds out whether or not one of these eight factors

23    is at play, like an increased supply to new/existing

24    customer or patient or increased supply to a new

1    facility, consistent with order pattern, increase in

2    stock due to promotion, first time order, consistent

3    with customer class order pattern, administration

4    release, or released unchanged with DEA/state

5    authority concurrence.

6          All of those could be reasons why an order of

7    interest wouldn't be suspicious?

8        A.   Correct.

9          MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

14        Q.   Were there ever situations in which you or

15   others in regulatory compliance would preemptively

16   increase the limits on a customer prior to a large

17   sale or a -- for example, a promotional -- a limited

18   time promotion in order to avoid triggering the

19   algorithm?

20          MS. KOSKI:  Object to form.

21          THE WITNESS:  Like I said before, I can't

22       speak to any promotions.  But regardless, the

23       algorithm tech would catch.  So if you read over

24       what the algorithm catches, it would catch any

```
1          order that is out of frequency, out of the normal

2          use of business.

3     BY MR. STOLTZ:

4          Q.   And those orders would automatically be held?

5          A.   (Nodding head.)

6          Q.   What was the turnaround for an order being

7     held?  How long does it take from an order being held

8     to an order ultimately being released?

9          A.   It varies.

10          MS. KOSKI:  Object to form.

11     BY MR. STOLTZ:

12          Q.   Was there ever, you know, a time that

13     compliance was shooting for or was there a maximum

14     amount of time it could take?  I mean, it just

15     varies?  It could take a year?  It could take two

16     minutes?

17          A.   Yes, sir.

18          Q.   Wouldn't that make it difficult to do

19     business?

20          MS. KOSKI:  Object to form.

21          THE WITNESS:  I don't think so.

22     BY MR. STOLTZ:

23          Q.   If someone ordered 100 units of opioids from

24     Anda and Anda held that for years, after awhile, that
```

```
 1    they would no longer need that order, would they?

 2              MS. KOSKI:  Object to form.

 3              THE WITNESS:  I can't say.

 4    BY MR. STOLTZ:

 5        Q.    Don't drugs have an expiration date?

 6        A.    Sure.

 7        Q.    Isn't Anda's position in the market to supply

 8    customers when they are unable to find product

 9    elsewhere?

10        A.    If it's a legit process, right.  So if it

11    hits as an order of interest, someone has to make

12    sure we want to ship on it.

13        Q.    How many people would review held orders?

14              MS. KOSKI:  Object to form.

15    BY MR. STOLTZ:

16        Q.    How many people at Anda's responsibility was

17    to review held orders at the time that you say you

18    were dealing with reviewing suspicious orders?

19        A.    Possibly up to five.

20        Q.    I'm going to show you what I'm going to mark

21    as Exhibit 9, Bates Number 14 -- 141492.  Just as

22    soon as I can get the sticker.

23              (Anda - Hall Exhibit 9 was marked for

24    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

1                THE WITNESS:   Thank you.

2       BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

13          MS. KOSKI:  Object to form.

14          THE WITNESS:  It appears that way.  I'm not

15      doing the math but . . .

16   BY MR. STOLTZ:

17      Q.   When you were in charge of suspicious order

18   monitoring, how long would it take you to review a

19   held order?

20      A.   It would vary depending on the order.

21      Q.   Could you make a guess, an average?

22      A.   No.  I'm sorry.

23      Q.   Would it be somewhere in between an hour and

24   a day?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I don't -- I'm sorry, I don't know.

 2      Q.   Would it take a week?

 3      A.   It could.  I don't know.

 4      Q.   Did it ever take a week?

 5      A.   Possibly.

 6      Q.   It possibly took -- would it ever take longer

 7   than a week?

 8      A.   I'm sorry, I don't know.

 9      Q.   You don't recall how long it took you to

10   review a held order based on the suspicious order

11   monitoring SOP that you and others drafted and

12   reviewed every year from 2011 to 2015?

13           MS. KOSKI:  Object to form.  Mischaracterizes

14      testimony.

15   BY MR. STOLTZ:

16      Q.   You have no idea how long this takes?

17      A.   No.  I'm sorry.

18      Q.   Would it be possible for six individuals to

19   review 480 held orders in a day?

20      A.   Possibly.

21      Q.   How many would that be per person?

22           Sorry.  I'll do the math.

23           MS. KOSKI:  You are asking her to do the

24      math?
```

```
 1              MR. STOLTZ:  No, that's fine.

 2              MS. KOSKI:  We need one of the big

 3       calculators.

 4              MS. REINA:  It's 80.

 5    BY MR. STOLTZ:

 6       Q.   So it's possible that a person could review

 7    80 held orders in a day?

 8       A.   Yes, sir.

 9       Q.   Okay.  Did you ever review 80 held orders in

10    a day?

11       A.   Possibly.

12       Q.   Does that seem like an unusually large amount

13    to you?

14       A.   I don't -- I really don't know.




18       Q.   Do you recall whether or not in 2016 from

19    January to August if any orders were referred to the

20    DEA?

21              MS. KOSKI:  Object to form.

22              THE WITNESS:  I can't say.  I'm sorry.  I

23       wasn't really directly involved.

24    ///
```

1    BY MR. STOLTZ:

18        Q.    And the internal system, was there a name for

19    that system?

20        A.    We really called it a bucket.  That was just

21    our -- what we called it but -- it was our order of

22    interest bucket.

23        Q.    Okay.  And if you increased -- if you had a

24    larger multiplier, you could avoid things going into

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the bucket, right?

 2         A.   The larger --
```

11    Q.   Okay.  Who is in charge of setting those

12    multipliers?

13         A.   I'm sorry, I don't know.

14         Q.   Okay.  I want to show you what I'm going to

15    mark as Exhibit 10.

16         (Anda - Hall Exhibit 10 was marked for

17    identification.)

18         MR. STOLTZ:  And, again, I apologize for the

19    awkward stapling.

20         MS. KOSKI:  Thank you.

21         MR. STOLTZ:  Exhibit 10 bearing the Bates

22    Number 149556.

23    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

```
3            What was Jay Spellman's position?

4            MS. KOSKI:  Object to form.

5     BY MR. STOLTZ:

6         Q.    What did Jay Spellman do for Anda at this

7     time?

8         A.    At this time, Jay Spellman was the executive

9     director of distribution and compliance.

10         Q.    And then what did Sabrina Solis do?

11         A.    Sabrina is the manager of regulatory

12     compliance.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 9    BY MR. STOLTZ:

10         Q.   You testified earlier that the initial --

11    initially, stores would be given a thousand-unit

12    order an a particular family?

13         A.   Sure.

14         Q.   One of those things that was outside of that

15    limit was oxycodone.

16              Is that accurate?

17         A.   Yes.

18         Q.   And the other thing was methadone?

19         A.   Yes, sir.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review

```
 1        A.   As I stated before, the algorithm will still

 2    catch the orders.  What she is stating is she

 3    reviewed the customers and everything -- and they are

 4    eligible and set for this order.  They have been

 5    approved.

 6        Q.   Prior to going through the algorithm?

 7        A.   There's limits, and there's an algorithm.

 8        Q.   Did Wegmans -- did their limits ever go down

 9    after this one-time purchase?

10             MS. KOSKI:  Object to form.

11    BY MR. STOLTZ:

12        Q.   Was there any SOP for bringing limits down

13    after a one-time purchase of a large amount of

14    opioids?

15             MS. KOSKI:  Object to form.

16             THE WITNESS:  I can't say for certain.

17    BY MR. STOLTZ:

18        Q.   Who would have -- would you agree that if

19    limits didn't return to their number prior to a

20    limited time increase, customers could order far more

21    than they normally would have been able to in the

22    future?

23             MS. KOSKI:  Object to form.

24             THE WITNESS:  Can you clarify?
```

```
1                    MR. STOLTZ:   Sure.

2        BY MR. STOLTZ:
```



```
20       BY MR. STOLTZ:

21            Q.   So you would be comfortable increasing limits

22       indefinitely after the review of a one-time large

23       purchase of a controlled substance?

24                 MS. KOSKI:   Object to form.   Mischaracterizes
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        testimony.

 2     BY MR. STOLTZ:
```



```
14        Q.   Was there ever a time that limits were

15     re-reviewed?  For example, you looked at the SOP

16     policy in general on a yearly basis.  Would limits

17     themselves ever be reviewed after they were set?

18             MS. KOSKI:  Object to form.

19             THE WITNESS:  Possibly.

20     BY MR. STOLTZ:

21        Q.   In the time that you were in charge of

22     suspicious order monitoring, whether that was after

23     Robert Brown being laid off or prior to his hiring,

24     were limits ever reviewed after they were set?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Possibly.  I can't say for a specific case.

 2        Q.    But there was never any policy to do so?

 3              MS. KOSKI:  Object to form.

 4              THE WITNESS:  Specifically reviewing the

 5        customer in general.

 6              So, as I stated before, the whole picture of

 7        the customer, re-reviewing them, making sure --

 8        someone the size of a Wegmans, re-reviewing and

 9        making sure we are comfortable with where they

10        stand.

11   BY MR. STOLTZ:

12        Q.    Were customers ever re-reviewed -- was there

13   ever a specific policy that you can recall to

14   re-review customers in situations other than where

15   they are asking for an increase in their control

16   limit?

17              MS. KOSKI:  Object to form.

18              THE WITNESS:  I can't say for certain.

19   BY MR. STOLTZ:

20        Q.    So that you know of, there was no policy to

21   do so?

22              MS. KOSKI:  Object to form.

23              THE WITNESS:  I can't say for certain.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   It was -- you were running the department

 3    prior to Robert Brown being hired and then after him

 4    being laid off?

 5             MS. KOSKI:  Object to form.  Mischaracterizes

 6        testimony.

 7    BY MR. STOLTZ:

 8        Q.   Were you in charge of suspicious order

 9    monitoring when Robert Brown was not with Anda?

10        A.   Yes.

11        Q.   While you were in charge of that, of

12    suspicious order monitoring, did you ever implement a

13    policy to review limits in situations other than

14    where a customer's asking for an increase in limits?

15        A.   We reviewed -- re-reviewed customers, yes.

16        Q.   I understand that you re-reviewed customers.

17             Did -- was there a policy that you can recall

18    to re-review customers in situations other than where

19    they were asking for an increase in limits?  And if

20    there was a policy, can you let me know what that

21    policy was?

22             MS. KOSKI:  Object to form.

23             THE WITNESS:  A written policy?  Is that what

24        you're --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   I don't know.

 3        A.   I guess --

 4        Q.   Maybe you wrote it down or -- I'm just asking

 5    you how you ran your department.

 6             Did you ever instruct anyone, written or

 7    otherwise, to re-review customers in situations where

 8    they were not asking for an increase in controlled

 9    substances?

10        A.   Possibly.

11        Q.   Possibly?

12        A.   Yes, sir.

13        Q.   Can you think of a reason why you might

14    possibly do that?

15        A.   I can't say for certain.

16             (Anda - Hall Exhibit 11 was marked for

17    identification.)

18    BY MR. STOLTZ:

19        Q.   I'm showing you what's been marked as

20    Exhibit 11, bearing the Bates number --

21             MS. KOSKI:  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
15          MS. KOSKI:  Object to form.

16   BY MR. STOLTZ:

17       Q.   Do you know when Anda made the transition to

18   reporting suspicious orders as opposed to suspicious

19   customers?

20          MS. KOSKI:  Object to form.

21          THE WITNESS:  No.

22   BY MR. STOLTZ:

23       Q.   Do -- was it a decision that you made or was

24   it a decision that Robert Brown made?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It was a decision somebody else made.  I did

 2    not make it.

 3        Q.    So it was at least after Robert Brown was

 4    hired and you transitioned to just focusing on

 5    licensures?

 6            MS. KOSKI:  Object to form.

 7            THE WITNESS:  Possibly.

 8    BY MR. STOLTZ:

 9        Q.    Well, if you didn't make the decision, then

10    necessarily it would have occurred after you were out

11    of the loop as far as suspicious order monitoring

12    goes, right?

13        A.    Possibly, yes.

14        Q.    And when was that again?

15        A.    I was in that role 2010 to maybe 2012.
```

20        Q.    Well, at this point, you're still in charge

21    of suspicious order monitoring, right?

22            MS. KOSKI:  Object to form.

23            THE WITNESS:  It was around that time that

24        Robert transitioned in, in 2012.  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1        the exact --

2               MR. STOLTZ:  Okay.

3    BY MR. STOLTZ:

4        Q.   So at least up until November of 2012 Anda

5    was reporting suspicious customers and not suspicious

6    orders?

7        A.   Yes, sir.

8               THE VIDEOGRAPHER:  Off the video record at

9        2:27.

10              (Recess from 2:27 until 2:33 p.m.)

11              THE VIDEOGRAPHER:  The time is 2:33 p.m.  We

12       are now back on the record.

13   BY MR. STOLTZ:

14       Q.   So during the whole time that you were at

15   Anda, the main focus of your employment -- at least

16   one of your main responsibilities was focused around

17   licensing, right?

18       A.   Yes, sir.

19       Q.   And that would entail making sure that the

20   customers had valid licenses to purchase

21   pharmaceuticals, right?

22       A.   Yes, sir.

23       Q.   And each state is a little bit different?

24       A.   For controlled substance?

Highly Confidential – Subject to Further Confidentiality Review

```
 1      Q.    For any type of licensing.

 2      A.    Yes, sir.

 3      Q.    When it comes to controlled substances, are

 4   states different?

 5      A.    Some states have a controlled substance

 6   license and some states do not.

 7      Q.    Okay.  So I guess some states kind of track

 8   the federal rules and other states don't?

 9            MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11      Q.    Would part of -- part of understanding

12   licensure wouldn't just be limited to the states,

13   right?  It would also be limited -- it would also

14   extend to requirements under the federal regulations

15   and federal code?

16      A.    Yes, sir.

17      Q.    And you mentioned that -- about how

18   frequently would -- are there separate licenses for

19   controlled substances and noncontrolled substances?

20      A.    In each state, it varies.  So each state has

21   different requirements.

22      Q.    As to federal law, is there a different

23   license for controlled substances and noncontrolled?

24      A.    Federal is your DEA registration.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  It's the DEA registration?

 2        A.    Yes, sir.

 3        Q.    And what type of information can you tell

 4   from a DEA registration?

 5        A.    The DEA registration has the name, the

 6   address, the schedules that they're approved for as

 7   well as expiration date, how much they paid for their

 8   registration, and when it was issued.

 9        Q.    There's a situation where you could -- maybe

10   a facility's DEA registration was out of date or

11   their DEA registration put them in a category of

12   customer that Anda didn't want to sell to, or at

13   least policy-wise didn't want to sell to.

14              Could Anda, for example, substitute in one of

15   the practitioner's DEA registration and sell product

16   directly to that individual in order to get product

17   to the customer that's DEA registration may have been

18   out of date?

19              MS. KOSKI:  Object to form.

20              THE WITNESS:  No, I'm not -- I'm sorry.  I'm

21        not sure --

22              MR. STOLTZ:  Sure.  That was a terrible

23        question.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2         Q.    So doctors have DEA registrations, right?

 3    Not all of them but some?

 4         A.    Yes, sir.

 5         Q.    And a pharmacy would have a DEA registration?

 6         A.    Yes, sir.

 7         Q.    Assuming, if they wanted one.

 8               What are some of the other classes of

 9    entities that can have a DEA registration?

10         A.    Anyone that is going to handle controlled

11    substances is required to have a DEA registration.

12         Q.    Okay.  If a pharmacist's DEA registration was

13    out of -- would a pharmacist himself or herself would

14    they have a DEA registration?

15         A.    No.  The pharmacy would have it.

16         Q.    Okay.  What about -- what about a clinic or a

17    hospital?  Would the doctor have a DEA registration

18    in addition to the hospital having a DEA

19    registration?

20         A.    Not -- a clinic and hospitals would be two

21    different classifications.  Some clinics won't have

22    their own licensure, and they would rely on the

23    physician.  And hospitals -- typically a hospital has

24    their own DEA registration.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  But there could be situations in

2    which -- well, there would be situations in which,

3    you know, a hospital would have a DEA registration

4    and doctors within that hospital would have a DEA

5    registration?

6              MS. KOSKI:  Object to form.

7    BY MR. STOLTZ:

8        Q.    Could you sort of have overlapping DEA

9    registrations is what I'm asking?

10             MS. KOSKI:  Object to form.

11             THE WITNESS:  The DEA can issue multiple DEA

12        registrations at the same address for different

13        people or different entities.

14   BY MR. STOLTZ:

15       Q.    Okay.  So then if you wanted to -- if you

16   wanted to avoid scrutiny for selling opioids to a

17   hospital or a clinic that had a DEA registration,

18   couldn't you use the doctor that works there's DEA

19   registration and sell to them directly as opposed to

20   that clinic?

21             MS. KOSKI:  Object to form.

22             THE WITNESS:  Can you please clarify?

23   BY MR. STOLTZ:

24       Q.    In situations where there are more than one
```

Highly Confidential - Subject to Further Confidentiality Review

1    DEA registration at one location -- and that's

2    something that's possible, right?

3        A.    Yes, sir.

4        Q.    Okay.  In situations where there are two --

5    more than one DEA registration at one location, would

6    it be possible to avoid DEA scrutiny by selling to

7    one and not the other?

8            MS. KOSKI:  Object to form.

9            THE WITNESS:  It just depends on who's our

10           customer.  I'm still not sure -- I'm unclear on

11           what your question is.

12           MR. STOLTZ:  I'm marking Exhibit 12, Bates

13           Number 136972.

14           (Anda - Hall Exhibit 12 was marked for

15    identification.)

16    BY MR. STOLTZ:



Highly Confidential - Subject to Further Confidentiality Review

10    BY MR. STOLTZ:

11        Q.   Well, it is.

12             But regardless, a DEA registration, is that

13    going to be required for all types of -- all types of

14    pharmaceuticals or just controlled substances?

15             MS. KOSKI:   Object to form.

16    BY MR. STOLTZ:

17        Q.   A DEA registration is required for ordering

18    controlled substances, right?

19        A.   For the -- yes.

20        Q.   Would you need a DEA registration to order

21    Tylenol?

22        A.   In our system, we -- as a new customer or an

23    existing customer, we try and have all of their

24    licensure on file.  And some of that is for

Highly Confidential - Subject to Further Confidentiality Review

1   chargeback reasons.  So the DEA is their -- the link,

2   the notifier, when things get sent back for

3   chargeback.  Not necessarily a controlled substance

4   buying customer or a controlled substance order; just

5   account maintenance.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          Q.   Did Anda have a policy of not distributing

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances to clinics?

2         MS. KOSKI:  Object to form.  Mischaracterizes

3      the document.

4    BY MR. STOLTZ:

5      Q.  When you were in charge of suspicious order

6    monitoring, which would have been in February of

7    2012, did you or did anyone else in regulatory -- the

8    regulatory department implement a policy of not

9    distributing controlled substances to clinics?

10     A.  Pain clinics.

11     Q.  This was a pain clinic?

12     A.  I can't say for certain.

13     Q.  When was that implemented, that policy?

14     A.  June 2010-ish.  I'm not a hundred percent

15   certain.

16     Q.  Were you a part of those conversations, or

17   that's just what you heard?

18         MS. KOSKI:  Object to form.

19         THE WITNESS:  Can you please clarify?

20         MR. STOLTZ:  Sure.

21   BY MR. STOLTZ:

22     Q.  When that decision was made -- you seem to

23   have a specific understanding of when that decision

24   was made.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you know why that decision was made?

2      A.    To discontinue the sale of controlled

3   substances to pain clinics.

4      Q.    And why was that policy implemented?

5          MS. KOSKI:  Object to form.

6          THE WITNESS:  I can't say for certain.

7   BY MR. STOLTZ:

8      Q.    Why do you remember that it was in June of

9   2010?  Is there anything else that happened in June

10  of 2010?

11     A.    June -- the reason I remember is in June 2010

12  is because our physicians were -- there was

13  expirations that occurred on that day.  So when I see

14  a customer, I can see that date of an expiration.

15     Q.    What do you mean an expiration?

16     A.    Expiration date on one of their licensure.

17     Q.    Oh.

18     A.    Sorry, it was one of those where you join

19  things.

20     Q.    So it was after -- I guess after June of

21  2010, that's when Anda was no longer going to

22  distribute to pain clinics?

23     A.    Pain clinics, yeah.  I believe it was 2010,

24  that decision, but . . .

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   But it didn't have a similar policy with

2    regards to physician in charges, or did it?

3            MS. KOSKI:  Object to form.

4    BY MR. STOLTZ:

5        Q.   Did Anda continue to distribute controlled

6    substances to pain clinics by sending those --

7    sending those pills to the physician in charge by

8    using their DEA registration?

9            MS. KOSKI:  Object to form.

10           THE WITNESS:  No, sir, not that I'm aware of.

11   BY MR. STOLTZ:

12       Q.   How long after 2010 did Anda continue to

13   distribute pain pills to pain clinics?

14           MS. KOSKI:  Object to form.

15   BY MR. STOLTZ:
```

```
21   BY MR. STOLTZ:

22       Q.   What are some other reasons why Anda would

23   not be allowed to sell controlled substances to a

24   type of license in 2012?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.  Foundation.

 2    BY MR. STOLTZ:

 3        Q.    What -- what is required as far as licenses

 4    before -- what licenses are required before someone

 5    can order controlled substances?

 6        A.    State license; if their state requires a

 7    controlled substance, a controlled substance license;

 8    and a DEA registration.

 9        Q.    And -- and what types of licenses is Anda not

10    allowed to distribute controlled substances to in

11    2012?

12        A.    There was a decision made to not sell to

13    wholesalers and pain clinics.
```



Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Weren't you the -- in charge of licensure?

 2        A.    Sure.

 3        Q.    Wasn't that one of your main

 4   responsibilities?

 5        A.    Yes, sir.

 6        Q.    And that was your main -- one of your main

 7   responsibilities in February of 2012?

 8        A.    Licensure, yes.

 9        Q.    And as part of that, your job was to ensure

10   that you were allowed -- and part of that would be

11   knowing what licenses you are allowed to sell to,

12   right?

13        A.    Yes, sir.

14        Q.    So in February of 2012, what licenses were

15   you not allowed to sell to?

16              MS. KOSKI:  Object to form.

17   BY MR. STOLTZ:

18        Q.    You don't know?

19        A.    Pain clinics and wholesalers.

20        Q.    Are those the only two type of licenses?

21        A.    Those are the two I remember for that time

22   frame.

23        Q.    Okay.  Was that a self-imposed rule?

24        A.    Can you please clarify?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   When I asked "What licenses are you not

2    allowed to sell to," was that a self-imposed

3    limitation?  Did Anda put those limitations on itself

4    or was that a requirement by state or federal

5    regulations?

6        A.   That was an Anda decision.

7        Q.   Are there some states that have a rule as to

8    licenses that can be sold to by a wholesaler?

9        A.   Not that I'm aware of, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

 3    BY MR. STOLTZ:

 4        Q.    So what was that internal system called?  I

 5    mean, how could you sort of monitor the tasks or

 6    whatever for a particular customer?

 7        A.    I believe you are referring to Remedy.

 8        Q.    Okay.  That would be what I'm referring to.

 9              So a system like Remedy, is that where you go

10    to see whether a customer had been denied, met their

11    limit for a certain month, that sort of thing?

12        A.    Remedy is more task-oriented.  So a rep will

13    send a request to a specific department asking for,

14    hey, please update the phone number, update the

15    address.  That's a task.

16        Q.    If a -- if a customer or an order was

17    reported to the DEA, where -- where would that show

18    up?  Would that also be on Remedy or on a different

19    electronic system?

20        A.    It would be in the Excel file called

21    "Customer Cutoff."  That's where those are captured.

22        Q.    And would that -- would that information ever

23    be put into Remedy or T PS or the O drive?

24        A.    TPS.  In the notes section of TPS.  You know,

1    it would vary that they would have a note saying the

2    customer was cut off.  Most of the time, it would.

3         Q.   And but then would it also include a note

4    whether or not a customer was ultimately reported to

5    the DEA?

6         MS. KOSKI:  Object to form.

7    BY MR. STOLTZ:

8         Q.   Where -- where -- where in Anda's internal

9    systems, electronic or otherwise, would -- would a

10   customer's -- a customer getting reported to the DEA,

11   where would that be reflected?

12        A.   In that Excel file with the -- Customer

13   Cutoff file.

14        Q.   So that wouldn't make it into the notes of a

15   due diligence file or TPS or --

16        A.   Possibly.

17        Q.   Possibly but not all the time?

18        A.   I can't say a hundred percent of the time.

19        MR. STOLTZ:  I'm going to show you what I'm

20        marking as Exhibit 13, Bates number 81549, and

21        its attachment, 81550.

22        (Anda - Hall Exhibit 13 was marked for

23   identification.)

24        MS. KOSKI:  Do you have another copy for her?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. STOLTZ:  Oh, of course.  Sorry about

2        that.

3     BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



```
 6    BY MR. STOLTZ:

 7        Q.   Were you able -- being in charge of

 8    suspicious order monitoring, at least during this

 9    time period, were you ever aware of what other

10    distributors were doing with respect to suspicious

11    order monitoring?

12        A.   No, not me specifically.

13        Q.   Would someone at Anda be aware of what other

14    distributors were doing with respect to suspicious

15    order monitoring?

16        A.   I can't say for certain.

17        Q.   Do you think Sabrina Solis would know?

18        A.   I can't say for certain.

19        Q.   You mentioned earlier that part of knowing

20    your customer was knowing who their primary

21    distributor was.

22             Is that accurate?

23        A.   Yes, sir.

24        Q.   And would that also include knowing how that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    primary distributor monitors that shared customer for

 2    suspicious orders?

 3         A.   Me specifically?

 4         Q.   If you wanted to know your customer and part

 5    of that included knowing who their primary

 6    distributor was, would that also include knowing how

 7    that primary distributor monitored that shared

 8    customer for suspicious orders?

 9         A.   No.

10              MS. KOSKI:  Object to form.

11              THE WITNESS:  No, sir.

12    BY MR. STOLTZ:

13         Q.   Would a primary distributor ever share with

14    Anda dispensing data?

15              MS. KOSKI:  Object to form.

16              MS. VAN TASSELL:  This is Rebecca Van Tasell.

17              Object to form.

18    BY MR. STOLTZ:

19         Q.   While you were in charge of regulatory

20    compliance and suspicious order monitoring, that

21    included knowing a customer, right?

22         A.   Yes, sir.

23         Q.   And part of knowing your customer was knowing

24    the primary distributor for that customer?
```

```
 1        A.   Yes, sir.

 2        Q.   Other than just in general knowing a

 3   customer, how would a primary distributor -- how

 4   would -- how would who the primary distributor is

 5   matter with regards to monitoring suspicious order

 6   monitoring?

 7             MS. KOSKI:  Object to form.

 8             MS. CARDENAS:  Object to form.

 9             THE WITNESS:  Can you please clarify?

10             MR. STOLTZ:  Sure.

11   BY MR. STOLTZ:

12        Q.   How is a primary distributor relevant to

13   monitoring for suspicious orders?

14             MS. CARDENAS:  Object to form.

15             THE WITNESS:  As I stated earlier, just

16        knowing your customer, knowing who they are doing

17        business with.

18   BY MR. STOLTZ:

19        Q.   Right.

20             Obviously, there's knowing who they are doing

21   business with, but how does that relate to monitoring

22   for suspicious orders?  How -- in what way would that

23   empower Anda to more effectively monitor for

24   suspicious orders?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MS. CARDENAS:  Object to form.

 2              THE WITNESS:  It's just a field.  It's an

 3         understanding of who they are doing business

 4         with.

 5    BY MR. STOLTZ:

 6         Q.   Do you think it would be easier to monitor

 7    for suspicious orders if you knew how much the

 8    primary distributor was distributing to that shared

 9    customer?

10              MS. VAN TASSELL:  Object to form.

11              MS. KOSKI:  Object to form.

12              THE WITNESS:  There's people from the ceiling

13         talking.

14              Sorry.

15              Can you please clarify?

16    BY MR. STOLTZ:

17         Q.   Would you agree that it was difficult to know

18    your customer without having -- without knowing

19    exactly how much the primary distributor was

20    dispensing to them?

21              MS. CARDENAS:  Object to form.

22              THE WITNESS:  I don't think "difficult" is

23         the appropriate word.

24    ///
```

```
1    BY MR. STOLTZ:

2         Q.    And what word would you use?

3         A.    It is -- knowing that we are secondary and

4    understanding where our position is, I don't think

5    it's difficult.  It's just what it is.

6         Q.    But in your capacity as a secondary

7    distributor, there would be information that you

8    would be missing, right?

9         A.    Yes, sir.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 6              THE WITNESS:  I can't say for certain.

 7     BY MR. STOLTZ:

 8        Q.   I want to show you what's been marked as

 9     Exhibit 14 -- not this one.

10              (Anda - Hall Exhibit 14 was marked for

11     identification.)

12              THE WITNESS:  Thank you.

13              MR. STOLTZ:  You got it?

14              MS. KOSKI:  Thank you.

15              MR. STOLTZ:  This is bearing the Bates number

16        of 132608.

17     BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
23          MR. STOLTZ:  Just for reference, the Bates

24      number of the -- of the last exhibit is 132608.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  That is Exhibit 14?

 2              MR. STOLTZ:  Yeah.

 3              Right?

 4              THE WITNESS:  Yes.

 5    BY MR. STOLTZ:

 6         Q.   Who is Howard Davis?

 7         A.   Howard Davis was an employee at Anda in 2011,

 8    I believe it was.

 9         Q.   Do you know when he left?

10         A.   He was there for approximately 90 days or so.

11    I don't have an exact date.  Maybe 2011.

12         Q.   He was only at Anda for 90 days?

13         A.   Yes, sir, I believe it was 90 days.

14         Q.   Do you recall why he left the company?

15         A.   It was a performance review at that 90-day

16    piece.

17         Q.   What is data waived?  Does that mean anything

18    to you?

19         A.   No, sir.  I'm not familiar.

20              MR. STOLTZ:  Can we take a break?

21              MS. KOSKI:  Sure.

22              THE VIDEOGRAPHER:  Off the record at 3:42.

23              (Recess from 3:42 until 3:59 p.m.)

24              THE VIDEOGRAPHER:  The time is 3:59 p.m.  We
```

```
 1        are now back on the record.

 2   BY MR. STOLTZ:

 3        Q.   You mentioned earlier that the TPS or Remedy

 4   wouldn't always show notes as to why an account had

 5   been shut down for controlled substances, right?

 6        A.   You asked me if a -- if it -- if TPS notes

 7   would reflect that we reported it to the DEA, I

 8   believe.

 9        Q.   Okay.  Would those reports include whether or

10   not an account was shut down?

11             MS. KOSKI:  Object to form.

12   BY MR. STOLTZ:

13        Q.   Shut down with respect to controlled

14   substances?

15        A.   The Excel file that goes to the DEA?

16        Q.   No.

17             So I'm talking about -- I guess I'm talking

18   about TPS or Remedy -- I'm not sure but -- in Anda's

19   internal systems.  If there was a customer that was

20   turned off for controlled substances, the fact they

21   had been turned off for controlled substances, that

22   would be reflected on TPS?

23        A.   Yes, sir.

24        Q.   Would -- would the reason why they had been
```

```
 1    turned off be reflected on TPS?

 2         A.   It might not necessarily go into detail.

 3         Q.   So it would just be like a little blur over

 4    something sometimes?

 5         A.   Yes, sir.
```

12    BY MR. STOLTZ:

13         Q.   Okay.  So when you were working on suspicious

14    order monitoring prior to Robert Brown coming on

15    board, that included -- that included order of

16    interest review process.

17              Did it also include control limit increase

18    process?

19         A.   Yes, sir.

20         Q.   And it also included whether or not to turn

21    on a customer for controls in the first place?

22         A.   Yes, sir.

23         Q.   And when somebody was initially turned on for

24    control, it would be turned on for 1,000 units?

```
 1        A.    Typically.

 2        Q.    What is a unit?  I mean, what does that refer

 3   to?  Is that like a pill bottle or --

 4        A.    So 1,000, in that family, they would be able

 5   to receive 1,000 tabs, let's say.  So a tab -- if a

 6   bottle is 100 -- or 500 in a bottle, they will be

 7   able to receive two bottles.

 8        Q.    Okay.  Was that ever -- was that always

 9   just -- so you're kind of on both ends of the -- you

10   know, on one hand, you are doing this in 2012, and

11   then you take over for Robert Brown on a temporary

12   basis in 2017?

13        A.    Yes, sir.

14        Q.    Do you recall when he was fired?

15        MS. KOSKI:  Object to form.

16   BY MR. STOLTZ:

17        Q.    When was Robert Brown fired?

18        MS. KOSKI:  Object to form.

19        THE WITNESS:  He was laid off in -- around

20        January-ish -- January/February 2017.

21   BY MR. STOLTZ:

22        Q.    Okay.  When you were running controlled

23   substance compliance in 2012, "units" referred to

24   tabs.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Did they refer to tabs in 2017?

2      A.   Yes, sir.

3      Q.   Was there ever any consideration given to the

4   actual strength of the tabs?  So, for example, would

5   oxycodone 30-milligram be in the same family as

6   oxycodone 15-milligram?

7      A.   The same family, the chemical family, yes,

8   sir.

9      Q.   Okay.  So I could -- I could -- if I was a

10  customer and I had a limit of 1,000 tabs, I could

11  buy, for example, 1,000 oxycodone 30 milligrams or I

12  could order 1,000 oxycodone 15-milligram, but both of

13  those would -- either would reach my limit, right,

14  even though one is twice as much of the chemical as

15  the 15-milligram?

16          MS. KOSKI:  Object to form.

17          THE WITNESS:  The chemical family, yes.

18  BY MR. STOLTZ:

19     Q.   So 1,000 tabs is not very much.

20          MS. KOSKI:  Object to form.

21  BY MR. STOLTZ:

22     Q.   Would customers ever be given more than

23  1,000 -- what was the purpose for such -- such a

24  low -- a low threshold to start?  I mean, was there

1    ever a process where someone could have a threshold

2    that was much higher -- much higher on the front end?

3            MS. KOSKI:  Object to form.

4            THE WITNESS:  We typically started with

5        1,000, especially with new customers, until we

6        could get a feel for what their business is and

7        how they were going to utilize Anda.

8    BY MR. STOLTZ:

9        Q.   Okay.  Were -- did you ever treat thresholds

10   differently with -- if you were a primary distributor

11   as opposed to a secondary distributor?

12           MS. KOSKI:  Object to form.

13           THE WITNESS:  If we were a primary, our -- it

14       would all depend on the due diligence, the

15       dispensing data, where that -- what that customer

16       was doing, and the bigger picture.

17   BY MR. STOLTZ:

18       Q.   Okay.  But there were times when Anda was a

19   primary across the board -- was -- was Anda ever the

20   primary distributor across all chemical families?

21       A.   I can't say for sure that we were.

22       Q.   But were there times when Anda was the

23   primary with respect to a certain chemical family?

24       A.   Yes, I believe so.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2            (Anda - Hall Exhibit 15 was marked for

3      identification.)

4      BY MR. STOLTZ:

5      Q.    I'm going to show you what's been marked as

6      Exhibit 15, bearing the Bates of

7      Anda_Hall_Personnel_001.

8      A.    Yes, sir.

9            MS. KOSKI:   Thanks.

10           MR. STOLTZ:   I'm sorry I don't have an

11     additional copy.   I'm happy to put it on the

12     ELMO.

13           MS. KOSKI:   And for the record, we have

14     produced this with a temporary Bates so that we

15     could get it to you quickly, but it will be

16     produced in the normal course as part of a bigger

17     production, just for people reading the

18     transcript.

19     BY MR. STOLTZ:



Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q.    Okay.  Do you remember why the Groveport,

 8   Ohio facility was closed?

 9        A.    We transitioned that facility to Olive

10   Branch, Mississippi because they were closer to the

11   FedEx hub.

12        Q.    And when it came to regulatory compliance,

13   did the regulatory compliance department ever have an

14   employee located at the warehouses, whether that was

15   in Groveport or Mississippi?

16        A.    No, we did not have somebody from compliance

17   at either of those facilities.

18        Q.    What was -- what was the virtual warehouse

19   system?  Did you have any familiarity with the

20   virtual warehouse at Anda?

21        A.    No, sir.

22        Q.    And who was your supervisor?  Was that

23   Jay Spellman?

24              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                THE WITNESS:  At which time?

2    BY MR. STOLTZ:

3        Q.   2016.

4        A.   Yes, sir.

5        Q.   And what was his title?

6        A.   I believe his title is executive director on

7    distribution and compliance.

8        Q.   Did he eventually -- who eventually took on

9    Robert Brown's role?

10       A.   Sabrina Solis.

11       Q.   Okay.  Was there ever a time that

12   Jay Spellman took on that role?

13       A.   Not directly, but he oversaw the whole

14   department.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          And instruct you not to answer to the extent

18     it calls for a legal conclusion, I think, at the

19     end, although I didn't understand the question.

20          You may want to restate the question.

21          I would instruct her not to -- if you didn't

22     intend to do that, then I would object as to

23     form.

24     ///

1    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

2          (Anda - Hall Exhibit 16 was marked for

3     identification.)

4     BY MR. STOLTZ:

5          Q.   I want to show you what's been marked as

6     Exhibit 16 --

7          A.   Thank you.

8          Q.   -- bearing the Bates number 136372.  And this

9     was back when Howard Davis was still with Anda.

10          MS. KOSKI:  Could we get a copy?

11          MR. STOLTZ:  Yeah.  Sorry about that.

12     BY MR. STOLTZ:

13          Q.   Now, at this time in December of 2011, was

14     Howard Davis in charge of controlled substance

15     compliance?

16          MS. KOSKI:  Object to form.

17     BY MR. STOLTZ:

18          Q.   What was Howard Davis's role?

19          A.   He was hired to oversee DEA analysts.

20          Q.   Okay.  So he had the position that

21     Robert Brown ended up getting hired for?

22          A.   Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

9        Q.   Oh, okay.  I see.

10            And Pat Williams, she was in sales, right?

11       A.   Pat Williams oversaw the sales department.

12  I'm not sure what her title was.

13       Q.   And sales, they would typically have access

14  to TPS?  Did they have access to Remedy as well, or

15  they would only be able to make opportunity -- like,

16  create opportunities that would be kicked up to

17  someone else through Remedy?

18            MS. KOSKI:  Object to form.

19            THE WITNESS:  So they would be able to go

20       into Remedy and create an opportunity, a task.

21  BY MR. STOLTZ:

22       Q.   But they wouldn't necessarily be able to --

23  to access Remedy?

24       A.   (Nodding head.)

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    They would be able to?

2        A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

2          Was sales usually notified contemporaneously?

3     A.    Through opportunities.  So if a rep submits

4     an opportunity for an increase or a new customer, the

5     task goes back to them once we close it.

6     Q.    And at this time in 2011, December of 2011,

7     you were working with controlled substance

8     compliance; is that accurate?

9     A.    That was part of my responsibility, yes.

10    Q.    And was it your understanding at that time

11    that it was -- it was your responsibility to report

12    suspicious customers to the DEA?

13    A.    Yes, sir.

21    Q.    Do you know if this drugstore was ever

22    referred to the DEA as a suspicious customer?

23    A.    No, I don't know, sir.

24    Q.    Do you know if it was the policy of Anda to

Highly Confidential - Subject to Further Confidentiality Review

1    report suspicious customers contemporaneously with

2    turning off a customer from controlled substances?

3         A.   Yes, that was the policy at Anda.

4         Q.   Was that the policy in December of 2011?

5         A.   Yes, sir.

6              (Anda - Hall Exhibit 17 was marked for

7    identification.)

8              MR. STOLTZ:  I'm going to show you what's

9         been marked as Exhibit 17, bearing the Bates

10        number of 133103.

11             THE WITNESS:  Thank you.

12             MS. KOSKI:  Thank you.

13   BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

```
10        A.    Valerie Nemia, yes.

11        Q.    What was her position?

12        A.    Sales.  I don't know her exact title.

13        Q.    Yeah, she was the sales manager.  There was

14    different -- there was different reps.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3       Q.   Please let me know if there's something else

4    happening and any updates you can.

5            MS. KOSKI:  Is that a question for the

6       witness?

7            MR. STOLTZ:  No.  I'm sorry.

8    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

```
 4    BY MR. STOLTZ:

 5        Q.   Was it your feeling that Anda was being

 6    watched in 2011 -- December of 2011?

 7        A.   No, sir.
```

```
11              THE WITNESS:  I think it's time for all of us

12        to take a cruise.

13              MS. KOSKI:  That's a kind of torture that you

14        have to look out the window at the cruise ships

15        coming in and out.

16              THE WITNESS:  They're going on vacation.

17              MR. STOLTZ:  What's that?

18              THE WITNESS:  The cruise ships.

19              MR. STOLTZ:  I promise you, we're almost

20        finished.

21              THE WITNESS:  Great.  Thank you.

22    BY MR. STOLTZ:

23        Q.   Were you aware of the large fines that the

24    DEA imposed on Cardinal and McKesson and other
```

```
 1    distributors?

 2              MS. CARDENAS:  Object to form.

 3              MS. VAN TASSELL:  Object to form.  This is

 4         Rebecca Van Tasell.

 5              MS. KOSKI:  You can answer.

 6              THE WITNESS:  Just general from the news.

 7              MR. STOLTZ:  Just a couple more documents and

 8         we'll get out of here.

 9    BY MR. STOLTZ:

10         Q.   Who is Mezanne Moo Young?

11         A.   Mezanne Moo Young works in our procurement

12    department for nontrade items.

13              MR. STOLTZ:  Just two more documents.

14              I'll show you what I'll mark as Exhibit 18.

15         It's bearing the Bates numbers 313264.

16              (Anda - Hall Exhibit 18 was marked for

17         identification.)

18              MS. KOSKI:  Thank you.

19    BY MR. STOLTZ:
```

Highly Confidential - Subject to Further Confidentiality Review

    7        Q.    And who was John Kincaide?

    8        A.    John Kincaide was a DEA analyst.

    9        Q.    So Rachelle Vance, she was a sales rep, or

   10    what was her role at Anda?

   11        A.    Rachelle Vance is a national accounts.

   12        Q.    National accounts?

   13        A.    Sales.  I don't remember if she's a manager

   14    or director, but she worked in the national account

   15    department.

Highly Confidential - Subject to Further Confidentiality Review



23        Q.   So each customer gets treated a little bit

24     differently?

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2   By MR. STOLTZ:

 3       Q.   Why would you treat customers differently?

 4       A.   Depending on how often they order from us,

 5   how many times their orders hitting in our order of

 6   interest bucket.  Variables.

 7       Q.   Why would -- why would how often they order

 8   from Anda be relevant to whether or not an increase

 9   in controls is granted?

10       A.   I'm not clear on your question.

11       Q.   You said that one of the ways -- the reasons

12   customers were treated differently could depend on

13   how often they order from Anda.

14              My question is:  Why would the frequency of

15   their orders from Anda be relevant when deciding

16   whether or not to increase a control limit?

17       A.   So somebody that hasn't done business with us

18   in six months, seven months, or very minimal would be

19   treated a little bit different than somebody --

20   possibly could be treated a little bit different than

21   somebody who was buying -- purchasing from us every

22   day.

23       Q.   Would a customer -- a frequent customer be

24   granted increases -- if a -- if a customer frequently
```

```
 1    ordered from Anda, would they be more likely to get a

 2    control limit increase --

 3              MS. KOSKI:  Object to form.

 4    BY MR. STOLTZ:

 5         Q.   -- upon request?

 6              MS. KOSKI:  Sorry.  Object to form.

 7              THE WITNESS:  Not necessarily, no.

 8    BY MR. STOLTZ:

 9         Q.   But it would be relevant in deciding whether

10    or not a controlled limit increase would be granted

11    to that customer upon their request?

12         A.   Each customer would be handled differently.

13    It would vary.
```

```
17    BY MR. STOLTZ:

18         Q.   We discussed EPIC a little bit earlier when

19    we were going over buying groups?

20         A.   Yes, sir.
```







Highly Confidential - Subject to Further Confidentiality Review

12        Q.    You weren't working in controlled substance

13   compliance in 2015 or 2014, right?

14        A.    No, sir.

15        Q.    And you weren't in charge of increasing

16   limits in 2014 or 2015 or even 2016, right?

17        A.    No, sir.

24    ///

1    BY MR. STOLTZ:

2        Q.   How would you have any knowledge of 2014 or

3    2015 as far as increases being granted or why those

4    increases were granted?

5        A.   We capture notes in our internal system, TPS.

6    But, again, I can't say for certain about these

7    specific cases.

Highly Confidential - Subject to Further Confidentiality Review

15     Q.   Has EPIC been an account since long before

16   July 2014?

17          MS. KOSKI:  Object to form.

18   BY MR. STOLTZ:

19     Q.   Wasn't EPIC an account when you were with

20   regulatory compliance -- or, excuse me, in controlled

21   substance compliance in 2011, 2012?

22     A.   EPIC is not an account.

23     Q.   EPIC is a buyer's club.

24          Was that a buying club that Anda distributed

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances to when you were working with

2    controlled substance compliance in 2011 and 2012?

3              MS. KOSKI:  Object to form.

4              THE WITNESS:  I can't say for certain.

5    BY MR. STOLTZ:

Highly Confidential - Subject to Further Confidentiality Review

13          MR. STOLTZ:  My last exhibit, Exhibit 19.

14          (Anda - Hall Exhibit 19 was marked for

15      identification.)

16          THE WITNESS:  Thank you.

17          MS. KOSKI:  Thank you.

18          MR. STOLTZ:  And this has the Bates

19      number 150162.

20      BY MR. STOLTZ:

```
1        Q.    Was he a compliance analyst?

2        A.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review



```
10      BY MR. STOLTZ:

11          Q.   Could a customer be suspicious in the absence

12      of suspicious orders from a regulatory controlled

13      substance compliance?

14          A.   Yes, sir.

15          Q.   What are some ways in which a customer could

16      be suspicious in the absence of suspicious orders

17      with respect to controlled substance compliance?

18          A.   A new account review.  So this -- a new

19      account review as well as an increase -- internal

20      increase request.

21          Q.   So -- so a customer -- you could determine

22      whether or not a customer was suspicious without ever

23      actually delivering an order to that customer?

24          A.   Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  And that would be based on the

 2   dispensing data that they provided you?

 3        A.   The due diligence, yes, sir.

 4        Q.   Okay.

 5             MR. STOLTZ:  I have no further questions.

 6             MS. KOSKI:  I don't have any questions.

 7             MS. CARDENAS:  No questions on my end.

 8             MS. KOSKI:  Any questions from anyone on the

 9   telephone?

10             I think we're good.

11             THE VIDEOGRAPHER:  The time is 5:20 p.m.  We

12        are going off the record.  This marks the end of

13        the deposition.

14             (Whereupon, the deposition concluded at

15   5:20 p.m.)

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                C E R T I F I C A T E

 2

 3           I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of EMILY HALL was duly taken

 7    on January 22, 2019, at 9:15 a.m. before me.

 8           The said EMILY HALL was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17           _____

18           KELLY J. LAWTON, RPR, LCR, CCR

19

20           (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6      REASON: _____

 7   _____  _____  _____

 8      REASON: _____

 9   _____  _____  _____

10      REASON: _____

11   _____  _____  _____

12      REASON: _____

13   _____  _____  _____

14      REASON: _____

15   _____  _____  _____

16      REASON: _____

17   _____  _____  _____

18      REASON: _____

19   _____  _____  _____

20      REASON: _____

21   _____  _____  _____

22      REASON: _____

23   _____  _____  _____

24      REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, EMILY HALL, do hereby acknowledge that I

 4      have read the foregoing pages, 1 to 249, and that the

 5      same is a correct transcription of the answers given

 6      by me to the questions therein propounded, except for

 7      the corrections or changes in form or substance, if

 8      any, noted in the attached Errata Sheet.

 9

10

11      _____      _____

12      EMILY HALL                                         DATE

13

14

15

16

17      Subscribed and sworn to before me this

18      _____ day of _____, 20____.

19      My Commission expires: _____

20

21      _____

        Notary Public

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```