Page 1

1             IN THE UNITED STATES COURT

2            NORTHERN DISTRICT OF OHIO

3               EASTERN DIVISION

4

5          ~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION   MDL NO. 2804

7   OPIATE LITIGATION

8                          Case No. 17-mdl-2804

9

10                         Judge Dan Aaron Polster

11  This document relates to:

12

13  City of Cleveland, Ohio v. Purdue Pharma L.P.,

14  et al.,

15  Case No. 1:18-OP-45132

16

17          ~~~~~~~~~~~~~~~~~~~~

18            Videotaped deposition of

19           GREGORY L. HALL, M.D.

20            December 19, 2018

21                9:10 a.m.

22              Taken at:

            Tucker Ellis

23           950 Main Avenue

            Cleveland, Ohio

24

25           Wendy L. Klauss, RPR

```
                                              Page 2

 1     APPEARANCES:
 2
 3          On behalf of the Witness:
                 Weston Hurd LLP
 4               DANIEL A. RICHARDS, ESQ.
                 The Tower at Erieview
 5               1301 East 9th Street
                 Suite 1900
 6               Cleveland, OH   44114-1862
                 (216) 687-3256
 7               DRichards@westonhurd.com
 8          On behalf of Cuyahoga County:
                 Napoli Shkolnik PLLC
 9               JOSEPH L. CIACCIO, ESQ.
                 400 Broadhollow Road, Suite 305
10               Melville, NY   11747
                 (631) 224-1133
11               Jciaccio@napolilaw.com
12          On behalf of Cardinal Health, Inc.,
            Co-Liaison Counsel for the Distributor
13          Defendants:
                 Williams & Connolly LLP
14               MONIKA ISIA JASIEWICZ, ESQ.
                 725 Twelfth Street, N.W.
15               Washington, DC   20005
                 (202) 434-5000
16               Ijasiewicz@wc.com
17          On behalf of Teva Pharmaceutical
            Industries Ltd.:
18               Morgan Lewis, LLP
                 WENDY WEST FEINSTEIN, ESQ.
19               One Oxford Centre, 32nd Floor
                 301 Grant Street
20               Pittsburgh, PA   15219-6401
                 (412) 560-3300
21               Wendy.feinstein@morganlewis.com
                        -AND-
22               MEGAN R. BRADEN, ESQ.
                 77 West Wacker Drive, Fifth Floor
23               Chicago, IL   60601
                 (312) 324-1000
24               Megan.braden@morganlewis.com
25
```

Page 3

```
 1    APPEARANCES, Continued:
 2         On behalf of Rite Aid:
                Morgan Lewis, LLP
 3              SCOTT T. SCHUTTE, ESQ.
                77 West Wacker Drive
 4              Chicago, IL   60601-5094
                (312) 324-1000
 5              Scott.schutte@morganlewis.com
 6         On behalf of Walmart Inc. F/K/A Wal-Mart
           Stores, Inc.:
 7              Jones Day
                CHRISTOPHER LOMAX, ESQ.
 8              600 Brickell Avenue
                Brickell World Plaza
 9              Suite 3300
                Miami, FL   33131
10              (305) 714-9700
                Clomax.@jonesday.com
11
           On behalf of Endo Health Solutions, Inc.,
12         Endo Pharmaceuticals Inc., Par
           Pharmaceutical, Inc., and Par
13         Pharmaceutical Companies, Inc.,(FKA Par
           Pharmaceutical Holdings, Inc.)
14              Arnold & Porter
                WILSON MUDGE, ESQ.
15              601 Massachusetts Ave,  N.W.
                Washington, D.C.   20001-3743
16              (202) 942-5150
                Wilson.Mudge@arnoldporter.com
17
           On behalf of Distributor
18         AmerisourceBergen Drug Corporation,
           Co-Liaison Counsel for the Distributor
19         Defendants:
                Jackson Kelly PLLC
20    `         GRETCHEN M. CALLAS, ESQ.
                500 Lee Street East, Suite 1600
21              Charleston, WV   25301-3202
                (304) 340-1169
22              Gcallas@jacksonkelly.com
23
24
25
```

Page 4

1    APPEARANCES, Continued:

2         On behalf of Distributor Defendant
          McKesson Corporation, Co-Liaison Counsel

3         for the Distributor Defendants:
               Covington & Burling LLP

4              MICHAEL LANOSA, ESQ.
               1999 Avenue of the Stars

5              Los Angeles, CA   90067
               (424) 332-8000

6              Mlanosa@cov.com
                    ~ ~ ~ ~ ~

7

     Also Present:

8

          Joe VanDetta, Videographer

9                   ~ ~ ~ ~ ~

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT INDEX

2      APPEARANCES:  ...........................   2

3      INDEX OF EXHIBITS .......................   6

4      EXAMINATION OF GREGORY L. HALL,  M.D.

       By Ms. JAZIEWICZ.........................   11

5      By Ms. Feinstein.........................  206

       By Mr. Schutte...........................  237

6

       REPORTER'S CERTIFICATE...................  242

7

       EXHIBIT CUSTODY

8      EXHIBITS RETAINED BY COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

INDEX OF EXHIBITS

1

NUMBER                  DESCRIPTION                    MARKED

2

Exhibit 1    A Document From The Cuyahoga .   85
3            County Board of Health,
             Entitled The Road to Public
4            Health, Annual Report 2017
5  Exhibit 2    Cuyahoga County Board of ..... 117
              Health Minutes of the
6             Meeting, March 28, 2018
7  Exhibit 3    Designated Confidential, ..... 122
              Email Exchange with
8             Attachment, Beginning with
              Bates Label CUYAH_014322863
9
   Exhibit 4    Designated Confidential, ..... 128
10            Email Exchange with
11            Attachment, Beginning with
              Bates Label CUYAH_014260170
12 Exhibit 5    Designated Confidential, ..... 130
              Email Exchange with
13            Attachment, Beginning with
              Bates Label CUYAH_014167489
14
   Exhibit 6    Designated Confidential, ..... 134
15            Email Exchange with
              Attachment, Beginning with
16            Bates Label CUYAH_014322836
17 Exhibit 7    A Printout From Dr. Greg ..... 143
              Hall's Website, "About Dr.
18            Greg Hall,"
19 Exhibit 8    Printout From Dr. Greg ....... 146
              Hall's Website, Painkillers
20            Killing More Than Just Pain
21 Exhibit 9    Designated Confidential, ..... 169
              Email Exchange, Beginning
22            with Bates Label
              CUYAH_01467892
23
   Exhibit 10   Cuyahoga County Board of ..... 176
24            Health, 2010 Annual Report
25 Exhibit 11   Designated Confidential, ..... 183
              June 2010 Email Exchange,

1               Beginning with Bates Label ...
                CUYAH_012344074

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             INDEX OF VIDEO OBJECTION

2    OBJECT                                        PAGE

3    objection.................................   50

4    object....................................   64

5    objection.................................   81

6    objecting.................................   83

7    object....................................  102

8    objection.................................  131

9    object....................................  141

10   objection.................................  153

11   objection.................................  153

12   objection.................................  157

13   objection.................................  158

14   objection.................................  159

15   objection.................................  159

16   objection.................................  171

17   objection.................................  171

18   objection.................................  171

19   objection.................................  171

20   objection.................................  172

21   objection.................................  172

22   object....................................  173

23   objection.................................  178

24   objection.................................  179

25   objection.................................  183

Page 9

1     objection................................... 183

2     object..................................... 195

3     object..................................... 198

4     objection................................... 201

5     object..................................... 201

6     objection................................... 211

7     objection................................... 224

8     objection................................... 226

9     objection................................... 227

10    objection................................... 228

11    objection................................... 228

12    object..................................... 229

13    object..................................... 236

14

15

16

17

18

19

20

21

22

23

24

25

Page 10

1          THE VIDEOGRAPHER:  We are now on

2     the record.  The date is December 19, 2018.

3     The time is 9:10 a.m.  The caption of the case

4     is In Re: National Prescription Opiate

5     Litigation.  The name of the witness is Gregory

6     Hall.

7               At this time the attorneys present

8     and those attending remotely will identify

9     themselves and the parties that they represent.

10          MS. JAZIEWICZ:  Isia Jasiewicz, of

11     Williams & Connolly LLC, on behalf of Cardinal

12     Health.

13          MS. FEINSTEIN:  Wendy West

14     Feinstein, with Morgan Lewis, on behalf of the

15     Teva defendants.

16          MR. SCHUTTE:  Scott Schutte, from

17     Morgan Lewis, on behalf of Rite Aid.

18          MR. LOMAX:  Christopher Lomax, from

19     Jones Day, on behalf of Walmart.

20          MR. CIACCIO:  Joseph Ciaccio,

21     Napoli Shkolnik, on behalf of Cuyahoga County.

22          MR. RICHARDS:  Dan Richards, from

23     the law firm of Weston Hurd, on behalf of Dr.

24     Greg Hall.

25          MS. JAZIEWICZ:  Who do we have on

Page 11

1    the phone?

2                MS. BRADEN:  Hi.  This is Megan

3    Braden, from Morgan Lewis, also on behalf of

4    the Teva Defendants.

5                MR. MUDGE:  This is Wilson Mudge,

6    of Arnold & Porter, on behalf of the Endo and

7    Par Defendants.

8                MR. LANOSA:  This is Michael

9    Lanose, from Covington & Burling, on behalf of

10   McKesson Corporation.

11               MS. CALLAS:  This is Gretchen

12   Callas, of Jackson Kelly, on behalf of

13   AmerisourceBergen.

14               THE VIDEOGRAPHER:  Would the court

15   reporter please swear in the witness.

16               GREGORY L. HALL, M.D., of lawful

17   age, called for examination, as provided by the

18   Statute, being by me first duly sworn, as

19   hereinafter certified, deposed and said as

20   follows:

21        EXAMINATION OF GREGORY L. HALL, M.D.

22   BY MS. JAZIEWICZ:

23        Q.    Go morning, Dr. Hall.

24        A.    Good morning.

25        Q.    Would you please state your name

Page 12

1    for the record.

2         A.    Gregory L. Hall.

3         Q.    Where do you live?

4         A.    Mayfield Village, Ohio.

5         Q.    How long have you lived there?

6         A.    12 years.

7         Q.    Have you ever been deposed before?

8         A.    I have.

9         Q.    How many times?

10        A.    Four times maybe.

11        Q.    In what kind of case?

12        A.    A malpractice case.

13        Q.    And when was the most recent time

14   that you were deposed?

15        A.    Maybe four years ago, maybe five,

16   something like that.

17        Q.    So since you have been through this

18   before, you know the drill, but just please

19   make sure that you respond audibly, so the

20   court reporter can get all your answers.  So

21   say yes or no, rather than uh-uh; is that okay?

22        A.    Yes, ma'am.

23        Q.    So you understand that you are

24   under oath?

25        A.    Yes, I do.

Page 13

1       Q.     Do you understand what that means?

2       A.     I have a perspective of it, yes,

3  ma'am.

4       Q.     What is your perspective?

5       A.     It means I should be honest.

6       Q.     You understand it means you should

7  tell the truth, the whole truth, and nothing

8  but the truth?

9       A.     Yes, ma'am.

10       Q.     And that you should testify based

11  on your knowledge, not what somebody has told

12  you?

13       A.     Yes, ma'am.

14       Q.     Are you currently employed?

15       A.     Yes, I am.

16       Q.     Who is your current employer?

17       A.     I am currently employed by

18  Cleveland State University as the co-director

19  of the NEOMED-CSU Partnership for Urban Health.

20  I'm also employed by Gregory L. Hall M.D.,

21  Inc., I'm a physician in private practice.

22       Q.     What portion of your time do you

23  spend on your employment at Cleveland State

24  University?

25       A.     It's a full-time position.

```
 1          Q.     What percentage of your working
 2     time do you spend on that job?
 3          A.     As part of my position, I train
 4     medical students, premed students, and so when
 5     they are in my office, I work in my office two
 6     half-days a week, they are shadowing me there,
 7     but I'm also still in my position at Cleveland
 8     State as a mentor for the students.  So part of
 9     my job is to be in my office two half-days.
10          Q.     Okay.  So the job -- the two
11     half-days that you spend in your office in your
12     private practice include time that you are
13     spending on your employment at Cleveland State,
14     mentoring students --
15          A.     Yes, ma'am.
16          Q.     -- is that right?
17          A.     That's correct.
18          Q.     And you mentioned that you spend
19     two half-days a week in our office in private
20     practice; is that right?
21          A.     That's correct.
22          Q.     And aside from those two half-days,
23     how much time do you spend on your employment
24     with Gregory Hall, M.D.?
25          A.     Oh, those are the two half-days I'm
```

1    with Gregory Hall, M.D., and then there is four

2    whole days I spend at Cleveland State

3    University.

4         Q.    So you spend four whole a week at

5    Cleveland State University, plus two half-days

6    in your private practice, which also includes

7    students shadowing you from Cleveland State

8    University; is that right?

9         A.    Yes, ma'am.

10        Q.    In your private practice, what kind

11   of medicine do you practice?

12        A.    Internal medicine, primary care.

13        Q.    During the two half-days a week

14   that you spend in your private practice office,

15   what are you doing during that time?

16        A.    Seeing patients.

17        Q.    Seeing patients.  And I believe you

18   said that you are employed by both Cleveland

19   State University and your private practice?

20        A.    I am, that's correct.

21        Q.    Do you have any other employment?

22        A.    I have a contractual agreement with

23   nursing homes and a nursing home company, as

24   medical director of four nursing homes.

25        Q.    Are those four nursing homes all

1    part of the same nursing home company?

2         A.    No.   Three are part of one and one

3    is part of another company.

4         Q.    Okay.  So what are the names of the

5    nursing homes that you have contracts with?

6         A.    I have a contract with Eliza Bryant

7    Village, University Manner, The Willows, and

8    Crawford Manner.

9         Q.    Are you employed by any of those

10   nursing homes?

11        A.    I receive reimbursement for being

12   the medical director.

13        Q.    Are you an independent contractor

14   for those nursing homes?

15        A.    Yes, ma'am.

16        Q.    What portion of your time do you

17   spend on these contractual agreements with

18   nursing homes?

19        A.    It varies.  I sort of do everything

20   at once.  They call, and when they call, I'm

21   available.

22        Q.    If you could estimate, sort of, in

23   a typical month what percentage of your time

24   you spend on your contractual agreements with

25   nursing homes?

Page 17

1           A.    20 percent.

2           Q.    Do your contracts with the nursing

3     homes specify a certain number of hours that

4     you work for them?

5           A.    I think the Eliza Bryant one does.

6     The other ones, I don't believe they do.

7           Q.    And what is the hourly requirement

8     for the Eliza Bryant one?

9           A.    I can't tell you for sure.  I've

10    got a couple numbers in my head.  I can't tell

11    you.  It is under ten.

12          Q.    Under ten hours per month?

13          A.    It's under ten hours per week.

14          Q.    You said you are compensated under

15    a contract for the time that you spend working

16    with nursing homes; is that right?

17          A.    For the time that I spend, yes,

18    working, yes.

19          Q.    Is that compensation based on the

20    number of hours that you work?

21          A.    No.

22          Q.    So it is structured more like a

23    salary, but you are an independent contractor;

24    is that fair to say?

25          A.    I think it's fair.

Page 18

1          Q.    And what kind of work do you do for

2     these nursing homes?

3          A.    I basically am the physician that's

4     over the physicians.

5          Q.    So you oversee other physicians who

6     work in the nursing homes?

7          A.    Yes.

8          Q.    Are those physicians employed by

9     the nursing home?

10         A.    No.

11         Q.    Do you see patients in nursing

12    homes?

13         A.    I do.

14         Q.    And what kind of care do you

15    provide the patients in nursing homes?

16         A.    Good care.

17         Q.    Any particular category of care,

18    any specialty?

19         A.    Internal medicine.

20         Q.    So you are employed by Cleveland

21    State University and by your private practice.

22    You also have contractual agreements with

23    nursing homes?

24         A.    In my practice, under my practice.

25         Q.    Under your practice?

Page 19

```
 1         A.    Correct.
 2         Q.    Okay.  Do you have any other
 3    employment?
 4         A.    No.  Not the way I'm thinking of
 5    employment, no.
 6         Q.    How are you thinking of employment?
 7         A.    I'm thinking of receiving a check.
 8         Q.    Do you have any other entities that
 9    you have independent contractor relationships
10    with?
11         A.    Yes.
12         Q.    What are those?
13         A.    I'm thinking that I've got a
14    contract with the Ohio Department of Youth
15    Services, where I do laser tattoo treatments on
16    youth that are in jail, gang tattoos, and try
17    to get those removed before they get out.
18         Q.    You said that was the Health
19    Department of Youth Services?
20         A.    The Ohio Department of Youth
21    Services.
22         Q.    Ohio Department of Youth Services.
23               Is that a state government agency?
24         A.    Yes.
25         Q.    How much time, in the average
```

1    month, do you spend on your contract with the

2    Ohio Department of Youth Services?

3           A.    Not much, not much at all.  It

4    would be a very small -- the treatments are

5    very short, and I might do two episodes a

6    month.  So it would be -- literally wouldn't

7    add up to a half hour.

8           Q.    Okay.  Setting aside nursing homes

9    and the Ohio Department of Youth Services, do

10   you have any other independent contractor

11   relationships?

12          A.    So the Cuyahoga County Board of

13   Health pays me every six months.  I don't

14   believe there is a contract, but I do get a

15   check every six months, but it's not an

16   employment situation.

17          Q.    Okay.  We will come back to that

18   one.

19                Do you have any other contractual

20   agreements to provide work or services?

21          A.    Nothing I can think of right now.

22          Q.    Can I ask how long have you had

23   your private practice?

24          A.    Yeah.  Since 2002.

25          Q.    And how long have you been employed

Page 21

1    by Cleveland State University?

2          A.    Since July, July 13, 2018.

3          Q.    Of 2018.  How long have you had a

4    contractual agreement with Eliza Bryant Nursing

5    Home?

6          A.    About a year.

7          Q.    How about with University Manner?

8          A.    Significantly longer.  I'm trying

9    to think.  Over ten years.

10         Q.    How about with The Willows?

11         A.    Also over ten years.

12         Q.    And how about with Crawford Manner?

13         A.    I know with Crawford, it's been 18

14   years.

15         Q.    Could you please tell me briefly

16   about your educational background.

17         A.    Yeah.  I went to, for college,

18   start there, I went to Williams College in

19   Williamstown, Massachusetts, and then to

20   Medical College of Ohio in Toledo, which is now

21   part of the University of Toledo School of

22   Medicine, and I did my residency at Cleveland

23   Clinic.

24         Q.    What did you study at Williams

25   College?

Page 22

1          A.    I majored in psychology and I was a
2     premed student.
3          Q.    And what field did you do your
4     residency in?
5          A.    Internal medicine.
6          Q.    Do you have any board
7     certifications?
8          A.    I do.
9          Q.    What?
10          A.    I have a board certification with
11     the National Board of Physicians and Surgeons.
12          Q.    Do you have any other professional
13     certifications?
14          A.    Not significant, no.
15          Q.    When you say not significant, what
16     do you mean by that?
17          A.    I had to get certified to do the
18     laser, use the laser for the tattoo removal.
19          Q.    When were you certified for that?
20          A.    Maybe six years ago.
21          Q.    Any other certifications?
22          A.    No.
23          Q.    Do you have any hospital
24     affiliations?
25          A.    Yes.

1        Q.    What are those affiliations?

2        A.    St. Vincent Charity Medical Center.

3    That's the only one.

4        Q.    Do you see patients at St. Vincent

5    Charity Medical Center?

6        A.    Yes, ma'am.

7        Q.    When you see patients at St.

8    Vincent Charity Medical Center, is that through

9    your private practice?

10       A.    Yes, it is.  I remembered that I am

11   the medical director of community outreach for

12   St. Vincent Charity Medical Center.  That ended

13   last month.  So up until last month, I was

14   that, and I had received income for that.  That

15   goes under my practice as an independent

16   contractor.

17       Q.    So your private practice was an

18   independent contractor for St. Vincent Charity

19   Medical Center?

20       A.    No.  When I got a check from St.

21   Vincent, that went into Gregory L. Hall, M.D.,

22   as part of the income.

23       Q.    So you were an independent

24   contractor for St. Vincent and used that income

25   to fund your private practice?

Page 24

1          A.     Correct.

2          Q.     And how long had you had that

3    position as medical director of community

4    outreach at St. Vincent?

5          A.     Probably ten years or more as well.

6          Q.     And when did that affiliation end?

7          A.     Last month.

8          Q.     Why did it end?

9          A.     The contract wasn't renewed.

10         Q.     Was it a yearly contract?

11         A.     It was.

12         Q.     Yearly.  And what were your duties

13   as medical director of community outreach at

14   St. Vincent?

15         A.     To be the liaison for the hospital

16   with area nursing homes and to be available

17   when there were health screenings and whatnot,

18   to review the labs.

19         Q.     And how much time would you spend

20   in an average month on your role as medical

21   director of community outreach at St. Vincent?

22         A.     I would spend 20 hours.

23         Q.     Was that an amount of time

24   specified in your contract?

25         A.     It was the maximal amount specified

1    in the contract.

2         Q.    You mentioned this briefly, but you

3    are a member of the board of the Cuyahoga

4    County Board of Health, right?

5         A.    Yes.

6         Q.    Are you employed with the board of

7    health?

8         A.    No.

9         Q.    Do you have a contract with the

10   board of health?

11        A.    No.

12        Q.    You mentioned that you receive

13   compensation for your work with the board of

14   health?

15        A.    Yes.

16        Q.    What sort of compensation do you

17   receive?

18        A.    I see it as negligible.

19        Q.    Is it pursuant to any agreement?

20        A.    It's not that I'm aware of.

21        Q.    How often do you receive

22   compensation?

23        A.    Every six months.

24        Q.    What is the amount that you receive

25   every six months?

1          A.    I am not aware of the amount.  It's

2    something like $400.  It's dependent on how

3    many meetings I attend.  So I thought about it

4    as I was driving in, and I just can't give you

5    a hard number.  I apologize.

6          Q.    And you said that depends on the

7    number of meetings you attend?

8          A.    Correct.

9          Q.    Does it depend on the number of

10   hours that you spend on your work for the board

11   of health?

12         A.    I don't know.

13         Q.    Who issues the check that you

14   receive every six months?

15         A.    I believe it is Cuyahoga County.

16         Q.    Is it Cuyahoga County or the

17   Cuyahoga County Board of Health?

18         A.    I believe it's Cuyahoga County.  I

19   could be wrong.

20         Q.    If you wanted to check that, where

21   would you look?

22         A.    My next check.

23         Q.    Do you have a particular position

24   on the board of the Cuyahoga County Board of

25   Health?

1          A.     I am the president pro tem.

2          Q.     What does that mean?

3          A.     When the president is absent, I

4     lead the meetings.  And I also have to take

5     notes that -- really, it is a form, where I

6     will indicate who moved and who seconded and

7     votes, and it is sort of in concert with the

8     commissioner, who is the official secretary of

9     the board.  So it's sort of a backup document

10    that I'm asked to do.

11         Q.     How long have you served on the

12    board of the Cuyahoga County Board of Health?

13         A.     2010.

14         Q.     And how long have you been

15    president pro tem?

16         A.     Probably four years.

17         Q.     How many members sit on the board?

18         A.     Six.

19         Q.     Are you able to remember all their

20    names?

21         A.     Yes.  Sherrie Dixon Williams,

22    Debbie Moss, James Gatt, Gregory Hall, and to

23    the left of me is -- he's going to be insulted.

24    I'll think of it before the deposition is over.

25         Q.     Is it Doug Wang?

1          A.    It is Doug Wang.  Thank's for not

2     distracting me.  Of course it's Doug Wang.

3     Yes, yes, it is.

4               I apologize.  Doug, I'm sorry.

5          Q.    And when you say to the left of

6     you, you mean if you were sitting in your board

7     meeting; is that correct?

8          A.    Correct.  Correct.

9               MR. RICHARDS:  We will let the

10    record reflect I'm not Doug Wang.

11         A.    Yeah.  I'm sorry, that's crazy.  So

12    that's one, two, three -- yeah, is that five?

13         Q.    That's five.

14         A.    Sorry.

15         Q.    So there are five members of the

16    board?

17         A.    Well, I don't know if Terry Allan

18    is the commissioner and secretary of the board.

19    I mean, I wasn't thinking that, but I could

20    play it off like I was saying that all along,

21    but he is the secretary of the board, so I

22    don't know if that counts.

23         Q.    Okay.  Terry Allan is the health

24    commissioner --

25         A.    Correct.

Page 29

1          Q.     -- is that right?

2                 And he also sits on the board as

3     secretary; is that right?

4          A.     He serves on the board as

5     secretary.

6          Q.     He serves on the board as

7     secretary.

8                 So let me just see if I got this

9     right.  There are five members of the board?

10         A.     Correct.

11         Q.     Plus Terry Allan, who serves on the

12    board as its secretary?

13         A.     To the best of my knowledge.

14         Q.     Do you know what Sherrie Dixon

15    Williams does for a living?

16         A.     Yeah.  She's a physician.

17         Q.     How about Debbie Moss?

18         A.     She's an attorney.

19         Q.     What does James Gatt do for a

20    living?

21         A.     He's retired.

22         Q.     Do you know what profession he

23    retired from?

24         A.     Not specifically.

25         Q.     What does Doug Wang do for a

Page 30

1    living?

2         A.    He's retired.

3         Q.    Do you know what profession he is

4    retired from?

5         A.    Not specifically.

6         Q.    When you say not specifically --

7         A.    I believe Doug Wang was in banking,

8    but I could be wrong.  I believe Jim Gatt was

9    in information technology, but I could be

10   wrong.

11        Q.    Am I right that you and Dr. Dixon

12   Williams are the only physicians on the board?

13        A.    You are correct.

14        Q.    Is there a requirement that there

15   be a physician or physicians on the board?

16        A.    Not that I'm aware of.

17        Q.    Are there any eligibility

18   requirements for individuals to serve on the

19   board?

20        A.    None that I'm aware of.

21        Q.    I believe you testified that you

22   became a member of the board in 2010; is that

23   right?

24        A.    That's correct.

25        Q.    Was there a vacancy then?

Page 31

1          A.    Yes.

2          Q.    Who left?

3          A.    Liticker, I don't know his first

4    name, Dr. Liticker.

5          Q.    Was Dr. Liticker also a physician?

6          A.    He was.

7          Q.    How did you become a board member?

8          A.    I went to a meeting of the district

9    council, which is a group of mayors that are in

10   Cuyahoga County, and was presented to them, and

11   they voted me in.

12         Q.    You said the district council.  Is

13   that the same thing as District Advisory

14   Council?

15         A.    Yes.  You say it much better.

16         Q.    And what is the District Advisory

17   Council?

18         A.    From my understanding, it is a

19   group of mayors from townships and villages in

20   Cuyahoga County.

21         Q.    Does the District Advisory Council

22   have representatives from every township and

23   village in Cuyahoga County?

24         A.    I can't say.

25         Q.    Does the District Advisory Council

1    include representatives from any cities?

2         A.    No.

3         Q.    So there is no representative from

4    the City of Cleveland?

5         A.    No.

6         Q.    You said you were presented to the

7    District Advisory Council.  Who presented you?

8         A.    Terry Allan.

9         Q.    When did you first meet Terry

10   Allan?

11        A.    I met him at a conference that I

12   was speaking at some years earlier, five or six

13   years earlier, so maybe 2005.  It was the We

14   Are the Uninsured Conference that was put on by

15   the Sisters of Charity.

16        Q.    And how did Mr. Allan come to

17   present you to the District Advisory Council?

18        A.    That would be that hearsay thing

19   you said not to do.  I don't know.

20        Q.    Did you express interest in

21   becoming a board member to him?

22        A.    I did not.

23        Q.    Did he approach you and ask you if

24   you would be interested in becoming a board

25   member?

Page 33

1         A.    Yes, he did.

2         Q.    When did that happen?

3         A.    I'm going to say 2009.

4         Q.    And approximately how many months

5    after he approached you were you presented to

6    the District Advisory Council?

7         A.    I'm going to say five.

8         Q.    Before you were presented to the

9    District Advisory Council, did you have to

10   submit any kind of application to become a

11   board member?

12        A.    No.  It wasn't an application.  It

13   was a CV.

14        Q.    Did you interview for the position

15   of board member?

16        A.    I don't think I did.  I mean, we

17   had a discussion, and I was presented.

18        Q.    When you say you had a discussion,

19   that was with Terry Allan?

20        A.    Yeah.  He called me and we had a

21   discussion.

22        Q.    Did you have any kind of discussion

23   with members of the District Advisory Council?

24        A.    I had a discussion with the mayor

25   of Mayfield Village, which is the village I

1  live in, to present me as a potential board

2  member, or to nominate me, I should say that.

3       Q.    So the mayor of your township

4  nominated you as a potential board member?

5       A.    Actually, no.

6       Q.    No?

7       A.    But I had a discussion with him

8  about that.  Someone else jumped in and

9  nominated me before he did.

10       Q.    Who nominated you?

11       A.    I do not know, but I appreciated

12  it.

13       Q.    So you were nominated, and then the

14  District Advisory Council voted; is that right?

15       A.    Yeah.  It was nominated, it was

16  seconded, and then they voted, correct.

17       Q.    Do you understand yourself to have

18  been appointed to the board; is that the word

19  you would use?

20       A.    By the District Advisory Council?

21       Q.    Right.

22       A.    Yeah, I guess.

23       Q.    Why were you interested in joining

24  the board of the Cuyahoga County Board of

25  Health?

Page 35

1      A.    I was the chairman of the Ohio

2  Commission on Minority Health, and we had

3  worked with the Cuyahoga County Board of Health

4  on local measures, and I am very interested in

5  the health of people that live in Cuyahoga

6  County.  So it was an honor.

7      Q.    You said you were chairman of the

8  Ohio Commission of Minority Health?

9      A.    Yeah.  Ohio Commission on Minority

10 Health.

11     Q.    On Minority Health.  Do you still

12 hold that position?

13     A.    No.

14     Q.    How long did you hold that position

15 for?

16     A.    I was chairman for four or five

17 years, and I was on the commission for 16

18 years.

19     Q.    Are you on the commission now?

20     A.    No.

21     Q.    What was the last year that you

22 served on the commission?

23     A.    Oh, I stepped down in -- my term

24 ended in September of this year.

25     Q.    Why did you step down?

Page 36

1           A.    I have a number of

2    responsibilities, and so when I got the

3    position at Cleveland State, I felt I needed to

4    give up something.

5           Q.    But you did not give up your work

6    with the board of the Cuyahoga County Board of

7    Health, right?

8           A.    No.

9           Q.    Is that work important to you?

10          A.    Yes.

11          Q.    Why so?

12          A.    Well, it's -- I feel that they do a

13   lot of good across an array of measures.

14          Q.    Does your work as a physician

15   inform your work for the board?

16          A.    I think so.

17          Q.    How so?

18          A.    Sometimes when we discuss, you

19   know, chronic disease, obesity, diabetes, I can

20   give an anecdotal story from my practice or

21   things that are sort of out there, as relates

22   to patients.

23          Q.    And how does your ability to give

24   stories based on your clinical practice enhance

25   or inform your work for the board?

1      A.    I don't know that it enhances or

2   informs.  I mean, I just contribute my

3   perspective.

4      Q.    Do you believe you have a valuable

5   perspective to contribute as a physician?

6      A.    I believe it is somewhat valuable.

7      Q.    Aside from sitting on the board of

8   the Cuyahoga County Board of Health and the

9   contract work you do with the Ohio Department

10  of Youth Services, do you currently work or

11  serve in any other governmental agency?

12     A.    Yes.

13     Q.    What agency?

14     A.    Medicaid.  I'm on the medical care

15  advisory committee for Ohio Medicaid.

16     Q.    Is that for the State of Ohio?

17     A.    Yes, ma'am.

18     Q.    How long have you been on the

19  medical care advisory committee for Ohio

20  Medicaid?

21     A.    Ten years.

22     Q.    What are your duties on that

23  committee?

24     A.    Really, just to advise.

25     Q.    Advise on what kind of issues?

Page 38

1           A.     Yeah.   From the perspective, I

2      think I was assigned because I was the chairman

3      of the commission on minority health, so it was

4      a minority health perspective, I believe, is

5      why I was appointed.

6           Q.     Are you compensated for your

7      work --

8           A.     No.

9           Q.     -- for Ohio Medicaid?

10          A.     No.

11          Q.     How many hours a month do you spend

12     on your work for Ohio Medicaid?

13          A.     We have quarterly meetings, and

14     recently they have been recently cancelled, so

15     it's negligible.

16          Q.     Aside from Cuyahoga County Board of

17     Health, Ohio Department of Youth Services and

18     Ohio Medicaid, do you currently work or serve

19     in any other governmental agency?

20          A.     No other governmental agencies I

21     can think of.

22          Q.     Do you serve on the board of any

23     other organizations?

24          A.     None that I can think of.

25          Q.     Have you ever worked or served in

1    any other governmental agency?  So we now have

2    Cuyahoga County Board of Health, Ohio

3    Department of Youth Services, Ohio Medicaid,

4    and then also the Ohio Commission on Minority

5    Health.  Are there any others?

6           A.    I don't think so.

7           Q.    And have you ever served on the

8    board of any other organizations?

9           A.    Yes.

10          Q.    What organizations?

11          A.    It was the North Eastern

12   Neighborhood Development Corporation.  I was

13   the chairman.

14          Q.    How long did you hold that

15   position?

16          A.    Ten years.

17          Q.    And when was the last year you held

18   that position?

19          A.    I can't tell you.  Late 2000s,

20   maybe.  I don't really -- I can't say.  Or mid

21   2000s, I think.

22          Q.    What is the Cuyahoga County Board

23   of Health?

24          A.    That's a good question.  It's -- I

25   see it from different perspectives.  I see it

Page 40

1    as the larger organization that employs over

2    100 people, and so I see it as the

3    organization.

4          Q.    Okay.  So when you say Cuyahoga

5    County Board of Health, you are defining that

6    to mean the full organization that employs over

7    100 people.  What is the work of that?

8          A.    To improve the health of the

9    citizens of Cuyahoga County.

10          Q.    Is the Cuyahoga County Board of

11    Health a government agency?

12          A.    I think of it as one.

13          Q.    Is it a government agency of

14    Cuyahoga County?

15          A.    I would imagine.

16          Q.    You would imagine, but you are not

17    sure?

18          A.    I am not sure.

19          Q.    Does Cuyahoga County have any other

20    health departments, aside from the board of

21    health?

22          A.    There is a health department in

23    Cleveland, and there may be another, but I

24    can't think of it.

25          Q.    What communities does the Cuyahoga

Page 41

1   County Board of Health serve?

2           A.     The communities in Cuyahoga County.

3           Q.     Does that include the City of

4   Cleveland?

5           A.     No.  But in some ways it does.

6           Q.     When you say, in some ways it does,

7   what do you mean?

8           A.     When we do, say, chronic disease,

9   obesity and nutrition measures, we touch people

10  in the City of Cleveland.  We don't exclude

11  people from the City of Cleveland, so our

12  interventions may impact them.

13          Q.     Do you, as a board member of the

14  Cuyahoga County Board of Health, interact at

15  all with the Cleveland health department?

16          A.     No.

17          Q.     Are there any other government

18  agencies in Cuyahoga County that deal with

19  public health issues?

20          A.     I don't know.

21          Q.     Does the board of health interact

22  with any other government agencies?

23          A.     I believe it does.

24          Q.     What agencies?

25          A.     Cleveland.

Page 42

1          Q.    So you, as a board member, don't

2    necessarily interact with the Cleveland health

3    department, but the board itself, the board of

4    health, meaning the broader organization,

5    might?

6          A.    Yes.

7          Q.    Okay.  Does the Cuyahoga County

8    Board of Health answer to any other government

9    agency?

10         A.    I feel like it answers to the

11   District Advisory Council.

12         Q.    And I think you said before the

13   District Advisory Council is a group of mayors

14   and leaders of townships and villages; is that

15   how you would say that?

16         A.    Yeah, yes.

17         Q.    What does the District Advisory

18   Council do?

19         A.    I can't say.  When I was sworn in,

20   he made a presentation to the mayors.

21         Q.    When you say he, you mean Terry

22   Allan?

23         A.    Terry Allan, correct.  Sorry.

24               So in that sense, I felt like he

25   was reporting out the activities of the board

Page 43

1    of health to them.

2         Q.    So you attended a District Advisory

3    Council meeting when you were becoming a board

4    member?

5         A.    Correct.

6         Q.    Since then, have you ever attended

7    any District Advisory Council meetings?

8         A.    I don't believe so.

9         Q.    What kind of authority does the

10   District --

11        A.    Oh, I was reappointed.  We serve

12   five-year terms.  So I would have had to go to

13   be reappointed in 2015.

14        Q.    When you went to be reappointed in

15   2015, how did that process work?

16        A.    I was presented for reappointment,

17   and, again, it was moved and seconded and voted

18   on, and I was reappointed.

19        Q.    Did Terry Allan present you?

20        A.    Yes.

21        Q.    What kind of authority does the

22   District Advisory Council have over the board

23   of health?

24        A.    I'm not aware.

25        Q.    We have talked briefly about Terry

Page 44

```
 1    Allan, who is health commissioner for the board
 2    of health.  What does he do in that role?
 3           A.    He's the commissioner of health.
 4           Q.    What does that mean?
 5           A.    I see him as overseeing the
 6    activities of the board of health.
 7           Q.    Is Terry Allan employed by the
 8    board of health?
 9           A.    I believe so.
10           Q.    Does the health commissioner answer
11    to the board of the board of health?
12           A.    I believe so.
13           Q.    Does the board of the board of
14    health have power to hire and fire the health
15    commissioner?
16           A.    Yes.
17           Q.    I think you said that you first met
18    Terry Allan at a conference; is that right?
19           A.    That's correct.
20           Q.    How long have you known Terry
21    Allan?
22           A.    Since that conference.
23           Q.    And remind me when that was?
24           A.    I couldn't tell you.  I mean, it
25    was before 2010, but I can't hammer it down.
```

Page 45

1    I'm thinking the mid/early 2000s.

2         Q.    So after you met Terry Allan at the

3    conference, but before you joined the board of

4    health, did you and Terry Allan stay in touch?

5         A.    No.

6         Q.    When he approached you in 2009

7    about becoming a board member, were you

8    surprised to hear from him?

9         A.    I was.

10        Q.    Do you know why he approached you?

11        A.    I think it is because of -- he said

12   it was because he enjoyed my presentation, and

13   he knew I was on the -- the chairman of the

14   commission on minority health.  Or at that

15   point in time I was on the -- I was the vice

16   chair for most of the time I was on the

17   commission for minority health.

18        Q.    Aside from working with Mr. Allan

19   on the board of health, do you have any other

20   relationship with Mr. Allan?

21        A.    No.

22        Q.    How many employees does the board

23   of health have?

24        A.    I can't tell you.

25        Q.    Is it more than 100?

Page 46

1          A.     Yes.

2          Q.     Is it more than 150?

3          A.     I believe so.

4          Q.     Is it more than 200?

5          A.     I can't say.

6          Q.     Who makes decisions to hire and

7    fire board of health employees?

8          A.     Human resources.

9          Q.     Does the board of the board of

10   health play a role in personnel decisions?

11         A.     Aside from the commissioner and the

12   attorney, no.

13         Q.     So when you say, aside from the

14   commissioner and the attorney, the board is

15   involved in hiring and firing the health

16   commissioner and the attorney for the board; is

17   that right?

18         A.     Well, we renewed his contract, so I

19   haven't been involved with any hiring or firing

20   of the commissioner.  I was involved with the

21   hiring of the attorney.

22         Q.     You say, we renewed his contract.

23   You mean Terry Allan's contract, as health

24   commissioner?

25         A.     Yes, ma'am.

Page 47

1       Q.    And you were also involved in

2  hiring the attorney for the board of health?

3       A.    Correct.

4       Q.    When was that?

5       A.    I'm going to say a couple years

6  into my term, maybe 2012, or something like

7  that.

8       Q.    What is the role of the board

9  itself within Cuyahoga County Board of Health?

10      A.    I know we approve funds that come

11  to the board of health, we receive

12  presentations on behalf of the activities of

13  the board of health.

14      Q.    What do you do as a board member?

15      A.    I attend the meetings.

16      Q.    How often do you attend meetings?

17      A.    Most of the time.

18      Q.    How often do the meetings occur?

19      A.    Monthly.

20      Q.    So there are monthly meetings, and

21  you attend most of those meetings; is that

22  right?

23      A.    By and large.  There is one today,

24  I'm missing that one.

25      Q.    Sorry about that.

Page 48

1          A.     That's all right.

2          Q.     How many hours a month do you spend

3     on your work for the board?

4          A.     Four.

5          Q.     And what do those hours consist of?

6          A.     Attending the meeting.

7          Q.     Do you do any other work for the

8     board of health other than attending a monthly

9     board meeting?

10         A.     I'm the chair of the diversity

11    committee.

12         Q.     What does that mean?

13         A.     That's a committee trying to make

14    sure the diversity issues are addressed, in

15    terms of personnel and contractors, and just

16    making sure we are a fair board of health.

17         Q.     So the diversity committee looks at

18    diversity issues within the board of health

19    itself; is that right?

20         A.     Correct.

21         Q.     So it is not about diversity in the

22    broader community?

23         A.     Well, we look at the broader

24    community and hope that we can mirror the

25    broader community in the diversity that it

Page 49

1    chose.

2          Q.    What do you do as chair of the

3    diversity committee?

4          A.    I chair the diversity committee

5    meetings.

6          Q.    How often does the diversity

7    committee meet?

8          A.    Twice a year now.

9          Q.    How long are those meetings?

10         A.    About 45 minutes.

11         Q.    Aside from attending the meetings,

12   do you do any other work as chair of the

13   diversity committee?

14         A.    I will review the minutes, and we

15   will have a phone call and set the agenda prior

16   to that, the meeting.

17         Q.    Aside from attending board meetings

18   and serving as chair of the diversity

19   committee, do you do any other work for the

20   Cuyahoga County Board of Health?

21         A.    I read emails, I try to stay

22   engaged, I read the a agenda, I read the

23   minutes.  It doesn't take long, but...

24         Q.    You said there is a monthly meeting

25   of the board plus two meetings a year of the

Page 50

```
 1    diversity committee.
 2              Are there any other types of
 3    meetings that you attend as a board member for
 4    the Cuyahoga County Board of Health?
 5         A.    None that I can remember.
 6         Q.    Are board meetings public?
 7         A.    Yes.
 8         Q.    So anyone can attend them?
 9         A.    Yes.
10         Q.    How many people, on average, attend
11    each board meeting?
12         A.    I'm going to say 20, 20 to 30.
13         Q.    Is that counting the members of the
14    board?
15         A.    Yeah.  I'm counting the people in
16    the room, right.
17         Q.    In a typical board meeting, what
18    are the categories of people who are in the
19    room?
20              MR. RICHARDS:  Objection.
21         Q.    So let's say -- I'll put it this
22    way:  Who attends board meetings?
23         A.    People interested.  I mean, I
24    attend.
25         Q.    So it's the board plus members of
```

Page 51

1    the community; is that fair to say?

2           A.     Everyone in there is a member of

3    the community.  Yes, that would be fair to say.

4           Q.     Do employees of the board attend

5    meetings?

6           A.     Yes.

7           Q.     Do employees of the board present

8    at meetings?

9           A.     Yes.

10          Q.     Are there any other government

11   officials that routinely attend meetings?

12          A.     No.

13          Q.     Do county executives ever attend

14   meetings?

15          A.     Not when I've been there.

16          Q.     Does the medical director attend

17   board meetings?

18          A.     Yes.

19          Q.     Who is the medical director?

20          A.     Heidi Gullett.

21          Q.     Why does the medical director

22   attend meetings?

23          A.     I don't know.

24          Q.     Does she always attend?

25          A.     She has, yes.

Page 52

1          Q.    What kind of actions of the
2     Cuyahoga County Board of Health require board
3     approval?
4          A.    I don't think I'm aware of it, to
5     the extent that you are asking.  I know that
6     things where money is being transferred, that
7     has to be presented to the board.
8          Q.    What happens at a typical board
9     meeting?
10         A.    We go through the agenda items.
11         Q.    Who sets the agenda of board
12     meetings?
13         A.    It's sent to me the week before, so
14     I'm not aware of, behind the scenes, who sets
15     that.
16         Q.    Do you know if it is somebody
17     employed by the board of health?
18         A.    I would imagine, yes.
19         Q.    Are there any activities that the
20     board of health does that do not require board
21     approval?
22         A.    I think so.
23         Q.    Do you know what those are?
24         A.    No.
25         Q.    Does the board of health have an

Page 53

1    annual budget?

2          A.    Yes.

3          Q.    What is that annual budget?

4          A.    I don't have it memorized.

5          Q.    Can you give me a ballpark?

6          A.    It's usually over 20 million.

7          Q.    What are the sources of the board

8    of health's funding?

9          A.    I know tax money from -- I'm not

10   sure if it's property tax, or how that actually

11   works -- from the communities we serve, and

12   then grant moneys come in.  I'm sure there is

13   support from the Cuyahoga County as well.

14         Q.    Do you know what the breakdown is

15   of the difference sources of funding the board

16   receives?

17         A.    We review the budget on a monthly

18   basis, but I haven't committed it to any kind

19   of memory.

20         Q.    So there is a budget document that

21   the board maintains?

22         A.    Yes.

23         Q.    Who maintains that document?

24         A.    I don't know what the title is

25   called, but I think of her as the chief

1  financial officer.

2         Q.    What is her name?

3         A.    I'm having a Doug Wang moment

4  again.  If you told me her name I could -- I'm

5  sorry.  I'm also sorry I'm forgetting her name

6  as well, but I'm looking right at her in my

7  head.  She sits to the left of me, kind of like

8  where he is.

9              MR. RICHARDS:  Again let the record

10  reflect that's not me.

11         A.    Judy.

12         Q.    Judy?

13         A.    Judy, I got Judy.

14         Q.    So Judy, last name unknown?

15         A.    Unremembered, yes.

16         Q.    Judy, last name unremembered, what

17  is her position with the board of health?

18         A.    Like I said, I think of her as a

19  chief financial officer, but I do not know her

20  position.

21         Q.    You're not sure of --

22         A.    But I think of her as -- she is the

23  head person in charge of things of that nature.

24         Q.    Okay.  Is Judy the person you would

25  ask if you wanted to see a copy of the budget?

Page 55

1          A.     No.   I mean, I would probably ask
2     Terry, if I wanted to see it, or I would just
3     wait until the next time.   When we get our
4     agenda and the minutes, the budget is in that
5     packet, so it comes monthly.   It was a budget
6     or a financial update.
7          Q.     So you receive a monthly financial
8     update together with your agenda for that
9     month's board meeting; is that right?
10         A.     Correct.
11         Q.     And if you wanted to see a copy of
12    that monthly financial update, you would ask
13    Terry Allan?
14         A.     That's what I would do, yes, but he
15    would say I could ask Judy as well.   I don't
16    think it's a problem.
17         Q.     Is the board itself involved when
18    the board of health receives funding?
19         A.     Yes.
20         Q.     How is the board involved when the
21    Cuyahoga County Board of Health receives
22    funding?
23         A.     We are presented with the action
24    that -- you know, we receive funds, we agree to
25    accept the funds, and they will say what the

Page 56

```
 1    amount is, and then we vote on agreeing to
 2    accepting those funds.
 3         Q.    Who makes that presentation to the
 4    board?
 5         A.    The president.
 6         Q.    And who is the president?
 7         A.    Debbie Moss.
 8         Q.    Does the board have any role in
 9    determining which grant the Cuyahoga County
10    Board of Health applies for?
11         A.    I would say we have a small role in
12    that.
13         Q.    What is that role?
14         A.    In the form of a discussion.
15         Q.    Is board approval required for the
16    Cuyahoga County Board of Health to apply for a
17    grant?
18         A.    I don't think so.
19         Q.    But you might have a discussion
20    about which grants the board is applying for?
21         A.    Might, right, correct.
22         Q.    Do you have a discussion about
23    every grant the Cuyahoga County Board of Health
24    applies for?
25         A.    No.
```

Page 57

1      Q.    Who decides how the board of health

2    spends its budget?

3      A.    Leaders of the board of health.

4      Q.    When you say, leaders of the board

5    of health, who do you consider to be the

6    leaders?

7      A.    I think the -- there are different

8    departments, and the department sort of has a

9    head, and my impression is that they sort of

10   submit the moneys that they need to run their

11   departments, and then there are ongoing

12   discussions that, again, I'm not aware of --

13   it's all hearsay -- and they come up with a

14   budget.

15     Q.    Does the board of the Cuyahoga

16   County Board of Health play a role in deciding

17   how the board of health spends its budget?

18     A.    Minimal.

19     Q.    What is that minimal role?

20     A.    I think we encourage them to have a

21   balanced budget.

22     Q.    Does the board have to approve

23   disbursement of funds?

24     A.    I believe so, in some way, but not

25   in the -- I'm not sure I'm thinking of it the

Page 58

1    same way you are.  What do you mean,

2    disbursement?

3         Q.    Well, when you say they are

4    involved in some way, what do you mean by that,

5    how would you explain it?

6         A.    I mean, I don't understand exactly

7    the ins and outs of how they disburse money,

8    but I know that we vote on measures where it --

9    that might accept money from a granting agency,

10   and from that extent, we were accepting money,

11   and then it goes out.

12        Q.    Do you vote on measures for the

13   Cuyahoga County Board of Health to spend money?

14        A.    I imagine in a way, yeah.  Yes.

15   Sorry.

16        Q.    Do you vote on measures every time

17   that the Cuyahoga County Board of Health spends

18   money?

19        A.    I would imagine no.

20        Q.    But you are not sure?

21        A.    I'm leaning toward -- heavily

22   toward no.  But, no, I'm not sure.  I am not

23   sure.

24        Q.    Can you think of particular

25   instances where the board has had to approve

Page 59

1   the Cuyahoga County Board of Health's spending

2   money?

3         A.    My impression is if, say, the state

4   board of health had money for lead abatement,

5   that money comes in, and then we have to

6   approve the spending of that money on a

7   particular parcel of building to abate the

8   lead.  And so that, I'm sure, has to be

9   approved.

10        Q.    You say -- you kind of phrased that

11  in the hypothetical, that if the state gives

12  money for abatement.

13        A.    Oh, I apologize.  I know for a fact

14  that we approve lead abatement money to go to

15  abate specific properties within Cuyahoga

16  County.

17        Q.    Do you know if there is any

18  particular amount above which board approval is

19  required for the Cuyahoga County Board of

20  Health to spend money?

21        A.    Yes.

22        Q.    What is that amount?

23        A.    I can't say for sure.

24        Q.    Can you give me a ballpark?

25        A.    My brain is saying 20,000, or 25.

1          Q.    So although you are not totally

2     sure, you think that for spending money under

3     about 20 to 25,000, board approval is not

4     required?

5          A.    Well, it's not required.  The board

6     of health as the members of the board of health

7     is not required.  There is another entity that

8     is called the CRC, contract review committee, I

9     believe.  They vote on the lower level amounts

10    that the board spends, and the board will

11    then -- the ones that break this threshold,

12    that I'm sorry I don't remember, then we would

13    vote on those.

14         Q.    So for amounts below the threshold,

15    which is somewhere around 20 to 25,000,

16    although you are not sure --

17         A.    I'm for sure not sure.

18         Q.    -- the contract review committee

19    votes on spending that money, and for amounts

20    above the threshold, the board members vote on

21    spending that money?

22         A.    That's my belief.

23         Q.    Who is on the contract review

24    committee?

25         A.    I cannot remember.

Page 61

```
 1        Q.    Are there members of the board on
 2   the contract review committee?
 3        A.    No.
 4        Q.    Are you a member of the contract
 5   review committee?
 6        A.    No.
 7        Q.    Does the board itself have any
 8   other committees or subcommittees?
 9        A.    I'm sure they do.
10        Q.    What are some of those committees
11   or subcommittees?
12        A.    They have a diversity committee.  I
13   can't tell you the name of it, because it just
14   changed, but they have a committee that
15   addresses diversity within the board.
16        Q.    Is that the committee that you are
17   the chair of?
18        A.    No.  That's another -- the
19   committee I'm chair of is made up of board
20   members.
21        Q.    Okay.
22        A.    So the board has another -- I
23   thought you were asking me about the committee,
24   like that the board of health, the way I think
25   of it, has, yes.
```

Page 62

1         Q.    So let's break it apart.

2               When I say the board itself, I mean

3    the board members, and when I say the Cuyahoga

4    County Board of Health, I mean the overall

5    organization.

6         A.    Okay.

7         Q.    Is that --

8         A.    That helps.

9         Q.    Do you understand that?

10        A.    Yes.  Okay.

11        Q.    So does the board itself, meaning

12   board member, have any other committees or

13   subcommittees?

14        A.    Yes.

15        Q.    What are those committees?

16        A.    They have a financial -- I can't

17   think of the right name, but it is a financial

18   committee.  And Doug Wang is the chairman.

19        Q.    And then you are the chairman of

20   the diversity committee --

21        A.    Correct.

22        Q.    -- is that right?

23              What other committees does the

24   board, meaning the board members, have?

25        A.    I'm not sure if they have set up

Page 63

1    any other committees.

2         Q.    Do you belong to the finance

3    committee?

4         A.    No.

5         Q.    What sort of public health issues

6    does the Cuyahoga County Board of Health work

7    on?

8         A.    Infant mortality, chronic disease,

9    lead abatement, teen pregnancy, and many more I

10   can't remember right now.

11        Q.    Are there any of those issues that

12   you are particularly interested in?

13        A.    I mean, I'm interested in all of

14   them.

15        Q.    Does the Cuyahoga County Board of

16   Health run programs?

17        A.    Yes.

18        Q.    How many programs does the board of

19   health currently run?

20        A.    A good number.

21        Q.    Can you give me a ballpark?

22        A.    I'd have to know a definition of a

23   program, but a lot.

24        Q.    Can you give me a ballpark of the

25   number of subject matter areas that the

Page 64

1    Cuyahoga County Board of Health touches on?

2         A.    Probably not.

3         Q.    When we are talking about programs

4    of the board of health, you say you would have

5    to know the meaning of the word program to give

6    me a ballpark.

7              Is there some kind of unit of

8    measure, in your mind, for a program or a

9    system or a committee, you know, what do you

10   think of the board of health's activities in

11   terms of?

12             MR. RICHARDS:  Object to form.

13        A.    The board of health does a lot, and

14   I don't want to insult them by saying the

15   number is lower than what it is.

16        Q.    Sure.

17        A.    And they do a lot.  So with infant

18   mortality, for example, there is, you know,

19   SIDS, and then there is sleep measures, and

20   then there is giving out cribs, and then there

21   is teen pregnancy.

22             And so within just infant

23   mortality, there may be 20 subprograms that

24   address the issue of infant mortality, and

25   that's just infant mortality.

1           So it could be hundreds or it could

2    be much lower.

3           Q.    Sure.  So there are many issues

4    that the Cuyahoga County Board of Health

5    addresses; is that fair to say?

6           A.    Correct.

7           Q.    And for each issue, there might be

8    many programs that the board engages in to

9    address those issues?

10          A.    Correct.

11          Q.    Do you know how many programs of

12   the Cuyahoga County Board of Health relate to

13   substance abuse issues?

14          A.    I do not.

15          Q.    How many programs relate to

16   prescription drug use?

17          A.    I don't know.

18          Q.    How many programs relate to issues

19   involving opiate use?

20          A.    I do not know.

21          Q.    Do the board members play any role

22   in developing Cuyahoga County Board of Health's

23   public health priorities?

24          A.    Yes.

25          Q.    What role is that?

Page 66

1          A.     I think we have strategic planning,

2      sort of, sessions.  We have had two in the

3      eight years that I've been there.  And in

4      conjunction with the leadership of the Cuyahoga

5      County Board of Health, we prioritize measures

6      or interventions.

7          Q.     You say you have had two strategic

8      planning sessions in your time on the board?

9          A.     Uh-huh.

10          Q.     Do you recall when those occurred?

11          A.     When I first started, in 2010, and

12      probably 2015.

13          Q.     Do strategic planning sessions

14      happen at board meetings?

15          A.     No.

16          Q.     So they are separate meetings?

17          A.     Well, the strategic planning

18      meetings that I was referring to were held

19      Saturday morning and it was an all day,

20      horrible thing.

21          Q.     Were those all day meetings public?

22          A.     I don't know.

23          Q.     Were there meetings -- or were

24      there minutes made of those strategic planning

25      sessions?

Page 67

1          A.    I don't know, in terms of minutes.

2          Q.    At those strategic planning

3    sessions, did you see any presentations?

4          A.    Yes.

5          Q.    Who made presentations?

6          A.    I remember this, some of the

7    leadership of the board.

8          Q.    Do you remember anyone in

9    particular?

10         A.    I do.  I remember the HIP Cuyahoga

11   presentation before that was started.  I do

12   remember that.

13         Q.    What is HIP Cuyahoga?

14         A.    Health Improvement Partnership

15   Cuyahoga.

16         Q.    What kind of issues does HIP

17   Cuyahoga work on?

18         A.    From my perspective, it was to gain

19   the perspective, really, of the members of the

20   citizens of Cuyahoga County, and in order to

21   stay in touch with what their needs and issues

22   are.

23         Q.    When was HIP Cuyahoga started?

24         A.    I believe we had a discussion of it

25   in our 2010, like very early discussions of the

Page 68

1    formation of that.

2         Q.    In the 2010 strategic planning

3    session, what are some of the issues that the

4    board decided would become priorities?

5         A.    I haven't any idea.

6         Q.    You don't remember?

7         A.    I do not remember, yes.

8         Q.    But at some point, you knew?

9         A.    When I was there.

10        Q.    What are some of the issues that

11   the board decided are priorities in the 2015

12   strategic planning sessions?

13        A.    I'm not remembering.

14        Q.    In either of those meetings, did

15   the board of health decide that any substance

16   abuse issues were strategic priorities?

17        A.    I don't remember.

18        Q.    In the 2015 meetings, did the board

19   decide that issues involving opiate use are a

20   priority?

21        A.    I do not remember.

22        Q.    In the 2010 meetings, did the board

23   decide that issues involving opiate use are a

24   priority?

25        A.    I do not remember.

Page 69

1          Q.     As a member of the board, are there

2     any issues that you have advocated should be

3     priorities for the Cuyahoga County Board of

4     Health?

5          A.     Yes.

6          Q.     What are those issues?

7          A.     One issue was related to customer

8     service, in the sense that I wanted the members

9     of restaurants and grocery stores and any

10    places where our inspectors went, I wanted them

11    to be able to give us feedback that the

12    encounter was civil and appropriate.

13         Q.     So you advocated that inspectors

14    from the Cuyahoga County Board of Health have

15    positive interactions with grocery stores and

16    restaurants that they inspect?

17         A.     Well, yes, yes.  That was part of

18    it, yes.  But I advocated that there be a way

19    that people who are inspected could give us

20    feedback, independent of that.

21         Q.     Okay.  Are there any other issues

22    that you have advocated should be priorities

23    for the Cuyahoga County Board of Health?

24         A.     No.

25         Q.     Is it important for the Cuyahoga

Page 70

1    County Board of Health to address a broad range

2    of issues?

3            A.    Very important.

4            Q.    Why is that important?

5            A.    Because health entails a broad

6    range of issues.

7            Q.    Is it important for the Cuyahoga

8    County Board of Health to devote its attention

9    to major public health issues affecting the

10   community?

11           A.    I believe so.

12           Q.    Why is that important?

13           A.    Because if it is a major issue,

14   then -- health issue, then we, as a board of

15   health, we should be involved.

16           Q.    Is it important for the board of

17   health to devote its attention to every public

18   health issue affecting the community?

19           A.    I don't think it's possible.

20                 MS. JAZIEWICZ:  I think now would

21   be a good moment for a five-minute break.

22                 THE VIDEOGRAPHER:  Off the record,

23   10:26.

24                 (Recess taken.)

25                 THE VIDEOGRAPHER:  On the record,

1    10:44.

2         Q.    Welcome back, Dr. Hall.

3         A.    Thank you.

4         Q.    We were talking some before the

5    break about the budget of the Cuyahoga County

6    Board of Health, and you mentioned that the

7    financial summary is included in the packet

8    that you get before board meetings; is that

9    right?

10        A.    I believe so, yes.

11        Q.    Does the board, meaning the members

12   of the board, approve the budget of the

13   Cuyahoga County Board of Health?

14        A.    Yes.

15        Q.    How often does the board approve

16   the budget?

17        A.    I know we do it annually.  I'm

18   thinking that we also may do amendments to the

19   budget.

20        Q.    Has the board ever not approved a

21   proposed budget?

22        A.    Are you saying do I know if

23   something didn't happen?

24        Q.    I'm saying, can you think of an

25   instance where there was a budget proposed to

1    the board and the board voted not to approve

2    it?

3           A.    Not off the top of my head.

4           Q.    You mentioned that before the board

5    meetings, you receive an agenda, and you also

6    receive a financial summary; is that right?

7           A.    Yes.

8           Q.    Is there anything else that you

9    routinely receive before board meetings?

10          A.    Yeah.  The packet includes, like, a

11   financial statement, the agenda for the meeting

12   that's coming up, the minutes for the meeting

13   that just passed.  That's consistent.

14               And then occasionally there is

15   other things that they would put in there, but

16   I think that's a consistent.

17          Q.    What kind of other things might you

18   see in your packet?

19          A.    We might see -- I don't remember

20   right now, but there is other things that, if

21   you gave me an example, I could tell you

22   whether it was in there.

23          Q.    Do you get briefings on any

24   initiatives of the Cuyahoga County Board of

25   Health --

Page 73

1          A.     Sometimes.

2          Q.     -- in your packet?

3          A.     Sometimes.

4          Q.     How often do you get briefings on

5     initiatives?

6          A.     Not as often as you think.  During

7     the meeting, we will get a verbal briefing

8     about specific measures.  So when a measure,

9     say the lead poisoning abatement comes, they

10    will say -- well, someone, the director or a

11    representative over the program, would give a

12    brief description of the item.

13              That happens more so than there

14    being something added to our packet.

15         Q.     Do you get briefings, in the sense

16    of updates on initiatives that the Cuyahoga

17    County Board of Health is working on?

18         A.     Sometimes.

19         Q.     And what form do those updates

20    take?

21         A.     Usually they are verbal, or there

22    may be a PowerPoint presentation during the

23    commissioner's report.

24         Q.     Does the commissioner give a report

25    during every board meeting?

Page 74

1          A.      Most every.

2          Q.      Does the commissioner report on the

3     full range of activities that the Cuyahoga

4     County Board of Health does?

5          A.      No.

6          Q.      Does the commissioner report on

7     some subset of the activities that the board of

8     health does?

9          A.      Yes.

10         Q.      Do you know how that subset is

11    determined?

12         A.      Sometimes when we are voting on

13    items, we will ask a number of questions, and

14    usually Terry will say, Well, we'll put

15    together a formal update, and then we will give

16    you that in a near commissioner's report.

17         Q.      So sometimes board members will

18    request topics for an update in the next

19    commissioner report; is that fair to say?

20         A.      Well, it's fair to say that when we

21    ask a critical mass of questions, Terry will

22    say, "Let's put together a full report."

23         Q.      Who determines what is -- what

24    topics are covered in every commissioner

25    report?

Page 75

1              A.     The commissioner.

2              Q.     So Mr. Allan determines what topics

3     to cover, and he might take into account what

4     issues the board has expressed interest in; is

5     that fair to say?

6              A.     I believe so.

7              Q.     On average, how many initiatives

8     might you hear about in the commissioner's

9     report, in a typical board meeting?

10             A.     I would say about three or four.

11             Q.     Do you remember what the

12    initiatives you heard about in the last board

13    meeting were?

14             A.     I'm really telling on myself.  Not

15    off the top of my head.

16                    I probably could come up before

17    this is over, because I'll continue to think

18    about it, but not off the top of my head.

19             Q.     How about in the past year or so,

20    what are some of the initiatives that you have

21    heard about in the commissioner's report?

22             A.     I mean, they are in the agenda.  I

23    mean, so I could, if you prompted me, I might

24    be able to -- I'm sort of in the moment.

25             Q.     In the past year or so, have you

Page 76

1    heard about initiatives around infant

2    mortality?

3         A.    I would say yes, but I can't think

4    of specifically what was presented, but, yes.

5         Q.    In the past year or so, have you

6    heard about initiatives around lead poisoning?

7         A.    I don't know if I heard a

8    presentation regarding lead poisoning.  We have

9    talked about it when the things get approved,

10   but I don't think I've heard a presentation

11   during the commissioner's report regarding lead

12   poisoning.

13        Q.    The past year or so, have you heard

14   anything during the commissioner's report about

15   initiatives relating to substance abuse?

16        A.    I don't remember that.

17        Q.    How about in the past three years

18   or so, have you heard anything in the

19   commissioner's report about initiatives

20   relating to substance abuse?

21        A.    I would imagine, yes.

22        Q.    Do you remember any particular

23   initiatives that you heard about relating to

24   substance abuse?

25        A.    I feel like it was related to

Page 77

```
 1    naloxone.
 2            Q.     What is naloxone?
 3            A.     It's a medication given to reverse
 4    opioid overdose.
 5            Q.     Since you became a board member in
 6    2010, aside from hearing about naloxone, have
 7    you heard presentations in the commissioner's
 8    report about any initiatives relating to
 9    substance abuse issues?
10            A.     I believe so.
11            Q.     What were those initiatives?
12            A.     I can't say specifically.  I
13    mean -- I can't say specifically.
14            Q.     And since 2010, how often would you
15    say you have heard about initiatives relating
16    to substance abuse?
17            A.     During the commissioner's report?
18            Q.     Sure.  Yes.
19            A.     Maybe three.
20            Q.     So that's three times since 2010?
21            A.     Maybe.
22            Q.     Maybe three times.
23            Do you remember, other than the
24    naloxone, what the other two times may have
25    been, two-ish times?
```

Page 78

1         A.    Related to opioid abuse.

2         Q.    Have you ever heard a presentation

3    during the commissioner's report about

4    substance abuse issues other than opioid abuse?

5         A.    Substance abuse other than opioid

6    abuse?  Not that I remember.

7         Q.    When the Cuyahoga County Board of

8    Health, as an organization, is deciding on

9    initiatives to focus on, who makes the

10   determination what initiatives they should

11   focus on?

12        A.    I don't know.  The leadership team.

13        Q.    Who is the leadership team?

14        A.    I would say Terry Allan and the

15   directors.

16        Q.    Meaning the directors of

17   departments within the board of health?

18        A.    Correct.

19        Q.    Do the board members play a role in

20   determining what initiatives the Cuyahoga

21   County Board of Health should focus on?

22        A.    In terms of the moneys we approve,

23   I guess we do.

24        Q.    Do you, as a board member, defer to

25   the staff, meaning the employees of the

1    Cuyahoga County Board of Health, to determine

2    the priorities of the board?

3          A.    I do.  I can't speak on behalf of

4    the board.

5          Q.    We talked earlier this morning

6    about some of the sources of funding for the

7    Cuyahoga County Board of Health, and you

8    mentioned local tax revenue; is that right?

9          A.    I'm fuzzy on that, in terms of tax,

10   but I feel like it's related to property tax,

11   but I'm not exactly sure.

12         Q.    So you think the board receives

13   some kind of local government revenue, but you

14   are not sure exactly what?

15         A.    Exactly how, yeah.

16         Q.    Do you know what percentage of the

17   board's budget comes from local government

18   revenue?

19         A.    No.

20         Q.    Is it less than 50 percent?

21         A.    I don't know.  I think it's -- I

22   don't know.  I don't know.  I mean, I should

23   know maybe, but I don't know.

24         Q.    So you just don't know at all what

25   percentage of funds comes from --

```
                                                    Page 80
 1          A.     Well, it's -- I sort of don't -- I

 2    don't know --

 3          Q.     Okay.

 4          A.     -- how else to say it.  It's out

 5    there, you could find out, and I could agree

 6    with you, but off the top of my head, I don't

 7    know.

 8          Q.     Okay.  Does the Cuyahoga County

 9    Board of Health play a role in informing

10    members of the public of public health issues

11    affecting the community?

12          A.     The organization?

13          Q.     Yes.

14          A.     Play a role informing the

15    community?

16          Q.     About public health issues.

17          A.     Yes.

18          Q.     And how does the Cuyahoga County

19    Board of Health play a role in informing

20    members of the community about public health

21    issues?

22          A.     A variety of ways.

23          Q.     What are some of those ways?

24          A.     The website, community initiatives,

25    networking through other organizations.
```

1          Q.    Is the Cuyahoga County Board of

2     Health subject to public records requests?

3          A.    I would imagine, yes.

4          Q.    When you say, I would imagine, do

5     you know for sure?

6                MR. RICHARDS:  Objection.

7          A.    I'm not sure of anything.  I'm

8     pretty sure I'm here right now.

9                I have heard discussions related to

10    that, but I don't know the ins and outs of it.

11         Q.    Okay.  Does the Cuyahoga County

12    Board of Health have annual reports?

13         A.    Yes.

14         Q.    Who writes the annual reports?

15         A.    I don't know.

16         Q.    Who selects topics for inclusion in

17    the annual reports?

18         A.    I don't know.

19         Q.    What role does the board itself,

20    meaning the board members, play in putting

21    together annual reports?

22         A.    Minimal.

23         Q.    When you say minimal, what is the

24    scope of the board member's role?

25         A.    I have not been asked for input,

Page 82

1    but I don't know.  I can't speak on behalf of
2    the other board members.
3           Q.    Does the board, meaning the board
4    members, have to approve annual reports of the
5    Cuyahoga County Board of Health?
6           A.    I don't believe so.
7           Q.    Do board members get the
8    opportunity to review annual reports before
9    they are published?
10          A.    I don't know.
11          Q.    Do you personally review those
12   reports before they are published?
13          A.    I don't know.  We get a report at a
14   meeting.  I don't know whether it's been -- you
15   know, obviously it has been published, because
16   it's printed, but I don't know if it's within
17   the public domain.  You know, I really don't
18   know the process of that.
19                So we might be approving it.  We
20   don't vote to approve it.  We see it
21   before -- before or at the same time as
22   everyone else.
23          Q.    So you see annual reports
24   regularly, but you're not sure if you see them
25   before or after they are published?

Page 83

1           A.      Correct.

2           Q.      Do you typically read the annual

3      reports that you see?

4           A.      I typically do not read it, no.

5           Q.      Why do you not read it?

6           A.      Time.

7           Q.      Is it important for the information

8      contained in annual reports to be accurate and

9      current?

10          A.      For the people that are reading it,

11     yes.

12          Q.      Why is that important?

13          A.      Because it is coming from an

14     authority.

15          Q.      Is it important for the annual

16     reports to cover the full range of public

17     health issues affecting Cuyahoga County?

18          A.      I don't put the report together, so

19     I'm not sure what the priorities are, so it

20     doesn't cover the full range, so it must not be

21     important.

22          Q.      Do the annual reports generally

23     address the most important public health issues

24     affecting Cuyahoga County?

25                  MR. RICHARDS:   I'm objecting.   He

Page 84

1    has already testified he doesn't normally

2    review the full reports.  You can answer.

3         Q.    You can answer.

4         A.    What's the question again?

5         Q.    Whether the annual reports

6    generally cover the most important public

7    health issues affecting Cuyahoga County?

8         A.    Right.  Well, that's why I pause.

9    I mean, there is much discussion on what's the

10   most important health issue addressing, you

11   know, Cuyahoga County, so...

12        Q.    When you say there is much

13   discussion about what is the most important

14   public health issue affecting Cuyahoga County,

15   is there discussion about that in your board

16   meetings?

17        A.    No.

18        Q.    What discussion are you referring

19   to?

20        A.    The discussion in my head.  So I

21   might say it's obesity, someone else might say

22   it's heart disease, and we would both have a

23   good argument, and we could both not agree that

24   either is the most important issue facing

25   Cuyahoga County.

Page 85

1          Q.     To you personally, what is the most

2     important health issue facing Cuyahoga County?

3          A.     I would probably say diabetes and

4     obesity.  They go hand in hand.

5          Q.     And why, in your view, is diabetes

6     and obesity the most important health issue

7     affecting Cuyahoga County?

8          A.     That's what I see in my patients.

9          Q.     What would you say are the top

10    three most important public health issues

11    affecting Cuyahoga County?

12         A.     To me?  Because that's -- I

13    think --

14         Q.     Yeah.

15         A.     -- again, I can't speak on behalf

16    of Cuyahoga County, and so the things that I

17    see in my patients and my practice is diabetes,

18    hypertension, heart disease.

19                          -   -   -   -   -

20                (Thereupon, Deposition Exhibit 1, A

21                Document From The Cuyahoga County

22                Board of Health, Entitled The Road

23                to Public Health, Annual Report

24                2017, was marked for purposes of

25                identification.)

Page 86

```
 1                      -   -   -   -   -
 2           Q.    I'm showing you what has been
 3     marked as Hall Exhibit 1, and this is printed
 4     from the Cuyahoga County Board of Health's
 5     website.  So this is publicly available and not
 6     Bates stamped.
 7                 Do you recognize this document?
 8           A.    I do not recognize the cover, no.
 9           Q.    Can you see by looking at it what
10     this document is?
11           A.    Yes.
12           Q.    What is it?
13           A.    It says The Road to Public Health
14     Annual Report 2017.
15           Q.    Is this the 2017 annual report of
16     the Cuyahoga County Board of Health?
17           A.    I have no idea.
18           Q.    You see it says Cuyahoga County
19     Board of Health at the top; is that right?
20           A.    Yes.  You're asking me to validate
21     that this is actually that, and I have never
22     seen this before.
23           Q.    You have never seen this before?
24           A.    I've never seen the cover.  I
25     haven't opened it, but I've never seen the
```

Page 87

1    cover.

2         Q.    Take a moment to look through the

3    full document and let me know when you have had

4    adequate opportunity to look it over.

5         A.    Okay.

6         Q.    Is this the 2017 annual report of

7    the Cuyahoga County Board of Health?

8         A.    It looks to be.

9         Q.    Do you know if this is the most

10   recent report, annual report of the Cuyahoga

11   County Board of Health?

12        A.    I don't know.

13        Q.    You don't know?

14        A.    I mean, I'm imagining it

15   encompasses this whole year, but I have never

16   seen this.  It is very nice.

17        Q.    If you turn to page 3 of this

18   report, please.  Do you see that this page is

19   titled Message From the Board?

20        A.    Uh-huh.

21        Q.    And there is a photograph of the

22   board there, and you are one of the members

23   that is pictured; is that right?

24        A.    That's correct.

25        Q.    Have you seen this message from the

Page 88

1    board before?

2          A.    No.

3          Q.    Does every annual report include a

4    message from the board?

5          A.    I don't know.

6          Q.    Do the board members play any role

7    in writing the message from the board?

8          A.    I can't say.

9          Q.    Have you ever played a role in

10   writing the message from the board?

11         A.    No.

12         Q.    Do you know who writes the message

13   from the board?

14         A.    No.

15         Q.    Have you ever played a role in

16   approving the message from the board?

17         A.    No.

18         Q.    If you turn to page 1 of this

19   document, you see a table of contents?

20         A.    Uh-huh.

21         Q.    And this includes some issues or

22   initiatives that are addressed by the Cuyahoga

23   County Board of Health; is that right?

24         A.    That's correct.

25         Q.    So those include safe routes to

Page 89

1    school, farm to school, Simon's Supermarket,

2    Arco Recycling, GIS mapping, communicable

3    disease, travel clinic, and financial

4    reporting --

5            A.    That's correct.

6            Q.    -- is that right?

7            A.    Uh-huh.

8            Q.    Who determines what issues or

9    initiatives are addressed in this annual

10   report?

11           A.    I don't know.

12           Q.    Based on this table of contents and

13   your brief review of the document now, which I

14   understand you have not seen before, is there

15   anything in this annual report related to

16   substance abuse issues?

17           A.    Not that I see.

18           Q.    Is there anything in this annual

19   report related to opioid abuse issues?

20           A.    Not that I saw.

21           Q.    Is there anything in this annual

22   report related to opioids at all?

23           A.    No.

24           Q.    Who determined that opioids should

25   not be mentioned in this annual report?

Page 90

1          A.     The person that put it together.

2          Q.     And you don't know who that is,

3     right?

4          A.     I do not.

5          Q.     Are you familiar with the terms

6     opioid and opiate?

7          A.     I've heard them both, yes.

8          Q.     In your mind, is there a

9     distinction between opioid and opiates?

10         A.     Maybe singular and plural or

11     something like that?

12         Q.     I realize I did say one singular

13     and one plural.  How about between opioid

14     singular and opiate singular?

15         A.     If there is a distinction, I'm not

16     aware.

17         Q.     In your experience, can those terms

18     be used interchangeably?

19         A.     Generally people will either use

20     one or the other.

21         Q.     Which term do you use?

22         A.     Opioid.

23         Q.     When you say opioid, what do you

24     mean; how do you define that term?

25         A.     It depends on the context.

Page 91

```
 1          Q.     How about in a public health
 2     context, how do you define the term opioid?
 3          A.     In a public health context, I'm not
 4     sure I do that.
 5          Q.     Okay.
 6          A.     Maybe in talking to my patients;
 7     how about that?  I refer to it as a group of
 8     medications that treat pain.
 9          Q.     So opioids are a group of
10     medications that treat pain.
11               Is OxyContin an opioid?
12          A.     I think of it as one.
13          Q.     Is heroin an opioid?
14          A.     I think of it as one.  Not a
15     medication used to treat pain, but I do
16     think -- there is a dent in my armor already,
17     but, yeah, I do think of heroin as an opioid.
18          Q.     How about fentanyl?
19          A.     I think of that as an opioid.
20          Q.     How about carfentanil?
21          A.     I'm going to assume that
22     carfentanil is related to fentanyl, but I can't
23     say for sure.
24          Q.     So you are not actually familiar
25     with carfentanil?
```

Page 92

1          A.     Not in that form, no.

2          Q.     When you say, not in that form,

3     what do you mean?

4          A.     There may be a commercial name that

5     I'm familiar with that might represent

6     carfentanil.  I'm just not aware of it as

7     carfentanil.

8          Q.     You don't know for sure if their is

9     a commercial name for carfentanil?

10         A.     No, no.

11         Q.     So when you use the word opioid,

12    that might include prescription medications,

13    right?

14         A.     Correct.

15         Q.     And it also might include illicit

16    drugs that have a chemical connection with

17    opium; fair to say?

18         A.     Yes.

19         Q.     Have you done any professional work

20    related to opioids?

21         A.     Have I ever been paid for doing

22    anything related to opioids?

23         Q.     Is there a distinction that you are

24    drawing between work that you are paid for and

25    work that you are not paid for?

Page 93

1          A.    What I was wondering was the
2     professional part.
3          Q.    Have you done any professional work
4     related to opioids?
5          A.    Right.  I have not been paid to do
6     any work related to opioids, no.
7          Q.    Do you, in your employment at
8     Cleveland State University, do you teach
9     students?
10         A.    Yes.
11         Q.    Do you teach any coursework related
12    to substance abuse?
13         A.    No.
14         Q.    Do you teach any coursework related
15    to prescription drug abuse?
16         A.    No.
17         Q.    Do you teach any coursework related
18    to opioids?
19         A.    No.
20         Q.    Have you ever taught any coursework
21    related to opioids?
22         A.    When you say coursework, no.
23         Q.    Have you ever taught in any other
24    setting about opioids?
25         A.    I gave a presentation to the Ohio

Page 94

1     Commission on Minority Health, as part of my

2     chairman's report, on opioids.

3           Q.    When was that?

4           A.    Maybe a year and a half, two years

5     ago.

6           Q.    What was that presentation about?

7           A.    Overdose deaths and opioid abuse.

8           Q.    Was it about overdose deaths and

9     opioid abuse in any particular community?

10          A.    Yes.

11          Q.    What community?

12          A.    The discussion really just dealt

13    with the disproportionately low impact of

14    opioid abuse in African American communities.

15          Q.    Is that the African American

16    community in Ohio?

17          A.    Yes.

18          Q.    Have you done any professional

19    writing about substance abuse issues?

20          A.    Using my definition of

21    professional, no.

22          Q.    What is your definition of

23    professional?

24          A.    Getting paid to do it.  I wrote an

25    article on my website about it for my patients,

Page 95

1    but I wasn't paid for it.

2         Q.    So you say you wrote an article on

3    your website for your patients about substance

4    abuse issues?

5         A.    Correct.

6         Q.    What is that article about,

7    specifically?

8         A.    Substance abuse and the dangers of

9    pain medication.

10        Q.    Have you done any other writing

11   about substance abuse?

12        A.    Yes.

13        Q.    What other writing have you done

14   about substance abuse?

15        A.    I wrote an article after Prince

16   died about substance abuse in pop stars.

17        Q.    Where was that article published?

18        A.    CNN Online and The Conversation,

19   and actually 28 other places republished it,

20   but mainly The Conversation and then CNN.

21        Q.    Were you asked by somebody to write

22   that article?

23        A.    No.

24        Q.    Did you write it as a freelancer;

25   is that fair to say?

1      A.    Not really.  Prince died, he didn't

2   drink, he didn't use drugs, and he died from an

3   accidental overdose, and I was a Prince fan.

4   So, you know, I felt like I needed to write

5   about it.

6      Q.    And what did you write about,

7   specifically, relating to Prince's death?

8      A.    Well, I actually looked at the top

9   50 artists of all time, and I wondered why it

10   seems like pop stars died young, and so I

11   looked at their cause of death.  It was over

12   Christmas break, I was bored.  And I just, sort

13   of, categorized what they died from and to see

14   if there was any kind of a disparity in it.

15           And when it was written, I really

16   couldn't get anyone to publish it for months,

17   until The Conversation published it.

18      Q.    What did you find about whether

19   there is any disparity that --

20      A.    That, yeah, pop stars do die young,

21   yes.

22      Q.    Did you establish any type of

23   causal -- causality to why pop stars die young?

24      A.    Increased drug use, and alcohol and

25   drug.  I think of alcohol as a drug as well.

1      Q.    Other than the article on your

2   website about the dangers of substance abuse

3   and pain medication and this article after

4   Prince died, have you done any

5   professional -- strike the word professional --

6   have you done any writing about substance

7   abuse?

8      A.    No.

9      Q.    Have you done any other writing

10   about opioids?

11      A.    None that I can remember, no.

12      Q.    Would you say that Cuyahoga County

13   currently has a public health problem related

14   to opioid use?

15      A.    Yes.

16      Q.    When did you first become aware of

17   that problem?

18      A.    On a widespread, sort of, county

19   health, I would imagine it was during a

20   presentation to the board of health.

21          I knew specifically in my practice

22   that my patients were having a problem, but I

23   didn't know if it was just my patients or

24   whether it was Cuyahoga County wide.  So I

25   imagine the county-wide information would have

1   come from the board of health.

2          Q.    Let's break it down.  In your

3   practice, from your patients, when did you

4   first become aware there was a problem with

5   opioid use amongst your patients?

6          A.    It gradually developed, but it's

7   been some years.  Probably eight, ten.

8          Q.    Has it been more than, say, about

9   eight or ten?  Let's say 2010 was eight years

10  ago.  Do you know if it was before or after

11  2010?

12         A.    I'm bad with years, when it comes

13  to that.

14         Q.    Okay.

15         A.    So I can't say specifically when it

16  became, but it's been a problem for a while,

17  more than five years for sure.

18         Q.    Okay.  And approximately when did

19  you become aware of the problem relating to

20  opioid use in the county broadly?

21         A.    Probably during one of the

22  presentations related to opioid abuse.

23         Q.    Can you remember the first

24  presentation that you saw related to opioid

25  abuse?

Page 99

1           A.    No.  I'm sorry.

2           Q.    Is there an epidemic related to

3     opioid abuse in Cuyahoga County?

4           A.    I'm not sure I know the definition

5     of an epidemic.

6           Q.    Would you use the term epidemic to

7     describe the public health problem around

8     opioid use in Cuyahoga County?

9           A.    I try not to use words I don't know

10    the meaning of.

11          Q.    Have you personally ever done any

12    research into the causes of the opioid problem

13    in Cuyahoga County?

14          A.    No.

15          Q.    Has the board of health ever done

16    any research into the causes of the opioid

17    problem in Cuyahoga County?

18          A.    I can't say.

19          Q.    Have you personally ever done any

20    research into the causes of overdose deaths in

21    Cuyahoga County?

22          A.    Putting together the letter -- the

23    letter -- the article on my website, I would

24    have looked at some information related to

25    that, when I put that together.

1          Q.    Aside from putting together the

2    article on your website, have you personally

3    ever done any research into the causes of

4    overdose deaths in Cuyahoga County?

5          A.    No.

6          Q.    Has the board of health ever done

7    any research into the causes of overdose deaths

8    in Cuyahoga County?

9          A.    I know they tracked it, so if

10   tracking it counts as research, then they track

11   it, for sure.

12         Q.    When you say they track it, what do

13   you mean by that?

14         A.    That we follow the number of opioid

15   deaths.

16         Q.    When you say we follow the number

17   of opioid deaths, do you mean we, the board

18   members?

19         A.    No, I'm sorry.  I mean the Cuyahoga

20   County Board of Health.

21         Q.    So the Cuyahoga County Board of

22   Health, as an organization?

23         A.    Well, someone within the board of

24   health.

25         Q.    Somebody within the board of health

Page 101

1      tracks overdose deaths?

2             A.     I believe so.

3             Q.     Do you, as a board member, receive

4      information about overdose deaths in Cuyahoga

5      County?

6             A.     I believe we have.

7             Q.     Who do you receive that information

8      from?

9             A.     I can't say.

10            Q.     How often do you receive that

11     information?

12            A.     I can't say that either.

13            Q.     Do you remember the last time that

14     you, in your capacity as a board member of the

15     Cuyahoga County Board of Health, received

16     information about overdose deaths in Cuyahoga

17     County?

18            A.     I believe the information I

19     received at a presentation related to the

20     board, and then that prompted me to give the

21     presentation to the commission on minority

22     health.  So they were in close approximation,

23     but I can't say when that was.

24            Q.     You said the presentation was about

25     one and a half to two years ago?

Page 102

1          A.     Uh-huh.

2          Q.     And you said the information you

3     saw in that presentation about overdose deaths

4     prompted you to give the presentation to the

5     Ohio Commission on Minority Health?

6          A.     I believe it did.

7          Q.     How did it prompt you to give that

8     presentation to the Ohio Commission on Minority

9     Health?

10          A.     I was surprised, again, of the

11     demographics of that.  They didn't follow the

12     normal demographics that I'm used to seeing.

13          Q.     How were you surprised by the

14     demographics?

15          A.     The increased suburban use, and the

16     disproportionately lower African American and

17     Latino, and proportionately higher White.

18          Q.     The disproportionately lower impact

19     that you are identifying on African Americans

20     and Latinos and disproportionately higher

21     impact on Whites, is that impact limited to a

22     particular cause of overdose death?

23               MR. RICHARDS:  I'm going to object

24     to form.

25          A.     Say that differently.

1          Q.     Yeah, let me try it a different

2     way.

3                 So you said that you saw a

4     presentation about overdose deaths in Cuyahoga

5     County.

6          A.     The part I've taken away, I was

7     moved by that aspect, of whatever the

8     presentation is, I don't remember specifically.

9          Q.     Was that presentation limited to

10    overdose on particular drugs?

11         A.     I don't know.

12         Q.     Was it limited to opioids?

13         A.     It was limited to opioids, yes.

14         Q.     Do you know if the data that you

15    saw in that presentation included overdoses

16    relate to prescription opioids?

17         A.     I believe it was opioids in

18    general.

19         Q.     So that data would include

20    information relate to heroin; is that right?

21         A.     Correct.

22         Q.     Could it also include information

23    related to overdose deaths relating to

24    fentanyl?

25         A.     Correct.

Page 104

1          Q.    So when you talk about a

2     disproportionately low impact on African

3     American and Latino communities and a

4     disproportionately high impact on Whites, that

5     impact you were talking is the impact of

6     opioids generally?

7          A.    Correct.

8          Q.    So that includes illicit opiates,

9     such as heroin?

10         A.    Yes.

11         Q.    And when you say disproportionately

12    low and high impact, relative to what?

13         A.    Relative to expected, based on the

14    population.

15         Q.    And is it a disproportionately low

16    impact on African American communities, for

17    instance, relative to other substance abuse

18    issues?

19         A.    Just relative to expected.  So if

20    you have -- African Americans is 13 percent of

21    the population, then you would expect that

22    percentage, all things being equal, heart

23    disease, cancer.  When it is not following

24    that, that's a disparity, and the commission of

25    minority health dealt with disparity.

Page 105

1        Q.    Got it.  In your presentation to

2   the Ohio Commission on Minority Health, did you

3   identify any causes for this disproportionate

4   impact you are identifying?

5        A.    Well, I didn't identify them.  We

6   just discussed it.  It was more of a

7   discussion.

8        Q.    What are some of the potential

9   causes that you discussed?

10       A.    There was a discussion of

11  prescribing pain medicine.

12       Q.    What specifically about prescribing

13  pain medicine?

14       A.    Having a low threshold to prescribe

15  pain medicine.

16       Q.    When you say having a low threshold

17  to prescribe pain medicine, you are talking

18  about doctors prescribing pain medicine, based

19  on a low threshold of what is needed; is that

20  fair to say?  How would you put it?

21       A.    And dentists, doctors and dentists.

22       Q.    Doctors and dentists prescribing

23  pain medication based on a low threshold of

24  pain, of medical need; how would you put it?

25       A.    Low threshold to treat pain.

1    Q.    Are you familiar with the Cuyahoga
2  County Opiate Task Force?
3    A.    Somewhat.
4    Q.    What is the Cuyahoga County Opiate
5  Task Force?
6    A.    Well, it's a program to address
7  opioid abuse and overdose.
8    Q.    Is that program affiliated in any
9  way with the Cuyahoga County Board of Health?
10    A.    I believe it is, yes.
11    Q.    When did you first become aware of
12  the Cuyahoga County Opiate Task Force?
13    A.    I would say years ago.
14    Q.    How many years ago?
15    A.    I would say more than five.
16    Q.    Do you know when the Cuyahoga
17  County Opiate Task Force first started?
18    A.    No.
19    Q.    Are you a member of the Cuyahoga
20  County Opiate Task Force?
21    A.    No.
22    Q.    Have you ever attended any meetings
23  of the Cuyahoga County Opiate Task Force?
24    A.    No.
25    Q.    Why not?

Page 107

1          A.     I don't think I was invited.

2          Q.     Do you know how often the Cuyahoga

3     County Opiate Task Force has meetings?

4          A.     No.

5          Q.     Do you know if the task force

6     meetings are public?

7          A.     I don't know.

8          Q.     Do you know if the Cuyahoga County

9     Opiate Task Force has an email listserv?

10         A.     No.

11         Q.     Do you receive any emails related

12    to the Cuyahoga County Opiate Task Force?

13         A.     I can't say.

14         Q.     Does the Cuyahoga County Board of

15    Health provide funding to the Cuyahoga County

16    Opiate Task Force?

17         A.     I believe so.

18         Q.     Is the board, meaning the board

19    members, involved in approving funding to the

20    Cuyahoga County Opiate Task Force?

21         A.     I believe so.

22         Q.     Can you remember a specific

23    instance when the Cuyahoga County Board of

24    Health approved funding for the Cuyahoga County

25    Opiate Task Force?

1          A.     No.

2          Q.     What are the sources from which the

3     Cuyahoga County Board of Health provides

4     funding to the Cuyahoga County Opiate Task

5     Force?

6          A.     I don't know specifically.

7          Q.     What does the Cuyahoga County

8     Opiate Task Force do?

9          A.     I don't know that specifically

10    either.

11         Q.     What programs does the Cuyahoga

12    County Opiate Task Force support?

13         A.     I can't list those either.

14         Q.     Does the Cuyahoga County Opiate

15    Task Force issue annual reports?

16         A.     I don't know.

17         Q.     Have you ever seen a report issued

18    by the Cuyahoga County Opiate Task Force?

19         A.     I believe I have.

20         Q.     In what context did you see that

21    report?

22         A.     I don't remember.

23         Q.     Was it in a board meeting?

24         A.     It would have been in a board

25    meeting, yes.

1      Q.    And do you remember what kind of

2  report it was?

3      A.    I feel like it was printed.

4      Q.    Was it an annual report?

5      A.    I can't say.

6      Q.    Did you read the report that you

7  saw in the board meeting?

8      A.    I perused it, like I did this one

9  here.

10      Q.    Have you ever read an annual report

11  issued by the Cuyahoga County Opiate Task

12  Force?

13      A.    Not cover to cover.

14      Q.    On how many occasions have you seen

15  reports issued by the task force?

16      A.    I remember one for sure.

17      Q.    Do you remember when that was?

18      A.    I do not.

19      Q.    Does the Cuyahoga County Opiate

20  Task Force spend money?

21      A.    I believe so.

22      Q.    Where does it get the money it

23  spends?

24      A.    I'm imagining they get it through

25  the Cuyahoga County Board of Health.

1      Q.    Do you know if they get it from any

2   particular fund within the Cuyahoga County

3   Board of Health?

4      A.    Yes, they do get it from some

5   particular funds, but I don't know what they

6   are.  I believe they come from the state.

7      Q.    So you believe the Cuyahoga County

8   Opiate Task Force receives funding from the

9   State of Ohio through the board?

10     A.    I believe it comes from -- I

11  believe it comes from the state, but I can't

12  say for sure.

13     Q.    Does the Cuyahoga County Opiate

14  Task Force receive funding from any local

15  agencies through the board?

16     A.    I don't know.

17     Q.    Does the Cuyahoga County Opiate

18  Task Force receive funding from any private

19  sources through the board?

20     A.    I don't know.

21     Q.    Have you met with any members of

22  the task force about the work of the task

23  force?

24     A.    Individually?  No.

25     Q.    Sure.

1           How about not individually?

2       A.      Well, they presented at a board

3   meeting.

4       Q.      Who presented at that board

5   meeting?

6       A.      Usually Vince Caraffi.

7       Q.      How many times has Vince Caraffi

8   presented at a board meeting about the work of

9   the task force?

10       A.      He has spoken to the board about it

11   multiple times.  Formal presentations, I know

12   once, but I can't say more than that.

13       Q.      So spoken to the board multiple

14   times.  Since you started on the board in 2010,

15   ballpark, how many times vas Vince Caraffi

16   spoken to the board about the task force?

17       A.      Maybe ten.

18       Q.      Who is Vince Caraffi?

19       A.      An employee of the Cuyahoga County

20   Board of Health.

21       Q.      Other than Vince Caraffi, has

22   anyone else ever spoken to the board about the

23   work of the Cuyahoga County Opiate Task Force?

24       A.      Someone else has, but I don't know

25   their name.

1        Q.    Do you remember if that person was

2    affiliated -- do you remember if that person

3    was an employee of the Cuyahoga County Board of

4    Health?

5        A.    They were an employee, yes.

6        Q.    Are you familiar with someone named

7    April Vince?

8        A.    I can't say for sure.

9        Q.    Are you familiar with someone named

10   Allisyn Leppla?

11       A.    No.

12       Q.    Who leads the Cuyahoga County

13   Opiate Task Force?

14       A.    I don't know.

15       Q.    Aside from hearing from Vince

16   Caraffi at board meetings about the work of the

17   Cuyahoga County Opiate Task Force, have you

18   ever spoken with Vince Caraffi?

19       A.    I'm sure I've spoken with him to

20   say hi.

21       Q.    Have you ever spoken with Vince

22   Caraffi about the work of the task force?

23       A.    I can't remember.  I don't believe

24   so.

25       Q.    You said that Vince Caraffi has

1    spoken to the board maybe ten times since 2010

2    about the Opiate Task Force.  Did those times

3    happen at any regular intervals?

4         A.    It occurred when there was an issue

5    that we were voting on, in terms of exchange or

6    accepting money.  So it would have had to have

7    been related to a board action related to

8    opioids.

9         Q.    So you would hear about the task

10   force in relation to board approval for receipt

11   or spending of funds?

12        A.    A board agenda item.

13        Q.    Aside from supporting the Cuyahoga

14   County -- sorry.  Let me back up.

15             Does the Cuyahoga County Board of

16   Health provide support for the Cuyahoga County

17   Opiate Task Force?

18        A.    I believe so.

19        Q.    What kind of support does the board

20   of health provide for the task force?

21        A.    Well, financial, I believe it's

22   financial support.  I mean, we are either

23   accepting or transferring moneys through.

24        Q.    Does the board of health provide

25   staff to support the work of the task force?

Page 114

1         A.    I don't know.  I mean, there is

2    certainly staff.  They are employees of the

3    board of health, so...

4         Q.    So there are employees of the board

5    of health that are involved in the task force?

6         A.    I don't know the definition of a

7    task force, but from my perspective, yes.

8         Q.    Aside from supporting the Cuyahoga

9    County Opiate Task Force, does the Cuyahoga

10   County Board of Health do any programmatic work

11   related to opioids?

12        A.    I believe so.  I don't know what is

13   aside from the task force or what is inside or

14   outside the task force, so I can't say.

15        Q.    Okay.  So setting aside the

16   distinctions of what is inside and outside the

17   task force, what does the Cuyahoga County Board

18   of Health do, in terms of programmatic work

19   relate to opioids?

20        A.    Well, I know there was a Project

21   DAWN, there was a project related to medication

22   disposals and setting up places where you can

23   dispose of extra medication that might be

24   around the house, and, you know, the ins and

25   outs of the task force.

Page 115

1      Q.    When you say ins and outs of the

2   task force, what are you including in that?

3      A.    That's my way of saying I don't

4   know.

5      Q.    Sure.  So you know generally that

6   there is a task force?

7      A.    Correct.

8      Q.    You know that the Cuyahoga County

9   Board of Health does some work related to

10  Project DAWN, and you know the Cuyahoga County

11  Board of Health has done some work related to

12  medication disposal; is that right?

13     A.    Right.

14     Q.    Are there any other programs that

15  you are aware of, or is there anything else

16  that you are aware of that the Cuyahoga County

17  Board of Health does to address the problem of

18  opioids?

19     A.    I know they are a model for the

20  state.  So I know that they support other parts

21  of the state, doing similar things.

22     Q.    When you say you know they are a

23  model for the state, what does that mean?

24     A.    That other boards of health or

25  other organizations have asked that we share

Page 116

1    the things that we do related to opioid abuse

2    with them.

3          Q.    You mentioned Project DAWN.  What

4    is Project DAWN?

5          A.    To me, I believe it is related to

6    naloxone distribution.

7          Q.    And how is the Cuyahoga County

8    Board of Health involved with Project DAWN?

9          A.    I don't know.

10          Q.    Does the Cuyahoga County Board of

11    Health distribute naloxone?

12          A.    I don't know.

13          Q.    How is the Cuyahoga County Board of

14    Health's work relate to Project DAWN funded?

15          A.    I don't know specifically.

16          Q.    Who would know?

17          A.    The director who is over Project

18    DAWN.

19          Q.    Who would know what specific

20    sources of funding the Opiate Task Force

21    receives from the board?

22          A.    The person over the Opiate Task

23    Force.

24          Q.    How is the Cuyahoga County Board of

25    Health's work related to medication disposal

Page 117

1    funded?

2          A.    I do not know.

3          Q.    Who would know that?

4          A.    I don't know.

5                         -  -  -  -  -

6                (Thereupon, Deposition Exhibit 2,

7                Cuyahoga County Board of Health

8                Minutes of the Meeting, March 28,

9                2018, was marked for purposes of

10               identification.)

11                         -  -  -  -  -

12         Q.    I'm showing you what has been mark

13   as Hall Exhibit 2.  Do you recognize this

14   document?

15         A.    Yes.

16               MR. CIACCIO:  Just for clarity, is

17   this a produced document, or is this a document

18   that you got from somewhere?

19         Q.    I'm sorry.  This is from the

20   Cuyahoga Board of Health website, so it is

21   publicly available and not Bates stamped.

22               What is this document?

23         A.    It looks like the minutes to the

24   March 28, 2018 meeting.

25         Q.    Have you seen these meeting minutes

Page 118

1    before?

2         A.    Probably.

3         Q.    If you look at the front page of

4    this document, about halfway down the page,

5    there is a motion for elections of office of

6    the board, president and president pro tem; do

7    you see that?

8         A.    I do.

9         Q.    It says a motion was made by Dr.

10   Hall, second by Mr. Wang to nominate Ms. Debbie

11   Moss as president of the board; do you see

12   that?

13        A.    I do.

14        Q.    So on the March 28, 2018 meeting,

15   the board voted for Debbie Moss to become

16   president of the board?

17        A.    Correct.

18        Q.    It then says below this, "It was

19   then moved by Mr. Gatt, seconded by Dr.

20   Williams, to nominate Dr. Gregory Hall as

21   president pro tem," and there was a vote; do

22   you see that?

23        A.    I do see it.

24        Q.    Do you remember being voted in as

25   president pro tem at the March 28 meeting of

Page 119

1    the board of health?

2         A.    Not specifically, but yes.

3         Q.    If you could turn to the second

4    page of this document, so it is inside, like,

5    the inside cover, there is a heading here for

6    Regular Actions of the Board, and there are a

7    number of resolutions listed here; do you see

8    that?

9         A.    I do.

10        Q.    If you look again about halfway

11   down the page, it says, "It was moved by

12   Mr. Wang, seconded by Ms. Moss, that the

13   following resolution," parentheses, "2018-31,

14   be adopted.

15             "Be it resolved to contract with

16   MetroHealth Systems to connect inmates with

17   opioid-use disorder to the Cleveland Treatment

18   Center to provide medicated-assisted treatment

19   in lieu of conviction from January 1, 2018

20   through August 31, 2018."  Did I read that

21   correctly?

22        A.    You did.

23        Q.    Do you recall voting on this

24   resolution to contract with MetroHealth

25   Systems --

Page 120

1        A.    No, I do not.

2        Q.    -- about medically assisted

3    treatment?

4        A.    Sorry.  No, I do not.

5        Q.    Who proposed resolution 2018-31 to

6    the board?

7        A.    The president.

8        Q.    I'm sorry?

9        A.    The president.

10       Q.    The president.

11       A.    Uh-huh.

12       Q.    At this board meeting, so if you

13    look underneath the ayes, you are listed as one

14    of the ayes voting --

15       A.    Yes.  Sorry.

16       Q.    -- to contract with MetroHealth

17    system; is that right?

18       A.    That is.

19       Q.    Do you recall reviewing any

20    materials related to this resolution before

21    voting on it?

22       A.    Materials of substance, things that

23    you can touch?

24       Q.    Let's start with physical

25    materials.  So written materials, did you

```
                                              Page 121
 1    review any written materials?
 2           A.     No.
 3           Q.     Did you hear any presentations
 4    related to the resolution?
 5           A.     There is a discussion associated
 6    with every action.
 7           Q.     Do you remember the discussion
 8    around this particular resolution?
 9           A.     No, I do not.
10           Q.     Do you see that connected to this
11    resolution it says, "Amount to be paid is not
12    to exceed $37,000"; is that right?
13           A.     That's correct.
14           Q.     Who set that amount?
15           A.     I don't know.
16           Q.     Does that amount come from any
17    particular source of funding?
18           A.     I don't know.
19           Q.     Do you know if that amount is
20    connected with a grant?
21           A.     No, I do not.
22           Q.     Do you know if you would have
23    known, at the time that you wrote it on this,
24    what the source of that funding was?
25           A.     Yes.
```

Page 122

1          Q.    So somebody would have told you,

2     but you just don't remember sitting here today?

3          A.    Correct.

4          Q.    Setting that aside, are you

5     familiar with any particular sources of funding

6     to which the Cuyahoga County Board of Health

7     has access related to addressing opioid issues?

8          A.    No, ma'am.

9          Q.    Are you familiar with the -- are

10    you familiar with any grant from the State of

11    Ohio related to addressing opioid-use issues?

12         A.    No, ma'am.

13                    -   -   -   -   -

14               (Thereupon, Deposition Exhibit 3,

15               Designated Confidential, Email

16               Exchange with Attachment, Beginning

17               with Bates Label CUYAH_014322863,

18               was marked for purposes of

19               identification.)

20                    -   -   -   -   -

21         Q.    I'm showing you what has been

22    marked as Hall Exhibit 3.  This is a document

23    bearing the Bates stamp CUYAH_014322863 through

24    865.

25         A.    I'm not understanding what you are

Page 123

1    saying.

2         Q.    Before I show you any document that

3    has Bates stamped on it, meaning these numbers

4    at the bottom right, I will just read them into

5    the record, so everybody knows that we are

6    talking about.

7         A.    Oh, okay.  I just spaced out on

8    you.

9         Q.    No need to respond to that.

10             Taking a look at this document, if

11   you look at the front page, you see that this

12   is an email at the top from Terry Allan to you,

13   Greg Hall; is that right?

14        A.    That's correct.

15        Q.    You see an email address there,

16   greg.hall@saberhealth.com.  Is that your email

17   address?

18        A.    Yes, one of them.

19        Q.    Is that the -- is that your current

20   email address?

21        A.    Yes.

22        Q.    What is Saber Health?

23        A.    It's a nursing home company.

24        Q.    Is that one of the nursing home

25   companies you contract with?

Page 124

1           A.    Yes.

2           Q.    Is this email address -- sorry.

3    Strike that.

4                 Do you use this email address,

5    greg.hall@saberhealth.com, in connection with

6    your work on the board of the Cuyahoga County

7    Board of Health?

8           A.    I did at the time.

9           Q.    Do you currently use it in

10   connection with your work on the Cuyahoga

11   County Board of Health?

12          A.    No.

13          Q.    Is there another email address that

14   you currently use in connection with your work

15   on the Cuyahoga County Board of Health?

16          A.    Yes.

17          Q.    What is that email address?

18          A.    It is glhall@roadrunner.com.

19          Q.    Are there any other email addresses

20   you have ever used in connection with your work

21   on the Cuyahoga County Board of Health?

22          A.    I don't know for sure.

23          Q.    Can you think of any other that you

24   may have used?

25          A.    I may have used

Page 125

1   drhall@drgreghall.com.

2        Q.    You see that this email at the top

3   of the page is dated September 5, 2012; is that

4   right?

5        A.    It is.

6        Q.    And do you see that in this email,

7   Terry Allan is forwarding you an email from

8   Vince Caraffi?

9        A.    Uh-huh.

10        Q.    Do you see that?

11        A.    Yes.

12        Q.    He says, "Hey Terry, could you do

13   me a favor and pass this along to Dr. Hall.  He

14   mentioned at the board meeting that he was

15   interested in attending the conference we are

16   hosting September 28," and he attaches a

17   brochure here.

18             Do you see that the brochure, in

19   that circle or oval that's kind of in the upper

20   right quadrant says, "The opiate epidemic

21   across the lifespan: Impact and

22   interventions" --

23        A.    I do see that.

24        Q.    -- do you see that?

25        A.    Huh-uh.

Page 126

1    Q.    Do you remember what board meeting

2    Vince Caraffi is talking about when he says

3    that you mentioned at a board meeting that you

4    were interested in a conference?

5    A.    No.

6    Q.    Do you remember hearing about the

7    opiate epidemic across the lifespan conference?

8    A.    I'm trying to remember if I went,

9    and I'm not sure if I went.  I may have

10    actually gone.

11    Q.    You may have gone, but you don't

12    remember for sure?

13    A.    I don't remember for sure, but

14    it's -- I feel like I may have gone.

15    Q.    Do you remember anything about the

16    conference?

17    A.    It was a huge -- in a huge

18    ballroom, you know, in a hotel.

19    Q.    Do you remember any particular

20    presentations from the conference?

21    A.    I didn't remember going,

22    so -- yeah, no.

23        I mean, you know, I'm

24    remembering -- I think I was there.  I could

25    not swear I was there, but I would bet I was

Page 127

1    there.

2         Q.    Why were you interested in

3    attending this conference?

4         A.    Because it's such a problem in my

5    practice.  At the time it was a big problem in

6    the practice.

7         Q.    This is in 2012, right?

8         A.    That's what the date says, yeah.

9         Q.    So by 2012, this was a big problem

10   in your practice?

11        A.    That's why I would have showed

12   interest in going and went, yeah.

13        Q.    Why are you interested in attending

14   conferences about issues that are a big problem

15   in your practice?

16        A.    It helps me address the problems

17   better.

18        Q.    Does attending conferences like

19   this inform your work as a member of the board

20   of the Cuyahoga County Board of Health?

21        A.    In some way I imagine it does.

22        Q.    In what way?

23        A.    Better education.

24        Q.    Okay.  You can set that aside.

25                    -  -  -  -  -

1              (Thereupon, Deposition Exhibit 4,

2              Designated Confidential, Email

3              Exchange with Attachment, Beginning

4              with Bates Label CUYAH_014260170,

5              was marked for purposes of

6              identification.)

7                    -  -  -  -  -

8         Q.    I'm showing you what has been

9    marked as Hall Exhibit 4.  This is a document

10   bearing the Bates stamp CUYAH_014260170 through

11   171.

12             Do you see that this is an email

13   from Terry Allan, addressed to you,

14   greg.hall@saberhealth.com, and others?

15        A.    Correct.

16        Q.    And this email is dated March 13,

17   2014; is that right?

18        A.    Yes.

19        Q.    In this email, Terry Allan says,

20   "Good morning.  We recently learned that CCBH

21   will be recognized for its work in coordinating

22   the Opiate Task Force of Cuyahoga County at the

23   annual meeting of Recovery Resources"; do you

24   see that?

25        A.    I do see that.

1       Q.    Did you attend the annual meeting
2    of Recovery Resources in 2014?
3       A.    I'm guessing you are going to show
4    me that I did.  I don't remember.
5       Q.    Do you remember attending?
6       A.    No.
7       Q.    You don't.  Okay.
8       A.    But I wouldn't be surprised.
9             No, no.  I'm sorry.
10      Q.    I actually don't think I'm going to
11   show you a document showing that you attended.
12            Do you remember anything about this
13   event?
14      A.    No.
15      Q.    Do you remember hearing about this
16   event at the time?
17      A.    I believe when I said that the
18   opioid task force was a model in the State of
19   Ohio, that this may have contributed to my
20   believing it was a model.
21      Q.    When you said it was a model, you
22   just mean that you generally know that it has
23   been recognized somehow in the state?
24      A.    Right.  That other organizations
25   felt that we were doing that right.

```
 1            Q.    If you look at the second to the
 2    last paragraph of Terry Allan's email, he says,
 3    "This is a very considerate gesture and an
 4    important distinction in addressing this very
 5    alarming public health issue."  Did I read that
 6    correctly?
 7            A.    You did.
 8            Q.    Do you agree with Terry Allan that
 9    the work -- strike.
10            Do you agree with Terry Allan that
11    issues related to opiate use present a very
12    alarming public health issue in Cuyahoga
13    County?
14            A.    I do.
15            Q.    Okay.  You can set that one aside.
16            Do you agree with Terry Allan that
17    in 2014, it was a very alarming health issue,
18    meaning opiate use was a very alarming health
19    issue?
20            A.    Yes.
21                          -  -  -  -  -
22                    (Thereupon, Deposition Exhibit 5,
23                    Designated Confidential, Email
24                    Exchange with Attachment, Beginning
25                    with Bates Label CUYAH_014167489,
```

Page 131

1              was marked for purposes of

2              identification.)

3                   -   -   -   -   -

4      Q.    I'm showing you what has been

5    marked as Hall Exhibit 5.  This is a document

6    bearing the Bates stamp CUYAH_014167489 through

7    492.  The way this email is produced, there is

8    this front cover page, and then there is the

9    email itself behind it.

10             Do you see from the front cover

11   page that this is a September 2014 email from

12   Vince Caraffi to you and Terry Allan?

13      A.    Yes.

14      Q.    And do you see that the subject

15   line is Role of the Prescriber Training?

16      A.    Yes.

17      Q.    Turning the page to the page ending

18   in 490, in this email Vince Caraffi says, "Good

19   morning, Dr. Hall.  I know you are aware of

20   CCBH's role in addressing the public health

21   epidemic of opioid abuse."

22             Do you agree with Mr. Caraffi that,

23   in 2014, there was public health epidemic

24   related to opioid abuse?

25             MR. RICHARDS:  Objection.

1          A.     Can I read it?

2          Q.     Sure.

3          A.     I don't remember this email either.

4                 Okay.  What's the question?

5          Q.     Do you agree with Mr. Caraffi that

6     in -- at the time in 2014, there was a public

7     health epidemic of opioid abuse?

8          A.     Yeah, I'm not aware of the

9     definition of epidemic, as I have said, so I

10    don't -- you know, I'm trying to not to -- I

11    think I just -- it was just of -- it wasn't

12    asking me if I agreed, it was just sort of

13    informational.

14         Q.     I'm asking if you agree.

15         A.     I trust his take.

16         Q.     Would you defer to Mr. Caraffi on

17    the assessment of the scope of the opioid

18    problem in Cuyahoga County?

19         A.     I would have to leave that to him.

20    You said don't do hearsay things, right?

21         Q.     Sure.  I'm just asking if you would

22    defer to him on that issue?

23         A.     I mean, I know what you are saying.

24    I'd have to see what his opinion is and

25    then --

Page 133

1          Q.     You see in the next sentence
2     Mr. Carafe says, "In 2014 we received a
3     five-year grant from the Ohio Department of
4     Health addressing contributing factors leading
5     to the significant increase in
6     misuse/fatalities from prescription medication,
7     opioids and benzodiazepines."
8               Do you recall -- are you familiar
9     with the grant that he's talking about?
10         A.     It sounds right.
11         Q.     Do you know what that grant was
12    called?
13         A.     No.
14         Q.     Did the board, meaning the board
15    members, vote to approve receipt of that grant?
16         A.     We vote to approve everything, in
17    terms of grant money.
18         Q.     In the next sentence, Mr. Carafe
19    says, "Working with the medical community is
20    one of the main components of the grant."  And
21    then he attaches this flyer for an event called
22    The Role of the Prescriber in Prescription Drug
23    Abuse.
24         A.     I looked at that.
25         Q.     Did you attend this event?

Page 134

1         A.    I don't believe I attended that

2    event.

3         Q.    When Mr. Caraffi says, "Working

4    with the medical community is one of the main

5    components of the grant," have you, as a member

6    of the medical community, done any work with

7    the task force related to this grant from the

8    Ohio Department of Health?

9         A.    No, I don't believe so.

10         Q.    You can set that aside.

11                    -  -  -  -  -

12              (Thereupon, Deposition Exhibit 6,

13              Designated Confidential, Email

14              Exchange with Attachment, Beginning

15              with Bates Label CUYAH_014322836,

16              was marked for purposes of

17              identification.)

18                    -  -  -  -  -

19         Q.    I'm showing you what has been

20    marked as Hall Exhibit 6.  This is a document

21    bearing the Bates stamp CUYAH_014322836 through

22    838.

23              Do you see at the top of the page

24    that this is an email from Terry Allan to you

25    in August of 2012?

Page 135

```
 1          A.    Yes.
 2          Q.    You can take a moment to look it
 3    over.
 4                Terry Allan says, "FYI, Greg," and
 5    he forwards you this flyer for an event called
 6    Prescribing Controlled Substances in Ohio
 7    During a Prescription Drug Abuse Crisis.
 8                Why did Terry Allan send this to
 9    you?
10          A.    Because I had an interest in
11    helping my patients who were addicted to pain
12    medicine.
13          Q.    How did Terry Allan know that you
14    had that interest?
15          A.    I would have had to -- I would have
16    had to have talked to him about that during the
17    board meeting.
18          Q.    Did you attend this event?
19          A.    No.
20          Q.    What did the Cuyahoga County Board
21    of Health have to do, if anything, with this
22    event?
23          A.    I don't know.
24          Q.    Have you ever attended an event
25    about prescribing practices for opioids?
```

1          A.    Yes.

2          Q.    What events have you attended about

3    prescribing practices for opioids?

4          A.    I attended an evening event that

5    was on at the hotel on Harvard that's right by

6    271.  I can't remember what it is.  But there

7    was an evening event there that I attended on

8    prescribing opioids.

9          Q.    When was that event?

10         A.    Years ago.

11         Q.    How many years ago, roughly?

12         A.    I don't know.  You may show me, so

13   I'll trust your judgment on that.  I don't

14   know.  I really don't.  But we could find it

15   out, but it was in that hotel that I'm blanking

16   on whether it was a Hilton or something, but it

17   was on the first floor, and it was in the

18   evening.

19         Q.    How would you go about finding out

20   when this event happened?

21         A.    Maybe call the hotel and ask them.

22         Q.    Do you know who put on this event?

23         A.    The one I went to?

24         Q.    Yes.

25         A.    No.

Page 137

1          Q.    Were there presentations at this
2    event?
3          A.    Yes.
4          Q.    What sort of presentations were
5    there at this event?
6          A.    It was discussing the appropriate
7    way to prescribe pain medicine and the
8    appropriate way to identify patients that may
9    be at risk for abuse.
10         Q.    Do you remember who presented at
11   the event?
12         A.    I believe Ted Parren presented.
13         Q.    Who is Ted Parren?
14         A.    He was a physician.
15         Q.    Where is he a physician?
16         A.    In Cleveland.  I mean, he's at St.
17   Vincent's, but he's also at other hospitals
18   too.
19         Q.    Do you know Dr. Parren?
20         A.    I've met him.
21         Q.    What did Dr. Parren present on?
22         A.    Sort of the profile of a patient
23   that might be at high risk for opioid abuse.
24         Q.    Did anyone else present at this
25   event?

1          A.     I'm sure they did.

2          Q.     Do you recall any other names or

3     affiliations of people who presented at the

4     event?

5          A.     No.

6          Q.     You said that the event discussed

7     appropriate ways to prescribe pain medications.

8     What did you learn about appropriate ways to

9     prescribe pain medications at this event?

10         A.     They went over, sort of, how to

11    calculate when a person is on too much, and

12    they talked about the equivalence, sort of,

13    between medications, when, you know, the opioid

14    content of one medication might be much

15    stronger, and so there is not equal -- how to

16    calculate what is too much and things of that

17    nature.

18         Q.     Did the presenters at that event

19    acknowledge that prescribing opioids may be

20    appropriate treatment for pain?

21         A.     I don't remember.  I would imagine

22    they did.

23         Q.     Did the presenters at that event

24    acknowledge that prescribing opioids might be a

25    medically necessary treatment for pain?

1        A.    I see that that's the same

2    statement that you made before.

3        Q.    In your view, can prescribing

4    opioids be an appropriate and medically

5    necessary treatment for pain?

6        A.    Yes.

7        Q.    Did this event include discussion

8    of any changes in prescribing practices or

9    standards around opioids?

10       A.    I think it did.

11       Q.    What were those changes?

12       A.    I don't remember.

13       Q.    Are you familiar with changes over

14   time related to the standards for appropriate

15   prescription of opioids?

16       A.    I'm aware of the changes, that

17   there have been changes and that the standards

18   have changed.

19       Q.    How have the standards changed?

20       A.    Can I say significantly?

21       Q.    Sure.  In what way --

22       A.    I'm not able to outline the

23   specific changes, but it's a challenge to keep

24   up with the changes, but I try to stay up on

25   them and I -- but I can't outline them for you

                                                  Page 140

1    right now.

2           Q.     When have the standards changed?

3           A.     Multiple times.

4           Q.     How about in the past ten years,

5    how have the standards changed?

6           A.     That's the timeframe when the

7    standards have changed.  I just read a change

8    that occurred that goes in effect, like, on the

9    23rd.

10          Q.     Of December?

11          A.     Of December.  Yes, I just read

12   those.

13          Q.     What is that, what did you read?

14          A.     I perused it.  It has to do with

15   offering naloxone in conjunction with opioids

16   to patients that seem that they are at an

17   increased risk for overdose.  That was kind of

18   what I took away from that most recent change.

19          Q.     And when you say that you saw this

20   recent change taking effect December 23rd,

21   who -- what is that a change to?  Is that a

22   change to a particular set of prescribing

23   guidelines or standards?

24          A.     It came from the Ohio State Medical

25   Board.

Page 141

1          Q.    Does the Ohio State Medical Board
2    have best practices for prescribing opioids?
3          A.    I think they do.
4          Q.    Do you keep up with those best
5    practices?
6          A.    Not specifically, because I really
7    try to avoid prescribing opioids now.
8          Q.    You say you try to avoid
9    prescribing opioids now.  Have you prescribed
10   opioids in the past?
11         A.    Yes.
12         Q.    How often have you prescribed
13   opioids in the past?
14              MR. RICHARDS:  I'm going to object.
15   This witness has been subpoenaed to testify
16   regarding his involvement as a member of the
17   board.  He's testified at length regarding that
18   today.  You are now far afield from his work at
19   the board, and you are getting into his private
20   medical practice.
21              You can answer the question, but I
22   think you are getting deeper and further and
23   further away from the subject matter of this
24   deposition.
25              MS. JAZIEWICZ:  I would just note

Page 142

1    for the record that Dr. Hall was -- we noticed

2    Dr. Hall's deposition as a witness in this

3    litigation, not in any particular capacity.

4         Q.    You can go ahead and answer.

5              MR. SCHUTTE:  And can I also add,

6    for the record -- this is Scott Schutte for

7    Rite Aid -- this witness testified earlier this

8    morning that his work in private practice

9    informs his ability to serve on the board of

10   Cuyahoga County Board of Health, and so for

11   that reason too, I think his testimony is

12   relevant.

13             MR. RICHARDS:  You can answer that.

14        A.    I have a problem answering.  I

15   don't know how to quantify the answer to your

16   thing, but when patients had pain requiring

17   more severe than what Infeds provide, I would

18   prescribe opioids.

19        Q.    And you say you try to avoid

20   prescribing opioids now.  At what point in time

21   did your prescribing practices change?

22        A.    I think they changed multiple

23   times.  As the requirements became more

24   complicated, I felt, because I'm in private

25   practice, I'm not affiliated with a large

Page 143

1    hospital system with the legal backbone, that

2    it would be best, as a private practitioner, to

3    really avoid prescribing opioids.

4            Q.    But you acknowledge that opioids

5    may be an appropriate and medically necessary

6    treatment for pain?

7            A.    I absolutely acknowledge that.

8                      -  -  -  -  -

9                 (Thereupon, Deposition Exhibit 7, A

10                Printout From Dr. Greg Hall's

11                Website, "About Dr. Greg Hall," was

12                marked for purposes of

13                identification.)

14                    -  -  -  -  -

15           Q.    Showing you what has been marked as

16   Hall Exhibit 7, this is a printout from a

17   website that's publicly available, so it is not

18   Bates stamped.  There is a URL at the bottom

19   right from drgreghall.com.

20                Do you recognize this document?

21           A.    I do.

22           Q.    What is this?

23           A.    It is a printout of what my website

24   shows.

25           Q.    So drgreghall.com is your website

Page 144

1    for your private practice --

2          A.    It is.

3          Q.    -- is that right?

4                And this specifically is a printout

5    of a web page titled "About Dr. Greg Hall,"

6    right?

7          A.    Yes.

8          Q.    And there is some information in

9    here about your background and your work.  Is

10   all of this information true and accurate?

11         A.    It may or may not be.  I

12   periodically update it.  It may not reflect

13   that I work for Cleveland State.

14         Q.    So it might not be up to date, but

15   it is, generally speaking, true and accurate?

16         A.    Generally speaking.  I would like

17   to think it's true and accurate, because I do

18   it myself.

19         Q.    You anticipated my next question,

20   which was whether you wrote this web page?

21         A.    Yes.

22         Q.    Did anybody else contribute to the

23   writing of this web page?

24         A.    I don't believe so, no.

25         Q.    If you turn to page 3 of this

Page 145

1    document, you can see the logo of the Cuyahoga

2    County Board of Health at the top, and

3    underneath that it says, "Dr. Greg Hall serves

4    on the Cuyahoga County Board of Health since

5    2010."  Why did you include this on your

6    website?

7         A.    Because I was talking about Dr.

8    Greg Hall.

9         Q.    Sure.  So the Cuyahoga County Board

10   of Health, serving on the board is one of the

11   things that you do in the community; is that

12   right?

13        A.    Correct.

14        Q.    And so you want your patients in

15   your private practice to know that, right?

16        A.    I want them to be aware of Dr. Greg

17   Hall, yeah.

18        Q.    And if you turn to page 8 of 17,

19   I'm looking at those page numbers on the top

20   right, on the top half of the page there, there

21   is a picture of the Cuyahoga Board of Health

22   members, and I believe that's you in the upper

23   left, right?

24        A.    That's correct.

25        Q.    Okay.  You can set that aside.

Page 146

```
 1                          -   -   -   -   -
 2                   (Thereupon, Deposition Exhibit 8,
 3                   Printout From Dr. Greg Hall's
 4                   Website, Painkillers Killing More
 5                   Than Just Pain, was marked for
 6                   purposes of identification.)
 7                          -   -   -   -   -
 8          Q.     I'm showing you what has been
 9    marked as Hall Exhibit 8, and this is another
10    printout from a publicly available website, so
11    it is not Bates stamped.
12                   And this is also from
13    drgreghall.com; is that right?
14          A.     Yes.
15          Q.     And this is a web page titled
16    Painkillers Killing More Than Just Pain; is
17    that right?
18          A.     That's correct.
19          Q.     So this is a different page, but on
20    the same website as Hall Exhibit 7 that we just
21    looked at, right?
22          A.     That's correct.
23          Q.     Did you write this web page?
24          A.     I did.
25          Q.     Did anybody else contribute to the
```

1    writing of this web page?

2        A.    I don't believe so.

3        Q.    Did anybody else contribute

4    research to this web page?

5        A.    I don't believe so.  Well, yeah.  I

6    mean, the screen shots of the tables, they --

7        Q.    Sorry.  Go ahead.

8        A.    They did those.  Yeah, I didn't do

9    those.  I didn't create the artwork.

10       Q.    So the sources you cite may have

11   done research but --

12       A.    Yeah.

13       Q.    -- as far as putting together this

14   web page, are you aware of any -- was anybody

15   else involved?

16       A.    No.

17       Q.    Okay.  So this is just you?

18       A.    It's just me.

19       Q.    Did you do research on this topic

20   before writing this web page?

21       A.    I would have had to, in order to

22   get the screen shots.

23       Q.    And what research did you do on

24   this topic?

25       A.    I would have gone to places to get

Page 148

1    these shots.  I mean, I would have gotten

2    information.  I mean, it would have been on web

3    based --

4         Q.    It would have been web-based

5    research?

6         A.    Yeah.  I did it at home, on my desk

7    at home.

8         Q.    About how much time would you

9    estimate you spent researching before writing

10   this web page?

11        A.    Not much.

12        Q.    When did you write this web page?

13        A.    I don't remember.

14        Q.    Was it within the past year?

15        A.    No.

16        Q.    Was it within the past five years?

17        A.    I can't even say that.  The website

18   migrated from an old website to a new website,

19   and the date would be the migration.  This was

20   an article I wrote quite a while ago.  It may

21   have been more than five years, I guess is what

22   I'm trying to say.  I wouldn't be surprised.

23        Q.    So it may have been more than five

24   years, but you don't remember when you wrote

25   this?

Page 149

1          A.    I don't remember, because it's been
2     a while.
3          Q.    Okay.  How long did you spend
4     writing this web page?
5          A.    I don't remember specifically, but
6     this is the article we were talking about
7     earlier.  But it wasn't -- it wouldn't have
8     been long -- I wouldn't have spent a long time
9     on it.
10         Q.    So earlier you referenced that you
11    wrote an article on your website for your
12    patients --
13         A.    Correct.
14         Q.    -- about substance abuse and
15    painkillers, right?
16         A.    Correct.
17         Q.    This is the article that you were
18    referring to?
19         A.    Correct.
20         Q.    Did anyone else review this article
21    before you posted it on your website?
22         A.    Unfortunately, no.
23         Q.    So this web page has not been peer
24    reviewed?
25         A.    No.

1        Q.      Is this web page something that you
2    would list as a publication on a CV?
3        A.      I might.
4        Q.      But this web page is different from
5    something like a peer-reviewed publication?
6        A.      Very different.
7        Q.      How is it different?
8        A.      It hasn't been peer reviewed, I'm
9    not an authority in pain medicine.  I could go
10   on.  This is purely from me to my patients.
11       Q.      So you are not an authority in pain
12   medicine?
13       A.      No.
14       Q.      You have no special expertise in
15   pain medicine?
16       A.      Absolutely not.
17       Q.      If you turn to -- actually, if you
18   look at the very bottom of this page, you say,
19   "Look at the stars who have accidently died
20   from pain medication overdoses and click on the
21   picture to read the article on Huffington
22   Post."
23              And then on the next page, there
24   are those little pictures, "Celebrity
25   Overdoses: Deaths highlight prescription drug

1    epidemic"; do you see that?

2         A.    I see it, yes.

3         Q.    And there is four celebrities

4    pictured there.  Do you know who any of those

5    celebrities are?

6         A.    I know Michael Jackson.

7         Q.    What do you know about the

8    circumstances of Michael Jackson's death?

9         A.    It was from a drug overdose.

10        Q.    Do you know what drug Michael

11   Jackson overdose on?

12        A.    He overdosed on propofol.

13        Q.    What is propofol?

14        A.    It's a medication to help you

15   sleep.

16        Q.    Is propofol an opioid?

17        A.    No.

18        Q.    If you look at the paragraph below

19   this picture we have just been talking about,

20   it says, "Here are the facts," and there are

21   some numbers there about the number of people

22   that die from overdoses on opioid drugs.

23        A.    Uh-huh.

24        Q.    What is your source for the figures

25   in that paragraph?

Page 152

1          A.     Well, it says CDC.

2          Q.     So it says source CDC on this

3     picture, National Data.  Are you saying that

4     that source is the same source for the

5     paragraph where you list numbers above?

6          A.     No, I'm not saying that.  I'm just

7     saying that's where the picture comes from.

8          Q.     Okay.  What about the numbers in

9     the paragraph above, 46 people per day?

10         A.     I don't know.

11         Q.     17,000 per year.  You don't know?

12         A.     No, I don't remember.

13         Q.     If you look at page 3 of 9, looking

14    at the page numbers on the bottom right, at the

15    top, you write, "How do overdoses occur?  Well,

16    the answer varies from person to person, but

17    most occur when combined with another

18    medication or another substance, alcohol or

19    other drugs."  Did you write that?

20         A.     I would have to, yes.

21         Q.     And would you still say that that

22    is true today, that most overdoses occur when

23    individuals combine medications or substances?

24         A.     I was thinking of it in terms of

25    like I've got a very low heroin-using

Page 153

1    population in my practice, so this was more

2    thinking about educating them in terms of ways

3    they might be at risk.

4              So my phrasing could easily be

5    inaccurate, but I was thinking of my patients.

6         Q.    Okay.  So you said that your

7    patients do not generally or not frequently use

8    heroin, right?

9         A.    Very few.

10         Q.    Do your patients use prescription

11    opioids?

12         A.    At the time they were.  And they do

13    now.  I'm sorry, to be clear, yes.

14         Q.    Okay.  And so when you talk about

15    the dangers of combining substances, you are

16    talking in part about prescription opioids; is

17    that right?

18         A.    Yes.

19         Q.    If an individual combines

20    prescription opioids with other medications or

21    other substances, is that a medically

22    legitimate use of those medications?

23              MR. CIACCIO:  Objection to form.

24              MR. RICHARDS:  Objection.

25         A.    Are you saying like if someone

Page 154

1    takes a pain medicine and drinks vodka with it,

2    is that medically appropriate?

3         Q.    Right.

4         A.    No, that would be medically

5    inappropriate.

6         Q.    So you would classify that as

7    misuse of the medications?

8         A.    Well, a lot of times they don't

9    know.

10        Q.    Okay.

11        A.    And so it is not a misuse, it's

12   just an accidental use.

13        Q.    So that's part of what you're doing

14   on this web page is informing patients that

15   they shouldn't do that?

16        A.    Hoping to.

17        Q.    If you turn to page 4 of this

18   document, the top paragraph there, you say,

19   "Nationwide, pharmacies received and ultimately

20   dispensed the equivalent of 69 tons of pure

21   oxycodone and 42 tons of pure hydrocodone in

22   2010 alone."  What is your source for those

23   figures?

24        A.    I don't have one.

25        Q.    You don't have one, meaning you

1      don't have one now or you didn't have one at

2      the time that you wrote this?

3             A.     I would have had a source at the

4      time.

5             Q.     But you don't remember what it was?

6             A.     No, ma'am.

7             Q.     And I think you said that you did

8      research for this web page by looking around

9      the internet; is that right?

10            A.     You make it sound different, but,

11     yeah, it was on the internet that I got this

12     information, correct.

13            Q.     Okay.  Are you familiar with the

14     role of the Drug Enforcement Agency in the

15     pharmaceutical supply chain?

16            A.     Probably not in this setting.  Not

17     to answer a lot of questions from it.  I'm

18     aware of the DEA, yes.

19            Q.     You are generally aware of the DEA?

20            A.     I am, yes.

21            Q.     Are you aware that the DEA

22     regulates controlled substances?

23            A.     I think so, yes.

24            Q.     Are you familiar with the DEA's

25     aggregate production quotas for controlled

Page 156

1    substances?

2         A.    I'm not.

3         Q.    Are you aware that the DEA has

4    quotas for production of controlled substances?

5         A.    No.

6         Q.    If you can turn to page 5 of this

7    document, there is -- the first paragraph on

8    the page below the picture says, "Providers

9    treating chronic, nonterminal pain patients who

10   have received opioid painkillers equal to or

11   greater than 80 milligrams MED, morphine

12   equivalent daily dose, for longer than three

13   continuous months should strongly consider

14   doing the following to optimize therapy and

15   help ensure patient safety," and you list some

16   actions there that providers should consider

17   taking; is that right?

18        A.    That's what it says, yes.  It's

19   wrong now.  It was accurate at the time.

20        Q.    How is it wrong now?

21        A.    There is no -- I don't prescribe

22   any for -- you know, the length of time is

23   wrong.  I don't know what the equivalent, but I

24   betcha that's been lowered.

25        Q.    So when you say that the length of

Page 157

1    time is wrong, what do you mean by that?

2        A.    Now there is no one in my practice

3    that gets medications even for a week, opioids.

4    So three months is just so far off the radar,

5    that that's just not accurate.

6        Q.    So you are saying that you would no

7    longer prescribe opioid pain killers equal to

8    or greater than 88 milligrams MED for three

9    continuous months?

10            MR. RICHARDS:  Objection.  You can

11    answer.

12        A.    I'm saying that this is inaccurate.

13        Q.    How is this inaccurate?

14        A.    The three months.  I can't say the

15    80, I betcha it's not 80, because it has been

16    lowered, based on the time, and I know that

17    three months is wrong.

18        Q.    The first part of this sentence

19    talks about treating chronic, nonterminal pain

20    patients.  Why did you specify nonterminal pain

21    there?

22        A.    Because that was chronic pain, and

23    that's wrong too.  I mean, they are supposed to

24    now be referred to a pain management specialist

25    for chronic, nonterminal pain.

1    Q.    So you are saying that you wouldn't

2  treat somebody with chronic, nonterminal pain,

3  you would refer them to a pain management

4  specialist; is that right?

5    A.    In my practice, correct, and in the

6  nursing home, correct.

7    Q.    But at the time that you wrote

8  this, which you said was a few years ago, you

9  might treat patients with chronic, nonterminal

10 pain?

11   A.    Correct.

12        MR. CIACCIO:  Objection to form.

13 Misstates testimony.

14   A.    Yeah.  I wouldn't have written it

15 unless I was prescribing pain medicine at the

16 time that I wrote it.

17   Q.    So at the time you were writing it,

18 you were following these prescribing -- this

19 prescribing advice that you list here; is that

20 right?

21   A.    Probably.

22   Q.    So at the time, you specified

23 nonterminal pain patients.

24   A.    Uh-huh.  Yes.

25   Q.    Does that mean that prescribing

                                    Page 159

1    standards at the time were different for

2    terminal pain patients?

3                 MR. RICHARDS:  Objection.

4         A.    Yes.

5         Q.    Currently, are prescribing

6    standards different for nonterminal and

7    terminal pain patients?

8         A.    I believe they are.

9         Q.    How are they different?

10                MR. RICHARDS:  Objection.

11        A.    Sorry.  The requirements are looser

12   for terminal pain.

13        Q.    When you say they are loser for

14   terminal pain, do you mean that it may be more

15   appropriate to prescribe opioids?

16        A.    Yes.

17        Q.    And it may be more appropriate to

18   prescribe opioids in greater doses?

19        A.    Yes.

20        Q.    And it may be more appropriate to

21   prescribe opioids over a greater length of

22   time?

23        A.    Yes.

24        Q.    So some of the factors that we have

25   been talking about that affect prescribing

Page 160

1     standards include whether the pain is

2     terminal -- or whether the patient is terminal?

3              A.    Correct.

4              Q.    It also includes the dose; is that

5     right?

6              A.    Correct.

7              Q.    It includes the length of time that

8     the patient needs the medication; is that

9     right?

10             A.    Correct.

11             Q.    What are some of the other factors

12    that you might consider in deciding whether

13    prescribing opioids is appropriate?

14             A.    What we call comorbidities, what

15    other issues, medical issues they might have

16    going on with them.

17             Q.    And it is your role, as a doctor,

18    to weigh risks and benefits, consider these

19    factors, and make a decision about what is

20    appropriate treatment?

21             A.    Correct.

22             Q.    If you look at the bottom of this

23    page, one of the --

24                   MR. RICHARDS:  What page are you

25    on?

Page 161

1          Q.     I'm sorry.  Page 5 still.

2                 One of the practices that you

3     recommended at the time for providers was

4     active use of OARRS; do you see that?

5          A.     I do.

6          Q.     What is OARRS?

7          A.     It is a website you can go to to

8     see what other prescribers may be prescribing

9     pain medicines for patients.

10         Q.     Do you still recommend that

11    providers consult OARRS?

12         A.     The regulations actually recommend

13    it, yes.

14         Q.     Do you consult OARRS in your

15    practice?

16         A.     In my office, I use so little, when

17    I do prescribe it, I will check, but it's very

18    little use.

19         Q.     Okay.  So understanding that your

20    practices and what you would recommend have

21    changed since the time you wrote this web page,

22    at the time you wrote this web page, did you

23    state anywhere that opioids should never be

24    prescribed?

25         A.     No.

1        Q.    Would you state that today --

2        A.    No.

3        Q.    -- that opioids should never be

4    prescribed.

5            MS. JAZIEWICZ:  Let's take a

6    five-minute break.

7            THE VIDEOGRAPHER:  Off the record,

8    12:40.

9            (Recess taken.)

10            THE VIDEOGRAPHER:  On the record,

11    1:31.

12        Q.    Welcome back, Dr. Hall.

13        A.    Thank you.

14        Q.    We were talking some before the

15    break about prescribing guidelines for opioids.

16        A.    Uh-huh.

17        Q.    Do you know if the Cuyahoga County

18    Board of Health does any work regarding

19    prescribing guidelines?

20        A.    I don't know.

21        Q.    Have you ever heard of someone

22    named Dr. Emily Metz?

23        A.    No.

24        Q.    Have you heard of a Dr. Joan Papp,

25    P-A-P-P?

Page 163

1          A.      Maybe.  I don't know.  Not for

2     sure.

3          Q.      How about Dr. Melanie Gelembiewski?

4          A.      No, and well done.

5          Q.      I'm Polish, so easy for me to say.

6                  Are you familiar with any work that

7     the Cuyahoga County Board of Health has done

8     with MetroHealth related to opioids?

9          A.      Other than what you showed me, the

10    email you showed me, not really, no.

11         Q.      Are you familiar with a grant

12    called the Injury Prevention Grant from the

13    State of Ohio?

14         A.      No.

15         Q.      Do you know whether the Cuyahoga

16    County Board of Health currently receives

17    funding from that grant?

18         A.      No.

19         Q.      Do you know whether the Cuyahoga

20    County Board of Health has ever received

21    funding from that grant?

22         A.      No.

23         Q.      Does the board, meaning the members

24    of the board of the Cuyahoga County Board of

25    Health, evaluate or review employees of the

Page 164

1    Cuyahoga County Board of Health?

2        A.    Sometimes, yes.

3        Q.    In what kinds of contexts might the

4    board members review employees of the Cuyahoga

5    County Board of Health?

6        A.    We review -- well, we do salaries;

7    we did -- certainly did a revision of their pay

8    grades; we congratulate promotion, people that

9    are promoted.

10       Q.    Are board members involved in

11   performance reviews for employees of Cuyahoga

12   County Board of Health?

13       A.    No.

14       Q.    Does the board, meaning members of

15   the board, evaluate or review implementation of

16   programs at the Cuyahoga County Board of

17   Health?

18       A.    We review them when we discuss

19   them, but we don't really evaluate them.

20       Q.    Do the board members ever provide

21   feedback on the implementation of programs at

22   the Cuyahoga County Board of Health?

23       A.    I think we do, to a certain extent.

24       Q.    What kind of feedback might you

25   provide?

1      A.    You know, if we -- if I hear good

2   things out in the community about certain

3   things, we will say we are doing a good job

4   with this, or if I'm not hearing about things,

5   I may say we need more information out in the

6   community about that.

7      Q.    Can you think of particular

8   instances where you have provided that kind of

9   feedback?

10     A.    Not off the top of my head.

11     Q.    Does the board provide any kind of

12   formal feedback?

13          Does the board, meaning members of

14   the board, provide any kind of formal feedback

15   on the implementation of programs at the

16   Cuyahoga County Board of Health?

17     A.    Formal in the sense of, you know,

18   our meetings, there are minutes, and I don't

19   know if that means formal.

20     Q.    Are the board members ever asked to

21   assess the effectiveness of any programs of the

22   Cuyahoga County Board of Health?

23     A.    No.

24     Q.    Do the board members issue any kind

25   of written reviews of programs at the Cuyahoga

Page 166

1    County Board of Health?

2         A.    I don't.

3         Q.    Do others?

4         A.    I'm not aware.

5         Q.    Dr. Hall, are you a lawyer?

6         A.    No.

7         Q.    Are you a pharmacist?

8         A.    No.

9         Q.    Are you an accountant?

10         A.    No.

11         Q.    Are you a statistician?

12         A.    No.

13         Q.    Do you have any training or

14    expertise in pharmacology?

15         A.    No.

16         Q.    Do you have any training or

17    expertise in behavioral health?

18         A.    Well, maybe I answered too -- as

19    part of medical school, you know, we had to

20    take pharmacology, so I guess I did have some

21    training in pharmacology, but I wouldn't say

22    that I have an expertise in it.

23              So when you are putting training

24    and expertise together, I sort of was hanging

25    on the expertise, and I don't have any

Page 167

1  expertise in it, but I do have training.

2          Q.    Okay.  Thank you for clarifying

3  that.

4                So you have some training in

5  pharmacology from medical school?

6          A.    Correct.

7          Q.    Beyond your basic training in

8  pharmacology in medical school, do you have any

9  expertise in pharmacology?

10         A.    No.

11         Q.    Do you have any training in

12 behavioral health?

13         A.    Yes.

14         Q.    What training do you have in

15 behavioral health?

16         A.    My undergraduate degree was in

17 psychology, and we had behavioral health

18 classes in the first two years of medical

19 school, and then we had psychiatry rotations in

20 medical school as well.

21                And University Manner has a

22 psych -- a significant psychiatric population,

23 and as the medical director, I'm not saying I

24 have any expertise, but I deal with the

25 psychiatrists in that sense.

1             So I probably have a little bit

2     more psychiatric exposure than the average

3     internist.

4          Q.    Okay.  So you have some exposure to

5     behavioral health from your psychology degree,

6     from medical school, and through your work at

7     University Manner, which is a nursing home; is

8     that right?

9          A.    Correct.

10         Q.    Do you have any special expertise

11    in mental health issues?

12         A.    No.

13         Q.    Beyond your undergraduate degree in

14    psychology, do you have any special expertise

15    in psychology?

16         A.    No.

17         Q.    Do you have any training in

18    epidemiology?

19         A.    No.  Well, I mean, so there may

20    have been a little epidemiology in medical

21    school.  They try to cover a lot of things, but

22    I'm not -- I'm a general internist, so I do not

23    claim to have an expertise in a lot of things.

24         Q.    So beyond touching on epidemiology

25    in medical school, you have no special training

Page 169

1    or expertise in epidemiology?

2         A.    No.   That's correct.

3         Q.    Do you have any training in

4    toxicology?

5         A.    No -- well, yes, again, in medical

6    school, but I wouldn't profess to be able to

7    discuss it.

8         Q.    So beyond basic training in medical

9    school, you have no special expertise in

10   toxicology?

11        A.    True.

12        Q.    Do you have any special expertise

13   in addiction medicine?

14        A.    No.

15                     -   -   -   -   -

16             (Thereupon, Deposition Exhibit 9,

17             Designated Confidential, Email

18             Exchange, Beginning with Bates Label

19             CUYAH_01467892, was marked for

20             purposes of identification.)

21                     -   -   -   -   -

22        Q.    Showing you what has been marked as

23   Hall Exhibit 9, this is a document bearing the

24   Bates stamp CUYAH_014167892 through 893.  And

25   again, this is an email that's produced with a

1    cover page and then there is the email.

2         A.    Uh-huh.  Yes, I'm sorry.

3         Q.    So if you look at the page ending

4    in 893, you see there is an email exchange here

5    between you and someone named Dee Samosky,

6    right?

7         A.    Correct.  Dee was an administrator.

8         Q.    Is she is an administrator at the

9    Cuyahoga County Board of Health?

10        A.    That's correct.

11        Q.    And this was an email exchange in

12   October of 2014, and if you look at the bottom

13   email in the chain, Dee says, "Here is Terry's

14   pharmacy," and she gives the address and phone

15   number of a pharmacy.

16        A.    Uh-huh.  Yes.

17        Q.    Who is the Terry that she is

18   talking about there?

19        A.    Terry Allan.

20        Q.    Terry Allan.  And then you respond,

21   asking, "What is his birth date?", and she

22   responds with his birth date; is that right?

23        A.    Correct.

24        Q.    Why was Dee Samosky sending you

25   Terry's pharmacy and birth date?

Page 171

1          MR. RICHARDS:  I'm going to put an

2    objection on the record here.  In the event

3    that this correspondence deals with anything

4    that would constitute something within the

5    physician-patient privilege, I would instruct

6    you not to answer that question.

7          MR. CIACCIO:  And as counsel for

8    Terry Allan and the board of health, I would

9    put on an objection that it is improper to ask

10   any questions that may be bordering on personal

11   medical information related to Terry Allan, and

12   I would request that the witness does not

13   disclose any personal medical information

14   related to Terry Allan.

15        Q.    Without disclosing any personal

16   medical information or violating a privilege

17   that you have with Mr. Allan, can you answer

18   the question?

19        A.    No.

20        Q.    Okay.  Are you Mr. Allan's doctor?

21          MR. RICHARDS:  Objection.

22   Objection.  Do not answer that question.

23          MR. CIACCIO:  Same objection on

24   behalf of Terry Allan.

25          MR. RICHARDS:  We are far afield

Page 172

1    now.

2            MS. JAZIEWICZ:  Okay.  This is a

3    document produced in the litigation.

4            MR. RICHARDS:  That's fine.

5            MS. JAZIEWICZ:  I'm just asking --

6            MR. RICHARDS:  You are asking him

7    physician-patient privileged questions.  I'm

8    going to instruct him not to answer.  If you

9    want to get David Cohen on the phone, we can do

10   that right now.

11        Q.   Is this email exchange relevant in

12   any way to your work on the Cuyahoga County

13   Board of Health?

14        A.   It would not have taken place if I

15   was not on the Cuyahoga County Board of Health.

16        Q.   Was this an email exchange that you

17   had within the scope of your work as a board

18   member on the Cuyahoga County Board of Health?

19            MR. RICHARDS:  Objection.

20        Q.   That's all I want to know.

21            MR. RICHARDS:  I'm instructing you

22   not to answer any more questions on this

23   subject matter.

24            MR. SCHUTTE:  I want to put an

25   objection on the record that you are asserting

Page 173

1    the physician-patient privilege without letting

2    the witness answer the question of whether the

3    person being referenced was his patient.

4                So there is no predicate for that

5    privilege being asserted.  I don't know where

6    this is going to go, but I think it is

7    important to have that issue on the record as

8    well.

9                MR. CIACCIO:  And just to be clear,

10   our objection is whether or not he was his

11   physician.  He's not -- he cannot disclose, and

12   Terry Allan's medical history is not an issue

13   in this litigation.

14               MS. JAZIEWICZ:  I'm not asking

15   about Terry Allan's history.

16               MR. CIACCIO:  Well, that's what I'm

17   saying.

18               MS. JAZIEWICZ:  I'm just asking if

19   this document has anything to do with Dr.

20   Hall's work on the board of health.

21               MR. CIACCIO:  No, I understand.  I

22   object to him answering the question about

23   whether he is Terry Allan's physician or any

24   questions that may at all somehow disclose

25   Terry Allan's medical information, whether or

Page 174

1    not he's his physician or not.

2              MR. SCHUTTE:  You can't assert a

3    physician-patient privilege if the record isn't

4    clear that there is a physician-patient

5    relationship.

6              MR. CIACCIO:  I'm not asserting a

7    physician-patient privilege.  I'm asserting a

8    privilege that there is a witness in this case

9    and there is no relevancy and there is no basis

10   to break his federal right with respect to his

11   medical information.

12              If Terry Allan was sitting here, I

13   wouldn't let Terry Allan talk about his own

14   medical history, just as you wouldn't let your

15   witnesses talk about their medical history.  So

16   we are not getting into Terry Allan's medical

17   history, whether or not Dr. Hall is Terry

18   Allan's physician.

19              MS. JAZIEWICZ:  I'm just asking

20   whether there is any relevancy.

21              MR. CIACCIO:  I understand.  I'm

22   responding to counsel's, I guess, objection to

23   our objection, not necessarily your most

24   recently asked question.  He went back to a

25   previous question.

1          MR. SCHUTTE:  Right.  And the

2     reason I did was because one of the objections

3     asserted was an instruction not to answer

4     because of the doctor-patient privilege, and my

5     only point is that whatever -- I understand

6     your objection and I understand where you're

7     going with it, and I'm not necessarily

8     disagreeing.

9          All I'm saying is that you are

10    asserting a doctor-patient privilege, but not

11    letting the witness answer a question about

12    whether there is a doctor-patient relationship,

13    that objection is invalid.

14          MR. CIACCIO:  Okay.

15          MR. RICHARDS:  And I would respond

16    that the patient -- or the doctor was asked a

17    question as to whether or not he could respond

18    to this line of questioning without getting

19    into anything like that, and he answered no.

20          So I would suggest that the record

21    suggests to the contrary, and I'm going to

22    instruct him not to answer.  So if you want to

23    call the Court on it, we can call the Court on

24    it.  If you want to put it at the end, we can

25    call the Court later, but I would like it if we

Page 176

1    could move forward with this deposition, since

2    he's now been here for several hours.

3                    MS. JASIEWICZ:  We can move

4    forward.

5                         -   -   -   -   -

6                    (Thereupon, Deposition Exhibit 10,

7                    Cuyahoga County Board of Health,

8                    2010 Annual Report, was marked for

9                    purposes of identification.)

10                        -   -   -   -   -

11        Q.    Showing you what has been marked as

12   Hall Exhibit 10, this is a document taken from

13   the Cuyahoga County Board of Health's website,

14   so it is publicly available and is not Bates

15   stamped.  You can take a moment to look it

16   over.

17        A.    Thank you.

18              Okay.

19        Q.    Dr. Hall, have you seen this

20   document before?

21        A.    I don't remember seeing it before,

22   but I'm sure I did.

23        Q.    Is this the 2010 annual report of

24   the Cuyahoga County Board of Health?

25        A.    That's what it says.

1      Q.    And if you look on the inside

2   cover, you see there is a photo there of

3   members of the board, and you are pictured, and

4   your name appears below it, right?

5      A.    Correct.

6      Q.    If you could please turn to page 9

7   of this document.  There is a heading here that

8   says Unintentional Prescription Drug Poisonings

9   and Unused Medications.  Have you read this

10  page of this document before?

11     A.    No.

12     Q.    Do you think that you ever read it,

13  or do you just not remember?

14     A.    I would bet I've never read it.

15     Q.    If you look at the first sentence

16  there, it say, "According to the Ohio

17  Department of Health, recent statistics show an

18  alarming trend in Ohio, an increase in

19  prescription drug abuse and overdose."  Did I

20  read that correctly?

21     A.    You did.

22     Q.    At the time that this document was

23  published in 2010, were you aware that there

24  had been an increase in prescription drug abuse

25  and overdoses in Ohio?

1           MR. RICHARDS:  Objection.

2      A.    I believe I probably was.

3      Q.    At the time this document was

4  published in 2010, had you already seen

5  problems with opioid use amongst your patients?

6      A.    I probably had.

7      Q.    And what sort of problems had you

8  seen at that point in 2010 amongst your

9  patients with opioid use?

10      A.    Addiction, signs of addiction.

11      Q.    Thinking about that 2010 time

12  period, how prevalent would you describe the

13  problem with opioid use in the community being

14  at that point?

15      A.    Fairly prevalent.

16      Q.    If you look at the next sentence

17  here, it says, "A new education and awareness

18  campaign was recently launched by ODH to

19  address this trend.  This campaign,

20  Prescription for Prevention: Stop the Epidemic,

21  includes," and then it lists various things

22  that the campaign does to stop the problem.

23           Was there, in your view, an

24  epidemic of prescription drug abuse in Cuyahoga

25  County in 2010?

Page 179

1           MR. RICHARDS:  Objection.  Asked
2    and answered.
3           A.    Yeah.  Remember, I'm stuck on the
4    epidemic thing.  I don't know.  There was a
5    problem in Cuyahoga County at the time.
6           Q.    So you are not comfortable using
7    the word epidemic, but there was a problem in
8    Cuyahoga County in 2010?
9           A.    Correct.
10          Q.    If you see -- if you look at the
11    first bullet point that's listed under facts
12    illustrating the magnitude of the problem, it
13    say, "In 2007, unintentional drug poisoning
14    became the leading cause of injury death in
15    Ohio, surpassing motor vehicle crashes and
16    suicides for the first time on record."  Did I
17    read that correctly?
18          A.    You did.
19          Q.    In 2007, was there a problem with
20    opioid drug abuse in Cuyahoga County?
21          A.    I think, based on that statement,
22    yes.
23          Q.    Based on your own observations in
24    the community, was there a problem in 2007?
25          A.    I believe so.

1          Q.    If you look at the next paragraph
2     under the bullet points, the first sentence
3     there says, "Cuyahoga County is one of the top
4     five counties in Ohio for reported prescription
5     drug overdoses."  Were you aware of that fact
6     in 2010?
7          A.    I probably wasn't aware of that
8     fact, but I take it, I mean, I would believe it
9     if --
10         Q.    Do you recall, when you joined the
11    board in 2007, do you recall seeing any
12    presentations to the board about the opioid
13    problem at that point?
14         A.    I don't recall to that extent, but
15    I wouldn't be surprised if you said there were.
16         Q.    And before you joined the board in
17    2010, had you already observed problems with
18    opioids amongst your patients?
19         A.    Yes.
20         Q.    If you look -- continuing with that
21    paragraph, it say, "In order to increase
22    efforts to combat this growing public health
23    problem, the Cuyahoga County Prescription For
24    Prevention Coalition was formed in June 2010."
25              And then the last sentence says,

Page 181

1    "The Cuyahoga County Board of Health is an

2    active member of this coalition."

3                    Do you remember the Cuyahoga County

4    Board of Health being involved in the Cuyahoga

5    County Prescription For Prevention Coalition?

6            A.     No, ma'am.

7            Q.     Do you know how that coalition was

8    funded?

9            A.     No.

10           Q.     Did the Cuyahoga County Board of

11   Health provide resources to that coalition?

12           A.     I know nothing about the coalition.

13           Q.     Since the time of this document in

14   2010, has the opioid problem in Cuyahoga County

15   gotten better or worse?

16           A.     It has gotten worse.

17           Q.     How about since 2015?

18           A.     I think it has plateaued, to a

19   certain extent, from my perspective.

20           Q.     And what are you basing your

21   perspective on there?

22           A.     My patients, not the board of

23   health.

24           Q.     So since 2015, based on your

25   observations of your patients, you would say

Page 182

1    that the problem with opioid use in Cuyahoga

2    County has plateaued; is that right?

3          A.    Yeah.  I have a predominant African

4    American population, so, yes.

5          Q.    Has the problem with opioid use in

6    Cuyahoga County decreased at all in the past

7    few years?

8          A.    I haven't committed the statistics

9    to memory.

10          Q.    Based on what you have observed

11    amongst your patients --

12          A.    Well, I don't have a Cuyahoga

13    County, sort of, base for my patients.  So

14    comparing them would be apples and oranges.  I

15    feel like we are making progress in the opioid

16    situation, but I can't speak for whether we

17    actually are, but I feel like we are.

18          Q.    If you look at the right column of

19    this page, the top sentence there says, "A

20    related problem that may contribute to the

21    risks outlined above is the disposal of unused

22    prescription medications"; do you see that?

23          A.    I see it.

24          Q.    Do you agree that the misuse of

25    undisposed prescription medications contributes

Page 183

1    to the opioid problem in Cuyahoga County?

2          A.    Yes.

3          Q.    If you look at the last sentence of

4    that paragraph, it says, "Alternatively many

5    people simply leave unused medications in their

6    cupboards or medicine cabinets, which means

7    they are available for misuse by teens or

8    others seeking recreational drugs."

9              If a teenager takes a drug from a

10   medicine cabinet, is that a legitimate medical

11   use of that drug?

12             MR. CIACCIO:  Objection to form.

13             MR. RICHARDS:  Objection.

14         A.    I don't believe so.

15         Q.    You can set that document aside.

16                  -   -   -   -   -

17             (Thereupon, Deposition Exhibit 11,

18             Designated Confidential, June 2010

19             Email Exchange, Beginning with Bates

20             Label CUYAH_012344074, was marked

21             for purposes of identification.)

22                  -   -   -   -   -

23         Q.    I'm showing you what has been

24   marked as Hall Exhibit Number 11.  This is a

25   document bearing the Bates stamp

Page 184

1    CUYAH_012344074 through 076.

2              And you see this is an email chain.

3    If you look at the second page of this

4    document, about halfway down the page, there is

5    an email there from you to Terry Allan.  This

6    is dated June 23, 2010, and you say, "I need a

7    resource for disposal of medication in our

8    nursing homes.  Can you help?"; is that right?

9         A.    That's correct.

10        Q.    Do you remember asking Terry Allan

11   about resources for disposal of medications in

12   2010?

13        A.    I remember it now.

14        Q.    Why were you asking Terry Allan for

15   resources for the disposal of medication in

16   nursing homes in 2010?

17        A.    I believe I witnessed a

18   presentation that talked about the disposal --

19   or medications, and they are not being properly

20   disposed of, and I then applied that new

21   knowledge to the nursing home I was in, saying,

22   well, how do you dispose?  I mean, are you

23   flushing it, are you -- and I found that they

24   didn't have a plan for how they were disposing

25   of it, so I was trying to establish one.

Page 185

```
 1         Q.    Where did you see that
 2    presentation?
 3         A.    I'm assuming it was at a board of
 4    health meeting, but I don't know.  I don't
 5    remember is the right answer.  But I would have
 6    called Terry, if I had seen it in conjunction
 7    with the board of health, but I don't remember
 8    what the meeting was.
 9         Q.    So you think you may have seen it
10    at a board of health meeting, but you can't
11    remember specifically?
12         A.    Because I called Terry.
13         Q.    Got it.  What kind of medications
14    were you referring to when you say, "I need a
15    resource for disposal of medications"?
16         A.    I think it was medications in
17    general.
18         Q.    Would that include opioids?
19         A.    It would include opioids.
20         Q.    So your patients in nursing homes
21    in 2010 included patients who had prescription
22    opioids; is that right?
23         A.    I'm sure they did.
24         Q.    What about your patients in nursing
25    homes today, do those include patients that
```

Page 186

1    have prescriptions for opioids?

2         A.    Yes.

3         Q.    You work in nursing homes.  You

4    also work in your private practice.  Is there a

5    difference between nursing home patients and

6    your private practice patients, in terms of the

7    prevalence of opioid prescriptions?

8         A.    Yes.

9         Q.    What is that difference?

10        A.    There is much more in the nursing

11   home.

12        Q.    Why is that?

13        A.    They have more acute issues, hip

14   replacement, knee replacement, you know,

15   post-orthopedic issues, reasons that you are in

16   the hospital.  The nursing home is sort of an

17   overflow for that.

18        Q.    And in your private practice, your

19   patient population, are you saying, has fewer

20   such acute problems?

21        A.    Yeah.  Yes.

22        Q.    What is the primary patient

23   population that you see in your private

24   practice?

25        A.    In what way, African American?

1          Q.    Yes, demographically, generally how
2     would you describe them?
3          A.    Male, females, probably 90 percent
4     African American, 10 percent everything else.
5     My oldest patient in the office is probably 92,
6     I have 107-year-old in a nursing home, and I
7     don't see anyone under -- I rarely see people
8     under 18.  Sometimes the parents will be a
9     patient, and they will ask me to see a 16 or
10    17-year-old, and I say, if I don't have to deal
11    with the parent, I will see them for some
12    issues, but generally, officially, it is 18 or
13    older, but occasionally I will smooge to a
14    slightly younger age.
15         Q.    And nursing home patients, I
16    assume, are predominantly older; is that right?
17         A.    Well, unfortunately, no.  Well,
18    predominantly older, but University Manner is a
19    psychiatric.  They have a significant number of
20    people younger than me, for example.  They have
21    a significant -- probably the average age is
22    probably 65 in University Manner, but, you
23    know, in the other facilities, it is, yeah,
24    it's significant, it's geriatric.
25         Q.    So turning back to this email, you

1    say you need a resource for disposal of

2    medication in nursing homes, and you say, "No

3    one wants the meds and they want to flush them.

4    I told them no."

5           A.    Correct.

6           Q.    What is wrong with flushing

7    medications?

8           A.    Well, from what I learned at the

9    time, flushing medications was wrong, and it

10   was news to me at that point, because my

11   patients will flush their medication.  If they

12   have a bad reaction to a medication, they just

13   run to the bathroom and flush it, and I guess

14   I, naively, did not think that there was a

15   problem with cleansing that water, but

16   apparently there was.

17          Q.    If you look at the response, so

18   turning from your email to the email on top of

19   it, Terry Allan says, "Sure, Greg.  John can

20   help, I believe."

21                Do you know what John he is

22   referring to there?

23          A.    I'm not seeing that.  Oh, I see.

24   "Sure.  I will talk -- "Sure, Greg, John can

25   help, I believe."  No, I don't know who that

1    is.

2         Q.    If you look at the bottom of the

3    front page of this document, so the page ending

4    in 074, there is the beginning of a message

5    there from John McLeod to Terry Allan, and then

6    if you turn the page, you are copied on it.  Is

7    that the John that Terry Allan was referring

8    to?

9         A.    Yeah.  I guess it was.

10        Q.    Do you know who John McLeod is?

11        A.    I know who he was at the time.  I

12   can't tell you, but he was a director.

13        Q.    He was a director within the

14   Cuyahoga County Board of Health?

15        A.    I believe so.

16        Q.    What was he the director of?

17        A.    He's since gone, so I couldn't tell

18   you.

19        Q.    If you look at that email there

20   from John McLeod, it say, "Sure, I will talk

21   with Vince Caraffi tomorrow about options and

22   get back to you both."

23             You mentioned Vince Caraffi earlier

24   today.  Who is Vince Caraffi?

25        A.    He's a person who presents to the

Page 190

1    board about the opioid task force.

2         Q.    Do you know why John McLeod said

3    that he was going to talk to Vince Caraffi

4    about this disposal of medications issue?

5         A.    I think I was more globally

6    discussing disposing medications, and where the

7    disposing medication arose was as it related to

8    opioids.  So I believe it moved in that

9    direction.

10        Q.    So you were talking generally about

11   disposal of medications, and because -- your

12   understanding is that because Vince Caraffi

13   works on opioid issues, that the disposal of

14   medications issue was relevant to him as well;

15   is that right.

16        A.    Correct.

17        Q.    Was Vince Caraffi working on

18   opioid-related issues in 2010, when this email

19   exchange occurred?

20        A.    I would imagine.

21        Q.    If you look at the next email, so

22   you respond, you say, "Thanks."  This is

23   working from the bottom up, so on the page

24   ending in 074, the email above that is from

25   John McLeod to you, copying Terry Allan, and

1    John McLeod gives you some information there

2    about the options for disposing of prescription

3    medications; is that right?

4           A.    What, the body of it here?

5           Q.    Yes.

6           A.    Yeah.  I haven't read it, but,

7    yeah, I'll take your word for it.  Do you want

8    me to read it?

9           Q.    Sure.

10          A.    Yes.

11          Q.    And do you see that at the bottom,

12   the bottom paragraph there, John McLeod

13   mentions that Vince is looking into the

14   possibility of starting a small pilot working

15   with some Cuyahoga County nursing homes through

16   the Lake County program, and he will explore

17   what it will take to initiate the pilot.  And

18   then he offers to pass along details if you are

19   interested in participating.

20          A.    Uh-huh.

21          Q.    And then do you see, at the top of

22   the page, that you respond, saying that you

23   would like to be involved?

24          A.    Yes.

25          Q.    Did that pilot program, working

Page 192

1    with Cuyahoga County nursing homes, ever

2    happen?

3            A.    Not to my memory.

4            Q.    Do you know why or why not?

5            A.    No.

6            Q.    Was the board of the Cuyahoga

7    County Board of Health ever asked to vote on

8    funding for that kind of program?

9            A.    I don't remember.  Nothing

10   involving nursing homes.  No, I would have

11   remembered that.  Not that I remember, but I

12   think I would have remembered.

13           Q.    Okay.  After you say, "Thanks.  I

14   would like to be involved," at the top of the

15   page here, you say, "The DEA does not want the

16   pharmacy involved in destruction of meds."

17                 What did you mean by that?

18           A.    I don't remember.

19           Q.    What was the basis for your

20   understanding that the DEA didn't want the

21   pharmacy involved?

22           A.    I don't remember.

23           Q.    Turning back, just for a moment, to

24   something you said about your private practice

25   patients, you were talking about their

Page 193

1    demographics.

2         A.    Yes.

3         Q.    What is the income level

4    demographic like for your private practice?

5         A.    It's probably disproportionately

6    poor.

7         Q.    What percentage of your private

8    practice patients are on Medicaid?

9         A.    Probably 25 percent.

10        Q.    And how does that income level of

11   your private practice patients compare with the

12   income level of your patients in nursing homes?

13        A.    It is probably more Medicaid

14   patients in the nursing home.  So it's probably

15   lower.

16        Q.    We talked a little bit about

17   disposal of prescription medications.  Do you

18   agree that -- and I believe that earlier today

19   you agreed that misuse of undisposed

20   medications contributes to the problem with

21   opioids in Cuyahoga County; is that right?

22        A.    Yes, I agree to that.

23        Q.    What are some of the other factors

24   that contribute to the problem with

25   prescription -- sorry.

Page 194

1              What are some of the other problems

2    that contribute to the problem with opioids in

3    Cuyahoga County?

4         A.    I mean, I guess, certain

5    demographics of the patients, like psychiatric

6    problems tend to contribute to increased levels

7    of abuse, depression, bipolar, schizophrenia.

8              I think, as you may have suggested,

9    that the heroin overdoses in people who are

10   drug addicts, that's not prescriptions,

11   contributes to it.

12        Q.    Would you say that the issues

13   surrounding illicit opioids, such as heroin,

14   contribute significantly to the problem with

15   opioids?

16        A.    I would say so, but I don't have

17   any direct knowledge of that but, yes, I would

18   say so.

19        Q.    When did you first learn you were

20   going to be deposed in this matter?

21        A.    I didn't mark it, but it's been a

22   while.  I didn't mark it on the calendar.  It's

23   been --

24        Q.    Ballpark?

25        A.    September, August.

Page 195

1          Q.    A couple months ago?

2          A.    Yeah.  More than a couple months

3     ago, yes.

4          Q.    And how did you learn that you were

5     going to be deposed in this matter?

6               MR. RICHARDS:  Object to the extent

7     that it calls for any attorney-client

8     discussions you would have had.

9          Q.    Yeah.  And don't tell me about the

10    content of your conversations with counsel.

11         A.    I received a subpoena.  That's how

12    I learned, I was subpoenaed.

13         Q.    Did you do anything to prepare for

14    today's deposition?

15         A.    No.  And it showed.

16         Q.    No, you're doing great.

17               Did you meet with anyone in

18    preparation for today's deposition?

19         A.    I met with the gentleman to my

20    left.

21         Q.    And that is?

22               MR. RICHARDS:  Let the record

23    reflect he is referring to me.

24               MR. SCHUTTE:  Not Dr. Wang.

25         Q.    So this time, you met with this

```
                                        Page 196

 1    gentleman on your left who is Mr. Richards this
 2    time, not Mr. Wang?
 3          A.    Correct.
 4          Q.    And when did you meet with
 5    Mr. Richards?
 6          A.    Yesterday.
 7          Q.    How long did you meet with him for?
 8          A.    It was probably about an hour and a
 9    half.
10          Q.    Did you meet with him in person or
11    on the phone?
12          A.    In person.
13          Q.    Other than that one meeting, did
14    you talk with anybody else to prepare for
15    today's deposition?
16          A.    No.
17          Q.    And was anybody else present during
18    your conversation with Mr. Richards yesterday?
19          A.    No.
20          Q.    Did you review any documents as
21    part of your preparation for today's
22    deposition?
23          A.    No.
24          Q.    Were you ever asked to preserve and
25    not throw away or delete documents that could
```

Page 197

1    be related to this litigation?

2         A.    No.

3         Q.    Preparing for your deposition

4    today, did you review the complaint in this

5    lawsuit?

6         A.    No.

7         Q.    Have you ever read the complaint in

8    this lawsuit?

9         A.    No.  I saw 60 Minutes on Sunday.

10   That's really the extent of my knowledge of

11   this.

12        Q.    What did you see on 60 Minutes on

13   Sunday?

14        A.    The segment on -- I can't even say

15   what the segment was called, but I saw this

16   segment on 60 Minutes.

17        Q.    And what was that segment about?

18        A.    It was about the persons that were

19   suing the people, the pharmaceuticals and

20   distribution companies.

21        Q.    When did you see this segment?

22        A.    I saw it Monday.

23        Q.    And it was aired on Sunday --

24        A.    Correct.

25        Q.    -- meaning this past Sunday; is

Page 198

1    that right?

2           A.     Correct.

3           Q.     Have you reviewed any pleadings

4    filed by the lawyers in this lawsuit?

5           A.     No.

6           Q.     Have you reviewed any deposition

7    testimony in this lawsuit?

8           A.     No.

9           Q.     When did you first hear about this

10   lawsuit?

11          A.     I can't say for sure.  I mean,

12   certainly earlier in this year, earlier than

13   when I was subpoenaed.

14          Q.     Okay.  So when you were subpoenaed,

15   you had already heard about this lawsuit?

16          A.     I had.

17          Q.     How did you first hear about this

18   lawsuit?

19                 MR. RICHARDS:  I'm going to again

20   object and instruct you not to answer, to the

21   extent that it involves any attorney-client

22   communications you may have had.

23          Q.     So without getting into

24   attorney-client communications.

25          A.     Right.  I think it just came on my

1    radar, in a very mild way.  Because I'm a

2    physician that sees patients with pain, and I

3    have had to argue with them, explaining why it

4    is more difficult for them to get medication.

5              And so whenever there is an

6    article, I try to make it available to the

7    patients, to say, it's not just me not giving

8    you pain medicine, there is a thing that's

9    going on.  So it's a significant amount of time

10   in the practice explaining.

11        Q.    So you sometimes have patients who

12   are asking for a prescription for opioids, you,

13   in your assessment of risks and benefits, don't

14   want to give one; is that right?

15        A.    Correct.

16        Q.    And you might tell them about

17   broader issues in the community around opioid

18   use?

19        A.    Correct.

20        Q.    Did you hear about this lawsuit in

21   the news?

22        A.    Probably.  I mean, I don't watch

23   the news, but on the internet, yeah.

24        Q.    Did you ever hear about this

25   lawsuit in the context of a board meeting with

1    the Cuyahoga County Board of Health?

2         A.    A public meeting, no.

3         Q.    How about in a nonpublic meeting?

4         A.    The nonpublic meetings, there was

5    an attorney present.

6         Q.    Okay.  So you heard about it in a

7    nonpublic meeting, in which there was an

8    attorney present?

9         A.    Correct.

10         Q.    I won't ask you about the content

11    of that conversation, since there was an

12    attorney present, but do you remember when that

13    meeting was?

14         A.    No.

15         Q.    Was it within the past six months?

16         A.    Yes.

17         Q.    Was it within the past four months?

18         A.    Well, there was certainly

19    discussion after we got the subpoena, so I

20    don't know the date for the subpoena, but there

21    was absolutely a discussion about the subpoena

22    that everyone was interested in discussing, and

23    it was with the attorney.

24              So, I mean, whenever I received the

25    subpoena, the following meeting there was a

Page 201

1    discussion.

2         Q.    Did you ever hear about this

3    lawsuit in a board meeting prior to receiving

4    the subpoena?

5         A.    I might have.

6         Q.    But you are not sure?

7         A.    I'm not sure.

8         Q.    Has the board ever voted on whether

9    to participate in this lawsuit?

10        A.    No.  We never voted on it.

11        Q.    Has that topic ever been discussed

12   at board meetings?

13             MR. CIACCIO:  Objection to form.

14             MR. RICHARDS:  I'm going to object

15   as well.  In the event that there were any such

16   discussions, if they involved communications

17   with counsel, I'll instruct you not to answer

18   said questions.

19        Q.    Setting aside communications with

20   counsel.

21        A.    No.

22        Q.    If there had been a vote taken,

23   would that have been reflected in board meeting

24   minutes?

25        A.    Yes.

1          Q.    Do you know what this lawsuit is

2     about?

3          A.    Not enough to discuss it.

4          Q.    What do you know about what this

5     lawsuit is about, in a few words?

6          A.    That would be discussing it.  You

7     know, what I learned from the 60 Minutes thing

8     is not what I perceived it to be, so I'm really

9     bad.

10         Q.    When you say what you learned from

11    the 60 Minutes thing was not what you perceived

12    it to be, what do you mean by that?

13         A.    I think that in some areas, the

14    problem was way worse than in my area.

15         Q.    When you say the problem, do you

16    mean the problem with opioid use?

17         A.    The problem I was talking about was

18    opioid distribution, was what I learned was --

19    it may or may not be accurate -- I'm just

20    saying what alarmed me was the opioid

21    distribution part of that episode.

22         Q.    Aside from what you saw in that 60

23    Minutes episode, do you have any familiarity

24    with the role of distributors in the

25    pharmaceutical supply chain?

Page 203

1          A.     None, zero, less than zero.

2          Q.     Do you know who the plaintiff in

3    this lawsuit is?

4          A.     No.

5          Q.     Do you know who the defendants are?

6          A.     No.

7          Q.     Do you know if the county is a

8    party to this lawsuit?

9          A.     The county?

10         Q.     Cuyahoga County.

11         A.     I think they are.  I don't know.

12   No, I don't know.

13         Q.     Is the Cuyahoga County Board of

14   Health a party to this lawsuit?

15         A.     No.

16         Q.     Even if you don't know the names of

17   specific defendants, do you know what category

18   the defendants in this lawsuit fall into?

19         A.     Category, in the sense that

20   pharmaceutical companies.

21         Q.     And how are you defining

22   pharmaceutical companies?

23         A.     A company that makes

24   pharmaceuticals.

25         Q.     Do you know if the Cuyahoga County

Page 204

1    Board of Health is seeking any damages in this

2    lawsuit?

3            A.    Yes, I do.  No, they are not.

4            Q.    I appreciate that very clear

5    answer.  The peril of "do you know questions."

6                  Are you familiar with -- strike

7    that.

8                  Aside from meetings with lawyers,

9    which you can't tell me about, have you spoken

10   with anyone about this lawsuit?

11           A.    No.

12           Q.    Have you had any dealings with

13   Cardinal Health?

14           A.    I don't believe so, but I don't

15   know what Cardinal Health does, at my level, as

16   a physician.

17           Q.    Have you spoken or communicated

18   with anyone at Cardinal Health?

19           A.    I don't -- I doubt it.  I mean, I

20   have not spoken with anyone that said, "I'm

21   calling from Cardinal Health."  No.

22           Q.    So not that you are aware of?

23           A.    Right.

24           Q.    Have you had any dealings with

25   McKesson Corporation?

1          A.     Yes.   My medical supplies company

2     is McKesson.

3          Q.     And when you say medical supplies,

4     what are you referring to?

5          A.     Like gowns, you know, paper gowns,

6     cotton balls, supplies, bandages.

7          Q.     What about, when you say medical

8     supplies, does that include any medications?

9          A.     I'm sure I have brought antibiotics

10    and the IM antibiotics or TB time tests, skin

11    tests to check for tuberculosis.

12         Q.     When you say medical supplies, does

13    that include prescription opioids?

14         A.     No.

15         Q.     So since McKesson Corporation

16    supplies your medical supplies, I

17    assume -- well, let me just ask.  Have you

18    spoken or communicated with anyone at McKesson

19    Corporation?

20         A.     No.  I just send the money every

21    month.

22         Q.     Have you had any dealings with

23    AmerisourceBergen Corporation?

24         A.     Not that I'm aware of.

25         Q.     Have you spoken or communicated

```
                                          Page 206
 1    with anyone at AmerisourceBergen Corporation?
 2         A.    No.
 3               MS. JAZIEWICZ:  I have no further
 4    questions.  I'm going to pass the mic.
 5               MS. FEINSTEIN:  Does anyone need to
 6    take a quick break while we switch?
 7               THE WITNESS:  No.
 8         EXAMINATION OF GREGORY L. HALL, M.D.
 9    BY MS. FEINSTEIN:
10         Q.    Good afternoon, Dr. Hall.
11         A.    Good afternoon.
12         Q.    I'll reintroduce myself.  My name
13    is Wendy West Feinstein, I'm with Morgan Lewis,
14    and I represent several defendants in this
15    lawsuit, which we have, kind of, called the
16    Teva defendants.  They are all related to one
17    another through corporate transactions.
18               Teva is a manufacturer of
19    pharmaceuticals.  Before today, have you heard
20    of Teva?
21         A.    No.
22         Q.    Do you know what Teva manufactures?
23         A.    No.
24         Q.    I'm going to apologize up front, if
25    I skip around a bit, because I'm going to try
```

Page 207

1    to be efficient and not cover too many of the

2    questions that my colleague went through

3    earlier today with you, but I do have a few

4    follow-ups from the perspective of the

5    manufacturers, okay?

6         A.    I appreciate it.

7         Q.    Before today, you had not heard of

8    Teva, correct?

9         A.    I have not.

10         Q.    And you're not aware of what Teva

11    manufacturers?

12         A.    I'm not aware what they

13    manufacture, correct.

14         Q.    And I believe you responded earlier

15    that you're not aware of who all the defendants

16    are in this lawsuit?

17         A.    I am not.

18         Q.    And counsel asked you earlier

19    whether you had reviewed the complaint to

20    prepare for your deposition; do you recall

21    that?

22         A.    I do.

23         Q.    At any point in time, have you

24    reviewed the complaint in this litigation?

25         A.    I did not.

1          Q.    You mentioned that you had seen the

2     60 Minutes piece and you watched it on Monday?

3          A.    Uh-huh.

4          Q.    Did you watch it because of your

5     deposition?

6          A.    I watched it because a deposition

7     was on my schedule for Wednesday.  I wasn't

8     sure it was going to happen, so I did not add

9     it to my schedule, and on Monday, I was told

10    that the deposition looked like it was going to

11    happen, so I told my assistant that I was going

12    to the deposition, and it says opioid

13    deposition, so I'd know what it was.

14              And she sent that tape, said it was

15    on 60 Minutes, and she sent the tape.  We had

16    no discussion, she saw that, and she sent it to

17    me.

18         Q.    She didn't talk to you at all about

19    the story though?

20         A.    No.

21         Q.    Had you, before learning of the

22    story on 60 Minutes from your assistant, had

23    you heard of it before?

24         A.    I had heard of it, yes.

25         Q.    Just a few moments ago, you

Page 209

1    mentioned that your perception of the lawsuit

2    before the 60 Minutes piece was different than

3    after you saw the 60 Minutes?

4        A.    It was amended, yea.

5        Q.    Can you please tell us what you

6    thought the lawsuit was about before you saw

7    the 60 Minutes piece?

8        A.    I thought it was about -- well, I

9    thought it was about the fact that physicians

10   were marketed to significantly by some of the

11   pharmaceutical companies that made pain meds,

12   and there were a number of initiatives at the

13   hospital, in terms of pain being a vital sign,

14   and that really we were getting beat up about

15   undertreating pain.

16              So that was a big quality issue

17   across insurance companies, the hospital,

18   everywhere, from a medical standpoint.  And so

19   we were being marketed to significantly about

20   increasing our use of pain medicine for chronic

21   pain, arthritic pain, things that we didn't

22   significantly -- so my perception was that the

23   suit was sort of in retaliation to that

24   overmarketing, let me put it that way.

25       Q.    The marketing that you just

Page 210

1    described, who, from your perspective, who was

2    engaging in that marketing?

3            A.     From my perspective, everyone in a

4    leadership position.  The hospital really

5    pushed it, and I sort of take the lead from the

6    hospital.

7            Q.     Did you -- strike that.

8                   Have you ever seen any marketing

9    from a manufacturer of a prescription opioid?

10           A.     Yes.

11           Q.     When did you see that?

12           A.     A lot.

13           Q.     When, can you give me a timeframe?

14           A.     Before 2010, I mean, yeah.  I mean,

15   once they started the pain being undertreated,

16   all we had was, you know, things that had

17   smiley faces on it or frown faces.

18                  I mean, there was a lot of

19   marketing that was educating providers about

20   the appropriate treatment of pain.

21           Q.     Is it your understanding that those

22   materials were prepared by manufacturers of

23   prescription opioids?

24           A.     It was my understanding, yes.

25           Q.     Do you know what manufacturers of

1   prescription opioids provided those materials

2   to you?

3         A.    No.  Not in particular, no.

4         Q.    Was there anything in those

5   materials that you reviewed that you thought

6   was inaccurate?

7         A.    I've already testified I'm not a

8   expert in any of this, so my sense was it was a

9   little over the top, but I didn't say anything.

10  So, I mean, so I accepted it as standard of

11  care.

12        Q.    Do you have any recollection of

13  what you viewed was over the top?

14        A.    I felt that --

15              MR. RICHARDS:  I just want to put

16  an objection on the record, counsel.  I think

17  you are getting into expert testimony area

18  right now.

19              This witness hasn't been

20  identified, not to the best of my knowledge, as

21  an expert witness, he certainly isn't being

22  compensated as an expert witness, and I object

23  to asking him expert opinions along the lines

24  that you are going down.

25              MS. FEINSTEIN:  Thank you, counsel.

Page 212

1          Q.    And I'll note for the record that

2     these questions are certainly by no means

3     asking for any sort of expert opinion, just

4     what you perceived in your personal

5     observations that you mentioned regarding

6     marketing materials.  So I'm not asking for you

7     to give me any sort of expert opinion, just

8     your perception of what you saw.

9              So with that, can you answer the

10    question.

11         A.    Can you repeat the question.

12         Q.    Sure.

13              MS. FEINSTEIN:  Could you read it

14    back, please?

15              THE NOTARY:  Question:  "Do you

16    have any recollection of what you viewed was

17    over the top?"

18         A.    No.

19         Q.    You mentioned that there were

20    smiley faces and frown faces.  Were those faces

21    on marketing materials that you received?

22         A.    They were on patient educational

23    materials that I received from marketers, as a

24    way to -- for the patients with varying

25    educational backgrounds to describe their level

Page 213

1    of pain.

2          Q.    And those were before 2010, you

3    thought?

4          A.    I feel like they were, yes.

5          Q.    The marketers, do you recall from

6    what companies those marketers came?

7          A.    No.

8          Q.    Were they affiliated with the

9    hospital?

10          A.    No.  Well, I can't say.  I doubt

11    it.

12          Q.    And you don't know whether they

13    were affiliated with any manufacturer of

14    prescription opioids?

15          A.    Absolutely not, no.

16          Q.    Other than the materials to assess

17    pain, do you recall receiving any other

18    marketing materials regarding prescription

19    opioids?

20          A.    Not that I could be specific about.

21          Q.    You mentioned just a few moments

22    ago that your perception was about the, sort

23    of, overmarketing of prescription opioids.  Did

24    I hear that correctly?

25          A.    Yes.

1          Q.     And what do you mean by that, the

2     overmarketing of prescription opioids?

3          A.     I felt that the emphasis that was

4     put on using the opioids was mildly excessive.

5          Q.     From what source were you receiving

6     that emphasis on using opioids?

7          A.     I have no idea.  Well, I can tell

8     you it was multiple sources, but I can't

9     identify them.

10          Q.     You mentioned that in the hospital

11     setting, and please correct me if I'm

12     misstating anything, because any notes are very

13     sketchy, but I thought you mentioned that in

14     the hospital setting physicians were being

15     taught that pain should be considered a vital

16     sign; is that right?

17          A.     Correct.

18          Q.     And do you know from what source

19     that information was coming?

20          A.     Well, it was presented as if it was

21     a Joint Commission.  It was oversight for

22     hospitals with a Joint Commission standard, a

23     gold standard, sort of.

24          Q.     Do you know whether any

25     pharmaceutical manufacturer provided

Page 215

1      information to you, as a physician, that pain
2      should be considered a vital sign?
3             A.     Not to that specifics, no.
4             Q.     Do you recall seeing any marketing
5      materials regarding prescription opioids that
6      you can associate directly with a manufacturer
7      of a prescription opioid?
8             A.     I can't, no.
9             Q.     Do you recall seeing any
10     direct-to-consumer marketing of prescription
11     opioids?
12            A.     No.
13            Q.     In Ohio, can a patient get a
14     prescription opioid without going to a
15     physician?
16            A.     Well, a provider, no.
17            Q.     So a healthcare provider that can
18     write a prescription?
19            A.     Correct.
20            Q.     So just to make sure that we are
21     clear on the record, in Ohio, it is not lawful
22     for a patient to get a prescription opioid,
23     except through someone authorized in Ohio to
24     write a prescription?
25            A.     That's correct.

1      Q.    You are aware that prescription

2   opioids are regulated by the Food and Drug

3   Administration, correct?

4      A.    Well, I believe -- the DEA, is that

5   under the Food and Drug Administration?

6      Q.    Are you aware that prescription

7   opioids are approved for --

8      A.    Oh, yeah, yeah.  I see what you're

9   saying.

10      Q.    -- marketing in the U.S. by the

11   Food and Drug Administration?

12      A.    Yes, yes, yes.  I see what you're

13   saying, yes.  I wasn't thinking that way, but,

14   yes.

15      Q.    Do you know whether the FDA, the

16   Food and Drug Administration, also regulates

17   the marketing of prescription opioids?

18      A.    No, I don't know.

19      Q.    I asked you briefly about Teva, my

20   clients.  I'm going to ask you about some other

21   manufacturers of prescription opioids to see

22   whether you are familiar with them.

23            Have you ever heard of Actavis?

24      A.    No.

25      Q.    Have you ever heard of Allergan?

Page 217

1          A.    Allergan, I feel like I have seen

2     that in a magazine somewhere.

3          Q.    Do you know whether Allergan

4     manufactures prescription opioids?

5          A.    No.

6          Q.    Have you ever heard of Cephalon?

7          A.    I have heard of Cephalon, and, no,

8     I don't know whether they make that.

9          Q.    In what context of have you heard

10    of Cephalon?

11         A.    I think I just saw it in a

12    magazine.  The Journal, I should say.

13         Q.    Have you heard of Endo?

14         A.    No.

15         Q.    Have you heard of Insys?

16         A.    No.

17         Q.    Have you heard of Janssen?

18         A.    Yes.

19         Q.    In what context have you heard of

20    Janssen?

21         A.    Same thing, journal ads and maybe

22    TV.

23         Q.    Do you know whether Janssen

24    manufactures prescription opioids?

25         A.    If I had to say yes or no, I would

Page 218

1    think that they did.

2         Q.    Do you know which prescription

3    opioid?

4         A.    No.

5         Q.    Have you ever heard of Johnson &

6    Johnson?

7         A.    Yes.

8         Q.    Do you know whether Johnson &

9    Johnson manufactures prescription opioids?

10        A.    No, I don't know.

11        Q.    Have you heard of Mallinckrodt?

12        A.    No.

13        Q.    Have you heard of Purdue?

14        A.    Yes.

15        Q.    Do you know whether Purdue

16   manufactures prescription opioids?

17        A.    I think they do.

18        Q.    Do you know what prescription

19   opioids?

20        A.    No.

21        Q.    Have you ever heard of Watson Labs?

22        A.    No.

23        Q.    Have you ever heard of Par

24   Pharmaceutical?

25        A.    No.

Page 219

1      Q.    How about Spec Rx?

2      A.    No.

3      Q.    Do you know, getting back to the

4  marketing point, do you know whether -- strike

5  that.

6          Have you ever written a

7  prescription for prescription opioids due to

8  pharmaceutical marketing?

9      A.    I believe I have.

10     Q.    In what circumstance did you write

11  that prescription, without getting into any

12  patient specifics, but what about the marketing

13  prompted that prescription opioid?

14     A.    I believe that there was, you know,

15  a suggestion that here is what the types of

16  patients that might not be receiving the pain

17  treatment, here is what they look like, you

18  know.

19          So it's, a lot of times, I need

20  something granular like that to say who is

21  specific for this, and who aren't you treating,

22  and so I think I feel like that -- I mean,

23  obviously it's my decision, I take

24  responsibility for that, but I believe that

25  that educated me, in a way.

1      Q.    So to make sure I'm understanding,
2  you learned, from a marketing piece, how to
3  recognize signs of pain in a patient that may
4  not be adequately treated?
5      A.    Correct.
6      Q.    And, therefore, you evaluated the
7  patient and determined that perhaps an opioid
8  would be an appropriate pain medication?
9      A.    Option, correct.
10      Q.    Do you know whether that
11  information that you just told us about came
12  from a pharmaceutical company?
13      A.    It came from a pharmaceutical rep.
14      Q.    Do you know from what company that
15  rep --
16      A.    No.
17      Q.    Have you ever been visited by a rep
18  of any of the companies I just asked you about
19  a moment ago?
20      A.    I imagine so, yes.
21      Q.    Do you know what companies who
22  manufacture prescription opioids have detailed
23  you through their reps?
24      A.    No.
25      Q.    Have you ever met with a rep from

Page 221

1    Cephalon?

2            A.    I don't really remember them that

3    way, so it would be related to the specific

4    brand name.

5            Q.    Have you ever prescribed Actiq?

6            A.    No.

7            Q.    Have you ever prescribed Fentora?

8            A.    No.

9            Q.    Have you prescribed OxyContin?

10           A.    Yes.

11           Q.    Do you recall whether you were

12   visited by any reps for OxyContin?

13           A.    Yes.

14           Q.    Those reps that visited -- strike

15   that.

16               The reps who visited you for

17   OxyContin, did they act professionally in your

18   presence?

19           A.    Yes.

20           Q.    Was it your impression of your

21   interactions with them that they were providing

22   you accurate information?

23           A.    Yes.

24           Q.    Have you ever prescribed oxycodone?

25           A.    Yes.

1      Q.    Have you been visited by any reps
2  regarding oxycodone?
3      A.    Well, not in that form, but more in
4  the form of Vicodin and Percocet and things
5  like that.
6      Q.    And have you been visited by reps
7  specifically with respect to Vicodin?
8      A.    Yes.
9      Q.    Were the reps that visited with you
10  with respect to Vicodin, did they act in a
11  professional and courteous manner?
12      A.    Yes, they did.
13      Q.    Was it your understanding that the
14  information that they provided to you was
15  accurate?
16      A.    Yes.
17      Q.    Were you visited by detail reps
18  with respect to Percocet?
19      A.    Yes.
20      Q.    And was it --
21      A.    They were professional, and I felt
22  like what they were telling me was accurate.
23      Q.    Excellent.  Have you been visited
24  by reps for any other prescription opioid that
25  you can recall?

1          A.     Yes.

2          Q.     What other prescription opioids?

3          A.     Fentanyl patch.

4          Q.     And how was your interaction with

5     the rep for the fentanyl patch?

6          A.     It was very professional, and I

7     thought the information was accurate.

8          Q.     Do you know from what company that

9     person came?

10         A.     No.

11         Q.     Any other prescription opioids?

12         A.     Yes, but I can't recall the

13    specifics.

14         Q.     At any point in time, regarding any

15    prescription opioid, have you had what you

16    would characterize as a negative experience

17    with a detail representative from that company?

18         A.     No.

19         Q.     At any point in time, did you feel

20    as though a representative of any prescription

21    opioid manufacturer provided you inaccurate

22    information?

23         A.     No.

24         Q.     Other than helping you -- strike

25    that.

Page 224

1          Other than providing information to

2     help identify patients who may be suffering

3     from pain that is inadequately treated, have

4     you written prescriptions based on what you

5     perceive to be marketing regarding prescription

6     opioids?

7               MR. CIACCIO:  Objection to form.

8          A.    I really write prescriptions based

9     on education, and I'm open to get education

10    from a number of venues, some of the time it's

11    a marketer from a specific device, can find the

12    good, the bad side effects.  So I don't

13    discriminate against marketing, and I'm able to

14    analyze their information and their pros and

15    cons and the patient outcomes as well.

16         Q.    What are some of the other sources

17    of information for you about pros and cons of

18    prescription medications?

19         A.    It's been so long.  I mean, the

20    pharmacists.

21         Q.    Do you read the prescribing

22    information that comes with prescription

23    medication?

24         A.    In the form that we get on the app

25    on the phone, Hippocrates, we will see side

Page 225

1     effects and contraindications and things of

2     that nature.

3          Q.     Hippocrates is an online source of

4     the FDA-approved prescribing information?

5          A.     Yes.

6          Q.     Does Hippocrates include what are

7     called black box warnings?

8          A.     Yes.

9          Q.     Have you ever reviewed the black

10    box warnings on prescription opioids?

11         A.     Yes.

12         Q.     Is addiction one of the things

13    that's warned about in the black box?

14         A.     Absolutely.

15         Q.     For how long have you known about

16    the addictive properties of prescription

17    opioids?

18         A.     Well, I mean, I think that as time

19    has passed, the sense of the addictive quality

20    of it has significantly ramped up.  So

21    OxyContin, for example, was marketed initially

22    as really not a danger for addiction, and then

23    that was amended.  So it's a matter of when

24    that was.

25         Q.     When did you first learn of the

Page 226

1    addictive properties of prescription opioids?

2         A.    I think it was with the patients,

3    when I would try to stop it, and then they

4    would really try to get me to continue to write

5    it.

6         Q.    Did you learn about the addictive

7    properties of opioids in medical school?

8         A.    Yes.

9         Q.    Are you aware of any medically

10   unnecessary prescriptions that were written for

11   patients due to marketing by pharmaceutical

12   companies?

13              MR. RICHARDS:   Objection.  Wait.

14   Are you asking him in the whole world, or what

15   are you --

16        Q.    In Cuyahoga County, we will limit

17   it to Cuyahoga County, are you aware of any

18   prescriptions?

19        A.    Say it again now.

20        Q.    In Cuyahoga County, are you aware

21   of any prescriptions that have been -- any

22   medically unnecessary prescriptions that have

23   been written due to pharmaceutical marketing?

24        A.    If we took today's guidelines for

25   writing opioids, most of the prescriptions that

Page 227

1    I wrote in 2010 would be what you are saying.

2              So the guidelines changed.  So I

3    was following the guidelines, I believed I was

4    following the guidelines at the time, but if

5    you applied those guidelines, there would be a

6    lot of medically necessary prescriptions.

7         Q.    Have you written medically

8    unnecessary prescriptions?

9         A.    Apparently I have, if you use

10   today's standards on what I did in the past.

11        Q.    What standards are you referring

12   to?

13        A.    The standards of treating chronic

14   pain, for example, chronic back pain, chronic

15   arthritis with opioids, I did that, and now

16   that's contraindicated.

17        Q.    At the time --

18              MR. RICHARDS:  Objection.  I think

19   she is asking you about at the time you

20   prescribed them.

21        A.    Oh, I wouldn't prescribe anything

22   that was not necessary.

23              MS. FEINSTEIN:  Thank you, counsel,

24   that's exactly --

25        A.    But I was making a point that --

Page 228

1    you know what I'm saying.

2         Q.    Yes, understood.  So under current

3    guidelines, your prescription -- your

4    prescriptions are consistent with current

5    guidelines --

6         A.    Absolutely.

7         Q.    -- is that correct?

8         A.    Absolutely.  Overly consistent with

9    them.

10        Q.    And so you have changed your

11   prescribing habits as the guidelines have

12   changed?

13        A.    Yes, ma'am.

14        Q.    At any point in time, doctor, in

15   Cuyahoga County, have you been aware of any

16   prescriptions being written that were

17   inconsistent with prescribing guidelines and

18   medically unnecessary, but resulted from

19   pharmaceutical marketing?

20             MR. CIACCIO:  Objection.

21             MR. RICHARDS:  Objection.

22        A.    Yeah.  That's too complicated a

23   question.

24        Q.    Are you aware of, in Cuyahoga

25   County, prescriptions that were written that

Page 229

1    were medically unnecessary but were written due

2    to pharmaceutical marketing?

3                    MR. RICHARDS:  I'm going to object

4    here.  I think you are getting deeply into

5    expert testimony now, and I also think that

6    that is such a broad question it is impossible

7    to answer.  Are you asking anecdotally,

8    firsthand knowledge?  I mean, that's a very

9    complicated question.

10        Q.    In your capacity --

11        A.    The answer is no.

12        Q.    Thank you.  Thank you.

13              Have you ever reported any

14    pharmaceutical marketing to the FDA?

15        A.    No.

16        Q.    You mentioned earlier that you

17    received information regarding prescribing

18    guidelines from the Ohio Medical Board; is that

19    right?

20        A.    Yes.

21        Q.    Do you receive prescribing

22    guidelines from any other source?

23        A.    Not that I review.

24        Q.    You are licensed to practice

25    medicine in the State of Ohio?

1          A.     Yes.

2          Q.     Are you aware licensed in any other

3     state?

4          A.     No.

5          Q.     Do you know whether Mr. Caraffi is

6     a physician?

7          A.     No.  I suspect he's not.

8          Q.     Other than the medical director of

9     the Cuyahoga County Board of Health, are there

10    any medical doctors or physicians who are staff

11    members of the Cuyahoga County Board of Health?

12         A.     Not staff members.

13         Q.     Any independent contractors of the

14    Cuyahoga County --

15         A.     I believe we do have an independent

16    contractor that helps us, travel medicine,

17    travel.

18         Q.     Are there any physicians that you

19    know of working with the Cuyahoga County Board

20    of Health on opioid issues?

21         A.     Not that I know of.

22         Q.     Do you have a CCBH.net email

23    address?

24         A.     No.

25         Q.     So I asked you a little bit

Page 231

1    earlier, before the 60 Minutes piece, what your

2    understanding of the litigation was.  What is

3    your understanding of the litigation now that

4    you have seen the 60 Minutes piece?

5          A.    Other than it's really, it's

6    going -- I don't want to say that.

7                It's going to be a big mess.

8          Q.    What did you learn in the 60

9    Minutes piece that affected your understanding

10   of the litigation?

11         A.    Not much.  It just broadened my

12   concept of the entire thing with the

13   distribution.  I just didn't -- I didn't -- I

14   wasn't aware of that aspect of it, if it's

15   accurate.

16         Q.    After you saw the 60 Minutes piece,

17   did you discuss it with anyone?

18         A.    No.

19         Q.    Have you discussed your deposition

20   with any of the other board members of the

21   Cuyahoga County Board of Health?

22         A.    No.  And I wanted to call Dr.

23   Heidi, but I didn't.  I knew better, but I --

24               MR. RICHARDS:  Can we take a

25   five-minute break?

Page 232

1              MS. FEINSTEIN:  Sure.

2              THE VIDEOGRAPHER:  Off the record

3      at 2:49.

4              (Recess taken.)

5              THE VIDEOGRAPHER:  On the record,

6      3:01.

7         Q.    Thank you.  Doctor, does the

8      Cuyahoga County Board of Health have an

9      epidemiology group?

10        A.    Yes.

11        Q.    Who is in that group?

12        A.    I don't know specifically.  There

13     is a Kippes, I believe is over the group,

14     Chris.

15        Q.    Do you know whether the

16     epidemiology group is doing any work with

17     respect to opioids?

18        A.    No.

19        Q.    Has the epidemiology group prepared

20     any reports for the board regarding substance

21     abuse?

22        A.    None I remember.

23        Q.    Do you know whether the Cuyahoga

24     County Board of Health has something called the

25     Heroin Campaign?

1          A.     No.

2          Q.     Have you ever heard the phrase

3     Heroin Campaign?

4          A.     No.

5          Q.     You are aware -- strike that.

6                 Earlier this morning, I believe,

7     you mentioned that heroin is an illicit opioid;

8     is that right?

9          A.     Correct.

10         Q.     You also mentioned fentanyl this

11    morning?

12         A.     Correct.

13         Q.     Then this afternoon, during some of

14    my questions, you mentioned a fentanyl patch,

15    right?

16         A.     Correct.

17         Q.     Is it your understanding that

18    fentanyl, there is a prescription form of

19    fentanyl?

20         A.     Yes.

21         Q.     And then there is an illicit

22    fentanyl; is that right?

23         A.     Yes.

24         Q.     In your experience -- strike that.

25                In your work on the board of health

Page 234

1    and in the information that you have received

2    regarding the opioid problem in Cuyahoga

3    County, have you made a distinction between

4    illicit opioids and prescription opioids?

5         A.    I mean, yeah, I believe there is a

6    distinction between the illicit opioids and the

7    prescription opioids, yes.

8         Q.    What is that distinction, in your

9    mind?

10        A.    The prescription ones are by

11   prescription, illicit ones are not.

12        Q.    As relates to the opioid problem in

13   Cuyahoga County, is there a distinctions?

14        A.    Well, there are reported higher

15   fatalities from overdoses from the illicit

16   fentanyl.

17        Q.    From where does the board of health

18   get information regarding the overdose -- the

19   overdoses in Cuyahoga County?

20        A.    I think it's in conjunction with

21   the coroner.

22        Q.    Does the coroner prepare -- strike

23   that.

24              Does the coroner present to the

25   board of health its findings?

Page 235

1          A.     He does not.

2          Q.     Have you ever been to a

3    presentation conducted by the coroner's office

4    related to opioid overdoses?

5          A.     No.

6          Q.     Have you ever seen any of those

7    PowerPoints?

8          A.     I don't believe so.

9          Q.     Have you ever heard of the risk

10   evaluation and mitigation strategies related to

11   controlled substances?

12         A.     I might have heard the title.  I

13   know nothing beyond that.

14         Q.     Sometimes abbreviated as REMS,

15   R-E-M-S?

16         A.     No.

17         Q.     Have you ever heard of the TIRF

18   REMS program?

19         A.     No.

20         Q.     And I take it then, because you

21   have never heard of the TIRF REMS program, you

22   have not prescribed medications that are

23   subject to the TIRF REMS program?

24         A.     I don't know.

25         Q.     Earlier this afternoon, you

Page 236

1    mentioned that you have been having more

2    conversations with your patients about

3    difficulty in obtaining opioid medications for

4    their pain relief?

5         A.    Not more recently, but in the

6    recent past, within -- yeah, in the past I have

7    had increased conversations.  Now they have

8    tapered off because we have all had them.

9         Q.    When you were having those

10   conversations, without disclosing anything

11   specific about your patients, can you tell us

12   generally what those conversations were?

13             MR. RICHARDS:  I'll object, to the

14   to the extent that is asks physician-patient

15   information.

16             If there is a way you can answer

17   that without getting into physician-patient

18   communications, I'll leave that to you.

19        A.    I generally talk about the changing

20   of the rules, as it were, related to

21   prescribing and dispensing pain medications,

22   and that it is an evolving process.

23        Q.    Have you found yourself referring

24   patients to pain management clinics?

25        A.    Yes.

Page 237

1          MS. FEINSTEIN:  I'm just going to

2     flip through my notes, doctor, and I think I'm

3     done, and I will pass the baton to one of my

4     colleagues.

5          Thank you, doctor.  I have nothing

6     further for you at this time.

7          THE WITNESS:  Thank you.

8       EXAMINATION OF GREGORY L. HALL, M.D.

9     BY MR. SCHUTTE:

10         Q.   Good afternoon, Dr. Hall.  My name

11    is Scott Schutte, I represent Rite Aid, and I

12    just have a few questions for you.

13              Are you aware, as you sit here

14    today, that Rite Aid, Walgreens, Walmart and

15    CVS are defendants in this lawsuit?

16         A.   No.

17         Q.   Do you have any knowledge as to why

18    Walgreens, Walmart, Rite Aid or CVS would be a

19    defendant in this lawsuit?

20         A.   Not really.

21         Q.   Do you recall, when you watched the

22    60 Minutes piece the other night, whether any

23    of those four entities were mentioned?

24         A.   I don't recall.

25         Q.   Ms. Feinstein asked you a question

1    earlier about other sources where you learned
2    the pros and cons of prescription drugs, and
3    you mentioned pharmacists.  Have you ever
4    spoken with a pharmacist about the pros and
5    cons of prescribing opioids?
6         A.    I'm sure I have.
7         Q.    Under what sort of circumstances?
8         A.    Usually when one formulation wasn't
9    available, and I would want to go to an
10   equivalent of something that I wasn't familiar
11   with, that might have been on the formulary for
12   their insurance.
13        Q.    In those discussions, did you
14   consider what the pharmacist was telling you to
15   be marketing?
16        A.    No.
17        Q.    Do you recall ever having any
18   discussions with any pharmacists from
19   Walgreens, Walmart, CVS or Rite Aid about
20   prescribing opioids?
21        A.    I don't recall, but I would imagine
22   there was.  I mean, you know, there are issues
23   in the past where there have been amending of
24   the prescription, and they will call and ask,
25   did you write for this, did you mean to write

Page 239

1    this or that, or I might have written

2    something, so, yes.

3         Q.    And, Dr. Hall, in those types of

4    discussions you were just mentioning, do you

5    ever have any concerns that the pharmacist that

6    you were speaking to was acting in an

7    inappropriate way?

8         A.    No.

9              MR. SCHUTTE:  Okay.  That's all I

10   have.  For once a lawyer promised to be quick.

11             MS. FEINSTEIN:  Let the record

12   reflect.

13             MR. RICHARDS:  We get to aggregate

14   all of the different questions from Morgan

15   Lewis attorneys.

16             You didn't have to put what I just

17   said on the record.

18             MR. SCHUTTE:  I believe that for

19   the lawyers in the room on the defense side,

20   that's all the questions we have, but does

21   anybody on the phone have any questions for Dr.

22   Hall before we pass the mic to the plaintiffs?

23             A VOICE:  Not at this time.

24             A VOICE:  No, thank you.

25             A VOICE:  None here.

1            A VOICE: No.

2            MR. SCHUTTE:  All right.  With

3    that, I think that concludes the defense

4    questioning of this witness.

5            MR. CIACCIO:  Plaintiffs don't have

6    any questions.  So you're done.

7            MR. RICHARDS:  We will read.  Thank

8    you everyone.

9            MR. SCHUTTE:  Thank you for your

10   time and patience.

11            THE VIDEOGRAPHER:  Off the record

12   at 3:11.

13        (Deposition concluded at 3:11 p.m.)

14                    - - - - -

15

16

17

18

19

20

21

22

23

24

25

Page 241

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 242

1              REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                              SS:

4    County of Cuyahoga.   )

5

6              I, Wendy L. Klauss, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, GREGORY L. HALL,

10   M.D., was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19              I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 243

1          I do further certify that I am not

2     a relative, counsel or attorney for either

3     party, or otherwise interested in the event of

4     this action.

5               IN WITNESS WHEREOF, I have hereunto

6     set my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 24th day of

8     December, 2018.

9

10

11

12

13          *Wendy L. Klauss*

14          Wendy L. Klauss, Notary Public

15               within and for the State of Ohio

16

17     My commission expires July 13, 2019.

18

19

20

21

22

23

24

25

```
                                                    Page 244
 1                   Veritext Legal Solutions
                        1100 Superior Ave
 2                         Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     December 24, 2018
 5
     To: Daniel A. Richards, Esq.
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3174234
 8
     Witness:  Gregory L. Hall, M.D.   Deposition Date:  12/19/2018
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 245

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3174234
3    CASE NAME: In Re: National Prescription Opiate Litigation
     DATE OF DEPOSITION: 12/19/2018
4    WITNESS' NAME: Gregory L. Hall, M.D.
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____        _____
9    Date                    Gregory L. Hall, M.D.
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Page 246

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

2

     ASSIGNMENT REFERENCE NO: 3174234
3    CASE NAME: In Re: National Prescription Opiate Litigation
     DATE OF DEPOSITION: 12/19/2018
4    WITNESS' NAME: Gregory L. Hall, M.D.
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10

           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____         _____
     Date                     Gregory L. Hall, M.D.
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23         _____
                 Notary Public
24
           _____
25               Commission Expiration Date

Page 247

1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 12/19/2018
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                  Gregory L. Hall, M.D.
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24

                    _____
25                  Commission Expiration Date

| & |
| --- |
| **&**   2:13 3:14 4:3 |
| 10:11 11:6,9 |
| 218:5,8 |

| 0 |
| --- |
| **012344074**   7:1 |
| 183:20 184:1 |
| **014167489**   6:13 |
| 130:25 131:6 |
| **014167892**   169:24 |
| **014260170**   6:11 |
| 128:4,10 |
| **014322836**   6:16 |
| 134:15,21 |
| **014322863**   6:8 |
| 122:17,23 |
| **01467892**   6:22 |
| 169:19 |
| **074**   189:4 190:24 |
| **076**   184:1 |

| 1 |
| --- |
| **1**   6:2 85:20 86:3 |
| 88:18 119:19 |
| **10**   6:23 176:6,12 |
| 187:4 |
| **100**   40:2,7 45:25 |
| **102**   8:7 |
| **107**   187:6 |
| **10:26**   70:23 |
| **10:44**   71:1 |
| **11**   5:4 6:25 183:17 |
| 183:24 |
| **1100**   244:1 |
| **117**   6:5 |
| **11747**   2:10 |
| **12**   12:6 |
| **12/19/2018**   244:8 |
| 245:3 246:3 247:2 |
| **122**   6:7 |

**128**   6:9
**12:40**   162:8
**13**   21:2 104:20
128:16 243:17
**130**   6:12
**1301**   2:5
**131**   8:8
**134**   6:14
**141**   8:9
**143**   6:17
**146**   6:19
**150**   46:2
**15219-6401**   2:20
**153**   8:10,11
**157**   8:12
**158**   8:13
**159**   8:14,15
**16**   35:17 187:9
**1600**   3:20
**169**   6:21
**17**   1:8 145:18
187:10
**17,000**   152:11
**171**   8:16,17,18,19
128:11
**172**   8:20,21
**173**   8:22
**176**   6:23
**178**   8:23
**179**   8:24
**18**   21:13 187:8,12
**1820**   244:2
**183**   6:25 8:25 9:1
**19**   1:20 10:2
**1900**   2:5
**195**   9:2
**198**   9:3
**1999**   4:4
**1:18**   1:15
**1:31**   162:11

| 2 |
| --- |
| **2**   5:2 6:5 117:6,13 |
| **20**   17:1 24:22 |
| 50:12,12 53:6 |
| 60:3,15 64:23 |
| 245:16 246:22 |
| 247:22 |
| **20,000**   59:25 |
| **200**   46:4 |
| **20001-3743**   3:15 |
| **20005**   2:15 |
| **2000s**   39:19,21 |
| 45:1 |
| **2002**   20:24 |
| **2005**   32:13 |
| **2007**   179:13,19,24 |
| 180:11 |
| **2009**   33:3 45:6 |
| **201**   9:4,5 |
| **2010**   6:24,25 27:13 |
| 30:22 44:25 66:11 |
| 67:25 68:2,22 |
| 77:6,14,20 98:9,11 |
| 111:14 113:1 |
| 145:5 154:22 |
| 176:8,23 177:23 |
| 178:4,8,11,25 |
| 179:8 180:6,17,24 |
| 181:14 183:18 |
| 184:6,12,16 |
| 185:21 190:18 |
| 210:14 213:2 |
| 227:1 |
| **2012**   47:6 125:3 |
| 127:7,9 134:25 |
| **2014**   128:17 129:2 |
| 130:17 131:11,23 |
| 132:6 133:2 |
| 170:12 |
| **2015**   43:13,15 |
| 66:12 68:11,18 |

181:17,24
**2017**   6:4 85:24
86:14,15 87:6
**2018**   1:20 6:6 10:2
21:2,3 117:9,24
118:14 119:19,20
243:8 244:4
**2018-31**   119:13
120:5
**2019**   243:17
**202**   2:15 3:16
**206**   5:5
**211**   9:6
**216**   2:6
**216-523-1313**
244:3
**2222**   243:13
**224**   9:7
**224-1133**   2:10
**226**   9:8
**227**   9:9
**228**   9:10,11
**229**   9:12
**23**   184:6
**236**   9:13
**237**   5:5
**23rd**   140:9,20
**24**   244:4
**242**   5:6
**24th**   243:7
**25**   59:25 193:9
**25,000**   60:3,15
**25301-3202**   3:21
**271**   136:6
**28**   6:6 95:19 117:8
117:24 118:14,25
125:16
**2804**   1:6,8
**2:49**   232:3

[3 - addiction]

**3**

**3**  6:7 87:17 122:14
 122:22 144:25
 152:13
**30**  50:12
**301**  2:19
**304**  3:21
**305**  2:9 3:10
**31**  119:20
**312**  2:23 3:4
**3174234**  244:7
 245:2 246:2
**324-1000**  2:23 3:4
**32nd**  2:19
**3300**  3:9
**33131**  3:9
**332-8000**  4:5
**340-1169**  3:21
**37,000**  121:12
**3:01**  232:6
**3:11**  240:12,13

**4**

**4**  6:9 128:1,9
 154:17
**400**  2:9 26:2
**412**  2:20
**42**  154:21
**424**  4:5
**434-5000**  2:15
**44114**  244:2
**44114-1862**  2:6
**45**  49:10
**45132**  1:15
**46**  152:9
**490**  131:18
**492**  131:7

**5**

**5**  6:12 125:3
 130:22 131:5
 156:6 161:1

**50**  8:3 79:20 96:9
**500**  3:20
**560-3300**  2:20

**6**

**6**  5:3 6:14 134:12
 134:20
**60**  197:9,12,16
 202:7,11,22 208:2
 208:15,22 209:2,3
 209:7 231:1,4,8,16
 237:22
**600**  3:8
**601**  3:15
**60601**  2:23
**60601-5094**  3:4
**631**  2:10
**64**  8:4
**65**  187:22
**687-3256**  2:6
**69**  154:20

**7**

**7**  6:17 143:9,16
 146:20
**714-9700**  3:10
**725**  2:14
**77**  2:22 3:3

**8**

**8**  6:19 145:18
 146:2,9
**80**  156:11 157:15
 157:15
**81**  8:5
**83**  8:6
**838**  134:22
**85**  6:2
**865**  122:24
**88**  157:8
**893**  169:24 170:4

**9**

**9**  6:21 152:13
 169:16,23 177:6
**90**  187:3
**90067**  4:5
**92**  187:5
**942-5150**  3:16
**950**  1:23
**9:10**  1:21 10:3
**9th**  2:5

**a**

**a.m.**  1:21 10:3
**aaron**  1:10
**abate**  59:7,15
**abatement**  59:4,12
 59:14 63:9 73:9
**abbreviated**
 235:14
**ability**  36:23 142:9
**able**  27:19 69:11
 75:24 139:22
 169:6 224:13
**absent**  27:3
**absolutely**  143:7
 150:16 200:21
 213:15 225:14
 228:6,8
**abuse**  65:13 68:16
 76:15,20,24 77:9
 77:16 78:1,4,4,5,6
 89:16,19 93:12,15
 94:7,9,14,19 95:4
 95:8,11,14,16 97:2
 97:7 98:22,25
 99:3 104:17 106:7
 116:1 131:21,24
 132:7 133:23
 135:7 137:9,23
 149:14 177:19,24
 178:24 179:20

194:7 232:21
**accept**  55:25 58:9
**accepted**  211:10
**accepting**  56:2
 58:10 113:6,23
**access**  122:7
**accidental**  96:3
 154:12
**accidently**  150:19
**account**  75:3
**accountant**  166:9
**accurate**  83:8
 144:10,15,17
 156:19 157:5
 202:19 221:22
 222:15,22 223:7
 231:15
**acknowledge**
 138:19,24 143:4,7
 245:11 246:16
**act**  221:17 222:10
 245:14 246:20
**actavis**  216:23
**acting**  239:6
**action**  55:23 113:7
 121:6 243:4
**actions**  52:1 119:6
 156:16
**actiq**  221:5
**active**  161:4 181:2
**activities**  42:25
 44:6 47:12 52:19
 64:10 74:3,7
**acute**  186:13,20
**add**  20:7 142:5
 208:8
**added**  73:14
**addicted**  135:11
**addiction**  169:13
 178:10,10 225:12
 225:22

**addictive** 225:16
225:19 226:1,6
**addicts** 194:10
**address** 64:24
65:9 70:1 83:23
106:6 115:17
123:15,17,20
124:2,4,13,17
127:16 170:14
178:19 230:23
244:15
**addressed** 48:14
88:22 89:9 128:13
**addresses** 61:15
65:5 124:19
**addressing** 84:10
122:7,11 130:4
131:20 133:4
**adequate** 87:4
**adequately** 220:4
**adjournment**
242:22
**administration**
216:3,5,11,16
**administrator**
170:7,8
**adopted** 119:14
**ads** 217:21
**advice** 158:19
**advise** 37:24,25
**advisory** 31:13,16
31:21,25 32:7,17
33:6,9,23 34:14,20
37:15,19 42:11,13
42:17 43:2,7,22
**advocated** 69:2,13
69:18,22
**affect** 159:25
**affiliated** 106:8
112:2 142:25
213:8,13

**affiliation** 24:6
**affiliations** 22:24
23:1 138:3
**affixed** 243:6
245:15 246:21
**afield** 141:18
171:25
**aforesaid** 242:12
**african** 94:14,15
102:16,19 104:2
104:16,20 182:3
186:25 187:4
**afternoon** 206:10
206:11 233:13
235:25 237:10
**age** 11:17 187:14
187:21
**agencies** 38:20
41:18,22,24
110:15
**agency** 19:23
37:11,13 38:19
39:1 40:11,13
42:9 58:9 155:14
**agenda** 49:15,22
52:10,11 55:4,8
72:5,11 75:22
113:12
**aggregate** 155:25
239:13
**ago** 12:15 22:20
94:5 98:10 101:25
106:13,14 136:10
136:11 148:20
158:8 195:1,3
208:25 213:22
220:19
**agree** 55:24 80:5
84:23 130:8,10,16
131:22 132:5,14
182:24 193:18,22

**agreed** 132:12
193:19
**agreeing** 56:1
**agreement** 15:22
21:4 25:19
**agreements** 16:17
16:24 18:22 20:20
**ahead** 142:4 147:7
**aid** 3:2 10:17
142:7 237:11,14
237:18 238:19
**aired** 197:23
**al** 1:14
**alarmed** 202:20
**alarming** 130:5,12
130:17,18 177:18
**alcohol** 96:24,25
152:18
**allan** 28:17,23
29:11 32:8,10,16
33:19 42:22,23
43:19 44:1,7,18,21
45:2,4,18,20 55:13
75:2 78:14 123:12
125:7 128:13,19
130:8,10,16
131:12 134:24
135:4,8,13 170:19
170:20 171:8,11
171:14,17,24
174:12,13 184:5
184:10,14 188:19
189:5,7 190:25
**allan's** 46:23
130:2 171:20
173:12,15,23,25
174:16,18
**allergan** 216:25
217:1,3
**allisyn** 112:10

**alternatively**
183:4
**amended** 209:4
225:23
**amending** 238:23
**amendments**
71:18
**american** 94:14,15
102:16 104:3,16
182:4 186:25
187:4
**americans** 102:19
104:20
**amerisourceberg...**
3:18 11:13 205:23
206:1
**amount** 24:23,25
25:24 26:1 56:1
59:18,22 121:11
121:14,16,19
199:9
**amounts** 60:9,14
60:19
**analyze** 224:14
**anecdotal** 36:20
**anecdotally** 229:7
**angeles** 4:5
**annual** 6:4,24 53:1
53:3 81:12,14,17
81:21 82:4,8,23
83:2,8,15,22 84:5
85:23 86:14,15
87:6,10 88:3 89:9
89:15,18,21,25
108:15 109:4,10
128:23 129:1
176:8,23
**annually** 71:17
**answer** 42:8 44:10
84:2,3 141:21
142:4,13,15

152:16 155:17
157:11 171:6,17
171:22 172:8,22
173:2 175:3,11,22
185:5 198:20
201:17 204:5
212:9 229:7,11
236:16
**answered** 166:18
175:19 179:2
**answering** 142:14
173:22
**answers** 12:20
42:10
**antibiotics** 205:9
205:10
**anticipated** 144:19
**anybody** 144:22
146:25 147:3,14
196:14,17 239:21
**apart** 62:1
**apologize** 26:5
28:4 59:13 206:24
**app** 224:24
**apparently** 188:16
227:9
**appear** 245:11
246:15
**appearances** 2:1
3:1 4:1 5:2
**appears** 177:4
**appended** 246:11
246:18
**apples** 182:14
**applicable** 241:7
**application** 33:10
33:12
**applied** 184:20
227:5
**applies** 56:10,24

**apply** 56:16
**applying** 56:20
**appointed** 34:18
38:5
**appreciate** 204:4
207:6
**appreciated** 34:11
**approach** 32:23
**approached** 33:5
45:6,10
**appropriate** 69:12
137:6,8 138:7,8,20
139:4,14 143:5
154:2 159:15,17
159:20 160:13,20
210:20 220:8
**approval** 52:3,21
56:15 59:18 60:3
113:10
**approve** 47:10
57:22 58:25 59:6
59:14 71:12,15
72:1 78:22 82:4
82:20 133:15,16
**approved** 59:9
71:20 76:9 107:24
216:7 225:4
**approving** 82:19
88:16 107:19
**approximately**
33:4 98:18
**approximation**
101:22
**april** 112:7
**arco** 89:2
**area** 24:16 202:14
211:17
**areas** 63:25
202:13
**argue** 199:3

**argument** 84:23
**armor** 91:16
**arnold** 3:14 11:6
**arnoldporter.com**
3:16
**arose** 190:7
**array** 36:13
**arthritic** 209:21
**arthritis** 227:15
**article** 94:25 95:2
95:6,15,17,22 97:1
97:3 99:23 100:2
148:20 149:6,11
149:17,20 150:21
199:6
**artists** 96:9
**artwork** 147:9
**aside** 14:22 20:8
37:7 38:16 40:20
45:18 46:11,13
49:11,17 77:6
100:1 112:15
113:13 114:8,13
114:15 122:4
127:24 130:15
134:10 145:25
183:15 201:19
202:22 204:8
**asked** 27:10 81:25
95:21 115:25
165:20 174:24
175:16 179:1
192:7 196:24
207:18 216:19
220:18 230:25
237:25
**asking** 52:5 61:23
86:20 132:12,14
132:21 170:21
172:5,6 173:14,18
174:19 184:10,14

199:12 211:23
212:3,6 226:14
227:19 229:7
**asks** 236:14
**aspect** 103:7
231:14
**assert** 174:2
**asserted** 173:5
175:3
**asserting** 172:25
174:6,7 175:10
**assess** 165:21
213:16
**assessment** 132:17
199:13
**assigned** 38:2
**assignment** 245:2
246:2 247:2
**assistant** 208:11
208:22
**assisted** 119:18
120:2
**associate** 215:6
**associated** 121:5
**assume** 91:21
187:16 205:17
**assuming** 185:3
**attached** 246:7
**attaches** 125:16
133:21
**attachment** 6:8,10
6:13,15 122:16
128:3 130:24
134:14
**attend** 26:3,7
47:15,16,21 50:3,8
50:10,24 51:4,11
51:13,16,22,24
129:1 133:25
135:18

**attended** 43:2,6
106:22 129:11
134:1 135:24
136:2,4,7
**attending** 10:8
48:6,8 49:11,17
125:15 127:3,13
127:18 129:5
**attends** 50:22
**attention** 70:8,17
**attorney** 29:18
46:12,14,16,21
47:2 195:7 198:21
198:24 200:5,8,12
200:23 243:2
**attorneys** 10:7
239:15
**audibly** 12:19
**august** 119:20
134:25 194:25
**authority** 43:9,21
83:14 150:9,11
**authorize** 246:11
**authorized** 215:23
**available** 16:21
24:16 86:5 117:21
143:17 146:10
176:14 183:7
199:6 238:9
**ave** 3:15 244:1
**avenue** 1:23 3:8
4:4
**average** 19:25
24:20 50:10 75:7
168:2 187:21
**avoid** 141:7,8
142:19 143:3
**aware** 25:20 26:1
30:16,20 43:24
52:4,14 57:12
90:16 92:6 97:16

98:4,19 106:11
115:15,16 131:19
132:8 139:16
145:16 147:14
155:18,19,21
156:3 166:4
177:23 180:5,7
204:22 205:24
207:10,12,15
216:1,6 226:9,17
226:20 228:15,24
230:2 231:14
233:5 237:13
**awareness** 178:17
**ayes** 120:13,14

**b**

**back** 20:17 71:2
113:14 162:12
174:24 187:25
189:22 192:23
212:14 219:3
227:14 244:15
**backbone** 143:1
**background** 21:16
144:9
**backgrounds**
212:25
**backup** 27:9
**bad** 98:12 188:12
202:9 224:12
**balanced** 57:21
**ballpark** 53:5
59:24 63:21,24
64:6 111:15
194:24
**ballroom** 126:18
**balls** 205:6
**bandages** 205:6
**banking** 30:7
**base** 182:13

**based** 13:10 17:19
36:24 89:12
104:13 105:18,23
148:3,4 157:16
179:21,23 181:24
182:10 224:4,8
**basic** 167:7 169:8
**basically** 18:3
**basing** 181:20
**basis** 53:18 174:9
192:19
**bates** 6:8,11,13,16
6:22 7:1 86:6
117:21 122:17,23
123:3 128:4,10
130:25 131:6
134:15,21 143:18
146:11 169:18,24
176:14 183:19,25
**bathroom** 188:13
**baton** 237:3
**bearing** 122:23
128:10 131:6
134:21 169:23
183:25
**beat** 209:14
**becoming** 32:21
32:24 43:3 45:7
**beginning** 6:8,10
6:13,15,21 7:1
122:16 128:3
130:24 134:14
169:18 183:19
189:4
**behalf** 2:3,8,12,17
3:2,6,11,17 4:2
10:11,14,17,19,21
10:23 11:3,6,9,12
47:12 79:3 82:1
85:15 171:24

**behavioral** 166:17
167:12,15,17
168:5
**belief** 60:22
**believe** 15:17 17:6
20:14 26:15,18
30:7,8,21 37:4,6
38:4 41:23 43:8
44:9,12 46:3
57:24 60:9 67:24
70:11 71:10 75:6
77:10 82:6 101:2
101:6,18 102:6
103:17 106:10
107:17,21 108:19
109:21 110:6,7,10
110:11 112:23
113:18,21 114:12
116:5 129:17
134:1,9 137:12
144:24 145:22
147:2,5 159:8
178:2 179:25
180:8 183:14
184:17 188:20,25
189:15 190:8
193:18 204:14
207:14 216:4
219:9,14,24
230:15 232:13
233:6 234:5 235:8
239:18
**believed** 227:3
**believing** 129:20
**belong** 63:2
**benefits** 160:18
199:13
**benzodiazepines**
133:7
**best** 29:13 141:2,4
143:2 211:20

**bet** 126:25 177:14
**betcha** 156:24
  157:15
**better** 31:15
  127:17,23 181:15
  231:23
**beyond** 167:7
  168:13,24 169:8
  235:13
**big** 127:5,9,14
  209:16 231:7
**bipolar** 194:7
**birth** 170:21,22,25
**bit** 168:1 193:16
  206:25 230:25
**black** 225:7,9,13
**blanking** 136:15
**board** 6:3,5,23
  20:12 22:6,10,11
  25:3,4,6,10,13
  26:10,17,24,24
  27:9,12,12,17 28:6
  28:16,18,21 29:2,4
  29:6,9,12 30:12,15
  30:19,22 31:7
  32:21,24 33:11,15
  34:1,4,18,24,24
  35:3 36:6,6,15,25
  37:7,8 38:16,22
  39:2,8,22 40:5,10
  40:20 41:1,13,14
  41:21 42:1,3,3,8
  42:25 43:3,22
  44:1,6,8,11,11,13
  44:13 45:3,7,19,22
  46:7,9,9,14,16
  47:2,8,9,11,13,14
  48:3,8,9,16,18
  49:17,20,25 50:3,4
  50:6,11,14,17,22
  50:25 51:4,7,17

52:2,2,7,8,11,17
52:20,20,25 53:7
53:15,21 54:17
55:9,17,18,20,21
56:4,8,10,15,16,20
56:23 57:1,3,4,15
57:16,17,22 58:13
58:17,25 59:1,4,18
59:19 60:3,5,6,10
60:10,20 61:1,7,15
61:19,22,24 62:2,3
62:4,11,12,24,24
63:6,15,18 64:1,4
64:10,13 65:4,8,12
65:21,22 66:5,8,14
67:7 68:4,11,15,18
68:22 69:1,3,14,23
70:1,8,14,16 71:6
71:8,11,12,13,15
71:20 72:1,1,4,9
72:24 73:17,25
74:4,7,17 75:4,9
75:12 77:5 78:7
78:17,19,21,24
79:1,2,4,7,12 80:9
80:19 81:1,12,19
81:20,24 82:2,3,3
82:5,7 84:15
85:22 86:4,16,19
87:7,11,19,22 88:1
88:4,6,7,10,13,16
88:23 97:20 98:1
99:15 100:6,17,20
100:21,23,25
101:3,14,15,20
106:9 107:14,18
107:18,23 108:3
108:23,24 109:7
109:25 110:3,9,15
110:19 111:2,4,8
111:10,13,14,16

111:20,22 112:3
112:16 113:1,7,10
113:12,15,19,24
114:3,4,10,17
115:9,11,17 116:8
116:10,13,21,24
117:7,20 118:6,11
118:15,16 119:1,6
120:6,12 122:6
124:6,7,11,15,21
125:14 126:1,3
127:19,20 133:14
133:14 135:17,20
140:25 141:1,17
141:19 142:9,10
145:2,4,9,10,21
162:18 163:7,16
163:20,23,24,24
164:1,4,5,10,12,14
164:15,16,20,22
165:11,13,14,16
165:20,22,24
166:1 170:9 171:8
172:13,15,17,18
173:20 176:7,13
176:24 177:3
180:11,12,16
181:1,4,10,22
185:3,7,10 189:14
190:1 192:6,7
199:25 200:1
201:3,8,12,23
203:13 204:1
229:18 230:9,11
230:19 231:20,21
232:8,20,24
233:25 234:17,25
**board's** 79:17
**boards** 115:24
**body** 191:4

**bordering** 171:10
**bored** 96:12
**bottom** 123:4
  143:18 150:18
  152:14 160:22
  170:12 189:2
  190:23 191:11,12
**box** 225:7,10,13
**braden** 2:22 11:2
  11:3
**brain** 59:25
**brand** 221:4
**break** 60:11 62:1
  70:21 71:5 96:12
  98:2 162:6,15
  174:10 206:6
  231:25
**breakdown** 53:14
**brickell** 3:8,8
**brief** 73:12 89:13
**briefing** 73:7
**briefings** 72:23
  73:4,15
**briefly** 21:15 25:2
  43:25 216:19
**broad** 70:1,5
  229:6
**broadened** 231:11
**broader** 42:4
  48:22,23,25
  199:17
**broadhollow** 2:9
**broadly** 98:20
**brochure** 125:17
  125:18
**brought** 205:9
**bryant** 16:6 17:5,8
  21:4
**budget** 53:1,3,17
  53:20 54:25 55:4
  55:5 57:2,14,17,21

71:5,12,16,19,21
71:25 79:17
**building** 59:7
**bullet** 179:11
180:2
**burling** 4:3 11:9

**c**

**ca** 4:5 244:25
**cabinet** 183:10
**cabinets** 183:6
**calculate** 138:11
138:16
**calendar** 194:22
**call** 16:20,20 49:15
136:21 160:14
175:23,23,25
231:22 238:24
**callas** 3:20 11:11
11:12
**called** 11:17 33:20
53:25 60:8 133:12
133:21 135:5
163:12 185:6,12
197:15 206:15
225:7 232:24
**calling** 204:21
**calls** 195:7
**campaign** 178:18
178:19,22 232:25
233:3
**cancelled** 38:14
**cancer** 104:23
**capacity** 101:14
142:3 229:10
**caption** 10:3
242:21
**carafe** 133:2,18
**caraffi** 111:6,7,15
111:18,21 112:16
112:18,22,25
125:8 126:2

131:12,18,22
132:5,16 134:3
189:21,23,24
190:3,12,17 230:5
**cardinal** 2:12
10:11 204:13,15
204:18,21
**care** 15:12 18:14
18:16,17 37:14,19
211:11
**carfentanil** 91:20
91:22,25 92:6,7,9
**case** 1:8,15 10:3
12:11,12 174:8
244:6 245:3 246:3
**categories** 50:18
**categorized** 96:13
**category** 18:17
203:17,19
**causal** 96:23
**causality** 96:23
**cause** 96:11
102:22 179:14
242:12
**causes** 99:12,16,20
100:3,7 105:3,9
**ccbh** 128:20
**ccbh's** 131:20
**ccbh.net** 230:22
**cdc** 152:1,2
**celebrities** 151:3,5
**celebrity** 150:24
**center** 23:2,5,8,12
23:19 119:18
**centre** 2:19
**cephalon** 217:6,7
217:10 221:1
**certain** 17:3
164:23 165:2
181:19 194:4

**certainly** 114:2
164:7 198:12
200:18 211:21
212:2
**certificate** 5:6
242:1 246:11
**certification** 22:10
245:1 246:1
**certifications** 22:7
22:13,21
**certified** 11:19
22:17,19
**certify** 242:8,19
243:1
**chain** 155:15
170:13 184:2
202:25
**chair** 45:16 48:10
49:2,4,12,18 61:17
61:19
**chairman** 35:1,7
35:16 38:2 39:13
45:13 62:18,19
**chairman's** 94:2
**challenge** 139:23
**change** 140:7,18
140:20,21,22
142:21 244:13,14
246:8 247:3
**changed** 61:14
139:18,19 140:2,5
140:7 142:22
161:21 227:2
228:10,12
**changes** 139:8,11
139:13,16,17,23
139:24 244:12
245:7 246:7,9
**changing** 236:19
**characterize**
223:16

**charge** 54:23
**charity** 23:2,5,8
23:12,18 32:15
**charleston** 3:21
**check** 19:7 20:15
23:20 26:13,20,22
161:17 205:11
**chemical** 92:16
**chicago** 2:23 3:4
**chief** 53:25 54:19
**chose** 49:1
**chris** 232:14
**christmas** 96:12
**christopher** 3:7
10:18
**chronic** 36:19 41:8
63:8 156:9 157:19
157:22,25 158:2,9
209:20 227:13,14
227:14
**ciaccio** 2:9 10:20
10:20 117:16
153:23 158:12
171:7,23 173:9,16
173:21 174:6,21
175:14 183:12
201:13 224:7
228:20 240:5
**circle** 125:19
**circumstance**
219:10
**circumstances**
151:8 238:7
**cite** 147:10
**cities** 32:1
**citizens** 40:9 67:20
**city** 1:13 32:4 41:3
41:10,11
**civil** 69:12 241:3,7
245:5 246:5

claim 168:23
clarifying 167:2
clarity 117:16
classes 167:18
classify 154:6
cleansing 188:15
clear 153:13 173:9
  174:4 204:4
  215:21
cleveland 1:13,23
  2:6 13:18,23 14:7
  14:13 15:2,5,7,18
  18:20 21:1,22
  32:4 36:3 40:23
  41:4,10,11,15,25
  42:2 93:8 119:17
  137:16 144:13
  243:7 244:2
click 150:20
client 195:7
  198:21,24
clients 216:20
clinic 21:23 89:3
clinical 36:24
clinics 236:24
clomax 3:10
close 101:22
cnn 95:18,20
coalition 180:24
  181:2,5,7,11,12
cohen 172:9
colleague 207:2
colleagues 237:4
college 21:17,18
  21:20,25
column 182:18
combat 180:22
combine 152:23
combined 152:17
combines 153:19

combining 153:15
come 20:17 32:16
  47:10 53:12 57:13
  75:16 98:1 110:6
  121:16
comes 55:5 59:5
  73:9 79:17,25
  98:12 110:10,11
  152:7 224:22
comfortable 179:6
coming 72:12
  83:13 214:19
commercial 92:4,9
commission 35:2,8
  35:9,17,19,22 38:3
  39:4 45:14,17
  94:1 101:21 102:5
  102:8 104:24
  105:2 214:21,22
  243:17 245:19
  246:25 247:25
commissioned
  242:8
commissioner
  27:8 28:18,24
  44:1,3,10,15 46:11
  46:14,16,20,24
  73:24 74:2,6,19,24
  75:1
commissioner's
  73:23 74:16 75:8
  75:21 76:11,14,19
  77:7,17 78:3
committed 53:18
  182:8
committee 37:15
  37:19,23 48:11,13
  48:17 49:3,4,7,13
  49:19 50:1 60:8
  60:18,24 61:2,5,12
  61:14,16,19,23

62:18,20 63:3
  64:9
committees 61:8
  61:10 62:12,15,23
  63:1
communicable
  89:2
communicated
  204:17 205:18,25
communications
  198:22,24 201:16
  201:19 236:18
communities
  40:25 41:2 53:11
  94:14 104:3,16
community 23:11
  24:3,13,21 48:22
  48:24,25 51:1,3
  70:10,18 80:11,15
  80:20,24 94:9,11
  94:16 133:19
  134:4,6 145:11
  165:2,6 178:13
  179:24 199:17
comorbidities
  160:14
companies 3:13
  123:25 197:20
  203:20,22 209:11
  209:17 213:6
  220:18,21 226:12
company 15:23
  16:1,3 123:23
  203:23 205:1
  220:12,14 223:8
  223:17
compare 193:11
comparing 182:14
compensated
  17:14 38:6 211:22

compensation
  17:19 25:13,16,22
complaint 197:4,7
  207:19,24
completed 242:22
  244:15
complicated
  142:24 228:22
  229:9
components
  133:20 134:5
concept 231:12
concerns 239:5
concert 27:7
concluded 240:13
concludes 240:3
conducted 235:3
conference 32:11
  32:14 44:18,22
  45:3 125:15 126:4
  126:7,16,20 127:3
conferences
  127:14,18
confidential 6:7,9
  6:12,14,21,25
  122:15 128:2
  130:23 134:13
  169:17 183:18
congratulate
  164:8
conjunction 66:4
  140:15 185:6
  234:20
connect 119:16
connected 121:10
  121:20
connection 92:16
  124:5,10,14,20
connolly 2:13
  10:11

cons 224:15,17 238:2,5

consider 57:5 156:13,16 160:12 160:18 238:14

considerate 130:3

considered 214:15 215:2

consist 48:5

consistent 72:13 72:16 228:4,8

constitute 171:4

consult 161:11,14

consumer 215:10

contained 83:8

content 138:14 195:10 200:10

contents 88:19 89:12

context 90:25 91:2 91:3 108:20 199:25 217:9,19

contexts 164:3

continue 75:17 226:4

continued 3:1 4:1

continuing 180:20

continuous 156:13 157:9

contract 16:6 17:15 19:14 20:1 20:14 24:9,10,24 25:1,9 37:9 46:18 46:22,23 60:8,18 60:23 61:2,4 119:15,24 120:16 123:25

contractor 16:13 17:23 19:9 20:10 23:16,18,24 230:16

contractors 48:15 230:13

contracts 16:5 17:2

contractual 15:22 16:17,24 18:22 20:19 21:4

contraindicated 227:16

contraindications 225:1

contrary 175:21

contribute 37:2,5 144:22 146:25 147:3 182:20 193:24 194:2,6,14

contributed 129:19

contributes 182:25 193:20 194:11

contributing 133:4

controlled 135:6 155:22,25 156:4 235:11

conversation 95:18,20 96:17 196:18 200:11

conversations 195:10 236:2,7,10 236:12

conviction 119:19

coordinating 128:21

copied 189:6

copy 54:25 55:11

copying 190:25

coroner 234:21,22 234:24

coroner's 235:3

corporate 206:17

corporation 3:18 4:2 11:10 39:12 204:25 205:15,19 205:23 206:1

correct 14:17,21 15:20 19:1 24:1 26:8 28:7,8,8,25 29:10 30:13,24 34:16 42:23 43:5 44:19 47:3 48:20 55:10 56:21 62:21 65:6,10 78:18 83:1 87:24 88:24 89:5 92:14 95:5 103:21,25 104:7 115:7 118:17 121:13 122:3 123:14 128:15 145:13,24 146:18 146:22 149:13,16 149:19 155:12 158:5,6,11 160:3,6 160:10,21 167:6 168:9 169:2 170:7 170:10,23 177:5 179:9 184:9 188:5 190:16 196:3 197:24 198:2 199:15,19 200:9 207:8,13 214:11 214:17 215:19,25 216:3 220:5,9 228:7 233:9,12,16 242:17

corrections 244:12 246:17

correctly 119:21 130:6 177:20 179:17 213:24

correspondence 171:3

cotton 205:6

council 31:9,12,14 31:17,21,25 32:7 32:17 33:6,9,23 34:14,20 42:11,13 42:18 43:3,7,22

counsel 2:12 3:18 4:2 171:7 195:10 201:17,20 207:18 211:16,25 227:23 241:1,10 243:2

counsel's 174:22

counties 180:4

counting 50:13,15

counts 28:22 100:10

county 2:8 6:3,5 6:23 10:21 20:12 25:4 26:15,16,17 26:18,24 27:12 31:10,20,23 34:24 35:3,6 36:6 37:8 38:16 39:2,22 40:5,9,10,14,19 41:1,2,14,18 42:7 47:9 49:20 50:4 51:13 52:2 53:13 55:21 56:9,16,23 57:16 58:13,17 59:1,16,19 62:4 63:6,15 64:1 65:4 65:12,22 66:5 67:20 69:3,14,23 70:1,8 71:5,13 72:24 73:17 74:4 78:7,21 79:1,7 80:8,18 81:1,11 82:5 83:17,24 84:7,11,14,25 85:2

85:7,11,16,21 86:4
86:16,18 87:7,11
88:23 97:12,18,24
97:25 98:20 99:3
99:8,13,17,21
100:4,8,20,21
101:5,15,17 103:5
106:2,4,9,12,17,20
106:23 107:3,8,12
107:14,15,20,23
107:24 108:3,4,7
108:12,14,18
109:11,19,25
110:2,7,13,17
111:19,23 112:3
112:12,17 113:14
113:15,16 114:9
114:10,17 115:8
115:10,16 116:7
116:10,13,24
117:7 122:6 124:6
124:11,15,21
127:20 128:22
130:13 132:18
135:20 142:10
145:2,4,9 162:17
163:7,16,20,24
164:1,5,12,16,22
165:16,22 166:1
170:9 172:12,15
172:18 176:7,13
176:24 178:25
179:5,8,20 180:3
180:23 181:1,3,5
181:10,14 182:2,6
182:13 183:1
189:14 191:15,16
192:1,7 193:21
194:3 200:1 203:7
203:9,10,13,25
226:16,17,20

228:15,25 230:9
230:11,14,19
231:21 232:8,24
234:3,13,19 242:4
245:10 246:15
**couple** 17:10 47:5
195:1,2
**course** 28:2
**coursework** 93:11
93:14,17,20,22
**court** 1:1 5:8
11:14 12:20
175:23,23,23
245:7
**courteous** 222:11
**cov.com** 4:6
**cover** 75:3 83:16
83:20 84:6 86:8
86:24 87:1 109:13
109:13 119:5
131:8,10 168:21
170:1 177:2 207:1
**covered** 74:24
**covington** 4:3 11:9
**crashes** 179:15
**crawford** 16:8
21:12,13
**crazy** 28:11
**crc** 60:8
**create** 147:9
**cribs** 64:20
**crisis** 135:7
**critical** 74:21
**csu** 13:19
**cupboards** 183:6
**current** 13:16 83:9
123:19 228:2,4
**currently** 13:14,17
37:10 38:18 63:19
97:13 124:9,14
159:5 163:16

**custody** 5:7
**customer** 69:7
**cuyah** 6:8,11,13
6:16,22 7:1
122:17,23 128:4
128:10 130:25
131:6 134:15,21
169:19,24 183:20
184:1
**cuyahoga** 2:8 6:2
6:5,23 10:21
20:12 25:3 26:15
26:16,17,18,24
27:12 31:10,20,23
34:24 35:3,5 36:6
37:8 38:16 39:2
39:22 40:4,9,10,14
40:19,25 41:2,14
41:18 42:7 47:9
49:20 50:4 52:2
53:13 55:21 56:9
56:16,23 57:15
58:13,17 59:1,15
59:19 62:3 63:6
63:15 64:1 65:4
65:12,22 66:4
67:10,13,15,17,20
67:23 69:3,14,23
69:25 70:7 71:5
71:13 72:24 73:16
74:3 78:7,20 79:1
79:7 80:8,18 81:1
81:11 82:5 83:17
83:24 84:7,11,14
84:25 85:2,7,11,16
85:21 86:4,16,18
87:7,10 88:22
97:12,24 99:3,8,13
99:17,21 100:4,8
100:19,21 101:4
101:15,16 103:4

106:1,4,9,12,16,19
106:23 107:2,8,12
107:14,15,20,23
107:24 108:3,4,7
108:11,14,18
109:11,19,25
110:2,7,13,17
111:19,23 112:3
112:12,17 113:13
113:15,16 114:8,9
114:17 115:8,10
115:16 116:7,10
116:13,24 117:7
117:20 122:6
124:6,10,15,21
127:20 128:22
130:12 132:18
135:20 142:10
145:1,4,9,21
162:17 163:7,15
163:19,24 164:1,4
164:11,16,22
165:16,22,25
170:9 172:12,15
172:18 176:7,13
176:24 178:24
179:5,8,20 180:3
180:23 181:1,3,4
181:10,14 182:1,6
182:12 183:1
189:14 191:15
192:1,6 193:21
194:3 200:1
203:10,13,25
226:16,17,20
228:15,24 230:9
230:11,14,19
231:21 232:8,23
234:2,13,19 242:4
**cv** 33:13 150:2

**cvs** 237:15,18
238:19

**d**

**d.c.** 3:15
**daily** 156:12
**damages** 204:1
**dan** 1:10 10:22
**danger** 225:22
**dangers** 95:8 97:2
153:15
**daniel** 2:4 244:5
**data** 103:14,19
152:3
**date** 10:2 127:8
144:14 148:19
170:21,22,25
200:20 241:11
244:8 245:3,9,19
246:3,13,25
247:20,25
**dated** 125:3
128:16 184:6
**david** 172:9
**dawn** 114:21
115:10 116:3,4,8
116:14,18
**day** 3:7 10:19
66:19,21 152:9
243:7 245:16
246:22 247:22
**days** 14:6,9,11,19
14:22,25 15:2,5,13
244:18
**dc** 2:15
**dea** 155:18,19,21
156:3 192:15,20
216:4
**dea's** 155:24
**deal** 41:18 167:24
187:10

**dealings** 204:12,24
205:22
**deals** 171:3
**dealt** 94:12 104:25
**dear** 244:10
**death** 96:7,11
102:22 151:8
179:14
**deaths** 94:7,8
99:20 100:4,7,15
100:17 101:1,4,16
102:3 103:4,23
150:25
**debbie** 27:22
29:17 56:7 118:10
118:15
**december** 1:20
10:2 140:10,11,20
243:8 244:4
**decide** 68:15,19,23
**decided** 68:4,11
**decides** 57:1
**deciding** 57:16
78:8 160:12
**decision** 160:19
219:23
**decisions** 46:6,10
**decreased** 182:6
**dee** 170:5,7,13,24
**deed** 245:14
246:20
**deemed** 244:19
**deeper** 141:22
**deeply** 229:4
**defendant** 4:2
237:19
**defendants** 2:13
3:19 4:3 10:15
11:4,7 203:5,17,18
206:14,16 207:15
237:15

**defense** 239:19
240:3
**defer** 78:24 132:16
132:22
**define** 90:24 91:2
203:21
**defining** 40:5
203:21
**definition** 63:22
94:20,22 99:4
114:6 132:9
**degree** 167:16
168:5,13
**delete** 196:25
**delivery** 241:9,11
**demographic**
193:4
**demographically**
187:1
**demographics**
102:11,12,14
193:1 194:5
**dent** 91:16
**dentists** 105:21,21
105:22
**department** 19:14
19:19,20,22 20:2,9
37:9 38:17 39:3
40:22 41:15 42:3
57:8 133:3 134:8
177:17 244:22
**departments**
40:20 57:8,11
78:17
**depend** 26:9
**dependent** 26:2
**depends** 26:6
90:25
**deposed** 11:19
12:7,14 194:20
195:5

**deposition** 1:18
27:24 85:20 117:6
122:14 128:1
130:22 134:12
141:24 142:2
143:9 146:2
169:16 176:1,6
183:17 195:14,18
196:15,22 197:3
198:6 207:20
208:5,6,10,12,13
231:19 240:13
242:20 244:8,11
245:1,3 246:1,3
**depression** 194:7
**describe** 99:7
178:12 187:2
212:25
**described** 210:1
**description** 6:1
73:12
**designated** 6:7,9
6:12,14,21,25
122:15 128:2
130:23 134:13
169:17 183:18
**desk** 148:6
**destruction**
192:16
**detail** 222:17
223:17
**detailed** 220:22
**details** 191:18
**determination**
78:10
**determine** 79:1
**determined** 74:11
89:24 220:7
**determines** 74:23
75:2 89:8

**determining** 56:9 78:20
**developed** 98:6
**developing** 65:22
**development** 39:12
**device** 224:11
**devote** 70:8,17
**diabetes** 36:19 85:3,5,17
**die** 96:20,23 151:22
**died** 95:16 96:1,2 96:10,13 97:4 150:19
**difference** 53:15 186:5,9
**different** 39:25 57:7 103:1 146:19 150:4,6,7 155:10 159:1,6,9 209:2 239:14
**differently** 102:25
**difficult** 199:4
**difficulty** 236:3
**direct** 194:17 215:10
**direction** 190:9
**directly** 215:6
**director** 13:18 15:24 16:12 23:11 24:3,13,21 51:16 51:19,21 73:10 116:17 167:23 189:12,13,16 230:8
**directors** 78:15,16
**disagreeing** 175:8
**disburse** 58:7
**disbursement** 57:23 58:2

**disclose** 171:13 173:11,24
**disclosing** 171:15 236:10
**discriminate** 224:13
**discuss** 36:18 164:18 169:7 202:3 231:17
**discussed** 105:6,9 138:6 201:11 231:19
**discussing** 137:6 190:6 200:22 202:6
**discussion** 33:17 33:18,21,22,24 34:7 56:14,19,22 67:24 84:9,13,15 84:18,20 94:12 105:7,10 121:5,7 139:7 200:19,21 201:1 208:16
**discussions** 57:12 67:25 81:9 195:8 201:16 238:13,18 239:4
**disease** 36:19 41:8 63:8 84:22 85:18 89:3 104:23
**disorder** 119:17
**disparity** 96:14,19 104:24,25
**dispensed** 154:20
**dispensing** 236:21
**disposal** 115:12 116:25 182:21 184:7,11,15,18 185:15 188:1 190:4,11,13 193:17

**disposals** 114:22
**dispose** 114:23 184:22
**disposed** 184:20
**disposing** 184:24 190:6,7 191:2
**disproportionate** 105:3
**disproportionately** 94:13 102:16,18 102:20 104:2,4,11 104:15 193:5
**distinction** 90:9,15 92:23 130:4 234:3 234:6,8
**distinctions** 114:16 234:13
**distracting** 28:2
**distribute** 116:11
**distribution** 116:6 197:20 202:18,21 231:13
**distributor** 2:12 3:17,18 4:2,3
**distributors** 202:24
**district** 1:2 31:8 31:12,13,16,21,25 32:7,17 33:6,9,23 34:14,20 42:11,13 42:17 43:2,7,10,22
**diversity** 48:10,14 48:17,18,21,25 49:3,4,6,13,18 50:1 61:12,15 62:20
**division** 1:3
**dixon** 27:21 29:14 30:11
**doctor** 160:17 171:20 175:4,10

175:12,16 228:14 232:7 237:2,5
**doctors** 105:18,21 105:22 230:10
**document** 1:11 6:2 27:9 53:20,23 85:21 86:7,10 87:3 88:19 89:13 117:14,17,17,22 118:4 119:4 122:22 123:2,10 128:9 129:11 131:5 134:20 143:20 145:1 154:18 156:7 169:23 172:3 173:19 176:12,20 177:7,10,22 178:3 181:13 183:15,25 184:4 189:3
**documents** 196:20 196:25
**doing** 15:15 92:21 115:21 129:25 154:13 156:14 165:3 195:16 232:16
**domain** 82:17
**dose** 156:12 160:4
**doses** 159:18
**doubt** 204:19 213:10
**doug** 27:25 28:1,2 28:4,10 29:25 30:7 54:3 62:18
**dr** 6:17,17,19 10:23 11:23 30:11 31:4,5 71:2 118:9 118:19,20 125:13 131:19 137:19,21 142:1,2 143:10,11

144:5 145:3,7,16
146:3 162:12,22
162:24 163:3
166:5 173:19
174:17 176:19
195:24 206:10
231:22 237:10
239:3,21
**drawing** 92:24
**drgreghall.com**
143:25 146:13
**drgreghall.com.**
125:1 143:19
**drhall** 125:1
**drichards** 2:7
**drill** 12:18
**drink** 96:2
**drinks** 154:1
**drive** 2:22 3:3
**driving** 26:4
**drug** 3:18 65:16
93:15 96:24,25,25
133:22 135:7
150:25 151:9,10
155:14 177:8,19
177:24 178:24
179:13,20 180:5
183:9,11 194:10
216:2,5,11,16
**drugs** 92:16 96:2
103:10 151:22
152:19 183:8
238:2
**due** 219:7 226:11
226:23 229:1
**duly** 11:18 242:7
242:10
**duties** 24:12 37:22

**e**

**e** 235:15
**earlier** 32:12,13
79:5 142:7 149:7
149:10 189:23
193:18 198:12,12
207:3,14,18
229:16 231:1
233:6 235:25
238:1
**early** 45:1 67:25
**easily** 153:4
**east** 2:5 3:20
**eastern** 1:3 39:11
**easy** 163:5
**educated** 219:25
**educating** 153:2
210:19
**education** 127:23
178:17 224:9,9
**educational** 21:16
212:22,25
**effect** 140:8,20
**effectiveness**
165:21
**effects** 224:12
225:1
**efficient** 207:1
**efforts** 180:22
**eight** 66:3 98:7,9,9
**either** 68:14 84:24
90:19 101:12
108:10,13 113:22
132:3 243:2
**elections** 118:5
**eligibility** 30:17
**eliza** 16:6 17:5,8
21:4
**ellis** 1:22
**email** 6:7,10,12,15
6:21,25 107:9

122:15 123:12,15
123:16,20 124:2,4
124:13,17,19
125:2,6,7 128:2,12
128:16,19 130:2
130:23 131:7,9,11
131:18 132:3
134:13,24 163:10
169:17,25 170:1,4
170:11,13 172:11
172:16 183:19
184:2,5 187:25
188:18,18 189:19
190:18,21,24
230:22 244:17
**emails** 49:21
107:11
**emily** 162:22
**emphasis** 214:3,6
**employed** 13:14
13:17,20 15:18
16:9 18:8,20
20:25 25:6 44:7
52:17
**employee** 111:19
112:3,5
**employees** 45:22
46:7 51:4,7 78:25
114:2,4 163:25
164:4,11
**employer** 13:16
**employment** 13:23
14:13,23 15:21
19:3,5,6 20:16
93:7
**employs** 40:1,6
**enclosed** 244:11
**encompasses**
87:15
**encounter** 69:12

**encourage** 57:20
**ended** 23:12 35:24
**endo** 3:11,12 11:6
217:13
**enforcement**
155:14
**engaged** 49:22
**engages** 65:8
**engaging** 210:2
**enhance** 36:24
**enhances** 37:1
**enjoyed** 45:12
**ensure** 156:15
**entails** 70:5
**entered** 246:9
**entire** 231:12
245:5 246:5
**entities** 19:8
237:23
**entitled** 6:3 85:22
**entity** 60:7
**epidemic** 99:2,5,6
125:20 126:7
131:21,23 132:7,9
151:1 178:20,24
179:4,7
**epidemiology**
168:18,20,24
169:1 232:9,16,19
**episode** 202:21,23
**episodes** 20:5
**equal** 104:22
138:15 156:10
157:7
**equivalence**
138:12
**equivalent** 154:20
156:12,23 238:10
**erieview** 2:4
**errata** 244:13,18
246:7,10,18 247:1

**esq** 2:4,9,14,18,22
  3:3,7,14,20 4:4
  244:5
**establish** 96:22
  184:25
**estimate** 16:22
  148:9
**et** 1:14
**evaluate** 163:25
  164:15,19
**evaluated** 220:6
**evaluation** 235:10
**evening** 136:4,7,18
**event** 129:13,16
  133:21,25 134:2
  135:5,18,22,24
  136:4,7,9,20,22
  137:2,5,11,25
  138:4,6,9,18,23
  139:7 171:2
  201:15 243:3
**events** 136:2
**everybody** 123:5
**evolving** 236:22
**exactly** 58:6 79:11
  79:14,15 227:24
**examination** 5:4
  11:17,21 206:8
  237:8
**example** 64:18
  72:21 187:20
  225:21 227:14
**exceed** 121:12
**excellent** 222:23
**excessive** 214:4
**exchange** 6:7,10
  6:12,15,21,25
  113:5 122:16
  128:3 130:24
  134:14 169:18
  170:4,11 172:11

172:16 183:19
  190:19
**exclude** 41:10
**executed** 246:10
**execution** 245:14
  246:19
**executives** 51:13
**exhibit** 5:7 6:2,5,7
  6:9,12,14,17,19,21
  6:23,25 85:20
  86:3 117:6,13
  122:14,22 128:1,9
  130:22 131:5
  134:12,20 143:9
  143:16 146:2,9,20
  169:16,23 176:6
  176:12 183:17,24
**exhibits** 5:3,8 6:1
**expect** 104:21
**expected** 104:13
  104:19
**experience** 90:17
  223:16 233:24
**expert** 211:8,17,21
  211:22,23 212:3,7
  229:5
**expertise** 150:14
  166:14,17,22,24
  166:25 167:1,9,24
  168:10,14,23
  169:1,9,12
**expiration** 245:19
  246:25 247:25
**expires** 243:17
**explain** 58:5
**explaining** 199:3
  199:10
**explore** 191:16
**exposure** 168:2,4
**express** 32:20

**expressed** 75:4
**extent** 52:5 58:10
  164:23 180:14
  181:19 195:6
  197:10 198:21
  236:14
**extra** 114:23

**f**

**f** 3:6
**faces** 210:17,17
  212:20,20,20
**facilities** 187:23
**facing** 84:24 85:2
**fact** 59:13 180:5,8
  209:9
**factors** 133:4
  159:24 160:11,19
  193:23
**facts** 151:20
  179:11
**fair** 17:24,25
  48:16 51:1,3 65:5
  74:19,20 75:5
  92:17 95:25
  105:20
**fairly** 178:15
**fall** 203:18
**familiar** 90:5
  91:24 92:5 106:1
  112:6,9 122:5,9,10
  133:8 139:13
  155:13,24 163:6
  163:11 204:6
  216:22 238:10
**familiarity** 202:23
**fan** 96:3
**far** 141:18 147:13
  157:4 171:25
**farm** 89:1
**fatalities** 133:6
  234:15

**favor** 125:13
**fda** 216:15 225:4
  229:14
**federal** 174:10
**feedback** 69:11,20
  164:21,24 165:9
  165:12,14
**feel** 36:12 42:10
  76:25 79:10 109:3
  126:14 182:15,17
  213:4 217:1
  219:22 223:19
**feinstein** 2:18 5:5
  10:13,14 206:5,9
  206:13 211:25
  212:13 227:23
  232:1 237:1,25
  239:11
**felt** 36:3 42:24
  96:4 129:25
  142:24 211:14
  214:3 222:21
**females** 187:3
**fentanyl** 91:18,22
  103:24 223:3,5
  233:10,14,18,19
  233:22 234:16
**fentora** 221:7
**fewer** 186:19
**field** 22:3
**fifth** 2:22
**figures** 151:24
  154:23
**filed** 198:4
**finance** 63:2
**financial** 54:1,19
  55:6,7,12 62:16,17
  71:7 72:6,11 89:3
  113:21,22
**find** 80:5 96:18
  136:14 224:11

244:11
**finding** 136:19
**findings** 234:25
**fine** 172:4
**fire** 44:14 46:7
**firing** 46:15,19
**firm** 10:23
**first** 11:18 31:3
 32:9 44:17 66:11
 97:16 98:4,23
 106:11,17 136:17
 156:7 157:18
 167:18 177:15
 179:11,16 180:2
 194:19 198:9,17
 225:25 242:10
**firsthand** 229:8
**five** 12:15 28:12
 28:13,15 29:9
 32:12 33:7 35:16
 43:12 70:21 98:17
 106:15 133:3
 148:16,21,23
 162:6 180:4
 231:25
**fka** 3:13
**fl** 3:9
**flip** 237:2
**floor** 2:19,22
 136:17
**flush** 188:3,11,13
**flushing** 184:23
 188:6,9
**flyer** 133:21 135:5
**focus** 78:9,11,21
**follow** 100:14,16
 102:11 207:4
**following** 104:23
 119:13 156:14
 158:18 200:25
 227:3,4

**follows** 11:20
**food** 216:2,5,11,16
**force** 106:2,5,12
 106:17,20,23
 107:3,5,9,12,16,20
 107:25 108:5,8,12
 108:15,18 109:12
 109:15,20 110:8
 110:14,18,22,23
 111:9,16,23
 112:13,17,22
 113:2,10,17,20,25
 114:5,7,9,13,14,17
 114:25 115:2,6
 116:20,23 128:22
 129:18 134:7
 190:1
**foregoing** 242:16
 242:21 245:13
 246:18
**forgetting** 54:5
**form** 27:5 56:14
 64:12 73:19 92:1
 92:2 102:24
 153:23 158:12
 183:12 201:13
 222:3,4 224:7,24
 233:18
**formal** 74:15
 111:11 165:12,14
 165:17,19
**formation** 68:1
**formed** 180:24
**formulary** 238:11
**formulation** 238:8
**forward** 176:1,4
 244:15
**forwarding** 125:7
**forwards** 135:5
**found** 184:23
 236:23

**four** 12:10,15 15:1
 15:4,24,25 27:16
 35:16 48:4 75:10
 151:3 200:17
 237:23
**free** 245:14 246:20
**freelancer** 95:24
**frequently** 153:7
**front** 118:3 123:11
 131:8,10 189:3
 206:24
**frown** 210:17
 212:20
**full** 13:25 40:6
 74:3,22 83:16,20
 84:2 87:3
**fund** 23:25 110:2
**funded** 116:14
 117:1 181:8
**funding** 53:8,15
 55:18,22 79:6
 107:15,19,24
 108:4 110:8,14,18
 116:20 121:17,24
 122:5 163:17,21
 192:8
**funds** 47:10 55:24
 55:25 56:2 57:23
 79:25 110:5
 113:11
**further** 141:22,23
 206:3 237:6
 242:19 243:1
**fuzzy** 79:9
**fyi** 135:4

**g**

**gain** 67:18
**gang** 19:16
**gatt** 27:22 29:19
 30:8 118:19

**gcallas** 3:22
**gelembiewski**
 163:3
**general** 103:18
 168:22 185:17
**generally** 83:22
 84:6 90:19 104:6
 115:5 129:22
 144:15,16 153:7
 155:19 187:1,12
 190:10 236:12,19
**gentleman** 195:19
 196:1
**geriatric** 187:24
**gesture** 130:3
**getting** 94:24
 141:19,22 174:16
 175:18 198:23
 209:14 211:17
 219:3,11 229:4
 236:17
**gis** 89:2
**give** 26:4 36:4,5,20
 36:23 53:5 59:24
 63:21,24 64:5
 69:11,19 73:11,24
 74:15 101:20
 102:4,7 199:14
 210:13 212:7
 241:1,10
**given** 77:3 242:13
 242:18
**gives** 59:11 170:14
 191:1
**giving** 64:20 199:7
**glhall** 124:18
**globally** 190:5
**go** 11:23 43:12
 52:10 59:14 85:4
 136:19 142:4
 147:7 150:9 161:7

173:6 238:9
**goes** 23:15 58:11
  140:8
**going** 27:23 33:3,7
  47:5 50:12 91:21
  102:23 126:21
  127:12 129:3,10
  141:14 160:16
  171:1 172:8 173:6
  175:7,21 190:3
  194:20 195:5
  198:19 199:9
  201:14 206:4,24
  206:25 208:8,10
  208:11 211:24
  215:14 216:20
  229:3 231:6,7
  237:1
**gold** 214:23
**good** 11:24 18:16
  36:13 39:24 63:20
  70:21 84:23
  128:20 131:18
  165:1,3 206:10,11
  224:12 237:10
**gotten** 148:1
  181:15,16
**government** 19:23
  40:11,13 41:17,22
  42:8 51:10 79:13
  79:17
**governmental**
  37:11 38:19,20
  39:1
**gowns** 205:5,5
**grades** 164:8
**gradually** 98:6
**grant** 2:19 53:12
  56:9,17,23 121:20
  122:10 133:3,9,11
  133:15,17,20

134:5,7 163:11,12
  163:17,21
**granting** 58:9
**grants** 56:20
**granular** 219:20
**great** 195:16
**greater** 156:11
  157:8 159:18,21
**greg** 6:17,18,19
  10:24 123:13
  135:4 143:10,11
  144:5 145:3,8,16
  146:3 188:19,24
**greg.hall** 123:16
  124:5 128:14
**gregory** 1:19 5:4
  10:5 11:16,21
  12:2 13:20 14:24
  15:1 23:21 27:22
  118:20 206:8
  237:8 242:9 244:8
  245:4,9 246:4,13
  247:20
**gretchen** 3:20
  11:11
**grocery** 69:9,15
**group** 31:9,19
  42:13 91:7,9
  232:9,11,13,16,19
**growing** 180:22
**guess** 34:22 78:23
  148:21 166:20
  174:22 188:13
  189:9 194:4
**guessing** 129:3
**guidelines** 140:23
  162:15,19 226:24
  227:2,3,4,5 228:3
  228:5,11,17
  229:18,22

**gullett** 51:20

**h**

**habits** 228:11
**half** 14:6,9,11,19
  14:22,25 15:5,13
  20:7 94:4 101:25
  145:20 196:9
**halfway** 118:4
  119:10 184:4
**hall** 1:19 5:4 6:18
  10:6,24 11:16,21
  11:23 12:2 13:20
  14:24 15:1 23:21
  27:22 71:2 86:3
  117:13 118:10,20
  122:22 123:13
  125:13 128:9
  131:5,19 134:20
  142:1 143:11,16
  144:5 145:3,8,17
  146:9,20 162:12
  166:5 169:23
  174:17 176:12,19
  183:24 206:8,10
  237:8,10 239:3,22
  242:9 244:8 245:4
  245:9 246:4,13
  247:20
**hall's** 6:17,19
  142:2 143:10
  146:3 173:20
**hammer** 44:25
**hand** 85:4,4 243:6
**hanging** 166:24
**happen** 33:2 66:14
  71:23 113:3 192:2
  208:8,11
**happened** 136:20
**happens** 52:8
  73:13

**hard** 26:5
**harvard** 136:5
**head** 17:10 54:7
  54:23 57:9 72:3
  75:15,18 80:6
  84:20 165:10
**heading** 119:5
  177:7
**health** 2:12 3:11
  6:3,4,5,24 10:12
  13:19 19:18 20:13
  24:17 25:4,7,10,14
  26:11,17,25 27:12
  28:23 34:25 35:2
  35:3,5,8,10,11
  36:7 37:8 38:3,4
  38:17 39:2,5,23
  40:5,8,11,20,21,22
  41:1,14,15,19,21
  42:2,4,8 43:1,23
  44:1,2,3,6,8,10,11
  44:14,14 45:4,14
  45:17,19,23 46:7
  46:10,15,23 47:2,9
  47:11,13 48:8,16
  48:18 49:20 50:4
  52:2,17,20,25
  54:17 55:18,21
  56:10,16,23 57:1,3
  57:5,16,17 58:13
  58:17 59:4,20
  60:6,6 61:24 62:4
  63:5,6,16,19 64:1
  64:4,13 65:4,12,23
  66:5 67:14 68:15
  69:4,14,23 70:1,5
  70:8,9,14,15,17,18
  71:6,13 72:25
  73:17 74:4,8 78:8
  78:17,21 79:1,7
  80:9,10,16,19,20

81:2,12 82:5
83:17,23 84:7,10
84:14 85:2,6,10,22
85:23 86:13,16,19
87:7,11 88:23
91:1,3 94:1 97:13
97:19,20 98:1
99:7,15 100:6,20
100:22,24,25
101:15,22 102:5,9
104:25 105:2
106:9 107:15,24
108:3 109:25
110:3 111:20
112:4 113:16,20
113:24 114:3,5,10
114:18 115:9,11
115:17,24 116:8
116:11 117:7,20
119:1 122:6
123:22 124:7,11
124:15,21 127:20
130:5,12,17,18
131:20,23 132:7
133:4 134:8
135:21 142:10
145:2,4,10,21
162:18 163:7,16
163:20,25 164:1,5
164:12,17,22
165:16,22 166:1
166:17 167:12,15
167:17 168:5,11
170:9 171:8
172:13,15,18
173:20 176:7,24
177:17 180:22
181:1,4,11,23
185:4,7,10 189:14
192:7 200:1
203:14 204:1,13

204:15,18,21
230:9,11,20
231:21 232:8,24
233:25 234:17,25
**health's** 53:8 59:1
64:10 65:22 86:4
116:14,25 176:13
**healthcare** 215:17
**hear** 45:8 75:8
113:9 121:3 165:1
198:9,17 199:20
199:24 201:2
213:24
**heard** 75:12,21
76:1,6,7,10,13,18
76:23 77:7,15
78:2 81:9 90:7
162:21,24 198:15
200:6 206:19
207:7 208:23,24
216:23,25 217:6,7
217:9,13,15,17,19
218:5,11,13,21,23
233:2 235:9,12,17
235:21
**hearing** 77:6
112:15 126:6
129:15 165:4
**hearsay** 32:18
57:13 132:20
**heart** 84:22 85:18
104:22
**heavily** 58:21
**heidi** 51:20 231:23
**held** 39:17 66:18
**help** 151:14
156:15 184:8
188:20,25 224:2
**helping** 135:11
223:24

**helps** 62:8 127:16
230:16
**hereinafter** 11:19
**hereunto** 243:5
**heroin** 91:13,17
103:20 104:9
152:25 153:8
194:9,13 232:25
233:3,7
**hey** 125:12
**hi** 11:2 112:20
**high** 104:4,12
137:23
**higher** 102:17,20
234:14
**highlight** 150:25
**hilton** 136:16
**hip** 67:10,13,16,23
186:13
**hippocrates**
224:25 225:3,6
**hire** 44:14 46:6
**hiring** 46:15,19,21
47:2
**history** 173:12,15
174:14,15,17
**hold** 35:12,14
39:14
**holdings** 3:13
**home** 15:23 16:1
18:9 21:5 123:23
123:24 148:6,7
158:6 168:7
184:21 186:5,11
186:16 187:6,15
193:14
**homes** 15:23,24,25
16:5,10,14,18,25
17:3,16 18:2,6,12
18:15,23 20:8
24:16 184:8,16

185:20,25 186:3
188:2 191:15
192:1,10 193:12
**honest** 13:5
**honor** 35:6
**hope** 48:24
**hoping** 154:16
**horrible** 66:20
**hospital** 22:23
24:15 143:1
186:16 209:13,17
210:4,6 213:9
214:10,14
**hospitals** 137:17
214:22
**hosting** 125:16
**hotel** 126:18 136:5
136:15,21
**hour** 20:7 196:8
**hourly** 17:7
**hours** 17:3,12,13
17:20 24:22 26:10
38:11 48:2,5
176:2
**house** 114:24
**huffington** 150:21
**huge** 126:17,17
**huh** 66:9 87:20
88:20 89:7 102:1
120:11 125:9,25
151:23 158:24
162:16 170:2,16
191:20 208:3
**human** 46:8
**hundreds** 65:1
**hurd** 2:3 10:23
**hydrocodone**
154:21
**hypertension**
85:18

**hypothetical**
59:11

**i**

**idea**  68:5 86:17
214:7
**identification**
85:25 117:10
122:19 128:6
131:2 134:17
143:13 146:6
169:20 176:9
183:21
**identified**  211:20
**identify**  10:8
105:3,5 137:8
214:9 224:2
**identifying**  102:19
105:4
**ijasiewicz**  2:16
**il**  2:23 3:4
**illicit**  92:15 104:8
194:13 233:7,21
234:4,6,11,15
**illustrating**  179:12
**imagine**  40:15,16
52:18 58:14,19
76:21 81:3,4
97:19,25 127:21
138:21 190:20
220:20 238:21
**imagining**  87:14
109:24
**impact**  41:12
94:13 102:18,21
102:21 104:2,4,5,5
104:12,16 105:4
125:21
**implementation**
164:15,21 165:15
**important**  36:9
69:25 70:3,4,7,12

70:16 83:7,12,15
83:21,23 84:6,10
84:13,24 85:2,6,10
130:4 173:7
**impossible**  229:6
**impression**  57:9
59:3 221:20
**improper**  171:9
**improve**  40:8
**improvement**
67:14
**inaccurate**  153:5
157:12,13 211:6
223:21
**inadequately**
224:3
**inappropriate**
154:5 239:7
**include**  14:12 32:1
41:3 88:3,25
92:12,15 103:19
103:22 139:7
145:5 160:1
185:18,19,25
205:8,13 225:6
**included**  71:7
103:15 185:21
244:13
**includes**  15:6
72:10 88:21 104:8
160:4,7 178:21
**including**  115:2
**inclusion**  81:16
**income**  23:14,22
23:24 193:3,10,12
**inconsistent**
228:17
**incorporated**
246:12
**increase**  133:5
177:18,24 180:21

**increased**  96:24
102:15 140:17
194:6 236:7
**increasing**  209:20
**independent**  16:13
17:23 19:9 20:10
23:15,18,23 69:20
230:13,15
**index**  5:1,3 6:1 8:1
**indicate**  27:6
**indicating**  244:13
**individual**  153:19
**individually**
110:24 111:1
**individuals**  30:18
152:23
**industries**  2:17
**infant**  63:8 64:17
64:22,24,25 76:1
**infeds**  142:17
**inform**  36:15,25
127:19
**information**  30:9
83:7 97:25 99:24
101:4,7,11,16,18
102:2 103:20,22
144:8,10 148:2
155:12 165:5
171:11,13,16
173:25 174:11
191:1 214:19
215:1 220:11
221:22 222:14
223:7,22 224:1,14
224:17,22 225:4
229:17 234:1,18
236:15
**informational**
132:13
**informing**  80:9,14
80:19 154:14

**informs**  37:2
142:9
**initially**  225:21
**initiate**  191:17
**initiatives**  72:24
73:5,16 75:7,12,20
76:1,6,15,19,23
77:8,11,15 78:9,10
78:20 80:24 88:22
89:9 209:12
**injury**  163:12
179:14
**inmates**  119:16
**input**  81:25
**ins**  58:7 81:10
114:24 115:1
**inside**  114:13,16
119:4,5 177:1
**inspect**  69:16
**inspected**  69:19
**inspectors**  69:10
69:13
**instance**  71:25
104:17 107:23
**instances**  58:25
165:8
**instruct**  171:5
172:8 175:22
198:20 201:17
**instructing**  172:21
**instruction**  175:3
241:2,10
**insult**  64:14
**insulted**  27:23
**insurance**  209:17
238:12
**insys**  217:15
**interact**  41:14,21
42:2
**interaction**  223:4

**interactions** 69:15
221:21
**interchangeably**
90:18
**interest** 32:20 75:4
127:12 135:10,14
**interested** 32:24
34:23 35:4 50:23
63:12,13 125:15
126:4 127:2,13
191:19 200:22
243:3
**internal** 15:12
18:19 22:5
**internet** 155:9,11
199:23
**internist** 168:3,22
**intervals** 113:3
**interventions**
41:12 66:6 125:22
**interview** 33:14
**invalid** 175:13
**invited** 107:1
**involved** 46:15,19
46:20 47:1 55:17
55:20 58:4 70:15
107:19 114:5
116:8 147:15
164:10 181:4
191:23 192:14,16
192:21 201:16
**involvement**
141:16
**involves** 198:21
**involving** 65:19
68:19,23 192:10
**ish** 77:25
**isia** 2:14 10:10
**issue** 64:24 65:7
69:7 70:13,14,18
84:10,14,24 85:2,6

108:15 113:4
130:5,12,17,19
132:22 165:24
173:7,12 190:4,14
209:16
**issued** 108:17
109:11,15
**issues** 26:13 37:25
41:19 48:14,18
63:5,11 65:3,9,13
65:18 67:16,21
68:3,10,16,19,23
69:2,6,21 70:2,6,9
75:4 77:9 78:4
80:10,16,21 83:17
83:23 84:7 85:10
88:21 89:8,16,19
94:19 95:4 104:18
122:7,11 127:14
130:11 160:15,15
168:11 186:13,15
187:12 190:13,18
194:12 199:17
230:20 238:22
**item** 73:12 113:12
**items** 52:10 74:13

---

## j

**jackson** 3:19
11:12 151:6,11
**jackson's** 151:8
**jacksonkelly.com**
3:22
**jail** 19:16
**james** 27:22 29:19
**janssen** 217:17,20
217:23
**january** 119:19
**jasiewicz** 2:14
10:10 176:3
**jaziewicz** 5:4
10:10,25 11:22

70:20 141:25
162:5 172:2,5
173:14,18 174:19
206:3
**jciaccio** 2:11
**jim** 30:8
**joan** 162:24
**job** 14:2,9,10
165:3
**joe** 4:8
**john** 188:19,21,24
189:5,7,10,20
190:2,25 191:1,12
**johnson** 218:5,6,8
218:9
**joined** 45:3 180:10
180:16
**joining** 34:23
**joint** 214:21,22
**jones** 3:7 10:19
**jonesday.com**
3:10
**joseph** 2:9 10:20
**journal** 217:12,21
**judge** 1:10
**judgment** 136:13
**judy** 54:11,12,13
54:13,14,16,24
55:15
**july** 21:2,2 243:17
**jumped** 34:8
**june** 6:25 180:24
183:18 184:6

---

## k

**k** 3:6
**keep** 139:23 141:4
**kelly** 3:19 11:12
**killers** 157:7
**killing** 6:20 146:4
146:16

**kind** 12:11 15:10
18:1,14 33:10,22
37:25 43:9,21
52:1 53:18 54:7
59:10 64:7 67:16
72:17 79:13 96:14
109:1 113:19
125:19 140:17
164:24 165:8,11
165:14,24 185:13
192:8 206:15
**kinds** 164:3
**kippes** 232:13
**klauss** 1:25 242:6
243:14
**knee** 186:14
**knew** 45:13 68:8
97:21 231:23
**know** 12:18 21:13
26:12 28:17,22
29:14,22 30:3
31:3 32:19 34:11
36:19 37:1 41:20
45:10 47:10 51:23
52:5,16,23 53:9,14
53:24 54:19 55:24
58:8 59:13,17
63:22 64:5,9,18
65:11,17,20 66:22
67:1 71:17,22
74:10 76:7 78:12
79:16,21,22,22,23
79:23,24 80:2,7
81:5,10,15,18 82:1
82:10,13,14,15,16
82:17,18 84:11
87:3,9,12,13 88:5
88:12 89:11 90:2
92:8 96:4 97:23
98:10 99:4,9
100:9 103:11,14

106:16 107:2,5,7,8
108:6,9,16 110:1,5
110:16,20 111:11
111:24 112:14
114:1,6,12,20,24
115:4,5,8,10,19,20
115:22 116:9,12
116:15,16,19
117:2,3,4 121:15
121:18,19,22
124:22 126:18,23
129:22 131:19
132:10,23 133:11
135:13,23 136:12
136:14,22 137:19
138:13 142:15
145:15 151:4,6,7
151:10 152:10,11
154:9 156:22,23
157:16 162:17,20
163:1,15,19 165:1
165:17,19 166:19
172:20 173:5
179:4 181:7,12
185:4 186:14
187:23 188:21,25
189:10,11 190:2
192:4 200:20
202:1,4,7 203:2,5
203:7,11,12,16,17
203:25 204:5,15
205:5 206:22
208:13 210:16,25
213:12 214:18,24
216:15,18 217:3,8
217:23 218:2,8,10
218:15,18 219:3,4
219:14,18 220:10
220:14,21 223:8
228:1 230:5,19,21
232:12,15,23

235:13,24 238:22
**knowledge** 13:11
29:13 184:21
194:17 197:10
211:20 229:8
237:17
**known** 44:20
121:23 225:15
**knows** 123:5

**l**

**l** 1:19,25 2:9 5:4
11:16,21 12:2
13:20 23:21 206:8
237:8 242:6,9
243:14 244:8
245:4,9 246:4,13
247:20
**l.p.** 1:13
**label** 6:8,11,13,16
6:22 7:1 122:17
128:4 130:25
134:15 169:18
183:20
**labs** 24:18 218:21
**lake** 191:16
**lanosa** 4:4 11:8
**lanose** 11:9
**large** 47:23 142:25
**larger** 40:1
**laser** 19:15 22:18
22:18
**late** 39:19
**latino** 102:17
104:3
**latinos** 102:20
**launched** 178:18
**law** 10:23
**lawful** 11:16
215:21
**lawsuit** 197:5,8
198:4,7,10,15,18

199:20,25 201:3,9
202:1,5 203:3,8,14
203:18 204:2,10
206:15 207:16
209:1,6 237:15,19
**lawyer** 166:5
239:10
**lawyers** 198:4
204:8 239:19
**lead** 27:4 59:4,8
59:14 63:9 73:9
76:6,8,11 210:5
**leaders** 42:14 57:3
57:4,6
**leadership** 66:4
67:7 78:12,13
210:4
**leading** 133:4
179:14
**leads** 112:12
**leaning** 58:21
**learn** 138:8 194:19
195:4 225:25
226:6 231:8
**learned** 128:20
188:8 195:12
202:7,10,18 220:2
238:1
**learning** 208:21
**leave** 132:19 183:5
236:18
**lee** 3:20
**left** 27:23 28:5
31:2 54:7 145:23
195:20 196:1
**legal** 143:1 244:1
247:1
**legitimate** 153:22
183:10
**length** 141:17
156:22,25 159:21

160:7
**leppla** 112:10
**letter** 99:22,23
244:19
**letting** 173:1
175:11
**level** 60:9 193:3,10
193:12 204:15
212:25
**levels** 194:6
**lewis** 2:18 3:2
10:14,17 11:3
206:13 239:15
**liaison** 2:12 3:18
4:2 24:15
**licensed** 229:24
230:2
**lieu** 119:19
**lifespan** 125:21
126:7
**limit** 226:16
**limited** 102:21
103:9,12,13
**line** 131:15 175:18
244:13 246:7
247:3
**lines** 211:23
**list** 108:13 150:2
152:5 156:15
158:19
**listed** 119:7
120:13 179:11
246:7,17
**listing** 246:7
**lists** 178:21
**listserv** 107:9
**literally** 20:6
**liticker** 31:3,4,5
**litigation** 1:7 10:5
142:3 172:3
173:13 197:1

207:24 231:2,3,10
244:6 245:3 246:3
**little** 150:24
161:16,18 168:1
168:20 193:16
211:9 230:25
**live** 12:3 34:1 35:5
**lived** 12:5
**living** 29:15,20
30:1
**llc** 10:11
**llp** 2:3,13,18 3:2
4:3
**local** 35:4 79:8,13
79:17 110:14
**logo** 145:1
**lomax** 3:7 10:18
10:18
**long** 12:5 20:22,25
21:3 24:2 27:11
27:14 35:14 37:18
39:14 44:20 49:9
49:23 149:3,8,8
196:7 224:19
225:15
**longer** 21:8 156:12
157:7
**look** 26:21 48:23
87:2,4 118:3
119:10 120:13
123:10,11 130:1
135:2 150:18,19
151:18 152:13
160:22 170:3,12
176:15 177:1,15
178:16 179:10
180:1,20 182:18
183:3 184:3
188:17 189:2,19
190:21 219:17

**looked** 96:8,11
99:24 133:24
146:21 208:10
**looking** 54:6 86:9
145:19 152:13
155:8 191:13
**looks** 48:17 87:8
117:23
**looser** 159:11
**los** 4:5
**loser** 159:13
**lot** 36:13 63:23
64:13,17 154:8
155:17 168:21,23
210:12,18 219:19
227:6
**low** 94:13 104:2
104:12,15 105:14
105:16,19,23,25
152:25
**lower** 60:9 64:15
65:2 102:16,18
193:15
**lowered** 156:24
157:16

## m

**m** 3:20 235:15
**m.d.** 1:19 5:4
11:16,21 13:20
14:24 15:1 23:21
206:8 237:8
242:10 244:8
245:4,9 246:4,13
247:20
**ma'am** 12:22 13:3
13:9,13 14:15
15:9 16:15 23:6
37:17 46:25 122:8
122:12 155:6
181:6 228:13

**madam** 244:10
**magazine** 217:2
217:12
**magnitude** 179:12
**main** 1:23 133:20
134:4
**maintains** 53:21
53:23
**major** 70:9,13
**majored** 22:1
**making** 48:16
182:15 227:25
**male** 187:3
**mallinckrodt**
218:11
**malpractice** 12:12
**management**
157:24 158:3
236:24
**manner** 16:7,8
21:7,12 167:21
168:7 187:18,22
222:11
**manufacture**
207:13 220:22
**manufacturer**
206:18 210:9
213:13 214:25
215:6 223:21
**manufacturers**
207:5,11 210:22
210:25 216:21
**manufactures**
206:22 217:4,24
218:9,16
**mapping** 89:2
**march** 6:6 117:8
117:24 118:14,25
128:16
**mark** 117:12
194:21,22

**marked** 6:1 85:24
86:3 117:9 122:18
122:22 128:5,9
131:1,5 134:16,20
143:12,15 146:5,9
169:19,22 176:8
176:11 183:20,24
**marketed** 209:10
209:19 225:21
**marketer** 224:11
**marketers** 212:23
213:5,6
**marketing** 209:25
210:2,8,19 212:6
212:21 213:18
215:4,10 216:10
216:17 219:4,8,12
220:2 224:5,13
226:11,23 228:19
229:2,14 238:15
**mart** 3:6
**mass** 74:21
**massachusetts**
3:15 21:19
**materials** 120:20
120:22,25,25
121:1 210:22
211:1,5 212:6,21
212:23 213:16,18
215:5
**matter** 63:25
141:23 172:23
194:20 195:5
225:23
**maximal** 24:25
**mayfield** 12:4
33:25
**mayor** 33:24 34:3
**mayors** 31:9,19
42:13,20

**mckesson** 4:2
11:10 204:25
205:2,15,18
**mcleod** 189:5,10
189:20 190:2,25
191:1,12
**mdl** 1:6,8
**mean** 22:16 27:2
28:6,19 33:16
37:2 40:6 41:7
42:21 44:4,24
46:23 48:12 50:23
55:1 58:1,4,6 62:2
62:4 63:13 75:22
75:23 77:13 79:22
84:9 87:14 90:24
92:3 100:13,17,19
113:22 114:1
115:23 126:23
129:22 132:23
137:16 147:6
148:1,2 157:1,23
158:25 159:14
168:19 180:8
184:22 192:17
194:4 198:11
199:22 200:24
202:12,16 204:19
210:14,14,18
211:10 214:1
219:22 224:19
225:18 229:8
234:5 238:22,25
**meaning** 42:4
62:11,24 64:5
71:11 78:16,25
81:20 82:3 99:10
107:18 123:3
130:18 133:14
154:25 163:23
164:14 165:13

197:25
**means** 13:1,5,6
165:19 183:6
212:2
**measure** 64:8 73:8
**measures** 35:4
36:13 41:9 58:8
58:12,16 64:19
66:5 73:8
**med** 156:11 157:8
**medicaid** 37:14,15
37:20 38:9,12,18
39:3 193:8,13
**medical** 14:4
15:24 16:12 21:20
23:2,5,8,11,12,19
24:3,13,20 37:14
37:19 51:16,19,21
105:24 133:19
134:4,6 140:24
141:1,20 160:15
166:19 167:5,8,18
167:20,23 168:6
168:20,25 169:5,8
171:11,13,16
173:12,25 174:11
174:14,15,16
183:10 205:1,3,7
205:12,16 209:18
226:7 229:18
230:8,10
**medically** 120:2
138:25 139:4
143:5 153:21
154:2,4 226:9,22
227:6,7 228:18
229:1
**medicated** 119:18
**medication** 77:3
91:15 95:9 97:3
105:23 114:21,23

115:12 116:25
133:6 138:14
150:20 151:14
152:18 160:8
184:7,15 188:2,11
188:12 190:7
199:4 220:8
224:23
**medications** 91:8
91:10 92:12 138:7
138:9,13 152:23
153:20,22 154:7
157:3 177:9
182:22,25 183:5
184:11,19 185:13
185:15,16 188:7,9
190:4,6,11,14
191:3 193:17,20
205:8 224:18
235:22 236:3,21
**medicine** 15:11,12
18:19 21:22 22:5
105:11,13,15,17
105:18 135:12
137:7 150:9,12,15
154:1 158:15
169:13 183:6,10
199:8 209:20
229:25 230:16
**medicines** 161:9
**meds** 188:3 192:16
209:11
**meet** 32:9 49:7
195:17 196:4,7,10
**meeting** 6:6 28:7
31:8 43:3 48:6,9
49:16,24 50:11,17
52:9 55:9 72:11
72:12 73:7,25
75:9,13 82:14
108:23,25 109:7

111:3,5,8 117:8,24
117:25 118:14,25
120:12 125:14
126:1,3 128:23
129:1 135:17
185:4,8,10 196:13
199:25 200:2,3,7
200:13,25 201:3
201:23
**meetings** 26:3,7
27:4 38:13 43:7
47:15,16,18,20,21
49:5,9,11,17,25
50:3,6,22 51:5,8
51:11,14,17,22
52:12 66:14,16,18
66:21,23 68:14,18
68:22 71:8 72:5,9
84:16 106:22
107:3,6 112:16
165:18 200:4
201:12 204:8
**megan** 2:22 11:2
**megan.braden**
2:24
**melanie** 163:3
**melville** 2:10
**member** 25:3
30:22 31:7 32:21
32:25 33:11,15
34:2,4 41:13 42:1
43:4 45:7 47:14
50:3 51:2 61:4
62:12 69:1 77:5
78:24 101:3,14
106:19 127:19
134:5 141:16
172:18 181:2
**member's** 81:24
**members** 27:17
28:15 29:9 33:23

50:13,25 60:6,20
61:1,20 62:3,24
65:21 67:19 69:8
71:11 74:17 78:19
80:10,20 81:20
82:2,4,7 87:22
88:6 100:18
107:19 110:21
133:15 145:22
163:23 164:4,10
164:14,20 165:13
165:20,24 177:3
230:11,12 231:20
**memorized** 53:4
**memory** 53:19
182:9 192:3
**mental** 168:11
**mentioned** 14:18
25:2,12 71:6 72:4
79:8 89:25 116:3
125:14 126:3
189:23 208:1
209:1 212:5,19
213:21 214:10,13
229:16 233:7,10
233:14 236:1
237:23 238:3
**mentioning** 239:4
**mentions** 191:13
**mentor** 14:8
**mentoring** 14:14
**mess** 231:7
**message** 87:19,25
88:4,7,10,12,16
189:4
**met** 32:11 44:17
45:2 110:21
137:20 195:19,25
220:25
**metrohealth**
119:16,24 120:16

163:8
**metz** 162:22
**miami** 3:9
**mic** 206:4 239:22
**michael** 4:4 11:8
151:6,8,10
**mid** 39:20 45:1
**midwest** 244:17
247:1
**migrated** 148:18
**migration** 148:19
**mild** 199:1
**mildly** 214:4
**milligrams** 156:11
157:8
**million** 53:6
**mind** 64:8 90:8
234:9
**minimal** 57:18,19
81:22,23
**minority** 35:2,8,9
35:11 38:3,4 39:4
45:14,17 94:1
101:21 102:5,8
104:25 105:2
**minute** 70:21
162:6 231:25
**minutes** 6:5 49:10
49:14,23 55:4
66:24 67:1 72:12
117:8,23,25
165:18 197:9,12
197:16 201:24
202:7,11,23 208:2
208:15,22 209:2,3
209:7 231:1,4,9,16
237:22
**mirror** 48:24
**missing** 47:24
**misstates** 158:13

**misstating** 214:12
**misuse** 133:6
154:7,11 182:24
183:7 193:19
**mitigation** 235:10
**mlanosa** 4:6
**model** 115:19,23
129:18,20,21
**moment** 54:3
70:21 75:24 87:2
135:2 176:15
192:23 220:19
**moments** 208:25
213:21
**monday** 197:22
208:2,9
**money** 52:6 53:9
58:7,9,10,13,18
59:2,4,5,6,12,14
59:20 60:2,19,21
109:20,22 113:6
133:17 205:20
**moneys** 53:12
57:10 78:22
113:23
**monika** 2:14
**month** 16:23
17:12 20:1,6
23:13,13 24:7,20
38:11 48:2 205:21
**month's** 55:9
**monthly** 47:19,20
48:8 49:24 53:17
55:5,7,12
**months** 20:13,15
25:23,25 26:14
33:4 96:16 156:13
157:4,9,14,17
195:1,2 200:15,17
**morgan** 2:18 3:2
10:14,17 11:3

206:13 239:14
**morganlewis.com**
2:21,24 3:5
**morning** 11:23,24
66:19 79:5 128:20
131:19 142:8
233:6,11
**morphine** 156:11
**mortality** 63:8
64:18,23,24,25
76:2
**moss** 27:22 29:17
56:7 118:11,15
119:12
**motion** 118:5,9
**motor** 179:15
**move** 176:1,3
**moved** 27:6 43:17
103:7 118:19
119:11 190:8
**mudge** 3:14 11:5,5
**multiple** 111:11
111:13 140:3
142:22 214:8

**n**

**n.w.** 2:14 3:15
**naively** 188:14
**naloxone** 77:1,2,6
77:24 116:6,11
140:15
**name** 10:5 11:25
31:4 54:2,4,5,14
54:16 61:13 62:17
92:4,9 111:25
177:4 206:12
221:4 237:10
244:6 245:3,4,15
246:3,4,21
**named** 112:6,9
162:22 170:5
242:9

names 16:4 27:20 138:2 203:16
napoli 2:8 10:21
napolilaw.com 2:11
national 1:6 10:4 22:11 152:3 244:6 245:3 246:3
nationwide 154:19
nature 54:23 138:17 225:2
near 74:16
necessarily 42:2 174:23 175:7
necessary 138:25 139:5 143:5 227:6 227:22
need 57:10 105:24 123:9 165:5 184:6 185:14 188:1 206:5 219:19
needed 36:3 96:4 105:19
needs 67:21 160:8
negative 223:16
negligible 25:18 38:15
neighborhood 39:12
neomed 13:19
networking 80:25
never 86:21,23,24 86:25 87:15 161:23 162:3 177:14 201:10 235:21
new 148:18 178:17 184:20
news 188:10 199:21,23

nice 87:16
night 237:22
nominate 34:2 118:10,20
nominated 34:4,9 34:10,13,15
nonpublic 200:3,4 200:7
nonterminal 156:9 157:19,20,25 158:2,9,23 159:6
normal 102:12
normally 84:1
north 39:11
northern 1:2
notarized 244:14
notary 212:15 242:6 243:14 244:25 245:10,18 246:15,23 247:23
note 141:25 212:1 244:12
notes 27:5 214:12 237:2
noticed 142:1
number 6:1 17:3 17:20 26:5,7,9 36:1 63:20,25 64:15 74:13 100:14,16 119:7 151:21 170:15 183:24 187:19 209:12 224:10 244:7,13
numbers 17:10 123:3 145:19 151:21 152:5,8,14 246:7
nursing 15:23,23 15:24,25 16:1,5,10 16:14,18,25 17:2

17:16 18:2,6,9,11 18:15,23 20:8 21:4 24:16 123:23 123:24 158:6 168:7 184:8,16,21 185:20,24 186:3,5 186:10,16 187:6 187:15 188:2 191:15 192:1,10 193:12,14
nutrition 41:9
ny 2:10

**o**

oarrs 161:4,6,11 161:14
oath 12:24
obesity 36:19 41:9 84:21 85:4,6
object 8:2,4,7,9,22 9:2,3,5,12,13 64:12 102:23 141:14 173:22 195:6 198:20 201:14 211:22 229:3 236:13
objecting 8:6 83:25
objection 8:1,3,5,8 8:10,11,12,13,14 8:15,16,17,18,19 8:20,21,23,24,25 9:1,4,6,7,8,9,10,11 50:20 81:6 131:25 153:23,24 157:10 158:12 159:3,10 171:2,9,21,22,23 172:19,25 173:10 174:22,23 175:6 175:13 178:1 179:1 183:12,13 201:13 211:16

224:7 226:13 227:18 228:20,21
objections 175:2
observations 179:23 181:25 212:5
observed 180:17 182:10
obtaining 236:3
obviously 82:15 219:23
occasionally 72:14 187:13
occasions 109:14
occur 47:18 152:15,17,22
occurred 66:10 113:4 140:8 190:19
october 170:12
odh 178:18
offering 140:15
offers 191:18
office 14:5,5,9,11 14:19 15:14 118:5 161:16 187:5 235:3 243:6
officer 54:1,19
official 27:8 245:15 246:21
officially 187:12
officials 51:11
oh 2:6 14:25 35:23 43:11 59:13 123:7 188:23 216:8 227:21
ohio 1:2,13,23 12:4 19:14,20,22 20:2,9 21:20 35:1 35:8,9 37:9,15,16 37:19 38:9,12,17

38:18 39:2,3,4
93:25 94:16 102:5
102:8 105:2 110:9
122:11 129:19
133:3 134:8 135:6
140:24 141:1
163:13 177:16,18
177:25 179:15
180:4 215:13,21
215:23 229:18,25
242:2,7 243:7,15
244:2
**okay** 12:21 14:10
16:4 19:2 20:8,17
28:23 40:4 42:7
54:24 61:21 62:6
62:10 69:21 80:3
80:8 81:11 87:5
91:5 98:14,18
114:15 123:7
127:24 129:7
130:15 132:4
145:25 147:17
149:3 152:8 153:6
153:14 154:10
155:13 161:19
167:2 168:4
171:20 172:2
175:14 176:18
192:13 198:14
200:6 207:5 239:9
**old** 148:18 187:6
187:10
**older** 187:13,16,18
**oldest** 187:5
**once** 16:20 111:12
210:15 239:10
**ones** 17:6 60:11
234:10,11
**ongoing** 57:11

**online** 95:18 225:3
**op** 1:15
**open** 224:9
**opened** 86:25
**opiate** 1:7 10:4
65:19 68:19,23
90:6,14 106:2,4,12
106:17,20,23
107:3,9,12,16,20
107:25 108:4,8,12
108:14,18 109:11
109:19 110:8,13
110:17 111:23
112:13,17 113:2
113:17 114:9
116:20,22 125:20
126:7 128:22
130:11,18 244:6
245:3 246:3
**opiates** 90:9 104:8
**opinion** 132:24
212:3,7
**opinions** 211:23
**opioid** 77:4 78:1,4
78:5 89:19 90:6,9
90:13,22,23 91:2
91:11,13,17,19
92:11 94:7,9,14
97:14 98:5,20,22
98:24 99:3,8,12,16
100:14,17 106:7
116:1 119:17
122:7,11 129:18
131:21,24 132:7
132:17 137:23
138:13 151:16,22
156:10 157:7
178:5,9,13 179:20
180:12 181:14
182:1,5,15 183:1
186:7 190:1,13,18

199:17 202:16,18
202:20 208:12
210:9 215:7,14,22
218:3 219:13
220:7 222:24
223:15,21 230:20
233:7 234:2,12
235:4 236:3
**opioids** 89:22,24
91:9 92:20,22
93:4,6,18,21,24
94:2 97:10 103:12
103:13,16,17
104:6 113:8
114:11,19 115:18
133:7 135:25
136:3,8 138:19,24
139:4,9,15 140:15
141:2,7,9,10,13
142:18,20 143:3,4
153:11,16,20
157:3 159:15,18
159:21 160:13
161:23 162:3,15
163:8 180:18
185:18,19,22
186:1 190:8
193:21 194:2,13
194:15 199:12
205:13 210:23
211:1 213:14,19
213:23 214:2,4,6
215:5,11 216:2,7
216:17,21 217:4
217:24 218:9,16
218:19 219:7
220:22 223:2,11
224:6 225:10,17
226:1,7,25 227:15
232:17 234:4,4,6,7
238:5,20

**opium** 92:17
**opportunity** 82:8
87:4
**optimize** 156:14
**option** 220:9
**options** 189:21
191:2
**oranges** 182:14
**order** 67:20
147:21 180:21
**organization** 40:1
40:3,6 42:4 62:5
78:8 80:12 100:22
**organizations**
38:23 39:8,10
80:25 115:25
129:24
**orthopedic** 186:15
**outcomes** 224:15
**outline** 139:22,25
**outlined** 182:21
**outreach** 23:11
24:4,13,21
**outs** 58:7 81:10
114:25 115:1
**outside** 114:14,16
**oval** 125:19
**overall** 62:4
**overdose** 77:4
94:7,8 96:3 99:20
100:4,7 101:1,4,16
102:3,22 103:4,10
103:23 106:7
140:17 151:9,11
177:19 234:18
**overdosed** 151:12
**overdoses** 103:15
150:20,25 151:22
152:15,22 177:25
180:5 194:9
234:15,19 235:4

**overflow** 186:17
**overly** 228:8
**overmarketing** 209:24 213:23 214:2
**oversee** 18:5
**overseeing** 44:5
**oversight** 214:21
**oxford** 2:19
**oxycodone** 154:21 221:24 222:2
**oxycontin** 91:11 221:9,12,17 225:21

**p**

**p** 162:25,25,25
**p.m.** 240:13
**pa** 2:20
**packet** 55:5 71:7 72:10,18 73:2,14
**page** 8:2 87:17,18 88:18 118:3,4 119:4,11 123:11 125:3 131:8,11,17 131:17 134:23 144:5,20,23,25 145:18,19,20 146:15,19,23 147:1,4,14,20 148:10,12 149:4 149:23 150:1,4,18 150:23 152:13,14 154:14,17 155:8 156:6,8 160:23,24 161:1,21,22 170:1 170:3 177:6,10 182:19 184:3,4 189:3,3,6 190:23 191:22 192:15 244:13,15 246:7 247:3

**paid** 92:21,24,25 93:5 94:24 95:1 121:11
**pain** 6:20 91:8,10 91:15 95:9 97:3 105:11,13,15,17 105:18,23,24,25 135:11 137:7 138:7,9,20,25 139:5 142:16 143:6 146:5,16 150:9,11,15,20 154:1 156:9 157:7 157:19,20,22,24 157:25 158:2,3,10 158:15,23 159:2,7 159:12,14 160:1 161:9 199:2,8 209:11,13,15,20 209:21,21 210:15 210:20 213:1,17 214:15 215:1 219:16 220:3,8 224:3 227:14,14 236:4,21,24
**painkillers** 6:19 146:4,16 149:15 156:10
**paper** 205:5
**papp** 162:24
**par** 3:12,12,13 11:7 218:23
**paragraph** 130:2 151:18,25 152:5,9 154:18 156:7 180:1,21 183:4 191:12
**parcel** 59:7
**parent** 187:11
**parentheses** 119:13

**parents** 187:8
**parren** 137:12,13 137:19,21
**part** 14:3,8 16:1,2 16:3 21:21 23:22 69:17 93:2 94:1 103:6 153:16 154:13 157:18 166:19 196:21 202:21 246:9
**participate** 201:9
**participating** 191:19
**particular** 18:17 26:23 58:24 59:7 59:18 67:9 76:22 94:9 102:22 103:10 110:2,5 121:8,17 122:5 126:19 140:22 142:3 165:7 211:3
**particularly** 63:12
**parties** 10:9
**partnership** 13:19 67:14
**parts** 115:20
**party** 203:8,14 243:3
**pass** 125:13 191:18 206:4 237:3 239:22
**passed** 72:13 225:19
**patch** 223:3,5 233:14
**patience** 240:10
**patient** 137:22 156:15 160:2,8 171:5 172:7 173:1 173:3 174:3,4,7 175:4,10,12,16

186:19,22 187:5,9 212:22 215:13,22 219:12 220:3,7 224:15 236:14,17
**patients** 15:16,17 18:11,15 23:4,7 36:22 85:8,17 91:6 94:25 95:3 97:22,23 98:3,5 135:11 137:8 140:16 142:16 145:14 149:12 150:10 153:5,7,10 154:14 156:9 157:20 158:9,23 159:2,7 161:9 178:5,9 180:18 181:22,25 182:11 182:13 185:20,21 185:24,25 186:5,6 187:15 188:11 192:25 193:8,11 193:12,14 194:5 199:2,7,11 212:24 219:16 224:2 226:2,11 236:2,11 236:24
**pause** 84:8
**pay** 164:7
**pays** 20:13
**peer** 149:23 150:5 150:8
**people** 35:5 40:2,7 41:9,11 50:10,15 50:18,23 69:19 83:10 90:19 138:3 151:21 152:9 164:8 183:5 187:7 187:20 194:9 197:19

perceive 224:5
perceived 202:8
202:11 212:4
percent 17:1 79:20
104:20 187:3,4
193:9
percentage 14:1
16:23 79:16,25
104:22 193:7
perception 209:1
209:22 212:8
213:22
percocet 222:4,18
performance
164:11
peril 204:5
period 178:12
periodically
144:12
person 54:23,24
90:1 112:1,2
116:22 138:11
152:16,16 173:3
189:25 196:10,12
223:9
personal 171:10
171:13,15 212:4
personally 82:11
85:1 99:11,19
100:2 245:11
246:15
personnel 46:10
48:15
persons 197:18
perspective 13:2,4
37:3,5 38:1,4
67:18,19 114:7
181:19,21 207:4
210:1,3
perspectives 39:25

perused 109:8
140:14
pharma 1:13
pharmaceutical
2:17 3:12,13,13
155:15 202:25
203:20,22 209:11
214:25 218:24
219:8 220:12,13
226:11,23 228:19
229:2,14
pharmaceuticals
3:12 197:19
203:24 206:19
pharmacies
154:19
pharmacist 166:7
238:4,14 239:5
pharmacists
224:20 238:3,18
pharmacology
166:14,20,21
167:5,8,9
pharmacy 170:14
170:15,25 192:16
192:21
phone 11:1 49:15
170:14 172:9
196:11 224:25
239:21 244:3
photo 177:2
photograph 87:21
phrase 233:2
phrased 59:10
phrasing 153:4
physical 120:24
physician 13:21
18:3 29:16 30:15
31:5 36:14 37:5
137:14,15 171:5
172:7 173:1,11,23

174:1,3,4,7,18
199:2 204:16
215:1,15 230:6
236:14,17
physicians 18:4,5
18:8 22:11 30:12
30:15 209:9
214:14 230:10,18
picture 145:21
150:21 151:19
152:3,7 156:8
pictured 87:23
151:4 177:3
pictures 150:24
piece 208:2 209:2
209:7 220:2 231:1
231:4,9,16 237:22
pilot 191:14,17,25
pittsburgh 2:20
place 172:14
242:20
places 69:10 95:19
114:22 147:25
plaintiff 203:2
plaintiffs 239:22
240:5
plan 184:24
planning 66:1,8,13
66:17,24 67:2
68:2,12
plateaued 181:18
182:2
play 28:20 46:10
57:16 65:21 78:19
80:9,14,19 81:20
88:6
played 88:9,15
plaza 3:8
pleadings 198:3
please 11:15,25
12:18 21:15 87:18

177:6 209:5
212:14 214:11
244:11,11
pllc 2:8 3:19
plural 90:10,13
plus 15:5 29:11
49:25 50:25
point 45:15 68:8
142:20 175:5
178:8,14 179:11
180:13 188:10
207:23 219:4
223:14,19 227:25
228:14
points 180:2
poisoning 73:9
76:6,8,12 179:13
poisonings 177:8
polish 163:5
polster 1:10
poor 193:6
pop 95:16 96:10
96:20,23
population 104:14
104:21 153:1
167:22 182:4
186:19,23
porter 3:14 11:6
portion 13:22
16:16
position 13:25
14:3,7 24:3 26:23
33:14 35:12,14
36:3 39:15,18
54:17,20 210:4
positive 69:15
possibility 191:14
possible 70:19
post 150:22
186:15

posted 149:21
potential 34:1,4
  105:8
power 44:14
powerpoint 73:22
powerpoints
  235:7
practice 13:21
  14:12,20 15:6,10
  15:11,14,19 18:21
  18:24,24,25 20:23
  23:9,15,17,25
  36:20,24 85:17
  97:21 98:3 127:5
  127:6,10,15
  141:20 142:8,25
  144:1 145:15
  153:1 157:2 158:5
  161:15 186:4,6,18
  186:24 192:24
  193:4,8,11 199:10
  229:24
practices 135:25
  136:3 139:8 141:2
  141:5 142:21
  161:2,20
practitioner 143:2
predicate 173:4
predominant
  182:3
predominantly
  187:16,18
pregnancy 63:9
  64:21
premed 14:4 22:2
preparation
  195:18 196:21
prepare 195:13
  196:14 207:20
  234:22

prepared 210:22
  232:19
preparing 197:3
prescribe 105:14
  105:17 137:7
  138:7,9 142:18
  156:21 157:7
  159:15,18,21
  161:17 227:21
prescribed 141:9
  141:12 161:24
  162:4 221:5,7,9,24
  227:20 235:22
prescriber 131:15
  133:22
prescribers 161:8
prescribing
  105:11,12,18,22
  135:6,25 136:3,8
  138:19,24 139:3,8
  140:22 141:2,7,9
  142:20,21 143:3
  158:15,18,19,25
  159:5,25 160:13
  161:8 162:15,19
  224:21 225:4
  228:11,17 229:17
  229:21 236:21
  238:5,20
prescription 1:6
  10:4 65:16 92:12
  93:15 103:16
  133:6,22 135:7
  139:15 150:25
  153:10,16,20
  177:8,19,24
  178:20,24 180:4
  180:23 181:5
  182:22,25 185:21
  191:2 193:17,25
  199:12 205:13

210:9,23 211:1
  213:14,18,23
  214:2 215:5,7,10
  215:14,18,22,24
  216:1,6,17,21
  217:4,24 218:2,9
  218:16,18 219:7,7
  219:11,13 220:22
  222:24 223:2,11
  223:15,20 224:5
  224:18,22 225:10
  225:16 226:1
  228:3 233:18
  234:4,7,10,11
  238:2,24 244:6
  245:3 246:3
prescriptions
  186:1,7 194:10
  224:4,8 226:10,18
  226:21,22,25
  227:6,8 228:4,16
  228:25
presence 221:18
  242:15
present 4:7 10:7
  32:17 34:1 43:19
  51:7 130:11
  137:21,24 196:17
  200:5,8,12 234:24
presentation
  42:20 45:12 56:3
  67:11 73:22 76:8
  76:10 78:2 93:25
  94:6 97:20 98:24
  101:19,21,24
  102:3,4,8 103:4,8
  103:9,15 105:1
  184:18 185:2
  235:3
presentations
  47:12 67:3,5 77:7

98:22 111:11
  121:3 126:20
  137:1,4 180:12
presented 31:10
  32:6,7 33:5,8,17
  43:16 52:7 55:23
  76:4 111:2,4,8
  137:10,12 138:3
  214:20
presenters 138:18
  138:23
presents 189:25
preserve 196:24
president 27:1,3
  27:15 56:5,6
  118:6,6,11,16,21
  118:25 120:7,9,10
pretty 81:8
prevalence 186:7
prevalent 178:12
  178:15
prevention 163:12
  178:20 180:24
  181:5
previous 174:25
primary 15:12
  186:22
prince 95:15 96:1
  96:3 97:4
prince's 96:7
printed 82:16 86:3
  109:3
printout 6:17,19
  143:10,16,23
  144:4 146:3,10
prior 49:15 201:3
priorities 65:23
  68:4,11,16 69:3,22
  79:2 83:19
prioritize 66:5

priority 68:20,24
private 13:21
14:12,19 15:6,10
15:14,19 18:21
20:23 23:9,17,25
110:18 141:19
142:8,24 143:2
144:1 145:15
186:4,6,18,23
192:24 193:4,7,11
privilege 171:5,16
173:1,5 174:3,7,8
175:4,10
privileged 172:7
pro 27:1,15 118:6
118:21,25
probably 24:5
27:16 55:1 64:2
66:12 75:16 85:3
98:7,21 118:2
155:16 158:21
168:1 178:2,6
180:7 187:3,5,21
187:22 193:5,9,13
193:14 196:8
199:22
problem 55:16
97:13,17,22 98:4
98:16,19 99:7,12
99:17 115:17
127:4,5,9,14
132:18 142:14
178:13,22 179:5,7
179:12,19,24
180:13,23 181:14
182:1,5,20 183:1
188:15 193:20,24
194:2,14 202:14
202:15,16,17
234:2,12

problems 127:16
178:5,7 180:17
186:20 194:1,6
procedure 241:7
245:5 246:5
process 43:15
82:18 236:22
produced 117:17
131:7 169:25
172:3
production 155:25
156:4 244:15,17
244:22
profess 169:6
profession 29:22
30:3
professional 22:12
92:19 93:2,3
94:18,21,23 97:5,5
222:11,21 223:6
professionally
221:17
profile 137:22
program 63:23
64:5,8 73:11
106:6,8 191:16,25
192:8 235:18,21
235:23
programmatic
114:10,18
programs 63:16
63:18 64:3 65:8
65:11,15,18
108:11 115:14
164:16,21 165:15
165:21,25
progress 182:15
project 114:20,21
115:10 116:3,4,8
116:14,17

promised 239:10
promoted 164:9
promotion 164:8
prompt 102:7
prompted 75:23
101:20 102:4
219:13
properly 184:19
properties 59:15
225:16 226:1,7
property 53:10
79:10
propofol 151:12
151:13,16
proportionately
102:17
proposed 71:21,25
120:5
pros 224:14,17
238:2,4
provide 18:15
20:20 107:15
113:16,20,24
119:18 142:17
164:20,25 165:11
165:14 181:11
provided 11:17
165:8 211:1
214:25 222:14
223:21
provider 215:16
215:17
providers 156:8
156:16 161:3,11
210:19
provides 108:3
providing 221:21
224:1
psych 167:22
psychiatric 167:22
168:2 187:19

194:5
psychiatrists
167:25
psychiatry 167:19
psychology 22:1
167:17 168:5,14
168:15
public 6:3 41:19
50:6 63:5 65:23
66:21 70:9,17
80:10,10,16,20
81:2 82:17 83:16
83:23 84:6,14
85:10,23 86:13
91:1,3 97:13 99:7
107:6 130:5,12
131:20,23 132:6
180:22 200:2
242:6 243:14
245:10,18 246:15
246:23 247:23
publication 150:2
150:5
publicly 86:5
117:21 143:17
146:10 176:14
publish 96:16
published 82:9,12
82:15,25 95:17
96:17 177:23
178:4
purdue 1:13
218:13,15
pure 154:20,21
purely 150:10
purposes 85:24
117:9 122:18
128:5 131:1
134:16 143:12
146:6 169:20
176:9 183:21

**pursuant** 25:19
241:3,6
**pushed** 210:5
**put** 32:14 50:21
72:15 74:14,22
83:18 90:1 99:25
105:20,24 136:22
171:1,9 172:24
175:24 209:24
211:15 214:4
239:16
**putting** 81:20
99:22 100:1
147:13 166:23

**q**

**quadrant** 125:20
**qualified** 242:8
**quality** 209:16
225:19
**quantify** 142:15
**quarterly** 38:13
**question** 39:24
84:4 132:4 141:21
144:19 171:6,18
171:22 173:2,22
174:24,25 175:11
175:17 212:10,11
212:15 228:23
229:6,9 237:25
**questioning**
175:18 240:4
**questions** 74:13,21
155:17 171:10
172:7,22 173:24
201:18 204:5
206:4 207:2 212:2
233:14 237:12
239:14,20,21
240:6
**quick** 206:6
239:10

**quite** 148:20
**quotas** 155:25
156:4

**r**

**r** 2:22 235:15
**radar** 157:4 199:1
**ramped** 225:20
**range** 70:1,6 74:3
83:16,20
**rarely** 187:7
**reaction** 188:12
**read** 49:21,22,22
83:2,4,5 109:6,10
119:20 123:4
130:5 132:1 140:7
140:11,13 150:21
177:9,12,14,20
179:17 191:6,8
197:7 212:13
224:21 240:7
245:5,6,12 246:5,6
246:17
**reading** 83:10
244:19
**realize** 90:12
**really** 27:5 37:24
39:20 67:19 75:14
82:17 94:12 96:1
96:15 136:14
141:6 143:3
163:10 164:19
197:10 202:8
209:14 210:4
221:2 224:8
225:22 226:4
231:5 237:20
**reappointed** 43:11
43:13,14,18
**reappointment**
43:16

**reason** 142:11
175:2 244:14
246:8 247:3
**reasons** 186:15
**recall** 66:10
119:23 120:19
133:8 138:2
180:10,11,14
207:20 213:5,17
215:4,9 221:11
222:25 223:12
237:21,24 238:17
238:21
**receipt** 113:10
133:15 244:18
**receive** 16:11
25:12,17,21,24
26:14 47:11 55:7
55:24 72:5,6,9
101:3,7,10 107:11
110:14,18 229:21
**received** 23:14
101:15,19 133:2
154:19 156:10
163:20 195:11
200:24 212:21,23
229:17 234:1
**receives** 53:16
55:18,21 79:12
110:8 116:21
163:16
**receiving** 19:7
201:3 213:17
214:5 219:16
**recess** 70:24 162:9
232:4
**recognize** 86:7,8
117:13 143:20
220:3
**recognized** 128:21
129:23

**recollection**
211:12 212:16
**recommend**
161:10,12,20
**recommended**
161:3
**record** 10:2 12:1
28:10 54:9 70:22
70:25 123:5 142:1
142:6 162:7,10
171:2 172:25
173:7 174:3
175:20 179:16
195:22 211:16
212:1 215:21
232:2,5 239:11,17
240:11 246:9
**records** 81:2
**recovery** 128:23
129:2
**recreational** 183:8
**recycling** 89:2
**reduced** 242:14
**refer** 91:7 158:3
**reference** 244:7
245:2 246:2
**referenced** 149:10
173:3 242:13,18
245:11 246:15
**referred** 157:24
**referring** 66:18
84:18 149:18
185:14 188:22
189:7 195:23
205:4 227:11
236:23
**reflect** 28:10 54:10
144:12 195:23
239:12
**reflected** 201:23

**regarding** 76:8,11
141:16,17 162:18
212:5 213:18
215:5 222:2
223:14 224:5
229:17 232:20
234:2,18 241:2,11
**regular** 113:3
119:6
**regularly** 82:24
**regulated** 216:2
**regulates** 155:22
216:16
**regulations** 161:12
**reimbursement**
16:11
**reintroduce**
206:12
**relate** 65:12,15,18
103:16,20 114:19
116:14
**related** 69:7 76:25
78:1 79:10 81:9
89:15,19,22 91:22
92:20,22 93:4,6,11
93:14,17,21 97:13
98:22,24 99:2,24
101:19 103:23
107:11 113:7,7
114:11,21 115:9
115:11 116:1,5,25
120:20 121:4
122:7,11 130:11
131:24 134:7
139:14 163:8
171:11,14 182:20
190:7,18 197:1
206:16 221:3
235:4,10 236:20
**relates** 1:11 36:21
234:12

**relating** 76:15,20
76:23 77:8,15
96:7 98:19 103:23
**relation** 113:10
**relationship** 45:20
174:5 175:12
**relationships** 19:9
20:11
**relative** 104:12,13
104:17,19 243:2
**relevancy** 174:9
174:20
**relevant** 142:12
172:11 190:14
**relief** 236:4
**remember** 27:19
50:5 60:12,25
63:10 67:6,8,10,12
68:6,7,17,21,25
72:19 75:11 76:16
76:22 77:23 78:6
97:11 98:23
101:13 103:8
107:22 108:22
109:1,16,17 112:1
112:2,23 118:24
121:7 122:2 126:1
126:6,8,12,13,15
126:19,21 129:4,5
129:12,15 132:3
136:6 137:10
138:21 139:12
148:13,24 149:1,5
152:12 155:5
176:21 177:13
179:3 181:3
184:10,13 185:5,7
185:11 192:9,11
192:18,22 200:12
221:2 232:22

**remembered**
23:10 192:11,12
**remembering**
68:13 126:24
**remind** 44:23
**remotely** 10:8
**removal** 22:18
**removed** 19:17
**rems** 235:14,18,21
235:23
**renewed** 24:9
46:18,22
**rep** 220:13,15,17
220:25 223:5
**repeat** 212:11
**replacement**
186:14,14
**report** 6:4,24
73:23,24 74:2,6,16
74:19,22,25 75:9
75:21 76:11,14,19
77:8,17 78:3
82:13 83:18 85:23
86:14,15 87:6,10
87:10,18 88:3
89:10,15,19,22,25
94:2 108:17,21
109:2,4,6,10 176:8
176:23
**reported** 180:4
229:13 234:14
**reporter** 5:8 11:15
12:20 245:7
**reporter's** 5:6
242:1
**reporting** 42:25
89:4
**reports** 81:12,14
81:17,21 82:4,8,12
82:23 83:3,8,16,22
84:2,5 108:15

109:15 232:20
**represent** 10:9
92:5 206:14
237:11
**representative**
32:3 73:11 223:17
223:20
**representatives**
31:22 32:1
**reps** 220:23
221:12,14,16
222:1,6,9,17,24
**republished** 95:19
**request** 74:18
171:12 246:9,11
**requested** 241:1,6
241:10
**requests** 81:2
**require** 52:2,20
**required** 56:15
59:19 60:4,5,7
244:25
**requirement** 17:7
30:14
**requirements**
30:18 142:23
159:11
**requiring** 142:16
**research** 99:12,16
99:20 100:3,7,10
147:4,11,19,23
148:5 155:8
**researching** 148:9
**residency** 21:22
22:4
**resolution** 119:13
119:24 120:5,20
121:4,8,11
**resolutions** 119:7
**resolved** 119:15

**resource** 184:7
185:15 188:1
**resources** 46:8
128:23 129:2
181:11 184:11,15
**respect** 174:10
222:7,10,18
232:17
**respond** 12:19
123:9 170:20
175:15,17 190:22
191:22
**responded** 207:14
**responding** 174:22
**responds** 170:22
**response** 188:17
**responsibilities**
36:2
**responsibility**
219:24
**restaurants** 69:9
69:16
**resulted** 228:18
**retained** 5:8
**retaliation** 209:23
**retired** 29:21,23
30:2,4
**returned** 244:18
**revenue** 79:8,13
79:18
**reverse** 77:3
**review** 24:18
49:14 53:17 60:8
60:18,23 61:2,5
82:8,11 84:2
89:13 121:1
149:20 163:25
164:4,6,15,18
196:20 197:4
229:23 241:2,6
244:12 245:1

246:1
**reviewed** 149:24
150:5,8 198:3,6
207:19,24 211:5
225:9
**reviewing** 120:19
**reviews** 164:11
165:25
**revision** 164:7
**richards** 2:4 10:22
10:22 28:9 50:20
54:9 64:12 81:6
83:25 102:23
131:25 141:14
142:13 153:24
157:10 159:3,10
160:24 171:1,21
171:25 172:4,6,19
172:21 175:15
178:1 179:1
183:13 195:6,22
196:1,5,18 198:19
201:14 211:15
226:13 227:18
228:21 229:3
231:24 236:13
239:13 240:7
244:5
**right** 14:16,20
15:8 17:16 20:21
25:4 29:1,3,9
30:11,23 34:14,21
36:7 44:18 46:17
47:22 48:1,19
50:16 54:6 55:9
56:21 62:17,22
63:10 71:9 72:6
72:20 79:8 81:8
84:8 86:19 87:23
88:23 89:6 90:3
92:13 93:5 103:20

115:12,13 120:17
121:12 123:4,13
125:4,20 127:7
128:17 129:24,25
132:20 133:10
136:5 140:1
143:19 144:3,6
145:12,15,20,23
146:13,17,21
149:15 152:14
153:8,17 154:3
155:9 156:17
158:4,20 160:5,9
168:8 170:6,22
172:10 174:10
175:1 177:4 182:2
182:18 184:8
185:5,22 187:16
190:15 191:3
193:21 198:1,25
199:14 204:23
211:18 214:16
229:19 233:8,15
233:22 240:2
**risk** 137:9,23
140:17 153:3
235:9
**risks** 160:18
182:21 199:13
**rite** 3:2 10:17
142:7 237:11,14
237:18 238:19
**road** 2:9 6:3 85:22
86:13
**roadrunner.com.**
124:18
**role** 24:20 44:2
46:10 47:8 56:8
56:11,13 57:16,19
65:21,25 78:19
80:9,14,19 81:19

81:24 88:6,9,15
131:15,20 133:22
155:14 160:17
202:24
**room** 50:16,19
239:19
**rotations** 167:19
**roughly** 136:11
**routes** 88:25
**routinely** 51:11
72:9
**rpr** 1:25
**rules** 236:20 241:3
241:7 245:5 246:5
**run** 57:10 63:16
63:19 188:13
**rx** 219:1

**s**

**s** 235:15 244:15
246:8,8 247:3
**saber** 123:22
**saberhealth.com**
124:5 128:14
**saberhealth.com.**
123:16
**safe** 88:25
**safety** 156:15
**salaries** 164:6
**salary** 17:23
**samosky** 170:5,24
**saturday** 66:19
**saw** 89:20 98:24
102:3 103:3,15
109:7 140:19
197:9,15,22
202:22 208:16
209:3,6 212:8
217:11 231:16
**saying** 28:20 59:25
64:14 71:22,24
115:3 123:1

132:23 152:3,6,7
153:25 157:6,12
158:1 167:23
173:17 175:9
184:21 186:19
191:22 202:20
216:9,13 227:1
228:1
**says** 86:13,18
118:9,18 119:11
121:11 125:12,20
126:2 127:8
128:19 130:2
131:18 133:2,19
134:3 135:4 145:3
151:20 152:1,2
156:8,18 170:13
176:25 177:8
178:17 180:3,25
182:19 183:4
188:19 208:12
**scenes** 52:14
**schedule** 208:7,9
**schizophrenia**
194:7
**school** 21:21 89:1
89:1 166:19 167:5
167:8,19,20 168:6
168:21,25 169:6,9
226:7
**schutte** 3:3 5:5
10:16,16 142:5,6
172:24 174:2
175:1 195:24
237:9,11 239:9,18
240:2,9
**scope** 81:24
132:17 172:17
**scott** 3:3 10:16
142:6 237:11

**scott.schutte** 3:5
**screen** 147:6,22
**screenings** 24:17
**seal** 243:6 245:15
246:21
**second** 118:10
119:3 130:1 184:3
**seconded** 27:6
34:16 43:17
118:19 119:12
**secretary** 27:8
28:18,21 29:3,5,7
29:12
**see** 18:11 23:4,7
25:18 29:8 39:25
39:25 40:2 44:5
54:25 55:2,11
67:3 72:18,19
82:20,23,24 83:3
85:8,17 86:9,18
87:18 88:19 89:17
96:13 108:20
118:7,11,22,23
119:7 121:10
123:11,15 125:2,6
125:10,18,23,24
128:12,24,25
131:10,14 132:24
133:1 134:23
139:1 145:1 151:1
151:2 161:4,8
170:4 177:2
179:10 182:22,23
184:2 185:1
186:23 187:7,7,9
187:11 188:23
191:11,21 197:12
197:21 210:11
216:8,12,21
224:25

**seeing** 15:16,17
102:12 176:21
180:11 188:23
215:4,9
**seeking** 183:8
204:1
**seen** 86:22,23,24
86:25 87:16,25
89:14 108:17
109:14 117:25
176:19 178:4,8
185:6,9 208:1
210:8 217:1 231:4
235:6
**sees** 199:2
**segment** 197:14,15
197:16,17,21
**selects** 81:16
**send** 135:8 205:20
**sending** 170:24
**sense** 42:24 69:8
73:15 165:17
167:25 203:19
211:8 225:19
**sent** 52:13 208:14
208:15,16
**sentence** 133:1,18
157:18 177:15
178:16 180:2,25
182:19 183:3
**separate** 66:16
**september** 35:24
125:3,16 131:11
194:25
**serve** 30:18 37:11
38:18,22 41:1
43:11 53:11 142:9
**served** 27:11
35:22 38:25 39:7
**serves** 29:4,6,11
145:3

**service** 69:8
**services** 19:15,19
19:21,22 20:2,9,20
37:10 38:17 39:3
**serving** 49:18
145:10
**session** 68:3
**sessions** 66:2,8,13
66:25 67:3 68:12
**set** 49:15 62:25
121:14 127:24
130:15 134:10
140:22 145:25
183:15 243:6
**sets** 52:11,14
**setting** 20:8 93:24
114:15,22 122:4
155:16 201:19
214:11,14
**severe** 142:17
**shadowing** 14:6
15:7
**share** 115:25
**sheet** 244:13 246:7
246:10,18 247:1
**sherrie** 27:21
29:14
**shkolnik** 2:8 10:21
**short** 20:5
**shots** 147:6,22
148:1
**show** 123:2 129:3
129:11 136:12
177:17
**showed** 127:11
163:9,10 195:15
**showing** 86:2
117:12 122:21
128:8 129:11
131:4 134:19
143:15 146:8

169:22 176:11
183:23
**shown** 244:16
**shows** 143:24
**side** 224:12,25
239:19
**sids** 64:19
**sign** 209:13 214:16
215:2
**signature** 241:5
243:13 244:14
**signed** 245:13
246:18
**significant** 22:14
22:15 133:5
167:22 187:19,21
187:24 199:9
**significantly** 21:8
139:20 194:14
209:10,19,22
225:20
**signing** 244:19
**signs** 178:10 220:3
**similar** 115:21
**simon's** 89:1
**simply** 183:5
**sincerely** 244:21
**singular** 90:10,12
90:14,14
**sir** 244:10
**sisters** 32:15
**sit** 27:17 237:13
**sits** 29:2 54:7
**sitting** 28:6 37:7
122:2 174:12
**situation** 20:16
182:16
**six** 20:13,15 22:20
25:23,25 26:14
27:18 32:12
200:15

**sketchy** 214:13
**skin** 205:10
**skip** 206:25
**sleep** 64:19 151:15
**slightly** 187:14
**small** 20:4 56:11
191:14
**smiley** 210:17
212:20
**smooge** 187:13
**solutions** 3:11
244:1 247:1
**somebody** 13:11
52:16 95:21
100:25 122:1
158:2
**somewhat** 37:6
106:3
**sorry** 28:4,11,14
42:23 47:25 54:5
54:5 58:15 60:12
99:1 100:19
113:14 117:19
120:4,8,15 124:2
129:9 147:7
153:13 159:11
161:1 170:2
193:25
**sort** 16:19,22
25:16 27:7,9
36:21 57:8,9 63:5
66:2 75:24 80:1
96:12 97:18
132:12 137:4,22
138:10,12 166:24
178:7 182:13
186:16 209:23
210:5 212:3,7
213:22 214:23
238:7

**sound** 155:10
**sounds** 133:10
**source** 121:17,24
151:24 152:2,4,4
154:22 155:3
214:5,18 225:3
229:22
**sources** 53:7,15
79:6 108:2 110:19
116:20 122:5
147:10 214:8
224:16 238:1
**spaced** 123:7
**speak** 79:3 82:1
85:15 182:16
**speaking** 32:12
144:15,16 239:6
**spec** 219:1
**special** 150:14
168:10,14,25
169:9,12
**specialist** 157:24
158:4
**specialty** 18:18
**specific** 59:15 73:8
107:22 116:19
139:23 203:17
213:20 219:21
221:3 224:11
236:11
**specifically** 29:24
30:5,6 76:4 77:12
77:13 95:7 96:7
97:21 98:15 103:8
105:12 108:6,9
116:15 119:2
141:6 144:4 149:5
185:11 222:7
232:12
**specifics** 215:3
219:12 223:13

**specified** 24:24,25
158:22 242:21
**specify** 17:3
157:20
**spend** 13:23 14:2
14:11,18,23 15:2,4
15:14 16:17,24
17:15,17 20:1
24:19,22 26:10
38:11 48:2 58:13
59:20 109:20
149:3
**spending** 14:13
59:1,6 60:2,19,21
113:11
**spends** 57:2,17
58:17 60:10
109:23
**spent** 148:9 149:8
**spoken** 111:10,13
111:16,22 112:18
112:19,21 113:1
204:9,17,20
205:18,25 238:4
**ss** 242:3
**st** 23:2,4,7,12,18
23:20,24 24:4,14
24:21 137:16
**staff** 78:25 113:25
114:2 230:10,12
**stamp** 122:23
128:10 131:6
134:21 169:24
183:25
**stamped** 86:6
117:21 123:3
143:18 146:11
176:15
**standard** 211:10
214:22,23

**standards** 139:9
139:14,17,19
140:2,5,7,23 159:1
159:6 160:1
227:10,11,13
**standpoint** 209:18
**stars** 4:4 95:16
96:10,20,23
150:19
**start** 21:18 120:24
**started** 66:11
67:11,23 106:17
111:14 210:15
**starting** 191:14
**state** 11:25 13:18
13:23 14:8,13
15:2,5,7,19 18:21
19:23 21:1 36:3
37:16 59:3,11
93:8 110:6,9,11
115:20,21,23
122:10 129:18,23
140:24 141:1
144:13 161:23
162:1 163:13
229:25 230:3
242:2,7 243:15
245:10 246:15
**statement** 72:11
139:2 179:21
245:13,14 246:19
246:19
**states** 1:1
**statistician** 166:11
**statistics** 177:17
182:8
**statute** 11:18
**stay** 45:4 49:21
67:21 139:24
**stenotypy** 242:14

**step** 35:25
**stepped** 35:23
**stop** 178:20,22
226:3
**stores** 3:6 69:9,15
**stories** 36:24
**story** 36:20 208:19
208:22
**strategic** 66:1,7,13
66:17,24 67:2
68:2,12,16
**strategies** 235:10
**street** 2:5,14,19
3:20
**strike** 97:5 124:3
130:9 204:6 210:7
219:4 221:14
223:24 233:5,24
234:22
**stronger** 138:15
**strongly** 156:13
**structured** 17:22
**stuck** 179:3
**student** 22:2
**students** 14:4,4,8
14:14 15:7 93:9
**study** 21:24
**subcommittees**
61:8,11 62:13
**subject** 63:25 81:2
131:14 141:23
172:23 235:23
**submit** 33:10
57:10
**subpoena** 195:11
200:19,20,21,25
201:4
**subpoenaed**
141:15 195:12
198:13,14

**subprograms**
64:23
**subscribed** 245:10
246:14 247:21
**subset** 74:7,10
**substance** 65:13
68:15 76:15,20,24
77:9,16 78:4,5
89:16 93:12 94:19
95:3,8,11,14,16
97:2,6 104:17
120:22 149:14
152:18 232:20
**substances** 135:6
152:23 153:15,21
155:22 156:1,4
235:11
**suburban** 102:15
**suffering** 224:2
**suggest** 175:20
**suggested** 194:8
**suggestion** 219:15
**suggests** 175:21
**suicides** 179:16
**suing** 197:19
**suit** 209:23
**suite** 2:5,9 3:9,20
244:2
**summary** 71:7
72:6
**sunday** 197:9,13
197:23,25
**superior** 244:1
**supermarket** 89:1
**supplies** 205:1,3,6
205:8,12,16,16
**supply** 155:15
202:25
**support** 53:13
108:12 113:16,19
113:22,25 115:20

**supporting** 113:13
114:8
**supposed** 157:23
**sure** 12:19 17:9
40:17,18 48:14,16
53:10,12 54:21
57:25 58:20,22,23
59:8,23 60:2,16,17
60:17 61:9 62:25
64:16 65:3 77:18
79:11,14 81:5,7,8
82:24 83:19 91:4
91:23 92:8 98:17
99:4 100:11
109:16 110:12,25
112:8,19 115:5
124:22 126:9,12
126:13 132:2,21
138:1 139:21
145:9 163:2
176:22 185:23
188:19,24,24
189:20 191:9
198:11 201:6,7
205:9 208:8
212:12 215:20
220:1 232:1 238:6
**surgeons** 22:11
**surpassing** 179:15
**surprised** 45:8
102:10,13 129:8
148:22 180:15
**surrounding**
194:13
**suspect** 230:7
**swear** 11:15
126:25
**switch** 206:6
**sworn** 11:18 42:19
242:10 245:10,13
246:14,18 247:21

system 64:9
120:17 143:1
systems 119:16,25

t

t 3:3
table 88:19 89:12
tables 147:6
take 27:4 49:23
73:20 75:3 87:2
132:15 135:2
162:5 166:20
176:15 180:8
191:7,17 206:6
210:5 219:23
231:24 235:20
taken 1:22 70:24
103:6 162:9
172:14 176:12
201:22 232:4
242:20
takes 154:1 183:9
talk 104:1 153:14
174:13,15 188:24
189:20 190:3
196:14 208:18
236:19
talked 43:25 76:9
79:5 135:16
138:12 184:18
193:16
talking 64:3 71:4
91:6 104:5 105:17
123:6 126:2 133:9
145:7 149:6
151:19 153:16
159:25 162:14
170:18 190:10
192:25 202:17
talks 157:19
tape 208:14,15

tapered 236:8
task 106:2,5,12,17
106:20,23 107:3,5
107:9,12,16,20,25
108:4,8,12,15,18
109:11,15,20
110:8,14,18,22,22
111:9,16,23
112:13,17,22
113:2,9,17,20,25
114:5,7,9,13,14,17
114:25 115:2,6
116:20,22 128:22
129:18 134:7
190:1
tattoo 19:15 22:18
tattoos 19:16
taught 93:20,23
214:15
tax 53:9,10 79:8,9
79:10
tb 205:10
teach 93:8,11,14
93:17
team 78:12,13
technology 30:9
ted 137:12,13
teen 63:9 64:21
teenager 183:9
teens 183:7
tell 13:7 17:9,10
21:15 39:19 44:24
45:24 61:13 72:21
189:12,17 195:9
199:16 204:9
209:5 214:7
236:11
telling 75:14
222:22 238:14
tem 27:1,15 118:6
118:21,25

ten 17:11,12,13
21:9,11 24:5
37:21 39:16 98:7
98:9 111:17 113:1
140:4
tend 194:6
term 35:23 47:6
90:21,24 91:2
99:6
terminal 159:2,7
159:12,14 160:2,2
terms 43:12 48:15
64:11 67:1 78:22
79:9 90:5,17
113:5 114:18
133:17 152:24
153:2 186:6
209:13
terry 28:17,23
29:11 32:8,9
33:19 42:21,23
43:19,25 44:7,18
44:20 45:2,4
46:23 55:2,13
74:14,21 78:14
123:12 125:7,12
128:13,19 130:2,8
130:10,16 131:12
134:24 135:4,8,13
170:17,19,20
171:8,11,14,24
173:12,15,23,25
174:12,13,16,17
184:5,10,14 185:6
185:12 188:19
189:5,7 190:25
terry's 170:13,25
testified 30:21
84:1 141:17 142:7
211:7

testify 13:10
141:15 242:10
testimony 142:11
158:13 198:7
211:17 229:5
242:13,17 245:6,7
246:6,9,12
tests 205:10,11
teva 2:17 10:15
11:4 206:16,18,20
206:22 207:8,10
216:19
thank 71:3 162:13
167:2 176:17
211:25 227:23
229:12,12 232:7
237:5,7 239:24
240:7,9
thank's 28:1
thanks 190:22
192:13
therapy 156:14
thing 31:13 32:18
66:20 142:16
179:4 199:8 202:7
202:11 217:21
231:12
things 36:21 52:6
54:23 72:15,17,20
76:9 85:16 104:22
115:21 116:1
120:22 132:20
138:16 145:11
165:2,3,4 168:21
168:23 178:21
209:21 210:16
222:4 225:1,12
think 17:5,25
20:21 21:9 27:24
33:16 36:16 38:2
38:21,24 39:6,21

40:12,24 42:12
44:17 45:11 52:4
52:22 53:25 54:18
54:22 55:16 56:18
57:7,20 58:24
60:2 61:24 62:17
64:10 66:1 70:19
70:20 71:24 72:16
73:6 75:17 76:3
76:10 79:12,21
85:13 91:12,14,16
91:17,19 96:25
107:1 124:23
126:24 129:10
132:11 139:10
141:3,22 142:11
142:22 144:17
155:7,23 164:23
165:7 173:6
177:12 179:21
181:18 185:9,16
188:14 190:5
192:12 194:8
198:25 202:13
203:11 211:16
217:11 218:1,17
219:22 225:18
226:2 227:18
229:4,5 234:20
237:2 240:3
**thinking** 19:4,6,7
19:13 28:19 45:1
57:25 71:18
152:24 153:2,5
178:11 216:13
**thirty** 244:18
**thought** 26:3
61:23 209:6,8,9
211:5 213:3
214:13 223:7

**three** 16:2 28:12
75:10 76:17 77:19
77:20,22 85:10
156:12 157:4,8,14
157:17
**threshold** 60:11
60:14,20 105:14
105:16,19,23,25
**throw** 196:25
**time** 10:3,7 12:13
13:22,25 14:2,12
14:23 15:15 16:16
16:23 17:15,17
19:25 24:19,23
45:15,16 47:17
55:3 58:16 66:8
82:21 83:6 96:9
101:13 121:23
124:8 127:5
129:16 132:6
139:14 142:20
148:8 149:8
153:12 155:2,4
156:19,22 157:1
157:16 158:7,16
158:17,22 159:1
159:22 160:7
161:3,21,22
177:22 178:3,11
179:5,16 181:13
188:9 189:11
195:25 196:2
199:9 205:10
207:23 223:14,19
224:10 225:18
227:4,17,19
228:14 237:6
239:23 240:10
242:20
**timeframe** 140:6
210:13

**times** 12:9,10
77:20,22,24,25
111:7,11,14,15
113:1,2 140:3
142:23 154:8
219:19
**tirf** 235:17,21,23
**title** 53:24 235:12
**titled** 87:19 144:5
146:15
**today** 47:23 122:2
141:18 152:22
162:1 185:25
189:24 193:18
197:4 206:19
207:3,7 237:14
**today's** 195:14,18
196:15,21 226:24
227:10
**told** 13:11 54:4
122:1 188:4 208:9
208:11 220:11
**toledo** 21:20,21
**tomorrow** 189:21
**tons** 154:20,21
**top** 72:3 75:15,18
80:6 85:9 86:19
96:8 123:12 125:2
134:23 145:2,19
145:20 152:15
154:18 165:10
180:3 182:19
188:18 191:21
192:14 211:9,13
212:17
**topic** 147:19,24
201:11
**topics** 74:18,24
75:2 81:16
**totally** 60:1

**touch** 41:9 45:4
67:21 120:23
**touches** 64:1
**touching** 168:24
**tower** 2:4
**township** 31:22
34:3
**townships** 31:19
42:14
**toxicology** 169:4
169:10
**track** 100:10,12
**tracked** 100:9
**tracking** 100:10
**tracks** 101:1
**train** 14:3
**training** 131:15
166:13,16,21,23
167:1,4,7,11,14
168:17,25 169:3,8
**transactions**
206:17
**transcribed**
242:16 245:7
**transcript** 5:1
241:3,6,9,11
244:11,12 245:5
245:12 246:5,11
246:17
**transcription**
242:17
**transferred** 52:6
**transferring**
113:23
**travel** 89:3 230:16
230:17
**treat** 91:8,10,15
105:25 158:2,9
**treated** 220:4
224:3

**treating** 156:9
157:19 219:21
227:13
**treatment** 119:17
119:18 120:3
138:20,25 139:5
143:6 160:20
210:20 219:17
**treatments** 19:15
20:4
**trend** 177:18
178:19
**true** 144:10,15,17
152:22 169:11
242:16
**trust** 132:15
136:13
**truth** 13:7,7,8
242:11,11,12
**try** 19:16 49:21
99:9 103:1 139:24
141:7,8 142:19
168:21 199:6
206:25 226:3,4
**trying** 21:8 48:13
126:8 132:10
148:22 184:25
**tuberculosis**
205:11
**tucker** 1:22
**turn** 87:17 88:18
119:3 144:25
145:18 150:17
154:17 156:6
177:6 189:6
**turning** 131:17
187:25 188:18
192:23
**tv** 217:22
**twelfth** 2:14

**twice** 49:8
**two** 14:5,9,10,19
14:22,25 15:5,13
20:5 28:12 49:25
66:2,7 77:24,25
94:4 101:25
167:18
**type** 96:22
**types** 50:2 219:15
239:3
**typical** 16:23
50:17 52:8 75:9
**typically** 83:2,4

**u**

**u.s.** 216:10
**uh** 12:21,21 66:9
87:20 88:20 89:7
102:1 120:11
125:9,25 151:23
158:24 162:16
170:2,16 191:20
208:3
**ultimately** 154:19
**undergraduate**
167:16 168:13
**underneath**
120:13 145:3
**understand** 12:23
13:1,6 34:17 58:6
62:9 89:14 173:21
174:21 175:5,6
**understanding**
31:18 122:25
161:19 190:12
192:20 210:21,24
220:1 222:13
231:2,3,9 233:17
**understood** 228:2
**undertreated**
210:15

**undertreating**
209:15
**undisposed** 182:25
193:19
**unfortunately**
149:22 187:17
**uninsured** 32:14
**unintentional**
177:8 179:13
**unit** 64:7
**united** 1:1
**university** 13:18
13:24 15:3,5,8,19
16:7 18:21 21:1,7
21:21 93:8 167:21
168:7 187:18,22
**unknown** 54:14
**unnecessary**
226:10,22 227:8
228:18 229:1
**unremembered**
54:15,16
**unused** 177:9
182:21 183:5
**update** 55:6,8,12
74:15,18 144:12
**updates** 73:16,19
**upper** 125:19
145:22
**ups** 207:4
**urban** 13:19
**url** 143:18
**use** 22:18 34:19
65:16,19 68:19,23
90:19,21 92:11
96:2,24 97:14
98:5,20 99:6,8,9
102:15 119:17
122:11 124:4,9,14
130:11,18 153:7
153:10,22 154:12

161:4,16,18 178:5
178:9,13 182:1,5
183:11 199:18
202:16 209:20
227:9
**usually** 53:6 73:21
74:14 111:6 238:8

**v**

**v** 1:13 244:6
**vacancy** 30:25
**validate** 86:20
**valuable** 37:4,6
**vandetta** 4:8
**varies** 16:19
152:16
**variety** 80:22
**various** 178:21
**varying** 212:24
**vas** 111:15
**vehicle** 179:15
**venues** 224:10
**verbal** 73:7,21
**veritext** 244:1,7
247:1
**veritext.com.**
244:17
**vice** 45:15
**vicodin** 222:4,7,10
**video** 8:1
**videographer** 4:8
10:1 11:14 70:22
70:25 162:7,10
232:2,5 240:11
**videotaped** 1:18
**view** 85:5 139:3
178:23
**viewed** 211:13
212:16
**village** 12:4 16:7
31:23 33:25,25

**villages** 31:19
42:14
**vince** 111:6,7,15
111:18,21 112:7
112:15,18,21,25
125:8 126:2
131:12,18 189:21
189:23,24 190:3
190:12,17 191:13
**vincent** 23:2,4,8
23:12,18,21,24
24:4,14,21
**vincent's** 137:17
**violating** 171:16
**visited** 220:17
221:12,14,16
222:1,6,9,17,23
**vital** 209:13
214:15 215:2
**vodka** 154:1
**voice** 239:23,24,25
240:1
**vote** 56:1 58:8,12
58:16 60:9,13,20
82:20 118:21
133:15,16 192:7
201:22
**voted** 31:11 34:14
34:16 43:17 72:1
118:15,24 201:8
201:10
**votes** 27:7 60:19
**voting** 74:12 113:5
119:23 120:14,21

**w**

**wacker** 2:22 3:3
**wait** 55:3 226:13
**waived** 244:19
**wal** 3:6
**walgreens** 237:14
237:18 238:19

**walmart** 3:6 10:19
237:14,18 238:19
**wang** 27:25 28:1,2
28:10 29:25 30:7
54:3 62:18 118:10
119:12 195:24
196:2
**want** 64:14 145:14
145:16 172:9,20
172:24 175:22,24
188:3 191:7
192:15,20 199:14
211:15 231:6
238:9
**wanted** 26:20
54:25 55:2,11
69:8,10 231:22
**wants** 188:3
**warned** 225:13
**warnings** 225:7,10
**washington** 2:15
3:15
**watch** 199:22
208:4
**watched** 208:2,6
237:21
**water** 188:15
**watson** 218:21
**way** 19:4 50:22
57:24 58:1,4,14
61:24 69:18 103:2
106:9 115:3
127:21,22 131:7
137:7,8 139:21
172:12 186:25
199:1 202:14
209:24 212:24
216:13 219:25
221:3 236:16
239:7

**ways** 41:5,6 80:22
80:23 138:7,8
153:2
**wc.com** 2:16
**web** 144:5,20,23
146:15,23 147:1,4
147:14,20 148:2,4
148:10,12 149:4
149:23 150:1,4
154:14 155:8
161:21,22
**website** 6:17,19
80:24 86:5 94:25
95:3 97:2 99:23
100:2 117:20
143:11,17,23,25
145:6 146:4,10,20
148:17,18,18
149:11,21 161:7
176:13
**wednesday** 208:7
**week** 14:6,19 15:4
15:13 17:13 52:13
157:3
**weigh** 160:18
**welcome** 71:2
162:12
**wendy** 1:25 2:18
10:13 206:13
242:6 243:14
**wendy.feinstein**
2:21
**went** 21:17,18
23:21 31:8 43:14
69:10 126:8,9
127:12 136:23
138:10 174:24
207:2
**west** 2:18,22 3:3
10:13 206:13

**weston** 2:3 10:23
**westonhurd.com**
2:7
**whatnot** 24:17
**whereof** 243:5
**white** 102:17
**whites** 102:21
104:4
**wide** 97:24,25
**widespread** 97:18
**williams** 2:13
10:11 21:18,24
27:21 29:15 30:12
118:20
**williamstown**
21:19
**willows** 16:7 21:10
**wilson** 3:14 11:5
**wilson.mudge**
3:16
**witness** 2:3 10:5
11:15 141:15
142:2,7 171:12
173:2 174:8
175:11 206:7
211:19,21,22
237:7 240:4 242:9
242:14,15,18
243:5 244:8,11
245:1,4,11 246:1,4
246:15
**witness's** 241:2
**witnessed** 184:17
**witnesses** 174:15
**witness'** 244:14
**wondered** 96:9
**wondering** 93:1
**word** 34:18 64:5
92:11 97:5 179:7
191:7

**words**  99:9 202:5
**work**  14:5 17:4,20
  18:1,6 20:20
  25:13 26:10 36:5
  36:9,14,15,25 37:9
  37:10 38:7,12,18
  40:7 43:15 48:3,7
  49:12,19 63:6
  67:17 92:19,24,25
  93:3,6 110:22
  111:8,23 112:16
  112:22 113:25
  114:10,18 115:9
  115:11 116:14,25
  124:6,10,14,20
  127:19 128:21
  130:9 134:6
  141:18 142:8
  144:9,13 162:18
  163:6 168:6
  172:12,17 173:20
  186:3,4 232:16
  233:25
**worked**  35:3 38:25
**working**  14:1
  17:15,18 45:18
  73:17 133:19
  134:3 190:17,23
  191:14,25 230:19
**works**  53:11
  190:13
**world**  3:8 226:14
**worse**  181:15,16
  202:14
**write**  95:21,24
  96:4,6 146:23
  148:12 152:15,19
  215:18,24 219:10
  224:8 226:4
  238:25,25

**writes**  81:14 88:12
**writing**  88:7,10
  94:19 95:10,13
  97:6,9 144:23
  147:1,20 148:9
  149:4 158:17
  226:25
**written**  96:15
  120:25 121:1
  158:14 165:25
  219:6 224:4
  226:10,23 227:7
  228:16,25 229:1
  239:1
**wrong**  26:19 30:8
  30:10 156:19,20
  156:23 157:1,17
  157:23 188:6,9
**wrote**  94:24 95:2
  95:15 121:23
  144:20 148:20,24
  149:11 155:2
  158:7,16 161:21
  161:22 227:1
**wv**  3:21

**y**

**yea**  209:4
**yeah**  20:24 21:17
  28:11,12 29:16
  33:20 34:15,22
  35:9 38:1 42:16
  50:15 58:14 72:10
  79:15 85:14 91:17
  96:20 103:1
  126:22 127:8,12
  132:8 145:17
  147:5,8,12 148:6
  155:11 158:14
  179:3 182:3
  186:21 187:23
  189:9 191:6,7

  195:2,9 199:23
  210:14 216:8,8
  228:22 234:5
  236:6
**year**  21:6 35:21,24
  39:17 43:12 49:8
  49:25 75:19,25
  76:5,13 87:15
  94:4 133:3 148:14
  152:11 187:6,10
  198:12
**yearly**  24:10,12
**years**  12:6,15 21:9
  21:11,14 22:20
  24:5 27:16 32:12
  32:13 35:17,18
  37:21 39:16 47:5
  66:3 76:17 94:4
  98:7,9,12,17
  101:25 106:13,14
  136:10,11 140:4
  148:16,21,24
  158:8 167:18
  182:7
**yesterday**  196:6
  196:18
**young**  96:10,20,23
**younger**  187:14,20
**youth**  19:14,16,19
  19:20,22 20:2,9
  37:10 38:17 39:3

**z**

**zero**  203:1,1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.