Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
        IN RE: NATIONAL        )
 4      PRESCRIPTION           )   MDL No. 2804
        OPIATE LITIGATION      )
 5      _____)   Case No.
                               )   1:17-MD-2804
 6                             )
        THIS DOCUMENT RELATES  )   Hon. Dan A.
 7      TO ALL CASES           )   Polster
 8
                   THURSDAY, JUNE 13, 2019
 9
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                       - - -
12           Videotaped deposition of Gerard
13      Hevern, M.D., held at the offices of Dechert
14      LLP, 100 Oliver Street, 40th Floor, Boston,
15      Massachusetts, commencing at 9:04 a.m., on
16      the above date, before Carrie A. Campbell,
17      Registered Diplomate Reporter and Certified
18      Realtime Reporter.
19
20
21                       - - -
22
             GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
25
```

```
 1                A P P E A R A N C E S :
 2
 3      KELLER ROHRBACK LLP
        BY:  DEAN KAWAMOTO
 4           dkawamoto@kellerrohrback.com
             ALISON GAFFNEY
 5           agaffney@kellerrohrback.com
        1201 Third Avenue, Suite 3200
 6      Seattle, Washington 98101
        (206) 623-1900
 7
 8      SIMMONS HANLY CONROY LLC
        BY:  SANFORD SMOKLER
 9           ssmokler@simmonsfirm.com
             (VIA REALTIME STREAM)
10      112 Madison Avenue, Seventh Floor
        New York, New York 10016
11      (212) 784-6400
12
        BARON & BUDD P.C.
13      BY:  JAY LICHTER
             Jlichter@baronbudd.com
14           (VIA REALTIME STREAM)
        15910 Ventura Boulevard, Suite 1600
15      Encino, California 91436
        (818) 839-2333
16      Counsel for Plaintiffs
17
18
        DECHERT LLP
19      BY:  TIMOTHY C. BLANK
             timothy.blank@dechert.com
20           NEGIN HADAGHIAN
             negin.hadaghian@dechert.com
21      100 Oliver Street, 40th Floor
        Boston, Massachusetts  02110
22      (617) 728-7100
        Counsel for Purdue Pharma
23
24
25
```

```
 1          O'MELVENY & MYERS LLP
            BY: MATTHEW T. MURPHY
 2              mtmurphy@omm.com
                (VIA TELECONFERENCE)
 3          7 Times Square
            New York, New York  10036
 4          (212) 326-2000
            Counsel for Johnson & Johnson and
 5          Janssen
 6
 7

            CAVITCH FAMILO & DURKIN, CO., L.P.A.
 8          BY:  ROBERT WEST
                 rwest@cavitch.com
 9               (VIA TELECONFERENCE)
            1300 East 9th Street
10          Cleveland, Ohio  44114
            (216) 621-7860
11          Counsel for Discount Drug Mart
12
13

            BAILEY WYANT PLLC
14          BY:  JUSTIN TAYLOR
                 jtaylor@baileywyant.com
15               (VIA REALTIME STREAM)
            500 Virginia Street East, Suite 600
16          Charleston, West Virginia 25301
            (304) 345-4222
17          Counsel for West Virginia Board of
            Pharmacy
18
19
20    VIDEOGRAPHER:
              ROBERT SWEIG,
21            Golkow Litigation Services
22                      - - -
23
24
25
```

```
 1                         INDEX

 2                                          PAGE

 3    APPEARANCES...................................    2

 4    EXAMINATIONS

 5      BY MS. GAFFNEY...........................    7

 6      BY MR. BLANK............................. 141

 7

 8                       EXHIBITS

 9      No.     Description                    Page

10    Hevern 1   Plaintiffs' Notice of Oral       8

                 Videotaped Expert Deposition of

11               Gerard Hevern

12    Hevern 2   Gerard J. Hevern, MD invoices    24

13    Hevern 3   Expert Report of Gerard J.       26

                 Hevern, MD

14

      Hevern 4   Dr. Gerard J. Hevern            80

15               Supplemental Materials

                 Considered, June 12, 2019

16

      Hevern 5   Correction page to Dr. Hevern's 113

17               report

18        (Exhibits attached to the deposition.)

19

20

21

22

23

24

25
```

```
 1                VIDEOGRAPHER:  We are now on
 2       the record.
 3                My name is Robert Sweig, and I
 4       am a videographer representing Golkow
 5       Litigation Services.
 6                Today's date is June 13, 2019,
 7       and the time is 9:04 a.m.
 8                This video deposition is being
 9       held in Boston, Massachusetts, in the
10       matter of In Re: National Prescription
11       Opiate Litigation, pending before the
12       United States District Court for the
13       Northern District of Ohio, Eastern
14       Division.
15                Our deponent is Gerard Hevern,
16       MD.
17                Would counsel attending locally
18       please identify yourselves for the
19       record?
20                MS. GAFFNEY:  Alison Gaffney
21       from Keller Rohrback for the
22       plaintiffs.
23                MR. KAWAMOTO:  Dean Kawamoto,
24       Keller Rohrback, for the plaintiffs.
25                MR. BLANK:  Tim Blank with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Dechert for defendant Purdue.
 2                   MS. HADAGHIAN:  Negin Hadaghian
 3              from Dechert, also for defendant
 4              Purdue.
 5                   VIDEOGRAPHER:  Thank you.
 6                   And would counsel attending via
 7              teleconference please identify
 8              yourselves for the record?
 9                   MR. MURPHY:  Matthew Murphy
10              from O'Melveny & Myers on behalf of
11              Johnson & Johnson and Janssen.
12                   MR. WEST:  Robert West on
13              behalf of Discount Drug Mart.
14                   VIDEOGRAPHER:  All right.
15              Thank you.
16                   Our court reporter is Carrie
17              Campbell, and she will now swear in
18              our witness.
19
20                   GERARD HEVERN, M.D.,
21      of lawful age, having been first duly sworn
22      to tell the truth, the whole truth and
23      nothing but the truth, deposes and says on
24      behalf of the Plaintiffs, as follows:
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 DIRECT EXAMINATION
 2    QUESTIONS BY MS. GAFFNEY:
 3         Q.     Good morning, Dr. Hevern.
 4                Could you please state and
 5    spell your full name for the record?
 6         A.     Sure.  My name is Gerard
 7    Hevern, G-e-r-a-r-d, last name Hevern,
 8    H-e-v-e-r-n.
 9         Q.     Thank you.
10                Have you ever been known by any
11    other names?
12         A.     Jerry, J-e-r-r-y.
13         Q.     Thank you.
14                Dr. Hevern, you understand
15    you're under oath today, right?
16         A.     I do.
17         Q.     Is there any reason that you
18    would be unable to give your full, complete
19    and honest testimony today?
20         A.     No.
21         Q.     Not on any medication that
22    would interfere with your ability to testify
23    today?
24         A.     I'm not.
25         Q.     Okay.  Have you ever testified
```

Highly Confidential - Subject to Further Confidentiality Review

1    in a deposition or trial or legal proceeding

2    before?

3         A.    Yes, I have.

4         Q.    Okay.  And we'll go back to

5    that later, but so I presume you're familiar

6    with the ground rules of depositions.

7    There's just a few I'd like to go over.

8              First is that we not speak over

9    each other for the sake of the record, the

10   court reporter, so please wait for me to

11   finish asking a question before you answer,

12   and I will wait for you to finish answering

13   before I ask another question.

14             Second is that when you answer

15   a question, please answer it verbally, not

16   nodding or shaking the head.

17             And then last, if I ask a

18   question that you don't understand, just let

19   me know and I will try to rephrase it.

20             Sound good?

21        A.    Sounds fine.

22             (Hevern Exhibit 1 marked for

23        identification.)

24   QUESTIONS BY MS. GAFFNEY:

25        Q.    Okay.  Great.

```
 1                    I would like to mark as
 2    Exhibit 1 the notice of deposition.
 3         A.     Do I hand this back to you
 4    or --
 5         Q.     No, that's your copy.
 6                    Have you seen this document
 7    before?
 8         A.     I have.
 9         Q.     Okay.  And you've reviewed this
10    notice, I take it?
11         A.     I have.
12         Q.     Okay.  Did you bring any
13    materials with you to the deposition today?
14         A.     No, I have not.
15         Q.     Okay.  Dr. Hevern, you said you
16    have testified before.
17                    What was the context in which
18    you testified before?
19         A.     In a number of malpractice
20    cases.
21         Q.     Okay.  And did you testify as
22    an expert witness or as a party to the
23    litigation or both?
24         A.     Party to -- excuse me, party to
25    the litigation.
```

```
 1          Q.     Okay.  Have you ever been

 2    engaged as an expert in litigation before?

 3          A.     No.

 4          Q.     Okay.  Have you ever advertised

 5    your services as an expert?

 6          A.     No.

 7          Q.     Are there any cases where even

 8    if you didn't testify as an expert you

 9    evaluated the case materials or prepared a

10    report?

11          A.     On two occasions.

12          Q.     Okay.  And what were those

13    occasions?

14          A.     One was reviewing a case in

15    Boston here for a lawyer who was defending a

16    physician who had died, concerning a man who

17    had overdosed on methadone.

18          Q.     Okay.

19          A.     And the second case was

20    reviewing a case for a man from Vermont who

21    had -- was an alcoholic, and there was a

22    change in his will following his discharge

23    from the hospital.

24          Q.     Okay.  With the case that was

25    here in Boston, when was that?
```

```
 1              A.      I don't remember explicitly,
 2     but I would say in the last eight years.
 3              Q.      Okay.  Did you prepare a
 4     written report for that?
 5              A.      No.
 6              Q.      Okay.  And how about the second
 7     case, the man from Vermont, when did that
 8     occur?
 9              A.      Probably in the early 2000s.
10              Q.      Okay.  And are those the only
11     two instances in which you have provided
12     expert services to litigation prior to your
13     engagement with this case?
14              A.      Correct.
15              Q.      Okay.  And in the cases in
16     which you were a party to litigation, how
17     many cases are we talking about?
18              A.      Seven.
19              Q.      Seven.
20                      Okay.  When was the earliest of
21     those?
22              A.      In the 1980s.
23              Q.      1980s.
24                      Okay.  And when was the most
25     recent?
```

1       A.      Probably in the late '90s or

2    early 2000s.

3       Q.      How did these seven cases

4    resolve?

5       A.      Two of them I was removed from.

6    I don't know what the word would be used,

7    legal, but I never went to court, and they

8    dropped my name from the legal suit, so

9    whatever that is.

10              Two of them went to court and

11   it was a verdict on my behalf, positive.

12              And three of them were settled

13   out of court.

14      Q.      Were all of these in the same

15   venue, in the same geographic location?

16      A.      They were all in New Hampshire.

17      Q.      Of the three that settled, when

18   did those take place?

19      A.      In the late '90s maybe, early

20   2000s.  I don't specifically recall.

21      Q.      And all of these were med mal

22   cases?

23      A.      Correct.

24      Q.      Okay.  What was the nature of

25   the allegations -- I know we're talking about

```
 1    seven different cases here, but were they all

 2    relating to the same type of treatment or a

 3    variety of treatment?

 4         A.    Almost all different varieties.

 5         Q.    Okay.  Could you describe them

 6    for me?

 7         A.    Which ones?  I don't --

 8         Q.    Start from the beginning.

 9         A.    The two that were dismissed

10    was -- I was on -- was a -- an inmate in a

11    jail that I was on call for and there was an

12    accusation that I delayed treatment.  And

13    after deposition, that was found -- I was

14    dismissed.

15              The second one was a woman who

16    had a septic emboli and died of a

17    intracranial bleed on a weekend that I was

18    not on call, and that was dismissed.

19              The two cases that I won was --

20    one was a case in which the -- a man who had

21    been hospitalized at the Riverway Center for

22    Recovery for alcoholism signed himself out

23    against medical advice on a weekend that I

24    was not on call and within a number of hours

25    hung himself.
```

```
 1                    Let's see.  The next case was a
 2      woman who presented with premature labor.  I
 3      was not her treating obstetrician.  I
 4      transferred her to an obstetrician who then
 5      transferred her down to Boston and the baby
 6      was born, and there was an accusation that I
 7      didn't effectively manage that.  And so the
 8      child was born with some delays but did fine,
 9      you know, is ultimately alive and well now.
10                    The cases that were -- that
11      were settled out of court was -- again, I was
12      on call for an obstetrical case.  They -- the
13      accusation was is that there was a delay in
14      doing a cesarean section for a baby in
15      distress.  I was named in the suit, I was
16      never deposed, and it was settled out of
17      court.
18                    The next case was I was on call
19      for a -- you know, one of the people that I
20      was on call for.  A woman called on a call
21      and had some chest pain that had previously
22      been worked up.  I recommended that she go to
23      the emergency room.  She delayed in going for
24      24 hours, and she developed a compression of
25      her thoracic vertebrae and became paraplegic.
```

```
 1    So that -- that -- I was deposed on that, and

 2    that settled out of court.

 3                 And the last and final case was

 4    a case of mine in which a man who had rectal

 5    bleeding, who I recommended a colonoscopy, he

 6    declined.  He had a sigmoidoscopy, which was

 7    negative, and subsequently died of colon

 8    cancer.

 9         Q.    Thank you for going through

10    that.

11                 So just reviewing what you just

12    explained of these cases which you were a

13    party to and then the two that you consulted

14    on as an expert, it sounds like only one of

15    them was related to opioids; is that correct?

16    The methadone overdose case?

17         A.    Correct.

18         Q.    And what was the -- and you

19    testified that you didn't provide a written

20    report; you just evaluated the case?

21         A.    Correct.

22         Q.    Okay.  Other than these

23    litigation contexts, have you ever testified

24    in a different capacity, for example, before

25    Congress or before a federal agency?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     So how did your participation

 3    in this case come about?

 4          A.     I received a phone call from

 5    Dechert.

 6          Q.     Had you ever worked with

 7    Dechert previously?

 8          A.     No.

 9          Q.     Were you surprised to get that

10    call?

11                 MR. BLANK:  Objection.

12                 THE WITNESS:  Yes.

13    QUESTIONS BY MS. GAFFNEY:

14          Q.     And why were you surprised?

15                 MR. BLANK:  Objection.

16                 THE WITNESS:  I didn't know who

17          Dechert was.  I didn't have any idea

18          of what was -- why my name might have

19          been selected.

20    QUESTIONS BY MS. GAFFNEY:

21          Q.     On that initial call with

22    Dechert, did the person you spoke with tell

23    you whom he or she represented?

24          A.     Yes.

25          Q.     I'm correct in assuming that
```

1      they told you they represented Purdue?

2          A.      Correct.

3          Q.      Any other defendants in this

4      litigation?

5                  MR. BLANK:  I'm sorry,

6          objection.

7                  MS. GAFFNEY:  I can clarify

8          that question.

9      QUESTIONS BY MS. GAFFNEY:

10         Q.      At the time they told you who

11     they represented on that initial phone call,

12     was it Purdue only or were any other

13     defendants mentioned?

14         A.      I think they only said Purdue.

15         Q.      Okay.  And can you describe for

16     me in your own words what this case is about?

17         A.      The case from my observation is

18     about two counties in maybe the state of

19     Ohio, I'm not exactly sure, who is claiming

20     that the current opioid crisis is the result

21     of aggressive marketing of and an increase in

22     the availability of prescription opioids.

23         Q.      Okay.  And why did you decide

24     to testify in this case?

25         A.      Because I don't think that's

Highly Confidential - Subject to Further Confidentiality Review

1    correct.

2         Q.    What was your understanding of

3    what your assignment as an expert would be

4    when you were first contacted about this

5    case?

6         A.    Was to render my opinion with

7    regards to my -- I'm being distracted a

8    moment.  Hold on for just one second.  I'm

9    being distracted by people.

10        Q.    I understand.

11        A.    I apologize.

12              I'll go back on.  I apologize

13   for that, but it just pulled my ears away.

14              So ask the question again.  I,

15   again, apologize, if you wouldn't mind.

16        Q.    No problem at all.

17              The question is, what was your

18   understanding of what your assignment as an

19   expert would be when you were first contacted

20   about this case?

21        A.    Okay.  What I saw my job to be

22   was to provide the -- Dechert with my opinion

23   with regards to my opinion as to how I viewed

24   the current, you know, opioid crisis, what

25   was -- what was my opinion about that.

```
 1           Q.     Okay.  And when you say "the
 2    current opioid crisis," what does that mean
 3    to you?
 4           A.     Well, it's a complex issue, and
 5    it's a complex problem.
 6           Q.     So when you say "the current
 7    opioid crisis," what's the time frame that
 8    you're thinking of?
 9           A.     It begins -- well, it's
10    variable.  It begins in the '90s and goes
11    through to current day.
12           Q.     When was it that you were first
13    contacted about serving as an expert in this
14    case?
15           A.     Mid-March of this year.
16           Q.     Do you have a signed retainer
17    agreement?
18           A.     I do.
19           Q.     And is it between you and
20    Dechert or between you and Purdue?
21           A.     I think it's between Dechert
22    and Purdue and me is what my understanding
23    is.
24           Q.     Do you remember when you signed
25    this agreement?
```

1      A.     I don't know if it was

2  April 1st or April 8th.  I can't -- it was

3  probably April 8th.  Okay.

4      Q.     Are there any restrictions in

5  your assignment, such as opinions you were

6  asked not to offer or parties you could not

7  offer opinions about?

8           MR. BLANK:  Objection.

9           THE WITNESS:  Oh, I was

10          never -- I was simply asked to render

11          my opinion obviously.

12  QUESTIONS BY MS. GAFFNEY:

13      Q.     And are you rendering your

14  opinion on behalf of Purdue only or any of

15  the other defendants in this case?

16      A.     I've been retained by Dechert,

17  and so I -- they were the ones that asked me

18  to produce the work, so I don't know how it's

19  going to be used other than what Dechert and

20  Purdue are choosing to use it.  And I don't

21  know that goes -- how that works.

22      Q.     But you did not sign a retainer

23  agreement with any other defendant in this

24  litigation?

25      A.     Correct.

1        Q.      Have you had any in-person or

2   telephone meetings in which representatives

3   of other defendants in this litigation were

4   present?

5        A.      No, not that I know of, other

6   than this, what's happening today.

7        Q.      Your compensation rate in this

8   matter is $500 per hour; is that correct?

9        A.      Correct.

10        Q.      And is that the same rate for

11   deposition, for trial, for travel, or does it

12   vary?

13        A.      No, it's -- that's the --

14   that's the rate that it would be charged.

15        Q.      How did you determine that

16   rate?

17        A.      It's a compilation of 99213s

18   times 4.

19        Q.      What does that mean?

20        A.      99213s is the billing --

21   billing for the -- for a visit to a doctor's

22   office, and the compensation rate is about

23   $125 for a 99213, times it by 4 is $500.

24        Q.      Understood.  Thank you.

25        A.      You're welcome.

```
1                I'm.

2                Sorry, it's...

3        Q.      Do you have -- do you know

4   roughly how much time you've spent working on

5   the case so far?

6        A.      In total, about 60 hours or so.

7        Q.      Approximately how much time of

8   that was spent preparing your report?

9        A.      Approximately 30.

10       Q.      And how much time preparing for

11  your deposition today?

12       A.      Probably, let's see, 16.

13       Q.      What did you do to prepare for

14  your deposition today?

15       A.      I spoke with counsel.

16       Q.      In-person meetings or telephone

17  conferences or both?

18       A.      In-person meetings.

19       Q.      How many in-person meetings?

20       A.      Three.

21       Q.      When did those take place?

22       A.      Last Saturday, I can't recall

23  the date.  Monday and Wednesday of this week.

24               So I'd revise my statement.  It

25  was about ten hours of preparation now that
```

```
 1    I've added it up in my head.
 2         Q.    Okay.  Thank you.
 3               And that leaves approximately
 4    20 hours.
 5               How did you spend those other
 6    20 hours?
 7         A.    Reviewing -- I reviewed some of
 8    the expert witness information and reviewed
 9    my own -- my own expert -- expert
10    presentation, reviewed it a number of times;
11    reviewed my CV to try to get it into my head
12    a little bit more clearly; did some, you
13    know, additional reading on the matter.
14               So that would be what I did.
15         Q.    Thank you.
16               And when you say "additional
17    reading," what sort of materials were you
18    reading?
19         A.    I read -- you know, I reread
20    some of the articles that I had noted.  I
21    wound up looking at some of the information
22    that was presented in some of the expert
23    witness testimony, read some reports from CDC
24    and NIDA and -- is what I did.
25         Q.    With respect to the articles
```

Highly Confidential - Subject to Further Confidentiality Review

1    that you reread, are there any that stand

2    out?

3           A.      None in particular.

4           Q.      And how about for the expert

5    witness testimony that you reviewed, were

6    there any expert reports or deposition

7    transcripts that you focused on in

8    particular?

9           A.      I looked at Lembke and

10   Schumacher, Schumacher.

11                  (Hevern Exhibit 2 marked for

12          identification.)

13   QUESTIONS BY MS. GAFFNEY:

14          Q.      I'll mark as Exhibit 2 the

15   invoices that we received.

16                  All right.  Your counsel

17   provided us with these copies of your

18   invoices.

19                  Did you prepare these invoices?

20          A.      I did.

21          Q.      Okay.  And are there any

22   invoices that you have not yet submitted for

23   the work that you've done thus far?

24          A.      Yes.

25          Q.      Approximately how many hours'

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work are on the invoice that has not yet been

 2    submitted?

 3          A.     I'm going to say maybe the

 4    30 -- 30 hours.

 5          Q.     Okay.  And the 30 hours would

 6    be -- when did that work take place?

 7          A.     In the last two weeks.

 8          Q.     In the last two weeks.

 9                 Who pays your invoices?

10          A.     Excuse me?

11          Q.     Who pays your invoices?

12                 For example, does the payment

13    come from Dechert?  From Purdue?

14          A.     I haven't received any payment

15    yet so I don't know.

16          Q.     Fair enough.

17          A.     Just --

18          Q.     To be determined.

19                 Has anyone assisted you with

20    your work on this case?

21          A.     No.

22          Q.     Other than meeting with your

23    counsel, did you speak with anyone else about

24    your deposition today?

25          A.     Just my family.  And my -- and
```

1    work.

2        Q.    And what was the nature of your

3    discussions with your family and with work

4    about the deposition?

5        A.    They were wondering what I was

6    doing and where I was going and what -- it

7    was simply to inform them of where I was

8    going to be and whether or not I was going to

9    be available or not.

10         (Hevern Exhibit 3 marked for

11      identification.)

12    QUESTIONS BY MS. GAFFNEY:

13        Q.    Okay.  I'll mark your report

14    and its exhibits as Exhibit 3 to the

15    deposition.

16        I would first like to ask you

17    about your CV.

18        You submitted your CV as

19    Exhibit A to your report; is that correct?

20        A.    Correct.

21        Q.    And did you prepare this, your

22    CV?

23        A.    Yes.

24        Q.    Exhibit A includes what appear

25    to be two separately formatted CVs, with the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   second CV listing honors and awards; is that

 2   right?

 3         A.     Correct.

 4         Q.     And so just for the sake of

 5   clarity, when I refer to your CV, it's to

 6   both of them together.

 7         A.     Yes.

 8         Q.     All right.  Do you have any

 9   other versions of your CV that you use for

10   purposes other than litigation?

11         A.     This is the only one I have.

12         Q.     And you said you reviewed your

13   CV before it was submitted; is that correct?

14         A.     Correct.

15         Q.     And so is it your testimony

16   that your CV is accurate and up to date?

17         A.     It is.

18         Q.     So going through your

19   educational background, you obtained your

20   medical degree from SUNY Stony Brook in 1976?

21         A.     Correct.

22         Q.     Do you recall anything about

23   your medical school training related to use

24   of opioids?

25         A.     I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      When you graduated from medical

2    school, what were your views on prescribing

3    opioids?

4               MR. BLANK:  Objection.

5               You can answer.

6               THE WITNESS:  I saw them as a

7        necessary part of the management of

8        acute medical needs that are

9        associated with pain.

10   QUESTIONS BY MS. GAFFNEY:

11      Q.      Could you give me some examples

12   of what those acute medical needs associated

13   with pain entail?

14              MR. BLANK:  As of 1976?

15              MS. GAFFNEY:  Yes.

16              THE WITNESS:  They would have

17       been postoperative treatments and

18       trauma.

19   QUESTIONS BY MS. GAFFNEY:

20      Q.      Has your view on prescribing

21   opioids changed since that time?

22      A.      No.

23      Q.      Your CV states that you

24   completed a family practice residency in

25   Ontario in 1978; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Do you remember if you

3   prescribed opioids to your patients in your

4   family practice residency then?

5       A.      I would assume I did, but I

6   can't answer that with definitiveness.

7       Q.      Going on the assumption that

8   you did, what sort of conditions would you

9   have prescribed opioids for in that family

10  practice?

11      A.      My recollection would have been

12  in an inpatient setting.  I don't believe I

13  was asked to manage patients in an outpatient

14  setting with opioids, other than maybe some,

15  you know, again, acute trauma, but it's going

16  back a fair amount of time.

17      Q.      Understood.

18              So this was an inpatient

19  setting that was at St. Joseph's Hospital?

20      A.      Correct.

21      Q.      Could you tell me a little bit

22  about what a family practice residency is in

23  an inpatient setting?

24              When I think of family

25  practice, I think of outpatient.

```
 1          A.      Correct.

 2                  So let me speak then toward the

 3     University of Western Ontario.

 4          Q.      Uh-huh.

 5          A.      It divided itself between six

 6     months' rotation in an inpatient setting and

 7     six months' rotation in an outpatient

 8     setting.  And so in an inpatient setting you

 9     were -- in your first year you were treated

10     as an intern and you did whatever service

11     that you were on, a medical service,

12     obstetrical service, pediatric service, et

13     cetera.

14                  And then in the second year you

15     were treated as a second-year resident, just

16     as if you were a second year resident in

17     orthopedics or surgery or OB/GYN, et cetera,

18     and you were then in the position to

19     supervise other interns and medical students

20     in that setting.

21                  So that's an inpatient setting

22     process.

23                  In an outpatient process, it

24     was in a fixed location in which patients in

25     that location remained a cadre of patients
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that would be passed on from resident to the

 2    next resident to the next resident.  So

 3    that's -- and there was supervising family

 4    physicians that kind of oversaw that process.

 5              And that would be a general

 6    overview.

 7         Q.    Thank you.

 8              And do you remember how you

 9    would have used opioids in that time?

10              MR. BLANK:  Objection.

11    QUESTIONS BY MS. GAFFNEY:

12         Q.    For your patients?

13              MR. BLANK:  Objection.

14              THE WITNESS:  Again, my -- I

15         don't have a recollection of explicit

16         interactions.  My assumption would be

17         that I used them for acute trauma, but

18         I don't know what -- I don't have -- I

19         can't recall explicit events.

20    QUESTIONS BY MS. GAFFNEY:

21         Q.    That's fine.

22              So you've mentioned a couple

23    times using opioids for acute trauma, pain

24    related to acute trauma.

25              Is there a point in time when
```

Highly Confidential - Subject to Further Confidentiality Review

1    you began prescribing opioids for chronic

2    pain?

3         A.    When I established my practice

4    in New Hampshire.

5         Q.    And when was that?

6         A.    When I established my practice

7    is in 1979.

8         Q.    1979.

9               And why was that a point in

10   time when you began prescribing opioids for

11   chronic pain?

12        A.    Surgeons were asking me to

13   essentially consult on patients that were

14   having -- they were having difficulties

15   managing their pain.

16        Q.    When you say "surgeons" were

17   asking you to consult, is that in the context

18   of postoperative pain?

19        A.    Correct.

20        Q.    And how does postoperative pain

21   relate to chronic pain?

22        A.    In the instances that I was

23   being consulted, these were major trauma

24   patients in which these patients were -- and

25   the first person I do recall was a woman at

Highly Confidential - Subject to Further Confidentiality Review

1   the age of 16 or 17 who had at that time

2   already undergone conservatively 12 different

3   abdominal surgeries in her life.  And so she

4   had transitioned from short-term

5   postoperative care to really long-term

6   because she was on opioids for all of these

7   acute events.

8        Q.    And do you remember with

9   respect to that consultation what the

10  recommendation or care you provided was?

11       A.    The general gist of what I did

12  for her and for many people was being able to

13  transition them from IV administration of

14  medications to oral medications so that they

15  could be discharged from the hospital.

16       Q.    And what would be the oral

17  medications you would transition this patient

18  and other patients like her to?

19       A.    At the time, probably

20  transitioning them to oxycodone and Vicodin,

21  I would imagine, or hydrocodone.

22       Q.    Okay.  So oxycodone at that

23  time, would that have been a combination

24  product or --

25       A.    It would have been Percocet,

1    which is oxycodone and Tylenol, and

2    hydrocodone and Tylenol is Vicodin.

3            Q.      How did you achieve that

4    transition?

5                    MR. BLANK:  Objection.

6    QUESTIONS BY MS. GAFFNEY:

7            Q.      And let me clarify.  When you

8    said "IV administration of medications," are

9    we also talking about opioid pain relievers

10   IV administration or something else?

11           A.      Well, variable, but they were

12   often either IV Dilaudid drips or they were

13   morphine drips or they were Demerol IM.

14           Q.      So generally speaking, how

15   would you transition patients from IV

16   Dilaudid or morphine or Demerol IM to

17   Percocet or Vicodin?

18           A.      The mechanism that I used was a

19   slow titration off of the IV medications, and

20   that takes -- that took oftentimes days and

21   then transitioning into oral medications.

22           Q.      So still talking about that

23   time, which would be the 1980s and early

24   1990s, are there other chronic pain

25   conditions other than these examples of

1    postsurgical pain that has become long-term

2    pain?

3              Are there other chronic pain

4    conditions for which you prescribed opioids

5    in that time frame?

6         A.    I would have for failed

7    surgical backs.

8         Q.    What does that mean, "a failed

9    surgical back"?

10        A.    Patients who had surgery for

11   herniated discs or for other kinds of back

12   trauma in which the symptoms persisted and

13   the -- that would be it.  Yeah, symptoms

14   continued after the surgery.

15        Q.    Generally speaking, what type

16   of opioid regimen would you prescribe for

17   someone with this situation?

18             MR. BLANK:  Objection.

19             THE WITNESS:  Challenging to go

20        back that long, but my presumption

21        would have been that I would have been

22        using some combination of methadone

23        and short-acting opioids in addition

24        to a number of other medications.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. GAFFNEY:

 2         Q.    And what would those other

 3    medications be, if you could give a couple

 4    examples?

 5         A.    They would fall into categories

 6    of antidepressants, antiseizure medications,

 7    muscle relaxants.

 8         Q.    Okay.  A variety?

 9         A.    Yeah, a variety.

10         Q.    Since that time, have your

11    prescribing practices with respect to opioids

12    changed?

13         A.    They have evolved.

14         Q.    Okay.  And how have they

15    evolved?

16         A.    There have been new products on

17    the market that I've been able to use, and

18    I've evolved my practice over the last

19    40 years to accommodate those new products.

20         Q.    Could you describe that in a

21    little more detail?

22              MR. BLANK:  Objection.

23              THE WITNESS:  Well, the -- I

24         have utilized long-acting opioids that

25         were not available, when methadone was
```

Highly Confidential - Subject to Further Confidentiality Review

1          the only long-acting opioid available.

2          So I've used a combination of

3          methadone, fentanyl patches, morphine

4          sulfate control release.  Oxy --

5          oxycodone control release has been my

6          control release.

7                  I've used a variety of

8          short-acting medications as well.

9                  I have utilized 20 or 30

10         alternative medications, you know, in

11         that period of time that fall into

12         those three general categories that I

13         mentioned above.

14    QUESTIONS BY MS. GAFFNEY:

15         Q.     So fair to say then what you're

16    describing, much of the evolution in your

17    prescribing practices has been based on the

18    medications that are available?

19         A.     Correct.

20         Q.     And have your prescribing

21    practices using these varieties of opioid

22    medications changed with respect to the

23    conditions which you treat with these drugs?

24         A.     You lost me on that question.

25    I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Trying to be precise, but I
 2    realize that was a long question.
 3                 Let me go back --
 4          A.     Yes, please.
 5          Q.     -- because you've described a
 6    few instances -- you described postsurgical
 7    pain that has become persistent, long-term
 8    pain?
 9          A.     Yes.
10          Q.     And you've described failed
11    surgical backs situation.
12                 Are there other conditions for
13    which you have used these other opioid
14    formulations?
15          A.     Other conditions would include
16    people who've had chronic, nonsurgically
17    curable conditions such as neuropathies due
18    to chemotherapy, neuropathies due to
19    diabetes, central pain syndrome such as
20    fibromyalgia or post-stroke issues, complex
21    regional pain disorder.  You know, a variety
22    of different people who've had rheumatoid
23    arthritis, lupus, most recently the
24    development of EDS, which is Ehlers-Danlos
25    syndrome.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              You name the disease, I've

2    looked at it and I've tried to manage the

3    pain that's been associated with those

4    things.

5         Q.    Are there any conditions which

6    in your experience you've found opioids to be

7    not effective?

8         A.    I've been able to use a

9    low-dose naltrexone in some of my patients

10   with great -- and so that's an antagonist, an

11   opioid antagonist.  That has become available

12   or at least reported over the last number of

13   years, and it seems to be effective in the

14   management of people who have

15   nerve-related -- long-term nerve-related

16   pain.

17        Q.    Okay.  And again, generally

18   speaking, when you do use opioids to treat

19   the chronic pain conditions that you've just

20   described in your patients, what is the

21   average dose range that you prescribe for

22   your patients?

23              MR. BLANK:  Objection.

24              THE WITNESS:  There actually is

25        no average dose range.
```

1    QUESTIONS BY MS. GAFFNEY:

2         Q.    Okay.  For a patient who has

3    never been on opioids before, what would be

4    the dose range you would start with?

5              MR. BLANK:  Objection.

6              THE WITNESS:  Actually, if --

7         in the consultative work that I do, if

8         they've not been on opioids, I use all

9         sorts of alternative choices.  And if

10        they've already been on those

11        alternative choices, I will then use

12        an opioid.

13             If I start out with an opioid,

14        I'll give you -- if I start out with,

15        for instance, methadone, I start out

16        about 5 milligrams a day.

17    QUESTIONS BY MS. GAFFNEY:

18        Q.    Okay.  And you said that for

19    patients who have not been on opioids you use

20    all sorts of alternative choices.

21             Is it fair to say that you do

22    not view opioids as a first-line therapy

23    then?

24        A.    Correct.

25        Q.    What sort of alternatives do

1   you start with instead of opioids?

2        A.    Well, many of the ones that

3   category -- I can give you names of drugs.

4   Okay.

5        Q.    What categories of --

6        A.    Well, the categories are the

7   things that I mentioned:  The

8   antidepressants, you know, antiseizure

9   medicines, muscle relaxants, nonsteroidal

10  anti-inflammatories.

11            And some of these unique

12  medications -- interestingly enough, some

13  people respond to anti-Parkinson's

14  medications.  Some respond to, believe it or

15  not, antibiotics.

16            So I see such a wide range of

17  people, and my choices are dependent upon

18  what they're presenting me with, I must say.

19        Q.    You mentioned as an example

20  when you might start a patient on opioid

21  therapy using 5 milligrams of methadone, are

22  there -- do you tend to go to methadone first

23  if you're trying opioid therapy, or are there

24  other opioids you also utilize?

25        A.    I generally utilize -- in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    initiating medications, I'll generally

 2    utilize a low-dose -- opioids that are --

 3    okay.  I'll take -- separating out acute

 4    pain, I will use a mixed-fixed combination.

 5                 Okay.  In people that are

 6    chronic, I will use -- I'll try to use a,

 7    quote, pure, you know, medication.

 8                 The reason being is the

 9    mixed-fixed combination, Tylenol does induce

10    end organ damage, where the others do not

11    create end organ damage.

12         Q.    And when you use the pure

13    medications, which compounds -- or which

14    molecules do you tend to use?

15         A.    I use oxycodone, morphine

16    sulfate, and I use tramadol, which is a

17    variation of the theme of a straight opioid.

18    And I use Nucynta, which is also a variation

19    in the theme of opioids.

20         Q.    And when you use oxycodone, for

21    example, what's the general dose range that

22    you use?

23                 MR. BLANK:  Objection.

24                 THE WITNESS:  Generally we

25         start out with 5 milligrams two to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              three times a day and then you adjust

 2              accordingly.

 3     QUESTIONS BY MS. GAFFNEY:

 4         Q.     And the 5 milligrams two to

 5     three times a day, that would be the

 6     short-acting oxycodone; is that correct?

 7         A.     Correct.  Right.

 8         Q.     Are there situations where you

 9     would use the long-acting over the

10     short-acting?

11         A.     When they have -- when patients

12     have failed at short-acting controlled, we'll

13     go to long-acting controlled -- I mean,

14     long -- excuse me, medicines that have

15     long-acting half-lives or they have a --

16     they're a control release is what I'm trying

17     to say.  I apologize.

18         Q.     So after patients have failed

19     at short-acting, then you might try the

20     controlled release?

21         A.     Correct.

22         Q.     And can you explain that to me

23     a little bit?

24                If the patient -- what does

25     that mean if the patient has failed at the
```

```
 1    short-acting formulation?

 2         A.     Their symptoms persist.  They

 3    haven't improved functional activity.  They

 4    have continued to be unable to participate in

 5    either activities of daily living or social

 6    interactions or general social settings is

 7    what I consider a failure of short-acting

 8    medications.

 9         Q.     And in that context, why might

10    the controlled release help?

11         A.     Control-release medicines in

12    general do provide a consistent level of

13    opioids in the system over a period of time,

14    and so you're not going through peaks and

15    troughs of medications that are short-acting.

16         Q.     You've described a couple times

17    fairly -- using fairly low doses of opioids

18    with your patients at 5 milligrams of

19    methadone and 5 milligrams of short-acting

20    oxycodone.

21              Is there in your practice an

22    upper range that you would go to in terms of

23    the dosage strength?

24              MR. BLANK:  Objection.

25              THE WITNESS:  I have -- in my
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            current position, I am managing many

2            legacy patients who have been on

3            higher doses of opiates that I did not

4            initiate.  And so I've taken care of

5            people who have been on probably 4 to

6            500 milligrams of oxycodone,

7            400 milligrams of methadone.

8       QUESTIONS BY MS. GAFFNEY:

9            Q.    That's a daily amount?

10           A.    Yes.

11           Q.    But those are legacy patients

12      for whom you did not initiate the medication,

13      that's correct?

14           A.    Correct.

15           Q.    What about for patients whose

16      opioid treatment started with your care?

17                 MR. BLANK:  Objection.

18                 THE WITNESS:  And the question

19           again?  I apologize.

20      QUESTIONS BY MS. GAFFNEY:

21           Q.    Sure, that was not very clear.

22                 In your experience is there --

23      do you perceive an upper bound for the amount

24      of daily dose of opioid that you're

25      comfortable prescribing to your patients?
```

1    A.    There are some upper limits

2    that I begin to say, if you're having more of

3    this, we need to be looking at alternative

4    choices.  And generally when people are

5    getting up to about 200 milligrams of

6    oxycodone or its equivalency in maybe

7    morphine sulfate, I begin to say, you know,

8    more may not be better.  We need to begin to

9    look at alternative choices or we need to

10   begin to look at all of these other lists of

11   medicines that I have -- categories of

12   medicines that I have indicated before and

13   begin to go through the 20 or 30 meds that I

14   use within the context of that.

15              Comparably, I use a whole

16   different approach to the set of circumstance

17   in terms of getting people to be motivated to

18   increase activity levels, and so I do a

19   pretty comprehensive process with these

20   people.

21       Q.    What does that comprehensive

22   process entail?

23       A.    Well, I've got about 10 or 20

24   handouts that I give.  I give them activity

25   levels that are doable and begin to mark

Highly Confidential - Subject to Further Confidentiality Review

1    progress based upon that.

2          Q.     What sort of information do the

3    10 or 20 handouts cover?

4          A.     There are two fanatic groups.

5    The first is to identify that the management

6    of chronic pain syndromes is divided into

7    behavioral changes that are spiritual

8    components, medication management, trust

9    between the physician and the doctor {sic},

10   physical activity.  It requires -- it

11   requires the use of adaptive devices.  It

12   requires management of expectations.

13              We discuss spirituality, and we

14   discuss choices of them developing a plan of

15   activity and action that they then become

16   adherent to versus me prescribing something.

17         Q.     That makes sense.

18              What are the adaptive devices

19   you mentioned?

20         A.     I have prescribed shoes, socks,

21   belts, neck braces, hand braces, underwear,

22   canes, wheelchairs, pillows, beds.

23         Q.     Okay.

24         A.     Those are all adaptive devices

25   that exist in this world.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.      Got it.

 2                  Why, in your experience, is

 3     around 200 milligrams a day the point where

 4     you want to start looking at alternatives?

 5          A.      Certainly the challenge that

 6     all patients face currently are the

 7     guidelines that have been created by CDC and

 8     by insurance companies.  And to achieve a

 9     prior authorization for more medications

10     greater than that is challenging for me and

11     for the patient.  That's number one.  There's

12     a barrier that gets created.

13                  Two, there is certainly

14     evidence that suggests that increasing doses

15     puts people at some increasing risk for

16     potential overdoses.

17                  And finally, the concept of

18     doing more of the same thing doesn't

19     necessarily give you a better outcome.

20          Q.      The first factor you mentioned,

21     the CDC guidelines, policies from insurance

22     companies, those have been more recent

23     factors; is that correct?

24                  I presume you're speaking of

25     the 2016 CDC guideline?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes, there have been -- there

 2      have been both CDC guidelines, there actually

 3      have been Medicare guidelines, there have

 4      been different insurance company guidelines,

 5      and they all kind of been -- been placed in

 6      public arenas so that people can review them.

 7                    And these were discussed in the

 8      American Society of Addiction Medicine

 9      meetings as early as the 2000s.

10            Q.      Okay.  So in terms of a factor

11      that you consider in your practice, would

12      these external guidelines have been something

13      that you were considering in the 2000s

14      when -- in terms of the dosage that you

15      prescribe for your patients?

16            A.      I've always considered, you

17      know, that -- I mean, even though those

18      guidelines have become more published, I've

19      always considered whether or not more is

20      going to be better, you know.  That's been a

21      historical component.

22            Q.      And is this general benchmark

23      of approximately 200 milligrams something

24      that has kind of always been the point where

25      you would look at alternatives in your
```

Highly Confidential - Subject to Further Confidentiality Review

1    practice, or has that changed over time?

2         A.    It has not changed over time.

3              And I'm trying to also say

4    that that number is not the number that then

5    creates my desire to then introduce all of

6    these other medications.  It's not like, oh,

7    you hit 200, now we have to consider this.

8              We're doing that on the

9    spectrum of patient care is what I'm trying

10   to say here.

11        Q.    That makes sense.

12             And knowing that we're talking

13   about many years of your medical practice

14   here, I'm just wondering about changes over

15   time.  And since the first factor you

16   mentioned, the guidelines and insurance

17   policies, I wasn't sure if that had been a

18   more recent factor that you consider or if

19   that has been your consistent practice for

20   decades.

21        A.    It has been.  That's what I'm

22   trying to indicate by that last statement.

23        Q.    And again, speaking generally,

24   how long would you say that you have kept

25   your patients on chronic opioid therapy?

```
 1              MR. BLANK:  Objection.

 2              THE WITNESS:  I have cared for

 3         people who have been on chronic opioid

 4         therapy for 20, 30 years.

 5    QUESTIONS BY MS. GAFFNEY:

 6         Q.     And those patients who have

 7    been on chronic opioid therapy for decades

 8    like that, what -- again, generally speaking,

 9    what dose of opioid therapy are they on for

10    that length of time?

11         A.     Actually very variable.  It's

12    not like -- from fairly low doses of one or

13    two Vicodin a day -- well, actually two

14    Vicodin a day, this one fellow, up to this

15    one man that I am caring for who has been

16    on -- who was a legacy patient.  He currently

17    is on about 200 or 230 milligrams of morphine

18    per day.  I mean, methadone per day.  I

19    apologize.

20         Q.     And with patients who are on

21    opioid therapy for that length of time, are

22    there things that you do to avoid the issue

23    of dose escalation and tolerance?

24         A.     Well, what occurs is that

25    they -- once they achieve these doses, they
```

```
 1    remain very functional at that.  They

 2    don't -- that's what I'm saying to you,

 3    these -- if you're on them for decades,

 4    they've achieved a stable dose.

 5              MR. BLANK:  Counsel, if you

 6         reach a good point, we've been going

 7         for a little bit over an hour, so a

 8         break would be appropriate.

 9              MS. GAFFNEY:  Yeah, let's take

10         a break.

11              VIDEOGRAPHER:  We're going off

12         the record at 10:12 a.m., and be

13         careful of your microphone, Doctor.

14              THE WITNESS:  Oh, great.  Thank

15         you.

16          (Off the record at 10:12 a.m.)

17              VIDEOGRAPHER:  We're back on

18         the record at 10:36 a.m.

19    QUESTIONS BY MS. GAFFNEY:

20         Q.    Welcome back, Dr. Hevern.

21         A.    Thank you.

22         Q.    Earlier you were testifying

23    about your prescribing practices with respect

24    to opioids and that your prescribing

25    practices have been fairly consistent over
```

1    time while incorporating newly available

2    formulations.

3              Is that a fair summary?

4    A.    Yes.

5    Q.    So taking a step back and

6    speaking about the medical community

7    generally, in your view, have the prescribing

8    practices of the overall medical community

9    with respect to opioids changed in the time

10   that you've been practicing, medicine?

11             MR. BLANK:  Objection.

12             THE WITNESS:  I don't -- I

13        can't tell you about that explicitly

14        because I don't know.

15   QUESTIONS BY MS. GAFFNEY:

16   Q.    In your observation practicing

17   medicine for decades, is it your view that

18   prescribing practices have remained

19   consistent with respect to opioids?

20   A.    What do you -- I'm not sure

21   what you're trying to ask.  I apologize.

22             Go ahead.

23   Q.    I'm trying to think about how

24   to phrase this a different way.

25             So looking at the -- and I'll

Highly Confidential - Subject to Further Confidentiality Review

1    narrow it from the medical community to

2    primary care physicians, family practice

3    doctors like yourself.

4              Is it your view that most

5    family practice doctors prescribe opioids in

6    the same way that you do?

7              MR. BLANK:  Objection.

8              THE WITNESS:  It's very

9         variable from doctor to doctor.

10   QUESTIONS BY MS. GAFFNEY:

11        Q.    And what are some of the

12   variations that you see?

13        A.    The variations are doctors not

14   prescribing any to doctors that are

15   comfortable prescribing some or -- some --

16   some more particular -- a particular opioid

17   for their patients.

18        Q.    You mentioned earlier that you

19   cared for some legacy patients who are on

20   higher doses than what you would generally

21   prescribe, 4 to 500 milligrams of an opioid a

22   day; is that right?

23        A.    Correct.

24        Q.    And in your view, would you

25   consider that overprescribing, when these

Highly Confidential - Subject to Further Confidentiality Review

1    patients come to you on that high of a dose?

2              MR. BLANK:  Objection.

3              THE WITNESS:  No.

4    QUESTIONS BY MS. GAFFNEY:

5         Q.    And why not?

6         A.    The patients who present with

7    those doses are still functionally -- excuse

8    me, are still doing -- functionally doing

9    okay at those doses.  So they both are

10   tolerating medications and are doing

11   reasonably well on them.

12        Q.    You testified when we first

13   began talking that your understanding of the

14   litigation is that the plaintiffs in this

15   case are claiming that the current opioid

16   crisis is the result of aggressive marketing

17   of and an increase in the availability of

18   prescription opioids.

19              And then you testified that you

20   decided to participate in this case as an

21   expert because you don't think that is

22   correct.

23              Do you recall that testimony?

24        A.    Yes.

25        Q.    So in your view if the current

```
 1    opioid crisis -- in your view, if it's not

 2    correct that the opioid crisis is the result

 3    of aggressive marketing and an increase in

 4    availability of prescription opioids, what do

 5    you see as having led to the current opioid

 6    crisis?

 7              MR. BLANK:  Objection.

 8              THE WITNESS:  Well, that's

 9         what's in my report, and so it's in my

10         report.

11    QUESTIONS BY MS. GAFFNEY:

12         Q.    Can you answer the question

13    just summarizing in your own words what your

14    view is on this?

15              MR. BLANK:  Objection.

16              THE WITNESS:  It's a complex

17         issue.  Addiction has existed for

18         decades, if not centuries, in the

19         United States, that it's an outcome of

20         a variety of problems that are

21         outlined in my -- in my -- in my

22         expert test -- expert report.

23    QUESTIONS BY MS. GAFFNEY:

24         Q.    You testified earlier that in

25    your view when you use the phrase "current
```

1   opioid crisis," you're referring to something

2   that began in the 1990s and continues to

3   present day; is that correct?

4         A.    Correct.

5         Q.    So given the view that you just

6   explained about addiction being something

7   that has existed for decades, if not

8   centuries, what led to the beginning of the

9   current opioid crisis in the 1990s?

10              MR. BLANK:  Objection.

11              THE WITNESS:  Cocaine was the

12        largest challenge in the '80s and

13        '90s.  Heroin came back into the --

14        not came back in, but was again fairly

15        available.

16              Again, my report -- I mean, I

17        can repeat the issues in my report,

18        and I will, but the need to address

19        underlying chronic pain conditions as

20        a result of medical problems, the

21        closing of facilities, the challenges

22        of mental health, reduction in a

23        workforce that was providing, you

24        know, valuable resources, emergence of

25        a lot of psychological trauma.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So there's many, many factors

 2         that are -- and that's what I tried to

 3         give in my report.

 4    QUESTIONS BY MS. GAFFNEY:

 5         Q.    And how does the need to

 6    address underlying chronic pain conditions as

 7    a result of medical problems factor into the

 8    development of the opioid crisis?

 9              MR. BLANK:  Objection.

10              THE WITNESS:  How does the

11         what?

12    QUESTIONS BY MS. GAFFNEY:

13         Q.    The first factor you listed was

14    the need to address underlying chronic pain

15    conditions as a result of medical problems.

16              How does that factor into the

17    current opioid crisis?

18              MR. BLANK:  Objection.

19              THE WITNESS:  Well, there was a

20         problem identified in the late '90s

21         and early 2000s that physicians were

22         inadequately managing chronic pain.

23    QUESTIONS BY MS. GAFFNEY:

24         Q.    How does that relate to an

25    opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. BLANK:  Objection.
 2                THE WITNESS:  The pressure was
 3           placed upon the hospitals and
 4           communities and physicians to address
 5           this issue, and one of those
 6           medications or a group of medications
 7           that could address that issue were
 8           opioids.
 9      QUESTIONS BY MS. GAFFNEY:
10           Q.    So if this group of medications
11      is being used to address a need that had been
12      identified of inadequately managed chronic
13      pain, how does that relate to development of
14      an opioid crisis?
15                MR. BLANK:  Objection.
16                THE WITNESS:  It's a factor
17           that contributes to medicines that
18           were available -- excuse me, that were
19           available to be diverted.
20      QUESTIONS BY MS. GAFFNEY:
21           Q.    So am I correct in
22      understanding what you're saying is that the
23      increased availability of prescription
24      opioids was a factor in the development of
25      the opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

1                    MR. BLANK:  Objection.

2                    THE WITNESS:  What I'm saying

3          is that the appropriate prescription

4          of opioids to patients who needed them

5          did not contribute to the problem, but

6          there was diversion of medications

7          that did occur.

8    QUESTIONS BY MS. GAFFNEY:

9          Q.    And what is your understanding

10   of the diversion of medications that did

11   occur?

12         A.    Medicines were taken or stolen

13   from people who were getting prescriptive

14   prescriptions, legitimate prescriptions, and

15   that was a source of diversion.

16         Q.    Is it your opinion that all of

17   the opioids that were prescribed for chronic

18   pain were, as you say, legitimate

19   prescriptions?

20                   MR. BLANK:  Objection.

21                   THE WITNESS:  As far as I would

22         determine, yes.

23   QUESTIONS BY MS. GAFFNEY:

24         Q.    And what's your basis for

25   saying that?

1          A.     My own personal experience and

2    the experience of people that I met in

3    different pain conferences that I went to and

4    different -- that were supported by the

5    American Pain Society, that there was a

6    legitimate use for opioids.

7          Q.     So just to understand, it's

8    based on your own personal experience but

9    also your knowledge of the prescribing

10   practices of other physicians?

11         A.     I don't have personal knowledge

12   of prescribing practices, but, again, it's

13   a -- it is knowledge arrived by conversation

14   with and attendance at educational lectures

15   that were geared toward informing physicians

16   who were managing chronic pain.

17         Q.     When you refer to educational

18   lectures, you mentioned a moment ago the

19   American Pain Society.

20                Are you referring to the same

21   thing?  Are these educational lectures

22   supported by the American Pain Society?

23         A.     There's -- yes.

24         Q.     And with this knowledge arrived

25   by a conversation with other physicians and

1    attendants at lectures such as these, did you

2    see a change in prescribing practices over

3    time with respect to opioids?

4        A.    There was an increase in the

5    prescriptive -- in prescribing opioids during

6    the 20 years that I attended these lectures,

7    yeah.

8        Q.    Going back to what you said a

9    moment ago about diversion and the medicines

10   being taken or stolen from people who were

11   getting legitimate prescriptions as a source

12   of diversion, what's the basis for your

13   saying that?

14       A.    Police reports.

15       Q.    Your review of police reports;

16   is that what you mean?

17       A.    Presentations on TV and radio.

18       Q.    In your practice, have any of

19   your patients ever experienced having their

20   prescriptions taken or stolen from them?

21       A.    Yes.

22       Q.    Are you familiar with the term

23   "pill mill"?

24       A.    Yes.

25       Q.    And what is your understanding

1    of what that refers to?

2          A.    The, I would say, rogue

3    physicians and rogue pharmacists that were

4    writing prescriptions for illegitimate

5    reasons in large quantities for cash in

6    certain locations of the country.

7          Q.    And you mentioned certain

8    locations of the country.

9                What are you referring to?

10         A.    I understand something existed

11   in Florida, in Appalachia and a couple of

12   other locations, but I haven't taken note of

13   all the locations that have been published on

14   TV.

15         Q.    And in your experience

16   practicing medicine in New Hampshire, were

17   you aware of any pill mills in that

18   geographic area?

19         A.    None that I know of.

20         Q.    In your view, have these pill

21   mills or, as you say, rogue physicians and

22   rogue pharmacists contributed to the

23   development of the opioid crisis?

24               MR. BLANK:  Objection.

25               THE WITNESS:  I can only assume

```
 1          that they did.

 2     QUESTIONS BY MS. GAFFNEY:

 3          Q.     You state in your report that

 4     you've been involved in the care of scores of

 5     patients who wanted or needed to be tapered

 6     from their opioid-based medications.

 7               I can give you a moment.

 8          A.     Where are we referring to?

 9          Q.     Page 8.  It's the second full

10     paragraph on page 8.

11          A.     Yes.

12          Q.     So when you say "wanted or

13     needed to be tapered," what do you mean by

14     that?

15          A.      In some instances they had come

16     to the end of their acute need of

17     medications, and they were having

18     difficulties stopping their medication.

19               In other instances they had

20     achieved an improved functional capacity and

21     were looking for the lowest effective dose of

22     medication.

23          Q.     And you explain that by

24     creating a plan, monitoring the patient and

25     reducing the patient at this low rate
```

Highly Confidential - Subject to Further Confidentiality Review

1    successful tapers have been achieved.

2              What does this plan look like,

3    generally speaking?

4              MR. BLANK:  Objection.

5              THE WITNESS:  It's different

6         for every individual, and it includes

7         medication adjustment downward and

8         providing the alternative meds that I

9         had stated earlier.

10   QUESTIONS BY MS. GAFFNEY:

11        Q.    You testified a moment ago that

12   there has been an increase in prescribing

13   opioids during the 20 years that you were

14   attending the lectures that you described

15   earlier.

16              Why do you think there was an

17   increase?

18              MR. BLANK:  Objection.

19              THE WITNESS:  To meet the unmet

20         need of patients.

21   QUESTIONS BY MS. GAFFNEY:

22        Q.    And is it your view that with

23   the increase in opioid prescribing, that that

24   unmet need has now been met?

25        A.    It has been improved.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    In the instances with your

2  patients, if you're starting an opioid naïve

3  patient on opioid therapy, what do you tell

4  the patient about opioids?

5        A.    That there are side effects and

6  there are challenges with its -- with their

7  use.

8        Q.    What are the side effects you

9  tell your patients about?

10        A.    Things like constipation,

11  itching, potentially cognitive changes.

12        Q.    Are there any other side

13  effects you tell your patients about with

14  opioid therapy?

15        A.    Those are the side effects that

16  I would highlight.

17        Q.    Okay.  How about the

18  challenges?

19        A.    Challenges are they can have

20  emotional changes, either positive or

21  negative, and mostly I dwell on the negative.

22  And there is a -- there are risks for

23  opioid-induced overdose, oftentimes

24  unintentional, and they need to safely manage

25  their medications.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How do you recommend that

2  patients address the challenge of the risk of

3  opioid-induced overdose?

4    A.    Not to take more than they are

5  prescribed.  I check the PDMP to make sure

6  there's no other prescribers and ask them to

7  inform me if there are changes that are

8  occurring that are -- that they're

9  uncomfortable with.

10    Q.    What sort of changes?

11    A.    Whatever they choose to call me

12  up and tell me about.

13    Q.    Do you ever co-prescribe

14  Naloxone with opioid treatment?

15    A.    Yes.

16    Q.    When do you do that?

17    A.    In the initiation of the

18  prescriptive events.

19    Q.    For every patient or for

20  certain patients?

21    A.    It's now become standard for

22  every patient.

23    Q.    When did that change come

24  about, that standard?

25    A.    Recently because -- recently,

1    really.

2         Q.    Is that something in your

3    practice you started doing five years ago?  A

4    year ago?  Just approximately?

5         A.    Within the last year.

6         Q.    So as we've discussed, when you

7    said "current opioid crisis," you said it

8    began in the 1990s.

9              When did you become aware of

10   it?

11        A.    Well, addiction has been a part

12   of what I've been doing now since 1979, so

13   it's been ever present in my life in terms of

14   my clinical -- you know, my clinical set of

15   circumstances.  So it wasn't like it was an

16   ah-ha moment.

17        Q.    And understanding that

18   addiction has been part of your practice as

19   long as you've practiced, you testified that

20   the current opioid crisis began in the 1990s.

21              So would you say that you

22   became aware of it as soon as it began at

23   that time?

24        A.    It -- the pattern of use of

25   heroin in the mid-'90s became much more of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a -- of something I was clinically seeing in
 2    the Riverway Center for Recovery, and that
 3    was new in that -- in the city and in that
 4    location.
 5         Q.    And was there a point in time
 6    when you were also seeing abuse of
 7    prescription opioids in your clinical
 8    practice?
 9         A.    Well, by 1999 the Riverway had
10    closed down, and so I was not performing
11    addiction services at that time, and so --
12    so, no.
13         Q.    In your family practice, is
14    that something that you have ever seen,
15    patients abusing prescription opioids?
16         A.    Yes, there have been some
17    individuals in the practice.
18         Q.    Looking at Exhibit A, your CV,
19    under the heading Licenses and Certificates.
20         A.    Yes.
21         Q.    One of the listings there is
22    2001, American Pain Society.
23               And do you have a license or a
24    certificate from the American Pain Society?
25         A.    That's a society that I belong
```

Highly Confidential - Subject to Further Confidentiality Review

1    to, but I'm not licensed by them.

2         Q.    And you mentioned earlier

3    attending conferences supported by the

4    American Pain Society.

5              In addition to attending those

6    conferences, how else have you been involved

7    with the American Pain Society?

8         A.    Mostly through conference

9    participation.

10        Q.    How would you describe the

11   American Pain Society?

12        A.    It has been a group of

13   physicians nationally that have been involved

14   with pain management for decades.

15        Q.    And how many conferences

16   sponsored by the American Pain Society would

17   you say you've attended?  Was it once a year?

18   Twice a year?

19        A.    Generally once a year since the

20   early -- maybe mid-'90s.

21        Q.    Have you ever held any

22   leadership positions with APS?

23        A.    No.

24        Q.    Would you say that APS has ever

25   taken positions, issues, with respect to

1    opioids?

2         A.    I don't know.

3         Q.    Your CV also lists

4    participation as a member of the Manchester

5    Cooperative Pain and Opioid Project?

6         A.    Yes.

7         Q.    Can you tell me about this

8    project?

9         A.    It was a short-lived project

10   that was an attempt to gather the Elliot

11   Hospital, this -- Catholic Medical Center,

12   and Hitchcock Medical Center into a

13   collaboration to begin to look at the -- how

14   were we going to provide services within the

15   community.

16              We had a number of meetings,

17   and the Catholic Medical Center then took

18   leadership in the process, and they have --

19   the cooperative pain project then became

20   their, kind of like, project.  And then all

21   of a sudden Elliot Hospital and the -- and

22   Hitchcock kind of like faded out of that

23   process.

24              So I have not -- to be honest

25   with you, I was in it from 2016 to 2017, and

Highly Confidential - Subject to Further Confidentiality Review

 1    I...

 2              Oops, I can't do that.  I

 3    apologize.

 4              MR. BLANK:  The witness has

 5       marked the exhibit --

 6              THE WITNESS:  I apologize.

 7              MR. BLANK:  -- correcting it

 8       from -- that entry from 2016 to

 9       present to 2017.

10              Just letting you know.

11              MS. GAFFNEY:  Thank you.

12              THE WITNESS:  Sorry.

13    QUESTIONS BY MS. GAFFNEY:

14       Q.    Your CV does not include any

15    publications that you've authored.

16              Have you ever published any

17    articles or editorials?

18       A.    I have not.

19       Q.    Your CV does list a number of

20    lectures and presentations.

21              Would you say that you have

22    kept detailed records of the presentations

23    you've given?

24       A.    No, I have not, except for the

25    last few that I -- you know, in the last year

Highly Confidential - Subject to Further Confidentiality Review

```
 1    or so.
 2         Q.    I was impressed that you noted
 3    that you spoke at the West High School
 4    parents night on September 19, 1990.
 5         A.    Yes.
 6         Q.    So how do you keep track of
 7    details like that?
 8         A.    I try to enter the events close
 9    to when they have happened, so...
10         Q.    That makes sense.
11         A.    And my nephew was going to
12    school at the time.
13         Q.    For the presentations in the
14    last year or so, do you have materials from
15    any of those presentations?
16         A.    I have -- for the Pain and
17    Addiction and New Approach to Management
18    Strategies, I have that, and I still have the
19    Chronic Pain in America slides.
20         Q.    Okay.  Have you provided your
21    counsel with those materials?
22         A.    They didn't ask.
23              MS. GAFFNEY:  Counsel, we would
24         like to request production of those
25         materials.
```

```
 1              MR. BLANK:  We will take that
 2         under advisement.
 3    QUESTIONS BY MS. GAFFNEY:
 4         Q.    One of the presentations
 5    listed, it's grand rounds at the University
 6    of Massachusetts Medical Center in Worcester
 7    on December 8, 1999.  The title is "Pain
 8    Management in the Emergency Room Setting:
 9    Treatment Choices That Reduce Abuse
10    Potential."
11              Do you remember that
12    presentation at all?
13         A.    Vaguely.
14         Q.    What do you mean -- what did
15    you mean by "treatment choices that reduce
16    abuse potential"?
17         A.    Granted, my memory is somewhat
18    selected here, but it was introducing at that
19    time the concept of alternative treatment
20    models to begin to look at frequency of
21    presentations to the emergency room and
22    looking toward -- those would be the things
23    that I would say that I can recall.
24         Q.    Alternative treatment models.
25    Alternative to what?
```

1          A.     Alternatives to simply

2     providing pain medications for presentations

3     to the emergency room.

4          Q.     And what would be some of those

5     alternative treatment models?

6          A.     Again, looking 20 years --

7     20-some-odd years ago, they would have

8     included the uses of nonsteroidal

9     anti-inflammatories.  They would have used

10    antidepressants.  They would have used at

11    that time short courses of medications of

12    opioids, if you were going to use that.

13               So those were some of the

14    components of really what I spoke toward.

15         Q.     You also list a presentation on

16    The Fifth Vital Sign:  Effective Management

17    of Acute and Chronic Pain given at Lawrence

18    General Hospital in September of 2001.

19               Do you remember that

20    presentation at all?

21         A.     I remember some of that,

22    that -- I remember some of that.

23         Q.     What does that refer to, the

24    fifth vital sign?

25         A.     The Joint Commission that

 1   accredits hospitals had asked hospitals to

 2   include in their assessment a patient's pain,

 3   and that became the fourth vital sign -- the

 4   fifth vital sign, excuse me, in addition to

 5   the four that we normally do.

 6        Q.    So how did you end up giving

 7   that presentation?

 8        A.    I was asked to -- I was asked

 9   to provide that presentation as a result of

10   Joe Russell, who was a Purdue rep, who had --

11   who had created -- who linked me with them,

12   that's all I can tell you, through their CME

13   committee.

14        Q.    When you say "linked you with

15   them," who is "them" that you're referring

16   to?

17        A.    The continuing medical

18   education committee at Lawrence General

19   Hospital.

20        Q.    And Joe Russell, the Purdue rep

21   you mentioned, is he a representative who

22   visited your practice frequently, or how did

23   you know Joe Russell?

24        A.    He would come two to three

25   times a year.

```
 1          Q.     For which years, approximately?

 2          A.     I don't recall explicitly.

 3                 MS. GAFFNEY:  Go off the

 4          record?

 5                 THE WITNESS:  Okay.  No,

 6          something -- yeah.  All of a sudden I

 7          felt this move.  I apologize.

 8     QUESTIONS BY MS. GAFFNEY:

 9          Q.     So the Purdue representative

10     connected you to the CME team at Lawrence

11     Hospital.

12                 Are you aware of whether Purdue

13     sponsored that talk at all?

14          A.     They did.

15          Q.     Did that sponsorship of that

16     talk involve any honoraria for you as the

17     speaker?

18          A.     Yes, it did.

19          Q.     And is that something that you

20     disclosed to the audience when giving that

21     talk?

22                 MR. BLANK:  Objection.

23                 THE WITNESS:  I probably did,

24          but because -- part of the -- my

25          assumption is yes.
```

```
 1    QUESTIONS BY MS. GAFFNEY:
 2         Q.    Looking over this list of
 3    presentations, are any other of these
 4    presentations here sponsored by drug
 5    manufacturers?
 6         A.    The Recent Advances in
 7    Premenstrual Dysphoric Disorder in 2000, you
 8    know, was sponsored by Lilly.
 9               And the one in 2001,
10    Antidepressant Therapy, was sponsored by
11    Lilly.
12               The Sublocade was -- in 2018
13    was sponsored by Indivior.
14               Those are the ones that strike
15    me in the moment.
16         Q.    I have a question about the
17    presentation listed as the Interface of Pain
18    and Addiction --
19         A.    Where are you?
20         Q.    -- from 2002 in Nashua, New
21    Hampshire.
22               Do you remember a group or a
23    more specific location?
24               To whom was that presentation
25    given?
```

```
 1                   MR. BLANK:  Objection.

 2                   THE WITNESS:  I don't recall.

 3      QUESTIONS BY MS. GAFFNEY:

 4           Q.     Why do you think Joe Russell

 5      recommended you for the fifth vital sign

 6      presentation?

 7                   MR. BLANK:  Objection.

 8                   THE WITNESS:  I don't know.  I

 9           had gotten to know him, and he knew

10           that I was giving lectures on alcohol

11           abuse.

12      QUESTIONS BY MS. GAFFNEY:

13           Q.     At that point you had already

14      given some lectures about chronic pain as

15      well; is that correct?

16           A.     Yes, I had.

17           Q.     And how did your first lecture

18      related to chronic pain come about?

19           A.     A woman by the name of Seddon

20      Savage, who was an addiction specialist at --

21      in the state of New Hampshire, asked me if I

22      would give a presentation.

23           Q.     Seddon Savage, is that --

24           A.     S-e-d-d-o-n, S-a-v-a-g-e,

25      Seddon Savage.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And she was an addiction

2    specialist.

3                Was she also an MD?

4        A.      Yes.  In anesthesiology.

5        Q.      Okay.  Turning to Exhibit B of

6    your report is your materials considered.

7    And we now also have the supplemental

8    materials considered list from your counsel.

9                Taking the two together, the

10   materials considered list and the

11   supplemental considered list, do these two

12   lists together identify all the materials

13   that you considered in forming your opinion

14   in this case?

15       A.      And my 40 or 50 years of

16   experience in addiction.

17                MR. BLANK:  Sorry, Counsel, I

18          don't think you've marked the

19          supplemental list.

20                MS. GAFFNEY:  Oh.  Thank you.

21                (Hevern Exhibit 4 marked for

22          identification.)

23                MR. BLANK:  This will be 4?

24                MS. GAFFNEY:  Uh-huh,

25          Exhibit 4.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. GAFFNEY:

 2         Q.     How did you determine what

 3    materials to note on the materials considered

 4    and supplemental materials considered list?

 5         A.     It was on -- the literature and

 6    other materials, those were the readings that

 7    I had done and the books that I had perused

 8    or actually read, or presentations that I

 9    read, and in creating my report referred back

10    to them was what I -- was how it worked.

11              In terms of the materials

12    considered, the -- and the supplemental

13    materials considered, these were information

14    that counsel provided to me.

15         Q.     Just to clarify, which

16    materials are you referring to as the ones

17    that counsel provided to you?

18         A.     Something called Gerard J.

19    Hevern Supplemental Materials Considered,

20    something called Topic and Materials

21    Considered by Gerard Hevern.

22         Q.     Okay.  Distinguishing that from

23    the page that starts with literature and

24    other materials?

25         A.     That's what I'm saying.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Got it.  Thank you.

 2                 And did you ever ask counsel

 3     for any specific materials?

 4          A.     No.

 5          Q.     With respect to the materials

 6     provided by counsel, did you rely on any of

 7     these materials for your report?

 8          A.     No.

 9          Q.     Supplemental materials

10     considered list, these are all things that

11     you considered after submitting your report,

12     19 expert reports, seven interrogatory

13     responses and one deposition transcript.

14                 Why did you review these

15     materials after submitting your report?

16                 MR. BLANK:  Objection.

17                 THE WITNESS:  I quickly

18          reviewed them.  I read Steven Cohen's

19          and Richard Del La Garza pretty much

20          thoroughly and Catherine Keyes.  All

21          the others I just kind of perused.

22                 I wanted to essentially see

23          what was being said by different

24          folks.

25                 MR. BLANK:  A short break would
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          be useful.
2                    MS. GAFFNEY:  Short break.  We
3          can do that.
4                    MR. BLANK:  Thank you.
5                    VIDEOGRAPHER:  We're going off
6          the record at 11:27 a.m.
7           (Off the record at 11:27 a.m.)
8                    VIDEOGRAPHER:  We are back on
9          the record at 11:41 a.m.
10    QUESTIONS BY MS. GAFFNEY:
11          Q.    Dr. Hevern, let's go back to
12    your materials considered list.  I have a few
13    questions about the materials provided to you
14    by counsel.
15                 Your list includes two
16    MDL-produced documents.  Let's see, I
17    think -- not the supplemental materials
18    considered list --
19          A.    This stuff here?
20          Q.    Yes, right at the top.
21          A.    Oh, I'm sorry.
22          Q.    What are those two documents?
23          A.    I actually don't know what they
24    are.
25          Q.    Safe to say they did not inform
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     your opinion in your report?

 2                    MR. BLANK:  Objection.

 3                    THE WITNESS:  Correct.

 4     QUESTIONS BY MS. GAFFNEY:

 5          Q.     And how about the Ohio Board of

 6     Pharmacy extract format description, what is

 7     that document?

 8          A.     I briefly reviewed it, but I

 9     did not -- it was not anything I used for my

10     opinion.

11          Q.     Okay.  Do you recall what it

12     was?

13          A.     Not at this point.

14          Q.     And now turning to the

15     literature and other materials list in that

16     same Exhibit B.

17          A.     Okay.

18          Q.     You testified that this is the

19     list you put together based on readings that

20     you had done or presentations you had read in

21     creating your report; is that correct?

22          A.     Correct.

23          Q.     So is it your testimony that

24     you've reviewed all of the materials on this

25     list carefully?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      And you believe that all of the

 3     materials listed here are reliable and

 4     support your opinions?

 5                  MR. BLANK:  Objection.

 6                  THE WITNESS:  Yes.

 7     QUESTIONS BY MS. GAFFNEY:

 8          Q.      Were any of the materials on

 9     this literature list provided to you by

10     counsel?

11          A.      No.

12          Q.      How did you go about

13     identifying the materials on this list?

14                  Did you run searches of the

15     literature, or how did you do that?

16          A.      Some I already possessed in my

17     physical possession and others I did Google

18     searches or med -- Medline searches.

19          Q.      What sort of search terms did

20     you use for those online searches?

21          A.      Multiple.

22          Q.      For example?

23          A.      Opioid and pain management,

24     ASEM definition of terms, DSM-V cat -- you

25     know, DSM-V categories for the description of
```

1   addiction, things like that.

2        Q.    Did you have any help

3   performing that research?

4        A.    No.

5        Q.    Do you remember when you did

6   those searches?

7        A.    Some of them began in April.

8   Many of them began in April when I started to

9   look.

10             And -- almost all of them were

11  in April.  Some of them may have been in

12  early May as I was concluding my report.

13       Q.    Before the break, you had

14  mentioned Purdue representative Joe Russell

15  who would come to your office two to three

16  times a year?

17       A.    Yes.

18       Q.    Would he be promoting certain

19  products when he would call on your office?

20       A.    He would be.

21       Q.    And what products or product

22  were those?

23       A.    It was OxyContin.

24       Q.    Did representatives of any

25  other pharmaceutical manufacturers call on

Highly Confidential - Subject to Further Confidentiality Review

```
1    your office?

2         A.      Yes.

3         Q.      Which manufacturers?

4         A.      Many.  Many.

5         Q.      Any that stand out in your

6    memory?

7         A.      Not in particular.

8         Q.      In these many sales calls, did

9    any representatives ever provide lunch for

10   you or your staff?

11        A.      That was the -- that was the

12   format that we used at our office.

13        Q.      When you say "that was the

14   format that you used," can you describe that

15   for me?

16        A.      Yes.

17               The lunchroom was the only

18   large room that we had, and so if my -- if

19   they were going to do a presentation and my

20   staff was there, they needed to provide them

21   lunch.

22        Q.      So the format would be that the

23   sales representative would provide lunch and

24   then during that lunch make a presentation

25   about a product; is that fair?
```

```
 1              A.      Correct.

 2              Q.      Do any of those product

 3      presentations stand out in your recollection?

 4                      MR. BLANK:  Objection.

 5                      THE WITNESS:  There were --

 6              there were so many drugs that were new

 7              in medicine that none of them stand

 8              out particular.

 9      QUESTIONS BY MS. GAFFNEY:

10              Q.      In your recollection, have you

11      ever prescribed a product based on what you

12      learned from some of these presentations?

13              A.      They assisted me in knowing.

14      Most of the time I relied upon the PDR.

15              Q.      Are you familiar with the

16      phrase "key opinion leader" or KOL?

17              A.      Only since I've read it in some

18      depositions.  But not depositions.  I mean

19      expert -- I didn't -- I haven't read any

20      depositions, but I mean in the expert witness

21      material that I read.

22              Q.      How about the phrase "speakers

23      bureau"?  Are you familiar with that?

24              A.      Yes, I am.

25              Q.      Did you ever serve on a
```

```
 1    speakers bureau for a drug manufacturer?

 2         A.    I have.

 3         Q.    Which manufacturer?

 4         A.    Lilly.

 5         Q.    Any others?

 6         A.    I -- well, I did presentations

 7    that was supported by Purdue but not in the

 8    speaker bureau format.

 9               I did presentations for whoever

10    produces Butrans, and I don't know who that

11    is.

12               And I did presentations for

13    Sublocade, which was Indivior.

14         Q.    In the presentations supported

15    by Purdue that you mentioned, were those with

16    respect to a particular product?

17         A.    No, those were some of the

18    items that you identified out of all of the

19    material produced by me.

20         Q.    How about the -- you testified

21    that you were on a speakers bureau for Lilly?

22         A.    Yes.

23         Q.    And was that with respect to a

24    particular product?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Which product was that?

2    A.    Prozac for the use of the

3    dysphoric dysfunction, which you know as

4    premenstrual syndrome, or may know as

5    premenstrual syndrome.

6    Q.    Have you received payment for

7    these talks that you've participated in?

8    A.    I have.

9    Q.    Do you know how much payment

10   you've received over the years?

11   A.    Probably less than $10,000.

12   Q.    And how did your involvement on

13   the presentations supported by Purdue come

14   about?

15   A.    My recollection was that -- my

16   recollection was that either Joe Russell or a

17   member of the CME committee would contact me.

18   Q.    Have you ever served as a

19   consultant to a pharmaceutical company?

20   A.    I went to two -- I don't know

21   what you would call them, but two weekend

22   retreats, I guess, to talk about -- in a

23   group setting on two occasions.

24   Q.    When did those take place?

25   A.    2014-ish.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Both of them in that time

2  frame?

3    A.    I believe so.

4    Q.    And did both of them involve

5  the same pharmaceutical company or were they

6  different?

7    A.    I think the same one.  So one

8  was clearly a Purdue product, and the other

9  one I think might have been a Purdue product,

10  but I'm not certain.

11    Q.    What were the two products?

12    A.    One was Hysingla, and the other

13  was looking at opioid -- or abuse-deterrent

14  properties that were being considered by

15  Purdue.

16    Q.    So what was the nature of what

17  you were asked to do on these weekend

18  retreats?

19    A.    Be a part of roundtable

20  discussions.

21    Q.    And were you compensated for

22  your participation in these discussions?

23    A.    Yes.  Yes, I was.

24    Q.    How much were you compensated?

25    A.    They paid for my transportation

1    and my hotel arrangements and a daily fee of

2    maybe a thousand dollars.  I'm not certain.

3        Q.    So with these products you've

4    been involved with, Prozac, Butrans,

5    Sublocade, Hysingla, have you ever

6    recommended any of these products to

7    colleagues?

8        A.    Prozac I did.  Hysingla I

9    did -- no, not Hysingla.  I mean Sublocade I

10   did.  I did not, you know, do any support

11   of Hysingla.

12       Q.    Okay.  So I have a list I'm

13   just going to run through.

14             Have you ever consulted for or

15   done any work for Endo?

16       A.    No.

17       Q.    Insys?

18       A.    Excuse me?

19       Q.    Insys?

20       A.    I don't -- no.

21       Q.    Teva?

22       A.    No.

23       Q.    Mallinckrodt?

24       A.    No.

25       Q.    Allergan?

```
 1        A.    No.

 2        Q.    Janssen?

 3        A.    No.

 4        Q.    Or Johnson & Johnson?

 5        A.    No.

 6        Q.    Okay.  AmerisourceBergen?

 7        A.    No.

 8        Q.    Anda?

 9        A.    No.

10        Q.    Cardinal Health?

11        A.    No.

12        Q.    CVS Pharmacy?

13        A.    No.

14        Q.    Discount Drug Mart?

15        A.    No.

16        Q.    HD Smith?

17        A.    No.

18        Q.    Health Mart Systems?

19        A.    No.

20        Q.    Henry Schein?

21        A.    No.

22        Q.    McKesson?

23        A.    No.

24        Q.    Rite Aid?

25        A.    No.
```

1      Q.     Walgreens?

2      A.     No.

3      Q.     Walmart?

4      A.     No.

5      Q.     Okay.  Thank you.

6             Do you have any personal

7   relationships with any current or former

8   employees at any of the drug manufacturers

9   we've been discussing?

10     A.     No.

11     Q.     You mentioned a moment ago with

12  respect to the Purdue presentations you

13  participated in that you were contacted by

14  Joe Russell or maybe a representative from a

15  CME committee?

16     A.     Correct.

17     Q.     The CME committees, do you

18  remember what organization those CME

19  committees belonged to or --

20     A.     Well, Lawrence General was one.

21  The VA system was the other.  Those are the

22  two that I -- but those would be the things

23  that I can recall.

24     Q.     Okay.  And in those two

25  examples -- say, for example, you were

Highly Confidential - Subject to Further Confidentiality Review

1    contacted by someone working on the CME

2    committee for the VA, when did you learn that

3    it was -- the presentation you were giving

4    was sponsored by Purdue?

5         A.    At the time that it was booked.

6         Q.    And you said that you prepared

7    the presentation materials that you would

8    use?

9         A.    Yes.

10        Q.    Did Purdue review those at all?

11        A.    No.

12        Q.    So turning now to your report

13   itself, you testified earlier that you didn't

14   have any assistance in drafting your report;

15   is that correct?

16        A.    Correct.

17        Q.    So every word and citation in

18   the report you drafted?

19        A.    Yes.

20        Q.    Okay.  Can you summarize for me

21   in your own words the opinions that you're

22   offering in this report?

23             MR. BLANK:  Objection.

24             THE WITNESS:  In general that

25        addiction has been a chronic problem

Highly Confidential - Subject to Further Confidentiality Review

 1              in our society; that factors that

 2              contribute to addiction include

 3              underlying mental health problems,

 4              family history, social and

 5              environmental events, biological

 6              issues of the individual; and that the

 7              mental health system was not adequate

 8              to deal with the burgeoning problems

 9              that were occurring.

10      QUESTIONS BY MS. GAFFNEY:

11              Q.      Thank you.

12                      When would you say you formed

13      these opinions?

14              A.      They've been formed over the 40

15      to 50 years of my work, and the opinions

16      about this process -- or the opinions about

17      this paper really was the culmination of some

18      of the reports that I gave in 2016 and 2018.

19              Q.      And what are those reports in

20      2016 and 2018 you're referring to?

21              A.      They're on my CV, and they are

22      essentially the same presentation that I gave

23      that began with -- well, actually 2017, with

24      Management of Chronic Pain and Coexisting

25      Disorders; 2018, the presentation I gave to

```
 1    the New Hampshire Academy of Family Practice

 2    and to the American Academy of Family

 3    Practice national conference for residents in

 4    2018.

 5         Q.    So looking back at the summary

 6    of opinions you just went through, addiction

 7    being a chronic problem in society, various

 8    factors contributing to that including mental

 9    health, social context, family, environmental

10    and biological context of the individual, and

11    then the mental health system not being

12    adequate to address these issues, are there

13    other opinions that you're -- you would

14    summarize as opinions you're offering in your

15    report?

16              MR. BLANK:  Objection.

17              THE WITNESS:  My report also

18         includes issues of the availability of

19         takeback components of medications.

20              The -- would be what I would

21         say.

22    QUESTIONS BY MS. GAFFNEY:

23         Q.    Are you offering any opinion in

24    this case on the efficacy of opioids for

25    chronic pain?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. BLANK:  Objection.

 2                  THE WITNESS:  That's not what I

 3         was asked, you know, to comment on.

 4    QUESTIONS BY MS. GAFFNEY:

 5         Q.    Okay.  So just to clarify that,

 6    it's not an opinion you're offering in this

 7    case?

 8         A.    That's correct.

 9         Q.    And, Dr. Hevern, you understand

10    that one of the purposes of submitting your

11    expert report is to disclose to the other

12    side and the Court all of the opinions you

13    will be offering in the case and then the

14    support for those opinions in advance of

15    trial; is that correct?

16         A.    I do.

17         Q.    So you don't intend to offer

18    any opinions that are not put forth in your

19    expert report at trial; is that also correct?

20         A.    Not unless something new comes

21    up.

22         Q.    And in terms of understanding

23    the bases for your opinions, are all of the

24    materials that you would consider a basis for

25    your opinions, in addition to your clinical
```

1    experience, provided in the materials

2    considered list?

3         A.     Yes.

4         Q.     Your report also contains

5    various footnotes.

6                Is that fair to say that where

7    you've identified materials supporting a

8    specific point in your report, you've

9    provided that in a footnote?

10        A.     Yes.

11        Q.     Where you have provided

12   footnotes in your report, is it your

13   testimony that these contain all of the

14   support for that particular point that they

15   correspond to?

16                MR. BLANK:  Objection.

17                THE WITNESS:  Yes.

18   QUESTIONS BY MS. GAFFNEY:

19        Q.     So for the statements that are

20   in your report without specific footnotes, is

21   it fair to say that the support for these

22   statements is your clinical experience?

23        A.     Yes.

24        Q.     So looking at the section in

25   your report called Historical Background,

Highly Confidential - Subject to Further Confidentiality Review

1    Americans' Fascination with Drugs --

2         A.      What page is that, please?

3         Q.      It starts on the bottom of

4    page 3.

5         A.      Okay.

6         Q.      Goes on to 4.

7         A.      All right.

8         Q.      And then the first full

9    paragraph on page 4, you mention morphine and

10   widespread incidence of addiction in the

11   1800s; is that right?

12        A.      Correct.

13        Q.      And you describe the occurrence

14   of morphine addiction as related to the Civil

15   War and war-related injuries.

16               What is the basis for that

17   statement?

18        A.      The research that I did for one

19   of my papers and what is common knowledge for

20   experts who have dealt with addiction.

21        Q.      What is the research that you

22   did for one of your papers?

23               Just to clarify what you just

24   mentioned, what are you referring to there?

25        A.      Hold on for a second.

1    Q.    Uh-huh.

2    A.    So in November 18, 2016, Drug

3    Abuse and the Never-Ending Saga was the

4    presentation I gave at the Elliot Hospital

5    grand rounds.  And during that period of

6    time, I did all of the -- a significant

7    amount of reading around the process of

8    substance use disorder and some of the

9    origins of that.

10    Q.    And are those materials that

11    you read listed in your materials considered

12    list?

13    A.    No, they're not.

14    Q.    So in terms of what you're

15    relying on as a basis for your statements in

16    your report here in this paragraph, is your

17    testimony that you're relying on materials

18    that have not been disclosed?

19          MR. BLANK:  Objection.

20          THE WITNESS:  This knowledge is

21          widely available to addiction

22          specialists, and I was placing this

23          information that is widely known to us

24          into this report so that it would have

25          context, historical context, of what

1       has gone on.

2    QUESTIONS BY MS. GAFFNEY:

3        Q.      Do you recall what some of

4    those materials that you read that are not

5    disclosed here were?

6            MR. BLANK:   Objection.

7    QUESTIONS BY MS. GAFFNEY:

8        Q.      With respect to this history?

9        A.      There is a -- there's a

10   textbook I have at home that was written in

11   probably 1909 that I have that I read through

12   about morphine and morphine use.

13       Q.      Have you read David

14   Courtwright's book Drug Paradise?

15       A.      No.

16       Q.      Did you read David

17   Courtwright's expert report?

18       A.      No.

19       Q.      It is listed on your materials

20   considered list.

21           Did you consider it at all?

22       A.      Not in the formation of my

23   presentation here.  I looked at this data

24   afterwards.

25       Q.      Are you intending to offer a

Highly Confidential - Subject to Further Confidentiality Review

1    rebuttal opinion to his report with respect

2    to the way you've characterized the morphine

3    addiction of the late 1800s?

4        A.    I'm not -- I was not asked to

5    rebut anything.

6        Q.    You also have the statement

7    that "elixirs containing varying amounts of

8    alcohol, opium, morphine, cocaine and heroin

9    were sold without government regulation until

10   1920."

11              What is your basis for that

12   statement?

13       A.    The development of the Harris

14   Act.

15       Q.    Do you know when that

16   legislation was enacted, sir?

17       A.    1920 -- well, between 1918 and

18   1921.

19       Q.    Still looking at this

20   description of the historical context in your

21   report, you describe some issues with

22   Vicodin, Darvocet and Percocet in the 1980s;

23   is that correct?

24       A.    Correct.

25       Q.    But your description of the

Highly Confidential - Subject to Further Confidentiality Review

1    historical context does not note any other

2    prescription opioid abuse.

3                    Why is that?

4         A.     Because in the 1990s when I was

5    running the chemical dependency unit at the

6    CMC, those were the drugs that we were

7    detoxing.

8         Q.     And in the late 1990s and early

9    2000s, to your knowledge, was there -- were

10   there any issues with prescription opioid

11   abuse?

12                    MR. BLANK:  Objection.

13                    THE WITNESS:  I was no longer

14        running the chemical dependency unit.

15        I was an independent practitioner at

16        that time.

17   QUESTIONS BY MS. GAFFNEY:

18        Q.     And as an independent

19   practitioner at that time, were you aware of

20   any issues with prescription opioid abuse?

21                    MR. BLANK:  Objection.

22                    THE WITNESS:  I was reading

23        about that.  I was not personally or

24        professionally involved in the

25        management other than a

Highly Confidential - Subject to Further Confidentiality Review

1           consultative -- selective

2           consultations, and that's my

3           knowledge.

4    QUESTIONS BY MS. GAFFNEY:

5           Q.    But you were reading about the

6    existence of issues with prescription opioid

7    abuse at that time?

8           A.    Yes.

9           Q.    Is there a reason why you did

10   not include it in your history section in

11   your report?

12          A.    Ask the question again?  Say

13   that one more time?

14          Q.    Is there a reason why you do

15   not include prescription opioid abuse in the

16   late 1990s and early 2000s in your history

17   section of your report?

18                MR. BLANK:  Objection.

19                THE WITNESS:  I did.

20   QUESTIONS BY MS. GAFFNEY:

21          Q.    Can you point me to that?

22          A.    Yeah.  Fifth paragraph, "Thus

23   dentists, oral surgeons, orthopedic surgeons

24   were prescribing Vicodin, along with other

25   prescription opioids, including Darvocet and

Highly Confidential - Subject to Further Confidentiality Review

1    Percocet."

2         Q.    Okay.  And this starts with

3    "around the same time."

4              Is your testimony that this is

5    intended to describe the late 1990s and early

6    2000s?

7              Because the prior paragraph

8    describes the 1980s.

9         A.    Correct.  And '80s

10   transitioning into the '90s, this was what

11   was happening.

12        Q.    Okay.  And were you aware of

13   issues with OxyContin abuse in the late 1990s

14   and early 2000s?

15             MR. BLANK:  Objection.

16             THE WITNESS:  Not specifically.

17   QUESTIONS BY MS. GAFFNEY:

18        Q.    Were you aware that there were

19   Congressional hearings about OxyContin abuse

20   in the early 2000s?

21        A.    In the early 2000s?  No, I did

22   not.  I don't recall that.

23        Q.    It's around that time that you

24   were giving presentations for Purdue,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BLANK:  Still in the early

 2         2000s?

 3                    MS. GAFFNEY:  In the early

 4         2000s, yes.

 5                    THE WITNESS:  Let me take a

 6         look.

 7               I was giving lectures around

 8         abuse and diversion and drug impact on

 9         society, but I did not read any

10         Congressional hearings is what I'm

11         trying to say to you.

12    QUESTIONS BY MS. GAFFNEY:

13         Q.    You were giving lectures around

14    abuse and diversion and drug impact on

15    society.

16               What sort of abuse and

17    diversion and drug impact are you referring

18    to?

19         A.    Issues of prescription drugs

20    that were being diverted.  That was the --

21    you know, and how they were presenting to

22    emergency rooms and to -- and to office --

23    and to private offices.

24         Q.    And were you aware of any

25    issues with OxyContin in particular being
```

1    diverted at that time?

2         A.    Yes.

3         Q.    Is there a reason why you did

4    not note that in your expert report, in your

5    historical summary?

6              MR. BLANK:  Objection.

7              THE WITNESS:  No.

8    QUESTIONS BY MS. GAFFNEY:

9         Q.    You state that in the 2000s --

10   it's on page 5, the second -- or the first

11   full paragraph, "The illegal drug cartels

12   that were supplying heroin began to lace it

13   with fentanyl."

14              What's your basis for that

15   statement?

16        A.    Two general sources:  what was

17   being reported on TV and radio and what was

18   being produced in literature surrounding drug

19   overdoses in CDC materials.

20        Q.    Is the literature that you

21   mentioned included in your materials

22   considered list?

23        A.    I'm sorry?

24        Q.    The literature that you just

25   mentioned, is that included in your materials

Highly Confidential - Subject to Further Confidentiality Review

1    considered list?

2         A.     It would be with the CDC

3    reports.

4         Q.     Okay.  And as you don't have a

5    footnote citation for this paragraph, can you

6    point me to the sources that you're relying

7    on for this paragraph?

8         A.     Some of it would be in

9    number 5, 2002 to 2013, some of the CD --

10   drug abuse and government, and then there are

11   different ones throughout here from CDC's

12   reports.

13        Q.     Can you point me to the

14   particular sources in the -- this is for the

15   statement about fentanyl appearing in the

16   2000s.

17        A.     They -- here they are.  Okay.

18   In the footnotes -- here it is.  Centers for

19   Disease Control Prevention FastStats

20   retrieved from the CDC -- that's on

21   tobacco -- the Centers for Disease Control

22   and Prevention for drug overdoses are the two

23   locations that I would have gone to.  So

24   those would -- those would begin to give me

25   information about the -- those components of

1    really what was happening.

2              I'd have to go through all of

3    these.  I'm quickly reading through them.

4              So those would be two of the

5    sources.

6         Q.    So the two CDC sources - one,

7    as you noted, is about tobacco, and the

8    other, the title is "US Opioid Prescribing

9    Rate Maps" - how do those support the

10   statement of fentanyl appearing in the 2000s

11   by way of illegal drug cartels?

12        A.    The other source was the

13   National Institute of Drug Abuse, drug trends

14   2015.

15        Q.    Okay.  And just going back to

16   my question about the two CDC sources.

17        A.    Yes.

18        Q.    The one about tobacco and the

19   other one about opioid prescribing rates, how

20   do those support the statement of fentanyl

21   appearing in the 2000s by way of illegal drug

22   cartels?

23        A.    There were two -- two

24   components what I said to you is the first

25   one is that was -- that became knowledge

Highly Confidential - Subject to Further Confidentiality Review

1    through releases on TV and on radio from the

2    CDC about those things, and that was being

3    published in different alerts from them.

4                    So those are not noted, but

5    they were noted by TV and radio.  Those

6    specific items would have referred to those

7    in the documentation.

8         Q.    The CDC FastStats on tobacco?

9         A.    That would be on the tobacco

10   one.

11                   There -- it would be for the,

12   you know, opioid prescription rates and

13   retrieve what they -- those would be items

14   that would be listed in the CDC reports.

15        Q.    With respect to fentanyl coming

16   through illegal drug cartels?

17        A.    I believe so.

18        Q.    Okay.  So as we discussed a few

19   minutes ago, disclosing the materials

20   considered, the materials that are forming

21   the bases for your opinion, is important to

22   the plaintiffs in litigation as well as the

23   Court.

24                   You've submitted an expert

25   report and materials considered list.  You

1    have stated that the statements in your

2    report that do not have footnote citations

3    are supported by your clinical experience.

4              So I'm just trying to

5    understand the support for the statement in

6    this paragraph in particular about illegal

7    drug cartels in the 2000s.

8              Is it your testimony that your

9    knowledge -- the basis for this statement is

10   what you saw on TV and heard on the radio, in

11   addition to the two CDC documents here as

12   well as the National Institute on Drug Abuse

13   publication from 2015?

14             MR. BLANK:  Objection.

15             THE WITNESS:  Yes, and

16        additional readings from CDC reports.

17        So it's a combination of all of those

18        things.

19   QUESTIONS BY MS. GAFFNEY:

20        Q.    Dr. Hevern, to the extent that

21   there are additional readings that you are

22   relying on as a basis for your expert

23   opinion, I would ask that you disclose those

24   sources.

25        A.    Okay.

1          MR. BLANK:  When you get to a

2     good breaking point, it's about 12:30,

3     so let us know if you're close.

4          MS. GAFFNEY:  Sure.  This is a

5     good breaking point now.

6          MR. BLANK:  Okay.

7          VIDEOGRAPHER:  We're going off

8     the record at 12:29 p.m.

9      (Off the record at 12:29 p.m.)

10          (Hevern Exhibit 5 marked for

11     identification.)

12          VIDEOGRAPHER:  We're back on

13     the record at 1:24 p.m.

14  QUESTIONS BY MS. GAFFNEY:

15     Q.    Welcome back, Dr. Hevern.

16     A.    Yes.

17     Q.    Your counsel provided us with

18  an amended page 4 of your complaint {sic},

19  which we'll mark it as Exhibit 5.

20     A.    Yes.

21     Q.    What was the change you made on

22  this page?

23     A.    Excuse me.  On the top line,

24  the amended version says, "By comparison,

25  there's approximately 47,000 opioid-related

Highly Confidential – Subject to Further Confidentiality Review

```
 1    deaths each year in 2016, 2017."

 2         Q.    Okay.  And what was the change?

 3         A.    It had read, "By comparison,

 4    there was approximately 47,000 prescription

 5    opioid-related deaths each year in 2016 and

 6    2017."

 7         Q.    Okay.  Thank you.

 8               And how did you come to believe

 9    this change was necessary?

10         A.    When I was reading the

11    transcript -- not transcription -- excuse me,

12    my report last night, I looked at it and I

13    said, "That's wrong."

14         Q.    Okay.  So you carefully

15    reviewed page 4, clearly.

16               You carefully reviewed the rest

17    of your report as well, I take it?

18         A.    Yes, I have.

19         Q.    Any other changes to your

20    report?

21         A.    No.

22         Q.    Okay.  Thank you.

23               On page 5 of your report, right

24    before the heading Addiction, that last

25    paragraph in the history summary of your
```

Highly Confidential - Subject to Further Confidentiality Review

1    report, you state that, "History teaches us

2    that there has always been, and likely always

3    will be, a segment of the population that is

4    susceptible to developing drug-seeking

5    behavior, and the predominant drugs of abuse

6    will vary or rotate over time."

7              Did I read that correctly?

8         A.    Yes.

9         Q.    And what is the basis for your

10   statement here?

11        A.    Both my clinical observation

12   and management of patients in -- or who had

13   addiction, the report from the drug abuse and

14   government publication that I list.

15        Q.    In footnote 5?

16        A.    That's what I meant, uh-huh.

17        Q.    Okay.

18        A.    That's what I meant, I'm sorry.

19        Q.    Is there anything else on your

20   materials considered list that you're relying

21   on for that statement?

22        A.    None.

23        Q.    And this citation in footnote 5

24   notes that, "Between 2002 and 2013, there was

25   a remarkably stable percentage of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    population, between 8 to 10 percent, that

 2    abused illicit drugs, representing a

 3    persistent population susceptible to

 4    developing substance abuse."

 5              Did I read that correctly?

 6         A.   Yes.

 7         Q.   And how do you define the term

 8    "abuse"?

 9              Here it's used, "abuse illicit

10    drugs," and then you reference substance

11    abuse.

12         A.   Substance -- they're

13    interchangeable.  Substance abuse and abuse

14    of illicit drugs are generally

15    interchangeable.

16         Q.   And what does "abuse" mean in

17    the context of drug use?

18         A.   Misusing a drug or alcohol and

19    becoming somehow impaired but not becoming

20    addicted to it.

21         Q.   Is there a difference between

22    misuse and abuse?

23         A.   Technically, I don't think so.

24         Q.   And then how would you define

25    addiction?
```

1      A.      Addiction, it's -- it's in my

2  definition here.  Should I read it?  Page 6,

3  second paragraph.

4      Q.      No, that's fine to point to

5  this paragraph.

6      A.      Okay.

7      Q.      Okay.  And then in your own

8  words, how does that differ from dependence?

9      A.      Dependence is an outcome of the

10  use of many different kinds of medications.

11              An addiction is a misuse of

12  those medications in a manner that creates

13  craving and difficulties for the individual.

14      Q.      And in your experience, are

15  there people who are dependent on drugs but

16  not abusing them?

17      A.      That's a challenging question.

18  Many different categories of drugs you can

19  become dependent upon.

20              I'm assuming you're talking

21  about opioids?

22      Q.      That's a fair assumption, but

23  actually my question was more general.

24              So what does it mean to be

25  dependent on drugs, whether it's opioids or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    another category?
 2         A.    Oh, dependency would mean that
 3    at the -- if you abruptly stop the
 4    medication, you'll have symptoms or a
 5    negative outcome.
 6         Q.    Okay.  So if I understand
 7    correctly, it is possible to become dependent
 8    on drugs without abusing them; is that
 9    correct?
10         A.    Correct.
11         Q.    And conversely, is it also
12    possible to abuse drugs without becoming
13    dependent on them?
14         A.    Yes.
15         Q.    So going back to footnote 5,
16    this percentage of the population susceptible
17    to developing substance abuse, the 8 to
18    10 percent you cite here, that does not take
19    into account a percentage of the population
20    that may be dependent on -- well, in this
21    context, dependent on opioids but not abusing
22    them; is that correct?
23              MR. BLANK:  Objection.
24              THE WITNESS:  Could you ask
25         that question again?  I lost --
```

```
 1    QUESTIONS BY MS. GAFFNEY:

 2         Q.      Uh-huh.

 3                 You represent in footnote 5

 4    that there's a stable percentage of the

 5    population, between 8 to 10 percent, that is

 6    susceptible to developing substance abuse.

 7                 And as we were just discussing,

 8    substance abuse and dependence are different

 9    concepts.

10         A.      Substance abuse and

11    dependence --

12         Q.      Dependence --

13         A.      -- are different concepts, yes.

14         Q.      So this -- is it correct to say

15    that this 8 to 10 percent proportion of the

16    population does not take into account

17    individuals who are dependent on, for

18    example, prescription opioids but not abusing

19    them?

20         A.      I'd want to reread the entire

21    component of it, but that's how I would

22    interpret that.

23         Q.      Okay.

24         A.      Hold on for just one second.

25                 Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And you said dependency would

2  mean that if you abruptly stop the

3  medication, the patient would have symptoms

4  or a negative outcome.

5             Have you seen that happen in

6  your practice with patients who are dependent

7  on opioids?

8      A.     Yes.

9      Q.     And in your experience with

10  these patients, what has happened -- well,

11  first of all, to back up.

12             What was the reason for the

13  abrupt stop in medication that led to this

14  outcome that you've seen in your practice?

15             MR. BLANK:  Objection.

16             THE WITNESS:  These are people

17       who have been referred to me whose

18       medications have been stopped by other

19       physicians.

20  QUESTIONS BY MS. GAFFNEY:

21      Q.     In your own practice, as we

22  spoke about this morning, you do not

23  generally abruptly stop patients' opioid

24  medications; is that correct?

25      A.     That's correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      But you do have clinical

 2      experience with patients who have had those

 3      medications abruptly stopped by other

 4      physicians and then referred to you for

 5      management of the symptoms they're

 6      experiencing?

 7              A.      That's correct.

 8              Q.      And what do you do in that

 9      situation to assist patients who are

10      experiencing -- fair to say they're

11      experiencing withdrawal what we're

12      discussing?

13              A.      Yes.

14              Q.      How do you assist patients in

15      that -- who are experiencing withdrawal?

16              A.      How do I --

17                      MR. BLANK:  Objection.

18                      THE WITNESS:  I apologize.

19                      How do I what?

20      QUESTIONS BY MS. GAFFNEY:

21              Q.      Assist patients --

22              A.      Oh, assist, I'm sorry.

23              Q.      -- who are experiencing

24      withdrawal?

25              A.      There are two approaches that I
```

1    can take.  The first is to treat them with a

2    combination of medications that treat

3    symptoms.  The second is to introduce then

4    the use of buprenorphine or Suboxone as a

5    medically assisted treatment for substance

6    abuse disorder.

7         Q.    And the first option, the

8    combination of medications that treat

9    symptoms, what's the combination of

10   medications you would use?

11        A.    The names of medications, or

12   what would you -- or the categories?

13        Q.    Or the categories, yeah.

14        A.    Well, one is to help prevent

15   nausea.  One is to help prevent diarrhea.

16   One is to help prevent the gooseflesh skin

17   and the sweating that's accompanied by that.

18   And depending on how emotionally agitated,

19   you would use a medicine to reduce anxiety.

20        Q.    And what are the factors you

21   consider with a patient in terms of choosing

22   that first option of treating the withdrawal

23   symptoms versus initiation of buprenorphine

24   or Suboxone?

25        A.    The choice would be based upon

Highly Confidential - Subject to Further Confidentiality Review

```
1    whether or not the patient is -- has

2    demonstrated opioid addiction, and that's why

3    they're withdrawing versus -- and if so, I

4    would then offer them the use of Suboxone to

5    treat their addiction and put them in what we

6    call a medically-assisted treatment.

7         Q.    Just going back, you said if

8    they demonstrated addiction and that's why

9    they're withdrawing versus -- what's the end

10   of that sentence?  Versus...

11        A.    Oh, if they are -- I have to

12   read the -- I apologize.  I don't mean to --

13        Q.    Do you want me to reread it?

14        A.    If you wouldn't mind, I'll pick

15   it up from that point.

16        Q.    So you said, "The choice would

17   be based upon whether or not the patient has

18   demonstrated opioid addiction and that's

19   what -- why they're withdrawing versus" --

20        A.    That the medication was

21   abruptly stopped by another physician because

22   they were no longer prescribing that

23   medication to them.

24        Q.    Am I correct to understand

25   meaning that it's a situation of dependence
```

```
 1   but not addiction?

 2        A.     That's what I'm trying to

 3   indicate.

 4        Q.     I take it you have a waiver to

 5   prescribe buprenorphine; is that right?

 6        A.     Correct.

 7        Q.     When did you obtain that

 8   waiver?

 9        A.     I believe in 2013.

10        Q.     In your report you discuss the

11   concept of pseudoaddiction.

12               Is that something that you

13   would say you've seen in your practice?

14        A.     Yes.

15        Q.     And in those instances of

16   pseudoaddiction in your practice, would you

17   address the phenomenon of pseudoaddiction by

18   increasing the opioid dose?

19        A.     I address that in both

20   inpatient and outpatient settings, and the

21   way to address it is by adjusting

22   medications, either frequency or amount, or

23   changing the medication altogether.

24        Q.     And when you say "adjusting

25   either frequency or amount," can you
```

1    elaborate on what that looks like?

2              MR. BLANK:  Objection.

3              THE WITNESS:  In an inpatient

4        setting, they may be giving a

5        medication every eight hours when they

6        should be giving it every four hours.

7        And so I write the order to be every

8        four hours, so that's a frequency.

9              And the other is that they're

10       giving a low dose of medication, and

11       you increase the actual milligram per

12       dose that they're getting, but the

13       frequency or the interval between each

14       dosing remains the same.

15   QUESTIONS BY MS. GAFFNEY:

16       Q.    How many patients would you say

17   you have treated with -- that exhibit

18   pseudoaddiction?

19       A.    A few hundred probably.

20       Q.    And how do you know in those

21   situations that it is pseudoaddiction and not

22   addiction?

23       A.    Most often because they respond

24   to my adjustments in their medication.

25   They -- the symptoms that they're having,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they are resolved.
 2         Q.      And in your experience, could a
 3    patient be exhibiting signs of addiction and
 4    still have those behaviors resolved by
 5    adjustments in medication?
 6         A.      The symptoms would abate, but
 7    addiction would move them to misuse that
 8    medicine again.
 9         Q.      Okay.  Looking at page 7 of
10    your report --
11         A.      Okay.
12         Q.      -- underneath the heading,
13    "Opioids Prescribing Versus Opioids Abuse,"
14    you have the statement, "For patients with no
15    history of substance abuse or mental health
16    issues, the risks -- the risk of iatrogenic
17    addiction is low."
18               What is the basis for this
19    opinion?
20         A.      Data that I've read through
21    different reports.
22         Q.      And in this paragraph you have
23    two footnote citations.
24               Is that some of the reports
25    you're referring to?
```

```
 1            A.     I don't know if those explicit

 2     ones are the ones that I'm referring to --

 3     I'd have to reread the article -- but those

 4     data are in the handout.

 5                   I'd have to relook at that

 6     explicit form to say -- to link those two

 7     precisely.

 8            Q.     Okay.  So just to understand --

 9     so as you sit here today, can you point me to

10     the -- any sources that you're relying on for

11     the statement that "the risk of iatrogenic

12     addiction is low for patients with no history

13     of substance abuse or mental health issues"?

14                   MR. BLANK:  Objection.

15                   THE WITNESS:  What I can say is

16            it's -- it's in -- I can't select in

17            the moment through these 50 or 60

18            references in the moment, you know,

19            that reference, but it would be in

20            here.

21     QUESTIONS BY MS. GAFFNEY:

22            Q.     So your testimony is that the

23     basis for this opinion exists in your

24     materials considered list, but you did not

25     provide a footnote for it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BLANK:  Objection.
 2              THE WITNESS:  Well, the
 3         footnote is number 7, is what I'm
 4         saying to you, is what I'm
 5         referencing.
 6              Are there other references
 7         within the list?  I'm saying there
 8         probably is, but I'm not going to be
 9         able to pull them out and begin to
10         finger point them to you.
11    QUESTIONS BY MS. GAFFNEY:
12         Q.    When did you form this opinion?
13         A.    Which opinion?
14         Q.    That for patients with no
15    history of substance abuse or mental health
16    issues, the risk of iatrogenic addiction is
17    low.
18         A.    When I began to look at this
19    issue back in probably the early '90s, maybe
20    the late '80s.
21         Q.    Do you consider yourself to be
22    familiar with the literature on this issue?
23         A.    Yes.
24         Q.    And is it your opinion that all
25    of the literature on this issue uniformly
```

1    supports your statement?

2              MR. BLANK:  Objection.

3              THE WITNESS:  There's a wide

4         range of -- there's a wide range

5         within the definition of addiction --

6         of iatrogenic addiction in the

7         literature.

8    QUESTIONS BY MS. GAFFNEY:

9         Q.    So when you say "there's a wide

10   range" in the literature, does that mean it's

11   your understanding that the literature does

12   not uniformly support your statement?

13        A.    It supports two different data

14   points.  I'm talking about no history of

15   substance abuse or mental health issues, the

16   iatrogenic issue is low.

17              There are other data that do

18   not exclude those -- there are other pieces

19   of data or data that doesn't exclude --

20   exclude those, and so the rates are higher in

21   that -- in that population.

22        Q.    Okay.  But just for the way

23   that you've expressed it here, which is

24   limited to the population for patients with

25   no history of substance abuse or mental

1    health issues, is it your opinion that the

2    literature existing on that question

3    uniformly supports your statement that for

4    those patients the risk of iatrogenic

5    addiction is low?

6            MR. BLANK:  Objection.

7            THE WITNESS:  Yes.

8    QUESTIONS BY MS. GAFFNEY:

9        Q.    The wide range that exists in

10   the literature that you mentioned, what is

11   the range?

12       A.    It's as, believe it or not, low

13   as less than 1 percent to as high as -- I've

14   seen in the 30s, 30 percent.  Commonly said

15   between 1 and 20 -- and 20 percent.

16       Q.    Keep going to page 9 of your

17   report.

18       A.    Sure.

19       Q.    Sorry, just give me a second.

20   The inside might be wrong.

21            Okay.  Here it is at the top of

22   the page.  "The current problem of opioid

23   misuse and abuse seems to be part of a much

24   larger and complex substance abuse problem

25   driven primarily by powerful socioeconomic

Highly Confidential - Subject to Further Confidentiality Review

1    factors rather than by any specific substance

2    of abuse."

3              What do you mean by "powerful

4    socioeconomic factors"?

5        A.    The rates of poverty, rates of

6    identification of socioeconomic factors, are

7    primarily poverty and, interestingly enough

8    in some instances, is wealth.  In some

9    instances it turns out to be complacency

10   within the context of what's going on, and in

11   some instances it's the outcome of -- those

12   are -- those are the instances of what you're

13   talking -- what exist.

14       Q.    And to understand the basis for

15   your opinion here, you have cited -- you have

16   two footnotes here citing two different

17   articles, and I take it that these are --

18   form part of the basis for your opinion here?

19       A.    Yes.

20       Q.    Okay.  Are there any other

21   bases for this opinion?

22       A.    Again, a lot of it is based

23   upon my observation, you know, in caring for

24   a lot of patients over -- you know, tens of

25   thousands of patients over 40 years.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Keep going through your

2    report.

3              On pages 10 through 11 of your

4    report, you discuss that states were slow to

5    adopt recommended measures to curb opioid

6    abuse.

7              Is that a fair summary?

8    A.    Yes.

9    Q.    And that they've also gone too

10   far in some respects?

11   A.    Yes.

12   Q.    What are some of these

13   recommended measures to curb opioid abuse?

14   A.    There have been, if not exactly

15   here, three of them that would be noted.  The

16   first one was the development of something

17   called the PDMP, or Prescription Drug

18   Monitoring Program, the second one was the

19   ability to have a drug takeback, and the

20   third has been the development of these now

21   commercially available bags that you can pour

22   extra medicines in that make them unusable,

23   are three off the top of my head without

24   rereading all of my other components here.

25   Q.    It's on page 11 that you say

1    that "in some cases, however, the pendulum

2    has swung back too far."

3                 What do you mean by that, "the

4    pendulum has swung back too far"?

5         A.    There are patients who would be

6    considered, quote, legacy patients, unquote,

7    on opioid-based pain medications, and their

8    medications are being discontinued, and the

9    outcome is a negative outcome for the

10   patient.

11        Q.    What sort of negative outcome

12   for the patient?

13        A.    From a reduction in functional

14   capacity and activity, increasing pain, and

15   an increasing suicide rate.

16        Q.    And is the primary basis for

17   your opinions in this section your clinical

18   experience?

19        A.    Clinical experience, and there

20   are some references in here as well

21   to Volkow, V-o-l-k-o-w.  Yeah, New England

22   Journal of Medicine and...

23        Q.    Any others that you would point

24   to as forming the basis for your opinions

25   here in this section?

Highly Confidential - Subject to Further Confidentiality Review

1           A.      There are a number -- there are

2     a number of others, I don't -- that are in

3     here that I don't want to -- I mean, they're

4     in here and I could -- I could find, but it

5     will take some time to do that.

6                   The other one is -- how do you

7     pronounce that?  Oquendo, O-q-u-e-n-d-o, and

8     Volkow, V-o-l-k-o-w.  Passik, the two Passik

9     articles, Dowma.

10                  So there are a series of

11     articles in here that support that concept.

12          Q.      Okay.  Thank you.

13                  When did you form this opinion?

14                  MR. BLANK:  Objection.

15                  THE WITNESS:  The opinion --

16     QUESTIONS BY MS. GAFFNEY:

17          Q.      Just to clarify, the opinion we

18     were just discussing with respect to these

19     measures -- the pendulum swinging back too

20     far.

21          A.      In the last two years.

22          Q.      Turning to the section of your

23     report on neonatal abstinence syndrome.

24          A.      Yes.

25          Q.      You state that "there's little,

1    if any, evidence that babies with neonatal

2    abstinence syndrome born to mothers who

3    receive prescription medications during

4    pregnancy and were medically managed by an

5    obstetrician have lingering effects or

6    disabilities, nor is there any evidence that

7    there's an increased cost of treatment."

8            What's the basis for that

9    statement?

10        A.    That's directly out of a -- out

11    of an article, that's number one.

12            Number two is that the

13    manage -- when -- when women who are pregnant

14    are known to have use of opiate-based pain

15    medications for whatever reason and the

16    obstetrician is supervising that process,

17    they also then alert then the neonatal units

18    of what's happening, and so there's a --

19    there's a more intensive kind of observation

20    of that process.

21            Often those mothers deliver on

22    due dates at the expected date of

23    confinement, and there are less premature

24    births.  And so that's the basis of really

25    what goes on.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Okay.  So in large part coming
 2    from your clinical experience?
 3          A.      Correct.
 4          Q.      Okay.  And you mentioned an
 5    article.
 6                  What article is that?
 7          A.      Well, hopefully I included it
 8    here.
 9                  Okay.  I don't see -- oh, here
10    it is.  One of them is "Opioid Use Disorder
11    and Rise in Pregnant Women, Practical Pain."
12                  That was one of the articles.
13          Q.      Are there any others on your
14    materials considered list?
15          A.      Not that I noted.
16          Q.      Do you consider yourself
17    familiar with the literature with respect to
18    changes in the neonatal brain following
19    prenatal opioid exposure?
20          A.      I'm not familiar with that
21    literature.
22          Q.      You state that there isn't any
23    evidence that there's an increased cost of
24    treatment for these babies with neonatal
25    abstinence syndrome whose mother has been
```

Highly Confidential - Subject to Further Confidentiality Review

1    managed by an obstetrician, but you also

2    state that the infants are immediately

3    entered into the NICU.

4                Would you agree that NICU care

5    comes with an increased cost compared to care

6    outside of the NICU?

7         A.    It probably does, uh-huh, yes.

8         Q.    Well, would you agree that NICU

9    care -- does it bring any risk, increased

10   risk, such as risk of infection?

11        A.    I don't know that literature.

12   I can't comment on that.

13        Q.    What's the basis for your

14   statement that women actively using illicit

15   drugs, that many of them have more than one

16   unexpected pregnancy?

17        A.    More than one unexpected

18   pregnancy?

19                Actually, it's women who are

20   using illicit and polysubstance abuses, they

21   tend to have unintentional pregnancies.

22        Q.    I'm just looking at the -- at a

23   line here.  It says, "Without the needed

24   ongoing recovery support through counseling

25   and medication-assisted treatment, many of

Highly Confidential - Subject to Further Confidentiality Review

1    these women have more than one unexpected

2    pregnancy."

3          A.      Yes, that also is true.

4                  What happens is they do not

5    achieve effective protection against

6    pregnancy.

7          Q.      And what's the basis for that

8    statement?

9          A.      Both some clinical observation

10   as well as reading literature and discussions

11   within the context of some of the different

12   hospital committees that I am a part of.

13         Q.      The literature that you

14   mentioned, is it on the materials considered

15   list?

16         A.      I'm not -- I don't think that

17   is.

18         Q.      And the following sentence,

19   "Most, if not all, of these children become

20   wards of the state, being raised either by

21   grandparents or foster parents," what's the

22   basis for that statement?

23         A.      The outcomes of the children

24   that I've seen who are -- whose mothers are

25   actively using and the outcomes of what I see

1    in practice currently.  The number of

2    children that are being raised by their

3    grandparents is profound.

4         Q.    Okay.  So your clinical

5    practice is the basis for that?

6         A.    Yes.

7         Q.    Okay.  Dr. Hevern, would you

8    say that you have been personally affected by

9    the opioid crisis?

10        A.    What do you mean?

11        Q.    Do you feel that the opioid

12   crisis has affected you personally in any

13   way?

14        A.    I have not personally been

15   affected by it.

16        Q.    Has it affected you

17   professionally?

18             MR. BLANK:  Objection.

19             THE WITNESS:  Yes.

20   QUESTIONS BY MS. GAFFNEY:

21        Q.    How so?

22        A.    A lot more work.

23        Q.    The type of work you're

24   referring to, is it the work you do treating

25   patients with addiction or --

1        A.      Correct.

2        Q.      Outside of your work with

3    Dechert in this case, have you ever worked

4    with any of the other law firms involved in

5    this litigation?

6                I can run through the list

7    if --

8        A.      You don't have to run through

9    the list.  The answer is no.

10        Q.      Are you familiar with any of

11    the experts working with the plaintiffs in

12    this litigation?

13        A.      What do you mean?

14        Q.      Do you know any of them

15    professionally or personally?

16        A.      No.

17        Q.      Same question for any of the

18    other defense experts?

19        A.      I've never met them.

20        Q.      Do you communicate with any of

21    the other experts offering reports on behalf

22    of the defense in this litigation?

23        A.      No, I have not.

24                MS. GAFFNEY:  We can take a

25        short break.

Highly Confidential - Subject to Further Confidentiality Review

```
1              VIDEOGRAPHER:  We're going off

2         the record at 2:10 p.m.

3          (Off the record at 2:10 p.m.)

4              VIDEOGRAPHER:  We're back on

5         the record at 2:21 p.m.

6              MS. GAFFNEY:  Dr. Hevern, I

7         don't have any further questions.  I

8         understand your counsel --

9              MR. BLANK:  Thank you, Counsel.

10             So I will have just one or two

11        questions.  So I'm going to move over

12        to the other side of the table so you

13        continue to look in the right

14        direction.  Give me a moment.

15             VIDEOGRAPHER:  Do you want to

16        go off the record?

17             CROSS-EXAMINATION

18   QUESTIONS BY MR. BLANK:

19        Q.    Dr. Hevern, just two follow-up

20   areas of questions.

21             Earlier today Ms. Gaffney asked

22   you about the fees that you received for

23   various speaker engagements over your career;

24   is that right?

25        A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      I believe you said something in

2    the range of $10,000?

3          A.      Yes, correct.

4          Q.      Was that a total amount over a

5    period of time?

6          A.      It's probably total amount over

7    the 20 years that I've spoken.

8          Q.      Okay.  And so for a typical

9    engagement, what are the fees for just a

10   one-time -- sorry, a single engagement?

11         A.      From $350 to $1,500.

12         Q.      And earlier today Ms. Gaffney

13   also asked you a number of questions about

14   presentations that you've made and speaker

15   bureau practices.

16                 Do you recall that?

17         A.      Yes.

18         Q.      And I believe that one of the

19   presentations you said you made was on

20   Butrans.

21                 Do you recall that?

22         A.      Yes.

23         Q.      And was that in a speaker

24   bureau format?

25         A.      That was a speaker bureau
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      format, correct.

2                MR. BLANK:  Okay.  I don't have

3           anything further.

4                MS. GAFFNEY:  No further

5           questions.

6                MR. BLANK:  We're off the

7           record.

8                VIDEOGRAPHER:  Okay.  This

9           concludes the videotaped deposition of

10          Gerard Hevern, MD.

11               We are going off the record at

12          2:23 p.m.

13      (Deposition concluded at 2:23 p.m.)

14                    - - - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Gerard Hevern, MD, was
     duly sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16
          _____
17        CARRIE A. CAMPBELL,
          NCRA Registered Diplomate Reporter
18        Certified Realtime Reporter
          Notary Public
19        Dated:  June 14, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2

 3

 4            I,_____, do
         hereby certify that I have read the foregoing
 5       pages and that the same is a correct
         transcription of the answers given by me to
 6       the questions therein propounded, except for
         the corrections or changes in form or
 7       substance, if any, noted in the attached
         Errata Sheet.
 8

 9

10

11

12       _____
         Gerard Hevern, M.D.                 DATE
13

14

15       Subscribed and sworn to before me this
16       _____ day of _____, 20 _____.
17       My commission expires: _____
18

19       Notary Public
20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - - - - - -

                           ERRATA

 2                      - - - - - - -

 3      PAGE    LINE   CHANGE/REASON

 4      _____   _____  _____

 5      _____   _____  _____

 6      _____   _____  _____

 7      _____   _____  _____

 8      _____   _____  _____

 9      _____   _____  _____

10      _____   _____  _____

11      _____   _____  _____

12      _____   _____  _____

13      _____   _____  _____

14      _____   _____  _____

15      _____   _____  _____

16      _____   _____  _____

17      _____   _____  _____

18      _____   _____  _____

19      _____   _____  _____

20      _____   _____  _____

21      _____   _____  _____

22      _____   _____  _____

23      _____   _____  _____

24      _____   _____  _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

                   LAWYER'S NOTES
 2                    - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```