Highly Confidential - Subject to Further Confidentiality Review

1                UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF OHIO

3                     EASTERN DIVISION

4

5      ----------------------------x

6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

7    OPIATE LITIGATION              ) 1:17-MD-2804

8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

9      ----------------------------x

10

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                CONFIDENTIALITY REVIEW

          VIDEOTAPED DEPOSITION OF PAMELA HINKLE

13

                      WASHINGTON, D.C.

14

                 THURSDAY, JANUARY 24, 2019

15

                       9:06 A.M.

16

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd

Highly Confidential - Subject to Further Confidentiality Review

1     Deposition of PAMELA HINKLE, held at the law

2     offices of:

3

4

5               ZUCKERMAN SPAEDER, LLP

6               1800 M Street, N.W.

7               Suite 1000

8               Washington, D.C. 20036

9               (202) 778-1801

10

11

12

13     Pursuant to notice, before Leslie Anne Todd,

14     Court Reporter and Notary Public in and for the

15     District of Columbia, who officiated in

16     administering the oath to the witness.

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFFS:

 4        WILLIAM BAKER, ESQUIRE

 5        BRIAN ROOF, ESQUIRE

 6        WEISMAN, KENNEDY & BERRIS, LLP

 7        101 West Prospect Avenue, Suite 1600

 8        Cleveland, Ohio 44115

 9        (216) 781-1111

10

11        JAMES A. DEROCHE, ESQUIRE

12        GARSON JOHNSON ATTORNEYS, LLC

13        101 W. Prospect Avenue

14        Midland Building, Suite 1610

15        Cleveland, Ohio 44115

16        (216) 696-9330

17

18   ON BEHALF OF CVS HEALTH AND THE WITNESS:

19        ALEXANDRA W. MILLER, ESQUIRE

20        KYLE A. CRAWFORD, ESQUIRE

21        ZUCKERMAN SPAEDER, LLP

22        1800 M Street NW, Suite 1000

23        Washington, D.C. 20036-5807

24        (202) 778-1801
```

```
 1    APPEARANCES (Continued):

 2    ON BEHALF OF CARDINAL HEALTH:

 3        JOSEPH S. BUSHUR, ESQUIRE

 4        KATELYN ADAMS, ESQUIRE (Telephonically)

 5        WILLIAMS & CONNOLLY LLP

 6        725 Twelfth Street, N.W.

 7        Washington, D.C. 20005

 8        (202) 434-5107

 9

10    ON BEHALF OF McKESSON CORPORATION:

11        MEGHAN MONAGHAN, ESQUIRE

12        COVINGTON & BURLING LLP

13        One City Center

14        850 Tenth Street, N.W.

15        Washington, D.C. 20001-4956

16        (202) 662-5261

17

18    ON BEHALF OF WALMART:

19        CHRISTINE D. PROROK, ESQUIRE (Telephonically)

20        PATRICK DuBOIS, ESQUIRE (Telephonically)

21        JONES DAY

22        77 West Wacker Drive

23        Chicago, Illinois 60601-1692

24        (312) 782-3939
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2        JUSTIN C. TAYLOR, ESQUIRE (Telephonically)

 3        BAILEY & WYANT, PLLC

 4        Suite 600

 5        500 Virginia Street East

 6        Charleston, West Virginia 25301

 7        (304) 345-4222

 8

 9   ON BEHALF OF HBC COMPANY:

10        ELLY HELLER-TOIG, ESQUIRE (Telephonically)

11        MARCUS & SHAPIRA LLP

12        One Oxford Centre, 35th Floor

13        Pittsburgh, Pennsylvania 15219

14        (412) 471-3490

15

16   ON BEHALF OF AMERISOURCEBERGEN:

17        M. JANE BRANNON, ESQUIRE (Telephonically)

18        JON L. ANDERSON, ESQUIRE (Telephonically)

19        JACKSON KELLY, PLLC

20        175 East Main Street

21        Lexington, Kentucky 40507

22        (859) 288-2805

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:

 4        DAVID KOUBA, ESQUIRE (Telephonically)

 5        ARNOLD & PORTER KAYE SCHOLER LLP

 6        601 Massachusetts Avenue, N.W.

 7        Washington, DC 20001-3743

 8        (202) 942-5435

 9

10   ALSO PRESENT:

11        PATTI CARDINAL (Telephonically)

12        AMY KENNEDY (Telephonically)

13        STEPHANIE HACKMAN (Paralegal)

14        ZACH HONE (Trial technician)

15        DANIEL HOLMSTOCK (Videographer)

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               C O N T E N T S

 2   EXAMINATION OF PAMELA HINKLE              PAGE

 3       By Mr. Baker                      12, 299

 4       By Mr. DeRoche                        238

 5

 6                 E X H I B I T S

 7             (Attached to transcript)

 8   CVS-HINKLE DEPOSITION EXHIBITS            PAGE
```

```
 9   No. 40    E-mail re FW: Top 10 Report Review,

10             Bates CVS-MDLT1-000019491         300

11   No. 41    E-mail string re FW: Attorney/Client

12             Privileged Information, Bates

13             CVS-MDLT1-000083855 to 000083856   48

14   No. 203   E-mail string The CVS Retunement,

15             Bates CVS-MDLT1-000022040 to

16             000022053                        259

17   No. 207   Required Headcount to Complete

18             IRR SOM Process, Bates CVS-MDLT1-

19             000029884                        263

20   No. 223   E-mail string re IRR Recap...

21             Privileged and Confidential/

22             Attorney Client Privilege, Bates

23             CVS-MDLT1-000110414 (with

24             attachment)                      271
```

```
 1              E X H I B I T S (Continued)

 2               (Attached to transcript)

 3    CVS-HINKLE DEPOSITION EXHIBITS              PAGE

 4    No. 228   IRR dated October 2nd, 2011,

 5              Bates CVS-MDLT1-000056304 to

 6              000056341                         276

 7    No. 229   Document titled "October 2011

 8              Control IRR Recap"               286

 9    No. 231   Document titled "November 2011

10              Control IRR Recap"               296

11    No. 232   IRR recap for November 29, 2011,

12              Bates CVS-MDLT1-000056888 to

13              000056908                         287

14    No. 500   Dear Registrant letter from the

15              DEA to CVS TN Distribution, Inc.,

16              dated December 27, 2007, Bates

17              CVS-MDLT1-000115464 to 000115466  187

18    No. 508   Document titled "List I Chemicals

19              (PSE, EPH) and Control Drug Policy

20              & Procedure, Bates CVS-MDLT1-

21              000009812 to 000009814            206

22    No. 509   E-mail string re IRR Narratives,

23              Bates CVS-MDLT1-000109803 to

24              000109806                         216
```

```
 1                E X H I B I T S (Continued)

 2                 (Attached to transcript)

 3    CVS-HINKLE DEPOSITION EXHIBITS                    PAGE

 4    No. 511   E-mail string re IRR Narratives,

 5              Bates CVS-MDLT1-000109843 to

 6              000109859                               220

 7    No. 512   CVS Distribution Center, Controlled

 8              Drug - DEA Standard Operating

 9              Procedures Manual, Bates CVS-MDLT1-

10              000021018 to 000021083                 201

11    No. 513   CVS Corporation, Item Review

12              Report, Control Drugs, Bates

13              CVS-MDLT1-000024496 to 000024497       194

14    No. 514   PSE IRR Recap reports, Bates

15              CVS-MDLT1-000020397 to 000020412       102

16    No. 516   E-mail string re IRR/SOM

17              Retunement BSR_LOG_61148, Bates

18              CVS-MDLT1-000057759                      26

19    No. 522   E-mail re Emailing: DEA Speaking

20              Points IRR.ppt, Bates CVS-MDLT1-

21              000088134 to 000088146                  73

22    No. 523   E-mail re FW: [Blank], Bates

23              CVS-MDLT1-000020425 to 000020428

24              (with attachment)                      150
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3    CVS-HINKLE DEPOSITION EXHIBITS              PAGE

 4    No. 536   E-mail re Justication (2).docx,

 5              Bates CVS-MDLT1-000033498 to

 6              000033499                           81

 7    No. 538   E-mail string re FW: The CVS

 8              Retunement Attorney Client

 9              Privilege, Bates CVS-MDLT1-

10              000022040 to 000022053            59

11    No. 550   E-mail string re Attorney

12              Privileged and confidential,

13              Bates CVS-MDLT1-000100265 to

14              000100268                          97

15    No. 554   E-mail re DEA Closing Remarks,

16              Bates CVS-MDLT1-000008385 to

17              000008386                         179

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2              -------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4     record.  My name is Daniel Holmstock.  I am the

 5     videographer for Golkow Litigation Services.

 6              Today's date is January 24, 2019.  The

 7     time on the video screen is 9:06 a.m.

 8              This deposition is being held at the law

 9     offices of Zuckerman Spaeder, LLP, at 1800 M

10     Street, Northwest, Suite 1000, in Washington,

11     D.C., in the matter of In Re:  National

12     Prescription Opiate Litigation, MDL No. 2804,

13     pending before the United States District Court

14     for the Northern District of Ohio, Eastern

15     Division.

16              The deponent today is Pam Hinkle.

17              Counsel will be noted for appearances on

18     the stenographic record.

19              The court reporter is Leslie Todd, who

20     will now administer the oath.

21                   PAMELA HINKLE,

22          and having been first duly sworn,

23          was examined and testified as follows:

24                   DIRECT EXAMINATION
```

```
 1   BY MR. BAKER:

 2        Q    Your name is Pam Hinkle?

 3        A    Yes, sir.

 4        Q    And are you represented by Ms. Miller

 5   sitting next to you?

 6        A    Yes, sir.

 7        Q    Okay.  Ms. Miller also represents CVS?

 8        A    Yes, sir.

 9        Q    Okay.  Where are you employed?

10        A    Where?

11        Q    Where are you employed?

12        A    CVS.

13        Q    There are certainly different names for

14   CVS entities.  Which entity employs you?

15             MS. MILLER:  Object to form.

16             THE WITNESS:  CVS Logistics.

17   BY MR. BAKER:

18        Q    Okay.  Throughout this deposition, there

19   will be many times that Ms. Miller says "Object"

20   or "Object to form."  Just so you know, that --

21   she's probably told you, but I'm just going to

22   repeat it -- that that doesn't mean that you

23   should fail to answer the question.  It's just

24   what lawyers do is they object, and then that just
```

```
 1    preserves the opportunity later to maybe go to a

 2    judge to try to reformulate something referencing

 3    the question or the answer.

 4              So I don't want you to be thrown off,

 5    and I don't want to stop and have a lot of pause

 6    between my question and your answer simply because

 7    the word "Object to form" or that phrase is said.

 8    Okay?

 9         A    Yes, sir.

10         Q    And if she tells you to not answer the

11    question, then that is her prerogative, and you

12    should obey whatever she tells you to do because

13    she is your lawyer.  Okay?

14         A    Yes, sir.

15         Q    But the only time you wouldn't answer is

16    when she says, I'm instructing her not to answer.

17    Okay?

18              And also with my questions, I'm going to

19    try to be as direct as I can be.  And I would

20    appreciate it in response if you could be as

21    direct in the response as you could be too.  It

22    will help us move through this smoothly, and I

23    would appreciate it if you would do that.  Okay?

24         A    Yes, sir.
```

```
 1          Q    All right.

 2               MS. MILLER:  I'm going to just object to

 3     the opening.

 4     BY MR. BAKER:

 5          Q    All right.  So CVS Logistics, that's the

 6     department within which you work at CVS, correct?

 7          A    Yes, sir.

 8          Q    All right.  What is the name of the

 9     company that you work for?

10          A    CVS.

11          Q    Okay.  All right.  So what is your job

12     title -- what -- tell me when you first -- strike

13     all that.

14               When did you first go to work for CVS?

15          A    1977.

16          Q    And what was your job at that time?

17          A    General warehouse.

18          Q    Which warehouse did you work at?

19          A    In the Knoxville distribution center.

20          Q    And what were your duties?

21          A    General warehouse.  Just different

22     things:  Picking, inventory control, just general

23     warehouse at that point.

24          Q    Did any of that have to do with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   controlled substances or not?

 2        A     No, sir.

 3              MS. MILLER:  Object to form.

 4              Just give me a chance --

 5   BY MR. BAKER:

 6        Q     Ma'am --

 7              MS. MILLER:  -- after he asks his

 8   question to object.

 9   BY MR. BAKER:

10        Q     -- did any of your duties have anything

11   to do with controlled substances in the warehouse

12   at that time?

13              MS. MILLER:  Object to form.

14              THE WITNESS:  No, sir.

15   BY MR. BAKER:

16        Q     Okay.  You continued in that position

17   until when?

18        A     Approximately 1980s, 1982, '83.

19        Q     Then what did your position and title

20   become?

21        A     I was a supervisor for our front store

22   products.

23        Q     Within the logistics department in

24   Knoxville?
```

```
 1          A     Yes, sir.

 2          Q     What did that job title entail insofar

 3   as daily duties?

 4          A     I had oversight to the pickers and

 5   stockers in the front store warehouse.

 6          Q     All right.  Did those job duties have

 7   any connection with any controlled substances or

 8   not?

 9          A     No, sir.

10          Q     All right.  How long did you remain in

11   that position?

12          A     Approximately 1990 -- '97, I went into

13   the pharmacy.

14          Q     Okay.  And was that in Knoxville?

15          A     Yes, sir.

16          Q     Okay.  Explain the pharmacy, because

17   most people would think of a pharmacy as something

18   in the nature of a store, and -- and you're

19   talking about a pharmacy inside of a distribution

20   center; is that right?

21                MS. MILLER:  Object to form.

22                THE WITNESS:  Yes, sir.

23   BY MR. BAKER:

24          Q     Okay.  Explain the nature of a pharmacy
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    within a distribution center as opposed to how

 2    somebody might envision it as a pharmacy in a

 3    shopping center or a pharmacy in a standalone

 4    store.

 5              MS. MILLER:  Object to form.

 6              THE WITNESS:  The pharmacy within a

 7    distribution center is where you pick, pack and

 8    ship.  And I oversaw that process in the pharmacy.

 9    BY MR. BAKER:

10        Q    Okay.  So it's the pharmacy department

11    within the warehouse?

12        A    Yes, sir.

13        Q    Okay.  And the pharmacy department

14    within the warehouse, does that include controlled

15    substances?

16        A    Yes, sir.

17        Q    Were you having anything to do with

18    controlled substances at that point?

19        A    Yes, sir.

20        Q    And that would have been from 1997 until

21    when?

22        A    Approximately 2003 -- '02, '03.

23        Q    Okay.  What was your promotion in 2003?

24              MS. MILLER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. BAKER:

2       Q    What did your job title become in 2002,

3  2003?

4       A    The loss prevention manager.

5       Q    Was that in the Knoxville distribution

6  center?

7       A    Yes, sir.

8       Q    What were the duties associated with

9  your job as loss prevention manager from 2000 --

10  2002, 2003 onward?

11       A    Oversight to the security of that

12  particular building.

13       Q    And did you continue in that position

14  for a period of years?

15       A    Yes, sir.

16       Q    How many years?

17       A    Approximately 2008, I became the

18  regional loss prevention manager.

19       Q    Okay.  When you were the loss prevention

20  manager in the Knoxville distribution center from

21  2003 to approximately 2008, did your job have any

22  connection with controlled substances?

23            MS. MILLER:  Object to form.

24  BY MR. BAKER:

1          Q     Go ahead.

2          A     Security of the areas, yes, sir.

3          Q     What does that mean, the security of the

4    areas in connection with controlled substances?

5          A     Ensuring that they are following the

6    guidelines around the security of those areas.

7          Q     Such as the -- the vault and the fencing

8    and that sort of thing?

9                MS. MILLER:  Object to form.

10               THE WITNESS:  It was not a vault.  We

11   don't carry C-IIs.

12   BY MR. BAKER:

13         Q     Okay.

14         A     It would have been just the areas, the

15   secured areas, the caged areas, the DEA-approved

16   areas.

17         Q     Okay.  Did you have anything to do with

18   monitoring those controlled substances that were

19   within those caged areas?

20               MS. MILLER:  Object to form.

21               THE WITNESS:  Not in the security

22   capacity, no, sir.

23   BY MR. BAKER:

24         Q     Did you have anything to do during those

```
 1   years between 2003 and '08 with the suspicious

 2   order monitoring system, if any, at CVS?

 3             MS. MILLER:  Object to form.

 4             THE WITNESS:  Not that I recall, sir.

 5   BY MR. BAKER:

 6        Q    All right.  What happened in 2008?

 7        A    2000 --

 8             MS. MILLER:  Object.

 9   BY MR. BAKER:

10        Q    Go ahead.

11             MS. MILLER:  Pam, just give me a chance

12   after he asks his question to object.  Go ahead.

13   BY MR. BAKER:

14        Q    What did your position become in 2008?

15             MS. MILLER:  Object to form.

16   BY MR. BAKER:

17        Q    You just testified that you worked from

18   2003 to two -- approximately 2008 in the position

19   that you said, and then I asked you what did your

20   position become next in approximately 2008.

21             Is that question clear?

22             MS. MILLER:  Object to form.

23             THE WITNESS:  Yes, sir, it is clear.

24   BY MR. BAKER:
```

```
 1          Q     What's the answer to that question?

 2          A     I was the liaison between the

 3   distribution centers LP and the operations from a

 4   compliance component.

 5          Q     How long did you remain in that

 6   position?

 7          A     I'm still currently in that position.

 8          Q     Okay.  So I wrote down you're the

 9   liaison between the distribution centers loss

10   prevention and operations compliance; is that

11   right?

12                MS. MILLER:  Object to form.

13                THE WITNESS:  Yes, sir.

14   BY MR. BAKER:

15          Q     Okay.  So what is the name of your

16   position?

17          A     Senior manager.

18          Q     Senior manager of what?

19          A     Logistics, quality and compliance.

20          Q     Let me make sure I have this straight.

21   So from 2008 up to the present time, have you held

22   that position?

23          A     Yes, sir.

24          Q     And from 2008 to the present time, your
```

1    position has been senior manager of logistics,

2    quality and compliance.  Is that right?

3         A     Yes, sir.

4         Q     What are your duties in that position?

5         A     I support the distribution centers when

6    any of the government agencies visits that they

7    should have.  I work with the distribution centers

8    around remodels.  If they should be doing a

9    remodel in their pharmacies, what that would

10   involve.  I meet with government agencies as

11   needed.  Specific to new buildings, when we

12   construct new buildings and getting those

13   approvals, working with those government agencies.

14        Q     Since your promotion to senior manager

15   of logistics, quality and compliance in 2008, what

16   involvement have you had in that position with the

17   suspicious order monitoring program as it relates

18   to controlled substances distributed by CVS

19   distribution centers to CVS pharmacies?

20        A     I had oversight.

21        Q     What does that mean?

22        A     I had oversight to reviews for

23   suspicious order monitoring.

24        Q     Okay.  Could you go into more detail

```
 1    about what that means so I could understand what

 2    your job duties are in that respect.

 3                 MS. MILLER:  Object to form.

 4                 THE WITNESS:  I had oversight from

 5    approximately '11 till roughly the end of '12.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4      Q    Okay.  I want you to assume there was an

5   e-mail that indicated that in March of 2011 that

6   the program had been moved to Knoxville, and that

7   you were taking over the program at that point.

8           Does that sound consistent with the time

9   frame that you think the program moved to

10  Knoxville?

11          MS. MILLER:  Object to form.

12          THE WITNESS:  That would be approximate,

13  sir.

14          MR. BAKER:  Could you pull up

15  number 516, please.

16          (Exhibit No. 516 was premarked for

17          identification.)

18  BY MR. BAKER:

19      Q    This is an e-mail that's dated 3/14/11

20  from John Mortelliti to Ellen Demetrius, with a

21  copy going to you.  And it says:  "The IRR process

22  has been shifted to our Knoxville DC with the LP

23  analyst position.  I have forwarded the info to

24  Pam Hinkle, who will be overseeing the process

Highly Confidential - Subject to Further Confidentiality Review

```
 1   going forward."

 2            Do you see that?

 3       A    I do see that, sir.

 4       Q    Is that consistent with when you recall

 5   the program moving to Knoxville?

 6            MS. MILLER:  Object to form.

 7            THE WITNESS:  That sounds roughly about

 8   the time, sir.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7        Q     Was Mr. Miller one of the first

8    employees to go to work for you there within the

9    suspicious order monitoring program?

10       A     Yes, sir.

11       Q     Okay.  Do you know how long it was after

12   the program first moved to Knoxville before

13   Mr. Miller started doing any duty within the

14   suspicious order monitoring program?

15            MS. MILLER:  Object to form.

16            THE WITNESS:  I don't recall, sir.

17   BY MR. BAKER:

18       Q     Do you know how long Mr. Miller

19   performed duties within the suspicious order

20   monitoring program at Knoxville once he started

21   working there in that program?

22            MS. MILLER:  Object to form.

23            THE WITNESS:  I -- I don't recall, sir.

24   BY MR. BAKER:

 1         Q    Do you have any estimation of when that

 2    would be?

 3              MS. MILLER:  Object to form.

 4    BY MR. BAKER:

 5         Q    If you assume the program moved to

 6    Knoxville in March of 2011, approximately how long

 7    after that was it that Mr. Miller started working

 8    within the program?

 9              MS. MILLER:  Object to form.

10              THE WITNESS:  When it moved to

11    Knoxville, Shannon was -- would have been doing

12    the reviews.  I don't know the dates, sir.

13    BY MR. BAKER:

14         Q    Okay.  Would he have been one of the

15    first people to start doing the reviews once the

16    program moved there?

17         A    Yes, sir.

18              MS. MILLER:  Object to form.

19    BY MR. BAKER:

20         Q    And approximately how long did he

21    continue in that position doing the reviews?  When

22    you say "the reviews," I assume that means the

23    reviews of the IRRs; is that right?

24         A    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q    Okay.  And could you explain to me, to

2    the best of your recollection, how long Mr. Miller

3    was in that position reviewing IRRs.

4    A    Sir, I don't know the length of time.

5    I'm sorry.

6    Q    Okay.  How about Mr. Cain, Stephen Cain,

7    what was his position when the program moved to

8    Knoxville?

9         MS. MILLER:  Object to form.

10        THE WITNESS:  He was hired to conduct

11   the reviews as an analyst, sir.

12   BY MR. BAKER:

13   Q    Okay.  What was Mr. Cain's position

14   relative -- what were his duties on a daily basis

15   relative to -- to the suspicious order monitoring

16   system in Knoxville?

17   A    To review the reports.

18   Q    The item review reports?

19   A    Yes, sir.

20   Q    The IRRs?

21   A    Yes, sir.

22   Q    So did Mr. Cain do anything different

23   than what Mr. Miller did or did they do the same

24   job?

```
 1              MS. MILLER:  Object to form.

 2              THE WITNESS:  They were doing the same

 3     job, sir.

 4     BY MR. BAKER:

 5         Q    Okay.  And were they both considered LP

 6     analysts?

 7              MS. MILLER:  Object to form.

 8              THE WITNESS:  Yes, sir.

 9     BY MR. BAKER:

10         Q    How long did Mr. Cain work in that

11     position at the Knoxville office?

12         A    Sir, I don't recall.

13         Q    I'm going to just ask if you would --

14     if -- if you have to reflect, that's fine, but I

15     have a limited amount of time, and if you take

16     that long to answer between questions -- I

17     understand you're reflecting and trying to

18     remember.  If you don't remember, then if that's

19     your answer, that's fine, you don't remember.  If

20     you do, that's good too.  I'd like to know.

21              But I have a limited amount of time

22     today, and if you take that length of time between

23     each question to answer it, I'm not going to be

24     able to get through my questions.  Okay.  And it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   going to take a long time to get through them

 2   otherwise.  So if you could try to get the flow

 3   going a little quicker, I would appreciate it.

 4   Okay?

 5             All right.  So --

 6             MS. MILLER:  Mr. Baker, the witness can

 7   take the time she needs to answer your questions.

 8             MR. BAKER:  I understand, but it's --

 9   it's -- it's every single question is she's taking

10   a good 30 seconds to pause, and it's going to

11   cause me to lose the extent of time I have to go

12   through this deposition.

13   BY MR. BAKER:

14        Q    So if you know the answer, great.  If

15   you don't, just tell me you don't.  Okay?

16             So the next --

17             MS. MILLER:  Object to the colloquy.

18   BY MR. BAKER:

19        Q    All right.  The next question is --

20             MS. MILLER:  You can take the time you

21   need to answer the question.

22   BY MR. BAKER:

23

24
```

1

2

3

4          Q      Paul Lawson replaced Stephen Cain?

5          A      Yes, sir.

6          Q      And what period of time did Aaron

7     Burtner work for you when you were in the

8     Knoxville office?

9                 MS. MILLER:  Object to form.

10                THE WITNESS:  I don't recall, sir.

11    BY MR. BAKER:

12         Q      Okay.  Did Mr. Burtner replace anybody?

13         A      Yes, sir.  Shannon Miller.

14         Q      Okay.  Let me just see if I have it

15    straight.  The first two people that worked as LP

16    analysts for you when the SOM program moved to

17    Knoxville were Shannon Miller and Stephen Cain; is

18    that correct?

19         A      Yes, sir.

20         Q      Okay.  And later Paul Lawson replaced

21    Stephen Cain; is that right?

22         A      Yes, sir.

23         Q      And later Aaron Miller replaced -- Aaron

24    Burtner replaced Shannon Miller; is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MILLER:  Object to form.

 2              THE WITNESS:  Yes, sir.

 3   BY MR. BAKER:

 4       Q    Okay.  So when the program moved to

 5   Knoxville, was there always two LP analysts or

 6   were there at times just one LP analyst?

 7              MS. MILLER:  Object to form.

 8   BY MR. BAKER:

 9       Q    Working for you.

10              MS. MILLER:  Object to form.

11              THE WITNESS:  There was one when it

12   first moved to Knoxville.

13   BY MR. BAKER:

14       Q    Was that Mr. Miller?

15       A    Yes, sir.

16       Q    Okay.  And when did it become two?

17              MS. MILLER:  Object to form.

18              THE WITNESS:  I don't remember the exact

19   date.  It was shortly after it moved to Knoxville,

20   and I -- I don't remember the date, sir.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          THE WITNESS:  Sir, I didn't do the day

24     to day.  I didn't actually review the IRR.  There

1    were individuals that reported to me that actually

2    conducted those reviews.

3    BY MR. BAKER:

4         Q    Okay.  And what did you tell the people

5    that worked under you that were conducting those

6    reviews that you expected them to do with respect

7    to reviewing the IRRs?

8              MS. MILLER:  Object to form.

9              THE WITNESS:  There were criterias in

10   place that they were to go by when they were

11   reviewing those reviews, sir.  I don't remember

12   the -- the details behind -- you know, I know that

13   they looked at the reviews, each -- each customer

14   as it popped on -- that were populated, and if

15   there were reasons to believe that there were

16   additional reasons to do due diligence, then that

17   due diligence was conducted, sir.

18   BY MR. BAKER:

19        Q    Okay.  Now, Mr. Mortelliti was involved

20   with training the people that worked under you; is

21   that right?

22        A    Yes, sir.

23        Q    Okay.  Did he train all four of those

24   people or had some involvement with training of

```
 1    all four of those people?

 2              MS. MILLER:  Object to form.

 3              THE WITNESS:  I don't recall, but I

 4    will -- I don't recall if he --

 5    BY MR. BAKER:

 6         Q    Okay.  If Mr. Mortelliti testified that

 7    he trained Mr. Burtner, you would have no reason

 8    to disagree with that, correct?

 9              MS. MILLER:  Objection to form.

10              THE WITNESS:  No, sir, I would have no

11    reason to --

12    BY MR. BAKER:

13         Q    If Mr. Mortelliti testified -- I want

14    you to assume that Mr. Mortelliti has -- that his

15    testimony is to the effect that any time a

16    hydrocodone-combination product appeared on the

17    daily IRR report that that would cause him to

18    refer it for further investigation, every single

19    one of them, is that consistent with how you ran

20    your program in Knoxville?

21              MS. MILLER:  Object to form.

22              THE WITNESS:  Sir, I don't recall.

23    BY MR. BAKER:

24         Q    Okay.  You don't recall whether or not
```

Highly Confidential - Subject to Further Confidentiality Review

1    you ran your program in Knoxville such that every

2    single hydrocodone-combination product order that

3    appeared on the IRR was -- was subjected to

4    further due diligence?  You don't recall that one

5    way or the other?

18           MS. MILLER:  Bill, could we take a break

19    in a few minutes, please?

20           MR. BAKER:  I'm -- yeah, I'm -- I've

21    got -- can we get to 11:00?  We've already taken

22    two breaks and we haven't been three hours.

23           MS. MILLER:  Yeah, well, let's -- let's

24    see how -- Pam, are you ready for a break?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BAKER:  No, I'm ready to finish like

 2  until 11:00, because I don't want -- I want to

 3  finish this line of questioning, if I could.

 4              MS. MILLER:  Well, let's see.  I mean

 5  it's up to the witness.

 6              If you -- if you need a break before

 7  that --

 8              MR. BAKER:  Actually not --

 9              MS. MILLER:  -- say the word.

10              MR. BAKER:  -- because that was -- you

11  didn't ask me to take a break, but if you need a

12  bathroom break, we can do that, but I don't want

13  to take a break right in the middle of my line of

14  questioning, okay?

15              So do you need a bathroom break right

16  this minute?

17              MS. MILLER:  Are -- are you good for a

18  little bit longer, and then we can take a little

19  bit longer break?

20              MR. BAKER:  Yeah.

21              MS. MILLER:  We've been going for close

22  to 50 minutes.

23              MR. BAKER:  All right.  So let's go.

24              MS. MILLER:  Just so --
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11             MR. BAKER:  Okay.  Fair enough.  We'll

12    take a five-minute break.

13             THE VIDEOGRAPHER:  The time is 10:49

14    a.m.  We're going off the record.

15             (Recess.)

16             THE VIDEOGRAPHER:  The time is 11:05

17    a.m., and we're back on the record.

18    BY MR. BAKER:

19        Q    Ms. Hinkle, during the break that we

20    just took, it was about 15 minutes; is that right?

21             MS. MILLER:  Object to form.

22    BY MR. BAKER:

23        Q    Is that right?

24        A    Sir, I didn't look at the time.

1        Q    Give me your best estimate.

2             MS. MILLER:  Object to form.

3    BY MR. BAKER:

4        Q    Ms. Hinkle, that's a very simple

5    question.

6             I'm going to tell you that based upon

7    when we went off the record to the time we went

8    back on was about 15 minutes.

9             Do you have any reason to disagree with

10   that?

11       A    No, sir, I just don't -- I just don't --

12       Q    Did you talk to your attorney about your

13   testimony in this case during that break?

14            MS. MILLER:  I'm going to object based

15   on attorney-client privilege, and instruct the

16   witness not to answer.

17            MR. BAKER:  That is not accurate.

18   You're not supposed to talk to the witness during

19   the break.  It's just as if she's on a -- on a

20   witness stand in a federal court.  The federal

21   rules of procedure and the ethics rules permit me

22   to ask that question, and also -- also prohibit

23   you from coaching the witness or talking to the

24   witness during breaks.

```
 1   BY MR. BAKER:

 2       Q    Now, did you talk to your attorney about

 3   your testimony in this case during that break?

 4   I'm allowed to ask that question if she did.

 5            MS. MILLER:  Object.

 6            Based on attorney-client privilege, I

 7   instruct you not to answer.

 8            MR. BAKER:  Okay.  I'm going to ask you

 9   not to talk to her about her testimony during the

10   breaks, and we're not going to take an excessive

11   numbers of breaks at every 30 to 45 minutes.  If I

12   get to a middle of a line of questioning, we're

13   going to finish that line of questioning and not

14   take a break, and you're prohibited, I'm going t

15   tell you, from talking to her about her testimony

16   during breaks.

17            It's very obvious that's what you're

18   doing.  It's very obvious that the witness has

19   been coached.  And it's very obvious that she's

20   intentionally looking around and taking long

21   breaks between the questions and the time that she

22   gives the answers.  That's very obvious.

23   BY MR. BAKER:

24       Q    I've been doing this for 35 years.  I'm
```

```
1    not -- this is not my first deposition.  This is

2    not my first rodeo, ma'am.  And let me explain,

3    I'm not going to put up with it from now to the

4    end of this deposition.  No more talking to your

5    attorney during the breaks.

6              If you do, I'm going to ask you, did you

7    talk to her, and if she instructs you not to

8    answer, it's because you did talk to her.  And if

9    that happens, I'm going to call up the judge and

10   I'm going to report this.

11             Do you understand that?

12             MS. MILLER:  Objection to the speech and

13   the lecture, and I instruct you to listen to the

14   questions as you were doing before.

15   BY MR. BAKER:

16        Q    Did you talk to your attorney about your

17   testimony during the break?

18             MS. MILLER:  Objection.  Attorney-client

19   privilege.  Instruct you not to answer.

20   BY MR. BAKER:

21        Q    I'm going to tell you, Don't do it.

22             MS. MILLER:  Objection.

23   BY MR. BAKER:

24        Q    All right.  Now, let's move forward.
```

```
 1              MS. MILLER:  Objection to the tone.

 2    Objection to the treatment of the witness during

 3    this deposition.

 4              MR. BAKER:  Look, I know what's going on

 5    here --

 6              MS. MILLER:  You're out of line.

 7              MR. BAKER:  -- Ms. Miller, and you can't

 8    tell me that I'm not -- that it's not obvious

 9    what's going on.  It's very obvious.  I'm just

10    asking you not to do it.

11              MS. MILLER:  Bill, I ask you to be

12    professional and courteous.

13              MR. BAKER:  I am professional and

14    courteous --

15              MS. MILLER:  And let's move on with the

16    deposition.

17              MR. BAKER:  -- but, look, don't -- don't

18    act like that's not what just happened.

19              MS. MILLER:  Let's move on.

20              MR. BAKER:  That's exactly what

21    happened.

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

BY MR. BAKER:

5    Q    All right.  Ma'am, do you know who the

6  DEA is?

7    A    Yes, sir.

8    Q    Who is that?

9    A    Drug Enforcement Agency.

10    Q    And you realize the Drug Enforcement

11  Agency has jurisdiction over controlled substances

12  and the -- and you as a distributor of controlled

13  substances.  You understand that?

14         MS. MILLER:  Object to form.

15         THE WITNESS:  I -- I understand, sir.

16  BY MR. BAKER:

17    Q    Okay.  And this -- during the period of

18  time that you worked at CVS as a manager in the

19  department that monitored the distribution of

20  controlled substances from the distribution

21  centers to the pharmacies --

22         You understand that, correct?

23         MS. MILLER:  Object to form.

24         THE WITNESS:  Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BAKER:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 8          The question is simply this:  The IRR

 9    recap report is a recap of which orders on the IRR

10    daily report for that month were subjected by the

11    LP analyst to further due diligence review,

12    correct?

13              MS. MILLER:  Object to form.  Asked and

14    answered.

15              THE WITNESS:  The report was -- the

16    information was put on the report that -- of

17    information that they -- they would do reviews for

18    and put -- placed on that report, sir.  That's

19    what I -- I know happened.

20    BY MR. BAKER:

21          Q    Do you know why something appears on

22    this report?

23              MS. MILLER:  Object to form.

24              THE WITNESS:  They were doing reviews on

1   those -- on that information, sir.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18          MR. BAKER:  I understand your objection,

19    and you don't have to say it any more than just,

20    "Object to form."  If you say it with any more,

21    you know, vocalization, it doesn't make it any

22    more of an objection.  In fact, I will be happy to

23    give you a standing objection.

24          Can we just agree that I'll give you

1    standing objection to every single question -- to

2    object to form on every single question?

3              MS. MILLER:  No, I think I'm going to

4    object to form.  It's my right.

5              MR. BAKER:  Okay.  But if you say it

6    just "object to form," without going, "Object to

7    form," and vehemently like that, that's not going

8    to make it any more of an objection than if you

9    just object.  So -- so --

10             MS. MILLER:  Well, then can I correct

11   you when you raise your voice?  Is that how this

12   is going to work?

13             MR. BAKER:  I -- I would prefer you not

14   do that.

15             MS. MILLER:  Well, I would prefer you

16   would not do that to me.  So let's -- why don't we

17   just agree that we each --

18             MR. BAKER:  But I just want to have the

19   ability to ask --

20             MS. MILLER:  -- each speak on the record

21   as we see fit.

22             MR. BAKER:  -- the question without

23   being interrupted every single time.

24             MS. MILLER:  You -- you're -- I'm

1    allowing you to ask your question, and then I'm

2    objecting, as is my right.

3              MR. BAKER:  Right.  But if you say it

4    any louder than what you're -- if you say it just

5    in this tone, "Object to form," I get it.  You

6    don't have to say, "Object to form," and spread

7    that out with such volume.  It doesn't make it any

8    more of an objection.  So but just hold the

9    objection down so that the witness can answer, I'd

10   appreciate it.

11             MS. MILLER:  Okay.  Are you going to

12   hold your volume down as well?

13             MR. BAKER:  To the extent that I need to

14   communicate, I will use volume.  So --

15             MS. MILLER:  And I reserve the right to

16   do the same.

17             MR. BAKER:  Okay.  So let's move

18   forward.



19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



    1
    2
    3
    4
    5
    6
    7
    8
    9
   10
   11
   12
   13
   14
   15
   16
   17
   18
   19
   20
   21
   22
   23          MR. BAKER:  We're going to take a break

   24    for lunch.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE VIDEOGRAPHER:   The time is

2     12:45 p.m.   We're going off the record.

3                    (Lunch recess.)

4                    THE VIDEOGRAPHER:   The time is 1:29

5     p.m., and we're back on the record.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1   a new exhibit.

2              (Exhibit No. 513 was premarked for

3              identification.)

4              MS. MILLER:  It's a new exhibit.

5              THE WITNESS:  Oh, okay.

6   BY MR. BAKER:

7        Q    All right.  Do you recognize this -- at

8   the top it says:  "Item Review Report, Control

9   Drugs," and it's the first page of an item review

10  report, 3/25/2011, with the grid sheet.

11             Do you recognize this to be something

12  that you're familiar with?

13       A    Yes, sir.

14             MS. MILLER:  Object to form.  Object

15  to the --

16             THE WITNESS:  I've seen this.

17             MR. BAKER:  She said yes.

18             MS. MILLER:  -- incomplete exhibit.

19             MR. BAKER:  She said yes.

20  BY MR. BAKER:

21       Q    All right.  So this would appear on the

22  front of all the IRRs, right?

23             MS. MILLER:  Object to form.

24             THE WITNESS:  Yes.  This would be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what -- would be familiar to me.

 2   BY MR. BAKER:

 3       Q    Okay.  Look at those attributes in the

 4   left-hand column.  Do you see those attributes?

 5       A    I do, sir.

 6       Q    Okay.  Do you know what a PZ score range

 7   is?

 8       A    Today I do not.  At that time I don't --

 9   I don't know -- I mean, I just don't know what it

10   is, sir.

11       Q    Okay.  Did you know at the time that you

12   were the suspicious order monitoring manager?

13       A    At the time I don't know.  I don't know

14   if I did or not, sir.

15       Q    All right.  And you see there at the

16   bottom where it says "Score."  Do you see that?

17       A    Yes, sir.

18       Q    All right.  And then just to the right,

19   "Description."  It says:  "Score decides if an

20   order is suspicious or not.  If it is greater than

21   a threshold value (currently .15), the order

22   is" -- and then go to the next page -- "flagged as

23   suspicious."

24           Is that what the document says?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A    That is what the document says, sir.

 2              MR. BAKER:  Okay.  Go back to the prior

 3    page where it said "Score."  All right.  And go

 4    all the way over to that -- yeah, go to the box

 5    that says -- just flag it all the way across,

 6    "Score decides," et cetera.  Okay.

 7    BY MR. BAKER:

 8         Q    It says:  "Score decides if an order is

 9    suspicious or not.  If it is greater than a

10    threshold value (currently .15), the order is

11    flagged as suspicious."  Correct?

12              MS. MILLER:  Object to form.

13    BY MR. BAKER:

14         Q    Right?

15         A    That's what the --

16              MS. MILLER:  Object to form.

17    BY MR. BAKER:

18         Q    Okay.  And then the next --

19              MS. MILLER:  Can you let her finish.

20              What were you --

21    BY MR. BAKER:

22         Q    I'm sorry, were you finished?

23         A    That was just what the document states,

24    sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    Right.  Okay.  I thought I did.  If I

2   don't let you finish, please tell me to -- please

3   hold your hand up and ask me to let you finish,

4   because I'll be glad to let you finish as long as

5   you're answering the question.  Okay?

6        A    Yes, sir.

7        Q    All right.  So the next one says,

8   "Possible Values."  It says:  "Score is a combined

9   result of all the above factors based on their

10  values and weights."  Correct?

11            MS. MILLER:  Object to form.

12  BY MR. BAKER:

13       Q    That's what it says, right?

14       A    That's what it says on the doc, yes.

15       Q    And all the above values -- if you -- if

16  you take all the above values on those attributes

17  that we're talking about, we're talking about the

18  PZ score, the PZ -- you understand all those

19  attributes on the left side are scored and that

20  the total score is at the bottom?  Do you

21  understand that?

22            MS. MILLER:  Object to form.

23            THE WITNESS:  Sir, I -- I'm -- I've seen

24  this doc.  I'm familiar with the doc, but I can't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    speak to all of the intricates.  I mean, I see

 2    what it's saying there, but I just can't speak to

 3    all of it.

 4    BY MR. BAKER:

 5        Q    Sure.  All right.  So it says in the

 6    next column, "Interpretation."  "Higher the score,

 7    more suspicious is the order."  Correct?

 8             MS. MILLER:  Object to form.

 9             THE WITNESS:  That's what it states in

10    the document.

11    BY MR. BAKER:

12        Q    Okay.  Even though over there in the

13    left-hand column where it says:  "Score decides if

14    an order is suspicious or not.  If it's -- if it

15    is a great -- if it is a -- if it is greater than

16    a threshold value (currently .15), the order

17    is" -- go to the next page -- "the order is

18    flagged as suspicious."

19             Do you see that?

20        A    I do see it states that there.

21        Q    All right.  Go back to the previous

22    page.  Even though it says that, if you go over to

23    the right, you see that .65 there?

24        A    I do see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q    Okay.  All right.

 2              MR. BAKER:  Let's see the whole document

 3    now.

 4    BY MR. BAKER:

 5         Q    It says the "Model Weight" -- see up at

 6    the top right, "Model Weight"?

 7              The model weight, and then go down to

 8    the bottom, ".65."  Do you see that?

 9         A    I do see where it states that, sir.

10         Q    Okay.  Was this suspicious order

11    monitoring algorithm system that was delivered by

12    the Buzzeo company, was it somehow changed to

13    where the score would only flag an order at .65 as

14    opposed to .15?

15              MS. MILLER:  Object to form.

16              THE WITNESS:  Sir, I'm not aware of

17    that.  I -- I'm not familiar with that at all,

18    sir.  I can't tell you.

19    BY MR. BAKER:

20         Q    If somebody had done that, and you're

21    the suspicious order monitoring manager, is that

22    something that you would want to know as a quality

23    control person in the suspicious order monitoring

24    department?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MILLER:  Object to form.

 2              THE WITNESS:  There would have been --

 3    there are experts with the data that was pulled

 4    together on this.  I would not be an expert on

 5    this particular subject, sir.

 6    BY MR. BAKER:

 7         Q    What I'm asking is, if somebody changed

 8    the program to where it would only flag an order

 9    to .65, and yet the program description said, "The

10    score decides if an order is suspicious or not.

11    If it is greater than threshold -- if it is

12    greater than a threshold value (currently .15),

13    the order is considered suspicious," and somebody

14    raised that score internally within the program

15    to .65, as a quality control person working for

16    CVS in the suspicious order monitoring program and

17    charged with reviewing the IRRs and managing the

18    people that review the IRRs, is this something

19    that you would have wanted to know?

20              MS. MILLER:  Object to form.

21              THE WITNESS:  Sir, the -- the program

22    itself is -- I would -- we would rely on the

23    experts to put that information together.  I don't

24    know what all of these -- or remember all of these
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    elements.  I don't know what these are all

2    indicating.  So I -- I -- there's experts that

3    would -- I would rely on to understand the things

4    that would go into that program for us to get

5    reports for us to review.

6    BY MR. BAKER:

7         Q    Okay.  Let's see if we can pull up the

8    SOP.  Let's go to the Exhibit 512, please.

9              (Exhibit No. 512 was premarked for

10             identification.)

11             MS. MILLER:  Is that a new exhibit or --

12             MR. BAKER:  SOP.  Hold on just one

13   second.

14   BY MR. BAKER:

15        Q    Now, you took over the program, the

16   suspicious order monitoring program in Knoxville

17   on or around March of 2011, to the best of your

18   recollection; is that correct?

19        A    Sometime in 2011, early 2011, yes, sir.

20        Q    All right.  And CVS had what's called

21   standard operating procedures that were in place

22   for the purpose of determining how things should

23   be run within CVS, correct?

24             MS. MILLER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  There are standard

 2   operating procedures, yes, sir, in place.

 3   BY MR. BAKER:

 4       Q    Okay.  And the standard operating

 5   procedure we're looking at was revised on 3/11/11,

 6   correct?

 7              MS. MILLER:  Object to form.

 8              THE WITNESS:  That's what this document

 9   states, sir, yes.

10   BY MR. BAKER:

11       Q    So when you took over as a suspicious

12   order monitoring manager in Knoxville on or about

13   March of 2011, to the best of your recollection,

14   this would have been the SOP in place at that

15   time.  Is that right?

16              MS. MILLER:  Object to form.

17              You want to take a moment to look at it?

18              THE WITNESS:  (Peruses document.)

19              Based on the date, yes, sir, I would say

20   this is -- this is the --

21   BY MR. BAKER:

22       Q    All right.  So do you remember when I

23   showed you Exhibit No. 500, do you remember the

24   paragraph that says that:  "Title 21 CFR 1301.74
```

```
 1   specifically requires that a registrant design and

 2   operate a system to disclose to the registrant

 3   suspicious of controlled substances"?  Do you

 4   remember that?

 5              MS. MILLER:  You can look at the -- you

 6   can look at the exhibit.  It's exhibit --

 7              MR. BAKER:  It's Exhibit 500.

 8              THE WITNESS:  Okay.  (Peruses document.)

 9   BY MR. BAKER:

10        Q    Yes, ma'am.  Do you remember that?

11              MS. MILLER:  Object to form.

12              THE WITNESS:  I do remember you showing

13   me this, sir.

14   BY MR. BAKER:

15        Q    Okay.  And -- and you did get this

16   document back in 2008; is that right?

17              MS. MILLER:  Object to form.

18   BY MR. BAKER:

19        Q    To the best of your recollection?

20        A    Get the Exhibit --

21        Q    This document --

22        A    -- 500?

23        Q    -- Exhibit 500, yes, ma'am.

24        A    Yes, sir.
```

```
 1          Q     And to the best of your recollection,

 2    you would have read it; is that right?

 3                MS. MILLER:  Object to form.

 4                THE WITNESS:  Yes, sir, I would have

 5    read it.

 6    BY MR. BAKER:

 7          Q     Okay.  So now let's go back to Exhibit

 8    No. 512, and let's go back where it's -- down

 9    towards the second paragraph at the bottom, it

10    says "CVS is responsible..."

11                Do you see that?

12                MR. BAKER:  Okay.  Bold that first

13    sentence if you would.

14                MS. MILLER:  Pam, he --

15                THE WITNESS:  This one?

16                MS. MILLER:  -- is on Exhibit 512 now.

17                MR. BAKER:  Yes, this is the SOP.

18                MS. MILLER:  Can you direct her where on

19    the hard copy you're looking, Bill?

20                MR. BAKER:  Sure.

21    BY MR. BAKER:

22          Q     On the first page of the hard copy of

23    Standard Operating Procedures Manual, 3/11/11.  Do

24    you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A     Yes, sir.

 2      Q     Okay.  Do you see where it says -- down

 3   to the second or third to last paragraph, it says:

 4   "CVS is responsible for ensuring compliance with

 5   DEA regulatory requirements, and that

 6   responsibility cannot be an abdicated or

 7   transferred to anyone else."

 8            Do you see that?

 9      A     I do see where it states that, sir.

10      Q     What does the word "abdicated" mean to

11   you?

12            MS. MILLER:  Object to form.

13   BY MR. BAKER:

14      Q     Do you know?

15      A     No, sir, I don't.

16      Q     What does "transferred" mean?

17      A     Transferred to anyone else.

18      Q     Okay.  So CVS, according to CVS's own

19   policy, at least -- strike that question.

20            CVS, according to its own standard

21   operating procedures manual, is responsible for

22   ensuring compliance with DEA regulatory

23   requirements, and that responsibility cannot be

24   abdicated or transferred to anyone else, at least
```

```
 1    according to this document.

 2              Is that correct?

 3              MS. MILLER:  Object to form.

 4              THE WITNESS:  That's what the document

 5    states, yes.

 6              MR. BAKER:  Let's go to Exhibit 508,

 7    please.

 8              (Exhibit No. 508 was premarked for

 9              identification.)

10    BY MR. BAKER:

11        Q    All right.  Within the logistics

12    department, are there separate policies and

13    procedures that are published aside from the

14    master policy standard operating procedure manual

15    that is within CVS corporate?

16              MS. MILLER:  Object to form.

17              THE WITNESS:  The standard operating

18    procedures are for -- you know, each business

19    unit, separate SOPs, but they're all -- they start

20    at the corporate office.

21    BY MR. BAKER:

22        Q    Okay.  The thick one that we just went

23    through that's dated 3/11/11 -- you know, that we

24    went through the first page that was about 60 or
```

Highly Confidential - Subject to Further Confidentiality Review

1    65 pages long?

2         A    Yes, sir.

3         Q    All right.  Is that considered something

4    that's the overall corporate policy and procedure

5    or -- or how does that work?

6              MS. MILLER:  Object to form.

7    BY MR. BAKER:

8         Q    I know it has separate departments

9    identified within it, but -- do you know what I'm

10   asking?

11             MS. MILLER:  Object to form.

12             THE WITNESS:  Yes, I -- I believe so.

13   BY MR. BAKER:

14        Q    Okay.  All right.  So when we have a

15   separate type of policy and procedure, such as you

16   see in Exhibit 508 here -- look at the top, it

17   says "Logistics IRR Analyst."  Do you see that?

18        A    I do see that.

19        Q    Okay.  How does that get generated as a

20   separate document, separate and apart from the

21   document that I showed you that was dated 3/11/11?

22             MS. MILLER:  Object to form.

23   BY MR. BAKER:

24        Q    Do you know?

 1                    MS. MILLER:  Object to form.

 2                    THE WITNESS:  I don't know how they

 3      differentiate between each of the policies.

 4      BY MR. BAKER:

 5           Q    Okay.  Would this effective date of

 6      June -- June 28, 2011, that would have been when

 7      you were employed at CVS in the SOM department in

 8      Nashville; is that correct?

 9                    MS. MILLER:  Object to form.

10                    THE WITNESS:  I was employed in the

11      Knoxville distribution center, yes, sir.

12      BY MR. BAKER:

13           Q    Okay.  And review date of March 28,

14      2012, you still would have been employed in

15      Knoxville in the suspicious order monitoring

16      department; is that correct?

17                    MS. MILLER:  Object to form.

18                    THE WITNESS:  Yes, sir, I believe I -- I

19      believe so.

20      BY MR. BAKER:

21           Q    Okay.  And that department was

22      considered logistics; is that right?

23                    MS. MILLER:  Object to form.

24      BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q     It was part of the logistics department?

 2        A     Yes, sir, it was part of the logistics

 3   department.

 4        Q     And this title of this document is

 5   "Logistics IRR Analyst, Suspicious Transactions."

 6   Do you see that?

 7             MS. MILLER:  Object to form.

 8   BY MR. BAKER:

 9        Q     Do you see that?

10             MS. MILLER:  I don't see that, Bill.

11             MR. BAKER:  Up at the top.  Okay.  Maybe

12   this one is different -- yeah, this one looks

13   different.

14             MS. MILLER:  Yeah.

15             MR. BAKER:  I'm sorry.

16             MS. MILLER:  Because that's not what --

17   that's not the document we're looking at.

18             MR. BAKER:  Is this the 508 -- is that

19   the 508 that you have?

20             Okay, we'll put this under the ELMO

21   then.  I'll do it this way.

22   BY MR. BAKER:

23        Q     Do you see this -- I have it here on the

24   screen under the ELMO.  Do you see where it says
```

```
 1   "Logistics IRR Analyst - Suspicious Order

 2   Monitoring (SOM) Program."  Do you see that?

 3        A    I do see that.

 4        Q    Okay.  And the effective date is

 5   June 28, 2011, with last revision date March 28,

 6   2012, correct?

 7        A    I do see that, sir.

 8        Q    Okay.  Do you see where the document is

 9   highlighted where it says "Thresholds" right here

10   where I'm drawing that line?  Do you see that?

11        A    I do, sir.

12        Q    It says:  "CVS has established

13   thresholds that restrict the amount of Control

14   Drugs, PSE, and other List I chemicals that can be

15   ordered by each store within a specific time

16   frame.  These thresholds and subsequent analysis

17   of irregular activity are the primary tools to

18   stop suspicious orders of common drugs -- of

19   Control Drugs, PSE, and other List I chemicals.

20   These thresholds and in-depth order analysis are

21   based on historical trends of sales, individual

22   store ordering patterns, and other suspicious

23   order prevention methods."

24             Is that what the document says so far?
```

```
 1           A     It is what the document states.

 2           Q     Then it goes on to state, and I would

 3     like to bold this, it says:  "Stores may not order

 4     more than the threshold amount, and the DC may not

 5     ship amounts that exceed these thresholds."

 6                 Is that what the document says?

 7                 MS. MILLER:  Object to form.

 8                 THE WITNESS:  That's what the document

 9     indicated, yes, sir.

10     BY MR. BAKER:

11           Q     Okay.  And would this document have

12     governed your department during the period of time

13     that this particular policy and procedure was in

14     effect at CVS in the logistics department as it

15     related to suspicious order monitoring and the SOM

16     program?

17                 MS. MILLER:  Object to form.

18                 THE WITNESS:  I don't recall the actual

19     document, but they -- we had procedures in place

20     that -- what we would follow.

21     BY MR. BAKER:

22           Q     And was this one of them?

23                 MS. MILLER:  Object to form.

24                 THE WITNESS:  I do believe that there
```

1    are thresholds, sir.

2    BY MR. BAKER:

3        Q    Was this the policy in effect during

4    that time frame that was -- was for the purpose of

5    something that was to be followed in the

6    "Logistics IRR Analyst, Suspicious Order

7    Monitoring Program"?

8            MS. MILLER:  Object to form.

9            THE WITNESS:  Based on the dates, it --

10   of this document, I just don't recall this actual

11   document because of the years passed, but it

12   appears to be a document that we would have used.

13   BY MR. BAKER:

14       Q    Okay.  And again, when you were talking

15   about thresholds, the threshold that we were

16   talking about under the suspicious order

17   monitoring system that was developed by the Buzzeo

18   company, do you recall that to be .15 from the

19   document I showed you?

20           MS. MILLER:  Object to form.

21   BY MR. BAKER:

22       Q    Do you remember that, ma'am?

23           MS. MILLER:  Object to form.

24           THE WITNESS:  I don't -- I don't know

1    what the algorithms were.  I don't remember that

2    piece.

3    BY MR. BAKER:

4        Q    Okay.  Let's see if I can refresh your

5    recollection.  Let's go back to that piece.  And

6    that piece is 513.

7             And down at the bottom where it says,

8    "Score" -- do you see the "Score"?  Where it says,

9    "Score decides if an order is suspicious or not"?

10            MS. MILLER:  Object to form.

11   BY MR. BAKER:

12       Q    Do you see that?

13            MS. MILLER:  Object to form.

14   BY MR. BAKER:

15       Q    Does this refresh your recollection,

16   this document, what I'm showing you?

17       A    This document --

18            MS. MILLER:  Object to form.

19            THE WITNESS:  -- I see what it states.

20   BY MR. BAKER:

21       Q    Does that refresh your recollection as

22   to what the document shows, having the document in

23   front of you?

24       A    Yes, that it states the .15.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Right.  And it says:  "If it's greater

 2   than a threshold value (currently .15), the order

 3   is," then go to the next page, "flagged as

 4   suspicious."

 5             Is that what the document says?

 6             MS. MILLER:  Object to form.

 7             THE WITNESS:  That's what the document

 8   states, sir.

 9   BY MR. BAKER:

10        Q    All right.  The purpose of thresholds is

11   so that there can be some sort of way to measure

12   whether or not an order is considered to be

13   suspicious, correct?

14             MS. MILLER:  Object to form.

15             THE WITNESS:  There's a -- CVS uses

16   thresholds as far as -- and this is, again, just

17   on what I know as a threshold and ways --

18   different ways as far as the thresholds for a

19   specific drug.  I do -- I mean, I remember the --

20   the threshold -- I mean, the -- the name

21   threshold.  I know that it was -- it's

22   something with -- in our -- the systems that they

23   use thresholds, but I don't know the exacts around

24   the thresholds and how they're all -- how it's
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13        THE VIDEOGRAPHER:   The time is 2:03 p.m.

14    We're going off the record.

15            (Pause.)

16        THE VIDEOGRAPHER:   The time is 2:04 p.m.

17    We're back on the record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          I think I'm going to pass the mic over

13   to my co-counsel, and we can take a break.  Thank

14   you.

15          THE VIDEOGRAPHER:  The time is 2:23

16   p.m., and we're going off the record.

17          (Recess.)

18          THE VIDEOGRAPHER:  The time is 2:36

19   p.m., and we're back on the record.

20          FURTHER DIRECT EXAMINATION

21   BY MR. DE ROCHE:

22       Q    Good afternoon.  My name is Jim

23   De Roche, and I've got some -- a few follow-up

24   questions for you this afternoon.

1          First of all, I want to learn more about

2     Pam Hinkle, because we didn't really get a lot of

3     background on you.

4          First of all, where -- did you go to

5     college?

6          A    I did not go to college.

7          Q    Okay.  You're a high school graduate?

8          A    I am.

9          Q    Okay.  Do you have any training at all

10    with respect to DEA regulations?

11          MS. MILLER:  Object to form.

12    BY MR. DE ROCHE:

13          Q    At any point in time.

14          A    Over my years, yes, sir, I've had

15    training.

16          Q    Okay.  Well, I want to know what that

17    training was, when you received it, who gave you

18    to you.  So lay it out for us.

19          MS. MILLER:  Object to form.

20          THE WITNESS:  Sir, I don't have -- I

21    don't have time frames.  I don't have specifics.

22    I don't have that information, sir.

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8             MS. MILLER:  Object to form.

9             MR. DE ROCHE:  What is the basis of the

10   objection, Counsel?

11            MS. MILLER:  What year what?

12            MR. DE ROCHE:  What year -- what year?

13   The context of the question was quite clear.  What

14   was the basis for your objection?

15            MS. MILLER:  Well, your question was

16   what year.

17            MR. DE ROCHE:  Right.  Why is that

18   objectionable?  What's wrong with that form of

19   question?

20            MS. MILLER:  There's no -- there's no

21   context to that.

22            MR. DE ROCHE:  The context was the prior

23   answer she gave.  That's pretty clear, isn't it?

24            MS. MILLER:  Could you please --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. DE ROCHE:  No, I'm not going to

 2     listen to objections that are baseless.  You can

 3     object to form if you have a basis for it.  You

 4     can't sit there and object to every question with

 5     a completely baseless objection.

 6                MS. MILLER:  I can't object?

 7                MR. DE ROCHE:  That you can't do.

 8                MS. MILLER:  I'm objecting on the record

 9     based on my right to do so.

10                MR. DE ROCHE:  You're allowed to object

11     on the record when you have a basis for it.

12                MS. MILLER:  Well, if your question --

13                MR. DE ROCHE:  Not just when you're just

14     asking -- objecting to every question.

15                MS. MILLER:  I can object --

16                MR. DE ROCHE:  We've put up with that

17     all day today.

18                MS. MILLER:  I can object based on

19     grounds that I see fit.  You cannot tell me how --

20                MR. DE ROCHE:  If you have grounds, you

21     can object.  I agree, Counsel.

22                MS. MILLER:  -- how to do my job.  I'm

23     objecting to form.

24                MR. DE ROCHE:  When it's baseless just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to interfere, you can't.

 2              MS. MILLER:  I'm not interfering.  I'm

 3   stating it on the record.  I have a right to

 4   object to form on the record.  I'm sorry if you

 5   don't like the way this process works.

 6              MR. DE ROCHE:  Well, I don't like the

 7   way the process has been perverted by objections

 8   that are baseless.  That's what I object to.

 9              MS. MILLER:  Oh, you're objecting to

10   the -- you're objecting to an attorney objecting

11   on the record.

12              MR. DE ROCHE:  For baseless reasons,

13   yeah, I am.

14              MS. MILLER:  It's not --

15              MR. DE ROCHE:  You bet your -- you bet I

16   am.

17              MS. MILLER:  It's not baseless reasons.

18   And I would just ask that you would refrain from

19   having this colloquy when I am simply doing

20   exactly what I'm entitled to do, which is object

21   to form on the record.

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6             MS. MILLER:  Jim, we've been going for a

7    while.  Can we take a quick break?

8             MR. DE ROCHE:  Sure.

9             THE VIDEOGRAPHER:  The time is

10   3:22 p.m., and we're going off the record.

11            (Recess.)

12            THE VIDEOGRAPHER:  The time is

13   3:33 p.m., and we're back on the record.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



4          MR. DE ROCHE:   Let's go to 231.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14          MR. DE ROCHE:  I have nothing further.

15          MS. MILLER:  Do you have --

16          MR. DE ROCHE:  We're done.

17          MS. MILLER:  We're going to take -- I'd

18  ask to have a ten-minute break --

19          THE VIDEOGRAPHER:  The time is --

20          MS. MILLER:  -- to determine whether we

21  want to review, and we may come back and do a

22  redirect.

23          THE VIDEOGRAPHER:  The time is 3:59 p.m.

24  We're going off the record.

```
 1              (Recess.)

 2              THE VIDEOGRAPHER:  The time is

 3   4:16 p.m., and we're back on the record.

 4                 REDIRECT EXAMINATION

 5   BY MR. BAKER:

 6        Q    Ms. Hinkle, have you --

 7              THE VIDEOGRAPHER:  Hold on.  Thank you.

 8   BY MR. BAKER:

 9        Q    Have you been employed for 41 straight

10   years with CVS?

11        A    Yes, sir, I have.

12        Q    Have you been employed anywhere else

13   during that 41 years?

14        A    No, sir, I have not.

15        Q    How old were you when you went to work

16   for them?

17        A    I was right out of high school.  I was

18   18, I believe.

19        Q    Okay.  So that would you make you how

20   old right now, 59?

21              MS. MILLER:  Object to form.

22   BY MR. BAKER:

23        Q    Is that right?

24        A    60.
```

```
1          Q    Okay.  Do you plan to retire at CVS?

2               MS. MILLER:  Object to form.

3               THE WITNESS:  Yes, sir, I do plan to

4    retire at CVS.

5    BY MR. BAKER:

6          Q    Do you consider CVS part of your family?

7               MS. MILLER:  Object to form.

8    BY MR. BAKER:

9          Q    If you've been with them 41 years?

10              MS. MILLER:  Object to form.

11              THE WITNESS:  I have a high respect for

12   my job and for my company --

13   BY MR. BAKER:

14         Q    Sure.

15         A    -- as I do anybody -- anything.

16         Q    I understand.

17              So let me show you Exhibit No. 40.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          MR. BAKER:  Thank you very much.  No

24     further questions.

Highly Confidential - Subject to Further Confidentiality Review

1              MS. MILLER:  No questions.

2              THE VIDEOGRAPHER:  Okay.  The time is

3    4:21 p.m., January 24, 2019.  Going off the

4    record, concluding the videotaped deposition.

5              (Whereupon, the deposition of

6              PAMELA HINKLE was concluded

7              at 4:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2          The undersigned Certified Shorthand Reporter

 3   does hereby certify:

 4          That the foregoing proceeding was taken before

 5   me at the time and place therein set forth, at which

 6   time the witness was duly sworn; That the testimony

 7   of the witness and all objections made at the time

 8   of the examination were recorded stenographically by

 9   me and were thereafter transcribed, said transcript

10   being a true and correct copy of my shorthand notes

11   thereof; That the dismantling of the original

12   transcript will void the reporter's certificate.

13          In witness thereof, I have subscribed my name

14   this date:  January 28, 2019.

15

16

17                      _____

18                      LESLIE A. TODD, CSR, RPR

19                      Certificate No. 5129

20   (The foregoing certification of

21   this transcript does not apply to any

22   reproduction of the same by any means,

23   unless under the direct control and/or

24   supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2        Please read your deposition over carefully and

 3   make any necessary corrections. You should state the

 4   reason in the appropriate space on the errata sheet

 5   for any corrections that are made.

 6   After doing so, please sign the errata sheet

 7   and date it.

 8        You are signing same subject to the changes you

 9   have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative that

11   you return the original errata sheet to the deposing

12   attorney within thirty (30) days of receipt of the

13   deposition transcript by you. If you fail to do so,

14   the deposition transcript may be deemed to be

15   accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   - - - - - -

 2                   E R R A T A

 3                   - - - - - -

 4    PAGE LINE CHANGE

 5    _____ _____ _____

 6    REASON: _____

 7    _____ _____ _____

 8    REASON: _____

 9    _____ _____ _____

10    REASON: _____

11    _____ _____ _____

12    REASON: _____

13    _____ _____ _____

14    REASON: _____

15    _____ _____ _____

16    REASON: _____

17    _____ _____ _____

18    REASON: _____

19    _____ _____ _____

20    REASON: _____

21    _____ _____ _____

22    REASON: _____

23    _____ _____ _____

24    REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2       I,_____, do hereby

3   certify that I have read the foregoing pages, and

4   that the same is a correct transcription of the

5   answers given by me to the questions therein

6   propounded, except for the corrections or changes in

7   form or substance, if any, noted in the attached

8   Errata Sheet.

9

10  _____

11  PAMELA HINKLE                         DATE

12

13

14  Subscribed and sworn to

15  before me this

16  _____day of_____,20___.

17  My commission expires:_____

18  _____

19  Notary Public

20

21

22

23

24
```