1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION
3

     IN RE: NATIONAL          )
4    PRESCRIPTION             )   MDL No. 2804
     OPIATE LITIGATION        )
5    _____   )   Case No.
                              )   1:17-MD-2804
6                             )
     THIS DOCUMENT RELATES    )   Hon. Dan A.
7    TO ALL CASES             )   Polster
8
                THURSDAY, JUNE 20, 2019
9

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                     - - -
12          Videotaped deposition of James
13   Hughes, Ph.D., held at the offices of
14   Covington &  Burling, LLP, 620 Eighth Avenue,
15   New York, New York, commencing at 9:40 a.m.,
16   on the above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter and Certified
18   Realtime Reporter.
19
20
21                     - - -
22

              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25

```
 1              A P P E A R A N C E S :
 2
 3
         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
 4       BY:  RACHEL GEMAN
              rgeman@lchb.com
 5            VALERIE D. COMENENCIA ORTIZ
         250 Hudson Street, 8th Floor
 6       New York, New York 10013
         (212) 355-9500
 7
 8
         SIMMONS HANLY CONROY, LLC
 9       BY:  SANFORD SMOKLER
              ssmokler@simmonsfirm.com
10            (VIA REALTIME STREAM)
         112 Madison Avenue, Seventh Floor
11       New York, New York 10016
         (212) 784-6400
12
13
         BARON & BUDD P.C.
14       BY:  JAY LICHTER
              Jlichter@baronbudd.com
15            (VIA REALTIME STREAM)
         15910 Ventura Boulevard, Suite 1600
16       Encino, California 91436
         (818) 839-2333
17       Counsel for Plaintiffs
18
19       COVINGTON & BURLING LLP
         BY:  RONALD G. DOVE, JR.
20            rdove@cov.com
              ANNA Q. HAN
21            ahan@cov.com
         850 Tenth Street, NW
22       Washington, DC 20001-4956
         (202) 662-6000
23       Counsel for McKesson Corporation
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        DECHERT LLP
          BY: DANIEL GOLDBERG-GRADESS
 2            Daniel.Goldberg-Gradess@dechert.com
          1095 Avenue of the Americas
 3        New York, New York 10036
          (212) 698-3500
 4        Counsel for Purdue Pharma
 5
 6        O'MELVENY & MYERS LLP
          BY:  CAMERON BAGHAI
 7            cbaghai@omm.com
              (VIA TELECONFERENCE)
 8        610 Newport Center Drive, 17th Floor
          Newport Beach, California 92660
 9        (949) 823-6900
          Counsel for Janssen and Johnson &
10        Johnson
11
12        ZUCKERMAN SPAEDER LLP
          BY:  R. MILES CLARK
13            mclark@zuckerman.com
              (VIA TELECONFERENCE)
14        1800 M Street NW, Suite 1000
          Washington, DC  20036-5807
15        (202) 778-1800
          Counsel for CVS Indiana, LLC, and
16        CVS RX Services, Inc.
17
18        MARCUS & SHAPIRA LLP
          BY:  DARLENE NOWAK
19            nowak@marcus-shapira.com
              (VIA  TELECONFERENCE)
20        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
21        (412) 338-4690
          Counsel for HBC
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        FOLEY & LARDNER LLP
          BY:  KATY E. KOSKI
 2             kkoski@foley.com
               (VIA REALTIME STREAM)
 3        111 Huntington Avenue
          Boston, Massachusetts 02199-7610
 4        (617) 502-3242
          Counsel for Anda
 5

 6
          CAVITCH FAMILO & DURKIN, CO., L.P.A.
 7        BY:  ROBERT WEST
               rwest@cavitch.com
 8             (VIA TELECONFERENCE)
          1300 East 9th Street
 9        Cleveland, Ohio  44114
          (216) 621-7860
10        Counsel for Discount Drug Mart
11
12        BAILEY WYANT PLLC
          BY:  JUSTIN TAYLOR
13             jtaylor@baileywyant.com
               (VIA REALTIME STREAM)
14        500 Virginia Street East, Suite 600
          Charleston, West Virginia 25301
15        (304) 345-4222
          Counsel for West Virginia Board of
16        Pharmacy
17
18    VIDEOGRAPHER:
              DAN LAWLOR,
19         Golkow Litigation Services
20
                       - - -
21
22
23
24
25
```

```
 1                      INDEX
 2                                        PAGE
 3   APPEARANCES..................................   2
 4   EXAMINATIONS
 5     BY MS. GEMAN..............................    8
 6
 7                   EXHIBITS
 8    No.     Description                    Page
 9   Hughes 1  Plaintiffs' Amended Notice of    8
              Oral Videotaped Expert
10            Deposition of James Hughes
11   Hughes 2  James W. Hughes curriculum vitae  19
12   Hughes 3  James W. Hughes Experience as     51
              Testifying Expert
13
     Hughes 4  Expert Report of Professor James  92
14             W. Hughes, Ph.D., May 10, 2019
15   Hughes 5  Defense Experts Disclosed on May 105
               10, 2019
16
     Hughes 6  Plaintiffs' Experts             108
17
     Hughes 7  Cornerstone Research invoices   125
18
     Hughes 8  Invoice for May 31, 2019 James  125
19             W. Hughes
20   Hughes 9  Errata pages and attachments    125
21      (Exhibits attached to the deposition.)
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1       VIDEOGRAPHER:  We are now on

2   the record.  My name is Dan Lawlor.

3   I'm a videographer with Golkow

4   Litigation Services.

5       Today's date is June 20, 2019,

6   and the time is 9:40 a.m.

7       This video deposition is being

8   held in New York City, New York, in

9   the matter of National Prescription

10  Opiate Litigation MDL Number 2804.

11      The deponent is James Hughes.

12      Counsel please identify

13  yourselves beginning with plaintiffs.

14      MS. GEMAN:  Good morning.

15  Rachel Geman, Lieff Cabraser, for

16  plaintiffs.

17      MS. ORTIZ:  Valerie Comenencia

18  Ortiz, Lieff Cabraser as well.

19      MR. DOVE:  Ron Dove, Covington

20  & Burling, for McKesson Corporation.

21      MS. HAN:  Anna Han, also from

22  Covington & Burling for McKesson.

23      MR. GRADESS:  Daniel

24  Goldberg-Gradess with Dechert for

25  Purdue.

```
 1                    VIDEOGRAPHER:  Counsel on the
 2         phone, please?
 3                    MR. BAGHAI:  Cameron Baghai
 4         from Johnson & Johnson on behalf of --
 5         pardon me, from O'Melveny & Myers
 6         behalf of the Johnson & Johnson and
 7         Janssen defendants.
 8                    MR. WEST:  Robert West from
 9         Cavitch on behalf of Discount Drug
10         Mart.
11                    MS. NOWAK:  Darlene Nowak,
12         Marcus & Shapira, on behalf of HBC
13         Services.
14                    MR. CLARK:  Miles Clark from
15         Zuckerman Spaeder on behalf of the CVS
16         defendants.
17                    VIDEOGRAPHER:  The court
18         reporter is Carrie Campbell and will
19         now swear in the witness.
20
21                    JAMES HUGHES, Ph.D.,
22     of lawful age, having been first duly sworn
23     to tell the truth, the whole truth and
24     nothing but the truth, deposes and says on
25     behalf of the Plaintiffs, as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

1          (Hughes Exhibit 1 marked for

2     identification.)

3

4              DIRECT EXAMINATION

5  QUESTIONS BY MS. GEMAN:

6     Q.    Good morning.  We just met off

7  the record, but again, my name is Rachel

8  Geman.

9              Do you prefer to be addressed

10 as Professor Hughes or something else?

11    A.    Professor Hughes is fine.

12 Dr. Hughes is fine.  Either one.

13    Q.    Okay.  Thanks.

14             I know you're a very

15 experienced deponent, so let me just remind

16 you that as with other depositions, you're

17 testifying under oath.

18             Do you understand that?

19    A.    I do.

20    Q.    Is there any reason you can't

21 testify truthfully today?

22    A.    No, there's not.

23             I just would point out I have a

24 medication that makes my hands shake.

25    Q.    Okay.

1      A.      So if I drink with two hands on

2  the video, it doesn't mean anything is wrong

3  with me, especially after the last attempt at

4  the deposition.

5      Q.      Okay.  We won't --

6      A.      But other than that.

7      Q.      I understand.  We won't think

8  you're nervous or anything.

9      A.      Okay.

10     Q.      I'm someone who gesticulates a

11 lot with or without medication, so we

12 understand.

13             Thank you.

14             Have you ever been a party in

15 litigation or arbitration?

16     A.      Yes.

17     Q.      How many times?

18     A.      I think just once.

19     Q.      When was that?

20     A.      That would have been from

21 about -- starting in about 1993 I was the --

22 I can't remember exactly, next friend or

23 something.  My wife had taken out a sex

24 discrimination suit against her employer, and

25 so I was a next friend party along with our

Highly Confidential - Subject to Further Confidentiality Review

1    son.

2          Q.      Oh, so you had a -- did you

3    have a consortium claim or something like

4    that?

5          A.      Yes, I think so.

6          Q.      Okay.  And do you know what

7    court that was before?

8          A.      I don't think we got any

9    further than the Human Rights Commission in

10   Massachusetts.  I don't actually think we got

11   to a court.

12         Q.      Who was the employer?

13         A.      Amherst College.

14         Q.      Is your wife an academic also?

15         A.      She's retired, but she was,

16   yes.

17         Q.      An economist?

18         A.      Yes.

19         Q.      And that was, as you say, in

20   the early '90s?

21         A.      Yeah.  Started in about 1993,

22   yeah.

23         Q.      And have you ever testified --

24   and sorry, let me strike that and reask.

25                 Did you testify under oath in

1    that proceeding?

2         A.      No, I did not.

3         Q.      Do you recall if you submitted

4    any statements or verified statements under

5    oath in writing in that proceeding?

6         A.      I don't recall specifically,

7    but I don't think so.

8         Q.      And when were you retained in

9    this matter?

10        A.      To the best of my recollection,

11   last fall.

12        Q.      Who retained you?

13        A.      That's always a good question.

14               So I was contacted through

15   Cornerstone Research, and my retention

16   letter, I believe, is with Covington.

17        Q.      And which defendants are you

18   working on behalf of?

19        A.      I started out with just

20   McKesson, and now it is McKesson and

21   AmerisourceBergen.

22        Q.      And how did it come to be that

23   you also were working on behalf of

24   AmerisourceBergen?

25        A.      Mr. Dove told me one day I was

1    working on behalf of AmerisourceBergen.

2        Q.    Okay.  Have you interacted with

3    lawyers for Amerisource?

4        A.    No.

5        Q.    Do you know who they are?

6        A.    No.

7        Q.    And is the Cornerstone work

8    indivisible, meaning is all of the work that

9    they did equally applicable to both of those

10   defendants?

11       A.    Yes, as in my report, I think

12   that everything is applicable to both

13   defendants.

14       Q.    And would you say that your

15   report -- well, actually, let me strike that

16   question.

17             Had you worked with Covington

18   in the past?

19       A.    Yes.  And I'm hemming and

20   hawing a little bit because there were cases

21   that were joint defense groups, and Covington

22   was in the joint defense group.

23             Directly like this where

24   they're the main attorneys I deal with, no, I

25   don't believe so, but they've been in joint

```
 1   defense groups that I've worked.

 2        Q.     In which matters that you

 3   recall was Covington part of the joint

 4   defense group?

 5        A.     The one that comes immediately

 6   to mind is Nexium and -- that's the only one

 7   I know for certain was Nexium.

 8        Q.     And what about the other

 9   attorneys on the phone and in this room, have

10   you done work on behalf of clients that were

11   represented by any of these law firms to your

12   recollection?

13        A.     Yeah, I have a hard time

14   keeping law firms straight, so I -- the

15   honest answer is I don't know, no.

16        Q.     Have you done -- have you

17   interacted with O'Melveny before?

18        A.     Probably.

19        Q.     What about Dechert?

20        A.     Probably.

21        Q.     Okay.  What about Zuckerman

22   Spaeder?

23        A.     Sorry?

24        Q.     Zuckerman Spaeder?

25        A.     I don't believe so.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.     And have you -- and can you

2    remember on how many instances you have done

3    work for any of those law firms?  In other

4    words, on behalf of any of the clients of

5    those law firms?

6    A.     No more than twice for those

7    two.  Probably only once.

8    Q.     Are you counting this as one of

9    them?

10   A.     No.

11   Q.     Okay?  So --

12   A.     So counting this would be

13   twice.

14   Q.     So Nexium is the first one?

15   A.     Nexium is the first one with

16   Covington.  And I've done, again, a joint

17   defense group, I believe Dechert has been

18   involved and O'Melveny has been involved in

19   joint defense group, but I can't tell you

20   which cases or case.

21   Q.     So it's more than twice that

22   these firms have been in a joint defense

23   group?

24   A.     Okay.  Let's clarify what we

25   mean by "these firms."  So I know once that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I've worked with Covington in a joint defense
 2    group and in this matter.
 3              O'Melveny I believe was in one
 4    joint defense group that I worked with.
 5         Q.    Which case?
 6         A.    I couldn't tell you, but the
 7    name is familiar --
 8         Q.    An antitrust -- Oh, sorry.
 9         A.    Yes, it was a pharma case, that
10    much I would know.
11         Q.    Okay.
12         A.    And the same with -- did I
13    say O'Melveny -- same with Dechert, the name
14    is familiar.  I believe they were in a joint
15    defense group, but I had not worked with them
16    as directly as I work with Covington on this
17    case.
18         Q.    Have you done any work on
19    behalf of McKesson prior to this case?
20         A.    No.
21         Q.    Have you done any work for
22    Amerisource prior to this case?
23         A.    No.
24         Q.    Have you done any work for any
25    of the distributor defendants in this case
```

Highly Confidential - Subject to Further Confidentiality Review

1  prior to this case?

2      A.      No.

3      Q.      Have you done any work on

4  behalf of a pharmacy prior to this case?

5      A.      Pharmacy, no.

6      Q.      Okay.  And you have done

7  substantial work for pharmaceutical

8  manufacturers, correct?

9      A.      Pharmaceutical manufacturers

10  and pharmacy benefit managers.

11      Q.      What is the scope of your

12  representation in this matter?

13      A.      I was asked to perform

14  basically three tasks.  I was asked to

15  provide a primer, if you will, on the

16  operation of the pharmaceutical market, how

17  the flow of goods and payments and

18  information flows throughout this market.

19              Secondly, I was asked to

20  describe what kind of data was available to

21  payers regarding opioid prescriptions and

22  opioid consumption.

23              And third, I was asked to

24  describe what sort of tools were available to

25  payers in the -- what tools were available to

Highly Confidential - Subject to Further Confidentiality Review

1   payers in order to modify consumer and

2   physician behavior regarding opioid

3   prescriptions.

4        Q.     And previous to this, had you

5   ever done any work on behalf of payers as you

6   define them in this report?

7        A.     On -- no.

8        Q.     Did counsel give you any

9   assumptions on which you relied in preparing

10   your report?

11        A.     No.

12        Q.     Are you aware that there's a

13   trial set in this matter?

14        A.     I am.

15        Q.     Do you know when it is?

16        A.     The fall; September, October.

17        Q.     Are you planning to attend?

18        A.     I have not been asked to as of

19   yet.

20        Q.     How did you prepare for this

21   deposition?

22        A.     I reviewed my report, I

23   reviewed much of the background material, and

24   I met with counsel and with Cornerstone.

25        Q.     With whom at Cornerstone?

1    A.    At Cornerstone it was Dr. Ofer

2  Cohen.

3    Q.    O-f-e-r, C-o-h-e-n?

4    A.    Right.  Right.  Exactly as it

5  sounds.

6          And Ms. Jennifer McCabe.

7    Q.    Were they present at the

8  meetings with lawyers?

9    A.    Yes.

10   Q.    Did you meet with them

11  separately?

12   A.    Meet, no.  Talked on the phone

13  with them separately, yes.

14   Q.    Okay.  Did you generate notes

15  from those discussions?

16   A.    No.

17   Q.    How long did you spend

18  preparing for this deposition?

19   A.    Between independent work and

20  meetings, it was probably between 15 and

21  20 hours, I would think.

22   Q.    And do you --

23   A.    And part of that was just

24  expanded, because, of course, as you know, we

25  were supposed to do this a couple weeks ago,

1    and so in between there was additional

2    preparation.  So that's why it seems to be

3    quite a lot.

4         Q.    And you've mentioned that you

5    met with counsel.

6              Do you mean the two individuals

7    sitting next to you?

8         A.    Yes, Mr. Dove and Ms. Han.

9         Q.    Any other individuals?

10        A.    No.

11        Q.    In preparing your report, did

12   you speak to any individual employees of

13   McKesson or Amerisource?

14        A.    No.

15        Q.    Do you know if your team at

16   Cornerstone conducted such interviews or had

17   such conversations?

18        A.    No, I don't believe so.  They

19   wouldn't have done that without me.

20             (Hughes Exhibit 2 marked for

21        identification.)

22   QUESTIONS BY MS. GEMAN:

23        Q.    So what is being marked as

24   Exhibit 2 is the updated version of your

25   curriculum vitae.

1          Do you recognize this document?

2     A.     I do.

3     Q.     When did you prepare it?

4     A.     Within the last two weeks, put

5  it that way.

6     Q.     And is this the only CV you

7  presently use?

8     A.     Yes, this would be the CV I

9  would presently use, correct.

10     Q.     Sorry, go ahead.

11     A.     That's fine.  I'm done.

12     Q.     Who prepared this?

13     A.     I did.

14     Q.     And do you have any other

15  degrees other than those mentioned here?

16     A.     No.

17     Q.     And you mentioned that your

18  thesis was the economics of medical

19  malpractice reform?

20     A.     That's correct.

21     Q.     By "thesis," do you mean your

22  dissertation?

23     A.     Correct.

24     Q.     And was the work on that funded

25  by any pharma company?

1       A.      No, the thesis -- the

2  dissertation was not.  There was follow-on

3  research on medical malpractice reform that

4  was funded by the Robert Wood Johnson

5  Foundation, but that's it.

6       Q.      And that is Johnson & Johnson?

7       A.      They're ultimately funded by

8  Johnson & Johnson, that's my understanding.

9       Q.      Okay.  And this reminds me of

10  something I should have asked earlier, have

11  you ever done any litigation or --

12  litigation-related work on behalf of Johnson

13  & Johnson?

14       A.      Actually, yes.  Okay.

15  Somewhere on here there is a case that is the

16  State of Texas versus -- why is it not -- oh,

17  there it is.  It's on the second page of

18  Appendix B.  I'm sorry, we haven't marked my

19  report.

20       Q.      That's okay.  Just go ahead and

21  tell me what the case is.

22       A.      It was the State of Texas,

23  Allen Jones v. Janssen LP, and I was under --

24  I was told that Janssen was part of or at

25  least at the time of the case was part of

Highly Confidential - Subject to Further Confidentiality Review

```
1   Johnson & Johnson.

2        Q.     And what did that case involve?

3        A.     That was a -- basically a false

4   claims case involving the drug Risperdal.  In

5   the state of Texas, it was the State of Texas

6   Medicaid system.

7        Q.     Did the State of Texas

8   interfere in that lawsuit?

9        A.     I'm not quite -- it's a legal

10  thing.  I'm not quite sure what you mean.

11       Q.     Was the case being prosecuted

12  by lawyers from the State of Texas, or do you

13  recall if it was private counsel for the

14  relater, the whistleblower, who was

15  prosecuting that case?

16       A.     I think it was a hybrid of

17  that.  I believe it was private counsel that

18  had been appointed by the State of Texas.

19       Q.     Oh, I see.

20              And did that case ultimately

21  resolve?

22       A.     Yes, it was settled.  I don't

23  know.  They never tell me.

24       Q.     Were you deposed in that case?

25       A.     Yes, I was.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  And did it have to
2  do with the safety or efficacy of Risperdal?
3    A.    Not exactly.  As I -- as I
4  recall -- and this is quite a while ago now.
5  As I recall, it had to do with claims that
6  Janssen was making about Risperdal and the
7  State of Texas was taking issue with the
8  veracity of those claims, as I recall.
9    Q.    And what was the scope of your
10  work in that case?
11    A.    Damages.
12    Q.    Meaning if the allegations are
13  true, how much did the state pay?
14    A.    Actually, both.  It was both
15  merits and damages.  So it was were the
16  allegations, at least the economic
17  allegations, true, and if so, what were the
18  damages.
19    Q.    Did you create a damage model
20  in that case?
21    A.    No.  My task was to comment on
22  the plaintiff's expert report, so I did not
23  do an independent model.
24    Q.    All right.  Have you done --
25  aside from the medical monitoring -- medical

1   monitoring -- I'm sorry, medical malpractice

2   that we alluded to a minute ago, have you

3   done research that has been funded by the

4   pharmaceutical industry?

5        A.     Yes.  There is on Exhibit 2 at

6   the bottom of page 4, there is a working

7   paper called "Napsterizing Pharmaceuticals"

8   that I did with Professor Moore and Dean

9   Snyder, and we received funding for that

10  from -- it's Aventis now.  It was something

11  previous to Aventis in those days.  And I

12  believe we received some funding from PhRMA,

13  the trade association.

14       Q.     Okay.  Any other examples?

15       A.     No, that's all.

16       Q.     And you said the company was

17  Actavis?  Did I get that --

18       A.     No.  No, Aventis.

19       Q.     Oh, Aventis.

20              Okay.  And what is the PEPC?

21       A.     I'm sorry, what are we

22  referring --

23       Q.     Are you familiar with an

24  organization called the Pharmaceutical

25  Economics and Policy Council?

1    A.    Oh, yes, I am.  Yes.

2    Q.    What is that?

3    A.    That was -- I don't think it's

4  still active.  That was a group of economists

5  that would meet and share some research

6  findings during the annual meetings of the

7  American Economic Association.

8    Q.    Were you a member?

9    A.    I guess.  I mean -- I'm sorry,

10  I didn't have a membership card or anything,

11  but I was invited to such meetings.

12    Q.    All right.  And do you know --

13  do you know who created that organization?

14    A.    I believe it was Pfizer, yes.

15    Q.    Have you done any work for

16  Pfizer?

17    A.    Yes.  Again, at the bottom of

18  page 2, there's a case Putney versus Pfizer,

19  that was the -- that's the one that was most

20  direct.  And Pfizer has been involved in a

21  number of other cases, but I can't -- I can't

22  keep the manufacturers straight.

23          So suffice it to say that I

24  have worked for Pfizer more than once.

25    Q.    All right.  And you

1    represented -- or you were working on behalf

2    of Pfizer in those instances?

3         A.     Yes.

4         Q.     And for how many years were you

5    a sort of de facto member of the PEPC?

6         A.     I attended their meetings

7    twice.

8         Q.     And do you know, did the

9    organization last longer than two years?

10        A.     I think it did, but I kind of

11   lost touch.  Yeah, I -- basically I had -- I

12   stopped going to the American Economic

13   Association meetings.  I didn't have any

14   reason to go anymore.

15        Q.     Can you tell me what you mean

16   by that?

17        A.     Well, if you're not -- if

18   you're not presenting a paper and you're not

19   hiring a new faculty member, it's during the

20   holidays and so it's just kind of annoying to

21   go and have a child and so it's like unless I

22   had to go, I didn't go.

23        Q.     I understand.  We've all been

24   there.

25               All right.  So what prompted

1    your interest in the medical malpractice

2    arena?

3         A.    My father-in-law.  He was a

4    cardiologist and he was -- so this would have

5    been the early '80s and we were -- the

6    country was in the midst of yet another

7    medical malpractice crisis as it were, and

8    there was -- there were a couple of things.

9              First of all, my father-in-law

10   and I would argue about the use of contingent

11   fees by plaintiff's attorneys.  And he was

12   saying, "well, because they -- because they

13   work for a share of the winnings, they file

14   so many, so many, so many cases, and that

15   shouldn't be allowed."

16             And as an economist, it's like,

17   well, wait, if you're -- when are you going

18   to file more cases, when you're actually at

19   risk of not receiving any return or when

20   you're charging by the hour and you're going

21   to get paid either way.  And so that latter

22   question motivated the theoretical part of

23   the dissertation.

24             And then I did a data analysis

25   of various medical malpractice reforms that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    had been tried in various states during the

 2    1970s.

 3         Q.     Thank you.

 4                And you said that in the early

 5    '80s the country was in the midst of another

 6    medical malpractice crisis.

 7                What is a "medical malpractice

 8    crisis"?

 9         A.     Yeah, I should -- I should say

10    medical malpractice insurance crisis, is that

11    physicians were finding their medical

12    malpractice insurance rates to be increasing

13    at alarming rates or what they found to be

14    alarming rates, and some specialties,

15    particularly things like obstetrics, were

16    having -- some people were having trouble

17    finding insurance at all.

18         Q.     And you felt that in the early

19    '80s was the second such crisis?

20         A.     Yes, and I recall had two more

21    since then.

22         Q.     What were the subsequent two?

23         A.     Early '90s and late '90s, but

24    the early '80s one was the most severe

25    because people just didn't know how to handle
```

Highly Confidential - Subject to Further Confidentiality Review

1   it.  There's been more involvement in terms

2   of underwriting by state organizations that

3   has lessened the blow.

4        Q.    Have you ever provided expert

5   work on behalf of a party in a medical

6   malpractice case?

7        A.    No.

8        Q.    And did your research explore

9   any, I guess you -- sort of principal agent

10  issues or what you might consider problematic

11  incentives for plaintiff's or defendant's

12  counsel in medical malpractice cases?

13       A.    Yeah.  I mean, the first essay,

14  that's exactly what it was -- exactly what it

15  was about.  And the nutshell version of the

16  findings were for plaintiffs, the legal

17  issues or something where they have to seek

18  out expertise, plaintiffs don't know, they

19  know they were injured, they don't know

20  whether the doctor had done anything wrong,

21  so they consult an expert.

22            But there's an information

23  problem between the principal, the patient,

24  and the agent, the doctor, in that the doctor

25  knows something -- I'm sorry, the lawyer

1  knows something that the client doesn't know,

2  and they both know that information is

3  asymmetric.

4           So the use of contingent fees

5  was a -- is a method of resolving that

6  information issue by aligning the incentives

7  of the contingent fee attorney with those of

8  the client.

9           So do contingent fees cause

10  more medical malpractice litigation?  Yes,

11  but not necessarily in a bad way, because

12  transactions that otherwise -- mutually

13  beneficial transactions that otherwise

14  wouldn't be able to take place are now able

15  to take place.

16      Q.     And picking up on the perhaps

17  dinner conversation with your father-in-law,

18  did you find any evidence or support for the

19  idea that the hourly paid defendant's counsel

20  had any sort of complicated incentives or

21  possibly misaligned incentives with clients?

22      A.     No, I was actually focused

23  solely on plaintiffs.  I did not do anything

24  on defense counsel.

25      Q.     Did you find -- did you make

1    any findings or look into issues of delay?

2         A.    Delay?  No.  No.

3               No, this was simply a matter of

4    what in terms of plaintiff's compensation,

5    what is going to increase or decrease the

6    number of cases that would be beneficially

7    filed.

8         Q.    Okay.  And you started teaching

9    at Albany?

10        A.    Yes.

11        Q.    Correct?

12              And did you begin teaching

13   before your Ph.D. was completed?

14        A.    Yes, I taught a year as a

15   teaching assistant in the economics program

16   at the University of Michigan, and then I

17   taught, again, as a TA, for two more years in

18   the University of Michigan business school.

19        Q.    Is that on your résumé here?

20        A.    It's not, no.

21        Q.    Okay.  So I'm so sorry.  Which

22   years were you teaching at the University of

23   Michigan business school?

24        A.    '84-'85 -- no, '82-'83 and

25   '84-'85.  That would have been the business

1   school.

2          And then '81-'82 would have

3   been the -- sorry.  Yeah, '81-'82 was the

4   economics department, had to be.

5          Q.     So you were -- when you say

6   "University of Michigan," you mean Ann Arbor?

7          A.     Yes, I was in the Ph.D. program

8   at that point.

9          Q.     Oh, I see.  So you were --

10         A.     I was a graduate student.

11         Q.     I see.  Okay.

12         And you moved to Amherst in,

13  what, the summer of 1987?

14         A.     That's correct.

15         Q.     And you lived there

16  through 1992?

17         A.     Yes.

18         Q.     All right.  I grew up in

19  Amherst, and I was living there at that time.

20         A.     Oh, wow.

21         Q.     Did you ever interact with the

22  math department at U Mass Amherst?

23         A.     No.  No, I did not.

24         Q.     And what caused you to leave

25  Amherst?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    You know, my wife and I were

2  both on the faculty at Amherst, and she was

3  ahead of me by a year in the tenure clock, if

4  you will, and she was denied tenure in 19 --

5  in January of 1992.  And so we left for the

6  fall of 1992, and that's the incident that

7  generated the lawsuit that I was a plaintiff

8  in.

9    Q.    I see.  I see.

10    A.    She left Amherst and went to

11  Colby College in Waterville, Maine, and I

12  went to Bates College in Lewiston, Maine.

13  They're about 50 miles apart.

14    Q.    So you solved the two-body

15  problem?

16    A.    We did.  We were very lucky.

17  You know, we went from being from in the same

18  department to being within 50 miles of one

19  another, which is pretty lucky.

20    Q.    And what was the name of the --

21  if you recall the name of the case that your

22  wife brought?  I guess it was a denial of

23  tenure case.

24    A.    Yeah, I don't know

25  specifically, but my guess is it would have

Highly Confidential - Subject to Further Confidentiality Review

```
 1   been Debra Barbezat, Debra is D-e-b-r-a, and

 2   Barbezat is B-a-r-b-e-z-a-t, versus Trustees

 3   of Amherst College is my best guess at the

 4   name.

 5        Q.     Okay.  The last Amherst

 6   question I'll ask you is did you ever go to

 7   the movies at the new mall?

 8        A.     Yes.

 9        Q.     All right.  I may have sold you

10   tickets.

11        A.     Oh, wow.  Okay.

12        Q.     All right.  And then, as you

13   said, you moved to Bates.

14               You got tenure at Bates?

15        A.     I did.

16        Q.     Which year?

17        A.     1997.  Oh, no, let me take that

18   back.

19               It's a little complicated.  I

20   received tenure in 1995, and I received the

21   title of associate professor of economics in

22   1997 because of a weirdness in the -- in the

23   faculty handbook at Bates at the time.

24        Q.     Okay.  And you have recently

25   retired?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yep, May 24th.

2    Q.    May 24th.  Congratulations.

3    A.    Thank you.

4    Q.    Are you also retiring from

5    consultant work?

6    A.    No, not yet.  Probably another

7    year or two.

8    Q.    And when was the -- when was

9    the last time you were teaching at Bates?

10   A.    There's -- at Bates we have a

11   fall semester, a winter semester, and then in

12   May we have something called short term.  And

13   professors teach one course, students take

14   one course, and so that short term of 2019

15   was my last class at Bates.

16   Q.    Had you also taught that fall

17   and that spring and that winter?

18   A.    Yes.

19   Q.    Okay.  Do you have Ph.D.

20   students?

21   A.    No.  Bates College is a

22   undergraduate, liberal arts college.

23   Q.    Okay.  And when was the last

24   time you taught a class denominated as health

25   economics?

1      A.      Mid-'90s at Amherst College --

2  I'm sorry, mid-'90s at Bates College.

3      Q.      Okay.  Do you think the field

4  has changed a lot since then?

5      A.      No, actually, I don't believe

6  it has.

7      Q.      And health economics is still

8  taught at Bates, correct?

9      A.      Yes.  My former colleague, Nate

10  Tefft, T-e-f-f-t, teaches health economics.

11      Q.      Do you know if his class has

12  any sort of section or module or case study

13  on the opioid crisis?

14      A.      No, I don't know one way or the

15  other.  I never -- I never looked at his

16  syllabus.

17      Q.      Okay.  So other than the work

18  at Albany, Amherst, Bates and Michigan, any

19  other academic positions?

20      A.      I don't know how to classify

21  it.  I had a year in -- we'll call it 19 --

22  well, wait, it's probably here somewhere.  I

23  was a post doc at Brandeis University.

24      Q.      Okay.  So that was not a

25  sabbatical; it was a post doc?

1       A.      Correct, yes.  That was

2  1992-1993.  It's listed as a nonacademic

3  position on page 9, but it was research

4  rather than teaching, which, I guess, is why

5  I called it a nonacademic position.

6       Q.      Have you followed the housing

7  cost in the San Francisco area?

8       A.      Actually, accidentally, yes, I

9  have.  Our son worked in the Bay area for

10  several years living in an apartment that we

11  found out belatedly had been foreclosed on.

12  So actually we learned a lot about the

13  housing in San Francisco that way.

14       Q.      The so-called -- the ghost

15  property market is complicated.

16       A.      Yeah, very complicated.

17       Q.      And during that position of

18  which you've been speaking, you studied the

19  effects of Medicaid expenditures on extending

20  coverage for outpatient and residential drug

21  treatment to pregnant drug users?

22       A.      Correct.

23       Q.      And what was the finding of

24  your work?

25       A.      Not terribly exciting, if

```
 1    you -- if Medicaid increases expenditures,

 2    you get more outpatient residential drug

 3    treatment.  That's a little trite.

 4              Higher expenditures were

 5    effective in increasing the number of

 6    patients that were treated for drug abuse.

 7        Q.    Did you speak with any of the

 8    subjects?

 9        A.    No.

10        Q.    Were you aware of this

11    litigation before you were retained in it?

12        A.    Specifically, no.  I was -- I

13    think it would be fair to say I was aware of

14    a growing opioid issue.  It certainly was

15    something that was -- it's certainly a

16    problem that has hit my home state of Maine

17    quite hard.

18        Q.    And have you done any work in

19    this case for the sort of causes of why Maine

20    has been so hard hit?

21        A.    No, I have not.

22        Q.    Do you have knowledge about the

23    crisis' impact at Bates?

24        A.    I'm sorry, could you repeat

25    that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sorry.

2          Do you have any knowledge of

3    the extent or existence of the crisis' impact

4    at Bates College?

5    A.    Yes.  I guess I would say yes,

6    and the effect has been almost nonexistent

7    among the students.  It's had some effect on

8    campus safety, but I serve on disciplinary

9    committees and opioids have not come up in

10   student discipline but yet.  There has been

11   more -- somewhat more larceny in the areas

12   around campus.

13   Q.    And are those students the

14   victims or the perpetrators of that --

15   A.    Victims.

16   Q.    Victims.  I see.

17         So are the perpetrators people

18   in the community who are not associated with

19   the university?

20   A.    Correct.

21   Q.    And have you had occasion in

22   those hearings to interact with any

23   individuals who are addicted to opioids?

24   A.    No, because these incidents

25   happened off campus.  They're handled by the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Lewiston police.  They're not -- they're

 2    generally not a college issue, per se.

 3         Q.    I see.

 4               And we can just focus for a

 5    second on your nonacademic work.

 6               So we just talked a little bit

 7    about your work at Brandeis, correct?

 8         A.    Yes.

 9         Q.    So let's turn to page 10.

10               In connection with your work --

11               MR. DOVE:  Counsel, just I

12         think there's a slight -- there's --

13         never mind.  I've got an odd version

14         with a blank page on it.

15               MS. GEMAN:  Oh, okay.  Yeah,

16         I'm just using the version you gave me

17         this morning.

18               Are you all set?

19               MR. DOVE:  Yes.

20               MS. GEMAN:  Okay.  No worries.

21    QUESTIONS BY MS. GEMAN:

22         Q.    In connection with your work

23    for the EPA, did you support limits on CFCs

24    and asbestos?

25         A.    Yes.  It really wasn't for me
```

1  to support, so I was overseeing the economic

2  analyses of regulations that were being

3  proposed by the Agency that would have --

4  well, that did restrict chlorofluorocarbons

5  and asbestos.

6           Your question made it sound

7  like it was my decision, and it really

8  wasn't.

9      Q.    I understand.

10           I guess I could put more

11  precisely, was it your opinion as an

12  economist that the proposed regulations would

13  be efficacious in limiting the use of CFCs in

14  asbestos?

15      A.    Yes, it was, and as life went

16  on, because of technological changes,

17  especially with chlorofluorocarbons, the

18  transition away from chlorofluorocarbons was

19  actually much, much cheaper than we had

20  estimated in 1980.

21      Q.    We should be so lucky with

22  current threat.

23           And you then did some work for

24  SRI International?

25      A.    Correct.

1    Q.      What is that?

2    A.      SRI International used to be

3    known as Stanford Research Institute.  And so

4    this was a -- this was basically a summer

5    job, and in that the program -- the

6    programming model was a linear program to

7    help petroleum refineries, if they have a --

8    if they have $20 million to spend in reducing

9    emissions, where in the refinery would be the

10   most cost-effective ways -- cost-effective

11   places to put that -- put that investment.

12   And that was that model.

13           And then the manual and

14   information disclosure was basically you can

15   regulate a market or you can enhance the

16   information available to participants in the

17   market and by doing so help them to modify

18   their own behavior.  And that was -- there

19   were examples of that in this manual from

20   1981.

21   Q.      And are you generally a sort of

22   proponent of regulation or of enhancing the

23   information available to the participants in

24   the market?

25   A.      I think it depends on the -- it

1    depends on the situation.  I mean, if we're

2    talking plutonium, I'm all for regulation.

3    You just don't -- there's some things you

4    just don't want to mess with.

5                    At the same time, and this is

6    what we did with chlorofluorocarbons and

7    marketable rights, I am -- I think it's fair

8    to say I'm in favor of regulation if it is

9    not possible to find a market solution to the

10   problem.

11                   So I think, you know, the idea

12   of marketable rights and permits have really

13   revolutionized pollution control.  I think we

14   get a lot more pollution control for a lot

15   less money by solving these problems through

16   the market as opposed to -- I mean, the way

17   it -- the way it used to be done was, okay, a

18   steel mill's polluting, you have to put on

19   this technology.  They spend several million

20   dollars putting on this technology.  Two

21   years later, something new is invented and

22   then they have to do that.

23                   And the firms, you know, they

24   balk at this.  They say, we don't want to

25   pollute, but we don't want to go out of

1    business either.  And so by turning it from

2    regulations into economic incentives, I

3    think, has been incredibly successful.

4         Q.    Can you think of examples

5    involving pharmaceutical manufacturers where

6    either regulations on the one hand or

7    economic incentives on the other has

8    addressed a problem in the market?

9         A.    Well, sure.  I mean, sort of

10   everything in the -- in the last section of

11   my report, I mean, prior authorizations, step

12   edits, formulary placement, quantity limits,

13   all of those things are economic incentives

14   that don't tell people what to do, but they

15   alter their incentives about what drugs

16   should be -- what drugs are going to be

17   prescribed and in what quantities.

18        Q.    What about -- I guess I meant

19   to be asking me about incentives that act

20   directly on pharmaceutical manufacturers.

21        A.    I can't think of any sitting

22   right here today.

23        Q.    What about on distributors?

24        A.    Same, I can't think of any

25   sitting here today.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  What about on

2    pharmacies?

3    A.    Again, referring to my report,

4    like the organizations like the OARRS data in

5    Ohio that give pharmacies the ability to

6    check on a customer's opioid use and react to

7    that, if it's excessive, I take that as an

8    economic incentive, that they have -- they

9    have better information which makes the

10   market work better in keeping -- shall we

11   say, keeping tabs or preventing people with

12   opioid problems from obtaining further

13   opioids.

14   Q.    And what information over the

15   past, say, ten years was available to

16   distributors to help them keep tabs or

17   prevent people with opioid problems from

18   obtaining further opioids?

19   A.    There was the ARCOS data that

20   allowed distributors to see -- to see whether

21   other distributors were selling to the same

22   entity, and that was modified a year later to

23   let the distributors see an anonymized

24   version of the quantities that were being

25   shipped.

1    Q.    Did you -- have you ever worked

2  with ARCOS data?

3    A.    No, I have not.

4    Q.    Did you know what it was before

5  this case?

6    A.    No, I didn't.

7    Q.    Okay.  Do you know of any other

8  sources of information the distributors had

9  to assist them in keeping tabs on opioid

10  prescriptions and/or shipments?

11    A.    Yeah, I wasn't actually asked

12  to examine anything really regarding the

13  information available to distributors.  My

14  assignment was limited strictly to payers.

15    Q.    And do you -- separate from the

16  fact that it is outside the scope of your

17  opinions in this case, have you in the course

18  of working on this case become aware of the

19  sources of information available to

20  distributors?

21    A.    No.

22    Q.    And when working on your

23  report, did you look for contrary

24  information?

25    A.    I'm sure.  I mean, the

1    assignment that I -- that I give to my staff

2    at Cornerstone is to, you know, research a

3    particular topic, and that is, research all

4    of the information, what may be contrary,

5    what may be supportive.  In this case, given

6    this -- or I'm sorry, not in this case, but

7    given my assignment, there's not -- we didn't

8    find any, nor did I expect that we would find

9    anything that would say prior authorization

10   is not effective in reducing prescriptions or

11   additional information is not effective in --

12   or reference to monitoring individual claims

13   data by payers would not be effective in

14   identifying doctor shoppers or pharmacy

15   shoppers.  I would be -- if I missed

16   something, fine, but I would be stunned that

17   there would be such contrary information.

18        Q.    And what if there were entities

19   that had far more easy access to information,

20   would you consider that -- would you consider

21   that contrary information or sort of off

22   subject?

23        A.    Entities outside of payers, I

24   think would be outside the scope of my

25   assignment.

1      Q.      And going back to your

2    non-economic positions, you state that you

3    became a litigation consultant in 1990,

4    correct?

5      A.      Yes.

6      Q.      And what got you started on

7    this 30-year journey?

8      A.      Yeah, I mean, 1990, there was

9    a -- there was a discrimination case that my

10   wife and I sort of jointly -- ironically my

11   wife's research area was sex discrimination

12   in academic labor markets.

13     Q.      That is ironic.

14     A.      It was very ironic.

15             And so we were like jointly

16   retained to work for a plaintiff, and that

17   was 1990.  And that was a very brief

18   engagement because we did a couple of damage

19   scenarios and then we were told the case

20   settled and that was -- that was sort of

21   that.

22     Q.      Had she -- oh, sorry, go ahead.

23     A.      And the only thing I was going

24   to say is then there's a gap until about 1995

25   before I did any more litigation consulting.

1       Q.     So did the -- was it somebody

2  that was denied tenure in --

3       A.     No, it was -- if memory serves,

4  and it's a long time ago, I believe it was a

5  manager at a retail establishment -- it

6  wasn't Target, but it was something like

7  Target -- who had been dismissed and the

8  claim was age discrimination.

9       Q.     Have you done other work in

10  connection with employment litigation?

11       A.     Kind of.  As favors to

12  colleagues, I've done -- I don't know if it's

13  universal, and hopefully I'll never find out,

14  but in divorce proceedings in Maine when

15  they're trying to allocate equitable

16  property, there -- if one of the spouses is

17  not employed, there's a step in which they're

18  supposed to with reference to their training

19  and experience determine what their earning

20  power may be on the market.  And I was not

21  employed, but I was asked a couple of times

22  by colleagues to perform such an analysis,

23  and I did as a favor.

24       Q.     And then what resparked your

25  interest in 1995 in doing litigation

Highly Confidential - Subject to Further Confidentiality Review

1  consulting work?

2       A.     Yeah, let me just make sure I

3  have it.  Yeah.  So as it says in Exhibit 1

4  in paragraph 2, I started as a consulting

5  economist on the brand name prescription drug

6  litigation in 1995.  And my involvement in

7  that was I had been -- when I was teaching at

8  the University of Michigan business school,

9  my supervisor was Professor Edward Snyder.

10  He and I became coauthors and friends.  He

11  became -- by 1995 he became an associate dean

12  at the University of Michigan.  So he was

13  retained as a testifying expert in the brand

14  name prescription drug antitrust litigation,

15  and there were several state cases involved,

16  Maine being one of them, District of

17  Columbia, Michigan and one other that's not

18  going to come to mind.

19            And so he needed someone to

20  serve as his staff and to do the kind of

21  analysis that I now have Cornerstone do for

22  me.  And so I started as his consultant in

23  that case, in the warfarin case and in the

24  Cardizem CV case.  And then by 1998, 1999,

25  Dean Snyder was getting numerous engagements

```
 1    and started referring some of them to me

 2    because he was too busy.  And so then I

 3    started as a testifying expert around 2000.

 4                 MR. DOVE:  Just so the record

 5          is clear, I think you referred to

 6          Exhibit 1, which I think you meant to

 7          say your report.

 8                 THE WITNESS:  My report, which

 9          is not an exhibit yet, I'm sorry.

10          Never mind.  Yes.

11    QUESTIONS BY MS. GEMAN:

12          Q.    I understood what you meant.

13          A.    Okay.  Sorry.

14          Q.    I think before we switch to the

15    next exhibit, it's been close to an hour.

16                 Do you want to take a quick

17    break or keep going?

18          A.    Sure, we can take a break.

19                 VIDEOGRAPHER:  Going off the

20          record.  The time is 10:32.

21          (Off the record at 10:32 a.m.)

22                 VIDEOGRAPHER:  We're going back

23          on the record.  Beginning of Media

24          File Number 2.  The time is 10:45.

25                 (Hughes Exhibit 3 marked for
```

```
 1            identification.)

 2    QUESTIONS BY MS. GEMAN:

 3         Q.      So, Professor Hughes, before we

 4    turn to what's been marked as Exhibit 3, I

 5    would just request that as there are further

 6    updates -- if there are further updates to

 7    your CV that we be provided with them.

 8               Is that acceptable?

 9         A.      Certainly.

10         Q.      Okay.  And actually, while

11    we're on Exhibit 2, can you please turn to

12    the section entitled "Articles in Refereed

13    Journals"?

14         A.      Yes.

15         Q.      Do any of these articles

16    involve the marketing of pharmaceuticals?

17         A.      No.  My published academic work

18    has not involved pharmaceuticals, but over

19    the course of this 25-year journey in

20    consulting, there have been dozens of reports

21    that I've written, and I think that the vast

22    majority of them would have resulted in

23    peer-reviewed, published articles except that

24    they were under protective order so I wasn't

25    allowed to submit them.
```

1          So these are only the articles

2     that were, shall we say, allowed to be

3     published.

4          Q.     And why is it your view that

5     they would -- that the expert reports

6     submitted on behalf of defendants in

7     litigation could be turned into

8     peer-reviewed, published articles?

9          A.     Oh, for one thing you have

10    access to data from the defendants and

11    sometimes from named plaintiffs that you just

12    don't really get access to as an academic

13    economist.  And so by using those data, we

14    would be able to look at behavior, for

15    example, a lot of the cases that I work on

16    involve generic entry, what actually happens

17    in different therapeutic groups when there is

18    generic entry of a certain type, at a certain

19    time, in a certain number using the actual

20    manufacturer's data.

21          That seems to me that articles

22    somewhat like that have been published, and I

23    don't see any reason why the things that I

24    wrote under protective orders would not also

25    find a peer-reviewed outlet.

1    Q.     Do you see any differences

2  between work on behalf of a pharmaceutical

3  defendant that is being sued for allegedly

4  keeping generics out of a market and work for

5  a -- or work on an academic article that is

6  not prepared outside the context of

7  litigation?

8    A.     Well, I mean, it depends.

9  There can be differences, and there can --

10  there cannot be differences in the sense that

11  both may try to be prospective in terms of

12  what are -- what would be the outcome if

13  certain -- what would be the outcome under

14  certain conditions of generic entry in terms

15  of numerosity, in terms of the -- in terms of

16  numerosity, in terms of the therapeutic group

17  you're in, in terms of a lot of other market

18  factors.

19           Again, you know, applied

20  microeconomists, we look at markets and what

21  happens to them.  So generic entry is a shock

22  to a particular market and applied micro

23  people find it interesting to see what

24  happens under different circumstances.

25           So, I mean, to answer your

1    question, a lot of the articles that are out

2    there are, shall we say, aggregates, so they

3    look at across a large number of drugs.  It

4    would be illustrative from an academic

5    standpoint to look at what happens with

6    particular drugs with particular number of

7    entrants in particular therapeutic groups,

8    and that is not really in the literature at

9    the moment that I'm aware of.

10       Q.     Is it your testimony that your

11   work on behalf of the pharmaceutical industry

12   is a form of research?

13       A.     Oh, absolutely.

14              What are you doing?  You're --

15   in the research that I have published here is

16   you're looking at a market, what happens when

17   there's a change in this market.  So I did a

18   number of papers on the English rule for

19   compensating attorneys during litigation and

20   what happens under the English and American

21   rules, and we have data on that.  So that's a

22   market.  And for legal services, it's

23   compensated -- this work is compensated in

24   one way under one set of rules and another

25   way under another set of rules.  What

1    changes?

2            All right.  So by the same

3    token you're doing the same thing in the

4    consulting research, here's what happened

5    with generic entry or here's hypothesized

6    what would have happened had generic entry

7    happened sooner, or what would have happened

8    if generic entry had happened in larger

9    numbers.  Again, it's a shock to a market,

10   what was the result.

11           You go through the same

12   procedure, basically, whether it's for the

13   legal services market or it's for the

14   pharmaceuticals market.

15       Q.    Have you ever declined to work

16   on a piece of pharmaceutical litigation on

17   behalf of a defendant for reasons other than

18   scheduling conflicts, press of business or

19   conflict?

20       A.    Yes.

21       Q.    Okay.  Under what

22   circumstances?

23       A.    I didn't think that as an

24   economist I had anything to honestly say that

25   would help them.

1    Q.      And was that a function of the

2    merits of the case or just your fields within

3    economics not being a fit with this field of

4    economics that that case arguably called for?

5    A.      Yeah, I mean, I actually think

6    it was the merits of the case.

7    Q.      And have you ever turned down

8    plaintiff side work?

9    A.      I've never been approached for

10   plaintiff side of work.

11   Q.      Have you ever been sought to do

12   plaintiff side work?

13   A.      No.  I have actually never

14   really sought any kind of work.  It's just

15   what comes to me is what comes to me.

16   Q.      But you have a relationship

17   with Cornerstone, right?

18   A.      Well, I have a relationship

19   with Cornerstone, but prior to that, it was,

20   you know, very much word of mouth amongst

21   attorneys, you know.

22   Q.      Amongst attorneys for defense

23   side?

24   A.      Sure.

25   Q.      Pharma companies?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Sure, but it could have been

2  amongst attorneys for plaintiff side.  Well,

3  okay, hang on.  Let me take that back.

4            A long, long time ago, let's

5  call it 1995, I was retained by -- briefly by

6  Heins, Mills and somebody in --

7     Q.     Olson?

8     A.     Yeah, Heins, Mills & Olson.  It

9  was -- I believe it's on here.

10    Q.     You represented a plaintiff

11 medical doctor; is that right?

12    A.     No.  It was airline

13 transportation.  It was the so-called travel

14 agency case.

15    Q.     And you represented plaintiffs?

16    A.     And I represented plaintiffs,

17 but I was not -- I did not testify.  It

18 was -- it was very brief.  I did some

19 document review and did some discussions with

20 attorneys, and then they ended up hiring a

21 different person for -- to actually do the

22 testifying.  So I was approached by

23 plaintiffs in that case, and I did take the

24 retention, but it didn't last very long.

25    Q.     And is that case that you just

1    mentioned located, moving for a second, to

2    Exhibit 3?

3          A.    No, it wouldn't be because I

4    wasn't testifying.

5          Q.    I see.

6          A.    Yeah.

7          Q.    So going back to your refereed

8    papers, is that a synonym for peer-reviewed?

9          A.    Yes, all of these would have

10   been peer reviewed.

11         Q.    Okay.  Have you written any

12   papers on the supply chain of

13   pharmaceuticals?

14         A.    No, I have not.

15         Q.    Have you written any papers

16   about opioids?

17         A.    Yeah, let me be more precise.

18   I have not written any peer-reviewed articles

19   on the pharmaceutical supply chain, but I

20   have written several sections of several

21   reports on that supply chain.

22               Again, for opioids, I have

23   written the report that we're talking about

24   today, but I have not written any

25   peer-reviewed articles on that.

1  Q.    Have you written any

2  peer-reviewed articles that required the

3  study of the role or functions of

4  distributors in any capacity?

5  A.    Yes, in the -- again, in the

6  course of my work for the PBM Medco, there

7  was discussion of the role of distributors,

8  but, no, I've not -- I've not submitted any

9  of those -- I did not submit that work for

10 publication in a peer-reviewed journal.

11 Q.    Have you published any

12 peer-reviewed articles that requires the

13 study or of the goal or function of

14 distributors in any capacity?

15 A.    Not in a peer-reviewed journal,

16 no.

17      I have written such reports,

18 but I have not been allowed to submit them

19 to -- for peer review.

20 Q.    Have you written such reports

21 outside the context of litigation?

22 A.    Okay.  Let's just back up a

23 second.

24      Could you define such reports?

25 Q.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Have you ever written about any
 2   aspect of the distributor industry in any
 3   context outside of litigation?
 4        A.      No.
 5        Q.      Okay.  Have you published -- or
 6   which peer-reviewed articles, if any, would
 7   you consider to relate to the market for
 8   prescription drugs?
 9        A.      Again, I've written several
10   reports in the course of my consulting work
11   that I do believe would be eligible for
12   publication in peer-reviewed journal, but I
13   wasn't allowed to submit them.  But on the
14   list before us today in Exhibit 2, I have
15   not -- there are no papers like that in
16   peer-reviewed journals.
17        Q.      So you have not published
18   peer-reviewed articles that relate to the
19   market for prescription drugs?
20        A.      There's none on this list, no,
21   but I have certainly written such reports.
22        Q.      Are you saying that you have
23   peer-reviewed articles that have been
24   published that are not on this list?
25        A.      No.  I'm saying that I've
```

1    written reports on that topic, but they

2    have -- I have not been allowed to submit

3    them for peer-reviewed publication.

4         Q.    On whose behalf have you

5    written reports on the topic of the market

6    for prescription drugs?

7         A.    Gosh, almost everybody.

8              I would say on Exhibit 3,

9    almost every report that is on there dealing

10   with pharmaceuticals, almost every one would

11   have included a section on the distribution

12   and payment flows for prescription

13   pharmaceuticals.

14        Q.    So let's turn sort of formally

15   to Exhibit 3.

16        A.    Okay.

17        Q.    This is current, correct?

18        A.    It is.

19        Q.    All right.  And you were

20   deposed in the Restasis matter quite

21   recently?

22        A.    A week ago Friday.

23        Q.    Do you recall the name of the

24   lawyer deposing you?

25        A.    Yes, ironically she's from

1    Heins, Mills & Olson.  Renee -- Renee.  I may

2    come up with her last name.

3            Q.      And you submitted a report on

4    behalf of defendant in that case?

5            A.      Correct.

6            Q.      Okay.  If you look at all the

7    litigations listed on the first page, did you

8    submit reports on behalf of the plaintiffs in

9    any of these cases?

10           A.      On the first page, no.

11           Q.      Okay.  And was the second

12   page -- well, let's just ask the same

13   question about the second page.

14                   Of the litigations listed on

15   pages 2 and 3, which, if any, were ones in

16   which you submitted a report on behalf of

17   plaintiffs?

18           A.      On page 3, there is -- at the

19   very top, there's Putney versus Pfizer,

20   Putney versus Pfizer and MWI Veterinary

21   Supply.  I was retained by Pfizer, who was

22   the plaintiff in the matter.

23           Q.      Pfizer was the plaintiff in the

24   matter, Putney, Inc., versus Pfizer?

25           A.      Well, I -- yes, I believe there

1    were cross-complaints.

2         Q.      I see.

3                 So Pfizer was sued and then it

4    brought claims, cross-claims, against Putney?

5         A.      Other way around; Pfizer sued

6    and Putney brought a cross-claim against

7    Pfizer.

8         Q.      I see.

9                 And were you representing

10   Pfizer in both of those matters?  Were they

11   consolidated?

12        A.      I believe they were

13   consolidated.  There was one report and one

14   deposition.

15        Q.      What was the subject of that

16   lawsuit?

17        A.      So veterinarians can prescribe

18   for their patients any pharmaceutical that's

19   approved by the FDA for human use.  Companies

20   can go beyond that and do the clinical trials

21   so that they get FDA approval specifically

22   for veterinary use.

23                Pfizer had done this with one

24   of their products, and I'm not going to

25   remember which one it was, but they had a

1    product that was approved for human use and

2    it was also FDA approved for veterinary use

3    in dogs and cats.  Putney is a company

4    actually in Maine, and what they do is they

5    buy FDA-for-humans-approved generic drugs,

6    bottle them and sell them to veterinarians.

7              Putney was advertising this

8    particular generic drug.  The drug that

9    Pfizer had veterinary approval for, Putney

10   was advertising that drug as being FDA

11   approved, which was technically correct.  It

12   was FDA approved for human use, but it was

13   not FDA approved for Pfizer -- not Pfizer,

14   for veterinary use.

15             So Pfizer sued to have them

16   stop that advertising because it was --

17   Pfizer considered it to be misleading, and

18   Putney countersued and said, no, it's not in

19   effect.  And there were competing experts and

20   there were depositions and then the case

21   settled, and I know in this case the case

22   settled with Putney agreeing to stop that

23   kind of advertising.

24       Q.    Did you opine that the ads were

25   misleading?

1          A.     No, actually what I -- all that

2    I was doing was calculating damages.

3          Q.     Meaning assuming that the ads

4    were found misleading, what damages --

5          A.     Yes.

6          Q.     -- were to follow?

7          A.     Right.

8          Q.     And did you create a damage

9    model for purposes of calculating damages?

10         A.     I think it would be a big

11   compliment to that work to call it a model.

12   There was basically a calculation of what

13   sales Pfizer lost and then multiplied by the

14   revenues that they would have gotten.

15              So, yes, technically a model,

16   but it was not -- certainly not an intricate

17   one at all.

18         Q.     Was it a Lanham Act case?

19         A.     Couldn't tell you.

20         Q.     Okay.  So did you -- how did

21   you go about determining which sales Pfizer

22   lost?

23              For example, did you assume

24   that any sale that Putney got was one that

25   Pfizer had lost, or did you make a more

1    complicated assessment?

2        A.    I did something I thought -- to

3    my recollection, I did something that I

4    thought was actually quite honest, which was

5    I didn't really know exactly how many sales

6    Pfizer would have lost, and so I believe I

7    did three scenarios.  I did a sensitivity

8    analysis and just gave the range of the

9    potential losses and left it at that.

10       Q.    So what were the inputs to the

11   three scenarios?

12       A.    Oh, I -- wow, I don't remember.

13       Q.    Do you remember anything about

14   the --

15       A.    I'm actually lucky I remember

16   the three scenarios.

17       Q.    You mean that there were three?

18       A.    That there were three.  And I'm

19   not going to be to specifically -- a lot of

20   time in deposition was spent because the

21   defense expert had made a really egregious

22   mistake, and I can't remember what it was,

23   but it would be classified as a really stupid

24   mistake, and, you know, I pointed it out,

25   corrected it and whatnot.  And then we spent

1  a lot of time in deposition with kind of

2  like, well, everybody makes mistakes, don't

3  they, and like, yes.  I mean, so it kind of

4  went like that, but I don't remember exactly

5  how I came up with the -- with the three

6  scenarios.

7          I don't think it was anything

8  terribly complicated because this was not a

9  huge matter for Pfizer, so I probably had

10 worst-case, middle-case, best-case.

11 Worst-case probably was every sale Putney

12 made was one that was lost by Pfizer, would

13 have been an overestimate; and then the other

14 two were determined somehow, but I don't

15 remember how.

16     Q.    Did you have an opinion as to

17 which was the most fair or reasonable case

18 scenario?

19     A.     I don't recall, although -- I

20 don't recall, although I seem to remember

21 that I said that the -- every sale Putney

22 made was a lost sale to Pfizer, that it was

23 my opinion that that was truly a worst-case

24 scenario but yet highly unlikely.

25     Q.    You said it was an

Highly Confidential - Subject to Further Confidentiality Review

1    overestimate?

2         A.      Yeah, it was highly unlikely.

3    And so in being highly unlikely, there -- I

4    didn't believe it possible that every Putney

5    sale was a sale lost by Pfizer because -- for

6    one thing because the price differential.

7         Q.      And what was the -- do you

8    recall what distinguished the conservative

9    from the median scenarios?

10        A.      No, I really don't.

11        Q.      And was there one between

12   conservative and median that you advocated?

13        A.      No.  I remember in -- I

14   remember in deposition saying that it was --

15   that I thought it was, you know, very much up

16   to a jury or a judge to determine which one

17   of these would be the most likely that I

18   actually didn't have an opinion.  And again,

19   in deposition almost all the time was spent

20   talking about the defense expert's report.

21   Very little time was spent talking about my

22   report.

23        Q.      But you considered it

24   reasonable to say, I don't have to come up

25   with an exact number, right, because I'm not

1    the judge, jury, executioner; I am simply the

2    expert economist, correct?

3         A.    Yes.  And it's possible -- I

4    don't remember.  I think it's possible that I

5    was instructed by counsel for Pfizer to just

6    say -- just come up with three scenarios from

7    best to worst and, you know, we'll deal with

8    it otherwise.  And so I believe that was not

9    my idea.  I believe I was following counsel

10   instructions.

11        Q.    And do you recall if Pfizer

12   recovered any money in that litigation?  If

13   you can disclose it.  I don't, you know --

14        A.    Well, number one, I don't know

15   whether they did.  I believe, as it was put

16   to me, is that -- by counsel for Pfizer I --

17   it was put to me, like this was a big waste

18   of time because Putney ultimately agreed to

19   do what we asked them to do before anybody

20   sued anybody.  So Putney -- so my

21   interpretation is that Putney stopped the

22   advertising and that was that, but they may

23   have gotten money.  I wasn't told one way or

24   the other.

25        Q.    All right.  So other than the

Highly Confidential - Subject to Further Confidentiality Review

1    Pfizer engagement that we have been speaking

2    of, are there any other matters listed on

3    pages 2 and 3 of Hughes Exhibit 3 in which

4    you worked for a plaintiff?

5         A.     Yeah.  On pages 2 and 3, no.  I

6    had a -- in addition to the travel agent

7    case, I did have a retention for plaintiff in

8    a case that was dropped, so it's not on here

9    because I never actually testified to it.

10   And it was -- involved the school instrument

11   rental market in southeastern Michigan.

12        Q.     So that the travel airlines

13   case was not one in which you were retained,

14   correct?

15        A.     I was retained and I was paid

16   for the few hours that I worked.  It was

17   probably like 20 hours or so that I worked.

18        Q.     As a consultant?

19        A.     As a consultant, yeah.

20        Q.     I see.

21               And the --

22        A.     I believe I was being

23   considered as a testifying expert, but I

24   wasn't retained as such, no.

25        Q.     Did you suggest damage models

 1    or damage calculation mechanisms in that

 2    case?

 3         A.     Yeah, I didn't get that far

 4    because I was -- my recollection is that time

 5    was spent gleaning what I could from two

 6    banker's boxes of documents, and that was --

 7    that's what I remember.  And so I believe I

 8    gave orally, you know, an opinion about what

 9    this was and what the possible uses were, but

10    that was as far as it went.

11         Q.     In either of this consultancy

12    that we've just been speaking of or the

13    Putney case, did you do any regression

14    analyses in connection with your work?

15         A.     In which case?  In any case?

16         Q.     Sorry, no.  No.  No.  I'll

17    break it down.  I asked about two things, but

18    we'll just go one by one.

19              In your work for Pfizer in the

20    Putney matter, did you conduct any regression

21    analyses?

22         A.     No.

23         Q.     And so the sensitivity analyses

24    to which you referred in the Putney matter,

25    can you describe what those were?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Like I said, it was very
 2  simple.  So there was a hypothesized call it
 3  but for number for sales, and price, I
 4  believe, we held constant.  And so it was
 5  simply the change in sales times the -- times
 6  the wholesale price was the damages.  This
 7  was -- if I recall correctly, I think my
 8  report was like 15 pages.  It was really
 9  short.
10        Q.      And as an expert, you felt it
11  was reasonable to hold price constant in that
12  analysis, correct?
13        A.      Yes, because, if I recall
14  correctly, Pfizer hadn't changed the price in
15  the two or three years since they'd had FDA
16  approval.  There was a reason for it.  It
17  wasn't just me picking it.
18        Q.      Otherwise, you would have
19  picked a but for price?
20        A.      I don't know.  Probably.
21        Q.      And in the work for the -- I'm
22  sorry, the airline price -- the travel --
23        A.      Travel agency.
24        Q.      Travel agency, did you do any
25  statistical analysis?
```

1    A.    No.

2    Q.    And in the school instrument

3  case in southeast Michigan, can you describe

4  your -- well, for that case, can you describe

5  the work you did?

6    A.    Yeah.  So I was retained by the

7  plaintiffs.  It was a company called Meridian

8  Winds, and they were in the business of

9  renting band instruments to students and to

10  schools.  And they had -- they were up

11  against a much larger competitor and their --

12  when I was retained, their allegation was --

13  basically their larger competitor was pricing

14  substantially below what Meridian Winds was

15  charging.  And so I looked at what

16  information had been made available, there

17  had been a little bit of discovery.  But kind

18  of the end of it was my talking with the

19  management at Meridian Winds and it's like,

20  well, could you match these prices that your

21  competitor is charging?  And they said, yes,

22  but it wouldn't be profitable.  And then I

23  asked, but would it be above your cost of

24  production, if you will.  And they said, yes.

25  And then I said, as an economist, you really

Highly Confidential - Subject to Further Confidentiality Review

1  don't have any grounds here.  And so then it

2  was dropped.

3      Q.     Meaning you felt they didn't

4  have grounds to say that the pricing by the

5  defendant violated the antitrust laws simply

6  by being low?

7      A.     Right.  So I said basically

8  that it was my opinion that if you went into

9  court against a defendant who was pricing

10  above their cost of production, that you

11  weren't going to get very far and it would be

12  a waste of -- it would be a waste of time

13  spent on me, certainly.  And so they decided

14  to drop it.

15     Q.     So that's helpful.  Thank you.

16            So do you have any testifying

17  engagements that are not listed on this

18  Exhibit 3?

19     A.     Yes.

20     Q.     Okay.  Is that because you have

21  not yet submitted a report?

22     A.     In one I have submitted a

23  report but I haven't been disclosed, if you

24  will.  I've not been deposed.  So it's

25  probably -- I mean, it's probably okay to say

Highly Confidential - Subject to Further Confidentiality Review

```
 1   who that is.
 2              But then there's one, two --
 3   anyway, other than what's on this list --
 4   other than this case and what's on this list,
 5   I have three other active cases.
 6        Q.    It doesn't sound like you're
 7   close to retirement.
 8        A.    Yeah, it --
 9        Q.    So talking about the first
10   thing you mentioned and you said it was
11   probably okay.
12              Can you tell me about --
13              MR. DOVE:  Let me stop you for
14        a minute because I want to make sure
15        that you don't disclose anything
16        that's subject to a confidentiality
17        agreement or any sort of
18        communications with your counsel with
19        regard to that matter.  I mean, if
20        it's -- if it's confidential --
21              THE WITNESS:  The other side
22        knows who I am, and I will ultimately
23        be deposed, so it's not really a
24        secret.
25              So this is a case that's, in
```

Highly Confidential - Subject to Further Confidentiality Review

1          effect, a follow-on to the modafinil

2          case, and it's UnitedHealthcare is

3          seeking damages regarding modafinil.

4          And I have written a report commenting

5          on their expert's damage calculations.

6     QUESTIONS BY MS. GEMAN:

7          Q.     So UHC is the plaintiff and

8     Teva is the defendant?

9          A.     It's a joint defense group.

10    Teva and -- I know Mylan settled.  Actually,

11    Mylan may still be -- I don't know.

12         Q.     But Teva is -- or rather on

13    whose behalf are you working?

14         A.     Teva, I believe.

15         Q.     All right.  And is another name

16    for modafinil Provigil?

17         A.     Yes.

18         Q.     It's a wakefulness drug?

19         A.     Beg your pardon.

20         Q.     It's a wakefulness drug?

21         A.     Yes, correct.

22         Q.     And does that case also involve

23    armodafinil?

24         A.     No.  It's just an allegation of

25    overpaying for Provigil.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Due to keeping generics out of

2  the market?

3      A.      I'm sorry --

4      Q.      I'm sorry.

5      A.      -- I'm having trouble hearing

6  you.

7      Q.      I'm so sorry.

8              Due to keeping generics out of

9  the market?

10     A.      Yes.  Compared to earlier

11  generic entry, yes, uh-huh.

12     Q.      All right.  And that is an

13  antitrust case?

14     A.      Yes, I suppose so.  I don't --

15  I get hired to do damages.  What exactly what

16  law it's under is not always relevant to what

17  I do.

18     Q.      Have you created a damage model

19  in that case?

20     A.      No, I wasn't asked to do that.

21  There UHC presented an expert report and I

22  was asked to evaluate the reliability and

23  accuracy of those calculations, but I was not

24  asked to do a damages model of my own

25  construction.

1      Q.     Did you do any evaluation of

2  any of the plaintiffs' expert reports in this

3  opioids matter?

4      A.     No.

5      Q.     Have you reviewed any of the

6  plaintiffs' experts' reports?

7      A.     In this matter, no.

8      Q.     Okay.  Do you intend to?

9      A.     I haven't been asked to.  I

10  will if I'm asked to.

11      Q.     Okay.  So you mentioned you're

12  working on three other matters in addition to

13  this opioids matter, and one of them involves

14  modafinil.

15      A.     Correct.

16      Q.     Are the other two matters ones

17  in which you've been retained by counsel for

18  the defendants?

19      A.     Yes.

20      Q.     Are they class actions?

21      A.     Yes.

22      Q.     Are they antitrust matters, if

23  you know?

24      A.     Yes, I believe they are.

25      Q.     Okay.  And are the defendants

1   pharmaceutical companies?

2        A.     Yes, they are.

3        Q.     Can you tell me who they are?

4               MR. DOVE:  Again, cautioning

5        you on the confidentiality concern.

6               THE WITNESS:  Yeah, actually, I

7        can't.

8   QUESTIONS BY MS. GEMAN:

9        Q.     Okay.  Can you tell me who the

10  lawyers are?

11       A.     Like I say, law firms to me,

12  I'm sorry, are all Gilbert and Sullivan.  I

13  can't keep them straight.

14              I know the one; it's just not

15  coming to me.  If I think of it, I'll tell

16  you.

17       Q.     Do you know -- sorry.

18              Do you know if it's one of the

19  firms representing one of the defendants in

20  this opioids matter?

21       A.     I don't specifically know.

22       Q.     Okay.  Have you ever testified

23  before Congress?

24       A.     No.

25       Q.     Have you ever testified before

Highly Confidential - Subject to Further Confidentiality Review

1   any government agency?

2          A.      No, I have not.

3          Q.      So not the FDA or CDC or DEA?

4          A.      No.

5                  I -- this doesn't count, but I

6   was scheduled to testify before Congress, but

7   I was scheduled to testify before Congress on

8   the English rule, which Dean Snyder and I had

9   done a lot of research on, but our testimony,

10  if I recall, was scheduled for September 13,

11  2001.

12         Q.      Oh.

13         A.      So that was that.

14         Q.      Were those hearings reconvened

15  at any point?

16         A.      Not with us, no.

17         Q.      Okay.  And do you know if those

18  hearings resulted in any litigation -- I'm

19  sorry, legislation being passed?

20         A.      I'm positive that it did not,

21  but I don't know specifically because I would

22  know if something had changed.

23         Q.      Okay.  Do you have a list of

24  organizations, even a partial, for which

25  you've done consulting work?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Organizations, do you mean

2    firms, law firms, manufacturers?

3    Q.    No, no, the underlying

4    entities.

5         So, for example, in this case,

6    McKesson, here you're testifying?

7    A.    Right.  Do I have a list?  No,

8    I don't.

9    Q.    About how many -- about how

10   many different pharmaceutical companies have

11   you done consulting work for?

12   A.    Counting joint defense groups,

13   it would probably be between 10 and 15.

14   Q.    And how would you -- if you

15   were to take your work from 19 -- really,

16   1995 to the present, of your litigation work,

17   how would you divide the time between

18   consulting -- let me ask that again.

19        Consulting and serving as a

20   testifying expert?

21   A.    Gosh, after 2000, everything

22   I've done has been as a testifying expert.

23   Q.    Okay.  That's helpful.

24        So you sort of started out

25   working, like you said before, with Professor

1    Snyder?

2          A.      Right.

3          Q.      Did you do consulting work --

4    was all of the consulting work you did in

5    connection with matters for which Professor

6    Snyder was testifying or slated to testify?

7          A.      Yes, he was the testifying

8    expert, and I did the data analysis or other

9    research to help him construct his report.

10         Q.      And you stated that your expert

11   reports were accepted in 30 cases?

12         A.      Yes.

13         Q.      Now, you understand that's not

14   the same as those cases won, correct?

15         A.      Correct.  It means my testimony

16   has never been excluded.

17         Q.      Right.

18                 And it hasn't been the case in

19   all of those that the Court has expressly

20   ruled on your testimony.  In some instances

21   it wasn't challenged; in some instances the

22   issue may have been mooted by a settlement,

23   correct?

24         A.      Yes, although I guess I would

25   disagree.  I think my testimony has always

1    been challenged, but, yes, in a number of

2    these cases settlements mooted any ruling on

3    my -- on the, say, class certification that I

4    was testifying on, yeah.

5         Q.      And when you say "your

6    testimony has always been challenged," do you

7    mean that in each of the 30 cases a Daubert

8    or Frye motion was filed?

9         A.      Ah, okay.  We have a different

10   understanding of "challenge."  No, there was

11   always an opposing expert is what I meant.

12        Q.      Oh, yeah.

13        A.      Sorry.

14        Q.      No, that's fine.

15               But I guess just to ask my

16   question more precisely, and I appreciate

17   that clarification, do you know how many

18   cases of the 30 was a formal motion

19   challenging you as an expert, either your

20   qualifications or your methods or their

21   relationship to the subject matter of the

22   case, in how many cases did that sort of

23   formal challenge occur?

24        A.      I don't know the total, but

25   I -- sitting here today, I know of three

1    where it has been, and I would imagine there

2    have been more.  Surprisingly to me, I'm

3    rarely told if there's a Daubert motion filed

4    against me.  I don't know why I'm rarely

5    told, but I am.

6          Q.    And do you know of your -- of

7    the 30 cases in which you've been a

8    testifying expert, in how many of those would

9    you say the defendant prevailed?

10         A.    Oh, in the early -- in, say,

11   2000 to 2010, they -- this is -- this is a

12   somewhat wild guess, probably 30 percent the

13   defendants prevailed, and in recent years

14   it's been 70-some percent.

15         Q.    Why is that a wild guess?

16         A.    Because I was just remembering

17   back to -- so, well, I mean, I can be a

18   little more -- I guess I can be a little more

19   precise.

20               Okay.  So going back to -- on

21   the third page of Exhibit 3, defendants

22   prevailed in Altman versus Bayer.  This is in

23   pharmaceuticals.  Defendants prevailed in

24   Axium Plastics, and then it was reversed was

25   the last I heard.

1          Neurontin, that was a direct

2   purchaser case, and the class was certified

3   in part and denied in part.

4          Johns versus Bayer, I very

5   definitely Dauberted in that case.  I was

6   accused of being rude to the opposing expert,

7   which was true, but the case was dismissed,

8   so that was never ruled on.

9          I know I was not subject of a

10  Daubert motion in Nexium.

11         And I know that currently there

12  are Daubert motions that have been filed

13  against me in the Loestrin 24 antitrust

14  litigation.

15         Those are the ones I know of.

16     Q.    Do you recall the subject

17  matter of the Neurontin case?

18     A.    Yes, off-label marketing.

19     Q.    And do you recall what harm was

20  caused by that marketing?

21     A.    I was doing direct class

22  certifications, so, no.

23     Q.    Do you recall if there was harm

24  to individuals from the conduct of the

25  defendants in that case and their marketing

1    of Neurontin?

2         A.    No, I don't recall one way or

3    the other.

4         Q.    Have you ever testified in

5    cases that you consider to involve mass

6    personal harm?

7         A.    Not that I -- that wasn't ever

8    the subject -- the product liability end was

9    never the subject of anything that I was

10   retained on, so I think the answer would be

11   no.

12        Q.    Do you have an understanding of

13   what legal claims are alleged in this matter?

14        A.    As it is described in my

15   report, is the limit of my understanding of

16   the allegations, yes.

17        Q.    Have you ever done work

18   apportioning damages in a case between and

19   among different defendants or potential

20   defendants?

21        A.    No.

22        Q.    Are you offering any opinions

23   relating to apportionment of fault in this

24   case?

25        A.    No.

1    Q.    Okay.  Do you own stock in your

2  own name in any pharmaceutical company?

3    A.    Not that I know of.  I own a

4  lot of mutual funds that probably do have

5  stock in pharmaceutical companies, but I

6  don't know directly.

7    Q.    Okay.  So at this point or

8  certainly since May 24th, 100 percent of your

9  work is in the litigation and consulting

10 area?

11   A.    Uh-huh.

12   Q.    Okay.  In the last five years,

13 it's been less than 100 percent, I assume?

14   A.    Yes.

15   Q.    How would you -- how would you

16 describe it in the last -- well, putting

17 aside this time period --

18   A.    Sure.

19   Q.    -- when it's 100 percent.

20   A.    I think the main thing to

21 understand is it's highly variable.  So this

22 past year was a fairly busy consulting year,

23 so I would say that -- well, it's two things:

24 It was a busy consulting year and an easy, if

25 you will, teaching year.  I'll explain that

1    in a second.

2             So I would say in the past year

3    my time was probably 60 percent consulting to

4    40 percent teaching and research.  Two years

5    ago, it was probably 10 percent.

6        Q.    2017 it was 10 percent --

7        A.    Yeah, 2016.

8        Q.    -- 10 percent litigation work

9    and 90 percent academic work?

10       A.    Yeah, it was just -- I maybe

11   was working on one, maybe two cases, in that

12   time, just there weren't -- I wasn't doing

13   anything.

14            So it's highly variable, but I

15   would say if you were to average over the

16   last four years, it's probably about

17   60 percent teaching and 40 percent litigation

18   averaged over the five-year period.

19       Q.    And what is the ratio of

20   income, though?

21            I mean, that's the ratio of

22   work hours, correct?

23       A.    Right.  So in the past year --

24            MR. DOVE:  I'm going to object.

25       I believe special master has asked us

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to focus on -- you know, obviously you
 2          may ask him questions about his income
 3          and these cases and about
 4          pharmaceutical matters and so forth,
 5          but doing anything that would allow
 6          you to calculate his income in other
 7          unrelated matters and his employment
 8          at the university and other unrelated
 9          matters, I think that's outside the
10          scope of what the special master is
11          allowing.
12               MS. GEMAN:  And I think that's
13          sort of inherent in the ratio, but --
14          well, let's keep going and you can
15          object if you think that there's a
16          question that in your view runs afoul
17          of any -- the spirit of any or the
18          letter of any special master ruling.
19     QUESTIONS BY MS. GEMAN:
20          Q.    So, I'm sorry, Professor
21     Hughes, can you -- you gave a ratio of work
22     hours.
23          A.    Yes.
24          Q.    Averaged over the last five
25     years.
```

```
 1                    How would that translate to

 2      income?

 3                    MR. DOVE:  Objection for the

 4           reasons stated.

 5                    THE WITNESS:  Yeah, actually,

 6           let me -- I forgot to complete my

 7           previous answer.

 8                    Is that I said initially that

 9           in the last year or so consulting has

10           been very busy and teaching hasn't

11           been.  In anticipation of my

12           retirement, my colleagues gave me a

13           very light teaching load.  So instead

14           of teaching a five-course load, I was

15           only teaching a three-course load.  So

16           that explains some of why the ratio of

17           consulting hours was so high.

18                    Plus they were courses that I

19           taught numerous times before so there

20           was not a lot of preparation time

21           involved.

22                    Okay.  That said, the ratio of

23           income is -- over that five-year

24           period has probably -- it's really

25           hard to say.  The ratio of income is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              probably 30 to 50 percent consulting

 2              versus the rest being teaching as an

 3              average.

 4    QUESTIONS BY MS. GEMAN:

 5         Q.     So your testimony is that the

 6    consulting work hours is commensurate with

 7    the consulting/testifying work income

 8    roughly?

 9         A.     Yeah, to the best estimate that

10    I have sitting here today.  I would have to

11    go back and do the math to be more precise.

12         Q.     And overall, would you say in

13    the last five years how much income have you

14    earned from a mixture of consulting and/or

15    testifying on behalf of pharmaceutical

16    companies and distributors in absolute terms

17    versus relative to any other source of

18    income?

19         A.     Over the past five years?

20         Q.     Yes.

21         A.     I would probably say several

22    hundred thousand dollars.  Something like

23    that.

24              (Hughes Exhibit 4 marked for

25         identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. GEMAN:
 2        Q.     Now, what's been marked as --
 3   what's been marked as Exhibit 4 is your
 4   report, and I know that there's some errata
 5   and so forth, but before we turn to that, I
 6   wanted to ask you -- and we will turn to
 7   that, no worries.  But before we turn to
 8   that, I wanted to ask you to turn to
 9   Exhibit C, which is the appendix setting
10   forth materials considered.
11             And can you let me know when
12   you've gotten to Appendix C?
13        A.     Yes, I'm there.
14        Q.     All right.  Are you drawing a
15   distinction between materials considered and
16   those relied on?
17        A.     Yes.
18        Q.     Okay.  So which of these
19   materials did you rely on in forming your
20   opinions?
21        A.     Oh, I would have to compare
22   this to the notes in the report.  I could not
23   tell you -- I could not go through the list
24   and tell you sitting here today.
25        Q.     Is there anything here that
```

Highly Confidential - Subject to Further Confidentiality Review

1    jumps out at you as something that you didn't

2    rely on?

3         A.    No, I don't believe so.

4         Q.    How could one ascertain which

5    materials you relied on?

6         A.    I think you would have to

7    compare this list to the citations that are

8    contained in the body of the report.

9         Q.    So it's your testimony that all

10   of the citations in the report reflect

11   matters that you relied on and any material

12   cited in Appendix C but that is not in your

13   report would be considered but not relied on?

14        A.    Never say never, but that's

15   probably largely true.

16        Q.    Okay.  So we would just ask for

17   the materials that you relied on, if you

18   think it's something other than the cites in

19   the report.

20        A.    Oh, okay.  Uh-huh.

21        Q.    Do you have a file of the

22   materials you considered and/or relied on in

23   this matter?

24        A.    Do you mean do I have hard

25   copies of these?

1    Q.    Any kind of file, electronic,

2    hard copy?

3    A.    Yeah, there are electronic

4    copies of all of that -- all of the things

5    that are in the footnotes.

6    Q.    And how did you come to obtain

7    those --

8    A.    Well --

9    Q.    -- materials?

10    A.    -- because I started with the

11    outline and the assignment that I gave to the

12    staff at Cornerstone and sent them off to

13    research and fill in the -- fill in the

14    blanks in the outline.  And so the materials

15    that resulted was the materials that

16    Cornerstone had identified at my direction.

17    Q.    Okay.  And so was it a file --

18    the electronic file to which you referred,

19    was that prepared by Cornerstone?

20    A.    Yes.

21    Q.    Was it sort of housed there or

22    in their system?

23    A.    Yes and no.  In the end, there

24    is a version -- okay.  In the end there's a

25    linked copy of my report so that and

1   electronically you can click on any of the

2   footnotes and it will take you to the

3   document that is being cited.  And that was

4   on their system, on my system.

5        Q.     Okay.

6        A.     But this is after the report

7   was filed.

8        Q.     And so the file of materials

9   that you considered, was that -- did you have

10  to sort of log into Cornerstone to get that

11  file, or was it on your own system?

12       A.     All of this I would have had to

13  log in to Cornerstone's system and download

14  it, yes.

15       Q.     Were there any materials that

16  you yourself added to the file?

17       A.     Well, yes.  If you refer just

18  for a second to the table of contents, I

19  mean, Section 4, Roman numeral IV, of the

20  report, that is -- that's all -- I did all of

21  that.

22       Q.     Meaning you wrote that entire

23  section of the report?

24       A.     I wouldn't say the entire

25  section, but I wrote the body and I had

1  Cornerstone fill in some of the sources.  But

2  I had many of the sources -- because as I

3  said before, there was -- in almost every

4  pharmaceutical report I've done, there's been

5  a section similar to this, and so this

6  section drew heavily on my previous research.

7      Q.      How much of the report in

8  general did you write?

9      A.      Well, we had a system where we

10  started with the outline, which basically

11  started -- the outline started with

12  Sections 4, 5 and 6, which were at a high

13  level things that I -- things that were

14  developed based on my experience and

15  expertise.  Some of the subheadings were also

16  put into place, and then I asked Cornerstone

17  to go off and to find sources that would

18  relate to the points in the outline.

19            And then at that point we would

20  discuss what the findings were, and at that

21  point I would ask Cornerstone to take a crack

22  at the first draft of the sections.

23  Following that, I would spend several hours

24  doing a very heavy edit of that work to make

25  sure that it's written in my voice, to make

1    sure that it is accurate, based on my

2    experience and to make sure that it

3    actually -- not actually, accurately reflects

4    my opinion.

5              So that by the time I sign the

6    report, I consider that all the words in the

7    report are mine.

8         Q.     Who prepared the outline?

9         A.     I did it jointly with

10   Cornerstone through phone conversations, if

11   you will.

12        Q.     And did that outline sort of

13   turn into a draft or did it --

14             MR. DOVE:  I'm going to object.

15        I've allowed some questioning on this,

16        but special master has made clear in

17        his June 10th e-mail order that

18        counsel may not ask about the amount

19        or nature of time spent drafting the

20        report itself or meeting with counsel

21        to discuss the report.

22   QUESTIONS BY MS. GEMAN:

23        Q.     I'm not sure this question

24   falls outside that order.

25             Just is the outline a separate

1   document, or is it -- I understand the rules,

2   drafts are not discoverable, but I'm just

3   asking if the outline is a separate document?

4        A.     The outline is not a separate

5   document.  We start with the outline and

6   then -- I don't know if you'd call it taking

7   turns, but it would be clear is that, as we

8   would say, you know, okay, Cornerstone has

9   the pen, so they're doing -- so we're not

10  editing over top of each other.  And then

11  where I would e-mail them and say, okay, I

12  want the pen tonight or this weekend because

13  I'm going to do work on it.

14             But the outline file, if you

15  will, turned into this document over the --

16  over the course of time.

17       Q.     Did you interact with any of

18  the defendants' other experts in your work in

19  this matter?

20       A.     No.

21       Q.     Do you know if Cornerstone --

22  strike that.

23             Do you know if your sort of

24  team at Cornerstone interacted with other

25  defense experts?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not to my knowledge.  I never

2  heard of that, but I can't swear to it

3  because I don't know what they did or didn't

4  do.

5    Q.    Have you reviewed any materials

6  pertinent to this case since May 10, 2019?

7         MR. DOVE:  Objection as to

8     form.

9         THE WITNESS:  No, I don't

10     believe so.

11  QUESTIONS BY MS. GEMAN:

12    Q.    Okay.  And so the first

13  category of materials considered is academic

14  articles.

15         Do you see that there?

16    A.    Hang on.  I closed it.

17         MR. DOVE:  This is Appendix C,

18     Counsel?

19         MS. GEMAN:  Yes.

20         THE WITNESS:  Okay.  Yes.

21  QUESTIONS BY MS. GEMAN:

22    Q.    And did you personally review

23  all of these articles and working papers?

24    A.    No.  These were -- I reviewed

25  some of them.  I reviewed some parts of

1  others, but the complete review of these

2  articles was done by my staff at Cornerstone

3  at my direction.

4      Q.    Did people give you kind of

5  sections to look at from among those articles

6  or sort of help you triage which ones to look

7  at?

8      A.    No, not exactly.  Well, let me

9  put it differently.  Sometimes somebody will

10  say, well, this article was particularly

11  pertinent, you know, especially Section 3,

12  and it was my habit at that point to, if

13  possible, to review the entire article; not

14  just the, you know, hypothetical Section 3.

15      Q.    To the extent that any of these

16  articles or working papers are actually cited

17  in the report, did you review them in their

18  totality?

19      A.    Not all of them, no.

20      Q.    How were the Bate-stamped

21  materials that you reviewed selected?

22      A.    Again, this was -- Cornerstone

23  was tasked with finding Bates-stamped

24  materials that were relevant to the opinions

25  that I was offering, and so these would have

1    been selected by Cornerstone.

2        Q.    Were you able to query the

3    larger database of documents?

4        A.    Yes, we were able to.  I did

5    not do so personally, no.

6        Q.    Were there any documents that

7    you expressly asked for, or did you feel that

8    their selection was pursuant to your general

9    instructions and complete?

10       A.    Yes, they were following my

11   assignment, and I was -- as the information

12   came in, I was happy with what they had

13   produced for me.

14       Q.    Okay.  And the depositions and

15   associated exhibit section, this begins on

16   page 7, do you see that, of Appendix C?

17       A.    Yes.

18       Q.    Did you read all of these

19   depositions?

20       A.    I -- no, I did not read all

21   of -- all of them.  I read the vast majority

22   of the Wharton and Applegate depositions, but

23   I did not read them in their -- you know,

24   probably read 60 or 70 percent of them, of

25   those two.  And then bits and pieces of the

1  others.

2     Q.    How did you come to review this

3  particular group of depositions?

4     A.    These were people that, again,

5  pursuant to my instructions that Cornerstone

6  had identified who had opinions that were

7  expressed in deposition that were relevant to

8  the opinions that I was putting forth in my

9  report.

10    Q.    Did individuals give you select

11  pages or help direct you to excerpts?

12    A.    Not at that point.  There were

13  sections that were selected of these

14  depositions that were cited in the report,

15  and I looked at those.  But, you know, when

16  you're reading a deposition like that or

17  you're directed to certain parts, it's kind

18  of like when you go to the library looking

19  for a particular book and you find that book

20  and then there's ten other books on other

21  side that you're interested in.  So they

22  might have directed me to a particular cite,

23  but I usually ended up reading several pages

24  before and several pages after to make sure I

25  had the context of what was being offered to

Highly Confidential - Subject to Further Confidentiality Review

1    me.

2         Q.    Understood.

3               Who are Donald Wharton and Mary

4    Applegate?

5         A.    They -- okay.  Mary Applegate

6    is -- her exact place in the organizational

7    chart, she's very high up in Ohio Medicaid,

8    and I think that Dr. Wharton is like head of

9    pharmaceutical -- the head of the

10   pharmaceutical section of Ohio Medicaid.

11   Something like that.  I actually don't

12   remember exactly, but I believe they're both

13   employed by Ohio Medicaid.

14        Q.    Did you review any Amerisource

15   documents?

16        A.    No, I did not.

17        Q.    And I believe I asked you

18   before about plaintiff's expert reports.  Let

19   me now ask about defendants.

20              Have you read any expert

21   reports submitted by defendants in this

22   matter?

23        A.    No.

24        Q.    Okay.  Do you know who

25   plaintiffs' experts are?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      No, not specifically.

2                (Hughes Exhibit 5 marked for

3        identification.)

4   QUESTIONS BY MS. GEMAN:

5        Q.      Okay.  So what's being marked

6   as Exhibit 5 is a list of the defense experts

7   disclosed on May 10th in this matter.

8                I assume you've not seen this

9   document before?

10       A.      I have not.

11       Q.      Okay.  And can you tell me if

12  you -- other than yourself, you obviously

13  know yourself, can you tell me if you know

14  any of the individuals listed on this

15  document?

16       A.      Okay.  Under Endo and Par, I

17  know Henry Grabowski.  And when I say "know,"

18  I know by reputation.  We've never met.  I

19  know of his work.

20               Under Henry Schein, I believe I

21  know Dr. Maness, only to the extent that,

22  again, if memory serves, he coauthored a

23  paper that I used in my dissertation, I

24  believe.  But I don't know him personally at

25  all.
```

```
 1                    Under McKesson, I know

 2    Dr. Bell.  He has on occasion been an expert

 3    on cases that I was also serving on.  So, for

 4    example, he may do merits when I do class

 5    certification or something.  That said, I

 6    don't believe we've ever met.

 7                    Kevin Murphy I know by sterling

 8    reputation.  He'll get the Nobel Prize in

 9    economics one of these days.  He and

10    Cockburn, I'm familiar with.  I worked with

11    him that -- that organization founded by

12    Pfizer that we talked about before, the

13    pharmaceutical economics something council.

14        Q.    PEPC?

15        A.    Yes, I knew him through that.

16    Although we've talked on the phone, I've

17    never actually met him.

18                    Robert Navarro, I know him

19    through his work.

20                    And Daniel Kessler, if it's the

21    Daniel Kessler I think it is, I know him.  I

22    know him by reputation, by his experience.

23                    And that would be it.

24        Q.    So what is the scope of Henry

25    Grabowski's work?  You said -- you mentioned
```

Highly Confidential - Subject to Further Confidentiality Review

1   you knew him sort of by the scope of his

2   work.

3        A.    You don't mean on this case?

4        Q.    Correct.

5        A.    Oh, okay.

6              Yeah, so his work, I would

7   consider him to be a well-published expert in

8   pharmaceutical markets.  He's, in particular,

9   done some good work on generic entry and the

10  effects of the Hatch-Waxman Act, things like

11  that.

12       Q.    And similarly, I think you

13  mentioned you knew Robert Navarro through his

14  work?

15       A.    Right.  And Robert Navarro, his

16  work is related to the payment system in

17  pharmaceuticals, so he has done work on

18  third-party payers and PBMs and the like in

19  how -- how PBMs and the like operate, if I

20  recall correctly.

21       Q.    And who is Daniel Kessler?

22       A.    If it's the Daniel Kessler I'm

23  thinking of, he was commissioner of something

24  at government, FDA or CMS or something like

25  that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you thinking of David

2  Kessler?

3    A.    Oh.  So -- okay.  So that's

4  David Kessler.  Okay.  So I don't know Daniel

5  Kessler then.  Thanks for clarifying that for

6  me.

7    Q.    No problem.

8         (Hughes Exhibit 6 marked for

9         identification.)

10 QUESTIONS BY MS. GEMAN:

11   Q.    And I'm going to introduce as

12 Hughes Exhibit 6 my bespoke list of

13 plaintiffs' experts.

14         There's a clean copy for the

15 witness, and I wasn't able to white out some

16 checks that I made had in mine, but I want

17 you to have a copy.

18         And so I really would have

19 preferred to make this just a demonstrative

20 for you to look at it, but with so many

21 people on the phone and it just seemed easier

22 just to give out a piece of paper.

23         So what this is is a list of

24 plaintiffs' exhibits -- plaintiffs' experts.

25         Do you know any of these

Highly Confidential - Subject to Further Confidentiality Review

1   individuals?

2       A.    I know a number of them by

3   reputation.  You know, I know their names.  I

4   don't know them personally.

5             And that would include Jonathan

6   Gruber.  There's David Kessler, now I'm on

7   the right one.  I know Thomas McGuire.

8   Actually I worked for Thomas McGuire 50 years

9   ago -- not 50, 45 years ago.  I know Meredith

10  Rosenthal.  And I believe that's it.

11      Q.    Okay.  In what context did you

12  work for Thomas McGuire?

13      A.    So it is 1977, 1978, Professor

14  McGuire is on the faculty of Boston

15  University.  I was a master's student in

16  economics at Boston University, and I was

17  assigned to Professor McGuire as his research

18  assistant on some work he was doing.  His

19  initial claim to fame research was on mental

20  health, issues involving mental health.

21            So I worked as a research

22  assistant for Professor McGuire for a year

23  and have not -- we haven't laid eyes on each

24  other since.

25      Q.    Was that a good experience?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yeah, it was fine.

 2          Q.      Do you respect him as an

 3   economist?

 4          A.      As an economist, yeah, uh-huh.

 5          Q.      Would you say he has a sterling

 6   reputation?

 7          A.      I have not kept up with his

 8   work.  I know that -- I mean, I would say

 9   that he has a -- I would certainly say that

10   he has a great reputation regarding the

11   economics of mental health.  To the extent

12   that he's branched off into other things, I

13   just haven't followed his career in that

14   regard.

15          Q.      Fair enough.

16                  And I think you said you know

17   Meredith Rosenthal?

18          A.      Yes, I do.

19          Q.      How do you know her?

20          A.      She has been the plaintiff's

21   expert in at least a half a dozen cases where

22   I have worked as defense expert.

23          Q.      Okay.  Have you met her

24   personally?

25          A.      Actually, no.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And have you met Jonathan

2    Gruber personally?

3    A.    No, I only know him by

4    reputation.

5    Q.    Okay.  What kind of work does

6    he do?

7    A.    Well, my recollection is he

8    started out primarily as a labor economist

9    and then he branched off into health, and I

10   believe that he was an important economist on

11   the group that put together the legislation

12   that became ObamaCare.

13   Q.    Have you done any work on

14   ObamaCare?

15   A.    No.  I mean, I have been asked

16   on a couple of occasions to explain the

17   workings of ObamaCare to individuals and

18   groups, but, you know, through the college,

19   there would be like reunion weekend, and so I

20   would be asked by the dean of the faculty to

21   talk about ObamaCare.

22   Q.    Do you know David Kessler

23   personally?

24   A.    Not personally, no.

25   Q.    Have you ever heard him speak?

1    A.    No.  I have read deposition

2 testimony by him, and I have probably read

3 Congressional testimony by him.  I believe in

4 conjunction with my work on AWP matters.

5    Q.    Do you consider yourself an FDA

6 regulatory expert?

7    A.    Well, it kind of depends on

8 what you mean by FDA regulatory expert.  In

9 the course of doing that work that became the

10 working paper known as Napsterizing

11 Pharmaceuticals, one of the paths that I took

12 on of the three coauthors there, one of the

13 tasks that I took on was to come up with a --

14 and I don't know quite how to put it.  But

15 basically to come up with a list of NDCs that

16 have been -- I'm sorry, NDAs that have been

17 approved by the FDA over probably the past

18 20 years at that point and to learn about

19 changes in their, you know, fast track

20 system, changes in their requirements.  So

21 that part of the regulatory aspect I have

22 known quite closely.  I can't say that I've

23 kept up with it in the last few years.

24         But as -- would I have the same

25 sort of knowledge of the workings of the FDA

1  as David Kessler, no, I would not, but

2  there's aspects of it that I am very familiar

3  with.

4      Q.    Do you have familiarity with

5  pharmaceutical marketing regulations?

6      A.    Familiarity only, you know, to

7  the extent that I've worked on a couple of

8  false claims and a couple of off-label

9  marketing cases, but outside of that, no.

10      Q.    Other than Neurontin, which

11  off-label cases have you worked on?

12      A.    The Celexa and Lexapro cases

13  had an off-label aspect to it.

14            And the -- I think the

15  Risperdal case could be said to have had some

16  off-label aspects to it, if I remember

17  correctly.

18      Q.    Have you ever undertaken to

19  determine the extent of off-label use of a

20  drug?

21      A.    Well, in the Celexa and Lexapro

22  cases, my task was to evaluate the accuracy

23  and reliability of the plaintiffs' damage

24  calculation, and part of their damage

25  calculation involved the off-label marketing.

Highly Confidential – Subject to Further Confidentiality Review

1              I critiqued their methodology,

2     but I was not asked and I did not propose an

3     alternative methodology.

4              And the same would be true for

5     Neurontin.

6          Q.     What were the off-label usages

7     alleged to be occurring for Celexa and

8     Lexapro?

9          A.     Pediatric uses as I recall.

10         Q.     Are they both anti-depression

11    drugs?

12         A.     Correct.

13         Q.     And do you recall the outcome

14    of the Celexa/Lexapro litigation?  Did it

15    settle?  Did it go to trial, et cetera?

16         A.     I believe it was dismissed.  I

17    believe it was dismissed.  I could be wrong.

18         Q.     Okay.  And we talked earlier

19    about the Neurontin matter, correct?

20         A.     Right.

21         Q.     And what was the off-label use

22    of the Risperdal?

23         A.     I don't recall specifically,

24    but it was -- Risperdal is a mental health

25    drug, and there was some -- if I'm

1    remembering correctly, and I may not be, but

2    there was some mental health indication that

3    there was an accusation that it was being

4    marketed for that -- that claim was it

5    shouldn't have been marketed.  I may not have

6    that correct, though.  It's been a long time.

7         Q.     Did you do any study of any

8    potential off-label use of Risperdal?

9         A.     No.  There again, I was -- my

10   assignment was to look at the methodology

11   that had been put forth by the plaintiff's

12   expert, so I did not -- I was not asked to

13   and didn't construct one of my own.

14        Q.     Do you recall how that case

15   resolved?

16        A.     Risperdal?

17        Q.     Yes.

18        A.     It settled somehow, and I don't

19   know exactly.  I have no idea what the terms

20   were, but I know it settled.

21        Q.     Just to be clear, are you

22   offering any criticisms of plaintiffs'

23   experts here in this opioids case?

24        A.     I haven't reviewed any of their

25   reports, so I don't have any basis to

```
 1    criticize them in this matter, no.

 2         Q.    Okay.  Do you have any -- so

 3    you have no opinions about the plaintiffs'

 4    experts' work in this case?

 5         A.    Their work in this case, no.

 6         Q.    Correct.

 7               And do you have any knowledge

 8    of the types of analyses or methodologies

 9    they employed?

10         A.    I do not know, not in this

11    case, no.

12         Q.    Okay.  Do you want to keep

13    going for a while, or do you want to take a

14    break?  We've been going more than an hour.

15         A.    Let's go another 20 minutes or

16    so and then we'll take a break.

17               MR. DOVE:  I'm fine.  I know we

18         have lunch, but it will stay -- I

19         think it's -- it will stay there for

20         another 20 minutes.  That's fine.  All

21         right.  Whatever.

22               MS. GEMAN:  Okay.  So we'll go

23         through the next -- I appreciate that.

24         Unless you want to take a lunch break

25         now?
```

1          MR. DOVE:  I'm fine going on.

2    QUESTIONS BY MS. GEMAN:

3          Q.    Okay.  So let's, if we could,

4    look from appendix -- move from Appendix C to

5    Appendix D.

6          So tell me when you've had a

7    chance to review it.

8          A.    Appendix D of my report, right?

9          Q.    Yes.

10          A.    Yes, I'm there.  I'm fine.

11          Q.    Okay.  And is this -- so are

12    these instructions that you put together?

13          A.    These are instructions that

14    Cornerstone and I put together

15    collaboratively.

16          Q.    Okay.  Is this all the

17    instructions that apply to the importation

18    and processing of the Ohio Medicaid claims

19    data?

20          A.    Yes, it's my understanding that

21    this is everything that was done to clean the

22    Ohio Medicaid data.

23          Q.    Okay.  And did you yourself

24    investigate whether the duplicate

25    observations were, in fact, real duplicates?

1    A.    Yes, in the sense that during a

2    conference call with Cornerstone, they -- we

3    went through all of this, actually, looking

4    through examples in the data.  And so we

5    discussed at some length what the criteria

6    for a duplicate observation would be, and

7    so -- and then that's the definition that

8    results here, all variables take on values

9    identical to those of another claim or

10   everything except the internal control number

11   and the date were the same.

12   Q.    And did you -- was your working

13   assumption of large scripts or large

14   quantities dispensed was an error in the

15   data?

16   A.    There was this business where

17   suddenly every -- in that three-year -- I am

18   sorry, three-quarter period where everything

19   seemed to be inflated by a factor of a

20   thousand, and so we made the assumption that

21   that's what was going -- that that's what was

22   going on.

23   Q.    And did you do any external

24   investigation as to whether -- sorry, I -- as

25   to whether there, in fact, an error that

```
1    sort of multiplied the claims by a thousand?

2         A.    I believe that Cornerstone put

3    the question back to Ohio Medicaid, and they

4    either did not get an answer or got an I

5    don't know why that is answer.

6         Q.    Okay.

7         A.    But it was not -- if they

8    asked -- if I'm remembering correctly, if

9    they asked, they didn't get an answer one way

10   or another.

11        Q.    And in -- I'm looking at

12   paragraph 10, which is the exclusion rules.

13        A.    Right.

14        Q.    So you excluded denied claims,

15   correct?

16        A.    Correct.

17        Q.    And you -- and now I'm jumping

18   to 3.  Excluding claims for prescriptions

19   that fell outside the sample time period,

20   correct?

21        A.    Correct.

22        Q.    And then how did you define

23   medication-assisted treatment?

24               Was that based on the MAT

25   indicator?
```

1    A.    Yes, as it says in note 11, the

2  MAT claims were either H3T or H3W.

3    Q.    Okay.  And respond to opioid

4  antagonists and opioid withdrawal therapy

5  agents?

6    A.    Yes.

7    Q.    And do you recall what effect

8  that exclusion had on the analysis?

9    A.    No, I don't.

10    But -- I don't know what effect

11  that had except to say that there were many,

12  many claims for medication-assisted

13  treatment.  It was not a small -- it was not

14  a small number of claims.

15    Q.    So what I'd like to do before

16  the break is just make sure I understand who

17  the folks were that you were working with at

18  Cornerstone.

19    A.    Uh-huh.

20    Q.    And what was Jennifer McCabe's

21  sort of function?

22    A.    Jennifer McCabe really stepped

23  in after the claim was -- not claim -- after

24  the report was filed.  The professional that

25  had previously led the team, Lisa Tichy, had

```
 1   to take a family leave, and so Jennifer

 2   stepped in sort of -- basically as team

 3   leader after that.

 4        Q.    And when did Ms. Tichy leave

 5   and get sort of replaced or subbed in by

 6   Ms. McCabe?

 7        A.    Pretty soon after May 10th.  I

 8   don't know the exact date, but it was within

 9   a couple of weeks of that.

10        Q.    May 10th of 2019 or '18?

11        A.    No, '19.  It was -- Dr. Tichy

12   worked with us all the way up through the

13   filing of the report, and it was only

14   afterwards that Ms. McCabe took over as team

15   leader.

16        Q.    I see.

17              And you mentioned Ofer Cohen

18   earlier today.

19        A.    Uh-huh.

20        Q.    Can you tell me what role he

21   had?

22        A.    Yes.  He was primarily

23   responsible for the document research and the

24   data analysis.  He was, I think, the person

25   who -- we may find this out, but I think he's
```

1    the person who spent the most time on this

2    matter in the course of forming the report.

3    Not only did he do much of the data analysis

4    and the research, but he also, I believe,

5    directed the analysts who assisted him.

6           Q.     And who was -- who is Sidharth

7    Shah?

8           A.     Pardon me?

9           Q.     Who is Sidharth Shah?

10          A.     I don't know.

11          Q.     Who is Maria Vergara?

12          A.     I don't know.  Both of them, I

13   believe, were on one phone call with me.  The

14   name kind of rings a bell, but who they are

15   or what exactly their role is, I do not know.

16          Q.     Who is Florian Rundhammer?

17          A.     Yeah, Florian was -- he was a

18   member of the team that -- gosh, there was

19   one section of the analysis that he headed

20   up, and sitting here today, for the life of

21   me, I can't think of which one it was.

22          Q.     Okay.

23          A.     But he headed up one of the

24   sections of the research.

25          Q.     Who's Andrew Sfekas,

Highly Confidential - Subject to Further Confidentiality Review

```
1    S-f-e-k-a-s?
2          A.      I don't know.
3          Q.      Who is Rebecca Nicoletti?
4          A.      I don't know.
5          Q.      Okay.  Who is Andrea Goodman?
6          A.      Again, I don't know.
7          Q.      Okay.  Who is Heather Gamberg?
8          A.      I don't know.  I assume all of
9    these people are analysts in the Cornerstone
10   team, but I have not had personal contact
11   with them.
12         Q.      Who is Yuxin Han?
13         A.      Same thing, I think a member of
14   the -- an analyst member of the team, but I
15   have not had personal contact with that
16   person.
17         Q.      Okay.  What about Amy Tingle?
18         A.      Same thing, member of the team,
19   but I have not had personal contact with
20   them.
21         Q.      Who did you interact with most?
22   Is that Dr. Tichy?
23         A.      Dr. Tichy and Dr. Cohen.
24         Q.      And doctor who?
25         A.      Cohen, Ofer Cohen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Dr. Cohen.

 2                 Okay.  And who is Samantha

 3   Chamblee?

 4          A.     I don't know.  I assume a

 5   member of the team, but nobody that I had

 6   personal interaction with.

 7          Q.     Okay.  Who is Kelsey Johnson?

 8          A.     Same thing, I don't know who

 9   she is.  I did not have personal contact with

10   her.

11          Q.     Okay.  What about Brennan Day?

12          A.     I don't know that -- I did not

13   have personal contact with that person.  A

14   member of the team, I'm sure.

15          Q.     Okay.  What about Ralph Blasey

16   or Blasey?

17          A.     Same answer, a member of the

18   team, but I did not have personal

19   interactions with him.

20          Q.     And what office were these

21   folks in, the ones that you did have contact

22   with?

23          A.     The ones that -- Dr. Tichy and

24   Dr. Cohen were both in the New York office.

25          Q.     And did you come to New York
```

Highly Confidential - Subject to Further Confidentiality Review

1    and work with them, or was it mostly

2    telephonic?

3         A.    Almost all telephone.  There

4    was one occasion when I was at Cornerstone

5    New York for a different case and we went off

6    into a conference room and talked about some

7    of the things that we were -- that we were

8    working on at the moment, but it just -- it

9    was serendipitous.  It wasn't -- I didn't

10   come down specifically for that meeting.

11                MS. GEMAN:  Okay.  I appreciate

12        that.  Should we do a lunch break?

13                MR. DOVE:  Sure.

14                VIDEOGRAPHER:  We're going off

15        the record.  The time is 12:15.

16         (Off the record at 12:15 p.m.)

17                VIDEOGRAPHER:  We're going back

18        on the record.  Beginning of Media

19        File 3.  The time is 1:01.

20                (Hughes Exhibits 7, 8 and 9

21        marked for identification.)

22   QUESTIONS BY MS. GEMAN:

23        Q.    Good afternoon.

24        A.    Good afternoon.

25        Q.    So if I could please ask you to

Highly Confidential - Subject to Further Confidentiality Review

1    look at what has been marked as Exhibit 7.

2                Do you see that?

3        A.     I do.

4        Q.     Do you know what this is?

5        A.     Not specifically, but it looks

6    like it is Cornerstone invoices in this

7    matter.  I've not seen it before.

8        Q.     So you're not generally copied

9    on their --

10       A.     No.

11       Q.     Do you receive any kind of

12   summaries of -- not their work product, but

13   the amount of their work?

14       A.     No.

15       Q.     And I can -- we sort of made it

16   one exhibit for convenience, but, you know,

17   this is the work from September 2018 through

18   April of 2019.  And if you look -- at least

19   it appears based on the dates.  And if you

20   look at Exhibit 8, that is a document that

21   appears to be an invoice that you submitted;

22   is that correct?

23       A.     That is correct.

24       Q.     Okay.  And do you prepare an

25   invoice like this every month?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Yes, when I've worked some
 2   hours, yes.
 3        Q.      Yes.
 4                And you submit it directly to
 5   Ms. Morrison?
 6        A.      No, I submit it to a woman
 7   named Kristin at Cornerstone.
 8        Q.      I see.
 9                Have you met Erika Morrison?
10        A.      I have not.
11        Q.      All right.  And your hourly
12   rate in this matter has been $900 per hour?
13        A.      After the first of the year.
14   In 2018, it was 850.
15        Q.      Okay.  How did you go about
16   setting both last year's and this year's
17   rates?
18        A.      Basically what other -- it's
19   just kind of like anything else, periodically
20   you take a raise.  There was no science to
21   it.
22        Q.      Okay.  And do you know if
23   there's any work that's been done on this
24   matter that hasn't been billed?
25        A.      Yes, everything that's been
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    done since June 1st has not yet been billed,

 2    at least as far as I go, and I assume there's

 3    also hours from Cornerstone as well.

 4         Q.    Okay.  And do you get paid

 5    monthly from Cornerstone?

 6               Let me rephrase.  I'm so sorry.

 7               For your own work?

 8         A.    Right.  Yes, basically I get --

 9    I get paid my hourly billings, I get paid by

10    Cornerstone usually within the first 15 days

11    of the month or so.

12         Q.    Okay.  And how many hours did

13    you work in June for which you have not yet

14    submitted an invoice?

15         A.    Probably between 15 and 20.

16         Q.    Okay.  You may have said that

17    earlier in the depo.

18               And do you know how many hours

19    the staff collectively at Cornerstone have

20    worked in June?

21         A.    No.

22         Q.    And what about in May?

23         A.    Cornerstone?

24         Q.    Yes.

25         A.    I have no idea.
```

 1          Q.       Do you have -- do you know how

 2   much Cornerstone has billed -- strike that.

 3                   Do you know how much

 4   Cornerstone has invoiced on this matter?

 5          A.       I do not.

 6          Q.       Okay.  Would it surprise you if

 7   it was over a million?

 8          A.       No, it probably -- no, it

 9   wouldn't surprise me because there has been a

10   ton of work that has gone into this report,

11   so that wouldn't surprise me at all.

12          Q.       And you receive compensation

13   from Cornerstone based on its collective

14   staff billings; is that correct?

15          A.       I do.

16          Q.       Is that reflected in your

17   hourly rate, or is that separate?

18          A.       That is separate.

19          Q.       Okay.  Can you explain to me

20   how that works?

21          A.       Sure.

22                   So when I bring -- when I do a

23   case with Cornerstone in exchange for giving

24   them right of first refusal to the work and

25   other activities I engage in in marketing

Highly Confidential - Subject to Further Confidentiality Review

1    Cornerstone, I am compensated with -- by

2    15 percent of their collected staff billings

3    on each project.

4         Q.    So how much have you received

5    from Cornerstone for this project?

6         A.    That's really hard to -- how

7    much have I received in that kind of

8    compensation?

9              Yeah, that's really hard to say

10   because they pay twice a year.  They pay in

11   March and they pay again in November.

12   November, yeah, November.  And -- oh, I'm

13   sorry, March and September.  And they don't

14   pay that compensation until they've collected

15   from the client.  So in the March payment, I

16   know I would have received something on this

17   project, but all of the projects that I work

18   with Cornerstone are all lumped together in a

19   single amount.

20        Q.    I see.

21        A.    But since it is up through

22   March and it would had to have been paid and

23   we weren't working all that terribly hard, I

24   wouldn't expect it was a whole lot.

25        Q.    So what you get twice a year

Highly Confidential - Subject to Further Confidentiality Review

1    from Cornerstone is an amount that reflects

2    15 percent of the collected billing on all of

3    the work that you're doing with them?

4         A.     All of the different cases I'm

5    doing with them, yes.

6         Q.     All right.  And are you doing

7    other cases with them right now?

8         A.     Yes.  Intuniv is one.  I lost

9    my exhibits here.  Ah, thank you.  Restasis

10   and Intuniv and Thalomid and Revlimid are all

11   with Cornerstone and active to one degree or

12   another.

13        Q.     And you say you give them the

14   right of first refusal?

15        A.     Yes.

16        Q.     And so that means if you're

17   approached about a case and you know you're

18   going to need backup support, you go to them

19   first?

20        A.     Right.

21               And if they -- if it fits

22   within their expertise, but generally if they

23   do do a conflict check and sometimes they're

24   conflicted out, and so then they can't help

25   me.

1    Q.    Now, in this case you were

2    approached by Cornerstone?

3    A.    Yes, I think that's the best

4    way to put it.

5    Q.    So does that same arrangement

6    apply to cases when they approach you?

7    A.    Yes, it does.

8    Q.    And you mentioned you do other

9    marketing in connection with Cornerstone?

10   A.    Yeah, that's -- marketing is

11   probably not the -- like I don't appear in

12   commercials, but if there is interviewing for

13   a case with a big joint defense group, I will

14   come down to New York or Washington or Boston

15   and join in the presentation as part of the

16   team.  And sometimes we get the case,

17   sometimes we don't, so I do that.

18         But I do that kind of travel

19   and whatnot at my own expense.

20   Q.    About how often do you make

21   those trips with Cornerstone?

22   A.    Two, three times a year.

23   Q.    Are they usually in

24   pharmaceutical cases?

25   A.    Usually, yes.  Not always, but

Highly Confidential - Subject to Further Confidentiality Review

1    usually.

2          Q.     Are any of the cases from your

3    appendix -- well, now Exhibit 3.  I think it

4    was once Appendix B.  Were they procured

5    through such a presentation, if you remember?

6          A.     The Skelaxin case, I think that

7    was kind of a group -- that was sort of a

8    group interview, yeah.  The other ones

9    have -- the other ones have been like

10   one-on-one phone calls or meetings with

11   attorneys.

12         Q.     Any other activities in

13   connection with Cornerstone other than those

14   trips and the work -- case-specific work?

15         A.     No.

16         Q.     Have you ever had a

17   relationship like this with other consulting

18   firms?

19         A.     If by "like this" right of

20   first refusal, the answer to that is no.  But

21   I do with -- it's pretty typical now, no

22   matter who I work with, that I will receive

23   15 percent of their billings as compensation.

24         Q.     And have you ever worked with a

25   group called GLC?

1       A.      No.

2       Q.      So, Professor Hughes, if you

3    look at what's been marked as Exhibit 9, it's

4    a couple of different things, but

5    collectively it was produced to us as a form

6    of sort of errata.

7       A.      Correct.

8       Q.      Okay.  First of all, other

9    than -- and you can take some time and flip

10   through that if you like.  But other than

11   what's reflected in Exhibit 9, are there

12   other corrections or changes that you would

13   like to make to your report?

14      A.      No.

15      Q.      Okay.  All right.  So can you

16   tell us about -- or tell me when you've

17   looked at it.

18      A.      Okay.  I'm sorry.

19      Q.      Yeah, sorry.

20              Tell me when you've had the

21   chance to look at Exhibit 9.

22      A.      Oh, okay.  Yes, I thought I

23   missed a question.  Okay.  Yes, I have.

24      Q.      Thank you.

25              So let's start with the sort of

1    cover page, which is page 69, and that --

2    this is a replacement page 69, correct?

3          A.      That is correct.

4          Q.      Can you tell us what's

5    different?

6          A.      Yes.  At the top of page 69

7    there used to be three points and --

8    actually, I should just look at what the --

9    what it used to be.

10               So the sentence used to read,

11   starting on 68, it said, "My analysis shows

12   that Ohio Medicaid did not encourage

13   utilization of abuse-deterrent opioids:

14   Number one, it excluded several

15   abuse-deterrent formulations from its

16   Fee-For-Service PDLs."  And that statement

17   was not completely true because if you look

18   at the exhibit that, I believe, is -- it's

19   not Exhibit 2.  It is 13?  Yes.

20               If you look at the revised

21   Exhibit 13 -- for some reason it's not marked

22   as Exhibit 13 -- the first column says,

23   "Number of FDA-approved abuse-deterrent

24   opioids," and then compare that to the number

25   of abuse-deterrent opioids on the PDL, the

1   original statement 1 implied incorrectly that

2   all of the abuse-deterrent opioids appearing

3   in the first column were actually available

4   on the market and we discovered after the

5   report was filed that while there were some

6   that had been FDA approved, they were not

7   actually available on the market.  So it

8   would have been irrelevant whether they were

9   on the PDL or not.

10              So we removed that statement,

11  that first statement, that they excluded

12  several abuse-deterrent formulations.

13              And refer to note 2 on the new

14  Exhibit 13, "The number of FDA-approved

15  abuse-deterrent opioids available at the time

16  the PDL was published."

17       Q.     So you are no longer rendering

18  an opinion that Ohio Medicaid excluded

19  several abuse-deterrent formulations, or is

20  your opinion that it did not exclude any

21  abuse-deterrent formulations?

22       A.     Okay.  Let me see if I can

23  explain it this way.  So let's look at 2017,

24  the number of abuse-deterrent opioids is 10,

25  and the number of abuse-deterrent opioids on

1   the PDL in the second column in 2017 is only

2   5.

3           Now, is the difference of 5

4   because they were excluded from the PDL by

5   Ohio Medicaid or is the difference due to

6   those other five may have been FDA approved

7   but were not actually available on the

8   market.  Since we could not tell the

9   difference, we withdraw that claim.

10      Q.      So in other words, you're not

11  expressing any opinion about whether Ohio

12  Medicaid excluded any abuse-deterrent

13  formulations --

14      A.      Correct.

15      Q.      -- from its PDLs?

16      A.      Correct.

17      Q.      Thank you.

18          Okay.  So the next -- so the

19  other documents that were part of the errata,

20  I mean, we can start with Exhibit 13 since

21  we're there.

22          So do you see the document that

23  says at the top right "Exhibit 13"?

24      A.      Yes.

25      Q.      So is this a revised

Highly Confidential - Subject to Further Confidentiality Review

 1   Exhibit 13, or is it just that you wanted to

 2   kind of produce it so that it was handy to

 3   discuss in connection with page 69?

 4       A.    Yeah, I'm a little confused.

 5   The Exhibit 13 is the revised Exhibit 13.

 6   I'm sorry, Exhibit 13 itself is not revised.

 7   The conclusions, the opinions that I render

 8   from Exhibit 13 have changed.

 9       Q.    So should we remove this,

10   what's been marked as Exhibit 13, from the

11   errata?

12           MR. DOVE:  Just to clarify the

13       record --

14           THE WITNESS:  Let me make sure

15       I'm right about that.

16           MR. DOVE:  Note number 2 might

17       be different.

18           THE WITNESS:  Well, that's what

19       I was -- that's what I was expecting,

20       but I was not seeing, so...

21   QUESTIONS BY MS. GEMAN:

22       Q.    Okay.  Let's --

23       A.    Oh, that's true, Exhibit 13,

24   the table has not been changed but footnote 2

25   has changed, the first sentence.  It used to

1    say that that column was "the number of

2    FDA-approved abuse-deterrent opioids

3    available on the market each year at the time

4    the PDL was published."

5              And that's been changed to "the

6    number of FDA-approved abuse-deterrent

7    opioids available at the time the PDL was

8    published."

9         Q.    So how are you defining

10   available?

11        A.    FDA approved, whether it's on

12   the market or not.  So in the first version,

13   the claim was they were available on the

14   market.

15        Q.    I understand.

16        A.    Okay.

17        Q.    So it's a little bit redundant

18   because it says "FDA-approved opioids

19   available"?

20        A.    Fair enough.  Yeah.

21        Q.    But we now have clarity about

22   what that means.

23        A.    Yeah.

24        Q.    Okay.  So this is -- any other

25   changes to Exhibit 13?

1      A.      No, that's it.

2      Q.      And did you spot this issue

3  when you were reviewing your report after it

4  was submitted, or how did it come to your

5  attention that there was this issue?

6      A.      It was brought to my attention

7  by Cornerstone because they had learned this

8  by reference to the expert report of another

9  defense expert.

10     Q.      Okay.  So let's -- so can you

11  tell us what these other documents are and

12  how they're different?

13     A.      Sure.

14             So Exhibit 2 in the original

15  report was missing the rows of information

16  for 2017 and 2018.  And that was due to a

17  last-minute programming typo.  That was --

18  MCP was changed to MCO or vice versa, and so

19  the data disappeared for 2018 -- excuse me,

20  so 2017 and 2018 were originally dropped

21  accidentally, and then when the -- it was

22  noticed after it was filed that this wasn't

23  missing data but actually a programming

24  error.  The programming error was corrected

25  and so now the correct numbers for 2017 and

Highly Confidential - Subject to Further Confidentiality Review

```
 1      '18 appear in Exhibit 2.
 2          Q.    Okay.  Thank you.
 3                MR. DOVE:  Just for the record
 4          and just so it's clear, because we're
 5          dealing with exhibits that have been
 6          marked highly confidential, I mean,
 7          Exhibit 2 is supposed to be highly
 8          confidential, and Exhibit 13, the
 9          corrected version, highly
10          confidential.  I believe the exhibits
11          you printed out, you printed out the
12          Excel file rather than the PDF which
13          has those labels, and that's why the
14          labels didn't come up.
15                THE WITNESS:  Ah.
16                MS. GEMAN:  That was -- oh, I
17          think I understand.
18                So we -- I think you sent them
19          to us in both PDF and Excel, and we
20          printed them both in PDF and Excel.
21                MR. DOVE:  That may be -- I
22          just want to make sure they're --
23                MS. GEMAN:  Okay.
24                MR. DOVE:  That label --
25                MS. GEMAN:  No, I understand.
```

```
 1                So just to be clear, so what --
 2        collectively the errata appears to
 3        consist of the replacement page 69,
 4        which we discussed, as well as the
 5        corrected Exhibits 2 and 13.
 6                It appears that Exhibits 2 and
 7        13 were probably given to us in both
 8        PDF and Excel.  For whatever reason, I
 9        don't know if it was our printing or
10        what you sent, we thought they might
11        be different because the version that
12        does not say "highly confidential" has
13        information that the PDF does not,
14        namely the second and third pages.
15                Is that right?
16                MS. HAN:  Right.  So the PDF
17        would just be the first, I guess, tab
18        of the Excel sheets, and then the
19        other information is the underlying
20        data that was used to compile the
21        exhibits of.
22                MS. GEMAN:  Okay.  So we
23        thought these were four different
24        documents, but it's really essentially
25        two different documents?
```

1          MS. HAN:  Right.

2          MS. GEMAN:  One that is

3     slightly more wholesome than the

4     other.

5  QUESTIONS BY MS. GEMAN:

6          Q.    Okay.  So other than the

7  changes to Exhibits 2, 13 and that paragraph

8  or that clause in page 69, are there any

9  other corrections or changes you wish to make

10  in your report?

11          A.    No.  Outside of the

12  modification to my testimony listed in the

13  CV, which we've already talked about.

14          And just so we know for when

15  we're done, I now have no idea what's

16  Exhibit 8 and what's Exhibit 9.  I've screwed

17  it up.

18          Q.    That's okay.

19          A.    So we'll have to straight it

20  out afterwards.

21          Q.    Sure.  Exhibit 8 is just your

22  invoice dated March -- dated May 31st.

23          A.    Okay.

24          Q.    And then everything else is

25  Exhibit 9.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Okay.  We'll find it.

 2          Q.      Yeah, and I had asked you

 3     counsel and he graciously agreed that it

 4     probably makes sense to just give another

 5     report that has everything correct in it.

 6                  MR. DOVE:  When do we want to

 7          do that?

 8                  MS. GEMAN:  Okay.  Thanks.

 9          Then we don't have to worry about

10          Exhibit 9 and so forth.

11     QUESTIONS BY MS. GEMAN:

12          Q.      Okay.  So and let me just ask

13     you, Professor Hughes, to turn to Exhibit 4

14     and confirm for us that it is your signature

15     on page 80?

16          A.      Yes, it is.

17          Q.      And is this a -- you know,

18     incorporating by reference the corrections

19     you just talked about, is this a full and

20     complete statement of the opinions you intend

21     to offer in this matter?

22          A.      Subject to the reservation that

23     should there be new data or other new

24     information that comes to light that may

25     cause me to supplement my opinion, barring

1   that, yes, this contains all of the opinions

2   I would intend to offer.

3          Q.     Okay.  And if you could please

4   turn to paragraph 8, and this paragraph

5   recites the analyses you were asked to

6   perform, correct?

7          A.     Oh, never mind.  I went to

8   page 8.  My bad.  I'm sorry.

9          Q.     Oh, it's page 3, paragraph 8.

10         A.     Sorry.

11         Q.     That's all right.

12         A.     Yes, paragraph 8 includes --

13   lists the analyses that I was requested to

14   perform.

15         Q.     And what is your understanding

16   of the relevance of each of these analyses to

17   this case?

18         A.     Well, to describe the market

19   for prescription pharmaceutical products, the

20   entities and the information and tools

21   available to affect prescribing behavior.

22   There's a couple of different places where

23   that touches.  Ultimately if there's any sort

24   of price-related damages, there's a question

25   of, because of the complexity of

Highly Confidential - Subject to Further Confidentiality Review

1    pharmaceutical payments, who actually paid

2    what.

3              There's the question of what

4    information flows between the different

5    entities, so what did the various entities

6    know, how long have they known it.

7              The second point is related is

8    what kind of information do the payers

9    collect in the normal course of business that

10   may be used to determine opioid prescription

11   writing, opioid prescription usage and the

12   like.

13             And then finally, as payers are

14   the one entity that actually has tools for

15   affecting doctor choices and patient choices

16   and pharmacy choices.

17             The third part was to look at

18   the tools that the payers may have available

19   to them that would have allowed them to

20   affect the demand for opioids and other

21   alternative pain treatments.

22        Q.    So it's your testimony that

23   only the payers have access to tools to

24   influence doctor and patient choices?

25        A.    Not exactly.  The payers have

1  unique tools that allow them to influence

2  doctor and patient choices.

3      Q.     Did you study the tools the

4  manufacturer has to influence doctor and

5  payer -- doctor and patient choices?

6      A.     No.  I was not asked to do

7  that, no.

8      Q.     Okay.  And did you study the

9  tools that the distributors have to analyze

10 doctor-patient choices?

11     A.     No, again, I was not asked to

12 do that.

13     Q.     All right.  So are you

14 suggesting or rendering any opinion about

15 whether -- which group has the most ability

16 to influence those choices?

17     A.     I was not asked to do any sort

18 of comparison, but except to say that the

19 payers do have a unique standing in terms of

20 having access to virtually complete records

21 of the prescriptions that are filled by their

22 beneficiaries and the pharmacies that fill

23 them, and the payers are uniquely situated to

24 implement tools like formulary placement,

25 quantity limits, prior authorization, step

1    edits and the like, that can -- can and have

2    influenced the number of opioid prescriptions

3    that are dispensed and consumed.

4         Q.    Would you agree that

5    pharmaceutical manufacturers have some unique

6    tools at their disposal to influence doctor

7    and patient choices?

8         A.    I wasn't asked to examine that,

9    so I don't know.

10        Q.    Right.

11              Well, earlier you agreed they

12   had tools at their disposal.

13              Would you agree that they have

14   some unique tools at their disposal?

15        A.    Manufacturers?  Maybe one, they

16   get to set the price.

17        Q.    What about distributors?

18        A.    Again, I wasn't asked to do

19   that, and I -- so I don't know whether or not

20   they have any tools that would be useful in

21   this manner.

22        Q.    Okay.  And have you studied the

23   impact of manufacturers or distributors on

24   formulary placement, prior authorization and

25   the other tools that you uniquely ascribed to

Highly Confidential - Subject to Further Confidentiality Review

```
1    payers?

2         A.    I'm not sure -- could you try

3    that question again?

4         Q.    Sure.

5               Have you studied -- let's start

6    for this report.

7               For the purpose of this report,

8    have you studied the impact of manufacturers

9    on formularies on pharmaceutical and

10   therapeutics committees or other entities

11   that create formularies?

12        A.    I'm not aware that

13   manufacturers have formularies.  If I

14   understood your question correctly.

15        Q.    Yeah, no, I may not have been

16   clear.

17        A.    Okay.

18        Q.    Have you studied the extent to

19   which pharmaceutical manufacturers influence

20   formulary decisionmakers through marketing or

21   other means?

22        A.    Oh, okay, right.  No, I was --

23   I have not studied that.  I wasn't asked to

24   do that.

25        Q.    Okay.  Have you studied that
```

1    question in any context?

2         A.    Sure.  To the extent that the

3    practice of brand manufacturers giving

4    rebates in exchange, for example, formulary

5    placement, that is a topic that's come up a

6    lot in, for example, class certification.

7         Q.    Have you studied it in your

8    academic work?

9         A.    No, I have not.

10        Q.    Okay.  Have you ever studied

11   that topic in any connection other than

12   saying essentially pricing is too complicated

13   for purposes of antitrust impact or opinions

14   to that effect?

15        A.    I'm going to ask you to

16   rephrase that one.

17        Q.    Do you understand my question?

18        A.    No, that's why I asked you to

19   rephrase it.

20        Q.    Sure.

21             So how does it come up -- how

22   does it come up a lot in class certification,

23   this question of formulary placement or

24   rebate -- you know, rebates or -- rebates in

25   exchange for formulary placement?

1    A.    Okay.  So if you're talking

2    about class certification and plaintiffs are

3    attempting to -- plaintiff experts are

4    attempting to present an accurate, reliable

5    methodology for assessing injury and damages

6    on a class-wide basis using common proof,

7    rebates and the presence of PBMs

8    administering rebates can, just to put it

9    briefly, greatly complicate determining which

10   of the entities, consumers, third-party

11   payers, PBMs, pharmacies sometimes, who paid

12   what for a particular prescription.  And the

13   rebates relate to formulary placement, which

14   gets back to your original question.

15   Q.    So would you say that

16   pharmacies -- pharmaceutical manufacturers

17   have a material impact on formulary

18   placement?

19   A.    Not all of them.  I mean, for

20   example, generic companies typically do not

21   give rebates in exchange for formulary

22   placement.

23   Q.    And what about prior

24   authorizations, have you ever studied the

25   role of pharmaceutical manufacturers or their

1    employees in facilitating or assisting with

2    prior authorizations?

3            A.      No, I wasn't asked to do that,

4    and I did not.

5            Q.      Have you studied that in any

6    context?

7            A.      No.

8            Q.      Okay.  And turning to the

9    second -- going a little bit backwards, I

10   guess, through the bullet points in

11   paragraph 8.  The second bullet point reads

12   that you were asked to, quote, "examine and

13   describe the information on opioid

14   prescriptions that were available to payers

15   serving patients in plaintiffs'

16   jurisdictions."

17               What is the relevance of that

18   information to this case in your

19   understanding?

20           A.      Well, again, to the extent that

21   there was a problem with the quantity of

22   opioid prescriptions that were being

23   dispensed and consumed as alleged, the

24   question arises is what information did the

25   payers have that would have allowed them to

Highly Confidential - Subject to Further Confidentiality Review

1    monitor individuals, would allow them to

2    monitor physicians, would allow them to

3    monitor pharmacies in terms of how many

4    prescriptions they were giving out, but more

5    specifically to whom they were -- those

6    prescriptions were being written, by whom

7    were they being written, and the payers have

8    the individual claims data that other

9    entities do not tend to have, at least not as

10   complete as what's available to the payers.

11        Q.    And did you evaluate the

12   information on opioid prescriptions that were

13   available to the distributors?

14        A.    No, the focus of my report and

15   the focus of my assignment was restricted to

16   payers.

17        Q.    And is it your view that the

18   payers -- or strike that.

19             Do you think it would have been

20   helpful to compare the information that was

21   available to the distributors relative to the

22   payers, especially given the, you know,

23   different incentives those different groups

24   may have?

25        A.    Well, again, that wasn't part

1    of my assignment, and I did not do it, but

2    it's my lay understanding that individual --

3    detailed individual claims data, like the

4    payers have, is not available to distributors

5    in the normal course of business because it

6    doesn't -- they have no use for it in the

7    normal course of business.

8          Q.     What is your understanding

9    of -- it's your testimony that distributors

10   have no use for prescribing patterns

11   generally in their normal course of business?

12   I just want to understand your testimony.

13         A.     Distributors have no use for a

14   prescription in Bangor, Maine, from the Rite

15   Aid on Main Street was dispensed to Bob Jones

16   on December 3, 2017.  That's not a piece of

17   information that I understand a distributor

18   would come by in the normal course of

19   business, but it's something that would

20   definitely be a piece of information or

21   pieces of information that payers would have

22   readily at their disposal because they're

23   adjudicating that claim.

24         Q.     I guess I was asking something

25   slightly different, which is your statement

1    that distributors don't have a use for

2    certain -- at least certain prescription

3    information in their normal course of

4    business.

5              Do you have any understanding

6    of how it might be important for distributors

7    to monitor whatever data they do have about

8    prescription information?

9              MR. DOVE:  Objection to form.

10             THE WITNESS:  Yeah, well, first

11        of all, I don't think that was your

12        first question, if I may say so.

13             But I wasn't asked to examine

14        anything about what the distributors

15        had available to them or what they

16        could have done with it.  That wasn't

17        part of my assignment.

18   QUESTIONS BY MS. GEMAN:

19        Q.    Okay.  Are you offering

20   testimony that there was sort of nothing they

21   could have done, they, the distributors?

22        A.    No, I'm not offering any

23   testimony regarding the distributors at all,

24   almost none, aside from the availability of

25   ARCOS data.  But the -- otherwise, I'm not

Highly Confidential - Subject to Further Confidentiality Review

1  offering any testimony about anything that

2  the distributors could have or could not have

3  done.  It's not anything that I was asked to

4  examine, and I did not.

5  Q.    So you don't have an opinion

6  sitting here now about whether it would have

7  been sort of easier for the distributors or

8  for the payers to monitor and/or take steps

9  to prevent overprescription?

10          MR. DOVE:  Objection.  Form.

11          THE WITNESS:  Again, I wasn't

12      asked to examine it -- examine that

13      question regarding distributors.

14      However, the payers -- it is my

15      testimony that the payers had very

16      detailed information from a number of

17      sources that would both alert them to

18      potential problems with opioids and

19      they had the information in order to

20      monitor individual players, individual

21      pharmacies, individual consumers,

22      individual doctors.  And furthermore,

23      had the tools to affect the

24      dispense -- affect the prescribing and

25      consumption patterns for opioids.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. GEMAN:
 2        Q.    So is it your opinion that
 3   that's the -- on a normative level, that
 4   that's the step at which that sort of
 5   monitoring and corrective action should
 6   occur?
 7              MR. DOVE:  Objection to form.
 8   QUESTIONS BY MS. GEMAN:
 9        Q.    Versus more upstream?
10        A.    It's my opinion that that's the
11   stage at which it could occur.  Whether it
12   should have or not, could it have been done
13   sooner?  Yes.  The detailed patient
14   information was available long before it was
15   being used, as is outlined in my report.
16              But exactly what firms should
17   have done was not part of my assignment.
18        Q.    In paragraph 15, you state in
19   the first sentence "that others may influence
20   a physician's treatment decision."
21              Who are or what are you
22   referring to?  You give an example in the
23   next sentence, but is that a complete list?
24        A.    It is a -- for example, the
25   patient and the payer and the -- or -- the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    payer or the insurer can have an influence on

 2    the physician's decision.

 3           Q.     And who or what else?

 4           A.     Again, my report was confined

 5    to examining payers, and so payers are the

 6    influencers that I'm referring to as being

 7    able to influence the physician's decision.

 8           Q.     I understand.

 9                  But who -- you know, in terms

10    of understanding your sentence, "others may

11    influence his or her decision," his or her

12    being the physician, who other than patient

13    or payers --

14           A.     Yeah, I haven't --

15           Q.     And insurers and class sponsors

16    can influence the decision?

17           A.     Yeah, regarding the opioid

18    question, I wasn't asked to examine that, and

19    I have not.

20           Q.     Okay.  So you're not opining

21    one way or the other as to whether

22    manufacturers or distributors influenced

23    physicians?

24           A.     Correct.

25           Q.     Okay.  And starting on

```
 1   paragraph 43, you talk about distributors.

 2              Do you see that, from

 3   paragraphs 43 through 47?

 4        A.    Yes.

 5        Q.    48, excuse me?

 6        A.    Sorry, yes.

 7        Q.    Okay.  And again, did you

 8   examine any distributor data?

 9        A.    No, this is simply, as it were,

10   a primer in the roles in the -- the roles of

11   the different entities in the pharmaceutical

12   distribution chain.

13        Q.    And did you examine any

14   suspicious activity reports?

15        A.    No, I did not have access to

16   those, to my knowledge.

17        Q.    Can you describe your

18   understanding of McKesson's system for

19   suspicious activity reporting?

20        A.    No, I wasn't asked to examine

21   that, and I did not.  Nothing related to that

22   was given to me because it was beyond the

23   scope of my assignment.

24        Q.    Same answer for Amerisource?

25        A.    Correct.
```

1    Q.    And skipping ahead for a second

2    to paragraph 70 on page 27, I can wait for

3    you to get there.

4    A.    Yes.

5    Q.    All right.  And you described

6    four sort of analyses here, correct, in this

7    paragraph?

8    A.    Correct.

9    Q.    All right.  And you produced

10   the data supporting these analyses?

11   A.    Yes, in that it was converted

12   into exhibits.

13       So in my report, I don't put

14   all of the millions of observations, but the

15   exhibit that was created from those millions

16   of observations is included as an exhibit.

17   Q.    Okay.  And how did you select

18   those particular analyses?

19   A.    I'm sorry, I couldn't hear the

20   last word.

21   Q.    Sorry, how did you select these

22   particular analyses or trends?

23   A.    Cornerstone and I, we discussed

24   what would be useful to decisionmakers if

25   they were trying to monitor and identify

1    sources of opioid overprescribing or

2    overconsumption.

3         Q.     And were there other analyses

4    that you considered but you felt the data

5    wasn't sufficient to permit it to be run?

6         A.     No, not really.  These were the

7    four that -- and again, things like doctor

8    shopping and pharmacy shopping, doctors who

9    prescribe large numbers and the trends over

10   time, these seem to be the most important.

11        Q.     What is your understanding of

12   how suspicious activity is defined?

13        A.     I don't have an understanding

14   of how suspicious activity is defined.  I

15   simply in the exhibits categorized -- I'm

16   sorry, tabulated the number of prescriptions,

17   the number of MMEs or the like and identified

18   where the 99th percentile was with the idea

19   that one could reasonably examine the

20   activities of the entities in the 99th

21   percentile and above.

22        Q.     Does this report set out all of

23   your opinions in this matter?

24        A.     To date.  Again, should

25   additional information or additional data

1  that is relevant become available, I reserve

2  the right to supplement, but barring that,

3  yes.

4       Q.    How certain are you of your

5  opinions in this report?

6       A.    I would say I am extremely

7  confident in the conclusions of my report.

8       Q.    Okay.  And is there any

9  information you don't have that would

10 strengthen or weaken your opinions?

11      A.    Not that I can think of sitting

12 here today, no.

13      Q.    And I'm not talking about

14 unknown unknowns.  I mean sort of known

15 unknowns?

16      A.    There's nothing that I know of

17 that would affect my opinion one way or

18 another, I guess, is the answer your

19 question.

20           MS. GEMAN:  Could we take a

21      quick break?

22           MR. DOVE:  Sure.

23           VIDEOGRAPHER:  We're going off

24      the record.  The time is 1:45.

25       (Off the record at 1:45 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
1              VIDEOGRAPHER:  We're going back

2        on the record.  Beginning of Media

3        File 4.  The time is 1:57.

4   QUESTIONS BY MS. GEMAN:

5        Q.     Professor Hughes, I neglected

6   to ask you earlier what professional

7   organizations you are a member of?

8        A.     None.

9        Q.     And you had talked earlier

10  about how you were, I think, a member of the

11  American Economic Association?

12       A.     I was at one point, yes.

13       Q.     All right.  When did you stop

14  being a member of that organization?

15       A.     Oh, probably 2007, 2008,

16  something like that.

17       Q.     Okay.  Any professional

18  organizations -- strike that.

19              Have there been any

20  professional organizations in the last ten

21  years -- sorry about that.

22              So I was just asking have there

23  been professional organizations in the last

24  ten years that you've been a member of?

25       A.     Last ten years, no.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And then in the period 1995

2   through 2008, other than the American

3   Economic Association, any others?

4      A.     I believe for a year I was a

5   member of the Western Economics Association,

6   which you had to become a member to register

7   for the conference.  So it wasn't that I

8   wanted to be a member, but you had to to go

9   to the conference, but other than that, no.

10          MS. GEMAN:  All right.  Okay.

11      Well, we are done.  Thank you for your

12      time.

13          THE WITNESS:  Thank you.

14          MR. DOVE:  Yeah, we have no

15      questions.

16          VIDEOGRAPHER:  All right.  This

17      concludes today's deposition.  We're

18      going off the record.  The time is

19      1:58.

20      (Deposition concluded at 1:58 p.m.)

21              - - - - - - -

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE

 2

 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, James Hughes, Ph.D., was
     duly sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.

 7           I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.

10

             I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.

14

15

16
                  _____
17               CARRIE A. CAMPBELL,
                 NCRA Registered Diplomate Reporter
18               Certified Realtime Reporter
                 Notary Public
19               Dated:  June 21, 2019

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4     carefully and make any necessary corrections.

5     You should state the reason in the

6     appropriate space on the errata sheet for any

7     corrections that are made.

8              After doing so, please sign the

9     errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13             It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2

 3

 4              I,_____, do
      hereby certify that I have read the foregoing
 5    pages and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8

 9

10

11

12    _____
      James Hughes, Ph.D.              DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    Notary Public
20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                         ERRATA

 2                    - - - - - - -

 3       PAGE    LINE    CHANGE/REASON

 4       _____   _____   _____

 5       _____   _____   _____

 6       _____   _____   _____

 7       _____   _____   _____

 8       _____   _____   _____

 9       _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       - - - - - - -

                       LAWYER'S NOTES

 2                       - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```