Highly Confidential - Subject to Further Confidentiality Review

```
 1                IN THE UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF OHIO

 2                        EASTERN DIVISION

 3

     IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804

 4   OPIATE LITIGATION NO. 2804       )

                                      )

 5   APPLIES TO ALL CASES             ) Hon. Dan A. Polster

                                      )

 6

 7          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 8                  CONFIDENTIALITY REVIEW

 9

                 VIDEO DEPOSITION OF VALERIE KAISEN

10

                        January 18, 2019

11                         9:39 a.m.

12

13

14          Reporter:  John Arndt, CSR, CCR, RDR, CRR

                    CSR No. 084-004605

15                    CCR No. 1186

16

17

18

19

20

21

22

23

24
```

```
 1            DEPOSITION OF VALERIE KAISEN produced,
      sworn, and examined on January 18, 2019, at
 2    Spangenberg, Shibley & Liber LLP, 1001 Lakeside Avenue
      East, Suite 1700, in the City of Cleveland, State of
 3    Ohio, before John Arndt, a Certified Shorthand Reporter
      and Certified Court Reporter.
 4
 5                 APPEARANCES OF COUNSEL
 6
      On Behalf of Plaintiffs:
 7         Wagstaff & Cartmell LLP
           4740 Grand Avenue, Suite 300
 8         Kansas City, MO  64112
           (816) 701-1174
 9         BY:  MR. ANDREW N. FAES
                afaes@wcllp.com
10              MR. LUKE F. CALLAHAN
                lcallahan@wcllp.com
11
           -and-
12
           Robbins Geller Rudman & Dowd, LLP
13         655 West Broadway, Suite 1900
           San Diego, CA  92101
14         (619) 231-1058
           BY:  MS. KOMAL JAIN
15              kjain@rgrdlaw.com
16    On Behalf of Walmart:
           Jones Day
17         325 John H. McConnell Boulevard, Suite 600
           Columbus, OH  43215
18         (614) 469-3939
           BY:   MS. CASTEEL E. BORSAY
19              cborsay@jonesday.com
                (present via speakerphone)
20
      On Behalf of Endo Pharmaceuticals:
21         Arnold & Porter Kaye Scholer, LLP
           250 West 55th Street
22         New York, NY  10019
           (212) 836-8000
23         BY:  MR. ZENO HOUSTON
                zeno.houston@arnoldporter.com
24              (present via speakerphone)
```

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of AmerisourceBergen:
 3          Jackson Kelly PLLC
            50 South Main Street, Suite 201
 4          Akron, OH  44308
            (330) 252-9060
 5          BY:   MS. SANDRA K. ZERRUSEN
                  skzerrusen@jacksonkelly.com
 6                (present via speakerphone)
 7   On Behalf of Cardinal Health:
            Porter Wright Morris & Arthur LLP
 8          950 Main Avenue, Suite 500
            Cleveland, OH  44113
 9          (216) 443-2542
            BY:   MS. TRACY S. FRANCIS
10                tfrancis@porterwright.com
11   On Behalf of Teva Pharmaceutical:
            Morgan, Lewis & Bockius, LLP
12          1111 Pennsylvania Avenue, NW
            Washington, DC  20004
13          (202) 739-5806
            BY:   MR. JONATHAN E. MAIER
14                jonathan.maier@morganlewis.com
15   On Behalf of Valerie Kaisen:
            Caravona & Berg, LLC
16          1001 Lakeside Avenue East, Suite 1700
            Cleveland, OH  44114
17          (216) 696-6500
            BY:   MR. AARON P. BERG
18                aberg@cbjustice.com
19
    Also present:  Jacob Arndt, videographer
20                 Mike Toth, trial technician
21
22
23
24
```

1                    INDEX OF INTERROGATION
2    Examination by Mr. Faes                    Page 9
     Examination by Mr. Maier                   Page 270
3    Examination by Mr. Faes                    Page 275
4

                     INDEX OF EXHIBITS
5

     Exhibit Teva-Kaisen-001                    Page 11
6    (Notice of deposition)
7    Exhibit Teva-Kaisen-002                    Page 29
     (2016 performance review)
8

     Exhibit Teva-Kaisen-003                    Page 40
9    (Chart)
10   Exhibit Teva-Kaisen-004                    Page 44
     (Approval package for Application Number
11   20-747-S003)
12   Exhibit Teva-Kaisen-005                    Page 46
     (Risk Management Program)
13   (TEVA_CHI_00049296 - TEVA_CHI_00049325)
14   Exhibit Teva-Kaisen-006                    Page 65
     (Actiq Master Plan)
15   (TEVA_CHI_00042757 - TEVA_CHI_00042817)
16   Exhibit Teva-Kaisen-007                    Page 77
     (Business Plan 2002 Val McGinley)
17   (TEVA_MDL_A_10027910 - TEVA_MDL_A_10027915)
18   Exhibit Teva-Kaisen-008                    Page 101
     (2003 Actiq Marketing Plan)
19   (TEVA_CHI_00042882 - TEVA_CHI_00042950)
20   Exhibit Teva-Kaisen-009                    Page 125
     (2004 Actiq Marketing Plan)
21   (TEVA_CHI_00042951 - TEVA_CHI_00043009)
22   Exhibit Teva-Kaisen-010                    Page 128
     (Department of Health and Human Services
23   letter)
     (TEVA_MDL_A_01584978 - TEVA_MDL_A_01584987)
24

```
 1              INDEX OF EXHIBITS (CONTINUED)
 2
    Exhibit Teva-Kaisen-011                  Page 140
 3  (2005 Actiq Marketing Plan)
    (TEVA_CHI_00043010 - TEVA_CHI_00043093)
 4
    Exhibit Teva-Kaisen-012                  Page 159
 5  (Guilty plea agreement)
 6  Exhibit Teva-Kaisen-013                  Page 162
    (E-mail)
 7  (TEVA_MDL_A_09069589 - TEVA_MDL_A_09069591)
 8  Exhibit Teva-Kaisen-014                  Page 169
    (E-mail)
 9  (TEVA_MDL_A_03571871 - TEVA_MDL_A_03571874)
10  Exhibit Teva-Kaisen-015                  Page 175
    (2005-2006 Marketing Plan)
11  (TEVA_MDL_A_00368405 - TEVA_MDL_A_00368625)
12  Exhibit Teva-Kaisen-016                  Page 178
    (Marketing Plan 2007)
13
    Exhibit Teva-Kaisen-017                  Page 183
14  (Ohio Valley Area Business Review)
    (TEVA_MDL_A_00398748)
15
    Exhibit Teva-Kaisen-018                  Page 190
16  (E-mail)
    (TEVA_MDL_A_11198978 - TEVA_MDL_A_11198980)
17
    Exhibit Teva-Kaisen-019                  Page 193
18  (GPE Actiq RMP Initial Off-Label Prescriber
    Listing: July 2008)
19  (TEVA_MDL_A_01485059 - TEVA_MDL_A_01485061)
20  Exhibit Teva-Kaisen-020                  Page 197
    (E-mail)
21  (TEVA_MDL_A_10030379)
22  Exhibit Teva-Kaisen-021                  Page 202
    (Complaint)
23
    Exhibit Teva-Kaisen-022                  Page 207
24  (Akron Beacon Journal article)
```

```
 1                INDEX OF EXHIBITS (CONTINUED)
 2
    Exhibit Teva-Kaisen-023                    Page 211
 3  (Chart)
 4  Exhibit Teva-Kaisen-024                    Page 212
    (E-mail)
 5  (TEVA_MDL_A_02072423 - TEVA_MDL_A_02072424)
 6  Exhibit Teva-Kaisen-025                    Page 216
    (Department of Justice press release)
 7
    Exhibit Teva-Kaisen-026                    Page 223
 8  (FAQs)
    (TEVA_MDL_A_00982822 - TEVA_MDL_A_00982836)
 9
    Exhibit Teva-Kaisen-027                    Page 227
10  (07-19-07 sales bulletin)
    (TEVA_MDL_A_00013847 - TEVA_MDL_A_00013856)
11
    Exhibit Teva-Kaisen-028                    Page 231
12  (04-15-08 sales bulletin)
    (TEVA_MDL_A_00739357)
13
    Exhibit Teva-Kaisen-029                    Page 234
14  (E-mail)
    (TEVA_MDL_A_06384299 - TEVA_MDL_A_06384302)
15
    Exhibit Teva-Kaisen-030                    Page 238
16  (Passion 4 Performance Impact)
17  Exhibit Teva-Kaisen-031                    Page 246
    (E-mail)
18  (TEVA_MDL_A_09104614)
19  Exhibit Teva-Kaisen-032                    Page 249
    (Department of Health & Human Services letter)
20  (TEVA_MDL_A_01251177 - TEVA_MDL_A_01251183)
21  Exhibit Teva-Kaisen-033                    Page 253
    (E-mail)
22  (TEVA_MDL_A_01868221 - TEVA_MDL_A_01868222)
23  Exhibit Teva-Kaisen-034                    Page 256
    (Opiate Action Team RX prescribing guidelines)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INDEX OF EXHIBITS (CONTINUED)
 2
     Exhibit Teva-Kaisen-035                   Page 256
 3   (Opioid morphine equivalent conversion
     factors)
 4   (TEVA_MDL_A_03702927)
 5   Exhibit Teva-Kaisen-036                   Page 260
     (E-mail)
 6   (TEVA_MDL_A_09098179)
 7   Exhibit Teva-Kaisen-037                   Page 262
     (E-mail)
 8   (TEVA_MDL_A_01868209)
 9   Exhibit Teva-Kaisen-038                   Page 266
     (E-mail)
10   (TEVA_MDL_A_01290215 - TEVA_MDL_A_01290216)
11   Exhibit Teva-Kaisen-039                   Page 270
     (E-mail)
12   (TEVA_MDL_A_00979785 - TEVA_MDL_A_00979786)
13
                   (Exhibits are attached.)
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                    THE VIDEOGRAPHER:  We are now on the

 2      record.  My name is Jacob Arndt.  I am a videographer

 3      for Golkow Litigation Services.  Today's date is

 4      January 18th, 2019, and the time is 9:39 AM.  This

 5      video deposition is being held in Cleveland, Ohio, In

 6      Re: National Prescription Opiate Litigation for the

 7      United States District Court, Northern District of

 8      Ohio, Eastern Division.  The deponent is Valerie

 9      Kaisen.  Will counsel please identify themselves?

10                    MR. FAES:  Andy Faes and Komal Jain for

11      plaintiffs.

12                    MR. MAIER:  Jonathan Maier for the Teva

13      defendants.

14                    MS. FRANCIS:  Tracy Francis from Porter,

15      Wright, Morris & Arthur for Cardinal Health.

16                    MR. CALLAHAN:  Luke Callahan with the

17      plaintiffs.

18                    MR. BERG:  Aaron Berg.  I'm retained

19      counsel for Ms. Kaisen for the proceeding.

20                    THE VIDEOGRAPHER:  Thank you.  The court

21      reporter is John Arndt and will now swear in the

22      witness.

23

24            The witness, VALERIE KAISEN, first having been
```

```
 1    duly sworn, testified as follows:

 2              QUESTIONS BY MR. FAES:

 3        Q.    Could you state your name for the record,

 4    please?

 5        A.    Valerie Kaisen.

 6        Q.    Good morning, Ms. Kaisen.  My name is Andy

 7    Faes.  I represent the plaintiffs in this litigation.

 8    Do you understand that?

 9        A.    Yes.

10        Q.    And do you understand that this lawsuit

11    has been brought on behalf of various states, counties,

12    and municipalities across the United States against

13    Teva and other defendants seeking to recover damages

14    for the public nuisance that is alleged to have been

15    caused by the opioid crisis?

16        A.    Yes.

17        Q.    And what city do you currently live in?

18        A.    Hinckley.

19        Q.    And that's in Ohio?

20        A.    Uh-huh.

21        Q.    And we met briefly for the first time

22    yesterday; right?

23        A.    Yes.

24        Q.    Have you ever given a deposition before
```

Highly Confidential - Subject to Further Confidentiality Review

1    today?

2           A.    No.

3           Q.    I'm sure your lawyer has briefed you on

4    the finer points of depositions, but I just want to ask

5    you to tell me -- if I ask you a question that you

6    don't understand today, will you let me know?

7           A.    Yes.

8           Q.    And if I ask you a question and you answer

9    the question, I'm going to assume that you understood

10   the question that I asked.  Is that fair enough?

11          A.    Yes.

12          Q.    I'm going to mark Exhibit Number 1 to your

13   deposition.

14                [Exhibit Teva-Kaisen-001

15                marked for identification.]

16          Q.    And this is just the notice of deposition

17   that notes the time and date when this is occurring.

18   I'm not actually going to ask you any questions about

19   it.  We just mark it for the record because that's our

20   favorite thing to do, like doctors taking your height,

21   weight, and blood pressure at the start of an exam, is

22   we mark the deposition notice.  But that deposition

23   notice notes -- just notes that -- the time and place

24   of your deposition.  Now, you're actually here pursuant

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to a subpoena that was served on you; right?

 2          A.    Yes.

 3          Q.    And are you represented by counsel in this

 4    matter?

 5          A.    Yes.

 6          Q.    Who is your counsel?

 7          A.    Aaron Berg.

 8          Q.    So -- and Aaron Berg doesn't represent

 9    Teva or Cephalon; right?

10          A.    No.

11          Q.    Did -- and did anyone from Teva reach out

12    to you or offer to represent you in this proceeding?

13          A.    No.

14          Q.    What is your highest level of education?

15          A.    Bachelor's of science.

16          Q.    And where did you receive that from?

17          A.    University of Massachusetts Amherst.

18          Q.    And what's it in?  What's the bachelor's

19    of science in --

20          A.    General and in clinical nutrition.

21          Q.    And who's your current employer?

22          A.    Theratechnologies, Syneos.

23          Q.    And that's another job in the

24    pharmaceutical industry; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    And I understand your primary

3    responsibility right now is to sell or promote an HIV

4    medication.  Is that right?

5          A.    HIV medications, yes.

6          Q.    What medication is that?

7          A.    Trogarzo and Egrifta.

8          Q.    And those are the two -- those are

9    currently the only two drugs that you're responsible

10   for?

11         A.    Yes.

12         Q.    How long were you with Cephalon, which

13   then later became Teva?

14         A.    In total, 2001 to February 22nd, 2017.

15         Q.    So well over 15 years; right?

16         A.    Uh-huh.

17         Q.    And for nearly the entire time that you

18   worked for Cephalon, which then later became Teva, from

19   2001 up until about the end of 2015, you were

20   responsible for -- at all times for promoting either

21   the Actiq product or the Fentora product; right?

22         A.    Not the entire time.

23         Q.    From 2001 to 2015?

24         A.    Oh, to 2015.  I'm sorry.  If you say so.
```

 1    They changed directions.  Sorry.  I don't recall.

 2         Q.    But if I told you that the records

 3    indicate that --

 4         A.    Yes.  Yes.

 5         Q.    -- between 2001 through the end of 2015

 6    you were responsible for promoting either Actiq and

 7    then later Fentora --

 8         A.    If the records show, yes.

 9         Q.    -- would that be consistent with your

10    memory?

11         A.    Sure.

12         Q.    And prior to joining Cephalon, you

13    actually had a great deal of experience in the

14    pharmaceutical industry; right?

15         A.    Yes.

16         Q.    Prior to -- where did you work prior to

17    joining Cephalon and then later Teva?

18         A.    I worked -- prior to Teva I worked for

19    Centocor, which is a division of Johnson & Johnson.

20         Q.    And did you work from -- various companies

21    within Johnson & Johnson from approximately 1991 to

22    2001?

23         A.    I also worked for Janssen.

24         Q.    And Janssen is a Johnson & Johnson

Highly Confidential - Subject to Further Confidentiality Review

```
 1    company; right?

 2         A.    A division of Johnson & Johnson, yes.  And

 3    then I left to go to Boehringer Mannheim, and then they

 4    were -- the drug was sold to J & J -- or promoted by J

 5    & J.

 6         Q.    And during that time did you promote

 7    some -- sell or promote some other drugs or products

 8    that were indicated for pain management?

 9         A.    Could you clarify what time period you

10    want?

11         Q.    Well, let me just ask it this way.  Prior

12    to joining Cephalon and which later became Teva, did

13    you have some experience --

14         A.    Yes.

15         Q.    -- selling or promoting --

16         A.    Yes.

17         Q.    -- drugs for pain management?

18         A.    Yes.

19         Q.    And just -- we're kind of talking to each

20    other.  Try to slow down and let me get the whole

21    question out; okay?  And what drugs were those?

22         A.    Duragesic.  Alfenta, Sufenta.  Amrix.

23    Well, that was not before.  I can't remember right now,

24    but yeah.
```

```
1            Q.    And Amrix -- actually, that's -- I think

2    you might have been mixed up.  That's actually a

3    Cephalon product, right, not a Johnson & Johnson

4    product?

5            A.    Yes.

6            Q.    So you wouldn't have promoted that prior

7    to joining Cephalon?

8            A.    No.  No.

9            Q.    And before Johnson & Johnson, you worked

10   for Astra Pharma from approximately 1985 to 1991; is

11   that right?

12           A.    Yes.  Uh-huh.

13           Q.    And what kind of products did you promote

14   for them?

15           A.    For them I also -- Hemopad, which was a --

16   well, Hemopad and also injectable morphine.  Alfenta,

17   Sufenta, or was that with J & J?  I'm trying to think.

18   Gosh.  You're going way back.  Injectables.  With Astra

19   and hemolytic.

20           Q.    And were any of those products for pain

21   management?

22           A.    Yes.

23           Q.    Which ones?

24           A.    The -- I'm trying to think.  Xylocaine.
```

```
 1    Sensorcaine.  Those are local anesthetics.  I can't

 2    recall what else.

 3         Q.    So you were first hired by Cephalon, and

 4    that later became Teva, but you were first hired with

 5    Cephalon in February of 2001?

 6         A.    Yes.

 7         Q.    That would have been when you actually

 8    started; right?

 9         A.    Yes.

10         Q.    And eventually that company became Teva?

11         A.    Yes.

12         Q.    And that happened in approximately 2011;

13    right?

14         A.    Yes.

15         Q.    And you ultimately left Teva in 2017;

16    right?

17         A.    Yes.

18         Q.    And what were the circumstances of your

19    departure from Teva?

20         A.    I was laid off.

21         Q.    What was the -- were you told a reason, or

22    what was the reason you were told why you were being

23    laid off at that time in 2017?

24         A.    I don't recall, except downsizing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Now, during your time at Cephalon, you --
 2   we talked a little bit about this already.  You were
 3   responsible for selling two different opioid narcotic
 4   products; right?
 5          A.    Yes.
 6          Q.    And those two product -- the name of those
 7   two products were Actiq and Fentora?
 8          A.    Yes.
 9          Q.    And prior to joining Cephalon, which later
10   became Teva, you had no experience -- you had
11   experience with pain medications, and we went through
12   the names of some of those medications, but you had no
13   experience selling opioids or narcotics prior to
14   joining Cephalon; is that true?
15          A.    No.
16          Q.    What --
17          A.    Morphine with Astra.  I said that.  Yeah.
18          Q.    Any other experience specifically selling
19   opioids other than when you sold morphine for Astra?
20          A.    Duragesic is a fentanyl patch with
21   Janssen.
22          Q.    So prior --
23          A.    And Alfenta and Sufenta were used in
24   anesthesia in the OR.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So prior to joining Cephalon and Teva you

 2    actually had some experience in the industry --

 3          A.    Yes.

 4          Q.    -- selling opioids, and that included

 5    selling a fentanyl patch, which is the same drug that's

 6    in Actiq and Fentora?  It's just a different delivery

 7    system; right?

 8          A.    Yes.

 9          Q.    The patch is more of a gradual release

10    product where the Fentora and Actiq products are rapid

11    onset opioids; right?

12                MR. MAIER:  Objection.  Form.

13          A.    Yes.

14          Q.    (By Mr. Faes)  So the first product that

15    you were -- one of the first products that you were

16    responsible for detailing and promoting when you became

17    an employee of Cephalon in February of 2001 was the

18    Actiq product; right?

19          A.    Yes.

20          Q.    And you would have been -- begun promoting

21    and selling that product immediately after your hiring

22    and training in February of 2001; right?

23          A.    Yes.

24          Q.    And the Actiq product -- that was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    essentially a fentanyl stick and sometimes it was

 2    called a lollipop; right?

 3          A.    Not out of our verbiage.

 4          Q.    But it was a fentanyl stick that went in

 5    the mouth and was intended to be absorbed in the mouth;

 6    right?

 7          A.    Yes.

 8          Q.    And you came to learn that some people

 9    would sometimes refer to it as a lollipop; right?

10          A.    Yes.

11          Q.    It wasn't officially company-sponsored

12    jargon, but some people would call it that; right?

13          A.    Yes.

14          Q.    When -- and when the Actiq product came on

15    the market when you joined in 2001, it was still a

16    relatively new product; right?

17          A.    Yes.

18          Q.    And in 2001, when you started detailing

19    it, some people probably associated it with a prior

20    product which was a lozenge that was used prior to

21    surgery; is that right?

22          A.    Yes.

23          Q.    Tell me about that product.

24          A.    I don't really recall, but it was -- I
```

1    never sold it, but I think the indication was for

2    pediatric prior to surgery or in surgery.  I'm not

3    sure.

4          Q.    And that was kind of an issue you

5    encountered early on as you needed to educate doctors

6    on the difference between the fentanyl -- what some

7    people called the lollipop and this lozenge that had

8    been on the market for a while; right?

9          A.    Yes.

10               MR. MAIER:  Object to form.

11         Q.    (By Mr. Faes)  Because the -- and that's

12   because the Actiq lollipop was certainly not intended

13   for children; right?

14               MR. MAIER:  Object to form.

15         A.    It was not intended for children.

16         Q.    (By Mr. Faes)  And it was --

17         A.    Never promoted that way.

18         Q.    Right.  Now, this Actiq product -- you

19   would have promoted or sold that right up until about

20   the end of 2006; right?

21         A.    If that's the time period you have.

22         Q.    Well, my question -- does that -- I mean,

23   is that consistent with your memory that you would have

24   promoted the Actiq --

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Okay.

2      Q.      -- right up until around the end of 2006?

3      A.      Yes.

4      Q.      And at the end of 2006, you would have

5   switched from -- end of 2006, early 2007, you would

6   have switched from promoting the Actiq product to

7   promoting the new Fentora product; right?

8      A.      Yes.

9      Q.      And the Fentora product was marketed by

10  the company as a new and improved replacement to the

11  Actiq product; right?

12          MR. MAIER:  Objection.  Form.

13     A.      Sorry.  I heard something over there.

14     Q.      (By Mr. Faes)  Yeah.  Throughout the day,

15  counsel will object, and that's just for the record for

16  later in case there's any issues.  You can ignore that.

17  You can -- and just give him time to answer, but you

18  can ignore it and you can still answer the question.

19  The only time you can't answer a question is if your

20  counsel may --

21     A.      Okay.

22     Q.      -- direct you or advise you not to answer

23  a question.  Okay?

24     A.      Okay.  Please repeat the question, please.

```
 1          Q.    Sure.  The Actiq -- sorry.  I'll start

 2   over.  And the Fentora product was marketed as a new

 3   and improved replacement product to the Actiq; right?

 4              MR. MAIER:  Objection.  Form.

 5          A.    Yes.

 6          Q.    (By Mr. Faes)  And once you started

 7   promoting Fentora, you stopped promoting Actiq; right?

 8          A.    Yes.

 9          Q.    Meaning you never promoted Actiq and

10   Fentora at the same time?

11          A.    I don't recall.

12          Q.    So -- and the Fentora product, instead of

13   being like a lollipop, these were actually buccal tabs,

14   meaning they weren't intended to be swallowed; they

15   were intended to be put in the cheek and dissolved in

16   the mouth; right?

17          A.    Yes.

18              THE VIDEOGRAPHER:  Excuse me, ma'am.

19              [Discussion off the record.]

20          A.    Could you repeat that question about the

21   buccal?

22          Q.    (By Mr. Faes)  So the question was, and

23   the Fentora product, instead of being like a lollipop,

24   these were actually buccal tabs, meaning they weren't
```

Highly Confidential - Subject to Further Confidentiality Review

1    intended to be swallowed; they were intended to be

2    placed in the cheek and dissolved in the mouth; right?

3         A.    Yes.

4         Q.    Now, one of the things that you -- well,

5    strike that.  First let me ask you this.  What was your

6    understanding of the reason why you -- you said you

7    couldn't remember if you ever promoted Actiq and

8    Fentora at the same time, but you would agree that you

9    stopped promoting Actiq shortly after the Fentora

10   product was launched; right?

11        A.    Yes.

12        Q.    What was the reason for that?

13        A.    New product.

14        Q.    And it was marketed as an improved

15   product; right?

16        A.    I don't recall.

17        Q.    Well, one of the things that you were told

18   to go out and promote and tell doctors about was an

19   improvement of the product was the fact that unlike the

20   Actiq stick, the Fentora product didn't have any sugar;

21   right?

22        A.    Yes.

23        Q.    And you also talked about the absorption

24   and the ease of use of the Fentora was better than the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Actiq stick; right?
 2              MR. MAIER:  Objection.  Form.
 3         A.   Yes.
 4         Q.   (By Mr. Faes)  You would talk about the
 5    fact that it had a faster rapid onset, right -- the
 6    Fentora product?
 7         A.   I understand the question.
 8         Q.   Okay.
 9         A.   I'm just thinking about it.
10         Q.   Okay.
11              [Interruption by the reporter.]
12         A.   Yeah, thank you.  Because it's coming at
13    me pretty fast, so I'll need distinct -- repeat that
14    question.
15         Q.   (By Mr. Faes)  Sure.  You would talk about
16    the fact that the Fentora had a more rapid or faster
17    onset than the Actiq product; right?
18         A.   I don't recall.
19         Q.   Well, let me put it another way.  Maybe --
20    whether or not you promoted it as having a faster or
21    more rapid onset specifically than the Actiq product,
22    that's certainly a product attribute of the Fentora
23    that you would have explained to doctors in part of
24    your promotion and detailing efforts; right?
```

```
 1        A.    Yes.

 2        Q.    And another thing that you would tell

 3   doctors is that by using the Fentora product a patient

 4   could get ahead of the pain?  That was one of the

 5   benefits of the product; right?

 6              MR. MAIER:  Objection.  Form.

 7        A.    I'm not going to answer that because I

 8   don't remember.

 9        Q.    (By Mr. Faes)  But you did sometimes hear

10   in meetings the -- I mean, you would go to various

11   marketing meetings and sales meetings with other

12   salespeople and people in the marketing department;

13   right?

14        A.    Yes.

15        Q.    And you would hear sometimes the saying

16   that pain is pain?

17        A.    Yes.

18        Q.    Regardless of the source, pain is pain?

19   And is that something -- that's a saying or something

20   that you would use when you called on doctors promoting

21   the Actiq and Fentora product?

22              MR. MAIER:  Objection.  Form.

23        A.    I don't recall.

24        Q.    (By Mr. Faes)  Now, other than noticing
```

Highly Confidential - Subject to Further Confidentiality Review

1    the differences or improvements between the Fentora

2    product and the Actiq product, such as the fact that it

3    was -- the Fentora product had a lack of sugar and some

4    of the other stuff that we talked about, you would have

5    essentially used the same tools and strategies to sell

6    and promote the Fentora product that you did the --

7    that you used for the Actiq product; right?

8              MR. MAIER:  Objection.  Form.

9         A.    I don't recall.

10        Q.    (By Mr. Faes)  And you promoted Fentora

11   all the way up until the end of 2015; right?

12        A.    Yes.

13        Q.    And at the end of 2015, did the company

14   make a decision as a company to stop promoting Fentora

15   with its own internal sales force?

16             MR. MAIER:  Objection.  Foundation.

17        A.    I was put to another sales force.

18        Q.    (By Mr. Faes)  Okay.  But did you -- were

19   you made aware that as you were being transitioned to

20   another sales force that Teva was actually going to

21   bring in a third-party company to continue to mar --

22        A.    I don't recall.

23        Q.    Let me get whole question out.

24        A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you remember as you were transitioned

2  to a new sales force that Teva was actually going to

3  bring in a third-party company to take over various

4  aspects of marketing and promoting the Fentora product?

5         MR. MAIER:  Objection.  Foundation.

6    A.    I don't recall.

7    Q.    (By Mr. Faes)  Do you recall having to

8  meet or speak with anybody on a team when you were

9  taken off Fentora that would be taking over duties of

10 calling on physicians that you had previously called on

11 for Fentora?

12   A.    I don't remember.

13   Q.    In late two -- so you were moved from

14 Fentora to other products at the end of 2015?

15   A.    Yes.

16   Q.    Do you remember towards the end of 2016

17 you being asked to once again promote Fentora products

18 for a short period of time?  Do you remember that?

19   A.    Yes.

20   Q.    And what was the reason that you

21 understood that you were being asked to promote Fentora

22 again for a short time in 2016?

23   A.    Reach.  Reach.

24   Q.    What does that mean?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Reaching the physicians that needed

 2    information, so --

 3          Q.    Was --

 4          A.    Educational material.

 5          Q.    Was one of the reasons to help the company

 6    exceed its financial objectives?

 7          A.    I don't recall.

 8                MR. MAIER:  Objection.  Foundation.

 9                [Discussion off the record.]

10          Q.    (By Mr. Faes)  Well, I'm going to hand you

11    what's been marked as Exhibit Number 2 to your

12    deposition.  I'm just going to write a tiny little 2 in

13    the corner here.

14                [Exhibit Teva-Kaisen-002

15                marked for identification.]

16                MR. FAES:  So that will be yours and

17    that's a copy for counsel's --

18                MR. BERG:  Okay.  Thank you.

19                MR. FAES:  And this is 42, Mike.

20          A.    Huh.

21          Q.    (By Mr. Faes)  So this is a document

22    entitled 2016 performance review for Valerie J. Kaisen.

23    Do you see that?

24          A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And if you look down towards the bottom
2    under goals for 2016, do you see where it states
3    started selling Fentora again to help the company
4    exceed financial objectives?  Do you see that?
5          A.    I do.
6          Q.    And that would have been -- this would
7    have been a document that you would have seen because
8    it was your performance review; right?
9          A.    Hang on.  Hang on.
10         Q.    And actually if you look above it says --
11   actually appears to be your comments -- comments by
12   Valerie J. Kaisen.  Do you see that above?
13         A.    I do.
14         Q.    So this would have actually been something
15   that you wrote that you helped selling Fentora again in
16   2016 to help the company exceed financial objectives;
17   right?
18               MR. MAIER:  Objection.  Form, foundation.
19         A.    Yes.
20         Q.    (By Mr. Faes)  So what did you mean by
21   that when you wrote it?
22         A.    I don't recall.
23         Q.    Well, I mean, it's fair to say that you
24   probably wouldn't have written that in your comments
```

```
 1    for your annual employee review --

 2         A.    Yeah.

 3         Q.    -- if someone hadn't told you that that

 4    was the reason why you were being asked to sell or

 5    promote Fentora again; right?

 6               MR. MAIER:  Objection.  Form, foundation.

 7         A.    Okay.

 8         Q.    (By Mr. Faes)  Is that -- I mean, is that

 9    true?  That's probably not something you would have

10    just come up on your own?

11         A.    Yes.

12               MR. MAIER:  Same objection.

13         Q.    (By Mr. Faes)  So you -- so between Actiq

14    and Fentora, over 15 years -- 15-plus years, you

15    probably would have made literally thousands of sales

16    calls during that time period in Cleveland in the State

17    of -- and the State of Ohio; right?

18         A.    Yes.

19         Q.    And I don't know that we talked about your

20    sales territory, but your sales territory at all times

21    between 2001 and 2015 included Cleveland and parts of

22    Ohio; right?

23         A.    Yes.

24         Q.    And you would have kept notes of each time
```

1    that you made a sales call on a doctor; right?

2         A.    Notes?

3         Q.    Yeah, sales -- call notes?

4               MR. MAIER:  Objection.  Form.

5         A.    We do not have call notes after a certain

6    time period.

7         Q.    (By Mr. Faes)  But there was a period of

8    time where you did have call notes --

9         A.    Yes.

10        Q.     -- or at least a call log; right?

11              MR. MAIER:  Objection.  Form.

12        A.    Call log?  I don't know what that means.

13        Q.    (By Mr. Faes)  Okay.  At all times when

14   you were promoting Actiq and Fentora from 2001 to 2011,

15   each time you made a visit to a doctor's office or a

16   doctor himself, you would have noted things like the

17   date, the time, and the doctor, and when that occurred;

18   right?

19        A.    Yes.

20        Q.    And that would happen every time; right?

21   You were trained to do that?

22        A.    Yes.

23        Q.    And were you trained that that was

24   actually required by law that you kept a record of

1    that?

2         A.    Yes.

3         Q.    And it was company policy that you do

4    that; right?

5         A.    Yes.

6         Q.    And for a time you would actually keep

7    notes of what transpired during a call; right?

8              MR. MAIER:  Objection.  Form.

9         A.    I don't understand the question.

10        Q.    (By Mr. Faes)  Okay.  Well, let me --

11   maybe this will help.  Let me mark what's going to be

12   Exhibit Number 3 to your deposition.

13             MR. FAES:  Oh, she found it.  Yeah.

14        A.    Are you talking prior?

15        Q.    (By Mr. Faes)  Well, let me just show you

16   the document.

17        A.    Okay.

18        Q.    Maybe this will help you -- refresh your

19   memory.  So this is Exhibit Number 3 to your

20   deposition, and this is a sampling of your -- what I

21   understand to be your call notes --

22        A.    Put it up there.

23        Q.     -- from approximately 2011 --

24             MR. FAES:  This is 7.1, Mike.

```
 1          A.    What's the date?  Oh, yeah.

 2          Q.    (By Mr. Faes)  So if you look at this

 3   document.

 4          A.    Yes.

 5          Q.    Like the first entry is -- it's got a call

 6   date, 3-21-2001.  It's got your name, which is -- at

 7   that time would have been Valerie McGinley instead of

 8   Valerie Kaisen; right?

 9          A.    Yes.

10          Q.    It's got a rep ID.  That's your rep ID;

11   right?

12          A.    Yes.

13          Q.    Was your rep ID 1502 at all times when you

14   were a rep, or do you know?

15          A.    I don't recall.

16          Q.    It's got a health care provider name,

17   which would be the doctor or doctor's office you called

18   on, right, and the first entry is -- for an example,

19   would be James Bressi; right?

20          A.    Yes.

21          Q.    It's got his DEA number; right?

22          A.    Yes.

23          Q.    And going acro -- it's got a city, state,

24   ZIP code, primary specialty; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yeah.

2        Q.    And it's got the product you detailed?

3        A.    Yes.

4        Q.    Which on this particular document,

5   which -- all these are Actiq sales calls.  And if you

6   want to look through the entire 20 pages, go ahead and

7   do that, but I believe these are all Actiq sales calls.

8        A.    I just have to look at the dates.

9              MR. FAES:  Okay.  While you're doing

10  that -- can you put that sticker over the 2 on Exhibit

11  2?

12       A.    Yeah.

13       Q.    (By Mr. Faes)  And on these call notes,

14  which are -- start early on after you were hired -- the

15  first one on this is March 27th of 2001, and that would

16  have been about a month after you were hired; right?

17       A.    Yes.

18       Q.    So this first entry probably would have

19  been one of your very first sales calls; right?

20       A.    Yes.

21       Q.    And if you look at the first comment, at

22  this time you were allowed to put a call comment in,

23  and on this one it, just for an example, says Dr.

24  Bressi on vacation.  Had great meeting with his nurse
```

```
 1   Jackie, who set me up breakfast Monday.  His next lunch

 2   was December 4th.  Discussed breakthrough cancer pain,

 3   BTcP --

 4          A.    Uh-huh.

 5          Q.    -- and the welcome kit she loved.  She is

 6   very impressed with the results of pain control of

 7   Actiq.  She is going to help.  Right?

 8          A.    Yes.

 9          Q.    Now, at some time in 2006 or -- well,

10   strike that.  Let me back up.  Tell me at this time

11   when you first started, how was -- what was the method

12   that you used to enter call notes?  Did you use a

13   computer?  Did you write things out?  Did you --

14   probably didn't have an iPad in 2001.

15          A.    I don't recall when the change was.

16          Q.    So -- but at this time in 2001 you were

17   allowed to --

18          A.    We had paper copies.  Yes.

19          Q.    Let me start over.

20          A.    Thank you.

21          Q.    At this time in 2001 you had the ability

22   to enter a descriptive call comment describing what

23   happened during the call if you wanted to; right?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And at some point in 2006 or 2007, that
 2   changed; right?
 3        A.    Yes.
 4        Q.    And at some point in 2006 and 2007, you
 5   didn't have the ability to enter a call comment even if
 6   you wanted to, such as the one you see in this exhibit
 7   on the right-hand side; right?
 8              MR. MAIER:  Objection.  Form.
 9        A.    Yes.
10        Q.    (By Mr. Faes)  And that was because the
11   way the call notes entry system was set up, you didn't
12   even have an option to enter a free-form comment even
13   if you wanted to; right?
14        A.    Yes.
15        Q.    And all of the other fields -- they were
16   generally dropdown boxes, so you had to -- did you have
17   to select between certain options?
18        A.    What year are you discussing?
19        Q.    When the change occurred in 2006 or 2007.
20        A.    Okay.  Yes.
21        Q.    From your experience, what was the reason
22   you understood why the company made that change in the
23   way that you were making call notes or sales logs --
24   whichever terminology you prefer?
```

```
 1                    MR. MAIER:  Objection.  Foundation.

 2          A.     Industry.

 3          Q.     (By Mr. Faes)  What do you --

 4          A.     Change.

 5          Q.     Industry changed.  What do you mean by

 6   that?

 7          A.     Due to certain -- we were told that we are

 8   getting our call notes taken away due to the industry.

 9          Q.     And was one of the things that had changed

10   in the industry that prompted this change the issue

11   that Purdue had had with some of their call notes from

12   their reps detailing the OxyContin product, which was

13   another opioid narcotic?

14                    MR. MAIER:  Objection.  Form, foundation.

15          A.     I don't know what their decision was.  I

16   just know what I might have thought.

17          Q.     (By Mr. Faes)  Well, what was your

18   understanding at that time of the -- whether or not --

19   let me start over.  What was your understanding at the

20   time of whether or not the situation with Purdue and

21   their notes that their sales reps had kept with

22   OxyContin was one of the reasons why -- the way these

23   call notes were changed?

24                    MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    It was the way the industry was going.

2    I -- rephrase your question.  I'm a little -- sorry.

3          Q.    (By Mr. Faes)  Well, did you have an

4    understanding at that time, around the time these call

5    notes were being changed, that there were some folks at

6    Purdue that had been detailing OxyContin, which was

7    another opioid narcotic, that were getting in trouble

8    for having all kinds of crazy things written in their

9    call notes?

10               MR. MAIER:  Objection.  Form.

11         A.    I wasn't at Purdue.

12         Q.    (By Mr. Faes)  I know you weren't at

13   Purdue, but I'm just asking, did you have an

14   understanding at the time the company changed the sales

15   reps that that was going on -- the sales notes -- that

16   that was going on?  I apologize.

17         A.    In our company, the change was made

18   because of the industry.  It's above my pay grade.  I

19   just do what I'm told, but you cannot -- how do I say

20   this?  Everybody's interpretation is different.

21         Q.    Sure.  Sure.  I understand.

22         A.    So --

23         Q.    And I'm just asking for your

24   interpretation and your knowledge.  Did you have
```

Highly Confidential - Subject to Further Confidentiality Review

1    knowledge at that time --

2         A.    That's not important --

3         Q.     -- that one of the things that was going

4    on in the industry was that folks who had worked for

5    Purdue and had detailed OxyContin at that time were

6    getting in trouble for all kinds of things that they

7    had written in their call notes when they were calling

8    on doctors for the OxyContin product?

9              MR. MAIER:  Objection.  Form, foundation.

10        A.    Yes.

11        Q.    (By Mr. Faes)  And was it your

12   understanding or your belief at the time that that was

13   one of the reasons why Teva decided to change the way

14   that call notes were kept and no longer have -- give

15   you the ability to enter a free-form call comment?

16        A.    My understanding, not my decision.

17        Q.    So was it your --

18        A.    That was a corporate decision.

19        Q.    Right.  Was it your understanding that one

20   of the reasons that they took away your ability to

21   enter a call comment as we see in Exhibit 3, is because

22   of liability reasons?

23             [Exhibit Teva-Kaisen-003

24             marked for identification.]

1        A.    Yes.

2              MR. MAIER:  Objection.  Form, foundation.

3        Q.    (By Mr. Faes)  Now, during your employment

4   as a sales representative for Fentora and Actiq, you

5   would have been paid a base salary plus a bonus; right?

6        A.    Yes.

7        Q.    And that bonus would always be based on

8   some sales goal passed down by the company; right?

9        A.    Yes.

10       Q.    And the bonus would be based on whether

11  you met or exceeded those sales goals; right?

12       A.    Yes.

13             MR. MAIER:  Objection.  Form.

14       Q.    (By Mr. Faes)  And the plan -- your salary

15  and bonus plan -- that would have changed from year to

16  year, but in general, your bonus would have represented

17  about 30 percent of your income and your base salary

18  would have represented about 70 percent of your income?

19  Does that sound consistent with your memory?

20             MR. MAIER:  Objection.  Foundation.

21       A.    There were times I didn't make bonus and

22  there were times I made bonus.

23       Q.    (By Mr. Faes)  No, I understand that.

24       A.    So how are you going to get 30 percent?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So let me see if I can phrase it another

 2   way.

 3          A.     Thank you.

 4          Q.     If you made 100 percent of your bonus, in

 5   general your bonus could represent up to 30 percent of

 6   your income and your base salary would represent about

 7   70 percent?  Is that accurate?

 8          A.     Yes.

 9          Q.     And that was true more or less the entire

10   time you detailed Actiq and Fentora from 2001 to 2015?

11          A.     It was a changing goal.  It changed.

12          Q.     Right.  I under -- and I understand that

13   the goals changed year by year and it fluctuated, but

14   I'm just asking in general that 70-30 percentages --

15   seven --

16          A.     I don't remember exactly.  I'm sorry.

17          Q.     Okay.  Fair enough.  So what I want to do

18   is kind of take you back to the beginning starting in

19   February 2001 when you first started and were trained

20   and put out in the field and selling Actiq.  When you

21   were initially hired and sent out to the field, selling

22   and promoting Actiq would have been one of your primary

23   responsibilities; right?

24          A.     Yes.
```

```
 1          Q.    And at some point during your initial

 2    training with Cephalon, before you would have been sent

 3    out into the field, you would have been made aware that

 4    the Actiq product was subject to a risk map or risk

 5    minimization plan which was required by the FDA as a

 6    condition of being able to sell Fentora in the United

 7    States; right?

 8                MR. MAIER:  Objection.  Foundation.

 9          A.    What date?

10          Q.    (By Mr. Faes)  When you first started --

11          A.    2001?

12          Q.     -- and were trained in 2001.

13          A.    State that question again.

14          Q.    Sure.  At some point during your initial

15    training with Cephalon, before you would have been sent

16    out into the field, you would have been made aware and

17    trained that the Actiq product was subject to a risk

18    map or risk minimization plan, which was required by

19    the FDA as a condition of being able to sell Fentora in

20    the United States; right?

21                MR. MAIER:  Same objection.

22          A.    I guess I'm confused with your questioning

23    because you're saying Actiq and then Fentora, or else

24    I'm missing it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    (By Mr. Faes)  Okay.  That's -- you're
 2   right.  That's actually my fault.  So at some point --
 3   let me start over and restate the question.  At some
 4   point during your initial training with Cephalon,
 5   before you would have been sent out into the field, you
 6   would have been made aware and trained that the Actiq
 7   product was subject to a risk map or risk minimization
 8   plan, which was required by the FDA as a condition of
 9   being able to sell Actiq in the United States; right?
10            MR. MAIER:  Same objection.
11            A.    I don't remember.
12            Q.    (By Mr. Faes)  Okay.  Let me hand you,
13   just to orient ourselves, what I'm marking as Exhibit
14   Number 4 to your deposition.
15            [Exhibit Teva-Kaisen-004
16            marked for identification.]
17            MR. FAES:  And this is one, Mike.  Yeah.
18            Q.    (By Mr. Faes)  So this is a document from
19   the FDA, and it's -- you see the trade name?  It's for
20   Actiq?
21            A.    Uh-huh.
22            Q.    And the approval date is March 26th of
23   1999.  Do you see that?
24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And if I can have you turn to the fourth

2    page in, which is a letter dated March 26th of 1999.

3          A.    I was not with the company at that time --

4    for -- yeah.  Okay.

5          Q.    And you see it's a letter from the FDA and

6    it's actually to Anesta, which would have been the

7    holder of Actiq at this time.  Do you understand that?

8          A.    Yes.

9          Q.    You had an understanding that initially

10   Anesta was the company that had Actiq and then Cephalon

11   acquired Actiq from Anesta; right?

12         A.    Yes.

13         Q.    And it just says dear Ms. Richards, please

14   refer to the supplemental new drug application, SNDA,

15   dated February 10th, 1999, received February 19th,

16   1999, submitted under Section 505B of the Federal Food,

17   Drug, and Cosmetic Act for Actiq, oral transmucosal

18   fentanyl citrate, 200, 400, 600, 800, 1,200, and 1,600

19   milligrams.  Is that milligrams?

20         A.    Mic.

21         Q.    I'm sorry?

22         A.    Yes.  Mic.  Mics.

23         Q.    And those were -- mics?

24         A.    Micrograms.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    Micrograms.  Okay.  Thank you.  So these

2    were the microgram strengths that Actiq was available

3    in; right?

4              MR. MAIER:  Objection.  Form.

5         A.    Yes.

6         Q.    (By Mr. Faes)  And if you look down in the

7    third paragraph, I guess, from the bottom, it says for

8    future reference, revisions to the RMP, which means

9    risk map, must be submitted as a supplement that

10   requires our prior approval.  Do you see that?

11        A.    Yes.

12        Q.    So this is the risk map, and I'm just

13   using this to orient you into time and space.  I

14   realize you weren't there in 1999, but this document

15   indicates that Actiq was approved in 1999 and it was

16   subject to a risk map that needed to be approved by the

17   FDA, and it needed to be approved if there was a change

18   or supplement to it; right?

19             MR. MAIER:  Objection.  Foundation.

20        A.    Okay.

21        Q.    (By Mr. Faes)  So you can set that aside,

22   and I'm going to hand you what's been marked as Exhibit

23   Number 5 to your deposition.

24             [Exhibit Teva-Kaisen-005
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked for identification.]

 2         Q.    And this title is -- this document is

 3   titled Actiq risk manage -- sorry.  Let me start over.

 4   This document is titled Actiq risk management program,

 5   August 1st, 2001.  Do you see that?

 6         A.    Uh-huh.

 7         Q.    And at this time you would have been with

 8   the company; right?

 9         A.    Yes.

10         Q.    So this would have been one of the risk

11   maps that would have been in effect while you were

12   detailing and promoting Actiq; right?

13         A.    I don't remember.

14         Q.    Okay.  Well, let's go through it, and I

15   just want to ask some questions about whether or not

16   you remember parts of this document or whether you were

17   trained or given information --

18         A.    Okay.

19         Q.     -- by your superiors at the company about

20   any of this document.  Okay?

21         A.    Yeah.

22         Q.    So if you turn into the first page of

23   this, it says under introduction the Actiq risk

24   minimization program, RMP, has been designed to address
```

1    three key potential risk situations.  Did I say Page 1?

2    I mean Page 5.

3         A.    This is Page 1 up here.  Sorry.

4         Q.    So let me start over because you weren't

5    there yet.

6         A.    Thank you.

7         Q.    Are you there?

8         A.    Yeah.

9         Q.    So if you look at the introduction section

10   of this document, under introduction it says the Actiq

11   risk management program, RMP, has been designed to

12   address three key potential risk situations, and it has

13   three main things that it's designed to address, right,

14   and the second of the three is improper patient

15   selection, prescriptions to and usage by

16   opioid-nontolerant patients; right?

17        A.    Yes.

18        Q.    And if you look down at the bottom of this

19   page starting at key messages for the RMP, which is the

20   risk management program, it says there are several key

21   messages repeated throughout the RMP which are listed

22   below.  For the balance of the document these messages

23   will be referenced simply as child safety, proper

24   patient selection, and prevention of diversion or abuse

Highly Confidential - Subject to Further Confidentiality Review

1    messages.  Do you see that?

2         A.    I do.

3         Q.    And then if you go to the following page

4    on Page 6, under proper patient selection, messages, it

5    says Actiq is specifically contraindicated for use in

6    opioid-nontolerant patients and Actiq is specifically

7    contraindicated for acute postoperative pain, and the

8    third one down is Actiq is specifically indicated

9    solely for the treatment of breakthrough cancer pain in

10   chronic opioid-tolerant cancer patients; right?

11        A.    Yes.

12        Q.    So is this information that you would have

13   been trained on before you were sent out into the field

14   as a sales representative who was promoting and

15   detailing Actiq?

16        A.    Yes.

17        Q.    And below it says prevention and diversion

18   abuse messages, Actiq may be habit forming.

19        A.    Trying to catch up.  Hang on, please.

20   This is not catching up.  Okay.  Can you start over?

21        Q.    Sure.  Down below it says prevention and

22   diversion -- prevention of diversion and abuse

23   messages, Actiq may be habit forming.

24        A.    Yeah.

```
 1          Q.    That's something else you were trained

 2   on --

 3          A.    Yes.

 4          Q.     -- before being sent out into the field

 5   to detail or promote Actiq; right?

 6          A.    Yes.

 7          Q.    And if you -- let's go onto Page 11.  On

 8   this page down towards the bottom, starting with the

 9   bottom paragraph, it says Actiq --

10                MR. BERG:  Hold on.

11          A.    It's not the same time period here, so --

12          Q.    (By Mr. Faes)  I'm sorry?

13          A.    Do we have it now?  We're good?

14          Q.    Oh, we're just getting the screens synced

15   up.

16          A.    You're going and this isn't --

17          Q.    Got it.  Are we there now?

18          A.    Start over, please.

19          Q.    Sure.  So if you --

20                MR. BERG:  Here.  Let's just locate it.

21          Q.    (By Mr. Faes)  So if you look on Page 11

22   of this 2001 risk map, down towards the bottom it

23   states Actiq is intended to be used only --

24          A.    Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      -- in the care of cancer patients and
2    only by oncologists and pain specialists who are
3    knowledgeable and skilled in the use of Schedule II
4    opioids to treat cancer pain?
5          A.      Yes.
6          Q.      Is that something you were trained on
7    before you were sent out into the field, that it was
8    only to be used by oncologists and pain specialists?
9          A.      Yes.
10         Q.      And this would have been direction given
11   to you by your trainers and superiors at the company
12   that you should follow the guidelines set forth in this
13   risk map; right?
14                 MR. MAIER:  Objection.  Form.
15         A.      Yes.
16         Q.      (By Mr. Faes)  And did they train you that
17   these guidelines were required by the FDA as a
18   condition of keeping the product on the market?
19                 MR. MAIER:  Objection.  Form.
20         A.      I don't know about the market, but this is
21   what we were trained in.
22         Q.      (By Mr. Faes)  Okay.  Well, regardless,
23   you would agree that you were trained that it was
24   company policy to adhere to these guidelines; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    If you turn to Page 12 of this, under 4.1,

3   key message points.  It states the education of

4   physicians, nurses, pharmacies, caregivers, and

5   patients on the safe use of Actiq is an integral part

6   of the Actiq risk management program.  These

7   educational messages are drawn directly from the Actiq

8   package insert.  These key safety messages, which have

9   been described earlier in Section 1.1 of this RMP,

10  include -- and the third bullet point down is

11  prevention of diversion and abuse messages.  Do you see

12  that?

13       A.    Yes.

14       Q.    And that's something that you were trained

15  on by your superiors prior to going out into the field

16  and promoting Actiq; right?

17       A.    Yes.

18       Q.    And you understood that it was company

19  policy to adhere to these guidelines; right?

20       A.    Yes.

21       Q.    At all times --

22       A.    Yes.

23       Q.    -- when you were promoting Actiq?  If you

24  turn to Page 13 of this document under 4.4,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    publications.

 2         A.    I need a break.

 3         Q.    Yeah, I hear you need a break.  I got like

 4    three more questions in this document and then we'll

 5    take a break; okay?

 6         A.    Thank you.

 7         Q.    Unless you need to now.

 8         A.    No, no, no.

 9         Q.    I told you you could take a break anytime

10    you want, but -- so under this Section 4.4,

11    publications, it states manuscripts will be submitted

12    to peer-reviewed journals for consideration.  They will

13    include messages that reinforce elements of this RMP;

14    right?

15         A.    Okay.

16         Q.    Is that something that you were trained on

17    that the company would do prior to going out into the

18    field to sell Actiq?

19         A.    I don't remember.

20         Q.    Did you understand that it was company

21    policy to -- during your time selling and promoting

22    Actiq that manuscripts would be submitted to

23    peer-reviewed journals for consideration that include

24    messages that reinforce elements of the RMP?
```

```
 1                    MR. MAIER:  Objection.  Foundation.

 2          A.    I don't remember.

 3          Q.    (By Mr. Faes)  If you turn to Page 17 of

 4   this document.  Strike that.  Turn to page 16 of this

 5   document.  And you see there's a section entitled the

 6   oncology sales specialist.

 7          A.    Yeah.

 8          Q.    And it says, at least as part of the risk

 9   map -- this risk map, it says that full-time oncology

10   sales specialists have been placed in the field to

11   personally call on the target audience.  The oncology

12   sales specialists are the primary day-to-day link of

13   the physicians, nurses, and pharmacists who will be

14   using the product.  The oncology sales specialists will

15   play a key role in implementing the RMP.  Do you see

16   that?

17          A.    I do.

18          Q.    During your time at Cephalon in 2001 --

19   August of 2001 and 2002 -- did Cephalon in fact have

20   full-time oncology sales specialists?

21                    MR. MAIER:  Objection.  Form, foundation.

22          A.    I don't remember.

23          Q.    (By Mr. Faes)  Were you aware of any

24   full-time oncology sales specialists?
```

```
 1                MR. MAIER:  Objection.  Form.

 2        A.    I don't remember.

 3        Q.    (By Mr. Faes)  Were you considered a

 4  full-time oncology sales specialist, or were you

 5  considered something different?

 6        A.    I really don't remember what my title was.

 7  It changed so much.

 8        Q.    Was your initial -- do you recall if your

 9  initial title when you were hired was PCS sales

10  specialist?  Would that be consistent with your memory?

11        A.    That's a primary care specialist -- PCP.

12  What is your definition of that?  What is it?

13        Q.    Well, let me ask it another way.

14        A.    Give me the acronym definition.

15        Q.    At any time during your employment with

16  Cephalon --

17        A.    Cephalon.

18        Q.    Cephalon and Teva.  Let me ask it another

19  way.  When I -- for the rest of the day, if I say the

20  company, can we agree that I'm talking about Cephalon

21  and then Teva?  Because it was essentially -- from your

22  perspective it was the same employer the whole time;

23  right?

24        A.    I'm not going to agree with that.  I'd
```

Highly Confidential - Subject to Further Confidentiality Review

1    like you to keep them separated --

2            Q.    Okay.

3            A.    -- because they were two separate --

4            Q.    Fair enough.  At any time during your

5    employment with Cephalon or Teva, were you -- did you

6    ever have the word oncology or oncology specialist in

7    your title?

8            A.    I don't remember.

9            Q.    Well, let's turn to Page 17 of this and

10   look at some of the duties of the oncology sales

11   specialist.

12           A.    Okay.

13           Q.    Upon hiring, each specialist will receive

14   a letter outlining his responsibilities.  This letter

15   will stress the requirement to limit the promotion of

16   Actiq to the approved indication, discourage off-label

17   use, direct the specialist to promote only to the

18   target audiences, describe the serious consequences of

19   violating this policy, and reinforce the three key

20   messages of the risk map.  Do you see that?

21           A.    I do.

22           Q.    Was one of your job responsibilities ever

23   to specifically discourage off-label use?

24                 MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    (By Mr. Faes)  And how did you do that?

3          A.    Well, they asked -- well, I would just --

4     I'd go in to a physician.  The indication is for

5     breakthrough cancer pain.  And if they asked me about

6     something else, I would say the indication is for

7     breakthrough cancer pain, and if you'd like to have any

8     more information, fill out a medical information

9     request.

10         Q.    But that was -- you'd agree with me that

11    that was -- strike that.  You would agree with me that

12    that is the limit of what the company trained you to do

13    in order to discourage off-label use, is to simply

14    repeat what the indication to the doctor -- strike

15    that.  You'd agree with me that that is the limit of

16    what the company trained you to do to discourage

17    off-label use of Actiq, is to simply restate to the

18    physician, if he was using it off-label, what the

19    indication was?

20              MR. MAIER:  Objection.  Form, foundation.

21         A.    That was part of it, but I don't remember.

22         Q.    (By Mr. Faes)  Well, I mean, you would

23    agree with me that you generally didn't feel like it

24    was appropriate for you to get between the doctor and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the patient in his prescribing decisions; right?

 2                MR. MAIER:  Objection.  Form.

 3         A.    I was never privy to be there.  I was

 4    never -- I never knew what the physician was writing

 5    for an individual patient.  Is that what you're getting

 6    at?

 7         Q.    (By Mr. Faes)  So my question is simply,

 8    you would agree with me --

 9         A.    I need a break.

10         Q.     -- that you generally didn't feel like it

11    was appropriate for you to get in between the doctor

12    and his patients in his prescribing decisions?  It

13    wasn't part of your job --

14         A.    Right.

15         Q.     -- to second-guess his decisions or

16    discourage him from what he thought was appropriate;

17    right?

18                MR. MAIER:  Objection.  Form.

19         A.    I guess no.  I mean, I stated the

20    indication.  I would not get in between their

21    prescribing, no, but I would state the indication.

22         Q.    (By Mr. Faes)  Right.  And that was the

23    limit of what you would do to discourage the doctor

24    from writing it off-label, is to restate the
```

1    indication; right?

2              MR. MAIER:  Objection.  Form.

3         A.    I can't remember.  I'm sorry.

4         Q.    (By Mr. Faes)  Okay.

5              MR. MAIER:  Break?

6         A.    I need a break.

7              MR. MAIER:  All right.  We'll take a

8    break.

9              MR. FAES:  Okay.  Let's take a break.

10        A.    Thank you.

11             THE VIDEOGRAPHER:  We are going off the

12   record at 10:41 AM.

13             [A brief recess was taken.]

14             THE VIDEOGRAPHER:  We are back on the

15   record at 10:59 AM.

16        Q.    (By Mr. Faes)  Ms. Kaisen, we're back on

17   the record after a short break.  Are you ready to

18   proceed?

19        A.    Yes.

20        Q.    So we were talking before the break about

21   the oncology sales specialist referenced in Page 16 of

22   the August 2001 risk map.  If the records reflect that

23   your position at this time in August of 2001 was that

24   you were a PCS sales specialist or pain care

Highly Confidential - Subject to Further Confidentiality Review

```
1    specialist -- sales specialist, would you have any

2    reason to disagree with that?

3         A.    No.

4         Q.    During this time in 2001 and 2002, did

5    you -- do you recall ever meeting with anyone else who

6    was considered an oncology sales specialist at

7    Cephalon?

8              MR. MAIER:  Objection.  Form.

9         A.    I don't remember.

10        Q.    (By Mr. Faes)  Do you recall -- well,

11   strike that.  Was there anyone else at Cephalon that

12   you were aware of whose job it was to discuss and

13   discourage off-label use of Actiq with physicians other

14   than yourself?

15             MR. MAIER:  Objection.  Form, foundation.

16        A.    I don't remember.

17        Q.    (By Mr. Faes)  If you can turn to Page 27

18   of this risk map.  Under off-label usage, individual

19   prescribers, it states whenever a problem of off-label

20   usage becomes known and individual prescribers are

21   identified, the following activities will take place.

22   And the first activity is that a letter from Cephalon,

23   Inc.'s medical department will be sent to all

24   identified prescribers to emphasize the approved
```

Highly Confidential - Subject to Further Confidentiality Review

1   indication and appropriate patient selection.  Do you

2   see that?

3          A.    I do.

4          Q.    Were you trained by your superiors that

5   this was something that would go on at Cephalon

6   whenever a problem of off-label usage becomes known?

7                MR. MAIER:  Objection.  Form.

8          A.    I don't remember.

9          Q.    (By Mr. Faes)  When you were a sales rep

10  at Cephalon, do you remember ever participating or

11  being involved in any kind of a program whereby -- when

12  off-label -- a problem with off-label usage became

13  known, individual prescribers would be sent a letter

14  emphasizing the approved indication?

15               MR. MAIER:  Objection.  Form.

16         A.    I don't remember.

17         Q.    (By Mr. Faes)  But you would agree with me

18  that part of your responsibilities as a sales rep would

19  have been to be familiar with this Actiq risk map,

20  including the goals and objectives of the risk map;

21  right?

22               MR. MAIER:  Object to form.

23         Q.    (By Mr. Faes)  I realize it was a long

24  time ago.

1          A.     I don't remember.  18 years, 19 years ago.

2          Q.     But that is something you were trained on,

3     that according to this risk map, Actiq should only be

4     used in opioid-tolerant patients with cancer; right?

5          A.     Yes.

6          Q.     And you were trained on the same thing for

7     Fentora when it came out and replaced Actiq as the

8     focus of your selling and promotional activities;

9     right?

10         A.     Could you repeat that?  Not the first

11    part; the second part.  I was thinking about the first

12    part.

13         Q.     You were trained on the same thing,

14    meaning that according to the risk map, Fentora should

15    only be used in opioid-tolerant patients with cancer

16    when it came out and replaced Actiq as the focus of

17    your selling and promotional activities; right?

18         A.     Yes.

19                MR. MAIER:  Object to form.

20         Q.     (By Mr. Faes)  Breakthrough pain without

21    cancer was not indicated for Actiq or Fentora at any

22    time when you worked for Cephalon and Teva; right?

23         A.     It was not indicated.

24         Q.     And you would agree with me that marketing

1    or promoting Actiq or Fentora for breakthrough pain

2    without cancer would be off-label; right?

3         A.    Yes.

4         Q.    And you understood that marketing

5    off-label was illegal; right?

6         A.    Yes.

7         Q.    And you were instructed and trained not to

8    do that; right?

9         A.    Yes.

10        Q.    Now, you understand that every year or so,

11   Cephalon and later Teva would come out with marketing

12   plans for the Actiq and Fentora products; right?

13        A.    Yes.

14              MR. MAIER:  Objection.  Form.

15        Q.    (By Mr. Faes)  And those marketing plans

16   were put together by the marketing department; right?

17        A.    Yes.

18        Q.    And they contained strategies and tactics

19   for successfully promoting and selling both Actiq and

20   later Fentora; right?

21              MR. MAIER:  Objection.  Form.

22        A.    Yes.

23        Q.    (By Mr. Faes)  And these were national

24   marketing plans, meaning they were intended to be used

```
 1    all over the United States; right?

 2         A.    Yes.

 3         Q.    And that would include the territory that

 4    you were responsible, which included at all times

 5    Cleveland and part of Ohio; right?

 6         A.    Yes.

 7         Q.    And those marketing -- as a sales

 8    representative responsible for promoting and selling

 9    Actiq and Fentora, those marketing plans would have

10    been shared with you; right?

11         A.    Yes.

12         Q.    And that's because as a sales

13    representative, you were the person in the trenches, so

14    to speak, meaning you were one of the persons

15    responsible for carrying out various aspects of those

16    plans in the field; right?

17         A.    Yes.

18         Q.    And you recall that many of these early

19    marketing plans for Actiq had a bell on the cover;

20    right?

21         A.    Yes.

22         Q.    And that bell became kind of a marketing

23    symbol within the company for the Actiq product; right?

24         A.    Yes.
```

 1          Q.    And why was that?  Explain to me what the

 2   bell represented.

 3          A.    I'm thinking, and I -- you can get pain

 4   relief on demand?

 5          Q.    Right.  And so essentially it was kind

 6   of -- it was a little bell.  Ding the bell, get relief

 7   on demand; right?

 8          A.    (Nodding "yes.")

 9                MR. MAIER:  Objection.  Form.

10          Q.    (By Mr. Faes)  And that was essentially

11   what Actiq was for, was for somebody who was having a

12   breakthrough onset of pain and was already on an opioid

13   and needed to get through that breakthrough pain;

14   right?

15          A.    Yes.

16          Q.    So I'm going to hand you what's been

17   marked as Exhibit Number -- I'm going to hand you

18   what's been marked as Exhibit Number 6 to your

19   deposition.

20                [Exhibit Teva-Kaisen-006

21                marked for identification.]

22          A.    Oh.  I'm taking your stickers.

23          Q.    Yeah, I'm trying to keep my stickers

24   straight so I don't lose them again.

```
 1          A.     I'm taking your stickers.

 2          Q.     And this a document entitled -- I know

 3   this is thick.  I'm not going to go through all of it

 4   with you.  Don't worry.

 5          A.     No.

 6          Q.     This is a document entitled Actiq master

 7   plan.  Do you see that?  And it's dated November 16th,

 8   2000.  Do you see that?

 9          A.     Prior to my employment.

10                 MR. BERG:  Just yes.

11          A.     Yes.

12          Q.     (By Mr. Faes)  So if I can have you just

13   turn to Page 2 of this document.

14          A.     Put it up there.

15                 MR. FAES:  I think it's 3 for you, Mike.

16          A.     It's easier for me up there.  There's --

17   oh, there it is.  3.  2.  2.  Okay.

18          Q.     (By Mr. Faes)  So if you see under

19   Paragraph 4 --

20                 MR. BERG:  Might be easier just to --

21          A.     It's actually easier here.

22          Q.     (By Mr. Faes)  If you see on Paragraph 4

23   of this, it states that feedback from the field

24   indicates that oncologists simply aren't treating that
```

1   many people for breakthrough cancer pain.  Do you see

2   that?

3          A.    Yes.

4          Q.    And as you stated, this predates your

5   employment, but is this information that would have

6   been communicated to you upon your initial training on

7   Actiq when you joined Cephalon?

8                MR. MAIER:  Objection.  Form, foundation.

9          A.    Don't remember.

10         Q.    (By Mr. Faes)  Is it something that you

11  came to understand during the course of your employment

12  with Cephalon?

13         A.    Yes.

14         Q.    If you go down to Paragraph 5 it states

15  that among physicians who are prescribing Actiq,

16  activity is skewing increasingly towards the

17  nononcologists.  Units written by oncologists now

18  represent just 16 percent of total product usage, with

19  48 percent coming from pain management specialists.  Do

20  you see that?

21         A.    I see it.

22         Q.    Is that statement consistent with your

23  understanding of what the approximate breakdown was

24  between oncologists and pain management specialists

1    when you were working at Cephalon?

2              MR. MAIER:  Objection.  Form, foundation.

3         Q.    (By Mr. Faes)  In early 2001, 2002?

4              MR. MAIER:  Same objection.

5         A.    I don't know.

6         Q.    (By Mr. Faes)  Do you have any reason as

7    you sit here today to disagree with that?

8         A.    If it's written it's written.

9         Q.    Okay.  And if you go to Paragraph 6, it

10   states we believe that the pain management specialist

11   is likely to be a more aggressive writer and adopter of

12   Actiq.  Do you see that?

13        A.    Uh-huh.

14        Q.    Is that something you were trained on or

15   was communicated to you within your first few years as

16   a sales representative for Actiq?

17             MR. MAIER:  Objection.  Form.

18        A.    I don't remember.

19        Q.    (By Mr. Faes)  Was that something that you

20   came to understand during the course of your employment

21   with Cephalon when you were promoting Actiq?

22             MR. MAIER:  Objection.  Form.

23        A.    Yes.

24        Q.    (By Mr. Faes)  And if you go to the last

Highly Confidential - Subject to Further Confidentiality Review

```
 1    symptom of this paragraph, it states in addition, from

 2    a business perspective, these physicians tend to have

 3    patients who are more likely to be truly chronic with

 4    many years of potential usage of the product either for

 5    breakthrough pain or generally for other chronic pain

 6    conditions.  Do you see that?

 7          A.    I see it.

 8          Q.    Is that information that was shared with

 9    you from the marketing department during your time

10    selling Actiq?

11                MR. MAIER:  Objection.

12          A.    I don't remember.

13          Q.    (By Mr. Faes)  Is that something that you

14    came to understand was true when you were promoting and

15    selling Actiq?

16          A.    No comment.  Rephrase.

17          Q.    Did you come to understand when you were a

18    sales representative promoting and detailing Actiq that

19    the pain -- from a business perspective, the pain

20    management specialists tend to have patients who are

21    more likely to be truly chronic with many years of

22    potential usage of the product either for breakthrough

23    pain or more generally for other chronic pain

24    conditions?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAIER:  Objection.  Form, foundation.

 2          A.    I don't like the way that question is --

 3    I'm sorry.  I don't know how to answer that.

 4          Q.    (By Mr. Faes)  So is it fair to say you

 5    can't answer that question yes or no as you sit here

 6    today?

 7          A.    Yes.  I can't answer it.  Don't remember.

 8          Q.    What do you remember about that?

 9                    MR. MAIER:  Objection.  Form.

10          A.    Question?

11          Q.    (By Mr. Faes)  Yes.  What do you remember

12    about whether or not from a business perspective pain

13    management specialists tend to have patients who are

14    more likely to be truly chronic with many years of

15    potential usage of the product?

16          A.    What I do remember is the oncologists at

17    the time were deferring their patients to pain

18    management because they didn't have the expertise or

19    the environment -- it was making them uncomfortable, so

20    they would refer to the pain specialists, and that's

21    why we went to the pain specialists.  This is a

22    little --

23          Q.    But you would agree with me that pain

24    specialists in general are more likely to have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   noncancer patients like oncologists; right?

 2         A.    Yes.

 3               MR. MAIER:  Objection.  Form.

 4         Q.    And a person who does not have cancer --

 5   terminal cancer is much more likely to have many

 6   potential years of use with any product; right?

 7               MR. MAIER:  Objection.  Form, foundation.

 8         A.    I guess.

 9         Q.    (By Mr. Faes)  If you go to the top of

10   Page 3, which is the next page in this document, under

11   strategic recommendations.  It states based on our

12   experience to date with Actiq, we believe it can

13   continue to grow aggressively into 2001 and beyond,

14   expanding the target physician and patient population

15   to allow penetration of the broad chronic pain market.

16   This should be the driver of all activities associated

17   with Actiq in 2001 -- marketing, clinical, regulatory,

18   and operations.  Do you see that?

19         A.    Uh-huh.

20         Q.    Is that information that was given by the

21   marketing department to you while you were a sales

22   representative detailing and promoting Actiq?

23               MR. MAIER:  Objection.  Form.

24         A.    I don't remember.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (By Mr. Faes)  Did you come to understand

2    that this was true while you were a sales

3    representative promoting and detailing Actiq?

4              MR. MAIER:  Objection.  Form.

5    A.    For the indication of breakthrough cancer

6    pain, period.

7    Q.    (By Mr. Faes)  So with the

8    qualification -- with that qualification, you did

9    understand this to be true?

10              MR. MAIER:  Objection.  Form.

11    A.    I guess I'm confused by your questioning.

12    I'm sorry.  Rephrase.

13    Q.    (By Mr. Faes)  Okay.  So my question is,

14    when you were a sales representative for Cephalon

15    detailing Actiq, did you come to understand that based

16    on the company's experience to date with Actiq in 2001

17    that the company believed it could continue to grow

18    aggressively into the years beyond by expanding the

19    target physician and patient population to allow

20    penetration of the broad chronic pain market?

21              MR. MAIER:  Objection.  Form, foundation.

22    A.    I don't remember.  I don't like the way

23    he's phrasing it.  Sorry.

24    Q.    (By Mr. Faes)  So if you go down to --

Highly Confidential - Subject to Further Confidentiality Review

1    it's the middle of the page starting with bring

2    existing clinical programs.  So under strategic

3    recommendations it states that one of them is to bring

4    existing clinical programs to fruition and expand them

5    to support broadened product usage.  Do you see that?

6         A.    Uh-huh.

7         Q.    And then below that it states invest in

8    clinical programs to broaden clinical database into

9    nonmalignant chronic pain states.  These will be mostly

10   IND studies.  We envision trials in breakthrough pain

11   as more as well -- as well as more general chronic

12   pain.  Do you see that?

13        A.    I do.

14              MR. MAIER:  Objection.  Form.

15        Q.    (By Mr. Faes)  And it also states that

16   they're going to publish and use that data in the

17   short-term for peer-to-peer environments under the WLF.

18   Do you see that?

19        A.    Yes.

20        Q.    And WLF states for Washington Legal

21   Foundation; right?

22        A.    Uh-huh.

23        Q.    And you were familiar with the Washington

24   Legal Foundation reprints while you were a sales rep

1    for Actiq; right?

2        A.    Yes.

3              MR. MAIER:  Objection.  Form, foundation.

4        Q.    (By Mr. Faes)  And while you were a sales

5    rep for Fentora; right?

6        A.    I don't remember if we had them then.

7        Q.    Okay.  Well, we're going to actually look

8    at that a little later, but if the records reflect that

9    those WLF reprints continue to be available into 2008,

10   that would have been during the time that you were

11   promoting or detailing Fentora; right?

12       A.    Yes.

13       Q.    And you understood that in general the WLF

14   or Washington Legal Foundation reprints were studying

15   Actiq for indications other than breakthrough pain in

16   patients with cancer; right?

17             MR. MAIER:  Objection.  Form, foundation.

18       A.    I honestly don't remember.

19       Q.    (By Mr. Faes)  You don't recall if the WLF

20   reprints included -- could include studying "Acteeq" --

21   sorry -- Actiq -- in indications such as back pain or

22   migraines or in noncancer patients?

23             MR. MAIER:  Objection.  Form, foundation.

24       A.    I don't remember the WLF papers as to

1   exactly what they were each, as to know that.  I don't

2   remember.

3          Q.    (By Mr. Faes)  With regard to envisioning

4   trials in breakthrough pain as well as more general

5   chronic pain, you did have an understanding, though,

6   that that was a company strategy, to study Actiq in

7   studies for indications that were beyond the label;

8   right?

9          A.    Yes.

10               MR. MAIER:  Objection.  Form, foundation.

11         Q.    (By Mr. Faes)  And you could make those

12  studies available if they were published, for example,

13  through the Washington Legal Foundation if the

14  physician initiated an off-label discussion; right?

15         A.    Okay.

16         Q.    That's true; right?

17               MR. MAIER:  Objection.  Form.

18         A.    I don't remember, honestly.

19         Q.    (By Mr. Faes)  Well, if a physician came

20  to you and said --

21         A.    I forget how they worked.

22         Q.    If a physician came to you and said, for

23  example, Ms. Kaisen, would Actiq work for migraines?

24  Could I use it in one of my patient for migraines?

Highly Confidential - Subject to Further Confidentiality Review

1    Your response would be essentially to say, well,

2    Doctor, the Actiq is indicated for breakthrough pain in

3    opioid-tolerant patients with cancer only, but I can

4    fill out a MIRF or a medical information request form

5    for you; right?

6         A.    Yes.

7              MR. MAIER:  Objection.  Form.

8         Q.   (By Mr. Faes)  And once you filled out

9    that form and sent it to the company, the company could

10   then send -- could look in their archives and see if

11   they had an article that discussed Actiq for the

12   indication he was asking for and could send it to him;

13   right?

14        A.    Yes.

15             MR. MAIER:  Objection.  Form, foundation.

16        Q.   (By Mr. Faes)  And that could include

17   documents that the company made available through the

18   Washington Legal Foundation; right?

19             MR. MAIER:  Same objection.

20        A.    I don't know what they sent.  They

21   answered, but I don't know what they sent exactly.  We

22   weren't privy to that.

23        Q.   (By Mr. Faes)  But you understood that if

24   a article discussing the use of Actiq and the

Highly Confidential - Subject to Further Confidentiality Review

```
1    indication the doctor was asking about existed, the

2    company could send that to the doctor; right?

3         A.    Yes.

4               MR. MAIER:  Objection.  Foundation.

5         Q.    (By Mr. Faes)  You can set that aside.

6    I'm done with it.

7         A.    What's that?

8         Q.    You can set that one aside.

9         A.    Oh.

10              MR. BERG:  This whole thing.

11        Q.    (By Mr. Faes)  So I'm going to hand you

12   what's been marked as Exhibit Number 4 to your

13   deposition.  7.  I'm going to hand you what's been

14   marked as Exhibit Number 7 to your deposition.

15              [Exhibit Teva-Kaisen-007

16              marked for identification.]

17        Q.    And this is a document titled business

18   plan 2002, Val McGinley.  Do you see that?

19        A.    Uh-huh.

20        Q.    And that would be you; right?

21        A.    Yeah.

22        Q.    That was your name prior to being Kaisen?

23        A.    Yes.

24        Q.    And this is a document that you would have
```

 1    actually authored; right?

 2            A.    I don't see a trail on it, like an e-mail.

 3    So if you say so.  I don't see an e-mail --

 4            Q.    Well, did you write this document or not?

 5            A.    It looks familiar, but --

 6            Q.    Okay.  Well, let's look at some of it and

 7    see if it refreshes any of your memory.  Under market

 8    analysis and overview, you state that the Cleveland

 9    territory has a steady growth in prescriber counts, TRx

10    counts, TRx units, DDD, and TM.  Do you see that?

11            A.    Yes.

12            Q.    And TRx counts and TRx units means

13    prescription counts and prescription units; right?

14            A.    Yes.

15            Q.    What does DDD and TM mean?

16            A.    TM would be -- I'm guessing total market.

17    I'm not sure what DDD is.

18            Q.    If you go on it states that --

19            A.    Total market.  I'm not sure.  Okay.

20            Q.    If you go on it states that Cleveland has

21    always been very conservative and slow to adapt;

22    however, once they become comfortable with a product it

23    becomes entrenched.  There has never been any coverage

24    in my territory prior to my entry and now there is a

Highly Confidential - Subject to Further Confidentiality Review

1   groundwork of established writers.  Do you see that?

2       A.    Yes.

3       Q.    It says the foundation makes a wonderful

4   platform to drive growth and catapult Cleveland into a

5   top dollar-generating sales territory for 2002; right?

6       A.    Yes.

7       Q.    And the foundation -- that would refer --

8   what would that refer to?

9       A.    Foundation of the established writers, I

10  would assume.

11      Q.    So after reading this, does this refresh

12  your recollection at all if this is a document that you

13  would have written or if it was just one that would

14  have been written by your managers and shared with you?

15          MR. MAIER:  Objection.  Foundation.

16      A.    If you say it was written by me it was

17  written by me.  It looks familiar.  I'd be more --

18      Q.    (By Mr. Faes)  Well, I mean, I don't want

19  to put words in your mouth.  What do you --

20      A.    I would be more comfortable if there was

21  an e-mail trail on this.

22      Q.    Okay.  Well, I mean, I'll represent to you

23  that it was in your custodial file of documents that

24  was received by the company.  So assuming that to be

Highly Confidential - Subject to Further Confidentiality Review

1   true, you'd agree with me that you either would have

2   written it or would have received and reviewed it;

3   right?

4          A.    Yes.

5                MR. MAIER:  Objection.  Form, foundation.

6          Q.    (By Mr. Faes)  If you turn to the second

7   page of this document and you list -- you or your

8   manager list goaled for 2002.

9          A.    Okay.

10         Q.    And it says to have 100 percent of my top

11  physicians -- top 15 physicians write Actiq; right?

12         A.    Yes.

13         Q.    So that's written in the first person, so

14  it's likely that this was probably written by you and

15  not by your manager; right?

16               MR. MAIER:  Objection.  Form.

17         A.    Yes.

18         Q.    (By Mr. Faes)  And if you look down under

19  MEPs, entertainment.  And MEPs refers to medical

20  education programs; right?

21         A.    Yes.

22         Q.    And it looks like you've got a list of

23  MEPs or medical education programs that you completed

24  in 2002; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     And one of them you list was completed on

 3   January 24th, 2002.

 4          A.     Okay.

 5          Q.     And it looks like the audience for that

 6   one was psychiatrists and pain physicians.  Do you see

 7   that?

 8          A.     Yeah.

 9          Q.     So does this indicate that there would

10   have been a --

11                 MR. BERG:  It's physiatrists.

12          A.     It's physiatrists.

13          Q.     (By Mr. Faes)  Physiatrists.

14                 MR. BERG:  Physiatrists, not

15   psychologists.

16          Q.     (By Mr. Faes)  Sorry.  Let me restate

17   that.

18          A.     Thanks for the pickup.  I didn't get that.

19          Q.     Physiatrist.

20          A.     It's physiatrists.  "Potayto," "potahto."

21          Q.     And if you turn to the following page of

22   this, it reflects that you completed another MEP or

23   medical education program on April 18th and the

24   audience was high-decile pain management physicians and
```

```
 1   physiatrists in the Toledo area; right?

 2        A.    Number 1 was not in the Toledo area.

 3        Q.    I'm sorry.  I've turned the page to Page

 4   3.

 5        A.    I'm sorry.

 6        Q.    So on the following page of this document

 7   it also indicates that you completed another medical

 8   education program on April 18th and the audience was

 9   high-decile pain management physicians and physiatrists

10   in the Toledo area.  Do you see that?

11        A.    Yes.

12        Q.    And high-decile pain management

13   physicians -- what did that mean?

14        A.    The company would give us what they felt

15   were high decile and whatever the decile parameters

16   were at the time.  I don't remember, but usually they

17   were -- I don't remember what the parameters were, but

18   high deciles were the ones we needed to target.

19        Q.    And one of the things that would indicate

20   a high-decile physician at that time would have been

21   whether they were a high prescriber of other opioids;

22   right?

23              MR. MAIER:  Objection.  Form, foundation.

24        A.    Yes.
```

```
 1          Q.    (By Mr. Faes)  And that's because you

 2   would want to target or detail for Actiq someone who

 3   was already opioid tolerant; right?

 4          A.    Right.

 5          Q.    And so a high-decile pain management

 6   physician is someone that you would want to

 7   specifically target or invite to these medical

 8   education programs; right?

 9          MR. MAIER:  Objection.  Form, foundation.

10          A.    If they treated cancer pain.

11          Q.    (By Mr. Faes)  And if you look down, it

12   looks like you had two different events where Dr. James

13   Bressi was the speaker, right, for a medical education

14   program?

15          A.    Yes.

16          Q.    So you would have used Dr. Bressi on

17   multiple occasions as a speaker for Actiq; right?

18          A.    Three as of this page.

19          Q.    And what do you remember about Dr. Bressi

20   and his practice?

21          A.    Specify the question, please.

22          Q.    Tell me what you remember about Dr.

23   Bressi's practice?

24          A.    Time frame?
```

1      Q.    Well, we're in 2002, so tell me about what

2   you remember about Dr. Bressi's practice in 2002 when

3   you were using him as a speaker in various programs for

4   Actiq.

5      A.    He was a thought leader in the area, and

6   he was a high prescriber due to decile, and oncologists

7   would refer to him.

8      Q.    And how did you select Dr. Bressi as a

9   speaker for Actiq?

10             MR. MAIER:  Objection.  Form.

11      A.    I don't remember.  There was different

12   criteria every year.

13      Q.    (By Mr. Faes)  So at this time in early --

14   in 2002, the selection process for speakers would have

15   been more informal; right?  There wouldn't have been an

16   approved list by the company at this time?

17             MR. MAIER:  Objection.  Form, foundation.

18      A.    I don't remember.

19      Q.    (By Mr. Faes)  Well, tell me about the

20   process you would have used in 2002 in deciding whether

21   or not to use a particular physician as a speaker for a

22   medical education program.

23             MR. MAIER:  Objection.  Form, foundation.

24      A.    I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    (By Mr. Faes)  If you can turn to the
2    following page of this document.  Oh, sorry.  I have
3    one more question about Dr. Bressi.  What kind of
4    doctor did you say Dr. Bressi was?
5          A.    Pain management.  Anesthesia.
6          Q.    Didn't he also practice in physical
7    rehabilitation?
8                MR. MAIER:  Objection.  Form, foundation.
9          A.    I don't know.
10         Q.    (By Mr. Faes)  So in several of these
11   events, the target audience is a physiatrist; right?
12   Is included in the target audience for the medical
13   education program?
14         A.    There were several different specialties.
15         Q.    And physiatrist was one of them; right?
16         A.    Yes.  If they treated cancer pain.
17         Q.    But a physiatrist is a different specialty
18   than a oncologist or a pain specialist; right?
19         A.    Yes.
20         Q.    And at this time -- and was it true that
21   your superiors or your bosses at the company would have
22   known that physiatrists were being invited to and
23   attending these medical education programs for Actiq?
24               MR. MAIER:  Objection.  Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    (By Mr. Faes)  And did anyone at the

 3   company ever express any concerns or tell you that you

 4   shouldn't do that, that you should only invite

 5   oncologists and pain specialists to medical education

 6   programs?

 7              MR. MAIER:  Objection.  Form.

 8        A.    I don't remember.

 9        Q.    (By Mr. Faes)  So you'd agree with me that

10   nobody -- none of your superiors, none of your bosses

11   at the company ever told you that you shouldn't invite,

12   for example, a physiatrist to a medical education

13   program for Actiq because that was inconsistent with

14   the risk map for the Actiq?

15              MR. MAIER:  Objection.  Form.

16        A.    Can I answer the --

17              MR. BERG:  Yeah.

18        A.    If they treated -- and I said this before.

19   If they treated breakthrough cancer pain, they were

20   invited.  So there were "physiahtrists" or

21   "physyatrists" that did treat cancer pain.

22        Q.    Sure, I understand that.  My question is

23   simply, your superiors at the company were aware that

24   physiatrists were attending these medical education
```

Highly Confidential - Subject to Further Confidentiality Review

1    programs; right?

2              MR. MAIER:  Objection.  Form, foundation.

3         A.    I don't know what they looked at, so I

4    guess they did.

5         Q.    (By Mr. Faes)  Well, you'd agree with me

6    that nobody at the -- none of your superiors at the

7    company ever came to you and said, hey, you shouldn't

8    be inviting or allowing, for example, physiatrists to

9    attend MEPs because that's inconsistent with the risk

10   map?  Nobody ever told you that; right?

11        A.    No.

12             MR. MAIER:  Objection.  Form.

13        Q.    And if someone had told you that,

14   somebody -- a superior, your boss at the company -- you

15   would have done what you were told; right?

16        A.    Yes.

17        Q.    (By Mr. Faes)  If you turn to the

18   following page of this document under regional

19   symposium, it states MediCom Worldwide and myself --

20   I'll slow down.

21        A.    What page are we on?

22        Q.    I'll start over.

23        A.    Thank you.

24        Q.    Sorry.  I'm trying to get you out of here

```
 1    as fast as I can, so --

 2            A.    I appreciate that.

 3            Q.    So we're under regional symposium.

 4            A.    Got it.

 5            Q.    And it states that MediCom Worldwide and

 6    myself instrumented a regional symposium in Cleveland

 7    on May 22nd, 2002.  There were 38 key physicians from

 8    Cleveland, Akron, Warren, Canton, and Youngstown areas.

 9    Dr. "Guiden"?

10            A.    "Goodin."

11            Q.    Am I pronouncing that right?

12            A.    "Goodin."

13            Q.    Gudin was the guest speaker.  He did a

14    terrific job.  I am already seeing a great ROI.  Do you

15    see that?

16            A.    Yes.

17            Q.    And these would have been your comments at

18    the time that Dr. Jeffrey -- I'll probably pronounce it

19    wrong again --

20            A.    "Goodin."

21            Q.    -- Gudin was a guest speaker and you were

22    seeing a terrific ROI or return on investment from that

23    speaking program; right?

24                  MR. MAIER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    (By Mr. Faes)  And return on investment or

 3   ROI was an important factor in utilizing these medical

 4   education programs; right?

 5              MR. MAIER:  Objection.  Form.

 6        A.    Educating.

 7        Q.    (By Mr. Faes)  Right.  The purpose of

 8   these programs was to educate other doctors on Actiq;

 9   right?

10        A.    Yeah.

11        Q.    And the hope was that once these other

12   doctors were educated that they would hopefully start

13   prescribing Actiq or trying it in their patients as

14   well; right?

15        A.    Yes.

16              MR. MAIER:  Objection.  Form.

17        Q.    (By Mr. Faes)  And with those additional

18   prescriptions would be more revenue for the company;

19   right?

20        A.    Yes.

21        Q.    And that's what that refers to, is return

22   on investment, because these speaking programs had a

23   cost; right?

24              MR. MAIER:  Objection.  Form, foundation.
```

1      A.    I don't remember, but yes, I guess they

2  would.

3      Q.    (By Mr. Faes)  Well, I mean, certainly you

4  knew that like Dr. Gudin, for example, or Dr. Bressi --

5      A.    But the MediCom Worldwide -- I don't

6  remember them, so --

7      Q.    Well, in general, doctors like Dr. Bressi,

8  who gave three different talks according to this

9  document, the company, Cephalon, would pay them for

10  their time --

11      A.    Uh-huh.

12      Q.     -- to come to these symposiums and speak;

13  right?

14      A.    Yes.

15      Q.    And there was a cost for that?

16      A.    Yes.

17      Q.    And you would want to look at whether or

18  not you were seeing a return on investment down the

19  line if the people -- those doctors that you hired to

20  talk -- that those doctors that they talked to were

21  actually writing prescriptions or trying Actiq after

22  the medical education program was done; right?

23           MR. MAIER:  Objection.  Form.

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    (By Mr. Faes)  And that's what the ROI or

2    return on investment refers to; right?

3               MR. MAIER:  Objection.  Form, foundation.

4        A.    Not necessarily.

5        Q.    (By Mr. Faes)  But that's one of the

6    aspects; right?

7               MR. MAIER:  Objection.  Form.

8        A.    Education, return on investment.

9    Educating was important.

10       Q.    (By Mr. Faes)  Right.  So if you look on

11   the following page of this document, you've got a list

12   of your top physician targets for 2002; right?

13       A.    I don't see where you're saying.

14              MR. BERG:  Where is this?

15       Q.    (By Mr. Faes)  It's the following page.

16       A.    I see barriers to success.

17       Q.    Maybe it's two pages forward.  It's -- the

18   Bates ending is in 7915.

19       A.    Okay.

20       Q.    If you look at the bottom.

21       A.    Got it now.

22       Q.    Okay.  So we're on the page with Bates

23   ending 7195 and you see you've got top physician

24   targets listed for 2002; right?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    And excuse me.  Your top target is Dr.

3    James Bressi; right?

4          A.    Yes.

5          Q.    And you can see -- and that's the same

6    doctor that you were already using as a speaker; right?

7          A.    Yes.

8          Q.    And you can see he was writing at this

9    time 39 prescriptions for Actiq a month; right?

10         A.     39 in three months.

11         Q.    Oh, 39 in three months.  Thanks for that

12   correction.  And his specialty was anesthesiology;

13   right?

14         A.     Anesthesiology, pain management.

15         Q.    And Greg Thomas was your second largest

16   target, and he was a physiatrist; right?

17         A.     (Nodding "yes.")

18         Q.    And your third target was -- third biggest

19   target was Mark Allen, who was an anesthesiologist;

20   right?

21         A.     Uh-huh.  Pain management.

22         Q.    And the four -- your fourth biggest target

23   was -- his specialty was family practice?

24              MR. MAIER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    (Nodding "yes.")

 2        Q.    (By Mr. Faes)  And your fifth largest

 3   target was doc -- I assume Dr. Heather Scullin, and her

 4   specialty is PM and R.  Do you see that?

 5        A.    Uh-huh.

 6        Q.    And PM and R would stand for physical

 7   medicine and rehabilitation; right?

 8        A.    Uh-huh.

 9        Q.    So at this time in 2002, your -- none of

10   your top five targets were oncologists or pain

11   management specialists; right?

12              MR. BERG:  Well, objection.  I think she

13   said one of the anesthesiologists was a pain

14   management.

15        Q.    (By Mr. Faes)  Okay.  So which of the

16   anesthesiologists -- which of the people on this list

17   did you consider a pain management specialist?

18        A.    James Bressi.

19        Q.    Okay.

20        A.    Let me finish.  Mark Allen.

21        Q.    Okay.

22        A.    I can't remember, but I think Greg Thomas

23   too was pain management certified.

24        Q.    So at this time in 2002, it would be true
```

Highly Confidential - Subject to Further Confidentiality Review

1    that two of your top five targets were not pain

2    management specialists or oncologists; right?

3              MR. MAIER:  Objection.  Form.

4         A.    Heather Scullin was pain management too,

5    from what I remember.

6         Q.    (By Mr. Faes)  But at least according to

7    this document, which is in your business plan dated

8    2002, it lists her specialty as PM and R, which is

9    physical --

10        A.    Medicine and rehab.

11        Q.     -- medicine and rehabilitation; right?

12        A.    Uh-huh.

13        Q.    Would you have called on physical medicine

14   and rehabilitation doctors in 2002 for Actiq?

15        A.    I called on whoever they wanted me to call

16   on according to the decile.

17        Q.    And when you say whoever they wanted you

18   to call on --

19        A.    The company.

20        Q.     -- you mean the company, your superiors;

21   right?

22        A.    (Nodding "yes.")

23              MR. MAIER:  Objection.  Form.

24        Q.    (By Mr. Faes)  And nobody at this time in

1  2002 ever told you that someone with a primary

2  specialty of physical medicine and rehabilitation would

3  be an inappropriate person to call on because they

4  weren't a pain management specialist or oncologist;

5  right?  Nobody ever told you that?

6       A.    No.

7             MR. MAIER:  Objection.  Form.

8       Q.    (By Mr. Faes)  And if somebody had told

9  you that, that that was -- you shouldn't call on that

10  type of doctor because it's inconsistent with the risk

11  map, you would have done what you were told; right?

12      A.    Yes.

13      Q.    Are you done?  I don't want to cut you

14  off.

15      A.    That's fine.

16      Q.    Okay.  And at this time it indicates that

17  you were also calling on family practitioners like Dr.

18  Edward Urban; right?

19      A.    Yes.

20      Q.    And nobody at the company or your

21  higher-ups, your superiors, your bosses -- nobody ever

22  told you that it would be inappropriate to call on a

23  family practice person for Actiq; right?

24            MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    No.

2          Q.    (By Mr. Faes)  And you would have shared

3    this plan with your manager; right?  Your manager would

4    have known that this was your plan and this is your top

5    five targets for 2002; right?

6          A.    Yes.

7          Q.    And if your boss had a problem with any of

8    this, he would have told you and you would have done as

9    you were instructed; right?

10               MR. MAIER:  Objection.  Foundation.

11         A.    Yes.

12         Q.    (By Mr. Faes)  And nobody at the company

13   ever told you that Ms. Kaisen, which I think was

14   McGinley at the time -- nobody ever told you, Ms.

15   Kaisen, you shouldn't be calling on family practice

16   specialty doctors because that's inconsistent with the

17   risk map that says you're only supposed to call on

18   oncologists and pain specialists; right?

19               MR. MAIER:  Objection.  Form.

20         A.    I don't remember.

21         Q.    (By Mr. Faes)  Well, if someone had, it's

22   probably something you would have remembered because

23   you would have changed your plan and not called on them

24   anymore; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. MAIER:  Objection.  Form, foundation.

 2        A.    Yes.

 3        Q.    (By Mr. Faes)  And if somebody had told

 4   you that, you would have done as you were instructed by

 5   your superiors; right?

 6        A.    Yes.  Yes.

 7        Q.    Then if you look down you've got a Dr.

 8   Brocker in your six through 15 targets listed as one of

 9   your targets as well, and he's -- his specialty is

10   neurologist; right?

11        A.    Pain management too.

12        Q.    But did you -- but listed here in your

13   document, in your business plan, you don't list him as

14   a pain management specialist; you list his specialty as

15   neurology; right?

16        A.    Because the box is only so big.  That's

17   me.  Sorry.

18        Q.    Okay.  Well, let me ask you this.

19        A.    That's being honest.

20        Q.    Okay.  That's fine.  Fair enough.  I don't

21   want to put words on your mouth.  I apprec --

22        A.    My typing skills are not that great.

23        Q.    No, I appreciate you offering that.

24   That's why we do these depositions, is because
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sometimes what's reflected on the document is different

 2    than what a person remembers, so that's why we go

 3    through it.  But let me ask you this.  Would you have

 4    called on somebody with a primary specialty of

 5    neurology at this time if the company had asked you to?

 6              MR. MAIER:  Objection.  Form.

 7         A.    If the company asked me to?

 8         Q.    (By Mr. Faes)  Yes.  Did you -- well, let

 9    me ask it another way.

10         A.    Rephrase that.

11         Q.    Let me -- yeah.  Let me ask it another

12    way.  Did you call on people with a primary specialty

13    of neurologist when you were promoting or detailing

14    Actiq -- Actiq?

15         A.    Neurology pain management, yes.

16         Q.    Right.  And so no one --

17         A.    No.

18         Q.    No one at Cephalon ever told you that it

19    was inappropriate for you to call on that type of

20    doctor; right?

21         A.    No.

22              MR. MAIER:  Objection.  Form.

23         Q.    (By Mr. Faes)  And nobody ever told you

24    that that was inconsistent with the risk map that said
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you were only supposed to call on patients who are --

 2   strike that.  No one ever told you that that was

 3   inappropriate, to call on somebody with a primary

 4   specialty of neurology, because that was inconsistent

 5   with the risk map that said the company would only call

 6   on doctors with a specialty in oncology or pain

 7   management; right?

 8              MR. MAIER:  Objection.  Form.

 9        A.    Hang on.  I'm reading this, and I'm not

10   sure I said that.  I didn't answer exactly, I don't

11   think.

12              MR. BERG:  Did anyone in the company tell

13   you that any of the people you were calling on was

14   wrong?

15        A.    No.

16        Q.    (By Mr. Faes)  And that included

17   neurologists; right?

18        A.    I guess.

19        Q.    If someone at the company --

20        A.    If someone told me, yes, then I would.

21        Q.    Let me get the whole question out.

22        A.    Yeah.

23        Q.    If someone at the company had ever told

24   you that it was inappropriate to call on a neurologist
```

1    to sell or promote Actiq, you would have listened to

2    that direction and followed that direction from the

3    company; right?

4           A.    Yes.  All right.

5           Q.    Okay.  Just looking down here on personal

6    development.

7           A.    Uh-huh.

8           Q.    Says please advise, coach me of a

9    development plan or pathway to become a district

10   manager with Cephalon.  I can bring 18 years of

11   hospital pharmaceutical sales experience to the table.

12   13 of those years were in pain management and oncology.

13   I have also had almost a full year experience as an

14   interim district manager; right?

15          A.    Yes.

16          Q.    And this was a request that you put in to

17   your superiors at Cephalon at the time; right?

18          A.    (Nodding "yes.")

19          Q.    Who was your district manager at this

20   time?

21          A.    I don't remember.

22          Q.    When it says you had a full year of

23   experience as an interim district manager, was that at

24   Cephalon, or was that somewhere else?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Astra.  1996 or 1995 or 1994.

2          Q.     Do you remember if anyone at Cephalon ever

3    acted on this request?

4                 MR. MAIER:  Objection.  Foundation.

5          A.     I don't remember.

6          Q.     (By Mr. Faes)  You can set that document

7    aside.  I'm going to hand you what's been marked as --

8    doing okay?

9          A.     Yeah.  Thank you.

10         Q.     I'm going to hand you what's been marked

11   as Exhibit Number 8 to your deposition.

12                [Exhibit Teva-Kaisen-008

13                marked for identification.]

14         Q.     You want to keep the one with the sticker.

15   You get all the ones with the stickers because you're

16   the guest of honor.

17         A.     Okay.

18         Q.     So this is a document titled 2003 Actiq

19   marketing plan.  Do you see that?

20         A.     Uh-huh.

21         Q.     This is the type of document that we were

22   talking about earlier?  This is a document put together

23   by the marketing department that would have been shared

24   with the field sale specialists such as yourself;
```

1    right?

2          A.    Yes.

3          Q.    And the marketing department and the

4    company would have relied as you as the field

5    specialist, as kind of the person in the trenches, to

6    carry out at least some of the strategies that are laid

7    out in this plan; right?

8          A.    Yes.

9          Q.    So if you can turn to Page 2 of this

10   document.  Under executive summary it states 2002

11   performance review.  Cephalon experienced another

12   extraordinarily successful year with Actiq in 2002.

13   This achievement can be attributed primarily to focused

14   and integrated marketing and sales efforts, which build

15   upon the successful repositioning of Actiq in 2001.  Do

16   you see that?

17         A.    Yes.

18         Q.    Is that consistent with your memory that

19   the company had a extraordinarily successful year with

20   Actiq in 2002?

21               MR. MAIER:  Objection.  Foundation.

22         A.    I don't remember, but okay.

23         Q.    (By Mr. Faes)  But do you have any reason

24   to dispute --

Highly Confidential - Subject to Further Confidentiality Review

1        A.     No.

2        Q.     -- this document that states that the

3   company did have an extraordinarily successful year

4   with Actiq?

5        A.     I don't dispute it.

6        Q.     I can have you turn to Page 4 of this

7   document.  And the top of this is labeled situation

8   analysis, 2002 review.  Do you see that?

9        A.     Yes.

10       Q.     And it says 2002 promotional strategy by

11   key marketing issue.  Do you see that?

12       A.     Hang on.  Thank you.

13       Q.     So helpful to have the guy pulling

14   everything out for you, isn't it?

15       A.     Whew.  It's very helpful.  Okay.  Repeat

16   your question.

17       Q.     So this -- so I'm just saying -- I'm just

18   trying to orient you on the document.

19       A.     Okay.

20       Q.     You see that we're looking at a document

21   under 2002 promotional strategy by key marketing issue;

22   right?

23       A.     Yes.

24       Q.     And this appears to be a recap of

```
 1    promotional strategies that were used in 2002; right?

 2         A.    Yeah.

 3         Q.    And as we saw earlier, the -- 2002 was a

 4    very successful year for Actiq and the company; right?

 5         A.    Okay.

 6         Q.    And if you look on the second issue, it

 7    says one of the issues was lack of knowledge in the

 8    assessment and treatment of breakthrough pain, BTP,

 9    among targeted physician specialties, and the strategy

10    to deal with that issue is to educate targeted

11    physician specialties about the benefits of assessing

12    and treating breakthrough pain, BTP, with Actiq.  Do

13    you see that?

14         A.    I do.

15         Q.    Is it your -- strike that.  Is that one of

16    the strategies that you used as a sales representative

17    in 2002?

18         A.    I don't remember.

19         Q.    If you look down at the last issue and

20    strategy, do you see that the last issue listed is

21    limited direct promotional reach, and the strategy is

22    direct the most effective promotional and educational

23    efforts to the highest potential targeted physicians,

24    maximize ROI or return on investment of promotional and
```

```
 1   educational efforts?  Do you see that?

 2        A.    Yes.

 3        Q.    And that's consistent with what we talked

 4   about earlier, that you want to maximize the return on

 5   investment of educational efforts such as the speaker

 6   programs that we talked about earlier; right?

 7              MR. MAIER:  Objection.  Form.

 8        A.    Yes.

 9        Q.    (By Mr. Faes)  And that was something that

10   you were trained and was communicated by the marketing

11   department, was a strategy that should be employed in

12   successfully detailing Actiq; right?

13        A.    Could you rephrase that?

14        Q.    I'll try.

15        A.    Well --

16              MR. BERG:  You're referring to the

17   strategy at the bottom of the page?

18        Q.    (By Mr. Faes)  Let me reask the question.

19        A.    Thank you.

20        Q.    Would you agree with me that the strategy

21   of directing the most effective promotional and

22   educational efforts to the highest potential targeted

23   physicians, maximizing ROI of promotional and

24   educational efforts, was a strategy that was
```

Highly Confidential - Subject to Further Confidentiality Review

1    communicated to you that should be employed when

2    detailing or promoting Actiq?  Essentially that was

3    something you were told you should do; right?

4              MR. MAIER:  Objection.  Form.

5         A.    I don't remember.

6         Q.    (By Mr. Faes)  But you -- I mean, this is

7    a -- strike that.  As we talked about earlier, the

8    marketing plan came out every year and it would have

9    been shared with representatives in the field such as

10   yourself?

11        A.    Uh-huh.

12        Q.    And if the company directed you to employ

13   a particular strategy or tactic, you would generally

14   follow the instructions you were given; right?

15        A.    Yes.

16        Q.    And this is one of the strategies or

17   directions they gave you; right?

18        A.    Yes.

19        Q.    If you can turn to Page 14 of this

20   document.  We're going to start down at the bottom in

21   the section stated tracking studies.  Actually, let's

22   start above that, because this is in a section titled

23   usage by disease area.  Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    So it says in this document that the
 2    current data utilized by Cephalon for disease usage
 3    information is captured by the physician drug and
 4    diagnosis audit, PDDA, from Scott Levin.  Do you see
 5    that?
 6          A.    I do.
 7          Q.    Is that accurate that at this time the
 8    company would have been using and tracking disease
 9    usage information captured by this Scott Levin?
10                MR. MAIER:  Objection.  Form, foundation.
11          A.    I don't remember.
12          Q.    (By Mr. Faes)  Well, if you look down
13    under tracking studies, it states that in May and
14    December of 2001, primary research was implemented to
15    educate product awareness, perception, and use by pain
16    type among pain specialists and oncologists.  Obviously
17    oncologists included in both tracking studies cited use
18    of Actiq primarily in the treatment of breakthrough
19    cancer pain.  Additionally, participating pain
20    specialists cited Actiq usage in the follow disease
21    states, illustrating a wide spectrum of application and
22    opportunity.  Do you see that?
23          A.    Yes.
24          Q.    And if you turn to the following pain --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    or strike that.  If you would turn to the following

2    page, you see a table that it's referring to, and it

3    states usage of Actiq cited by pain specialists.  Do

4    you see that?

5         A.    I see it.

6         Q.    And according to this, it looks like the

7    company received information that stated that 48

8    percent of MDs have written prescriptions for lower

9    back pain; right?

10              MR. MAIER:  Objection.  Form, foundation.

11        A.    I see.

12        Q.    (By Mr. Faes)  20 percent of doctors have

13   written Actiq for osteoarthritis.

14              MR. MAIER:  Same objection.

15        Q.    (By Mr. Faes)  24 percent for post-trauma.

16              MR. MAIER:  Same objection.

17        Q.    (By Mr. Faes)  16 percent for diabetic

18   neuropathy.

19              MR. MAIER:  Same objection.

20        Q.    (By Mr. Faes)  12 percent for rheumatoid

21   arthritis and 24 percent for other type of headache.

22   Do you see that?

23        A.    I do.

24              MR. MAIER:  Same objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     (By Mr. Faes)  You would agree with me

2    that all of these uses for Actiq would be off-label;

3    right?

4                MR. MAIER:  Objection.  Form.

5      A.     It says cancer patients.

6                MR. BERG:  The ones highlighted.

7      A.     Oh, the one --

8      Q.     (By Mr. Faes)  I'm sorry?

9      A.     It says cancer patients, what I'm reading.

10     Q.     Well, that's the second line, right -- 40

11   percent are cancer patients?

12     A.     Oh, you're talking highlighted?  I'm

13   looking at this versus this.  You want highlighted or

14   not?

15     Q.     Well, I think we're both looking at the

16   same thing.  I'm just talking about different parts of

17   it.

18     A.     Okay.  Show me which part you're loo --

19                MR. BERG:  The highlighted.

20     A.     The highlighted?

21     Q.     (By Mr. Faes)  Yes.

22     A.     Oh, sorry.  Yes.

23     Q.     So you would agree with me that all of

24   these uses -- lower back pain, osteoarthritis,

Highly Confidential - Subject to Further Confidentiality Review

1    post-trauma, diabetic neuropathy, rheumatoid arthritis,

2    and other type of headache -- would all be off-label

3    uses of Actiq?

4            A.    Yes.

5                  MR. MAIER:  Objection.  Form, foundation.

6            Q.    (By Mr. Faes)  And this would be data that

7    the company is aware of, that at this time in 2003 some

8    doctors -- in fact, a high percentage of doctors in

9    some categories -- were using Actiq off-label; right?

10                 MR. MAIER:  Objection.  Form.

11           A.    If that's what it says.

12           Q.    (By Mr. Faes)  And this is information

13   that would have been communicated to you as a sales

14   representative who needed to know this information so

15   they could use it out in the field; right?

16                 MR. MAIER:  Objection.  Form.

17           A.    I don't remember.

18           Q.    (By Mr. Faes)  Well --

19           A.    I don't remember this in particularly.

20           Q.    Okay.  So did the company -- is it true

21   then that the company never told you any of this, that

22   all of these subspecialties were writing Actiq

23   off-label in 2003?

24                 MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't remember.

 2        Q.    (By Mr. Faes)  Is this information you

 3   would have wanted to know as a sales specialist for

 4   Actiq in 2003?

 5        A.    No, because my indication was for

 6   breakthrough cancer pain, period.

 7        Q.    So if physicians in your territory were

 8   using Actiq off-label, would you want to know that?

 9              MR. MAIER:  Objection.  Form.

10        A.    I don't know how to answer the question.

11              MR. BERG:  Just --

12        A.    I don't remember.

13        Q.    (By Mr. Faes)  So you don't remember if

14   you would have wanted to know in 2003 whether

15   physicians you were detailing for Actiq were using the

16   product off-label?

17              MR. MAIER:  Objection.  Form.

18        A.    I don't remember.  Help me out here.

19              MR. BERG:  What was that?

20        A.    He's fishing and -- I don't remember this.

21        Q.    (By Mr. Faes)  So if you --

22              MR. BERG:  I understand that -- you just

23   want to repeat the question in terms of --

24              MR. FAES:  Right.  So my --
```

1            MR. BERG:  Irrespective of the table,

2   you're asking if she had come to know --

3       A.    Would I have wanted to?  I don't remember

4   at that time what I would have wanted.

5       Q.    (By Mr. Faes)  Fair enough.

6       A.    That's 19 years ago, or 17 years ago.

7       Q.    That's fair enough.  Let's move on.  I'm

8   going to go to the following pages -- page of this

9   document, and we're under the section labeled clinical

10  needs to expand usage.  Do you see that?

11      A.    Yes.

12      Q.    And it states that as noted in the Actiq

13  2002 marketing plan, anesthesiologists and other pain

14  specialists who have similar prescribing habits may not

15  require substantial evidence to implement Actiq in

16  numerous disease states other than breakthrough cancer

17  pain due to the reasons listed above, primarily --

18  particularly their familiarity with fentanyl.  Do you

19  see that?

20      A.    I do.

21            MR. MAIER:  Objection.  Form.  Misstates

22  the document.

23      Q.    (By Mr. Faes)  And if you look above it

24  talks about what those factors are.  Actiq used by pain

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specialists in the aforementioned disease states may be

 2    due to several reasons --

 3         A.    Thank you.

 4         Q.    -- including familiarity with fentanyl,

 5    comfort with fentanyl, comfort with using --

 6         A.    Can you slow down, please?

 7         Q.    Sure.

 8         A.    Because I'm trying to flip with him.

 9         Q.    No.  Yeah, I understand.  I can slow down.

10         A.    Thank you.  I'm just -- need to have

11    direct questions to me, please, with the information in

12    front of me, period.  Thank you.

13         Q.    Understood.  So if you look at the section

14    above.

15         A.    Okay.

16         Q.    It talks about what those reasons are that

17    some physicians may not require substantial clinical

18    evidence to implement Actiq in numerous disease states

19    other than breakthrough cancer pain.

20         A.    I don't remember this.

21         Q.    Okay.  So nobody at the company ever

22    communicated to you that there were numerous physicians

23    that were willing to use Actiq for disease states other

24    than breakthrough cancer pain with limited clinical
```

1    evidence?

2              MR. MAIER:  Objection.  Form, foundation.

3        A.    Restate that question, please.

4        Q.    (By Mr. Faes)  Sure.  Did anyone from

5    Cephalon at this time communicate to you that there

6    were a number of physicians that would be comfortable

7    using Actiq in numerous disease states other than

8    breakthrough cancer pain with limited evidence?

9              MR. MAIER:  Same objection.

10       A.    I don't remember.

11       Q.    (By Mr. Faes)  If that had been

12   communicated to you, is that information that you would

13   have used in the field?

14             MR. MAIER:  Objection.  Form.

15       A.    If it did not have breakthrough cancer

16   pain I would have not used it in the field, period.

17       Q.    (By Mr. Faes)  So if we look down in this

18   strategy planning document, starting with the disease

19   states.  It's about three lines down from where we are.

20   So in this strategic marketing plan it states that the

21   disease states that represent the largest growth

22   opportunities for Actiq include but are not limited to

23   osteoarthritis, rheumatoid arthritis, chronic back

24   pain, migraine headaches, complex regional pain

1    syndrome, and postherpetic neuralgia.  Do you see that?

2          A.    I do.

3                MR. MAIER:  Objection.  Form.

4          Q.    (By Mr. Faes)  Is this information that --

5    well, first of all, these are all -- these disease

6    states in this 2003 strategic marketing plan which was

7    distributed to sales reps such as yourself --

8          A.    Uh-huh.

9          Q.     -- states that these disease states

10   represent the largest growth opportunities; right?

11         A.    Okay.

12         Q.    And all -- you would agree with me that

13   all of these disease states would represent off-label

14   uses of Actiq; right?

15               MR. MAIER:  Objection.  Form.

16         A.    Yeah.

17         Q.    (By Mr. Faes)  Did anyone at Cephalon ever

18   tell you to promote Actiq for these disease states?

19         A.    Not that I remember.

20         Q.    Would you agree that if anyone at Cephalon

21   ever did tell you to promote Actiq for these disease

22   states, that would be inappropriate?

23         A.    Yes.

24         Q.    You'd agree that that would be off-label?

1          A.     Yes.

2          Q.     You'd agree that that -- because it's

3     off-label that would be illegal?

4               MR. MAIER:  Objection.  Form.

5          A.     Yes.

6          Q.     (By Mr. Faes)  Do you have any idea why

7     then it would be included in this company 2003

8     marketing plan identifying these as the largest growth

9     opportunities for Actiq?

10              MR. MAIER:  Objection.  Form, foundation.

11         A.     I don't remember this, period.  I can't

12    surmise and guess what they were thinking.

13         Q.     (By Mr. Faes)  Well, you'd agree with me

14    that this -- if this was one of the company's marketing

15    strategies that this is an inappropriate marketing

16    strategy to promote Actiq to patients in these type of

17    patient populations; right?

18              MR. MAIER:  Objection.  Form, foundation.

19         A.     I just don't know where you're going with

20    this.  I don't remember this document, period.

21         Q.     (By Mr. Faes)  I understand.  But my

22    question is, you'd agree with me that if it was the

23    company's strategy to promote Actiq to patients in

24    these patient populations, that would be inappropriate;

```
 1    right?

 2         A.    Yes.

 3               MR. MAIER:  Objection.  Form, foundation.

 4         Q.    (By Mr. Faes)  And we can agree that this

 5    is information --

 6         A.    I just can't remember what complex

 7    regional pain syndrome is.

 8         Q.    We can agree that this is information

 9    that's included in the 2003 --

10         A.    Yes.

11         Q.     -- Actiq marketing plan; right?

12               MR. BERG:  One moment.

13               [Discussion off the record.]

14         Q.    (By Mr. Faes)  So if you -- just two more

15    things in this document and then we'll be done with it.

16    If you can turn to Page 19 of this document.  Bates

17    numbers ending in 2901, if that helps orient yourself.

18    And I want you to look at the pie chart --

19         A.    Uh-huh.

20         Q.     -- below in the caption that states Actiq

21    marketing designated sales targets by specialty.  8,464

22    physicians.  Do you see that?

23         A.    Uh-huh.

24         Q.    And this would appear to be a breakdown of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    targets that the company -- the specialties that the

 2    company was targeting for Actiq; right?

 3                  MR. MAIER:  Objection.  Foundation.

 4          A.    Okay.

 5          Q.    (By Mr. Faes)  And it looks like oncology

 6    is 16 percent and ANES pain, which I assume is

 7    anesthesiologists and pain specialists --

 8          A.    Yes.

 9          Q.      -- is 24 percent.  And all the other

10    categories represent over 50 percent of the pie, right,

11    combined?

12          A.    Yes.

13          Q.    So is this consistent with your

14    recollection at this time that less than 50 percent of

15    the designated sales targets by specialty were pain

16    specialists or oncologists?

17                  MR. MAIER:  Objection.  Form.

18          A.    I don't remember at this time -- that

19    time.

20          Q.    (By Mr. Faes)  Assuming this to be true,

21    that at this time less than 50 percent of the targeted

22    physicians for Actiq were pain specialists or

23    oncologists, do you remember anyone ever expressing

24    concern that targeting physicians in these other
```

1    specialties was inconsistent with the risk map that

2    stated that only oncologists and pain specialists were

3    supposed to be targeted for Actiq promotion?

4              MR. MAIER:  Objection.  Form.

5         A.    I don't remember.

6         Q.    (By Mr. Faes)  If you had been told that,

7    is that something you likely would have remembered?

8              MR. MAIER:  Objection.  Form.

9         A.    I don't remember.

10        Q.    (By Mr. Faes)  If you had been told that,

11   is that -- that it was inappropriate to target anyone

12   other than cancer specialists or pain specialists, you

13   would have followed that direction by the company;

14   right?

15        A.    Thank you.  I would have followed the

16   direction, and the direction was always for

17   breakthrough cancer pain, period.

18        Q.    Right.  There wasn't any restriction that

19   what you recall on the specialty of the doctor that you

20   could call on?

21             MR. MAIER:  Objection.  Form.

22        A.    Certain specialties treated cancer

23   patients, period.  Certain physicians.

24        Q.    (By Mr. Faes)  So if we can turn to Page

Highly Confidential - Subject to Further Confidentiality Review

```
1    38 of this document, and this is the last thing we're

2    going to do with this one.  If you can go down to --

3    well, the top part of this document is listing key

4    marketing issues, and it says there are seven key

5    issues that need to be addressed for Actiq in 2003.

6    And if you look at the second to the bottom one, one of

7    the seven key issues listed is limited clinical data

8    outside of breakthrough cancer pain.  Do you see that?

9         A.    Uh-huh.

10        Q.    And it says e.g., OA, RA, chronic back

11   pain, CPRS, that highlights the need for rapid pain

12   relief as well as producing --

13        A.    Pharmacoeconomic.

14        Q.    Pharmacoeconomic -- thank you -- benefit

15   data will be crucial for -- in growing the use of Actiq

16   as well as overcoming current and future reimbursement

17   hurdles.  Do you see that?

18        A.    Uh-huh.

19        Q.    Why would that be a key marketing issue

20   that would need to be addressed for Actiq in 2003?  Why

21   would the company need to develop efficacy data outside

22   of breakthrough cancer pain?

23             MR. MAIER:  Objection.  Form, foundation.

24        A.    I don't remember this, and this is a huge
```

Highly Confidential - Subject to Further Confidentiality Review

 1   document.

 2        Q.    (By Mr. Faes)  Well, let me ask you this.

 3        A.    Are you sure it wasn't written by

 4   marketing?  What did we get as sales reps?

 5        Q.    Right.  I mean, we talked about the fact

 6   that you -- that marketing plans would have been shared

 7   with you.

 8        A.    Disseminated.  But this document in

 9   particular -- was this marketing's personal document,

10   or was this handed to the sales reps?  Because I don't

11   remember.

12        Q.    Well, in general you remember being -- you

13   remember seeing documents with this bell on the front

14   of it; right?

15        A.    Yes.

16        Q.    So let me get back to my question.  Now

17   I've lost my page.  First of all, were you aware that

18   the company believed that developing efficacy data

19   outside of breakthrough cancer pain was a key marketing

20   issue that needed to be addressed?

21              MR. MAIER:  Objection.  Foundation.

22        A.    Redo that question, please.

23        Q.    (By Mr. Faes)  Were you aware --

24        A.    Because there's three different questions

1    in there.

2         Q.    So were you aware that the company

3    believed that developing efficacy data outside of

4    breakthrough cancer pain was a key marketing issue that

5    needed to be addressed in 2003?

6              MR. MAIER:  Objection.  Foundation.

7         A.    I don't remember.

8         Q.    (By Mr. Faes)  Do you believe it would be

9    inappropriate at this time in 2003, given Actiq's

10   indication, to be developing efficacy data outside of

11   breakthrough cancer pain for marketing purposes?

12             MR. MAIER:  Objection.  Form.

13        A.    That's two different questions again.

14        Q.    (By Mr. Faes)  Let me restate.

15        A.    Clinical studies and marketing are two

16   different things.  Now, reask your question.

17        Q.    Given Actiq's indication in 2003, which

18   was for breakthrough cancer pain only --

19        A.    Uh-huh.

20        Q.    -- do you believe it would be

21   inappropriate to be developing data outside of

22   breakthrough cancer pain for marketing purposes?

23             MR. MAIER:  Objection.  Form.

24        A.    You're still asking two different

Highly Confidential - Subject to Further Confidentiality Review

```
 1    questions.  I'm sorry.

 2          Q.    (By Mr. Faes)  Would you agree with me --

 3          A.    Ask me marketing or sales.

 4          Q.    All right.  I'll withdraw that question.

 5    My -- how about -- let me start over.  Would you agree

 6    that it would be inappropriate this -- inappropriate at

 7    this time in 2003, given Actiq's indication to use

 8    efficacy data outside of breakthrough cancer pain in

 9    promotional efforts?

10          A.    Yes.

11                MR. MAIER:  Objection.  Form.

12          A.    Better question.

13          Q.    (By Mr. Faes)  Okay.  You can set that

14    document aside and we'll move on.  Are you doing okay?

15    I think we've been going about an hour-and-a-half.

16                MR. MAIER:  Hour-and-a-half.

17          Q.    (By Mr. Faes)  You want to take a quick --

18          A.    How much more is there?

19          Q.    (By Mr. Faes)  It's hard to say.  It's

20    getting to be about lunchtime too.  I don't know if we

21    want to break for lunch or --

22          A.    No.  You guys can eat here and ask

23    questions.

24          Q.    Okay.  Do you want to keep going or do you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    want to take a quick five-minute break?

 2                  MR. BERG:  Do you want to keep going or

 3    you want to take a --

 4         A.    Yeah, let's do another 10, 15 minutes,

 5    then I got to go potty.

 6         Q.    (By Mr. Faes)  Okay.

 7         A.    If you guys -- I mean, it's up to you guys

 8    what you want to do.

 9                  MR. BERG:  Let's go.

10         A.    I'm okay with that.

11         Q.    (By Mr. Faes)  So I'm going to hand you --

12    I'm going to hand you what's been marked --

13         A.    Can I grab him for a minute?

14                  MR. FAES:  Yeah.  Let's just take a quick

15    five-minute break.

16         A.    Okay.  Fine.

17                  MR. FAES:  I need to use the restroom

18    anyway, so --

19                  THE VIDEOGRAPHER:  We are going off the

20    record at --

21                  MR. FAES:  We don't need to take a long

22    one.

23         A.    If you need to do it, you can ask.

24                  THE VIDEOGRAPHER:  We are going off the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     record at 12:17 PM.

 2                [A brief recess was taken.]

 3                THE VIDEOGRAPHER:  We are back on the

 4     record at 12:29 PM.

 5        Q.    (By Mr. Faes)  Ms. Kaisen, we're back on

 6     the record after a short break.  Are you ready to

 7     proceed?

 8        A.    Yes.

 9        Q.    Before we went on break, Ms. Kaisen, we

10     were discussing various Actiq marketing plans in the

11     early years, in 2002 and 2003.  Do you remember that?

12        A.    Yes.

13        Q.    I'm going to hand you what's been marked

14     as Exhibit Number 9 to your deposition.

15                [Exhibit Teva-Kaisen-009

16                marked for identification.]

17        Q.    And this is the two thousand --

18                UNIDENTIFIED WOMAN:  I'm sorry.  Could

19     someone unmute the phone, please, if you're back on the

20     record?

21                [Discussion off the record.]

22        Q.    (By Mr. Faes)  So for the benefit of the

23     people on the phone, I've just handed Ms. Kaisen what's

24     been marked as Exhibit Number 9 to the deposition, and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this is a document titled 2004 Actiq marketing plan.

 2    Do you see that, Ms. Kaisen?

 3         A.    I do.

 4         Q.    And I only want to -- you'll be happy to

 5    know I only want to ask you about one thing in this

 6    document.  If you could turn to Page 30 of this

 7    document.  And if you look on this page, it's a page --

 8         A.    Hang on.  Hang on.

 9         Q.    Okay.

10         A.    Okay.  Got it.

11         Q.    If you look on this page, it's a page

12    entitled SWOT analysis and key marketing issues, Actiq

13    SWOT analysis; right?

14         A.    Okay.

15         Q.    And SWOT stands for strengths, weaknesses,

16    opportunities, and threatens; right?

17         A.    Okay.

18         Q.    And if you look under opportunities, one

19    of the opportunities listed in this 2004 Actiq

20    marketing plan are physician eagerness to evaluate

21    drugs outside of breakthrough cancer pain.  Creates

22    opportunities to generate data in needed areas.  Do you

23    see that?

24         A.    I do.
```

```
 1        Q.    Do you remember that being communicated to

 2   you as a sales representative in 2004 that physician

 3   eagerness to evaluate the drug Actiq outside of

 4   breakthrough cancer pain was an opportunity?

 5        A.    I do not remember this.

 6        Q.    Do you feel it would be inappropriate for

 7   the company to view that as a strategic opportunity at

 8   that time, given Actiq's indication?

 9              MR. MAIER:  Objection.  Form.

10        A.    Qualify -- I don't think this was

11   something -- I don't know if this was disseminated to

12   the sales force or this was the marketing plan that was

13   internal, because I don't remember.

14        Q.    (By Mr. Faes)  Understood.  Let me ask you

15   this.  Do you remember the company -- well, strike

16   that.  At this time in 2004 when you were promoting

17   Actiq, were you ever informed that the company was in

18   trouble with the FDA for promoting Actiq off label?

19        A.    I don't remember.

20              MR. MAIER:  Objection.  Form.

21        Q.    (By Mr. Faes)  I'm going to hand you

22   what's been marked as Exhibit -- I'm going to hand you

23   what's been marked as Ex --

24        A.    Can I close it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    You can set that aside.  I'm going to hand

 2    you what's been marked as Exhibit Number 10 to your

 3    deposition.

 4               [Exhibit Teva-Kaisen-010

 5                marked for identification.]

 6               MR. FAES:  Mike, this is 45.

 7          Q.    (By Mr. Faes)  And this is a document from

 8    the FDA.  It's a letter from the FDA to Carol Marchione

 9    at Cephalon, Inc.  Do you see that?

10          A.    Yes.

11          Q.    Transmitted by facsimile.  And it states

12    dear Marchione, please refer to the meeting between

13    representatives from your firm and DDMAC on August

14    30th, 2004.  The purpose of this meeting was to discuss

15    Cephalon's concern with the DDMAC review process for

16    Actiq and to discuss DDMAC's concern with Cephalon's

17    promotional activities for Actiq.  Do you see that?

18          A.    I do.

19          Q.    And you know that DDMAC -- from your long

20    experience working in the pharmaceutical industry, you

21    know what DDMAC is; right?  You know that's the

22    enforcement arm of the FDA; right?

23          A.    Uh-huh.

24          Q.    And if you turn to the second page of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document, this reflects that these are industry meeting

 2    minutes held on August 30th, 2004, and it looks like a

 3    number of Cephalon representatives were there,

 4    including a senior vice-president of pharmaceutical

 5    operations, Robert P. Roche.  Do you see that?

 6         A.    Yeah.

 7         Q.    And Andy Pyfer, and you know he would have

 8    been the active product director at that time?

 9         A.    Okay.

10         Q.    Would you -- would Andy Pyfer have been

11    one of your superiors at this time?

12         A.    Yes.

13         Q.    Did you have contact with Mr. Pyfer?

14         A.    In what --

15         Q.    Direct contact?

16         A.    I don't remember.

17         Q.    You -- did you ever -- you didn't ever

18    report directly to him, though; right?

19         A.    That's a better question.  No.

20         Q.    So if you turn to the page in this

21    document ending in 4982.

22         A.    I just want to clarify.  When you say

23    representatives of the company, I'm thinking of sales

24    representatives.  So if you could verbalize upper
```

1    management or sales representatives, I would appreciate

2    that, because when opening this document I thought I

3    was going to see sales rep names.

4         Q.    (By Mr. Faes)  Okay.  So to be fair, if

5    you go back to Page 2, these were -- these people that

6    were attending this meeting with the FDA on behalf of

7    Cephalon -- these were senior people; right?

8         A.    Yes.

9         Q.    These are -- these are all people that

10   were above you --

11        A.    Yes.

12        Q.     -- at Cephalon; right?

13        A.    Let the record note I've never seen this

14   document.

15        Q.    Okay.  If you can turn to the page ending

16   in 4982.

17        A.    Okay.

18        Q.    And if you look at Paragraph 4, it's --

19   one of the notes is that DDMAC expressed concerns that,

20   as indicated by Cephalon's briefing package for and

21   presentation for the July 14th, 2014, meeting, the

22   company is training its sales force to detail doctors

23   in a manner that elicits off-label inquiries and to

24   respond inappropriately to those inquiries from doctors

1    regarding off-label use.  Do you see that?

2         A.    I see it.

3         Q.    And you --

4               MR. MAIER:  So the -- sorry.  So the

5    record is clear, you said 2014.  It's 2004.

6         A.    Thank you.

7               MR. FAES:  All right.

8               MR. MAIER:  Just so --

9               MR. FAES:  I'd better restate it.

10              MR. BERG:  That's fine.  We'll stipulate

11   that the document speaks for itself.

12              MR. FAES:  Well, I don't know if you can

13   do that unless counsel wants to speak for it.

14              MR. BERG:  Okay.

15              MR. MAIER:  Would you just ask the

16   question again --

17              MR. FAES:  Okay.

18        Q.    (By Mr. Faes)  So starting in Paragraph

19   Number 4, it states that DDMAC expressed concerns that,

20   as indicated by Cephalon's briefing package for and

21   presentation at the July 14th, 2004, meeting, the

22   company is training its sales force to detail doctors

23   in a manner that elicits off-label inquiries and to

24   respond inappropriately to those inquiries from doctors

```
1    regarding off-label use.  Do you see that?

2         A.    I see it.

3         Q.    And you mentioned earlier that you've

4    actually never seen this document before; right?

5         A.    I don't --

6         Q.    Is thi --

7         A.    I don't remember this at all.

8         Q.    Is this information that anyone -- any of

9    your superiors ever gave to you at Cephalon, that the

10   FDA felt that its sales representatives were detailing

11   Actiq inappropriately with regard to off-label use?

12              MR. MAIER:  Objection.  Form, foundation.

13        A.    I don't remember.

14        Q.    (By Mr. Faes)  If you had received this

15   kind of information, that probably would have stuck out

16   in your mind; right?

17        A.    Yes.

18              MR. MAIER:  Objection.  Form.

19        Q.    (By Mr. Faes)  And you probably would have

20   wanted to correct those concerns; right?

21              MR. MAIER:  Objection.  Form.

22        A.    Yes.

23        Q.    (By Mr. Faes)  Because you want to be in

24   compliance with the law; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      So if this was communicated by the FDA to

3    the company, you would want somebody to give you this

4    information; right?

5        A.      Yes.

6        Q.      And as you sit here today, you can't

7    remember anybody ever telling you this; right?

8               MR. MAIER:  Objection.  Form.

9        A.      I'm not saying that.  I'm saying I've

10   never seen this document.

11       Q.      (By Mr. Faes)  But you also as you sit

12   here today don't remember anyone ever tell -- ever

13   giving you this information verbally or in any other

14   form; right?

15       A.      I don't remember.

16       Q.      So is that a yes, you don't -- that was

17   what the question was, do you remember anybody ever

18   giving you this information?

19       A.      No.

20       Q.      DDMAC -- if you go it says DDMAC indicated

21   that Cephalon's apparent practice of training its

22   representatives to broadly discuss breakthrough pain in

23   sales calls appears to invite or solicit questions from

24   physicians regarding off-label use of the product.  Do

Highly Confidential - Subject to Further Confidentiality Review

1   you see that?

2        A.    I do.

3              MR. MAIER:  Objection.  Form.

4        Q.    (By Mr. Faes)  Did anyone at Cephalon --

5   anyone that was above you or supervising -- ever tell

6   you that the enforcement arm of the FDA, DDMAC,

7   believed that the training for its Actiq

8   representatives gave rise to the practice of discussing

9   it off-label?

10             MR. MAIER:  Objection.  Form.

11       A.    I don't remember.

12       Q.    (By Mr. Faes)  But again, if someone had

13  told you that, that probably would have stuck out in

14  your mind; right?

15             MR. MAIER:  Objection.  Form.

16       A.    I always followed the letter of the law.

17  So I don't know how to answer your question.  I mean,

18  I've never seen this.  I don't remember them saying it

19  to me.  I don't know if they did or they didn't.  I

20  don't remember.

21       Q.    (By Mr. Faes)  But you'd agree that if you

22  were -- someone at the company in 2004 had come to you

23  and said Ms. Kaisen, the FDA has come to us and told us

24  that they believe that Actiq is being promoted in a

Highly Confidential - Subject to Further Confidentiality Review

1   manner that suggests off-label use and we need to

2   retrain you and change your practices, you probably

3   would have remembered that; right?

4              MR. MAIER:  Objection.  Form, foundation.

5         A.    That was a long time ago.  I would have

6   if -- I don't remember.  I don't know what you want.  I

7   don't remember.  If they did, I would have done to the

8   letter of the law, period.

9         Q.    (By Mr. Faes)  And you would have wanted

10  to know that information because you would have wanted

11  to comply with the law; right?

12        A.    How I did my sales representing was always

13  breakthrough cancer pain, period.

14        Q.    Right.  I understand that, but this is

15  communication from the FDA stating that in two -- as of

16  2004 they believed that the way Actiq sales

17  representatives are doing their sales call suggests

18  off-label use; right?  That's what this says?

19        A.    Yes.

20        Q.    And like I said, no -- you don't remember

21  anybody ever telling that and you would want to know

22  that; right?

23              MR. MAIER:  Objection.  Form.

24        A.    I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    (By Mr. Faes)  If you go on to the fourth

2  line up, it reads DDMAC stated that although responses

3  to off-label questions provided in the sales training

4  materials include a statement of the indication, no

5  risk information is provided regarding the off-label

6  use, and moreover, the rest of the response appears to

7  suggest a strong medical basis for and encourage

8  off-label use, which is concerning, especially given

9  the RMP, which means risk management program; right?

10    A.    Uh-huh.

11    Q.    Did anyone ever come to you in 2004 and

12  tell you that the response question suggested in

13  materials -- training materials that were used -- being

14  used for Actiq suggested for and encouraged off-label

15  use according to the FDA?

16          MR. MAIER:  Objection.  Form.

17    A.    I don't remember.  I see it, but I don't

18  remember.

19    Q.    (By Mr. Faes)  You don't remember them

20  ever giving you this information; right?

21    A.    I don't.

22    Q.    And this is information that you would

23  have wanted in order to comply with the law; right?

24          MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Somehow I feel he's leading.

 2              MR. BERG:  There's no -- all right.

 3        A.    He's leading me to say something I'm

 4   not --

 5              MR. BERG:  Right.  Let me just object to

 6   the form as well.  I think the deponent's concern is

 7   that you're accusing her of doing something illegal,

 8   and I think probably she needs to be reassured that's

 9   not the question.

10        A.    I feel like it's a --

11        Q.    (By Mr. Faes)  Right.  I mean, we've --

12        A.    It's a leading question, and I --

13              MR. BERG:  Well, no, he can ask a leading

14   question, but just --

15        A.    I just -- I don't -- how many times do I

16   have to tell him I don't remember this?

17        Q.    (By Mr. Faes)  My question is, you would

18   have wanted to know this information; right?

19        A.    Yes.

20        Q.    And assuming that Cephalon didn't give you

21   this information, that would have prevented you from

22   doing your job properly and following the letter of the

23   law; right?

24              MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.    I don't remember if they did or they

2   didn't.

3      Q.    (By Mr. Faes)  Right.  I understand that.

4   But I'm asking a hypothetical.

5      A.    Oh.

6      Q.    I'm allowed to do that.  So assuming --

7   since you can't remember, assuming that Cephalon never

8   gave you this information, that that would have

9   prevented you from doing your job as a sales

10  representative and following the letter of the law;

11  right?

12         MR. MAIER:  Objection.  Form, foundation.

13     A.    Restate that, please.

14     Q.    (By Mr. Faes)  Assuming that Cephalon

15  never gave you this information listed in Paragraph 4

16  of this document, that would have prevented you from

17  effectively doing your job as a sales representative;

18  right?

19         MR. MAIER:  Objection.  Form, foundation.

20     A.    Help me out with this.

21         MR. BERG:  He's asking you, do you feel

22  that not having this information would have affected

23  you to do your job and follow the law?

24         MR. FAES:  Well, actually I changed it and
```

```
 1    I didn't have follow the law.

 2                MR. BERG:  Okay.

 3                MR. FAES:  Do you need me to ask the

 4    question again?  I'm not trying to --

 5                MR. BERG:  I think it's assuming she's not

 6    following the law to begin with.

 7                MR. FAES:  Well, I didn't ask it that

 8    way --

 9                MR. BERG:  Well -- okay.

10                MR. FAES:   -- so let me ask it again.

11        A.    But --

12        Q.    (By Mr. Faes)  Assuming --

13        A.    I don't mean to be difficult, but I don't

14    remember this given to me, and if you say that it was

15    given to me or if it was going to give it to me -- yes,

16    I always do the legal thing, period.

17        Q.    (By Mr. Faes)  Right.  So my question

18    is --

19                MR. BERG:  Okay.

20        Q.    (By Mr. Faes)  If Cephalon didn't give you

21    the information listed in Paragraph 4 of this letter,

22    would that have prevented you from doing your job

23    effectively as a sales rep?

24                MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Whether they did or didn't give that to

2   me, I would have still followed breakthrough cancer

3   pain and not sold off-label, period.  Does that answer

4   your question?

5      Q.      (By Mr. Faes)  Sure.  But I mean, if the

6   FDA believed that Cephalon was doing something wrong

7   currently in 2004 with regard to its promotion of

8   Actiq, you would want to know that; right?

9      A.      Yes.

10     Q.      Okay.  You can set that document aside.

11  So I'm going to hand you what's been marked as Exhibit

12  Number 7 to your deposition.  No, it's not.

13          MR. FAES:  It's 7 for you, Mike.

14     Q.      (By Mr. Faes)  I'm going to hand you

15  what's been marked as Exhibit Number 11 to your

16  deposition.

17          [Exhibit Teva-Kaisen-011

18          marked for identification.]

19     A.      2005.  Is this yours or mine?

20     Q.      That's yours.  You get the one with --

21  always get the one with the sticker.

22     A.      Oh.

23     Q.      And I usually give you yours first.  And

24  doc -- or where are we?  What exhibit are we on?

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit Number 11 is a document entitled 2005 Actiq

 2    marketing plan.  Do you see that?

 3         A.    Hang on.  Just looking to see who is on

 4    the -- who the people were.  Yeah.  Yes.  Thank you.

 5         Q.    Yeah.  And since you're looking at that,

 6    the first name listed is Andy Pyfer, and he would have

 7    been the product director for Actiq at this time;

 8    right?

 9         A.    Okay.

10         Q.    And he would have been one of your

11    superiors at the company; right?

12         A.    Yes.

13         Q.    And again, this document has the old

14    familiar bell on the front of it that you're familiar

15    with; right?

16         A.    Yes.

17         Q.    And if you turn to Page 2 of this

18    document, which I believe is actually the third page in

19    because you're not counting the cover, and under

20    executive summary it states 2004, performance review.

21    And it says in 2004 Actiq continued its growth;

22    however, not at the same rate as in prior years.  Actiq

23    sales for 2004 will likely fall short of the budget

24    number of $416 million with a forecast number of $387
```

```
 1    million in gross shipments.  Do you see that?

 2           A.     Uh-huh.

 3           Q.     Is that consistent with your memory with

 4    regard to the performance of Actiq in 2004?

 5                  MR. MAIER:  Objection.  Form, foundation.

 6           A.     I honestly don't remember.

 7           Q.     (By Mr. Faes)  Is this information that

 8    would have been shared with you as part of your job as

 9    a sales representative as the overall sales of the

10    products that you were working on?

11           A.     Overall sales would be shared with us,

12    yes.  This document I'm not so sure.

13           Q.     But you have no reason to dispute these

14    numbers as we went over --

15           A.     Because I don't remember --

16           Q.      -- on this page of the document?

17           A.     I don't remember them.

18           Q.     Okay.  So if you go to Page 6 of this

19    document.

20           A.     Okay.

21           Q.     Do you see there's external factors listed

22    with regard to Actiq, and the first one is negative

23    media attention?  There has been an increase in the

24    volume of press coverage around Actiq and other
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    opioids.  This coverage is centered mainly on cases of

2    abuse and diversion.  Do you see that?

3         A.    Uh-huh.

4         Q.    Is that something you remember occurring

5    at this time in 2005 with regard to Actiq, that there

6    was increased negative media attention?

7         A.    I don't remember.

8         Q.    As you sit here, do you have any reason to

9    believe that the information reported in this 2005

10   Actiq marketing plan isn't true?

11        A.    No, because I don't think I was privy to

12   it.

13        Q.    So you don't think that you were privy to

14   the marketing plans of the company as a sales

15   representative out in the field who was responsible for

16   executing those plans?

17        A.    That's not what I said.  That's not what I

18   said.  This -- the marketing plan, yes, we had to

19   follow the marketing plan.  However, the extent in this

20   document I don't remember.  This whole entire

21   document -- I don't remember seeing this or remember

22   it.

23        Q.    So irrespective of the document -- let's

24   put the document aside.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Okay.

 2        Q.     The document is just a guide really meant

 3   to help you remember what was occurring at this time

 4   because it was a long time ago.  So my question is, is

 5   it true that in 2005 there was an increase in the

 6   volume of press coverage around Actiq and other opioids

 7   and that that coverage centered mainly on cases of

 8   abuse and diversion?

 9               MR. MAIER:  Objection.  Foundation.

10        A.     I don't remember.

11        Q.     (By Mr. Faes)  Is it true that in 2005

12   there were DDMAC criticisms of promotional materials?

13        A.     I don't remember.

14               MR. MAIER:  Objection.  Foundation.

15        Q.     (By Mr. Faes)  And that was -- that's

16   referring to the document that we just looked at

17   previously that was discussing those concerns; right?

18        A.     Right.

19        Q.     And if there had been DDMAC criticisms of

20   promotional materials, you would have wanted to know

21   about those concerns; right?

22        A.     Yes.

23        Q.     And do you remember ever being told about

24   any DDMAC or FDA concerns with any of the promotional
```

1    materials you were using for Actiq?

2                    MR. MAIER:  Objection.  Form, foundation.

3         A.    I don't remember.

4         Q.    (By Mr. Faes)  Do you remember anyone ever

5    coming to you in the field and saying, hey, we need to

6    stop using these promotional materials because the FDA

7    has criticisms of them?

8                    MR. MAIER:  Objection.  Form.

9         A.    I remember something about the bell and

10   that they had to take everything off the literature,

11   and that's just the back of my mind.

12        Q.    (By Mr. Faes)  So do you remember that

13   there were apparently some concerns from the FDA about

14   materials related to Actiq; you just don't remember

15   specifically what they were?

16        A.    Yes.

17                   MR. MAIER:  Objection.  Form.  Misstates

18   testimony.

19        Q.    (By Mr. Faes)  Do you remember at this

20   time in 2005 that there was a growing opiophobia,

21   meaning concerns of abuse, addiction, and diversion,

22   among physicians, patients, and member of the general

23   public?

24                   MR. MAIER:  Objection.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    In 2005?

 2        Q.    (By Mr. Faes)  Uh-huh.

 3        A.    Okay.  This has been occurring a lot

 4   earlier than 2005.  So am I aware of it then?

 5        Q.    But do you remember growing concerns about

 6   opiophobia?

 7              MR. MAIER:  Objection --

 8        A.    I don't remember at that time growing

 9   concerns or not.  I just remember that it always has

10   been a concern.

11        Q.    (By Mr. Faes)  Do you have any reason to

12   believe that this is untrue -- what's reported in this

13   2005 marketing plan, that there was growing concern of

14   opiophobia?

15        A.    No.

16        Q.    What's your understanding of what

17   opiophobia is?

18        A.    First of all, I've never heard the term

19   opiophobia.

20        Q.    Never before --

21        A.    I don't remember opiophobia.

22        Q.    Be --

23        A.    Now, people who are afraid of opioids, but

24   I've never heard it called opiophobia.  People who are
```

1    afraid -- it's the same thing -- who are afraid of

2    opioids because they're afraid that they are going to

3    become addicted.  So the cancer patients -- we would

4    have a tough time with cancer patients taking enough

5    meds to get them out of pain because they were afraid

6    they were going to get addicted even though they were

7    going to die in three, four months.

8              So when you have a fear, that's what I'm

9    thinking of, is opiophobia.  I've never heard op -- now

10   I'm feeling like I didn't get trained correctly, but

11   opiophobia -- I know what it means, but I've never

12   heard it by the company, I don't think.

13        Q.    So it's your testimony that in 15 years

14   detailing Actiq and Fentora --

15        A.    Oh, geez.

16        Q.     -- you've never heard the term

17   opiophobia?

18              MR. MAIER:  Objection.  Form.

19        A.    I don't remember.

20        Q.    (By Mr. Faes)  Okay.  So if you turn to

21   Page 25 of this document.  It states that -- up there

22   at the very top it states that based on physician

23   reporting, 90 percent of Actiq use is for BTP or

24   breakthrough pain outside of cancer with the majority

Highly Confidential - Subject to Further Confidentiality Review

```
1    of use, 55 percent of total, being for chronic back
2    pain.  This broad use of Actiq suggests there might be
3    prescribers who understand or are experienced
4    prescribing fentanyl, treat the pain pathophysiology,
5    not the disease state or etiology, understand the
6    benefits Actiq affords their patients, are comfortable
7    utilizing it belong -- beyond its labeled indication.
8    Do you see that?
9          A.    I do.
10         Q.    Do you remember at this time in 2005 that
11   the company had data indicating that 90 percent of
12   Actiq use is for breakthrough pain outside of cancer?
13               MR. MAIER:  Objection.  Foundation.
14         A.    I don't remember that statement.
15         Q.    (By Mr. Faes)  Is that -- do you have any
16   reason to believe that that statement isn't true as
17   it's contained in this 2005 marketing plan prepared by
18   the company?
19               MR. MAIER:  Objection.  Foundation.
20         A.    I don't know what they were thinking, but
21   90 percent seems awfully high to me.  That seems crazy.
22         Q.    (By Mr. Faes)  Were you ever told that 90
23   percent --
24         A.    I don't remember.
```

```
 1          Q.    Let me get the whole question out.  Were
 2   you ever told by the company that in 2005, 90 percent
 3   of Actiq use was for breakthrough pain outside of
 4   cancer?
 5               MR. MAIER:  Objection.  Form.
 6          A.    I don't remember that.
 7          Q.    (By Mr. Faes)  And you'd agree with me --
 8   well, strike that.  If that was data that was true and
 9   the company knew that, is that information you would
10   have wanted to know?
11          A.    Yeah.
12          Q.    And we can agree that Actiq use for
13   breakthrough pain outside of cancer is illegal; right?
14          A.    Yes.
15               MR. MAIER:  Objection.  Form.
16          Q.    (By Mr. Faes)  Yeah, that's actually a bad
17   question.  We can agree that breakthrough -- strike
18   that.  We can agree that the use of Actiq for
19   breakthrough pain outside of cancer is off-label;
20   right?
21          A.    Better question.  Thank you.  Yes.
22          Q.    And it's actually -- if you want to go
23   back and correct that -- it's not actually illegal; it
24   would just be illegal to promote it off-label; right?
```

```
 1           A.      Exactly.

 2           Q.      So a doctor can prescribe it off-label and

 3    it's not necessarily illegal; right?

 4           A.      Yes.

 5           Q.      Now I'm going to take a second here.  This

 6    is actually to your benefit because the clock is

 7    running and I'm trying to cut this down a little bit;

 8    okay?  So if you can turn to Page 44 on this document,

 9    there's just one more thing I want to ask about --

10           A.      Just looking at -- never --

11           Q.       -- ask you about this and then we'll set

12    it aside.

13           A.      Yeah.

14           Q.      On Page 44 in about the center of the

15    document it states that there has been increased

16    scrutiny by the FDA on Actiq's use and they have

17    expressed concerns with the growing reports of abuse

18    mis -- and misuse of the product.  Do you see that?

19           A.      I do.

20           Q.      Is that consistent with your memory that

21    in 2005 there were growing concerns about abuse and

22    misuse of Actiq?

23                   MR. MAIER:  Objection.  Form.

24           A.      I don't remember.
```

1          Q.    (By Mr. Faes)  You can set that document

2     aside, and actually what I'm going to have you do is if

3     you can dig out --

4          A.    Uh-oh.

5          Q.    Well, before you do that, let me just ask

6     you this.  During your time promoting Actiq, you did

7     become aware that sometimes some of the physicians that

8     you called on did promote -- or strike that.  You would

9     agree with me that during your time promoting Actiq you

10    became aware that some of your physicians would

11    sometimes prescribe Actiq off-label; right?

12         A.    Yes.

13         Q.    And if I can have you pull out Exhibit 3

14    out of that stack, which is your call notes.

15         A.    I'm getting stuck.  Yeah.  Okay.

16         Q.    So I just want to ask you about a couple

17    of things on this.  If you look at the very first page

18    on the fifth entry from the bottom.  You see you've got

19    a call to Dr. James Bressi on 6-13-01?

20         A.    Okay.

21         Q.    And if you look in your call comments, you

22    noted --

23         A.    Uh-huh.

24         Q.    -- that you discussed Actiq for

Highly Confidential - Subject to Further Confidentiality Review

1    breakthrough cancer pain.  He is mad about Ohio

2    Medicare.  Five PTS, which I assume mean patients, got

3    turned down this week for not having breakthrough

4    cancer pain.  He wants the person at O.Med he can write

5    a letter to.  Do you see that?

6         A.    I do.

7         Q.    And this would have been a call note

8    entered by you?

9         A.    Yes.

10        Q.    And this note would indicate that at this

11   time, at least five of Dr. Bressi's patients were being

12   prescribed Actiq off-label; right?

13              MR. MAIER:  Objection.  Form.

14        A.    Yes.

15        Q.    (By Mr. Faes)  And this is early on with

16   your time with the company; right?  This is in June of

17   2001?

18        A.    If you say so.  Is it -- what's the date?

19        Q.    Well, you can look at the call date.

20   6-13-2001.

21        A.    Okay.

22        Q.    And so that would be about four months

23   after you started with the company; right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And unfortunately these aren't labeled,
2    but if you can -- don't have page numbers, but if you
3    can turn to Page 11.  And it might be easier for you to
4    follow along on the screen.  And if you look at the
5    fourth entry down, this is -- you note that you've made
6    a call note on August 31st of 2001.  And what's that
7    doctor's name?  Antoine --
8          A.    I'm not there yet.
9          Q.    Okay.  I'll let you read the doctor's name
10   because you're probably better than me.
11         A.    I don't remember him.  Chahine.
12         Q.    Okay.  Well, we'll just do the best we can
13   with the pronunciation.
14         A.    He's an oncologist.
15         Q.    Right.  So this is a note to Dr. Antoine
16   Chahine, who you say is an oncologist --
17         A.    Uh-huh.  Right there.
18         Q.    -- on August 31st of 2001.  And the call
19   comments note discussed Actiq with breakthrough pain
20   with Dr. Eldab.  He is very interested in using in his
21   head and neck patients.  Do you see that?
22         A.    I do.
23         Q.    And you'd agree with me that even for a
24   cancer doctor, prescribing Actiq for the indication of
```

Highly Confidential - Subject to Further Confidentiality Review

1    head or neck pain would be an off-label use; right?

2            MR. MAIER:  Objection.  Form.

3        A.    Head or neck patients with cancer.  Head

4    cancer, neck -- head and neck cancer.

5        Q.    (By Mr. Faes)  Okay.  Fair enough.  If you

6    turn to Page 13 of this document, and you're looking at

7    the one -- the entry that's -- one, two, three, four,

8    five, six, seven -- we're looking at the entry that's

9    eight from the bottom.

10       A.    Hang on.

11       Q.    Yeah, it's hard to read, isn't it?

12       A.    Yeah.  Okay.

13       Q.    So this is another call --

14       A.    Oncologist.

15       Q.    This is another call note dated April 30th

16   of 2001 entered by you, and again this is Dr. Eric

17   Chevlen?

18       A.    Uh-huh.

19       Q.    And it sta -- again it states discussed

20   Actiq for breakthrough cancer pain.  He says he uses it

21   on his head and neck patients.  I tried to expand this

22   to other patients with breakthrough cancer pain.  Do

23   you see that?

24       A.    Yes.  Head and neck cancer patients.

```
 1          Q.    So that doesn't indicate to you that Dr.

 2   Chevlen could have been using it on head and neck

 3   patients that didn't have breakthrough cancer pain,

 4   that didn't have cancer?

 5                MR. MAIER:  Objection.  Form.

 6          A.    Only with cancer.  Head and neck cancer.

 7          Q.    (By Mr. Faes)  If I can have you turn to

 8   Page 17 of this document.  You're looking at the fourth

 9   entry from the top, and this --

10                MR. FAES:  Huh?

11                MS. JAIN:  Fourth from the bottom.

12                MR. FAES:  Fourth from the bottom.  Thank

13   you.

14          Q.    (By Mr. Faes)  We're looking at the --

15   we're on Page 17 of this document.  We're looking at

16   fourth entry from the bottom.

17          A.    Uh-huh.

18          Q.    And this is an entry dated August 10th of

19   2001, and this is on a Dr. Jerome Yokiel?

20          A.    Yokiel.

21          Q.    And the call comment is that you discussed

22   Actiq for breakthrough pain at a lunch and learn.  He

23   told me he was having great success for migraines.  Do

24   you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes, but I have to back you up, because

2   I'm not going to answer that question, because you keep

3   saying breakthrough pain, and it's breakthrough cancer

4   pain, and I want to be very strict with that when you

5   ask me those questions.

6       Q.      Oh, that's my fault.  Let me reask the

7   question.

8       A.      Thank you.

9       Q.      So this call note dated 8-10-2001, you

10  state discussed Actiq for breakthrough cancer pain at a

11  lunch and learn.  He told me he was having great

12  success for migraines.  Do you see that?

13      A.      I do.

14      Q.      And this would be a call note that would

15  have been entered by you in August of 2001; right?

16      A.      Okay.

17      Q.      And you noted that Dr. Yokiel was having

18  success with Actiq for migraines; right?

19      A.      Okay.

20      Q.      And that would have been an off-label use;

21  right?

22      A.      Yes.  Which would have been followed up

23  with a medical request form.

24      Q.      So this is -- these are notes from 2001,

Highly Confidential - Subject to Further Confidentiality Review

1    so we can see that at least as in 2001, which was your

2    first year as a representative for Cephalon -- I'm

3    going to start over because they're recording

4    everything and it's just going to sound awful.  So

5    these are notes from 2001, and you can see that during

6    your first year at Cephalon you were aware of at least

7    two doctors that were prescribing Actiq for off-label

8    use; right?

9              MR. MAIER:  Objection.  Form.

10        A.    Not two.  Where's the other one?  You said

11   head and neck cancer.

12        Q.    (By Mr. Faes)  Dr. Bressi and Dr. Yokiel.

13   Remember Dr. Bressi was -- had five patients that got

14   turned down for not having breakthrough cancer pain?

15        A.    Okay.

16        Q.    And Dr. Yokiel was using it for migraines;

17   right?

18              MR. MAIER:  Objection.  Form, foundation.

19        A.    That's true.

20        Q.    (By Mr. Faes)  Right.  And so we know --

21   and we know that there's at least six patients in your

22   category that are getting it off-label, because Dr.

23   Bressi had five and Dr. Yokiel must have had at least

24   one if he was using it for migraines; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAIER:  Objection.  Form, foundation.

 2          A.    Yes.

 3          Q.    (By Mr. Faes)  And we know that eventually

 4   you weren't allowed to enter the kind of call comments

 5   that we're seeing here in Exhibit Number 3 because the

 6   company changed the policy on the way that call

 7   comments were allowed to be entered; right?

 8                    MR. MAIER:  Objection.  Form, foundation.

 9          A.    The industry, yes.

10          Q.    (By Mr. Faes)  And that was done for

11   liability reasons; right?

12          A.    I don't know.

13                    MR. MAIER:  Objection.  Form, foundation.

14          Q.    (By Mr. Faes)  Well, didn't you testify

15   earlier that it was for liability reasons?

16          A.    You had asked me that question --

17                    MR. MAIER:  Objection.  Form.

18          A.    -- and I said yes, that could be one of

19   the reasons -- liability.  It wasn't the only reason.

20          Q.    (By Mr. Faes)  Well, what were some --

21          A.    I don't know what the other reasons were.

22   It could have -- so liability could have been one of

23   them, so I answered yes.

24          Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Your questions need to be more direct.

 2        Q.     And so if you were -- if a situation like

 3   this were to occur after that change in company policy

 4   was made to the way call notes were allowed to be

 5   entered, situations like the ones with Dr. Bressi and

 6   Dr. Yokiel wouldn't have been recorded at that time;

 7   right?

 8               MR. MAIER:  Objection.  Form.

 9        Q.     (By Mr. Faes)  At least not in your call

10   notes?

11        A.     They wouldn't have been in the call notes.

12        Q.     Now, at some point during your employment

13   at Cephalon did you become aware that the company pled

14   guilty to promoting Actiq and other drugs off-label in

15   violation of the law?

16        A.     Yes.

17        Q.     I'm going to hand you what's been marked

18   as Exhibit Number 12 to your deposition.

19               [Exhibit Teva-Kaisen-012

20               marked for identification.]

21               MR. FAES:  10.1, Mike.

22        Q.     (By Mr. Faes)  And this is a guilty plea

23   agreement between the United States of America and

24   Cephalon; right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Uh-huh.

2      Q.     And if you look under Section 1 it states

3   that Cephalon agrees to plead guilty to one count of

4   information, waiving prosecution by indictment,

5   charging it with introduction into interstate commerce

6   of drugs that were misbranded through off-label

7   promotion, a misdemeanor in violation of 21 USC Section

8   331.  Do you see that?

9      A.     Where's the date on this?

10     Q.     Well, if you turn to the second-to-last

11  page, you can see that this was signed on September

12  15th of 2008 by Gerald Pappert, who's the

13  vice-president and general counsel for Cephalon at this

14  time; right?

15     A.     I was trying to get a frame of reference.

16     Q.     Sure.

17     A.     Thank you.  Okay.

18     Q.     And if you turn back to the first page, it

19  states that this is all arising from -- in the third to

20  last sentence of the paragraph, this is all arising

21  from Cephalon's off-label promotion of its drug

22  Provigil, Gabitril, and Actiq between January 2001 and

23  October of 2001.  Do you see that?

24     A.     Uh-huh.

```
 1          Q.    So this -- as we said, this happened in

 2    September of 2008; right?

 3          A.    Okay.

 4          Q.    And this would have -- was this announced

 5    within the company, or were you made aware of it?

 6          A.    We were made aware.

 7          Q.    Did any -- are you aware of anyone that

 8    ever lost their job as a result of this guilty plea?

 9                MR. MAIER:  Objection.  Foundation.

10          A.    I don't remember.

11          Q.    (By Mr. Faes)  Are you aware of any

12    disciplinary action ever taken against anyone as a

13    result of this guilty plea?

14                MR. MAIER:  Objection.  Foundation.

15          A.    I don't remember.

16          Q.    (By Mr. Faes)  Are you aware of any

17    changes to company policies and procedures that were

18    implemented as a result of this guilty plea?

19                MR. MAIER:  Objection.  Foundation.

20          A.    Are you talking the CIA agreement?

21          Q.    (By Mr. Faes)  Well, I'm asking you, are

22    you aware of any changes to company policies and

23    procedures?

24          A.    I just don't know when it was.  CIA
```

1    agreement?

2          Q.    So you believe that there was a corporate

3    integrity agreement or CIA agreement that was required

4    to be signed as a part of this settlement agreement;

5    right?

6          A.    Yes.

7          Q.    Were there any other changes to policies

8    and procedures that you're aware of that were

9    implemented as a result of this guilty plea?

10         A.    I don't remember.

11         Q.    I'm going to hand you what's been marked

12    as Exhibit Number 15 (sic) to your deposition.

13              [Exhibit Teva-Kaisen-013

14              marked for identification.]

15              MR. FAES:   This is 12, Mike, for you.

16         Q.    (By Mr. Faes)   This is an e-mail from

17    Randy Spokane, and he would have been your boss's boss

18    at this time this e-mail was sent in 2006; right?

19         A.    Yes.

20         Q.    And the subject of this e-mail is Wall

21    Street Journal, 11-21-2006, Cephalon used improper

22    tactics.  Do you see that?

23         A.    Yes.

24         Q.    And this would have been about two years

Highly Confidential - Subject to Further Confidentiality Review

1  before the corporate integrity agreement -- or I'm

2  sorry.  This would have -- strike that and start over.

3  This would have been about two years before the guilty

4  plea that we just looked at that was signed in 2008;

5  right?

6      A.    Yes.

7      Q.    So if you look further down, it states the

8  Wall Street Journal continues to cover issues related

9  to the promotion of Actiq?

10      A.    Uh-huh.

11      Q.    And it appears that there's an article

12  from the Wall Street Journal further down.  And it

13  starts, from setting unrealistically high sales quotas

14  to pushing larger prescriptions at higher doses,

15  drugmaker Cephalon, Inc., engaged in a questionable

16  practice to expand the sales of Actiq, a powerful

17  narcotic lollipop approved only to treat cancer pain,

18  according to a two-year investigation by the

19  Connecticut Attorney General.  Do you see that?

20      A.    I do.

21      Q.    In 2006, were you aware that in addition

22  to being charged with -- by the Department of Justice

23  and settling with them in 2008, that Cephalon was also

24  under investigation for its promotion of Actiq by the

```
 1    Connecticut Attorney General?

 2                 MR. MAIER:  Objection.  Form, foundation.

 3         A.    I don't remember.  I was not copied on

 4    this either.

 5         Q.    (By Mr. Faes)  So your boss's boss never

 6    felt it necessary to share this information with you?

 7                 MR. MAIER:  Objection.  Form, foundation.

 8         A.    I don't remember.

 9         Q.    (By Mr. Faes)  Let me ask a better

10    question.  At this time, Randy Spokane would have been

11    your boss's boss; right?

12         A.    Uh-huh.

13         Q.    And you don't recall ever -- anyone at

14    Cephalon ever sharing the information with you that

15    Actiq was under investigation by the Connecticut

16    Attorney General for questionable promotional tactics

17    used with Actiq?

18         A.    I don't remember.

19         Q.    And you would have been a sales

20    representative promoting and detailing Actiq at this

21    time; right?

22         A.    Yes.

23         Q.    Is this information that you would have

24    wanted to know?
```

```
 1          A.    I don't know how to answer that question.

 2          Q.    So you don't -- do you know one way or the

 3    other whether you would want to know this as a person

 4    distributing Actiq?

 5               MR. MAIER:  Objection.  Form.

 6          A.    Help me out here.  I don't understand him.

 7          Q.    (By Mr. Faes)  Let me strike that and

 8    reask a different question.  If the Connecticut

 9    Attorney General believed that the tactics being used

10    to promote Actiq were illegal and the company was under

11    investigation for that, is that something that you

12    would have wanted to know as someone who was promoting

13    the product in 2006?

14               MR. MAIER:  Objection.  Form, foundation.

15               MR. BERG:  Is that something you would

16    have wanted to know?

17          A.    I follow what the company tells me.  Do I

18    want to know this or not know it?  Okay.  All

19    information's good.

20          Q.    (By Mr. Faes)  So the answer is yes, you

21    would have liked to have known; right?

22          A.    Okay.

23          Q.    And if you go on, it states that people

24    familiar with the probe say that among other tactics,
```

1    Cephalon promoted the drug off-label or for nonapproved

2    uses to neurologists and touted small studies conducted

3    by doctors to whom it had ties in an effort to get

4    Actiq prescribed for migraines.  In addition, they say,

5    Cephalon flew doctors to seminars that promoted Actiq's

6    use for headaches and in patients who might not

7    tolerate it well.  Do you see that?

8         A.    I do.

9         Q.    Were you aware when you were promoting

10   Actiq at this time in 2006 that these were allegations

11   made by the Connecticut Attorney General?

12        A.    I don't remember.

13        Q.    If someone had made you aware of that, do

14   you think you -- do you think it would have stuck out

15   in your mind?

16             MR. MAIER:  Objection.  Form.

17        A.    At this point I don't remember.

18        Q.    (By Mr. Faes)  Is that information you

19   would have wanted to know?

20        A.    Yes.  I mean --

21        Q.    If you turn to the following page of this

22   document.  And I'm looking at the sixth paragraph from

23   the bottom, and it states in a one-page article in the

24   Wall Street Journal earlier this month --

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BERG:  Hold on.  One second.  Do you

 2      need -- you want to take a break, or do you want him to

 3      start over with the question?

 4           A.    No.  Go ahead.

 5           Q.    (By Mr. Faes)  If you look at the sixth

 6      paragraph from the bottom, it states in a one-page

 7      article in the Wall Street Journal earlier this month,

 8      Cephalon acknowledged that it sends sales

 9      representatives to a broad range of doctors, many of

10      whom have nothing to do with cancer.  The company says

11      such visits are appropriate because cancer visits are

12      often treated for pain by noncancer doctors.  Do you

13      see that?

14           A.    I do.

15           Q.    Is that consistent with messaging that you

16      would have received as a sales rep for Actiq at this

17      time?

18                    MR. MAIER:  Objection.  Form.

19           A.    I don't know what the company has to say,

20      but we followed physicians, noncancer doctors, but they

21      treated cancer patients.

22           Q.    (By Mr. Faes)  So it's true then that

23      you -- it's true what Cephalon says, that it sends

24      sales representatives to a broad range of doctors, many
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   of whom have nothing to do with cancer?

 2              MR. MAIER:  Objection.  Form, foundation.

 3   Misstates testimony.

 4        A.    Please rephrase.  I guess I'm getting

 5   tired or -- this is --

 6        Q.    (By Mr. Faes)  Is it your understanding

 7   that it was true or not true in 2006 that Cephalon

 8   would send sales representatives to a broad range of

 9   doctors, many of whom have nothing to do with cancer?

10              MR. MAIER:  Objection.  Form, foundation.

11        A.    Can I qualify that?

12              MR. BERG:  Yeah, you can answer as best

13   you can.  Yeah.

14        A.    We were given a list of physicians to call

15   on.  Did they send me there?  I just don't like that

16   send thing.  Send me there?  We would vet them.  In

17   other words, I would go to the decile and I would ask

18   them, did you treat patients with break -- for

19   breakthrough cancer pain?

20        Q.    (By Mr. Faes)  So they -- so it's true

21   then that they would -- the company would sometimes

22   send you to doctors to detail Actiq that had nothing to

23   do with cancer?

24              MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No comment.  I just don't remember.  I

 2   don't know how to answer that question.  I just don't

 3   like the question.  I just don't think it's very

 4   direct.

 5          Q.    (By Mr. Faes)  So I'm going to hand you --

 6                MR. MAIER:  You may have accidentally

 7   skipped Exhibit 13, unless I'm missing something.  In

 8   the numbering, did we go from 12 to 15?

 9                MS. JAIN:  That's 14.

10                [Discussion off the record.]

11                MR. MAIER:  We can just continue.  I don't

12   want to hold us up.

13          Q.    (By Mr. Faes)  Okay.  I'm going to hand

14   you what's been marked as Exhibit Number 14 to your

15   deposition.

16                [Exhibit Teva-Kaisen-014

17                marked for identification.]

18          Q.    And this is another Wall Street Journal

19   article that was circulated within the company dated

20   November 3rd, 2006.  Do you see that?

21          A.    Well, I wouldn't say it was throughout the

22   company.  It was to Cynthia Condodina.

23          Q.    Right.  And Cynthia Condodina was a person

24   within the company; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     You said throughout the company.

2        Q.     So this is an article that was distributed

3   within the company dated 11-3-2006; right?

4        A.     Yes.

5        Q.     And this is from the Wall Street Journal,

6   apparently dated November 3rd, 2006; right?

7        A.     Yes.

8        Q.     So despite whether or not this was

9   circulated within the company or not, this would be an

10  article that would be publicly available; right?

11       A.     Yes.

12       Q.     And if you look down in the middle

13  paragraph next to the picture that isn't there,

14  starting with data on the right-hand side, this states

15  data gathered from a network of doctors by research

16  firm ImpactRx between June 2005 and October 2006

17  suggest that 80 percent of patients who use the drug

18  don't have cancer.  Instead, doctors prescribe it

19  off-label for unapproved uses such as headaches or back

20  pain.  Do you see that?

21       A.     I do.

22       Q.     And we saw earlier in the 2005 Actiq

23  marketing plan that the company estimated in 2005 that

24  the off-label use of Actiq was 90 percent; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Uh-huh.

 2        Q.    So this reporting is fairly consistent

 3   with that; right?

 4              MR. MAIER:  Objection.  Form.

 5        A.    I've never seen this.  And this is written

 6   by media.  I would need to see the statistics behind

 7   it.  This is media driven.  Sorry.

 8        Q.    (By Mr. Faes)  Right.  But my question

 9   was, this 80 percent off-label use as reported by the

10   media is fairly consistent with the 90 percent figure

11   reported --

12        A.    How do I answer that?

13        Q.       -- by the company in their 2005 marketing

14   plan; right?

15              MR. MAIER:  Objection.  Form.

16        A.    I really don't know how to answer that

17   question.  I am not privy to this.  I don't remember

18   this.

19        Q.    (By Mr. Faes)  Well, was this information

20   ever shared with you, that the off-label use for the

21   Actiq product in 2005 and 2006 was somewhere between 80

22   and 90 percent?

23              MR. MAIER:  Objection.  Form, foundation.

24        A.    As prior I said, I don't remember.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  If you had been told that,

 2    do you think that's something that you would remember?

 3                MR. MAIER:  Objection.  Form.

 4          A.    I don't remember it now.

 5          Q.    (By Mr. Faes)  Do you have any reason as

 6    you sit here today to think that those numbers as

 7    reported in the Wall Street Journal aren't true?

 8                MR. MAIER:  Objection.  Foundation.

 9          A.    I think the media is very biased.  I do

10    not trust things that come out of the media.  If you

11    show me a double-blind placebo-controlled study I will

12    then look at it, but if you're showing me something the

13    media generated as -- me as an individual, Val Kaisen,

14    I do not believe -- put a lot of weight into it.

15          Q.    Do you think that the company's marketing

16    plan from 2005 is reliable?  Do you believe the 90

17    percent figure of off-label use from that document?

18                MR. MAIER:  Objection.  Foundation.

19          A.    If they say it is, then yes.

20          Q.    (By Mr. Faes)  So the company document

21    estimating 90 percent in your mind is more reliable

22    than the Wall Street Journal which only estimates 80

23    percent; right?

24                MR. MAIER:  Objection.  Form.
```

```
 1          A.    I don't believe the media, period.  Do I

 2   recognize those numbers from the marketing material?  I

 3   don't remember.  I'm staying pretty consistent in my

 4   answers here, so I'm not sure what you -- you want me

 5   to reiterate it again?

 6          Q.    (By Mr. Faes)  No, I think you've answered

 7   my question.

 8          A.    Thank you.

 9                [Discussion off the record.]

10                MR. FAES:  Would you mind if we just went

11   off the record just for a minute -- for five minutes?

12                THE VIDEOGRAPHER:  We are going off the

13   record -- going off the record at 1:31 PM.

14                [A brief recess was taken.]

15                THE VIDEOGRAPHER:  We are back on the

16   record at 1:56 PM.

17          Q.    (By Mr. Faes)  Ms. Kaisen, we're back on

18   the record after a brief lunch break.  Are you ready to

19   proceed?

20          A.    Yes.

21          Q.    Now, all morning we've been talking about

22   Actiq --

23                UNIDENTIFIED WOMAN:  I'm sorry.  Can you

24   unmute the phone again, please?
```

```
 1                    [Discussion off the record.]

 2          Q.    (By Mr. Faes)  So Ms. Kaisen, all morning

 3   we've been talking about your detailing and promotion

 4   of Actiq; right?

 5          A.    Yes.

 6          Q.    And as we discussed earlier in the day, in

 7   late 2006, you -- or early 2007, you discontinued your

 8   promotion and detailing of Actiq and switched to

 9   promoting Fentora in place of it; right?

10                MR. MAIER:  Objection.  Form.

11          A.    If you say so yes.

12          Q.    (By Mr. Faes)  Well, you don't dispute

13   that that happened?

14          A.    I don't dispute it.

15          Q.    You're just not sure of the dates; is that

16   right?

17          A.    Yes.  Thank you.  Yes.

18          Q.    So I'm going to hand you what's been

19   marked as -- well, I got to mark it first.  I'm going

20   to hand you what's eventually going to be marked as

21   Exhibit Number 15 to your deposition.  And I know this

22   is a huge document, but I'm only going to ask you

23   about -- I know this is a huge document, but I'm only

24   going to ask you about four pages from it.
```

```
 1                    [Exhibit Teva-Kaisen-015

 2                    marked for identification.]

 3        Q.    And it might even be easier just to --

 4   that's yours.  I always give you yours first, so maybe

 5   I need to reverse the order on that.

 6        A.    Yeah.

 7        Q.    So this is a document titled FEBT

 8   2005-2006 marketing plan.  Do you see that?

 9        A.    Uh-huh.

10        Q.    And you knew that FEBT was the

11   pre-approval name essentially for what eventually

12   became Fentora; right?

13        A.    I don't remember.

14        Q.    Okay.  Well, I'll represent to you that

15   that is the case, that FEBT is what ultimately became

16   Fentora and that's what this is, is the 2005 and 2006

17   marketing plan.  Fair enough?

18        A.    Yes.

19        Q.    If you turn to Page 6 of this document and

20   if you look up in critical success factors up in the

21   upper right-hand corner, it states that a critical

22   success factor in launching Fentora was to convert

23   Actiq loyalists within 90 days.  Do you see that?

24        A.    Uh-huh.
```

1    Q.    Was that one of the directives given to

2  you by your superiors when Fentora was launched, was

3  that you wanted to convert Actiq loyalists within 90

4  days of the launch?

5    A.    I don't remember.

6    Q.    Do you have any reason as you sit here

7  today to dispute that that was direction given to you

8  by your superiors when Fentora was launched?

9    A.    I don't.

10    MR. MAIER:  Objection.  Foundation.

11    Q.    (By Mr. Faes)  If you can turn to Page 8

12  of this document, starting on the third paragraph from

13  the bottom, it states in order to create a significant

14  adoption of fentanyl effervescent buccal tablet, FEBT,

15  Cephalon must take a two-step approach, successfully

16  convert Actiq loyalists to FEBT adopters within the

17  first 90-day prelaunch period, and expand the universe

18  of ROO-prescribing physicians.  Do you see that?

19    MR. MAIER:  Objection.  Form.

20    A.    Yes.

21    Q.    (By Mr. Faes)  And ROO means rapid onset

22  opioid; right?

23    A.    Thank you.  Yes.

24    Q.    And the former attempt will be the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    priority at launch because of the loss of Actiq patent

 2    protection just prior to or at the launch of FEBT.  Do

 3    you see that?

 4         A.    I see it.

 5         Q.    Is this consistent with your memory of

 6    what you would have been given direction on regarding

 7    marketing efforts for the launch of Fentora?

 8              MR. MAIER:  Objection.  Form.

 9         A.    Yes.

10         Q.    (By Mr. Faes)  And --

11         A.    I didn't -- I don't remember the part with

12    Actiq patent protection, though.

13         Q.    Okay.  But do you have any reason to

14    dispute that?

15         A.    No.

16         Q.    That would be normal within the industry

17    to stop promoting a branded product once it loses

18    patent protection; right?

19         A.    Yes.

20         Q.    And you would expect that based on your

21    long history --

22         A.    Yes.

23         Q.     -- of working in the industry; right?

24         A.    (Nodding "yes.")
```

```
 1          Q.    Is that a yes?  You're just shaking your
 2    head.
 3          A.    Yes.
 4          Q.    Okay.  Sorry.  I just have to have the
 5    verbal answer for the record.  And the following
 6    sentence says because of the absence of time to convert
 7    Actiq loyalists to FEBT adopters, both the market and
 8    Cephalon must be fully prepared for the FEBT launch.
 9    Do you see that?
10          A.    Uh-huh.
11          Q.    And is that consistent with your memory,
12    is that once the Fentora product was ready for launch,
13    you guys wanted to be ready right away to get out there
14    in the field and start converting doctors to the
15    Fentora product?
16          A.    Yes.
17                MR. MAIER:  Objection.  Form.
18          Q.    (By Mr. Faes)  And if you can turn to Page
19    12 of this document.  You know what?  I think this is
20    all repetitive of what I've already asked you, so you
21    can set that aside.  I'm going to hand you what's been
22    marked as Exhibit Number 16 to your deposition.
23                [Exhibit Teva-Kaisen-016
24                marked for identification.]
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. FAES:  You know what?  I should give

 2     her the copy with the binder clip.

 3           Q.    (By Mr. Faes)  This is his.  This is

 4     yours.

 5           A.    Oh.

 6           Q.    So Exhibit Number 15 is a document --

 7                 MS. JAIN:  16.

 8           Q.    (By Mr. Faes)  -- labeled marketing plan

 9     2007 for Fentora.  Do you see that?

10           A.    Yes.

11                 THE VIDEOGRAPHER:  Excuse me.  Your

12     microphone I think fell off again.

13                 [Discussion off the record.]

14           Q.    (By Mr. Faes)  So Exhibit Number 16 is a

15     PowerPoint titled marketing plan 2007 and it's for

16     Fentora; right?

17           A.    Yes.

18           Q.    And if you turn to Slide 49 of this

19     document.  And if you want we'll just put it up on the

20     screen.  You see --

21           A.    Yeah, I see that.

22           Q.     -- the title of this slide is Actiq

23     monthly prescriber account, and this states that PCPs

24     or primary care providers continue to outnumber pain
```

```
 1   specialists.  Do you see that?

 2        A.    Yes.

 3        Q.    And according to this document, at least

 4   at the time of the launch of Fentora in -- at least at

 5   the time in September 2006, which is when this pie

 6   graph was prepared, the primary care providers as a

 7   group outnumbered pain specialists in terms of the

 8   number of -- in terms of the prescriber account; right?

 9             MR. MAIER:  Objection.  Foundation.

10        A.    Yes.

11        Q.    (By Mr. Faes)  And is that consistent with

12   your memory with regard to Actiq in September of 2006?

13        A.    I really don't remember, but if you say

14   so.

15        Q.    Do you have any reason to dispute that

16   this --

17        A.    No.

18        Q.    -- isn't true?  If you can turn to Page

19   51 of this document.  Again, this is from a marketing

20   plan 2007 for Fentora.  States conditions treated with

21   Actiq.  You see that title?

22        A.    Yes.

23        Q.    And it says despite promotion in

24   breakthrough cancer pain, Actiq uses -- Actiq use
```

1    mirrors that of all opioids, and if you see on the

2    left-hand side there it shows a breakdown of the

3    underlying conditions being treated with Actiq at that

4    time.  Do you see that?

5         A.    Yes.

6         Q.    And you see that 38 percent of Actiq use

7    is for back pain, 22 percent is for neurology, 14

8    percent is for headache, eight percent is for cancer,

9    and six percent is for arthritis; right?

10        A.    Yes.

11        Q.    And those are all -- except for cancer,

12   those are all off-label indications; right?

13              MR. MAIER:  Objection.  Foundation.

14        A.    Yes.

15        Q.    (By Mr. Faes)  So what this slide is

16   saying is despite the way Actiq is being promoted, it

17   looks like the majority of prescribers at this time,

18   according to the company's data, are using it for

19   off-label use; right?

20              MR. MAIER:  Objection.  Form.

21        A.    Yes.

22        Q.    (By Mr. Faes)  Is that consistent with

23   your understanding of Actiq use at this time in late

24   2006?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. MAIER:  Objection.  Foundation.

 2          A.    I don't remember.

 3          Q.    (By Mr. Faes)  Do you have any reason to

 4   believe that this data from this company document isn't

 5   true?

 6          A.    I don't.

 7          Q.    If you look at Page 67 of this document,

 8   you see a -- you see a breakdown of Fentora

 9   productivity by specialty.  Do you see that?

10          A.    Yes.

11          Q.    And you've got it broken down by pain,

12   anesthesiologist, primary care physicians, neurologist,

13   physio -- what's --

14                  MS. JAIN:  I think it's psychiatry.

15                  MR. BERG:  Psychiatry.

16          A.    That's psychiatrist.

17          Q.    (By Mr. Faes)  Right.  Psychiatrists,

18   oncologists, and all others.  Do you see that?

19          A.    Yes.

20                  MR. MAIER:  Objection.  Form.

21          Q.    (By Mr. Faes)  So it appears at this time

22   in 2006 there are a large number of people who aren't

23   oncologists or pain specialists using Fentora at this

24   time, according to this document; right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. MAIER:  Objection.  Form.

 2         A.    Yes.

 3         Q.    (By Mr. Faes)  And is that consistent with

 4    your understanding of Fentora use at that time?

 5                  MR. MAIER:  Objection.  Foundation.

 6         A.    I don't remember at that time.

 7         Q.    (By Mr. Faes)  Do you have any reason to

 8    dispute that the information presented in this company

 9    document isn't true?

10         A.    No.

11         Q.    Let me reask it a better way.  Do you have

12    any reason to believe that the information presented in

13    this company document isn't true?

14         A.    Having a moment here.  Sorry.  I don't.

15         Q.    Okay.  You can set that document aside.

16         A.    Whew.

17         Q.    I'm going to hand you what's been marked

18    as Exhibit Number 17 to your deposition.

19                  [Exhibit Teva-Kaisen-017

20                  marked for identification.]

21         Q.    There's his.  There's yours.

22                  MR. FAES:  I have a bonus copy of this one

23    if you want it.

24                  MR. MAIER:  I've made it this far.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. FAES:  Okay.

 2         Q.    (By Mr. Faes)  So this has a placeholder

 3    on the front of it, but if you turn to the first slide

 4    it states Ohio area business review and it's dated May

 5    13th of 2008.  Do you see that?

 6         A.    Uh-huh.

 7         Q.    And in 2008 you would have been in the

 8    Ohio Valley area; right?

 9         A.    Yes.

10         Q.    And Michael Morreale would have been your

11    direct report at this time; right?

12         A.    Yes.

13         Q.    The page -- and if you can turn to Page 3

14    of this document.  You see it's got a layout of various

15    territories.  And again, your name was McGinley at this

16    time; right?

17         A.    Yes.

18         Q.    So -- and this is just more of a visual so

19    we can see.  You'd agree that that red shaded area up

20    there would have represented your territory at this

21    time in 2008; right?

22         A.    Yes.

23         Q.    And that was the territory where you were

24    promoting, among other things, Fentora, right, in 2008?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.  I'm sorry.  I was looking up there,

2    Erie.  I don't remember that one.  But okay.  Yes.

3          Q.    And as we discussed earlier, your

4    territory at all times when you were detailing and

5    promoting Actiq and Fentora included Cleveland and part

6    of Ohio; right?

7          A.    Yes.

8          Q.    If you can turn to Page 11 of this

9    document, and this is a slide entitled Fentora

10   learning, and you see that the last bullet point notes

11   that over the six months' script data, 60 percent of

12   the area scripts are for 200 and 400 MCGs, while only

13   25 percent are for 600 and 800 MCGs.  Do you see that?

14         A.    Yes.

15         Q.    Do you remember at this time in 2008 that

16   the lower doses of Fentora, which would be the 200 and

17   400 MCGs, were a higher percentage of the

18   prescriptions?

19         A.    Yes.

20               MR. MAIER:  Objection.  Foundation.

21         Q.    (By Mr. Faes)  Did you come to learn as a

22   sales representative that the price point for the

23   higher doses at 600 or 800 MCGs cost more?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so it would be true then that if

2  physicians prescribed the higher doses for Fentora or

3  started a person on a higher dose, that would mean more

4  revenue for the company; right?

5         MR. MAIER:  Objection.  Form, foundation.

6    A.    Could you ask that question again?

7  Because they wouldn't start on a higher dose --

8    Q.    (By Mr. Faes)  Sure.  It would be true

9  then that if physicians prescribed their patients a

10  higher dose for Fentora, that would mean more revenue

11  for their company; right?

12    A.    Yes.

13         MR. MAIER:  Objection.  Form, foundation.

14    Q.    (By Mr. Faes)  Oh, you answered it.  I

15  didn't realize it.  I'm sorry.  I didn't hear the -- I

16  thought you were looking through --

17    A.    I'm just reading along waiting for you to

18  ask a question.

19    Q.    I thought you were looking through the

20  thing and trying to come up with an answer.

21    A.    No.

22    Q.    I didn't see that you'd answered yes, so I

23  apologize.  So if you turn to the next page of this

24  document, which is Slide 12.  You see that this slide

Highly Confidential - Subject to Further Confidentiality Review

1   is titled keys to success for Fentora, and you see that

2   the bottom bullet point is educate physicians about the

3   benefits of proper utilization of Fentora via increase

4   in number of units per script and strength?  Do you see

5   that?

6        A.    Yes.

7        Q.    So that was something that your superiors,

8   including your direct report, Michael Morreale,

9   believed was important for a sales rep to do, was to

10  talk to physicians about increasing the number of units

11  per script in strength?

12            MR. MAIER:  Objection.  Foundation.

13       A.    Yes.

14       Q.    (By Mr. Faes)  And so if you go back to

15  the bullet point just two points above that.  This is

16  going to kind of transition to our next topic.  One of

17  the key success factors that Mr. Morreale, who's your

18  direct boss, identified as a key to success for Fentora

19  was effective utilization of CSPs; right?

20       A.    Yes.

21       Q.    And that means Cephalon speaker programs;

22  right?

23       A.    Yes.

24       Q.    And we talked about speaker programs

Highly Confidential - Subject to Further Confidentiality Review

```
1    earlier and I think we used a different acronym when it
2    was used for Actiq and now I can't remember what it
3    was.
4          A.    I'm not good at acronyms.  Don't ask.
5          Q.    But they changed the name to Cephalon
6    speaker programs; right?
7          A.    Yes.
8          Q.    And that's essentially the same as the
9    speaker programs that were being done previously with
10   Actiq; right?
11         A.    Yes.
12         Q.    So -- you can set that document aside.  So
13   one of your jobs as a sales representative detailing
14   Fentora and also earlier Actiq, as we discussed, was to
15   set up Cephalon speaker programs for events for
16   Fentora?
17         A.    Yes.
18         Q.    And what would be some of the qualities
19   you would look for as a speaker when looking for a
20   Fentora speaker?
21         A.    Actually, in my territory it would be
22   academic speakers, because it's an academic area.  I'm
23   not going to bring -- I needed high-profile academic
24   physicians.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So one of the qualities would you -- you

2    would look for is you want an academic; right?

3    A.    Uh-huh.

4    Q.    You would want ideally somebody who was

5    high profile; right?

6    A.    Yes.

7    Q.    And that would mean someone who's

8    respected in the community?

9    A.    Yes, or United States.

10    Q.    Oh, okay.  So you would sometimes bring in

11    people from outside of your territory to come in and

12    peak to doctors within your territory about Fentora;

13    right?

14    A.    Yes.

15    Q.    And at this time in -- at the time -- by

16    the time you were promoting Fentora starting in late

17    2006 or 2007, was there actually an approved list of

18    speakers provided by the company?

19    A.    I don't remember.

20    Q.    Would you agree with me that regardless of

21    whether or not there was a approved list of speakers

22    that you ultimately ran any speaker by -- that you

23    ulti -- strike that.  Would you agree with me that

24    regardless of whether there was a list of approved

Highly Confidential - Subject to Further Confidentiality Review

1    speakers, any speaker that you were considering, you

2    would ultimately run that name by your superiors before

3    you would be given a green light to use that speaker in

4    your territory?

5         A.    Yes.

6               MR. MAIER:  Objection.  Form.

7         Q.    (By Mr. Faes)  So in other words, it

8    wasn't 100 percent your decision about whether or not

9    to use a particular speaker for Fentora or Actiq;

10   right?

11        A.    Yes.

12        Q.    You were required by company policy and

13   training to check with your superiors to make sure that

14   that person was okay before you used that person;

15   right?

16              MR. MAIER:  Objection.  Form.

17        A.    Yes.

18        Q.    (By Mr. Faes)  So I'm going to hand you

19   what's been marked as Exhibit Number 18 to your

20   deposition.

21              [Exhibit Teva-Kaisen-018

22              marked for identification.]

23        Q.    And this is an e-mail -- this is an e-mail

24   dated February 19th of 2005.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And this is an e-mail to you -- I'm sorry.

 3   This is -- starting over.  This is an e-mail from

 4   you --

 5          A.    Uh-huh.

 6          Q.     -- to your boss at this time, Michael

 7   Morreale, dated February 19th, 2005.  Do you see that?

 8          A.    I do.

 9                MR. BERG:  2015.  2015.

10          Q.    (By Mr. Faes)  So this is an e-mail from

11   you to your boss, Michael Morreale, dated February 19th

12   of 2005; right?

13          A.    No, 2015.

14          Q.    Two -- I did it again.  At least I haven't

15   talked about Dr. Fentora yet today.  So this is an

16   e-mail from you to your boss, Michael Morreale, dated

17   February 19th, 2015; right?

18          A.    Yes.

19          Q.    And you state Michael -- well, actually,

20   let's go down to the first part of this e-mail where

21   it's from Katie O'Connor, and it states thank you for

22   your continued support of the Fentora hcpConnect

23   videoconference series.  We are hoping to increase the

24   number of speakers who can conduct hcpConnect programs
```

1  and we are asking for your assistance.  Do you see

2  that?

3        A.    I do.

4        Q.    And the Fentora hcpConnect videoconference

5  series was a -- it was a Cephalon speaker program but

6  it was done by videoconference; right?

7        A.    Yes.

8        Q.    And it goes on to say we would like each

9  regional manager to recommend up to five speakers.  Do

10  you see that?

11        A.    Yes.

12        Q.    And in response to this up above you state

13  Michael, in response to speakers, I would like to

14  nominate Dr. Riad Laham, Cleveland Clinic Pain

15  Management, 6803 Mayfield Road, Maryland Heights (sic),

16  Ohio.  Do you see that?

17        A.    Yes.

18        Q.    So you actually nominated Dr. Laham as a

19  potential Fentora speaker?

20        A.    Yes.

21        Q.    And he was ultimately approved and you

22  used him in speaking events; right?

23        A.    Yes.

24        Q.    And if you can -- well, I'm going to set

1    that aside.  We might come back to that in a minute,

2    but -- can you tell me the exhibit number on that?

3                    MS. JAIN:  18.

4           Q.    (By Mr. Faes)  18?  Thank you.  So this is

5    a document that I will mark as Exhibit Number 19.

6                    [Exhibit Teva-Kaisen-019

7                    marked for identification.]

8           Q.    And this is a document labeled GTE Actiq

9    RMP initial off-label prescriber listing dated July of

10   2008.  Do you see that?

11          A.    I do, but it's GPE, and I don't know what

12   that stands for.

13          Q.    Okay.  But this -- what it appears to be

14   is a list of providers that have prescribed Actiq

15   off-label in the past; right?

16                   MR. MAIER:  Objection.  Foundation.

17          A.    Yes.

18          Q.    (By Mr. Faes)  And if you turn to the

19   second page of this document, and do you see the second

20   column that Dr. Riad Laham is listed on this document

21   as a doctor who has prescribed Actiq off-label in the

22   past?  Right?

23          A.    Yes.

24          Q.    So it would be true then that in

1    accordance with guidance you got from the company, the

2    company's knowledge that a physician had prescribed

3    either Actiq or Fentora off-label in the past would not

4    necessarily disqualify that physician for being a

5    potential speaker for those two products; right?

6          A.    I don't have an answer to that.  I wasn't

7    privy to that decision.

8          Q.    So your answer is that you don't know, you

9    weren't privy to that decision?  Is that accurate?

10         A.    I nominate, they decide.

11         Q.    So you would agree with me then that if

12   anyone at the company had ever told you that you

13   shouldn't nominate or use a speaker for Actiq or

14   Fentora if you knew that that person had prescribed

15   off-label in the past, you would have followed that

16   directive from your superiors; right?

17               MR. MAIER:  Objection.  Form.

18         A.    Yes.

19         Q.    (By Mr. Faes)  And we can agree that

20   Dr. -- since Dr. Laham was ultimately approved by your

21   superiors to be a Fentora speaker and they had this

22   data, they must have been okay with the fact that he

23   had prescribed Actiq off-label in the past --

24               MR. MAIER:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    (By Mr. Faes)   -- and that that didn't

 2     disqualify him from being a potential Fentora speaker;

 3     right?

 4                  MR. MAIER:  Objection.  Form, foundation.

 5            A.    Yes.

 6            Q.    (By Mr. Faes)  Can I have you look back at

 7     the previous exhibit, which was Exhibit Number 18?  So

 8     if you look at the second page of this document, it

 9     starts at the top.  It says for your reference, the

10     list of current hcpConnect speakers is below.  Do you

11     see that?

12            A.    Uh-huh.

13            Q.    And if you look about in the middle of the

14     page, you see a Dr.  Steve Simon from Leawood, Kansas;

15     right?

16            A.    Yes.

17            Q.    So at this time in 2015, Dr. Simon was

18     already an approved speaker for Fentora by the company;

19     right?

20            A.    Yes.

21            Q.    And you actually used Dr. Steve Simon in

22     your territory to give speaker programs throughout the

23     years for both Fentora and Actiq; right?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And you were aware that -- were you aware

2   that Dr. Steven Simon had actually been a --

3      A.    Can we strike that?  I don't remember on

4   Actiq or Fentora.  I remember I used him, but I'm not

5   sure which product or both.  I'm not sure.  But I did

6   use him, yes.

7      Q.    But you know he was an approved speaker

8   for both Actiq and Fentora; right?

9      A.    Yes.

10         MR. MAIER:  Objection.  Form.

11      Q.    (By Mr. Faes)  And you know he gave

12   speaker programs throughout the company -- or strike

13   that.  You know that he gave speaker programs for both

14   Actiq and Fentora throughout various parts in the

15   United States for the company; right?

16      A.    Yes.

17         MR. MAIER:  Objection.  Foundation.

18      Q.    (By Mr. Faes)  And you're not saying that

19   you didn't use Steven Simon in your territory?  You're

20   just saying you can't remember one way or the other as

21   you sit here today; right?

22      A.    I did use him in my territory.  I just

23   can't remember if it was Fentora or Actiq or both.

24      Q.    (By Mr. Faes)  Okay.  So what you're

Highly Confidential - Subject to Further Confidentiality Review

1    saying is you might have used him for Actiq -- strike

2    that.  You might have used him for Actiq or Fentora or

3    both?  You just can't remember one way or the other as

4    you sit here today what you used him for; right?

5         A.    Yes.  Right.

6         Q.    So I'm going to hand you what's been

7    marked as Exhibit Number 20 to your deposition.

8              [Exhibit Teva-Kaisen-020

9              marked for identification.]

10        Q.    Sorry.  That's his.  That's yours.  So

11   many pieces of paper floating around.  So Exhibit

12   twenty --

13        A.    I already saw that.

14        Q.    So Exhibit Number 20 is an e-mail from

15   Philip Tocco to you.

16        A.    Uh-huh.

17        Q.    And a Frank Mazzucco dated September 19th

18   of 2006; right?

19        A.    Yes.

20        Q.    And the subject line is opportunity;

21   right?

22        A.    Yes.

23        Q.    And this is an e-mail that would have been

24   received by you; right?

1      A.    Yes.

2      Q.    And it states, hey, team.  I wanted to

3  share a great and rare opportunity with you.  Dr. Simon

4  will be able to conduct Fentora programs made during

5  the Fentora launch.  As you know, Dr. Simon is

6  currently capped at the current time.  An exception has

7  been made for the remainder of the year pending the

8  approval of Fentora.  Dr. Simon will be available for

9  an extra 25K in talks beginning at launch and ending

10  December 31st.  After this date, his total cap will

11  return to 100K as before.  Do you see that?

12      A.    Yes.

13      Q.    So this reflects that someone at the

14  company is sending you an e-mail indicating that Dr.

15  Simon is a approved speaker that you might want to

16  consider to give talks about the Fentora product which

17  is about to launch at this time; right?

18      A.    Yes.

19            MR. MAIER:  Objection.  Form, foundation.

20      Q.    (By Mr. Faes)  And this indicates that he

21  generally has a cap of $100,000 a year.  Is that your

22  understanding from reading this?

23            MR. MAIER:  Objection.  Foundation.

24      A.    Yes.

Highly Confidential – Subject to Further Confidentiality Review

1    Q.    (By Mr. Faes)  And it appears that he --

2    did you understand -- strike that.  Did you understand

3    when you worked at Cephalon that the company generally

4    had a policy not to pay speakers for any product more

5    than $100,000 in a single year?

6    A.    Yes.

7    Q.    And it looks like they're making an

8    exception in this case because Dr. Simon is close to

9    that $100,000 cap, so they're approving him for an

10   extra $25,000 for the -- through the end of the year

11   for the launch of Fentora; right?

12          MR. MAIER:  Objection.  Foundation.

13   A.    Yes.

14   Q.    (By Mr. Faes)  So that would indicate that

15   he had actually done quite a few speaker programs for

16   Cephalon at this time if he's already at or approaching

17   his $100,000 cap; right?

18          MR. MAIER:  Objection.  Form.

19   A.    If you say so.

20   Q.    (By Mr. Faes)  And if you go to the final

21   sentence, this states that since time and money may be

22   limited during the launch, I can say that Dr. Simon is

23   quite good at conducting teleconferences, so that might

24   be a great way of maximizing the use of Dr. Simon.  Do

1    you see that?

2         A.    I do.

3         Q.    So this is direction from Mr. Philip Tocco

4    at the company essentially endorsing Dr. Simon as a

5    person who's good for conducting teleconferences on the

6    Fentora product; right?

7              MR. MAIER:  Objection.  Form.

8         A.    Yes.

9         Q.    (By Mr. Faes)  And he's recommending that

10   you strongly consider using Dr. Simon for Fentora

11   speaking programs in your territory or he wouldn't have

12   sent it to you; right?

13             MR. MAIER:  Objection.  Form, foundation.

14        A.    He's just saying FYI.  David Hennecke is

15   the one that's saying it's a good opportunity.

16        Q.    (By Mr. Faes)  But that's the message that

17   you would have received from the company upon getting

18   this e-mail --

19        A.    Yes.

20        Q.    -- is that the company thought it was a

21   good idea to use Dr. Simon for tele -- for a

22   teleconference to do a speaker program for the Fentora

23   launch; right?

24             MR. MAIER:  Objection.  Form, foundation.

1      A.    Yes.  I just wanted to qualify that you

2  said that Phil Tocco had said that was a great and rare

3  opportunity when it was really David Hennecke.

4      Q.    (By Mr. Faes)  Right.  He just forwarded

5  it --

6      A.    Yes.

7      Q.    -- and it was David Hennecke that sent

8  the initial e-mail; right?

9      A.    Yes.

10      Q.    Who was David Hennecke?

11      A.    I don't know what he was at that time.

12  Manager or -- maybe manager or -- I forget what they

13  call them.  Managed care person.  I'm not sure.  I

14  don't remember.

15      Q.    So during your time using Dr. Simon as a

16  speaker for products within your territory, did you

17  come to learn that prior to becoming a medical doctor,

18  he had actually been a pharmacist?

19      A.    I did not know that.

20      Q.    And did you know that prior to becoming a

21  pharmacist -- strike that.  Did you know that prior to

22  becoming a doctor when he was a pharmacist in Kansas

23  City, he actually pled guilty to a felony of

24  intentionally distributing controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No idea.

 2          Q.    I'm going to hand you what's been marked

 3   as Exhibit Number 21 to your deposition.

 4                [Exhibit Teva-Kaisen-021

 5                marked for identification.]

 6          Q.    And as you can see from the top, this is a

 7   document --

 8          A.    Wow.

 9          Q.     -- that indicates it's the State Board of

10   Pharmacy versus Steve Simon and it's got a stamp of

11   November 6th of 1975 at the top.  Do you see that?

12          A.    Okay.  Yeah.

13          Q.    And the complaint states that -- well, and

14   it's versus Steve Simon, who's from Kansas City; right?

15          A.    Right.

16          Q.    And it's the -- Number 3 of the complaint

17   states that the respondent was found guilty in the

18   United States District Court for the Western District

19   of Missouri on December 8th, 1975, of the offense of --

20          A.    Wow.

21          Q.     -- knowingly and intentionally

22   distributing controlled substances; right?

23          A.    Wow.  Wow.

24          Q.    And if you turn -- well, strike that.
```

1    So -- and if you see the -- at the bottom of the page,

2    of the same page, it notes that the State Board of

3    Pharmacy has determined that the conviction constitutes

4    unprofessional conduct under the provisions of Section

5    338.055, RSMo 1969, which provides in part the

6    following specifications shall be deemed unprofessional

7    or dishonorable conduct within the meaning of this

8    section.  Conviction of a felony.  Do you see that?

9         A.    Yeah.

10        Q.    So apparently Dr. Steve Simon is a

11   convicted felon; right?

12        A.    Wow.

13             MR. MAIER:  Objection.  Foundation.  Form.

14        A.    Yes.

15        Q.    (By Mr. Faes)  And we saw from documents

16   we looked at earlier that as early as 2006, the

17   company -- people at the company were recommending that

18   you use him as a potential speaker in your territory;

19   right?  He was on an approved list provided by the

20   company; right?

21        A.    Yes.

22             MR. MAIER:  Objection.  Form.

23        Q.    (By Mr. Faes)  And you had an expectation

24   that if the company was sending you around an approved

1    list of speakers, the company would have done their due

2    diligence in making sure that those people were

3    appropriate speakers for the promotion of Fentora;

4    right?

5         A.    Yes.

6         Q.    And you would never expect that the

7    company would put somebody on that list who was a

8    convicted felon; right?

9              MR. MAIER:  Objection.  Form.

10        A.    Are you asking me right or yes or no?  I

11   would never have expected the company.  So rephrase

12   your question.  The --

13        Q.    (By Mr. Faes)  You never -- my question

14   is, you never expected that the company would put

15   someone on the approved speaker list who was a

16   convicted felon; right?

17             MR. MAIER:  Objection.  Form.

18        A.    True.

19        Q.    (By Mr. Faes)  And certainly not one who

20   was convicted of intentionally distributing controlled

21   substances; right?

22        A.    True.

23             MR. MAIER:  Objection.  Form.

24        Q.    (By Mr. Faes)  Which is the very type of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    product that Fentora and Actiq is; right?

 2         A.    Yes.

 3               MR. MAIER:  Objection.  Form.

 4         Q.    (By Mr. Faes)  They're both controlled

 5    substances?  If someone at the company had told you

 6    that, you certainly wouldn't have used him as a speaker

 7    in your territory; right?

 8         A.    Never.

 9               MR. MAIER:  Objection.  Form.

10         Q.    (By Mr. Faes)  And you relied on the

11    company to check that out for you?  You understood that

12    there were other people in the company who were

13    supposed to vet and make sure that the people that went

14    on that list were appropriate; right?

15         A.    Yes.

16         Q.    Do you feel duped that the company

17    provided you a list that had a convicted felon who pled

18    guilty to intentionally distributing controlled

19    substances on that list?

20               MR. MAIER:  Objection.  Form.

21         A.    I don't like the word duped, but I don't

22    like it.  Wow.

23         Q.    (By Mr. Faes)  Now, remember -- hold on

24    just a sec.  Now, remember we were looking back earlier
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in the day at a list of speakers that -- speaker

 2    programs that you conducted in your territory in 2002;

 3    right?

 4         A.    Yes.

 5         Q.    And one of the speakers that you used I

 6    think at least three times was a Dr. James Bressi?

 7         A.    Yes.

 8         Q.    You did use him three times; right?

 9         A.    Okay.

10         Q.    You can look back at the exhibit if you

11    need to, but --

12         A.    If you say so, yes.

13         Q.    Do you want to look at the exhibit again,

14    or --

15         A.    No.

16         Q.    So you used Dr. Bressi at least three

17    times to promote Actiq in your territory in 2002;

18    right?

19         A.    Yes.

20         Q.    Do you recall how many times you did use

21    him?

22         A.    No.

23         Q.    I'm going to hand you what's been marked

24    as Exhibit Number 22 to your deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    [Exhibit Teva-Kaisen-022

 2                    marked for identification.]

 3          Q.    There you go.  And this is a document from

    the Akron Beacon Journal, ohio.com.  Do you see that?

 5          A.    I do.

 6          Q.    And the headlight is Stow pain clinic

 7    closing after court upholds sexual imposition

 8    conviction against doctor accused of abusing patients.

 9    Do you see that?

10          A.    I do.

11          Q.    And it says Summit Pain Specialists in

12    Stow is permanently closing Monday after years of

13    wrangling over a sex abuse scandal involving a doctor

14    there.  Do you see that?

15          A.    I do.

16          Q.    And it says in the second paragraph the

17    Ohio Supreme Court on August 3rd upheld the Summit

18    County Common Pleas Court conviction of former doctor

19    James Bressi, who once co-owned the business doctor --

20    with former doctor Robert Stephen Geiger.  Do you see

21    that?

22          A.    Yes.

23          Q.    And that appears to be the same Dr. James

24    Bressi that you used as a speaker for Actiq at one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    point; right?

 2         A.    Yes.

 3         Q.    And it goes on to state that the clinic's

 4    troubles started in 2001, when patients began calling

 5    the Stow police reporting that they had been sexually

 6    abused by Bressi inside the pain clinic.  Do you see

 7    that?

 8         A.    You said 2001.

 9         Q.    Huh?

10         A.    You mean 2012?

11         Q.    Yes, I do.  And it states that the

12    clinic's trouble started in 2012, when patients began

13    calling Stow police reporting that they had been

14    sexually abused by Bressi inside the pain clinic;

15    right?

16         A.    I see it.

17         Q.    Did you ever see anything unusual or out

18    of the ordinary when you called on Dr. Bressi's office?

19              MR. MAIER:  Objection.  Form.

20         A.    No.

21         Q.    (By Mr. Faes)  And you certainly would

22    have never used Dr. Bressi if you thought he was the

23    type of doctor -- strike that.  You certainly would

24    have never used Dr. Bressi as a Cephalon speaker if you
```

Highly Confidential - Subject to Further Confidentiality Review

1 had known that he was sexually abusing patients inside

2 his office; right?

3              MR. MAIER:  Objection.  Form.

4       A.    This was 2016.  When I used him it was

5 prior to this.

6       Q.    (By Mr. Faes)  Right.  And you never would

7 have used him if you knew anything like that was going

8 on; right?

9              MR. MAIER:  Objection.  Form.

10      A.    True.  It's a different time period.

11      Q.    (By Mr. Faes)  So you can set that

12 document aside.  Now, during your time as a rep for

13 Cephalon detailing Actiq and Fentora, you would have

14 called on a Dr. -- would you have called on a Dr.

15 Gregory Gerber?

16      A.    Yes.

17      Q.    G-E-R-B-E-R.  What do you remember about

18 Dr. Gerber?

19      A.    Pain management out in Sandusky, married

20 to a pharmacist, and had a special needs daughter.

21      Q.    What do you remember about the nature of

22 his practice?

23      A.    Pain management.

24      Q.    So he was a pain management doctor?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Uh-huh.

2        Q.      What do you remember about the kinds of

3   patients that he saw?

4                MR. MAIER:  Objection.  Form.

5        A.      Pain management patients.

6        Q.      (By Mr. Faes)  Do you remember seeing

7   anything unusual or out of the ordinary when you

8   visited Dr. Gerber's office?

9        A.      No.

10               MR. MAIER:  Objection.  Form.

11       Q.      (By Mr. Faes)  Do you remember anything

12  you ever saw in Dr. Gerber's office that would cause

13  you to suspect there were any diversion of opioids

14  taking place?

15               MR. MAIER:  Objection.  Form.

16       A.      No.

17       Q.      (By Mr. Faes)  And you would have called

18  on Gerber a number of times; right?

19       A.      Off and on for the years.

20       Q.      And he would have been one of the top

21  prescribers in your territory at one time; right?

22               MR. MAIER:  Objection.  Form.

23       A.      For --

24       Q.      (By Mr. Faes)  For Fentora.
```

```
 1                    MR. MAIER:  Same objection.

 2          A.    I don't remember if he was one of the top

 3    or the top or whatever while I was detailing him.

 4          Q.    (By Mr. Faes)  Okay.  Well, I'm going to

 5    hand you what's been marked as Exhibit Number 23 to

 6    your deposi -- that's my copy.  I'm going to hand you

 7    what's been marked as Exhibit Number 23 to your

 8    deposition.

 9                    [Exhibit Teva-Kaisen-023

10                    marked for identification.]

11                    MR. FAES:  And this is 22 for you, Mike.

12          A.    Okay.

13          Q.    (By Mr. Faes)  And these are your call

14    notes or call log.

15          A.    Uh-huh.

16          Q.    Whichever you prefer.  Would you call

17    these your call notes or call logs?

18          A.    They're not notes, so I guess they would

19    be logs.

20          Q.    So these are your call logs to Dr. Gregory

21    Gerber --

22          A.    Uh-huh.

23          Q.    -- from July 18th of 2007 to November

24    28th of 2016.  Do you see that?  Take your time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Thank you.  12.  12.  What?  12.  What?
 2    Yeah, but I didn't have him the whole time.  13.  14.
 3          Q.    Sure.  And actually, if you look on the
 4    first page, it looks like there's a gap between
 5    December 5th of 2008 and July 14th of 2011.  Do you see
 6    that?
 7          A.    I do.  Thank you.
 8          Q.    And that's because during that time he
 9    wasn't your responsibility; right?
10          A.    Yes.
11          Q.    He was assigned to another sales
12    representative.  I think her name was Nicole Reese.
13    Does that sound right?
14          A.    Yes.
15          Q.    At any rate, you can count these up if you
16    want to, but I count that you made 76 calls to his
17    office in this time frame between July 18th of 2007 and
18    November 28th of 2016.  Do you have any reason to
19    dispute that?
20          A.    No.
21          Q.    I'm going to hand you what's been marked
22    as Exhibit Number 24 to your deposition.
23                [Exhibit Teva-Kaisen-024
24                marked for identification.]
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FAES:  I think this is 22.5 for you,
 2   Mike.
 3        Q.   (By Mr. Faes)  So this is an e-mail and
 4   attachment from Michael Morreale to you and others
 5   dated June 5th of 2012.  Do you see that?
 6        A.   Yeah.
 7        Q.   So this would have been an e-mail that you
 8   would have received; right?
 9        A.   Yes.
10        Q.   And it says a list -- here is a list of
11   physicians sorted by the stop Subsys writers based on
12   the last 26-week period.  I also included Fentora and
13   Abstral and plan on sending another report sorted by
14   the top Abstral writers.  Let's make sure we are
15   following up with these physicians to remind them why
16   Fentora is the best TIRF on the market.  Do you see
17   that?
18        A.   Yes.
19        Q.   And these other products -- Subsys and
20   Abstral -- those would be other rapid onset fentanyl
21   products that would be kind of competitors to Fentora;
22   right?
23        A.   Yes.
24        Q.   And this would have been in June of 2012
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    while you would have been responsible for calling on

 2    Dr. Gerber; right?

 3          A.    Okay.

 4          Q.    And in fact, if you want to look back at

 5    your call notes, you've got three calls in May of 2012

 6    and two in June of 2012 to Dr. Gerber; right?

 7          A.    Okay.  June.  June.  June 2012.  Yes.

 8          Q.    And so if you can turn to the last page of

 9    this document.

10          A.    This one?

11          Q.    Yes, the Exhibit Number --

12          A.    Okay.

13          Q.    What exhibit is that?

14                MR. BERG:  24.

15          A.    Thank you.

16          Q.    (By Mr. Faes)  If you can turn to the last

17    page of Exhibit Number 24 for me.

18          A.    Yeah.

19          Q.    And you can see actually the very first

20    line of this is sales rep name Valerie Kaisen, Gerber,

21    Gregory, and it looks like his weekly product TRx

22    total, which would be prescription total at this time,

23    was 41; right?

24          A.    Wow.  Yeah.
```

1        Q.    So that would indicate that he was one of

2    the higher prescribers of Fentora at this time; right?

3        A.    Yes.

4              MR. MAIER:  Objection.  Form, foundation.

5        Q.    (By Mr. Faes)  And you'd agree with me

6    that you wouldn't be looking -- it wouldn't be your

7    job -- it wouldn't be your job to look at this report

8    or any other report for signs that a prescriber's

9    orders were suspicious; right?

10             MR. MAIER:  Objection.  Form.

11       A.    Right.

12       Q.    (By Mr. Faes)  That would be someone

13   else's job at the company; right?

14       A.    Right.

15       Q.    And you would be relying on others at the

16   company for that; right?

17       A.    Repeat your question.  I'm sorry.  I'm

18   getting a little --

19       Q.    You would be relying on others at the

20   company to look at reports of prescriptions or sales or

21   distribution for signs that a prescriber's orders were

22   suspicious; right?

23       A.    Yes.

24             MR. MAIER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    (By Mr. Faes)  That was somebody else's

2  responsibility; right?

3      A.    Yes.

4      Q.    And you relied on other people at the

5  company to make sure that that was getting done; right?

6            MR. MAIER:  Objection.  Form.

7      A.    Yes.

8      Q.    (By Mr. Faes)  And if someone told you

9  that has a prescriber's orders were suspicious or

10  indicative of potential diversion, you wouldn't call on

11  that physician anymore; right?

12      A.    Yes.

13            MR. MAIER:  Objection.  Form.

14      Q.    (By Mr. Faes)  And nobody ever told you

15  that with regard to Dr. Gerber; right?

16      A.    No.

17      Q.    I'm going to hand you what's been marked

18  as Exhibit Number 25 to your deposition.

19            [Exhibit Teva-Kaisen-025

20            marked for identification.]

21      Q.    That's yours.  You gave him the wrong copy

22  again.  So this is a press release from the Department

23  of Justice dated August 22nd of 2018.  Do you see that?

24      A.    Yeah.  I'm seeing -- yeah.

```
1          Q.    And the headline is Justice Department

2    takes first-of-its-kind legal action to reduce opioid

3    over-prescription.  Do you see that?

4          A.    Yes.

5          Q.    And it states the Justice Department has

6    filed a complaint to bar two Ohio doctors from

7    prescribing medications after an investigation revealed

8    that they recklessly and unnecessarily distributed

9    painkillers and other drugs.  Temporary restraining

10   orders, a first of its kind against doctors allegedly

11   prescribing opioids under the Controlled Substances

12   Act, were served this week that prevent -- that forbid

13   Michael P.  Tricaso, D.O., of Akron, and Gregory J.

14   Gerber, M.D., of Sandusky from writing prescriptions.

15   Do you see that?

16         A.    I do.

17         Q.    Were you aware that the Department of

18   Justice filed a complaint and got a temporary

19   restraining order preventing Dr. Gerber from writing

20   prescriptions in 2018?

21         A.    No.

22         Q.    If you go down to the second-to-last

23   paragraph, the press release states these doctors were

24   simply drug dealers in white lab coats, said U.S.
```

```
 1    Attorney Justin Herdman.  They illegally prescribed
 2    painkillers and other drugs for no legitimate medical
 3    purpose.  Putting so-called physicians like these out
 4    of business is one of several steps we are taking to
 5    turn the tide on opioid and drug crisis that has caused
 6    so much death and heartbreak in our community.  Do you
 7    see that?
 8         A.    I do.
 9         Q.    After having read this and becoming aware
10    of this, do you wish someone at Teva had found -- had
11    reviewed Dr. Gerber's reports of ordering and Fentora
12    and if they found it to be suspicious reported that to
13    you?
14               MR. MAIER:  Objection.  Form, foundation.
15         A.    I wasn't here at the time, but if there
16    was anything suspicious, yes.  I was not working at the
17    company at this time.
18         Q.    (By Mr. Faes)  If you turn to the second
19    page of this.  It states that Gerber in October of 2017
20    began seeing an undercover federal agent.  The
21    undercover agent did not complain of pain during each
22    of their six visits and Gerber received a minimal
23    medical examination, but each time Gerber prescribed
24    controlled substances for the undercover agent,
```

 1    including oxycodone, dronabinol, and alprazolam.  Do

 2    you see that?

 3         A.    I do.

 4         Q.    You'd agree with me that you wouldn't want

 5    to call on a doctor that would knowingly prescribe a

 6    opioid narcotic to someone who didn't have an

 7    underlying necessary medical condition with a minimal

 8    medical examination; right?

 9              MR. MAIER:  Objection.  Form, foundation.

10         A.    I would want to know -- your question

11    needs to be a little more directed.  I would not -- I

12    would want to know.  There's several parts to your

13    question.

14         Q.    (By Mr. Faes)  You're right.  It's a bad

15    question.  Let me try to ask a better one.  You'd agree

16    with me that you wouldn't want to call on a doctor

17    who's illegally prescribing a narcotic to a person who

18    doesn't need it; right?

19         A.    Yes.

20         Q.    And I understand that this event that's

21    being reported in here was in October of 2017, but you

22    last called on Dr. Gerber on November 28th of 2016;

23    right?

24         A.    Okay.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And if you look in the paragraph above

2    this, it looks like some of Dr. Gerber's conduct

3    occurred during the time that you called on him between

4    2013 and 2016.  States Dr. Gerber operated Gregory

5    Gerber, M.D., LLC, from 2819 Hayes Avenue, Suite 4,

6    Sandusky.  Gerber received $175,000 between 2013 and

7    2016 from Insys Therapeutics, Inc., to promote Subsys,

8    a liquid formulation of fentanyl applied under the

9    tongue, a spray used to treat cancer-related pain.  Do

10    you see that?

11      A.    I do.

12      Q.    And that was a product that he was also

13    prescribing according to the exhibit we looked at where

14    he was prescribing 41 Fentora prescriptions a week;

15    right?  He was also prescribing 13 -- writing 2013

16    Subsys prescriptions at that time a week; right?

17              MR. MAIER:  Objection.  Form, foundation.

18      A.    Okay.

19      Q.    (By Mr. Faes)  And so if we look back at

20    Exhibit Number 23, which are your call notes to Dr.

21    Gerber.  Call log to Dr. Gerber.

22              MR. FAES:  I think it's 22 for you, Mike.

23      Q.    (By Mr. Faes)  You noticed that on this

24    particular document, you didn't have the discretion to

Highly Confidential - Subject to Further Confidentiality Review

1   put in any call comments at this time like you were

2   able to prior to 2006 with the other call notes that we

3   looked at earlier today; right?

4        A.    Yes.

5              MR. FAES:  And can we put up Exhibit 3 and

6   Exhibit 23 up side-by-side, which I think is that one

7   and 7.1, Mike?

8        Q.    (By Mr. Faes)  So if we look at Exhibit

9   Number 3 on the left, you can see that at that time

10  prior to 2006 you had the ability to put in call

11  comments detailing at least some of what occurred

12  during your actual calls; right?

13       A.    I can't really see that.  This is all Dr.

14  Bressi.

15       Q.    Right, but my question is, at this time in

16  2001 and continuing on --

17       A.    Okay.

18       Q.    -- until about 2006 or 2007, you had the

19  ability to write comments in detailing what had

20  actually occurred on your visits; right?

21       A.    Yes.

22       Q.    And by the time you were seeing Dr. Gerber

23  on Exhibit 23 on the right, you didn't have that

24  ability; right?

```
 1          A.    Right.

 2          Q.    So we would have no way of knowing what

 3   went on during those 76 calls because the company took

 4   away your discretion and your ability to put in a

 5   comment of what occurred on those calls; right?

 6          A.    Yes.

 7                MR. MAIER:  Objection.  Form.

 8          Q.    (By Mr. Faes)  So I'm going to switch

 9   gears a little bit here.  And we'll kind of go back to

10   Fentora.  At some point during your time with Cephalon

11   and later Teva, you became aware that the company was

12   seeking an expanded indication for the Fentora product;

13   right?

14          A.    Yes.

15          Q.    You were aware that they had at least

16   asked the FDA for the indication of being able to

17   use -- excuse me -- being able to use Fentora for

18   breakthrough pain in patients without cancer, where it

19   was currently only indicated for patients with cancer;

20   right?

21          A.    Yes.

22          Q.    And you actually received -- well, strike

23   that.  And you're aware that the FDA ultimately never

24   gave Cephalon or Teva permission to promote or sell
```

1    Fentora for noncancer pain; right?

2            A.    Yes.

3                  MR. MAIER:  Objection.  Foundation.

4            Q.    (By Mr. Faes)  And you would have actually

5    received training and instruction from the company on

6    how to deal with questions from doctors such as can

7    Fentora be used in noncancer-related breakthrough pain;

8    right?

9            A.    Yes.

10           Q.    I'm going to hand you what's been marked

11   as Exhibit Number 26 to your deposition.

12                 [Exhibit Teva-Kaisen-026

13                 marked for identification.]

14                 MR. FAES:  This is 24, Mike.  Yeah, you

15   got it.

16           Q.    (By Mr. Faes)  And this is a document

17   titled sales training and development, frequently asked

18   questions, FAQs, and responses.  Do you see that?

19           A.    Yes.

20           Q.    And you see down at the bottom it's

21   labeled FEN-2232, February 2011; right?

22           A.    Yes.

23           Q.    So this would have been an approved

24   training material that would have been in effect at the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   company as of February of 2011; right?

 2              MR. MAIER:  Objection.  Form, foundation.

 3        A.    Yes.

 4        Q.    (By Mr. Faes)  If you can turn to Page 5

 5   at this -- of this document.  Under Question 5, it

 6   gives a model question and an ACT targeted response;

 7   right?

 8        A.    Yes.

 9        Q.    And the model question is can Fentora be

10   used in noncancer-related breakthrough pain; right?

11        A.    Yes.

12        Q.    And the targeted response is Fentora is

13   only indicated in breakthrough pain for opioid-tolerant

14   patients with cancer.  I can fill out a medical

15   information request form, MIRF, if you have other --

16   questions about other types of pain; right?

17        A.    Yes.

18        Q.    And that's the response that you were

19   trained on by the company; right?

20        A.    Yes.

21        Q.    That's the response you were trained to

22   give?

23        A.    (Nodding "yes.")

24        Q.    And the company limited you to respond in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this manner; right?

 2         A.    Yes.

 3         Q.    You wouldn't try to dissuade the doctor

 4    from prescribing it for noncancer-related breakthrough

 5    pain other than to repeat this targeted response

 6    reiterating the indication; right?

 7         A.    Yes.

 8               MR. MAIER:  Objection.  Form.

 9         Q.    (By Mr. Faes)  You wouldn't, for example,

10    tell the physician that -- for example, that the

11    company had actually asked the FDA for that indication

12    that he's asking about, but the FDA had told Cephalon

13    and the company no, they couldn't sell it for that

14    indication because they had serious concerns about

15    misuse, abuse, overdose, and addiction; right?

16               MR. MAIER:  Objection.  Form, foundation.

17         A.    I would never have said that.

18         Q.    (By Mr. Faes)  Right.  That's not a

19    response you were trained to give; right?

20         A.    No.

21         Q.    You would have limited your response to

22    the targeted response that's listed on this document;

23    right?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And it would be true if the doctor tried

2   to engage you further you would essentially have to say

3   look, Doctor.  That's beyond my pay grade.  I can fill

4   out a MIRF or I can direct you to the medical affairs

5   department; right?

6             MR. MAIER:  Objection.  Form, foundation.

7      A.    Yes.  Something like that.

8      Q.    (By Mr. Faes)  Right.  So this medical --

9   the response includes that you can fill out a medical

10  information request form, or a MIRF, if the doctor has

11  other -- questions about other types of pain; right?

12     A.    Yes.

13     Q.    And that MIRF request could trigger the

14  company to potentially send the doctor an article or a

15  reprint of a study where Fentora or Actiq was used

16  outside of the approved indication for

17  noncancer-related breakthrough pain; right?

18     A.    Yes.

19            MR. MAIER:  Objection.  Form, foundation.

20     Q.    (By Mr. Faes)  And you were trained in

21  fact that you couldn't submit too many MIRFs or medical

22  information requests?  In fact, you couldn't -- they

23  told you you couldn't over-MIRF; right?

24            MR. MAIER:  Objection.  Form, foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't remember.

 2        Q.    (By Mr. Faes)  Okay.  Let me hand you

 3   what's been marked as Exhibit Number 27 to your

 4   deposition.

 5              [Exhibit Teva-Kaisen-027

 6              marked for identification.]

 7              MR. FAES:  I'm skipping one, Mike.

 8        Q.    (By Mr. Faes)  So this is a document

 9   titled sales bulletin, and it's to all sales -- all

10   field sales personnel, dated July 19th of 2007; right?

11        A.    Yes.

12        Q.    And so this would have been a document

13   received by you because you would have been a field

14   salesperson in January 19th of 2007; right?

15        A.    Yes.

16        Q.    And if you turn to the second page of this

17   document, there's a section entitled model sales call

18   behaviors; right?

19        A.    Yes.

20        Q.    And under Number 2 there's a question and

21   answer, and the question is, should we still complete

22   MIRFs for off-label questions?  Is there a thing as

23   MIRFing too much?  Do you see that?

24        A.    Yes.
```

```
 1          Q.    And the model response is the direct --

 2   strike that.  The model response is representatives

 3   should definitely complete MIRFs for off-label

 4   questions.  This is the appropriate vehicle for

 5   responding when a physician asks a question regarding

 6   an off-label use of one of Cephalon products.  There is

 7   no thing -- no such thing as MIRFing too much.  Do you

 8   see that?

 9          A.    Yes.

10          Q.    And this is training that you would have

11   received from Cephalon; right?

12          A.    Yes.

13          Q.    And you would have followed their

14   instructions; right?

15          A.    Yes.

16          Q.    And so you were trained and told that

17   there was no such thing as MIRFing too much; right?

18          A.    Yes.

19          Q.    And earlier in the day you remember we

20   were talking about Cephalon speaker programs?  Do you

21   remember that?

22          A.    Yes.

23          Q.    Can you turn to Page 5 of this document

24   ending in 3852?  The page numbers are in the upper
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    left-hand corner.

 2          A.    Bottom?

 3          Q.    Confused.  Yeah, just give him a second.

 4          A.    No, I mean the bottom.

 5          Q.    Looking at Number 6.  So on the bottom of

 6    Page 5, one of -- there's another model question and

 7    model answer, right, that you were trained on?

 8          A.    (Nodding "yes.")

 9          Q.    And the question is, is it a compliance

10    violation if an attendee brings up off-label

11    discussions --

12          A.    Uh-huh.

13          Q.      -- questions during a CSP, or Cephalon

14    speaker program?  Is the sales representative required

15    to stop the discussion?  Do you see that?

16          A.    Yes.

17          Q.    And the answer is speakers are permitted

18    to respond to off-label questions, but only at the end

19    of a Cephalon speaker program during the Q & A portion

20    of the program.  Accordingly, such questions should be

21    deferred by the Cephalon speaker program speaker to the

22    end of the program and should not be answered --

23    addressed during the 20-minute on-label presentation.

24    Did I read that correctly?
```

Highly Confidential - Subject to Further Confidentiality Review

 1     A.    Yes.

 2     Q.    And that is consistent and is actually

 3  training and instructions you got from your superiors

 4  at the time; right?

 5     A.    Yes.

 6     Q.    So it was in fact true that doctors

 7  sometimes did and could ask questions about off-label

 8  use of Actiq or Fentora following a Cephalon speaker

 9  program; right?

10     A.    When the speaker was finished.

11     Q.    Right.  So this was one way that a -- that

12  the company could get within the confines of the law

13  information regarding off-label use of the Actiq or the

14  Fentora products to physicians; right?

15           MR. MAIER:  Objection.  Form, foundation.

16     A.    My understanding of that was to separate

17  medical -- sales -- medical from sales or whatever it

18  was.  The speaker being the medical and the questions

19  were separate, not --

20     Q.    (By Mr. Faes)  Right.  I understand.

21     A.    Not to mix the two.

22     Q.    I understand.  At the end of the

23  program --

24     A.    Right.

```
 1        Q.      -- this was one way that the company

 2   could have a speaker that they hired talk about

 3   off-label use of Fentora or Actiq?  They could give a

 4   program and then they could answer questions about

 5   off-label use at the end of that program; right?

 6              MR. MAIER:  Objection.  Form.

 7        A.    If they were answering questions, yes.

 8        Q.    (By Mr. Faes)  And you were taught that

 9   that was perfectly legal; right?

10        A.    Yes.

11              MR. MAIER:  Objection.  Form.

12        Q.    (By Mr. Faes)  And it was -- since it was

13   within the confines of the law, it was Cephalon's

14   policy that that was allowed; right?

15        A.    Yes.

16              MR. MAIER:  Objection.  Form, foundation.

17        Q.    (By Mr. Faes)  I'm going to hand you

18   what's been marked as Exhibit Number 28 to your

19   deposition.

20              [Exhibit Teva-Kaisen-028

21              marked for identification.]

22        Q.    And this is another sales bulletin to --

23   and it's to PCS, which would be pain care

24   specialists --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     Uh-huh.

2        Q.     -- dated April 15th of 2008.  Do you see

3   that?

4        A.     Yeah.

5        Q.     And you were a pain care specialist --

6        A.     Yes.

7        Q.     -- at that time, right, so you would have

8   received this?

9        A.     Yes.

10        Q.     And the subject is WLF policy update.  Do

11   you see that?

12        A.     Uh-huh.

13        Q.     And it states this communication is being

14   sent to inform you of an update utilizing the WLF,

15   Washington Legal Foundation, reprints.  In order to

16   better manage our business within today's ever-changing

17   regulatory environment, it has been decided that the

18   distribution of all WLF reprints cease immediately and

19   all copies of these reprints in your possession should

20   be destroyed.  Do you see that?

21        A.     Yes.

22        Q.     Should your physicians have a question or

23   request information outside of the Fentora-approved

24   indication, these articles will only be available
```

Highly Confidential - Subject to Further Confidentiality Review

 1    through a medical affairs response via an unsolicited

 2    medical information request form or a MIRF; right?

 3         A.    Yes.

 4         Q.    So this is a communication that you would

 5    have received at this time; right?

 6         A.    Yes.

 7         Q.    And you would have followed it and done

 8    what the company instructed; right?

 9         A.    Yes.

10         Q.    And as we talked about earlier, these WLF

11    reprints -- that's the Washington Legal Foundation;

12    right?

13         A.    Uh-huh.

14         Q.    And those included articles that discussed

15    Actiq and Fentora in some off-label indications; right?

16              MR. MAIER:  Objection.  Form, foundation.

17         A.    I don't remember what was in each of the

18    reprints.

19         Q.    (By Mr. Faes)  Is it true that at least

20    some of the Washington Legal Foundation articles

21    included the use of Fentora and Actiq in off-label

22    indications?

23         A.    I don't remember.

24              MR. MAIER:  Objection.  Form, foundation.

```
 1          Q.    (By Mr. Faes)  But at least according to

 2    this document, since the direction is now that these

 3    articles will only be available through a MIRF request

 4    from April 15th of 2008 going forward, you would read

 5    that to mean that prior to that date you could

 6    distribute those or leave those behind without a MIRF

 7    request; right?

 8          A.    Yes.

 9                MR. MAIER:  Objection.  Form, foundation.

10          Q.    (By Mr. Faes)  I'm going to hand you

11    what's been marked as Exhibit Number 29 to your

12    deposition.

13                [Exhibit Teva-Kaisen-029

14                marked for identification.]

15          A.    This is too much for me right now.

16          Q.    We're on the homestretch.  Trust me.

17          A.    Yeah, because this is a lot for me right

18    now.

19          Q.    And this is an e-mail and attachment.  And

20    I don't really need you to look at the e-mail other

21    than to note that the beginning of the e-mail notes

22    that it's a Actiq promotional guidelines PowerPoint,

23    and it says that the PCS would have implemented this

24    algorithm throughout the Actiq lifecycle.  Do you see
```

1    that?

2        A.    Yes.  Thank you.

3        Q.    So at least according to this e-mail,

4    the -- this algorithm or decision tree that we're going

5    to look at was implemented by the pain care sales

6    force, which you were a member of, throughout the Actiq

7    lifecycle?

8            MR. MAIER:  Objection.  Form.

9        A.    I'm not sure.

10       Q.    (By Mr. Faes)  Okay.  Well, let's take a

11   look at it.  So I really only want to ask you about one

12   specific part of this, and this is the second-to-last

13   page.  And this is a decision tree and it starts at the

14   top, and for Actiq providers -- again, this is --

15   according to the e-mail is a decision tree utilized by

16   the pain sales care force (sic) throughout the Actiq

17   lifecycle.

18            It instructs the sales rep to open the

19   call with the following question.  Do you have the

20   potential to treat patients with cancer pain?  And if

21   you go to the right, if the physician responds no, it

22   goes down and instructs the rep to support by providing

23   Actiq safety and efficacy info, providing coupons and

24   welcome kits, and limiting calls to 12 times a year.

Highly Confidential - Subject to Further Confidentiality Review

1   Do you see that?

2        A.    I do.

3        Q.    Is that instruction that you would have

4   received when you were promoting Actiq during the

5   product lifecycle, that in response to the question, do

6   you treat patients with cancer pain, if the physician

7   responded no, you were still allowed to provide Actiq

8   coupons; right?

9             MR. MAIER:  Objection.  Form.

10       A.    I don't remember this, but this is

11  written.  Okay.

12       Q.    (By Mr. Faes)  Okay.  So well, independent

13  of this -- I'm just trying to refresh your memory.

14       A.    Okay.

15       Q.    Is it true that when you were promoting

16  Actiq during the product lifecycle --

17       A.    Uh-huh.

18       Q.    -- that you were trained that you could

19  ask the question or open the call with do you have the

20  potential to treat patients with cancer pain?

21       A.    Yes.

22       Q.    That was often how you started a call;

23  right?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And that was part of your training?

 2          A.    Yes.

 3          Q.    And you followed that training and did

 4    that quite often; right?

 5          A.    Yes.

 6          Q.    And then if the physician responds no, you

 7    could still provide that physician with Actiq coupons

 8    and a welcome kit; right?

 9          A.    Yes.

10          Q.    And if the physician responded no at that

11    time, you were told by the company that you could still

12    call on that physician up to 12 times a year; right?

13          A.    I don't remember that.

14          Q.    Do you have any reason to believe that

15    that's not true?

16          A.    No.

17          Q.    And if that is the company's instructions

18    that you could still call on a doctor that answered no

19    to that question, but you would -- you had to limit

20    your calls to 12 times a year, you would have followed

21    those instructions from the company; right?

22          A.    Yes.

23          Q.    So I'm going to hand you what's been

24    marked as Exhibit Number 30 to your deposition.
```

```
 1                    [Exhibit Teva-Kaisen-030

 2                    marked for identification.]

 3          Q.    And this is a PowerPoint and the title is

    passion for performance impact.  Do you see that?

 5          A.    I do.

 6          Q.    If you turn to the first page, this

 7   appears to be a Great Lakes -- a POA agenda for a Great

 8   Lakes meeting on June 7th and 8th of 2011.  Do you see

 9   that?

10          A.    Yes.

11          Q.    And it looks like your boss, Michael

12   Morreale, was leading a couple of the first sessions;

13   right?

14          A.    Yes.

15          Q.    And you were in the Great Lakes region at

16   this time reporting to Michael Morreale, so you would

17   have attended Great Lakes sales meetings; right?

18          A.    Yes.

19          Q.    Where did you usually have your Great

20   Lakes sales meeting?

21          A.    They were anywhere.  Anywhere within the

22   Great Lakes.

23          Q.    That's exactly what Ms. Gillenkirk says.

24   Nobody can remember where they met.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    They weren't exciting venues.  Trust me.

 2          Q.    Where would -- I mean, where would you all

 3    usually meet?  Just at a hotel or rent a conference

 4    room or something?

 5          A.    At a hotel in a city.  I think we even had

 6    one in Cleveland -- I'm not sure -- many years ago.

 7          Q.    Was there a city that you typically met

 8    in?

 9          A.    Cincinnati a lot.

10          Q.    Well, that's not very convenient for you.

11    Okay.  So turning to Page 4 of this document.  We've

12    got a slide titled top Fentora writers.

13          A.    We're not there yet.

14                MR. BERG:  Let's wait for it to come up.

15                MR. FAES:  I think it's July 24.  Uh-huh.

16    They're not labeled, but I handwrote on all of my pages

17    so I could tell him what page to go to.

18          A.    Okay.

19          Q.    (By Mr. Faes)  So this is a slide entitled

20    top Fentora writers, and this would have been

21    information that was presented at the meeting in 2011;

22    right?

23          A.    Yes.

24          Q.    And if you look at -- I think there's four
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    columns here that are yours, Valerie McGinley.  If I
2    can get Mike to highlight those.  The first two are the
3    fourth and fifth one from the top.
4         A.    Uh-huh.
5               MR. FAES:  Actually, if you can highlight
6    them rather than call it out, because we're going to
7    have to go above that.
8         Q.    (By Mr. Faes)  So at this time in 2011, as
9    presented at this meeting, you had four of the top
10   Fentora writers presented on this list, including the
11   third highest and the fourth highest in the entire
12   Great Lakes region; right?
13        A.    Yeah.
14        Q.    And your top prescriber was --
15        A.    I can't look.
16        Q.    -- Sami Moufawad.  Your second one was
17   Riad Laham.  Your third one down was Jack Rutkowski,
18   and your fourth one was Sandra Hazra.  Do you see that?
19        A.    Uh-huh.
20        Q.    So in at least one of your top four
21   prescribers, their primary specialty group is listed as
22   a primary care provider; right?
23        A.    Yes.
24        Q.    So at this time in 2011, one of the top
```

1    four prescribers that you had of Fentora was not an

2    oncologist or a pain specialist; he was a primary care

3    provider; right?

4         A.    Yes.

5              MR. MAIER:  Objection.  Form.

6         Q.    (By Mr. Faes)  And if you look at the

7    second column on Dr. Gregory Gerber, he was actually

8    the second highest prescriber at this time in the

9    entire Great Lakes region; right?

10             MR. MAIER:  Objection.  Foundation.

11        A.    It's making me dizzy.  That's why I'm

12   looking away.  I was not calling on him in that time.

13        Q.    (By Mr. Faes)  Right.  This is the time

14   that we talked about where Nicole Reese was calling on

15   him; right?

16        A.    Right.

17        Q.    And you actually got him back -- this is

18   in June.  I think you got him back in early July, so

19   you got him back in your territory about a month after

20   this; right?

21        A.    Yeah.

22        Q.    And when you got him back he would have

23   been the second highest prescriber of Fentora in the

24   entire Great Lakes region; right?

```
 1                    MR. MAIER:  Objection.  Form, foundation.

 2         A.    Yes.

 3         Q.    (By Mr. Faes)  What were the circumstances

 4   surrounding you getting Dr. Gerber back in your

 5   territory?  Why did that happen?

 6         A.    What year again?

 7         Q.    This is 2011.

 8         A.    We realigned so many times.  I can't

 9   really remember.

10         Q.    So it was a territory realignment?

11         A.    Yeah.

12         Q.    And you -- as a result of that you got the

13   second highest prescriber in the entire Great Lakes

14   region?

15         A.    Yes.

16                    MR. MAIER:  Objection.  Form.

17         Q.    (By Mr. Faes)  And that -- getting the

18   second highest prescriber in the Great Lakes region

19   would have been good for you in terms of meeting your

20   sales performance goals; right?

21                    MR. MAIER:  Objection.  Form.

22         A.    Yes and no.

23         Q.    (By Mr. Faes)  What do you mean by that,

24   yes and no?  How is getting the second highest
```

1    prescriber not good for meeting your sales goal?

2              MR. MAIER:  Objection.  Form.

3         A.    Because you have to keep him at that

4    level.

5         Q.    (By Mr. Faes)  Right.  So you've got to

6    continually -- your sales goals are based on their

7    prior volume; right?

8         A.    Yes.

9         Q.    So in order to meet your sales goals

10   you've got to push to keep that doctor at or above that

11   level; right?

12        A.    Yes.

13             MR. MAIER:  Objection.  Form.

14        Q.    (By Mr. Faes)  On the last page of this

15   document under Fentora strategies, one of the Fentora

16   strategies is that Amrix should only be a mention call.

17   Do you see that?

18        A.    Yes.

19        Q.    And Amrix was the only other product that

20   you were responsible for detailing and promoting at

21   that time; right?

22        A.    I don't remember.  We -- I don't remember.

23        Q.    Well, and Amrix was a muscle relaxer;

24   right?

```
 1        A.    Yes.

 2        Q.    And did you come to understand that one of

 3   the reasons you were instructed that a Fentora

 4   strategy -- well, first of all, strike that and let me

 5   start over.  Would you agree with me that you were

 6   generally instructed, consistent with this, that Amrix

 7   should be a mention call, that if you detailed a doctor

 8   for both products you generally wanted to detail the

 9   Fentora first?

10              MR. MAIER:  Objection.  Form.

11        A.    I don't remember.

12        Q.    (By Mr. Faes)  Did you come to understand

13   that Amrix was a lower-priority target because the

14   Fentora prescription was worth much more to the company

15   than an Amrix prescription?

16              MR. MAIER:  Objection.  Form, foundation.

17        A.    I don't remember.

18        Q.    (By Mr. Faes)  You can set that aside.

19              [Discussion off the record.]

20              THE VIDEOGRAPHER:  We are going off the

21   record at 3:33 PM.

22              [A brief recess was taken.]

23              THE VIDEOGRAPHER:  We are back on the

24   record at 3:40 PM.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    (By Mr. Faes)  Ms. Kaisen, we're back on

 2     the record after a short break.  Are you ready to

 3     proceed?

 4          A.    Yes.

 5          Q.    So I want to switch gears a little bit now

 6     and talk about the FDA REMs or risk evaluation and

 7     mitigation strategy program.  Okay?  At some point

 8     during 2011, you become aware that the FDA was going to

 9     require a REMs or a risk evaluation and mitigation

10     strategy program for Fentora going forward; right?

11                MR. MAIER:  Objection.  Form.

12          A.    If you say so.

13          Q.    (By Mr. Faes)  Well, you understood that

14     there was -- at some point there was going to be --

15          A.    Yes.

16          Q.     -- a REMs program, and as part of that

17     REMs program, in order for a doctor and a patient to be

18     able to continue to receive Fentora going forward, both

19     the doctor and the patient would have to sign consent

20     forms indicating, among other things, that they

21     understood that the only indication for Fentora was for

22     breakthrough pain in opioid-tolerant patients with

23     cancer only; right?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    I'm going to hand you what's been marked

 2    as Exhibit Number 31 to your deposition.  And this is

 3    an e-mail dated July 21st of 2001.  Do you see that?

 4               [Exhibit Teva-Kaisen-031

 5               marked for identification.]

 6          A.    Uh-huh.

 7          Q.    And it includes that it's been sent to

 8    sales, PCS east region; right?

 9          A.    Yes.

10          Q.    And that's kind of a group e-mail that you

11    would have received because you were in the east

12    region; right?

13          A.    Yes.

14          Q.    And it states that dear Fentora sales

15    team, on July 20th, 2011, we received approval of a

16    risk evaluation and mitigation strategy, or REMs, from

17    the U.S. Food and Drug Administration, FDA.  And if you

18    go down it states now that we are in the approval

19    phase, we would ask you to continue to execute your POA

20    II strategy during the Fentora window of opportunity.

21    Do you see that?

22          A.    Yes.

23          Q.    So the instructions from the company at

24    this time is that a REMs or risk evaluation mitigation
```

1    strategy is coming, but you should continue to execute

2    your plan of action for Fentora during this window of

3    opportunity; right?

4         A.    Yes.

5         Q.    And it also directs at this time you do

6    not proactively discuss the approved Fentora and Actiq

7    REMs; right?

8         A.    Yes.

9         Q.    And that's instructions you would have

10   received at the time; right?

11        A.    Yes.

12        Q.    And you would have followed that

13   instruction handed down by your superiors; right?

14        A.    Yes.

15        Q.    And one of the other things that they

16   instruct you to do is if you're asked about your

17   customers, about the Fentora or Actiq REMs, please

18   respond to all inquires in the following manner.  And

19   the third thing they tell you to do is to remind your

20   customers that the approval of Fentora and the Actiq

21   REMs does not currently change their process for

22   Fentora writing.  Do you see that?

23        A.    Yes.

24        Q.    So essentially their instructions to you

Highly Confidential - Subject to Further Confidentiality Review

```
1    at that time is for the time being, the REMs is coming,

2    your customers will eventually have to sign a consent

3    form, along with the customers, but for now doctors can

4    keep writing as usual; right?

5         A.    Yes.

6               MR. MAIER:  Objection.  Form.

7         Q.    (By Mr. Faes)  And don't inform the

8    doctors that this is coming unless they ask; right?

9         A.    Yes.

10              MR. MAIER:  Objection.  Form.

11        Q.    (By Mr. Faes)  And they referred to this

12   time period as a window of opportunity; right?

13        A.    Yes.

14        Q.    And they also instruct you, even though

15   this REMs is coming, that until then you should

16   continue to work your plan in order to continue to

17   exceed our goal, which I assume is the company goal, of

18   1,100 prescriptions per week for the rest of 2011;

19   right?

20        A.    Yes.

21        Q.    So they essentially tell you to -- even

22   though the REMs is coming, to keep working to exceed

23   your goals -- your sales goals, keep trying to sell as

24   much Fentora as possible; right?
```

```
1          A.    Yes.

2                MR. MAIER:  Objection.  Form.

3          Q.    (By Mr. Faes)  You can set that aside.

4    I'm going to hand you what's been marked as Exhibit

5    Number 32 to your deposition.

6                [Exhibit Teva-Kaisen-032

7                marked for identification.]

8          Q.    And this is a letter to the FDA -- or

9    strike that.  This is a letter from the FDA to

10   Cephalon, and I'll represent to you that this date is

11   dated July 20th of 2011, which is the day before the

12   e-mail we just looked at, which is marked as Exhibit

13   Number 31.

14         A.    Okay.

15         Q.    So this is the actual letter.  Have you

16   ever seen this document before?

17         A.    No.

18         Q.    I'll represent to you that this is the

19   letter that the FDA sent to Cephalon informing them of

20   the REMs program, and then you got an e-mail about this

21   the day later, which we looked at as Exhibit Number 31.

22   Okay?

23         A.    Okay.

24         Q.    And if you turn to the second page of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    document.  It states that, in the middle of the page,

2    since Fentora was approved on September 25th of 2006,

3    we became aware of reports of deaths, including

4    patients treated for migraine headaches and chronic low

5    back pain.  Do you see that?

6         A.    I do.

7         Q.    So essentially the FDA is saying that

8    they've become aware since Fentora was approved that

9    some people are being treated with Fentora off-label

10   and some of those people are dying; right?

11              MR. MAIER:  Objection.  Form.

12        A.    Yes.

13        Q.    (By Mr. Faes)  And further down it says

14   pursuant to 50-1(f)(1) (sic), we've determined that

15   Fentora can remain on the market only if elements

16   necessary to assure safe use are required as part of

17   the REMs --

18        A.    Thank you.

19        Q.     -- to mitigate the risks of overdose,

20   abuse, addiction, and serious complication due to

21   medication errors that are listed in the labeling.  Do

22   you see that?

23        A.    Yes.

24        Q.    And the last sentence states these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   elements will also assure proper patient selection and

 2   dispensing of Fentora.  Do you see that?

 3        A.    Yes.

 4        Q.    So essentially what this letter is saying

 5   is that one of the reasons for the REMs is, Number 1,

 6   that people are using off-label and are dying, and

 7   Number 2, the expanded use of Fentora in these

 8   noncancer applications is giving them a concern of a

 9   risk of overdose, abuse -- overdose, abuse, addiction,

10   and serious complications; right?

11             MR. MAIER:  Objection.  Form, foundation.

12        A.    I don't see overdose.  Oh, there you go.

13   Yes.

14        Q.    (By Mr. Faes)  And so if you look back at

15   Exhibit Number 31, first of all, it tells you as a

16   sales rep not to proactively bring it up.

17        A.    Okay.

18        Q.    This REMs; right?

19        A.    (Nodding "yes.")

20        Q.    And it lists four things you do -- you

21   should do if a physician does bring it up; right?

22        A.    Yes.

23        Q.    And you'd agree with me that nowhere in

24   that list of four things does it instruct you to inform
```

Highly Confidential - Subject to Further Confidentiality Review

1    physicians that the REMs is being put into place

2    because the FDA has become aware of people using

3    Fentora off-label and dying, does it?

4              MR. MAIER:  Objection.  Form.

5         A.    Simplify the question, please.  I'm

6    getting brain dead.  Sorry.  Strike brain dead, please.

7         Q.    (By Mr. Faes)  So we're looking at Exhibit

8    Number 31, the --

9              MR. BERG:  The e-mail the day --

10        Q.    (By Mr. Faes)  The e-mail --

11        A.    Yes.

12        Q.     -- that is informing you as the sales rep

13   that this REMs is coming; right?

14        A.    Yes.

15        Q.    And if you look in the middle of the page

16   it says don't proactively bring up --

17        A.    Yes.

18        Q.     -- the REMs with your physician, but it

19   tells you four things to do if a doctor does bring it

20   up; right?

21        A.    Yes.

22        Q.    And none of those four things include

23   telling the doctor that -- to tell the doctor that the

24   REMs has -- one of the reasons the REMs is coming out

Highly Confidential - Subject to Further Confidentiality Review

1   is because the FDA has become aware that certain people

2   are using Actiq off -- or sorry -- that certain people

3   are using Fentora off-label and are dying; right?

4           MR. MAIER:  Objection.  Form.

5       A.   Yes.

6       Q.   (By Mr. Faes)  And there's nothing in here

7   instructing you as a sales rep to tell doctors that one

8   of the reasons the Fentora REMs is coming out is

9   because the FDA has serious concerns about overdose,

10  abuse, addiction, and serious complications from

11  Fentora; right?

12          MR. MAIER:  Objection.  Form, foundation.

13      A.   Yes.

14      Q.   (By Mr. Faes)  You can set that aside.  So

15  I'm going to hand you what's been marked as Exhibit 33

16  to your deposition.

17          [Exhibit Teva-Kaisen-033

18          marked for identification.]

19          MR. FAES:  And Mike, I've skipped to 35.

20  Cut out another one.

21      Q.   (By Mr. Faes)  So this is an e-mail

22  string.  Exhibit 35 is an e-mail string from you to

23  your boss, Michael Morreale.  And let's actually start

24  at the beginning of this e-mail string.  It goes bottom

1    to top on August 3rd of 2013.

2              And it's an e-mail from to you Michael and

3    the subject is forward, prescribing opioid guidelines,

4    and you state Michael, FYI, the State Medical Board of

5    Ohio has instituted the attached guidelines for

6    prescribing opioids for the treatment of chronic

7    nonterminal pain, 80 milligram of a morphine equivalent

8    daily dose, MED trigger point.  It has gone into effect

9    as of July 1st, 2013.  Several of my HCPs have brought

10   this to my attention and have been removing patients

11   from our product.  Can you please advise me how to

12   proceed?  Do you see that?

13        A.    I do.

14        Q.    And this is an e-mail that would have been

15   written by you; right?

16        A.    Yes.

17        Q.    And the product that health care providers

18   have been removing their patients from that you're

19   referencing is Fentora; right?

20        A.    Yes.

21        Q.    And you're reaching out to your manager,

22   your direct report, for advice to what to do about this

23   situation because you're losing customers and losing

24   sales; right?

```
1          A.      Uh-huh.

2          Q.      And the response from your boss, Michael

3    Morreale, is Val, use your relationships and have some

4    conversations with your thought leaders on these

5    guidelines to find out what their thoughts on it -- to

6    find out their thoughts on it and help you develop a

7    plan to deal with it.  You need to consistently educate

8    and remind your writers on why Fentora is the best

9    option for their breakthrough cancer pain patients.

10              You mentioned that you have lost several

11   patients because of these guidelines.  Who were the

12   physicians and what did they have to say about it and

13   what med did they switch them to?  Let me know what you

14   find out from your thought leaders.  Michael Morreale.

15   Do you see that?

16         A.      Yes.

17         Q.      So kind of not a very useful answer;

18   right?

19         A.      No comment.

20         Q.      So basically what Michael is saying is he

21   doesn't know what to do and you should reach out to

22   some other people to try to figure this situation out;

23   right?

24         A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. MAIER:  Objection.  Form, foundation.

 2         Q.    (By Mr. Faes)  And you reply in response

 3    to his question that, hi, Dr. Chen, Dr. Poje, and Dr.

 4    Goddard; right?

 5         A.    Yes.

 6         Q.    And those are the doctors that are

 7    concerned about it and taking their patients off

 8    Fentora; right?

 9         A.    Their cancer patients, yes.

10         Q.    And you say they didn't switch them to

11    anything.  They are decreasing, weaning them, and then

12    not prescribing short-acting and just using the long so

13    that they are below the 80 milligram trigger.

14         A.    Yes.

15         Q.    Thank you for your input.  Val.

16         A.    Yes.

17         Q.    And so let me mark as Exhibit --

18                [Exhibit Teva-Kaisen-034

19                marked for identification.]

20         Q.    I'm going to hand you what's been marked

21    as Exhibit Number 34 to your deposition.  That's yours.

22    That's his.  And then I'll also mark Exhibit Number 35.

23                [Exhibit Teva-Kaisen-035

24                marked for identification.]
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Here we go.

2      Q.    Now, Exhibit Number 34 -- that's the

3  actual Ohio prescribing guidelines that you were

4  discussing in that prior e-mail; right?

5      A.    Yes.

6      Q.    And the title of this document is fighting

7  prescription drug abuse, Rx prescribing guidelines.  Do

8  you see that?

9      A.    Yes.

10     Q.    So the intent of this from the Ohio opioid

11 action team is to fight prescription drug abuse; right?

12     A.    Yes.

13     Q.    And so if you look down from the third

14 from the top, it says that the new opioid prescribing

15 guidelines recommend that 80 milligrams MED for more

16 than three months for patients with chronic nonterminal

17 pain should trigger the prescriber to reevaluate the

18 effectiveness and safety of the patient's pain

19 management plan; right?

20     A.    Yes.

21     Q.    And so basically what this is saying is

22 that if you're going above the 30 milligrams MED in a

23 single day for more than three months --

24     A.    I don't see 30.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    I'm sorry?

 2        A.    I don't see 30.

 3        Q.    Sorry.  So basically what this is saying

 4   is that if you go above 80 milligrams MED for more than

 5   three months with a patient with chronic nonterminal

 6   pain, you should reevaluate your treatment plan for

 7   that patient because it might not be safe; right?

 8        A.    Right.

 9              MR. MAIER:  Objection.  Form, foundation.

10        Q.    (By Mr. Faes)  That's your understanding

11   from this document at this time; right?

12        A.    Yes.

13              MR. MAIER:  Objection.

14        Q.    (By Mr. Faes)  And so you knew that in

15   order to be -- strike that.  In order to be a proper

16   candidate for Fentora you had to be an opioid-tolerant

17   patient; right?

18        A.    Yes.

19        Q.    And in order to be an opioid-tolerant

20   patient you needed to be on 60 milligrams MED to be

21   qualified to be an opioid-tolerant patient; right?

22        A.    Yes.

23        Q.    So in order to take Fentora you've already

24   got to be on 60 milligrams MED of some long-term-acting
```

1    opioid, and the smallest dose to Fentora is 100

2    milligrams; right?

3                    MR. MAIER:  Objection.  Form.

4         A.    I'm sorry.  60 milligrams of morphine

5    equivalent of short-acting, and then a 25 mic patch of

6    long-acting or higher equivalent.  Your question was --

7    go back to his question.  You were already on 60

8    milligrams of some long-term opioid, and the smallest

9    dose -- okay.

10        Q.    (By Mr. Faes)  Let me try and start over

11   and see if I can ask a better question; okay?

12        A.    Just -- thank you.

13        Q.    So the smallest dose of Fentora is 100

14   micrograms; right?

15        A.    Yes.

16        Q.    And if you look at the conversion chart

17   marked as Exhibit 35 and you look at the conversion for

18   fentanyl buccal or SL tablets, the conversion is .13,

19   which would mean the smallest dose of Fentora at 100

20   micrograms would be 30 milligrams equivalent MED;

21   right?

22                    MR. MAIER:  Objection.  Form.

23        A.    Yes.

24        Q.    (By Mr. Faes)  So essentially in order to

1    take Fentora in accordance with these new Ohio

2    guidelines, the most Fentora that you could take in a

3    day would be only one 100 microgram tab; right?

4              MR. MAIER:  Objection.  Form.

5         A.    I'm not sure.  I'm getting dizzy with the

6    numbers.

7         Q.    (By Mr. Faes)  Okay.  So -- but at any

8    rate, you'd agree that a lot of your doctors were

9    taking off -- taking their patients off Fentora

10   altogether and only keeping them on long-acting opioids

11   because they felt that they couldn't prescribe Fentora

12   and stay within the new guidelines; right?

13        A.    The cancer patients.

14             MR. MAIER:  Objection.  Form.

15        A.    Yes.

16        Q.    (By Mr. Faes)  So let me hand you what's

17   been marked as Exhibit Number 36.

18             [Exhibit Teva-Kaisen-036

19             marked for identification.]

20        Q.    And this is an e-mail from you down at the

21   bottom to another Ohio sales rep, Corinne Gillenkirk,

22   asking about this issue; right?

23        A.    Yes.

24        Q.    And you say FYI, you probably know this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    already, but I attached a copy for you.  I've had some

 2    management physicians stop writing due to the new Ohio

 3    guidelines in Ohio.  Let me know your thoughts.  Right?

 4         A.    Yes.

 5         Q.    And this is you reaching out to another

 6    fellow sales rep trying to find a solution to this

 7    problem; right?

 8         A.    Yes.

 9         Q.    And this is essentially -- one of the

10    reasons you did this probably was because your boss

11    didn't give you a very useful answer; right?

12               MR. MAIER:  Objection.  Form.

13         Q.    (By Mr. Faes)  Is that true?

14         A.    I don't know why I did it back then, but

15    it could be.

16         Q.    And her response is yes, a physician of

17    mine gave me a copy a while back.  He's the only one

18    who's voiced concern over the 80MG morphine equivalent

19    dose.  I don't bring it up otherwise.  Right?

20         A.    Yes.

21         Q.    So her -- kind of her advice is she hasn't

22    had much problem with it, but she doesn't bring it up

23    if the doctor doesn't; right?

24               MR. MAIER:  Objection.  Form, foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Okay.

2        Q.    (By Mr. Faes)  Is that true?

3              MR. MAIER:  Same objection.

4        A.    It says so.

5        Q.    (By Mr. Faes)  And is that your

6   understanding of what she was telling you?

7              MR. MAIER:  Same objection.

8        A.    My understanding, yes.

9        Q.    (By Mr. Faes)  Just three left and we're

10  done.  I'm going to hand you what's been marked as

11  Exhibit Number 37 to your deposition.

12             [Exhibit Teva-Kaisen-037

13             marked for identification.]

14       Q.    And this is an e-mail dated May 30th of

15  2014, and again, this is from you to your boss, Michael

16  Morreale.  And if you look halfway down it states

17  challenges.  The Cleveland Clinic is not wanting their

18  physicians to write TIRFs.  Some have not renewed their

19  REMs.  They are encouraging blocks.  Do you see that?

20       A.    Yes.

21       Q.    And that was an issue that you were

22  experienced at the time that you passed on to your

23  boss, that some doctors at this time in 2014 basically

24  didn't want to sign the REMs consent form to continue
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to sell -- to continue to be able to write Fentora;

 2   right?

 3               MR. MAIER:  Objection.  Form.

 4        A.    They did not want to write TIRFs.

 5        Q.    (By Mr. Faes)  Right.  And TIRF --

 6        A.    It had nothing to do with the REMs.

 7        Q.    Huh?

 8        A.    It had nothing to do with the REMs.  They

 9   just didn't want to -- it says some have not renewed

10   because they don't want to write any more short-acting.

11        Q.    Okay.  And was that because of the Ohio

12   prescribing guidelines that we just talked about?

13        A.    I don't know.

14               MR. MAIER:  Objection.  Foundation.

15        A.    I don't remember.

16        Q.    (By Mr. Faes)  Well, if you go --

17        A.    On here it says -- yeah.

18        Q.    So you just don't remember the reason why?

19        A.    It says it right here now.

20        Q.    Right.  So it says that the reason is the

21   Ohio prescribing guidelines on opioids do not prescribe

22   over 80 milligram or equivalent per patient per day.

23   The exception is cancer.  However, physicians have

24   expressed that they don't want to write that much for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   any patient, including cancer patients.

 2       A.    Yes.

 3       Q.    The DEA has visited several physicians.

 4   Certain internal medicine physicians have been warned

 5   for not giving up their patients to pain management

 6   after 12 weeks.  Physicians in my territory are

 7   decreasing their opioids tremendously and fear

 8   increasing their cancer patients.

 9             MR. MAIER:  Object --

10       A.    Including --

11       Q.    (By Mr. Faes)  Sorry.  Including their

12   cancer patients.

13       A.    Yes.

14       Q.    So this reflects that these Ohio

15   prescription guidelines that were intended to fight

16   prescription drug abuse are still continuing to be an

17   issue that you're reporting to your superiors in May of

18   2014; right?

19             MR. MAIER:  Objection.  Form.

20       A.    Drug abuse?  I mean, give me a better

21   question than that.

22       Q.    (By Mr. Faes)  So these -- this reflects

23   that these -- that the new Ohio -- strike that.  Let me

24   start over.  This reflects that the new Ohio
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    prescription guidelines which recommend limiting

2    patients to 80 milligrams MED are continuing to be a

3    factor that you were reporting as an issue to your

4    boss, Michael Morreale, at this time; right?

5              MR. MAIER:  Objection.  Form.

6         A.   Including their cancer patients.

7         Q.   (By Mr. Faes)  So is the answer to my

8    question yes --

9         A.   Yes.

10        Q.    -- that this continues to be an issue?

11        A.   Yes.

12        Q.   And as we discussed, the purpose of those

13   guidelines is to fight prescription drug abuse; right?

14              MR. MAIER:  Objection.  Foundation.

15        A.   These are cancer patients.

16        Q.   (By Mr. Faes)  I understand.  But my

17   question is, you understand that the Ohio prescribing

18   guidelines were put in place specifically to fight

19   prescription drug abuse; right?

20        A.   Sure.

21        Q.   And at this time this is really affecting

22   the sales in your territory; right?

23              MR. MAIER:  Objection.  Foundation, form.

24        A.   It's affecting my cancer patients.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    (By Mr. Faes)  And it's affecting your

 2   sales as well; right?

 3        A.    Which affects sales.  Yes.

 4        Q.    And when your sales are affected, that

 5   affects your income as well; right?

 6              MR. MAIER:  Objection.  Form.

 7        A.    Yes.  It's all about the patients.

 8        Q.    (By Mr. Faes)  I'm going to hand you

 9   what's been marked as Exhibit Number 38 to your

10   deposition.

11              [Exhibit Teva-Kaisen-038

12              marked for identification.]

13        Q.    Do I only have one copy?  I think I only

14   have one copy.  So I only have one copy, so I'm going

15   to have to give you mine and I'll look at the one on

16   the screen.

17        A.    Okay.

18        Q.    This is -- I'm handing you what I've

19   been -- what's marked as Exhibit Number 38.  And you

20   can go to the second page of this, which is where the

21   e-mail starts.  It starts with an e-mail -- well, it's

22   on the previous page.  I think it's to you and then it

23   carbon copies Mr. Morreale, your boss, and your boss's

24   boss, Randy Spokane.  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And -- yeah, it's to you.  So let's go

3  back to the second page.  And it states on November

4  2nd, 2012, you recorded a Fentora call to the following

5  health care provider.  Debbie Macko.  And it says this

6  HCP is on the do-not-compensate list for Fentora.

7  Please document an explanation for this call and

8  forward to your region manager -- region manager.  Do

9  you see that?

10     A.    Yes.

11     Q.    So this would have been an e-mail that you

12  received; right?

13     A.    Yes.

14     Q.    And was this part of an automated system

15  whereby if there was a doctor that you called on that

16  you were not supposed to, you would get an automated

17  message?

18          MR. MAIER:  Objection.  Form.

19     A.    I don't remember, but --

20     Q.    (By Mr. Faes)  Well, let's go to the first

21  page of this.  And it says on November 4th, 2012,

22  Valerie Kaisen wrote, hi, Michael.  The pain center at

23  South Pointe changed their policy.  They are having

24  lunches again.  I cannot change them back to compensate

Highly Confidential - Subject to Further Confidentiality Review

```
 1   on the iPad.  Thank you.

 2        A.    Where are you?  Oh, okay.  Got it.  Sorry.

 3        Q.    You see that?

 4        A.    Yeah.

 5        Q.    So that was your response at the time?

 6        A.    Yes.

 7        Q.    And then if you look prior to that --

 8        A.    Okay.  What's your question?

 9        Q.    So I'm just going through the e-mail.  And

10   then your boss writes back, Debbie Macko is on the DNC

11   list, so you can't make calls on her.  Please explain

12   why you made a call on her.  Right?

13        A.    Yes.

14        Q.    So this is your boss saying that she's on

15   the DNC list and you're not supposed to call on her;

16   right?

17        A.    Yes.

18        Q.    And you reply I did not put her on the

19   do-not-compensate list.  They stopped having lunches

20   about 18 months ago.  A couple of months ago they

21   changed to being able to accept food.  Also, she is the

22   nursing administrator of pain management.  I'm sorry.

23   I will not call on her or feed her going forward.

24   Thanks.  Valerie Kaisen.  Right?
```

```
 1          A.    Okay.

 2          Q.    So that was the response you would have

 3    given Michael at the time --

 4          A.    Yes.

 5          Q.     -- that you didn't realize she was on the

 6    DNC list and wouldn't call her again; right?

 7          A.    Yes.

 8          Q.    And your boss writes back Val, this has

 9    nothing to do with the HCP and the Sunshine Act.

10    Teva/Cephalon deemed Debbie Macko as a do not

11    compensate, AKA do not call, meaning the health care

12    provider is not appropriate to make calls based on her

13    specialty.  Do you see that?

14          A.    Yes.

15          Q.    So basically Michael is telling you that

16    this doctor isn't an appropriate doctor for you to be

17    calling on; right?

18          A.    Right.

19          Q.    And you reply I'm sorry.  I put on a call

20    to Deb Macko.  I didn't realize she was on the list.  I

21    will not call on her again.  Right?

22          A.    Yes.

23          Q.    So I'm going to hand you what's been

24    marked as Exhibit Number 39 to your deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    [Exhibit Teva-Kaisen-039

 2                    marked for identification.]

 3          Q.    And this is an e-mail about three months

 4   later dated February 11th of 2013.  And again, if you

 5   look at where the e-mail begins --

 6                    MR. FAES:  This is the next document, 40.

 7   It's 40.

 8          Q.    (By Mr. Faes)  If you look at the document

 9   where the e-mail string begins.  It starts on February

10   10th of 2013, and again it's to you and your boss and

11   your boss's boss, Michael Morreale and Randy Spokane,

12   and again you're getting a message that on February

13   8th, 2013, you recorded a Fentora call again to Debbie

14   Macko; right?

15          A.    Yes.

16          Q.    And your response again is, three months

17   later, Michael, Debbie Macko is on the Cleveland Clinic

18   south pain center, and that you didn't know that she

19   was on the DNC list; right?

20          A.    Yes.

21          Q.    And you respond that she didn't know --

22   that she hasn't been on the list before; right?

23          A.    Yes.

24          Q.    And this is despite having called on her
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    three months earlier and receiving a similar message

 2    that she was on the DNC list; right?

 3         A.    I don't remember.  It's here, but I don't

 4    remember.

 5         Q.    Well, do you have any reason to dispute

 6    the authenticity of these documents that we've looked

 7    at?

 8         A.    No.

 9               MR. FAES:  Okay.  I think that's all the

10    further questions I have at this time, subject to any

11    follow-up from any other counsel that's going to

12    question.

13               MR. MAIER:  Yeah.

14               MR. FAES:  I don't think Ms. Jain has any

15    questions.  Is that right?

16               MS. JAIN:  That's correct.

17               MR. MAIER:  I have five minutes of

18    questions.

19         A.    Yes.

20               [Discussion off the record.]

21               QUESTIONS BY MR. MAIER:

22         Q.    So I just have hopefully about five

23    minutes of questions for you, and to keep them short

24    we're going to bounce around a little bit on topics,
```

1    but we won't spend long on any one of them.  So did the

2    FDA-approved labels for Actiq and Fentora include their

3    indications?

4              MR. FAES:  Object to form.

5         A.   You're going to have to talk slower, but

6    yes.

7         Q.   Do the FDA-approved labels for Actiq and

8    Fentora include information about the risks associated

9    with them?

10             MR. FAES:  Object to form.

11        A.   Yes.

12        Q.   (By Mr. Maier)  What were some of the

13   risks that were on the label, if you remember?

14        A.   Now we're going back.  Bradycardia.  I

15   can't remember, you guys, right now.

16        Q.   That's fine.  But it's fair to say that

17   you recall that the risks that were identified by the

18   FDA were on the label for each of those drugs?

19        A.   Yes.

20             MR. FAES:  Object to form.

21        Q.   (By Mr. Maier)  We just spoke about the

22   REMs program.  Do you remember that?

23        A.   Yes.

24        Q.   So do you remember if there was an

Highly Confidential - Subject to Further Confidentiality Review

```
 1   FDA-approved REMs program for all transmucosal

 2   immediate-release fentanyl products?

 3        A.   Yes.

 4        Q.   Is that the same thing as the REMs program

 5   that we talked about in that one e-mail from 2011, or

 6   do you remember if there was a Fentora Actiq REMs

 7   program and then TIRF REMs after?

 8             MR. FAES:  Object to form.

 9        A.   I don't remember, but I think they were

10   all the same time.  They were all the same time.

11        Q.   (By Mr. Maier)  But once there was a REMs

12   program in place, doctors were required to enroll

13   before they could prescribe Fentora; is that right?

14        A.   Yes.

15        Q.   And patients were required to enroll

16   before they could receive Fentora?

17        A.   Yes.

18        Q.   And that REMs program also included

19   information about the risks associated with Fentora and

20   Actiq?

21             MR. FAES:  Object to form.

22        A.   Yes.

23        Q.   (By Mr. Maier)  Did you ever promote Actiq

24   or Fentora off label?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No.

2            MR. FAES:  Object to form.

3      Q.    (By Mr. Maier)  Were you ever told to

4  promote Actiq or Fentora off label?

5            MR. FAES:  Object to form.

6      A.    No.

7      Q.    (By Mr. Maier)  Did you ever use

8  promotional material when you were promoting Actiq and

9  Fentora that you understood to contain anything that

10  would constitute off-label promotion of either drug?

11            MR. FAES:  Object to form.

12      A.    No, I don't remember.  No.

13      Q.    (By Mr. Maier)  Earlier today you were

14  asked about physicians prescribing medication off

15  label.  Do you remember that?

16      A.    Yes.

17      Q.    Who makes the decision about whether an

18  off-label use of a prescription is medically

19  appropriate?

20            MR. FAES:  Object to form.

21      A.    The physician.

22      Q.    (By Mr. Maier)  Do you remember when we

23  talked about MIRFs earlier?

24      A.    Yes.

```
1              Q.     When you submitted a MIRF, it was medical

2     affairs who dealt with it, you said, I believe?

3              A.     Yes.

4              Q.     Was medical affairs part of marketing?

5              A.     No.

6                     MR. FAES:  Object to form.

7              Q.     (By Mr. Maier)  So to your knowledge did

8     Cephalon or Teva marketing personnel respond

9     substantively to any questions about off-label use?

10                    MR. FAES:  Object to form.

11             A.     Never.

12             Q.     (By Mr. Maier)  You were asked earlier

13    about what you were trained to say if a doctor said

14    that they did not treat cancer patients.  Do you

15    remember that?

16             A.     Yes.

17             Q.     Those doctors who said that they didn't

18    have cancer patients could have had cancer patients in

19    the future; correct?

20                    MR. FAES:  Object to form.

21             A.     Yes.

22             Q.     (By Mr. Maier)  And in your experience,

23    would it have been helpful for them to be prepared if a

24    cancer patient who might benefit from Actiq and Fentora
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and been a good candidate for on-label use come into

 2    their office?

 3         A.    Yes.

 4               MR. FAES:  Object to form.

 5         Q.    (By Mr. Maier)  Did you receive compliance

 6    training at Teva and Cephalon?

 7         A.    Yes.

 8         Q.    Did it inform you of your obligation to

 9    promote products for only labeled indications?

10         A.    Yes.

11         Q.    How often did those occur?

12         A.    I don't remember, but it seemed like all

13    the time.

14         Q.    Were they mandatory?

15         A.    Oh, yeah.

16               MR. MAIER:  That's all I have.  Thank you.

17         A.    Thank you.  Whew.

18               QUESTIONS BY MR. FAES:

19         Q.    Earlier -- I just have one or two

20    follow-up questions.  Earlier defense counsel was

21    asking you who makes the decision about whether an

22    off-label use for a product is appropriate.  Do you

23    remember that question?

24         A.    Who -- I guess -- say it again.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Yes.   Earlier defense counsel was asking

2    you a question about who makes the decision whether or

3    not an off-label use for a product is appropriate.   Do

4    you remember that?

5      A.    Yes.

6      Q.    And you answered that it's the

7    physician --

8      A.    Yes.

9      Q.    -- that makes that decision; right?   And

10   you'd agree with me that the physician, in order to

11   make the appropriate decision about whether to use a

12   product off label, needs to have all the appropriate

13   information; right?

14          MR. MAIER:   Objection.   Form, foundation.

15     A.    That's up to the physician to make the

16   decision.

17     Q.    (By Mr. Faes)  But in order to make -- you

18   would agree with me that in order for the doctor to

19   make an informed decision, he needs to have all of the

20   relevant information about the risks and benefits of

21   the product; right?

22     A.    Yes.

23          MR. MAIER:   Objection.   Form.

24     Q.    (By Mr. Faes)  And that would include

Highly Confidential - Subject to Further Confidentiality Review

1   information such as whether the FDA had serious

2   concerns about abuse, misuse, overdose, and addiction

3   in the patient population he's considering treating;

4   right?

5           A.    Yes.

6                 MR. MAIER:  Objection.  Form, foundation.

7           Q.    (By Mr. Faes)  And that would include

8   information regarding deaths that had occurred while

9   patients were on that drug for the indication that he's

10  considering; right?

11                THE WITNESS:  Yes.

12                MR. MAIER:  Same objection.

13                MR. FAES:  That's all the further

14  questions I have.

15                MS. FRANCIS:  No questions.

16                MR. MAIER:  That's it.

17                MR. BERG:  Okay.

18                THE VIDEOGRAPHER:  We are going off the

19  record at 4:20 PM.

20                [Discussion off the record.]

21                MR. BERG:  She'll waive.

22

23                     [SIGNATURE WAIVED.]

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 C E R T I F I C A T E

 2

 3          I, JOHN ARNDT, a Certified Shorthand

 4   Reporter and Certified Court Reporter, do hereby

 5   certify that prior to the commencement of the

 6   examination, VALERIE KAISEN was sworn by me to testify

 7   the truth, the whole truth and nothing but the truth.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9   true and accurate transcript of the proceedings as

10   taken stenographically by and before me at the time,

11   place and on the date hereinbefore set forth.

12          I DO FURTHER CERTIFY that I am neither a

13   relative nor employee nor attorney nor counsel of any

14   of the parties to this action, and that I am neither a

15   relative nor employee of such attorney or counsel, and

16   that I am not financially interested in this action.

17

18

19          _____

20          JOHN ARNDT, CSR, CCR, RDR, CRR

21          CSR No. 084-004605

22          CCR No. 1186

23

24
```