Page 1

1              IN THE UNITED STATES COURT

2              NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4                ~~~~~~~~~~~~~~~~~~~~

5    IN RE:  NATIONAL PRESCRIPTION

6    OPIATE LITIGATION              MDL No. 2804

7                                   Case No. 17-md-2804

8                                   Judge Dan Polster

9    This document relates to:

10   The County of Summit, Ohio, et al.,

11   v.  Purdue Pharma L.P., et al.,

12   Case No. 1:18-OP-45090 (N.D. Ohio)

13   _____/

14

15

16       VIDEOTAPED DEPOSITION OF DARIN C. KEARNS

17           December 05, 2018, at 9:00 a.m.

18                     Akron, Ohio

19

20

21

22

23   Reported by:

24   Anne E. Vosburgh, CSR-6804

25   Job No. 3150798

Page 2

1                        -oOo-

2

3          On December 5, 2018, commencing at

4      approximately 9:00 a.m., the deposition of

5      Darin Kearns, taken by Counsel for the

6      Defendants, was held at the offices of the

7      Akron Bar Association, located at 57 South

8      Broadway Street, Akron, Ohio, held before and

9      stenographically reported by

10     Anne E. Vosburgh, Certified Shorthand

11     Reporter No. 6804, Registered Professional

12     Reporter, Certified Realtime Reporter, and

13     Notary Public.

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 3
 1   APPEARANCES:

 2

 3   On behalf of the Plaintiffs Summit County,

 4   the City of Akron, and the Witness:

 5         Motley Rice, LLC

 6         28 Bridgeside Boulevard

 7         Mount Pleasant, South Carolina 29464

 8         832.216.9229

 9         By:  Michael J. Pendell, Esq.

10              mpendell@motleyrice.com

11         By:  Andrew P. Arnold, Esq.

12              aarnold@motleyrice.com

13         By:  Jodi Westbrook Flowers, Esq.

14              jflowers@motleyrice.com

15   and

16         Summit County Children Services

17         264 South Arlington Street

18         Akron, Ohio  44306-1354

19         330.379.2041

20         By:  Jonathan D. Hart, Esq.

21              hartj@summitkids.org

22

23

24

25
```

Page 4

1   (Appearances, continued.)

2

3   On behalf of Walmart Inc. F/K/A

4   Wal-Mart Stores, Inc.:

5        Jones Day

6        51 Louisiana Avenue, N.W.

7        Washington, D.C.  20001-2113

8        202.879.3939

9        By:  Shirlethia Franklin, Esq.

10            sfranklin@jonesday.com

11

12

13  On behalf of Endo Health Solutions, Inc.,

14  Endo Pharmaceuticals Inc., Par Pharmaceutical,

15  Inc., and Par Pharmaceutical Companies, Inc.,

16  (FKA Par Pharmaceutical Holdings, Inc.)

17       Arnold & Porter

18       44th Floor

19       777 South Figueroa Street

20       Los Angeles, California  90017-5844

21       213.243.4160

22       By:  Tiffany M. Ikeda, Esq.

23            (via teleconference)

24            tiffany.ikeda@arnoldporter.com

25

Page 5

1    (Appearances, continued.)

2

3    On behalf of Distributor Defendant

4    McKesson Corporation, Co-Liaison Counsel

5    for the Distributor Defendants:

6         Covington & Burling LLP

7         One City Center

8         850 Tenth Street, NW

9         Washington, D.C.   20001-4956

10        202.662.6000

11        By:  David W. Haller, Esq.

12             dhaller@cov.com

13

14   On behalf of AmerisourceBergen

15   Drug Corporation:

16        Reed Smith LLP

17        1301 K Street, N.W.

18        Suite 1000, East Tower

19        Washington, D.C.   20005

20        202.414.9200

21        By:  Kelly H. Hibbert, Esq.

22             khibbert@reedsmith.com

23        By:  Lindsay A. DeFrancesco, Esq.

24             ldefrancesco@reedsmith.com

25

Page 6

1    (Appearances, continued.)

2

3    On behalf of Cardinal Health:

4         Porter Wright Morris & Arthur, LLP

5         1900 K Street NW

6         Suite 1110

7         Washington, D.C.  20006

8         202.778-3007

9         By:  Darcy Copeland Jalandoni, Esq.

10             djalandoni@porterwright.com

11

12

13   On behalf of Insys Therapeutics, Inc.:

14        Holland & Knight LLP

15        800 17th Street N.W.

16        Suite 1100

17        Washington, D.C.  20006

18        202.469.5222

19        By:  Jessica Farmer, Esq.

20             jessica.farmer@hklaw.com

21

22   ALSO PRESENT:

23        Kurt Henschel, Legal Videographer

24

25

1                        I N D E X

2

3    WITNESS:  DARIN KEARNS

4

5           ---------- EXAMINATIONS ----------

6    Examination by Ms. Hibbert                        13

7    Examination by Mr. Haller                        310

8    Examination by Mr. Pendell                       351

9    Re-Examination by Mr. Haller                     354

10

11

12           ---------- OCCURRENCES ----------

13                                         Page   Line

14   Instruction not to answer               22     23

15   Instruction not to answer               36     21

16   Instruction not to answer               41      5

17   Instruction not to answer              355      8

18

19

20

21

22

23

24

25

```
 1        ---------- EXHIBITS ----------

 2    NUMBER          DESCRIPTION              PAGE

 3    Exhibit 1    Summit County, response to      19

 4                 Interrogatory 18

 5    Exhibit 2    City of Akron, response to      19

 6                 Interrogatory 18

 7    Exhibit 3    Email chain, beginning          31

 8                 Bates SUMMIT_344090

 9    Exhibit 4    Darin C. Kearns - CPA,          44

10                 Curriculum Vitae, Bates

11                 SUMMIT_001921248 through

12                 SUMMIT_001921250

13    Exhibit 5    Summit County Children         116

14                 Services Program Structure,

15                 Bates SUMMIT_000003847

16                 through SUMMIT_000003857

17    Exhibit 6    2016 Annual Report, Summit     174

18                 County Children Services,

19                 Bates SUMMIT_000019809

20                 through SUMMIT_000019812

21    Exhibit 7    Summit County Children         188

22                 Services 2017 Budget, Bates

23                 SUMMIT_000982175 through

24                 SUMMIT_000982225

25
```

Page 9

1   (Exhibits, continued.)

2   Exhibit 8        Summit County Children            212

3                    Services, Adjusted Budget

4                    Summary, Bates

5                    SUMMIT_001463636 through

6                    SUMMIT_001463637

7   Exhibit 9        Summit County Children            249

8                    Services 2018 Budget, Bates

9                    SUMMIT_000990286 through

10                   SUMMIT_000990324

11  Exhibit 10       Spreadsheet                       285

12  Exhibit 11       September 5, 2017, SSAB            290

13                   Budget and Levy Committee

14                   Meeting Minutes

15  Exhibit 12       Email chain Kearns and            298

16                   Ream, beginning Bates

17                   SUMMIT_01916138

18                   (Exhibits attached.)

19

20

21

22

23

24

25

1                    Akron, Ohio

2        Wednesday, December 5, 2018, 9:00 a.m.

3                 ---------------

4                  PROCEEDINGS

5                 ---------------

6              THE VIDEOGRAPHER:  We're on the

7        record at 9:12.  Today's date is December 5th,

8        2018.

9                    We're here in the matter of National

10       Prescription Opiate Litigation.  This

11       deposition is taking place in Akron, Ohio.

12                   Will counsel please identify

13       themselves for the record.

14                   MR. PENDELL:  Mike Pendell,

15            Motley Rice, for the Plaintiffs.

16                   MR. ARNOLD:  Andrew Arnold,

17            Motley Rice, for the plaintiffs.

18                   MS. FLOWERS:  Jodi Flowers, on

19            behalf of the County of Summit and the

20            City of Akron.

21                   MR. HART:  John Hart, in-house

22            counsel for Summit County Children

23            Services.

24                   MR. HALLER:  David Haller from

25            Covington & Burrell for McKesson.

1            MS. JALANDONI:  Darcy Jalandoni

2       of Porter Wright Morris & Arthur for

3       Partner Health.

4            MS. FRANKLIN:  Shirlethia

5       Franklin, Jones Day, on behalf of

6       Walmart Inc.

7            MS. FARMER:  Jessica Farmer of

8       Holland & Knight on behalf of Insys.

9            MS. DEFRANESCO:  Lindsay DeFrancesco

10      from Reed Smith on behalf of

11      AmerisourceBergen Drug Corporation.

12           MS. HIBBERT:  Kelly Hibbert of

13      Reed Smith on behalf of

14      AmerisourceBergen Drug Corporation.

15           THE VIDEOGRAPHER:  Is there

16      anyone on the phone?

17           MR. PENDELL:  Anyone on the

18      phone?

19           MS. IKEDA:  Hi.  This is

20      Tiffany Ikeda of Arnold & Porter on

21      behalf of Endo and the Par

22      Pharmaceutical Defendants.

23                      ---

24

25

1          DARIN KEARNS,

2               having been called as a witness, was

3               duly sworn to testify to the truth by

4               an authorized notary public and

5               testified as follows.

6                         ---

7               MS. HIBBERT:  We have one

8               housekeeping matter to go over on the

9               record really quick before we begin the

10              deposition.

11                   And that is that we sent

12              correspondence to -- I think it was

13              Ann Kearns, no relation to Mr. Kearns,

14              the witness here today -- several

15              correspondences on November 16th, 21st,

16              and 27th, regarding the document

17              production for the custodial file of Mr.

18              Darin Kearns, the witness here today.

19                   I don't think we ever got a

20              direct response on Mr. Kearns' document

21              production, so we're going to reserve

22              the right to, pending any issues that

23              come out during the deposition here

24              today or following the deposition with

25              regard to additional documents that need

1          to be produced, we'll reserve the right

2          to reopen the deposition.

3                  MR. PENDELL:  Okay.  And I --

4          we -- I -- just for the record, we do --

5          I do object to that.

6                      ---

7                  EXAMINATION

8    BY MS. HIBBERT:

9          Q.   Mr. Kearns, can you please state

10   your full name for the record.

11         A.   Sure.  Darin Christopher Kearns.

12         Q.   We met off the record but, again,

13   my name is Kelly Hibbert and I represent one

14   of the defendants today.

15              Thank you for being here today.

16              Mr. Kearns, have you ever been

17   deposed before?

18         A.   I have not.

19         Q.   What's your understanding of the

20   lawsuit that your county, Summit County, has

21   filed?

22         A.   My basic understanding of the

23   lawsuit is to ascertain, essentially, who is

24   responsible for the opioid epidemic and the

25   financial impact that it has had on --

1    specifically on, for me, Summit County

2    Children Services.

3              Q.   Do you know who any of the

4    defendants are in the case?

5              A.   I do not.

6              Q.   Do you know any of the other

7    plaintiffs aside from Summit County?

8              A.   I know of, I believe, Summit

9    County Public Health.  I know the County of

10   Summit.  I think the ADM board is also

11   involved but, other than that, I don't know.

12             Q.   I note specifically you don't

13   know any of the other -- or any of the

14   defendants in the case.

15             Do you know, generally, who

16   Summit County has sued in this litigation?

17             A.   I do not.

18             Q.   Do you know any of the

19   allegations involved in the case?

20             A.   No, not specifically.

21             Q.   Have you ever read the complaint?

22             A.   I have not.

23             Q.   Do you know what that is, a

24   complaint?

25             A.   Yes.

1          Q.   Do you have any information as to

2     anything specific that any of the defendants

3     in this case did wrong in any way?

4          A.   I do not.

5          Q.   Did you do anything to prepare

6     for your deposition here today?

7          A.   I met with counsel for

8     Summit County.

9          Q.   And is that both in-house counsel

10    and outside counsel here present today?

11         A.   Yes.  John and these gentlemen.

12         Q.   The gentlemen here from

13    Motley Rice --

14         A.   Yes.

15         Q.   -- to your right?

16         A.   Yes.

17         Q.   How many times did you meet with

18    them?

19         A.   I believe it was twice.

20         Q.   When were those meetings?

21         A.   We just met Monday and last

22    Thursday.

23         Q.   How long were the meetings?

24         A.   Roughly an hour.

25         Q.   I don't want to know about any of

1      the conversations that you had during those

2      meetings, but did you review any documents

3      during those prep meetings?

4                  MR. PENDELL:  And you can answer

5            whether you reviewed documents, but

6            you're not to disclose if -- what

7            specific documents you reviewed.  Go

8            ahead.

9                  THE WITNESS:  Yes, we did.

10     BY MS. HIBBERT:

11          Q.   Did the review of any of those

12     documents refresh your recollection as to

13     events that you experienced in your

14     employment with Summit County?

15                  MR. PENDELL:  Objection to the

16            form.

17                  THE WITNESS:  I don't know that I

18            understand the question.  I mean --

19     BY MS. HIBBERT:

20          Q.   Sure.

21                  And because you haven't gone

22     through a deposition before, let me go over a

23     couple of ground rules.  One of which is, if

24     I ask a question here today and you don't

25     understand, please let me know.  I don't want

1      you to answer anything that you're not clear

2      what I'm asking.

3              A.   Okay.

4              Q.   Okay?

5              A.   Uh-huh.

6              Q.   And also, you're doing a really

7      good job so far, but make sure that you keep

8      your answers verbal.  So no nodding the head,

9      shrugging your shoulders.  The court reporter

10     to your left and my right needs to be able to

11     take down everything that you say.

12              Do you understand?

13              A.   Yes, I do.

14              Q.   And you're also doing a really

15     good job about this, but make sure to let me

16     get my full question out before you begin

17     your answer, and I will do the same, letting

18     you answer before I ask the next question.

19     Do you understand?

20              A.   Yes, I do.

21              Q.   Going back to the documents that

22     you reviewed in preparation for your

23     deposition, did review of any specific

24     documents refresh your recollection as to

25     anything regarding your employment with

1    Summit County?

2              MR. PENDELL:  Objection to the

3         form.

4              THE WITNESS:  In reviewing the

5         documents, I mean, it just helped me

6         to -- I guess I just refreshed my

7         memory, in terms of what I had produced.

8    BY MS. HIBBERT:

9         Q.   What you had produced, what do

10   you mean by that?

11        A.   Well, the document that I was

12   asked to produce, I -- I mean, I -- looking

13   at it, I got an opportunity to refresh my

14   memory.

15        Q.   What document was that?

16        A.   That was a spreadsheet that was

17   produced to help us understand the impact, at

18   that point in time, of what the cost to our

19   agency might have been, or may have been.

20        Q.   When did you produce that

21   spreadsheet?

22        A.   I don't know, specifically, but

23   it was in 2017.  Probably -- I think it was

24   in -- probably around May 2017.

25        Q.   And did you draft that

Page 19

1        spreadsheet yourself?

2                A.   I did.

3                Q.   Did you have any help?

4                A.   No.

5                     (Summit County, response to

6                     Interrogatory 18, marked as

7                     Deposition Exhibit 1.)

8                     (City of Akron, response to

9                     Interrogatory 18, marked as

10                     Deposition Exhibit 2.)

11    BY MS. HIBBERT:

12                Q.   Mr. Kearns, I'll show you what

13    I'm marking as Deposition Exhibits 1 and 2.

14    And I'll give counsel a copy as well.

15                     We've marked as Exhibit 1 the

16    Interrogatory Response Number 18 for

17    Summit County.  And, Number 2, the

18    interrogatory response for the City of Akron

19    for Interrogatory Number 18 as well.

20                     Mr. Kearns, feel free to go over

21    both of these documents.  They should be

22    very, very similar, if not all the same,

23    except for a couple different numbers.

24                     Do you need a moment to go over

25    that?

Page 20

1            A.    I would.  Yes, please.

2                  (Reviewing document.)

3      BY MS. HIBBERT:

4            Q.    Mr. Kearns, to save us some time,

5      let me know when you're through Exhibit 1.

6      I'm only going to ask you some questions at

7      this point about that exhibit.

8            A.    Okay.

9                  Exhibit 2 is substantially the

10     same?

11           Q.    At this time we're going to set

12     Exhibit 2 aside for a moment.

13                 Did you have enough time to go

14     over Exhibit 1?

15           A.    Well, not in full detail, but

16     yes.

17           Q.    Have you ever seen that document

18     before?

19           A.    I have not.

20           Q.    Okay.

21                 Turning to the last page of

22     Exhibit 1, which is actually Exhibit 2 of the

23     interrogatory response.  Let me know when

24     you're there.

25           A.    (Indicating.)

Page 21

1             Q.   Have you ever seen that

2      spreadsheet before?

3             A.   I have.

4             Q.   Is that the spreadsheet we were

5      just referring to that you reviewed in

6      preparation for your deposition and produced

7      to help understand the impact of the cost to

8      the agency?

9             A.   Yes.  We did look at this

10     spreadsheet.

11            Q.   And is that the spreadsheet that

12     you were referring to that you produced?

13            A.   I did not produce this, no.

14            Q.   The spreadsheet that you referred

15     to that you produced, did that -- was that

16     used to create this spreadsheet, to your

17     knowledge?

18            A.   I do not know.

19            Q.   What was included in the

20     spreadsheet that you produced in May 2017, or

21     around there, to help understand the impact

22     of the cost to the agency?

23            A.   I was asked to look at the

24     child-specific costs of our agency and to

25     apply a percentage to those costs to get a --

1        as I said, an estimate of what the costs were

2        related to opioid removals.

3                Q.   This spreadsheet here marked in

4        Exhibit 2 and Exhibit 1, did you have any

5        part in putting this spreadsheet together?

6                    MR. PENDELL:  Objection to form.

7                    THE WITNESS:  I did not.

8        BY MS. HIBBERT:

9                Q.   When did you review this?

10               A.   I believe I saw this last

11       Thursday.

12               Q.   Had you seen it before preparing

13       for your deposition?

14               A.   I had not.

15                   And I should correct my statement

16       earlier.  I did see one page from this

17       document.

18               Q.   What page was that?

19                   MR. PENDELL:  You know what, I'm

20          going to ask you not to answer that

21          question.

22                   (Instruction given.)

23                   THE WITNESS:  Okay.

24                   MR. PENDELL:  Okay.

25                   MS. HIBBERT:  What's the basis?

1          MR. PENDELL:  Attorney-client

2      privilege and work product.

3          Anything I showed him at his

4      deposition, he can -- I mean, he can

5      state if this refreshes his

6      recollection.  He's not going to talk

7      about what he was shown in preparation

8      for his depo.

9          MS. HIBBERT:  I can ask him what

10     he has seen out of this document,

11     whether he's seen it before.

12         He's answered that he has, and

13     that he's seen a specific page, so I can

14     ask him what page that is.  I'm not

15     asking him what he was shown during his

16     prep.

17         MR. PENDELL:  But you asked him

18     when he did, and if he was shown the

19     document at his prep.  And if he

20     tells --

21         MS. HIBBERT:  I actually only --

22         MR. PENDELL:  -- you that he --

23         (Simultaneous speaking.)

24         MS. HIBBERT:  -- asked him if he

25     saw the spreadsheet during his prep --

Page 24

1          MR. PENDELL:  He --

2          MS. HIBBERT:  -- which he's

3     already answered.

4          MR. PENDELL:  He's not going to

5     answer that question.

6          MS. HIBBERT:  Okay.

7          MR. PENDELL:  So --

8   BY MS. HIBBERT:

9       Q.   Mr. Kearns, have you seen this

10   interrogatory response before?

11      A.   I saw a page, and I saw the

12   spreadsheet at the back.

13      Q.   And did that page that you saw

14   refresh your recollection in any way as to

15   anything related to your employment with

16   Summit County, including any of the costs or

17   expenditures that you believe Summit County

18   may be seeking to recover in this case?

19          MR. PENDELL:  Objection to form.

20          THE WITNESS:  I mean, I don't

21      think that the spreadsheet at the

22      back -- it doesn't appear -- it does not

23      appear to directly link to my

24      spreadsheet that I produced.

25

1     BY MS. HIBBERT:

2          Q.    Okay.

3               And you don't recall having any

4     involvement in producing the numbers that are

5     reflected in this spreadsheet in Exhibit 1,

6     correct?

7          A.    I had no direct duty in regard to

8     preparing the spreadsheet at the back.

9          Q.    Okay.

10              Can you turn to page 9 of

11    Exhibit 1?  Let me know when you're there.

12         A.    I am.

13         Q.    Okay.

14              Do you see your name listed there

15    at the top of page 9 of Exhibit 1 in answer

16    to Interrogatory Number 18 for Summit County?

17         A.    Yes, I do.

18         Q.    And it actually begins on page 8.

19              It says:

20              "Additionally, Plaintiff

21               identifies the following persons

22                with knowledge of such damages."

23              And "such damages" being listed

24    above that on page 7 and 8.  And it lists

25    your name there on page 9.

Page 26

1                  Do you see that?

2           A.    I'm sorry.  Can you refer to

3      where you were referring to again?  I'm

4      sorry.

5           Q.    Sure.  The bottom of page 8.

6           A.    Okay.

7           Q.    It says:

8                  "Additionally, Plaintiffs

9                identify -- Plaintiff identifies

10                the following persons with

11                knowledge of such damages."

12                  The "such damages" being those

13      listed above on pages 7 and 8.  And it lists

14      your name as a person with knowledge on

15      page 9.

16                  Do you see that?

17           A.    Yes, I do.

18           Q.    What knowledge do you have as to

19      any of the damages listed here in

20      Interrogatory Response Number 18, marked as

21      Exhibit 1?

22                  MR. PENDELL:  Objection to form.

23                  THE WITNESS:  In my duties as the

24           CFO for Summit County Children Services,

25           I did produce a spreadsheet that

```
 1              estimated the costs associated with

 2              opioid removals.

 3                     And while I don't know that -- I

 4              mean, because I wasn't directly involved

 5              in producing this spreadsheet, my

 6              assumption is that my calculations are

 7              somehow factored into this.

 8       BY MS. HIBBERT:

 9              Q.   Why do you assume that?

10              A.   Well, I mean, I guess, because I

11       produced a document estimating the cost that

12       had the -- the author of this spreadsheet had

13       to start from somewhere.

14              Q.   Do you know who the author of

15       this spreadsheet was?

16              A.   I do not.

17              Q.   And did anyone ask you to confirm

18       that the numbers reflected in this

19       spreadsheet in Exhibit 1 were accurate?

20                     MR. PENDELL:  Objection to form.

21                     You're not to disclose any

22              communications you had with counsel.

23                     But if you can answer the

24              question other than that, go ahead.

25                     THE WITNESS:  The question was
```

Page 28

1           again?

2      BY MS. HIBBERT:

3           Q.   Did anyone ask you to confirm

4      that the numbers reflected here in Exhibit 1,

5      the spreadsheet in Exhibit 1, were accurate?

6           A.   No.  I was not asked to verify

7      these numbers.

8           Q.   And did you verify them?

9                Outside of being asked, did you

10     compare them to what you had calculated in

11     the spreadsheet that you produced?

12          A.   No.  I've done no comparative

13     work.

14          Q.   Outside of the spreadsheet that

15     you produced related to opioid removals, do

16     you have any knowledge as to any of the

17     damages being claimed in this case?

18          A.   No, I do not.

19          Q.   Do you have any knowledge as to

20     any of the items listed on page 7 -- pages 7

21     and 8 in the bullet points starting with

22     "Increased availability of

23     medication-assisted treatment"?

24               MR. PENDELL:  Objection to form.

25               THE WITNESS:  No, I do not.

Page 29

1          BY MS. HIBBERT:

2                  Q.    Turning to page 6 of Exhibit 1 --

3          let me know when you're there.

4                  A.    I am.

5                  Q.    There's a bullet point at the

6          very bottom of page 6.  It states:

7                          "Past and ongoing lost tax

8                   revenue in the amount of

9                   approximately $734 million."

10                 Do you see that?

11                 A.    Yes, I do.

12                 Q.    Do you have any knowledge as to

13         the past and ongoing lost tax revenue for

14         Summit County or the City of Akron?

15                 MR. PENDELL:  Objection to form.

16         BY MS. HIBBERT:

17                 Q.    Related to the allegations in

18         this case.

19                 MR. PENDELL:  Same objection.

20                 THE WITNESS:  No, I do not.

21         BY MS. HIBBERT:

22                 Q.    If I can ask you to turn to

23         Exhibit 2, interrogatory responses for the

24         City of Akron.

25                 Back up for a minute.

Page 30

1              Did you know that you were listed
2    as a person with knowledge as to damages in
3    this case for Summit County?
4         A.    Yes, I did.
5         Q.    And did you know that you were
6    also listed as a person with knowledge as to
7    damages for the City of Akron in this case?
8         A.    Yes, I did.
9         Q.    Turning to page -- pages 8 and 9
10   of Exhibit 2, the same information that we
11   went over previously identifying you as a
12   person with knowledge of such damages is
13   listed here for the City of Akron; is that
14   right?
15        A.    Yes, it is.
16        Q.    Did you prepare any sort of
17   analysis or spreadsheet like you did for
18   Summit County for the City of Akron?
19        A.    No, I did not.
20        Q.    Do you have any information or
21   knowledge about damages specific to the City
22   of Akron?
23        A.    No, I do not.
24        Q.    Do you know why you were
25   identified as a person with knowledge of

Page 31

1      damages related to the City of Akron here?

2              A.   No, I do not.

3              Q.   You can set that aside.

4                   I'm going to show you what I've

5      marked as Exhibit Number 3.

6                   (Email chain, beginning Bates

7                   SUMMIT_344090, marked as

8                   Deposition Exhibit 3.)

9      BY MS. HIBBERT:

10             Q.   Have you ever seen this document

11     before?

12             A.   Yes.

13             Q.   This document is an email chain

14     between you, Ms. Julie Barnes, and

15     Rich Marountas -- is that how you pronounce

16     his last name?

17             A.   I believe so.

18             Q.   Who is Julie Barnes?

19             A.   She is the executive director of

20     Summit County Children Services.  She's also

21     my direct report -- or I report directly to

22     her, excuse me.

23                  MS. HIBBERT:  And just for the

24          record, too, Exhibit 3 is ending in

25          Bates label 344090.

1      BY MS. HIBBERT:

2             Q.   Do you see that number at the

3      bottom right-hand corner there?

4             A.   Yes, I do.

5             Q.   Do you know who Rich Marountas

6      is?

7             A.   I don't know what his specific

8      job duties are.  I believe he's with

9      Summit County Department of Health -- or

10     Health Department.  I don't know if he's the

11     director or the finance director.

12            Q.   Do you know if he's the chief

13     epidemiologist?

14                 MR. PENDELL:  Objection to form.

15                 THE WITNESS:  I don't.

16     BY MS. HIBBERT:

17            Q.   Have you ever heard that term

18     before?

19            A.   I've heard the term before, but I

20     don't recall.

21            Q.   Do you recall this correspondence

22     from just over a year ago, in October of

23     2017?

24            A.   Yes, I do.

25            Q.   Do you know why Ms. Barnes is

1      asking you to send information regarding the

2      cost of the opioid epidemic to

3      Rich Marountas?

4              A.   I do not know.

5              Q.   Did you ever ask her why that

6      information was being asked to be sent?

7              A.   No, I did not.

8              Q.   Did you ever have any

9      conversations with Ms. Barnes or

10     Mr. Marountas about the information or this

11     request?

12              MR. PENDELL:  Objection to form.

13              THE WITNESS:  No, neither one.

14     BY MS. HIBBERT:

15              Q.   And the top email here is from

16     you to Ms. Barnes, cc'ing Rich.  And it has

17     you saying, "Please see the attached and let

18     us know if you have any questions."

19              So you sent something to

20     Ms. Barnes and to Rich at this point,

21     correct?

22              A.   Yes, I did.

23              Q.   Did you follow up with any

24     questions as to the information you sent to

25     them after October 6th, 2017?

Page 34

1          A.   I did not.

2          Q.   Did anyone follow up with you

3     with any questions as to the information you

4     sent on this date?

5          A.   Not to my recollection, no.

6          Q.   And the attachment that you

7     reference there is also attached to Exhibit 3

8     here.  There is a spreadsheet -- it looks a

9     little bit funny because it's been printed

10    out -- on the last two pages of the exhibit.

11          Do you see that?

12          A.   Yes, I do.

13          Q.   Is this the spreadsheet that you

14    were referencing earlier that you produced to

15    help understand the impact of the cost to the

16    agency in approximately May of 2017?

17          A.   Yes, it is.

18          Q.   Since sending this spreadsheet to

19    Mr. Marountas in October 2017, have you made

20    any further edits or revisions to your

21    calculations pertaining to the impact of the

22    cost to the agency reflected in this

23    spreadsheet?

24          A.   Yes, I have made revisions.

25          Q.   When did you make those

Page 35

1    revisions?

2         A.   I can't recall the specific date,

3    but probably within the last two to three

4    months.

5         Q.   Why did you make revisions to the

6    spreadsheet in the last two to three months?

7              MR. PENDELL:  I'm going to object

8         to that question.

9              And I'm going to instruct you, if

10        it involves a communication with

11        lawyers, not to answer but, otherwise,

12        you can answer.

13   BY MS. HIBBERT:

14        Q.   Can you answer that question with

15   those instructions in mind?

16        A.   I believe I can.

17             We were looking -- basically, we

18   were asked to revise the original

19   spreadsheet, just based on additional

20   information that we had received that would

21   help to clarify.

22        Q.   The additional information that

23   you received, was that received from

24   attorneys representing Summit County in this

25   case?

```
 1              A.   It was produced in-house, the
 2      information that was received.
 3              Q.   Who produced it in-house?
 4              A.   Our quality improvement
 5      department produced that information.
 6              Q.   And the quality improvement
 7      department is not based in the legal
 8      department, correct?
 9              A.   It is not.
10              Q.   What information was produced by
11      the quality improvement department that led
12      you to revise the numbers reflected in the
13      spreadsheet marked as Exhibit 3?
14                 MR. PENDELL:  Objection.  Well --
15           yeah, I'm going to instruct the witness
16           not to answer this.
17                 You're getting into conversations
18           called by counsel's request, so he's not
19           going to answer any of these questions.
20                 (Instruction given.)
21                 MS. HIBBERT:  We've already
22           determined that the QI department is not
23           within legal.
24                 MR. PENDELL:  It was done at
25           Counsel's request.  He's not going to
```

Page 37

1                 answer the question.

2                        We can argue about it if you'd

3                 like to, or you can ask another

4                 question.  But I'm instructing the

5                 witness not to answer any of these

6                 questions.

7           BY MS. HIBBERT:

8                 Q.   Mr. Kearns, do -- outside of this

9           instance that we've discussed just a moment

10          ago, have you ever worked with the QI

11          department in obtaining different numbers and

12          calculations before?

13                Q.   I have not directly.

14                Q.   Do you understand that the QI

15          department does pull numbers and do various

16          calculations for Summit County Children

17          Services on a regular basis?

18                       MR. PENDELL:  Objection to form.

19                       THE WITNESS:  I do understand

20              that, yes.

21          BY MS. HIBBERT:

22                Q.   That's part of their job as the

23          quality improvement department, correct?

24                       MR. PENDELL:  Objection to form.

25                       THE WITNESS:  Yes, it is.

Page 38

1      BY MS. HIBBERT:

2            Q.    And have they ever pulled numbers

3      or done any calculations for you related to

4      the costs associated with opioids and the

5      impact to the agency outside of the instance

6      two to three months ago that we were just

7      discussing?

8                  MR. PENDELL:  Objection to form.

9                  THE WITNESS:  Not that I am aware

10        of.

11     BY MS. HIBBERT:

12           Q.    Are you aware of any other

13     analysis that the QI department has done at

14     any time other than the one two to three

15     months ago we were just discussing, related

16     to determining the impact of the cost of

17     opioids to the agency?

18           A.    Not that I'm aware of.

19           Q.    When you revised the calculations

20     included in Exhibit 3, did you send those to

21     anyone other than attorneys at the agency?

22           A.    I believe Julie Barnes received a

23     copy.

24           Q.    Was she the one that asked you to

25     revise the numbers?

```
                                             Page 39
 1              MR. PENDELL:  That's a yes-or-no
 2         question.
 3              THE WITNESS:  Yes.
 4    BY MS. HIBBERT:
 5         Q.  When did she ask you to revise
 6    the numbers, your calculations included in
 7    Exhibit 3?
 8         A.  Well, it was probably, as I said,
 9    two or three months ago.
10         Q.  Did you send those revised
11    calculations to Ms. Barnes via email?
12         A.  Yes, I did.
13         Q.  And, again, those revised
14    calculations that you sent to Ms. Barnes, was
15    that about two or three months ago that you
16    sent them to her?
17         A.  Yes, if not sooner.  I have
18    done -- I did a revision probably two or
19    three months ago, and I think I've done
20    another one since.
21         Q.  Why did you do another one since?
22              MR. PENDELL:  Objection to form.
23              And I'm going to remind you not
24         to disclose any communications you've
25         had with counsel.  If you can answer the
```

```
 1            question otherwise, feel free.
 2                   THE  WITNESS:   Again, the
 3            additional revision was based on, you
 4            know, revised information.
 5      BY MS. HIBBERT:
 6            Q.   And the newly revised
 7      information, did that also come from your QI
 8      department?
 9            A.   Yes.  It was based upon the
10      information provided by the QI department.
11            Q.   Do you know who instructed the QI
12      department to obtain additional information?
13            A.   That would have been Julie,
14      Julie Barnes.
15            Q.   What information was obtained by
16      the QI department that led you to revise
17      again the calculations included in Exhibit 3?
18                   MR. PENDELL:  Objection.
19                   I'm going to shut this down in a
20            moment.  I've already told you that
21            there was information that was requested
22            at the request of counsel.  You are
23            making an end run around that.  He's not
24            going to answer these questions.
25                   I'm instructing you not to answer
```

Page 41

1           those questions.  It's attorney work

2           product.  We're not going there.  I

3           can --

4                 (Instruction given.)

5                 MS. HIBBERT:  Counsel, there's no

6           need to get heated here.  We're at the

7           beginning of the deposition of --

8                 MR. PENDELL:  You are making a

9           run around.

10                MS. HIBBERT:  -- a long day.

11                MR. PENDELL:  You are making a

12          run around.  You're trying to get

13          through the attorney-client work

14          product --

15                MS. HIBBERT:  I'm not.

16                MR. PENDELL:  -- attorney-client

17          communication and attorney work product

18          doctrine.

19                MS. HIBBERT:  I'm simply asking

20          questions about a different, now,

21          instance that was directed by

22          Ms. Barnes, who is not an attorney.  And

23          that's not privileged, Counsel.

24                MR. PENDELL:  If it was done at

25          my request, that is work product and

Page 42

1          you're not entitled to it.

2                  So move on, because he's not

3          going to answer these questions.

4                  MS. HIBBERT:  If you're

5          representing that Ms. Barnes did that at

6          your request, then --

7                  MR. PENDELL:  I think that's the

8          representation I just made on the

9          record.

10                 MS. HIBBERT:  Okay.  Well, that

11         wasn't clear to me.

12                 MR. PENDELL:  Move on.

13                 MS. HIBBERT:  Again, there's no

14         reason to get angry.  We don't need to

15         start that here today.

16                 MR. PENDELL:  I'm not getting

17         angry.  Stop showboating because the

18         camera is on.  Ask your questions and

19         move on.

20                 MR. ARNOLD:  This is

21         video-recorded.  There's no --

22                 MR. PENDELL:  That's right.

23                 MS. HIBBERT:  I think the video

24         will show exactly how you're acting.

25         It's very inappropriate.

Page 43

1              We can move on.

2              MR. HALLER:  I'm going to make an

3        objection.

4              MR. PENDELL:  Stop the speeches

5        and move on.

6              MR. HALLER:  If the plaintiffs

7        here are going to rely on the original

8        spreadsheet with this witness, and their

9        experts are going to rely on this

10       original spreadsheet, I don't have a

11       problem.

12             But if the experts in this case

13       are going to rely on a revised

14       spreadsheet and they've been shown that,

15       I promise you, I will move to preclude

16       any testimony from that expert relying

17       on anything you are stopping us from

18       inquiring into today.

19             MR. PENDELL:  Your objection is

20       noted.

21             MS. FLOWERS:  Which spreadsheet

22       are you referring to?  The one in his

23       hand, or --

24             MR. HALLER:  The original

25       spreadsheet in Exhibit 3, he's revised

Page 44

1          that twice.

2                 If the experts to this case are

3          going to rely on any of those revisions,

4          it's totally inappropriate for you to

5          preclude questioning about those revised

6          spreadsheets today.

7                    MR. ARNOLD:  We agree.

8                    MR. HALLER:  But --

9                    MS. FLOWERS:  So I think where

10         that makes us land, just so that we can

11         be clear, is that, as I understand, the

12         first spreadsheet that he talks about is

13         fair game.

14                    MS. HIBBERT:  Which spreadsheet

15         is that, Exhibit 3, the original

16         calculations?

17                    MS. FLOWERS:  Yes.

18                    MR. PENDELL:  Correct.

19    BY MS. HIBBERT:

20            Q.   Okay.  Let's set aside Exhibit 3.

21    We'll come back to that a little bit later.

22            A.   Okay.

23                    (Darin C. Kearns - CPA,

24                    Curriculum Vitae, Bates

25                    SUMMIT_001921248 through

Page 45

1                 SUMMIT_001921250, marked as

2                 Deposition Exhibit 4.)

3       BY MS. HIBBERT:

4             Q.   Mr. Kearns, I'm going to show you

5       what was marked as Exhibit 4.  It's a copy of

6       your CV that was produced in this case.

7                 I assume you've seen this

8       document before?

9             A.   Yes, I have.

10            Q.   Is this an accurate copy of your

11      curriculum vitae or CV?

12            A.   It is, yes.

13            Q.   Do you know when you prepared

14      this copy, this CV marked Exhibit 4?

15            A.   A month or so ago.

16            Q.   Did you prepare it for any

17      specific reason?

18            A.   I was asked to prepare it for

19      this purpose.

20            Q.   For the litigation?

21            A.   Yes.

22            Q.   You weren't applying for a new

23      job, were you?

24            A.   I was not, no.

25            Q.   I ask that because it has updated

Page 46

1      information.  Do you see that?

2                  It has information regarding your

3      current duties, correct?

4             A.   Yes, it does.

5             Q.   Going back to your education,

6      where it all started.

7             A.   Sure.

8             Q.   What was the highest level of

9      education that you obtained?

10            A.   My Bachelor of Business

11     Administration.

12            Q.   And that was a major in

13     accounting obtained in 1992; is that correct?

14            A.   Yes.

15            Q.   You're also a Certified Public

16     Accountant; is that right?

17            A.   I am, yes.

18            Q.   And you obtained that

19     certification in November of 2003?

20            A.   Yes.

21            Q.   Do you keep that certification

22     active?

23            A.   I do not.  My certification is

24     inactive currently.

25            Q.   When did it become inactive?

Page 47

```
 1              A.   A good long time ago.  I honestly

 2      don't know specifically.  It has been a

 3      number of years.

 4              Q.   For any of the positions that

 5      you've held over time, did you have to have a

 6      current and active certification?

 7              A.   No.

 8              Q.   Do you have any training in

 9      forensic accounting?

10              A.   No, I do not.

11              Q.   Do you have any other licenses or

12      certifications other than the Certified

13      Public Accountant that you know expired some

14      time ago?

15              A.   No, I do not.

16              Q.   Do you have any other specialized

17      training?

18              A.   No, I do not.

19              Q.   You don't have any training in

20      medicine --

21              A.   No.

22              Q.   -- correct?

23                   You don't have any training in

24      pharmacy?

25              A.   I do not.
```

Page 48

1          Q.    Do you have any training in law?

2          A.    I do not.

3          Q.    And do you have any training in

4     epidemiology?

5          A.    No, I do not.

6          Q.    Do you have any friends or family

7     members with training in these specialties?

8          A.    None that I can think of.

9          Q.    Outside of the couple of meetings

10    that you had with your attorneys in

11    preparation for this deposition, did you

12    speak with anybody else?

13              MR. PENDELL:  Objection.

14    BY MS. HIBBERT:

15          Q.    In preparation for the

16    deposition.

17          A.    Oh, okay.  No, I have not.

18          Q.    Did you speak with Ms. Barnes

19    about the deposition?

20          A.    No, I have not.

21          Q.    Were you aware that Ms. Barnes

22    had her own deposition this past Monday, a

23    couple days ago?

24          A.    I am aware, yes.

25          Q.    And did you speak with her after

1 her deposition?

2   A. Only briefly, in terms of was it

3 fun or was it not.

4   Q. And what did she say?

5   A. She said it wasn't something that

6 she would want to do again any time soon.

7   Q. Did you speak to Ms. Barnes about

8 the substance of her testimony during her

9 deposition on December 3rd?

10   A. I did not.

11   Q. Have you done any research in

12 preparation for your deposition today?

13   A. I have not.

14   Q. Outside of documents that you may

15 have reviewed with counsel in your meetings

16 preparation for your deposition, did you

17 review any other documents on your own in

18 preparation for the deposition?

19   A. No, I did not.

20   Q. Have you reviewed any transcripts

21 of testimony prepared in this case in

22 preparation for your deposition?

23   A. No, I have not.

24   Q. After you graduated with your

25 Bachelor of Administration, what was your

Page 50

1       first employment?

2               A.   My first employment after

3       graduation would have been the Ohio

4       Department of Human Services.

5               Q.   Is that on your CV marked as

6       Exhibit 4?

7               A.   It is.  It's Ohio Job and Family

8       Services.  It's formerly known as the Ohio

9       Department of Human Services.

10              Q.   Got it, okay.

11              A.   My apologies.

12              Q.   It said that you had worked at

13      the Ohio Department of Job and Family

14      Services from 1999 to 2010, correct?

15              A.   Yes, that's correct.

16              Q.   And you held various auditing

17      positions in your roles at the Ohio

18      Department of Job and Family Services; is

19      that correct?

20              A.   Yes.

21                   If I might back up, I was

22      employed at TGI Fridays immediately after I

23      graduated, so -- I was a restaurant manager.

24              Q.   Me too.

25              A.   Oh.

1          Q.    In your role with Ohio Job and

2     Family Services, can you explain, throughout

3     your various auditing roles there, what your

4     responsibilities included?

5          A.    How long is this deposition?  I'm

6     sorry.

7               I can.  I started my career with

8     the Ohio Department of Job and Family

9     Services as an auditor.  We were responsible

10    for auditing job and family service

11    organizations, children's services, and child

12    support agencies.

13              We looked at the financial

14    workings of the agency.  We did internal

15    control testing.

16              We did, you know, compliance

17    testing with rules and regulations and

18    standards that the Ohio Department of Job and

19    Family Services had set.

20              I eventually moved to audit

21    supervisor, where those job duties included,

22    you know, supervising the auditors who were

23    doing, you know, the field work.

24              I had primary responsibility for

25    preparation of reports.  I was the liaison

Page 52

1    with the agencies.

2            So for entrance and exit

3    conferences, I would work between the

4    auditors and the agency that we were

5    auditing.  I'm sorry.  I think I jumped.  I

6    went auditor in charge, and then I went audit

7    supervisor.

8            But, I mean, essentially we were

9    tasked with auditing job and family service

10   agencies.

11        Q.   And did you have an occasion to

12   audit Summit County services in your time at

13   Ohio Department of Job and Family Services?

14        A.   Yes, I did.

15        Q.   How many times did you have an

16   opportunity to audit SCCS?

17            Do you know what I'm referring to

18   when I say SCCS?

19        A.   Yes, I do.

20        Q.   That's typically how people refer

21   to Summit County Children Services, correct?

22        A.   It is.

23        Q.   Going back to my question.  How

24   many times, if you recall, did you have the

25   opportunity to audit SCCS?

1                A.    I believe we audited SCCS twice.

2                Q.    Do you recall what years?

3                A.    I do not.

4                Q.    Do you recall the results of

5        those audits?

6                A.    Specifically, I don't, no.

7                Q.    Do you recall if there were any

8        deficiencies noted during those audits?

9                    MR. PENDELL:  Objection to form.

10                   THE WITNESS:  Again, I don't

11           recall the specific audit results.

12                   I mean, it was -- I could say

13           with some certainty that there were

14           probably non-compliant citations.  I

15           don't believe there were any monetary

16           findings.  But to specifically recall, I

17           do not.

18       BY MS. HIBBERT:

19                Q.    Do you recall whether you were

20       auditing the financials of SCCS, or

21       compliance with policies or procedures, or

22       both?

23                   MR. PENDELL:  Objection to form.

24                   THE WITNESS:  We did both.

25

1  BY MS. HIBBERT:

2       Q.   If there were non-compliant

3  citations for either of those two audits at

4  SCCS, where would I obtain that information?

5       A.   At this point, I believe you

6  would have to do a records request from the

7  Ohio Department of Job and Family Services to

8  obtain those audit reports.

9       Q.   In circumstances during your time

10  as an auditor for Ohio Department of Job and

11  Family Services, when there was a

12  non-compliant citation, what was the outcome

13  of that?  What did that mean?

14       A.   Well, we had an audit committee

15  that we submitted our audit reports to.

16            And the audit committee then was

17  tasked with working with the specific agency

18  to develop what was called a corrective

19  action plan.

20            So for each non-compliant

21  citation that was noted, the auditee would

22  need to produce a corrective action plan.

23       Q.   And you don't recall whether

24  there was a corrective action plan produced

25  for either of the Summit County Children

1        Services audits that you conducted, correct?

2              A.   I do not recall.

3              Q.   Outside of the audits that you

4        specifically conducted of SCCS, do you have

5        any knowledge of any other audits that anyone

6        else conducted of SCCS during your time at

7        the Ohio Department of Job and Family

8        Services?

9              A.   I do not.

10             Q.   In your time as an auditor at the

11       Ohio Department of Job and Family Services,

12       did you ever have occasion to audit or

13       participate in an audit of Cuyahoga County's

14       Children Services department?

15             A.   Yes, I did.

16             Q.   How many times did you do that?

17             A.   I believe we audited Cuyahoga

18       County's Children Services once.

19             Q.   Do you recall what year that was?

20             A.   I do not.

21             Q.   Do you recall the outcome?

22             A.   Again, no.  I don't recall the

23       specific outcome.

24             Q.   Do you recall any specifics as to

25       any of the findings or results from that

1    audit?

2            A.    I do not.

3            Q.    The City of Akron doesn't have

4    its own children services department,

5    correct?

6            A.    Not to my knowledge, no.

7            Q.    Were there any other children's

8    services departments in the State of Ohio

9    that you had the opportunity to audit during

10   your time at the Ohio Department of Job and

11   Family Services?

12           A.    Yes, several.

13           Q.    Do you recall whether there were

14   negative outcomes for any of the audits of

15   children's services departments in Ohio at

16   that time?

17           A.    I do not specifically recall.

18           Q.    In your time at Ohio Job and

19   Family Services, were you ever asked -- or

20   did you assess the financial impact of a

21   particular drug?

22           A.    No, we did not.

23           Q.    Outside of your work that you did

24   in producing the spreadsheet that we've now

25   identified as Exhibit Number 3, have you ever

Page 57

1          done an assessment like that before where

2          you've assessed the financial impact of a

3          particular drug?

4                    A.    I have not.

5                    Q.    In your role as auditor for the

6          Ohio Department of Job and Family Services

7          from 1999 to 2010, did you have the

8          opportunity to audit any specific programs

9          related to opioids for either Summit or

10         Cuyahoga County?

11                   A.    I did not.

12                   Q.    Why did you leave the Ohio

13         Department of Job and Family Services in

14         2010?

15                   A.    I was released from employment.

16                   Q.    You were terminated?

17                   A.    I was.

18                   Q.    Do you know the reason for that

19         termination?

20                   A.    I do.

21                   Q.    What was it?

22                   A.    I was accused of fraternization.

23                   Q.    Was there an investigation

24         conducted into that accusation?

25                   A.    Yes, there was.

Page 58

1          Q.    What was the result of that

2     investigation?

3          A.    To my knowledge, they found me

4     guilty.

5          Q.    Was there some sort of

6     administrative proceeding that followed that

7     investigation where they found you guilty?

8          A.    No.

9          Q.    Who conducted the investigation?

10         A.    Office of the Chief Inspector for

11    Ohio Department of Job and Family Services

12    conducted the investigation.

13         Q.    And did this occur in 2010?

14         A.    Yes, it did.

15         Q.    How long did the investigation go

16    on?

17         A.    I am uncertain.  I don't know.

18         Q.    Do you know when you were first

19    made aware of the accusation?

20         A.    I believe it was in late 2009.

21         Q.    And the allegation was improper

22    fraternization with a colleague; is that

23    correct?

24         A.    That is correct.

25         Q.    Do you know what date you were

Page 59

1    terminated?
2         A.   Not specifically.  I believe it
3    was September of -- I believe it was in
4    September of 2010.
5         Q.   Did you have an opportunity to
6    provide any written or oral testimony or
7    explanation regarding those accusations
8    during the investigation?
9         A.   I was interviewed by the
10   investigator.
11        Q.   Do you know if that was recorded?
12        A.   I believe it was, yes.
13        Q.   Was it recorded via video or
14   audio?
15        A.   I believe audio.
16        Q.   Did you obtain a copy of that
17   audio recording?
18        A.   I know at one point I had
19   received a transcript.
20        Q.   Do you know if you still have a
21   copy of that transcript?
22        A.   I do not still have a copy of
23   that transcript.
24        Q.   Do you know what happened to
25   that?

1          A.    I threw it away a long time ago.

2          Q.    When you received that

3     transcript, was that during your employment

4     with Summit County?

5          A.    No, it was not.

6          Q.    Do you know whether that

7     transcript is maintained by the Ohio

8     Department of Job and Family Services?

9          A.    I do not know.

10         Q.    Do you know whether the audio

11    recording itself is maintained by the Ohio

12    Department of Job and Family Services?

13         A.    I do not know.

14         Q.    Do you know whether the record of

15    the investigation into your accusations has

16    been expunged in any way?

17              Do you know what that means?

18         A.    I do, and I do not know if it has

19    been or not.

20         Q.    When you were terminated from

21    your position with the Ohio Department of Job

22    and Family Services, did you lose any

23    benefits or severance that might otherwise

24    have been available, despite the allegations?

25              MR. PENDELL:  Objection to form.

1                   THE WITNESS:  I lost my

2           accumulated vacation balance.  That was

3           the only thing that I lost.

4     BY MS. HIBBERT:

5                   Q.   Did you have to report that --

6     those accusations or the findings of that

7     investigation to anyone or any body?

8                   A.   No, I did not.

9                   Q.   Do you know if at that time you

10    were still certified as a public account?

11                  A.   Yes, I was.

12                  Q.   And you didn't have to report the

13    accusations or the findings of the

14    investigation to any certifying body?

15                  A.   Not to my knowledge, no.

16                  Q.   Did you lose the certification

17    for your accounting as a result of these

18    accusations?

19                  A.   No, I did not.

20                  Q.   You let those lapse?

21                  A.   I did.

22                  Q.   After your termination from the

23    Ohio Department of Job and Family Services,

24    you moved to the Wayne County Department of

25    Job and Family Services; is that right?

Page 62

1                A.    That is correct.

2                Q.    Did you interview for that

3         position?

4                A.    Yes, I did.

5                Q.    And did you have to disclose the

6         reason for your termination from your

7         previous employment during that interview

8         process?

9                A.    I did not.

10               Q.    Were they aware of your

11        termination or the accusations against you

12        when they hired you, to your knowledge?

13               A.    Not to my knowledge.

14               Q.    Were there any restrictions on

15        your employment with Ohio state or any of the

16        counties in Ohio as a result of your

17        termination from the Ohio Department of Job

18        and Family Services?

19                    MR. PENDELL:  Objection to form.

20                    THE WITNESS:  No, not to my

21            knowledge.

22        BY MS. HIBBERT:

23               Q.    And you were hired with

24        Wayne County Department of Job and Family

25        Services as a business

Page 63

1         administrator/controller; is that correct?

2              A.   That is correct.

3              Q.   And you worked there from 2010 to

4         2015?

5              A.   Yes.

6              Q.   What were your responsibilities

7         as a business administrator/controller?

8              A.   I had responsibility for the

9         fiscal department.  So obviously the internal

10        control system, you know, the processes and

11        procedures for the payment of bills, the

12        recording of revenues.

13                  I was also responsible for

14        building facilities and maintenance.  And I

15        was also responsible for information

16        technology and maintenance of the information

17        technology system.

18                  I was the liaison with the State

19        of Ohio, which was, you know, for maintenance

20        of their equipment on our site.

21             Q.   Did you have any involvement with

22        Wayne County's Children Services Department

23        in this role?

24             A.   I did not.

25                  MR. PENDELL:  Counsel, I don't

1          want to interrupt.  We've been going for

2          about an hour, so when we get to a good

3          point where we can take a break, I would

4          appreciate it.

5                   MS. HIBBERT:  I'm actually on the

6          verge of a coughing fit, so I'd be okay

7          with taking a break at this point.

8                   THE VIDEOGRAPHER:  Off the

9          record, 10:15.

10                  (Recess taken from 10:15 a.m. to

11                  10:35 a.m.)

12                  THE VIDEOGRAPHER:  On the record,

13          10:35.

14     BY MS. HIBBERT:

15          Q.   Mr. Kearns, we left off a moment

16     ago.  We were talking about your employment

17     with Wayne County Department of Job and

18     Family Services.

19                  Do you recall that?

20          A.   I do.

21          Q.   Did any of your responsibilities

22     involve opioids in any way in your role at

23     Wayne County Department of Job and Family

24     Services?

25          A.   No, they did not.

Page 65

1            Q.   You left Job and Family Services
2       for Wayne County in 2015, correct?
3            A.   Yes, I did.
4            Q.   And why did you leave employment
5       with Wayne County at that time?
6            A.   For a better opportunity.
7            Q.   So you left on your own accord?
8            A.   I did.
9            Q.   And what was the better job
10      opportunity?
11           A.   I went to Portage County Job and
12      Family services.
13           Q.   So this was just a -- not even
14      just another county over, because they are
15      quite far apart, correct?
16           A.   They are quite far apart, yes.
17           Q.   And what made you want to go to
18      Portage County Department of Job and Family
19      Services?
20           A.   Well, the additional compensation
21      was a big part of it.  And just the fact that
22      Wayne County Job and Family Services is
23      what's considered a standalone agency,
24      whereas Portage County Job and Family
25      Services is what's considered a quadruple

Page 66

1      combined.

2                   So it would give me exposure to

3      child support, children's services, and

4      what's called workforce investment, in

5      addition to Job and Family Services.

6                   Q.   And Portage County is in Ohio,

7      correct?

8                   A.   Yes, it is.

9                   Q.   Did you have to disclose on any

10     of your job applications or interviews with

11     Portage County, your termination from the

12     Ohio Department of Job and Family Services?

13                  A.   I did not.

14                  Q.   The Portage County of Job and

15     Family Services is a much larger department

16     than the Wayne County, correct?

17                  A.   Yes, it is.

18                  Q.   It has a $29 million social

19     service agency budget, as opposed to

20     $10 million for Wayne County, correct?

21                  A.   That is correct.

22                  Q.   What were your responsibilities

23     with Portage County Job and Family Services?

24                  A.   They were -- I mean, they were

25     primarily the same as with Wayne County Job

Page 67

1     and Family Services.

2                    I had responsibility for the

3     fiscal department, again, the internal

4     control system, the policies and procedures

5     related to that, the, you know, establishment

6     of budgets, purchase orders, all those

7     different sorts of things.

8                    While I did not have

9     responsibility for information technology,

10    the office service supervisor did report to

11    me, I believe.  That's -- I believe she did.

12                    So it was primarily the same as

13    Wayne County Job and Family Services.

14         Q.   But with Portage County Job and

15    Family Services, if I heard you correctly,

16    you did have responsibility for the finances

17    related to the Children Services department

18    in that county; is that correct?

19         A.   Yes, I did.

20         Q.   And what responsibilities did you

21    have specifically with regard to the

22    Children Services Department in Portage

23    County?

24         A.   Again, the responsibilities that

25    I held were more so related to the policies

Page 68

1       and procedures for how to, you know, process

2       invoices, establish purchase orders, you

3       know, the maintenance of the budget, drawing

4       of funds, you know, different things along

5       that line.

6            Q.   Did any aspect of your

7       involvement with Portage County involve

8       opioids in any way?

9            A.   That was probably the first time

10      that opioids really became an issue for me

11      that I understood.

12                You know, through upper level

13      management meetings with, you know, the

14      managers, particularly the Children Services

15      director, you know.

16                And she spoke of, you know, the

17      issue concerning opioids and, you know,

18      removal of children because of.

19           Q.   And what did the director of the

20      Children Services discuss specifically about

21      the impact of opioids on children services?

22           A.   Well, she specifically discussed

23      the fact that we had to remove children, and

24      that there were -- you know, sometimes there

25      were placement costs involved.

Page 69

1             Sometimes there were, you know,

2       we were able to put the children into what's

3       called a kinship placement, which still

4       involves some cost, but certainly not as much

5       as a purchase placement setting.

6             And so her concern was the fact

7       that we were having to place more children as

8       a result of opiate removals -- or

9       opiate-related removals.

10            Q.   Were you involved in any sort of

11      analysis of the financial impact of opioids

12      on Portage County Children Services?

13            A.   We did not do any specific

14      analysis of costs related to opioid removals

15      in Portage County.

16            Q.   Were you involved in the

17      financial analysis of the effect of opioids

18      on any agency or department within Portage

19      County?

20            A.   No.

21            Q.   I think we've gone over all of

22      your previous employment prior to joining

23      Summit County, correct?

24            A.   That is correct.

25            Q.   In any of the roles that you held

Page 70

1          prior to coming to Summit County, were you

2          responsible for or did you assess the

3          financial impact of any particular variable

4          on any agency or department for any of the

5          counties or states that you worked for?

6                   A.    That was a lot.  Could you repeat

7          the question?

8                   Q.    Sure.

9                        Earlier I asked you if whether,

10         in your roles, you had assessed the financial

11         impact of any particular drug on the county

12         or -- the department or agencies that you

13         were overseeing.

14                       Do you recall that question?

15                  A.    I do.

16                  Q.    So I'm asking a broader question

17         now.

18                       Have you ever performed an

19         analysis of the financial impact of any

20         particular variable on any of the agencies or

21         departments that you've had responsibility

22         for --

23                       MR. PENDELL:  Objection to form.

24         BY MS. HIBBERT:

25                  Q.    -- prior to coming to

Page 71

1        Summit County?

2                A.   Okay.

3                     I would say yes.  I mean, but

4        obviously not related.  I did an analysis in

5        Wayne County related to purchasing of a new

6        phone system.

7                     And I had to look at each

8        component of the phone system, from purchase

9        to maintenance, upgrades, and updates to the

10       system, you know, integration into our

11       computer system, because we were looking at a

12       voice over IP system.

13                    So I had to do a relatively

14       significant analysis of the cost of each

15       proposed system to Wayne County.

16               Q.   Any other analysis of financial

17       impact other than the phone system in

18       Wayne County prior to coming to

19       Summit County?

20               A.   Not that I can specifically

21       remember, no.

22               Q.   And certainly nothing with regard

23       to financial impact of any elicit or legal

24       drugs, correct?

25               A.   That is correct.

1             Q.    Had you done any analysis of the

2       financial impact of increased cost for

3       placement for children services in any of the

4       roles that you held prior to coming to

5       Summit County?

6             A.    No, I had not.

7             Q.    You left Portage County

8       Department of Job and Family Services after a

9       relatively short time, about six months.  Is

10      that right?

11            A.    Six months, that is correct.

12            Q.    And why did you leave employment

13      with Portage County?

14            A.    Well, Summit County is a little

15      bit closer to home, and there was a financial

16      benefit as well.  So those were the primary

17      reasons.

18            Q.    Was there an opening for the

19      position that you took over in Summit County?

20            A.    There was going to be a vacancy,

21      yes.

22            Q.    And how did you become aware of

23      that vacancy?

24            A.    Summit County reached out to me

25      to inquire as to whether or not I would be

1          interested in having a chat about the

2          position.

3                   Q.   Who at Summit County reached out

4          to you?

5                   A.   Ms. Valerie Nash, who is our

6          deputy director of human services -- or, I'm

7          sorry, human resources.  Excuse me.

8                   Q.   Do you know how Ms. Nash came to

9          know of you?

10                  A.   I do.  I had the opportunity to

11         audit Stark County Job and Family Services

12         where not only Ms. Nash was employed, but

13         also Julie Barnes was the director at the

14         time.

15                  So I guess through circles,

16         Valerie identified me as a candidate and

17         invited me to come and talk with her about

18         the position.

19                  Q.   When you audited the Stark County

20         Job and Family Services, was that in your

21         role at the Ohio Department of Job and Family

22         Services?

23                  A.   Yes, it was.

24                  Q.   And do you know what time period

25         it was that you did that audit with

Page 74

1      Stark County?

2              A.   I don't recall.

3              Q.   When Valerie Nash first

4      approached you, what was that discussion

5      like?

6              A.   Valerie -- I don't think it was

7      Valerie.  I think it was Leslie -- I can't

8      think what her last name is right now.

9      Her -- Valerie's administrative assistant

10     called me and she asked me if I would like to

11     come and chat about a job opportunity.  She

12     really didn't give me a lot of details above

13     and beyond that.

14             Q.   Did you have to fill out an

15     application for that job?

16             A.   I did.

17             Q.   And did you end up going to have

18     that chat about that job?

19             A.   I did.

20             Q.   Was that with Ms. Nash?

21             A.   It was with -- it was with

22     Valerie and Julie.

23             Q.   Julie Barnes?

24             A.   Julie Barnes and Gary Binns, who

25     was my predecessor.

Page 75

1          Q.   Do you know what Gary Binns'
2     title was?
3          A.   He held my title, deputy
4     director, fiscal services.
5          Q.   And at that time was Ms. Barnes
6     the executive director of Summit County
7     Children Services?
8          A.   Yes, she was the executive
9     director.
10          Q.   And was that chat an interview?
11          A.   Yes, it was.
12          Q.   Was that the only interview you
13     had for the job at Summit County?
14          A.   Yes, it was.
15          Q.   And, again, with Summit County,
16     did you have to disclose your termination
17     from Ohio Department of Job and Family
18     Services in applying for the job with
19     Summit County?
20          A.   Yes, I did.
21          Q.   Was that part of the application?
22          A.   Yes, it was.
23          Q.   Were there any issues related to
24     that disclosure being --
25          A.   No, there were not.

Page 76

1          Q.   Summit County didn't, to your

2     knowledge, do any additional investigation

3     into those allegations, correct?

4          A.   Not to my knowledge.

5          Q.   How long after you first

6     interviewed with Ms. Nash, Ms. Barnes, and

7     Mr. Binns, did you officially come on?

8          A.   I think it was probably a month

9     between the interview and when I actually

10    started employment with Summit County

11    Children Services.

12         Q.   Did you overlap with

13    Mr. Gary Binns, or had he retired before you

14    came on?

15         A.   I overlapped with Gary.

16         Q.   He did eventually retire,

17    correct?

18         A.   Yes, he did.

19         Q.   How long did you overlap?

20         A.   I think we overlapped for about

21    eight weeks.

22         Q.   Did Mr. Binns provide any

23    training during that time period?

24         A.   Yes, he did.

25         Q.   What training did you undergo for

1          your role as deputy executive director of

2          fiscal services for Summit County?

3                   A.    Well, Gary was tasked with --

4          excuse me -- walking me through, you know,

5          the primary duties of the deputy director of

6          fiscal services.

7                        He showed me his processes for,

8          you know, preparing the financial reports to

9          present to the board of directors.  He walked

10         me through his day-to-day duties in terms of,

11         you know, documents that need to be signed

12         for approval, for payment, childcare

13         invoices, and things along that line.

14                       He also walked me through the

15         policies and procedures that were necessary

16         to maintain a strong internal control system,

17         you know, within, you know, the fiscal

18         department.

19                       He also introduced me to my

20         direct report for facility services.  Her

21         name is Linda McMahon.

22                       And I walked through -- you know,

23         he walked me through his interactions with

24         her and his responsibilities, in terms of,

25         you know, approving projects for facilities

Page 78

1          maintenance and capital improvements,

2          different things along that line.

3                    I mean, so -- I don't know how

4          much detail you want me to go into.  We could

5          talk about it for quite some time.

6               Q.   Sure.

7                    Going back to the interview that

8          you had with Summit County, were you asked

9          any questions specifically related to

10         opioids?

11              A.   I'm sorry.  Could you -- I didn't

12         catch the entire question.

13              Q.   Sure.

14                   When you interviewed for the job

15         at Summit County, were you asked any

16         questions related to opioids?

17              A.    I was not, not to my

18         recollection.

19              Q.   Was there any discussion about

20         the impact of opioids on Summit County

21         Children Services during your interview

22         process?

23              A.   Not to my recollection.

24              Q.   To your knowledge, had Gary Binns

25         prepared any financial analysis of the impact

Page 79

1    of opioids on Summit County Children Services

2    before you got there?

3            A.    Not to my knowledge.

4            Q.    To your knowledge, had anyone

5    prepared any analysis of the financial impact

6    of opioids on Summit County Children Services

7    before you came on board in June of 2016?

8            A.    Not to my knowledge.

9            Q.    Can you give a general overview

10    of what your responsibilities are -- let's

11    start --

12            Let me ask this.  Have your

13    responsibilities changed in any way as deputy

14    executive director of fiscal services for

15    Summit County since you began in June of

16    2016?

17            A.    Not specifically, no.

18            Q.    Can you give me an overview of

19    what those responsibilities include?

20            A.    Yes.  Again, I'm primarily

21    responsible for the function of the fiscal

22    department, the internal control system for

23    maintenance of financial records.

24            I'm responsible for all of the

25    policies and procedures of the fiscal

1          department, you know, that dictate how we

2          handle certain types of invoices, costs.

3                    We are the -- we're responsible

4          for donated funds, as that is a separately

5          maintained account and so we write -- you

6          know, we pay bills out of that account.  So,

7          again, I have responsible for internal

8          control over our donated funds.

9                    Any audits of our department, I

10         am the lead individual for audits, audit

11         responses, you know, corrective action plans,

12         anything along that line, if we are asked to

13         do one.

14                    As I mentioned, facilities,

15         facility services are under my umbrella, and

16         also facilities maintenance.

17              Q.   Has Summit County Children

18         Services -- and, again, I'm going to go back

19         to referring to them as SCCS, so it's not

20         such a mouthful.

21                    Have they been audited since you

22         joined Summit County in June 2016?

23              A.   Yes, we have.

24              Q.   Who have they been audited by?

25              A.   We have been audited by the

Page 81

1      Auditor of State, of Ohio.  We are included

2      as part of the single audit of the County of

3      Summit.  As a quasi, you know, government

4      entity, we're included under that audit.

5              We've also gone through a federal

6      audit for our Title IV-E case files and cost

7      reimbursement.  I think that's -- social

8      security, also audited our social security

9      records in regards to children that receive

10     SSI benefits.

11          Q.   So the ones that you just went

12     through, are they four separate audits?

13          A.   Yes.  Those would all be separate

14     audits.

15          Q.   So there's an Ohio state, Summit

16     county, a federal audit, and a separate

17     social security audit; is that correct?

18          A.   Yes.  Those would all be separate

19     audits.

20          Q.   Do you recall when the Ohio state

21     audit occurred?

22          A.   Yeah.  We just included our

23     Auditor of State around June of this year, I

24     believe.  And we were also audited in 2017,

25     and it concluded around the same time,

Page 82

1      probably around June of 2017.

2           Q.   Is that an annual audit

3      regularly?

4           A.   Yes, it is an annual audit.

5           Q.   What were the results of the 2017

6      Ohio state audit?

7           A.   Our --

8                MR. PENDELL:  Objection to form.

9                THE WITNESS:  I'm sorry?

10               MR. PENDELL:  I was just

11          objecting.  You can answer.

12               THE WITNESS:  Our 2017 audit, we

13          had no -- we had no findings.

14     BY MS. HIBBERT:

15          Q.   What does that mean, to have no

16     findings?  They came in, they left, no one

17     said anything about it?

18          A.   That would be correct, yes.  They

19     were happy with our -- yeah.  They were happy

20     with it.

21          Q.   When they're happy with what

22     they've audited, do you get some sort of

23     report indicating that?

24          A.   Generally not.  We just -- we're

25     not noted as, you know, having a, you know,

Page 83

1         non-compliant citation or a finding for

2         recovery or a, you know, something along that

3         lines.  So we were not mentioned in the 2017

4         report.

5                 Q.   They don't give you any accolades

6         if you successfully pass the audit, they just

7         tell you if you've done something wrong?

8                 A.   That would be correct.

9                 Q.   How about the 2018 audit that

10        just wrapped up in June of this year?  What

11        was the result of that audit?

12                    MR. PENDELL:  Objection to form.

13                    THE WITNESS:  The 2018 audit, we

14           had one non-compliant citation that was

15           noted.

16        BY MS. HIBBERT:

17                Q.   What did that involve?

18                A.   It involved the recording of

19        what's called full-time equivalency data into

20        our state financial system.

21                Q.   What is full-time equivalency

22        data?  What does that mean?

23                A.   Full-time equivalency data is a

24        measure of the number of employees that we

25        have on staff.  So not necessarily a

Page 84

1    headcount, but how many employees work, on

2    average, 40 hours per week.

3              So we could have two part-time

4    employees working 20 hours each, and that

5    would be equivalent to one FTE.

6              We have to report that data to

7    the State of Ohio.  While it does not impact

8    our financial performance directly, the State

9    of Ohio uses that data to allocate costs to

10   federal programs.

11        Q.   What does that mean, that they

12   use the data to allocate costs to federal

13   programs?  Can you explain that a bit more?

14        A.   Essentially what that means is

15   that, you know, obviously at the state level,

16   there are several federal funding sources,

17   from Title IV-E, Title IV-B, TANF, food

18   stamps, Medicaid, you know, I could name

19   several more.

20              The State of Ohio needs to have a

21   defined methodology for assigning costs to

22   those federal programs.  They use the FTE

23   data from children services for the state, as

24   a whole, to assign costs to the federal

25   programs.

Page 85

1          Q.   And does that analysis impact in

2     any way how much is eventually allocated to

3     you from those federal funds?  And by "you,"

4     I mean Summit County?

5          A.   Not to my knowledge, no.

6          Q.   Was there a corrective action

7     plan put into place as a result of the

8     non-compliant citation?

9          A.   Yes, there was.

10          Q.   Were you involved in the

11     development of that corrective action plan?

12          A.   Yes.  I created the plan and

13     submitted it to the audit team.

14          Q.   When was that submitted?

15          A.   I think in July, sometime around

16     that July/August time frame.

17          Q.   And what did the corrective

18     action plan entail?

19          A.   The corrective action plan

20     essentially detailed how we were going to

21     address the deficiency.

22               And, you know, it was

23     essentially, you know, the establishment of,

24     you know, a calendar to indicate when FTE

25     data should be entered, and then an email

Page 86

1          reminder to myself to do it.

2                    Q.    And how often is that data

3          supposed to be entered?

4                    A.    Monthly.

5                    Q.    How long is the corrective action

6          plan in place?

7                    A.    I don't know.

8                    Q.    Is there a plan to do some sort

9          of re-audit to ensure satisfaction of the

10         details of the corrective action plan?

11                   A.    I am not sure how the Auditor of

12         State follows up on these types of matters.

13                   Q.    Did you have any conversations

14         with the Auditor of State about the terms of

15         the corrective action plan?

16                   A.    Only through -- they did --

17         because we had a non-compliant citation, it

18         was mentioned in the audit report.

19                    And I believe they had a

20         statement in the audit report that said they

21         had accepted our corrective action plan.

22                   Q.    Do you know when you received

23         that audit report?

24                   A.    Probably -- again, that time

25         frame, probably around August, September

Page 87

1          somewhere around there, they issued their
2          final report.
3                 Q.    Do you know whether that's a
4          publicly-available document?
5                 A.    It is.
6                 Q.    So that's something I could find
7          on the internet?
8                 A.    Yes, Auditor of State.
9                 Q.    Were there any other
10         non-compliant findings or deficiencies noted
11         during the 2018 Ohio state audit?
12                A.    For Summit County Children
13         Services, there were not.
14                Q.    Were there other non-compliant
15         findings or deficiencies noted for other
16         Summit County programs during that audit?
17                      MR. PENDELL:  Objection to form.
18                      THE WITNESS:  I do not know.
19         BY MS. HIBBERT:
20                Q.    Are you aware of any other
21         non-compliant findings or deficiencies for
22         any other state audit prior to the time you
23         joined Summit County Children Services in
24         June of 2016?
25                A.    I am not aware.

Page 88

1              Q.    There's also a Summit County

2        audit you spoke about, correct?

3              A.    There is, yes.

4              Q.    Was there just one Summit County

5        audit in the time that you've been with SCCS,

6        or multiple?

7              A.    Well, we are a part of

8        Summit County's audit as a whole.

9              Q.    What does that mean?

10             A.    There's what's called a single

11       audit that's mandated by the federal

12       government.

13                   The State of Ohio has to do

14       single audits of county entities.  And as

15       part of the county as a whole, you know, we

16       participate as part of that audit.

17                   So Summit County is being

18       audited.  Since we're part of Summit County,

19       we participate.  We are also audited as part

20       of that audit.

21             Q.    And when Summit County is being

22       audited -- is that the state audit that

23       you're referring to, or another audit?

24             A.    Yes.  The Auditor of State -- the

25       Auditor of State is conducting that audit.

Page 89

1              Q.   So the Summit County audit that
2         we referred to earlier, that's still under
3         the Ohio state audit that we've already
4         talked about, or is that something separate?
5              A.   Yes, it is.  That is underneath
6         the Auditor of State.
7              Q.   There's no separate
8         Summit County-specific audit that you have
9         participated in in your role with SCCS other
10        than what we've already talked about with
11        Ohio state?
12             A.   If I understand the question
13        correctly, no, there is no other -- only with
14        the Auditor of State.
15             Q.   Moving on to the federal audit
16        for the Title IV-E that we discussed, has
17        that been a single audit since your joining
18        SCCS, or has that been multiple audits?
19                  MR. PENDELL:  Objection to form.
20                  THE WITNESS:  That is a single
21           audit that we have participated in.
22        BY MS. HIBBERT:
23             Q.   When was that conducted?
24             A.   I want to say -- I believe it
25        began in the late summer of 2016 and

Page 90

1          concluded -- excuse me -- early '17, early

2          2017.

3                    Q.    What were the findings or results

4          of your audit for the federal IV-E?

5                    A.    We received a clean audit.

6                    Q.    And do you receive a report in

7          the circumstance of a clean audit such as

8          that one?

9                    A.    No, we don't -- I mean, other

10         than to be told.  That federal IV-E audit is

11         actually a state-wide audit.

12                   So the federal government comes

13         in and selects individual counties and then a

14         random number of cases.  And we have to

15         produce the documents for the federal

16         government to review.

17                   And we only know that we, as

18         Summit County Children Services, we received

19         a clean audit report.

20                   Q.    Do you know how many files SCCS

21         had to produce to the federal government for

22         that audit?

23                   A.    I don't recall.

24                   Q.    And clean audit, meaning there

25         were no non-compliant findings or deficiency

Page 91

1          findings, correct?

2                  A.    That is correct.

3                  Q.    The social security audit that

4          you referenced, was that a single audit or

5          were there multiple audits?

6                  A.    That was a single audit.

7                  Q.    When was that conducted?

8                  A.    In late 2017.

9                  Q.    Was that in conjunction with the

10         federal audit or was it separate?

11                 A.    It was not.  It was separate.

12                 Q.    And what were the results of the

13         social security audit?

14                 A.    We also received a clean finding.

15                 Q.    So no deficiencies, no

16         non-compliant findings?

17                 A.    No deficiencies, no non-compliant

18         findings.

19                 Q.    Have we talked about all the

20         audits that you're aware of of SCCS?

21                 A.    That I'm aware of, yes.

22                 Q.    Going back to your CV.  Do you

23         have that in front of you?

24                 A.    I do.

25                 Q.    You've detailed in a lengthy

Page 92

1       paragraph here what -- a description of your

2       role as deputy executive director for fiscal

3       services for Summit County Children Services.

4                    Do you see that?

5            A.   Are you referencing the entire

6       first paragraph?

7            Q.   Yes.

8            A.   Yes, I see it.

9            Q.   And it says here that you partner

10      with the agency's executive team and board of

11      trustees.

12                   Do you see that?

13           A.   Yes.

14           Q.   Are you part of the executive

15      team for Summit County Children Services?

16           A.   Yes.  I am part of the executive

17      team.

18           Q.   And who else is on that executive

19      team?

20           A.   It would be Julie Barnes, our

21      executive director, Katerina Papas, who is

22      our deputy director for legal services.

23      Amy Davidson, who is our deputy director of

24      social services, Valerie Nash, our deputy

25      director of human resources, and myself.

Page 93

1              Q.    Does the executive team report to

2         the board of trustees?

3              A.    Yes.  We report to the board of

4         trustees.

5              Q.    Do you know how many people were

6         on the board of trustees?

7              A.    No, I don't know the actual

8         number.

9              Q.    What role does the board of

10        trustees have in dictating the policies and

11        procedures of SCCS?

12                   MR. PENDELL:  Objection to form.

13                   THE WITNESS:  Ultimately we

14            report to the board of trustees.

15                   When we make significant changes

16            to policies and procedures, particularly

17            policies -- not so much procedures --

18            the board generally approves the

19            changes.  I'm talking maybe --

20            significant changes.

21                   So if we have a proposed change

22            to a human resource policy that may

23            accept several employees or groups of

24            employees, the board would be asked to

25            approve that change.

Page 94

1               Whereas if I change who signs off

2          on a bill in my department, they're not

3          going to -- they're not asked to approve

4          that.

5               So, I mean, they have oversight

6          over the executive team.  Obviously

7          Julie Barnes reports to the board of

8          trustees directly.

9     BY MS. HIBBERT:

10          Q.   Have there been -- has the board

11    of trustees approved any significant changes

12    to policy since you joined Summit County

13    Children Services in June of 2016?

14               MR. PENDELL:  Objection, form.

15               THE WITNESS:  Yes, they have.

16    BY MS. HIBBERT:

17          Q.   What policies have they approved

18    since then?

19          A.   I don't know that I could

20    specifically identify.  I know we have

21    presented them with policy changes.  I think

22    a number of them out of human resources, but

23    I cannot specifically say what they were

24    related to.

25          Q.   Do you know if there have been

Page 95

1          any policy changes that have been presented
2          to the board of trustees since you've been
3          with SCCS that have not been approved?
4                   A.    None that I'm aware of, no.
5                   Q.    Do any of the policy changes that
6          have been presented to the board of trustees
7          during your time with the SCCS involve
8          opioids in any way?
9                   A.    Not that I am specifically aware
10         of, no.
11                        And I might add on to that, we
12         did -- in 2016, we had to ask the board for a
13         budget adjustment.  Which -- we haven't
14         talked about the budget process, but it's
15         rather lengthy and cumbersome.
16                        But as a result of, you know,
17         increased placement costs, we had to ask the
18         board for an increase to our paid placement
19         budget, and the board had to approve that.
20         So that was a rather significant change that
21         was likely driven by increased costs related
22         to this topic.
23                   Q.    How often, let me ask you this,
24         do you meet with the board of trustees?
25                   A.    We meet monthly.

Page 96

1         Q.    "We," being the executive team?

2         A.    Yes.  I'm sorry.  The executive

3    team meets monthly with the board of

4    trustees.

5         Q.    And is that a public meeting?

6         A.    Yes, it is.

7         Q.    Are there minutes generated from

8    those meetings?

9         A.    Yes, there are minutes.

10        Q.    Are you always involved in those

11   monthly meetings?

12        A.    Yes, I am.

13        Q.    What are your responsibilities to

14   the extent that they carry over from month to

15   month in those meetings with the board of

16   trustees?

17        A.    My responsibility focuses mainly

18   on financial reporting to the board of

19   trustees.

20        Q.    What measures or financial

21   metrics are you reporting to the board of

22   trustees on a monthly basis?

23        A.    I report our monthly -- I report

24   on our monthly financial statements.

25        Q.    Are those monthly financial

1      statements that you, yourself, put together?

2              A.   Yes, myself and my director of

3      finance.

4              Q.   Who is?

5              A.   Bob King.

6              Q.   That's Robert King?

7              A.   Robert King, yes.

8              Q.   You or Mr. King put together

9      monthly reports since you began with SCCS in

10     June of 2016?

11             A.   Yes, we have.

12             Q.   And are those kept in any

13     particular location electronically?

14             A.   Yes.  They are in an electronic

15     file system that is accessible both to myself

16     and Bob.

17             Q.   Do you know if those monthly

18     reports were collected and produced in this

19     litigation?

20             A.   I do not know if they were.

21             Q.   Were you involved in any way in

22     the collection of your documents or documents

23     related to SCCS for this litigation?

24             A.   Yes, I was.

25             Q.   What was your involvement?

1               A.   Counsel asked me to gather

2          documents, and I did so.

3               Q.   What documents did you gather for

4          this litigation?

5               A.   Me, specifically?

6               Q.   Yes.

7               A.   Primarily budgets.

8               Q.   Are those hard copy documents or

9          electronic?

10              A.   They were electronic -- yeah,

11         they were electronic.

12              Q.   And what years did you gather

13         budgets for?

14              A.   I believe it was 2008 through

15         2017.

16              Q.   And did you indeed gather and

17         turn over budgets for all of the years from

18         2008 to 2017?

19              A.   Yes, I did.

20              Q.   And what specific document are

21         you referring to when you say "the budget"?

22         Is there a document that's called something

23         in particular?

24              A.   No.

25              Q.   Is it a PDF document?

1          A.    No, it's an Excel file.

2          Q.    It's a spreadsheet?

3          A.    Yes.

4          Q.    Do those spreadsheets have

5     different sheets on them?  Do you know what I

6     mean when I say that?

7                Let me ask you a different

8     question.

9          A.    Sure.

10          Q.    What information is included in

11     those budget spreadsheets that you collected?

12          A.    I'm trying to think of the file

13     configuration.  I know that there is a -- I

14     believe that there's a cover sheet, and then

15     it's fed by, you know, tabulated sheets

16     behind it.

17          Q.    And what information is included

18     on those tabulated sheets?

19          A.    That's where we break down our

20     budget into line item detail.

21          Q.    Are those tabulations included in

22     the spreadsheet, are those ultimately

23     included in a budget report?

24          A.    Yes, they are.

25          Q.    We'll get to the budget process

1      in a little bit.  I know that that's a

2      complicated process, and we'll go over it in

3      just a minute.

4                 What other documents did you

5      collect and turn over in this litigation?

6           A.   Other than what I've mentioned, I

7      don't know.

8           Q.   So just the budget spreadsheets

9      for the years 2008 to 2017?

10                MR. PENDELL:  Objection to form.

11                THE WITNESS:  That is correct.

12     BY MS. HIBBERT:

13          Q.   Did you collect and turn over any

14     of the monthly reports that we've referred

15     to?

16          A.   I don't know if we did.

17          Q.   You also put together quarterly

18     financial reports in your role with

19     Summit County Children Services, correct?

20          A.   No, not specifically.  We don't

21     create a quarterly financial report.

22          Q.   If you can turn to your CV marked

23     as Exhibit 4 for a moment.

24          A.   Sure.

25          Q.   The paragraph description under

Page 101

1         your role as deputy executive director of

2         fiscal services.

3                    A.    Uh-huh.

4                    Q.    The last sentence there states:

5                          "Plans and develops the

6                           operating budget for the agency,

7                           which includes monthly and

8                           quarterly financial reports."

9                    A.    Yes.

10                   Q.    Is that incorrect then that there

11        are quarterly financial reports that you

12        generate?

13                   A.    It's a bit of a misnomer.  In

14        regards to a financial report, what we do is

15        we create a quarterly operating forecast,

16        which essentially forecasts out our

17        carried-forward cash balance.

18                          So it's -- really, it's not a

19        financial statement.

20                   Q.    The sentence there goes on --

21        Exhibit 4 -- you also plan and development

22        short and long-term budget forecasts.

23                          Is that what you're referring to

24        there?

25                   A.    Those would be included in --

Page 102

1      yes.  Those would be used to forecast our
2      carry-forward cash, yes.
3            Q.   So the quarterly forecast that
4      you refer to, that's like a short-term budget
5      forecast?
6            A.   No.
7            Q.   Are they separate documents?
8            A.   They're separate, but they
9      interact with each other.  I mean, a
10     short-term, you know, budget forecast would
11     be used to project to the end of our fiscal
12     year.  Whereas, you know, a long-term budget
13     would be used to forecast our cash, our
14     carried-forward cash, if that makes any sense
15     at all to you.
16           Q.   The short and long-term
17     forecasts, are those spreadsheets as well?
18           A.   Yes.
19           Q.   And are those maintained in a
20     separate electronic file that you have access
21     to?
22           A.   Yes, they are.
23           Q.   Do you know if those were
24     collected and turned over in this litigation?
25           A.   I do not know.

Page 103

1              Q.    Your CV also references what you

2         call "levy projections."

3                    Can you describe what those are?

4              A.    Sure.

5                    Our levy projection is also

6         related to our operating forecast because we

7         need to look at -- as an entity that is

8         primarily funded through levy collections, we

9         need to know and understand what we are going

10        to anticipate in future periods for those

11        levy collections.

12                   So we do projections, you know,

13        looking at levy collections, talking to the

14        County of Summit, asking them what we can

15        anticipate, and using those numbers to

16        project out where we see our cash balance at

17        the end of any particular fiscal period.

18             Q.    Are the levy projections

19        themselves kept in a separate spreadsheet as

20        well?

21             A.    No.  They're included with the

22        operating forecast.

23             Q.    Other than the monthly and

24        potentially quarterly financial reports,

25        short and long-term budget forecasts, and

Page 104

1       levy projections, are there any other sort of

2       documents or spreadsheets that you keep on a

3       regular basis that indicate the financial --

4       finances of SCCS?

5             A.   Could you repeat that one more

6       time just to make sure I understood your

7       question.

8             Q.   Sure.

9             Other than the monthly and

10      quarterly financial reports that we've

11      discussed, the short and long-term budget

12      forecasts, and the levy projections, are

13      there any other documents or spreadsheets

14      that you keep on a regular basis that would

15      show the finances of SCCS over time?

16           A.   The only other document that I

17      would maintain would be our payroll

18      projection.

19           Q.   Is that a spreadsheet?

20           A.   It is a spreadsheet, yes.

21           Q.   And how often do you update the

22      payroll projection spreadsheet?

23           A.   With each payroll, I update that

24      spreadsheet.

25           Q.   Is that a monthly payroll?

Page 105

1              A.    Biweekly payroll.

2              Q.    Do you know if the payroll

3    projection spreadsheets were collected and

4    turned over in this litigation?

5              A.    I do not know.

6              Q.    Did you search for any other

7    documents other than these budget

8    spreadsheets that we've already discussed in

9    connection with collecting documents for this

10   litigation?

11                  MR. PENDELL:  Objection to form.

12                  THE WITNESS:  No, not to my

13        knowledge.

14   BY MS. HIBBERT:

15             Q.    Do you ever do any SCCS-related

16   work on any home or personal device?

17             A.    I do not.

18             Q.    Do you know if any documents were

19   collected from your computer at SCCS?

20             A.    I do not know.

21             Q.    You do have your own computer at

22   the SCCS office --

23             A.    Yes, I do.

24             Q.    -- that you work from, correct?

25             A.    Correct.

Page 106

1           Q.    Do you have an SCCS or

2     Summit County-owned cellular device as well?

3           A.    I do not.

4           Q.    So the cellphone that you have,

5     is that your own personal device?

6           A.    It is.

7           Q.    And you don't conduct any SCCS

8     business through your personal device, do

9     you?

10          A.    I do not.

11          Q.    Do you have a laptop or anything

12    like that that you work from at home?

13          A.    I have an iPad that is owned by

14    SCCS.

15          Q.    Do you know if any documents or

16    data were collected from your SCCS-owned iPad

17    in connection with this litigation?

18          A.    I do not know.

19          Q.    Have you searched for any

20    documents in connection with this litigation

21    on your SCCS-owned iPad?

22          A.    I have not, no.

23          Q.    In your role with SCCS, I know

24    how you talked about how you -- you have some

25    responsibilities for setting policies and

Page 107

1      procedures, I think, related to the financial

2      aspects of SCCS; is that correct?

3              A.    That is correct, yes.

4              Q.    You don't have any involvement in

5      the policy setting or program management

6      related to any particular programs that SCCS

7      has, correct?

8                    Bad question.  Let me rephrase.

9              A.    Thank you.

10             Q.    Other than the financial metrics

11     or policies and procedures related to

12     financial metrics, you're not involved in any

13     sort of policies or policy setting related to

14     the particular programs that SCCS puts into

15     place; is that correct?

16                   MR. PENDELL:  Objection to form.

17                   THE WITNESS:  I am not involved

18          in that process, no.

19     BY MS. HIBBERT:

20             Q.    Are you involved in setting any

21     policies for SCCS that don't particularly

22     relate to the finances of the agency?

23                   MR. PENDELL:  Objection to form.

24                   THE WITNESS:  Only those that

25          would be directly related to facilities

Page 108

1          management.

2     BY MS. HIBBERT:

3          Q.    What does that mean, "facilities

4     management"?

5          A.    Essentially, the care and keeping

6     of the building, you know, keeping up with

7     the HVAC system, you know.

8                But even things as specific as,

9     you know, the security of the building, you

10    know, ID badges.  You know, office services

11    are also included in that and so the movement

12    of correspondence from the mailroom and

13    things along that line would be considered

14    facilities management.

15         Q.    Is it fair to say then that you

16    have not been involved with any policy

17    setting for any program specifically related

18    to opioids that SCCS has run?

19         A.    That is correct.  I have not been

20    directly involved in any of those policies.

21         Q.    And you're not involved in

22    determining which programs SCCS puts into

23    place, correct?

24         A.    That would be correct, to the

25    extent -- I mean, I would be advised in terms

Page 109

1          of the financial impact.

2                     I would be asked, you know, to

3          review, you know, how it was going to impact

4          us financially if we had the budget

5          available, you know, to take on a new

6          program, or something along that line.

7               Q.    Have you been involved in

8          assessing in any way the need for certain

9          programs under SCCS?

10              A.    I have not.

11              Q.    Have you been involved in any way

12         with the implementation of certain programs

13         under SCCS?

14              A.    No, I have not.

15              Q.    Is it fair to say that any

16         responsibilities that you have in your

17         employment with Summit County that are

18         related to opioids are limited to financial

19         management?

20              A.    Yes.  My job duties are

21         specifically limited to financial management

22         in that regard.

23              Q.    I think you said this before, but

24         you report to Julie Barnes; is that correct?

25              A.    Yes, I do.

Page 110

1           Q.    Do you report to anybody else?

2           A.    No, I do not.

3           Q.    Who reports to you?

4           A.    Mr. Bob King, Robert King,

5      Ms. Linda McMahon, and my administrative

6      assistant, Ms. Michelle Tersigni is also a

7      direct report.

8           Q.    Have we gone over today all of

9      the oversight responsibilities that you have

10     in your role with SCCS?

11          A.    The primary ones, yes.

12          Q.    And your responsibilities haven't

13     changed over time since June of 2016,

14     correct?

15          A.    Not significantly, no.

16          Q.    Do you oversee performance

17     reviews for Mr. King, Ms. McMahon, and your

18     administrative assistant?

19          A.    Yes, I do.  I complete their

20     performance evaluations.

21          Q.    And I'm sorry, the name of your

22     administrative assistant is?

23          A.    Michelle Tersigni.

24          Q.    How often do you conduct

25     performance reviews?

```
                                      Page 111
 1              A.    They are conducted on an annual
 2      basis.
 3              Q.    Have any of the folks that report
 4      to you, Mr. King, Ms. McMahon --
 5              A.    McMahon, yeah.
 6              Q.    -- or Ms. Tersigni received a
 7      negative performance review?
 8              A.    No, they have not.
 9              Q.    You've never held any other
10      positions for Summit County, correct?
11              A.    I have not.
12              Q.    In your position with
13      Summit County, have you ever been
14      disciplined?
15              A.    No, I haven't.
16              Q.    Have you received a performance
17      evaluation?
18              A.    Yes, I have.
19              Q.    Who conducts your performance
20      evaluation?
21              A.    Julie Barnes conducts my
22      performance evaluation.
23              Q.    How many times have you been
24      evaluated since June of 2016?
25              A.    I have been evaluated twice.
```

Page 112

1          Q.   And what were the results of

2     those evaluations?

3          A.   They were generally positive.

4          Q.   You say generally.  Were there

5     any negative aspects or constructive

6     criticism?

7          A.   There's always room for

8     improvement.  So, yes, I would say there was

9     some constructive criticism.

10         Q.   What room for improvement was

11    noted in either of the two evaluations that

12    you've had with Summit County?

13         A.   Julie feels that I'm too nice at

14    times and maybe not direct enough with my

15    direct reports.

16         Q.   Has Ms. Barnes noted any

17    deficiencies in your direct reports'

18    responsibilities?

19         A.   No, she has not.

20         Q.   Or has she noted any deficiencies

21    in their performance?

22         A.   Not specifically, no.

23         Q.   Are you aware of any complaints

24    that your direct reports have made to

25    Ms. Barnes or anyone else regarding your

Page 113

1       supervision of them?

2               A.    No, I am not aware.

3               Q.    Do you know why Ms. Barnes

4       thought that you were being too nice, or not

5       direct enough with your direct reports?

6               A.    No.  I don't know why she feels

7       that way, but ...

8               Q.    Were there any examples that were

9       given?

10              A.    Not that I recall.

11                    I mean, I think that goes to just

12      our interpersonal relationship with

13      perhaps -- Linda McMahon is very

14      strong-willed.  And, you know, I've been

15      tasked with trying to calm her down, per se.

16      And I'm of the mind that you catch more flies

17      with honey than you do with vinegar.  And I

18      take a little softer approach.

19                    And I think Julie would prefer

20      that I be a little more direct.

21              Q.    Were there any other negative

22      aspects or constructive criticism in your

23      evaluations that we haven't discussed

24      already?

25              A.    Not that I recall, no.

```
                                          Page 114
 1           Q.   Were those evaluations written,
 2      to your knowledge?
 3           A.   Yes, they are.
 4           Q.   Do you receive a copy of those
 5      evaluations?
 6           A.   Yes, I do.
 7           Q.   And do you save them, yourself?
 8           A.   I believe I still have a copy,
 9      yes.
10           Q.   Do you save them on your computer
11      at Summit County Children Services?
12           A.   No.  I don't scan them.
13           Q.   So you receive them in hard copy?
14           A.   Yes, that's correct.
15           Q.   And where do you save them?
16           A.   I probably have my performance
17      evaluations at home.
18           Q.   Do you keep or maintain a
19      separate folder or file at home for any
20      documents related to your employment with
21      Summit County?
22           A.   Other than my performance
23      evaluation, no, I would not.
24                MR. PENDELL:  Darin, we've been
25         going for about an hour.  Do you need to
```

Page 115

1            take a break?

2                    THE WITNESS:  Maybe five minutes

3            just to run to the bathroom, please.

4                    MS. HIBBERT:  Yes.  I will agree.

5            If we can keep the break to five

6            minutes, that would be great.

7                    MR. PENDELL:  Sure.  Appreciate

8            it.

9                    THE WITNESS:  That would be

10           great.

11                   THE VIDEOGRAPHER:  Off the

12           record, 11:32.

13                   (Recess taken.)

14                   THE VIDEOGRAPHER:  On the record,

15           11:41.

16      BY MS. HIBBERT:

17           Q.   Mr. Kearns, earlier we talked

18      about several different audits that SCCS has

19      undergone since you joined SCCS in June 2016.

20      Do you remember that?

21           A.   Yes, I do.

22           Q.   Do you recall on April 2017 a

23      Child and Family Services review?  Does that

24      sound familiar at all?

25           A.   It does, although I don't believe

Page 116

1      my department was involved.

2             Q.   Do you have any knowledge as to

3      that review?

4             A.   No, I do not.

5             Q.   That wasn't one of the audits

6      that we already discussed, correct?

7             A.   It is not, no.

8             Q.   Have you been involved in the

9      development of a program improvement plan as

10     a result of the Child and Family Services

11     review?

12            A.   I have not been involved in that

13     process.

14            Q.   Do you have any knowledge of the

15     program improvement plan?

16            A.   I do not.  I have not been

17     privileged to see it.

18            Q.   I'm going to show you what I am

19     marking as Exhibit Number 5 to this

20     deposition.

21                 (Summit County Children Services

22                 Program Structure, Bates

23                 SUMMIT_000003847 through

24                 SUMMIT_000003857, marked as

25                 Deposition Exhibit 5.)

Page 117

1                    MR. PENDELL:  Thank you.

2                    MS. HIBBERT:  You're welcome.

3        BY MS. HIBBERT:

4             Q.    Have you ever seen this document

5        before?

6             A.    Yes, I believe I have.

7             Q.    This is an organizational chart

8        for Summit County, correct?

9             A.    For Summit County Children

10       Services, correct.

11            Q.    On page 1 of Exhibit 5 -- and for

12       the record, this is a document produced in

13       this litigation, Bates number ending 3847 on

14       the first page.

15                    On page 1, Mr. Kearns, this

16       represents the, kind of, highest level

17       organization of Summit County Children

18       Services, correct?

19            A.    Yes, that is correct.

20            Q.    And we've talked about this

21       organization to some extent, the executive

22       office reports to the board of trustees.

23                    That's reflected at the top of

24       this chart, correct?

25            A.    Yes, that is correct.

1          Q.   And you're part of that executive

2     office, correct?

3          A.   I report to the executive office,

4     yes.

5          Q.   Who is in the executive office

6     that you report to?

7          A.   That would be Julie Barnes.

8          Q.   Is she the only person in the

9     executive office?

10          A.   Yes.

11          Q.   Okay.

12              And your department falls over on

13     the left here under fiscal services, correct?

14          A.   Yes, that is correct.

15          Q.   You don't have any involvement

16     with the other three departments listed here,

17     social services, administrative and legal

18     services, and human resources and support

19     services, other than the analysis of the

20     financial management of those departments,

21     correct?

22          A.   That is correct.

23          Q.   And under fiscal services, there

24     are four divisions or departments listed

25     there.

Page 119

1                    Do you see that?

2              A.    Yes, I do.

3              Q.    Those are accounting and finance,

4         office services, facilities/fiscal services,

5         and security, correct?

6              A.    Yes, that is correct.

7              Q.    And we've gone over this in going

8         over your responsibilities as deputy

9         director.

10                   You have responsibility for all

11        four of these divisions or departments,

12        correct?

13             A.    Yes, that is correct.

14             Q.    Turning to page 3 of what's

15        marked as Exhibit 5.  This particular

16        organizational chart details the management

17        stack for SCCS.

18                   Do you see that?

19             A.    Yes, I do.

20             Q.    And under fiscal services, we've

21        talked about the three folks identified right

22        under you, Darin Kearns.  That's

23        Michelle Tersigni, Robert King, and

24        Linda McMahon, correct?

25             A.    Yes, that's correct.

Page 120

1              Q.    Bob King, or Robert King, how do

2        his responsibilities differ from yours?

3                    He is the department director of

4        fiscal services, correct?

5              A.    That is correct.  He is the

6        department director.

7              Q.    How do his responsibilities

8        differ from yours?

9              A.    Bob's duties differ -- they focus

10       more on the day-to-day functioning of the

11       fiscal department.

12                   You know, he looks more at, you

13       know, are purchase orders sufficient?  Are

14       invoices being processed properly?  You know,

15       he works much more closely with the County of

16       Summit fiscal department.

17                   You know, just in terms of our

18       interaction with the Banner financial system,

19       Bob is our liaison with the County of Summit.

20                   So he's much more involved with

21       the day-to-day -- I don't want to say

22       routine, because nothing is ever routine, but

23       just for of the day-to-day functions of the

24       fiscal office.

25             Q.    Does he put together the monthly

Page 121

1          financial reports that we've discussed

2          before, or is that something you do yourself?

3                  A.    The monthly statements do come to

4          me through Bob King.

5                      So, yes, ultimately he puts the

6          financial statements together, and then I

7          make financial statement notes and review the

8          financial statements and ask for any

9          necessary changes that I might see.

10                 Q.    To your knowledge, has Bob King

11         been involved in any of the assessment of the

12         financial impact of opioids on SCCS?

13                 A.    Not to my knowledge.

14                 Q.    He didn't help you put together

15         the spreadsheet that we've referenced before

16         that was included in Exhibit 3?

17                 A.    He did not.

18                 Q.    You've not asked him to perform

19         any analysis with regard to the financial

20         impact of opioids on SCCS, correct?

21                 A.    That is correct.  I have not

22         asked him.

23                 Q.    Have you ever asked him to

24         perform any analysis of the financial impact

25         of any particular variable on SCCS?

1          A.    No, I don't believe that I have.

2          Q.    To your knowledge, do you know if

3    Mr. King was asked to collect and produce any

4    documents related to this litigation?

5          A.    Only in conjunction with the

6    budget documents that he and I gathered.

7          Q.    And you spoke to him about

8    gathering the budget documents that we

9    discussed before?

10          A.    Yes, I did.

11          Q.    Did he actually gather those

12    documents for you?

13          A.    He and I participated in that

14    process.

15          Q.    What did that process entail

16    exactly?

17          A.    It was really just a review of

18    our electronic, you know, file systems to

19    find the budget documents that had been

20    requested, and to produce those.

21          Q.    And the budget documents that you

22    are referring to, those are just the budget

23    spreadsheets for the years 2008 to 2017 that

24    we referred to before, correct?

25               MR. PENDELL:  Objection to form.

```
                                          Page 123
 1                    THE WITNESS:  That is correct.
 2        BY MS. HIBBERT:
 3             Q.   Was it an individual spreadsheet
 4        for each of those years, or multiple
 5        documents?
 6             A.   I don't recall.
 7             Q.   Did you instruct or ask Mr. King
 8        to look for any other documents in connection
 9        with this litigation?
10             A.   No.
11             Q.   Did you talk with Mr. King in
12        preparation for your deposition here today?
13             A.   No.
14             Q.   Does Mr. King know that you're
15        here for a deposition?
16             A.   Yes, he does.
17             Q.   How does he know that, if you
18        haven't talked to him about the deposition?
19             A.   Well --
20                    MR. PENDELL:  Objection to form.
21                    THE WITNESS:  Perhaps I'm
22           misunderstanding.  I obviously alerted
23           Bob that I was going to be out of the
24           office because he's in charge now in my
25           absence.
```

1            But, otherwise, we haven't had

2        any in depth, lengthy conversations

3        about the deposition process or --

4    BY MS. HIBBERT:

5            Q.   Have you had any conversations

6    with Mr. King about the litigation at all?

7            A.   No.

8            Q.   Have you talked with anybody else

9    in SCCS about the litigation?

10           A.   No.

11               MR. PENDELL:  Objection to form.

12               THE WITNESS:  Sorry.  I'm getting

13       ahead of you.

14               MR. PENDELL:  That's all right.

15       I was slow.

16   BY MS. HIBBERT:

17           Q.   Turning to the next page of

18   Exhibit 5., this is the org chart for the

19   fiscal services division.

20               So this is a further breakdown of

21   the division you're responsible for, correct?

22           A.   Yes.

23           Q.   So all of these additional folks

24   that are listed on this org chart below

25   Bob King and Linda McMahon, we haven't

1    discussed those before, right?

2            A.   No, we have not.

3            Q.   Those are all direct reports to

4    Bob King or Linda McMahon?

5            A.   McMahon.  It doesn't look like

6    it, but -- I know it's not important.

7                 MR. PENDELL:  It is not the WWE

8        executive, right?

9                 THE WITNESS:  It is not the WWE

10       executive.

11   BY MS. HIBBERT:

12           Q.   The spelling, for the record, is

13   M-c-M-a-h-o-n, pronounced McMahon.

14           A.   Pronounced McMahon, yes.

15                I'm sorry.  What was your

16   question?

17           Q.   Sure.

18                The folks that are listed on this

19   org chart under Mr. King and Ms. McMahon,

20   they aren't direct reports to you, right?

21           A.   They are not my direct reports,

22   no.

23           Q.   They directly report to either

24   Mr. King or Ms. McMahon?

25           A.   That is correct.

1        Q.   To your knowledge, are any of the

2     individuals listed on this organizational

3     chart -- have any of these individuals been

4     involved in assessing the financial impact of

5     opioids on SCCS?

6        A.   To my knowledge, none of them

7     have been involved.

8        Q.   You've not had any conversations

9     with any of these individuals listed on

10     Exhibit 5, the fiscal services division,

11     about the financial impact of opioids on

12     SCCS, have you?

13        A.   I have had no conversations with

14     them related to the impact.

15        Q.   Did any of the folks that are

16     listed here on the fiscal services division

17     org chart marked as Exhibit 5, help you in

18     any way in gathering the data or calculating

19     the data that's included in that spreadsheet

20     marked as Exhibit 3?

21        A.   No, they did not.

22        Q.   Has Bob King been the director of

23     fiscal services for as long as you've been

24     with Summit County?

25        A.   Yes, he has.

```
                                          Page 127

  1                  Q.   Do you know how long he's been

  2         with Summit County?

  3                  A.   Nine years.

  4                  Q.   Do you know who held that role

  5         before him?

  6                  A.   No, I do not.

  7                  Q.   How long had Gary Binns been the

  8         executive director before his retirement and

  9         your replacement of him?

 10                  A.   16 years, Gary had been the

 11         deputy director of finance.

 12                  Q.   The structure of the fiscal

 13         services division that we've just looked at,

 14         has that been the same since you joined SCCS

 15         in June 2016?

 16                  A.   No, it has not.

 17                  Q.   How has that changed over time?

 18                  A.   When I assumed the position,

 19         Bob King and who is listed as Jennifer Snyder

 20         were both direct reports to Gary Binns.

 21                       I changed the structure by

 22         promoting Bob King to the director of

 23         finance, and placing Jennifer Snyder, I

 24         believe she's fiscal officer, underneath him

 25         as direct report.
```

Page 128

1           Q.   And why did you make that change?

2           A.   I felt -- I felt it was necessary

3      to help clarify roles within our department.

4      I felt that Bob had earned the promotion to

5      director of finance.  And it was really to

6      try and enact a cultural change within the

7      fiscal department.

8           Q.   Had you observed an issue with

9      the culture when you came on in June 2016

10     that made you want to make that change?

11          A.   Yes, I had.

12          Q.   What was the issue with the

13     culture that you identified?

14          A.   The issue was that the fiscal

15     department was really segregated into two,

16     what I might call, silos.

17               We look at the organizational

18     chart, Bob King was a director of -- and had

19     one group underneath him.  And at the time,

20     it was -- Susan Beaver was his equal and had

21     a group underneath her.

22               And the two sides really

23     didn't -- it's almost like they didn't

24     interact.  There was a line of division

25     between the two, and I felt that that was

Page 129

1          inefficient for, you know, good function in

2          the fiscal department, so I made the change.

3                  Q.    You said Susan Beaver was the

4          name?

5                  A.    Yeah.   Susan Beaver was -- she

6          was a fiscal officer, and she left employment

7          shortly after I arrived.

8                  Q.    And she was in the same role as

9          Bob King when you first came on?

10                 A.    She was not.   I don't know if we

11         want to look at the --

12                 Q.    Sure.

13                  The org chart we were just

14         looking to that is referred to as Exhibit 5,

15         would it be helpful to look at that?

16                 A.    Yes.   And in particular, the

17         fiscal department -- I forget what page it

18         was on.

19                 Q.    Sure.

20                  I think it was page 4 of

21         Exhibit 5, the fiscal services division org

22         chart.

23                 A.    Okay.   I'm trying to find

24         Jennifer Snyder.

25                  There she is.   She's underneath

1          Bob King, and she is a direct report on the

2          lower right-hand second box there.  She's the

3          fiscal officer.

4                  Q.    Okay.  So that's the role that

5          Susan Beaver held previously?

6                  A.    Correct.

7                  Q.    When did Jennifer Snyder come on?

8                  A.    She came on in -- I want to say

9          September of 2016.

10                 Q.    Was Ms. Beaver terminated or did

11         she leave on her own accord?

12                 A.    She left on her own accord.

13                 Q.    Do you know what the reason was

14         for her leaving?

15                 A.    I do not know.

16                 Q.    What is Ms. Snyder's role as

17         fiscal officer IV-E and support services?

18                 A.    Her role -- underneath her, she

19         has individuals who compete IV-E eligibility.

20                       So as, you know, children are

21         brought into the agency or removed from

22         homes, we have to process what's called IV-E

23         eligibility to determine whether or not we

24         can make a federal claim for the cost of

25         their care and keeping.  So she has those

1          individuals underneath her.

2                    She also has adoption subsidy

3          employees that work with our adoption

4          department to establish subsidies for

5          children that are adopted.

6                    She also has our IV-E specialist

7          who works with the SACWIS system, who

8          processes claims for those children that are

9          found to be eligible and reimbursable.

10                   And then we also have an employee

11         that does what's called our adoption payroll

12         and processes our SSI benefits for children

13         that receive those.

14              Q.   And when the structure was

15         different, when Ms. Beaver held that role,

16         did she have different responsibilities than

17         Ms. Snyder does now?

18              A.   No.  The responsibilities were

19         the same, primarily.

20              Q.   Was it simply a reporting

21         structure that was different before you

22         changed it?

23              A.   Yes.  It was a reporting

24         structure.  And just the overall mentality

25         that, you know, we're not going to have two,

Page 132

1    you know, separate silos of employees.

2               We're all one.  We're all the

3    fiscal department, and we're going to work

4    together as such.

5          Q.   When you came on and identified

6    this cultural issue, did you perceive that

7    issue as affecting anything related to the

8    financial management of SCCS?

9          A.   Perhaps only in the sense that it

10   just wasn't a healthy work environment for

11   the fiscal employees.

12         Q.   Can you elaborate on that any

13   more?

14         A.   Well, only as I said, there

15   seemed to be two specific groups of

16   employees.  I would have to say that there

17   was probably some general dislike and

18   discord, and they just didn't work well

19   together.

20              And so I just took that

21   opportunity to change the structure and

22   improve the culture.

23         Q.   The cultural issue that you've

24   identified and you've spoken about, did you

25   believe that that impacted the actual

Page 133

1          financial management of the budget for SCCS

2          prior to you joining in June 2016?

3                    A.    No.  I don't believe it impacted

4          the financial budget process.

5                    Q.    Does the fiscal services division

6          report to or interface with other similar

7          departments at the state level?

8                    A.    Say that again.

9                    Q.    Does the -- your fiscal services

10         division, does it interface or interact with

11         similar divisions at the state level?

12                   A.    No, it does not.

13                   Q.    How about at the federal level?

14                   A.    No, we do not.

15                   Q.    And how about other county fiscal

16         services divisions, do you interface or

17         interact with those other divisions?

18                        MR. PENDELL:  Objection to form.

19                        THE WITNESS:  I do individually.

20              I mean, I'm a member of the Ohio

21              Department of -- or Ohio Job and Family

22              Services Directors' Association Fiscal

23              Committee.

24                   So, you know, I participate in,

25              you know, monthly, sometimes bi-monthly

Page 134

1          meetings.

2      BY MS. HIBBERT:

3          Q.   In your role as the Ohio Job and

4      Family Services -- are you just a member of

5      the Ohio Job and Family Services Directors'

6      Association Fiscal Committee?

7          A.   I'm just a member, yes.

8          Q.   Is that run by any sort of board?

9          A.   No, it is not.

10         Q.   Are you a member that has any,

11     you know, voting or say in any policies or

12     procedures of that organization?

13         A.   No.

14         Q.   What does that organization do,

15     generally?

16              MR. PENDELL:  Objection to form.

17          You can answer.

18              THE WITNESS:  Essentially the

19          fiscal committee is obviously a -- it's

20          a subpart of the Ohio Job and Family

21          Services Directors' Association.  We get

22          together and we talk about, you know,

23          fiscal issues around the state.

24              And then the Ohio Job and Family

25          Services Directors' Association, to my

Page 135

1          understanding, lobbies on our behalf.

2               Q.    Lobbies with what?

3               A.    Well, lobbies with either the

4     Department of Job and Family Services

5     directly or with the legislature for, you

6     know, additional funding, changes in policy,

7     things along that line.

8               Q.    Is there anyone else from SCCS

9     that is on the fiscal committee for Ohio Job

10    and Family Services Directors' Association?

11              A.    No, there is not.

12              Q.    During the monthly or bi-monthly

13    meetings for that association, has the

14    financial impact of opioids on any specific

15    children services division in Ohio state been

16    discussed?

17              A.    Yes.

18              Q.    In what aspect?

19              A.    Because it is a state-wide

20    committee, I have opportunity to talk to, you

21    know, fiscal, you know, directors, CFOs from

22    other counties.

23                   And they have made comments along

24    the same lines, that increased cost and

25    placement of children as a result of opioid

Page 136

1          removals, you know, general conversation

2          about the opioid crisis and how it has

3          impacted their counties in particular.

4                    Q.    Have you presented any

5          information during any of these meetings with

6          this association as to the financial impact

7          of opioids on Summit County Children

8          Services?

9                    A.    No, I have not.

10                   Q.    Have you had any discussions

11         during these monthly or bi-monthly meetings

12         with this association about the specific

13         financial impact of opioids on SCCS?

14                   A.    No, I have not.

15                   Q.    Has anyone else at these meetings

16         presented on the financial impact of opioids

17         on SCCS?

18                   A.    Not to my knowledge.

19                   Q.    Has anyone else at these meetings

20         for this association presented on the

21         financial impact of opioids on any other

22         children services departments in Ohio?

23                   A.    Not to my knowledge, no.

24                   Q.    Have there been any presentations

25         given at these meetings on the financial

1        impact of opioids on any other department or

2        division for any other agency in Ohio?

3             A.   Not to my knowledge.

4             Q.   So earlier when we talked about

5        the discussions that were had about financial

6        impact of opioids during these meetings, in

7        what context were those discussions had?

8             A.   Really, they were just general

9        conversations, I mean, because there's

10       obviously a -- you know, we all know one

11       another, so we talk before and we talk after.

12              And, you know, it was really just

13       general conversation about, you know, the

14       fact that we're feeling the impact

15       financially of, you know, having to care for

16       more kids.

17            Q.   Have you shared any of your

18       analysis that you conducted on the financial

19       impact of opioids on SCCS with anybody from

20       the Ohio Job and Family Services Directors'

21       Association?

22            A.   I have not.

23            Q.   Have you shared that analysis

24       with anybody outside of SCCS, aside from

25       attorneys?

Page 138

1              A.    No, I have not.

2              Q.    Are there any other associations

3       or organizations that you are a part of where

4       financial impact of opioids has been

5       discussed over the last two and a half years?

6              A.    There are no other associations,

7       no.

8              Q.    Have you attended any conferences

9       in which fiscal services divisions or

10      representatives from different fiscal

11      services divisions have shared information on

12      the potential financial impact of opioids on

13      their agencies?

14             A.    No, I have not.

15             Q.    Aside from the conversations

16      we've already talked about here today, have

17      you had any discussions or conversations with

18      anybody else about the potential financial

19      impact of opioids on SCCS, specifically?

20                   MR. PENDELL:  Objection to form.

21                   THE WITNESS:  Not that I recall.

22      BY MS. HIBBERT:

23             Q.    Do you know if there are meeting

24      minutes that are produced as a result of

25      the -- or in conjunction with the monthly or

Page 139

1          bi-monthly meetings for the directors'
2          association?
3                  A.   Yes.  There are meetings -- I'm
4          sorry.  There are minutes produced.
5                  Q.   Are those publicly available, do
6          you know?
7                  A.   I don't know.
8                  Q.   Is it a publicly-open meeting?
9                  A.   I don't believe so.
10                 Q.   Do you keep copies of those
11         minutes?
12                 A.   I do not.
13                 Q.   But you receive them?
14                 MR. PENDELL:  Objection to form.
15                 THE WITNESS:  Now that you
16            mention it, no, I don't believe that I
17            do.
18         BY MS. HIBBERT:
19                 Q.   Why do you believe that there are
20         minutes kept from those meetings?
21                 A.   Now I'm second guessing myself.
22         I don't know that there are minutes kept in
23         those meetings, yeah.
24                 Q.   Fair enough.
25                 I'm going to switch over a little

Page 140

1        bit and start talking about budgeting,

2        budgeting process for SCCS, which you are

3        very much a part of, correct?

4               A.   Yes.  I am very much a part of

5        the budgeting process.

6               Q.   Can you list for me what sources

7        of funds are used to pay for SCCS, generally,

8        very high level?

9               A.   Very high level?

10              Q.   Yes.

11              A.   I assume that you're asking that

12       we use federal funds.  Obviously, our local

13       funds, in terms of our levy.  I have a very

14       small portion of state funding.  And that's

15       the extent of it.

16              Q.   You also receive donations,

17       correct?

18              A.   Correct.

19              Q.   And grants as well?

20              A.   Yes.  That would be included in

21       our federal and state funding streams.

22              Q.   I see.

23                   And are there any other sources

24       of funds that are used to pay for SCCS

25       services other than what we've discussed?

Page 141

1          A.    No.

2          Q.    You mentioned the levy as a

3    source of the local funds.

4                Can you explain what that is?

5          A.    Our levy?

6          Q.    Yes.

7          A.    Sure.

8                It's a -- essentially a tax that

9    is levied on the property values of

10   homeowners and businesses within

11   Summit County.  And based on millage that is

12   enacted, it generates 60 percent of our total

13   revenue, roughly 60 percent.

14         Q.    Roughly 60 percent, but

15   variations over year to year?

16         A.    Sure.

17         Q.    There is a levy cycle, correct?

18         A.    Yes, there is.

19         Q.    At which point the levy is

20   reassessed?

21         A.    That is correct.

22         Q.    And how often does that happen?

23   What is the levy cycle?

24         A.    Our levy cycle is every six

25   years.

Page 142

1          Q.    Has it always been that way?

2          A.    To my knowledge, yes.

3          Q.    And what happens during that levy

4    cycle?  What's the process for reassessment

5    of the levy?

6          A.    Are you referring to at the end

7    of the six-year period?

8          Q.    Sure.

9                Is there -- yes.  Let me

10   rephrase.

11               So there's a six-year period for

12   which the levy that is set exists, correct?

13         A.    Correct.

14         Q.    And at the end of that six-year

15   period, is it then reassessed?

16         A.    Yes, it is.

17         Q.    And what's the process for that

18   reassessment?

19         A.    Well, the process for us is that

20   we look at, as I had mentioned earlier, the

21   operating forecast.  We look at our cash

22   carry-forward balance, and we try and project

23   out what our future financial needs will be,

24   as well as our future levy collections, if we

25   were to renew the levy, based on what the

Page 143

1       county would provide us, what we could

2       anticipate as our projected revenues.

3                   And, you know, we basically make

4       an assessment as to whether or not we can

5       renew the levy, or do we need to ask for

6       additional funds based on our operating

7       forecast and how long our cash, carry

8       forward, will last.

9               Q.   When was the last time that the

10      levy, I guess -- when was the last year in

11      which the levy was set that began the last

12      cycle?

13              A.   That would have been in 2012.

14              Q.   And the reassessment of that levy

15      was recently undertaken, is that correct, in

16      the past year?

17              A.   That is correct.

18              Q.   And a new levy was voted on in

19      this past election cycle in November,

20      correct?

21              A.   Yes.  We had the levy on the

22      ballot with a 1 million increase.  It was

23      approved by 60.2 percent of the voters.

24              Q.   In 2012, the last time that it

25      was -- the levy cycle began, was the levy

Page 144

1      increased at that time as well?

2              A.    No.   The levy was not increased

3      in 2012.

4              Q.    When was the last time that the

5      levy was increased prior to this last

6      assessment?

7              A.    The last increase to our levy was

8      30 years prior.

9              Q.    So would you say then that the

10     levy increase was long overdue?

11                  MR. PENDELL:   Objection to form.

12                  THE WITNESS:   No.   I wouldn't

13         agree with that assessment.

14     BY MS. HIBBERT:

15             Q.    Why not?

16                  It was certainly assessed that

17     there was a significant need for increase in

18     the tax levy this past year, correct?

19             A.    That is correct.

20             Q.    And part of the problem was that

21     there was a significant amount of lost

22     revenue from 2008 to 2012 due to the

23     financial crisis and resulting drop in

24     property values, correct?

25                  MR. PENDELL:   Objection to form.

Page 145

1                    THE WITNESS:  Yes, that is
2           correct.
3       BY MS. HIBBERT:
4            Q.   And just to go back a little bit,
5       the tax levy that we talked about, the
6       millage, that's all dependent on property
7       values in the jurisdiction, correct?
8            A.   Millage is determined by --
9       essentially, by us.  We present it to the
10      board, and the social service advisory
11      committee and county counsel ultimately
12      approves our millage.
13                   But our collections that are then
14      received are based on property values.
15           Q.   The amount that you ultimately
16      take in from the levy is dependent on the
17      property values in the jurisdiction, fair?
18           A.   That is correct.
19           Q.   In addition to the lost revenue
20      in 2008 to 2012 due to the financial crisis,
21      was there also an issue with lost additional
22      revenue due to the phase-out of taxes on
23      tangible business personal property that
24      affected the amount of tax levy that was
25      available in this past levy cycle?

Page 146

1                    MR.  PENDELL:  Objection to the
2             form.
3                    THE WITNESS:  Yes, tangible
4             personal property tax was phased out by
5             the State of Ohio during -- I think
6             beginning in around 2012 and concluding
7             in 2016.
8       BY MS. HIBBERT:
9             Q.   What was that tax on tangible
10      business personal property?  Can you describe
11      that?
12                   MR.  PENDELL:  Objection to form.
13                   THE WITNESS:  No.  I don't
14            understand the -- I don't know
15            specifically what that tax was.
16      BY MS. HIBBERT:
17            Q.   Do you understand the effect that
18      the phase out of that specific tax had on the
19      tax levy amount this past tax cycle?
20            A.   The phase out of tangible
21      personal property tax didn't affect our levy
22      collections.
23            Q.   It affected the amount of
24      additional revenue that was collected,
25      correct?

Page 147

```
1              A.   Yes.   Tangible personal property
2       taxes was separate and distinct from levy
3       collections.
4              Q.   I see.
5                   How did the tangible personal
6       property tax affect revenue?
7                   MR. PENDELL:  Objection to form.
8                   THE WITNESS:  At its peak,
9              tangible personal property tax was worth
10             roughly about $3.8 million to
11             Summit County Children Services.
12                  And, again, it was phased out
13             over the course of about a five-year
14             period.  So we lost -- I think in total
15             it was -- I would have to guess.  I
16             don't know what the total was.
17       BY MS. HIBBERT:
18             Q.   Was that $3.8 million per year
19       that it was worth when it was in effect?
20             A.   Yes, I do believe it was.
21             Q.   And were those -- were those
22       funds received from the tangible personal
23       property tax, were they allocated to any
24       specific programs or anything specific to
25       SCCS, or were they generally available?
```

Page 148

1                 MR. PENDELL:  Objection to form.

2                 THE WITNESS:  Yes.  They were

3           generally available to the agency to use

4           for, you know, operating purposes.

5      BY MS. HIBBERT:

6           Q.   And that's not an insignificant

7      loss to SCCS, $3.8 million per year for

8      overall budget, correct?

9                 MR. PENDELL:  Objection.

10                THE WITNESS:  That's correct.

11          It's not insignificant.

12     BY MS. HIBBERT:

13          Q.   Has there ever been any

14     assessment done on the exact impact the

15     financial crisis had from 2008 to 2012 on

16     lost revenue, and the resulting property

17     value decrease?

18                MR. PENDELL:  Objection to form.

19                THE WITNESS:  I wouldn't say that

20          we have done anything specific, but we

21          have certainly looked at, you know, our

22          levy collection revenue over that time

23          period.

24                You know, obviously, we've looked

25          at the tangible personal property tax,

Page 149

1              you know, that we lost.  And we have,

2              you know, been able to calculate, you

3              know, the total loss between those two

4              time frames.

5     BY MS. HIBBERT:

6          Q.   Is it fair to say that the lost

7     revenue from these two different things, the

8     financial crisis and the resulting drop in

9     property values, and the lost tangible

10    personal property tax were main factors in

11    asking for an increase in the tax levy this

12    cycle?

13                MR. PENDELL:  Objection to form.

14                THE WITNESS:  I would say that

15             they certainly contributed.  I don't

16             know that -- I don't know that I would

17             characterize it as main, as the main

18             reason.  But it certainly contributed,

19             yes.

20    BY MS. HIBBERT:

21         Q.   Would you say they had a higher

22    contribution than any other factors in

23    increasing the tax levy this cycle?

24                MR. PENDELL:  Objection.

25                THE WITNESS:  I don't know that I

Page 150

1           can answer that.  I don't know.

2      BY MS. HIBBERT:

3           Q.   What other factors were

4      considered in asking for the additional tax

5      levy this cycle?

6           A.   Well, we look at our budget as a

7      whole.  And obviously -- well, in looking at

8      our budget and where we have been since

9      mid-2011, we have been running budget

10     deficits somewhere around mid-2011.

11              So we look at cash reserves and

12     what we need to operate going forward,

13     obviously our personnel cost, our placement

14     costs, which are our two largest cost items,

15     are factored into that.

16              So while loss of revenue is a

17     significant factor, we also have to consider

18     an increase in cost.

19          Q.   Has there ever been any

20     assessment done as to whether opioids have

21     affected revenues for SCCS, to your

22     knowledge?

23          A.   To my knowledge, there's been no

24     assessment done in terms of what opioids have

25     cost us in revenue.

1         Q.   The only assessment that you're

2     aware of that we've talked about previously

3     before, represented in that spreadsheet,

4     Exhibit 3, those represent an analysis of the

5     effect of opioids on costs and expenditures,

6     correct?

7         A.   Yes, that is correct.

8         Q.   That's a fair representation of

9     that spreadsheet?

10        A.   Yes.  It represents -- you know,

11    it's an estimate of the impact.

12        Q.   And even though there's been no

13    formal assessment, to your knowledge, have

14    opioids or the opioid crisis affected

15    revenues for SCCS in any way?

16            MR. PENDELL:  Object to form.

17            THE WITNESS:  I don't know.  I

18        don't know.

19    BY MS. HIBBERT:

20        Q.   You don't have any knowledge as

21    to any effect on revenues that opioids have

22    had for SCCS, correct?

23        A.   I do not.

24        Q.   The additional tax levy that went

25    into effect -- let me step back -- that was

1      approved this past election cycle, when does

2      that go into effect?

3              A.   Collections will begin in 2019

4      and we will receive it in 2020.

5              Q.   Do you know how much additional

6      revenue you expect the increase in tax levy

7      to produce beginning in 2020 for SCCS?

8              A.   Summit County Office of Fiscal

9      Services has told us to project $12,085,000

10     in additional revenue.

11             Q.   And is that $12,085,000 specific

12     to what SCCS will get as revenue itself, or

13     is that for Summit County as a whole?

14             A.   That is specific to SCCS and the

15     revenue we are expected to receive.

16             Q.   You also receive funds from Ohio

17     state, correct, as part of our budget?

18             A.   From the State of Ohio?

19             Q.   Yes.

20             A.   Yes, we do.

21             Q.   Is it true that Ohio ranks last

22     in support for child welfare agencies?

23                  MR. PENDELL:  Objection to form.

24                  THE WITNESS:  Yes.  That is an

25          accurate representation of the state of

1           Ohio.

2      BY MS. HIBBERT:

3           Q.   Has that been something that has

4      been noted as a problem for SCCS, the lack of

5      funding from the state?

6           A.   Yes, it has.

7           Q.   Do you understand that the state

8      aid for SCCS is 5 percent of the agency's

9      total revenue?

10          A.   Yes, I do.

11          Q.   Do you understand that that's

12     significantly less than other states in the

13     United States?

14               MR. PENDELL:  Objection to form.

15               THE WITNESS:  Yes, I do.

16     BY MS. HIBBERT:

17          Q.   Would you agree that the state of

18     Ohio is the worst in the nation when it comes

19     to funding children's services?

20               MR. PENDELL:  Objection to form.

21          Asked and answered.

22               THE WITNESS:  I would agree that

23          the state of Ohio ranks last in the

24          funding for children's services.

25

Page 154

1    BY MS. HIBBERT:

2         Q.   Has that been an issue that SCCS

3    has undertaken to advocate against in the

4    time that you've been with the agency?

5         A.   I do know that Julie Barnes is a

6    member of the Public Children Services

7    Association of Ohio, which is a specific

8    lobbying group, similar to the Ohio Job and

9    Family Services Directors' Association, and

10   they have been lobbying the state legislature

11   for additional funding.

12        Q.   And what have been the results of

13   that lobbying effort, to your knowledge?

14        A.   Very little, to my knowledge.

15        Q.   To your knowledge, has there been

16   any feedback given as to that lobbying

17   effort?

18        A.   From whom?

19        Q.   From the state as to why

20   additional funds aren't expected?

21        A.   To my knowledge, no.

22        Q.   Going back to the levy cycle, I

23   know we said the last time it was assessed

24   was in 2012 and now it was just recently

25   assessed in 2018.

Page 155

1                   When does the next levy cycle
2        end?
3                   A.   Well, we would be revisiting in
4        2024.
5                   Q.   So it's still on a six-year levy
6        cycle; is that correct?
7                   A.   Yes, it is.
8                   Q.   I've seen reference somewhere to,
9        for some reason, the levy cycle perhaps
10       changing to a 12-year levy cycle.
11                  Do you have any knowledge about
12       that?
13                  A.   No, I do not.
14                  Q.   You've never heard of that
15       before?
16                  A.   No.
17                  Q.   Were there any other changes to
18       the levy cycle or the levy assessment process
19       made in this cycle other than what we've
20       already talked about?
21                  A.   Not to my knowledge.
22                  Q.   Are the state funds received from
23       the State of Ohio, are they allocated for any
24       specifics program-wise or department-wise for
25       SCCS?

1          A.    They are not allocated for a

2     specific purpose.

3          Q.    So they fall into what would

4     typically be referred to as a general fund

5     for use by the agency; is that correct?

6          A.    For a loose definition, yes, that

7     would be correct.

8          Q.    Same question for the funds

9     received from the tax levy.  Does that fall

10    into kind of a general bucket of funds that

11    can be used by the agency?

12         A.    Yes.

13         Q.    Those aren't allocated in any

14    certain way?

15         A.    They're only limited by the levy

16    language, which indicates that the funds are

17    for abused and neglected and dependent

18    children.

19         Q.    And does that have any practical

20    impact on how those funds are used by the

21    agency?

22         A.    No, not significantly.

23         Q.    Like can those funds not be used

24    for payroll, for example?

25              MR. PENDELL:  Objection to form.

                                        Page 157

1              THE WITNESS:  Oh, yes.  They can
2         be used for payroll.
3              But -- I cannot even think of a
4         good example.  Like, you don't want to
5         go and, you know, pay -- I don't know,
6         somebody else's bill that's not
7         associated with, you know, the care and
8         keeping of children.
9              I mean, you don't want to -- I
10        don't even know how to say it.  But we
11        have very few instances where we have to
12        make those types of decisions.
13   BY MS. HIBBERT:
14        Q.   And you cannot think of any
15   specific examples of those instances here
16   today, correct?
17        A.   No.  No.
18        Q.   What percentage does your federal
19   revenue account for of the overall budget on
20   average for SCCS?
21        A.   On average, it's around
22   30 percent federal revenue.
23        Q.   And has that increased or
24   decreased substantially in the last couple of
25   years since you've been in charge of the

Page 158

1     budget for Summit County Children Services?

2          A.   It has not increased or decreased

3     substantially, no.

4          Q.   Same question for the state

5     revenue that we talked about earlier.  Has

6     that increased or decreased in any

7     substantial way over the past two and a half,

8     three years?

9          A.   It has not increased in any

10    substantial way, no.

11         Q.   It hasn't been decreased either?

12         A.   It has not, no.

13         Q.   So we've talked about the tax

14    levy making up about 60 percent of the

15    overall revenue, federal income revenue

16    making about 30 percent, and state about

17    5 percent.

18              Are those generally accurate

19    average numbers?

20         A.   Yeah.  Generally, yes.

21         Q.   What makes up the other

22    5 percent?

23         A.   We do receive a couple of grants

24    which we consider local funding.  Wendy's

25    Wonderful Kids provides us with a, you know,

                                                    Page 159

1       small amount of money.

2                     And all of those percentages are,

3       you know, as we said, those are rough

4       estimates.  If we looked at our total state

5       revenues, it's probably closer to 8 percent.

6                     The one I think that you're

7       referring to is called our State Child

8       Protective Allocation, and it's roughly

9       5 percent.  Then there are other smaller

10      buckets of money that we receive from the

11      state.

12              Q.   What's the difference between the

13      child protective allocation from the state

14      and the other buckets of money?

15              A.   Other than the dollar amount, the

16      State Child Protective Allocation is the

17      largest allocation that the state gives us.

18      You know, it's roughly 2 -- $2.6 million.

19                     The other allocations that we

20      receive, which are called Emergency Service

21      Allocations, you know, they're in the

22      hundreds of thousands, and so they're very

23      small by comparison.

24              Q.   And there's no difference in how

25      those funds can be used between the child

Page 160

1          protective allocation funds and the emergency

2          services funds, correct?

3               A.    The emergency services funds do

4          generally come with some strings attached,

5          that the case that you're working with has to

6          have certain, you know, characteristics in

7          order to use the money for that particular

8          case.

9               Q.    What particular characteristics

10         must the case involve to use the emergency

11         services fund?

12              A.    Well, for example, we have what's

13         called -- ESAA is the acronym for emergency

14         services allocation.  We have ESAA

15         preservation dollars that are available to

16         us.

17                    So we have to -- essentially, the

18         case has to carry the characteristic that

19         we're trying to preserve the child inside the

20         home.

21                    So an example would be we're

22         going to pay your rent for the next two

23         months so that you don't lose your housing

24         and we have to then, you know, take custody

25         of your children.  That would be an example.

Page 161

1          Q.   And are there other examples

2     other than the preservation dollars that fall

3     within the ESAA kind of limitations that we

4     talked about?

5          A.   Yes.  There's preservation and

6     there's reunification.

7          Q.   What does that mean?

8          A.   Reunification essentially means

9     what it says.  The case has to carry the

10    characteristic that -- excuse me -- we are

11    trying to reunify the family -- or reunify

12    the child with the family or with the kinship

13    care provider.

14         Q.   Do you have to submit any sort of

15    reporting or anything to evidence that those

16    characteristics were present for the cases

17    that you used the emergency services funds

18    for?

19         A.   We don't have to submit anything

20    specific to the State of Ohio, but we have to

21    notate those characteristics in the SACWIS

22    system, in the case file.

23         Q.   What is the SACWIS system?

24         A.   SACWIS is the State-Administered

25    Child Welfare Information System.

Page 162

1          Q.    And abbreviated SACWIS?

2          A.    Yes.

3          Q.    Referred to frequently as SACWIS,

4    correct?

5          A.    That is correct.

6          Q.    And how is that system used by

7    your department?

8          A.    My department uses SACWIS in a

9    couple of different ways.  I had mentioned

10   earlier that we have to do eligibility

11   determination for IV-E clients to -- IV-E

12   kids.  I shouldn't say "clients."  They're

13   not our clients.  That's poor.

14                But we have to determine

15   eligibility for children that come into our

16   custody.  That is performed in the SACWIS

17   system.

18         Q.    What are you looking for to

19   determine eligibility for IV-E, for the

20   children that are coming into the system?

21         A.    I don't know specifically.

22         Q.    Who performs that analysis?

23         A.    We have one individual in our

24   department, her name is Stephanie Capps, that

25   completes that analysis.

Page 163

1          Q.    Aside from determining

2     eligibility for IV-E, children coming into

3     the system, how else is the SACWIS system

4     used by your department?

5          A.    The SACWIS system is also used by

6     a financial eligibility specialist -- I

7     believe that's her title.  And she uses

8     SACWIS essentially to pay the placement

9     bills.

10          So, you know, the information

11     that's maintained in SACWIS is compared to

12     the invoice that's received, and then we

13     proceed with processing the invoice for

14     placement costs.

15          Q.    And the information that you're

16     referring to that's maintained in SACWIS that

17     they're looking for to pay these placement

18     bills, what is that, exactly?

19          A.    We look at -- essentially, we

20     look at spans of placement.  So if a

21     placement provider whom we have a contract

22     with says that they had a child from this

23     date to this date, that information has to be

24     reflected in SACWIS.

25          Q.    And is that information reflected

1          in SACWIS in like a case file for that child?

2                    A.   Yes.  Each child has a specific

3          case identifier, and their information is

4          maintained independent of any other.

5                    Q.   When you're going into the SACWIS

6          system, or whoever is going in from your

7          department to look for either eligibility or

8          the financial eligibility, are they looking

9          then at the specific case file for that

10         individual child?

11                   A.   Could you repeat that one more

12         time?

13                   Q.   Sure.

14                   When the individual from your

15         department that is looking into eligibility

16         for IV-E or financial eligibility, for each

17         of those circumstances, are they then going

18         into the SACWIS system and looking at the

19         individual case file for that child?

20                        MR. PENDELL:  Objection, form.

21                        THE WITNESS:  Yes.  They would be

22              looking at the individual child's

23              record.

24         BY MS. HIBBERT:

25                   Q.   To your knowledge, who maintains

Page 165

1          the individual child's record in the SACWIS

2          system?

3                    A.   I don't know who the custodian of

4          that -- I don't know.

5                    Q.   Do you know whether it's

6          individuals from SCCS that are actually

7          inputting the information into the SACWIS

8          system for the children?

9                         MR. PENDELL:  Objection to form.

10                        THE WITNESS:  Yes.  There are.  I

11            mean, but -- I think that -- and I

12            shouldn't speculate.  I would guess.

13         BY MS. HIBBERT:

14                   Q.   But it's your understanding that

15         the SACWIS system is the electronic database

16         encompassing the individual case files for

17         each child involved with SCCS services,

18         correct?

19                   A.   Yes.  That is correct.

20                   Q.   Other than eligibility for IV-E

21         and financial eligibility, are there any

22         other things that your department used the

23         SACWIS system for?

24                   A.   Not to my knowledge.

25                   Q.   For determining eligibility for

Page 166

1          IV-E or the financial eligibility and the use

2          of the SACWIS system to do those things, are

3          there any sort of reports that are run for

4          those processes?

5                    A.    Not to my knowledge.

6                    Q.    Like when we're determining, you

7          said, whether a paid placement bill is paid,

8          is that something that's done on a monthly

9          basis where they're checking the financial

10         eligibility in SACWIS?

11                   A.    Yes.  That is a monthly process

12         that we check the eligibility in the date

13         span, so to say.

14                   Q.    And who is performing that

15         process?

16                   A.    Margaret Cross completes our paid

17         placement billing.

18                   Q.    What's her title?

19                   A.    I believe she's a financial

20         eligibility specialist.  I think that's what

21         her title is.

22                   Q.    Does she run any reports on the

23         paid placement billing on a monthly basis for

24         you?

25                   A.    No, she does not.

1          Q.   Is your department in charge of

2     entering any information into the SACWIS

3     system?

4          A.   Yes.  My department is

5     responsible for entering information into

6     SACWIS.

7          Q.   What information is your

8     department responsible for entering into the

9     SACWIS system?

10          A.   My department would be

11     responsible for entering in eligibility

12     and -- yeah, eligibility information.

13          Q.   Eligibility for what?

14          A.   For IV-E eligibility, to

15     determine eligibility and reimbursability.

16          Q.   I see.  So when we were talking

17     earlier about accessing the SACWIS system for

18     eligibility for IV-E, that wasn't to

19     determine the IV-E, that was to actually

20     input the information as to the IV-E

21     eligibility; is that correct?

22          A.   No.  My department actually

23     enters the information, and based on what is

24     provided to them, what they enter,

25     eligibility is determined.

1          Q.   Is there any other information

2     that your department is responsible for

3     inputting into the SACWIS system other than

4     that related to eligibility?

5          A.   Not that I'm aware of.

6          Q.   Any other uses of the SACWIS

7     system other than what we've already talked

8     about?

9          A.   Not to my knowledge, no.

10         Q.   Do you, yourself, ever access the

11    SACWIS system?

12         A.   Gratefully, I do not.

13         Q.   If you needed to obtain

14    information from the SACWIS system, who would

15    you call?

16         A.   I would more than likely talk to

17    Jennifer Snyder and/or Julie Barnes.

18         Q.   And why is that?

19         A.   Well, Jennifer, as mentioned

20    earlier, supervises the individuals that

21    enter the information into the SACWIS system.

22    And Julie, you know -- if I didn't know who

23    else to turn to, I would turn to Julie.

24         Q.   Precentage-wise, or average

25    precentage-wise, how much revenue do the

1    grants make up on a yearly basis for SCCS?

2         A.   I don't know.  I would have to

3    guess.

4         Q.   Have you kept track of that

5    information year to year --

6         A.   Yes.

7         Q.   -- for budgeting purposes?

8         A.   Yes.

9         Q.   And would that information be

10   accounted for in the budget?

11        A.   Yes.  It would be accounted for

12   in a line item.

13        Q.   What grants -- during your time,

14   your tenure at SCCS, what grants have -- has

15   the agency applied for?

16        A.   Well, I don't know what they have

17   applied for.

18        Q.   Have you been involved in the

19   application process for any particular

20   grants?

21        A.   I have not been involved in the

22   application process.

23        Q.   Have you been asked to submit any

24   information to support any applications for

25   grants?

Page 170

```
 1              A.    No, I have not.
 2              Q.    Do you know who is in -- who is
 3       responsible for applying for grants for SCCS?
 4              A.    I do not know the specific
 5       individual who completes grant applications
 6       for SCCS.
 7              Q.    Is there -- is it somebody that's
 8       in your department or another department?
 9              A.    It's in another department.  It
10       is not in my department.
11              Q.    Do you know what department?
12              A.    I do not.
13              Q.    Do you know the process for which
14       grants are picked or selected for
15       application?
16              A.    I do not.
17              Q.    Do you know what grants SCCS has
18       received in the time that you've been in
19       charge of the agency, the fiscal management
20       of the agency?
21              A.    Yes.  I do know the grants that
22       we've received.
23              Q.    What types of grants has the
24       agency received during your tenure there?
25              A.    We have received STARS grant.
```

Page 171

1      We've received two HUD grants that are for

2      housing in what's called Rapid Rehousing.

3              Q.   What does "Rapid Rehousing" mean?

4              A.   Rapid Rehousing is associated

5      with our independent living group.  So it's

6      children that have been in our custody, in

7      our permanent custody, that have now

8      emancipated, so they've reached -- graduated

9      from school, reached the age of 18, and

10     they're now living on their own.

11              So Rapid Rehousing is essentially

12     used to make sure they don't go homeless.  If

13     something happens with their housing

14     situation, that we're able to respond

15     quickly, get them into another housing

16     situation.

17              Q.   Is there an age cutoff for a

18     child to receive services from SCCS?

19              A.   I don't know if there's a

20     specific age cutoff.

21              Q.   I interrupted you.

22              Aside from the STARS grant and

23     the HUD grants, are there any other grants

24     that you're aware of that SCCS has received

25     during your tenure there?

Page 172

1          A.   I think I mentioned earlier, the

2     Wendy's Wonderful Kids, which is

3     adoption-related.  It's support for adoptions

4     services.

5               There's been some other small

6     grants that we've received.  They're

7     relatively small, but we have a workforce

8     initiative grant that we currently have;

9     another that's called 60 Days to Family or 30

10    Days to Family.  30 Days to Family.

11              And we have one that is just

12    getting ready to start, and it's called the

13    Start grant.

14         Q.   Where are these grant funds

15    coming from?  Or does it differ between grant

16    to grant?

17              MR. PENDELL:  Objection to form.

18              THE WITNESS:  It does differ from

19         grant to grant.  The STARS grant and the

20         HUD grants are federal funds.  I believe

21         the Workforce Initiative is a

22         state-funded grant.  I think the Start

23         grant is state-funded.

24              Wendy's Wonderful Kids is the

25         Dave Thomas Foundation.  So that's a

Page 173

1              private foundation that provides those

2              grant funds.

3                      So there's various sources for

4              the grants.

5       BY MS. HIBBERT:

6              Q.   When did the county first

7       obtain -- or SCCS first obtain the STARS

8       grant?

9                      MR. PENDELL:  Objection to form.

10                     THE WITNESS:  I believe it was

11             2010 when the STARS grant began;

12             obviously before my tenure as deputy

13             director.

14      BY MS. HIBBERT:

15             Q.   We'll come back to that a bit

16      later.

17                     I think one other thing, one

18      other source of funds that we haven't

19      discussed yet that SCCS has available is

20      what's called I believe the fund balance.

21                     Do you know what I mean when I

22      say that?

23             A.   I do not.

24             Q.   Have you ever heard of anything

25      called like the carryover funds or the fund

Page 174

1      balance?

2              A.   Yes.   We have a carry-forward

3      balance, yes.

4              Q.   What does the carry-forward

5      balance mean to you?

6              A.   The carry-forward balance is

7      essentially -- I mean, it's essentially

8      unspent revenue that we're able to carry

9      forward from fiscal period to fiscal period.

10                  MS. HIBBERT:  I'm going to show

11            you what I'm going to mark as Exhibit 6.

12                  THE WITNESS:  Thank you.

13                  (2016 Annual Report, Summit

14                  County Children Services, Bates

15                  SUMMIT_000019809 through

16                  SUMMIT_000019812, marked as

17                  Deposition Exhibit 6.)

18      BY MS. HIBBERT:

19              Q.   Have you ever seen that document

20      before?

21              A.   Yes, I have seen this.

22              Q.   This is the 2016 annual report

23      for Summit County Children Services, correct?

24              A.   Yes, it is.

25              Q.   Did you help draft this report?

1            A.   Yes.  I think that prior to

2      Gary's departure, he and I worked on this, or

3      at least he walked me through the process of

4      how to put this information together.

5                 So, yeah, I do believe I worked

6      on this financial report, this report.

7            Q.   And is this annual report

8      something that you've put out every year

9      since you arrived at SCCS in 2016?

10           A.   Yes.

11           Q.   I want to turn to page 4 of the

12     document marked as Exhibit 6, for the record,

13     beginning with Bates Number 19809.

14                 Let me know when you're there.

15           A.   I'm there.

16           Q.   I'm going to refer down to --

17     there's a chart at the bottom left-hand

18     corner of page 4 of Exhibit 6.

19                 Do you see that chart?

20                 MR. PENDELL:  It's marked A12 at

21           the bottom, correct?

22                 MS. HIBBERT:  Yes.

23                 THE WITNESS:  Yes.  I see the

24           chart.

25

1      BY MS. HIBBERT:

2              Q.   Okay.

3                   And it is titled at the top "2016

4      Summary of Financial Statements."

5                   Do you see that?

6              A.   Yes.

7              Q.   Right underneath there, it says

8      "Beginning fund balance," and it has a

9      balance there.

10                  And then at the bottom of that

11     chart there, it has an ending fund balance

12     and it has a balance there.

13                  What does that mean, the fund

14     balance that's reflected there?

15                  MR. PENDELL:  Objection to form.

16         What do you mean by "there"?

17                  MS. HIBBERT:  "There" being what

18         I just referenced.

19                  MR. PENDELL:  Right.  But you

20         talked about the beginning fund balance

21         and the ending fund balance, and you

22         said "What's reflected there."

23                  I'm unclear as to whether you're

24         talking about the beginning fund balance

25         or the ending fund balance, my

```
                                            Page 177
  1          objection.
  2                  MS. HIBBERT:  Thanks for your
  3          speaking objection.  You can limit it to
  4          form next time.
  5     BY MS. HIBBERT:
  6          Q.   Mr. Kearns, did you understand my
  7     question?
  8          A.   I believe so.  I believe you're
  9     asking me what the fund balance represents;
 10     is that --
 11          Q.   Correct, yes.
 12          A.   Okay.  If I can put it in
 13     layman's terms --
 14          Q.   Please do.
 15          A.    -- essentially, how I explain
 16     fund balance is essentially if you have a
 17     checkbook -- and hopefully you all have a
 18     checkbook -- and you have a beginning balance
 19     that comes forward from one month to the
 20     next, and then you function through that
 21     month and you pay your car payment and your
 22     house and you get your paycheck and you do
 23     all of those sorts of things.  And at the end
 24     of that given month, you have a balance left
 25     in your checking account.
```

1             That's what fund balance is.  You

2      begin with a balance, you perform all of your

3      fiscal functions for a given year, and then

4      you have an ending fund balance.

5             Q.   Was there an initiation or an

6      initial fund balance at the beginning of the

7      inception of SCCS, to your knowledge?

8             A.   I do not know.

9             Q.   You don't know how that fund

10     balance was initially established; is that

11     correct?

12             MR. PENDELL:  Objection to form.

13             THE WITNESS:  I do not know.

14     BY MS. HIBBERT:

15             Q.   Would it be fair to characterize

16     the fund balance as sort of a reserve for

17     SCCS?

18             A.   I would say that's a generally

19     fair representation, yes.

20             Q.   I've seen that fund balance

21     described somewhere as a service delivery

22     insurance fund for emergency and mandated

23     services.

24             Is that an accurate

25     characterization of what the fund represents?

Page 179

1                    MR. PENDELL:  Objection to form.

2                    THE WITNESS:  I have never heard

3           that characterization before.

4                    MS. HIBBERT:  I wish I could find

5           where I saw that.

6                    Counsel, we're nearing on

7           1:00 here, and I think I'm about to

8           switch gears and get into a slightly

9           different line of questions.  So if we

10          want to break for lunch, now I think

11          would probably be a good time.

12                   MR. PENDELL:  Sure.

13                   THE VIDEOGRAPHER:  Off the

14          record, 12:53.

15                   (Recess taken, 12:53 p.m. to

16                   1:51 p.m.)

17          -----------------------

18          AFTERNOON SESSION

19          -----------------------

20                   THE VIDEOGRAPHER:  We're on the

21          record, 1:51.

22       BY MS. HIBBERT:

23              Q.   Mr. Kearns, when we left off

24       before lunch, we were talking about what was

25       called a fund balance in your report.

Page 180

1              Do you recall that conversation?

2         A.   I do.

3         Q.   Is it fair to call a fund balance

4    a surplus of funds?

5         A.   I think it could be fairly

6    characterized as a surplus, a carry forward.

7    I mean, it's something that we have to have

8    because of the funding structure that we live

9    within at Summit County Children Services.

10        Q.   Do you know when that surplus was

11   built up over time?

12        A.   I do not.

13        Q.   Do you have any information about

14   how that surplus was built up?

15        A.   I don't have any specific

16   information other than there are years when

17   our revenues would exceed our expenditures.

18             And, again, it's a process that

19   we really have to -- we have to have that

20   process as a levy-funded agency, because in

21   any -- as part of the levy process, the levy

22   funding process, we have to have a cash build

23   during the beginning of the levy process,

24   maybe even the first six years of the levy.

25             And then we go into what we call

Page 181

1          a cash burn or a cash utilization phase,

2          because we're primarily funded with the levy.

3                    And just because of the nature of

4          the levy that we have and the funding

5          structure that we live within, because we

6          work on a reimbursement basis, so we don't

7          get money so to say "up front."  We have to

8          spend it and then we get reimbursed.

9          That's -- we have to have a fund balance in

10         order to exist.

11              Q.   Okay.  There was a lot packed

12         into that answer.

13              A.   There was.  I'm sorry.

14              Q.   I'll start with the levy cycle

15         and how it -- if I can paraphrase that, how

16         it starts out with, I guess, more of a

17         surplus, and then there's a cash burn, I

18         think you described it as.

19              A.   Yeah.

20              Q.   Why is that part of the levy

21         cycle?  What is it about the levy that makes

22         that a case?

23              A.   Because of our funding structure

24         and because, as we discussed earlier, you

25         know, our federal revenues haven't changed

Page 182

1    significantly over the last three or four

2    years.  Our levy is -- I mean, it's a set

3    dollar amount.

4              And because we don't -- when

5    property values rise, we don't get any

6    additional levy dollars.  Okay?

7              So our levy -- at the point when

8    it's levied, that's the dollar amount that we

9    can collect.

10             So because of that and the nature

11   of doing business -- I mean, you're going to

12   have employees get raises.  You're going to

13   have increases in costs for placing children.

14   You're going to pay more for electric.  It's

15   just the natural course of doing business.

16   You have to build a cash balance in order

17   to -- in order to survive.

18        Q.   And has that always been

19   consistent, to your knowledge, that through

20   the levy cycle there's a buildup of the cash

21   balance, and then there are years that are

22   cash-burning years, as you put it?

23        A.   Yes.  To the best of my

24   knowledge, in the entities that I have either

25   worked for here in Portage County or audited

Page 183

1    in the past, there is a cash build and then a

2    cash utilization.  Let's put it that way.

3           Q.   In the past levy cycle, so that

4    was from, I think you said, 2000 -- I'm

5    sorry, 2006 to 2012; is that right?

6           A.   That would have been the

7    previous.  I think it would be -- our most

8    recent began in 2012.

9           Q.   Okay.

10           So let's go 2012 to 2018.  Was

11    there a year or years in that period of time

12    where the revenue exceeded the expenditures

13    and there was a cash build?

14           A.   There were not.

15           Q.   There were not.

16           How about the levy cycle before

17    that, 2006 to 2012, same question.  Was there

18    a year or years in that cycle where the

19    revenue exceeded expenditures and there was a

20    cash build?

21           A.   Yes.  I believe from -- it would

22    have been 2006 through like the mid-2011,

23    they would have been in a cash-building

24    cycle.

25           Q.   Do you know why or has there been

Page 184

1     any assessment as to why there was no

2     cash-building cycle years in the last levy

3     cycle, 2012 to 2018?

4            A.   There was no cash build during

5     that time frame, because when we -- well,

6     when SCCS entered the 2012 levy cycle, they

7     had a significant cash carry-forward, so

8     there was no need to ask for additional

9     revenue, you know, from the levy because they

10    had sufficient cash to carry them forward.

11           Q.   So there was no change to the

12    levy -- I think you said there was no change

13    to the levy for some 30 years before this

14    past reassessment, 2018, correct?

15           A.   That is correct.

16           Q.   So in 2012, when the levy was

17    reassessed, there was no change made to it at

18    that point?

19           A.   Correct.

20           Q.   And part of that analysis was

21    because there was a significant cash balance

22    that would be moving forward with SCCS,

23    correct?

24           A.   Yes.  That is accurate.

25           Q.   Do you anticipate or have you

Page 185

1      forecasted a cash build year or years in the
2      next levy cycle due to the increase in tax
3      levy?
4            A.    Yes.  We have done projections.
5            Q.    And what have you projected as
6      far as cash-building years in the next levy
7      cycle?
8            A.    We are projecting -- if memory
9      serves me correctly, we are projecting
10     probably the next -- through the next six to
11     seven years should be cash-building years.
12           Q.    Why is that?  Is there an
13     explanation as to why you think the next six
14     to seven years are going to be cash-building
15     years?
16           A.    Yes.  The next six to seven years
17     need to be cash-building years because,
18     again, the way that we're funded, going into
19     2019, our cash balance right now we're
20     projecting is around $12 million.
21                 Probably in August of 2019, we'll
22     slip into the single digits, maybe even the
23     low single digits, in terms of that cash
24     carry-forward, and that's not sufficient to
25     carry us through 2020 and on.

```
 1              So we really have to rebuild that
 2      cash balance in order to survive at
 3      the -- you know, in the second half of the --
 4      probably the second levy cycle, when we're
 5      utilizing cash again.
 6          Q.   And is the building of that cash
 7      balance in the next six to seven years, is
 8      that focused on increasing revenues probably
 9      through the tax levy, or does it also involve
10      cutting costs and expenditures?
11              MR. PENDELL:  Objection to form.
12              THE WITNESS:  The cash build will
13          primarily be related to additional
14          revenue.
15      BY MS. HIBBERT:
16          Q.   Through the tax levy or --
17          A.   Through the tax levy, yes.
18          Q.   The tax levy that we've been
19      discussing, is that a levy that is
20      specifically for SCCS or is that part of a
21      more general levy for Summit County that then
22      is allocated for SCCS, in part?
23              MR. PENDELL:  Objection to form.
24              THE WITNESS:  It is specific to
25          Summit County Children Services.
```

Page 187

1          BY MS. HIBBERT:
2                  Q.    Does it have a specific name?
3                  A.    No.
4                  Q.    Just the SCCS tax levy?
5                  A.    Yeah.  No, it doesn't have a
6          specific name.
7                  Q.    Is that how you refer to it?
8                  A.    Yeah.  We just call it the
9          Children Services levy.
10                 Q.    Does that tax levy also apply to
11         residents in the city of Akron, or is that
12         only specific to Summit County, to your
13         knowledge?
14                 A.    It would apply to residents of
15         the city of Akron, yes.
16                 Q.    Children residing in the city of
17         Akron, they receive services, if they are
18         going to receive services, through SCCS,
19         correct?  There's no separate Children
20         Services for Akron?
21                      MR. PENDELL:  Objection to form.
22                      THE WITNESS:  Not that I'm aware
23            of.
24         BY MS. HIBBERT:
25                 Q.    The costs that would be

Page 188

1      associated with services received by or
2      provided to children residing in the city of
3      Akron, would that be picked up by SCCS?
4              A.    Could you state the question
5      again?  I'm sorry.
6              Q.    Sure.
7                    There's no cost sharing between
8      the city of Akron and Summit County with
9      regard to services provided by SCCS for any
10     children residing in the city of Akron,
11     correct?
12             A.    Not that I'm aware of.
13             Q.    You don't receive any funds from
14     the city of Akron specifically for SCCS,
15     correct?
16             A.    No, we do not, not from the city
17     of Akron.
18             Q.    Are you aware of any costs or
19     expenditures on behalf of the city of Akron
20     for any Children Services that aren't assumed
21     by SCCS?
22             A.    Not that I'm aware of.
23                   (Summit County Children Services
24                   2017 Budget, Bates
25                   SUMMIT_000982175 through

Page 189

1                    SUMMIT_000982225, marked as

2                    Deposition Exhibit 7.)

3       BY MS. HIBBERT:

4               Q.    I'm going to show you what I've

5       marked as Exhibit Number 7.

6               A.    Thank you.

7               Q.    Have you seen this document

8       before?

9               A.    Yes, I have.

10              Q.    And this is the 2017 budget, for

11      the record, Bates-labeled on the first page

12      982175.

13                    Do you recognize this to be the

14      2017 budget?

15              A.    Yes, I do.

16              Q.    Do you have a role in preparation

17      of -- or did you have a role in the

18      preparation of this document, Exhibit 7, the

19      2017 budget?

20              A.    Yes, I did.

21              Q.    We'll refer to this over the next

22      couple of hours, but I want to first direct

23      your attention to page 22 of Exhibit 7.

24                    Let me know when you're there.

25              A.    I am.

1          Q.   And this is the page for the

2     financial services -- I'm sorry, the

3     financial statement revenues, correct?

4          A.   Yes, it is the revenues.

5          Q.   And this is a chart of breakdown

6     of the actual and then forecasted revenues

7     for SCCS, correct?

8          A.   That is correct.

9          Q.   And as we talked about before,

10    these include funds coming in from federal,

11    state, and local, as well as the levy,

12    correct?

13         A.   Yes.  That is correct.

14         Q.   We talked a little bit about

15    federal funds earlier, the funds that are

16    listed here for regional training, foster --

17    I believe that's parent regional training,

18    and then down the line.

19              Are those funds that are

20    consistent from year to year or do they

21    change -- not in amounts, but in titles?  Do

22    those funds change year to year?

23         A.   No.  Those are very consistent.

24         Q.   Did those funds have different

25    criteria for inclusion or the amounts that

Page 191

1       are allocated for those funds?

2               A.   I don't understand what you're

3       asking.

4               Q.   Sure.

5                    Are there criteria -- are there

6       inclusion criteria for any of the federal

7       funds received from SCCS?

8               A.   Again, I don't understand what

9       you mean by "inclusion criteria."

10              Q.   Sure.

11                   Does SCCS have to meet any

12      specific criteria to receive the federal

13      funds?

14              A.   Okay.  You mean other than,

15      obviously, with IV-E, as we talked about

16      earlier, there is an eligibility criteria,

17      eligibility and reimbursability.  A lot of

18      the -- like independent living, for example,

19      those are earmarked specifically for

20      emancipated youth that we talked about

21      earlier, so there's some criteria to being

22      able to access those dollars, but ...

23              Q.   Are there any criteria like SCCS

24      has to have particular programs in place or

25      they have to meet particular metrics or

1      anything like that that need to be met to

2      receive these federal funds that you're aware

3      of?

4               A.    Not that I'm aware of, no.

5               Q.    Same question for the state

6      funds.  Are there any specific criteria or

7      metrics that SCCS has to meet in order to

8      receive those state funds?

9               A.    No, other than, you know,

10     obviously for some of the state programs, I

11     mean, they have criteria that you have to

12     identify in the case file in order to access

13     that funding.  But otherwise, no.

14               Q.    What do you mean by "criteria in

15     the case file"?

16               A.    For example, like kinship

17     incentives.  We cannot place a child in a

18     foster care setting and then claim a kinship

19     incentive.  A child has to be placed in a

20     kinship incentive in order to access that

21     funding.

22               Q.    Going back to the federal funds,

23     what is the -- I think you referenced this

24     before -- the TANF Title 20, the T-A-N-F?

25     What is that?

Page 193

1          A.    TANF Title 20 -- TANF is
2     Temporary Assistance for Needy Families.  And
3     the Title 20 references the criteria that has
4     to be in place in order to use those dollars.
5     So, essentially, it's TANF dollars that can
6     be used for Title 20 purposes.  And those are
7     funds that we access for the care and keeping
8     of children.
9          Q.    And the STARS grant there is
10    listed at the bottom of the federal funds.
11              Do you see that?
12         A.    I do.
13         Q.    Is that the only federal grant
14    that SCCS has received during your tenure?
15         A.    No.  Above, you'll see there's
16    the HUD grant, transitional housing.  Those
17    are also federal dollars.
18         Q.    What are the parent support local
19    funds?
20         A.    Parent support local funds would
21    be child support that we receive for children
22    that are in our custody.
23         Q.    Are those -- how is that, I
24    guess, generated?
25         A.    Those funds are generated

1    essentially by when we take custody of a

2    child and there is court-ordered child

3    support for that child, it is supposed to be

4    redirected from the custodial parent to us.

5            Q.    Do you work with the office of --

6    is there an Office of Child Support that you

7    work for -- work with in conjunction to

8    receiving those funds?

9            A.    There is an office -- there is an

10   Office of Child Support in Summit County.

11   And we don't work closely with them.

12   Generally, they notify us when there is a

13   child that has support, and they forward that

14   support to us.

15           Q.    So they are in charge of -- the

16   Office of Child Support for Summit County are

17   in charge of the actual collection of that

18   support order?

19           A.    That is correct.

20           Q.    Other than the limited criteria

21   that we've discussed so far, is there any

22   other criteria that SCCS has to meet in order

23   to receive any of the revenues that we've

24   discussed thus far today?

25           A.    None specific that I would point

Page 195

1          to.

2                    Q.    Are you yourself in charge of

3          setting the annual budget for SCCS?

4                    A.    I am not.

5                    Q.    Who is in charge of that process?

6                    A.    Ultimately, our budget is

7          approved by county counsel.  They have the

8          final approval.  But our budget moves through

9          several phases prior to that.

10                   Q.    Let's talk about each one of

11         those phases.  Where does it start?

12                   A.    The budget starts with myself.

13         It is then reviewed by the executive team

14         several times, at which point it is moved

15         forward to our resources committee, which is

16         part of our board of trustees.

17                   Q.    Are they all board of trustee

18         members that make up the resources committee?

19                   A.    Yes.  They are all members of the

20         board of trustees.

21                   Q.    What other committees exist for

22         the board of trustees?

23                   A.    There is a rules committee and a

24         planning and programs committee.

25                   Q.    And after the resources

Page 196

1    committee, where does the budget go?

2            A.    After resources committee, they

3    will -- actually, the resources committee

4    will recommend to the full board the adoption

5    of the budget.

6                (Interruption in proceedings.)

7                MS. HIBBERT:  Apologies to the

8            folks on the phone.  I understand the

9            phone has been on mute for -- I think

10           it's been about ten minutes we've been

11           going.

12   BY MS. HIBBERT:

13           Q.    And after the resources committee

14   recommends the full adoption to the board of

15   trustees, what happens then in the budget

16   process?

17           A.    The budget is then taken to

18   Social Service Advisory Board in

19   Summit County, and the budget and levy

20   committee within the Social Services Advisory

21   Board then reviews and approves our budget.

22           Q.    Do you know who is on the Social

23   Services Advisory Board?

24           A.    I do not, not specifically.

25           Q.    Do you know who is on the budget

Page 197

```
1       and levy committee of the Social Services

2       Advisory Board?

3               A.    Not specifically, I do not.

4               Q.    Do you know any members?

5               A.    I know a couple.

6               Q.    What are their names?

7               A.    Brian Nelson is one of the

8       members.

9                     I just lost her name.  When it

10      comes back to me, I'll ...

11              Q.    Going back to the Resources

12      Committee for the board of trustees, who is

13      on that committee?

14              A.    The Resources Committee for the

15      board of trustees?  That would be Anna Arvay,

16      Keith Malick, Omar Banks, Beth Kuckuck,

17      Diane Miller-Dawson, Katie Stoynoff, and I

18      think that's all.

19              Q.    After the budget and levy

20      committee receives the budget, what happens

21      after that?  Where does it go?

22              A.    The Social Services Advisory

23      Board budget levy committee will recommend

24      the budget to the full Social Services

25      Advisory Board for approval.
```

Page 198

1          Q.   And then after that?
2          A.   The full Social Services Advisory
3    Board will recommend our budget be forwarded
4    to Eileen Shapiro, who will be asked to
5    present it to county counsel for approval.
6          Q.   Who is Eileen Shapiro?  What's
7    her role or title?
8          A.   She is the Summit County
9    executive.
10         Q.   How long has Ms. Shapiro been the
11   Summit County executive?
12         A.   I'm not certain.
13         Q.   And you said that Ms. Shapiro,
14   after she approves, she forwards it to the
15   county counsel?
16         A.   Yes, she does.
17         Q.   And then the county counsel
18   ultimately either approves or disapproves of
19   the budget, correct?
20         A.   Yes.  That is correct.
21         Q.   At any one of these various steps
22   that we've identified, are there
23   opportunities to -- if one of the levels of
24   review doesn't approve an item or multiple
25   items, does it just go back down to the next

Page 199

1          level to be revised, or how does that work?

2                  A.    If one of the levels disapproved,

3          the budget would ultimately come back to me,

4          back to -- you know, I guess back to the base

5          level.  We would make the adjustment.  And

6          then my understanding is that we would have

7          to run the budget back through the same

8          process, back up to that level.

9                  Q.    So it's kind of like start over?

10                 A.    That would be correct.

11                 Q.    Has that happened in any of the

12         years that you've been with SCCS, where

13         you've had to -- where the budget has come

14         back to you and you've had to start the

15         process over again?

16                 A.    No.  We have not had a budget

17         rejected.

18                 Q.    Do you know in any years, before

19         you came on to SCCS, whether there has been a

20         budget rejection?

21                 A.    Not to my knowledge.

22                 Q.    Are you involved in each level of

23         the budget process that we've identified?

24                 A.    I'm involved in each level with

25         the exception of the presentation to the full

Page 200

1      SSAB.

2              Q.    And when you say "presentation to

3      the full SSAB," that's when the budget and

4      levy committee are presenting to the full

5      board, correct?

6              A.    Yes.  That is correct.

7              Q.    So when it's presented to the

8      executive team, are you presenting that

9      budget at that point?

10             A.    Yes, I am presenting.

11             Q.    And then when it makes its way to

12     the Resources Committee, are you responsible

13     for presenting the budget at that point too?

14             A.    Yes.  I assist in the

15     presentation, along with Julie Barnes.

16             Q.    And are you involved then in

17     recommending the budget to the full board of

18     trustees after that point?

19             A.    Yes, along with, again,

20     Ms. Barnes.

21             Q.    And do you and Barnes at that

22     point also give a presentation on the budget?

23             A.    Generally not.  We only answer

24     questions if anybody on the full board has a

25     question.  She or I will field the question

Page 201

1    and answer it.

2            Q.   And then the same for the budget

3    and levy committee.  Do you present the

4    budget to them or is it more of a Q&A?

5            A.   It is a presentation, and

6    Ms. Julie Barnes and I make that

7    presentation.

8            Q.   For the 2017 budget that we were

9    just looking at, were there any obstacles

10   that you recall in getting that budget passed

11   in that year?

12                MR. PENDELL:  Objection to form.

13                THE WITNESS:  Not that I recall.

14   BY MS. HIBBERT:

15           Q.   In the 2017 budget, were you

16   asking for an increase in the budget?

17           A.   Yes.  I believe there was an

18   increase in spending.

19           Q.   And has that been consistent year

20   to year since you came on to SCCS?

21           A.   Yes.  In the two budgets -- well,

22   now the three budgets that I've presented,

23   there have been slight increases in spending,

24   yes.

25           Q.   So you've now presented a 2019

                                        Page 202

1       budget as well?

2              A.   Yes, I have.

3              Q.   And has that been approved?

4              A.   It is in the final process.

5       County counsel is hopefully going to approve

6       it soon.

7              Q.   So it's gone through all the

8       steps.  It's with county counsel now?

9              A.   That is correct.

10             Q.   When does the budget process

11      begin, at what point in the year?

12             A.   Around May.

13             Q.   And when do you typically present

14      to the executive team your proposed budget?

15             A.   I generally present to executive

16      team early in June.

17             Q.   And when is the budget ultimately

18      usually approved?  Is there a timing that's

19      required for the budget to be approved?

20             A.   When you say "ultimately

21      approved," do you mean by county counsel?

22             Q.   Yes.

23             A.   About the first week in December.

24             Q.   So right now.

25             A.   Right now.

Page 203

1          Q.    Is that consistent year to year?

2          A.    Yes, it is.

3          Q.    In the years that you have been

4      on SCCS, so half the year for 2016, 2017, and

5      now 2018, have you operated SCCS under budget

6      each year, or within the budget each year?

7          A.    Yes.  Our spending has come in

8      under budget each year.

9          Q.    Do you know whether that was the

10     case in the years that -- before you came on,

11     whether the spending had come in under budget

12     every year?

13         A.    Yes, it has, but there is --

14     there's additional information that I think

15     is pertinent to understanding why, because --

16     because of the -- we have to live within the

17     county financial system.  So whatever budget

18     we get approved by county counsel, that's

19     what we're approved to spend.

20              So even though we have this cash

21     carry-forward that we've referred to, we

22     cannot access those funds unless we go back

23     to county counsel for a budget adjustment,

24     similar to the one I mentioned in 2016 where

25     we had to increase our paid placement budget.

1          So we're very conservative when

2     we budget, because if we cut it too close,

3     without going back for a budget adjustment,

4     which has to go through the entire process

5     that we just discussed, we cannot access

6     additional funds.  And so we are very

7     conservative when we budget.

8          Q.   When did you go back and ask for

9     the paid placement budget adjustment?

10         A.   That was in -- I think it was in

11    November of 2016.  We requested an increase

12    in paid placement and foster care budget.

13         Q.   And is that adjustment for that

14    one in particular, the paid placement, is

15    that an adjustment in just the line item for

16    that particular budget expenditure?

17         A.   Yes.  For lack of a better way of

18    saying it, it would be an adjustment to that

19    line item.

20         Q.   Can you -- for expenditures, can

21    you -- can you essentially move funds around

22    to cover if there's going to be additional

23    costs necessary for a particular year, or

24    does it have to come out of that exact

25    budgeted amount for that line item?

1          A.   In the Banner system, we have --

2     we have pool budgets.  So we have seven

3     different pools that we have money budgeted

4     in.  And that's -- to the County of Summit,

5     that's the extent of our budget.  It's those

6     seven pools.

7               If there's money available from

8     different line items within a pool, we can

9     move it.  But in order to move money from one

10    pool to the next, we have to ask for a pool

11    budget adjustment, which has to go to county

12    counsel and be approved.

13         Q.   Was the paid placement budget

14    adjustment, was that a pool budget

15    adjustment?

16         A.   That was -- well, I mean, that

17    was a full budget adjustment because there

18    was not money available in the pool to move

19    money from one line item to the next.  So we

20    just had to increase the pool as a whole in

21    order to satisfy those costs.

22         Q.   I think you said there were seven

23    different pools; is that right?

24         A.   There are seven different pools.

25         Q.   What are the seven pools?  Are

1    they identified anywhere in the budget that

2    we can point to?

3            A.    They're not on our budget.  They

4    may be in -- I mean, I don't -- honestly, I

5    don't know what has been produced, so I can't

6    answer that question.

7            Q.    Okay.

8                  Well, then from your memory, what

9    are the seven pools?

10                 MR. PENDELL:  Objection to form.

11                 THE WITNESS:  Thank you.

12                 I don't know that I can give you

13         all seven.  I mean, payroll is a

14         specific pool.  Contract services is a

15         specific pool.  I think facility

16         services is a specific pool.  And then

17         beyond that, I'm -- I don't know.

18    BY MS. HIBBERT:

19            Q.    What pool does the paid placement

20    fall into?

21            A.    Contract services pool.

22            Q.    Do foster home expenses fall into

23    a different pool?

24            A.    No.  Foster home expenses are in

25    the same pool.

1          Q.   Are all child-related expenses in

2     the same pool?

3          A.   I don't know that.

4          Q.   And just looking back at Exhibit

5     Number 7 that we marked, the 2017 budget, if

6     you can flip to page 23 for me and let me

7     know when you're there.

8          A.   I am.

9          Q.   So when I say "child-related,"

10    I'm looking at the second grouping there

11    under "Operational Accounts" on the financial

12    statement expenditures form here.  And it

13    lists out the child-related operational

14    accounts' expenditures, including paid

15    placements, foster home expense, adoption

16    subsidy and expenses, and other

17    child-related.

18               Do you know whether all of those

19    fall into the same pool?

20          A.   I do not.  I don't know.

21          Q.   Have you had to go back and ask

22    for any other budget adjustments other than

23    the paid placement budget adjustment in

24    November of 2016?

25          A.   Yes.

1          Q.    How many other times?

2          A.    One other time.

3          Q.    What did that entail?

4          A.    We needed to adjust our payroll

5     account in the same year, 2016.

6          Q.    Why did you need to adjust the

7     payroll account?

8          A.    Because my predecessor

9     underbudgeted for payroll expenditures.

10         Q.    That's something that is --

11    should be known year to year, right, how much

12    the payroll is going to cost?

13         A.    Yes.

14         Q.    Why was it, in your opinion,

15    underbudgeted before you came on in 2016?

16         A.    It was underbudgeted because,

17    while we should and we do know what our

18    payroll costs are going to be generally from

19    year to year, one of the variants that we

20    have are retirements.

21              And one of the caveats of the

22    structure of our system is when somebody

23    retires, they receive what's called a

24    vacation and a sick leave payout.

25              So as a result of really not

1        recognizing the potential payout for vacation

2        and sick leave accrual balances, we came up

3        short on our payroll account.

4                Q.    How short was the payroll account

5        in 2016?  Do you recall?

6                A.    Ballpark, $12,700.

7                Q.    The paid placement budget

8        adjustment that we talked about before, was

9        that also the result of being underbudgeted

10       by your predecessor?

11               A.    Yes.  Again, my predecessor did

12       not anticipate the increase in costs that we

13       saw in 2016.  And as a result, we were

14       underbudgeted.

15               Q.    Do you recall how underbudgeted

16       the paid placement budget was when you sought

17       the adjustment?

18               A.    We asked for a $1.7 million

19       adjustment increase.

20               Q.    For the remainder of 2016?

21               A.    Yes.

22               Q.    So from November to December, you

23       anticipated a cost of $1.7 million for paid

24       placement for SCCS?

25               A.    Yes.

1          Q.    Was the $1.7 million adjustment

2     also to make up for any deficit that you had

3     acquired up until November 2016 for the paid

4     placement budget?

5          A.    No, it was not to make up for a

6     deficit.

7          Q.    And were you approved for that

8     paid placement budget adjustment?

9          A.    Yes, we were approved.

10         Q.    Did you receive the $1.7 million?

11         A.    Our budget was increased by

12    $1.7 million, yes.

13         Q.    Where did that money come from,

14    when the budget was increased at that point

15    in time?

16         A.    That budget adjustment allowed us

17    to access $1.7 million of the cash carried

18    forward.

19         Q.    Same with the payroll account

20    adjustment, around $12,000 is what you said

21    was the deficit.  Is that what you asked for,

22    for the adjustment?

23         A.    Yes.  We did that to the penny.

24         Q.    And did you receive that amount

25    of money as well?

Page 211

1           A.    Yes, we did.

2           Q.    Did that come from also the cash

3      balance carry-forward amount?

4           A.    Yes, it did.

5           Q.    Any other budget adjustments that

6      you've asked for during your tenure at SCCS

7      that we haven't already talked about?

8           A.    No.  There are no other

9      adjustments.

10          Q.    What is the STARS program?

11          A.    My understanding of the STARS

12     program is that we employed recovery coaches

13     to work with individuals in the community who

14     were struggling with substance abuse issues.

15          Q.    Do you have any knowledge as to

16     the details of how that program worked on a

17     day-to-day basis?

18          A.    I do not.

19          Q.    If you can turn back to

20     Exhibit 7, the 2017 budget, on page 3,

21     there's some discussion about the STARS

22     program.  Let me know when you're there.

23          A.    I am.

24          Q.    And it says there in -- I think

25     it's the second paragraph:

Page 212

1                    "We're entering the final year

2                of a five-year federal grant for

3                the STARS program, which has

4                provided $500,000 each year to

5                address substance abuse in

6                families through assessment and a

7                variety of services."

8                    Is that the amount that was

9        provided through the federal STARS grant each

10       year, $500,000?

11               A.   Yes.   The grant award was

12       $5,000 -- $500,000 annually.

13                    (Summit County Children Services,

14                    Adjusted Budget Summary, Bates

15                    SUMMIT_001463636 through

16                    SUMMIT_001463637, marked as

17                    Deposition Exhibit 8.)

18       BY MS. HIBBERT:

19               Q.   I'll show you what's been marked

20       as Exhibit Number 8.

21                    I asked that question because

22       there's a little bit of, I think, discrepancy

23       in a couple of different spreadsheets, and I

24       wanted to clarify that.

25                    Have you seen the document that

Page 213

1       I've marked as Exhibit 8 before?

2               A.    Yes, I believe I have.

3               Q.    And this is the adjusted budget

4       summary, for the record, Bates-labeled

5       1463636.

6                     Did you put this together

7       yourself?

8               A.    No.  This was probably a

9       collaboration between myself and Bob King.

10              Q.    Did you ask him to put it

11      together?

12              A.    I would be certain that I asked

13      him to assist me in pulling this information

14      together, yes.

15              Q.    And do you recall why you wanted

16      to pull this information together?

17              A.    Well, this appears to be the

18      document that we pulled together for the

19      budgets that were requested by counsel.

20              Q.    So when we spoke earlier about

21      the budget spreadsheets that you believe you

22      collected and produced or turned over for

23      years 2008 to 2017, you think that this chart

24      that we're looking at, Exhibit Number 8,

25      reflects that information that are on those

1      spreadsheets or is the actual document that

2      you turned over?

3                A.   I'm sorry, I --

4                Q.   Sure.

5                     We spoke earlier about budget

6      spreadsheets for the years 2008 to 2017 that

7      you think you collected and turned over.

8                     Do you remember that?

9                A.   Yes.

10               Q.   Were those separate spreadsheets

11     from what we're looking at here, Exhibit

12     Number 8, or do you believe that this is the

13     document that you turned over?

14               A.   Yes.  I believe this is the

15     document that we turned over.

16               Q.   So there weren't separate

17     spreadsheets for each year, 2008 to 2017, for

18     the budgets for those years?

19               A.   Not that I recall.

20               Q.   So this here, Exhibit Number 8,

21     is the only document that you collected and

22     turned over in relation to this litigation,

23     correct?

24               A.   To the best of my knowledge, yes.

25               Q.   Was this document -- did it exist

Page 215

1       before -- strike that.

2                   Did you create this document to

3       be turned over for the litigation?

4           A.   This document existed in some

5       variant to this.  I mean, it might not have

6       looked specifically like this, but we keep

7       some historical record of budgets that

8       appears to be very similar to this.

9           Q.   And the historical record of the

10      budgets that SCCS keeps, are those maintained

11      in an electronic system?

12          A.   Yes.

13          Q.   And are those maintained in a way

14      that you would be able to pull up information

15      for each one of the years pertaining to the

16      budget?

17          A.   I think, if I'm understanding

18      correctly, yes, we could look at each

19      individual, similar to this, yes.

20          Q.   Is there a reason why you didn't

21      collect those individual historical documents

22      pertaining to the budgets as opposed to

23      providing information in a summary form, as

24      reflected in Exhibit 8?

25                  MR. PENDELL:  Objection to form.

Page 216

1          THE WITNESS:  I'm sorry.  Can you

2     restate the question?

3  BY MS. HIBBERT:

4          Q.   Sure.

5          Is there a reason why you didn't

6  collect those individual historical documents

7  reflecting the budgets year to year as

8  opposed to including this information in one

9  document reflected as Exhibit 8?

10          A.   No specific reason that I can

11  recall.

12          Q.   If we were -- if we wanted to

13  confirm the numbers set forth in Exhibit 8,

14  the budget numbers with the historical --

15  with the actual information pertaining to the

16  budgets from year to year, we would have to

17  look back at those historical documents,

18  correct?

19          A.   I don't know that I understand

20  the question.

21          Q.   Sure.

22          MR. PENDELL:  Well, let me object

23     to the form, then.

24  BY MS. HIBBERT:

25          Q.   If I wanted to confirm whether a

Page 217

1          number here provided for, let's say, the 2015

2          budget was correct and that was the actual

3          budgeted amount for that year, I would have

4          to look back at the historical documents that

5          you discussed to ascertain that information,

6          correct?

7                      MR. PENDELL:  Objection to form.

8                      THE WITNESS:  If I understand,

9               yes, you could.

10         BY MS. HIBBERT:

11              Q.   We turned to this document

12         originally to talk about the STARS grant.

13         And you can see here on the federal funds

14         line items, the STARS grant is listed on the

15         last line there of Exhibit 8.

16                   Do you see that?

17              A.   I do.

18              Q.   And it appears that the STARS

19         grant -- the first grant that was received

20         was in 2013; is that correct?

21              A.   That's what's reported, yes.

22              Q.   And it's reported that in 2013,

23         there was a $500,000 grant received or at

24         least budgeted, correct?

25              A.   Yes.  These are budgeted amounts.

Page 218

1              Q.    So this document here isn't

2       reflecting the actual monies received.  These

3       are just the monies that were budgeted to be

4       received, correct?

5              A.    That is correct.

6              Q.    And same with the second page of

7       this document listing out the expenditures.

8       These aren't the actual expenditures for any

9       given year.

10              These are the budgeted

11       expenditures, correct?

12              A.    Yes.  That is correct.

13              Q.    The STARS grant budget

14       information from 2014, 2015, 2016, 2017,

15       reflect a $450,000 budgeted amount.  Do you

16       know why there was a difference between 2013

17       and those other years?

18              A.    The STARS grant was very slow to

19       get started in the early years.  For whatever

20       reason, the grant participants, manager

21       within our department, may not have done the

22       greatest job of getting the grant off the

23       ground.

24              And so, you know, the 2014, 2015,

25       2016 revenues, you know, were likely based on

Page 219

1       the fact that, you know, the previous deputy

2       director of finance didn't anticipate

3       accessing the $500,000.

4               Because the federal government

5       didn't just give us $500,000.  We had to

6       perform services, make payment, and then

7       claim grant expenses in order to get the

8       money back.

9          Q.   That's what you've referred to

10      before previously as being a reimbursement

11      system, right?

12         A.   That is an example of a

13      reimbursement system, yes.

14         Q.   And in the reimbursement system,

15      you have to spend the money and then request

16      reimbursement through these various revenue

17      sources; is that right?

18         A.   Yes.  That is correct.

19         Q.   What's the time lag between, you

20      know, spending the money and requesting

21      reimbursement and getting paid on those

22      requests?

23         A.   For our Title IV-E funds, the

24      time lag is three months.  Actually, it's six

25      months, so we have to report our federal IV-E

Page 220

1    expenditures quarterly.  They go to the

2    state.  The state sends them to the Feds, and

3    it takes the Feds another three months for

4    them to process.  So it's actually a

5    six-month lag time for our federal IV-E

6    funds.

7              For something like the STARS

8    grant, you know, I can make -- I could make

9    draw requests on a monthly basis.  You could,

10   but we chose to do it quarterly, so we

11   received reimbursement for that grant on a

12   quarterly basis.

13        Q.   How about all the other funding

14   sources?  Are they -- do they vary in the

15   reimbursement schedule, if you will?

16        A.   All of the IV-E funding

17   sources -- no, not all of them -- are Title

18   IV-E, other institutional, or Title IV-E,

19   foster care maintenance.  We receive those on

20   a monthly basis, but there is a lag time, you

21   know.  Basically, they're running about a

22   month behind.  So there is a lag on those.

23        Q.   In the time that you've been at

24   SCCS, have you ever requested for

25   reimbursement and not received the full

Page 221

1        amount that you requested?

2              A.    Not to my knowledge, no.

3              Q.    And who is in charge of making

4        those requests for reimbursement?

5              A.    The requests for reimbursement

6        are actually run through our

7        state-administered financial system.  It's

8        called CFIS.  It's the County Financial

9        Information System, CFIS.

10                   You know, individuals,

11       Kathy VanHoose, who is an account specialist,

12       enters data.  You know, it's gathered at the

13       end of each month.  And I ultimately approve

14       it.

15                   And then we do what's called

16       consolidate, where we send the information to

17       the state of Ohio, and they make the claim.

18             Q.    Now, we were talking earlier

19       about the documents that we would need to

20       look back to to confirm that these budgeted

21       amounts were correct.  And I think we

22       referred to them as historical documents.

23                   Do those documents have a name or

24       a title?

25             A.    No.

Page 222

1              Q.    Are there particular documents
2        that you have in mind that would reflect the
3        actual budgeted amount for each year?
4              A.    No.  I mean, other than our
5        budget book or this document.
6              Q.    Would the budget book then -- let
7        me ask it this way.  Was a budget book
8        prepared for every year, as far as you know?
9              A.    As far as I know, yes.
10             Q.    So if we went back and compared
11       the budget book to these numbers, they should
12       reflect the same numbers?
13             A.    Yes, they should.
14             Q.    So one trend that I noted from
15       the adjusted budget summary that you put
16       together in Exhibit 8 is that, consistent
17       with what I think we've talked about before,
18       from 2008 until 2018, reflected in this
19       chart, generally the trend has been a
20       reduction or decrease in the total amount of
21       revenues received by SCCS; is that correct?
22             A.    Yes.  That would be correct.
23             Q.    And I believe you testified
24       earlier that you expect that there will be a
25       bump starting in 2020 due to the increase in

Page 223

1      tax levy; is that right?

2              A.    That is correct.

3              Q.    And do you actually expect the

4      total budgeted revenue amount for 2020 to

5      increase above what it is currently budgeted

6      for 2019?

7              A.    Yes.  I would expect that total

8      revenue amount to increase.

9              Q.    Is the current budgeted revenue

10     total for 2019 more than the total budgeted

11     revenue for 2018?

12             A.    Yes.  I think there is a slight

13     increase in revenue anticipated.

14             Q.    Now, same trend for the

15     expenditures on the next page of Exhibit 8.

16     Over time, as reflected in this document,

17     from 2008 to 2018, generally the expenditures

18     have been on a downward trend.  Fair?

19             A.    Yes, from '08 to -- I would say

20     it looks like somewhere around '14, we saw

21     decreases, and then generally an increase

22     from '15 to '18.

23             Q.    And still in 2018, this budget

24     expenditure amount just over $52 million is

25     less than the budgeted expenditure amount for

1      2008, being just over 54 million, correct?

2            A.    Yes.   That is correct.

3            Q.    And is the same true for the 2019

4      budgeted expenditure amount?  Is that

5      still -- do you know what has been budgeted

6      for the 2019 expenditure amount?

7            A.    I would have to guess at it.   I

8      know approximately.

9            Q.    Has the budgeted expenditure

10     amount for 2019 gone down for the budgeted

11     amount for 2018?

12            A.    No, it has not.

13            Q.    Has there been any assessment

14     performed as to what caused the decrease in

15     expenditures from 2008 to approximately 2015?

16            A.    Yes, there has been some analysis

17     done.

18            Q.    And what has that analysis shown?

19            A.    Well, the analysis -- the

20     analysis showed a couple of different factors

21     contributed to the decrease in costs, one of

22     which was that we significantly -- well, we

23     reduced staff from 2008, I think, until

24     around 2012, where we leveled off.

25                  Additionally, SCCS did what was

Page 225

1     called a buyout.  So for individuals that

2     were close to retirement, we have the ability

3     to buy their last, you know, year or two of

4     retirement credit.  It essentially moves high

5     wage earners off the payroll and replaces

6     them with lower wage earners.  So they did a

7     buyout.

8              The County of Summit also changed

9     the healthcare program somewhere I believe

10    around 2011, 2012, where they eliminated one

11    of the more expensive healthcare options, and

12    that helped to decrease costs as well.

13         Q.   The reduction in staff that you

14    mentioned in 2008 to 2012, was that done by

15    layoffs?

16         A.   I don't specifically know.

17         Q.   So you wouldn't know if there

18    were any particular departments or divisions

19    within SCCS that experienced more layoffs

20    than another?

21         A.   I do not.

22         Q.   Do you know whether the staffing

23    levels have recovered from the reduction in

24    the 2008 to 2012 time period or whether

25    they've stayed the same since then?

1                MR. PENDELL:  Objection to form.

2                THE WITNESS:  Our staffing level

3          has moderated over the last several

4          years.  I think we have been in the

5          range of 300 to 330 employees for the

6          last four or five years.

7      BY MS. HIBBERT:

8          Q.   Going back to the 2017 budget

9      marked as Exhibit Number 7, we've looked now

10     at the total budgeted amounts for the STARS

11     program.

12              I want to look now to the amounts

13     of actual spend for those programs on

14     page 22.

15         A.   Okay.

16         Q.   Let me know when you're there.

17         A.   Okay.  I'm there.

18         Q.   So we have the actual numbers of

19     spend for the STARS grant in 2013, 2014, and

20     2015.  And the numbers here reflect that the

21     spend was not the entire grant; is that

22     correct?

23         A.   Yes.  They did not expend the

24     entire amount of the grant.

25         Q.   Do you know why that's the case

Page 227

1          in these years, 2013, '14, or '15, why the

2          entire grant allocation was not spent on the

3          STARS program?

4                    A.    I do not know.

5                    Q.    Do you know if in the past, say

6          2017 and coming up now 2018, have as

7          to -- strike that.

8                    In 2017, did SCCS spend the

9          entire grant money allocated for the STARS

10         program?

11                   A.    Yes, we did.

12                   Q.    On page 4 of Exhibit 7, the 2017

13         budget -- if you can flip to that.

14                   A.    Okay.

15                   Q.    Did you have any part in drafting

16         any of the narrative part of the Exhibit

17         Number 7, the budget report?

18                   A.    No, I did not.

19                   Q.    About halfway down on page 4,

20         maybe a little bit more than halfway down, it

21         starts with "Please note."  Do you see that

22         little inset paragraph there?

23                   A.    Yes, I do.

24                   Q.    It says:

25                   "SCCS is monitoring a trend of

Page 228

```
 1                 increasing custody numbers that
 2                 began in late 2015 and overall
 3                 continued throughout the first
 4                 half of 2016.  Analysis of cases
 5                 suggests that, at least in part,
 6                 this increase is linked to the
 7                 heroin epidemic and other
 8                 substance abuse within
 9                 Summit County."
10                 Have you seen that before?
11                 MR. PENDELL:  Objection to form.
12                 THE WITNESS:  Have I seen this
13            statement before?
14      BY MS. HIBBERT:
15            Q.   Yes.
16            A.   No, I have not.
17            Q.   Do you have any knowledge as to
18      an increase in custody numbers that began in
19      late 2015?
20            A.   Yes.
21            Q.   And had you heard before that
22      this increase was linked to the heroin
23      epidemic and other substance abuse within
24      Summit County?
25            A.   I don't understand.  Before --
```

                                            Page 229

1         I'm sorry.  I don't understand your question.

2               Q.   Had you heard that before, that

3         the increase in custody numbers that began in

4         2015 was linked to the heroin epidemic and

5         other substance abuse within Summit County?

6                    MR. PENDELL:  Objection, form.

7                    THE WITNESS:  I knew of the

8              increase in custody numbers.  As I said,

9              I arrived at the agency in late 2015 --

10             was it late 2015?  No, I'm sorry,

11             mid-2016 I arrived at the agency.

12                   And so at that point in time, my

13             only knowledge would really be based

14             upon conversation in our executive team

15             meetings where, you know, Julie Barnes

16             would, you know, be talking about, you

17             know, the increase in custody numbers

18             and the drivers behind that.

19        BY MS. HIBBERT:

20             Q.   And did she speak about one of

21        the drivers being this heroin epidemic?

22             A.   I don't know that I ever recall

23        her saying "heroin" specifically.

24             Q.   Do you know who drafted the

25        language in this budget report marked as

Page 230

1     Exhibit 7?
2          A.   I do not know who drafted this
3     language.
4          Q.   Do you know who took part in
5     drafting any part of the budget report marked
6     as Exhibit 7?
7          A.   Yes.  Obviously, Director Barnes
8     put together part of this, and there's a
9     financial narrative, I think, that sits in
10    front of the budget, that I completed.
11              But aside from that, I don't know
12    who contributes.
13         Q.   What financial narrative are you
14    referring to?  What page are you on?
15         A.   Sure.  That would be page 18, 19,
16    and 20.
17         Q.   So starting with the
18    Summit County Children Services preliminary
19    2017 operating budget forward, this part
20    is -- was it drafted primarily by you?
21         A.   Yes.  This was written by me.
22         Q.   And all of the spreadsheets that
23    we've been referring to on pages 22 and 23,
24    those were all generated by you and drafted
25    by you as well?

Page 231

1             A.    Myself and Bob King.

2             Q.    And the same with all of the

3       spreadsheets that carry on through -- let's

4       see -- page 32.  Did you participate in

5       drafting all of those spreadsheets?

6             A.    Yes.  I participated in drafting

7       those.

8             Q.    I'm going to ask you to flip to

9       page 14.

10            A.    Okay.

11            Q.    Did you help draft any of these

12      or put together these charts that are

13      included on pages 14, 15, and 16?

14            A.    No.  I had no part in the

15      creation of these charts.

16            Q.    Do you know who did create them?

17            A.    Not specifically, I do not.

18            Q.    Looking specifically at the

19      monthly average number in children in

20      custody, this first chart on the top of

21      page 14 -- do you see that?

22            A.    Yes, I do.

23            Q.    Have you ever seen that chart

24      before?

25            A.    Yes, I have seen this chart

1     before.

2              Q.    And generally, this depicts that

3     the monthly average number of children in

4     custody, although increasing slightly in the

5     past few years reflected on this chart, is

6     down substantially still from a decade ago.

7     Is that fair?

8              A.    Yes.  That is what the chart

9     represents, yes.

10              Q.    In 2007, the chart represents

11     that there was a -- 1,057 was the number, the

12     monthly average number for children in

13     custody.

14              Do you see that?

15              A.    Yes, I do.

16              Q.    Versus the last year here in this

17     chart, 2015, down to 601, correct?

18              A.    Yes.  That's correct.

19              Q.    Do you know what the average

20     monthly number of children in custody is for

21     2018?

22              A.    As of Monday, our children in

23     custody was 821.

24              Q.    Do you know whether that reflects

25     the monthly average number for that year, or

Page 233

1       is that just the number that it was that day?

2              A.    That would be the number of

3       children that we had in custody as of Monday.

4              Q.    Again, do you know what the

5       monthly average number of children in custody

6       is for 2018 thus far?

7              A.    I would have to guess.

8              Q.    Do you know what the monthly

9       average number of children in custody was for

10      2017?

11             A.    I don't recall.  I would have to

12      guess.

13             Q.    Not above 800, to your

14      recollection?

15                   MR. PENDELL:  Objection to form.

16                   THE WITNESS:  To my recollection,

17          no, it was not greater than 800.

18      BY MS. HIBBERT:

19             Q.    Still lower than it was a decade

20      ago; is that fair?

21                   MR. PENDELL:  Objection to form.

22                   THE WITNESS:  Yes.  It would be

23          lower than a thousand.

24                   MR. PENDELL:  Are we moving on to

25          a new document?

Page 234

```
 1              MS. HIBBERT:  Yes.
 2              MR. PENDELL:  We've been going
 3         for over an hour.  Is now a good time to
 4         take a break?
 5              MS. HIBBERT:  Sure.
 6              MR. PENDELL:  Thank you.
 7              THE VIDEOGRAPHER:  Off the
 8         record, 2:59.
 9              (Recess taken.)
10              THE VIDEOGRAPHER:  On the record,
11         3:24.
12    BY MS. HIBBERT:
13         Q.   Mr. Kearns, we've been going for
14    a good bit of the day at this point.  Is
15    there any testimony that you feel like you
16    need to correct or clarify that you've given
17    thus far today?
18              MR. PENDELL:  Objection to form.
19              THE WITNESS:  None that I can
20         think of, no.
21    BY MS. HIBBERT:
22         Q.   We had discussed a little bit --
23    before going off the record, a little bit
24    about the STARS program.
25              Do you recall that testimony?
```

Page 235

1          A.    I do, yes.

2          Q.    And you had mentioned that you

3     felt that -- or it was your impression that

4     the manager in charge of the STARS program

5     when it was first initiated in 2013 didn't do

6     the greatest job of getting it off the

7     ground.

8                Do you remember that testimony?

9          A.    I do.

10         Q.    What did you mean by that?

11         A.    Again, I should point out that

12    the STARS grant began before I was employed

13    by Summit County Children Services.  But my

14    understanding is that they just had a

15    difficult time getting the recovery coaches

16    in place and really getting the grant up and

17    running, getting it off the ground.  It was

18    just, you know, slow out of the gate, so to

19    say.

20         Q.    Who was in charge of running the

21    STARS program at that point in 2013?

22         A.    I know who was in charge when I

23    arrived.  I don't know if that individual

24    changed or not.

25         Q.    Who was in charge when you

Page 236

1        arrived in 2016?

2              A.    Her name was Beth Kinney.

3              Q.    Do you know how long she's been

4        employed with Summit County?

5              A.    I do not.

6              Q.    Do you know how much money was

7        spent by SCCS with regard to the STARS

8        program that was specifically spent

9        addressing opioids?

10             A.    We have no specific data that

11       would isolate those costs.

12             Q.    There's no specific data that

13       would tell us that this STARS money was spent

14       addressing this particular type of drug; is

15       that correct?

16                   MR. PENDELL:  Objection to form.

17                   THE WITNESS:  We don't have that

18           data currently.  I'm uncertain whether

19           or not it could be gathered from the

20           case files or not.

21       BY MS. HIBBERT:

22             Q.    So fair to say, then, we couldn't

23       go back and ascertain from the case files

24       whether specific STARS money was spent to

25       address prescription opioid misuse?

```
                                              Page 237

 1                MR. PENDELL:  Objection to form.

 2                THE WITNESS:  No.  I can't say

 3          that I would agree with that.  I don't

 4          know what's in the case file and what is

 5          not.

 6   BY MS. HIBBERT:

 7          Q.   From what you know sitting here

 8   today, as the deputy director for SCCS

 9   Financial Services, do you know of any way to

10   ascertain information as to what specific

11   drugs or drug issues were addressed through

12   use of STARS funds?

13          A.   Short of reviewing the case

14   files, I don't know of any other way to

15   ascertain that information.

16          Q.   And through review of the case

17   files, would that tell you whether there were

18   specific STARS funds spent on that case or

19   the services provided in that case?

20                MR. PENDELL:  Objection to form.

21                THE WITNESS:  This is only my

22          personal opinion, but I would see that

23          review of the case file as the only way

24          to ascertain whether or not the client

25          had a substance-abuse issue related
```

1          directly to opioids.

2      BY MS. HIBBERT:

3          Q.   And that assessment hasn't been

4      done, as far as you know?

5          A.   As far as I know, it has not.

6          Q.   Just because an individual has a

7      substance-abuse problem related to opioids,

8      that doesn't mean that there were any STARS

9      funds directly spent on services provided to

10     children in that family situation, correct?

11         A.   Repeat it one more time, please.

12         Q.   Sure.

13              Just because an individual has a

14     substance-abuse problem related to opioids,

15     that doesn't mean that there was any -- or

16     there were any STARS funds spent directly

17     related to services for children in that

18     situation?

19              MR. PENDELL:  Objection to form.

20              THE WITNESS:  I don't know.

21     BY MS. HIBBERT:

22         Q.   Did you request year to year the

23     total amount of STARS grant funds from the

24     federal government?

25         A.   The grant itself was awarded for

Page 239

1        a five-year period, with a maximum amount of

2        funding of $500,000 per year.  We also had to

3        match those funds with local dollars.

4                Q.    What was the matching rate?

5                A.    The matching rate was indexed

6        over the life of the grant.  It started at

7        15 percent for the first two years, I

8        believe.  Second two years were 20 percent,

9        and the last year was 25 percent.

10               Q.    In the expenditure -- I'm sorry,

11       the revenue -- strike that.

12                     Where would that information as

13       to how much was matched out of the local

14       funds, where would that be included?  Is that

15       on the revenue side or the expenditure side

16       of the spreadsheets we've been looking at in

17       the budget plans?

18               A.    The match itself would not be

19       specifically identified in the line item.

20       You know, we look at local match as salary

21       for the coordinator, you know, overhead

22       costs, to, you know, keep the lights on, you

23       know, run the computer system, to facilitate

24       the grant-running.

25                     So our matching dollars would be

Page 240

1       comingled in several different line items.

2               Q.    Of the revenue or the expenditure

3       side?

4               A.    It would be on the expenditure

5       side.

6               Q.    And the local matching funds,

7       where are they coming from?

8               A.    Local matching funds would come

9       from our budgeted expenditure amounts.

10              Q.    Do you still have Exhibit

11      Number 7 in front of you?

12              A.    Which would that be?

13              Q.    That's the 2017 budget.  I think

14      that's the one you have right in front of

15      you.

16              A.    Yes, I do.

17              Q.    Can you turn to page 27?

18              A.    Yes.

19              Q.    Okay.

20                    This page here, page 27 of

21      Exhibit 7, this is the financial statement

22      for expenditures identifying grant-specific

23      expenses.

24                    The local matching that we were

25      just discussing, is that included in these

Page 241

1            line items?
2                    A.    No.  Again, the matching expenses
3            would be interspersed in several different
4            line items from payroll to supplies to
5            utilities.  That's how we matched.
6                    Q.    What is a grant-specific expense?
7                    A.    Grant-specific expenses, as
8            identified on this page, you know, were
9            essentially those expenses that we identified
10           that could be attributed specifically to a
11           STARS grant and/or any other grant that we
12           might have at that given point in time.
13                   Q.    So for here in the 2017 budget
14           for these expenditures, is there any
15           expenditures in the grant-specific expenses
16           that are specific to the STARS program or the
17           STARS grant?
18                   A.    In grant-specific expenses?
19                   Q.    Correct.
20                   A.    Yes.
21                   Q.    Which ones?
22                   A.    Well, at the bottom, the last
23           line in grant-specific expenses, where it
24           says "grant-specific expense," that's where
25           our STARS grant expenditures would lie.

Page 242

1              Q.    Is that always the case year to

2       year, that the grant-specific expense line

3       item represents the expenditures for the

4       STARS grant?

5              A.    The STARS grant and other expense

6       items as well, yes.

7              Q.    What other expense items fall

8       within that catchall line item

9       "grant-specific expenses" in the

10      grant-specific expenses chart?

11             A.    I don't know that I could -- I

12      don't know.

13             Q.    What does that mean to be a

14      grant-specific expense specific to the STARS

15      grant?  That's not the grant money that

16      you've spent and sought reimbursement for,

17      correct?

18             A.    Yes, it is, because we had

19      contracted services for, like, you know, the

20      recovery coaches.  That would be considered a

21      grant-specific expense.

22             Q.    So the grant-specific expense

23      line item here on page 27 of Exhibit 7 for

24      the years 2013, '14, and '15, well exceeds

25      $500,000, yet we know from our previous

Page 243

1        discussion that SCCS sought reimbursement for

2        under $500,000 in each of the years through

3        the STARS grant.  How do you explain that

4        difference?

5                    (Reported requested

6                    clarification.)

7              A.    Well, there are several other

8        expenses that are reported in that

9        grant-specific line item.

10             Q.    So we wouldn't be able to

11       ascertain the exact amount expended specific

12       to the STARS grant under the grant-specific

13       expense line item just by looking at this

14       chart, correct?

15             A.    That would be correct.

16             Q.    Is there a way that we would be

17       able to determine the amount of expenses

18       expended related to the STARS grant?

19             A.    Yes.

20             Q.    How would that be done?

21             A.    The easiest way to do it would be

22       to look -- and as odd as it sounds, would be

23       to look at the revenues.

24             Q.    So the actual amount expended

25       under the revenue page, page 22 for the STARS

Page 244

1    grant, reflects the same amounts for the

2    expenditures for the STARS grant; is that

3    fair?

4              A.   It would -- it would --  that

5    would represent the federal dollars that we

6    expended and then received back, yes.

7              Q.   The local matching dollars, are

8    those included in the grant-specific expenses

9    line item on page 27?

10             A.   Not necessarily, no.  Again, they

11    are interspersed between payroll and benefits

12    and --

13             Q.   Are any other expenses other than

14    the expenses that are ultimately reimbursed

15    through the federal grant reflected in the

16    grant-specific expense for the STARS grant on

17    page 27?

18             A.   I'm sorry.  I don't understand.

19             MR. PENDELL:  Objection.

20    BY MS. HIBBERT:

21             Q.   Aside from the money spent under

22    the STARS program that's reimbursed by the

23    federal STARS grant, and the local matching

24    dollars, are there any other expenditures for

25    the STARS program that would be reflected

Page 245

1          anywhere on the expenditures chart?

2                A.    Other than those which we've

3          discussed, with the matching funds being

4          interspersed, no.

5                Q.    Okay.

6                      Were you involved in the -- I

7          don't know if it was a reapplication or an

8          application for a second STARS grant in 2017?

9                A.    I was involved in requesting an

10         extension utilizing unspent grant dollars

11         from the previous five years.

12               Q.    And from the previous five years,

13         being 2013 to -- or would it be?  I guess it

14         was only up until 2017 at that point,

15         correct?

16               A.    Yes, five years.

17               Q.    Do you know what the total amount

18         of unspent grant dollars were for those four

19         years?

20               A.    It was approximately 480 --

21         $485,000.

22               Q.    And did the grant money that went

23         unspent year to year, did that carry over to

24         the next year or not?

25               A.    No, it did not.

Page 246

1          Q.   So the extension that you sought

2      in 2017, that was to utilize the unspent

3      money that did not carry over from those

4      years, 2013 to 2017, correct?

5          A.   Yes, that is correct, so we could

6      utilize the unspent grant funds from previous

7      years.

8          Q.   What was that extension

9      request -- what did that entail?

10         A.   My responsibility was essentially

11     to calculate the unspent grant amount.  That

12     was the extent of my responsibility.

13         Q.   Did you participate in drafting

14     any forms or submissions for that extension?

15         A.   No, I did not.

16         Q.   Do you know who was responsible

17     for putting together the package for that

18     extension?

19         A.   I believe Kevin Brown was

20     responsible for putting together that packet.

21         Q.   And what was Kevin Brown's title?

22         A.   I don't know.

23         Q.   Do you know what department he

24     was in?

25         A.   I believe he works in quality

Page 247

1      improvement -- worked.

2              Q.   He's deceased now, correct?

3              A.   He is.

4              Q.   And when did he pass away?  Do

5      you know?

6              A.   No.  I want to say 2017, but I

7      don't know when.

8              Q.   Now, the extension request was

9      submitted, to your knowledge, in 2017,

10     correct?

11             A.   Yes.  So Kevin probably passed in

12     2018, but I'm a little foggy on that.

13             Q.   I'm not going to hold you to

14     that.

15                  Do you know whether or not SCCS

16     received the approval for the extension

17     request?

18             A.   Yes, we did.

19             Q.   You did.

20                  When did you receive that

21     approval?

22             A.   I don't recall specifically when

23     we received it, but it was late 2017.

24             Q.   The extension request, is that

25     different than what I've seen referenced as a

Page 248

1          Regional Partnership Grant 4?

2                    A.    I don't know.

3                    Q.    You don't ever recall hearing

4          that, a regional partnership grant?

5                    A.    I think the STARS grant was

6          referred to that.  That RPG4 sounds familiar,

7          but I'm not certain.

8                    Q.    The $485,000 carryover funds,

9          have those been incorporated into -- were

10          those incorporated into the budget for 2018?

11                    A.    Yes, they were.

12                    Q.    Was SCCS already supposed to

13          get -- were they already awarded grant money

14          for 2018 under the five-year period of the

15          original grant approval?

16                    A.    Were we supposed to get money in

17          '18 under the original?  Is that the

18          question?

19                    Q.    Right.  The grant was set to

20          expire in 2017; is that right?

21                    A.    The grant was set to expire in

22          2017.  We knew that we had made the request

23          to expend the unused funds, so because of the

24          budgetary process that, you know, we've

25          discussed earlier, if we don't budget for it,

Page 249

1        then we can't spend it.  So we went ahead and

2        added it into the 2018 budget, really before

3        we knew whether or not we were going to

4        receive the extension.

5                    (Summit County Children Services

6                    2018 Budget, Bates

7                    SUMMIT_000990286 through

8                    SUMMIT_000990324, marked as

9                    Deposition Exhibit 9.)

10       BY MS. HIBBERT:

11            Q.   I'm going to show you what I'm

12       marking as Exhibit Number 9.

13            A.   Thank you.

14            Q.   Do you recognize that document?

15            A.   Yes, I do.

16            Q.   This is the 2018 budget, for the

17       record, Bates Number 990286.

18                 Did you take part in the

19       preparation of this document?

20            A.   Yes, I did.

21            Q.   Turning to page 19 of the 2018

22       budget marked as Exhibit 9 -- let me know

23       when you're there.

24            A.   I am.

25            Q.   The STARS grant revenue budget

1          for 2018 reflects an amount of $600,000.

2                    Do you see that?

3               A.    I do.

4               Q.    How do you reconcile that

5          budgeted amount with what we've discussed so

6          far being that in 2018, SCCS was seeking only

7          the extension of the carryover fees of

8          $485,000?

9               A.    The reason for the

10         $600,000 amount is because, as we explained

11         or talked about earlier, the budget process

12         begins in May.  And really, by the time the

13         budget leaves our building -- by the time we

14         get through our resource committee, it's

15         July.

16                    So essentially, we base that

17         number upon unused funds that were identified

18         in the previous years, and then basically a

19         conservative view of where we're going to

20         spend all of the 2017 money.  We didn't know

21         if we were or were not, so we included -- we

22         went for 600,000 when the amount, just

23         glancing through here, was actually 445.

24              Q.    So you ended up spending more in

25         2017 of the STARS grant 2017 money than you

Page 251

1      had anticipated in early 2017 when this

2      budget was being prepared; is that fair?

3          A.   That is correct.  We spent out

4      the entire grant amount in 2017.

5          Q.   Do you know why SCCS didn't apply

6      for another five-year STARS grant?

7          A.   I do not know.

8          Q.   Were you part of any discussions

9      or conversations about whether or not SCCS

10      would apply for another five-year STARS

11      grant?

12          A.   I was not party to those

13      conversations.

14          Q.   Did you ask anyone why you were

15      only seeking an extension as opposed to a new

16      grant?

17          A.   No, I did not.

18          Q.   Do you have any information as to

19      the success of the STARS program under SCCS?

20          A.   I do not.

21          Q.   And is it your understanding that

22      the STARS program will no longer operate in

23      2019?

24          A.   It is my understanding that we

25      are going to continue with the recovery

Page 252

1          coaches and they will be paid for under the

2          Start grant that I had mentioned earlier.

3                Q.    Start, not STARS?  It's a new

4          grant?

5                A.    Start, S-t-a-r-t, yes.

6                Q.    And were you involved in the

7          application process for that Start grant?

8                A.    No, I was not.

9                Q.    Do you know when SCCS obtained

10         approval for that Start grant?

11               A.    I know that we presented it to

12         our board this month for them to approve us

13         accepting the grant.

14               Q.    Do you know how it came about

15         that the grant money was offered to SCCS?

16               A.    I do not.

17               Q.    Do you know what amount has been

18         promised for that Start grant for SCCS?

19               A.    I would be guessing at the

20         amount.

21               Q.    Is that not included in the 2019

22         budget?

23               A.    It is not.

24               Q.    Why not?

25               A.    Because when the 2019 budget was

Page 253

1      created, we had no information related to the

2      Start grant.  We didn't know that it was

3      coming.

4            Q.    And do you anticipate that the

5      Start grant money will be received in 2019?

6                 MR. PENDELL:  Objection to form.

7                 THE WITNESS:  I would anticipate,

8         yes.

9      BY MS. HIBBERT:

10           Q.    How much do you anticipate

11     receiving in 2019?

12           A.    Again, I don't know.  I don't

13     recall what the total grant amount is.

14           Q.    And you don't recall per year

15     what you're expecting to receive from that

16     grant?

17           A.    I do not.

18           Q.    Do you know if it's a

19     year-to-year grant or does it have a

20     several-year term?

21           A.    I don't know.

22           Q.    Do you have any other information

23     about the Start grant other than we've

24     already talked about?

25           A.    No.  Information -- detailed

                                                    Page 254

1         information hasn't been provided to me about

2         the Start grant as of yet.

3                 Q.   Who would have information about

4         the Start grant?

5                 A.   Julie Barnes.

6                 Q.   And you said you just presented

7         that to your board of trustees recently?

8                 A.   I did not present it, but it was

9         presented to the board, yes.

10                Q.   And how do you know it was

11        presented to the board?

12                A.   I was in the meeting.

13                Q.   Great.

14                     Who presented it to the board

15        then?

16                A.   I believe Amy Davidson.

17                Q.   What's her title?

18                A.   She's the deputy director of

19        social services.

20                Q.   Did she present on what the total

21        amount will be for the Start grant?

22                A.   She did, but, boy, I can't

23        remember.

24                Q.   That's okay.  There are meeting

25        minutes kept of the board of trustees

Page 255

1    meetings, correct?

2          A.    Yes, there are.

3          Q.    If that information was

4    presented, it's likely going to be in the

5    meeting minutes?

6          A.    It likely would, yes.

7          Q.    Is there a process by which you

8    can incorporate the Start grant into the 2019

9    budget once you receive confirmation that you

10    will be receiving funds?

11          A.    Yes.  Worst case scenario is that

12    we would have to do a budget adjustment to

13    include the expenses related to, you know,

14    the recovery coaches and continuing that

15    service.  That would be worst case scenario.

16          Q.    Worst case scenario because any

17    budget adjustment takes a considerable amount

18    of effort; is that fair?

19          A.    That is correct.

20          Q.    And the budget adjustment that

21    you had for 2016 for the paid placement, did

22    that also take a considerable amount of

23    effort to pass through?

24          A.    Yes, it did.

25          Q.    Is there also what's called an

Page 256

1      FRRC grant?  Do you know what that is?

2           A.    Yes, there is.

3           Q.    And what is that?

4           A.    I honestly don't know.

5           Q.    Have you ever heard of the

6      Substance Abuse Unit?

7           A.    No, I have not.

8           Q.    Do you have any knowledge or

9      details about the Family Reunification

10     through Recovery Court?

11          A.    Other than that's the acronym for

12     FRRC.

13          Q.    And there was a grant award for

14     that court, the FRRC, correct?

15          A.    Yes.

16          Q.    Do you have any information as to

17     when that grant award was first received?

18          A.    No, I do not.

19          Q.    Is the grant award for FRRC

20     reflected in either the 2017 or 2018 budgets

21     that you have before you marked as Exhibits 7

22     and 9?

23          A.    It would be included in there,

24     yes.

25          Q.    Turning to Exhibit Number 9, the

1      2018 budget, can you point to me where in the

2      -- I assume it's in the revenue spreadsheet,

3      correct?

4              A.   It would have to be in both the

5      revenue and the expenditure spreadsheet.

6              Q.   In the revenue spreadsheet, can

7      you point to me what line item represents the

8      FRRC grant?

9              A.   I believe FRRC was accounted for

10     underneath the grants line item.

11             Q.   Under the state funds grants?

12             A.   Yes.

13             Q.   Were there other grants included

14     under that line item as well or was it just

15     the FRRC?

16             A.   No.  There were other grants.

17             Q.   Is there any way for me to

18     determine how much grant money was received

19     for the FRRC from any of your revenue

20     statements?

21                  Certainly not from this one,

22     correct?

23             A.   No.

24             Q.   Do you know if that information

25     is kept anywhere, how much grant money is

Page 258

1      received specific for the FRRC grant?

2              A.    I believe that detail would be

3      maintained in the Banner financial system.

4              Q.    What's the Banner financial

5      system?

6              A.    That is the county's financial

7      system of which we have to record all of our

8      revenues and expenditures.

9              Q.    How often do you have to record

10     revenues and expenditures in the Banner

11     financial system?

12             A.    Well, we enter our information

13     into Banner in real-time.

14             Q.    So anytime you're getting like a

15     reimbursement, it's entered into the

16     financial system?

17             A.    When we pay a bill, we're

18     entering it into Banner, yes.

19             Q.    Are there reports generated from

20     that system that you keep for record-keeping

21     purposes?

22             A.    I do not.

23             Q.    Do you know if anyone at SCCS

24     keeps any reports from that system?

25             A.    No.

Page 259

1          Q.    Who enters the information into

2     the Banner financial system?

3          A.    Kathy VanHoose.

4          Q.    What's her title?

5          A.    I want to say she's a financial

6     account specialist or fiscal account

7     specialist.  We could find her on the

8     organizational chart, but --

9          Q.    I know you said that you don't

10    know of any reports that have been run.

11          Do you know of the ability to run

12    reports in the Banner financial system?

13          A.    I do not know.

14          Q.    Has there been any assessment

15    done, to your knowledge, as to what the cost

16    per child for paid placements has been over

17    time?

18          A.    Yes.

19          Q.    And what has that assessment

20    resulted in?  What were the results?

21          Do you know what the cost per

22    child for paid placements were over time?

23          A.    I do.  And it varies according to

24    the placement setting.

25          Q.    Where can I obtain that

Page 260

1          information as to the assessment of the cost
2          per child for paid placements?
3                  A.   I would have that information in
4          my electronic file system.
5                  Q.   Do you keep a running spreadsheet
6          of that information or how is it maintained?
7                  A.   Yes.  There is a running
8          spreadsheet.  I'm uncertain as to how far it
9          goes back, but --
10                 Q.   You anticipated my next question.
11                 When did you begin keeping that
12         running spreadsheet?
13                 A.   I asked for the data probably --
14         I want to say probably the end of 2016.
15                 Q.   Why did you ask for that data at
16         that time?
17                 A.   Well, I felt the data was
18         pertinent to my job duty in terms of
19         budgeting and trying to anticipate costs
20         going forward and trying to project costs.  I
21         thought it was important that I know the cost
22         per child.
23                 Q.   Do you think that cost per child
24         for placements is an important aspect or
25         important information to be able to ascertain

Page 261

1    the financial impact, say, of opioids at

2    SCCS?

3                    MR. PENDELL:  Objection to form.

4                    THE WITNESS:  Can you say that a

5        different way?

6    BY MS. HIBBERT:

7            Q.    Sure.  I'll try.

8                  The cost per paid placements has

9    increased from 2006 to 2018, correct?

10           A.    Yes, generally.

11           Q.    At least increased in 2016.

12   Fair?

13           A.    Fair.  Yes.

14           Q.    There was a spike in the cost of

15   placements in 2016, correct?

16           A.    Yes.

17           Q.    In order to determine how that

18   spike in paid placements affected the

19   financial health of SCCS, would it be

20   important for us to know the cost per child

21   for paid placements?

22                   MR. PENDELL:  Objection.

23                   THE WITNESS:  I don't think your

24       restatement helped.  I don't understand

25       your question.

Page 262

1        BY MS. HIBBERT:

2                Q.   Okay.  Sure.

3                     If I wanted to -- strike that.

4                     The spreadsheet that you kept on

5        the cost per child for paid placements, is

6        that just one individual spreadsheet?

7                A.   Yes.

8                Q.   Are there any other spreadsheets

9        or documents that include information about

10       cost per child for paid placements over time?

11               A.   That's the only one that I'm

12       aware of.

13               Q.   Did you calculate, yourself, the

14       cost per child for paid placements that are

15       incorporated in your running spreadsheet?

16               A.   No, I did not.

17               Q.   Who made those calculations?

18               A.   Margaret Cross.

19               Q.   What's her title?

20               A.   I think it's financial account

21       specialist or something.

22               Q.   Do you know what methodology she

23       employed to make those calculations?

24               A.   The calculations are completed in

25       an Excel spreadsheet.

Page 263

1          Q.   Do you know what formulas were

2     used or how she came up with those costs per

3     child?

4          A.   I understand the formulas that

5     she used, yes.

6          Q.   What were they, then?

7          A.   It's looking at, you know, how

8     many children are in a particular setting for

9     that month compared to the number of days

10    that the child -- you know, that we had for

11    total for the child in that placement

12    setting, and look at the costs, and calculate

13    an average based upon that.

14         Q.   Paid placement is different than

15    foster care, correct?

16         A.   We have -- yes.  Our foster care,

17    yes, would be different from paid placement.

18         Q.   What is paid placement and how is

19    it different than foster care?

20              MR. PENDELL:  Objection to form.

21              THE WITNESS:  Paid placement is

22        our purchased placement settings.

23    BY MS. HIBBERT:

24         Q.   And what are those settings?  Is

25    it like a family that's being paid to take in

Page 264

1          children?  How does it work?

2                    MR. PENDELL:  Objection to form.

3                    THE WITNESS:  The purchase

4             placement setting would include a

5             residential, a group home, and then our

6             purchased foster homes.

7          BY MS. HIBBERT:

8               Q.   Was there ever an assessment done

9          to determine the cause of the increase in

10         paid placements in 2016?

11              A.   Not to my knowledge, no.

12              Q.   Is it your understanding that the

13         paid placement costs are still less in 2016

14         to 2018 than they were a decade before?

15                   MR. PENDELL:  Objection to form.

16                   THE WITNESS:  I don't know

17            without looking at the data.  I don't

18            know.

19         BY MS. HIBBERT:

20              Q.   Sure.

21                   I think -- let me ask you this.

22         You don't know how far back your running

23         spreadsheet goes for the cost per child for

24         paid placements, correct?

25              A.   That's correct.

Page 265

1          Q.   Do you have any information as to

2     the total amount spent for paid placements

3     for any years before 2013?

4          A.   Yes.  We have that -- I think

5     that date is included on -- in our budget

6     books for prior years and --

7          Q.   We could ascertain that data from

8     any of the various budgets books before 2017

9     that we've seen here today, correct?

10         A.   Yes.

11         Q.   If you turn to Exhibit Number 8,

12    the budget summary document that you prepared

13    and turned over in this litigation, we can

14    get a general sense of how much was actually

15    spent based on what the budgeted amount for a

16    line item is for the next year.  Fair?

17         A.   Yes.  That would be correct.

18         Q.   You wouldn't necessarily be

19    budgeting for less than what you expended on

20    a line item the year before, correct?

21         A.   That is correct.

22         Q.   Turning to page 2 of Exhibit 8 on

23    the expenditures page, on the second kind of

24    grouping there, the first line item is "paid

25    placements," correct?

Page 266

1              A.   Yes, it is.

2              Q.   And from 2008 to 2013, there's a

3         steady decline in the amount budgeted for

4         paid placements.  Is that fair?

5              A.   Yes, it is.

6              Q.   We can assume from that

7         information that there was a steady decline

8         in the amount spent in paid placements from

9         2008 to 2013.  Fair?

10             A.   That is correct.  That is what

11        the spreadsheet indicates.

12             Q.   Looking at the 2018 budgeted

13        amount, it's 11.5 million -- do you see

14        that -- for paid placements?

15             A.   Yes, I do.

16             Q.   Still less than the budgeted

17        amount was for 2008, a decade earlier,

18        $13,649,000.

19                  Do you see that?

20             A.   Yes, I do.

21             Q.   So even though there was a spike

22        in paid placement costs in the last three

23        years, it still is not as much as the paid

24        placement costs were a decade ago in 2008.

25        Fair?

Page 267

1            A.    Based on the data on the

2       spreadsheet, yes, that is correct.

3            Q.    And going back to what, you know,

4       we discussed a little bit earlier, the

5       average number of children per month in

6       custody, numbers now, or in the past three

7       years, still less than they were a decade

8       ago, correct?

9                 MR. PENDELL:  Objection.

10                 THE WITNESS:  Yes.  That is

11          correct.

12       BY MS. HIBBERT:

13            Q.    I believe we looked at this

14       before too.  Overall expenditures for SCCS

15       now, or in the past three years, still less

16       than they were a decade ago, correct?

17            A.    Yes, based on the data in the

18       spreadsheet, that's correct.

19            Q.    You don't have any reason to

20       believe the data on this spreadsheet that you

21       yourself prepared, in part at least, is

22       incorrect in any way, correct?

23            A.    I have no reason to believe that,

24       no.

25            Q.    Mr. Kearns, as promised, I'm

Page 268

1         going to return back to Exhibit 3 that we

2         looked at earlier today.  I have a couple

3         additional questions about that exhibit.

4                 Let me know when you have it in

5         front of you.

6                 A.   Okay.

7                 Q.   When was the first time that SCCS

8         took any steps to identify the costs driven

9         by opioid misuse?

10                MR. PENDELL:  Objection.

11                THE WITNESS:  Well, I created the

12            spreadsheet, I believe, in May of 2017.

13        BY MS. HIBBERT:

14                Q.   And is it your understanding

15        that -- excuse me -- your creation of this

16        spreadsheet in May of 2017 reflected in

17        Exhibit Number 3 was the first effort that

18        SCCS took to identify the costs related to

19        opioids?

20                A.   I don't know that.

21                Q.   Are you aware of any other

22        assessment or analysis or efforts taken to

23        identify costs related to opioids other than

24        your efforts related to this spreadsheet

25        marked as Exhibit 3?

Page 269

1               A.    Not during my tenure.

2               Q.    This was the first time, your

3      development or creation of this spreadsheet,

4      May 2017, this was the first time that you

5      had tried to quantify or determine the

6      financial impact of opioids -- or related to

7      opioids on anything, correct?

8               A.    Yes.  This was my first attempt

9      to quantify the impact.

10              Q.    Is it fair to say that this is

11     not something that you focused on before this

12     lawsuit was anticipated?

13                    MR. PENDELL:  Objection to form.

14                    THE WITNESS:  It wasn't something

15         that I had been asked to do prior, no.

16     BY MS. HIBBERT:

17              Q.    It wasn't something that was

18     considered in SCCS generally either, correct?

19                    MR. PENDELL:  Objection to form.

20                    THE WITNESS:  I don't know that

21         prior to this date, that there had been

22         a request to quantify the impact

23         financially.  But I know from my

24         executive team meetings that the opioid

25         crisis and the impact was discussed from

Page 270

1          time to time in those meetings.

2     BY MS. HIBBERT:

3          Q.   How did you develop this

4     spreadsheet marked as Exhibit Number 3?  What

5     was your process?

6          A.   Well, we have the ability to pull

7     Banner data really for several years in

8     arrears.  So I pulled the -- I pulled the

9     Banner data related to all of those cost

10    centers that we considered to be

11    child-specific, you know, put those -- put

12    that data into a table, summarized the total

13    of each one of those cost categories over the

14    years that are displayed with the exception,

15    of course, 2017, it was only five months, and

16    then multiplied each category by 30 percent.

17         Q.   Now, we saw, going over some of

18    the other budget documents for 2017, 2018,

19    there are several other expenditure line

20    items that are typically included in a

21    budget, correct, than what's reflected here?

22         A.   Yes.  Oh, yes.

23         Q.   Is it fair to say, then, that

24    these are the only line items that you and

25    SCCS have identified as being in any way

1          related to or affected by opioids?

2                  A.   At the time that this spreadsheet

3          was created, yes, these were the cost

4          categories that we felt were child-specific

5          and were related -- or could be impacted by

6          the opioid epidemic in the county.

7                  Q.   Have you identified additional

8          cost categories or line items that may have

9          been impacted by opioids since the creation

10         of this chart?

11                      MR. ARNOLD:  Objection.  I

12              instruct the witness not to answer to

13              the extent it involves attorney-client

14              privilege or work product.

15         BY MS. HIBBERT:

16                 Q.   Can you answer with that

17         instruction?

18                 A.   I'll follow the instruction of my

19         counsel.

20                     MS. HIBBERT:  And maybe this is

21             clarification for counsel, but is it --

22             was there no assessment done other than

23             at the direction of counsel of

24             additional cost items?

25                     MR. ARNOLD:  Well, no.  He can

Page 272

1          answer the question.  You asked, "Have

2          you identified additional cost

3          categories," so it's a yes/no question.

4                   MS. HIBBERT:  That's the question

5          you objected to.

6                   MR. ARNOLD:  Yep.

7                   MS. HIBBERT:  So are you

8          objecting or withdrawing the objection?

9                   MR. PENDELL:  Well, that's not

10         what he said.  He said, "I instruct the

11         witness not to answer to the extent it

12         implicates attorney-client

13         communications and privilege."

14                  He can answer "yes" or "no."  He

15         just can't go beyond that.

16                  MS. HIBBERT:  Okay.  Well, that's

17         not what you originally said when you

18         objected.  So let's reask the question.

19         We can set an objection on the record --

20                  MR. PENDELL:  Calm down.

21                  MS. HIBBERT:  -- and he can

22         answer "yes" or "no."

23                  MR. PENDELL:  That's exactly what

24         he said.

25                  Calm down.  Calm yourself down.

Page 273

1          Okay?

2                  MS. HIBBERT:  Excuse me, Counsel.

3                  MR. PENDELL:  Excuse me.  You've

4          been rude all day.  Since we started,

5          you've been rude.

6                  MS. HIBBERT:  I don't know what

7          you're talking about, honestly.

8                  MR. PENDELL:  You have been.  You

9          have been.  You have been.

10                 And you guys jump up and down

11         when your attorney-client privilege is

12         implicated.  So just relax.  We're not

13         going to --

14                 MR. HALLER:  Implying that she's

15         hysterical is gender bias, and it's

16         inappropriate.

17                 MS. HIBBERT:  Yeah.  I --

18                 MR. HALLER:  Really

19         inappropriate.  Okay?  So let's keep it

20         calm.

21                 MR. PENDELL:  Thanks a lot, sir.

22         We'll take it under advisement, okay?

23                 MR. HALLER:  Thank you.

24                 MS. HIBBERT:  I couldn't agree

25         more.  I think your objections are

1          highly inappropriate.  I think your

2          speaking objections -- let me continue,

3          sir.

4                  MR. PENDELL:  Don't point your

5          finger at me.  Don't point your finger

6          at me.

7                  MS. HIBBERT:  I'm going to do

8          whatever I want to do right now --

9                  MR. PENDELL:  Okay.  Okay.

10                  MS. HIBBERT:  -- because you are

11          interrupting me.  You're talking over

12          me.  You're being, frankly, a jerk.

13                  And any other observations you

14          want to make, let's take it outside, off

15          the record.  We're not doing this

16          anymore on the record here.

17                  MR. PENDELL:  Take it outside?

18          Are you like inviting me outside so you

19          can inflict violence on me?

20                  MR. ARNOLD:  All right.  Let's

21          move on.

22                  MS. HIBBERT:  Excuse me, Counsel?

23                  MR. PENDELL:  Ask your questions.

24                  MS. HIBBERT:  Let's go off the

25          record.

```
                                            Page 275
 1                   MR. PENDELL:  Ask your questions.
 2                   MS. HIBBERT:  Off the record.
 3                   THE VIDEOGRAPHER:  Off the
 4          record, 4:14.
 5                   (Recess taken.)
 6                   THE VIDEOGRAPHER:  On the record,
 7          4:25.
 8     BY MS. HIBBERT:
 9           Q.   Mr. Kearns, have you identified
10     additional cost categories or line items that
11     may have been impacted by opioids since the
12     creation of this chart reflected in Exhibit
13     Number 3?
14           A.   No, I have not.
15           Q.   Where did the number 30 percent
16     come from in this chart?
17           A.   The number 30 percent came from a
18     hand count that was done by Sharon Geffken,
19     who was our deputy director of social
20     services prior to Amy Davidson.
21           Q.   Hand count of what?
22           A.   She literally went through case
23     by case.  I guess, maybe "hand count" is a
24     poor description, but she went through SACWIS
25     case by case and identified all the cases
```

Page 276

1    where opioid abuse was identified as a
2    contributing factor to removal.
3          Q.   Did you ever talk to Ms. Geffken
4    about the steps that she employed to identify
5    this information?
6          A.   No, I did not.
7          Q.   Do you have any knowledge about
8    the steps that she employed to identify this
9    information?
10         A.   No, I do not.
11         Q.   Do you know what she identified
12   as opioid abuse?
13         A.   No, I do not.
14         Q.   Do you know what she was looking
15   for to identify cases where, quote/unquote,
16   "opioid abuse was identified as a
17   contributing factor to removal"?
18         A.   No, I do not.
19         Q.   Do you know what specific
20   information in SACWIS Ms. Geffken was looking
21   for to identify these cases?
22         A.   No, I do not.
23         Q.   Do you know what types of
24   information exist in the SACWIS system
25   related in any way to substance abuse?

Page 277

1              A.    No, I do not.

2              Q.    Do you know whether the

3        information she pulled, being the cases that

4        she identified where, quote, "opioid abuse

5        was identified as a contributing factor to

6        removal" -- do you know whether that was

7        broken out by specific drug?

8              A.    No, I do not.

9              Q.    Do you know whether there was

10       identification of prescription opioids versus

11       illicit opioids?

12             A.    No, I do not.

13             Q.    Do you know whether that was

14       possible, whether she could have identified

15       whether the opioid abuse that she had

16       identified was either prescription versus

17       illicit?

18             A.    No, I do not.

19             Q.    Do you know whether there's

20       information that she could have obtained as

21       to what particular prescription opioid drug,

22       if it were a prescription opioid drug, was at

23       issue in that case?

24             A.    I'm sorry.  Read it one more

25       time?

Page 278

1          Q.    Sure.

2                Do you know whether or not

3     there's information she could have obtained

4     as to what particular prescription opioid

5     drug, if it were a prescription opioid drug,

6     was at issue in the case?

7          A.    No, I do not.

8          Q.    Do you know if there's any way to

9     determine if a prescription drug was at

10    issue, a prescription opioid drug, who the

11    manufacturer of that drug was?

12         A.    No, I do not.

13         Q.    Do you know if a prescription

14    opioid was at issue in any one of these

15    cases, whether there was information as to

16    who distributed that drug?

17         A.    No, I do not.

18         Q.    Do you know if there was a

19    prescription opioid at issue in any one of

20    these cases if there was information as to

21    what pharmacy the drug came from?

22         A.    No, I do not.

23         Q.    Do you know if Ms. Geffken looked

24    at any of that information in her analysis of

25    the SACWIS data that underlies your

Page 279

1          spreadsheet marked as Exhibit 3?

2                   A.    I do not know.

3                   Q.    Did you ask her any questions

4          about how she was identifying, quote/unquote,

5          "opioid abuse" in these cases?

6                   A.    No, I did not.

7                   Q.    Did you speak to anybody else

8          besides attorneys representing Summit County

9          in this case about how, quote/unquote,

10         "opioid abuse" was identified by Ms. Geffken

11         in this analysis?

12                   MR. PENDELL:  Objection --

13                   THE WITNESS:  I'm sorry.

14                   MR. PENDELL:  I was just going to

15           object to the form.  Go ahead.

16                   THE WITNESS:  No, I have not.

17         BY MS. HIBBERT:

18                   Q.    Is it fair to say, then, in this

19         30 percent that's been identified, the

20         30 percent number, there's no way to

21         determine what percentage of that percentage

22         was a result of prescription opioids?

23                   MR. PENDELL:  Objection to form.

24                   THE WITNESS:  I don't know.

25

Page 280

1      BY MS. HIBBERT:

2            Q.    In the information that you have

3      available to you, there's no way to determine

4      that, correct?

5            A.    That's correct.

6            Q.    Do you have any knowledge as to

7      what "a contributing factor to removal"

8      means?

9            A.    Not specifically, no.

10           Q.    Do you understand that in the

11     SACWIS system, the contributing factor listed

12     is not the actual reason for removal?

13           MR. PENDELL:  Objection to form.

14           THE WITNESS:  No, I don't.  I

15        don't work in SACWIS.

16     BY MS. HIBBERT:

17           Q.    Do you understand that the actual

18     reason for removal for children in this

19     analysis was not evaluated?

20           A.    I'm sorry?

21           MR. PENDELL:  Objection.

22           THE WITNESS:  Could you repeat

23        it?

24     BY MS. HIBBERT:

25           Q.    Do you know if the actual removal

Page 281

1          reason, the reason that a child was removed,

2          do you know whether that was evaluated in

3          Ms. Geffken's analysis that underlies your

4          calculations in Exhibit 3?

5                    A.    I don't know.

6                    Q.    Do you have any other information

7          as to the methodology that Ms. Geffken

8          employed in determining the 30 percent number

9          other than what you've already told me here

10         today?

11                   A.    No, I do not.

12                   Q.    Of the 30 percent number that you

13         have included in your calculations, there's

14         no way to identify what percentage of that

15         resulted from use of heroin, correct?

16                   A.    I don't know.

17                   Q.    With the information that you

18         have available to you right now, you cannot

19         ascertain what percentage of this 30 percent

20         was a result of heroin use, correct?

21                        MR. ARNOLD:  Asked and answered.

22                        THE WITNESS:  I don't know.

23         BY MS. HIBBERT:

24                   Q.    You don't know if you can

25         identify that information, or you know you

Page 282

1    can't do that from the information that you

2    have available to you?

3              MR. PENDELL:  Objection to form.

4              THE WITNESS:  The information is

5         not available to me.

6    BY MS. HIBBERT:

7         Q.    You don't have any information

8    available to you and you did not have any

9    information available to you in making these

10   calculations as to what percentage fentanyl

11   or carfentanil or any other illicit substance

12   contributed to this analysis, correct?

13             MR. PENDELL:  Objection to form.

14             THE WITNESS:  Again, that

15        information is not available to me.

16   BY MS. HIBBERT:

17        Q.    And as far as you know, there's

18   no -- there's no way to determine what --

19   precentage-wise, what impact any specific

20   drug, illicit or not, had on the SCCS,

21   correct?

22        A.    I do not know.

23        Q.    That's not something you've been

24   asked to determine?

25        A.    No, it is not.

Page 283

1          Q.   Who asked you to prepare the
2     Excel spreadsheet included in Exhibit
3     Number 3?
4          A.   Julie Barnes, my executive
5     director, asked me to prepare the
6     spreadsheet.
7          Q.   And did you have any discussion
8     with her about why she was asking you to
9     prepare that spreadsheet?
10         A.   Yes, I did.
11         Q.   What were those discussions?
12    What did they entail?
13         A.   The discussion that I had with
14    Julie indicated that the County of Summit was
15    considering this lawsuit and that they had
16    asked us to try and create a document which
17    basically illustrated the impact.
18         Q.   Did Ms. Barnes provide you with
19    this 30 percent number?
20         A.   Yes, she did.
21         Q.   And did she tell you that
22    Ms. Geffken had performed the analysis that
23    we just spoke about?
24         A.   Yes, she did.
25         Q.   Did you speak to Ms. Geffken

Page 284

1       personally about the analysis that she

2       employed?

3              A.   No, I did not speak to her

4       directly.

5              Q.   Have you ever spoken to

6       Ms. Sharon Geffken about the analysis that

7       underlies your calculations reflected in

8       Exhibit Number 3?

9              A.   No, I have not.

10              Q.   Did you ask Ms. Barnes any

11       specific questions about the methodology

12       employed by Ms. Geffken?

13              A.   No, other than asking, you know,

14       generally how she created the number, when I

15       was -- that's when Julie told me that she had

16       done a hand count.

17              Q.   She told you what you have

18       already told us about the methodology,

19       correct?

20              A.   That is correct.

21              Q.   Did you ask Ms. Barnes any other

22       information about that analysis that

23       underlies your calculations in Exhibit

24       Number 3?

25              A.   No, I did not.

Page 285

1          Q.   Did you ask to see the actual
2     data that was pulled from the SACWIS system
3     to confirm the 30 percent number?
4          A.   No, I did not.
5          Q.   Did you do any analysis yourself
6     to confirm the 30 percent number?
7          A.   I do not have that information
8     available to me.
9          Q.   So you took the 30 percent number
10    from Ms. Barnes, plugged it into your
11    calculations that are reflected in Exhibit
12    Number 3; is that fair?
13         A.   That is correct.
14         Q.   You didn't do any other sort of
15    analysis or fact investigation as to the
16    underlying data or information for your
17    calculations, correct?
18              MR. PENDELL:  Objection to form.
19              THE WITNESS:  No, I did not do
20        any additional calculations.
21              (Spreadsheet, marked as
22              Deposition Exhibit 10.)
23    BY MS. HIBBERT:
24         Q.   I'm going to show you what's been
25    marked as Exhibit Number 10.

Page 286

1              A.    Thank you.

2              Q.    Have you ever seen this document

3        before?

4              A.    Yes, I have.

5              Q.    When did you first see this

6        document?

7              A.    Probably a week to ten days ago.

8              Q.    Did you participate in any way in

9        the creation of this document?

10             A.    No, I did not.

11             Q.    Did review of the information

12       contained in Exhibit Number 10, when you

13       reviewed that a week or two ago, I think you

14       said, did that inform you in any way about

15       any of the analysis that you had performed

16       regarding the financial impact of opioids on

17       SCCS?

18             A.    Other than in reviewing the 2016

19       data, I felt that it supported, at least in

20       most part, the 30 percent that we had used.

21             Q.    What do you mean by "other than

22       reviewing the 2016 data"?

23             A.    Well, I mean that, you know, when

24       I created the spreadsheet in May of 2017 and

25       I was given the 30 percent figure that my

Page 287

1      understanding was created in 2016, I felt

2      that it gave support to that 30 percent

3      figure, this work did.

4            Q.   Do you know who created this

5      document?

6            A.   I do not know specifically who

7      created this document.

8            Q.   Do you know how this document was

9      created, where this information came from?

10                MR. PENDELL:  Objection to form.

11                THE WITNESS:  I do not know the

12          methodology employed to create this

13          spreadsheet.

14     BY MS. HIBBERT:

15           Q.   And you haven't done anything to

16     confirm any of the numbers that are reflected

17     in this document marked as Exhibit Number 10,

18     correct?

19           A.   That would be correct, because

20     this information is not available to me.

21           Q.   The information in the SACWIS

22     system is not available to you; is that what

23     you're saying?

24           A.   That is correct.

25           Q.   Did the quality improvement

1       department provide the information that you

2       used to populate the calculations in Exhibit

3       Number 3?

4             A.   I'm sorry.  What information are

5       you referring to in Exhibit Number 3?

6             Q.   Any of the information included

7       in Exhibit Number 3.

8             A.   No.  The QI department did not

9       contribute to this document.

10            Q.   They didn't contribute to this

11      analysis in any way, as far as you know?

12            A.   No, they did not.

13            Q.   To your knowledge, has there been

14      any assessment of the actual number of

15      children or percentage of children that come

16      into the custody of SCCS as a result of

17      opioid abuse or addiction?

18                 MR. PENDELL:  Objection to form.

19                 THE WITNESS:  I don't know.

20      BY MS. HIBBERT:

21            Q.   Other than what you've told me so

22      far about Exhibit Number 10, do you have any

23      other information about this document?

24            A.   No, I do not.

25            Q.   To your knowledge is the term

Page 289

1          "removal" -- is that different than

2          "custody"?

3                    A.    I don't know.

4                    Q.    Do you know what that term means,

5          "removal"?  What do you understand that term

6          to mean?

7                    A.    In my opinion, "removal" would

8          mean that a child was removed from a

9          particular setting.  Whether or not custody

10         was established I would think would be a

11         whole other -- that would be another action.

12                   Q.    Just because a child is removed

13         from their setting doesn't necessarily mean

14         that they come into the custody of SCCS,

15         correct?

16                   A.    That is correct.

17                   Q.    There's some sort of assessment

18         that has to happen in between that point in

19         time, removal, and establishment of custody,

20         correct?

21                   A.    That's my understanding.

22                   Q.    And just because a child is

23         removed from a home setting doesn't mean that

24         they aren't returned to that home setting

25         soon thereafter, correct?

Page 290

1          A.    I believe that to be true, yes.

2          Q.    Do you have any information as to

3     what's been referred to as "a caseworker

4     blitz data entry" into the SACWIS system in

5     2016?

6          A.    No.  I have no information

7     related to that.

8                (September 5, 2017, SSAB Budget

9                and Levy Committee Meeting

10               Minutes, marked as Deposition

11               Exhibit 11.)

12    BY MS. HIBBERT:

13         Q.    I'm going to show you what I've

14    marked as Exhibit Number 11.

15               Have you ever seen this document

16    before?

17         A.    I have not.

18         Q.    Do you receive the meeting

19    minutes from the SSAB Budget and Levy

20    Committee?

21         A.    No, I do not.

22         Q.    Do you recall attending a budget

23    and levy committee meeting on September 5th,

24    2017, or thereabouts?

25         A.    Yes, I do.

Page 291

1          Q.   And it says here under the guests

2     -- on the first page of Exhibit 11, it lists

3     your name there as a guest attending that

4     meeting, correct?

5          A.   Yes.

6          Q.   I want to turn to page 5,

7     Bates-labeled at the bottom 924665.

8          A.   Okay.

9          Q.   And these bullet points reflect,

10    at the top there, Julie Barnes giving

11    highlights regarding the 2018 SCCS budget,

12    which you have knowledge of, correct?

13         A.   Yes, I do.

14         Q.   About halfway down the bullet

15    points, starting with paid placement costs --

16    do you see that bullet?

17         A.   Yes, I do.

18         Q.   It says:

19              "They're budgeted at

20          11.5 million.  There has been some

21          stabilization around the number of

22          kids in custody after the spike in

23          2016.  Due to the opiate epidemic,

24          there are currently 650 in custody

25          compared to over 700 in 2016,

Page 292

1            although there hasn't been much

2            savings realized as the kids in

3            custody have more profound needs,

4            resulting in higher costs."

5          Did I read that correctly?

6     A.    Yes, I believe you did.

7     Q.    Do you have any information as to

8   what this means here by the kids coming into

9   custody having "more profound needs,

10  resulting in higher costs"?

11        A.    The only knowledge that I would

12  have would be related to the placement

13  setting that the child was placed in.  I

14  don't have any access to assessments for

15  child needs or anything along that line.

16        Q.    And what information do you have

17  as to the placement settings?

18        A.    Well, I do -- we keep track of

19  kids in each particular placement setting.

20  Again, that's information that we had

21  discussed earlier that I use to try to

22  project costs going forward.

23        Q.    And how does the placement

24  setting for these kids coming into custody in

25  2013 result in higher costs?

Page 293

1           A.    I'm sorry.  Did you say 2013?

2           Q.    I'm sorry.  I meant 2016.

3           A.    Okay.

4           Q.    I did say 2013, but I meant 2016.

5                 Do you want me to repeat the

6     question?

7           A.    Yes, please.

8           Q.    How does the placement setting

9     for these kids coming into custody in 2016

10    result in higher costs?

11          A.    In 2016, we saw a much higher --

12    we saw a higher number of kids go into

13    residential group home settings, which are

14    significantly more costly than our

15    agency-licensed homes or our purchased foster

16    home settings.

17          Q.    And do you have an understanding

18    as to why a higher number of kids were going

19    into residential or group homes in 2016?

20          A.    I do not.  That information is

21    not available to me.

22          Q.    Did you understand there to be a

23    limitation on the number of foster homes

24    available in this time period, 2016?

25                MR. PENDELL:  Objection to form.

```
 1              THE WITNESS:  I did know that we
 2         were utilizing the majority of our
 3         agency-licensed homes and that the
 4         market for purchased foster settings was
 5         very competitive.
 6    BY MS. HIBBERT:
 7         Q.   You don't have any information to
 8    suggest that the increase in number of kids
 9    going into residential or group homes were
10    because they needed residential or group
11    homes as opposed to another setting, do you?
12         A.   No.  That information is not
13    available to me.
14         Q.   Do you have any information as to
15    why a child might be placed in a particular
16    setting and what needs of the child would
17    dictate what setting they get put into?
18         A.   No.  That information is not
19    available to me.
20         Q.   You don't have any information to
21    suggest that a child with greater needs would
22    need residential or group home setting versus
23    another type of setting?
24              MR. PENDELL:  Objection to form.
25              THE WITNESS:  That's correct.
```

                                                    Page 295

1           That information is not available to me.

2      BY MS. HIBBERT:

3           Q.   Have you had any discussions with

4      anybody at SCCS about the increasing number

5      of kids going into residential or group

6      homes?

7           A.   I know that Amy Davidson and I,

8      who is the deputy director of social

9      services, we have had some conversation in

10     our executive team meetings related to the

11     number of kids going into a particular

12     placement setting as opposed to another.

13          Q.   And the residential or group

14     homes, are those paid placement settings?

15          A.   Those are paid placement

16     settings, yes.

17          Q.   And that's part of the reason

18     why -- or the reason why in 2016 there was a

19     spike in paid placement costs, correct?

20          A.   Because we had additional

21     children in those settings?

22          Q.   Yes.

23          A.   Yes.

24          Q.   Do you have any knowledge as to

25     any other reason for the spike in paid

Page 296

1      placement settings other than additional kids

2      needing places to go and being put into the

3      residential and group paid placement homes?

4            A.   Other than what Ms. Barnes

5      indicated here in her report, that the kids

6      had, you know, more profound need, no.

7            Q.   Do you have any information about

8      what profound needs Ms. Barnes was referring

9      to?

10           A.   I do not.  That's not available

11     to me.

12           Q.   And you haven't seen any analysis

13     or assessment of what needs these children in

14     2016 or thereafter actually had, correct?

15                MR. PENDELL:  Objection to form.

16                THE WITNESS:  That's correct.

17          That's not available to me.

18     BY MS. HIBBERT:

19           Q.   That's not been made available to

20     you, correct?

21           A.   Correct.  It's not made available

22     to me.

23           Q.   The increase that you saw, the

24     budget adjustment of -- I think it was

25     $1.7 million for the paid placement line item

Page 297

1          in 2016 --
2                    A.    Yes.
3                    Q.    -- was that in any way related
4          specifically to opioids?
5                    A.    The adjustment was related to the
6          increase in cost that we experienced in our
7          paid placement line item and in our foster
8          care line item.
9                          And I would assume that that is
10         directly as a result of the opioid epidemic.
11                   Q.    That's an assumption; that's not
12         something that you've seen borne out in
13         actual data that you've looked at, correct?
14                         In other words, it's not
15         something that you've assessed?
16                   A.    It's not something that I've
17         assessed, no.
18                   Q.    And that's not something that
19         you've seen assessed by SCCS, correct?
20                         MR. PENDELL:  Objection to form.
21                         THE WITNESS:  Other than the
22            assessment that Sharon Geffken did in
23            2016, no.
24         BY MS. HIBBERT:
25                   Q.    And you haven't seen any of that

Page 298

1      data that she created from her analysis,

2      correct?

3              A.    I have not seen the data.

4              Q.    And the 2017, 2018, and now 2019

5      budget process, you said for each of those

6      years that you had asked for an increase in

7      the budget amounts, correct?

8              A.    Each year, the total budget has

9      increased, yes.

10             Q.    Were any of the requests for

11     increase in budget amount for those three

12     years specifically related to expenses that

13     SCCS had determined related to opioids?

14             A.    They were not specifically

15     related to opioids, no.

16             Q.    Were any of the requests for

17     increase in budget specifically related to

18     substance abuse at all?

19             A.    Not to my knowledge.

20                   (Email chain Kearns and Ream,

21                   beginning Bates SUMMIT_01916138,

22                   marked as Deposition Exhibit 12.)

23     BY MS. HIBBERT:

24             Q.    I'll show you what's been marked

25     as Exhibit Number 12.

1                Do you recognize this email?

2          A.   Yes.

3          Q.   This is an email chain between

4     you and an Ann Ream, for the record,

5     Bates-labeled 1916138.

6                Who is Ms. Ann Ream?

7          A.   Ann Ream is our department

8     director for community relations.

9          Q.   What are her responsibilities in

10    that role, to your knowledge?

11         A.   At this point in time, Ann's

12    primary responsibility was the function of

13    our levy campaign.

14         Q.   What does that mean, "function of

15    your levy campaign"?

16         A.   Well, she was responsible, you

17    know, to make sure that our levy campaign was

18    running efficiently.  She's also responsible

19    for what we call community education or

20    community outreach.  So she was very busy in

21    getting us into the public spotlight,

22    participating in parades and different things

23    along that line.

24                So she's -- she's basically our

25    liaison between ourselves and the community

Page 300

1       and the media.

2               Q.   Is it fair to say that her job,

3       in part, is to let the community know what

4       they're paying for through the tax levy?

5               A.   No, I don't know that that's

6       completely accurate.

7               Q.   It's to inform the community of

8       what services SCCS are providing, correct, in

9       part?

10              A.   In part, yes.

11              Q.   Do you recall this email from Ann

12      Ream on April 19th, 2018?

13                   I'm looking at the first email in

14      the chain.

15              A.   Okay.  Yeah, I recall.

16              Q.   She's asking you here for a stat,

17      a percentage number for what she's referenced

18      in the subject line of this email as an OP/ED

19      piece, correct?

20                   Do you know what that means?

21              A.   No.  I mean, I've heard the term.

22      I know it's something like a letter to an

23      editor or what-have-you.

24              Q.   And do you know if there was any

25      sort of opinion editorial or letter to the

Page 301

1      editor that was created after this email?

2              A.   I do not.

3              Q.   In the email to you on April 19,

4      2018, Ms. Reams is seeking a percentage

5      number for the increase in the cost of

6      placing and caring for children in agency

7      custody who are not able to be safely

8      maintained in their own homes, correct?

9              A.   Yes.  That's what she's asking

10     for.

11             Q.   And she says to you, "I can

12     change the narrative to, quote, 'help', end

13     quote, the argument of the increase in

14     placement costs, if need be."

15                  Do you know what she meant by

16     that?

17             A.   I do not.

18             Q.   What did you take that to mean

19     when you read that?

20             A.   I don't know that I read much

21     into that.

22             Q.   Have you ever talked to Ms. Ream

23     or anyone else at SCCS about creating a

24     narrative to help the argument that there was

25     an increase in placement costs and the

Page 302

1           relationship of those costs to opioids?

2                   A.    Say that again?

3                   Q.    Sure.

4                         Have you ever talked to Ms. Ream

5           or anyone else at SCCS about creating a

6           narrative to help the argument that there was

7           an increase in placement costs and the

8           relationship of those costs to opioids?

9                         MR. PENDELL:  Objection to form.

10                        THE WITNESS:  I don't know.

11          BY MS. HIBBERT:

12                  Q.    You respond to Ms. Ream on

13          April 26th, the next email up in the chain,

14          and you provide a stat, a percentage,

15          2.98 percent of increase -- or total

16          placement costs on average between 2012 and

17          2017.

18                        Do you see that?

19                  A.    Yes, I do.

20                  Q.    And you say, "You can word it to

21          fit your narrative."

22                        Do you know what -- do you recall

23          what you meant by that sentence?

24                  A.    I was probably saying she could

25          word it however she wanted to, you know, to

Page 303

1      complete her op/ed.

2              Q.    And you don't know what narrative

3      she ultimately created using those numbers,

4      do you?

5              A.    I do not.

6              Q.    Do you know how you came to

7      determine that percentage, 2.98 percent?

8              A.    Yes.  I remember.  Yes.

9              Q.    How did you determine it?

10             A.    Oh, I basically looked at the

11     cost data from 2012 to 2017, calculating the

12     increases and decreases, you know, between

13     the different years, and then averaging --

14     averaging those in order to come up with the

15     $337,200 and the 2.9 percent.

16             Q.    And this is the total placement

17     cost.  That includes paid placement and

18     foster care, correct?

19             A.    In reading this, it likely only

20     included paid placement.

21             Q.    In your description to Ms. Ream

22     on April 26, 2018, you say:

23                  "Total placement costs, which

24                includes both paid placement and

25                 foster care, has increased

Page 304

1            2.98 percent."

2                 A.    Oh, okay.

3                 Q.    Does that clarify?

4                 A.    Yeah.  I'm sorry.  I didn't --

5        yep.

6                 Q.    So it would include both?

7                 A.    It would include both.

8                 Q.    Are there costs associated with

9        any other placement, aside from paid

10       placement and foster care, that you have

11       elaborated or listed here?

12                A.    No, there are not.

13                Q.    You clarify later on in this

14       email chain that -- the last email on the

15       chain, May 17, 2018, that "The combined

16       average cost per day currently stands at

17       $128.13."

18                      Do you see that?

19                A.    Yes, I do.

20                Q.    And is that, again, taking into

21       account both paid placements and foster care?

22                A.    Yes, it would.

23                Q.    Is that still the combined

24       average cost per day, to your knowledge?

25                A.    No.  I would have to guess.  I'm

Page 305

1      sure it has changed.

2              Q.   Have you performed any analysis

3      as to what the average cost per day is in the

4      last three months?

5              A.   I have average cost per day data

6      related to the different placement settings,

7      yes.

8              Q.   Is that what you keep on an

9      ongoing basis, a running basis?

10             A.   Yes.

11             Q.   What type of document do you keep

12     that information in?

13             A.   It's an electronic spreadsheet.

14             Q.   Is that the same electronic

15     spreadsheet that we were talking about

16     earlier, the running spreadsheet that you

17     keep of costs per child for paid placements?

18             A.   I'm sorry.  I got distracted.

19                  (Interruption in proceedings.)

20                  THE VIDEOGRAPHER:  Off the

21         record, 5:05.

22                  (Recess taken.)

23                  THE VIDEOGRAPHER:  On the record,

24         5:17.

25

Page 306

1      BY MS. HIBBERT:

2           Q.    Mr. Kearns, when we went off the

3      record briefly there, I was clarifying what

4      running spreadsheet you were referring to.

5      And I believe you had testified that you had

6      kept a running spreadsheet of the cost per --

7      the cost per day, on average, for all

8      placement paid and foster care.

9               Do you remember that testimony?

10          A.    Yes, I do.

11          Q.    Is that the same running

12     spreadsheet that we had talked about earlier

13     today when we were talking about the cost per

14     child for paid placements?

15          A.    Yes, it is.

16          Q.    Do you keep any other running

17     spreadsheets of data that looks at cost per

18     day or cost per child for any other

19     particular expenditure?

20               MR. PENDELL:  Objection to form.

21               THE WITNESS:  I have one also for

22        the adoption payroll.

23     BY MS. HIBBERT:

24          Q.    Is that a separate spreadsheet?

25          A.    That would be a separate

Page 307

1          spreadsheet, yes.

2                    Q.    Are either of those spreadsheets

3          titled something in your electronic database?

4                    A.    They are, but I can't recall what

5          the title is.

6                    Q.    Are you keeping the running

7          spreadsheet of the cost per child for paid

8          placements and the cost per day for all

9          placements for any particular reason?

10                   A.    Again, I use it for cost

11         projection purposes so that I can try and

12         anticipate, you know, what our paid placement

13         costs are going to be going forward.

14                   Q.    How long have you been

15         maintaining that running spreadsheet?

16                   A.    I believe I asked for it probably

17         in late 2016.

18                   Q.    Going back to the analyses that

19         you performed in 2017 that are reflected in

20         the calculations included in Exhibit

21         Number 3, is it fair to say that you cannot

22         identify any specific costs that you or SCCS

23         contend are attributable --

24                        (Reporter interruption.)

25                        MS. HIBBERT:  I'll restate it.

Page 308

1      BY MS. HIBBERT:

2           Q.   With regard to the analysis or

3      assessment that you did back in 2017 that's

4      reflected in the spreadsheet marked as

5      Exhibit Number 3, is it fair to say that you

6      cannot identify any specific costs that you

7      or SCCS contends were attributable to the

8      actions of any particular defendant?

9                MR. PENDELL:  Objection to form.

10               THE WITNESS:  That would be

11          correct.

12     BY MS. HIBBERT:

13          Q.   And that includes any

14     manufacturer of any pharmaceutical, any

15     distributor of pharmaceuticals, or any

16     pharmacy distributing or filling

17     prescriptions for a prescription opioid,

18     correct?

19               MR. PENDELL:  Objection to form.

20               THE WITNESS:  Yes, that would be

21          correct.

22     BY MS. HIBBERT:

23          Q.   Is it fair to say too that you

24     cannot quantify in dollars how much your

25     expenditures or SCCS's expenditures have

Page 309

1          increased as a result of any actions or

2          inactions by any particular defendant in this

3          case?

4                    MR. PENDELL:  Objection to form.

5                    THE WITNESS:  Yes.  To identify

6               the increase specifically to any single

7               defendant, you know, we could not do

8               that.

9     BY MS. HIBBERT:

10              Q.   And that includes any

11         manufacturer, any distributor, or any retail

12         pharmacy, correct?

13                   MR. PENDELL:  Objection to form.

14                   THE WITNESS:  That would be

15              correct.

16                   MS. HIBBERT:  I'm going to turn

17              the questioning over now to my

18              colleague, David.

19                   Want to switch seats?

20                   THE VIDEOGRAPHER:  Off the

21              record.

22                   (Recess was taken.)

23                   THE VIDEOGRAPHER:  On the record,

24              5:22.

25                         ---

Page 310

1                    EXAMINATION

2        BY MR. HALLER:

3              Q.    Hello, Mr. Kearns.

4              A.    Hello.

5              Q.    So we were just discussing

6        per-child costs.  The per-child costs that

7        you have calculated, are those just direct

8        costs, or have you also allocated, you know,

9        salaries, benefits, and other overhead type

10       items?

11             A.    Those are just direct costs.

12             Q.    If I could refer you back to

13       Exhibit 7, which is the 2017 budget.

14             A.    Okay.

15             Q.    And if we look on page 14, this

16       is one of the graphs, bar charts that we

17       looked at previously on the top portion of

18       that page.  And that shows monthly average

19       number of children in custody from 2006 to

20       2015, right?

21             A.    Yes, it does.

22             Q.    And we discussed how from 2006

23       and 2007 through at least 2012, the monthly

24       average number of children in custody

25       decreased, correct?

1          A.    That is what the -- yes.  That is

2     what the data indicates.

3          Q.    And do you have any

4     understanding, during that time period of

5     2006 to 2012, whether the average cost per

6     child was increasing, decreasing, or flat?

7               MR. PENDELL:  Objection to form.

8               THE WITNESS:  I do not.

9     BY MR. HALLER:

10         Q.    Would that be something you could

11    calculate by looking at the -- you know, by

12    taking the costs reflected in the budgets

13    that we've looked at and dividing the direct

14    cost numbers by the average monthly number of

15    children in custody?

16         A.    Well, you could certainly create

17    a rather rough estimate of the average cost

18    per child by doing that, yes.

19         Q.    What is your view concerning the

20    reason why the monthly average number of

21    children in custody was significantly higher

22    in 2006 and 2007 than the next five-year

23    period after that?

24               MR. PENDELL:  Objection to form.

25               THE WITNESS:  My understanding --

```
 1            and this is only from information that
 2            Julie Barnes has shared -- is that there
 3            was significant philosophical change at
 4            the State of Ohio, and that these
 5            reductions in children in custody was
 6            reflective of the state as a whole, in
 7            terms of, you know, how they approached
 8            taking children into custody or not.
 9    BY MR. HALLER:
10            Q.   That was a desire on the part of
11    the state to encourage more intact families
12    and less separation; is that right?
13            A.   I don't know specifically what
14    the change in philosophy was.
15            Q.   Do you have any understanding as
16    to whether the State of Ohio has been
17    changing its philosophy in the last several
18    years concerning its aggressiveness in
19    removing children?
20            A.   I do not know.
21            Q.   Can I refer you to Exhibit 11, or
22    the committee minutes from -- it's titled
23    "SSAB Budget and Levy Committee Minutes of
24    September 5, 2017."
25            A.   Exhibit 11?
```

Page 313

1          Q.   Correct.

2          A.   Yes.

3          Q.   On the last page, the top bullet

4     point states that "In terms of the operating

5     levy, SCCS is trending ahead of where they

6     were anticipating at $25.7 million due to new

7     construction activity in the county."

8               Do you see that?

9          A.   Yes, I do.

10          Q.   What new construction activity is

11     that referring to?

12          A.   I don't know specifically.  I

13     know that because of the design of our levy,

14     as I had mentioned earlier, our dollar amount

15     is fixed.  So when property values increase

16     in the county, we don't capture additional

17     revenue.

18               But when new assets are

19     constructed and then placed into use, we do

20     receive additional levy revenue for those.

21     So it could be new homes.  It could be a new

22     business.

23               So because the economy, I'm

24     assuming, has been robust, we have seen new

25     construction activity, and that has

1      contributed to a slight increase in our levy

2      revenues.

3              Q.   So these are new properties, I

4      guess -- never mind.  Strike that.

5                   So your understanding is that the

6      economy in Summit County recently has been

7      robust enough that there's been increased

8      construction leading to additional revenues

9      under the levy; is that right?

10             A.   That's my understanding, yes.

11             Q.   If I could turn to Exhibit 3,

12     please, which is your initial analysis of

13     opioid-related expenditures.

14             A.   Okay.  Okay.

15             Q.   At the time you prepared this

16     analysis, did you believe it to be a

17     reasonable estimate of the costs incurred by

18     SCCS that were related to opioid-abuse

19     issues?

20             A.   Yes.  At the time this

21     spreadsheet was created, I felt that it was

22     accurate at least for the purpose that we

23     created it for.

24             Q.   Did you believe it was accurate

25     or a reasonable estimate at the time?

Page 315

```
 1            A.   Well, I guess accurate in terms
 2       of the math is correct.  And, again, for the
 3       purpose that it was created, I felt it was
 4       reasonable.
 5            Q.   And how did you feel about the
 6       30 percent figure that was supplied to you in
 7       terms of its accuracy or not?
 8            A.   Well, my assumption was that it
 9       was accurate.
10            Q.   That was because it was based on
11       a hand count?
12            A.   Yes.
13            Q.   Did you know what years the hand
14       count covered?
15            A.   No.  I'm not sure.
16            Q.   Did you ask which years were
17       counted for purposes of the hand count?
18            A.   No, I did not.
19            Q.   Did it strike you as surprising
20       that the number of opioid-related cases was
21       exactly 30 percent in each of the years of
22       2012, 2013, 2014, 2015, and 2016?
23                 MR. PENDELL:  Objection to form.
24                 THE WITNESS:  I know that Julie
25            Barnes and I had a discussion related to
```

Page 316

1             the use of 30 percent across those

2             several years.  But, again, at the time

3             that we were asked to create this

4             document, I didn't have any other

5             information which to use.

6     BY MR. HALLER:

7             Q.   I'm just trying to get into your

8     head a bit.  So you get this number -- you're

9     a financial person.  I assume it would be

10    surprising to you at the time if somebody had

11    done a hand count and reported back that the

12    exact number was exactly 30 percent for each

13    of these years.

14                  You assumed, I'm presuming, that

15    that was some kind of an estimate, that the

16    30 percent was an estimate, right?

17                  MR. PENDELL:  Objection to form.

18                  THE WITNESS:  I do not know if it

19        was an estimate.

20    BY MR. HALLER:

21            Q.   And I want to understand what was

22    in your head.  So did you believe that a hand

23    count was done and that the result of the

24    hand count was an exact 30.00 percent for

25    each of these years?

Page 317

1              A.   At this point in time, in 2017, I
2       knew that the hand count didn't extend back
3       to 2012.  I was given the percentage and I
4       used that to produce the document.
5              Q.   You didn't know how far back it
6       extended, but you knew it didn't extend as
7       far back was 2012; is that right?
8              A.   That would be correct.
9              Q.   Now, I assume that when a child
10      is removed from the custody of one or both of
11      the parents that there are often multiple
12      reasons why that removal occurs; is that
13      right?
14                   MR. PENDELL:  Objection to form.
15                   THE WITNESS:  I don't know.
16      BY MR. HALLER:
17             Q.   Is the child sometimes removed
18      because one or both of the parents are
19      beating the child?
20                   MR. PENDELL:  Objection to form.
21                   THE WITNESS:  I don't know.
22      BY MR. HALLER:
23             Q.   You have no idea whether the
24      agency you work for has ever removed a child
25      because of the physical abuse of the child by

                                                    Page 318

1          one or both of the parents; is that right?

2                    MR. PENDELL:  Objection to form.

3                    THE WITNESS:  That information

4             isn't available to me.

5     BY MR. HALLER:

6          Q.   So sitting here today, you have

7     no idea if this agency has ever removed a

8     child based on physical abuse; is that right?

9                    MR. PENDELL:  Objection to form.

10            Asked and answered.

11    BY MR. HALLER:

12         Q.   That occurs sometimes, right?

13    And you know that, right?

14                   MR. PENDELL:  Objection to form.

15                   THE WITNESS:  Well, yeah.  So

16            that would be incorrect.

17    BY MR. HALLER:

18         Q.   And sometimes a child is removed

19    because there's domestic violence in the

20    household from one spouse to the other,

21    correct?

22                   MR. PENDELL:  Objection to form.

23                   THE WITNESS:  I would believe so,

24            yes.

25

1    BY MR. HALLER:

2         Q.    Do you have any understanding

3    with regard to the hand count that was done,

4    that if a child was removed because of

5    physical violence against the child or

6    domestic violence as between the spouses, and

7    one of those spouses also had an addiction to

8    an opioid, how that particular removal was

9    coded?

10              MR. PENDELL:  Objection to form.

11              THE WITNESS:  I do not know how

12        that would be coded.

13   BY MR. HALLER:

14        Q.    Under the analysis that was

15   reflected in Kearns Exhibit 10, do you know

16   how such a removal would be coded?

17        A.    I do not.

18        Q.    You said that Exhibit 10 gave you

19   some comfort after the fact with regard to

20   the 30 percent figure you had previously

21   used; is that right?

22        A.    That's correct.

23        Q.    And that's because the 2016

24   figure in this document was 27 percent; is

25   that right?

Page 320

1              A.    Yes.

2              Q.    And did it give you any concern

3      that the 2017 figure was 21 percent?

4                    Or put another way, if the

5      27 percent figure was giving you comfort, was

6      the 21 percent figure giving you discomfort?

7                    MR. PENDELL:  Objection to form.

8                    THE WITNESS:  No.  Because in

9          discussion with Julie Barnes, she

10          indicated to me that these numbers are

11          more than likely underrepresented.

12      BY MR. HALLER:

13              Q.    What explanation did she give to

14      you with regard to why she thought they were

15      underrepresented?

16              A.    To my understanding, it was based

17      on the methodology that was used to pull the

18      data from SACWIS and the fact that

19      caseworkers may or may not have been coding

20      things properly even to this day.

21              Q.    There's a footnote with regard to

22      the first half of -- well, with regard to

23      2015, right?  And the footnote on page 1 says

24      that 2015 might be understated.

25                    There's no footnote stating that

Page 321

1    2016 or 2017 might be understated; is that

2    right?

3              A.    That's correct.

4              Q.    And what is the reason, if any,

5    that you think 2016 or 2017 might be

6    understated?

7                    MR. PENDELL:  Objection to form.

8                    THE WITNESS:  Other than the

9         conversation that I had with

10        Julie Barnes, I don't have any data on

11        which to make that assumption.

12   BY MR. HALLER:

13             Q.    And she didn't detail to you the

14   reasons why; is that right?

15             A.    She did not.

16             Q.    Now, the bullets at the top half

17   of the first page of Exhibit 10 suggest that

18   the coding as to whether or not a removal was

19   opioid-related depended on the reunification

20   case plan and whether one or both of the

21   adults or caretakers had a substance abuse or

22   addiction characteristic; is that right?

23             A.    That appears to be correct, yes.

24             Q.    Then if the reunification plan

25   suggested that one of the adults or

Page 322

1       caretakers who were going to after the
2       removal obtain custody of the child had a
3       substance abuse issue, that the removal
4       itself was then retroactively believed to
5       have been related to opioids; is that right?
6               A.   Could you restate that?  Could
7       you repeat it?
8               Q.   I assume a reunification plan is
9       later in time than a removal, correct?
10                      MR. PENDELL:  Objection to form.
11                      THE WITNESS:  Yes, it is.
12      BY MR. HALLER:
13              Q.   And as I understand these bullets
14      at the top of the page, it determines whether
15      the original removal was opioid-related or
16      not based on what's noted in a reunification
17      plan, correct?
18                      MR. PENDELL:  Objection to form.
19                      THE WITNESS:  I'm not certain.
20      BY MR. HALLER:
21              Q.   So going back to my other
22      example, if a parent is beating a child and
23      the child is removed, but then the child is
24      going to be reunified with some other adult
25      who has an opioid addiction, that's going to

Page 323

1        be coded as an opioid removal, correct?

2                    MR. PENDELL:  Objection to form.

3        BY MS. HIBBERT:

4              Q.   Is that your understanding of

5        these bullets?

6                    MR. PENDELL:  Objection to form.

7                    THE WITNESS:  I don't know.  I do

8            not work in SACWIS.  I don't know how it

9            would be coded.

10       BY MR. HALLER:

11             Q.   And I want to know, when you read

12       this, what was your understanding of the

13       situation that I just described?

14                   MR. PENDELL:  Objection to form.

15                   THE WITNESS:  Your scenario

16           appears to be correct.

17       BY MR. HALLER:

18             Q.   Did it give you any discomfort

19       that in 2015, 16 percent of total removals,

20       according to this methodology, were coded as

21       an opioid removal?  Which is about half of

22       the 30 percent you used.

23             A.   Well, given the backdrop that the

24       state had not really started encouraging

25       counties to enter substance abuse and

Page 324

1       addiction characteristics until 2016, I

2       wasn't uncomfortable with the 30 percent.

3              Q.   Now, in your analysis in

4       Exhibit 3, you applied the 30 percent also to

5       the years 2012 through 2014, correct?

6              A.   That is correct.

7              Q.   And the methodology reflected on

8       Exhibit 10 was not possible to apply for

9       those years, right, because the reunification

10      plans were not coded with respect to whether

11      or not an opioid was involved, correct?

12             A.   That would be accurate.

13             Q.   So as we sit here today, we still

14      don't know, even under this methodology, what

15      the right percentage would be for 2012

16      through 2014, right?

17             A.   Yes.  That would be accurate.

18             Q.   Now, on the last page of

19      Exhibit 3, there are references to certain

20      grant expenses.  Can you describe what those

21      are in terms of -- you know, categorically

22      what a grant-specific expense is?

23             A.   What line item are you referring

24      to?

25             Q.   Well, for example, under

Page 325

1        "Grant-specific expenses" there's a bunch of

2        items.  It's the second grouping of items on

3        that last page.

4                A.    Okay.

5                Q.    So can you describe what that

6        category means, what a grant-specific expense

7        is?

8                A.    Well, there are several costs

9        that are captured in that category, but

10       specifically, we captured expenses that were

11       directly attributable to grants.

12               Q.    So you mean the cost of filling

13       out a grant application, submitting it?  Is

14       that what this is capturing?

15               A.    No.  This would be the cost for

16       actually, you know, running the grant,

17       incurring the costs, you know, the personnel,

18       the supplies, the contracted services, those

19       sorts of items.

20               Q.    Maybe I'm thinking about this --

21       I'm sure I'm thinking about this

22       simplistically, but I thought a grant was

23       revenue to your agency, not an expense.

24               A.    Because of our financial system,

25       we have to account for both the expenditure

1          and the revenue because we have to establish

2          a budget and then we have to live within

3          that.

4                    For grants where we have to make

5          expenditures and then ask for reimbursement,

6          we have to capture that data on the

7          expenditure side and then also show it on the

8          revenue side.

9               Q.   And you applied the 30 percent

10         figure to these grant items, right?

11              A.   Yes.  It appears that I did.

12              Q.   And so it was your view at the

13         time that 30 percent of the grants received

14         by your agency were related to opioids in

15         some way; is that right?

16              A.   They were child-specific costs

17         that, yes, we applied the 30 percent average

18         to.

19              Q.   So were you -- with regard to

20         that 30 percent of revenue that was coming

21         in, were you viewing that as a credit against

22         the expenses that your agency was incurring?

23              A.   Yes.  The revenue would offset

24         the expenses.

25              Q.   If we were to come up with a

Page 327

1          bottom-line figure for the analysis you did
2          here, we would take the 30 percent expenses
3          and reduce it by 30 percent of the grants; is
4          that right?
5                    MR. PENDELL:  Objection to form.
6                    THE WITNESS:  For those expenses
7             specifically related to grants?
8     BY MR. HALLER:
9             Q.    Right.
10            A.    Yes.
11            Q.    Now, subsequent to the analysis
12         you -- well, before I get there, what data
13         system or database did you query to generate
14         Exhibit 3?
15            A.    Well, this was data taken from
16         the Banner financial system.
17            Q.    And earlier Ms. Hibbert was
18         asking whether you had the capacity to run a
19         report off of Banner, and I thought you said
20         no.  Did I mishear that?
21                    MR. PENDELL:  Objection to form.
22                    THE WITNESS:  No.  I don't think
23            you misheard that.
24     BY MR. HALLER:
25            Q.    But somehow you were able to run

Page 328

1        a report off of Banner for Exhibit 3; is that
2        right?
3                    MR. PENDELL:  Objection to form.
4            Go ahead.
5                    THE WITNESS:  Sure.
6                    Bob King, my director of finance,
7            pulled the data down and put it into an
8            Excel spreadsheet and then I queried the
9            data from there.
10       BY MR. HALLER:
11           Q.   So when you answered
12       Ms. Hibbert's question as to whether you
13       could generate a report from Banner and you
14       said no, you meant that you personally could
15       not, but your staff could; is that right?
16           A.   That is correct.
17           Q.   Is Mr. King the person in your
18       agency most knowledgeable concerning the
19       Banner system?
20                   MR. PENDELL:  Objection to form.
21                   THE WITNESS:  Yes.  He would be.
22       BY MR. HALLER:
23           Q.   Now, subsequent to this
24       Exhibit 3, you engaged in two different
25       analyses that you believed were a more

Page 329

1          accurate reflection of the opioid-related

2          costs in your agency; is that right?

3                    MR. PENDELL:  Objection to form.

4                    THE WITNESS:  I'm sorry.  Did you

5             say subsequent to this?

6          BY MR. HALLER:

7               Q.   Right.  I thought I heard you

8          testify earlier today that there were two

9          different occasions where you modified this

10         analysis to come up with what you currently

11         believe is a more accurate analysis of the

12         opioid-related costs to your agency.

13                   Is that right or not?

14                   MR. PENDELL:  Objection to form.

15                   THE WITNESS:  Yes.  There have

16            been revisions to this.

17         BY MR. HALLER:

18              Q.   And you believe those revisions

19         to more accurately reflect the costs that

20         your agency has incurred related to the

21         opioid issues; is that right?

22                   MR. PENDELL:  Objection to form.

23                   THE WITNESS:  I would say yes.

24         BY MR. HALLER:

25              Q.   But you're not willing today to

Page 330

1              testify concerning those revised estimates

2              because your lawyer is instructing you not

3              to; is that right?

4                    A.    Yes.

5                          MR. PENDELL:  Objection.

6                    Objection.

7                          MR. HALLER:  Are you willing to

8                    let him testify concerning those

9                    revisions?

10                          MR. PENDELL:  No.

11                          MR. HALLER:  So can you explain

12                    the objection?

13                          MR. PENDELL:  The objection was

14                    whether -- your question was "You're not

15                    willing today."  He's not doing it

16                    because he was instructed not to.

17                    Whether he's willing or not is

18                    irrelevant.

19                          I'm also objecting because this

20                    is now your third or fourth attempt

21                    collectively to make an end run around

22                    something, the attorney-client privilege

23                    and work product doctrine.

24                          So that's my objection.

25                          MR. HALLER:  I haven't yet asked

Page 331

1          him at all about the substance of those
2          revisions.  My question is whether he's
3          willing to testify to them or not --
4                  MR. PENDELL:  And that's already
5          been --
6                  MR. HALLER:  -- based on your
7          instruction.
8                  MR. PENDELL:  And I don't mean to
9          interrupt you, but that's already been
10         stated on the record more than once.
11    BY MR. HALLER:
12         Q.   And as we sit here today, you
13    believe that Exhibit 3 is no longer an
14    accurate reflection of the costs that your
15    agency has incurred as a result of
16    opioid-related issues; is that right?
17                 MR. PENDELL:  Objection to form.
18                 MR. ARNOLD:  Form.
19                 THE WITNESS:  I would say that
20         Exhibit 3 was valid at the time that it
21         was created and for the purpose that we
22         created it.
23    BY MR. HALLER:
24         Q.   But as we sit here today, you no
25    longer believe it to be valid and accurate;

Page 332

1       is that right?

2                    MR. PENDELL:  Objection.  Asked

3            and answered.

4                    MR. ARNOLD:  Asked and answered.

5       BY MR. HALLER:

6            Q.    Their objections are -- they

7       believe I've asked that question before.  But

8       I'm entitled to actually -- even if I did,

9       which I disagree with, I'm entitled to ask it

10      again.  So if you would answer it again, that

11      would be great.

12                   MR. PENDELL:  I object to that

13           too.  But you're entitled -- you're not

14           the arbiter of what you're entitled to,

15           so -- I will direct my witness.  Thank

16           you.

17                   MR. HALLER:  Are you directing

18           him not to answer that question?

19                   MR. PENDELL:  No, that's not at

20           all.  I'm instructing you that I'm going

21           to direct him and you are not.

22      BY MR. HALLER:

23           Q.    So that's the point.  He's not

24      instructing you not to answer, so you can go

25      ahead.

```
                                        Page 333
 1              A.   Would you go ahead and ask the
 2       question again?
 3              Q.   Yeah.  I'm sorry.
 4                   But as you sit here today, you
 5       don't believe any longer that Exhibit 3 is an
 6       accurate reflection of the costs incurred by
 7       your agency related to opioid issues; is that
 8       right?
 9                   MR. PENDELL:  Objection to form.
10          Asked and answered.
11                   THE WITNESS:  I do believe that
12          there is a more accurate representation.
13       BY MR. HALLER:
14              Q.   On the first page of your
15       analysis, which is Exhibit 3, there's a
16       category, "Replacement cost analysis," and a
17       second category, "Foster home expense."
18                   Do you see that?
19              A.   Yes, I do.
20              Q.   And then one of the sub
21       subcategories is "kinship care stipend."
22                   Can you explain to me what a
23       kinship care stipend is?
24              A.   A kinship care stipend is
25       essentially when we place a child in a
```

Page 334

1           kinship setting.  There is a monthly stipend
2           that that kinship caregiver receives.  And
3           that is a kinship care stipend.
4                   Q.   And are kinship care stipends
5           subsidized or reimbursed through a grant?
6                   A.   No, they are not.
7                   Q.   So on the next page where we have
8           "kinship incentive" under the grant-specific
9           expenses, can you explain what a kinship
10          incentive is?
11                  A.   I can.
12                  Q.   Would you, please?
13                  A.   Yes.  A kinship incentive --
14          actually, it's something that is exclusive to
15          some accounting.  We have elected to add an
16          incentive for somebody volunteering to be a
17          kinship placement.
18                  Q.   And who funds the kinship
19          incentive?
20                  A.   We do, Summit County Children
21          Services.
22                  Q.   Is there any IV-E eligibility
23          that relates to kinship or that's driven by a
24          kinship placement?
25                  A.   A kinship placement, a child

Page 335

1      could be IV-E eligible, but they would not be

2      reimbursable.

3              Q.   What does that mean to be

4      eligible but not reimbursable?

5              A.   In order to be reimbursable,

6      there are certain criteria that the placement

7      setting has to achieve, one of which is to be

8      a licensed setting.  Our kinship providers

9      are not licensed; therefore, they are not

10     reimbursable.

11             Q.   In what way is a kinship

12     incentive a grant-specific expense?  What is

13     the relationship between a kinship incentive

14     and a grant?

15             A.   I don't know that it is.  I

16     wasn't responsible for establishing the

17     structure, the cost structure that you see.

18     So kinship incentive is not necessarily a

19     grant-specific expense.  It's simply where my

20     predecessor and perhaps his predecessor

21     before him decided to put the kinship

22     incentive costs.

23             Q.   The ESAA Preservation below that

24     is, in fact, a grant; is that right?

25             A.   It is not.

1          Q.   What is that?

2          A.   ESAA Preservation is an

3    allocation that we receive from the State of

4    Ohio, so it is state-funded.  Again, as

5    explained earlier, we have to meet certain

6    criteria in order to access those funds in

7    terms of preservation activities.

8          Q.   But from the perspective of

9    Summit County, the ESAA Preservation amount

10   is paid to it by the State of Ohio, correct?

11         A.   Those are state funds, yes.

12         Q.   Okay.  And the kinship incentive

13   of $308,000, are those county funds or state

14   funds?

15         A.   The kinship incentive would be

16   county funds.

17         Q.   What about the other funds

18   beneath ESAA Preservation?  Are those state

19   or county funds?

20         A.   Differential response.  That was

21   state funding, I believe.  Obviously, we

22   don't receive any of those funds any longer.

23              Non-recurring adoption expense

24   is -- I think that is state-funded.

25   Independent living is a federal funding

                                              Page 337

1          stream.

2                    Foster parent training stipend,

3          that's -- actually, I'm not certain where we

4          fund that from.

5                    And obviously, grant-specific

6          expense, there are several items that fall

7          into that.  Some could be federal.  Some

8          could be state.  Some could be local.

9               Q.   With regard to your Exhibit 3

10         analysis, why did you go back to 2012 and no

11         further?

12                   I guess that's two questions.

13         First, why did you go back to 2012 and not,

14         say, 2013?  And second, why didn't you go

15         back earlier than 2012?

16                   MR. PENDELL:  Objection.

17                   THE WITNESS:  I don't know.

18         BY MR. HALLER:

19              Q.   Did somebody ask you to go to

20         2012?

21                   MR. PENDELL:  Objection to form.

22                   THE WITNESS:  Yes.  I believe

23            Julie Barnes asked me to go back to

24            2012.

25

Page 338

1      BY MR. HALLER:

2              Q.    And did she tell you why?

3              A.    Not that I recall, no.

4              Q.    Did she tell you that the reason

5      to start in 2012 was because -- again, look

6      back to Kearns Exhibit 7 -- that was the year

7      when the monthly average number of children

8      in custody stopped going down and started

9      increasing again?

10                  MR. PENDELL:  Objection to form.

11                  THE WITNESS:  I do not know if

12          that was her reasoning.

13     BY MR. HALLER:

14              Q.    Mr. Kearns, where did you get the

15     STARS grant expenditure entries for your

16     Exhibit 3 analysis?

17              A.    The STARS grant expenditures?  Is

18     that what you're asking?

19              Q.    Yes.

20              A.    I likely pulled those from --

21     what's the website called? -- I likely pulled

22     those from the Payment Management System

23     website.

24              Q.    If I could refer you to page 22

25     of Exhibit 7.  And if you could keep your

Page 339

1          Exhibit 3 open at the same time.

2               A.   Okay.  I'm sorry.  What was the

3          other --

4               Q.   Exhibit 7, page 22.

5               A.   Okay.

6               Q.   I'm looking at the 2014 numbers

7          for STARS grant.

8               A.   Okay.

9               Q.   In the financial statement in

10         Exhibit 7, the STARS grant figure is

11         $412,523.

12              A.   Yes.  I see that.

13              Q.   And that doesn't match with any

14         of the STARS numbers in your Exhibit 3

15         analysis.

16                   Do you know why?

17              A.   No.  I do not know.

18              Q.   Do you know why the 2015 numbers

19         are different as between the two documents?

20              A.   No.  I do not know.

21              Q.   Now, the bar graphs that we were

22         looking at previously on page 14 of

23         Exhibit 7, that table goes back to 2006.

24                   Does your agency have the data by

25         which one could go further back in time to

Page 340

1    see the monthly average number of children in

2    custody?

3            A.    I am uncertain.

4            Q.    Do you know which database was

5    queried to generate the bar chart on page 14?

6            A.    No, I do not.

7            Q.    I want to go back.  You've said a

8    couple times that the amount your agency

9    receives by virtue of the levy is a set

10   amount and doesn't go up when property values

11   go up.  You said one exception to that is for

12   new construction.  But for existing

13   construction, the amount doesn't go up even

14   if property values go up; is that right?

15           A.    I don't understand -- I think I

16   understand, but I want to make sure I

17   understand so I don't answer incorrectly.

18           Q.    I'm guessing that you understand

19   and I don't, so my questions are trying to

20   get me to the same point that you are.

21           A.    Okay.

22           Q.    And I'm just sort of reorienting

23   us a bit.

24                 Do you recall the fact that

25   you've stated a couple of times today that

1          your agency receives a set amount by virtue

2          of the levy and that it doesn't go up if

3          property values go up, correct?

4                    A.    Yes.    That's correct.

5                    Q.    And when you say that, do you

6          limit that to a particular levy period, that

7          it doesn't go up within that levy period, but

8          then would it reset when a new levy was put

9          into place?

10                    A.    Yes.    Exactly.

11                    Q.    So property values are going up,

12          and it resets at the new levy.    And then

13          there is some increase that's received by

14          virtue of the increase in property values,

15          correct?

16                    A.    Yes.    When a new tax is levied,

17          it would be levied against the property

18          values at that point in time.

19                    Q.    Now, from a taxpayer perspective,

20          do they pay their portion of this levy once

21          every levy period or do they pay it on an

22          annual basis?

23                    A.    They pay twice during the levy

24          period.

25                    Q.    Once every three years or

1      something?

2           A.   I'm sorry.  They pay once -- they

3      pay twice a year.  Twice a year.

4           Q.   And the mill rate, remind me, was

5      what, 2.25 or something?

6           A.   Yes.  Our current levy is 2.25

7      mill.

8           Q.   And that's going to go up by

9      approximately one mill; is that right?

10          A.   That is correct.

11          Q.   Now, on Exhibit -- Kearns

12     Exhibit 6, which is this annual report, 2016

13     annual report, where it refers to the

14     operating levy in the summary financial

15     statement that appears on page 4?

16          A.   Okay.

17          Q.   It says "Net" after the term

18     "operating levy."  What does the term "net"

19     mean?

20          A.   Net indicates that our county

21     fiscal office actually has fees that they

22     charge for the collection of the tax.  So the

23     $25.2 million is net of the fees and

24     delinquent collections that our county fiscal

25     office charges against the levy.

Page 343

1                Q.    Now, what's the county mill rate
2       at this point?  Is it like 10.7 or 11.7?  Do
3       you know?
4                A.    I don't know that.
5                Q.    And when a taxpayer receives a
6       bill, do they see Summit County Children
7       Services millage charge as a separate item or
8       is it included within a different line item
9       on their tax bill?
10               A.    I can only speak from the
11      perspective of Wayne County.  That's where I
12      live.
13               Q.    Okay.
14               A.    And, yes, we see it separately in
15      Wayne County.  But I'm uncertain for
16      Summit County.
17               Q.    And is the Wayne County bill rate
18      for its children services agency greater or
19      lesser than 2.25 mill?
20               A.    I would have to guess.  I believe
21      it's less, but I'm really guessing.
22               Q.    I take it you're guessing because
23      you just don't remember.  You've seen the
24      bill before, but you're not picturing it in
25      your mind; is that right?

Page 344

1            A.    That would be correct.

2            Q.    Now, as we sit here today, how

3     far out have you projected the expenses of

4     Summit County Children Services agency?

5            A.    I believe we have projected out

6     to 2032.

7                  MR. HALLER:  Do you know if

8        that's been produced, those projections?

9     BY MR. HALLER:

10           Q.    I take it -- have you provided

11    those projections to your lawyer in this

12    case?

13           A.    No.  They were not requested.

14           Q.    If I can refer you to page 21 of

15    Kearns Exhibit 7.

16           A.    Okay.

17           Q.    If we compare the benefits

18    expenditures from 2008 -- well, let me strike

19    that.  Let me start over.

20                 If we look at the total operating

21    expenditures as between 2008 and the 2019

22    projected expenditures, there's about a

23    $3 million difference, give or take, correct?

24           A.    Yes, there is.

25           Q.    So it's projected that in 2019,

Page 345

1      about $3 million more will be spent than was

2      spent in 2008, right?

3                   That's just saying the same thing

4      in a different way.

5            A.   Well, it is, but you also -- I

6      think I should note that the 2008 are actual

7      expenses --

8            Q.   Right.

9            A.   -- as compared to the 2019

10     projected.

11           Q.   Right.  So it's projected that in

12     2019 it will cost the agency about $3,000

13     more than it cost them actually in 2008,

14     right?

15           A.   Yes.

16           Q.   And if I try to determine the

17     components of that increase, one of the lines

18     I'm looking at is the benefits line.

19                   And the benefits paid in 2008

20     were 6.5 or $6.6 million, whereas the

21     projected benefits paid to employees in 2019

22     is $9.4 million, right?

23           A.   Yes.  According to the data,

24     that's correct.

25           Q.   So it's projected that agency

Page 346

1           employees will be paid about $3 million more

2           in benefits in 2019 than they were actually

3           paid in 2008, right?

4                   A.   That is the current projection,

5           yes.

6                   Q.   Do you know why benefits payments

7           are projected to increase so substantially in

8           relation to 2008?

9                   A.   My initial guess would be

10          healthcare costs.

11                  Q.   And by healthcare costs, are

12          agency employees provided with insurance?

13                  A.   Yes.

14                  Q.   So insurance costs are projected

15          to be higher in 2019 than they were in 2008;

16          is that your assumption?

17                  A.   That is correct.

18                  Q.   And the other item that has

19          changed significantly, 2008 versus the 2019

20          projections, are payroll, right?  It's

21          projected that about slightly less than a

22          million dollars will be paid, you know, more

23          in 2019 than was paid in 2008; is that right?

24                  A.   Yes.  According to the data, we

25          are projecting more payroll.

                                    Page 347

1            Q.    And do you know whether that

2       projected payroll figure of $20.5 million is

3       higher than the 2008 actual payroll because

4       of headcount or because of higher per-person

5       salaries?

6            A.    It would be because of salaries.

7            Q.    And do you have a -- do you have

8       an assumption as to whether headcount in 2019

9       is projected to be greater or lesser than

10      actual headcount in 2008?

11           A.    I believe that we're still -- we

12      will be below where the headcount was in

13      2008.

14           Q.    Could you please look at

15      footnote 5 to that financial statement, the

16      operating forecast?

17                 And can you please explain to me

18      what is being referred to by the reference to

19      "new programs that are being designed," and

20      how those are anticipated to decrease paid

21      outside placement costs?

22           A.    Yes.  My -- again, it's a rather

23      ancillary understanding, is that what's

24      called a Rapid Response program has been put

25      in place to where when a child the identified

Page 348

1    as a potential for removal, we have a -- I

2    believe it's a contract with a service

3    provider that they would go into the home

4    immediately and provide some intensive

5    services to try and keep the child from

6    coming into custody.

7         Q.    Which would decrease the number

8    of children in custody; is that right?

9              I guess, again, referring back to

10   page 14 in the bar chart of the monthly

11   average number of children in custody, which

12   was going down steadily until 2012, but then

13   has been increasing slightly since then.

14             Is it the hope of that new

15   program that we'll begin to see a decrease in

16   the monthly average number of children in

17   custody?

18        A.    Well, the hope was, yes, to

19   either see a decrease or at least a leveling

20   off, yes.

21        Q.    Now, the hand count done by --

22   Ms. Geffken?

23        A.    Geffken.

24        Q.    Yeah.  Do you know whether she

25   prepared any hard-copy report or analysis of

Page 349

1          the work she did?

2                  A.    I do not know.

3                  Q.    Okay.  And did your lawyers

4          request that you look for that and produce it

5          to us in this matter?

6                  A.    I'm uncertain.  I don't know.

7                  Q.    Okay.  So yesterday, when there

8          were documents -- we've obviously identified

9          during the course of the deposition today

10         various documents, including a hand count

11         analysis and various other things.

12                 It was your preference yesterday

13         that we send you a letter concerning those

14         items rather than list them right now on the

15         record.  Does that make sense?

16                 A.    Yes.

17                 MR. HALLER:  So we'll do that.

18             I'm not putting it on the record right

19             now, but instead I will follow up or one

20             of my colleagues will follow up with a

21             letter.

22                 MS. HIBBERT:  And we'll reserve

23             the right to keep this deposition -- or

24             reopen this deposition at the time that

25             we do obtain additional documents that

Page 350

1          should have produced before the

2          deposition.

3                    MR. PENDELL:  I object to your

4          keeping the deposition open.  We

5          obviously don't agree to that.

6                    MS. HIBBERT:  Noted.

7                    MR. HALLER:  I'm sure everyone is

8          reserving all their rights from now and

9          in perpetuity.

10                    For today, I have no further

11          questions, and I don't think anyone else

12          does either.

13                    Anyone on the phone have any

14          questions?

15                    MS. IKEDA:  I have no questions.

16                    MR. HALLER:  Okay.  Thank you.

17                    THE VIDEOGRAPHER:  Off the

18          record, 6:18.

19                    (Recess taken.)

20                    THE VIDEOGRAPHER:  On the record,

21          6:37.

22                    MR. PENDELL:  Mr. Kearns, it's

23          been a long day and we all appreciate

24          your time and you being here.  We just

25          have a couple of quick questions before

                                    Page 351

1              we conclude.

2                           ---

3                      EXAMINATION

4      BY MR. PENDELL:

5              Q.   Would you agree that SCCS's

6      ability to respond to the opioid crisis is

7      constrained by the revenue available to SCCS?

8                   MR. HALLER:  Objection to form,

9          leading.

10                  MS. HIBBERT:  Join.

11                  THE WITNESS:  Yes.

12     BY MR. PENDELL:

13             Q.   Mr. Kearns, is there an opioid

14     crisis in this community?

15                  MR. HALLER:  Objection.  No

16         foundation.

17                  MS. HIBBERT:  Join.

18                  THE WITNESS:  Yes, I believe

19         there is.

20     BY MR. PENDELL:

21             Q.   And is your belief formed by any

22     personal experience?

23             A.   Yes, it is.

24             Q.   Would you be comfortable sharing

25     that personal experience with the jury?

Page 352

1          A.   Yes.

2               I have a brother-in-law whom I

3     watched go in and out of treatment

4     facilities, I think it's been four times now,

5     for opiate-related addiction.

6               I have had to experience sitting

7     with him in a hospital room -- sorry --

8     waiting to see whether he was going to live

9     or die.

10              His father, who has had to lock

11    his prescription drugs, his prescription

12    opiates, in a safe to keep his son from

13    stealing them and consuming them.  I have

14    done the same with those that are in my home,

15    because he has at times had access to my

16    home.

17              So I have watched his opioid

18    addiction devastate him, his parents, and my

19    wife, along with myself, because I do care

20    for him.

21         Q.   To your knowledge, did your

22    brother-in-law's addiction begin with an

23    addiction to prescription opioids?

24              MS. HIBBERT:  Objection to form.

25              THE WITNESS:  To my knowledge,

Page 353

1          yes, it did.

2                    MR. PENDELL:  We thank you very

3          much for your time.  We have no more

4          questions.

5                    MR. HALLER:  I have some

6          questions.

7                    MR. PENDELL:  Just for the

8          record, you have three minutes and 25

9          seconds.

10                   MR. HALLER:  It's nine minutes.

11                   MR. PENDELL:  We're now on

12         cross-examination and you get minute for

13         minute after me.  That's what the

14         protective order says, the CMO in this

15         case, so you have three minutes and 25

16         seconds.

17                   MR. HALLER:  I disagree with

18         that.

19                   MR. PENDELL:  You're getting

20         three minutes and 25 seconds.

21                   MR. HALLER:  I disagree.

22                   MR. PENDELL:  At three minutes

23         and 25 seconds, we're leaving the room,

24         just so you know.

25

Page 354

```
 1                       ---
 2                RE-EXAMINATION
 3    BY MR. HALLER:
 4          Q.   Mr. Kearns, what's your
 5    brother-in-law's name?
 6                MR. PENDELL:  Objection.  He's
 7          not going to identify who his
 8          brother-in-law is on the record.  He's
 9          not going to provide you that
10          information.
11    BY MR. HALLER:
12          Q.   Where does he live?
13                MR. PENDELL:  You can give him
14          the general vicinity of where he lives.
15                THE WITNESS:  Ashland County.
16    BY MR. HALLER:
17          Q.   What's his address?
18                MR. PENDELL:  We object to
19          providing his address.
20    BY MR. HALLER:
21          Q.   What's his father's address?
22                MR. PENDELL:  We object to him
23          giving his father's address.
24    BY MR. HALLER:
25          Q.   What's his father's name?
```

Page 355

1                    MR. PENDELL:  We object to

2            identifying who his father is as well.

3                    MR. HALLER:  Are you instructing

4            him not to answer?

5                    MR. PENDELL:  I am, because these

6            are real people's lives, and you're not

7            going to find out where they live, sir.

8                    (Instruction given.)

9                    MR. HALLER:  You opened the door.

10                   MR. PENDELL:  That's fine.

11      BY MR. HALLER:

12           Q.   Did your brother-in-law once have

13      a legitimate medical need for a prescription

14      opioid?

15           A.   He did.

16           Q.   And what gave rise to that

17      legitimate need?

18           A.   An automobile accident.

19           Q.   Did you once have a legitimate

20      need for prescription opioids?

21           A.   I have been prescribed

22      prescription opioids, yes.

23           Q.   And they are in your medicine

24      cabinet which you now lock; is that right?

25           A.   They are in my safe.

1          Q.    In your safe.

2                And what was the need that led

3     you to obtain the prescription for the

4     opioids?

5          A.    I had a cyst removed from the

6     back of my neck.

7          Q.    And what was the drug that you

8     were prescribed?

9          A.    Oxycodone.

10         Q.    Did the father that you mentioned

11    have a legitimate medical need for a

12    prescription opioid?

13         A.    Yes, he did.

14         Q.    And what was that?

15         A.    It was a work-related accident.

16         Q.    And what was the nature of the

17    accident?

18         A.    He fell off the back of a flatbed

19    truck and injured his back.

20         Q.    Prior to the prescription opioid

21    addiction that your brother-in-law had, did

22    he have any previous addictions to any

23    substance?

24         A.    Not that I know of.

25         Q.    Did he drink heavily?

Page 357

1                     A.    I am uncertain.

2                     Q.    What treatment has your

3          brother-in-law received for his addiction?

4                     A.    I only know that he's been in and

5          out of facilities.  I don't know the specific

6          treatment regimen that he received.

7                     Q.    Did he come to abuse any opioid

8          other than a prescription opioid?

9                     A.    I am uncertain.

10                    Q.    Do you understand him to have

11         ever used heroin?

12                    A.    I'm sorry?

13                    Q.    Do you understand him to have

14         ever used heroin?

15                    A.    Not to my knowledge.

16                    Q.    Do you understand him to have

17         ever used fentanyl?

18                    A.    I'm uncertain.

19                    Q.    What do you understand the

20         prescription opioids to be that he has used?

21                    A.    Percocet is one that I know.

22                    Q.    Any others?

23                    A.    Not to my knowledge.

24                    Q.    When he had his legitimate

25         medical need, was his prescription covered by

Page 358

1          or paid for by insurance?

2                    A.    I believe so.

3                    Q.    What insurance?

4                    A.    That I don't know.

5                    Q.    Has he ever been on Medicare or

6          Medicaid?

7                    A.    Yes.

8                    Q.    Did Medicaid pay for his

9          prescription opioid?

10                   A.    I don't know.

11                   Q.    Is he currently on Medicaid?

12                   MR. PENDELL:  That's it.

13                   THE WITNESS:  Yes.

14        BY MR. HALLER:

15                   Q.    Does he have any private

16        insurance?

17                   MR. PENDELL:  We are done

18            answering questions.  Three minutes and

19            25 seconds.  That's it.

20                   MR. HALLER:  Obviously, I'll make

21            clear for the record that I have

22            additional questions.

23                   It's obviously my position that

24            you sprung this personal story on, and

25            it's now fair game for questioning and

Page 359

1           discovery.  And we'll be sending our

2           discovery requests concerning this

3           issue.

4                 MR. PENDELL:  It was my turn to

5           ask questions, sir.  You had plenty of

6           time to ask questions, and now it's my

7           turn.

8                 MR. HALLER:  We've both stated

9           our positions.

10                MS. HIBBERT:  I also -- before we

11          go off the record, I want to understand

12          the basis of your objection and

13          instruction for your witness not to

14          answer the questions about the identity

15          of his brother-in-law.

16                MR. PENDELL:  Because that is a

17          private individual.  He was telling his

18          story.  He is not here to out his

19          brother-in-law so that folks can find

20          out where he lives and harass him and

21          embarrass him.  That's not the purpose

22          of the story.

23                MS. HIBBERT:  So it's not raising

24          any privilege objection, just to be

25          clear?

1          MR. PENDELL:  I don't have an

2     attorney-client relationship with him.

3          MS. HIBBERT:  Right.  So what

4     basis are you instructing your client

5     not to answer?

6          MR. PENDELL:  I think I just told

7     you.

8          So you can do two things.  You

9     can call the judge.  You can file a

10    motion.  But he's not going to answer

11    those questions.  I'm done talking about

12    it.

13         We'll read and sign.  Thank you

14    very much.

15         MS. HIBBERT:  Excuse me.

16         MR. PENDELL:  Darin, let's go.

17         MS. HIBBERT:  You've interrupted

18    me all day today.  I'm asking you a

19    question.  I'm trying to get the basis

20    of your objection --

21         MR. PENDELL:  I just gave it to

22    you.

23         MS. HIBBERT:  -- and you're

24    walking out of the room.

25         For the record --

1          MR. PENDELL:  I gave it to you.

2     I'm not going to argue with you about

3     it.  I gave you the basis of it.

4          MS. HIBBERT:  But you're not

5     giving me any opportunity to respond and

6     have a conversation on the record about

7     this.

8          Counsel, earlier you would not

9     converse with me off the record, and now

10     you're refusing to converse with me on

11     the record, just to be clear?

12          MR. PENDELL:  I'm not going to

13     argue with you about it.  I've stated my

14     position.  You've stated yours.  You go

15     do what you're going to do.  We're

16     leaving.

17          MR. ARNOLD:  I don't believe we

18     are on the record anymore.  The

19     deposition is over.

20          MS. HIBBERT:  No.  We are on the

21     record, and we're going to continue to

22     be on the record until I agree to go

23     off.  Because both parties have to agree

24     to go off the record in this case.

25          MR. HALLER:  Thank you,

Page 362

1                Mr. Kearns.  And I'm sorry about your
2         brother-in-law.
3                    MS. HIBBERT:  We can stay on the
4         record for my part, and I don't need
5         opposing counsel in the room for this.
6                    I disagree with the objection and
7         the basis of the objection raised by
8         opposing counsel.  It's not appropriate.
9                    It's not appropriate to instruct
10        your witness not to answer when there's
11        no privilege objection or privileged
12        information on the table or being asked
13        about.  And we will file a motion on
14        this issue.
15                    Thank you.
16                    THE VIDEOGRAPHER:  Off the
17        record?
18                    MR. HALLER:  All set.
19                    THE VIDEOGRAPHER:  Off the
20        record, 6:47.
21                    (Time noted: 6:47 p.m.)
22
23
24
25

Page 363

1

2

3

4          Whereupon, counsel was requested to give

5      instruction regarding the witness's review of

6      the transcript pursuant to the Civil Rules.

7

8

9                    SIGNATURE:

10          Transcript review was requested pursuant

11      to the applicable Rules of Civil Procedure.

12

13

14               TRANSCRIPT DELIVERY:

15          Counsel was requested to give

16      instruction regarding delivery date of

17      transcript.

18

19

20

21

22

23

24

25

Page 364

1                    C E R T I F I C A T E

2

3          I, ANNE E. VOSBURGH, Certified Shorthand

4     Reporter, Registered Professional Reporter,

5     Certified Realtime Reporter, and Notary

6     Public, hereby certify:

7          That DARIN KEARNS was duly sworn by me,

8     an authorized Notary Public, and that this

9     deposition is a true and correct record of

10    the testimony given by such witness to the

11    best of my knowledge and ability.

12          I further certify that I am not related

13    to any of the parties to this action and that

14    I am in no way interested in the outcome of

15    this matter.

16          In witness whereof, I have hereunto set

17    my hand this day, December 10, 2018.

18

19

20    Anne E. Vosburgh, CSR-6804, RPR, CRR

21

22

23

24

25

```
                                                    Page 365
1                        Veritext Legal Solutions
                             1100 Superior Ave
2                               Suite 1820
                          Cleveland, Ohio 44114
3                        Phone: 216-523-1313
4
     December 10, 2018
5
     To: Michael J. Pendell
6
     Case Name: In Re: National Prescription Opiate Litigation v.
7
     Veritext Reference Number: 3150798
8
     Witness:  Darin C. Kearns       Deposition Date:  12/5/2018
9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 366

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3150798
 3    CASE NAME: In Re: National Prescription Opiate Litigation v.
      DATE OF DEPOSITION: 12/5/2018
 4    WITNESS' NAME: Darin C. Kearns
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____        _____
 9    Date                        Darin C. Kearns
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

```
1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 3150798
3    CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 12/5/2018
4    WITNESS' NAME: Darin C. Kearns
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                   Darin C. Kearns
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 368

1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2               ASSIGNMENT NO: 12/5/2018
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____       _____
20   Date                         Darin C. Kearns
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

[& - 2012]                                                                                          Page 1

| **&** |
| --- |
| **&**   4:17 5:6 6:4,14 |
| 10:25 11:2,8,20 |

| **0** |
| --- |
| **000003847**   8:15 |
| 116:23 |
| **000003857**   8:16 |
| 116:24 |
| **000019809**   8:19 |
| 174:15 |
| **000019812**   8:20 |
| 174:16 |
| **000982175**   8:23 |
| 188:25 |
| **000982225**   8:24 |
| 189:1 |
| **000990286**   9:9 |
| 249:7 |
| **000990324**   9:10 |
| 249:8 |
| **001463636**   9:5 |
| 212:15 |
| **001463637**   9:6 |
| 212:16 |
| **001921248**   8:11 |
| 44:25 |
| **001921250**   8:12 |
| 45:1 |
| **01916138**   9:17 |
| 298:21 |
| **05**   1:17 |
| **08**   223:19 |

| **1** |
| --- |
| **1**   8:3 19:7,13,15 |
| 20:5,14,22 22:4 |
| 25:5,11,15 26:21 |
| 27:19 28:4,5 29:2 |
| 117:11,15 143:22 |
| 320:23 |

**1,057**   232:11
**1.7**   209:18,23
210:1,10,12,17
296:25
**10**   9:11 66:20
285:22,25 286:12
287:17 288:22
319:15,18 321:17
324:8 364:17
365:4
**10.7**   343:2
**1000**   5:18
**10:15**   64:9,10
**10:35**   64:11,13
**11**   9:12 290:11,14
291:2 312:21,25
**11.5**   266:13 291:20
**11.7**   343:2
**1100**   6:16 365:1
**1110**   6:6
**116**   8:13
**11:32**   115:12
**11:41**   115:15
**12**   9:15 155:10
185:20 298:22,25
**12,000**   210:20
**12,085,000**   152:9
152:11
**12,700**   209:6
**12/5/2018**   365:8
366:3 367:3 368:2
**128.13.**   304:17
**12:53**   179:14,15
**13**   7:6
**13,649,000**   266:18
**1301**   5:17
**13334**   364:19
**14**   223:20 227:1
231:9,13,21
242:24 310:15
339:22 340:5

348:10
**1463636**   213:5
**15**   223:22 227:1
231:13 239:7
242:24
**16**   127:10 231:13
323:19
**16th**   12:15
**17**   1:7 90:1 304:15
**17th**   6:15
**18**   8:4,6 19:6,9,16
19:19 25:16 26:20
171:9 223:22
230:15 248:17
**1820**   365:2
**188**   8:21
**19**   8:3,5 230:15
249:21 301:3
**1900**   6:5
**1916138**   299:5
**19809**   175:13
**1992**   46:13
**1999**   50:14 57:7
**19th**   300:12
**1:00**   179:7
**1:18**   1:12
**1:51**   179:16,21

| **2** |
| --- |
| **2**   8:5 19:10,13,17 |
| 20:9,12,22 22:4 |
| 29:23 30:10 |
| 159:18 265:22 |
| **2.25**   342:5,6 |
| 343:19 |
| **2.6**   159:18 |
| **2.9**   303:15 |
| **2.98**   302:15 303:7 |
| 304:1 |
| **20**   84:4 192:24 |
| 193:1,3,6 230:16 |

239:8 366:16
367:22 368:22
**20.5**   347:2
**2000**   183:4
**20001-2113**   4:7
**20001-4956**   5:9
**20005**   5:19
**20006**   6:7,17
**2003**   46:19
**2006**   183:5,17,22
261:9 310:19,22
311:5,22 339:23
**2007**   232:10
310:23 311:22
**2008**   98:14,18
100:9 122:23
144:22 145:20
148:15 213:23
214:6,17 222:18
223:17 224:1,15
224:23 225:14,24
266:2,9,17,24
344:18,21 345:2,6
345:13,19 346:3,8
346:15,19,23
347:3,10,13
**2009**   58:20
**2010**   50:14 57:7,14
58:13 59:4 63:3
173:11
**2011**   150:9,10
183:22 225:10
**2012**   143:13,24
144:3,22 145:20
146:6 148:15
154:24 183:5,8,10
183:17 184:3,6,16
224:24 225:10,14
225:24 302:16
303:11 310:23
311:5 315:22

317:3,7 324:5,15
337:10,13,15,20
337:24 338:5
348:12
**2013** 217:20,22
218:16 226:19
227:1 235:5,21
242:24 245:13
246:4 265:3 266:2
266:9 292:25
293:1,4 315:22
337:14
**2014** 218:14,24
226:19 315:22
324:5,16 339:6
**2015** 63:4 65:2
217:1 218:14,24
224:15 226:20
228:2,19 229:4,9
229:10 232:17
310:20 315:22
320:23,24 323:19
339:18
**2016** 8:17 79:7,16
80:22 87:24 89:25
94:13 95:12 97:10
110:13 111:24
115:19 127:15
128:9 130:9 133:2
146:7 174:13,22
175:9 176:3 203:4
203:24 204:11
207:24 208:5,15
209:5,13,20 210:3
218:14,25 228:4
229:11 236:1
255:21 260:14
261:11,15 264:10
264:13 286:18,22
287:1 290:5
291:23,25 293:2,4

293:9,11,19,24
295:18 296:14
297:1,23 307:17
315:22 319:23
321:1,5 324:1
342:12
**2017** 8:22 9:12
18:23,24 21:20
32:23 33:25 34:16
34:19 81:24 82:1
82:5,12 83:3 90:2
91:8 98:15,18
100:9 115:22
122:23 188:24
189:10,14,19
201:8,15 203:4
207:5 211:20
213:23 214:6,17
218:14 226:8
227:6,8,12 230:19
233:10 240:13
241:13 245:8,14
246:2,4 247:6,9,23
248:20,22 250:20
250:25,25 251:1,4
256:20 265:8
268:12,16 269:4
270:15,18 286:24
290:8,24 298:4
302:17 303:11
307:19 308:3
310:13 312:24
317:1 320:3 321:1
321:5
**2018** 1:17 2:3 9:8
10:2,8 83:9,13
87:11 154:25
183:10 184:3,14
203:5 222:18
223:11,17,23
224:11 227:6

232:21 233:6
247:12 248:10,14
249:2,6,16,21
250:1,6 256:20
257:1 261:9
264:14 266:12
270:18 291:11
298:4 300:12
301:4 303:22
304:15 364:17
365:4
**2019** 152:3 185:19
185:21 201:25
223:6,10 224:3,6
224:10 251:23
252:21,25 253:5
253:11 255:8
298:4 344:21,25
345:9,12,21 346:2
346:15,19,23
347:8
**202.414.9200** 5:20
**202.469.5222** 6:18
**202.662.6000** 5:10
**202.778-3007** 6:8
**202.879.3939** 4:8
**2020** 152:4,7
185:25 222:25
223:4
**2024** 155:4
**2032** 344:6
**21** 7:15 320:3,6
344:14
**212** 9:2
**213.243.4160** 4:21
**216-523-1313**
365:3
**21st** 12:15
**22** 7:14 189:23
226:14 230:23
243:25 338:24

339:4
**23** 7:14 207:6
230:23
**249** 9:7
**25** 239:9 353:8,15
353:20,23 358:19
**25.2** 342:23
**25.7** 313:6
**26** 303:22
**264** 3:17
**26th** 302:13
**27** 240:17,20
242:23 244:9,17
319:24 320:5
**27th** 12:16
**28** 3:6
**2804** 1:6,7
**285** 9:11
**29** 66:18
**290** 9:12
**29464** 3:7
**298** 9:15
**2:59** 234:8

---

**3**

**3** 8:7 31:5,8,24
34:7 36:13 38:20
39:7 40:17 43:25
44:15,20 56:25
119:14 121:16
126:20 151:4
211:20 268:1,17
268:25 270:4
275:13 279:1
281:4 283:3 284:8
284:24 285:12
288:3,5,7 307:21
308:5 314:11
324:4,19 327:14
328:1,24 331:13
331:20 333:5,15
337:9 338:16

339:1,14 344:23
345:1 346:1
**3,000** 345:12
**3.8** 147:10,18
148:7
**30** 144:8 157:22
158:16 172:9,10
184:13 270:16
275:15,17 279:19
279:20 281:8,12
281:19 283:19
285:3,6,9 286:20
286:25 287:2
315:6,21 316:1,12
316:16 319:20
323:22 324:2,4
326:9,13,17,20
327:2,3
**30.00** 316:24
**300** 226:5
**308,000** 336:13
**31** 8:7
**310** 7:7
**3150798** 1:25
365:7 366:2 367:2
**32** 231:4
**330** 226:5
**330.379.2041** 3:19
**337,200** 303:15
**344090** 8:8 31:7,25
**351** 7:8
**354** 7:9
**355** 7:17
**36** 7:15
**3847** 117:13
**3:24** 234:11
**3rd** 49:9

**4**

**4** 8:9 45:2,5,14
50:6 100:23
101:21 129:20

175:11,18 227:12
227:19 248:1
342:15
**40** 84:2
**41** 7:16
**412,523** 339:11
**44** 8:9
**44114** 365:2
**44306-1354** 3:18
**445** 250:23
**44th** 4:18
**450,000** 218:15
**45090** 1:12
**480** 245:20
**485,000** 245:21
248:8 250:8
**4:14** 275:4
**4:25** 275:7

**5**

**5** 2:3 7:16 8:13
9:12 10:2 116:19
116:25 117:11
119:15 124:18
126:10,17 129:14
129:21 153:8
158:17,22 159:9
290:8 291:6
312:24 347:15
**5,000** 212:12
**500,000** 212:4,10
212:12 217:23
219:3,5 239:2
242:25 243:2
**51** 4:6
**52** 223:24
**54** 224:1
**57** 2:7
**5:05** 305:21
**5:17** 305:24
**5:22** 309:24

**5th** 10:7 290:23

**6**

**6** 8:17 29:2,6
174:11,17 175:12
175:18 342:12
**6.5** 345:20
**6.6** 345:20
**60** 141:12,13,14
158:14 172:9
**60.2** 143:23
**600,000** 250:1,10
250:22
**601** 232:17
**650** 291:24
**6804** 1:24 2:11
364:20
**6:18** 350:18
**6:37** 350:21
**6:47** 362:20,21
**6th** 33:25

**7**

**7** 8:21 25:24 26:13
28:20,20 189:2,5
189:18,23 207:5
211:20 226:9
227:12,17 230:1,6
240:11,21 242:23
256:21 310:13
338:6,25 339:4,10
339:23 344:15
**700** 291:25
**734** 29:9
**777** 4:19

**8**

**8** 7:17 9:2 25:18
25:24 26:5,13
28:21 30:9 159:5
212:17,20 213:1
213:24 214:12,20
215:24 216:9,13

217:15 222:16
223:15 265:11,22
**800** 6:15 233:13,17
**821** 232:23
**832.216.9229** 3:8
**850** 5:8

**9**

**9** 9:7 25:10,15,25
26:15 30:9 249:9
249:12,22 256:22
256:25
**9.4** 345:22
**90017-5844** 4:20
**924665** 291:7
**982175** 189:12
**990286** 249:17
**9:00** 1:17 2:4 10:2
**9:12** 10:7

**a**

**a.m.** 1:17 2:4 10:2
64:10,11
**a12** 175:20
**aarnold** 3:12
**abbreviated** 162:1
**ability** 225:2
259:11 270:6
351:6 364:11
**able** 17:10 69:2
149:2 171:14
174:8 191:22
215:14 243:10,17
260:25 301:7
327:25
**absence** 123:25
**abuse** 211:14
212:5 228:8,23
229:5 237:25
238:7,14 256:6
276:1,12,16,25
277:4,15 279:5,10

288:17 298:18
314:18 317:25
318:8 321:21
322:3 323:25
357:7
**abused** 156:17
**accept** 93:23
**accepted** 86:21
**accepting** 252:13
**access** 102:20
168:10 191:22
192:12,20 193:7
203:22 204:5
210:17 292:14
336:6 352:15
**accessible** 97:15
**accessing** 167:17
219:3
**accident** 355:18
356:15,17
**accolades** 83:5
**accord** 65:7
130:11,12
**account** 61:10
80:5,6 157:19
177:25 208:5,7
209:3,4 210:19
221:11 259:6,6
262:20 304:21
325:25
**accountant** 46:16
47:13
**accounted** 169:10
169:11 257:9
**accounting** 46:13
47:9 61:17 119:3
334:15
**accounts** 207:11
207:14
**accrual** 209:2

**accumulated** 61:2
**accuracy** 315:7
**accurate** 27:19
28:5 45:10 152:25
158:18 178:24
184:24 300:6
314:22,24 315:1,9
324:12,17 329:1
329:11 331:14,25
333:6,12
**accurately** 329:19
**accusation** 57:24
58:19
**accusations** 59:7
60:15 61:6,13,18
62:11
**accused** 57:22
**achieve** 335:7
**acknowledge**
366:11 367:16
**acquired** 210:3
**acronym** 160:13
256:11
**act** 366:14 367:20
**acting** 42:24
**action** 54:19,22,24
80:11 85:6,11,18
85:19 86:5,10,15
86:21 289:11
364:13
**actions** 308:8
309:1
**active** 46:22 47:6
**activities** 336:7
**activity** 313:7,10
313:25
**actual** 93:7 132:25
190:6 194:17
214:1 216:15
217:2 218:2,8
222:3 226:13,18

243:24 280:12,17
280:25 285:1
288:14 297:13
345:6 347:3,10
**add** 95:11 334:15
**added** 249:2
**addiction** 288:17
319:7 321:22
322:25 324:1
352:5,18,22,23
356:21 357:3
**addictions** 356:22
**addition** 66:5
145:19
**additional** 12:25
35:19,22 40:3,12
65:20 76:2 124:23
135:6 143:6
145:21 146:24
150:4 151:24
152:5,10 154:11
154:20 182:6
184:8 186:13
203:14 204:6,22
268:3 271:7,24
272:2 275:10
285:20 295:20
296:1 313:16,20
314:8 349:25
358:22
**additionally** 25:20
26:8 224:25
**address** 85:21
212:5 236:25
354:17,19,21,23
365:15
**addressed** 237:11
**addressing** 236:9
236:14
**adjust** 208:4,6

**adjusted** 9:3
212:14 213:3
222:15
**adjustment** 95:13
199:5 203:23
204:3,9,13,15,18
205:11,14,15,17
207:23 209:8,17
209:19 210:1,8,16
210:20,22 255:12
255:17,20 296:24
297:5
**adjustments**
207:22 211:5,9
**adm** 14:10
**administered**
161:24 221:7
**administration**
46:11 49:25
**administrative**
58:6 74:9 110:5
110:18,22 118:17
**administrator**
63:1,7
**adopted** 131:5
**adoption** 131:2,3
131:11 172:3
196:4,14 207:15
306:22 336:23
**adoptions** 172:3
**adult** 322:24
**adults** 321:21,25
**advised** 108:25
**advisement**
273:22
**advisory** 145:10
196:18,20,23
197:2,22,25 198:2
**advocate** 154:3
**affect** 146:21
147:6

**affixed** 366:15
367:21
**afternoon** 179:18
**age** 171:9,17,20
**agencies** 51:12
52:1,10 70:12,20
138:13 152:22
**agency** 18:19 21:8
21:22,24 34:16,22
38:5,17,21 51:14
52:4 54:17 65:23
66:19 69:18 70:4
101:6 107:22
130:21 137:2
148:3 154:4 156:5
156:11,21 169:15
170:19,20,24
180:20 229:9,11
293:15 294:3
301:6 317:24
318:7 325:23
326:14,22 328:18
329:2,12,20
331:15 333:7
339:24 340:8
341:1 343:18
344:4 345:12,25
346:12
**agency's** 92:10
153:8
**aggressiveness**
312:18
**ago** 32:22 37:10
38:6,15 39:9,15,19
45:15 47:1,14
48:23 60:1 64:16
232:6 233:20
266:24 267:8,16
286:7,13
**agree** 44:7 115:4
144:13 153:17,22

237:3 273:24
350:5 351:5
361:22,23
**ahead** 16:8 27:24
124:13 249:1
279:15 313:5
328:4 332:25
333:1
**aid** 153:8
**akron** 1:18 2:7,8
3:4,18 8:5 10:1,11
10:20 19:8,18
29:14,24 30:7,13
30:18,22 31:1
56:3 187:11,15,17
187:20 188:3,8,10
188:14,17,19
**al** 1:10,11
**alerted** 123:22
**allegation** 58:21
**allegations** 14:19
29:17 60:24 76:3
**allocate** 84:9,12
**allocated** 85:2
147:23 155:23
156:1,13 186:22
191:1 227:9 310:8
**allocation** 159:8
159:13,16,17
160:1,14 227:2
336:3
**allocations** 159:19
159:21
**allowed** 210:16
**amerisourceberg...**
5:14 11:11,14
**amount** 29:8
144:21 145:15,24
146:19,23 159:1
159:15 182:3,8
204:25 210:24

211:3 212:8 217:3
218:15 221:1
222:3,20 223:4,8
223:24,25 224:4,6
224:10,11 226:24
238:23 239:1
243:11,17,24
245:17 246:11
250:1,5,10,22
251:4 252:17,20
253:13 254:21
255:17,22 265:2
265:15 266:3,8,13
266:17 298:11
313:14 336:9
340:8,10,13 341:1
**amounts** 190:21
190:25 217:25
221:21 226:10,12
240:9 244:1 298:7
**amy** 92:23 254:16
275:20 295:7
**analyses** 307:18
328:25
**analysis** 30:17
38:13 69:11,14,17
70:19 71:4,14,16
72:1 78:25 79:5
85:1 118:19
121:19,24 137:18
137:23 151:4
162:22,25 184:20
224:16,18,19,20
228:4 268:22
278:24 279:11
280:19 281:3
282:12 283:22
284:1,6,22 285:5
285:15 286:15
288:11 296:12
298:1 305:2 308:2

314:12,16 319:14
324:3 327:1,11
329:10,11 333:15
333:16 337:10
338:16 339:15
348:25 349:11
**ancillary** 347:23
**andrew** 3:11 10:16
**angeles** 4:20
**angry** 42:14,17
**ann** 12:13 299:4,6
299:7 300:11
**ann's** 299:11
**anna** 197:15
**anne** 1:24 2:10
364:3,20
**annual** 8:17 82:2,4
111:1 174:13,22
175:7 195:3
341:22 342:12,13
**annually** 212:12
**answer** 7:14,15,16
7:17 16:4 17:1,17
17:18 22:20 24:5
25:15 27:23 35:11
35:12,14 36:16,19
37:1,5 39:25
40:24,25 42:3
82:11 134:17
150:1 181:12
200:23 201:1
206:6 271:12,16
272:1,11,14,22
332:10,18,24
340:17 355:4
359:14 360:5,10
362:10
**answered** 23:12
24:3 153:21
281:21 318:10
328:11 332:3,4

333:10

**answering** 358:18

**answers** 17:8

**anticipate** 103:10
103:15 143:2
184:25 209:12
219:2 253:4,7,10
260:19 307:12

**anticipated** 209:23
223:13 251:1
260:10 269:12
347:20

**anticipating** 313:6

**anybody** 48:12
110:1 124:8
137:19,24 138:18
200:24 279:7
295:4

**anymore** 274:16
361:18

**anytime** 258:14

**apart** 65:15,16

**apologies** 50:11
196:7

**appear** 24:22,23
366:11 367:15

**appearances** 3:1
4:1 5:1 6:1

**appears** 213:17
215:8 217:18
321:23 323:16
326:11 342:15

**appended** 367:11
367:18

**applicable** 363:11

**application** 74:15
75:21 169:19,22
170:15 245:8
252:7 325:13

**applications** 66:10
169:24 170:5

**applied** 169:15,17
324:4 326:9,17

**apply** 21:25
187:10,14 251:5
251:10 324:8

**applying** 45:22
75:18 170:3

**appreciate** 64:4
115:7 350:23

**approach** 113:18

**approached** 74:4
312:7

**appropriate** 362:8
362:9

**approval** 77:12
195:8 197:25
198:5 247:16,21
248:15 252:10

**approve** 93:25
94:3 95:19 198:24
202:5 221:13
252:12

**approved** 94:11
94:17 95:3 143:23
152:1 195:7 202:3
202:18,19,21
203:18,19 205:12
210:7,9

**approves** 93:18
145:12 196:21
198:14,18

**approving** 77:25

**approximately** 2:4
29:9 34:16 224:8
224:15 245:20
342:9

**april** 115:22
300:12 301:3
302:13 303:22

**arbiter** 332:14

**argue** 37:2 361:2
361:13

**argument** 301:13
301:24 302:6

**arlington** 3:17

**arnold** 3:11 4:17
10:16,16 11:20
42:20 44:7 271:11
271:25 272:6
274:20 281:21
331:18 332:4
361:17

**arnoldporter.com**
4:24

**arrears** 270:8

**arrived** 129:7
175:9 229:9,11
235:23 236:1

**arthur** 6:4 11:2

**arvay** 197:15

**ascertain** 13:23
217:5 236:23
237:10,15,24
243:11 260:25
265:7 281:19

**ashland** 354:15

**aside** 14:7 20:12
31:3 44:20 137:24
138:15 163:1
171:22 230:11
244:21 304:9

**asked** 18:12 21:23
23:17,24 28:6,9
33:6 35:18 38:24
45:18 56:19 70:9
74:10 78:8,15
80:12 93:24 94:3
98:1 109:2 121:18
121:22,23 122:3
153:21 169:23
198:4 209:18

210:21 211:6
212:21 213:12
260:13 269:15
272:1 281:21
282:24 283:1,5,16
298:6 307:16
316:3 318:10
330:25 332:2,4,7
333:10 337:23
362:12

**asking** 17:2 23:15
33:1 41:19 70:16
103:14 140:11
149:11 150:4
177:9 191:3
201:16 283:8
284:13 300:16
301:9 327:18
338:18 360:18

**aspect** 68:6 135:18
260:24

**aspects** 107:2
112:5 113:22

**assess** 56:20 70:2

**assessed** 57:2
70:10 144:16
154:23,25 297:15
297:17,19

**assessing** 109:8
126:4

**assessment** 57:1
121:11 143:4
144:6,13 148:14
150:20,24 151:1
151:13 155:18
184:1 212:6
224:13 238:3
259:14,19 260:1
264:8 268:22
271:22 288:14
289:17 296:13

297:22 308:3
**assessments**
292:14
**assets** 313:18
**assign** 84:24
**assigning** 84:21
**assignment** 366:2
367:2 368:2
**assist** 200:14
213:13
**assistance** 193:2
**assistant** 74:9
110:6,18,22
**assisted** 28:23
**associated** 27:1
38:4 157:7 171:4
188:1 304:8
**association** 2:7
133:22 134:6,21
134:25 135:10,13
136:6,12,20
137:21 139:2
154:7,9
**associations** 138:2
138:6
**assume** 27:9 45:7
140:11 257:2
266:6 297:9 316:9
317:9 322:8
**assumed** 127:18
188:20 316:14
**assuming** 313:24
**assumption** 27:6
297:11 315:8
321:11 346:16
347:8
**attached** 9:18
33:17 34:7 160:4
367:7
**attachment** 34:6

**attempt** 269:8
330:20
**attended** 138:8
**attending** 290:22
291:3
**attention** 189:23
**attorney** 23:1 41:1
41:13,16,17,22
271:13 272:12
273:11 330:22
360:2
**attorneys** 35:24
38:21 48:10
137:25 279:8
**attributable**
307:23 308:7
325:11
**attributed** 241:10
**audio** 59:14,15,17
60:10
**audit** 51:20 52:6
52:12,16,25 53:11
54:8,14,15,16
55:12,13 56:1,9
57:8 73:11,25
80:10 81:2,4,6,16
81:17,21 82:2,4,6
82:12 83:6,9,11,13
85:13 86:9,18,20
86:23 87:11,16,22
88:2,5,8,11,16,20
88:22,23,25 89:1,3
89:8,15,17,21 90:4
90:5,7,10,11,19,22
90:24 91:3,4,6,10
91:13
**audited** 53:1 55:17
73:19 80:21,24,25
81:8,24 82:22
88:18,19,22
182:25

**auditee** 54:21
**auditing** 50:16
51:3,10 52:5,9
53:20
**auditor** 51:9 52:6
54:10 55:10 57:5
81:1,23 86:11,14
87:8 88:24,25
89:6,14
**auditors** 51:22
52:4
**audits** 53:5,8 54:3
55:1,3,5 56:14
80:9,10 81:12,14
81:19 88:14 89:18
91:5,20 115:18
116:5
**august** 85:16
86:25 185:21
**author** 27:12,14
**authorize** 367:11
**authorized** 12:4
364:8
**automobile** 355:18
**availability** 28:22
**available** 60:24
87:4 109:5 139:5
145:25 147:25
148:3 160:15
173:19 205:7,18
280:3 281:18
282:2,5,8,9,15
285:8 287:20,22
293:21,24 294:13
294:19 295:1
296:10,17,19,21
318:4 351:7
**ave** 365:1
**avenue** 4:6
**average** 84:2
157:20,21 158:19

168:24 231:19
232:3,12,19,25
233:5,9 263:13
267:5 302:16
304:16,24 305:3,5
306:7 310:18,24
311:5,14,17,20
326:17 338:7
340:1 348:11,16
**averaging** 303:13
303:14
**award** 212:11
256:13,17,19
**awarded** 238:25
248:13
**aware** 38:9,12,18
48:21,24 58:19
62:10 72:22 87:20
87:25 91:20,21
95:4,9 112:23
113:2 151:2 168:5
171:24 187:22
188:12,18,22
192:2,4 262:12
268:21

| b |
| --- |

**b** 84:17
**bachelor** 46:10
49:25
**back** 17:21 24:12
24:22 25:8 29:25
44:21 46:5 50:21
52:23 78:7 80:18
91:22 145:4
151:25 154:22
173:15 192:22
197:10,11 198:25
199:3,4,4,7,8,14
203:22 204:3,8
207:4,21 211:19
216:17 217:4

219:8 221:20
222:10 226:8
236:23 244:6
260:9 264:22
267:3 268:1
307:18 308:3
310:12 316:11
317:2,5,7 322:21
337:10,13,15,23
338:6 339:23,25
340:7 348:9 356:6
356:18,19 365:15
**backdrop** 323:23
**bad** 107:8
**badges** 108:10
**balance** 61:2
101:17 103:16
142:22 173:20
174:1,3,5,6 176:8
176:9,11,12,14,20
176:21,24,25
177:9,16,18,24
178:1,2,4,6,10,16
178:20 179:25
180:3 181:9
182:16,21 184:21
185:19 186:2,7
211:3
**balances** 209:2
**ballot** 143:22
**ballpark** 209:6
**banks** 197:16
**banner** 120:18
205:1 258:3,4,10
258:13,18 259:2
259:12 270:7,9
327:16,19 328:1
328:13,19
**bar** 2:7 310:16
339:21 340:5
348:10

**barnes** 31:14,18
32:25 33:9,16,20
38:22 39:11,14
40:14 41:22 42:5
48:18,21 49:7
73:13 74:23,24
75:5 76:6 92:20
94:7 109:24
111:21 112:16,25
113:3 118:7 154:5
168:17 200:15,20
200:21 201:6
229:15 230:7
254:5 283:4,18
284:10,21 285:10
291:10 296:4,8
312:2 315:25
320:9 321:10
337:23
**base** 199:4 250:16
**based** 35:19 36:7
40:3,9 141:11
142:25 143:6
145:14 167:23
218:25 229:13
263:13 265:15
267:1,17 315:10
318:8 320:16
322:16 331:6
**basic** 13:22
**basically** 35:17
143:3 220:21
250:18 283:17
299:24 303:10
**basis** 22:25 37:17
96:22 104:3,14
111:2 166:9,23
169:1 181:6
211:17 220:9,12
220:20 305:9,9
341:22 359:12

360:4,19 361:3
362:7
**bates** 8:8,10,15,19
8:22 9:4,8,16 31:6
31:25 44:24
116:22 117:13
174:14 175:13
188:24 189:11
212:14 213:4
249:6,17 291:7
298:21 299:5
**bathroom** 115:3
**beating** 317:19
322:22
**beaver** 128:20
129:3,5 130:5,10
131:15
**began** 79:15 89:25
97:9 143:11,25
173:11 183:8
228:2,18 229:3
235:12
**beginning** 8:7 9:16
31:6 41:7 146:6
152:7 175:13
176:8,20,24
177:18 178:6
180:23 298:21
**begins** 25:18
250:12
**behalf** 3:3 4:3,13
5:3,14 6:3,13
10:19 11:5,8,10,13
11:21 135:1
188:19
**belief** 351:21
**believe** 14:8 15:19
22:10 24:17 31:17
32:8 35:16 38:22
53:1,15 54:5
55:17 58:20 59:2

59:3,12,15 67:11
67:11 81:24 86:19
89:24 98:14 99:14
114:8 115:25
117:6 122:1
127:24 132:25
133:3 139:9,16,19
147:20 163:7
166:19 172:20
173:10,20 175:5
177:8,8 183:21
190:17 201:17
213:2,21 214:12
214:14 222:23
225:9 239:8
246:19,25 254:16
257:9 258:2
267:13,20,23
268:12 290:1
292:6 306:5
307:16 314:16,24
316:22 318:23
329:11,18 331:13
331:25 332:7
333:5,11 336:21
337:22 343:20
344:5 347:11
348:2 351:18
358:2 361:17
**believed** 322:4
328:25
**beneath** 336:18
**benefit** 72:16
**benefits** 60:23
81:10 131:12
244:11 310:9
344:17 345:18,19
345:21 346:2,6
**best** 182:23 214:24
364:11

**beth** 197:16 236:2
**better** 65:6,9
204:17
**beyond** 74:13
206:17 272:15
**bi** 133:25 135:12
136:11 139:1
**bias** 273:15
**big** 65:21
**bill** 94:2 157:6
166:7 258:17
343:6,9,17,24
**billing** 166:17,23
**bills** 63:11 80:6
163:9,18
**binns** 74:24 75:1
76:7,13,22 78:24
127:7,20
**bit** 34:9 44:21
72:15 84:13 100:1
101:13 140:1
145:4 173:15
190:14 212:22
227:20 234:14,22
234:23 267:4
316:8 340:23
**biweekly** 105:1
**blitz** 290:4
**board** 14:10 77:9
79:7 92:10 93:2,3
93:6,9,14,18,24
94:7,10 95:2,6,12
95:18,19,24 96:3
96:15,18,21
117:22 134:8
145:10 195:16,17
195:20,22 196:4
196:14,18,21,23
197:2,12,15,23,25
198:3 200:5,17,24
252:12 254:7,9,11

254:14,25
**bob** 97:5,16 110:4
120:1,19 121:4,10
123:23 124:25
125:4 126:22
127:19,22 128:4
128:18 129:9
130:1 213:9 231:1
328:6
**bob's** 120:9
**body** 61:7,14
**book** 222:5,6,7,11
**books** 265:6,8
**borne** 297:12
**bottom** 26:5 29:6
32:3 175:17,21
176:10 193:10
241:22 291:7
327:1
**boulevard** 3:6
**box** 130:2
**boy** 254:22
**break** 64:3,7 99:19
115:1,5 179:10
234:4
**breakdown**
124:20 190:5
**brian** 197:7
**bridgeside** 3:6
**briefly** 49:2 306:3
**broader** 70:16
**broadway** 2:8
**broken** 277:7
**brother** 352:2,22
354:5,8 355:12
356:21 357:3
359:15,19 362:2
**brought** 130:21
**brown** 246:19
**brown's** 246:21

**bucket** 156:10
**buckets** 159:10,14
**budget** 8:22 9:3,8
9:13 66:19 68:3
95:13,14,19 98:21
99:11,20,23,25
100:8 101:6,22
102:4,10,12
103:25 104:11
105:7 109:4 122:6
122:8,19,21,22
133:1,4 148:8
150:6,8,9 152:17
157:19 158:1
169:10 188:24
189:10,14,19
195:3,6,8,12 196:1
196:5,15,17,19,21
196:25 197:19,20
197:23,24 198:3
198:19 199:3,7,13
199:16,20,23
200:3,9,13,17,22
201:2,4,8,10,15,16
202:1,10,14,17,19
203:5,6,8,11,17,23
203:25 204:2,3,7,9
204:12,16 205:5
205:11,13,14,17
206:1,3 207:5,22
207:23 209:7,16
210:4,8,11,14,16
211:5,20 212:14
213:3,21 214:5
215:16 216:14
217:2 218:13
222:5,6,7,11,15
223:23 226:8
227:13,17 229:25
230:5,10,19
239:17 240:13

241:13 248:10,25
249:2,6,16,22,25
250:11,13 251:2
252:22,25 255:9
255:12,17,20
257:1 265:5,12
270:18,21 290:8
290:19,22 291:11
296:24 298:5,7,8
298:11,17 310:13
312:23 326:2
**budgetary** 248:24
**budgeted** 204:25
205:3 217:3,24,25
218:3,10,15
221:20 222:3
223:4,5,9,10,25
224:4,5,9,10
226:10 240:9
250:5 265:15
266:3,12,16
291:19
**budgeting** 140:1,2
140:5 169:7
260:19 265:19
**budgets** 67:6 98:7
98:13,17 201:21
201:22 205:2
213:19 214:18
215:7,10,22 216:7
216:16 256:20
265:8 311:12
**build** 180:22
182:16 183:1,13
183:20 184:4
185:1 186:12
**building** 63:14
108:6,9 183:23
184:2 185:6,11,14
185:17 186:6
250:13

**buildup** 182:20
**built** 180:11,14
**bullet** 28:21 29:5
  291:9,14,16 313:3
**bullets** 321:16
  322:13 323:5
**bump** 222:25
**bunch** 325:1
**burling** 5:6
**burn** 181:1,17
**burning** 182:22
**burrell** 10:25
**business** 46:10
  62:25 63:7 106:8
  145:23 146:10
  182:11,15 313:22
**businesses** 141:10
**busy** 299:20
**buy** 225:3
**buyout** 225:1,7

**c**

**c** 1:16 8:9 44:23
  125:13 364:1,1
  365:8 366:4,9
  367:4,13 368:20
**ca** 365:25
**cabinet** 355:24
**calculate** 149:2
  246:11 262:13
  263:12 311:11
**calculated** 28:10
  310:7
**calculating** 126:18
  303:11
**calculations** 27:6
  34:21 37:12,16
  38:3,19 39:6,11,14
  40:17 44:16
  262:17,23,24
  281:4,13 282:10
  284:7,23 285:11

285:17,20 288:2
307:20
**calendar** 85:24
**california** 4:20
**call** 103:2 128:16
168:15 180:3,25
187:8 299:19
360:9
**called** 12:2 36:18
54:18 66:4 69:3
74:10 83:19 88:10
98:22 130:22
131:11 159:7,20
160:13 171:2
172:9,12 173:20
173:25 179:25
208:23 221:8,15
225:1 255:25
338:21 347:24
**calm** 113:15
272:20,25,25
273:20
**camera** 42:18
**campaign** 299:13
299:15,17
**candidate** 73:16
**capacity** 327:18
**capital** 78:1
**capps** 162:24
**capture** 313:16
326:6
**captured** 325:9,10
**capturing** 325:14
**car** 177:21
**cardinal** 6:3
**care** 108:5 130:25
137:15 157:7
161:13 192:18
193:7 204:12
220:19 263:15,16
263:19 297:8

303:18,25 304:10
304:21 306:8
333:21,23,24
334:3,4 352:19
**career** 51:7
**caregiver** 334:2
**caretakers** 321:21
322:1
**carfentanil** 282:11
**caring** 301:6
**carolina** 3:7
**carried** 101:17
102:14 210:17
**carry** 96:14 102:2
142:22 143:7
160:18 161:9
174:2,4,6,8 180:6
184:7,10 185:24
185:25 203:21
211:3 231:3
245:23 246:3
**carryover** 173:25
248:8 250:7
**case** 1:7,12 14:4
14:14,19 15:3
24:18 28:17 29:18
30:3,7 35:25
43:12 44:2 45:6
49:21 81:6 160:5
160:8,10,18 161:9
161:22 164:1,3,9
164:19 165:16
181:22 192:12,15
203:10 226:25
236:20,23 237:4
237:13,16,18,19
237:23 242:1
255:11,15,16
275:22,23,25,25
277:23 278:6
279:9 309:3

321:20 344:12
353:15 361:24
365:6 366:3 367:3
**cases** 90:14 161:16
228:4 275:25
276:15,21 277:3
278:15,20 279:5
315:20
**caseworker** 290:3
**caseworkers**
320:19
**cash** 101:17 102:2
102:13,14 103:16
142:21 143:7
150:11 180:22
181:1,1,17 182:16
182:20,22 183:1,2
183:13,20,23
184:2,4,7,10,21
185:1,6,11,14,17
185:19,23 186:2,5
186:6,12 203:20
210:17 211:2
**catch** 78:12
113:16
**catchall** 242:8
**categorically**
324:21
**categories** 270:13
271:4,8 272:3
275:10
**category** 270:16
325:6,9 333:16,17
**cause** 264:9
**caused** 224:14
**caveats** 208:21
**cc'ing** 33:16
**cellphone** 106:4
**cellular** 106:2
**center** 5:7

**centers** 270:10
**certain** 80:2 109:8
  109:12 156:14
  160:6 198:12
  213:12 248:7
  322:19 324:19
  335:6 336:5 337:3
**certainly** 69:4
  71:22 144:16
  148:21 149:15,18
  257:21 311:16
**certainty** 53:13
**certificate** 367:11
**certification** 46:19
  46:21,23 47:6
  61:16 366:1 367:1
**certifications**
  47:12
**certified** 2:10,12
  46:15 47:12 61:10
  364:3,5
**certify** 364:6,12
**certifying** 61:14
**cfis** 221:8,9
**cfo** 26:24
**cfos** 135:21
**chain** 8:7 9:15
  31:6,13 298:20
  299:3 300:14
  302:13 304:14,15
**change** 93:21,25
  94:1 95:20 128:1
  128:6,10 129:2
  132:21 184:11,12
  184:17 190:21,22
  301:12 312:3,14
  365:13,14 367:8
  368:3
**changed** 79:13
  110:13 127:17,21
  131:22 181:25

  225:8 235:24
  305:1 346:19
**changes** 93:15,19
  93:20 94:11,21
  95:1,5 121:9
  135:6 155:17
  365:12 366:7
  367:7,9
**changing** 155:10
  312:17
**characteristic**
  160:18 161:10
  321:22
**characteristics**
  160:6,9 161:16,21
  324:1
**characterization**
  178:25 179:3
**characterize**
  149:17 178:15
**characterized**
  180:6
**charge** 52:6
  123:24 157:25
  167:1 170:19
  194:15,17 195:2,5
  221:3 235:4,20,22
  235:25 342:22
  343:7
**charges** 342:25
**chart** 117:7,24
  119:16 124:18,24
  125:19 126:3,17
  128:18 129:13,22
  175:17,19,24
  176:11 190:5
  213:23 222:19
  231:20,23,25
  232:5,8,10,17
  242:10 243:14
  245:1 259:8

  271:10 275:12,16
  340:5 348:10
**charts** 231:12,15
  310:16
**chat** 73:1 74:11,18
  75:10
**check** 166:12
**checkbook** 177:17
  177:18
**checking** 166:9
  177:25
**chief** 32:12 58:10
**child** 21:24 51:11
  66:3 115:23
  116:10 152:22
  159:7,13,16,25
  160:19 161:12,25
  163:22 164:1,2,10
  164:19 165:17
  171:18 192:17,19
  193:21 194:2,2,3,6
  194:10,13,16
  207:1,9,13,17
  259:16,22 260:2
  260:22,23 261:20
  262:5,10,14 263:3
  263:10,11 264:23
  270:11 271:4
  281:1 289:8,12,22
  292:13,15 294:15
  294:16,21 305:17
  306:14,18 307:7
  310:6,6 311:6,18
  317:9,17,19,24,25
  318:8,18 319:4,5
  322:2,22,23,23
  326:16 333:25
  334:25 347:25
  348:5
**child's** 164:22
  165:1

**childcare** 77:12
**children** 3:16 8:13
  8:18,21 9:2,7
  10:22 14:2 26:24
  31:20 37:16 52:21
  54:25 55:14,18
  56:4 63:22 67:17
  67:22 68:14,18,20
  68:21,23 69:2,7,12
  72:3 75:7 76:11
  78:21 79:1,6
  80:17 81:9 84:23
  87:12,23 90:18
  92:3,15 94:13
  100:19 114:11
  116:21 117:9,17
  130:20 131:5,8,12
  135:15,25 136:7
  136:22 147:11
  154:6 156:18
  157:8 158:1
  160:25 162:15,20
  163:2 165:8 171:6
  174:14,23 180:9
  182:13 186:25
  187:9,16,19 188:2
  188:10,20,23
  193:8,21 212:13
  230:18 231:19
  232:3,12,20,22
  233:3,5,9 235:13
  238:10,17 249:5
  263:8 264:1 267:5
  280:18 288:15,15
  295:21 296:13
  301:6 310:19,24
  311:15,21 312:5,8
  312:19 334:20
  338:7 340:1 343:6
  343:18 344:4
  348:8,11,16

**children's** 51:11 56:7,15 66:3 153:19,24
**chose** 220:10
**christopher** 13:11
**circles** 73:15
**circumstance** 90:7
**circumstances** 54:9 164:17
**citation** 54:12,21 83:1,14 85:8 86:17
**citations** 53:14 54:3
**city** 3:4 5:7 8:5 10:20 19:8,18 29:14,24 30:7,13 30:18,21 31:1 56:3 187:11,15,16 188:2,8,10,14,16 188:19
**civil** 363:6,11 366:5 367:5
**claim** 130:24 192:18 219:7 221:17
**claimed** 28:17
**claims** 131:8
**clarification** 243:6 271:21
**clarify** 35:21 128:3 212:24 234:16 304:3,13
**clarifying** 306:3
**clean** 90:5,7,19,24 91:14
**clear** 17:1 42:11 44:11 358:21 359:25 361:11
**cleveland** 365:2

**client** 23:1 41:13 41:16 237:24 271:13 272:12 273:11 330:22 360:2,4
**clients** 162:11,12 162:13
**close** 204:2 225:2
**closely** 120:15 194:11
**closer** 72:15 159:5
**cmo** 353:14
**coaches** 211:12 235:15 242:20 252:1 255:14
**coded** 319:9,12,16 323:1,9,20 324:10
**coding** 320:19 321:18
**collaboration** 213:9
**colleague** 58:22 309:18
**colleagues** 349:20
**collect** 100:5,13 122:3 182:9 215:21 216:6
**collected** 97:18 99:11 102:24 105:3,19 106:16 146:24 213:22 214:7,21
**collecting** 105:9
**collection** 97:22 148:22 194:17 342:22
**collections** 103:8 103:11,13 142:24 145:13 146:22 147:3 152:3 342:24

**collectively** 330:21
**combined** 66:1 304:15,23
**come** 12:23 40:7 44:21 73:17 74:11 76:7 121:3 130:7 160:4 162:15 173:15 199:3,13 203:7,11 204:24 210:13 211:2 240:8 275:16 288:15 289:14 303:14 326:25 329:10 357:7
**comes** 90:12 153:18 177:19 197:10
**comfort** 319:19 320:5
**comfortable** 351:24
**coming** 70:1,25 71:18 72:4 162:20 163:2 172:15 190:10 227:6 240:7 253:3 292:8 292:24 293:9 326:20 348:6
**comingled** 240:1
**commencing** 2:3
**comments** 135:23
**commission** 366:19 367:25 368:25
**committee** 9:13 54:14,16 133:23 134:6,19 135:9,20 145:11 195:15,18 195:23,24 196:1,2 196:3,13,20 197:1 197:12,13,14,20

**communication** 35:10 41:17
**communications** 27:22 39:24 272:13
**community** 211:13 299:8,19 299:20,25 300:3,7 351:14
**companies** 4:15
**comparative** 28:12
**compare** 28:10 344:17
**compared** 163:11 222:10 263:9 291:25 345:9
**comparison** 159:23
**compensation** 65:20
**compete** 130:19
**competitive** 294:5
**complaint** 14:21 14:24
**complaints** 112:23
**complete** 110:19 303:1
**completed** 230:10 262:24 365:15
**completely** 300:6
**completes** 162:25 166:16 170:5
**compliance** 51:16 53:21

197:23 200:4,12 201:3 250:14 290:9,20,23 312:22,23
**committees** 195:21

**compliant** 53:14
54:2,12,20 83:1,14
85:8 86:17 87:10
87:14,21 90:25
91:16,17
**complicated** 100:2
**component** 71:8
**components**
345:17
**computer** 71:11
105:19,21 114:10
239:23
**concern** 69:6
320:2
**concerning** 68:17
311:19 312:18
328:18 330:1,8
349:13 359:2
**conclude** 351:1
**concluded** 81:25
90:1
**concluding** 146:6
**conduct** 106:7
110:24
**conducted** 55:1,4
55:6 57:24 58:9
58:12 89:23 91:7
111:1 137:18
**conducting** 88:25
**conducts** 111:19
111:21
**conferences** 52:3
138:8
**configuration**
99:13
**confirm** 27:17
28:3 216:13,25
221:20 285:3,6
287:16
**confirmation**
255:9

**conjunction** 91:9
122:5 138:25
194:7
**connection** 105:9
106:17,20 123:8
**conservative**
204:1,7 250:19
**consider** 150:17
158:24
**considerable**
255:17,22
**considered** 65:23
65:25 108:13
150:4 242:20
269:18 270:10
**considering**
283:15
**consistent** 182:19
190:20,23 201:19
203:1 222:16
**consolidate** 221:16
**constrained** 351:7
**constructed**
313:19
**construction**
313:7,10,25 314:8
340:12,13
**constructive** 112:5
112:9 113:22
**consuming** 352:13
**contained** 286:12
**contend** 307:23
**contends** 308:7
**context** 137:7
**continue** 251:25
274:2 361:21
**continued** 4:1 5:1
6:1 9:1 228:3
**continuing** 255:14
**contract** 163:21
206:14,21 348:2

**contracted** 242:19
325:18
**contribute** 288:9
288:10
**contributed**
149:15,18 224:21
282:12 314:1
**contributes**
230:12
**contributing**
276:2,17 277:5
280:7,11
**contribution**
149:22
**control** 51:15
63:10 67:4 77:16
79:22 80:8
**controller** 63:1,7
**conversation**
136:1 137:13
180:1 229:14
295:9 321:9 361:6
**conversations**
16:1 33:9 36:17
86:13 124:2,5
126:8,13 137:9
138:15,17 251:9
251:13
**converse** 361:9,10
**coordinator**
239:21
**copeland** 6:9
**copies** 139:10
**copy** 19:14 38:23
45:5,10,14 59:16
59:21,22 98:8
114:4,8,13 348:25
**corner** 32:3
175:18
**corporation** 5:4
5:15 11:11,14

**correct** 22:15 25:6
33:21 36:8 37:23
44:18 46:3,13
47:22 50:14,15,19
52:21 55:1 56:5
58:23,24 62:1
63:1,2 65:2,15
66:7,16,20,21
67:18 69:23,24
71:24,25 72:11
76:3,17 81:17
82:18 83:8 88:2
91:1,2 100:11,19
105:24,25 107:2,3
107:7,15 108:19
108:23,24 109:24
110:14 111:10
114:14 116:6
117:8,10,18,19,24
117:25 118:2,13
118:14,21,22
119:5,6,12,13,24
119:25 120:4,5
121:20,21 122:24
123:1 124:21
125:25 130:6
140:3,17,18
141:17,21 142:12
142:13 143:15,17
143:20 144:18,19
144:24 145:2,7,18
146:25 148:8,10
151:6,7,22 152:17
155:6 156:5,7
157:16 160:2
162:4,5 165:18,19
167:21 174:23
175:21 177:11
178:11 184:14,15
184:19,23 187:19
188:11,15 190:3,7

| | | | |
|---|---|---|---|
| 190:8,12,13 | 342:10 344:1,23 | 38:4 68:25 69:14 | **counsel's** 36:18,25 |
| 194:19 198:19,20 | 345:24 346:17 | 80:2 84:9,12,21,24 | **count** 275:18,21 |
| 199:10 200:5,6 | 364:9 | 95:17,21 150:14 | 275:23 284:16 |
| 202:9 214:23 | **corrections** 365:12 | 151:5 163:14 | 315:11,14,17 |
| 216:18 217:2,6,20 | 367:17 | 182:13 186:10 | 316:11,23,24 |
| 217:24 218:4,5,11 | **corrective** 54:18 | 187:25 188:18 | 317:2 319:3 |
| 218:12 219:18 | 54:22,24 80:11 | 204:23 205:21 | 348:21 349:10 |
| 221:21 222:21,22 | 85:6,11,17,19 86:5 | 208:18 209:12 | **counted** 315:17 |
| 223:2 224:1,2 | 86:10,15,21 | 224:21 225:12 | **counties** 62:16 |
| 226:22 232:17,18 | **correctly** 67:15 | 236:11 239:22 | 70:5 90:13 135:22 |
| 234:16 236:15 | 89:13 185:9 | 260:19,20 263:2 | 136:3 323:25 |
| 238:10 241:19 | 215:18 292:5 | 263:12 264:13 | **county** 1:10 3:3,16 |
| 242:17 243:14,15 | **correspondence** | 266:22,24 268:8 | 8:3,13,18,21 9:2,7 |
| 245:15 246:4,5 | 12:12 32:21 | 268:18,23 291:15 | 10:19,22 13:20,20 |
| 247:2,10 251:3 | 108:12 | 292:4,10,22,25 | 14:1,7,9,9,16 15:8 |
| 255:1,19 256:14 | **correspondences** | 293:10 295:19 | 16:14 18:1 19:5 |
| 257:3,22 261:9,15 | 12:15 | 301:14,25 302:1,7 | 19:17 24:16,17 |
| 263:15 264:24,25 | **cost** 18:18 21:7,22 | 302:8,16 303:23 | 25:16 26:24 29:14 |
| 265:9,17,20,21,25 | 27:11 33:2 34:15 | 304:8 305:17 | 30:3,18 31:20 |
| 266:10 267:2,8,11 | 34:22 38:16 69:4 | 307:13,22 308:6 | 32:9 35:24 37:16 |
| 267:16,18,22 | 71:14 72:2 81:6 | 310:6,6,8,11 | 52:12,21 54:25 |
| 269:7,18 270:21 | 130:24 135:24 | 311:12 314:17 | 57:10 60:4 61:24 |
| 280:4,5 281:15,20 | 150:13,14,18,25 | 325:8,17 326:16 | 62:24 64:17,23 |
| 282:12,21 284:19 | 188:7 208:12 | 329:2,12,19 | 65:2,5,11,14,18,22 |
| 284:20 285:13,17 | 209:23 259:15,21 | 331:14 333:6 | 65:24 66:6,11,14 |
| 287:18,19,24 | 260:1,21,23 261:8 | 335:22 346:10,11 | 66:16,20,23,25 |
| 289:15,16,20,25 | 261:14,20 262:5 | 346:14 347:21 | 67:13,14,18,23 |
| 291:4,12 294:25 | 262:10,14 264:23 | **coughing** 64:6 | 68:7 69:12,15,19 |
| 295:19 296:14,16 | 270:9,13 271:3,8 | **counsel** 2:5 5:4 | 69:23 70:1,11 |
| 296:20,21 297:13 | 271:24 272:2 | 10:12,22 15:7,9,10 | 71:1,5,15,18,19 |
| 297:19 298:2,7 | 275:10 297:6 | 19:14 27:22 39:25 | 72:5,7,13,14,19,24 |
| 300:8,19 301:8 | 301:5 303:11,17 | 40:22 41:5,23 | 73:3,11,19 74:1 |
| 303:18 308:11,18 | 304:16,24 305:3,5 | 49:15 63:25 98:1 | 75:6,13,15,19 76:1 |
| 308:21 309:12,15 | 306:6,7,13,17,18 | 145:11 179:6 | 76:10 77:2 78:8 |
| 310:25 313:1 | 307:7,8,10 311:5 | 195:7 198:5,15,17 | 78:15,20 79:1,6,15 |
| 315:2 317:8 | 311:14,17 325:12 | 202:5,8,21 203:18 | 80:17,22 81:2,16 |
| 318:21 319:22 | 325:15 333:16 | 203:23 205:12 | 85:4 87:12,16,23 |
| 321:3,23 322:9,17 | 335:17 345:12,13 | 213:19 271:19,21 | 88:1,4,14,15,17,18 |
| 323:1,16 324:5,6 | **costly** 293:14 | 271:23 273:2 | 88:21 89:1,8 |
| 324:11 328:16 | **costs** 21:24,25 | 274:22 361:8 | 90:18 92:3,15 |
| 336:10 341:3,4,15 | 22:1 24:16 27:1 | 362:5,8 363:4,15 | 94:12 100:19 |

103:14 106:2
109:17 111:10,13
112:12 114:11,21
116:21 117:8,9,17
120:15,19 126:24
127:2 133:15
136:7 141:11
143:1 145:11
147:11 152:8,13
158:1 173:6
174:14,23 180:9
182:25 186:21,25
187:12 188:8,23
194:11 195:7
196:19 198:5,8,11
198:15,17 202:5,8
202:21 203:17,18
203:23 205:4,11
212:13 221:8
225:8 228:9,24
229:5 230:18
235:13 236:4
249:5 271:6 279:8
283:14 313:7,16
314:6 334:20
336:9,13,16,19
342:20,24 343:1,6
343:11,15,16,17
344:4 354:15
366:10 367:15
**county's** 55:13,18
63:22 88:8 258:6
**couple** 16:23
19:23 48:9,23
157:24 158:23
162:9 189:22
197:5 212:23
224:20 268:2
340:8,25 350:25
**course** 147:13
182:15 270:15

349:9
**court** 1:1 17:9
194:2 256:10,14
366:7
**cov.com** 5:12
**cover** 99:14
204:22
**covered** 315:14
357:25
**covington** 5:6
10:25
**cpa** 8:9 44:23
**create** 21:16
100:21 101:15
215:2 231:16
283:16 287:12
311:16 316:3
**created** 85:12
253:1 268:11
271:3 284:14
286:24 287:1,4,7,9
298:1 301:1 303:3
314:21,23 315:3
331:21,22
**creating** 301:23
302:5
**creation** 231:15
268:15 269:3
271:9 275:12
286:9
**credit** 225:4
326:21
**crisis** 136:2 144:23
145:20 148:15
149:8 151:14
269:25 351:6,14
**criteria** 190:25
191:5,6,9,12,16,21
191:23 192:6,11
192:14 193:3
194:20,22 335:6

336:6
**criticism** 112:6,9
113:22
**cross** 166:16
262:18 353:12
**crr** 364:20
**csr** 1:24 364:20
**cultural** 128:6
132:6,23
**culture** 128:9,13
132:22
**cumbersome**
95:15
**current** 46:3 47:6
223:9 342:6 346:4
**currently** 46:24
172:8 223:5
236:18 291:24
304:16 329:10
358:11
**curriculum** 8:10
44:24 45:11
**custodial** 12:17
194:4
**custodian** 165:3
**custody** 160:24
162:16 171:6,7
193:22 194:1
228:1,18 229:3,8
229:17 231:20
232:4,13,20,23
233:3,5,9 267:6
288:16 289:2,9,14
289:19 291:22,24
292:3,9,24 293:9
301:7 310:19,24
311:15,21 312:5,8
317:10 322:2
338:8 340:2 348:6
348:8,11,17

**cut** 204:2
**cutoff** 171:17,20
**cutting** 186:10
**cuyahoga** 55:13
55:17 57:10
**cv** 45:6,11,14 50:5
91:22 100:22
103:1
**cycle** 141:17,23,24
142:4 143:12,19
143:25 145:25
146:19 149:12,23
150:5 152:1
154:22 155:1,6,9
155:10,18,19
181:14,21 182:20
183:3,16,18,24
184:2,3,6 185:2,7
186:4
**cyst** 356:5

## d

**d** 3:20 7:1
**d.c.** 4:7 5:9,19 6:7
6:17
**damages** 25:22,23
26:11,12,19 28:17
30:2,7,12,21 31:1
**dan** 1:8
**darcy** 6:9 11:1
**darin** 1:16 2:5 7:3
8:9 12:1,18 13:11
44:23 114:24
119:22 360:16
364:7 365:8 366:4
366:9 367:4,13
368:20
**data** 83:19,22,23
84:6,9,12,23 85:25
86:2 106:16
126:18,19 221:12
236:10,12,18

260:13,15,17
264:17 265:7
267:1,17,20 270:7
270:9,12 278:25
285:2,16 286:19
286:22 290:4
297:13 298:1,3
303:11 305:5
306:17 311:2
320:18 321:10
326:6 327:12,15
328:7,9 339:24
345:23 346:24
**database** 165:15
307:3 327:13
340:4
**date** 10:7 34:4
35:2 58:25 163:23
163:23 166:12
265:5 269:21
363:16 365:8
366:3,9,19 367:3
367:13,25 368:20
368:25
**dave** 172:25
**david** 5:11 10:24
309:18
**davidson** 92:23
254:16 275:20
295:7
**dawson** 197:17
**day** 4:5 11:5 41:10
77:10,10 120:10
120:10,21,21,23
120:23 211:17,17
233:1 234:14
273:4 304:16,24
305:3,5 306:7,18
307:8 320:20
350:23 360:18
364:17 366:16

367:22 368:22
**days** 48:23 172:9
172:10,10 263:9
286:7 365:18
**dear** 365:10
**decade** 232:6
233:19 264:14
266:17,24 267:7
267:16
**deceased** 247:2
**december** 1:17 2:3
10:2,7 49:9
202:23 209:22
364:17 365:4
**decided** 335:21
**decisions** 157:12
**decline** 266:3,7
**decrease** 148:17
222:20 224:14,21
225:12 347:20
348:7,15,19
**decreased** 157:24
158:2,6,11 310:25
**decreases** 223:21
303:12
**decreasing** 311:6
**deed** 366:14
367:20
**deemed** 365:19
**defendant** 5:3
308:8 309:2,7
**defendants** 2:6 5:5
11:22 13:14 14:4
14:14 15:2
**deficiencies** 53:8
87:10,15,21 91:15
91:17 112:17,20
**deficiency** 85:21
90:25
**deficit** 210:2,6,21

**deficits** 150:10
**defined** 84:21
**definition** 156:6
**defrancesco** 5:23
11:9
**defranesco** 11:9
**delinquent** 342:24
**delivery** 178:21
363:14,16
**department** 32:9
32:10 36:5,7,8,11
36:22 37:11,15,23
38:13 40:8,10,12
40:16 50:4,9,13,18
51:8,18 52:13
54:7,10 55:7,11,14
56:4,10 57:6,13
58:11 60:8,12,21
61:23,24 62:17,24
63:9,22 64:17,23
65:18 66:12,15
67:3,17,22 69:18
70:4,12 72:8
73:21 75:17 77:18
79:22 80:1,9 94:2
116:1 118:12
120:3,6,11,16
128:3,7,15 129:2
129:17 131:4
132:3 133:21
135:4 137:1
155:24 162:7,8,24
163:4 164:7,15
165:22 167:1,4,8
167:10,22 168:2
170:8,8,9,10,11
218:21 246:23
288:1,8 299:7
365:22
**departments** 56:8
56:15 70:21

118:16,20,24
119:11 133:7
136:22 225:18
**departure** 175:2
**depended** 321:19
**dependent** 145:6
145:16 156:17
**depicts** 232:2
**depo** 23:8
**deposed** 13:17
**deposition** 1:16
2:4 10:11 12:10
12:23,24 13:2
15:6 16:22 17:23
19:7,10,13 21:6
22:13 23:4 31:8
41:7 45:2 48:11
48:16,19,22 49:1,9
49:12,16,18,22
51:5 116:20,25
123:12,15,18
124:3 174:17
189:2 212:17
249:9 285:22
290:10 298:22
349:9,23,24 350:2
350:4 361:19
364:9 365:8,11
366:1,3 367:1,3
**depth** 124:2
**deputy** 73:6 75:3
77:1,5 79:13 92:2
92:22,23,24 101:1
119:8 127:11
173:12 219:1
237:8 254:18
275:19 295:8
**describe** 103:3
146:10 324:20
325:5

**described** 178:21
181:18 323:13
**description** 8:2
92:1 100:25
275:24 303:21
**design** 313:13
**designed** 347:19
**desire** 312:10
**despite** 60:24
**detail** 20:15 78:4
99:20 258:2
321:13
**detailed** 85:20
91:25 253:25
**details** 74:12
86:10 119:16
211:16 256:9
**determination**
162:11
**determine** 130:23
162:14,19 167:15
167:19 243:17
257:18 261:17
264:9 269:5 278:9
279:21 280:3
282:18,24 303:7,9
345:16
**determined** 36:22
145:8 167:25
298:13
**determines** 322:14
**determining** 38:16
108:22 163:1
165:25 166:6
281:8
**devastate** 352:18
**develop** 54:18
270:3
**development**
85:11 101:21
116:9 269:3

**develops** 101:5
**device** 105:16
106:2,5,8
**dhaller** 5:12
**diane** 197:17
**dictate** 80:1
294:17
**dictating** 93:10
**die** 352:9
**differ** 120:2,8,9
172:15,18
**difference** 159:12
159:24 218:16
243:4 344:23
**different** 19:23
37:11 41:20 67:7
68:4 78:2 99:5,7
115:18 131:15,16
131:21 138:10
149:7 162:9 179:9
190:24 205:3,8,23
205:24 206:23
212:23 224:20
240:1 241:3
247:25 261:5
263:14,17,19
289:1 299:22
303:13 305:6
328:24 329:9
339:19 343:8
345:4
**differential** 336:20
**difficult** 235:15
**digits** 185:22,23
**direct** 12:20 25:7
31:21 77:20 110:7
112:14,15,17,24
113:5,5,20 125:3
125:20,21 127:20
127:25 130:1
189:22 310:7,11

311:13 332:15,21
**directed** 41:21
**directing** 332:17
**direction** 271:23
**directly** 24:23
27:4 31:21 37:13
84:8 94:8 107:25
108:20 125:23
135:5 238:1,9,16
284:4 297:10
325:11
**director** 31:19
32:11,11 68:15,19
73:6,13 75:4,6,9
77:1,5 79:14 92:2
92:21,22,23,25
97:2 101:1 119:9
120:3,6 126:22
127:8,11,22 128:5
128:18 173:13
219:2 230:7 237:8
254:18 275:19
283:5 295:8 299:8
328:6
**directors** 77:9
133:22 134:5,21
134:25 135:10,21
137:20 139:1
154:9
**disagree** 332:9
353:17,21 362:6
**disapproved** 199:2
**disapproves**
198:18
**disciplined** 111:14
**disclose** 16:6
27:21 39:24 62:5
66:9 75:16
**disclosure** 75:24
**discomfort** 320:6
323:18

**discord** 132:18
**discovery** 359:1,2
**discrepancy**
212:22
**discuss** 68:20
**discussed** 37:9
68:22 89:16
104:11 105:8
113:23 116:6
121:1 122:9 125:1
135:16 138:5
140:25 173:19
181:24 194:21,24
204:5 217:5
234:22 245:3
248:25 250:5
267:4 269:25
292:21 310:22
**discussing** 38:7,15
186:19 240:25
310:5
**discussion** 74:4
78:19 211:21
243:1 283:7,13
315:25 320:9
**discussions** 136:10
137:5,7 138:17
251:8 283:11
295:3
**dislike** 132:17
**displayed** 270:14
**distinct** 147:2
**distracted** 305:18
**distributed** 278:16
**distributing**
308:16
**distributor** 5:3,5
308:15 309:11
**district** 1:2
**dividing** 311:13

**division** 1:3 124:19,21 126:10 126:16 127:13 128:24 129:21 133:5,10 135:15 137:2

**divisions** 118:24 119:11 133:11,16 133:17 138:9,11 225:18

**djalandoni** 6:10

**doctrine** 41:18 330:23

**document** 1:9 12:16,20 18:11,15 20:2,17 22:17 23:10,19 27:11 31:10,13 45:8 87:4 98:20,22,25 104:16 117:4,12 174:19 175:12 189:7,18 212:25 213:18 214:1,13 214:15,21,25 215:2,4 216:9 217:11 218:1,7 222:5 223:16 233:25 249:14,19 265:12 283:16 286:2,6,9 287:5,7 287:8,17 288:9,23 290:15 305:11 316:4 317:4 319:24

**documents** 12:25 16:2,5,7,12 17:21 17:24 18:5 19:21 49:14,17 77:11 90:15 97:22,22 98:2,3,8 100:4 102:7 104:2,13

105:7,9,18 106:15 106:20 114:20 122:4,6,8,12,19,21 123:5,8 215:21 216:6,17 217:4 221:19,22,23 222:1 262:9 270:18 339:19 349:8,10,25

**doing** 17:6,14 51:23 182:11,15 274:15 311:18 330:15

**dollar** 159:15 182:3,8 313:14

**dollars** 160:15 161:2 182:6 191:22 193:4,5,17 239:3,25 244:5,7 244:24 245:10,18 308:24 346:22

**domestic** 318:19 319:6

**donated** 80:4,8

**donations** 140:16

**door** 355:9

**downward** 223:18

**draft** 18:25 174:25 231:11

**drafted** 229:24 230:2,20,24

**drafting** 227:15 230:5 231:5,6 246:13

**draw** 220:9

**drawing** 68:3

**drink** 356:25

**driven** 95:21 268:8 334:23

**drivers** 229:18,21

**drop** 144:23 149:8

**drug** 5:15 11:11 11:14 56:21 57:3 70:11 236:14 237:11 277:7,21 277:22 278:5,5,9 278:10,11,16,21 282:20 356:7

**drugs** 71:24 237:11 352:11

**due** 144:22 145:20 145:22 185:2 222:25 291:23 313:6

**duly** 12:3 364:7

**duties** 26:23 32:8 46:3 51:21 77:5 77:10 109:20 120:9

**duty** 25:7 260:18

**e**

**e** 1:24 2:10 7:1 81:6 84:17 89:16 90:4,10 130:17,19 130:22 131:6 162:11,11,19 163:2 164:16 165:20 166:1 167:14,18,19,20 191:15 219:23,25 220:5,16,18,18 334:22 335:1 364:1,1,3,20

**earlier** 22:16 34:14 70:9 89:2 115:17 137:4 142:20 158:5 162:10 167:17 168:20 172:1 181:24 190:15 191:16,21 213:20

214:5 221:18 222:24 248:25 250:11 252:2 266:17 267:4 268:2 292:21 305:16 306:12 313:14 327:17 329:8 336:5 337:15 361:8

**early** 90:1,1 202:16 218:19 251:1

**earmarked** 191:19

**earned** 128:4

**earners** 225:5,6

**easiest** 243:21

**east** 5:18

**eastern** 1:3

**economy** 313:23 314:6

**ed** 300:18 303:1

**editor** 300:23 301:1

**editorial** 300:25

**edits** 34:20

**education** 46:5,9 299:19

**effect** 69:17 146:17 147:19 151:5,21,25 152:2

**efficiently** 299:18

**effort** 154:13,17 255:18,23 268:17

**efforts** 268:22,24

**eight** 76:21

**eileen** 198:4,6

**either** 54:3,25 57:9 112:11 125:23 135:3 158:11 164:7 182:24 198:18 256:20

269:18 277:16
307:2 348:19
350:12
elaborate 132:12
elaborated 304:11
elected 334:15
election 143:19
152:1
electric 182:14
electronic 97:14
98:9,10,11 102:20
122:18 165:15
215:11 260:4
305:13,14 307:3
electronically
97:13
elicit 71:23
eligibility 130:19
130:23 162:10,15
162:19 163:2,6
164:7,8,15,16
165:20,21,25
166:1,10,12,20
167:11,12,13,14
167:15,18,21,25
168:4 191:16,17
334:22
eligible 131:9
335:1,4
eliminated 225:10
else's 157:6
email 8:7 9:15
31:6,13 33:15
39:11 85:25
298:20 299:1,3
300:11,13,18
301:1,3 302:13
304:14,14 365:17
emancipated
171:8 191:20

embarrass 359:21
emergency 159:20
160:1,3,10,13
161:17 178:22
employed 50:22
73:12 211:12
235:12 236:4
262:23 276:4,8
281:8 284:2,12
287:12
employee 131:10
employees 83:24
84:1,4 93:23,24
131:3 132:1,11,16
182:12 226:5
345:21 346:1,12
employment 16:14
17:25 24:15 50:1
50:2 57:15 60:3
62:7,15 64:16
65:4 69:22 72:12
76:10 109:17
114:20 129:6
enact 128:6
enacted 141:12
enclosed 365:11
encompassing
165:16
encourage 312:11
encouraging
323:24
ended 250:24
endo 4:13,14
11:21
engaged 328:24
ensure 86:9
entail 85:18
122:15 208:3
246:9 283:12
enter 167:24
168:21 258:12

323:25
entered 85:25 86:3
184:6 258:15
367:9
entering 167:2,5,8
167:11 212:1
258:18
enters 167:23
221:12 259:1
entire 78:12 92:5
204:4 226:21,24
227:2,9 251:4
366:5 367:5
entities 88:14
182:24
entitled 42:1 332:8
332:9,13,14
entity 81:4 103:7
entrance 52:2
entries 338:15
entry 290:4
environment
132:10
epidemic 13:24
33:2 228:7,23
229:4,21 271:6
291:23 297:10
epidemiologist
32:13
epidemiology 48:4
equal 128:20
equipment 63:20
equivalency 83:19
83:21,23
equivalent 84:5
errata 365:13,18
367:7,10,18 368:1
esaa 160:13,14
161:3 335:23
336:2,9,18

esq 3:9,11,13,20
4:9,22 5:11,21,23
6:9,19
essentially 13:23
52:8 84:14 85:20
85:23 101:16
108:5 134:18
141:8 145:9
160:17 161:8
163:8,19 171:11
174:7,7 177:15,16
193:5 194:1
204:21 225:4
241:9 246:10
250:16 333:25
establish 68:2
131:4 326:1
established 178:10
289:10
establishing
335:16
establishment
67:5 85:23 289:19
estimate 22:1
151:11 311:17
314:17,25 316:15
316:16,19
estimated 27:1
estimates 159:4
330:1
estimating 27:11
et 1:10,11
evaluated 111:24
111:25 280:19
281:2
evaluation 111:17
111:20,22 114:23
evaluations
110:20 112:2,11
113:23 114:1,5,17

| | | | |
|---|---|---|---|
| **events** 16:13 | 92:2,10,14,16,18 | 275:12 279:1 | 306:19 325:25 |
| **eventually** 51:20 | 92:21 93:1 94:6 | 281:4 283:2 284:8 | 326:7 338:15 |
| 76:16 85:2 | 96:1,2 101:1 | 284:23 285:11,22 | **expenditures** |
| **evidence** 161:15 | 117:21 118:1,3,5,9 | 285:25 286:12 | 24:17 151:5 |
| **exact** 148:14 | 125:8,10 127:8 | 287:17 288:2,5,7 | 180:17 183:12,19 |
| 204:24 243:11 | 195:13 198:9,11 | 288:22 290:11,14 | 186:10 188:19 |
| 316:12,24 | 200:8 202:14,15 | 291:2 298:22,25 | 204:20 207:12,14 |
| **exactly** 42:24 | 229:14 269:24 | 307:20 308:5 | 208:9 218:7,8,11 |
| 122:16 163:18 | 283:4 295:10 | 310:13 312:21,25 | 220:1 223:15,17 |
| 272:23 315:21 | **exhibit** 8:3,5,7,9 | 314:11 319:15,18 | 224:15 240:22 |
| 316:12 341:10 | 8:13,17,21 9:2,7 | 321:17 324:4,8,19 | 241:14,15,25 |
| **examination** 7:6,7 | 9:11,12,15 19:7,10 | 327:14 328:1,24 | 242:3 244:2,24 |
| 7:8,9 13:7 310:1 | 19:15 20:5,7,9,12 | 331:13,20 333:5 | 245:1 258:8,10 |
| 351:13 353:12 | 20:14,22,22 22:4,4 | 333:15 337:9 | 265:23 267:14 |
| 354:2 | 25:5,11,15 26:21 | 338:6,16,25 339:1 | 308:25,25 314:13 |
| **examinations** 7:5 | 27:19 28:4,5 29:2 | 339:4,10,14,23 | 326:5 338:17 |
| **example** 156:24 | 29:23 30:10 31:5 | 342:11,12 344:15 | 344:18,21,22 |
| 157:4 160:12,21 | 31:8,24 34:7,10 | **exhibits** 8:1 9:1,18 | **expense** 207:15 |
| 160:25 191:18 | 36:13 38:20 39:7 | 19:13 256:21 | 241:6,24 242:2,5,7 |
| 192:16 219:12 | 40:17 43:25 44:15 | **exist** 181:10 | 242:14,21,22 |
| 322:22 324:25 | 44:20 45:2,5,14 | 195:21 214:25 | 243:13 244:16 |
| **examples** 113:8 | 50:6 56:25 100:23 | 276:24 | 324:22 325:6,23 |
| 157:15 161:1 | 101:21 116:19,25 | **existed** 215:4 | 333:17 335:12,19 |
| **exceed** 180:17 | 117:11 119:15 | **existing** 340:12 | 336:23 337:6 |
| **exceeded** 183:12 | 121:16 124:18 | **exists** 142:12 | **expenses** 206:22 |
| 183:19 | 126:10,17,20 | **exit** 52:2 | 206:24 207:1,16 |
| **exceeds** 242:24 | 129:14,21 151:4 | **expect** 152:6 | 219:7 240:23 |
| **excel** 99:1 262:25 | 174:11,17 175:12 | 222:24 223:3,7 | 241:2,7,9,15,18,23 |
| 283:2 328:8 | 175:18 189:2,5,18 | **expected** 152:15 | 242:9,10 243:8,17 |
| **exception** 199:25 | 189:23 207:4 | 154:20 | 244:8,13,14 |
| 270:14 340:11 | 211:20 212:17,20 | **expecting** 253:15 | 255:13 298:12 |
| **exclusive** 334:14 | 213:1,24 214:11 | **expend** 226:23 | 324:20 325:1,10 |
| **excuse** 31:22 73:7 | 214:20 215:24 | 248:23 | 326:22,24 327:2,6 |
| 77:4 90:1 161:10 | 216:9,13 217:15 | **expended** 243:11 | 334:9 344:3 345:7 |
| 268:15 273:2,3 | 222:16 223:15 | 243:18,24 244:6 | **expensive** 225:11 |
| 274:22 360:15 | 226:9 227:12,16 | 265:19 | **experience** 351:22 |
| **executed** 367:10 | 230:1,6 240:10,21 | **expenditure** | 351:25 352:6 |
| **execution** 366:14 | 242:23 249:9,12 | 204:16 223:24,25 | **experienced** 16:13 |
| 367:19 | 249:22 256:25 | 224:4,6,9 239:10 | 225:19 297:6 |
| **executive** 31:19 | 265:11,22 268:1,3 | 239:15 240:2,4,9 | **expert** 43:16 |
| 75:6,8 77:1 79:14 | 268:17,25 270:4 | 257:5 270:19 | |

experts 43:9,12
44:2
expiration 366:19
367:25 368:25
expire 248:20,21
expired 47:13
explain 51:2 84:13
141:4 177:15
243:3 330:11
333:22 334:9
347:17
explained 250:10
336:5
explanation 59:7
185:13 320:13
exposure 66:2
expunged 60:16
extend 317:2,6
extended 317:6
extension 245:10
246:1,8,14,18
247:8,16,24 249:4
250:7 251:15
extent 96:14
108:25 117:21
140:15 205:5
246:12 271:13
272:11

**f**

f 4:3 192:24 364:1
facilitate 239:23
facilities 63:14
77:25 80:14,16
107:25 108:3,14
119:4 352:4 357:5
facility 77:20
80:15 206:15
fact 65:21 68:23
69:6 137:14 219:1
285:15 319:19
320:18 335:24

340:24
factor 150:17
276:2,17 277:5
280:7,11
factored 27:7
150:15
factors 149:10,22
150:3 224:20
fair 44:13 108:15
109:15 139:24
145:17 149:6
151:8 178:15,19
180:3 223:18
232:7 233:20
236:22 244:3
251:2 255:18
261:12,13 265:16
266:4,9,25 269:10
270:23 279:18
285:12 300:2
307:21 308:5,23
358:25
fairly 180:5
fall 156:3,9 161:2
206:20,22 207:19
242:7 337:6
falls 118:12
familiar 115:24
248:6
families 193:2
212:6 312:11
family 48:6 50:7
50:13,18 51:2,8,10
51:19 52:9,13
54:7,11 55:7,11
56:11,19 57:6,13
58:11 60:8,12,22
61:23,25 62:18,24
64:18,23 65:1,12
65:18,22,24 66:5
66:12,15,23 67:1

67:13,15 72:8
73:11,20,21 75:17
115:23 116:10
133:21 134:4,5,20
134:24 135:4,10
137:20 154:9
161:11,12 172:9
172:10,10 238:10
256:9 263:25
far 17:7 65:15,16
185:6 194:21,24
222:8,9 233:6
234:17 238:4,5
250:6 260:8
264:22 282:17
288:11,22 317:5,7
344:3
farmer 6:19 11:7,7
father 352:10
355:2 356:10
father's 354:21,23
354:25
fed 99:15
federal 81:5,16
84:10,12,16,22,24
85:3 88:11 89:15
90:4,10,12,15,21
91:10 130:24
133:13 140:12,21
157:18,22 158:15
172:20 181:25
190:10,15 191:6
191:12 192:2,22
193:10,13,17
212:2,9 217:13
219:4,25 220:5
238:24 244:5,15
244:23 336:25
337:7
feds 220:2,3

feedback 154:16
feel 19:20 40:1
234:15 315:5
feeling 137:14
feels 112:13 113:6
fees 250:7 342:21
342:23
fell 356:18
felt 128:2,2,4,25
235:3 260:17
271:4 286:19
287:1 314:21
315:3
fentanyl 282:10
357:17
field 51:23 200:25
figueroa 4:19
figure 286:25
287:3 315:6
319:20,24 320:3,5
320:6 326:10
327:1 339:10
347:2
file 12:17 97:15
99:1,12 102:20
114:19 122:18
161:22 164:1,9,19
192:12,15 237:4
237:23 260:4
360:9 362:13
filed 13:21
files 81:6 90:20
165:16 236:20,23
237:14,17
fill 74:14
filling 308:16
325:12
final 87:2 195:8
202:4 212:1
finance 32:11 97:3
119:3 127:11,23

128:5 219:2 328:6
**finances** 67:16
104:4,15 107:22
**financial** 13:25
51:13 56:20 57:2
69:11,17 70:3,10
70:19 71:16,23
72:2,15 77:8
78:25 79:5,23
83:20 84:8 96:18
96:20,24,25
100:18,21 101:8
101:11,14,19
103:24 104:3,10
107:1,10,12 109:1
109:18,21 118:20
120:18 121:1,6,7,8
121:12,19,24
126:4,11 132:8
133:1,4 135:14
136:6,13,16,21,25
137:5,18 138:4,12
138:18 142:23
144:23 145:20
148:15 149:8
163:6 164:8,16
165:21 166:1,9,19
175:6 176:4 190:2
190:3 203:17
207:11 221:7,8
230:9,13 237:9
240:21 258:3,4,6
258:11,16 259:2,5
259:12 261:1,19
262:20 269:6
286:16 316:9
325:24 327:16
339:9 342:14
347:15
**financially** 109:4
137:15 269:23

**financials** 53:20
**find** 87:6 122:19
129:23 179:4
259:7 355:7
359:19 365:11
**finding** 83:1 91:14
**findings** 53:16
55:25 61:6,13
82:13,16 87:10,15
87:21 90:3,25
91:1,16,18
**fine** 355:10
**finger** 274:5,5
**first** 44:12 50:1,2
58:18 68:9 74:3
76:5 92:6 117:14
129:9 173:6,7
180:24 189:11,22
202:23 217:19
228:3 231:20
235:5 239:7
256:17 265:24
268:7,17 269:2,4,8
286:5 291:2
300:13 320:22
321:17 333:14
337:13
**fiscal** 63:9 67:3
75:4 77:2,6,17
79:14,21,25 92:2
101:2 102:11
103:17 118:13,23
119:4,20 120:4,11
120:16,24 124:19
126:10,16,23
127:12,24 128:7
128:14 129:2,6,17
129:21 130:3,17
132:3,11 133:5,9
133:15,22 134:6
134:19,23 135:9

135:21 138:9,10
152:8 170:19
174:9,9 178:3
259:6 342:21,24
**fit** 64:6 302:21
**five** 115:2,5
147:13 212:2
226:6 239:1
245:11,12,16
248:14 251:6,10
270:15 311:22
**fixed** 313:15
**fka** 4:16
**flat** 311:6
**flatbed** 356:18
**flies** 113:16
**flip** 207:6 227:13
231:8
**floor** 4:18
**flowers** 3:13 10:18
10:18 43:21 44:9
44:17
**focus** 120:9
**focused** 186:8
269:11
**focuses** 96:17
**foggy** 247:12
**folder** 114:19
**folks** 111:3 119:21
124:23 125:18
126:15 196:8
359:19
**follow** 33:23 34:2
271:18 349:19,20
**followed** 58:6
**following** 12:24
25:21 26:10
**follows** 12:5 86:12
**food** 84:17
**footnote** 320:21,23
320:25 347:15

**forecast** 101:15
102:1,3,5,10,13
103:6,22 142:21
143:7 347:16
**forecasted** 185:1
190:6
**forecasts** 101:16
101:22 102:17
103:25 104:12
**foregoing** 366:13
367:18
**forensic** 47:9
**forget** 129:17
**form** 16:16 18:3
22:6 24:19 26:22
27:20 28:24 29:15
32:14 33:12 37:18
37:24 38:8 39:22
53:9,23 60:25
62:19 70:23 82:8
83:12 87:17 89:19
93:12 94:14
100:10 105:11
107:16,23 122:25
123:20 124:11
133:18 134:16
138:20 139:14
144:11,25 146:2
146:12 147:7
148:1,18 149:13
151:16 152:23
153:14,20 156:25
164:20 165:9
172:17 173:9
176:15 177:4
178:12 179:1
186:11,23 187:21
201:12 206:10
207:12 215:23,25
216:23 217:7
226:1 228:11

229:6 233:15,21
234:18 236:16
237:1,20 238:19
253:6 261:3
263:20 264:2,15
269:13,19 279:15
279:23 280:13
282:3,13 285:18
287:10 288:18
293:25 294:24
296:15 297:20
302:9 306:20
308:9,19 309:4,13
311:7,24 315:23
316:17 317:14,20
318:2,9,14,22
319:10 320:7
321:7 322:10,18
323:2,6,14 327:5
327:21 328:3,20
329:3,14,22
331:17,18 333:9
337:21 338:10
351:8 352:24
**formal** 151:13
**formed** 351:21
**formerly** 50:8
**forms** 246:14
**formulas** 263:1,4
**forth** 216:13
**forward** 101:17
102:2,14 142:22
143:8 150:12
174:2,4,6,9 177:19
180:6 184:7,10,22
185:24 194:13
195:15 203:21
210:18 211:3
230:19 260:20
292:22 307:13
365:15

**forwarded** 198:3
**forwards** 198:14
**foster** 190:16
192:18 204:12
206:22,24 207:15
220:19 263:15,16
263:19 264:6
293:15,23 294:4
297:7 303:18,25
304:10,21 306:8
333:17 337:2
**found** 58:3,7 131:9
**foundation** 172:25
173:1 351:16
**four** 81:12 118:24
119:11 182:1
226:6 245:18
352:4
**fourth** 330:20
**frame** 85:16 86:25
184:5
**frames** 149:4
**franklin** 4:9 11:4,5
**frankly** 274:12
**fraternization**
57:22 58:22
**free** 19:20 40:1
366:14 367:20
**frequently** 162:3
**fridays** 50:22
**friends** 48:6
**front** 91:23 181:7
230:10 240:11,14
268:5
**frrc** 256:1,12,14
256:19 257:8,9,15
257:19 258:1
**fte** 84:5,22 85:24
**full** 13:10 17:16
20:15 83:19,21,23
196:4,14 197:24

198:2 199:25
200:3,4,17,24
205:17 220:25
**fun** 49:3
**function** 79:21
129:1 177:20
299:12,14
**functioning**
120:10
**functions** 120:23
178:3
**fund** 156:4 160:11
173:20,25 176:8
176:11,13,20,21
176:24,25 177:9
177:16 178:1,4,6,9
178:16,20,22,25
179:25 180:3
181:9 337:4
**funded** 103:8
172:22,23 180:20
181:2 185:18
336:4,24
**funding** 84:16
135:6 140:14,21
153:5,19,24
154:11 158:24
180:8,22 181:4,23
192:13,21 220:13
220:16 239:2
336:21,25
**funds** 68:4 80:4,8
85:3 140:7,12,13
140:24 141:3
143:6 147:22
152:16 154:20
155:22 156:8,10
156:16,20,23
159:25 160:1,2,3
161:17 172:14,20
173:2,18,25 180:4

188:13 190:10,15
190:15,19,22,24
191:1,7,13 192:2,6
192:8,22 193:7,10
193:19,20,25
194:8 203:22
204:6,21 217:13
219:23 220:6
237:12,18 238:9
238:16,23 239:3
239:14 240:6,8
245:3 246:6 248:8
248:23 250:17
255:10 257:11
334:18 336:6,11
336:13,14,16,17
336:19,22
**funny** 34:9
**further** 34:20
124:20 337:11
339:25 350:10
364:12
**future** 103:10
142:23,24

| g |
| --- |

**game** 44:13
358:25
**gary** 74:24 75:1
76:13,15 77:3
78:24 127:7,10,20
**gary's** 175:2
**gate** 235:18
**gather** 98:1,3,12
98:16 122:11
**gathered** 122:6
221:12 236:19
**gathering** 122:8
126:18
**gears** 179:8
**geffken** 275:18
276:3,20 278:23

279:10 281:7
283:22,25 284:6
284:12 297:22
348:22,23
**geffken's** 281:3
**gender** 273:15
**general** 79:9
132:17 136:1
137:8,13 156:4,10
186:21 265:14
354:14
**generally** 14:15
82:24 93:18 112:3
112:4 134:15
140:7 147:25
148:3 158:18,20
160:4 178:18
194:12 200:23
202:15 208:18
222:19 223:17,21
232:2 261:10
269:18 284:14
**generate** 101:12
327:13 328:13
340:5
**generated** 96:7
193:24,25 230:24
258:19
**generates** 141:12
**gentlemen** 15:11
15:12
**getting** 36:17
42:16 124:12
172:12 201:10
218:22 219:21
235:6,15,16,17
258:14 299:21
353:19
**give** 19:14 66:2
74:12 79:9,18
83:5 200:22

206:12 219:5
320:2,13 323:18
344:23 354:13
363:4,15
**given** 22:22 36:20
41:4 113:9 136:25
154:16 177:24
178:3 218:9
234:16 241:12
286:25 317:3
323:23 355:8
364:10
**gives** 159:17
**giving** 291:10
320:5 354:23
361:5
**glancing** 250:23
**go** 12:8 16:7,22
19:20,24 20:13
27:24 58:15 65:17
78:4 80:18 100:2
145:4 152:2 157:5
171:12 180:25
183:10 196:1
197:21 198:25
203:22 204:4,8
205:11 207:21
220:1 236:23
272:15 274:24
279:15 293:12
296:2 328:4
332:24 333:1
337:10,13,14,19
337:23 339:25
340:7,10,11,13,14
341:2,3,7 342:8
348:3 352:3
359:11 360:16
361:14,22,24
**goes** 101:20
113:11 260:9

264:23 339:23
**going** 12:21 17:21
20:6,11 22:20
23:6 24:4 31:4
35:7,9 36:15,19,25
39:23 40:19,24
41:2 42:3 43:2,7,9
43:13 44:3 45:4
46:5 52:23 64:1
72:20 74:17 78:7
80:18 85:20 91:22
94:3 103:9 109:3
114:25 116:18
119:7 123:23
131:25 132:3
139:25 150:12
154:22 160:22
164:5,6,17 174:10
174:11 175:16
182:11,12,14
185:14,18 187:18
189:4 192:22
196:11 197:11
202:5 204:3,22
208:12,18 226:8
231:8 234:2,13,23
247:13 249:3,11
250:19 251:25
255:4 260:20
267:3 268:1
270:17 273:13
274:7 279:14
285:24 290:13
292:22 293:18
294:9 295:5,11
307:13,13,18
309:16 322:1,21
322:24,25 332:20
338:8 341:11
342:8 348:12
352:8 354:7,9

355:7 360:10
361:2,12,15,21
**good** 17:7,15 47:1
64:2 129:1 157:4
179:11 234:3,14
**government** 81:3
88:12 90:12,16,21
219:4 238:24
**graduated** 49:24
50:23 171:8
**graduation** 50:3
**grant** 170:5,25
171:22 172:8,13
172:14,15,16,19
172:19,19,22,23
173:2,8,11 193:9
193:13,16 212:2,9
212:11 217:12,14
217:19,19,23
218:13,18,20,22
219:7 220:8,11
226:19,21,24
227:2,9 235:12,16
238:23,25 239:6
239:24 240:22
241:6,7,11,11,15
241:17,18,23,24
241:25 242:2,4,5,9
242:10,14,15,15
242:21,22 243:3,9
243:12,12,18
244:1,2,8,15,16,16
244:23 245:8,10
245:18,22 246:6
246:11 248:1,4,5
248:13,15,19,21
249:25 250:25
251:4,6,11,16
252:2,4,7,10,13,15
252:18 253:2,5,13
253:16,19,23

254:2,4,21 255:8
256:1,13,17,19
257:8,18,25 258:1
324:20,22 325:1,6
325:13,16,22
326:10 334:5,8
335:12,14,19,24
337:5 338:15,17
339:7,10
**grants** 140:19
158:23 169:1,13
169:14,20,25
170:3,14,17,21,23
171:1,23,23 172:6
172:20 173:4
257:10,11,13,16
325:11 326:4,13
327:3,7
**graphs** 310:16
339:21
**gratefully** 168:12
**great** 115:6,10
254:13 332:11
**greater** 233:17
294:21 343:18
347:9
**greatest** 218:22
235:6
**ground** 16:23
218:23 235:7,17
**group** 128:19,21
154:8 171:5 264:5
293:13,19 294:9
294:10,22 295:5
295:13 296:3
**grouping** 207:10
265:24 325:2
**groups** 93:23
132:15
**guess** 18:6 27:10
73:15 143:10

147:15 165:12
169:3 181:16
193:24 199:4
224:7 233:7,12
245:13 275:23
304:25 314:4
315:1 337:12
343:20 346:9
348:9
**guessing** 139:21
252:19 340:18
343:21,22
**guest** 291:3
**guests** 291:1
**guilty** 58:4,7
**guys** 273:10

**h**

**h** 5:21 125:13
**half** 138:5 158:7
186:3 203:4 228:4
320:22 321:16
323:21
**halfway** 227:19,20
291:14
**haller** 5:11 7:7,9
10:24,24 43:2,6,24
44:8 273:14,18,23
310:2 311:9 312:9
316:6,20 317:16
317:22 318:5,11
318:17 319:1,13
320:12 321:12
322:12,20 323:10
323:17 327:8,24
328:10,22 329:6
329:17,24 330:7
330:11,25 331:6
331:11,23 332:5
332:17,22 333:13
337:18 338:1,13
344:7,9 349:17

350:7,16 351:8,15
353:5,10,17,21
354:3,11,16,20,24
355:3,9,11 358:14
358:20 359:8
361:25 362:18
**hand** 32:3 43:23
130:2 175:17
275:18,21,23
284:16 315:11,13
315:17 316:11,22
316:24 317:2
319:3 348:21
349:10 364:17
**handle** 80:2
**happen** 141:22
289:18
**happened** 59:24
199:11
**happens** 142:3
171:13 196:15
197:20
**happy** 82:19,19,21
**harass** 359:20
**hard** 98:8 114:13
348:25
**hart** 3:20 10:21,21
**hartj** 3:21
**head** 17:8 316:8
316:22
**headcount** 84:1
347:4,8,10,12
**health** 4:13 6:3
11:3 14:9 32:9,10
261:19
**healthcare** 225:9
225:11 346:10,11
**healthy** 132:10
**heard** 32:17,19
67:15 155:14
173:24 179:2

228:21 229:2
256:5 300:21
329:7
**hearing** 248:3
**heated** 41:6
**heavily** 356:25
**held** 2:6,8 47:5
50:16 67:25 69:25
72:4 75:3 111:9
127:4 130:5
131:15
**hello** 310:3,4
**help** 18:17 19:3
21:7,21 34:15
35:21 121:14
126:17 128:3
174:25 231:11
301:12,24 302:6
**helped** 18:5
225:12 261:24
**helpful** 129:15
**henschel** 6:23
**hereunto** 364:16
**heroin** 228:7,22
229:4,21,23
281:15,20 357:11
357:14
**hi** 11:19
**hibbert** 5:21 7:6
11:12,12 12:7
13:8,13 16:10,19
18:8 19:11 20:3
22:8,25 23:9,21,24
24:2,6,8 25:1 27:8
28:2 29:1,16,21
31:9,23 32:1,16
33:14 35:13 36:21
37:7,21 38:1,11
39:4 40:5 41:5,10
41:15,19 42:4,10
42:13,23 44:14,19

45:3 48:14 53:18
54:1 61:4 62:22
64:5,14 70:24
82:14 83:16 87:19
89:22 94:9,16
100:12 105:14
107:19 108:2
115:4,16 117:2,3
123:2 124:4,16
125:11 134:2
138:22 139:18
144:14 145:3
146:8,16 147:17
148:5,12 149:5,20
150:2 151:19
153:2,16 154:1
157:13 164:24
165:13 173:5,14
174:10,18 175:22
176:1,17 177:2,5
178:14 179:4,22
186:15 187:1,24
189:3 196:7,12
201:14 206:18
212:18 216:3,24
217:10 226:7
228:14 229:19
233:18 234:1,5,12
234:21 236:21
237:6 238:2,21
244:20 249:10
253:9 261:6 262:1
263:23 264:7,19
267:12 268:13
269:16 270:2
271:15,20 272:4,7
272:16,21 273:2,6
273:17,24 274:7
274:10,22,24
275:2,8 279:17
280:1,16,24

281:23 282:6,16
285:23 287:14
288:20 290:12
294:6 295:2
296:18 297:24
298:23 302:11
306:1,23 307:25
308:1,12,22 309:9
309:16 323:3
327:17 349:22
350:6 351:10,17
352:24 359:10,23
360:3,15,17,23
361:4,20 362:3
**hibbert's** 328:12
**high** 140:8,9 225:4
**higher** 149:21
292:4,10,25
293:10,11,12,18
311:21 346:15
347:3,4
**highest** 46:8
117:16
**highlights** 291:11
**highly** 274:1
**hired** 62:12,23
**historical** 215:7,9
215:21 216:6,14
216:17 217:4
221:22
**hklaw.com** 6:20
**hold** 247:13
**holdings** 4:16
**holland** 6:14 11:8
**home** 72:15
105:16 106:12
114:17,19 160:20
206:22,24 207:15
264:5 289:23,24
293:13,16 294:22
333:17 348:3

352:14,16
**homeless** 171:12
**homeowners**
141:10
**homes** 130:22
264:6 293:15,19
293:23 294:3,9,11
295:6,14 296:3
301:8 313:21
**honestly** 47:1
206:4 256:4 273:7
**honey** 113:17
**hope** 348:14,18
**hopefully** 177:17
202:5
**hospital** 352:7
**hour** 15:24 64:2
114:25 234:3
**hours** 84:2,4
189:22
**house** 10:21 15:9
36:1,3 177:22
**household** 318:20
**housekeeping** 12:8
**housing** 160:23
171:2,13,15
193:16
**hud** 171:1,23
172:20 193:16
**huh** 17:5 101:3
**human** 50:4,9 73:6
73:7 92:25 93:22
94:22 118:18
**hundreds** 159:22
**hvac** 108:7
**hysterical** 273:15

**i**

**idea** 317:23 318:7
**identification**
277:10

**identified** 30:25
56:25 73:16
119:21 128:13
132:5,24 198:22
199:23 206:1
239:19 241:8,9
250:17 270:25
271:7 272:2 275:9
275:25 276:1,11
276:16 277:4,5,14
277:16 279:10,19
347:25 349:8
**identifier** 164:3
**identifies** 25:21
26:9
**identify** 10:12
26:9 94:20 192:12
268:8,18,23 276:4
276:8,15,21
281:14,25 307:22
308:6 309:5 354:7
**identifying** 30:11
240:22 279:4
355:2
**identity** 359:14
**ikeda** 4:22 11:19
11:20 350:15
**illicit** 277:11,17
282:11,20
**illustrated** 283:17
**immediately** 50:22
348:4
**impact** 13:25
18:17 21:7,21
34:15,21 38:5,16
56:20 57:2 68:21
69:11 70:3,11,19
71:17,23 72:2
78:20,25 79:5
84:7 85:1 109:1,3
121:12,20,24

126:4,11,14
135:14 136:6,13
136:16,21 137:1,6
137:14,19 138:4
138:12,19 148:14
151:11 156:20
261:1 269:6,9,22
269:25 282:19
283:17 286:16
**impacted** 132:25
133:3 136:3 271:5
271:9 275:11
**implementation**
109:12
**implicated** 273:12
**implicates** 272:12
**implying** 273:14
**important** 125:6
260:21,24,25
261:20
**impression** 235:3
**improper** 58:15
**improve** 132:22
**improvement** 36:4
36:6,11 37:23
112:8,10 116:9,15
247:1 287:25
**improvements**
78:1
**inactions** 309:2
**inactive** 46:24,25
**inappropriate**
42:25 44:4 273:16
273:19 274:1
**incentive** 192:19
192:20 334:8,10
334:13,16,19
335:12,13,18,22
336:12,15
**incentives** 192:17

**inception** 178:7
**include** 79:19
190:10 255:13
262:9 264:4 304:6
304:7
**included** 21:19
38:20 39:6 40:17
51:4,21 81:1,4,22
99:10,17,21,23
101:25 103:21
108:11 121:16
126:19 140:20
231:13 239:14
240:25 244:8
250:21 252:21
256:23 257:13
265:5 270:20
281:13 283:2
288:6 303:20
307:20 343:8
365:13
**includes** 101:7
303:17,24 308:13
309:10
**including** 24:16
207:14 216:8
349:10
**inclusion** 190:25
191:6,9
**income** 158:15
**incorporate** 255:8
**incorporated**
248:9,10 262:15
367:12
**incorrect** 101:10
267:22 318:16
**incorrectly** 340:17
**increase** 95:18
143:22 144:7,10
144:17 149:11
150:18 152:6

185:2 201:16,18
203:25 204:11
205:20 209:12,19
222:25 223:5,8,13
223:21 228:6,18
228:22 229:3,8,17
264:9 294:8
296:23 297:6
298:6,11,17 301:5
301:13,25 302:7
302:15 309:6
313:15 314:1
341:13,14 345:17
346:7
**increased** 28:22
72:2 95:17,21
135:24 144:1,2,5
157:23 158:2,6,9
210:11,14 261:9
261:11 298:9
303:25 309:1
314:7
**increases** 182:13
201:23 303:12
**increasing** 149:23
186:8 228:1 232:4
295:4 311:6 338:9
348:13
**incurred** 314:17
329:20 331:15
333:6
**incurring** 325:17
326:22
**independent** 164:4
171:5 191:18
336:25
**indexed** 239:5
**indicate** 85:24
104:3
**indicated** 283:14
296:5 320:10

**indicates** 156:16
266:11 311:2
342:20
**indicating** 20:25
82:23 365:13
**individual** 80:10
90:13 123:3
162:23 164:10,14
164:19,22 165:1
165:16 170:5
215:19,21 216:6
235:23 238:6,13
262:6 359:17
**individually**
133:19
**individuals** 126:2
126:3,9 130:19
131:1 165:6
168:20 211:13
221:10 225:1
**inefficient** 129:1
**inflict** 274:19
**inform** 286:14
300:7
**information** 15:1
30:10,20 33:1,6,10
33:24 34:3 35:20
35:22 36:2,5,10
40:4,7,10,12,15,21
46:1,2 54:4 63:15
63:16 67:9 99:10
99:17 136:5
138:11 161:25
163:10,15,23,25
164:3 165:7 167:2
167:5,7,12,20,23
168:1,14,21 169:5
169:9,24 175:4
180:13,16 203:14
213:13,16,25
215:14,23 216:8

216:15 217:5
218:14 221:9,16
237:10,15 239:12
251:18 253:1,22
253:25 254:1,3
255:3 256:16
257:24 258:12
259:1 260:1,3,6,25
262:9 265:1 266:7
276:5,9,20,24
277:3,20 278:3,15
278:20,24 280:2
281:6,17,25 282:1
282:4,7,9,15
284:22 285:7,16
286:11 287:9,20
287:21 288:1,4,6
288:23 290:2,6
292:7,16,20
293:20 294:7,12
294:14,18,20
295:1 296:7
305:12 312:1
316:5 318:3
354:10 362:12
**initial** 178:6
314:12 346:9
**initially** 178:10
**initiated** 235:5
**initiation** 178:5
**initiative** 172:8,21
**injured** 356:19
**input** 167:20
**inputting** 165:7
168:3
**inquire** 72:25
**inquiring** 43:18
**inset** 227:22
**inside** 160:19
**insignificant** 148:6
148:11

**inspector** 58:10
**instance** 37:9 38:5
41:21
**instances** 157:11
157:15
**institutional**
220:18
**instruct** 35:9
36:15 123:7
271:12 272:10
362:9
**instructed** 40:11
330:16
**instructing** 37:4
40:25 330:2
332:20,24 355:3
360:4
**instruction** 7:14
7:15,16,17 22:22
36:20 41:4 271:17
271:18 331:7
355:8 359:13
363:5,16
**instructions** 35:15
**insurance** 178:22
346:12,14 358:1,3
358:16
**insys** 6:13 11:8
**intact** 312:11
**integration** 71:10
**intensive** 348:4
**interact** 102:9
128:24 133:10,17
**interaction** 120:18
**interactions** 77:23
**interested** 73:1
364:14
**interface** 133:6,10
133:16
**internal** 51:14
63:9 67:3 77:16

79:22 80:7
**internet** 87:7
**interpersonal**
113:12
**interrogatory** 8:4
8:6 19:6,9,16,18
19:19 20:23 24:10
25:16 26:20 29:23
**interrupt** 64:1
331:9
**interrupted**
171:21 360:17
**interrupting**
274:11
**interruption** 196:6
305:19 307:24
**interspersed** 241:3
244:11 245:4
**interview** 62:2,7
75:10,12 76:9
78:7,21
**interviewed** 59:9
76:6 78:14
**interviews** 66:10
**introduced** 77:19
**investigation**
57:23 58:2,7,9,12
58:15 59:8 60:15
61:7,14 76:2
285:15
**investigator** 59:10
**investment** 66:4
**invited** 73:17
**inviting** 274:18
**invoice** 163:12,13
**invoices** 68:2
77:13 80:2 120:14
**involve** 64:22 68:7
83:17 95:7 160:10
186:9

**involved** 14:11,19
27:4 68:25 69:10
69:16 83:18 85:10
96:10 97:21
107:12,17,20
108:16,20,21
109:7,11 116:1,8
116:12 120:20
121:11 126:4,7
165:17 169:18,21
199:22,24 200:16
245:6,9 252:6
324:11
**involvement** 25:4
63:21 68:7 97:25
107:4 118:15
**involves** 35:10
69:4 271:13
**ip** 71:12
**ipad** 106:13,16,21
**irrelevant** 330:18
**isolate** 236:11
**issue** 68:10,17
128:8,12,14 132:6
132:7,23 145:21
154:2 237:25
277:23 278:6,10
278:14,19 322:3
359:3 362:14
**issued** 87:1
**issues** 12:22 75:23
134:23 211:14
237:11 314:19
329:21 331:16
333:7
**item** 99:20 169:12
198:24 204:15,19
204:25 205:19
239:19 242:3,8,23
243:9,13 244:9
257:7,10,14

265:16,20,24
296:25 297:7,8
324:23 343:7,8
346:18
**items** 28:20
150:14 198:25
205:8 217:14
240:1 241:1,4
242:6,7 270:20,24
271:8,24 275:10
310:10 325:2,2,19
326:10 337:6
349:14
**iv** 81:9 84:17,17
89:16 90:4,10
130:17,19,22
131:6 162:11,11
162:19 163:2
164:16 165:20
166:1 167:14,18
167:19,20 191:15
219:23,25 220:5
220:16,18,18
334:22 335:1

**j**

**j** 3:9 365:5
**jalandoni** 6:9 11:1
11:1
**jennifer** 127:19,23
129:24 130:7
168:17,19
**jerk** 274:12
**jessica** 6:19 11:7
**jessica.farmer**
6:20
**jflowers** 3:14
**job** 1:25 17:7,15
32:8 37:22 45:23
50:7,13,18 51:1,8
51:10,18,21 52:9
52:13 54:7,10

55:7,11 56:10,18
57:6,13 58:11
60:8,12,21 61:23
61:25 62:17,24
64:17,23 65:1,9,11
65:18,22,24 66:5
66:10,12,14,23,25
67:13,14 72:8
73:11,20,21 74:11
74:15,18 75:13,17
75:18 78:14
109:20 133:21
134:3,5,20,24
135:4,9 137:20
154:8 218:22
235:6 260:18
300:2
**jodi** 3:13 10:18
**john** 10:21 15:11
**join** 351:10,17
**joined** 80:22 87:23
94:12 115:19
127:14
**joining** 69:22
89:17 133:2
**jonathan** 3:20
**jones** 4:5 11:5
**jonesday.com**
4:10
**judge** 1:8 360:9
**julie** 31:14,18
38:22 40:13,14
73:13 74:22,23,24
92:20 94:7 109:24
111:21 112:13
113:19 118:7
154:5 168:17,22
168:23 200:15
201:6 229:15
254:5 283:4,14
284:15 291:10

312:2 315:24
320:9 321:10
337:23
**july** 85:15,16
250:15
**jump** 273:10
**jumped** 52:5
**june** 79:7,15 80:22
81:23 82:1 83:10
87:24 94:13 97:10
110:13 111:24
115:19 127:15
128:9 133:2
202:16
**jurisdiction** 145:7
145:17
**jury** 351:25

**k**

**k** 4:3 5:17 6:5
**katerina** 92:21
**kathy** 221:11
259:3
**katie** 197:17
**kearns** 1:16 2:5
7:3 8:9 9:15 12:1
12:13,13,18,20
13:9,11,16 19:12
19:20 20:4 24:9
37:8 44:23 45:4
64:15 115:17
117:15 119:22
177:6 179:23
234:13 267:25
275:9 298:20
306:2 310:3
319:15 338:6,14
342:11 344:15
350:22 351:13
354:4 362:1 364:7
365:8 366:4,9
367:4,13 368:20

**keep** 17:7 46:21
104:2,14 114:18
115:5 139:10
215:6 239:22
258:20 260:5
273:19 292:18
305:8,11,17
306:16 338:25
348:5 349:23
352:12
**keeping** 108:5,6
130:25 157:8
193:7 258:20
260:11 307:6
350:4
**keeps** 215:10
258:24
**keith** 197:16
**kelly** 5:21 11:12
13:13
**kept** 97:12 103:19
139:20,22 169:4
254:25 257:25
262:4 306:6
**kevin** 246:19,21
247:11
**khibbert** 5:22
**kids** 137:16
158:25 162:12
172:2,24 291:22
292:2,8,19,24
293:9,12,18 294:8
295:5,11 296:1,5
**kind** 117:16
156:10 161:3
199:9 265:23
316:15
**king** 97:5,6,7,8
110:4,4,17 111:4
119:23 120:1,1
121:4,10 122:3

123:7,11,14 124:6
124:25 125:4,19
125:24 126:22
127:19,22 128:18
129:9 130:1 213:9
231:1 328:6,17
**kinney** 236:2
**kinship** 69:3
161:12 192:16,18
192:20 333:21,23
333:24 334:1,2,3,4
334:8,9,13,17,18
334:23,24,25
335:8,11,13,18,21
336:12,15
**knew** 229:7
248:22 249:3
317:2,6
**knight** 6:14 11:8
**know** 14:3,6,8,9
14:11,13,15,18,23
15:25 16:17,25
18:22 20:5,23
21:18 22:19 25:11
27:3,14 29:3 30:1
30:5,24 32:5,7,10
32:12,25 33:4,18
40:4,11 45:13
47:2,13 51:16,22
51:23 52:17 57:18
58:17,18,25 59:11
59:18,20,24 60:6,9
60:10,13,14,17,18
61:9 63:10,19
67:5 68:1,3,4,12
68:13,15,16,17,24
69:1 71:10 73:8,9
73:24 75:1 77:4,8
77:11,17,17,22,25
78:3 80:1,6,11
81:3 82:25,25

83:2 84:15,18
85:22,23,24 86:7
86:22 87:3,18
88:15 90:17,20
93:5,7 94:19,20,25
95:16 97:17,20
99:5,13,15 100:1,7
100:16 102:10,12
102:23,25 103:9
103:12 105:2,5,18
105:20 106:15,18
106:23 108:6,7,9
108:10,10 109:2,3
109:5 113:3,6,14
120:12,13,14,17
122:2,18 123:14
123:17 125:6
127:1,4 129:1,10
130:13,15,20
131:25 132:1
133:24,25 134:11
134:22 135:6,21
135:21 136:1
137:10,10,12,13
137:15 138:23
139:6,7,22 143:3
146:14 147:16
148:4,21,24 149:1
149:2,3,16,16,25
150:1 151:10,17
151:18 152:5
154:5,23 157:5,5,7
157:10 158:25
159:3,18,21 160:6
160:24 162:21
163:10 165:3,4,5
168:22,22 169:2
169:16 170:2,4,11
170:13,17,21
171:19 173:21
175:14 178:8,9,13

180:10 181:25
183:25 184:9
186:3 189:24
192:9 196:22,25
197:4,5 199:4,18
203:9 206:5,12,17
207:3,7,18,20
208:17 211:22
216:19 218:16,24
218:25 219:1,20
220:8,21 221:10
221:12 222:8,9
224:5,8 225:3,16
225:17,22 226:16
226:25 227:4,5
229:15,16,17,22
229:24 230:2,4,11
231:16 232:19,24
233:4,8 235:18,22
235:23 236:3,6
237:4,7,9,14 238:4
238:5,20 239:20
239:21,22,23
241:8 242:11,12
242:19,25 245:7
245:17 246:16,22
246:23 247:5,7,15
248:2,24 249:22
250:20 251:5,7
252:9,11,14,17
253:2,12,18,21
254:10 255:13
256:1,4 257:24
258:23 259:9,10
259:11,13,21
260:21 261:20
262:22 263:1,7,10
264:16,18,22
267:3 268:4,20
269:20,23 270:11
273:6 276:11,14

276:19,23 277:2,6
277:9,13,19 278:2
278:8,13,18,23
279:2,24 280:25
281:2,5,16,22,24
281:25 282:17,22
284:13 286:23
287:4,6,8,11
288:11,19 289:3,4
294:1 295:7 296:6
299:17 300:3,5,20
300:22,24 301:15
301:20 302:10,22
302:25 303:2,6,12
307:12 309:7
310:8 311:11
312:7,13,20
313:12,13 315:13
315:24 316:18
317:5,15,21
318:13 319:11,15
323:7,8,11 324:14
324:21 325:16,17
335:15 337:17
338:11 339:16,17
339:18,20 340:4
343:3,4 344:7
346:6,22 347:1
348:24 349:2,6
353:24 356:24
357:4,5,21 358:4
358:10
**knowledge** 21:17
25:22 26:11,14,18
28:16,19 29:12
30:2,6,12,21,25
55:5 56:6 58:3
61:15 62:12,13,21
76:2,4 78:24 79:3
79:4,8 85:5
105:13 114:2

116:2,14 121:10
121:13 122:2
126:1,6 136:18,23
137:3 142:2
150:22,23 151:13
151:20 154:13,14
154:15,21 155:11
155:21 164:25
165:24 166:5
168:9 178:7
182:19,24 187:13
199:21 211:15
214:24 221:2
228:17 229:13
247:9 256:8
259:15 264:11
276:7 280:6
288:13,25 291:12
292:11 295:24
298:19 299:10
304:24 352:21,25
357:15,23 364:11
**knowledgeable**
328:18
**known** 50:8
208:11
**kuckuck** 197:16
**kurt** 6:23

**l**

**l.p.** 1:11
**label** 31:25
**labeled** 189:11
213:4 291:7 299:5
**lack** 153:4 204:17
**lag** 219:19,24
220:5,20,22
**land** 44:10
**language** 156:16
229:25 230:3
**lapse** 61:20

**laptop** 106:11
**larger** 66:15
**largest** 150:14
159:17
**late** 58:20 89:25
91:8 228:2,19
229:9,10 247:23
307:17
**law** 48:1 352:2
354:8 355:12
356:21 357:3
359:15,19 362:2
**law's** 352:22 354:5
**lawsuit** 13:20,23
269:12 283:15
**lawyer** 330:2
344:11
**lawyers** 35:11
349:3
**layman's** 177:13
**layoffs** 225:15,19
**ldefrancesco** 5:24
**lead** 80:10
**leading** 314:8
351:9
**leave** 57:12 65:4
72:12 130:11
208:24 209:2
**leaves** 250:13
**leaving** 130:14
353:23 361:16
**led** 36:11 40:16
356:2
**left** 17:10 64:15
65:1,7 72:7 82:16
118:13 129:6
130:12 175:17
177:24 179:23
**legal** 6:23 36:7,23
71:23 92:22
118:17 365:1

368:1
**legislature** 135:5
154:10
**legitimate** 355:13
355:17,19 356:11
357:24
**lengthy** 91:25
95:15 124:2
**leslie** 74:7
**lesser** 343:19
347:9
**letter** 300:22,25
349:13,21 365:19
**letting** 17:17
**level** 46:8 68:12
84:15 117:16
133:7,11,13 140:8
140:9 199:1,5,8,22
199:24 226:2
**leveled** 224:24
**leveling** 348:19
**levels** 198:23
199:2 225:23
**levied** 141:9 182:8
341:16,17
**levy** 9:13 103:2,5,8
103:11,13,18
104:1,12 140:13
141:2,5,17,19,23
141:24 142:3,5,12
142:24,25 143:5
143:10,11,14,18
143:21,25,25
144:2,5,7,10,18
145:5,16,24,25
146:19,21 147:2
148:22 149:11,23
150:5 151:24
152:6 154:22
155:1,5,9,10,18,18
156:9,15 158:14

180:20,21,21,23
180:24 181:2,4,14
181:20,21 182:2,6
182:7,20 183:3,16
184:2,6,9,12,13,16
185:2,3,6 186:4,9
186:16,17,18,19
186:21 187:4,9,10
190:11 196:19
197:1,19,23 200:4
201:3 223:1 290:9
290:19,23 299:13
299:15,17 300:4
312:23 313:5,13
313:20 314:1,9
340:9 341:2,6,7,8
341:12,20,21,23
342:6,14,18,25
**liaison** 5:4 51:25
63:18 120:19
299:25
**licensed** 293:15
294:3 335:8,9
**licenses** 47:11
**lie** 241:25
**life** 239:6
**lights** 239:22
**limit** 177:3 341:6
**limitation** 293:23
**limitations** 161:3
**limited** 109:18,21
156:15 194:20
**linda** 77:21 110:5
113:13 119:24
124:25 125:4
**lindsay** 5:23 11:9
**line** 7:13 68:5
77:13 78:2 80:12
99:20 108:13
109:6 128:24
135:7 169:12

179:9 190:18
204:15,19,25
205:8,19 217:14
217:15 239:19
240:1 241:1,4,23
242:2,8,23 243:9
243:13 244:9
257:7,10,14
265:16,20,24
270:19,24 271:8
275:10 292:15
296:25 297:7,8
299:23 300:18
324:23 327:1
343:8 345:18
365:13 367:7
368:3
**lines** 83:3 135:24
345:17
**link** 24:23
**linked** 228:6,22
229:4
**list** 140:6 349:14
**listed** 25:14,23
26:13,19 28:20
30:1,6,13 118:16
118:24 124:24
125:18 126:2,9,16
127:19 190:16
193:10 217:14
280:11 304:11
367:7,17
**listing** 218:7 367:7
**lists** 25:24 26:13
207:13 291:2
**literally** 275:22
**litigation** 1:6
10:10 14:16 45:20
97:19,23 98:4
100:5 102:24
105:4,10 106:17

106:20 117:13
122:4 123:9 124:6
124:9 214:22
215:3 265:13
365:6 366:3 367:3
**little** 34:9 44:21
72:14 100:1
113:18,20 139:25
145:4 154:14
190:14 212:22
227:20,22 234:22
234:23 247:12
267:4
**live** 180:8 181:5
203:16 326:2
343:12 352:8
354:12 355:7
**lives** 354:14 355:6
359:20
**living** 171:5,10
191:18 336:25
**llc** 3:5
**llp** 5:6,16 6:4,14
**lobbies** 135:1,2,3
**lobbying** 154:8,10
154:13,16
**local** 140:12 141:3
158:24 190:11
193:18,20 239:3
239:13,20 240:6,8
240:24 244:7,23
337:8
**located** 2:7
**location** 97:13
**lock** 352:10
355:24
**long** 15:23 41:10
47:1 51:5 58:15
60:1 76:5,19 86:5
101:22 102:12,16
103:25 104:11

126:23 127:1,7
143:7 144:10
198:10 236:3
307:14 350:23
**longer** 251:22
331:13,25 333:5
336:22
**look** 21:9,23 71:7
103:7 123:8 125:5
128:17 129:11,15
142:20,21 150:6
150:11 163:19,20
164:7 215:18
216:17 217:4
221:20 226:12
239:20 243:22,23
263:12 310:15
338:5 344:20
347:14 349:4
**looked** 51:13
127:13 148:21,24
159:4 215:6 226:9
267:13 268:2
278:23 297:13
303:10 310:17
311:13
**looking** 18:12
35:17 71:11
103:13 129:14
150:7 162:18
163:17 164:8,15
164:18,22 201:9
207:4,10 213:24
214:11 231:18
239:16 243:13
263:7 264:17
266:12 276:14,20
300:13 311:11
339:6,22 345:18
**looks** 34:8 120:12
223:20 306:17

**loose** 156:6
**los** 4:20
**lose** 60:22 61:16
160:23
**loss** 148:7 149:3
150:16
**lost** 29:7,13 61:1,3
144:21 145:19,21
147:14 148:16
149:1,6,9 197:9
**lot** 70:6 74:12
181:11 191:17
273:21
**louisiana** 4:6
**low** 185:23
**lower** 130:2 225:6
233:19,23
**lunch** 179:10,24

**m**

**m** 4:22 125:13,13
**madam** 365:10
**mailroom** 108:12
**main** 149:10,17,17
**maintain** 77:16
104:17 114:18
**maintained** 60:7
60:11 80:5 102:19
163:11,16 164:4
215:10,13 258:3
260:6 301:8
**maintaining**
307:15
**maintains** 164:25
**maintenance**
63:14,16,19 68:3
71:9 78:1 79:23
80:16 220:19
**major** 46:12
**majority** 294:2
**making** 40:23 41:8
41:11 158:14,16

221:3 282:9

**malick** 197:16

**management**
68:13 107:5 108:1
108:4,14 109:19
109:21 118:20
119:16 132:8
133:1 170:19
338:22

**manager** 50:23
218:20 235:4

**managers** 68:14

**mandated** 88:11
178:22

**manufacturer**
278:11 308:14
309:11

**margaret** 166:16
262:18

**mark** 174:11

**marked** 19:6,9,15
22:3 26:20 31:5,7
36:13 45:1,5,14
50:5 100:22
116:24 119:15
126:17,20 174:16
175:12,20 189:1,5
207:5 212:16,19
213:1 226:9
229:25 230:5
249:8,22 256:21
268:25 270:4
279:1 285:21,25
287:17 290:10,14
298:22,24 308:4

**market** 294:4

**marking** 19:13
116:19 249:12

**marountas** 31:15
32:5 33:3,10
34:19

**mart** 4:4

**match** 239:3,18,20
339:13

**matched** 239:13
241:5

**matching** 239:4,5
239:25 240:6,8,24
241:2 244:7,23
245:3

**math** 315:2

**matter** 10:9 12:8
349:5 364:15

**matters** 86:12

**maximum** 239:1

**mckesson** 5:4
10:25

**mcmahon** 77:21
110:5,17 111:4,5
113:13 119:24
124:25 125:4,5,13
125:14,19,24

**md** 1:7

**mdl** 1:6

**mean** 16:18 18:5
18:10,12 23:4
24:20 27:4,10
52:8 53:12 54:13
66:24 71:3 78:3
82:15 83:22 84:11
85:4 88:9 90:9
94:5 99:6 102:9
108:3,25 113:11
133:20 137:9
157:9 161:7
165:11 171:3
173:21 174:5,7
176:13,16 180:7
182:2,11 191:9,14
192:11,14 202:21
205:16 206:4,13
215:5 222:4

235:10 238:8,15
242:13 286:21,23
289:6,8,13,23
299:14 300:21
301:18 325:12
331:8 335:3
342:19

**meaning** 90:24

**means** 60:17 84:14
161:8 280:8 289:4
292:8 300:20
325:6

**meant** 293:2,4
301:15 302:23
328:14

**measure** 83:24

**measures** 96:20

**media** 300:1

**medicaid** 84:18
358:6,8,11

**medical** 355:13
356:11 357:25

**medicare** 358:5

**medication** 28:23

**medicine** 47:20
355:23

**meet** 15:17 95:24
95:25 191:11,25
192:7 194:22
336:5

**meeting** 9:14 96:5
138:23 139:8
254:12,24 255:5
290:9,18,23 291:4

**meetings** 15:20,23
16:2,3 48:9 49:15
68:13 96:8,11,15
134:1 135:13
136:5,11,15,19,25
137:6 139:1,3,20
139:23 229:15

255:1 269:24
270:1 295:10

**meets** 96:3

**member** 133:20
134:4,7,10 154:6

**members** 48:7
195:18,19 197:4,8

**memory** 18:7,14
185:8 206:8

**mentality** 131:24

**mention** 139:16

**mentioned** 80:14
83:3 86:18 100:6
141:2 142:20
162:9 168:19
172:1 203:24
225:14 235:2
252:2 313:14
356:10

**met** 13:12 15:7,21
192:1

**methodology**
84:21 262:22
281:7 284:11,18
287:12 320:17
323:20 324:7,14

**metrics** 96:21
107:10,12 191:25
192:7

**michael** 3:9 365:5

**michelle** 110:6,23
119:23

**mid** 150:9,10
183:22 229:11

**midwest** 365:17
368:1

**mike** 10:14

**mill** 342:4,7,9
343:1,19

**millage** 141:11
145:6,8,12 343:7

miller 197:17
million 29:9 66:18
  66:20 143:22
  147:10,18 148:7
  159:18 185:20
  209:18,23 210:1
  210:10,12,17
  223:24 224:1
  266:13 291:20
  296:25 313:6
  342:23 344:23
  345:1,20,22 346:1
  346:22 347:2
mind 35:15 113:16
  222:2 314:4
  343:25
minute 29:25
  100:3 353:12,13
minutes 9:14 96:7
  96:9 115:2,6
  138:24 139:4,11
  139:20,22 196:10
  254:25 255:5
  290:10,19 312:22
  312:23 353:8,10
  353:15,20,22
  358:18
mishear 327:20
misheard 327:23
misnomer 101:13
misunderstanding
  123:22
misuse 236:25
  268:9
moderated 226:3
modified 329:9
moment 19:24
  20:12 37:9 40:20
  64:15 100:23
monday 15:21
  48:22 232:22

233:3
monetary 53:15
money 159:1,10
  159:14 160:7
  181:7 205:3,7,9,18
  205:19 210:13,25
  219:8,15,20 227:9
  236:6,13,24
  242:15 244:21
  245:22 246:3
  248:13,16 250:20
  250:25 252:15
  253:5 257:18,25
monies 218:2,3
monitoring 227:25
month 45:15 76:8
  96:14,15 177:19
  177:21,24 220:5
  220:22 221:13
  252:12 263:9
  267:5
monthly 86:4
  95:25 96:3,11,22
  96:23,24,25 97:9
  97:17 100:14
  101:7 103:23
  104:9,25 120:25
  121:3 133:25,25
  135:12,12 136:11
  136:11 138:25
  139:1 166:8,11,23
  220:9,20 231:19
  232:3,12,20,25
  233:5,8 310:18,23
  311:14,20 334:1
  338:7 340:1
  348:10,16
months 35:4,6
  38:6,15 39:9,15,19
  72:9,11 160:23
  219:24,25 220:3

270:15 305:4
morris 6:4 11:2
motion 360:10
  362:13
motley 3:5 10:15
  10:17 15:13
motleyrice.com
  3:10,12,14
mount 3:7
mouthful 80:20
move 42:2,12,19
  43:1,5,15 204:21
  205:9,9,18 274:21
moved 51:20
  61:24 195:14
movement 108:11
moves 195:8 225:4
moving 89:15
  184:22 233:24
mpendell 3:10
multiple 88:6
  89:18 91:5 123:4
  198:24 317:11
multiplied 270:16
mute 196:9

## n

n 7:1 125:13
  192:24
n.d. 1:12
n.w. 4:6 5:17 6:15
name 13:10,13
  25:14,25 26:14
  31:16 74:8 77:21
  84:18 110:21
  129:4 162:24
  187:2,6 197:9
  221:23 236:2
  291:3 354:5,25
  365:6 366:3,4,15
  367:3,4,21

names 197:6
narrative 227:16
  230:9,13 301:12
  301:24 302:6,21
  303:2
nash 73:5,8,12
  74:3,20 76:6
  92:24
nation 153:18
national 1:5 10:9
  365:6 366:3 367:3
natural 182:15
nature 181:3
  182:10 356:16
nearing 179:6
necessarily 83:25
  244:10 265:18
  289:13 335:18
necessary 77:15
  121:9 128:2
  204:23
neck 356:6
need 12:25 19:24
  41:6 42:14 54:22
  77:11 103:7,9
  109:8 114:25
  143:5 144:17
  150:12 184:8
  185:17 192:1
  208:6 221:19
  234:16 294:22
  296:6 301:14
  355:13,17,20
  356:2,11 357:25
  362:4
needed 168:13
  208:4 294:10
needing 296:2
needs 17:10 84:20
  142:23 292:3,9,15
  294:16,21 296:8

296:13
**needy** 193:2
**negative** 56:14
  111:7 112:5
  113:21
**neglected** 156:17
**neither** 33:13
**nelson** 197:7
**net** 342:17,18,20
  342:23
**never** 111:9
  155:14 179:2
  314:4
**new** 45:22 71:5
  109:5 143:18
  233:25 251:15
  252:3 313:6,10,18
  313:21,21,24
  314:3 340:12
  341:8,12,16
  347:19 348:14
**newly** 40:6
**nice** 112:13 113:4
**nine** 127:3 353:10
**nodding** 17:8
**non** 53:14 54:2,12
  54:20 83:1,14
  85:8 86:17 87:10
  87:14,21 90:25
  91:16,17 336:23
**northern** 1:2
**notarized** 365:14
**notary** 2:13 12:4
  364:5,8 365:25
  366:10,18 367:15
  367:23 368:23
**notate** 161:21
**note** 14:12 227:21
  345:6 365:12
**noted** 43:20 53:8
  54:21 82:25 83:15

87:10,15 112:11
112:16,20 153:4
222:14 322:16
350:6 362:21
**notes** 121:7
**notify** 194:12
**november** 12:15
  46:19 143:19
  204:11 207:24
  209:22 210:3
**number** 8:2 19:16
  19:17,19 25:16
  26:20 31:5 32:2
  47:3 56:25 83:24
  90:14 93:8 94:22
  116:19 117:13
  175:13 189:5
  207:5 212:20
  213:24 214:12,20
  217:1 226:9
  227:17 231:19
  232:3,11,12,20,25
  233:1,2,5,9 240:11
  249:12,17 250:17
  256:25 263:9
  265:11 267:5
  268:17 270:4
  275:13,15,17
  279:20 281:8,12
  283:3,19 284:8,14
  284:24 285:3,6,9
  285:12,25 286:12
  287:17 288:3,5,7
  288:14,22 290:14
  291:21 293:12,18
  293:23 294:8
  295:4,11 298:25
  300:17 301:5
  307:21 308:5
  310:19,24 311:14
  311:20 315:20

316:8,12 338:7
340:1 348:7,11,16
365:7,13
**numbers** 19:23
  25:4 27:18 28:4,7
  36:12 37:11,15
  38:2,25 39:6
  103:15 158:19
  216:13,14 222:11
  222:12 226:18,20
  228:1,18 229:3,8
  229:17 267:6
  287:16 303:3
  311:14 320:10
  339:6,14,18 367:7
**nw** 5:8 6:5

---

**o**

**o** 125:13
**object** 13:5 35:7
  151:16 216:22
  279:15 332:12
  350:3 354:18,22
  355:1
**objected** 272:5,18
**objecting** 82:11
  272:8 330:19
**objection** 16:15
  18:2 22:6 24:19
  26:22 27:20 28:24
  29:15,19 32:14
  33:12 36:14 37:18
  37:24 38:8 39:22
  40:18 43:3,19
  48:13 53:9,23
  60:25 62:19 70:23
  82:8 83:12 87:17
  89:19 93:12 94:14
  100:10 105:11
  107:16,23 122:25
  123:20 124:11
  133:18 134:16

138:20 139:14
144:11,25 146:1
146:12 147:7
148:1,9,18 149:13
149:24 152:23
153:14,20 156:25
164:20 165:9
172:17 173:9
176:15 177:1,3
178:12 179:1
186:11,23 187:21
201:12 206:10
215:25 217:7
226:1 228:11
229:6 233:15,21
234:18 236:16
237:1,20 238:19
244:19 253:6
261:3,22 263:20
264:2,15 267:9
268:10 269:13,19
271:11 272:8,19
279:12,23 280:13
280:21 282:3,13
285:18 287:10
288:18 293:25
294:24 296:15
297:20 302:9
306:20 308:9,19
309:4,13 311:7,24
315:23 316:17
317:14,20 318:2,9
318:14,22 319:10
320:7 321:7
322:10,18 323:2,6
323:14 327:5,21
328:3,20 329:3,14
329:22 330:5,6,12
330:13,24 331:17
332:2 333:9
337:16,21 338:10

351:8,15 352:24
354:6 359:12,24
360:20 362:6,7,11
**objections** 273:25
274:2 332:6
**observations**
274:13
**observed** 128:8
**obstacles** 201:9
**obtain** 40:12 54:4
54:8 59:16 168:13
173:7,7 259:25
322:2 349:25
356:3
**obtained** 40:15
46:9,13,18 252:9
277:20 278:3
**obtaining** 37:11
**obviously** 63:9
71:4 84:15 94:6
123:22 134:19
137:10 140:12
148:24 150:7,13
173:12 191:15
192:10 230:7
336:21 337:5
349:8 350:5
358:20,23
**occasion** 52:11
55:12
**occasions** 329:9
**occur** 58:13
**occurred** 81:21
**occurrences** 7:12
**occurs** 317:12
318:12
**october** 32:22
33:25 34:19
**odd** 243:22
**offered** 252:15

**office** 58:10 67:10
105:22 108:10
117:22 118:2,3,5,9
119:4 120:24
123:24 152:8
194:5,6,9,10,16
342:21,25
**officer** 127:24
129:6 130:3,17
**offices** 2:6
**official** 366:15
367:21
**officially** 76:7
**offset** 326:23
**oh** 48:17 50:25
157:1 270:22
303:10 304:2
**ohio** 1:2,10,12,18
2:8 3:18 10:1,11
50:3,7,8,13,17
51:1,8,18 52:13
54:7,10 55:7,11
56:8,10,15,18 57:6
57:12 58:11 60:7
60:11,21 61:23
62:15,16,17 63:19
66:6,12 73:21
75:17 81:1,15,20
82:6 84:7,9,20
87:11 88:13 89:3
89:11 133:20,21
134:3,5,20,24
135:9,15 136:22
137:2,20 146:5
152:16,18,21
153:1,18,23 154:7
154:8 155:23
161:20 221:17
312:4,16 336:4,10
365:2

**okay** 13:3 17:3,4
20:8,20 22:23,24
24:6 25:2,9,13
26:6 42:10 44:20
44:22 48:17 50:10
64:6 71:2 118:11
129:23 130:4
176:2 177:12
181:11 182:6
183:9 191:14
206:7 226:15,17
227:14 231:10
240:19 245:5
254:24 262:2
268:6 272:16
273:1,19,22 274:9
274:9 291:8 293:3
300:15 304:2
310:14 314:14,14
325:4 336:12
339:2,5,8 340:21
342:16 343:13
344:16 349:3,7
350:16
**omar** 197:16
**once** 55:18 255:9
331:10 341:20,25
342:2 355:12,19
**ones** 81:11 110:11
241:21
**ongoing** 29:7,13
305:9
**ooo** 2:1
**op** 1:12 300:18
303:1
**open** 139:8 339:1
350:4
**opened** 355:9
**opening** 72:18
**operate** 150:12
251:22

**operated** 203:5
**operating** 101:6
101:15 103:6,22
142:21 143:6
148:4 230:19
313:4 342:14,18
344:20 347:16
**operational**
207:11,13
**opiate** 1:6 10:10
69:8,9 291:23
352:5 365:6 366:3
367:3
**opiates** 352:12
**opinion** 208:14
237:22 289:7
300:25
**opioid** 13:24 22:2
27:2 28:15 33:2
69:14 135:25
136:2 151:14
236:25 268:9
269:24 271:6
276:1,12,16 277:4
277:15,21,22
278:4,5,10,14,19
279:5,10 288:17
297:10 308:17
314:13,18 315:20
319:8 321:19
322:15,25 323:1
323:21 324:11
329:1,12,21
331:16 333:7
351:6,13 352:17
355:14 356:12,20
357:7,8 358:9
**opioids** 38:4,17
57:9 64:22 68:8
68:10,17,21 69:11
69:17 78:10,16,20

79:1,6 95:8
108:18 109:18
121:12,20 126:5
126:11 135:14
136:7,13,16,21
137:1,6,19 138:4
138:12,19 150:20
150:24 151:5,14
151:21 236:9
238:1,7,14 261:1
268:19,23 269:6,7
271:1,9 275:11
277:10,11 279:22
286:16 297:4
298:13,15 302:1,8
322:5 326:14
352:23 355:20,22
356:4 357:20
**opportunities**
198:23
**opportunity** 18:13
52:16,25 56:9
57:8 59:5 65:6,10
73:10 74:11
132:21 135:20
361:5
**opposed** 66:19
215:22 216:8
251:15 294:11
295:12
**opposing** 362:5,8
**options** 225:11
**oral** 59:6
**order** 160:7
181:10 182:16,17
186:2 192:7,12,20
193:4 194:18,22
205:9,21 219:7
261:17 303:14
335:5 336:6
353:14

**ordered** 194:2
**orders** 67:6 68:2
120:13
**org** 124:18,24
125:19 126:17
129:13,21
**organization**
117:17,21 134:12
134:14
**organizational**
117:7 119:16
126:2 128:17
259:8
**organizations**
51:11 138:3
**original** 35:18
43:7,10,24 44:15
248:15,17 322:15
**originally** 217:12
272:17
**outcome** 54:12
55:21,23 364:14
**outcomes** 56:14
**outreach** 299:20
**outside** 15:10 28:9
28:14 37:8 38:5
48:9 49:14 55:3
56:23 137:24
274:14,17,18
347:21
**overall** 131:24
148:8 157:19
158:15 228:2
267:14
**overdue** 144:10
**overhead** 239:21
310:9
**overlap** 76:12,19
**overlapped** 76:15
76:20

**oversee** 110:16
**overseeing** 70:13
**oversight** 94:5
110:9
**overview** 79:9,18
**owned** 106:2,13
106:16,21
**oxycodone** 356:9

**p**

**p** 3:11
**p.m.** 179:15,16
362:21
**package** 246:17
**packed** 181:11
**packet** 246:20
**page** 7:13 8:2
20:21 22:16,18
23:13,14 24:11,13
25:10,15,18,24,25
26:5,15 28:20
29:2,6 30:9
117:11,14,15
119:14 124:17
129:17,20 175:11
175:18 189:11,23
190:1 207:6
211:20 218:6
223:15 226:14
227:12,19 230:14
230:15 231:4,9,21
240:17,20,20
241:8 242:23
243:25,25 244:9
244:17 249:21
265:22,23 291:2,6
310:15,18 313:3
320:23 321:17
322:14 324:18
325:3 333:14
334:7 338:24
339:4,22 340:5

342:15 344:14
348:10 365:13,15
367:7 368:3
**pages** 26:13 28:20
30:9 34:10 230:23
231:13
**paid** 95:18 166:7,7
166:16,23 203:25
204:9,12,14
205:13 206:19
207:14,23 209:7
209:16,23 210:3,8
219:21 252:1
255:21 259:16,22
260:2 261:8,18,21
262:5,10,14
263:14,17,18,21
263:25 264:10,13
264:24 265:2,24
266:4,8,14,22,23
291:15 295:14,15
295:19,25 296:3
296:25 297:7
303:17,20,24
304:9,21 305:17
306:8,14 307:7,12
336:10 345:19,21
346:1,3,22,23
347:20 358:1
**papas** 92:21
**par** 4:14,15,16
11:21
**parades** 299:22
**paragraph** 92:1,6
100:25 211:25
227:22
**paraphrase**
181:15
**parent** 190:17
193:18,20 194:4
322:22 337:2

**parents** 317:11,18
318:1 352:18
**part** 22:5 37:22
65:21 75:21 81:2
84:3 88:7,15,16,18
88:19 92:14,16
118:1 138:3 140:3
140:4 144:20
152:17 180:21
181:20 184:20
186:20,22 195:16
227:15,16 228:5
230:4,5,8,19
231:14 249:18
251:8 267:21
286:20 295:17
300:3,9,10 312:10
362:4 367:9
**participants**
218:20
**participate** 55:13
88:16,19 133:24
231:4 246:13
286:8
**participated** 89:9
89:21 122:13
231:6
**participating**
299:22
**particular** 56:21
57:3 70:3,11,20
97:13 98:23
103:17 107:6,14
119:15 121:25
129:16 136:3
160:7,9 169:19
191:24,25 204:14
204:16,23 222:1
225:18 236:14
263:8 277:21
278:4 289:9

292:19 294:15
295:11 306:19
307:9 308:8 309:2
319:8 341:6
**particularly** 68:14
93:16 107:21
**parties** 361:23
364:13
**partner** 11:3 92:9
**partnership** 248:1
248:4
**party** 251:12
**pass** 83:6 247:4
255:23
**passed** 201:10
247:11
**pay** 80:6 140:7,24
157:5 160:22
163:8,17 177:21
182:14 258:17
341:20,21,23
342:2,3 358:8
**paycheck** 177:22
**paying** 300:4
**payment** 63:11
77:12 177:21
219:6 338:22
**payments** 346:6
**payout** 208:24
209:1
**payroll** 104:17,22
104:23,25 105:1,2
131:11 156:24
157:2 206:13
208:4,7,9,12,18
209:3,4 210:19
225:5 241:4
244:11 306:22
346:20,25 347:2,3
**pdf** 98:25

**peak** 147:8
**pendell** 3:9 7:8
10:14,14 11:17
13:3 16:4,15 18:2
22:6,19,24 23:1,17
23:22 24:1,4,7,19
26:22 27:20 28:24
29:15,19 32:14
33:12 35:7 36:14
36:24 37:18,24
38:8 39:1,22
40:18 41:8,11,16
41:24 42:7,12,16
42:22 43:4,19
44:18 48:13 53:9
53:23 60:25 62:19
63:25 70:23 82:8
82:10 83:12 87:17
89:19 93:12 94:14
100:10 105:11
107:16,23 114:24
115:7 117:1
122:25 123:20
124:11,14 125:7
133:18 134:16
138:20 139:14
144:11,25 146:1
146:12 147:7
148:1,9,18 149:13
149:24 151:16
152:23 153:14,20
156:25 164:20
165:9 172:17
173:9 175:20
176:15,19 178:12
179:1,12 186:11
186:23 187:21
201:12 206:10
215:25 216:22
217:7 226:1
228:11 229:6

233:15,21,24
234:2,6,18 236:16
237:1,20 238:19
244:19 253:6
261:3,22 263:20
264:2,15 267:9
268:10 269:13,19
272:9,20,23 273:3
273:8,21 274:4,9
274:17,23 275:1
279:12,14,23
280:13,21 282:3
282:13 285:18
287:10 288:18
293:25 294:24
296:15 297:20
302:9 306:20
308:9,19 309:4,13
311:7,24 315:23
316:17 317:14,20
318:2,9,14,22
319:10 320:7
321:7 322:10,18
323:2,6,14 327:5
327:21 328:3,20
329:3,14,22 330:5
330:10,13 331:4,8
331:17 332:2,12
332:19 333:9
337:16,21 338:10
350:3,22 351:4,12
351:20 353:2,7,11
353:19,22 354:6
354:13,18,22
355:1,5,10 358:12
358:17 359:4,16
360:1,6,16,21
361:1,12 365:5
**pending** 12:22
**penny** 210:23

**people** 52:20 93:5
**people's** 355:6
**perceive** 132:6
**percent** 141:12,13
141:14 143:23
153:8 157:22
158:14,16,17,22
159:5,9 239:7,8,9
270:16 275:15,17
279:19,20 281:8
281:12,19 283:19
285:3,6,9 286:20
286:25 287:2
302:15 303:7,15
304:1 315:6,21
316:1,12,16,24
319:20,24 320:3,5
320:6 323:19,22
324:2,4 326:9,13
326:17,20 327:2,3
**percentage** 21:25
157:18 279:21,21
281:14,19 282:10
288:15 300:17
301:4 302:14
303:7 317:3
324:15
**percentages** 159:2
**percocet** 357:21
**perform** 121:18
121:24 178:2
219:6
**performance** 84:8
110:16,20,25
111:7,16,19,22
112:21 114:16,22
**performed** 70:18
162:16 224:14
283:22 286:15
305:2 307:19

**performing**
166:14
**performs** 162:22
**period** 73:24
76:23 103:17
142:7,11,15
147:14 148:23
174:9,9 183:11
225:24 239:1
248:14 293:24
311:4,23 341:6,7
341:21,24
**periods** 103:10
**permanent** 171:7
**perpetuity** 350:9
**person** 26:14 30:2
30:6,12,25 118:8
316:9 328:17
347:4
**personal** 105:16
106:5,8 145:23
146:4,10,21 147:1
147:5,9,22 148:25
149:10 237:22
351:22,25 358:24
**personally** 284:1
328:14 366:11
367:15
**personnel** 150:13
325:17
**persons** 25:21
26:10
**perspective** 336:8
341:19 343:11
**pertaining** 34:21
215:15,22 216:15
**pertinent** 203:15
260:18
**pharma** 1:11
**pharmaceutical**
4:14,15,16 11:22

308:14
**pharmaceuticals**
4:14 308:15
**pharmacy** 47:24
278:21 308:16
309:12
**phase** 145:22
146:18,20 181:1
**phased** 146:4
147:12
**phases** 195:9,11
**philosophical**
312:3
**philosophy** 312:14
312:17
**phone** 11:16,18
71:6,8,17 196:8,9
350:13 365:3
**physical** 317:25
318:8 319:5
**picked** 170:14
188:3
**picturing** 343:24
**piece** 300:19
**place** 10:11 69:7
85:7 86:6 107:15
108:23 191:24
192:17 193:4
235:16 333:25
341:9 347:25
**placed** 192:19
292:13 294:15
313:19
**placement** 68:25
69:3,5 72:3 95:17
95:18 135:25
150:13 163:8,14
163:17,20,21
166:7,17,23
203:25 204:9,12
204:14 205:13

206:19 207:23
209:7,16,24 210:4
210:8 255:21
259:24 263:11,14
263:17,18,21,22
264:4,13 266:22
266:24 291:15
292:12,17,19,23
293:8 295:12,14
295:15,19 296:1,3
296:25 297:7
301:14,25 302:7
302:16 303:16,17
303:20,23,24
304:9,10 305:6
306:8 307:12
334:17,24,25
335:6 347:21
**placements** 207:15
259:16,22 260:2
260:24 261:8,15
261:18,21 262:5
262:10,14 264:10
264:24 265:2,25
266:4,8,14 304:21
305:17 306:14
307:8,9
**places** 296:2
**placing** 127:23
182:13 301:6
**plaintiff** 25:20
26:9
**plaintiffs** 3:3
10:15,17 14:7
26:8 43:6
**plan** 54:19,22,24
85:7,11,12,18,19
86:6,8,10,15,21
101:21 116:9,15
321:20,24 322:8
322:17

planning 195:24
plans 80:11 101:5
  239:17 324:10
pleasant 3:7
please 10:12 13:9
  16:25 20:1 33:17
  115:3 177:14
  227:21 238:11
  293:7 314:12
  334:12 347:14,17
  365:11,11
plenty 359:5
plugged 285:10
point 18:18 20:7
  29:5 33:20 54:5
  59:18 64:3,7
  141:19 182:7
  184:18 194:25
  195:14 200:9,13
  200:18,22 202:11
  206:2 210:14
  229:12 234:14
  235:11,21 241:12
  245:14 257:1,7
  274:4,5 289:18
  299:11 313:4
  317:1 332:23
  340:20 341:18
  343:2
points 28:21 291:9
  291:15
policies 53:21 67:4
  67:25 77:15 79:25
  93:10,16,17 94:17
  106:25 107:11,13
  107:21 108:20
  134:11
policy 93:22 94:12
  94:21 95:1,5
  107:5,13 108:16
  135:6

polster 1:8
pool 205:2,8,10,10
  205:14,18,20
  206:14,15,16,19
  206:21,23,25
  207:2,19
pools 205:3,6,23
  205:24,25 206:9
poor 162:13
  275:24
populate 288:2
portage 65:11,18
  65:24 66:6,11,14
  66:23 67:14,22
  68:7 69:12,15,18
  72:7,13 182:25
porter 4:17 6:4
  11:2,20
porterwright.com
  6:10
portion 140:14
  310:17 341:20
position 60:21
  62:3 72:19 73:2
  73:18 111:12
  127:18 358:23
  361:14
positions 47:4
  50:17 111:10
  359:9
positive 112:3
possible 277:14
  324:8
potential 138:12
  138:18 209:1
  348:1
potentially 103:24
practical 156:19
precentage 168:24
  168:25 282:19

preclude 43:15
  44:5
predecessor 74:25
  208:8 209:10,11
  335:20,20
prefer 113:19
preference 349:12
preliminary
  230:18
prep 16:3 23:16,19
  23:25
preparation 17:22
  21:6 23:7 48:11
  48:15 49:12,16,18
  49:22 51:25
  123:12 189:16,18
  249:19
prepare 15:5
  30:16 45:16,18
  283:1,5,9
prepared 45:13
  49:21 78:25 79:5
  222:8 251:2
  265:12 267:21
  314:15 348:25
preparing 22:12
  25:8 77:8
prescribed 355:21
  356:8
prescription 1:5
  10:10 236:25
  277:10,16,21,22
  278:4,5,9,10,13,19
  279:22 308:17
  352:11,11,23
  355:13,20,22
  356:3,12,20 357:8
  357:20,25 358:9
  365:6 366:3 367:3
prescriptions
  308:17

present 6:22 15:10
  77:9 145:9 161:16
  198:5 201:3
  202:13,15 254:8
  254:20
presentation
  199:25 200:2,15
  200:22 201:5,7
presentations
  136:24
presented 94:21
  95:1,6 136:4,16,20
  200:7 201:22,25
  252:11 254:6,9,11
  254:14 255:4
presenting 200:4,8
  200:10,13
preservation
  160:15 161:2,5
  335:23 336:2,7,9
  336:18
preserve 160:19
presuming 316:14
previous 62:7
  69:22 183:7 219:1
  242:25 245:11,12
  246:6 250:18
  356:22
previously 30:11
  130:5 151:2
  219:10 310:17
  319:20 339:22
primarily 66:25
  67:12 79:20 98:7
  103:8 131:19
  181:2 186:13
  230:20
primary 51:24
  72:16 77:5 110:11
  299:12

**printed** 34:9
**prior** 69:22 70:1
  70:25 71:18 72:4
  87:22 133:2 144:5
  144:8 175:1 195:9
  265:6 269:15,21
  275:20 356:20
**private** 173:1
  358:15 359:17
**privilege** 23:2
  271:14 272:13
  273:11 330:22
  359:24 362:11
**privileged** 41:23
  116:17 362:11
**probably** 18:23,24
  35:3 39:8,18
  53:14 68:9 76:8
  82:1 86:24,25
  114:16 132:17
  159:5 179:11
  185:10,21 186:4,8
  213:8 247:11
  260:13,14 286:7
  302:24 307:16
**problem** 43:11
  144:20 153:4
  238:7,14
**procedure** 363:11
  366:5 367:5
**procedures** 53:21
  63:11 67:4 68:1
  77:15 79:25 93:11
  93:16,17 107:1,11
  134:12
**proceed** 163:13
**proceeding** 58:6
**proceedings** 10:4
  196:6 305:19
**process** 62:8 68:1
  78:22 95:14 99:25

100:2 107:18
116:13 122:14,15
124:3 130:22
133:4 140:2,5
142:4,17,19
155:18 166:11,15
169:19,22 170:13
175:3 180:18,20
180:21,22,23
195:5 196:16
199:8,15,23 202:4
202:10 204:4
220:4 248:24
250:11 252:7
255:7 270:5 298:5
**processed** 120:14
**processes** 63:10
  77:7 131:8,12
  166:4
**processing** 163:13
**produce** 18:12,20
  21:13 26:25 54:22
  90:15,21 122:3,20
  152:7 317:4 349:4
**produced** 13:1
  18:7,9,17 21:6,12
  21:15,20 24:24
  27:11 28:11,15
  34:14 36:1,3,5,10
  45:6 54:24 97:18
  117:12 138:24
  139:4 206:5
  213:22 344:8
  350:1
**producing** 25:4
  27:5 56:24
**product** 23:2 41:2
  41:14,17,25
  271:14 330:23
**production** 12:17
  12:21 365:15,17

365:22
**professional** 2:11
  364:4
**profound** 292:3,9
  296:6,8
**program** 8:14
  107:5 108:17
  109:6 116:9,15,22
  155:24 211:10,12
  211:16,22 212:3
  225:9 226:11
  227:3,10 234:24
  235:4,21 236:8
  241:16 244:22,25
  251:19,22 347:24
  348:15
**programs** 57:8
  84:10,13,22,25
  87:16 107:6,14
  108:22 109:9,12
  147:24 191:24
  192:10 195:24
  226:13 347:19
**project** 102:11
  103:16 142:22
  152:9 260:20
  292:22
**projected** 143:2
  185:5 344:3,5,22
  344:25 345:10,11
  345:21,25 346:7
  346:14,21 347:2,9
**projecting** 185:8,9
  185:20 346:25
**projection** 103:5
  104:18,22 105:3
  307:11 346:4
**projections** 103:2
  103:12,18 104:1
  104:12 185:4
  344:8,11 346:20

**projects** 77:25
**promise** 43:15
**promised** 252:18
  267:25
**promoting** 127:22
**promotion** 128:4
**pronounce** 31:15
**pronounced**
  125:13,14
**properly** 120:14
  320:20
**properties** 314:3
**property** 141:9
  144:24 145:6,14
  145:17,23 146:4
  146:10,21 147:1,6
  147:9,23 148:16
  148:25 149:9,10
  182:5 313:15
  340:10,14 341:3
  341:11,14,17
**proposed** 71:15
  93:21 202:14
**protective** 159:8
  159:13,16 160:1
  353:14
**provide** 59:6
  76:22 143:1
  283:18 288:1
  302:14 348:4
  354:9
**provided** 40:10
  167:24 188:2,9
  212:4,9 217:1
  237:19 238:9
  254:1 344:10
  346:12
**provider** 161:13
  163:21 348:3
**providers** 335:8

**provides** 158:25
173:1
**providing** 215:23
300:8 354:19
**public** 2:13 12:4
14:9 46:15 47:13
61:10 96:5 154:6
299:21 364:6,8
366:10,18 367:15
367:23 368:23
**publicly** 87:4
139:5,8
**pull** 37:15 213:16
215:14 270:6
320:17
**pulled** 38:2 213:18
270:8,8 277:3
285:2 328:7
338:20,21
**pulling** 213:13
**purchase** 67:6
68:2 69:5 71:8
120:13 264:3
**purchased** 263:22
264:6 293:15
294:4
**purchasing** 71:5
**purdue** 1:11
**purpose** 45:19
156:2 314:22
315:3 331:21
359:21
**purposes** 148:4
169:7 193:6
258:21 307:11
315:17
**pursuant** 363:6,10
**put** 69:2 85:7 97:1
97:8 100:17
120:25 121:14
175:4,8 177:12

182:22 183:2
213:6,10 222:15
230:8 231:12
270:11,11 294:17
296:2 320:4 328:7
335:21 341:8
347:24
**puts** 107:14
108:22 121:5
**putting** 22:5
246:17,20 349:18

**q**

**q&a** 201:4
**qi** 36:22 37:10,14
38:13 40:7,10,11
40:16 288:8
**quadruple** 65:25
**quality** 36:4,6,11
37:23 246:25
287:25
**quantify** 269:5,9
269:22 308:24
**quarterly** 100:17
100:21 101:8,11
101:15 102:3
103:24 104:10
220:1,10,12
**quasi** 81:3
**queried** 328:8
340:5
**query** 327:13
**question** 16:18,24
17:16,18 22:21
24:5 27:24,25
35:8,14 37:1,4
39:2 40:1 52:23
70:7,14,16 78:12
89:12 99:8 104:7
107:8 125:16
156:8 158:4 177:7
183:17 188:4

192:5 200:25,25
206:6 212:21
216:2,20 229:1
248:18 260:10
261:25 272:1,3,4
272:18 293:6
328:12 330:14
331:2 332:7,18
333:2 360:19
**questioning** 44:5
309:17 358:25
**questions** 20:6
33:18,24 34:3
36:19 37:6 40:24
41:1,20 42:3,18
78:9,16 179:9
200:24 268:3
274:23 275:1
279:3 284:11
337:12 340:19
350:11,14,15,25
353:4,6 358:18,22
359:5,6,14 360:11
**quick** 12:9 350:25
**quickly** 171:15
**quite** 65:15,16
78:5
**quote** 276:15
277:4 279:4,9
301:12,13

**r**

**r** 252:5 364:1
**raised** 362:7
**raises** 182:12
**raising** 359:23
**random** 90:14
**range** 226:5
**ranks** 152:21
153:23
**rapid** 171:2,3,4,11
347:24

**rate** 239:4,5 342:4
343:1,17
**reached** 72:24
73:3 171:8,9
**read** 14:21 277:24
292:5 301:19,20
323:11 360:13
366:5,6,12 367:5,6
367:17
**reading** 303:19
365:19
**ready** 172:12
**real** 258:13 355:6
**realized** 292:2
**really** 12:9 17:6,14
68:10 74:12
101:18 122:17
128:5,15,22 137:8
137:12 180:19
186:1 208:25
229:13 235:16
249:2 250:12
270:7 273:18
323:24 343:21
**realtime** 2:12
364:5
**ream** 9:16 298:20
299:4,6,7 300:12
301:22 302:4,12
303:21
**reams** 301:4
**reapplication**
245:7
**reask** 272:18
**reason** 42:14
45:17 57:18 62:6
130:13 149:18
155:9 215:20
216:5,10 218:20
250:9 267:19,23
280:12,18 281:1,1

295:17,18,25
307:9 311:20
321:4 338:4
365:14 367:8
368:3
**reasonable** 314:17
314:25 315:4
**reasoning** 338:12
**reasons** 72:17
317:12 321:14
**reassessed** 141:20
142:15 184:17
**reassessment**
142:4,18 143:14
184:14
**rebuild** 186:1
**recall** 25:3 32:20
32:21 35:2 52:24
53:2,4,7,11,16,19
54:23 55:2,19,21
55:22,24 56:13,17
64:19 70:14 74:2
81:20 90:23
113:10,25 115:22
123:6 138:21
180:1 201:10,13
209:5,15 213:15
214:19 216:11
229:22 233:11
234:25 247:22
248:3 253:13,14
290:22 300:11,15
302:22 307:4
338:3 340:24
**receipt** 365:18
**receive** 81:9 90:6
114:4,13 131:13
139:13 140:16
152:4,15,16
158:23 159:10,20
171:18 187:17,18

188:13 191:12
192:2,8 193:21
194:23 208:23
210:10,24 220:19
247:20 249:4
253:15 255:9
290:18 313:20
336:3,22
**received** 35:20,23
35:23 36:2 38:22
59:19 60:2 86:22
90:5,18 91:14
111:6,16 145:14
147:22 155:22
156:9 163:12
170:18,22,24,25
171:1,24 172:6
188:1 191:7
193:14 217:19,23
218:2,4 220:11,25
222:21 244:6
247:16,23 253:5
256:17 257:18
258:1 326:13
341:13 357:3,6
**receives** 197:20
334:2 340:9 341:1
343:5
**receiving** 194:8
253:11 255:10
**recess** 64:10
115:13 179:15
234:9 275:5
305:22 309:22
350:19
**recognize** 189:13
249:14 299:1
**recognizing** 209:1
**recollection** 16:12
17:24 23:6 24:14
34:5 78:18,23

233:14,16
**recommend** 196:4
197:23 198:3
**recommending**
200:17
**recommends**
196:14
**reconcile** 250:4
**record** 10:7,13
12:9 13:4,10,12
31:24 42:9 60:14
64:9,12 115:12,14
117:12 125:12
164:23 165:1
175:12 179:14,21
189:11 213:4
215:7,9 234:8,10
234:23 249:17
258:7,9,20 272:19
274:15,16,25
275:2,4,6 299:4
305:21,23 306:3
309:21,23 331:10
349:15,18 350:18
350:20 353:8
354:8 358:21
359:11 360:25
361:6,9,11,18,21
361:22,24 362:4
362:17,20 364:9
367:9
**recorded** 42:21
59:11,13
**recording** 59:17
60:11 63:12 83:18
**records** 54:6 79:23
81:9
**recover** 24:18
**recovered** 225:23
**recovery** 83:2
211:12 235:15

242:20 251:25
255:14 256:10
**recurring** 336:23
**redirected** 194:4
**reduce** 327:3
**reduced** 224:23
**reduction** 222:20
225:13,23
**reductions** 312:5
**reed** 5:16 11:10,13
**reedsmith.com**
5:22,24
**refer** 26:2 52:20
102:4 175:16
187:7 189:21
310:12 312:21
338:24 344:14
**reference** 34:7
155:8 347:18
365:7 366:2 367:2
**referenced** 91:4
121:15 176:18
192:23 247:25
300:17 366:11
367:15
**references** 103:1
193:3 324:19
**referencing** 34:14
92:5
**referred** 21:14
89:2 100:14
122:24 129:14
156:4 162:3
203:21 219:9
221:22 248:6
290:3 347:18
**referring** 21:5,12
26:3 43:22 52:17
80:19 88:23 98:21
101:23 122:22
142:6 159:7

163:16 230:14,23
288:5 296:8 306:4
313:11 324:23
348:9
**refers** 342:13
**reflect** 218:15
222:2,12 226:20
291:9 329:19
**reflected** 25:5
27:18 28:4 34:22
36:12 117:23
163:24,25 176:14
176:22 215:24
216:9 222:18
223:16 232:5
244:15,25 256:20
268:16 270:21
275:12 284:7
285:11 287:16
307:19 308:4
311:12 319:15
324:7
**reflecting** 216:7
218:2
**reflection** 329:1
331:14 333:6
**reflective** 312:6
**reflects** 213:25
232:24 244:1
250:1
**refresh** 16:12
17:24 18:13 24:14
**refreshed** 18:6
**refreshes** 23:5
**refusing** 361:10
**regard** 12:25 25:7
67:21 71:22
109:22 121:19
188:9 236:7 308:2
319:3,19 320:14
320:21,22 326:19

337:9
**regarding** 12:16
17:25 33:1 46:2
59:7 112:25
286:16 291:11
363:5,16
**regards** 81:9
101:14
**regimen** 357:6
**regional** 190:16,17
248:1,4
**registered** 2:11
364:4
**regular** 37:17
104:3,14
**regularly** 82:3
**regulations** 51:17
**rehousing** 171:2,3
171:4,11
**reimbursability**
167:15 191:17
**reimbursable**
131:9 335:2,4,5,10
**reimbursed** 181:8
244:14,22 334:5
**reimbursement**
81:7 181:6 219:10
219:13,14,16,21
220:11,15,25
221:4,5 242:16
243:1 258:15
326:5
**rejected** 199:17
**rejection** 199:20
**relate** 107:22
**related** 22:2 24:15
28:15 29:17 31:1
38:3,15 57:9 67:5
67:17,25 69:9,14
71:4,5 75:23 78:9
78:16 94:24 95:21

97:23 103:6
105:15 107:1,6,11
107:13,25 108:17
109:18 114:20
122:4 126:14
132:7 168:4 172:3
186:13 207:1,9,13
207:17 237:25
238:7,14,17
243:18 253:1
255:13 268:18,23
268:24 269:6
270:9 271:1,5
276:25 290:7
292:12 295:10
297:3,5 298:12,13
298:15,17 305:6
314:13,18 315:20
315:25 321:19
322:5,15 326:14
327:7 329:1,12,20
331:16 333:7
352:5 356:15
364:12
**relates** 1:9 334:23
**relation** 12:13
214:22 346:8
**relations** 299:8
**relationship**
113:12 302:1,8
335:13 360:2
**relatively** 71:13
72:9 172:7
**relax** 273:12
**released** 57:15
**rely** 43:7,9,13 44:3
**relying** 43:16
**remainder** 209:20
**remember** 71:21
115:20 214:8
235:8 254:23

303:8 306:9
343:23
**remind** 39:23
342:4
**reminder** 86:1
**removal** 68:18
276:2,17 277:6
280:7,12,18,25
289:1,5,7,19
317:12 319:8,16
321:18 322:2,3,9
322:15 323:1,21
348:1
**removals** 22:2
27:2 28:15 69:8,9
69:14 136:1
323:19
**remove** 68:23
**removed** 130:21
281:1 289:8,12,23
317:10,17,24
318:7,18 319:4
322:23 356:5
**removing** 312:19
**renew** 142:25
143:5
**rent** 160:22
**reopen** 13:2
349:24
**reorienting** 340:22
**repeat** 70:6 104:5
164:11 238:11
280:22 293:5
322:7
**rephrase** 107:8
142:10
**replacement** 127:9
333:16
**replaces** 225:5
**report** 8:17 31:21
31:21 61:5,12

67:10 77:20 82:23
83:4 84:6 86:18
86:20,23 87:2
90:6,19 93:1,3,14
96:23,23 99:23
100:21 101:14
109:24 110:1,7
111:3 118:3,6
125:23 127:25
130:1 133:6
174:13,22,25
175:6,6,7 179:25
219:25 227:17
229:25 230:5
296:5 327:19
328:1,13 342:12
342:13 348:25
**reported** 1:23 2:9
217:21,22 243:5,8
316:11
**reporter** 2:11,12
2:12 17:9 307:24
364:4,4,5 366:7
**reporting** 96:18
96:21 131:20,23
161:15
**reports** 51:25 54:8
54:15 77:8 94:7
97:9,18 100:14,18
101:8,11 103:24
104:10 110:3
112:15,17,24
113:5 117:22
121:1 125:3,20,21
127:20 166:3,22
258:19,24 259:10
259:12
**represent** 13:13
151:4 244:5
**representation**
42:8 151:8 152:25

178:19 333:12
**representatives**
138:10
**represented** 151:3
**representing**
35:24 42:5 279:8
**represents** 117:16
151:10 177:9
178:25 232:9,10
242:3 257:7
**request** 33:11
36:18,25 40:22
41:25 42:6 54:6
219:15 238:22
246:9 247:8,17,24
248:22 269:22
349:4 367:9,11
**requested** 40:21
122:20 204:11
213:19 220:24
221:1 243:5
344:13 363:4,10
363:15
**requesting** 219:20
245:9
**requests** 219:22
220:9 221:4,5
298:10,16 359:2
**required** 202:19
365:25
**research** 49:11
**reserve** 12:21 13:1
178:16 349:22
**reserves** 150:11
**reserving** 350:8
**reset** 341:8
**resets** 341:12
**residential** 264:5
293:13,19 294:9
294:10,22 295:5
295:13 296:3

**residents** 187:11
187:14
**residing** 187:16
188:2,10
**resource** 93:22
250:14
**resources** 73:7
92:25 94:22
118:18 195:15,18
195:25 196:2,3,13
197:11,14 200:12
**respect** 324:10
**respond** 171:14
302:12 351:6
361:5
**response** 8:3,5
12:20 19:5,8,16,18
20:23 24:10 26:20
336:20 347:24
**responses** 29:23
80:11
**responsibilities**
51:4 63:6 64:21
66:22 67:20,24
77:24 79:10,13,19
96:13 106:25
109:16 110:9,12
112:18 119:8
120:2,7 131:16,18
299:9
**responsibility**
51:24 63:8 67:2,9
67:16 70:21 96:17
119:10 246:10,12
299:12
**responsible** 13:24
51:9 63:13,15
70:2 79:21,24
80:3,7 124:21
167:5,8,11 168:2
170:3 200:12

246:16,20 299:16
299:18 335:16
**restate** 216:2
307:25 322:6
**restatement**
261:24
**restaurant** 50:23
**restrictions** 62:14
**result** 58:1 61:17
62:16 69:8 83:11
85:7 95:16 116:10
135:25 138:24
208:25 209:9,13
279:22 281:20
288:16 292:25
293:10 297:10
309:1 316:23
331:15
**resulted** 259:20
281:15
**resulting** 144:23
148:16 149:8
292:4,10
**results** 53:4,11
55:25 82:5 90:3
91:12 112:1
154:12 259:20
**retail** 309:11
**retire** 76:16
**retired** 76:13
**retirement** 127:8
225:2,4
**retirements**
208:20
**retires** 208:23
**retroactively**
322:4
**return** 268:1
**returned** 289:24
365:18

**reunification**
161:6,8 256:9
321:19,24 322:8
322:16 324:9
**reunified** 322:24
**reunify** 161:11,11
**revenue** 29:8,13
141:13 144:22
145:19,22 146:24
147:6 148:16,22
149:7 150:16,25
152:6,10,12,15
153:9 157:19,22
158:5,15,15
168:25 174:8
183:12,19 184:9
186:14 219:16
223:4,8,9,11,13
239:11,15 240:2
243:25 249:25
257:2,5,6,19
313:17,20 325:23
326:1,8,20,23
351:7
**revenues** 63:12
143:2 150:21
151:15,21 159:5
180:17 181:25
186:8 190:3,4,6
194:23 218:25
222:21 243:23
258:8,10 314:2,8
**review** 16:2,11
17:23 22:9 49:17
90:16 109:3 111:7
115:23 116:3,11
121:7 122:17
198:24 237:16,23
286:11 363:5,10
365:12 366:1
367:1

**reviewed** 16:5,7
17:22 21:5 49:15
49:20 195:13
286:13
**reviewing** 18:4
20:2 237:13
286:18,22
**reviews** 110:17,25
196:21
**revise** 35:18 36:12
38:25 39:5 40:16
**revised** 38:19
39:10,13 40:4,6
43:13,25 44:5
199:1 330:1
**revision** 39:18
40:3
**revisions** 34:20,24
35:1,5 44:3
329:16,18 330:9
331:2
**revisiting** 155:3
**rice** 3:5 10:15,17
15:13
**rich** 31:15 32:5
33:3,16,20
**right** 12:22 13:1
15:15 17:10 30:14
32:3 42:22 46:16
61:25 72:10 74:8
119:21 124:14
125:1,8,20 130:2
176:7,19 183:5
185:19 202:24,25
205:23 208:11
219:11,17 223:1
240:14 248:19,20
274:8,20 281:18
310:20 312:12
314:9 316:16
317:7,13 318:1,8

318:12,13 319:21
319:25 320:23
321:2,14,22 322:5
324:9,15,16
326:10,15 327:4,9
328:2,15 329:2,7
329:13,21 330:3
331:16 332:1
333:8 335:24
340:14 342:9
343:25 345:2,8,11
345:14,22 346:3
346:20,23 348:8
349:14,18,23
355:24 360:3
**rights** 350:8
**rise** 182:5 355:16
**robert** 97:6,7
110:4 119:23
120:1
**robust** 313:24
314:7
**role** 51:1 57:5
63:23 64:22 73:21
77:1 89:9 92:2
93:9 100:18 101:1
106:23 110:10
127:4 129:8 130:4
130:16,18 131:15
134:3 189:16,17
198:7 299:10
**roles** 50:17 51:3
69:25 70:10 72:4
128:3
**room** 112:7,10
352:7 353:23
360:24 362:5
**rough** 159:3
311:17
**roughly** 15:24
141:13,14 147:10

159:8,18
**routine** 120:22,22
**rpg4** 248:6
**rpr** 364:20
**rude** 273:4,5
**rules** 16:23 51:17
195:23 363:6,11
366:5 367:5
**run** 40:23 41:9,12
108:18 115:3
134:8 166:3,22
199:7 221:6
239:23 259:10,11
327:18,25 330:21
**running** 150:9
220:21 235:17,20
239:24 260:5,7,12
262:15 264:22
299:18 305:9,16
306:4,6,11,16
307:6,15 325:16

**s**

**s** 252:5 365:15
367:8,8 368:3
**sacwis** 131:7
161:21,23,24
162:1,3,8,16 163:3
163:5,8,11,16,24
164:1,5,18 165:1,7
165:15,23 166:2
166:10 167:2,6,9
167:17 168:3,6,11
168:14,21 275:25
276:20,24 278:25
280:11,15 285:2
287:21 290:4
320:18 323:8
**safe** 352:12 355:25
356:1
**safely** 301:7

**salaries** 310:9
347:5,6
**salary** 239:20
**satisfaction** 86:9
**satisfy** 205:21
**save** 20:4 114:7,10
114:15
**savings** 292:2
**saw** 22:10 23:25
24:11,11,13 179:5
209:13 223:20
270:17 293:11,12
296:23
**saying** 33:17
204:18 229:23
287:23 302:24
345:3
**says** 25:19 26:7
92:9 161:9 163:22
176:7 211:24
227:24 241:24
291:1,18 301:11
320:23 342:17
353:14
**scan** 114:12
**sccs** 52:16,18,25
53:1,20 54:4 55:4
55:6 80:19 88:5
89:9,18 90:20
91:20 93:11 95:3
95:7 97:9,23
104:4,15 105:15
105:19,22 106:1,7
106:14,16,21,23
107:2,6,14,21
108:18,22 109:9
109:13 110:10
115:18,19 119:17
121:12,20,25
124:9 126:5,12
127:14 132:8

133:1 135:8
136:13,17 137:19
137:24 138:19
140:2,7,24 147:25
148:7 150:21
151:15,22 152:7
152:12,14 153:4,8
154:2 155:25
157:20 165:6,17
169:1,14 170:3,6
170:17 171:18,24
173:7,19 175:9
178:7,17 184:6,22
186:20,22 187:4
187:18 188:3,9,14
188:21 190:7
191:7,11,23 192:7
193:14 194:22
195:3 199:12,19
201:20 203:4,5
209:24 211:6
215:10 220:24
222:21 224:25
225:19 227:8,25
236:7 237:8 243:1
247:15 248:12
250:6 251:5,9,19
252:9,15,18
258:23 261:2,19
267:14 268:7,18
269:18 270:25
282:20 286:17
288:16 289:14
291:11 295:4
297:19 298:13
300:8 301:23
302:5 307:22
308:7 313:5
314:18 351:7
**sccs's** 308:25
351:5

**scenario** 255:11
255:15,16 323:15
**schedule** 220:15
**school** 171:9
**se** 113:15
**seal** 366:15 367:21
**search** 105:6
**searched** 106:19
**seats** 309:19
**second** 130:2
139:21 186:3,4
207:10 211:25
218:6 239:8 245:8
265:23 325:2
333:17 337:14
**seconds** 353:9,16
353:20,23 358:19
**security** 81:8,8,17
91:3,13 108:9
119:5
**see** 22:16 25:14
26:1,16 29:10
32:2 33:17 34:11
46:1 92:4,8,12
103:16 116:17
119:1,18 121:9
140:22 147:4
167:16 175:19,23
176:5 193:11,15
217:13,16 227:21
231:4,21 232:14
237:22 250:2
266:13,19 285:1
286:5 291:16
302:18 304:18
313:8 333:18
335:17 339:12
340:1 343:6,14
348:15,19 352:8
**seeking** 24:18
250:6 251:15

301:4
**seen** 20:17 21:1
22:12 23:10,11,13
24:9 31:10 45:7
117:4 155:8
174:19,21 178:20
189:7 212:25
228:10,12 231:23
231:25 247:25
265:9 286:2
290:15 296:12
297:12,19,25
298:3 313:24
343:23
**segregated** 128:15
**selected** 170:14
**selects** 90:13
**send** 33:1 38:20
39:10 221:16
349:13
**sending** 34:18
359:1
**sends** 220:2
**sense** 102:14 132:9
265:14 349:15
**sent** 12:11 33:6,19
33:24 34:4 39:14
39:16
**sentence** 101:4,20
302:23
**separate** 81:12,13
81:16,18 89:4,7
91:10,11 102:7,8
102:20 103:19
114:19 132:1
147:2 187:19
214:10,16 306:24
306:25 343:7
**separately** 80:4
343:14

**separation** 312:12
**september** 9:12
  59:3,4 86:25
  130:9 290:8,23
  312:24
**serves** 185:9
**service** 51:10 52:9
  66:19 67:10
  145:10 159:20
  178:21 196:18
  255:15 348:2
**services** 3:16 8:14
  8:18,22 9:3,8
  10:23 14:2 26:24
  31:20 37:17 50:4
  50:8,9,14,18 51:2
  51:9,11,19 52:12
  52:13,21 54:7,11
  55:1,8,11,14,18
  56:4,8,11,15,19
  57:6,13 58:11
  60:8,12,22 61:23
  61:25 62:18,25
  63:22 64:18,24
  65:1,12,19,22,25
  66:3,5,12,15,23
  67:1,13,15,17,22
  68:14,20,21 69:12
  72:3,8 73:6,11,20
  73:22 75:4,7,18
  76:11 77:2,6,20
  78:21 79:1,6,14
  80:15,18 84:23
  87:13,23 90:18
  92:3,3,15,22,24
  94:13 100:19
  101:2 108:10
  114:11 115:23
  116:10,21 117:10
  117:18 118:13,17
  118:18,19,23

119:4,4,20 120:4
124:19 126:10,16
126:23 127:13
129:21 130:17
133:5,9,16,22
134:4,5,21,25
135:4,10,15 136:8
136:22 137:20
138:9,11 140:25
147:11 152:9
153:19,24 154:6,9
158:1 160:2,3,11
160:14 161:17
165:17 171:18
172:4 174:14,23
178:23 180:9
186:25 187:9,17
187:18,20 188:1,9
188:20,23 190:2
196:20,23 197:1
197:22,24 198:2
206:14,16,21
212:7,13 219:6
230:18 235:13
237:9,19 238:9,17
242:19 249:5
254:19 275:20
295:9 300:8
325:18 334:21
343:7,18 344:4
348:5
**session** 179:18
**set** 20:11 31:3
  44:20 51:19
  142:12 143:11
  182:2 216:13
  248:19,21 272:19
  340:9 341:1
  362:18 364:16
**setting** 69:5
  106:25 107:5,13

107:20 108:17
192:18 195:3
259:24 263:8,12
264:4 289:9,13,23
289:24 292:13,19
292:24 293:8
294:11,16,17,22
294:23 295:12
334:1 335:7,8
**settings** 263:22,24
  292:17 293:13,16
  294:4 295:14,16
  295:21 296:1
  305:6
**seven** 185:11,14
  185:16 186:7
  205:2,6,22,24,25
  206:9,13
**severance** 60:23
**sfranklin** 4:10
**shapiro** 198:4,6,10
  198:13
**shared** 137:17,23
  138:11 312:2
**sharing** 188:7
  351:24
**sharon** 275:18
  284:6 297:22
**sheet** 99:14 365:13
  367:7,10,18 368:1
**sheets** 99:5,15,18
**shirlethia** 4:9 11:4
**short** 72:9 101:22
  102:4,10,16
  103:25 104:11
  209:3,4 237:13
**shorthand** 2:10
  364:3
**shortly** 129:7
**shoulders** 17:9

**show** 19:12 31:4
  42:24 45:4 104:15
  116:18 174:10
  189:4 212:19
  249:11 285:24
  290:13 298:24
  326:7
**showboating**
  42:17
**showed** 23:3 77:7
  224:20
**shown** 23:7,15,18
  43:14 224:18
  365:16
**shows** 310:18
**shrugging** 17:9
**shut** 40:19
**sick** 208:24 209:2
**side** 239:15,15
  240:3,5 326:7,8
**sides** 128:22
**sign** 360:13
**signature** 363:9
  364:19 365:14
**signed** 77:11
  366:13 367:18
**significant** 71:14
  93:15,20 94:11
  95:20 144:17,21
  150:17 184:7,21
  312:3
**significantly**
  110:15 153:12
  156:22 182:1
  224:22 293:14
  311:21 346:19
**signing** 365:19
**signs** 94:1
**silos** 128:16 132:1
**similar** 19:22
  133:6,11 154:8

203:24 215:8,19

**simplistically**
325:22

**simply** 41:19
131:20 335:19

**simultaneous**
23:23

**sincerely** 365:21

**single** 81:2 88:10
88:14 89:17,20
91:4,6 185:22,23
309:6

**sir** 273:21 274:3
355:7 359:5
365:10

**sit** 324:13 331:12
331:24 333:4
344:2

**site** 63:20

**sits** 230:9

**sitting** 237:7 318:6
352:6

**situation** 171:14
171:16 238:10,18
323:13

**six** 72:9,11 141:24
142:7,11,14 155:5
180:24 185:10,13
185:16 186:7
219:24 220:5

**slight** 201:23
223:12 314:1

**slightly** 179:8
232:4 346:21
348:13

**slip** 185:22

**slow** 124:15
218:18 235:18

**small** 140:14
159:1,23 172:5,7

**smaller** 159:9

**smith** 5:16 11:10
11:13

**snyder** 127:19,23
129:24 130:7
131:17 168:17

**snyder's** 130:16

**social** 66:18 81:7,8
81:17 91:3,13
92:24 118:17
145:10 196:18,20
196:22 197:1,22
197:24 198:2
254:19 275:19
295:8

**softer** 113:18

**solutions** 4:13
365:1 368:1

**somebody** 157:6
170:7 208:22
316:10 334:16
337:19

**son** 352:12

**soon** 49:6 202:6
289:25

**sooner** 39:17

**sorry** 26:2,4 51:6
52:5 73:7 78:11
82:9 96:2 110:21
124:12 125:15
139:4 181:13
183:5 188:5 190:2
214:3 216:1 229:1
229:10 239:10
244:18 277:24
279:13 280:20
288:4 293:1,2
304:4 305:18
329:4 333:3 339:2
342:2 352:7
357:12 362:1

**sort** 30:16 58:5
69:10 82:22 86:8
104:1 107:13
134:8 161:14
166:3 178:16
285:14 289:17
300:25 340:22

**sorts** 67:7 177:23
325:19

**sought** 209:16
242:16 243:1
246:1

**sound** 115:24

**sounds** 243:22
248:6

**source** 141:3
173:18

**sources** 84:16
140:6,23 173:3
219:17 220:14,17

**south** 2:7 3:7,17
4:19

**span** 166:13

**spans** 163:20

**speak** 48:12,18,25
49:7 229:20 279:7
283:25 284:3
343:10

**speaking** 23:23
177:3 274:2

**specialist** 131:6
163:6 166:20
221:11 259:6,7
262:21

**specialized** 47:16

**specialties** 48:7

**specific** 15:2 16:7
17:23 21:24 23:13
30:21 32:7 35:2
45:17 53:11 54:17
55:23 57:8 69:13

89:8 98:20 108:8
132:15 135:14
136:12 146:18
147:24,24 148:20
152:11,14 154:7
156:2 157:15
161:20 164:2,9
170:4 171:20
180:15 186:24
187:2,6,12 191:12
192:6 194:25
206:14,15,16
216:10 236:10,12
236:24 237:10,18
240:22 241:6,7,15
241:16,18,23,24
242:2,9,10,14,14
242:21,22 243:9
243:11,12 244:8
244:16 258:1
270:11 271:4
276:19 277:7
282:19 284:11
307:22 308:6
324:22 325:1,6
326:16 334:8
335:12,19 337:5
357:5

**specifically** 14:1
14:12,20 18:22
47:2 53:6,16 55:4
56:17 59:2 67:21
68:20,22 71:20
78:9 79:17 94:20
94:23 95:9 98:5
100:20 108:17
109:21 112:22
138:19 146:15
162:21 186:20
188:14 191:19
196:24 197:3

215:6 225:16
229:23 231:17,18
236:8 239:19
241:10 247:22
280:9 287:6 297:4
298:12,14,17
309:6 312:13
313:12 325:10
327:7
**specifics** 55:24
155:24
**speculate** 165:12
**speeches** 43:4
**spelling** 125:12
**spend** 181:8
203:19 219:15
226:13,19,21
227:8 249:1
250:20
**spending** 201:18
201:23 203:7,11
219:20 250:24
**spent** 227:2 236:7
236:8,13,24
237:18 238:9,16
242:16 244:21
251:3 265:2,15
266:8 345:1,2
**spike** 261:14,18
266:21 291:22
295:19,25
**spoke** 68:16 88:2
122:7 213:20
214:5 283:23
**spoken** 132:24
284:5
**spotlight** 299:21
**spouse** 318:20
**spouses** 319:6,7
**spreadsheet** 9:11
18:16,21 19:1

21:2,4,10,11,14,16
21:20 22:3,5
23:25 24:12,21,24
25:5,8 26:25 27:5
27:12,15,19 28:5
28:11,14 30:17
34:8,13,18,23 35:6
35:19 36:13 43:8
43:10,14,21,25
44:12,14 56:24
99:2,22 103:19
104:19,20,22,24
121:15 123:3
126:19 151:3,9
257:2,5,6 260:5,8
260:12 262:4,6,15
262:25 264:23
266:11 267:2,18
267:20 268:12,16
268:24 269:3
270:4 271:2 279:1
283:2,6,9 285:21
286:24 287:13
305:13,15,16
306:4,6,12,24
307:1,7,15 308:4
314:21 328:8
**spreadsheets** 44:6
99:4,11 100:8
102:17 104:2,13
105:3,8 122:23
212:23 213:21
214:1,6,10,17
230:22 231:3,5
239:16 262:8
306:17 307:2
**sprung** 358:24
**ssab** 9:12 200:1,3
290:8,19 312:23
**ssi** 81:10 131:12

**stabilization**
291:21
**stack** 119:17
**staff** 83:25 224:23
225:13 328:15
**staffing** 225:22
226:2
**stamps** 84:18
**standalone** 65:23
**standards** 51:18
**stands** 304:16
**stark** 73:11,19
74:1
**stars** 170:25
171:22 172:19
173:7,11 193:9
211:10,11,21
212:3,9 217:12,14
217:18 218:13,18
220:7 226:10,19
227:3,9 234:24
235:4,12,21 236:7
236:13,24 237:12
237:18 238:8,16
238:23 241:11,16
241:17,25 242:4,5
242:14 243:3,12
243:18,25 244:2
244:16,22,23,25
245:8 248:5
249:25 250:25
251:6,10,19,22
252:3 338:15,17
339:7,10,14
**start** 27:13 42:15
79:11 140:1
172:12,13,22
181:14 195:11
199:9,14 252:2,3,5
252:7,10,18 253:2
253:5,23 254:2,4

254:21 255:8
338:5 344:19
**started** 46:6 51:7
76:10 218:19
239:6 273:4
323:24 338:8
**starting** 28:21
222:25 230:17
291:15
**starts** 181:16
195:12 227:21
**stat** 300:16 302:14
**state** 13:9 23:5
56:8 62:15 63:18
81:1,15,20,23 82:6
83:20 84:7,8,15,20
84:23 86:12,14
87:8,11,22 88:13
88:22,24,25 89:3,6
89:11,14 90:11
133:7,11 134:23
135:15,19 140:14
140:21 146:5
152:17,18,25
153:5,7,17,23
154:10,19 155:22
155:23 158:4,16
159:4,7,11,13,16
159:17 161:20,24
172:22,23 188:4
190:11 192:5,8,10
220:2,2 221:7,17
257:11 312:4,6,11
312:16 323:24
336:3,4,10,11,13
336:18,21,24
337:8 366:10
367:15
**stated** 331:10
340:25 359:8
361:13,14

statement 22:15
  86:20 101:19
  121:7 190:3
  207:12 228:13
  240:21 339:9
  342:15 347:15
  366:13,14 367:19
  367:19
statements 96:24
  97:1 121:3,6,8
  176:4 257:20
states 1:1 29:6
  70:5 101:4 153:12
  153:13 313:4
stating 320:25
stay 362:3
stayed 225:25
steadily 348:12
steady 266:3,7
stealing 352:13
stenographically
  2:9
step 151:25
stephanie 162:24
steps 198:21 202:8
  268:8 276:4,8
stipend 333:21,23
  333:24 334:1,3
  337:2
stipends 334:4
stop 42:17 43:4
stopped 338:8
stopping 43:17
stores 4:4
story 358:24
  359:18,22
stoynoff 197:17
stream 337:1
streams 140:21
street 2:8 3:17
  4:19 5:8,17 6:5,15

strike 215:1 227:7
  239:11 262:3
  314:4 315:19
  344:18
strings 160:4
strong 77:16
  113:14
structure 8:14
  116:22 127:12,21
  131:14,21,24
  132:21 180:8
  181:5,23 208:22
  335:17,17
struggling 211:14
sub 333:20
subcategories
  333:21
subject 300:18
submissions
  246:14
submit 161:14,19
  169:23
submitted 54:15
  85:13,14 247:9
submitting 325:13
subpart 134:20
subscribed 366:10
  367:14 368:21
subsequent 327:11
  328:23 329:5
subsidies 131:4
subsidized 334:5
subsidy 131:2
  207:16
substance 49:8
  211:14 212:5
  228:8,23 229:5
  237:25 238:7,14
  256:6 276:25
  282:11 298:18
  321:21 322:3

323:25 331:1
  356:23
substantial 158:7
  158:10
substantially 20:9
  157:24 158:3
  232:6 346:7
success 251:19
successfully 83:6
sued 14:16
sufficient 120:13
  184:10 185:24
suggest 294:8,21
  321:17
suggested 321:25
suggests 228:5
suite 5:18 6:6,16
  365:2
summarized
  270:12
summary 9:4
  176:4 212:14
  213:4 215:23
  222:15 265:12
  342:14
summer 89:25
summit 1:10 3:3
  3:16 8:3,8,11,12
  8:13,15,16,17,19
  8:20,21,23,24 9:2
  9:5,6,7,9,10,17
  10:19,22 13:20
  14:1,7,8,10,16
  15:8 16:14 18:1
  19:5,17 24:16,17
  25:16 26:24 29:14
  30:3,18 31:7,20
  32:9 35:24 37:16
  44:25 45:1 52:12
  52:21 54:25 57:9
  60:4 69:23 70:1

71:1,19 72:5,14,19
  72:24 73:3 75:6
  75:13,15,19 76:1
  76:10 77:2 78:8
  78:15,20 79:1,6,15
  80:17,22 81:3,15
  85:4 87:12,16,23
  88:1,4,8,17,18,21
  89:1,8 90:18 92:3
  92:15 94:12
  100:19 103:14
  106:2 109:17
  111:10,13 112:12
  114:11,21 116:21
  116:23,24 117:8,9
  117:17 120:16,19
  126:24 127:2
  136:7 141:11
  147:11 152:8,13
  158:1 174:13,15
  174:16,23 180:9
  186:21,25 187:12
  188:8,23,25 189:1
  194:10,16 196:19
  198:8,11 205:4
  212:13,15,16
  225:8 228:9,24
  229:5 230:18
  235:13 236:4
  249:5,7,8 279:8
  283:14 298:21
  314:6 334:20
  336:9 343:6,16
  344:4
summitkids.org
  3:21
superior 365:1
supervises 168:20
supervising 51:22
supervision 113:1

**supervisor** 51:21
52:7 67:10
**supplied** 315:6
**supplies** 241:4
325:18
**support** 51:12
66:3 118:18
130:17 152:22
169:24 172:3
193:18,20,21
194:3,6,10,13,14
194:16,18 287:2
**supported** 286:19
**supposed** 86:3
194:3 248:12,16
**sure** 13:11 16:20
17:7,15 26:5 46:7
70:8 78:6,13
86:11 99:9 100:24
103:4 104:6,8
115:7 125:17
129:12,19 141:7
141:16 142:8
164:13 171:12
179:12 188:6
191:4,10 214:4
216:4,21 230:15
234:5 238:12
261:7 262:2
264:20 278:1
299:17 302:3
305:1 315:15
325:21 328:5
340:16 350:7
**surplus** 180:4,6,10
180:14 181:17
**surprising** 315:19
316:10
**survive** 182:17
186:2

**susan** 128:20
129:3,5 130:5
**switch** 139:25
179:8 309:19
**sworn** 12:3 364:7
366:10,13 367:14
367:18 368:21
**system** 63:10,17
67:4 71:6,8,10,11
71:12,15,17 77:16
79:22 83:20 97:15
108:7 120:18
131:7 161:22,23
161:25 162:6,17
162:20 163:3,3,5
164:6,18 165:2,8
165:15,23 166:2
167:3,9,17 168:3,7
168:11,14,21
203:17 205:1
208:22 215:11
219:11,13,14
221:7,9 239:23
258:3,5,7,11,16,20
258:24 259:2,12
260:4 276:24
280:11 285:2
287:22 290:4
325:24 327:13,16
328:19 338:22
**systems** 122:18

**t**

**t** 192:24 252:5,5
364:1,1
**table** 270:12
339:23 362:12
**tabulated** 99:15
99:18
**tabulations** 99:21
**take** 17:11 64:3
109:5 113:18

115:1 145:16
160:24 194:1
234:4 249:18
255:22 263:25
273:22 274:14,17
301:18 327:2
343:22 344:10,23
**taken** 2:5 64:10
115:13 179:15
196:17 234:9
268:22 275:5
305:22 309:22
327:15 350:19
**takes** 220:3 255:17
**talk** 23:6 73:17
78:5 123:11
134:22 135:20
137:11,11 168:16
195:10 217:12
276:3
**talked** 89:4,10
91:19 95:14
106:24 115:17
117:20 119:21
123:18 124:8
137:4 138:16
145:5 151:2
155:20 158:5,13
161:4 168:7
176:20 190:9,14
191:15,20 209:8
211:7 222:17
250:11 253:24
301:22 302:4
306:12
**talking** 64:16
93:19 103:13
140:1 167:16
176:24 179:24
221:18 229:16
273:7 274:11

305:15 306:13
360:11
**talks** 44:12
**tanf** 84:17 192:24
193:1,1,5
**tangible** 145:23
146:3,9,20 147:1,5
147:9,22 148:25
149:9
**tasked** 52:9 54:17
77:3 113:15
**tax** 29:7,13 141:8
144:18 145:5,24
146:4,9,15,18,19
146:19,21 147:6,9
147:23 148:25
149:10,11,23
150:4 151:24
152:6 156:9
158:13 185:2
186:9,16,17,18
187:4,10 223:1
300:4 341:16
342:22 343:9
**taxes** 145:22 147:2
**taxpayer** 341:19
343:5
**team** 85:13 92:10
92:15,17,19 93:1
94:6 96:1,3
195:13 200:8
202:14,16 229:14
269:24 295:10
**technology** 63:16
63:17 67:9
**teleconference**
4:23
**tell** 83:7 236:13
237:17 283:21
338:2,4

**telling** 359:17
**tells** 23:20
**temporary** 193:2
**ten** 196:10 286:7
**tenth** 5:8
**tenure** 169:14
  170:24 171:25
  173:12 193:14
  211:6 269:1
**term** 32:17,19
  101:22 102:4,10
  102:12,16 103:25
  104:11 253:20
  288:25 289:4,5
  300:21 342:17,18
**terminated** 57:16
  59:1 60:20 130:10
**termination** 57:19
  61:22 62:6,11,17
  66:11 75:16
**terms** 18:7 49:2
  77:10,24 86:14
  108:25 120:17
  140:13 150:24
  177:13 185:23
  260:18 312:7
  313:4 315:1,7
  324:21 336:7
**tersigni** 110:6,23
  111:6 119:23
**testified** 12:5
  222:23 306:5
**testify** 12:3 329:8
  330:1,8 331:3
**testimony** 43:16
  49:8,21 59:6
  234:15,25 235:8
  306:9 364:10
  366:6,7 367:6,9,12
**testing** 51:15,17

**tgi** 50:22
**thank** 13:15 107:9
  117:1 174:12
  189:6 206:11
  234:6 249:13
  273:23 286:1
  332:15 350:16
  353:2 360:13
  361:25 362:15
**thanks** 177:2
  273:21
**therapeutics** 6:13
**thereabouts**
  290:24
**thing** 61:3 173:17
  345:3
**things** 67:7 68:4
  77:13 78:2 108:8
  108:13 135:7
  149:7 165:22
  166:2 177:23
  299:22 320:20
  349:11 360:8
**think** 12:12,19
  14:10 18:23 24:21
  39:19 42:7,23
  44:9 48:8 52:5
  69:21 74:6,7,8
  76:8,20 81:7
  85:15 94:21 99:12
  107:1 109:23
  113:11,19 129:20
  146:5 147:14
  157:3,14 159:6
  165:11 166:20
  172:1,22 173:17
  175:1 179:7,10
  180:5 181:18
  183:4,7 184:12
  185:13 192:23
  196:9 197:18

203:14 204:10
  205:22 206:15
  211:24 212:22
  213:23 214:7
  215:17 221:21
  222:17 223:12
  224:23 226:4
  230:9 234:20
  240:13 248:5
  260:23 261:23
  262:20 264:21
  265:4 273:25
  274:1 286:13
  289:10 296:24
  321:5 327:22
  336:24 340:15
  345:6 350:11
  352:4 360:6
**thinking** 325:20
  325:21
**third** 330:20
**thirty** 365:18
**thomas** 172:25
**thought** 113:4
  260:21 320:14
  325:22 327:19
  329:7
**thousand** 233:23
**thousands** 159:22
**three** 35:3,6 38:6
  38:14 39:9,15,19
  118:16 119:21
  158:8 182:1
  201:22 219:24
  220:3 266:22
  267:6,15 298:11
  305:4 341:25
  353:8,15,20,22
  358:18
**threw** 60:1

**thursday** 15:22
  22:11
**tiffany** 4:22 11:20
**tiffany.ikeda** 4:24
**time** 18:18 20:4,11
  20:13 38:14 47:1
  47:5,14 49:6
  52:12 54:9 55:6
  55:10 56:10,16,18
  60:1 61:9 65:5
  68:9 72:9 73:14
  73:24 75:5 76:23
  78:5 81:25 83:19
  83:21,23 84:3
  85:16 86:24 87:22
  88:5 95:7 104:6
  104:15 110:13
  127:17 128:19
  143:9,24 144:1,4
  148:22 149:4
  154:4,23 164:12
  169:13 170:18
  177:4 179:11
  180:11 183:11
  184:5 208:2
  210:15 219:19,24
  220:5,20,23
  223:16 225:24
  229:12 234:3
  235:15 238:11
  241:12 250:12,13
  258:13 259:17,22
  260:16 262:10
  268:7 269:2,4
  270:1,1 271:2
  277:25 289:19
  293:24 299:11
  311:4 314:15,20
  314:25 316:2,10
  317:1 322:9
  326:13 331:20

339:1,25 341:18
349:24 350:24
353:3 359:6
362:21
**times** 15:17 52:15
52:24 55:16
111:23 112:14
195:14 208:1
340:8,25 352:4,15
**timing** 202:18
**title** 75:2,3 81:6
84:17,17 89:16
163:7 166:18,21
192:24 193:1,3,6
198:7 219:23
220:17,18 221:24
246:21 254:17
259:4 262:19
307:5
**titled** 176:3 307:3
312:22
**titles** 190:21
**today** 12:14,18,24
13:14,15 15:6,10
16:24 42:15 43:18
44:6 49:12 110:8
123:12 138:16
157:16 194:24
234:17 237:8
265:9 268:2
281:10 306:13
318:6 324:13
329:8,25 330:15
331:12,24 333:4
340:25 344:2
349:9 350:10
360:18
**today's** 10:7
**told** 40:20 90:10
152:9 281:9
284:15,17,18

**top** 25:15 33:15
117:23 176:3
231:20 291:10
310:17 313:3
321:16 322:14
**topic** 95:22
**total** 141:12
147:14,16 149:3
153:9 159:4
222:20 223:4,7,10
223:10 226:10
238:23 245:17
253:13 254:20
263:11 265:2
270:12 298:8
302:15 303:16,23
323:19 344:20
**totally** 44:4
**tower** 5:18
**track** 169:4
292:18
**training** 47:8,17
47:19,23 48:1,3,7
76:23,25 190:16
190:17 337:2
**transcribed** 366:7
**transcript** 59:19
59:21,23 60:3,7
363:6,10,14,17
365:11,12 366:5
366:12 367:5,11
367:17
**transcripts** 49:20
**transitional**
193:16
**treatment** 28:23
352:3 357:2,6
**trend** 222:14,19
223:14,18 227:25

288:21 360:6

**trending** 313:5
**tried** 269:5
**truck** 356:19
**true** 152:21 224:3
290:1 364:9
**trustee** 195:17
**trustees** 92:11
93:2,4,6,10,14
94:8,11 95:2,6,24
96:4,16,19,22
117:22 195:16,20
195:22 196:15
197:12,15 200:18
254:7,25
**truth** 12:3
**try** 128:6 142:22
261:7 283:16
292:21 307:11
345:16 348:5
**trying** 41:12 99:12
113:15 129:23
160:19 161:11
260:19,20 316:7
340:19 360:19
**turn** 25:10 29:22
98:17 100:5,13,22
168:23,23 175:11
211:19 240:17
265:11 291:6
309:16 314:11
359:4,7
**turned** 102:24
105:4 213:22
214:2,7,13,15,22
215:3 217:11
265:13
**turning** 20:21 29:2
30:9 119:14
124:17 249:21
256:25 265:22

**twice** 15:19 44:1
53:1 111:25
341:23 342:3,3
**two** 34:10 35:3,6
38:6,14 39:9,15,18
54:3 84:3 112:11
128:15,22,25
131:25 132:15
138:5 149:3,7
150:14 158:7
160:22 171:1
201:21 225:3
239:7,8 286:13
328:24 329:8
337:12 339:19
360:8
**type** 236:14
294:23 305:11
310:9
**types** 80:2 86:12
157:12 170:23
276:23
**typically** 52:20
156:4 202:13
270:20

**u**

**uh** 17:5 101:3
**ultimately** 93:13
99:22 121:5
145:11,15 195:6
198:18 199:3
202:17,20 221:13
244:14 303:3
**umbrella** 80:15
**uncertain** 58:17
236:18 260:8
340:3 343:15
349:6 357:1,9,18
**unclear** 176:23
**uncomfortable**
324:2

**underbudgeted**
208:9,15,16 209:9
209:14,15
**undergo** 76:25
**undergone** 115:19
**underlies** 278:25
281:3 284:7,23
**underlying** 285:16
**underneath** 89:5
127:24 128:19,21
129:25 130:18
131:1 176:7
257:10
**underrepresented**
320:11,15
**understand** 16:18
16:25 17:12,19
18:17 21:7,21
34:15 37:14,19
44:11 89:12 103:9
146:14,17 153:7
153:11 177:6
191:2,8 196:8
216:19 217:8
228:25 229:1
244:18 261:24
263:4 280:10,17
289:5 293:22
316:21 322:13
340:15,16,17,18
357:10,13,16,19
359:11
**understanding**
13:19,22 135:1
165:14 199:6
203:15 211:11
215:17 235:14
251:21,24 264:12
268:14 287:1
289:21 293:17
311:4,25 312:15

314:5,10 319:2
320:16 323:4,12
347:23
**understated**
320:24 321:1,6
**understood** 68:11
104:6
**undertaken**
143:15 154:3
**unit** 256:6
**united** 1:1 153:13
**unquote** 276:15
279:4,9
**unspent** 174:8
245:10,18,23
246:2,6,11
**unused** 248:23
250:17
**update** 104:21,23
**updated** 45:25
**updates** 71:9
**upgrades** 71:9
**upper** 68:12
**use** 84:12,22
140:12 148:3
156:5 160:7,10
166:1 193:4
237:12 281:15,20
292:21 307:10
313:19 316:1,5
**uses** 84:9 162:8
163:7 168:6
**usually** 202:18
**utilities** 241:5
**utilization** 181:1
183:2
**utilize** 246:2,6
**utilizing** 186:5
245:10 294:2

**v**

**v** 1:11 365:6 366:3
367:3
**vacancy** 72:20,23
**vacation** 61:2
208:24 209:1
**valerie** 73:5,16
74:3,6,7,22 92:24
**valerie's** 74:9
**valid** 331:20,25
**value** 148:17
**values** 141:9
144:24 145:7,14
145:17 149:9
182:5 313:15
340:10,14 341:3
341:11,14,18
**vanhoose** 221:11
259:3
**variable** 70:3,20
121:25
**variant** 215:5
**variants** 208:19
**variations** 141:15
**varies** 259:23
**variety** 212:7
**various** 37:15
50:16 51:3 173:3
198:21 219:16
265:8 349:10,11
**vary** 220:14
**verbal** 17:8
**verge** 64:6
**verify** 28:6,8
**veritext** 365:1,7
368:1
**veritext.com.**
365:17
**versus** 232:16
277:10,16 294:22
346:19

**vicinity** 354:14
**video** 42:21,23
59:13
**videographer** 6:23
10:6 11:15 64:8
64:12 115:11,14
179:13,20 234:7
234:10 275:3,6
305:20,23 309:20
309:23 350:17,20
362:16,19
**videotaped** 1:16
**view** 250:19
311:19 326:12
**viewing** 326:21
**vinegar** 113:17
**violence** 274:19
318:19 319:5,6
**virtue** 340:9 341:1
341:14
**vitae** 8:10 44:24
45:11
**voice** 71:12
**volunteering**
334:16
**vosburgh** 1:24
2:10 364:3,20
**voted** 143:18
**voters** 143:23
**voting** 134:11

**w**

**w** 5:11
**wage** 225:5,6
**waiting** 352:8
**waived** 365:19
**wal** 4:4
**walked** 77:9,14,22
77:23 175:3
**walking** 77:4
360:24

**walmart** 4:3 11:6

**want** 15:25 16:25
  49:6 64:1 65:17
  78:4 89:24 120:21
  128:10 129:11
  130:8 157:4,9
  175:11 179:10
  189:22 226:12
  247:6 259:5
  260:14 274:8,14
  291:6 293:5
  309:19 316:21
  323:11 340:7,16
  359:11

**wanted** 212:24
  213:15 216:12,25
  262:3 302:25

**washington** 4:7
  5:9,19 6:7,17

**watched** 352:3,17

**way** 15:3 24:14
  60:16 64:22 68:8
  79:13 85:2 95:8
  97:21 109:8,11
  113:7 126:18
  142:1 151:15
  156:14 158:7,10
  183:2 185:18
  200:11 204:17
  215:13 222:7
  237:9,14,23
  243:16,21 257:17
  261:5 267:22
  270:25 276:25
  278:8 279:20
  280:3 281:14
  282:18 286:8,14
  288:11 297:3
  320:4 326:15
  335:11 345:4
  364:14

**wayne** 61:24 62:24
  63:22 64:17,23
  65:2,5,22 66:16,20
  66:25 67:13 71:5
  71:15,18 343:11
  343:15,17

**ways** 162:9

**we've** 19:15 36:21
  37:9 56:24 64:1
  69:21 81:5 89:3
  89:10 100:14
  104:10 105:8
  114:24 117:20
  119:7,20 121:1,15
  127:13 138:16
  140:25 148:24
  151:2 155:19
  158:13 168:7
  170:22 171:1
  172:6 186:18
  194:21,23 196:10
  198:22 199:23
  203:21 222:17
  226:9 230:23
  234:2,13 239:16
  245:2 248:24
  250:5 253:23
  265:9 311:13
  349:8 359:8

**website** 338:21,23

**wednesday** 10:2

**week** 84:2 202:23
  286:7,13

**weeks** 76:21

**welcome** 117:2

**welfare** 152:22
  161:25

**wendy's** 158:24
  172:2,24

**went** 30:11 52:6,6
  65:11 81:11

151:24 222:10
  245:22 249:1
  250:22 275:22,24
  306:2

**westbrook** 3:13

**whereof** 364:16

**wide** 90:11 135:19

**wife** 352:19

**willed** 113:14

**willing** 329:25
  330:7,15,17 331:3

**wise** 155:24,24
  168:24,25 282:19

**wish** 179:4

**withdrawing**
  272:8

**witness** 3:4 7:3
  12:2,14,18 16:9,17
  18:4 22:7,23
  24:20 26:23 27:25
  28:25 29:20 32:15
  33:13 36:15 37:5
  37:19,25 38:9
  39:3 40:2 43:8
  53:10,24 61:1
  62:20 82:9,12
  83:13 87:18 89:20
  93:13 94:15
  100:11 105:12
  107:17,24 115:2,9
  123:1,21 124:12
  125:9 133:19
  134:18 138:21
  139:15 144:12
  145:1 146:3,13
  147:8 148:2,10,19
  149:14,25 151:17
  152:24 153:15,22
  157:1 164:21
  165:10 172:18
  173:10 174:12

175:23 178:13
  179:2 186:12,24
  187:22 201:13
  206:11 216:1
  217:8 226:2
  228:12 229:7
  233:16,22 234:19
  236:17 237:2,21
  238:20 253:7
  261:4,23 263:21
  264:3,16 267:10
  268:11 269:14,20
  271:12 272:11
  279:13,16,24
  280:14,22 281:22
  282:4,14 285:19
  287:11 288:19
  294:1,25 296:16
  297:21 302:10
  306:21 308:10,20
  309:5,14 311:8,25
  315:24 316:18
  317:15,21 318:3
  318:15,23 319:11
  320:8 321:8
  322:11,19 323:7
  323:15 327:6,22
  328:5,21 329:4,15
  329:23 331:19
  332:15 333:11
  337:17,22 338:11
  351:11,18 352:25
  354:15 358:13
  359:13 362:10
  364:10,16 365:8
  365:11 366:1,4,11
  367:1,4,15

**witness's** 363:5

**witness'** 365:14

**wonderful** 158:25
  172:2,24

| | | |
|---|---|---|
| **word**   302:20,25 | 129:5 139:23 | 180:16,24 182:2 |
| **words**   297:14 | 158:20 167:12 | 182:21,22 183:11 |
| **work**   23:2 28:13 | 175:5 181:19 | 183:18 184:2,13 |
| 41:1,13,17,25 | 187:5,8 273:17 | 185:1,6,11,11,14 |
| 51:23 52:3 56:23 | 300:15 304:4 | 185:15,16,17 |
| 84:1 105:16,24 | 318:15 333:3 | 186:7 199:12,18 |
| 106:12 131:3 | 348:24 | 203:3,10 213:23 |
| 132:3,10,18 181:6 | **year**   32:22 55:19 | 214:6,18 215:15 |
| 194:5,7,7,11 199:1 | 81:23 83:10 | 218:17,19 226:4,6 |
| 211:13 264:1 | 102:12 141:15,15 | 227:1 232:5 239:7 |
| 271:14 280:15 | 142:7,11,14 | 239:8 242:24 |
| 287:3 317:24 | 143:10,16 144:18 | 243:2 245:11,12 |
| 323:8 330:23 | 147:13,18 148:7 | 245:16,19 246:4,7 |
| 349:1 356:15 | 155:5,10 169:5,5 | 250:18 265:3,6 |
| **worked**   37:10 | 175:8 178:3 | 266:23 267:7,15 |
| 50:12 63:3 70:5 | 183:11,18 185:1 | 270:7,14 298:6,12 |
| 175:2,5 182:25 | 190:20,20,22,22 | 303:13 312:18 |
| 211:16 247:1 | 201:11,19,20 | 315:13,16,21 |
| **workforce**   66:4 | 202:11 203:1,1,4,6 | 316:2,13,25 324:5 |
| 172:7,21 | 203:6,8,12 204:23 | 324:9 341:25 |
| **working**   54:17 | 208:5,11,11,19,19 | **yep**   272:6 304:5 |
| 84:4 160:5 | 212:1,2,4,10 | **yesterday**   349:7 |
| **workings**   51:14 | 214:17 216:7,7,16 | 349:12 |
| **works**   120:15 | 216:16 217:3 | **youth**   191:20 |
| 131:7 246:25 | 218:9 222:3,8 | |
| **worst**   153:18 | 225:3 232:16,25 | |
| 255:11,15,16 | 238:22,22 239:1,2 | |
| **worth**   147:9,19 | 239:9 242:1,2 | |
| **wrapped**   83:10 | 245:23,23,24 | |
| **wright**   6:4 11:2 | 248:14 251:6,10 | |
| **write**   80:5 | 253:14,19,19,20 | |
| **written**   59:6 114:1 | 265:16,20 298:8 | |
| 230:21 | 311:22 338:6 | |
| **wrong**   15:3 83:7 | 342:3,3 | |
| **wwe**   125:7,9 | **yearly**   169:1 | |
| **x** | **years**   47:3 53:2 | |
| **x**   7:1 | 98:12,17 100:9 | |
| **y** | 122:23 123:4 | |
| **yeah**   36:15 81:22 | 127:3,10 138:5 | |
| 82:19 98:10 111:5 | 141:25 144:8 | |
| | 157:25 158:8 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.