Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | MDL No. 2804 |
| PRESCRIPTION OPIATE | ) | |
| LITIGATION | ) | Case No. |
| | ) | 1:17-MD-2804 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Hon. Dan A. |
| ALL CASES | ) | Polster |
| | ) | |

— — —

Wednesday, May 29, 2019
— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

Videotaped Deposition of DANIEL P.
KESSLER, JD, Ph.D., held at Jones Day,
1755 Embarcadero Road, Palo Alto, California,
commencing at 9:02 a.m., on the above date,
before Debra A. Dibble, Registered Diplomate
Reporter, Certified Realtime Reporter,
Certified Realtime Captioner, and Notary
Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
1    A P P E A R A N C E S:
2    KELLER ROHRBACK LLC
     BY:  DAVID J  KO, ESQUIRE
3       dko@kellerrohrback com
     1201 Third Avenue
4    Suite 3200
     Seattle, Washington 98101-3052
5    (206) 623-1900
     Counsel for Plaintiffs
6
7    CARELLA BYRNE CECCHI OLSTEIN BRODY &
     AGNELLO PC
8    BY:  DONALD ECKLUND, ESQUIRE
        decklund@carellabyrne com
9       (attending telephonically)
     5 Becker Farm Road
10   Roseland, New Jersey 7068
     (973) 994-1700
11   Counsel for MDL Plaintiffs
12
     JONES DAY
13   BY:  STEVEN N  GEISE, ESQUIRE
        sngeise@jonesday com
14      CLAIRE CASTLES, ESQUIRE
        ccastles@jonesday com
15   4655 Executive Drive
     Suite 1500
16   San Diego, California 92121
     (858) 314-1200
17   Counsel for Walmart Corporation
18
     O'MELVENY & MYERS LLP
19   BY:  DANIEL LEIGH, ESQUIRE
        dleigh@omm com
20   Two Embarcadero Center
     28th Floor
21   San Francisco, California 94111-3823
     (415) 984-8921
22   Counsel for Janssen Pharmaceuticals
     Inc  and Johnson & Johnson
23
24
```

## Page 3

```
1       DECHERT LLP
        BY:  MARY KIM, ESQUIRE
2          mary kim@dechert com
        One Bush Street
3       Suite 1600
        San Francisco, California 94104
4       (415) 262-4500
        Counsel for Purdue Pharma
5
6       COVINGTON & BURLING LLP
        BY:  BRYANT E  PULSIPHER, ESQUIRE
7          bpulsipher@cov com
        415 Mission Street
8       San Francisco, California 94105-2533
        (415) 591-7055
9       Counsel for McKesson Corporation
10
        ZUCKERMAN SPAEDER LLP
11      BY:  DANIEL MOYLAN, ESQUIRE
           dmoylan@zuckerman com
12      100 East Pratt Street
        Suite 2440
13      Baltimore, Maryland 21202-1031
        (410) 949-1159
14      Counsel for CVS Indiana LLC and CVS
        Rx Services Inc
15
16
        THE VIDEOGRAPHER:
17
           Darnell Brown,
18         Golkow Litigation Services
19
20
21
22
23
24
```

## Page 4

```
1              INDEX
2
   APPEARANCES              6
3
   PROCEEDINGS              6
4
5
   EXAMINATION OF DANIEL P. KESSLER, JD,  Ph.D.:
6
     DIRECT EXAMINATION BY MR. KO      7
7
     CROSS EXAMINATION BY MR. GEISE    246
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
1           DEPOSITION EXHIBITS
            DANIEL P. KESSLER, JD,  Ph.D.
2             May 29, 2019
3    NUMBER        DESCRIPTION        PAGE
4    Kessler-1  Plaintiffs' Notice of Oral    18
               Videotaped Expert Deposition
5              of Daniel Kessler
6    Kessler-2  5-10-19 Expert Report of      23
               Daniel P. Kessler
7
     Kessler-3  The Effects of Medicare       239
8              Advantage on Opioid Use, by
               Baker, Bundorf, Daniel
9
     Kessler-4  The Effects of Medicare       239
10             Advantage on Opioid Use, by
               Baker, Bundorf, Daniel
11             Acknowledgments and
               Disclosures
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1            PROCEEDINGS.
2       (May 29, 2019 at 9:02 a.m.)
3       THE VIDEOGRAPHER:  Good
4 morning.  We are now on the record.
5 My name is Darnell Brown, and I'm the
6 videographer with Golkow Litigation
7 Services.  Today's date is May 29,
8 2019, and the time is 9:02 a.m.
9       This video deposition is being
10 held in Palo Alto, California, in the
11 matter of In Re: National Prescription
12 Opiate Litigation for the
13 United States District Court for the
14 Northern District of Ohio.
15       The deponent is Daniel Kessler.
16       Counsel, please identify
17 yourselves for the record.
18       MR. KO:  Good morning,
19 everyone.  David Ko of Keller Rohrback
20 on behalf of the MDL plaintiffs.
21       MR. GEISE:  Steve Geise from
22 Jones Day on behalf of Walmart and the
23 witness.
24       MS. CASTLES:  Claire Castles on

Page 7

1 behalf of Walmart and the witness.
2       MR. BREWER:  Matt Brewer of
3 Bartlit Beck on behalf of Walgreens.
4       MS. KIM:  Mary Kim of Dechert
5 on behalf of Purdue.
6       MR. LEIGH:  Daniel Leigh from
7 O'Melveny & Myers on behalf of Janssen
8 defendants.
9       MR. PULSIPHER:  Bryant
10 Pulsipher from Covington & Burling on
11 behalf of McKesson.
12       DANIEL P. KESSLER, JD, Ph.D.,
13 having first been duly sworn, was examined
14 and testified as follows:
15       DIRECT EXAMINATION
16 BY MR. KO:
17     Q.    Good morning.  Before we begin,
18 Dr. Kessler, do you prefer to go by
19 Dr. Kessler, Professor Kessler?  Daniel?
20 Dan?  Mr. Kessler?
21     A.    Whatever you'd like.  I'm
22 pretty easy.
23     Q.    Okay.  Great.  We'll go with
24 Professor Kessler and see how that goes.

Page 8

1 Professor, where do you
2 currently reside?
3     A.    In Stanford, California.
4     Q.    Okay.  And how long have you
5 lived here?
6     A.    At my Stanford address, ten
7 years.
8     Q.    Okay.  And is that your
9 permanent residence?
10     A.    Yes.
11     Q.    Do you have any other
12 residences?
13     A.    No.
14     Q.    All right.  And I know you've
15 been deposed before, but let me just go over
16 a few ground rules that are important to me.
17 Debbie, the court reporter here, has what I
18 believe is the most important job in
19 transcribing everything, so it's very
20 important that we don't talk over each other.
21 So please wait until I finish my question
22 before you move on to your answer; and
23 likewise, I'll try to wait until you finish
24 your response before I move on to my next

Page 9

1 question.
2     Does that sound good?
3     A.    Yes.
4     Q.    Great.  And to the extent I do
5 ask a yes-or-no question and your answer is,
6 in fact, "yes" or "no," please do respond in
7 that manner rather than simply shaking your
8 head or nodding your head.
9     Is that okay?
10     A.    Yes.
11     Q.    Great.  From time to time
12 counsel at this table may object to my
13 questioning, including your counsel.  Unless
14 they clearly instruct you not to answer, I'd
15 request that you nevertheless answer my
16 question.
17     Does that sound fair?
18     A.    Yes.
19     Q.    Great.
20     If at any point in the day you
21 feel like you need a break, please request
22 one and I'll do my best to accommodate.
23 Okay?
24     A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    Q.    Is there anything you can think
2  of, Professor, that will prevent you from
3  testifying truthfully or honestly today?
4    A.    No.
5    Q.    Great.  Professor Kessler, did
6  you prepare for this deposition today?
7    A.    Yes.
8    Q.    And what did you do to prepare?
9        MR. GEISE:  Just let me
10       interject.  I don't think he's asking
11       for any communications that you had
12       with counsel about that.  So if you
13       can answer without disclosing those
14       communications, you're free to.
15       THE WITNESS:  Of course.
16       I met with Mr. Geise and
17       Ms. Castles yesterday, and I reviewed
18       my report and other case documents
19       over the weekend.
20   Q.    (BY MR. KO)  And with respect
21  to your meeting yesterday, how long did that
22  last?
23   A.    About six or seven hours.
24  Also, I should say also at the meeting were

Page 11

1  Mike DeCesaris and Brianna Cardiff-Hicks from
2  Cornerstone Research.
3    Q.    Okay.  In addition to meeting
4  with individuals at Cornerstone, who I
5  understand assisted you with this report, and
6  Mr. Geise and Ms. Castles, have you met with
7  anyone else to prepare for this deposition
8  today?
9    A.    No.
10   Q.    And was the session, the
11  preparation session yesterday, the only prep
12  that you had with other individuals other
13  than going through the report as you said on
14  your own and going through other documents?
15   A.    Oh, I actually also met with
16  Mr. DeCesaris and Ms. Cardiff-Hicks last
17  Thursday for a couple of hours.
18   Q.    Okay.  And where was that
19  meeting?
20   A.    At Cornerstone Research in
21  Menlo Park.
22   Q.    And in addition to meeting with
23  them in person, did you ever have any
24  communication with them over the telephone to

Page 12

1  prepare for the deposition?
2    A.    No.
3    Q.    And at this meeting last
4  Thursday, were counsel present?
5    A.    No.
6    Q.    Okay.  And so what did you
7  discuss with those two individuals in
8  preparation for this deposition?
9    A.    We discussed the data analysis
10  conducted under my direction for this report.
11   Q.    Okay.
12   A.    And the literature underlying
13  the report.
14   Q.    In addition to generally the
15  data analysis supporting your report and the
16  literature referenced in your report, did you
17  speak with them about anything else in
18  connection with this deposition today?
19   A.    No.
20   Q.    Okay.  Approximately how many
21  hours would you say that you have spent
22  preparing for this deposition?
23   A.    Less than 20.  Between 15 and
24  20.

Page 13

1    Q.    And approximately six or seven
2  of those were with counsel and the balance of
3  that was without counsel; is that accurate?
4    A.    Yes.
5    Q.    Okay.  Great.
6        Now, you mentioned a moment ago
7  that you reviewed some documents in
8  connection with preparing for this
9  deposition.  Can you describe to me what
10  documents that you reviewed?
11       MR. GEISE:  And again, if it's
12       a document that counsel showed you or
13       talked to you about, I'd ask you not
14       to answer on that.  If it's a document
15       you looked at with -- in meetings and
16       counsel wasn't present, you're
17       certainly free to disclose that.
18       THE WITNESS:  All the documents
19       that I reviewed were documents that I
20       discussed with counsel.
21   Q.    (BY MR. KO)  Okay.  And so were
22  those all documents that were provided to you
23  by counsel?
24       MR. GEISE:  Objection, form.

4 (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    THE WITNESS: No.
2    Q.   (BY MR. KO) How did you obtain
3  these documents to review?
4    A.   Some of them were provided by
5  counsel. Some of them I had found and some
6  of them were found or produced by the
7  Cornerstone people.
8    Q.   Okay. Well, let's talk about
9  the documents that you said you had found.
10  How did you find those documents?
11    A.   As part of my literature review
12  and study of this issue.
13    Q.   Okay. And what about with
14  respect to the documents that were found or
15  produced by the Cornerstone people? How do
16  you know -- or how did they obtain those
17  documents?
18    A.   Some of those documents they
19  obtained through literature review or study.
20  Some of those documents they produced as a
21  result of data analysis conducted under my
22  direction.
23    Q.   Okay. Now, I understand that
24  you've listed materials that you've

Page 15

1  considered in preparing your report in the
2  appendix of your expert report. Can you
3  think of any documents that you reviewed in
4  connection with preparing for this deposition
5  that are not listed in that appendix?
6    A.   Yes.
7    Q.   Okay. Which documents are
8  those?
9    MR. GEISE: Again, same
10  instruction. If it's a document that
11  was provided to you or showed to you
12  by counsel, I'd claim privilege on
13  that. But if it's something outside
14  of that, you can answer.
15    MR. KO: Well, I'd actually
16  like to interject for a moment. To
17  the extent the documents were --
18  contained facts or data or certain
19  assumptions that counsel provided to
20  you, I'd actually ask you to respond
21  and answer.
22    MR. GEISE: Just to clarify, if
23  you're asking if there was a document
24  that he is relying on for purposes of

Page 16

1  his opinions that was provided by
2  counsel, you would like to talk about
3  that. But if it's something he's not
4  relying on and is not relevant to his
5  opinions, then you're not asking about
6  that?
7    MR. KO: We can certainly start
8  with the former.
9    MR. GEISE: Okay.
10    Q.   (BY MR. KO) So let me ask you
11  again, to be clear.
12    I understand that you have
13  indicated that you have considered certain
14  documents in your expert report; correct?
15    A.   Yes.
16    Q.   Are there any documents that
17  you have reviewed in preparation for this
18  deposition that are not listed in appendix --
19  in the appendix in your expert report for
20  which you say you've considered those
21  materials?
22    A.   I haven't reviewed any
23  documents that are relevant to my opinions
24  that are not listed in the report.

Page 17

1    Q.   I see. So every document --
2  well, strike that.
3    Just so the record is clear,
4  you have reviewed certain documents in
5  connection with preparing for this
6  deposition; correct?
7    A.   Well, I'm not -- I'm not sure
8  I'd say that. I have reviewed other
9  documents related to this matter that are not
10  listed in the appendix to my report, but
11  none -- none of them -- I didn't review them
12  specifically in preparation for this
13  deposition, and none of them are relevant to
14  the opinions I express in my report. Any
15  opinion I express in my report relies only on
16  the documents in the report.
17    Q.   Okay. And so a moment ago or
18  earlier this morning when you described that
19  you had reviewed certain documents before
20  today, all of the documents that you rely
21  upon in forming your opinions and that
22  support your report are contained in the
23  appendix in your expert report; is that
24  correct?

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   Yes.
2    Q.   Great.
3         I'd like to go ahead and direct
4    your attention to the exhibit that's in front
5    of you.
6         (Whereupon, Deposition Exhibit
7    Kessler-1, Plaintiffs' Notice of Oral
8    Videotaped Expert Deposition of Daniel
9    Kessler, was marked for
10   identification.)
11        MR. KO:  It's been marked as
12   Exhibit 1.  And I've set some extra
13   copies right there for counsel.
14   Q.   (BY MR. KO)  Have you seen
15   this --
16        MR. GEISE:  And, Counsel,
17   before you -- let me just, for the
18   record, pose an objection to the -- to
19   Exhibit 1 which is the Plaintiffs'
20   Notice of Oral Videotaped Expert
21   Deposition of Daniel Kessler.
22        Professor Kessler has complied
23   with both the Court's Case Management
24   Order No. 1 and Federal Rules of Civil

Page 19

1    Procedure 26 in particular with regard
2    to his production of documents.  You
3    can certainly ask him any questions
4    about the subject matter enumerated in
5    Exhibit A of the deposition notice
6    Exhibit 1, but Professor Kessler
7    doesn't have any further production
8    and has no obligation to do so.
9    Q.   (BY MR. KO)  Professor Kessler,
10   have you reviewed this document -- or have
11   you seen this document before?
12   A.   No.
13   Q.   Okay.  So counsel didn't
14   provide you with this notice?
15   A.   No.  Counsel -- counsel
16   mentioned it to me and described it in
17   general terms, but I didn't get a copy.
18   Q.   Okay.  And what did they --
19   what did counsel mention to you about this
20   particular exhibit?
21        MR. GEISE:  And I would object
22   to the extent you're asking for
23   communications from counsel.  I
24   believe that's privileged.  Instruct

Page 20

1    you not to answer.
2    Q.   (BY MR. KO)  I want to turn
3    your attention to the second item in that
4    notice.  And I know you've not -- you haven't
5    seen it before, but I'd just like to ask you
6    about a couple of things relevant to that
7    point.
8         Go ahead and read the second
9    bullet in that notice.
10   A.   I've read it.  I understand.
11   Q.   Okay.  Do you have -- separate
12   and apart of what's requested in that notice,
13   do you have an itemization of hours that
14   you've spent in this case?
15   A.   Not with me today, but I -- I
16   have sent the counsel and the client an
17   itemization of ours, yes.
18   Q.   Okay.  So do you have -- you
19   have invoices that you have submitted to, as
20   you say, counsel and the client regarding the
21   hours that you've spent in this matter;
22   correct?
23   A.   Yes.
24   Q.   And you didn't -- so the record

Page 21

1    is clear, you didn't bring those invoices or
2    an itemization of those hours to this
3    deposition today; correct?
4    A.   No.
5    Q.   Why not?
6    A.   I didn't think I needed to.  I
7    wasn't aware that I was supposed to.
8         MR. KO:  Okay.  And I would
9    just note for the record that, in
10   connection with Mr. Geise's objection
11   to this notice, that we obviously
12   reserve the right to seek the invoices
13   and question Professor Kessler on them
14   at the appropriate time.
15        MR. GEISE:  And you're
16   certainly free to question
17   Professor Kessler about his
18   itemization of hours spent and
19   compensation paid throughout the
20   deposition today, absent the invoices
21   themselves.
22   Q.   (BY MR. KO)  Now, a moment ago,
23   you said you provided the invoice to counsel
24   and to the client.

6 (Pages 18 to 21)

Page 22

1          And which client in particular
2    did you provide those to?
3        A.    Walmart.
4        Q.    Okay.  Any other entities that
5    you've provided your invoices to?
6        A.    No.
7        Q.    Okay.  Do you provide any
8    invoices to or through Cornerstone?
9        A.    Oh, I may have given a copy of
10   one of the earlier invoices to Cornerstone.
11   Initially, they were going to process them to
12   Walmart for me, but that's not the way it's
13   turned out.  I've now just sent -- Walmart
14   had always been paying me directly, and
15   Cornerstone was just essentially handing them
16   the invoice.  But that didn't really work for
17   anyone, so now I just send them to Walmart
18   directly.
19       Q.    And approximately when was
20   that, when you first provided an invoice to
21   Cornerstone to facilitate to Walmart?
22       A.    I don't remember.  It was a --
23   maybe three or six months ago.
24       Q.    Okay.  Now, going back to the

Page 23

1    notice that's in front of you, there is also
2    a request regarding your CV at No. 3.
3          Do you see that?
4        A.    Yes.
5        Q.    And I know that you've
6    disclosed your CV in connection with your
7    expert report.  Is the CV that's listed in
8    your expert report the most updated CV that
9    you have?
10       A.    Yes.
11       Q.    Okay.  Great.
12          And just so the record is
13   clear, do you -- did you bring any documents
14   to this deposition today?
15       A.    No.
16       Q.    Great.
17          I'd now like to turn your
18   attention to what's been marked as Exhibit 2.
19          (Whereupon, Deposition Exhibit
20          Kessler-2, 5-10-19 Expert Report of
21          Daniel P. Kessler, was marked for
22          identification.)
23       Q.    (BY MR. KO)  Which is right
24   there in front of you.

Page 24

1          MR. KO:  Again, there's a copy.
2    Probably not a sufficient amount of
3    copies, but there are copies on the
4    table for counsel.
5        Q.    (BY MR. KO)  And Professor
6    Kessler, does this document look familiar to
7    you?
8        A.    Yes.
9        Q.    And this is a copy of the
10   complete expert report with appendices that
11   you are -- that you have submitted in this
12   case; correct?
13       A.    Yes.
14       Q.    And does this contain all of
15   the opinions you intend to offer in this
16   case?
17       A.    No.  Not necessarily.
18       Q.    Okay.  Well, why is that the
19   case?
20       A.    There are at least two classes
21   of opinions that I may offer subsequent to
22   this report.
23       Q.    Okay.  Can you describe those
24   two classes?

Page 25

1        A.    Yes.
2          The first class of opinion is
3    opinions about the relationship between
4    prescription opioid shipments and mortality
5    that I may provide opinions on if -- if and
6    when NCHS grants me permission to use the
7    restricted-use mortality data data.
8          The second class of opinions
9    are opinions about the impact of defendants'
10   challenged conduct on county government
11   activity more generally, which I may provide
12   opinions on if and when I am able to
13   understand the source of plaintiffs'
14   allegations about distributor -- the impact
15   of distributor defendants' challenged conduct
16   on county government activity.
17       Q.    Okay.  And taking that second
18   class, as you've described it, first, just so
19   I understand and to make sure the record is
20   clear, the -- can you describe what you mean
21   by "source"?
22          MR. GEISE:  I'm just going to
23   object to the form.
24          MR. KO:  Sure.  Let me ask it

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    more clearly so you understand exactly
2    where I'm coming from.
3        Q.   (BY MR. KO)  A moment ago you
4    had described two classes of opinions that
5    you may give after or that are not contained
6    within the four corners of this report;
7    correct?
8        A.   Yes.
9        Q.   And the second class, you
10   claim, was the impact of distributor
11   defendants' challenged conduct on county
12   government activity; correct?
13       A.   Yes.
14       Q.   And I believe you referenced an
15   inability to -- an inability to understand
16   the source of the data for which you can make
17   that calculation.
18       Do I understand that correctly?
19       A.   Yes.  And actually let me just
20   correct my response to your former question.
21       The second class includes not
22   only distributor defendants' challenged
23   conduct, but also marketing defendants'
24   challenged conduct.

Page 27

1        But apologize, let me go back
2    to your actual question.
3        Yes, I was unable to understand
4    the source of the data for what the source of
5    the data were for plaintiffs' allegations
6    about the impact of distributor defendants'
7    challenged conduct on county government
8    activity, yes.
9        Q.   Okay.  And can you describe
10   what you were unable to understand with
11   respect to the source of the data?
12       A.   Yes.  From Professor Cutler's
13   report I understood that plaintiffs' had
14   calculated the share of shipments that were
15   attributable to distributor defendants'
16   challenged conduct.  That was a table in
17   Professor Cutler's report.
18       And Professor Cutler had
19   explained how he would use that to calculate
20   the amount of harm caused by distributor
21   defendants' challenged conduct under his
22   model.
23       So in order to understand what
24   Professor Cutler was doing, I sought to

Page 28

1    determine how he had obtained those values,
2    and I was unable to find the source of those
3    values in the locations that Professor Cutler
4    or other witnesses indicated.
5        Q.   Okay.  And is there anything
6    else that you can think of that describes
7    your inability to find the source of the data
8    to come up with an opinion regarding
9    defendants' -- or the distributor defendants'
10   challenged conduct?
11       A.   Well, I reviewed Professor
12   Cutler's deposition.  I reviewed Dr. McCann's
13   reports and supplemental material.  And
14   nowhere could I find the numbers in Professor
15   Cutler's report according to the locations
16   specified by him in deposition or in any of
17   those materials.
18       Q.   And did you review Dr. McCann's
19   deposition transcript?
20       A.   I don't think I did.
21       Q.   Okay.  Other than the two
22   classes of opinions that you have reserved
23   the right to offer, are there any other
24   opinions that are not contained in this

Page 29

1    report that you may potentially provide at
2    trial?
3        A.   No.  I mean, I may use
4    demonstratives or other potential materials
5    that aren't strictly in the report, but the
6    opinions I will offer will all be grounded in
7    what's here in front of us.
8        Q.   Okay.  And going back a moment
9    ago to again the classes of opinions that you
10   may provide later, you also mentioned
11   reference to the manufacturer defendants'
12   challenged conduct.
13       Did I hear you correctly?
14       A.   I meant to say marketing
15   defendants, but yes, that's right.
16       Q.   Thank you for clarifying.
17       So with respect to the
18   marketing defendants, what is the potential
19   opinion that you plan on giving at trial that
20   is not contained in your report?
21       MR. GEISE:  Object to the form.
22       THE WITNESS:  Well, it's hard
23   for me to say because the plaintiffs'
24   estimates of the effect of distributor

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    defendants' challenged conduct must
2    necessarily depend in part on their
3    estimates of the effect of marketing
4    defendants' challenged conduct since
5    the sum of the effects can't add up to
6    more than 100 percent of the harm.  So
7    given that, I certainly want to
8    reserve the right to offer an opinion
9    on the effect of distributor
10   defendants' challenged conduct.  I
11   have to also reserve the right to
12   offer an opinion on marketing
13   defendants' challenged conduct because
14   those two effects are interrelated.
15        MR. KO:  I see.
16        Q.   (BY MR. KO)  Now, going back to
17   your report.
18        Obviously, you've submitted
19   this report in this case.  Did you draft the
20   entire report on your own?
21        A.   Well, every word and number in
22   here is my own.  Others have reviewed this
23   report.
24        Q.   So did you draft the entire

Page 31

1    report on your own?
2        A.   I would say yes.
3        Q.   Okay.  And I know that, as we
4    discussed before, Cornerstone has assisted
5    you in preparation of this report.
6        Can you describe what they did
7    to assist?
8        A.   Sure.  Cornerstone conducted,
9    under my supervision and direction, the
10   statistical analyses and tabulations
11   contained in the report.  Cornerstone helped
12   me with the literature reviews, although I
13   read every one of the papers, at least I
14   looked at them and read them myself.
15        And Cornerstone helped me with
16   formatting and language and stuff like that.
17        Q.   Did they draft any initial
18   portions of the report for your review?
19        MR. GEISE:  I'm going to object
20        to the extent you're asking about
21        drafts of a report.  I believe that's
22        been off-limits for purposes of this
23        case and is under the rules.
24        MR. KO:  Are you instructing

Page 32

1    him not to answer?
2        MR. GEISE:  Yes.
3        MR. KO:  Okay.  Did -- and I
4    don't need you to understand what
5    specifically they did.  I am just
6    simply asking whether or not they
7    engaged in any drafting of the report
8    for your review.
9        MR. GEISE:  It's been asked and
10   answered, but you can answer it again.
11        THE WITNESS:  I wrote the
12   report.  All the language in it is
13   mine.
14        Q.   (BY MR. KO)  And I understand
15   that, and I'm simply asking whether or not
16   Cornerstone prepared any portions of the
17   report for your review.
18        A.   Well, certainly if by portions
19   you would include the tables, yes, they made
20   the tables under my supervision and
21   direction.  I can't make them come out like
22   this.
23        Q.   Sure.  In terms of the text and
24   any of the words, outside of the tables, did

Page 33

1    Cornerstone play a part in drafting any
2    sections for your review?
3        A.   No.  I mean, I wrote the
4    report.  They commented before.  I would not
5    describe what they did as drafting any of it.
6    That's just not how I would describe it.
7        Q.   Sure.  Understood.  Thank you.
8        And so your testimony here
9    today is that you drafted all -- the entire
10   report on your own; is that correct?
11        MR. GEISE:  Object to the form,
12   misstates the testimony.
13        THE WITNESS:  I mean, I wrote
14   this report.  The words are all mine.
15        Cornerstone, the folks at
16   Cornerstone have reviewed the report,
17   they made some comments and
18   suggestions, some of which I accepted,
19   some of which I rejected.
20        All words here, all the wording
21   is mine.  All the concepts are mine.
22        Q.   (BY MR. KO)  So you have just
23   indicated that Cornerstone made some comments
24   and some suggestions.

9  (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Can you describe what comments
2 and suggestions they made to your report?
3    MR. GEISE:  Object and instruct
4    you not to answer to the extent this
5    gets into the drafting process and the
6    prior drafts of the report.
7    Q.  (BY MR. KO)  Are you going to
8 follow your counsel's instruction there?
9    A.  Yes.
10    Q.  Okay.  Are there any aspects of
11 what they said or commented on the report
12 that were not related to the actual drafting
13 of the report?
14    A.  No.
15    Q.  Okay.  Approximately how much
16 time did you spend drafting the report on
17 your own?
18    A.  Do you mean from the start,
19 when I started reviewing documents in this
20 matter all the way up until I turned in the
21 report?  Is that the amount that you're
22 asking for?
23    Q.  Well, actually, let's start
24 with -- and I appreciate the clarifying

Page 35

1 question back to me.
2    Let's start with the simple
3 drafting of the actual report, which I
4 understand you did on your own, separate and
5 apart from any introductory or background
6 materials that were reviewed.
7    With respect to drafting the
8 report, approximately how much time did you
9 spend doing so?
10    A.  It's hard for me to estimate,
11 because a lot of the time drafting is spent
12 back and forth looking at and reviewing all
13 the materials.  So I'm not sure -- I guess
14 I'm just not understanding what the line is
15 between reviewing materials and drafting.
16    Q.  Okay.  So then let's start --
17 or let's go back and expand it to time spent
18 reviewing materials.  Approximately how much
19 time would you say you have spent drafting
20 the report when also considering that that
21 would include reviewing materials?
22    A.  Sure.  So that -- what I
23 understand you to be asking is the time I've
24 spent on this matter up until the preparation

Page 36

1 for deposition.  So up -- sorry, up until the
2 submission of the report, and then I would
3 say that's probably 350 hours.  In that
4 ballpark.
5    Q.  And is there any way that you
6 can break down -- well, a moment ago you had
7 said that you had reviewed certain documents
8 that weren't relevant to your report or were
9 not relevant in connection with this
10 deposition, at least from your perspective.
11    Was any of that 350 hours spent
12 reviewing documents that are not relevant to
13 your report?
14    A.  Yes.
15    Q.  Do you have an approximate
16 breakdown on the percentage?
17    A.  Oh, gosh.  I mean, I guess when
18 you say not relevant to, I was thinking
19 documents that I read that I didn't rely on
20 in forming my opinions.  And so there were so
21 many documents.  Gosh, I just don't know.
22    Q.  Sure.
23    A.  Yeah.
24    Q.  So of -- with respect to the

Page 37

1 350 hours that you've spent, it's my
2 understanding that that's the approximate
3 total amount you've spent in connection with
4 this litigation and your retention in this
5 case.
6    Is that accurate to say?
7    MR. GEISE:  Object to the form.
8    THE WITNESS:  No.  I was
9 responding that that's the amount I
10 spent from my retention to the
11 submission of the report, to the final
12 production and submission of the
13 report.
14    MR. KO:  And thank you.  And
15 sorry for interrupting.
16    THE WITNESS:  No, no.
17    Q.  (BY MR. KO)  So with that
18 clarification, let me ask:  Approximately how
19 much time have you spent in this matter as a
20 whole?
21    A.  Between 350 and 400 hours.
22    Q.  And when were you first
23 retained in this matter?
24    A.  June of 2018.

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.    And I understand you were
2  retained by Walmart; correct?
3    A.    Yes.
4    Q.    And do you also -- was your
5  engagement agreement or your retention
6  agreement with Walmart and Jones Day or --
7  I'll stop there.
8          Just so the record is clear,
9  was your engagement agreement or your
10  retention agreement with Walmart and
11  Jones Day?
12    A.    Yes.
13    Q.    I want to ask you some more
14  questions about your engagement in a moment,
15  but first can you turn with me to page 62 of
16  your expert report?
17    A.    Sure.
18    Q.    And so the record is clear,
19  page 62 is the beginning of Professor
20  Kessler's report -- or excuse me, is the
21  beginning of the appendices of Professor
22  Kessler's expert report.  And on page 62 is
23  the beginning of appendix A, which is set
24  forth as CV and testimony list.

Page 39

1          Do you see that?
2    A.    Excuse me.  Yes.
3    Q.    And the CV that appears
4  following page 62 is accurate as of today;
5  correct?
6    A.    Yes.
7    Q.    Do you have any updates or
8  revisions you'd like to provide to this CV?
9    A.    No.
10    Q.    Now, you've indicated that you
11  have a Ph.D. in economics from MIT from 1994.
12  And I see that you also have a JD from
13  Stanford in 1993.  Did you do those programs
14  concurrently?
15    A.    Yes.
16    Q.    And when did you start at MIT?
17  For purposes of your Ph.D., when did you
18  start at MIT?
19    A.    In 1988.
20    Q.    And when did you start at
21  Stanford Law School?
22    A.    1990.
23    Q.    Did you commute?
24    A.    No.

Page 40

1    Q.    How were you able to obtain
2  both of those degrees concurrently?
3    A.    I was a resident in
4  Massachusetts from 1988 to 1990.  Then a
5  resident in California from 1992, '93, making
6  some visits back to Massachusetts in 1992,
7  '93, to defend my thesis and complete my
8  degree.
9    Q.    So I might be just as confused
10  as Debbie, but is there a -- there's a
11  two-year gap where maybe you weren't a
12  resident somewhere, or did I miss that?  I
13  believe you said that you were a resident in
14  Massachusetts from 1988 to 1990?  Or did you
15  say 1998 to 1992?
16    A.    I was a resident in
17  Massachusetts from 1988 to 1990.
18          Then probably officially a
19  California resident from 1990 to today.
20          In 1992-93, I made some trips
21  back to Massachusetts to defend my thesis and
22  complete my degree.
23    Q.    Okay.  Thank you for that
24  clarification.

Page 41

1          And what did you write your
2  thesis in for purposes of your Ph.D. at MIT?
3    A.    My thesis was on the topics of
4  health economics and law and economics using
5  empirical statistical methods.
6    Q.    And did you have a particular
7  focus with respect to those two general and
8  broad categories?
9    A.    That's how I would describe it.
10    Q.    Okay.  And while you were at
11  MIT, were you part of any organizations or
12  groups?
13    A.    Gosh, I don't -- I mean, I just
14  don't remember.  I'm not sure what you're
15  asking.
16    Q.    Well, oftentimes at schools and
17  grad schools there are organizations, clubs,
18  things of that nature.  Were you affiliated
19  with any such clubs or organizations when you
20  were at MIT?
21    A.    I don't remember.
22    Q.    Sure.  Did you receive any
23  awards or honors at MIT while obtaining your
24  Ph.D.?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.    I was a National Science
2  Foundation fellow at MIT.  I was a -- I
3  had -- I had some other MIT-based fellowship.
4  Gosh, I just don't -- it was so long ago.  I
5  just don't remember really.
6    Q.    Fair enough.
7        You know Professor Gruber;
8  correct?
9    A.    I know Professor Gruber
10  professionally, yes.
11    Q.    And when did you first meet
12  Professor Gruber?
13    A.    Oh, gosh.  Long ago.
14    Q.    Did you guys overlap at MIT?
15    A.    You know, I can't remember if
16  Professor Gruber went to Harvard or MIT for
17  grad school now.
18        I do remember I've -- I've
19  known Professor Gruber for years.
20    Q.    Approximately how many years?
21    A.    25 years.
22    Q.    Okay.  But you didn't attend
23  school with him ever?  At least as far as you
24  recall?

Page 43

1    A.    I think he was a year or two
2  ahead of me, but I'm not sure -- I just don't
3  remember.
4        I do remember him as part of
5  the community, but I don't remember
6  overlapping specifically.
7    Q.    I'm going back to your CV
8  that's listed after page 62 in your report.
9        You also list certain awards
10  and fellowships.  Do you see that at the
11  bottom of your CV?
12    A.    Yes.
13    Q.    And I just want to get an
14  understanding on a few of these.  With
15  respect to the Stanford Center on Longevity,
16  you indicate you have been an affiliate since
17  2008; correct?
18    A.    Yes.
19    Q.    Can you describe the extent of
20  your involvement with the Stanford Center on
21  Longevity?
22    A.    Sure.  Absolutely.
23        The Stanford Center on
24  Longevity is a center that's very interested

Page 44

1  in demographic trends in the United States
2  and particularly -- in particular about
3  trends among aging and older Americans.  And
4  they have affiliates throughout the
5  university who also are interested in the
6  study of aging, which I am, insofar as aging
7  Americans use a lot of healthcare and use a
8  lot of publicly funded healthcare through the
9  Medicare program.
10        I also have some familiarity
11  with the basic demographics of aging, and so
12  I enjoy participating in events that they
13  have studying that because I can learn from
14  the demographers and others who work on that
15  at the center.
16    Q.    And can you describe the extent
17  of your affiliation.
18        In other words, what is --
19  affiliate, to a layperson, means that you're
20  associated.  Some people could defer to
21  that interpretation, but generally speaking
22  an affiliate means that you're associated
23  with an organization.  Can you describe to
24  the Court and to the jury the extent of your

Page 45

1  involvement with the Stanford Center on
2  Longevity?
3    A.    Sure.  I attend events that
4  they have.  I speak with the management and
5  the fellows who are resident there.  And I
6  review and read some of their materials when
7  they come out.
8    Q.    Okay.  And you've listed your
9  affiliation with this group under the awards
10  and fellowships, and so I want to understand
11  why you've done that.
12    A.    Sure.  I mean, I consider it an
13  honor that they wanted me to be an affiliate
14  with them.  I think it's a fantastic group
15  that does important work.  And so I'm -- I'm
16  honored that they invited me to participate
17  in their organization.
18    Q.    And how many affiliates are
19  there with this particular organization?  Do
20  you know?
21    A.    Gosh, I don't know.
22    Q.    Okay.
23        Any ballpark estimation at all?
24    A.    No, I don't know.

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

```
1        Q.   Is it over 50?
2        A.   I just really don't know.
3        Q.   Okay.  You've also listed that
4   you are an affiliate for both the Center for
5   Social Innovation at the Stanford business
6   school as well as an affiliate for the Center
7   for Health Policy at Stanford.
8             Do you see those listed under
9   your awards and fellowships?
10       A.   Yes.
11       Q.   So is your response with
12  respect to those two organizations the same
13  that you provided regarding the Stanford
14  Center on Longevity?  In other words, you've
15  listed those under your awards and
16  fellowships because you're considering it an
17  honor to be a part of those groups?
18       A.   Yes.  I do.
19            I've actually been more
20  involved with the Center for Social
21  Innovation and with the Center for Health
22  Policy than with the Center on Longevity, but
23  I also consider it an honor that those groups
24  have invited me to participate, yes.
```

Page 47

```
1        Q.   Okay.  And so let's take the
2   Center For Health Policy first.  You've said
3   that you are involved more than your
4   affiliation with the Stanford Center on
5   Longevity.
6             Can you describe to the Court
7   the extent of your involvement with that
8   particular organization?
9        A.   Sure.  I'm also a professor by
10  courtesy at the Stanford school of medicine,
11  which is where the Center For Health Policy
12  is focused.
13            And so I'm -- you know, I'm a
14  professor by courtesy in that department.  So
15  that's an additional link that I have with
16  the Center For Health Policy.
17            The Center For Social
18  Innovation, I taught for many years at the
19  graduate school of business.  I still teach a
20  class over there, but I had been teaching
21  courses that were part of the center's
22  purview for many, many years.  And so that's,
23  you know, an additional link that I have with
24  the Center For Social Innovation.
```

Page 48

```
1   They still consult me on
2   various internal governance matters because
3   of my historical links with the center.
4        Q.   Okay.  And do you know
5   approximately how many affiliates there are
6   at the Center For Social Innovation?
7        A.   No, I don't know.
8        Q.   The same question with respect
9   to the Center For Health Policy.  Do you know
10  how many affiliates there are?
11       A.   No, I don't know.
12       Q.   Now, I also understand that you
13  are a research associate for the National
14  Bureau of Economic Research and you've been
15  such -- or you've been a research associate
16  since 1999; is that correct?
17       A.   Yes, I'm a research associate
18  at the National Bureau, yes.
19       Q.   And can you describe to the
20  Court and the jury the extent of your
21  involvement with the NBER?
22       A.   Sure.  The NBER is a
23  non-profit, non-partisan economic research
24  organization.  I participate in their
```

Page 49

```
1   activities.  I use their computer systems.
2   I've administered grants through them over
3   the years.  And I consider it an honor to be
4   a research associate there.  That's why I've
5   put it on my CV.
6        Q.   You are aware of -- or you know
7   who Professor David Cutler is; correct?
8        A.   Yes, I know who Professor
9   Cutler is.
10       Q.   And do you know whether or not
11  he's a research associate at the NBER?
12       A.   Yeah, I'm sure David -- I'm
13  sure Professor Cutler is a research associate
14  at the NBER.
15       Q.   And a moment ago we talked
16  about Professor John Gruber.  Do you know
17  whether or not he is a research associate at
18  the NBER?
19       A.   Yes.
20       Q.   Okay.  Yes, he -- you are aware
21  that he is a research associate; correct?
22       A.   Your question was did I know
23  whether he was a research associate.  I do
24  know, and yes, I know that he is a research
```

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    associate.
2         Q.    Okay.  Thank you for that
3    clarification.
4         Do you also know who Professor
5    Tom McGuire is?
6         A.    I know who Professor Tom
7    McGuire is, yes.
8         Q.    And how long have you known
9    Professor McGuire?
10        A.    I don't know Professor McGuire
11   as well as I know Professor Gruber.
12   I know him professionally.  I'm
13   not sure how long.
14        Q.    Okay.  Fair enough.
15        Do you know whether or not he's
16   a research associate at the National Bureau
17   of Economic Research?
18        A.    I don't know.
19        Q.    Okay.  Do you know Professor
20   Jeffrey Liebman?
21        A.    I do know Professor Liebman.
22        Q.    And how long have you known
23   him?
24        A.    Wow.  I -- again, I only know

Page 51

1    him professionally.  Probably 20 years.  In
2    the ballpark of 20 years.
3         Q.    And are you aware of whether or
4    not he is a research associate at the NBER?
5         A.    I believe he is, but I am not
6    certain.  Yeah, I'm not certain.
7         Q.    Okay.  By the way, with respect
8    to all four of these professors that we just
9    discussed, Professors Gruber, Cutler,
10   McGuire, and Liebman, do you know any of them
11   outside of your professional capacity?
12        A.    No.
13        Q.    In other words, would you
14   consider any of them your colleagues?
15        MR. GEISE:  Object to the form.
16        THE WITNESS:  Yes.  I mean, I'd
17   consider them all my colleagues.
18        MR. KO:  Okay.  Great.
19        THE WITNESS:  In a professional
20   context.
21        Q.    (BY MR. KO)  Do you respect all
22   four of them?
23        MR. GEISE:  Objection, vague.
24        THE WITNESS:  I think they're

Page 52

1    all very smart academic researchers.
2         I certainly have read many of
3    the papers that they've written, and
4    learned from them.
5         Q.    (BY MR. KO)  And do you know
6    Professor Meredith Rosenthal?
7         A.    Not really.
8         Q.    Okay.  You don't have a
9    professional relationship with her?
10        A.    No, I would not say I know
11   Professor Rosenthal professionally, no.
12        Q.    So is it fair to say that you
13   know Professors Cutler, Gruber, McGuire, and
14   Liebman more than you know Professor
15   Rosenthal?
16        A.    Yes.  That's a correct
17   assessment.
18        Q.    Okay.  Now going back to your
19   CV on the awards and fellowships that you
20   list, are there -- I just want to make sure
21   the record is clear, are there any other
22   awards or fellowships that you can think of
23   that you have had or currently have that are
24   not listed here?

Page 53

1         A.    Gosh, I -- I don't know.  I
2    mean, I've -- over time, had many fellowships
3    and awards.  These are the most important
4    ones.
5         Q.    Okay.  Fair enough.
6         A.    And most recent.
7         Q.    They're the most recent ones?
8         A.    Yes.  Well, it's not -- that's
9    really not accurate.  These are the most
10   important ones.  That's a more accurate
11   response to your question.
12        Q.    Okay.  Thank you for that
13   clarification.
14        Regarding the academic
15   publications that you've listed on your CV
16   that appear on pages 2 through 7, are these
17   all the academic publications that you have
18   either authored or coauthored in your
19   professional career?
20        A.    Yes.
21        Q.    Are there any academic
22   publications that are not listed here that
23   you have authored or coauthored?
24        A.    No.

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1      Q.    And you've also, at the bottom
2    of page 7, listed three academic manuscripts
3    in progress.  Do you see that?
4      A.    Yes.
5      Q.    Can you describe what you mean
6    when you reference -- or when you indicate
7    that these are academic manuscripts in
8    progress?
9      A.    Sure.  A manuscript in
10    progress, as I listed on my CV, is one that
11    is in manuscript form and ready to be shared
12    and commented on but not yet accepted for
13    publication.
14      Q.    So the intention is for these
15    three manuscripts in progress to be academic
16    publications.  Is that fair to say?
17      A.    Yes.
18      Q.    And your CV going forward to
19    page 8 also sets forth certain non-academic
20    publications; correct?
21      A.    Yes.
22      Q.    Are there any other
23    non-academic publications that appear -- or
24    that do not appear here that you have

Page 55

1    authored or coauthored in your professional
2    career?
3      A.    Not that I'm aware of.
4      Q.    And you've also listed, at the
5    bottom of page 9, four case studies that you
6    have been a part of.  Do you see that?
7      A.    Yes.
8      Q.    Are there any other case
9    studies that are not listed here that you
10    have either authored, coauthored, or been a
11    part of?
12      A.    No.
13      Q.    Thank you.
14            Sure.
15            MR. KO:  Debbie has indicated
16    that she needs a moment to go off the
17    record.
18            THE VIDEOGRAPHER:  Time is now
19    9:58.  Going off the record.
20            (Recess taken, 9:58 a m. to
21    10:16 a m.)
22            THE VIDEOGRAPHER:  The time is
23    now 10:15.  Back on the record.
24      Q.    (BY MR. KO)  Okay.  Professor

Page 56

1    Kessler, welcome back from the break.
2            Before we had to go off the
3    record for a bit, we were discussing the case
4    studies that appeared on your CV on page 9.
5    Do you see that?
6      A.    Yes.
7      Q.    And actually I want to turn to
8    the next page, page 10, where you list five
9    unpublished reports.  Are those all the
10    unpublished reports that you have either
11    authored or coauthored in your professional
12    career?
13      A.    Yes.
14      Q.    And why are those reports
15    unpublished?
16      A.    I didn't make sufficient effort
17    to get them published, to develop them into
18    publishable form, but they're publicly
19    available reports that I prepared either for
20    a foundation or for a client.  And so I list
21    them in the interest of full disclosure and
22    completeness.
23      Q.    Are there any of these five
24    reports which you submitted for publication

Page 57

1    that were rejected?
2      A.    No.
3      Q.    Okay.  So going back to all of
4    the studies that you list here, does your CV
5    accurately reflect all the academic
6    publications, all the academic manuscripts in
7    progress, all the non-academic publications,
8    all the case studies, and all the unpublished
9    reports you have either authored or
10    coauthored in your professional career?
11      A.    Yes.
12      Q.    Great.  And on the final
13    section of your CV, you indicate that you
14    have been a referee or reviewer for certain
15    journals; is that correct?
16      A.    Yes.
17      Q.    Approximately how long have you
18    been a referee or reviewer for any of these
19    journals?
20      A.    Oh, my gosh.  Many of these go
21    back 20 years.  But they're ongoing.
22            Can you be more specific?
23      Q.    Sure.  When did you first
24    become a referee or reviewer for any of the

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    journals listed in your CV?
2         A.    When did I first become a
3    referee or reviewer for any journal?
4    1993-'94.
5         Q.    And are there any of these
6    journals or publications for which you are
7    now no longer a referee or reviewer?
8         A.    There are none that have
9    informed me that I'm never going to referee
10   for them or review for them.  There are some
11   organizations and journals for which I have
12   not refereed or reviewed a paper in a while,
13   but they will often come back to me and ask
14   me to do something for them after a year or
15   two of not contacting me.
16        Q.    Sure.  And so is that your
17   definition of "a while," maybe a year or two,
18   in the context of these questions that we're
19   discussing in terms of your involvement as a
20   referee or reviewer?
21        A.    Yes.
22        Q.    Out of these journals and
23   organizations, are there any that -- or which
24   one of these journals or publications have

Page 59

1    you had the greatest involvement in in terms
2    of being a referee or reviewer?
3              MR. GEISE:  Object to the form.
4              THE WITNESS:  Well, it would
5         depend -- it depends sort of what you
6         mean by that.  I guess I'm not sure I
7         understand the question.
8         Q.    (BY MR. KO)  Well, we can
9    turn -- we can talk in terms of quantity to
10   begin with.
11             In terms of the amount of times
12   that you have been asked to be a referee or a
13   reviewer for a particular publication or
14   article, which particular publications or
15   journals would you describe as having the
16   greatest involvement in?
17        A.    Well, so this -- this list
18   includes both publications and foundations
19   and grantors.  And so for the foundations and
20   grantors, I serve as a reviewer of grants,
21   not as a referee of academic papers.  But
22   limiting your question to the journals, which
23   is what I understood it to be, probably the
24   journal that, for which I've refereed the

Page 60

1    largest number of papers is the -- it's
2    either the Journal of Health Economics or
3    Health Affairs, where I review lots and lots
4    of manuscripts.
5         Q.    Okay.  And can you give me an
6    approximate breakdown of what you mean by
7    "lots"?
8         A.    Oh, gosh.  It seems like a lot.
9              Well, for the Journal of Health
10   Economics, I just finished two manuscript
11   reviews last week.  Preceding that, I had one
12   or two a few months ago.
13             Health Affairs, I'll get review
14   requests maybe once every two to three
15   months.
16        Q.    Okay.  And how long has that
17   been the case with respect to -- starting
18   with the Health Affairs?
19        A.    Well, I mean, I don't
20   remember -- I mean, a long time.  Ten years
21   maybe.  I don't know.
22        Q.    Okay.  So is it fair to say
23   that over the course of the past ten years
24   you received approximately four manuscripts

Page 61

1    to referee from the Journal of Health
2    Affairs?
3              MR. GEISE:  Object to the form.
4              THE WITNESS:  More than four
5         over the last decade.
6         Q.    (BY MR. KO)  I meant -- sorry,
7    I meant four per year on an annual basis.
8         A.    Probably less than four per
9    year.  Probably not 40 over the past decade.
10   I would have to speculate.  I just don't keep
11   track.
12        Q.    Sure.  And with respect to the
13   Journal of Health Economics, would you say
14   that you referee more or less than the amount
15   of times you referee for Health Affairs?
16        A.    It's hard to say.  I really
17   don't know.  I don't keep track.
18        Q.    Sure.  And you don't get
19   compensated in your role as a referee, do
20   you?
21        A.    No.  Actually, you should add
22   some of these do pay referees.  But not the
23   Journal of Health Affairs or Health
24   Economics.  But some do.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Q.   Going back to the Academic
2  Publications that you list on page 2 of your
3  CV, you list several -- I'll give you a
4  moment to get there.
5        Let me know when you get back
6  to that page?
7    A.   Yes.
8    Q.   So on this first page, you list
9  several academic publications, many of which
10 you've coauthored with Laurence Baker and
11 Kate Bundorf; correct?
12   A.   Yes.
13   Q.   Is it fair to say that the
14 majority of the academic publications you've
15 had in the last four to five years have, in
16 fact, been with these two individuals?
17   A.   I think that's accurate.
18   Q.   And who is Laurence Baker?
19   A.   Laurence Baker is a professor
20 at Stanford Medical School.
21   Q.   And who is Kate Bundorf?
22   A.   Kate Bundorf is also a
23 professor at Stanford Medical School.
24   Q.   And are you colleagues with

Page 63

1  both of them?
2    A.   Yes.
3    Q.   Are you friends with both of
4  them?
5    A.   We're professional colleagues.
6    Q.   Would you say you have a
7  relationship with them outside of your
8  professional capacity?
9    A.   We're friendly with our
10 families in a broad sense, but we are not
11 close friends.
12       I am not close friends with
13 either Professor Baker or Professor Bundorf.
14   Q.   Fair enough.
15       Do you know that Professor
16 Laurence Baker has been disclosed as an
17 expert in this litigation as well for the
18 defendants?
19   A.   Yes.
20   Q.   Okay.
21       And when did you learn of that?
22   A.   After he submitted his report.
23   Q.   Okay.  So did you have any
24 communications with him with respect to this

Page 64

1  litigation prior to when he disclosed his
2  report on May 10th?
3    A.   No.
4    Q.   And did you ever communicate
5  with him about this litigation at all?
6    A.   No.
7    Q.   Okay.  What about -- same
8  question with respect to Kate Bundorf.  Have
9  you spoken with her at all about your work in
10 this litigation?
11   A.   No.
12   Q.   Relatedly, have you spoken with
13 anyone outside of counsel that you prepared
14 with and helped you -- strike that.
15       Other than counsel at Jones Day
16 and individuals at Cornerstone, have you
17 spoken with anyone else in connection with
18 this litigation?
19   A.   Does that include my wife?
20   Q.   Sure.
21   A.   Yes, I've told my wife about my
22 participation in this matter.
23   Q.   Other than your wife or
24 individuals at -- attorneys at Jones Day or

Page 65

1  individuals at Cornerstone, have you spoken
2  with anyone else about this litigation?
3    A.   I have also informed my
4  children.
5    Q.   Other than your family, counsel
6  at Jones Day, and individuals at Cornerstone,
7  have you spoken with anyone else about this
8  litigation?
9    A.   No.
10   Q.   You've not spoken with any of
11 your colleagues or other professors at
12 Stanford or any of the organizations that
13 you're affiliated with about your work in
14 this case?
15   A.   No.
16   Q.   Okay.  With respect to Laurence
17 Baker, do you work with him in any other
18 capacity outside of co-authoring academic
19 publications with him?
20   A.   Well, I'm a member of -- a
21 professor, by courtesy, in his department.
22       So we do meet periodically with
23 regard to health research and policy
24 departmental issues.

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1      Q.    Outside of the relationship you
2   have with him as -- at the medical school, do
3   you work -- and outside of the academic
4   publications that you have coauthored with
5   him, do you have any other relationship with
6   Professor Baker or do you work with him in
7   any other capacity?
8      A.    Oh, yes.  We are also on the
9   Stanford University Benefits Committee
10  together.  The committee on faculty/staff
11  human resources.  So I work with Lauren in
12  that capacity as well, with Professor Baker.
13     Q.    How many individuals -- well,
14  let me rephrase.
15          In terms of this role that you
16  just described, so you and Professor Baker,
17  among others, work to develop the programs or
18  the plans that Stanford professors and
19  employees can obtain in terms of health
20  benefits?
21     A.    I'm sorry, are you talking
22  about the responsibilities of the committee
23  on faculty/staff human resources?
24     Q.    Yeah, let's start there.  Can

Page 67

1   you describe the responsibilities you have in
2   that regard?
3      A.    Of course.
4          The committee on faculty and
5   staff human resources is an advisory
6   committee to the director of human resources
7   of the university.
8          On the committee are some
9   faculty members who have research interests
10  that overlap with the committee's area of
11  study.  Some staff members, the CFO of the
12  university is on the committee, Randy
13  Livingston, and the director of human
14  resources and the director of benefits are
15  also on the committee.
16          Our role is advisory to the
17  director of human resources and the CFO.  We
18  do not have any authority to make decisions
19  at the university.
20     Q.    How many members are on the
21  advisory committee?
22     A.    The committee itself consists
23  of maybe 15 members total.  Something in --
24  15 to 20.  We meet monthly.

Page 68

1      Q.    And how long have you been an
2   advisory committee member?
3      A.    I'm a full committee member.
4   The committee's role is advisory.
5          We don't have authority to make
6   benefits decisions for the university.
7   That's what I meant by advisory.  I served on
8   the committee -- I believe we have five-year
9   terms or three-year terms.
10          I served one term in the 2000s,
11  and then the director of benefits asked me to
12  return to the committee, maybe it was last
13  year.
14          And I agreed to.
15     Q.    Okay.  As a committee member,
16  did you ever have any communications or
17  engage in any of the negotiations on behalf
18  of the university with insurers or plan
19  providers?
20     A.    We certainly communicate with
21  the director of human resources and the
22  director of benefits regarding their
23  negotiations with our insurers.
24          I do not and we as a committee

Page 69

1   do not negotiate with anyone directly.
2      Q.    So just so the record is clear
3   and to make sure I understand, have you had
4   any direct communications or negotiations
5   with any insurers in your capacity as a
6   committee member?
7      A.    I have had direct
8   communications with insurers in my capacity
9   as a committee member, request -- helping the
10  committee to request information from the
11  insurers regarding what they've -- their bids
12  and what they've offered to do for the
13  university.  But I have no role in
14  negotiating anything.
15     Q.    And do you know how long
16  Professor Baker has been on this committee?
17     A.    I don't.
18     Q.    Now going back to your CV and
19  turning specifically to page 8, where you
20  list non-academic publications, is it fair to
21  say you've also coauthored several of these
22  non-academic publications with Glenn Hubbard?
23     A.    Yes.
24     Q.    And actually in addition to the

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    non-academic publications, I've also noticed
2    that you've coauthored several academic
3    publications with him as well.
4             Is that fair to say?
5        A.   Yes.
6        Q.   Okay.  And same types of
7    questions with respect to Glenn Hubbard as
8    I've been asking about Lawrence Baker and
9    Kate Bundorf.
10            Do you know him -- or are you
11   professional colleagues with Glenn Hubbard?
12       A.   Yes.  I know Professor Hubbard
13   in a professional context.  We are not
14   personal friends.
15       Q.   And how long have you known
16   Glenn Hubbard?
17       A.   Oh, gosh.  I've known Professor
18   Hubbard for -- I don't know.  Maybe 15 years?
19   I -- I would have to look back.
20       Q.   And do you work with him in any
21   professional capacity outside of co-authoring
22   non-academic publications and academic
23   publications with him?
24       A.   Professor Hubbard helped me

Page 71

1    work on the unpublished report, The Effect of
2    Behavioral Health Interventions on Healthcare
3    Costs, but that was 15 years ago.  Other than
4    that, no.
5        Q.   Do you respect Glenn Hubbard?
6        A.   Professor Hubbard has written
7    many papers that I think have contributed to
8    my understanding of health economics and
9    public finance.
10       Q.   Earlier today we discussed when
11   you were first retained in this litigation,
12   and I believe you indicated June of 2018; is
13   that correct?
14       A.   Yes.
15       Q.   Okay.  And who first approached
16   you?
17       A.   It was -- I believe it was
18   Mr. Hussain from Cornerstone Research who
19   first suggested that I could work on this
20   matter.
21       Q.   And when you say Mr. Hussain,
22   was that Michael Hussain?
23       A.   No, Samid Hussain.
24       Q.   Samid Hussain.

Page 72

1        A.   H-U-S-S-A-I-N.
2        Q.   And what did he specifically
3    approach you about?
4        A.   Mr. Hussain said that there was
5    a matter -- I forget if he even mentioned it
6    was -- the specific subject of it, but then
7    he put me in touch with -- I believe with
8    Mr. Geise.
9        Q.   Okay.  And that was
10   approximately June of 2018?  Or before?
11       A.   Okay.  I think it was -- yeah,
12   the beginning of June of 2018.  I think
13   that's right.
14       Q.   Okay.  So did Mr. Hussain
15   approach you -- what were you first
16   contacted -- or what were you first asked to
17   do when you were first contacted in this
18   litigation?
19            MR. GEISE:  I just want to
20       clarify, you're asking what
21       Mr. Hussain talked to him about or
22       after that initial meeting with
23       counsel?
24       Q.   (BY MR. KO)  Mr. Hussain,

Page 73

1    first, yes.
2        A.   I mean, I don't remember what
3    Mr. Hussain told me exactly.  I mean, he --
4    it may have been as general as there's a
5    matter I want to -- you to speak with one
6    of -- with an attorney about, and not have
7    even told me about the topic matter.  I just
8    don't remember.
9        Q.   Okay.  And without divulging
10   the substance of any communications you may
11   have had with counsel, when did you first
12   become aware of the assignment that you were
13   given in this case?
14       A.   Without -- I mean, I can't
15   really answer that without -- I'm sorry, I
16   just don't understand the question.
17       Q.   Well, the question is strictly
18   relegated to timing.  When did you first get
19   the assignment from either Mr. Geise or any
20   other counsel about the expert work that you
21   were going to provide in this case?
22       A.   When we first -- yeah, I mean,
23   when we first met was when counsel, including
24   Mr. Geise, told me about the assignment.

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.    Okay.  And this was June of
2  2018?
3    A.    Yes.
4    Q.    Okay.  And were you aware --
5  prior to either discussing with Mr. Hussain
6  or Mr. Geise your involvement in this
7  litigation, were you aware of lawsuits that
8  were brought against manufacturers and
9  distributors of prescription opioids?
10    A.    In a broad sense, yes.
11    Q.    Okay.
12      So you understood, prior to
13  your involvement in this case, that lawsuits
14  were being brought on behalf of governmental
15  agencies against manufacturers and
16  distributors of prescription opioids.  Is
17  that fair to say?
18    A.    I -- I can't recall what I knew
19  exactly a year ago.  I had been broadly -- I
20  do remember having seen news stories about --
21  I don't know if it was this litigation
22  specifically, but the general issue of
23  litigation by some sets of plaintiffs against
24  manufacturers and distributors.  I just don't

Page 75

1  remember whether I was aware of the specific
2  litigation or not.
3    Q.    Sure.  And generally speaking,
4  and prior to your communications with
5  Mr. Geise or any other counsel or Mr. Hussain
6  at Cornerstone, did you have any opinions or
7  perspectives about the nature of these
8  lawsuits?
9    A.    No.
10    Q.    You had no opinion regarding
11  the merits of these lawsuits?
12    A.    No.
13    Q.    Okay.  Now, I understand in
14  your report that you are charging $850 an
15  hour for your work in this case.  Is that
16  accurate?
17    A.    Yes.
18    Q.    And do you have a different
19  rate with respect to the deposition testimony
20  you are providing today?
21    A.    No.
22    Q.    Okay.  And the same question
23  with respect to any potential trial testimony
24  that you are going to provide.  Is the

Page 76

1  same rate, the $850 rate that you will charge
2  for any trial testimony that you provide in
3  this case?
4    A.    Yes.
5    Q.    Okay.  And I believe you said
6  earlier today that you've spent approximately
7  350 to 400 hours in connection with this
8  litigation.  Is that accurate?
9    A.    Yes.
10    Q.    And so how much have you billed
11  either Jones Day or Walmart, or both, in
12  connection with the work that you have done
13  in this case?
14    A.    Well, I've either billed or
15  will bill, you know, whatever the 350 to 400
16  times 850 is.
17    Q.    Okay.  And do you have an
18  understanding of approximately how much that
19  is?
20      I think --
21    A.    I could figure it out.
22    Q.    Sure.  I think by my rough
23  math, it's probably at least 300,000.  Or
24  approximately 300,000.

Page 77

1    A.    Yeah.  That's the right
2  ballpark.
3    Q.    Okay.  So you've -- is it
4  accurate to say that you've billed around
5  $300,000 for the expert work you have
6  provided in this case thus far?
7    A.    Have billed or will bill.
8    Q.    Okay.  And have you been paid
9  in connection with the work that you have
10  done in this litigation?
11    A.    I haven't been paid for all of
12  it because I haven't billed yet for all of
13  it.  I've been paid some, yes.
14    Q.    Approximately how much have you
15  been paid thus far?
16    A.    I have been paid approximately
17  $200,000.
18    Q.    And who pays you?  In other
19  words, who signs the checks?
20    A.    The checks have come from
21  Walmart.
22    Q.    And can you describe the
23  frequency of the checks?  Is it -- do you get
24  paid on a monthly basis?  A quarterly basis?

20  (Pages 74 to 77)

Page 78

1    How frequent do you get paid?
2         A.    I send bills.  I don't send
3    them necessarily every month, because there
4    were some months when I did not spend much
5    time on this matter.  And I didn't want to
6    waste people's time processing a bill for
7    $850.  When I have accrued a substantial
8    amount of time, I send a bill to Walmart and
9    to Jones Day -- copying Jones Day, and then
10   Walmart has sent me checks in the mail.
11        Q.    Now, a moment ago you described
12   that there were some months when you didn't
13   work as frequently as others.
14            Looking over the course of the
15   last year, what were the general time frames
16   in which you worked more, relative to other
17   months in this case?
18        A.    The last couple of months have
19   been fairly intense because we received
20   plaintiffs' expert reports at the -- well, in
21   bits and pieces between the end of March and
22   mid to end April.  And so during that time I
23   have spent a lot of time on this matter.
24        Q.    Other than the March to April

Page 79

1    time period, were there any other periods of
2    time over the course of the past year since
3    you were retained in which you've spent a
4    substantial amount of time working on this
5    case?
6         A.    I mean, I don't remember my
7    distribution of hours over the period prior
8    to receipt of the plaintiffs' reports.
9            I mean, I just don't remember.
10        Q.    Have you been retained by
11   Walmart ever before as an expert or
12   consultant?
13        A.    No.
14        Q.    And have you ever worked with
15   or been retained by the law firm Jones Day as
16   an expert or consultant in the past?
17        A.    No, I don't think so.
18        Q.    Okay.
19            I'm going to turn to paragraph
20   6 of your report, which appears on page 2.
21            Let me know when you get there.
22        A.    Sure.
23        Q.    Paragraph 6 indicates, "I
24   understand that Walmart Inc. and other

Page 80

1    defendants in the above referenced litigation
2    may use my expert testimony at trial," end
3    quote.
4            Did I read that correctly?
5         A.    Yes.
6         Q.    Do you have a retainer
7    agreement or any other type of agreement with
8    any other defendant in this case other than
9    Walmart?
10        A.    No.
11        Q.    Okay.  And so how do you
12   understand or how have you come to understand
13   that other defendants may use your expert
14   testimony at trial?
15        A.    I guess my understanding was
16   that if I testify at trial serving as an
17   expert for Walmart, other defendants may have
18   the ability to use that testimony in their
19   role in this litigation.
20        Q.    And how did you arrive at that
21   understanding?
22            MR. GEISE:  And to the extent
23   any of your understanding comes from
24   communications with counsel, I

Page 81

1    instruct you not to answer.
2            But if you can otherwise
3    answer, that's fine.
4            THE WITNESS:  I will follow
5    Mr. Geise's recommendation and not
6    answer that.
7         Q.    (BY MR. KO)  Would you agree
8    with me, Professor Kessler, that this is --
9    what you've set forth in paragraph 6 can be
10   characterized as an assumption that you've
11   put in your report?
12            In other words, aren't you
13   assuming that Walmart and other defendants
14   may use your expert testimony at trial.
15            Would you agree with me?
16        A.    It's -- I just understand that
17   that's a possibility.  I don't know -- I'm
18   not an expert on the Federal Rules of Civil
19   Procedure, so I couldn't tell you if
20   that's -- if that's -- if they have that
21   ability or not.
22        Q.    Right.  And I'm asking you a
23   simple question.  Were you told to assume
24   that other defendants other than Walmart may

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    use your expert testimony at trial?
2            MR. GEISE:  And again, if the
3    communication in question is one with
4    counsel, I instruct you not to answer
5    it.
6            THE WITNESS:  I'm going to
7    follow Mr. Geise's recommendation and
8    not answer the question.
9        Q.    (BY MR. KO)  And I would
10   actually ask you to respond to the question,
11   because to the extent it was an assumption,
12   Mr. Geise, as you know, the assumptions that
13   are provided by counsel are discoverable.
14           So were you told to assume that
15   other defendants may use your testimony at
16   trial?
17           MR. GEISE:  And let me
18   interject another objection there.
19           I think if it's an assumption
20       that forms the basis of his opinions,
21       it may be fair game.  I don't think
22       the assumption you're asking for or
23       the content here goes to the basis of
24       any of his opinions.

Page 83

1            MR. KO:  Okay.
2            THE WITNESS:  In this -- I
3    mean, this doesn't affect any of my
4    opinions in this matter.  It just
5    doesn't affect any of my opinions in
6    this matter.
7        Q.    (BY MR. KO)  I understand.
8            Have you spoken with any other
9    counsel outside of counsel at Jones Day about
10   the expert work you either have performed or
11   may perform in the future in this case?
12       A.    Yes.
13       Q.    And without divulging the
14   nature or the substance of those
15   communications, can you disclose the identity
16   of who those counsel were?
17       A.    Yes.  I was at a meeting
18   with -- I apologize, I'm blanking out on
19   Matt's last name.  But with Matt.
20       Q.    So the record is clear, Matt --
21   the Matt who is present at this deposition?
22       A.    Yes.
23           THE WITNESS:  I'm sorry, I
24       forgot your last name.

Page 84

1            MR. BREWER:  No worries.  It
2    happens all the time.
3            THE WITNESS:  Yes.
4        Q.    (BY MR. KO)  And the Realtime
5    conveniently shows that his last name is
6    Brewer.
7        A.    Oh, that's right.  Brewer.
8        Q.    So in addition to Matt Brewer,
9    have you spoken with any other counsel
10   outside of counsel at Jones Day or at Bartlit
11   Beck, where Matt is a lawyer?
12       A.    No.
13       Q.    Okay.  And when did that
14   meeting occur?
15       A.    I was at a meeting in
16   Los Angeles with Mr. Geise, Ms. Castles, and
17   Mr. Brewer -- oh, when was it?  I believe it
18   was -- it was after -- it was just right
19   after plaintiffs' experts disclosed their
20   reports.  So it was either the very end of
21   March or the beginning of April.
22       Q.    And were there any other
23   individuals present other than yourself,
24   Mr. Geise, Ms. Castles, or Mr. Brewer?

Page 85

1        A.    There may have been -- there
2    may have been someone on the phone, but I
3    just don't remember.  I just don't remember
4    who it was.
5        Q.    Were there any individuals from
6    Cornerstone on the phone or that attended in
7    person?
8        A.    There may have been a
9    Cornerstone -- oh, yes.  Mr. DeCesaris was at
10   the meeting, yes.  He was physically at the
11   meeting.
12       Q.    Okay.  So in addition to
13   Mr. DeCesaris, Mr. Geise, Ms. Castles,
14   Mr. Brewer, were there any other individuals
15   that were present at the meeting?
16       A.    At the physical meeting in Los
17   Angeles, no, I don't believe so.
18       Q.    And how long did that meeting
19   last?
20       A.    Might have been three or four
21   hours.
22       Q.    And Mr. DeCesaris, he was one
23   of the individuals that you met with and
24   spoke with last week in Menlo Park in

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  connection with preparing for this
2  deposition; is that accurate?
3      A.  Yes.
4      Q.  And remind me who the other
5  individual was?
6      A.  Ms. Cardiff-Hicks.
7  C-A-R-D-I-F-F hyphen H-I-C-K-S.
8      Q.  Now, with respect to the $850
9  per hour rate that you are charging in this
10  case, did you negotiate that rate?
11     A.  No.
12     Q.  Did you just simply propose
13  that rate to counsel and Walmart and they
14  accepted?
15     A.  Yes.
16     Q.  And is the $850 rate in line
17  with the expert work you've done in the past?
18     A.  Yes.  That's my current hourly
19  rate.
20     Q.  Okay.  Going back to the two
21  individuals that assisted you at Cornerstone,
22  as we have discussed at frequent times
23  throughout the course of the day, Cornerstone
24  has assisted you in terms of preparing this

Page 87

1  report; correct?
2      A.  Yes.
3      Q.  And can you describe to the
4  jury what Cornerstone does?
5      MR. GEISE:  Object to the form.
6      THE WITNESS:  I'm sorry, do you
7  mean in a broad sense or what they did
8  in this particular matter?
9      Q.  (BY MR. KO) The former.
10     A.  Yes.  Cornerstone is a
11  litigation support and strategic consulting
12  firm.  So they provide litigation support
13  services and strategic consulting services to
14  their clients.
15     Q.  And I understand you're
16  affiliated with Cornerstone; is that
17  accurate?
18     A.  Yes.
19     MR. GEISE:  Object to the form.
20     Q.  (BY MR. KO) What's your
21  position at Cornerstone, if you have one?
22     A.  Yes, I'm a senior advisor at
23  Cornerstone.
24     Q.  And how long have you been

Page 88

1  affiliated with Cornerstone?
2      A.  I think I have been a senior
3  advisor there for five years or so.
4      Q.  And prior to that, did you have
5  a different role?
6      A.  Yes.
7      Q.  And what was that different
8  role or title?
9      A.  I don't believe I had a formal
10  title at Cornerstone prior to that.  I had
11  worked with them on some -- both strategic
12  consulting and litigation matters in the
13  years prior to becoming a senior advisor.
14     Q.  Okay.  And how long would you
15  say you worked with Cornerstone and/or been
16  affiliated with them?
17     A.  Gosh.  Are you asking when the
18  first engagement -- what was the earliest
19  engagement that I've ever had that -- with
20  which I worked with Cornerstone?
21     Q.  Sure.  Why don't you answer
22  that one.
23     A.  Might have been 15 or 20 years
24  ago.

Page 89

1      Q.  Okay.  And so is it fair to say
2  that you regularly work with them for
3  purposes of doing expert work in your
4  professional capacity?
5      MR. GEISE:  Object to the form.
6      THE WITNESS:  I have worked
7  with them several times in the past.
8      Q.  (BY MR. KO) Okay.  Is there --
9  or are there instances in your professional
10  career when you've worked as an expert
11  witness in which you do not use Cornerstone
12  for litigation support?
13     A.  Yes.
14     Q.  Okay.  And can you describe
15  approximately how many times you have been an
16  expert in which they have provided you with
17  litigation support?
18     A.  Could I look at my list of
19  testimony?
20     Q.  Sure.
21     A.  Because that would help.
22         I have it right here, I think.
23     Q.  It's at the end of Appendix A,
24  I believe.

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1     A.   So I can certainly tell you on
2  this list, the matter between the State of
3  Washington and Franciscan, I worked with
4  Cornerstone on that.
5          The BRFHH versus
6  Willis-Knighton, I worked with Cornerstone on
7  that.
8          Lutz, I believe I did not work
9  with Cornerstone.
10         I believe on the University of
11 California versus Aon Hewitt, I believe I
12 worked with them on that.
13         Bay Area Surgical Management, I
14 worked with them on that.
15         The State Compensation
16 Insurance Fund matter, I worked with them on
17 that.
18         And the ExamWorks matter, I
19 worked with them on that.
20         So that's -- of these six
21 matters I've worked with Cornerstone.
22     Q.   Okay.  So just so the record is
23 clear, that what you were reading from
24 indicates the testimony -- the expert

Page 91

1  testimony you've provided in the last four
2  years; correct?
3      A.   Yes.
4      Q.   And you have listed nine such
5  engagements, and you've indicated that you've
6  worked with Cornerstone in six of those nine
7  engagements; correct?
8      A.   Yes.
9      Q.   And prior to the testimony that
10 you provided in the last four years, have you
11 also worked with Cornerstone?
12         MR. GEISE:  Asked and answered.
13         THE WITNESS:  Yes.
14     Q.   (BY MR. KO)  In addition to
15 those -- in addition to the six times listed
16 here, approximately how many times did you
17 work with Cornerstone?
18     A.   Prior to the past 4 years this
19 testimony was?
20     Q.   Correct.
21     A.   Oh, gosh.
22         I mean, I just -- I don't
23 remember.  At least a few -- I mean, I can
24 remember a couple of cases, but I -- I just

Page 92

1  couldn't give you a good count.  Probably --
2  I would guess maybe another four or five.
3      Q.   So fair to say that you've
4  worked with Cornerstone approximately ten to
5  11 times over the course of your professional
6  career as an expert witness?
7      A.   That's a reasonable estimate.
8      Q.   And how many times have you
9  been retained as an expert in your
10 professional career?
11     A.   Do you mean as a testifying
12 expert?
13     Q.   Sure, let's start there.  How
14 many times have you been retained as a
15 testifying expert in your professional
16 career?
17     A.   So there are the nine times in
18 the past four years.  Prior to that, maybe
19 another five or six times.  Or maybe four
20 times.  I'm not sure.
21     Q.   Okay.  So fair to say you've
22 been retained as a testifying expert over the
23 course of your professional career
24 approximately 15 to -- 14 to 15 times?

Page 93

1      A.   Yeah.  That's a -- that's a
2  fair estimate.
3      Q.   Okay.
4          Have you also been retained
5  ever in your professional career as a
6  non-testifying expert or a consultant?
7      A.   Yes.
8      Q.   Approximately how many times
9  have you been retained as a non-testifying
10 expert or consultant?
11     A.   Are you including with regard
12 to strategic consulting and non-litigation
13 matters?
14     Q.   Let's start with litigation
15 matters first.  How many times have you been
16 retained as a non-testifying expert or
17 consultant in litigation matters?
18     A.   Maybe another four times.
19     Q.   And with --
20     A.   Yeah.  I don't -- I'm not sure.
21     Q.   Sure.
22         And with respect to the
23 strategic consulting in non-litigation
24 matters that you referenced before,

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    approximately how many times have you been
2    engaged in that capacity?
3        A.   Would you include executive
4    training as part of that also?
5        Q.   What do you mean by executive
6    training?
7        A.   Holding classes for executives
8    of insurers and healthcare companies.
9        Q.   Yes, let's count those.
10       A.   If you include my executive
11   teaching engagements and strategic
12   consulting, I don't know, maybe another ten
13   times I've been engaged by different
14   entities.
15       Q.   Okay.  So excluding the
16   executive teaching engagements and strategic
17   consulting engagements, is it fair to say
18   that you've been retained as either a
19   testifying expert or a non-testifying expert
20   or consultant in litigation matters
21   approximately 20 times?
22       A.   Over the past 20 years?  Yeah,
23   that sounds like a fair estimate.
24       Q.   How about with respect to your

Page 95

1    entire professional career?  I'm just trying
2    to make sure the record is clear.  So with
3    respect to your entire professional career,
4    is it fair to say that you've been engaged as
5    either a testifying expert or a
6    non-testifying expert or consultant in
7    litigation matters approximately 20 times?
8        A.   Yes.
9        Q.   Now, with respect to the work
10   that Cornerstone has done in this case, do
11   you know how much they charge?
12       A.   No.
13       Q.   Have you seen any invoices or
14   an accounting or itemization of hours they
15   have spent on this matter?
16       A.   No.
17       Q.   You do know the rates that
18   individuals at Cornerstone charge for their
19   work as a litigation support firm?
20       A.   I've seen some of their rate
21   sheets over the years, but I -- just sitting
22   here today, I don't remember exactly what
23   they are.
24       Q.   Have you seen a rate sheet for

Page 96

1    the amounts they charge in connection with
2    this litigation?
3        A.   I don't think so.
4        Q.   Okay.  And with respect to the
5    rate sheets you've seen over the years, do
6    you have an approximate -- or do you have an
7    understanding of the approximate rates they
8    have charged?
9        A.   Only very approximately.  It's
10   been a while since I looked at this.
11       Q.   And to your best recollection,
12   what is the approximate rate that you recall
13   seeing?
14       A.   It varies depending on the type
15   of service, the level of employee that
16   they're working with.
17           It would just be speculating to
18   try to reconstruct my memory of this.  It's
19   just too long ago.
20       Q.   In connection with the work
21   that you're performing in this case, do you
22   have a primary point of contact at
23   Cornerstone?
24       A.   I do.  I speak with both

Page 97

1    Ms. Cardiff-Hicks and Mr. DeCesaris.
2        Q.   So is it fair to say that they
3    are your primary contacts?
4        A.   Yes.
5        Q.   Okay.  And what are their
6    positions at Cornerstone?
7        A.   Mr. DeCesaris's position is the
8    director of data analytics.  And
9    Ms. Cardiff-Hicks is a manager, or she may be
10   a -- called a senior manager.  I'm not sure
11   what -- exactly.
12       Q.   And prior to the work you have
13   performed in this case, have you -- or had
14   you had the occasion to work with either of
15   them in any of your prior expert work in
16   which they supported you?
17       A.   Yes.
18       Q.   And who did you -- which one of
19   the two individuals did you work with before?
20       A.   I've worked with Mr. DeCesaris
21   before.
22       Q.   Okay.  Approximately how many
23   times?
24       A.   Maybe four?  Three or four

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    times. I'm not sure.
2         Q.    Do you know the approximate
3    rate that he charges in this litigation?
4         A.    I don't.
5         Q.    Okay.  In your prior work with
6    Cornerstone, have you ever seen the actual
7    invoices or bills that they have submitted?
8         A.    No.  I don't think I have, no.
9         Q.    So you've never seen any
10   invoice that they've submitted in connection
11   with the expert work that they have supported
12   you on in your professional career?
13        A.    No.  I don't review
14   Cornerstone's invoices.
15        Q.    And I'm not necessarily asking
16   whether or not you review them or you are
17   tasked with reviewing them.  I'm just simply
18   asking whether or not you've seen any
19   invoices or seen any reference to the amounts
20   that they've billed in specifically the work
21   that they have supported you on as an expert.
22        A.    I mean, I can't remember.  I
23   couldn't say that I've never seen anything.
24   I just -- but I just don't remember.

Page 99

1         Q.    And are you aware that
2    Cornerstone is supporting other defense
3    experts in this case?
4         A.    I became aware of that after
5    the expert reports were disclosed.
6         Q.    Okay.  And do you know
7    approximately how many experts -- other
8    defense experts they're supporting?
9         A.    I saw the reports of -- I think
10   there were two other experts that they were
11   supporting, but I'm not -- I don't remember.
12   I believe it was two others.
13        Q.    Okay.  Do you believe you have
14   a particular expertise in opioids?
15             MR. GEISE:  Object to the form.
16             THE WITNESS:  I believe I have
17        an expertise in the application of
18        microeconomics and empirical data
19        analysis to health policy problems and
20        healthcare finance problems, and
21        opioids are a special case of that.
22        So in that sense, yes.
23        Q.    (BY MR. KO)  So is it fair to
24   say that the -- or you would agree that the

Page 100

1    issues raised by the opioid crisis fit
2    underneath the umbrella of a health policy
3    problem that you've just described?
4         A.    Certainly some of the issues in
5    this matter fit underneath that umbrella.
6         Q.    Okay.  Have you conducted
7    research or published articles on opioid use,
8    misuse, or abuse?
9             MR. GEISE:  Object to the form.
10            THE WITNESS:  Yes.
11        Q.    (BY MR. KO)  And have you
12   written or authored or coauthored any
13   articles regarding the use, misuse, or abuse
14   of opioids?
15        A.    Yes.
16        Q.    And which articles?
17        A.    It's on my CV.
18        Q.    So let's start with the
19   academic publications.  Can you identify for
20   me which articles you believe you have
21   written or authored or -- that you have
22   written or authored or coauthored regarding
23   the use, misuse, or abuse of opioids?
24        A.    There's only one.  It's the

Page 101

1    manuscript in progress on the bottom of
2    page 7, The Effects of Medicare Advantage on
3    Opioid Use.
4         Q.    Okay.  So other than The
5    Effects of Medicare Advantage on Opioid Use
6    which you coauthored with Lawrence Baker and
7    Kate Bundorf, which, as you noted, is an
8    academic manuscript in progress, are there
9    any other academic or non-academic
10   publications that are set forth in your CV
11   that are about the use, misuse, or abuse of
12   opioids?
13        A.    No.
14        Q.    Okay.  Have you ever researched
15   or published or authored any articles on
16   diversion of opioids?
17            MR. GEISE:  Object to the form.
18            THE WITNESS:  The -- this NBER
19        working paper, the manuscript in
20        progress that we're discussing, does
21        not touch on diversion specifically,
22        so I guess the answer is no.
23        Q.    (BY MR. KO)  And have you ever
24   researched or published any articles or

26 (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    studies or publications regarding the use,
2    misuse, or abuse of illicit opioids like
3    heroin or fentanyl?
4        A.   Do you mean for academic
5    purposes?
6        Q.   For any purpose.  Because
7    you've listed academic publications and
8    non-academic publications in your CV.
9        A.   So I'm sorry, do you mean not
10   including this matter?  Do you mean have I
11   done any work on this issue, research on
12   this, not including research done for this
13   matter?  Is that what you're asking?
14       Q.   That's correct.  Outside of the
15   work you've done in connection with preparing
16   this expert report, have you ever done any
17   research or published any academic or
18   non-academic publications regarding the use,
19   abuse, or misuse of illicit opioids like
20   heroin or fentanyl?
21       A.   No.
22       Q.   And with respect to this
23   academic manuscript in progress, titled The
24   Effects of Medicare Advantage on Opioid Use,

Page 103

1    it's essentially a working -- it's also what
2    we could refer to as a working paper.  Is
3    that fair to say?
4        A.   Yes.
5        Q.   And is this working paper
6    peer-reviewed?
7        A.   It is reviewed by the NBER to
8    ensure that it meets the NBER's standards for
9    publication as an NBER working paper.  It is
10   not peer-reviewed in the sense of a
11   publication.  How a publication in the
12   Journal of Health Economics or a medical
13   journal would be peer-reviewed, though, no.
14       Q.   And with respect to the review
15   done by the NBER, has that review process
16   taken place yet?
17       A.   It has.
18       Q.   Okay.  And has it been -- and
19   what was the outcome of that review?
20       A.   It was approved for
21   publication, for distribution as an NBER
22   working paper.
23       Q.   Okay.  And do you plan on or
24   otherwise intend to have it be published as

Page 104

1    an actual academic publication or in a
2    journal for submission to be a peer-reviewed
3    article or study?
4        A.   Yes.
5        Q.   Okay.  And when do you plan on
6    doing that?
7        A.   It has been submitted for
8    publication.
9        Q.   Which journals did you submit
10   it to?
11       A.   It is submitted to the Journal
12   of Health Economics.
13       Q.   Okay.  Any other journals that
14   it's been submitted to, or is that the only
15   one?
16       A.   You're only allowed to submit
17   to one at a time.
18       Q.   When did you first begin
19   working on that study?
20            And to be clear, when did you
21   first begin working on The Effects of
22   Medicare Advantage on Opioid Use with
23   Laurence Baker and Kate Bundorf?
24       A.   Oh, gosh.

Page 105

1            I don't remember.
2        Q.   Do you recall whether or not it
3    was in 2018 -- or sorry, in 2017?
4        A.   It was for sure prior to my --
5    it was prior to June 2018.  I can -- I'm sure
6    of that.
7            Was it -- did we start on this
8    in 2017?  I just don't remember.
9        Q.   And with respect to that
10   article, I know -- or with respect to the
11   working paper, I know that there's references
12   made to certain stand-alone plans.
13           Is that a fair characterization
14   of that working paper?
15       A.   If by stand-alone plans you
16   mean Medicare Part D prescription drug plans
17   that are not part of a Medicare advantage
18   plan, that is correct.
19       Q.   That's helpful.  That's
20   actually what I was trying to ask.  I know
21   that there's various definitions, or at least
22   some people believe there are various
23   definitions of stand-alone plans.
24           In the context of the working

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    paper that we are discussing, what is your
2    definition of a stand-alone plan?
3        A.    When this paper uses the term
4    "stand-alone plans," this paper is
5    exclusively about Medicare prescription drug
6    plans.  About Medicare prescription drug
7    plans that are part of a Medicare Advantage
8    plan, and Medicare prescription drug plans
9    that are not part of a Medicare Advantage
10   plan, and we use the term "stand-alone plans"
11   in the paper as shorthand for Medicare
12   prescription drug plans that are not part of
13   a stand-alone -- that are not part of a
14   Medicare Advantage plan.
15       Q.    Okay.
16       A.    Sorry.
17       Q.    Thank you for that explanation.
18       Now, in addition to being a
19   professor at Stanford, I also understand that
20   you are a senior fellow at the Hoover
21   Institute; correct?
22       A.    Yes, I am a senior fellow at
23   the Hoover Institution.
24       Q.    And do you get compensated as a

Page 107

1    senior fellow at the Hoover Institution?
2        A.    The Hoover Institution pays
3    part of my university salary.  I'm not
4    compensated separately.  It's part of
5    Stanford University.
6        Q.    I see.  And do you know
7    approximately how much they subsidize or
8    otherwise contribute to your salary?
9        A.    My time allocation, I'm
10   allocated 50 percent to the law school and
11   50 percent to the Hoover Institution at
12   Stanford.
13       Q.    Okay.  So is your primary
14   affiliation at Stanford?  I know that you are
15   a professor at various schools, but is your
16   primary affiliation with the law school?
17       A.    I mean, I -- I'm 50 percent
18   time at the law school and 50 percent time at
19   the Hoover Institution.  I'm also a tenured
20   professor at the graduate school of business,
21   where I used to teach 100 percent of the
22   time, but now do not teach for them any more.
23   So I -- they do not pay any part of my salary
24   at present.

Page 108

1        Q.    Okay.  So in terms of --
2    separate and apart from the Hoover Institute,
3    but in terms of your role as a professor at
4    the law school and I believe a professor at
5    the business school where you teach one
6    course as a professor -- by courtesy at the
7    medical school, amongst those three schools,
8    is it fair to say that your primary
9    affiliation right now is with the law school?
10       A.    No.  I would describe my
11   affiliation as split equally between the law
12   school and the Hoover Institution.
13       Q.    And I was asking separate from
14   the Hoover Institute.  So --
15       A.    Oh.
16       Q.    -- in terms of just the schools
17   that you are a professor at, which include,
18   as I understand, the law school, the business
19   school, and the medical school --
20       How about I ask it this way:
21   You don't receive any compensation from the
22   medical school; correct?
23       A.    No, I do not.
24       Q.    And you don't receive any

Page 109

1    compensation currently from the business
2    school; correct?
3        A.    I do not receive compensation
4    from the business school at Stanford.
5    ███████████████████████████████
     ███████████████████████████████
     ███████████████████████████████
     ███████████████████████████████
     ███████████████████████████████
     ███████████████████████████████
12       Q.    Okay.  And approximately how
13   long have you been receiving that amount?
14       A.    Well, you know, I've gotten
15   raises over the years.  I mean, I -- it's
16   been in that ballpark for the past few years.
17   And it was lower before then, and then I got
18   a raise.
19       Q.    You became a senior fellow at
20   the Hoover Institute in 2006, I believe.  Is
21   that correct?
22       A.    That sounds right.
23       Yes, yes, that's right.  I'm
24   just looking at my CV.  Yes.

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1     Q.    And is there any difference at
2  the Hoover Institute between a senior fellow
3  and a fellow?
4     A.    We -- we have many different
5  types of fellows at the Hoover Institution.
6  And they're -- it's according to a
7  complicated set of university rules.
8           A senior fellow is the position
9  that's equivalent to a tenured professor.
10    Q.    Were you ever a fellow at the
11 Hoover Institute, or were you always a senior
12 fellow at the Hoover Institute in terms of
13 your affiliation with that institution?
14    A.    I was a national fellow in '97,
15 '98, and that -- that's a -- I believe that
16 position no longer -- well, it may exist.
17 That's a sort of one-year visitorship for
18 younger people.  We now have -- we have other
19 positions like research fellow.
20          I just -- I don't know what the
21 terms of all of them are.
22    Q.    Fair enough.
23          How many -- do you know
24 approximately how many senior fellows there

Page 111

1  are at the Hoover Institute?
2     A.    I believe the Hoover
3  Institution has around 30 senior fellows.
4     Q.    Now, I also believe you're a
5  senior fellow at the Stanford Institute For
6  Economic Policy?
7     A.    At the Stanford Institute For
8  Economic Policy Research, yes.
9     Q.    Thank you.  Yes.
10    A.    Uh-huh.
11    Q.    And how long have you been a
12 senior fellow there?
13    A.    They appointed me as a senior
14 fellow in 2016.
15    Q.    Okay.  And do you get
16 compensated in connection with that role?
17    A.    No, I do not receive
18 compensation from the Stanford Institute For
19 Economic Policy Research.
20    Q.    And do you know how many senior
21 fellows there are at the Stanford Institute
22 For Economic and Policy Research?
23    A.    I don't know how many senior
24 fellows testify at the Stanford Institute For

Page 112

1  Economic Policy Research.
2     Q.    Now, a moment ago you
3  indicated, I believe, that you teach --
4  currently teach one class at the business
5  school still; is that correct?
6     A.    I may have said that.  The
7  more -- a more accurate way to describe that
8  class -- and I apologize if I didn't do this
9  correctly, is that I teach a university-wide
10 class on healthcare, finance, and regulation.
11 That class is available to law students,
12 business students, medical students, and
13 public policy students for credit in their
14 departments, and that's the business school
15 class that I teach.
16    Q.    Okay.  And do you currently
17 teach -- I know you teach at the law school,
18 but do you currently teach any courses at the
19 medical school?  Other than its affiliation
20 with this university-wide class that you just
21 indicated?
22    A.    No.  That -- that class --
23 that's the only medical school class I teach.
24 It is listed as a medical school class, and,

Page 113

1  in fact, I teach it with Professor Bundorf.
2     Q.    Do you have any professional
3  licenses, certifications, or accreditations?
4     A.    No.  No, I don't think I do.
5     Q.    Okay.  So you're not licensed
6  to practice law anywhere notwithstanding the
7  fact that you did go to Stanford Law School?
8     A.    No, I'm not a member of any
9  bar.
10    Q.    Okay.  Were you ever a member
11 of any bar?
12    A.    No.
13    Q.    Okay.  And do you have any
14 types of accreditations or licenses with
15 respect to finance or accounting?  Like for
16 example, do you have a CFA or a CPA --
17    A.    No.
18    Q.    -- any of those?
19    A.    No.
20    Q.    And going back to your
21 affiliation with Cornerstone, do you -- have
22 you ever received any compensation directly
23 from Cornerstone in your professional career?
24    A.    Yes.

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Q.    Okay.  And has this
2  compensation always been in connection with
3  expert work, or do you receive a separate
4  salary or compensation from them?
5         Let me ask it this way, because
6  it looks like you're confused.
7    A.    Go ahead.
8    Q.    Can you describe to me the
9  nature of the compensation you received from
10  Cornerstone in your professional career?
11    A.    Yes.  I receive a share of the
12  billings that they collect and make from
13  cases where they support me, plus they make a
14  fixed payment to me on a quarterly basis in
15  my role as senior advisor.
16
17
18
19
20
21    Q.    Okay.  And has that always been
22  the case in terms of your affiliation with
23  them?  Or when did you start receiving a
24  fixed payment from Cornerstone?

Page 115

1    A.    I became a senior advisor, I
2  believe it was something like five years ago.
3  And it was at that point that they began to
4  make that payment to me.
5    Q.    Okay.  And with respect to the
6  share of the billings that you receive from
7  Cornerstone, what percentage of the billings
8  do you receive?
9    A.    It's according to some formula,
10  and I don't -- I just don't remember.
11  It's -- yeah, I just don't remember the terms
12  of the formula.  It's in the ballpark of
13  sometimes it's 7 percent, sometimes it's more
14  than that, and it depends on how the case was
15  brought and how it develops.
16    Q.    Okay.  So do you have any
17  understanding of the upper bound or upper
18  range of the percentage that you received?
19  Because I know you said sometimes 7 percent.
20  But can you describe to me what the
21  approximate range is?
22    A.    Yeah.  Yeah, it's between 7 and
23  15 percent.
24    Q.    And the 7 to 15 percent is

Page 116

1  relative to the total amount of their
2  billings for the engagement that they support
3  you on?
4    A.    You know, I'm just not -- I
5  don't remember.  There are some exclusions
6  from the base on which they calculate that,
7  and I just don't -- I just don't remember how
8  they do it.
9    Q.    And in the instances in the
10  past in which Cornerstone has supported you,
11  when do you typically receive the share
12  payment?  Is it at the conclusion of a
13  litigation?  Or do you receive periodic
14  payments?
15    A.    I believe that they are
16  periodic payments that occur sometime after
17  the litigation concludes.  I'm not sure.
18    Q.    Okay.  In connection with the
19  work you were doing in this case, have you
20  received any payments from Cornerstone
21  pursuant to the compensation structure that
22  you have with them, which includes the fixed
23  plus share amount?
24    A.    No, I have not received any

Page 117

1  payments from them regarding this matter.
2    Q.    Other than your -- the fixed
3  amount that you get on a quarterly basis?  Or
4  have you not even attained that?
5    A.    No, they have paid me that, but
6  that is not with respect to this matter.
7  That's invariant to this matter.
8    Q.    Got it.
9         Now, in connection with the
10  expert work you have done in litigation
11  matters, and this includes the non-testifying
12  expert work and the consultant work that we
13  described, is it accurate to say that you've
14  done or you've received a substantial amount
15  of income in connection with your expert work
16  in your professional career?
17         MR. GEISE:  Object to the form.
18         THE WITNESS:  I guess I
19  don't -- I'm not sure what you mean by
20  substantial.
21    Q.    (BY MR. KO)  Yeah, well, why
22  don't you describe it to me.
23         Do you have an understanding of
24  approximately how much income you have

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  obtained as an expert witness over your
2  professional career?
3      A.   Wow.  I mean, I haven't added
4  it up over my whole career.
5      Q.   Do you have a general
6  understanding of how much that amount is?
7      A.   Not really.  Could you be more
8  specific?  I mean, if you could be more
9  specific, I might be able to give you a more
10  definite answer.
11     Q.   Sure.  Well, let's take the
12  expert work that you have disclosed in your
13  report over the course of the last four
14  years.
15          Would you -- would it be fair
16  to say that you've obtained at least
17  $1 million for your services as an expert
18  witness with respect to the nine cases set
19  forth in your report?
20     A.   Yes.  Over the past four years,
21  that would be fair.
22     Q.   Would it be fair to say that
23  you've obtained at least $2 million for your
24  expert services with respect to these nine

Page 119

1  cases?
2      A.   That sounds high.  That sounds
3  like it's probably an upper bound.
4      Q.   So is it fair to say that
5  you've obtained somewhere between 1 to
6  $2 million for the expert services you've
7  provided that you've set forth in your report
8  over the last four years?
9      A.   Yes.  Over the past four years,
10  it is fair to say I have obtained 1 to
11  $2 million in my role as an expert, yes.
12     Q.   And in addition to these nine
13  engagements, I think we discussed a moment
14  ago that you've been engaged as a testifying
15  expert or a non-testifying expert or
16  consultant about 10 or 11 additional times;
17  correct?
18     A.   This is over the course of my
19  whole career?
20     Q.   Correct.
21     A.   Yes.
22     Q.   And with respect to these
23  additional 10 or 11 engagements, is the
24  amount of income that you have received in

Page 120

1  connection with these engagements over a
2  million dollars?
3      MR. GEISE:  If you know.
4      THE WITNESS:  I -- yeah, I just
5  couldn't tell you.  It's -- I would --
6  that sounds like an upper bound to me,
7  because many of these engagements, if
8  I divide a million by ten, were for
9  less than $100,000.  So -- but I -- I
10  just haven't tabulated this statistic
11  from my professional career.
12     Q.   (BY MR. KO)  Sure.  Were there
13  any engagements -- you indicated that many of
14  these engagements were for under $100,000,
15  but do you recall engagements in which you
16  received over $100,000?  And this is
17  specifically with respect to the additional
18  engagements that are not listed in this
19  expert report.
20     A.   Yes.  I -- I can think of at
21  least one consulting engagement where I was
22  paid more than $100,000 that is not listed as
23  a -- where I was not serving as a testifying
24  expert in the past four years.

Page 121

1      Q.   You can only think of one in
2  which you obtained six figures or received
3  six figures?
4      A.   The -- I can only tell you
5  that -- about one that I remember for sure,
6  yes.
7      Q.   Would it be fair to say that
8  you've obtained at least $2 million of income
9  in connection with your work as an expert or
10  non-testifying expert or consultant in
11  connection with litigation over the course of
12  your professional career?
13     A.   Is this including consulting
14  income like strategic consulting and
15  executive teaching?
16     Q.   No.  We'll get to that in a
17  moment.  But I'm asking specifically with
18  respect to the work you've done as either an
19  expert, a non-testifying expert, or a
20  consultant in connection with litigation, is
21  it fair to say that you've obtained at least
22  $2 million of income in connection with these
23  roles over the course of your professional
24  career?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A.    You know, I just don't know.  I
2  haven't tallied this up.
3    Q.    Is it fair to say you've
4  received at least $1.5 million in connection
5  with -- $1.5 million of income in connection
6  with your role as an expert, a non-testifying
7  expert, or a consultant in connection with
8  litigation?
9    A.    Do you mean over the past
10  20 years?
11    Q.    Over the course of your entire
12  professional career.
13    A.    Yes.  That -- that would be
14  fair to say.
15    Q.    Okay.  So you've obtained at
16  least $1.5 million of income in connection
17  with your work as an expert, a non-testifying
18  expert, or a consultant in connection with
19  litigation over the course of your
20  professional career?
21    A.    Yes.  That's a fair estimate.
22    Q.    Now, in addition to your work
23  as an expert, and, of course, your salary as
24  a professor, you have alluded to other

Page 123

1  consulting work that you have done for which
2  you have obtained income.  Is that accurate?
3    A.    Yes.
4    THE WITNESS:  May we take a
5  bathroom break?  Is that okay?
6    MR. KO:  Sure.  Of course.  I
7  realized I haven't looked at the time.
8    THE VIDEOGRAPHER:  The time is
9  11:41 a.m.  Going off the record.
10    (Recess taken, 11:41 a.m. to
11  11:50 a.m.)
12    THE VIDEOGRAPHER:  The time is
13  now 11:49.  Back on the record.
14    Q.    (BY MR. KO)  Welcome back from
15  the break, Professor Kessler.
16    Before we broke, we were
17  talking about the work you've done as a
18  consultant.  And can you describe to me the
19  types of organizations that you have provided
20  consulting services for?
21    A.    Yes.  By this I gather you mean
22  non-litigation related?
23    Q.    Correct.
24    A.    Yes.  So I served as a

Page 124

1  consultant to a firm called Press Ganey
2  Associates, which is -- or it was the largest
3  provider of physician and hospital quality
4  surveys.  I don't know if they're still the
5  largest anymore, but I served as a consultant
6  to them with regard to their strategic
7  planning and survey development process.
8    That was in -- probably between
9  2005 and 2010.
10    I have served as a consultant
11  to -- I teach in the executive program for
12  Sutter Health, so that's a -- I've taught in
13  the Sutter Health executive program for,
14  gosh, maybe ten years now.
15    Q.    And so you currently are still
16  teaching at the Sutter Health executive
17  program?
18    A.    I taught at the Sutter Health
19  executive program in April.  Yeah, we had a
20  session in April.
21    Q.    Oh, April of this year?
22    A.    Yes.
23    Q.    In addition to consulting for
24  Press Ganey and Sutter Health, are there any

Page 125

1  other organizations or entities that you
2  provide consulting services for?
3    A.    Yes.  I've provided consulting
4  services to a company called The Medicines
5  Company.  And this was in -- gosh, when was
6  this?  Maybe 2010.  The Medicines Company is
7  a pharmaceutical company that made a
8  synthetic anticoagulant, and the question
9  that I was investigating for them was whether
10  that --
11    MR. GEISE:  I just want to be
12  careful and interrupt here.  I don't
13  know if any of any of that
14  other consultations is confidential.
15  But before you get into any of the
16  substance about what you were doing
17  for somebody, I just want to caution
18  you to make sure you consider if any
19  of that is confidential or not.
20    I have no problem with you
21  answering the question, but I don't
22  know the nature of those other
23  consultations.
24    THE WITNESS:  No, thank you.  I

32 (Pages 122 to 125)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    appreciate that.  I'm only discussing
2    non-confidential engagements here.
3        My engagement -- my engagement
4    with Press Ganey was non-confidential,
5    but it actually resulted in an
6    academic paper that I wrote with a
7    woman who I believe was a sociologist
8    there.
9        Any engagement with Sutter is
10   not confidential.  I teach in their
11   executive program.
12       My engagement with The
13   Medicines Company was not
14   confidential.  That also resulted in
15   an academic paper that I wrote with a
16   cardiologist and with a fellow -- I
17   believe he was an epidemiologist from
18   the Premier organization.
19       Premier is a hospital group
20   purchasing organization that was also
21   interested in the research that I was
22   conducting for The Medicines Company
23   on their synthetic anticoagulant.
24       Q.    (BY MR. KO)  So in addition to

Page 127

1    Press Ganey, Sutter Health, and The Medicines
2    Company, have you ever provided any
3    consulting services to any other entities or
4    organizations?
5        A.    I'm trying to remember.  This
6    was 15 years ago.
7        I would estimate they paid
8    me -- maybe it was $20,000 or $25,000.
9        Q.    Okay.  And what about with
10   respect to the unpublished report you
11   conducted for the Physician Insurers
12   Association of America?  Do you recall the
13   approximate compensation you received from
14   them?
15       A.    It was in that same ballpark.
16       Q.    And moving to your role as a
17   consultant for the -- for Press Ganey and
18   Associates, from 2005 to 2010 or
19   approximately that time frame, how much were
20   you compensated in connection with those
21   consulting services?
22       A.    I don't remember exactly.
23       That was a very big client that
24   I worked for over many years.

Page 128

1        So that was the one that I can
2    recall would have been in excess of $100,000.
3        The others, I don't really
4    recall.
5        Q.    And the amount that is in
6    excess of $100,000, is that over the course
7    of the entire duration of your time
8    consulting with them or was that on an annual
9    basis?
10       A.    Not on an annual basis.  That
11   was over the whole five-year relationship.
12       Q.    And you have no recollection of
13   how much you obtained in connection with your
14   consulting services offered to either Sutter
15   Health Care or The Medicines Company?
16       A.    Well, Sutter, I can remember,
17   because I just did that.  Sutter paid me
18   $7,000 for teaching in their program.
19       The Medicines Company, I don't
20   remember.
21       Q.    And was that just a one-time
22   fee, or do you get paid by Sutter?  With
23   respect to Sutter Health, do you get paid
24   from them regularly?

Page 129

1        A.    Whenever I participate in their
2    programs, and they run them -- they don't run
3    them on a calendar schedule, they run them
4    according to their own needs.
5        And so when I participate in
6    them, then they pay me.  But otherwise, they
7    do not pay me a salary.
8        Q.    Are you aware of the defendants
9    that have been named in this litigation?  And
10   in particular the defendants that are part of
11   the trial this fall?
12       A.    Yes, I am aware of the
13   defendants.
14       Q.    Okay.  Have you ever been
15   retained by any of the defendants as a
16   consultant in the past?
17       A.    Yes.
18       Q.    Okay.  Which ones?
19       A.    I was retained by Purdue
20   Pharma, not in connection with this
21   litigation, but as a consultant for
22   consulting services.
23       Q.    And when was that?
24       A.    That was in 2016.

33  (Pages 126 to 129)

Page 130

1      Q.    And approximately how long did
2  that engagement last with Purdue?
3      A.    That was approximately a year.
4      Q.    And what was the nature of the
5  consulting services that you provided for
6  Purdue?
7          MR. GEISE:  If you can disclose
8  it.
9          THE WITNESS:  The nature of the
10  services was confidential.
11      Q.    (BY MR. KO)  Okay.  And how do
12  you understand that to be the case in terms
13  of the confidential nature of that work?
14      A.    That's the agreement that I
15  signed.
16      Q.    Okay.  So you signed an
17  agreement with them?
18      A.    In connection with my provision
19  of consulting services, yes.
20      Q.    And do you recall approximately
21  how much you got paid in connection with the
22  consulting services you provided to Purdue?
23      A.    Yes.
24      Q.    And how much was that?

Page 131

1      A.    It was around $30,000.
2      Q.    And they paid you for all those
3  services?
4      A.    Yes.
5      Q.    Do you have any type of
6  arrangement with Purdue currently?
7      A.    No.
8      Q.    Do you recall who you worked
9  with at Purdue in connection with the
10  consulting services you provided?
11      A.    No, I don't remember that.
12      Q.    Do you know if you actually
13  worked with individuals at Purdue?
14      A.    Yes.
15      Q.    But you don't recall their
16  names?
17      A.    Who was it?  Yeah, I just don't
18  remember that.
19      Q.    Do you know approximately how
20  many individuals you worked with at Purdue?
21      A.    I spoke with probably five or
22  six people.
23      Q.    And how frequently did you
24  communicate with them over the course of this

Page 132

1  one-year engagement?
2      A.    Yeah, I'm concerned -- I'm --
3  I'm hesitant to respond because the terms of
4  my engagement with them were confidential.
5          So I just -- I can't recall if
6  the agreement I signed precluded me from
7  off -- from giving you a description, an
8  answer to that question or not.  But I think
9  I really -- I mean, I've described the
10  engagement.  I know that that is not
11  confidential, the existence of it.  But the
12  terms of it are confidential.
13      Q.    And in connection with -- well,
14  do you have a copy yourself of the
15  confidential agreement that you signed with
16  Purdue?
17      A.    I did at one time.  I don't
18  know.
19      Q.    And do you recall how you
20  communicated with the individuals at Purdue?
21  Is it by e-mail or by phone or both?
22      A.    Probably both.
23      Q.    And did you ever meet with them
24  in person?

Page 133

1      A.    I don't remember.  I don't
2  think so.
3      Q.    Okay.  Do you recall working
4  with any other non-Purdue employees in
5  connection with this consultation arrangement
6  that you had with Purdue?
7      A.    No.
8      Q.    Do you recall whether or not
9  you reached out to any non-Purdue employees
10  in connection with this consultation
11  agreement?
12      A.    I don't recall having done
13  that.
14      Q.    Okay.  And I know you said that
15  you were -- you had this arrangement for
16  approximately one year beginning in 2016.  Do
17  you have a recollection of when in 2016 this
18  arrangement began?
19      A.    I don't remember.
20      Q.    Okay.  You have no recollection
21  of whether or not it was the beginning or the
22  middle or the end of 2016?
23      A.    I just don't remember.
24      Q.    Now, in addition to the

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  consulting work that you've done for Purdue,
2  which you've indicated is confidential
3  pursuant to the terms of the agreement that
4  you've signed with them, have you done any
5  other consulting work for any other defendant
6  in this litigation.
7      A.    Not that is not confidential.
8      Q.    Okay.  And separate and apart
9  from whether or not it is confidential, can
10 you identify the entities for which you have
11 provided consulting services for?  Other than
12 Purdue that are also defendants in this
13 litigation?
14     A.    No.
15     Q.    So no, you can't identify them,
16 or no, you have not provided any consulting
17 services to these entities?
18     A.    I -- there are no other
19 entities to whom I've provided consulting
20 services for whom the actual provision of
21 services was not confidential.
22     Q.    I see.  And I actually just
23 want to make sure the record is clear with
24 respect to the specific defendants in this

Page 135

1  case.  So let me go over some entities and
2  examine whether or not you've actually
3  provided consulting services for them.
4          Have you ever provided any
5  consulting services for Allergan?
6      A.    So I can't answer these
7  questions because if I were to answer them,
8  then that would have the possibility of
9  divulging whom I provided or did not provide
10 services to, and those agreements were
11 confidential, so I just can't answer those
12 without violating the agreements that I've
13 signed.
14     Q.    So your testimony is that the
15 confidential agreements themselves prevent
16 you from even disclosing the entity?
17     A.    Yes.
18     Q.    Okay.  And you -- if I go
19 through a list, you're unwilling to testify
20 as to whether or not you've actually -- like,
21 for example, if there is an entity in which
22 you did not provide testifying -- or
23 consulting services for, you are not going to
24 disclose that entity either?

Page 136

1          MR. GEISE:  The problem with
2  that, Counsel, is you could then ask
3  about 20.  He says no for 18 and can't
4  answer the other two, and by nature of
5  that he's disclosed the information he
6  can't disclose.
7          MR. KO:  I understand that if I
8  went through the 20, but I'm just
9  making sure that the record is clear.
10 And I may be a little slow, but I knew
11 where I was going with that question,
12 so I just want to make sure --
13         MR. GEISE:  I figured you did.
14 It was creative, I'll give you credit.
15 But we're not going to start down the
16 first nine and then get to one that
17 Professor Kessler can't answer.
18         So, I mean, I think -- and you
19 can ask the question, but I think the
20 record is clear as to the problem with
21 proceeding.
22     Q.    (BY MR. KO)  I just want to
23 make sure that the record is clear.  So you
24 are -- you have disclosed the fact that you

Page 137

1  have been a consultant for Purdue in the
2  past, but you're not willing to disclose the
3  nature of the work that you did for them;
4  correct?
5      A.    My agreement with Purdue did
6  not preclude me from saying that I had served
7  as a consultant for them, so I testified as
8  to that.
9          My agreement with Purdue did
10 preclude me from testifying as to the
11 substance of what I performed.  I agreed to
12 keep that confidential, yes.
13     Q.    And so with respect to other
14 confidential agreements you have, it's your
15 testimony that you cannot disclose the
16 identity of the entities for which you
17 provided consulting services for; is that
18 accurate?
19     A.    Yes, those agreements required
20 me to not only keep the substance of the
21 engagement confidential, but also keep the
22 fact that I had worked with the entity
23 confidential.
24     Q.    Okay.  And with respect to the

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1   time frame that you have been retained by any
2   of these entities pursuant to a confidential
3   agreement, can you provide approximately when
4   you were retained to provide such services?
5       A.   No.  If I were to do that, that
6   would be a violation of the agreement that I
7   signed.
8       Q.   Okay.  So it's your testimony
9   that these confidential agreements also
10  preclude you from disclosing the time period
11  or the date on which you were retained as a
12  consultant; correct?
13      A.   The confidentiality agreements
14  I signed precluded me from identifying the
15  entity, the work, or the timing of the work.
16  All of those matters were -- I agreed to keep
17  confidential.
18      Q.   Okay.  And do you have copies
19  of these confidentiality agreements?
20      A.   I did at one time.  I don't
21  know.
22      Q.   Okay.  And so how is it that
23  you recall that you're precluded from
24  disclosing both the entity and the time

Page 139

1   period for which you were retained as a
2   consultant?
3       A.   Because I remember that the
4   agreements said I wasn't supposed to disclose
5   the work that I had done.
6       Q.   And again, so the record is
7   clear, the Purdue confidentiality agreement
8   does allow you to disclose the timing and the
9   entity for which you provided consulting
10  services, but nothing else.  Is that
11  accurate?
12      A.   Yes.
13      Q.   Do you recall --
14      A.   That's right.
15      Q.   Sorry to interrupt.
16      A.   No, no.
17      Q.   Do you recall anything else
18  about the agreement you had with Purdue which
19  allows you to disclose anything else in
20  addition to the entity that you're providing
21  services for, the time period for which you
22  were retained?
23      A.   No, I don't -- I don't
24  remember.

Page 140

1       Q.   So the confidentiality
2   agreements that you have with these other
3   entities that are defendants in this
4   litigation, is it fair to say that those
5   confidentiality agreements preclude you from
6   disclosing anything about the nature of that
7   arrangement?
8       A.   That's my recollection.  I
9   mean, I -- I didn't -- I don't have them here
10  today, but my recollection is that I agreed
11  not to disclose that information.
12      Q.   Okay.  And do you have an
13  understanding or can you provide me with a
14  general estimate for how much you've been
15  paid in connection with the consulting
16  services you have provided outside of the
17  consulting service arrangement you have with
18  Purdue?
19      A.   No.  That would be covered by
20  the confidentiality agreements.  And I can't
21  remember.  I mean, I can't remember anyway,
22  but that would certainly be covered.
23      Q.   Okay.  So it's your testimony
24  that the confidentiality agreements also have

Page 141

1   a provision preventing you from disclosing
2   the amount that you have received from that
3   entity in connection with your consulting
4   services; correct?
5       A.   Well, if I disclosed the amount
6   that I received, then that would be
7   information that would enable the third party
8   to identify, potentially, the entity.  So
9   yes, that...
10      Q.   And I appreciate that
11  explanation.  But I was just asking a simple
12  question, and that is whether or not you
13  believe that the consulting agreements you
14  have with these entities specifically prevent
15  you from disclosing the amount you received
16  as compensation in connection with your
17  consulting services.
18      A.   Well, I mean, I can't remember
19  specifically, but I -- what I remember is the
20  answer that I provided you.
21      Q.   Well, if you can't remember
22  specifically, how do you recall that you
23  can't disclose the amount that you have
24  received from any particular entity that is

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1   also a defendant in this litigation in
2   connection with the consulting arrangement
3   you have?
4        A.    Because were I to provide that
5   information, that could enable the third
6   party to identify who the entity is.
7             I'm sorry, maybe I'm just not
8   understanding your --
9             I just really can't give you
10  information that enables you or any third
11  party to identify these organizations when I
12  signed confidentiality agreements that
13  preclude me from doing so.
14       Q.    And I'm just simply asking you
15  how you arrived at that understanding and
16  whether or not it was something specific in
17  the provision or something that -- something
18  specific in the provision of that consulting
19  agreement or something else.
20            And all I'm asking is whether
21  or not you recall that there was a specific
22  provision in the consulting agreement with an
23  entity that precluded you from disclosing the
24  amount you obtained as compensation for your

Page 143

1   consulting services.
2        A.    Oh, gosh.  I can't remember.
3   Yeah, I can't recall.
4        Q.    But you have a general
5   understanding that you are not to disclose
6   the amounts you've obtained from these
7   entities; correct?
8        A.    Because it could enable the
9   third party to identify who the entities are,
10  yes.
11       Q.    And how did you arrive at that
12  general understanding?
13       A.    That's my -- I mean, that's my
14  understanding of our arrangement.
15       Q.    Right.
16       A.    That's my reasoning.
17       Q.    And so I'm just trying to drill
18  down a little bit in terms of how you arrived
19  at that understanding, because you've said
20  that you don't recall any specific provision.
21  So if you don't recall a specific provision
22  in any of the confidentiality agreements that
23  you've signed, how do you know that you
24  cannot disclose the amount you have received

Page 144

1   in connection with any of these arrangements,
2   consulting arrangements that you have
3   provided consulting services for?
4             MR. GEISE:  Asked and answered.
5             THE WITNESS:  Yeah, I mean,
6        it -- I mean, Mr. Geise had a fairly
7        clear explanation about this a moment
8        ago.  I guess I'm just not
9        understanding.  I must just not be
10       understanding the question, because as
11       he said, if I gave you amounts for
12       organizations, then that would --
13       could enable somebody to back out who
14       the organizations were.  But then that
15       would violate the agreements that I
16       signed.
17       Q.    (BY MR. KO)  Mr. Geise is not
18  the person answering the questions today,
19  and, of course, he is entitled to state his
20  objections for the record.  But I am just
21  trying to get an understanding of how it is
22  the case that you have become aware that you
23  are not to disclose the amounts you've
24  received as compensation for consulting

Page 145

1   services you've provided for any defendant in
2   this litigation in the past.
3        A.    So that -- that's not --
4             So I don't agree with that
5   statement because I did disclose the amount I
6   received as compensation from Purdue, because
7   that agreement did not preclude me from doing
8   so.
9        Q.    Outside of the arrangement you
10  have with Purdue, how did you become aware
11  that you are not to disclose the amounts
12  you've received as compensation from any
13  individual -- any entity that is a defendant
14  in this litigation?
15            MR. GEISE:  Asked and answered.
16            THE WITNESS:  If I were to
17       disclose the amounts, then that could
18       enable the third party or listener to
19       identify who the organizations are.
20       Q.    (BY MR. KO)  Okay.  Is there
21  any other basis to support your belief that
22  you cannot disclose the amount other than a
23  third party or listener being able to back
24  out the amounts to potentially identify the

37  (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    entity?
2           MR. GEISE:  Do you mean other
3    than the agreement to itself?
4           MR. KO:  Well, he -- he
5    testified he doesn't recall the
6    agreement, so -- the specific
7    provisions of the agreement so I'm
8    actually not asking other than the
9    agreement itself.
10          THE WITNESS:  Well, it's not
11   that I don't recall the agreement.
12   Your earlier question was whether I
13   recalled a specific provision in the
14   agreement targeting amounts.  And it
15   is true I cannot recall that, but I
16   can recall that the agreements
17   precluded identification of who the
18   parties were.  And my concern is that
19   if I were to answer your question,
20   that could enable you or anyone to
21   back out who the parties were, which
22   then would put me in the position of
23   having violated the agreements that
24   I've signed.

Page 147

1        Q.    (BY MR. KO)  Understood.
2           And can you disclose how many
3    such arrangements you have had in the past
4    with defendants in this litigation outside of
5    Purdue?
6        A.    No, I can't disclose anything
7    about that, because provision of that
8    information could enable you or a third party
9    to back out who the organizations were, which
10   would then place me in violation of the
11   confidentiality agreements that I signed.
12       Q.    Okay.  Now we're getting into a
13   theoretical problem with math or potentially
14   economic problem, but I actually completely
15   disagree with the ability to back out
16   organizations for the question I asked.
17          I am simply asking you the
18   number of engagements you have with entities
19   that are defendants in this litigation.
20          Can you disclose that number?
21       A.    No, my understanding, except
22   for the arrangement with Purdue which I
23   described to you, my understanding is that I
24   am not to disclose anything about those

Page 148

1    engagements, including the number, the
2    amount, or the time period.
3        Q.    Right.  And I'm not asking you
4    the number of times you've been retained by a
5    particular entity.  I'm simply asking you the
6    amount of confidential agreements that you
7    have with a defendant in this litigation.
8        A.    My understanding is that that
9    would be a violation -- disclosing that would
10   be a violation of my agreements.
11       Q.    So there are provisions in
12   these agreements that say that you can't
13   disclose the existence of the agreement
14   itself?
15          MR. GEISE:  Asked and answered.
16          THE WITNESS:  Yes.  That's
17   the -- that's the essence of it.
18       Q.    (BY MR. KO)  And so the record
19   is clear, you're unwilling to answer the
20   amount of times you've been retained as a
21   consultant for a defendant that is in this
22   litigation other than Purdue; correct?
23          MR. GEISE:  Object to the form.
24   It's not a question of willingness.

Page 149

1    It's a question of adhering to a
2    confidentiality agreement.
3           THE WITNESS:  Yeah.  I mean,
4    that -- the problem is that -- it's
5    not -- the problem is that I've signed
6    agreements that say I am not to
7    disclose the existence of this
8    agreement, and what you're asking me
9    is to violate that term.  And I
10   just -- that's just -- I can't do that
11   because that would be against what
12   I've agreed to.
13       Q.    (BY MR. KO)  But you are
14   disclosing the fact that such agreements
15   exist because you are indicating that you've
16   signed such agreements; correct?
17       A.    I cannot disclose anything
18   about agreements where I've said I'm not
19   going to disclose anything about the
20   agreements.  I can't tell you yes, I have or
21   no, I haven't, because I've said I wouldn't
22   disclose that.
23       Q.    Well, a moment ago you --
24          Well, let me make sure the

38  (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    record is clear, then.  Are you saying that
2    no such agreement exists?
3         A.    I'm saying I cannot disclose --
4    when I have entered agreements that say the
5    agreement is confidential, the existence of
6    the agreement is confidential, I cannot
7    disclose whether or not I have entered
8    agreements like that.  Because were I to do
9    that, that would then indicate that I had.
10   And so I cannot answer those questions
11   without subsequently violating agreements
12   that I've signed.
13        Q.    "Yes" or "no," Professor
14   Kessler, have you entered into a
15   confidentiality agreement with an entity that
16   is a defendant in this litigation outside of
17   Purdue?
18        MR. GEISE:  Asked and answered.
19        THE WITNESS:  I -- if I were to
20        answer that question, that would
21        provide you with information that I've
22        agreed not to provide.  I'm sorry, I
23        just cannot -- I don't violate
24        agreements that I've signed.  I

Page 151

1    apologize.
2         Q.    (BY MR. KO)  But you have
3    indicated a moment ago that you entered into
4    such agreements.  Or do you want to revise
5    that answer now?
6         MR. GEISE:  Object to the form.
7         THE WITNESS:  Yeah, I cannot
8         identify or comment on agreements that
9         I've signed that preclude me from
10        identifying that the agreement exists.
11        I just can't do it one way or
12        the other, because to do so would
13        indicate that they exist, but then
14        that's a violation of the
15        confidentiality agreement.
16        I apologize if I'm just not
17        understanding.
18        Q.    (BY MR. KO)  No, you -- you are
19   making the record perfectly clear.
20        A.    Okay.
21        Q.    Other than your retention by
22   Jones Day in this case, have you ever been
23   hired by any other law firms that represent
24   defendants in this litigation?

Page 152

1         Well, let me ask it this way
2    instead of doing some sort of memory test.
3    I'll go through some of the law firms, and I
4    just want to know whether or not you've been
5    retained by them before in the past.
6         Have you ever been --
7         A.    Okay.  Go ahead.
8         Q.    Have you ever been retained by
9    Kirkland & Ellis as an expert or a
10   consultant?
11        A.    I'm not sure.
12        Q.    Okay.  How about Arnold &
13   Porter?  Have you ever been retained by them?
14        A.    I don't think so.
15        Q.    How about Holland & Knight?
16        A.    No.  That doesn't sound
17   familiar.
18        Q.    How about O'Melveny?
19        A.    I don't know.  I'm not sure.
20        Q.    Have you ever been retained by
21   Ropes & Gray?
22        A.    No.
23        Q.    Have you ever been retained by
24   Dechert?

Page 153

1         A.    I don't think so.
2         Q.    Okay.  Have you ever been
3    retained by Morgan Lewis?
4         A.    I don't remember.
5         Q.    And going back to actually your
6    retention by Jones Day in this case, have you
7    ever worked with Jones Day before in the
8    past?
9         MR. GEISE:  Asked and answered.
10        MR. KO:  I apologize for that.
11        THE WITNESS:  No, I don't think
12        so.  No, I have not worked with
13        Jones Day before.
14        Q.    (BY MR. KO)  Have you ever
15   worked with Mr. Geise or Ms. Castles ever
16   before?
17        A.    No.
18        Q.    Have you worked with Reed --
19   has Reed Smith ever engaged you for expert
20   services?
21        A.    I don't think so.
22        Q.    How about Bingham Greenebaum &
23   Doll?
24        A.    No.  That doesn't ring a bell.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1       Q.    How about Williams & Connolly?
2  Have they engaged you as an expert?
3       A.    I don't remember.  Maybe years
4  ago.  I don't remember.
5       Q.    What matter was that?
6       A.    It might have been -- I just --
7  yeah, I don't remember.
8       Q.    Was it just one occasion that
9  you -- that you may have worked with them?
10      A.    It only would have been one
11  occasion, and it would have been a long time
12  ago.
13      Q.    Has Zuckerman Spaeder ever
14  engaged you as an expert or consultant?
15      A.    No.
16      Q.    How about Covington & Burling?
17      A.    I don't think so.
18      Q.    How about Bartlit Beck?
19      A.    That doesn't sound familiar.
20            We could go on the list of
21  my -- I could tell you who has engaged me on
22  the testimony list, but I -- I just don't
23  remember these folks.
24      Q.    Sure.  No, that's fine.  We may

Page 155

1  do it that way, but this is -- we'll just do
2  it this way for now.
3            How about the law firm Locke
4  Lord?  Do you recall ever being engaged by
5  them?
6       A.    No.
7            No, I don't think so.  No.
8       Q.    How about Cavitch Familo &
9  Durkin?
10      A.    No.  That's -- I've never heard
11  of that.
12      Q.    Barnes & Thornburg?  Have they
13  ever retained you?
14      A.    No.
15      Q.    Now, in addition to being an
16  expert in providing consulting services, have
17  you also ever received income or fees for
18  being a speaker?
19      A.    From -- from anybody?
20      Q.    Yeah, from any source.
21      A.    Yes.
22      Q.    Okay.  How frequent would you
23  say you've been paid as a speaker?
24      A.    Not very frequently.

Page 156

1       Q.    When is the last time you
2  provided -- when was the last time that you
3  were provided a fee for speaking?
4       A.    Would you count executive
5  teaching as speaking?  Or is that sort of
6  separate?
7       Q.    Well, we've kind of gone over
8  that already, unless there's something else
9  that you want to add to that.  But yeah, I'm
10  talking outside of your executive teaching
11  role.
12      A.    I see.
13      Q.    Are there any other speaking
14  engagements for which you've been compensated
15  a fee for?
16      A.    I was a -- I was a speaker at,
17  I believe, an event for AHIP, America's
18  Health Insurance Plans, in 2010, or so.  And
19  I think they paid me maybe $3,000.  Or
20  $5,000.
21            Have I been a speaker at any
22  other events?  Not that I can remember.
23      Q.    And have you ever done any
24  consulting work for the government?

Page 157

1       A.    Yes.
2       Q.    And when was that, and can you
3  describe the nature of the consulting work
4  you performed?
5       A.    Sure.  I served as a consultant
6  to the Federal Trade Commission in -- maybe
7  it was 2005 to 2007, helping them on a report
8  on competition in markets for healthcare that
9  they were working on.
10            I most recently served as an
11  expert for the State of Washington in a
12  disagreement they were having with an
13  integrated delivery system -- some physician
14  practices in Washington state over contracts
15  that those practices had entered with one
16  another.
17            I served as an expert for
18  the -- I served as a consultant to the
19  government of Canada.  This was many years
20  ago.  About their long-run competition policy
21  and strategy.
22            I believe that's all.
23      Q.    Okay.  And were you compensated
24  for the services that you provided to the

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    FDC, the State of Washington, and Canada?
2        A.    Yes.
3        Q.    Approximately how much?
4        A.    I really just don't remember.
5    I mean, adding it all up, I would imagine
6    it's in the neighborhood of $200,000, or
7    maybe -- yeah, something like that.  I don't
8    remember.
9        Q.    And this is just with respect
10   to the consulting work you've done on behalf
11   of state and federal or foreign governments;
12   correct?
13       A.    The State of Washington, the
14   Federal Trade Commission, and the government
15   of Canada, yes.
16       Q.    Any other consulting work
17   you've done for governments outside of those
18   three instances?
19       A.    Not that I can remember.
20       Q.    Okay.  And I also understand
21   that you worked under the McCain campaign in
22   2008.  Is that fair to say?
23       A.    I don't think so.
24       Q.    Did you have any affiliation

Page 159

1    with Senator McCain's campaign in 2008?
2        A.    I -- not that I can remember.
3    I may have spoken with some folks there, but
4    I -- I had no formal position in the McCain
5    campaign.
6        Q.    Understood.  Have you had any
7    positions with any political figures or
8    campaigns in the past?
9        A.    No.  No formal positions in
10   political organizations and campaigns.
11       Q.    Okay.
12           MR. KO:  It's 12:32.  And I
13   indicated that we should break for
14   lunch at 12:30.  Is now a good time
15   for lunch?
16           THE WITNESS:  Sure.  Of course.
17           THE VIDEOGRAPHER:  The time is
18   now 12:31.  Going off the record.
19           (Recess taken, 12:31 p.m. to
20   1:02 p.m.)
21           THE VIDEOGRAPHER:  Time is now
22   1:01.  Back on the record.
23       Q.    (BY MR. KO)  Welcome back from
24   lunch, Professor Kessler.

Page 160

1              Now, in connection with the
2    expert work that you have provided over the
3    course of your career, has there ever been an
4    instance in which you've been excluded as an
5    expert witness by a court?
6        A.    No.
7        Q.    And have there ever been any
8    portions of an expert report that you have
9    disclosed or submitted in a case which have
10   been stricken or excluded?
11       A.    No.
12       Q.    How many times have you sat for
13   a deposition?
14       A.    Maybe eight or nine times.
15       Q.    And over the course of your
16   entire professional career?
17       A.    Yes.
18       Q.    And have you ever testified
19   before Congress?
20       A.    No.
21       Q.    Have you testified before any
22   federal agency or committee?
23       A.    Yes.
24       Q.    When and what were the

Page 161

1    circumstances?
2        A.    I testified at the FTC, I
3    believe it was once in 2005 and then once
4    some years later, I believe.
5        Q.    Other than your testimony
6    before the FTC, have you ever testified
7    before any federal agency or committee?
8        A.    Not that I can recall.
9        Q.    Have you ever testified before
10   a grand jury?
11       A.    No.
12       Q.    Have you ever provided any
13   testimony or statements or declarations of
14   any sort to the FDA?
15       A.    No.
16       Q.    Okay.  How about the DEA?  Have
17   you ever provided any testimony or statements
18   to the DEA?
19       A.    No.
20       Q.    Have you provided any testimony
21   or statements to the CDC?
22       A.    No.
23       Q.    Okay.  Do you own any stock?
24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1     Q.    Do you have any direct stock
2  ownership in any pharmaceutical companies?
3     A.    Do you mean not through a
4  mutual fund?
5     Q.    Correct, that's why I was
6  asking direct.
7     A.    No, I don't think so.
8     Q.    Do you happen to have any
9  patents of any sort?
10    A.    No.
11    Q.    Now, we've gone over some
12 entities that you have received compensation
13 as a consultant and fees for speaker, among
14 other things.
15         In connection with your
16 professional and academic research, have you
17 also received funding from any source other
18 than the two instances that you -- that we
19 went over earlier in your unpublished
20 reports?
21    A.    From any source?
22    Q.    Correct.
23    A.    Yes.
24    Q.    Who have you received funding

Page 163

1  from other than the Physicians Insurers
2  Association of America or the Pharmaceutical
3  Research and Manufacturers of America?
4     A.    I've received funding from the
5  National Science Foundation.  I've received
6  funding from the National Institutes on
7  Aging.  The National Institutes on Aging is a
8  division of the Department of Health and
9  Human Services.
10         I've received funding from the
11 Agency for Healthcare Policy and Research,
12 now called the Agency for Healthcare Research
13 and Quality.  That's also part of the
14 department -- of the U.S. Department of
15 Health and Human Services.  I've received
16 funding from the American Cancer Society.
17 I've received funding from the California
18 Healthcare Foundation.  That was some years
19 ago.
20         I've received funding from the
21 Foundation for Better Health.
22         I've received funding from -- I
23 think that's comprehensive.
24    Q.    Okay.  Thank you.  That was a

Page 164

1  helpful list.
2         In terms of these entities that
3  you've received funding from, are all of
4  those -- or was -- were all those instances
5  of funding in connection with research or
6  publications that you were intending to
7  author?  Or were -- did you receive funding
8  from these sources outside of research?
9     A.    They were for research or
10 publications.
11    Q.    Any entities that you received
12 funding from that you just listed a moment
13 ago to me that you did not receive for
14 research or publication?
15    A.    No.  They were all for research
16 or for preparation of publications.
17    Q.    Are you familiar with a group
18 PhRMA, P-H-R-M-A?
19    A.    Yes.
20    Q.    Have you ever received any
21 funding from them?
22    A.    Yes.  That's the -- that PhRMA
23 is the abbreviation for the Pharmaceutical
24 Research and Manufacturers of America.

Page 165

1     Q.    Thank you for that
2  clarification.
3     A.    Yes.
4     Q.    And are you familiar with the
5  group the Manhattan Institute for Policy
6  Research?
7     A.    Yes.
8     Q.    Have you ever received any
9  funding from them?
10    A.    I don't think so.  I can't
11 remember -- but I can't remember.  Certainly
12 not in the last decade.
13    Q.    Okay.  Is it fair to say or
14 accurate to say that you've received funding
15 from the pharmaceutical industry?
16         MR. GEISE:  Object to the form.
17         THE WITNESS:  Well, I mean, I
18 served as a consultant to PhRMA for
19 the preparation of this unpublished
20 report.
21         I served as a consultant to The
22 Medicines Company for research on the
23 anticoagulant that we discussed
24 previously.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1          I served as a consultant to
2    Purdue.
3          I think that's -- I think
4    that's it.
5      Q.   (BY MR. KO)  Okay.  So is it
6    accurate to say that you've received funding
7    from the pharmaceutical industry?
8          MR. GEISE:  Object to the form,
9    asked and answered.
10         THE WITNESS:  The funding from
11    the pharmaceutical industry that I
12    received is what I just outlined.
13      Q.   (BY MR. KO)  So "yes" or "no,"
14    have you -- is it fair to say that you've
15    received funding from the pharmaceutical
16    industry?
17         MR. GEISE:  Object to the form,
18    asked and answered.
19         THE WITNESS:  The way I would
20    describe it is I have served as a
21    consultant in the forms that I've
22    described to you and was paid by
23    participants in the pharmaceutical
24    business.  That's how I would describe

Page 167

1    it.
2      Q.   (BY MR. KO)  Okay.  I know
3    we've gone over your familiarity with some of
4    the plaintiffs' experts in this case,
5    including professors Gruber, Cutler, McGuire,
6    Liebman, and Rosenthal.  Are you familiar
7    with any other plaintiff expert in this case?
8      A.   I'm not personal friends with
9    anyone.  I have heard of and heard
10    Professor Lembke speak before.  She's a
11    colleague of mine at the Stanford School of
12    Medicine.
13         As for the others, there were a
14    lot of them.  We could go through the list.
15    None ring a bell immediately.
16      Q.   Turn with me to Appendix A at
17    page 7 of your report.
18      A.   Yep.
19      Q.   And on that page you list
20    expert reports that you considered in
21    connection with providing your report in this
22    case.  Is that accurate to say?
23         MR. GEISE:  I think you're in
24    Appendix B.

Page 168

1          MR. KO:  Thank you, Steve.
2          Yes, Appendix B, Materials
3    Considered, page 7.
4          THE WITNESS:  Yep.
5      Q.   (BY MR. KO)  You set forth --
6    and carrying on over to page 8, you set forth
7    a series of exert reports that you
8    considered; is that correct?
9      A.   Yep.
10      Q.   And I believe these are all --
11    actually all of the expert reports that
12    plaintiffs' disclosed on March 25th.
13         Are you, in addition to the
14    names that we have discussed previously,
15    including Professors Gruber, McGuire, Cutler,
16    Liebman, Rosenthal, and Lembke, are you
17    familiar with any of the other plaintiffs'
18    experts in this case?
19      A.   Well, these weren't all
20    disclosed on March 25th, so I can't agree to
21    your statement.
22      Q.   Fair enough.  Let me ask it so
23    it doesn't have that level of ambiguity for
24    you.  You've set forth all of the expert

Page 169

1    reports that you've considered for purposes
2    of providing your report; correct?
3      A.   Yes.
4      Q.   With respect to the plaintiffs'
5    experts listed on pages 7 and 8 of your
6    Appendix B, other than Professors Cutler,
7    McGuire, Gruber, Rosenthal, Liebman, and
8    Lembke, do you know and/or are you familiar
9    with any other plaintiffs' expert in this
10    case?
11      A.   No.
12      Q.   Okay.  So is it fair to say
13    that when you considered and reviewed these
14    expert reports, other than Cutler, McGuire,
15    Gruber, Rosenthal, Liebman, and Lembke, this
16    was -- that was the first time you had
17    encountered these names?
18      A.   Yes.  I don't recall having
19    heard of any of these people prior to seeing
20    their reports.
21      Q.   Are you familiar with the list
22    of defense experts that have been disclosed
23    in this case other than, of course, Laurence
24    Baker, whom we've discussed before?

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    A.   No.
2    Q.   Okay.  So you haven't seen a --
3  well, have you reviewed any other defense
4  expert report in this case?
5    A.   Yes.
6    Q.   Which ones?
7    A.   I've reviewed Professor Baker's
8  report.  I reviewed Professor -- oh, gosh.
9  What's the matter with me?  I reviewed
10  Murphy's report.
11    Q.   Is that Kevin Murphy?
12    A.   Kevin Murphy.
13         I've reviewed Professor
14  Lichtenberg's report.
15         I've reviewed -- oh my
16  goodness, what's the name of the Columbia law
17  school person?  How can I have -- be
18  forgetting this?
19    Q.   Is it Justin McCrary?
20    A.   Justin McCrary.  I've reviewed
21  Professor McCrary's report.
22         Murphy, McCrary, Baker,
23  Lichtenberg.
24         I believe that's all I've
     reviewed.

Page 171

1    Q.   And did you review all these
2  reports after May 10th?
3    A.   Yes.
4    Q.   In other words, did you review
5  any of these reports prior to their
6  disclosure?
7    A.   No.  I was not aware of -- I
8  was not aware of the reports prior to their
9  disclosure.
10         I wasn't aware of any of them
11  prior to their disclosure.
12    Q.   And I believe I've asked this
13  before, but you hadn't communicated -- or you
14  have not communicated with any other defense
15  expert in this case; correct?
16         Other than Laurence Baker?
17         MR. GEISE:  Do you mean about
18  the case?
19         THE WITNESS:  No, that's not --
20         MR. KO:  About -- yes.  Just so
21  the record is clear.
22         THE WITNESS:  Go ahead.
23    Q.   (BY MR. KO)  Have you
24  communicated with any other defense expert in

Page 172

1  this case about this -- about your engagement
2  or their engagement?
3    A.   I have -- no, I have not
4  communicated with any defense experts about
5  either my engagement or their engagement.
6    Q.   Okay.  Now, is it fair to
7  say -- and this is my review of some of the
8  articles that you've disclosed in your CV,
9  but is it fair to say that you are in favor
10  of tort reform?
11         MR. GEISE:  Object to the form.
12         THE WITNESS:  That's sort of a
13         very big question.  I think some tort
14         reforms can be helpful and some may
15         not be helpful.
16    Q.   (BY MR. KO)  And you're right,
17  I agree with you, tort reform is a broad
18  concept.  So let me ask you specifically, is
19  it fair to say that you are a -- you have
20  taken positions on medical malpractice
21  lawsuits?
22    A.   I have conducted research and
23  written about medical malpractice liability
24  laws and liability reform, yes.

Page 173

1    Q.   And what is the general nature
2  of the research and articles that you have
3  written about medical malpractice liability
4  laws and liability reform?
5    A.   It would be hard to summarize
6  all of that, you know, in -- just in a blurb
7  sitting here today.
8         But was there a specific -- was
9  there a specific article you want -- you were
10  interested in or --
11    Q.   No.  Let me ask you this.  Have
12  you engaged in any political efforts to
13  support tort reform?
14         MR. GEISE:  Object to the form.
15         THE WITNESS:  I'm not sure I
16         understand what you mean by "political
17         efforts."
18    Q.   (BY MR. KO)  Have you been
19  involved in any organizations or groups or
20  been a member of any entity that supports
21  tort reform?
22    A.   I guess I'm still just not sure
23  what -- I'm just not sure what you're asking.
24  I'm sorry, I just don't understand.

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1      Q.    Have you been involved in any
2  organizations or groups or been a member of
3  any entity that has taken a position on
4  medical malpractice liability?
5      A.    Well, I served as a consultant
6  to the Physician Insurer's Association of
7  America in connection with the preparation of
8  the report that we discussed.  And I'm -- I'm
9  confident that the Physician Insurer's
10  Association of America is in favor of less
11  medical malpractice liability.
12     Q.    Other than this entity, are you
13  involved with or affiliated with in any way
14  any group that has taken a position on
15  medical malpractice liability?
16     A.    No.
17     Q.    Okay.  I see that you are on
18  Appendix B of your report.  And let's turn to
19  the beginning of Appendix B.  And so the
20  record is clear, the title of Appendix B is
21  Documents Considered List; correct?
22     A.    Yes.
23     Q.    And here you list all of the
24  documents that you have considered in

Page 175

1  connection with preparing your report; is
2  that right?
3      A.    Yes.
4      Q.    And what is your definition of
5  considered?
6      A.    My definition of considered is
7  that I considered the document for whether or
8  not it was relevant to my opinions in this
9  report.
10     Q.    And so it's not necessarily the
11  case that consider is synonymous with relied
12  upon?
13           In other words, is it your
14  testimony that all of these documents support
15  any of the conclusions or bases for your
16  conclusions that are contained in your
17  report?
18     A.    Yeah.  I don't consider -- I'm
19  not -- when I developed this list, I did not
20  consider -- I did not form it with the
21  understanding that it was identical to
22  documents relied upon.  The way I think of
23  documents relied upon is the ones I cited in
24  my report.

Page 176

1      Q.    Got it.
2           And so the documents that
3  you've actually relied upon to support the
4  basis of your opinions that you give in your
5  report are a more narrower list or a smaller
6  list than the documents that appear here in
7  Appendix B; correct?
8      A.    Yes.
9      Q.    Okay.
10          And with respect to your review
11  of all of these documents, did you, in fact,
12  review every single document that's listed
13  here in Appendix B?
14     A.    Well, Appendix B contains all
15  of the case documents.  And the reason I put
16  them in there was because counsel made them
17  available to me.  And over the past year,
18  I've looked at many, many of these and did
19  not keep record of exactly which ones I read
20  and when.
21          And so I just asked to include
22  all of them because I couldn't remember
23  exactly which ones I'd read and when.  That's
24  with regard to the case documents.

Page 177

1      Q.    That's helpful.
2           So would it be fair to say that
3  all the documents that are listed here,
4  including, of course, the case documents that
5  you've identified, those are all the
6  documents that were made available to you by
7  counsel?
8      MR. GEISE:  Object to the form.
9      THE WITNESS:  Yeah, I would
10  not -- that --
11     MR. KO:  I'm sorry if I
12  misheard you.
13     THE WITNESS:  Yeah, that's not
14  accurate.
15     MR. KO:  Okay.
16     Q.    (BY MR. KO)  Did you review
17  every single one of the documents that you've
18  listed as materials considered in this
19  Appendix B?
20     A.    Well, with regard to the case
21  documents, I have looked at each of these
22  documents at least in passing.  I can't
23  remember which ones and when.
24          The expert reports, I looked at

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    each one of the expert reports in the process
2    of determining which reports I would respond
3    to.
4           The depositions, I read
5    Professor Cutler's, Professor Gruber's, and
6    Professor McGuire's depositions. And the
7    academic -- the academic texts are the texts
8    that I cited in my report and that I had been
9    working and studying as part of my academic
10   research.
11          And so to, you know, be fair, I
12   put them all on the list.
13      Q.   Right. Thank you for that
14   explanation. And I'm just asking a simple
15   question, is it your testimony that you
16   reviewed every document that you had listed
17   in Appendix B?
18      A.   I have -- if by "reviewed," you
19   mean looked at every document, the answer is
20   yes.
21          If by "reviewed," you mean read
22   completely, the answer is no.
23      Q.   Okay. Are there documents for
24   which -- and you don't have to identify the

Page 179

1    specific ones, but are there documents for
2    which Cornerstone reviewed for you?
3       A.   The Cornerstone people may have
4    reviewed some or all of these documents, but
5    these are documents that I looked at at least
6    once at some point over the past year.
7       Q.   Okay. And do you know whether
8    or not Cornerstone, in fact, reviewed any of
9    these documents?
10      A.   No.
11      Q.   You don't know whether or not
12   they reviewed them?
13      A.   I don't.
14      Q.   Can you provide an approximate
15   breakdown of how many documents that appear
16   in Appendix B you actually reviewed from
17   start to finish?
18          MR. GEISE: I'll just object to
19   the form as to your definition of
20   "start to finish."
21          THE WITNESS: I mean, the legal
22   documents, you know, I did not read
23   every word of every one of these.
24          I couldn't even begin to give

Page 180

1    you an estimate of the fraction that I
2    read in detail because it occurred
3    over such a long period and there are
4    so many of them.
5           The expert reports, I focused
6    on the reports that I cite in my reply
7    report.
8           The depositions, I read
9    Professor Cutler's, Professor
10   Gruber's, and Professor McGuire's
11   depositions completely.
12          The academic papers, over the
13   past two or three years I have read
14   all of these, from -- more or less
15   start to finish.
16      Q.   (BY MR. KO ) Let's talk just
17   real briefly about a few of those academic
18   texts that you've reviewed from start to
19   finish.
20      A.   Sure.
21      Q.   Or more or less start to
22   finish, as you've described, over the past
23   two or three years. There's a couple of
24   textbooks you've set forth in your academic

Page 181

1    text list; right?
2           Well, I'll turn your attention
3    specifically to page 9 of your report.
4       A.   All right.
5       Q.   Of Appendix B of your report.
6           There's at least a -- one
7    reference to Professor Gruber's public
8    finance and public policy textbook; correct?
9       A.   Oh, yes.
10      Q.   And so you've reviewed that two
11   or three times over the past couple of years?
12          MR. GEISE: Object to the form.
13          THE WITNESS: That's -- I don't
14   believe that's my testimony.
15      Q.   (BY MR. KO) So your
16   testimony -- I just want to make sure it's
17   clear, you have indicated that there are
18   articles that you set forth in Appendix B of
19   your report; correct?
20      A.   Yes.
21      Q.   And forgive me if I misheard
22   you, but I believe you said that you had more
23   or less reviewed all of these two or three
24   times over the course of the past few years?

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    Or did I get that wrong?
2         A.    Yeah, I think that's just
3    simply incorrect.  I don't think I said that.
4         Q.    All right.  Have you reviewed
5    every single academic text that you've set
6    forth in pages 8 through 11 of Appendix B of
7    your report?
8         A.    Yes, I have reviewed all of the
9    academic texts I set forth in pages 8 through
10   11 of my report, as I have all of the case
11   documents.  The extent to which I reviewed
12   them depended on their relevance to the
13   preparation of the report.
14        Q.    And where it helped inform you
15   in providing an opinion or the basis of your
16   opinion in your report, you have cited as
17   such in the body of your expert report.  Is
18   that fair to say?
19        A.    Yes, that's accurate.
20        Q.    Okay.  And with respect to
21   Gruber's textbook -- so I just want to make
22   sure the record is clear.
23             Did you actually, in fact,
24   review that entire textbook?

Page 183

1         A.    I did.  I did not read
2    Professor Gruber's textbook from cover to
3    cover.  I did page through it.  I bought a
4    copy of it and paged through it and looked at
5    it.
6         Q.    And you bought the 5th edition;
7    correct?
8         A.    That is correct.
9         Q.    And is the Greene Economic --
10   Econometric Analysis, 7th edition, that's
11   listed right above the Gruber textbook, is
12   that also a textbook?
13        A.    It is.
14        Q.    And is your testimony the same
15   with respect to that textbook, that you
16   didn't necessarily read it from cover to
17   cover, but when appropriate, you relied on
18   relevant portions of it?
19        A.    I certainly didn't -- well,
20   I've -- over the years I've read this
21   textbook quite a bit.  In preparation for
22   this report, I looked only at the sections
23   that were cited in the documents considered
24   list.

Page 184

1         Q.    And that would be Sections 8.2
2    and 8.31; correct?
3         A.    Yes.  That's right.
4         Q.    And were those listed --
5    actually, I won't ask you that.
6             And one thing I noticed on the
7    case documents that you were provided access
8    to, I understand that you have set forth and
9    considered a series of discovery requests
10   made by both plaintiffs and defendants in
11   this case?
12        A.    Yes.
13        Q.    Do you recall ever reviewing,
14   considering, or relying upon any of the
15   responses and objections to those discovery
16   requests?
17             MR. GEISE:  Other than the ones
18        listed?  Or...
19             MR. KO:  Other than the ones
20        listed.
21             MR. GEISE:  Okay.
22             THE WITNESS:  Oh, other than
23        the ones listed.  No, I -- if it's not
24        on this list, I don't think I looked

Page 185

1    at it.
2         Q.    (BY MR. KO)  And you can
3    correct me if I'm wrong, but I believe there
4    are responses and objections to discovery
5    requests made by the defendants -- well, let
6    me clarify.
7             There are responses and
8    objections made by Cleveland, Cuyahoga, and
9    Summit Counties.  I don't recall seeing
10   responses and objections made by any of the
11   defendants in this case.
12             Do you recall reviewing,
13   reading, or otherwise relying upon in any
14   manner the responses and objections made by
15   any of the defendants in this case?
16        A.    And these are responses and
17   objections that aren't on the document --
18   aren't on my documents considered list?  Or
19   are they on here?
20        Q.    Well, let's take a moment to
21   divorce ourselves from this list.  I'll just
22   ask you, do you recall reviewing any
23   responses and objections made by defendants
24   to plaintiffs' discovery requests in this

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    case?
2           I see that my instruction
3    didn't really work because you're still
4    looking at the list, but feel free to respond
5    however you want.
6      A.    Any responses made by
7    defendants to discovery requests by
8    plaintiffs.  I can't recall.
9      Q.    Regardless, all the documents
10   that you considered or reviewed to some
11   degree are set forth in this Appendix B;
12   correct?
13     A.    Yes.  If it's -- if it's not on
14   this appendix, I did not consider it.
15     Q.    Okay.  Thank you.  That's
16   helpful.
17     A.    With the exception of the
18   expert -- the Defendants' expert reports
19   which I got after I submitted this and I
20   mentioned to you a few minutes ago.
21     Q.    Correct.  So in addition to the
22   documents set forth in Appendix B, you have
23   reviewed four additional defense expert
24   reports.  And outside of that universe of

Page 187

1    documents, you've not looked at any other
2    document in this case; correct?
3      A.    For purposes of forming my
4    opinion, that is correct.
5      Q.    Okay.  Now, in going back to
6    page 7 of your materials considered -- or
7    documents considered list, and in particular
8    the expert reports that you set forth, you
9    list that you considered, for many of these
10   expert reports, the supporting materials
11   underlying their expert reports; is that
12   correct?
13     A.    Yes.
14     Q.    And so did you actually review,
15   yourself, all of the supporting materials
16   underlying, for example, Professor David
17   Cutler's report?
18     A.    I think the answer is no
19   because if by -- if supporting materials
20   includes the NCHS data to which -- for which
21   I did not have permission to view, I did not
22   view that.  So if that's a supporting
23   material of Professor Cutler, which I -- I
24   think it -- it would be classified, I did not

Page 188

1    look at that.
2      Q.    Are you aware of all of the
3    reliance materials that were disclosed in
4    connection with Professor David Cutler's
5    report?
6      A.    Are reliance material -- I
7    guess I don't understand.
8      Q.    Sure.  I can ask it more
9    specifically.
10          Are you aware that in
11   connection with the expert reports of
12   Professor Gruber, Cutler, Rosenthal, McGuire,
13   there was a shared data appendix?
14     A.    Yes, I am aware of the shared
15   data appendix.
16     Q.    Did you review the shared data
17   appendix?
18     A.    I looked at the file, but I did
19   not -- I -- I think, in there, was NCHS data,
20   and I did not look at that because I did not
21   have permission to do so.
22     Q.    Other than the NCHS data, do
23   you recall reviewing all other aspects of
24   that shared data appendix?

Page 189

1      A.    You know, I couldn't tell you
2    that I reviewed all of it because there were
3    a lot of files.  I looked at it and tried to
4    determine which files I had permission to
5    review and which I didn't.  And then I
6    secondarily tried to determine which files
7    were relevant and which files weren't.  And
8    I'm not sure if I reviewed all of them.
9      Q.    And how did you make that
10   determination for identifying which files
11   were relevant and which files were not?
12     A.    I would open them up and see if
13   I could figure out what was in them and if I
14   could trace back where that file fit into the
15   reports.  And given that I was constrained in
16   time, that I did not receive those materials
17   when I understood them to have been due on
18   the 25th, I just really had very little time,
19   and so I just did the best I could.
20     Q.    For purposes of identifying
21   which materials were relevant and which
22   materials were not, did you make that
23   determination on your own, or did you receive
24   assistance from anyone else?

48 (Pages 186 to 189)

Page 190

1      A.   I received assistance from both
2   Cornerstone and from Mr. Geise and
3   Ms. Castles.
4      Q.   Okay.  Anybody else that you
5   received assistance from in identifying which
6   materials were relevant other than
7   individuals at Cornerstone and counsel at
8   Jones Day?
9      A.   No.
10      Q.   Did counsel, including
11   Mr. Geise and Ms. Castles, identify for you
12   any specific documents to review?
13           MR. GEISE:  With respect to any
14       documents we identified for review, I
15       instruct you not to answer because
16       that gets into attorney work product.
17           MR. KO:  And I'm not asking you
18       to disclose the identity of the
19       documents.  I'm just simply asking
20       whether or not Mr. Geise or
21       Ms. Castles identified documents for
22       you to review.
23           MR. GEISE:  You can answer that
24       question.

Page 191

1           THE WITNESS:  Do you mean in
2       this whole matter?
3      Q.   (BY MR. KO)  Well, in
4   connection with determining which -- thank
5   you for that clarification -- in connection
6   with determining which documents were
7   relevant or not for purposes of preparing
8   your report.
9      A.   They -- yes.  Mr. Geise and
10   Ms. Castles certainly identified documents
11   for review that they thought were relevant,
12   but my review of documents was by no means
13   limited to what they recommended or what
14   Cornerstone recommended.  I had access to all
15   of these documents, and I spent several hours
16   sifting through them on my own.
17      Q.   You've indicated before that
18   you have spent approximately 350 to 400 hours
19   in connection with this litigation; correct?
20      A.   Yes.
21      Q.   So is the -- does that amount
22   include the time spent reviewing all of the
23   documents that you've said you've sifted
24   through?

Page 192

1      A.   Yes.
2      Q.   Okay.  So your review of all of
3   the documents listed in Appendix B -- and I
4   understand that your review varies by
5   degree -- but all of the hours spent in terms
6   of reviewing these documents are included in
7   the 350 to 400 hours you've spent working on
8   this litigation.  Is that accurate to say?
9      A.   Well, no, I don't think that's
10   accurate.
11           I mean, yeah, that's not
12   accurate.
13      Q.   Okay.  So there is time
14   spent -- and I'm just -- this isn't --
15      A.   No, go ahead.
16      Q.   This isn't a game or anything.
17      A.   No, no.
18      Q.   I'm just trying to
19   understand -- I'm trying to perfect the
20   record.
21           The hours spent, you have said,
22   engaged in this litigation, are approximately
23   350 to 400 hours; correct?
24      A.   Yes.  I agree with that.

Page 193

1      Q.   And I just want to make sure I
2   understand what you just said a moment ago.
3   Are there hours spent beyond the 350 to
4   400 hours that were spent reviewing some of
5   the materials listed in Appendix B?
6      A.   Yes.
7      Q.   Okay.  Approximately how much?
8      A.   Oh, gosh.  I mean -- I mean,
9   the problem is, is that many of these
10   academic texts listed here are things that
11   I'm reading also for my research purposes.
12   And so, you know, I just don't even know how
13   many hours I've spent on reading some of
14   these academic papers.  I --
15      Q.   Out --
16      A.   Many hours.
17      Q.   Outside of the academic texts,
18   are there any depositions, expert reports, or
19   case documents that you have -- and/or legal
20   documents that you have reviewed or
21   considered that are not part of the 350 to
22   400 hours you have spent working on this
23   matter?
24      A.   No.  Any review of depositions,

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    expert reports, or case documents would be
2    counted in the 350 to 400 hours.
3        Q.    Okay.  And then for purposes of
4    the academic publications and texts that you
5    have listed that you've said that you have
6    spent considerable time on, both before or
7    during this engagement in connection with
8    your -- in connection with your work outside
9    of expert work in this litigation, how have
10   you determined what portion of that review is
11   for expert services in this case versus
12   otherwise?
13       A.    Well, if I'm reading the
14   document for research purposes, I do not bill
15   the client for it.  If I'm reading the
16   document for purposes of developing an expert
17   opinion in this matter, then I do.
18       Q.    Okay.  And speaking of the
19   expert opinions in this matter, so the record
20   is clear, this report contains all of the
21   opinions that you plan on giving in this case
22   outside of the two exceptions you've noted
23   earlier today; correct?
24           MR. GEISE:  Asked and answered.

Page 195

1           THE WITNESS:  Yes, outside of
2    the two classes of exceptions that we
3    discussed earlier, that is correct.
4        Q.    (BY MR. KO)  And the basis, or
5    the bases of all of your opinions that are
6    contained in this report -- actually, strike
7    that.
8           Are there any bases or analyses
9    that you plan on doing in this case that are
10   not contained in your report or are not part
11   of the two classes of opinions that you have
12   reserved the right to opine on?
13       A.    No.
14       Q.    And I know that we had
15   discussed earlier today the paragraph in your
16   report that says that you may be retained by
17   other -- or that you may -- your expert
18   testimony may be used by other defendants in
19   this case.  And I just want to make sure that
20   I understand completely and accurately your
21   testimony in that regard.
22           You don't have or plan on being
23   engaged by any other defendant other than
24   Walmart in this case, is that accurate?

Page 196

1        A.    I have not been engaged by any
2    other defendant, and nor do I plan on being
3    engaged by any other defendant.
4        Q.    And have you had any
5    discussions with any other defendant about
6    potential retention in this matter?
7        A.    No.
8        Q.    In paragraph -- well, turn to
9    paragraph 4 of your report.
10           You indicate that, "I hold the
11   opinions I expressed in this report to a
12   reasonable degree of certainty in the field
13   of economics."
14           Did I read that correctly?
15       A.    Yes.
16       Q.    Can you describe to me what you
17   mean by that?
18       A.    Yes.  What I mean by that is
19   that by the standards in the field of
20   economics, the opinions that I'm offering are
21   supported by the theory and practice of that
22   discipline, as I understand it.
23       Q.    And so how certain are you,
24   would you say, of the opinions that you're

Page 197

1    giving in this case?
2           MR. GEISE:  Object to the form.
3           THE WITNESS:  To a reasonable
4    degree of certainty.
5           That's how I would describe it.
6        Q.    (BY MR. KO)  Okay.  And Section
7    3 on the same page sets forth the summary of
8    opinions that you are giving in this report
9    and in this case; correct?
10       A.    Yes.
11       Q.    And I want to talk just briefly
12   about the NCHS agreement and the opinions
13   that you are giving in connection with that,
14   which we've discussed at various moments
15   today.
16           Is it fair to say that you
17   are -- one of the opinions that you are
18   giving in this case is that you -- you don't
19   believe that plaintiffs' experts had written
20   permission to use the NCHS restricted
21   mortality data?
22       A.    No.
23       Q.    Okay.  Can you help clarify to
24   me what specific opinion you are giving with

50  (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    respect to the NCHS restricted mortality
2    data?
3        A.    It's what I say in my report.
4        Q.    Which portion?
5        A.    I'm reading the third sentence
6    in paragraph 8.  "It is not clear that the
7    plaintiffs' experts had written permission to
8    use the restricted-use vital statistics data
9    for this litigation."  That's my opinion.
10       Q.    And don't you also indicate
11   that you weren't comfortable signing the
12   agreement presented to you regarding the NCHS
13   restricted mortality data?
14       A.    No, I don't think I said that.
15       Q.    Well, turn with me to
16   paragraph 10 that appears on the bottom of
17   page 3 and through the top of page 4.
18       A.    Okay.
19       Q.    In the penultimate sentence of
20   paragraph 10, you end by saying, "I decline
21   to analyze the restricted-use vital
22   statistics data for this report."
23             Did I read that correctly?
24       A.    Yes.

Page 199

1        Q.    So is it fair to say that --
2    well, let's go to the beginning of that
3    sentence.  You also state that, "Because I
4    was not willing to violate the published
5    rules of NCHS" -- and there's some further
6    language -- you indicate that, "I declined to
7    analyze the restricted use vital statistics
8    data for this report."
9             Do you see that portion of the
10   report?
11       A.    Yes.
12       Q.    So is it -- and I just want to
13   get your understanding of some of the
14   opinions you were giving with respect to the
15   NCHS restricted mortality data.
16             Is it your opinion that you
17   believe that plaintiffs' experts should not
18   have signed the agreement that they signed in
19   order to access the NCHS restricted mortality
20   data?
21       A.    No, that's not -- I don't offer
22   that opinion anywhere.
23       Q.    Okay.
24             What is your -- and I know

Page 200

1    you've said that you've -- you've indicated
2    your opinion on the NCHS issue in this
3    report, but sitting here today, could you
4    summarize to me what your opinion is with
5    respect to the NCHS agreement, why you
6    declined to use the restricted mortality
7    data?
8             MR. GEISE:  Object to the form.
9    Compound.
10            THE WITNESS:  It's exactly what
11   I -- I guess I -- I've stated my
12   opinion in my report.  If you have a
13   question about -- I could read it to
14   you, but...
15            I mean, if you have a question
16   about my opinion, I'm happy to answer.
17       Q.    (BY MR. KO)  Did you ever see
18   the data use agreement offered by NCHS on
19   this case for use of restricted mortality
20   data?
21       A.    Well, what I saw was what I say
22   in my documents considered list.  What I saw
23   was a -- well, let me see.  I just want to
24   make sure and tell you exactly what I saw.

Page 201

1             Oh, for goodness sake.  How can
2    I not find this?
3             MR. GEISE:  I think you're
4    looking for page 11.
5             THE WITNESS:  Thank you.
6             MR. GEISE:  Not coaching,
7    but --
8             THE WITNESS:  No, no.  Thank
9    you.  I'm sorry.
10            MR. KO:  Steve, you coach so
11   much.
12            THE WITNESS:  Yes.  So I saw an
13   e-mail exchange between you and
14   Mr. Knapp.  Then I saw an e-mail
15   exchange between Ted Miller and you
16   and Ms. Ritter.
17            And that's --
18            MR. KO:  I believe there's a
19   third e-mail.
20            THE WITNESS:  And then this
21   e-mail from Ms. Bierstein to
22   Ms. Welch.
23            And so those are the documents
24   that I saw.

51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    And, you know, in my 20 years
2  of experience, having worked with
3  restricted-use federal data, these
4  documents did not constitute a data
5  use agreement that ought -- would give
6  me permission to analyze and review
7  the NCHS mortality data, and it is for
8  that reason that I declined to do so.
9    MR. KO: Okay. So that's a
10 very helpful explanation. Thank you.
11   Q.   (BY MR. KO) So it's your
12 testimony that you reviewed those three
13 pieces of correspondence that we just
14 described, but beyond that you didn't
15 actually see the data use agreement that may
16 have potentially provided you with access to
17 the restricted mortality data?
18   A.   Well, as part of this
19 correspondence, I saw a -- there was a
20 fragment of some data use agreement with an
21 organization called PIRE.
22        And that data use agreement was
23 for the use of the NCHS mortality data for
24 PIRE to produce summary statistics for public

Page 203

1  consumption. That's my memory. But this was
2  an attachment or a fragment of these e-mails.
3        But that had nothing to do with
4  this litigation, and so I had requested from
5  counsel whether there was any other materials
6  that would clarify that I, or, you know,
7  there was some permission in place for use of
8  these data in connection with this
9  litigation. And I did not -- I didn't get
10 anything back from them beyond that which
11 I've described to you.
12        And it was my judgment that the
13 materials that I reviewed, including the
14 portions of what appeared to be a data use
15 agreement with some other organization for
16 some other purpose, that that was all that
17 counsel could provide me. And I felt that
18 basis was insufficient for me to review
19 restricted -- these restricted data.
20   Q.   And I just want to make sure
21 the record is clear. So in connection with
22 the NCHS restricted mortality data, the
23 documents you reviewed are the three e-mails
24 that you set forth in Appendix B. One of the

Page 204

1  e-mails for which you described contained
2  fragments of a data use agreement between
3  PIRE -- or involving PIRE. Is that accurate?
4    A.   Yes. I believe that was
5  contained in those --
6        If it's not contained in those
7  three e-mails, then I should have put it on
8  here, because I did see this. And I -- my
9  memory is that it was in these e-mails. But
10 yes, that's right.
11   Q.   So other than these three
12 e-mail chains and correspondences, which did
13 include, as you say, fragments of the PIRE
14 data use agreement, did you review any other
15 documents or consider any other documents in
16 determining whether or not you had permission
17 to access the NCHS restricted mortality data?
18   A.   Well, actually -- I mean, I --
19 no other case documents, but I did review the
20 NCHS website to make sure that I had
21 understood correctly that these data were
22 restricted-use to begin with.
23        But yes, that -- aside from
24 that and these documents, that's totally

Page 205

1  accurate.
2    Q.   Okay. So other than the NCHS
3  website and the three e-mail correspondence
4  that you set forth in Appendix B, at least
5  one of which contained fragments of the PIRE
6  data use agreement, did you review any other
7  documents or consult with any other source to
8  determine whether or not you had access to
9  the NCHS restricted mortality data?
10   A.   No.
11   Q.   Okay. Are you aware at all of
12 whether or not other defense experts in this
13 case have signed an agreement that allows
14 them to view the NCHS restricted mortality
15 data?
16   A.   No.
17   Q.   Are you aware of whether or not
18 other consultants for defense experts in this
19 case, or individuals at the consulting firms
20 for the defense experts in this case, have
21 signed an agreement that allows them to view
22 the NCHS restricted mortality data?
23   A.   No.
24   Q.   And by the way, do you have any

52 (Pages 202 to 205)

Page 206

1    understanding of what data was specifically
2    restricted by the NCHS that you did not view?
3         A.    Yes.
4         Q.    And what was restricted by the
5    NCHS that you couldn't examine or view?
6         A.    My understanding is that the
7    county-level data file based on the multiple
8    cause of death data, for years after -- I
9    believe it's 2005 or later, or maybe 2006 or
10   later, are restricted-use only, requiring
11   prior agreement from NCHS on a
12   project-specific basis for use.
13        Q.    And is it all the data from
14   2006 onwards regarding the multiple cause of
15   death, or is it some percentage or portion of
16   the death data that is restricted based on
17   your understanding?
18        A.    My understanding is that if the
19   source of a -- if one obtains a
20   restricted-use file from a federal agency,
21   one is not allowed to share that file or use
22   it for any purposes other than the purposes
23   for which the original use was granted.
24   That's my understanding of how data use

Page 207

1    agreements work.
2              And so for that reason I choose
3    not to analyze that file, because I did not
4    receive any permission from NCHS with my name
5    on it that said I could analyze the file for
6    purposes of this litigation.
7         Q.    And separate and apart from
8    whether or not you saw your name on any
9    specific permission form from NCHS, you were
10   also not presented with a specific agreement
11   that would have granted you such permission;
12   correct?
13        A.    Yeah, I was not offered an
14   agreement that I could sign for permission to
15   use these data for this litigation.  I never
16   was offered an agreement like that.
17        Q.    Yeah.  Were you offered an
18   agreement of any kind?
19        A.    Well, it was --
20             MR. GEISE:  Object to the form.
21        Q.    (BY MR. KO)  Other than the
22   one -- other than the fragments of the PIRE
23   agreement that you have indicated that you
24   reviewed in connection with the e-mail

Page 208

1    correspondences that are set forth in
2    Appendix B.
3         A.    Other than the fragments of the
4    PIRE agreement or some product of those
5    fragments, no.
6         Q.    What do you mean by "product of
7    those fragments"?
8         A.    Some taking of those fragments
9    and putting them in another document.  I just
10   don't remember all of the things that I had
11   looked at but what I can tell you confidently
12   is I was presented with no document that
13   described the use of the NCHS restricted-use
14   mortality data data in this litigation; for
15   this matter, I was presented with no document
16   of that sort.
17        Q.    Were you presented with any
18   other document other than the fragments of
19   the PIRE agreement or, as you say, the
20   products of that agreement for you to sign?
21             In other words, were you ever
22   offered an opportunity to sign an agreement
23   such that you could get access to the NCHS
24   restricted mortality data?

Page 209

1              MR. GEISE:  Object to the form.
2              THE WITNESS:  Certainly not
3         that -- such that I could get access.
4         Because if -- because the document did
5         not say it was for the purpose for
6         which I would have used the data.
7         Q.    (BY MR. KO)  And I think we're
8    talking over each other just a little bit,
9    and I'm just -- I'm not trying --
10        A.    Go ahead.
11        Q.    -- to trick you.  I don't think
12   you're trying to trick me.
13        A.    No, no, of course not.
14        Q.    I'm just trying to ask a simple
15   question.  What -- can you identify for me
16   all of the documents that were presented to
17   you for which you had an opportunity to
18   access the NCHS restricted mortality data?
19        A.    For purposes of this litigation
20   or for any purpose?
21        Q.    For purposes of this
22   litigation, can you identify for me all of
23   the documents that you were presented for
24   which you had an opportunity to access the

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    NCHS restricted mortality data?
2        A.    I was presented with no
3    document that provided me an opportunity to
4    access the NCHS mortality data for purposes
5    of this litigation.
6        Q.    Can you -- for purposes of this
7    litigation, can you identify for me all of
8    the documents that were presented to you for
9    which you had a potential opportunity to
10   access the NCHS restricted mortality data
11   separate and apart from whether or not you
12   believed you could get access to such data?
13       MR. GEISE:  Object to the form.
14   Argumentative and compound.
15       THE WITNESS:  I was presented
16   with no document that provided me an
17   opportunity to access the NCHS
18   mortality data for purposes of this
19   litigation.
20       Q.    (BY MR. KO)  Were you provided
21   with any document from counsel containing the
22   words NCHS?
23       A.    Yes.
24       Q.    Can you describe to me what

Page 211

1    those documents were?
2        A.    There was a document that
3    appeared to be an agreement between NCHS and
4    PIRE for purposes of analyzing restricted-use
5    mortality data data for producing descriptive
6    statistics for some -- for public consumption
7    of some sort.
8        Q.    And were you presented with an
9    opportunity to sign that agreement?
10       A.    I don't know if I would say I
11   was presented with an opportunity to sign it.
12   I was shown the document, but I couldn't sign
13   it because that wasn't the reason I was going
14   to use the NCHS data.  So, I mean, it just
15   wouldn't make any sense for me to sign it.
16       Q.    And that's an absolutely fair
17   clarification that you made with respect to
18   my question.
19             You did not sign that agreement
20   that you were presented with; correct?
21       A.    It was an agreement with an
22   organization with which I wasn't affiliated
23   for purposes of analyzing the data that had
24   nothing to do with what I was going to do.

Page 212

1    So I -- I just -- it was -- it wasn't
2    something that made any sense for me to sign.
3        Q.    Regardless of whether or not
4    you believed that there was any sense to
5    signing it, you did not sign any agreements
6    in this case that would have potentially
7    allowed you access to the NCHS restricted
8    mortality data; is that correct?
9        A.    That document would not have
10   potentially allowed me access because it did
11   not specify the use to which I would put the
12   data.  So even if I would have signed it, it
13   would have been a violation of the agreement
14   for me to then turn around and use that data
15   in this litigation.  That document is -- has
16   no potential to provide me with permission to
17   use that data in this litigation.
18       Q.    You are aware -- you've been
19   assisted by Cornerstone in this case;
20   correct?
21       A.    Yes.
22       Q.    Are you aware of whether or not
23   individuals at Cornerstone signed any
24   agreements that allowed them access to NCHS

Page 213

1    restricted mortality data?
2        A.    I'm not aware of whether they
3    signed it or not.
4        Q.    Do you believe that those
5    individuals that have signed the agreement
6    are in violation of certain federal laws that
7    you say that you are -- would be in danger of
8    violating if you had signed that agreement?
9        A.    I don't know what they did or
10   didn't do.
11       Q.    Turn to --
12       A.    I can tell you that once I
13   figured out that I would not use the data
14   because of the reasons that I've outlined --
15   it was not immediately clear to me what was
16   going on here.  But once it became clear, I
17   cautioned the Cornerstone people against use
18   of the data for the reasons that I've stated
19   in my testimony.
20       MR. KO:  I move to strike that
21   response as I didn't have a question
22   pending.
23       Q.    (BY MR. KO)  The paragraphs 11
24   through 17 of your report also contain and

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    reflect a summary of your opinions.  Is that
2    accurate?
3        A.   Yes.
4            THE WITNESS:  Could we take a
5    short bathroom break?
6            MR. KO:  Sure, of course.
7            THE VIDEOGRAPHER:  The time is
8    now 2:08.  Going off the record.
9            (Recess taken, 2:08 p.m. to
10   2:16 p m.)
11           THE VIDEOGRAPHER:  The time is
12   now 2:16.  Back on the record.
13       Q.   (BY MR. KO)  Before we broke, I
14   was asking you to turn to paragraphs 12
15   through 17 of your report.
16           Are you there?
17       A.   Yes.
18       Q.   And is it fair to say, or
19   accurate to say that paragraphs 12 through 17
20   contain the summary of the expert opinions
21   you are giving in this case separate and
22   apart from the NCHS restricted mortality data
23   issue?
24       A.   And the issue of the timing of

Page 215

1    plaintiffs' experts' data production
2    described in paragraph 7, yes.
3        Q.   Okay.  So paragraphs 12 through
4    17 reflect the opinions that -- the summary
5    of the expert opinions you are giving in this
6    case separate and apart from the NCHS
7    restricted mortality data issue and the
8    timing of plaintiffs' experts' disclosures in
9    this case; correct?
10       A.   Yes.
11       Q.   And turn to page 6 in
12   paragraphs 12 through 14.  Well, actually,
13   before we do that, I want to turn to Figure 1
14   of your expert report, which is set forth on
15   page 5.
16           This is a flowchart that you
17   prepared that reflects where in your report
18   you're responding to certain opinions
19   provided by plaintiffs' expert reports;
20   correct?
21       A.   Both the location of my
22   responses and my understanding of the flow
23   of -- and the interrelationship between
24   plaintiffs' experts' reports, yes.

Page 216

1        Q.   And with respect to the entry
2    you have on the top left-hand corner of this
3    roadmap where you indicate Rosenthal and
4    McCann, you indicate that that is contained,
5    or the analysis that you have in response to
6    Rosenthal and McCann is in -- contained in
7    the appendix of your report?
8        A.   Yes.
9        Q.   And can you describe to me what
10   portions of the appendix respond to Rosenthal
11   and McCann's analysis?
12       A.   Well, it's in the appendix that
13   I identify the interrelationship between
14   Professor Rosenthal and potentially Professor
15   Mc- -- Dr. McCann, their reports and
16   Professor Cutler's and McGuire's report.
17           I don't respond to Professor
18   Rosenthal or Professor McCann's reports in
19   the sense of critiquing their analysis beyond
20   what I have here in the report.
21       Q.   Sure.  Is it fair to say the
22   critique -- or is it fair to say that the
23   analysis that you focus on on -- for the
24   plaintiffs' experts is the analysis or the

Page 217

1    analyses of Professor Cutler and Professor
2    McGuire?
3        A.   Professor Cutler, Gruber,
4    McGuire, and Keyes.
5        Q.   With respect to the opinions
6    provided by Professor Gruber and Professor
7    Keyes, is your -- or are your opinions
8    regarding their expert analysis set forth
9    in -- or is the summary of your opinions
10   regarding their analysis set forth in
11   paragraph 16(b)?
12       A.   Certainly 16(b) does highlight
13   some of my concerns with Professor Gruber's
14   and Keyes' analysis.  I have other concerns
15   with Professor Gruber's analyses that are
16   outside of paragraph 16(b) that are
17   referenced elsewhere in my report.
18       Q.   Let me ask it this way.  Is it
19   fair to say that the primary analysis that
20   you are critiquing, for purposes of your
21   expert report, is the analysis of Professor
22   Cutler?
23       A.   I spend most of the time in my
24   report with my concerns about Professor

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    Cutler's analysis.  If that's responsive to
2    your question.  But I also have concerns
3    about Professor Keyes, Gruber, and McGuire,
4    as outlined in my report.
5        Q.    So is it fair to say that the
6    plaintiffs' expert analyses that you are
7    critiquing is with regard to Professor
8    Cutler, Professor Gruber, Professor Keyes,
9    and Professor McGuire?
10            Correct?
11       A.    In this report, I would reserve
12   my right to -- reserve the right to examine
13   Dr. McCann's analysis and Professor
14   Rosenthal's analysis once I've been able to
15   understand if Dr. McCann's analysis is
16   included at all as part of plaintiffs'
17   analysis of damages.  And if it is included,
18   how so?
19       Q.    Separate and apart from the
20   reservation of rights that you've made clear
21   today, within the four corners of this
22   particular report that is Exhibit 2 of this
23   deposition, is there any critique that you
24   have of any expert report outside of

Page 220

1    of the summary of your opinions; correct?
2        A.    Yes.  This is a summary of
3    the -- the summary of the reasons why I have
4    the opinion that Professor Cutler's estimates
5    of the causal effect of prescription opioid
6    shipments on county government activity are
7    overstated and unreliable.
8        Q.    And the basis for all of these
9    reasons are contained in your report;
10   correct?
11       A.    Yes, with the exception of the
12   possibility of future reports when I learn
13   about the source of Professor Cutler's use of
14   the distributor defendants' responsibility
15   percentages, yes.
16       Q.    And separate and apart from
17   learning about the source of Professor
18   Cutler's use of the distributor defendants'
19   responsibility percentages, there is nothing
20   outside of this report that you need to
21   support the opinions set forth in 16(a)
22   through (f); correct?
23       A.    There is nothing I additionally
24   need, but it's also true that I reserve the

Page 219

1    Professor Cutler, Professor Gruber,
2    Professor Keyes, or Professor McGuire?
3        A.    Not -- nothing over and above
4    what I've said in the report.
5        Q.    So -- okay.
6            With respect to Professor
7    Cutler's analysis, your critique of his
8    report is summarized in paragraph 16.  Is
9    that fair to say?
10       A.    Yes.
11       Q.    And in particular, you indicate
12   that Professor Cutler's estimates of the
13   causal effect of prescription opioid
14   shipments on county government activity are
15   overstated and unreliable.
16           Is that an accurate reflection
17   of the expert testimony or opinions you are
18   giving with respect to Professor Cutler's
19   expert report?
20       A.    Yes, that's certainly one
21   opinion I'm offering.  Yes.
22       Q.    And you -- and you set forth
23   the reasons for why they were overstated and
24   unreliable in paragraph 16(a) through 16(f)

Page 221

1    right to provide further criticism of
2    Professor Cutler's method and analysis if and
3    when I receive permission to examine the NCHS
4    mortality data.
5        Q.    Okay.  So separate -- or
6    outside of the source of Professor Cutler's
7    use of the distributor defendants'
8    responsibility percentages and your belief
9    that you need permission from NCHS to review
10   the NCHS restricted mortality data, are all
11   of the opinions or the bases of your opinions
12   that you've set forth with respect to
13   Professor Cutler's analysis contained within
14   this report?
15       A.    Yes.
16       Q.    Okay.  And same questions with
17   respect to Professor Gruber, McGuire, and
18   Keyes.  Are all of the bases for your
19   opinions regarding their expert analysis
20   contained in your report?
21       A.    With the exception of the two
22   topics on which I would reserve the right to
23   provide a supplemental report, yes.
24       Q.    And in paragraph 17 you talk

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    about your opinion of Professor McGuire's
2    analysis.
3           Do you see that?
4       A.    Yes.
5       Q.    And you are generally claiming
6    that his analysis is flawed because he relies
7    on Professor Cutler's overstated and
8    unreliable estimates; is that accurate?
9       A.    Yes.
10      Q.    And so, in other words, and
11   just so I understand your opinion, you are
12   reaching the conclusion about Professor
13   McGuire's analysis being unreliable because
14   he relies on Professor Cutler, which you also
15   believe is unreliable; is that correct?
16      A.    Yes. I conclude that Professor
17   McGuire's estimates are overstated and
18   unreliable because he relies on Professor
19   Cutler's estimates, which are overstated and
20   unreliable, yes.
21      Q.    And you are not performing any
22   independent or empirical analysis on
23   Professor McGuire's work; correct?
24          MR. GEISE:  Object to the form.

Page 223

1          THE WITNESS:  I have not --
2    yeah, I'm not sure what you mean by
3    independent analysis. I'm sorry, I'm
4    just not -- I'm not understanding.
5       Q.    (BY MR. KO)  Have you done any
6    empirical work in response to Professor
7    McGuire's expert report?
8       A.    Insofar as Professor McGuire
9    relies on Professor Cutler's crime
10   regressions for -- to support his opinion, I
11   have done empirical work.
12      Q.    Separate and apart from that
13   empirical work, which we'll get to in a
14   little more detail in a moment, have you done
15   any other empirical work regarding Professor
16   McGuire's conclusions?
17      A.    Yes. But do you mean -- do you
18   mean work regarding Professor McGuire's
19   conclusions that do not depend in any way on
20   Professor Cutler?
21          I'm sorry, I'm --
22      Q.    Yeah, let me ask it this way.
23   It's a fair -- I understand what you're
24   trying to seek clarification on.

Page 224

1       A.    Go ahead.
2       Q.    So let me try to ask you a more
3    direct question.
4           Are you providing anywhere in
5    your report your own estimate or conclusion
6    about what costs the bellwethers have
7    incurred that are the responsibility of the
8    defendants?
9       A.    No.  That -- it was not part of
10   my assignment to provide an estimate of the
11   costs that the bellwethers have incurred that
12   are -- were the responsibility of the
13   defendants.
14      Q.    And are you providing your own
15   conclusions regarding the causal effect or
16   the percentage for which defendants should be
17   liable in this case?
18      A.    I am not providing a specific
19   estimate of the percentage of potential harms
20   from opioids that -- for which defendants
21   should be liable in this case.  That was not
22   part of my assignment.
23      Q.    And with respect to the crime
24   regressions that you have, in my terms,

Page 225

1    revised from Cutler, would you fairly
2    characterize those as empirical work that
3    you've done in this case?
4       A.    Yes.
5       Q.    Are there any other regressions
6    that you have run or rerun other than the
7    crime regressions that are set forth in your
8    report?
9       A.    Do you mean regressions that
10   I've run or rerun that form the basis of any
11   of my opinions?
12      Q.    Let's start there, yes.
13      A.    No.
14      Q.    So other than the crime
15   regression that you have rerun that Professor
16   Cutler ran in his report, is it accurate to
17   say that you have not run any other
18   regressions for purposes of your report?
19      A.    I have not run any other
20   regressions on which I rely in my report.
21      Q.    Other than the crime
22   regressions that you reran for --
23      A.    Other than the crime
24   regressions --

Golkow Litigation Services - 877.370.DEPS

Page 226

1    Q.    -- on Professor Cutler's
2  report?
3    A.    Yes.  Yes.
4    Q.    So just to clean it up a little
5  bit, so the record is clear, because it's a
6  big part of my job.
7       So the record is clear, other
8  than the crime regressions that you have
9  rerun that Professor Cutler ran in his
10  report, is it accurate to say that you have
11  not run any other regressions for purposes of
12  your report that you have relied upon in
13  forming the opinions disclosed in your
14  report?
15    A.    Yes.
16    Q.    I want to turn to the
17  section -- section 11 of your report and in
18  particular paragraph 132 on page 60.
19       Let me know when you get there.
20    A.    Yes.
21    Q.    And in paragraph 132, which is
22  contained in section 11 of your report,
23  titled Conclusion, you identify a series of
24  determinants that you claim plaintiffs'

Page 227

1  experts have failed to utilize or consider in
2  purposes of developing their model.  Is that
3  accurate?
4    A.    No.  I mean, what I said was
5  that Professor Cutler's regression models
6  failed to incorporate these determinants.
7  That's my opinion.
8    Q.    Okay.  And the determinants
9  that you indicate Professor Cutler has
10  ignored include the, I believe, eight
11  determinants that you list in subparagraphs
12  132(a) through (h); correct?
13    A.    Eight categories of
14  determinants that are not included in his
15  model, yes.
16    Q.    Okay.  And so are these -- with
17  respect to these determinants, are you saying
18  that it was just Professor Cutler that failed
19  to incorporate these determinants, or are you
20  saying other experts also failed to include
21  these determinants?
22    A.    Well, Professor Gruber's
23  descriptive statistics also failed to include
24  analysis of these determinants.

Page 228

1       By implication, Professor
2  McGuire's estimates, because they rely on
3  Professor Cutler's estimates, fail to
4  incorporate these determinants in his
5  analysis.
6       That's a -- those are the three
7  of plaintiffs' experts who -- where I am
8  expressing concern that their damages
9  modeling has ignored, discounted, or
10  abstracted away from these eight categories
11  of determinants.
12    Q.    So is it fair to say that these
13  determinants that you say plaintiffs' experts
14  ignore, discounted, or abstracted away from
15  are also opinions that you are disclosing in
16  this case.
17       And actually, that was a poor
18  question.  Let me ask it again.
19       With respect to the
20  determinants that you set forth in
21  paragraph 132, is it your expert opinion that
22  plaintiffs' experts have failed to consider
23  and in particular have ignored, discounted,
24  or abstracted away from these determinants?

Page 229

1    A.    Well, I don't know if I would
2  use the word "failed to consider."  I mean,
3  the damages modeling that Professor Cutler
4  performs and the descriptive statistics that
5  Professor Gruber calculates, and in turn the
6  damages calculations that Professor McGuire
7  performs, do not incorporate these
8  determinants in their analysis.
9    Q.    And with respect to your
10  analysis of the determinant at
11  paragraph 132(a), which are sociological
12  factors, you indicate that those are
13  discussed in paragraph 64(a) of your report;
14  is that accurate?
15    A.    Yes.
16    Q.    Is there any other portion of
17  your report other than what's included in
18  paragraph 64(a) that discusses this
19  particular determinant?
20    A.    I think maybe.  I'm not sure if
21  it's all in 64(a) or not.
22       I know that that's one place
23  where it's discussed.
24    Q.    Okay.  Well, can you point me

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  to other areas in which those determinants
2  are discussed in your report and why you
3  didn't identify them in paragraph 132(a)?
4      A.   Well, I mean, paragraph 63
5  talks about those determinants also.
6          To the extent I didn't cite
7  every single paragraph in the conclusion
8  paragraph, it was only a matter of, you
9  know -- it wasn't intentional, for sure.
10     Q.   Other than paragraphs 63 and
11 64(a), are there any other areas in your
12 report where you discuss sociological factors
13 determinants that you claim plaintiffs'
14 experts ignored?
15     A.   Well, I mean -- I mean, in part
16 those are also part of my concerns about
17 Professor Cutler's indirect regression models
18 too.  So the concerns expressed in paragraphs
19 63, 64(a), and then the concluding paragraph
20 also apply to some of the concerns that I
21 expressed in paragraphs 70 to 76.
22     Q.   Is there a reason why you
23 didn't identify those in paragraph 132(a), or
24 here are you just providing illustrative

Page 231

1  examples?
2      A.   Yes.  That's a good way to put
3  it, that in paragraph 132(a), I was just
4  providing an illustrative example.  Thank
5  you.
6      Q.   It took until 2:42 for you to
7  thank me.
8      A.   I'm sorry.
9      Q.   You are going to thank me again
10 shortly.
11         But same question with respect
12 to all the social determinants -- or excuse
13 me, all the determinants that you set forth
14 in paragraph 132(a) through (h).  When you're
15 providing your discussion of these
16 determinants, are you simply identifying some
17 illustrative examples of where they're
18 discussed in your report?
19     A.   Yes.  That's accurate.
20     Q.   Turn with me to Appendices C
21 through F, which appear on pages 64 through
22 71 of your report.
23         And these -- are you there?
24     A.   Yes.  Yes.

Page 232

1      Q.   Is it fair to say that these --
2  at least with respect to Appendices C, D, and
3  E, those are summaries of what you understand
4  plaintiffs' expert's damage model consists
5  of?
6      A.   Yes.
7      Q.   Okay.  And so in other words, I
8  just want to make sure I understand, that
9  with respect to Appendices C, D, and E,
10 you're not doing any independent empirical
11 analysis of your own but simply summarizing
12 Professor Cutler's methodology; correct?
13     A.   Yes.  This is my effort to
14 trace back Professor Cutler's damages
15 methodology, yes.
16     Q.   And then appendix F does
17 contain the crime regression that you reran
18 that we discussed a moment ago; correct?
19     A.   Yes.
20     Q.   And so that does contain some
21 of the empirical analysis that you performed
22 in this case?  Or that does reflect the
23 empirical analysis that you performed in this
24 case; correct?

Page 233

1      A.   Yes.
2      Q.   Professor Kessler, are you
3  aware of when the trial in this litigation is
4  scheduled for?
5      A.   No.
6      Q.   Okay.  Have you been requested
7  to set aside time this fall for potential
8  trial testimony in this case?
9      A.   I believe counsel has mentioned
10 this to me.  I don't remember any specific
11 dates, though.
12     Q.   Okay.  And do you plan -- if
13 asked, do you plan on being present at trial
14 in this case?
15     A.   Yes.
16     Q.   And other than -- well, let me
17 ask it this way, to be clean.  Because I like
18 your words sometimes better than mine, if not
19 more often than not.
20         But is there anything you plan
21 on doing between now and trial, if asked, to
22 testify as an expert witness?
23         MR. GEISE:  Objection.  That's
24 pretty broad.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    THE WITNESS: If -- I mean,
2  certainly I may undertake some of the
3  additional analyses that we've
4  discussed.  That would be one
5  possibility.
6    I may prepare some
7  demonstratives that are -- have less
8  small print than the ones -- some of
9  the ones that I've produced in this
10  report.
11    But I have no specific plans at
12  this time for what else I would do.
13    Q.   (BY MR. KO)  And do you intend
14  to conduct any further research or conduct
15  any empirical analysis in connection with
16  your engagement as an expert in this case?
17    A.   Do you mean beyond the areas
18  that I've reserved the right to conduct
19  additional analyses?
20    Q.   Yes.
21    A.   Yes, certainly beyond those
22  areas, I don't intend to conduct any other
23  analysis for this report, although I am
24  performing ongoing academic research on this

Page 235

1  subject.
2    Q.   And that ongoing academic
3  research is related to the working paper --
4  the manuscript in progress that you were
5  co-authoring with Laurence Baker and Kate
6  Bundorf?
7    A.   Yes.
8    Q.   Is there any other academic
9  work or ongoing academic work that you
10  currently are doing with respect to opioids
11  or opioid use?
12    A.   Yes.
13    Q.   Can you describe to me what
14  that consists of?
15    A.   That work is very preliminary,
16  so I don't have any results or anything
17  exciting to talk about here today.  But it's
18  along the same lines of the Medicare
19  Advantage paper, using claims data to
20  investigate prescriber behavior and insurance
21  markets.
22    Q.   Okay.  Anything outside of that
23  work that has any relation to opioids that
24  you are currently doing or researching or

Page 236

1  investigating?
2    A.   No.
3    Q.   By the way, have you ever used
4  opioids?
5    A.   Yes.
6    Q.   Under what circumstances have
7  you used opioids?
8    A.   I've used prescription opioids
9  under a doctor's order after medical
10  procedures.
11    Q.   And how many times have you
12  been prescribed prescription opioids?
13    A.   Maybe three.
14    Q.   And can you give me a general
15  understanding of when in your life that
16  was -- that happened to be the case?
17    A.   I'm really not comfortable
18  discussing my personal medical history.
19    MR. GEISE:  And I understood
20  the question just to be when.  I would
21  agree, I don't think you need to get
22  into your personal medical history;
23  but if it's a question about timing,
24  perhaps you can answer time as opposed

Page 237

1  to why.
2    MR. KO:  That's exactly right.
3    MR. GEISE:  If you're
4  comfortable with that.
5    Q.   (BY MR. KO)  I was simply
6  asking, when -- do you recall when -- just so
7  the record is clear, do you recall when you
8  were described prescription opioids?
9    A.   Yeah.  The last time was
10  probably three years ago, or something like
11  that.
12    Q.   And there were two additional
13  times previous to that?
14    A.   Yes.
15    Q.   For which you were prescribed
16  prescription opioids?
17    A.   Yes.
18    Q.   Do you recall the duration of
19  the prescription you received in each
20  instance?
21    A.   No.
22    Q.   Do you have any family or
23  friends that have suffered from any opioid
24  addiction or opioid misuse issues?

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1      MR. GEISE:  And I would object.
2  I believe this is far outside the
3  scope of his report.  Beyond anything
4  he's being offered as an expert on and
5  an invasion of privacy.  So I would
6  suggest you don't need to answer that.
7      THE WITNESS:  I'm going to
8  follow my counsel's suggestion.
9      MR. KO:  Well, I'd note for the
10  record that many of these similar
11  questions were asked of the
12  plaintiffs' experts.
13      So unless you actually do
14  believe it is an invasion of privacy,
15  I ask that you respond.  And I do
16  believe it's relevant to this case and
17  it's important for the jury to know.
18  Q.    (BY MR. KO)  Do you have any
19  family or friends that you know that suffer
20  from an opioid addiction of any kind?
21      MR. GEISE:  Same objection, and
22  same admonition.
23      THE WITNESS:  I'm going to
24  follow counsel's recommendation and

Page 239

1  decline to answer.
2  Q.    (BY MR. KO)  Are you aware of
3  anyone, family or friends or anyone you know
4  personally that has died from an opioid
5  overdose?
6      MR. GEISE:  Same objection.
7  Same admonition.
8      THE WITNESS:  I'm going to
9  follow counsel's recommendation.
10  Q.    (BY MR. KO)  I want to hand you
11  really quickly a copy of what we're going to
12  mark as Exhibit 3.
13      (Whereupon, Deposition Exhibit
14      Kessler-3, The Effects of Medicare
15      Advantage on Opioid Use, by Baker,
16      Bundorf, Daniel was marked for
17      identification.)
18      MR. KO:  And we'll just do this
19  quickly and mark Exhibit 4 as well
20  because they're related.
21      (Whereupon, Deposition Exhibit
22      Kessler-4, The Effects of Medicare
23      Advantage on Opioid Use, by Baker,
24      Bundorf, Daniel Acknowledgments and

Page 240

1  Disclosures, was marked for
2  identification.)
3  Q.    (BY MR. KO)  Professor Kessler,
4  you have in front of you Exhibits 3 and 4, or
5  what have been marked as Exhibits 3 and 4.
6  And Exhibit 3 is the article we discussed --
7  we have discussed at various moments today
8  that you coauthored with Laurence Baker and
9  Kate Bundorf; correct?
10  A.    Yes.
11  Q.    And this is the -- so we're
12  clear, this is the working paper that is also
13  reflected -- this is the working paper that
14  is reflected on page 7 of your CV.  The
15  bottom of page 7 in your CV that's titled The
16  Effects of Medicare Advantage on Opioid Use;
17  correct?
18  A.    Yes.
19  Q.    Now, I just want to turn your
20  attention very quickly to the second
21  paragraph on page 1 of Exhibit 3.
22      You indicate that there's a
23  link to the financial relationships you and
24  your coauthors have that are relevant to this

Page 241

1  particular working paper; is that correct?
2  A.    Yes.
3  Q.    And there is a link that you
4  disclose in paragraph 2, which is actually
5  what is set forth in Exhibit 4.  Is that
6  accurate?
7  A.    This looks right.
8  Q.    Okay.  So Exhibit 4 is the link
9  to the -- the URL link to what you describe
10  in the second paragraph of page 1 of
11  Exhibit 3.  Is that right?
12  A.    Yes.
13  Q.    And on Exhibit 4 there is a
14  disclosure of financial relationships for
15  Daniel Kessler.  Do you see that?
16  A.    Yes.
17  Q.    And it appears -- the --
18  Exhibit 4 indicates that you have received
19  speaking and consulting fees from insurers,
20  integrated delivery systems and other
21  providers of medical products and services.
22      Did I read that correctly?
23  A.    Yes.
24  Q.    And is that an accurate

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    reflection and assessment of the types of
2    entities that you've received speaking and
3    consulting fees from?
4        A.    Yes.
5        Q.    And you've also indicate --
6    we've gone over your experience with
7    Cornerstone, obviously, but you also indicate
8    here that you receive grant support from the
9    Agency For Healthcare Research and Quality.
10       Do you see that?
11       A.    Yes.
12       Q.    And how much was the amount of
13   that grant support?
14       A.    From AHRQ.  It's a very large
15   grant.  And I'm a coinvestigator on it.
16       It pays only a small part of my
17   salary.  It does pay for some data and
18   research assistance on projects that I'm
19   working on.
20       I'm not the PI on the grant, so
21   I'm not exactly sure of the grant's overall
22   magnitude.
23       Q.    And when you say it supports a
24   small part of your salary, what salary are

Page 243

1    you referring to?
2        A.    My university, my Stanford
3    University salary.
4        Q.    So the grant you receive from
5    AHRQ, or the Agency For Healthcare Research
6    and Quality, is in connection with the
7    compensation you receive as a professor?
8        A.    Yes.
9        Q.    And you don't know the exact
10   amount that they provide grant support for
11   you?
12       A.    I don't.  I believe it was in
13   the -- you know, I just don't know.  I just
14   don't even really know.
15       Q.    And when did they begin
16   providing grant support for you?
17       A.    I believe we got the AHRQ grant
18   in 2016.
19       Yeah, I think that was 2016
20   that we got it.
21       Q.    And you've been receiving grant
22   support from AHRQ since at least 2016, then?
23   Is that your testimony?
24       A.    I believe it was -- it may have

Page 244

1    been 2017.  I don't know, actually.
2        Q.    So you -- it's fair to say
3    you've been receiving grant support from AHRQ
4    for the past three or four years?
5        A.    At least the past two years.
6    At least the past two years.
7        Q.    And you don't have any
8    recollection of what that amount is?
9        A.    It's a small fraction in
10   percentage terms of my Stanford salary.  I
11   think it's in the ballpark of $10,000 a year,
12   but I don't -- I just don't remember.
13       Q.    Okay.  That's helpful.
14       Earlier this afternoon we
15   discussed some confidentiality agreements
16   that you have entered into with certain
17   entities that are defendants in this case.
18   Do you recall that?
19       A.    Yes.
20       Q.    If ordered by the Court to
21   produce those confidentiality agreements,
22   would you provide those?
23       A.    If I -- if I have them and can
24   find them and the Court orders me to do

Page 245

1    something, then I would certainly consider
2    that very seriously.
3        Q.    And if ordered to testify about
4    the nature of those confidentiality
5    agreements by the Court, would you be willing
6    to do so?
7        A.    I mean, I guess I'd have to --
8    I'd have to consult counsel to determine how
9    to handle the conflict between a court order
10   and an agreement that I had signed.  I just
11   don't know what I'd do, but I would certainly
12   take a court order very seriously.
13       Q.    Well, are you aware of whether
14   or not any of the confidentiality agreements
15   that you signed had provisions in there that
16   said unless instructed by a court, you are
17   not to disclose the nature of the
18   relationship?
19       A.    I don't remember.
20       Q.    You don't recall whether or not
21   that provision existed or not?
22       A.    Yeah, I just don't remember.
23       Q.    Okay.
24       MR. KO:  Well,

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    Professor Kessler, that's all the
2    questions I have for this afternoon.
3    Thank you for your time.
4            MR. GEISE:  I have a few
5    questions.  I'm happy to keep going.
6            Are you okay to go without a
7    break?  Or do you want to take a quick
8    break?
9            THE WITNESS:  Yeah, let's take
10   a quick break.
11           THE VIDEOGRAPHER:  The time is
12   now 2:58.  Going off the record.
13           (Recess taken, 2:59 p.m. to
14   3:08 p.m.)
15           THE VIDEOGRAPHER:  Time is now
16   3:07.  Back on the record.
17           CROSS EXAMINATION
18   BY MR. GEISE:
19       Q.   Professor Kessler, I wanted to
20   ask you just a few follow-up questions on
21   some things you were asked during your
22   deposition today.
23           First, if I could ask you to
24   turn your attention to paragraph 10 of your

Page 247

1    expert report which has been marked as
2    Exhibit 2 to your deposition.
3        A.   Sure.  Go ahead.
4        Q.   In the first sentence of
5    paragraph 10, you write: For these reasons I
6    requested from counsel documentation of
7    written approval by NCHS for my analysis of
8    the restricted-use vital statistics data in
9    this litigation.
10           Do you see that?
11       A.   Yes.
12       Q.   Have you ever been presented a
13   data use agreement from NCHS to use the
14   restricted-use vital statistics data in this
15   litigation?
16       A.   No.
17       Q.   In one of your answers to a
18   question from Mr. Ko, you mentioned that
19   you've seen a product of a fragment from an
20   agreement with PIRE, P-I-R-E, regarding use
21   of restricted-use data.  Do you recall that
22   testimony?
23       A.   Yes.
24       Q.   Can you tell the jury what you

Page 248

1    recall in terms of signing a fragment from a
2    PIRE agreement regarding restricted-use vital
3    statistics data?
4            MR. KO:  Objection, asked and
5    answered.
6            THE WITNESS:  I mean, I
7    remember the agreement being with
8    PIRE.  I remember the agreement
9    describing the work that was to be
10   governed by it.  I remember that the
11   work described to be governed by the
12   agreement being the production of
13   descriptive statistics for public
14   health; or I forget, some kind of
15   public health type organization, but
16   it certainly didn't have anything, any
17   mention of this litigation in it.
18       Q.   (BY MR. GEISE)  Do you have any
19   other understanding as to whether a
20   Special Master in this litigation has
21   provided any direction that a data use
22   agreement originating with PIRE could be
23   signed for access to the restricted-use data
24   in this case?

Page 249

1        A.   I don't know what the
2    Special Master has ordered.  Yeah, I just
3    don't know.
4        Q.   Can a data use agreement with
5    the NCHS be amended or revised by a signatory
6    to include matters and individuals beyond
7    those granted access by NCHS?
8            MR. KO:  Object to the form.
9    Objection, foundation.
10           THE WITNESS:  Certainly it's my
11   understanding of data use agreements
12   that they could not be amended without
13   written consent of the agency that
14   initially issued the data use
15   agreement.
16       Q.   (BY MR. GEISE)  I believe in
17   some of your answers today you've indicated
18   that you have had data use agreements with
19   NCHS for use of restricted-use vital
20   statistics data in the past.
21           Is that accurate?
22       A.   No.
23       Q.   Have you had data use
24   agreements with -- to use restricted-use

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    vital statistics data from NCHS in the past?
2         A.   No.  I haven't had any
3    restricted -- I haven't had data use
4    agreements with NCHS to use the
5    restricted-use vital statistics data.  I have
6    had agreements with CMS, with the cancer --
7    the SEER cancer registry.  I've had
8    restricted data use agreements with private
9    organizations.  I've had restricted-use data
10   agreements with Medi-Cal.
11            Have I had other restricted-use
12   data agreements with other countries or other
13   federal entities?
14            I may have had a restricted-use
15   data agreement with the FTC.  I can't recall.
16   But I've certainly seen many, many of these
17   over the years.
18        Q.   In the circumstances where
19   you've had these restricted-use data
20   agreements, did you have the ability to use
21   that data once you received it for purposes
22   other than those indicated in the data use
23   agreement?
24        A.   No.

Page 251

1         Q.   What is your understanding of
2    the ramifications that could fall upon you if
3    you used them for purposes other than those
4    outlined in the data use agreement?
5         MR. KO:  Object to the form.
6         THE WITNESS:  Do you mean -- my
7    understanding is that's a very serious
8    matter and a position I would never
9    want to find myself in; because at the
10   very least, it's my understanding, for
11   example, that CMS could bar me from
12   ever using restricted-use federal data
13   in the future, which would be very
14   harmful to my career.  I understand
15   there's also the possibility of fines,
16   potentially prison, but I -- but also
17   ramifications to my institution that
18   they would -- they may find Stanford
19   to be in violation of data use
20   agreements that it has, which would be
21   very harmful to my career and the
22   university.
23        Q.   (BY MR. GEISE)  Professor
24   Kessler, I want to turn your attention now to

Page 252

1    Exhibit 4 to your deposition, which is the
2    acknowledgments link related to your working
3    paper that you wrote with Laurence Baker and
4    Kate Bundorf.  Do you have that in front of
5    you?
6         A.   Yes.
7         Q.   In questioning by Mr. Ko, you
8    were read the section of the acknowledgments
9    that related to a disclosure of financial
10   relationships for Daniel Kessler.  Do you see
11   that part of Exhibit 4?
12        A.   Yes.
13        Q.   At the time of this
14   acknowledgment in December of 2018, had your
15   expert report in this matter been filed yet?
16        A.   No.
17        Q.   As of December of 2018, would
18   it have been premature to list your work on
19   behalf of Walmart in this matter under your
20   disclosure of financial relationships?
21        MR. KO:  Object to the form.
22        THE WITNESS:  Well, as you see,
23   in this disclosure I don't list any of
24   the specific entities except

Page 253

1    Cornerstone, where I'm a senior
2    advisor with a position and AHRQ.  So
3    it's consistent with that.
4         Q.   (BY MR. GEISE)  And my question
5    is, as of December 2018 there have not been
6    any public disclosure of your work on behalf
7    of Walmart in this matter; correct?
8         A.   That is correct.
9         Q.   One final topic area, Professor
10   Kessler.  During your examination this
11   morning, you were asked about your
12   familiarity with certain experts who had been
13   designated on behalf of the plaintiffs,
14   specifically Professors Gruber, Cutler,
15   McGuire, and Liebman.  Do you recall that
16   discussion?
17        A.   Yes.
18        Q.   And I believe you were asked if
19   you've reviewed articles and papers that
20   those professors have written throughout the
21   years.  Do you recall that question?
22        MR. KO:  Objection to the
23   extent it mischaracterizes the
24   questions that I asked.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1          THE WITNESS:  Yeah, I mean I
2     don't recall the questions
3     specifically, but I do recall we
4     discussed Professors Cutler, Gruber,
5     Liebman, and McGuire.
6     Q.     (BY MR. GEISE)  And I believe
7     you were asked specifically if you respected
8     those other individuals.  Do you recall that
9     question?
10     A.     Yes.
11     Q.     Even if you respect these other
12     individuals, do you always agree with their
13     conclusions in any of their academic work?
14     A.     No.  I don't always agree with
15     everything Professors Cutler, Gruber,
16     McGuire, and Liebman write.
17          MR. GEISE:  I have no further
18     questions.  Thank you,
19     Professor Kessler.
20          MR. KO:  I have nothing
21     further.
22          THE VIDEOGRAPHER:  The time is
23     now 3:17.  This concludes the
24     deposition.  Going off the record.

Page 255

1          (Proceedings recessed at
2     3:19 p.m.)
3          --o0o--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 256

1          CERTIFICATE
2     I, DEBRA A  DIBBLE, Registered
Diplomate Reporter, Certified Realtime
3     Reporter, Certified Realtime Captioner,
Certified Court Reporter and Notary Public,
4     do hereby certify that prior to the
commencement of the examination, DANIEL P
5     KESSLER, JD,  Ph D  was duly sworn by me to
testify to the truth, the whole truth and
6     nothing but the truth
7          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8     testimony as taken stenographically by and
before me at the time, place and on the date
9     hereinbefore set forth, to the best of my
ability
10
          I DO FURTHER CERTIFY that pursuant
11     to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
12     before the conclusion of the deposition
13          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
14     nor counsel of any of the parties to this
action, and that I am neither a relative nor
15     employee of such attorney or counsel, and
that I am not financially interested in the
16     action
17
18
19
     _____
     DEBRA A  DIBBLE, RDR, CRR, CRC
20     NCRA Registered Diplomate Reporter
     NCRA Certified Realtime Reporter
21     Certified Court Reporter
22
     Dated: 29 May 2019
23
24

Page 257

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4     carefully and make any necessary corrections.
5     You should state the reason in the
6     appropriate space on the errata sheet for any
7     corrections that are made.
8          After doing so, please sign the
9     errata sheet and date it.
10          You are signing same subject to
11     the changes you have noted on the errata
12     sheet, which will be attached to your
13     deposition.
14          It is imperative that you return
15     the original errata sheet to the deposing
16     attorney within thirty (30) days of receipt
17     of the deposition transcript by you.  If you
18     fail to do so, the deposition transcript may
19     be deemed to be accurate and may be used in
20     court.
21
22
23
24

65  (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1             ERRATA
2   PAGE LINE CHANGE
3   \_\_\_\_ \_\_\_\_ _____
4       REASON: _____
5   \_\_\_\_ \_\_\_\_ _____
6       REASON: _____
7   \_\_\_\_ \_\_\_\_ _____
8       REASON: _____
9   \_\_\_\_ \_\_\_\_ _____
10      REASON: _____
11  \_\_\_\_ \_\_\_\_ _____
12      REASON: _____
13  \_\_\_\_ \_\_\_\_ _____
14      REASON: _____
15  \_\_\_\_ \_\_\_\_ _____
16      REASON: _____
17  \_\_\_\_ \_\_\_\_ _____
18      REASON: _____
19  \_\_\_\_ \_\_\_\_ _____
20      REASON: _____
21  \_\_\_\_ \_\_\_\_ _____
22      REASON: _____
23  \_\_\_\_ \_\_\_\_ _____
24      REASON: _____

Page 260

1          LAWYER'S NOTES
2
3  PAGE  LINE
4  \_\_\_\_ \_\_\_\_ _____
5  \_\_\_\_ \_\_\_\_ _____
6  \_\_\_\_ \_\_\_\_ _____
7  \_\_\_\_ \_\_\_\_ _____
8  \_\_\_\_ \_\_\_\_ _____
9  \_\_\_\_ \_\_\_\_ _____
10 \_\_\_\_ \_\_\_\_ _____
11 \_\_\_\_ \_\_\_\_ _____
12 \_\_\_\_ \_\_\_\_ _____
13 \_\_\_\_ \_\_\_\_ _____
14 \_\_\_\_ \_\_\_\_ _____
15 \_\_\_\_ \_\_\_\_ _____
16 \_\_\_\_ \_\_\_\_ _____
17 \_\_\_\_ \_\_\_\_ _____
18 \_\_\_\_ \_\_\_\_ _____
19 \_\_\_\_ \_\_\_\_ _____
20 \_\_\_\_ \_\_\_\_ _____
21 \_\_\_\_ \_\_\_\_ _____
22 \_\_\_\_ \_\_\_\_ _____
23 \_\_\_\_ \_\_\_\_ _____
24 \_\_\_\_ \_\_\_\_ _____

Page 259

1     ACKNOWLEDGMENT OF DEPONENT
2
3
4     I, DANIEL P. KESSLER, JD, Ph.D.,
   do hereby certify that I have read the
5  foregoing pages and that the same is a
   correct transcription of the answers given by
6  me to the questions therein propounded,
   except for the corrections or changes in form
7  or substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12  _____
   DANIEL P. KESSLER, JD, Ph.D.    DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 \_\_\_\_\_.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24

66 (Pages 258 to 260)