Page 110

1              IN THE UNITED STATES COURT

2             NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5              ~~~~~~~~~~~~~~~~~~~~~

6    IN RE:  NATIONAL PRESCRIPTION   MDL NO. 2804

7    OPIATE LITIGATION

8                              Case no.

9                              17-mdl-284

10                             Judge Dan Polster

11

12   This document relates to:

13   The County of Summit, Ohio, et al.,

14        V.

15   Purdue Pharma L.P., et al.,

16   Case No. 1:18-OP-45090 (N.D. Ohio)

17             ~~~~~~~~~~~~~~~~~~~~~

18             Continued deposition of

19          PATRICK LEONARD, VOLUME II

     PORTIONS OF THE TRANSCRIPT ARE DESIGNATED

20                 CONFIDENTIAL

21             March 27, 2019

                 11:03 a.m.

22

                  Taken at:

23             Ulmer & Berne

            1660 W. Second Street

24             Cleveland, Ohio

25          Wendy L. Klauss, RPR

Page 111

```
 1    APPEARANCES:
 2
           On behalf of the City of Akron, Summit
 3         County, and the Witness:
                Motley Rice LLC
 4              JAMES W. LEDLIE, ESQ.
                CAROLINE RION, ESQ.
 5              28 Bridgeside Boulevard
                Mt. Pleasant, SC   29464
 6              (843) 216-9140
                Jledlie@motleyrice.com
 7              Crion@motleyrice.com
 8         On behalf of the Department of Justice;
           United States Drug Enforcement
 9         Administration:
                United States Attorney's Office:
10              JAMES R. BENNETT, II, ESQ.
                RENEE A. BACCHUS, ESQ.
11              United States Courthouse
                801 West Superior Avenue
12              Suite 400
                Cleveland, OH   44113
13              (216) 622-3988
                James.bennett4@usdoj.gov
14              Renee.bacchus@usdoj.gov
                         -AND-
15              JOHN J. CIPRIANI, ESQ.
                431 Howard Street
16              Detroit, MI   48226
                (313) 234-4002
17              John.j.cipriani@usdoj.gov
18
19
20
21
22
23
24
25
```

Page 112

```
 1    APPEARANCES, Continued
 2         On behalf of Walmart Inc.:
                 Jones Day
 3               PATRICIA OCHMAN, ESQ.
                 North Point
 4               901 Lakeside Avenue East
                 Cleveland, OH   44114-1190
 5               (216) 586-3939
                 Pochman@jonesday.com
 6
           On behalf of CVS Rx Services, Inc. and
 7         CVS Indiana, LLC:
                 Zuckerman Spaeder LLP
 8               DANIEL P. MOYLAN, ESQ.
                 100 East Pratt Street, Suite 2440
 9               Baltimore, MD   21202-1031
                 (410) 949-1159
10               Dmoylan@zuckerman.com
11         On behalf of AmeriSourceBergen Drug
           Corporation:
12               Jackson Kelley, PLLC
                 ANDREW N. SCHOCK, ESQ.
13               50 South Main Street, Suite 201
                 Akron, OH   44308
14               (330) 252-9060
                 Anschock@jacksonkelley.com
15
           On behalf of Johnson & Johnson and
16         Janssen Pharmaceuticals, Inc.:
                 Tucker Ellis, LLP
17               JEFFREY M. WHITESELL, ESQ.
                 950 Main Avenue, Suite 1100
18               Cleveland, OH   44113
                 (216) 592-5000
19               Jeffrey.whitesell@tuckerellis.com
20
21
22
23
24
25
```

```
 1     APPEARANCES, Continued:
 2          On behalf of Mallinckrodt LLC and
            SpecGx LLC.
 3                  Ropes & Gray
                    JOSH GOLDSTEIN, ESQ.
 4                  Prudential Tower
                    800 Boylston Street
 5                  Boston, MA   02199-3600
                    (617) 951-7000
 6                  Joshua.goldstein@ropesgray.com 1211
                         -AND-
 7                  HAYDEN MILLER, ESQ.
                    1211 Avenue of the Americas
 8                  New York, NY   10036
                    (212) 596-9451
 9                  Hayden.miller@ropesgray.com
10          On behalf of McKesson Corporation:
                    Covington & Burling, LLP
11                  NEIL K. ROMAN, ESQ.
                    STEVEN WINKELMAN, ESQ.
12                  One City Center
                    850 Tenth Street, NW
13                  Washington, DC 20001-4856
                    (202) 662-6000
14                  Nroman@cov.com
                    Swinkelman@cov.com
15                       -AND-
                    CHRISTOPHER EPPICH, ESQ.
16                  1999 Avenue of the Stars
                    Los Angeles, CA   900067-4643
17                  (424) 332-4764
                    Ceppich@cov.com
18
            On behalf of HBC Service Company:
19                  Marcus & Shapira, LLP
                    MOIRA CAIN-MANNIX, ESQ.
20                  One Oxford Centre, 35th Floor
                    301 Grant Street
21                  Pittsburgh, PA   15219-6401
                    (412) 471-3490
22                  Cain-mannix@marcus-shapira.com
                         ~  ~  ~  ~  ~
23
24
25
```

Page 114

TRANSCRIPT INDEX

APPEARANCES:............................... 111

INDEX OF EXHIBITS ....................... 115

EXAMINATION OF PATRICK LEONARD

By Mr. Roman............................... 117

By Mr. Winkelman.......................... 176

By Mr. Moylan............................. 245

By Mr. Goldstein.......................... 290

By Mr. Moylan............................. 342

REPORTER'S CERTIFICATE.................... 346

EXHIBIT CUSTODY

EXHIBITS RETAINED BY COURT REPORTER.

1                        INDEX OF EXHIBITS
     NUMBER              DESCRIPTION              MARKED
2
     Exhibit 7    Previously Marked, ........... 132
3                 Designated Confidential,
                  Email Chain, Beginning with
4                 Bates Label AKRON 000368766
5    Exhibit 9    Designated Confidential, ..... 130
                  Email Chain, with
6                 Attachment, Beginning with
                  Bates Label AKRON 001163442
7
     Exhibit 10   A Three-Page Document ........ 142
8                 Printed Off of the Justice
                  Department DEA Diversion
9                 Control Division Website on
                  November 25 of 2018
10
     Exhibit 11    Designated Confidential, .... 169
11                Multi-Page Document Bearing
                  Production Numbers AKRON
12                001135275 through 5406
13   Exhibit 12    Designated Confidential, .... 186
                  Email Chain, Subject: Expert
14                Witness, Beginning with
                  Bates Label AKRON 001142305
15
     Exhibit 13    Designated Confidential, .... 190
16                6-30-2014 Email Chain, with
                  Attachment, Beginning with
17                Bates Label SUMMIT 001233671
18   Exhibit 14    Designated Confidential, .... 218
                  Email Chain, Beginning with
19                Bates Label AKRON 000367833
20   Exhibit 15   2014 Final Rule Rescheduling . 247
                  of Hydrocodone Combination
21                Products from Schedule III
                  to Schedule II
22
     Exhibit 16   Designated Confidential, ..... 249
23                9-25-2010 Email, Bates Label
                  AKRON 001142381
24
     Exhibit 17   Designated Confidential, ..... 255
25                11-05-2010 Email, Bates
                  Label AKRON 000368237

 1                     .............................
      Exhibit 18      Designated Confidential, ..... 257
 2                    4-11-2011 Email, Bates Label
                      AKRON 001142386
 3
      Exhibit 19      Harper Search Warrant........ 257
 4
      Exhibit 20      Spreadsheet From the Ohio .... 262
 5                    Board of Medicine
 6    Exhibit 21      License Look Up, Adolph ...... 266
                      Harper
 7
      Exhibit 22      Press Release From U.S. ...... 267
 8                    Attorney's Office For the
                      Northern District of Ohio
 9                    From February 1, 2015
10    Exhibit 23      Designated Confidential, ..... 292
                      1-16-2013 Email, Bates
11                    Labeled AKRON_000368456
12    Exhibit 24      Designated Confidential, ..... 293
                      Protected Health
13                    Information, Patient Deaths
                      Associated with Dr. Harper,
14                    Beginning with Bates Labeled
                      AKRON 000368457
15
      Exhibit 25      Federal Register, Volume 80, . 311
16                    Number 138, Monday, July 20,
                      2015/Notices
17
      Exhibit 26      Indictment for Dr. Harper..... 318
18
      Exhibit 27      Newspaper Article Concerning . 322
19                    Dr. Gregory Ingram
20    Exhibit 28      Designated Confidential, ..... 329
                      National Diversion Survey
21                    Questionnaire, Beginning
                      with Bates AKRON 000370688
22
      Exhibit 29      Designated Confidential, ..... 336
23                    7-25-2011 Email, Beginning
                      with Bates AKRON 000368263
24
25

```
 1              PATRICK LEONARD, of lawful age,
 2    called for examination, as provided by the
 3    Statute, being by me first duly sworn, as
 4    hereinafter certified, deposed and said further
 5    as follows:
 6              EXAMINATION OF PATRICK LEONARD
 7    BY MR. ROMAN:
 8              MR. ROMAN:  Why don't we go ahead
 9    and do introductions.  Jim, do you want to
10    start?
11              MR. LEDLIE:  Sure.  I'm James
12    Ledlie, from the Motley Rice law firm, on
13    behalf of the City of Akron and Summit County,
14    and I'm joined by Caroline Rion, also from
15    Motley Rice, and this is a continuation of the
16    deposition.
17              MR. BENNETT:  James Bennett, on
18    behalf of the Department of Justice, United
19    States Drug Enforcement Administration, from
20    the U.S. Attorney's Office in Cleveland.
21              MR. CIPRIANI:  John Cipriani, from
22    the Drug Enforcement Administration.
23              MS. BACCHUS:  Renee Bacchus,
24    Assistant United States Attorney, on behalf of
25    the United States Drug Enforcement
```

                                        Page 118

1    Administration, DEA, and the U.S. Attorney's
2    Office.
3              MS. OCHMAN:  Patricia Ochman, Jones
4    Day, for Walmart.
5              Mr. MOYLAN:  Daniel Moylan,
6    Zuckerman Spaeder, for CVS.
7              MR. SCHOCK:  Andrew Schock, Jackson
8    Kelley, for AmeriSourceBergen Drug Corporation.
9              MR. WHITESELL:  Jeff Whitesell,
10   from Tucker Ellis, on behalf of Johnson &
11   Johnson and Janssen.
12             MR. MILLER:  Hayden Miller, Ropes &
13   Gray, on behalf of Mallinckrodt LLC and SpecGx
14   LLC.
15             MR. GOLDSTEIN:  Josh Goldstein,
16   Ropes & Gray, on behalf of Mallinckrodt LLC.
17             MR. WINKELMAN:  Steven Winkelman,
18   Covington & Burling, on behalf of McKesson
19   Corporation.
20             MR. ROMAN:  And Neil Roman,
21   Covington & Burling, also on behalf of
22   McKesson.  I think we're out of time.
23   BY MR. ROMAN:
24        Q.   How are you, Det. Leonard?
25        A.   I'm fine.  Yourself?

Page 119

1    Q.    Good.  Thank you.

2          Any reason you can't give complete

3    and truthful testimony today?

4    A.    No.

5          Q.    Did you review the transcript of

6    the deposition that we took on January 31?

7    A.    I did a couple weeks ago, yes.

8          Q.    Is there anything in there that you

9    would like to change or alter or amend in any

10   way?

11   A.    Actually, there is one.  At one

12   point I said that the Dr. Harper case was

13   turned over to the DEA.  It was never turned

14   over.  A joint case was opened.  It was still

15   an Akron case.  It was a dual case.  It wasn't

16   actually given to the DEA as theirs and not the

17   City of Akron.

18         Q.    Any other changes you wanted to

19   make?

20   A.    No, sir.

21         Q.    Have you done anything to prepare

22   for your resumed deposition today?

23   A.    I have met with counsel and I have

24   met with United States Government attorneys.

25         Q.    How many meetings have you had with

Page 120

```
 1    counsel and the United States attorneys?

 2         A.    Probably three, two with U.S.

 3    attorneys and one with counsel.

 4         Q.    Okay.  By counsel, you are

 5    referring to Mr. Ledlie?

 6         A.    Yes, sir.

 7         Q.    Okay.  When did you meet with Mr.

 8    Ledlie?

 9         A.    Besides today, I don't know, it's

10    been a couple weeks ago.  I don't remember when

11    it was.

12         Q.    Was anybody else present when you

13    spoke with Mr. Ledlie?

14         A.    No.

15         Q.    Was anybody on the phone when you

16    spoke with Mr. Ledlie?

17         A.    I do not recall.

18         Q.    More than half a day or less than

19    half a day?

20         A.    Less than half a day.

21         Q.    And how about the United States,

22    who -- what attorneys from the United States

23    have you talked with in preparation for your

24    testimony today?

25         A.    That are in the room here, Mr.
```

Page 121

1    Bennett and Mr. Cipriani.

2        Q.    When was the first time you talked

3    to Mr. Bennett and Mr. Cipriani?

4        A.    I don't have dates, sir.  I don't

5    know.

6        Q.    A couple weeks ago?

7        A.    We spoke this past Monday, and we

8    have exchanged emails with Mr. Cipriani a

9    couple of times since then.

10        Q.    Was anybody else present when you

11    spoke with them?

12        A.    Renee, Ms -- I'm sorry.  I don't

13    remember Renee's last name -- Bacchus was there

14    on Friday as well -- or Monday as well.

15        Q.    Okay.  Anybody besides those three,

16    at any point?

17        A.    No, sir.

18        Q.    And nobody on the phone or anything

19    like that?

20        A.    No, sir.

21        Q.    And what was the total amount of

22    time that you have spoken to attorneys for the

23    United States in preparation for your testimony

24    today?

25        A.    About two hours in -- I correct

1    that.  Mr. Ledlie was on the phone on Monday

2    with us.

3         Q.    Anybody else?

4         A.    No.

5         Q.    Have you discussed the expected

6    substance of your testimony today with anyone

7    other than the folks you have identified so

8    far?

9         A.    No, sir.

10         Q.    Have you reviewed any deposition

11    transcripts, other than your own, in

12    preparation for your testimony today?

13         A.    No, sir, I have not.

14         Q.    Have you done anything else to

15    prepare for your testimony today, other than

16    what you have so far described?

17         A.    No, sir.

18         Q.    Okay.  So I believe that the way we

19    left it last time is you took us up to about

20    February of 2012, and that's when you started

21    working for the DEA tactical diversion squad,

22    correct?

23         A.    Yes, sir.

24         Q.    And if I use the acronym TDS, you

25    will understand what that refers to?

1          A.     Yes, sir.

2          Q.     The diversion squad, right?

3          A.     Correct.

4          Q.     And are you still a task force

5     officer with the TDS?

6          A.     I am.

7          Q.     And if I use the acronym TFO, you

8     will understand that refers to task force

9     officer?

10         A.     I will.

11         Q.     And you joined the TDS as a TFO in

12    February 2012, correct?

13         A.     Yes, sir.

14         Q.     How did this assignment come about?

15         A.     At some point, the GS was -- from

16    the Cleveland DEA office reached out to our

17    department and informed them that they were

18    creating a TDS group out of the Cleveland DEA

19    and asked if I was interested in being a part

20    of it.

21         Q.     First all, a couple more acronyms

22    in there.  What does GS stand for?

23         A.     A group supervisor.  I believe he

24    ████████████████████████████████████████████

25    that contacted our office.

Page 124

1          Q.     And he is with the Drug Enforcement
2     Administration?
3          A.     Yes, sir.
4          Q.     And was his request made directly
5     to you or was it made to your superiors?
6          A.     It was made to my superiors.
7          Q.     And were you given a choice, or was
8     this an order from your superiors to join the
9     TDS as a TFO?
10          A.     I was given a choice.
11          Q.     And you accepted?
12          A.     Yes, sir.
13          Q.     Do you know for how long TDS has
14     been around?
15          A.     We started the group in February of
16     2012.  I was one of the initial members.
17          Q.     Who are the other initial members?
18               MR. BENNETT:  Objection.  You may
19     talk generally about the task force.  You may
20     not give specifics on strengths of the task
21     force and those details.  So if these are
22     publicly known individuals on the task force,
23     then you may answer.  If they are not publicly
24     known, then you are not authorized to answer
25     that.

1        Q.    Let me ask a different question.

2              First of all, do you know how many

3   other members of the task -- how big the task

4   force was when you started?

5              MR. BENNETT:  Objection.  Again,

6   the size of the force is not something that

7   this witness is authorized to answer.

8        Q.    Were any other officers at the

9   Cleveland Police Department or Akron Police

10  Department members of TDS as of February 2002?

11             MR. BENNETT:  You may answer that.

12       A.    No, they were not.

13       Q.    Subsequently, did members of the

14  Akron Police Department and Cleveland Police

15  Department join TDS?

16       A.    Yes.

17       Q.    Who were those?

18       A.    About a year ago, Det. John Prince

19  from the Cleveland Police Department joined the

20  TDS.

21       Q.    And then how about from Summit

22  County or Cuyahoga County?

23       A.    Yes.  Det. Lori Baker-Stella from

24  Summit County Sheriff's Office.  There was a

25  deputy from the Cuyahoga County Sheriff's

Page 126

1    Department, Lou Scabelli, he's no longer with

2    us, and he's been replaced by John Gioitti.

3         Q.    Do you recall their dates of

4    participation?

5         A.    Mr. Gioitti was somewhere around

6    the same time as Mr. Prince, about a year ago.

7         Q.    What are your responsibilities

8    within TDS?

9         A.    We are considered to have the same

10   responsibilities as an agent, open and

11   investigate cases.

12        Q.    What type of cases?

13        A.    Prescription criminal cases.

14        Q.    What do you mean by "prescription

15   criminal cases"?

16        A.    The TDS, the tactical diversion

17   squad, we are geared toward overprescribing

18   physicians, pharmaceuticals, any pharmacists

19   that are dispensing illegally or improperly,

20   down to patients that are selling their

21   narcotics.

22        Q.    So all forms of prescription drug

23   diversion, correct?

24        A.    Yes, sir.

25        Q.    Do you have any responsibilities

1    for budgeting or finance?

2         A.    I do not.

3         Q.    Do you have any responsibilities

4    for administration or leadership?

5         A.    No.  Unless I'm the case agent,

6    then I still have to -- I don't have -- I have

7    control over my case up until the point where

8    the supervisor would supercede.

9         Q.    How are cases assigned among TFOs?

10        A.    It really just depends.  Some cases

11   are assigned by the group supervisor.  In our

12   particular TDS, cases that are in the Summit

13   County control area would go to myself or Det.

14   Baker-Stella first.  Physicians in our area, we

15   would be at least the -- maybe not the case

16   officer, but a co-case officer on them.

17        Q.    And are you still employed by Akron

18   Police Department?

19        A.    I am.

20        Q.    And, in fact, they pay your -- they

21   pay your salary, and then the federal

22   government pays your overtime; is that right?

23             MR. LEDLIE:  Object to the form of

24   the question.  Misstates.

25        Q.    Who pays your salary?

Page 128

1        A.    The Akron Police Department pays my
2    salary.
3        Q.    And your overtime when you are
4    working on TDS work is paid for by the federal
5    government?
6        A.    Right.  The Akron Police Department
7    still pays my overtime.  They are reimbursed
8    quarterly by the federal government.
9        Q.    And do you still report to
10   superiors within the Akron Police Department?
11       A.    Yes, sir.
12       Q.    And how do you decide who you are
13   working for on a given day?
14       A.    I'm assigned to the Cleveland DEA.
15   I check in with Akron every day, and then I go
16   to the Cleveland office.
17       Q.    When you joined TDS in February of
18   2012, did you receive any specialized training
19   relating to or in connection with this
20   assignment?
21       A.    Yes.  I was sent to Quantico for a
22   week-long diversion school.
23       Q.    Was that in February of 2012?
24       A.    No, I believe it was -- it was at
25   least a year, maybe two years later.

Page 129

1          Q.    And what can you tell me about the

2     training that you received at Quantico?

3          A.    It was case studies and additional

4     information on how other investigators had

5     utilized investment tools and techniques to

6     conduct cases.

7          Q.    Who ran the program?

8          A.    The DEA.

9          Q.    Were you the only person from the

10    Cleveland/Akron area to attend?

11         A.    That class I was.

12         Q.    Did you receive any other training

13    in connection with your assignment to TDS?

14         A.    I went to numerous schools for

15    training.  I believe one of the HIDTA schools

16    the DEA had me go to was a surveillance

17    technique school.

18         Q.    And when you went and you did the

19    Quantico training and these other trainings, do

20    you know who paid for those?

21         A.    I do not.  I assume Quantico was

22    paid for -- I'm not supposed to assume.  So DEA

23    sent me.  I flew, so it was on my DEA travel

24    card, so DEA paid for my flight back and forth

25    and the hotel stay.

Page 130

```
 1                      -   -   -   -   -
 2              (Thereupon, Deposition Exhibit 9,
 3              Designated Confidential, Email
 4              Chain, with Attachment, Beginning
 5              with Bates Label AKRON 001163442,
 6              was marked for purposes of
 7              identification.)
 8                      -   -   -   -   -
 9       Q.    I'm handing you what has been
10   marked as Leonard Exhibit 9.
11              MR. BENNETT:  Counsel, can you tell
12   me which tab this is in the binder you gave me
13   this morning?
14              MR. WINKELMAN:  4.
15              MR. BENNETT:  Okay.  Thank you.
16       Q.    Exhibit 19 is a three-page document
17   bearing production numbers Akron 001163442
18   through 44.  Have you seen this document
19   before?
20       A.    Yes, sir.
21       Q.    Exhibit 9 is an email chain.  The
22   last entry is an email from Chip Westfall to
23   you dated July 16 of 2013; do you see that?
24       A.    Yes.
25       Q.    You received this email from
```

1    Mr. Westfall on or about that date in the

2    ordinary course of business?

3         A.    I did.

4         Q.    So Mr. Westfall is a lieutenant in

5    the Akron Police Department, correct?

6         A.    Yes, he was.

7         Q.    And did you report directly to him?

8         A.    Yes, sir.

9         Q.    And in this email chain, he asks

10   you to attend a one-day summit on

11   pharmaceutical drug diversion training,

12   correct?

13        A.    Yes, sir.

14        Q.    And did you, in fact -- this is in

15   August of 2013, correct?

16        A.    Yes, sir.

17        Q.    And did you, in fact, attend that

18   training?

19        A.    No, sir, I don't believe I did.

20        Q.    Do you know why not?

21        A.    The only reason I would have not

22   attended was if we had an operation going that

23   day.

24        Q.    So why do you believe you did not

25   attend this training?

1       A.    Because I don't remember going to

2    anything at the Cuyahoga County College

3    Technical Training Center.  I don't recall

4    attending that facility for a training.

5           Q.    Okay.

6                 MR. LEDLIE:  What was this Exhibit

7    Number?

8                 MR. WINKELMAN:  9.

9                     -  -  -  -  -

10                (Thereupon, Deposition Exhibit 7,

11                Previously Marked, Designated

12                Confidential, Email Chain, Beginning

13                with Bates Label AKRON 000368766,

14                was marked for purposes of

15                identification.)

16                    -  -  -  -  -

17          Q.    Det. Leonard, I'm handing you what

18    we marked as Exhibit 7 at your first

19    deposition.

20                MR. LEDLIE:  And at the last

21    deposition, I instructed that I'm clawing this

22    back based on the police investigation

23    privilege.

24                MR. ROMAN:  But this was not clawed

25    back.

Page 133

1              MR. LEDLIE:  If you intend -- we
2     can get the special master on the phone if you
3     would like to, but I'm not going to allow any
4     questioning on this.  I'm asserting the
5     privilege under police investigation and
6     techniques and schools.  I'm not going to allow
7     any questions on this.
8              MR. ROMAN:  I don't know why it
9     wasn't included in the clawback.  When you
10    tried to prepare for the deposition, you clawed
11    back a number of documents.
12             MR. LEDLIE:  We discussed this at
13    the last deposition, but we can take it up with
14    the Court, if you want.
15        Q.    So when we spoke in January, Det.
16    Leonard, we talked about your diversion
17    investigations pre-2012; do you recall that?
18        A.    Yes, sir.
19        Q.    And you identified different types
20    of diversion: theft, forgery, doctor shopping,
21    pill sharing, overprescribing and pill mills;
22    do you recall that?
23        A.    Yes, sir.
24        Q.    And have you in your work with TDS
25    dealt with or addressed all these same forms of

Page 134

1    diversion?

2         A.    Yes, sir.

3         Q.    Are you aware of any other forms of

4    diversion, and are there any others in which

5    you have been involved since joining TDS?

6         A.    I was involved in assisting a civil

7    investigation with the diversion investigator,

8    where the --

9              MR. LEDLIE:  I'm going to object.

10   This falls, in my opinion, outside of the

11   specific case and this falls outside of

12   authorization, in my understanding.

13             MR. BENNETT:  I'll indicate under

14   the scope of the authorization, Det. Leonard is

15   authorized to talk about cases including civil

16   cases that have been filed publicly and

17   resolved.  So I believe he may be talking about

18   a case that has been filed publicly and

19   resolved, in which case he is authorized to

20   answer that question.

21             If, however, it is an investigation

22   that was not publicly filed and resolved, then

23   you do not have authorization to answer that.

24   So I would join in the scope of the objection,

25   to the extent that it is not a public case.

Page 135

1        A.    We returned a bunch of records,

2    files, to a corporation in Wadsworth that had

3    paid a very large fine to the U.S. Government,

4    reference distribution of some narcotics.

5        Q.    First of all, let me just ask

6    whether or not this matter has been filed

7    publicly and resolved?

8        A.    It was civilly open and closed.  I

9    don't know any more than that.

10        Q.    When you say you returned a bunch

11    of records to a corporation in Wadsworth, what

12    does that have to do with --

13        A.    They were a dispensing

14    organization.

15        Q.    And what type of an organization?

16        A.    I don't even know what the name of

17    it was at this point.  It was probably 2012,

18    2011, 2014.  It was early.  We assisted a

19    diversion unit.  A diversion investigator was

20    assigned to our TDS, and, like I said, we

21    assisted in returning files from an open case

22    that was recently closed in a civil litigation.

23        Q.    I understand you returned the

24    files, but what was the investigation into,

25    what was going on?

Page 136

1          A.     It was a dispensing issue.

2          Q.     So a pill mill?

3          A.     No.  It was a distribution center.

4          Q.     Whose distribution center?

5          A.     I don't recall.

6          Q.     Do you know who the defendants are

7     in this case?

8          A.     I do not.

9          Q.     I'm just going to show you, Det.

10    Leonard, the caption on the corrected second

11    amended complaint and jury demand in this case,

12    and ask you to look at the list of defendants

13    and ask if any of the defendants were involved

14    in that case?

15         A.     I've looked at that.  If I saw the

16    name, I wouldn't recognize who it was.  I don't

17    know who the distributing --

18         Q.     Do you know whether, for example,

19    it was my client, McKesson?

20         A.     I know exactly where the facility

21    is at, I could drive there, I don't know the

22    name of it.

23         Q.     Where is the facility?

24         A.     In Wadsworth, Ohio.

25         Q.     And do you know what they were

Page 137

1    distributing there?
2         A.    No.
3         Q.    Were you involved at all in the
4    investigation?
5         A.    No, sir.
6         Q.    You just were returning the papers?
7         A.    Yes, sir.
8         Q.    I'm sorry.  You said you are aware
9    of who the defendants are in this case?
10        A.    No, I'm not.
11        Q.    So let me --
12        A.    I'm sorry.  Are you talking about
13   the case in Wadsworth?
14        Q.    No, this case.
15        A.    Yes, I know who the defendants in
16   this case are.
17        Q.    Have you ever investigated any of
18   the defendants in this case for anything?
19             MR. BENNETT:  Objection.  Scope.
20   He's not authorized to discuss any
21   investigations as a DEA task force officer that
22   would have involved any particular individual,
23   including but not limited to the defendants in
24   this case.  To the extent that he investigated
25   any of them before becoming a task force

1    officer, he may answer.

2              MR. ROMAN:  Well, can he answer

3    that yes or no?

4              MR. BENNETT:  He may not, unless

5    they were publicly charged and convicted.  If

6    he has any cases that were actually indicted

7    and convicted against any defendants, he may

8    answer that as well.  That's within the scope.

9         Q.    First of all, can you answer that

10   question?

11        A.    The answer is no.

12        Q.    How about pre-February 2012, have

13   you ever investigated any of the defendants in

14   this case -- did you investigate any of the

15   defendants in this case pre-February of 2012?

16        A.    No, I did not.

17        Q.    Are you aware of any instance since

18   February of 2012 in which one of the defendants

19   in this case has sold or distributed an opioid

20   where there has not been a prescription from a

21   licensed practitioner?

22             MR. BENNETT:  Objection.  Scope.

23   You are not authorized to answer that question,

24   to the extent it calls for official Department

25   of Justice information, stuff that you did as a

Page 139

1    task force officer.

2              To the extent you did something

3    other than being a task force officer, you may

4    answer.

5         A.    Everything I did in my

6    investigations were as a task force officer.

7         Q.    Well, let me ask you this:  As an

8    officer of the Akron Police Department, have

9    you at any time investigated any of the

10   defendants for selling or distributing an

11   opioid where there has not been a prescription

12   from a licensed practitioner?

13             MR. LEDLIE:  Object to the scope,

14   to the extent you are asking about after

15   February of 2012.

16        A.    Can you restate your question.

17             MR. ROMAN:  Well, I mean, I assume

18   you are instructing the witness not to answer?

19             MR. LEDLIE:  Well, my

20   understanding, I'm counseling him that if I

21   understood counsel for the Department of

22   Justice, you are not allowed to discuss

23   specific cases that you did or did not

24   investigate from February of 2012 that were DEA

25   matters.  If you have other matters that are

Page 140

1   city matters, you are allowed to answer that.

2          A.    I can't answer that question.

3               MR. ROMAN:  I will just note that

4   it seems that our Touhy authorization is

5   largely illusory, but...

6          Q.    So in their interrogatory

7   responses, Summit County and Akron identified

8   pill mills operated in their jurisdictions run

9   by the following doctors:  Dr. Harper, Dr.

10  Adolph Harper; Dr. Brian Heim, H-E-I-M; Dr.

11  ███████████████████████████████████████████

12  ███████████████████████████████████████

13  T-R-I-C-A-S-O; and Dr. Gregory Ingram,

14  I-N-G-R-A-M.

15               I understand, Det. Leonard, that

16  you were involved in the Harper investigation;

17  is that correct?

18         A.    Yes, sir.

19         Q.    Were you involved in any of the

20  other investigations?

21               MR. LEDLIE:  I would object to the

22  characterization of a "pill mill."  I believe

23  we said there was improper prescribing, but I

24  don't believe that language is accurate.

25         A.    A couple of those names are still

Page 141

1    open, ongoing investigations, and I am involved

2    in most of the other names you read.

3           Q.    Are there any in which you have not

4    been involved with?  Do you want me to read the

5    list again?

6           A.    Please.

7           Q.    Dr. Heim, Dr. Njoku, Dr. Lazzerini,

8    Dr. Tricaso, Dr. Ingram.

9           A.    I believe that Dr. Njoku was a

10   medical board investigation.  I'm not positive,

11   but that's what I recall.

12          Q.    And all the others, you were

13   involved with the investigations into them?

14          A.    Yes, sir.

15          Q.    And do you have any information,

16   based on your investigations, that any

17   defendant in this case ever sold or marketed a

18   prescription opioid to any of these five

19   doctors, everybody except for Dr. Njoku?

20               MR. BENNETT:  Objection.  Scope.

21   The witness an authorized to answer his

22   personal knowledge regarding the identities of

23   individuals who have been charged and

24   convicted.  He is not authorized to discuss the

25   substance of his investigation.

Page 142

1                    MR. ROMAN:   I think you're going to

2        have a tough time objecting to this one.

3              Q.    This is off your website.

4              A.    Okay.

5                    MR. LEDLIE:  Objection.  That's the

6        DEA's website, not Det. Leonard's.

7                    MR. BENNETT:  And counsel, for the

8        record, we did review this when you gave it to

9        us this morning, and we do not have any

10       objections to you asking questions on this one.

11                   MR. ROMAN:  Good.

12                         -   -   -   -   -

13                   (Thereupon, Deposition Exhibit 10, A

14                   Three-Page Document Printed Off of

15                   the Justice Department DEA Diversion

16                   Control Division Website on November

17                   25 of 2018, was marked for purposes

18                   of identification.)

19                         -   -   -   -   -

20             Q.    Det. Leonard, I'm handing you what

21       has been marked as Leonard Exhibit 10.  It is a

22       three-page document that I will represent was

23       printed off of the Justice Department DEA

24       Diversion Control Division website on November

25       25 of 2018.

1                Have you seen this document before?

2        A.    Earlier today.

3        Q.    The first page, there is a heading

4    Tactical Diversion Squads; do you see that?

5        A.    Yes, I do.

6        Q.    And the first paragraph of that

7    reads, "The Tactical Diversion Squads combine

8    DEA resources with those of federal, state and

9    local law enforcement agencies in an innovative

10   effort to investigate, disrupt, and dismantle

11   those suspected of violating the Controlled

12   Substances Act or other appropriate federal,

13   state or local statutes pertaining to the

14   diversion of licit pharmaceutical controlled

15   substances or licit chemicals"; do you see

16   that?

17       A.    I do.

18       Q.    And is that the mission of the

19   division, as you understand it?

20       A.    Yes, sir.

21       Q.    How does TDS go about disrupting

22   and dismantling those suspected of violating

23   the Controlled Substances Act?

24             MR. BENNETT:  Objection.  Scope.

25   He's not authorized to answer anything about

Page 144

1    the investigation or intelligence gathering and

2    dissemination techniques.

3              And so to the extent you can talk

4    at a high level generally, you may, but you may

5    not disclose any of the techniques used by the

6    task force or the DEA.

7         Q.    You can give me a general

8    description, please?

9         A.    I mean, it's a pretty

10   self-explanatory what the paragraph says.  We,

11   you know, complaints that come -- or forwarded

12   to us or investigative suspicious activity, we

13   would follow up with investigations.

14        Q.    Let me step back a second.  Do you

15   have an understanding of the Controlled

16   Substances Act?

17        A.    Yes.

18        Q.    And what is that understanding?

19        A.    It's the act that controls all the

20   distribution of controlled substances.

21        Q.    And do you know to whom it is

22   directed?

23        A.    No.

24        Q.    Have you ever read it?

25        A.    I've -- yes.  It's been a long time

Page 145

1    ago.

2         Q.    Do you understand whether it is

3    directed at maybe manufacturers or distributors

4    or pharmacies, all three, some of them?

5         A.    I believe it is all of them.

6         Q.    On the second page of this

7    document, it lists the Ohio TDS offices as

8    being in Cleveland, Columbus; do you see that?

9         A.    Yes.

10        Q.    Well, strike that.

11             Do you know what the jurisdictions

12   are of those two offices, do they coordinate,

13   is Cleveland responsibile for certain portions

14   of the state and Columbus responsibile for

15   other portions, what is the relationship

16   between those two offices?

17        A.    The state is divided where

18   Cleveland has so many of the northern counties

19   and at some point Columbus has the rest of the

20   state.

21        Q.    And you are out of the Cleveland

22   office, correct?

23        A.    Yes, sir.

24        Q.    Do you ever coordinate with those

25   in the Columbus office?

1          A.    Yes, sir.

2               MR. BENNETT:  Objection.  Scope.

3     You are not authorized to talk about the

4     specific cases, but you can talk generally

5     about coordination.

6          Q.    And in what types, not specific

7     cases, in what types of matters do you

8     coordinate with those in the Columbus office?

9          A.    Open investigations.  That would

10    depend on what -- it could be any or all,

11    depending what we were working.

12         Q.    Do you have statewide

13    investigations?

14         A.    Yes.  We have multistate

15    investigations.

16         Q.    And in those situations where you

17    have multistate investigations, do you

18    coordinate with TDS offices in other states?

19         A.    Yes, sir.

20         Q.    Now, do TDS's responsibilities

21    extend to the diversion of all prescription

22    drugs, as opposed to just prescription opioids?

23         A.    All we investigate are the opioids.

24    All that I have been involved with are the

25    opioids.

1          Q.    How did you know about TDS in

2     general, whether others within TDS in any of

3     these offices are involved with the diversion

4     of prescription -- of prescription drugs that

5     are not opioids?

6                MR. BENNETT:  Objection.  Form.

7          A.    We do investigate other -- we have

8     had some -- just a second.

9          Q.    Is this a matter of privilege?

10         A.    I just have a question for counsel.

11               MR. BENNETT:  Is it around the

12    scope of your authorization?

13               THE WITNESS:  Yes.

14               MR. BENNETT:  You can talk

15    generally about the type of cases, but not any

16    specific questions.  So he asked about another

17    controlled substance that is not an opioid and

18    whether he is authorized to talk about it.  I

19    have instructed the witness that he is

20    authorized to answer generally about the type

21    of cases if there is other prescription drugs,

22    but not about a specific investigation.  That

23    was your question.

24         A.    So we have done others besides

25    ████████████████████████████████████████████

1   █████████████████████████████

2      Q.    I gather you are 100 percent -- you

3   personally are 100 percent on prescription

4   opioids?

5           MR. LEDLIE:  Objection to form.

6      A.    No.  I have investigated other

7   ███████████████████████████████████████████

8   ████████████████████████████████████

9   other prescription narcotics, other

10   prescription medications.

11      Q.    Can you quantify the time that you

12   have spent on investigating diversion of

13   prescription opioids versus other types of

14   prescription drugs?

15      A.    Only to say that the large majority

16   of the time would be opioids.  I don't have a

17   specific breakdown for you.

18      Q.    And do you ever -- are you ever

19   involved in the investigation of

20   nonprescription opioids, such as heroin or

21   fentanyl?

22           MR. LEDLIE:  Objection to the

23   characterization of fentanyl as a

24   nonprescription opioid.

25      Q.    Well, this is fentanyl,

Page 149

1    nonprescription fentanyl?

2         A.    We have been involved in

3    individuals that are making -- have their own

4    pills -- pill press.  So an individual that is

5    making fake prescription medication, that may

6    include illicit fentanyl, we have done those

7    investigations.

8         Q.    So those would be counterfeit

9    pills, correct?

10        A.    Yes, sir, that's correct.

11        Q.    And that's something you and others

12   in TDS have investigated?

13        A.    Yes, sir.

14        Q.    Can you give me a sense of how much

15   time you spent on this an a day-to-day basis

16   investigating the diversion of prescription

17   opioids as opposed to everything else you

18   investigate, whether it be prescription

19   nonopioids or just nonprescription drugs?

20             MR. LEDLIE:  Object to the form of

21   the question.

22        A.    It would be a guess to give you a

23   percentage.  The majority of our time is spent

24   on opioids.

25        Q.    Diversion of prescription opioids?

Page 150

1          A.    Yes, sir.

2                MR. BENNETT:  Do you want to take a

3    break, counsel?

4                MR. ROMAN:  I'll be fine.  I'll get

5    some water.

6          Q.    So a few minutes ago, we talked

7    about the types of diversion: theft, forgery,

8    things of that nature.

9                Has the types of diversion you can

10   investigate changed over time; has the mix

11   changed over time?

12               MR. LEDLIE:  Object to the form of

13   the question.

14         A.    Since joining the TDS, more of my

15   time has been spent on larger investigations,

16   whether it be, you know, pill presses,

17   physician offices, prescribers, more so than

18   individual doctor shoppers.

19         Q.    Do you know why that's been the

20   case?

21         A.    We have more assets available and

22   more manpower to go along with the

23   investigative tools.

24         Q.    When did you receive these

25   additional assets and manpower?

Page 151

1              MR.  LEDLIE:   Object  to  the  form  of
2      the  question.
3          A.    Those  assets  I'm  talking  about  are
4      the  other  TFOs  and  agents  that  are  from  2012  on
5      that  I  work  hand  in  hand  with  everyday.
6          Q.    Since  2012,  you  have  started
7      focusing  on  the  larger  cases?
8              MR.  LEDLIE:   Object  to  the  form  of
9      the  question.
10         A.    No.   I  did  the  Dr.  Harper  case
11     several  years  prior  to  2012.   At  that  time  I
12     used  --  the  additional  manpower  came  from  the
13     state  board  of  pharmacy  and  the  medical  board.
14         Q.    So  can  you  provide  more  detail
15     about  the  additional,  what  you  call  assets  that
16     have  become  available  since  2012?   Are  you
17     talking  about  additional  federal  agents;  is
18     that  it?
19         A.    Federal  agents,  overtime,  vehicles.
20     It  is  easier  to  do  your  job  when  you  have
21     additional  people  helping  you.
22         Q.    And  have  all  those  addition  assets
23     been  federally  funded?
24         A.    I  know  most  of  them  have.   I  can't
25     think  of  any  that  haven't,  but  I  can't  give  you

Page 152

1    100 percent on that.

2         Q.    Do you have any familiarity at all

3    with the budget of TDS?

4         A.    No, sir.

5         Q.    Do you know if Akron or Summit

6    provides any financial assistance to TDS, other

7    than paying your base salary and benefits?

8         A.    I do not know that.

9         Q.    Are you familiar with any cost

10   sharing or reimbursement agreements, other than

11   with respect to your own overtime, between TDS

12   and the City of Akron or the Akron Police

13   Department?

14        A.    There is an asset forfeiture

15   sharing agreement.

16        Q.    Please describe that.

17        A.    It is based on the federal

18   government guidelines of assets that are seized

19   in a prosecution, and they will be divided up

20   between the government and the agencies that

21   provide assistance to the TDS.

22        Q.    When you say, "Between the

23   government and the agencies," you are talking

24   about the federal government?

25        A.    Yes, sir.

Page 153

1          Q.    And do you know how that division

2     is worked out as between the federal government

3     and the state agencies?

4          A.    I know that I provide a DAG form.

5     I write out how many hours I have invested in

6     the case, and someone up the chain determines

7     what percentage each city or municipality will

8     receive from the assets.

9          Q.    What is the DAG form?

10          A.    Department of Justice.

11                MR. CIPRIANI:  Deputy Attorney

12     General Form.

13          Q.    That's your understanding?

14          A.    Yes, sir.

15          Q.    I just want to make sure.  You are

16     sworn, and he's not.

17          A.    Right.

18          Q.    And when you are talking about

19     asset forfeiture, what types of assets are we

20     talking about?

21          A.    Anything seized of value.

22          Q.    Such as?

23          A.    It could be cars, cash, bank

24     accounts, houses, jewelry.

25          Q.    Would you have any sense on an

Page 154

1    annual basis how much the City of Akron or the

2    Akron Police Department receives pursuant to

3    this asset forfeiture sharing agreements?

4           A.    No, I do not.

5           Q.    Do you know where these DAG forms

6    are maintained?

7           A.    No, sir, I do not.

8           Q.    Do you personally maintain copies

9    of the DAG forms that you completed?

10          A.    I do not.

11          Q.    Where do you send them?

12          A.    To one of the administrative staff

13   at the Cleveland Drug Enforcement

14   Administration office to be processed.

15          Q.    Do you know who in particular?

16          A.    Ashley -- for the life of me, I

17   can't think of her last name right now --

18   Williams.

19          Q.    Do you know what Ms. Williams does

20   with them?

21          A.    No, sir, I don't.

22          Q.    Now, the last time we talked, you

23   testified that there was no opioid crisis in

24   Akron before 2012; do you remember that

25   testimony?

Page 155

1          A.     Yes, sir.

2          Q.     And is that still your testimony?

3                 MR. LEDLIE:  Object to the form.

4    Misstates his testimony.

5          A.     Yes, sir, I still believe that the

6    epidemic did not hit prior to 2012.

7          Q.     Is it your view that there is now

8    an opioid crisis or epidemic in Akron?

9          A.     Yes, sir, there is.

10         Q.     How to you describe that crisis or

11   epidemic?

12         A.     An overwhelming medical problem in

13   the opioids in our geographical area of

14   Northeastern Ohio.

15         Q.     What are the elements of that

16   overwhelming medical problem?

17         A.     The amount of time and money spent

18   by the fire department, the police department,

19   the emergency rooms, the coroner's office

20   investigating and following up on overdoses and

21   overdose deaths within our region.

22         Q.     And you believe that this epidemic

23   or crisis -- do you prefer one of those two

24   terms?

25         A.     It doesn't matter to me.

1        Q.    Okay.  You believe this epidemic or

2   crisis drug began sometimes between 2012 and

3   2019, correct?

4        A.    The crisis, I do have an opinion.

5   The crisis has been ongoing throughout the

6   2000s.  It continued to evolve.  I don't

7   believe it turned into an epidemic until after

8   2012, but there has been a continual opioid

9   crisis in the geographical area of Summit and

10  Northeastern Ohio.

11       Q.    When do you believe it became an

12  epidemic in the Akron area?

13       A.    I think that's one of those

14  questions that, based on my training,

15  experience in the field, and doing my job, that

16  those are information I've learned as a TFO and

17  an Akron police officer.

18            I have a hard time disseminating

19  what I'm authorized to say legally.

20            MR. BENNETT:  So I'll remind the

21  witness that he is not authorized to give

22  personal opinions regarding nonpublic facts or

23  information you acquired as part of the

24  performance of your task force officer duties.

25  Information you learned outside of the cases

                                        Page 157

1    you investigated, as a TFO, then you may

2    answer.

3            A.    And therein lies the problem.  I

4    believe that most of what I learned as a TFO

5    would give me the idea of what years that

6    epidemic started.  So unfortunately, I'm not

7    authorized to answer that.

8            Q.    Let me ask a different question.

9    What changed, what was it that was not an

10   epidemic before and that became an epidemic,

11   what was the difference, was it just a matter

12   of magnitude, was there an event?

13           A.    I don't think there was one

14   specific event.  I think it was a continued

15   growth of the crisis that turned into an

16   epidemic, whether it is sheer volume of

17   victims, of individuals, that overwhelmed all

18   the resources we had in the area.

19           Q.    And your view is that sometime

20   between 2012 and 2019, the sheer volume took

21   an -- increased, correct?

22                 MR. LEDLIE:  Object to the form.

23           A.    Yes, I believe that's a fair

24   statement.

25           Q.    Now, originally, you said you

1    didn't care whether I used "crisis" or

2    "epidemic," and we were both using it

3    interchangeably, and then you kind of drew a

4    distinction; do you recall that testimony?

5         A.    Yes, sir.

6         Q.    What is your understanding of

7    crisis and how does that differ in your mind

8    from that of an epidemic?

9         A.    Are you asking my personal opinion?

10        Q.    Well, your opinion as someone who

11   has been on the front lines in Akron for

12   decades fighting --

13        A.    I would say that the crisis is

14   something we are still combatting.  We were

15   still able to handle a percentage, you know, a

16   larger percentage of it, the state, keep pace

17   with it, even though it continued to evolve.

18             As we continued to lose ground on

19   it, that was still a crisis, until we were

20   completely overwhelmed.  I would say that would

21   be the epidemic.

22        Q.    So in your mind, it is just an

23   order of magnitude, an epidemic is greater than

24   a crisis; is that a fair summary?

25             MR. LEDLIE:  Object to form.

Page 159

1          A.     Yes, sir.

2          Q.     And was there a certain event or

3     series of events that, in your mind, caused the

4     crisis to evolve into an epidemic?

5          A.     I don't believe I'm authorized to

6     answer that.

7               MR. BENNETT:  The extent that that

8     requires you to rely on nonpublic information

9     you learned at the Department of Justice, you

10    can't answer.

11              To the extent that it's information

12    beyond that that you can answer, whether that's

13    related to Akron and Summit County resource

14    issues or information you learned that is

15    public, then you may answer.

16         A.     I don't believe I can answer that.

17         Q.     Are you familiar with the scope of

18    the opioid crisis or opioid epidemic in

19    jurisdictions outside of Akron and Summit

20    County?

21         A.     No, sir, I am not.

22              Well, take that back.  I'm aware of

23    the opioid epidemic and crisis as it pertains

24    to Ohio, Northeastern Ohio, and through the

25    TDS.  A lot of my cases are not in Akron and

1      Summit County, they are in Northeastern Ohio,
2      so I'm aware of Northeastern Ohio.
3              Q.    But, for example, are you able to
4      make a comparison between the situation here
5      and the situation, for example, in Kentucky?
6              A.    No, sir, I'm not.
7              Q.    How about other parts of Ohio,
8      other than where you focused?
9              A.    No.  My knowledge and intelligence
10     on the opioid epidemic is for this area.
11             Q.    Forgive me if I'm asked this
12     before, but do you investigate issues involving
13     heroin and fentanyl at all?
14             A.    I do not, minus what we said about
15     pill presses.  If I investigate a pill press
16     and there is fentanyl, then that will fall
17     under the scope of my investigations.
18             Q.    Because in your mind a counterfeit
19     drug is a form of diversion?
20             A.    Yes, sir.
21             Q.    And when we talk about an opioid
22     crisis or an opioid epidemic, do you
23     include -- do you draw a distinction between
24     prescription opioids and nonprescription
25     opioids?

Page 161

1            MR. LEDLIE:  Object to the form of
2      the question.
3            A.    No, I don't.  Only because I
4      believe that the opioid epidemic led to the
5      illicit opioid epidemic.
6            Q.    You mean the prescription --
7            A.    Yes.  The addiction to the
8      prescription opioids have led to the heroin and
9      the fentanyl and the illicit drugs.
10           Q.    And what is the basis for that
11     belief?
12           A.    The opioid addiction.  People I've
13     seen that are abusing opioids, prescription
14     opioids, when they can't get a continued
15     prescription from a physician, when they can't
16     afford to buy the pills, that they turn to
17     heroin.
18           Q.    And do you talk to these people?
19           A.    Sometimes.
20           Q.    How often do you talk to the people
21     who have started with prescription opioids and
22     then can't get the pills and then turn to
23     heroin or fentanyl or some other form of
24     illicit drugs?
25           A.    I don't know how many times I have

1    talked to them, but hundreds of times over the

2    last 15, 20 years in law enforcement and

3    working narcotics.

4            Q.    How has it come up?

5            A.    Normally during an interview

6    investigation of a doctor shopper.

7            Q.    How many interviews do you think

8    you have conducted of doctor shoppers?

9            A.    Hundreds.

10           Q.    And in these interviews, do you

11   always ask how they started on opioids?

12           A.    Yes, sir.

13           Q.    And how often -- do you take notes

14   of these interviews?

15           A.    I type up a report.

16           Q.    Do you maintain these reports?

17           A.    The City of Akron does.

18           Q.    Where are they maintained?

19           A.    The record room.

20           Q.    What are they called?

21           A.    Reports of Investigation.

22           Q.    And you open one every single time

23   that you talk to a doctor shopper, for example?

24           A.    No.

25           Q.    When do you prepare a report and

Page 163

1    when do you not prepare a report?

2         A.    When there is a criminal

3    investigation where a criminal charge is filed.

4         Q.    I know there is some -- well, in

5    what circumstances do you talk to a doctor

6    shopper where there is no criminal

7    investigation?

8         A.    That person could end up becoming a

9    source.

10        Q.    Well, aren't you investigating at

11   that point?

12        A.    But those aren't reports typed

13   on -- source information doesn't go on a report

14   of investigation.

15        Q.    In these reports of an

16   investigation, when you talk to the doctor

17   shoppers and they tell you that they started

18   off on prescription opioids, is that something

19   that you write down?

20             MR. LEDLIE:  I'm going to object to

21   the extent that this calls for the tools and

22   techniques of case investigation of diversion

23   cases.  The actual tools and techniques that

24   the detective employs would be subject to law

25   enforcement privilege.

Page 164

1            If you want to talk generally,

2     without going into the tools and techniques

3     that he utilized, but you are talking about a

4     specific report of investigation, and there is

5     no way that I can see that you can do that.

6            MR. ROMAN:  I'm talking about

7     general practice, and I can assure you that we

8     just spent the last two and a half hours with

9     Det. Moran asking him about specific reports

10    that he filed on behalf the Cleveland Police

11    Department.

12            MR. LEDLIE:  I don't represent the

13    Cleveland Police Department.

14            MR. ROMAN:  I understand you don't.

15    Are you instructing the witness not to answer?

16            MR. LEDLIE:  I'm instructing the

17    witness not to reveal the tools and techniques

18    that you use to investigate specific

19    investigations.  To the extent that you can

20    answer his question without doing that, you may

21    do so.

22            MR. ROMAN:  I'm not sure this is a

23    tool and technique.  This is a reporting

24    procedure that I'm asking about.

25            MR. LEDLIE:  If I understand your

Page 165

1    question, it is in these reports of
2    investigation, which is a specific case, when
3    you talk to a doctor, they would then tell you,
4    you go into the contents of an interview of a
5    doctor shopper, that's a tool and technique of
6    an investigation.
7                MR. ROMAN:  I'm asking what he
8    writes down.
9                MR. LEDLIE:  Oh, is that your
10   question?
11               MR. ROMAN:  Yeah.
12        Q.    So you interview someone.  You are
13   investigating the doctor shopper and you
14   interview that person.
15        A.    Okay.
16        Q.    And that person tells you, "I
17   started on prescription opioids."  Do you write
18   that down in your reports?
19        A.    Not always, no.
20        Q.    When do you do it and when do you
21   not do it?
22        A.    Normally what I write down on the
23   report would be the elements of the crime.  Our
24   prosecutor's office wants to make sure you ask
25   the physician, did they write the prescription.

Page 166

1   The doctor shopper is someone who has multiple

2   physicians' prescription.

3                   THE WITNESS:  Am I going past the

4   scope?

5                   MR. LEDLIE:  Yeah.  You're going

6   into how you build a case, how you build the

7   contents of the case for the prosecutor.  I'm

8   going to object and assert -- not just object,

9   I'm going to assert a privilege, a law

10  enforcement and prosecutorial privilege as to

11  that.

12                  MR. ROMAN:  We have a witness here

13  who has made a broad statement that people who

14  are overdosing on nonprescription opioids

15  started on prescription opioids, and I'm trying

16  to test that assertion, and you are precluding

17  me from doing so.

18                  MR. LEDLIE:  I'm not precluding you

19  from doing that.  You asked him how he went

20  about getting that information.  He's answered

21  your questions, but now you are getting into

22  how you actually build an individual case.

23                  MR. ROMAN:  Well, no.  I'm trying

24  to figure out -- so I'll tell you exactly where

25  I'm going.  It's no secret here.

1          What I'm trying to do is find out

2     whether this information is in reports.  My

3     guess is if it is anything like Cleveland,

4     that's an overstatement as to how often this

5     fact shows up in these reports, and I'm just

6     trying to lay a foundation for that.  I don't

7     think we have received the reports, which is a

8     different issue.

9          MR. LEDLIE:  Reports of

10    investigations have been made available to you,

11    thousands of them.  And he has already answered

12    that he doesn't always write down this piece of

13    information.  So you have been allowed to

14    inquire into that, but I'm not going to

15    allow how he builds -- he was just going into

16    something as to how he builds the elements of a

17    crime and what goes into that.  That I'm not

18    going to allow.

19          MR. ROMAN:  Let me ask a different

20    question.

21         Q.    Why do you ask -- you say you

22    always ask whether the person started on

23    prescription opioids?

24         A.    I never use the word "always."  The

25    majority of the time, yes, I ask that.

1      Q.    Why do you do that?

2      A.    To get a feel for the person, put

3  them at ease and start talking to them, as part

4  of the investigative technique to develop a

5  rapport.

6      Q.    When you write it down that the

7  person started on prescription opioids, for

8  what purpose are you doing that?

9            MR. LEDLIE:  Objection, and

10  privilege as to the purpose for which he would

11  write down a report of investigation, the

12  prosecutor's office, he already described.  To

13  ask any further questions beyond that is

14  privileged.

15      Q.    I apologize if I have already asked

16  this before, but generally, I know you don't

17  like the word "always," but generally, if

18  somebody tells you they started on prescription

19  pills in these reports and the investigations,

20  do you generally write that down?

21      A.    Probably not.

22      Q.    How often would you say?

23      A.    Not very often.

24      Q.    Can you give me a percentage of the

25  time that someone -- that folks have told you

Page 169

1    that they started on prescription opioids

2    before turning to heroin and fentanyl and other

3    types of illicit opioids?

4           A.    It would be a guess.

5           Q.    So you don't know whether it is

6    more than 50 percent?

7           A.    I would be guessing.

8           Q.    Okay.  So you don't know?

9           A.    I could give my guess, but I don't

10   know if you want a guess.

11          Q.    I don't want your guess.

12          A.    Okay.  No, I don't have a number in

13   my head where that is a certain percentage that

14   I think would be more accurate than another

15   percentage.

16          Q.    You can't say whether it is more

17   than half or not, can you?

18          A.    No, I cannot.

19                      -   -   -   -   -

20                (Thereupon, Deposition Exhibit 11,

21                Designated Confidential, Multi-Page

22                ██████████████████████████████████

23                ████████████████████████████████

24                marked for purposes of

25                identification.)

Page 170

1                - - - - -

2       Q.    Det. Leonard, I handed you --

3            MR. BENNETT:  Counsel, before we

4  begin questions on this exhibit, the United

5  States would seek to have the majority of this

6  exhibit maintained as confidential and may have

7  some redactions.

8  ████████████████████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████

13 ██████████████████████████████████████████████████

14 ███████████████████████████████████████████

15 ██████████████████████████████████

16            To the extent other questions may

17 be asked regarding the annual report or the

18 emails, we intend to request that remain

19 confidential, but you would be able to ask this

20 witness within the scope of his authorization

21 ██████████████████████████████████████████████

22 █████████████████████████████████████████

23 ██████████████████████████████████

24            That is a DEA document and a

25 federal document, it contains federal

Page 171

1    information that is subject to law enforcement

2    and other privileges.

3                    MR. ROMAN:  Let's see how much we

4    can get with this one.

5         Q.    Det. Leonard, I'm handing you what

6    has been marked as Akron 00113527 -- I

7    misspoke.

8                    Det. Leonard, I'm handing you what

9    has been marked as Exhibit 11, which is a

10   multi-page document bearing production numbers

11   Akron 001135275 through 5406.

12                   Let me just first ask, have you

13   seen this document before?

14        A.    Earlier today, yes.

15        Q.    Not beforehand?

16        A.    No, sir.

17        Q.    You will see on the first page, the

18   center of this email, is an executive assistant

19   and training coordinator with the Ohio

20   H-I-D-T-A, HIDTA; do you see that?

21        A.    Yes, sir.

22        Q.    And you understand that to be a

23   acronym for the High Intensive Drug Trafficking

24   Area, correct?

25        A.    That's correct.

Page 172

1         Q.     Have you had any involvement with

2    HIDTA?

3         A.     I have had training in HIDTA, yes.

4         Q.     What type of training?

5         A.     That's where some of the

6    surveillance classes that we spoke of earlier

7    were conducted.

8         Q.     Do you recall when those took

9    place?

10        A.     No, sir.

11    ███   ████████████████████

12   ███████████████████████████████

13   ███████████████████████████████

14   █████

15          ██████████████████████████

16  ████████████████████████████████████

17   ███████████

18                 MR. ROMAN:  We are good with that.

19                 MR. BENNETT:  So far, assuming it

20   is within the scope of his authorization, he

21   can answer about questions on that page.

22                 MR. ROMAN:  Okay.

23                 MR. BENNETT:  Just so you know,

24   it's 5333 is where it starts that we have

25   issues.

Page 173

1    Q.    So this is a page -- page 288

2  appears within the 2017 annual report of HIDTA,

3  and you see the cover page on page 283, if you

4  want to go back to that.

5    A.    I saw that page.  Thank you.

6    Q.    So this page has got -- the top

7  says HIDTA Threat Assessment And Strategy

8  Assessment; do you see that?

9    A.    Yes, sir.

10    Q.    In the second paragraph, it reads,

11  "In response to the 2017 Ohio HIDTA drug threat

12  survey and during the majority of interviews

13  conducted in 2017, law enforcement officials

14  identified opioids as the greatest drug threat

15  in the Ohio HIDTA region"; do you see that?

16    A.    Yes, sir.

17    Q.    If you go above that, to the first

18  paragraph, it say, "Fentanyl and its analogs

19  have become the primary drug threat in the Ohio

20  HIDTA region"; do you see that?

21    A.    Yes, sir.

22    Q.    And first of all, do you agree with

23  that statement?

24         MR. LEDLIE:  Object to the form of

25  the question.

Page 174

1          A.     Yes, sir.

2          Q.     And since when have, in your

3     mind -- I'm sorry.

4                 Is this true today, that fentanyl

5     and its analogs are still the primary drug

6     threats in the Ohio HIDTA region?

7                 MR. BENNETT:  Objection.  Scope.

8     To the extent that your personal opinion would

9     rely on nonpublic facts, you are not authorized

10    to answer.

11                To the extent that you have a

12    personal opinion that is based on public facts

13    or are non-DOJ information, you may answer.

14         A.     I'm not going to be allowed to

15    answer that one.

16         Q.     I think I know what is going to

17    happen when I ask about this, but before 2017,

18    did you have a view as to whether or not

19    fentanyl and its analogs had become the primary

20    drug threat in the Ohio HIDTA region?

21                MR. BENNETT:  Objection.  Scope.

22    Same instruction.

23         A.     Again, all my information would

24    have come through as a TFO.

25                MR. BENNETT:  Just so you are

Page 175

1    aware, officer, if you obtain public

2    information as a TFO, you may answer based on

3    that public information.

4              THE WITNESS:  Yes, sir.

5         Q.    The next sentence on page 288

6    reads, "The primary source of the fentanyl

7    being transported and sold in Ohio is Mexican

8    DTOs"; do you see that?

9         A.    I'm not sure which paragraph you

10   are in, sir.

11        Q.    Still the first paragraph, second

12   sentence.

13        A.    Okay.

14        Q.    Do you see that now?

15        A.    I do.

16        Q.    DTO is an acronym for drug

17   trafficking organization?

18        A.    That's correct.

19        Q.    And do you agree or disagree with

20   that statement that as of 2017, the primary

21   source of the fentanyl being transported and

22   sold in Ohio was Mexican DTOs?

23             MR. BENNETT:  Objection.  Scope.

24   Same instruction.

25        A.    My answer would be the same, that I

1    would be unauthorized to answer that.

2           Q.    Could you please turn to the page

3    Bates stamped 336.

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████████████████

7    ████████████████████████████████████

8    believe this witness -- and I'm going to

9    instruct this witness that he's not authorized

10   in the scope of his authorization to answer any

11   questions based on any official information he

12   has received from the Department of Justice and

13   his work as a task force officer.

14          Q.    Are you going to follow that

15   instruction?

16          A.    Absolutely.

17                MR. ROMAN:  Why don't we go ahead

18   and take a lunch break.

19                (Recess taken.)

20                MR. WINKELMAN:  On the record.

21             EXAMINATION OF PATRICK LEONARD

22   BY MR. WINKELMAN:

23          Q.    Good afternoon, Det. Leonard.

24          A.    Good afternoon.

25          Q.    Before the break, you and my

Page 177

1    esteemed colleague had been talking a little

2    bit about counterfeit drugs, and I think you

3    referred to them as pill presses; is that

4    right?

5          A.    Some of the investigations that

6    were pill presses have been investigated, yes.

7          Q.    And how would you define a pill

8    press?

9          A.    A machine used to fabricate a pill.

10         Q.    More generally, how would you

11   describe pill press operations?

12         A.    I've seen pill presses that produce

13   one pill at a time and some that produce

14   multiple pills, but there is a die-cast in it

15   that when the press is activated, it would

16   create a pill to look like another pill, a

17   legitimate pill.

18         Q.    Generally speaking, who operates

19   these pill presses?

20         A.    Criminal element.

21         Q.    Is it always a criminal element?

22         A.    Well, if they are making illicit

23   drugs, yes.

24         Q.    Are you aware of any of the

25   defendants in this case operating pill presses?

```
 1              MR. LEDLIE:  Object to the form of
 2    the question.
 3         A.    No, I'm not.
 4         Q.    Would you agree that pill presses
 5    have contributed to the opioid crisis or
 6    epidemic?
 7         A.    Yes.
 8         Q.    Could you say what portion or do
 9    you have an estimate of what portion of your
10    investigations involved pill presses?
11         A.    It's a small percentages.  I
12    couldn't give you a percentage, but it's -- I
13    don't spend a lot of time on pill presses.
14         Q.    Under 50 percent then?
15         A.    Yes.
16         Q.    Under 25?
17         A.    Yes.
18         Q.    You mentioned several other forms
19    of diversion as well: pill theft, pill sharing,
20    prescription forgery; do you remember that?
21         A.    Yes.
22         Q.    Do those also involve criminal
23    elements?
24         A.    Yes.
25         Q.    And are you aware of the defendants
```

Page 179

1    in this case engaging in any of those

2    activities?

3                MR. BENNETT:  Objection.  Scope.

4    To the extent that that calls on you to discuss

5    investigations you have done as a task force

6    officer, you are not authorized to answer;

7    otherwise, you may answer.

8        A.    I guess I'm not authorized to

9    answer.

10       Q.    Fair enough.  Does the task force

11   monitor diversion or keep statistics on the

12   rate of diversion on either Akron or Summit

13   County or Northern Ohio?

14               MR. BENNETT:  Objection.  You may

15   answer regarding publicly disclosed.

16               A VOICE:  Is anybody there?

17               MR. ROMAN:  Sorry.  We have only

18   been going a few minutes here, maybe four or

19   five questions, and we were on mute.  I'm

20   sorry.

21               MR. BENNETT:  And again, I'll state

22   my objection to the scope.  You are not

23   authorized to disclose internal statistics that

24   DEA have produced to the task force.  To the

25   extent that it is public or publicized, you may

Page 180

1    answer.

2         Q.    And to clarify, I'm only asking if

3    the statistics are kept, not what those

4    statistics are.

5         A.    Either way, I don't supply

6    information towards the statistics or produce

7    any.

8         Q.    You're not aware of any statistics

9    kept by the task force?

10        A.    I'm not aware of any.

11             MR. LEDLIE:  Object to the form of

12   the question.

13        Q.    To the best of your knowledge, do

14   some of the diverted opioids that you

15   investigate or become aware of come from

16   outside of the Akron area?

17        A.    Yes.

18        Q.    What percentage would you say?

19        A.    That would again fall under the

20   scope of my position as a task force officer.

21        Q.    Are you aware of the percentage

22   though?

23             MR. BENNETT:  Objection.  You are

24   not authorized to answer any information

25   regarding nonpublic information you have

Page 181

1      obtained as a task force officer.

2           Q.    Again, I'm asking whether you are

3      only aware of that information, as

4      distinguished from not that that information

5      is.

6                 MR. BENNETT:  Understood, but the

7      fact of whether is exists or not is in and of

8      itself DEA DOJ information that he is not

9      authorized to disclose.

10          A.    I'm going to refuse to answer.

11          Q.    Understood.  But is it your

12     understanding that some opioids, for example,

13     come from, say, Southern Ohio?

14          A.    Yes.

15          Q.    And surrounding states?

16          A.    Yes.

17          Q.    And from foreign countries?

18          A.    As an Akron police officer prior to

19     becoming a task force officer, I don't know

20     that I've ever investigated any that have come

21     from legitimate -- if are we talking about

22     prescription medications from out of the

23     country.

24          Q.    What about nonprescription

25     medications?

1           A.    I don't know that I've had any
2      investigations on any investigations prior to
3      2012 that came from out of the country.
4      Prescription, scheduled, nonscheduled, I don't
5      know that I did any investigations.
6           Q.    Have you had any investigations
7      that involve counterfeit drugs coming from
8      foreign countries?
9           A.    Again, I'm not authorized to answer
10      that question, from my position.
11           Q.    Do you have any knowledge -- do you
12      have any knowledge of drugs coming from foreign
13      countries, counterfeit or otherwise, that were
14      part of publicly filed and concluded
15      investigations?
16           A.    I do not.
17           Q.    And again, do you have any
18      knowledge of either the Akron Police Department
19      or the task force keeping any statistics on
20      foreignly imported prescription opioids or
21      nonprescription drugs or counterfeit drugs?
22                 MR. BENNETT:  Objection to the
23      scope.  To the extent that it calls for
24      information regarding task force statistics
25      that are kept and not publicized, he is not

Page 183

1    authorized to answer that question.  Otherwise,
2    from the DEA's perspective, you may answer.
3          A.    I don't have any information on
4    those records being kept or information on
5    those records.
6          Q.    Do you yourself keep those type of
7    statistics?
8          A.    No, sir.
9          Q.    When does the task force or the
10   Akron Police Department decide to open a case,
11   or how do cases come to it?
12         A.    We get different cases in various
13   ways.  It can be a citizen calling, complaining
14   that a family member is being overprescribed by
15   a certain physician.  We could get some of the
16   overdoses where the prescription bottles are
17   available at the scene of the overdose.  We
18   have sources that provide information.  There
19   is really no end way to say that someone
20   couldn't start a case.  It's just how the
21   information is gathered or who sends it to us.
22         Q.    What would you say is the most
23   common source of the case coming to you?
24         A.    Gosh, I get them in so many
25   different, various ways, that I don't know if

Page 184

1    there is a common one.

2              For the doctor shopper, it would be

3    a pharmacist calling me and saying that they

4    tried to put a prescription through, and it was

5    denied because another prescription had already

6    been filled on that insurance and someone was

7    doctor shopping.

8         Q.    Have you ever received tips from

9    other government agencies or law enforcement

10   agencies?

11        A.    Yes.

12        Q.    Any other policies or procedures on

13   when you open a case or when you have received

14   enough information to begin an investigation?

15             MR. BENNETT:  Objection.  To the

16   extent that this calls for the internal

17   deliberative process of starting cases within

18   the DEA, you are not authorized to answer,

19   regarding any particular policies or

20   thresholds.

21             To the extent you can answer

22   generally, or non-DEA information, then the

23   scope doesn't apply in that situation.

24             MR. LEDLIE:  As to the time period

25   prior to 2012 when you were working exclusively

Page 185

1    for the City of Akron, I would join in the
2    objection, to the extent that any policy or
3    procedures of the police department on how to
4    investigate cases would fall into the police
5    officer privilege, police investigation
6    privilege.
7                 MR. BENNETT:  Generally speaking.
8         A.    Generally speaking, I would open
9    cases.  If I received a number of cases at the
10   same time within the same timeframe, I would
11   prioritize the cases and work the cases that
12   were more egregious than others, until I could
13   catch up with the lower-level cases.
14        Q.    Did the types of sources you relied
15   on for cases change once you joined the task
16   force, moving from ATD to the task force?
17        A.    I don't know if it really changed
18   or if we had -- because I was a task force
19   officer, I have access to additional
20   information that I wouldn't have had as an
21   Akron police officer.
22        Q.    What type of information is that?
23                 MR. BENNETT:  Objection.  That's
24   outside of the scope of his authorization.  As
25   far as what information that he needed as a

Page 186

1  task force officer to generate cases, he is not

2  authorized to answer that question.

3                      -  -  -  -  -

4                 (Thereupon, Deposition Exhibit 12,

5                 Designated Confidential, Email

6                 Chain, Subject: Expert Witness,

7                 Beginning with Bates Label AKRON

8                 ████████████████████████████████

9                 of identification.)

10                     -  -  -  -  -

11        Q.    Det. Leonard, I'm handing you what

12  ██████████████████████████████

13             Det. Leonard, do you recognize this

14  document?

15        A.    I do.

16        Q.    I've handed you what has been

17  marked as Exhibit 12.

18             MR. BENNETT:  This doesn't look

19  like the same tab.  It doesn't look like tab

20  19.

21             MR. LEDLIE:  This is an email dated

22  ██████████████████████████████████████████

23             MR. WINKELMAN:  Sorry.  Tab 18.

24             MR. LEDLIE:  Before you ask your

25  question, I have a -- this seems to go into

Page 187

1    police investigation of a particular case, but

2    I guess I'll wait to hear what your question

3    is.

4              MR. BENNETT:  And actually, before

5    we get to the question, the United States

6    intends to claw this document back.  It

7    includes internal deliberations and prosecutory

8    information.  It also includes information

9    protected by criminal rule 6(e), which is grand

10   jury information.  So Det. Leonard will not be

11   authorized to answer any questions regarding

12   the particulars of contents of these emails.

13             MR. WINKELMAN:  Do you intend to

14   claw this back in its entirety or provide a

15   redacted version?

16             MR. BENNETT:  So, counsel, I don't

17   have a good answer for your question, and the

18   reason I don't have an answer is I haven't had

19   a chance to fully review the document.  We just

20   received it this morning.

21             I understand this to be part of the

22   internal deliberations on prosecuting a

23   particular case and the use of expert witnesses

24   by the United States and by the detective, and

25   as a result, it is going to have to be vetted

                                        Page 188

1    before I know if it is going to be clawed back

2    in full or clawed back and redacted.

3                MR. WINKELMAN:  Just to clarify,

4    there are portions of this email that are

5    pre-2012.  I assume your objection does not

6    extend to those communications?

7                MR. BENNETT:  It does extend to

8    those communications, because I believe this

9    case began as a joint case, and that the

10   communications with the expert, potential

11   expert were -- it was in a continuing course of

12   conduct that resulted in a federal case, is my

13   understanding.  So we will have to review it.

14               MR. WINKELMAN:  Well, we reserve

15   our -- your position is noted.

16               MR. BENNETT:  Any portions of the

17   emails that were pre-2012, you will be able to

18   ask about, but I don't know enough about the

19   case to know whether any of that is going to be

20   implicated after 2012.

21               So at this point, he's not

22   authorized to answer any questions about the

23   contents of these emails, and we will certainly

24   be seeking some redaction, if not clawing back

25   the document in full.

Page 189

1          Q.    Well, just to get this on the

2     record, this is an email dated June 25, 2012,

3     ████████████████████████████████████████████

4     correct?

5          A.    Yes, sir, that's correct.

6          Q.    And the opening or the top email is

7     from your email address?

8          A.    That's correct, from my Akron email

9     address.

10         Q.    From your Akron Police Department

11    email address?

12         A.    Yes, sir.

13         Q.    Not your Department of Justice

14    email address?

15         A.    That's correct.

16         Q.    And I may have already asked you

17    this, but do you recognize this document?

18         A.    Yes, sir, I do.

19         Q.    And did you send this in the

20    regular course of your business?

21              MR. BENNETT:  Objection.  Beyond

22    the scope of his authorization.  He's not

23    authorized to answer that question.

24         Q.    Are you going to follow that

25    instruction?

```
                                              Page 190
 1         A.    Yes, I am.
 2         Q.    All right.  We will move on.
 3               MR. WINKELMAN:  This one is tab 19.
 4                  -  -  -  -  -
 5               (Thereupon, Deposition Exhibit 13,
 6               Designated Confidential, 6-30-2014
 7               Email Chain, with Attachment,
 8               Beginning with Bates Label SUMMIT
 9               001233671, was marked for purposes
10               of identification.)
11                  -  -  -  -  -
12         Q.    Det. Leonard, I've just handed you
13    what has been marked Exhibit 13.
14         A.    Yes.
15         Q.    Do you recognize this document?
16         A.    I saw it earlier today.
17         Q.    And this is an email from
18    Courtney --
19    ███        ███████
20    ███        █████████████████████████████
21    number SUMMIT_001233671.
22         A.    Correct.
23         Q.    You were a recipient on this email?
24         A.    Yes, I was.
25         Q.    Did you receive this email in the
```

Page 191

1    normal course of your business?

2           A.    I did.

3           Q.    Did you maintain it in the normal

4    course of your business?

5                 MR. LEDLIE:  Object to the form of

6    the question.

7           A.    It was maintained in my email.  I

8    didn't do anything special to maintain it.

9           Q.    Do you have any reason to believe

10   this is not the same email you received?

11          A.    I do not.

12          Q.    Det. Leonard, this, to the best of

13   my knowledge, was not included in Akron's

14   document production.  Do you know why that

15   would be?

16          A.    I do not.

17          Q.    Did you provide all your emails for

18   your attorneys to review when you were

19   collecting documents?

20          A.    My secretary provided everything.

21          Q.    And if I could direct your

22   attention to pages starting at 701.

23          A.    Okay.

24                MR. BENNETT:  So, counsel, since we

25   didn't see this document before this morning,

Page 192

1   is that part of the Model Policy on the Use of

2   Opioid Analgesics, or is this something else?

3   701 comes after 700, but I don't know if it is

4   all the same document.  It is all under the

5   same tab, but I don't know if it's all the same

6   document.

7            So to the extent that this is from

8   the state medical board, we don't have an

9   objection.  To the extent that this is an

10  internal document regarding how investigations

11  are done, we would object to this witness

12  answering any questions about it, and we would

13  seek to have this clawed back if this is a DEA

14  document.

15           MR. LEDLIE:  If it happens to be an

16  Akron document, we would have a separate

17  objection and clawback, because this seems to

18  go into the tools and techniques and red flags

19  to investigate positions, starting the 701.

20           I have no objection to the document

21  entitled Model Policy on the Use of Opioid

22  Analgesics.

23       Q.   Det. Leonard, this document,

24  starting at 701, to the best of your knowledge,

25  is this part of the Model Policy on the Use of

1    Opioids and Analgesics in the Treatment of

2    Chronic Pain?

3          A.    I don't believe it is.

4          Q.    You believe it is a separate

5    document?

6          A.    Yes, sir, I do believe it is a

7    separate document.

8          Q.    Do you know what this document is?

9          A.    Starting on 701?

10         Q.    Yes.

11         A.    This would be --

12               MR. LEDLIE:  I'm going to instruct

13    the witness not to answer, if doing so would

14    discuss anything --

15               MR. BENNETT:  Counsel, can we go

16    off the record and speak to the witness about

17    privilege issues outside the room?

18               MR. WINKELMAN:  Yes.

19               (Pause.)

20               MR. WINKELMAN:  Let's go back on

21    the record.  Counsel, would you mind putting

22    that on the record.

23    ████████████████████████████████████████████

24    ████████████████████████████████████████████

25    ████████████████████████

Page 194

1             MR. WINKELMAN:  701, I believe.

2             MR. BENNETT:  What did I say?

3             MR. WINKELMAN:  You said 71.

4             MR. BENNETT:  701 through 719,

5     ending numbers of 719.

6             After talking with the witness, we

7     are not able to determine the origin of this

8     document, and as a result, we do not have a

9     position at this point on whether it be clawed

10    back on not.

11            To the extent that it is a

12    Department of Justice or otherwise a federal

13    document, we will be seeking to claw that back

14    once we can determine that.  To the extent it

15    is not a federal document, we don't have the

16    authority to claw it back; however, we will

17    instruct the witness that he is not authorized

18    to discuss any of the techniques in here or

19    confirm whether or not he does or uses any of

20    these techniques and whether he agrees with the

21    statements made in this document.

22        Q.    Det. Leonard, do you recognize this

23    document, again starting at page 701?

24        A.    I just saw it today, so I didn't

25    recognize it as previously seeing it, no.

1          Q.    And this document appears to

2     describe -- it says, quote, "Here are some red

3     flags to look out for with respect to a

4     physician's medical practice"?

5          A.    That's correct.

6          Q.    So this appears to list things that

7     one would look for when investigating

8     physicians?

9                MR. BENNETT:  Objection.  To the

10    extent you are asking the officer to confirm

11    that that's what one would look for, you are

12    not authorized to answer the scopes and

13    techniques that you may use or confirm any of

14    the information at this time.

15                MR. WINKELMAN:  I'm just asking at

16    this point what the document describes.

17                MR. BENNETT:  Objection.  He said

18    he had never seen the document before.  I

19    object to the form of the question.  The

20    document speaks for itself.

21          Q.    You can answer.

22          A.    I'm not authorized to answer at

23    this time.

24          Q.    Prior to joining the task force,

25    are these the types of red flags you would use

Page 196

1   to look or investigate physicians?

2            MR. LEDLIE:  I would instruct the

3   witness that as to the tools and techniques of

4   his investigation of drug diversion cases

5   during his time for the City of Akron, that

6   under the police investigation privilege, he is

7   instructed not to answer that question.

8            If you can answer it from some

9   other source of information, you can do so.

10       A.   I cannot answer it from any other

11  source of information, so I'm unauthorized to

12  answer at this time.

13       Q.   Have you received similar docs

14  describing red flags for other forms of

15  diversion?

16            MR. BENNETT:  Objection.  To the

17  extent that it would be beyond the scope of

18  your authorization, that you received it as DOJ

19  information or DEA information.

20       Q.   I'm just asking whether you

21  received he documents, not exactly what they

22  describe.

23       A.   I still don't believe I'm

24  authorized to answer at this time.

25            A VOICE:  Are we still waiting for

Page 197

1     the witness to come back?

2              MR. ROMAN:  Sorry.  We were --

3     again, you missed about three or four minutes.

4     I'll take the fall again.  I'm sorry.  We won't

5     do it again, promise.

6         Q.    Det. Leonard, in deciding whether

7     to investigate diversion or in the course of

8     investigating diversion, have you ever tried to

9     determine the total number of opioids being

10    prescribed to residents in Akron, Summit

11    County, or Cuyahoga County?

12              MR. BENNETT:  Objection.  Beyond

13    the scope of your authorization, to the extent

14    the calls for the investigations you've done as

15    a task force officer or information involved in

16    your investigation as a task force officer.

17        A.    I'm unauthorized to answer that

18    question.

19        Q.    And again, at this point, I'm just

20    asking whether you have tried to determine

21    those total numbers.  I'm not asking what those

22    numbers are.

23              MR. BENNETT:  Objection.  Same

24    instruction.  Beyond the scope of his

25    authorization, as far as what he did,

Page 198

1      regardless of whether he tells you the results

2      of what he did.

3          A.    Again, I'll follow the advice of

4      counsel.

5          Q.    This might get the same response

6      then, but have you ever tried to compare the

7      number of opioids against the number of -- the

8      population of those cities or counties?

9              MR. BENNETT:  Objection.  Outside

10     the scope of his authorization, to the extent

11     that it calls for information he tried to

12     obtain as a result of his task force officer

13     investigation.

14         A.    I'll try to answer.

15         Q.    Understood.  Would you agree that

16     there are reasons why the number of pills in an

17     area, even if they were greater or higher

18     relative to the local population, there might

19     be justification for that?

20             MR. BENNETT:  Objection.  To the

21     extent this calls for a personal opinion

22     regarding nonpublic facts or information you

23     acquired as part of the performance of your

24     duties as a task force officer, if you can

25     answer not relating on nonpublic facts or

1    information, then you may answer.

2         A.    I'm not able to answer on nonpublic

3    facts and information.

4         Q.    If there were a hospital located in

5    a county or a town with a relatively small

6    population, would it surprise you to see a high

7    volume of opioids distributed in that area?

8         A.    I guess I would be curious as to

9    how high the volume would be.  It could

10   and -- the answer is yes or no, based on, you

11   know, the facts and circumstances surrounding

12   it.

13        Q.    Why might it not surprise you or

14   under what facts or circumstances would it not

15   be surprising to see a high ratio in a small

16   town that has a hospital?

17             MR. LEDLIE:  Objection to the form

18   of the question.  The hypothetical is improper.

19   Scope.

20             MR. BENNETT:  I'll also remind you

21   of the scope, that you can't use nonpublic

22   facts or information to answer the hypothetical

23   opinion question.

24        A.    Growing up in the Steel Valley, the

25   Youngstown area, there seems to be a high

1    percentage of women developing breast cancer.

2    I don't know if it has to do with the steel

3    mills.  So different areas could generate

4    different medical conditions.

5          Q.    Why would those medical conditions

6    or the prevalence of those medical conditions

7    lead to a higher volumes of opioids?

8          A.    I think cancer leads to

9    prescriptions of opioids.  So I'm saying there

10   could be a medical condition in some areas that

11   may lead to that.

12         Q.    And in some of those cases, the

13   prescription of opioids would be medically

14   necessary?

15         A.    In some, yes.

16               MR. LEDLIE:  Object to the form of

17   the question.  It calls for expert testimony.

18         Q.    Det. Leonard, you had previously

19   testified, I believe, that prior to 2012, you

20   did not have access to the ARCOS database?

21         A.    That's correct.

22         Q.    Once you joined the task force, did

23   you obtain access to ARCOS?

24               MR. BENNETT:  Hold on a second.

25   Okay.  You can answer that.

Page 201

1          A.    I do have access to ARCOS.  I don't

2     have -- use it personally, so if I wanted to

3     request a password for the ARCOS database, I

4     could have one, but I don't access ARCOS.

5          Q.    Do you ever use ARCOS or the data

6     collected from ARCOS?

7               MR. BENNETT:  Objection.  To the

8     extent that this calls for you to disclose

9     investigative techniques, the effectiveness of

10    which would be impaired, you may not answer.

11    To the extent that it relates to your general

12    duties as a task force officer, you may answer

13    at a high, general level regarding your duties.

14         A.    At a general level, I do have

15    access to information from ARCOS.

16         Q.    But you don't have your own user

17    name and password?

18         A.    I don't use it enough to have my

19    own user name and password.

20         Q.    Someone else gives you that

21    information?

22               MR. BENNETT:  You can answer that

23    question.

24         A.    Yes.

25         Q.    For what purpose?

1          MR. BENNETT:  Objection.  To the

2     extent that this calls for investigative

3     techniques, you may not answer.  To the extent

4     it relates to your general duties as a task

5     force officer, you may answer regarding your

6     general duties.

7          A.    It relates to investigative

8     techniques, so I'm not authorized to answer.

9          Q.    Even generally speaking?

10         A.    Yes.

11         Q.    When did you start using ARCOS?

12    Did you use it right when you joined the task

13    force, or did it start later?

14         A.    I believe I have only logged in one

15    or two times, and it has been several years

16    since.  Somewhere in the middle, a couple years

17    after I was there.  It isn't a database that a

18    new guy in the unit is going to jump in and

19    say, "Let me jump into ARCOS."  I didn't know

20    it existed for a couple of years.

21         Q.    A couple of years when you were on

22    the task force?

23         A.    Yes.  Still learning the systems

24    and learning the databases and learning the

25    different computer systems that the DEA

Page 203

1    provided.

2         Q.    Are you aware of anyone else at the

3    task force who uses ARCOS?

4              MR. BENNETT:  Object.  To the

5    extent it calls for investigative techniques of

6    the task force, you are not authorized to

7    answer.  Regarding the general duties as a task

8    force officer, you can answer whether there are

9    general duties of people at the task force

10   generally who use ARCOS.

11        A.    So the diversion investigators

12   normally use ARCOS, all agents and TFOs have

13   access to ARCOS.  I don't believe most TFOs

14   typically use ARCOS.

15        Q.    Do other members of the Akron

16   Police Department have access to ARCOS?

17        A.    Not that I'm aware of.

18        Q.    None of them do?

19        A.    No, sir.  Can I clarify that?  We

20   do have other TFOs on the Akron Police

21   Department that are assigned to different parts

22   of the DEA.  Whether they are on the other

23   teams and they, I'm sure, would have access to

24   some things, I'm not aware of.  So there could

25   be someone else on the Akron Police Department

1   that has access.  I'm not sure if they do or

2   not.

3           Q.    So there are other members of the

4   Akron Police Department that are assigned to

5   other DEA task forces?

6           A.    Yes.

7           Q.    What task forces are those?

8           A.    They are just assigned to the DEA

9   task force.  I'm not sure that they all have

10  names.  They are not part of the TDS.

11          Q.    Do you have a general sense of what

12  other types of task forces they are or what

13  they are directed at?

14          A.    The general DEA, and they work

15  illicit drugs.  Whether it's the 3,000 foot

16  overview, investigating cartels, money

17  laundering, narcotics coming in from other

18  countries, they are assigned to those task

19  forces.  They are not really task forces.  They

20  are assigned to those teams of the DEA.

21          Q.    Why wouldn't the task force member

22  use ARCOS?

23                MR. BENNETT:  Objection.  To the

24  extent that this calls for investigative

25  techniques, you are not authorized to answer

Page 205

1    it.  To the extent that you can answer at a

2    high level of general duties of task force

3    officers, you may answer.

4          A.    I guess at a high level, we have

5    intelligence analysts that can run that

6    information for me, and then I can get that

7    information from them.

8          Q.    So they can give you the data

9    that's available on ARCOS without you having to

10   access it?

11         A.    Yes.

12         Q.    Would it be more difficult to do

13   your job without ARCOS?

14               MR. BENNETT:  Objection, to the

15   extent that it calls for you to disclose your

16   investigative techniques.  You can talk about

17   your general duties.  You may answer.

18         A.    It's a good tool.

19         Q.    You find it useful?

20         A.    I can say it is useful, yes.

21         Q.    Would your job be more difficult

22   without it?

23         A.    Potentially, yes.

24         Q.    It would potentially be harder to

25   identify diversion without ARCOS?

Page 206

1              MR. LEDLIE:  Object to the form of

2    the question.

3          A.    I don't know that it would make a

4    huge difference.  The majority of cases I have

5    worked over the last 22 years as a narcotics

6    detective I haven't used ARCOS.  It's been

7    beneficial when it has been used, but it isn't

8    something that I rely on, that's bread and

9    butter that I have to have.  Does that sound

10   fair enough?

11         Q.    That sounds fair enough.

12         A.    Okay.

13         Q.    Det. Leonard, have you ever heard

14   the term "suspicious special order report"?

15         A.    Yes, I have.

16         Q.    In what context?

17         A.    Something that would generate

18   possibly the investigation into why a party or

19   a -- if someone is receiving too much

20   medication, someone received shipments ahead of

21   time, if pharmacies were receiving more

22   medication than they needed or should have.

23   I'm not sure I am answering your question.

24         Q.    Well, to start off, in your

25   experience, who drafts a suspicious order

Page 207

1  report, who prepares them?

2         A.    I don't know who prepares them.  I

3  know I have seen a couple of emails reference

4  suspicious order reports in my employment from

5  the 3,000 foot of DEA.  I have never had one

6  directed to me or had one assigned to me to

7  investigate.  I know they exist, and I have

8  heard the term before.

9         Q.    How have you received them?

10              MR. LEDLIE:  Object to the form of

11  the question.

12         A.    I'm not 100 percent sure.  I

13  believe it was an email that listed a

14  suspicious order report, but, like I say, I

15  have had so many emails, it's not something I

16  would follow up on, so I wouldn't pay

17  particular attention to that email, that it's

18  going to be assigned to me.

19              I may assist somebody else, but

20  it's not going to be a case I'm going to open.

21         Q.    You wouldn't follow up if you had

22  received a suspicious order report?

23         A.    That email wouldn't have come to

24  just me.  It would have gone to the whole unit

25  and other individuals, and it would have been

Page 208

1    more than an information gathering, to let me

2    know that, hey, this is going on, your

3    assistance may be needed later to assist in

4    this.

5         Q.    Would somebody else be responsible

6    for following up on a suspicious order report?

7         A.    Yes, sir.

8         Q.    Who would that be?

9              THE WITNESS:  Am I allowed to say

10   who I think it would be?

11             MR. BENNETT:  To the extent that

12   you can answer about the general operations of

13   the task force but not the specific

14   investigative techniques.  So to the extent

15   that you can answer generally what happens, if

16   you know, then you may answer that.

17        A.    Generally, I believe that would

18   fall under the diversion unit, and that's

19   separate from the TDS.

20        Q.    This is a diversion unit with the

21   APD or with the --

22        A.    No, no.  We're talking about the

23   DEA.

24        Q.    With the DEA?

25        A.    Yes.

Page 209

1          Q.    Are there particular agents who
2     would be responsible for that?
3          A.    There are diversion investigators
4     who would be responsible for that.
5          Q.    What are their names?
6          A.    I don't know.  I don't believe I'm
7     at liberty to say their names.
8                MR. BENNETT:  I was going to
9     object.  It is beyond the scope of his
10    authorization.  It's not something he's
11    authorized to discuss.
12         Q.    So just to clarify, do you not know
13    or are you not authorized?
14         A.    No.  I know the agents' names, the
15    investigators' names.  I don't believe I'm
16    authorized to say their names.
17         Q.    But those agents would be
18    responsible for following up on suspicious
19    order reports?
20         A.    Right.  They are not agents, they
21    are investigators.
22         Q.    What's the difference?
23               THE WITNESS:  Am I allowed to say?
24               MR. BENNETT:  You can answer that
25    question.

Page 210

1          A.    Agents are sworn law enforcement,

2     they carry guns and have arrest authority.

3     Diversion investigators do not have arrest

4     authority and do not carry sidearms.

5          Q.    So these investigators would be

6     responsible for following up on suspicious

7     order reports?

8          A.    Yes, sir.

9          Q.    Det. Leonard, we are handing you

10    Summit County and City of Akron, Ohio Plaintiff

11    First Amended Responses and Objections to

12    Distributor Defendants' First Set of

13    Interrogatories.

14              MR. BENNETT:  Do you have one more

15    for me?

16              MR. WINKELMAN:  It should be tab

17    20.

18         Q.    Det. Leonard, do you recognize this

19    document?

20         A.    I don't believe I have ever seen

21    this before.  This isn't our -- is this our

22    litigation for this event?

23              MR. LEDLIE:  It's not the

24    complaint.

25         Q.    It's not the complaint.

Page 211

1           A.    I don't know what this is.  I've

2     never seen this.

3           Q.    If I can direct your

4     attention -- do you have any reason to believe

5     that this isn't what it purports to be, which

6     is the city and the county's responses to

7     interrogatories?

8           A.    I don't have any reason to believe

9     it's not what you say it is.

10          Q.    If I can direct your attention to

11    pages 8 through 12.

12               These pages list pharmacies that

13    allegedly have suspicious orders of controlled

14    substances based on ARCOS data.

15          A.    Okay.

16               MR. LEDLIE:  Would there be a

17    confidential designation for this questioning,

18    to the extent it involves ARCOS data?

19               MR. WINKELMAN:  Of course.

20          Q.    Do you see this list of pharmacies?

21          A.    I do.

22          Q.    And before this litigation, were

23    you aware that these pharmacies had high

24    volumes of opioid orders?

25               MR. BENNETT:  Objection.  Scope.

Page 212

1    To the extent that this calls for you to answer

2    regarding information you received or

3    investigations you did as a DEA task force

4    officer, you are not authorized to answer.

5              To the extent that it's information

6    you obtained prior to becoming a task force

7    officer or public officer, you may answer.  You

8    also may answer if any of these individuals

9    have been charged and convicted of a diversion

10   crime.

11        A.    So your question again, please,

12   sir?

13        Q.    Were you aware that any of

14   these -- the pharmacies on this list had high

15   volumes before this case?

16        A.    No.  I never had any information

17   with reference to any volumes at any of the

18   pharmacies.

19        Q.    Are you aware whether any of the

20   defendants filed suspicious order reports about

21   any of these pharmacies?

22        A.    No.  I never received suspicious

23   order reports as an Akron police officer prior

24   to 2012, and I'm unauthorized to answer after

25   2012.

Page 213

1        Q.    And are you aware whether any of

2   the defendants blocked orders to any of these

3   pharmacies or reported orders to the DEA as

4   suspicious?

5        A.    Not information that was ever

6   provided to me.

7        Q.    Do you have any idea why that

8   information would not have been provided to

9   you?

10            MR. BENNETT:  Objection.  To the

11   extent that this calls for the internal

12   deliberative process of the Department of

13   Justice, you are not authorized to answer.

14   Also to the extent that it calls for the

15   investigative techniques, you are not

16   authorized to answer.

17        A.    I'm unauthorized to answer.

18        Q.    Det. Leonard, during your last --

19   or the first deposition, you testified that you

20   started using OARRS, O-A-R-R-S, before 2012?

21        A.    Correct.

22        Q.    Have you since then?

23        A.    Yes, sir.

24        Q.    When?

25            MR. BENNETT:  Objection.  To the

Page 214

1    extent -- this is beyond the scope of his

2    authorization.  To the extent that that is a

3    technique that you use as a DEA task force

4    officer, you are not authorized to answer that

5    question.

6            A.    I'm not authorized to answer.

7            Q.    At a high level, what do you use it

8    for?

9            A.    I'm not authorized to answer that I

10   use it, so I can't authorize if I did, what I

11   used it for.

12               THE WITNESS:  Am I correct in that?

13               MR. LEDLIE:  For the period of time

14   prior to 2012, at a very general level, without

15   revealing your case investigations, I think you

16   may answer that question for the period of time

17   that you were exclusively Akron.

18           A.    I would use it to generate patient

19   profiles, which showed the person's name, the

20   pharmacy name, the number of prescriptions,

21   locations, the date they were filled, the date

22   they were written, and any dates that

23   overlapped on cash pay or insurance pay

24   patients.

25           Q.    So did OARRS primarily contain

Page 215

1   patient information then?

2        A.    It did.  It also contained

3   physician prescribing information.  If you run

4   a physician OARRS, it would show all the

5   patients that a particular physician wrote

6   controlled narcotics to.

7        Q.    So would you run both physicians

8   and patients through OARRS, depending on who

9   you were investigating?

10             MR. LEDLIE:  As to the details of

11  any specific case, I instruct the witness not

12  to answer under the --

13       A.    I run a physician OARRS if I was

14  investigating a physician.

15       Q.    So if you were investigating a

16  particular patient, say, doctor shopping, you

17  might run the patient's name?

18       A.    Yes.

19       Q.    Do you ever use OARRS to check the

20  volume of medications dispensed by a pharmacy?

21             MR. LEDLIE:  Objection and

22  instruction not to answer as to whether you use

23  OARRS to check the volume of medications, if

24  that is a tool and technique of an

25  investigative process.

1          A.     There is limited access for law

2     enforcement to OARRS.  Some of those search

3     engines can only be performed by personnel from

4     the Ohio Board of Pharmacy who manages the

5     OARRS account.  I don't have access to do that

6     and I'm not sure if they do.

7          Q.     So you have access to patient

8     information and physicians, but not pharmacies?

9          A.     Correct.

10          Q.     Does OARRS contain information

11     about pharmaceutical distributors?

12          A.     Not that I'm aware of.

13          Q.     Has OARRS, have you found it useful

14     in investigating diversion?

15          A.     Yes.

16          Q.     Would your job be more difficult

17     without it?

18          A.     More time consuming.

19          Q.     How so?

20          A.     Prior to OARRS, I had to go to

21     every individual pharmacy, have the pharmacist

22     print a patient profile, and then I had to go

23     and enter it in an EXCEL spreadsheet and do

24     what OARRS did manually.

25          Q.     So without OARRS, it would be more

Page 217

1    difficult to detect diversion?

2         A.    I don't know if difficult is the

3    right word.  It wouldn't be any more difficult,

4    it would just be more time consuming to process

5    it.

6         Q.    So it would take more time?

7         A.    Yes, sir.

8         Q.    It would take more effort?

9         A.    Yes, sir.

10              MR. LEDLIE:  Object to the form of

11   the question.

12        Q.    So it would take more effort?

13        A.    It would.

14        Q.    It would take more resources?

15        A.    Yes.

16        Q.    So it would be more difficult;

17   wouldn't it?

18        A.    Okay.  Yes.

19        Q.    Do you know whether any of the

20   defendants have access to OARRS?

21        A.    I do not know that.

22        Q.    To the best of your knowledge, do

23   they have access to OARRS?

24        A.    It depends.  In this litigation?

25        Q.    In this litigation.

Page 218

1              A.    I have no idea if they have access

2      to OARRS.  Wait.  I guess I'm looking -- each

3      individual pharmacy -- a pharmacist does have

4      access to OARRS.  A pharmacist can run a

5      patient and check OARRS.  At a corporate level,

6      I don't know what they do, but individual

7      pharmacists do have access to OARRS.

8              Q.    Individual pharmacists do, but you

9      don't know whether a pharmaceutical distributor

10     has access to OARRS?

11             A.    Correct.

12             Q.    But you would agree if they didn't

13     have access to OARRS, it would be more

14     difficult for them to detect diversion?

15                   MR. LEDLIE:  Objection to the form

16     of the question.

17             A.    Are we talking about pharmacists?

18             Q.    Any entity that didn't have access

19     to OARRS, it would be more difficult for them

20     to detect diversion?

21             A.    Yes.

22                         -   -   -   -   -

23                   (Thereupon, Deposition Exhibit 14,

24                   Designated Confidential, Email

25                   Chain, Beginning with Bates Label

1          AKRON 000367833, was marked for

2          purposes of identification.)

3               -  -  -  -  -

4     Q.    Det. Leonard, I'm handing you what

5  has been marked as Exhibit 14.

6          MR. LEDLIE:  This document I

7  discovered today, and we are invoking

8  attorney-client privilege for Summit County as

9  to the communications between the prosecutor

10  and this officer about a case.  So I'm

11  instructing you not -- I'm clawing this back,

12  and I would ask that this not be addressed at

13  this deposition.

14          MR. BENNETT:  What was your exhibit

15  number?

16     Q.    We will move on.

17          Det. Leonard, would it be fair to

18  say that there are bases to your

19  investigations?

20          That is sort of an unfair question.

21          MR. LEDLIE:  Objection.

22          MR. BENNETT:  To the extent that it

23  does not call for -- objection.  Scope.  You

24  are not authorized to answer the question, to

25  the extent that it calls for your law

                                          Page 220

1    enforcement investigative techniques.  To the

2    extent that you can answer it generally or

3    outside the scope of your task force duties,

4    you may answer.

5            Q.    Let me just break it up a little

6    bit.

7                  At some stage you become aware or

8    get evidence or become aware of a case, and so

9    you open an investigation.

10           A.    Okay.

11           Q.    And then there is an investigation,

12   correct?

13           A.    Yes.

14           Q.    And if there is enough evidence,

15   there may be charges or an indictment?

16           A.    Yes.

17           Q.    And then if that moves forward,

18   there might be a conviction?

19           A.    Correct.

20           Q.    At what point in that process, if

21   at any point, where you have a suspected

22   diverter, do you notify, say, the board of

23   pharmacy or the Ohio Medical Board or the DEA

24   about that suspected diverter?

25                 MR. BENNETT:  Objection.  Scope.

Page 221

1    To the extent that it calls for your

2    investigative techniques, you are not

3    authorized to answer it.  If you can answer it

4    regarding your general duties as a task force

5    officer or your practice outside of being a

6    task force officer, then you may answer it.

7        A.    Anything I'm doing with the DEA I'm

8    going to have a case open and they are already

9    going to know about it.  Unless it is a

10   pharmacy, a pharmacist, or something involved

11   in a pharmacy, I would not notify the pharmacy

12   board.  Unless it is as medical professional, I

13   would not notify the medical board.  So there

14   is no 3,000 foot overview.

15           If it is just a diversion case, it

16   would be processed through the courts and

17   handled appropriately.

18       Q.    Let's take this one at a time.  If

19   it did involve -- if your investigation did

20   involve a pharmacy, say, that was suspected of

21   oversupplying, at what point would you notify

22   the board of pharmacy?

23           MR. BENNETT:  Objection.  Same

24   instruction.

25       A.    I'm trying to think of a way if I

Page 222

1    could answer it.

2         Q.    Let me ask it this way:  When you

3    receive a tip about a suspected -- say a

4    suspected pharmacy, do you notify the board of

5    pharmacy at that point?

6         A.    If I can confirm a tip -- I will

7    try to confirm or deny it first before I waste

8    their time.  If I can confirm that it is a

9    legitimate tip and an investigation is needed,

10   then I will contact them and either ask for

11   their assistance or give them what I've got and

12   pass the case over to them.

13        Q.    How do you confirm a tip before you

14   have begun an investigation?

15             MR. LEDLIE:  Object to the form of

16   the question, and to the extent that that calls

17   for the deliberative process of your

18   investigation under the police officer law

19   enforcement privilege.

20             MR. BENNETT:  And also object to

21   the extent that it relates to law enforcement

22   investigative techniques or internal

23   deliberations of DEA, you are not authorized to

24   answer the question.  But if you can answer it

25   without disclosing techniques or the internal

Page 223

1   deliberative process, then you can answer.

2        A.    I cannot answer without disclosing

3   those techniques, so I'm going to not answer

4   that question.

5        Q.    In the case of a physician, similar

6   question, at what point would you notify the

7   Ohio Medical Board of a suspected diverter?

8             MR. BENNETT:  Objection.  Same

9   instruction.

10            MR. LEDLIE:  Objection.  Same

11   instruction.

12       A.    In the 3,000 foot overview, there

13   is no -- if we needed assistance, I would

14   contact them for assistance, whether it was

15   manpower, if we needed some.  If not, then they

16   would find out when the case came to a close.

17       Q.    In the meantime, what if anything

18   do you do to prevent that entity or suspected

19   entity from engaging in further diversion?

20            MR. LEDLIE:  Object to the form of

21   the question, and to the extent that it goes

22   into your police investigative techniques and

23   tools, I'm going to instruct you not to answer

24   as to your time as a city employee.

25            MR. BENNETT:  I'm also objecting.

Page 224

1    Scope.  You are not authorized to answer to the

2    extent that this question calls for

3    investigative techniques or the internal

4    deliberative process of the Department of

5    Justice, DEA.

6        A.    So from the 3,000 foot, we would

7    conduct an investigation using all of our

8    different techniques, and if we are able to

9    produce enough evidence that it's something we

10   move forward on, then we would move forward

11   with charges.

12       Q.    Is there anything you can do to

13   prevent that entity from, say, if it is a

14   pharmacy prescribing or a physician from

15   overprescribing while the investigation is

16   ongoing?

17           MR. LEDLIE:  Object to the form as

18   hypothetical.  To the extent you are asking

19   about individual cases, I'm going to instruct

20   the witness not to answer any investigative

21   techniques.

22           MR. BENNETT:  Objection.  Same.

23       A.    I'm not going to be able to answer

24   that question.

25       Q.    Once you completed an

Page 225

```
 1    investigation, do you make efforts to get the

 2    board of pharmacy or the medical board to

 3    withdraw or revoke the licenses of, say, a

 4    pharmacy or a physician?

 5              MR. BENNETT:  Objection.  To the

 6    extent that it calls for you to talk about your

 7    investigative techniques or your deliberative

 8    process, you can't, if you can talk about your

 9    general duties as part of your practice, then

10    you can answer.

11         A.    Generally speaking, that wouldn't

12    be something that I would go to a medical board

13    or a pharmacy board for.  If it's a case I'm

14    working, I would have that as part of something

15    I would discuss with my AUSA assigned to the

16    case.  By AUSA, I'm talking about Assistant

17    United States Attorney.

18         Q.    So you personally don't make

19    efforts or reach out to, say, the board of

20    pharmacy or the medical board to ensure that a

21    physician's, say, license was revoked?

22              MR. LEDLIE:  I'm going to instruct

23    the witness not to answer as to any specific

24    case, but if you can answer the question

25    generally.
```

Page 226

1          A.    Generally, I have reached out to

2    those agencies to assist in revoking licenses.

3          Q.    Do you know how long it generally

4    takes them to do that?

5          A.    No, I don't have a timeframe for

6    you.

7          Q.    How long does a typical

8    investigation last, one of your investigations?

9          A.    I guess it depends on what it is.

10   If it's a doctor shopper, it could be done in a

11   couple weeks.  If it's a physician, it could

12   take years.

13         Q.    With a physician, say, what's the

14   average time?

15         A.    It is going to be at least between

16   a year and two.  Physician investigations don't

17   happen quickly.

18         Q.    And what marks the beginning of the

19   investigation; is it getting the tip or getting

20   some -- getting the case from some other

21   source?

22         A.    I guess the beginning of the

23   investigation would be when I start putting my

24   manhours or our unit starts putting our

25   manhours into the investigation.  If someone

1  else had a case, if the pharmacy board had a

2  case for a year and then called us, my case

3  didn't start until they called us.

4       Q.    So the case might not get opened

5  until, say, maybe sometime after you get your

6  first tip about the case?

7            MR. LEDLIE:  Object to the form.

8  Misstates his testimony.

9       A.    A lot of times when manhours are

10 put towards a case prior to the case initiation

11 being opened on the case, in my mind, that case

12 was still opened prior to the case initiation

13 being typed up and started, even though those

14 manhours were prior to the initiation on paper

15 of the case.

16      Q.    But you marked the beginning of the

17 case is when you start putting manhours on it?

18      A.    Yes, sir.

19      Q.    And what marks the end of the case?

20      A.    Normally conviction.

21      Q.    And it is possible that you get a

22 tip well before you start putting manhours in

23 the case?

24      A.    Yes, sir.

25      Q.    And as you said, the diversion or

Page 228

1    suspected diversion may have been going on for

2    some time before that even?

3         A.    I expect it was going on sometime

4    before that.  I don't get the tip the first

5    time someone diverts.

6         Q.    Would it be fair to say that during

7    the course of your investigation then, any

8    delay in the investigation allows the diversion

9    to continue?

10              MR. BENNETT:  Objection.  You are

11   not authorized to answer that question

12   regarding the investigative techniques or the

13   specifics of the investigation.

14        A.    I guess my best answer for that

15   would be that we continue to investigate.  We

16   don't have one investigation open at a time.

17   So we can't control what people continue to do

18   while we are investigating.

19        Q.    So they could continue diverting

20   prescription opioids while the investigation is

21   ongoing?

22        A.    Potentially, yes.

23        Q.    And in your view, have the board of

24   pharmacy and the medical board been acting

25   quickly enough to withdraw licenses of

Page 229

1      physicians and pharmacies?

2                  MR. BENNETT:  Objection.  Beyond

3      the scope of your authorization, to the extent

4      that that is nonpublic information you required

5      as a task force officer.  To the extent that

6      you can answer with an opinion that does not

7      involve nonpublic Department of Justice task

8      force information, then you can answer.

9           A.    I don't have any nonpublic

10     information on that, so I'm not going to be

11     able to answer that.

12          Q.    This might get the same response,

13     but in your view, have the board of pharmacy

14     and the medical board, do they provide

15     effective oversight of physicians and

16     pharmacies?

17                  MR. LEDLIE:  Object to the form of

18     the question.  Calls for a medical and

19     pharmaceutical degree, which he has neither.

20                  MR. BENNETT:  Objection.  Same

21     response from me.

22          A.    Decline to answer.

23          Q.    On the basis of those instructions?

24          A.    Yes.

25          Q.    Not because you don't know?

Page 230

1           MR. BENNETT:  Objection.  Beyond

2    the scope of his authorization, to the extent

3    that it calls for him to talk about knowledge

4    he has as a result of a task force officer

5    that's nonpublic.

6           A.    I'm going to refuse to answer on

7    those grounds.

8           Q.    Det. Leonard, do you have any sort

9    of metric or scale for, say, measuring the

10   magnitude of the cases you work on, or rating

11   them, comparing them against each other, say,

12   based on volume or number of prescriptions

13   written or something along those lines?

14          MR. BENNETT:  Objection.  Beyond

15   the scope of his authorization, to the extent

16   that it is calling for the internal

17   deliberative process of DEA regarding measuring

18   cases and thresholds.  To the extent that you

19   can answer personally what you o, that's not

20   related to the DEA's internal deliberative

21   process, you may answer.

22          A.    Prior to 2012, I would look at the

23   volume of prescriptions that were either forged

24   or overlapped, the number of pills that a

25   prescription was written for, the sheer volume

Page 231

1    of some patients.

2                    If those were -- if I had ten cases

3    and, you know, one of them only had two

4    overlaps and a Vicodin of 20 pills, it would

5    fall to the bottom the pile.  So the higher

6    volume cases I would try to work first.  I

7    didn't really have an official go-by sheet in

8    my head that I would categorize them, but I

9    would try to evaluate them as which ones were

10   more important and which ones were more

11   pressing at the time.

12                    MR. LEDLIE:  If we can take a

13   break.  I need a break.

14                    MR. WINKELMAN:  Okay.

15                    (Recess taken.)

16                    MR. WINKELMAN:  Back on.

17        Q.    So before we continue, just to

18   create a record, I wanted to go back to what we

19   had introduced as Exhibit 12.  It was a June

20   25, 2012 email, and our understanding is that

21   the United States has taken the position that

22   communications in this document, even those

23   that predate Patrick Leonard's joining the DEA

24   task force, so for example in 2011, are

25   nonetheless covered by the DEA's law

Page 232

1    enforcement privilege, and that because this

2    later became a federal case, it is

3    retroactively covered by a privilege, and I'm

4    sure Mr. Bennett will correct me if that

5    misstates their position or clarify as

6    necessary.

7              MR. BENNETT:  So let me clarify,

8    just slightly.  This witness is not authorized,

9    so it is outside of the scope of his

10   authorization, to discuss specific

11   investigations or activities.  Because it is my

12   understanding that this case ultimately became

13   a federal investigation and federal case, it's

14   beyond the scope of his authorization to talk

15   about that, regardless of whether he was a

16   deputized task force officer at the time of the

17   activities or not.

18             So that would be our position.  So

19   he's not authorized under subsection A of his

20   authorization letter dated March 20, 2019.

21             MR. LEDLIE:  And there was an

22   additional objection that the City of Akron had

23   as to that this discussion with an expert

24   witness about a case falls under the law

25   enforcement privilege, but a separate issue

Page 233

1    than the DEA's.

2              MR. BENNETT:  And there may be

3    privileges, and that's the reason why these

4    issues have to be vetted through DOJ and DEA

5    prior to the witness being authorized on behalf

6    of the United States, but what I'm saying is

7    I'm not asserting a specific privilege at this

8    point, I'm only asserting that he's not

9    authorized to talk about this under his

10   authorization letter, and that it may very well

11   be privileged.

12             MR. WINKELMAN:  To clarify, both

13   Akron and DOJ are asserting that privilege,

14   that objection or position at this point,

15   despite this being a case that was publicly

16   filed and I believe led to a conviction,

17   correct?

18             MR. LEDLIE:  The fact that it is

19   public -- you can ask him those questions, but

20   the contents of this email about his

21   communications with an expert is the source of

22   at least Akron's.

23             MR. BENNETT:  And he is authorized

24   to identify individuals who -- including

25   physicians, who were charged and convicted of

Page 234

1    diversion-related offense, but if you want to

2    ask him if the doctor was charged and convicted

3    and the nature of those charges and

4    convictions, he can answer that, but the

5    individual activities or his investigation of

6    that charge specific to those investigations he

7    is not authorized.

8                   MR. WINKELMAN:  So he cannot

9    testify as to, in your position, cannot testify

10   as to how he acquired that case and what he did

11   in the course of the investigation?

12                  MR. BENNETT:  Correct.  My position

13   would be he's not authorized to answer those

14   questions.  How he acquired the case or what he

15   did once he acquired the information, that's

16   beyond the scope of his authorization.

17                  MR. WINKELMAN:  Understood.

18        Q.    Thank you for your patience, Det.

19   Leonard.

20        A.    No problem.

21        Q.    I believe when we concluded, you

22   had just been mentioning a little bit or

23   discussing a little bit about prioritizing your

24   cases based on which ones appeared to be higher

25   volume, and I just wanted to clarify -- well,

Page 235

1    first of all; is that accurate?  Do you

2    remember that testimony?

3         A.    Yes, and that is accurate.

4         Q.    As I understood it, you said that

5    was pre-2012.  To the extent you are able to

6    do -- also do that same sort of measurement or

7    ranking post 2012, once you joined the task

8    force?

9              MR. BENNETT:  Objection.  Beyond

10    the scope his authorization, to the extent it

11    would disclose the internal deliberative

12    process of the DEA.

13              To the extent you can answer about

14    your personal choices, unrelated to the

15    internal deliberative process of the DEA, you

16    can answer.

17         A.    I don't have authorization to

18    answer that question.

19         Q.    But pre-2012, you did engage in

20    that type of ranking or prioritization?

21         A.    I would prioritize cases, yes.

22         Q.    Based on volume?

23              MR. LEDLIE:  Object to the form of

24    the question.

25         A.    Yes, volume was one of the

Page 236

1    ingredients I used to prioritize cases.

2           Q.    What are the other ingredients?

3                 MR. LEDLIE:  Objection.  Asked and

4    answered.

5           A.    If I answer that more, it is

6    telling you how I did my cases, how I decide it

7    would be part of my case investigations.

8           Q.    When you say higher volume, volume

9    based on what, volume of pills, volume of

10   prescription, or some other measure?

11          A.    A combination of both.  Whether it

12   is the number of total prescriptions or number

13   of total pills that were on the prescriptions.

14          Q.    Based on that measurement, what is

15   the biggest opioid case you have ever worked

16   on?

17          A.    I have no idea.

18                MR. BENNETT:  Objection.  To the

19   extent that it calls for investigation and

20   activities you have done as a task force

21   officer.  If you are asking him pre-2012, then

22   I don't have an objection, or if it is a

23   publicly filed case that resulted in a

24   conviction, you may answer the biggest

25   conviction that you have received in a case you

Page 237

1    were involved in.

2         A.    Probably the biggest conviction was

3    the Dr. Harper case, where he pled guilty and

4    was sentenced to 12 years in federal prison.

5         Q.    To go back for one moment, I asked

6    what the other ingredients you used to

7    prioritize your cases were, and you said that

8    your answer would be telling how you did your

9    cases, how you decide would be part of your

10   case investigation.

11            I just want to clarify.  Are you

12   saying you don't know the answer to that

13   question, or are you saying that it is

14   following your counsel's instruction not to

15   answer that question?

16        A.    I'm following my counsel's

17   instruction on investigative techniques and how

18   the cases are decided.

19        Q.    Thank you.

20            You mentioned a Harper case, or the

21   Dr. Harper case was among the convicted cases

22   or cases that ended in convictions was one of

23   the largest you worked on.  Do you recall any

24   others?

25        A.    Dr. Gregory Ingram pled guilty to,

Page 238

1    I think it was, 48 counts of trafficking.  I'm
2    just trying to make sure in my head which ones
3    were convicted and which ones are still open.
4    So I'm not sure which ones have been closed
5    yet.  So I apologize for not --
6           Q.    Take your time.
7           A.    Dr. Heim is closed.  I don't know
8    what his sentencing guidelines were.  That's
9    probably all I can tell you right now.
10          Q.    Were those all pharmacist cases?
11          A.    I don't know what you mean by
12   pharmacist cases.  Those are physicians.
13          Q.    Sorry.  These are all physician
14   cases, physicians who allegedly were
15   overprescribing?
16          A.    Yes.  Not necessarily
17   overprescribing, but some were illegally
18   prescribing.
19          Q.    Writing false prescriptions?
20          A.    Yes, sir.
21          Q.    Where did these cases occur?
22          A.    Those were federal cases, so they
23   were where the 9th District Court of the United
24   States, Northern Ohio.
25          Q.    What drugs are being converted in

Page 239

1    those cases?

2         A.    Let's see, OxyContin, oxycodone,

3    Vicodin, Xanax.  Those were in all the cases.

4    At the time it was primarily Vicodin.

5              Harper was the OxyContin,

6    oxycodone, Xanax, Vicodin, Demerol.  Morphine,

7    I believe, was in the Harper case.  Mostly

8    Percocet for Dr. Ingram.

9         Q.    Who is responsible for

10   investigating that type of diversion, as a

11   general matter?

12             MR. LEDLIE:  Object to the form of

13   the question.  Vague.

14        A.    It would fall into a couple

15   different places.  The Harper investigation

16   started with myself and a member of the board

17   of pharmacy.  Dr. Ingram started with the City

18   of Akron.  Dr. Heim was a federal case.  Just

19   on where the referral comes from and who they

20   go to.

21        Q.    Do you maintain, based on this

22   metric you have provided about higher volume

23   cases and lower volume case, let's start with

24   pre-2012, did you maintain a record or any sort

25   of written report or summary of the cases that

Page 240

1   you ranked by volume?

2         A.    No, I did not.  Those cases I was

3   talking about volume were doctor shoppers.

4   Those were all doctor shopper cases that I was

5   referring to.

6         Q.    Not physician cases?

7         A.    No.

8         Q.    And again, did you maintain any

9   sort of record of those cases you measured by

10  volume?

11        A.    No.

12        Q.    Post 2012, did you keep any sort of

13  record like that?

14        A.    No.

15              MR. BENNETT:  Objection.  Outside

16  the scope of his authorization, to the extent

17  that it calls for the activities as the DEA

18  TDS.  Otherwise, you can answer.

19              MR. LEDLIE:  He did.  He said no.

20        Q.    Have you participated in any

21  programs to combat the opioid epidemic or

22  crisis, whichever you prefer, other than

23  criminal investigations and prosecutions?

24        A.    I'm a member of the Summit County

25  Opiate Task Force.

Page 241

1          Q.    What is that?

2          A.    It is a group of individuals that

3    get together and meets, and there is mental

4    healthcare workers, there is county workers,

5    the Summit County judges, investigators get

6    together to try to brainstorm and find ideas to

7    help curb the problem.

8          Q.    How long have you been a member of

9    that group?

10          A.    Probably about a year now.  Maybe a

11    little over that.

12          Q.    Do you know how long it has

13    existed?

14          A.    No, I do not.

15          Q.    Does it have a budget?

16          A.    I don't know.

17          Q.    Does it expend any resources on

18    programs or things like that or provide other

19    programs to others?

20          A.    All the programs offered are

21    through the county, so they are -- I don't know

22    what everybody's individual budget is.  I know

23    that judges show up on -- you know, these are

24    Monday to Friday, 8:00 to 5:00, so everyone is

25    on the city or county dime when they are there,

```
                                        Page 242
 1    so no one is incurring additional expenses.  I
 2    don't know if they have a budget assigned to
 3    that group or not.
 4         Q.    What is that group's purpose or
 5    mission?
 6         A.    The Summit County drug initiative
 7    for opiates, so I'm sure the goal is to protect
 8    the citizens of Akron and get those that need
 9    help.
10         Q.    I guess one way of putting this is
11    if they appear to have meetings on a regular
12    basis, but don't offer programs, so what
13    exactly --
14         A.    I didn't say they don't offer
15    programs.  I said I don't know what programs
16    they offer if they do, and I don't know what
17    their budget is if they have one.
18         Q.    So they might offer programs, you
19    are just not aware?
20         A.    Correct.
21         Q.    Who else is involved in that task
22    force?
23         A.    The judges, there is the Summit
24    County Health Department, other law enforcement
25    agencies.
```

Page 243

1          Q.     Which agencies?

2          A.     The Cuyahoga Falls Police

3    Department, I know I have seen the chief of

4    police, Chief Davis there at those meetings.

5          Q.     Which judges are there?

6          A.     Judge Joy -- Judge Joy -- I can't

7    think of her last name.  Normally it is the

8    drug court judges that interact with a lot of

9    the defendants in drug cases.

10          Q.     Has that task force been

11    successful?

12          A.     I don't know what the results are.

13          Q.     Has there been any measurement of

14    its results?

15          A.     Not that I'm aware of.

16          Q.     I think I just have a few more.

17                 Det. Leonard, do you use email in

18    your work?

19          A.     I do.

20          Q.     How many email addresses do you

21    have?

22          A.     Two.

23          Q.     Is one of them

24    ████████████████████████████████

25          A.     Yes.

1   ██      ████████████████████████████

2   usdoj.gov?

3          A.    Yes.

4          Q.    No other email addresses?

5          A.    No.  Those are my work.  There is a

6   shortened one for the DEA internal, I think,

7   but it's the same email.

8          Q.    What do you mean by that, a shorter

9   one?

10          ██      ███████████████████████

11  ██  █████████████████████████████████

12  to the same email address, it's just written

13  different.

14          Q.    Do you delete old emails?

15          A.    Some, yes.  None since this case

16  started.

17          Q.    How old are your oldest emails?

18          A.    I don't know.  When I log in, I

19  read the new emails.  I don't go back and read

20  old emails.

21          Q.    You don't know how far back they

22  go?

23          A.    No.

24          Q.    Have you submitted all of your

25  potential relevant emails to counsel for

Page 245

1    review?

2         A.    My secretary submitted everything.

3         Q.    Did you personally review those?

4         A.    I did not.

5         Q.    Do you use a cellphone for work?

6         A.    I do.

7         Q.    And do you send text messages for

8    work?

9         A.    Sometimes, yes.

10        Q.    Did you make your messages

11   available to counsel so they could review your

12   text messages?

13        A.    No, I did not.

14             MR. WINKELMAN:  I think we are

15   ready to take a break.

16             (Pause.)

17         EXAMINATION OF PATRICK LEONARD

18   BY MR. MOYLAN:

19        Q.    Det. Leonard, my name is a Daniel

20   Moylan for the CVS defendants.  I'm going to

21   have just a few questions about the Dr. Harper

22   investigation, and I can represent that I've

23   had a chance to review the exhibits that I plan

24   to use with counsel for the government,

25   Mr. Bennett and his colleague at the DEA, and I

1    think we have reached an agreement that at

2    least with respect to the federal government's

3    objections, some of the things we have heard

4    today that they do not object to these points,

5    but if there are further --

6            MR. BENNETT:  In other words, there

7    were certain documents that you showed us that

8    we did object to.  It's my understanding you

9    are not using those?

10           MR. MOYLAN:  Correct.

11           MR. BENNETT:  The documents that we

12   did indicate to you that we did have objections

13   on behalf of the DEA, there were some of those

14   as well.  Assuming you show him the ones we had

15   no objection to, that would be our position,

16   but if something comes up as we are going

17   through, if there is a misunderstanding, we

18   will let you know.

19           MR. MOYLAN:  Sure.  Thank you.

20           MR. LEDLIE:  For the record,

21   counsel has not shared any of these with me.

22   So we will be dealing with them as we go

23   through them.

24           MR. MOYLAN:  Right.

25       Q.   So I'm going to start with Exhibit

Page 247

1    15.

2                    -  -  -  -  -

3              (Thereupon, Deposition Exhibit 15,

4              2014 Final Rule Rescheduling of

5              Hydrocodone Combination Products

6              from Schedule III to Schedule II,

7              was marked for purposes of

8              identification.)

9                    -  -  -  -  -

10        Q.    There were just a few questions in

11   your prior deposition about the rescheduling of

12   hydrocodone combination products.  I know it's

13   been a while, but do you remember you were

14   asked a little bit about that in your prior

15   deposition?

16        A.    I do.

17        Q.    And you may have indicated that you

18   believe that that took place sometime in 2008?

19        A.    Yeah.  I believe it was like

20   October, if my memory serves me correctly.

21        Q.    Right.  What I wanted to do is go

22   through this exhibit and see if this may

23   refresh your memory as to when this scheduling

24   occurred.

25              It's a little bit hard to read, and

Page 248

1    I apologize for that, but this is a document

2    that is the final rule for the rescheduling of

3    hydrocodone combination products from schedule

4    III to schedule II.

5              As you look through the document,

6    do you see the indication that this is the

7    final rule for that rescheduling?

8         A.    Yes, sir, I do.

9         Q.    And in the first sentence under the

10   heading Summary, the document speaks that,

11   "With the issuance of this final rule, the

12   Administrator of the Drug Enforcement

13   Administration reschedules hydrocodone

14   combination products from schedule III to

15   schedule II of the Controlled Substances Act";

16   do you see that?

17        A.    Yes, sir.

18        Q.    And do you see that the effective

19   date for this rule is October 6, 2014?

20        A.    Yes, sir, I do.

21        Q.    Does that refresh your recollection

22   as to the timeframe when hydrocodone

23   combination products were rescheduled?

24        A.    Yes, sir.

25        Q.    That's all with that.

```
                                            Page 249
 1                    -  -  -  -  -
 2              (Thereupon, Deposition Exhibit 16,
 3              Designated Confidential, 9-25-2010
 4              Email, Bates Label AKRON 001142381,
 5              was marked for purposes of
 6              identification.)
 7                    -  -  -  -  -
 8         Q.    I just handed you what has been
 9    marked as Exhibit 16.  This is an email chain
10    from a person named -REDACTED-, to
11    you dated September 25, 2010.  Does this look
12    like a document that you have seen before
13    today?
14         A.    Yes, sir.
15         Q.    And do you recall receiving this in
16    connection with your work as an Akron police
17    detective?
18         A.    I do.  I couldn't tell you the
19    exact time I remember seeing it, but, yes.
20              MR. LEDLIE:  This appears to be a
21    confidential tip from a pharmacist, and it
22    should be clawed back under the police
23    investigation privilege.
24              MR. MOYLAN:  Now, with respect to
25    that request, or the indication that you would
```

Page 250

1    like to claw this back, would there be -- let

2    me ask the witness first, if I can.

3           Q.    Is this a person who you regard as

4    a confidential source?

5                 MR. LEDLIE:  I would instruct -- I

6    would instruct the witness that he can answer

7    whether it is a source.  Whether or not they

8    are confidential, I think is irrelevant to the

9    privilege of law enforcement.

10          A.    Yes, -REDACTED- is a source.

11          Q.    Okay.  Without going into specifics

12   about that individual, you can confirm from the

13   information that you are looking at that he is

14   a pharmacist?

15                MR. LEDLIE:  I would ask that you

16   not use this document to answer that question,

17   but if you have an independent recollection of

18   his status, then you can, but I'm clawing back

19   this document and I don't think there should be

20   any questions about this document.  If you want

21   to ask about the subject matter, go ahead.

22                MR. MOYLAN:  I think what we might

23   want to do is the possibility of redacting

24   information to the extent it concerns a

25   confidential source, if you have an opportunity

Page 251

1    to confirm that it is a confidential source.

2                MR. LEDLIE:  It doesn't matter to

3    me whether it is confidential or not.  This is

4    the details of an investigation, the tools and

5    techniques of his craft, and I believe it is

6    privileged under the law enforcement privilege.

7    So I don't think that --

8                MR. MOYLAN:  So to confirm, your

9    position is that the receipt of an email from a

10   third party is a technique used by law

11   enforcement?

12               MR. LEDLIE:  A source, a source of

13   information about a potential diversion case,

14   yes, absolutely.

15               MR. MOYLAN:  To the extent it

16   concerns a confidential source, I think we

17   would be amenable to the redaction of the name,

18   but to suggest that this is a technique used by

19   law enforcement, we would disagree with that.

20               MR. LEDLIE:  Your position is

21   noted.

22        Q.    In connection with the

23   investigation of Dr. Harper, in general, do you

24   believe that you received tips from pharmacists

25   about his prescribing practices?

Page 252

1          MR. BENNETT:  Objection.  Beyond

2     the scope of his authorization.  The Dr. Harper

3     investigation and prosecution was a federal

4     case, and under his authorization letter, he is

5     not authorized to disclose any information

6     regarding any investigations or activities.

7               So to the extent it relates to Dr.

8     Harper, he is not authorized to disclose

9     activities and investigations.

10          MR. MOYLAN:  Let me clarify,

11     because I think that the number of the

12     documents that we have reviewed together

13     earlier, including this document, do reflect

14     tips from pharmacists, and I had understood

15     that the government did not have an objection

16     to the extent that those tips were prior to the

17     Det. Leonard's work on the TDS.

18               So let me limit the scope of my

19     question to detective work for the Akron Police

20     Department before February 2012.

21          MR. BENNETT:  And counsel, I'm not

22     sure I understood, and this was probably my

23     fault, that it was the Dr. Harper

24     investigation.

25               I understood you saying that he had

Page 253

1   received tips, and again it may be my

2   misunderstanding, that he had received tips

3   about pharmacists prior to 2012, which I did

4   tell you that we didn't have a position on

5   because it was prior to 2012.

6            If, however, they were tips that

7   related to a federal case, which is what Dr.

8   Harper was, then that would be the -- even

9   though it was prior to him joining the task

10  force, it would still be the investigation and

11  activities of a federal case, and as a result,

12  he is not authorized at this time to answer any

13  questions about that investigation.

14            MR. MOYLAN:  I think every document

15  that we reviewed concerned the Dr. Harper

16  investigation, with the exception of several,

17  and all of them I thought we were clear

18  involved activities before Det. Leonard joined

19  the TDS.  So that's significantly different

20  than what I think we discussed earlier.

21            MR. BENNETT:  Counsel, may we take

22  a moment with you off the record and look at

23  those again?

24            MR. MOYLAN:  Sure.

25            (Recess taken.)

                                              Page 254

1           MR. MOYLAN:  Back on the record.

2                Just another brief statement.  We

3    have had a chance to confer with counsel for

4    the government and counsel for the plaintiffs,

5    and I think we have reached an accommodation

6    with respect to some of the documents that we

7    are going to review.

8                In essence, what we talked about

9    with respect to these exhibits is redacting the

10   names of individual persons who came forward as

11   part of the Harper investigation prior to 2012,

12   and otherwise, the information on the documents

13   would not be redacted or clawed back.

14               If I am under a misconception with

15   respect to that, as we go through them, we will

16   discuss it again as need be, but that's my

17   understanding of the concept that we agreed to.

18          MR. BENNETT:  That is correct.  The

19   only thing the government would add is that he

20   can confirm whether or not he received this

21   information, but that he will not be talking

22   about any subsequent activities or what he did

23   as a result of it or how it relates to any of

24   his investigations of Dr. Harper.

25          MR. MOYLAN:  And that is correct.

Page 255

1   I agree with that.

2            MR. LEDLIE:  I have not seen all

3   the documents.  Conceptually, I believe we have

4   an understanding, but we will just have to look

5   at the documents where you are going.

6            MR. MOYLAN:  Understood.

7   Understood.  With respect to Exhibit 16, I

8   think subject to what we discussed, this

9   document would not be clawed back, but we would

10  redact names as appropriate within the email.

11       Q.   My question is, can you confirm

12  that you did receive a complaint from a

13  pharmacist at the location indicated on the

14  email in or around September 2010 concerning

15  Dr. Harper's prescribing practices?

16       A.   Yes, sir, I did.

17                 -  -  -  -  -

18            (Thereupon, Deposition Exhibit 17,

19            Designated Confidential, 11-05-2010

20            Email, Bates Label AKRON 000368237,

21            was marked for purposes of

22            identification.)

23                 -  -  -  -  -

24       Q.   I just handed you what has been

25  marked as Exhibit 17.  This is another email

1  that appears to be from -- well, it appears to

2  be an exchange between you and another

3  individual, based on the last email, the one

4  earliest in time, it ends with a -REDACTED-.  That

5  email appears to be from November 5, 2010.

6           As you look through the content of

7  this, does this appear to be another complaint

8  with respect to Dr. Harper that you received

9  from a pharmacist?

10           MR. LEDLIE:  Before you can answer

11  that, I have no objection to that question with

12  respect to the email dated 8:27 a.m.  I do

13  believe that his response should be redacted in

14  its entirety under the police investigation

15  privilege.

16           MR. BENNETT:  We also believe this

17  is beyond the scope of his authorization to

18  answer any questions about the first part of

19  that email, his response.

20           MR. MOYLAN:  I'm going to reserve

21  on that, but I understand the position.

22      Q.   Just starting with the bottom

23  email, can you confirm that this appears to

24  have been a complaint received from a

25  pharmacist concerning Dr. Harper's prescribing

Page 257

1    practices?

2         A.    Yes.

3                   -  -  -  -  -

4              (Thereupon, Deposition Exhibit 18,

5              Designated Confidential, 4-11-2011

6              Email, Bates Label AKRON 001142386,

7              was marked for purposes of

8              identification.)

9                   -  -  -  -  -

10                  -  -  -  -  -

11             (Thereupon, Deposition Exhibit 19,

12             Harper Search Warrant, was marked

13             for purposes of identification.)

14                  -  -  -  -  -

15        Q.    I'm going to show you two exhibits

16   now together, and I can represent for the

17   record that these came to us as an email with

18   its attachment.  So I'm going to hand you both

19   together.  I'm marking them separately.  It

20   will be Exhibits 18 and 19.

21             My first question is really just a

22   confirmation of something that we discussed off

23   the record among counsel and the witness, but

24   in looking at the email and the attached -- the

25   attached warrant, it is a warrant affidavit

Page 258

1    actually, a search warrant affidavit, does this

2    appear to be a document that you recall seeing

3    before today?

4         A.    Yes, it is.

5         Q.    And does this email and search

6    warrant and the evidence relate to the

7    investigation of Dr. Harper?

8         A.    It does.

9         Q.    And do you understand that this

10   warrant or this affidavit was in support of a

11   state search warrant?

12        A.    It was, but to be specific, this is

13   not an affidavit for the search warrant.  This

14   was a rough draft by Agent Tom Miksch that was

15   sent to me.  This is not what was typed by me

16   and given to a judge as an affidavit.  Part of

17   this information is in there, but this is not

18   the actual affidavit that was turned in.

19        Q.    Right.  Understood.  That makes

20   perfect sense.  And actually, if you wouldn't

21   mind, I want to replace the version that's

22   going to be in the record with a clean copy.  I

23   apologize for giving you my version.

24             MR. LEDLIE:  And, counsel, to be

25   clear, the identity of the individuals will be

Page 259

1     redacted in this or not?

2               MR. MOYLAN:  Yes.  I think that's

3     fair.

4          Q.    And just on the draft search

5     warrant affidavit, I would like to direct your

6     attention to the third paragraph from the

7     bottom that begins, "Statement to affiant by

8     agent Thomas Miksch"; do you see the

9     paragraph --

10         A.    Yes, sir.

11         Q.    -- that I'm referring to.

12               And do you see in that first

13    sentence that I was reading from, a statement

14    that, "On January 4, 2011, Miksch personally

15    spoke with -REDACTED-, a licensed pharmacist

16    in the State of Ohio, regarding Dr. Adolph

17    Harper MD, a prescriber in Akron, Ohio"; do you

18    see that?

19               MR. LEDLIE:  Counsel, I requested

20    and now move to strike that.  If you could

21    reask the question leaving out the identity of

22    the pharmacist, her name.

23               MR. MOYLAN:  That's fine.  I

24    apologize.  Let me -- we will strike that or

25    remove it from the deposition record, as we

Page 260

1    can.

2         Q.    But my question to you is:  Is this

3    consistent with your understanding of the

4    investigation with Agent Miksch regarding a

5    pharmacist by this name who came forward on or

6    around January 4, 2011?

7              MR. BENNETT:  Objection.  Beyond

8    the scope of his authorization.  To the extent

9    that are asking about his activities or his

10   knowledge of the investigation, he can answer

11   whether or not he is aware of the named

12   pharmacist providing information, providing a

13   tip.

14        A.    I'm aware that -REDACTED- is a

15   pharmacist and -REDACTED- did provide a tip.

16             MR. LEDLIE:  Let's just redact it.

17   A pharmacist.

18        A.    I'm sorry.  A pharmacist.

19        Q.    Without referring to the name, try

20   to remember that caveat, but without referring

21   to -REDACTED- name again, do you know where this

22   individual pharmacist worked?

23        A.    I do.

24        Q.    And where was that?

25        A.    -REDACTED- worked at the Rite Aid Pharmacy

Page 261

1    on Kenmore Boulevard in Akron.

2         Q.    Thank you.  If I could direct your

3    attention to the next page, in the middle of

4    that page is a long paragraph that indicates

5    that on March 15, 2011, Agent Miksch met with

6    another individual, who is indicated as being a

7    licensed pharmacist in the State of Ohio,

8    regarding information about Dr. Harper; do you

9    see that?

10        A.    I do.

11        Q.    And can you verify that this named

12   individual is also a licensed pharmacist who

13   came forward as part of the Harper

14   investigation?

15        A.    Yes, I can.

16        Q.    And do you know where this

17   individual worked?

18        A.    I do.

19        Q.    And where was that?

20        A.    ███████████████████  on ████

21   ██████████████  in Akron.

22        Q.    Do you -- strike that.  That's

23   enough for that.

24                       -  -  -  -  -

25                  (Thereupon, Deposition Exhibit 20,

Page 262

1          Spreadsheet From the Ohio Board of
2          Medicine, was marked for purposes of
3          identification.)
4                      -  -  -  -  -
5      Q.     So with respect to Exhibit 20, I
6  can represent to you that this is a spreadsheet
7  that, based on an email, which we will not be
8  showing you today, that this -- that this chart
9  purports to be from the Ohio Board of Medicine,
10  and my question is, do you remember seeing this
11  document before today?
12      A.     I do not.
13      Q.     Do you see -- and again, consistent
14  with the conceptual agreement, we will be
15  redacting names of individual pharmacists and
16  patients from this document, but I have a few
17  questions about other points.
18              As you look through the information
19  in the comment section on the right column, do
20  you see in the top third there is a reference
21  to Ritzman Pharmacy will no longer fill Harper
22  Rx's?
23      A.     Yes.
24      Q.     And do you see that that note is
25  indicated as having been entered on or around

Page 263

1    December 15, 2010?

2           A.    Yes, that's correct.

3           Q.    Do you recognize the name of the

4    pharmacist who -- first of all, when you see

5    RPH, does that indicate to you that it is a

6    pharmacist?

7           A.    Yes, sir, it does.

8           Q.    And do you recognize the name of

9    that individual?

10          A.    I do.

11          Q.    You can confirm that it is somebody

12   associated with the pharmacy that is in that

13   column, or in the comment field?

14          A.    Yes, sir.

15          Q.    Do you see in the fourth column

16   with the date November 30, 2009, this appears

17   to be from Summa Barberton Hospital, and the

18   comments say, "Loss privileges, not response to

19   pages, not writing daily notes, dangerous

20   surgery procedures"; do you see that?

21          A.    I do.

22          Q.    In reviewing the items in the

23   comment section, do you believe that this list

24   of complaints refers to the -- refers to

25   complaints about Dr. Harper?

Page 264

1          A.     I do.

2          Q.     And do you see that in one of the

3     entries for March 3, 2011, there is a reference

4     in the comment section to CVS, 1949 West Market

5     Street?

6          A.     I do.

7          Q.     Does that indicate that a complaint

8     was received on or around that day from a CVS

9     Pharmacy?

10               MR. LEDLIE:  Object to the form of

11    the question as to whether that was

12    contemporaneous with that date.  It's not

13    clear.  You can answer.

14         A.     Yes, I agree that was a complaint

15    from that pharmacist, reference Dr. Harper.

16         Q.     And on the item immediately above

17    that, do you see there is another pharmacist

18    named, and the comments say, "Rx's issues at

19    CVS 590 East Market, excessive Rx's and sample

20    drug cocktail, ICD, 9 issues"; do you see that?

21         A.     I do.

22         Q.     How do you interpret that

23    statement?

24               MR. BENNETT:  Beyond the scope of

25    the authorization.  To the extent you need

Page 265

1    information or activities gathered during a

2    specific investigation, you are not authorized

3    to answer.  If you can answer outside of

4    activities of a specific investigation, if you

5    happen to know, you may answer.

6              MR. LEDLIE:  Not to disrupt the

7    answer, I did notice there are people other

8    than pharmacists, but anyone in the complaint

9    field will be redacted as well as the patient

10   field will be redacted, but go ahead.

11        A.   I can't answer that without

12   violating the order.

13        Q.   Okay.  But can you validate that a

14   complaint was received from this pharmacist

15   associated with CVS, 590 East Market?

16        A.   Yes, I can.

17        Q.   Can you also validate that two

18   complaints were received on or around March 17,

19   2011 from Walgreens pharmacists?

20             MR. LEDLIE:  Object to the form of

21   the question.  Misstates the document.  We have

22   a date of complaint.  It is in the comments.

23   It's not clear that they were entered at the

24   same time or anything.

25        A.   There appears to be two complaints,

Page 266

1   both from Walgreens, ███████████,

2   ████████, on those dates.

3        Q.    Okay.  And can you also validate

4   that a complaint was received from Giant Eagle,

5   the next item on that chart, on or around March

6   21, 2011?

7        A.    Yes, that appears to be the case as

8   well.

9        Q.    Okay.

10                   -  -  -  -  -

11            (Thereupon, Deposition Exhibit 21,

12            License Look Up, Adolph Harper, was

13            marked for purposes of

14            identification.)

15                   -  -  -  -  -

16        Q.    This document I can represent I

17   obtained online from the Ohio licensing portal

18   available publicly, and this appears to refer

19   to the voluntary surrender of Dr. Harper's

20   investigation.

21            Without revealing anything that you

22   may have learned as a TDS task force officer,

23   is this consistent with your understanding of

24   the public information about the status of Dr.

25   Harper's license?

```
                                           Page  267

 1          A.    Yes.

 2          Q.    Is it also consistent with the

 3     timeframe that you are aware from public

 4     sources of the voluntary surrender of his

 5     license?

 6          A.    Yes.

 7                        -   -   -   -   -

 8                  (Thereupon, Deposition Exhibit 22,

 9                  Press Release From U.S. Attorney's

10                  Office For the Northern District of

11                  Ohio From February 1, 2015, was

12                  marked for purposes of

13                  identification.)

14                        -   -   -   -   -

15          Q.    I hand you what has been marked as

16     Exhibit 22.  This is a press release from the

17     U.S. Attorney's Office for the Northern

18     District of Ohio from February 1, 2015.

19                  As you had stated earlier, the

20     press release states that Dr. Harper was

21     sentenced to ten years in prison for illegally

22     prescribing hundreds of thousands of doses of

23     painkillers and other pills to customers for no

24     legitimate medical purpose, even after at least

25     eight customers died from overdose deaths,
```

Page 268

1    according to law enforcement officials.  Do you

2    see where I was reading from in the first

3    paragraph?

4         A.    Yes.

5         Q.    And based only on public sources

6    and not from anything learned in your capacity

7    as a task force officer, is that consistent

8    with your understanding with Dr. Harper's

9    activities that led to that ten-year sentence?

10              MR. BENNETT:  For the record, we

11   had a discussion about this, and I want Det.

12   Leonard to know that we agree that he is able

13   under his authorization to confirm the facts

14   are in the press release.

15              So, Det. Leonard, if that's your

16   understanding of the case, you are able to

17   confirm the facts that he is asking that's in

18   the press release.

19         A.    Yes, that's what I understand.

20   Correct.

21         Q.    And several other, just discreet

22   points about this press release.  In the third

23   to the last paragraph from the bottom of page

24   1, it refers to Dr. Harper's customers that

25   came to his office and received prescriptions

Page 269

1    for addictive prescription medicines without

2    being examined by Harper and often without

3    seeing him at all, according to court

4    documents.

5              Again, based only on public

6    sources, can you confirm that that is a

7    correct -- are you aware that that's a correct

8    description of the case against Dr. Harper?

9         A.    It is one of the aspects of the

10   case, yes.

11        Q.    I'm not going to mark this as an

12   exhibit, but you referred earlier today in your

13   testimony to Det. John Prince?

14        A.    Correct.

15        Q.    And he's also a task force officer

16   along with yourself?

17        A.    Yes, sir.

18        Q.    And you understand him to be a

19   Cleveland diversion detective?

20        A.    Yes, sir.

21        Q.    I'm going to read -- actually, let

22   me ask you a general question.  Are you

23   familiar with a Pharmacy Alert System?

24        A.    Yes.

25        Q.    What is that system?

Page 270

1              A.      It is different in different areas.
2      In our area, one of the pharmacists kind of
3      took charge of it and they would disseminate
4      information.   If I wanted to put out a hotline,
5      I would send them an email with the doctor's
6      name that was being abused.   Whatever was going
7      on, I would send him an email, they would
8      disseminate one to a local CVS, one to a Rite
9      Aid, one to a Marc's, and then Marc's or CVS
10     would all disseminate to their own agencies.
11     That way we would get the information out.

12              It fell apart because of the fax
13     system, and when everybody started getting
14     emails, it didn't seem to work so well, because
15     if I sent it to one pharmacist and they are off
16     for three days and don't open their emails,
17     nobody else gets it.   When the faxes went away,
18     the alert system went away.
19         Q.      And in an annual report that Det.
20     Prince authored in 17, he refers to an expanded
21     use of the Pharmacy Alert System.   I know that
22     you didn't author Det. Prince's report, but do
23     you have any understanding of what he may refer
24     to as expanded use of the Pharmacy Alert
25     System?

Page 271

1           A.    I'm not sure what he would be
2     referring to.
3           Q.    You mentioned that there was a
4     particular pharmacist that took charge of that
5     early in the process.  Who was that?
6           A.    Ritzman's.
7           Q.    Ritzman's, okay.  At least as it
8     may have operated according to your
9     understanding, I want to ask you if this is
10    consistent with how you understand the system
11    worked when you were familiar with it.
12               It says, "The alert system
13    continues to aid in the successful
14    identification and prosecution of prescription
15    drug offenders."  Do you think that
16    characterization from Det. Prince is a fair
17    one?
18          A.    Yes.
19          Q.    He continued that, "It has led to a
20    strong partnership with many of our local
21    pharmacists who are at the front lines of
22    prescription drug diversion and often feel like
23    they were being victimized."  Do you agree with
24    that characterization from Det. Prince?
25          A.    Yes.

1      Q.    And the last sentence in his report

2    on this topic says, "Without their assistance,"

3    referring to pharmacists, "pharmaceutical drug

4    diversion enforcement would be next to

5    impossible."  Do you agree with that

6    characterization?

7               MR. LEDLIE:  Object to the form of

8    the question.

9          A.    I do agree.

10         Q.    In respect to your work prior to

11   becoming a task force officer, so prior to

12   February of 2012, if you conducted an

13   investigation involving forged prescriptions,

14   did you typically get those cases through a

15   report from a pharmacist?

16         A.    Yes.

17         Q.    I think you said earlier today that

18   you regard investigations of physicians as

19   indepth and time consuming?

20         A.    Yes, sir.

21         Q.    They are among one of the more

22   indepth, time consuming investigations of

23   diversion that you are involved in?

24         A.    Yes, sir.

25         Q.    Have you ever seen a doctor

Page 273

1    diversion case prosecuted without the

2    involvement of a medical expert?

3                MR. LEDLIE:  Object to the form of

4    the question.

5                MR. BENNETT:  And I object to the

6    extent that it calls for you to talk about

7    cases that were not convictions, that were

8    federal investigations.  You are only

9    authorized to talk about the specific public

10   knowledge of prosecuted and convicted cases.

11               MR. MOYLAN:  If we are talking

12   about publicly filed cases presented in court,

13   I would suggest we shouldn't limit that

14   instruction only to convictions.

15        Q.    So my question would be with

16   respect to any publicly charged case against a

17   doctor, are you familiar with any such case

18   that did not involve the use of a medical

19   expert?

20        A.    Yes.

21        Q.    You are?

22        A.    Yes.

23        Q.    Can you remember the particulars

24   about that case?

25        A.    Dr. Gregory Ingram.

Page 274

1          Q.    And how was his case prosecuted

2     without the use of a medical expert?

3                MR. BENNETT:  Objection.  To the

4     extent that it calls for you to disclose the

5     internal deliberative process of either the

6     U.S. Attorney's Office or the DEA, you are not

7     authorized to answer that question.  And if you

8     can answer it without, based on publicly

9     available information, then you may answer.

10         Q.    And I'm really only interested in

11    publicly available information about how the

12    case was prosecuted, if you know.

13         A.    I'm trying to draw, you know, the

14    red folder/green folder separation in my head.

15    It was an Akron case that went federal.

16                Can I have second to confer with

17    the DEA counsel?

18                MR. BENNETT:  Is that okay,

19    counsel, for privilege purposes?

20         A.    I don't want to put my foot in my

21    mouth.

22         Q.    I want to see if I can short

23    circuit it, because what I'm interested in is

24    the presentation of public evidence.  So I'm

25    not really interested in deliberative process

Page 275

1    at all.

2              But to the extent you are aware of

3    how the case was actually presented, my

4    interest is what was it about Dr. Ingram's case

5    that -- first of all, did it lead to a

6    conviction, can I ask that?

7         A.    Yes.

8         Q.    It did.  And in terms of the public

9    presentation of evidence, what were the nature

10   of the charges and the evidence against him?

11        A.    He pled guilty to 48 counts of

12   trafficking.

13        Q.    Without getting into any

14   deliberative materials regarding the TDS work

15   that you did, was the evidence of his

16   trafficking so overwhelming that that was an

17   unusual case that didn't involve a medical

18   expert?

19              MR. BENNETT:  Objection.  To the

20   extent that that calls for you to discuss the

21   internal deliberative process or the substance

22   of your particular investigation that's not

23   public, you are not authorized to answer that

24   question.

25              To the extent that you can discuss

Page 276

1   the publicly available information in answering

2   that question, then you may answer.

3        A.    All my information on that is case

4   oriented.

5        Q.    Is it fair to say that that's the

6   only case involving a diversion investigation

7   of a doctor that was prosecuted that did not

8   involve the use of a medical expert?

9        A.    Yes, that I'm aware of.

10       Q.    Why it more difficult to

11  investigate doctors for diversion than some

12  other defendants?

13             MR. BENNETT:  Objection.  Beyond

14  the scope of your authorization, to the extent

15  that that calls for you to disclose

16  investigative techniques or the internal

17  deliberative process of the DEA.  To the extent

18  that you can give a 3,000 feet general answer,

19  then you may answer.

20       A.    Basically, because I don't have a

21  medical degree, and you only know what you know

22  and you don't know what you don't know.  So a

23  medical expert is required.

24       Q.    Implicit in your answer is that

25  evaluating prescribing decisions by doctors

Page 277

1    involves medical expertise; doesn't it?

2         A.    Yes, it does.

3         Q.    Does it also involve having an

4    understanding of the patient clinical

5    information in order to evaluate doctor

6    prescribing practices?

7              MR. BENNETT:  Objection.  Same

8    instruction.

9         A.    I guess from my personal knowledge

10   as a patient, as an individual that, yes, I

11   think that that information is necessary.

12        Q.    Okay.  And is that clinical

13   information concerning an individual patient

14   information that is available to the public?

15        A.    No, not formally.

16        Q.    Is it protected by federal privacy

17   laws?

18        A.    By HIPAA, yes.

19        Q.    And are you aware whether any

20   pharmaceutical distributor has access to

21   patient clinical information?

22        A.    I'm not aware.

23        Q.    Do you have any reason to believe

24   that they are in possession of that kind of

25   information?

Page 278

1          A.    I guess from the 3,000 foot level,

2     I would assume if they are paying for -- not

3     assuming, but all the payments and diagnosis

4     codes are read and understood by somebody at

5     some level or they wouldn't continue to be

6     processed.  So I would assume they have some

7     type of knowledge.  How much, I don't know.

8          Q.    So you don't know, but your

9     assumption is that there is some patient

10    specific information that is available to the

11    drug distributors?

12         A.    That's my personal opinion.  I

13    don't know professionally, no.

14         Q.    You don't know that.  Okay.  I'm

15    just going to have a few questions about

16    defendants in this case.

17              Have you ever heard of a company

18    called CVS Indiana LLC, that particular entity?

19              MR. BENNETT:  Objection.  Beyond

20    the scope of your authorization, to the extent

21    that that deals with a specific investigation

22    you undertook as a task force officer;

23    otherwise, you can answer the question.

24         A.    Then I don't -- I'm not allowed to

25    answer.

Page 279

1          Q.    And I'll limit my questions from
2    here on to work that is not within your task
3    force work, and I'll also limit it to
4    information that doesn't pertain to any
5    nonpublic DEA-related information.  So with
6    those limitations, I'm going to ask some more
7    questions.
8               Have you ever heard of a company,
9    subject to those limitations called, CVS Rx
10   Services, Inc.?
11         A.    It doesn't ring a bell, so I don't
12   know.
13         Q.    Subject to the same limitations, is
14   it fair to say you don't have any understanding
15   of what their business is, those two entities
16   that I mentioned?
17         A.    Yes, sir, that's correct.
18         Q.    So you were not aware that they are
19   defendants in this case?
20         A.    I know CVS is a defendant.  I don't
21   know, whatever said Rx, Inc., if that's who CVS
22   is, I don't know the title or the name you are
23   giving them.
24         Q.    Okay.  Do you have any
25   understanding, apart from your task force work,

Page 280

1   of why those two CVS entities are named as

2   defendants in this case?

3          A.   I guess I'm not sure of your

4   question.

5          Q.   Do you have any understanding of

6   what the claims or allegations are against

7   those particular CVS entities?

8          A.   I read the indictment, but I don't

9   know what specifically for those two -- no, I

10  don't.  I didn't memorize the indictment.

11         Q.   I think for all of us defense

12  counsel, you are referring to a civil complaint

13  as opposed to a criminal.

14         A.   The complaint, yes.

15         Q.   So with respect to any other

16  national pharmacy chains, are you aware -- let

17  me take them one by one.

18              Are you aware that Rite Aid is a

19  defendant in this case?

20         A.   Yes, I am.

21         Q.   Are you aware that Walgreens is a

22  defendant?

23         A.   I am.

24         Q.   And are you aware that Walmart is a

25  defendant?

Page 281

1          A.    Yes, I am.

2          Q.    Can you describe what you remember

3    about the claims against any of those retail

4    pharmacy chains?

5          A.    No, I cannot.

6          Q.    So you are unaware -- or correct me

7    if I'm wrong, are you aware that any of those

8    pharmacy chains was not sued in its role as a

9    retail pharmacy?

10         A.    I'm aware of it.  I just don't know

11   the specifics.

12         Q.    So you understand that they are not

13   being sued as dispensing medicines to any

14   customer?

15         A.    Yes.

16         Q.    You do understand that.  Okay.

17               And do you know that no pharmacists

18   are defendants in this lawsuit?

19         A.    Yes, I understand that.

20         Q.    Apart from your work involving the

21   TDS, do you have any personal knowledge other

22   than that, other than from that work, of

23   systems used by drug distributors to detect or

24   prevent diversion?

25         A.    I do not.

Page 282

1      Q.    Do you believe that any of your

2  colleagues in the Akron Police Department are

3  aware or have knowledge of the systems used by

4  drug distributors to detect or prevent

5  diversion?

6           MR. LEDLIE:  Object to the form of

7  the question.  Calls for speculation.

8      A.    I do not believe anyone at the

9  police department has -- there may be one or

10  two individuals that has access to OARRS, but

11  other than that, no one has any other access

12  that I'm aware of.

13      Q.    Not referring to any work that you

14  have been involved with as part of the TDS, in

15  your general 30,000 foot understanding as an

16  experienced detective, do you believe that you

17  or your fellow detectives in the police could

18  tell if a doctor overprescribed opioids, simply

19  based on the quantity or duration of a

20  prescription?

21           MR. LEDLIE:  Object to the extent

22  this is a hypothetical, and this is a fact

23  witness.  Improper question.  Beyond the scope.

24      A.    I don't know that anyone could

25  determine that.  I don't know that we have any

Page 283

1    physicians that work for the police department

2    without a further indepth investigation before

3    they could determine that.

4         Q.    Okay.  So you would need further

5    investigation to make an assessment about

6    whether a doctor had overprescribed if all you

7    knew was the quantity and the duration of the

8    prescription?

9         A.    Yes, that's correct.

10        Q.    And so again, except for any

11   TDS-related work, have you ever sought a search

12   warrant for a doctor solely based the amount or

13   duration of a prescription?

14        A.    No.

15        Q.    And do you believe a doctor, other

16   than TDS-related work, do you believe that a

17   doctor -- have you ever seen doctor prosecuted

18   solely based on the quantity or duration of a

19   prescription?

20        A.    No.

21        Q.    Have you ever seen a doctor

22   disciplined by the Ohio Board of Medicine on

23   that sole basis?

24        A.    No.  I don't have any access to

25   what the medical board does, so I don't -- I

Page 284

1    wouldn't know if they did or didn't.

2         Q.    You wouldn't know.  All right.

3              Would you agree, based on your

4    experience, other than your TDS work, with the

5    view that doctor prescribing practices are

6    central in how much medicine is prescribed for

7    people in the Akron area?

8              MR. LEDLIE:  Object to form of the

9    question.  Beyond the scope.  Expert testimony.

10        A.    Can you rephrase it?  I'm not

11   sure -- restate it.

12        Q.    Sure.  Other than TDS-related work,

13   do you believe that doctor prescribing

14   practices are central to how much prescription

15   medicine is distributed into the Akron area?

16        A.    Definitely one of the key

17   ingredients.

18        Q.    Okay.  And is it fair to say that

19   if a doctor does not write a prescription for

20   opioids, then a pharmacist cannot dispense

21   opioids lawfully; is that correct?

22        A.    Yes, sir.

23        Q.    And a patient cannot lawfully

24   obtain opioids without a prescription from a

25   licensed doctor, correct?

Page 285

1          A.    Legally, yes, correct.

2          Q.    Just a few questions from a 30,000

3    foot view, and not at all interested in trade

4    craft for the police department, and again

5    excepting anything that you have done with the

6    TDS, in a doctor investigation, do you

7    generally try to interview patients of that

8    doctor?

9          A.    I do.

10         Q.    And again, without getting into any

11   particulars, nothing to do with TDS, is it

12   common to try to do -- to try to go into the

13   doctor's office, either an investigator or an

14   informant, to pose as a patient?

15         A.    I'm not sure if we are getting into

16   techniques, how we do our job of sending

17   sources in or not.

18              MR. LEDLIE:  I think at a very,

19   very high level for your time with Akron, we

20   would be okay with that, a very high level.

21         A.    Yes, it is something we would try

22   to do.

23         Q.    Okay.  And in those situations,

24   what are some of the things you look for?

25              MR. LEDLIE:  Now I think you are

Page 286

1    not at 30,000 feet, and I would instruct you

2    not to go into any tools or techniques of your

3    investigation that you believe would reveal

4    nonpublic information.

5         A.    So give me the question again.

6         Q.    So if there is any undercover work

7    to make contact with a doctor, what sort of

8    things do you look for to try to evaluate if

9    the doctor is acting appropriately or not?

10         A.    I think all those things are going

11    to be -- fall under the tools of the trade and

12    things I'm going to do.

13              The only thing I would tell you is

14    investigations sources and techniques I would

15    use to further prosecute someone.

16         Q.    Okay.  I'll move on.

17              Is physical surveillance around a

18    doctor's office something that is commonly

19    done, and apart from TDS work?

20         A.    Yes.

21         Q.    I think you had conducted something

22    like four doctor investigations in all your

23    time as an Akron police detective prior to

24    joining the TDS; is that correct?

25              MR. LEDLIE:  I would instruct the

```
 1   witness not to answer as to any uncharged or
 2   any investigations that are not resulting in
 3   criminal charges, under the police
 4   investigation process, police investigation
 5   rule.  He can talk about public cases.
 6        Q.    Let's start with public cases, but
 7   to the extent we are not getting into any named
 8   individuals, which I don't intend to, I just
 9   wanted to know what the volume of cases was.
10             So let's start with the charged
11   cases.  Doctor charged cases while working as
12   an Akron police detective, how many can you
13   remember?
14        A.    There was Harper, Ingram.
15        Q.    Same ones you mentioned earlier?
16        A.    Yes, so...
17        Q.    So I wasn't clear.  Those were also
18   some task force cases?
19        A.    Harper started as Akron and ended
20   up task force.  Ingram I was on the task force
21   when the case -- when I initiated the case.
22             There were a couple of cases that I
23   don't know how they turned out, because they
24   were turned over to different agencies, so I
25   can't speak on whether they were convicted or
```

Page 288

```
1    not, so I really can't talk about those cases.
2         Q.    Let me try --
3              MR. BENNETT:  If he is able to
4    answer your question without regarding TDS
5    cases, because you asked for convicted case, so
6    that's within the scope of his authorization.
7         Q.    I think we may have all the ones
8    that you remember by name, and I want to get an
9    overall number and see if I can verify that
10   prior to TDS you have done a total of four
11   investigations of physicians in the 14 years
12   you worked in diversion.  Without naming any
13   particular doctors, does that sound like a
14   correct number?
15        A.    It was probably closer to six,
16   because there were a couple that weren't
17   disclosed because they --
18             MR. LEDLIE:  Don't tell him the
19   reason.
20        A.    They weren't charged.
21        Q.    Four to six, something around that
22   number.  Okay.
23             In the doctor prescribing --
24   overprescribing cases or diversion cases that
25   you have been involved in, is an OARRS lookup
```

Page 289

1    done in everyone of those cases, to the extent

2    the OARRS system was available to you?

3         A.    In the doctors?

4         Q.    Doctor prescribing cases.

5              MR. BENNETT:  And you're talking

6    non-TDS cases, correct?

7              MR. MOYLAN:  Yes, that's what I'm

8    asking.

9         A.    I believe so.  Yes, I believe an

10   OARRS was used when available.  I believe that

11   OARRS was used, yes.

12             MR. MOYLAN:  And you object to that

13   question with respect to TDS?

14             MR. BENNETT:  Correct.  He is not

15   authorized to discuss the law enforcement

16   investigative techniques he used investigating

17   cases for the tactical diversion squad of DEA.

18   That would include databases that he accesses

19   and uses, which would include OARRS.  So he's

20   not authorized to answer that.

21        Q.    Is it fair to say that the goal in

22   a doctor diversion case is to determine if the

23   doctor is prescribing medicine outside the

24   range of acceptable medical judgment?

25        A.    Yes.  Outside of the scope of

Page 290

1    medical necessity and judgment, yes.

2         Q.    And you think it is fair to say

3    that investigating a doctor is significantly

4    more complicated than investigating other

5    sources of diversion?

6             MR. LEDLIE:  Object to the form of

7    the question.

8         A.    Yes.

9             MR. MOYLAN:  I think that's all I

10   have.

11            MR. LEDLIE:  Let's take a break.

12            (Recess taken.)

13            MR. GOLDSTEIN:  Back on.

14         EXAMINATION OF PATRICK LEONARD

15   BY MR. GOLDSTEIN:

16         Q.    Good afternoon, detective.

17         A.    Good afternoon.

18         Q.    A few questions for you.  Probably

19   more than a few, to be fair.

20             You are familiar that some of the

21   defendants in this case are manufacturers; is

22   that right?

23         A.    Yes, I am.

24         Q.    Are you aware of the allegations

25   against the manufacturers in this case?

1      A.    Yes.  I have read through the
2   complaint.
3      Q.    And what is your general
4   understanding of those allegations?
5      A.    They flooded markets and put drugs
6   in the area that gave physicians the
7   opportunity to prescribe more drugs and more
8   people became addicted.
9      Q.    Do you have an understanding of
10   whether you provided any information to the
11   plaintiffs that was then put into the complaint
12   with respect to the manufacturers in this case?
13      A.    No, I never spoke with the
14   plaintiffs prior to seeing the complaint.
15      Q.    Understood.  And I believe earlier
16   you reviewed some what's called interrogatory
17   responses?
18      A.    Yes.
19      Q.    Do you have an understanding
20   whether you provided any information that was
21   used in any interrogatory response by the
22   plaintiffs?
23      A.    I don't know what was used, so I
24   don't know.  I provided a lot of information,
25   the city provided a lot of information.

Page 292

1              MR. LEDLIE:  The content of your

2     conversation with counsel is privileged, and I

3     would ask you not to reveal the content of any

4     communications.

5          Q.    Let me ask it this way:  Are you

6     aware of any specific allegations against

7     manufacturers related to marketing activities

8     in this case?

9          A.    No, I don't believe so.

10         Q.    Okay.

11                    -  -  -  -  -

12               (Thereupon, Deposition Exhibit 23,

13               Designated Confidential, 1-16-2013

14               Email, Bates Labeled

15               AKRON_000368456, was marked for

16               purposes of identification.)

17                    -  -  -  -  -

18         Q.    Handing you, detective, what has

19     been marked as Exhibit 23.

20               MR. BENNETT:  Counsel, is this

21     January 16, 2013 an email that you gave us a

22     copy of already?

23               MR. GOLDSTEIN:  Correct.

24               MR. BENNETT:  Okay.  Thank you.

25         Q.    Have you seen this email before

Page 293

1    today?

2           A.    Yes, I have.

3           Q.    What is it?

4           A.    It is an email from Agent Tom

5    Miksch from the board of pharmacy to me,

6    reference Dr. Harper case.

7           Q.    I'm handing you also what has been

8    marked as Exhibit 24.

9                        -  -  -  -  -

10                 (Thereupon, Deposition Exhibit 24,

11                 Designated Confidential, Protected

12                 Health Information, Patient Deaths

13                 Associated with Dr. Harper,

14                 Beginning with Bates Labeled AKRON

15                 000368457, was marked for purposes

16                 of identification.)

17                        -  -  -  -  -

18          Q.    And do you recognize Exhibit 24?

19          A.    I do.

20          Q.    What is that?

21          A.    It is a list of patients that are

22    from the coroner's office, patients we

23    associate with death due to Dr. Harper.

24          Q.    Do you recall receiving these

25    documents during the course of your work on the

Page 294

1    TDS?

2         A.    Yeah.  I guess it was during TDS,

3    yes.

4         Q.    And did you do anything based on

5    the information contained in these documents in

6    the course of your work for TDS?

7              MR. BENNETT:  Objection.  Beyond

8    the scope of his authorization.  He's not

9    authorized to disclose the activities he

10   performed as a result of this.  So he's not

11   authorized to answer that question.

12        Q.    If you look at Exhibit 24, Exhibit

13   24 is an attachment to the email from Exhibit

14   23; is that right?

15        A.    Yes, sir, that's correct.

16        Q.    And if you look at -- do you

17   recognize the general format of this document?

18        A.    Yes, sir.

19        Q.    And what is it?

20        A.    It was a spreadsheet set up by

21   Agent Miksch with information on the

22   individuals that overdosed.

23        Q.    If you look towards the middle of

24   the -- strike that.

25                  To clarify, these are all

1  individuals who overdosed during what period of

2  time?

3          A.    It looks like 2009 through 2012.

4          Q.    And based on the information in the

5  cover email, I take it these are all patients

6  of Dr. Harper who had overdosed; is that right?

7          A.    That's correct.

8          Q.    And when did your investigation of

9  Dr. Harper begin?

10          A.    I'm not sure of the exact date.  I

11  believe it was somewhere around 2010, plus or

12  minus, minus probably.  9, 10, somewhere in

13  that area.

14          Q.    Okay.  Now, if you look towards the

15  middle of this spreadsheet, you see the column

16  labeled cause?

17          A.    Yes, sir.

18          Q.    Do you have an understanding of

19  what information is contained in that column?

20          A.    I do.

21          Q.    What is it?

22          A.    The cause of death determined by

23  the coroner.

24          Q.    And if you go one more column over,

25  it says labs?

1          A.     Yes, sir.

2          Q.     Do you have an understanding of

3     what that column refers to?

4          A.     That would be what the toxicology

5     report shows what was in the individual's

6     system.

7          Q.     And one more over, Rx's, do you

8     have an understanding of what that refers to?

9          A.     Pharmaceuticals that were involved

10    in the death of the individual.

11         Q.     Did you ever reach a conclusion

12    about whether the -- whether Dr. Harper

13    prescribed any of the prescriptions listed in

14    that Rx's column?

15              MR. BENNETT:  Objection.  Scope.

16    It is beyond the scope of his authorization,

17    because it would require him to disclose DEA

18    activities, and as a result he is not

19    authorized to answer this question.

20         Q.     Turn back to the cause column.

21         A.     Okay.

22         Q.     See if you would just take a second

23    to review the causes that are listed there.

24         A.     Okay.

25         Q.     Fair to say there are several

Page 297

1    different causes listed in that column?

2         A.    Yes, sir.

3         Q.    And one of those causes is

4    complications of heroin use, I'm looking, 1, 2,

5    3, 4, that's the fifth cause listed?

6         A.    Yes.

7         Q.    The next cause listed is cocaine

8    and opiate toxicity; do you see that?

9         A.    Yes.

10         Q.    And what does that refer to?

11         A.    I would assume that's what the

12    coroner put as cause of death, cocaine and

13    opiate toxicity.

14         Q.    Now, having reviewed the entire

15    column, is this asking, at a high level, is

16    this range of causes of death consistent with

17    your experience investigating these types of

18    cases?

19         A.    This is the only doctor case that I

20    investigated that had multiple deaths.  So that

21    would sum up my experience and information on

22    that level.

23         Q.    What about your -- as far as your

24    general understanding of the causes of

25    opioid-related overdoses in the Cleveland and

Page 298

1    Akron area, is this listing of several

2    different causes, including heroin overdoses

3    and cocaine/opiate toxicity overdoses,

4    consistent with that experience and

5    understanding?

6              MR. LEDLIE:  Object to the form of

7    the question.  You can answer.

8         A.    Along with the combined drug

9    effects, yes.

10         Q.    What do you mean by, "combined drug

11   effects"?

12         A.    Well, that same column, combined

13   drug effects is listed at least four or five

14   times, along with combined drug toxicity.

15         Q.    And what do you have an

16   understanding of that to mean?

17         A.    It is not one particular opiate

18   that someone overdosed on.  There is multiple

19   players on board.

20              MR. LEDLIE:  And the record will

21   reflect the results are listed in this column

22   as acute hydromorphone toxicity.  There is a

23   number.  The record speaks for itself, but

24   there are other columns listed here that have

25   not been identified on the record.

Page 299

1          MR. GOLDSTEIN:  I certainly agree
2     the record speaks for itself.
3          Q.   Do you have an understanding of
4     where cause is listed as combined drug effects,
5     and there are several different drugs, do you
6     have an understanding of whether that is
7     consistent with the patient taking a legitimate
8     medical prescription for any of those drugs?
9          A.   Yes.
10         Q.   What is your understanding?
11         A.   That they have taken too many.
12    This is an overdose.  This is the combination
13    of multiple drugs.  I'm not sure I'm answering
14    your question.
15         Q.   Do you form an opinion on whether
16    or not someone who has overdosed, where the
17    cause is a combination of multiple drug
18    effects, whether the overdose was caused by
19    consumption from legitimate prescription
20    opioids?
21         MR. BENNETT:  Objection to the
22    scope.  You are not authorized to give your
23    personal opinion regarding nonpublic facts or
24    information you acquired as a task force
25    officer.  To the extent you can offer an

```
                                                  Page 300

 1    opinion without disclosing or using nonpublic

 2    facts or information, you may answer the

 3    question.

 4              MR. LEDLIE:  I have an additional

 5    objection, and that is that he is a TDS.  He's

 6    not one of the opiate death investigators.  So

 7    this entire scope is beyond his factual

 8    knowledge and it is improper.

 9         A.   So back to your question.

10         Q.   I'll just move on.

11         A.   Okay.  Sorry.

12         Q.   If you turn back in your stack to

13    Exhibit 22.  Continuing on the discussion of

14    your investigation of Dr. Harper, and if you

15    look at the fifth paragraph down.

16         A.   Okay.

17         Q.   You see where it says, "Harper may

18    have been a doctor, but he sold drugs like a

19    common street level dealer"; do you see that?

20         A.   Yes.

21         Q.   Do you agree with that statement?

22         A.   Yes.

23         Q.   Is it a fair characterization, Dr.

24    Harper as a drug dealer?

25         A.   Yes.
```

Page 301

1          Q.     Why is that?

2                 MR. BENNETT:  Objection.  Beyond

3     the scope of his authorization, to the extent

4     that he would have to disclose the specifics of

5     his investigation that have not been made

6     public.  He can confirm the facts stated in

7     this to be consistent with his investigation,

8     but he is not allowed to provide additional

9     information.  Beyond the scope of his

10    authorization.

11         Q.     Well, I'm asking it this way:

12    Based on the conduct that Dr. Harper engaged in

13    that you already testified about today, does

14    that inform your testimony about why you would

15    consider him to be a drug dealer?

16         A.     I guess I'm not sure what you are

17    asking.

18         Q.     Dr. Harper was giving out

19    prescriptions without a legitimate medical

20    purpose.  Is that a reason you would

21    characterize him as a drug dealer?

22         A.     Yes.

23         Q.     And fair to apply that same

24    standard to any doctor who was giving out

25    prescriptions without a legitimate medical

Page 302

1  purpose, that you would describe them as a drug

2  dealer?

3           MR. LEDLIE:  Object to the form.

4  Objection.

5       A.    Yes.

6       Q.    The tactical diversion squad was

7  created in February of 2012, you testified to

8  that earlier?

9       A.    The Cleveland office TDS started in

10  February of 2012, that's correct.

11       Q.    Thank you for the clarification.

12           Do you have an understanding as to

13  why the TDS was created in 2012?

14       A.    I assume why.  I don't have -- no

15  one has told me exactly why, but from working

16  in the field and understanding the dynamics of

17  what was going on in Northern Ohio, I expect

18  that was why it was created.

19       Q.    What was that?

20       A.    Because of the abuse of opiates

21  that we began investigating right away.

22       Q.    Is it fair to say that when you

23  were -- your focus before you joined the TDS

24  was investigating doctor shoppers?

25           MR. LEDLIE:  Object to the form of

Page 303

1    the question.  Misstates testimony.

2         A.    It was one of my investigations.

3    Yes, it was one of the forms of the

4    investigation.

5         Q.    Fair to say before you joined TDS,

6    you were primarily investigating drug users as

7    opposed to drug dealers?

8         A.    No.  As I stated earlier, somewhere

9    between four and six physicians have been

10   investigated by myself and other joint units

11   prior to joining the DEA task force in 2012.

12   They didn't all come to indictment and

13   conviction, but there were other investigations

14   that did take place.

15        Q.    From your time in working diversion

16   cases, which I believe started in 1998; is that

17   right?

18        A.    Yes.

19        Q.    All the way up until you joined

20   TDS, would you say the majority of your cases

21   were focused on investigating drug users as

22   opposed to drug dealers?

23        A.    Pure case numbers, yes.

24        Q.    And when you joined TDS, is it fair

25   to say that the majority of your cases were

Page 304

1    focused on investigating drug dealers as

2    opposed to drug users?

3              MR. BENNETT:  Objection.  To the

4    extent that it calls for specific

5    investigations, you are not authorized to

6    answer.  To the extent you can answer regarding

7    your general duties as a task force officer,

8    you are authorized to answer regarding your

9    general duties and the general categories of

10   cases.

11             MR. LEDLIE:  And I'll object to the

12   form of the question.

13       A.    So general duties have a bigger

14   picture rather than just individual drug

15   abuses.  I don't know if that answers your

16   question or not.

17       Q.    I think as a general matter, was

18   the TDS primarily investigating drug dealers or

19   drug users, without reference to any specific

20   cases?

21             MR. BENNETT:  Objection.  You may

22   answer regarding your general duties and not

23   the specifics of the task force.

24             MR. LEDLIE:  I'll object to the

25   characterization of drug dealers.  It is vague,

Page 305

1    and I'm not sure what you are asking.

2         A.    My general duties as a member of

3    the Cleveland TDS encompass all of those.

4    Primarily, on a larger section, the safety of

5    citizens, and we would gear towards more

6    physician oriented, or larger cases, than

7    doctor shoppers.

8         Q.    So I'm not asking about your

9    specific duties, but your investigations as a

10   general matter.  Were the majority of your

11   investigations investigations of drug dealers

12   or drug users?

13             MR. LEDLIE:  Object to the form of

14   the question.  Vague, once again, as to drug

15   dealers.  I'm not sure what you are asking

16   about in terms of narcotics.  Illicit

17   narcotics, are you talking about doctors, are

18   you talking about physicians assistants?

19   That's a vague question.

20        A.    I guess that's where I'm confused,

21   because we just got done saying that Dr. Harper

22   was a drug dealer.

23             So a physician investigation, are

24   you saying that any investigations we do on

25   physicians are considered drug dealers

Page 306

1    separate, or are you talking about someone

2    selling heroin and cocaine and bringing the

3    cartel in from Mexico?

4         Q.    I'm asking about who the focus of

5    your investigations were, who were the targets

6    of your investigations.

7              So I believe your testimony has

8    been that the targets were doctor shoppers and

9    overprescribing physicians and manufacturers of

10   counterfeit opiates; is that a fair statement?

11        A.    Yes, it is.

12        Q.    And so of those three targets,

13   which was the largest group that you

14   investigated?

15        A.    While still working the larger

16   cases with the Cleveland TDS, I was still

17   responsible for the doctor shoppers in Akron,

18   and that kind of all commingled into the same

19   categories.

20        Q.    You testified earlier that in your

21   conversations with doctor shoppers, you had

22   come to learn from them that they had started

23   with prescription opiates and then moved to

24   illicit drugs; is that accurate?

25        A.    Yes.

Page 307

1          Q.    Did you -- strike that.

2                Do you have any concerns about the

3    truthfulness of the statement that doctor

4    shoppers make to you during the course of your

5    investigation?

6                MR. BENNETT:  Objection.  Beyond

7    the scope of his authorization.  To the extent

8    it relates to federal investigations that he

9    has done, he is not authorized to offer an

10   opinion as to the truth and veracity of the

11   people that come in front of him.

12               And so I would instruct him to the

13   extent that that relates to task force

14   operation investigations, you are not

15   authorized to answer.  If you want to ask him

16   pre-2012.

17        Q.    Let's start with pre-2012.

18               MR. LEDLIE:  Object to the form of

19   the question.  You can answer to the extent you

20   are able.

21        A.    I believe most of the people I

22   interviewed, during an interview they are

23   giving me additional facts that I'm able to

24   check, and normally when I conduct an

25   interview, I know the answer to at least 75

Page 308

1    percent of the questions I'm going to ask them,

2    and when they are being honest with those

3    questions, I have no reason to believe that

4    they lied about what they started with and what

5    they became addicted to throughout that

6    process.

7         Q.    Do you have an opinion as to

8    whether there is a different stigma associated

9    with taking a prescription opioid and then

10   having it lead to illicit drug abuse, versus

11   starting with illicit drugs in the first place?

12             MR. LEDLIE:  Object to the form of

13   the question.  Compound, vague and assumes

14   facts not in evidence.

15        A.    I do understand there is a

16   difference in that, yes.

17        Q.    And might that be a reason why a

18   person you are interviewing in the course of

19   one of your investigations might not be

20   truthful with you when telling you what the

21   reason was -- or what the initial drug that

22   they took was?

23             MR. LEDLIE:  Object to the form of

24   the question.  Without revealing any police

25   investigation techniques that are nonpublic,

Page 309

1    you may answer that question, but it seems to

2    explicitly call for investigation techniques.

3           A.    I don't know how to answer that.  I

4    already have affirmative knowledge that they

5    are taking opioids, prescription medication in

6    those investigations.  So I guess I don't

7    understand your question as to whether they

8    started with that or not, when I have OARRS

9    reports and investigative evidence showing that

10   they were taking those medications.

11          Q.    When you were having these

12   conversations with doctor shoppers, is it fair

13   to say they were targets of investigations at

14   the time you were talking to them?

15          A.    Yes.

16          Q.    And did they understand that?

17          A.    Oh, yes.

18          Q.    Did they understood that you were a

19   detective when they were speaking with you?

20          A.    Most of those conversations took

21   place on the 6th floor of the Akron police

22   detective bureau, so they were detained and

23   waiting to be charged that day when they had

24   those interviews.

25          Q.    Understood.  Now, in the course

Page 310

1   your investigation of overprescribing

2   physicians, have you ever served in an

3   undercover capacity?

4           MR. BENNETT:  Objection.  To the

5   extent that this talks about your activities

6   with the TDS, you are not authorized to answer

7   that question.  It is beyond of the scope of

8   your authorization.

9           MR. LEDLIE:  And the City of Akron

10  would join in revealing whether he did or did

11  not serve in an undercover capacity.  That puts

12  your safety at risk, and I would instruct you

13  not to answer that question, as to the City of

14  Akron.

15      Q.   Have you ever been involved in

16  secretly recording a physician in the course of

17  one of your investigations?

18           MR. BENNETT:  Objection.  Beyond

19  the scope of his authorization.  To the extent

20  you are asking about TDS activities, I would

21  instruct the witness he is not authorized to

22  answer that question regarding TDS activities.

23           MR. LEDLIE:  As to the City of

24  Akron, law enforcement privilege as to that

25  question.

Page 311

1      Q.    Handing you what has been marked as

2   Exhibit 25.

3                    -  -  -  -  -

4              (Thereupon, Deposition Exhibit 25,

5              Federal Register, Volume 80, Number

6              138, Monday, July 20, 2015/Notices,

7              was marked for purposes of

8              identification.)

9                    -  -  -  -  -

10     Q.    Now, have you seen Exhibit 25

11  before?

12     A.    I have not.

13     Q.    And I'll direct you on the first

14  page, in the far left column, the Recommended

15  Rulings, Findings of Fact, Conclusions of Law

16  and Decision of the Administrative Law Judge;

17  do you see that?

18     A.    I do.

19     Q.    And then if you look in that first

20  paragraph, "The nature of the case,

21  Administrative Law Judge"; you see that?

22     A.    Yes.

23     Q.    And so it is referring to the

24  matter of Syed Akhtar-Zaidi, M.D.; do you see

25  that?

Page 312

1          A.    I do.

2          Q.    Are you familiar with Dr. Zaidi?

3          A.    I am.

4          Q.    And if you look at the next

5     paragraph down, at the very top of the middle

6     column there, this is, "The drug enforcement

7     administrator, through her deputy

8     administrator, issued an order to show cause

9     why the administrator should not revoke DEA

10    Certificate of Registration number BA3842259

11    issued to Syed Jawed Akhtar-Zaidi, M.D., and

12    should not deny any application for renewal or

13    modification of the same"; do you see that?

14         A.    I do.

15         Q.    Did you have an understanding of

16    what this document is?

17         A.    I do.

18         Q.    What is your understanding?

19         A.    It is the federal issue reference

20    the DEA certificate of Akhtar-Zaidi for his DEA

21    license.

22         Q.    Now, if you turn to maybe the fifth

23    or sixth page, in the top right the number is

24    42981.

25         A.    42981?

Page 313

```
1          Q.    Yeah.  You see in the far left
2     column, towards the bottom, "Dr. Zaidi's
3     treatment of Officer Patrick Leonard under the
4     ████████████████████████████████████
5          A.    I do.
6          Q.    Do you have an understanding of
7     what -- you want to take a minute -- I can
8     just -- we can just walk through.
9               The second paragraph says, "Det.
10    ████████████████████████████████████████████
11    ███████████████████████████████████████████
12    ████████████████████████████████████
13         A.    I do see that.
14         Q.    Is that accurate?
15         A.    It is.
16         Q.    What do you recall about your work
17    in an undercover capacity investigating Dr.
18    Zaidi?
19              MR. BENNETT:  Objection.  This is
20    beyond the of scope of his authorization.  He
21    is authorized to confirm factual information
22    contained in this decision, but he's not
23    authorized to discuss the substance or
24    activities that are not in this related to his
25    or DEA's investigation.
```

Page 314

1          So I would instruct the witness
2    that this is beyond the scope of his
3    authorization, but anything other than to
4    confirm the facts that are concerned in this
5    administrative law decision.
6          Q.    It says in the second sentence,
7    that you attended six office visits with Dr.
8    Zaidi, and in each visit received prescriptions
9    for controlled substances; is that accurate?
10         A.    It is.
11    █       ████████████████████████████████
12    █████████████████████████████████████
13         A.    It is.
14         Q.    Is it accurate that Dr. Zaidi was
15    engaged in the misleading -- strike that.
16                    █████████████████████████
17    ███████████████████████████████████████████
18    ███████████████████████████████████
19    ███████████████████████████████████████
20    ██████████████████████████████████
21    ███████████████████
22         A.    Yes.
23              MR. BENNETT:  Objection.  I would
24    indicate to the witness that he may confirm his
25    testimony, but he may not add facts beyond what

Page 315

1    is contained in the administrative law

2    decision.

3              So if it is not within the

4    administrative law decision, as far as what he

5    mislead Dr. Zaidi about, he may not confirm

6    that.

7         Q.    Let me direct you to the next

8    paragraph down.  It says, "In his role as

9    ██████████████████████████████████████████

10   correct?

11        A.    Yes.

12        Q.    "Det. Leonard reported that he had

13   stiffness in his lower back.  In his initial

14   interview with Christy Barrett, Det. Leonard

15   reported pain levels of between three and four

16   on a ten point scale"; is that accurate?

17        A.    No.  It was between two and three,

18   but that's --

19        Q.    Fair enough.  And do you recall who

20   Christy Barrett was?

21        A.    She was an employee there.  I

22   couldn't pick her out of a lineup today.

23        Q.    And if you could take a minute to

24   review the remainder of that paragraph.

25              MR. LEDLIE:  The paragraph in his

Page 316

1   ████████████████████████

2               MR. GOLDSTEIN:  Yes.  Thank you.

3        A.    Okay.

4        Q.    Is everything contained in that

5   paragraph accurate, to the best of your

6   knowledge?

7             A.    Yes, sir, I believe it is.

8             Q.    You can put that aside.

9             Did the undercover work described

10  in -- is the type of undercover work that we

11  just discussed consistent with the undercover

12  work -- strike that.  Let me ask you a

13  different question that will have the same

14  result.

15             In that interest, I'll just move

16  on.

17             You testified previously that there

18  are some instances in which you have reached

19  out to the board of pharmacy regarding revoking

20  a prescriber's license; do you recall that

21  testimony?

22        A.    No.  I said I would work with the

23  board of pharmacy.  I never called them and

24  asked them to revoke a pharmacist's license.

25        Q.    Do you recall in which cases that

1   you have worked on that a pharmacist's license

2   has been revoked by the board of pharmacy?

3        A.    No, not offhand.

4        Q.    Do you recall roughly how many

5   times that's happened?

6        A.    A handful.  Maybe three to five.

7        Q.    In the course of any investigation

8   of a prescriber prior to joining TDS, did you

9   ever come across any marketing materials that

10  were provided by the manufacturer of opioids?

11       A.    No.  The only thing, in our first

12  session in January, was that conference that I

13  went to where someone from one of the

14  pharmaceutical companies spoke, and that was

15  the only time.

16       Q.    Did you ever encounter any

17  materials that were provided to physicians in

18  particular by a manufacturer of opioids?

19       A.    No, I don't recall acquiring any,

20  no.

21       Q.    Prescription opioids, to be clear.

22       A.    Yes.

23       Q.    Since joining the TDS, have you

24  encountered any marketing materials provided by

25  a manufacturer of the prescription opioids?

```
                                        Page 318
  1               MR.  BENNETT:  Objection.  To the
  2     extent that calls for information related to
  3     your investigation, you are not authorized to
  4     answer.  To the extent that you obtained
  5     information from a public source unrelated to
  6     your information or aware of information, you
  7     may answer.
  8          A.    I'm not going to be allowed to
  9     answer.
 10          Q.    Handing you what has been marked as
 11     Exhibit 26.
 12                          -   -   -   -   -
 13               (Thereupon, Deposition Exhibit 26,
 14               Indictment for Dr. Harper, was
 15               marked for purposes of
 16               identification.)
 17                          -   -   -   -   -
 18          Q.    Do you recognize this document?
 19          A.    I do.
 20          Q.    What is it?
 21          A.    This is a the indictment for Dr.
 22     Harper and his office, his associates.
 23          Q.    I believe we talked through a lot
 24     of the information in here already, so I'm just
 25     going to ask you a couple questions.
```

Page 319

1              If I could direct you to page 11 of

2     the document.  Do you see in paragraph 35 (a),

3     it says, "On or about the dates listed below,

4     from his office in Akron, Ohio, Adolph Harper,

5     Jr. issued, quote, prescriptions for the

6     following controlled substances on the

7     following day to JC, a Harper DTO customer not

8     charged herein"; do you see that?

9         A.    I do.

10        Q.    And then there is a table

11    underneath the indictment -- underneath that

12    paragraph.  Do you see the table?

13        A.    I do.

14        Q.    And do you have an understanding of

15    what information is contained in that table?

16        A.    Yes, I do.

17        Q.    And what is that understanding?

18        A.    It is the individual's prescription

19    records, dates written, filled, what the

20    prescriptions were, the strength and the

21    quantity.

22        Q.    And is it fair to say that

23    according to the indictment, these were

24    prescriptions that were written that did not

25    have a legitimate medical purpose?

Page 320

1          A.    Yes, sir, it is.

2          Q.    If you turn to the next page,

3    paragraph (b), there is another list of

4    prescriptions, this time written to customer

5    KC; do you see that?

6          A.    I do.

7          Q.    Fair to say that these are also

8    prescriptions that were not legitimate,

9    according to the indictment?

10          A.    Yes, that's correct.

11          Q.    The same for paragraph (c)?

12          A.    Yes.

13          Q.    If you turn to the next page, why

14    don't you just look through the tables.  If you

15    just flip through, there is tables, there is

16    similar tables on the following five pages,

17    pages 13 through 18.  They all appear to be in

18    roughly the same format.

19               MR. LEDLIE:  Paragraph (d) through

20    (l), for the record.

21               MR. GOLDSTEIN:  Thank you.

22               MR. LEDLIE:  Unless you are going

23    on.

24          Q.    That was on the top of 18.

25               Fair to say that all the

Page 321

1    prescriptions, according to this indictment,

2    all the prescriptions contained in those tables

3    were not written for legitimate medical

4    purpose?

5         A.    Yes, fair to say.

6         Q.    You can put that document aside.  I

7    just have a few more questions.

8              Your work in the TDS -- with

9    respect to your work in the TDS, can you

10   describe the general command structure of your

11   unit?

12        A.    Yeah.  There is members of the TDS

13   from local jurisdictions and from the DEA.

14   There is a GS, a group supervisor, who we

15   report to, and then there is an ASAC above

16   that, a RAC and an ASAC that are just senior

17   level management, supervisors, but my group

18   supervisor is my immediate supervisor.

19        Q.    And do you have an understanding of

20   who within the general command structure is

21   responsible for setting the priorities of your

22   unit?

23        A.    My group supervisor decides what we

24   do.

25        Q.    Have there been -- strike that.

1            At a high level, you agree with the

2    priorities of your unit, as set forth by your

3    supervisor?

4            MR. BENNETT:  Objection.  You are

5    not authorized to express personal opinions

6    that rely on nonpublic facts or information.

7    To the extent you have a personal opinion that

8    does not use public facts or information to

9    answer that question, you are authorized to

10   answer that.

11       A.    I do not have a public opinion.

12       Q.    I hand you what has been marked

13   Exhibit 27.

14                  -  -  -  -  -

15              (Thereupon, Deposition Exhibit 27,

16              Newspaper Article Concerning Dr.

17              Gregory Ingram, was marked for

18              purposes of identification.)

19                  -  -  -  -  -

20       A.    Yes.

21       Q.    Do you see this is a press release

22   about Dr. Gregory Ingram?

23       A.    Yes.

24              MR. BENNETT:  Objection.

25   Mischaracterizes the exhibit.  My

Page 323

1    understanding, this is an article written by

2    Eric Heisig for Cleveland.com.  It is not a

3    press release from the Department of Justice.

4              MR. GOLDSTEIN:  Thank you.  I

5    misspoke.  I misspoke.  It is not a press

6    release, so thank you for the clarification.

7         Q.    Fair to say this is a newspaper

8    article written about Dr. Gregory Ingram?

9         A.    Yes, that's fair to say.

10        Q.    And if you look at the -- do you

11   recall testifying about Dr. Ingram earlier

12   today?

13        A.    I do.

14        Q.    And you recall testifying that Dr.

15   Ingram's case was the one case you could think

16   of in which the opinion of a medical

17   professional was not necessary for the

18   prosecution of that case?

19        A.    Yes, sir.

20        Q.    If you look at the first sentence,

21   "A former Akron doctor was sentenced Tuesday to

22   one year in prison for prescribing painkillers

23   to strip club dancers and their friends in

24   exchange for money and sexual favors"; do you

25   see that?

Page 324

1           A.    I do.

2           Q.    And then it says Dr. Ingram was

3     that prescriber that it is referring to; is

4     that right?

5           A.    Yes, it does.

6           Q.    And are those statements accurate?

7                 MR. BENNETT:  Objection.  This is

8     beyond the scope of his authorization to

9     disclose specific information.  To the extent

10    this was disclosed by the United States to the

11    Federal District Court, you are authorized to

12    answer it.

13                To the extent that this is a report

14    by Cleveland.com that you are unaware whether

15    those facts have been disclosed publicly by the

16    United States, you are not authorized to

17    answer.

18          A.    I'm not aware of whether the U.S.

19    public court disclosed this or dot com.  So I

20    don't know the answer.

21          Q.    Okay.  You testified that Dr.

22    Ingram was charged and convicted; is that

23    right?

24          A.    Yes, sir.

25          Q.    And there was an indictment filed

1    in connection with those charges, presumably?

2         A.    Yes, sir.

3         Q.    And are you aware of generally the

4    contents of that indictment?

5         A.    Yes, I am.

6         Q.    And are you aware that the

7    indictment is a public document?

8         A.    I am.

9         Q.    And did that indictment, as far as

10   you are aware, contain information

11   corroborating the statements here that Dr.

12   Ingram was sentenced for prescribing

13   painkillers to strip club dancers and their

14   friends in exchange for money and sexual

15   favors?

16              MR. LEDLIE:  You are authorized to

17   answer based on the indictment, if you know.

18        A.    Yes.

19        Q.    And is that the reason why the

20   opinion of a medical professional was not part

21   of the prosecution of his case, without

22   disclosing any information you have and any

23   nonpublic information related to the

24   prosecution?

25              MR. BENNETT:  Objection.  To the

Page 326

```
 1    extent that that calls for the internal
 2    deliberations and prosecutorial discretion of
 3    the United States, you are not authorized to
 4    answer.
 5                MR. LEDLIE:  I'll object to the
 6    form.
 7         Q.    Based on your personal knowledge.
 8         A.    I don't really have any personal
 9    knowledge on this case, except what is my
10    professional knowledge on this case, because it
11    was entirely my case.  So it was all in the
12    scope of my TDS employment.
13         Q.    I think we can move on.
14                MR. GOLDSTEIN:  Let's go off the
15    record for two minutes.
16                (Recess taken.)
17         Q.    Det. Leonard, what drugs are
18    more -- thank you, Det. Leonard.  Just a few
19    more questions today.
20                What drugs are more commonly seized
21    in your county than other Ohio counties, if
22    any?
23         A.    I don't normally seize the drugs.
24    Most of the drugs I deal with are on paper,
25    they have already been dispensed and used, so
```

Page 327

1    I'm not really seizing the actual prescription

2    pills themselves.

3            Q.    Do you know which drugs are most

4    heavily used and abused within these counties,

5    which illegal drugs, I should say?

6            A.    Which illegal drugs?

7            Q.    Correct.

8            A.    Heroin and fentanyl, marijuana.

9            Q.    In any particular order?

10           A.    I wouldn't know which order.  Those

11   are the ones that are abused the most, illicit

12   drugs, cocaine.

13               I don't work -- the only reason I

14   know that is from other agents in my Akron

15   Police Department office, the cases that they

16   are working.  I don't work illicit cases.  So I

17   don't handle a lot of those drugs.

18           Q.    Do you have an understanding of how

19   often any of those particular drugs are seized

20   within the TDS jurisdiction?

21               MR. LEDLIE:  Object to the form of

22   the question.

23               MR. BENNETT:  And I object to the

24   extent that you are asking for DEA cases.  I

25   understood you asking Akron and things like

Page 328

1    that.

2         Q.    Let me strike the question.

3              Are there -- do you have any

4    understanding of how often illegal drugs are

5    seized in the counties in Northern Ohio?

6              MR. LEDLIE:  Object to the form of

7    it.

8         A.    Our patrol units seize drugs every

9    day.  Obviously, not in large quantities

10   everyday, but drugs are seized and tagged into

11   evidence on a daily basis.

12        Q.    Do you have an understanding of

13   whether any particular illegal drug that you

14   just discussed is most commonly related to

15   violent crime in Northeastern Ohio?

16        A.    It would only be my assumption and

17   my guess, so, no, I can't gave you an accurate

18   answer to that question.

19        Q.    Do you have a sense of whether use

20   of prescription opioids versus use of illegal

21   drugs, whether one of those is more commonly

22   associated with violent crime in Northeastern

23   Ohio?

24              MR. LEDLIE:  Object to the form of

25   the question.

Page 329

1      A.    No, I really don't have a feel for

2  which one would be -- which would be a bigger

3  problem, violent-wise.

4      Q.    In connection with your work in the

5  Akron Police Department, are you aware of any

6  grants that your department has received that

7  relate to the investigation of illegal drug

8  use?

9      A.    We discussed earlier that I had one

10  grant from the Ohio Attorney General's Office

11  that assisted in the funding of the Dr. Harper

12  investigation.  Our grant writers, I know they

13  work tirelessly trying to find available funds.

14  I don't know what all they have received and

15  where they went.

16      Q.    Putting that grant aside -- strike

17  that.

18              I'm going to show you what has been

19  marked as Exhibit 28.

20                    -  -  -  -  -

21              (Thereupon, Deposition Exhibit 28,

22              Designated Confidential, National

23              Diversion Survey Questionnaire,

24              Beginning with Bates AKRON

25              000370688, was marked for purposes

Page 330

1           of identification.)

2                  -  -  -  --

3      Q.    Do you recognize this document?

4      A.    I do.

5      Q.    What is it?

6      A.    A National Diversion Survey

7  Questionnaire that I fill out on a quarterly

8  basis.

9      Q.    And you fill out the information

10  with your duties on the Akron Police

11  Department?

12      A.    I do.

13      Q.    And why are you the person in the

14  Akron Police Department that fills this out?

15           MR. LEDLIE:  Object to the form of

16  the question.  Calls for speculation.

17      A.    Because I investigate the

18  prescription investigations.

19      Q.    Who is the recipient?  Do you know

20  who the recipient of this information is?

21      A.    I do.  It is the Nova Southeastern

22  University that does this study.

23      Q.    Do you have an understanding of why

24  they are seeking this information?

25      A.    I understand they are trying to see

                                                    Page 331

1    what medications are abused and in what

2    frequency, how many numbers they have.  I don't

3    know their overall end goal or their end game

4    on it.

5         Q.    Understood.  If you turn to the

6    page 3 of this document, there is a list.  On

7    the left-hand column, there is a list of drugs

8    diverted or allegedly diverted, and the next

9    column over is the number of cases in which the

10   drug is mentioned; do you see that?

11        A.    I do.

12        Q.    And I take it you are the one that

13   populates the second column, the number of

14   cases in which the drug is mentioned?

15        A.    I do.

16        Q.    And what do you populate that

17   column based on?

18        A.    On active investigations that I

19   have either started or -- started that quarter.

20        Q.    And are these investigations that

21   are limited only to Akron Police Department or

22   are they also DEA?

23        A.    These are Akron Police Department,

24   within the zip codes of the City of Akron.

25        Q.    So fair to say this does not --

Page 332

1    completing this questionnaire does not relate

2    in any way to the work on TDS?

3           A.    Correct.

4           Q.    If you take a look through the

5    column the Number of Cases, you see there is

6    two for Adderall, there is two for

7    Benzodiazepine, there is four for Codeine; do

8    you see that?

9           A.    I do.

10           Q.    If you turn to the next page, you

11   see that there are two cases related to Vicodin

12   tablets?

13           A.    Yes.

14           Q.    On the next page, there is a three

15   cases related to Percocet?

16           A.    Yes.

17           Q.    The next page there is one case

18   related to Ultram?

19           A.    Yes.

20           Q.    And do you have any reason to doubt

21   the accuracy of those figures?

22           A.    No.

23           Q.    Turn to the last page.

24           A.    Okay.

25           Q.    It says, "Other Drug Trends:

Page 333

1    Illicit Drugs: Heroin Cases"?

2         A.    Yes.

3         Q.    And then the far left column asks,

4    it says, "During the past three months, how

5    many new heroin cases were opened by your

6    department?" and the number of cases here is

7    listed as 57?

8         A.    That's correct.

9         Q.    And do you have any reason to doubt

10   those figures?

11        A.    I do not.

12        Q.    If you look at the last box on this

13   document, did you populate that -- did you

14   respond to that question?

15        A.    I did.

16        Q.    And do you have any reason to doubt

17   any of the information contained there?

18        A.    I do not.

19        Q.    And how did you go about completing

20   this question -- or responding to this

21   question?

22        A.    I took down that the new ongoing

23   drug trends for the promethazine with codeine.

24   The 57 heroin cases, I get that information

25   from the two detectives that work the heroin

Page 334

1    overdose cases.  Those are their numbers.  And

2    then the other amounts are what the oxycodone

3    products generally sell for, about a dollar a

4    milligram in the area, two milligrams Xanax

5    bars.  These are just prices that -- street

6    values of the narcotics.

7           Q.    Was this information that was all

8    provided by APD investigators?

9           A.    Yes.

10          Q.    So Det. Leonard, with respect to

11   Exhibit 28, are any of the cases that were

12   described, either the heroin cases or the cases

13   related to diversion, cases that you were

14   personally working on?

15          A.    Yes.  The diversion cases.

16          Q.    Okay.  But they were cases that

17   were not also DEA cases as part of the TDS?

18                MR. LEDLIE:  Objection.  To the

19   extent that requires you to disclose what

20   investigations you are doing for the DEA, you

21   are not authorized to answer that.  I believe

22   you indicated that these were Akron cases and

23   Akron numbers, and they were cases that were

24   open in Akron.

25                So we would not have an objection

1    to you answering on behalf of Akron, but you

2    would not be able to comment regarding --

3                   THE WITNESS:  Okay.

4         A.    Can I ask him a question for a

5    second?

6                   MR. LEDLIE:  I have a question

7    about this, because I have your interest as

8    well.

9                   MR. BENNETT:  Can we go off the

10   record to talk about privilege?

11                  MR. GOLDSTEIN:  Sure.

12                  MR. BENNETT:  Thank you.

13                  (Recess taken.)

14                  MR. GOLDSTEIN:  Back on the record.

15                  MR. BENNETT:  Counsel, after having

16   a chance to confer with the witness, to the

17   extent that all, some, or none of these cases

18   were also opened as a DEA case, the witness is

19   not authorized to answer any questions

20   regarding whether they were or were not also

21   opened as DEA cases.  He is only allowed to

22   answer on behalf of Akron in the cases opened

23   in Akron.

24                  MR. GOLDSTEIN:  Okay.  In that

25   case, I don't have any first questions on that

Page 336

1    document.

2         Q.    This is, mercifully, the last

3    document of the day.

4                    -  -  -  -  -

5               (Thereupon, Deposition Exhibit 29,

6               Designated Confidential, 7-25-2011

7               Email, Beginning with Bates AKRON

8               000368263, was marked for purposes

9               of identification.)

10                   -  -  -  -  -

11        Q.    Handing you Exhibit 29, do you

12   recognize this document?

13        A.    I do.

14        Q.    What is it?

15        A.    It is an email from Ashley Frank

16   Summit County Courthouse.

17        Q.    I believe you testified earlier who

18   Ashley Frank is -- maybe not.  I'll strike

19   that.

20               Who is Ashley Frank?

21        A.    I believe Ashley works for Summit

22   County Court for the drug court.  Yeah, she

23   works for drug court.  That was a different

24   Ashley we talked about earlier.

25        Q.    Thank you.  Ashley Williams?

Page 337

1          A.     Yes.

2          Q.     And if you look at the middle of

3     the page, it looks like Ashley is asking you if

4     the individual referenced here would be a

5     candidate for drug court; is that accurate?

6          A.     Yes.   That appears what she is

7     asking, yes.

8          Q.     And she says, "I ran his OARRS

9     again"; do you see that in the second sentence?

10          A.     I do.

11          Q.     And then if you look down, there is

12     a list of over a dozen entries; do you see

13     that?

14          A.     I do see that.

15          Q.     And what is your understanding of

16     those entries that are listed, starting from

17     March 15 to June 28?

18          A.     They are a list of narcotics, drugs

19     that this individual filled during that

20     timeframe.

21          Q.     And is this information that was

22     obtained through the OARRS database?

23          A.     It appears that it was, yes.

24          Q.     And it looks like this individual

25     obtained prescription opioids from several

Page 338

1    different sources listed here?

2         A.    I'm sorry.  Say that again.  I was

3    reading.

4         Q.    It looks like there were several

5    different sources of the prescription opioids

6    that this individual received?

7         A.    Are you talking about prescribers?

8         Q.    Correct.

9         A.    Yes.  There are multiple

10   prescribers, to include Akron General and

11   Summa.

12        Q.    Okay.  Prescribers and dispensers,

13   to the extent --

14        A.    I don't have dispensers on mine.  I

15   just have the physicians.  I don't have any

16   pharmacies listed.

17        Q.    Okay.  So these would have referred

18   to -- where it says from Summa, that would

19   refer to a prescription written by a Summa

20   physician?

21        A.    More than likely an emergency room

22   physician, yes, but again, it doesn't say that

23   either.

24        Q.    And is this type of information the

25   type of information that you would typically

Page 339

1    look to obtain when using the OARRS database in

2    the course of your investigations prior to

3    2012?

4              MR. LEDLIE:  Objection.  To the

5    extent that you are asking for how he

6    investigates, the tools and techniques how he

7    investigates the cases prior to 2012, law

8    enforcement privilege.

9              You can answer as to public legally

10   available information, not subject to --

11       A.   I don't know that there is any

12   public information.  This all would have been

13   through my law enforcement information.  So I

14   don't know that I can answer that question.

15       Q.   Have you ever -- strike that.

16              You have run -- you have looked for

17   this type of information through -- you have

18   looked to obtain this type of information

19   through OARRS in the course of your diversion

20   investigations prior to 2012, correct?

21       A.   Yes.

22       Q.   And why was it important to your --

23   is it important information to your

24   investigations?

25       A.   It is.

Page 340

1    Q.    And why is that?

2         MR. LEDLIE:   Now I would object as

3    to why you are going into how a -- police

4    investigation privilege.  If you are asking

5    about how he conducts his investigation, why

6    that would be important, but he's already

7    talked about OARRS extensively.

8    Q.    Maybe I'll ask it this way:

9    Setting aside whether it is important or not,

10   why do you -- why would you be interested in

11   this information from the OARRS database?

12   A.    I mean, that's -- for no other

13   reason except for law enforcement information,

14   I wouldn't use the OARRS database, so that

15   would all fall under how I do and why I do the

16   prescription investigations.  So I don't know

17   if I can answer that without going into the law

18   enforcement privilege.

19   Q.    The number of prescriptions that

20   were written, that are set forth here, are all

21   to the same individual, correct?

22   A.    Yes.

23   Q.    And is that consistent with

24   diversion?

25   A.    Yes.

Page 341

1          Q.     And why is that?

2          A.     Multiple prescriptions in a short

3    timeframe, a doctor shopper.

4          Q.     Does that suggest they were not

5    obtained for a legitimate medical purpose?

6          A.     Yes.

7                 MR. GOLDSTEIN:  I have nothing

8    further.  I would just note that we reserve the

9    right to re-open this deposition subject to

10   some of the positions taken today by counsel

11   for the plaintiffs and for the government, and

12   that we would also reserve the right to seek

13   additional Touhy authorization from this

14   witness.

15                MR. ROMAN:  I actually would

16   quarrel with the phrasing of that.  I don't

17   think we are re-opening that.  I think we are

18   not closing this deposition.

19                The objections and instructions

20   have been, in our view, improperly overbroad,

21   and we reserve all rights, so we do not close

22   this deposition.

23                MR. MOYLAN:  Before we go into

24   ending statements, I have just a couple more

25   questions with respect to Exhibit 29.

Page 342

1              EXAMINATION OF PATRICK LEONARD

2       BY MR. MOYLAN:

3              Q.    If you know, detective, do certain

4       hospitals in the Akron area or the Cleveland

5       area have pharmacies located on site?

6              A.    They do.

7              Q.    Do you know if Summa Health

8       operates retail pharmacies on site?

9              A.    They have a pharmacy on site.  I

10      don't know if it is retail or not.

11             Q.    I'm going direct your attention to

12      a website, and I'm going to read the address

13      into the record, www.SummaHealth.org, and there

14      is a page for retail pharmacy services.  I'm

15      going to show you this website.

16                   I'm going to ask if you have any

17      reason, if you look at that information, to

18      doubt the accuracy of it?

19             A.    No, I don't have any reason to

20      doubt the accuracy.

21                   MR. MOYLAN:  That's all the

22      questions I have.  Thank you.

23                   MR. ROMAN:  With that, I think we

24      are done for the day, detective.

25                   MR. LEDLIE:  I'm not done.

                                               Page 343

1              MR. ROMAN:  Sorry.

2              MR. LEDLIE:  First of all, as to

3     whether or not this deposition is open or not,

4     this is the second day of deposition of Det.

5     Leonard.  Many of these issues could have been

6     sorted out if counsel had worked with the

7     government more.

8              I know that we were not -- the

9     government has already identified that many of

10    these documents were not provided, and we have

11    come close.  I don't have, unless our court

12    reporter can give us a total, but we are very

13    nearly at the seven hour mark, and so I

14    understand everybody's position for the record,

15    but we are not in agreement that this

16    deposition is open.

17             I believe this deposition is

18    closed.  If you have additional questions to

19    ask today, please do so, otherwise, we will not

20    agree to this deposition being open.

21             MR. ROMAN:  Your position is noted.

22             MR. GOLDSTEIN:  Do you have any

23    questions?

24             MR. LEDLIE:  No.  I'm not going to

25    ask any questions.  Other than to say thank

Page 344

1   you.

2                   MR. GOLDSTEIN:  Thank you.

3                   MR. LEDLIE:  We do not waive

4   signature.

5           (Deposition concluded at 5:44 p.m.)

6                     - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                    TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 346

1                     REPORTER'S CERTIFICATE

2    The State of Ohio,     )

3                                       SS:

4    County of Cuyahoga.   )

5

6               I, Wendy L. Klauss, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, PATRICK LEONARD,

10   was by me first duly sworn to testify the

11   truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19               I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified.

22

23

24

25

Page 347

1          I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5              IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 2nd day of

8    April, 2019.

9

10

11

12

13                    *Wendy L. Klauss*

14          Wendy L. Klauss, Notary Public

15              within and for the State of Ohio

16

17   My commission expires July 13, 2019.

18

19

20

21

22

23

24

25

Page 348

```
 1                    Veritext Legal Solutions
                         1100 Superior Ave
 2                          Suite 1820
                       Cleveland, Ohio 44114
 3                     Phone: 216-523-1313
 4

     April 2, 2019
 5

     To: James Ledlie
 6

     Case Name: In Re: National Prescription Opiate Litigation v.
 7

     Veritext Reference Number: 3272305
 8

     Witness:  Patrick Leonard, Vol II      Deposition Date:  3/27/2019
 9

10   Dear Sir/Madam:

11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 349

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2

      ASSIGNMENT REFERENCE NO: 3272305
 3    CASE NAME: In Re: National Prescription Opiate Litigation v.
      DATE OF DEPOSITION: 3/27/2019
 4    WITNESS' NAME: Patrick Leonard, Vol II
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____        _____
 9    Date                    Patrick Leonard, Vol II
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12

           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15

           I have affixed my name and official seal
16

      this _____ day of_____, 20_____.
17

                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3272305
 3   CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 3/27/2019
 4   WITNESS' NAME: Patrick Leonard, Vol II
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Patrick Leonard, Vol II
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
                    Notary Public
24
          _____
25        Commission Expiration Date
```

Page 351

1                         ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 3/27/2019
3       PAGE/LINE(S) /        CHANGE        /REASON
4       _____
5       _____
6       _____
7       _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15      _____
16      _____
17      _____
18      _____
19

        _____        _____
20      Date                     Patrick Leonard, Vol II
21      SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22      DAY OF _____, 20_____ .
23                      _____
                        Notary Public
24
                        _____
25                      Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.