Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | MDL NO. 2804 |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


- - -


December 20, 2018


- - -


            Videotaped deposition of
DAVID LIN, taken pursuant to notice, was
held at the law offices of Drinker Biddle
& Reath, 105 College Road East,
Princeton, New Jersey, beginning at 9:18
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter,
Certified Realtime Reporter, and Notary
Public.


- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:
 2
         THE LANIER FIRM
 3       BY:  EVAN M. JANUSH, ESQ.
              IAN S. MILLICAN, ESQ.
 4       126 East 56th Street
         6th Floor
 5       New York, New York 10022
         (212) 421-2800
 6       evan.janush@lanierlawfirm.com
         ian.millican@lanierlawfirm.com
 7       Representing the Plaintiffs
 8
         O'MELVENY & MYERS, LLP
 9       BY:  ROSS B. GALIN, ESQ.
         Times Square Tower
10       7 Times Square
         New York, New York 10036
11       (212) 326-2000
         rgalin@omm.com
12
            - and -
13
         O'MELVENY & MYERS, LLP
14       BY:  EMILIE K. WINCKEL, ESQ.
         1625 Eye Street, NW
15       Washington, D.C. 20006
         (202) 383-5300
16       Ewinckel@omm.com
         Representing the Defendants, Janssen
17       and Johnson & Johnson and the
         Witness
18
19       PIETRAGALLO GORDON ALFANO BOSICK &
         RASPANTI, LLP
20       BY:  ALEXANDER M. OWENS, ESQ.
         1818 Market Street, Suite 3402
21       Philadelphia, Pennsylvania 19103
         (215) 320-6200
22       amo@pietragallo.com
         Representing the Defendant, Cardinal
23       Health
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 3

```
 1        APPEARANCES:  (Cont'd.)
 2
 3        ALLEGAERT, BERGER & VOGEL, LLP
          BY:  CHRISTOPHER ALLEGAERT, ESQ.
 4        111 Broadway, 20th Floor
          New York, New York 10006
 5        (212) 616-7060
          callegaert@abv.com
 6        Representing the Defendant,
          Rochester Drug Co-Op
 7
 8        TELEPHONIC APPEARANCES:
 9
          JACKSON KELLY, PLLC
10        BY:  GRETCHEN M. CALLAS, ESQ.
          500 Lee Street East
11        Suite 1600
          Charleston West Virginia 25301
12        (304) 340-1169
          Gcallas@jacksonkelly.com
13        Representing the Defendant,
          AmerisourceBergen
14
15        HUGHES HUBBARD & REED, LLP
          BY:  TINA M. SCHAEFER, ESQ.
16        2345 Grand Boulevard
          Kansas City, Missouri 64108
17        (816) 709-4159
          tina.schaefer@hugheshubbard.com
18        Representing the Defendant, UCB,
          Inc.
19
20        COVINGTON & BURLING, LLP
          BY:  RYAN ROBERTS, ESQ.
21        3000 El Camino Real
          5 Palo Alto Square
22        Palo Alto, California 94306
          (650) 632-4718
23        rroberts@cov.com
          Representing the Defendant, McKesson
24        Corporation
```

Highly Confidential - Subject to Further Confidentiality Review

Page 4

```
 1       TELEPHONIC APPEARANCES:   (Cont'd.)
 2
         ARNOLD & PORTER KAYE SCHOLER, LLP
 3       BY:  ANGEL TANG NAKAMURA, ESQ.
         777 Figueroa Street, 44th Floor
 4       Los Angeles, California 90017
         (213) 243-4000
 5       Angel.nakamura@arnoldporter.com
         Representing the Defendants, Endo
 6       Health Solutions; Endo
         Pharmaceuticals, Inc.; Par
 7       Pharmaceutical Companies, Inc. f/k/a
         Par Pharmaceutical Holdings, Inc.
 8
 9       JONES DAY
         BY:  MEREDITH KINCAID, ESQ.
10       1420 Peachtree Street, NE
         Suite 800
11       Atlanta, Georgia 30309
         (404) 581-8043
12       Mkinkaid@jonesday.com
         Representing the Defendant, Walmart
13
14       FOX ROTHSCHILD, LLP
         BY: EILEEN OAKES MUSKETT, ESQ.
15       1301 Atlantic Avenue
         Midtown Building, Suite 400
16       Atlantic City, New Jersey 08401
         (609) 348-4515
17       Emuskett@foxrothschild.com
         Representing the Defendant, Validus
18       Pharmaceuticals
19
         ALSO PRESENT:
20
21       VIDEOTAPE TECHNICIAN:
22          Henry Marte
23
24
```

Page 5

```
 1                    -  -  -
 2                I  N  D  E  X
 3                    -  -  -
 4
    Testimony of:
 5                        DAVID LIN
 6
          By Mr. Janush       13,  372
 7
          By Mr. Galin          355
 8
 9
10                    -  -  -
11              E  X  H  I  B  I  T  S
12                    -  -  -
13
14    NO.           DESCRIPTION           PAGE
15    Janssen
      Lin-1        Memo,                  51
16                 Business Analytics
                   Marketing Research
17                 Plan
                   JAN-MS-00448838
18
      Janssen
19    Lin-2        Video 1                59
                   Introduction Video
20                 Script
                   JAN-MS-00131172-56
21
      Janssen
22    Lin-3        Highlights of          74
                   Prescribing Information
23                 Nucynta
                   10/2010
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                        -  -  -
 2              E X H I B I T S  (Con'd.)
 3                        -  -  -
 4
 5   NO.              DESCRIPTION            PAGE
 6   Janssen
     Lin-4            Common Objections      101
 7                    And Appropriate
                      Responses
 8                    JAN-MS-03007298-04
 9   Janssen
     Lin-5            E-mail Thread          118
10                    1/9/12
                      Subject, Dow Jones
11                    Nucynta Warning Letter
                      JAN-MS-01122345-48
12
     Janssen
13   Lin-6            Fax Cover Sheet        122
                      8/26/11
14                    FDA Letter, 8/26/11
                      Subject, Nucynta
15                    JAN-0003-0002930-35
16   Janssen
     Lin-7            Slide Deck             142
17                    Unleashing the Power
                      JAN-MS-01114237
18
     Janssen
19   Lin-8            Slide Deck             165
                      Nucynta 2011
20                    Business Plan
                      Draft Only
21                    JAN00008227-80
22   Janssen
     Lin-9            Master Budget          190
23                    Excel Spreadsheets
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 7

```
 1                        -  -  -
 2            E X H I B I T S  (Con'd.)
 3                        -  -  -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Janssen
       Lin-10           E-mail Thread           232
 7                      12/9/12
                        Subject, Pain CSO
 8                      Team Recruiting
                        Briefing
 9                      JAN-MS-01049919-20
10     Janssen
       Lin-11           Work Order #6724        250
11                      Pain Management
                        Sales Team
12                      JAN-MS-00576727-46
13     Janssen
       Lin-12           E-mail Thread           259
14                      1/26/12
                        Subject, Guang Yang
15                      Opana ER 10 Top
                        JAN-MS-00289532-34
16
       Janssen
17     Lin-13           E-mail Thread           270
                        1/15/13
18                      Subject, Extended
                        Team Meeting
19                      JAN-MS-00660588
                        JAN-MS-00660589
20
       Janssen
21     Lin-14           Slide Deck              287
                        Nucynta ER Launch
22                      Readiness
                        Launch Governance
23                      Review
                        4/7/11
24                      JAN00010363-09
```

Highly Confidential - Subject to Further Confidentiality Review

Page 8

```
 1                      -  -  -
 2            E X H I B I T S  (Con'd.)
 3                      -  -  -
 4
 5    NO.            DESCRIPTION           PAGE
 6    Janssen
      Lin-15         E-mail Thread         292
 7                   1/21/10
                     Subject, 2010 PriCara
 8                   Pain Incentive Compensation
                     Plan Cycle 1
 9                   JAN-MS-01049657-58
                     JAN-MS-01049659
10
      Janssen
11    Lin-16         E-mail Thread         308
                     1/18/13
12                   Subject, KOLs Attending
                     National Sales Meeting
13                   JAN-MS-02069472
                     JAN-MS-02069476
14                   JAN-MS-02069473
15    Janssen
      Lin-17         E-mail Thread         318
16                   8/26/13
                     Subject, Status Recap
17                   JAN-MS-00288407
                     JAN-MS-01511433
18
      Janssen
19    Lin-18         E-mail, 2/2/12        322
                     Subject, Gharibo
20                   Update
                     JAN-MS-01079820
21
      Janssen
22    Lin-19         Prescribe             328
                     Responsibly
23                   Link from/to
                     JAN-MS-00766218
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 9

```
 1                        -  -  -
 2             E X H I B I T S  (Con'd.)
 3                        -  -  -
 4
 5      NO.              DESCRIPTION            PAGE
 6      Janssen
        Lin-20           E-mail Thread          335
 7                       1/12/14
                         Subject, ADF Coalition
 8                       JAN-MS-02097372-73
 9      Janssen
        Lin-21           Letter, 12/16/13       337
10                       Subject, Smart Moves
                         Smart Choices
11                       JAN-MS-00984287-95
12      Janssen
        Lin-22           E-mail Thread          340
13                       6/23/10
                         Subject, Thank you!
14                       ASCP Information on
                         DEA
15                       JAN-MS-00362016
                         JAN-MS-00362018
16
        Janssen
17      Lin-23           E-mail Thread          343
                         10/2/13
18                       Subject, Post-LC
                         LWG for Nucynta ER
19                       JAN-MS-02525303-04
20      Janssen
        Lin-24           E-mail Thread          350
21                       1/29/10
                         Subject, Action
22                       Prescription Opioid
                         Painkillers
23                       JAN-MS-00837195-98
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1                      -   -   -
 2            E X H I B I T S  (Con'd.)
 3                      -   -   -
 4
 5     NO.             DESCRIPTION          PAGE
 6     Janssen
       Lin-25          Slide Deck          353
 7                     Risk Management
                       Chapter 1
 8                     Potential Risks
                       Associated with
 9                     Opioids and Tapentadol
                       ER
10                     JAN-MS-01057540-78
11     Janssen
       Lin-26          Demonstrative       355
12                     Of David Lin
                       With Handwritten
13                     Notes
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              DEPOSITION SUPPORT INDEX
 3                        -   -   -
 4
 5      Direction to Witness Not to Answer
 6      PAGE    LINE
        None.
 7
 8      Request for Production of Documents
 9      PAGE    LINE
        None.
10
11      Stipulations
12      PAGE    LINE
        None.
13
        Questions Marked
14
        PAGE    LINE
15      None.
16
17
18
19
20
21
22
23
24
```

Page 12

```
 1              THE VIDEOGRAPHER:  We are
 2         now on the record.  My name is
 3         Henry Marte.  I'm a videographer
 4         with Golkow Litigation Services.
 5              Today's date is
 6         December 20th, 2018, and the time
 7         is 9:18 a.m.
 8              This videotaped deposition
 9         is being held in Princeton, New
10         Jersey, in the matter of National
11         Prescription Opiate Litigation.
12              The deponent today is David
13         Lin.
14              All appearances will be
15         noted on the stenographic record.
16              Will the court reporter
17         administer the oath to the
18         witness.
19                   -  -  -
20              ... DAVID LIN, having been
21         first duly sworn, was examined and
22         testified as follows:
23                   -  -  -
24                   EXAMINATION
```

Highly Confidential - Subject to Further Confidentiality Review

Page 13

```
 1                    -  -  -
 2    BY MR. JANUSH:
 3         Q.    Hi, Mr. Lin.  We had the
 4    privilege of meeting briefly before this
 5    deposition began.  My name is Evan
 6    Janush.  Thank you appearing today for
 7    your deposition.  Have you ever been
 8    deposed before?
 9         A.    Yes.
10         Q.    How many times?
11         A.    My recollection is
12    approximately two.  These were over ten
13    years ago.  So I think two -- two
14    instances.
15         Q.    Was that in the same case or
16    different cases?
17         A.    Different cases.
18         Q.    And what were the nature of
19    those two cases?
20         A.    I believe one was an
21    antitrust case and one was a patent case.
22         Q.    Do you remember, when you
23    were deposed, were you employed by
24    Janssen at the time?
```

Page 14

```
 1          A.    I was employed by, yes,
 2    Janssen or another -- it might have gone
 3    under a different name, but ti was still
 4    within Johnson & Johnson.
 5          Q.    What were the products at
 6    issue concerning those cases?
 7          A.    Hormonal contraception.
 8          Q.    In both cases?
 9          A.    My recollection is yes.
10          Q.    In this case, when did you
11    first learn about the deposition?
12          A.    I believe I was approached
13    regarding this deposition in the early
14    September -- either late August --
15    somewhere around Labor Day, is my
16    recollection.
17          Q.    Do you remember who
18    contacted you?
19          A.    Yes.  It was one of the
20    attorneys for J&J.
21          Q.    Do you remember whether that
22    was inhouse counsel or outside counsel
23    for J&J?
24          A.    Inhouse counsel.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Did you meet with anyone to

2    prepare for this particular deposition?

3          A.    Yes, I did.

4          Q.    Who did you meet with?

5          A.    The gentleman sitting on my

6    left and Emilie.  Ross and Emilie.

7          Q.    On how many different dates

8    did you meet with Ross and Emilie?

9          A.    We spent approximately two

10   days.  Yeah, two days.

11         Q.    Did you have separate --

12   were those -- those were in-person

13   meetings or telephone meetings?

14         A.    Those were in-person

15   meetings.

16         Q.    Okay.  Were they full-day

17   meetings?

18         A.    The better part of each day,

19   yes.

20         Q.    And approximately how many

21   hours per day did you meet?

22         A.    Somewhere between seven --

23   this is inclusive of all breaks and lunch

24   and everything.  So probably seven hours,

Page 16

1    seven to eight.

2            Q.    Per day?

3            A.    Per day.

4            Q.    Did you meet with any

5    inhouse counsel for Janssen to prepare

6    for your deposition?

7            A.    No.

8            Q.    Did anyone from Janssen

9    communicate with you other than Janssen's

10   outside counsel, Ros and Emilie --

11           A.    No.

12           Q.    -- concerning your

13   deposition?

14           A.    No.

15           Q.    Without getting into any

16   specifics, were you shown documents to

17   prepare you in advance of your

18   deposition?

19           A.    I was shown documents that

20   were representative of the types of

21   things that might be covered.

22           Q.    Okay.  Did you discuss this

23   deposition with anyone who is not your

24   counsel?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I mentioned it to my inhouse

2   attorneys, with my current employer, to

3   explain, just out of full disclosure,

4   that I would be out for a couple days.

5      Q.     And your inhouse -- your

6   current employer is who?

7      A.     My current employer is

8   Bristol-Myers Squibb.

9      Q.     I'm going to try to run

10  through your employment history as

11  quickly as I can.  I'm going to try and

12  spare you by ripping through as much as I

13  can myself, okay?  I may ask for some

14  details here and there.  So perhaps

15  you'll be able to help fill in the gaps.

16          I'm going to start with your

17  Janssen employment in 1997.  And just for

18  demonstrative purposes, I'm going to take

19  some notes.

20          I understand that you

21  started in July of 1997; is that right?

22      A.     That is right.

23      Q.     Okay.  And you started as

24  the assistant product director, sanitary

1   protection and over-the-counter personal

2   products company?

3           A.     Yes.

4           Q.     Is that right?

5           A.     That's correct.

6           Q.     All right.  What did you

7   generally do as the assistant product

8   director for sanitary protection and

9   over-the-counter products?

10          A.     These were entry level

11  marketing roles.  They entailed basic

12  elements of running a consumer brand.  So

13  I did things like forecasting,

14  promotional analysis, merchandising

15  strategy, market research.

16          Q.     Okay.

17          A.     Those are the big ones.

18          Q.     And from there, I have it

19  listed that you became a product director

20  of women's health personal products from

21  August of 1999 to July of 2000.  Is that

22  about right?

23          A.     Yes.

24          Q.     Okay.  And what did you do

Page 19

1    as a product director of women's health?

2          A.    At that time I was

3    responsible for an over-the-counter

4    product that was in vaginal anti-fungals.

5          Q.    What was that product?

6          A.    That was Monistat.

7          Q.    Okay.  Incidentally, in this

8    position, did your performance get

9    reviewed?

10         A.    Yes.

11         Q.    Okay.  And going back to

12   your assistant product director of

13   sanitary protection and over-the-counter

14   personal products, did your performance

15   get reviewed there as well?

16         A.    Yes.

17              MR. GALIN:  Mr. Janush, just

18         for the folks on the phone, I

19         think it's worth noting that

20         you're writing notes down on a

21         sheet using the Elmo as he's

22         speaking.

23              Sorry, folks.

24              MR. JANUSH:  Is there a live

Highly Confidential - Subject to Further Confidentiality Review

Page 20

1          feed from which people can see

2          this video at the same time?

3               THE VIDEOGRAPHER:  So they

4          do have a feed of the witness, but

5          not of the Elmo.  The Elmo is

6          being recorded obviously.

7               MR. JANUSH:  So for the

8          record, the Elmo is recording what

9          I'm doing.  And everyone will have

10          access to this and be able to see

11          my notes.

12  BY MR. JANUSH:

13          Q.    August 2000 to

14  September 2002, I have you listed as

15  director of marketing for Johnson &

16  Johnson Gateway, and that in this

17  position you managed the global marketing

18  and product development strategies for

19  J&J Gateway web-based products and

20  services; is that right?

21          A.    That is correct.

22          Q.    So J&J Gateway.

23               What are web-based products

24  and services?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     In the context of Johnson &

2     Johnson Gateway, this was a suite of

3     capabilities that was designed to enable

4     product launches and -- across multiple

5     geographies, and it also served as an

6     electronic -- let me think of the right

7     word.  This was early E-commerce, so it

8     was a way for hospitals and/or

9     distributors to place orders with the J&J

10    medical device business, basically

11    replacing fax by using an online order

12    system.

13          Q.     Did you get reviewed in that

14    position?  Did your performance get

15    reviewed?

16          A.     Yes.

17          Q.     The next position I show is

18    that you were product director for

19    women's healthcare for Ortho-McNeil

20    Pharmaceuticals from October 2002 to

21    June 2004; is that right?

22          A.     That's right.

23          Q.     Okay.  What did you do as a

24    product director for women's healthcare

Page 22

1    for Ortho-McNeil?

2            A.    I was the -- there, I was

3    the lead marketer for a new entry in

4    hormonal birth control, called Ortho

5    Tri-Cyclen LO.  That entailed promotional

6    strategy developing a forecast and making

7    resource allocation decisions for how the

8    commercial -- commercialization of that

9    product would take place.

10           Q.    And did you have your

11   performance reviewed in this role?

12           A.    My recollection is yes,

13   there was a performance review system.

14           Q.    Okay.  And when you have

15   your performance review, are you

16   typically presented with a document to

17   review and input your own comments as to

18   how you personally viewed your

19   performance for the year?

20           A.    The my recollection is that

21   most of these, I would say, virtually the

22   entire time that I was employed by

23   Johnson & Johnson, there was an

24   electronic system where you entered your

Highly Confidential - Subject to Further Confidentiality Review

Page 23

1    objectives for the year, typically

2    between four and five objectives.

3             You comment on it at the

4    midpoint of the year.  At the end of the

5    year, then your manager would typically

6    make a comment, a summary comment at the

7    end of the year.  And they are captured.

8         Q.    And did you have the

9    opportunity to review the end of the year

10   performance reviews throughout your

11   history of employment at Janssen, or the

12   various entities within Johnson & Johnson

13   that you worked for?

14        A.    Typically the reviews were

15   done at the beginning of the new year.

16   And there would be a sit-down

17   conversation and it could last anywhere

18   from 30 minutes, to, my recollection,

19   45 minutes at the most.  Yes.

20        Q.    And so it's just, to be

21   clear, it's your recollection that for

22   every year, so I don't have to ask the

23   question, every year of your employment,

24   you were reviewed formally in writing

Highly Confidential - Subject to Further Confidentiality Review

Page 24

1    within some online system that allowed

2    you to capture your own notes and allowed

3    your supervisor to capture his or her

4    notes; is that right?

5         A.    My recollection is almost

6    every year I would do that, yeah.

7         Q.    And almost every year

8    someone would in turn review you?

9         A.    Yes.

10        Q.    Okay.  The fifth job I have

11   listed is that you were a group product

12   director for urology.  And that this was

13   for Ortho-McNeil Pharmaceuticals from

14   July '04 to July '06; is that right?

15        A.    Yes.

16        Q.    Okay.  What did you do

17   generally in that role?

18        A.    I was responsible for a --

19   for two marketed products in the urology

20   space.  So it was simply managing a

21   larger portfolio than one product.

22        Q.    What products were they?

23        A.    Ditropan XL, and a product

24   called Elmiron.

Page 25

1          Q.    And the sixth job I have you

2     performing is director of marketing for

3     Ortho Women's Health and Urology.  And

4     that would be from July '06 to

5     February '08; is that right?

6          A.    That is right.

7          Q.    Okay.  What did you do

8     generally in that role?

9          A.    That was an expansion of

10    responsibilities from urology, and the

11    women's health portfolio was added to my

12    responsibility set.  So I had a broader

13    base of assets in terms of overall

14    oversight from a marketing perspective.

15         Q.    So greater responsibility.

16    What does it mean to have a broader base

17    of assets?

18         A.    It was a women's health

19    portfolio which had hormonal

20    contraception products, some vaginal

21    anti-fungals.  And then there was the

22    urology portfolio that I mentioned

23    earlier.  So Ditropan XL and Elmiron.  So

24    I became responsible for that entire

Page 26

1    group of assets.

2         Q.    I have information listed

3    here that your 2007 business results

4    exceeded sales and profit commitments by

5    $105 million and by $40 million

6    respectively.  Would you agree with that

7    statement?

8         A.    Yes.

9         Q.    Okay.  And in this role you

10   co-promoted Elmiron with an alliance with

11   Bayer Healthcare; is that right?

12        A.    That's correct.

13        Q.    Okay.  Next job I have is

14   that you were director of marketing,

15   institutional and hospital, for Janssen

16   Pharmaceuticals for -- between

17   February 2008 and December 2008; is that

18   right?

19        A.    That is right.

20        Q.    All right.  Tell us about

21   what you did as director of marketing

22   institutional hospital for Janssen

23   Pharmaceuticals.

24        A.    The company had submitted an

1    sNDA for a product in anticipation of it

2    being approved by the FDA.  I was brought

3    in to prepare the organization for

4    launch.  The product was not approved as

5    of August, and I worked within the

6    organization to close down the operation

7    in December.

8         Q.    So did you receive

9    essentially a transfer to a different

10   group when you became director of

11   marketing, Janssen Pharmaceuticals, in

12   July -- January of 2009?

13        A.    That was not a transfer.

14   That was simply within the same operating

15   unit.

16        Q.    Okay.  And you were in that

17   role as director of marketing for Janssen

18   from January 2009 through December 2009;

19   is that right?

20        A.    That's right.

21        Q.    Okay.  What did you do in

22   this role?

23        A.    In that role I was not

24   responsible for any product.  I was

Page 28

1    essentially asked to pull a -- pull a

2    team together, a cross-functional team to

3    envision what a more effective commercial

4    model could look like in the future.  So,

5    typically called business transformation.

6    Working alongside consultants that I

7    hired, management consulting firms.

8          Q.    And you were working on

9    creating a cross-functional team that was

10   not tied to any particular product at the

11   time?

12         A.    That's correct.

13         Q.    So this was, would it be

14   fair to say, akin to talent development

15   and creating a -- a unit that would be

16   implemented in the future?

17         A.    No.  It was -- it was more

18   accurately described as identifying what

19   are the potential capabilities that a

20   pharmaceutical company needed to evolve

21   in order to be actively and effectively

22   participating in healthcare marketing or

23   commercialization in the future.

24         Q.    All right.  And what did

Page 29

1    you -- what did you -- what was the

2    upshot of that work?

3          A.    The end result of that work

4    was identification of key capabilities,

5    specifically customer-facing capabilities

6    that needed to be evolved, strengthened,

7    if you will.  And also made a

8    recommendation to strategically isolate

9    more mature brands in a different

10   business unit, because it required

11   different skill sets.

12         Q.    Okay.  And the next role

13   that I have is that you became the

14   director of marketing for pain for

15   Janssen Pharmaceuticals, January 2010

16   through October 2012; is that right?

17         A.    That is right.

18         Q.    All right.  What did -- what

19   did you generally have responsibility for

20   as the director of marketing for pain for

21   Janssen in January 2010, in between

22   January 2010 and October of 2012?

23         A.    In that role I was the brand

24   leader, akin to the previous positions

Page 30

1    that I described, for a product called

2    Nucynta, and subsequently led the launch

3    of Nucynta ER, in the United States.

4         Q.    All right.  And Nucynta ER

5    is the Nucynta extended-release formula,

6    right?

7         A.    That's right.

8         Q.    Okay.  What does -- what

9    does it mean to be the brand leader for

10   Nucynta?

11        A.    The brand leader's

12   responsibility customarily involves,

13   you're the lead marketer and you

14   interface with key cross-functional

15   partners, such as sales, managed care,

16   business analytics and many other

17   enabling functions, to set a strategy for

18   a particular brand which typically

19   includes to what audience do you want to

20   engage, and how we differentiate this

21   product from others in the competitive

22   set.

23        Q.    What does it mean to have

24   led the launch of Nucynta ER?

Page 31

1          A.     Leading the launch of a

2     product would have entailed anticipating

3     how -- or contemplating how the product

4     would be positioned, communicated prior

5     to launch.  It would involve -- it would

6     involve definitely participation in label

7     negotiations with the FDA.

8               And then upon approval, be

9     responsible for marshalling the resources

10    of the overall organization to begin

11    promoting the product to a customer base.

12         Q.     When you speak about label

13    negotiations, that's something that --

14    that you would have been involved in?

15         A.     As a -- as a member of a

16    U.S. market, not directly responsible.

17    Those were regulatory discussions.

18               Simply, think of us as a --

19    not directly accountable but able to

20    provide input, just to make sure that

21    words are clear, labels are important in

22    the sense that they -- they're enduring

23    documents, so it's to make sure that the

24    clinical trials that were used as the

1   basis of approval, just to make sure

2   nomenclature is correct, that there's no

3   confusing terms, basically.

4                So as a marketing leader,

5   we're not directly responsible but you

6   have input into ensuring that we're using

7   the right words.

8        Q.    I'm just going to take some

9   notes.

10               And in terms of marshalling

11  resources to begin promoting, can you

12  expand on what that means?

13       A.    In the context of any

14  pharmaceutical product, this one

15  included, it would be -- we have an

16  intended audience, because these are

17  the -- this is the audience for whom we

18  feel would be the adopters of a new

19  product, where we feel like we can make

20  inroads by getting them to use our

21  product versus someone else's.  And so

22  very simply it's what's the relevant

23  audience where we think we can make an

24  impact.

1              And then marshalling

2    resources really pertains to, if you've

3    identified that audience, how many can I

4    -- it's not reasonable to get to all of

5    them.  So of the ones that you can get to

6    with the sales reps that you have ability

7    to access, what's a -- what's a middle

8    ground there in terms of

9    commercialization.

10         Q.    So strategizing how to use

11   sales force to reach doctors?

12         A.    Correct.

13         Q.    Okay.  Who were your key

14   direct reports in this time period as

15   director of sales and marketing -- excuse

16   me -- director of marketing between

17   January 2010 and October 2012?

18         A.    The team certainly evolved

19   during that period.  So could you

20   clarify?  Do you -- are you asking me to

21   list names of people who were direct

22   reports?

23         Q.    Yeah, who were key direct

24   reports that worked with you and worked

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1   under you, in executing the leading of

2   the launch and marshalling resources to

3   promote?

4                    MR. GALIN:  Objection to

5           form.

6                    THE WITNESS:  In the -- in

7           the period of 2010, 2011, this is

8           prior to the launch of Nucynta ER.

9           This was just during promotion of

10          Nucynta.

11              Key direct reports would

12          have included Dave Moore, Nithya

13          Desikan, Ron Kuntz, Patricia Yap.

14          And I'd like to just clarify that

15          some of these folks that I'm

16          listing, it's possible that they

17          would have been a direct report to

18          a direct report.  So I'm going to

19          speak generally about the brand

20          team.  But these are some folks.

21              Lisa Ferguson, Kanitha

22          Burns, Lisa Bianciani, Dominic

23          Lazzaro, Frank DeMiro, and again

24          for clarity, I'm listing names of

Highly Confidential - Subject to Further Confidentiality Review

Page 35

1           people who have been on the brand.

2           I cannot be exactly clear as to

3           their tenure and which years.

4           It's quite a long time ago.

5    BY MR. JANUSH:

6           Q.    And the next role that I

7    have you as performing is director of

8    sales and marketing, neuroscience/pain at

9    Janssen Pharmaceuticals, October 2012

10   through December 2013; is that right?

11          A.    That's right.

12          Q.    What did you do in this role

13   generally as director of sales and

14   marketing for neuroscience/pain for

15   Janssen?

16          A.    Essentially it was the

17   marketing job that I just described for

18   you.  And had expanded responsibility to

19   include a specialty sales force which was

20   a complete change out of our selling

21   structure in 2013.  So I had -- the main

22   difference is I bolted on sales to my

23   responsibility.

24          Q.    Okay.  And was this a board

Page 36

1    level role to be the director of sales

2    and marketing for the department of

3    neuroscience and pain?

4                 MR. GALIN:  Objection to

5         form.

6                 THE WITNESS:  The terms that

7         are used here is that, every

8         operating unit within -- let me

9         clarify.  Most of the larger

10        operating units had a

11        cross-functional team of leaders,

12        so direct reports to the president

13        of the business unit constituted a

14        management board that was

15        responsible for the day-to-day

16        operations of that unit.

17             So that's why I wanted to

18        clarify what board level means,

19        board level meaning of an

20        operating unit.  But that was not

21        a unique thing relative to me.

22             Other brand leaders within

23        that business unit, were also

24        members of that management board,

Highly Confidential - Subject to Further Confidentiality Review

1          along with cross-functional

2          leaders.

3   BY MR. JANUSH:

4          Q.    And who was the president of

5   neuroscience and CNS that you reported

6   to?

7          A.    In which year?

8          Q.    Sorry.  October 2012 to

9   December 2013.

10         A.    The president of the

11  business unit at the time was a gentleman

12  by the name of Michael Yang.

13         Q.    And I have notes stating

14  that in this position you provided

15  general management leadership for a

16  120-person commercial team, including

17  sales, marketing, market access, and

18  patient assistance and sales training.

19  Is that accurate?

20         A.    Yes.

21         Q.    And I have additional notes

22  stating that you drove total prescription

23  share growth through the four months

24  following the new specialty sales team

Page 38

1   formation.  Is that right?

2          A.    In the context of -- yes, we

3   organized a new selling structure that

4   was put in place in January 2013, and it

5   was during that time, yes, that -- that

6   references the right period, yes.

7          Q.    And we're going to get into

8   that a bit further down the road.  That

9   new sales team that you're speaking to is

10  the specialty pain force, right?

11         A.    That's right.

12         Q.    And I also have notes

13  stating that you -- when you led that new

14  standalone business unit, the specialty

15  pain force, that you exceeded -- your

16  group exceeded the 2013 business plan

17  commitment, 102 percent to forecast and

18  thereby delivering plus 2 percent

19  operational growth with a higher profit

20  contribution, in the face of a flat

21  category and multiple competitive

22  entrants to the market.

23               Would that be accurate?

24         A.    Yes, that's accurate.

1          Q.     And when we speak about

2      multiple competitive entrants to the

3      market, we're speaking about other

4      companies that were introducing opioid

5      products to the market at or around the

6      same time that Nucynta ER was being

7      introduced; is that right?

8          A.     That's right.

9          Q.     And I have further notes

10     indicating that you championed the pain

11     franchise evolution to this specialty

12     focus business unit.  Was this specialty

13     focus unit, this is again referring to

14     the pain force; is that right?

15         A.     That's right.  Not only the

16     pain force, but the general composition

17     of the business was different than in the

18     prior years, meaning it was not one of

19     many products in a bag.  It was reduced

20     to roughly 90-person sales organization,

21     a much smaller infrastructure.

22              MR. GALIN:  I don't -- I'm

23         new to the Elmo process.  But just

24         for the record I should note that

Page 40

1          you do as you want in your notes,

2          but it doesn't quite capture the

3          complete answer that he gave.

4              MR. JANUSH:  Right.  These

5          are -- this is demonstrative.  And

6          the transcript will always exist,

7          as will the video.

8              MR. GALIN:  That's fine.  I

9          just want --

10             MR. JANUSH:  I can only do

11         the best that I can do while --

12             MR. GALIN:  I'm impressed --

13             MR. JANUSH:  -- listening

14         and writing.

15             MR. GALIN:  I'm impressed

16         you're keeping up as well as you

17         are.

18             MR. JANUSH:  Thanks.

19  BY MR. JANUSH:

20         Q.   And my notes also indicate

21  that you oversaw the sales force strategy

22  development, hiring, training, and the

23  incentive compensation design.  Would all

24  of that be correct as well?

Highly Confidential - Subject to Further Confidentiality Review

1           A.    That is correct.

2           Q.    I'm just going to take some

3    notes on that.

4                 (Whereupon, a discussion was

5           held off the record.)

6                 MR. JANUSH:  I think it's

7           fairly mundane notes.

8                 MR. GALIN:  The question is

9           if folks want to take a break

10          right now just to see if we can do

11          that.  I don't want to throw

12          off --

13                MR. JANUSH:  I'm willing to

14          accommodate that to look into

15          whether that can be done.  We can

16          go off the record.

17                MR. GALIN:  Shall we take a

18          brief break allow people on the --

19          to see if we can accommodate folks

20          on the phone?

21                THE VIDEOGRAPHER:  Sure.

22          Yeah, I can't make any promises.

23          But I'll try to see if I can send

24          out a feed.

Page 42

1                The time is 9:52 a.m.  Off

2           the record.

3                (Short break.)

4                THE VIDEOGRAPHER:  We are

5           back on the record.  The time is

6           10:00 a.m.

7      BY MR. JANUSH:

8           Q.   Okay.  Before we went on

9      break, we were talking about some of your

10     last positions, specifically the sixth

11     position, director of marketing for pain,

12     and the seventh position, director of

13     sales and marketing neuroscience pain.

14                I want to just make sure

15     that I break these two positions down

16     with respect to asking the question I

17     asked earlier about performance reviews.

18                Were you -- was your

19     performance reviewed, to your

20     recollection, when you were director of

21     marketing for pain at Janssen?

22           A.   Yes, my recollection is we

23     did have performance reviews.

24           Q.   Okay.  Who would have

Page 43

```
 1   reviewed your performance when you were

 2   director of marketing for pain at

 3   Janssen?

 4          A.    Are you asking me for who

 5   would --

 6          Q.    The person, the --

 7          A.    The -- the specific name of

 8   the person?

 9          Q.    Yeah.  Like, who would your

10   boss have been that would have been

11   reviewing the director of marketing

12   position?

13          A.    It would have -- there

14   was -- in that -- in those three years I

15   probably had three different managers.

16          Q.    Okay.

17          A.    So it would have included,

18   in 2 -- my 2010 review would have -- I

19   just want to clarify that I -- the dates,

20   the exact date and year could be wrong.

21   But in order -- the right order I think

22   was Kimberly Park, who was vice president

23   of sales and marketing for internal

24   medicine.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 44

1              The second one might have --
2     would -- would have been Kati Chupa, who
3     was the vice president of marketing for
4     anti-infectives, the GI, gastrointestinal
5     business, and also pain.
6              And the very last review in
7     that role would have been Vanessa
8     Broadhurst, the president of internal --
9     Janssen internal medicine.
10         Q.    Okay.  And with regard to
11    the reviews that would have been
12    performed by Kimberly Park, by Vanessa --
13    by Kati Chupa, and by Vanessa Broadhurst,
14    you would have had an opportunity to see
15    those formal reviews and sign off on them
16    after they were completed by your
17    supervisors?
18         A.    Yes.
19         Q.    And moving forward to the
20    position as director of sales from
21    October 2012 to December 2013, who would
22    have reviewed you for that slightly more
23    than one-year period?
24         A.    I'd like to clarify that

Page 45

1   that role was director of sales and

2   marketing.

3          Q.    Sorry.  Director of sales

4   and marketing, yes.

5          A.    That review would have been

6   conducted by Michael Yang, my supervisor

7   during that year.

8          Q.    Do you remember being

9   reviewed by Michael Yang?

10         A.    My recollection is yes, I

11  recall being reviewed by -- by Michael.

12         Q.    Okay.  How'd that review go?

13         A.    Can you be more specific?

14         Q.    Sure.  Was it a positive

15  review, a mid -- a midlevel --

16  middling -- middle of the road review, or

17  a negative review?

18         A.    I think I would characterize

19  it as positive, as I would characterize

20  almost all my reviews at J&J.

21         Q.    Okay.  Do you remember what

22  your -- what your bonus targets were for

23  2000 -- 2012 to December 2013?

24         A.    No, sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1           MR. GALIN:  Objection to

2       form.

3    BY MR. JANUSH:

4           Q.    Do you remember what your --

5    you don't remember what your targets were

6    as compared to your base comp?

7           A.    It's -- I'd like to clarify

8    for the record.  I haven't been at J&J

9    for some time.

10          Q.    I understand.

11          A.    Numericals around targets,

12   those were unique to the band, the job

13   band.  But I can't -- I can't tell you

14   exactly what numbers they were.

15          Q.    What led to your transition

16   from the director of sales and marketing

17   position in neuroscience and pain group

18   at Janssen to your role as vice president

19   of marketing global franchise

20   organization in January of 2014?

21          MR. GALIN:  Objection to

22      form.

23   BY MR. JANUSH:

24          Q.    I could ask first -- the

Page 47

1    preliminary question.

2              Is it correct that in

3    January of 2014 you transitioned to the

4    vice president, marketing, global

5    franchise organization?

6         A.    That's correct.

7         Q.    What led to that transition?

8         A.    At the most basic level,

9    it's career development.

10        Q.    Okay.  Is there anything

11   happening in the pain market with respect

12   to Nucynta that led to the transition out

13   of the role of director of sales and

14   marketing in neuroscience and pain?

15        A.    No, sir.  The -- if you look

16   at the context of the different roles

17   that I've held, we were entering the time

18   when I had decided it was roughly three

19   and a half to four years on one business,

20   and I was given an opportunity to move to

21   a different sector of the company at a

22   higher level.  And those are few and far

23   between.  And so I entered the process

24   and was selected for the role, and so I

Page 48

1  moved.

2      Q.    Incidentally, was it during

3  that tenure between January 2014 to

4  April 2015 when you were in that new and

5  more substantial role, I would say, that

6  Nucynta was -- efforts were being made to

7  sell Nucynta?

8      A.    I read about -- so when I

9  moved, let me clarify, first I read about

10  the sale through my Apple phone on the

11  stock ticker.  Once I moved sectors from

12  Janssen into the consumer business, for

13  all intents and purposes, it's a

14  different world.

15          So I was in a completely new

16  business, in a global role, not the U.S.

17  role.  And so, yes, I learned about it --

18  I learned about it after it happened.

19      Q.    What led you to -- I

20  understand that you were separated from

21  Janssen in April of 2015; is that right?

22      A.    That's not right.  I was

23  separated -- I separated from Johnson &

24  Johnson Consumer companies in April of

Highly Confidential - Subject to Further Confidentiality Review

1    2015.

2          Q.    Okay.  What does it mean to

3    have separated from Johnson & Johnson

4    Consumer companies?

5          A.    The consumer sector was

6    going through a restructure.  So all of

7    the roles, like the roles I had, the role

8    I held, which was global in scope, were

9    being restructured to become regional

10   roles.  And as a result, I was informed

11   that in 20 -- I was -- at the end of 2015

12   that role would be regraded from vice

13   president to senior director.

14               At that point you're given

15   an option of take -- take the re-scoped

16   role, or you can opt for a package,

17   separation package, and move on.  I chose

18   the separation package.

19          Q.    And your separation

20   agreement has been produced before your

21   deposition.

22          A.    Yes.

23          Q.    Was part of that valuation

24   based on your 17 or so years of service

Page 50

1    to the company?

2            A.    My understanding is it's a

3    formula based where you are compensated

4    for unused vacation days, and some

5    formula based on years of service.

6            Q.    Okay.  Fair to say that

7    we've covered your employment history on

8    a broad strokes level from when you

9    started with a Johnson & Johnson entity

10   to when you were separated in April of

11   2015?

12           A.    I hope I've answered all

13   your questions.

14           Q.    I'm asking whether we have

15   accurately covered your employment

16   history on a broad level?

17           A.    Yeah, I have no other roles

18   within J&J.

19           Q.    Thanks for clarifying that.

20   Okay.

21                 Moving on to some

22   substantive matters, I hope.  Thank you

23   for working with me to get your

24   background information out of the way.

Highly Confidential - Subject to Further Confidentiality Review

Page 51

1                   I have a document Bates

2       marked JAN-MS-00448838.  I am marking it

3       as Exhibit 1.

4                   (Document marked for

5              identification as Exhibit

6              Janssen-Lin-1.)

7                   MR. JANUSH:  As a courtesy,

8              wherever I could, we put a cover

9              sheet on top of the document.  We

10             can peel that out and not count it

11             as part of the exhibit.  I'm sure

12             you'll agree.  I did it to make it

13             easier so no one is searching for

14             where these documents are.

15                  MR. GALIN:  I appreciate

16             that.

17                  MR. JANUSH:  I have a copy

18             for counsel as well.

19                  MR. GALIN:  Thank you.

20      BY MR. JANUSH:

21             Q.   This document is titled

22      business analytics marketing research

23      plan.  It appears to be sent from you.

24      And it's addressing the subject of

Page 52

1    Nucynta ER qualitative messaging study.

2              Excuse me.  It's from Mike

3    Hanlon to you.  Who was Mike Hanlon?

4         A.    Question for clarification.

5    I'd like to answer who Mike Hanlon is

6    first, but then will you give me some

7    time to review the document?

8         Q.    Absolutely.

9         A.    Okay.  Mike Hanlon was the

10   market research leader for Nucynta.

11        Q.    Okay.  Ready?

12        A.    Yes.

13        Q.    Okay.  I'm not seeking to

14   delve too deeply into this document.  I'm

15   trying to understand as a general

16   concept.  This is a memo that is

17   documenting the concept that, "The

18   Nucynta ER launch team had recently

19   completed market research which

20   identified the creative concept that will

21   move forward in various promotional

22   executions"; is that right?

23        A.    I agree with you, that's

24   what it says.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  And it looks like,

2    based on the next sentence, that,

3    "Results from a quantitative assessment

4    of 39 potential messages produced a

5    subset of the most compelling efficacy,

6    safety, tolerability, and MOA messages."

7                    MOA stands for mechanism of

8    action; is that right?

9          A.     That's my understanding,

10   yes.

11         Q.     Okay.  And skipping down to

12   the second paragraph.  It states, "Upon

13   completion of this phase, these messages

14   will be integrated with the concept and

15   the overall message flow will be

16   developed and tested.  Ultimately, this

17   output will inform brand and molecule

18   messaging at launch."

19                    Do you see that?

20         A.     Yes.

21         Q.     In your own words, can you

22   describe what a -- what this qualitative

23   message study was seeking to achieve?

24         A.     Very simply, a qualitative

Page 54

1    message testing would seek to understand,

2    of all the things that one could

3    communicate about a product, what would

4    be the most compelling to differentiate

5    it in the mind of an audience, which I

6    need to just clarify here.

7              It looks like, it says here

8    obtain feedback from HCPs.  So that would

9    be in the minds of a doctor or a nurse,

10   how would we actually break through the

11   clutter.

12        Q.    And what -- more

13   specifically, the group that was studied

14   with approximately 40 total interviews,

15   if we look at methodology at the bottom,

16   or near the bottom where I'm

17   highlighting, included 50 percent of

18   PCP -- that's primary care physicians,

19   right?

20        A.    Yes.

21        Q.    30 percent of the group

22   would be pain specialists that would be

23   interviewed, right?

24        A.    Yes.

Page 55

1          Q.    And 20 percent would be a

2     mix of neurologists, rheumatologists,

3     oncologists, and surgeons.

4               Do I have that right?

5          A.    Yes.

6          Q.    Okay.  And it says,

7     "Recruited from the ER target list."

8               What's the ER target list?

9          A.    So I don't have that target

10    list in front of me.  What I would

11    speculate, based on the fact that this is

12    pre -- it's mentioning prelaunch.  The --

13    if it was prelaunch, I am conjecturing

14    that the ER target list would have been a

15    set of prescribing physicians in the

16    United States that wrote long-acting

17    opioids, and it was a starting point of

18    these are the potential -- these are the

19    particular audiences that the brand would

20    seek to engage upon launch.

21               For clarity, that target

22    list prelaunch is probably bigger than

23    when you actually get to a launch,

24    because when you actually get to a

Page 56

1    launch, there is constrained resources.

2    You're limited by the capacity of the

3    sales force to actually reach them.

4              But this is the logical

5    starting point.  So I think what the memo

6    is trying to just convey in that sentence

7    is that you would want to recruit people

8    from research that you could conceivably

9    be interacting with in the future.

10        Q.    Okay.  At the bottom, it

11   says, "Action standard, results of this

12   research will be used to determine the

13   most clear and compelling message

14   elements that will be used to

15   successfully and appropriately launch

16   Nucynta ER."

17              Do you see that?

18        A.    Yes.

19        Q.    Did -- did -- are you aware

20   of other instances in which Janssen went

21   out and hired a third party, as -- as in

22   this case, it looks like it's Susan Wyant

23   of the Dominion Group, to conduct what --

24   what I understand is referred to as

1    segmentation studies?

2          A.    So can you repeat -- are you

3    asking if this is a segmentation study?

4          Q.    Well, first of all, is this

5    a segmentation study, or just a message

6    study?

7          A.    My understanding of this,

8    based on the -- what's available here is

9    that this is purely a recommendation

10   briefing me on the fact that we're going

11   to do some market research.

12         Q.    Okay.  And it's called a

13   study in objectives, right?

14         A.    Yes.

15         Q.    And it's to identify the

16   most clear and compelling way to

17   communicate key efficacy, safety,

18   tolerability and MOA messages, right?

19         A.    Yes.

20         Q.    And you are specifically

21   seeking to identify the pain and patient

22   types that healthcare practitioners would

23   treat with Nucynta ER and why.  Is that

24   also right?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1          A.    Yeah, I'm reading what
2     you're showing me, yes.
3          Q.    Okay.  And you're seeking to
4     gain insight into current attitudes
5     towards and treatments of, nociceptive,
6     neuropathic and mixed pain, right?
7          A.    That's right.
8          Q.    Did Janssen routinely engage
9     third parties to study and obtain
10    feedback from healthcare practitioners in
11    terms of the most compelling ways to
12    communicate efficacy, safety,
13    tolerability and mechanism of action
14    messages?
15         A.    As a general concept,
16    getting the voice of the customer
17    typically entailed hiring a third-party
18    market research firm to engage outside
19    customers to understand their points of
20    view on a particular topic.
21         Q.    And did Janssen routinely
22    engage third parties to go out and
23    perform market research to identify the
24    most clear and compelling ways to

Highly Confidential - Subject to Further Confidentiality Review

Page 59

1  communicate efficacy, safety,

2  tolerability and mechanism of action

3  messages?

4          A.    Generally speaking, it was

5  very, very commonplace to use third

6  parties to -- third-party market research

7  experts to study things inclusive of the

8  things you've pointed out here.

9                So yes, this would be --

10  messaging would be one element of it.

11  And this is -- this is very commonplace

12  prior to a launch.

13          Q.    Okay.  For now I'm going to

14  put Exhibit 1 aside.

15                MR. JANUSH:  I'm going to

16          mark as Exhibit 2, four documents

17          that I understand go together.

18          The Bates numbers -- I can pull

19          that for you.  The Bates numbers

20          are JAN-MS-00131172, 131175,

21          131180, and 13155 for the record.

22                (Document marked for

23          identification as Exhibit

24          Janssen-Lin-2.)

Page 60

1    BY MR. JANUSH:

2         Q.    I'm presenting to you what's

3    been produced from the sales training

4    file share.  So without getting into the

5    document and pausing for a moment, let's

6    talk about sales training file share.

7                Explain for us what the

8    sales training file share is.

9         A.    Sir, I can't explain what

10   the sales training file share is.

11        Q.    Are you familiar with the --

12   with the concept that there's a sales

13   training file share repository on your

14   network that sales representatives can

15   pull down training materials?

16                MR. GALIN:  Objection to

17           form.

18   BY MR. JANUSH:

19        Q.    Just asking.

20        A.    I am aware that sales

21   training materials can be accessed by

22   sales reps.

23                The specifics of how it's

24   stored, how it's loaded, how it's

Page 61

```
1   downloaded, how it's accessed is -- other
2   than someone gets it from their PC, I
3   could not speak intelligently to that.
4        Q.   Okay.  So these are videos
5   that were apparently produced in 2010
6   while you were the director of marketing
7   for the pain group.  We're going to go to
8   the first page, Video 1, introduction
9   video.  And it's a script, it appears,
10  from Frank DeMiro, product director for
11  Nucynta.
12            It starts by saying, "Hello
13  everyone, I'm Frank DeMiro, product
14  director for Nucynta.  It is hard to
15  believe that we are well over six months
16  into the launch of Nucynta."
17            And this would be referring
18  to the launch of Nucynta IR, correct, in
19  2010?
20       A.   That was the only product
21  that was approved at the time, so yes.
22       Q.   Okay.  And it states -- I'm
23  going to skip some of this.  But, "You
24  have all worked extremely hard to raise
```

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    awareness of Nucynta and the dual

2    mechanism of action, not only with

3    physicians, but with pharmacists and

4    nurses too."

5                   Do you see that?

6          A.    Yes, I do.

7          Q.    Okay.  And I want to pause

8    here for a moment.  Janssen never

9    actually established with clinical data,

10   approved by the FDA, that Nucynta has a

11   dual mechanism of action.  Isn't that

12   right?

13                 MR. GALIN:  Objection to

14         form.

15                 THE WITNESS:  Mechanisms of

16         action are stated, or they are

17         described generally in a label.

18         But there's no -- there's --

19         mechanism of action is not

20         something that's ever studied in a

21         clinical trial for any drug.

22                 MR. JANUSH:  Move to strike,

23         nonresponsive.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    The label that was approved

2    by the FDA had a caveat concerning the

3    language of mechanism of action, didn't

4    it?

5          A.    My recollection is yes.

6          Q.    Do you remember what --

7    what's your recollection of what that

8    caveat was?

9          A.    My recollection is that the

10   label would have said that the precise

11   mechanism of action is -- I'm not sure

12   what the word would be.  But it's a

13   caveat to the point of --

14         Q.    Unknown?

15         A.    That might be it.  Something

16   to the effect of unknown or not -- not

17   precise.

18         Q.    And the only basis for

19   Janssen's dual mechanism of action

20   statements are derived from preclinical

21   rat studies, isn't that right?

22         A.    My recollection of the basis

23   of this would be something other than

24   Phase III clinical trials.  So I am

Page 64

1   stating for the record, I don't know

2   whether it was preclinical, or if it was

3   a Phase I, but I believe it was not in

4   the Phase III pivotal trials that were

5   used for registration.

6           Q.    And as you sit here today,

7   you don't -- you don't know one way or

8   the other whether it was only rat studies

9   through which the hypothesis of dual

10  mechanism of action was derived?

11          A.    As I sit here before you

12  today, I want to reiterate for the record

13  that I came onto the brand in 2010 which

14  was following the launch of Nucynta.  So

15  I was not involved and I am at the moment

16  unfamiliar with what constituted the

17  basis of some of those earlier statements

18  that were put into the label.  It just

19  was before my time.

20          Q.    Understood.  But you were

21  also the director of marketing in 2010,

22  correct?

23          A.    Correct.

24          Q.    And so as the director of

Page 65

1    marketing, the buck stops with you in

2    terms of marketing messages, I mean

3    you're the person most accountable for

4    marketing messages, right?

5                    MR. GALIN:  Objection to

6           form.

7                    THE WITNESS:  I am the

8           leader who makes a strong

9           recommendation on how the product

10          should be positioned, how it

11          should be messaged.  And I do so

12          in consultation with the

13          appropriate legal, regulatory,

14          medical, healthcare compliance

15          checks.

16   BY MR. JANUSH:

17          Q.    And in that role as director

18   of marketing, did you ever take the time

19   to review the label and the underlying

20   studies to make sure that when making

21   statements from a marketing perspective

22   about dual mechanism of action, that they

23   are -- those statements are supported by

24   science?

Page 66

1          A.    As the director of

2    marketing, my job is to make sure -- my

3    job at the time was to make sure that

4    everything we did regarding promotion of

5    the product was according to the label.

6                The specific underlying

7    studies that may have preceded me are

8    items that I would have absolutely leaned

9    on my medical and clinical colleagues for

10   historical perspective.

11         Q.    And who would those

12   colleagues have been that you would have

13   leaned on for historical perspective?

14         A.    Well, it would have been

15   people in the medical -- in the medical

16   affairs function.  It could have been

17   colleagues from the R&D organization in

18   clinical affairs.

19                But I was not directly the

20   one verifying most of the things that we

21   are talking about.

22         Q.    Well, Frank DeMiro worked

23   under you, right?

24         A.    That's correct.

Page 67

 1          Q.    And would Frank DeMiro have

 2   verified his own statements independently

 3   or -- I'm trying to get to the bottom of

 4   statements like -- well, let's turn to

 5   specifically the Video 4, which ends in

 6   -- which is Bates Number 13115.

 7               And I'm going to look at the

 8   second bullet.  I'm going to actually box

 9   it in on this screen where it looks like

10   Frank DeMiro is saying, "Be sure to

11   always set up the dual mechanism of

12   action and include both the opioid and

13   nonopioid components.

14               "Our mechanism of action is

15   a key differentiating factor from other

16   currently available C-II opioids, so be

17   sure to speak specifically to the mu

18   opioid agonist and norepinephrine

19   reuptake inhibitor."

20               Do you see that?

21          A.    Yes, I do.

22          Q.    Do you agree with the

23   statement that your mechanism of action

24   regarding Nucynta was a key

Page 68

1   differentiating factor from other

2   currently available C-II opioids?

3          A.    I agree that at one point in

4   time it was believed to be a

5   differentiating factor based on what's

6   communicated here in the script.

7          Q.    In 2010, do you know whether

8   the FDA would have allowed this

9   statement -- whether the FDA would have

10  viewed this statement to be in conformity

11  with the label?

12                MR. GALIN:  Objection to

13          form.

14                THE WITNESS:  So I'd like to

15          clarify.  This appears to be

16          something that took place in 2010,

17          at the same time that I joined the

18          brand.

19                Anything that is produced

20          for sales training or promotional

21          communication with customers would

22          be reviewed by a cross-functional

23          team in the copy review process of

24          the organization, which would

Page 69

1           comprise legal -- which would

2           comprise legal, medical,

3           regulatory, healthcare compliance,

4           and any other subject matter that

5           would have to weigh in as to its

6           accuracy.  All materials at the

7           time of first use are in fact sent

8           to the FDA.

9                So I can't answer your

10          question specifically as to

11          whether the FDA would agree or

12          not.

13               What I can tell you is

14          everything that was done was

15          reviewed and sent to the FDA.

16  BY MR. JANUSH:

17       Q.    You're not -- you're not

18  saying that script -- sales training

19  scripts and videos are sent to the FDA

20  for approval.  You're not taking that

21  position, are you?

22       A.    I'm just saying in general

23  everything is reviewed.

24       Q.    When you say "everything," I

Page 70

1    want to be -- break down what

2    "everything" means.

3           A.    Okay.

4           Q.    Because I think that --

5    that -- that you might -- you might be

6    going a little off the reservation in

7    terms of what the FDA reviews.  So I'm

8    just trying to be careful here.

9           A.    Okay.

10          Q.    This is an internal video,

11   not an external piece that gets delivered

12   to a doctor as a leave-behind piece or a

13   product insert, a package insert.

14                This is a video script for

15   sales training purposes.  Are you taking

16   the position that all of Janssen's video

17   scripts for sales training purposes got

18   reviewed by the FDA?

19          A.    No, I'm not.  I'm simply

20   saying that they are all reviewed

21   internally by a copy review committee.

22          Q.    I understand that's your

23   position.  You understand the

24   distinction, the fact that people might

Page 71

1    review scripts internally doesn't

2    necessarily equate to accuracy?  Do you

3    understand that as a concept?

4                    MR. GALIN:  Objection to

5           form.

6    BY MR. JANUSH:

7           Q.    In other words, I'm

8    addressing -- I'm presenting you with

9    quotes from a video.

10          A.    Yeah.

11          Q.    And your answer is they

12   would have been reviewed internally.

13                  I'm not asking you questions

14   about whether this would have been

15   reviewed internally.

16                  I'm asking you questions

17   about whether you personally reviewed and

18   sought to ensure as director of

19   marketing, that statements -- sales

20   training scripts, were supported by the

21   package insert, were in conformity with

22   the package insert.

23                  Do you understand what I'm

24   getting at?

Highly Confidential - Subject to Further Confidentiality Review

Page 72

1          A.    Yeah, okay.  So let me

2     clarify your question.  You're asking me

3     if I personally verified the information

4     contained in the script?

5          Q.    Right.

6          A.    The answer is, I do not, I

7     did not personally verify all the

8     information that's contained in the

9     script.

10         Q.    Next question.  You had

11    addressed it's -- that the script would

12    be reviewed internally by a broad team of

13    others.  How sure are you that sales

14    training videos would be reviewed by a

15    cross-functional team?

16         A.    I would find it hard to

17    believe that anything like this would not

18    be.  It was standard protocol that all

19    standard -- all sales training materials

20    would be reviewed by that promotional

21    review committee.

22         Q.    Okay.  So if there were --

23    was a mistake made, such that the

24    statements contained in the script are

Highly Confidential - Subject to Further Confidentiality Review

1    deemed at a later date to have not been

2    in conformity with the label, that

3    mistake would, therefore, be owned by a

4    multitude of people?

5                MR. GALIN:  Objection to

6          form.

7                THE WITNESS:  I can't tell

8          you who owns the mistake.

9                If a -- if a mistake is

10         made, you're asking me to

11         conjecture as to where the

12         responsibility lies?

13   BY MR. JANUSH:

14         Q.    Yes, I am.

15         A.    I think the exact

16   responsibility -- the exact placement of

17   responsibility for a potential, and we're

18   talking about a hypothetical situation

19   right now, I don't know that I can answer

20   where that exact responsibility would sit

21   because it is through this process which

22   governs all of the materials that are

23   used, whether for sales training and/or

24   promotion.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2              identification as Exhibit

3              Janssen-Lin-3.)

4    BY MR. JANUSH:

5         Q.    I'm going to hand you what's

6    been marked as Lin Exhibit 3.  This is --

7    does not have a Bates number on it.  It's

8    the label -- we'll keep that out for a

9    minute.  It's the label for Nucynta in

10   October 2010.

11             Turn to the page -- you can

12   feel free to find if it's anywhere else,

13   but turn to the page for mechanism of

14   action.

15             That mechanism of action

16   says, "Tapentadol is a centrally acting

17   synthetic analgesic.  Although its exact

18   mechanism is unknown, analgesic efficacy

19   is thought to be due to mu opioid agonist

20   activity and the inhibition of

21   norepinephrine reuptake."

22             Do you see that?

23        A.    Yes.

24        Q.    So the FDA actually required

Page 75

1    this language, "although the exact

2    mechanism is unknown."

3              Do you see that?

4        A.    I do.

5        Q.    And that's what you were

6    referring to earlier as being the caveat

7    language, right?

8        A.    Yes.

9        Q.    Are you aware that folks in

10   Janssen's medical liaison team would

11   correct others when -- when messages were

12   going out regarding the dual mechanism of

13   action and say, "You actually have to add

14   this language in, this label language,

15   'although the exact mechanism is

16   unknown'"?  Have you ever seen that

17   happen?

18              MR. GALIN:  Objection to

19         form.

20              THE WITNESS:  Sir, I've

21         never seen that happen.

22   BY MR. JANUSH:

23        Q.    Okay.  Interestingly,

24   Kanitha Burns was one of your direct

Page 76

1    reports?

2            A.    She was.

3            Q.    And I'm going to --

4            A.    May I clarify?  She was a

5    direct report to a direct report.

6            Q.    Okay.  And who was the

7    intermediary report?

8            A.    Patricia Yap was the

9    intermediary.

10           Q.    Okay.  But going back to

11   this, you would agree that this is

12   limiting language that the FDA required

13   when speaking about mechanism of action,

14   correct?

15                 MR. GALIN:  Objection to

16           form.

17                 THE WITNESS:  I would agree

18           that it's a -- it's a

19           clarification that the exact

20           mechanism of action is unknown.

21   BY MR. JANUSH:

22           Q.    So if the exact mechanism of

23   action is unknown, that renders it

24   difficult, if not impossible, to

Highly Confidential - Subject to Further Confidentiality Review

1    unequivocally make statements about a

2    dual mechanism of action; isn't that

3    right?

4           A.    If we are following the

5    label, I would agree with you that it

6    says it's unknown and it's thought.  I'm

7    agreeing with the language.

8           Q.    Right.  So then going back

9    to the video script, if this was to be

10   tracking the label, wouldn't -- shouldn't

11   this have said, "Be sure to always set up

12   our thought that the dual mechanism of

13   action is due to mu opioid agonist

14   activity and the inhibition of

15   norepinephrine reuptake; however, the

16   exact mechanism of action is unknown."

17   That would be the most accurate way to

18   pitch to doctors mechanism of action

19   language when tracking the label, right?

20                MR. GALIN:  Objection to

21          form.

22                THE WITNESS:  I don't -- I

23          can't as -- let me be clear.

24                I am not a script writer for

Page 78

1          sales training, nor am I a medical

2          expert who is really well versed

3          in the clinical attributes of this

4          molecule.

5                  I agree with what the label

6          says.  I cannot state for certain

7          what I think is the most accurate

8          way to portray it in a script.

9    BY MR. JANUSH:

10          Q.    Let me say it differently.

11    FDA labels provide the ambit for what a

12    manufacturer of a drug can say about its

13    drug.  True or false?

14          A.    I believe the FDA -- the

15    United States package insert serves as

16    the home base of promotion.

17          Q.    Will you at least be able to

18    admit that the statements contained in

19    this video nowhere address the qualifying

20    language that "the exact mechanism of

21    action is unknown"?

22                MR. GALIN:  Objection to

23          form.

24                THE WITNESS:  What we're

Page 79

```
 1          looking at here is a script for a

 2          sales training video.

 3               I acknowledge that the --

 4          the words on this page are

 5          different than the words contained

 6          in the United States package

 7          insert.

 8               I cannot render an opinion

 9          as to whether or not it's the best

10          representation of discussing the

11          mechanism of action in a sales

12          training video.

13  BY MR. JANUSH:

14          Q.   I'd like to go back to --

15  I'm going to have you turn to a page in

16  the script at JAN-MS-00131177.  I'm

17  putting it up on the screen so you can

18  see where I'm at.

19               MR. GALIN:  Do you need

20          help?

21               THE WITNESS:  Is that

22          Video 1, 2, 3 or 4?

23  BY MR. JANUSH:

24          Q.   It's at Video 2, flashcard.
```

Page 80

1              And this appears to be

2    addressing acute back and neck pain,

3    patients experience a variety of symptoms

4    and signs.

5              And next bullet is

6    addressing this mixture of symptoms and

7    signs have been associated with both

8    nociceptive and neuropathic pain

9    processes.

10             And here at the third bullet

11   it's addressing targeting both the

12   ascending and descending pathways may

13   provide more effective analgesia in

14   studies involving IV and epidural agents.

15             As you sit here today, do

16   you understand that that dual mechanism

17   of action involved a review of the

18   ascending and descending pathways, do

19   you -- do you recall that language at

20   Janssen?

21        A.    Are you -- are you asking if

22   I've --

23        Q.    If you --

24        A.    -- if I've seen this

Page 81

1    language before?

2         Q.    Yeah.  And specifically the

3    concept of ascending and descending

4    pathways.

5         A.    I am familiar with the

6    concept, yes.

7         Q.    Okay.  What does it mean?

8         A.    I think we've discussed the

9    mechanism of action and what is believed

10   to be working in two different parts of

11   the central nervous system.

12        Q.    Okay.  And interestingly in

13   this script, Janssen is addressing that

14   targeting both the ascending and

15   descending pathways, i.e., the dual

16   mechanism of action, may provide more

17   effective analgesia in studies involving

18   IV and epidural agents.  Do you see that?

19        A.    Yes.

20        Q.    Nucynta was not an IV or

21   epidural agent, right?

22        A.    That's right.

23        Q.    So making a statement about

24   what is observed regarding descending

Highly Confidential - Subject to Further Confidentiality Review

1    pathways when studying IV and epidural

2    agents doesn't have a bearing on Nucynta,

3    right?

4              MR. GALIN:  Objection to

5         form.

6              THE WITNESS:  I think it's

7         important that we're looking at an

8         entire video suite, which is, it's

9         context for training -- it's

10        context for training, so --

11   BY MR. JANUSH:

12        Q.    Let me break that down.

13        A.    Mm-hmm.

14        Q.    Studies involving

15   the ascending and descending neuro

16   pathways concerning IV and epidural

17   agents, is context for Nucynta?

18             MR. GALIN:  Objection to

19        form.

20             THE WITNESS:  This is a --

21        let me clarify that this training

22        video script is -- I'm looking at

23        this for the first time.

24             I'm simply stating that in a

Page 83

```
 1          sales training video, there can
 2          sometimes be references to other
 3          components of science that are
 4          irrelevant to the therapeutic area
 5          in which your product is
 6          competing.
 7               I agree that that is not a
 8          direct link -- it is not a
 9          descriptor of Nucynta itself.
10   BY MR. JANUSH:
11          Q.   And in fact, studies
12   regarding dual mechanism of action in IV
13   therapy or epidural agents were nowhere
14   addressed within the Nucynta label,
15   correct?
16          A.   I can't verify or -- I can't
17   confirm or deny that.
18          Q.   All right.  Why don't you
19   take a look at Exhibit 3.  Take as much
20   time as you need.  And show me where dual
21   mechanism of action concerning IV or
22   epidural agents was deemed relevant to
23   the clinical pharmacology of Nucynta at
24   Page 15.
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Could you ask your question

2   again after I've looked at this?

3       Q.    Show me where the dual

4   mechanism of action concerning IV or

5   epidural agents was deemed relevant to

6   the clinical pharmacology of Nucynta.

7       A.    So I don't see mention of IV

8   or epidural agents in this section.

9       Q.    How about anywhere in the

10  label?

11      A.    I'd have to read the label.

12  Would you -- would you like me to read

13  the label?

14      Q.    Sure.  I want to -- I want

15  to make sure that we are clear that

16  Janssen was using off-label scientific

17  discussions concerning IV therapy and

18  epidural agents to support a general

19  concept of a dual mechanism of action in

20  the context of promoting Nucynta.

21              MR. GALIN:  Objection to

22          form.

23  BY MR. JANUSH:

24      Q.    So I'd like you to review

Highly Confidential - Subject to Further Confidentiality Review

1    the label and show me where there's any

2    support for this statement.

3         A.    Okay.  Could you just

4    clarify the question again, please?

5         Q.    I asked you to review the

6    label.

7         A.    Yes.

8         Q.    And show me where there's

9    any support for the statement concerning

10   IV therapy and epidural agents to support

11   a general concept of dual mechanism of

12   action in the context of promoting

13   Nucynta.

14        A.    After reviewing the label,

15   particularly the clinical pharmacology

16   section, which is where it would most

17   likely be stated, the words "regarding IV

18   and epidural" are not directly contained

19   within the label.

20             I'd like to clarify though,

21   that the context in the script was -- it

22   clearly referenced that those were -- the

23   mechanism of action and those agents were

24   separate and distinct, they made no

Page 86

1    allusion to Nucynta.

2         Q.    Isn't it true, however, that

3    this entire script is about Nucynta, and

4    supporting Nucynta's dual mechanism of

5    action is a component of this script?

6    You're not fussing on that point, right?

7         A.    I haven't read the entire

8    script, sir.  So I would agree there are

9    several parts of this.  From what I see

10   as the -- after a quick scan, there

11   are -- show what there's -- there's

12   descriptors in the script about how to

13   use various pieces.  There's also parts

14   in here that are meant to highlight,

15   through voiceover -- highlight specific

16   parts of their promotional pieces.

17              So, I don't have the full

18   context of what this script represented.

19   I'm only looking at copies here for the

20   first time.

21         Q.    Okay.  Well, can you turn to

22   the page where there's a picture of

23   the -- what looks like a sales rep/doctor

24   interaction.  Its Bates number at the

Page 87

1    bottom ends in 176.

2         A.    Okay.

3         Q.    "Rep script:  Norepinephrine

4    place a critical role in pain

5    modulation."

6              Do you see that?

7         A.    Yes.

8         Q.    "The action of

9    norepinephrine in the descending pathway

10   modulates pain signals transmitted

11   through the ascending pathway."

12             Do you see that?

13        A.    Yes.

14        Q.    "Norepinephrine and mu

15   opioid receptors interact at multiple

16   levels in the central nervous system and

17   this interaction may help regulate pain

18   signals."

19             Did I read that right?

20        A.    Yes.

21        Q.    Okay.  And that is

22   addressing the norepinephrine and the mu

23   opioid receptors, the dual mechanism of

24   action concerning Nucynta, right?

Page 88

```
1          A.    I agree with you that there
2    is reference to an ascending -- I'm
3    sorry -- a reference to --
4          Q.    Descending?
5          A.    -- descending and ascending
6    pathways.
7                There is not a mention of
8    Nucynta in that paragraph.
9          Q.    Well, since we're going
10   to -- we're going to mince words like
11   that, why don't you skip to the bottom.
12   And I'm in the mentioning that there's a
13   Nucynta.  I'm going to the closing
14   language that I'm boxing in here on the
15   screen.
16               "Doctor, would you agree
17   that the mechanism of norepinephrine
18   reuptake inhibition may be an important
19   part of your treatment plan for your pain
20   patients?"
21               This is clearly talking
22   about norepinephrine reuptake inhibition
23   in the context of a sales rep discussion
24   about Nucynta, isn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 89

1              MR. GALIN:  Objection to

2         form.

3              THE WITNESS:  This is what

4         would typically be construed as

5         an -- uncovering a physician need

6         and trying to acknowledge that

7         there could be room for something

8         that acted a little bit

9         differently, something new on the

10        market.

11   BY MR. JANUSH:

12        Q.    Go back a page.

13             MR. JANUSH:  I'm going to

14        move to strike that response as

15        nonresponsive.

16   BY MR. JANUSH:

17        Q.    This is -- that page was the

18   second page.  This is the first page.

19             "Video 2 flashcard."  In the

20   middle of the page, "After addressing how

21   you will use the flashcard to communicate

22   key messages regarding the role of

23   norepinephrine and NRIs in analgesia."

24   It goes down to say, "Then you will

Page 90

1    transition to the visual aid to review

2    the dual mechanism of action of Nucynta

3    as well as the clinical data and close

4    for the first choice use in moderate to

5    severe acute back and neck pain

6    patients."

7              Do you see that?

8         A.   Yes.

9         Q.   This is clearly addressing a

10   sales call, isn't it?

11             MR. GALIN:  Objection to

12        form.

13   BY MR. JANUSH:

14        Q.   In other words, it's a plan

15   for a Nucynta sales call.  This is a

16   script for instructing a rep how to

17   transition to a visual aid to review the

18   dual mechanism of action of Nucynta,

19   isn't it?

20             MR. GALIN:  Objection to

21        form.

22             THE WITNESS:  The script as

23        I see it here, yes, is basically

24        saying use the flashcard, open the

Highly Confidential - Subject to Further Confidentiality Review

```
 1          call, and then transition to your

 2          clinical message, which -- and

 3          again I don't have the visual aid

 4          in front of me.  But if it's

 5          saying here that the visual aid

 6          contains the MOA and then the

 7          clinical messages, then I think

 8          what we're saying is yes, we would

 9          want to have the flashcard precede

10          the visual aid in a sales call.

11   BY MR. JANUSH:

12          Q.    And that this -- that the

13   discussion of mechanism of action and the

14   discussion of norepinephrine is in the

15   context of an overall conversation --

16   hypothetical conversation with a doctor

17   about Nucynta?

18          A.    Yes.

19          Q.    Okay.  Thank you.

20          Now, earlier you said that

21   you didn't know whether the studies that

22   had been done concerning dual mechanism

23   of action were -- what did you say?

24   Phase III or what?
```

Page 92

1          A.    My comments were mechanism

2     of action, the supposed mechanism of

3     action, you asked me if these were only

4     studied through preclinical studies.  I

5     responded I don't know exactly whether it

6     was preclinical or Phase I, because I

7     came in the market -- or I came onto the

8     brand, Nucynta was already launched.  So

9     I couldn't be accurate as to exactly what

10    studies constituted that language in the

11    label.

12          Q.    So let's clarify now.

13          A.    Okay.

14          Q.    Can you turn to Page 15 of

15    the label going back to clinical

16    pharmacology at Section 12.

17          A.    Yes.

18          Q.    All right.

19    Pharmacodynamics, do you see that?

20          A.    Yes.

21          Q.    All right.  "Tapentadol is a

22    centrally acting synthetic analgesic.  It

23    is 18 times less potent than morphine and

24    binding to the human mu opioid receptor

Page 93

1    and two to three times less potent in

2    producing analgesia in animal models."

3              Do you see that?

4         A.    Yes.

5         Q.    The next sentence,

6    "Tapentadol has been shown to inhibit

7    norepinephrine reuptake in the brains of

8    rats, resulting in increased

9    norepinephrine concentrations."

10             Do you see that?

11        A.    Yes.

12        Q.    "In preclinical models" --

13   I'm circling that -- "the analgesic

14   activity due to the mu opioid receptor

15   agonist activity of tapentadol can be

16   antagonized by selective mu opioid

17   antagonists, whereas the norepinephrine

18   reuptake inhibition is sensitive to

19   norepinephrine modulators."

20             Did I read that right?

21        A.    Yes.

22        Q.    This is clearly only

23   limiting the dual mechanism of action to

24   preclinical rat studies, isn't it?

Page 94

1           MR. GALIN:  Objection to
2      form.
3           THE WITNESS:  Yeah,
4      according to what's written here,
5      yes.
6  BY MR. JANUSH:
7      Q.    Okay.  That clarifies what
8  we were discussing earlier, right?
9      A.    Yes.
10      Q.    Okay.  And indeed, the only
11  way to really test for mechanism of
12  action is to engage in post-label --
13  post-labeling tests that specifically
14  seek to test for mechanism of action and
15  prove that up with the FDA; isn't that
16  right?
17           MR. GALIN:  Objection to
18      form.
19           THE WITNESS:  I think that
20      would be -- it would be unfair for
21      me to comment on what studies
22      would be required to prove a
23      mechanism of action.  That's a
24      clinical pharmacology job.

1            In my role as a brand

2            leader, I really wouldn't be able

3            to surmise what's the right

4            clinical studies to be done.

5   BY MR. JANUSH:

6        Q.    Okay.  So you just trusted

7   those around you that the statements

8   conveyed from your brand team were

9   correct?

10        A.    There's a certain amount of

11   trust that you have to have in the

12   process to review what goes into things

13   like scripts, promotional materials, and

14   how you represent the brand.

15            We believed that there

16   was -- and I'm speaking during my time at

17   Janssen on the Nucynta brand.  There's an

18   amount of faith you have to have in the

19   process, in the rigors of that process.

20            So to my earlier point about

21   I can't verify every single statement

22   that's made scientifically, you do have

23   to rely on the folks that are deemed to

24   be more expert.

Page 96

1          Q.    But this concept of a dual

2    mechanism of action was a key

3    differentiating factor to sell Nucynta as

4    being different than other opioids in the

5    class, wasn't it?

6          A.    I can't -- I can state that

7    it was -- I can acknowledge that it was

8    in the video script that you showed me

9    here.  And I can also state that during

10   my time on the brand, it was is deemed to

11   be not very effective in communicating

12   the efficacy and tolerability of Nucynta

13   in the eyes of prescribers.

14              MR. JANUSH:  Move to strike.

15         Nonresponsive.

16   BY MR. JANUSH:

17         Q.    I asked you whether it

18   was -- whether the concept of a dual

19   mechanism of action was a key

20   differentiating factor utilized by

21   Janssen to demonstrate when selling its

22   product, Nucynta, that it is different

23   from other opioids in the class.  Is that

24   a true or false statement?

Page 97

1          A.     I can acknowledge that it

2     was part of the selling message.  It was

3     a key communication point at one period

4     in time.

5          Q.     And what period of time in

6     time was that?

7          A.     My recollection is that was

8     at the early launch days of Nucynta and

9     shortly thereafter.  One of my first

10    actions was that that was deemed to be

11    ineffective in terms of helping customers

12    really solve the problems they needed to

13    solve, which is does it work and can my

14    patients afford it.

15         Q.     So when -- by the time that

16    Nucynta -- let's pin this down.

17                By the time that Nucynta ER

18    launched and you were the head of the

19    launch team, as well as the head of sales

20    and marketing and the head of the pain

21    force team, is it your testimony that

22    when ER launched, your brand team would

23    have stopped utilizing the dual mechanism

24    of action as a selling feature of Nucynta

Page 98

1    ER?

2           A.    Without the exact

3    promotional materials that were used at

4    the launch of Nucynta ER, I can't tell

5    you exactly how it was worded.

6                 My recollection is, even if

7    it was mentioned as part of a broader set

8    of messages, it was only an

9    acknowledgment to the fact that it was

10   mentioned before, but it was not the key

11   selling feature of Nucynta ER.

12          Q.    What, what became the key

13   selling feature of Nucynta ER?

14          A.    My recollection, this is

15   strategically, is that the key messages

16   for differentiating Nucynta ER in the

17   eyes of customers, or in the minds of

18   customers, was really around its

19   efficacy, its tolerability.

20                So does it work was the

21   question that we tried to answer, because

22   that's the most common question asked by

23   physicians in my recollection of market

24   research.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And how did you answer, as

2     head of the brand team, whether Nucynta

3     ER works?

4                MR. GALIN:  Objection to

5          form.

6                THE WITNESS:  I would go

7          right back to the promotional

8          message that was developed in

9          conjunction with our United States

10         package insert.

11               And we would go through the

12         clinical trial results, talking

13         about how Nucynta ER reduced pain

14         intensity in the model that was

15         studied.

16               We would then go into the

17         tolerability results of each of

18         those studies.  And the overall --

19         the overall strategic intent was

20         to communicate that it does work.

21         And that's what formed the basis

22         of approval from the FDA.

23    BY MR. JANUSH:

24         Q.    As you sit here today, do

Highly Confidential - Subject to Further Confidentiality Review

Page 100

1    you remember what the key messages were,

2    the core messages for Nucynta ER?

3         A.    As I sit here today, and I'm

4    looking back many years now, efficacy,

5    tolerability, affordability, mechanism of

6    action could have been in there, but it

7    would have been not near the top of the

8    list.  And that's strategically what I

9    would -- what I recall in terms of a core

10   message.

11               MR. GALIN:  Mr. Janush, just

12          as a point of process --

13               MR. JANUSH:  Yeah.

14               MR. GALIN:  -- first, just

15          so those on the phone know, we're

16          writing down notes on -- using the

17          Elmo --

18               MR. JANUSH:  You don't need

19          to interrupt my deposition to let

20          them know that we're writing

21          notes.

22               MR. GALIN:  Well, I just

23          think they should know so that

24          they can follow along, since we're

Page 101

1           seeing them here and they are not.

2                But what I do want to just

3           take a moment for, is it looks

4           like you're about to introduce a

5           new exhibit.  We've been going for

6           a little more than an hour.  I'd

7           be happy, if you think it's going

8           to be just a few more minutes and

9           the witness is okay going a little

10          longer, or would this be a good

11          time for a break?

12                MR. JANUSH:  Good time for a

13          break.

14                THE VIDEOGRAPHER:  Stand by

15          please.  Remove your microphones.

16          The time is 11:09 a.m., going off

17          the record.

18                (Short break.)

19                THE VIDEOGRAPHER:  The time

20          is 11:24 a.m.  Back on the record.

21                (Document marked for

22          identification as Exhibit

23          Janssen-Lin-4.)

24   BY MR. JANUSH:

Page 102

1          Q.     Mr. Lin, I'm going to hand

2     you a document that I've marked as

3     Exhibit -- Lin Exhibit 4.  Its Bates

4     stamp is JAN-MS-03007298.  Its title is

5     "Common Objections and Appropriate

6     Responses."  At the bottom of the page it

7     says, "For internal training use only."

8               Do you recognize this

9     document?

10         A.     I can't speak to the exact

11    document, but I have seen documents that

12    do have things like common objections and

13    responses.

14         Q.     Okay.  So you've seen

15    documents of the type; is that right?

16         A.     Yes.

17         Q.     Okay.  And this appears to

18    be a script to deal with objections and

19    appropriate responses when having a

20    conversation between a sales rep and a

21    doctor addressing at the top of the page

22    the differences between Nucynta and --

23    Nucynta IR and tramadol IR.

24               And -- is that right?

1      A.    Yes.

2      Q.    And then going more towards

3  the middle on the bottom of the page, it

4  seems to be an objection handler or

5  objection document with appropriate

6  responses for the sales rep to address a

7  doctor who is saying, "I will not use

8  Nucynta as a first choice agent."

9            Do I have that right?

10     A.    Yes.

11     Q.    Okay.  Starting at the top,

12  the first bold heading.  The topic is,

13  "What is the difference between Nucynta

14  IR and tramadol IR?"

15            Do you see that?

16     A.    Yes.

17     Q.    And it says, first answer,

18  "Doctor, there are many differences

19  between Nucynta and tramadol.  For the

20  sake of this discussion, let's focus on

21  four of the differences."

22            And the first difference,

23  "Nucynta is a new molecule that is

24  unrelated to tramadol.  Unlike tramadol

Page 104

1    IR, Nucynta IR has a dual mechanism of

2    action which consists of mu opioid

3    receptor agonism and norepinephrine

4    inhibition reuptake."

5              Did I read that correctly?

6        A.    Yes.

7        Q.    Incidentally, is there any

8    qualifying language in this objection

9    handler document that addresses the exact

10   mechanism of action is actually unknown,

11   Doctor?

12       A.    Well, based on the -- what's

13   written on the script, there's no other

14   language.

15       Q.    Okay.  So meaning there's no

16   other language other than an affirmative

17   statement that, unlike tramadol, Nucynta

18   IR has a dual mechanism of action; is

19   that right?

20       A.    That's correct.

21       Q.    Okay.  Moving towards the

22   bottom.  The third bullet to address the

23   objection handler -- well, actually,

24   earlier -- no, we'll stick with the third

Page 105

 1   bullet.

 2              It says, "If the doctor is

 3   not convinced of the differentiation

 4   between Nucynta 50-milligram and

 5   Oxycodone IR, go back and review the

 6   ten-day end-stage joint disease pivotal

 7   trial data regarding efficacy and the

 8   improved GI tolerability."

 9              Do you see that?

10        A.    Yes.

11        Q.    What was sought to be

12   conveyed regarding the ten-day end-stage

13   joint disease pivotal trial data?  Do you

14   remember?

15        A.    I know that -- I recall that

16   the end stage joint disease was one of

17   the key clinical trials highlighting in

18   the promotional message.  But I can only

19   surmise from this training document that

20   it has -- there is compelling

21   differentiation in some measure of

22   tolerability.

23        Q.    Between Nucynta and

24   Oxycodone IR, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1          A.    No.  Typically the studies
2     are not head-to-head.  So they are
3     Nucynta immediate release in the same arm
4     versus placebo, and then an active
5     comparator versus placebo.  So they would
6     be shown appropriately in that manner.
7          Q.    So we agree with that
8     statement, that it's not a head-to-head
9     study, and that's how the data would be
10    shown.  But I'm addressing the statement
11    made at Bullet 3.  "If the doctor is not
12    convinced of the differentiation" -- that
13    means the difference, right -- "between
14    Nucynta 50-milligram and Oxycodone IR" --
15    let's just pause right there.
16              This opening to the bullet
17    is addressing making a differentiation
18    between Nucynta and Oxycodone IR,
19    correct?
20          A.    Yeah, that's the -- that's
21    the preamble to the sentence.
22          Q.    Right.  Okay.  "Go back and
23    re-review the ten-day end stage joint
24    disease pivotal trial data regarding

Highly Confidential - Subject to Further Confidentiality Review

Page 107

1    efficacy and the improved GI

2    tolerability."

3                    The entire context is

4    addressing directing the rep to go back

5    and review the ten-day joint disease

6    pivotal trial data to continue to

7    differentiate between Nucynta and

8    oxycodone IR, right?

9                    MR. GALIN:  Objection to

10            form.

11   BY MR. JANUSH:

12            Q.    I mean these -- these aren't

13   my words.  I'm reading from a Janssen

14   script.

15            A.    The -- the general approach

16   to differentiating a product in this

17   class or in any other class is to go back

18   to your clinical data, because that is

19   what's contained in your label and that's

20   usually the most compelling way to

21   convince a customer that there are some

22   differentiating features about your

23   product.

24            Q.    Okay.  I'm specifically

Page 108

1    focusing on this language about

2    convincing a doctor regarding the

3    differentiation between Nucynta and

4    oxycodone IR.  You with me?

5           A.    I'm -- yeah, I'm tracking

6    with you.

7           Q.    Okay.  So tracking with me

8    on that notion --

9           A.    Yes.

10          Q.    -- that I'm specifically

11   focusing on the goal here, to

12   differentiate between Nucynta and

13   oxycodone IR, is to go back and re-review

14   the ten-day end stage joint disease

15   pivotal trial data regarding efficacy and

16   the improved GI tolerability.

17                Still tracking with me?

18          A.    Yes.

19          Q.    Okay.  Do you remember what

20   the FDA said about the ten-day end stage

21   joint disease pivotal trial data and

22   whether Janssen was permitted to make

23   comparator statements between Nucynta and

24   oxycodone based on that data?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No, I don't.

2          Q.    Did the -- would it concern

3    you if sales reps are being trained to go

4    back to a limited ten-day end stage joint

5    disease trial to make comparator

6    statements if the FDA deemed that trial

7    to be insufficiently numbered in terms of

8    its -- its depth and reach -- powered I

9    should say, that's the appropriate

10   word -- insufficiently powered to make

11   comparative statements?

12              Well, let's start with a

13   different premise.  I'll strike that and

14   ask a different question.

15              Are you aware that the FDA

16   advised Janssen that the ten-day study

17   was insufficiently powered and not

18   appropriate -- not appropriately designed

19   with endpoints for Janssen to make the

20   statement that Nucynta had a better GI

21   tolerability profile as compared with

22   oxycodone?

23          A.    No.

24              MR. GALIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2     BY MR. JANUSH:

3          Q.    You didn't know that?

4          A.    I'm not aware of that.

5          Q.    And if I'm right, and the

6     FDA advised Janssen that it could not

7     make such GI safety representations or

8     tolerability representations comparing

9     Nucynta to oxycodone, and that Janssen

10    was doing that, that would be a bad

11    thing, right?

12              MR. GALIN:  Objection to

13         form.

14    BY MR. JANUSH:

15         Q.    You can answer.

16         A.    I think in general we -- we

17    would want to be sticking to the label,

18    and I would agree that we would want to

19    reference the right studies for the

20    right -- to -- to illustrate the right

21    point.

22         Q.    Let's go back to that label

23    and -- do you have it, the exhibit?  It

24    should be before you, the label?

Page 111

1              Can you find support in the

2    label concerning this ten-day end stage

3    joint disease pivotal trial?

4         A.    In 14.2, there is entry

5    called end stage degenerative joint

6    disease.  Is that where we're -- that's

7    what I'm reading.  There's 14.1, and

8    there's 14.2 under clinical trial.

9         Q.    And in this end stage

10   degenerative joint disease portion of the

11   label, nowhere did the FDA permit Janssen

12   to include in its package insert a GI

13   comparison on improved tolerability as

14   compared with oxy, isn't that right?

15              MR. GALIN:  Objection to

16        form.

17   BY MR. JANUSH:

18        Q.    You can answer.

19        A.    I'm just reading to make

20   sure that I understand the -- the

21   contents of the study here.

22        Q.    In fact, and the reason you

23   won't find that is because this is a

24   different study than the ten-day study

Highly Confidential - Subject to Further Confidentiality Review

Page 112

1    that I was referring to.  This study is

2    only studying Nucynta at 50 milligrams

3    and 75 milligrams with a placebo.  This

4    is not the ten-day joint study that I was

5    referring to concerning oxycodone as a

6    comparator in the class.  Do you

7    understand that?

8          A.    I under --

9          Q.    So the point I'm trying to

10   make is, if this is the only study you're

11   able to point to addressing a -- a joint

12   disease study, and it's not the oxycodone

13   study, it inherently means that the FDA

14   didn't permit Janssen to include an

15   oxycodone comparator ten-day study in the

16   label with the statement that there is an

17   improved GI tolerability presented by

18   Nucynta as compared with oxy.  Do you

19   understand me?

20              MR. GALIN:  Objection to

21         form.

22   BY MR. JANUSH:

23         Q.    I'll try and clean it up.

24   I'm trying to get the concept out.

Page 113

1              In other words, earlier you

2      said you had tracked to the label, you'd

3      looked to the label to see what you could

4      say, right?

5              A.    Yes.

6              Q.    And I'm asking you to look

7      to the label and find anything on an oxy

8      comparison where Nucynta and its ten-day

9      end stage joint disease pivotal trial

10     data was permitted by the FDA to be

11     included in -- in the label to address

12     Nucynta's improved GI tolerability over

13     oxy.  And I don't think it can be found.

14     I want to know if you agree.

15              MR. GALIN:  Objection to

16          form.

17              THE WITNESS:  I acknowledge

18          that the version of the label that

19          I'm looking here, the version I'm

20          looking at here, this label from

21          2009, in the clinical trial

22          section, I see two studies.  One

23          is an orthopedic study.  And the

24          other one is entitled -- sorry.

Page 114

```
 1          End Stage Degenerative Joint
 2          Disease.
 3               I'm still trying to
 4          reconcile -- I'm just trying to
 5          reconcile your question of -- that
 6          these are different studies.
 7               It's been a long time since
 8          I've --
 9   BY MR. JANUSH:
10        Q.    Well, the way I can give you
11   that comfort I think is -- and I'm not --
12   I'm not trying to testify.  I'm trying to
13   be accurate with you.
14               Because when you turn to
15   Page 21 and you look at Figure 2?
16        A.    Okay.
17        Q.    And the measurements are
18   charted.  The package insert is comparing
19   placebo to Nucynta 50-milligram and
20   Nucynta 75-milligram at Day 5, do you see
21   that?
22        A.    Yes.
23        Q.    And oxycodone is missing
24   from the grid, right, from the chart?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 115

1          A.    Yes, that's right.

2          Q.    And if you go back a page to

3    the start and the explanation of the

4    study, it says, "A randomized

5    double-blind parallel group active and

6    placebo-controlled multiple-dose

7    study" -- multiple dose study, I'm boxing

8    that in -- "evaluated the efficacy and

9    safety of 50-milligram and 75-milligram

10   Nucynta given every four to six hours

11   during waking hours for ten days in

12   patients aged 18 to 80 years."

13              Do you see that?

14         A.    Yes.

15         Q.    Nothing about this study is

16   about oxy -- has to do with oxycodone,

17   right?

18         A.    I -- I can't say that for

19   certain.  Because the word active -- I

20   acknowledge that there's Nucynta 50 and

21   75 and I acknowledge there's placebo, but

22   there's -- what I'm trying to recollect

23   is when it says active, that might be an

24   active comparator.

Highly Confidential - Subject to Further Confidentiality Review

Page 116

1      Q.    Okay.

2      A.    So --

3      Q.    And if it was, and if I'm

4    wrong, and it -- and this is the ten-day

5    joint disease study and it included oxy

6    as an active comparator, the FDA

7    certainly didn't permit a comparison

8    statement to be made in this package

9    insert that there was improved GI

10   tolerability for Nucynta IR as compared

11   with oxy, true or false?

12             MR. GALIN:  Objection to

13        form.

14   BY MR. JANUSH:

15        Q.    It's not in here, right?

16        A.    There -- there is no word

17   regarding oxycodone here in the

18   description of the study.

19             I am alluding to that it

20   possibly could be, because it says active

21   control which often is referencing

22   there's another compound being tested

23   against placebo.

24             To answer the question

Page 117

1    about -- I want to go back and say the

2    context.  If this was a sales training

3    document, these are not actual claims.

4    They -- we'd have to look in totality,

5    which is look at the actual visual aid

6    and what's portrayed that.  Because that

7    would, in fact, be the -- to triangulate

8    what was the actual message that was

9    delivered to a customer.

10                MR. JANUSH:  Move to strike,

11           nonresponsive.

12    BY MR. JANUSH:

13           Q.    We're on this document, the

14    package insert, the label.  And I had a

15    question pending.

16           A.    I agree with you that the --

17    as currently stated in the label, there

18    is no direct reference in 14.2 to the

19    word oxycodone.

20           Q.    Or to the notion that the

21    active comparator was -- had a worse GI

22    safety profile than Nucynta, right?

23           A.    That is not stated in 14.2.

24           Q.    And again, just to recap,

Highly Confidential - Subject to Further Confidentiality Review

1    you were unaware that the FDA had advised

2    Janssen it could not make comparator

3    representations regarding improved GI

4    tolerability of Nucynta over oxycodone,

5    correct?

6            A.    That's correct.  I'm not

7    aware.

8            (Document marked for

9            identification as Exhibit

10           Janssen-Lin-5.)

11   BY MR. JANUSH:

12           Q.    I'm going to move on to

13   Exhibit Number 5, which is Bates-marked

14   JAN-MS-01122345.

15           MR. JANUSH:  I'm going to

16           hand a copy to counsel and another

17           copy to counsel.  Did I hand you

18           the actual exhibit?  Let me swap

19           with you.

20           MR. GALIN:  Do you want the

21           exhibit back?

22           MR. JANUSH:  Nope.

23   BY MR. JANUSH:

24           Q.    All right.  This is an

Page 119

1    e-mail string.  And it starts with an

2    e-mail from Nanette Meyer on the third

3    page.

4              Do you see that at the

5    bottom?

6         A.    Yes.

7         Q.    And you are listed as a

8    recipient.  I'm circling it so you can

9    see where it is on the screen and find

10   it.  And it's January 5th, 2012.  And

11   it's addressing a -- what's called a

12   warning letter regarding statements about

13   Nucynta.  And I'm going to turn to the

14   last page specifically.

15             It says, "In a warning

16   letter, the division of drug marketing,

17   advertising, and communications said it

18   has become aware of oral statements made

19   by an Ortho-McNeil Janssen representative

20   on January" -- "on December 8, 2010, at

21   the 2010 American Society of Health

22   System Pharmacists Midyear Clinical

23   Meeting and Exhibition in Anaheim,

24   California, regarding its drug Nucynta,

Page 120

1    immediate release oral tablets, C-II.

2              "The representative's

3    statements promote an unapproved use for

4    Nucynta, make unsubstantial superiority

5    and other claims about the drug and

6    minimize the serious risks associated

7    with Nucynta."

8              Do you see that?

9         A.   Yes.

10        Q.   Do you remember receiving

11   this e-mail and learning about the FDA's

12   letter to Janssen in 2012 concerning a

13   2010 promotion -- speech given by a rep

14   at this American Society of Health System

15   Pharmacists Midyear Clinical Meeting?

16        A.   I cannot recall the exact

17   instance of receiving this e-mail.  I

18   would typically be made aware of things

19   like this, so it is perfectly within my

20   day-to-day life that I would have learned

21   of it, but I don't -- I don't recall this

22   exact correspondence.

23        Q.   Okay.  Without addressing

24   whether you recall the exact e-mail

Highly Confidential - Subject to Further Confidentiality Review

Page 121

1    itself, do you recall the subject matter

2    that I'm addressing, because it's not

3    every day that the FDA issues a letter

4    concerning false promotional statements

5    about a drug, right?

6                MR. GALIN:  Objection to

7          form.

8                THE WITNESS:  I don't -- I

9          can't speak to how often FDA makes

10         corrections on people's -- on our

11         promotional messages.

12               This particular instance --

13   BY MR. JANUSH:

14         Q.    We'll get into it more.  I'm

15   going to get into detail.  I'm not trying

16   to play hide-the-ball.

17         A.    Okay.

18         Q.    I'm just trying to ask

19   you -- I'm actually serious about

20   establishing the concept that it isn't an

21   everyday or every week occurrence that a

22   manufacturer gets a letter from DDMAC

23   contending that a sales representative

24   went off-label and made statements that

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1   are unapproved?  I'm right about that,

2   right?

3           A.    I would agree that it's not

4   a very common occurrence.

5           Q.    Okay, thanks.

6                 (Document marked for

7                 identification as Exhibit

8                 Janssen-Lin-6.)

9   BY MR. JANUSH:

10          Q.    I'm going to hand you what

11  I've marked as Exhibit 6.  It's Bates

12  number JAN-0003-0002930.  I'll hand you

13  that.

14                MR. JANUSH:  And give a copy

15          to your counsel.

16  BY MR. JANUSH:

17          Q.    And turning to the first

18  page, this is a letter that was

19  transmitted to Roxanne McGregor-Beck,

20  associate director of regulatory,

21  advertising and promotion.

22                Do you see that?

23          A.    Yes.

24          Q.    Did you interface with

Page 123

1    Roxanne Beck in your role as leading the

2    marketing team?

3           A.    Yeah.  She was the

4    regulatory leader for Nucynta.

5           Q.    And actually, in 2012 --

6    let's see.  The interesting thing here is

7    that that e-mail string that I addressed

8    earlier at the prior exhibit was

9    addressing, in 2012, in January of 2012,

10   a letter that seems to have been

11   transmitted on August 26, 2011.

12               In fact, on the prior

13   exhibit, just so that we're clear, it

14   says that in the second portion of the

15   e-mail string on the first page, "Chris,

16   attached please find the letter we

17   received from DDMAC back in August of

18   2011 in regard to an interaction that

19   they had with a sales representative at a

20   medical convention."

21               Do you see that?

22          A.    Yes.

23          Q.    And I'm only doing that and

24   circling back to make it clear to you

Page 124

1    that when I'm presenting you with this

2    August 26, 2011, fax cover sheet and

3    accompanying letter, that we are on the

4    same page that it is the letter that's

5    referenced in the e-mail here, okay?

6            A.    I -- okay.

7            Q.    I'm going to give you a

8    moment to review this letter, because I

9    want to know whether it's your position

10   that you recall receiving this important

11   letter from DDMAC.

12               Now, realistically, I should

13   swap with you, because I marked up the

14   wrong copy that I put a sticker on.  So

15   we'll just re-sticker this.  I didn't do

16   much with it, but I put two highlights on

17   it.  So I'm going to draw your attention

18   to those sections any way.

19               I see that you finished

20   reading the document, right?

21           A.    Yes.

22           Q.    Okay.  There's -- there's at

23   least three things that I'd like to -- to

24   address with you for this document.

```
 1                    Number one, I'd like to
 2     address the topic with you concerning the
 3     fact that statements were made off-label
 4     that diabetic peripheral neuropathy
 5     patients, or DNP patients could stay on
 6     Nucynta longer, and that Nucynta provides
 7     10 milligrams of opioid oxycodone pain
 8     control, similar to tramadol, but with
 9     less GI constipation, nausea and
10     vomiting.
11                    That's Topic 1, okay?
12                    Topic 2 is that I'm going to
13     address with you the GI safety
14     comparisons that are addressed within
15     this letter concerning Nucynta having a
16     better GI safety profile than oxycodone
17     and tramadol.  Okay?
18                    And Topic 3 is -- concerns
19     the notion that Nucynta has been shown to
20     release hospital stays in comparison to
21     oxycodone and tramadol.  You with me
22     still?
23          A.    Yes.
24          Q.    And --
```

Page 126

1             MR. GALIN:  Objection to

2         form.

3    BY MR. JANUSH:

4         Q.    And I may add a fourth

5    topic, but I just wanted to outline for

6    you where I'm going so that it's going to

7    be easy to follow me.  And if you don't

8    understand something that I'm addressing,

9    just let me know.

10            So turning to Page 2.  At

11   the bottom of the page there's a

12   subheading, Unsubstantiated Superiority

13   Claims/Minimization of Risk.

14            Do you see that?

15        A.    Yes.

16        Q.    It says, "During the

17   December 8, 2010, discussion at ASHP, the

18   Ortho-McNeil Janssen representative

19   further indicated that DPNP patients stay

20   on Nucynta for longer and Nucynta

21   provides 10 milligrams of opioid

22   oxycodone pain control, similar to

23   tramadol, but with less GI constipation,

24   nausea and vomiting."

Page 127

1                  Now, my question for you is,

2      is this claim misleading because it

3      implies that Nucynta is clinically

4      superior, i.e., safer, as compared to

5      oxycodone and tramadol for DPNP patients?

6          A.    I think there's a lot of

7      parts to that question.  So there's no

8      indication -- Nucynta did not have an

9      indication, to the best of my knowledge,

10     still does not have an indication,

11     Nucynta immediate release, for the relief

12     of pain associated with diabetic

13     peripheral neuropathy, so --

14         Q.    So as a threshold matter, it

15     was off-label to address diabetic

16     peripheral neuropathy?

17         A.    Yes.

18         Q.    Okay.  We agree.

19                Now, addressing the next

20     component which is that the claim

21     misleadingly implies that Nucynta is

22     safer as compared to oxycodone and

23     tramadol, isn't that correct?

24                MR. GALIN:  Objection to

Page 128

```
 1          form.
 2     BY MR. JANUSH:
 3          Q.    The -- the claim
 4     misleadingly implies clinical
 5     superiority, i.e., safety, compared to
 6     oxycodone and tramadol?
 7                    MR. GALIN:  Objection to
 8          form.
 9                    THE WITNESS:  I agree with
10          the statement as written in the
11          letter.
12     BY MR. JANUSH:
13          Q.    Okay.  So what I'm -- what
14     I'm -- what I was about to say is, my
15     question isn't being plucked from thin
16     air.  It's actually tracking the language
17     of the FDA's reprimand, right?
18          A.    I think that the statement
19     as written here is how I would construe
20     that finding for sure.
21          Q.    And the statement is this
22     claim misleadingly implies that Nucynta
23     is clinically superior, i.e., safer,
24     compared to oxycodone and tramadol for
```

Page 129

1    DPNP patients, right?

2              A.    I think the claim is

3    incorrect, yeah.

4              Q.    And then the second

5    sentence, the ensuing sentence states,

6    "Specifically, it," meaning the claim,

7    "implies that Nucynta has been shown to

8    have less GI gastrointestinal adverse

9    reactions, i.e., constipation, nausea,

10   and vomiting, in comparison to oxycodone

11   and/or tramadol when this is not the

12   case."

13              Do you see that?

14   A.    Yes.

15              Q.    So this isn't just saying

16   the statement is wrong in the context of

17   diabetic peripheral neuropathy.  The FDA

18   at that sentence is saying the statement

19   of comparison regarding GI issues, that

20   Nucynta is better than oxy and/or

21   tramadol, that's just not the case

22   generally, isn't that right?

23              A.    If the claim that was made

24   is what's highlighted here in the bullet

Page 130

 1    point, then I -- I would agree that those

 2    claims are -- if that -- if that, in

 3    fact, is the claim that the FDA is

 4    offering, commenting about, which it is

 5    here, then those -- that superior safety

 6    or superior -- or a comparison to

 7    oxycodone or tramadol, is, in fact,

 8    incorrect.

 9         Q.    Okay.  And then it goes on

10    to say, "We note that although safety

11    data was collected from patients taking

12    Nucynta and oxycodone during the clinical

13    studies for Nucynta, FDA determined that

14    the studies were not adequately powered

15    for the analysis of multiple safety

16    endpoints, and that the dose of oxycodone

17    used as a comparator was not demonstrated

18    to be equianalgesic to the doses of

19    Nucynta studies."

20              Do you see that?

21         A.    Yes.

22         Q.    And that means like not

23    equal to the doses of Nucynta studied,

24    right, that word, equianalgesic?

Page 131

1          A.     The word generally in this

2    category means if you take X milligrams

3    of one drug that's -- there's not enough

4    evidence necessarily to say that it's

5    equal to a particular milligram of

6    another drug.

7          Q.     And the FDA goes on to say,

8    "Therefore, safety comparative data were

9    not considered clinically meaningful and

10   were not included in the approved PI for

11   Nucynta."

12               Do you see that?

13         A.     Yes.

14         Q.     Earlier we -- we went

15   through this, and I know I'm going to be

16   introducing this later document to you,

17   we went through this with the label and I

18   was addressing where the safety

19   comparison was for Nucynta to be deemed

20   improved or better than oxy.  Do you

21   remember that?

22         A.     Yes.

23         Q.     And it was lacking, right?

24         A.     That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 132

1          Q.    And now, you're seeing that
2     it was lacking because the FDA didn't
3     permit Janssen to make statements that
4     Nucynta had a better GI safety profile as
5     compared with oxycodone, right?
6                MR. GALIN:  Objection to
7          form.
8                THE WITNESS:  Yeah, I'm --
9          I'm acknowledging that what you've
10         just said is what's contained in
11         this letter.  Yeah.
12    BY MR. JANUSH:
13         Q.    And you don't disagree with
14    this history, right?
15               As you sit here today,
16    you're reading an FDA letter --
17         A.    Yeah.
18         Q.    -- you have nothing to say
19    the FDA got it wrong and what we're
20    addressing here is incorrect?
21               MR. GALIN:  Objection to
22         form.
23               THE WITNESS:  There are --
24         I'm acknowledging that this letter

Highly Confidential - Subject to Further Confidentiality Review

Page 133

```
1          is very clear about what the
2          finding was at this particular
3          event.
4              What I can't state for
5          certain, because I just simply
6          have no firm recollection, is
7          there are multiple interactions
8          with FDA ongoing around clinical
9          studies, interpretation of
10         studies.
11             But, yeah, in the instance
12         that we are talking about here,
13         it's right there.
14   BY MR. JANUSH:
15         Q.   And the instance we are
16   talking about here is not limited to
17   necessarily -- it's calling out a
18   speaking event that occurred in -- in
19   2010, but it's a 2011 letter addressing
20   the limitations within Nucynta's label,
21   isn't it?
22             MR. GALIN:  Objection to
23         form.
24             THE WITNESS:  Let me make
```

Page 134

1          sure I understand --

2     BY MR. JANUSH:

3          Q.    Meaning, meaning, it's

4     addressing the concept that although

5     safety data was collected from patients

6     taking Nucynta and oxycodone during the

7     clinical studies for Nucynta, FDA

8     determined that the studies were not

9     adequately powered for the analysis of

10    multiple safety endpoints and that the

11    dose of oxycodone used as a comparator

12    was not demonstrated to be equal to the

13    doses of Nucynta studied.

14              Did I read that right?

15         A.    You did.

16         Q.    That's not limited to just

17    the representatives statement in 2010 at

18    a convention.  That's a sweeping

19    statement about the clinical study

20    presented for the labeling of Nucynta,

21    isn't it?

22         A.    I'd agree that reflects what

23    their opinion of the label is at that

24    point in time.

Highly Confidential - Subject to Further Confidentiality Review

Page 135

1          Q.    Okay.

2          A.    Yeah.

3          Q.    Okay.  And moving further,

4    "In addition" -- middle of the page --

5    "during the December 8, 2010 discussion

6    at ASHP, the Ortho-McNeil Janssen

7    representative indicated that when

8    physicians prescribe Nucynta, they:

9    'Won't have to put patients on docusate

10   or senna.  Patients get out of the

11   hospital a day earlier, which saves

12   thousands of dollars because they're

13   going to be able to have a bowel

14   movement.'"

15               Did I read that right?

16         A.    Yes.

17         Q.    And the FDA came back and

18   said, "This claim mistakenly implies that

19   treatment with Nucynta has been shown to

20   reduce length of hospital stay in

21   comparison to oxycodone and tramadol."

22               Did I read that correctly?

23         A.    Yep.

24               MR. GALIN:  Actually, I

Page 136

1          think you mistakenly said

2          "mistakenly" instead of

3          "misleadingly."

4                    MR. JANUSH:  Misleadingly.

5          Sorry.  My eyes are playing tricks

6          on me.

7    BY MR. JANUSH:

8          Q.    And then at the bottom of

9    the paragraph, I'm going to skip down to

10   the sentence beginning with "in

11   addition," and I'm highlighting so you

12   can follow me.

13                   "In addition, as detailed

14   above, the lack of support for comparing

15   the safety and efficacy of Nucynta to

16   oxycodone and tramadol makes it

17   impossible to make a treatment cost

18   comparison based on the length of

19   hospital stay.  If you have any evidence

20   to support such claims, please submit it

21   to FDA for review."

22                   Do you know whether, after

23   receiving this letter, Janssen ever

24   submitted to FDA for review any support

Page 137

1    for the notion that being on Nucynta

2    would reduce the length of a hospital

3    stay due to less constipation as compared

4    to other Schedule II opioid products?

5          A.    I'm not aware of what

6    follow-up correspondence took place as it

7    relates to that element of the letter or

8    any other parts of the letter.

9          Q.    Now, moving on to the

10   section entitled "Unsubstantiated

11   Efficacy Claim."

12               "The sales representatives

13   statement that Nucynta provides

14   10-milligram of opioid oxycodone pain

15   control similar to tramadol is misleading

16   because it implies that Nucynta has been

17   shown to be non-inferior to oxycodone,

18   tramadol, or other opioids.

19               "Specifically, the claim

20   implies that Nucynta has been shown to

21   provide equivalent pain control,

22   equianalgesia, when compared to other

23   opioids, including oxycodone and

24   tramadol.

Page 138

```
 1                    "We note that although

 2     oxycodone was included as an active

 3     comparator in the arm" -- "active

 4     comparator arm in the clinical studies

 5     for Nucynta, FDA determined that your

 6     analyses to obtain a non-inferior claim

 7     regarding the efficacy of Nucynta

 8     compared to oxycodone were inadequate,

 9     and the results of those analyses were,

10     therefore, excluded from the approved

11     PI."

12                    Do you see that?

13          A.    Yes.

14          Q.    The FDA then goes on to say.

15     "The FDA is not aware of any well

16     controlled head-to-head clinical trials

17     comparing the efficacy of Nucynta to

18     tramadol or any other opioids."

19                    And it asks, "If you have

20     any evidence to support this claim,

21     please submit it to FDA for review."

22                    Do you know if any evidence

23     was supported -- was submitted to support

24     this claim --
```

Highly Confidential - Subject to Further Confidentiality Review

Page 139

1         A.    I don't know the status --

2         Q.    -- after receiving this

3    letter?

4         A.    I don't know the status of

5    any follow-up correspondence with the FDA

6    on any of these matters.

7         Q.    What's your understanding of

8    the concept of off-label marketing,

9    generally?

10        A.    That's a pretty broad

11   question.  I would say generally

12   speaking, if you're representing the

13   product outside of indication, or

14   anything that's not substantiated by the

15   evidence that you have in the label, that

16   would generally be recalled -- generally

17   be referred to as off-label.

18        Q.    And is off-label marketing

19   permitted or impermitted --

20   impermissible?

21        A.    Off-label marketing is

22   absolutely not permitted.

23        Q.    So it's improper to market

24   off-label messages about Nucynta to a

Page 140

1    doctor, right?

2          A.    It is improper.

3          Q.    And as shown in this

4    instance, it's a pretty big deal for a

5    sales representative -- well, let me --

6    let me ask a different question.

7                The letter that we were

8    addressing from the FDA concerned a

9    Janssen sales representative that was

10   speaking at a pharmaceutical conference,

11   right, in Anaheim?

12         A.    I'm looking back at the

13   exhibit.

14         Q.    The American Society of

15   Health System Pharmacists Midyear

16   Clinical Meeting and Exhibition.

17         A.    It definitely appears that

18   it was a sales representative.  I can't

19   tell from the e-mail or the letter what

20   was the context in which they were

21   speaking, meaning was it a large

22   audience, was it a one-on-one.  If your

23   question was to elaborate on that, I'm

24   sorry, I misunderstood.

Page 141

1          Q.    What I'm addressing is a

2    sales representative was employed by

3    Janssen and was representing the company

4    at the American Society of Health System

5    Pharmacists Midyear Clinical Meeting and

6    Exhibition, right?

7          A.    Yes, it appears that way.

8          Q.    And the sales representative

9    that Janssen had permitted to attend this

10   meeting made unsubstantiated statements

11   about the superior GI tolerability

12   compared to other opioids, right?

13              MR. GALIN:  Objection to

14        form.

15              THE WITNESS:  I acknowledge

16        that the sales rep was mentioned

17        here in this letter to have made

18        those comments.

19   BY MR. JANUSH:

20        Q.    So at least as of the date

21   of this letter from the FDA in August of

22   2011, the FDA was conveying to Janssen

23   that Janssen and its sales reps were not

24   permitted to market the concept that

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Nucynta had a superior GI tolerability as

2    compared to oxycodone; isn't that right?

3           A.    That's my interpretation,

4    yes.

5           Q.    Okay.  So that was August of

6    2011, that FDA letter.  And now I'm going

7    to take you forward to a 42-slide

8    PowerPoint called "Unleashing the Power,"

9    where the document metadata for this

10   PowerPoint shows that it was 12/6/2011,

11   so about four months later following the

12   FDA letter.

13              (Document marked for

14              identification as Exhibit

15              Janssen-Lin-7.)

16   BY MR. JANUSH:

17          Q.    And I'm producing to you

18   JAN-MS-0114237 as Exhibit Number 7.

19              And the custodian for this

20   PowerPoint is a gentleman that you

21   mentioned earlier named Dominic Lazzaro.

22   And if we go to the Page 2 of this

23   PowerPoint, Mr. Lazzaro is right here.

24   You're at the top.  Going to the left

Highly Confidential - Subject to Further Confidentiality Review

Page 143

1    side it looks like, Mr. Lazzaro was under

2    Lisa -- how do I pronounce her last name.

3    Bianciani or Bianciani?

4            A.    I don't know.  I think it's

5    Lisa Bianciani.

6            Q.    Bianciani.  And Lisa appears

7    to be, although not directly under

8    Kanitha Burns, perhaps all of these are

9    direct -- Kanitha Burns, Lisa, and

10   Dominic Lazzaro all appear to be direct

11   reports to Tricia Yap; is that right?

12           A.    Yeah, that's how it should

13   appear.

14           Q.    And Tricia Yap is a direct

15   report to you; is that right?

16           A.    Yes.

17           Q.    Okay.  And it's addressing

18   at Page 2, "This is our brand team.

19   David Lin is our fearless leader and our

20   director of marketing.  Tricia Yap has

21   recently joined our team, coming over

22   from Ethicon, and is our group product

23   director."

24                   Dominic Lazzaro is tasked

Page 144

1    with below, "Detail strategy and NP/PA

2    strategy, as well as speaker programs and

3    medical meetings, retail Puerto Rico."

4              What is -- digital strategy

5    refers to digital marketing strategy; is

6    that right?

7         A.    Yes, generally.

8         Q.    Okay.  And what's NP/PA

9    strategy?  Is that focusing on nurse

10   practitioners and physician assistants?

11        A.    Yes.

12        Q.    And tell us about what it

13   means to be responsible for speaker

14   programs and medical meetings.

15        A.    Speaker programs were an

16   important part of the educational

17   component of -- of brand, particularly at

18   launch.

19              So in the instance of

20   Nucynta, a speaker program would have

21   been otherwise known as a speaker bureau.

22   There's a core content of information

23   about the product.  There are some number

24   of key faculty that are trained to

Highly Confidential - Subject to Further Confidentiality Review

Page 145

1    deliver them -- the message.  And then

2    those faculty would conduct speaker

3    programs in various locations around the

4    country, usually anywhere from -- it's

5    hard to generalize, but I would say ten

6    to fifteen people in a venue.  And they

7    would deliver that promotional message.

8         Q.    Okay.  And incidentally, you

9    had corrected me earlier when I had only

10   addressed that you were director of

11   marketing.  You said director of sales

12   and marketing.

13            At this time, this should

14   have been listed director of sales and

15   marketing as well, if this is truly from

16   December 6, 2011, because, as we went

17   over your resumé or your history of

18   employment, you were director of sales

19   and marketing at that time, right?

20        A.    No.  I was director of sales

21   and marketing starting December of 2012

22   going into 2013.

23        Q.    Got it.

24        A.    That was -- that was the

Page 146

1    time that we made that change.

2            Q.    I'll cross that out.

3                  And incidentally, when you

4    moved over to director of sales and

5    marketing, did all of these people stay

6    under you?

7            A.    I would say some did.  Some

8    moved on to new assignments.  They're --

9    these teams are living, breathing, so

10   it's -- my recollection is that one or

11   two of them moved on to different

12   assignments by 2013.

13           Q.    And who may they have been?

14                 You still worked with Tricia

15   Yap, right?

16           A.    If I'm thinking back to

17   2013, Tricia Yap was on the brand.  Frank

18   DeMiro.  Ron Kuntz.  Kanitha Burns.  And

19   I believe by that time Lisa Ferguson had

20   moved on to another role.  And I also

21   believe that Lisa Bianciani -- I believe

22   she moved during that time, but I can't

23   be certain of the date.

24           Q.    I'd like to go back to

Page 147

1   Page 1 of this PowerPoint.  And let's

2   talk about the image of the lion and the

3   rose unleashing the power.  Somewhere in

4   this document or another document, I read

5   about the fact that this lion was

6   actually a real lion from the San Diego

7   Zoo.  I think counsel is laughing

8   at this.

9                This was -- this was to

10  convey -- it's at Page 11.  The lion

11  in -- in the picture was a real lion from

12  the San Diego Zoo named Major, and

13  Janssen is saying he's symbolic to the

14  brand because a lion is big and

15  powerful -- big and powerful, yet he's

16  able to hold a rose which shows the

17  gentle nature.

18               Do you see that?

19       A.    Yes, I see that.

20       Q.    Were you part of approving

21  this brand marketing campaign of a lion

22  with a rose in his mouth to convey that

23  Nucynta is strong but gentle?

24       A.    I was definitely part of

Page 148

1    approving the use of this icon.

2         Q.    Okay.  And the concept was

3    to convey efficacy and tolerability,

4    right?

5         A.    Among many factors, that was

6    one of the factors.

7         Q.    And it was the factor that

8    was highlighted in Mr. Lazzaro's

9    presentation, wasn't it?

10        A.    It was -- I'd like to

11   clarify.  These are speaker notes.  They

12   don't necessarily mean that they were

13   ever spoken.

14             These are -- speaker notes

15   during -- during these kinds of

16   presentations are often used by speakers

17   only to get a sense of how they'd like to

18   communicate.

19             It doesn't necessarily mean

20   that they were actually the one that

21   communicated it and it -- because I don't

22   know what was the ultimate version that

23   was used on stage.

24             So I think for clarity, I'd

Page 149

1    just like to offer up that speaker notes

2    are often your best thinking at the time

3    that the slides are constructed.  They

4    don't necessarily mean that they were the

5    ones spoken.  And the words that were

6    chosen for the notes were not always the

7    ones that were used on stage.

8            Q.    Understood.

9            MR. JANUSH:  Move to strike,

10          nonresponsive.  I didn't have a

11          question pending on that topic.

12   BY MR. JANUSH:

13          Q.    We'll move over to Slide 9.

14   And we'll focus on the slide.

15          And this presentation is

16   addressing Nucynta total prescriptions,

17   that's what TRx stands for, right?

18          A.    Yes.

19          Q.    Is highly concentrated.  Is

20   this intended to be -- be --

21   approximately 7,000 targets make up

22   approximately 80 percent of the business?

23          A.    Yes.

24          Q.    Then there's a chart, a pie

Page 150

1    chart, and it's showing active writers

2    versus nonactive targets.

3                 And this seems to be

4    indicating that your active Nucynta

5    writers comprise 28 percent of total

6    targets as of this point in time; is that

7    right?

8         A.    Yes, that's my takeaway.

9         Q.    Okay.  And when we -- when

10   we speak about targets, you're utilizing

11   underlying data to figure out who your

12   prescriber targets are.  And I don't know

13   how good your eyes are, but looks to be

14   that there's a source reference down here

15   that says IMS Xponent, GPharma WE.  And

16   it looks like it says September 16, 2011.

17                Do you see that?

18        A.    Yes.

19        Q.    So that means that you --

20   you have gotten your data on these

21   Nucynta prescribers from IMS Xponent

22   data; is that right?

23        A.    Yes.

24        Q.    Okay.  And here --

Highly Confidential - Subject to Further Confidentiality Review

Page 151

1             MR. GALIN:  Which slide did

2       you go to?

3             MR. JANUSH:  Slide 12.

4             MR. GALIN:  Thank you.

5             MR. JANUSH:  Sure.

6   BY MR. JANUSH:

7       Q.    At Slide 12, the

8   presentation is addressing data to

9   compete with OxyContin.  Do you see that?

10      A.    Yes.

11      Q.    This refers to the chronic

12  low back pain study, the diabetic

13  peripheral neuropathy pain study, the DPN

14  study, and the one year safety study,

15  right?

16      A.    Yes.

17      Q.    And do you know whether

18  the -- do you know what -- what the

19  outcomes were concerning the chronic low

20  back pain study as it concerned Nucynta

21  versus placebo with an OxyContin active

22  control?

23      A.    Are you asking if I recall

24  the exact --

Highly Confidential - Subject to Further Confidentiality Review

Page 152

1        Q.    Yeah, do you recall what the

2   results were, you know, broadly speaking?

3        A.    Broadly speaking, if we

4   were -- if we were using these studies as

5   the basis of promotion, then the finding

6   would typically be that we'd see Nucynta

7   ER versus placebo as being highly

8   effective.  We would also see OxyContin

9   as the active control also being

10  effective.  And you would see Nucynta ER

11  versus placebo in tolerability also being

12  effective.  And the same with OxyContin,

13  generally speaking.

14       Q.    Let's break that answer down

15  a bit.

16            Earlier in your testimony

17  today and right now, you acknowledged the

18  notion that OxyContin was an active

19  control, right?

20       A.    Active comparator.

21       Q.    Active comparator.

22            Was this a head-to-head

23  study with OxyContin?

24       A.    No.

Highly Confidential - Subject to Further Confidentiality Review

Page 153

1        Q.    No.  And because it wasn't a

2   head-to-head study, that limits the

3   ability to make certain representations

4   about the outcomes of the study results

5   as it concerns Nucynta being more

6   tolerable or having less GI adverse

7   events as compared with oxycodone; isn't

8   that right?

9        A.    I think it would be fair to

10  say you couldn't say it in the way you've

11  just stated it.

12       Q.    Okay.  So you could say it

13  in a wordsmithy way but not in the way I

14  said it?

15       A.    You can --

16            MR. GALIN:  Objection to

17       form.

18            THE WITNESS:  The way you

19       can do it in pharmaceutical

20       promotions is to show both arms of

21       the study and let the data be

22       representative of the data.

23  BY MR. JANUSH:

24       Q.    In other words, you can show

Page 154

1    a chart, but you can't talk about it?

2              MR. GALIN:  Objection to

3         form.

4              THE WITNESS:  You can still

5         talk about it.  And there's

6         appropriate words that were placed

7         on any -- on any visual aid or

8         training document that would

9         acknowledge, here's how you talk

10        about it.

11   BY MR. JANUSH:

12        Q.   What would be an example of

13   appropriate words as to how you would be

14   able to talk about Nucynta ER having a

15   better GI safety profile as compared with

16   the active control of OxyContin?

17             MR. GALIN:  Objection to

18        form.

19             THE WITNESS:  I think -- I

20        think that's a -- I've been away

21        from this category for a very long

22        time, so I think it would be

23        inappropriate for me to respond to

24        or to conjecture about what's

Page 155

1          appropriate when I'm not actively

2          involved in the business.

3    BY MR. JANUSH:

4          Q.    So moving to Page 19 or

5    Slide 19.  Here is a chart that is

6    addressing powerful efficacy.

7                Do you see that?

8          A.    Yes.

9          Q.    And in the text it's saying,

10   "You'll also want to highlight the study

11   design on this asset by pointing out the

12   doses studied, placebo, Nucynta ER

13   100-milligram to 250 milligrams and

14   OxyContin 20 milligrams to 50 milligrams.

15   This will be important later when we

16   discuss dosing.  Remember, it was a not a

17   head-to-head study and oxycodone CR was

18   included as an active analgesia control

19   for assay sensitivity.  Nucynta's ER pain

20   reduction from baseline here is both

21   statistically and clinically

22   significant," right?

23                That's what it says right?

24         A.    That's what it says, yes.

Page 156

1          Q.    Okay.  Do you know whether

2    these words got conveyed at the

3    conference, at the meeting?

4               MR. GALIN:  Objection to

5          form.

6    BY MR. JANUSH:

7          Q.    No?

8          A.    You're asking me to comment

9    as to whether these -- whether these

10   precise words were communicated at a

11   meeting that we haven't discussed?

12         Q.    Well, this is -- this was a

13   meeting addressing the launch of Nucynta

14   ER, right?

15         A.    Will you remind me of the

16   date stamp of this file?

17         Q.    Actually I'm wrong.  I

18   apologize.  This is a meeting discussing

19   Nucynta ER generally and progress made.

20   I believe this was December 6, 2011.  Was

21   it the launch?  Let's see.  I have two

22   different PowerPoints.  I want to make

23   sure I'm not confused either.

24               I think this was the meeting

Page 157

1    addressing the launch of "Unleashing the

2    Power," the new branding campaign

3    regarding the lion with the rose -- with

4    the rose in its mouth.

5              With that said, that's not

6    so important.  So I'm going to move on.

7    Earlier, I was addressing the comparator

8    issues and GI-related adverse events.  So

9    I'm going to direct your attention to

10   Page 21.

11             And the notes are addressing

12   the top -- the chart at the top

13   concerning gastrointestinal disorders

14   reported in at least 5 percent of

15   patients at any treatment group, placebo,

16   Nucynta ER, and oxycodone ER.

17             Do you see that?  Do you see

18   that?

19        A.    Yes, yes.

20        Q.    And at the bottom the notes

21   say, "You'll see the system organ class

22   results po pup as a bar graph, showing

23   the GI-related adverse events for

24   placebo, Nucynta ER and OxyContin.  Like

Page 158

1    we always say, a picture is worth a

2    thousand words.  Be sure to stay

3    disciplined with your message here and

4    don't make comparative statements."

5              Do you see that?

6         A.    Yes.

7         Q.    Earlier I said you're not

8    allowed to make comparative statements,

9    and you said something to the effect --

10   and I don't want to paraphrase -- that

11   certain statements could be made

12   consistent with the data.

13             So I want to understand.  Do

14   you agree that you can't make comparative

15   statements concerning the outcome of this

16   study?

17        A.    Yes.

18        Q.    You agree with that?

19        A.    Yes.

20        Q.    Okay.  So if that was done

21   following the chronic lower back pain

22   study and sales reps were trained to make

23   comparison statements between Nucynta ER

24   and OxyContin, that would be a bad thing,

Page 159

1    right?

2          A.    That would be inconsistent

3    with the direction they'd been given.

4          Q.    When you say "they were

5    given," you're not, as you sit here

6    today, making a generalization, are you,

7    that sales and marketing folks never gave

8    scripts or PowerPoint presentations to

9    sales reps to address the comparison

10   between OxyContin and Nucynta's GI safety

11   profile, are you?

12              MR. GALIN:  Objection to

13         form.

14   BY MR. JANUSH:

15         Q.    You're not taking the

16   position that that never happened, are

17   you?

18         A.    I'm taking the position that

19   as a brand leader, working in partnership

20   with my colleagues in sales, we would

21   never have made a -- given sales

22   direction or any materials or produced

23   any materials that would have done as

24   you've described.

Page 160

1              MR. JANUSH:  Off the record.

2              THE VIDEOGRAPHER:  The time

3         is 12:36 p.m.  Going off the

4         record.

5                   -   -   -

6              (Lunch break.)

7                   -   -   -

8      A F T E R N O O N   S E S S I O N

9                   -   -   -

10             THE VIDEOGRAPHER:  We are

11        back on the record.  The time is

12        1:42 p.m.

13                  -   -   -

14             EXAMINATION (Cont'd.)

15                  -   -   -

16   BY MR. JANUSH:

17        Q.    Mr. Lin, I'm going to

18   transition into a different topic and I'm

19   going to address, in as general a manner

20   as I can, budget concerns or budget

21   information with respect to the Nucynta

22   brand, okay.

23             As the marketing leader of

24   Nucynta for a period of time, and as the

Highly Confidential - Subject to Further Confidentiality Review

Page 161

1    sales and marketing leader for Nucynta

2    thereafter, did you have occasion to

3    review Janssen's Nucynta budgets, annual

4    budgets?

5          A.    If you're speaking about the

6    annual marketing budget, for sure, yes.

7          Q.    Yes.  Okay.  Would you

8    typically get those in an Excel file, for

9    example?

10         A.    They are constructed using

11   Excel typically.  And they can be

12   presented either in Excel, sometimes a

13   PowerPoint, sometimes a Word document.

14   It all depends on the exact view that the

15   audience is looking for.

16         Q.    Do you have a facility with

17   receiving Excel file and filtering it and

18   drilling down for your group when seeking

19   to review an annual marketing budget?

20         A.    I'm not sure I understand

21   the question.

22         Q.    Do you know how to use

23   Excel?

24         A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1          Q.    Okay.  Are you proficient

2     with it?

3          A.    Yes, I am.

4          Q.    You know how to filter for

5     data and determine exactly what you want

6     to find in a given marketing plan?

7          A.    I know -- I'm familiar with

8     how to use filters.  I never had occasion

9     to use filters or sort data in a way that

10    you're describing, not with Nucynta.

11         Q.    I'm not talking about

12    complex pivot tables --

13         A.    Yeah.

14         Q.    -- but generally, do you

15    know how to -- like if you wanted to look

16    at the budget for Kanitha Burns, would

17    you have known, sitting in your office at

18    Janssen, how to click on a person and see

19    what, what are they responsible for as an

20    example?

21              MR. GALIN:  Objection to

22         form.

23              THE WITNESS:  If a budget --

24         I think the more accurate way for

Highly Confidential - Subject to Further Confidentiality Review

Page 163

1           me to describe it is a budget is

2           made up of different categories

3           and there's different line items.

4           Not typically are they formally

5           associated with a person.

6    BY MR. JANUSH:

7           Q.    I'm going to start with a

8    presentation, PowerPoint slides, that

9    concerns, I believe, 2010 and 2011 budget

10   figures.  It may also include 2009 budget

11   figures.  And it addresses a concept of

12   2010 OE-PBP BME's total Nucynta.  Do you

13   have any idea of what OE-PBP BME's means?

14          A.    My recollection is that OE

15   stands for October estimate.  PBP would

16   stand for preliminary business plan.

17                So my -- my recollection

18   would be that would be a snapshot in time

19   that represents sometime in the October

20   time frame --

21          Q.    Got it.

22          A.    -- previewing the year --

23   the year later.

24          Q.    So for example, and -- and

Page 164

1    I'll produce this to you for review in a

2    minute.  I just want to learn a little

3    more before I start asking questions in

4    greater detail.

5              If I'm looking at 2010

6    OE-PBP and the chart breaks down 2009

7    ACT, that means actual, right?

8         A.    Yes.  ACT would mean actual.

9         Q.    And then 2010 OE is an

10   October estimate for 2010, meaning we're

11   in -- we're in month 10 of 12, this is

12   what we estimate for the rest -- for

13   2010?

14        A.    Yes.  That's generally where

15   do you think the spend would be --

16        Q.    In the next two months?

17        A.    -- in that year.

18        Q.    Total --

19        A.    Total for the year.

20        Q.    The only -- the only months

21   you're estimating at that point are the

22   remaining two, correct?  Meaning purchase

23   orders get filled, invoices get paid if

24   it's October?

Highly Confidential - Subject to Further Confidentiality Review

Page 165

1          A.    I just -- no, the October

2     estimate designation is just a rough

3     point in time.  So the October estimate

4     could probably mean any time from

5     September to the end of the year --

6          Q.    Okay.

7          A.    -- up until you actually

8     have an actual.

9          Q.    And then the 2011 PBP, what

10     would that stand for again?

11          A.    That would be the

12     preliminary business plan for what you

13     think the budget might be.  Well, that's

14     what you're work -- that's the assumption

15     you're working on for the following year.

16          Q.    Okay.  So I'm going to

17     produce to you what we're marking as

18     Exhibit 8.

19               (Document marked for

20               identification as Exhibit

21               Janssen-Lin-8.)

22     BY MR. JANUSH:

23          Q.    I'm going to have you help

24     me -- walk me through it.  It's a --

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    marked JAN 008227.  I'll move the clip.

2    It's a draft of the 2011 business plan?

3              And just turn to Page 4 if

4    you will.  And Page 4 isn't necessarily

5    looking at budget issues.  It's looking

6    at key issues and strategies; is that

7    right?

8         A.    That's correct.

9         Q.    And so specifically it's

10   addressing that skeptical and habitual

11   marketplace, what would that mean?

12        A.    As described here, it's a --

13   it's just a generalization of the

14   environment in which this product is

15   competing.  That is to say, very loosely,

16   because, you know, again I don't -- I

17   don't have the exact context of the time.

18   This -- the Schedule II opioid market,

19   which is the, in this case it would be

20   short-acting opioids, it's a -- we

21   described it as a skeptical market

22   because there is a lot of entrenchment,

23   so there's not a lot of new agents.  And

24   so we had, at the time, a dominant player

Page 167

1    in oxycodone, most of which was generic.

2    And what's described as habitual

3    marketplace is that not unlike a lot of

4    other categories, once physicians become

5    used to writing a particular product for

6    a particular condition or a patient type,

7    it's really hard for them to adopt

8    something new.  So, it's generally just

9    saying it's a tough market.

10        Q.    And one of the things that

11   made it tough was the other side of this

12   chart, it says, "Nucynta not viewed as

13   superior to oxy molecule."

14             And would you agree with

15   that, with that statement, as a business

16   key issue and key strategic issue that

17   you were facing?

18        A.    Yes.  And it was absolutely

19   an issue that was highlighted.

20        Q.    Okay.  And let's talk about

21   growth strategies.

22             Strengthen differentiation

23   through new and compelling evidence.

24   What was the goal here?

Highly Confidential - Subject to Further Confidentiality Review

Page 168

```
1            A.    The goal basically is to
2    differentiate the product versus what's
3    existing in the market.  And at its most
4    basic level, create some sort of
5    awareness with the prescribing audiences,
6    and in so doing, get them to try the
7    product.
8            Q.    And moving over to drive
9    favorable and competitive access --
10           A.    Yes.
11           Q.    -- what's that referring to?
12           A.    The -- the concept of market
13   access relates to the payer environment.
14   So the majority -- I shouldn't
15   mischaracterize majority.
16               The -- the basic payment
17   channels in the United States are private
18   insurance, Medicare, Medicaid, those are
19   the major players.  And when you're a new
20   product to launch, it was incumbent upon
21   the brand to -- to gain access and not be
22   disadvantaged in the eyes of the doctor
23   and the patient.
24               Specifically, we're saying
```

Page 169

1   as favorable and competitive means let's

2   get on a level playing field so that

3   there's not a reason to deny writing the

4   product because of cost only.

5          Q.    So was there an effort

6   within Janssen to get Nucynta on as many

7   formularies as is possible?

8          A.    Generally speaking, there

9   was an effort for the targeted channels

10  to make sure that the access was as much

11  on par with the competitors as possible.

12         Q.    What is this -- what do you

13  mean by targeted channels?

14         A.    Let's say we're targeting

15  private insurance, Aetna, CIGNA, you want

16  to be -- you -- you have to look at each

17  channel or each plan in and of itself.

18  So if a product, let's say that's already

19  been in the market is Tier 1, generics

20  are typically Tier 1, so there's either

21  free or maybe $5 for a co-pay.  You want

22  to be as high up on the tiers as makes

23  sense for the brand, so that it doesn't

24  look like the out-of-pocket is extremely

Page 170

1    high and cost prohibitive for a patient.

2        Q.    And as a branded product

3    that was new to the market, it had a

4    price premium over a generic, Nucynta

5    did, right?

6        A.    Yes, it did.

7        Q.    And that made it a little

8    harder for Janssen to compete in the

9    market; is that right?

10       A.    Being new and being at a

11   higher price point would be a challenge

12   in the beginning.

13       Q.    So tell the Court in this

14   case, what Janssen did in order to gain

15   better market access?

16       A.    The principle means to get

17   better access would basically be to

18   negotiate a more favorable rebate to

19   payers where we thought the business

20   would be most relevant.

21       Q.    Can you explain that in

22   greater detail?

23       A.    So generally speaking,

24   there's a list price.  And most

Page 171

1    manufacturers will discount off that list

2    price, thereby reducing the co-pay to the

3    patient.  And so you -- a brand would

4    seek to offer a rebate that would allow

5    it to be competitive with the other

6    agents in the class.  The exact

7    competitive mix is going to differ by

8    plan, but to try to put -- to put the

9    brand in a competitive position that was

10   less disadvantaged from a cost

11   perspective to the patient.

12        Q.    Now, there's two different

13   types of rebates, as I understand it, at

14   least.  There's the rebate that you're

15   speaking about with regard to a seller or

16   a distributor selling your drugs, getting

17   a discount off list price, right?

18        A.    I'm sorry.  You've mentioned

19   distributors.

20        Q.    A seller of Nucynta getting

21   a discount off list price?

22             MR. GALIN:  Objection to

23        form.

24             THE WITNESS:  I'm not

Highly Confidential - Subject to Further Confidentiality Review

Page 172

1          tracking, when you say a seller of

2          Nucynta.  Do you mean the actual

3          company, Janssen?

4    BY MR. JANUSH:

5          Q.    No.  Janssen sells it --

6    sells Nucynta through distribution

7    channels, right?

8          A.    That was -- yes, that was

9    the primary means.

10         Q.    Okay.  So who is getting the

11   rebate?

12         A.    The rebate that I'm speaking

13   about is to the health plan.

14         Q.    Okay.  So there's a health

15   plan rebate.  Do you know anything about

16   the subject of chargebacks?

17         A.    Broadly speaking --

18         Q.    Let's first start with

19   defining what it is.  What's a

20   chargeback?

21         A.    I'm not sure I can give a

22   precise answer to a chargeback.  I can

23   speak to the fact that if there was a

24   Medicaid rebate, Medicaid would settle up

Page 173

1  with the manufacturer at the quarter's

2  end, and there would typically be a

3  chargeback of some sort.  That's an

4  example.

5        Q.    And that's when, for

6  example, the price paid for the drug is

7  less than the price -- the price

8  ultimately paid for the drug is less than

9  the sale price was to the initial buyer,

10  correct?

11             MR. GALIN:  Objection to

12        form.

13             THE WITNESS:  I can't speak

14        to whether -- it was -- when you

15        say the --

16  BY MR. JANUSH:

17        Q.    In other words, if you're

18  selling a drug to Medicaid, but Medicaid

19  gets paid less than the list price, than

20  some differential, constitutes a

21  chargeback, and a rebate back to -- and

22  Medicaid is probably not the best

23  example.

24             A better example would be if

Page 174

1   you're selling a drug to McKesson, as an

2   example, and McKesson is paying a

3   contract price with Janssen.  Isn't it

4   the case that when they represent that

5   they failed to sell the drug at that

6   contract price, they seek a chargeback?

7               MR. GALIN:  Objection to

8         form.

9               THE WITNESS:  I can't speak

10        to that.  I don't have --

11  BY MR. JANUSH:

12        Q.    So you don't have knowledge

13  on that?

14        A.    I don't have enough

15  experience.

16        Q.    Fair enough.  I'm going to

17  move on to a different topic.  Next

18  topic.

19               You talked about -- you

20  talked about rebates generally.  Your

21  marketing group created a coupon program

22  for Nucynta.

23               Do you remember that?

24        A.    I recall there was a patient

Page 175

1    assistance program that was created.  But

2    the exact name, I can't recall right now.

3         Q.    Okay.  Leave the exact name

4    aside.  Why don't you tell us everything

5    that you can about that coupon program?

6         A.    My recollection is with

7    Nucynta, there were some -- there was a

8    program that offices could hand to

9    patients that allowed them to get some

10   number -- some portion of their

11   prescription at a discounted rate when

12   they go to pharmacy.

13        Q.    And that was to assist

14   patients in getting their first

15   prescription, right?

16        A.    That was the intent, yes.

17        Q.    And the concept is that once

18   patients have their first prescription

19   and like the drug, hopefully they'll stay

20   on the drug, right?

21             MR. GALIN:  Objection to

22             form.

23             THE WITNESS:  The -- I can't

24             characterize it as that.

Highly Confidential - Subject to Further Confidentiality Review

Page 176

1              The program, in my

2        recollection, it was for Nucynta

3        immediate release which had,

4        according to the indication, a set

5        amount of time.

6              The rationale for

7        implementing that program was that

8        coverage with managed care was not

9        very strong.  And the

10        out-of-pocket cost would have been

11        very prohibitive for most patients

12        to even afford that one

13        prescription.

14              So, hence, in order to help

15        to allow offices to get some

16        patients started, they were given

17        an allotment of these -- I think

18        they were called co-pay cards, to

19        help certain patients get started.

20   BY MR. JANUSH:

21        Q.   Do you remember hiring

22   McKesson to administer a co-pay program

23   with Janssen on Nucynta?

24              MR. GALIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 177

1      form.

2           THE WITNESS:  I don't recall

3      who -- I don't recall which

4      company we selected to administer

5      that program.  If you are -- if

6      you're asking if McKesson could

7      have been one of them, it would

8      have had to have been one of the

9      larger distributors that provided

10     that type of service.

11 BY MR. JANUSH:

12     Q.   Do you recall how much money

13 was charged by that third party to

14 administer the rebate program?

15     A.   I do not.

16     Q.   Does $2 million plus ring a

17 bell to you?

18     A.   I can't put $2 million in

19 context of total cost of --

20     Q.   Well, we'll work with

21 something later and see what we can do.

22          I'm going to have you turn

23 to Page 15 of this exhibit.  And at Page

24 15 am I correct that this is addressing

Page 178

1    the October review of 2010 with a

2    business plan forecasting for a total

3    budget of $44 million for 2011; is that

4    right?

5           A.    Yeah, that looks like this

6    is what this is trying to depict.

7           Q.    Okay.  And in 2010, the

8    October analysis of the 2010 budget shows

9    a total budget projection for Nucynta

10   marketing at $36 million; is that right?

11          A.    Yes.

12          Q.    With 21 percent of that

13   broken down to agency.  What does agency

14   mean?  Is that advertising agencies?

15          A.    That is usually encompassing

16   an advertising agency.  It could also

17   entail media buying agencies.  But

18   broadly speaking, third-party outside

19   agency.

20          Q.    Okay.  And it shows that

21   21 percent of the budget is dedicated to

22   speaker programs.

23                And can you describe what

24   that's referring to, speaker programs?

Page 179

1          A.     Here, based on my

2    recollection of the program, was the

3    brand had a speaker bureau, which was a

4    collection of -- it was a trained group

5    of doctors and possibly nurse

6    practitioners, who could speak -- who

7    were trained to speak about the brand,

8    according to the promotional program and

9    the promotional content.  And they would

10   be invited to speak to doctors in the

11   community based on a program that our

12   representatives set up with that

13   doctor -- with that speaker.

14          Q.     Okay.  So 21 percent of

15   $36 million total budget equates to, by

16   my rough math, somewhere just a tick

17   above $7.2 million dedicated to speaker

18   programs.  That's a lot of money to

19   devote to paying for programs to have

20   doctors go out and speak with other

21   doctors, isn't it?

22          A.     Launching a new product,

23   sir, requires some resources.

24          Q.     And the coupons and vouchers

Page 180

1    is estimated at 10 percent of the total

2    budget, so $3.6 million.  Fair to say

3    that's right?

4           A.    Yes.

5           Q.    Okay.  And that's addressing

6    $3.6 million of total budget that's spent

7    on making it easier for patients to

8    access that, at least, the first

9    prescription; is that right?

10          A.    For Nucynta, yes, the

11   program is designed to help reduce the

12   upfront cost for a prescription.

13          Q.    And I see 16 percent in

14   purple dedicated to sales force support.

15   What kind of sales force support would be

16   included in a budget like this?

17          A.    For sales force support,

18   it -- I'm just wanting to be cognizant of

19   the other buckets.  So here this is

20   probably the materials, the actual -- the

21   cost of producing actual physical

22   materials that a sales force would use.

23                So it could be the

24   promotional visual aid that's on their

Highly Confidential - Subject to Further Confidentiality Review

Page 181

1    iPad.  It could be flashcards.  It could

2    be publications.  It could simply be

3    reprinting of a package insert that's

4    required to be left behind on every call.

5           Q.    Does it include the sales

6    force overhead?

7           A.    No.  Nothing in these

8    budgets would be --

9           Q.    Personnel?

10          A.    -- would touch personnel.

11          Q.    And when we look to 2011,

12   the budget was projected to increase by

13   $8 million; is that right?

14          A.    That is the number being

15   proposed on that particular day.  I can't

16   speak to whether that was the final

17   number.

18          Q.    Understood.  Do you recall

19   why the budget needed to -- or why there

20   was a proposal to increase the budget by

21   $8 million?  Would it have been tied to

22   the notion of Nucynta ER's launch?

23          A.    The -- I can't -- I can't

24   recollect exactly what the rationale was

Page 182

1    for going up.  The increase in overall

2    spend typically would have to do with,

3    I'm looking at the -- the categories, the

4    percentage -- the percentages didn't

5    change, but the absolute amount might

6    have gone up in correlation with an

7    expected rise in forecast.

8            Q.    Well, the percentage has

9    changed a bit.  For example, speaker

10   programs went from 21 percent to

11   24 percent.  Agency fees appeared to go

12   down a bit.  But let's talk about that,

13   that speaker program issue once more.

14            Do speaker programs include

15   both advisory board meetings as well as

16   key opinion leader-led discussions?

17            A.    The speaker program -- the

18   speaker programs, as I understand these

19   classifications, would be the latter of

20   what you said, which is just speaker

21   programs.

22            Q.    So hiring a key opinion

23   leader to present on pain-related issues

24   to other physicians.

Page 183

1        A.    I just want to clarify.  The

2   people that spoke on behalf of the brand

3   were known as the speaker bureau.  Those

4   were all folks that were trained.  So,

5   yes, if -- if you mean hiring a -- or

6   putting someone on a contract to be part

7   of the bureau to deliver promotional

8   talks, that's absolutely included in the

9   speaker bureau.

10       Q.    And internally at Janssen

11  you referred to these folks as key

12  opinion leaders, didn't you?

13       A.    Well, the term can be

14  interchangeable.  Sometimes folks would

15  call them key opinion leaders.

16  Oftentimes just a speaker in the speaker

17  bureau.

18       Q.    I'd like to move to page --

19  I think it's 29, but the page numbers are

20  listed vertically.  It ends in Bates

21  number 8255.  Do you see that?

22       A.    Yes.

23       Q.    Okay.  So here, when we are

24  talking about 2009, in 2010 it's listed

Page 184

1    as ACT.  That's actual, right?

2          A.    Yes.

3          Q.    So for 2009, Janssen spent

4    $39.2 million to market Nucynta IR and

5    $1.5 actual million to market ER, for a

6    total of $40.6 million; is that right?

7          A.    That's correct what's on the

8    page.

9          Q.    Okay.  And moving to the

10   next page.  We are addressing the

11   breakdown by color coding for the

12   strategy for 2011 spend by strategy,

13   total Nucynta.

14              And here it says total

15   budget, 44 million.  And the green

16   represents the largest amount,

17   26.4 million allocated toward accelerate

18   trial and adoption.  What does that mean?

19         A.    If we are talking about

20   Nucynta, total Nucynta, most of the

21   business plans were categorized or broken

22   up into just general -- general

23   categories to give you a sense of how --

24   how an investment was being directed.

Page 185

1              So accelerating trial and

2    adoption was just another way to cut all

3    the different line items that are in a

4    longer Excel spreadsheet.  So this would

5    include something like the agency costs,

6    because the agency's work is to help

7    develop the messages that are used to

8    promote the product.  So that would be

9    typically included in something like

10   accelerate trial and adoption.

11         Q.    Would it include making

12   Janssen's contribution payment to pain

13   advocacy groups?

14         A.    I can't speak based on

15   what's here, whether that would include

16   making a sponsorship to an advocacy

17   group.

18         Q.    While you were running the

19   Nucynta marketing brand, incidentally,

20   did you have involvement in who Janssen

21   would work with, with regard to promoting

22   pain management through pain advocacy

23   groups?

24                   MR. GALIN:  Objection to

Page 186

```
 1          form.
 2                  THE WITNESS:  As a head of
 3          the brand, one of the things that
 4          I was charged to do was making
 5          overall resource allocation, as we
 6          saw from the percentages.
 7                  So generally my role
 8          entailed, is one area of
 9          investment overweighted versus
10          another, and trying to find the
11          optimal mix.
12                  In that mix is a small
13          amount, relative to the larger
14          total, for sponsorships and
15          participation or engagement with
16          advocacy organizations.
17   BY MR. JANUSH:
18          Q.   Which groups do you recall
19   engaging with, which advocacy
20   organizations?
21          A.   Well, I'd have to be clear,
22   the engagement with advocacy
23   organizations were done through a
24   advocacy director, who --
```

Page 187

1          Q.    Who is that?

2          A.    The person that -- that I'm

3    most familiar with, in terms of handling

4    advocacy was Robyn Kohn who was the

5    national advocacy director for internal

6    medicine.

7          Q.    Is it Cohen, C-O-H-E-N,

8    or --

9          A.    K-O-H-N.  And it's Robyn

10   with a Y.

11         Q.    And that title is national

12   advocacy director?

13         A.    That's my recollection of

14   her title.

15         Q.    Okay.  And tell us about

16   what Robyn Kohn would do, what was her

17   function in terms of engaging with

18   advocacy groups?

19         A.    My recollection is that

20   Robyn interfaced with -- across

21   therapeutic areas for Janssen internal

22   medicine, and was the interface to any

23   advocacy organization.  So beyond that, I

24   couldn't tell you how the day-to-day role

Highly Confidential - Subject to Further Confidentiality Review

Page 188

1   was handled, I was not in day-to-day

2   conversations in that area.  Because I

3   was responsible for bigger -- a bigger

4   set of the responsibilities of the brand.

5          Q.    What involvement, if at all,

6   did you have in interfacing with pain

7   management advocacy organizations, for

8   example like AAPM?

9          A.    My only involvement as it

10  relates to advocacy was approving the

11  proportion of the budget that would be

12  allocated to the advocacy function.  And

13  that advocacy function had the expertise

14  to determine which organizations to work

15  with, and where, if any, sponsorships

16  were made.

17         Q.    What role, if any, did you

18  have in overseeing key opinion leader

19  development?

20         A.    Again, it's consistent with

21  the other areas, my principal

22  responsibility was to ensure that the

23  allocation of the overall investment was

24  weighted appropriately relative to the

Highly Confidential - Subject to Further Confidentiality Review

Page 189

1    other.  So the end result in terms of
2    total investment in speaker bureau, or
3    speaker programs was -- became my -- I
4    had to endorse it.  And be approved as a
5    proportion of the spend of the overall
6    company's budget.
7           Q.    Who reported to you that
8    directly oversaw key opinion leader
9    development?  Was it Frank DeMiro?
10          A.    Frank DeMiro did report to
11   me, and he was involved in the
12   development of key opinion leaders for
13   the pain business.  He worked in
14   conjunction with medical affairs and --
15   and occasionally R&D to identify the
16   right people.
17          Q.    Who at medical affairs would
18   he have worked with to identify the right
19   key opinion leaders to speak on behalf of
20   Janssen's pain products?
21          A.    In terms of identifying top
22   level faculty, these are faculty who
23   trained the speakers in partnership with
24   our medical team.  Head of medical

Page 190

1    affairs would have included -- I'm going

2    to just make sure I get the timing right.

3    Dr. Bruce Moskovitz.  And Dr. Gary

4    Vorsanger.  And any other members of

5    their staff, including medical science

6    liaisons who may know key opinion

7    leaders.

8                (Document marked for

9           identification as Exhibit

10          Janssen-Lin-9.)

11   BY MR. JANUSH:

12        Q.    I'm going to have my

13   colleague give me his laptop.  I'm going

14   to plug in, for the next exhibit, because

15   it's too cumbersome to print out.  It's

16   an Excel file.

17                I'm going to plug in and

18   populate it on the screen.  And we'll

19   produce it at the end of this deposition

20   as an electronic file that will be

21   attached to the deposition transcript.

22                THE VIDEOGRAPHER: All you

23          have to do is drag that window to

24          your right.  It will pop up.

Page 191

1                    MR. JANUSH:  This is JAN --
2             we're going to test my technology
3             capabilities.
4                    MR. GALIN:  You've already
5             demonstrated they're superior to
6             mine.  I couldn't have set all
7             this up.
8                    MR. JANUSH:  This is what
9             took a bit of time.
10                    A-ha.  Okay.  This is hard
11             because where's the mouse?
12                    THE VIDEOGRAPHER:  Go to the
13             right.
14    BY MR. JANUSH:
15             Q.   All right.  So can you see
16    this screen?  This is Bates Number
17    JAN-00119068, and this is a 2012 brand
18    investment summary.  Have you seen
19    documents like this before, Mr. Lin?
20             A.    I have seen documents like
21    this, yes.
22             Q.    Okay.  And it looks like,
23    going to the left side, there is
24    strategic imperatives.  And I'm going to

Highly Confidential - Subject to Further Confidentiality Review

Page 192

1    read some of this.  "Drive broad and

2    competitive access and availability."

3    And then to the right side, "Provide

4    patient saving programs."

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  And then it looks

8    like there's a -- I'm going to box it in,

9    I'm highlighting -- or, maybe not

10   highlighting, but "23.5 JU budget."

11             Does that stand for June

12   budget?

13        A.    The term JU is used for June

14   update which is probably in the --

15   somewhere in the April to -- it refers to

16   generally the period of, if you're

17   looking at a snapshot, somewhere in the

18   April, May, June period.

19        Q.    Okay.  And then there's a

20   next column that says, "$1.7 million to

21   cut," from whatever this June budget was;

22   is that right?  Looking to cut from the

23   June budget on the column to the right?

24        A.    So for clarity, I'm just

Highly Confidential - Subject to Further Confidentiality Review

Page 193

1    guessing, because these are scenarios.

2    But they appear consistent with an

3    exercise that brands would do if they're

4    trying to reduce the budget or at least

5    prioritize.

6         Q.    And then on the right side,

7    do you see $21.8 million budget.  Do you

8    see that?

9         A.    Yes.

10         Q.    Okay.  So we were just

11    earlier looking at a 2009 actual budget.

12    And then a 2010 October review of a

13    budget, a 2011 forecast going up to a

14    hypothetical $44 million marketing

15    budget.

16              And now we're in 2012 and

17    we're looking at less than half of the

18    2011 forecasted budget; is that right?

19    At this $21.8 million?

20              MR. GALIN:  Objection to

21         form.

22              THE WITNESS:  I would agree

23         that the number is roughly half of

24         what was on that hypothetical

Page 194

1        proposed.

2   BY MR. JANUSH:

3        Q.    Okay.  Does that -- does

4   this $21.8 million budget for 2012 fall

5   within the ballpark of your recollection

6   in terms of a significant drop between

7   2011 and 2012 in Nucynta's brand

8   investment plan?

9        A.    I'm so many years out from

10  working on the brand that I can't speak

11  to the actual year-by-year change.

12       Q.    Okay.

13       A.    And what my -- because I

14  don't know that this was an actual -- I

15  don't know if this is where the actuals

16  were.  But I see it as a scenario.

17       Q.    Yeah.  I'm going to possibly

18  hand you over the laptop to use your

19  Excel skills to view the actuals.  But it

20  looks like there is a -- I'll blow this

21  up, budget as of 12/20.  That seems to be

22  close to the end of the year, 12/20.  And

23  it shows invoiced $22,617,386 with an

24  expected invoice number of 288 -- or 98,

Highly Confidential - Subject to Further Confidentiality Review

Page 195

1    I can't read it well -- 396, an open

2    amount of $419,755, and a sliver for no

3    purchase order of $236,848.

4              Am I understanding that no

5    PO correctly?

6         A.    That's what shows here.

7         Q.    Okay.  Invoiced 22,617 --

8    $22,617,386.

9              What does invoiced mean?

10        A.    The company received the

11   invoice, and most likely what happens --

12   well, what happens when you're invoiced

13   is you authorize payment for that

14   invoice.

15        Q.    So more likely than not, the

16   notion of $22,617,386 is an actual

17   number, right?  It's an invoiced number,

18   it's actual, not just forecasted, once

19   it's invoiced?

20        A.    In all likelihood, it would

21   be -- those invoices would be paid.

22        Q.    And there's a tab for

23   actuals that is really hard to read.  So

24   we're just going to do it a little

Highly Confidential - Subject to Further Confidentiality Review

Page 196

1    differently.  And we're going to scroll

2    up to the top and see what I can find on

3    filtering, if I could filter.  Give me

4    one second.  This is Decile.ten.  This is

5    a vendor of the marketing department?

6                    MR. GALIN:  Objection to

7            form.

8                    THE WITNESS:  It is a

9            third-party professional promotion

10           agency.

11   BY MR. JANUSH:

12           Q.    Okay.  So Decile.ten for

13   2012, and there's a spend category,

14   $462,663.57.  What would this -- what

15   would this company be doing?  I see on

16   the doc header, "Webcast, speaker

17   trainings," I see "clinical educators."

18   Can you shed light on Decile.ten?

19           A.    Yeah.  I can shed more light

20   on Decile.ten than I can on the line

21   items that are on here.

22           Q.    Well, here's some line

23   items.  I can blow up for you.

24           A.    Okay.

Page 197

1          Q.    Speaker deck update, webcast

2     speaker training, Prescribe Responsibly

3     phase, sales training contracting,

4     Nucynta IR pain policy slide deck

5     development, Steve Stanos honorarium,

6     appears to be paid through Decile.ten.

7                Let me pause there.  So this

8     is an instance that instead of

9     utilizing -- instead of Janssen directly

10    paying Dr. Stanos, Dr. Stanos was paid

11    through Decile.ten.  Is that fair to say

12    that that's what this line item shows?

13         A.    You know, I have no

14    recollection of this transaction.

15         Q.    I'm not asking if you have a

16    recollection.  I'm asking if that's what

17    it shows, because there's a PO text.

18    That's purchase order text, right?  And

19    there's a document number.  That's

20    usually a purchase number, right, on the

21    left?

22         A.    Okay.

23         Q.    I'm asking you.  I'm asking

24    you.  I'm just going through it.  And it

Page 198

1    says spend, $2,750.

2              Do you see that?

3         A.   Yes.

4         Q.   And it's under the

5    Decile.ten account.

6              Do you see that at Column F?

7         A.   Yes.

8         Q.   Okay.  So I'm not trying to

9    speculate either.  I'm just trying to

10   conclude if it's correct that Decile.ten

11   billed an invoice for Steve Stanos

12   honorarium for Nucynta ER.

13             MR. GALIN:  Objection to

14        form.

15   BY MR. JANUSH:

16        Q.   Based on this.

17        A.   Based on what's listed here,

18   it does appear there's a line item where

19   a -- I'm going to guess it's a physician

20   customer, was paid to do a service for

21   the brand.

22        Q.   Okay.  So going back to my

23   earlier question, who is Decile.ten?

24   What did they do for you?  Can you shed a

Page 199

1    little more light on it?

2         A.    Yeah.  Broadly speaking,

3    Decile.ten focuses on helping brands

4    develop their promotional message,

5    particularly with a focus on speaker

6    programs.  I think they are also in

7    managed care communications, where

8    they're -- they're helping brands talk to

9    payers.  So they're -- the main

10   distinction is that they are different

11   than the agency that would help develop a

12   promotional message for use on an iPad

13   with a doctor in their office.

14        Q.    Okay.

15             MR. JANUSH:  Can you help me

16        get back to undo this?

17             THE VIDEOGRAPHER:  Over

18        here?

19             MR. JANUSH:  Yeah.  I want

20        to get -- undo that.  This should

21        be on -- I wish I had it all on

22        one screen because...

23             We're going to need to take

24        a brief break for this technical

Highly Confidential - Subject to Further Confidentiality Review

 1      issue.

 2              THE VIDEOGRAPHER:  The time

 3      is 2:30 p.m.  Going off the

 4      record.

 5              (Short break.)

 6              THE VIDEOGRAPHER:  We are

 7      back on the record.  The time is

 8      2:37 p.m.

 9              MR. JANUSH:  Thank you for

10      accommodating me and the technical

11      issue I encountered a moment ago.

12              MR. GALIN:  No worries.

13  BY MR. JANUSH:

14      Q.   Earlier I had asked about

15  the coupon voucher program.  And I'd

16  asked if you knew who -- who managed it.

17  And I threw out the name McKesson.  I've

18  actually found through this budget that

19  it was McKesson Specialty Arizona Inc.

20              Does that name ring a bell

21  to you in any way?  No?

22      A.   McKesson rings a bell now,

23  But Specialty Arizona Inc., no.

24      Q.   All right.  Now, scroll with

Highly Confidential - Subject to Further Confidentiality Review

Page 201

1    me, I'm going to move a couple columns to

2    the right.  First of all, there's a bunch

3    of purchase orders, and then to the right

4    are purchase order texts.  And it seems

5    to be -- it seems to indicate that this

6    is primarily Nucynta voucher provides up

7    to 10 FR -- I think that's the ten free

8    pills.  Does that sound right to you?

9         A.    That -- that sounds

10   familiar, yes.

11        Q.    And then the Nucynta savings

12   card offers out-of-pocket savings, I'm

13   assuming is what would have been stated

14   after that; is that right?

15        A.    Yes.

16        Q.    Okay.  And it's all 2012,

17   I'm going to represent to you -- first of

18   all, we're only in a 2012 budget.  And

19   the dates range from 12/27/2012 -- or I

20   should say from October 15, 2012, to

21   12/17/2012, and in a two-month period,

22   the spend column reflects a sum of

23   $2,124,480.99.

24                   Do you see that at the

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    bottom in the sum?

2         A.    Yes.

3         Q.    Okay.  What would this

4    expenditure -- would this expenditure

5    have been paid to McKesson to manage the

6    coupon or -- or rebate program for

7    patients?

8              MR. GALIN:  Objection to

9         form.

10             THE WITNESS:  Based on the

11        POs that I see and what limited

12        text there is, I am going to

13        conjecture that this is for the

14        management of those programs.

15   BY MR. JANUSH:

16        Q.    Okay.  I'm going to move

17   into a different screen.  Graphical.

18   This is under the graphical REP slide or

19   page within this Excel -- Excel file.

20   And it starts at the top with budget as

21   of 12/20.  Invoiced $22,617,386.

22   Expected invoice, $288,396.  Open, 419 --

23   $419,755.  No purchase order $236,848.

24   And a budget total of $23,562,385.  And

Highly Confidential - Subject to Further Confidentiality Review

Page 203

1   it looks like your group was over budget

2   by $1.762 million.

3            Does that look right to you

4   or what I'm reflecting accurate -- an

5   accurate representation of what's on this

6   screen based on this document?

7            A.   At a very high level, it

8   looks like -- I would have to check the

9   formulas, but it would appear, if the

10  math is right, that there's a scenario

11  where the brand could be over budget.

12           Q.   Now, I'm just trying to

13  focus on some big picture payments here.

14  And I see Weber Shandwick purchase order

15  for $172,295, but it's just an initial --

16  I believe an initial purchase order.  And

17  when you scroll down, the sum looks like

18  it's $603,000.  I'm going to make sure

19  I'm reading that column right by

20  scrolling up to total.  Yeah, total

21  purchase order.  Total PO, $603,000 in

22  green allocated to Weber Shandwick with

23  Frank DeMiro as the assigned Janssen

24  employee for this account.

Highly Confidential - Subject to Further Confidentiality Review

Page 204

```
1              What services did Weber
2    Shandwick provide to you generally?
3         A.    Weber Shandwick is a PR
4    communications firm in healthcare.
5         Q.    So what kind of services
6    would they have provided as it concerned
7    Nucynta?
8         A.    Without their exact scope of
9    work in front of me, the kinds of things
10   they generally do are to -- PR firms will
11   be engaged in liaise with healthcare
12   publications, the healthcare press, life
13   sciences press.  And their objective is
14   to understand what are the potential
15   venues or advertising opportunities that
16   a brand could potentially participate in.
17        Q.    Okay.  Earlier we talked
18   about national advocacy.  We talked about
19   programs, maybe not national, but
20   advocacy in general.  And here is,
21   "Develop national" -- and it's at Line
22   Item 232.  "Develop national pain policy
23   platform to align HPADs and SGA."  What
24   does that stand for?  To align HPADs and
```

Highly Confidential - Subject to Further Confidentiality Review

1    SGA?

2         A.    I'll start with the second

3    one.  SGA, State Government Affairs.  And

4    HPADs, I just -- I don't recall what that

5    stands for.  It's an acronym for a team

6    of people that -- there was only a few --

7    a handful of them.  They -- I want to say

8    they dealt with health policy.  That's

9    the only recollection that I can think of

10   right now.

11        Q.    Okay.  And I want to jump

12   down to Line 255.  And these subtitles

13   that are in black background with white

14   font, these are section headings, under

15   which different line items follow; is

16   that right?

17        A.    They are indeed.  They look

18   like groupings.

19        Q.    Groupings.  Okay.  So let's

20   talk -- start with the grouping, "Advance

21   awareness of undertreatment of pain."

22             Do you see that?

23        A.    Yes.

24        Q.    Okay.  And the owner of that

Page 206

1    grouping is Lisa Ferguson and Frank

2    DeMiro, it looks like.  Do I have that

3    right?

4           A.    Yes.

5           Q.    Okay.  And looking at,

6    "Advance awareness of under treatment of

7    pain," the entities that put in purchase

8    orders and are in this grouping are

9    Nucynta -- are Ketchum, Inc.  That's a

10   public relations firm, right?

11          A.    Yes.

12          Q.    Nucynta Smart Moves, Smart

13   Choices toolkit.  That was actually a

14   website, Smart Moves, Smart Choices;

15   isn't that right?

16          A.    My recollection is there was

17   a website, but there was also a press

18   kit.

19          Q.    Okay.  This is -- this is --

20   I think you're right.  This is a toolkit

21   and a DVD, it looks like, postage for

22   Smart Moves, Smart Choices.  And then

23   Smart Moves, Smart Choices fulfillment.

24   What would that stand for, fulfillment?

Page 207

1          A.    In the -- in the lingo of

2    these brands, fulfillment would be if a

3    customer requested something through a

4    business reply card or maybe went online

5    and to something and said, "I'd like to

6    get something."  It's usually an

7    educational piece -- piece of educational

8    material.

9          Q.    Okay.  And along with,

10   "Advancing awareness of undertreatment of

11   pain," comes Weber Shandwick's fee.

12              Do you see that?

13         A.    Yeah.

14         Q.    Okay.  And I also see

15   something called "PAINweek Curtain

16   Raiser."  What's that?

17         A.    I don't know how these are

18   used together.  Curtain raiser is a PR

19   type of term.  When there's a --

20   something akin to national breast cancer

21   awareness week.  There's a -- it's when

22   there's a callout to focus on a

23   particular subject in healthcare.

24         Q.    Okay.  I'm trying to scroll

Highly Confidential - Subject to Further Confidentiality Review

Page 208

1   to see if there's anything else that I

2   want to address.

3              So there's a subheading at

4   Line 200, "Obtain hospital stocking and

5   formulary access."  And within that

6   section comes "Joint Commission book

7   program, $200,000."

8              What does that pertain to?

9      A.    I don't recall exactly what

10  that program was.  I'm familiar with the

11  term "Joint Commission."  That's --

12     Q.    It's not just a term.  It's

13  the hospital accreditation group,

14  correct?

15     A.    Yeah, that sounds right.

16     Q.    Joint Commission is the

17  group that led the effort to create pain

18  as a fifth vital sign in or about year

19  2000; is that right?

20             MR. GALIN:  Objection to

21         form.

22             THE WITNESS:  I can't speak

23         to the accuracy of that.

24  BY MR. JANUSH:

Page 209

1         Q.    Okay.  Do you know why you

2    were paying in year 2012 $200,000 to the

3    Joint Commission?

4         A.    Based on what we've seen

5    here, I can't -- I can't be certain what

6    that is.

7         Q.    I see something at Line 165,

8    a new subheading group, "Accelerate

9    regional pull-through of national

10   formularies."

11             What does it mean to

12   accelerate regional pull-through of

13   national formularies?

14        A.    When a health plan puts a

15   product, for example, on Nucynta and

16   they've deemed it to be in a particular

17   tier, and they've put guidelines around

18   it as to conditions of use, for example

19   if you failed a generic -- you have to

20   try a generic first, but if the generic

21   didn't work, then you can try a branded

22   product.

23             That's -- that might be a

24   condition of formulary approval on a

Page 210

1    national level.  But all these plans

2    have -- they call them children plans at

3    various regions in the country.  And from

4    a managed -- from a practicality

5    standpoint, even if we're approved -- a

6    brand is approved at the national

7    formulary level, unless the brand makes

8    inroads at the regional level, the

9    doctors in that region -- or the patients

10   in that region don't get to actually

11   experience the particular rebate/co-pay

12   that was negotiated at the national

13   level.

14            So it's an extra step to do

15   that.  And so that's more than likely

16   what that means, is to make sure that the

17   national coverage is reflected at the

18   regional level.

19        Q.    And I see that that one --

20   I've added the sums, and I've grayed it

21   out, so you can see -- I'll follow with

22   my mouse, from the bottom to the top of

23   that category.  I've added this up, or

24   Excel has.  And it looks like $1,073,831

Highly Confidential - Subject to Further Confidentiality Review

Page 211

1    has been allocated to this access and

2    pull-through issue.

3              Any idea why, within that

4    there would be a line item for the

5    American Journal of Managed Care

6    publication for $150,000 budget?

7              MR. GALIN:  Objection.

8    BY MR. JANUSH:

9         Q.    Not actual, but budget.  The

10   actual is only $52,700.

11        A.    I don't recall what that

12   line item would be specifically referring

13   to, no.

14        Q.    And Profero agency fee,

15   $215,000.  What would Profero agency fee

16   be doing to accelerate regional

17   pull-through of national formularies?

18        A.    Profero specializes in

19   developing educational materials for

20   offices, specifically for use in doctors'

21   offices so that -- well, let me -- let me

22   be accurate.  Either materials for a

23   sales rep to use with an office or

24   material to leave behind at the office.

Highly Confidential - Subject to Further Confidentiality Review

Page 212

1          Such material would

2     basically be designed to educate the

3     office on what is the coverage of a

4     product like Nucynta in the plans that

5     are most dominant in their geography.

6          Q.    Okay.  Here at Line 223, the

7     subheading is, "Advocate for responsible

8     prescribing through nonbranded tools."

9     And we have Prescribe Responsibly app.

10    Is that the Prescribe Responsibly iPad

11    app for sales reps, or is this the

12    Prescribe Responsibly web program

13    available to the public?

14         A.    I don't know exactly which

15    tactical execution item that was.  I

16    can't speak to that.

17         Q.    And Prescribe Responsibly,

18    just so we're clear -- we'll talk about

19    it a little later in greater detail, but

20    that's the website created by Janssen

21    that was an unbranded tool that linked

22    from Nucynta's website -- linked from

23    Nucynta's -- Nucynta's website, and

24    addressed pain and chronic pain issues

Highly Confidential - Subject to Further Confidentiality Review

Page 213

1    and put publications on line for patients

2    to read; is that right?

3              MR. GALIN:  Objection to

4         form.

5              THE WITNESS:  I -- I can

6         definitely say I was -- I am

7         familiar with the Prescribe --

8         Prescribe Responsibly initiative.

9         Whether or not -- and I believe

10        there was a website.  Whether --

11        whether Nucynta -- you could link

12        it from Nucynta.com or the exact

13        resources that were offered on it,

14        I can't speak to that with any

15        accuracy.

16   BY MR. JANUSH:

17        Q.    Okay.  Who would be the best

18   person to talk to, during your tenure,

19   about Prescribe Responsibly?

20              Would it be Ron Kuntz?  He

21   is listed as the owner in that

22   subcategory.  That's why I'm asking.

23        A.    So I think he is potentially

24   one to speak to.  But again, I -- since

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1     this is a living breathing document at

2     the time, it could have been -- there is

3     on occasion where you have a swap-out in

4     responsibilities.  So I think he would be

5     one.

6             Q.     Granted it is December 20,

7     2012, is the last date entered on this

8     document.  So your year-end -- your --

9     when does your year end at Janssen?

10            A.     When I was there it was

11    December.

12            Q.     Right.  That's what I'm

13    getting at.

14            A.     All -- all I'm saying is

15    that what we're -- what we're looking at

16    here is a -- I think it's important to

17    put into context that the spreadsheet

18    you're looking at here has a combination

19    of things that are run from a financial

20    system of invoices paid.  And also

21    reflects what a brand team was looking at

22    in order to drive closure of those POs.

23                  So who was the subject

24    matter expert may or may not have been

Page 215

1    the name listed.  When you -- when you

2    have outstanding POs and you want to

3    chase invoices at the end of the year,

4    which is a common practice in a brand,

5    oftentimes the responsibility is divvied

6    up between various people to essentially

7    chase down vendors for -- for invoices.

8    So I do think it's important to put that

9    in context, because a lot of what's shown

10   here has more to do with just keeping

11   records straight, landing the budget

12   number accurately.

13        Q.   So I'm going to go to the

14   first top category in the 2012 brand

15   investment summary.  It's in black.  The

16   group heading is execute leading edge

17   peer-to-peer education.  Do you see that?

18        A.   Yes.

19        Q.   And in blue next to it, the

20   strategic imperative says, "Establish

21   Nucynta as new standard in moderate to

22   severe pain management."

23             Do you see that?

24        A.   Yes.

Page 216

1          Q.    And the first line item is,

2     "Live speaker programs (including

3     regional hot spots) with a $4.5 million

4     budget," it looks like, but then I

5     won't -- I'll go directly to the actual

6     to see what that is.

7               "Invoiced 4 million."  Do

8     you see that?

9          A.    Yes.

10         Q.    Okay.  So this would tend to

11    reflect that $4 million had been

12    invoiced, and according to your earlier

13    testimony, should be paid for live

14    speaker programs that had thus far been

15    billed as of this point in time in 2012,

16    right?

17         A.    That would be my conclusion.

18         Q.    Okay.  And the vendor for

19    these live speaker programs is a company

20    by the name of MedForce.  Do you see

21    that, it's right in the line D?

22         A.    Yes, I see that.

23         Q.    Who is MedForce, what did

24    they do?  Did you work with them

Highly Confidential - Subject to Further Confidentiality Review

Page 217

1    personally?

2          A.    I did not work with MedForce

3    personally.  MedForce is a third-party

4    agency that manages speaker programs for,

5    fair to say a good number, if not a large

6    number, of pharmaceutical manufacturers.

7                 They essentially handle

8    logistics for setting up a speaker

9    program.

10         Q.    What does that mean, to

11   handle logistics?  Would -- would the

12   speakers be paid through MedForce?

13         A.    The part about logistics

14   that I can -- that I'm familiar with is

15   if, for example, I was a sales rep, and I

16   was going to hold a speaker program, I

17   would choose the speaker from the

18   available list of speakers.  I would call

19   up MedForce and say, Dr. Speaker and I

20   have agreed to do a program on

21   February 25th here in Princeton,

22   New Jersey.  MedForce would help secure a

23   location or a venue that was appropriate

24   for a speaker program that was within

Page 218

1   healthcare compliance guidelines and they

2   would set it up.

3              And then once it was set up,

4   the representative could distribute or

5   communicate through e-mail invitations or

6   verbal invitations to the customers that

7   he or she wished to invite.  MedForce

8   would take care of the travel

9   arrangements of the speaker.  Typically

10  they are more local, but it would ensure

11  that the program was -- all the

12  logistics, from the speaker getting there

13  to the AV equipment being there, to the

14  restaurant menu.

15       Q.    And just under that live

16  speaker program, budget number for

17  MedForce, there is full service for

18  meeting direct?

19       A.    Yes.

20       Q.    Then there's Nucynta 2011

21  speakers bureau execution credit.  Do you

22  know what an execution credit is?

23       A.    Well, typically if -- if the

24  speaker bureau, you know, the -- the

Page 219

1   vendor might invoice -- they may invoice

2   too much, because it was an anticipated

3   number of programs to execute.  And if

4   you don't use it -- if they don't

5   actually hit it, then there's a credit.

6          Q.    Okay.  And then it gets to

7   KOL stakeholder database and decile.ten

8   is the vendor.  What is the KOL

9   stakeholder database?

10         A.    I'm not -- it -- it doesn't

11  ring a bell right now.  But part of

12  the -- the desire of a brand is to make

13  sure that you -- that the brand is able

14  to categorize all the different folks

15  that are influential in a particular

16  area.  So a typical KOL database may have

17  a person listed as very good for the

18  neurology community, or very good for

19  let's say surgeons.  Just to give a

20  little bit of structure.

21         Q.    And in this instance, at

22  least for Line 9 in the 2012 brand

23  investment summary, decile.ten is listed

24  as the vendor who managed this KOL

Page 220

1   stakeholder database for Nucynta?

2           A.    It appears like that, yes.

3           Q.    And moving down one line to

4   Line 10, core message development speaker

5   deck update.  And it looks like I can

6   skip that because there's not an invoice

7   associated with it.  So I want to be

8   correct in how I deal with that.

9                 But it may be that the

10  invoices are here.  Project -- they are.

11  Project management and consultancy

12  services for Q1, 2, 3 and 4, all

13  associated with decile.ten and all

14  invoiced for 1, 2, 3 and 4.  And it looks

15  like $99,952 was associated with project

16  management and consultancy services.

17                What kind of project

18  management and consultancy services did

19  decile.ten provide with respect to core

20  message development and speaker deck

21  update?

22          A.    So the speaker bureau, the

23  folks on the speaker bureau delivered

24  their programs, these promotional

Page 221

1    programs from an approved -- what we

2    called a core deck.  The core deck was

3    developed and maintained by a firm, in

4    this case, decile.ten.

5              One of the important things

6    about the speaker deck is that any change

7    to that deck required a thorough edit

8    process, resubmission into a -- into a

9    copy review process, and then was

10   disseminated again to the speakers.

11        Q.    And, in fact, in addition to

12   project management and consultancy

13   services, deck updates which you were

14   just addressing was separately invoiced.

15        A.    Okay.

16        Q.    And it looks like $115,421

17   was listed as the total purchase order.

18   So that would be for updating the

19   PowerPoint slides --

20        A.    Yeah.

21        Q.    -- for key opinion leaders

22   to talk about?

23        A.    Yes.

24        Q.    Okay.  And then there's

Page 222

1    something called Interactive Presentation

2    Builder 3.0 with an invoice for $122,300.

3    What's that, if you can recall?

4            A.    My recollection of

5    Presentation Builder was it allowed a

6    trained speaker to decide the order of

7    how they wanted to handle the program.

8    So for example, if a speaker decided,

9    let's say for discussion's sake, the --

10   the audience was more orthopedic

11   surgeons, then it would be incumbent upon

12   that speaker -- the interest level of the

13   audience would be more focused on

14   immediate release Nucynta because they're

15   focused on postoperative pain management.

16   If the audience was a pain specialist,

17   you might have more of it be Nucynta

18   extended-release.

19            So it just simply allowed

20   them to say, I'm going to take the big

21   chunk and put it upfront, and -- they

22   couldn't change the content.  They can

23   only just change the order of different

24   sections.

Highly Confidential - Subject to Further Confidentiality Review

Page 223

1          Q.    Got it.  Okay.  And as to

2     that.  I'm going to scroll back up.  That

3     would have been $122,300 invoiced.  Do

4     you see that?

5          A.    I do.

6          Q.    Now, we're going to get to

7     some other topics.  At Line 39, "Deploy

8     differential resourcing to drive local

9     market opportunities."

10               Do you see that?

11         A.    Yes.

12         Q.    And then the next subheading

13    is, "Product theaters, AAPM, APS, AANP,

14    PAINWeek," and a projected $400,000

15    budget.  And again, that's a subheading

16    under which some line items now appear.

17    Do you see at Line 41, the first line

18    item is, "2012 APS product theater"?

19         A.    Yes.

20         Q.    And APS stands for the

21    American Pain Society, doesn't it?

22         A.    Yes.

23         Q.    And so what is a product

24    theater of the APS?

Page 224

1          A.    My recollection is that a

2    product theater is when a manufacturer or

3    a brand can pay for a slot in the

4    meeting.  You are basically buying a --

5    buying a spot on the schedule to deliver

6    a promotional message.

7          Q.    Okay.  And for that there's

8    a purchase order of $143,457.

9                Do you see that?

10         A.    I do.

11         Q.    Okay.  And so there's also a

12   2012 AAPM product theater.  Would that be

13   similar to APS theater where Janssen is

14   buying a spot to deliver a promotional

15   message about Nucynta?

16         A.    That would be similar.

17         Q.    Okay.  And they are --

18   sorry, I scrolled out.  But there we have

19   a charge of -- an invoice of $139,129; is

20   that right?

21         A.    It looks correct.

22         Q.    Okay.  And then there's a

23   smaller charge under that for MPR live

24   report at AAPM meeting, $37,450.  What's

Page 225

1    an MPR live report at an AAPM meeting?

2            A.    I don't know what an MPR

3    line report is.

4            Q.    Okay.  Then we'll skip it.

5    We'll go down to 2012 PAINWeek product

6    theater.  Similar to what you testified

7    about regarding APS and AAPM?  Would it

8    be the case that Janssen was paying

9    $44,400 to the PAINWeek group to get in a

10   promotional spot to discuss Nucynta?

11           A.    I believe that's what that

12   would be intended for, yes.

13           Q.    Okay.  And now here comes

14   one that's a little bigger.  Line 48, and

15   the subheading is, "Competitively

16   differentiate versus oxy."

17                 Do you see that?

18           A.    Yes.

19           Q.    And under that is, "Vendor

20   ICC."  Who is ICC?

21           A.    ICC stands for Integrated

22   Communications Corporation.  It's an

23   ad -- professional advertising company

24   under one of the large healthcare

Page 226

```
1    conglomerates.  I don't remember which

2    one.

3           Q.    And it looks like the owner

4    of this is a new name for us, Paul

5    Lowman.  Do you see that?

6           A.    I do.

7           Q.    Who is Paul Lowman within

8    Janssen?

9           A.    Paul Lowman at the time was

10   a product manager.  So my -- in looking

11   at what's here, he was probably assigned

12   to just handle the invoicing.

13          Q.    Okay.  And under Paul

14   Lowman, the owner is Tricia Yap

15   associated with the line item for agency

16   fees.  And this is Line 50 on this

17   spreadsheet.  And I'm going to scroll

18   over.

19                It looks like agency fees

20   from ICC to competitively differentiate

21   Nucynta versus oxy totaled $2,882,043.

22   Does that look right?  Am I representing

23   this correctly?

24          A.    That -- that looks accurate.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 227

1        Q.    Okay.  So that's -- if
2    hypothetically this budget was
3    $23 million or in that range, we're
4    talking about an amount greater than 10
5    percent of the total annual marketing
6    brand investment budget for Nucynta to
7    differentiate Nucynta as compared with
8    oxy; is that right?
9        A.    I think it's accurate to say
10    that roughly two point -- I forget the
11    exact number.
12        Q.    2.8 million --
13        A.    $2.8 million or
14    $2.9 million --
15        Q.    Of the total --
16        A.    -- of the total was spent on
17    a scope of work that was attributed to
18    ICC, professional communications agency
19    to help develop the promotional assets
20    that were utilized by the brand, some of
21    which we looked at examples of.
22        Q.    Okay.  I'm just trying to be
23    careful here.
24                All right.  So the biggest

Page 228

1    line item in the entire brand investment

2    strategy appears to be the live speaker

3    programs at $4 million.  And the next two

4    items that are above $2 million are the

5    McKesson rebate program or coupon program

6    and this comparison with oxy.

7              Fair to say that, number

8    one, funding your speaker program was

9    pretty important to Janssen's overall

10   brand investment strategy to promote

11   Nucynta?

12        A.   Peer-to-peer education was a

13   critical part of the marketing mix for

14   driving awareness and adoption for

15   Nucynta and Nucynta ER.

16        Q.   Fair to say that funding the

17   rebate program in order to get better

18   access for patients to be prescribed or

19   to want to pick up and pay for at the

20   co-pay level Nucynta was important to

21   Janssen's brand strategy to promote

22   Nucynta?

23              MR. GALIN:  Objection to

24         form.

Page 229

1           THE WITNESS:  I think

2           supporting -- it was important to

3           the brand as a newcomer to the

4           category to support good access

5           for patients and provide customers

6           with the ability to help their --

7           their patients get started on a

8           brand that didn't have the best

9           coverage at the time of launch.

10  BY MR. JANUSH:

11           Q.    Is it also fair to say that

12  it was really important for Janssen to

13  compete against oxy and that's why, in

14  2012, it permitted the brand to be

15  invoiced $2,882,433 to advance those

16  endeavors?

17           MR. GALIN:  Objection to

18           form.

19           THE WITNESS:  I think -- I

20           think it's really fair to say that

21           when launching a new entrant in a

22           very crowded and complacent

23           market, that working -- seeking

24           the help of an advertising agency

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1          to help differentiate the brand in

2          the eyes of the customer is a

3          really important step towards

4          successful adoption.

5    BY MR. JANUSH:

6          Q.    Okay.  Now, I'd like you to

7    answer my question though.  My question

8    wasn't about the really competitive,

9    crowded market.  My question was about

10   oxy and the fact that you just testified

11   about a really competitive crowded

12   market, and yet there is an effort to

13   only differentiate against oxy, led me to

14   ask my specific question.

15         A.    Sure.

16         Q.    Is that fair?

17         A.    Sure.

18               MR. GALIN:  Objection to

19         form.

20   BY MR. JANUSH:

21         Q.    So was it important for

22   Janssen to competitively differentiate

23   Nucynta vis-à-vis oxy?

24         A.    I'll qualify to say that the

Page 231

1    oxy -- oxycodone or OxyContin was

2    generally regarded as a standard of care.

3    And as a new entrant, differentiating of

4    standard of care is absolutely important.

5         Q.    And that's why we continue

6    to see efforts to differentiate between

7    Nucynta and oxy in marketing materials,

8    because it was really important for

9    Janssen to do so, right?

10             MR. GALIN:  Objection to

11        form.

12             THE WITNESS:  I'm just

13        conjecturing because we're not

14        looking at a specific piece.  But

15        it's important to differentiate a

16        new entrant based on the clinical

17        data using all the players in that

18        clinical trial and showcase

19        efficacy and tolerability.

20    BY MR. JANUSH:

21        Q.    I'm going to move onto

22    another topic since this jammed up again.

23    I covered a lot on this budget, so we'll

24    move forward.

Highly Confidential - Subject to Further Confidentiality Review

Page 232

1              (Document marked for

2         identification as Exhibit

3         Janssen-Lin-10.)

4    BY MR. JANUSH:

5         Q.    I'm marking Lin Exhibit 10.

6    It's Bates number is JAN-MS-01049919.

7              This is an e-mail -- there

8    you go, sir.  Sorry.

9              MR. JANUSH:  Counsel.  One

10        for you.  One for you.

11   BY MR. JANUSH:

12        Q.    This is an e-mail from you

13   to a large list of recipients.  And I'll

14   try and shrink this a bit.  All right.

15   It's dated 1/29/2012, and the subject is

16   pain CSO team recruiting briefing.

17              This is concerning the

18   contract sales organization.  That's what

19   CSO stands for, right?

20        A.    That's right.

21        Q.    And this is -- more

22   specifically, this concerns the Quintiles

23   provided or staffed contract sales

24   organization that we spoke about earlier

Highly Confidential - Subject to Further Confidentiality Review

Page 233

1    this morning that comprised the pain

2    force; is that right?

3         A.    That's right.

4         Q.    Okay.  And in this e-mail,

5    you are advising colleagues that "this

6    e-mail contains pertinent information

7    regarding our upcoming Quintiles pain

8    representative cluster meetings.  Please

9    take the time to familiarize yourself

10   with the contents and attachments.

11   During Monday's preparation call, our

12   Quintiles partners will review the

13   remaining details regarding onsite

14   logistics."

15              And moving further below,

16   you address as background, "As you have

17   heard from recent communications,

18   promotion of Nucynta ER and Nucynta in

19   2013 will be assumed by a standalone pain

20   sales team.  This team will be staffed

21   and run by Quintiles and will collaborate

22   closely with the Janssen pain

23   organization."

24                   I'll pause there for a

Page 234

1  moment.  I was going to ask you a

2  question about the composition of this

3  team, but I see it's answered in the very

4  next paragraph.  77 territory

5  representatives and seven district

6  managers and one national leader

7  comprised this pain force; is that right?

8          A.    Yep, that's right.

9          Q.    And so at this time, when

10  this pain force transitioned to Nucynta

11  from Quintiles, did Janssen 100 percent

12  do away with having their former sales

13  reps that covered Nucynta continue to

14  detail Nucynta?  In other words, did the

15  pain force take over 100 percent for the

16  nation all detailing efforts concerning

17  Nucynta IR and Nucynta ER?

18          A.    If recollection of the

19  timeline is correct, the hiring took

20  place during December.  Quintiles hired

21  the sales team based on qualifications

22  that were given to them by Janssen.

23              The Janssen team that

24  previously sold Nucynta ER and Nucynta

Page 235

```
 1    essentially were responsible for the
 2    product transitioning to a new rep in the
 3    first quarter of 2013.  The
 4    representatives hired by Quintiles, I
 5    can't remember the exact date when 77
 6    were all on board, but suffice it to say
 7    there's about a quarter transition and
 8    there's about a quarter of when there's
 9    really very inconsistent coverage of a
10    customer base.
11          Q.    Fair enough.  So, you went
12    from a pain or a Nucynta sales force that
13    comprised some numbers of hundreds of
14    detailers of sales reps that were
15    promoting Nucynta, to 77 salespeople with
16    seven district managers and one national
17    leader?
18              MR. GALIN:  Objection to
19          form.
20    BY MR. JANUSH:
21          Q.    Is that right?
22          A.    We transitioned from a sales
23    force that had three products, the other
24    two being cardiovascular and metabolism,
```

Page 236

1    and the pain product, to a standalone of

2    a sales force that just focused on pain.

3           Q.    Going back -- thank you for

4    that clarification, but going back to my

5    question.

6                 That other sales force,

7    notwithstanding how many other products

8    they covered, numbered into the hundreds

9    of sales folks that were detailing

10   Nucynta; is that right?

11          A.    That's generally accurate,

12   yes.

13          Q.    Do you remember how many

14   hundreds?

15          A.    I don't remember the exact

16   number.  My -- my recollection is it's

17   somewhere north of 500.  Probably shy of

18   somewhere under a thousand.

19          Q.    Okay.  Fair to say that

20   77 salespeople, no matter how skilled

21   they may be, can't cover the entire

22   country?

23          A.    These 77 were deployed

24   nationally in all major metropolitan

Page 237

1  areas where there was a concentration of

2  relevant prescribers.

3        Q.    I appreciate that.  That's

4  another way of saying that these 77

5  weren't allocated to cover the entire

6  country, right?

7        A.    For purposes of that

8  product, they were covering, in my

9  estimation, most of the country.

10       Q.    Because they were covering

11  areas where prescribers were prescribing

12  Nucynta?

13       A.    They were covering areas

14  where prescribers were covering -- they

15  were writing Nucynta and Nucynta ER.  And

16  because there was a population of

17  treaters of pain.

18       Q.    We're going to get back to

19  this very topic in just a short bit of

20  time.  Okay?

21       A.    All right.

22       Q.    Before I move on to the next

23  exhibit, I want to ask some questions

24  about this Quintiles, this transition to

Page 238

1    Quintiles.

2              What was your personal role

3    in terms of hiring the members of the

4    Quintiles pain force?

5         A.    My role as the franchise

6    leader was that I chose, in conjunction

7    with other leaders -- I made the

8    recommendation to choose Quintiles as the

9    contract sales organization.

10             My role also extended into

11   aligning with others in our organization,

12   the qualifications, the profile and the

13   deployment scenario, all of which served

14   as the -- think of it as a, this is the

15   specifications to hand over to the

16   contract sales organization Quintiles,

17   from which they actually began to staff

18   their team based on our requirements.

19        Q.    Did these salespeople obtain

20   Janssen e-mail addresses to communicate

21   within Janssen?

22        A.    Yes.

23        Q.    Did they have any offices

24   within Janssen or were they remote

Page 239

1    employees?

2           A.    Well, all sales

3    representatives and district managers

4    are, by definition, field based so they

5    don't have offices.

6           Q.    And why hire and train an

7    entirely new sales force, a standalone

8    pain force employed by Quintiles, instead

9    of utilizing the Janssen employees that

10   were previously trained, some of which

11   who had been trained for years in

12   detailing Nucynta?

13          A.    Competing priorities.

14   Janssen internal medicine was in the

15   middle of a launch of two important

16   blockbuster products.  They needed to

17   basically refocus all efforts on those

18   two particular opportunities which had a

19   lot of overlap in customer base and they

20   were deemed to be of more strategic

21   importance to the future of the

22   organization.

23          Q.    But you had some great

24   salespeople who were ranked highly within

Highly Confidential - Subject to Further Confidentiality Review

Page 240

1    the company who were doing a good job and

2    made their inroads with doctors' offices

3    and were high performing and awarded

4    sales reps detailing Nucynta, didn't you?

5         A.    There were, in fact, people

6    that were very experienced with pain.

7         Q.    And so why not transition

8    the very best of the best to move over to

9    your new pain sales force and have other

10   people trained to cover the -- the other

11   general health products that you were

12   addressing, concerning cardiac care and I

13   forget what the other one was?

14        A.    Metabolics.

15        Q.    Metabolics.

16        A.    Type 2 diabetes.  I think in

17   an ideal world as you've described it is

18   how one might approach it.  But one of

19   the other key philosophies when you deal

20   with a large sales organization, is that

21   we try to actually minimize change

22   because those representatives have --

23   they know a particular geography very

24   well, they know the health ecosystem in

Highly Confidential - Subject to Further Confidentiality Review

Page 241

1    that area, and as you're focusing on

2    launching two new products that have

3    significant opportunity in competitive

4    profiles -- with competitive profiles,

5    the overriding factor is knowledge of a

6    particular marketplace trumps specific

7    knowledge about one therapeutic area.

8           Q.    However, you weren't going

9    out with a mindset to hire skilled sales

10   representatives from Quintiles that had

11   prior experience detailing pain, pain

12   medicine?

13              MR. GALIN:  Objection to

14          form.

15              THE WITNESS:  Are you -- are

16          asking me if that was a criteria?

17   BY MR. JANUSH:

18          Q.    Yeah.

19          A.    If -- if you're asking me if

20   we sought to hire -- if Quintiles sought

21   to hire representatives with pain

22   background --

23          Q.    I can hear you at the same

24   time.  I'm not being rude.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1          A.    If you're asking me if

2     Quintiles sought to hire folks with a

3     pain background, that was one -- I

4     believe, if my recollection serves

5     correctly, that was one of the criteria

6     that we asked for in the hiring profile.

7          Q.    Fair enough.  So the nuance

8     I would suggest -- I would assert instead

9     is that while pain -- experience with

10    pain may have been a screening criteria,

11    experience with pain in the Schedule II

12    opioids space was not a screening

13    criteria; isn't that right?

14              MR. GALIN:  Objection to

15         form.

16              THE WITNESS:  I can't speak

17         specifically right now to the job

18         description.  It may not have been

19         a show stopper.  If recollection

20         serves me correctly, it was

21         absolutely something that was

22         highlighted as something desirable

23         to have.

24    BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 243

```
 1        Q.   Okay.  This is your e-mail,
 2   turning -- turning back to it.
 3             MR. GALIN:  You grabbed my
 4        version.
 5             MR. JANUSH:  Sorry, sorry,
 6        sorry.
 7             MR. GALIN:  I just want to
 8        follow along.
 9             MR. JANUSH:  Which exhibit?
10        My apologies.
11             MR. GALIN:  No worries.  I
12        just needed it to follow along.
13   BY MR. JANUSH:
14        Q.   Exhibit 10.  "The ideal
15   candidate" -- it's the last sentence,
16   second-to-last sentence.  I'm
17   highlighting it.  "As you'll note in the
18   job description, experience in pain was a
19   screening criteria, but was not limited
20   to experience in the C-II market.
21   Selling experience within a specialty
22   market is also important."
23             Do you see that?
24        A.   Yes.
```

Page 244

1          Q.     So we're not that far apart

2     from each other.  You're saying that pain

3     was a screening criteria.  And I'm saying

4     prior experience in the C-II market was

5     not a limiting factor here, not in your

6     words.  Now that you've read your e-mail,

7     do you agree where I'm coming from?

8          A.     I can see where you're

9     coming from, but to be totally accurate

10    and fair, we should look at the job

11    description.

12         Q.     Yeah.  That would have been

13    great.  I think that the attachment,

14    there's only a bit of it on the next

15    page.  The attachment for the job

16    description, Pain Specialty Rep.doc was

17    withheld from production.  We'll be

18    calling for it.  But I don't have it here

19    to go over it with you.  I only have the

20    very -- the three themes to consider,

21    that somebody be a self-starter and be

22    self-motivated, have business and

23    customer insight.  Incidentally, it says,

24    "Can they uncover the referral flows in

Page 245

1    their market?"

2                    What does that mean?

3          A.    Very simply, that means

4    if -- the referral flows are, in its

5    simplest sense, there are pain

6    specialists in a particular city that are

7    the go-to referral centers from

8    particular doctors.  So that helps you

9    isolate who are the specialists in the

10   area that others listen to.

11         Q.    And then the next question

12   is, "Can they uncover the treatment

13   algorithms of each practice and be viewed

14   as bringing value?"

15                   What does that mean?

16         A.    Well, treatment algorithms

17   are important to understand because it

18   overlaps directly with patient flow.  So

19   if an orthopedic -- I'll give you an

20   example.  If an orthopedic surgeon does

21   a -- does a procedure on somebody, maybe

22   prescribes pain medication upon

23   discharge, but that person has to go to

24   rehab, it's also important to know who

Page 246

1    that patient's primary care might be in

2    the area so that you can connect the dots

3    in terms of knowing where that patient

4    may be going for follow-up visits.

5         Q.    All right.  Thank you for

6    that explanation.  I'm going to put that

7    aside again.

8              Incidentally, I haven't

9    asked you much about Greg Preston.  How

10   did Greg Preston get selected to be the

11   national pain force leader?  Did you

12   personally interview him?

13        A.    I did personally interview

14   him.

15        Q.    What were the qualifications

16   that you recall that led him to get to

17   land that role as head of the pain force

18   team?

19        A.    I can't recall the exact --

20   the specific job description.  But I

21   worked with Quintiles senior management

22   in describing the kind of person that we

23   felt was important.  At that level, it

24   has a dominant -- the dominant criteria

Page 247

1   would be more how do they interface with

2   senior leaders in the organization across

3   multiple functions, because their job is

4   really to -- their job is oversight of

5   the contract.

6           Q.    Where was his office?

7           A.    His official office was in

8   Quintiles headquarters in Cary, North

9   Carolina, where I believe he resided.

10  But he did --

11          Q.    Did -- I'm sorry.  Go ahead.

12          A.    But he did have an office in

13  our building, and he was in the -- I

14  can't speak to how often he was in the

15  building.  But it was enough to be

16  present.  But keep in mind most of the

17  folks in those kinds of roles spend

18  anywhere from 50 to 70 percent of their

19  time on the road meeting with district

20  managers, meeting with reps.

21          Q.    Did you fairly consistently

22  check in with him and get updates with

23  him on the accomplishments and efforts of

24  the pain force?

Highly Confidential - Subject to Further Confidentiality Review

Page 248

```
 1          A.    I think it's fair to say
 2    that we were in contact every week, at
 3    least once.
 4          Q.    Did you -- how would you
 5    stay in contact?  Would you stay in
 6    contact by phone, by e-mail?
 7          A.    Pretty standard to have him
 8    included on conference calls regarding
 9    performance.  And it was fit for
10    purpose -- fit for purpose, whatever was
11    needed to be done.  So whether it was
12    phone call or e-mail, we maintained
13    communications.
14          Q.    Well, do you recall
15    e-mailing him during the time that he
16    served as your pain force national
17    manager, national director?
18          A.    Of course I recall having
19    e-mailed him and called him.
20          Q.    Would you have shared
21    metrics over a -- concerning the pain
22    force's outcomes with him via e-mail?
23          A.    Very, very high
24    probability -- we talked metrics every
```

Page 249

1    week, so whether that was in person or

2    over e-mail, there was going to be some

3    sort of dialogue.

4           Q.    How long did you work with

5    him?

6           A.    He was selected close to the

7    time of that e-mail that we talked about.

8    And I can't recall whether he was already

9    selected as the national leader or was in

10   final rounds with his own company.  And I

11   would have worked with him from the

12   time -- whatever time he was officially

13   named until the time that I left that

14   business.

15          Q.    Fair to say that there would

16   be a significant volume of e-mail

17   correspondence during that time with --

18   between you and Greg Preston?

19          A.    I can't characterize how

20   much e-mail it was or wasn't.

21               What I -- as the national

22   sales leader, we would most definitely

23   include him on business reviews, which

24   could have been over -- if he was in the

Page 250

1    building, he would be in person.  If he

2    wasn't, he would be calling in.  So it

3    could have been a conference call.  But

4    there's -- when you go over metrics,

5    there's sales leader, there's analytics,

6    so there's other folks in the discussion

7    as well.  So...

8                    THE VIDEOGRAPHER:  The time

9           is 3:58 p.m.  Going off the

10          record.

11                   (Brief pause.)

12                   THE VIDEOGRAPHER:  We are

13          back on the record.  The time is

14          3:39 p.m.

15                   (Document marked for

16          identification as Exhibit

17          Janssen-Lin-11.)

18    BY MR. JANUSH:

19          Q.    I'm going to hand you what

20    has been marked as Lin Exhibit 11.  This

21    is the Work Order 6724.  Its Bates stamp

22    is JAN-MS-00576727.  This is the contract

23    between Quintiles and Janssen, is it not,

24    for the specialty pain force

Highly Confidential - Subject to Further Confidentiality Review

Page 251

1   representatives?

2          A.     That looks like what it is.

3          Q.     Okay.  I want to turn to

4   Page 11.  And let's see.  You are listed

5   as the internal project manager or

6   responsible person to whom the service

7   provider will report.  Was that correct?

8          A.     Yes.

9          Q.     Okay.  Now, moving forward

10  to Page 12.  Just for the record, year

11  one, this is a two-year sales agreement;

12  is that right?

13         A.     That's correct.

14         Q.     And so year one, sales force

15  positions, there's a daily rate, an

16  estimated days worked and estimated total

17  fees.  And that goes for the sales reps,

18  the 77 sales representatives, the seven

19  district managers, and the one project

20  leader; is that right?

21         A.     That looks correct, yeah.

22         Q.     And so estimated fees for

23  year one, $11,957,972.81 for this

24  Quintiles staffed sales force, true?

Highly Confidential - Subject to Further Confidentiality Review

Page 252

1         A.    Yes.

2         Q.    Year two, same numbers, 77

3    sales representatives, seven district

4    managers, one project leader.  And we

5    have an increase, and the total estimated

6    fees were $12,410,699.28; is that right?

7         A.    Yeah, that looks right.

8         Q.    Do you recall whether you

9    went -- whether Janssen went over these

10   numbers in terms of the -- the total

11   Quintiles sales force cost?

12        A.    I don't have any information

13   that would suggest the actual costs in

14   that year.

15        Q.    So in total, Janssen agreed

16   to pay an outside company $24,368,671 to

17   staff a sales force for two years to sell

18   Nucynta; is that right?

19             MR. GALIN:  Objection to

20        form.

21             THE WITNESS:  Are you adding

22        up the two numbers that are listed

23        here in year one and year two?

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 253

1          Q.     I am.

2          A.     Estimates?

3          Q.     I am.

4          A.     Well, if your math is right,

5     then I would say the estimate for the

6     direct sales force cost from Quintiles

7     was estimated at the time of signing of

8     the contract to be about that number.

9          Q.     Do you have any reason to

10    believe that -- that the actual cost

11    didn't match closely with these

12    estimates?

13         A.     I have no recollection of

14    any significant deviation from these

15    agreed upon budgets.

16         Q.     Did you oversee compensation

17    for the pain sales force?

18         A.     I oversaw the crafting of

19    the incentive compensation strategy, but

20    the compensation itself is -- is executed

21    or run through a sales compensation.

22         Q.     This was -- these fees that

23    are included in this contract, was

24    this -- was this a base salary and bonus

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    structure estimate, or were these just

2    the base figures?

3              In other words, sales

4    representatives get paid commissions

5    or -- or bonuses based on how many total

6    prescriptions they may sell in a given

7    quarter, right?

8         A.    Sure.  Is there a particular

9    item that you would like me to look up?

10        Q.    There may be.  Let's see.

11   Page 13, there's an incentive plan

12   administration at Subparagraph C.  It

13   says, "Clients shall pay service provider

14   an amount equal to, 1, the amount of all

15   nonsalary compensation earned by sales

16   force employees in accordance with the

17   terms of the incentive plan or otherwise

18   requested by client, and an amount equal

19   to 9.7 percent of such compensation for

20   service providers employer costs."

21              I understand that this going

22   to the service provider, that's

23   Quintiles, right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 255

1            MR. GALIN:  You are missing

2        the Elmo.

3            MR. JANUSH:  Oh, sorry,

4        sorry, thank you.

5    BY MR. JANUSH:

6        Q.    That goes to the service

7    provider.  But it's referencing all

8    nonsalaried compensation earned by the

9    sales force employees in accordance with

10   the terms of the incentive plan.  So was

11   there a separate -- a separate incentive

12   plan or was there an incentive plan that

13   I might be missing?

14       A.    My recollection is that

15   there was an incentive plan put in place

16   for the sales force.

17       Q.    So, so earlier when I was

18   addressing the -- the $24 million plus,

19   that's just the base compensation, right?

20            MR. GALIN:  Objection to

21       form.

22            THE WITNESS:  I -- to be

23       fair, I -- from the costs that we

24       were looking at, or the estimates

Page 256

1          that we reviewed -- those --

2     BY MR. JANUSH:

3          Q.     Well, it breaks it down --

4          A.     -- those --

5          Q.     -- here.

6          A.     -- those do not directly

7     speak to someone's salary.  Those were

8     speaking to an average daily rate that

9     the service provider would be paid for

10    the work they provided.

11         Q.     Right.  In other words,

12    daily rate multiplied by estimated days

13    worked times -- added up to an estimated

14    total days worked, added up to total

15    fees.

16              This is a base salary based

17    on how many days 77 salespeople worked.

18    There's nothing about incentive-based

19    compensation in this, right?

20         A.     I don't believe in the

21    numbers we are looking at here involve

22    incentive compensation.

23         Q.     Okay.  So separate and apart

24    from this agreement, there should be

Page 257

1    another agreement concerning the

2    Quintiles pain force incentive

3    compensation?

4              MR. GALIN:  Objection to

5         form.

6              THE WITNESS:  I don't know

7         if there would be a separate

8         agreement to the incentive plan,

9         but my recollection is that there

10        was an incentive plan put in place

11        consistent with that of other

12        Janssen's sales forces.

13   BY MR. JANUSH:

14        Q.    Did your sales and marketing

15   team ever target doctors for Nucynta

16   prescriptions because such doctors were

17   high prescribers?

18        A.    May I clarify?  When you say

19   Nucynta, do you mean Nucynta ER, Nucynta

20   immediate release, or in general the

21   both?

22        Q.    We'll -- we'll start with

23   Nucynta ER.

24        A.    We targeted -- I think

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    there's a vetting process for how the

2    actual customer targets are derived.  The

3    actual number of physicians that wrote

4    long-acting opioids, as I'm speaking to

5    Nucynta ER, was far greater than the

6    number that we could actually reach with

7    the resources we had.

8              But in general, if you asked

9    me for characterizing the targets that we

10   would seek to engage, writers of

11   long-acting opioids, specifically branded

12   ones.

13         Q.   Do you recall being involved

14   in communications about setting up a

15   meeting with a high prescribing physician

16   who was very specifically writing

17   prescriptions of your competitor's

18   product and not writing Nucynta ER

19   prescriptions?

20              MR. GALIN:  Objection to

21         form.

22              THE WITNESS:  During my time

23         as a brand leader, I met with

24         customers when I was out with the

Highly Confidential - Subject to Further Confidentiality Review

Page 259

1          sales representatives.  I met --
2          when I would go out on a day with
3          a rep.  So I would meet with
4          customers as -- as a tagalong to
5          the normal course of their day.
6              Whether or not they fit the
7          exact criteria that you're
8          describing is -- I can't speak yes
9          or no to that with any accuracy.
10  BY MR. JANUSH:
11      Q.    So during your tenure as the
12  national sales and marketing director,
13  you -- you actually went and did
14  ride-alongs with sales reps?
15      A.    Occasionally.  I -- I made
16  it a point to go out once or twice.  Most
17  folks in those roles do, to ensure that
18  we didn't lose touch with reality.
19              (Document marked for
20          identification as Exhibit
21          Janssen-Lin-12.)
22  BY MR. JANUSH:
23      Q.    I'm going to mark as Exhibit
24  Number 12 an e-mail chain that's Bates

Highly Confidential - Subject to Further Confidentiality Review

Page 260

1    number is JAN-MS-00289532.

2                    And I'm going to have you

3    turn to the second page of the exhibit

4    ending in 533.

5                    And specifically in the

6    middle of the page, Kanitha Burns is

7    writing to Elizabeth Bianciani copying

8    Patricia Yap, David Lin, you, Paul Lowman

9    who we discussed earlier, Ron Kuntz, Lisa

10   Ferguson, Frank DeMiro, and Dominic

11   Lazzaro regarding a doctor named Guang

12   Yang, Opana ER 10 top.  Do you see that?

13          A.    Yes.

14          Q.    I'll actually move this

15   folder.  Use this.

16                    And Lisa, or Elizabeth

17   Bianciani, I know she goes by -- by Lisa,

18   wrote, "Hi, is anyone able to make it out

19   to Cleveland, Ohio, on Thursday?  I am in

20   marketing excellence training on

21   Wednesday through Thursday of this week.

22   Guang Yang has written 558 Opana ER total

23   prescriptions in the past 13 weeks and

24   represents 3,159 long-acting opioid total

Page 261

1   prescriptions.  He has not written any

2   Nucynta ER total prescriptions in the

3   last" -- "in the past 13 weeks.  If

4   Thursday does not work, Lisa, could you

5   let me know when you plan on heading out

6   there?  Would it be possible to piggyback

7   on your trip."

8            Before I ask a question, I

9   just want to get your confirmation I read

10  this correctly.  Yes?

11       A.    Yes.

12       Q.    Okay.  And Kanitha Burns,

13  who is not a sales representative, who is

14  a marketing program director, correct?

15       A.    She is in marketing.

16       Q.    And she's an executive in

17  marketing, right, fairly high up, just a

18  couple -- a couple slots below Patricia,

19  her -- she reported directly to Patricia

20  Yap, didn't she?

21       A.    She did.

22       Q.    And Patricia Yap reported

23  directly to you?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1          Q.    Okay.  So there's David Lin,
2     Patricia Yap, and Kanitha Burns with a
3     number of other employees on that
4     third -- on that third tier.  Fair?
5          A.    Fair.
6          Q.    Okay.  "Lisa, I should be
7     able to do it, especially if it's in and
8     out same day.  Let's talk tomorrow.
9     Kanitha."
10               Now, I deposed Kanitha Burns
11     not that long ago.  I didn't get any
12     testimony from her that she assisted in
13     sales and went out and met with high
14     prescribers of long-acting opioids.
15               How common is that practice
16     to send out a marketing executive from
17     Janssen's headquarters in New Jersey out
18     to Cleveland, Ohio to meet with a high
19     prescriber?
20               MR. GALIN:  Objection to
21          form.
22               THE WITNESS:  Well, first
23          let's talk about the role.  So I
24          would say Kanitha and others like

Page 263

1          Kanitha are definitely people --

2          those are -- those are roles that

3          are primarily based on marketing.

4          But marketing and sales have a

5          very close collaboration.

6               And I would characterize it

7          as, it is true that occasionally

8          someone from home office may visit

9          a customer for the purpose of

10         learning about the customer's

11         practice, their -- the area,

12         hearing about things like managed

13         care.

14   BY MR. JANUSH:

15         Q.    He hadn't written a

16   prescription in 13 weeks.  He wasn't

17   really a customer right then, right?

18         A.    No.

19         Q.    In fact, it's because he was

20   writing a competitor's -- script for --

21   prescriptions for Opana ER that he was

22   specifically targeted for a visit; isn't

23   that right?

24         A.    Based on the

Page 264

1    characterization in this e-mail chain,

2    that's exactly why you'd want to visit

3    the customer, is to learn why they do

4    what they do.

5         Q.    And to convince them to

6    consider writing for Nucynta ER, right?

7         A.    Absolutely.  The end game is

8    to drive awareness of your product with a

9    customer that is using long-acting

10   opioids.

11        Q.    A doctor -- let me ask you a

12   different question.

13             When Lisa or Elizabeth

14   Bianciani is reporting out that, "Guang

15   Yang has written 558 Opana ER

16   prescriptions in the past 13 weeks and

17   represents 3,159 long-acting opioid total

18   prescriptions," is the 3,159 an annual

19   metric?  Like, how is that being used, if

20   you know?

21        A.    I -- there's no data source

22   here to say what time period it is, so I

23   can only -- typically, those numbers are

24   read quarterly or annually.

Page 265

1          Q.     And the subject is Opana is

2     Guang Yang -- Guang Yang Opana ER 10 top.

3               Is that referring to the

4     fact that Guang Yang is a top 10 Opana ER

5     prescriber?

6          A.     I can't verify that that

7     is -- that that doctor is a top 10

8     prescriber of Opana ER.  But I

9     acknowledge that the concept would be

10    something that would potentially be

11    discussed.

12         Q.     When you say the concept,

13    the concept in this subject -- this

14    subject line --

15         A.     Yes.

16         Q.     -- the Opana ER ten top?

17         A.     Not specific to Opana ER,

18    but a customer who has adopted branded

19    long-acting opioids is really in the

20    sweet spot of where all the competitors

21    want to compete.

22         Q.     They're considered -- in

23    decile terms, what would -- what would a

24    doctor like this be considered?

Page 266

```
1          A.    I don't know where they
2   would be considered in the decile of a
3   long-acting opioid prescriber.  But the
4   general thesis is that if they are
5   willing to consider branded products,
6   then they might not be as -- they might
7   not be as wed to generic only.
8          Q.    I mean, assuming that Dr.
9   Guang Yang worked five days a week in an
10  office practice and wasn't working
11  weekends, and worked for 13 weeks, we're
12  talking about 65 days of writing
13  prescriptions and it amounts to 8.5 Opana
14  ER prescriptions per day.  That's a lot
15  of pain -- opioid pain prescriptions
16  written in one day, isn't it?
17              MR. GALIN:  Objection to
18         form.
19              MS. NAKAMURA:  Objection to
20         form.
21              THE WITNESS:  I can't -- I
22         can't speak to where that ranks
23         because we're giving a lot of
24         hypotheticals about the days
```

Page 267

1    worked, the number of patients

2    seen.  I think it's unfair to

3    categorize that level of

4    prescribing for any one

5    prescriber.

6           THE COURT REPORTER:  Could

7    you tell me who was objecting?

8    Can you say your name?

9           MS. NAKAMURA:  This is Angel

10   Nakamura of Arnold & Porter for

11   Endo.

12          THE COURT REPORTER:  Thank

13   you.

14          MR. GALIN:  Mr. Janush, are

15   you done with this?

16          MR. JANUSH:  I'm going to

17   move on from this topic.

18          MR. GALIN:  Okay.  I wanted

19   to wait until you were done just

20   to make one point, which is, for

21   the record, there appears on it

22   some highlighting in the middle of

23   it.  My understanding is it was

24   not produced with the

Highly Confidential - Subject to Further Confidentiality Review

Page 268

1           highlighting, so just for the

2           actual record -- I don't know

3           where the highlighting came on.  I

4           just want the exhibit to be

5           accurate.

6                MR. JANUSH:  This actually

7           was produced, we believe, just as

8           you're seeing it.  If not, look in

9           the native.  Not the image.  Look

10          in the native.  And if we're

11          wrong, we didn't highlight it.  So

12          I think you have to look at the

13          native.

14                MR. GALIN:  Not making an

15          issue of it now.  We'll just

16          figure it out.

17                MR. JANUSH:  Understand

18          this.  I will always do the right

19          thing and work with you always.

20          So if its native production is not

21          highlighted, we will make sure

22          that we fix it.

23                MS. WINCKEL:  It's not.

24                MR. JANUSH:  It's not?

Highly Confidential - Subject to Further Confidentiality Review

Page 269

1          Okay.  I didn't do it.

2          MR. GALIN:  I'm not

3     suggesting anything deceptive.

4          MR. JANUSH:  We will

5     absolutely swap out this exhibit

6     for an unhighlighted version.

7          MR. GALIN:  We've been

8     going, other than our little

9     15-minute break -- or second

10    break, we've been going for about

11    an hour and 25 or so minutes.  I

12    don't know how others feel.  I'm

13    okay.  The witness, how do you

14    feel?  Should we take a break now?

15    Any other in the room as well?

16    There's others in the room as

17    well.

18         MR. ALLEGAERT:  You guys

19    decide what you want to do.  The

20    court reporter is the most

21    important person.

22         THE COURT REPORTER:  I'm

23    fine.  Whatever you guys want to

24    do.

Page 270

1              THE WITNESS:  I can go

2         another 15 minutes before a bio

3         break.

4    BY MR. JANUSH:

5         Q.    Okay:  All right.  I'm going

6    to hand you what's been marked as Lin

7    Exhibit 13.

8              (Document marked for

9         identification as Exhibit

10         Janssen-Lin-13.)

11    BY MR. JANUSH:

12         Q.    This concerns an e-mail, a

13    parent e-mail, and an attachment.  The

14    parent e-mail is JAN-MS-0066055 -- 0588.

15    The attachment is 00660589.  Again, Lin

16    Exhibit 13.

17              The parent e-mail is from a

18    Stephanie Melo to Johnette Johnson cc'g

19    Frank DeMiro, you, Mr. Lin, and Patricia

20    Yap.

21              Do you see that on the first

22    page?

23         A.    Mm-hmm.

24         Q.    And it's addressing an

Page 271

1   extended team meeting that is soon to

2   occur, a proposed agenda.  You're listed

3   as providing the pain sales force update.

4   And then we go into the extended team

5   meeting slide deck.  That is the

6   attachment.

7                   So first, second slide, just

8   as in the e-mail, you are listed as

9   providing a pain sales force update; is

10  that right?

11          A.    Yes.

12          Q.    Okay.  And then I'm going to

13  draw your attention to Slide 5 where the

14  presentation addresses, "Generate data on

15  comparative" -- effectiveness --

16  effective -- efficacy -- sorry,

17  "efficiency, and abuse."

18                  What was being sought from

19  Janssen's perspective in addressing

20  efficiency and abuse?

21          A.    So in the context of this

22  document, I want to clarify, that the

23  grayed-out box, because it is grayed out,

24  this is the responsibility of the medical

Highly Confidential - Subject to Further Confidentiality Review

Page 272

1    affairs health economics team.  So

2    typically we call these integrated

3    strategies, so you can see on one page

4    what's being -- what's being worked on.

5                     So the specifics of what

6    usually comes out of these, or why

7    there're topics that are on there is they

8    are probably -- they are usually

9    referencing key topics that are asked by

10   healthcare providers, other key opinion

11   leaders -- it could be a payer.  And

12   those top issues that are raised would be

13   captured by medical affairs, and they

14   would be placed into a strategy document

15   to say we should -- in order to satisfy

16   inquiries from our outside stakeholders

17   we should try to generate data on these

18   topics.

19                     Whether or not there was

20   ever budget specifically for every topic

21   that's listed here, is not clear.  But

22   that was the stated intent.

23             Q.    Okay.  And at the top you

24   are addressing some key business

Highly Confidential - Subject to Further Confidentiality Review

Page 273

1   questions.

2        A.    Yep.

3        Q.    What is the potential impact

4   of generic Opana ER and OxyContin

5   entrants in long-acting opioid market?

6             What's the answer to that

7   within this slide, if there is one?

8        A.    Well, there's not a direct

9   correlation between a key question.  They

10  are meant to be thought provoking in

11  terms of the general conditions in that

12  competitive environment.

13            So I -- I would say most

14  likely the -- the middle column there, in

15  terms of access and value proposition,

16  would probably, in part, evolved from

17  some of those questions that you just

18  mentioned in that third box.

19       Q.    So what does it mean to

20  enhance the integration of access

21  message?

22       A.    Well, looking back to the

23  discussion we had earlier, one potential

24  example of integration of access message

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1     is, if the brand received, I'll use for

2     example maybe a Tier 2 status on a

3     particular health plan that we mentioned

4     as the parent national plan, but that the

5     regional children plans weren't

6     necessarily adopting that same -- that

7     same tier placement, it would be

8     incumbent upon, not only our national

9     account directors who deal with managed

10    care plans, but also our sales leaders,

11    to make sure that they actively engage

12    those local plans and say just wanted to

13    clarify that your parent plan has us on

14    Tier 2 to be used after let's say a

15    generic and at a co-pay of X dollars.  We

16    want to make sure that you're aware that

17    that's the coverage of your national

18    plan.

19              That -- when that doesn't

20    happen correctly, then there are -- it

21    can lead to customer confusion.

22         Q.   I'm going to move forward to

23    Slide 7.  This is just the org chart

24    showing the Janssen pain organization

Page 275

1    resides within the CNS business unit.

2                    CNS stands for what

3    incidentally?

4          A.    Central nervous system.

5          Q.    Okay.  And this is the --

6    the Michael Yang you talked about this

7    morning that was the individual who would

8    have reviewed you in your role when you

9    were, I believe, both the national

10   marketing director and national sales

11   director; is that right?

12         A.    That's right.

13         Q.    The next slide at Page 8.

14   This is just addressing the pain force

15   that we were discussing earlier.  And on

16   the right side, it says, "Focus coverage

17   of high prescribers within targeted

18   markets."  And that's what you were

19   speaking to earlier, isn't it, regarding

20   the territories where there are a

21   concentration of opioid prescribers,

22   physicians prescribing long-acting

23   opioids?

24                    MR. GALIN:  Objection to

Page 276

```
 1        form.
 2   BY MR. JANUSH:
 3        Q.    Is that right?
 4        A.    The -- the focus -- the
 5   reason why this is here, stated here, I'm
 6   going back a number of years, but it was
 7   important at the time to make sure that
 8   the extended team, which was
 9   cross-functional partners, would have
10   confidence that the representatives that
11   were hired were hired to be in the most
12   important markets.
13              So coverage of the folks who
14   wrote long-acting and short-acting
15   opioids, with a focus on branded.
16        Q.    Okay.  And the next slide at
17   Slide 9 is a map for the pain specialist
18   group.  This is for your pain force for
19   2013; is that right?
20        A.    Yes, that's --
21        Q.    And it's color-coded.  And
22   it's color-coded in seven colors which
23   line up in the key at the bottom to the
24   different regions or districts that were
```

Highly Confidential - Subject to Further Confidentiality Review

Page 277

1    carved out for the pain specialty Nucynta

2    pain force group; is that right?

3            A.    That's right.

4            Q.    Okay.  So earlier I talked

5    about the difference between sales reps

6    detailing across the country versus in

7    targeted locations, right?

8            A.    Yes.

9            Q.    This map, to use a Janssen

10   line from an earlier PowerPoint, a

11   picture is worth a thousand words, right?

12           A.    Yes.

13           Q.    This map identifies the --

14   the areas of greater intensity of focus

15   where Janssen was dedicating its Nucynta

16   pain force sales representatives; is that

17   right?

18           A.    That's correct.  This is

19   the -- this is meant to depict the

20   deployment of the sales team.

21           Q.    Okay.  If the colors of each

22   region are not observed in any of the

23   states that are listed, that are set

24   forth as blank or white, does that mean

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    that Janssen did not send sales reps into

2    those territories to detail Nucynta?

3           A.    That is -- yes, that's

4    right.

5           Q.    Was one of the goals,

6    therefore, to target the territories, the

7    regions or districts, however, whatever

8    is the appropriate term used, that

9    historically had the higher volume of

10   long-acting and short-acting opioid

11   prescriptions?

12                MR. GALIN:  Objection to

13          form.

14                THE WITNESS:  I think it's

15          fair to say that to place a rep in

16          a particular geography, two things

17          were taken into consideration.

18          The overall size of the geography

19          and making sure you had within a

20          rough concentric circle, that

21          would allow a rep to be productive

22          with a number of customers that

23          were deemed to be good potential

24          customers -- a number of physician

Page 279

1          customers that were deemed to be

2          good Nucynta ER or Nucynta target

3          customers.

4     BY MR. JANUSH:

5          Q.    And moving on to the next

6     slide.  Fair to say that in the past, in

7     2012, in fourth quarter 2012, Nucynta

8     targets totaled approximately 46,000

9     targets, right?

10              MR. GALIN:  Objection to

11          form.

12              THE WITNESS:  According to

13          the -- the document that I'm

14          looking at, it does look like

15          there was approximately 46,000

16          targets in the fourth quarter of

17          2012.

18    BY MR. JANUSH:

19          Q.    And the major change with

20    this pain force transition, with this

21    Quintiles contract sales force, is that

22    in first quarter 2013, the sales force

23    would -- would look at three different

24    groups of customers, one of which is

Highly Confidential - Subject to Further Confidentiality Review

Page 280

1    greyed out.  The first group is Nucynta

2    targets transitioning to pain team, and

3    that's approximately 7,000 healthcare

4    practitioners; is that right?

5           A.    Yes.

6           Q.    And the second is Nucynta

7    opt-in targets, and that's listed as

8    being approximately 6,000 targets, right?

9                 MR. GALIN:  Object to form.

10   BY MR. JANUSH:

11          Q.    What is a --

12                THE COURT REPORTER:  I need

13          an answer.

14                MR. JANUSH:  Oh, thank you.

15          Sorry.

16   BY MR. JANUSH:

17          Q.    That's -- that's Nucynta

18   opt-in targets.  That's at approximately

19   6,000 targets; is that right?

20          A.    Yes.  The label says 6,000.

21          Q.    What's a Nucynta opt-in

22   target?

23          A.    I don't recall directly

24   right now what an opt-in target was.  I'm

Page 281

1    going to venture to guess only that it's

2    a customer that expressed interest in

3    Nucynta or that might have been flagged

4    that -- from a prior sales team that they

5    were -- they thought they were going to

6    be able to make some constructive inroads

7    with that customer.

8        Q.    And then the greyed box is

9    Nucynta nontargets at 23,000.  Does this

10   mean these are the -- these are the

11   doctors that this new sales force will

12   not be targeting?

13       A.    I can't be -- I can't be

14   certain as to what this meant.  This

15   is -- this is quite -- quite a ways back.

16            But I would venture to say

17   that just given the placement and the

18   hierarchy, it's the least important of

19   the targets that are being discussed in

20   this meeting.

21       Q.    And in this meeting, there's

22   also a discussion on multiple delivery

23   vehicle for peer-to-peer speaker programs

24   at Slide 20.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1        A.    Yes.

2        Q.    So is it the case that

3    Janssen offered all three of these

4    different types of peer-to-peer speaker

5    programs, the first being live programs,

6    the second being virtual programs, and

7    the third being these pull-through

8    vehicles with speaker news channels and

9    attendee news channel and target news

10    channel?

11        A.    Yes.  This appears to be the

12    basic format of the peer-to-peer program.

13        Q.    And in the virtual programs,

14    those are where a physician can go on

15    meeting direct and, through a website,

16    see a virtual program.  Is it -- is it a

17    scheduled program or something that's

18    pre-recorded and available at any time?

19        A.    I can't recall whether it

20    was pre-recorded or whether it was

21    scheduled.

22             If I had to guess, it could

23    have been a mix of both.

24        Q.    And the third category,

Page 283

1   pull-through vehicles, can you tell us

2   what speakers news channel is and

3   attendee news channel and target news

4   channel, one by one?

5        A.    You know, I've never watched

6   one of these particular programs.  So I

7   can only guess based on the labeling

8   that's on it, exactly what they were

9   intended for.

10            But in general, they're used

11  as follow-up.  That's why we use the term

12  pull-through.  So if someone attended a

13  program, and they offered their e-mail

14  address and that they wanted to receive

15  an update, if there ever was one, if

16  there was a worthy update, they could be

17  e-mailed a link that said, "If you'd like

18  to learn more about what we covered at

19  the last speaker program, you can click

20  here and hear more."

21       Q.    So is the naming designation

22  "pull-through vehicles" used to address

23  pulling a doctor, you know, over the line

24  into Nucynta's product line?

Highly Confidential - Subject to Further Confidentiality Review

Page 284

1          A.    I think -- in fairness, I
2     think these marketing programs are
3     designed to capture someone's attention,
4     educate them, and then give them all the
5     opportunity to learn more.  So that's how
6     we want to characterize it.  Pull-through
7     is make sure they have another avenue to
8     ask questions or get more information.
9               MR. JANUSH:  Let's go off
10          the record with a break.
11               THE VIDEOGRAPHER:  Stand by,
12          please.  The time is 4:19 p.m.
13          Off the record.
14               (Short break.)
15               THE VIDEOGRAPHER:  We are
16          back on the record.  The time is
17          4:38 p.m.
18     BY MR. JANUSH:
19          Q.    Mr. Lin, I'm going to go
20     back to Exhibit 13, because I didn't
21     question you about one of the maps that
22     was on it.  So I questioned you about
23     the --
24               THE VIDEOGRAPHER:  Your

Highly Confidential - Subject to Further Confidentiality Review

Page 285

1          microphone.  It's right there.

2     BY MR. JANUSH:

3          Q.    On Exhibit 13 at Slide 30,

4     Page 30, is a different map.  It's

5     more -- it's the central district here,

6     and it's coded in multiple different

7     colors, whereas on the national map it

8     seemed like this area had one or two

9     colors.

10              First of all, just to

11    confirm, I see Columbus, Ohio, is in

12    green.  Youngstown, Ohio, is in green.

13    Toledo, Ohio, is in yellow.  Cincinnati,

14    Ohio, is in pink.

15              First question is, if you

16    know, why -- why were the -- why was Ohio

17    and some of these other territories

18    broken up by multiple colors on this map?

19         A.    This map, it looks like each

20    color is representing a specific sales

21    territory.

22         Q.    Okay.  So it says pain

23    specialist 2013.  Pain specialist 2013,

24    Page 9.  Check it out on the screen.  I'm

Page 286

1    just going back and forth between the

2    two.

3              And so orange would have

4    covered all of central on the big map.

5    And that's one territory, correct, or

6    one -- one district or region?

7         A.    Region or district.

8         Q.    Okay.  And so within regions

9    or districts there were multiple

10   territories; is that right?

11        A.    That's right.

12        Q.    It may be the case -- so in

13   looking at Ohio, it looks like Cleveland

14   is a different green than Columbus, and

15   then there's the yellow for Toledo and

16   Cincinnati.  So is it fair to say that as

17   it concerned Ohio, within the central

18   district or territory, there were --

19   district or region, there were four

20   sub-territories; is that right?

21        A.    I would describe these to be

22   four territories.  And yeah, every color

23   on here -- it's got a number in the

24   key -- is probably a territory.

Highly Confidential - Subject to Further Confidentiality Review

Page 287

1        Q.    Okay.  And again, Ohio falls

2    within the central district, right, going

3    back to the screen?

4        A.    Yes.

5        Q.    And the central district is

6    one of the districts that was one of the

7    seven targeted districts for the new pain

8    force, the new Nucynta contract sales

9    organization pain force in 2013; is that

10   right?

11       A.    That's right.

12       Q.    Okay.

13             (Document marked for

14             identification as Exhibit

15             Janssen-Lin-14.)

16   BY MR. JANUSH:

17       Q.    I'm going to hand you what's

18   been marked JAN-00010363.  That is marked

19   as Exhibit 14.  And this is a slide deck

20   titled "Nucynta ER Launch Readiness,

21   Launch Governance Review," dated April 7,

22   2011.  And with this, I'm going to turn

23   your attention to Slide 12.  And I'm

24   going to key in on -- at the top,

Page 288

1    "Utilizing peer-to-peer to accelerate

2    impact.  National train top 25 KOL

3    clinical educators."

4                Is this referring to train

5    the top 25 key opinion leaders and

6    clinical educators to assist in

7    peer-to-peer communications?

8        A.    Yes, I believe so.

9        Q.    And then at the regional

10   level, it's addressing, "Regional live

11   programs targeting Nucynta

12   launch-friendly states, which are listed

13   to be Ohio, Florida, California, Texas,

14   and New York."  Is that right?

15       A.    That's what that says, yes.

16       Q.    What does it mean to -- for

17   Ohio, as an example, to be listed as a

18   Nucynta launch-friendly state?

19       A.    The exact definition of a

20   launch-friendly state is not -- I don't

21   want to speculate as to what that means.

22   But in general, the launch of Nucynta ER,

23   one of the key considerations for the

24   launch of Nucynta ER was that if you had

Page 289

1    prescribers who already have adopted

2    Nucynta, one of the first places that a

3    sales team would want to go to is

4    somebody who's already tried Nucynta as

5    they're introducing Nucynta ER.

6          Q.    But we are not talking about

7    individual prescribers on this slide.

8    It's more specifically or more broadly

9    talking about launch-friendly states.  So

10   is this taking into account that Ohio,

11   Florida, California, Texas and New York

12   are states where there are already a fair

13   amount of Nucynta prescribers, and,

14   therefore, Nucynta ER already has a

15   platform from which to spring off of

16   Nucynta IR?

17         A.    I'm -- it's unclear from

18   this deck, but in terms of markets, I

19   would -- I'm going to guess that these

20   were places where Nucynta uptake might

21   have been healthier than other markets in

22   the country, and those would be the

23   places that the team would want to start

24   with Nucynta ER.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1          Q.    Okay.  So since I don't want

2    you to guess, I'm going to go back to the

3    last exhibit, Exhibit 13.  We're going to

4    go back to that Slide 9, the national

5    map, and confirm whether your guess was

6    correct.

7               So I'm looking at

8    California, Texas -- some coloration --

9    Ohio, New York, and Florida.  And all of

10   the states that I just listed are states

11   where -- that fall within the seven

12   regions that the new pain force was

13   dedicated to; is that right?

14        A.    I would agree there's a

15   correlation between what's written on

16   Slide 12 of the exhibit we're looking at,

17   which is prelaunch of Nucynta ER, and

18   also the field deployment in 2013.

19               There is a correlation in

20   that some of the states that are

21   mentioned on one slide also appear to be

22   on the deployment map of 2013.

23        Q.    Okay.  And when you say some

24   of the states that are listed on Page 12

Highly Confidential - Subject to Further Confidentiality Review

Page 291

 1    of Exhibit 14 --

 2            A.    Yeah.

 3            Q.    -- it's actually all of the

 4    states listed.  I'm going to circle.

 5    Ohio, Florida, California, Texas, and New

 6    York, all appear as a correlation within

 7    the seven districts?

 8                  MR. GALIN:  Objection to

 9            form.

10    BY MR. JANUSH:

11            Q.    Isn't that right?

12                  MR. GALIN:  Objection to

13            form.

14                  THE WITNESS:  Yeah.  I want

15            to clarify.  So I'm sorry, I was

16            looking at Slide 9 of the previous

17            exhibit --

18    BY MR. JANUSH:

19            Q.    Fair.

20            A.    -- to say that there are

21    other states that are covered, but not

22    listed here.  But there is an overlap.

23    I'm agreeing.

24                  (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 292

1           identification as Exhibit

2           Janssen-Lin-15.)

3    BY MR. JANUSH:

4           Q.    I'm going to hand you a

5    document that I'm marking Lin Exhibit 15.

6    This is another instance of a parent

7    e-mail and attachment.  The parent e-mail

8    is JAN-MS-01049657.  The attachment is

9    JAN-MS-1049659.

10              The e-mail is from you and

11   it's to a group of people, addressing --

12   we're going back in time now to 2010.  So

13   this would be Nucynta IR, original

14   Nucynta days, right?  And it's the

15   PriCara pain incentive compensation plan

16   that's being attached.

17              So my first question is,

18   this is one of the few documents that I

19   found associated with your name that

20   addresses PriCara as opposed to Janssen.

21   Tell us about PriCara's involvement with

22   Nucynta.

23          A.    So this is -- e-mail is

24   dated January 20th, 2010.  So I'm about

Highly Confidential - Subject to Further Confidentiality Review

Page 293

1    20 calendar days into my role.  PriCara

2    was the name of the organization that

3    sold Levaquin, which is an

4    anti-infective, AcipHex, GI drug, and

5    then launched Nucynta.  PriCara was the

6    name of the operating unit.  So the

7    pain -- I'm sorry, sales force was just

8    generally called PriCara.

9         Q.    So is that why I see in an

10   e-mail parenthetical, or bracketed, OMP,

11   is that Ortho-McNeil PriCara U.S.?

12        A.    No.

13        Q.    No?

14        A.    I think --

15        Q.    Or is that Ortho-McNeil

16   Pharmaceutical U.S.?

17        A.    I think it's Ortho-McNeil

18   Pharmaceutical, but I also would

19   recommend or suggest that those suffixes,

20   if you will, have very little to do often

21   with the exact business unit.  They're

22   just IT -- different servers.

23        Q.    Okay.  So I'm going to jump

24   forward as quickly as I can.  This is

Page 294

1   just -- I just wanted to provide the

2   parent e-mail to underscore that you were

3   the person who was attaching the

4   attachment that was called the final

5   PowerPoint "2010 PriCara pain incentive

6   plan cycle one."

7                And I'm going to jump

8   forward to Slide 9 within the PowerPoint.

9                Starting with the first

10  arrow, "Pay per prescription above

11  baseline.  Great earning opportunity.

12  You are paid for every prescription above

13  your baseline."

14               Tell us what this means in

15  short.

16       A.    Well, I think it's -- once

17  you determine what the baseline is,

18  someone has to cross over that baseline

19  in order to get paid incrementally for

20  every prescription.

21       Q.    And there was also a volume

22  leaders bonus for the top two territories

23  with total Nucynta volume earned more

24  than the rest; is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 295

1          A.    That appears to be a
2    highlight for the plan, yes.
3          Q.    Okay.  I want to move
4    forward two slides to Number 11.
5                And, "Goal:  Grow number of
6    prescriptions per prescriber."  And above
7    that -- and that's for persistency.
8                So is persistency referring
9    to frequency of visits and growing
10   prescriptions per prescriber through
11   being persistent as a sales -- sales rep?
12         A.    I think the -- what's
13   alluded to here, because the audience is
14   a sales rep, it's not about how many
15   visits you make.  It's about the fact
16   that there's a need to cultivate new
17   customers.  And in marketing speak, you
18   want the customer to not just try
19   something.  You want them to try it and
20   think it can be part of their practice.
21   So the number of prescriptions per
22   prescriber would be one of those very
23   subtle intangible markers of, they've
24   made it part of their decision choice as

Page 296

1    opposed to just trying it once.

2          Q.    So that would speak to what

3    we were talking about earlier regarding

4    that -- that doctor in Cleveland, Ohio,

5    who was a high Opana ER prescriber.

6    Getting someone like that who -- who

7    isn't just trying it once, but is

8    committed to prescribing your branded

9    product; is that right?

10         A.    I think that's --

11               MR. GALIN:  Objection to

12          form.

13               MS. NAKAMURA:  Objection to

14          form.

15               THE WITNESS:  In general,

16          when you cultivate a customer,

17          you -- you want to have them try

18          something, and assuming they see

19          the clinical results based on the

20          product profile that you have

21          educated them on, you want them to

22          make it part of their solution

23          set.

24               And in this case, if a

Page 297

```
1          doctor is going to write a
2          short-acting opioid, the desire or
3          the objective for the rep is to
4          make sure that Nucynta is
5          considered part of those -- like a
6          legitimate choice in that doctor's
7          suite of options.
8   BY MR. JANUSH:
9          Q.    And then the next slide,
10  focusing on "sell more, earn more,
11  earnings are uncapped.  Targeted earnings
12  22,000 per annum."
13              Is this referring to that
14  the sales reps targeted bonus earnings
15  should be $22,000 per year?
16          A.    That is not a -- my
17  recollection of these numbers is that a
18  $22,000 figure is not representative of a
19  promise.
20          Q.    Oh, I understand that.
21          A.    It probably, if history
22  serves me correctly, is that that is a
23  budgeted amount per representative if
24  they hit baseline of everything.  So
```

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    that'll be the, you know, if you hit

2    everything to objective, that's your

3    starting pool.

4            Q.    And here, you were

5    introducing a bonus plan where, if you go

6    above baseline, a sales rep would get

7    paid per prescription; is that right?

8            A.    That's what it says, yes.

9            Q.    And the more prescriptions

10   you generate, the larger, in big orange

11   bold letters, your reward; is that right?

12           A.    I agree that's what -- what

13   it says.

14           Q.    Okay.  And there's a great

15   image here.  More of this, written

16   prescriptions, equals more cash.  Is that

17   what that's showing?

18           A.    That indeed is the visual.

19           Q.    Okay.  And in the very next

20   slide, it's showing a sales

21   representative's pay per total

22   prescription rates.  And, if I understand

23   this correctly, it looks like, starting

24   at Prescription 1 and running through

Highly Confidential - Subject to Further Confidentiality Review

Page 299

1    Prescription 49, a sales rep would get

2    $20 per prescription; is that right?

3           A.    According --

4           Q.    I'm at Slide 13.

5           A.    Yeah, according to what I

6    see here, and I'm going to clarify, at

7    least my understanding is that above

8    baseline -- everything above

9    baseline's -- the first prescription to

10   the 49th prescription following baseline,

11   the pay per prescription rate is $20.

12          Q.    Okay.  Here, however, it

13   doesn't -- it's not addressing a

14   baseline.  This compensation plan seems

15   to be saying get paid for every

16   prescription -- or no, I apologize.

17               On Slide 12 I see above

18   baseline pay per prescription, with pay

19   per prescription tiers.

20               So in other words, if -- if

21   a sales rep has a specific baseline

22   target and they exceed their core that

23   they are supposed to sell or have

24   prescribed within their region, then when

Page 300

1    they go above that number, every

2    prescription between 1 and 49 they get

3    paid an extra $20; is that right?

4                    And then from 50 to 99 they

5    get paid an extra $25; is that right?

6          A.    That's -- that's right.

7          Q.    And then from 100 to 149,

8    they get paid an extra $30 per

9    prescription, right?

10                   And then from 150 to 249,

11   they get paid an extra $45 per

12   prescription; is that right?

13                   And then starting at

14   Prescription Number 250 above baseline

15   and ending nowhere because it's uncapped,

16   they would get $60 per every additional

17   prescription that a doctor writes; is

18   that correct?

19         A.    That's correct, according to

20   the table.

21         Q.    Okay.  And the next page,

22   Slide 14 addresses you are paid on all

23   prescribers in all zip codes within your

24   territory total DIRT.  Do you see that?

Page 301

1          A.    Yes.

2          Q.    And it says, "Based on IMS

3    best address and recent call activity."

4              What does that mean, the

5    "based on IMS address" -- "best address

6    and recent call activity"?

7          A.    I am not an expert in the

8    call planning -- call targeting area.

9    But IMS is the database that's accessed

10   to determine the -- the existence of a

11   target, the address, the doctor's name,

12   the medical license number.

13             My guess, based on what's

14   written here, is that best address has

15   something to do with the fact that

16   sometimes there are doctors.  It was

17   often the case that doctors had an office

18   in a hospital in one district and maybe

19   they had a private practice office in

20   another zip code.  And so verifying their

21   address was often a consideration,

22   particularly with the targets that were

23   being called on for Nucynta.

24                  And the recent call activity

Page 302

1    has to do with whatever the most recent

2    database showed as the -- if the doctor

3    was in your zip code.

4         Q.    Okay.  And the next slide

5    addresses additional incentive awards for

6    sales reps, particularly the president's

7    award, rewards the best of the best, an

8    exciting award opportunity for the best

9    performers.

10             And it looks like there's a

11   picture of a beach at oceanfront, a

12   resort at poolside, and a ski resort or a

13   snowy mountain.  Do you see those images

14   at Page 15?

15        A.    Yes, I do.

16        Q.    Okay.  Did Janssen reward

17   the best of the best sales

18   representatives with beach vacations or

19   vacations of the like depicted in these

20   pictures?

21        A.    I can't speak to what venues

22   the best of the best were treated to.

23        Q.    Can you speak to whether

24   they were treated to venues though?

Page 303

1          A.    Historically, the top very

2    small percentage, and I -- I don't know

3    the number, it's a handful of people,

4    would be recognized, and that's a

5    cumulative across all product portfolios.

6                They -- the top bunch would

7    be recognized in something usually akin

8    to the president's award.

9                What constituted that

10   president's award at one point did

11   involve a trip, a reward trip.  And --

12   and I just can't speak to whether or not

13   there was one that happened on a beach or

14   on a mountain.

15        Q.    Right.  But it would have

16   been a trip to some destination?

17        A.    Yes.  The top sales force,

18   the top performers of every sales force

19   in the organization would be together

20   typically in a rewards trip.

21        Q.    An all-expenses-paid

22   vacation or getaway?

23        A.    It's an all-expense-paid for

24   the person, yeah.  It's -- it's like --

Page 304

1  that's part of why it's called a reward

2  trip.

3          Q.    Okay.  And then the

4  AwardperQs underneath that.  What is

5  AwardperQs?

6          A.    My -- my recollection was

7  award -- I think it was called

8  AwardperQs.

9          Q.    Oh.

10         A.    And they were just -- when

11 someone didn't necessarily -- if -- I

12 think you could -- there were perk points

13 or some sort of reward points that

14 correlated with some unit of measure.

15 And if someone chose, instead of taking a

16 trip, they could redeem their points for

17 something else, very akin to service

18 anniversary gifts.

19         Q.    So they could receive their

20 AwardperQs for merchandise, and it says

21 "tremendous travel"?

22         A.    It does say "tremendous

23 travel."

24         Q.    And one of the things that

Highly Confidential - Subject to Further Confidentiality Review

Page 305

1    are listed here is -- appears to be like

2    a designer purse or handbag; is that

3    right?

4            A.    It looks like a bag of some

5    sort.

6            Q.    And another is a laptop; is

7    that right?

8            A.    That looks like a laptop.

9            Q.    And another perk is a TAG

10   Heuer watch.

11                 Do you see that?

12           A.    I see a watch.  I can't

13   speak to the brand.

14           Q.    And another is a set of golf

15   clubs; is that right?

16           A.    Yes.

17           Q.    Okay.  We're going to go

18   over one more slide before we move off

19   this exhibit.  The slide is "Earnings

20   examples."  And it brings up what you

21   were addressing earlier about earnings

22   over baseline, prescriptions written over

23   baseline.  I'm at Slide 22.

24                 And this is giving a

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    hypothetical example that if someone's

2    baseline volume is 199, but they got

3    doctors to write 490 total prescriptions,

4    they would be at 291 prescriptions total

5    over baseline.

6              Do you see that?

7        A.   Yes.

8        Q.   And so with Tier 1, 2, 3, 4,

9    and 5, all being impacted because they

10   went over that 200, and because they are

11   at 291 over baseline, it's showing how

12   the math would work out for the first 49

13   prescriptions over baseline at $20; the

14   second, 50 at $25; the third tier, 50

15   prescriptions at $30; and so on, to

16   quarterly earnings of $10,750 in bonus

17   earnings for one quarter.

18             Do you see that?

19       A.   Yes.

20       Q.   So was this a better plan in

21   terms of opportunities afforded in 2010

22   to Nucynta sales reps than what existed

23   in 2009?

24             MR. GALIN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  I don't -- I

3               can't speak to -- well, two

4               things.  One is, I don't know the

5               2009 incentive compensation plan

6               for Nucynta.

7     BY MR. JANUSH:

8          Q.    Okay.

9          A.    That's one.

10                    Number two is I'm not an

11    expert in incentive compensation.  But

12    what I do recall is that the examples

13    that are portrayed usually give you --

14    they give you an example of how the

15    calculation works, but they are designed

16    to motivate.  And because they are

17    designed to motivate, it's a very -- when

18    they're modeled, a very small number --

19    just from a budgeting perspective, a very

20    small number of representatives would

21    actually have the feasibility to achieve

22    this model.

23          Q.    Focusing on what you said,

24    it's designed to motivate sales

Highly Confidential - Subject to Further Confidentiality Review

Page 308

1    representatives to get doctors to write

2    Nucynta prescriptions --

3            A.    Yes.

4            Q.    -- to increase the sales

5    rep's bonus earnings, correct?

6            A.    Correct.

7                  (Document marked for

8                  identification as Exhibit

9                  Janssen-Lin-16.)

10   BY MR. JANUSH:

11           Q.    I'm going to hand you what

12   I'm marking as Lin Exhibit 16.  This is

13   another example of three documents

14   combined for one exhibit.  It is a parent

15   e-mail at JAN-MS-02069472 with an

16   attachment at JAN-MS-02069476, and a

17   second attachment at JAN-MS-02069473.

18                  I'll hand you Exhibit 16.

19                  MR. JANUSH:  And counsel.

20   BY MR. JANUSH:

21           Q.    This is an e-mail from you

22   to members, I believe, of the marketing

23   team regarding a -- it's sent January 18,

24   2013.  And it's concerning KOLs attending

Highly Confidential - Subject to Further Confidentiality Review

Page 309

1    the national sales meeting.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    Okay.  And here we're going

5    back to the subject of launching a new

6    specialty pain force that we

7    affectionately call them the pain force.

8    And at this point in time, it seems that

9    you are confirming the team is hired and

10   is currently in process with home study

11   and will enter the market in the next two

12   weeks.

13             Earlier we spoke about not

14   pinning down exactly when they were being

15   put into -- the sales force integrated.

16   So this seems to indicate that somewhere

17   between the end of January and beginning

18   of February of 2013, the new pain force

19   was entering the game; is that right?

20        A.    I think, yes, broadly

21   speaking, that's correct.

22        Q.    And you are addressing,

23   towards the bottom of this e-mail, "While

24   the pain force is an experienced group of

Page 310

1   sales professionals, we intend to

2   thoroughly prepare them to deliver

3   maximum value and impact to the pain

4   community.  To that end, we will be

5   conducting one and a half days of KOL

6   immersion training at upcoming pain force

7   national sales meeting."

8              Do you see that?

9        A.    I do.

10       Q.    Do you recall being part of

11  leading a KOL immersion training for the

12  new pain force at the pain force national

13  sales meeting?

14       A.    I recall being at the

15  meeting.  This particular national sales

16  meeting, I kicked off the national sales

17  meeting.  I did not personally set up the

18  immersion training.  But I do know that

19  it took place.

20       Q.    Okay.  "We have" -- and it

21  continues to say, quote -- you continue

22  to write, "We have an esteemed panel of

23  KOLs, national thought leaders, that have

24  agreed to partner with us to deliver this

Highly Confidential - Subject to Further Confidentiality Review

Page 311

1    important application-based training.

2    Attached please find more info on the KOL

3    immersion training, curriculum, and a bio

4    fact sheet on each of these KOLs."

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  And then the next

8    page is -- includes the training agenda.

9    And --

10        A.    Sir, may I just clarify?

11   You asked me earlier -- or you stated

12   that I was writing to marketing

13   colleagues.

14        Q.    Yeah.

15        A.    I want to clarify, this was

16   to -- the e-mail was directed towards the

17   medical affairs and the clinical

18   development team.  So these were all MDs

19   and researchers within the Janssen

20   organization.

21        Q.    Okay.  And to be fair,

22   that's not the extent of it though.  You

23   also copied Patricia Yap, Kanitha Burns,

24   and Frank DeMiro, who were all part of

Highly Confidential - Subject to Further Confidentiality Review

1    your marketing team, right?

2           A.    Absolutely, yes.

3           Q.    Okay.

4           A.    I was just clarifying the

5    "to" line.

6           Q.    The "to" line.  Fair enough.

7    Fair enough.  Thank you for that

8    clarification.

9                 And were all of those folks

10   on the "to" line involved in the national

11   sales meeting for the pain force as well?

12          A.    My recollection is that some

13   of them could have been involved in only

14   specific areas of the agenda.

15          Q.    And when we turn to the

16   agenda, there aren't specific names

17   associated with each time slot except

18   for, at least on this page, the recap on

19   day two between 8:00 a.m. and 8:15 a.m.

20   And that's with Greg Preston and you in

21   the general session before the entire

22   sales force; is that right?

23          A.    That's right.

24          Q.    And you're recapping all

Highly Confidential - Subject to Further Confidentiality Review

Page 313

1    that occurred, yesterday, the day before,

2    Day 1; is that right?

3         A.    That's right.

4         Q.    Okay.  And moving on to the

5    next page, I think this attachment is the

6    KOL information sheet.

7              Do you see that?

8         A.    Yes.

9         Q.    Okay.  Do you know how these

10   physicians got selected to be KOLs at

11   your national sales training for this new

12   pain force?

13        A.    I don't recall the exact

14   criteria for how each of these was

15   selected to participate in this meeting.

16   But generally speaking, it would be

17   because they are regarded as being

18   credible and good educators.

19        Q.    Are you aware that some of

20   these key opinion leaders, for example

21   Dr. Charles Argoff as just one example,

22   were utilized not just by Janssen, but by

23   multiple different manufacturers as a key

24   opinion leader to convey the message of

Page 314

1    the undertreatment of pain in America?

2          A.    It would not surprise me if

3    any one of these individuals also worked

4    on behalf of other makers of pain

5    medicines.

6          Q.    And in fact, as listed in

7    the bio information, the limited

8    information concerning Dr. Charles

9    Argoff, he is a member of the

10   International Association For the Study

11   of Pain, as well as the -- what we have

12   referred to earlier as a pain advocacy

13   group, the American Academy of Pain

14   Medicine and also the American Academy of

15   Neurology; is that correct?

16              MR. GALIN:  Objection to

17         form.

18              THE WITNESS:  I believe

19         it's -- what's listed here would

20         have represented the most accurate

21         portrayal of his memberships.

22   BY MR. JANUSH:

23         Q.    Turning to the next page,

24   you have Dr. Jeffrey Gudin listed as a

Highly Confidential - Subject to Further Confidentiality Review

Page 315

1    key opinion leader, one of the nine key

2    opinion leaders at this national sales

3    meeting; is that right?

4          A.    That's right.

5          Q.    And Dr. Gudin is listed as

6    being a member of the American Medical

7    Society, American Society of

8    Anesthesiology, American Society of

9    Addiction Medicine, American Society of

10   Regional Anesthesia, and the American

11   Pain Society; is that right?

12         A.    That is right.

13         Q.    Are you aware that the

14   American Medical Society and the American

15   Society of Addiction Medicine, and the

16   American Pain Society are all advocacy

17   groups that received funding and

18   sponsorship from manufacturers like

19   Janssen?

20              MR. GALIN:  Objection to

21         form.

22              THE WITNESS:  I am not aware

23         if they specifically received

24         funds from any manufacturer or

Page 316

```
 1          Janssen.
 2     BY MR. JANUSH:
 3          Q.    As you sit here today, you
 4     have no knowledge whatsoever as to
 5     whether these pain advocacy groups were
 6     sponsored by manufacturers such as or
 7     including Janssen?
 8               MR. ALLEGAERT:  Objection to
 9          form.
10               THE WITNESS:  What I can
11          refer back to is our earlier
12          discussion around corporate
13          sponsorships of advocacy, in that
14          there was some amount of monies in
15          our budget that were earmarked
16          generally for advocacy and handled
17          through our national advocacy
18          director.
19               I can't speak to the precise
20          list you've asked me here, about
21          whether they received any
22          contributions from manufacturers
23          or Janssen.
24     BY MR. JANUSH:
```

Page 317

1          Q.    Before I move off this
2     exhibit.  You stated that you didn't have
3     direct involvement in selecting the key
4     opinion leaders for this national sales
5     meeting; is that right?
6          A.    That's right.
7          Q.    Did you have any involvement
8     with regard to reviewing the proposed
9     individuals from -- from whomever
10    selected them for participation at this
11    meeting?
12         A.    I don't have a direct
13    recollection of a specific review of the
14    individuals prior to extending
15    invitations, no.
16         Q.    And who would have been
17    the -- the person at Janssen who extended
18    invitations to these key opinion leaders
19    to present at the national sales meeting
20    for the new pain force?
21         A.    I can't speak with any
22    specificity as to who directly extended
23    the invitation.  It most likely was
24    either an internal associate or the

Page 318

```
 1    invitation could have been extended on

 2    behalf of Janssen by one of our

 3    professional firm agencies that might

 4    have handled logistics.

 5              Q.    Okay.

 6                    (Document marked for

 7              identification as Exhibit

 8              Janssen-Lin-17.)

 9    BY MR. JANUSH:

10              Q.    I'm going to move on to what

11    we are marking as Lin Exhibit 17.

12                    This is another e-mail with

13    an attachment.  It's JAN-MS-00288407 and

14    JAN-MS-01511433.

15                    And I'm going to represent

16    for the record that the attachment

17    doesn't come up within the family of the

18    e-mail.  However, through metadata and

19    the title, we pieced together the fact

20    that the attachment is the, based on

21    metadata, has the same date and has the

22    same doc title as what's listed on the

23    third page of the e-mail at Exhibit 17?

24                    So I'll hand you Exhibit 17.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 319

1               And this is being provided

2       to you, sir, more so as a confirmation of

3       what we earlier addressed when we went

4       through that Excel spreadsheet and talked

5       about Decile.ten.  Do you remember that

6       discussion a bit?

7               A.    Yes.

8               Q.    And when we talked about

9       Decile.ten, we were addressing the

10      concept that Decile.ten create -- would

11      create slide decks for key opinion

12      leaders.  Do you remember that?

13              A.    Yes.

14              Q.    Okay.  So this is an e-mail

15      from Patricia Yap to Carissa Wysocki

16      copying Keith Hofbeck and Amy Bryce dated

17      August 26, 2013, and below Carissa wrote

18      to Tricia -- that's how Patricia, what

19      her -- her -- what she goes by is Tricia;

20      is that right?

21              A.    That's right.

22              Q.    Okay.  And it's addressing

23      the slide decks that Decile.ten was

24      putting together.

Highly Confidential - Subject to Further Confidentiality Review

Page 320

1              At the bottom of the e-mail

2      it says, "Per your discussion with Amit,

3      we will put together an HCC slide in the

4      presentation we send you tomorrow for

5      training.  Since it is only one slide,

6      does Amit need to be on the call and

7      present?  Please advise."

8              And earlier in the string

9      it's addressing, on August 19, 2013, I've

10     highlighted it in orange, "Attached are

11     the final versions of Nucynta ER virtual

12     and Nucynta live, final version of NER

13     live was sent on 8/9.  First use dates we

14     are 8/15 for NER live and 8/23 for NER

15     virtual and Nucynta live."

16             Do you see that?

17         A.    I do.

18         Q.    And then at the bottom of

19     the third page it's addressing the title

20     for the attachment, Nucynta ER virtual

21     version final 8/19/13 and Nucynta live

22     version final 8/16/13.  Do you see that?

23         A.    I do.

24         Q.    And I don't have both of

Page 321

1    them, I was only able to find one of

2    them.

3                 And the reason that they are

4    not associated to the e-mail is because

5    they come -- they were attached earlier

6    in the string and not to the last e-mail

7    in the chain.

8                 That said, the document that

9    follows appears to be a slide deck of the

10   type we spoke about when discussing the

11   budget.

12                Is this something that looks

13   like what Decile.ten might have produced

14   for key opinion leaders to utilize when

15   discussing Nucynta?

16        A.    Yes, this looks like the

17   work product that would have been used

18   for promotional education activity,

19   delivered probably in a speaker bureau.

20        Q.    Okay.  Does the name

21   Dr. Gharibo ring a bell?

22        A.    No, sir.

23                (Document marked for

24                identification as Exhibit

Page 322

1          Janssen-Lin-18.)

2    BY MR. JANUSH:

3          Q.    I'm going to hand you what

4    I've marked as Lin Exhibit 18.

5    JAN-MS-01079820.  And it's an e-mail from

6    Frank DeMiro to others, including you,

7    Patricia Yap, Dominic Lazzaro, Roxanne

8    McGregor-Beck and others, and it's

9    addressing Tim and Vandana.  Who are

10    Tim -- Timothy Conniff and Vandana

11    Kataria?

12          A.    My recollection is that

13    Vandana was a district manager in the

14    sales force, the PriCara sales force.

15    And Tim Conniff was a region business

16    director in the sales force, most likely

17    the direct supervisor of Vandana.

18          Q.    Okay.  And this is

19    addressing that, quote, Frank DeMiro

20    wrote, "I have spent a good deal of time

21    this week understanding what transpired

22    at Dr. Gharibo's speaker program last

23    week, and the implications that it could

24    have on our business.

Page 323

1              "After careful review and

2      much discussion with all of you, I just

3      got off the phone with Dr. Gharibo, and

4      informed him that he will be removed from

5      our speaker bureau.  Without going into

6      all of the details, I gave him a high

7      level overview of the key areas of

8      concern.  While he was certainly

9      disappointed, he expressed sincere

10     appreciation for the call and also for

11     the strong partnership we as an

12     organization have had with him over the

13     last three years."

14              Having read this quote and

15     addressed this e-mail in part with you,

16     does it refresh your recollection at all

17     in terms of who Dr. Gharibo was or what

18     happened in this time period?

19          A.    No, sir.  No direct

20     recollection of Dr. Gharibo.

21          Q.    Okay.  I'm going to

22     represent to you that -- that Dr.

23     Christopher Gharibo works as a pain

24     specialist at NYU Langone Health.

Highly Confidential - Subject to Further Confidentiality Review

Page 324

1                  So as you sit here today,

2       you don't recall whether Dr. Gharibo

3       expressed that opioids should not be used

4       as a first line treatment when he was

5       speaking about opioid products; is that

6       right, you don't recall that?

7               A.    Is there a specific --

8               MR. GALIN:  Objection to

9          form.

10              THE WITNESS:  Is there a

11         specific publication or something

12         that we are talking about?

13         Because all I'm looking at here is

14         an e-mail about --

15      BY MR. JANUSH:

16              Q.    I'm just asking you a

17      question --

18              A.    -- summarizing a telephone

19      conversation.

20              Q.    Just asking you a question.

21              A.    Could you repeat the

22      question?

23              Q.    Sure.  As you sit here

24      today, you don't recall whether

Highly Confidential - Subject to Further Confidentiality Review

Page 325

1     Dr. Gharibo expressed that opioids should

2     not be used as a first-line treatment

3     when he was speaking about opioid

4     products?

5             A.    No.

6             Q.    Okay.  Do you recall hearing

7     that Dr. Gharibo was concerned that

8     opioids were being overutilized and other

9     treatment modalities existed that should

10    be tried first?

11            A.    No.

12            Q.    Do you recall hearing that

13    Dr. Gharibo felt that doctors were

14    dropping the ball by overprescribing

15    opioids too much?

16                MR. GALIN:  Objection to

17            form.

18                THE WITNESS:  No.

19    BY MR. JANUSH:

20            Q.    But what you can see from

21    this e-mail is that Dr. Gharibo got

22    removed from Janssen's speaker bureau,

23    without getting into all of the details,

24    quote.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1             Do you see that?

2        A.    I do see that.  That's what

3    is written here.

4        Q.    And you can also see that

5    what's written here is that the

6    implications of Dr. Gharibo speaker

7    program last week could have a negative

8    impact on Janssen's business.

9             Do you see that as well,

10    right?

11        A.    I don't see the word

12    "negative impact", sir.

13        Q.    Correct.  But that is the

14    intent that's being conveyed in this

15    e-mail, isn't it?

16        A.    I can't speak to the intent

17    that was conveyed in the e-mail that was

18    written by Frank.

19        Q.    So let's -- let's go through

20    it.

21             "I have spent a good deal of

22    time this week understanding what

23    transpired at Dr. Gharibo's speaker

24    program last week and the implications

Highly Confidential - Subject to Further Confidentiality Review

Page 327

1   that it could have on our business.

2   After careful review and much discussion

3   with all of you, I just got off the phone

4   with Dr. Gharibo and informed him that he

5   will removed from our speaker bureau."

6              Sir, you don't remove people

7   from a speaker bureau when their

8   statements could have a positive impact

9   on your business, right?

10             MR. GALIN:  Objection to

11        form.

12             THE WITNESS:  You typically

13        remove a speaker from the speaker

14        bureau because they're found to

15        not necessarily be in the spirit

16        of a promotional message.

17  BY MR. JANUSH:

18        Q.   Okay.  Moving on.

19             Do you remember earlier in

20  the deposition we were discussing the

21  concept that Nucynta's website links to

22  Prescribe Responsibly and -- or I was

23  discussing and you weren't sure whether

24  there was a linking between the websites?

Highly Confidential - Subject to Further Confidentiality Review

Page 328

1          A.    Yes, I recall that

2    conversation.

3              (Document marked for

4              identification as Exhibit

5              Janssen-Lin-19.)

6    BY MR. JANUSH:

7          Q.    I'm going to hand you an

8    exhibit that is Bates-numbered

9    JAN-MS-0076628.  It's Lin-19.

10             MR. JANUSH:  And I'm going

11             to ask counsel to disregard --

12             since the actual exhibit doesn't

13             have this sticker on it, that it's

14             a copy from the prior deposition.

15             Disregard the sticker.  I've

16             covered it over with the Lin

17             exhibit sticker.

18    BY MR. JANUSH:

19         Q.    So moving to the last page

20    of the exhibit, in very small font, is a

21    diagram of how linking works on the web.

22    And I'm going to try and zoom in here.

23             And it says, "This picture

24    gives a good description of how linking

Page 329

```
1    works.  As each relevant site links to

2    another, they form a trust relationship

3    between them for that particular term or

4    subject, usually qualified by the anchor

5    text.  Then as all of them begin linking

6    to one another, a larger cloud of

7    relevance is formed, creating a larger

8    environment of trust among all of the

9    sites which search engines use to

10   determine how a site should rank in

11   search engine results."

12                Do you see that?

13        A.    I do see that.

14        Q.    Do you understand as a

15   marketing director or as someone who has

16   been involved in marketing, certainly

17   during the age of the internet, this

18   concept of linking between sites and

19   creating a more trusted relationship on

20   the web as one site links to another and

21   a search engine accords those sites with

22   a greater ranking in search results?

23        A.    I have to say I'm not very

24   educated or knowledgeable about the
```

Page 330

1    topic.

2          Q.    Okay.  So you don't have --

3    fair to say that you don't have much

4    experience with regard to web-based

5    marketing?

6                MR. GALIN:  Objection to

7          form.

8                THE WITNESS:  I think it

9          depends on -- I am familiar with

10          the notion that the internet is

11          used as a vehicle for lots of

12          marketing -- marketing types of

13          services and products.

14    BY MR. JANUSH:

15          Q.    Have you -- have you heard

16    of the concept of search engine

17    optimization?

18          A.    I have heard the term

19    "search engine optimization."

20          Q.    And in conjunction with

21    that, have you heard about having

22    multiple sites that link to each other to

23    create a greater zone of trust amongst

24    those sites?

Highly Confidential - Subject to Further Confidentiality Review

Page 331

1          A.    That concept is not one that
2     I'm familiar with.
3          Q.    Okay.  Well, this was --
4     this was produced by Janssen to explain
5     the document or the pages that precede it
6     concerning Prescribe Responsibly and
7     Nucynta ER.
8               And so do you see over here
9     in the upper left-hand corner, "Nucynta
10    resources, managing chronic pain," and
11    that links to PrescribeResponsibly.com
12    pain assessment resources?
13         A.    I do.
14              MR. GALIN:  Objection to
15         form.
16    BY MR. JANUSH:
17         Q.    Do you see that?
18         A.    I see -- I see what you're
19    circling.  It's the first line of this
20    table.
21         Q.    Okay.  And in fact, there's
22    another -- one, two, three, four, five,
23    six, seven, eight, nine, ten -- 11
24    different -- well, they're not all

Highly Confidential - Subject to Further Confidentiality Review

Page 332

1    different.  So let me -- let me break

2    that down.

3              There is -- in the second

4    line, a different page within the

5    Nucynta.com site that's about acute pain

6    management.  And that's a linking to

7    assessment resources as well.

8              Do you see that?

9         A.   Yes, I see that.

10        Q.   And then there's a third

11   Nucynta page addressing professional

12   resources and that's linking to Prescribe

13   Responsibly page assessment resources.

14             Do you see that?

15        A.   I do.

16        Q.   And then there's another

17   Nucynta page at healthcare professional

18   resources, and that's linking to

19   PrescribeResponsibly.com hospital

20   resources.

21             Do you see that?

22        A.   I see that.

23        Q.   And then there's another

24   Nucynta page concerning dosing and

Page 333

1    administration dosing guide.  And that's

2    linking to pain assessment resources at

3    Prescribe Responsibly.

4                    Do you see that?

5          A.    Yes.

6          Q.    And then there's another

7    Nucynta page concerning opioid withdrawal

8    study.  And that's linking to risk

9    assessment resources page at

10   PrescribeResponsibly.com.

11                   Do you see that?

12         A.    Yes.

13         Q.    And then there's Nucynta

14   page for safety profiles, opioid

15   withdrawal -- forgive me -- that's what

16   I've addressed just before, that that's

17   linking to risk assessment resources.

18                   And then there's healthcare

19   professional resources on the Nucynta

20   page.  And that's linking to pain

21   assessment resources, but I believe

22   that's redundant of one of the ones that

23   I've addressed above.

24                   So I'll stop there and just

Page 334

1    say, fair to say that there were a few

2    different subpages on Nucynta.com that

3    are shown in this document to be linking

4    to Prescribe Responsibly resources, true?

5          A.    According to the document,

6    which I have not seen before, and based

7    on the column headings, I would have to

8    assume it's representing that there is a

9    link from one site to another.

10          Q.    And if you go to that last

11    page, this is addressing the purposeful

12    nature of linking, isn't it?

13                MR. GALIN:  Objection to

14          form.

15    BY MR. JANUSH:

16          Q.    The statement that, "This

17    picture gives a good description of how

18    linking works.  As each relevant site

19    links to another, they form a trust

20    relationship."  And I could read on, but

21    I'm going to end it there.

22          A.    I can't speak to the

23    validity or the use of this.  I

24    acknowledge that the words are on this

Highly Confidential - Subject to Further Confidentiality Review

Page 335

1    page, on this exhibit.  I don't know how

2    this was used, so I don't have much more

3    to add to the validity of what it says.

4           Q.    This next exhibit may go

5    pretty quickly.  It's Lin Exhibit 20.

6                 (Document marked for

7                 identification as Exhibit

8                 Janssen-Lin-20.)

9    BY MR. JANUSH:

10          Q.    It's an e-mail,

11   JAN-MS-02097372, and it's dated

12   January 12, 2014.  It's sent by Dan

13   Cohen, senior vice president government

14   relations and public policy.  You are

15   copied on the e-mail.  And it's

16   addressing the ADF coalition organization

17   conference call for Tuesday, January 21,

18   2014.  And you are copied on the

19   attachment.

20                Well, before I get to the

21   attachment, at the bottom of the e-mail

22   it says, "Dear all, please find attached

23   a list of the organizations that have

24   indicated a desire to join or consider

Highly Confidential - Subject to Further Confidentiality Review

Page 336

1    joining the initial formation of the ADF

2    coalition.  Please review the list.  Let

3    me know if your organization is in the

4    correct area and if you will be able to

5    join the conference call."

6                   And then above that is Ron

7    Kuntz writing back, "All, let's make sure

8    we have appropriate people are on this

9    call taking place on January 21st so we

10   know what activities this coalition is

11   working on and to ensure we have a

12   voice."

13                  Do you see that?

14        A.    I do.

15        Q.    Then when we turn to the

16   agenda, it's addressing some of the

17   invited participants.  I see Grunenthal

18   USA, the Center For Lawful Access and

19   Abuse Deterrence.  I'm not going to name

20   them all, but I'm going to focus on some.

21   RADARS, and certain co-defendants of

22   Janssen, in this case Teva

23   Pharmaceuticals, Purdue Pharma, Endo

24   Pharmaceuticals, Mallinckrodt

Page 337

1    Pharmaceuticals.

2              And my question for you is,

3    do you know whether Janssen joined this

4    abuse deterrence formulations coalition?

5         A.    I do not know.

6         Q.    Okay.  Who would be the --

7    the best person to talk to ask that

8    question?

9              Would it be Ron Kuntz that

10   suggested having a voice on that call?

11        A.    I don't know if he's the

12   best person, but he is --

13        Q.    A person.

14        A.    He is a person.

15             (Document marked for

16             identification as Exhibit

17             Janssen-Lin-21.)

18   BY MR. JANUSH:

19        Q.    Moving on to Exhibit 21.

20   JAN-MS-00984287.  This is, as I

21   understand it, an agreement you entered

22   into concerning a sponsorship proposal

23   from the Community Anti-Drug Coalitions

24   of America to provide funding of $120,000

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  to sponsor the Smart Moves Smart Choices

2  program in December of 2013.  Do you

3  remember entering into this agreement?

4         A.    No, I don't.

5         Q.    Going to the third page, is

6  that your signature?

7         A.    That is not my signature.

8         Q.    Is that your electronic

9  signature that would have been used on a

10  PDF?

11         A.    It has -- it has to be

12  something electronic.  It's not my

13  personal signature.

14         Q.    Okay.  As you sit here

15  today, are you -- are you -- I understand

16  that you don't recall entering into this,

17  but are you taking the position that you

18  didn't enter into this or that you just

19  don't recall -- you don't recall having

20  electronically signed this?

21         A.    I'm taking the position that

22  I don't recall reviewing this document

23  and signing it.

24         Q.    Okay.  You do know however

Highly Confidential - Subject to Further Confidentiality Review

Page 339

1    that in 2000 and -- that at some point in

2    time in 2013, 2014, that Janssen did

3    partner with Smart Moves Smart Choices,

4    right?

5              MR. GALIN:  Objection.

6    BY MR. JANUSH:

7         Q.   We discussed that earlier

8    within the budget discussion?

9              MR. GALIN:  Objection to

10         form.

11             THE WITNESS:  I -- yes, I do

12         recall in the context of that

13         budget discussion there was a

14         support for Smart Moves Smart

15         Choices.

16   BY MR. JANUSH:

17        Q.   And we talked about the

18   toolkit that Smart Moves Smart Choices

19   would have provided Janssen with, do you

20   remember that?

21        A.   We -- I recall our

22   discussion was that there was a line item

23   that mentioned something about a

24   toolkit.

Page 340

1            (Document marked for

2            identification as Exhibit

3            Janssen-Lin-22.)

4    BY MR. JANUSH:

5            Q.    Moving on to Lin Exhibit 22.

6    This is a --

7                 MR. JANUSH:  Bless you.

8    BY MR. JANUSH:

9            Q.    This is a parent e-mail with

10   an attachment.  Parent e-mail is

11   JAN-MS-00362016, attachment

12   JAN-MS-00362018.

13               It's an e-mail from you.

14   And this is addressing quality care

15   coalition for patients in pain.

16               And an attachment titled

17   Patients in Pain:  How U.S. Drug

18   Enforcement Administration Rules Harm

19   Patients in Nursing Facilities.  A survey

20   of clinicians.

21               Do you see that?

22       A.    Yes.

23       Q.    Okay.  And you were

24   forwarding this on to Lisa Ferguson

Page 341

1    stating, "Lisa, since your team has much

2    experience with LTC, please see attached.

3    Sorry for large file."

4                Was LTC referring to

5    long-term care?

6           A.    Yes, LTC stands for

7    long-term care.

8           Q.    Okay.  What was your intent

9    in forwarding on this article to Lisa

10   Ferguson?

11          A.    Just sharing information.

12          Q.    Can you elaborate?

13          A.    Well, as I'm looking at this

14   e-mail, there's someone from an outside

15   organization writing to Robyn, Robyn

16   forwards to a number of folks across a

17   variety of functional areas.

18                At the time here, in 2010 --

19   2010 if my recollection is correct, Lisa

20   was one of the national sales directors

21   in the PriCara sales force.  So I did as

22   folks often do, which is pass things

23   along as information.

24          Q.    So let's go to the second

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    e-mail of the string, because I think

2    there's a little more to it.  It states,

3    "FYI, spoke with ASCP today.  Reviewing

4    these documents and wanted to pass on per

5    interests in pain and elderly

6    populations, legislation around

7    E-prescribing, C-IIs in skilled nursing

8    facilities, et cetera.  Been invited to

9    participate in the Quality Care Coalition

10   For Patients in Pain.  We would be the

11   only Pharma rep."

12              I'll stop there.  The "we"

13   that's being referred to as the only

14   Pharma rep is Janssen, correct?

15              MR. GALIN:  Objection to

16        form.

17              THE WITNESS:  I -- I

18        can't -- I can't speak as to

19        whether Robyn meant that.  But I

20        would have to -- based on what's

21        written here, I think it's a

22        likelihood she's referring to "we"

23        as an entity.

24   BY MR. JANUSH:

Page 343

1          Q.    Right.  And Robyn's a

2   Johnson & Johnson employee, right?

3          A.    Yes.  Robyn Kohn is a J&J

4   employee.

5          Q.    Okay.  And she's addressing,

6   "We will address alignment strategies

7   before moving forward.  Robyn."

8                And then you forward it to

9   Lisa, and address, "Since your team has

10  much experience with LTC, please see

11  attached."

12               Do you know if after

13  forwarding this on, Janssen aligned

14  itself with the Quality Care Coalition

15  For Patients in Pain?

16         A.    No, I don't recall what

17  transpired -- what transpired from this

18  e-mail.

19               (Document marked for

20               identification as Exhibit

21               Janssen-Lin-23.)

22  BY MR. JANUSH:

23         Q.    I'm going to hand you what's

24  been marked Lin Exhibit 23.  It's

Highly Confidential - Subject to Further Confidentiality Review

Page 344

1    Bates-numbered JAN-MS-02525303.

2              This appears to be a meeting

3    invitation e-mail sent to you and others

4    on the Nucynta team about a meeting for

5    recommended revisions to the label of

6    Nucynta ER.

7              It starts with, "Dear all, I

8    am scheduling this meeting to discuss the

9    LC-recommended revisions in the U.S.

10   package insert to align the company

11   position with Duragesic.  I identified

12   three main points to focus on."

13             Before we get into those

14   three main points, LC-recommended

15   revisions, does that stand for label

16   change recommended revisions?

17        A.    Forgive me.  I just need a

18   moment to review the context here.

19             My recollection is only

20   around the acronym.  In the subject line

21   you asked me what post-LC means.  I don't

22   know what post-LC means.  LWG my

23   recollection is that that stands for

24   label working group.

Highly Confidential - Subject to Further Confidentiality Review

Page 345

1      Q.    And it looks like Teodora

2  Doherty is suggesting three main points

3  to focus on.

4            Do you see that?

5      A.    Yes.

6      Q.    And one of the three main

7  points to focus on is addressed in --

8  under the "Nucynta ER is" section.

9            And I'm going to go down to

10  the third bullet.

11            "Nucynta ER is a long-acting

12  extended-release opioid pain medicine

13  that can put you at risk for overdose and

14  death.  Even if you take your dose

15  correctly as prescribed, you are at risk

16  for opioid addiction, abuse and misuse

17  that can lead to death."

18            Do you see that?

19      A.    I do.

20      Q.    That language that was being

21  proposed to this group was not adopted,

22  was it?

23      A.    Sir, I don't know whether

24  that was adopted.  I only see that that

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    was a point of discussion that was raised

2    for this teleconference.

3         Q.    So a point of discussion

4    raised for the teleconference was whether

5    Janssen should increase the warning about

6    the risk of death when using Nucynta,

7    true?

8              MR. GALIN:  Objection to

9         form.

10             THE WITNESS:  No.  I think

11        it's important to look at the

12        context of this e-mail, is that

13        the author, Teodora, raised a

14        couple of points for discussion

15        based on, as I read the first

16        line, in consideration for

17        aligning with Duragesic.

18   BY MR. JANUSH:

19        Q.    Right.  I'm with you.  And

20   so in consideration of aligning the USPI,

21   the U.S. package insert, with the

22   company's position concerning Duragesic,

23   a discussion was raised as to whether the

24   Nucynta warning concerning the risk for

Page 347

1    overdose and death should be revised,

2    true?

3                    MR. GALIN:  Objection to

4           form.

5                    THE WITNESS:  All I can

6           speak to is it appears from this

7           e-mail that Teodora Doherty is

8           suggesting that these are the

9           points that would be relevant for

10          the discussion.  I don't know if

11          anything else came up.  And I

12          don't know that all of these were

13          discussed.  I just know that it's

14          represented in the e-mail.

15   BY MR. JANUSH:

16          Q.   And the best way to

17   determine whether Janssen adopted the

18   position, the discussion point as to

19   whether the warning should be modified to

20   include this language would be to look at

21   the next ensuing package insert, fair?

22                   MR. GALIN:  Objection to

23          form.

24                   THE WITNESS:  I don't think

Highly Confidential - Subject to Further Confidentiality Review

Page 348

1           that's fair.

2     BY MR. JANUSH:

3           Q.    Why not?

4           A.    I think in label

5     negotiations, there are things that

6     sponsors may discuss, but ultimately

7     anything that ends up in the package

8     insert is through alignment with the FDA.

9           Q.    Right.  The FDA does not

10    prevent a manufacturer from ever

11    increasing its warning language, does it?

12              MR. GALIN:  Objection to

13              form.

14              THE WITNESS:  I don't know.

15              I'm not an authority on how the

16              FDA operates.  I'm only speaking

17              to the fact that these are points

18              that are raised in an e-mail.

19    BY MR. JANUSH:

20          Q.    And so I'm saying -- making

21    the point that one would know whether

22    this language was adopted by looking at

23    the label.  And your position is, not

24    necessarily, because the FDA might not

Page 349

1  have permitted an increased warning; is

2  that right?

3          A.    I think that is one point to

4  consider.  The other point is this was

5  what appears to be aligning -- aligning a

6  company position with another product in

7  the portfolio.  So there are more than

8  one variable here.

9          Q.    But that actually has

10  nothing to do with the question that I'm

11  addressing.  I'm addressing whether a

12  company can raise -- increase the degree

13  and nature of its warning in its package

14  insert.  And you're saying that the next

15  ensuing label may not be indicative of

16  whether the company sought to increase

17  its warning because the FDA potentially

18  could put a halt to a company creating a

19  stronger warning that is more pro -- more

20  protective of patients?

21              MR. GALIN:  Objection to

22          form.

23              THE WITNESS:  I think those

24          are your words, not mine.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2          Q.    But that's the upshot, isn't

3    it?

4                MR. GALIN:  Objection to

5          form.

6                THE WITNESS:  I think that's

7          unfair to represent what I'm

8          saying.

9                I am literally saying that

10         these are words contained in an

11         e-mail which looks to be within

12         the context of a meeting invite.

13         I don't know.  I can't speak to

14         how the discussion resulted and I

15         can't speak to what did or didn't

16         ensue from that discussion.

17                (Document marked for

18         identification as Exhibit

19         Janssen-Lin-24.)

20    BY MR. JANUSH:

21          Q.    I've marked Lin Exhibit 24,

22    as JAN-MS-0087195.  This is an e-mail

23    from you to Frank DeMiro, amongst others,

24    including Ron Kuntz.  And you're sharing

Highly Confidential - Subject to Further Confidentiality Review

Page 351

1    another e-mail that followed below that

2    from you to Kim Park and Bruce Moskovitz

3    where you addressed a draft from Bruce

4    Moskovitz and added a commercial

5    marketing perspective in maroon text that

6    didn't copy in maroon here, but I'm going

7    to have you turn to Page 2 of this

8    e-mail.  And I'm going to bracket on the

9    Elmo what appears in maroon text as your

10   added paragraphs.  It's the last two

11   paragraphs in the e-mail.

12              And, "This concerned a study

13   published Monday in the Annals of

14   Internal Medicine, that found that more

15   doctors are prescribing oxycodone,

16   morphine, and other opioid painkillers

17   for back pain, arthritis, and headache,

18   leading to potentially fatal overdoses."

19              Do you remember weighing in

20   on this topic while employed at Janssen?

21        A.    I don't -- I don't recall

22   writing or addressing this particular

23   article.  I was 19 days into my

24   assignment.  And -- but it would be

Page 352

1    customary to review, if I was asked for

2    an opinion.

3         Q.    While you were employed at

4    Janssen, were you ever part of the CDT,

5    the compound development team?

6         A.    The compound development

7    team, I was -- I think the term was I was

8    a standing guest because the compound

9    development team usually comprises

10   someone from the global marketing team.

11   But as the U.S. representative, I was

12   often a guest.

13        Q.    Okay.  Were you ever part of

14   the core task team, the CTT?

15        A.    I'm not familiar with the

16   term "CTT."

17        Q.    Were you ever involved with

18   drafting a or reviewing the REMS for

19   tapentadol?

20        A.    I do not recall drafting or

21   reviewing a REMS document.

22        Q.    Never reviewed the REMS

23   whatsoever?

24        A.    I think in -- it would be my

Page 353

1    recollection that I probably have seen a

2    finished version of a REMS that was

3    handed to offices.

4              (Document marked for

5         identification as Exhibit

6         Janssen-Lin-25.)

7    BY MR. JANUSH:

8         Q.    I've marked as Exhibit 25,

9    Lin Exhibit 25, JAN-MS-01057540.  This is

10   the tapentadol REMS.

11             Do you recall seeing this

12   risk evaluation mitigation strategy or

13   risk management strategy for tapentadol?

14        A.    I believe I've seen things

15   like this, but I can't specify if this is

16   the exact version I have ever seen.

17        Q.    What's the goal of a REMS?

18        A.    Well, consistent with --

19   REMS is basically an evaluation of the

20   risks associated with the use of a

21   particular product, to my understanding.

22             And then there's a

23   significant amount of investment or

24   resources that are put against it to

Page 354

1   mitigate that risk.  So it's evaluation

2   and mitigation of identified risks

3   associated with the use of a product.

4          Q.    You played no role

5   whatsoever in drafting or reviewing a

6   REMS during any of your time involved in

7   overseeing sales and marketing of Nucynta

8   IR or ER?

9          A.    I have no recollection of

10  crafting or specifically reviewing a REMS

11  document.

12         Q.    Okay.

13              MR. JANUSH:  At this point

14              I'm going to stop and turn the

15              floor over.

16              MR. GALIN:  Can I ask for

17              just a five-minute break?

18              MR. JANUSH:  Of course.

19              MR. GALIN:  To streamline

20              for anything that I might have to

21              ask the witness.

22              THE VIDEOGRAPHER:  The time

23              is 6:09 p.m.  Going off the

24              record.

Highly Confidential - Subject to Further Confidentiality Review

Page 355

1                    (Short break.)

2                    THE VIDEOGRAPHER:  The time

3            is 6:17 p.m.  Back on the record.

4                    MR. JANUSH:  This is Evan

5            Janush for plaintiffs.  I'm just

6            performing a housekeeping matter

7            and marking Lin Exhibit 26 as the

8            demonstrative, the notes that I

9            created while Mr. Lin was

10           testifying.  And that's all I

11           have.

12                   (Document marked for

13           identification as Exhibit

14           Janssen-Lin-26.)

15                   MR. GALIN:  Great.

16                        -   -   -

17                   EXAMINATION

18                        -   -   -

19   BY MR. GALIN:

20        Q.    This is Ross Galin for the

21   Johnson & Johnson Janssen defendants.

22   Mr. Lin, I don't want to take too much

23   time.  But I do want to have an

24   opportunity to ask you a couple of

Highly Confidential - Subject to Further Confidentiality Review

Page 356

1    questions.

2              Starting with, you were

3    involved, were you not, in the

4    development of marketing materials?

5         A.    I think it's fair to say

6    that as a brand leader, I oversaw a team

7    that directly developed the marketing

8    materials.

9         Q.    All right.  Can you tell me

10   first what is the purpose of putting

11   together marketing materials?

12        A.    Marketing materials, at a

13   high level, are basically a means to

14   effectively communicate the product

15   profile in a way that is compelling,

16   represents the data contained in the PI,

17   so that engagement with customers can be

18   productive and educational.

19        Q.    Okay.  You mentioned the PI.

20   What role does the PI, if any, play in

21   the marketing materials?

22        A.    The PI serves as a home base

23   from which the items like the clinical

24   trials would be derived or pulled.  A lot

Page 357

1    of the data is pulled from a PI.

2              In addition, when a

3    representative engages with an office,

4    they always leave a PI immediately before

5    or after their discussion with the

6    physician.

7          Q.    Does information have to

8    come solely from the PI to be included in

9    any marketing claims or materials?

10         A.    I would say the majority of

11   what's on the marketing materials does

12   come from a PI.  But there are instances

13   where there are other data sources.  It

14   could be publications or other studies.

15   So long as that data is not inconsistent

16   with what's in the label, then it can be

17   a judgment as to whether it's included in

18   the marketing materials.

19         Q.    Are there any obligations to

20   present data on safety in your marketing

21   materials?

22         A.    Yes.  In the message, the

23   dialoguing or the presentation of the

24   educational materials that are by a sales

Page 358

1    representative, in the -- in the case of

2    visual aids, whether they be paper or

3    electronic, it's always first and

4    foremost to show the important safety

5    information upfront.  And that has to be

6    covered before moving into the other core

7    messages contained in the visual aid.

8         Q.    Okay.  Can you walk me

9    through, if you would, the process of

10   creating marketing materials?

11        A.    So I'll use, as an example,

12   the most common marketing materials is in

13   the form of a visual aid, which is used

14   by a sales representative to educate a

15   physician customer or a nurse.

16             The visual aid is developed,

17   usually in partnership with a third-party

18   advertising agency.  The concepts and the

19   copy, which would include all the facts

20   and figures, are submitted together.  And

21   they are reviewed by something called a

22   promotional review committee.  Sometimes

23   they take different names in different

24   firms.  That committee is comprised of

Page 359

1    functional experts, in medical,

2    regulatory, legal, healthcare compliance.

3    That would be the core team.  And they

4    would review the piece for accuracy, and

5    with the lens of their functional

6    expertise to ensure that, again, it's

7    accurate, and the intent of the piece is

8    substantiated with the data that's cited.

9         Q.    Can a piece be used by the

10   company or its sales representatives

11   without going through the promotional

12   review committee process?

13        A.    No.  Any piece that's used

14   by a sales representative or other

15   customer-facing team members need to

16   be -- they need to use materials that are

17   reviewed by a promotional review

18   committee.

19        Q.    And are sales

20   representatives required to use visual

21   aids or detail pieces, so to speak, in

22   any interaction with HCPs?

23        A.    The intent of an interaction

24   with an HCP is to educate.  And the

Page 360

1   visual aid is -- visual aid or a clinical

2   piece would be the preferred way to

3   educate a doctor on clinical material --

4   clinical content.

5            It is highly desirable so

6   that you can cite the information

7   accurately.  And usually it helps to have

8   something to supplement the points.

9        Q.    You testified earlier today

10  when Mr. Janush was asking you a couple

11  of questions about relying on others to

12  ensure that the claims were accurate

13  and/or that marketing pieces had what was

14  necessary.  Was it the PRC process that

15  you were referring to or some other

16  process, or people?

17       A.    I was referring -- in that

18  discussion, I was referring to the PRC

19  process where materials were reviewed by

20  this cross-functional team to ensure

21  accuracy.

22       Q.    We've been talking about

23  materials.  Is it simply the materials

24  that go through PRC, or do other things

Page 361

1   go -- such as claims generally go through

2   PRC?

3          A.    Any content that is shared

4   with a customer outside the four walls of

5   the building would be going through PRC,

6   inclusive of visual aids, speaker

7   programs, websites.

8          Q.    Not to belabor the point

9   because it's long in the day, but just to

10  be clear, you said that the PRC has

11  regulatory, medical, healthcare

12  compliance and legal?

13         A.    Those are central members of

14  the PRC, yes.

15         Q.    Okay.  And what roles do

16  each of them play in the PRC?

17         A.    In reviewing a piece, each

18  of those individuals reviews, first and

19  foremost, with their functional expert

20  hat on.  But also in weighing the

21  totality of the piece, it's important for

22  them to collaborate as a team to make

23  a -- to make a judgment as to if all the

24  information fits together in a way that

Page 362

1   is consistent with the spirit of the

2   indication in the label.

3          Q.    We spoke earlier today about

4   some sales rep training.  Do you recall

5   that?

6          A.    Yes.

7          Q.    And do you recall Mr. Janush

8   showed you some written portions or

9   printouts of video training?

10         A.    Yes, I do.

11         Q.    Can you explain to me how

12  those types of training fit into the

13  overall training that sales reps receive

14  both in general and nonspecific pieces?

15         A.    In general, based on my time

16  working on the Nucynta brand, training

17  programs for a sales rep can comprise

18  those types of video scripts that we

19  viewed earlier.  Those may be utilize to

20  do provide an overview of the training

21  program.  But a training program would

22  also entail other elements, which we did

23  not review today, such as modules on

24  clinical data, on safety specifically.

Page 363

1            And the training program

2    would also culminate in practice using a

3    visual aid or key resources, also some

4    sort of exam, whether it be written or a

5    role play with a sales trainer.

6            Q.    You mentioned the visual

7    aids and you mentioned when we were

8    speaking about those training pieces

9    before, that they were meant to be used

10   with flash cards and visual aids.

11            Do you recall that?

12            A.    Yes, I do.

13            Q.    How, if at all, do you think

14   the visual aids would have affected or

15   related to what was in the training that

16   we looked at?

17            A.    I think in the scripts we

18   reviewed earlier that I think pertained

19   to some training videos, they made

20   reference to visual aids.  So in -- in

21   the actual training for the use of the

22   visual aid, there would be additional

23   content or classes, online classes or

24   modules, or in-person classes that would

Page 364

1    go through in much more detail about the

2    points highlighted in the visual aid

3    regarding clinical efficacy, and would

4    put a much finer point on the specific

5    claims or representations of the product

6    in the visual aid or any other flash

7    card.

8         Q.    Would you expect -- would

9    the -- is it possible for the language in

10   the visual aids to deviate or expand on

11   the information in the training modules?

12        A.    It is possible that the

13   wording in the visual aid is different

14   than what is provided in a training video

15   that may be more of an introductory video

16   to the overall training program.

17             The language in the visual

18   aid is usually -- contains things around

19   the product efficacy, product

20   tolerability, safety information.

21             And so the exact wording of

22   what's contained in the visual aid may

23   not always appear, for example, in a

24   script which is designed to introduce an

Page 365

1  overall curriculum.

2          Q.    Shift gears, hopefully to my

3  last subject, to sales comp and

4  incentives.  We looked earlier today at a

5  sales comp for -- I think it was 2010

6  Nucynta, slide deck that had some

7  baseline and targets and explained the

8  plan to the sales force.  Do you recall

9  that?

10         A.    Yes.

11         Q.    I can pull that out if folks

12 need to look at it.

13              MR. GALIN:  Do you need to

14        look at it?

15 BY MR. GALIN:

16         Q.    Let me ask you a couple of

17 questions.  One of the things -- well

18 actually, withdrawn.  Let me start with

19 this.

20              Can you give me a basic

21 understanding of the breakdown of a

22 representative's income or compensation

23 between base salary and comp?

24         A.    The majority -- in the --

Page 366

1    typically in the pharmaceutical industry,

2    the overall percentage of compensation

3    for a sales rep is primarily comprised of

4    their base salary.

5              Incentive comp is exactly

6    that, it's above -- over -- it's over

7    base compensation based on performance.

8              But the majority, for most

9    sales reps, the majority of their income

10   will be represented by the base salary.

11        Q.    And is that true of the

12   Nucynta sales teams that you were

13   involved with at your time at Janssen?

14        A.    Yeah, my recollection of the

15   overall incentive structure or the

16   incentive scheme was that the base salary

17   represented the majority of their overall

18   compensation.

19        Q.    Okay.  When Mr. Janush was

20   asking you about the model that was

21   presented and had an example, you had

22   suggested that it's not exactly

23   representative of what sales reps

24   normally would achieve or earn.  Can you

Highly Confidential - Subject to Further Confidentiality Review

Page 367

1    expound on that, or explain what you

2    meant by that?

3         A.    Yes.  I think the -- the

4    example that was provided in that

5    particular incentive compensation

6    overview, I would characterize, based on

7    experience, as being on the higher end of

8    a potential payout.  And that did not

9    apply to the vast majority of the folks

10   in the sales organization.  It was -- I

11   think the spirit of those documents is to

12   motivate a sales rep to perform at their

13   best.

14        Q.    Why do you have to include

15   incentive comp?

16        A.    My understanding of

17   incentive comp is that -- for -- for two

18   reasons.  Number one, sales forces

19   work -- they are field based.  They work

20   alone.  And they typically are very

21   competitive and incentive comp is there

22   to drive their overall competitiveness.

23   But I think when you're working alone

24   in -- in a non-office setting, mostly

Page 368

1    living out of your car, incentive comp

2    serves to provide some sort of

3    incentive -- some sort of reward for the

4    efforts that are taken day-to-day.

5         Q.    And are there guardrails or

6    procedures in place to mitigate against

7    that incentive leading to improper

8    conduct by the reps?

9              MR. JANUSH:  Objection.

10             THE WITNESS:  The incentive

11             plan is set forth in the beginning

12             of the year.  And as you saw from

13             that example, there are guidelines

14             for qualifying, there are

15             guidelines for which customers can

16             apply to an incentive program.

17             And so there are, in my

18             recollection -- the plans are

19             structured to provide guidance

20             around what constitutes good

21             performance.

22             And so at the end of every

23             quarter, when the incentives are

24             being calculated, it is -- it is

Highly Confidential - Subject to Further Confidentiality Review

Page 369

```
 1           the responsibility of the sales
 2           leadership, along with healthcare
 3           compliance and human resources, to
 4           ensure that the results that are
 5           being used to calculate incentive
 6           comp have been derived based on
 7           proper performance.
 8   BY MR. GALIN:
 9           Q.    Are sales reps monitored or
10   reviewed in any way to ensure compliance?
11                 MR. JANUSH:  Objection.
12                 THE WITNESS:  From the
13           standpoint of -- of performance
14           management, it is very -- it's
15           commonplace for district managers
16           to ride with their sales reps to
17           ensure they are able to coach
18           them, to ensure that they are
19           communicating and educating
20           customers optimally.  So coaching
21           is a -- is a key component of it.
22                 In addition, healthcare
23           compliance officers also do ride
24           with reps.  And so while those are
```

Page 370

1          representative samplings, there is

2          a -- there are checks to ensure

3          that reps are performing at their

4          best and according to their job

5          description and in line with the

6          product label.

7     BY MR. GALIN:

8          Q.    I hope to be my final

9     question:

10              Can you share with us the

11    role that contests play in sales comp?

12         A.    On select instances, a sales

13    leadership team may decide to fund and

14    execute a contest.  The contests are --

15    the structure can be different depending

16    on the incentive plan.

17              Typically they are just a

18    little bit of a booster, usually to

19    encourage teamwork at a district level,

20    or at a level higher than the individual.

21    And they're -- they're very common just

22    to pull a team together to either get off

23    to a really good start in the year, or to

24    have a strong close.

Highly Confidential - Subject to Further Confidentiality Review

Page 371

1                 And so while the incentive

2      plan rewards the individual performance

3      of a sales rep, many times a contest will

4      be used to bring a district together and

5      say, if we can all hit this goal, we may

6      be eligible for a little bit extra in

7      terms of reward.

8                 I do think it's important to

9      note that the contests are in no way

10     overshadow the incentive comp.  They are

11     a much smaller amount.

12                My recollection is contests

13     would have payouts between 500 and

14     $1,000.  So not as significant as the

15     overall potential payout of an incentive

16     plan.

17                MR. GALIN:  Contrary to the

18          words of the federal judge for

19          whom I clerked, he said never

20          trust a lawyer who says he only

21          has one more question.  I'm going

22          to stop there.

23                    -   -   -

24                EXAMINATION

Page 372

```
1                    -  -  -

2   BY MR. JANUSH:

3        Q.    You said earlier, Mr. Lin,

4   "When a rep engages with an office, they

5   always leave a package insert immediately

6   before or after their discussion with the

7   physician."

8             Do you remember that?

9        A.    Yes, I do.

10       Q.    You can't really make that

11  statement, can you?

12            MR. GALIN:  Objection.

13  BY MR. JANUSH:

14       Q.    You are not with every rep

15  on every visit with every doctor, are

16  you?

17       A.    I can clarify that the reps

18  are instructed per their overall job

19  responsibilities to leave a package

20  insert at the time of the visit.

21       Q.    Okay.  Sir, I'm going to

22  guess that you've never reviewed a large

23  Excel file of your sales representatives'

24  call notes while you were at Janssen
```

Highly Confidential - Subject to Further Confidentiality Review

Page 373

1    concerning Nucynta sales reps.  Am I

2    right or wrong?

3         A.    It would be fair to say that

4    I don't -- I have never reviewed call

5    notes for a sales force.

6         Q.    Would -- would it surprise

7    you if call notes routinely demonstrate

8    that, the converse to your quote, that --

9    that reps fight for doctor time, may

10   barely get to see -- on some visits, may

11   barely get to see a doctor and on other

12   visits have an extensive discussion.

13   Would that surprise you or would you

14   expect that?

15             MR. GALIN:  Objection to

16        form.

17             THE WITNESS:  The examples

18        you've just mentioned, I think are

19        very commonplace in the

20        pharmaceutical industry.  And they

21        are -- they represent the list of

22        potential outcomes during a visit.

23   BY MR. JANUSH:

24        Q.    Right.  And in -- and in

Page 374

1    some instances, would it surprise you if

2    in many instances a rep who has a

3    discussion leaves behind a leave-behind

4    document, called a leave behind, that is

5    not actually a package insert?

6         A.    It would be more accurate to

7    represent that many of the leave behinds

8    are actually -- have a package insert

9    affixed.  And that's what allows the

10   package insert to accompany the actual

11   piece.

12        Q.    Have you seen leave behinds

13   that actually don't have package inserts,

14   because those exist, right?

15             MR. GALIN:  Objection to

16        form.

17             THE WITNESS:  I think during

18        my -- my time in this industry,

19        it's pretty commonplace to affix a

20        PI to anything that's left behind

21        in the office.

22             MR. JANUSH:  Move to strike,

23        nonresponsive.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

Page 375

1          Q.    I'm not talking about what's
2    pretty common.  I'm saying a package --
3    leave behinds that do not contain package
4    inserts exist, right?
5          A.    During my time on the brand,
6    we did not, to my recollection, produce
7    leave behinds that did not have a package
8    insert affixed.
9                I cannot comment as to
10   whether they actually exist, any -- any
11   resource from any manufacturer has a
12   package insert affixed or not.
13         Q.    And so when you testified
14   earlier that when a rep engages with an
15   office, they always leave a package
16   insert immediately before or after their
17   discussion with the physician, what you
18   meant to say is reps are instructed to
19   leave a package insert behind; is that
20   right?
21         A.    I think that's fair to
22   characterize it as they are instructed to
23   leave a package insert.
24         Q.    Earlier when your counsel

Page 376

1    was questioning you, you were talking

2    about a PRC process and that all

3    materials, any content shared with the

4    customer, meaning a doctor, would go

5    through PRC.  Do you remember that?

6            A.    Yes.

7            Q.    Do you sit on PRC, on the

8    PRC group?

9            A.    As a member of a marketing

10   team, does not sit on PRC.

11           Q.    Right.  So you don't have

12   any firsthand knowledge of every single

13   communication that made it to a doctor

14   concerning whether such communications

15   went through PRC, correct?

16               MR. GALIN:  Objection to

17           form.

18               THE WITNESS:  I don't have

19           firsthand knowledge.  And if -- if

20           I'm answering your question, I

21           don't have firsthand knowledge of

22           sitting through a PRC for every

23           possible piece that went to a

24           doctor.

Highly Confidential - Subject to Further Confidentiality Review

Page 377

1    BY MR. JANUSH:

2         Q.   So you can't really make a

3    global statement that any communication

4    that a representative, a sales rep made

5    to a doctor was passed on by or approved

6    by the PRC, can you?

7              MR. GALIN:  Objection to

8         form.

9              THE WITNESS:  Could you just

10        repeat the --

11   BY MR. JANUSH:

12        Q.   You can't really make a

13   global statement that any communication

14   that a sales representative made to a

15   doctor was approved by the PRC, can you?

16        A.   I cannot make a

17   representation to -- that anything said

18   by a representative -- the words used by

19   a representative were, in fact, reviewed

20   by PRC.

21             What I can represent is that

22   any materials that a representative is

23   trained to use in communicating the

24   attributes of a product, are -- they are

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    reviewed by PRC.

2         Q.    And by materials, you're

3    referring to, as an example, a

4    leave-behind, correct?

5         A.    Yes.

6         Q.    And by materials you're also

7    reviewing to -- referring to, excuse me,

8    the iPad sales aid that Janssen produced

9    for its sales reps to go through in a

10   live meeting with the doctor, the iPad

11   app on Nucynta; is that right?

12        A.    That's right.

13             MR. JANUSH:  I don't have

14             any further questions.  However,

15             I'd like to note my objection on

16             the record concerning the failure

17             by defendant Janssen to produce

18             any personnel reviews of Mr. Lin

19             concerning his time working with

20             Nucynta whatsoever, particularly

21             considering Mr. Lin's testimony

22             that he was reviewed during each

23             year that he performed a role as a

24             director of marketing or director

Page 379

```
1          of sales and marketing for the

2          pain group concerning the Nucynta

3          product.

4               MR. GALIN:  I'll simply note

5          for the record that we've

6          responded to plaintiffs' and

7          Mr. Janush's letter in particular,

8          with our response to that.

9               And we'll let that letter

10         serve as our response at this

11         point.

12              THE VIDEOGRAPHER:  No

13         further questions, right?

14              Okay.  This marks the end of

15         today's deposition.  The time is

16         6:43 p.m.  Off the record.

17              (Excused.)

18              (The deposition concluded at

19         approximately 6:43 p.m.)

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 380

```
1

2                    CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.

7

             It was requested before
8    completion of the deposition that the
     witness, DAVID LIN, have the opportunity
9    to read and sign the deposition
     transcript.

10

11

12       _____
         MICHELLE L. GRAY,
13       A Registered Professional
         Reporter, Certified Shorthand
14       Reporter, Certified Realtime
         Reporter and Notary Public
15       Dated:  December 26, 2018

16

17

18            (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 381

1                  INSTRUCTIONS TO WITNESS

2

3                  Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                  After doing so, please sign

9    the errata sheet and date it.

10                 You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                 It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 382

```
 1                   -  -  -  -  -  -

                        E  R  R  A  T  A

 2                   -  -  -  -  -  -

 3

 4      PAGE   LINE   CHANGE

 5      ____  ____    _____

 6         REASON:    _____

 7      ____  ____    _____

 8         REASON:    _____

 9      ____  ____    _____

10         REASON:    _____

11      ____  ____    _____

12         REASON:    _____

13      ____  ____    _____

14         REASON:    _____

15      ____  ____    _____

16         REASON:    _____

17      ____  ____    _____

18         REASON:    _____

19      ____  ____    _____

20         REASON:    _____

21      ____  ____    _____

22         REASON:    _____

23      ____  ____    _____

24         REASON:    _____
```

Highly Confidential - Subject to Further Confidentiality Review

Page 383

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5      hereby certify that I have read the

6      foregoing pages, 1 - 384, and that the

7      same is a correct transcription of the

8      answers given by me to the questions

9      therein propounded, except for the

10     corrections or changes in form or

11     substance, if any, noted in the attached

12     Errata Sheet.

13

14

15     _____

16      DAVID LIN                        DATE

17

18

19     Subscribed and sworn
       to before me this

20     _____ day of _____, 20_____.

21     My commission expires:_____

22

       _____

23     Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

Page 384

```
 1                    LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```