1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5

6     ******************************

7     IN RE:

8     NATIONAL PRESCRIPTION OPIATE     MDL NO. 2804

      LITIGATION

9

      This document relates to:     Case No. 17-MD-2804

10

      All cases                     Hon. Dan A. Polster

11    ******************************

12            HIGHLY CONFIDENTIAL - SUBJECT

13          TO FURTHER CONFIDENTIALITY REVIEW

14             VIDEOTAPED DEPOSITION OF:

15                  RONALD LINK

16                  MOTLEY RICE

17                55 Cedar Street

18             Providence, Rhode Island

19           December 11, 2018       9:09 a.m.

20

21

22             Darlene M. Coppola

23          Registered Merit Reporter

24          Certified Realtime Reporter

```
 1   APPEARANCES:

 2   Representing the Plaintiffs:

 3        LEVIN PAPANTONIO THOMAS MITCHELL

 4        RAFFERTY PROCTOR PA

 5        316 Baylen Street

 6        Pensacola, FL 32502

 7        BY:  WILLIAM BAKER, ESQUIRE

 8             STEPHANIE HACKMAN, PARALEGAL

 9        T 850.485.4160

10

11   Representing the Plaintiffs:

12        GARSON JOHNSON, LLC

13        101 West Prospect Avenue

14        Midland Building

15        Suite 1600

16        Cleveland, OH 44115

17        BY:  JAMES A. DEROCHE, ESQUIRE

18             PATTI CARDINAL, ESQUIRE

19              (Via telephone)

20        T 216.296.9330

21        E Jderoche@weismanlaw.com

22

23   (Continued on the next page)

24
```

```
 1   APPEARANCES (Continued):

 2   Representing the Plaintiffs:

 3   (Via telephone)

 4        WEISMAN, KENNEDY & BERRIS CO., L.P.A.

 5        101 West Prospect Avenue

 6        Midland Building

 7        Suite 1600

 8        Cleveland, OH 44115

 9        BY:  DANIEL P. GOETZ, ESQUIRE

10        T 216.781.1111

11        E dgoetz@weismanlaw.com

12

13   Representing the Plaintiffs:

14   (Via telephone and video stream)

15        MOTLEY RICE LLC

16        28 Bridgeside Boulevard

17        Mount Pleasant, SC 29464

18        BY:  MICHAEL E. ELSNER, ESQUIRE

19             AMANDA UNTERREINER, ESQUIRE

20        T 843.216.9000

21        E melsner@motleyrice.com

22          aunterreiner@motleyrice.com

23

24   (Continued on next page)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2   Representing the Defendant CVS Indiana, CVS RX

 3   Services and the Witness:

 4        ZUCKERMAN SPAEDER LLP

 5        1800 M Street NW

 6        Suite 1000

 7        Washington, DC 20036

 8        BY  GRAEME W. BUSH, ESQUIRE

 9        T 202.778.1800

10        E gbush@zuckerman.com

11

12   Representing the Defendants Endo Health

13   Solutions Inc., Endo Pharmaceuticals Inc.,

14   Par Pharmaceutical, Inc.; Par Pharmaceutical

15   Companies, Inc. (FKA Par Pharmaceutical

16   Holdings, Inc.):

17   (Via telephone and video stream)

18        ARNOLD & PORTER KAYE SCHOLER, LLP

19        777 South Figueroa Street

20        44th Floor

21        Los Angeles, CA 90017-5844

22        BY:  TIFFANY IKEDA, ESQUIRE

23        T 213.243.4238

24        E tiffany.ikeda@arnoldporter.com
```

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant Walmart:

 3    (Via telephone and video stream)

 4         JONES DAY

 5         77 West Wacker

 6         Chicago, IL 60601

 7         BY:  JOANNE CACERES, ESQUIRE

 8         T 312.269.4159

 9         E jcaceres@jonesday.com

10

11    Representing the Defendant HBC Company:

12    (Via video stream)

13         MARCUS & SHAPIRA LLP

14         One Oxford Centre

15         35th Floor

16         Pittsburgh, PA 15219

17         BY:  RICHARD HALPERN, ESQUIRE

18         T 412.471.3490

19         E rhalpern@marcus-shapira.com

20

21

22    (Continued on next page)

23

24
```

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant McKesson:

 3    (Via video stream)

 4         COVINGTON & BURLING LLP

 5         1999 Avenue of the Stars

 6         Los Angeles, CA 90067

 7         BY: MICHAEL LANOSA, ESQUIRE

 8         T 424.332.4780

 9         E mlanosa@cov.com

10

11    Representing the Defendant Cardinal Health:

12    (Via video stream)

13         WILLIAMS & CONNOLLY LLP

14         725 Twelfth Street, NW

15         Washington, DC 20005

16         BY:  ANDREW MCBRIDE, ESQUIRE

17         T 202.434.5686

18         E amcbride@wc.com

19

20    (Continued on next page)

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Appearances (Continued):

 2

 3   Representing the Defendant AmerisourceBergen:

 4   (Via video stream)

 5        JACKSON KELLY PLLC

 6        500 Lee Street East

 7        Charleston, WV 25301

 8        BY:  GRETCHEN CALLAS, ESQUIRE

 9        T 304.340.1000

10        E gcallas@jacksonkelly.com

11

12

13   Also Present:

14   Gina Veldman, Trial Services

15   Robert Martignetti, CLVS

16

17

18

19

20

21

22

23

24
```

```
 1                          INDEX
 2                       EXAMINATION
 3   Witness Name                                      Page
 4   RONALD LINK
 5      Direct By Mr. Baker ............................. 13
 6      Cross By Mr. DeRoche ............................ 337
 7

                          EXHIBITS
 8
     CVS-LINK          Description                  Page
 9
     No. 36A           E-mail, CVS 000012286        18
10
     No. 10A           E-mail dated January         22
11                     9, 2014
12   No. 25            Track One CVS Store          24
                       Information, Bates CVS
13                     000007362 through 7364
14   No. 3             "Poisoning Deaths:           37
                       Opioid Analgesics"
15
     No. 60            CVS Logistics, June 6,       47
16                     2014, CVS 000039935
                       and 936
17
     No. 113           Logistics Planning           54
18                     Update, CVS 000100362
                       through 364
19
     No. 19B           E-mail, CVS 000003076        57
20
     No. 49            July 1, 2013 Wholesale       61
21                     Supply Agreement, CVS
                       000030750 through
22                     30808
23
24
```

```
 1                        INDEX
 2                      EXHIBITS
 3   CVS-LINK        Description              Page
 4   No. 50          July 1, 2009 Wholesale     65
                     Supply Agreement, CVS
 5                   000030817 through
                     30891
 6
     No. 51          January 1, 2004,           67
 7                   Wholesale Supply
                     Agreement, CVS
 8                   000030892 and 30995
 9   No. 102         E-mail, CVS 000091508      73
                     through 1518
10
     No. 58          SOP, Bates CVS 34375       83
11                   through 34378
12   No. 12          SOM Program, CVS           89
                     000002188 and CVS
13                   000034375 through 378
14   No. 89          CVS SOM, May 2014, CVS     93
                     000081680 through 1681
15
     No. 120         E-mail, CVS 000076135      95
16
     No. 87          SOM, January 16, 2014,     95
17                   CVS 000078029 through
                     8031
18
     No. 104         E-mail, CVS 0000103329     99
19
     No. 18          E-mail, CVS               112
20                   00007525204 through
                     25259
21
     No. 48          CVS Distribution          116
22                   Center Policy, CVS
                     000024877 through
23                   24941
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     INDEX
 2                   EXHIBITS
 3   CVS-LINK      Description              Page
 4   No. 57        E-mail, CVS 000034234    120
                   through 234
 5
     No. 94        E-mail, CVS 000087889    123
 6                 and 890
 7   No. 98        E-mail, CVS 000089188    123
 8   No. 70        E-mail, CVS 000057751    124
                   through 754
 9
     No. 97        E-mail, CVS 000088956    129
10                 with Attachment, CVS
                   000088957 through 9025
11
     No. 81        E-mail, CVS 000075299    132
12                 with Attachment, CVS
                   000075300 through
13                 75312
14   No. 36        E-mail, CVS 000012286    146
15   No. 67        E-mail, CVS 000055834    149
16   No. 90        E-mail, CVS 000083367    152
                   with Attachment,
17                 Suspicious Order
                   Monitoring for
18                 PSE/Control Drugs
19   No. 71        E-mail, CVS 000057759    155
                   and 55834
20
     No. 43        E-mail, CVS              157
21                 0000000022040 through
                   2053
22
     No. 106       E-mail, CVS 000029867    166
23                 through 870
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          INDEX
 2                        EXHIBITS
 3    CVS-LINK          Description                 Page
 4    No. 107          E-mail, CVS 000022230        171
                       and 231
 5
      No. 34           Notes, CVS 000010529         187
 6                     through 532
 7    No. 103          E-mail dated May 15,         189
                       2014
 8
      No. 119          Suspicious Order             198
 9                     Monitoring Training,
                       CVS 000106514 through
10                     6561
11    No. 95           E-mail, CVS 000088523,       202
                       Six Pages
12
      No. 55           Business Idea                217
13                     Description, CVS
                       000034175 through 177
14
      No. 82           E-mail dated October         222
15                     12, 2010
16    No. 83           E-mail, CVS 000075564        226
                       and 542
17
      No. 92           E-mail, CVS 0000/83064       232
18                     with Attachment, Five
                       Pages
19
      No. 53           E-mail, CVS 000033579        248
20                     through 581
21    No. 62           E-mail, CVS 000055298        255
                       through 302
22
      No. 54           E-mail, CVS 000034168        258
23                     through 171
24
```

Golkow Litigation Services

Highly Confidential - Subject to Further Confidentiality Review

| | | INDEX | |
| --- | --- | --- | --- |
| 1 | | INDEX | |
| 2 | | EXHIBITS | |
| 3 | CVS-LINK | Description | Page |
| 4 | No. 85 | E-mail, CVS 000076114 through 117 | 264 |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | No. 108 | CVS DEA Visit 8/5 to 8/8/2013, CVS 000008389 through 8395 | 283 |
| 9 | | | |
| 10 | No. 68 | E-mail, CVS 000057736 through 738 | 286 |
| 11 | No. 40B | E-mail, CS 000017250, Nine Pages | 305 |
| 12 | | | |
| 13 | No. 111 | E-mail, CVS 000099706 through 709 | 308 |
| 14 | No. 105 | SOM Risk Analysis, CVS 000103343 | 322 |
| 15 | | | |
| 16 | No. 35 | Memorandum, CVS 000010542 and 543 | 333 |
| 17 | No. 221 | E-mail, CVS 000103859 and 3867 | 337 |
| 18 | | | |
| 19 | No. 222 | CVS 3322 - Brookpark Rd., Cleveland, OH, Orders of HCPs | 342 |
| 20 | | | |
| 21 | No. 223 | Brookpark RD CVS Orders Places to IN DC | 345 |
| 22 | No. 201 | Hydrocodone Shipments: CVS Pharmacy No. 3322 | 353 |
| 23 | | | |
| 24 | No. 213 | E-mail, CVS 000106598 through 601 | 357 |

Highly Confidential - Subject To Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  We are now on

 2      the record.  My name is Robert Martignetti.

 3      I'm a videographer for Golkow Litigation

 4      Services.  Today's date is December 11, 2018,

 5      and the time is 9:09 a.m.

 6                This video deposition is being held in

 7      Providence, Rhode Island In Re:  National

 8      Prescription Opiate Litigation.  The deponent

 9      is Ron Link.  Counsel will be noted on the

10      stenographic record.

11                The court reporter is Darlene Coppola

12      and will now swear in the witness.

13

14                    RONALD LINK,

15                witness, having first been

16      satisfactorily identified and duly sworn,

17      testifies and states as follows:

18

19                    DIRECT EXAMINATION

20      BY MR. BAKER:

21           Q.   Your name is Ronald Link?

22           A.   Yes, it is.

23           Q.   Could you tell us the date of today?

24           A.   December 11th.
```

```
 1            Q.    Could you tell us what day of the week

 2       it is?

 3            A.    It is -- gee, Tuesday.

 4            Q.    Okay.  Those were direct questions.

 5       Those were direct answers.  And that's what

 6       I'm here to do, is to ask you direct questions

 7       and get direct answers.  The reason I say that

 8       is because during the deposition, oftentimes

 9       witnesses will take off in a direction of ten

10       or twelve sentences to answer a really direct

11       question that calls for a really direct

12       answer.

13              So, for example, I asked you what day

14       of the week it was and you gave me a day.  I

15       asked you what date it was, you gave me a

16       date.

17              So as we go through this deposition

18       and I ask you direct questions that have

19       keywords, like dates --

20            A.    Yeah.

21            Q.    -- and days and times, that's what I'm

22       looking for.

23              Fair enough?

24            A.    Yeah.
```

```
 1          Q.    So you are what with CVS?

 2          A.    I am no longer employed with CVS.

 3          Q.    When were you employed with CVS?

 4          A.    I was employed until this past

 5    December 2017.

 6          Q.    You were employed from when to when?

 7          A.    1994 to 2017.

 8          Q.    During the period of 1994 through

 9    2017, what positions did you hold and on what

10    dates did you hold those positions?

11          A.    First three years, '94 to '97, I was

12    the director of operations for the Lumberton

13    DC.

14          Q.    When you say DC, that's an acronym for

15    distribution center?

16          A.    Distribution center.

17          Q.    You understand that a jury will be

18    hearing what your testimony is today.  So when

19    you use acronyms, you have to speak up and

20    tell me what those acronyms are.  Correct?

21          A.    Correct.

22          Q.    So when we say DC throughout this

23    deposition, you're talking about distribution

24    center?
```

```
 1          A.   Distribution center.

 2          Q.   When we say SOM, we're talking about

 3     suspicious order monitoring, correct?

 4          A.   Correct.

 5          Q.   When we talk about SOP, we're talking

 6     about standards of procedure; is that right?

 7          A.   Correct.

 8          Q.   Standard operating procedures?

 9          A.   Standard operating procedures.

10          Q.   When we talk about P&P, we're talking

11     about policy and procedure, correct?

12          A.   Correct.

13          Q.   So when we say an SOM, P&P, all those

14     acronyms, you understand what we're talking

15     about, correct?

16          A.   Correct.

17          Q.   So go ahead and tell me from 1994

18     until when, you were what?

19          A.   1994 until I think it was 2007, I was

20     vice president of logistics.  And then from

21     2007 through 2017, I was senior VP of

22     logistics.

23          Q.   Vice president of logistics would be

24     what in relation to the hierarchy of logistics
```

1    at CVS?

2         A.   I reported into a senior vice

3    president of logistics.  So it would be --

4         Q.   What senior -- I'm sorry.  Go ahead.

5         A.   Yeah, so I -- I would probably -- I

6    would be viewed as the number two person, I

7    guess.

8         Q.   And then from 2007 to 2017, you were

9    the number one person with respect to

10   logistics at CVS; is that correct?

11        A.   That's correct.

12        Q.   There are multiple different CVS names

13   of corporations.

14             Which CVS did you work for from 2007

15   through 2017?

16        A.   The CVS Pharmacy.

17        Q.   CVS Pharmacy is located where?

18        A.   Woonsocket, Rhode Island.

19        Q.   That's where the corporate offices

20   are, correct?

21        A.   Correct.

22        Q.   And the distribution centers that you

23   were in charge of as the number one person

24   from 2007 through 2017, that's where the CVS

Highly Confidential - Subject to Further Confidentiality Review

```
 1        suspicious order monitoring program was run

 2        for narcotics; is that correct?

 3                     MR. BUSH:  Objection.

 4    BY MR. BAKER:

 5        Q.   Is that right?

 6             Let me rephrase the question.

 7             Did the logistics department that you

 8    were head of from 2007 through 2017 own the

 9    suspicious order monitoring program?

10        A.   Not -- not that entire period of time.

11        Q.   During what period of time did

12    logistics own that program?

13        A.   We got directly involved with that

14    around 2012, I believe the date was.

15        Q.   Let me show you what's marked as

16    exhibit -- let me show you what's marked as

17    Exhibit 36A.

18

19             (Exhibit No. 36A marked for

20    identification.)

21

22    BY MR. BAKER:

23        Q.   This is an e-mail from Mr. Mark

24    Nicastro to you dated 8/18/13.  And in the
```

```
 1      last paragraph it says, "I know Tom and Craig

 2      want the process in Woonsocket, and if they're

 3      going to own it, staff it, and manage it,

 4      fine.  My understanding is logistics owns this

 5      process, so either Dan or I have it."

 6                  MR. BUSH:  Dean, I think you

 7      meant.

 8      BY MR. BAKER:

 9           Q.   "Dean or I have it."

10                Did I state that correct?

11           A.   Correct.

12           Q.   So what that means is that at least we

13      know that in 2015 that logistics owned the SOM

14      process; is that correct?

15           A.   That's correct.

16           Q.   And you say that they started owning

17      it -- the logistics department started owning

18      it when?

19           A.   The transition, I believe, was roughly

20      the year prior.

21           Q.   In 2012?

22           A.   2012.

23           Q.   Which department owned the SOM process

24      before it was transferred to logistics?
```

```
 1          A.    Loss prevention.

 2          Q.    Where is loss prevention located?

 3          A.    In Woonsocket, Rhode Island.

 4          Q.    Who was the head of loss prevention

 5    during the period of time that the SOM process

 6    was run out of Woonsocket?

 7          A.    Judy Hughes.

 8          Q.    Where is Judy Hughes today?

 9          A.    I believe she's still in Woonsocket.

10          Q.    When you were vice president of

11    logistics before you became senior vice

12    president, were you in contact with Judy

13    Hughes regarding the SOM program or not?

14          A.    I don't recall.

15          Q.    Sir?

16          A.    I do not recall.

17          Q.    During the period of time that you

18    were senior vice president from 2007 through

19    2017 of logistics, were you in touch with Amy

20    Propatier, the DEA compliance coordinator for

21    CVS?

22          A.    Not directly.

23          Q.    Did you even know that she held the

24    position of DEA's compliance coordinator?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes, I did.

 2          Q.   Did you ever have any communication

 3     with her?

 4          A.   Not directly, no.

 5          Q.   During the period of time that the

 6     suspicious order monitoring program was owned

 7     by the logistics department at CVS from 2012

 8     through 2014, when you were employed there,

 9     you had no communication with the DEA

10     compliance coordinator, which at that time was

11     Amy Propatier?

12          A.   Not directly.

13          Q.   What about indirectly?

14          A.   I don't recall.  I don't recall.

15          Q.   So you don't recall any communication

16     with the DEA compliance coordinator when you

17     were the senior vice president of logistics at

18     CVS when the logistics department owned the

19     suspicious order monitoring program, correct?

20          A.   Correct.

21          Q.   Let me show you Document No. 10A.

22               This is an e-mail.

23

24
```

```
 1              (Exhibit No. 10A marked for

 2       identification.)

 3

 4       BY MR. BAKER:

 5          Q.   This is an e-mail from Dean Vanelli to

 6       you, Ronald Link, dated 1/9/2014.

 7               At the bottom it says, "Suspicious

 8       order monitoring program," it says, "assumed

 9       ownership of suspicious order monitoring

10       program."

11               We know from your testimony at least

12       that the suspicious order monitoring program

13       was owned by logistics in 2012, correct?

14          A.   Correct.

15          Q.   So this is not accurate that the

16       assumption of the ownership was in 2014.  The

17       assumption of the ownership was in 2012.

18       Correct?

19                   MR. BUSH:  Objection.

20       BY MR. BAKER:

21          Q.   Does that make sense?

22          A.   (Witness reviews document.)

23          Q.   Is that yes or no?

24          A.   I'm just not clear on the dates right
```

Highly Confidential - Subject to Further Confidentiality Review

 1    now.  I apologize.

 2         Q.   We'll move on.

 3              But from your recollection, it was in

 4    2012 that logistics started to own the SOM

 5    program; is that correct?

 6         A.   I believe that was the date where the

 7    transition took place.

 8         Q.   Would anybody be higher up in

 9    logistics than you during the period of time

10    that the SOM program was owned by logistics

11    from 2012 to 2014?

12         A.   I was the senior person in logistics.

13         Q.   So the answer is nobody would have

14    been higher up than you?

15         A.   No.

16         Q.   Correct?

17         A.   No.

18         Q.   As the person the highest up in

19    logistics in charge of SOM, the suspicious

20    order monitoring program -- I want to make it

21    clear -- you never once remember communicating

22    with the DEA compliance coordinator, which was

23    Amy Propatier, correct?

24         A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   And you never really knew that she was

 2        DEA compliance coordinator, did you?

 3                   MR. BUSH:  Objection.

 4              A.   I knew she was the DEA compliance

 5        coordinator.

 6        BY MR. BAKER:

 7              Q.   You never really knew what she did or

 8        didn't do with that title, correct?

 9              A.   I did not interact with her.

10              Q.   Let me direct you to Exhibit No. 25,

11        please.  This is a list of CVS stores in Ohio.

12                   Are these CVS stores ones that were

13        served by CVS distribution centers?

14

15                   (Exhibit No. 25 marked for

16        identification.)

17

18              A.   I -- I believe so.  I mean, I have --

19        I don't -- I'm not sure.  I mean, from looking

20        at the addresses, I'm not sure.  I really

21        don't know.

22        BY MR. BAKER:

23              Q.   Well, let me ask you something.  Would

24        there be anybody, other than CVS distribution
```

1    centers, that would have primarily distributed

2    narcotics to CVS pharmacies during the period

3    of time that you were employed at CVS?

4        A.    Wholesalers would have been.

5        Q.    How about with respect to hydrocodone,

6    which were class 3 narcotics?

7        A.    At that time, it was CVS.

8        Q.    CVS had distribution centers

9    throughout the United States that you managed,

10   correct?

11       A.    Correct.

12       Q.    There were 19 total distribution

13   centers; is that correct?

14       A.    Currently.

15       Q.    And during the period of time that you

16   managed those distribution centers, those

17   distribution centers, at least some of them,

18   had class 3 narcotics licenses to distribute

19   narcotics, correct?

20       A.    That is correct.

21       Q.    Did all of them, or did just some of

22   them?

23       A.    They all had class 3.

24       Q.    And class 3 narcotics, up until

Highly Confidential - Subject to Further Confidentiality Review

```
 1        November -- excuse me -- October 6 of 2014,

 2        included hydrocodone and hydrocodone

 3        combination products; is that correct?

 4             A.   Correct.

 5             Q.   Class 2 products included OxyContin,

 6        oxycodone, and those related products; is that

 7        correct?

 8             A.   Correct.

 9             Q.   So the class 2 narcotic products were

10        supplied to CVS pharmacies throughout the

11        United States by outside vendors, correct?

12             A.   Correct.

13             Q.   And those outside vendors included

14        people like McKesson, correct?

15             A.   Correct.

16             Q.   And it included people like Cardinal,

17        correct?

18             A.   Correct.

19             Q.   It included people like Mallinckrodt;

20        is that correct?

21             A.   I am not aware of that.

22             Q.   You're not aware?

23             A.   No.

24             Q.   We'll get into those documents in just
```

```
 1      a few moments.

 2            A.    Yes, yes.

 3            Q.    So the class 3 narcotics, which would

 4      have been hydrocodone combination products,

 5      those were purchased from whom by the

 6      distribution centers to be stored in the

 7      distribution centers?  Who were they purchased

 8      from?

 9            A.    The purchasing department within CVS.

10            Q.    Where would they purchase them from?

11            A.    From the manufacturers, I believe.

12            Q.    So from various outside vendors,

13      correct?

14            A.    Yes.

15            Q.    And then once they were stored in CVS

16      distribution centers throughout the United

17      States, at some point there were orders made

18      by each pharmacy throughout the United States

19      to those distribution centers for those

20      narcotics to be distributed and supplied to

21      those -- sent to those pharmacies, correct?

22            A.    Correct.

23            Q.    And those pharmacies numbered what

24      during the period of time that you were there,
```

1    ranging from when you -- when you started

2    until the time that you quit?

3        A.    Could you clarify the question?

4        Q.    Okay.  You started working -- well,

5    let's cover the period of time from 2006 until

6    2014.

7        A.    Okay.

8        Q.    How many CVS pharmacies were there,

9    approximately, in 2006 that your company

10   distributed to and then how many did that end

11   up being in 2014?

12       A.    I don't recall the exact number in

13   2006.

14       Q.    Could you give us the range?

15   Approximately 7,000?

16       A.    Yeah.  I was going to say maybe 6,000

17   stores, I would say.

18       Q.    And then in 2014, that was up to over

19   9,700; is that correct?

20       A.    I believe it's about that number,

21   yeah.

22       Q.    So during the period of time that you

23   were the senior vice president of logistics,

24   from 2007 until 2014, we're talking about

```
 1        between 18 and 19 distribution centers at that

 2        time, correct?

 3            A.   We did not have 19 distribution

 4        centers, but we had -- I think we had 17

 5        distribution centers.

 6            Q.   Well, at some point, it bumped up to

 7        19, correct?

 8            A.   Correct.

 9            Q.   Kansas City was the last one that you

10        opened?

11            A.   Recently.

12            Q.   Last year, correct?

13            A.   Correct.

14            Q.   And during this period of time, each

15        one of those distribution centers had a

16        process through which the pharmacies

17        throughout the United States that were CVS

18        pharmacies would order their narcotics, their

19        class 3 narcotics, the hydrocodones and

20        hydrocodone combination products, from CVS

21        distribution centers, correct?

22            A.   Could you ask the question again?

23            Q.   During the period of time from 2007 to

24        2014 that you were senior vice president of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      logistics --

 2           A.   Right.

 3           Q.   -- in charge of the suspicious order

 4      monitoring program --

 5           A.   Right.

 6           Q.   -- at CVS --

 7           A.   Right.

 8                     MR. BUSH:  Objection.  Go ahead.

 9                     MR. BAKER:  What's the

10      objection?

11                     MR. BUSH:  I don't think that's

12      what he said.  He said he was in charge of the

13      suspicious order monitoring program.

14      BY MR. BAKER:

15           Q.   When were you -- when were you senior

16      vice president of logistics at CVS?

17                     MR. BUSH:  That's not what I'm

18      saying.  But...

19      BY MR. BAKER:

20           Q.   When were you senior vice president of

21      logistics at CVS?

22           A.   At 2007 through 2017.

23           Q.   Okay.  During the period of time that

24      you were senior vice president of logistics at
```

Highly Confidential - Subject to Further Confidentiality Review

1    CVS, did CVS pharmacies order primarily their

2    hydrocodone combination products and class 3

3    narcotics from CVS distribution centers?

4         A.   Primarily, I would say no.

5         Q.   Okay.  Who primarily did those

6    pharmacies order class 3 narcotics from?

7         A.   The wholesalers.

8         Q.   So those would be called outside

9    vendors, correct?

10        A.   Correct.

11        Q.   So did the outside vendors then supply

12   more quantities of narcotics to those

13   pharmacies during that time frame than CVS

14   distribution centers did?

15        A.   I don't know.  I don't know the

16   quantities.

17        Q.   When I meant primarily, I meant

18   primarily who was the one that a pharmacy

19   would pick up the phone and call in order to

20   make an order?

21        A.   The wholesalers.

22        Q.   And then secondarily, they would call

23   the CVS distribution centers?

24        A.   There was a period -- there was a

```
 1        transition period where CVS did not carry, you

 2        know...

 3           Q.   Class 3?

 4           A.   Class -- class, you know...

 5           Q.   So let's go from --

 6                MR. BUSH:  Can I -- excuse me.

 7        Can I ask both of you to make sure that you

 8        each let the other finish, because I think

 9        it's -- you're both talking over each other.

10                MR. BAKER:  No problem.

11        BY MR. BAKER:

12           Q.   And if you think I'm overstepping you

13        in your answer, hold your hand up and I'll let

14        you finish.

15           A.   Yeah.

16           Q.   Fair enough?

17           A.   Yeah.

18           Q.   So from 2007 to 2014 when you were

19        senior vice president of logistics, there

20        was -- during that period of time from 2007

21        through October 6 of 2014, hydrocodone

22        combination products were considered

23        Schedule III narcotics, correct?

24           A.   Correct.
```

1        Q.   There was a change in the scheduling

2    October 6, 2014 where HCPs or hydrocodone

3    combination products were scheduled upward by

4    the FDA to Schedule II?

5        A.   Correct.

6        Q.   So what I'm asking is, during the

7    period of time from 2007 to 2014, October --

8        A.   Correct.

9        Q.   -- when HCPs were Schedule IIIs --

10       A.   Correct.

11       Q.   -- did CVS pharmacies order those

12   hydrocodone combination products from outside

13   vendors other than CVS distribution centers?

14       A.   They did also order from outside

15   vendors, correct.

16       Q.   And did they order as much or more

17   from outside vendors than they did from CVS

18   distribution centers, or do you know?

19       A.   I don't know.

20       Q.   In addition to ordering from outside

21   vendors, did the CVS pharmacies, during that

22   time frame from 2007 through 2014 October,

23   order from CVS distribution centers when

24   they -- when they needed Schedule III

```
1      narcotics?

2          A.   Yes.

3          Q.   And my question relates back to this

4      Exhibit No. 25, which is the list of Track 1

5      CVS stores which are in Ohio.

6               Did the CVS distribution centers, to

7      your knowledge, during the period of 2007

8      through 2014, October, supply class 3

9      narcotics, including hydrocodone combination

10     products, to that list of CVS stores?

11                    MR. BUSH:  Objection.

12     BY MR. BAKER:

13         Q.   To your knowledge?

14         A.   My difficulty is not knowing whether

15     or not these addresses are the CVS stores,

16     but...

17         Q.   I want you to assume --

18         A.   Yeah.

19         Q.   -- for the sake of my question that --

20     I've handed you Exhibit No. 25, assume that

21     that's the list of stores in what's called the

22     Track 1 CVS, which would be -- which would be

23     inclusive of Summit County, Ohio and Cuyahoga

24     County, Ohio.
```

```
1          A.    Okay.

2          Q.    I want you to assume that.

3          A.    Okay.

4          Q.    I want you to assume -- I'm asking

5    you, for the period of 2007 through 2014,

6    October, did CVS distribution centers supply

7    hydrocodone combination products to that list

8    of stores, if that is a list of Track 1

9    stores?

10         A.    If this is the accurate list, the

11   answer would be yes.

12         Q.    Okay.  Thank you.

13               Now, during the period of time that

14   you were employed by CVS, the CVS pharmacies

15   sold both Schedule II narcotics and Schedule

16   III narcotics, is that correct?

17         A.    Correct.

18         Q.    Then from the period of October 2014

19   when the Schedule III narcotics of HCPs,

20   hydrocodone combination products, were then

21   rescheduled to Schedule IIs, at that point,

22   all of the narcotics that were sold by CVS

23   pharmacies in Schedule IIs were provided by or

24   supplied by outside vendors, correct?
```

```
 1        A.   Correct.

 2        Q.   Now, narcotics are controlled

 3   substances under federal law.  You know that,

 4   right?

 5        A.   Yes.

 6        Q.   And you know that controlled

 7   substances, in order to distribute those, you

 8   have to have a certain type of license from

 9   the DEA, correct?

10        A.   Correct.

11        Q.   And you understand, as senior vice

12   president of logistics or prior senior vice

13   president of logistics, that that requires the

14   distribution centers to follow the rules

15   related to what DEA lays down for distribution

16   centers, correct?

17        A.   Correct.

18        Q.   Now, you're aware that during the

19   period of time of 2006, at the very least

20   2006, there was a period thereafter where

21   there was a build-up of the opioid crisis,

22   correct?

23        A.   I -- I'm not -- I'm not sure about

24   what's defined as a build-up.  I mean...
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.   Are you familiar that this country is

2       in the midst of an opioid crisis?

3              A.   Yes, I am.

4              Q.   Are you familiar that that's been

5       going on for at least the past ten years?

6              A.   Yes.

7              Q.   Are you familiar with the statistics

8       related to that?

9              A.   I am not.

10                  MR. BAKER:  Could you please

11      pull up the charts, the DEA charts, please, in

12      sequence.

13                  I'm on Plaintiffs' Exhibit 3.

14

15                  (Exhibit No. 3 marked for

16      identification.)

17

18      BY MR. BAKER:

19             Q.   I'm going to show you -- well, first

20      of all, you know who the DEA is -- the US DEA

21      is, correct?

22             A.   Correct.

23             Q.   That's the United States Drug

24      Enforcement Administration, which governs the
```

```
 1       regulation of narcotics, correct?

 2            A.   Correct.

 3            Q.   Now, are you familiar with the

 4       poisoning deaths of opioid analgesics having

 5       increased virtually every single year from

 6       1999 through 2013?

 7            A.   I am not.

 8            Q.   Are you familiar with the fact that,

 9       for instance, in 2007, when you became senior

10       vice president of logistics, that there were

11       14,440 -- 14,459 deaths from opioid

12       analgesics?

13                      MR. BUSH:  Objection.

14       BY MR. BAKER:

15            Q.   Did you know that?

16            A.   I did not.

17            Q.   Is that what that chart indicates to

18       you?

19            A.   It does, yeah.

20            Q.   Assuming this chart to be correct, did

21       you know that, during the period of time that

22       you were senior vice president of logistics at

23       CVS, that the opioid deaths increased to a

24       peak of over 16,000 per year between 2010 and
```

Highly Confidential - Subject to Further Confidentiality Review

1    2013?

2         A.    I was not aware of that.

3         Q.    Are you aware of how many people are

4    dying today?

5         A.    I do not know the stat.

6         Q.    Is this something that you studied

7    about when you were senior vice president of

8    logistics at CVS in charge of the suspicious

9    order monitoring program?

10         A.    I did not study it, no.

11         Q.    Did you ever try to familiarize

12    yourself with the extent of the crisis and the

13    extent of the deaths that were occurring in

14    the United States as a result of opioids?

15         A.    I did not.

16         Q.    Did you realize that these opioids

17    that were causing these deaths were

18    distributed through CVS pharmacies?

19                   MR. BUSH:  Objection.

20    BY MR. BAKER:

21         Q.    Or distributed to CVS pharmacies?

22                   MR. BUSH:  Objection.

23    BY MR. BAKER:

24         Q.    Did you know that?

```
  1                    MR. BUSH:  Objection.

  2       BY MR. BAKER:

  3            Q.   Yes?

  4            A.   Yes.

  5            Q.   Okay.  Did you know that -- go to the

  6       next one -- that the International Narcotics

  7       Control Board gathered statistics in 2012 as

  8       to who was consuming the highest amount of

  9       hydrocodone in the world?  Did you know that?

 10            A.   I did not.

 11            Q.   Did you know that the United States,

 12       according to the statistics kept by the DEA

 13       and this chart, was the country with the

 14       highest -- with the highest consumption of

 15       hydrocodone, which is -- which is 99 percent

 16       of global consumption?

 17            A.   I'm not aware of that.

 18            Q.   Okay.  Did you know that CVS sold or

 19       that your distribution centers that you were

 20       in charge of during the period of 2007 through

 21       2014 distributed hydrocodone combination

 22       products to CVS pharmacies that account for

 23       part of that 99 percent?

 24            A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   Let me ask you to look at the next

 2         chart.  It's entitled "United States Rates of

 3         Opioid Overdose Deaths, Sales, and Treatment

 4         Admissions of 1999 to 2010."

 5              Do you see that chart in front of

 6         you?

 7              A.   I do.

 8              Q.   Do you see that there are three lines.

 9         One is green on the top.  One is red in the

10         middle.  One is blue on the bottom.

11              Do you see that chart?

12              A.   I do.

13              Q.   Have you ever seen this chart before?

14              A.   I have not.

15              Q.   I want you to assume that these are

16         statistics that were gathered by the United

17         States DEA and charted as such.

18              Do you see that the top number there,

19         the top line is called "Opioid sales"?

20              Do you see that?

21              A.   I do.

22              Q.   And do you understand that the middle

23         line is opioid deaths, the red line?

24              A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.    Do you see that those lines run

2     parallel to each other?

3           A.    I do.

4           Q.    Do they correlate with each other, to

5     the best of your knowledge, from looking at

6     that chart?

7           A.    Visually, they correlate.

8           Q.    Is there, according to this visual

9     correlation, an opioid sales and opioid deaths

10    correlation such that the higher the degree of

11    sales of opioids during this period of time,

12    the higher degree of deaths during this period

13    of time?

14                That's a yes or no.

15          A.    I'd say yes.

16          Q.    Let's go to the next document.

17                The next document discusses the 2012

18    Ohio drug overdose deaths.

19                Do you see that?

20          A.    Yes.

21          Q.    Can I switch with you for just a

22    second.  Let me see that one that's yellowed

23    in.

24                Do you see on the top here, it says
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        that "Drug overdose deaths continue to be a

 2        public health crisis in Ohio, with a 366

 3        percent increase in the number of deaths from

 4        2000 to 2012"?

 5            A.   Yes.

 6            Q.   Okay.  Were you aware of that when you

 7        were working at CVS?

 8                 Were you aware of this statistic?

 9            A.   I was not.

10            Q.   Were you aware of any of the

11        statistics that I showed you in the other

12        charts --

13            A.   No.

14            Q.   -- from the DEA?

15            A.   I was not.

16            Q.   Skip down four bullet points.  Bullet

17        Point No. 4 and 5.

18                 Do you see her where it says "Opioids

19        prescription or heroin remain the driving

20        factor behind the unintentional drug overdose

21        epidemic in Ohio, that approximately

22        two-thirds, or 1,272, of the drug overdoses

23        involved any opioid in 2012, similar to 2011."

24                 Did you know that?
```

```
1            A.   I did not.

2            Q.   Do you know that these statistics were

3       gathered by the Ohio Department of Health,

4       Office of Vital Statistics analysis conducted

5       by the Injury Prevention Program?  Did you

6       know that?

7            A.   I did not.

8            Q.   Did anybody ever show you these

9       statistics, or did you ever try to study these

10      statistics when you were employed by CVS in

11      charge of the suspicious order monitoring

12      program?

13           A.   No.

14           Q.   Did the opioid crisis and the

15      statistics associated with the opioid crisis

16      have any concern of you while you were

17      employed by CVS as the senior vice president

18      in charge of logistics?

19                Did that concern you at all?

20           A.   It -- I'd say yes.  Yeah.

21           Q.   If it concerned you, then, why did you

22      not attempt to do any research on it to see

23      the extent of the problem?

24           A.   I had -- I had people directly
```

1    responsible for managing all that detail.

2              MR. BUSH:  Go ahead.  You can

3    answer.  It looked like Bill was going to

4    interrupt you.  I just wanted to make sure you

5    got to answer the question.

6    BY MR. BAKER:

7         Q.   But you were never told by those

8    people what the research showed; is that what

9    you're saying?

10        A.   That's correct.

11        Q.   Pull out the next chart, please.  This

12   is called the drug diversion map.

13             MR. BUSH:  I think you took the

14   exhibit from him.

15             MR. BAKER:  I'm sorry.  Let's

16   see that one back, please.

17   BY MR. BAKER:

18        Q.   This is called a "Drug Diversion Map,

19   Migration Out of Florida."

20             Have you ever seen this map before?

21        A.   I have not.

22        Q.   This map -- your lawyer can explain,

23   because we've gone over this in

24   Miss Propatier's deposition -- this map is

Highly Confidential - Subject To Further Confidentiality Review

```
 1          something that is a CVS document.

 2                  Did you know that?

 3          A.   I did not.

 4          Q.   Did you know that this map was

 5   contained within CVS files, the drug diversion

 6   migration out of Florida map?

 7          A.   I did not.

 8          Q.   Have you ever heard of the opioid or

 9   OxyContin Express?

10          A.   I have not.

11          Q.   Have you ever heard of something

12   called the Opioid Express?

13          A.   No.

14          Q.   Are you familiar with the concept of

15   migration of opioids out of Florida up through

16   states north of there, inclusive of Ohio?  Are

17   you familiar with that?

18          A.   I am not.

19          Q.   Nobody ever attempted to explain that

20   this exists?

21          A.   I'm not familiar with it.

22                  MR. BAKER:  Let me see that

23   back, if I could.  Actually, you can have it.

24                  Give me Exhibit 60, please.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                (Exhibit No. 60 marked for

 3         identification.)

 4

 5    BY MR. BAKER:

 6         Q.   I'm handing you Exhibit 60.  This is a

 7    list of CVS logistics distribution centers in

 8    existence as of June of 2014; is that correct?

 9         A.   Correct.

10         Q.   And it lists 19 distribution centers,

11    correct?

12         A.   Correct.

13         Q.   Now, you -- did you resign from CVS?

14         A.   I retired from CVS.

15         Q.   You retired?

16         A.   Yeah.

17         Q.   What month did you retire?

18         A.   December.

19         Q.   Of 2014?

20         A.   '17.

21         Q.   '17.  I'm sorry.

22              So this is a complete list of all the

23    distribution centers in the United States even

24    as of now; is that correct?  With the
```

```
 1      exception of Kansas City.

 2          A.   Correct.

 3          Q.   Is that right?

 4          A.   Correct.

 5          Q.   Kansas City is not on this list, and

 6      Kansas City would make it number 20; is that

 7      right?

 8          A.   Correct.

 9          Q.   So right now, to your knowledge, there

10      are 20 distribution centers of CVS throughout

11      the United States?

12          A.   Yes.

13          Q.   Is that correct?

14          A.   There is no DC in Puerto Rico.

15          Q.   So there are 19 distribution centers,

16      but Puerto Rico is what?

17          A.   Puerto Rico, we had stores, but we did

18      not have a distribution center there.

19          Q.   Did the suspicious order monitoring

20      system that was run through your department

21      from 2007 through 2014, when you were employed

22      there, did it include transactions to stores

23      in Puerto Rico or not?

24                   MR. BUSH:  Objection.  That
```

```
 1        misstates the record.

 2              A.   I'm not aware of that.

 3        BY MR. BAKER:

 4              Q.   Were there CVS retail stores in Puerto

 5        Rico?

 6              A.   I don't recall when we opened up

 7        stores in Puerto Rico.

 8              Q.   Were there pharmacies in Puerto Rico?

 9              A.   Yes.

10              Q.   When do you believe, to the best of

11        your recollection, there were pharmacies in

12        Puerto Rico?

13              A.   I don't recall.  I don't recall.

14              Q.   When there were pharmacies in Puerto

15        Rico during your time at CVS, did CVS supply

16        from its distribution centers any narcotics to

17        Puerto Rico pharmacies?

18              A.   No.

19              Q.   When you were employed at CVS, did the

20        Puerto Rico retailers, the Puerto Rico

21        pharmacies order all of their narcotics,

22        class 2s and class 3s, from outside vendors?

23              A.   Yes.

24              Q.   During the period of time that you
```

1     were employed at CVS, did any of those drugs

2     that were supplied to the Puerto Rico

3     pharmacies run through the suspicious order

4     monitoring system at CVS?

5          A.   I am -- I don't know.

6          Q.   You don't recall having seen any of

7     that, do you?

8          A.   I don't.

9          Q.   So Puerto Rico was an outlier on its

10    own relative to whether anybody was or wasn't

11    going to monitor that in the context of CVS's

12    efforts; is that correct?

13         A.   Yeah, I'm not aware, yeah.

14         Q.   Insofar as the suspicious order

15    monitoring system that your department owned

16    from 2012 through 2014 when you were there, it

17    was responsible for doing the suspicious order

18    monitoring of all narcotics that were received

19    by the pharmacies in the CVS chain throughout

20    the United States; is that correct?

21                   MR. BUSH:  Objection.

22         A.   I'm not 100 percent sure, yeah.

23    BY MR. BAKER:

24         Q.   Now, you were the person most senior

Highly Confidential - Subject to Further Confidentiality Review

1  in the logistics department that was in charge

2  of the suspicious order monitoring system from

3  2012 through 2014, correct?

4       A.   Correct.

5       Q.   My question is was that department in

6  charge of monitoring suspicious orders by all

7  of the CVS pharmacies throughout the United

8  States?

9       A.   I'm not sure.  Again, your -- I don't

10  know.  I'm not clear.

11       Q.   It was a nationwide suspicious order

12  monitoring system, correct?

13       A.   Correct.

14       Q.   It wasn't something that was

15  distribution center to distribution center in

16  2012, was it?

17            It was all in Indiana at that point,

18  was it not?

19       A.   Correct.

20       Q.   Okay.  So it centralized in the

21  Indiana distribution center, correct?

22       A.   Correct.

23       Q.   And that's -- that's a logistics

24  department?

1        A.    Correct.

2        Q.    Where you were in charge of,

3    correct?

4        A.    Correct.

5        Q.    So my question is did that

6    distribution center run the suspicious order

7    monitoring system for the entire United

8    States?

9        A.    At that time yes, yes.

10        Q.    And so any narcotics that were ordered

11    by any CVS pharmacy, that's what you were in

12    charge of monitoring in Indiana, correct?

13            MR. BUSH:  Objection.

14    BY MR. BAKER:

15        Q.    Is that right?

16        A.    The -- yeah, I --

17            MR. BUSH:  You can answer the

18    question.

19        A.    I am not sure, because of the

20    outside -- outside vendor component.

21    BY MR. BAKER:

22        Q.    So let me ask it this way:  With

23    respect to class 3 narcotics, which would have

24    included hydrocodone combination products up

Highly Confidential - Subject to Further Confidentiality Review

```
 1        until October 2014 --

 2             A.    Correct.

 3             Q.    -- all of the suspicious order

 4        monitoring that was done for the class 3

 5        narcotics was run out of one distribution

 6        center, which was Indiana from 2012 to 2014;

 7        is that correct?

 8             A.    That is correct.

 9             Q.    And that would include all of the

10        class 3 narcotics that would have been ordered

11        through CVS distribution centers, correct?

12             A.    Correct.

13             Q.    That would have also included all of

14        the class 3 narcotics that were ordered

15        through outside vendors by CVS pharmacies,

16        correct?

17             A.    I'm not sure.  I'm not clear on that.

18             Q.    We'll get into that in a minute.

19             A.    All right.

20             Q.    So are you familiar with even what the

21        suspicious order monitoring system monitored,

22        whether it be just those class 3 narcotics

23        that were ordered from CVS distribution

24        centers or if it also included the CVS outside
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      vendors or not?

 2              Do you know or have any idea?

 3          A.   I'm not clear -- not sure.

 4          Q.   But, again, you were the senior person

 5      in charge of that program, right?

 6          A.   I was the senior person responsible

 7      for the entire logistics organization.

 8          Q.   Okay.

 9          A.   And let me clarify.  That was not my

10      sole responsibility, also.  But I...

11                  MR. BAKER:  Could you hand me

12      Exhibit 113, please.

13

14              (Exhibit No. 113 marked for

15      identification.)

16

17                  MR. BAKER:  Off the record for a

18      quick break.

19                  THE VIDEOGRAPHER:  The time is

20      9:48 a.m., and we're off the record.

21

22              (Brief recess.)

23

24                  THE VIDEOGRAPHER:  The time is
```

Highly Confidential - Subject to Further Confidentiality Review



1       9:48 a.m., and we're on the record.

2

3       BY MR. BAKER:

Highly Confidential - Subject To Further Confidentiality Review

```
1          Q.   It states, "SOM process will include

2     store controlled substances, orders placed

3     with CVS warehouses and outside vendors,

4     Cardinal and McKesson," correct?

5          A.   Correct.

6          Q.   So we know from looking at this,

7     July 8, 2013, that prospectively at least, the

8     plan was at that time to include outside

9     vendors, correct?

10         A.   Correct.

11         Q.   And up until that time, outside vendor

12    purchases by CVS pharmacies were not being

13    monitored by CVS; is that correct?

14         A.   Again, I was not -- I'm not aware --

15    I'm not aware that it wasn't.

16         Q.   At least according to the document,

17    that's what it indicates; is that right?

18         A.   Correct.

19         Q.   And these are the same stores that

20    were purchasing narcotics that were for sale

21    retail to the United States public; is that

22    correct?

23         A.   Correct.

24         Q.   And those included class 3 narcotics;
```

1      is that right?

2          A.    Correct.

3          Q.    And those also included class 2

4      narcotics, correct?

5          A.    Correct.

6          Q.    So who, if anybody, was monitoring

7      those purchases by CVS pharmacies and sales to

8      the general public, to your knowledge, if

9      anybody?

10         A.    I'm not aware of who would be

11     monitoring that.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.   Well, if the purpose of the system is

 2         to prevent diversion and there's no system in

 3         place to do it --

 4              A.   Yeah.

 5              Q.   -- then naturally, the chances of

 6         diversion increase, correct?

 7              A.   Yes.  Yeah.

 8              Q.   So, see, that's one of those questions

 9         that has a logical answer.  So I appreciate

10         you answering it logically rather than trying

11         to do the dance.  Okay?

12                   MR. BUSH:  Objection to the

13         speech by counsel.

14         BY MR. BAKER:

15              Q.   So these narcotics that have a higher

16         opportunity for diversion when they are not

17         being monitored, those are the same narcotics,

18         according to the DEA, that are causing deaths

19         in this opioid crisis, correct?

20              A.   Correct.

21              Q.   And those are the same narcotics that

22         are sold by CVS pharmacies, correct?

23              A.   Correct.

24              Q.   And those are the same narcotics that
```

Highly Confidential - Subject to Further Confidentiality Review



```
5                    MR. BAKER:  Could you go to

6        No. 58, please.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







12        Q.    Let me show you Exhibit No. 50.

13

14              (Exhibit No. 50 marked for

15        identification.)

16

17        BY MR. BAKER:

18        Q.    This is a document entitled "Wholesale

19        Supply Agreement, July 1, 2009."  Do you see

20        that?  Between Cardinal Health and CVS, Inc.

21              Do you see that in the first

22        paragraph?

23        A.    I do.

24        Q.    The Bates number on this is 30817,

Highly Confidential - Subject to Further Confidentiality Review

```
 1      correct?  At the bottom?

 2          A.   Correct.  Correct.

 3          Q.   And this is dated July 1, 2009,

 4      correct?

 5          A.   Correct.

 6          Q.   All right.  And you see on page 30840

 7      in that agreement, but I'll show it to you

 8      right here -- do you see on page 30817 in that

 9      agreement that it is signed by CVS Pharmacy,

10      Inc., 7/1/2009?

11              Do you see that?

12          A.   I do.

13          Q.   This is signed by CVS Pharmacy

14      Purchasing and Pharmaceutical Relations,

15      correct?

16          A.   Correct.

17          Q.   Is that who does the purchasing of

18      these outside vendor supply --

19          A.   Yes.

20          Q.   -- of narcotics to CVS pharmacies?

21          A.   Yes.

22          Q.   And you're not made aware of that when

23      these purchases are going on, correct?

24          A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   And so you really have no idea during

 2       the period of time that you were in charge of

 3       the suspicious order monitoring program and

 4       logistics just the extent to which these

 5       outside vendors were providing narcotics to

 6       CVS pharmacies; is that correct?

 7            A.   That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 2173-39 Filed: 08/12/19 85 of 366. PageID #: 313408.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review









3                    MR. BAKER:  We've been going on

4       for an hour and a half, so we'll take a

5       break.

6                    THE VIDEOGRAPHER:  The time is

7       10:24 a.m., and we're off the record.

8

9            (Off the record at 10:24 a.m.)

10

11           (Exhibit No. 120 marked for

12      identification.)

13

14           THE VIDEOGRAPHER:  The time is 10:37

15      a.m.  We're on the record.

16

17      BY MR. BAKER:









Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



         9              MR. BAKER:  Could you pull

10      No. 34, please.

11

12              (Exhibit No. 34 marked for

13      identification.)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





         4              MR. BAKER:  I'm going to turn it

         5     over to my partner, Mr. Jim DeRoche.  He's

         6     going to go through some of that data with

         7     you.

         8              THE WITNESS:  Okay.

         9              MR. BUSH:  Is this a good time

        10     for a break, a five-minute break?

        11              THE VIDEOGRAPHER:  The time

        12     is --

        13              MR. BUSH:  You're done, Bill?

        14              MR. BAKER:  Hold on.

        15              MR. BUSH:  Hold on.

        16          (Brief pause in proceedings.)

        17              MR. BAKER:  I tell you what,

        18     let's do one more document.

        19

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





7           First of all, I want to show you what

8    we've marked as Exhibit 221.

9

10          (Exhibit No. 221 marked for

11   identification.)

12

13          MR. DEROCHE:  Let me put a

14   sticker on that one so it would be official.

15          MR. BUSH:  What did you say it

16   was?  221?

17          MR. DEROCHE:  221.

18   BY MR. DEROCHE:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
     5                    MR. DEROCHE:  I have nothing

     6          further.

     7                    MR. BAKER:  That's it.

     8                    MR. BUSH:  People on the phone

     9          don't have anything?  I guess, give me one

    10          second.

    11               Off the record.

    12                    THE VIDEOGRAPHER:  The time is

    13          3:26 p.m., and we're off the record.

    14

    15               (Off the record at 3:26 p.m.)

    16

    17                    THE VIDEOGRAPHER:  The time is

    18          3:27 p.m.

    19               This deposition has concluded, and we

    20          are off the record.

    21

    22               (Deposition concluded at 3:27 p.m.)

    23

    24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          CERTIFICATION

 2            I, DARLENE M. COPPOLA, a Notary Public, do hereby

 3       certify that RONALD LINK, after having satisfactorily

 4       identifying himself, came before me on the 11th day of

 5       December, 2018 in Providence, Rhode Island, and was by me

 6       duly sworn to testify to the truth and nothing but the

 7       truth as to his knowledge touching and concerning the

 8       matters in controversy in this cause; that he was

 9       thereupon examined upon her oath and said examination

10       reduced to writing by me; and that the statement is a true

11       record of the testimony given by the witness, to the best

12       of my knowledge and ability.

13             I further certify that I am not a relative or

14       employee of counsel/attorney for any of the parties, nor a

15       relative or employee of such parties, nor am I financially

16       interested in the outcome of the action.

17             WITNESS MY HAND THIS 14th day of December, 2018.

18

19

20

21       DARLENE M. COPPOLA              My commission expires:

22       NOTARY PUBLIC                   November 11, 2022

23       REGISTERED MERIT REPORTER

24       CERTIFIED REALTIME REPORTER
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5

 6       *********************************

 7       IN RE:

 8       NATIONAL PRESCRIPTION OPIATE

         LITIGATION

 9

         This document relates to:

10

         All cases

11

         *********************************

12

13           I, RONALD LINK, say that I have read the foregoing

14       deposition and hereby declare under penalty of perjury the

15       foregoing is true and correct:

16       (as prepared)  (as corrected on errata.)

17             Executed this _____ day of _____ 20_____,

18       at _____, _____.

19

20

21

22              _____

23                      RONALD LINK

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CORRECTION PAGE

 2        DEPONENT:   RONALD LINK

 3        DATE TAKEN: DECEMBER 11, 2018

 4        CASE:      NATIONAL PRESCRIPTION OPIATE LITIGATION

 5        *************************************************

 6        PAGE / LINE / SHOULD READ/REASON

 7        _____/_____/_____

 8        _____/_____/_____

 9        _____/_____/_____

10        _____/_____/_____

11        _____/_____/_____

12        _____/_____/_____

13        _____/_____/_____

14        _____/_____/_____

15        _____/_____/_____

16        _____/_____/_____

17        _____/_____/_____

18        _____/_____/_____

19        _____/_____/_____

20        _____/_____/_____

21        _____/_____/_____

22        _____/_____/_____

23        _____/_____/_____

24        _____/_____/_____
```