Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____  )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES  )   Hon. Dan A.
 7    TO ALL CASES            )   Polster
 8
              THURSDAY, JULY 11, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                   - - -
12            Videotaped deposition of Michael
13    Mapes, held at the offices of The Mining
14    Exchange, A Wyndham Grand Hotel & Spa,
15    8 South Nevada Avenue, Colorado Springs,
16    Colorado, commencing at 9:41 a.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                   - - -
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
25
```

```
 1               A P P E A R A N C E S :
 2

     LANIER LAW FIRM, P.C.
 3   BY:  W. MARK LANIER
              wml@lanierlawfirm.com
 4          RACHEL LANIER
              rachel.lanier@lanierlawfirm.com
 5          ROBERT LEONE
              robert.leone@lanierlawfirm.com
 6   10940 W. Sam Houston Parkway N., Suite 100
     Houston, Texas 77064
 7   (713) 659-5200
 8
 9   GREENE, KETCHUM, FARRELL, BAILEY
     & TWEEL LLP
10   BY:  PAUL T. FARRELL, JR.
              paul@greeneketchum.com
11   419 Eleventh Street
     Huntington, West Virginia 25701
12   (314) 525-9115
13
14   MCHUGH FULLER LAW GROUP
     BY:  MICHAEL J. FULLER, JR.
15          mike@mchughfuller.com
            AJ ELKINS
16          aj@mchughfuller.com
            (VIA REALTIME STREAM)
17   97 Elias Whiddon Road
     Hattiesburg, Mississippi 39402
18   (601) 261-2220
19
20   SIMMONS HANLY CONROY LLC
     BY:  LAURA L. FITZPATRICK
21          lfitzpatrick@simmonsfirm.com
     112 Madison Avenue
22   New York, New York  10016-7416
     (212) 784-6400
23
24
25
```

```
 1      BARON & BUDD, P.C.
        BY:  MARK PIFKO
 2           mpifko@baronbudd.com
             JAY LICHTER
 3           jlichter@baronbudd.com
             (VIA REALTIME STREAM)
 4           STERLING CLUFF
             scluff@baronbudd.com
 5           (VIA REALTIME STREAM)
        15910 Ventura Boulevard, Suite 1600
 6      Encino, California 91436
        (818) 839-2333
 7      Counsel for Plaintiffs
 8
 9      NAPOLI SHKOLNIK, PLLC
        BY:  HUNTER SHKOLNIK
10           hunter@napolilaw.com
             (VIA TELECONFERENCE)
11           SHAYNA SACKS
             ssacks@napolilaw.com
12           (VIA REALTIME STREAM)
        360 Lexington Avenue, 11th Floor
13      New York, New York 10017
        (212) 397-1000
14      Counsel for Cuyahoga County
15
16      US DEPARTMENT OF JUSTICE
        BY:  JAMES R. BENNETT, II
17           james.bennett4@usdoj.gov
             RENÉE BACCHUS
18           renee.bacchus@usdoj.gov
        United States Courthouse
19      801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113
20      (216) 622-3988
21      and
22      US DEPARTMENT OF JUSTICE
        BY:  MARIAMA C. SPEARS
23           mariama.c.spears@usdoj.gov
        8701 Morrisette Drive
24      Springfield, Virginia 22152
        (202) 598-6204
25      Representing the US DOJ and the Witness
```

```
 1    REED SMITH LLP
      BY:  SHANNON MCCLURE
 2         smcclure@reedsmith.com
           ABIGAIL PIERCE
 3         abigail.pierce@reedsmith.com
      1717 Arch Street, Suite 3100
 4    Philadelphia, Pennsylvania 19103
      (215) 851-8100
 5    Counsel for AmerisourceBergen
 6
 7    WILLIAMS & CONNOLLY LLP
      BY:  JENNIFER G. WICHT
 8         jwicht@wc.com
           BRAD MASTERS
 9         bmasters@wc.com
      725 Twelfth Street, N.W.
10    Washington, DC 20005
      (202) 434-5331
11    Counsel for Cardinal Health, Inc.
12
13    COVINGTON & BURLING LLP
      BY:  CHRISTOPHER K. EPPICH
14         ceppich@cov.com
      1999 Avenue of the Stars
15    Los Angeles, California 90067
      (424) 332-4764
16
      and
17
      BY:  MEGHAN E. MONAGHAN
18         mmonaghan@cov.com
      850 Tenth Street, NW
19    Washington, DC 20001-4956
      (202) 662-6000
20    Counsel for McKesson Corporation
21    JONES DAY
22    BY:  NEAL J. STEPHENS
           nstephens@jonesday.com
23         PATRICK BEISELL
      1755 Embarcadero Road
24    Palo Alto, California 94303
      (650) 739-3939
25    Counsel for Walmart
```

```
 1      KIRKLAND & ELLIS, LLP
        BY:   JENNIFER LEVY
 2            jennifer.levy@kirkland.com
              CATIE VENTURA
 3            catie.ventura@kirkland.com
        1301 Pennsylvania Avenue, N.W.
 4      Washington, DC 20004
        (202) 879-5000
 5      Counsel for Allergan Finance, LLC
 6
 7

        BARTLIT BECK LLP
 8      BY:  KATHERINE SWIFT
             kswift@bartlit-beck.com
 9           (VIA REALTIME STREAM)
        54 West Hubbard Street, Suite 300
10      Chicago, Illinois 60654
        (312) 494-4400
11      Counsel for Walgreens
12
13      DECHERT LLP
        BY:  ERIK W. SNAPP
14           erik.snapp@dechert.com
        35 West Wacker Drive, Suite 3400
15      Chicago, Illinois  60601
        (312) 646-5800
16      Counsel for Purdue Pharma
17
18      ROPES & GRAY, LLP
        BY:  WILLIAM DAVISON
19           william.davison@ropesgray.com
        800 Boylston Street
20      Boston, Massachusetts 02199-3600
        (617) 951-7000
21      Counsel for Mallinckrodt & SpecGx
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        BARNES & THORNBURG LLP
          BY:   WILLIAM A. HAHN, II
 2            william.hahn@btlaw.com
          11 South Meridian Street
 3        Indianapolis, Indiana  46204-3535
          (317) 236-1313
 4        Counsel for HD Smith
 5
 6        MORGAN, LEWIS & BOCKIUS LLP
          BY:   JOHN P. LAVELLE, JR.
 7            john.lavelle@morganlewis.com
          1701 Market Street
 8        Philadelphia, Pennsylvania 19103-2921
          (215) 963-5000
 9        Counsel for Rite Aid
10
11        LOCKE LORD LLP
          BY:   BRANDAN MONTMINY
12            brandan.montminy@lockelord.com
          2200 Ross Avenue, Suite 2800
13        Dallas, Texas 75201
          (214) 740-8445
14        Counsel for Henry Schein, Inc., and
          Henry Schein Medical Systems, Inc.
15
16
          ZUCKERMAN SPAEDER LLP
17        BY:   ANTHONY M. RUIZ
              aruiz@zuckerman.com
18            (VIA TELECONFERENCE AND STREAM)
          1800 M Street NW, Suite 1000
19        Washington, DC  20036-5807
          (202) 778-1800
20        Counsel for CVS Indiana, LLC, and
          CVS RX Services, Inc.
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        O'MELVENY & MYERS LLP
          BY:  RYAN SYNDER
 2             rsnyder@omm.com
               (VIA TELECONFERENCE AND STREAM)
 3             AMY LUCAS
               alucas@omm.com
 4             (VIA REALTIME STREAM)
               SETH BAGLIN
 5             sbaglin@omm.com
               (VIA REALTIME STREAM)
 6        1999 Avenue of the Stars, 8th Floor
          Los Angeles, California 90067
 7        (213) 430-6326
 8        and
 9        TUCKER ELLIS LLP
          BY:  JEFFREY C. SINDELAR, JR.
10             jeffrey.sindelar@tuckerellis.com
               (VIA TELECONFERENCE)
11        950 Main Avenue, Suite 1100
          Cleveland, Ohio  44113-7213
12        (216) 696-3697
          Counsel for Janssen and Johnson &
13        Johnson
14
15        MORGAN, LEWIS & BOCKIUS LLP
          BY:  MAUREEN K. BARBER
16             valerie.toth@morganlewis.com
               (VIA TELECONFERENCE AND STREAM)
17        One Oxford Centre, 32nd Floor
          Pittsburgh, Pennsylvania 15219-6401
18        (412) 560-3300
          Counsel for Teva Pharmaceuticals
19        USA, Inc., Cephalon, Inc., Watson
          Laboratories, Inc., Actavis LLC,
20        Actavis Pharma, Inc., f/k/a Watson
          Pharma, Inc.
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MARCUS & SHAPIRA LLP
            BY:   JOSHUA A. KOBRIN
 2                kobrin@Marcus-Shapira.com
                  (VIA TELECONFERENCE AND STREAM)
 3          301 Grant Street, 35th Floor
            Pittsburgh, Pennsylvania 15219-6401
 4          (412) 338-4690
            Counsel for HBC
 5
 6

            FOX ROTHSCHILD LLP
 7          BY:   ZACHARY MARTIN
                  Zmartin@foxrothschild.com
 8                (VIA TELECONFERENCE)
            2700 Kelly Road, Suite 300
 9          Warrington, Pennsylvania  18976-3624
            (215) 345-7500
10          Counsel for Prescription Supply, Inc.
11
12          CAVITCH FAMILO & DURKIN, CO., L.P.A.
            BY:   ERIC J. WEISS
13                eweiss@cavitch.com
                  (VIA TELECONFERENCE)
14          1300 East 9th Street
            Cleveland, Ohio  44114
15          (216) 621-7860
            Counsel for Discount Drug Mart
16
17

            FLAHERTY SENSABAUGH BONASSO PLLC
18          BY:   JACK SMITH
                  jsmith@flahertylegal.com
19                (VIA TELECONFERENCE AND STREAM)
            200 Capitol Street
20          Charleston, West Virginia  25338
            (304) 345-0200
21          Counsel for Masters Pharmaceutical
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      FOLEY & LARDNER LLP
        BY:  KATY E. KOSKI
 2           kkoski@foley.com
             (VIA REALTIME STREAM)
 3      111 Huntington Avenue, Suite 2500
        Boston, Massachusetts 02199-7610
 4      (617) 342-4000
        Counsel for Anda
 5
 6
        BAILEY WYANT PLLC
 7      BY:  JUSTIN TAYLOR
             jtaylor@baileywyant.com
 8           (VIA REALTIME STREAM)
        500 Virginia Street East, Suite 600
 9      Charleston, West Virginia 25301
        (304) 345-4222
10      Counsel for West Virginia Board of
        Pharmacy
11
12
     ALSO PRESENT:
13
             SPECIAL MASTER DAVID R. COHEN
14      david@specialmaster.law
        24400 Chagrin Boulevard, Suite 300
15      Cleveland, Ohio 44122
        (216) 831-0001
16
17      Juan Wilson, Lanier Law Firm
        Georgia Macy, Lanier Law Firm
18
19
     VIDEOGRAPHER:
20      DAN LAWLOR,
        Golkow Litigation Services
21
                      - - -
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2                                             PAGE
 3    APPEARANCES...................................    2
 4    EXAMINATIONS
 5      BY MS. MCCLURE..............................   17
 6      BY MS. WICHT................................  191
 7      BY MR. EPPICH...............................  207
 8      BY MR. STEPHENS.............................  233
 9
10                       EXHIBITS
11      No.      Description                         Page
12    Mapes 1    May 3, 2019 letter from US           23
                 Department of Justice to
13               Michael Mapes
14    Mapes 2    Mike Mapes LinkedIn profile          47
                 printout
15
      Mapes 3    Code of Federal Regulation           79
16               1301.74 printout from Westlaw
17    Mapes 4    US Department of Justice DEA         99
                 July 23, 1998 letter to Chris
18               Zimmerman,
                 ABDCMDL00315783 -
19               ABDCMDL00315794
20    Mapes 5    US Department of Justice DEA        121
                 July 23, 1998 letter to Bergen
21               Brunswig,
                 US-DEA-00025671
22
      Mapes 6    US Department of Justice DEA        122
23               letter dated December 27, 2007
                 to registrant,
24               US-DEA-00001771 -
                 US-DEA-00001772
25
```

| 1  | Mapes 7  | Memorandum dated August 16, 2005, subject Internet Presentation with AmerisourceBergen on August 10 2005, US-DEA-00000147 - US-DEA-00000164 | 133 |
| 5  | Mapes 8  | Memorandum dated October 20, 2005, subject Internet Presentation with McKesson Corp. On September 1, 2005, MCKMDL00496859 - MCKMDL00496875 | 141 |
| 8  | Mapes 9  | Memorandum dated August 23, 2005, subject Meeting with Cardinal Health, Inc., Concerning Internet Pharmacies, US-DEA-00000352 - US-DEA-00000366 | 142 |
| 11 | Mapes 10 | E-mail(s), CAH_MDL_PRIORPROD_DEA07_ 00857912-R | 145 |
| 13 | Mapes 11 | E-mail(s), CAH_MDL_PRIORPROD_DEA07_ 01106667-R | 146 |
| 15 | Mapes 12 | Order to Show Cause and Immediate Suspension of Registration, ABDCMDL00269383 - ABDCMDL00269387 | 154 |
| 18 | Mapes 13 | Order of Special Dispensation and Agreement Between The Drug Enforcement Administration and AmerisourceBergen Drug Corporation, ABDCMDL00398334 - ABDCMDL00279857 | 156 |
| 22 | Mapes 14 | Settlement and Release Agreement, ABDCMDL00279854 - ABDCMDL00279865 | 158 |

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Mapes 15   E-mail(s),                          169
                ABDCMDL00316083 -
 2              ABDCMDL00316110
 3   Mapes 16   US Department of Justice DEA        179
                Diversion Control Division
 4              Pharmaceutical Industry
                Conference printout
 5
     Mapes 17   AmerisourceBergen Drug              180
 6              Enforcement Administration
                Pharmaceutical Industry
 7              Conference, Wholesale
                Distribution Diversion Control
 8              Program, September 11, 2017,
                US-DEA-00001777 -
 9              US-DEA-00001799
10   Mapes 18   Summary of the DEA-HDMA Meeting     200
                on Suspicious Orders Meeting
11              Date:  Sept 7, 2007,
                HDS_MDL_00135664 -
12              HDS_MDL_00135665
13   Mapes 19   Internet Pharmacies, Joseph         246
                Rannazzisi,
14              US-DEA-00002413
15        (Exhibits attached to the deposition.)
16
17
18
19
20
21
22
23
24
25
```

```
 1              VIDEOGRAPHER:  We are now on
 2       the record.
 3              My name is Dan Lawlor.  I'm the
 4       videographer with Golkow Litigation
 5       Services.
 6              Today's date is July 11, 2019,
 7       and the time is 9:41 a.m.
 8              This video deposition is being
 9       held in Colorado Springs, Colorado, in
10       the matter of National Prescription
11       Opiate Litigation, MDL Number 2804.
12              The deponent is Michael Mapes.
13              Counsel, please identify
14       yourselves, starting with the
15       plaintiffs.
16              MR. LANIER:  My name is Mark
17       Lanier.  I'm here on behalf of the
18       plaintiffs.
19              I've got with me from my firm
20       Bob Leone, Rachel Lanier, Georgia
21       Macy, Juan Wilson in the room.
22              And then I know that there are
23       other plaintiffs' attorneys present,
24       but I'll let them identify themselves.
25              MS. FITZPATRICK:  Laura
```

Highly Confidential - Subject to Further Confidentiality Review

1    Fitzpatrick, Simmons Hanly Conroy.

2         MR. FARRELL:  Paul Farrell,

3    Jr., co-lead for the plaintiffs.

4         MR. PIFKO:  Mark Pifko, Baron &

5    Budd, for plaintiffs.

6         MR. FULLER:  Mike Fuller on

7    behalf of plaintiffs.

8         MS. MCCLURE:  And we'll just

9    continue in the room and then we can

10   do the phone.

11        This is Shannon McClure, Reed

12   Smith, on behalf of AmerisourceBergen.

13        MS. PIERCE:  Abby Pierce from

14   Reed Smith on behalf of

15   AmerisourceBergen.

16        MR. EPPICH:  Chris Eppich of

17   Covington & Burling on behalf of

18   McKesson.

19        MS. MONAGHAN:  Meghan Monaghan

20   of Covington & Burling on behalf of

21   McKesson.

22        MS. SWIFT:  Kate Swift for

23   Walgreens.

24        MS. WICHT:  Jennifer Wicht from

25   Williams & Connolly for Cardinal

Highly Confidential - Subject to Further Confidentiality Review

1        Health.

2            MR. MASTERS:  Brad Masters,

3        Williams & Connolly, Cardinal Health.

4            MR. LAVELLE:  John Lavelle from

5        Morgan Lewis on behalf of Rite Aid of

6        Maryland.

7            MR. STEPHENS:  Neal Stephens

8        from Jones Day for Walmart.

9            MR. SNAPP:  Erik Snapp from

10        Dechert on behalf of the Purdue

11        defendants.

12            MS. VENTURA:  Catie Ventura of

13        Kirkland & Ellis on behalf of the

14        Allergan defendants.

15            MS. LEVY:  Jennifer Levy from

16        Kirkland & Ellis on behalf of the

17        Allergan defendants.

18            MR. DAVISON:  William Davison

19        of Ropes & Gray on behalf of the

20        Mallinckrodt defendants.

21            MR. MONTMINY:  Brandan

22        Montminy, Locke Lord, on behalf of the

23        Henry Schein defendants.

24            MR. HAHN:  Bill Hahn, Barnes &

25        Thornburg, on behalf of HD Smith.

1            MS. BACCHUS:  Renée Bacchus, US
2      Attorney's Office, Northern District
3      of Ohio, on behalf of the Department
4      of Justice and DEA.
5            MS. SPEARS:  Mariama Spears on
6      behalf of the DEA.
7            MR. BENNETT:  James Bennett
8      from the US Attorney's Office in the
9      Northern District of Ohio on behalf of
10     the Department of Justice and DEA.
11           SPECIAL MASTER COHEN:  David
12     Cohen, special master.
13           VIDEOGRAPHER:  And counsel on
14     the phone, please identify yourselves.
15           MR. SHKOLNIK:  Hunter Shkolnik,
16     plaintiffs.
17           MR. BEISELL:  Patrick Beisell
18     for Walmart.
19           COURT REPORTER:  I'm sorry, one
20     at a time, please.
21           MS. MCCLURE:  Zach?
22           MR. MARTIN:  This is Zach
23     Martin, Prescription Supply.
24           MR. SMITH:  Jack Smith,
25     Flaherty Sensabaugh Bonasso, for

Highly Confidential - Subject to Further Confidentiality Review

1    Masters Pharmaceutical.

2         MR. KOBRIN:  Josh Kobrin for HB

3    Service Company.

4         MR. SNYDER:  Ryan Snyder from

5    O'Melveny & Myers on behalf of Johnson

6    & Johnson and the Janssen defendants.

7         MR. SINDELAR:  Jeffrey Sindelar

8    from Tucker Ellis on behalf of Johnson

9    & Johnson and Janssen.

10        MS. BARBER:  Maureen Barber

11   from Morgan Lewis for the Teva

12   defendants.

13        MR. RUIZ:  Anthony Ruiz from

14   Zuckerman Spaeder for CVS.

15        MR. WEISS:  Eric Weiss with

16   Cavitch, Familo & Durkin on behalf of

17   Discount Drug Mart.

18        VIDEOGRAPHER:  All right.  The

19   court reporter today is Carrie

20   Campbell and will now swear in the

21   witness.

22            EXAMINATION

23 QUESTIONS BY MS. MCCLURE:

24   Q.    Good morning, Mr. Mapes.

25   A.    Good morning.

1      Q.      That was a lengthy introduction

2    to a big room with a lot of people here.

3              So I am Shannon McClure.  I'm

4    from the law firm of Reed Smith.  I represent

5    AmerisourceBergen Drug Corporation.

6              Thank you for coming here today

7    and tomorrow.  We appreciate your appearance

8    here today.

9              We're just going to go through

10   some deposition ground rules so that you are

11   oriented to what we're going to be doing here

12   today.

13             Just to explain the timing to

14   you, which your counsel may have explained,

15   the defendants have been afforded eight hours

16   to question -- to question you, and the

17   plaintiffs have been afforded five hours.

18             Defendants and plaintiffs may

19   each elect to reserve some of their time to

20   go after, so the defendants may go and then

21   the plaintiffs and then a reservation of

22   time.

23             Do you understand that today?

24        A.      Yes, I do.

25        Q.      And so your deposition will

1  begin today and will continue and conclude

2  tomorrow.

3          This is a question and answer

4  format, so I'll be doing the questions for

5  the first part, and then there will be other

6  defendants who will take over questioning on

7  behalf of the defense, and then the

8  plaintiffs will as well.

9          If there's ever a time that I

10  ask you a question that you don't understand,

11  I would like you to please ask me to rephrase

12  the question and tell me that you don't

13  understand that.

14          Do you understand that

15  instruction?

16      A.    Yes, I do.

17      Q.    And similarly, if I insert

18  facts or assumptions into a question that are

19  inaccurate, then what I would like you to do

20  is to correct those.

21          Can we agree on that?

22      A.    Yes.

23      Q.    And similarly, when other

24  counsel question you in the room from either

25  side, will you agree that to the extent that

Highly Confidential - Subject to Further Confidentiality Review

1    there are factual inaccuracies or predicates

2    that are inserted into a question that you

3    don't agree with, you will not only respond

4    to the question but you would correct those

5    factual inaccuracies?

6         A.    Okay.

7         Q.    And if you answer my question,

8    then I'm going to assume that you understood

9    the question as I asked it.

10             Is that fair?

11        A.    Yes, it is.

12        Q.    And today your answers must be

13   verbal.  We do have a videocamera set up, but

14   nevertheless, in order for Carrie, the court

15   reporter, to take down what's been said in

16   the room, I do need you to -- instead of

17   nodding or shaking your head, I do need you

18   to provide verbal answers.

19             Can you agree to do that today?

20        A.    Yes.

21        Q.    It can be easy in the course of

22   normal conversation to nod or shake your

23   head, but she can't get that down.

24        A.    Right.

25        Q.    Similarly, often in human

```
 1    conversation we know where the other person

 2    is going or we start to finish the question

 3    that they're asking or answer it before the

 4    question has been completed.  That makes it

 5    difficult later when we need to go back and

 6    look at the transcript as to what was said.

 7              So what I would ask is that you

 8    allow me to finish my questions, and then,

 9    similarly, I will allow you to completely

10    finish your answers before I ask another

11    question.

12              Is that fair?

13    A.    Yes.

14    Q.    And if I do inadvertently

15    interrupt you -- and I assure you it is

16    inadvertent, I don't mean to -- then please

17    just let me know that you're not finished

18    answering, and I will of course stop and let

19    you finish your answer.

20              Is that fair?

21    A.    Okay.

22    Q.    Okay.  There may be objections

23    from time to time interposed by any of the

24    counsel in the room, including Mr. Bennett.

25    For the most part, when objections are
```

 1    interposed, you are still required to answer

 2    the question after an objection, say, to

 3    form.

 4              Do you understand that?

 5        A.    Yes.

 6        Q.    There may be occasions where

 7    you may be instructed not to answer the

 8    question, and in that instance then you would

 9    have to determine whether you would follow

10    the instructions of counsel and not answer

11    the question, and there may be discussions

12    among counsel about those instructions.

13              But for the most part, an

14    objection is simply for the record and then

15    you would be required to answer the question.

16              Do you understand that?

17        A.    Yes.

18        Q.    And you and I have never met

19    before.  I introduced myself when I took the

20    government up to the breakout room; is that

21    correct?

22        A.    That's correct.

23        Q.    And we've never written or

24    exchanged any letters or e-mails?

25        A.    That's correct.

```
 1          Q.      And we've never spoken on the

 2    phone?

 3          A.      Not that I'm aware of.

 4          Q.      Or had any communication,

 5    right?

 6          A.      Yep.

 7          Q.      Okay.  And this is a question

 8    that often comes up in depositions and might

 9    seem strange to you, but it's a standard

10    question that we always ask witnesses.

11                  Are you on any medications

12    today that would affect your ability to

13    recall information or testify truthfully here

14    today?

15          A.      No.

16          Q.      Okay.  And you understand that

17    DOJ and DEA have authorized you to testify

18    here today on behalf -- regarding certain

19    topics about your work at DEA, right?

20          A.      Yes.

21                  (Mapes Exhibit 1 marked for

22          identification.)

23    QUESTIONS BY MS. MCCLURE:

24          Q.      I'm going to hand you a

25    document that has been marked Mapes 1.  And
```

Highly Confidential - Subject to Further Confidentiality Review

 1   if you could take a look at that document and

 2   let me know when you've had an opportunity to

 3   review it.

 4        A.     Okay.  I've reviewed it.

 5        Q.     Now, given that this document

 6   is addressed to you, is it fair for me to

 7   assume that you have, in fact, seen this

 8   document before?

 9        A.     I have.

10        Q.     This is not the first time

11   you're seeing it?

12        A.     That's correct.

13        Q.     And to the best of your

14   recollection, did you receive it sometime

15   shortly after May 3, 2019, which is the date

16   on page 1?

17        A.     Yes.

18        Q.     Okay.  The letter references a,

19   quote, "previous denial of authorization" in

20   the first sentence.

21             Do you see that?

22        A.     Yes.

23        Q.     Had you previously received a

24   communication from DEA or DOJ that there had

25   been a request for your deposition received

1    that had been denied?

2        A.      Yes, I had.

3        Q.      Okay.  Do you recall when you

4    received that communication?

5        A.      I don't really remember exactly

6    when it was.

7        Q.      And you may not remember

8    exactly when it was.  That's fair.

9                Today I'm asking you, right

10   now, about something that was several months

11   ago.  In this deposition I'll be asking you

12   about things that may be several years ago or

13   even many years ago.

14               What I would like is for you to

15   tell me in each of those instances where I'm

16   asking you about a time period and you don't

17   exactly remember, that's totally fair.  What

18   I would like you to do is tell me if you

19   think -- if you can approximate when it was.

20   Was it a couple of months before this, was it

21   a year before this, if you can recall.

22       A.      Probably three or four months

23   before this.

24       Q.      And I have not seen that

25   communication.  Is it fair to say that it

Highly Confidential - Subject to Further Confidentiality Review

1    would have been a shorter communication than

2    this one in the fact that you were not, in

3    fact, authorized and thus there were no

4    topics listed, or am I incorrect about that?

5         A.    Yes, it was shorter.

6         Q.    And in advance of today's

7    deposition, did you review the topics on

8    which you were authorized to provide

9    testimony?

10        A.    I did.

11        Q.    And that is Topics 1 through 8,

12   which are listed on pages 1 and 2, correct?

13        A.    Yes.

14        Q.    And then with regard to those

15   areas of testimony, there is a second list

16   which comprises A through M and lists out the

17   subsets of information that you would not be

18   permitted to testify about those topics.

19             Is that a fair reading of this

20   letter?

21        A.    Yes.

22        Q.    And so things that are

23   privileged information are things that you

24   would not be permitted to testify about

25   within those first eight topics on pages 1 to

Highly Confidential - Subject to Further Confidentiality Review

1    2, correct?

2         A.    Yes.

3         Q.    Okay.  You can set that

4    document aside for now.

5               Have you been contacted by any

6    party to act as an expert in this matter?

7         A.    Yes, I have.

8         Q.    And has that been in a

9    testifying expert capacity or in a consulting

10   expert capacity?

11        A.    Consulting.

12        Q.    Okay.  And who is that entity

13   who has retained you?

14        A.    The only one that's retained me

15   is Williams Connolly.

16        Q.    And have you met with attorneys

17   from Williams & Connolly?

18        A.    Yes.

19        Q.    And you are aware that they

20   represent Cardinal Health, correct?

21        A.    That's correct.

22        Q.    Okay.  With whom did you meet?

23        A.    I've forgotten the names.

24   Jennifer and a couple other attorneys.

25        Q.    And was that a single meeting?

1      A.      Yes.

2      Q.      How long was that meeting?

3      A.      Six or seven hours.

4      Q.      Do you recall approximately

5    when that meeting was?

6      A.      It was the Monday after Easter,

7    whatever that day was.

8      Q.      I don't know it either, but

9    thank you for -- that's helpful.

10              Did they provide any documents

11   for you to review, if you recall?

12     A.      No, I don't recall reviewing

13   documents.

14     Q.      Have you seen any of the

15   plaintiffs' expert reports in this case?

16     A.      No.

17     Q.      Did you review Cardinal's DEA

18   expert report authored by Brian Reise?

19     A.      No.

20     Q.      Since the time that you were

21   authorized by DEA on May 3, 2019, to testify

22   as a fact witness in this case, have you

23   spoken with anyone at Williams & Connolly or

24   anyone representing Cardinal Health about any

25   work for them?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     Have you done any expert work

 3   in this case since you were authorized to

 4   testify pursuant to Exhibit 1, which is the

 5   May 3rd letter?

 6          A.     No.

 7          Q.     Did you meet with anyone to

 8   prepare for your deposition today?

 9          A.     Yes, I did.

10          Q.     Okay.  And who did you meet

11   with?

12          A.     The three attorneys here.

13          Q.     And by "the three attorneys

14   here," you're talking about the three

15   attorneys to your left --

16          A.     Yes.

17          Q.     -- which is Mr. Bennett,

18   Ms. Spears and Ms. Bacchus?

19          A.     Yes.

20          Q.     Was there anyone else in those

21   meetings?

22          A.     No.

23          Q.     Were those meetings conducted

24   as a conference call?

25                 Was there anyone on a phone?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     No.

 2        Q.     Did you meet one time or more

 3   than one time with those three attorneys?

 4               MR. BENNETT:  Objection.  Form.

 5               Are you talking about for this

 6        deposition?

 7               MS. MCCLURE:  Let me rephrase.

 8   QUESTIONS BY MS. MCCLURE:

 9        Q.     The three attorneys to your

10   left that you identified, have you met with

11   them for multiple reasons, in other words,

12   for this deposition and for other reasons?

13        A.     Yes, I met with them twice.

14        Q.     Okay.  What was the nature

15   of -- I assume one of the meetings, at least,

16   was to prepare for this deposition; is that

17   correct?

18        A.     It is.

19        Q.     And what was the nature of the

20   other meeting?

21        A.     To discuss my background with

22   DEA, the things that I've done, what I've

23   been involved in, that kind of thing.

24        Q.     So is it fair to say that that

25   was an informational meeting that you had
```

1    with these three attorneys?

2         A.      Yes.

3         Q.      And then the second meeting was

4    specifically to prepare for the deposition?

5         A.      Yes.

6         Q.      How long did the first

7    meeting -- and by "the first meeting," I'm

8    referring to the informational meeting --

9    last?

10        A.      Three or four hours.

11        Q.      Where was that meeting?

12        A.      It was in the DEA office here

13   in Colorado Springs, and some people were on

14   the phone.

15        Q.      Okay.  So for the informational

16   meeting, who was physically present with you

17   in the room at the DEA office in Colorado

18   Springs?

19        A.      Mr. Bennett was, and I don't

20   recall if anyone else was physically present

21   in the room.

22        Q.      To the best of your

23   recollection, were Ms. Bacchus and Ms. Spears

24   on the phone for that meeting, that

25   informational meeting?

1      A.      I'm not sure who was on the

2   phone.  I don't remember.

3      Q.      So it's possible there are

4   other attorneys, other than the three you've

5   named here today, who were present on the

6   phone for that first informational meeting?

7      A.      It's possible, yes.

8      Q.      But as of right now, you just

9   don't remember who they were?

10     A.      That's correct.

11     Q.      For the second meeting to

12  prepare for this deposition, how long was

13  that meeting?

14     A.      Four hours.

15     Q.      Where was that meeting?

16     A.      At the DEA office here in

17  Colorado Springs.

18     Q.      And when was that meeting?

19     A.      Yesterday.

20     Q.      When was the informational

21  meeting that was the first meeting?

22     A.      Early this year.  I don't know

23  exactly when, but several months ago.

24     Q.      Do you recall whether that

25  first meeting was before or after you

Highly Confidential - Subject to Further Confidentiality Review

1    received that first communication that I

2    don't have a copy of that did not authorize

3    you to appear for a deposition?

4         A.    I'm not certain.

5         Q.    Have you met with anyone from

6    plaintiffs' counsel in preparing for today's

7    deposition or in the informational meeting

8    that you discussed that was several months

9    ago?

10              MR. BENNETT:  Objection.

11         Compound.

12    QUESTIONS BY MS. MCCLURE:

13         Q.    Let me rephrase.

14              Did you meet with anyone from

15    plaintiffs' counsel today before -- in

16    preparation for today's deposition?

17         A.    No.

18         Q.    Okay.  And so some names of

19    plaintiffs' attorneys would be Mark Lanier,

20    Don Migliori, Linda Singer, Jayne Conroy,

21    Ms. Finkelstein, Hunter Shkolnik, Pete

22    Weinberger, Mike Fuller, Mark Pifko, Paul

23    Farrell, none of those attorneys were

24    attorneys that you met with in preparation

25    for your deposition today?

```
 1                    MR. BENNETT:  Objection.  Form.

 2               You can answer.

 3                    THE WITNESS:  That's correct.

 4    QUESTIONS BY MS. MCCLURE:

 5          Q.      During your meeting yesterday

 6    to prepare for this deposition today, was

 7    there anyone on the phone?

 8          A.      No.

 9          Q.      And to the best of your

10    knowledge, that long list of plaintiffs'

11    attorneys that I've provided you were not on

12    the phone for your informational meeting, but

13    you can't be certain because you don't recall

14    exactly who was on the phone; is that fair?

15          A.      I believe anybody that was on

16    the phone was a government attorney, so they

17    wouldn't have been the plaintiffs' attorneys.

18          Q.      Great.  Thank you.

19                  And have you retained private

20    counsel for this deposition here today?

21          A.      No, I have not.

22          Q.      So you didn't work with any

23    private counsel in preparation for your

24    testimony here today?

25          A.      That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

 1        Q.     And by "private counsel," I'm

 2    referring to nongovernmental attorneys.

 3        A.     Right.

 4        Q.     Okay.  Separately from the

 5    meetings we've discussed, which is the

 6    informational meeting several months ago and

 7    then the preparation for your deposition here

 8    today, have you met with plaintiffs' counsel

 9    regarding this case generally?

10        A.     I did meet with plaintiffs'

11    counsel a couple of times in Washington, DC.

12        Q.     And by "a couple of times,"

13    does that mean two times?

14        A.     Yes.

15        Q.     And was that two different

16    times or two consecutive days?

17        A.     Two different times.

18        Q.     When were those meetings,

19    approximately?

20        A.     Last late summer and fall.

21        Q.     So summer and fall of 2018?

22        A.     Yes.

23        Q.     How long were those meetings?

24        A.     Two or three hours each.

25        Q.     Where were they?

1    A.    In an office downtown in DC.

2    Q.    Do you recall whose office?

3    A.    No, I don't.

4    Q.    And who attended those?

5          Well, let me ask first this

6    question.  We'll call those the first and

7    second meetings in the spring and fall

8    of 2018 -- summer and fall of 2018.

9          For the summer of 2018 meeting,

10   who attended that meeting?

11   A.    Joseph Rannazzisi, who was also

12   with DEA, retired, myself, and there were

13   five or six attorneys from various law firms.

14   Q.    Do you recall their names?

15   A.    No, I don't.

16   Q.    Do you see any of those

17   attorneys in the room here today?

18   A.    No.

19   Q.    How did that meeting come

20   about, that summer of 2018 meeting?

21   A.    I was contacted by Joseph

22   Rannazzisi.  He told me that he was working

23   with this group and asked me to come to

24   Washington to meet with the group.

25   Q.    When you say he said "he was

1    working with this group," what group did he

2    mean, to your understanding?

3         A.     This group of attorneys that

4    were plaintiffs' attorneys.

5         Q.     And so you understood that

6    these were plaintiffs' attorneys representing

7    city, county governments in opioid

8    litigation?

9         A.     Representing -- excuse me.

10   Representing states, Indian tribes, cities,

11   counties.

12        Q.     Okay.  Any other type of

13   entities you understood that this group of

14   plaintiffs' attorneys represented?

15        A.     No.

16        Q.     And was Joseph Rannazzisi

17   present for the entire first meeting in the

18   spring -- in the summer or fall of 2018?

19        A.     He was.

20        Q.     Were you retained as an expert

21   at the conclusion of either the first or the

22   second meeting in 2018 with plaintiffs'

23   counsel?

24        A.     No, I was not.

25        Q.     Tell me what you can remember

1    from those meetings.

2          A.      Generally, discussions about

3    DEA policies, suspicious order monitoring,

4    that kind of issue.

5          Q.      The second meeting in summer or

6    fall of 2018, who was present?

7          A.      Joseph Rannazzisi was present

8    and some of the same group of attorneys.

9          Q.      But do you know whether it was

10   the exact same group or it might have shifted

11   to some degree?

12         A.      It could have been shifted

13   somewhat, but mostly the same.

14         Q.      Do you see any attorneys in

15   this room who attended that second meeting?

16         A.      No.

17         Q.      And why did the second meeting

18   happen, to your knowledge?

19         A.      They had more questions about

20   suspicious order monitoring, quotas, ARCOS,

21   those kind of issues.

22         Q.      Other than DEA policies,

23   quotas, ARCOS and suspicious order

24   monitoring, can you recall any other topic

25   from either of those two meetings that you

1    discussed with plaintiffs' counsel?

2          A.      No.

3          Q.      Do you remember what you

4    discussed about quotas?

5          A.      Very little, because my

6    knowledge of quotas is very limited.

7          Q.      Of that very little that you

8    discussed about quotas, do you remember what

9    specifically you discussed about quotas given

10   your limited knowledge?

11         A.      That there are quotas set for

12   manufacturing of certain drugs, and the DEA

13   sets those quotas, and different

14   manufacturers have their share of the quota

15   for different drugs.  That's about it.

16         Q.      Do you recall what you

17   discussed in those two meetings about ARCOS?

18         A.      Just generally what ARCOS is

19   and where the information comes from and how

20   it's used.

21         Q.      And what is ARCOS?

22         A.      ARCOS is a system that collects

23   information from all sales of Schedule II

24   drugs and Schedule III narcotic drugs.

25         Q.      So it's transactional data?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      Provided by whom?

 3          A.      By the registrants that are

 4   selling the drugs.

 5          Q.      And what did you tell

 6   plaintiffs' counsel about how ARCOS is used?

 7          A.      It's used to see which drugs

 8   are going to which pharmacies from which

 9   wholesalers.  It's used to look at pharmacies

10   to see if they're buying from several

11   wholesalers, that kind of thing.

12          Q.      ARCOS is accessible to DEA,

13   correct?

14          A.      Yes.

15          Q.      ARCOS is not accessible to

16   registrants in the industry, correct?

17          A.      I don't know if it is today.

18   It was not when I was there.

19          Q.      So registrants would generally

20   have access to their own transactional data,

21   correct?

22          A.      Yes.

23          Q.      But not the transactional data

24   of, say, a competitor of theirs who is also a

25   wholesaler?

1    A.    That's correct.

2    Q.    And what did you tell the

3  plaintiffs' attorneys regarding suspicious

4  order monitoring, that topic?

5    A.    We discussed the suspicious

6  order monitoring, what the regulation says

7  about suspicious order monitoring, and what

8  the current practice is within DEA.

9    Q.    And by "current practice," you

10  mean today?

11    A.    Yes.

12    Q.    Now, you left DEA.  We'll go

13  through your background in more detail, but

14  you left DEA in 2007, correct?

15    A.    That's correct.

16    Q.    But you're aware of the current

17  practice today with respect to DEA because

18  you are still in the industry and are aware

19  of DEA practices; is that fair?

20    A.    That specific practice, yes,

21  because I've talked to DEA folks about it.

22    Q.    When you say you've "talked to

23  DEA folks" about that specific practice, are

24  you saying you've talked to DEA folks since

25  you left DEA in 2007 regarding DEA's approach

1    to suspicious order monitoring?

2         A.    Yes.

3         Q.    With whom have you had

4    discussions at DEA since you left it in 2007

5    about DEA's approach to suspicious order

6    monitoring?

7         A.    More than one person.  The one

8    I remember is Cathy Gallagher, who was the

9    chief of the liaison and policy section.

10        Q.    And have you talked with

11   Ms. Gallagher once or more than once?

12        A.    More than once.

13        Q.    How regularly have you

14   communicated with Ms. Gallagher since 2007

15   regarding DEA's approach to suspicious order

16   monitoring?

17        A.    Not regularly.  It's been two

18   or three times, possibly.

19        Q.    And that's two or three times

20   since 2007?

21        A.    Yes.

22        Q.    Have you spoken with anyone

23   else at DEA regarding DEA's approach to

24   suspicious order monitoring since the time

25   you left DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.     No.
 2       Q.     So a minute ago when I asked
 3   you with whom had you spoken with DEA since
 4   you left in 2007 about DEA's approach to
 5   suspicious order monitoring, I thought you
 6   indicated that it was more than one person,
 7   but the one that you remembered was Cathy
 8   Gallagher.
 9              Is there more than one person
10   that you've spoken with since 2007?
11       A.     I don't recall talking to
12   anyone else about that specific subject.
13       Q.     Have you talked with DEA
14   representatives since you left in 2007 about
15   other nonsuspicious order monitoring topics?
16       A.     About DEA policy specifically
17   or about other --
18       Q.     I'm not asking about your
19   personal connections with people you may have
20   worked with that you keep in touch with about
21   non-DEA matters.
22              So my question is limited to
23   DEA-related matters, whether it's suspicious
24   order monitoring or policies or something
25   else, enforcement approach.  You tell me what
```

1    the topics would be.

2              MR. BENNETT:  Objection.  Form.

3              Go ahead.

4              THE WITNESS:  I have spoken

5         with other people in DEA about issues

6         related to pharmacies that I was

7         working for and DEA's approach with

8         those pharmacies.

9    QUESTIONS BY MS. MCCLURE:

10        Q.     So about specific registrants?

11        A.     Yes.

12        Q.     That you were either employed

13   by or consulting for?

14        A.     Yes, employed by.

15        Q.     And was the nature of those

16   conversations asking for guidance from DEA,

17   or were you providing information to DEA?

18        A.     Providing information about

19   what the pharmacy was doing, how they were

20   handling controlled substances.

21        Q.     How about the topic of DEA

22   policies?

23              We're going back to the

24   meetings that you had in summer and fall

25   of 2018 with plaintiffs' counsel.

Highly Confidential - Subject to Further Confidentiality Review

1       What did you tell plaintiffs'

2   counsel regarding DEA's policies?

3       A.      Are we talking a particular

4   policy, like suspicious orders, or...

5       Q.      I don't know.

6               Did you discuss more than one

7   policy, DEA policy, with plaintiffs' counsel?

8       A.      I don't think so because I

9   hadn't been there for a number of years, so I

10  wasn't sure what DEA's current policies are

11  on most topics.

12      Q.      But you recall discussing

13  suspicious order monitoring, DEA policies,

14  with plaintiffs, correct?

15      A.      Yes.

16      Q.      And were those DEA policies

17  that you discussed with plaintiffs in the

18  summer or fall of 2018 the policies that had

19  been in effect when you were at DEA?  So

20  prior to December of 2007.

21      A.      We discussed those policies as

22  part of the Distributor Initiative meetings

23  that we had with wholesalers.

24      Q.      Were you paid for your

25  attendance at these two meetings?

1      A.      Yes.

2      Q.      How much were you paid?

3      A.      $300 an hour.

4      Q.      And each of the meetings was

5    two to three hours, meaning that the most it

6    was was six hours, is that correct, in total?

7      A.      It may have been an hour or two

8    more.  I don't recall for sure.

9      Q.      Okay.  Were you asked to serve

10   as an expert at the conclusion of or during

11   these meetings?

12     A.      We discussed it, but it didn't

13   go any further.

14     Q.      Why?

15     A.      You would have to ask them.

16     Q.      Do you have any understanding

17   as to why you were not retained as an expert?

18     A.      No.

19     Q.      Were those meetings

20   informational meetings in which you were

21   providing information to the plaintiffs, or

22   were the plaintiffs also providing you

23   information about their lawsuits?

24     A.      It was mostly me providing

25   information to them in response to their

1    questions.

2         Q.      Do you recall any information

3    that they provided to you?

4         A.      No.

5                 (Mapes Exhibit 2 marked for

6         identification.)

7    QUESTIONS BY MS. MCCLURE:

8         Q.      I'm going to hand you a

9    document that's been marked as Mapes

10   Exhibit 2, which is a LinkedIn printout of

11   your bio.

12                If you could take a moment and

13   review that, and let me know when you've had

14   a chance to do so.

15        A.      I have.

16        Q.      And so according to this

17   profile, you worked for DEA for a little more

18   than 30 years in total, correct?

19        A.      That's correct.

20        Q.      From 1977 to 2007?

21        A.      Yes.

22        Q.      And you held a number of

23   positions over the course of your tenure at

24   DEA, correct?

25        A.      Correct.

1    Q.    Were all of those positions in

2  the diversion side of DEA?

3         MR. BENNETT:  Objection.  Form.

4         THE WITNESS:  They were all

5     related to the diversion program, yes.

6  QUESTIONS BY MS. MCCLURE:

7    Q.    And so some of your positions

8  may not have been actually having you housed

9  in diversion, but the subject matter about

10  which you were employed for DEA related to

11  diversion in all of your 30-year -- in all of

12  your positions over 30 years?

13    A.    That's correct.

14    Q.    You started out as a diversion

15  investigator in Detroit and Cleveland?

16    A.    Yes.

17    Q.    Detroit was approximately

18  '80 -- sorry, '77 to '83 or '84?

19    A.    Yes.

20    Q.    And then Cleveland was '83 or

21  '84 to '85 or '86?

22    A.    Yes.

23    Q.    I note that you graduated from

24  college, which was Ferris State University,

25  in 1974; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     It is.

 2        Q.     And then what -- did you have

 3   any jobs or positions between 1974 and 1977?

 4        A.     I did.

 5        Q.     What were those?

 6        A.     I was a deputy sheriff for

 7   about two and a half years in Michigan, and

 8   after that I worked for the -- as a civilian

 9   for the Department of the Army as a budget

10   analyst for about a year.

11        Q.     And then you applied for a

12   position at DEA?

13        A.     Yes.

14        Q.     What is a diversion

15   investigator?

16        A.     Someone that investigates

17   registrants or potential registrants that

18   handle controlled substances, investigates

19   the movement of controlled substances and

20   diversion of controlled substances from

21   legitimate channels.

22        Q.     In the course of your duties as

23   a diversion investigator, did you conduct

24   audits or cyclic investigations of

25   registrants?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did.

2    Q.    Including wholesalers?

3    A.    Yes.

4    Q.    In connection with those cyclic

5    audits -- am I using the correct phrase?

6    A.    Yes.

7    Q.    Okay.  In connection with those

8    cyclic audits, would you review suspicious

9    order monitoring systems?

10    A.    Yes.

11    Q.    Was that a standard part in

12    your experience of a diversion investigator's

13    role?

14    A.    It was.

15    Q.    And so it was a responsibility

16    that diversion investigators needed to carry

17    out with respect to registrants for the field

18    office to which they were assigned?

19    A.    That's correct.

20    Q.    The results of those audits

21    would be reported on a DEA 6 report?

22    A.    They would.

23    Q.    If a diversion investigator

24    determines that a registrant was not

25    complying with the regulations, would the

Highly Confidential - Subject to Further Confidentiality Review

 1    investigator tell the registrant what that

 2    registrant was doing wrong?

 3                MR. BENNETT:  Objection.

 4        Incomplete hypothetical.

 5    QUESTIONS BY MS. MCCLURE:

 6        Q.    You can answer.

 7        A.    Yes, they would.

 8        Q.    And that's in your experience

 9    at DEA?

10        A.    Yes.

11        Q.    As a diversion investigator?

12        A.    Yes.

13        Q.    And later as a group

14    supervisor, you expected your diversion

15    investigators to communicate with registrants

16    about what they were doing wrong?

17        A.    Yes.

18        Q.    So that they could correct it?

19        A.    That's right.

20        Q.    Was it an expectation in your

21    experience that a diversion investigator in

22    such a circumstance would follow up to see if

23    that issue had been corrected?

24                MR. BENNETT:  Objection.  Form.

25                THE WITNESS:  It would be

Highly Confidential - Subject to Further Confidentiality Review

1          followed up, whether it was by that

2          diversion investigator or another one.

3    QUESTIONS BY MS. MCCLURE:

4          Q.     Okay.  Audits can also be

5    conducted outside of the cyclic process if

6    there was a particular reason or something

7    came up that suggested that an audit might be

8    appropriate; is that accurate?

9          A.     It is.

10          Q.     What was your next position at

11   DEA after diversion investigator in

12   Cleveland?

13          A.     I was a staff coordinator at

14   headquarters in Washington, DC.

15          Q.     And was that for -- for how

16   long a period of time?

17          A.     A little less than a year.

18          Q.     What is the job of a staff

19   coordinator?

20          A.     To review the reports from a

21   field office and the requests from the field

22   office for assistance with investigative

23   matters.

24          Q.     So do I have it correct that a

25   field office, one of DEA's field offices, may

Highly Confidential - Subject to Further Confidentiality Review

1    reach out to headquarters because they had

2    something that they required more resources

3    for than they had available to them?

4         A.    Either resources in terms of

5    funding or in terms of more personnel or

6    whatever they needed.

7         Q.    Did headquarters have access to

8    some information that a field office would

9    not have had access to?

10        A.    Yes.

11        Q.    Let me rephrase that question.

12              Would a diversion investigator

13   reach out to a staff coordinator such as

14   yourself to get some information to support

15   an investigation?

16              MR. BENNETT:  Objection.  Form.

17              THE WITNESS:  They may.

18   QUESTIONS BY MS. MCCLURE:

19        Q.    You later became an instructor

20   at Quantico?

21        A.    Yes.

22        Q.    Quantico is a location in

23   Virginia where DEA diversion investigators

24   train; is that right?

25        A.    It is.

1    Q.    And what did you -- did you, in

2    fact, instruct those potential diversion

3    investigators in the course of that position?

4    A.    I did.

5    Q.    What did you instruct them

6    about?

7    A.    Various topics related to

8    diversion, whether it's drug field testing,

9    auditing, those kind of things.

10         I didn't do the majority of the

11   teaching for diversion investigators.  We had

12   folks from the field come in and do that.

13   Q.    But you did some instruction

14   about diversion?

15   A.    Yes.

16   Q.    Your next position in the

17   1990s, if I have this timing correct, was as

18   a group supervisor in the Denver field

19   office?

20   A.    That's correct.

21   Q.    What were the years of that

22   position?

23   A.    Roughly '92 to '97.

24   Q.    Were you also a regional

25   manager of diversion control --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    -- in that same time period?

3    A.    Yes.  The diversion program

4  manager, yes.

5    Q.    Is that a different position,

6  or is that part of the group supervisor

7  title?

8    A.    That's a different position.

9    Q.    How did the duties of a

10 diversion program manager differ from those

11 of a group supervisor?

12   A.    The supervisor supervises a

13 group of investigators, in this case in the

14 Denver office, and the manager deals with the

15 supervisor in Denver, the supervisor in Salt

16 Lake City, the supervisor in Albuquerque, in

17 the entire field division.

18   Q.    Okay.  So the regional man --

19 I'm sorry.  The diversion program manager is

20 a higher-up position than the group

21 supervisor?

22   A.    Yes.

23   Q.    And what were the years that

24 you held the position of diversion program

25 manager?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Roughly '97, '98-ish.

 2          Q.     And in each of these two

 3   positions, the group supervisor position and

 4   the diversion program manager position, you

 5   oversaw diversion investigators, or the group

 6   supervisors who are overseeing those

 7   diversion investigators, in connection with

 8   their oversight and investigation and

 9   enforcement of the Controlled Substances Act;

10   is that correct?

11          A.     Yes.

12          Q.     What was your next position

13   after diversion program manager?

14          A.     Liaison with the United Nations

15   International Archives Control Board in

16   Vienna, Austria.

17          Q.     Did you actually live in

18   Vienna?

19          A.     Yes.

20          Q.     And that was for approximately

21   two years?

22          A.     Yes.

23          Q.     And what were your

24   responsibilities in that position?

25          A.     Working mostly with the
```

1    precursor control group of the UN to deal

2    with issues between countries about shipments

3    of precursor chemicals for controlled

4    substance manufacture.

5         Q.      And your next position was

6    deputy chief of the liaison and policy

7    section?

8         A.      It was.

9         Q.      And is that a promotion from

10   what your prior position had been?

11        A.      No, it was a lateral.

12        Q.      Was it a promotion from the

13   diversion program manager role?

14        A.      No, it was lateral.

15        Q.      That's all lateral.

16               And what were your

17   responsibilities as deputy chief of liaison

18   and policy?

19        A.      Working with the staff

20   coordinators and with the section chief to

21   work with the industry to interpret policies

22   and procedures, and work with those who were

23   writing Federal Register announcements about

24   various issues.

25        Q.      When you say "work with those

1   who were writing Federal Register

2   announcements," what does that mean?

3        A.      For issues related to the

4   Office of Diversion, there were a couple of

5   people in liaison and policy who wrote the

6   Federal Register announcements about

7   policies, and so we'd review those and

8   discuss those and that kind of thing.

9        Q.      So did you have oversight

10  responsibility over the individuals who were

11  writing announcements about DEA policies in

12  the Federal Register?

13       A.      They worked for a unit chief,

14  and the unit chief reported to the section

15  chief that I worked with, but I didn't have

16  oversight.

17       Q.      What was your next position

18  after deputy chief of liaison and policy?

19       A.      I was chief of the planning and

20  resources section at headquarters.

21       Q.      How long did you have that

22  role?

23       A.      About two years.

24       Q.      So what years are we in at this

25  point for the planning and resources role?

```
1          A.      2003 and '4, possibly.

2          Q.      And what were the

3    responsibilities of that position?

4          A.      Dealing with personnel issues,

5    hiring, budget issues, equipment, those kind

6    of things.

7          Q.      And your next position after

8    the planning and resources one?

9          A.      Was chief of the E-Commerce

10   section.

11         Q.      So did that begin in

12   approximately 2004?

13         A.      Yes.

14         Q.      And go through when?

15         A.      Middle of 2005.

16         Q.      What is chief of a section at

17   DEA?  What does that mean?

18         A.      It means that there are units

19   within a section that have people that are

20   performing various functions, and the section

21   chief is the manager of the unit chiefs.

22         Q.      So who were the unit chiefs

23   that you were overseeing in the E-Commerce

24   section?

25                 MR. BENNETT:  Objection to
```

1       form.  Time.

2       QUESTIONS BY MS. MCCLURE:

3           Q.      So he's identified the time

4   period as -- am I correct that it's 2004 to

5   2005 that you were the chief of E-Commerce?

6           A.      Yes.

7           Q.      How many unit chiefs did you

8   have?

9           A.      Three, I believe.

10          Q.      And did they each have

11  different roles?

12          A.      Yes.

13          Q.      What were those roles?

14          A.      One was dealing with the

15  programs known as CSOS and EPCS, computerized

16  programs, one was detailing with the

17  contractors that were working in the

18  programs, and one was the targeting and

19  analysis unit that was looking at data from

20  available sources.

21          Q.      Did the data from available

22  sources that the targeting and analysis unit

23  look at include ARCOS?

24          A.      Yes.

25          Q.      What other sources?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BENNETT:  Objection.

2       Scope.

3           You're not authorized to

4       disclose any confidential law

5       enforcement databases or confidential

6       law enforcement investigative tools.

7           To the extent that you can

8       answer without disclosing such

9       confidential databases or

10      investigative tools, you may answer

11      the question.

12          THE WITNESS:  There's none

13      other -- other tools that are public

14      tools.

15  QUESTIONS BY MS. MCCLURE:

16      Q.    So the only public tool that

17  you are authorized here to discuss today that

18  targeting and analysis work with is ARCOS,

19  correct?

20      A.    Correct.

21      Q.    In that role as chief of

22  E-Commerce, did you meet with registrants?

23      A.    I had meetings with

24  representative of different registrants to

25  talk about different issues.

1    Q.    What do you mean by

2  "representatives"?

3    A.    It might be someone from their

4  IT department or someone from their legal

5  department or someone from their compliance

6  department or something like that.

7    Q.    You then served as the chief of

8  the regulatory unit?

9    A.    That's correct.

10    Q.    What is the regulatory unit?

11    A.    It was a unit that looked at --

12  well, it was a section that looked at the

13  regulatory investigations that were done

14  within the Office of Diversion Control by the

15  field offices.  Also issued import/export

16  declarations and permits for controlled

17  substances that were coming into or leaving

18  the country.

19    Q.    When you say that that section

20  looked at the regulatory investigations that

21  were done within the Office of Diversion

22  Control, what does that mean, to look at

23  them?

24    A.    It means all the reports that

25  are written by the field offices come to the

1   staff coordinators in headquarters that

2   review those to see if they're following the

3   appropriate policies and procedures and see

4   if there are issues that are consistent

5   issues across the country with several

6   registrants or not.

7        Q.    What would those reports be

8   called that you reviewed?

9        A.    They would be DEA 6s that were

10  reports of investigation of registrants of

11  any kind.

12       Q.    You left DEA in 2007?

13       A.    That's correct.

14       Q.    At that time were you the chief

15  of the regulatory unit?

16       A.    The regulatory section, yes.

17       Q.    I'm sorry, the regulatory

18  section.

19             And why did you leave DEA?

20       A.    I retired.

21       Q.    And after that you became a

22  consultant, correct?

23       A.    Yes.

24       Q.    Is that what iSAW means,

25  I-S-A-W?  Is that your company?

1    A.    No, it's not.

2    Q.    Okay.  What is iSAW?

3    A.    It's a company that's

4  developing technology to identify suspects

5  and witnesses to criminal activity.

6    Q.    Is iSAW related to diversion --

7    A.    No.

8    Q.    -- or the pharmaceutical

9  industry?

10   A.    No.

11   Q.    After you left DEA in 2007,

12 were you also a consultant in the industry

13 for diversion-related questions or issues?

14   A.    Yes, I was.

15   Q.    And did that -- did you form a

16 consulting company for that?

17   A.    No, that was mostly an

18 independent consultant.

19   Q.    But there's not a company name

20 or something like that that I would -- that

21 you would be able to tell me for the purpose

22 of your post-DEA consulting to industry

23 regarding diversion?

24   A.    A pharmacy that I worked for

25 created a company to do consulting.  That was

1    a Controlled Substance Compliance Group, but

2    that was owned by that pharmacy, and I worked

3    with them and did consulting.

4           Q.      When did you begin working for

5    that pharmacy?

6           A.      About 2009.

7           Q.      And what is that pharmacy

8    called at that time in 2009?

9           A.      At the time that pharmacy was

10   Assured Pharmacy.

11          Q.      And so Assured created a

12   subsidiary company called the Controlled

13   Substance Compliance Group.

14               Do I have that correct?

15   A.      Yes.

16          Q.      And you began working for the

17   Controlled Substance Compliance Group in

18   2009?

19          A.      No, that wasn't created until

20   probably 2013-ish.

21          Q.      And so initially you worked

22   directly for Assured?

23          A.      Yes.

24          Q.      What kinds of activities did

25   you do for Assured?

1   A.      I was the chief compliance

2   officer for the group of pharmacies and wrote

3   policies and procedures, reviewed the

4   pharmacies to be sure they're following the

5   policies and procedures.

6       Q.      Are you still working for

7   Assured today?

8       A.      No.

9       Q.      When did you stop working for

10  Assured?

11      A.      Assured was bought out by

12  another group called Cordant Health Services,

13  and so they became known as Cordant

14  pharmacies, and I worked with them through

15  the end of 2015.

16      Q.      So from 2009 through 2015, you

17  were working for Assured or Cordant,

18  depending on what the name was at the time?

19      A.      Right.

20      Q.      Did your job duties change over

21  that 2009 to 2015 time period?

22      A.      No.

23      Q.      Going back to your independent

24  consulting unrelated to Assured or Cordant,

25  there's no company name that you had or that

1    you used for that kind of consulting,

2    correct?

3         A.     Correct.

4         Q.     And who were your clients in

5    the independent consulting business that you

6    had after leaving DEA, to the best that you

7    can recall?

8         A.     AmerisourceBergen, HD Smith,

9    Meijer Company, M-e-i-j-e-r, Henry Schein,

10   Physicians Pharmaceutical Corporation.

11             There's others I just can't

12   recall this second.

13        Q.     Okay.  During what period of

14   time were you acting as an independent

15   consultant after leaving DEA in 2007?

16        A.     The --

17        Q.     And I'm talking now

18   specifically about the consulting relating to

19   diversion.

20        A.     From 2008 through 2015 or '16.

21        Q.     So there's some overlap there

22   between the independent consulting work that

23   you were doing and your work for Assured and

24   Cordant in terms of time, correct?

25        A.     Yes.  Assured was part time.

 1          Q.     Okay.  Did Assured become full

 2    time at some point?

 3          A.     No.

 4          Q.     So for the entire 2009 to 2015

 5    time period with Assured and then Cordant,

 6    that was all part time?

 7          A.     That's correct.

 8          Q.     What was your first position

 9    that was physically located at DEA

10    headquarters?

11          A.     That was the staff coordinator.

12          Q.     Okay.

13                 MR. BENNETT:  Do you need a

14          break, or are you okay?

15    QUESTIONS BY MS. MCCLURE:

16          Q.     And that was 2001 to 2003?

17          A.     No.

18          Q.     If I have it wrong, then tell

19    me.

20          A.     Yeah, that was -- that was

21    earlier than that.  That was right after

22    Cleveland.

23          Q.     Okay.  Thank you.

24                 So Cleveland ended in '85, '86,

25    right?

1    A.    Yes.

2    Q.    Okay.  Then you went back into

3    the field, correct, at some point?

4          MR. BENNETT:  Objection.  Form.

5    QUESTIONS BY MS. MCCLURE:

6    Q.    When you were working -- let me

7    rephrase that.

8          During the time that you were a

9    group supervisor, that was in Denver --

10   A.    Correct.

11   Q.    -- not at headquarters,

12   correct?

13   A.    Correct.

14   Q.    And during the time that you

15   were the diversion program manager, that was

16   not physically located at headquarters,

17   correct?

18   A.    Correct.

19   Q.    Okay.  When was the next

20   position that you had when you went to --

21   when you were working at headquarters?

22         MR. BENNETT:  Objection.  Form.

23         THE WITNESS:  When I went back

24   to headquarters, it was the deputy

25   chief of liaison and policy first.

```
 1    QUESTIONS BY MS. MCCLURE:

 2          Q.      Okay.  Thank you.

 3                  In 2005, who was the head of

 4    the Office of Diversion Control?

 5          A.      I'm not certain.  It could have

 6    been one of a couple of different people.

 7          Q.      Was Bill Walker one of those

 8    couple of different people?

 9          A.      Yes.

10          Q.      Who else could it have been?

11          A.      Joe Rannazzisi.

12          Q.      You just don't recall when the

13    transition happened?

14          A.      Correct.

15          Q.      Did Joe Rannazzisi take over

16    that role from Bill Walker?

17          A.      Yes.

18          Q.      Okay.  No one in between,

19    correct?

20          A.      Correct.

21          Q.      Did you work with Joe

22    Rannazzisi in that time period?

23          A.      I did.

24          Q.      Did you report to him?

25          A.      I did.
```

1      Q.      And this is in the role as

2  chief of liaison and policy or chief of the

3  E-Commerce section?

4      A.      Either E-Commerce or the

5  regulatory section.  I'm not sure exactly

6  when he came in.

7      Q.      Right.

8              So he was not the head of the

9  Office of Diversion when you were chief of

10  liaison and policy?

11      A.      No, that was Laura Nagel.

12      Q.      But you don't recall whether

13  you reported to him in your role as chief of

14  E-Commerce or chief of regulatory section or

15  both?

16      A.      I did, as chief of regulatory

17  section, report to Joe Rannazzisi, but I'm

18  not sure in E-Commerce who it was.

19      Q.      Now, you previously talked

20  about your role in -- do I have it --

21  planning and budget?

22              Do I have that title correct?

23  Probably not.

24      A.      It was planning and resources.

25      Q.      Planning and resources.

1             There's two different sides to

2    DEA, correct?

3         A.    Yes.

4             MR. BENNETT:  Objection.  Form.

5             You can answer.

6    QUESTIONS BY MS. MCCLURE:

7         Q.    And is there some other word

8    that you would use to refer to them other

9    than "sides"?

10        A.    Well, there is the diversion

11   part of DEA, there's enforcement, there's

12   intelligence, there's laboratories.  So

13   there's several different aspects to DEA.

14        Q.    So you said diversion,

15   enforcement, lab --

16        A.    Intelligence, laboratories.

17        Q.    Is diversion funded differently

18   than enforcement?

19        A.    It is.

20        Q.    How is that funding different?

21        A.    It's paid for through a fee

22   account by fees paid by the registrants to

23   register.

24        Q.    You said there's the laboratory

25   section and the intelligence section.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do laboratories and

2   intelligence support both enforcement and

3   diversion, or do they support one or the

4   other?

5              MR. BENNETT:  Objection.

6       Scope.

7              You can answer.

8              THE WITNESS:  Yes, both.

9   QUESTIONS BY MS. MCCLURE:

10      Q.    And how is enforcement funded?

11             MR. BENNETT:  Objection.

12      Scope.

13             THE WITNESS:  Through

14      Congressional appropriations.

15  QUESTIONS BY MS. MCCLURE:

16      Q.    What is on-call time, if you

17  know?

18      A.    I don't know.

19      Q.    Okay.  That's not something

20  that happened in the diversion side?

21      A.    No, it's nothing I've heard of.

22      Q.    So if diversion is funded by

23  fee accounts paid for by registrants, the

24  fees that are set for registrants are at

25  DEA's discretion and under DEA's control; is
```

```
 1    that right?
 2              MR. BENNETT:  Objection.
 3         Scope.
 4              THE WITNESS:  They're set
 5         through a rulemaking process.
 6    QUESTIONS BY MS. MCCLURE:
 7         Q.     That includes input from DEA?
 8         A.     Yes.
 9              MS. MCCLURE:  Why don't we go
10         off the record and take a short break.
11              MR. BENNETT:  Okay.
12              VIDEOGRAPHER:  We're going off
13         record.  The time is 10:49.
14          (Off the record at 10:49 a.m.)
15              VIDEOGRAPHER:  We're going back
16         on record, beginning Media File
17         Number 2.  The time is 11:06.
18    QUESTIONS BY MS. MCCLURE:
19         Q.     Still good morning, Mr. Mapes.
20              You understand that you're
21    still under oath today?
22         A.     I do.
23         Q.     What is the role of a wholesale
24    distributor?
25         A.     To distribute drugs and other
```

1  products to the retail pharmacies and doctors

2  and anyone else that has a need for them, if

3  it's registered, if it's a controlled

4  substance.

5      Q.      So distributors and wholesalers

6  sell more than just controlled substances?

7      A.      Yes.

8      Q.      A whole variety of products?

9      A.      Yes.

10     Q.      Do you understand the use of

11  the term "distributors" and "wholesalers," do

12  you use that interchangeably, or do you think

13  of those as being different words?

14     A.      Interchangeable.

15     Q.      Do distributors sell

16  pharmaceutical products directly to patients?

17     A.      No.

18     Q.      So they sell to other

19  registrants within the supply chain, whether

20  it's a retail pharmacy, a hospital customer,

21  a physician, et cetera, right?

22     A.      Correct.

23     Q.      So prescriptions are written by

24  doctors?

25              MR. BENNETT:  Objection.  Form.

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.     In your knowledge?

 3         A.     Among others.

 4         Q.     Other health care professionals

 5    write a prescription, correct?

 6         A.     Correct.

 7         Q.     And then a patient takes that

 8    prescription generally to a pharmacy or to

 9    some other entity who is a registered -- if

10    it's a controlled substance within the supply

11    chain?

12         A.     Yes.

13         Q.     But not a wholesaler or a

14    distributor?

15         A.     Correct.

16         Q.     And so an order that a

17    wholesaler or a distributor receives from,

18    say, a pharmacy is generally a bulk order,

19    correct?

20         A.     Yes.

21         Q.     It's not intended to be -- it's

22    not as if a pharmacy places an order to fill

23    a specific person's prescription most

24    commonly, right?

25         A.     Correct.
```

1    Q.    Instead, the pharmacy or the

2  person ordering from the wholesaler has

3  grouped together an anticipated need for a

4  particular medication, and they order that in

5  bulk from a distributor, right?

6          MR. BENNETT:  Objection.  Form.

7          THE WITNESS:  Correct.

8  QUESTIONS BY MS. MCCLURE:

9    Q.    So an order is not being filled

10  in response to a particular patient's

11  prescription?

12    A.    Not normally.

13    Q.    Is it your understanding that

14  distributors do not see prescription-level

15  data in the ordinary course of doing their

16  day-to-day business of filling orders placed

17  by other -- by their customers?

18          MR. BENNETT:  Objection.  Form.

19          THE WITNESS:  They may see

20      prescription-level data when they're

21      establishing new customers or when

22      they're reviewing what's going on at a

23      pharmacy, but not when filling every

24      order.

25

Highly Confidential - Subject to Further Confidentiality Review

1     QUESTIONS BY MS. MCCLURE:

2         Q.     In your experience,

3   distributors conduct due diligence on new

4   customers that they're considering bringing

5   on board, correct?

6         A.     Yes.

7         Q.     And is it in that context that

8   they may see some prescription-level data?

9         A.     That's one of the reasons they

10   would.

11         Q.     And how would the distributor

12   obtain that data in that new customer

13   situation?

14         A.     By visiting the pharmacy and

15   asking to see information about how many

16   prescriptions, what drugs, frequency, that

17   kind of thing.

18         Q.     So they would request it?

19         A.     Yes.

20         Q.     And then you also mentioned

21   that in a, what I will call, ongoing due

22   diligence situation when a customer is

23   already a customer and you're evaluating

24   whether there's some concern or problem with

25   that customer, a distributor may obtain

1    prescription-level data?

2         A.    Correct.

3         Q.    During your time at DEA, you

4    became familiar with the regulation regarding

5    the identification and reporting of

6    suspicious orders?

7         A.    Yes.

8         Q.    To your knowledge, has that

9    regulation changed since it was issued or

10   promulgated?

11        A.    Not that I'm aware of.

12        Q.    Is that something that you

13   believe you would have been aware of in your

14   course of employment at DEA and your

15   subsequent employment?

16        A.    Probably.

17              (Mapes Exhibit 3 marked for

18        identification.)

19   QUESTIONS BY MS. MCCLURE:

20        Q.    Okay.  I'll hand you what's

21   been marked as 3.

22              If you could take a look at

23   that and let me know when you've had a chance

24   to look through it.

25        A.    I've reviewed it.

1      Q.      So when we're talking about the

2   regulation regarding to the identification

3   and reporting of suspicious orders, which

4   section of this Exhibit 3 are we talking

5   about?

6      A.      Suspicious orders ends in

7   1301.74(b).

8      Q.      And 1301.74(b) defines a

9   suspicious order to include orders of unusual

10   size, orders deviating substantially from a

11   normal pattern and orders of unusual

12   frequency, right?

13      A.      Yes.

14      Q.      Does the regulation explain to

15   a registrant how to identify an order of

16   unusual size?

17           MR. BENNETT:  Objection.  Form.

18           THE WITNESS:  It does not.

19   QUESTIONS BY MS. MCCLURE:

20      Q.      Does the regulation explain to

21   a registrant how to identify an order of

22   unusual frequency?

23           MR. BENNETT:  Objection.  Form.

24           THE WITNESS:  It does not.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.     Does the regulation explain to

 3   a registrant how to identify an order that

 4   deviates substantially from a normal pattern?

 5              MR. BENNETT:  Objection.  Form.

 6              THE WITNESS:  It does not.

 7   QUESTIONS BY MS. MCCLURE:

 8        Q.     Registrants are responsible for

 9   designing their own suspicious order

10   monitoring systems; is that correct?

11        A.     It is.

12        Q.     Is a registrant to take into

13   account considerations that are unique to

14   them in designing such a system, for example,

15   their customer base?

16        A.     Yes.

17        Q.     So would one registrant

18   potentially have a different-looking or

19   different nature of a customer base than

20   another registrant?

21        A.     Yes.

22        Q.     Is it possible that those

23   registrants would then have designed

24   different suspicious order monitoring

25   systems?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     It's possible.

2      Q.     Is there a holy grail or

3    articulated DEA model standard for what

4    constitutes a suspicious order?

5            MR. BENNETT:  Objection.  Form.

6            THE WITNESS:  Not that I'm

7        aware of.

8    QUESTIONS BY MS. MCCLURE:

9      Q.     And you've spent your 30-year

10   career in DEA in diversion-related roles?

11     A.     Yes.

12     Q.     Does DEA define for registrants

13   what essential features are that every

14   suspicious order monitoring system must have

15   to be compliant?

16           MR. BENNETT:  You can answer.

17           THE WITNESS:  They may talk

18       with industry or with industry

19       associations about those kind of

20       things or answer specific questions

21       from a registrant.

22   QUESTIONS BY MS. MCCLURE:

23     Q.     So in your experience, DEA may

24   answer a specific question from a registrant

25   about a possible feature that that registrant

Highly Confidential - Subject to Further Confidentiality Review

1    is considering for its suspicious order

2    monitoring system and provide information to

3    that registrant as to whether that feature

4    would be compliant --

5                    MR. BENNETT:  Objection.

6    QUESTIONS BY MS. MCCLURE:

7         Q.     -- with the Controlled

8    Substances Act?

9                    MR. BENNETT:  Objection.

10         Incomplete hypothetical.

11                    You can answer.

12                    THE WITNESS:  Yes.

13    QUESTIONS BY MS. MCCLURE:

14         Q.     Tell me more about what you

15    know about that.

16         A.     If a registrant asks a specific

17    question, if having a particular part of a

18    system is appropriate, they could give their

19    opinion about whether that's appropriate as

20    part of a system.

21         Q.     But does DEA mandate that

22    certain features must be included by every

23    registrant within suspicious order monitoring

24    systems?

25         A.     No.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.      So, for example, in your

 2    experience, would DEA instruct registrants

 3    that to be compliant, a suspicious order

 4    monitoring system must compare orders to

 5    orders received from other similarly sized

 6    pharmacies within a geographic area?

 7              MR. BENNETT:  Objection.

 8         Vague.  Incomplete hypothetical.

 9         Scope.

10              You can answer within the

11         limits of scope letter, if you can.

12              THE WITNESS:  DEA looks at them

13         one registrant at a time, so they're

14         not telling them to compare them with

15         other registrants.  Looking at each

16         registrant uniquely.

17    QUESTIONS BY MS. MCCLURE:

18      Q.      And is that because DEA affords

19    registrants the discretion to design a

20    compliant suspicious order monitoring?

21              MR. BENNETT:  Objection.

22         Scope.

23              You are not here to speak on

24         behalf of DEA.  You may speak in your

25         personal capacity.

1          THE WITNESS:  I'm now confused

2      about what the question was.

3  QUESTIONS BY MS. MCCLURE:

4      Q.     No problem.

5          In your experience, DEA affords

6  registrants the discretion to design a

7  suspicious order monitoring system that is

8  effective?

9          MR. BENNETT:  Same objection.

10          You may answer --

11          THE WITNESS:  Yes.

12          MR. BENNETT:  -- in your

13      personal capacity.

14  QUESTIONS BY MS. MCCLURE:

15      Q.     And so if I have this correct,

16  DEA will advise as to a specific feature when

17  requested, when information is requested by a

18  registrant, but will not put together a list

19  of the mandated features that every

20  suspicious order monitoring system must

21  include in order to be compliant.

22          Do I have that correct?

23      A.     I have talked with registrants

24  in the past about specific aspects of their

25  system in giving them advice.  I'm not sure

```
 1   if DEA is currently doing that or not.

 2         Q.    When you say you have "talked

 3   with registrants in the past about specific

 4   aspects of their system in giving them

 5   advice," is that in your capacity at DEA?

 6         A.    Yes.

 7         Q.    But in your experience, DEA

 8   does not publish, put forth, any sort of list

 9   of mandated requirements that must be in a

10   suspicious order monitoring system in order

11   for that system to be effective or compliant?

12         A.    I haven't seen one.

13         Q.    If you haven't seen a written

14   list, are you aware of some informal list --

15         A.    No.

16         Q.    -- of features --

17         A.    No, I'm not.

18         Q.    -- that DEA mandates be

19   included in every suspicious order monitoring

20   system?

21              MR. BENNETT:  Let her finish

22         the question first.

23              THE WITNESS:  Okay.

24              No.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:
 2         Q.    If a former DEA diversion
 3    investigator identified a number of features
 4    that must be included in a suspicious order
 5    monitoring system in order for it to be
 6    compliant, would that match with your
 7    experience at DEA?
 8              MR. BENNETT:  Objection.
 9         Scope.  Incomplete hypothetical and
10         vague.
11              You can answer in your personal
12         capacity but not on behalf of DEA.
13              THE WITNESS:  I'm not aware of
14         any that we've had, so it wouldn't be
15         consistent with what I have seen.
16    QUESTIONS BY MS. MCCLURE:
17         Q.    It would not be consistent with
18    what you've seen or experienced in your time
19    at DEA?
20         A.    That's correct.
21         Q.    Do you agree that there -- that
22    the review of an order to determine whether
23    it is suspicious or not is a subjective one?
24              MR. BENNETT:  Objection.
25         Vague.
```

```
 1                    You can answer.

 2                    THE WITNESS:  Yes.

 3       QUESTIONS BY MS. MCCLURE:

 4            Q.      Meaning that the individual or

 5       entity reviewing that order takes into

 6       account the totality of the circumstances and

 7       makes a determination as to whether that

 8       order is or is not a suspicious order; is

 9       that right?

10            A.      Yes.

11            Q.      Have you heard the phrase

12       "totality of circumstances" previously in the

13       course of your tenure at DEA?

14            A.      I have.

15            Q.      Do you recall in what context

16       you've heard that?

17            A.      Discussing suspicious orders.

18            Q.      And is that a phrase that's

19       used commonly within DEA or the industry

20       regarding reporting suspicious orders?

21            A.      I don't know that it's common.

22            Q.      Regardless -- okay.

23                    You've heard the term "totality

24       of the circumstances" before?

25            A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And as we discussed

2  previously, each customer -- or I'm sorry,

3  each registrant has a different customer

4  base, right?

5    A.    Correct.

6    Q.    No customer -- or no

7  registrant's customer base will exactly match

8  that of another registrant?

9    A.    Correct.

10    Q.    And so the information

11  available to one registrant regarding whether

12  an order -- let me strike that and start

13  over.

14          The information available to

15  one registrant about a particular order and

16  the customer placing it might be different

17  than the information available to another

18  registrant?

19    A.    And you're using -- I don't

20  quite understand the question yet.

21    Q.    Okay.  We've talked about how

22  registrants have different customer bases,

23  right?

24    A.    Yes.

25    Q.    And so when a registrant or a

Highly Confidential - Subject to Further Confidentiality Review

```
1   wholesaler in this case is evaluating an

2   order and trying to determine whether it's

3   suspicious or not --

4              Are you with me?

5   A.      Uh-huh.  Yes.

6   Q.      -- the information that

7   Registrant A may have about that order or

8   that customer may be different than the

9   information that is available to

10  Registrant B?

11             MR. BENNETT:  Objection.

12  Vague.  Incomplete hypothetical.

13             THE WITNESS:  Yes, they may be

14  different.

15  QUESTIONS BY MS. MCCLURE:

16  Q.      Each registrant conducts its

17  own due diligence?

18  A.      They should.

19  Q.      To your knowledge, they should,

20  right?

21  A.      Yes.

22  Q.      So do registrants, in your

23  experience, share due diligence files?

24  A.      No.

25  Q.      Does the regulation -- I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looking back at Mapes Exhibit 3 -- define the

 2    form or format that a suspicious order report

 3    must take?

 4         A.     It does not.

 5         Q.     Does it say what information is

 6    supposed to be provided to DEA?

 7         A.     No, it doesn't.

 8         Q.     Does the regulation in Mapes

 9    Exhibit 3 say anything about whether a

10    registrant can ship a suspicious order?

11              MR. BENNETT:  Objection.  Form.

12              THE WITNESS:  No, it doesn't.

13    QUESTIONS BY MS. MCCLURE:

14         Q.     And this section of the

15    regulation, 1301.74(b), it has not changed

16    since 1971?

17         A.     I'm not aware of any changes.

18         Q.     Are you familiar with excessive

19    purchase reports?

20         A.     Yes.

21         Q.     What are they?

22         A.     Reports that are sent by

23    wholesalers of purchases of controlled

24    substances that they, after the fact, think

25    may be excessive.
```

1    Q.    Was the submission of excessive

2  purchase reports, in your experience,

3  standard practice in the industry?

4    A.    It was.

5    Q.    Was there a particular time

6  that you believe, in your experience, it was

7  standard practice in the industry to submit

8  those?

9    A.    From the time I started with

10  DEA in 1977 until we had the meetings with

11  the individual wholesalers, that was the --

12  the standard practice, to submit those.

13    Q.    And in your experience, DEA

14  reviewed those reports as compliant with the

15  Controlled Substances Act?

16        MR. BENNETT:  Objection.

17    Scope.

18        This is not a 30(b)(6) witness

19    who can speak on behalf of DEA.

20        You may answer in your personal

21    capacity within the limits of the

22    scope letter.

23        THE WITNESS:  Yeah, I viewed

24    those as compliant with the regulation

25    for suspicious orders.

1    QUESTIONS BY MS. MCCLURE:

2         Q.      And in your experience of

3    conducting audits of distribution centers,

4    that was one of your roles as a diversion

5    investigator, right?

6         A.      Yes.

7         Q.      Conducting audits?

8         A.      Yes.

9         Q.      And as a group supervisor, you

10   would oversee diversion investigators who

11   were conducting audits?

12        A.      That's correct.

13        Q.      And that would include a review

14   of their suspicious order monitoring systems?

15        A.      That's correct.

16        Q.      Including the formats that they

17   were using to submit and how they were

18   identifying and reporting suspicious orders

19   to DEA?

20        A.      Correct.

21        Q.      And in the course of your role

22   as a diversion investigator and a group

23   supervisor, you accepted these excessive

24   purchase reports as compliant with the

25   Controlled Substances Act?

1          MR. BENNETT:  You can answer

2     that.

3          THE WITNESS:  Yes.

4  QUESTIONS BY MS. MCCLURE:

5     Q.    You don't recall saying to

6  anyone, "Hey, you can't submit these kinds of

7  documents" in the course of your roles as a

8  diversion investigator or a group supervisor?

9          MR. BENNETT:  Objection.

10     Scope.

11          You are not authorized to

12     disclose information regarding any

13     specific DEA investigations or

14     activities.

15          You may answer this question

16     yes or no on whether you remember

17     saying that.

18          THE WITNESS:  Can you repeat

19     the question?

20  QUESTIONS BY MS. MCCLURE:

21     Q.    I can.

22          You don't recall saying to

23  anyone, a registrant, for example, "You can't

24  submit these kinds of excessive purchase

25  reports and still be compliant with the

```
 1    Controlled Substances Act" in your role as a

 2    diversion investigator or a group supervisor?

 3                    MR. BENNETT:  Same objection.

 4                    You can answer.

 5                    THE WITNESS:  No, I don't

 6         remember saying that.

 7    QUESTIONS BY MS. MCCLURE:

 8         Q.     And we've been talking about

 9    excessive purchase reports, but sometimes

10    people -- registrants would call them by

11    different names.

12                    Do you recall that, or in your

13    experience were they all called excessive

14    purchase reports?

15         A.     Generally referred to as

16    excessive purchase reports.  Could be called

17    suspicious order reports.

18         Q.     And were they generally in a

19    similar format across the industry?

20                    MR. BENNETT:  Objection.  Form.

21         Vague.

22                    You can answer it.

23    QUESTIONS BY MS. MCCLURE:

24         Q.     Do you understand my question?

25         A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    They were in different formats
 2   depending on the company that was sending
 3   them.  Some would send computer printouts.
 4   Some would send copies of invoices.  So there
 5   are different ways that they were sent.
 6        Q.    They generally provided the
 7   same kind of information?
 8        A.    Yes.
 9        Q.    About purchases and sales that
10   had already happened?
11        A.    Correct.
12        Q.    And DEA accepted those?
13              MR. BENNETT:  Objection.
14   QUESTIONS BY MS. MCCLURE:
15        Q.    In your personal experience?
16              MR. BENNETT:  Scope.
17              You're not here as a 30(b)(6)
18        witness to answer on behalf of DEA.
19              You may answer in your personal
20        capacity of what you did.
21              THE WITNESS:  Yes, we accepted
22        those.
23              MR. LANIER:  Did he say -- I'm
24        trying to be careful -- "we" after you
25        told him not to speak for the DEA but
```

```
 1        himself?

 2                  MS. MCCLURE:  Mark --

 3                  MR. BENNETT:  I believe that

 4        was his testimony, yes.

 5                  MS. MCCLURE:  That is his

 6        testimony.

 7                  MR. LANIER:  Okay.

 8    QUESTIONS BY MS. MCCLURE:

 9        Q.    So in your personal experience,

10    were you the only one who accepted these?

11                  MR. BENNETT:  You can answer.

12                  THE WITNESS:  No other groups

13        accepted the same type of reports.

14    QUESTIONS BY MS. MCCLURE:

15        Q.    So saying "we" is referring to

16    you and those other groups, right?

17        A.    The others that I was

18    supervising at the time.

19        Q.    So in the course of your role

20    as a diversion investigator, as well as the

21    time when you acted as a group supervisor and

22    had diversion investigators reporting to you,

23    yes?

24        A.    Yes.

25        Q.    Are you aware of DEA
```

1    headquarters approving particular suspicious

2    order monitoring systems submitted by a

3    registrant at any time in your experience at

4    DEA?

5              MR. BENNETT:  Objection.  Form.

6              You can answer.

7              THE WITNESS:  I do recall one

8         time that I was in headquarters and we

9         received a letter from a wholesaler

10        about their suspicious order

11        monitoring program, and we told them

12        that it did comply with the

13        requirements in the regulation.

14   QUESTIONS BY MS. MCCLURE:

15        Q.    What role were you in when you

16   received that letter?

17        A.    The deputy chief of liaison and

18   policy.

19        Q.    And when you say "we" received

20   that letter, were you personally involved

21   with the approval of that suspicious order

22   monitoring system?

23              MR. BENNETT:  You can answer.

24              THE WITNESS:  Yes.

25

```
1   QUESTIONS BY MS. MCCLURE:

2        Q.     Who else is encompassed within

3   that "we" that you've provided?

4        A.     A staff coordinator that

5   reviewed the incoming correspondence from the

6   company, drafted the response to the company

7   and then sent it to me for approval, or in

8   this case signature, to send it to the

9   company.

10       Q.     Did you sign that?

11       A.     Yes.

12       Q.     And what company was that?

13       A.     AmerisourceBergen.

14       Q.     Can you think of any other

15  instances in which you have a personal

16  recollection of DEA's approval of a

17  suspicious order monitoring system?

18       A.     No, I cannot.

19              (Mapes Exhibit 4 marked for

20       identification.)

21  QUESTIONS BY MS. MCCLURE:

22       Q.     I'm going to mark an exhibit as

23  4.  This is a series of letters exchanged,

24  and they're all going to be amalgamated as

25  one exhibit for today.
```

Highly Confidential - Subject to Further Confidentiality Review

1              If you could take a look

2    through those letters and let me know when

3    you've had a chance to review them.

4         A.    Okay.  I've generally reviewed

5    them.

6         Q.    Now, when I was previously

7    asking you about approvals, you recalled a

8    situation in which you had signed a letter to

9    AmerisourceBergen.

10             Is that a different set of

11   letters or a letter that is not this set

12   that's marked as Exhibit 4?

13        A.    Yes, it's not included in here.

14        Q.    Okay.  So let me back up.

15             This set of letters is dated in

16   the '96 to '98 time period, right?  Over a

17   time span through '96, '97, and then ending

18   in June 23rd -- I'm sorry, July 23, '98,

19   right?

20        A.    Correct.

21        Q.    And these are exchanged between

22   the Department of Justice, DEA Enforcement

23   Administration -- I'm sorry, the Drug

24   Enforcement Administration and Chris

25   Zimmerman at Bergen, right?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Correct.

2        Q.      So not AmerisourceBergen

3    because this predated the merger with

4    Amerisource.

5                Are you aware of that?

6                MR. BENNETT:  Objection.  Form.

7                THE WITNESS:  Could you restate

8        the question?

9    QUESTIONS BY MS. MCCLURE:

10       Q.      Yes, I can.

11               As of 1998, Bergen was a

12   separate company from Amerisource.

13               Do you know that, or am I

14   telling you --

15       A.      Yes.

16       Q.      You are aware of that?

17       A.      Yes, I am.

18       Q.      Okay.  You previously told me

19   you had signed a letter approving a system

20   that AmerisourceBergen had.

21               Was that a later letter that

22   was subsequent to the 2001 merger between

23   Amerisource and Bergen, or was that a letter

24   that you recall being part of this exchange

25   with Bergen?

1          A.     It was subsequent to this.  It

2    was after the merger of Amerisource and

3    Bergen.

4          Q.     Do you recall the approximate

5    time period of the approval letter that you

6    recall signing regarding AmerisourceBergen's

7    suspicious order monitoring program that had

8    to have been after 2001, which was the merger

9    of those two companies?

10               MR. BENNETT:  Objection.  Form.

11               THE WITNESS:  No, I don't

12         recall the time frame.

13    QUESTIONS BY MS. MCCLURE:

14         Q.     Can we agree it would have --

15    you recall it being AmerisourceBergen, so

16    after the merger in 2001, if I'm telling you

17    the correct date of the merger, right?

18         A.     Yes.

19         Q.     Would it have been prior to

20    2007, which is when there was a settlement

21    and release agreement executed between DEA

22    and AmerisourceBergen?

23         A.     Yes.

24         Q.     So sometime in between 2001 and

25    2007, you recall a different exchange of

1    letters that is not reflected here in Mapes

2    Exhibit 4 in which you signed a document, a

3    letter, approving AmerisourceBergen's

4    suspicious order monitoring system?

5         A.     That's correct.

6         Q.     In your experience at DEA,

7    would letters approving suspicious order

8    monitoring systems be things that were

9    retained, kept by DEA?

10             MR. BENNETT:  Objection.

11        Scope.  Calls for speculation.

12             You can answer.

13             THE WITNESS:  Generally all

14        correspondence was retained.

15   QUESTIONS BY MS. MCCLURE:

16        Q.     Okay.  So is it reasonable to

17   think that a letter approving a suspicious

18   order monitoring system, of which you can

19   only recall one instance of it happening,

20   would be something that would be retained by

21   DEA?

22             MR. BENNETT:  Objection.

23        Scope.  Calls for speculation.

24             You can answer.

25             THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.    So you don't recall when in

 3   between '01 and '07 this would have been?

 4        A.    It would have been while I was

 5   deputy chief of the liaison and policy

 6   section, so it would have been during that

 7   time frame.

 8        Q.    And would you be so kind as to

 9   remind me to the best of your recollection

10   when that time frame was?

11             MR. BENNETT:  Objection.  Asked

12        and answered.

13             MS. MCCLURE:  Yeah, it is asked

14        and answered.

15             MR. BENNETT:  You can answer.

16             MS. MCCLURE:  I just don't

17        remember.

18             MR. BENNETT:  You can answer

19        again.

20   QUESTIONS BY MS. MCCLURE:

21        Q.    Was that approximate --

22             MR. BENNETT:  Wait a second.

23             MS. MCCLURE:  Okay.

24             MR. BENNETT:  You have a

25        question pending.
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. MCCLURE:  Yeah, I have a

2      question pending, you're right.

3          THE WITNESS:  I can't recall

4      the exact dates of that.

5   QUESTIONS BY MS. MCCLURE:

6      Q.    But that was immediately prior

7   to you becoming chief of the E-Commerce

8   section in 2004?

9      A.    No, it was immediately prior to

10  me becoming chief of the administrative

11  section.

12     Q.    Planning and resources?

13     A.    The planning and resources

14  section.

15     Q.    And you did that from

16  approximately 2003 to 2004 as to your prior

17  testimony?

18     A.    Correct.

19     Q.    So can we limit the time period

20  for when this letter would have been as

21  sometime between 2001 and then 2003 when you

22  took over the chief of the planning and

23  resources section?

24     A.    Yes.

25     Q.    Division?  Section?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Section.

2        Q.      Section.

3                Okay.  So between '01 and '03.

4                Understanding you've been gone

5    from DEA since 2007, do you have a copy of

6    this letter in your personal possession?

7        A.      No.

8        Q.      Do you recall to whom you sent

9    this letter approving of AmerisourceBergen's

10   suspicious order monitoring system sometime

11   between 2001 and 2003?

12       A.      To Chris Zimmerman at

13   AmerisourceBergen.

14       Q.      How did that letter come about?

15   What led to you -- strike that.

16               What led to you issuing that

17   letter?

18               MR. BENNETT:  Objection.

19       Scope.

20               You are not authorized to

21       disclose the internal deliberative

22       process of the Department of Justice

23       or any attorney-client communication

24       or privileged conversations.

25               To the extent you can answer
```

Highly Confidential - Subject to Further Confidentiality Review

1        the question without disclosing that

2        information, you may answer.

3               THE WITNESS:  It was in

4        response to a letter from

5        AmerisourceBergen.

6   QUESTIONS BY MS. MCCLURE:

7        Q.     Was that letter from

8   AmerisourceBergen from Chris Zimmerman?

9        A.     It was.

10       Q.     Did you know Chris Zimmerman at

11  the time -- in this 2001 to 2003 time period?

12       A.     No.

13       Q.     And you said you recall a staff

14  coordinator passing that letter on to you for

15  evaluation?

16       A.     To review, yes.

17       Q.     What do you recall, if

18  anything, doing to evaluate the request?

19       A.     I don't --

20               MR. BENNETT:  Objection.  Same

21        instruction regarding the internal

22        deliberative process.

23               You can answer.

24               THE WITNESS:  I don't recall.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.     But you do recall that the end

 3   conclusion that you reached was to issue a

 4   letter back to Chris Zimmerman at

 5   AmerisourceBergen approving of the suspicious

 6   order monitoring system?

 7        A.     That's correct.

 8        Q.     The letters I showed you, which

 9   are Mapes Exhibit 4, do you recall whether

10   you reviewed those letters in evaluating

11   Chris Zimmerman's 2001 to 2003, somewhere in

12   that time period, letter he sent to you on

13   behalf of AmerisourceBergen?

14             MR. BENNETT:  Objection.

15        Scope.

16             You can answer that question

17        yes or no only, if you remember.

18             THE WITNESS:  I don't recall.

19   QUESTIONS BY MS. MCCLURE:

20        Q.     Do you recall if you were aware

21   of these letters, meaning Mapes Exhibit 4,

22   when you evaluated the subsequent 2001 to

23   2003 request from Chris Zimmerman for

24   approval of the AmerisourceBergen Drug

25   Corporation suspicious order monitoring
```

Highly Confidential - Subject to Further Confidentiality Review

1    system?

2         A.    I don't recall seeing these

3    when I was looking at that other letter.

4         Q.    Meaning that you don't know if

5    you did or not or -- let me ask you.

6              You don't know if you reviewed

7    these letters or not when you evaluated that

8    letter?

9         A.    I don't believe that I did, but

10   I don't know.

11        Q.    You don't know for certain?

12        A.    That's correct.

13        Q.    Is this the first time that

14   you've ever seen the letters that are

15   reflected as Mapes Exhibit 4, when I've shown

16   them to you, or have you seen them prior to

17   today?

18        A.    I don't recall seeing any of

19   these letters before.

20        Q.    It's possible you may have in

21   the course of your time at DEA or in

22   consulting with AmerisourceBergen, but

23   sitting here today, you don't recall; is that

24   correct?

25              MR. BENNETT:  Objection.

1          You can answer.

2          Form.

3          You can answer.

4          THE WITNESS:  Yeah, I don't

5     recall seeing them before.

6  QUESTIONS BY MS. MCCLURE:

7          Q.     Did you take over the chief of

8  liaison and policy section role from Patricia

9  Good?

10         A.     No.

11         Q.     Who was previously in that role

12 when you took it over?

13         A.     I was the deputy chief of

14 liaison and policy working with Patricia.

15         Q.     I apologize.

16         So in this 2001 to 2003 time

17 frame when you issued this letter approving

18 of AmerisourceBergen's suspicious order

19 monitoring system, at that time you were

20 reporting to Patricia Good?

21         A.     Yes.

22         Q.     Okay.  Was Thomas Gitchel the

23 immediate prior chief of liaison and policy

24 prior to Patricia Good, to your knowledge?

25         A.     Yes, he was.

 1          MS. MCCLURE:  Go off the
 2    record.
 3          VIDEOGRAPHER:  Going off the
 4    record.  The time is 11:52.
 5     (Off the record at 11:52 a.m.)
 6          MR. LANIER:  And the reason
 7    I've asked to go back on the record is
 8    because you are asking for production
 9    of this letter that you clearly had
10    some indication, as you asked your
11    questions, might exist.  You have
12    asked for the letter, and it has not
13    been produced by them.
14          But by my recollection, and I'm
15    having our people search diligently,
16    it's not been presented by y'all,
17    either.
18          MS. MCCLURE:  Well, agreed.
19          SPECIAL MASTER COHEN:  Why
20    don't we --
21          MR. LANIER:  If you've got that
22    letter --
23          MS. MCCLURE:  I thought he was
24    finished.
25          MR. LANIER:  If you've got that

Highly Confidential - Subject to Further Confidentiality Review

1      letter, you have not produced it prior

2      to this deposition.  That's

3      outrageous.

4           MS. MCCLURE:  Mr. Lanier, I,

5      sitting here today, am not aware of

6      that letter.

7           To the extent that you believe

8      that my questions, quote, clearly have

9      some indication that I'm aware of the

10     letter existing, that is false.

11          MR. LANIER:  Okay.  As long as

12     you'll state on the record you had no

13     clue that that letter exists --

14          MS. MCCLURE:  Didn't I just do

15     that?

16          MR. LANIER:  That's fine.  I'll

17     accept that from you.

18          And I'll also accept that you

19     think your client's done a diligent

20     search and your client doesn't have

21     the letter or they sure would have

22     produced it because it's absolutely

23     subject to a lot of requests.

24          MS. MCCLURE:  Do you think that

25     that letter would have been in the

1       best interests of my client to produce

2       had we located it?

3              SPECIAL MASTER COHEN:  Don't

4       need to argue amongst each other.

5              MS. MCCLURE:  Regardless,

6       Mr. Bennett, as we discussed off the

7       record and we will now memorialize on

8       the record, the defendants -- I do not

9       have the Touhy request in front of me.

10      Nevertheless, I believe it's fairly

11      obvious and not disputable that such

12      an approval letter of

13      AmerisourceBergen's 2000 -- some --

14      such an approval letter from DEA to

15      AmerisourceBergen sometime between the

16      2001-2003 time period, executed and

17      signed by Mr. Mapes, as he has

18      testified here today, would be

19      included within the scope of the

20      requests that the defendants have

21      made.

22             I would request that DEA search

23      for and produce that letter to the

24      extent it can be located.

25             Mr. Mapes has testified that in

Highly Confidential - Subject to Further Confidentiality Review

1           his experience such a letter would

2           have been retained by DEA, similar to

3           the letter that DEA did produce to

4           AmerisourceBergen dated July 23, 1998,

5           issued to Bergen Brunswig and having a

6           subject at the bottom of it called

7           "Approved Suspicious Order Monitoring

8           System, US-DEA-00025671."

9               I would also request that for

10          the convenience of the witness that

11          search be conducted promptly, because

12          I will state now on the record that to

13          the extent the letter is produced

14          subsequent to Mr. Mapes deposition,

15          I'm in the unfortunate position, and

16          apologize to Mr. Mapes for doing this,

17          but we would request that his

18          deposition, to the extent it's not

19          produced today or tomorrow, be

20          reconvened to -- for the purpose of

21          questioning regarding that letter.

22              MR. BENNETT:  Counsel, I can

23          tell you that DEA did do a diligent

24          search for records responsive to the

25          requests that, in particular, the

 1          defense sent.  It has produced a

 2          number of documents.

 3                  I have never seen the document

 4          that was Mr. Mapes referenced, and to

 5          the best of my knowledge, that was

 6          never collected in the DEA's search

 7          process and was not being withheld.

 8                  I would ask DEA to do a search.

 9                  I do want the parties to

10          understand that there are retention

11          schedules and documents are, in the

12          normal course of a government agency,

13          not retained beyond certain periods of

14          time.

15                  I do not know whether a

16          retention schedule would have applied

17          to this document and whether or not

18          it -- how long it would have been

19          retained.  But I will ask DEA to look

20          for the document, and we'll make a

21          determination whether or not it can be

22          released or whether it needs to be

23          redacted and released.

24                  MS. MCCLURE:  Regardless --

25                  MR. BENNETT:  I will make that

1          at our next break.

2                 MS. MCCLURE:  Regardless, what

3          I would ask in terms of whether the

4          document can be produced or would have

5          to be redacted, what I do ask is if

6          their document located and it is being

7          withheld, in other words, not just

8          redacted and produced in redacted

9          form, if the document is being

10         withheld, we would ask that you

11         confirm the existence of the document

12         and explain what the reason is --

13                MR. BENNETT:  Of course.

14                MS. MCCLURE:  -- that you

15         believe it should be withheld, not

16         simply withhold the document.

17                MR. BENNETT:  Of course.

18                Yes, I mean, I think we have to

19         do a privilege log for any documents

20         we withhold, so...

21                But at our next break, I will

22         send an e-mail to DEA to see if they

23         can locate it.

24                MS. MCCLURE:  Thank you.

25         Mr. Mapes, apologies for the --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  Go back on the
 2      video?
 3              MS. MCCLURE:  Yes, let's go
 4      back on video.
 5              VIDEOGRAPHER:  Going back on
 6      video.  Beginning of Media File 3.
 7      The time is 11:59.
 8  QUESTIONS BY MS. MCCLURE:
 9      Q.      Mr. Mapes, thank you, and
10  apologies for the -- as we said, sometimes
11  there will be attorney sidebars and
12  discussions, so thank you for your patience
13  while we work through that.
14      A.      Okay.
15      Q.      Do you remember anything about
16  the program that AmerisourceBergen submitted
17  to you for -- with that request for approval
18  in that 2001 to 2003 time frame?
19      A.      No, I don't remember the
20  details of it.
21      Q.      Sitting here today and having
22  reviewed Mapes Exhibit 4, which discusses --
23  well, let's turn to the last document within
24  that set of documents, which begins -- the
25  little Bates numbers on the bottom say
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    319751.

2         A.     Yes.

3         Q.     That's a letter from Chris

4    Zimmerman at Bergen to Tom Gitchel dated

5    September 30, 1996, correct?

6         A.     Yes, it is.

7         Q.     And we don't need to read

8    through the entire letter, but is it your

9    understanding generally, having reviewed this

10   letter, that at the time Bergen was doing two

11   things to report a suspicious order; one was

12   monthly excessive purchase reports, correct?

13              MR. BENNETT:  Objection.  Form.

14         This witness lacks personal knowledge.

15         He said he'd never seen this letter

16         before.

17   QUESTIONS BY MS. MCCLURE:

18         Q.     Okay.  You've reviewed this

19   letter when I handed it to you a few minutes

20   ago, correct?

21         A.     Correct.

22         Q.     This letter -- I'm trying to

23   avoid having to go through the whole letter

24   and use up a lot of time, everyone's time,

25   here.  But essentially there were two methods
```

Highly Confidential - Subject to Further Confidentiality Review

1   that this letter discusses, whether you've

2   seen it before or not, that Bergen was using

3   in 1998 to report and identify suspicious

4   orders to DEA.

5              MR. BENNETT:  Same -- I'm

6        sorry.

7   QUESTIONS BY MS. MCCLURE:

8        Q.    One of those was the provision

9   of monthly excessive purchase reports,

10  correct?

11             MR. BENNETT:  Objection.  Form.

12       Lack of personal knowledge.

13  QUESTIONS BY MS. MCCLURE:

14       Q.    And that's referenced on

15  page 1, paragraph 2?

16             MR. BENNETT:  You can answer

17       the last question.

18             THE WITNESS:  Yes, it does talk

19       about excessive purchase reports being

20       sent.

21  QUESTIONS BY MS. MCCLURE:

22       Q.    And then in the next paragraph

23  it also talks about phone calls placed by

24  Bergen to DEA?

25             MR. BENNETT:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MS. MCCLURE:

2        Q.     Correct?

3        A.     Yes.  Yes, it does.

4        Q.     And ultimately, the proposal in

5    this letter was to prepare a daily suspicious

6    order report of completed transactions that

7    would go either via fax or some other method

8    to DEA field offices.

9               Is that your understanding

10   having read this letter?

11               MR. BENNETT:  Objection.  Form.

12               THE WITNESS:  I'm not certain

13        that they're completed orders or sales

14        or orders that they've received, from

15        what it says here.

16   QUESTIONS BY MS. MCCLURE:

17       Q.     Okay.  Do you recall whether

18   the letter that you approved sometime between

19   2001 and 2003 reflected daily reports going

20   to DEA field offices from AmerisourceBergen

21   of suspicious orders?

22       A.     I don't recall.

23       Q.     Okay.  So reviewing this letter

24   does not refresh your recollection as to what

25   it was you approved sometime between 2001 and
```

1    2003?

2         A.    No, it does not.

3              (Mapes Exhibit 5 marked for

4         identification.)

5    QUESTIONS BY MS. MCCLURE:

6         Q.    Okay.  This is Mapes 5.  It's a

single-page document.

8              Now, Mr. Mapes, on the previous

9    document I handed -- oh, let me know when

10   you've had a chance to review it.  Apologies.

11        A.    Okay.

12        Q.    So having done a comparison,

13   this document is, I believe, the DEA's

14   version of the same letter that's attached as

15   Mapes Exhibit 4.  It's produced by the DEA,

16   which we can tell because at the bottom it

17   says US-DEA-00025671.

18              Do you see that at the bottom?

19        A.    Yes, I do.

20        Q.    And the difference is that at

21   the bottom there's a blacked-out box which is

22   a redaction implemented by DEA, and then the

23   subject added there is "approved suspicious

24   order monitoring system."

25              Are you familiar with these

1    subjects or notations at the bottom of DEA

2    copies of letters and communications in your

3    experience at DEA?

4              MR. BENNETT:  Objection.

5         Scope.

6              You may answer that question

7         yes or no only.

8              THE WITNESS:  No, I'm not.

9              MS. MCCLURE:  Okay.  You can

10        set that aside.

11             (Mapes Exhibit 6 marked for

12        identification.)

13   QUESTIONS BY MS. MCCLURE:

14        Q.    I'm going to hand you a

15   document that is marked Mapes Exhibit 6.

16             And I just realized -- I

17   apologize for the record -- I have not been

18   reading Bates numbers in.  US-DEA-00001771.

19             Take a look at that and let me

20   know when you've had a chance to review it.

21        A.    I've reviewed it.

22        Q.    Have you seen this document

23   before?

24        A.    I have.

25        Q.    Did you see this document, to

1    the best of your recollection,

2    contemporaneously with it being issued in or

3    around December of 2007, or have you seen

4    this document more -- only more recently?

5         A.    Only more recently.

6         Q.    By "only more recently," is

7    that referencing the two meetings that you

8    had with DEA counsel to both give information

9    to them and prepare for this deposition, or

10   did you see this letter in connection with

11   your summer and fall 2018 meeting with

12   plaintiffs' counsel?

13              MR. BENNETT:  Objection.  Form.

14              THE WITNESS:  I don't recall

15         seeing it with meetings with plaintiff

16         counsel.

17              I didn't see it at DEA because

18         I was retired before the letter was

19         sent out.

20              I did see it yesterday in

21         preparation for the deposition.

22   QUESTIONS BY MS. MCCLURE:

23        Q.    To the best of your

24   recollection then, the first time you recall

25   seeing this letter was yesterday?

1     A.     No, I've seen it other times

2     between the time I retired and yesterday.

3     Q.     Do you recall how you saw it

4     those other times?

5     A.     It was from a registrant, I

6     can't remember which one, but a registrant

7     that sent it to me that had received it from

8     DEA.

9     Q.     Do you recall whether it would

10    have been shortly after this letter was sent

11    in the early course of your consulting work,

12    or was it later than that, if you can --

13    A.     It was later than that.

14    Q.     So it's fair to say from your

15    answers that you, it seems, did not review

16    this letter prior to it being issued, say, in

17    the last months of your tenure at DEA?

18            MR. BENNETT:  Objection.

19        Scope.

20            You're not authorized to

21        disclose the internal deliberations of

22        DEA.

23            You may answer that question

24        yes or no only, whether you saw it

25        prior to leaving DEA, a draft.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  No, I did not.

 2   QUESTIONS BY MS. MCCLURE:

 3        Q.      If we look at paragraph 3 of

 4   this letter, the second sentence says,

 5   "Filing a monthly report of completed

 6   transactions, e.g., excessive purchase report

 7   or high unit purchases, end parens, does not

 8   meet the regulatory requirement to report

 9   suspicious orders."

10                    Based on your experience at

11   DEA, was this a change in how DEA handled

12   suspicious order reporting?

13                    MR. BENNETT:  Objection.

14        Scope.

15                    You're not here as a 30(b)(6)

16        witness to talk on behalf of DEA.

17                    You may disclose your personal

18        knowledge regarding this topic from

19        your time at DEA, what you personally

20        did.

21                    THE WITNESS:  I believe from my

22        experience it was a change.

23   QUESTIONS BY MS. MCCLURE:

24        Q.      Because previously in your

25   experience at DEA excessive purchase reports
```

1    had been accepted by DEA for suspicious order

2    reporting as you previously testified,

3    correct?

4            MR. BENNETT:  Objection.

5        Scope.  This is not a 30(b)(6) witness

6        that can answer on behalf of DEA.

7            You may answer what you

8        personally did while at DEA in

9        response to that question.

10            THE WITNESS:  It was a change

11        that was started, from my experience,

12        when we had the meetings with

13        individual wholesalers, individual

14        distributors, starting in 2005.

15    QUESTIONS BY MS. MCCLURE:

16        Q.    So in 2005, which you've just

17    referenced, you began talking with

18    distributors on something called the

19    Distributor Initiative?

20        A.    That's correct.

21        Q.    Whose idea was the Distributor

22    Initiative?

23            MR. BENNETT:  Objection.

24        Scope.  Objection.

25            You're not to disclose internal

Highly Confidential - Subject to Further Confidentiality Review

1    deliberative process.

2         If you know of a person who

3    came up with the idea for a

4    Distributor Initiative, you may answer

5    who that person was.

6         THE WITNESS:  I'm not sure I

7    can answer the question.

8         MR. BENNETT:  Can we go off the

9    record for a minute?

10        MS. MCCLURE:  Yeah.

11        VIDEOGRAPHER:  We're going off

12   record.  The time is 12:14.

13    (Off the record at 12:14 p.m.)

14        VIDEOGRAPHER:  We're going back

15   on record.  Beginning of Media File 4.

16   The time is 12:17.

17        MR. BENNETT:  So the witness

18   can answer the question as far as the

19   people who came up with the idea.

20        In addition, we did discuss and

21   would prefer to wait until one o'clock

22   for the lunch break because we started

23   late this morning, and it would make

24   the afternoon very long if we go two

25   hours and then we have the rest of the

```
 1          time in the afternoon.

 2               So if the parties would agree,

 3          we'd prefer to wait until -- take the

 4          lunch break at one o'clock.

 5               MS. MCCLURE:  Provided that my

 6          personal comfort situation will last

 7          us until one o'clock, we can do that.

 8               MR. BENNETT:  Well, we can take

 9          a quick break, but as far as the lunch

10          break goes, we'd rather wait.

11               If you want to take a comfort

12          break --

13               MS. MCCLURE:  Okay.  I would

14          like to take a five-minute comfort

15          break.

16               MR. BENNETT:  So let's have his

17          answer.  We'll take --

18               MS. MCCLURE:  So let's have you

19          answer.  We'll do five really short,

20          short, short five -- three to five

21          minutes and then go back on.

22               MR. BENNETT:  And then we can

23          do a lunch break 1, 1:30, whatever.

24               MS. MCCLURE:  Yeah.  Exactly.

25               MR. BENNETT:  All right.  You
```

1          can answer the last question, based on

2          our conversation, as far as the name

3          of the individuals.

4                    THE WITNESS:  It was Kyle

5          Wright and myself that initiated that.

6                    MS. MCCLURE:  Okay.  Quick

7          five-minute-or-less break.

8                    VIDEOGRAPHER:  Going off the

9          record.  The time is 12:18.

10          (Off the record at 12:18 p.m.)

11                   VIDEOGRAPHER:  Going back on

12         the record.  Beginning of Media

13         File 5.  The time is 12:27.

14   QUESTIONS BY MS. MCCLURE:

15         Q.     Okay.  So Kyle Wright and

16   yourself initiated the Distributor

17   Initiative?

18         A.     That's correct.

19         Q.     Is it sometimes called the

20   distributor briefings?

21         A.     Yes.

22         Q.     Do you -- okay.

23                So those are interchangeable?

24         A.     They are.

25         Q.     And what was the reason that

Highly Confidential - Subject to Further Confidentiality Review

 1    you and Mr. Wright initiated the distributor

 2    briefings?

 3              MR. BENNETT:  Objection.

 4         Scope.  Internal deliberative process.

 5              You may answer why the

 6         initiative was started but may not

 7         give specifics of the deliberations.

 8              THE WITNESS:  It was started in

 9         response to the Internet pharmacy

10         issue.

11    QUESTIONS BY MS. MCCLURE:

12         Q.    What was the Internet pharmacy

13    issue?

14         A.    That was when websites were

15    starting to offer their service to patients,

16    doctors and pharmacies to put the three

17    together so that patients could get a

18    prescription filled by a pharmacy after

19    completing a questionnaire on a website and

20    getting that approved by a doctor for a

21    prescription, and a pharmacy getting the

22    prescriptions and filling those and sending

23    them to the patients.

24         Q.    So DEA's concern, am I right,

25    that there was not a doctor-patient

1    relationship in this scenario, the Internet

2    pharmacy situation?

3         A.    That's one of the concerns,

4    yes.

5         Q.    What was the other concern?

6    I'm sorry if I missed it.

7         A.    That the pharmacies were

8    filling prescriptions for patients that they

9    knew nothing about, for doctors that weren't

10   within the geographic area, all for the same

11   drug.

12        Q.    Okay.  And this Internet

13   pharmacy issue, as you called it, was

14   concerning to DEA?

15        A.    It was concerning to me, yes.

16        Q.    In fact, by 2005, were Internet

17   pharmacies overwhelming DEA and exhausting

18   its resources as -- in your experience during

19   that time period?

20             MR. BENNETT:  Objection.

21        Scope.

22             You may answer in your personal

23        experience and not on behalf of DEA.

24             THE WITNESS:  There were a

25        significant number of investigations,

Highly Confidential - Subject to Further Confidentiality Review

1        and the investigations are lengthy.

2    QUESTIONS BY MS. MCCLURE:

3        Q.      So is that, yes, that the

4    resources needing to be devoted to the

5    Internet pharmacy issue were becoming a

6    problem or a concern?

7        A.      A concern.

8        Q.      A concern.

9               So you, together with

10   Mr. Wright, developed presentations for

11   distributors, correct?

12       A.      That's correct.

13       Q.      Was it basically the same

14   presentation given multiple times, or did the

15   presentation itself change?

16       A.      It was the same basic

17   presentation with some unique information

18   about sales of each specific wholesaler that

19   we were talking with.

20       Q.      And before you gave -- or held

21   the first distributor briefing, had you

22   gotten your PowerPoint approved by DEA?

23              MR. BENNETT:  Objection.

24       Scope.

25              You are not authorized to

Highly Confidential - Subject to Further Confidentiality Review

```
1              disclose the internal deliberative

2              process or any advice you received

3              from counsel.

4                   You may answer the last

5              question yes or no only, whether there

6              was formal approval of DEA of the

7              final PowerPoint.

8                   THE WITNESS:  Yes, there was.

9    QUESTIONS BY MS. MCCLURE:

10        Q.    And did you give this

11   presentation to individual distributors or

12   distributors as a whole?

13              How did it work?

14        A.    Individual distributors.

15        Q.    And how would you communicate

16   to the distributors that there was a new

17   initiative starting?

18              How did you communicate?

19        A.    Called them and asked them to

20   come to headquarters to discuss it.

21              (Mapes Exhibit 7 marked for

22        identification.)

23   QUESTIONS BY MS. MCCLURE:

24        Q.    I'm going to mark a document

25   Exhibit 7.
```

1              And for the record,

2   US-DEA-00000147 through 164?

3        A.     Okay.  I've reviewed it.

4        Q.     Okay.  The first page of this

5   document that ends in 147, what is this?

6        A.     This is a memo that I signed to

7   William Walker, who was the deputy assistant

8   administration in diversion, about a meeting

9   that was held on August 10th with Steve Mays

10  of the AmerisourceBergen Drug Company.

11       Q.     And this memo was authored by

12  you, right?

13             That's your signature?

14       A.     Yeah, it was actually authored

15  by Kyle Wright, and I signed it.

16       Q.     Okay.  But you signed it after

17  reviewing it, I assume?

18       A.     Yes.

19       Q.     Right?

20       A.     Yes.

21       Q.     And you wouldn't have signed it

22  unless it was a complete and accurate

23  description of the meeting you had had?

24             MR. BENNETT:  Objection.  Form.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.     Let me strike that.

 3                Is this a complete and accurate

 4    description of the meeting that you had with

 5    Steve Mays?

 6         A.     As I remember it, yes.

 7         Q.     And then the second document

 8    that begins 149 and ends at 162, what is that

 9    document?

10         A.     That is a copy of the

11    PowerPoint presentation that was used in the

12    meeting.

13         Q.     So this is DEA's PowerPoint

14    presentation, correct?

15         A.     Yes.

16         Q.     In other words, it's not a

17    presentation AmerisourceBergen brought; it's

18    a DEA-authored presentation, correct?

19         A.     Yes.

20         Q.     The presentation that you

21    previously testified you had approved as part

22    of the distributor briefings, right?

23         A.     Yes.

24         Q.     And then the last document,

25    which is 163 to 164, what is that?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Those are some questions that

2  we provided to AmerisourceBergen that could

3  be asked to help them in their

4  decision-making process about whether or not

5  to ship controlled substances to a specific

6  pharmacy.

7      Q.      To Internet pharmacies?

8      A.      In this case we were discussing

9  Internet pharmacies, yes.

10      Q.      That was the purpose of the

11  meeting you had with AmerisourceBergen on

12  August 10, 2005, correct?

13      A.      Yes, it was.

14      Q.      To discuss Amerisource -- I

15  mean to discuss Internet pharmacies?

16      A.      Yes.

17      Q.      And that's what it says -- and

18  if we flip back to the first page of Mapes 7,

19  the purpose of the meeting was to address the

20  illegal domestic Internet pharmacy problem

21  and their source of supply.

22              That's at the bot -- first

23  paragraph?

24      A.      Yes.

25      Q.      And the memo is called "The

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Internet Presentation," right?
 2         A.     It is.
 3         Q.     And the title of the document
 4    that begins on 149, which is the PowerPoint
 5    that you gave, is called "Internet Pharmacy
 6    Data," right?
 7         A.     Yes.
 8         Q.     And from the memo that you
 9    wrote -- I'm sorry, that Kyle Wright wrote
10    and you signed, it looks like you led -- you,
11    Michael Mapes, led this distributor briefing
12    with AmerisourceBergen, this particular one,
13    right?
14         A.     That's correct.
15         Q.     This was the first distributor
16    briefing?
17         A.     It was.
18         Q.     Why start with
19    AmerisourceBergen Drug Corporation?
20         A.     I don't recall why.
21         Q.     Okay.  And at the conclusion of
22    the presentation, from your memo, it seems
23    that Mr. Mays had arrived to this meeting
24    with some material for DEA -- I'm sorry,
25    that's not at the end of the memo.  That's at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the bottom of page 1 of the memo.

 2              Do you see that?

 3    A.        Yes, I do.

 4    Q.        Do you recall Mr. Mays arriving

 5    at this meeting with material to discuss with

 6    you?

 7    A.        No.

 8    Q.        Do you recall when you set

 9    up -- well, first of all, let me back up.

10              Did you personally set up this

11    meeting with Steve Mays?

12    A.        I did.

13    Q.        Do you recall your conversation

14    with Steve Mays to set up this meeting?

15    A.        No.

16    Q.        So it appears that Mr. Mays

17    presented a sales profile for a pharmacy.

18              Do you see that?

19    A.        Yes, I do.

20    Q.        Did you know Mr. Mays before

21    this meeting?

22    A.        I had seen him at industry

23    meetings and that kind of thing.  Didn't know

24    him well.

25    Q.        How would you describe
```

Highly Confidential - Subject to Further Confidentiality Review

1 Mr. Mays' demeanor during this meeting?

2      A.     I really don't recall.

3      Q.     Okay. At the end of the memo

4 on the top of the document Bates-labeled 148,

5 the -- I'm sorry, the third full paragraph,

6 it says, "It was agreed that if E-Commerce

7 operations were to identify a highly

8 suspicious pharmacy to which

9 AmerisourceBergen was the wholesaler, that

10 OC -- ODCO" --

11      That stands for E-Commerce

12 operations, right?

13      A.     Yes.

14      Q.     -- "would notify

15 AmerisourceBergen via e-mail of the

16 suspicious activity for AmerisourceBergen to

17 review and take the actions the company deems

18 appropriate."

19      Do you recall that portion of

20 the meeting?

21      A.     No.

22      Q.     Subsequent to this, do you

23 recall reaching out to AmerisourceBergen to

24 notify AmerisourceBergen of any suspicious

25 activity that DEA wanted AmerisourceBergen to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    review and take appropriate action?

 2              MR. BENNETT:  Objection.

 3         Scope.

 4              You're not authorized to

 5         disclose information about specific

 6         investigations.

 7              At this time you can answer

 8         this question yes or no only regarding

 9         whether you remember having such

10         conversations.

11              THE WITNESS:  No, I don't

12         recall any specific conversations.

13    QUESTIONS BY MS. MCCLURE:

14         Q.    Was Mr. Mays cooperative during

15    this meeting, to your recollection?

16              MR. BENNETT:  Objection.  Form.

17         Vague.

18              THE WITNESS:  I just don't

19         recall.

20    QUESTIONS BY MS. MCCLURE:

21         Q.    Okay.  Other than what is

22    outlined in this memo and the presentation,

23    was there anything else discussed with

24    Mr. Mays during this briefing?

25         A.    I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If there was anything else

2  discussed, is it fair to say that your

3  practice would have been to put it in a memo

4  or in the presentation?

5    A.    In the memo.

6    Q.    Okay.  So if there's anything

7  else discussed, it would be in the memo

8  itself?

9    A.    Right.

10          (Mapes Exhibit 8 marked for

11          identification.)

12  QUESTIONS BY MS. MCCLURE:

13    Q.    Okay.  A document marked as 8.

14          Let me know when you've had a

15  chance to review that document.

16    A.    Okay.  I've reviewed it.

17    Q.    Okay.  So this is a similar

18  presentation titled "Internet Presentation

19  with McKesson Corp" for the memo on page 1 of

20  this Mapes 8, right?

21    A.    Yes, it is.

22    Q.    And this is a similar document

23  to what we just reviewed.

24          There's a cover memo followed

25  by a somewhat clearer copy of the

Highly Confidential - Subject to Further Confidentiality Review

1    presentation, and that's MCKMDL00496859 to

2    875, right?

3         A.    Yes.

4         Q.    And same -- may not be

5    literally identical, but the same basic

6    presentation you had given to

7    AmerisourceBergen Drug Corporation, correct?

8         A.    Yes.

9         Q.    And again, for the same

10   purpose, Internet pharmacies?

11        A.    Yes.

12        Q.    And again, if there had been

13   something additional discussed in your

14   meeting, you would have included it in the

15   cover memo?

16        A.    Yes.

17              (Mapes Exhibit 9 marked for

18        identification.)

19   QUESTIONS BY MS. MCCLURE:

20        Q.    And Mapes 9, US-DEA-00000352

21   through 366.

22        A.    Okay.  I've reviewed that.

23        Q.    Okay.  And that is a similar

24   memo followed by the PowerPoint presentation

25   that you provided to Cardinal Health on the

1    topic of Internet pharmacies on August 22,

2    2005?

3         A.    It is.

4         Q.    Okay.  And again, may not be

5    literally identical, but the same basic

6    presentation you had given to

7    AmerisourceBergen Drug Corporation and

8    McKesson, correct?

9         A.    Yes.

10        Q.    For the same purpose, Internet

11   pharmacy issues?

12        A.    Yes.

13        Q.    And again, if there had been

14   something additional discussed in your

15   meeting, you would have included it in your

16   cover memo?

17        A.    Yes.

18        Q.    And we've gone through

19   AmerisourceBergen Drug Corporation, Cardinal

20   and McKesson.

21             Did you give similar

22   presentation to other registrants during the

23   '05-'06 time frame?

24        A.    Yes.

25        Q.    Did you personally continue to

1    give distributor briefings in your role as

2    the chief of the regulatory section?

3         A.    I don't recall.

4         Q.    So at the time, these ones that

5    we've gone through in 2005, you were the

6    chief of the E-Commerce section; is that

7    right?

8         A.    Correct.

9         Q.    And you don't recall whether

10   you -- when you shifted to the new role as

11   the chief of regulatory section, whether you

12   continued to give these distributor

13   briefings?

14        A.    I just don't recall.

15        Q.    Do you know whether -- do you

16   know whether the briefings continued into the

17   year 2007, whether you were involved with

18   them or not?

19        A.    There were other briefings, but

20   I don't recall exactly the time frame of

21   them.

22        Q.    Okay.  What is a termination

23   notice in relation to a pharmacy?

24        A.    I'm not sure whose terminology

25   that is.

1     Q.     Okay.  Would sometimes DEA

2   inform registrants that another registrant

3   had stopped shipping controlled substances to

4   a pharmacy?

5     A.     That was done for a short

6   period of time, yes.

7     Q.     And do you know what short

8   period of time that process was done for?

9     A.     No, I don't recall.

10           (Mapes Exhibit 10 marked for

11           identification.)

12   QUESTIONS BY MS. MCCLURE:

13     Q.     Okay.  I'm going to hand you a

14   document marked 10, which is

15   CAH_MDL_PRIORPROD_DEA07_00857912-R.

16     A.     Okay.

17     Q.     Is this an example of an

18   instance where DEA would advise wholesalers

19   that distribution of controlled substances

20   had been halted to -- let me rephrase that.

21   Sorry.

22           Is this an example of DEA

23   notifying registrants of an immediate

24   suspension order for certain DEA

25   registrations?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes, it is.

2      Q.      Okay.  You can put that one

3   aside.

4              (Mapes Exhibit 11 marked for

5       identification.)

6   QUESTIONS BY MS. MCCLURE:

7      Q.      And I will mark Mapes 11, which

8   is all -- the same intro to the Bates number,

9   ending in 01106667-R.

10     A.      Okay.

11     Q.      Is this document that I've

12  marked as Mapes 11 an example of DEA

13  notifying registrants that a certain

14  distributor who's unnamed had cut back on

15  sales of hydrocodone combination products?

16             MR. BENNETT:  Objection.

17      Foundation.  Vague.

18  QUESTIONS BY MS. MCCLURE:

19     Q.      You can answer, if you can.

20     A.      It is.

21     Q.      And this document is dated

22  January 11, 2006.

23             Does reviewing this document

24  refresh your recollection of the time period

25  during which DEA would advise registrants

Highly Confidential - Subject to Further Confidentiality Review

1    about pharmacy activity, either terminations

2    or, as in this example, cutbacks took place?

3         A.    It's an example of that, yes.

4         Q.    And does it refresh your

5    recollection as to the time period?

6         A.    Yes.

7         Q.    At least in '06?

8         A.    Yes.

9         Q.    Do you know how long after

10   January 11, 2006, DEA engaged in this

11   practice?

12        A.    No, I don't.

13        Q.    Do you know why this practice

14   was halted?

15             MR. BENNETT:  Objection.

16        Scope.

17             You can answer that question

18        yes or no but may not disclose

19        internal deliberative process or

20        attorney-client privileged

21        communications.

22             THE WITNESS:  Yes.

23   QUESTIONS BY MS. MCCLURE:

24        Q.    Can you tell me why this

25   practice was halted?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2      Q.      Is that because your counsel --

3   or DEA counsel, Mr. Bennett, has instructed

4   you not to reveal internal deliberative

5   process or attorney-client privileged

6   communications?

7      A.      Yes.

8      Q.      Okay.  Looking back at that

9   exhibit, it looks like it went to an e-mail

10  address called ODC@USDOJ.gov.

11          Do you know what that means?

12     A.      No, I don't recall.

13     Q.      Is that possibly an internal

14  distribution list that was set up for

15  purposes of communicating with registrants?

16          MR. BENNETT:  Objection.  Calls

17     for speculation.

18          THE WITNESS:  I just don't

19     recall.

20  QUESTIONS BY MS. MCCLURE:

21     Q.      Why did DEA send this

22  information that's reflected in Mapes 11 to

23  registrants?

24          MR. BENNETT:  Objection.

25     Scope.

```
 1              You're not a 30(b)(6) witness
 2        to answer on behalf of DEA.  You may
 3        answer based on your reason for
 4        sending the e-mail while you were
 5        there.
 6              THE WITNESS:  My reason for
 7        sending the e-mail was to provide
 8        additional information to the
 9        wholesalers when they're making a
10        decision about selling controlled
11        substances to a specific registrant.
12   QUESTIONS BY MS. MCCLURE:
13        Q.    Because you believed that the
14   additional information would be helpful to
15   wholesalers?
16        A.    Yes.
17        Q.    Based on your experience, would
18   a distributor have a way to know about
19   another distributor's actions in cutting off
20   or cutting back supply to a pharmacy, other
21   than your e-mail that we just looked at of
22   Mapes 11?
23              MR. BENNETT:  Objection.
24        Vague.
25              You can answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  They may know

 2         about that.  If their salespeople were

 3         in the pharmacy and talked to the

 4         pharmacist, they may know those

 5         things.

 6  QUESTIONS BY MS. MCCLURE:

 7         Q.    Okay.  Do you recall whether

 8  you or others with whom you worked, to the

 9  extent you know, sent this kind of

10  information out frequently or whether it was

11  uncommon?

12                    MR. BENNETT:  Objection.

13         Vague.  Compound.

14                    THE WITNESS:  Uncommon.

15  QUESTIONS BY MS. MCCLURE:

16         Q.    In the course of your

17  employment at DEA, you were aware that

18  registrants were shipping orders that had

19  been reported to DEA as suspicious, right?

20                    MR. BENNETT:  Objection.

21         Scope.

22                    This is beyond the scope that

23         this witness has been authorized.

24                    You may answer based on your

25         personal recollection.
```

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  After having the

2       distributor briefings with individual

3       wholesalers, I don't recall instances

4       where products that were reported as

5       suspicious were shipped.

6  QUESTIONS BY MS. MCCLURE:

7       Q.    Does the Controlled Substances

8  Act say that registrants should not ship

9  suspicious orders?

10            MR. BENNETT:  Objection.  Form.

11       Calls for a legal conclusion.

12            You can answer based on your

13       personal capacity, not on behalf of

14       DEA.

15            If you know.

16            THE WITNESS:  Not specifically,

17       no.

18  QUESTIONS BY MS. MCCLURE:

19       Q.    And if an order is unusual in

20  size, frequency or pattern, do you agree that

21  that does not necessarily mean that that

22  order is going to be diverted?

23            MR. BENNETT:  Objection.

24       Vague.  Objection.  Incomplete

25       hypothetical.

Highly Confidential - Subject to Further Confidentiality Review

1           You can answer it.

2           THE WITNESS:  I agree.

3    QUESTIONS BY MS. MCCLURE:

4           Q.    And so the fact that an order

5    or a portion of an order is diverted after a

6    distributor ships it, would you agree that

7    that does not make that order that has

8    already been shipped now suspicious, if it

9    was not suspicious at the time it was

10   shipped?

11          MR. BENNETT:  Objection.

12       Vague.  Objection.  Calls for

13       speculation.  Legal conclusion.

14          You may answer in your personal

15       capacity but not on behalf of DEA.

16          THE WITNESS:  I don't really

17       understand the nuances there.

18   QUESTIONS BY MS. MCCLURE:

19          Q.    Okay.  If an order is not

20   suspicious and is therefore filled and

21   shipped and later downstream is diverted,

22   that fact of that diversion does not now

23   render the order suspicious; do you agree

24   with that?

25          MR. BENNETT:  Objection.  Same

1    objections.

2          You can answer in your personal

3    capacity.

4          THE WITNESS:  Yes.

5  QUESTIONS BY MS. MCCLURE:

6    Q.    Similarly, if an order is

7  regarded as suspicious but is shipped, would

8  you agree that that order is not necessarily,

9  in fact, going to be diverted?

10          MR. BENNETT:  Objection.  Calls

11      for speculation.  Vague.  Incomplete

12      hypothetical.  Outside the scope.

13          You may answer in your personal

14      capacity but not on behalf of DEA.

15          THE WITNESS:  Yes.

16          MS. MCCLURE:  It's 1:06.  I'm

17      going to suggest we go ahead and take

18      a lunch break.  That may allow us to

19      streamline.

20          MR. BENNETT:  Okay.  That's

21      fine.

22          VIDEOGRAPHER:  We're going off

23      record.  The time is 1:06.

24      (Off the record at 1:06 p.m.)

25          VIDEOGRAPHER:  We're going back

Highly Confidential - Subject to Further Confidentiality Review

1    on the record.  Beginning of Media

2    File Number 6.  The time is 2:11.

3    QUESTIONS BY MS. MCCLURE:

4        Q.    Good afternoon, Mr. Mapes.

5              You understand you're still

6    under oath?

7        A.    I do.

8        Q.    Okay.  Are you aware that DEA

9    issued an order to show cause and immediate

10    suspension order served on April 24, 2007, to

11    AmerisourceBergen Drug Corporation?

12              MR. BENNETT:  You can answer.

13              THE WITNESS:  I'm aware that

14        they issued one for a specific

15        distribution center.

16    QUESTIONS BY MS. MCCLURE:

17        Q.    For the Orlando distribution

18    center?

19        A.    Yes.

20              (Mapes Exhibit 12 marked for

21        identification.)

22    QUESTIONS BY MS. MCCLURE:

23        Q.    Go ahead and mark this document

24    as Mapes 12.

25        A.    Okay.  I've read it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      Did you have any involvement in
 2   DEA work leading up to the issuance of this
 3   document that is Mapes 12?
 4              MR. BENNETT:  Objection.
 5        Scope.
 6              You can answer that question
 7        yes or no only.
 8              THE WITNESS:  No, I did not.
 9   QUESTIONS BY MS. MCCLURE:
10        Q.      Have you seen this document
11   before?
12        A.      No, I haven't.
13        Q.      But you were aware of its
14   existence prior to me telling you this today?
15        A.      Yes.
16        Q.      And you're familiar with the
17   concepts of DEA's use of order to show cause
18   and immediate suspension orders?
19        A.      I am.
20        Q.      And so was the effect of this
21   order to halt AmerisourceBergen Drug
22   Corporation's ability to fill any orders for
23   controlled substances out of the Orlando
24   distribution center?
25              MR. BENNETT:  You can answer.
```

Highly Confidential - Subject to Further Confidentiality Review

1           You can answer, I'm sorry.

2           THE WITNESS:  Yes.

3           (Mapes Exhibit 13 marked for

4      identification.)

5  QUESTIONS BY MS. MCCLURE:

6      Q.    Mark a document -- keep both

7  that out and this, if you would.

8           This is 13, which is

9  ABDCMDL00398334, and the prior document,

10  which was Mapes 12 is ABDCMDL00269383.

11          Take a look at that and let me

12  know when you've had a chance to review it.

13      A.    I've reviewed it.

14      Q.    And have you seen this document

15  before?

16      A.    No, I have not.

17      Q.    Were you aware of this document

18  prior to today, even if you've not seen the

19  actual document?

20      A.    Yes.

21      Q.    Okay.  So this order of special

22  dispensation is dated April 27, 2007, on the

23  last page, right?

24      A.    Yes.

25      Q.    And it indicates on the first

Highly Confidential - Subject to Further Confidentiality Review

1    page that the immediate suspension order,

2    which is Mapes 12, had been served on

3    April 24th, right?

4        A.    Yes.

5        Q.    So three days after the

6    original immediate suspension order was

7    issued, this order of special dispensation,

8    which is Mapes 13, was signed by DEA,

9    correct?

10       A.    Yes.

11       Q.    And that order of special

12   dispensation permitted AmerisourceBergen Drug

13   Corporation to fill orders for controlled

14   substances out of the Orlando facility for a

15   specific set of customers, namely hospitals,

16   clinics, the Department of Defense,

17   pharmacies within hospitals, clinics or

18   Department of Defense facilities, and the

19   facilities of PMSI, PharMerica and Kindred

20   Health Care and their subsidiaries, correct?

21       A.    Yes.

22       Q.    And do you have an

23   understanding as to why this order of special

24   dispensation happened three days after the

25   immediate suspension order?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No, I wasn't involved in that

2  process.

3      Q.      Okay.  What involvement did you

4  have in connection with this order to show

5  cause?

6              MR. BENNETT:  Objection.

7          Scope.

8              You are not allowed to disclose

9          any nonpublic information regarding

10         enforcement actions taken by DEA or

11         any nonpublic information regarding

12         your investigations or activities at

13         DEA.

14             To the extent that there is

15         publicly disclosed facts about what

16         role you played in any investigation

17         that resulted in these documents, you

18         may answer.

19             MS. MCCLURE:  In response to

20         that instruction, I am going to

21         withdraw that question, introduce

22         another document and come back to it.

23             (Mapes Exhibit 14 marked for

24         identification.)

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.     This is going to be marked as

 3    Mapes 14.

 4              MS. MCCLURE:  And, James, while

 5         Mr. Mapes is reviewing Mapes 14, I

 6         will direct your attention to

 7         paragraph 6 under Section 3 of the

 8         agreement on page 6, which provides

 9         "AmerisourceBergen and the DEA may

10         each disclose the existence of this

11         agreement and information about this

12         agreement to the public without

13         restriction."

14              Moreover, Mr. Mapes' Touhy

15         letter permits him to provide

16         information regarding his personal

17         recollection regarding DEA's

18         interpretation and enforcement of and

19         practices related to the CSA and its

20         implementing regulations.

21              So I will just note that and

22         ask you to take a look at those.

23              MR. BENNETT:  Okay.  I

24         understand your comment about the

25         settlement agreement "the DEA may
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        disclose" doesn't necessarily mean

 2        that a former employee has been

 3        authorized to disclose that on behalf

 4        of DEA.

 5               And in addition, I would note

 6        that even with the authorization that

 7        you're -- that you reference, which

 8        was number 8, it does say in number 7

 9        his personal recollection of any

10        information publicly disclosed by the

11        United States regarding enforcement

12        actions taken by DEA.

13               And I will also note in A it

14        says he is not authorized to disclose,

15        irrespective of the above

16        authorizations, any information

17        regarding any specific DEA

18        investigations or activities.

19               And so I don't know what your

20        questions are going to be, and to the

21        extent that this agreement has been

22        disclosed and other information has

23        been disclosed, he is authorized to

24        talk about that.

25               To the extent that he may --
```

1          and I don't know the answer to this,

2          but to the extent that he may have

3          been involved in investigation before

4          these orders were issued and that

5          information has never been made public

6          to your clients or to the public, he

7          is not authorized to disclose what he

8          did as an investigation that led up to

9          this.

10                    THE WITNESS:  Okay.  I reviewed

11         it.

12    QUESTIONS BY MS. MCCLURE:

13         Q.    Okay.  Let's address one --

14    let's address Mr. Bennett's concern first.

15                    Did you have any personal

16    involvement in the investigation that led to

17    the issuance of the -- what we've marked as

18    Mapes 12?

19                    MR. BENNETT:  You may answer

20         that question yes or no only.

21    QUESTIONS BY MS. MCCLURE:

22         Q.    And the question is the time

23    leading up to it, so prior to April 19, 2007.

24         A.    Yes.

25         Q.    But you said that you did not

Highly Confidential - Subject to Further Confidentiality Review

1    have any involvement in the order of special

2    dispensation which we've marked as Mapes 13?

3              MR. BENNETT:  Objection.

4       Mischaracterizes past testimony.

5    QUESTIONS BY MS. MCCLURE:

6       Q.    And if that's not correct,

7    please correct me.

8       A.    I had not seen that document

9    prior to today.

10      Q.    But you did have involvement in

11   events or discussions that led up to the

12   issuance of the order of special dispensation

13   marked as Mapes 13?

14      A.    No.

15             MR. BENNETT:  You may -- okay.

16   QUESTIONS BY MS. MCCLURE:

17      Q.    Okay.  Let me just be -- so no

18   involvement in Mapes 13 leading up to it?

19      A.    That's correct.

20      Q.    Okay.  After DEA issued

21   Mapes 12, the order to show cause, did the

22   DEA work with AmerisourceBergen to evaluate

23   and develop a new suspicious order monitoring

24   program?

25      A.    Can you repeat that question,

1    please?

2        Q.    After DEA issued what we've

3    marked as Mapes 12, which is the order to

4    show cause and immediate suspension of

5    registration, did the DEA work with

6    AmerisourceBergen to evaluate and develop a

7    new suspicious order monitoring program?

8          MR. BENNETT:  Objection.

9       Vague.

10          You can answer it.

11         THE WITNESS:  No,

12       AmerisourceBergen created a new

13       program that we reviewed after they

14       created it.

15    QUESTIONS BY MS. MCCLURE:

16        Q.    When you say "we reviewed after

17    they created it," was that something that you

18    were personally involved with, that review?

19        A.    Yes.

20        Q.    So AmerisourceBergen created a

21    new program in response to this order to show

22    cause, and then DEA reviewed that newly

23    designed program.

24          Do I have that correct?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you were involved from DEA?

2    A.    Yes.

3    Q.    Who else from DEA was involved

4  in the review of AmerisourceBergen's program

5  that was developed in this April, May 2007

6  time period?

7              MR. BENNETT:  You can answer.

8              THE WITNESS:  I think I need to

9         discuss that with these folks.

10             MR. BENNETT:  Can we go off the

11        record?

12             VIDEOGRAPHER:  Going off

13        record.  The time is 2:29.

14         (Off the record at 2:29 p.m.)

15             VIDEOGRAPHER:  Going back on

16        record.  Beginning of Media File 7.

17        Time 2:31.

18             MR. BENNETT:  Counsel, I've had

19        an opportunity to discuss off the

20        record with the witness, and I have

21        explained to the witness that he is

22        authorized to answer your last

23        question, which was to identify the

24        people at DEA involved in the review.

25             I have indicated to him that he

1    is not authorized to disclose what

2    might have been specifically said that

3    was an internal deliberation or was

4    guidance from General Counsel's

5    office.

6           And with that, he's authorized

7    to answer the last question that you

8    asked.

9           Do you need the last question

10   read back?

11           THE WITNESS:  No, I'm good.

12           MS. MCCLURE:  Okay.

13           THE WITNESS:  I reviewed it,

14   along with Kyle Wright and Larry Cody

15   from the Office of Chief Counsel.

16   QUESTIONS BY MS. MCCLURE:

17       Q.    And when you say "I reviewed

18   it," the "it" you're referring to is the

19   changed program that AmerisourceBergen had

20   developed, correct?

21       A.    Yes.

22       Q.    And after you, Kyle Wright and

23   Larry Cody reviewed that new program is when

24   the document that I've marked as Mapes 14,

25   settlement and release agreement, was

Highly Confidential - Subject to Further Confidentiality Review

1   executed by DEA and AmerisourceBergen Drug

2   Corporation on June 22, 2007; is that

3   correct?

4        A.    Yes, it is.

5        Q.      In between April 24, 2007, when

6   the order to show cause was served, and

7   June 22, 2007, when the settlement and

8   release agreement was signed, you worked with

9   AmerisourceBergen personnel who were

10  developing that program, correct?

11            MR. BENNETT:  Objection.

12       Vague.

13            THE WITNESS:  I reviewed the

14       work product that they created and

15       gave comments, but didn't work

16       directly with them as they were

17       developing it.

18  QUESTIONS BY MS. MCCLURE:

19       Q.      And then they would take your

20  comments and incorporate them into the

21  program that they were working on; is that

22  correct?

23       A.      Yes.

24       Q.      So it was not one time that you

25  reviewed something related to this changed

Highly Confidential - Subject to Further Confidentiality Review

```
 1    program, but instead you would review it,

 2    give comments, they would be incorporated,

 3    you would review again.

 4                    Is that an accurate assessment?

 5                    MR. BENNETT:  Objection.

 6         Vague.  Compound.

 7                    THE WITNESS:  It was more along

 8         the lines of them having a specific

 9         question that was a part of the

10         changes.

11                    They would call with a specific

12         question, we'd discuss it, and then

13         they would go back and work on it with

14         another specific question, that kind

15         of thing, rather than reviewing an

16         entire document.

17    QUESTIONS BY MS. MCCLURE:

18         Q.    Okay.  So it was -- pieces of

19    it along the way would be presented to you

20    for review and comment, and then maybe the

21    next day or a few days later they would reach

22    out again with some other related question.

23                    Is that a fair assessment of

24    that time period?

25                    MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Vague.

 2               THE WITNESS:  Yes.

 3   QUESTIONS BY MS. MCCLURE:

 4        Q.     And do you recall whether that

 5   work was primarily in April and May of 2007?

 6        A.     I don't recall exactly when

 7   these things happened, no.

 8        Q.     Okay.  So you've talked about

 9   some phone calls that you would have with

10   AmerisourceBergen personnel.

11               Did you also have, you,

12   personally, have in-person meetings that you

13   attended about this changed program?

14               And I'm specifically talking

15   about the time period between April 24th of

16   '07, and the signing of the settlement and

17   release agreement on June 22, 2007.

18        A.     There were meetings to discuss

19   the settlement agreement that included

20   discussions about the suspicious order

21   monitoring.

22        Q.     Where were those meetings

23   physically?

24        A.     I'm not sure.  I do recall one

25   that was at the AmerisourceBergen
```

Highly Confidential - Subject to Further Confidentiality Review

1   headquarters.  I'm not sure if there was

2   others or not.

3         Q.     We've talked about DEA

4   personnel who were involved.

5               Who do you recall being

6   involved in the work on this changed program

7   from the AmerisourceBergen Drug Corporation

8   side?

9         A.     I don't recall who it was.

10        Q.     You don't recall anyone from

11  AmerisourceBergen Drug Corporation that was

12  involved in the development of that changed

13  program over that two months?

14        A.     It would be a guess at this

15  point.  I just don't recall it.

16               (Mapes Exhibit 15 marked for

17        identification.)

18  QUESTIONS BY MS. MCCLURE:

19        Q.     Show you a document that's

20  marked 15.  For the record, ABDCMDL00316083.

21               This is a series of e-mails

22  that I'm not intending to ask you specific

23  questions about except to the extent as to

24  whether they refresh your recollection

25  regarding who from AmerisourceBergen Drug

1    Corporation was involved in development of

2    the new program that you worked with.

3         A.    Okay.  I've reviewed it.

4         Q.    And does Exhibit 15 refresh

5    your recollection as to who from

6    AmerisourceBergen was involved with the

7    design of the changed program in the April,

8    May, June 2007 time period?

9         A.    Could you repeat the initial

10   question?

11        Q.    You mean the question I just

12   asked as to who was involved with the --

13             Who do you recall being

14   involved with the changed program that

15   AmerisourceBergen was working with and that

16   you reviewed in that April, May, June 2007

17   time period from AmerisourceBergen?

18        A.    I was thinking the initial

19   question had to do with who was at specific

20   meetings that we had with Amerisource instead

21   of general involvement.

22        Q.    Okay.  Let's start with general

23   involvement.

24             Who from AmerisourceBergen do

25   you generally recall being involved with the

Highly Confidential - Subject to Further Confidentiality Review

1    creation of the changed program in April, May

2    and June of 2007?

3        A.      The person that I dealt with

4    most on that was Steve Mays.

5        Q.      Okay.  Anyone else you

6    recollect?

7        A.      I can see e-mails related to

8    that from Eric Triveni and others that I

9    don't really recall.

10        Q.      So your primary recollection is

11    Steve Mays?

12        A.      Yes.

13        Q.      And so it sounds like the

14    communications between you and

15    AmerisourceBergen during this time period

16    involved phone calls, e-mails, as we've just

17    seen in Mays 15 {sic}, as well as some

18    in-person meetings; is that correct?

19        A.      Yes, it is.

20        Q.      But you don't recall the number

21    of in-person meetings that you attended

22    regarding the changed program?

23        A.      No, I don't.

24        Q.      One feature of the changed

25    program was that AmerisourceBergen would now

Highly Confidential - Subject to Further Confidentiality Review

1    hold orders flagged by a computer program and

2    investigate them as to whether they were

3    suspicious or not and only ship the orders

4    that AmerisourceBergen determined were not

5    suspicious; is that correct?

6         A.    That's my understanding, yes.

7         Q.    And is it your understanding

8    that that was a significant change in the

9    industry that was undertaken in 2007?

10             MR. BENNETT:  Objection.

11        Vague.

12             You can answer.

13             THE WITNESS:  Yes, that was a

14        change.

15   QUESTIONS BY MS. MCCLURE:

16        Q.    Do you recall in connection

17   with this review also reviewing

18   AmerisourceBergen's due diligence procedures

19   and files?

20        A.    I don't specifically recall

21   that, no.

22        Q.    Do you recall working with

23   AmerisourceBergen during this time period on

24   thresholds?

25        A.    No, I don't.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.      Do you recall working with

 2   AmerisourceBergen on a new customer due

 3   diligence questionnaire in this time period?

 4        A.      No.

 5        Q.      The settlement agreement, if we

 6   turn to Mapes 14, on page 3, in

 7   Subsection 2C.  Tell me when you're there.

 8        A.      I'm there.

 9        Q.      The settlement agreement called

10   for -- or required -- okay.  Let me back up.

11               This Section 2 is called

12   "Obligations of DEA," correct?

13        A.      It is.

14        Q.      And Section C provides that

15   "the DEA shall conduct reviews of the

16   functionality of AmerisourceBergen's

17   diversion compliance program, parentheses,

18   compliance reviews, end parentheses, at up to

19   five distribution centers of

20   AmerisourceBergen."

21               And then it lists them out,

22   correct?

23        A.      Yes.

24        Q.      Were you involved in the

25   functionality compliance reviews conducted
```

Highly Confidential - Subject to Further Confidentiality Review

1  between June 22, 2007, and the August 24,

2  2007 date set forth in this settlement

3  agreement?

4      A.    My memory is that I was

5  involved in two of them.

6      Q.    So of the five facilities or

7  distribution centers, you attended the

8  functionality compliance reviews at two of

9  them?

10      A.    Yes.

11      Q.    Do you recall which two?

12      A.    Williamston, Michigan, and

13  Columbus, Ohio.

14      Q.    And Columbus is not listed

15  there because there was an avenue to just

16  have DEA select two facilities, correct?

17      A.    Yes.

18      Q.    And so Columbus -- the Columbus

19  distribution center was one that DEA selected

20  for these compliance functionality reviews?

21      A.    Yes.

22      Q.    Do you recall who attended the

23  compliance functionality reviews at Orlando,

24  Sugar Land and the fifth distribution center

25  that DEA selected?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I do not.

2      Q.      How long were the functionality

3  compliance reviews that you attended in

4  Williamston and Columbus?

5      A.      Most of the day at each of

6  them.

7      Q.      And what was the purpose that

8  you understood you were fulfilling when you

9  conducted these functionality compliance

10 reviews?

11     A.      To determine if the

12 distribution centers were following the new

13 procedures that Amerisource had concerning

14 compliance.

15     Q.      What activities do you recall

16 performing in connection with those

17 compliance functionality reviews?

18          MR. BENNETT:  Objection.

19     Objection.  Scope.

20          To the extent that this would

21     reveal investigative or intelligence

22     gathering and dissemination techniques

23     whose effectiveness would be impaired

24     by disclosing, you may not disclose

25     your activities.

1              To the extent that it does not,

2       you may answer the question.

3              THE WITNESS:  Okay.  And the

4       answer is, I don't remember

5       specifically what we did at the

6       locations.

7    QUESTIONS BY MS. MCCLURE:

8       Q.     Okay.  Do you remember who else

9    from DEA -- I understand you don't recall who

10   did the other specific functionality

11   reviews -- scratch that.  Back up.

12             Moving along further in that

13   paragraph it says, "DEA shall also review the

14   investigatory files of the customers serviced

15   by the distribution centers subject to the

16   compliance reviews that are maintained by

17   AmerisourceBergen's corporate security and

18   regulatory affairs department in

19   Chesterbrook, Pennsylvania."

20             Do you see that language?

21      A.     Yes, I do.

22      Q.     Do you recall being involved in

23   the review of the customer files at

24   Chesterbrook?

25      A.     No, I don't.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Was it your understanding that

2  AmerisourceBergen Drug Corporation's license

3  for the Orlando facility was returned and

4  AmerisourceBergen was permitted to fulfill

5  customer controlled substances orders out of

6  the Orlando facility after the execution of

7  the settlement agreement?

8      A.      If by "license" you're

9  referring to the DEA registration, yes.

10     Q.      Thank you.

11             And so is it fair to conclude

12 that the compliance functionality reviews

13 confirmed that the distribution centers were,

14 in fact, following the new procedures that

15 AmerisourceBergen had regarding compliance?

16     A.      Yes.

17     Q.      Okay.  You can set those

18 documents aside.

19             After you reviewed the new

20 changed program that AmerisourceBergen had

21 developed, you attended a DEA-sponsored

22 pharmaceutical industry conference in

23 Houston, Texas, in September of 2007.

24             Do you recall that?

25     A.      Yes, I do.

1    Q.    And that was a DEA diversion

2  control division-sponsored conference,

3  correct?

4    A.    It was.

5    Q.    And you invited Chris Zimmerman

6  to present with you at this conference,

7  right?

8    A.    Someone did, yes.

9    Q.    It was not you personally?

10    A.    No.

11    Q.    Did you have an understanding

12  that Chris Zimmerman was asked to present at

13  this conference because you and DEA thought

14  that AmerisourceBergen's new system, the

15  changed system, was appropriate and would be

16  good to share with others in the industry?

17            MR. BENNETT:  Objection.

18        Scope.

19            You are not a 30(b)(6) witness

20        authorized to testify on behalf of

21        what DEA thought.  You may answer with

22        respect to what you thought personally

23        while you were at DEA.

24            THE WITNESS:  Yes, that was my

25        understanding of why he was asked to

Highly Confidential – Subject to Further Confidentiality Review

```
 1      be part of that.
 2   QUESTIONS BY MS. MCCLURE:
 3      Q.     And so I wasn't there, but it
 4   sounds like you and Mr. Zimmerman were both
 5   up on stage together presenting ABDC's
 6   changed program to industry at a DEA
 7   conference.
 8               Do I have that correct?
 9      A.     Yes.
10               (Mapes Exhibit 16 marked for
11      identification.)
12   QUESTIONS BY MS. MCCLURE:
13      Q.     Show you a document marked 16.
14               Now, Mr. Mapes, you are, of
15   course, free to review the entire document.
16   The section that I will be asking you about
17   is on the second page under a header called
18   "Suspicious Orders."
19      A.     I've reviewed it.
20      Q.     In the second paragraph under
21   Suspicious Orders, it says, "Mr. Zimmerman
22   stressed the importance of knowing your
23   customer and providing due diligence
24   investigation on all new retail and wholesale
25   accounts with the exception of retail chain
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies."

2              Do you see that language there?

3        A.    I do.

4        Q.    Can you explain the exception

5    for retail chain pharmacies?

6        A.    No, I didn't discuss that

7    particular exception with him, so I don't

8    know why he included that.

9        Q.    Did you review Mr. Zimmerman's

10   PowerPoint prior to co-presenting with him at

11   this DEA-sponsored industry conference?

12       A.    I'm not sure he had a

13   PowerPoint.

14             (Mapes Exhibit 17 marked for

15       identification.)

16   QUESTIONS BY MS. MCCLURE:

17       Q.    Show you a document that is

18   marked Mapes 17.

19       A.    I've reviewed this.

20       Q.    So does this refresh your

21   recollection that Chris Zimmerman had a

22   PowerPoint that he presented at the

23   September 11, 2007 industry conference?

24       A.    No, I still don't remember the

25   presentation details.

1    Q.    Okay.  I'm not asking if you

2    remember the presentation details.  I'm just

3    asking if you recall that Chris Zimmerman

4    stood on stage with you and made a

5    presentation and that it had a PowerPoint

6    attached in connection with it.

7    A.    We were both --

8          MR. BENNETT:  Objection.

9    Compound.

10         You can answer.

11         THE WITNESS:  We were both on

12    stage for a presentation, but I don't

13    remember the PowerPoint.

14    QUESTIONS BY MS. MCCLURE:

15    Q.    Okay.  Was there anyone else

16    from DEA who presented on this changed

17    AmerisourceBergen program along with

18    Mr. Zimmerman, or was it only you?

19    A.    It was just Mr. Zimmerman and

20    myself.

21    Q.    Do you recall referring to this

22    changed program as the new industry standard?

23    A.    No, I don't recall that.

24    Q.    Do you believe that -- was it

25    your understanding that it was expected by

1    DEA, to your understanding, to serve as a new

2    standard?

3              MR. BENNETT:  Objection.

4         Scope.

5              You're not authorized as a

6         30(b)(6) witness to speak on behalf of

7         DEA.  You may answer based on your

8         personal understanding at the time.

9              THE WITNESS:  It's my

10        understanding that the

11        AmerisourceBergen system was an

12        example of a system that contained the

13        type of information that we were

14        looking for.

15   QUESTIONS BY MS. MCCLURE:

16        Q.    And was compliant with the

17   Controlled Substances Act?

18        A.    Yes.

19        Q.    And was being carried out in

20   connection with the program that you had

21   reviewed based on your personal, on-site

22   reviews of those distribution centers?

23        A.    Yes.

24        Q.    If you turn to page 9 of

25   whatever this PowerPoint exhibit is --

```
 1              MR. BENNETT:  Mapes 17.

 2              MS. MCCLURE:  Thank you.  Yes,

 3       Mapes 17.

 4   QUESTIONS BY MS. MCCLURE:

 5       Q.     -- which has little Bates

 6   numbers on it that end in 1786.

 7              It says, "Historically,

 8   controlled substance" -- I'm looking at the

 9   second and third bullet -- "slash, listed

10   chemical order monitoring has been based on a

11   ship and report process."

12              And the next bullet, "ABC's OMP

13   process is now based on identify, capture,

14   investigate and report suspicious orders, all

15   prior to shipment."

16              Do you see that language?

17       A.     Yes, I do.

18       Q.     And was it your understanding

19   that this was one of the new features of the

20   changed program that AmerisourceBergen had

21   developed?

22       A.     Yes.

23       Q.     And this was new not just to

24   AmerisourceBergen but to the wholesale

25   industry?
```

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BENNETT:  Objection.

2       Vague.  Foundation.

3   QUESTIONS BY MS. MCCLURE:

4       Q.    Distributor industry.

5           MS. MCCLURE:  He can answer the

6       question, right?  He was waiting --

7           MR. BENNETT:  Oh, yeah.

8           So, objection.  Vague.

9       Objection.  Foundation.

10          You may answer.

11          THE WITNESS:  Yes, this was a

12      change for the wholesale industry.

13  QUESTIONS BY MS. MCCLURE:

14      Q.    Mr. Mapes, after you retired

15  from DEA in 2007, you began consulting, as we

16  discussed much earlier in today's deposition?

17      A.    Yes.

18      Q.    And one of those companies that

19  you performed some consulting work for was

20  AmerisourceBergen Drug Corporation, correct?

21      A.    That's correct.

22      Q.    When did you first start

23  consulting for AmerisourceBergen Drug

24  Corporation?

25      A.    In early 2008.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.        And are you still consulting

2    for them?

3          A.        No, I'm not.

4          Q.        When did you stop consulting

5    for ABDC?

6          A.        Around 2014, 2015.

7          Q.        And why was that?

8          A.        Because I was spending a lot of

9    time with the pharmacy that I was working

10   with and didn't have time to do both

11   adequately.

12         Q.        And the work you performed for

13   ABDC, did that include advising on compliance

14   with DEA regulations and policies?

15         A.        It did.

16         Q.        Did that include discussing

17   issues that might come up about DEA's

18   interpretation of the regulations?

19         A.        Yes.

20         Q.        And did it include actual

21   on-site visits to pharmacies to assist with

22   due diligence, whether it's new customer or

23   ongoing customer due diligence?

24         A.        It did.

25         Q.        Did you also -- sorry, strike

1    that.

2            Do you recall actually visiting

3    pharmacies on behalf of ABDC?

4        A.    Yes.

5        Q.    Do you recall how often?

6        A.    Generally it would be two or

7    three times a year for a week, but seeing

8    several pharmacies in that week's time in a

9    part of the country.

10       Q.    What kind of activities would

11   you perform at the pharmacy?

12       A.    Looking at the pharmacies,

13   seeing what kind of customers they had, what

14   kind of drugs they were selling, the

15   relationship between the pharmacy and the

16   physicians, discussing issues with the

17   pharmacist.

18       Q.    Did anyone from ABDC accompany

19   you on these visits to pharmacies?

20       A.    Yes, every time.

21       Q.    And do you know whether ABDC

22   was also performing other on-site visits at

23   pharmacies that you were not personally

24   involved with?

25       A.    Yes, they were.

1    Q.    Did you also perform audits of

2  AmerisourceBergen Drug Corporation's

3  suspicious order monitoring program?

4    A.    Yes, I did.

5    Q.    How many times did you audit

6  the order monitoring program?

7    A.    Annually for five or six years.

8    Q.    And do you recall concluding

9  that ABDC's suspicious order monitoring

10  program for those audits that you conducted

11  was in compliance with the Controlled

12  Substances Act?

13    A.    That's not the review that I

14  was conducting.

15    Q.    Tell me about the review that

16  you were conducting.

17    A.    I was looking at it to

18  determine if it was in compliance with the

19  ABC policies and procedures.

20    Q.    Okay.  And those ABC policies

21  and procedures were the policies and

22  procedures that were developed in connection

23  with the changed program in 2007, correct?

24    A.    In conjunction with that and

25  changes that were made subsequent to that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So it would have been

2    the policies and procedures that were enacted

3    that you would have reviewed back in 2007

4    during your time at DEA, as well as any

5    updates or improvements that had been made to

6    them subsequent?

7    A.    Yes.

8    Q.    And did you determine that ABDC

9    was in compliance with its policies and

10   procedures for these annual audits?

11   A.    There were generally issues to

12   discuss, improvements to be made, but

13   generally in compliance, yes.

14   Q.    Going back to excessive

15   purchase reports.

16        DEA's acceptance of excessive

17   purchase reports changed at some point,

18   correct?

19        MR. BENNETT:  Objection.

20   Scope.

21        You're not authorized to speak

22   on behalf of DEA.  You may speak on

23   your personal knowledge of what you

24   observed while working at DEA.

25        THE WITNESS:  The nature of the

Highly Confidential - Subject to Further Confidentiality Review

1    reports that I was involved with that

2    were accepted did change, yes.

3    QUESTIONS BY MS. MCCLURE:

4         Q.    And what was the change?

5         A.    It was change from a report

6    that was called an excessive purchase report

7    after the fact to a report that was of

8    specific suspicious orders before they were

9    shipped.

10        Q.    And that's the change that

11   we've talked about that AmerisourceBergen had

12   in the April, May, June 2007 time period that

13   you reviewed, correct?

14        A.    Yes.

15        Q.    Were you aware of any industry

16   participants making that change prior to that

17   program that you reviewed in April, May and

18   June of 2007?

19        A.    I don't recall the exact dates

20   when other companies were making the changes,

21   but it was a change that happened routinely

22   after we had the Distributor Initiative

23   meeting with companies.

24        Q.    And was this -- do you know if

25   this was viewed by industry, based on your

 1    knowledge, as a significant change or a minor

 2    one?

 3         A.     I don't know how they viewed

 4    it.

 5         Q.     No one ever said anything to

 6    you about that?

 7         A.     No.

 8         Q.     Was there any rulemaking put

 9    into effect regarding this change?

10              Do you know what I mean by

11    rulemaking?

12         A.     Yeah.  Notice and comment

13    rulemaking, no, there wasn't.

14              MS. MCCLURE:  So we know who

15         put us on hold, and it's Napoli.

16              Hunter.  I recall Hunter.

17              So I think we're going to need

18         to hang this up.

19              So anyone who's on the phone

20         who can hear us, we're going to --

21              So I think we need -- so we're

22         going to go off the record.

23              VIDEOGRAPHER:  Okay.  Going off

24         record.  The time is 3:13.

25          (Off the record at 3:13 p.m.)

```
 1              VIDEOGRAPHER:  We're going back

 2       on the record.  Beginning of Media

 3       File 8.  The time is 3:26.

 4              MS. MCCLURE:  So thank you,

 5       Mr. Mapes.  I'm going to at this point

 6       turn the defense questioning over to

 7       Ms. Wicht on behalf of Cardinal.  I

 8       appreciate you, again, being here

 9       today.  And subject to my redirect

10       anticipated for tomorrow, I will turn

11       over questioning.

12              EXAMINATION

13  QUESTIONS BY MS. WICHT:

14       Q.    Good afternoon, Mr. Mapes.

15       A.    Good afternoon.

16       Q.    As Shannon just said, I'm

17  Jennifer Wicht, and I represent Cardinal

18  Health.

19              And you -- as you indicated

20  before, you and I have met previously on one

21  occasion, correct?

22       A.    Correct.

23       Q.    Okay.  I have just basically

24  some follow-up questions.  I'm going to come

25  back to some areas that you spoke about
```

1    already with Ms. McClure generally and just

2    ask a few more questions on them.

3            So what I will do generally at

4    the beginning is try to just orient you about

5    the subject that I'm going to back to, so

6    I'll refer to the testimony that you gave

7    earlier today.  But certainly if I, in doing

8    that, I say something that's incorrect and is

9    not what you said earlier today, I ask you to

10   please correct me when I do that.

11           Okay?

12   A.      Okay.

13   Q.      Thank you.

14           Okay.  So earlier today you

15   testified that during your tenure at the DEA

16   you would have periodic conversations with

17   registrants about their suspicious order

18   monitoring systems, correct?

19   A.      Yes.

20   Q.      And I think you said that from

21   time to time you would speak with people and

22   they would ask you for advice or input about

23   some particular feature of their suspicious

24   order monitoring system.

25           Do I have that correct?

1      A.      Yes.

2      Q.      Okay.  And when you had those

3  conversations with registrants, did you

4  attempt to provide them with guidance about

5  their systems?

6      A.      More than guidance about their

7  system.  Just answering the specific question

8  that they had.

9      Q.      Okay.  You were --

10          MR. BENNETT:  I'm not sure the

11      realtime is rolling.  At least our

12      screen isn't working.  I don't know if

13      others are having the same problem.

14  QUESTIONS BY MS. WICHT:

15      Q.      Okay.  Thank you.  I had to

16  look back and see the answer that you had

17  given because I got distracted there.

18          So you were answering questions

19  about -- from registrants about their

20  suspicious order monitoring systems; is that

21  fair?

22      A.      Yes.

23      Q.      And when you had those

24  conversations where you would answer

25  questions, were you attempting to help

1    registrants meet their regulatory

2    obligations?

3         A.     Yes.

4         Q.     And when you had those

5    conversations with registrants, were you

6    honest in the advice that you provided to

7    them about their suspicious order monitoring

8    systems?

9         A.     Yes.

10        Q.     And did you believe that

11   registrants could rely on the information

12   that you provided in those conversations that

13   you had with them about their suspicious

14   order monitoring systems?

15        A.     Yes.

16        Q.     And were you aware -- strike

17   that.

18               At the point in time in your

19   tenure at DEA when you were supervising other

20   diversion investigators, were you aware of

21   whether those individuals were having

22   conversations with registrants about their

23   suspicious order monitoring systems of a

24   similar nature to what you've described?

25               MR. BENNETT:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Vague.

 2                  THE WITNESS:  Not necessarily,

 3          no.

 4     QUESTIONS BY MS. WICHT:

 5          Q.      Do you know -- you don't know

 6     one way or another whether they were or they

 7     were not having those conversations?

 8          A.      That's correct.

 9          Q.      Okay.  You were Kyle Wright's

10     supervisor for a period of time at DEA,

11     correct?

12          A.      Yes.

13          Q.      Do you have any knowledge or

14     recollection as to whether Mr. Wright

15     specifically had conversations with

16     registrants where he provided -- where he

17     answered questions about suspicious order

18     monitoring systems?

19          A.      No, I don't.

20          Q.      Okay.  Would you expect that if

21     a representative of DEA was having a

22     conversation with a registrant to answer

23     their questions about suspicious order

24     monitoring systems, that the DEA employee

25     would be honest in their conversations with
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the registrant?

 2         A.      Yeah, I would expect so.

 3         Q.      And would you expect that the

 4    registrant would be able to rely on the

 5    information that was provided by the DEA

 6    employee in those conversations?

 7         A.      Yes.

 8         Q.      Okay.  I'm going to change

 9    topics a little bit here.

10              Another thing that you

11    described in your testimony earlier today was

12    a change in DEA's expectation of how

13    suspicious order reporting should be done.

14              Do you recall that?

15              MR. BENNETT:  Objection.

16         Mischaracterizes testimony.  This

17         witness did not speak for DEA's

18         expectation.

19    QUESTIONS BY MS. WICHT:

20         Q.      I'll rephrase the question in

21    light of the objection.

22              Earlier in your testimony

23    today, you described a change in your

24    expectation or understanding of how

25    wholesalers would conduct suspicious order

1    monitoring and reporting, correct?

2         A.    Yes.

3         Q.    And that was -- you were just

4    recently testifying about that in connection

5    with the presentation that you did with ABDC

6    at the diversion conference in the fall

7    of 2007, correct?

8         A.    Yes.

9         Q.    Okay.  And I think you said,

10   but please correct me if I'm wrong, that you

11   were aware that the expectation -- or you

12   were -- excuse me, strike that.  Let me start

13   again.

14              You were aware that the system

15   that ABDC was presenting at the conference

16   represented a change in how wholesalers were

17   conducting suspicious order monitoring and

18   reporting; is that correct?

19        A.    It is.

20        Q.    Okay.  And when -- but there

21   was no change in the regulation, correct?

22        A.    That's correct.

23        Q.    So is it fair to say that the

24   change was in what DEA -- how DEA was

25   expecting wholesalers to comply with the

1   regulation?

2            MR. BENNETT:  Objection.

3        Scope.

4            You're not authorized to speak

5        on behalf of DEA.  You may speak upon

6        your personal knowledge of what was

7        happening.

8            THE WITNESS:  Yes, I did expect

9        that wholesalers would report

10       suspicious orders differently than

11       they had prior to the meetings and

12       that conference.

13   QUESTIONS BY MS. WICHT:

14       Q.    Okay.  So when you -- when your

15   expectations changed about how wholesalers

16   would report suspicious orders, did you

17   expect that wholesalers would be able to

18   change their systems instantaneously, or did

19   you expect that it would take some time for

20   them to implement the change to the systems?

21       A.    My expectation is that it would

22   take some time.  Not a -- not a year, not six

23   months, but some time for them to change.

24       Q.    Because they were required

25   to -- they were being asked to prepare and

1    establish effectively a new suspicious order

2    monitoring system, correct?

3         A.    Yes.

4         Q.    Okay.  I want to come back to

5    talking about the presentation that you made

6    with ABDC in the fall of 2007, and I want to

7    direct your attention back to Exhibit 17, if

8    you still have that in front of you.

9         A.    Yes, I do.

10        Q.    Sorry, thank you.

11              So if you would -- if you

12   would -- and this was a -- I believe you

13   testified earlier that the presentation was

14   made by Mr. Zimmerman of ABDC, correct?

15        A.    Yes, it was.

16        Q.    And you were on the stage with

17   him at the time that he presented?

18        A.    Yes.

19        Q.    And if you would turn to Slide

20   Number 7 in the deck, which has the Bates

21   number ending 1784?

22        A.    Yes.

23        Q.    And that's a slide that's

24   titled "New Customer Due Diligence," correct?

25        A.    It is.

1    Q.    And do you see that on the

2  slide deck it says, "Retail chain pharmacies

3  are exempted from the due diligence

4  investigations completed on new retail and

5  wholesale accounts"?

6    A.    It does.

7    Q.    Do you recall, when this

8  presentation was delivered, whether anyone

9  from DEA stated -- stood up and told the

10 group that DEA didn't agree with that

11 exemption?

12    A.    I don't recall if they did or

13 didn't.

14         (Mapes Exhibit 18 marked for

15    identification.)

16 QUESTIONS BY MS. WICHT:

17    Q.    I've handed you what's been

18 marked as Exhibit 18, if you want to take a

19 moment and look at that.

20         And just for the record, this

21 is a document that's Bates-stamped

22 HDS_MDL_00135664 through 65.

23         MR. LANIER:  Do you have a copy

24    for me, Shannon?

25         MS. WICHT:  I'm not Shannon,

Highly Confidential - Subject to Further Confidentiality Review

```
1              but I can get you one.
2                    MR. LANIER:  Oh, I'm sorry, I
3         don't have my glasses on.
4                    Thank you.  Sorry, Jennifer.
5                    MS. WICHT:  No problem.
6                    THE WITNESS:  Okay.
7    QUESTIONS BY MS. WICHT:
8         Q.      Have you ever seen this
9    document before, Mr. Mapes?
10        A.      No, I have not.
11        Q.      Okay.  Do you see at the top
12   that it's titled as a "Summary of the DEA
13   HDMA Meeting on Suspicious Orders"?
14        A.      Yes.
15        Q.      And are you familiar with HDMA?
16        A.      Yes.
17        Q.      And what is HDMA?
18        A.      It's an industry association,
19   the Healthcare Distribution Management
20   Association.
21        Q.      And do you see that this
22   recites a meeting date of September 7, 2007,
23   and it lists several DEA attendees, including
24   you?
25        A.      Yes.
```

1    Q.    Do you recall meeting with HDMA

2    on the subject of suspicious orders in

3    approximately this time frame?

4    A.    No.

5    Q.    Okay.  If you could turn your

6    attention to the second page of the document,

7    please.

8    A.    (Witness complies.)

9    Q.    And there's a first sort of

10   full bullet that appears on that page, and it

11   says, "DEA also does not want to see --

12   receive suspicious order reports that merely

13   reflect volumes that went over a threshold.

14   They wanted reports that are, quote, true,

15   close quote, suspicious orders."

16              Do you see that?

17   A.    Yes.

18   Q.    Do you recall ever

19   communicating that to HDMA?

20   A.    No, because I really don't

21   recall the meeting.

22   Q.    Okay.  Do you recall -- leaving

23   aside whether it was at this particular

24   meeting, which I understand that you can't

25   recall, do you recall ever communicating that

1   point that's recited here, that DEA only

2   wanted to receive suspicious order reports

3   of, quote, true suspicious orders to

4   registrants?

5       A.      I recall discussing that, but I

6   don't recall who it was with or when, that

7   kind of thing.

8       Q.      Okay.  Fair enough.

9              And what does that mean, to say

10  that DEA -- well, to your understanding, what

11  did that mean when you communicated that DEA

12  wanted to receive reports that were true

13  suspicious orders, not merely volumes that

14  went over a threshold?

15      A.      That we are looking for reports

16  that the wholesalers had reviewed, not just

17  with a raw number of drugs that were ordered

18  but reviewed it and determined that it was

19  suspicious.

20      Q.      So I think earlier you

21  described suspicious order reporting as

22  requiring some element of subjective

23  judgment; is that right?

24      A.      Yes.

25      Q.      So this point that DEA wanted

Highly Confidential - Subject to Further Confidentiality Review

1    reports that are true suspicious orders, is

2    that conveying that DEA wanted to receive

3    reports only after the wholesaler had applied

4    that subjective judgment?

5                    MR. BENNETT:  Objection.

6         Scope.

7                    You're not authorized to speak

8         on what DEA wanted.

9                    You may speak on what you

10        personally meant when you communicated

11        that point to registrants.

12                    THE WITNESS:  Now I don't

13        remember the question.

14   QUESTIONS BY MS. WICHT:

15        Q.    That's what I was just about to

16   say.

17                    So the question was:  When you

18   were communicating to registrants that DEA

19   wanted to receive true suspicious order

20   reports, not merely volumes that went over a

21   threshold, were you conveying that you wanted

22   to receive reports only after the wholesaler

23   had applied their subjective judgment to

24   determine whether the order was truly

25   suspicious?

1      A.     Yes, that's what I was...

2      Q.     Okay.  If someone asserted that

3  90 percent of all orders that were shipped

4  after September of 2007 should have been

5  reported to DEA as suspicious, would that be

6  consistent with your expectations as you've

7  described them today?

8      A.     If they said 90 percent of

9  orders shipped by wholesalers, no, I wouldn't

10 think that was a number that was close to

11 those that should be suspicious.

12     Q.     I'm going to switch gears again

13 here for a moment and just talk -- a couple

14 of questions about excessive purchase

15 reports.

16            I think you mentioned earlier

17 today that different registrants may have

18 provided excessive purchase reports in

19 different forms; is that right?

20     A.     That's correct.

21     Q.     And sometimes different

22 registrants may have called the reports by

23 different names; is that right?

24     A.     Yes.

25     Q.     Do you have any recollection

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about whether Cardinal Health referred to

 2    those reports as ingredient limit reports?

 3         A.    I don't recall.

 4         Q.    Don't recall one way or the

 5    other?

 6         A.    Right.

 7         Q.    Fair enough.

 8               You testified earlier today

 9    about cyclic audits performed by DEA

10    investigators of wholesalers' distribution

11    centers, correct?

12         A.    Yes.

13         Q.    I just have a couple of

14    follow-up questions about that.

15               At the conclusion of a cyclic

16    audit, is it correct that the DEA

17    investigator's report would not be provided

18    to the registrant?

19         A.    Yes, that's correct.

20         Q.    So is it correct that a

21    registrant who went through a cyclic audit

22    and had no discrepancies found, the

23    registrant would not have a DEA document

24    reflecting that fact?  Is that correct?

25         A.    Unless the registrant requested
```

Highly Confidential - Subject to Further Confidentiality Review

1    it through FOI or something like that.

2        Q.    So your understanding that

3    registrants could receive audit reports

4    through the FOIA process?

5        A.    Yes.

6            MS. WICHT:  I don't have any

7        more questions this afternoon, so I'm

8        going to turn it over to the next

9        person.

10            Thank you very much, Mr. Mapes.

11            THE WITNESS:  Okay.

12            VIDEOGRAPHER:  Going off the

13        record.  The time is 3:48.

14         (Off the record at 3:48 p.m.)

15            VIDEOGRAPHER:  We're going back

16        on record.  Beginning of Media File 9.

17        The time is 3:50.

18                EXAMINATION

19    QUESTIONS BY MR. EPPICH:

20        Q.    Good afternoon, Mr. Mapes.  My

21    name is Chris Eppich.  I represent McKesson

22    in this litigation.

23        A.    Good afternoon.

24        Q.    I just have a few questions for

25    you to follow up on the questions of my

Highly Confidential - Subject to Further Confidentiality Review

1    colleagues this morning and this afternoon.

2              It's true that the DEA

3    registers every pharmacy, distributor and

4    manufacturer that handles controlled

5    substances, correct?

6         A.    Yes.

7         Q.    And each pharmacy, distributor

8    and manufacturer must submit an application

9    for controlled substances to DEA?

10        A.    Yes.

11        Q.    DEA evaluates each application?

12             MR. BENNETT:  Objection.

13   Scope.

14             You can answer, if you know.

15             THE WITNESS:  They evaluate

16   them in different ways depending on

17   the category of the registrant.  A

18   manufacturer is much more of an

19   evaluation than a retail pharmacy.

20   QUESTIONS BY MR. EPPICH:

21        Q.    What is the evaluation of a

22   manufacturer?

23             MR. BENNETT:  Objection.

24   Scope.

25             THE WITNESS:  It's an on-site

```
 1          review of their recordkeeping,

 2          security, quotas, what they're going

 3          to manufacture, all the -- you know,

 4          everything from A through Z at the

 5          manufacturer.

 6   QUESTIONS BY MR. EPPICH:

 7          Q.    Will you describe the

 8   evaluation of a potential distributor

 9   registrant?

10                MR. BENNETT:  Objection.

11          Scope.

12                THE WITNESS:  It's a review, an

13          on-site review, at the location to

14          determine if they have the proper

15          security, recordkeeping and other such

16          things to become a wholesaler.

17   QUESTIONS BY MR. EPPICH:

18          Q.    And will you describe the

19   evaluation process for a potential pharmacy

20   registrant?

21                MR. BENNETT:  Objection.

22          Scope.

23                THE WITNESS:  It's basically a

24          clerical review to be sure that they

25          have the appropriate state license.
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. EPPICH:

2         Q.     Is there an on-site inspection

3    or review of a potential pharmacy registrant?

4              MR. LANIER:  Object to these

5         questions.  The time frame is not put

6         into them.

7              MR. BENNETT:  I object to

8         scope.

9    QUESTIONS BY MR. EPPICH:

10        Q.     While you were at DEA, sir.

11        A.     It changed while I was at DEA.

12   For the first several years there was no

13   on-site review of pharmacies, but after some

14   point in time in the mid-2005-ish time, there

15   were some offices that were performing

16   on-site reviews of pharmacies.

17        Q.     Do you know why that changed?

18             MR. BENNETT:  Objection.

19        Scope.

20             You're not authorized to

21        disclose the internal deliberative

22        process of the DEA.

23             To the extent that you can

24        answer this question based on your

25        personal knowledge without disclosing

Highly Confidential - Subject to Further Confidentiality Review

 1          internal deliberations, you may

 2          answer.

 3                  THE WITNESS:  So I don't really

 4          know why some divisions did that and

 5          others didn't.

 6     QUESTIONS BY MR. EPPICH:

 7          Q.      If I could ask you to turn to

 8     Exhibit 3.

 9          A.      I've got it.

10          Q.      Look at Section 1301.74(a).

11                  Are you familiar with

12     Section 1301.74(a), sir?

13          A.      Yes.

14          Q.      Section 1301.74(a) says,

15     "Before distributing a controlled substance

16     to any person who the registrant does not

17     know to be registered to possess the

18     controlled substance, the registrant shall

19     make a good faith inquiry either with the

20     administration or with the appropriate state

21     controlled substances registration agency, if

22     any, to determine that the person is

23     registered to possess the controlled

24     substance."

25                  Do you see that, sir?

1      A.      I do.

2      Q.      So Section 1301.74(a) requires

3  a registrant to make a good faith inquiry to

4  determine that a customer is registered to

5  possess controlled substances; is that

6  correct?

7      A.      It is.

8      Q.      Section 1301.74(a) requires a

9  registrant to then check its customer's DEA

10  registration before distributing controlled

11  substances to the customer, correct?

12      A.      It requires they check it at

13  some point in time, not necessarily every

14  time before they distribute.

15      Q.      Section 1301.74(a) imposes no

16  other requirement on distributors to perform

17  due diligence on its customers, does it?

18      A.      It does not.

19      Q.      And DEA conducts diligence on

20  the applicants so the distributors can rely

21  on the DEA registrations when complying with

22  1301.74(a)?

23              MR. BENNETT:  Objection.

24      Scope.  Objection.  Vague.  Objection.

25      Calls for speculation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And this witness is not a
 2         30(b)(6) witness, so he's not
 3         answering on behalf of DEA.
 4              To the extent you have an
 5         opinion in your personal capacity, you
 6         may answer.
 7              THE WITNESS:  Okay.  If you
 8         could restate the question for me.
 9    QUESTIONS BY MR. EPPICH:
10         Q.    I'll strike the question.
11              Earlier today you testified
12    about how the Office of Diversion Control is
13    funded.
14              Do you remember that testimony?
15         A.    Yes.
16         Q.    And you testified that the
17    Office of Diversion Control is funded through
18    registration fees; is that correct?
19         A.    Yes.
20         Q.    The Office of Diversion Control
21    is also funded through any fines levied
22    against registrants, correct?
23         A.    No.
24         Q.    Is the only source of funding
25    for the Office of Diversion Control
```

Highly Confidential - Subject to Further Confidentiality Review

1    registration fees?

2        A.      The majority is registration

3    fees.  There are also a few positions that

4    are from appropriated funds, but very few.

5        Q.      Earlier today you testified

6    about the emergence of Internet pharmacies in

7    the early 2000s.

8              Do you recall that testimony?

9        A.      Yes, I do.

10       Q.      Internet pharmacies represented

11   a significant shift in pharmaceutical

12   diversion, correct?

13             MR. BENNETT:  Objection.

14       Vague.

15             You can answer.

16             THE WITNESS:  They did

17       represent a shift.

18   QUESTIONS BY MR. EPPICH:

19       Q.      There were concerns that DEA's

20   anti-diversion group was understaffed to

21   address the Internet pharmacy issue?

22       A.      I don't recall those concerns,

23   no.

24       Q.      DEA decided that one way to

25   help combat the Internet pharmacies would be

Highly Confidential - Subject to Further Confidentiality Review

1    to establish this Internet Distributor

2    Initiative, correct?

3              Excuse me, the Internet -- let

4    me strike that.

5              One way that -- and DEA decided

6    that one way to combat the Internet pharmacy

7    issue would be to establish the Distributor

8    Initiative, correct?

9              MR. BENNETT:  You can answer.

10             THE WITNESS:  Yes.

11   QUESTIONS BY MR. EPPICH:

12        Q.    And these Distributor

13   Initiative meetings were meant to educate

14   distributors about Internet pharmacies?

15        A.    Yes.

16        Q.    And during the Distributor

17   Initiative meetings, you introduced

18   additional diligence, guidance and

19   instructions to distributors to confirm that

20   a distributor is not servicing a rogue

21   Internet pharmacy, correct?

22             MR. BENNETT:  Objection.

23        Vague.

24             THE WITNESS:  To help them

25        understand what to look at to

1          determine if a customer is a rogue

2          Internet pharmacy.

3    QUESTIONS BY MR. EPPICH:

4          Q.    The objective of this

5    additional diligence that you were requesting

6    out of distributors was for the distributors

7    to be able to identify those rogue Internet

8    pharmacy customers of theirs, correct?

9          A.    Yes.

10          Q.    You were not intending the

11    additional diligence to require distributors

12    to investigate the inner workings of every

13    independent pharmacy across America that they

14    may service, correct?

15               MR. BENNETT:  Objection.

16          Vague.  Objection.  Scope.

17               You may speak on your personal

18          capacity but not on behalf of DEA in

19          response to this question.

20               THE WITNESS:  I was expecting

21          that over time they would use the same

22          procedures for all the pharmacies that

23          they were dealing with to be certain

24          that there wasn't a problem that they

25          wouldn't see without the extra due

Highly Confidential - Subject to Further Confidentiality Review

1        diligence.

2    QUESTIONS BY MR. EPPICH:

3        Q.     And the problem that they were

4    to be looking for was whether or not they

5    were an Internet pharmacy?

6        A.     An Internet pharmacy or any

7    pharmacy that was selling drugs for other

8    than legitimate medical purpose.

9        Q.     Such as a pill mill, correct?

10       A.     Yes.

11       Q.     Now, during the distributor

12    briefings, you told distributors that you

13    were not concerned with large retail chain

14    pharmacies at the time, correct?

15       A.     No.

16       Q.     That's not correct?

17       A.     I don't believe so.

18       Q.     Do you recall instructing

19    distributors at the distributor briefings to

20    conduct due diligence on retail chain

21    pharmacies?

22       A.     I don't recall that we made a

23    distinction between retail chain pharmacies

24    and independent pharmacies.

25       Q.     In asking the distributors to

1    conduct this additional diligence, you

2    understood that distributors did not have

3    access to all of the distribution and sales

4    data from each of their pharmacy customers,

5    correct?

6         A.    Yes.

7         Q.    And you also understood the

8    distributors would not be able to identify

9    all of the bad actors within the supply chain

10   with this additional diligence, correct?

11              MR. BENNETT:  Objection.

12        Vague.

13              THE WITNESS:  I didn't expect

14        that they could immediately identify

15        everyone, no.

16   QUESTIONS BY MR. EPPICH:

17        Q.    DEA -- or let me strike that.

18              It wasn't your intention that

19   distributors became deputized agents to the

20   DEA, was it?

21              MR. BENNETT:  Objection.

22        Vague.  Argumentative.

23              THE WITNESS:  No.

24   QUESTIONS BY MR. EPPICH:

25        Q.    I would like to return to the

1  2007 presentation that you provided to

2  industry with ABDC in September of 2007.  I

3  believe it's marked as Exhibit 17.

4          So the primary purpose, or a

5  primary purpose --

6          MR. BENNETT:  Counsel, I'm

7      sorry, I just want to make sure I have

8      the right exhibit.

9          You said 17, which I believe

10     was Amerisource -- represented to be

11     AmerisourceBergen's presentation, not

12     Mr. Mapes' presentation.  I think he

13     said he'd never seen it.

14         I just want to make sure since

15     your question said the one "you"

16     presented at the conference.

17         MR. EPPICH:  Thank you.  Thank

18     you, Mr. Bennett.  Let me strike that

19     question.

20         MR. BENNETT:  Okay.

21  QUESTIONS BY MR. EPPICH:

22    Q.    I'd just like to direct you to

23  Exhibit 17.

24         Now, Mr. Mapes, you were

25  present for the presentation by ABDC on

 1    September 11, 2007; is that correct?

 2         A.    Yes.

 3         Q.    And you asked ABDC to present

 4    this information to the industry at this

 5    conference, correct?

 6              MR. BENNETT:  Objection.

 7         Mischaracterizes prior testimony.

 8              THE WITNESS:  They were asked

 9         to present it.  I didn't personally

10         ask them, but someone within DEA did.

11    QUESTIONS BY MR. EPPICH:

12         Q.    Thank you for that

13    clarification.

14              And someone from the DEA asked

15    ABDC to provide this presentation to educate

16    the other distributors in the industry on the

17    new standards for suspicious order monitoring

18    programs; is that correct?

19         A.    That's correct.

20         Q.    I'd like you to turn to page 9

21    of Exhibit 17.

22              And earlier you looked at the

23    third bullet on page 9 that reads, "ABC's OMP

24    process is now based on identify, capture,

25    investigate and report suspicious orders all

Highly Confidential - Subject to Further Confidentiality Review

1    prior to shipment."

2              Do you remember that testimony?

3    A.      Yes.

4    Q.      Do you agree that a

5    distributor's program that identified,

6    captured or blocked, investigated and

7    reported suspicious orders prior to shipment

8    would be in compliance with the Controlled

9    Substances Act and its regulations?

10   A.      It could be, depending on what

11   their criteria for identifying suspicious

12   orders were.

13   Q.      And if that criteria were

14   similar to the criteria presented in

15   Exhibit 17, then such a program would be in

16   compliance with the Controlled Substances Act

17   and its regulations, correct?

18              MR. BENNETT:  Objection.

19         Incomplete hypothetical.  Vague.

20              THE WITNESS:  I believe it

21         could be, yes.

22   QUESTIONS BY MR. EPPICH:

23   Q.      Earlier today you testified

24   about -- let me strike that.

25              Sir, would you agree with me

```
 1   that there is an opioid crisis?

 2        A.    Yes.

 3        Q.    Would you agree that there are

 4   a variety of factors that contribute to the

 5   opioid crisis?

 6        A.    Yes.

 7        Q.    Illegal heroin from cartels

 8   contributes to the opioid crisis?

 9             MR. BENNETT:  Objection.

10        Vague.

11             THE WITNESS:  I would be

12        guessing at this point because I

13        haven't currently kept up with the

14        intelligence on those kind of issues.

15   QUESTIONS BY MR. EPPICH:

16        Q.    Well, in your time at the DEA,

17   was illegal heroin from cartels contributing

18   to an opioid crisis?

19             MR. BENNETT:  Objection.

20        Foundation.  Objection.  Scope.

21             You're not authorized to

22        disclose information from specific DEA

23        investigations, activities or

24        intelligence that has not been

25        publicly disseminated.
```

1          To the extent that you can

2     answer this question without

3     disclosing nonpublic DEA information,

4     you can answer.

5          THE WITNESS:  I believe

6     generally the opioid crisis started

7     after I left DEA.  There was heroin,

8     the source of which I don't know, but

9     there was heroin available, illicit.

10 QUESTIONS BY MR. EPPICH:

11     Q.     When do you believe the opioid

12 crisis started?

13     A.     I don't know.

14     Q.     Would you agree with me that

15 diversion can occur in many different ways?

16     A.     Yes.

17     Q.     For example, opioids can be

18 stolen from a delivery truck; that's

19 diversion, correct?

20     A.     Yes.

21     Q.     Someone could go into their

22 grandmother's cabinet and take their

23 grandmother's opioids that she was prescribed

24 for a legitimate purpose; that would be

25 diversion?

1     A.     Yes.

2     Q.     Someone could take opioids from

3  a friend who was prescribed the opioids for

4  legitimate reasons; that would be diversion,

5  wouldn't it?

6     A.     Yes.

7     Q.     Distributors have nothing to do

8  with opioids that are diverted when the

9  opioids are stolen from friends or family

10  members, do they?

11     A.     No, they don't.

12     Q.     The vast majority of diversion

13  occurs once opioids leave the closed system

14  of distribution; would you agree with that?

15     A.     I don't know that to be true or

16  not.

17     Q.     Would you agree that

18  distributors cannot control what happens to

19  pills diverted outside the closed -- let me

20  strike that.

21          You would agree that

22  distributors cannot control what happens to

23  pills once those pills are delivered to their

24  pharmacy customers, correct?

25          MR. BENNETT:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   You can answer.

 2                   THE WITNESS:  That's correct.

 3    QUESTIONS BY MR. EPPICH:

 4         Q.    Are you familiar with the term

 5    "overprescribing"?

 6         A.    Yes.

 7         Q.    What is overprescribing?

 8         A.    It's when a prescriber

 9    prescribes more controlled substances than

10    are necessary or prescribes controlled

11    substances to people that it may not be

12    necessary for.

13         Q.    Is overprescribing a form of

14    diversion?

15         A.    Yes.

16         Q.    Overprescribing is a form of

17    diversion even if the prescriber is

18    well-intentioned and believes there's a

19    legitimate medical purpose for prescribing

20    the amount and dosage that he or she

21    prescribed?

22                   MR. BENNETT:  Objection.  Form.

23         Calls for speculation.  Scope.

24                   THE WITNESS:  It could be.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EPPICH:

 2         Q.    But it's not always, is it,

 3    sir?

 4         A.    I don't think so.

 5         Q.    You'd agree with me the

 6    distributors have no insight into determining

 7    whether a doctor has overprescribed opioids

 8    to her patient?

 9              MR. BENNETT:  Objection.  Form.

10         Calls for speculation.  Incomplete

11         hypothetical.

12              THE WITNESS:  Generally not.

13    QUESTIONS BY MR. EPPICH:

14         Q.    Are you familiar with the term

15    "illegal prescribing"?

16         A.    Yes.

17         Q.    What is illegal prescribing?

18         A.    Prescribing controlled

19    substances for other than a legitimate

20    medical purpose.

21         Q.    Is illegal prescribing a form

22    of diversion?

23         A.    Yes.

24         Q.    You'd agree with me that

25    illegal prescribing contributes to the opioid
```

1    crisis?

2         A.    Yes.

3         Q.    Earlier today you testified

4    about meetings that you had with the

5    plaintiffs' counsel in 2018.

6              Do you remember that testimony?

7         A.    Yes.

8         Q.    I believe you said you had two

9    meetings, one in the summer and one in the

10   fall of 2018, correct?

11        A.    Yes.

12        Q.    Now, did you -- during those

13   meetings with the plaintiffs' counsel in

14   2018, did you tell plaintiffs' counsel that

15   the DEA had approved the distributors'

16   submission of excessive purchase reports

17   after orders had been shipped?

18        A.    I believe that was discussed,

19   yes.

20        Q.    Did you tell plaintiffs'

21   counsel during those meetings that in your

22   experience excessive purchase reports

23   complied with the requirements of the

24   Controlled Substances Act and its

25   regulations, at least for your time at DEA

1  between 1977 and the distributor briefings?

2      A.    Yes.

3      Q.    Did you tell plaintiffs'

4  counsel during these meetings in 2018 that

5  the Controlled Substances Act and its

6  regulations do not include a no shipping

7  requirement?

8      A.    I don't believe so.

9      Q.    You didn't discuss the no

10  shipping requirement?

11      A.    I don't recall that

12  specifically.

13      Q.    During these meetings with the

14  plaintiffs' counsel in 2018, did you tell

15  plaintiffs' counsel the distributor briefings

16  focused on Internet pharmacy issues?

17      A.    Yes.

18      Q.    Did you tell plaintiffs'

19  counsel that the additional diligence you

20  requested of distributors at these

21  distributor briefings was to help identify

22  Internet pharmacies?

23      A.    I don't recall specifically

24  that was how it was worded.

25      Q.    But something similar?

1     A.     Yes.

2     Q.     At these meetings with

3 plaintiffs' counsel in 2018, did you tell

4 plaintiffs' counsel that distributors had no

5 access to the ARCOS data submitted by other

6 distributors?

7     A.     I don't believe so.

8     Q.     Did you discuss ARCOS data with

9 the plaintiffs' counsel in 2018?

10    A.     There was a discussion of ARCOS

11 data, what it consists of and what's

12 available.

13    Q.     Did you discuss who had access

14 to ARCOS data during your meetings with

15 plaintiffs' counsel?

16    A.     I don't recall if we did.

17    Q.     After your discussions with the

18 plaintiffs' counsel, the plaintiffs did not

19 contact you to ask you to serve as an expert

20 for plaintiffs in this case, correct?

21    A.     That's correct.

22    Q.     Do you recall what other topics

23 you discussed with plaintiffs' counsel during

24 these meetings in 2018?

25    A.     Not really.  It was just a

1  broad range of topics, but I can't come up

2  with any particular one.

3      Q.    Do you recall the names of any

4  attorneys present at the meetings with

5  plaintiffs' counsel in 2018?

6      A.    No, I don't at this point.

7      Q.    If you look to your right, do

8  you see any of the plaintiffs' counsel here

9  today that attended that meeting?

10     A.    There's a couple that may have

11 been at the meeting, at one of the meetings,

12 yes.

13     Q.    Do you remember any of their --

14 can you point to any of those individuals,

15 sir?

16         MR. FARRELL:  We're just

17     waving.

18         THE WITNESS:  Yeah, they're

19     just waving.

20         MR. LANIER:  None of us were

21     there.

22         THE WITNESS:  Yeah, I don't

23     see...

24 QUESTIONS BY MR. EPPICH:

25     Q.    Okay.  Now, you mentioned that

1    Mr. Rannazzisi contacted you to join

2    plaintiffs' counsel at this meeting?

3         A.      That's correct.

4         Q.      Do you remember that testimony?

5                 Have you had any conversations

6    with Mr. Rannazzisi outside of these two

7    meetings with Mr. Rannazzisi about the opioid

8    crisis?

9         A.      Before the meetings, yes.

10        Q.      And when were those

11   conversations?

12        A.      I don't recall the exact dates

13   or even approximately when they were.  We had

14   a couple of phone calls and...

15        Q.      Were they just prior to your

16   first meeting in 2018 with the plaintiffs'

17   counsel, or were they some years prior?

18        A.      More along the lines of months

19   prior.

20        Q.      Do you recall what you

21   discussed with Mr. Rannazzisi during those

22   conversations?

23        A.      A little bit about opioids and

24   a lot about people that we knew and where

25   they were and that kind of thing.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      During your meetings
 2    with plaintiff --
 3                   MR. LANIER:  Can I interrupt
 4          for just a moment?  I apologize.
 5                   The record on 218, line 16, has
 6          me saying, "One of us was there,"
 7          Ms. Campbell.
 8                   It should be "none of us was
 9          there," is what I said.
10                   Thank you.
11    QUESTIONS BY MR. EPPICH:
12          Q.      If there was a question
13    pending, I'll strike it and start over.
14                   Mr. Mapes, during the meetings
15    with plaintiffs' counsel in 2018, were there
16    any other former DEA employees present at the
17    meeting?
18          A.      Joe Rannazzisi was present at
19    both, but he was the only former DEA employee
20    that was there besides myself.
21                   MR. EPPICH:  Thank you, sir.  I
22          have no further questions at this
23          time, and I'll turn you over to my
24          colleague, Mr. Stephens.
25                   VIDEOGRAPHER:  Going off
```

1          record.  The time is 4:20.

2           (Off the record at 4:20 p.m.)

3                   VIDEOGRAPHER:  We're going on

4          the record.  Beginning of Media

5          File 10.  The time is 4:34.

6                   EXAMINATION

7    QUESTIONS BY MR. STEPHENS:

8          Q.    Mr. Mapes, good afternoon.  My

9    name's Neal Stephens.  I'm from the Jones Day

10   law firm, and I represent Walmart.

11                We met earlier today, but you

12   and I have never spoken before?

13         A.    That's correct.

14         Q.    Okay.  I'll also be asking you

15   some questions, not just on Walmart's behalf

16   but also on behalf of retail chain

17   pharmacies.  And for your benefit, that will

18   include CVS, Rite Aid, Walgreens and HBC and

19   Giant Eagle.

20                Okay?

21         A.    Yes.

22         Q.    Okay.  All right.

23                And since I'm going last, I've

24   carved out a lot of material out of my

25   outline, but I do have a couple follow-up

Highly Confidential - Subject to Further Confidentiality Review

 1   questions on some of the topics that you've

 2   already testified to today.

 3              Okay?

 4        A.    Okay.

 5        Q.    And the first one is, there was

 6   a series of questions from a couple of my

 7   colleagues that related to shipping orders

 8   that had been flagged as suspicious.

 9              Do you recall that line of

10   questions?

11        A.    Yes.

12        Q.    And you had indicated that at

13   some point you were aware that registrants

14   had a practice of shipping orders that had

15   been reported as suspicious.

16              Do you recall that?

17        A.    That had been reported before

18   2005 in excess -- in suspicious or excessive,

19   that they had shipped those.

20        Q.    I'm just -- right.

21              So my point is that you were

22   just aware that there had been a practice at

23   some point in time that orders that had been

24   flagged as potentially suspicious had still

25   been shipped.  I'm just trying to reorient

Highly Confidential – Subject to Further Confidentiality Review

1    you --

2         A.    Yes.

3         Q.    -- to that testimony.  Okay?

4               Now, is it fair --

5               MR. BENNETT:  Objection.

6         Mischaracterizes his testimony.  He

7         said suspicious or excessive, not just

8         suspicious.

9    QUESTIONS BY MR. STEPHENS:

10        Q.    Okay.  Is it fair to say that

11   you're not aware of any deadline that DEA set

12   that changed this practice related to the

13   shipping of suspicious orders?

14        A.    I'm aware that the practice was

15   changed as we had meetings with wholesalers

16   in 2005 and beyond; that then they changed

17   from sending the excessive or suspicious

18   orders after the fact, and they started doing

19   it ahead of the fact and then resolving that

20   suspicion before they shipped.

21        Q.    Okay.  Mr. Mapes, but are you

22   aware of any deadline that was set, any date

23   certain set by DEA sent out to the

24   registrants, as to what date that practice

25   had to change?

```
 1              MR. BENNETT:  Objection.  Asked
 2        and answered.
 3              THE WITNESS:  I'm not aware of
 4        a specific deadline.
 5   QUESTIONS BY MR. STEPHENS:
 6        Q.    Okay.  All right.  Another
 7   topic that you addressed earlier today in the
 8   first session of questioning related to what
 9   DEA's expectations were of various
10   registrants about how they designed their SOM
11   system.
12              Do you recall that line of
13   questions?
14        A.    Yes.
15        Q.    And just to reorient you, it
16   was basically along the lines of your
17   expectation was that a SOMs system for a
18   registrant was not a one-size-fits-all
19   proposition, correct?
20        A.    Correct.
21        Q.    It would depend on the
22   registrant's business model, right?
23        A.    Yes.
24        Q.    Okay.  And it's a situation
25   where, for example, some distributors supply
```

1    hospitals and some don't, right?

2         A.    That's correct.

3         Q.    And some distributors would

4    supply hospice centers, for example, and

5    other registrants don't?

6         A.    Correct.

7         Q.    Okay.  And some distributors

8    might supply independent pharmacies that the

9    distributor does not own, right?

10        A.    Yes.

11        Q.    But other distributors, like

12   retail chain pharmacies, do not supply

13   independent pharmacies that they do not own,

14   right?

15        A.    Correct.

16        Q.    Retail chain pharmacies

17   commonly use a self-distribution model where

18   they only distribute through to chain stores

19   that the retail chain pharmacy owns; is that

20   fair?

21        A.    Yes.

22        Q.    And so, for example, you'd

23   agree that during your tenure at DEA, Walmart

24   distribution centers only distributed

25   controlled substances to Walmart store

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies, fair?

2         A.      Yeah, that's my understanding.

3         Q.      Okay.  And for CVS, CVS would

4    have done the same; they would have only

5    supplied through to CVS stores?

6         A.      Yes.

7         Q.      And Rite Aid would have only

8    distributed through to Rite Aid stores?

9         A.      Yes.

10        Q.      And Walgreens would have only

11   distributed through to Walgreens stores?

12        A.      Yes.

13        Q.      And my last example, HBC, Giant

14   Eagle would have only distributed through to

15   HBC, Giant Eagle stores, fair?

16        A.      I don't know about that

17   particular retail chain, so I can't really

18   comment.

19        Q.      Okay.  During your tenure at

20   DEA, did you think that a SOM system for a

21   retail chain pharmacy who only distributes to

22   pharmacies that it owns may be different than

23   a SOM system for a distributor who

24   distributes to pharmacies that it doesn't

25   own?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     Yes.

 2         Q.     And would you agree that it

 3    could be reasonable for a retail chain

 4    pharmacy like Walmart to not have to include

 5    all of the compliance measures in its SOM

 6    systems that might be necessary for a

 7    distributor who distributes controlled

 8    substances to customers that the distributor

 9    does not own?

10              MR. BENNETT:  Objection.

11         Scope.  Vague.  Incomplete

12         hypothetical.

13              You can answer.

14              THE WITNESS:  Yes, I agree

15         there could be differences between the

16         systems for those two organizations.

17    QUESTIONS BY MR. STEPHENS:

18         Q.     Okay.  Would you agree that

19    during your tenure at DEA you expected that

20    each registrant would take reasonable steps

21    to try to avoid shipping to customers who

22    would divert the controlled substances?

23         A.     Yes.

24         Q.     And would you agree that one

25    key point of the Controlled Substances Act is
```

1    that you wanted distributors to set up their

2    supply chain so they took reasonable steps to

3    try to avoid supplying controlled substances

4    to customers who may divert them?

5         A.    Yes.

6         Q.    And is it fair to say that if a

7    distributor did not supply customers who

8    diverted opioids, the distributor was

9    behaving reasonably?

10              MR. BENNETT:  Objection.

11         Scope.  Incomplete hypothetical.

12              You can answer.

13              THE WITNESS:  It would be fair

14         to say, yes, that if no one that they

15         distributed to was diverting drugs,

16         that their systems were appropriate.

17    QUESTIONS BY MR. STEPHENS:

18         Q.    Okay.  As an example, would you

19    agree that a distributor was acting

20    reasonably if it structured its business so

21    it did not distribute controlled substances

22    to rogue Internet pharmacies and only

23    distributed to retail chain pharmacies who

24    were among the registrants who did not divert

25    controlled substances?

```
 1              MR. BENNETT:  Objection.

 2        Scope.  Incomplete hypothetical.

 3        Calls for speculation.

 4              THE WITNESS:  If they did not

 5        distribute to Internet pharmacies and

 6        did not distribute to anyone who

 7        diverted, my opinion is that

 8        they're being reasonable, yes.

 9   QUESTIONS BY MR. STEPHENS:

10        Q.    As a general matter, during

11   your tenure as a diversion investigator,

12   would you agree that you focused your

13   anti-diversion efforts where you saw

14   diversion occurring?

15        A.    Where we saw diversion

16   occurring and where we saw where we could

17   influence that, whether it was at that level

18   or another level.

19        Q.    Okay.  Would you agree that in

20   the 2005, 2006 time frame, you saw diversion

21   of controlled substances occurring in rogue

22   Internet pharmacies?

23        A.    Yes, among other places.

24        Q.    Okay.  And during that time

25   frame, the 2005, 2006 time frame, rogue
```

1    Internet pharmacies became a focus for you

2    and other diversion investigators at DEA?

3         A.      They did.

4         Q.      Would you agree that in the

5    2006 era, rogue Internet pharmacies presented

6    you and your colleagues at DEA with the

7    greatest threat of diversion that was

8    operating within the closed system of

9    distribution that DEA regulates?

10        A.      I don't know that they were the

11   greatest threat, because there was still all

12   the other situations with doctors who were

13   overprescribing and pharmacies who were

14   selling without prescriptions and those

15   things.  So I can't really quantify which was

16   the biggest threat.

17        Q.      Okay.  But would you agree,

18   Mr. Mapes, that in this time period, this

19   2005, 2006 time frame, the onset of rogue

20   Internet pharmacies led DEA to institute its

21   Internet Distributor Initiative that you've

22   testified earlier today?

23        A.      Yes.

24        Q.      And as part of that effort, you

25   met with wholesale distributors to educate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them about the issues presented by rogue

 2    Internet pharmacies?

 3         A.     That's correct.

 4         Q.     Can you recall how many

 5    meetings you personally attended?

 6         A.     No.

 7         Q.     Can you estimate?

 8                Was it more than ten?

 9         A.     My estimate is 10 or 12.

10         Q.     Okay.  But it wouldn't have

11    been more than 15?

12         A.     I'm not really certain.

13         Q.     Okay.  How about this:  It

14    wouldn't have been more than 20?

15         A.     Probably not.

16         Q.     Okay.  Were there others?  Did

17    you have other colleagues at DEA during this

18    time frame that you're aware of who were also

19    meeting with wholesale distributors on this

20    distributor briefing?

21         A.     There were others after I

22    retired from DEA who were doing it.  I think

23    I was involved in every one of the

24    distributor briefings while I was still

25    there.
```

```
 1          Q.      Okay.  And can you refresh me

 2   on when these briefings started?

 3                  Was it 2005?

 4          A.      Yes.

 5          Q.      Okay.  And you retire in

 6   mid-2007?

 7          A.      October of 2007, yes.

 8          Q.      You remember that date, right?

 9          A.      Yes.

10          Q.      Okay.  After 30 years, you can

11   remember that date, right?

12                  Okay.  Fair enough.

13                  All right.  So in between 2005

14   and October of 2007, your recollection is, is

15   that there were about 12 or so Internet

16   distributor briefings that you conducted with

17   wholesale distributors?

18          A.      Yes.

19          Q.      Okay.  And was each of those

20   like a one-on-one meeting between DEA and one

21   wholesale distributor?

22          A.      One distributor, several people

23   from the distributor at times, sometimes an

24   individual, and sometimes with counsel,

25   sometimes without.
```

1     Q.     Okay.  So my point, Mr. Mapes,

2  is your recollection of the entirety of the

3  number of wholesale distributors who received

4  this briefing during your career at DEA is

5  about 12?

6     A.     About that.

7     Q.     Okay.  How did DEA -- or how

8  did you select which wholesale distributor

9  was going to receive the briefing?

10     A.     We started at first with

11  Amerisource, Cardinal and McKesson because

12  they're obviously those with the largest

13  volume, and then we went to lower volume

14  distributors such as HD Smith and others that

15  were maybe regional distributors, not

16  nationwide distributors, that kind of thing.

17     Q.     Okay.  So you've identified

18  four.

19          Can you recall any of the other

20  eight or so that you met with during your

21  career?

22     A.     Not right now, I can't.

23     Q.     You did not meet with Walmart

24  to provide an Internet distributor briefing

25  between 2005 and 2007, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      That's correct.
 2        Q.      Do you agree that during this
 3   time frame DEA acknowledged in presentations
 4   that it made that no chain pharmacies were
 5   rogue pharmacies?
 6                MR. BENNETT:  You can answer.
 7                THE WITNESS:  I don't believe
 8        that was in DEA presentations.
 9   QUESTIONS BY MR. STEPHENS:
10        Q.      Okay.  Let me see if I can
11   refresh your recollection.
12        A.      Okay.
13                (Mapes Exhibit 19 marked for
14        identification.)
15   QUESTIONS BY MR. STEPHENS:
16        Q.      So I'm going to show you what's
17   been marked as Deposition Exhibit Number 19.
18   It's a document that is Bates-numbered
19   US-DEA-00002413.
20                And if you look at the very
21   first slide, it says "Internet Pharmacies."
22   It's got Mr. Rannazzisi's name there, and
23   it's a slide deck.
24                Do you see that?
25        A.      Yes.
```

```
 1              Q.      And I'd ask you to turn to

 2    Slide 50 in the presentation.  It's almost

 3    all the way at the back, Mr. Mapes.

 4                      Do you see that?

 5              A.      I do.

 6              Q.      And Slide 50 details -- the

 7    title is "The Rogue Pharmacy."

 8                      Do you see that?

 9              A.      Yes.

10              Q.      Do you see the second bullet?

11              A.      Yes.

12              Q.      What does the second bullet

13    say?

14              A.      "No chain pharmacies."

15              Q.      Okay.  And does this appear to

16    you to be a presentation that DEA provided on

17    the topic of Internet pharmacies?

18                      MR. BENNETT:  Objection.

19              Foundation.

20                      And I also object that the

21              witness did not have a chance to

22              review the entire document or

23              understand the context of the

24              particular slide that you pointed him

25              out to.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It appears to be

 2         a presentation that Mr. Rannazzisi did

 3         concerning Internet pharmacies.  I

 4         don't know when or to which group or

 5         anything like that, and I haven't seen

 6         this before.

 7    QUESTIONS BY MR. STEPHENS:

 8         Q.    If you look at the -- page 2 or

 9    slide 2, you'll see a date at the bottom,

10    March of 2007.

11              Do you see that?

12         A.    Yes.

13         Q.    Okay.  And you were still at

14    DEA in March of 2007?

15         A.    Yes.

16         Q.    Okay.  All right.  I'm finished

17    with that exhibit, Mr. Mapes.

18              In enforcing the Controlled

19    Substances Act during your tenure at DEA, did

20    you believe that every registrant was

21    entitled to due process in every diversion

22    investigation that you conducted?

23              MR. BENNETT:  You can answer.

24              THE WITNESS:  Yes.

25
```

```
1    QUESTIONS BY MR. STEPHENS:

2         Q.     Why?

3         A.     Just part of the system.

4         Q.     But what do you mean "part of

5    the system"?

6         A.     That if we find something that

7    we think is wrong, that they, either in a

8    response to a letter of admonition or an

9    administrative hearing or any other forum,

10   they provide their take on the situation.

11        Q.     Okay.  Do you believe that DEA

12   must separately assess the facts as to each

13   individual actor in DEA's closed system of

14   distribution to determine whether a

15   particular registrant has violated the

16   Controlled Substances Act?

17             MR. BENNETT:  You can answer.

18             THE WITNESS:  Yes, I believe

19        that they need to look at each

20        registrant individually rather than

21        looking at an entire group.

22   QUESTIONS BY MR. STEPHENS:

23        Q.     So would you agree that every

24   manufacturer, distributor and retail chain

25   pharmacy is entitled to individualized review
```

1    of its own conduct before being accused for

2    potential violations of the Controlled

3    Substances Act committed by somebody else?

4                MR. BENNETT:  Objection.

5           Vague.  Scope.

6                You can answer in your personal

7           capacity.

8                THE WITNESS:  Yeah, I believe

9           that they -- they should have that

10          opportunity, yes.

11   QUESTIONS BY MR. STEPHENS:

12          Q.    So, for example, would you

13   agree that you should not accuse a retail

14   chain pharmacy of improper distribution where

15   a rogue Internet pharmacy diverts controlled

16   substances and there is no evidence that the

17   retail chain pharmacy distributed the

18   controlled substances to the rogue Internet

19   pharmacy?

20                MR. BENNETT:  Objection.

21          Vague.  Scope.  Incomplete

22          hypothetical.

23                You can answer in your personal

24          capacity.

25                THE WITNESS:  Yes, I believe

1          that each should be treated

2          differently based on the facts and

3          circumstances.

4     QUESTIONS BY MR. STEPHENS:

5          Q.     So let's go back to another

6     topic that you mentioned briefly this

7     morning.  You had mentioned a DEA 6 report.

8               Do you remember talking about

9     that when you were talking about your time in

10    Detroit and Cleveland as diversion

11    investigator?

12         A.     Yes.

13         Q.     Can you describe what a DEA 6

14    report is?

15         A.     A DEA 6 is just a form for

16    reporting investigative information.

17         Q.     And one of the purposes of

18    reporting it in a DEA 6 is that information

19    is preserved for other investigators to use

20    on other investigations if the information

21    that you put in there might be relevant to

22    them?

23               MR. BENNETT:  Objection.

24         Scope.

25               You're not authorized to

1          disclose law enforcement sensitive

2          information or confidential

3          investigative techniques.

4                    You may answer this question

5          yes or no only on whether that would

6          be one of your purposes in doing a

7          DEA 6.

8                    THE WITNESS:  Yes, it would be.

9    QUESTIONS BY MR. STEPHENS:

10         Q.    Okay.  You also, in the course

11   and scope of your duties as a diversion

12   investigator over your 30 years at DEA, you

13   had the opportunity to use DEA's NADDIS

14   database, correct?

15                   MR. BENNETT:  Objection.

16         Scope.

17                   You may answer that question

18         yes or no only on whether you used the

19         NADDIS database.

20                   THE WITNESS:  Yes, I did.

21   QUESTIONS BY MR. STEPHENS:

22         Q.    And the NADDIS database stands

23   for Narcotics and Dangerous Drugs Information

24   System?

25                   MR. BENNETT:  You can answer

1          that question, if you know.

2                    THE WITNESS:  Yes.

3     QUESTIONS BY MR. STEPHENS:

4          Q.    Okay.  NADDIS -- at a very

5     general, high level, NADDIS is a database

6     where DEA agents will input information about

7     subjects of investigation, including any

8     contact information or biographical

9     information they might have on that subject?

10                    MR. BENNETT:  Objection.

11          Scope.

12                    You are not authorized to

13          disclose information regarding

14          confidential databases maintained by

15          the DEA or the information contained

16          therein.

17                    And so to the extent you can

18          answer without disclosing the

19          confidential information or ways that

20          the database is used, you can answer.

21                    Beyond that, you are not

22          authorized to disclose information

23          regarding specific databases that are

24          nonpublic.

25                    THE WITNESS:  Okay.

```
 1                It's a database where

 2          headquarters inputs information from

 3          DEA reports of investigation.

 4   QUESTIONS BY MR. STEPHENS:

 5          Q.    Okay.  And it's preserved for

 6   other agents in other locations to use

 7   downstream if there might be something

 8   helpful there?

 9                MR. BENNETT:  Objection.

10          Scope.

11                You are not authorized to

12          disclose confidential law enforcement

13          investigative techniques.

14                You may answer yes or no only

15          as far as whether you used NADDIS for

16          the purpose -- for that purpose.

17                THE WITNESS:  Yes, I did.

18   QUESTIONS BY MR. STEPHENS:

19          Q.    Okay.  DEA diversion

20   investigators also use something called the

21   RICS database; is that accurate?

22          A.    I never heard of that.

23          Q.    You have not heard of the

24   database called the Registrant Information

25   Consolidation System database?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I have not.

 2        Q.     Would you agree that narcotics

 3   enforcement, based on your experience, is

 4   more effective when federal agencies

 5   cooperate with each other on investigations?

 6             MR. BENNETT:  Objection.

 7        Scope.

 8             You may answer that with your

 9        personal opinion, but you are not

10        speaking on behalf of DEA.

11             THE WITNESS:  Yes, my personal

12        opinion is that cooperation with other

13        agencies is important.

14   QUESTIONS BY MR. STEPHENS:

15        Q.     And your personal opinion,

16   based on all of your personal experience as a

17   DEA diversion investigator, would be that

18   when both agencies share information with

19   each other, the agencies can make more

20   informed decisions about how to structure

21   their investigations?

22             MR. BENNETT:  Objection.

23        Vague.  Objection.  Scope.

24             You may give your personal

25        opinion, if you understand the
```

1       question.

2               THE WITNESS:  Yes, they can.

3   QUESTIONS BY MR. STEPHENS:

4       Q.      And would you agree as a

5   general matter, based on your 30 years of

6   experience at DEA, that the sharing of

7   information between investigative agencies

8   leads to more collaboration among law

9   enforcement, which often leads to more

10  successful investigation and reduces

11  diversion?

12              MR. BENNETT:  Same objection.

13              THE WITNESS:  I would agree

14      that it leads to more collaboration

15      and effective investigations.

16  QUESTIONS BY MR. STEPHENS:

17      Q.      Okay.  And would you agree,

18  based on your experience in your cases that

19  you've worked over the years, that diversion

20  can be reduced when DEA chooses to share

21  information with other federal, state and

22  local law enforcement agencies?

23              MR. BENNETT:  Objection.

24      Scope.

25              You are not authorized to speak

1          on behalf of DEA.

2                   If you have a personal opinion,

3          you may give your personal opinion

4          based on your personal experiences.

5                   THE WITNESS:  My opinion is

6          that it's hard to quantify diversion

7          and whether or not sharing of

8          information reduces diversion.

9                   So it does lead to more

10         investigations, but whether those

11         reduce diversion or not, I'm not

12         certain.

13    QUESTIONS BY MR. STEPHENS:

14         Q.    Would you agree that drug

15    traffickers and diverters are the ones who

16    potentially benefit if DEA decides to isolate

17    itself from folks who could help advance

18    DEA's diversion investigations?

19                   MR. BENNETT:  Objection.

20         Vague.  Calls for speculation.  Scope.

21                   You are not authorized to speak

22         on behalf of DEA.

23                   If you have personal

24         information that you can form a

25         personal opinion, you may give your

Highly Confidential – Subject to Further Confidentiality Review

1       personal opinion.

2               THE WITNESS:  I've forgotten

3       the question now.

4    QUESTIONS BY MR. STEPHENS:

5       Q.      Sure.

6               Would you agree that drug

7    traffickers and diverters are the ones who

8    potentially benefit if DEA decides to isolate

9    itself from individuals who could help

10   advance DEA's diversion investigations who

11   are outside of DEA?

12      A.      If those individuals are other

13   law enforcement agencies, yes.

14      Q.      Okay.  Would you agree that DEA

15   should be ready, willing and able to share

16   information with any good faith registrant

17   who could help DEA prevent diversion?

18              MR. BENNETT:  Objection.

19       Scope.  Vague.  Incomplete

20       hypothetical.  Calls for speculation.

21              You are not authorized to speak

22       on behalf of DEA.  If you have

23       personal experiences which will allow

24       you to form a personal opinion, you

25       may give your personal opinion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  I would agree
 2          with that as long as the information
 3          sharing is within the bounds of that
 4          that's allowed by law and regulation.
 5   QUESTIONS BY MR. STEPHENS:
 6          Q.    Okay.  Based on your experience
 7   at DEA, as you were trying to make a
 8   determination as to whether to bring an
 9   action against someone, would you agree that
10   to make the most accurate assessment of the
11   charging decision that was in front of you,
12   that you wanted as much relevant information
13   as possible about the suspect's action in
14   front of you so you can make an accurate,
15   informed decision on what DEA should do?
16                  MR. BENNETT:  Objection.
17          Vague.  Form.
18                  You can answer.
19                  THE WITNESS:  Yes.
20   QUESTIONS BY MR. STEPHENS:
21          Q.    If your colleagues down the
22   road at FBI withheld relevant information
23   from you on an investigation so that you only
24   had partial information about your suspect's
25   conduct, would you agree that it would make
```

Highly Confidential - Subject to Further Confidentiality Review

1    it harder for you to make an accurate,

2    informed decision about what to do?

3              MR. BENNETT:  Objection.  Form.

4         Scope.  Vague.  Calls for speculation.

5              You can answer.

6              THE WITNESS:  I never had the

7         situation personally where the FBI

8         withheld information.  It could be

9         detrimental if they did.

10   QUESTIONS BY MR. STEPHENS:

11        Q.    Okay.  And since it could be

12   detrimental, would you agree that the sharing

13   of information between FBI and DEA in the

14   question I just posed to you would reduce the

15   number of potential mistakes a law

16   enforcement agency might make on an important

17   decision in an investigation?

18             MR. BENNETT:  Objection.  Form.

19        Scope.  Vague.  Calls for speculation.

20        Incomplete hypothetical.

21             You can answer.

22             THE WITNESS:  Yes, I would

23        agree.

24   QUESTIONS BY MR. STEPHENS:

25        Q.    Okay.  Given your general

Highly Confidential - Subject to Further Confidentiality Review

1  duties included some leadership positions at

2  DEA and at headquarters, I'd like to ask you

3  some questions about leadership principles

4  that you may have followed during your time

5  at DEA.

6           Okay?

7     A.    Okay.

8     Q.    All right.  So based on your

9  experience as a leader at DEA, would you

10 agree that the success of an organization

11 often depends in part on tactical decisions

12 made by its leader?

13          MR. BENNETT:  Objection.

14     Vague.

15          THE WITNESS:  Yes.

16 QUESTIONS BY MR. STEPHENS:

17     Q.    Do you agree that good leaders

18 hold themselves accountable for the decisions

19 they make?

20     A.    Yes.

21     Q.    If your goal is to reduce

22 diversion, would you agree that a good leader

23 at DEA should be willing to share information

24 about diversion issues with good faith

25 registrants so the registrants may be able to

1    use that information to help DEA decrease

2    diversion?

3                MR. BENNETT:  Objection.  Form.

4          Scope.  Vague.  Incomplete

5          hypothetical.  Calls for speculation.

6                You can answer, if you have an

7          opinion.

8                THE WITNESS:  Yes, they should,

9          but again within the constraints of

10          what's authorized by law and

11          regulation.

12    QUESTIONS BY MR. STEPHENS:

13          Q.    Would you agree that good

14    leaders at DEA also ensure that their

15    personal conduct and the conduct of their

16    team comports to the standards that they

17    expect others to follow?

18                MR. BENNETT:  Objection.

19          Vague.

20                THE WITNESS:  I don't quite

21          understand the question.

22                If you're saying that the DEA

23          employees comport to the same

24          standards they're of expecting

25          registrants, they're in a different

1          business and doing different things,

2          so...

3     QUESTIONS BY MR. STEPHENS:

4          Q.     Well, let me ask it this way.

5                 Do you agree that the American

6     public has a right to expect that the leaders

7     of our law enforcement agencies will lead

8     their teams in a fashion that is consistent

9     with the standards that they impose on the

10    folks that they regulate?

11                MR. BENNETT:  Objection.

12         Vague.  Calls for speculation.

13                THE WITNESS:  It seems

14         reasonable, yes.

15    QUESTIONS BY MR. STEPHENS:

16         Q.     Okay.  Is it fair to say that

17    the American public has a right to expect

18    that when DEA sees diversion happening, DEA

19    will not simply let the diversion continue to

20    happen?

21                MR. BENNETT:  Objection.

22         Vague.  Incomplete hypothetical.

23         Calls for speculation.

24                THE WITNESS:  Yes, but within

25         the bounds of the available resources.

```
 1    QUESTIONS BY MR. STEPHENS:

 2         Q.    Based on your experience as a

 3    leader at DEA, if DEA expects registrants it

 4    regulates to take reasonable measures to

 5    prevent diversion, is it fair for the

 6    American public to expect that DEA will do

 7    the same?

 8              MR. BENNETT:  Objection.

 9         Incomplete hypothetical.  Vague.

10         Calls for speculation.  Scope.

11              You can answer, if you have an

12         opinion.

13              THE WITNESS:  I really don't

14         have an opinion on that.

15    QUESTIONS BY MR. STEPHENS:

16         Q.    All right.  Well, how about

17    this.

18              If DEA has information that a

19    shipment of controlled substances headed to

20    Customer X will be diverted by Customer X, do

21    you think that the American public should be

22    able to rely on DEA to step in and intercept

23    that shipment of controlled substances before

24    those controlled substances reach Customer X?

25              MR. BENNETT:  Objection.
```

```
 1          Scope.  Vague.  Incomplete

 2          hypothetical.  Calls for speculation

 3          and calls for a legal conclusion.

 4               THE WITNESS:  I believe the DEA

 5          should take some appropriate action,

 6          and that should be expected.

 7    QUESTIONS BY MR. STEPHENS:

 8          Q.    Okay.  Let me switch gears here

 9    a little bit.

10               And what I'd like to do is ask

11    you some questions about some of -- some of

12    the investigative techniques that DEA has

13    that may be different than what a registrant

14    might be able to do as it's setting up its

15    SOM program.

16               Okay?

17          A.    Okay.

18          Q.    During your tenure as a DEA

19    investigator, were there occasions where you

20    were able to identify a potential diverter

21    based on information that DEA developed as

22    opposed to information that was provided to

23    DEA by a registrant in a suspicious order

24    report?

25               MR. BENNETT:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Scope.

 2              You may answer that question

 3        yes or no only.

 4              THE WITNESS:  Yes.

 5   QUESTIONS BY MR. STEPHENS:

 6        Q.    Okay.  Would you agree that DEA

 7   has unique law enforcement investigative

 8   powers that are available to DEA to identify

 9   potential diverters that are not available to

10   a registrant like Walmart?

11              MR. BENNETT:  Objection.

12        Vague.

13              THE WITNESS:  Yes.

14   QUESTIONS BY MR. STEPHENS:

15        Q.    Okay.  DEA has subpoena power,

16   for example, correct?

17        A.    That's correct.

18        Q.    Walmart does not have subpoena

19   power to subpoena a doctor, correct?

20        A.    Not that I'm aware of.

21        Q.    Okay.  Now, DEA can issue

22   subpoenas to help investigate potential

23   diversion, right?

24              MR. BENNETT:  Objection.  Form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STEPHENS:

 2         Q.    Based on your experience, do

 3    you agree that DEA can issue a subpoena to

 4    help investigate potential diverters?

 5              MR. BENNETT:  You can answer,

 6         if you know.

 7              THE WITNESS:  Yes.

 8    QUESTIONS BY MR. STEPHENS:

 9         Q.    Okay.  And during your time at

10    DEA, DEA collected information in diversion

11    investigation through subpoenas?

12              MR. BENNETT:  Objection.

13         Scope.

14              You may answer that question

15         yes or no only.

16              THE WITNESS:  Yes.

17    QUESTIONS BY MR. STEPHENS:

18         Q.    To your knowledge, did Joe

19    Rannazzisi ever authorize you or anyone else

20    to share information with any registrant the

21    DEA had obtained through subpoenas?

22              MR. BENNETT:  Objection.

23         Scope.

24              You may answer that question

25         yes or no only.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  No.
 2    QUESTIONS BY MR. STEPHENS:
 3         Q.     Would you agree that search
 4    warrants are a second vehicle that provide
 5    DEA an investigative tool that registrants
 6    like Walmart do not have?
 7                    MR. BENNETT:  You can answer.
 8                    THE WITNESS:  Yes.
 9    QUESTIONS BY MR. STEPHENS:
10         Q.     Okay.  DEA can apply to a
11    magistrate judge to obtain a search warrant,
12    right?
13         A.     Yes.
14         Q.     And a search warrant would give
15    DEA the ability to potentially search rogue
16    pain clinics to obtain documents that might
17    advance a diversion investigation the DEA is
18    conducting?
19         A.     That's correct.
20                    MR. BENNETT:  Objection.
21         Objection.  Scope.
22                    You can answer that yes or no
23         only based on your personal
24         experiences.
25                    THE WITNESS:  Yes.
```

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Okay.  Based on your personal

 3   experience, Mr. Mapes, DEA also can obtain

 4   what is known as an ISP search warrant, an

 5   Internet service provider search warrant,

 6   which allows DEA to intercept e-mail

 7   communications which would include

 8   conversations between a doctor and the

 9   doctor's patients that might relate to

10   diversion, true?

11              MR. BENNETT:  Objection.

12        Scope.

13              You are authorized to answer

14        whether you know of a document

15        entitled an "ISP search warrant" in

16        your personal experience, yes or no

17        only.

18              THE WITNESS:  No.

19   QUESTIONS BY MR. STEPHENS:

20        Q.    You've never heard of an ISP

21   search warrant?

22        A.    No.

23        Q.    Okay.  All right.

24              But just on the topic of search

25   warrants generally, we'll go to premises
```

Highly Confidential - Subject to Further Confidentiality Review

1  search warrant, which is the first example I

2  gave you where you go to a magistrate, the

3  magistrate authorizes DEA to go to address X

4  and DEA conducts a search there.

5          You're familiar with those,

6  right?

7      A.    Yes.

8      Q.    Okay.  Now, did Joe Rannazzisi

9  ever authorize, to your knowledge, anyone at

10  DEA to disclose to any registrant any

11  information obtained from a search warrant so

12  that that registrant could help DEA in a

13  diversion investigation?

14          MR. BENNETT:  Objection.

15      Scope.

16          You may answer that question.

17          THE WITNESS:  Not that I'm

18      aware of.

19          MR. BENNETT:  Well --

20  QUESTIONS BY MR. STEPHENS:

21      Q.    Okay.

22          MR. BENNETT:  He's answered

23      your question.

24          I do object to the scope of

25      that.  I was going to authorize him to

1       answer that yes or no only.

2           He has said not to his

3       knowledge, so we can move on.

4   QUESTIONS BY MR. STEPHENS:

5       Q.      And just to reconfirm, Walmart

6   has no ability to go to a magistrate judge to

7   obtain a search warrant, right?

8       A.      That's correct.

9       Q.      No registrant can go to a

10  magistrate judge and seek a search warrant,

11  right?

12      A.      I wouldn't say that, because

13  DEA is a registrant, so...

14      Q.      Okay.  Other than law

15  enforcement agencies, no private sector

16  registrant can go to a magistrate and seek a

17  search warrant; is that fair?

18      A.      Yes.

19      Q.      All right.  The use of the

20  grand jury is a third example of an

21  investigative technique that is unique to law

22  enforcement and something that is not

23  available to private sector registrants,

24  fair?

25              MR. BENNETT:  Objection.

1           Scope.  Objection.  Form.  Calls for a

2           legal conclusion.

3                   You can answer, if you know, in

4           your personal knowledge.

5                   THE WITNESS:  Yes.

6                   MR. BENNETT:  I'm sorry, I'm

7           not sure I understand his answer to

8           your question on whether somebody in

9           the private sector can go to the grand

10          jury or not.

11  QUESTIONS BY MR. STEPHENS:

12          Q.     Okay.  So let me restate it.

13                  Based on your experience at

14  DEA, can anyone other than law enforcement

15  use the grand jury as a tool to conduct due

16  diligence on a customer?

17          A.     No.

18          Q.     Okay.  Would you agree that the

19  grand jury is an investigative technique that

20  is available to law enforcement and law

21  enforcement only?

22                  MR. BENNETT:  Objection.

23          Vague.  Objection.  Calls for a legal

24          conclusion.

25                  You can answer in your personal

Highly Confidential - Subject to Further Confidentiality Review

1              knowledge, if you know.

2                    THE WITNESS:  Yes, it is a

3              tool.

4     QUESTIONS BY MR. STEPHENS:

5              Q.    Okay.  And DEA can subpoena a

6     suspected diverter to the grand jury and ask

7     him questions under the penalty of perjury

8     related to whether that individual has

9     diverted any controlled substances?

10                   MR. BENNETT:  Objection.

11             Vague.  Objection.  Calls for a legal

12             conclusion.  Objection.  Foundation.

13                   If you have any personal

14             knowledge whether DEA can subpoena a

15             suspected diverter -- oh, and

16             objection.  Scope.

17                   You may answer in your personal

18             knowledge.

19                   THE WITNESS:  My personal

20             opinion is that DEA can serve a

21             subpoena that was issued, but DEA

22             doesn't issue subpoenas.

23    QUESTIONS BY MR. STEPHENS:

24             Q.    Okay.  The subpoena would be

25    issued by either a federal prosecutor's

```
 1   office, a US Attorney's office, or a state

 2   prosecutor's office?

 3        A.    Yes.

 4        Q.    A district attorney's office,

 5   right?

 6        A.    Yes.

 7        Q.    Okay.  If DEA and the

 8   prosecutors believe that a witness has lied

 9   in providing testimony to a grand jury, that

10   individual could be prosecuted for perjury,

11   right?

12             MR. BENNETT:  Objection.

13        Incomplete hypothetical.  Calls for a

14        legal conclusion.  Scope.

15             You can answer based on your

16        personal experience, if you know.

17             THE WITNESS:  I haven't had the

18        personal experience of that happening,

19        no.

20   QUESTIONS BY MR. STEPHENS:

21        Q.    Okay.  Would you agree that

22   being able to compel witnesses to the grand

23   jury and answer questions under the penalty

24   of perjury is a very valuable tool to DEA in

25   building diversion cases?
```

```
 1                    MR. BENNETT:  Objection.
 2          Vague.  Scope.  Calls for a legal
 3          conclusion.
 4                    You can answer.
 5                    THE WITNESS:  Yes.
 6     QUESTIONS BY MR. STEPHENS:
 7          Q.     And Walmart cannot compel
 8     witnesses to testify in front a grand jury,
 9     correct?
10          A.     That's correct.
11          Q.     And the other companies who
12     you've met today at your deposition, none of
13     them have the ability to compel any witnesses
14     to go to a grand jury; is that fair?
15          A.     That's correct.
16          Q.     Okay.  Would you agree that
17     conducting undercover operations present a
18     fourth example where DEA has unique
19     investigative tools to conduct diversion
20     investigations?
21                    MR. BENNETT:  Objection.
22          Vague.  Objection.  Scope.
23                    If you have an opinion, you may
24          answer that question yes or no only.
25                    THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STEPHENS:
 2         Q.    Okay.  For example, based on
 3    your experience conducting diversion
 4    investigations, DEA can use undercover
 5    officers to purchase controlled substances
 6    from diverting Internet pharmacies and pain
 7    clinics?
 8              MR. BENNETT:  Objection.
 9         Scope.
10              You are not authorized to
11         disclose confidential law enforcement
12         investigative or intelligence-
13         gathering and dissemination techniques
14         whose effectiveness would thereby be
15         impaired.
16              To the extent that you can
17         answer the question without disclosing
18         confidential law enforcement
19         investigative techniques, you can
20         answer.  Otherwise, you are instructed
21         not to answer.
22              THE WITNESS:  Yes, they can.
23    QUESTIONS BY MR. STEPHENS:
24         Q.    Okay.  The undercover officers
25    in a DEA operation, for example, in a
```

Highly Confidential - Subject to Further Confidentiality Review

1    diversion investigation, are allowed to

2    legally tape record the conversations that

3    they have with the operator of the business

4    that's under investigation?

5              MR. BENNETT:  Objection.

6         Scope.

7              You are not authorized to

8         disclose confidential law enforcement

9         techniques or how undercover

10        investigations are done.  Also, you

11        are not authorized to draw legal

12        conclusions.

13             I'm instructing you not to

14        answer that question.

15             MR. STEPHENS:  On what --

16             MR. FARRELL:  Sustained.

17             MR. STEPHENS:  On what basis?

18             MR. BENNETT:  That it's a

19        confidential law enforcement

20        investigative technique on how they do

21        investigations and what evidence they

22        gather.

23   QUESTIONS BY MR. STEPHENS:

24        Q.    Are you aware, Mr. Mapes, that

25   there had been literally thousands of

Highly Confidential - Subject to Further Confidentiality Review

1    investigations that have played out in

2    courtrooms across the United States of

3    America where United States Attorneys have

4    put DEA agents on the stand and have played

5    tapes of undercover operations to convince

6    juries to convict drug traffickers under

7    Title 21?

8              MR. BENNETT:  You may answer

9         that question, based on your personal

10        knowledge, yes or no only.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. STEPHENS:

13        Q.    Okay.  So then undercover

14   officers can legally tape record

15   conversations that they have with the

16   operators of the businesses that DEA is

17   investigating; is that fair?

18             MR. BENNETT:  Objection.  Calls

19        for a legal conclusion.  Scope.

20             I don't think this witness can

21        draw a legal conclusion in this

22        deposition.

23             You're asking whether he can

24        legally tape.  I don't think he's both

25        authorized to do that or qualified to

Highly Confidential - Subject to Further Confidentiality Review

 1          make a conclusion.  Plus, I think it's

 2          an incomplete hypothetical.

 3                 So I'm going to instruct him

 4          that he's not authorized on behalf of

 5          DEA or use any DEA information in

 6          answering that question.

 7                 MR. STEPHENS:  Okay.  I will

 8          move on to conserve time.

 9    QUESTIONS BY MR. STEPHENS:

10          Q.     Would you agree that Walmart

11    and CVS, Walgreens, Rite Aid, do not have the

12    ability to use law enforcement agents to

13    conduct undercover operations of businesses?

14                 MR. BENNETT:  Objection.

15          Vague.  Incomplete hypothetical.

16          Calls for a legal conclusion.

17                 You can answer if you have an

18          opinion.

19                 THE WITNESS:  No, I'm not

20          really certain about that.

21    QUESTIONS BY MR. STEPHENS:

22          Q.     Okay.  Are you aware that it

23    might be illegal in certain states for a

24    private actor, private company, to secretly

25    tape record conversations with other people?

Highly Confidential – Subject to Further Confidentiality Review

```
 1              MR. BENNETT:  Objection.
 2         Scope.
 3              To the extent you have personal
 4         information, you can answer that --
 5         you can give your personal opinion.
 6              Calls for a legal conclusion.
 7              THE WITNESS:  I don't know
 8         which states may have which laws, so I
 9         can't really answer that.
10    QUESTIONS BY MR. STEPHENS:
11         Q.    So you don't know one way or
12    the other.  Okay.
13              To your knowledge, did Joe
14    Rannazzisi ever authorize you or anyone else
15    that you know of at DEA to disclose to
16    registrants who could help DEA in diversion
17    investigations information that DEA had
18    obtained in undercover operations?
19              MR. BENNETT:  Objection.
20         Scope.
21              You are not authorized to
22         disclose information regarding
23         specific DEA investigations or
24         activities.  You may answer this
25         question yes or no only.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  No.
 2   QUESTIONS BY MR. STEPHENS:
 3        Q.     Okay.  As a fifth example of an
 4   investigative technique that is unique to DEA
 5   and federal law enforcement, would you agree
 6   that DEA, in a local US Attorney's Office,
 7   has the ability to apply to a judge for an
 8   order that would allow DEA to record
 9   telephone calls made by the subject of DEA's
10   investigation, a Title 3 wiretap?
11                    MR. BENNETT:  You can answer
12        that question.
13                    THE WITNESS:  Yes.
14   QUESTIONS BY MR. STEPHENS:
15        Q.     And would you agree that a
16   Title 3 wiretap allows DEA to listen in to
17   every discussion over the target's telephone?
18                    MR. BENNETT:  Objection.
19        Scope.  Calls for a legal conclusion.
20        Incomplete hypothetical.
21                    You can answer, if you know.
22                    THE WITNESS:  Every call except
23        for those that are required to be
24        minimized.
25
```

```
 1    QUESTIONS BY MR. STEPHENS:
 2         Q.    Okay.  Very good.
 3               And that's spelled out in the
 4    order that the judge -- the DEA and the
 5    US Attorney's Office present to the judge and
 6    the judge signs, right?
 7         A.    Yes.
 8         Q.    Okay.  All right.  Another form
 9    of electronic surveillance is a room bug.
10               Are you familiar with a room
11    bug?
12               MR. BENNETT:  Objection.
13          Scope.
14               He's not authorized to disclose
15          confidential law enforcement
16          investigative or intelligence-
17          gathering techniques, the
18          effectiveness of which would be
19          impaired.
20               You may answer this question
21          yes or no only whether you are
22          familiar with the term "a room bug."
23               THE WITNESS:  Yes.
24    QUESTIONS BY MR. STEPHENS:
25         Q.    Okay.  A room bug is like a
```

```
 1   Title 3 telephonic intercept.  It's a device

 2   that's placed in a particular location and it

 3   records, right?

 4               MR. BENNETT:  You can answer

 5         that question yes or no only if you

 6         know.

 7               THE WITNESS:  Yes.

 8   QUESTIONS BY MR. STEPHENS:

 9        Q.    Okay.  And in comparison to

10   DEA, which has the ability to apply to a

11   judge for these wiretaps and room bugs,

12   Walmart would not have the ability to apply

13   to a judge for a room bug or a wiretap, fair?

14               MR. BENNETT:  Objection.  Calls

15         for a legal conclusion.

16               You can answer in your personal

17         knowledge, if you know.

18               THE WITNESS:  That's correct.

19   QUESTIONS BY MR. STEPHENS:

20        Q.    And would you agree that

21   electronic surveillance can be an enormous

22   help to DEA in determining whether a suspect

23   is diverting controlled substances?

24               MR. BENNETT:  Objection.

25         Vague.  Scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   You can answer in your personal

 2           capacity if you have an opinion.

 3                   THE WITNESS:  Yes, it could be.

 4       QUESTIONS BY MR. STEPHENS:

 5           Q.     Okay.  And based on your

 6       30 years at DEA, are you aware of any

 7       situation where Joe Rannazzisi or anyone else

 8       who was running the Office of Diversion

 9       Control ever authorized you or anyone else at

10       DEA to disclose to a registrant who could

11       help DEA in a diversion investigation the

12       information that DEA had obtained through

13       electronic surveillance?

14                   MR. BENNETT:  Objection.  Form.

15           Scope.  Compound.

16                   You're not authorized to

17           disclose any information regarding

18           specific DEA investigations or

19           activities.

20                   You may answer this question

21           yes or no only, if you understand.

22                   THE WITNESS:  Could you restate

23           the question?

24       QUESTIONS BY MR. STEPHENS:

25           Q.     Sure.
```

 1                    Based on your 30 years at DEA,

 2     are you aware of any situation where anyone

 3     who is running the Office of Diversion

 4     Control ever authorized you or anyone else at

 5     DEA to disclose to a registrant who could

 6     help DEA in a diversion investigation with

 7     information that DEA had obtained through

 8     electronic surveillance?

 9                    MR. BENNETT:  Same objections

10         and instruction.

11                    THE WITNESS:  No, I'm not.

12     QUESTIONS BY MR. STEPHENS:

13         Q.    All right.  Let's talk about

14     number 6, and that will be information from

15     state medical boards or state local law

16     enforcement.  Okay?

17                    DEA, during your tenure and on

18     investigations you worked, obtained

19     information from state and local law

20     enforcement regarding diversion

21     investigations the DEA was conducting; is

22     that accurate?

23                    MR. BENNETT:  Objection.

24         Scope.

25                    You can answer yes or no only.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Yes.
 2   QUESTIONS BY MR. STEPHENS:
 3        Q.     Okay.  Would you agree that
 4   private sector registrants like the companies
 5   that you've met here today do not have the
 6   ability to obtain information from state and
 7   local law enforcement investi -- state and
 8   local law enforcement regarding
 9   investigations that state and local law
10   enforcement is conducting on suspected
11   diverters?
12                MR. BENNETT:  Objection.  Form.
13        Incomplete hypothetical.  Calls for
14        speculation.
15                You can answer, if you have an
16        opinion.
17   QUESTIONS BY MR. STEPHENS:
18        Q.     Let me strike the question and
19   ask a better question.
20        A.     Okay.
21        Q.     That question wasn't so
22   artfully crafted, Mr. Mapes.
23                Are you aware of any situation
24   during your tenure at DEA where state and
25   local law enforcement shared information with
```

1  a registrant related to an investigation that

2  state and local law enforcement was doing of

3  a suspected diverter?

4            MR. BENNETT:  Objection.

5       Scope.

6            You can answer that question

7       yes or no only.

8            THE WITNESS:  Yes.

9  QUESTIONS BY MR. STEPHENS:

10      Q.    Okay.  Would you agree that DEA

11 can obtain information from state medical

12 boards regarding investigations that the

13 state medical board is conducting?

14           MR. BENNETT:  You can answer

15      that question.

16           THE WITNESS:  Yes.

17 QUESTIONS BY MR. STEPHENS:

18      Q.    Okay.  Are you aware of any

19 situation where a state medical board

20 provided information to a non-law enforcement

21 registrant related to investigation --

22 pending investigations that the state medical

23 board was conducting?

24           MR. BENNETT:  You can answer

25      that question yes or no only.

Highly Confidential – Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2   QUESTIONS BY MR. STEPHENS:
 3        Q.    Okay.  Are you aware of any
 4   situation where Mr. Rannazzisi ever
 5   authorized you or anyone else at DEA to
 6   disclose to a registrant who could help DEA
 7   advance its diversion investigation with
 8   information that DEA had obtained from state
 9   and local law enforcement?
10                    MR. BENNETT:  Objection.
11        Scope.  Vague.
12                    You can answer that question
13        yes or no.
14                    THE WITNESS:  No.
15   QUESTIONS BY MR. STEPHENS:
16        Q.    Are you aware of any situation
17   where Mr. Rannazzisi ever authorized you or
18   anyone else at DEA to disclose to a
19   registrant who could help DEA advance its
20   diversion investigation with information that
21   DEA had obtained from a state medical board?
22                    MR. BENNETT:  Objection.
23        Scope.  Vague.
24                    You can answer that question
25        yes or no only.
```

1       THE WITNESS:  No.

2   QUESTIONS BY MR. STEPHENS:

3       Q.      Are you aware of anyone who was

4   in the position of running the Office of

5   Diversion Control who ever authorized you or

6   anyone else at DEA to disclose to a

7   registrant who could help DEA advance its

8   diversion investigation with information that

9   DEA had obtained from a state medical board?

10      MR. BENNETT:  Objection.

11      Scope.  Vague.

12      You can answer that question

13      yes or no only.

14      THE WITNESS:  No.

15  QUESTIONS BY MR. STEPHENS:

16      Q.      Are you aware of anyone who was

17  in the position of running the Office of

18  Diversion Control who had ever authorized you

19  or anyone else at DEA to disclose to a

20  registrant who could help DEA advance its

21  diversion investigation with information the

22  DEA had obtained from state or local law

23  enforcement?

24      MR. BENNETT:  Objection.

25      Scope.  Vague.

1          You can answer that question

2     yes or no only.

3          THE WITNESS:  No.

4  QUESTIONS BY MR. STEPHENS:

5     Q.    Did private sector companies

6  such as Walmart or Walgreens or Rite Aid have

7  the ability to access NADDIS information?

8          MR. BENNETT:  You can answer

9     that question, if you know.

10          THE WITNESS:  No.

11  QUESTIONS BY MR. STEPHENS:

12     Q.    Did private sector companies,

13  Walmart, Walgreens, CVS, have the ability to

14  access DEA 6 reporting from DEA's databases?

15          MR. BENNETT:  You can answer

16     the question.

17          THE WITNESS:  Only through FOI

18     requests or discovery from a case or

19     something like that.

20  QUESTIONS BY MR. STEPHENS:

21     Q.    Okay.  But DEA will not provide

22  responses, if you know, to FOIA requests

23  related to pending investigations?

24          MR. BENNETT:  Objection.

25     Scope.  Calls for speculation.  Calls

1        for a legal conclusion.

2                You may answer based on your

3        personal experience and personal

4        knowledge while you were at DEA.

5                THE WITNESS:  They have not

6        provided that that I'm aware of.

7   QUESTIONS BY MR. STEPHENS:

8        Q.    Okay.  So information from

9   NADDIS would be a seventh example where DEA

10  agents can use that information, but private

11  sector companies cannot obtain that

12  information related to pending investigations

13  where the registrant might be able to help

14  DEA with its diversion investigation?

15               MR. BENNETT:  Objection.

16        Vague.  Form.

17               You can answer.

18               THE WITNESS:  That's correct.

19  QUESTIONS BY MR. STEPHENS:

20        Q.    Okay.  So let's talk about

21  ARCOS here briefly.

22               You testified a little bit

23  about ARCOS earlier.

24               Do you recall that?

25        A.    Yes.

```
 1        Q.      Okay.  Now, DEA could analyze

 2  ARCOS information from all registrants to

 3  develop leads on potential diverters during

 4  your tenure at DEA; is that fair?

 5              MR. BENNETT:  You can answer

 6      it.

 7              THE WITNESS:  Yes, it is.

 8  QUESTIONS BY MR. STEPHENS:

 9        Q.      Okay.  And was that information

10  helpful in advancing DEA diversion

11  investigations?

12              MR. BENNETT:  Objection.

13      Vague.

14              You can answer.

15              THE WITNESS:  Yes, it was.

16  QUESTIONS BY MR. STEPHENS:

17        Q.      Okay.  During your tenure at

18  DEA, did DEA share ARCOS information it

19  received from one distributor with all other

20  distributors?

21              MR. BENNETT:  You can answer

22      that question.

23              THE WITNESS:  No.

24  QUESTIONS BY MR. STEPHENS:

25        Q.      So did Mr. Rannazzisi, when he
```

Highly Confidential - Subject to Further Confidentiality Review

1   ran the Office of Diversion Control, ever

2   authorize you or anyone else, to your

3   knowledge, at DEA to disclose to a registrant

4   who could help advance DEA's investigation of

5   a suspected diverter with information from

6   ARCOS that related to information that had

7   been supplied to DEA from other registrants?

8           MR. BENNETT:  Objection.

9       Scope.  Vague.  Form.

10          You can answer that question

11      yes or no only.

12          THE WITNESS:  No.

13  QUESTIONS BY MR. STEPHENS:

14      Q.    To your knowledge, did anyone

15  who ran the Office of Diversion Control at

16  DEA during your tenure there ever authorize

17  you or anyone else at DEA to disclose to a

18  registrant who could help advance DEA's

19  investigation of a suspected diverter with

20  information from ARCOS that related to

21  information that had been supplied to DEA

22  from other registrants?

23          MR. BENNETT:  Objection.  Form.

24      Scope.  Vague.

25          You can answer that question

Highly Confidential - Subject to Further Confidentiality Review

```
 1          yes or no only.

 2                    THE WITNESS:  No.

 3     QUESTIONS BY MR. STEPHENS:

 4          Q.    Okay.  Move on to my next

 5     topic.

 6                    You testified a little bit

 7     earlier about your background and how you had

 8     worked in field divisions and then had gone

 9     to headquarters, right?

10          A.    Yes.

11          Q.    And you also provided some

12     information about how DEA is structured and

13     how certain squads have DEA enforcement

14     agents and other squads have DEA diversion

15     investigators.

16                    Do you recall that testimony?

17          A.    Yes.

18                    MR. BENNETT:  Objection.

19          Mischaracterizes testimony.

20                    MR. STEPHENS:  I don't think

21          so, but...

22     QUESTIONS BY MR. STEPHENS:

23          Q.    You also -- during your tenure

24     at DEA, when you were retiring, is it fair

25     that there were about 20 field divisions or
```

Highly Confidential - Subject to Further Confidentiality Review

1    so throughout the country at DEA?

2              MR. BENNETT:  You can answer.

3              THE WITNESS:  Yes.

4    QUESTIONS BY MR. STEPHENS:

5        Q.    And each division is run by a

6    special agent in charge?

7        A.    It is.

8        Q.    And the special agent in charge

9    is known as the SAC, the S-A-C?

10        A.    Yes.

11        Q.    Okay.  And that's the highest

12    level at a field division, right?

13        A.    Yes.

14        Q.    Okay.  And there are a couple

15    other high-level positions, one of which

16    would be the assistant special agent in

17    charge, the ASAC; is that fair?

18        A.    Fair.

19        Q.    And another high-level position

20    in the field is what they call a RAC, a

21    resident agent in charge, fair?

22        A.    Yes.

23        Q.    Okay.  Now, based on your

24    experience at DEA, how many of -- how many

25    SACs can you identify that came up through

Highly Confidential - Subject to Further Confidentiality Review

```
1    the ranks as a diversion investigator?

2         A.     None.

3         Q.     Zero?

4         A.     Yeah.

5         Q.     Okay.  Based on your career,

6    how many ASACs can you identify that came up

7    through the ranks as a diversion investigator

8    as opposed to a special agent on the

9    enforcement side?

10        A.     An ASAC position is a special

11   agent position, the equivalent in diversion

12   is the diversion program manager.

13        Q.     Okay.  So can you identify any

14   ASAC who came up through the ranks as a

15   diversion investigator during your 30 years

16   at DEA?

17        A.     There were a couple who were

18   diversion investigators and then went to

19   become special agents and ended up being

20   ASACs, but they were -- they were agents at

21   that point.

22        Q.     Okay.  So there were two that

23   you can recall?

24        A.     A couple I can recall, yes.

25        Q.     Okay.  All right.  Now,
```

1    enforcement agents are special agents, right?

2    That's how they're referred to within DEA?

3         A.    Yes.

4         Q.    And the enforcement agents

5    investigate drug trafficking organizations

6    like the Medellin cartel or the Sinaloa

7    cartel, fair?

8         A.    Among their own duties, yes.

9         Q.    Okay.  Diversion investigators,

10   by contrast, focus on diversion

11   investigations; is that fair?

12        A.    Yes.

13        Q.    Now, at DEA, special agents can

14   also work diversion investigations, right?

15        A.    Yes.

16        Q.    There is no rule, there's no

17   law, there's no regulation that says

18   enforcement agents are prohibited from

19   helping diversion investigators work

20   diversion investigations; is that fair?

21        A.    That's correct.

22        Q.    Do you think that diversion

23   would have been further reduced during your

24   time at DEA if the special agents in charge

25   at the field division level would have made

1    diversion investigations more of a priority?

2              MR. BENNETT:  Objection.

3         Scope.  Incomplete hypothetical.

4         Calls for speculation.

5              This is not a 30(b)(6) witness,

6         so you are not authorized to answer on

7         behalf of DEA.

8              To the extent that you have a

9         personal opinion in your personal

10        capacity, you may answer the question.

11             THE WITNESS:  No, I really

12        don't know if that would have made a

13        difference or not.

14   QUESTIONS BY MR. STEPHENS:

15        Q.    Okay.  Well, for example, would

16   you expect that supervisors in the field

17   divisions like SACs, ASACs and RACs should be

18   familiar with suspicious activity reports?

19             MR. BENNETT:  Objection.

20        Scope.  Incomplete hypothetical.

21        Calls for speculation.

22             This is not a 30(b)(6) witness

23        who can speak on behalf of the DEA.

24             To the extent that you have a

25        personal opinion, you may answer in

Highly Confidential - Subject to Further Confidentiality Review

1          your personal capacity.

2                  THE WITNESS:  I don't believe

3          the SACs and ASACs would be involved

4          in something at that level and that

5          detail.

6     QUESTIONS BY MR. STEPHENS:

7          Q.     Okay.  How about US Attorney's

8     Offices, during your 30 years at DEA, do you

9     think that the US Attorney's Offices devoted

10    the level of resources that you wanted to

11    diversion cases as opposed to enforcement

12    cases against drug trafficking organizations?

13                 MR. BENNETT:  Objection.

14         Scope.  Incomplete hypothetical.

15         Calls for speculation.

16                 This is not a 30(b)(6) witness

17         who can answer on behalf of DEA or

18         give DEA's position.

19                 To the extent that you have a

20         personal opinion, you may give your

21         opinion in your personal capacity.

22                 THE WITNESS:  Personally, we

23         always had good support from the

24         US Attorney's Offices.

25

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Can you name any chief of

 3   narcotics for any of the 94 US Attorney's

 4   Offices during your tenure at DEA, based on

 5   your experience, who prosecuted more

 6   diversion investigations than enforcement

 7   matters against drug trafficking

 8   organizations?

 9             MR. BENNETT:  Objection.  Form.

10        Scope.

11             You can answer.

12             THE WITNESS:  I don't know how

13        many enforcement cases they did versus

14        diversion cases, so I really don't

15        know.

16   QUESTIONS BY MR. STEPHENS:

17        Q.    Can you name any OCDETF chief,

18   who ran any of the nine OCDETF regions in the

19   United States and the Caribbean during your

20   tenure at DEA, whose OCDETF team prosecuted

21   more diversion investigations compared

22   against enforcement cases brought by special

23   agents against drug trafficking

24   organizations?

25             MR. BENNETT:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Scope.

 2                  You can answer.

 3                  THE WITNESS:  Again, I don't

 4          know the total of the numbers of

 5          cases, so I couldn't say.

 6   QUESTIONS BY MR. STEPHENS:

 7          Q.    Okay.  Would you agree that

 8   within DEA, both diversion investigators and

 9   enforcement special agents are investigators

10   within DEA?

11                  MR. BENNETT:  Objection.

12          Vague.

13                  THE WITNESS:  Yes.

14   QUESTIONS BY MR. STEPHENS:

15          Q.    Okay.  Based on your 30 years

16   of experience and what you wanted to

17   accomplish in anti-diversion efforts, what

18   percentage of mix between how many -- what

19   percent of enforcement special agents that

20   were allocated at DEA against what percentage

21   of diversion investigators there were at DEA

22   was the right mix?

23                  MR. BENNETT:  Objection.  Form.

24          Objection.  Scope.  Objection.  Calls

25          for speculation.
```

```
 1   QUESTIONS BY MR. STEPHENS:

 2        Q.    Let me re -- fair enough,

 3   Counsel.  Let me restate it.

 4             So during your tenure, 30-year

 5   tenure, at DEA working diversion

 6   investigations, for DEA to be as effective as

 7   possible in its anti-diversion efforts, what

 8   percentage of authorized investigator slots

 9   should have been allocated to diversion

10   investigators as opposed to special agents?

11             MR. BENNETT:  Objection.  Form.

12        Objection.  Scope.

13             To the extent that you have a

14        personal opinion, you may give it in

15        your personal capacity.

16             But you are not a 30(b)(6)

17        witness, and you are not authorized to

18        speak on behalf of DEA's allocation of

19        resources.

20             THE WITNESS:  And I really

21        don't know what that -- allocation

22        would be best.

23   QUESTIONS BY MR. STEPHENS:

24        Q.    During your tenure at DEA, did

25   you think that there should have been more
```

1    diversion investigators in the mix working

2    diversion investigations as opposed to

3    enforcement special agents focused on drug

4    trafficking organizations?

5                    MR. BENNETT:  Objection.

6         Scope.

7                    You can answer in your personal

8         capacity if you have a personal

9         opinion, but you may not speak on

10        behalf of DEA.

11                   THE WITNESS:  My opinion is no,

12        because we usually had agents to work

13        on the cases with us when necessary.

14   QUESTIONS BY MR. STEPHENS:

15        Q.    What percentage of time do you

16   think enforcement special agents, during your

17   tenure at DEA, spent working on diversion

18   matters as opposed to enforcement matters

19   against drug trafficking organizations?

20                   MR. BENNETT:  Objection.

21        Foundation.  Calls for speculation.

22                   You can answer, if you know.

23                   THE WITNESS:  I really don't

24        know what percentage.  A small

25        percentage.

```
 1              MR. STEPHENS:  Okay.  Let me
 2         take a quick break and see if we are
 3         done for the night.
 4              VIDEOGRAPHER:  We're going off
 5         record.  The time is 5:47.
 6          (Off the record at 5:47 p.m.)
 7              VIDEOGRAPHER:  Going back on
 8         record.  Beginning of Media File 11.
 9         The time is 5:48.
10    QUESTIONS BY MR. STEPHENS:
11         Q.    Mr. Mapes, thank you.  I just
12    have a few more questions for you before we
13    wrap up for the evening.
14              I had asked you some questions
15    earlier on about who you recall meeting with
16    between 2005 and 2007 in those 12 or so
17    distributor briefings that you gave.
18              Do you recall that testimony?
19         A.    Yes.
20         Q.    Okay.  Let me ask a couple of
21    follow-up questions.
22              Did you meet with CVS in a
23    Distributor Initiative meeting between 2005
24    and 2007?
25         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Did you meet with Rite Aid?

 2          A.     No.

 3          Q.     Did you meet with Walgreens?

 4          A.     No.

 5                 MR. STEPHENS:  Okay.  Thank

 6          you.  I have no further questions.

 7                 I would like to state for the

 8          record that we're reserving our full

 9          90 minutes for any potential redirect.

10                 And with that, I'm done.  Thank

11          you.

12                 MR. BENNETT:  Okay.

13                 MS. LEVY:  This is Jennifer

14          Levy for the manufacturing defendants.

15          We will decline to ask questions today

16          and reserve any questions we may have

17          until the 90-minute redirect we may do

18          tomorrow.

19                 VIDEOGRAPHER:  All right.  This

20          concludes the deposition for today.

21          Going off the record.  The time is

22          5:50.

23           (Off the record at 5:50 p.m.)

24                 - - - - - - -

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE
 2
 3          I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Michael Mapes, was duly
     sworn by me to testify to the truth, the
 6   whole truth and nothing but the truth.
 7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
            I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
16
            _____
17   CARRIE A. CAMPBELL,
     NCRA Registered Diplomate Reporter
18   Certified Realtime Reporter
     Notary Public
19   Dated:  July 11, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1              INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8              After doing so, please sign the

9    errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13             It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2

 3

 4         I,_____, do
      hereby certify that I have read the foregoing
 5    pages and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8

 9

10

11

12    _____
      Michael Mapes              DATE
13

14

15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18

19    Notary Public
20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - - -

                          ERRATA

 2                    - - - - - - -

 3     PAGE    LINE    CHANGE/REASON

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

1

      – – – – – – –

      LAWYER'S NOTES

2

      – – – – – – –

3    PAGE   LINE

4    _____  _____  _____

5    _____  _____  _____

6    _____  _____  _____

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25