Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

IN RE:  NATIONAL  :  MDL NO. 2804
PRESCRIPTION OPIATE :
LITIGATION          :
-----------------------------------------
                    :  CASE NO.
THIS DOCUMENT       :  1:17-MD-2804
RELATES TO ALL CASES:
                    :  Hon. Dan A.
                    :  Polster

- - -

Friday, January 18, 2019
- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

            Videotaped deposition of
CAROL MARCHIONE, taken pursuant to
notice, was held at Golkow Litigation
Services, One Liberty Place, 1650 Market
Street, Suite 5150, Philadelphia,
Pennsylvania 19103, beginning at 9:31
a.m., on the above date, before Amanda
Dee Maslynsky-Miller, a Certified
Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
1   APPEARANCES:
2
3       SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
        BY:  MARK G. CRAWFORD, ESQUIRE
4       BY:  DYLAN JENSEN, ESQUIRE
        One Sansome Street
5       Suite 2830
        San Francisco, California 94104
6       (415) 546-7300
        Mcrawford@skikos.com
7       Djensen@skikos.com
        Representing the Plaintiffs
8
9
10      BRANSTETTER, STRANCH & JENNINGS,
        PLLC
11      BY:  BENJAMIN A. GASTEL, ESQUIRE
        223 Rosa L. Parks Avenue
12      Suite 200
        Nashville, Tennessee 37203
13      (877) 369-0267
        Beng@bsjfirm.com
14      Representing the Staubus Plaintiffs
15
16
        MORGAN, LEWIS & BOCKIUS LLP
17      BY:  TINOS DIAMANTATOS, ESQUIRE
        77 West Wacker Drive
18      Chicago, Illinois 60601
        (312) 324-1484
19      Tinos.diamantatos@morganlewis.com
20      - and -
21      BY:  VINEETA PRAKASH KAMATH, ESQUIRE
        1111 Pennsylvania Avenue NW
22      Washington, DC 20004
        (202) 739-3000
23      Representing the Defendant,
        Teva Corporation
24
```

Page 3

```
1   APPEARANCES:  (Continued)
2
3       JONES DAY
        BY:  SHUBHA M. HARRIS, ESQUIRE
4       90 South Seventh Street
        Suite 4950
5       Minneapolis, MN 55402
        (612) 217-8800
6       Shubhaharris@jonesday.com
        Representing the Defendant,
7       Walmart
8
9
10
        PIETRAGALLO GORDON ALFANO BOSICK &
11      RASPANTI
        BY:  LESLIE A. MARIOTTI, ESQUIRE
12      1818 Market Street
        Suite 3402
13      Philadelphia, Pennsylvania 19103
        (215) 320-6200
14      LAM@pietragallo.com
        Representing the Defendant,
15      Cardinal Health, Inc.
16
17
        ARNOLD & PORTER KAYE SCHOLER LLP
18      BY:  WILSON D. MUDGE, ESQUIRE
        601 Massachusetts Ave, NW
19      Washington, DC 20001
        (202) 942-5000
20      Wilson.mudge@arnoldporter.com
        Representing the Defendant,
21      Endo Pharmaceuticals, Endo Health,
        and Par Pharmaceuticals
22
23
24
```

Page 4

```
1   APPEARANCES:  (Continued)
2   VIA TELEPHONE/LIVESTREAM:
3
4       REED SMITH, LLP
        BY:  RYAN K. BLAKE, ESQUIRE
5       Three Logan Square
        1717 Arch Street, Suite 3100
6       Philadelphia, Pennsylvania, 19103
        (215) 851-8100
7       Rblake@reedsmith.com
        Representing the Defendant,
8       AmerisourceBergen
9
10
11      ALLEGAERT BERGER & VOGEL LLP
        BY:  LAUREN J. PINCUS, ESQUIRE
12      111 Broadway, 20th Floor
        New York, New York 10006
13      (212) 616-7075
        Lpincus@abv.com
14      Representing the Defendant,
        Rochester Drug Corporation
15
16
17      ALSO PRESENT:
        David Lane, Videographer
18      Rich Christian, Trial Technician
19
20
21
22
23
24
```

Page 5

```
1               - - -
2            I N D E X
3               - - -
4
    Testimony of: CAROL MARCHIONE
5
6       By Mr. Crawford       11, 537
        By Mr. Diamantatos       511
7       By Mr. Gastel           499
8
9               - - -
        E X H I B I T S
10
11              - - -
12  NO.     DESCRIPTION       PAGE
    Teva-Marchione
13  Exhibit-1  Resume, Carol S. Marchione  14
14  Teva-Marchione
    Exhibit-2  LinkedIn, Carol S.
15          Marchione          43
16  Teva-Marchione
    Exhibit-3  TEVA_MDL_A_01861562-572   45
17
18  Teva-Marchione
    Exhibit-4  Org Chart, Regulatory
19          Affairs, 2004          45
20  Teva-Marchione
    Exhibit-5  TEVA_MDL_A_08242688-693   68
21  Teva-Marchione
    Exhibit-6  No Bates
22          1998 21 CFR 314.520     79
23  Teva-Marchione
    Exhibit-7  TEVA_MDL_A_03272088-117   83
24
```

2 (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-Marchione Exhibit-8 | TEVA_MDL_A_08387849-8059 | 202 |
| Teva-Marchione Exhibit-9 | TEVA_MDL_A_04578988-9017 | 130 |
| Teva-Marchione Exhibit-10 | No Bates Quality Assurance Memorandum | 161 |
| Teva-Marchione Exhibit-11 | TEVA_MDL_A_01575289-972 | 177 |
| Teva-Marchione Exhibit-12 | TEVA_MDL_A_011595-553 | 191 |
| Teva-Marchione Exhibit-13 | TEVA_MDL_A_08531805-810 | 209 |
| Teva-Marchione Exhibit-14 | TEVA_MDL_A_08242504-505, With attachment | 231 |
| Teva-Marchione Exhibit-15 | TEVA_MDL_A_01405193-5194 | 245 |
| Teva-Marchione Exhibit-16 | TEVA_CHI_0043010-0983 | 257 |
| Teva-Marchione Exhibit-17 | TEVA_MDL_A_01159525-527 | 291 |
| Teva-Marchione Exhibit-18 | TEVA_MDL_A_08242371-373 | 316 |
| Teva-Marchione Exhibit-19 | TEVA_MDL_A_03317918-921 | 328 |

Page 7

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-Marchione Exhibit-20 | TEVA_MDL_A_01582360-377 | 342 |
| Teva-Marchione Exhibit-21 | TEVA_MDL_A_08245587-590 | 346 |
| Teva-Marchione Exhibit-22 | TEVA_MDL_A_01584978-986 | 355 |
| Teva-Marchione Exhibit-23 | TEVA_MDL_A_07424105-109 | 393 |
| Teva-Marchione Exhibit-24 | TEVA_MDL_A_00267691-694 | 393 |
| Teva-Marchione Exhibit-25 | TEVA_MDL_A_01583546-550 | 393 |
| Teva-Marchione Exhibit-26 | TEVA_MDL_A_01583458-460 | 410 |
| Teva-Marchione Exhibit-27 | U.S. Department of Justice - Pharmaceutical Company Cephalon to Pay $425 Million For Off-Label Drug Marketing | 414 |
| Teva-Marchione Exhibit-28 | Government's Memorandum for Entry of Plea and Sentencing | 415 |
| Teva-Marchione Exhibit-29 | TEVA_CHI_00028341-691 | 425 |
| Teva-Marchione Exhibit-30 | TEVA_MDL_A_08399245-251 | 425 |

Page 8

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Teva-Marchione Exhibit-31 | TEVA_MDL_A_08399239-587 | 425 |
| Teva-Marchione Exhibit-32 | TEVA_MDL_A_02074924-969 | 426 |
| Teva-Marchione Exhibit-33 | TEVA_MDL_A_00038282-295 | 458 |
| Teva-Marchione Exhibit-34 | TEV_FE00116840-843 | 468 |
| Teva-Marchione Exhibit-35 | TEVA_MDL_A_00349300-301 | 469 |
| Teva-Marchione Exhibit-36 | TEVA_MDL_A_00651161-168 | 481 |
| Teva-Marchione Exhibit-37 | TEVA_MDL_A_07679381-383 | 485 |
| Teva-Marchione Exhibit-38 | TEVA_MDL_A_07679384-521 | 485 |
| Teva-Marchione Exhibit-39 | TEVA_MDL_A_074679522 | 552 |
| Teva-Marchione Exhibit-40 | TEVA_MDL_A_08261145.xls | 490 |
| Teva-Marchione Exhibit-41 | TEVA_MDL_A_08475177-178 | 495 |
| Teva-Marchione Exhibit-42 | TEVA_MDL_A_08380029-030 | 504 |
| Teva-Marchione Exhibit-43 | TEVA_MDL_A_03130348 | 509 |

Page 9

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

| Page Line | Page Line | Page Line |
|---|---|---|
| None | | |

Request for Production of Documents

| Page Line | Page Line | Page Line |
|---|---|---|
| None | | |

Stipulations

| Page Line | Page Line | Page Line |
|---|---|---|
| 10  1 | | |

Question Marked

| Page Line | Page Line | Page Line |
|---|---|---|
| None | | |

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1                    - - -
2               (It is hereby stipulated and
3          agreed by and among counsel that
4          sealing, filing and certification
5          are waived; and that all
6          objections, except as to the form
7          of the question, will be reserved
8          until the time of trial.)
9                    - - -
10              VIDEO TECHNICIAN:  We are
11         now on the record.  My name is
12         David Lane, videographer for
13         Golkow Litigation Services.
14         Today's date is January 18th,
15         2019.  Our time is 9:31 a.m.
16              This deposition is taking
17         place in Philadelphia,
18         Pennsylvania, in the matter of
19         National Prescription Opiate
20         Litigation MDL.  Our deponent
21         today is Carol Marchione.  Counsel
22         will be noted on the stenographic
23         record.  The court reporter is
24         Amanda Miller, who will now swear

Page 11

1          in our witness.
2                    - - -
3               CAROL MARCHIONE, after
4          having been duly sworn, was
5          examined and testified as follows:
6                    - - -
7               VIDEO TECHNICIAN:  Please
8          begin.
9                    - - -
10              EXAMINATION
11                   - - -
12         BY MR. CRAWFORD:
13         Q.   Good morning.
14         A.   Good morning.
15         Q.   My name is Mark Crawford, I
16    represent the plaintiffs in the opioid
17    litigation.
18              Can you please state your
19    name?
20         A.   Sure.  Carol Marchione.
21         Q.   And where is your current
22    home and work addresses?
23         A.   They're both the same.  And
24    it's

Page 12

1          Q.   And have you ever had your
2     deposition taken before?
3          A.   Yes, I have.
4          Q.   And about how many times?
5          A.   At least twice.
6          Q.   And what were those cases
7     about?
8          A.   One was for Actiq, a
9     fentanyl product for dental decay.  And
10    to be honest, I can't remember what the
11    other one was for.
12         Q.   What was the nature of the
13    Actiq lawsuit?
14              Was it a lawsuit?
15         A.   I believe it was, yes.
16         Q.   And do you know what the
17    claims were in that suit?
18         A.   The claims were that Actiq
19    caused significant tooth loss, due to the
20    sugar in the product.
21         Q.   And how long ago was that
22    deposition?
23         A.   God.  I can approximate, ten
24    years ago.

Page 13

1          Q.   Okay.  So you know -- you're
2     aware you're under oath right now,
3     correct?
4          A.   Yes, I am, I'm aware.
5          Q.   And the deposition is being
6     videotaped?
7          A.   Yes, I am.
8          Q.   And I guess the basic rules,
9     you know to make audible responses, not
10    nodding your head or -- yes or no.
11         A.   I understand.
12         Q.   And if you don't understand
13    a question, please ask me to rephrase it.
14         A.   I will do that.
15         Q.   And take any breaks when you
16    need them.
17         A.   Okay.  Thank you.
18         Q.   All right.  And you're aware
19    that your testimony here could be used at
20    trial before a jury, correct?
21         A.   That's my understanding.
22         Q.   And if your counsel had
23    asked you if you would appear at a trial
24    in this case, would you be ready and

4 (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  willing to go to trial to testify?
2      A.   I believe so.
3      Q.   And you're represented here
4  by counsel?
5      A.   I am.
6      Q.   But you're not a current
7  Teva employee, are you?
8      A.   I am not.
9      Q.   And what's your current work
10  position or occupation?
11      A.   I have my own consulting
12  business.  So I'm a principal of
13  Marchione and Associates, LLC.
14      Q.   And what does your business
15  do?
16      A.   Regulatory affairs
17  consulting for pharmaceutical companies.
18      Q.   And is Teva or Cephalon any
19  of your current clients?
20      A.   No, they are not.
21      Q.   How about Actavis?
22      A.   No, they're not.
23      Q.   All right.
24          - - -

Page 15

1          (Whereupon, Teva-Marchione
2      Exhibit-1, Resume, Carol S.
3      Marchione, was marked for
4      identification.)
5          - - -
6  BY MR. CRAWFORD:
7      Q.   We've marked as Exhibit-1
8  Document 560.  But as Exhibit-1, it is
9  a -- appears to be a resume.
10          Is this your resume?
11      A.   It's an old resume.
12      Q.   Right, okay.  And it
13  summarizes your experience here.
14          Is this -- maybe take a
15  quick look at it.
16          Does this accurately reflect
17  your work history up to this point, and
18  qualifications?
19      A.   Yes, it does.
20      Q.   And you provide a summary of
21  your experience up at the top.  About
22  midway through, it says, Experience
23  includes success with wide variety of FDA
24  regulated mechanisms, such as -- and it

Page 16

1  lists RiskMAPs and promotion review,
2  right?
3      A.   Correct.
4      Q.   And what is a RiskMAP?
5      A.   A RiskMAP is the predecessor
6  to what the FDA calls a REMS.  So it was
7  a program that was put into place with
8  the FDA to control or -- distribution and
9  sales of products that they have safety
10  concerns.  And it's associated with
11  Subpart H, approved products, such as
12  Actiq and Fentora.
13      Q.   And what is Subpart H?
14      A.   Subpart H is a section under
15  21 C.F.R. 314 which discusses marketing
16  approval of pharmaceutical drugs.
17      Q.   And, you know, what is the
18  purpose or intent of Subpart H?
19      A.   Subpart H is for -- to
20  accelerate approval of life-threatening
21  drugs.  That's the intention.
22          However, usually any drug
23  that they have a concern of safety,
24  they've invoked Subpart H to be able to

Page 17

1  control more tightly for -- for
2  postmarketing.
3      Q.   So is it kind of conditions
4  or requirements placed on the company
5  with regard to the drug, to make sure
6  that it is safely used?
7          MR. DIAMANTATOS:  Objection
8      to form.
9          Go ahead.
10  BY MR. CRAWFORD:
11      Q.   Would that be a fair
12  characterization?
13          MR. DIAMANTATOS:  Objection
14      to form.
15          THE WITNESS:  Generally,
16      yes.
17  BY MR. CRAWFORD:
18      Q.   And did Actiq and Fentora
19  have RiskMAPs?
20      A.   Actiq had a RiskMAP.  And
21  I'm thinking that -- I told you that was
22  the predecessor of REMS.
23          Fentora, I think, was under
24  a REMS.  So it was an evolution, but the

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  same principles applied.
2       Q.   All right.  And it says,
3  under -- your first positions you list
4  here were Teva Pharmaceuticals, formerly
5  Cephalon, correct?
6       A.   Correct.
7       Q.   And you were there from 2000
8  until about November 2011, right?
9       A.   No.  I was --
10      Q.   Until present, yeah.
11           So when did you leave Teva?
12      A.   It was 2013,
13  approximately -- I think it was May,
14  around 2013.
15      Q.   All right.  And it says one
16  of the accomplishments was successfully
17  negotiated multiple product approvals.
18           And you list Fentora and
19  Actiq, correct?
20      A.   That's correct.
21      Q.   And are those two drugs, you
22  mentioned that they were under a RiskMAP
23  or a REMS, right?
24      A.   Correct.

Page 19

1       Q.   And RiskMAP, what is --
2  that's kind of an acronym.
3            What does that stand for, do
4  you know?
5       A.   It's obsolete now, so -- I
6  think it was risk -- I don't know what
7  the "map" stands for now.  I just can't
8  remember the exact acronym, what it
9  meant.
10      Q.   How about REMS, what does
11  that acronym stand for?
12      A.   Risk evaluation and
13  mitigation processes or plans --
14      Q.   Strategy?
15      A.   -- strategy plans.
16      Q.   Okay.  So risk evaluation
17  and mitigation strategy?
18      A.   That's correct.
19      Q.   All right.  And REMS was
20  something that Congress instituted,
21  correct me if I'm wrong, in about 2007 or
22  '08, right?
23           MR. DIAMANTATOS:  Objection
24      to form.  Foundation.

Page 20

1            THE WITNESS:  I don't
2  remember exactly.  But, again,
3  RiskMAP preceded REMS.  So I don't
4  know when Congress agreed, or if
5  they agreed.  I'm just dealing
6  with the FDA, in terms of their
7  guidances.
8  BY MR. CRAWFORD:
9       Q.   Is it your understanding
10  that the RiskMAP -- let me strike that.
11           Is it your understanding
12  that the REMS was a process that the FDA
13  was given power to impose conditions or
14  these plans onto drugs that have already
15  been approved, when, before they had that
16  power, they couldn't -- they couldn't
17  unilaterally do that?
18           MR. DIAMANTATOS:  Objection.
19  Form.  Foundation.
20           Go ahead.
21           THE WITNESS:  So they had
22  the approval when they approved
23  Subpart H, which was back in --
24  before that.  I think it evolved

Page 21

1  since then.
2            So they had the power in the
3  Act to do that, and the law
4  prior -- when the RiskMAP was in
5  place.
6            So it evolved, then, the
7  FDA, my understanding, interpreted
8  the guidances and they did -- I
9  understand they got more direction
10  from the Congress from there.
11           But it started with the
12  Subpart H approval.
13  BY MR. CRAWFORD:
14      Q.   So let me just try to
15  clarify at least the regulatory
16  standpoint.
17      A.   Sure.
18      Q.   It's my understanding, and
19  let me see if it's also your
20  understanding, that for RiskMAPs, which
21  preceded the REMS programs, RiskMAPs
22  could be imposed with regard -- in
23  conjunction with the approval of a
24  pharmaceutical drug, right?

6 (Pages 18 to 21)

Page 22

1    A.   Correct.
2    Q.   But it couldn't be imposed
3  by the FDA after the approval, I guess,
4  unless it was agreed to by the
5  manufacturer, right?
6         MR. DIAMANTATOS:  Objection
7  to form.  Foundation.
8         Go ahead.
9         THE WITNESS:  That's my
10  understanding.
11  BY MR. CRAWFORD:
12    Q.   And then after the REMS
13  program was put in place, the FDA was
14  given the power to impose that type of
15  risk strategy on a drug that was already
16  approved without getting the agreement of
17  the manufacturer, right?
18         MR. DIAMANTATOS:  Object to
19  form.  Foundation.
20         THE WITNESS:  Again, I'm
21  aware of the -- what was in the
22  law in the RiskMAP.  I can't be
23  specific about when -- the REMS
24  and how that was associated with

Page 23

1  the law.
2  BY MR. CRAWFORD:
3    Q.   But your understanding was,
4  with REMS, the FDA can impose a REMS
5  without the consent of the manufacturer?
6    A.   Yes, that's correct.
7    Q.   All right.  So Actiq and
8  Fentora, those are two drugs.
9         What period of time was
10  Actiq marketed by Cephalon?
11    A.   I'd say approximately 2001,
12  until Fentora got approved, which was, I
13  don't know, 2010, something around there.
14    Q.   Would 2006 make sense?
15    A.   Yes.
16    Q.   Okay.  And then Fentora was
17  approved in 2006, right?
18    A.   Okay, yes.
19    Q.   And it was a drug, by the
20  time you left in 2013, it was still being
21  marketed by Cephalon, right?
22    A.   I don't -- I believe so.
23    Q.   And can you tell me what
24  Actiq was indicated for?  What was the

Page 24

1  approved indication for Actiq?
2    A.   Actiq was approved for
3  breakthrough -- cancer breakthrough pain
4  in opioid-tolerant patients, for
5  breakthrough, yes, breakthrough pain.
6    Q.   So it was breakthrough pain?
7    A.   Yes.
8    Q.   Was Actiq also approved only
9  for use by cancer patients?
10    A.   Yes.
11    Q.   And tell me what
12  breakthrough pain is.
13    A.   So breakthrough pain are the
14  spikes of intense pain that occur in a --
15  over time.
16    Q.   And Actiq was intended to
17  treat this breakthrough pain in cancer
18  patients, right?
19    A.   That's correct.
20    Q.   Was -- when Actiq was
21  approved, was it approved to be used in
22  noncancer patients?
23    A.   No.
24    Q.   So you had to have cancer,

Page 25

1  really -- well, that was -- the approved
2  indication was for cancer patients' use
3  only, right?
4    A.   That's correct.
5         MR. DIAMANTATOS:  Objection
6  to form.
7         Go ahead.
8  BY MR. CRAWFORD:
9    Q.   And can you kind of describe
10  what the product looked like?
11         MR. DIAMANTATOS:  Objection
12  to form.
13         THE WITNESS:  It was a
14  lozenge on a handle, with a tag at
15  the bottom of the handle.
16  BY MR. CRAWFORD:
17    Q.   And you would stick it in
18  your mouth kind of like a lollipop?
19    A.   That's correct.
20    Q.   And then it would dissolve
21  quickly in the mouth and give you a shot
22  of what, of fentanyl, correct?
23    A.   That's correct.
24    Q.   And that would alleviate the

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  pain, the breakthrough pain, right? That
2  was the intent of the product?
3      A.    That's the intention, yes.
4      Q.    And when Fentora was
5  approved -- that was 2006, we decided,
6  right?
7      A.    Yes, I believe so.
8      Q.    And was that -- at the time,
9  do you know if Actiq had had -- the
10  patent had expired for Actiq in 2006?
11          Do you know if that's the
12  case?
13      A.    I just don't remember.
14      Q.    But Fentora was meant to be
15  kind of a replacement drug, by Cephalon,
16  for Actiq, right?
17          MR. DIAMANTATOS:  Objection
18  to form.  Foundation.
19  BY MR. CRAWFORD:
20      Q.    In the market.
21          MR. DIAMANTATOS:  Same
22  objections.
23          THE WITNESS:  That's my
24  understanding.

Page 27

1  BY MR. CRAWFORD:
2      Q.    And Fentora has, basically,
3  an identical indication as Actiq, right?
4      A.    That's what I remember.
5      Q.    And that was only for use in
6  cancer patients and for breakthrough
7  pain, right?
8          MR. DIAMANTATOS:  Objection
9  to form.
10          THE WITNESS:  In
11  opioid-tolerant, yes, patients.
12  BY MR. CRAWFORD:
13      Q.    And what do you mean by
14  "opioid-tolerant patients"?
15      A.    Patients who have had --
16  been exposed previously to opioids and
17  had enough buildup to be tolerant, so
18  they wouldn't -- so there was no lethal
19  adverse events.
20      Q.    So what were the dangers of
21  somebody who wasn't opioid tolerant using
22  the drug?
23          MR. DIAMANTATOS:  Objection.
24  Foundation.

Page 28

1          THE WITNESS:  I'm not a
2  physician.  But it's respiratory
3  distress, I understand.
4  BY MR. CRAWFORD:
5      Q.    So -- and how did -- can you
6  explain the mechanism of how Fentora
7  operated?
8          MR. DIAMANTATOS:  Objection.
9  Foundation.
10          THE WITNESS:  Can you
11  explain that question better?
12  BY MR. CRAWFORD:
13      Q.    Yes.
14          Actiq was a dissolving
15  lozenge at the end of a stick.
16          How was Fentora structured?
17      A.    It was a buccal lozenge that
18  you put in your mouth and it
19  disintegrated.  So it was similar in
20  process.
21      Q.    It just didn't have a stick
22  on it, right?
23      A.    I think there was a
24  different PK profile, but I don't

Page 29

1  remember.
2      Q.    "PK" stands for?
3      A.    Pharmacokinetic.
4      Q.    So you started at Cephalon
5  in 2000 as director of regulatory
6  affairs.
7          What were, generally, your
8  responsibilities as director of
9  regulatory affairs from 2000 until
10  December of 2001?
11      A.    I was responsible for the
12  interactions with the Food and Drug
13  Administration for both oncology and --
14  at that point, the only pain product was
15  Actiq.
16      Q.    And then you were promoted,
17  is that a promotion, to senior director
18  of regulatory affairs from 2002 to 2006,
19  correct?
20      A.    That's correct.
21      Q.    And did your
22  responsibilities change, or were there
23  additional ones?
24      A.    I don't remember.  I'm

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  sure -- you know, I'm sure something
2  changed, but I don't remember.
3      Q.   But you still had
4  responsibilities for Actiq, correct?
5      A.   I did.
6      Q.   And what were your
7  responsibilities with regard to Actiq as
8  senior director of regulatory affairs?
9      A.   Overseeing submissions to
10 FDA and all communication between the FDA
11 and the company, and to sit on
12 development and commercial teams
13 representing the regulations, the U.S.
14 regulations.
15     Q.   And did you have any
16 responsibilities with regard to the Actiq
17 RiskMAP?
18     A.   I did.
19     Q.   And what were those, that
20 you recall?
21     A.   I was -- there was an annual
22 report -- I'm sorry, there was a
23 quarterly compilation of information to
24 be sent to FDA, and oversight for --

Page 31

1  regulatory oversight for that -- for the
2  RiskMAP.
3      Q.   And would you help prepare
4  that report for the FDA on a quarterly
5  basis, you said?
6      A.   Initially.  And then I had a
7  subordinate that I hired to do that.
8      Q.   And who was that?
9      A.   Tracie Parker.
10     Q.   But you maintained overall
11 responsibility for that report?
12         MR. DIAMANTATOS:  Objection
13 to form.
14     Go ahead.
15         THE WITNESS:  I did.
16 BY MR. CRAWFORD:
17     Q.   So you would review the
18 reports that went to the FDA after Ms.
19 Parker prepared them?
20     A.   That's correct.
21     Q.   And how was information
22 collected or gathered for that report
23 during these time periods?
24         MR. DIAMANTATOS:  Objection

Page 32

1  to form.
2         THE WITNESS:  We would send
3  out a request document, who was --
4  the people who were responsible
5  throughout the company, to ask
6  them for information, which they
7  would send and we would compile
8  and review.
9  BY MR. CRAWFORD:
10     Q.   All right.  And then -- what
11 departments, generally, would you get
12 information from?
13         MR. DIAMANTATOS:  Objection
14 to form.
15         THE WITNESS:  Medical
16 affairs; commercial; safety; maybe
17 manufacturing, I think; and
18 quality.
19 BY MR. CRAWFORD:
20     Q.   And "commercial" means the
21 sales and marketing department?
22     A.   That's correct.
23     Q.   So you depend on the
24 accuracy of information that those

Page 33

1  departments provided to you in submitting
2  your report, right?
3         MR. DIAMANTATOS:  Objection.
4  Form.
5         THE WITNESS:  That's
6  correct.
7  BY MR. CRAWFORD:
8      Q.   So would you do anything --
9  if sales and marketing gave you
10 information to put in the report, would
11 you do anything to verify its accuracy,
12 or would you accept the information your
13 colleagues are providing as being
14 accurate?
15         MR. DIAMANTATOS:  Objection.
16 Form.
17 BY MR. CRAWFORD:
18     Q.   What was your practice?
19     A.   Right.  Quality assurance
20 had the responsibility to check the
21 processes.  So I accepted what was
22 received.
23     Q.   And quality assurance, that
24 was a department at Cephalon?

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1     A.   That's correct.
2     Q.   And they would periodically
3 perform audits of these departments to
4 make sure the RiskMAP was properly
5 implemented?
6       MR. DIAMANTATOS: Objection.
7 Form and foundation.
8       THE WITNESS: That was their
9    responsibility. I can't say how
10    they did it or when they did it or
11    how.
12 BY MR. CRAWFORD:
13     Q.   And what -- it's your
14 understanding that it was their
15 responsibility during the period that
16 Actiq, at least, was being marketed?
17       MR. DIAMANTATOS: Objection.
18 Form. Foundation.
19       THE WITNESS: That was my
20    understanding. I can't ascertain
21    what exactly happened.
22 BY MR. CRAWFORD:
23     Q.   So then you were promoted, a
24 promotion, I assume, to senior director

Page 35

1 and group leader, regulatory affairs,
2 from '07 to October 2011, correct?
3     A.   Correct.
4     Q.   And what was -- did your
5 responsibilities change in that position?
6     A.   I can't remember.
7     Q.   And this would have been the
8 period when Fentora was being actively
9 marketed by the company, right?
10       MR. DIAMANTATOS: Objection.
11 Form.
12    Go ahead.
13       THE WITNESS: So Fentora was
14    approved in 2006. I can't tell
15    you exactly, you know, when -- I
16    don't know what month it was
17    approved, but I can assume.
18 BY MR. CRAWFORD:
19     Q.   All right. So if it was
20 approved in '06, during the 2007 to 2011
21 period, that's the period that Fentora
22 was being actively marketed by the
23 company, right?
24       MR. DIAMANTATOS: Objection.

Page 36

1 Form. Foundation.
2    Go ahead.
3       THE WITNESS: Yes, I guess.
4    I don't know.
5 BY MR. CRAWFORD:
6     Q.   Do you know if Actiq was
7 being actively marketed, or had they
8 stopped actively marketing it after they
9 brought on Fentora?
10       MR. DIAMANTATOS: Objection.
11 Form.
12       THE WITNESS: That's not my
13    area. I believe -- I believe that
14    was the case, but I can't say for
15    sure.
16 BY MR. CRAWFORD:
17     Q.   Right. Thank you.
18       And then you were promoted,
19 senior director, head of oncology, global
20 regulatory affairs.
21       That was a promotion, or
22 just a lateral move?
23     A.   It was lateral. Because at
24 that point, I believe the pain area went

Page 37

1 over to somebody else. So I was then
2 just oncology.
3     Q.   Right. Did you have any
4 responsibilities for Actiq or Fentora
5 from November 2011 forward?
6     A.   There was a period of time
7 when they asked me to take over during an
8 interim -- I think when the vice
9 president left or whatever.
10       But for the most part, I was
11 oncology at that point.
12     Q.   And that doesn't involve the
13 pain drugs?
14     A.   That's correct.
15     Q.   And so you didn't have,
16 unless -- except for this interim period,
17 you didn't have responsibility for Actiq
18 and Fentora?
19     A.   That's correct.
20     Q.   And then you left --
21       MR. CRAWFORD: Did we get
22    that other document?
23       MR. JENSEN: No, not yet.
24 BY MR. CRAWFORD:

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1      Q.   We have a LinkedIn page,
2   we're waiting for a hardcopy, but can we
3   throw that up, and maybe mark it later as
4   Exhibit-2.
5          MR. DIAMANTATOS:  Sure.
6          MR. CRAWFORD:  All right.
7      Let's put up Document 556.
8   BY MR. CRAWFORD:
9      Q.   I just want to round out
10  your work history, so we pulled that
11  page.
12         MR. MUDGE:  Excuse me, this
13     is Will Mudge, for Endo and Par.
14     Do these documents you're showing
15     have Bates numbers on them, or are
16     they not numbered?
17         MR. CRAWFORD:  The resume
18     was numbered, so I would be happy
19     to read it into the record.  The
20     LinkedIn is --
21         MR. MUDGE:  That one, I
22     think, is okay.  But just if any
23     of these do have a Bates number,
24     if you could read them, that would

Page 39

1      be very helpful to me.
2          MR. CRAWFORD:  Sure.  I
3      would be happy to do that.
4   BY MR. CRAWFORD:
5      Q.   So we're going to mark, in a
6   second, this document as Exhibit-2, but
7   we have it up on the screen.
8          This seems to round out your
9   work history, correct?
10         MR. DIAMANTATOS:  Objection
11     to form.
12  BY MR. CRAWFORD:
13     Q.   At least after Teva?
14     A.   It appears correct.
15     Q.   So the information is
16  accurate on this?
17         MR. DIAMANTATOS:  Objection
18     to the form.  Asked and answered.
19         THE WITNESS:  I can't 100
20     percent -- there's actually -- I
21     checked LinkedIn pretty recently.
22     My current C.V. matches correctly,
23     but I know there's another
24     LinkedIn timeline, so the months

Page 40

1      could be off.
2   BY MR. CRAWFORD:
3      Q.   All right.
4      A.   But, in general, that's
5   correct.
6      Q.   Thank you for that
7   clarification.
8          So you left Teva -- is it
9   accurate that you left Teva about April
10  of 2013?
11     A.   That's correct.
12     Q.   And what were the
13  circumstances of your leaving Teva?
14     A.   Teva, which is how I
15  pronounce it, stopped oncology
16  development.  And I decided to go consult
17  on my own, because oncology is my
18  strength area.  So I wanted to continue
19  doing regulatory for that.
20     Q.   After you left Teva, did you
21  do any work in pain medications?
22         MR. DIAMANTATOS:  Objection.
23     Form.
24         THE WITNESS:  One of my

Page 41

1      clients was in the pain area.
2   BY MR. CRAWFORD:
3      Q.   And what client was that?
4      A.   I'm hesitating because I
5   think there's a confidentiality clause.
6   I don't know if I can relay that.
7      Q.   Well, let's discuss that at
8   a break.  So that's fine.  Thank you for
9   that.
10         So you left and you went to
11  Creative Regulatory Solutions for
12  pharmaceutical development and
13  commercialization; is that --
14     A.   That's incorrect.
15     Q.   Okay.
16     A.   The name of my company is
17  Marchione and Associates, LLC.
18         So that's not my title.
19  That's not my company.
20     Q.   All right.  So you became a
21  principal managing director of your own
22  company, at least, from May of 2013 to
23  December 2014, right?
24     A.   I believe that's the -- let

11 (Pages 38 to 41)

Page 42

1   me see.
2       Q.   Or thereabouts.  I won't
3   hold you to the exact month.
4       A.   Approximately, yes.
5       Q.   And then you -- it looks
6   like you moved back into business with
7   TetraLogic Pharmaceuticals from about
8   January of 2015 until some time in early
9   2016; is that correct?
10      A.   I believe so.
11      Q.   And what particular products
12  were you involved with there?
13      A.   Oncology.
14      Q.   And then you left them again
15  for Inipcocoll Pharmaceuticals, from May
16  of 2016 to about January of 2017; is that
17  correct?
18      A.   That's correct.
19      Q.   And what types of drugs did
20  you deal with there?
21          MR. DIAMANTATOS:  Objection
22      to form.
23      Go ahead.
24          THE WITNESS:  That was a

Page 43

1       pain product for surgery.
2   BY MR. CRAWFORD:
3       Q.   And was it an opioid
4   product?
5       A.   No.
6       Q.   And then from January 2018
7   to the present, you're now principal in
8   your own consulting company that you
9   referenced earlier, right?
10      A.   That's correct.
11      Q.   So we do have the hardcopy,
12  we just marked it Exhibit-2.
13          - - -
14          (Whereupon, Teva-Marchione
15      Exhibit-2, LinkedIn, Carol S.
16      Marchione, was marked for
17      identification.)
18          - - -
19          THE WITNESS:  Thank you.
20  BY MR. CRAWFORD:
21      Q.   And going back to your
22  resume, it looks like prior to joining
23  Teva, you had been at various
24  pharmaceutical companies prior to July

Page 44

1   2000; it looks like Aventis, Ligand, U.S.
2   BioScience and RW Johnson Research; is
3   that -- back to '91.
4       Were all of those in
5   regulatory positions with those
6   companies?
7           MR. DIAMANTATOS:  Objection
8       to form.
9           THE WITNESS:  Yes.
10  BY MR. CRAWFORD:
11      Q.   And did you handle any
12  matters dealing with pain products there
13  at any of these companies?
14          MR. DIAMANTATOS:  Objection
15      to form.
16          THE WITNESS:  At McNeil, I
17      worked on the topiramate, which is
18      Topamax, and Tramadol
19      applications.  I think topiramate
20      has a pain indication.  But
21      Tramadol is definitely pain.
22  BY MR. CRAWFORD:
23      Q.   And you have a degree,
24  Bachelor of Science in biology in 1998 --

Page 45

1   1980, from Villanova, correct?
2       A.   That's correct.
3       Q.   And any other degrees or
4   graduate degrees?
5       A.   No.
6       Q.   All right.  Let's move on
7   here.
8           MR. CRAWFORD:  Actually, I'm
9       going to mark the next document.
10      This will be Document 1554, and
11      also 548.  These are a couple of
12      organizational charts.  And I will
13      read the Bates number into the
14      record.
15          Exhibit-3 is Bates
16      TEVA_MDL_A_01861572, and Exhibit-4
17      is TEVA_MDL_A_01373072.
18          - - -
19          (Whereupon, Teva-Marchione
20      Exhibit-3,
21      TEVA_MDL_A_01861562-572, was
22      marked for identification.)
23          - - -
24          (Whereupon, Teva-Marchione

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    Exhibit-4, Org Chart, Regulatory
2    Affairs, 2004, was marked for
3    identification.)
4         - - -
5    BY MR. CRAWFORD:
6    Q.   So these are -- Exhibit-3
7    appears to be a corporate org chart for
8    regulatory affairs, dated May 28th, 2003,
9    in the bottom left.
10        And then what appears to be
11   a different configuration in an org chart
12   dated June 28th, 2004.
13        Do these charts reflect, to
14   your recollection, the organization of
15   the regulatory affairs departments during
16   these time periods?
17        MR. DIAMANTATOS:  Counsel,
18   excuse me.  I don't know that we
19   have the right exhibits on the
20   right Bates, at least I'm not
21   tracking which ones you're looking
22   at.
23        MR. CRAWFORD:  Okay.
24        MR. DIAMANTATOS:  So I have

Page 47

1    what's been handed to me, and has
2    also been handed to the witness,
3    Exhibit-4 is a one-page document,
4    the Bates ends in 3072.
5         MR. CRAWFORD:  Okay.
6         MR. DIAMANTATOS:  And I've
7    also been handed, as has the
8    witness, a document which has been
9    labeled Exhibit-3, it's a
10   multipage document.
11        MR. CRAWFORD:  I may have
12   pulled a page out of Exhibit-3.
13   So is there a regulatory affairs
14   page ending in 72?
15        THE WITNESS:  The last page.
16        MR. DIAMANTATOS:  The last
17   page of the document ends in Bates
18   72.
19        MR. CRAWFORD:  Okay.  That
20   will be Exhibit -- that's
21   Exhibit-3?
22        MR. JENSEN:  4.
23        MR. CRAWFORD:  4, okay.
24        MR. DIAMANTATOS:  No, I'm

Page 48

1    sorry.  Exhibit-3 is the one that
2    has the regulatory affairs on the
3    last page of Bates 1572.
4         MR. CRAWFORD:  Okay.  We can
5    go with that.
6         MR. DIAMANTATOS:  And the
7    witness also has Exhibit-4, which
8    is the one-page document which
9    ends in 3072.
10        MR. CRAWFORD:  Okay.
11        MR. DIAMANTATOS:  Sorry to
12   interrupt.  I just wanted to make
13   sure the record was clear.
14        MR. CRAWFORD:  No, that's
15   good.  Thank you.  Let's go with
16   that.  I must have had something
17   different in my files.
18   BY MR. CRAWFORD:
19   Q.   So we have Exhibit-3, a
20   chart, starting with TEVA_MDL_A_01861562,
21   clinical research and regulatory affairs.
22        If you go to the last page,
23   that appears to be the tree where you're
24   located, correct?

Page 49

1    A.   Correct.
2    Q.   And that is dated May 28th,
3    2003.
4         And then Exhibit-4 is the
5    one dated June 28th, 2004, that's
6    TEVA_MDL_A_01373072.
7         And I just wanted to ask if
8    this, to your recollection, accurately
9    reflects how your departments -- your
10   department was organized within the
11   corporate hierarchy or structure during
12   these times?
13        MR. DIAMANTATOS:  Objection
14   to form.
15        Go ahead.
16        THE WITNESS:  Yes.
17   BY MR. CRAWFORD:
18   Q.   And let's start with '03.
19        So you're listed here as a
20   senior director of regulatory affairs.
21   And you had underneath you, or working
22   for you, Tracie Parker and Susan
23   Williamson, correct?
24   A.   Yes.

13 (Pages 46 to 49)

Page 50

1     Q.   All right.  And they were --
2  were their functions mostly to help you
3  manage the regulatory affairs department?
4     A.   They may have had
5  responsibility for specific drugs, and I
6  oversaw their capabilities.
7     Q.   All right.  Good.  Thank
8  you.
9          And then it looks like the
10  position above you is vacant, vice
11  president of worldwide regulatory
12  affairs.
13          Who was your superior there
14  when you joined the company?
15          MR. DIAMANTATOS:  Objection.
16  Form.
17          THE WITNESS:  Oh, God.  I
18  can't remember his name.
19          I'm sorry, I just don't
20  remember his name right now.
21  BY MR. CRAWFORD:
22     Q.   That's fine.  It was quite a
23  while ago.
24          But do you remember there

Page 51

1  being a vacancy in that position above
2  you?
3     A.   Yes.  I remember -- it was
4  Ken, Ken White.  Yes.
5          And Ken White left
6  approximately a year or two after I
7  started.  So yes.
8     Q.   And how long did that
9  position stay vacant during this period?
10     A.   You know, I really don't
11  remember.
12     Q.   And it looks like it was
13  eventually filled by Victor Raczkowski;
14  is that correct?
15     A.   That's correct.
16     Q.   If you look at Exhibit-4.
17          So you reported to Mr.
18  Raczkowski after -- when he filled that
19  position starting at least in 2004,
20  right?
21     A.   That's correct.
22     Q.   And can you walk me through
23  your various -- I mean, was he your
24  superior during the entire time you were

Page 52

1  in the department until you left for the
2  oncology wing?
3          MR. DIAMANTATOS:  Objection
4  to form.
5          THE WITNESS:  Yeah, I would
6  need exact dates, because there
7  were -- I had multiple managers.
8          So I would need the exact date.
9  BY MR. CRAWFORD:
10     Q.   Why don't you just walk me
11  through the chronology of managers?
12          So you had Mr. Raczkowski,
13  right?
14          MR. DIAMANTATOS:  Objection.
15  Form.
16          Go ahead.
17          THE WITNESS:  Well,
18  initially I had Ken White.
19          There was a vacancy where I
20  reported to the chief medical
21  officer temporarily.
22  BY MR. CRAWFORD:
23     Q.   Who was that?
24     A.   It was originally Paul

Page 53

1  Blake, and then I think he put Leslie
2  Russel underneath him.
3          And then Victor Raczkowski
4  was there for a couple of years.  And
5  then he left and I had -- what was his
6  name -- Eric Floyd for about two years,
7  and he left.
8          And then I had Jim Ottinger
9  by the time I left.
10     Q.   How do you spell Ottinger?
11     A.   O-T-T-I-N-G-E-R.
12     Q.   And where were -- where was
13  Mr. Raczkowski based?  Was he in your
14  office?
15          MR. DIAMANTATOS:  Objection.
16  Form.
17          THE WITNESS:  Yes, he was in
18  Malvern at the time.
19  BY MR. CRAWFORD:
20     Q.   And that's where you were
21  located, Malvern?
22     A.   That's correct.
23     Q.   And were you in Malvern the
24  entire time you were there at Cephalon

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  and Teva?
2      A.  No.
3      Q.  Give me what offices you
4  were in and when you switched.
5      A.  Initially when I started in
6  2000, the office was in West Chester.
7  And then we moved offices across the
8  street for a year, or whatever.
9          And then we moved to
10 Malvern.  And that's pretty much the
11 whole time I was there, from that point
12 on.
13     Q.  So your superiors were
14 always in the same office you were?
15         MR. DIAMANTATOS:  Objection
16 to form.
17 BY MR. CRAWFORD:
18     Q.  Except for the interim
19 period, maybe?
20     A.  That's correct.
21     Q.  And looking at Exhibit-4, it
22 looks like you still have Tracie Parker
23 underneath you.  And then you now have
24 Penny Levin, Ruth Kearns and Darren

Page 55

1  Dorman below you.
2          Did they -- were those three
3  added after the -- May of 2003 to your
4  department?
5      A.  I believe so.
6      Q.  And did they assist you with
7  various products in the regulatory
8  aspect?
9      A.  Yes.
10         MR. DIAMANTATOS:  Objection
11 to form.
12         Go ahead.
13         THE WITNESS:  Yes.
14 BY MR. CRAWFORD:
15     Q.  And during this period, you
16 had responsibility for Actiq, right?
17         MR. DIAMANTATOS:  Objection.
18 Form.
19         THE WITNESS:  That is
20 correct.
21 BY MR. CRAWFORD:
22     Q.  All right.  That's all I had
23 on those.
24         Now, Cephalon was acquired

Page 56

1  at some point by Teva, correct?
2      A.  Yes.
3      Q.  And that was around 2011?
4      A.  I believe so.
5      Q.  And remind me, is that about
6  the time that you switched to oncology,
7  right, 2011?
8          If you look at Exhibit-1,
9  that might refresh your recollection.
10     A.  You showed me the -- yes.
11 Thank you.
12         2007 is when I became head
13 of oncology.
14     Q.  Oh, okay.  No.  I don't
15 think that's accurate here.
16         I think it was November 2011
17 you became head of oncology, right?
18     A.  No.
19     Q.  Okay.  So you were senior
20 director and group leader, regulatory
21 affairs, from 2007 to 2011, right?
22     A.  I was senior director and
23 group leader, it says -- let me get my
24 glasses -- 2007 to 2011, that's correct.

Page 57

1      Q.  And so then you moved to
2  head of oncology in November 2011, right?
3      A.  That's correct.  Sorry.
4      Q.  And do you know who
5  succeeded you in the position --
6  regulatory affairs position that oversaw
7  Fentora?
8      A.  I don't remember.  Maybe
9  Penny Levin may have taken that
10 responsibility.  I just don't remember.
11     Q.  Do you remember when --
12 after the acquisition, was there a
13 counterpart regulatory person at Teva
14 that you interacted with?
15         MR. DIAMANTATOS:  Objection
16 to form.
17         Go ahead.
18         THE WITNESS:  For,
19 specifically, you mean, as a
20 manager?
21 BY MR. CRAWFORD:
22     Q.  That was a bad question.  So
23 I'll withdraw it.
24         I'm trying to find out, so

15 (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    when Teva took over, there was --
2    obviously, was there any kind of merger
3    of operations at all with Teva USA and
4    Cephalon?
5         MR. DIAMANTATOS:  Objection
6    to form.
7         THE WITNESS:  No, not
8    really.  There was -- there could
9    have been some reorganization.  I
10   just don't remember.
11        Things went back-and-forth
12   numerous times, so that's why it's
13   difficult for me to remember when
14   and who and exactly --
15   BY MR. CRAWFORD:
16        Q.   Right.  Did Teva bring in
17   any of their regulatory people into your
18   department at all after the acquisition?
19        A.   Yes.
20        Q.   Do you remember who that
21   was?
22        A.   Mike -- what was Mike's last
23   name?  He came from Teva and he reported
24   to me.  What's Mike's last name?

Page 59

1         And, yes, there were
2    different people that were brought in.
3         Q.   And when Teva purchased
4    Cephalon, did Teva have its own opioid
5    products, pain products?
6         MR. DIAMANTATOS:  Objection
7    to form.  Foundation.
8    BY MR. CRAWFORD:
9         Q.   Generic?
10        MR. DIAMANTATOS:  Objection
11   to form.  Foundation.
12        THE WITNESS:  I don't -- I
13   don't know.  I didn't interact
14   with the generic group.  I can't
15   tell you.
16        The generic group was
17   separate when I was there.
18   BY MR. CRAWFORD:
19        Q.   Do you know who was head of
20   regulatory or in the regulatory
21   department for Teva after you guys
22   joined?
23        MR. DIAMANTATOS:  Objection.
24   Form.  Foundation.

Page 60

1         Go ahead.
2         THE WITNESS:  I believe when
3    they merged, I think Jim Ottinger,
4    who was head of branded products,
5    became head of at least branded,
6    and then eventually I think he
7    took over generic also.
8    BY MR. CRAWFORD:
9         Q.   And was he already with
10   Teva --
11        A.   No.  He was hired -- I don't
12   know exactly what year, but he was hired
13   in.
14        Q.   After the merger?
15        MR. DIAMANTATOS:  Objection.
16   Form.  Foundation.
17        THE WITNESS:  I'm not
18   exactly sure which -- the date or
19   when that was.
20   BY MR. CRAWFORD:
21        Q.   And after Teva acquired
22   Cephalon, did you become an employee of
23   Teva, or did you stay an employee of
24   Cephalon?

Page 61

1         A.   An employee of Teva.
2         Q.   And what Teva entity
3    employed you?  Do you know the name?
4         A.   Teva Pharmaceuticals.
5         Q.   What was the full name?
6    Teva Pharmaceuticals USA, or do you know?
7         A.   I think it was just Teva
8    Pharmaceuticals.
9         Q.   All right.  Do you recall
10   what your compensation was at the time
11   you left Teva?
12        A.   I'd approximate it to be
13   about 270 a year.
14        Q.   And about what was it when
15   you started?
16        A.   All the way back in 2000?  I
17   don't know.  I'd approximate it at 125.
18        Q.   And did you receive bonuses
19   or stock options as part of your
20   compensation?
21        A.   Yes.
22        Q.   And was that on a yearly
23   basis while you were there?
24        A.   Generally.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1      Q.   And what were those bonuses
2  based on? Your bonuses and your stock
3  options, what were they based on?
4           MR. DIAMANTATOS: Objection
5      to form.
6  BY MR. CRAWFORD:
7      Q.   What type of performance?
8           MR. DIAMANTATOS: Objection
9      to form.
10          THE WITNESS: I believe
11     that --
12          MR. CRAWFORD: Strike that.
13  BY MR. CRAWFORD:
14     Q.   Were they performance-based,
15  the bonuses and stock options?
16     A.   Yes.
17     Q.   And what were the criteria
18  for determining how much you would get?
19          MR. DIAMANTATOS: Objection.
20     Form. Foundation. Time frame.
21          THE WITNESS: So it differed
22     by time frame.
23  BY MR. CRAWFORD:
24     Q.   Just walk me through from

Page 63

1  when you started until you left Teva,
2  what you can remember, as far as the
3  criteria.
4           MR. DIAMANTATOS: Objection.
5      Form.
6           THE WITNESS: I think when I
7      began, my initial level, it could
8      have been a bonus was maybe 25
9      percent of my salary. And I think
10     it went up -- this was the
11     target -- it was approximately 32
12     percent.
13          But that was based upon not
14     just my performance, the
15     department performance and then
16     the company performance. So there
17     was an algorithm.
18  BY MR. CRAWFORD:
19     Q.   And how was your department
20  performance measured?
21          MR. DIAMANTATOS: Objection.
22     Form. Foundation.
23  BY MR. CRAWFORD:
24     Q.   If you know.

Page 64

1      A.   Every year there were
2  objectives, and if you met the
3  objectives.
4      Q.   And then the company
5  performance, what was that based on? Its
6  revenues or profits? Was that any of the
7  criteria?
8           MR. DIAMANTATOS: Objection.
9      Form. Foundation.
10          THE WITNESS: Company
11     objectives -- there was company
12     objectives, department objectives,
13     and then my personal objectives.
14  BY MR. CRAWFORD:
15     Q.   So that was your
16  understanding of what your bonus and
17  stock option awards were based on?
18     A.   That's correct.
19     Q.   And would this have been the
20  entire time period you were there, or did
21  it change?
22     A.   That's my recollection.
23     Q.   And then when you left the
24  company, we did take a look at your

Page 65

1  personnel file, and it looked like you
2  had gotten a $50,000 bonus in February
3  2012; an $87,000 in March of 2013; a
4  $260,000 payment in May of 2013; and even
5  after you left, we saw a $29,000 pay
6  stub.
7           Are these amounts that seem
8  in line with what your recollection is?
9           MR. DIAMANTATOS: Objection.
10     Form.
11          THE WITNESS: It sounds
12     about right.
13  BY MR. CRAWFORD:
14     Q.   And so the $260,000 payment
15  in May of 2013, was that considered a
16  severance-type of payment? Or what was
17  the basis of that payment?
18          MR. DIAMANTATOS: Objection.
19     Form.
20          THE WITNESS: That was a
21     severance.
22  BY MR. CRAWFORD:
23     Q.   And then the $87,000 bonus
24  in March of 2013, what was that based on?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    A.   That was the annual bonus.
2    Q.   And the $50,000 bonus in
3  February 2012, that, again, was the
4  annual bonus?
5    A.   That's correct.
6    Q.   And in addition to these
7  cash bonuses, you could get -- or you did
8  get stock options, too, correct?
9    A.   That's correct.
10    Q.   And approximately -- is
11  there any way to quantify the stock
12  options you received towards the end
13  there?
14    MR. DIAMANTATOS:  Objection.
15  Form.
16    THE WITNESS:  I really don't
17  remember --
18  BY MR. CRAWFORD:
19    Q.   Number of shares or value?
20    A.   -- because there were grant
21  options.  It's so complex, I couldn't
22  understand it from year to year.  So I
23  can't remember it right now.  Sorry.
24    Q.   Do you currently own Teva

Page 67

1  stock?
2    A.   No, I do not.
3    Q.   And it was granted in Teva
4  stock, right?
5    MR. DIAMANTATOS:  Objection.
6  Form.
7    THE WITNESS:  It depends
8  what year you're talking about.
9  BY MR. CRAWFORD:
10    Q.   So before Teva acquired
11  Cephalon, was it Cephalon stock that you
12  were given options?
13    MR. DIAMANTATOS:  Objection.
14  Form.  Assumes facts.
15    THE WITNESS:  Yes.
16  BY MR. CRAWFORD:
17    Q.   Yes?
18    A.   Yes.
19    Q.   And then after Teva acquired
20  Cephalon, were the stock options for Teva
21  stock?
22    MR. DIAMANTATOS:  Objection.
23  Form.
24    THE WITNESS:  I believe so.

Page 68

1  BY MR. CRAWFORD:
2    Q.   And now do you own any
3  Cephalon or Teva stock?
4    MR. DIAMANTATOS:  Objection.
5  Form.  Asked and answered.
6    THE WITNESS:  No, I do not.
7    MR. CRAWFORD:  Let's pull up
8  Document 596 and mark the next
9  exhibit.
10    - - -
11    (Whereupon, Teva-Marchione
12  Exhibit-5,
13  TEVA_MDL_A_08242688-693, was
14  marked for identification.)
15    - - -
16  BY MR. CRAWFORD:
17    Q.   So what we've marked here as
18  Exhibit-5 is a -- it looks like it's
19  stamped November 4th, 1998 letter from
20  the Department of Health and Human
21  Services to Anesta Corporation.  And it's
22  document TEVA_MDL_A_08242688.
23    And this appears to be the
24  approval letter for Actiq.

Page 69

1    Is that what this looks like
2  to you?
3    A.   Give me one second.
4    MR. DIAMANTATOS:  Objection.
5  Foundation.
6    THE WITNESS:  That's my
7  understanding.
8  BY MR. CRAWFORD:
9    Q.   And Anesta Corporation was
10  purchased by Cephalon some time before
11  you arrived at Cephalon, correct?
12    A.   That's correct.
13    Q.   And Patricia Richards, was
14  she at all in your department or at your
15  company when you joined Cephalon?
16    A.   No.
17    Q.   So this letter, go down to
18  the third paragraph.  It says, This new
19  drug application provides for the use of
20  Actiq for the management of breakthrough
21  cancer pain in patients with malignancies
22  who are already receiving and who are
23  tolerant to opioid therapy for their
24  underlying persistent cancer pain.

18 (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Is that your understanding
2 of what the approval -- the indication
3 was for Actiq that was approved by the
4 FDA?
5    A.  In general.  Sometimes the
6 actual labeled indication is slightly
7 different.
8    Q.  All right.  But you do
9 understand that it was approved only for
10 patients who had cancer, malignancies,
11 correct?
12    MR. DIAMANTATOS:  Objection
13 to form.
14    THE WITNESS:  That's what it
15 says here, yes.
16 BY MR. CRAWFORD:
17    Q.  Right.  But that's your
18 understanding of, ultimately, what it was
19 approved for, or at least one of the
20 conditions, right?
21    MR. DIAMANTATOS:  Objection
22 to form.  Asked and answered.
23    THE WITNESS:  Yes.
24 BY MR. CRAWFORD:

Page 71

1    Q.  It then says, in the next
2 paragraph, We have reviewed this
3 application under the restricted
4 distribution regulations contained in 21
5 C.F.R. 314.520, Subpart H, and have
6 concluded that restrictions on
7 distribution and use of Actiq are needed
8 to assure safe use of the product.
9    So this was the Subpart H
10 you were referring to, correct?
11    A.  Yes.
12    Q.  And then they state that, We
13 have completed the review of this
14 application, including the Actiq risk
15 management program, RMP, as amended.  We
16 have concluded that adequate information
17 has now been presented to demonstrate
18 that Actiq is safe and effective when
19 marketed in accordance with the terms of
20 restricted distribution and use described
21 in the risk management program.
22    So is it your understanding
23 that, in order for, in the FDA's view --
24 and this is just how you understood at

Page 72

1 the time -- in the FDA's view that the
2 risk management program was essential to
3 be implemented for the safe use of the
4 product?
5    MR. DIAMANTATOS:  Objection
6 to the form.  Foundation.  Calls
7 for speculation.
8    THE WITNESS:  So you're
9 asking me for the FDA's view.  And
10 what you just asked me is written
11 clearly here, so I'm assuming that
12 that's the case.
13 BY MR. CRAWFORD:
14    Q.  But you understood that in
15 order for Actiq to be a safe drug, it
16 needed to be marketed in accordance with
17 the RiskMAP?
18    MR. DIAMANTATOS:  Objection.
19 Form.  Foundation.
20    THE WITNESS:  That wasn't
21 necessarily my determination.  But
22 what I'm understanding is that the
23 FDA has deemed that.
24 BY MR. CRAWFORD:

Page 73

1    Q.  All right.  Thank you.
2    And then if you can go to
3 the next page, referencing changes to the
4 Actiq risk management program, it says,
5 Please note the attached risk management
6 program, RMP, is an integral part of the
7 approved NDA for this product and is an
8 essential component of the terms of this
9 NDA's approval by the FDA for marketing
10 this product in the United States.  As
11 such, any proposed changes in the risk
12 management program must be submitted to
13 FDA as a supplement to the NDA, and any
14 proposed change must have FDA prior
15 approval before implementation.  Changing
16 the risk management program without prior
17 FDA approval may render the product
18 misbranded and an unapproved new drug.
19    So reading that, does that
20 refresh any recollection that if the
21 RiskMAP was going to be changed by the
22 company, you needed FDA approval first
23 before implementing those changes?
24    MR. DIAMANTATOS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Form.  Foundation.
2        THE WITNESS:  There was
3    significant communication with the
4    FDA.  We tried many, many times,
5    over the course of years, to
6    revise the RiskMAP, and they would
7    not provide us feedback.  We
8    submitted supplements, they never
9    answered it.
10       So it got to the point there
11   were administrative issues that we
12   had to change.  So I communicated.
13   I wrote to them.  I finally said
14   that we need to change -- not
15   we're not changing any fundamental
16   issues, but because of the
17   administration issues that we have
18   to acknowledge, we were changing
19   and please let us know as soon as
20   possible.
21       And you'll find that in the
22   documentation.
23   BY MR. CRAWFORD:
24       Q.   Did they ultimately ever

Page 75

1    approve any supplements for any changes
2    in the Actiq RiskMAP?
3        MR. DIAMANTATOS:  Objection.
4    Form.  Vague.  Foundation.
5        THE WITNESS:  I don't
6    believe they ever did, to be
7    honest.
8    BY MR. CRAWFORD:
9        Q.   Was there one change -- and
10   I just remember looking through the
11   records -- where I think you submit some
12   type of supplement changing the name of
13   the sales force or something that
14   detailed the drug?
15       MR. DIAMANTATOS:  Objection.
16   Form.
17       THE WITNESS:  I know I did
18   at least one.  And then it got to
19   be, again, multiple
20   communications, e-mails.  I'd have
21   to estimate ten to fifteen
22   communications were done where
23   they would not respond to the
24   changes we requested.

Page 76

1        And so from that point on,
2    when I submitted a quarterly that
3    had a change, let's say, it went
4    to -- you know, Walmart to
5    Walgreens or something like that,
6    I had to say, this is a change and
7    we're acknowledging it's
8    administrative, but it's not
9    substantively changing the
10   RiskMAP.
11       And we had to do it that way
12   because we couldn't get
13   communication back.
14   BY MR. CRAWFORD:
15       Q.   But you agree, at least in
16   the beginning, the FDA is saying, in
17   order to get a change or before
18   implementing it, you have to get our
19   prior approval, right?
20       MR. DIAMANTATOS:  Objection.
21   Form.  Foundation.  Calls for
22   speculation.  Asked and answered.
23       THE WITNESS:  That's what it
24   says here.

Page 77

1    BY MR. CRAWFORD:
2        Q.   Do you know why the FDA was
3    not acting on any proposed changes that
4    you say were being made or asked --
5    requested?
6        MR. DIAMANTATOS:  Objection.
7    Form.  Calls for speculation.
8    Foundation.
9        THE WITNESS:  No, I do not.
10   BY MR. CRAWFORD:
11       Q.   If you could turn to Page
12   692 at the bottom.
13       A.   Got you.
14       Q.   They are stating here, the
15   FDA, in the letter to Anesta, In
16   addition, please note that this product
17   is only -- has been approved only for the
18   management of breakthrough cancer pain in
19   patients with malignancies who are
20   already receiving and who are tolerant to
21   opioid therapy for their underlying
22   persistent cancer pain.  As such, please
23   note the promotional statements or
24   representations by you that this product

20  (Pages 74 to 77)

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  may, indeed, be safe and efficacious in
2  the treatment of diseases or patient
3  populations beyond that contained in your
4  approved labeling may be considered a
5  violation of the Act.
6         So does that comport, as a
7  person, as somebody with regulatory
8  background, with what the rules are with
9  regard to promoting a product, an
10 FDA-approved product?
11        MR. DIAMANTATOS:  Objection.
12    Form.
13    Go ahead.
14        THE WITNESS:  Yes.
15 BY MR. CRAWFORD:
16    Q.   And when you joined Cephalon
17 in the regulatory department, would it
18 have been your practice to go back and
19 look at the initial approval files of the
20 drug that you -- drugs that you were
21 working with?
22    A.   If something required it,
23 yes.
24    Q.   Do you believe that you may

Page 79

1  have reviewed this letter at any time?
2     A.   Yes.
3     Q.   And do you believe you would
4  have reviewed it early in your tenure
5  there at Cephalon?
6        MR. DIAMANTATOS:  Objection
7    to form.
8    Go ahead.
9    THE WITNESS:  Yes.
10        MR. CRAWFORD:  All right.
11 Let's go to the next document
12 here.
13        MR. JENSEN:  Exhibit-6.
14        MR. CRAWFORD:  This doesn't
15 have a Bates number.
16         - - -
17        (Whereupon, Teva-Marchione
18 Exhibit-6, No Bates, 1998 21 CFR
19 314.520, was marked for
20 identification.)
21         - - -
22 BY MR. CRAWFORD:
23    Q.   I pulled 314.520, which that
24 was the section referenced on Page 1 of

Page 80

1  Exhibit-5, the approval letter, right?
2     A.   I believe so, yes.
3     Q.   And is that Subpart H right
4  here, or at least part of it?
5     A.   It's part of it.
6     Q.   And I tried to pull the
7  version back in 1998.  I don't know if
8  it's changed.
9        But it does say, If the FDA
10 concludes that a drug product shown to be
11 effective can be safely used only if
12 distribution or use is restricted, FDA
13 will require such postmarketing
14 restrictions as needed to assure safe use
15 of the drug product.
16        So is that your
17 understanding of what Subpart H and the
18 FDA is requiring when they approved
19 Actiq?
20        MR. DIAMANTATOS:  Objection
21    to form.
22        THE WITNESS:  They invoked
23    that subsection of Subpart H when
24    they approved Actiq.

Page 81

1  BY MR. CRAWFORD:
2     Q.   Right.  So the FDA there was
3  requiring the RiskMAP to assure that the
4  drug would be safely used, Actiq, right?
5        MR. DIAMANTATOS:  Objection.
6    Form.  Foundation.
7  BY MR. CRAWFORD:
8     Q.   Under Subpart H, in your
9  understanding?
10        MR. DIAMANTATOS:  Objection.
11    Form.  Foundation.  Calls for
12    speculation.
13        THE WITNESS:  I'm sorry, can
14    you repeat the first part of that
15    question?
16 BY MR. CRAWFORD:
17    Q.   We got kind of interchanged
18 there.  I'd be happy to do that.
19        I'm just -- now that you've
20 seen the letter and you've seen,
21 actually, the text of Subpart H that at
22 least we pulled here, is it your
23 understanding that the FDA -- that a drug
24 approved under Subpart H imposes

21 (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  conditions to ensure that the drug that
2  is approved under that section would be
3  used safely?
4          MR. DIAMANTATOS:  Objection.
5  Form.
6          THE WITNESS:  That it would
7  be restricted to -- I'm sorry, the
8  question was a little awkward.
9  BY MR. CRAWFORD:
10     Q.   Well, what's your
11 understanding of -- now that you've read
12 this section, you've read the letter,
13 what was your understanding of the FDA's
14 views on -- on the necessity of the
15 RiskMAP being approved to assure the safe
16 use of Actiq?
17         MR. DIAMANTATOS:  Objection.
18 Form.  Foundation.  Calls for
19 speculation.
20         THE WITNESS:  So if -- that
21 it was approved under limited
22 distribution and restrictions, and
23 it's -- what's missing here is,
24 under the big scope of Subpart H,

Page 83

1  is that if it's not, then it can
2  be -- then it gives the FDA the
3  authority to then pull back the
4  approval.
5          And that's -- you're missing
6  that section here.  But that's the
7  intention.
8  BY MR. CRAWFORD:
9      Q.   Thank you for filling that
10 in.  All right.
11         MR. CRAWFORD:  601 next.
12         MR. JENSEN:  This will be
13 Exhibit-7.
14           - - -
15         (Whereupon, Teva-Marchione
16 Exhibit-7,
17 TEVA_MDL_A_03272088-117, was
18 marked for identification.)
19           - - -
20         MR. CRAWFORD:  What we
21 marked here is a document
22 entitled, Risk Management Program
23 for Actiq, which is referenced in
24 the top.  And then lists the drug

Page 84

1      sponsor as Anesta Corp., a
2      subsidiary of Cephalon, Inc.  And
3      the date on the lower right is
4      February 9, 1999.  The document
5      number is TEVA_MDL_A_03272088.
6  BY MR. CRAWFORD:
7      Q.   Was this the RiskMAP that
8  you recall that was in place when you
9  joined the company, for Actiq?
10     A.   No.  When I joined, it was
11 still under Anesta.  And so we must have
12 submitted this after I joined.
13     Q.   I see.
14         So this was in place, at
15 least, early in your tenure there?
16     A.   Yes.
17     Q.   But you joined -- you joined
18 Cephalon in 2000, right?
19     A.   That's correct.
20     Q.   And this is dated February
21 9, 1999, and it does reference Cephalon.
22         But this is basically the
23 one that you were operating under when
24 you were there?

Page 85

1      A.   So it does have --
2          MR. DIAMANTATOS:  Objection
3  to form.
4          Go ahead.
5          THE WITNESS:  It does have
6  February 9, but the August 1st is
7  telling me -- so the issue is,
8  going back to the approval letter,
9  if a single word changes, the FDA
10 would then need approval.
11         So this is an instance where
12 we tried to keep the date -- we
13 tried to minimize any changes
14 whatsoever, because it wasn't yet
15 approved and the FDA wouldn't
16 approve it.
17         So that's why you have two
18 dates on this.  We added a
19 separate date, but we didn't want
20 to change the February 9th date
21 because -- because every single
22 letter was considered a change.
23         Does that make sense?
24 BY MR. CRAWFORD:

22 (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   Yes.
2         Is it your understanding,
3    though, that this version, at least, was
4    approved by the FDA?
5    A.   No, it was not.
6    Q.   So you're saying that the
7    February 9th, 1999 one is the approved
8    one?
9    A.   Probably, yes.
10   Q.   All right.
11        MR. CRAWFORD:  Let's take a
12   quick break, if we can.
13        VIDEO TECHNICIAN:  Going off
14   the record at 10:34 a.m.
15            - - -
16        (Whereupon, a brief recess
17   was taken.)
18            - - -
19        VIDEO TECHNICIAN:  We're
20   back on the record at 10:46 a.m.
21   BY MR. CRAWFORD:
22   Q.   All right.  We took a look,
23   and I think we found the February 9th,
24   1999 RiskMAP.  So we're getting copies

Page 87

1    made, and we'll mark that -- we're going
2    to mark it as Exhibit-8 once we get it,
3    and then we'll give you an opportunity to
4    take a look at it.  So I won't ask you
5    anything about it right now.
6         Let's proceed on with
7    Exhibit-7.  This essentially was the
8    RiskMAP version that you were working off
9    of when you -- after you arrived at
10   Cephalon, right?
11        MR. DIAMANTATOS:  Objection.
12   Form.
13        THE WITNESS:  I believe so.
14   BY MR. CRAWFORD:
15   Q.   Okay.  So I'd like to delve
16   into this.
17        On Page 5, under
18   introduction, it says, The Actiq risk
19   management program, RMP, has been
20   designed to address three potential risk
21   situations.
22        And one risk situation,
23   you'll agree with me, is diversion and
24   abuse, correct?

Page 88

1    A.   Yes.
2    Q.   And the goal, it states, is
3    the primary goal of making every
4    reasonable effort to reduce the risk of
5    potential untoward events in the
6    unintended populations, to the extent
7    possible.  This program includes the
8    following -- and then skipping down --
9    comprehensive, professional patient
10   caregivers and child educational
11   programs, interventions at the point of
12   dispensing, and Class II status for
13   Actiq.
14        So was it your
15   understanding, as well, that the goal of
16   this program was to reduce the risk of
17   untoward events in unintended
18   populations?
19        MR. DIAMANTATOS:  Objection
20   to form.  Foundation.  Calls for
21   speculation.
22        THE WITNESS:  That was one
23   of three reasons.
24   BY MR. CRAWFORD:

Page 89

1    Q.   What was the one reason --
2        MR. DIAMANTATOS:  Objection.
3    Form.
4    BY MR. CRAWFORD:
5    Q.   -- that you're referring to?
6    A.   What you just -- what you
7    just -- I'm going back to your question.
8    Q.   Right.
9    A.   I'm sorry, can you repeat
10   it?
11   Q.   I think you're right.
12        There were basically three
13   reasons for the RiskMAP program.  One of
14   them was for prevention of diversion and
15   abuse, correct?
16   A.   That's correct.
17   Q.   So I think that's the main
18   focus I'm going to have with regard to
19   looking through this.  I don't want to go
20   through every single word of it, so I'm
21   going to kind of direct more towards that
22   reason.
23        Below that, it says, This
24   document provides details and

23 (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    implementation tactics for all elements
2    of the Actiq risk management program.  No
3    single element can provide the complete
4    answer to reducing risk.  A lengthy
5    series of events must occur in sequence
6    before a risk can occur, yet any one of
7    multiple RMP elements can intervene to
8    interrupt the sequence and prevent the
9    risk event.  Redundancy of program
10   elements is one measure used to
11   strengthen the effectiveness of the RMP.
12   The purpose of the RMP is to ensure the
13   safe use of this product.
14           So is it your understanding
15   that the RiskMAP was -- had a, I would
16   say, elements, redundant elements, to
17   make sure that Actiq was used safely?
18           MR. DIAMANTATOS:  Objection
19       to form.  Foundation.
20       Speculation.
21           THE WITNESS:  That was
22       the -- that's what the FDA said
23       the intention of this document
24       was, yes.

Page 91

1    BY MR. CRAWFORD:
2        Q.    And do you believe, when you
3    were -- you were in charge of collecting
4    up information and submitting quarterly
5    reports to the FDA about how things were
6    progressing with regard to the operation
7    of the RiskMAP, right?
8        A.    That's correct.
9        Q.    And so you -- was it your
10   understanding that the RiskMAP contained
11   certain elements and programs that were
12   redundant to try to prevent any untoward
13   effects from the drug?
14           MR. DIAMANTATOS:  Objection.
15       Form.
16           THE WITNESS:  That was the
17       FDA's intention.
18   BY MR. CRAWFORD:
19       Q.    Okay.  And your job was to
20   make sure that the company was -- one of
21   your jobs was to make sure that the
22   company was trying to implement those
23   mechanisms, right?  Or at least report to
24   the FDA about how the company was doing?

Page 92

1        A.    That's correct.  Reporting
2    to the FDA, yes.
3        Q.    But other departments, it
4    was their job to make sure these elements
5    were implemented, right?
6        A.    That's correct.
7        Q.    And that would include sales
8    and marketing, right?
9        A.    That's correct.
10       Q.    And they would report to you
11   how they were doing in complying with the
12   RiskMAP, and you would assemble that, or
13   your underlings would, into a report to
14   the FDA?
15       A.    That's correct.
16       Q.    All right.  Good.  Fair
17   enough.
18           It does say, There are key
19   messages for the RiskMAP.  There are
20   several key messages repeated throughout
21   the RMP, which are listed below.
22           Proper patient selection and
23   prevention of diversion and abuse
24   messages look like they are some of the

Page 93

1    messages that the FDA wanted to convey,
2    right?
3            MR. DIAMANTATOS:  Objection
4        to form.  Foundation.  Calls for
5        speculation.
6            THE WITNESS:  That's what it
7        says --
8    BY MR. CRAWFORD:
9        Q.    According to this letter?
10       A.    According to this document.
11       Q.    Right.  And one of the
12   proper patient selection messages listed
13   on the next page, under the second bullet
14   point, is that, Actiq is specifically
15   indicated solely for the treatment of
16   breakthrough cancer pain in chronic
17   opioid-tolerant patients.
18           Is that one of the messages
19   the FDA wanted the company to convey?
20           MR. DIAMANTATOS:  Objection
21       to form.  Foundation.  Calls for
22       speculation.
23           THE WITNESS:  That's what
24       this document says, yes.

24  (Pages 90 to 93)

Page 94

BY MR. CRAWFORD:
Q.    And also for prevention of
diversion/abuse messages, the FDA wanted
the company to convey that Actiq may be
habit forming, right?
        MR. DIAMANTATOS:  Objection
to form.  Calls for speculation.
        THE WITNESS:  That's what
this document says.
BY MR. CRAWFORD:
Q.    And then it references, too,
under that bullet point there, that Actiq
is a Class II medication, right?
A.    That's what this document
says.
Q.    Is it your understanding
that Actiq was a Class II medication?
A.    Yes, it was.
Q.    Let's go to Page 9 of the
RiskMAP, at the bottom, under labeling.
        And then it says, C-II,
Schedule II, Classification 3.1.
        It says, Actiq will be a
C-II product, consistent with other

Page 95

strong opioids such as fentanyl,
morphine, Oxycodone and
hydromorphone-based products.  C-II is
the most restrictive classification
available, and raises the overall level
of vigilance and surveillance by all
parties involved with the product.
        So was it your understanding
that the FDA -- well, let's hear, what is
your understanding of what a Class II
product is and what restrictions are
imposed upon it?
A.    The details of that is more
for DEA people.  I was more focused on
the restrictions from under the RiskMAP.
        So I think there's
particular levels of people who can
prescribe C-II.  I don't know all the
details, because it's not my area of
expertise.
Q.    Understood.
        So the FDA wanted the
Schedule II classification to be another
tool, probably a redundant tool, to make

Page 96

sure it was used safely, right?
        MR. DIAMANTATOS:  Objection
to form.  Foundation.  Calls for
speculation.
        THE WITNESS:  That's what it
says in this document, yes.
BY MR. CRAWFORD:
Q.    And what you're saying is
there was another department within
Cephalon that -- that was in charge of
DEA compliance, right?
        MR. DIAMANTATOS:  Objection.
Form.  Mischaracterizes the
witness's testimony.
        THE WITNESS:  What I was
saying is I don't know the
specifics of the requirements
under the C-II.  And there was
another department that would
oversee that.
BY MR. CRAWFORD:
Q.    All right.  So that was
the -- was it called the compliance
department or DEA compliance department?

Page 97

A.    I don't know the formal
name.  But yes.
Q.    That was their basic
function --
A.    I believe so.
Q.     -- was to ensure that the
company was complying with all the Class
II requirements?
A.    That's my understanding.
Q.    Right.  And do you know who
was in charge of that department?
        Was it Colleen McGinn?  Does
that name seem familiar?
A.    It seems familiar.
Q.    And would they -- would the
DEA compliance department, or whatever
it's called, when you put your quarterly
reports together, would they be one of
the departments that would provide you
with input?
        MR. DIAMANTATOS:  Objection
to form.
        THE WITNESS:  I believe so.
I'd have to remember the

25 (Pages 94 to 97)

Page 98

1    specifics.  It's been a while.
2    BY MR. CRAWFORD:
3        Q.    But your department, or you
4    personally, didn't have any
5    responsibility for making sure that the
6    company was complying with the Class II
7    or DEA requirements, right?
8        A.    That's correct.
9        Q.    But it is a component of the
10   RiskMAP, so it would be part of your
11   reporting to the FDA regarding the Class
12   II issue?
13       A.    I don't remember exactly
14   what had to be reported for that.  I'd
15   have to look at this.
16       Once it's scheduled, it
17   doesn't change.  So it may just be
18   acknowledging that it has to be
19   scheduled.
20       Q.    Yeah, let's move on.  And if
21   you see something that had to be reported
22   about it, why don't we flag that?
23       A.    That's fine.
24       Q.    Fair enough.

Page 99

1        So the next page, it says,
2    right after the bullet points, The status
3    of Actiq -- is it pronounced Actiq or
4    Actiq?  How do you pronounce it?
5        A.    Officially, it was Actiq.
6        Q.    All right.
7        So the status of Actiq as a
8    C-II product is the primary risk
9    management element that a third potential
10   risk event, the potential of diversion
11   on/or abuse -- I don't think I read that
12   right.  Start again.
13       The status of Actiq as a
14   Class II product is the primary risk
15   management element against the third
16   potential risk event - the potential for
17   diversion and/or abuse.
18       So is it your view that the
19   RiskMAP that you were involved with
20   understood that the Class II
21   classification was an important element,
22   a primary element, for making sure that
23   the drug was not abused?
24       MR. DIAMANTATOS:  Objection.

Page 100

1        Form.  Foundation.
2        THE WITNESS:  I think it was
3    one of the elements.  I wouldn't
4    say it was the primary.
5    BY MR. CRAWFORD:
6        Q.    Again, there were redundant
7    elements to try to make sure that the
8    drug was used as safely as possible in
9    the RiskMAP, right?
10       A.    That's correct.
11       Q.    Let's go to Page 12.
12       Under 4.1, Key Message
13   Points, the RiskMAP states, The education
14   of physicians, nurses, pharmacists,
15   caregivers and patients on the safe use
16   of Actiq is an integral part of the Actiq
17   risk management program.
18       Again, it was your
19   understanding that that was an integral
20   part of the RiskMAP and the company's
21   obligations, right?
22       A.    What was?  The educational
23   program?
24       Q.    The education of doctors --

Page 101

1        A.    Yes.
2        Q.    -- nurses, pharmacists, et
3    cetera, right?
4        A.    That's correct.
5        Q.    And one of the messages was
6    prevention and diversion of abuse
7    messages, right?
8        A.    That's correct.
9        Q.    And then the educational
10   programs for physicians, nurses,
11   pharmacists, caregivers and patients will
12   also reinforce the following.
13       One point is efficacy and
14   side effects of the product, right?
15       A.    That's correct.
16       Q.    And then turning to Page 13,
17   it says, These key educational messages,
18   primarily focusing on safety, are
19   provided to the physicians, nurses and
20   pharmacists through the communication
21   vehicles which are discussed on the
22   following pages.
23       Do you understand what the
24   RiskMAP means by "communication vehicle"?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    A.   Yes.
2    Q.   So they are listed here.
3        One would be Actiq speakers
4   bureau medical education programs, right?
5    A.   Yes.
6    Q.   And the goal of those
7   programs, under the RiskMAP, would be to
8   educate doctors on these messages that we
9   just went over, correct?
10   A.   I'm just reading this.  Give
11  me one second.
12       I'm sorry, can you repeat
13  the question again?  I'm sorry.  I just
14  wanted to read that section before --
15   Q.   Please do.  If you need to
16  read something, take your time to do
17  that.
18   A.   So if you could ask the
19  question again.
20   Q.   Sure.
21       And the goal of the programs
22  under the RiskMAP would be to educate
23  doctors on these messages that we just
24  went over, correct?

Page 103

1    A.   That was one of the -- that
2   was one of the elements, to get the
3   risks -- the information on the risks
4   out.  It was a tool.
5    Q.   Right.  So the idea is to
6   use these speakers programs to educate
7   doctors on the risks and the messages
8   that are outlined in the RiskMAP, right?
9        MR. DIAMANTATOS:  Objection.
10  Form.
11       THE WITNESS:  So as I'm
12  reading this, they want to train
13  professionals to train others.  So
14  it was kind of a two-level
15  element.
16       That's why I was trying to
17  be clear.
18  BY MR. CRAWFORD:
19   Q.   Right.  It says those people
20  that are trained, these groups, will then
21  be called upon to educate the respective
22  peers and patients, via presentations in
23  local, state, regional and national
24  settings, correct?

Page 104

1    A.   That's correct.
2    Q.   That was at least what the
3   RiskMAP -- the RiskMAP, it was required
4   by the FDA, but it's something that
5   Anesta, and, I guess, the subsequent NDA
6   holders, were agreeable to doing, right?
7        Or was this just something
8   done because you were told to do it?
9        MR. DIAMANTATOS:  Objection.
10  Form.  Foundation.  Calls for
11  speculation.
12       THE WITNESS:  By taking over
13  the NDA, we had to agree to do
14  this, yes.
15  BY MR. CRAWFORD:
16   Q.   And take over those
17  responsibilities?
18   A.   That's correct.
19   Q.   Okay.  Thank you.
20       And then one of the other
21  communication vehicles would be
22  publications, under 4.4, correct?
23   A.   That's what it says here.
24   Q.   Right.  And the

Page 105

1   publications, it says, will include
2   messages that reinforce elements of the
3   RiskMAP, right?
4    A.   That's what it says here.
5    Q.   And then it lists a number,
6   in the next few pages, of publication
7   communication vehicles that the company
8   might utilize to get across its messages.
9        Is that how you understood
10  the program was to operate?
11   A.   That's what it says here.
12   Q.   But this is a program that
13  was intended to ensure the safe use of
14  Actiq, right?
15       MR. DIAMANTATOS:  Objection.
16  Form.  Foundation.
17  BY MR. CRAWFORD:
18   Q.   Help ensure, anyway?
19   A.   Help ensure, yes.
20   Q.   Right.  All right.  Under
21  Page 15, 5.0, Actiq Launch Program, the
22  RiskMAP states, Actiq will target a
23  relatively small group of clinicians.
24  The emphasis of the promotion will be

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1   highly educational.
2           That's what was intended in
3   promoting the drug, right?
4           MR. DIAMANTATOS:  Objection.
5       Form.  Foundation.
6   BY MR. CRAWFORD:
7       Q.   Through the RiskMAP?
8           MR. DIAMANTATOS:  Objection.
9       Form.  Foundation.  Calls for
10      speculation.
11          THE WITNESS:  This talks
12      specifically at launch, yes.
13  BY MR. CRAWFORD:
14      Q.   But even after launch,
15  did -- was the education supposed to stop
16  or was that supposed to continue
17  throughout the marketing of the drug?
18          MR. DIAMANTATOS:  Objection.
19      Form.  Foundation.  Calls for
20      speculation.
21          THE WITNESS:  I just wanted
22      to find where else it mentioned
23      that.  Because you just directed
24      me to this section for launch.

Page 107

1   BY MR. CRAWFORD:
2       Q.   All right.  Take your time,
3   too.  I don't want to rush you through
4   this.
5       A.   So this document
6   specifically says at launch.  The
7   interpretation, I believe, is to take it
8   beyond that.
9       Q.   Right.  The educational
10  would be messages to doctors?
11      A.   But it's not specified in
12  the RiskMAP, in the REMS or RiskMAP.
13      Q.   But the intent is that the
14  educational aspect will continue even
15  after launch --
16          MR. DIAMANTATOS:  Objection
17      to form.  Foundation.
18  BY MR. CRAWFORD:
19      Q.   -- in your view?
20          MR. DIAMANTATOS:  Calls for
21      speculation.
22          THE WITNESS:  It's not
23      written in here that way.  So it
24      was -- I believe it was the

Page 108

1       interpretation of the company.
2   BY MR. CRAWFORD:
3       Q.   All right.
4       A.   I can't say for -- you know,
5   it's not specified.
6       Q.   All right.  Let's go to the
7   next page, 16.
8           It talks about the oncology
9   sales specialists.  Cephalon, Inc. sales
10  organization, full-time oncology sales
11  specialists have been placed in the field
12  to personally call on the target
13  audience.  The oncology sales specialists
14  are the primary day-to-day link to the
15  physicians, nurses and pharmacies who
16  will be using the product.  The oncology
17  sales specialists play a key role in
18  implementing the RiskMAP.
19          Now, your understanding that
20  in implementing this RiskMAP plan, that
21  the sales representatives would play a
22  key role in disseminating the RiskMAP
23  messages.
24      A.   That's what it says in this

Page 109

1   document.
2       Q.   And it does say oncology
3   sales specialist there.
4           Cephalon didn't really have
5   an oncology sales specialist, did it --
6           MR. DIAMANTATOS:  Objection.
7   BY MR. CRAWFORD:
8       Q.   -- at the time?
9           MR. DIAMANTATOS:  Objection
10      to form.
11  BY MR. CRAWFORD:
12      Q.   They were more the pain
13  detailing people, right?
14          MR. DIAMANTATOS:  Objection.
15      Form.
16          THE WITNESS:  I don't
17      remember the exact title, but it
18      was a different -- they had
19      different titles than this.
20  BY MR. CRAWFORD:
21      Q.   But it would still mean
22  that -- whatever the name was of the
23  sales specialists, the intent was that
24  they would -- when they called upon

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    doctors to promote the drug, they would
2    be the ones to convey the RiskMAP
3    messages, right?
4         MR. DIAMANTATOS:  Objection.
5    Form.  Foundation.
6         THE WITNESS:  That's
7    implied, but it doesn't specify it
8    in the document.
9    BY MR. CRAWFORD:
10        Q.   Because it's a different
11   name?
12        A.   Exactly.
13        Q.   I think, and I could be
14   wrong, but I think there was actually a
15   supplemental change that the FDA approved
16   to change the name of the specialists.
17        Do you recall that at all?
18        A.   I don't know -- I don't
19   know -- I was trying to remember if they
20   approved any of it.  So I just don't
21   remember.
22        I know we submitted the
23   change.  But I just don't remember if it
24   was approved.

Page 111

1        Q.   All right.  Thank you.
2        Page 21, part of the
3    RiskMAP, under 7.0, is that product
4    samples will not be made available.
5        Do you know why that was an
6    important component of the RiskMAP?
7         MR. DIAMANTATOS:  Objection
8    to form.  Foundation.  Calls for
9    speculation.
10        THE WITNESS:  I don't know
11   what was in the FDA's mind, why
12   they specified that, to be honest.
13   I can't say what they were
14   thinking.
15   BY MR. CRAWFORD:
16        Q.   Okay.  But you know that
17   this plan prohibited the dissemination or
18   providing of samples of Actiq, right?
19        A.   That's what it says here,
20   yes.
21        Q.   And would that include
22   providing coupons or vouchers to get free
23   samples of the product --
24        MR. DIAMANTATOS:  Objection.

Page 112

1        Form.
2    BY MR. CRAWFORD:
3        Q.   -- in your view?
4         MR. DIAMANTATOS:  Objection.
5    Form.  Foundation.
6         THE WITNESS:  No, not
7    necessarily.
8    BY MR. CRAWFORD:
9        Q.   How is that different than
10   providing samples?
11        MR. DIAMANTATOS:  Objection.
12   Form.  Foundation.
13        THE WITNESS:  Because it
14   could be controlled better than
15   just handing out samples.  So it's
16   a more controlled distribution.
17   BY MR. CRAWFORD:
18        Q.   All right.  Moving on to
19   Page 22, 8.0, Surveillance goals and
20   activities.
21        The goals of the Actiq
22   surveillance and monitoring program are
23   to determine the effectiveness of the
24   Actiq risk management program by

Page 113

1    monitoring the potential incidence and
2    outcome of child accidental ingestion,
3    potential product use among opioid
4    nontolerant populations, off-label use,
5    and possible diversion and abuse; trigger
6    interventions when problems are
7    discovered; and make modifications to the
8    Actiq risk management program to improve
9    its effectiveness.
10        So it was your understanding
11   that, as part of this program, there was
12   some kind of surveillance and monitoring
13   program in place?
14        A.   Yes, there was.
15        Q.   And what department was that
16   run out of?
17        MR. DIAMANTATOS:  Objection
18   to form.
19   BY MR. CRAWFORD:
20        Q.   Was it quality assurance?
21        MR. DIAMANTATOS:  Objection.
22   Form.
23        THE WITNESS:  Safety had,
24   for instance, had its own

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1      processes; if they heard
2      something, they would respond.  So
3      each stream of processes had
4      evaluation by the initial
5      department, and then quality would
6      then check on that process.
7  BY MR. CRAWFORD:
8      Q.   And to initiate
9  modifications, if the company saw that
10 there was some shortcomings in the
11 program, it was free to make
12 modifications, so long as they submitted
13 them to the FDA and they were approved,
14 right?
15         MR. DIAMANTATOS:  Objection.
16     Form.
17         THE WITNESS:  That was the
18     interpretation of this document.
19 BY MR. CRAWFORD:
20     Q.   And, again, one of the
21 objects -- or goals of the Actiq
22 surveillance monitoring program was to
23 monitor the off-label use of the product,
24 right?

Page 115

1          MR. DIAMANTATOS:  Objection.
2      Form.  Foundation.
3          THE WITNESS:  That's what
4      this document asks for, yes.
5  BY MR. CRAWFORD:
6      Q.   And this is a document that
7  the company was required to follow as a
8  condition for continued -- being allowed
9  to continue to market Actiq, right?
10         MR. DIAMANTATOS:  Objection.
11     Form.  Foundation.  Asked and
12     answered.
13         THE WITNESS:  Yes.
14 BY MR. CRAWFORD:
15     Q.   And off-label use means --
16 what does that mean to you?
17     A.   That means it's documented
18 that somebody who doesn't meet the
19 labeled criteria is using the product.
20     Q.   So if somebody -- off-label
21 use might be somebody who is a noncancer
22 patient that used the product; that would
23 be off label?
24         MR. DIAMANTATOS:  Objection.

Page 116

1          Form.  Mischaracterizes the
2      witness's testimony.  Foundation.
3          THE WITNESS:  Can you repeat
4      the question again?
5  BY MR. CRAWFORD:
6      Q.   Yes.
7          So somebody who used the
8  drug who didn't have cancer, that would
9  be an off-label use of the drug?
10         MR. DIAMANTATOS:  Objection.
11     Form.  Vague.
12         THE WITNESS:  I have to
13     be -- I'm being careful, because
14     if it's prescribed, that's --
15     that's between a physician and a
16     patient.
17 BY MR. CRAWFORD:
18     Q.   Right.  I understand what
19 you're saying.
20         So doctors can make the
21 choice to -- they're not breaking any law
22 by prescribing it off label for a use
23 that's not in the approved indications,
24 right?

Page 117

1      A.   That's correct.
2      Q.   It's just that the company
3  can't market it to the doctors for an
4  off-label use; that's the rule, right?
5      A.   That's correct.
6      Q.   And so for Actiq, it's
7  approved, in part, to treat breakthrough
8  pain in patients with cancer, right?
9      A.   Who are non -- who are
10 opioid tolerant, yes.
11     Q.   Right.  Who are opioid
12 tolerant.
13         So one of the -- so if
14 somebody without cancer uses the drug or
15 is prescribed the drug, it might be legal
16 for the doctor to do that, but it is an
17 off-label use?  That would be --
18     A.   Correct.
19     Q.   -- one off-label use,
20 correct?
21         And somebody who wasn't
22 opioid tolerant, meaning they hadn't used
23 opioids before, that would be an
24 off-label use, right?

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1      A.   That's my understanding.
2      Q.   And if it was used for
3    something other than breakthrough pain,
4    which is in the indication, then that
5    would, again, be an off-label use?
6      A.   That's my understanding.
7      Q.   On Page -- let's see, the
8    bottom of Page 22, there's a direct
9    patient feedback section component, chain
10   pharmacy callback system.  Top of Page
11   23, it says, A callback system will be
12   used to directly query Actiq patients.
13           And, you know, one of the
14   queries was whether the patient received
15   an Actiq welcome kit.
16           Do you see that at the top
17   bullet point?
18     A.   Yes.
19     Q.   And then it says, The
20   partners included in this system include
21   Rite Aid, Eckerd, Walgreens and the Merck
22   Medco system, right?
23     A.   That's what it says.
24     Q.   So this program, or callback

Page 119

1    system, under the RiskMAP, was to be run
2    through those five partners, right?
3      A.   That's what it says here.
4      Q.   Right.  And then the next
5    section, 8.2, IMS Component.
6            It says here that,
7    Prescription data will be routinely
8    monitored.  The source of these data will
9    be IMS Xponent, the largest sample
10   available of Actiq prescriptions,
11   segmented by physician specialty, to
12   determine prescribing needs.  The IMS
13   Xponent data sample represents
14   prescriptions from over 1 million
15   prescribers and over 35,000 retail
16   pharmacies.  Additionally, IMS Xponent
17   captures 60 million mail order
18   prescriptions per year.
19           These data provide the
20   prescriber's name, the physician
21   specialty and zip code.  These data will
22   be analyzed by comparing the proportion
23   of prescriptions written by specialties
24   such as hematologists/oncologists

Page 120

1    (appropriate patient selection) to usage
2    by specialties such as surgeons,
3    (inappropriate patient selection).
4            So based on this, your
5    understanding was, the RiskMAP required
6    use of this IMS Xponent database to
7    analyze the prescribing of the doctors of
8    Actiq, right?
9            MR. DIAMANTATOS:  Objection.
10   Form.  Foundation.
11           Go ahead.
12           THE WITNESS:  That's what it
13   says here, yes.
14   BY MR. CRAWFORD:
15     Q.   But it's your understanding,
16   too?
17           I mean, I know it says that,
18   but the company -- the RiskMAP is
19   something that the FDA -- or that was
20   required as a condition or part of the
21   approval, right?
22     A.   That's correct.
23     Q.   And to make changes, you had
24   to get -- submit a supplement, and the

Page 121

1    FDA had to approve any change to this
2    RiskMAP, correct?
3      A.   That's correct.
4      Q.   Let's go to the next page,
5    24, Wholesaler data.
6            It does say, Cephalon, Inc.
7    will receive information on retail
8    pharmacy sales.  Additionally, every two
9    months -- skipping down to the third
10   paragraph there -- Additionally, every
11   two months a Cephalon Inc. trade sales
12   specialist (wholesaler representative)
13   will call on the high-volume Actiq
14   wholesalers.  This person will request
15   information on any additional pharmacies
16   which need to be added to the list.
17   Information from Cephalon's -- from
18   Cephalon's meetings with wholesalers will
19   be shared with the oncology sales
20   specialists for follow up.  The sponsor
21   will monitor for compliance at the RMP
22   point of dispensing and report violations
23   to the FDA quarterly, along with any
24   interventions made as a result.

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1      So do you recall if Cephalon
2  had this wholesaler data process in
3  place, reporting process, during the time
4  you were there?
5          MR. DIAMANTATOS: Objection.
6  Form. Foundation.
7          THE WITNESS: I believe we
8  did.
9      My hesitancy is because it
10  evolved. Things were evolving
11  depending upon the year and what
12  was available.
13      So you have to look at the
14  RiskMAP quarterlies all the way
15  along, how things may have
16  changed. So that's why I'm
17  implying that, in general, this is
18  my understanding, but things
19  could -- and operationally things
20  could have changed.
21      The intention was there, and
22  we did -- we did agree to it. And
23  we did implement it. But it may
24  not be exactly like that, as it

Page 123

1      evolved.
2  BY MR. CRAWFORD:
3      Q.   Just kind of in your own
4  words, what's your understanding of what
5  the company was to do with regard to this
6  wholesaler data tool here?
7          MR. DIAMANTATOS: Objection
8  to form.
9          THE WITNESS: Just what it
10  says, the sponsor will monitor the
11  compliance, and report violations
12  to the FDA quarterly.
13      And I believe that in our
14  quarterly reports, we explained
15  what we did. So we can find those
16  documents to accompany this.
17  BY MR. CRAWFORD:
18      Q.   But they were supposed to
19  kind of do some digging downstream, you
20  know; basically the company sold to
21  wholesalers, pretty much, right, the
22  drug?
23      They couldn't sell it
24  directly to pharmacies, could they?

Page 124

1      A.   You know, I don't know, to
2  be honest. It wasn't -- I just don't
3  remember, and I don't know how that
4  worked.
5      Q.   I'll represent, I believe,
6  that the restriction -- there was a
7  restriction, you couldn't sell directly
8  to pharmacies the Actiq.
9          But, regardless, my question
10  is, this requirement required the company
11  to kind of look downstream at the
12  wholesalers' customers and do some
13  digging about where there might be some
14  inappropriate distribution of the drug?
15      A.   That was --
16          MR. DIAMANTATOS: Objection.
17  Form. Foundation.
18      Go ahead.
19          THE WITNESS: That's the
20  requirement of this. I just don't
21  remember how it was implemented.
22      And the reports would tell you
23  that. So that's why I'm hesitant.
24  BY MR. CRAWFORD:

Page 125

1      Q.   Got it. I understand.
2  Thank you.
3      Go to 27, Page 27, under
4  9.1.2, under the section, Groups of
5  Prescribers.
6      Why don't you take, you
7  know, just a minute or whatever to read
8  this section?
9      A.   Section 9?
10      Q.   Yes. 9.1.2. It's under
11  9.1, Off-label usage, it's subsection of
12  9.0, Intervention.
13      A.   Okay. I'm done.
14      Q.   All right. Let me just read
15  this into the record. And I just want to
16  get your understanding, in your own
17  words, of how your department or the
18  company interpreted how this was supposed
19  to be implemented.
20      It says, If groups of
21  physicians (such as a particular
22  specialty) are identified as having
23  prescribed Actiq inappropriately, and
24  these prescriptions represent potential

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  off-label usage greater than 15 percent
2  of total quarterly Actiq prescriptions,
3  Cephalon, Inc. will contact the
4  appropriate professional society (i.e.,
5  American College of Surgeons, American
6  Society of Anesthesiologists).  This
7  letter will outline prescribing concerns
8  and offer to implement an educational
9  program in conjunction with the
10  professional society in a national
11  setting.
12          Prescribing patterns will be
13  monitored for the physician groups in
14  question and should the level continue to
15  exceed 15 percent of total Actiq
16  prescriptions for two additional
17  quarters, an aggressive educational
18  campaign will be initiated by mail,
19  clearly warning of the potential
20  liabilities of prescribing Actiq to
21  inappropriate patient populations.
22          So this was a requirement of
23  the RiskMAP, to have this monitoring of
24  groups of prescribers, right?

Page 127

1      A.   That's correct.
2      Q.   And do you recall what
3  department there at Cephalon was in
4  charge of implementing this tool?
5          MR. DIAMANTATOS:  Objection.
6  Form.  Foundation.  Assumes facts.
7  BY MR. CRAWFORD:
8      Q.   Or mechanism, I would say?
9          MR. DIAMANTATOS:  Same
10  objections.
11          THE WITNESS:  It may have
12  been from the IMS database.
13          If I looked at the report, I
14  could tell you better.  The report
15  describes how we did everything.
16  BY MR. CRAWFORD:
17      Q.   But I'm trying to find out
18  what department.
19          Was sales and marketing the
20  department that collected this
21  information and provided it to you for
22  the quarterly report?
23          MR. DIAMANTATOS:  Objection.
24  Form.  Foundation.

Page 128

1          THE WITNESS:  I believe so.
2          But if I could see one of
3  the quarterly reports, I could be
4  more specific.
5  BY MR. CRAWFORD:
6      Q.   Can you give me some kind of
7  account about how the company interpreted
8  this 15 percent requirement?
9          MR. DIAMANTATOS:  Objection.
10  Form.  Foundation.  Calls for
11  speculation.  Assumes facts.
12          THE WITNESS:  I can tell you
13  exactly if I saw the report.
14  BY MR. CRAWFORD:
15      Q.   Right.
16      A.   I'm just trying to remember,
17  and I don't want to say the wrong thing.
18      Q.   All right.  We'll try to
19  pull a report --
20      A.   That will be helpful.
21      Q.   -- and give that to you.
22  Thank you.  Yes.
23          And then the last page here,
24  10.0, on Page 29.  It does say, Cephalon,

Page 129

1  Inc. will provide a quarterly report to
2  the FDA compiled from all data collected
3  by the methods described under the Actiq
4  surveillance and monitoring program
5  interventions, see Sections 8.0 and 9.0
6  of the document.  This report will
7  describe and provide data and any
8  concerns for child safety, diversion and
9  off-label usage.
10          So that was -- that's the
11  report that you were required to prepare,
12  right?
13      A.   That's correct.
14      Q.   So one of those components
15  was to provide data and concerns about
16  off-label usage to the FDA, because they
17  wanted to know what was happening, right?
18      A.   Yes.
19          MR. CRAWFORD:  Can we go off
20  the record for a little bit?  I
21  think we might have a quarterly
22  report, and this might be a good
23  time to get that.
24          VIDEO TECHNICIAN:  Going off

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  the record.  11:22 a.m.
2       - - -
3       (Whereupon, a brief recess
4  was taken.)
5       - - -
6       VIDEO TECHNICIAN:  We're
7  back on the record at 11:34 a.m.
8       - - -
9       (Whereupon, Teva-Marchione
10  Exhibit-9,
11  TEVA_MDL_A_04578988-9017, was
12  marked for identification.)
13       - - -
14  BY MR. CRAWFORD:
15       Q.   Ms. Marchione, we did find a
16  quarterly report, I believe, Exhibit-9,
17  dated September 24th, 2003 signed by you.
18  It's TEVA_MDL_A_04578988.
19       Is this a quarterly report
20  that you referred to earlier?
21       A.   Yes, it is.
22       Q.   And this was prepared or
23  compiled by you or your department,
24  right?

Page 131

1       A.   That's correct.
2       Q.   And submitted to the FDA,
3  correct?
4       A.   That's correct.
5       Q.   And if you could, maybe take
6  a few moments to look at it, maybe go to
7  the first page, which is at 93.
8       It says, Actiq risk
9  management program, 17th quarterly
10  report, April 1st, 2003 to June 30th,
11  2003.
12       This was the report that was
13  referenced in, I think, Section 10 of the
14  RiskMAP document, right?
15       A.   That's correct.
16       Q.   And this is a report that
17  you would prepare in your ordinary course
18  of business, right?
19       A.   That's correct.
20       Q.   And this one, in fact, was
21  submitted to the FDA?
22       A.   That's correct.
23       Q.   And I think the first page
24  here, Page 2, actually, it says, Actiq

Page 132

1  surveillance and monitoring programs,
2  Sections 8 and 9, surveillance goals and
3  activities.
4       And then it starts with
5  direct patient feedback and continues
6  through with sections that correspond to
7  the actual RiskMAP sections, right?
8       A.   That's correct.
9       Q.   So I think my question
10  was -- that you wanted to refer to it --
11  I think it was dealing with the 15
12  percent requirement in the Actiq RiskMAP,
13  right?
14       A.   That's my recollection.
15       Q.   Yeah.  I think that was --
16  just so you can pull it up next to it,
17  that was Exhibit-7, Page 27, groups of
18  prescribers, under off-label usage.
19       And I think I had asked you
20  exactly how -- how the company
21  interpreted and implemented this
22  mechanism to evaluate the prescribing by
23  these groups of physicians.
24       Is there anything -- and

Page 133

1  take your time, but is there anything in
2  the quarterly report that triggers your
3  recollection of how the company might
4  have interpreted and utilized and
5  implemented that mechanism?
6       MR. DIAMANTATOS:  Objection
7  to form.
8       THE WITNESS:  Just give me a
9  minute, please.
10  BY MR. CRAWFORD:
11       Q.   Take your time.
12       This one, actually, I think,
13  at Page 11 and 12, seems to skip over the
14  9.1.2 section.
15       A.   That's what I'm looking at.
16       Because we did -- oh, God.
17  We did always have the 15 percent cutoff.
18  There was an IMS printout that listed --
19  did we -- wait a second.
20       So in Section 8.2.1 on Page
21  3, under, NDC Source Prescriber audit, it
22  states there, The data from the NDC
23  Source Prescriber audit shows that none
24  of the nontargeted physician specialties

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  exceeded 15 percent of the total
2  prescriptions during 2Q03.
3           So the actual documentation,
4  if I remember correctly, you know, was
5  very long and -- but we would get the
6  information and review it and put that
7  statement.
8           So it's on Page 3, under
9  8.2.1.
10      Q.   Right. Okay. So the
11  corresponding section in the Actiq
12  RiskMAP is on Page 23, under 8.2.1, IMS
13  Xponent. That shows a different data
14  source, NDC Source Prescriber audit.
15          Is that the reason why
16  that's different than what's required by
17  the RiskMAP?
18      A.   This is one of those
19  evolving operational things. And maybe
20  the IMS Xponent wasn't available any
21  longer. So I think they switched over to
22  an NDC component.
23      Q.   Do you know if the FDA ever
24  approved that switch?

Page 135

1           MR. DIAMANTATOS: Object to
2  form.
3           Go ahead.
4           THE WITNESS: I doubt it.
5  Again, we informed them every time
6  we changed something. But, as I
7  mentioned earlier, they -- we
8  never got, you know, an
9  acknowledgment letter.
10          We definitely sent it in
11  writing that -- what we were
12  changing along the way.
13  BY MR. CRAWFORD:
14      Q.   Right. But there's nothing
15  in 8.2.1 that talks about the 15
16  percent --
17      A.   So I think --
18      Q.   -- specialties. That comes
19  under -- if you look under the RiskMAP on
20  Page 27, that 15 percent is under 9.1.2.
21          And you'll agree with me
22  that that section is omitted, 9.1.2, from
23  the report, right?
24      A.   I agree. And it's one of

Page 136

1  those historical -- if you looked back in
2  the communication logs, we probably
3  communicated that we were now
4  combining -- using the IMS for the
5  Xponent.
6           And that's why we say here
7  explicitly that the nontargeted physician
8  specialties exceeded 15 percent of the
9  total prescriptions.
10          And it's one of those things
11  that you have to go back historically and
12  look at all the FDA correspondence to
13  figure out when that changed and why, and
14  we explain that.
15      Q.   But, I mean, it would have
16  been just as easy to put it under 9.1.2
17  on Page 12, right after 9.1.1, talking
18  about individual prescribers.
19          I mean, is there a reason
20  why you couldn't have put it under that
21  section, which is the logical section,
22  because that's where 15 percent is
23  discussed, in that section?
24      A.   Right. And I believe -- I

Page 137

1  can't remember exactly, but because they
2  were both kind of looking at the same
3  thing, I think we combined it into that.
4           So we could repeat it again,
5  but -- if you looked at the progression
6  of the reports and the communication, it
7  would probably make a lot of sense where
8  things were. We told them we were moving
9  things or what we were doing.
10          So we were probably using
11  the same source now to answer both
12  things. So this came up first, and
13  that's why we put it there.
14      Q.   So was there ever any point
15  in time that you, in one of these
16  reports, reported that there were
17  nontargeted physician specialties that
18  did exceed 15 percent of total
19  prescriptions?
20          MR. DIAMANTATOS: Objection.
21  Form. Vague as to time.
22  BY MR. CRAWFORD:
23      Q.   At any time.
24      A.   I think there was one --

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1        MR. DIAMANTATOS: Same
2    objection.
3        THE WITNESS: -- quarter, or
4    two. It was later in the -- it
5    was later, you know, towards the
6    end of the marketing or the sales.
7        So I don't know -- I can't
8    exactly -- but we only exceeded it
9    once or twice. That why I wanted
10    you to actually see this, because
11    we never -- I think we
12    initially -- we can find the
13    date -- we never exceeded it
14    except for once or twice.
15    BY MR. CRAWFORD:
16        Q. All right. And then do you
17    remember what nontargeted specialties
18    exceeded 15 percent in those reports?
19        A. I don't remember.
20        Q. All right. And what is a
21    nontargeted physician specialty?
22        A. I believe -- I believe
23    somewhere down the line we communicated
24    to the agency who -- the groups that

Page 139

1    they -- I don't know who, I guess,
2    commercial, identified were not
3    prescribing for oncology.
4        So it could go beyond
5    oncologists. And so whatever groups that
6    they identified, there's a communication
7    somewhere and why they chose those
8    groups.
9        Q. All right. So just turn to
10    Page 27 of Exhibit-7.
11        I'm trying to understand
12    about the -- this is 9.1.2.
13        A. 27 --
14        Q. That would be exhibit, I'm
15    sorry, Exhibit-7, which is the Actiq
16    RiskMAP.
17        A. I'm sorry, what page?
18        Q. I think you might be in the
19    quarterly report.
20        A. You want 27, sorry.
21        Q. Yes.
22        A. Okay.
23        Q. And I'm just trying to
24    understand what you're reporting here.

Page 140

1        So what the FDA -- or what
2    the RiskMAP says is, If groups of
3    physicians (such as a particular
4    specialty) are identified as having
5    prescribed Actiq inappropriately and
6    these prescriptions represent potential
7    off-label usage greater than 15 percent
8    of total quarterly Actiq prescriptions,
9    Cephalon will contact the appropriate
10    professional society.
11        A. Right.
12        Q. It gives examples, American
13    College of Surgeons, American Society of
14    Anesthesiologists.
15        And then you say in your
16    report to the FDA, under 8.2.1, Data from
17    the NDC Source Prescriber audit show that
18    none of the nontargeted physician
19    specialties exceeded 15 percent of the
20    total prescriptions during Q203.
21        So the nontargeted physician
22    specialties are specialties that are
23    not -- would not be prescribing the drug
24    as it was indicated, right?

Page 141

1        A. It's a commercial question.
2    My understanding is that they were --
3    they wouldn't target prescribers who
4    weren't prescribing to cancer patients.
5        Q. All right. So none of those
6    specialties exceeded 15 percent of total
7    prescriptions, is what you're saying
8    here?
9        A. That's correct.
10        MR. DIAMANTATOS: Objection.
11    Form.
12        THE WITNESS: That's my
13    understanding, yes.
14    BY MR. CRAWFORD:
15        Q. Now, what about the targeted
16    physician specialties, what would they
17    be, for example, like, anesthesiologists?
18        A. It was defined -- somewhere
19    in previous communications we defined
20    that. There's so many, you know -- I'd
21    have to look at all the documents.
22        Q. Sure. I understand.
23        Is there, like, an SOP or
24    something that may have helped clarify

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  things?
2      A.   I don't know.  It would be
3  with the commercial group, because they
4  were giving -- they were doing -- it was
5  a marketing research group that was
6  giving us this IMS data, and they
7  would -- and it may be on file somewhere
8  where they would define, you know, what
9  their search criteria was and what the
10  data were.
11      Q.   All right.  So when you
12  did -- when the company did identify some
13  nontargeted specialties that exceeded 15
14  percent, did they -- are you aware if
15  they took the appropriate steps here to
16  write letters, or if it exceeded two
17  quarters, embark on aggressive
18  educational program?
19      A.   To the best of my
20  recollection, what we did was any time we
21  were aware of off-label prescribing, we
22  sent a letter.  It was also a visit by
23  the -- it could have been by the sales
24  rep or MSL.

Page 143

1          And so we did -- rather than
2  going to a group, we wanted specifically
3  to target that physician, to make sure he
4  was aware of the prescribing.  So we --
5  so we did it in that way because it was
6  easier to identify -- we felt it would be
7  more effective to target the actual
8  prescriber than to a general group.  So
9  we did send off-label letters.
10      Q.   All right.  But that's
11  9.1.1, that's the individual prescriber
12  and you become aware that they're
13  prescribing off label, the RiskMAP
14  requires a letter sent to the individual
15  prescriber, right?
16      A.   Right.
17      Q.   And that's on Page 27 here
18  of Exhibit-7, correct?
19      A.   Right.
20      Q.   That's that mechanism,
21  right?
22      A.   Right.
23      Q.   But there is an additional
24  mechanism in 9.1.2, would you agree with

Page 144

1  me, that if you're aware of a group of
2  physicians that prescribe Actiq
3  inappropriately and they exceed 15
4  percent of the total Actiq prescriptions,
5  you're required to write a letter, at
6  least to the professional society,
7  outlining the prescribing concerns and
8  offering to implement educational
9  programs, right?
10          MR. DIAMANTATOS:  Objection.
11  Form.  Asked and answered.
12          THE WITNESS:  To that point
13  is, I think -- I can't remember
14  exactly.  I think we looked into
15  going to the society, and it
16  was -- we felt that going to the
17  specific doctors who were
18  prescribing off label would be
19  more effective.
20          I don't know if they -- I'd
21  have to -- I don't remember.  I
22  think they did try to go to those
23  societies, and, you know, they
24  felt that that's not the correct

Page 145

1  place for it.
2          You know, again, this goes
3  back to -- when this RiskMAP was
4  put together, it was done quickly.
5  There was not a lot of research
6  behind it.  So there's a lot of
7  things in here that couldn't
8  actually be implemented.
9          So what we tried to do is --
10  actually, I'd say, 90 percent of
11  the time we were overly aggressive
12  in going to more specific -- we
13  thought that would be better to go
14  to each physician, as opposed to a
15  group.
16          But we did research trying
17  to go to those groups, and I don't
18  think we could.
19  BY MR. CRAWFORD:
20      Q.   So did you do, like, a mass
21  mailing, then, to doctors about -- for
22  Actiq at any time?
23          I mean, after you
24  discovered -- after you reported that

37 (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    there were a group of physicians, did you
2    do a mass mailing to that group of
3    physicians with information about the
4    proper prescription of the drug?
5        A.   There were a couple mass
6    mailings done over the course of
7    commercial -- of commercial.  And I can't
8    remember what triggered that.
9        But that was to -- that was,
10   like, I don't know -- I don't know which
11   groups we chose.
12       We talked -- I'm trying to
13   remember.  We talked about trying to do
14   that.  And I don't know if they could get
15   a list or -- it didn't seem as effective.
16   So we went to the most conservative, and
17   went to all the physicians that were
18   prescribing off label, as opposed to --
19   that's, basically, what I can remember.
20       We've had meetings on it,
21   and I just don't remember the details.
22       We tried to comply with
23   every single thing in this document.  And
24   when we wouldn't, we went more

Page 147

1    conservatively.
2        Q.   Okay.  So let's split up
3    Actiq and Fentora.
4        For Actiq, was there ever --
5    you've heard of a Dear Doctor letter,
6    right?
7        A.   Yes.
8        Q.   Is that what you're thinking
9    that was sent out, just a form Dear
10   Doctor letter, with the doctor's name on
11   it, or was it -- were you sending
12   individual letters to doctors who you
13   actually knew were prescribing off label?
14       MR. DIAMANTATOS:  Objection
15   to form.
16       THE WITNESS:  The latter.
17   BY MR. CRAWFORD:
18       Q.   So you didn't do kind of a
19   general mass mailing to -- when you saw
20   this targeted -- nontargeted specialty
21   that was prescribing it more than 15
22   percent, you didn't do a mass mailing,
23   not knowing whether they were prescribing
24   off label or on label, that particular

Page 148

1    doctor; you just tried to find doctors
2    who you thought were prescribing off
3    label?
4        MR. DIAMANTATOS:  Objection.
5    Form.  Mischaracterizes testimony.
6        THE WITNESS:  We tried to do
7    that.  Somewhere there's a memo to
8    the file.
9        We tried to do everything
10   that was in there, and we couldn't
11   for some reason.  And it's
12   documented.  Whether the society
13   wouldn't accept something like
14   that or wouldn't give us the names
15   or -- there were reasons.
16       But I just -- I can't
17   remember offhand.
18   BY MR. CRAWFORD:
19       Q.   But if you sent letters to
20   the FDA -- or to these doctors, it would
21   be reflected in one of your quarterly
22   reports to the FDA, right?
23       A.   It is.  We talk about how
24   many letters went out that quarter.

Page 149

1        There was a number --
2        Q.   Are you looking for a
3    section that -- where you list the
4    doctors or give an account of the
5    individual letters that were sent out to
6    doctors?
7        A.   Yes.  Do you see that?
8        Q.   I recall seeing something
9    like that in others letters.  Maybe it's
10   not here.
11       But so the practice would
12   have been, if you did send out letters
13   under 9.2.1 or 9.2.2 or 9.1.2, you would
14   report to the FDA in one of the
15   quarterly reports, right?
16       A.   That's my recollection.
17       Q.   And you would not -- your
18   practice was not to send those letters
19   out and then not tell the FDA you did it,
20   once you found one of these triggers?
21       A.   I thought, on a quarterly
22   basis, we told how many letters went.
23       Q.   I'm just trying to -- if I
24   were trying to figure out what was sent

38 (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1   out to doctors that you referenced, I
2   could reference your quarterly reports to
3   get an accounting of what was sent out,
4   right?
5        A.   That was my recollection,
6   yes.
7        Q.   And that was your practice
8   to do that?
9        A.   Yes.  It went --
10       Q.   That's all I really want to
11  know.  Because I don't have all the
12  reports with me --
13       A.   I understand.
14       Q.   -- but I want to make sure
15  that if I want to try to find out what
16  was sent out --
17       A.   Yes.
18       Q.   -- the best source is for me
19  to go back over your quarterly reports
20  and look to see what was sent out, right?
21       A.   And if it wasn't in the
22  quarterly report, we had a file where we
23  kept -- I don't remember, but we kept
24  all, like, any memos, if something

Page 151

1   unusual would happen or whatever, we
2   would always ask for a memo to file.
3            And, like, our safety group
4   had all the -- each department would keep
5   their own files of what they sent.
6            So -- but there was -- I
7   remember there being a RiskMAP file that
8   we kept, I guess, in the document control
9   room that had all the memos and anything
10  unusual that happened.
11       Q.   Right.  But the letter, the
12  FDA wanted to know, one, if there was a
13  problem, which you identified with the 15
14  percent threshold being reached, and then
15  what you did about it?
16       A.   Right, right.
17       Q.   So the practice would have
18  been to include it in the quarterly
19  report to the FDA, say, hey, listen, we
20  saw a specialty exceeding 15 percent and
21  we sent a letter out to individual
22  doctors, and you either gave them the
23  number or the names or whatever, right?
24       A.   One or two of the quarterly

Page 152

1   reports reflect that one group only went
2   over 15 percent and what we did.
3        Q.   Right.
4        A.   I can't remember.
5            But, I guess, I was -- I
6   remember explicitly that it was only that
7   time that it ever reached over -- that
8   only the one group reached over 15
9   percent.
10       Q.   And you recollect that the
11  report, you reported what you did in
12  response?
13       A.   Yes.
14       Q.   So that would be the best
15  way for me to find out what letter --
16       A.   Exactly.
17       Q.   -- or if anything went out?
18       A.   And maybe in one of the
19  reports where it hit over 15 percent.
20           But, again, there were so
21  many of them and --
22       Q.   So many reports?
23       A.   Yes.
24       Q.   Yeah.  So we'll go back and

Page 153

1   look for that.
2        A.   Right.
3        Q.   We don't do it today.
4        A.   But it was very -- I mean,
5   it only hit once or twice.
6        Q.   All right.  What about
7   targeted groups?  What about if a
8   targeted group exceeded 15 percent and
9   you determined that potentially over 15
10  percent -- or potentially that the
11  off-label prescribing within that
12  targeted group exceeded 15 percent of
13  total Actiq prescriptions, would that be
14  something that you would monitor and
15  report to the FDA?
16       A.   I don't think that was -- I
17  don't think that was one of the
18  requirements for the RiskMAP, because the
19  targeted were patients -- were people who
20  were supposed to be prescribing, right?
21           But any time -- in general,
22  any time we ever became aware, through,
23  like, a serious adverse event -- any time
24  we became aware of an off-label use, we

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    would send a letter, whatever -- whatever
2    mechanism we heard about it.
3        Q.   You mean to an individual
4    doctor?
5        A.   Yes.
6        Q.   Right.  But I'm talking
7    about the groups of physicians
8    requirement, 9.1.2.
9        If you look at the RiskMAP
10   on Page 27, it doesn't talk about
11   targeted or nontargeted doctors --
12       A.   Right.
13       Q.   -- you're basically saying
14   that you did not have to monitor the
15   off-label usage for specialties that were
16   targeted, right?
17       A.   That's correct.  That's not
18   required.
19       But we did -- because it's a
20   redundant document, we did, regardless if
21   they were in the target or nontarget, if
22   we became aware of an off-label use, then
23   we would send a letter.
24       So this is just saying

Page 155

1    that -- this is saying that you're
2    allowed to go to targeted, because that's
3    the people prescribing for oncology.
4        Q.   Right.
5        A.   So that's fine.
6        But the FDA, the intention
7    of this was to look at the nontargeted
8    group, and if they were prescribing over
9    15 percent, that's when the FDA became
10   concerned.
11       Q.   What about -- what if a
12   targeted group, say -- I mean, targeted
13   groups, as far as I understand -- that
14   Cephalon designated as target groups were
15   not only oncologists, but they also
16   designated anesthesiologists --
17       A.   Right.
18       Q.   -- as a targeted group,
19   right?
20       A.   Right.
21       Q.   So that meant that Cephalon
22   felt it could legitimately detail and
23   promote to those -- to that group, right?
24       MR. DIAMANTATOS:  Objection

Page 156

1    to form.
2        THE WITNESS:  That's
3    correct.
4    BY MR. CRAWFORD:
5        Q.   So what if a group of
6    anesthesiologists, what if you look at
7    that targeted group, and you look at --
8    you determined that over 15 percent --
9    the prescriptions from that group
10   potentially exceeded 15 percent of all
11   total Actiq prescriptions that were off
12   label, wouldn't you have to take the
13   corrective action under 9.1.2 to inform
14   the professional societies and offer up
15   these educational programs?
16       MR. DIAMANTATOS:  Objection
17   to form.
18       THE WITNESS:  So --
19   BY MR. CRAWFORD:
20       Q.   Under the RiskMAP?
21       MR. DIAMANTATOS:  Objection
22   to form.
23       THE WITNESS:  I'm not the
24   right person to answer this.

Page 157

1        But there's an IMS ability
2    of seeing, like, what each -- I
3    don't think they could find that
4    out.  I think that's why it was
5    written this way.
6        So they could see what
7    groups were prescribing, and
8    when they could infer it was off
9    label because it was not targeted.
10       But I don't think they
11   could -- at least back then, I
12   don't think they could tell, like,
13   if that psychiatrist was
14   prescribing on label, off label.
15   Because I think that's a HIPAA
16   thing, or whatever.
17   BY MR. CRAWFORD:
18       Q.   I see what you mean.
19       So you're basically saying
20   that for the, quote, targeted -- look at
21   9.1.2 on 27.
22       They don't talk about
23   targeted or nontargeted doctors, right?
24   That's a Cephalon interpretation, or how

40 (Pages 154 to 157)

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  they implemented this provision, right?
2      A.   Right.
3      Q.   But it does talk about if it
4  exceeds 15 percent --
5      A.   Right.
6      Q.   -- to inform professional
7  societies, right?
8      A.   Right.
9      Q.   And one of the societies is
10  the American Society of
11  Anesthesiologists, right?
12      So if Cephalon thought that
13  anesthesiologists were a targeted group
14  and didn't have to look at whether they
15  were prescribing it off label within that
16  group, then why is the FDA saying that if
17  that group exceeds 15 percent, that they
18  need to go to them and educate them?
19      MR. DIAMANTATOS:  Objection.
20  BY MR. CRAWFORD:
21      Q.   I don't understand that.
22      MR. DIAMANTATOS:  Objection.
23  Form.  Foundation.  Calls for
24  speculation.

Page 159

1  BY MR. CRAWFORD:
2      Q.   Can you please explain that
3  to the jury?
4      MR. DIAMANTATOS:  Objection.
5  Form.  Foundation.  Calls for
6  speculation.  Asked and answered.
7      THE WITNESS:  I think I
8  explained it as best I could.
9  BY MR. CRAWFORD:
10      Q.   All right.  So it's also
11  your testimony that if it was a targeted
12  group, say anesthesiologists or
13  oncologists, that IMS didn't have a way
14  to find out exactly whether, within that
15  targeted group, they were prescribing it
16  off label or not?
17      MR. DIAMANTATOS:  Objection.
18  Form.  Foundation.  Calls for
19  speculation.  Mischaracterizes the
20  witness's testimony.
21      THE WITNESS:  I just don't
22  know IMS -- you know, you'd have
23  to ask somebody who specializes in
24  that.

Page 160

1      That was my understanding.
2  BY MR. CRAWFORD:
3      Q.   Okay.  Sure.
4      And that -- you get your
5  information from other people in the
6  company, you didn't know directly, right?
7      MR. DIAMANTATOS:  Objection
8  to form.
9  BY MR. CRAWFORD:
10      Q.   Is that correct?
11      A.   In that particular area,
12  yes.
13      Q.   And would that have come
14  from sales and marketing, that
15  information about breaking out
16  specialties and whether they did off
17  label --
18      A.   It was marketing -- it was
19  marketing research.
20      Q.   Thank you.
21      THE WITNESS:  Are we done
22  with these?
23      MR. CRAWFORD:  Yes.  We
24  might refer back later, so go

Page 161

1  ahead and stick them face down.
2      We marked next here a
3  document entitled, Quality
4  Assurance Memorandum to QA File,
5  from David Brennan, subject,
6  Internal audit of Actiq risk
7  management program, second quarter
8  2003.  It copies Tim Sheehan,
9  Carol Marchione, Bob Bader and
10  Mark Solomon.  It is marked
11  confidential, D0324.
12      - - -
13      (Whereupon, Teva-Marchione
14  Exhibit-10, No Bates, Quality
15  Assurance Memorandum, was marked
16  for identification.)
17      - - -
18  BY MR. CRAWFORD:
19      Q.   Do you recall seeing an
20  audit report before by Mr. Brennan?
21      A.   Yes.
22      Q.   And this is dated, it looks
23  like it's handwritten, December 2nd,
24  2003.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    And you're a recipient,
2  right?
3    A.   That's correct.
4    Q.   And Mr. Brennan was in the
5  quality assurance department?
6    A.   That's correct.
7    Q.   And he -- is it your
8  understanding that he was doing some kind
9  of compliance audit to see whether the
10 company was complying with the Actiq risk
11 management program, right?
12   A.   That's my recollection.
13   Q.   And he has here kind of a
14 summary -- executive summary here.  And
15 he lists as his objective, Audit Actiq
16 risk management program reporting
17 activities to determine compliance with
18 filing commitments, right?
19   A.   Yes, that's correct.
20   Q.   And then his conclusion is,
21 Based on the findings of this audit of
22 12th through 15th quarterly reports,
23 Cephalon is not in compliance in the risk
24 commitments communicated in the risk

Page 163

1  management program dated August 1, 2001
2  filed with Actiq NDA Number 20-747.
3    The identified issues will
4  be communicated to regulatory affairs
5  management -- that would be you, correct?
6    A.   Or my manager.
7    Q.   Okay.  And who was that?
8    A.   The date -- do we know what
9  date this is?
10   Q.   December of '03.
11   A.   It could have been Ken White
12 at the time.  I'm not quite sure.
13   Q.   Was he an interim manager
14 before -- while that seat was vacant that
15 we looked back at the --
16   A.   He was the initial manager.
17 I just don't remember when he left.
18   Q.   All right.  But I think if
19 you look back at Exhibit-3 --
20   A.   It was vacant?
21   Q.   Yes.
22     It says, May 28th, 2003,
23 that that position was vacant above you.
24     So would it have been an

Page 164

1  interim person, or by then did Mr.
2  Raczkowski come into place?
3    A.   I think by then it was maybe
4  the chief medical officer, Paul Blake.
5    Q.   Paul Blake then.
6      He was there on an interim
7  basis, right, until they could find a
8  full-time regular position?
9    A.   He was the -- he oversaw my
10 level above, so yes.
11   Q.   All right.  So -- but that
12 position was vacant, at the time, right
13 above you still?
14   A.   I believe so.
15   Q.   So Mr. Raczkowski was not
16 involved at the time this report
17 was prepared?
18   A.   I believe so.
19     MR. DIAMANTATOS:  Object to
20 form.
21     MR. CRAWFORD:  Is the form I
22   mispronounced his name, maybe?
23 BY MR. CRAWFORD:
24   Q.   So do you recall receiving

Page 165

1  this memo?
2    A.   Vaguely.
3    Q.   And he does go through the
4  audit results, starting on Page 2.
5      I just want to kind of go
6  through a couple of them here and see if
7  you remember these.
8    A.   Under 8.1, about midway
9  through, 8.1.1.4A, Rite Aid, Eckerd,
10 Walgreens, Merck Medco, participating
11 chains are not identified in the report.
12 Walgreens is the only chain represented.
13 The RiskMAP process guide indicates CVS
14 ProCare data is included, too, but this
15 does not match current practice.  The
16 paragraph of the RiskMAP indicates that
17 this program will only be conducted for
18 the first year of sales.  It also
19 indicates that after one year, the
20 company will negotiate with FDA to
21 discontinue the patient survey.
22     Do you know whether the
23 company ever negotiated to discontinue
24 the patient survey?

Golkow Litigation Services - 877.370.DEPS

Page 166

1     MR. DIAMANTATOS: Objection.
2  Form. Foundation. Assumes facts.
3     THE WITNESS: I don't
4  remember. But that could have
5  been one of the many
6  communications to the FDA of
7  something we were changing.
8  BY MR. CRAWFORD:
9     Q.  Do you recall if the FDA
10  ever signed off on dropping that program?
11     MR. DIAMANTATOS: Objection.
12  Form. Assumes facts.
13  BY MR. CRAWFORD:
14     Q.  Or negotiated a different
15  program there?
16     MR. DIAMANTATOS: Objection.
17  Form. Foundation. Assumes facts.
18     THE WITNESS: As I mentioned
19  previously, we -- it seemed like
20  the communication was more
21  one-sided. So we didn't hear
22  back.
23  BY MR. CRAWFORD:
24     Q.  Right. But there was no

Page 167

1  official approval by the FDA of the
2  change?
3     MR. DIAMANTATOS: Objection.
4  Form. Assumes facts. Foundation.
5     THE WITNESS: No.
6  BY MR. CRAWFORD:
7     Q.  Okay. In fact, was the
8  company only using Walgreens data at the
9  time?
10     MR. DIAMANTATOS: Objection.
11  Foundation.
12     THE WITNESS: I don't
13  remember.
14     I do remember that
15  throughout this there were
16  probably a lot of things that --
17  going back to things were
18  different. And if he was looking
19  at the original, because it wasn't
20  updated, we couldn't actually do a
21  lot of the things that were
22  required.
23     So that's why they're just
24  using Walgreens. Because some of

Page 168

1  these things just weren't able to
2  be done.
3  BY MR. CRAWFORD:
4     Q.  Do you know if the company
5  ever submitted a supplement to try to
6  change the provision to narrow it down to
7  Walgreens?
8     A.  I believe -- I believe we
9  did. Every time we tried to -- you know,
10  we came across something that was
11  different, we communicated it at some
12  point.
13     I'd have to look -- it was
14  so long ago. I would have to look.
15     Q.  Well, I mean, before this
16  point in time, did the company ever
17  submit some kind of formal application to
18  change the process to narrow the number
19  of partners here that were doing this?
20     MR. DIAMANTATOS: Objection.
21  Form. Foundation.
22     THE WITNESS: You know, if
23  I -- I'm trying to remember -- of
24  having a phone contact with the

Page 169

1  FDA and saying, you know, we've
2  communicated -- and I believe what
3  the project manager told us, well,
4  communicate -- just communicate it
5  and acknowledge it and -- until
6  you would get an approval.
7     So it would have to be in my
8  communication logs. We could --
9  obviously, I was concerned that we
10  weren't getting feedback. And I
11  think that it was communicated
12  that she told me to acknowledge it
13  in writing and then just keep
14  going until you change it.
15     I can't say for sure. But
16  that's a recollection I have,
17  because I was concerned that we
18  needed to change certain things.
19  BY MR. CRAWFORD:
20     Q.  But the FDA -- the RiskMAP
21  requires a supplement, which is a formal
22  application, to make a change, correct?
23     MR. DIAMANTATOS: Objection.
24  Form. Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1       THE WITNESS:  We tried that.
2  I mentioned that, yes.
3  BY MR. CRAWFORD:
4       Q.   Right.  But I'm just asking,
5  did you try, after this audit, to do that
6  or before this audit to make the change?
7       MR. DIAMANTATOS:  Objection.
8  Form.  Foundation.  Asked and
9  answered.
10       THE WITNESS:  I'd have to
11  look at the log.  I just don't
12  remember.
13       There was a lot of
14  communication about changes.
15  BY MR. CRAWFORD:
16       Q.   All right.  Then 8.2.1, it
17  says that, NDC source prescribers was
18  used instead of IMS Xponent.  NDC source
19  prescriber data is not reported.  We only
20  report that no specialty exceeds 15
21  percent.
22       That was -- that was what we
23  looked at when you flagged it under
24  8.2.1, right?

Page 171

1       A.   That's correct.
2       Q.   Then -- I mean, just looking
3  through this, he found -- Mr. Brennan did
4  find a number of inconsistencies between
5  the practices of the company in
6  effectuating the RiskMAP and what the
7  RiskMAP required, right?
8       MR. DIAMANTATOS:  Objection
9  to form.  Foundation.
10       THE WITNESS:  So what I
11  explained before is there were
12  inconsistencies against the
13  original one that he looked at.
14       If he -- I used to head up
15  the compliance group.  If he did
16  his -- if it was correctly
17  evaluated, he -- what should have
18  happened is he would have gone to
19  look at the actual documentation,
20  which was -- which I saw
21  originally, and it was stored in
22  files.  And he could have looked
23  for himself about the 15 percent,
24  as an example.

Page 172

1       So there is documentation to
2  support all this.  I don't think
3  in this -- in this audit report it
4  was evaluated as appropriately
5  as -- maybe as deep as it should
6  have been.
7       Because we have
8  documentation -- just like he
9  could have -- he could have
10  referenced the documentation where
11  we communicated to the FDA what
12  our changes were.
13       That gives you a sense
14  that -- I think this was a first
15  pass, and this should have been a
16  deeper dive, in terms of some of
17  these findings, because there --
18  there were -- and we actually --
19  we had follow-up to this case.
20       But there was everything,
21  you know, that we were doing
22  correctly.  And we had
23  documentation to support it.
24  BY MR. CRAWFORD:

Page 173

1       Q.   But the RiskMAP requires
2  actual approval by the FDA, through a
3  supplemental process, to make changes;
4  that's mandatory in the RiskMAP, right?
5       MR. DIAMANTATOS:  Objection.
6  Form.  Asked and answered.
7       THE WITNESS:  I mean, I
8  don't know how many times you want
9  me to say it.
10       We did -- we communicated
11  one way.  I talked to the FDA
12  project manager.  And we had to --
13  some of these things couldn't
14  feasibly be done, and so what are
15  we supposed to do?
16       You know, if anything, we
17  went -- for instance, there's
18  questions in the RiskMAP that you
19  were supposed to ask on callback.
20       By the time we kept evolving
21  and making this more and more
22  robust, we had pages of questions
23  to ask.  So, if anything, if you
24  saw what we really did, it was a

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1   lot more robust than the initial
2   RiskMAP.
3       We added a whole lot of
4   things, but we couldn't get it
5   included.  Not only couldn't we
6   get the changes, but we could not
7   get the additional things we
8   added.
9       So, you know, and --
10  eventually the FDA, we had a
11  meeting with the FDA, we made them
12  aware of everything.  We reviewed
13  all the data with them.  They had
14  no problem with what we were
15  doing.
16  BY MR. CRAWFORD:
17      Q.   Okay.  They had no problem
18  with any of the practices that you
19  were -- you had in place --
20      A.   That's correct.
21      Q.   Hold on.
22          -- the practices that you
23  had in place that didn't conform to the
24  exact terms of the written RiskMAP?

Page 175

1       MR. DIAMANTATOS:  Objection.
2   Form.
3   BY MR. CRAWFORD:
4       Q.   Is that what you're saying?
5       A.   Yes.  We met with them and
6   we went through the whole RiskMAP
7   process, all the data.  And we were --
8   there were no issues.  We never got any
9   problem -- any letters.
10          And we had, I don't know, 15
11  people at the FDA in that room who did
12  not have a problem with anything we did.
13  They understood what we were talking
14  about.
15      Q.   And when was that meeting?
16      A.   I remember it was July.  I'd
17  have to look at the date.
18      Q.   July of '04, after this
19  report?
20      A.   I'm sorry, I'd have to look
21  at the date.  But it was -- there's a big
22  binder -- because we went -- we had a
23  huge meeting with the agency.
24          It was -- yeah.  I'd have to

Page 176

1   look at the date.
2       Q.   Let's mark something here.
3       MR. CRAWFORD:  1138.  Let's
4   see if this is the binder or
5   information that you're
6   referencing.
7       This is July 12th, 2004.
8       THE WITNESS:  That sounds
9   right.
10      MR. CRAWFORD:  We'll give
11  you a copy.
12      THE WITNESS:  That sounds
13  right.
14      MR. CRAWFORD:  Why don't we
15  mark it, and you can just confirm
16  this is the meeting where they
17  said everything was okay.
18      THE WITNESS:  I don't want
19  to say -- let me be clear.  I
20  didn't say they said everything
21  was okay.  We -- I'm sorry if I
22  misrepresented.
23      We presented all the
24  information.  They received all

Page 177

1   the documentation.  And at the end
2   of that, we've never -- they
3   thanked us for coming, and we
4   never received any negative letter
5   or anything to the fact.
6          - - -
7       (Whereupon, Teva-Marchione
8   Exhibit-11,
9   TEVA_MDL_A_01575289-972, was
10  marked for identification.)
11         - - -
12  BY MR. CRAWFORD:
13      Q.   So we marked here
14  Exhibit-11.
15          And this is the meeting that
16  you're referring to that was to occur on
17  July 14th, right, 2004?
18      A.   July -- that's correct.
19      Q.   We'll get back to this.  I
20  just wanted to get our timeline straight.
21          So Mr. Brennan lists here --
22  let's go to the items requiring follow
23  up, which is on Page 330 here.
24          He's listed 14 points,

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  right, on those two pages?
2      A.  Okay.  Yep.  Yep.
3      Q.  So one item requiring
4  follow-up, he does reference the four
5  listed pharmacy chains are not included
6  as required by Section 8.1.1.
7          Section 8.0 further commits
8  that if any of the four organizations
9  aren't able to participate, Cephalon will
10  substitute another supplier, only
11  Walgreens is represented.
12          Does that -- does that
13  accurately reflect what the situation was
14  at that time, that only Walgreens was
15  represented?
16          MR. DIAMANTATOS:  Objection.
17  Form.  Foundation.  Calls for
18  speculation.
19          THE WITNESS:  Yeah, I'd have
20  to look.  I don't know.
21  BY MR. CRAWFORD:
22      Q.  There are a number of points
23  here.
24          Number 3, NDC Source

Page 179

1  Prescriber is used in place of IMS
2  Xponent specified in Section 8.2.1.
3          That's another issue he
4  raised, correct?  I think you address
5  that.
6      A.  It's written here.
7          MR. DIAMANTATOS:  Objection.
8  Form.
9  BY MR. CRAWFORD:
10      Q.  Going to Number 12, he says,
11  The quarterly RiskMAP or RMP report omits
12  Section 9.1.2.
13          We saw that in Exhibit-9
14  that we looked at, right?
15          MR. DIAMANTATOS:  Objection
16  to form.
17  BY MR. CRAWFORD:
18      Q.  Remember 9.1.2 was missing,
19  right?
20          MR. DIAMANTATOS:  Objection
21  to form.
22          THE WITNESS:  Right.  But we
23  told you that instead we had it
24  addressed earlier.

Page 180

1  BY MR. CRAWFORD:
2      Q.  It says, This section
3  requires that inappropriate prescriptions
4  representing potential off-label usage
5  greater than 15 percent of the total
6  Actiq prescriptions will prompt Cephalon
7  to offer educational programs to the
8  various professional societies.  It is
9  further specified -- it further specifies
10  that if the potential off-label usage
11  greater than 15 percent continues for two
12  additional quarters, Cephalon will
13  initiate an, quote, aggressive, unquote,
14  education campaign.  No documentation of
15  intervention could be found.
16          So that was one of Mr.
17  Brennan's findings in this document,
18  right?
19          MR. DIAMANTATOS:  Objection.
20  Form.  Foundation.  Calls for
21  speculation.
22          Go ahead.
23          THE WITNESS:  The reason I'm
24  hesitating is because I'm not sure

Page 181

1  if any did exceed it.
2          So he's saying -- and that's
3  why I'm reading 13.
4  BY MR. CRAWFORD:
5      Q.  All right.  Yes, let's read
6  13.
7          SOP 0426-J02 indicates that
8  only individual specialties with
9  prescription rates exceeding 15 percent
10  of the total Actiq prescriptions will be
11  reported to regulatory affairs.  There
12  are approximately 85 specialties
13  reported, three of which are included in
14  the list of exemptions in the SOP.  This
15  does not comply with the requirement in
16  Section 9.1.2 that prescriptions
17  representing potential off-label usage
18  greater than 15 percent prompts action.
19      A.  That doesn't make any sense
20  to me.  Because it doesn't -- it doesn't
21  talk about exceeding the 15 percent.
22          I don't understand.
23      Q.  Right.  But let's at least
24  break down what he's saying.

46  (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1        He says there are
2   approximately 85 specialties reported.
3        So were there about 85
4   specialties that the practice groups were
5   broken into for evaluation of the 15
6   percent threshold?
7        MR. DIAMANTATOS:  Objection.
8   Form.  Foundation.
9   BY MR. CRAWFORD:
10       Q.   Does that refresh your
11  recollection?
12       A.   I don't even understand what
13  he's saying.
14       MR. DIAMANTATOS:  Objection
15  to form.  One second.  One second.
16       THE WITNESS:  Sorry.
17       MR. DIAMANTATOS:  Objection.
18  Form.  Foundation.  The witness
19  never said she can't remember.
20  BY MR. CRAWFORD:
21       Q.   Do you remember there was a
22  process, I think you referenced a
23  document that you would get, where they
24  broke down the specialties in order to

Page 183

1   assess if any exceeded 15 percent for
2   nontargeted, right?
3        A.   That's correct.
4        Q.   Okay.  And there were, what,
5   approximately three targeted
6   specialties -- or how many targeted
7   specialties were there?
8        MR. DIAMANTATOS:  Objection.
9   Form.
10       THE WITNESS:  I don't -- I
11       can't tell from -- this doesn't
12       make sense to me, what he wrote.
13       So I can't tell you what he's
14       trying to say.
15  BY MR. CRAWFORD:
16       Q.   Were there -- is he right
17  that there were approximately 85
18  specialties that it was broken down to
19  for the evaluation of the 15 percent?
20       A.   I just don't remember.
21       Q.   All right.  It says, Action:
22  RA -- that's regulatory affairs, right --
23  will issue a response audit report by
24  12/31, right?

Page 184

1        That's the handwritten part
2   at the bottom of Page 331.
3        A.   That's what it says there.
4        Q.   And RA, you would assume
5   that's regulatory affairs, right?
6        A.   But I don't know whose
7   handwriting this is, and, you know.
8        Q.   Do you recall your
9   department preparing a report, or being
10  asked to, about this time?
11       A.   I recall having a meeting to
12  discuss these issues.  And I'm sure -- I
13  think there was a document to address all
14  the issues.  And it's probably in that
15  RMP file I was telling you.
16       Q.   If you could look at Page
17  345, there appears to be some type of
18  policy, POL-0009.  It's marked draft.
19       Is this -- can you tell
20  me -- have you seen this document before,
21  and can you tell me what it is?
22       A.   345.
23       So my recollection is it's a
24  draft SOP on the RiskMAP.

Page 185

1        Q.   Do you recall if there was a
2   final one at this time, or just the draft
3   that he attaches here?
4        A.   I don't recall.
5        Q.   If you turn to the third
6   page of it, Surveillance.  Well,
7   actually, go to Section 5,
8   Responsibilities.
9        It says, The RMP team
10  includes management representatives from
11  marketing, sales, drug safety and
12  regulatory affairs.  This team -- or the
13  team ensures that adequate systems are in
14  place to support the RMP program.
15       And then skipping down, it
16  says, Specific areas of responsibility
17  directly relevant to the various RMP
18  sections are assigned below.
19       Was that -- even though it
20  says draft, was that kind of the practice
21  at the time with regard to the
22  responsibilities for implementing the
23  program?
24       MR. DIAMANTATOS:  Objection.

47  (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    Form.
2         THE WITNESS:  That's
3    correct.  Because what the
4    activities were fell under the
5    operations of different groups.
6    BY MR. CRAWFORD:
7         Q.   Right.  And is it accurate
8    that marketing, sales, drug safety and
9    regulatory affairs all had a hand in
10   responsibility for making sure this
11   program was put into effect?
12        A.   To my recollection.
13        Q.   And you're regulatory
14   affairs.
15        You were one of several
16   departments, right?
17        A.   That's correct.
18        Q.   And then below, it looks
19   like how they kind of divided up
20   responsibility.
21        If you could look at 5.1 and
22   those assignments, does that basically
23   comport to your recollection of how the
24   duties were divided up -- or

Page 187

1    responsibility was divided up with regard
2    to the RiskMAP?
3         A.   There was a -- there's
4    probably another subsection of marketing
5    research, because a lot of the things
6    came from them, like the IMS database.
7         So I guess it is subsumed
8    under the marketing group.
9         Q.   So wouldn't marketing
10   research -- weren't they a subset or
11   subdepartment of the marketing
12   department?
13        A.   Yeah.  But it's -- yes.
14   Yes.
15        Q.   So it looks like here, at
16   least for your responsibilities, they
17   were, the patient leaflet and package
18   insert, right?
19        A.   That's correct.  That's what
20   it says here.
21        Q.   And then the -- skipping
22   down, the FDA quarterly reporting, right?
23        A.   That's correct.
24        Q.   And then things like

Page 188

1    off-label usage, that was drug safety and
2    marketing, right?
3         MR. DIAMANTATOS:  Objection.
4    Form.
5    BY MR. CRAWFORD:
6         Q.   That had that
7    responsibility?
8         That was right under 5.4,
9    the second one.
10        A.   Right.  Yes.
11        Q.   And then right below that,
12   marketing had the responsibility for the
13   IMS Xponent, IMS NDTI, and promotional
14   message audit, right?
15        A.   That's what -- yes.
16        Q.   And quality assurance had
17   the DEA communications, right?
18        A.   Correct.
19        Q.   And then drug safety, the
20   abuse and other matters, too, right,
21   listed there?
22        A.   That's correct.
23        Q.   Sales and marketing, it
24   looks like they had the responsibility

Page 189

1    for target audience, sales representative
2    training and field direction, right?
3         A.   Again, this is a draft
4    document.  I don't know if it's evolved.
5    And we had other groups.
6         But that's what it says in
7    this document, yes.
8         Q.   But this is, if Mr. Brennan
9    attached it, this must -- do you agree
10   this was the practice at the time, as far
11   as dividing up responsibility?
12        MR. DIAMANTATOS:  Objection.
13   Calls for speculation.
14        THE WITNESS:  Without having
15   an approved document, I'm just
16   hesitant, because if somebody
17   would disagree that that's their
18   area, I can't tell you that.
19        So if somebody drafts
20   something, people may not agree to
21   it.  So you have it in front of
22   you, but it may not be accurate.
23        It seems correct to me, but
24   I'm sure somebody could have a

48  (Pages 186 to 189)

Page 190

1     difference of opinion.
2   BY MR. CRAWFORD:
3     Q.   Fair enough.
4        So it does say below that,
5   POL-0009, draft, it says, Change, new
6   policy.
7        So it looks like it's
8   something that people were trying to get
9   down in writing at the time, right?
10       MR. DIAMANTATOS:  Objection
11   to form.  Calls for speculation.
12       THE WITNESS:  That's my
13   recollection.
14   BY MR. CRAWFORD:
15     Q.   But you -- putting the
16   report together, you needed to get input
17   from all these different departments
18   about their responsibility so you could
19   report it accurately to the FDA, right?
20     A.   That's correct.
21     Q.   And I'm just asking for your
22   understanding, not what other people may
23   have thought was their responsibility.
24        Your understanding was this

Page 191

1   is how the responsibilities broke down
2   and who would report to you on each one,
3   right?
4     A.   What I can remember.
5     Q.   Thank you.
6        MR. JENSEN:  Exhibit-12.
7         - - -
8        (Whereupon, Teva-Marchione
9   Exhibit-12, TEVA_MDL_A_011595-553,
10   was marked for identification.)
11        - - -
12       MR. CRAWFORD:  That's
13   Document 554.
14   BY MR. CRAWFORD:
15     Q.   All right.  We've marked
16   here TEVA_MDL_A_011595, a memo from you,
17   Carol Marchione, to certain people, Paul
18   Blake.
19        Who -- was he your boss at
20   the time?
21     A.   I believe, because Victor
22   must have been on board by that time, so
23   he was my boss's boss.
24     Q.   I see.  Victor Raczkowski,

Page 192

1   who was on the org chart we looked at,
2   right?
3     A.   That's correct.
4     Q.   And then there are other
5   people here from sales and marketing.
6        Andy Pyfer is one of the
7   recipients, was he in marketing?
8     A.   Yes, yes.
9     Q.   And then a cc to David
10   Brennan, right?  He's the guy that
11   prepared the audit?
12     A.   That's correct.
13     Q.   It's dated December 15th,
14   2003, Re: Actions to respond to audit
15   findings regarding the Actiq risk
16   management program, quality assurance
17   memorandum, 12/2/03.
18        Do you recall receiving --
19   or preparing this memo?
20     A.   No.  No, actually, I don't.
21     Q.   And if you look at the next
22   page, it looks like these are the 14
23   points that Mr. Brennan had raised in his
24   audit report.

Page 193

1        Do those look familiar?  And
2   then at least some kind of response,
3   right, by the company?
4        MR. DIAMANTATOS:  Objection
5   to form.
6        THE WITNESS:  I'd have to
7   review it.  It doesn't -- it does
8   not look familiar to me.
9        It seems that way.
10   BY MR. CRAWFORD:
11     Q.   Okay.  Take a look at
12   Exhibit --
13       MR. CRAWFORD:  Was it 10?
14       MR. JENSEN:  Yes, 10.
15   BY MR. CRAWFORD:
16     Q.   Take a look at Exhibit-10.
17     A.   Exhibit-10.
18     Q.   Yes.  Take a look at
19   Exhibit-10.
20        It attached 14 points --
21     A.   I'm sorry, what's
22   Exhibit-10?  Is that the --
23     Q.   The Brennan report.
24     A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1      Q.   Those are the same 14 points
2  that he had put in his audit report of
3  12/2/03, right?
4          And then this is at least
5  some type of response to each point below
6  it, right?
7      A.   It appears that way.
8      Q.   And, I mean, do you recall
9  anything about putting this memo
10  together?
11         And take some time to look
12  at it if you want to.
13     A.   Actually, I don't.  It could
14  have been initially put together by
15  Tracie Parker, who worked for me.
16         So is there a particular --
17  what do you want me to read?  Is there --
18     Q.   Yes.  Okay.  I'll direct you
19  in a second here.
20         But this would have been --
21  if somebody prepared something for your
22  signature, you would have read it?
23     A.   Definitely.
24     Q.   Definitely, okay.

Page 195

1          So when you're on -- you
2  have no reason to doubt that this isn't a
3  record from -- from the -- from your
4  regulatory files, right?
5      A.   That's correct.
6      Q.   Okay.  And you would have --
7  if somebody else helped prepare it for
8  you, you would have read it and verified
9  that you agreed with it, right?
10     A.   That's correct.
11     Q.   So I just want to direct
12  your attention here, I guess, to the
13  comments on the first page.
14         The memo states, In response
15  to the audit findings outlined in the
16  quality assurance memorandum regarding
17  the Actiq risk management program, RMP,
18  representatives from quality assurance,
19  global product safety, marketing, legal,
20  and regulatory affairs met on December
21  11th to review the 14 items requiring
22  follow up.
23         Do you see that?
24     A.   Yes.

Page 196

1      Q.   Do you recall that meeting
2  at all?  Is that refreshing your
3  recollection?
4      A.   I believe there was a
5  meeting to talk about this afterwards, I
6  do.
7      Q.   It says, Additionally, a
8  meeting with sales and marketing needs to
9  be convened to discuss their
10  understanding of the, quote,
11  inappropriate, unquote, physician
12  specialties to be monitored for the 15
13  percent limit, Items 12 and 13.  Due to
14  the additional activity, it was estimated
15  that a memo to respond to the audit
16  finding would be issued by year end.
17         Subsequently a revised RMP
18  containing any necessary revisions will
19  be issued by the end of January 2004 for
20  review by the management of the various
21  departments impacted by the RMP.
22         So do you interpret the
23  intent here as to looking at Mr.
24  Brennan's points and providing a revised

Page 197

1  RMP based on the points that he had
2  raised?
3          MR. DIAMANTATOS:  Objection
4      to form.
5          THE WITNESS:  That's how I
6      would interpret this.
7  BY MR. CRAWFORD:
8      Q.   And do you know if, in fact,
9  a revised RMP was prepared subsequent to
10  this memo, for the Actiq risk management
11  program?
12     A.   I can't remember.  But it
13  would be in our log.
14     Q.   Do you recall, you,
15  yourself, putting one together, a revised
16  RMP?
17     A.   I have hundreds of
18  submissions that I put together.  So, I'm
19  sorry, I'd have to look at the log.
20     Q.   Understood.  Thank you.  All
21  right.
22         It says, below that, Post --
23  updated, post-meeting note:  Legal (Ed
24  Berg) met with sales following the 12/11

Page 198

1  meeting and determined that the required
2  concepts of Number 9 are being met
3  through a regular sales department
4  process.  And, further, that Item 13 is
5  adequately outlined in SOP 0426-J02.
6  This information will be reflected in the
7  year-end memorandum noted.
8       So, basically, the
9  determination was made with these groups
10  that met, which included all these
11  groups, that the existing SOP adequately
12  addressed the 15 percent issue, right?
13     A.   I mean, that's what it says
14  here.
15       At this point, I think,
16  following this audit, our legal group
17  took over kind of the oversight, more
18  than myself, of everything coming from
19  our sales and marketing.  And that's Ed
20  Berg's reference.  So, I mean, that's
21  what this is saying.
22     Q.   All right.  But it's also
23  saying that the SOP, in their view,
24  looked adequate to address the issue?

Page 199

1     A.   That's -- what you read is
2  what it says.
3     Q.   Take a look at Number 13.
4  Actually, it does say, We respectfully
5  request to defer our response to this
6  follow-up item.  An internal meeting
7  should be convened to discuss how the
8  pain specialists are determined.
9       So at this point, at least,
10  there was no official response to the 13
11  -- it looks like there was going to be a
12  follow-up discussion about it, right?
13     A.   What I mentioned to you is
14  then, from that point, our legal
15  representatives took over that point and
16  that process.
17       So I think I was out of the
18  loop at that point.  So that's -- that's
19  as far as I could respond to it.
20     Q.   And that was Mr. Berg, then,
21  right?
22     A.   It was, yes.
23     Q.   And he was in the legal
24  department?

Page 200

1     A.   Yes, he was.
2     Q.   It looks like Mr. Berg has
3  some other responsibilities with regard
4  to these points, including Point 10, it
5  looks like somebody wrote, Ed Berg?
6     A.   Yeah, that's not my
7  document.
8     Q.   That's not your handwriting
9  here?
10     A.   No.
11     Q.   Let's go to --
12       MR. CRAWFORD:  How we doing?
13  Do you want to keep going here or
14  take a short break for lunch?  How
15  do you feel?
16       MR. DIAMANTATOS:  Why don't
17  we take a lunch break?
18       THE WITNESS:  Yes, let's
19  take a lunch break.
20       VIDEO TECHNICIAN:  Going off
21  the record at 12:39 p.m.
22          - - -
23       (Whereupon, a luncheon
24  recess was taken.)

Page 201

1          - - -
2       VIDEO TECHNICIAN:  Back on
3  the record at 1:13 p.m.
4  BY MR. CRAWFORD:
5     Q.   We have since, during the
6  lunch break, retrieved a document that
7  appears to be the 1999 RiskMAP, which we
8  had referenced earlier.
9       I think that -- we were
10  looking at Exhibit-7, which is the August
11  1st, 2001 RiskMAP listing Anesta Corp, a
12  subsidiary of Cephalon.  And I think
13  we've been operating off of that.
14       But you thought that
15  possibly, I think, correct me if I'm
16  wrong, that there was an earlier RiskMAP
17  that may have been the actual operative
18  one from '99.
19       And so we've attached
20  Exhibit-8, kind of a large, full
21  document, but with a copy of a Page 7857.
22  This is document TEVA_MDL_A_08387849.  At
23  Page 7857 is what appears to be a
24  February 9th, 1999 RiskMAP.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1              - - -
2          (Whereupon, Teva-Marchione
3      Exhibit-8,
4      TEVA_MDL_A_08387849-8059, was
5      marked for identification.)
6              - - -
7   BY MR. CRAWFORD:
8      Q.   And I just want to ask you
9   if this refreshes your recollection that
10  that's the '99 RiskMAP that you were
11  thinking of?
12     A.   It may be.  I'd have to look
13  word by word.  I didn't submit this.
14         And I don't know if there
15  was FDA changes to it.  So I really can't
16  say for sure.
17     Q.   Yeah.  But you had thought,
18  possibly, that the effective one that ran
19  through all the time you were there was
20  the '99 RiskMAP, not the '01, which you
21  thought may have had some adjustments to
22  it that hadn't been approved by the FDA;
23  is that correct?
24         MR. DIAMANTATOS:  Objection.

Page 203

1      Form.
2          Go ahead.
3          THE WITNESS:  So the way it
4      works is they submit it -- you'd
5      have to see the correspondence
6      back-and-forth with the FDA.
7          Because I was thinking about
8      looking at the approval letter,
9      because sometimes they'll
10     reference the date of the
11     submission for the RiskMAP.
12  BY MR. CRAWFORD:
13     Q.   Who is "they"?
14     A.   FDA.
15         So this is considered --
16  until I know that FDA said, this is
17  approved, this is just a draft,
18  basically.
19     Q.   Right.
20     A.   So I don't know if the
21  approval letter referenced this as the
22  RiskMAP or if there was correspondence in
23  between.
24         You know, anything to the

Page 204

1   NDA is dynamic, so it's not -- it's a
2   living document.  So there's nothing
3   that's necessarily in time, unless it
4   says it's approved.
5          So the FDA said -- if in the
6   approval letter it says, your RiskMAP as
7   of February 19th, that submission, is
8   approved, that's the only way I could
9   tell.
10     Q.   That's very clear.  Thank
11  you.
12         But, anyway, there is a '99
13  RiskMAP here.  If we found an FDA letter
14  that approved this one submitted here,
15  that would give you some assurance that
16  this is the one, the '99 one, that was in
17  effect when you arrived, right?
18         MR. DIAMANTATOS:  Objection
19     to form.
20         Go ahead.
21         THE WITNESS:  It appears
22     that way, but I'd have to go word
23     by word.
24  BY MR. CRAWFORD:

Page 205

1      Q.   And also see -- yeah, see
2   the sequence resulting in an FDA approval
3   letter, right?
4      A.   That's correct.
5      Q.   So it does say on this
6   letter, February 10th, 1999, from Anesta,
7   Reference is made to the November 4th,
8   1998 approval letter for the Actiq NDA.
9   Specific reference is made to your
10  comments concerning any proposed changes
11  to the current risk management program,
12  RMP, which is dated November 4th, 1998.
13  Since the RMP is considered an integral
14  part of the approved NDA, we draw your
15  attention to the revised RMP included in
16  this submission.  We trust that it will
17  meet with your approval.
18         So they are seeking --
19  you're interpreting this as they're
20  submitting this attached RiskMAP for the
21  FDA approval with any changes they had?
22     A.   Right.  And you don't --
23         MR. DIAMANTATOS:  Objection.
24  Form.  Foundation.  Calls for

52 (Pages 202 to 205)

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    speculation.
2         Go ahead.
3         THE WITNESS:  And you don't
4    know that without seeing
5    correspondence from the FDA.
6    BY MR. CRAWFORD:
7         Q.   We'll look for that.
8         I think -- I think -- my
9    recollection, I want to see if this may
10   be your recollection, if you went back
11   and reviewed these, I know you weren't
12   here at the time, but I think they
13   dropped Abbott as a marketing partner at
14   this time, and that may have been the
15   change that they requested.
16        Does that refresh your
17   recollection?
18        A.   That sounds -- that
19   sounds -- I know there was a situation
20   about dropping Abbott.  I just don't know
21   if there were any other changes to it.
22        I don't think there was
23   anything substantive.  But, again, there
24   may be some operational things.  I just

Page 207

1    don't know, without looking at it word by
2    word.
3         Q.   Okay.  Sounds like we have a
4    missing piece there.
5         It looks like, if you look
6    at Page 7855, that this packet does
7    attach an FDA-approved RMP dated November
8    4th, 1998, at Page 19-124, which was the
9    original RiskMAP.
10        Would that be how you would
11   understand this document?
12        A.   Yes, that's how I would
13   understand that.
14        Q.   And, in fact, when you go to
15   Page 124 -- or, actually, 125 -- well,
16   let's see.
17        124 says, FDA approved RMP,
18   November 4th, 1998.  Note:  The attached
19   RMP was included in the November 4th,
20   1998 facsimile from FDA.  See November 4,
21   1998 approval letter.
22        And then the next page is
23   the risk management program, November
24   4th, 1998.

Page 208

1         Does that look like what
2    could be the approved, original RiskMAP?
3         MR. DIAMANTATOS:  Objection.
4    Form.  Foundation.  Calls for
5    speculation.
6         THE WITNESS:  I'm just --
7    I'm seeing what you're seeing.
8         It looks like this is FDA
9    approved RMP November 4, 1998.  So
10   I'm assuming this is the first.
11   I'm assuming there was a revised
12   one of February 9th, 1999.
13        And what date is this?
14   BY MR. CRAWFORD:
15        Q.   That they submitted with
16   this packet, right?
17        A.   Right.
18        But I don't know if it was
19   ever approved.
20        Q.   And the missing link is
21   finding whether there was an approval
22   letter of this particular one, right?
23        A.   Correct.
24        Q.   If we found it, that would

Page 209

1    give you some assurance that this, in
2    fact, was the one in operation, at least
3    on the date of approval?
4         A.   They -- likewise, they may
5    have -- if I remember correctly, they may
6    have said the same thing, that we
7    submitted -- there may not be an approval
8    letter, is what I'm trying to say.  I
9    don't know if the FDA came back and
10   approved it.
11        Q.   All right.  Let's go to the
12   next document.  This is 1140.
13        MR. JENSEN:  Exhibit-13.
14        - - -
15        (Whereupon, Teva-Marchione
16        Exhibit-13,
17        TEVA_MDL_A_08531805-810, was
18        marked for identification.)
19        - - -
20   BY MR. CRAWFORD:
21        Q.   So here we marked as
22   document TEVA_MDL_A_08531805, Exhibit-13.
23        It looks like a standard
24   operating procedure, SOP-0001053, dated

53 (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1　February 11, 2005.
2　　　And the SOP is called,
3　Marketing Support of the Actiq Risk
4　Management Program.  And approvals are
5　noted here, including your name, of
6　February 11th, 2005.
7　　　Do you recall being involved
8　in approving this particular SOP about
9　the marketing support of Actiq risk
10　management program?
11　　A.　I actually don't remember.
12　　Q.　But your name is on here.
13　　And do you have any reason
14　to doubt that this is the approved
15　program and that you had -- at least had
16　a hand in the approval?
17　　　MR. DIAMANTATOS:  Objection.
18　Form.
19　　　Go ahead.
20　　　THE WITNESS:  I can only
21　assume that I -- you know, but I
22　just don't remember.  But it says
23　here that I approved, so I'm
24　assuming that the database copied

Page 211

1　that.
2　BY MR. CRAWFORD:
3　　Q.　So in the regular course of
4　business, if -- you've been involved in
5　getting SOPs approved there at Cephalon,
6　right?
7　　　MR. DIAMANTATOS:  Objection.
8　Form.
9　　　THE WITNESS:  In some cases
10　I've approved SOPs, yes.
11　BY MR. CRAWFORD:
12　　Q.　So, and then this -- and
13　would this be the normal format that you
14　would see after an approved SOP came out,
15　with the approvals and the attachment
16　document?
17　　　MR. DIAMANTATOS:  Objection
18　to form.
19　　　THE WITNESS:  So we switched
20　over to an electronic system.  So
21　I may have never looked at it this
22　way.
23　BY MR. CRAWFORD:
24　　Q.　All right.  Okay.  So

Page 212

1　Paragraph 1, or the top, says, Purpose
2　and scope:  The procedure outlines
3　marketing's responsibilities in the
4　Actiq risk management program, RMP, and
5　NDA approval letter.  The intent of the
6　risk management plan is to support the
7　approval of Actiq and to assure patient
8　access while addressing the potential
9　risks associated with appropriate patient
10　selection, child safety, diversion and
11　abuse.
12　　　And it does say, Departments
13　affected, marketing, sales, global
14　product safety, regulatory affairs and
15　legal.
16　　　So do you interpret this or
17　understand this document to be an SOP, a
18　standard operating procedure,
19　encompassing marketing's responsibility
20　with regard to the Actiq risk management
21　program?
22　　A.　That's what the document
23　says.
24　　Q.　And is that your

Page 213

1　understanding of what this is?
2　　A.　Yes, that's my
3　understanding.
4　　Q.　And there is a section
5　called, Groups of Prescribers, 4.5.
6　　　And at this point in time,
7　you're still writing the quarterly
8　reports reporting to the FDA on the Actiq
9　risk management program, right?
10　　A.　Yes.
11　　Q.　And one of the sections of
12　the RiskMAP is 9.1.2 that we've gone over
13　regarding groups of prescribers and
14　when -- when a group goes above 15
15　percent of Actiq use, that certain
16　actions are to be taken with regard to
17　education of that group through a
18　professional society, right?
19　　　MR. DIAMANTATOS:  Objection
20　to form.
21　　　THE WITNESS:  Yep, that's
22　correct.
23　　　MR. DIAMANTATOS:
24　Mischaracterizes the exhibit.

54 (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1      Go ahead.
2      THE WITNESS: I'm sorry,
3 could you repeat the question?
4 BY MR. CRAWFORD:
5    Q. All right. One of the
6 sections of the RiskMAP is 9.1.2, that
7 we've gone over, regarding groups of
8 prescribers, and when a group goes above
9 15 percent of Actiq use, that certain
10 actions are to be taken with regard to
11 education of that group through a
12 professional society, right?
13      MR. DIAMANTATOS: Same
14 objections.
15      THE WITNESS: Nontargeted
16 groups, right.
17 BY MR. CRAWFORD:
18    Q. Right. Nontargeted groups.
19     And that's found in
20 Exhibit-7, if you wanted to confirm that,
21 on Page 27.
22     So what I want to do is just
23 go through this section and see if you
24 can maybe give your understanding of how

Page 215

1 the process was to apply with regard to
2 targeted and nontargeted groups.
3     It says, The Actiq RMP
4 Section 9.1.2 requires intervention for
5 suspected off-label use in major
6 physician group populations. The
7 three-digit diagnosis code data is
8 evaluated by market research each
9 quarter. Any physician specialty
10 category, other than those related to
11 oncology, hematology or pain specialists
12 (including pain medicine, anesthesiology,
13 anesthesiology pain medicine, physical
14 medicine and rehabilitation and
15 palliative medicine), exceeding 15
16 percent of total mentions is highlighted.
17 The highlighted report is reviewed by
18 representatives from global product
19 safety, regulatory affairs, sales and
20 marketing. If needed, a letter
21 concerning -- in other words, regulatory
22 affairs, that's you, your department
23 would review the highlighted report,
24 right?

Page 216

1    A. Yes.
2    Q. Okay. Do you recall that
3 being the process back then?
4      MR. DIAMANTATOS: Objection
5 to form.
6      THE WITNESS: Yes.
7 BY MR. CRAWFORD:
8    Q. Okay. If needed, a letter
9 outlining prescribing concerns and the
10 offer to conduct an educational program,
11 in conjunction with a professional
12 society meeting or other national
13 setting, to the applicable professional
14 organization (e.g., American College of
15 Surgeons, American Academy of Physical
16 Medicine and Rehabilitation) is drafted
17 and circulated by marketing.
18     Upon acceptance of the
19 reviewing departments (legal, regulatory
20 affairs, global product safety, and
21 marketing) this letter will be sent to
22 the applicable organization. Responses
23 received from the professional
24 organization are filed with the letter.

Page 217

1 Regulatory affairs includes a copy of
2 this correspondence in the quarterly
3 report to the FDA.
4     So any letter that goes out
5 is supposed to be included in the
6 quarterly report, right?
7    A. That's what it says here.
8    Q. And that's your letter you
9 send, right?
10    A. No, I don't send it. I send
11 it to the FDA, but I don't send it out.
12    Q. All right. Well, you
13 author -- you're the signatory of the
14 quarterly report, right?
15    A. Of the report, yes.
16    Q. Right. And that gets sent
17 to the FDA?
18    A. That's correct.
19    Q. And that's what they're
20 referring to here, right, the quarterly
21 report?
22      MR. DIAMANTATOS: Objection
23 to form. Foundation. Calls for
24 speculation.

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1      THE WITNESS: I
2   misunderstood. I thought you
3   meant the correspondence.
4   BY MR. CRAWFORD:
5      Q. No, no, not the
6   correspondence to the doctor.
7      But the report reporting on
8   it, you were the author of that?
9      A. That's correct.
10     Q. Program compliance is the
11  responsibility of the Actiq brand leader.
12     So what program, do you
13  know, this SOP that you signed off on,
14  what program are they referring to?
15     MR. DIAMANTATOS: Objection
16  to form.
17     THE WITNESS: I'm sorry,
18  what are you talking about?
19  Program?
20  BY MR. CRAWFORD:
21     Q. The last sentence says,
22  Program compliance is the responsibility
23  of the Actiq brand leader.
24     I'm just wondering what

Page 219

1   program this refers to.
2      A. I didn't -- I didn't write
3   this, but I'm assuming they mean the
4   compliance to doing these activities.
5      Q. Got it.
6      So that would be the Actiq
7   brand leader, that's the marketing
8   department, right?
9      A. That's my interpretation.
10     Q. And do you know who the
11  Actiq brand leader was at this time?
12     A. I don't remember. It could
13  be Andy Pyfer or Michael Richardson. I'm
14  not sure which.
15     Q. All right. Now, so it looks
16  like to me, and I just want to confirm
17  that this is right, that certain
18  specialties are exempted from this 15
19  percent requirement, examining it, right?
20     A. That's what it says here.
21     Q. And that would be which
22  groups?
23     A. Well, you read it. So
24  it's -- this says including, so I

Page 220

1   can't -- I don't know all the specific
2   groups. It's in categories -- it's
3   general categories here.
4      Q. Well, it says, Any physician
5   specialty category other than those
6   related to oncology, hematology or pain
7   specialists.
8      And pain specialists include
9   pain medicine, anesthesiology,
10  anesthesiology pain medicine, and
11  physical medicine, rehabilitation and
12  palliative medicine.
13     Those groups are basically
14  exempted out; you don't do any
15  examination, under this procedure,
16  whether those groups are prescribing off
17  label in a manner where the total
18  prescriptions in that group exceed 15
19  percent of the Actiq --
20     A. So that's the targeted
21  group.
22     Q. Right.
23     A. So this is basically saying
24  the same thing as the RiskMAP, it's the

Page 221

1   nontargeted group which then exceeds 15
2   percent.
3      Q. Well, the RiskMAP mentions
4   nothing about targeted or nontargeted
5   groups, right?
6      A. I thought it did.
7      Q. Take a look at 9.1.2.
8      This is Cephalon's way of
9   implementing it, but it really doesn't
10  talk about exempting out targeted groups
11  or anything like that, does it?
12     That exhibit -- you pulled
13  it out there, Exhibit-7, Page 27, at the
14  bottom.
15     I'll just read it for the
16  record. It says, If groups of physicians
17  such as a particular specialty are
18  identified as having prescribed Actiq
19  inappropriately, and those prescriptions
20  represent the potential off-label use
21  greater than 15 percent of total Actiq
22  prescriptions, Cephalon Inc. will contact
23  the appropriate professional society
24  (i.e., American College of Surgeons,

56 (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1   American Society of Anesthesiologists).
2       That's the language in the
3   RiskMAP, right?
4       A.   Just give me one minute,
5   please.
6       Q.   Page 27.
7       A.   No, I know what it says on
8   27.  But, remember, we combined it.
9       So I just want to -- we were
10  talking about targeted earlier.  That
11  word was used in some document.
12      Q.   8.2.1 is what you're talking
13  about?
14      A.   8.2.1?  Maybe it was in the
15  report.
16      So what I explained before
17  is that there's targeted groups and
18  nontargeted groups.  So they identified
19  the target groups where they feel that
20  cancer patients go to see their
21  physician, it may not necessarily be
22  oncologists, it could be others.  And I
23  think that's what's included in this
24  general list here of pain meds,

Page 223

1   anesthesiologists, anesthesiology pain
2   med, physical med, rehab and palliative
3   care.  So they must have done some
4   analysis and said, cancer patients go to
5   these doctors.
6       So what they're saying is
7   that if there's any physician groups that
8   don't fall in that general umbrella, if
9   they go outside -- if they prescribe over
10  15 percent of the total, then that is the
11  targeted group, I think we referred to
12  that earlier, and that, then -- that they
13  would go and go to the group -- you know,
14  whatever, I'm making this up, but let's
15  say it's psychiatrists, and they would go
16  to the psychiatry -- you know, American
17  Association of Psychiatry and try to
18  say -- you know, let them know that we
19  want the list of your doctors to let them
20  know about Actiq and how it should be
21  used.
22      Q.   So --
23      A.   That's my interpretation.
24      Q.   So if psychiatry, as a

Page 224

1   nontargeted group, if total Actiq
2   prescriptions exceeded 15 percent, then
3   that would trigger the -- 15 percent off
4   label, then that would trigger the
5   duty --
6       A.   That's my --
7       MR. DIAMANTATOS:  Objection
8   to form.
9       THE WITNESS:  --
10  understanding.
11      MR. DIAMANTATOS:  Objection
12  to form.  Foundation.
13      Go ahead.
14  BY MR. CRAWFORD:
15      Q.   -- the duty to approach a
16  professional society?
17      MR. DIAMANTATOS:  Same
18  objections.
19      THE WITNESS:  That was my
20  understanding.
21  BY MR. CRAWFORD:
22      Q.   Okay.  And those are the
23  nontargeted groups, right?
24      A.   So -- yes.  Yes.

Page 225

1       Q.   So the targeted groups, they
2   are targeted groups because they are
3   appropriate targets for detailing, right?
4       MR. DIAMANTATOS:  Objection.
5   BY MR. CRAWFORD:
6       Q.   Is that why they're called
7   targeted?
8       MR. DIAMANTATOS:  Objection.
9   Form.  Speculation.  Foundation.
10      THE WITNESS:  That was my
11  interpretation.
12  BY MR. CRAWFORD:
13      Q.   Okay.  So if you're in a
14  targeted group, say, these pain
15  specialists, anesthesiologists, et
16  cetera, there's no analysis that's done
17  by the company, under the SOP, whether --
18  what percentage of doctors within those
19  targeted specialties prescribe Actiq off
20  label to see if that total amount
21  potentially exceeds 15 percent of the
22  total Actiq prescriptions, right?
23      MR. DIAMANTATOS:  Objection
24  to form.  Foundation.

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    THE WITNESS: My
2 interpretation -- my read of the
3 RiskMAP is that there was no --
4 there was no requirement for that.
5 I don't know if they did analysis
6 on that.
7 BY MR. CRAWFORD:
8    Q.    But, again, the RiskMAP
9 doesn't -- basically, it does say that
10 one of the potential societies you would
11 go to is the American Society of
12 Anesthesiologists, if their total
13 off-label prescribing exceeds 15 percent.
14    So the FDA, or the RiskMAP,
15 at least, contemplates that you might go
16 to the anesthesiologists if their
17 prescribing is over 15 percent off label,
18 right?
19    MR. DIAMANTATOS: Objection.
20 Form. Foundation. Calls for
21 speculation. Asked and answered.
22    THE WITNESS: I think at the
23 time there may have been -- the
24 FDA interpreted that you wouldn't

Page 227

1 go to an anesthesiologist if you
2 were a cancer patient.
3    And I don't know how -- to
4 be honest, I don't know how they
5 determined the targeted versus
6 nontargeted. It's a commercial
7 question.
8 BY MR. CRAWFORD:
9    Q.    Right. So that -- again,
10 this looks like it's in the sales and
11 marketing world, because that's what this
12 SOP applies to, right?
13    So you relied on sales and
14 marketing to make a determination of what
15 the targets were and nontargeted groups?
16    A.    I know that our legal group,
17 then, worked more closely with sales and
18 marketing to work with them to understand
19 their practices.
20    Q.    But you, in regulatory
21 affairs, were not in charge of trying to
22 figure out who is targeted or nontargeted
23 or how to divide this up?
24    A.    That's correct.

Page 228

1    Q.    You were just simply
2 reporting the results to the FDA, as they
3 filtered up from sales and marketing?
4    A.    I mean, I would have
5 questioned if, again, gynecology was on
6 there or something.
7    But I just -- or some
8 unusual group. But I didn't go into the
9 details of how they determined that.
10    Q.    But your understanding of
11 the process was if they are in a targeted
12 group, like these oncologists,
13 hematologists and pain specialists, they
14 were set aside, no analysis was done of
15 their off-label marketing --
16    MR. DIAMANTATOS: Objection.
17 BY MR. CRAWFORD:
18    Q.    -- as a group?
19    MR. DIAMANTATOS: Objection.
20 Asked and answered. Repeatedly.
21 The same question, the same
22 answers, repeatedly.
23    THE WITNESS: I think that's
24 as far as I can take it.

Page 229

1    I mean, I can't tell you
2 anything else, because I -- you
3 know, there was -- there must
4 have -- you know, I believe our
5 legal group evaluated how they
6 were determining that, because it
7 was raised at the audit.
8    So at that point --
9 BY MR. CRAWFORD:
10    Q.    I'm not asking how it's
11 determined -- I'm sorry to interrupt --
12 how you determined which groups are the
13 targeted groups.
14    I'm just saying, once
15 they've listed the targeted groups here,
16 they never did -- for the purposes of
17 9.2.1 -- or 9.1.2, they never -- they set
18 those aside and didn't do an analysis,
19 within those groups, of what percentage
20 or what off-label marketing or
21 prescriptions was done, right?
22    MR. DIAMANTATOS: Objection.
23 Form. Vague. Foundation. Calls
24 for speculation. Asked and

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 answered.
2 THE WITNESS: I don't know.
3 It was done within commercial, so
4 I don't -- I can't answer that.
5 BY MR. CRAWFORD:
6 Q. Well, I'm just trying to see
7 what your interpretation -- I mean, you
8 have -- you have responsibility of
9 reporting on this provision to the FDA.
10 So it just says that any
11 physician specialty category, other than
12 those related to oncology, hematology or
13 pain specialists, that exceed the 15
14 percent of total mentions is highlighted.
15 So it looks like that they
16 have excepted out those targeted groups
17 from the 15 percent analysis, right?
18 MR. DIAMANTATOS: Objection.
19 Form. Foundation. Calls for
20 speculation. Asked and answered
21 multiple times.
22 THE WITNESS: That's my
23 interpretation. And, you know,
24 they -- that's my interpretation.

Page 231

1 BY MR. CRAWFORD:
2 Q. All right. And let's mark
3 the next exhibit, then.
4 MR. CRAWFORD: 1693.
5 MR. JENSEN: This is
6 Exhibit-14.
7 - - -
8 (Whereupon, Teva-Marchione
9 Exhibit-14,
10 TEVA_MDL_A_08242504-505, with
11 attachment, was marked for
12 identification.)
13 - - -
14 BY MR. CRAWFORD:
15 Q. It looks like these are
16 the -- take a look at this here.
17 We've marked an e-mail
18 chain. It looks like you're on the one
19 dated May 13th, 2004, from Michael
20 Richardson to Carol Marchione and others,
21 Andy Pyfer; data for 15 percent Actiq
22 prescription meeting.
23 If you go down right to the
24 middle, under, Answers: Attached is the

Page 232

1 relevant data regarding the Actiq RiskMAP
2 Sections 8.2.1, 8.2.2, 9.1.2. The info
3 shows prescribing by specialty and
4 compares Actiq prescribers with overall
5 opioid prescribers.
6 So if you could just take a
7 look at this. And there is a colored
8 chart attached to it breaking down
9 primary specialties, Actiq prescription
10 count, Actiq prescription count, Actiq
11 prescriber percentage, and Actiq
12 prescription percentage.
13 Is this the chart of
14 specialties that your sales and marketing
15 department, or the company, was looking
16 at to ascertain the 15 percent threshold?
17 A. That's what I believe it is.
18 Q. And if you look at the
19 chart, it looks like there is kind of a
20 key in the back of the chart here, on
21 Page -- it must have been an attachment,
22 like a native spreadsheet, so it didn't
23 get a Bates number. But there is a chart
24 on the back with the code to the -- the

Page 233

1 key to the code.
2 But it looks like, if you
3 look at the first page of the chart, AN
4 and APM, they are both pain
5 anesthesiologist categories, right?
6 You may need your magnifying
7 glass for that.
8 A. Yeah, anesthesiology and --
9 Q. Look, you can look up here
10 on the screen. It might be easier.
11 A. Actually, I can see.
12 APM, it says management, so
13 I'm deducing it's pain management.
14 Q. And AN is anesthesiology.
15 So anesthesiology, total
16 prescriptions is 20 percent, or 19.57
17 percent, that exceeds the 15 percent,
18 right?
19 But it's an excepted
20 category, so you did not do an analysis
21 of whether any of that was off label,
22 right?
23 A. I may not have. I don't
24 know if -- you know --

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.   Right.
2    A.   -- I didn't do the analysis.
3    Q.   But under the process we
4    just read, that would have been -- that
5    would not have been one of the categories
6    where it's highlighted whether it's above
7    15 percent, right?
8    A.   That's my interpretation.
9    Q.   And the APM, that's another
10   pain group, that's 12.38 percent.
11        You know, if you combine
12   those, that's 31 percent of the
13   prescriptions are with these pain
14   specialties, right, anesthesiology and --
15   it looks like some type of pain
16   management, right?
17        A.   You know, I'm just hesitant.
18   I don't know what the difference between
19   Actiq prescriber and Actiq TRx means.
20   What's TRx?
21        Q.   I think it did come out.  I
22   think prescriber is the percentage of
23   prescribers -- of total prescribers, and
24   then the percentage is the percentage of

Page 235

1    the prescriptions that are written.
2         So 12 percent of the doctors
3    prescribing the drug are
4    anesthesiologists, and they are
5    prescribing 19.57 of the total
6    prescriptions.
7         Does that --
8         A.   Okay.  Yeah --
9         Q.   -- kind of help you
10   interpret that?
11        A.   -- that makes sense.
12        MR. DIAMANTATOS:  Objection
13   to form.
14        THE WITNESS:  I think that
15   makes sense.
16   BY MR. CRAWFORD:
17        Q.   So if we look down further,
18   family medicine, it's above 15 percent
19   for the prescriber percentage, but it's
20   at 11 percent for Actiq prescriptions,
21   right?
22        That's the third-to-last
23   one, FM?
24        A.   Right.  I see that.

Page 236

1         Q.   And my question is, as you
2    go to internal medicine, which is IM, a
3    little over halfway down on the next
4    page, that's at 8 percent of
5    prescriptions.
6         So wouldn't internal
7    medicine and family medicine, wouldn't
8    they both be kind of primary care
9    doctors?
10        Shouldn't they be combined
11   as a group, or is that something left
12   to the marketing department to determine?
13        MR. DIAMANTATOS:  Objection
14   to form, foundation.
15        THE WITNESS:  That was --
16   that was evaluated with marketing
17   and legal.
18   BY MR. CRAWFORD:
19        Q.   All right.  So are these --
20   would you agree with me that if you've
21   taken out, from looking at the 15 percent
22   threshold for these, quote, targeted
23   groups, and put them aside, and then
24   evaluated all the rest here to see if

Page 237

1    they rose between the 15 percent
2    threshold, wouldn't you agree with me
3    that these are so cut up that none of
4    them really would realistically rise
5    above 15 percent, so you would never
6    really have a reporting -- you would
7    never really report anything to the FDA,
8    because you would never have a situation
9    where it goes above 15 percent?
10        MR. DIAMANTATOS:  Objection.
11   Form.  Argumentative.  Foundation.
12        THE WITNESS:  I mean, I
13   think you can look at it the other
14   way, that it didn't -- I mean,
15   there was no -- there was no
16   algorithm given to us by FDA in
17   how to analyze that.
18        So, you know, I would look
19   at this and say, we did not hit 15
20   percent, based upon the way we
21   interpreted it.
22        And I thought the RiskMAP
23   actually alluded -- 15 percent
24   of -- so I find this as what we

60 (Pages 234 to 237)

Highly Confidential - Subject to Further Confidentiality Review

Page 238

```
 1    were supposed to do; you know,
 2    acceptable within what the
 3    parameters of the RiskMAP said.
 4  BY MR. CRAWFORD:
 5        Q.   So the marketing department
 6  was -- well, strike that.
 7        You would agree, though,
 8  that the goal of the RiskMAP was to
 9  minimize the amount of off-label
10  marketing, and if there was a problem
11  with off-label marketing, that some type
12  of intervention would take place?
13        Is that really kind of the
14  goal of the RiskMAP, or one of them?
15        MR. DIAMANTATOS:  Objection.
16    Form.
17  BY MR. CRAWFORD:
18    Q.   In your view?
19        MR. DIAMANTATOS:  Same
20    objection.
21        THE WITNESS:  What's being
22    prescribed and what's being
23    marketed are two different things.
24        So I think -- yes, I would
```

Page 239

```
 1    agree that that's what the RiskMAP
 2    is supposed to do.  But how people
 3    are actually prescribing doesn't
 4    necessarily mean that they were
 5    marketed to.  It means they
 6    were -- a fentanyl product and
 7    they're trying to address pain.
 8        So I feel that you can't
 9    necessarily equate the two.
10  BY MR. CRAWFORD:
11    Q.   But definitely the FDA was
12  concerned about off-label marketing when
13  it approved it with a RiskMAP, right?
14        That was one of the things
15  that they were -- expressed concern about
16  in the RiskMAP, right?
17        MR. DIAMANTATOS:  Objection.
18    Form.  Foundation.  Calls for
19    speculation.  Asked and answered.
20        THE WITNESS:  I mean, I
21    would agree with you that the
22    RiskMAP -- you wanted to target
23    marketing to the appropriate
24    people.
```

Page 240

```
 1  BY MR. CRAWFORD:
 2        Q.   And so the RiskMAP also
 3  wanted the company to take some type of
 4  corrective action, educational action, if
 5  it learned that there was an inordinate
 6  amount of off-label use, right?
 7        MR. DIAMANTATOS:  Objection.
 8    Form.  Vague.  Foundation.  Calls
 9    for speculation.  Asked and
10    answered.
11        THE WITNESS:  As I said
12    previously, any time that we
13    learned of off-label use from a
14    prescriber, they were informed
15    by -- I believe by a visit and a
16    letter to review the prescribing
17    information.
18  BY MR. CRAWFORD:
19    Q.   But also the RiskMAP
20  required, if you learned that groups of
21  prescribers -- you may not have known
22  their names, but if you knew the groups
23  of prescribers were prescribing off label
24  at a certain threshold, that would
```

Page 241

```
 1  trigger obligations, on your company's
 2  part, to go educate them as a group,
 3  not -- you know, not to send them
 4  individual letters, but to educate them
 5  as a group somehow, even if you don't
 6  have direct knowledge of a particular
 7  doctor in that group was prescribing off
 8  label, right?
 9        MR. DIAMANTATOS:  Objection.
10    Form.  Foundation.  Calls for
11    speculation.
12        Go ahead.
13        THE WITNESS:  I think the
14    SOP addressed that.  That's what
15    it says in the SOP.  You just
16    pointed it out to me, from the
17    marketing group, that that's what
18    they would do.
19        Right?  I mean --
20  BY MR. CRAWFORD:
21    Q.   Right.
22        But the RiskMAP, the intent
23  was not to just send individual letters
24  when you found out about a doctor who did
```

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  it -- that was one aspect, right?
2          But, remember, it's a
3  redundant program, right?
4          MR. DIAMANTATOS: Objection.
5  BY MR. CRAWFORD:
6      Q.   They had redundancies within
7  it; you remember reading it, right?
8          MR. DIAMANTATOS: Objection.
9  Form. Foundation. Asked and
10  answered repeatedly.
11         THE WITNESS: The SOP says
12     that. You read it to me. That --
13     their marketing SOP says that they
14     would do that, right?
15  BY MR. CRAWFORD:
16     Q.   No. I'm talking about
17  redundancy.
18         There are redundant
19  mechanisms within the RiskMAP to make
20  sure that the drug is safely used, right?
21         And the redundancy here is
22  not only sending letters to individual
23  prescribers that you learn are
24  prescribing off label, but educating them

Page 243

1  on the proper use.
2          But if you learn that groups
3  of prescribers are, that's 9.1.2, there
4  are mechanisms in place to educate that
5  group of prescribers, even if you don't
6  know of particular ones are prescribing
7  off label, right?
8          MR. DIAMANTATOS: Objection.
9  Form. Foundation. Calls for
10     speculation. Asked and answered
11     multiple times.
12         THE WITNESS: If you refer
13     back to the SOP that marketing --
14     it says that. It says that they
15     will go as a group. The one you
16     just pointed out to me, the
17     marketing one that had approval,
18     that's what it says it will do.
19  BY MR. CRAWFORD:
20     Q.   Right. I'm not saying --
21  I'm not talking about the SOP. I'm
22  just -- I'm talking about the RiskMAP has
23  that function.
24         You were just talking about

Page 244

1  writing a letter. But it also has the
2  function of education, and that's the
3  RiskMAP.
4          And you're saying that the
5  SOP implements that provision, right,
6  9.1.2 --
7      A.   Right.
8      Q.   -- right?
9      A.   Yes.
10         MR. DIAMANTATOS: Objection
11     to form. Mischaracterizes
12     testimony. Calls for speculation.
13     Asked and answered.
14         MR. CRAWFORD: Let's go to
15     1143.
16         MR. JENSEN: This will be
17     Exhibit-15.
18            - - -
19         (Whereupon, Teva-Marchione
20     Exhibit-15,
21     TEVA_MDL_A_01405193-5194, was
22     marked for identification.)
23            - - -
24  BY MR. CRAWFORD:

Page 245

1      Q.   We marked here an e-mail
2  string. I want to focus in on -- let's
3  start at the second page.
4          It's an e-mail from Tracie
5  Parker to Michael Richardson and others,
6  and you are cc'd on this as well.
7  Subject is, Prescribing specialties - 15
8  percent. It's TEVA_MDL_A_01405193.
9          Ms. Parker is your -- she
10  reports to you, correct, in the
11  regulatory department?
12     A.   She did.
13     Q.   Yes. All right.
14         So she writes, Michael, in
15  follow-up to the meeting today to review
16  the RMP, attached are the data from the
17  18th and 19th RMP quarterly reports, re
18  the breakdown of the prescribing
19  specialties. You will see that both AM
20  and PM are above 15 percent but are
21  considered to be targeted specialties.
22  Dan, correct me if I'm wrong. To date we
23  have been able to make the statement that
24  none of the nontargeted physician

Highly Confidential - Subject to Further Confidentiality Review

Page 246

```
1    specialties have exceeded 15 percent.
2    The data is forwarded to me each quarter
3    by Dan Winkelman, Mark Solomon.
4         Dan Winkelman and Mark
5    Solomon, is that -- are they in the
6    marketing department?  Who are they?
7         A.   I think so.
8         Q.   So, basically, it's reported
9    to the FDA -- what she's saying, really,
10   here -- is it your interpretation that
11   she is saying that you only report to the
12   FDA if a nontargeted specialty is
13   identified as exceeding 15 percent?
14        MR. DIAMANTATOS:  Objection
15   to form.  Foundation.  Calls for
16   speculation.
17        THE WITNESS:  That's what I
18   explained before.  That was --
19        that was our interpretation of
20   9.1.2.
21   BY MR. CRAWFORD:
22        Q.   Okay.  And if -- the
23   nontargeted specialties, is the
24   assumption made that those prescriptions
```

Page 247

```
1    are off label, if they're in that?
2         A.   The nontargeted would be the
3    groups that wouldn't -- wouldn't be
4    usually associated with cancer patients.
5         Q.   Right.  And so the
6    presumption is that if one of those
7    groups exceed the 15 percent, then you
8    can assume that, potentially, that's over
9    15 percent of the total Actiq
10   prescriptions being prescribed off label,
11   and so that's when the education function
12   starts, correct?
13        MR. DIAMANTATOS:  Objection.
14   Form.
15        THE WITNESS:  That's my
16   understanding.
17   BY MR. CRAWFORD:
18        Q.   Okay.  And then, again,
19   anesthesiology and PM are above 15
20   percent, those are the targeted groups,
21   anesthesiology and pain management.
22        But there's no reporting
23   requirement because they're targeted,
24   right?
```

Page 248

```
1         MR. DIAMANTATOS:  Objection.
2    Asked and answered over and over
3    again.
4         MR. CRAWFORD:  I'm just
5    asking in relation to this.
6         MR. DIAMANTATOS:  Then make
7    that clear from your question,
8    because you've asked these
9    identical questions repeatedly on
10   the record.
11        THE WITNESS:  That was my
12   interpretation.  It's all -- it's
13   all kind of the same thing.
14   BY MR. CRAWFORD:
15        Q.   All right.  So going back to
16   the first page.
17        Mr. Pyfer writes to Michael
18   Richardson, copying you, My opinion would
19   be to change this aspect of the RMP and
20   to track only those specialties that we
21   don't want to see prescribing Actiq
22   because their primary patient populations
23   pose a risk (where Actiq is
24   contraindicated).  These would be
```

Page 249

```
1    dentists, surgeons, minus oncology
2    surgeons, and pediatric specialties,
3    (until we have a label for this
4    population).  Wouldn't this make more
5    sense than trying to determine
6    inappropriate prescribing based on a
7    specialty?
8         And then he writes, How can
9    anyone in this world possibly determine
10   how a pain specialist (whether it is an
11   anesthesiologist, internal medicine,
12   physiatrist, FP/GP, et cetera) is
13   prescribing Actiq?  Focusing on and
14   tracking the specialties that are risky
15   specialties, based on our
16   contraindications, is the best way to
17   minimize the risk of Actiq being used in
18   unintended patient populations, isn't it?
19   Ultimately, isn't the purpose of the RMP
20   to minimize the risk in unintended
21   patient populations, not to try to guess
22   how physicians, especially skilled opioid
23   prescribers, are practicing medicine?
24        So Mr. Pyfer, in effect,
```

63 (Pages 246 to 249)

Page 250

1  wants to -- wants to reduce even further
2  the examination of the 15 percent
3  threshold by just looking only whether
4  the contraindicated specialties are
5  exceeding 15 percent, and he lists them
6  there, the surgeons and the dentists and
7  the pediatric specialties, right?
8          MR. DIAMANTATOS:  Objection
9  to form.  Calls for speculation.
10      Go ahead.
11         THE WITNESS:  That's my
12     interpretation of what he's
13     saying.
14  BY MR. CRAWFORD:
15      Q.   And he's also telling you
16  here that there's no way -- he says, How
17  in the world can you possibly tell,
18  within a specialty, if they're
19  prescribing off label?
20         That's what he's explaining,
21  right?
22      A.   Right.
23         MR. DIAMANTATOS:  Objection
24  to form.  Calls for speculation.

Page 251

1  BY MR. CRAWFORD:
2      Q.   Is that -- is that what
3  he -- and that's what he's telling you is
4  that that can't be done, right?
5          MR. DIAMANTATOS:  Objection
6  to form.  Calls for speculation.
7          THE WITNESS:  That's my
8      understanding.
9  BY MR. CRAWFORD:
10     A.   So is that one reason why,
11 when you took the targeted specialties,
12 that there was no effort made to -- is it
13 your understanding that no effort was
14 made to determine, within those targeted
15 specialties, whether -- what was being
16 prescribed off label.
17         MR. DIAMANTATOS:  Objection.
18     Form.  Asked and answered.
19         THE WITNESS:  I don't know
20     enough of how -- you know, the
21     data -- I think the key all comes
22     down to is you don't know, when
23     you're prescribing for somebody,
24     if they have cancer.  And the

Page 252

1          reason why you're prescribing --
2      this is my understanding, whether
3      it's true or not it's my
4      understanding.
5  BY MR. CRAWFORD:
6      Q.   Fair enough.
7      A.   When you prescribe
8  something, it doesn't say for cancer
9  pain -- it doesn't say what it's for,
10 it's just a prescription.
11         So I believe the issue is,
12 how do you know if they're prescribing
13 anything for cancer patients?  I mean,
14 even a dentist could prescribe it for
15 cancer patients.
16         So this was the dilemma that
17 is on the table, in terms of how -- how
18 do you sift out who is a target, who
19 isn't?  I mean, it was a real dilemma.
20         And all that I'm reading
21 here is, by introducing this to the
22 FDA -- he's saying try to make the
23 change -- then at least it opens a
24 dialogue, and then you can get the FDA's

Page 253

1  interpretation.
2          All we had was back in 1998
3  or '99 the FDA's, you know, limited
4  understanding, before the product was
5  even launched.  And as time went on and
6  we learned more, what we were always
7  trying to look for was a dialogue with
8  the agency of how we -- what we were
9  doing.  I mean, as I said, we kept trying
10 to do that.
11         And I feel that we were at
12 least successful in relaying our
13 concerns, our limitations in how to do
14 this, when we went to this July 4th
15 meeting.  Because we were very open
16 there, if you look through this whole,
17 huge document that I put together in four
18 days, and read very carefully, is that it
19 was really impossible to really match up,
20 you know, you have cancer with -- with
21 what your prescriber --
22         So it was a real dilemma in
23 trying to -- in trying to perform the
24 risk management process as much as that

64 (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  was initially written.
2  And we tried to do our best.
3  We tried to do an interpretation. But we
4  really wanted a dialogue with the agency
5  to try to get -- so they could understand
6  what we were up against. And that's
7  what, probably, you're seeing in a lot of
8  these back-and-forth.
9  And, again, I think we were
10  successful when we did go to the agency
11  to try to explain what our dilemmas were
12  and how we were doing it.
13  Q.  And one dilemma was, Mr.
14  Pyfer's pointing it out, you can't tell,
15  within a certain specialty, what the
16  specialist is prescribing it for, whether
17  it's cancer or noncancer?
18  A.  That's exactly -- that's
19  exactly it.
20  Q.  And that was your
21  understanding, up until this day, is
22  that's not -- that wasn't possible during
23  this time period, right?
24  A.  That's my understanding.

Page 255

1  Like this IMS -- I
2  understood that the IMS database couldn't
3  capture that. I don't know if it can. I
4  can't imagine how. But that's my limited
5  understanding.
6  Q.  All right. And then you
7  respond, Andy, I'm in agreement and I'm
8  trying to think of the best way to
9  support this in the revision to the FDA.
10  That's a revision of the
11  RiskMAP, right?
12  A.  That's correct.
13  Q.  I think that this point will
14  be a discussion point at a meeting that
15  I'm trying to set up, as suggested by
16  Victor, to discuss the more critical
17  issues with the VP level. I think
18  certain stakeholders, such as you, would
19  be invited. Thanks for your input.
20  Carol.
21  So you're, at a point,
22  working on a revision to the RiskMAP to
23  the FDA, right, the Actiq RiskMAP?
24  A.  Again, I think we were

Page 256

1  working on it multiple times. I think,
2  at this point, you know, I was saying I
3  want management's decision on this, I
4  wanted -- so new people came, new
5  management people came within Cephalon,
6  and I just wanted everyone to understand
7  it.
8  And so that's what this is
9  about, especially because my boss was
10  new.
11  Q.  And that's Mr. Raczkowski?
12  A.  Raczkowski. Doctor.
13  Q.  Dr. Raczkowski?
14  A.  I think so, yes.
15  MR. CRAWFORD:  Let's pull up
16  Exhibit -- Document 231.
17  MR. JENSEN:  This will be
18  Exhibit-16.
19  - - -
20  (Whereupon, Teva-Marchione
21  Exhibit-16, TEVA_CHI_0043010-0983,
22  was marked for identification.)
23  - - -
24  BY MR. CRAWFORD:

Page 257

1  Q.  What I'm giving you here is
2  the 2005 Actiq marketing plan,
3  TEVA_CHI_00043010.
4  This is -- were you involved
5  at all in preparing or reviewing the
6  marketing plans at Cephalon?
7  A.  I don't think so.
8  Q.  And did you review them at
9  all for whether they were complying with
10  the RiskMAP, or did you depend on sales
11  and marketing, or other departments, to
12  do that?
13  A.  This is an internal document
14  to marketing. And I didn't review
15  internal documents.
16  Q.  All right. And you see Andy
17  Pyfer is listed as the first name under
18  product director, right?
19  A.  Yes.
20  Q.  And you agree with me, at
21  least from the front of it, it looks like
22  the 2000 Actiq marketing plan, right?
23  A.  That's what it says.
24  Q.  And this is -- that stick

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    there is your understanding of what the
2    Actiq product looks like; that they put
3    in their mouth with the dissolved lozenge
4    at the top, right?
5        A.   That's correct.
6            MR. DIAMANTATOS: Objection.
7    Did you say 2000 Actiq marketing
8    plan?
9            MR. CRAWFORD: 2005.
10           MR. DIAMANTATOS: I think
11   the record --
12           MR. CRAWFORD: Let the
13   record --
14           MR. DIAMANTATOS: I heard
15   2000, and I think that's what the
16   record reflects. I just want to
17   be clear we're talking about the
18   same thing.
19           MR. CRAWFORD: Thank you.
20   Yes.
21   BY MR. CRAWFORD:
22       Q.   We're looking at the 2005
23   Actiq marketing plan.
24           So if you could look at Page

Page 259

1    22. This plan divides out -- on the top,
2    there are two charts, percent of
3    prescriptions -- TRx is prescriptions,
4    right?
5        A.   That's what you explained.
6        Q.   Is that your understanding
7    of what TRx is?
8            MR. DIAMANTATOS: Objection.
9    Foundation.
10           THE WITNESS: I wasn't sure.
11   But that's what you told me
12   earlier.
13   BY MR. CRAWFORD:
14       Q.   All right. Assuming it's
15   prescriptions, percent of prescriptions
16   by specialty, it lists, basically, five
17   specialties, plus other.
18           First being oncology, this
19   is for June 2003, is 3 percent. And it
20   lists also for 2004, it's 3 percent.
21   Neurology is 7 percent, and it's at 8
22   percent.
23           Now, neurology is a
24   nontargeted specialty, right?

Page 260

1            According to that SOP it
2    didn't fall within one of the targeted
3    specialties, right?
4        A.   It wasn't a subcategory. I
5    don't know how -- you know, I don't know
6    how -- when you have groups of umbrellas,
7    I don't know how they're interpreting
8    this.
9        Q.   But, certainly, it doesn't
10   fall within the SOP list of pain
11   specialists or oncologists?
12       A.   It said examples -- it said
13   examples of pain -- again, this is an
14   internal marketing document.
15           So I'm not quite -- you
16   know, I don't think I've seen this
17   before. So I don't know how they're
18   delineating things.
19       Q.   Sure. Fair enough. Okay.
20           But 20 percent is to primary
21   care providers, PCP.
22           Do you see that?
23       A.   I see that.
24       Q.   That exceeds 15 percent,

Page 261

1    right?
2        A.   20 is bigger than 15, yes.
3        Q.   And it carries over 21
4    percent in June 2004.
5            June 2004 is about the time
6    that you're communicating with Mr. Pyfer
7    here; his e-mail to you is May of 2004.
8            So this is about the time
9    you guys are talking about this 15
10   percent level, right?
11           MR. DIAMANTATOS: Objection.
12   Form.
13           THE WITNESS: What's the
14   date? Maybe. I'll have to check
15   up -- the dates.
16           What's the date of this?
17   BY MR. CRAWFORD:
18       Q.   I don't know if there's a
19   date on the document.
20       A.   So then I can't answer that
21   question.
22       Q.   But I'm just looking at the
23   chart date. It says, June 2004, the
24   prescriptions reference for that date are

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  primary care providers at 21 percent,
2  right?
3          MR. DIAMANTATOS:  Objection.
4      Form.
5          THE WITNESS:  That's what it
6      says in the document.
7  BY MR. CRAWFORD:
8      Q.   Do you know if Cephalon
9  reported to the FDA that primary care
10  providers had exceeded the 15 percent
11  level, after June of '04, in any of their
12  quarterly reports?
13          MR. DIAMANTATOS:  Objection.
14      Form.  Foundation.  Assumes facts.
15          THE WITNESS:  I don't
16      know -- again, I don't know the
17      interpretation.  I don't know PCPs
18      were -- was a target or not.  It's
19      hard for me to interpret this,
20      because it's out of context to the
21      RiskMAP, and, really, what they're
22      doing and how they're doing it.
23  BY MR. CRAWFORD:
24      Q.   Well, you depended on the

Page 263

1  marketing department to tell you when a
2  specialty exceeded 15 percent, right?
3          MR. DIAMANTATOS:  Objection.
4      Form.  Asked and answered.
5          THE WITNESS:  There was --
6      the document that you showed me
7      previously, we would get those
8      pages.
9          I think, then, when that
10      came out, I believe legal reviewed
11      it, and then -- before it came to
12      me.  So if it came to me telling
13      me that it exceeded, that's what I
14      would see.
15  BY MR. CRAWFORD:
16      Q.   Right.  So you would not
17  make the determination what specialty
18  exceeded 15 percent; you would either be
19  told by marketing or legal, or a
20  combination of the departments?
21      A.   That's correct.
22      Q.   So you reported -- if
23  nothing was reported to you exceeding 15
24  percent, it didn't get reported to the

Page 264

1  FDA, because you prepared the reports,
2  right?
3          MR. DIAMANTATOS:  Object to
4      the form.
5          THE WITNESS:  That's
6      correct.
7  BY MR. CRAWFORD:
8      Q.   You depended on those other
9  departments to let you know what was
10  exceeding 15 percent?
11          MR. DIAMANTATOS:  Objection.
12      Form.  Foundation.  Asked and
13      answered.
14          THE WITNESS:  Yes.  After --
15      initially, we looked at it.  And
16      then afterwards we -- it was
17      reviewed by legal and that's how
18      we got it.
19  BY MR. CRAWFORD:
20      Q.   "We" meaning you looked
21  at -- okay, you looked at the report.
22  But legal looked at it.  Okay.
23      A.   When I first was responsible
24  for the RiskMAP quarterlies, I looked at

Page 265

1  the printouts that we saw before.
2          As time evolved, and I can't
3  say exactly when, you know, again, Tracie
4  put these together, so it was up to her
5  to get that information.  And I believe
6  that somewhere during that time, legal
7  said that they would double-check, as an
8  interim, before it came to us.
9      Q.   And one of the other groups
10  is anesthesiology pain, that's in the
11  targeted group, and that was, it looks
12  like, 55 percent of total prescriptions
13  in June 2003, and it went down to 51
14  percent in June of '04.
15          Is that what you interpret
16  the charts to reflect there?
17          MR. DIAMANTATOS:  Objection.
18      Form.  Foundation.
19          THE WITNESS:  I mean, I
20      don't know if they were saying
21      this is -- I mean, if this is what
22      they want to do -- this is a
23      marketing plan.  I've never seen
24      this before.  I'd have to review

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    the document.
2        I don't know where they were
3    going with this.  Just seeing
4    diagrams, it's hard for me to tell
5    you definitively what they're
6    trying to do.
7    BY MR. CRAWFORD:
8        Q.   All right.  If you could
9    look at Page 24 of this marketing plan,
10   down at -- actually, Page 24, there's a
11   section called, Physician usage.
12       Do you see that?
13   A.   I do see it.
14       Q.   And then look at the top of
15   Page 25, it says, Based on physician
16   reporting, 90 percent of Actiq use is for
17   BTP -- that's breakthrough pain, right?
18       MR. DIAMANTATOS:  Objection.
19   Form.  Foundation.
20       THE WITNESS:  That's -- yes.
21   BY MR. CRAWFORD:
22       Q.   -- outside of cancer.
23       So what this report is
24   saying, this marketing report, is that 90

Page 267

1    percent of the Actiq use, in their view,
2    is off label for noncancer uses, right?
3        MR. DIAMANTATOS:  Objection.
4    Form.  Foundation.  Calls for
5    speculation.  She's repeatedly
6    said she's not familiar with this
7    document.
8    BY MR. CRAWFORD:
9        Q.   Is that how you interpret
10   the document?
11       MR. DIAMANTATOS:  Objection.
12   Form.  Foundation.  Calls for
13   speculation.  Asked and answered.
14       THE WITNESS:  I mean, I can
15   read it just like you.  I have the
16   same interpretation.
17   BY MR. CRAWFORD:
18       Q.   Does it look like they're
19   saying that 90 percent of Actiq use is
20   for BTP outside of cancer?
21       MR. DIAMANTATOS:  Objection.
22   Form.  Foundation.  Asked and
23   answered.  Calls for speculation.
24       THE WITNESS:  Again, that's

Page 268

1        what it says in this -- that's
2    what it says, if I read it.
3    BY MR. CRAWFORD:
4        Q.   And then it says, The
5    majority of use, 55 percent of total, is
6    being for chronic back pain.
7        That's not a cancer
8    indication, right?
9        MR. DIAMANTATOS:  Objection.
10   Form.  Foundation.  Calls for
11   speculation.
12       THE WITNESS:  I'm a
13   regulator.  I'm not a clinical
14   person.  So that's what it
15   says here.  I agree that that's what it
16   says in this document.
17   BY MR. CRAWFORD:
18       Q.   Then there's a chart that
19   lists distribution of conditions treated
20   with Actiq; the 55 percent back pain is
21   referenced and 22 percent headache.
22       That's not an indicated
23   condition for Actiq, right?
24       MR. DIAMANTATOS:  Objection.

Page 269

1        Form.  Foundation.  Calls for
2    speculation.
3        THE WITNESS:  Actiq is
4    indicated for cancer pain.
5    BY MR. CRAWFORD:
6        Q.   Right.  But not headache,
7    right?
8        MR. DIAMANTATOS:  Objection.
9    Form.  Foundation.
10       THE WITNESS:  You want to go
11   through everything?
12   BY MR. CRAWFORD:
13       Q.   There's just three or four,
14   I want to go through them.
15       Headache is not an indicated
16   use for Actiq, right?
17   A.   It's not an indicated use
18   for Actiq.
19       Q.   And that's 22 percent,
20   according to this chart, right?
21       MR. DIAMANTATOS:  Objection.
22   Form.  Foundation.  Calls for
23   speculation.
24   BY MR. CRAWFORD:

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1      Q.   And then there's FMS/MPS --
2  actually, do you know what that means?
3  Fibromyal --
4      A.   Maybe.  I don't know.
5          MR. DIAMANTATOS:  Objection
6  to form.
7  BY MR. CRAWFORD:
8      Q.   Fibromyalgia, myofacial
9  pain?
10         MR. DIAMANTATOS:  Objection
11  to form.  Calls for speculation.
12  Foundation.
13  BY MR. CRAWFORD:
14     Q.   That's not an indicated use
15  in your view as a regulatory specialist
16  in Cephalon, right?
17     A.   That's correct.
18     Q.   And arthritis is 13 percent,
19  right?
20     A.   Total, 13 percent.
21     Q.   That's not -- that's not an
22  indicated use for Actiq, right?
23     A.   That's not an indicated use.
24     Q.   And neuropathy is 12

Page 271

1  percent; again, that's not an indicated
2  use, correct?
3          MR. DIAMANTATOS:  Objection.
4  Form.  Foundation.  Calls for
5  speculation.
6          THE WITNESS:  That's not an
7  indicated use.
8  BY MR. CRAWFORD:
9      Q.   And then malignant, that --
10  malignant is cancer, right?
11         MR. DIAMANTATOS:  Objection.
12  Form.  Foundation.  Calls for
13  speculation.
14         THE WITNESS:  Yeah, I
15  don't -- I don't know specifically
16  how they got this here.
17  BY MR. CRAWFORD:
18     Q.   Right.  But malignancy is
19  cancer, right?
20         MR. DIAMANTATOS:  Same
21  objections.
22         THE WITNESS:  I mean, I'm
23  interpreting just like you are.
24  BY MR. CRAWFORD:

Page 272

1      Q.   And you agree with me, I'm
2  interpreting malignancy as cancer; is
3  that something that you agree or disagree
4  with?
5          MR. DIAMANTATOS:  Objection.
6  Form.  Foundation.  Asked and
7  answered.  Calls for speculation.
8  Argumentative.
9          THE WITNESS:  I don't know
10  why it doesn't say cancer pain.
11         So that's why I don't know
12  how they put that as an umbrella.
13  Why wouldn't they have put cancer
14  pain?  I don't know.  I don't know
15  the answer.
16  BY MR. CRAWFORD:
17     Q.   Something normally, in your
18  kind of lay understanding, at least, that
19  malignancy means cancer and
20  nonmalignant -- nonmalignant means not
21  cancer, right?
22         MR. DIAMANTATOS:  Objection.
23  Form.  Foundation.  Calls for
24  speculation.  Asked and answered.

Page 273

1  Argumentative.
2          THE WITNESS:  What do you
3  want me to say?  I think I said it
4  all.
5  BY MR. CRAWFORD:
6      Q.   It kind of comports with the
7  first sentence, it says, 90 percent of
8  Actiq use is for BTP outside of cancer.
9          So that leaves 10 percent
10  being for cancer, and that chart says 10
11  percent malignancy.  So, probably, it
12  links up that the malignancy means cancer
13  in this document, right?
14         MR. DIAMANTATOS:  Objection
15  to form.  Foundation.  Calls for
16  speculation.
17         THE WITNESS:  Probably -- I
18  mean, you're saying "probably."
19  That's an interpretation.
20  BY MR. CRAWFORD:
21     Q.   And then CRPS, complex
22  regional pain syndrome, is that an
23  indicated use for Actiq in the label?
24         MR. DIAMANTATOS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  Form.
2       THE WITNESS:  I have never
3  even heard of that before.  I
4  don't know what complex
5  regional -- I never heard that
6  syndrome before.
7  BY MR. CRAWFORD:
8       Q.  But it's not cancer, though?
9       A.  It's a syndrome --
10       MR. DIAMANTATOS:  Objection
11  to form.  Foundation.
12       THE WITNESS:  I don't know
13  if it's associated -- I really
14  don't know.  I'm not being
15  facetious.  I don't know if the
16  syndrome could be associated with
17  cancer.
18  BY MR. CRAWFORD:
19       Q.  All right.  Well, down below
20  that, again, source of the data is an IMS
21  patient chart audit, October of 2003.
22       Do you see that?
23       A.  I do.
24       Q.  Right below.

Page 275

1       A.  I see that.
2       Q.  So it looks like the source
3  of the information was taken from IMS
4  data, right?
5       MR. DIAMANTATOS:  Objection.
6  Form.  Foundation.  Calls for
7  speculation.
8       THE WITNESS:  That's what it
9  says in this document.
10  BY MR. CRAWFORD:
11       Q.  And that's October of '03,
12  correct?  Is that what it says?
13       MR. DIAMANTATOS:  Objection.
14  Form.  Foundation.
15       THE WITNESS:  That's what it
16  says.
17  BY MR. CRAWFORD:
18       Q.  And below, it says, It
19  should be noted that specialty usage
20  tends to fluctuate based on patient
21  presentation and physician recognition of
22  the need for rapid-acting or BTCP/DTP.
23  For example, neurology usage tends to be
24  higher for headache, 97 percent, while

Page 276

1  PCP usage is higher for back pain, 81
2  percent.
3       So primary care physicians,
4  PCP, are using it primarily for back
5  pain, 81 percent.
6       Do you see that?
7       A.  I see it on the page.
8       Q.  Now, below that, it says,
9  Actiq use by specialty.
10       And it lists malignant pain,
11  back pain, headache, all the conditions
12  that we just went through in that bar
13  chart, and it breaks it down by
14  specialty.
15       So do you see the specialty
16  anesthesiology and pain, right there in
17  the first column, right?
18       MR. DIAMANTATOS:  Objection.
19  Form.  Foundation.  Calls for
20  speculation.
21       Are you just having her
22  confirm what's in the document she
23  knows nothing about?  Is that what
24  your questions are calling for?

Page 277

1  BY MR. CRAWFORD:
2       Q.  Can you answer my question?
3       A.  It says, Anes -- it says,
4  Anes pain in the first column.
5       Q.  Right.  And so it looks like
6  this chart, would you agree with me,
7  breaks down the usage amongst the
8  anesthesiologists and pain specialists,
9  right?
10       MR. DIAMANTATOS:  Objection.
11  Form.  Foundation.  Calls for
12  speculation.
13       THE WITNESS:  I mean,
14  respectfully, I'm a regulator.
15  This is a marketing plan.  So
16  there may be somebody else that
17  you could talk to that could be
18  more -- I'm not trying to be, you
19  know, abrasive, but --
20  BY MR. CRAWFORD:
21       Q.  I know.
22       But Mr. Pyfer told you, in
23  Exhibit-15, that you couldn't break down
24  how the drug was used for what condition

70 (Pages 274 to 277)

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    within a specialty.
2         Do you remember that in
3    Exhibit-15?  He told you that?  He said
4    it was not possible?
5         A.   So I -- I don't -- I don't
6    know.  I didn't know that.
7         Q.   But didn't he tell you that,
8    right?
9         A.   Did he?
10        MR. DIAMANTATOS:  Objection.
11   Asked and answered.
12        THE WITNESS:  I mean, that
13   was my understanding.  I guess
14   what I -- the only thing I can say
15   is my understanding, and I don't
16   know about how IMS works, is you
17   can't tell what, specifically,
18   it's being -- I don't know where
19   they got these numbers.  I don't
20   know -- I don't know.  I mean,
21   that's what I understood.
22        Like, when somebody -- just
23   think about it, when you go get a
24   prescription filled, how do you

Page 279

1    know it's for cancer or not, you
2    know, or a headache?  They just
3    write -- they write what it is,
4    not what it's for.
5         So I don't know how they get
6    these numbers.
7    BY MR. CRAWFORD:
8         Q.   Right.  And Mr. Pyfer told
9    you there's no way to know, right?
10        MR. DIAMANTATOS:  Objection.
11   BY MR. CRAWFORD:
12        Q.   You're trusting your
13   marketing department telling you that,
14   right?
15        MR. DIAMANTATOS:  Objection.
16   Form.  Asked and answered.
17   Argumentative.  Calls for
18   speculation.
19   BY MR. CRAWFORD:
20        Q.   Is that right?
21        MR. DIAMANTATOS:  Same
22   objections.  Asked and answered
23   multiple times.
24        THE WITNESS:  And then my

Page 280

1    legal department became involved
2    with them, so I'm also trusting my
3    legal department.
4         And so I don't know.  I
5    mean, I just -- there may be a
6    really good response to this, I
7    just don't know the answer.
8    BY MR. CRAWFORD:
9         Q.   Right.  But I'm just asking,
10   Mr. Pyfer, in Exhibit-15, had informed
11   you that you couldn't tell, within a
12   specialty, how it was prescribed.
13        Do you agree with me that
14   that was what he was conveying to you in
15   Exhibit-15?
16        MR. DIAMANTATOS:  Objection.
17   This is getting to the point of
18   badgering the witness.  She's
19   answered the same question
20   repeatedly, counsel.  And she's
21   doing her best to respond to the
22   question that you've asked
23   multiple times.
24        The problem is that you're

Page 281

1    putting documents and asking her
2    things about other people, things
3    outside of her area.
4         This has now gone beyond the
5    point of you badgering the
6    witness, who's answered your
7    question.
8    BY MR. CRAWFORD:
9         Q.   Go ahead.  You can answer.
10        A.   It says, How can anybody in
11   this world possibly determine how a pain
12   specialist is prescribing Actiq?
13        And I don't know.  There may
14   be -- I don't know how they get these
15   numbers.  I think -- you know, really, if
16   you ask an IMS -- I mean, totally
17   objectively, you get an IMS specialist,
18   they could probably tell you.  I don't
19   know how that works.
20        Q.   All right.  But it does say,
21   Source: IMS patient chart audit, October
22   2003, right below that, right?
23        MR. DIAMANTATOS:  Objection.
24   Form.  Foundation.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    speculation.  Asked and answered.
2    BY MR. CRAWFORD:
3        Q.   I'm just saying --
4            MR. DIAMANTATOS:  I'm not
5    done with my objection.
6            Asked and answered
7    repeatedly.
8            MR. CRAWFORD:  I don't think
9    I asked that question.  That's for
10   sure.
11   BY MR. CRAWFORD:
12       Q.   Go ahead.
13       A.   So it says -- it references
14   IMS.  And I highly recommend that you
15   talk to an IMS person to understand how
16   they can analyze.  I don't know how that
17   happens.
18       Q.   Right.  You don't know how,
19   right?
20       A.   Right.  I don't.
21       Q.   And so you rely on other
22   people to tell you whether or not it can
23   be done or not.
24           And Mr. Pyfer told you it

Page 283

1    couldn't be done, right?
2            MR. DIAMANTATOS:  Objection.
3    Form.  Argumentative.  Asked and
4    answered.
5            THE WITNESS:  But -- I think
6    we can do this forever, without
7    having, I think an objective IMS
8    person, you know, take away from
9    fentanyl, from anything, and find
10   out how you can do that.
11           It may be something that
12   Andy is generalizing.  I don't
13   know how it was done.  I'm really
14   not trying to be --
15   BY MR. CRAWFORD:
16       Q.   I know you don't know how
17   it's done.  I know that.
18           But my question is, he told
19   you it couldn't be done, right?  That's
20   all I'm asking.  It's yes or no.
21       A.   We read it into --
22           MR. DIAMANTATOS:  Objection
23   as to instructing the witness how
24   to answer the question.  She's

Page 284

1    answered the question as to what
2    Mr. Pyfer told her in the e-mail.
3    She's repeatedly answered that
4    question, counsel.  Same
5    objection.
6    BY MR. CRAWFORD:
7        Q.   So you would agree with me
8    that Mr. Pyfer told you that it couldn't
9    be done, right?
10           MR. DIAMANTATOS:  Objection.
11   Asked and answered.
12           Go ahead and answer.
13           THE WITNESS:  I'm reading
14   from his e-mail.  If you want me
15   to read what he said, that's all I
16   can do.
17   BY MR. CRAWFORD:
18       Q.   Sure.
19       A.   Is that -- he says, How can
20   you possibly determine how a pain
21   specialist is prescribing Actiq?
22           And he was writing this not
23   to me specifically.  He was writing to
24   Michael Richardson, who works for him.  I

Page 285

1    was copied on it.
2        Q.   But you responded to him,
3    correct?
4            And you said, Andy, I'm in
5    agreement.  And I'm trying to think of
6    the best way to support this in the
7    revision to the FDA.
8            Right?
9            So you took what he said and
10   were trying to incorporate it into what
11   you were revising to the FDA, right?
12           MR. DIAMANTATOS:  Objection.
13   Form.  Argumentative.  Asked and
14   answered.  It mischaracterizes her
15   response to the e-mail, which was
16   not read in its entirety.
17           Go ahead and answer the
18   question.
19           THE WITNESS:  If I was going
20   to revise -- if I was going to
21   send a revision to the FDA, I'd
22   have to send a white paper
23   supporting why we're saying that,
24   and then I would have all the

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    documentation, including input
2    from IMS, to understand that.
3        So we -- I don't know if we
4    ever got that far, or where it
5    stood.
6        But I would have to
7    understand IMS and how they do the
8    research and how they categorize
9    and -- you know, I don't know
10   whether he's taking this as
11   buckets, or if they are giving him
12   specific analysis.  I just --
13   that's as good as I can do.
14   BY MR. CRAWFORD:
15       Q.   But you depend on the sales
16   and marketing department to give you
17   accurate and honest information, do you,
18   when you're preparing a RiskMAP or a
19   revision to the FDA; is that right?
20       MR. DIAMANTATOS:  Objection.
21   Form.  Asked and answered at least
22   five times.
23       THE WITNESS:  I depend --
24   we're all trained in ethics when

Page 287

1    we -- where we work.  And I depend
2    on everyone, just as, hopefully,
3    they depend on me to be the same
4    way.
5    BY MR. CRAWFORD:
6        Q.   And Mr. Pyfer is the first
7    person listed on this 2005 Actiq
8    marketing plan where, on Page 24, they're
9    breaking out Actiq use by specialty and
10   breaking out the use amongst
11   anesthesiologists and pain specialists,
12   and only 13 percent is used for malignant
13   pain, on label; the rest off label.
14       Would you agree with me
15   there?
16       MR. DIAMANTATOS:  Objection.
17   Form.  Foundation.  Calls for
18   speculation.  Argumentative.
19       THE WITNESS:  I can read
20   what you say.  I don't know how it
21   got there.  I don't know the
22   background behind it.
23       So that's all I can do is
24   agree that that's what is on the

Page 288

1    page.
2    BY MR. CRAWFORD:
3        Q.   Okay.
4        A.   Okay.
5        Q.   Thank you.
6        MR. CRAWFORD:  Do you want
7    to take a break?
8        MR. DIAMANTATOS:  Why don't
9    we do that.
10       VIDEO TECHNICIAN:  Going off
11   the record at 2:22 p.m.
12            - - -
13       (Whereupon, a brief recess
14   was taken.)
15            - - -
16       VIDEO TECHNICIAN:  We're
17   back on the record at 2:38 p.m.
18   BY MR. CRAWFORD:
19       Q.   Ms. Marchione, I just wanted
20   to ask -- we looked at that marketing
21   plan -- did anyone from marketing ever
22   tell you, in this 2004 time period, that
23   approximately 90 percent of Actiq was
24   being prescribed off label for noncancer

Page 289

1    pain?
2        MR. DIAMANTATOS:  Objection.
3    Form.
4        THE WITNESS:  Did anybody
5    tell me?  I can't remember.
6        But I did know that there
7    was a considerable amount of off
8    label, not marketing, but sales.
9    BY MR. CRAWFORD:
10       Q.   Sales.  Okay.
11       And just a couple
12   preliminaries I forgot to take care of.
13       You're represented here by
14   counsel at this deposition, right?
15       A.   Yes, I am.
16       Q.   And are you being paid at
17   all for your time, by anyone?
18       MR. DIAMANTATOS:  Objection.
19   Form.
20       Go ahead.
21       THE WITNESS:  No, I'm not
22   being paid today to be -- to be
23   deposed.
24   BY MR. CRAWFORD:

73 (Pages 286 to 289)

Page 290

1    Q.   How about for the prep, did
2  you meet with your counsel or any lawyers
3  to prepare for this deposition?
4    A.   Yes, I did.
5    Q.   And were you paid for that
6  time?
7    A.   Yes, I was.
8    Q.   And how much were you paid?
9    A.   I was paid the rate -- my
10 hourly rate as a consultant.
11   Q.   And what's that?
12   A.   It's $275 an hour.
13   Q.   And how many hours did you
14 meet before the deposition?
15   A.   God.  I want to estimate --
16 it was three days, but they weren't whole
17 days.  I don't know, maybe 12 to 15.
18   Q.   All right.  Thank you.
19       MR. CRAWFORD:  We marked the
20 next exhibit.
21       MR. JENSEN:  Exhibit-17.
22           - - -
23       (Whereupon, Teva-Marchione
24 Exhibit-17,

Page 291

1       TEVA_MDL_A_01159525-527, was
2  marked for identification.)
3           - - -
4       MR. CRAWFORD:  It's Document
5  599.
6  BY MR. CRAWFORD:
7    Q.   This is document
8  TEVA_MDL_A_01159525.
9       It's a letter from Dave
10 Brennan to Kerry Woods of the FDA, dated
11 February 23rd, 2004.
12      Have you ever seen a copy of
13 this letter before?
14   A.   No, I have not.
15   Q.   Mr. Brennan writes to Ms.
16 Woods, This letter is to inform you of
17 certain compliance issues at Cephalon,
18 Inc. of 145 Brandywine Parkway, West
19 Chester, PA.  As a former employee
20 responsible for conducting quality
21 assurance audits, I'm aware of violations
22 for which the company has taken no
23 action.  In fact, I believe my employment
24 was terminated for publishing a report

Page 292

1  within the company detailing
2  noncompliance in at least one of these
3  areas.
4       Were you aware that Mr.
5  Brennan had been terminated from
6  Cephalon?
7       MR. DIAMANTATOS:  Objection.
8  Form.  Foundation.
9       Go ahead.
10      THE WITNESS:  I knew he
11 left.  I didn't know he was
12 terminated.
13 BY MR. CRAWFORD:
14   Q.   You know he left around this
15 time period, after he did the report?
16   A.   I didn't -- I didn't connect
17 any correlation.  So I didn't -- you
18 know, I just didn't remember.
19   Q.   And do you know a gentleman,
20 at all, by the name of Tim Sheehan?
21   A.   Yes.  I think Tim was his
22 manager.
23   Q.   And do you know if he was --
24 had left the company about this time?

Page 293

1    A.   You know, I don't remember.
2    Q.   Do you know if he was
3  terminated?
4    A.   No, I don't.
5    Q.   Mr. Brennan continues, As
6  with any company, there are several
7  things that need to be corrected, some
8  more serious and some less.  I am aware
9  of several issues, but the most
10 important, and the one for which I
11 believe I was terminated, regards the
12 Actiq (oral fentanyl citrate on a stick)
13 risk management program.
14      This program is a condition
15 of approval in the Actiq NDA, detailing
16 several obligations the company has
17 regarding the monitoring and reporting of
18 marketing, prescribing habits, adverse
19 events, pharmacy compliance and patient
20 education.
21      He continues on, I published
22 an internal audit report, about 1
23 December 2003, detailing the points for
24 which the company was not in compliance.

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  I do not have a copy of the report
2  available to me at this time.  My
3  recollection is the noncompliance in the
4  report includes, among other things, the
5  following points.
6       And then you'll see that he
7  does raise the point about the customer
8  surveys of the top four pharmacies and
9  the welcome kit.
10       Do you see that in the first
11 point?
12      A.   I do see that.
13      Q.   And he does continue -- I
14 want to continue down to the third point.
15       He says, The drug is
16 approved for a very narrow therapeutic
17 category.  The RMP is designed to assure
18 that the drug is not marketed outside the
19 approved use.  The company is required to
20 monitor physician prescribing habits.
21 Physician specialties are described as
22 either representing appropriate patient
23 selection or inappropriate patient
24 selection.  If the ratio of prescriptions

Page 295

1  by specialties representing inappropriate
2  patient selection exceeds 15 percent of
3  the total prescriptions written, the
4  company is required to report this to the
5  FDA and required to conduct physician
6  training programs for the offending
7  specialties.
8       And he writes in the first
9  bullet point, In one section of the
10 quarterly reports to FDA, the company
11 simply states that no individual
12 specialty exceeds 15 percent.  This
13 statement applies to the three or four
14 specialties designated to represent
15 appropriate patient selection, as well as
16 the dozen or more specialties
17 representing inappropriate patient
18 selection.
19       And then he says, In the
20 section corresponding to the specialties
21 representing appropriate versus
22 inappropriate patient selection
23 requirement, nothing is reported.  This
24 section is routinely omitted from the

Page 296

1  report.
2       You recall in the report we
3  looked at that you prepared, Section
4  9.1.2 was, in fact, omitted from that
5  report, although you mentioned it had
6  been reported elsewhere, right?
7       MR. DIAMANTATOS:  Objection.
8  Form.  Foundation.  Misstates the
9  witness's testimony.  Asked and
10 answered.
11      THE WITNESS:  So if I can
12 just back up.
13       If you saw, like, that table
14 that you showed me where we had to
15 go to the very back page, with the
16 definitions of what the different
17 prescribers were, those are the
18 reports that we used to see in
19 order to make that statement.
20       Unfortunately, Dr.
21 Brennan -- I mean, Mr. Brennan
22 didn't do a very thorough job,
23 that I can tell, when he did this
24 audit.  He didn't go to source

Page 297

1  documents.  And, to me, that's
2  kind of 101 on a QA basis.
3       So if he worked for me, he
4  would have been fired, whether --
5  I mean, I shouldn't laugh about
6  this, but you go to source
7  documentation in order to find out
8  what was correct and what isn't.
9       I mean, my interpretation of
10 what he did was just look at the
11 report versus what was supposed to
12 be reported, and not really go
13 into the detail.
14       So he didn't really get into
15 the detail of what was available,
16 what was being reported, how
17 things were interpreted.
18       So what -- I'm looking at
19 this, it's not very thorough in
20 terms of his interpretation of
21 what we had available, what was
22 said, what wasn't.
23       He never looked at that
24 table that, you know, we were

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    talking about, showing where the
2    percentages were.
3    BY MR. CRAWFORD:
4        Q.   Can you grab the table that
5    you're referring to?  I just want to make
6    sure I know what exhibit that is.
7            Was it 14 you were looking
8    at?
9        A.   It was the one that had all
10   the numbers, and then the last page had
11   the definitions.  Do you remember that
12   one?
13       Q.   Yeah, Page 14 -- or
14   Exhibit-14.
15       A.   Exhibit-14.  Yes.
16           This is -- so that -- this
17   is the kind of report -- this is from
18   2004.  But when I was working on these
19   originally, we would get these and they
20   were always -- and you pointed out, that
21   they were all below 15 percent.
22           And that's what we -- what
23   we would normally use to make that
24   statement.

Page 299

1        Q.   But how do you know he
2    didn't look at these reports?
3            He mentions 85 specialties
4    that the company used, right?
5        A.   Because --
6            MR. DIAMANTATOS:  Object to
7    form.  Foundation.  Calls for
8    speculation.  Argumentative.
9            THE WITNESS:  Because I
10           looked in his memo.  I don't think
11           he referenced that.
12              He referenced everything he
13           looked at, and I don't see
14           anything about IMS data.
15              Documents and records.  He
16           didn't even -- yes, there's
17           nothing in here about looking at
18           IMS data.  He didn't go to source
19           documents.
20   BY MR. CRAWFORD:
21       Q.   So what would he have found
22   that may have changed his mind about how
23   Cephalon applied the 15 percent?
24       A.   He would --

Page 300

1            MR. DIAMANTATOS:  Objection.
2    Form.  Calls for speculation.
3            Go ahead.
4    BY MR. CRAWFORD:
5        Q.   What do you think he should
6    have looked at that he didn't look at?
7        A.   The -- and this was 2004 --
8            MR. DIAMANTATOS:  Objection
9    to form.
10           Go ahead.
11           THE WITNESS:  These tables.
12   BY MR. CRAWFORD:
13       Q.   And what would he have found
14   there that might have changed his view of
15   compliance with that provision?
16           MR. DIAMANTATOS:  Objection.
17   Calls for speculation.  Form.
18           THE WITNESS:  The
19           targeted -- he would have sat down
20           and figured out how they
21           identified target versus
22           nontarget, where the numbers would
23           come to.
24   BY MR. CRAWFORD:

Page 301

1        Q.   But he does say, in Number
2    13 of his report, I think you just had
3    that.
4            He says, There are
5    approximately 85 specialties reported,
6    three of which are included in the list
7    of exemptions in the SOP.
8            So he is obviously aware of
9    the report of all the specialties, right?
10           MR. DIAMANTATOS:  Objection.
11   Form.  Foundation.  Calls for
12   speculation.
13           THE WITNESS:  To that point,
14           there's no way -- how would I know
15           that?  I can't tell what -- I
16           can't tell what he looked at.  I
17           don't know where the 85 came from.
18   BY MR. CRAWFORD:
19       Q.   All right.  But, obviously,
20   he -- you're criticizing his methodology
21   here, right?
22       A.   So I was responsible for
23   compliance, and you always go to source
24   documents.  So because I can't understand

76 (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  which source documents he went to, it
2  wasn't pointed out, that's kind of
3  like -- that's what you learn, when you
4  go into compliance, that your source
5  documents are supposed to agree with your
6  summaries.
7      So I'm missing something
8  here.  And that's what -- that's what I'm
9  questioning.
10     And, I mean, I, maybe, could
11  go through everything that he talked
12  about, and I haven't had time to do that.
13  But I think -- I think a lot of the
14  concerns here is he really didn't delve
15  into the details and ask the right people
16  the right questions.
17     Because if you have a
18  concern when you're auditing, you go to
19  the next level.  I don't believe Mr.
20  Brennan did that, from looking just at
21  his audit report.
22     Q.   Well, I mean, he did go --
23  send this report to Tim Sheehan, which
24  was his boss, you, Bob Bader, Mark

Page 303

1  Solomon.
2      So he did give the report
3  and give some ability to respond, right?
4      That was the plan on the
5  bottom here, it says, RA will issue a
6  response audit report by 12/31.
7  That's you, right?
8      A.   I wouldn't say this is a
9  thorough initial audit report.
10     So when I would do audits --
11  or I should say oversee audits -- you
12  know, I used to do GCP.  So go to a
13  hospital, you interview some people and
14  you look at documents.  But if something
15  unusual occurs, you don't just stop
16  there.  Then you go -- you keep trying
17  to, like, figure it out.
18     Because if my auditor came
19  back and gave me a report that I didn't
20  feel like they delved into what the
21  rationale -- it could be a very innocent
22  comment, and they could blow up something
23  that makes it look worse than it is.  I
24  expect them to delve into the rationale

Page 304

1  and the reason why.
2      I didn't think that this
3  report is that thorough and really
4  supports his findings.  And so if I
5  was -- if I had an auditor, and, maybe a
6  beginning auditor, I would mentor them
7  and help them out.
8      But if this was somebody --
9  especially an internal company audit,
10  where you have a lot more flexibility to
11  go down the hall and talk to somebody, I
12  think -- I think that this audit report
13  is not very -- I'll get off my -- you
14  know, I teach this stuff.  So I just feel
15  that this isn't a very thorough report.
16     Q.   Do you know what he did
17  afterwards with regard to this report in
18  discussing it with company officials?
19         MR. DIAMANTATOS:  Objection.
20  Form.  Calls for speculation.
21  Foundation.
22         THE WITNESS:  No, I don't.
23  BY MR. CRAWFORD:
24     Q.   So how can you judge that he

Page 305

1  didn't -- he wasn't thorough on following
2  up on what he found in the report?
3         MR. DIAMANTATOS:  Objection.
4  Form.  Argumentative.
5         THE WITNESS:  Because I --
6  as an example -- I mean, I didn't
7  go through this thoroughly -- but
8  he should have referenced the IMS
9  data.  And you said, okay, well,
10  85.  But I don't see any -- I
11  don't know where he's getting that
12  from.  It's not clear.
13     Something -- this is
14  important, internal to the
15  company, you should really -- it
16  should be a roadmap to what the
17  findings are.
18     So I don't think this is
19  clear.  And I don't want to -- you
20  know, I don't want to throw him
21  under the bus.  I didn't have a
22  long time to look at this.  But
23  you really have to lay it out.
24  And that's what I would expect

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1      from an auditor of mine.
2  BY MR. CRAWFORD:
3      Q.   But Exhibit-14, this is the
4  document -- the type of document you
5  think he should have looked at, right?
6           MR. DIAMANTATOS:  Objection.
7      Form.  Foundation.  Calls for
8      speculation.
9  BY MR. CRAWFORD:
10     Q.   That's what you're saying,
11 he should have looked at the IMS -- this
12 data right here, right?
13     A.   Not just that, but for
14 everything.
15          Like, so, for instance, you
16 go through each -- and this is what I
17 would expect from an auditor.  I would go
18 through each, like, the Walgreens, and
19 then I would go and interpret, okay,
20 well, it's only Walgreens -- what does he
21 say -- Walgreens is the only chain
22 represented.
23          Well, I would have gone to
24 marketing and said, why is it -- you

Page 307

1  know, I would have said, I investigated
2  this and the others can't be represented,
3  because there was -- you know, there was
4  a practical reason why you can't.  I
5  don't think they were doing it anymore.
6  I don't remember the details.
7          What I'm saying is you don't
8  just -- you don't just identify issues.
9  At this level, you try to -- you try to
10 find out why, what you did.  You don't
11 just scratch the surface, in other words.
12          This is all -- there's a --
13 you know, if I went through this, there's
14 a lot of benign issues here that if he
15 just did a little more research, he'd
16 find out, for instance, that -- I don't
17 know, I'm making this up, that Eckerd no
18 longer does this, for instance.
19          And I can't remember all the
20 details.  But there's a lot of very
21 benign, rational reasons why things
22 weren't done.  And I don't think he went
23 that far.
24     Q.   Did you raise these

Page 308

1  criticisms with Mr. Brennan at the time
2  that he provided you with his audit
3  report?
4      A.   He didn't work for me.  And
5  I can't remember -- you know, we talked
6  about all these things, and we went
7  through the pieces and why -- and I think
8  my memo addressed some of the issues.
9      Q.   So look at Exhibit-12.
10          Did you raise any of these
11 points with him in Exhibit-12, that he
12 failed to do these things?
13     A.   So this went to the highest
14 levels of the company, and --
15     Q.   Including Mr. Brennan,
16 right?
17     A.   Let me go through here.
18          Well, I mean, for instance,
19 I mean, it wasn't -- you know, trying not
20 to be personal.  So, for instance, Number
21 3, the NDC Source Prescriber is used in
22 place of IMS Xponent.
23          Well, I think, if he did a
24 little more research, he would have found

Page 309

1  out why we were doing that, that they
2  were the same.
3          I'm not going to -- I hope
4  you don't mind.  I don't want to get into
5  detail here.  But that's just an example.
6  So I'm not going to -- I don't want to --
7  I'm not going to say, Mr. Brennan should
8  have done a more thorough -- I'm not
9  going to put it that way.  But that's
10 kind of inferred.
11     Q.   Right.  But you agree that
12 it's inconsistent with the RiskMAP, on
13 the Walgreens example, that they're only
14 using Walgreens and not the other four,
15 right?  It's just inconsistent with the
16 RiskMAP --
17          MR. DIAMANTATOS:  Objection.
18 BY MR. CRAWFORD:
19     Q.   -- right?
20          MR. DIAMANTATOS:  Objection.
21     Form.  Foundation.  Speculation.
22     Asked and answered.
23          THE WITNESS:  Right.  And as
24 I said previously, there are

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  inconsistencies.  And I told you
2  that, you know, when we started at
3  10:00 or whatever, that a lot of
4  it had to do -- because I said --
5  I said that operationally things
6  evolved; however, that the -- you
7  know, the function of what we were
8  trying to do stayed the same.
9      So we weren't able to get
10  Eckerd as a contractor, but we
11  were able to get Walgreens, or
12  something.  But the intention was
13  we were still doing what the FDA
14  wanted, but we didn't have the
15  ability to communicate a -- I
16  should not say communicate a
17  revision, but to revise it
18  formally; they didn't approve it.
19  But we did communicate to them
20  those issues that we couldn't do
21  this or we couldn't do that.
22      So why Mr. Brennan didn't
23  do -- you know, if he -- if he --
24  that's just one example.  But if

Page 311

1  he had dug a little further, we
2  would say, yes, this is different,
3  and this is the reason why, and we
4  tried to communicate it to the
5  FDA, we did communicate it to the
6  FDA, but it's not yet approved.
7  Something like that.
8      So that's why I'm saying --
9  I'm not saying there aren't
10  differences.  As I said from the
11  very beginning, you'll find
12  inconsistencies.  But it wasn't
13  because -- because we kept trying
14  to communicate to the FDA and get
15  it approved.
16  BY MR. CRAWFORD:
17      Q.   So he should have dug deeper
18  and found out that there was an excuse
19  that you had --
20      A.   That would be my
21  interpretation.
22          MR. DIAMANTATOS:  Objection.
23  Objection.  Mischaracterizes the
24  witness's testimony.  Form.

Page 312

1      Go ahead.
2  BY MR. CRAWFORD:
3      Q.   And then it says that -- on
4  his report, on Exhibit-10, he says, Items
5  requiring follow up.  The four listed
6  pharmacy chains are not included, as
7  required by Section 8.1.1.  Section 8
8  further commits that if any of the four
9  organizations are unable to participate,
10  Cephalon will substitute another
11  supplier.  Only Walgreens is represented.
12          So he is not saying this is
13  the final conclusion, but requires follow
14  up, right?
15          MR. DIAMANTATOS:  Objection.
16  Form.  Calls for speculation.
17  Asked and answered.
18  BY MR. CRAWFORD:
19      Q.   So he is opening up the
20  possibility that there needs to be some
21  kind of follow-up on this, right?
22          MR. DIAMANTATOS:  Objection
23  to form.  Calls for speculation.
24  Foundation.  Asked and answered.

Page 313

1          THE WITNESS:  I didn't read
2  this whole document, but what he
3  sent to the FDA doesn't look
4  like -- I don't get the sense that
5  he said, I did a really thorough
6  investigation and, you know, these
7  people are not doing what they're
8  supposed to.
9          I think that there's holes
10  that he's pointing out that -- or
11  differences, but not explaining
12  why.  And it's creating more of an
13  issue than was, in reality -- why
14  the changes were there.
15  BY MR. CRAWFORD:
16      Q.   But you said you didn't --
17  you didn't know what happened with him,
18  with conversations afterwards, right?
19      A.   No, I didn't.
20      Q.   So possibly he did follow it
21  up, right?  But you don't know?
22          MR. DIAMANTATOS:  Objection.
23  Calls for speculation.  Asked and
24  answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  BY MR. CRAWFORD:
2      Q.   And then he was terminated,
3  so he can't really do anything after he's
4  terminated, right?
5          MR. DIAMANTATOS:  Objection.
6      Assumes facts.  Asked and
7      answered.  The witness said she
8      doesn't know how he left the
9      company.
10 BY MR. CRAWFORD:
11     Q.   He says he was terminated,
12 right?
13     A.   Yeah, I really -- I
14 really -- I don't know.  I really don't
15 know.
16     Q.   But you saw that he said in
17 his letter to the FDA that he was
18 terminated, right?
19     A.   Here, yes.
20         MR. DIAMANTATOS:  Objection.
21     Form.
22 BY MR. CRAWFORD:
23     Q.   All right.  So Mr. Brennan's
24 letter, Exhibit-17, is dated February

Page 315

1  23rd, 2004, correct?
2      A.   The FDA -- give me one
3  second.
4      Q.   Exhibit-17.
5      A.   Give me one second here.
6          MR. DIAMANTATOS:  Objection.
7      Foundation.
8          THE WITNESS:  Here we go.
9      I'm gong to move -- give me one
10     second.  I'm going to move
11     everything back --
12 BY MR. CRAWFORD:
13     Q.   Take your time.
14     A.   -- to the pile.  Okay.
15         I've got it in front of me.
16     Q.   Just, the date is February
17 of 2004, right?
18         MR. DIAMANTATOS:  Objection.
19     Foundation.
20         THE WITNESS:  February 23rd.
21 BY MR. CRAWFORD:
22     Q.   Yes.
23     A.   Yes.
24         MR. CRAWFORD:  I want to

Page 316

1      mark the next document, 1692.
2          - - -
3          (Whereupon, Teva-Marchione
4      Exhibit-18,
5      TEVA_MDL_A_08242371-373, was
6      marked for identification.)
7          - - -
8          MR. JENSEN:  This is
9      Exhibit-18.
10 BY MR. CRAWFORD:
11     Q.   So this is an e-mail you
12 wrote to Francine Del Ricci in June of --
13 June 7th, 2004, re:  FDA contact report.
14 FDA raises concerns about Actiq off-label
15 use and diversion working document.doc --
16 and diversion.
17         There's an attachment,
18 working document.doc?
19     A.   So I actually forwarded it
20 to her.  I didn't write it to her.  Just
21 to be clear.
22     Q.   Sure.
23         You wrote down below --
24 that's right.  Your e-mail below is dated

Page 317

1  June 4th, 2004, to a number of people,
2  including high up in the company.  You
3  had mentioned Paul Blake, Ed Berg and
4  others.
5          The subject is, FDA contact
6  report, FDA raises concerns about Actiq
7  off-label use and diversion.
8          Is that an e-mail that you
9  wrote?
10     A.   Yes, it is.
11     Q.   And you write, Attached is a
12 telephone contact report detailing the
13 phone call that I received yesterday from
14 Bob Rappaport, director of the division
15 of anesthetic, critical care and
16 addiction drug products.  He expressed to
17 me that high levels of FDA are very
18 concerned about information that they
19 have analyzed that reflect staggering
20 off-label use and increasing reports of
21 diversion, misuse and unintended
22 pediatric use of Actiq.  He is requesting
23 that a Cephalon representative come to
24 FDA within the next couple of months to

80 (Pages 314 to 317)

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  discuss.  He asked for a meeting package
2  prior to this.
3          And this is what you
4  reported.
5          Did you take that call from
6  the FDA personally?
7      A.  Yes, I did.
8      Q.  And did he, in fact, report
9  a staggering off-label use that he was
10  aware of?
11          MR. DIAMANTATOS:  Objection.
12  Form.
13          THE WITNESS:  I believe I
14      tried to capture his words, so --
15  BY MR. CRAWFORD:
16      Q.  And you agree, at this time
17  you knew that the off-label use was high,
18  you testified, right?
19      A.  Yes.
20      Q.  Did you know it was 90
21  percent, or thereabouts?
22      A.  I didn't -- I didn't know
23  the actual amount.
24      Q.  So he asked for a meeting

Page 319

1  package prior to this.
2          Was that package sent to
3  him?
4      A.  Yes, it was.
5      Q.  And was that the Exhibit-11
6  that you sent?
7      A.  Yes.
8      Q.  Let's go to the actual
9  report you attach here.  It's a
10  regulatory telephone contact report from
11  you.
12          And the discussion says
13  that, Dr. Rappaport stated that the FDA
14  is very concerned about reports of
15  diversion and misuse of Actiq.
16          That's the first sentence.
17          Going to the second
18  paragraph, it states, Dr. Rappaport
19  stated that the agency's concern stems
20  from analysis and reports that have come
21  to the FDA's attention from review of
22  their sources.  He stated that rather
23  than discussing specific details, the
24  agency would like to meet with our

Page 320

1  company.  One of the intentions of the
2  risk management program was to limit the
3  use of the product to the indication, and
4  the reports that they are receiving
5  regarding off-label use have them
6  extremely concerned.  Their sources
7  reflect that many of the elements that
8  the RiskMAP was intended to control, such
9  as off-label use, especially, but also
10  pediatric exposure, diversion and abuse,
11  are increasing.  These analyses are
12  causing a real concern at high levels of
13  the agency -- in the agency.
14          And, again, at the very end
15  of the paragraph, the report states, He
16  reiterated that the off-label use of the
17  product is staggering.
18          So you agree here, I mean,
19  just from the tenor of the call that you
20  took from him, that they were very
21  concerned at the FDA about the off-label
22  use, right?
23          MR. DIAMANTATOS:  Objection.
24  Calls for speculation.  Form.

Page 321

1          Go ahead.
2          THE WITNESS:  And what
3      triggered the call, which was
4      stated here, was one case of
5      diversion that made the -- that
6      made the news.  And that's what
7      triggered the call.  And the rest
8      of the concerns he had there.
9          But it was -- it was that
10      the -- what do you call it -- the
11      API, whatever is on the wire, that
12      there was a Philadelphia case,
13      specifically, of diversion of
14      Actiq is what triggered that call.
15  BY MR. CRAWFORD:
16      Q.  So was it -- doesn't he say
17  here that the concern for the staggering
18  amount of off-label use is also a trigger
19  of the call?
20      A.  What was relayed to me, and
21  what I put into -- let me see -- it says,
22  In addition, please refer to conversation
23  requesting the source of Actiq use of the
24  Philadelphia diversion case.

81 (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    So that may have been a call
2  even before this one.  There may have
3  been two calls.  But that's what started
4  it.
5    And then -- I think then
6  he -- then he discussed the off-label use
7  also.  I'm not negating it, I'm just
8  saying that's what first triggered it.
9    Q.  But one of the purposes of
10 this particular call was the staggering
11 off-label use that had come to the
12 attention of the FDA and caused great
13 concerns high up in the FDA, right?
14    MR. DIAMANTATOS:  Objection.
15 Form.  Calls for speculation.
16 Assumes facts.
17 BY MR. CRAWFORD:
18    Q.  Is that what he told you?
19    A.  Well, if you read the first
20 sentence, it says -- he talks about the
21 diversion of the product that -- a single
22 incident of diversion that occurred in
23 the beginning of the year in the
24 Philadelphia area.

Page 323

1    Q.  That's what you explained to
2  him, right --
3    A.  No, no.
4    Q.  -- not what he said to you?
5    A.  No, no, that's what he
6  initially called for.
7    I remember this very
8  clearly.  Because I heard about it and
9  contacted DEA first, and I was getting
10 ready to pick up the phone to FDA.  And
11 he called me before I had a chance to
12 call him.
13    So that's how the call
14 started.  And then he said the rest of
15 the information.
16    Q.  Didn't the call start with
17 him saying the FDA is very concerned
18 about reports of diversion and misuse of
19 Actiq?  He said that there had been
20 discussions at very high levels of the
21 agency regarding several issues involving
22 the use of our product.
23    You state, I explained that
24 recent published articles have come to

Page 324

1  the attention of the company regarding
2  the diversion of the product that
3  virtually stem from a single instance
4  of -- incident of diversion that occurred
5  in the beginning of the year in the
6  Philadelphia area.
7    So you're -- so that's what
8  you told him, right, about the
9  Philadelphia incident?  He did not
10 tell --
11    A.  No, he --
12    Q.  -- you about it; you told
13 him.
14    A.  Maybe this was -- no, that's
15 what he first called me about.  That's
16 what triggered this.
17    And then we talked -- again,
18 I'm not denying that he said everything
19 else.  But that's what was the trigger,
20 because it made the news and he was
21 getting pressure from his management.
22    Q.  Well, it seems like -- it
23 seems like he was a little more concerned
24 about the one -- a little bit more

Page 325

1  concerned than just about the one
2  incident of diversion in Philadelphia,
3  right?
4    MR. DIAMANTATOS:  Objection.
5  Form.  Foundation.  Calls for
6  speculation.  Asked and answered.
7  Argumentative.
8    THE WITNESS:  As you -- as
9  you can read here, the answer is
10 yes, because I wrote this.
11    But I'm just saying how
12 the -- the course of the
13 conversation started with the
14 Philadelphia incident.
15 BY MR. CRAWFORD:
16    Q.  And then at the bottom of
17 the page, that last paragraph, you say,
18 He stated that he was very much involved
19 with the drafting of our RiskMAP, RMP,
20 that he knows this document very well and
21 the agency is very concerned that the
22 situation that occurred with OxyContin
23 may happen again.  He further stated that
24 the RMP was designed to limit the use of

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1   the product to the indicated use and this
2   does not seem to be working.
3         So he is telling you that
4   the RiskMAP is not working, correct?
5         A.   That's what he communicated
6   in this -- as I captured it.
7         Q.   So he -- it continues, Dr.
8   Rappaport stated that he would like our
9   company to come in for a meeting in a
10  month or two to provide a review of the
11  data on misuse, diversion, off-label use,
12  deaths, pediatric exposure, addiction and
13  abuse.
14        So that was the intent of
15  the meeting that he wanted to call,
16  right?
17        A.   That's correct.
18        Q.   And did that meeting, in
19  fact, occur?
20        A.   Yes, it did.
21        Q.   And was that the mid July
22  meeting of 2004?
23        A.   Yes, it is.
24        Q.   All right.  You stated that,

Page 327

1   I concluded that our company is also
2   concerned about the proper use of our
3   product.
4         But we saw in that marketing
5   plan that there was a reference to 90
6   percent off-label usage.
7         Did you see any concern in
8   that marketing document about the
9   off-label usage, or was it looked upon as
10  a business opportunity by the company?
11        MR. DIAMANTATOS:  Objection.
12  Form.  Entirely argumentative.
13  Improper question.  Foundation.
14  Calls for speculation.
15        THE WITNESS:  We actually
16  relayed all this information to
17  the FDA.
18        So I wanted to go in here to
19  see what we talked about off
20  label, so I can -- I think that's
21  a nice way of --
22        MR. CRAWFORD:  Your counsel
23  can ask questions on that.  I'm
24  going to move to the next

Page 328

1   question.
2         THE WITNESS:  Okay.
3         MR. DIAMANTATOS:  I'm going
4   to object to you interrupting her
5   answering your question.
6   BY MR. CRAWFORD:
7         Q.   All right.  I'll withdraw
8   the question.
9         MR. CRAWFORD:  Let's mark
10  the next exhibit, Doc 1689.  That
11  will be Exhibit-19.
12              - - -
13        (Whereupon, Teva-Marchione
14  Exhibit-19,
15  TEVA_MDL_A_03317918-921, was
16  marked for identification.)
17              - - -
18  BY MR. CRAWFORD:
19        Q.   This is an FDA letter.  On
20  the back page, they have the date, June
21  29th, 2004, from the FDA, including Mr.
22  Rappaport, to Anesta Corporation, care of
23  Cephalon, attention to your attention.
24        Do you recall receiving this

Page 329

1   letter from the FDA?
2         A.   Not specifically.  But I
3   remember this meeting that went with it.
4         Q.   Okay.  So they're writing to
5   you saying, We also refer to your
6   telephone conversation with Dr. Rappaport
7   on June 3, 2004 -- that was Exhibit-18
8   that we just looked at, right?
9         A.   That's correct.
10        Q.   -- in which he requested
11  that Cephalon meet with the agency to
12  present all of the available information
13  on certain aspects of the Actiq product.
14        And he writes -- or the FDA
15  writes, We are particularly concerned
16  that Actiq be promoted strictly within
17  its approved indication and only to
18  the -- its appropriate target audience.
19  We remind you that, per the indications
20  and usage section of the Actiq package
21  insert, Actiq is intended to be used only
22  in the care of cancer patients and only
23  by oncologists and pain specialists who
24  are knowledgeable of and skilled in the

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1   use of Schedule II opioids to treat
2   cancer pain.
3         As you know, these
4   restrictions are an important part of the
5   risk management program for the drug, to
6   discourage inappropriate and potentially
7   dangerous misuse of the drug. We would
8   like representatives promoting Actiq --
9   or for receiving -- I'm sorry.
10        We would like to know how
11  your company targets physicians that are
12  not oncologists for visits by sales
13  representatives promoting Actiq.
14        So in this letter, he's
15  requesting the type of information that
16  he'd like to receive for the meeting,
17  correct?
18       A.   Right.
19            MR. DIAMANTATOS:  Objection
20  to form. Calls for speculation.
21  Foundation.
22  BY MR. CRAWFORD:
23       Q.   And he says, We would like
24  to know the steps your company takes to

Page 331

1   ensure that there is no confusion about
2   the appropriate indicated use of this
3   drug. We are aware that your company
4   disseminates unbranded disease awareness
5   materials discussing breakthrough pain
6   generally. Please inform us whether
7   these materials are ever used in
8   conjunction with promotion of Actiq,
9   e.g., as part of a detail in which the
10  sales rep also discussed Actiq, or
11  disseminated with printed materials for
12  Actiq.
13        Now, these requests for
14  information from the FDA for the meeting,
15  who, at your company, was in charge of
16  putting this together to present to the
17  FDA for the meeting?
18       A.   I was.
19       Q.   And where did you collect up
20  this particular information that he's
21  requesting?
22       A.   From all over the company.
23       Q.   And you're looking at
24  Exhibit-11, correct?

Page 332

1        A.   I am. I'm trying to see if
2   there was a table of contents.
3            I mean, the RiskMAP is in
4   there, a lot of IMS data, sales.
5   Everything they asked for is included,
6   including all the marketing information.
7   The Dave Brennan audit report is in
8   there. All of our safety information.
9   There's tables on off-label use, misuse
10  and abuse.
11           I don't see a table of
12  contents. Oh, here it is.
13           Do you want me to go through
14  each attachment and say where it came
15  from? Is that -- I mean, I'm not quite
16  sure what you'd like.
17       Q.   I just wanted to know,
18  generally, where did you get information
19  to answer the question. I don't need to
20  know specific. If you don't know
21  generally, that's fine, we can skip
22  ahead.
23       A.   Generally, the safety group,
24  the commercial group. We got the audit

Page 333

1   report from QA. We got all the promotion
2   from marketing. Legal gave us some
3   initiatives.
4        Q.   So this letter, the July
5   12th letter that you wrote here, is
6   this -- you wrote this letter, correct?
7        A.   I'm sure there was a huge
8   input from many people.
9        Q.   All right. So there were
10  drafts that went around, but you kind of
11  spearheaded the effort to put it
12  together, right?
13       A.   Yes, that's correct.
14       Q.   And if you could look at
15  Page 8, the last paragraph, it states,
16  Prescriber data obtained by Cephalon from
17  IMS, NDC and Verispan do not provide any
18  conclusive information as to the
19  diagnosis of each patient at the
20  physician or patient level. These data,
21  as illustrated below, are available on
22  Actiq prescribing by specialty and show
23  the volume and distribution of
24  prescribing of Actiq by specialists.

84 (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1        Now, that first sentence is
2   contradictory to what we saw in the
3   marketing plan, where they actually could
4   break it down by specialty from the IMS
5   source data, correct?
6        MR. DIAMANTATOS:  Objection.
7   Form.  Foundation.
8        THE WITNESS:  Again, I don't
9        know where -- how that data was
10       arrived at.  They said IMS was
11       source.  But the FDA can also
12       check with IMS.
13       So I believe what we've told
14       them here was the truthful
15       information we have, which did
16       show -- you know, if you look
17       through it, it does show the use
18       in psychiatry -- you know, it does
19       mirror much of the information
20       that was in there.
21  BY MR. CRAWFORD:
22       Q.   Right.  But you're telling
23  the FDA that IMS does not provide any
24  conclusive information as to the

Page 335

1   diagnosis of each patient at the
2   patient -- physician or patient level.
3        Is that what you're
4   informing the FDA, right?
5        A.   That's what I was told.  And
6   I really suggest that you talk to an IMS
7   person to say what's the truth, because I
8   don't --
9        Q.   An IMS person within the
10  company, right?
11       A.   No.  I mean, in all
12  fairness, if you're investigating this,
13  you can go to the IMS, and the date when
14  this occurred, what was the ability of
15  IMS to get this -- obtain this data.  I
16  don't know the answer.  IMS could
17  objectively tell you that information.
18       Q.   Right.  But the company
19  obtained it somehow, because we saw it in
20  the marketing plan, right?
21       MR. DIAMANTATOS:  Objection
22  to form.
23  BY MR. CRAWFORD:
24       Q.   Broke it down -- remember

Page 336

1   anesthesiology had back pain at 49
2   percent and other uses within that
3   specialty, right?
4        MR. DIAMANTATOS:  Objection.
5   Form.  Foundation.  Calls for
6   speculation.
7   BY MR. CRAWFORD:
8        Q.   Do you recall that document?
9        MR. DIAMANTATOS:  Let me
10       finish my objections for the
11       record, please.
12       Objection.  Form.
13  Foundation.  Calls for
14       speculation.
15       THE WITNESS:  I do recall
16       it.  I don't know exactly how they
17       did it or how that information
18       arrived.
19       I saw it.  We read it
20       together.  That's all I can tell
21       you.
22  BY MR. CRAWFORD:
23       Q.   That's fine.
24       So somehow the company did

Page 337

1   get that data from somewhere, right?
2        MR. DIAMANTATOS:  Objection.
3   Form.  Calls for speculation.
4   BY MR. CRAWFORD:
5        Q.   Apparently, from the
6   document.
7        MR. DIAMANTATOS:  Objection.
8   Form.  Foundation.  Calls for
9        speculation.
10       One second.
11       Go ahead.
12       THE WITNESS:  I know as much
13       as you do in this case.
14  BY MR. CRAWFORD:
15       Q.   So you did reference a chart
16  on the next page, and it breaks it down
17  by specialty, the prescribing.
18       So it's PCP -- that's
19  primary care providers, right?
20       A.   Yes.
21       Q.   And neuro is neurologists or
22  neurology, right?
23       A.   Again, I know as much as
24  you.  That's how I would interpret it.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q.    And onc would be oncology?
2    A.    That's how I'm interpreting
3  it.
4    Q.    Psych, psychology, right?
5    A.    That's my interpretation.
6    Q.    And PNAN, pain or
7  anesthesiology, is that those areas
8  generally?
9    A.    You know, I don't know
10 exactly.  It sounds reasonable, from the
11 way you said it.
12   Q.    So you're reporting to the
13 FDA here the usage by these five
14 specialty groups, plus others; is that
15 correct?
16   A.    That -- yes.
17   Q.    But when you do the 15
18 percent calculation, you're cutting it up
19 much more when you try to analyze whether
20 a particular specialty went above 15
21 percent, right?
22       MR. DIAMANTATOS:  Objection.
23 Form.  Foundation.
24       THE WITNESS:  You know, I'd

Page 339

1  have to look at the algorithm and
2  what was used.  I really -- right
3  now is probably not the best time
4  for me to analyze this.
5      I don't know how this was
6  arrived at versus the other.  In
7  the next page there is the
8  quarterly distribution by
9  specialty.  So there's the
10 percentages.
11     I mean, we were totally
12 forthcoming to the agency on the
13 off label and where the
14 specialties were.
15 BY MR. CRAWFORD:
16   Q.    Right.  But you -- if, in
17 fact, you had the data in your marketing
18 plans in 2004 about the breakdown of
19 usage within a specialty, like for
20 anesthesiology pain, that isn't being
21 forthcoming, then, if you tell them that
22 IMS doesn't provide that data?
23       MR. DIAMANTATOS:  Objection.
24 Form.  Argumentative.

Page 340

1        THE WITNESS:  You know, all
2  I can say is we're showing the FDA
3  where the specialties are.  I
4  don't know all the details of how
5  that was arrived at.
6      I don't know what else to
7  say.
8  BY MR. CRAWFORD:
9    Q.    We also saw from the
10 marketing plan that PCPs, primary care
11 providers, were above 20 percent as a
12 specialty, right?
13       And that's what's reflected
14 here, right?
15   A.    Right.  Okay.  Yes.
16   Q.    So if that was above 15
17 percent, why aren't -- since they are a
18 nontargeted group, why weren't they
19 reported in the report as being above the
20 15 percent threshold where some type of
21 corrective action was taken pursuant to
22 9.1.2?
23   A.    You're saying psychiatry?
24   Q.    Right -- no, I'm talking

Page 341

1  about PCP, primary care providers.
2    A.    Was that in the -- I was
3  trying to think of the SOP.
4        Did they have PCPs in there?
5    Q.    No, that was not -- as an
6  untargeted -- as a targeted group, it
7  wasn't and that's outside --
8    A.    I don't know -- I don't know
9  how they identified target -- I don't
10 know all the -- all those categories.  So
11 I don't know how they add that up to be,
12 this is a group or not.
13       And so I don't even know
14 where the PCP, if it comes in one group.
15 I'd have to look at the -- those tables
16 with all that.  So I don't know how
17 that's -- how they summarized PCPs.
18   Q.    Right.  "They" meaning the
19 sales department put that together?
20   A.    The marketing research.
21   Q.    Right.  Marketing research.
22 All right.
23       MR. CRAWFORD:  Let's pull
24 627.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1          MR. JENSEN:  Exhibit-20.
2          - - -
3          (Whereupon, Teva-Marchione
4     Exhibit-20,
5     TEVA_MDL_A_01582360-377, was
6     marked for identification.)
7          - - -
8     BY MR. CRAWFORD:
9          Q.   These are the minutes of the
10    meeting -- we marked Exhibit-20,
11    TEVA_MDL_A_01582360.
12         These are the meetings of --
13    the minutes that the FDA sent to you of
14    the July 14th meeting, correct?
15         A.   Yes.
16         Q.   And this is the one where
17    you submitted Exhibit-11, the packet, to
18    them, right?
19         A.   Yes.
20         Q.   So you attended this
21    meeting, correct?
22         A.   Yes, I did.
23         Q.   All right.  And the
24    minutes -- the meeting objective of the

Page 343

1     FDA minutes state that, To get an update
2     from the sponsor on information related
3     to pediatric exposures, use, diversion,
4     misuse, overdose, death and off-label use
5     of Actiq and any noncompliance issues
6     that the sponsor is aware of related to
7     the risk management program
8     implementation of Actiq.
9          So you agree that was the
10    meeting objective as it's stated in that
11    paragraph, right?
12         A.   From the FDA perspective,
13    yes.
14         Q.   Okay.  Was that the
15    company's perspective, too?
16         MR. DIAMANTATOS:  Objection.
17    Form.
18    BY MR. CRAWFORD:
19         Q.   If you know.
20         MR. DIAMANTATOS:  Same
21    objection.  Foundation.
22         THE WITNESS:  I mean, it was
23    their meeting.  So, usually, the
24    person who calls the meeting has

Page 344

1     the objective.
2     BY MR. CRAWFORD:
3          Q.   Fair enough.  I understand.
4     Thank you.
5          It says, The agency is
6     concerned about the abuse and diversion
7     of Actiq and would like to understand the
8     steps Cephalon is taking to prevent abuse
9     and implementation of the risk management
10    program.  Available data suggests
11    considerable off-label use of Actiq and
12    the agency would like to understand the
13    steps Cephalon is taking to discourage
14    such use and ensure that off-label
15    promotion is not occurring.
16         If we go to the end there,
17    Number 3, it says, The sponsor stated
18    that they would like a meeting with DDMAC
19    regarding concerns about the review
20    process for draft promotional materials.
21         What is DDMAC?
22         A.   It's the division of the FDA
23    that is responsible for drug promotional
24    review.

Page 345

1          Q.   And it says, DDMAC expressed
2     concerns about the information provided
3     at this meeting and in the background
4     materials regarding the sponsor's
5     promotional practices as they relate to
6     off-label use.  And DDMAC recommended
7     further discussions on this issue.  DDMAC
8     and the sponsor agreed to have a
9     subsequent meeting to discuss these
10    issues.
11         Post-meeting note.  A
12    meeting between representatives from
13    DDMAC and Cephalon was held on August
14    30th, 2004.
15         Do you recall that meeting?
16         A.   Yes, I do.
17         Q.   And did you attend that
18    meeting?
19         A.   Yes, I did.
20         Q.   All right.  So let's mark
21    the next exhibit, which is Document --
22    well, let's mark Document 1753.
23         - - -
24         (Whereupon, Teva-Marchione

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Exhibit-21,
2    TEVA_MDL_A_08245587-590, was
3    marked for identification.)
4         - - -
5         MR. JENSEN: Exhibit-21.
6         MR. CRAWFORD: Give me one
7    second here.
8         All right. I think we're
9    missing the e-mail from this one.
10   It's on the screen, but we have --
11   we don't have it printed. So
12   we're going to have to get it, the
13   e-mail part, printed and replaced
14   here.
15   BY MR. CRAWFORD:
16        Q.   But it's just a short
17   e-mail. You're welcome to look at my
18   copy of the e-mail here, if you'd like.
19        MR. CRAWFORD: Let's
20   actually mark this. Here is the
21   actual exhibit.
22        MR. DIAMANTATOS: Can you
23   call out the Bates numbers, too,
24   and make sure you give me the full

Page 347

1    number?
2         MR. CRAWFORD: Right.
3         MR. DIAMANTATOS: Thank you.
4         MR. CRAWFORD: Let's do
5    that. And I don't want to give
6    you my boarding pass for United,
7    so I'll take that off here.
8         So the Bates number there is
9    TEVA_MDL_A_08245587.
10        Give that other document
11   back, and we'll mark this one
12   instead.
13        THE WITNESS: Sure.
14        MR. CRAWFORD: Thank you.
15        - - -
16        (Whereupon, a discussion off
17   the record occurred.)
18        - - -
19   BY MR. CRAWFORD:
20        Q.   All right. There we go.
21        So this was an e-mail from
22   you to Frances Smith, cc'ing yourself,
23   draft DDMAC meeting minutes. Fran, I
24   sent the attachment to Ed, Bob R., Andy,

Page 348

1    Greg, Tracie and Victor. I'm not sure if
2    it was received. Could you just check
3    with Victor if he got it. If he did, the
4    others did too. If he didn't, please
5    call me.
6         I want to go to the
7    attachment here, which are the draft
8    meeting minutes from the August 30th
9    meeting, right?
10        Did you prepare these?
11        A.   I believe I did, based upon
12   this.
13        Q.   Do you know if these were
14   ever finalized, from Cephalon's
15   standpoint?
16        A.   You know, I don't remember.
17        Q.   Okay. All right. So you
18   indicate that you attended the meeting
19   with Ed Berg, the assistant general
20   counsel, right?
21        A.   That's correct.
22        Q.   And Andy Pyfer was there as
23   well, correct?
24        A.   That's correct.

Page 349

1         Q.   And others from your
2    company.
3         You write -- or what's
4    written here is, Tom Abrams stated that
5    after reviewing the July 4th -- the July
6    14th, 2004 meeting package -- are they
7    referring here to the Exhibit-11 package?
8         A.   That's my understanding.
9         Q.   -- DDMAC has significant
10   concerns about the promotion of Actiq.
11   He stated that drug was approved under
12   Subpart H, due to its significant safety
13   concerns (i.e., it's dangerous and can
14   kill opioid-naive patients and children
15   at certain doses). FDA was concerned --
16   or was concerns, it says -- about the
17   safety of the drug at the time of
18   approval and it is concerned now. FDA
19   wants to avoid the unsafe use of the
20   product.
21        So do you recall, at the
22   meeting, these concerns that DDMAC was
23   raising about the promotion of Actiq?
24        A.   Vaguely.

88 (Pages 346 to 349)

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    Q.   Abrams stated that he feels
2  that Cephalon is not concerned about and
3  encourages the off-label use of the
4  product.  He specifically mentioned that
5  Cephalon did not seem concerned about the
6  15 percent cutoff of the inappropriate
7  sales target.
8        Do you see that?
9    A.   I do see that.
10   Q.   Do you recall that being
11 raised in the meeting?
12   A.   I don't remember.
13   Q.   Okay.  And they're referring
14 here, at least what's written in the
15 draft minutes written by your company, to
16 the 9.1.2, 15 percent cutoff, right?
17       MR. DIAMANTATOS:  Objection.
18 Form.  Foundation.  Calls for
19 speculation.
20       THE WITNESS:  That's how I
21 would infer it.  But, you know, I
22 can't say 100 percent.
23 BY MR. CRAWFORD:
24   Q.   All right.  Down at the

Page 351

1  bottom, it says, After that introduction,
2  Tom Abrams then provided more specific
3  comments.
4        And then at the end of that
5  paragraph, he says, His interpretation is
6  that by sending letters for off-label
7  use, it infers that Cephalon sales reps
8  should be discouraging off-label use of
9  the product.  By going to prescribers who
10 prescribe the product off label, Cephalon
11 is reinforcing off-label promotion.
12       That is what is written
13 here, at least in this draft form, of
14 what transpired at the meeting, correct?
15   A.   Yes.
16   Q.   And then skipping down to
17 the small paragraph two below that, After
18 further discussions, Tom Abrams and Carol
19 Barstow stated that they believe if we
20 continue to promote and screen
21 physicians, as we do currently, we are
22 putting ourselves at risk.  It was
23 recommended that we review our sales
24 training practices.

Page 352

1        So the FDA was concerned
2  about the targeting of doctors that were
3  outside of the intended targets, right?
4        MR. DIAMANTATOS:  Objection
5  to form.  Speculation.
6        THE WITNESS:  I mean, I
7  think it's clear how it's written
8  here.
9  BY MR. CRAWFORD:
10   Q.   Do you recall at the meeting
11 the FDA expressing concerns about how
12 doctors were targeted for promotion?
13   A.   I don't recall the details
14 of the meeting.  I'm just -- you know,
15 I'm sure I captured what I thought down
16 here.
17   Q.   So when this was drafted,
18 this was intended to try to capture, as
19 best as possible, what transpired at the
20 meeting, right?
21   A.   That would be my
22 interpretation.
23   Q.   And then the last paragraph
24 says, Tom Abrams concluded this part of

Page 353

1  the discussion by stating that FDA is
2  looking at the total picture of sales and
3  promotion of the product.  He stated that
4  our drug is under a lot of scrutiny
5  beyond FDA.  There have been complaints
6  about the promotion of the product and
7  that DDMAC is monitoring this very
8  closely.  He stated that they are
9  prepared to take action beyond NOV
10 letters and warning letters.  He stated
11 that it is the responsibility of the
12 corporate compliance to investigate the
13 sales training and materials.
14       So this is -- this seems
15 like a rather harsh assessment of the
16 promotional practices.
17       Did this raise any kind of
18 concerns within the company, after this
19 August 30th meeting?
20       MR. DIAMANTATOS:  Objection.
21 Form.
22       THE WITNESS:  I mean, I
23 can't remember actions afterwards.
24 But, obviously, yes, it expressed

Page 354

1      concern.
2  BY MR. CRAWFORD:
3      Q.   So he -- it sounds like --
4  like they're ready to take action beyond
5  letters and warning letters, that's what
6  happened.
7           And that means -- what type
8  of actions does the FDA have the
9  capability of taking in the regulatory
10 framework beyond that?
11          MR. DIAMANTATOS:  Objection.
12 Form.
13          Go ahead.
14          THE WITNESS:  They didn't
15      take any action.  They didn't give
16      us a warning letter.  They didn't
17      give us an NOV letter.  And they
18      took no action.
19 BY MR. CRAWFORD:
20     Q.   They took no action against
21 you?
22     A.   No.
23     Q.   Or the company?
24     A.   No.

Page 355

1      Q.   It just died after this?
2      A.   Yes.
3      Q.   Okay.  Last paragraph, last
4  sentence, DDMAC will provide their
5  minutes and Cephalon can review those and
6  provide comments and clarification to
7  those minutes.
8           So let's attach those
9  minutes, which are 627.
10          - - -
11          (Whereupon, Teva-Marchione
12      Exhibit-22,
13      TEVA_MDL_A_01584978-986, was
14      marked for identification.)
15          - - -
16          MR. CRAWFORD:  Is that
17      right?  I'm sorry, 1691.
18          MR. JENSEN:  Exhibit-22.
19 BY MR. CRAWFORD:
20     Q.   So are these the -- we've
21 marked here Exhibit-22,
22 TEVA_MDL_A_01584978.
23          This is a letter from the
24 FDA -- or DDMAC, rather, to you at

Page 356

1  Cephalon, correct?
2      A.   Yes.
3      Q.   And this appears to be the
4  minutes of the August 30th meeting that
5  the FDA is providing, right?
6      A.   That's correct.
7      Q.   And looking down here, under
8  background, it says, Cephalon requested a
9  follow-up meeting with DDMAC to discuss
10 concerns regarding the review process for
11 its promotional pieces.  DDMAC agreed to
12 meet with Cephalon and also stated that
13 it would like to discuss various concerns
14 DDMAC had regarding the promotion of
15 Actiq, including concerns regarding
16 information about Cephalon's promotion
17 that was provided by Cephalon during the
18 July 14th, 2004 joint division meeting
19 and in Cephalon's briefing package for
20 the July 14th, 2004 meeting.
21          So DDMAC was -- obviously,
22 that meeting did not go that well on the
23 14th; they were pretty concerned about
24 the off-label promotion in that meeting,

Page 357

1  right?
2           MR. DIAMANTATOS:  Objection
3      to form.  Foundation.  Calls for
4      speculation.  Argumentative.
5           THE WITNESS:  I mean, I
6      think you can read it.  It
7      wasn't -- they weren't giving us a
8      pat on the back.  But they also
9      pre-cleared all our promotion
10     pieces.  So they saw everything
11     that we sent them.
12 BY MR. CRAWFORD:
13     Q.   What do you mean they
14 "pre-cleared" it?
15     A.   So under Subpart H, you have
16 to send all of your promotion pieces to
17 the FDA before you release it.  So we did
18 that.  They gave us comments, and we
19 incorporated.  So they saw everything
20 that we were promoting on.
21     Q.   When you submitted the
22 materials to the -- to DDMAC or the FDA?
23     A.   No, DDMAC.  DDMAC is a
24 subset of FDA.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1      Q.   Did you have to get an
2    affirmative approval back to use it, or
3    was there, like, a 30-day period they
4    could comment and then you could use it?
5      A.   Yeah, within the 30 days --
6    I think it was 30 days, they would give
7    us comments on the pieces.
8      Q.   Right.
9      A.   And we would review those
10   comments and revise the pieces
11   accordingly before we issued them.
12     Q.   And what if you got no
13   comment back at all, could you use the
14   piece after 30 days?
15     A.   We would always tell them
16   that, but we always waited.
17     Q.   Right.  So you wouldn't even
18   use a piece until you got something back
19   from them, or were there instances where
20   there's a time period they have to get
21   back to you, and if they don't, you can
22   use it?
23     A.   I think --
24          MR. DIAMANTATOS:  Objection

Page 359

1    to form.
2          Go ahead.
3          THE WITNESS:  I think we
4    would always wait for comments.
5    BY MR. CRAWFORD:
6      Q.   The discussion points.
7    DDMAC's concerns regarding off-label use
8    of Actiq.  The targeting criteria and
9    lack of screening for physicians called
10   upon by Cephalon sales force to promote.
11   Actiq training and detailing practices,
12   which inappropriately broaden the drug's
13   labeled indication.  The eliciting of and
14   response of off-label inquiries regarding
15   Actiq.  Minimizing the fatal risk of
16   Actiq to children.  And the promotional
17   use of disease awareness materials that
18   discuss conditions for which Actiq is not
19   indicated to treat.
20          So those were DDMAC's
21   concerns coming into the meeting, right?
22          MR. DIAMANTATOS:  Objection
23   to form.  Foundation.  Calls for
24   speculation.

Page 360

1          THE WITNESS:  That's what
2    they wrote in here.
3    BY MR. CRAWFORD:
4      Q.   At least reflected in the
5    minutes?
6      A.   Yes.
7      Q.   Do you remember those
8    concerns being raised in the meeting?
9      A.   You know, in general.
10     Q.   So the concerns regarding
11   promotion here, it says, DDMAC expressed
12   significant concerns about the increasing
13   off-label use of Actiq, particularly in
14   light of the risk management plan that is
15   in effect for Actiq, which mandates that,
16   among other things, the company act to
17   prevent against improper patient
18   selection.  DDMAC reminded Cephalon that
19   off-label promotion is illegal and,
20   especially with a drug with a risk
21   profile like Actiq, raises significant
22   public health concerns.  As discussed
23   further below, DDMAC expressed concerns
24   that Cephalon's training and detailing

Page 361

1    practices appear to encourage the
2    off-label use of Actiq rather than
3    discourage it.
4          So, again, was this a
5    concern that DDMAC expressed in this
6    meeting to Cephalon and its attendees?
7      A.   I believe, I mean, like,
8    being written in here, they expressed
9    that.
10     Q.   So these minutes, is there
11   anything in these minutes -- and take
12   your time to look at them if you want, we
13   can go through it, is there anything in
14   these minutes that seems inaccurate about
15   what DDMAC had expressed to Cephalon
16   during that meeting?
17          And go ahead and take your
18   time if you need to look at that.
19     A.   Again, this is, obviously,
20   one-sided because they pre-cleared
21   everything.
22          And the reason why we
23   initially asked for that -- this meeting,
24   which it said initially, was because they

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  kept -- they kept reversing themselves on
2  their promotional review.  And I said,
3  you're costing the company a
4  significant -- a lot of money for your
5  reversals.
6          So I asked for prospective
7  meetings, on a quarterly basis, with
8  them, so we could review together so we
9  can get an understanding.
10         And that came out of that
11  July -- I asked them for this in that
12  July 4th meeting.  And this was the
13  follow-up.
14         So I think it says here
15  that -- following the July -- Cephalon
16  requested a follow-up meeting to discuss
17  the concerns regarding the review process
18  for its promotional pieces.
19         That's on the bottom, in the
20  background.
21         So I asked for this meeting
22  because I was concerned about how they
23  kept reversing themselves.  So I
24  understand -- they probably had

Page 363

1  legitimate concerns, but the FDA
2  pre-cleared all our promotion pieces.
3          So I feel like they were
4  talking out both sides of their mouth, in
5  a sense.
6      Q.   So you said they reversed
7  themselves.
8          Tell me what you mean by
9  "they reversed themselves."
10     A.   So in one -- in one piece
11  they would say, you have to -- you know,
12  you have to add this information, and
13  then the next -- the next time we would
14  add that information, we would put that
15  in for another piece in pre-clearance
16  with the information they wanted, and
17  they would tell us to take it out.
18         So this went back and forth,
19  every single piece.  So, you know,
20  they're not going to reflect in here
21  their faults, necessarily.  But, I mean,
22  they pre-cleared everything, so I'm not
23  quite sure why they were as surprised, if
24  I should say, with the concerns.  Because

Page 364

1  they -- they got to see all our pieces
2  before we had them printed.
3      Q.   Well, they're not talking --
4  the FDA -- DDMAC's concerns are on the
5  second page at A.
6          And I don't really see much
7  here about the promotional pieces,
8  although I think they did have a concern
9  about those at the meeting, correct?
10         MR. DIAMANTATOS:  Objection.
11  Form.
12  BY MR. CRAWFORD:
13     Q.   They had a concern about
14  promotional pieces at the meeting, is
15  that what you're saying?
16         MR. DIAMANTATOS:  Objection.
17  Form.  Calls for speculation.
18         THE WITNESS:  I thought you
19  were just reading to me where they
20  were concerned about
21  promotional -- I mean, I'd have
22  to --
23  BY MR. CRAWFORD:
24     Q.   I'm looking at discussion

Page 365

1  points, A.  It says, DDMAC's concerns
2  regarding -- the first is off-label use
3  of Actiq.
4          They were more concerned
5  about the use.  Remember, the staggering
6  use that the FDA brought up in the call,
7  prior to the July 14th meeting.
8          So they are concerned about
9  off-label use, which is, you know, not
10  directly promotional materials, they were
11  just concerned about the off-label use,
12  right?
13         MR. DIAMANTATOS:  Objection.
14  Form.  Calls for speculation.
15         THE WITNESS:  I'm sorry,
16  when you were reading something,
17  it sounded very distinctly like
18  they were concerned about the
19  pieces.
20  BY MR. CRAWFORD:
21     Q.   They may have been concerned
22  about the pieces.
23         But they are -- also, that
24  wasn't the whole subject of the meeting.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  They were concerned about the off-label
2  use of Actiq, right?
3      A.  Uh-huh.
4      Q.  Do you agree?
5      A.  Yes.
6      Q.  Okay.  And they were
7  concerned about the targeting criteria
8  used for targeting doctors with regard to
9  Actiq, right?
10         MR. DIAMANTATOS:  Objection.
11  Form.
12         THE WITNESS:  That's what
13  it --
14         MR. DIAMANTATOS:  Calls for
15  speculation.
16         THE WITNESS:  That's what it
17  says here.
18  BY MR. CRAWFORD:
19      Q.  Right.  A promotional piece
20  wouldn't necessarily clue them in to the
21  targeting practices that raises these
22  concerns, right?
23         MR. DIAMANTATOS:  Objection
24  to form.  Calls for speculation.

Page 367

1      Foundation.
2         THE WITNESS:  That's true.
3  But the quarterly reports told --
4  inferred where the targeting was.
5      So we were very up front.
6  We were very communicative.  There
7  was nothing that we were hiding.
8  And this huge package, it was very
9  specific about the off label and
10  what we were targeting.
11  BY MR. CRAWFORD:
12      Q.  Well, on off label, it
13  didn't reveal that 50 percent,
14  approximately, use among
15  anesthesiologists was for back pain.
16      A.  I mean, I can't remember the
17  page --
18         MR. DIAMANTATOS:  Objection.
19  Form.
20         THE WITNESS:  I'd have to go
21  through here.  But we were pretty
22  clear, I thought.
23  BY MR. CRAWFORD:
24      Q.  I think you told them you

Page 368

1  couldn't break down what it was
2  prescribed for within the specialty.
3         MR. DIAMANTATOS:  Objection.
4  Form.  Mischaracterizes --
5  BY MR. CRAWFORD:
6      Q.  Right.  Remember on Page
7  8 --
8         MR. DIAMANTATOS:  Objection.
9  Form.
10  BY MR. CRAWFORD:
11      Q.  -- of your letter?
12         MR. DIAMANTATOS:  Objection.
13  Form.  Mischaracterizes testimony.
14         THE WITNESS:  I'd have to go
15  through here further.  But I think
16  we were pretty clear that there
17  was significant off label, and I
18  thought we gave percentages.  It's
19  been -- obviously, it's been a
20  while since I --
21  BY MR. CRAWFORD:
22      Q.  Why don't you take a look
23  and find me the off-label disclosure in
24  that letter?

Page 369

1         But this is in the July 12th
2  letter you told them about it, right?
3      A.  The meeting -- the meeting
4  package?
5      Q.  Yes.
6      A.  Yes.
7      Q.  You did not tell them about
8  it in the quarterly reports, though?  All
9  the high off-label use, you didn't
10  disclose that?
11         MR. DIAMANTATOS:  Objection.
12  Form.  Vague.  Asked and answered.
13         THE WITNESS:  We complied
14  with everything they asked for in
15  the quarterlies.  And there's --
16  in there we talk about off-label
17  letters and everything.
18      Again, I'd have to -- it's
19  been a while for the specifics.
20  But we even showed a graph, I
21  thought.
22      Actiq off-label counts and
23  patient exposure.  It does show a
24  diagram, this is off-label counts

93 (Pages 366 to 369)

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    versus patient exposure.  This is
2    a very thick document.
3         But we were very
4    forthcoming.  Counts, letters,
5    patients' exposure.
6         It would take me forever to
7    go through this.
8    BY MR. CRAWFORD:
9         Q.   Well, why don't you grab
10   Exhibit-9, which is your quarterly
11   report, and show me where you're
12   disclosing the level of off-label use in
13   that report?
14        MR. DIAMANTATOS:  Are you
15        withdrawing the question with
16        regard to Exhibit-11, or are you
17        going to give her an opportunity
18        to find what you asked her to
19        find?
20        MR. CRAWFORD:  I thought she
21        said she couldn't find it.
22        MR. DIAMANTATOS:  That's not
23        what she said.  She said it would
24        take her time to find it.

Page 371

1         MR. CRAWFORD:  I'll withdraw
2         it.
3         MR. DIAMANTATOS:  Why don't
4         you note for the record how large
5         Exhibit-11 is, by listing the
6         Bates stamp?  That's something you
7         failed to do in comparison to what
8         the other exhibits are.
9         MR. CRAWFORD:  I only raised
10        it because she said, counsel, that
11        we told them about all the
12        off-label use in the report.
13        So I asked her -- it is a
14        large report, I agree.  So I'll
15        withdraw the question.
16   BY MR. CRAWFORD:
17        Q.   Let's go to your quarterly
18   report at Exhibit-9.
19        The document will speak for
20   itself, whatever is disclosed in there is
21   disclosed in there.
22        So let's go to Exhibit-9.
23   And if you could -- was Cephalon
24   forthcoming in this report about the

Page 372

1    extent of off-label use of Actiq?
2         MR. DIAMANTATOS:  Objection.
3         Form.  Argumentative.  Asked and
4         answered.  The document will speak
5         for itself.
6         MR. CRAWFORD:  I wanted her
7         view that if it is --
8         MR. DIAMANTATOS:  You didn't
9         want it on Exhibit-11.
10        MR. CRAWFORD:  I got it
11        already.  I just had her point it
12        out.
13        THE WITNESS:  So there's
14        no -- no specific section that
15        says what's your off-label use.
16        We had a report on all these
17        other -- so, I mean, we talked
18        about all the off-label letters we
19        got when we heard about it.
20        There isn't anything in here
21        to specifically ask, what's your
22        percent of off label?
23   BY MR. CRAWFORD:
24        Q.   Well, okay.  On Page 11,

Page 373

1    9.1, there's a section called, Off-label
2    usage, right?
3         A.   Let me see.  9.1.
4         I'm sorry, I'm looking at
5    Exhibit-7.
6         MR. DIAMANTATOS:  Exhibit-9.
7    BY MR. CRAWFORD:
8         Q.   Exhibit-9, I'm sorry.
9         A.   This is the RiskMAP.
10        I'm sorry, what page was it?
11        Q.   Page 11.  There's a section
12   on off-label usage, and there's no
13   disclosures in there about the extent of
14   the off-label usage or anything being
15   done.
16        A.   So what it tells you that we
17   need to do is, initial instance of off
18   label -- it doesn't ask for numbers.  It
19   says we need to send a letter from our
20   global product safety, which we did.
21        Q.   And then 9.1.2 is missing.
22        That section is missing,
23   right?
24        MR. DIAMANTATOS:  Objection.

94  (Pages 370 to 373)

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1     Form.
2          THE WITNESS:  And that's
3     about the percentage.  That was
4     about the 15 percent.
5          So that's about the
6     targeting.  So that's not
7     necessarily about how much -- you
8     know, like, it doesn't say, give
9     your percentage of off label.
10    BY MR. CRAWFORD:
11    Q.   Let's go back to Exhibit-22.
12         So I think my question was
13    here, I mean, these are minutes from the
14    FDA of DDMAC's concerns that are outlined
15    in Points 1, 2, 3 and 4 through 6.  They
16    express concerns here.
17         Were these concerns -- does
18    this accurately reflect, in your view,
19    the concerns that DDMAC raised at this
20    meeting that you attended?
21    A.   I'm going to have to read
22    it.
23    Q.   Sure.
24    A.   Give me a couple of minutes.

Page 375

1     Q.   Yes.
2     A.   You started with 2, did you?
3     Q.   Yeah.  And actually I can go
4     through the points that I -- that I'm
5     really concerned about or want to raise
6     with regard to whether they raise these
7     concerns.
8     A.   Okay.
9     Q.   So 2 -- I think we went
10    through 1.
11         2, DDMAC expressed concerns
12    that, as indicated by Cephalon's briefing
13    package for and presentation at the July
14    14th, 2004 meeting, the company targets
15    physicians for Actiq promotion purely
16    based on the number of opioid
17    prescriptions they write, and the company
18    is making no effort to screen these
19    targeted physicians to determine whether
20    they treat cancer patients and, thus,
21    would be appropriate to be detailed on
22    Actiq, given its limited indications,
23    i.e., management of breakthrough cancer
24    pain, in patients with malignancies who

Page 376

1     are already receiving and who are
2     tolerant to opioid therapy for their
3     underlying persistent cancer pain.
4          Again, was that -- was this
5     type of targeting concern raised at the
6     meeting, that you recall?
7          MR. DIAMANTATOS:  Objection.
8     Form.  Assumes facts.
9          THE WITNESS:  I believe it
10    was.  But I'm not seeing -- I'm
11    just trying to see -- we obviously
12    responded to in the meeting.
13    BY MR. CRAWFORD:
14    Q.   Right.  But they give you --
15    A.   The company takes the law
16    applying the -- very seriously.  Cephalon
17    confirms that it does target physicians
18    in various specialties by their opioid
19    prescribing practices, regardless of
20    whether they treat cancer patients or
21    cancer pain.  Specifically, physicians
22    who write at least 24 opioid
23    prescriptions in six months are targeted
24    for a sales call by Cephalon sales

Page 377

1     representative.  The company believes
2     that it's a good idea to call on
3     physicians who do not treat breakthrough
4     cancer pain, based on belief that such
5     calls can encourage these physicians to
6     treat these conditions, should they see
7     it in their practice.  The company also
8     stated its belief that a physician did
9     not need to routinely see cancer patients
10    to be an appropriate target for an Actiq
11    sales call.  Cephalon also confirmed that
12    its sales representatives will make
13    repeated calls to target physicians who
14    are not using Actiq for the treatment of
15    breakthrough cancer pain.  Cephalon also
16    indicated its belief that in addition to
17    communications from its medical
18    department, sending its sales
19    representatives to call on physicians who
20    are using Actiq off label was an
21    effective way of communicating important
22    risk information to these physicians and
23    did not encourage off-label use, though
24    they would consider DDMAC's comments on

Page 378

1    the issue.
2         Cephalon also noted it's
3    belief that the RiskMAP, RMP, does not
4    require the company to discourage
5    off-label use of Actiq. While noting
6    that it does not promote Actiq off label,
7    Cephalon stated its belief that pain in
8    general is an underrated medical need and
9    that Actiq can be used safely and
10   effectively for other uses than
11   breakthrough cancer pain. The company
12   will be pursuing a broadened indication
13   for the drug.
14        Q.    And doesn't DDMAC address
15   that argument in the paragraph above?
16        They state here, Actiq's
17   briefing package, at Page 598, in
18   comments made by Cephalon at the July
19   14th meeting, indicate that Cephalon
20   sales representatives are calling on
21   physicians who are not treating BTCP,
22   breakthrough cancer pain, and who are not
23   prescribing Actiq already. This is
24   especially concerning, as many of the

Page 379

1    targeted specialty areas, such as
2    physical medicine specialists, do not
3    routinely treat cancer patients. There
4    does not appear to be any reason -- let
5    me back up.
6         The physical medicine
7    specialties were -- was a specialty group
8    that was designated as a targeted group,
9    and so, therefore, was not being
10   monitored for the 15 percent or for the
11   off-label promotion in the SOPs, right?
12        A.    You know, I can't remember
13   exactly. But the rationale for why they
14   were doing what -- what they -- what were
15   targeted to do is in this second
16   paragraph.
17        So I believe -- I'm not
18   denying that DDMAC feels that way. I
19   think we have -- I think, Cephalon had a
20   very logical rationale for why we
21   promoted, to make sure it was safe.
22        And subsequently, we never
23   got a warning letter. We never got an
24   NOV. And they never took the approval

Page 380

1    away. So I don't know how one can
2    interpret that, other than, you know, we
3    were -- we expressed what our issues
4    were, and, you know, it's kind of on
5    either side.
6         And, you know, I think
7    that -- you know, I think that paragraph
8    speaks for itself.
9         Q.    Didn't Cephalon pay a $50
10   million fine, criminal fine, for
11   promoting Actiq and other drugs off label
12   during this period?
13        MR. DIAMANTATOS: Objection.
14   Form. Foundation.
15        Go ahead and answer the
16   question.
17        THE WITNESS: To be honest,
18   I thought it was -- I thought it
19   was for Provigil. I didn't know
20   if Actiq was part of the --
21   BY MR. CRAWFORD:
22        Q.    It was Gabitril, Provigil
23   and Actiq.
24        A.    And that was not -- I mean,

Page 381

1    that was not -- FDA did -- again, that's
2    what my hat is, the regulatory FDA hat, I
3    have never heard anything back from the
4    FDA, per se, that we were -- after that,
5    that they held anything up or NOVs or
6    anything.
7         Q.    So you never heard that
8    Cephalon had pleaded guilty to off-label
9    marketing of Actiq and Provigil and
10   Gabitril?
11        MR. DIAMANTATOS: Objection
12   to form. That mischaracterizes
13   the witness's answer.
14        Go ahead and answer.
15        THE WITNESS: I'm talking --
16   I'm -- my responsibility was my
17   communications with the FDA, and
18   how they interpreted.
19        We never had the product
20   withdrawn or an NOV or warning
21   letter from the FDA. So I'm
22   just -- and I hear what you're
23   saying. I'm not trying to deny
24   it. I'm just saying, this was my

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1     focus.
2  BY MR. CRAWFORD:
3     Q.   Right.  And I'm just trying
4  to understand if you had ever heard that
5  Actiq was part of the -- Actiq off-label
6  marketing by Cephalon was part of the
7  guilty plea that they entered in 2008?
8     A.   You know, my recollection, I
9  thought it was just Provigil.  I
10  really -- I'm not trying to be --
11    Q.   I know.
12         But you don't remember it
13  being Actiq?
14    A.   No, I actually did not.  To
15  be honest, I didn't.
16    Q.   Fair enough.
17         They do -- and this is in
18  response to the paragraph you read.  They
19  say, There does not appear to be any
20  reason for these sales calls to be, other
21  than to promote Actiq outside its labeled
22  indication.  And the fact that off-label
23  prescriptions have increased in such
24  specialty areas seems to add validity to

Page 383

1  this conclusion.
2         So you don't deny that
3  there's staggering off-label use of the
4  product at this time?
5         MR. DIAMANTATOS:  Objection.
6  Form.  Argumentative.
7         THE WITNESS:  I --
8         MR. DIAMANTATOS:
9  Foundation.
10         Go ahead.
11         THE WITNESS:  I will agree
12  there was off-label use at the
13  time, yes.
14  BY MR. CRAWFORD:
15    Q.   But would you agree it was
16  staggering?
17         MR. DIAMANTATOS:  Objection.
18  Form.
19         Go ahead.
20         THE WITNESS:  How does one
21  define that?  I don't know.  I'm
22  being open, I'm saying, yes, I
23  agree there was off-label use.
24  BY MR. CRAWFORD:

Page 384

1     Q.   In your view, would 90
2  percent off-label use be staggering?
3         MR. DIAMANTATOS:  Objection
4  to form.  Assumes facts.
5  Argumentative.  Asked and
6  answered.
7         THE WITNESS:  I don't know
8  if I would -- I probably --
9  staggering.
10         I don't know.  I guess --
11  it's definitely high, but there's
12  a lot of people -- I don't know.
13         Yes, it's a high level.
14  BY MR. CRAWFORD:
15    Q.   But the intent of the
16  RiskMAP was to try to prevent off-label
17  prescribing, right?
18         MR. DIAMANTATOS:  Objection.
19  Form.  Foundation.  Calls for
20  speculation.  Asked and answered.
21         THE WITNESS:  That was one
22  of the three intentions of the
23  RiskMAP.
24  BY MR. CRAWFORD:

Page 385

1     Q.   And then, and this is more
2  specific to what you read, In addition,
3  DDMAC expressed concerns regarding
4  Cephalon's stated reason at the July 14th
5  meeting for sending sales representatives
6  to call upon physicians who were clearly
7  using Actiq off label, namely, to provide
8  risk information to help ensure safe use
9  of the drug.  While DDMAC acknowledged
10  how important it is that these physicians
11  receive information from Cephalon
12  regarding the serious risks associated
13  with using this drug, as per the RiskMAP,
14  DDMAC questioned whether having a
15  promotional arm of the company, the sales
16  force, repeatedly call on these
17  physicians was the most effective way of
18  communicating risk information and
19  whether it would not also potentially
20  encourage -- encourage rather than
21  discourage the off-label uses, which
22  would violate the principles of the
23  RiskMAP.
24         So DDMAC clearly disagreed

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  with your rationale of sending these
2  sales representatives -- or the company's
3  rationale of sending these sales
4  representatives to doctors who, in
5  general, didn't treat cancer patients, to
6  try to talk to them about risk
7  information.  They thought it should come
8  from a nonpromotional arm.
9        Do you agree that that was
10 the position they took at the meeting?
11       MR. DIAMANTATOS:  Objection.
12 Form.  Foundation.  Calls for
13 speculation.  Argumentative.
14 BY MR. CRAWFORD:
15       Q.  You attended this meeting,
16 right?
17       A.  Right.
18       I understand -- I understand
19 the rationale, yes.
20       Q.  Okay.  And then, 3, DDMAC
21 expressed concern that Cephalon, as
22 indicated in the briefing package for the
23 July 14th, 2004 meeting, see Page 191,
24 and in its presentation at the meeting,

Page 387

1  is instructing its sales force to open
2  sales calls in a manner that fails to
3  focus on Actiq's limited indication and
4  instead focuses on the physician's
5  treatment of breakthrough pain in
6  general, thus inappropriately broadening
7  physicians' perceptions of the drug's use
8  to the treatment of all forms of BTP
9  rather than BTCP in the indicated
10 populations.
11       So, again, was this another
12 concern that DDMAC expressed in the
13 meeting?
14       MR. DIAMANTATOS:  Objection
15 to form and foundation.  Calls for
16 speculation.
17       THE WITNESS:  I mean, just
18 by -- I mean, this sounds correct.
19 It's in the minutes.
20       We did not object -- we
21 added a document in the file to
22 these minutes, if I can remember.
23 And I can't remember what they --
24 I don't know if you can find that.

Page 388

1        But -- so we did have some
2  clarifications to these minutes
3  after the fact.  So I just don't
4  remember the details.
5  BY MR. CRAWFORD:
6        Q.  And then just skipping ahead
7  to 6, it says, DDMAC expressed questions
8  and concerns regarding how Cephalon's
9  sales force is using disease awareness
10 materials that discuss broad conditions,
11 such as BTP, that would go beyond Actiq's
12 indicated use.
13       Is that, again, another
14 concern they expressed at this meeting?
15       MR. DIAMANTATOS:  Objection.
16 Form.
17       THE WITNESS:  Again, I don't
18 remember specifically.  But I'm
19 deducing, because it's written
20 here.
21 BY MR. CRAWFORD:
22       Q.  So, in summary -- and there
23 are other points, but in summary, they
24 state, DDMAC summarized that it is

Page 389

1  concerned -- this is on the last page.
2        A.  Okay.  The very last?
3        Q.  Yes, very last page under
4  summary.
5        A.  Okay.
6        Q.  I just want to look at that
7  first paragraph there under summary.
8        A.  Where it says, DDMAC
9  summarized?  That one?
10       Q.  Yes.
11       DDMAC summarized that it is
12 concerned about the promotion of Actiq
13 and is monitoring this promotion very
14 closely.
15       So DDMAC was, in fact,
16 intending to monitor this?  It wasn't
17 going to just drop it, right?
18       MR. DIAMANTATOS:  Objection.
19 Calls for speculation.  Form.
20 BY MR. CRAWFORD:
21       Q.  Is that what they conveyed
22 at the meeting?
23       A.  That's what they conveyed.
24       By default, they pre-cleared

98 (Pages 386 to 389)

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1  all the promotional pieces.  So by
2  default, they were doing that anyway.
3       Q.   So after this time, do you
4  remember DDMAC doing anything about this,
5  or did it just drop?
6            MR. DIAMANTATOS:  Objection.
7  Form.
8            THE WITNESS:  We never got
9  any -- anything else after this.
10           Again, the only other
11  communication was I sent, I
12  thought, a clarifying letter, to
13  the best of my knowledge.  I
14  can't -- maybe I'm misinterpreting
15  because there were so many
16  meetings, but -- so I think we
17  expressed some clarification on
18  our part.
19           But we never got an NOV or a
20  warning letter after this.
21  BY MR. CRAWFORD:
22       Q.   Okay.  It does say, DDMAC
23  also noted that FDA is prepared to take
24  whatever action is necessary to address

Page 391

1  any violations and ensure that Cephalon
2  complies with the law and that the public
3  health is protected.  Cephalon should
4  also be aware that DDMAC has received
5  complaints about its promotion, and that
6  it is under scrutiny by others who are
7  concerned about the potential for harm to
8  the public health from inappropriate use
9  of Actiq.  Cephalon is strongly advised
10  to take whatever steps are necessary to
11  ensure that it is in compliance with the
12  law.
13           So they wanted you to take
14  steps to comply with the law.
15           Did you have to wait for
16  them to keep pushing you or prompting you
17  to do it, or would you take steps -- was
18  the company going to take steps to comply
19  with the law?
20           MR. DIAMANTATOS:  Objection.
21  Form.  Foundation.  Calls for
22  speculation.  Argumentative.
23           Go ahead and answer.
24           THE WITNESS:  So it's an

Page 392

1  interpretation.  We never got
2  anything that said that we weren't
3  complying with the law from the
4  FDA.
5  BY MR. CRAWFORD:
6       Q.   All right.
7            MR. CRAWFORD:  Let's mark
8  the next few exhibits.
9            MR. DIAMANTATOS:  If you're
10  moving on to another exhibit,
11  maybe it's time to take a break.
12  We've been at it almost an hour
13  and-a-half.
14           MR. CRAWFORD:  We can do
15  that.
16           VIDEO TECHNICIAN:  Going off
17  the record at 4:03 p.m.
18              - - -
19           (Whereupon, a brief recess
20  was taken.)
21              - - -
22           VIDEO TECHNICIAN:  Back on
23  the record at 4:17 p.m.
24  BY MR. CRAWFORD:

Page 393

1       Q.   We marked three of the next
2  exhibits, 23, 24 and 25.
3              - - -
4            (Whereupon, Teva-Marchione
5  Exhibit-23,
6  TEVA_MDL_A_07424105-109, was
7  marked for identification.)
8              - - -
9            (Whereupon, Teva-Marchione
10  Exhibit-24,
11  TEVA_MDL_A_00267691-694, was
12  marked for identification.)
13              - - -
14           (Whereupon, Teva-Marchione
15  Exhibit-25,
16  TEVA_MDL_A_01583546-550, was
17  marked for identification.)
18              - - -
19           THE WITNESS:  Thank you.
20  BY MR. CRAWFORD:
21       Q.   23 --
22           MR. DIAMANTATOS:  Sorry, I
23  think I have -- 24 and 25.
24           THE WITNESS:  Thank you.

99 (Pages 390 to 393)

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1  BY MR. CRAWFORD:
2       Q.   Exhibit-23, if you look at
3  the last page, it's a fax cover page, is
4  a September 29th, 2004 fax from DDMAC to
5  Tracie Parker.
6            That was your person who
7  reported to you, correct?
8       A.   That's correct.
9       Q.   Okay.  And it's
10  TEVA_MDL_A_07424105.
11           And then we've also marked
12  as Exhibit-24 a letter from DDMAC to Ms.
13  Parker there at Cephalon regulatory
14  affairs.  That's dated November 24, 2004.
15           And then Exhibit-25 is a
16  fax, again, from DDMAC to you, Ms.
17  Marchione, dated November 29th, 2005.
18           So these are three DDMAC
19  letters written with regard to the
20  submission of promotional materials
21  Cephalon made to DDMAC regarding Actiq,
22  correct?
23       A.   To clarify, it's draft
24  promotion.  This was part of the

Page 395

1  pre-clearance process.
2       Q.   Right.  So DDMAC was getting
3  back to you and providing criticisms of
4  those materials and asking Cephalon to
5  correct them, correct?
6            MR. DIAMANTATOS:  Objection
7  to form.
8            THE WITNESS:  Or to revise
9  them.
10           Again, it wasn't -- these
11  pieces weren't out in the public
12  at all.  These were just draft
13  that went to the FDA for
14  pre-clearance.
15  BY MR. CRAWFORD:
16      Q.   Right.  So this -- all three
17  letters come after the August 30th
18  meeting, following up with your meeting
19  with DDMAC, where DDMAC was coming to you
20  explaining why these materials you were
21  proposing using for Actiq were improper,
22  right?
23      A.   Right.  But we have -- just
24  to be clear, we have these throughout the

Page 396

1  review process, before and after.  Every
2  time we sent any piece that ever went
3  out, we got one of these letters.
4       Q.   Right.  But these three are
5  pointing out problems with these pieces,
6  aren't they?
7       A.   There --
8            MR. DIAMANTATOS:  Objection
9  to form.
10           Go ahead.
11           THE WITNESS:  Problems,
12  maybe, is the wrong word.
13           But this is the whole point
14  that I was saying, is we would get
15  these types of -- so every piece
16  we sent, we would get a letter
17  like this.  And then, like, the
18  next piece would then reverse it.
19           So these are -- this is just
20  a routine type of review.  And
21  they always gave us comments, one
22  way or the other.  So this wasn't
23  something that was out in the
24  market that we were distributing.

Page 397

1  BY MR. CRAWFORD:
2       Q.   Right.  So each of these
3  letters they state, up near the
4  beginning -- so let's take Exhibit-23, as
5  an example, they state, Since many claims
6  and representations are similar or
7  closely related, DDMAC's comments on a
8  particular claim or representation apply
9  to similar claims or representations in
10  these and future promotional materials
11  for Actiq.
12           Right?  So they were trying
13  to teach you how to -- how to properly
14  prepare these materials, right?
15           MR. DIAMANTATOS:  Objection
16  to form.  Speculation.
17           Go ahead.
18           THE WITNESS:  So we're --
19  not teaching, but they're
20  saying -- this was my concern with
21  the agency, was so they say, okay,
22  for the future, you have to do
23  this.
24           Then we would get another

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    piece that would completely
2    reverse it, and say in the future
3    you have to change these pieces.
4    It was costing us extremely -- you
5    know, a large sum of money,
6    because every time they kept
7    reversing their positions.
8         So these are their judgments
9    on draft pieces.  When we would
10   get these comments, we would then
11   take our draft, revise them, based
12   upon -- to make sure they were in
13   compliance.  And then that would
14   be, then, the final piece.
15   BY MR. CRAWFORD:
16   Q.   Correct.
17        So they're telling you
18   what's wrong with the pieces, and you're
19   going back and correcting them and
20   re-submitting them?
21   A.   That correct.
22   Q.   And their intent is, in
23   telling you this, that you should apply
24   their comments to future promotional

Page 399

1    materials regarding Actiq, right?
2    A.   That's correct.
3         MR. DIAMANTATOS:  Objection
4    to form.  Speculation.
5    BY MR. CRAWFORD:
6    Q.   They say that in the first
7    paragraph here, up above, Since many
8    claims and representations are similar or
9    closely related, DDMAC's comments on a
10   particular claim or representation apply
11   to similar claims or representations in
12   these and future promotional materials
13   for Actiq.
14        Right?
15   A.   That's correct.
16   Q.   And that's -- they state
17   that again on Exhibit-24, right below the
18   bullet points, right?
19   A.   Yes.
20   Q.   And then Exhibit-25, they're
21   stating it again in that first -- the
22   last sentence of that paragraph,
23   underneath the bullet points, right?
24   A.   That's correct.

Page 400

1    Q.   So this first letter, dated
2    September 29th, that comes about a month
3    after -- less than a month after your
4    meeting with them, right?
5    A.   I guess --
6    Q.   August 30th meeting, right?
7    A.   Okay.  Yep.
8    Q.   So they are giving you --
9    they're following up on that meeting and
10   telling you what's -- what the problems
11   are with your promotional materials,
12   right?
13        MR. DIAMANTATOS:  Objection
14   to form.  Speculation.
15        THE WITNESS:  No.
16        MR. DIAMANTATOS:
17   Argumentative.
18        THE WITNESS:  That's not
19   what's happening.
20        So this started -- this is
21   just a normal review process.
22   It's nothing to do, necessarily,
23   with that meeting.
24        We had this review process

Page 401

1    going on for the whole -- for the
2    whole lifecycle of Actiq.  And we
3    will get these kind of comments --
4    even though the timing may be
5    such, but these were -- this is a
6    common -- this is how they write
7    these letters.  It's just giving
8    you the perspective of how they
9    want these draft pieces to be
10   revised.
11        So this is -- we have
12   maybe -- probably 100 of these, or
13   something.  So every time we went
14   to put a promotion piece out, we'd
15   have to get it pre-cleared.
16   BY MR. CRAWFORD:
17   Q.   Okay.  So this Exhibit-23,
18   they talk about this unsubstantiated
19   comparative claims, lack of important
20   contextual information, misleading
21   presentation of information,
22   overstatement of efficacy.
23        Are these common comments
24   made in the past about -- prior to this

101 (Pages 398 to 401)

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1    letter, about Actiq promotional materials
2    or draft ones that were provided to them?
3         MR. DIAMANTATOS:  Objection
4    to form.
5         THE WITNESS:  This is how
6    they -- this is how they kind of
7    talk when they reviewed the
8    documents.  So it's -- it's, you
9    know, this is how they tell you to
10   change things.
11        And they always have to --
12   they always have to support it in
13   context of the regulations.  And
14   so they'll say, you know, it's
15   overstatement or whatever.  So
16   they're trying to have you change
17   something.
18        But this is what
19   pre-clearance is all about.  And
20   Fentora was breakthrough -- our
21   subsequent approved product that
22   the FDA didn't have any problem,
23   we had the same types of pieces.
24        This is just -- this is a

Page 403

1    reflection of the review process
2    of promotional pieces, in general,
3    for pre-clearance.
4         And it's only under Subpart
5    H do you get this.  When you're
6    not under Subpart H, you kind
7    of -- you just get it out there,
8    and then when's you get an NOV or
9    warning letter.
10        But this is the normal kind
11   of comments that you get back.
12   And I've had other Subpart H
13   products, and they sound just like
14   this.
15   BY MR. CRAWFORD:
16        Q.   For non-Subpart H products,
17   my understanding, in the pharmaceutical
18   regulatory world, that you have to submit
19   your promotional pieces to the FDA,
20   there's just a 30-day period for the FDA
21   to comment or reject it, right?
22        A.   So it's actually -- no,
23   that's not the case.
24        So for non-Subpart H, it's a

Page 404

1    filing process.  And they don't even look
2    at it unless something invokes them to
3    have a problem.
4         So I think in a reference
5    to, you know, the meeting minutes you had
6    from Abrams, tongue-in-cheek, other
7    companies will complain about -- this is
8    very common now -- there's actually whole
9    groups within drug companies that look at
10   competitor's promotion and send complaint
11   documents about what they're doing.
12        So, like, the reference that
13   you read to me from Abrams, he says,
14   well, we get complaints.  Well, it could
15   also be that.  I mean, there's -- the big
16   pharma all have these -- you know,
17   they're kind of review people for other
18   people's promotion.
19        So that's -- that's regular
20   pieces.
21        Under Subpart H, you
22   cannot -- as I said before, they
23   approximate -- they tell you to
24   approximate, like, 30 to 45 days.  And

Page 405

1    it's not under a PDUFA time frame, so
2    you're kind of at the mercy of them of
3    when you can get your responses back.
4         So for every single piece
5    that has ever been produced, for both
6    Fentora and Actiq, we have documents that
7    look just like this.  And that was my --
8    you know, not to belabor, but that was my
9    frustration with the agency and why I
10   asked for that meeting.
11        Because -- so you'll get
12   this and they all say, just the way you
13   pointed out that, okay, future ones have
14   to do this.  So we go ahead and pull back
15   and change everything because of this.
16        And then we'll get the next
17   one that will say not to do that, with
18   future pieces to do that.  And that's
19   what my concern with the agency was that,
20   and that's why I said, can we
21   prospectively have a quarterly meeting?
22   So we don't have to keep doing this.  And
23   they said no, we can't do that.
24        So I wanted to be more

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1  proactive with the agency and make sure
2  that, you know, I thought, suppose we
3  just had a dialogue as opposed to writing
4  back and forth, we'd have a lot more
5  productive pieces and more in line with
6  their thinking. But they did not have
7  the manpower for that.
8      Q.   Well, they're trying to
9  communicate in these letters to you what
10  they feel is inappropriate about the
11  piece, right?
12      MR. DIAMANTATOS:  Objection
13  to form. Calls or for
14  speculation.
15      THE WITNESS:  Yes, this is a
16  recommendation to change.  Yes.
17  BY MR. CRAWFORD:
18      Q.   And then so, for instance,
19  on Exhibit-24, this is the November 24th,
20  2004 letter, they are saying one of your
21  Actiq montage journal ads are -- have
22  misleading presentation of information.
23  They have overstatement of efficacy.
24  Minimization of risk. With regard to the

Page 407

1  Actiq detail aid, it omits important risk
2  information. Overstates efficacy.
3      So they're giving you
4  guidance here, in these letters, about
5  what they feel is appropriate, or,
6  actually, what is inappropriate for these
7  ads, right?
8      A.   That's --
9      MR. DIAMANTATOS:  Objection
10  to form.
11  Go ahead.
12      THE WITNESS:  Yes, that's
13  what pre-clearance is all about.
14  BY MR. CRAWFORD:
15      Q.   And so, then again, in
16  Exhibit-25, they're talking about
17  overstatement of efficacy again in your
18  promotional pieces, misleading claims.
19      So they are giving you
20  feedback, aren't they, in these letters?
21      A.   They are.
22      And I'm just saying, this
23  terminology, when you see, overstatement
24  of efficacy, that's -- I want to say

Page 408

1  that's FDA-ese, that's how they talk.  I
2  mean, every piece says that.
3      And I've had promotion
4  pieces pre-cleared, you know, for other
5  things.  And that's kind of the dialogue.
6      Q.   Don't you think Actiq had a
7  problem with overpromotion and promoting
8  off label? Wasn't that a big problem?
9      MR. DIAMANTATOS:  Objection
10  to form.
11  BY MR. CRAWFORD:
12      Q.   At least in DDMAC's view?
13      MR. DIAMANTATOS:  Objection
14  to form. Calls for speculation.
15      THE WITNESS:  So after they
16  gave us guidance, we would revise
17  the piece accordingly, according
18  to what they said.  And we never
19  got an NOV or warning letter
20  after.
21      So we would take this
22  information, we revise the piece,
23  we produce the piece.  We may have
24  gotten an NOV because of the --

Page 409

1  maybe, one -- there were like --
2  it went to, like, 15 companies
3  because it was an electronic
4  issue.  And that was -- that was
5  more of an electronic issue.
6      So when you did Actiq, it
7  cut off the adverse events.  And
8  there were -- and we got, the
9  bucket of 15 other companies, all
10  having the same issue.  And it was
11  electronic information.
12      But other than that, we
13  never had a single NOV on this.
14  BY MR. CRAWFORD:
15      Q.   All right.  I'm going to
16  mark the next exhibit.
17      MR. JENSEN:  26.
18      - - -
19      (Whereupon, Teva-Marchione
20  Exhibit-26,
21  TEVA_MDL_A_01583458-460, was
22  marked for identification.)
23      - - -
24  BY MR. CRAWFORD:

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1     Q.   We marked here a June 25th,
2  2005 letter from Mr. Rappaport, of the
3  FDA, to your attention. It's
4  TEVA_MDL_A_01583458.
5           The document stated it's
6  concerning your new drug application,
7  dated November 22nd, 2004 -- or
8  supplemental new drug application. The
9  supplemental new drug application
10  proposes changes to the risk management
11  program, it states.
12          So this -- apparently, you
13  had submitted, for the company, proposed
14  changes to the Actiq risk management
15  plan. And this, their statement here,
16  they say, We have completed our review
17  and find the information presented is
18  inadequate and the supplemental
19  application is not approvable.
20          Do you recall receiving this
21  letter?
22     A.   I actually thought we had
23  one response back, out of all our
24  correspondence. So it kind of was in the

Page 411

1  back of my head that we got one letter.
2     Q.   So they rejected the
3  proposed changes you had made to the
4  RiskMAP and submitted to them as a
5  supplemental application, as you're
6  required to do under the RiskMAP, right?
7     A.   Correct.
8     Q.   And so they say, underneath,
9  According to -- they say that,
10  Deficiencies are summarized as follows.
11  Number 1, according to patient surveys,
12  only 25 of patients are now receiving
13  welcome kits. The method of distribution
14  of the kits has changed from the original
15  launch method of receiving them directly
16  from the prescriber to either receiving
17  them from the prescriber or via a
18  toll-free number. At the same time,
19  accidental exposures in children are
20  increasing.
21          It is instructing you to,
22  Evaluate whether the current method of
23  distribution of the welcome kit provides
24  an effective means for patients to obtain

Page 412

1  the kit. And if not, propose a strategy
2  for improvement.
3           So that was one reason they
4  rejected it, right, or found it not
5  approvable?
6           MR. DIAMANTATOS: Objection
7  to form. Calls for speculation.
8  BY MR. CRAWFORD:
9     Q.   Is that right?
10     A.   As you read it.
11     Q.   Okay. And then it says, 2,
12  The off-label use of Actiq and the number
13  of accidental pediatric exposures to
14  Actiq have been increasing, yet you
15  propose an expansion of the target
16  prescribers. Explain and justify the
17  proposed change, in wording, regarding
18  prescribers from oncologists and pain
19  specialists to physicians with special
20  training.
21           That was another thing they
22  wanted you to go back to explain, right?
23     A.   That's what it says here.
24     Q.   And then, 3, You propose a

Page 413

1  decrease in the surveillance of off-label
2  use of Actiq, in the face of increasing
3  off-label use by prescribers. Justify
4  the proposal for decreased monitoring of
5  off-label use of Actiq and outline
6  effective intervention to discourage it.
7           So they have rejected here,
8  at least for these reasons stated, in
9  your view, the proposed Actiq changes to
10  the RiskMAP, right?
11     A.   That's what it says here.
12     Q.   And do you know if, at any
13  time prior to -- do you know if, at any
14  time, whether the FDA approved any
15  changes to the RiskMAP, after this date?
16           MR. DIAMANTATOS: Objection
17  to form.
18           Go ahead.
19           THE WITNESS: I don't
20  remember.
21  BY MR. CRAWFORD:
22     Q.   You don't remember if they
23  did?
24     A.   Normally, the next step is

104 (Pages 410 to 413)

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1 that we would then send a response. I
2 don't remember what happened.
3          And it was near the -- it
4 was near the launch of Fentora, so I
5 don't know the timing.
6     Q.   Okay.  Fentora, I think we
7 established, was 2006, right?
8     A.   Yes.
9     Q.   All right.
10          MR. CRAWFORD:  Let's mark
11 the next exhibit.  This will be
12 99.  And let's mark 533, and we'll
13 just give them both.
14               - - -
15          (Whereupon, Teva-Marchione
16 Exhibit-27, U.S. Department of
17 Justice - Pharmaceutical Company
18 Cephalon to Pay $425 Million For
19 Off-Label Drug Marketing, was
20 marked for identification.)
21               - - -
22          (Whereupon, Teva-Marchione
23 Exhibit-28, Government's
24 Memorandum for Entry of Plea and

Page 415

1 Sentencing, was marked for
2 identification.)
3               - - -
4          MR. JENSEN:  27 and 28.
5 BY MR. CRAWFORD:
6     Q.   Okay.  We marked --
7          MR. CRAWFORD:  I'll wait for
8 the witness to get it here.
9 BY MR. CRAWFORD:
10     Q.   All right.  We marked here a
11 U.S. Department of Justice, Eastern
12 District of Pennsylvania, press release,
13 dated September 29th, 2008.
14          And then -- which is
15 Exhibit-27.  And it's entitled,
16 Pharmaceutical Company Cephalon to Pay
17 $425 Million for Off-Label Drug
18 Marketing.
19          It states here -- first of
20 all, let me ask you, do you have any
21 recollection, during this time period, of
22 Cephalon paying -- being held to pay $425
23 million for off-label drug marketing
24 during this time period?

Page 416

1     A.   I mean, I remember the CIA
2 and -- and there was a lawsuit.  I kept
3 thinking it was predominantly Provigil.
4     Q.   It says here, The United
5 States Attorney General Michael B.
6 Mukasey and Acting United States Attorney
7 Lori Magid today announced the filing of
8 a criminal information against, and a
9 civil settlement with, the pharmaceutical
10 company Cephalon, headquartered in West
11 Chester, PA, for the off-label marketing
12 of three of its drugs.  Magid, in today's
13 announcement, were joined by FDA Special
14 Agent-in-Charge Kim Rice -- and others
15 here that they list in the press release.
16          And it says, in the next
17 paragraph, The information alleges that
18 from approximately January 2001 through
19 at least 2006, Cephalon promoted the
20 drugs Actiq, Gabitril and Provigil for
21 uses other than what the federal Food and
22 Drug Administration approved.  The
23 company is charged with one count of
24 distribution of misbranded drugs,

Page 417

1 inadequate directions of use, a
2 misdemeanor offense.
3          Do you, looking at that,
4 recall now that this applied to Actiq?
5     A.   Well, it says it here, so.
6     Q.   At the time, you did not
7 know it was, up until today?
8     A.   You know, I really don't
9 remember.  I really don't remember.
10     Q.   So was there any discussion
11 in the company about paying this fine and
12 trying to --
13     A.   So we were --
14     Q.   -- do something about this?
15          MR. DIAMANTATOS:  Objection
16 to form.  And objection to
17 privilege, to the extent it
18 includes conversations with
19 in-house counsel about this
20 particular lawsuit.
21          I just want to clarify that
22 your question isn't calling for
23 those types of communications.
24 BY MR. CRAWFORD:

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1      Q.   Do you recall discussing
2  this within the company, this criminal
3  plea and fine?
4      A.   I never saw this particular
5  document.  I understand, you know, the
6  CIA, we signed a review of that and, you
7  know, whatever -- I could not remember if
8  Actiq was in there.
9      Reviewing this now, it talks
10 about -- and I've reviewed every single
11 promotion piece, and I know for a fact
12 that none of our pieces ever said
13 anything about migraines, sickle cell, et
14 cetera.
15      So I can only assume that
16 the sales rep probably verbally was doing
17 this.  All I can answer is for what
18 promotion pieces we had.
19      So this has got to be -- you
20 know, it's probably some aberrant sales
21 reps, is the only thing I can assume.
22 But I know the pieces that I pre-cleared
23 with the FDA, and I approved, did not
24 reflect any of these indications or

Page 419

1  non -- or patients who were not yet
2  opioid tolerant.
3      So it probably, I'm
4  deducing, it related to, you know, maybe
5  sales activities, that way.
6      Q.   What about some of the
7  concerns raised by DDMAC?
8      I mean, you weren't aware of
9  how they targeted physicians, were you?
10     MR. DIAMANTATOS:  Objection
11 to form.  Foundation.  Assumes
12 facts.
13     THE WITNESS:  I didn't know
14 the details of how they chose
15 which categories were targeted, if
16 that answers your question.
17 BY MR. CRAWFORD:
18     Q.   So, I mean, you're
19 speculating that it was just some
20 aberrant sales reps that caused this fine
21 to be imposed and guilty plea, right?
22     MR. DIAMANTATOS:  Objection.
23 Form.  Mischaracterizes the
24 testimony.

Page 420

1  BY MR. CRAWFORD:
2      Q.   Or do you know it was just
3  aberrant sales?
4      MR. DIAMANTATOS:  Let me
5  finish my objection, counsel,
6  please.
7      Objection.  Form.
8  Mischaracterizes the witness's
9  testimony.
10     THE WITNESS:  So I'm saying,
11 all the written documents that
12 they gave in a promotion that were
13 supported by the company were all
14 pre-cleared with FDA, submitted to
15 the FDA, reviewed by the promotion
16 review committee, and none of
17 those pieces discussed these
18 off-label uses, nor anything about
19 patients who were opioid
20 nontolerant.
21     So the pieces -- all I can
22 address is, I trained the sales
23 force.  I told them what they had
24 to do.  I got the pieces cleared.

Page 421

1  What they did with that, you know,
2  I didn't control that.
3      So I don't -- I don't
4  know -- you know, it's kind of
5  like going back to the details of
6  what these reasons were.  I don't
7  know the specifics.  All I can
8  talk to are the pieces, the
9  promotion pieces, that we had
10 pre-cleared and sent to the FDA.
11 And none of them, none of them
12 talked about off-label use or
13 nontolerant/opioid tolerant.
14 BY MR. CRAWFORD:
15     Q.   But there are other aspects
16 of sales and marketing.  There's
17 targeting of doctors.  There's, you know,
18 how they're trained.
19     And that wasn't your job to
20 train the sales reps, was it?
21     A.   Yes, I trained the sales
22 reps on the RiskMAP program.  Yes.
23     So I can't -- that's the
24 only thing that I can tell you that I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1  responsible for.  What happened outside
2  of that, you know, what was -- what they
3  were told to do outside of my area, I
4  can't answer to.
5      Q.   Right.  Well, just -- we've
6  marked Exhibit-28, which is the
7  Government's Memorandum For Entry of Plea
8  and Sentencing.
9          If you can just turn to Page
10 3, it does list the reasons here, or the
11 off-label practices, and its training of
12 its sales staff that the government
13 believed ignored legal restrictions on
14 promoting these drugs.
15         Do you see that on Page 3?
16     A.   I do.
17     Q.   Okay.  And the first one is,
18 Cephalon had its sales representatives
19 call on doctors who would not normally
20 prescribe the defendant's drugs in the
21 course of the doctor's practice.
22         That doesn't have anything
23 to do with the promotional pieces, does
24 it?

Page 423

1          MR. DIAMANTATOS:  Objection
2  to form.  Foundation.  Calls for
3  speculation.
4          THE WITNESS:  No.  I think
5  it goes back to the targeting
6  issue, and that was not under my
7  purview.
8  BY MR. CRAWFORD:
9      Q.   And then they say, Cephalon
10 trained its sales representatives on
11 techniques to prompt the doctors into
12 off-label conversations.
13         That was another claim by
14 the government, right?
15     A.   That's what it says here.
16         But all I did was train them
17 on the RiskMAP and the concerns of the
18 FDA.  So that's the only thing I can
19 really speak to.
20     Q.   So do you think that sales
21 reps received other training, maybe, that
22 you didn't attend?
23         MR. DIAMANTATOS:  Objection
24 to form.

Page 424

1          Go ahead.
2          THE WITNESS:  Yes.  I was
3  only -- I was only training for,
4  like, an hour or an hour
5  and-a-half.  I don't know how
6  long -- so they probably had a
7  couple of days.  So I don't know
8  where that came from.
9  BY MR. CRAWFORD:
10     Q.   It says, Cephalon's
11 compensation and bonus structure
12 encouraged off-label marketing.
13         That's not anything to do
14 with regulatory or you, right?
15     A.   Nothing.
16     Q.   And then, et cetera, et
17 cetera.  I won't keep going into that.
18     A.   Right.
19     Q.   So -- all right.
20         MR. CRAWFORD:  We'll mark
21 the next exhibit.
22         MR. JENSEN:  29.
23         - - -
24         (Whereupon, Teva-Marchione

Page 425

1  Exhibit-29, TEVA_CHI_00028341-691,
2  was marked for identification.)
3          - - -
4          MR. CRAWFORD:  We're going
5  to mark four exhibits here just so
6  we can kind of knock them out all
7  at once.
8          - - -
9          (Whereupon, Teva-Marchione
10 Exhibit-30,
11 TEVA_MDL_A_08399245-251, was
12 marked for identification.)
13         - - -
14         (Whereupon, Teva-Marchione
15 Exhibit-31,
16 TEVA_MDL_A_08399245-251, was
17 marked for identification.)
18         - - -
19         (Whereupon, Teva-Marchione
20 Exhibit-32,
21 TEVA_MDL_A_02074924-969, was
22 marked for identification.)
23         - - -
24 BY MR. CRAWFORD:

107 (Pages 422 to 425)

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1      Q.   So at some point in -- if
2    you take a look at what we marked here as
3    Exhibits-29, 30, 31 and 32, 29 is a
4    September 19th, 2006 letter from you to
5    Dr. Rappaport, of the FDA, referencing
6    the new drug application --
7      A.   If I can correct you, it
8    wasn't a letter from me.  It was from
9    Penny Levin.
10     Q.   Very good.  So she worked in
11   your department, right?
12     A.   Right.  And that's what I
13   was trying to remember.  I was looking
14   for my org chart, because I think that
15   may have been the time I went to
16   oncology.  I can't remember.  I mean,
17   there was an overlap.
18     Q.   Let's take a look at
19   Exhibit-1.  I want to get clear, because
20   I think you were here in '07 to 2011, you
21   went to oncology in '11.
22          So if you can check
23   Exhibit-1 --
24     A.   Yeah, maybe.  I just want to

Page 427

1    double check.
2      Q.   And make sure that you were
3    here as senior director -- or as senior
4    director and group leader, regulatory
5    affairs --
6      A.   Okay.
7      Q.   -- from 2007 to 2011.
8          Is that right?  Do you agree
9    with that?
10     A.   Yes.  I think right around
11   the time I got the approval for Fentora,
12   we kind of switched.  There was --
13     Q.   Take a look at your --
14     A.   I do understand the title.
15          But that doesn't necessarily
16   mean that I wasn't not working on pain at
17   the time.  So it's a little -- I don't
18   know exactly.
19          So all I'm saying is, when I
20   was group leader, I may not have been --
21   they may have switched over yet.  That's
22   what I was trying to figure out.
23          I can still talk to this.
24     Q.   When Fentora was approved,

Page 428

1    you were overseeing that effort, right?
2      A.   It pretty much went over to
3    Penny from that point on.
4      Q.   Let's go, actually, to your
5    first bullet point in the resume.
6          Actually -- yeah, your first
7    bullet point under, Accomplishments.
8      A.   Right.
9      Q.   And you say, Successfully
10   negotiated multiple product approvals.
11          And Fentora is on that list,
12   right?
13     A.   That's correct.  This is
14   a -- I mean, this is a supplement.
15          So I'm saying, after we got
16   promoted, there was a transition.
17     Q.   Right.  But this is not a
18   supplement.
19          This is an NDA for Fentora,
20   right?  It says, New drug application.
21     A.   This supplement contains --
22   with regard to the Fentora RiskMAP.
23     Q.   And this is one of your
24   accomplishments, was to get this

Page 429

1    approved, right?
2      A.   An amendment -- so it's an
3    amendment to the NDA.  Okay.  I was just
4    trying to ascertain.
5          So this was -- the amendment
6    wasn't yet approved.  So, yes, I was
7    working on this at the time.
8      Q.   So this is -- this is
9    getting the approval of Fentora here in
10   September of '06, you're working towards,
11   right?
12     A.   That is correct.
13     Q.   And that was one of your
14   accomplishments you outlined in your
15   resume, right?
16     A.   That's correct.
17     Q.   So you were, in fact, as
18   head of that regulatory department,
19   overseeing this approval process, right?
20     A.   Yes, I was.
21     Q.   So -- and then we have here,
22   they reference -- you state here in this
23   letter, it's TEVA_CHI 00028341,
24   Exhibit-29, you say, in your September

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    19th letter -- or, actually, Ms. Levin
2    does, 2006 letter, Reference is also
3    made -- this is the last part of
4    Paragraph 1.
5           Reference is also made to
6    telephone conference request from Ms. Kim
7    Compton, FDA project manager, on
8    September 18th, 2006, who requested that
9    a final submission of the revised Fentora
10   RiskMAP, along with attachments, be
11   submitted as an amendment to the NDA to
12   reflect all changes agreed upon during
13   the above-referenced FDA communications.
14          So this attachment here,
15   this attaches the FDA -- or the RiskMAP,
16   right?
17      A.   It appears that way, yes.
18      Q.   And the RiskMAP starts at
19   Page, if I'm correct, 28345, right?
20      A.   Yes.
21      Q.   And it also references, in
22   the September 19th letter, Reference --
23   this is the second sentence, Reference is
24   also made to the discipline review

Page 431

1    letters, August 29th and September 7th.
2           So I have attached those
3    discipline review letters as Exhibits-30
4    and 31.
5           Do you see those?
6      A.   30 and 31.  Yes, I do.
7      Q.   And those, in fact, are
8    addressed to you, right?
9      A.   They are.
10     Q.   They're from the FDA.
11          And can you explain what
12   these discipline review letters are?
13     A.   I'd have to -- you know, I
14   just got them.
15          But just in general,
16   discipline review letter is FDA feedback
17   for a -- you have to read it.
18          So it's the RiskMAPs
19   associated with -- complete response --
20   oh, so this is associated with -- so a
21   review -- a review letter is just
22   comments back, it could be on any part of
23   your NDA.
24          So this is obviously on our

Page 432

1    labeling.  And the other part, RiskMAP.
2    And the RiskMAP, at that time, was
3    considered labeling.
4      Q.   So they're making -- they're
5    telling you what you needed to change in
6    the Fentora RiskMAP, right --
7           MR. DIAMANTATOS:  Objection.
8    BY MR. CRAWFORD:
9      Q.   -- before it could be
10   approved --
11          MR. DIAMANTATOS:  Objection.
12   BY MR. CRAWFORD:
13     Q.   -- in these letters?
14          MR. DIAMANTATOS:  Objection
15   to form.  Vague.
16          And are you referring to all
17   three exhibits?  If you can just
18   be clear so she can --
19          MR. CRAWFORD:  30 and 31.
20   Very good.  Thank you, counsel.
21          THE WITNESS:  So 31 is here.
22   So everything was considered
23   draft, when you submit it under
24   the NDA.

Page 433

1           So these are comments to
2    change -- the comments to the
3    RiskMAP that they want changed
4    prior to they approved the FDA --
5    I mean, approve the NDA.
6           And, likewise, the changes
7    to the package insert for Number
8    31.
9    BY MR. CRAWFORD:
10     Q.   All right.  And so in
11   Exhibit-29, Ms. Levin is referencing
12   these discipline review letters and
13   indicating that the Fentora RiskMAP has
14   changed, final submission to reflect the
15   changes agreed upon, right?
16     A.   Formal response -- so this
17   constitutes Cephalon's response to the
18   agency's requests.  That's what it says
19   here.
20     Q.   So 32, then, was the
21   approval letter for the Fentora NDA,
22   right?
23          And that's addressed to you?
24     A.   It was.  Yep.  Yes, it is.

109 (Pages 430 to 433)

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1      Q.   So if you look at the fourth
2  paragraph down, it says, This new drug
3  application -- actually, before that.
4        Let's go through this.  So
5  the fourth paragraph down, it says, This
6  new drug application provides for the use
7  of Fentora for the management of
8  breakthrough pain in patients with cancer
9  who are already receiving and who are
10 tolerant to opioid therapy for their
11 underlying persistent cancer pain.
12       So that's the same
13 indication as Actiq, correct?
14     A.   That's correct.
15     Q.   So only -- Fentora, like
16 Actiq, could only be -- was only
17 indicated for use in cancer patients,
18 right?
19        MR. DIAMANTATOS:  Objection
20 to form.
21        Go ahead.
22        THE WITNESS:  That's
23 correct.
24 BY MR. CRAWFORD:

Page 435

1      Q.   So the last paragraph, Your
2  Fentora RiskMAP, it says, is an important
3  part of the postmarketing risk management
4  for fentanyl buccal tablet.  The primary
5  goals of your RiskMAP are to minimize the
6  use of Fentora by opioid nontolerant
7  individuals, minimize misuse of Fentora
8  and minimize the unintended accidental
9  exposure to Fentora.
10       So you understood the
11 RiskMAP to be an important part of the
12 postmarketing risk management, in the
13 FDA's views, right?
14        MR. DIAMANTATOS:  Objection
15 to form.  Speculation.
16        Go ahead.
17        THE WITNESS:  Obviously,
18        from the text it is an important
19        part.
20 BY MR. CRAWFORD:
21     Q.   Then it says, Your RiskMAP
22 must include the following components.
23 Implementation of a program and
24 distribution of materials to educate

Page 436

1  prescribers, pharmacies, nurses and
2  patients about the risks and benefits of
3  Fentora.
4        Right?
5      A.   That's what it says, yes.
6      Q.   And then 3 -- skipping to
7  3 -- or 2, Implementation of a reporting
8  and data collection system for safety
9  surveillance.
10       And, 3, implementation of a
11 plan to monitor, evaluate, and determine
12 the incidence of use of Fentora by opioid
13 nontolerant individuals, misuse of
14 Fentora and unintended, accidental,
15 exposure to Fentora.
16       So that was, according to
17 the letter, what the FDA viewed as the
18 primary goals of the RiskMAP, right?
19        MR. DIAMANTATOS:  Objection
20 to form.
21        THE WITNESS:  The components
22        of the RiskMAP, yes.
23 BY MR. CRAWFORD:
24     Q.   So it's saying here that the

Page 437

1  Fentora RiskMAP, submitted on August
2  31st, 2005, and finalized in your
3  submission dated September 19th, 2006,
4  and as described in the attached
5  document, adequately addresses each of
6  these requirements.
7        So they are referring to
8  Exhibit-29 here, right, the RiskMAP
9  attached to that?  Is that your
10 understanding of the letter?
11        MR. DIAMANTATOS:  Objection
12 to form.  Calls for speculation.
13 BY MR. CRAWFORD:
14     Q.   I'm trying to establish that
15 that's the RiskMAP they approved, right?
16     A.   I'm still -- submitted
17 August 31 -- I'm just trying to find
18 that.
19     Q.   It says, Finalized in your
20 submission dated September 19th, 2006 and
21 as described in the attached document.
22     A.   So it's 8/29, is that the
23 date?
24     Q.   It's September 19th, 2006.

110  (Pages 434 to 437)

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1      A.    September 19th. I'm just
2  trying to find that submission.
3      Q.    That would be Exhibit-29.
4      A.    29?
5      Q.    Yes.
6      A.    Got you.
7      Q.    And it's Page 28345.
8      A.    Okay.
9      Q.    What I'm trying to do is
10 establish that the one you sent to them,
11 or Ms. Levin sent to them on September
12 19th, 2006, is the one that they're
13 referencing here in the approval letter
14 that that's approved?
15     A.    I understand.  Thank you.
16     Q.    Is that how you understood
17 the letter?
18     A.    Yes, that's how I understand
19 it.
20     Q.    So you understand the final
21 RiskMAP that was approved is actually the
22 one that is actually attached to
23 Exhibit-29?
24     A.    That's my -- yes.

Page 439

1      Q.    All right.  It states, This
2  plan includes ongoing assessment and
3  periodic reporting to FDA of the
4  operation of the program and needed
5  revisions, if any.  Any change to the
6  program must be discussed with FDA prior
7  to its institution and is subject to the
8  FDA's determination that the required
9  components are still present.  We expect
10 your continued cooperation to resolve any
11 problems regarding the Fentora RiskMAP
12 that may be identified following approval
13 of this application.
14        So it was your understanding
15 that, in approving this, that there was
16 an ongoing assessment and periodic
17 reporting to the FDA on the operation of
18 the RiskMAP program, similar to what you
19 were reporting for Actiq, right?
20        MR. DIAMANTATOS:  Objection
21        to form.
22        THE WITNESS:  That's my
23        understanding, yes.
24 BY MR. CRAWFORD:

Page 440

1      Q.    And was somebody at
2  regulatory in charge, again, of ensuring
3  that reports were made to the FDA about
4  the RiskMAP?
5      A.    Yes.  And in this case, it
6  was Penny.
7      Q.    Okay.  So Penny took over
8  that function from you for this, or did
9  you take any responsibility for it?
10     A.    I think anything only
11 elevated to me if there was a significant
12 issue or concern.
13     Q.    But do you remember her
14 elevating anything to you about the
15 RiskMAP reporting for Fentora?
16     A.    I don't actually remember.
17     Q.    But she was, really, the
18 primary responsible person for that?
19     A.    Yes, she was.
20     Q.    And then the approval letter
21 does attach the label, at Page 928.
22 You'll see a big black box there.
23        Is that a black box warning?
24     A.    Yes, it is.

Page 441

1      Q.    And can you explain to me
2  what a black box warning is, in
3  regulatory parlance?
4      A.    So it shows concerns of the
5  product that can affect safety and
6  explains the FDA has revised, not just
7  the concerns, but how you can address
8  those concerns.  So if you see a certain
9  adverse event, how you can actually
10 diminish it or treat that adverse event.
11        And that's what the box is.
12     Q.    And they call it black box
13 because it's in a black box, right?
14     A.    That's correct.
15     Q.    And it's the most serious
16 type of warning you can give in a package
17 insert or label, is a black box warning,
18 right?
19     A.    That's correct, yes.
20     Q.    So it's -- a black box
21 warning is always put right in the front
22 on the first page, right?
23     A.    Yes, that's correct.
24     Q.    And here we have a black box

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1   warning for Fentora about it containing
2   fentanyl, an opioid agonist and a
3   Schedule II controlled substance with an
4   abuse liability similar to other opioid
5   analgesics.
6           So there are black box
7   warnings here, would you agree, that
8   pertains to abuse of the drug, correct?
9       A.   Yes.
10      Q.   And the black box warning,
11  the second paragraph, also contains a
12  bolded warning about the indicated use
13  for management of breakthrough pain in
14  patients with cancer, right, who are
15  already receiving -- who are tolerant to
16  opioid therapy for their underlying
17  persistent cancer pain; that's in the
18  black box, too, right?
19      A.   Yes, it is.
20      Q.   Let's go to the next doc.
21          Actually, go to Page --
22  Exhibit-29.  I had a couple of questions
23  about the RiskMAP.
24          So this RiskMAP contains

Page 443

1   similar elements -- do you recall at all
2   reviewing the RiskMAP for Fentora?
3       A.   We did.  It started out
4   similar, based upon what we had for
5   Actiq.  It was right around the time the
6   FDA actually was going to be issuing
7   RiskMAP guidance.  So they were trying to
8   have consistency with other products.
9           And there were a lot of new
10  elements that they took from the device
11  group.  A lot of it is, like,
12  prospective -- so it's prospective
13  analysis.  And so it started to morph
14  into a very different type of document
15  than the Actiq one.
16      Q.   All right.  But it did
17  contain a lot of elements similar to the
18  Actiq one, right?
19          MR. DIAMANTATOS:  Objection
20  to form.
21          THE WITNESS:  I think the
22      most significant difference was,
23      because of the FDA's -- one of the
24      most critical concerns about Actiq

Page 444

1           was its appearance of a lollipop,
2       which would be enticing to
3       children, whereas Fentora was a
4       buccal tablet, so it didn't
5       have -- you know, it looked like a
6       pill or lozenge.  So they weren't
7       as concerned of the pediatric -- I
8       shouldn't say weren't as
9       concerned, but it wasn't the
10      emphasis as much as it was for
11      Actiq.
12  BY MR. CRAWFORD:
13      Q.   But certainly misuse and
14  abuse were a concern?
15      A.   Yes, they were.
16      Q.   So, in fact, if you look at
17  Page 28347, which is about the sixth page
18  in here, that's the first page under,
19  Background.
20      A.   Yes.
21      Q.   Do you see that, under the
22  middle there, it says, As Fentora
23  contains a potent opiate, fentanyl, the
24  SECURE program is focused on minimizing

Page 445

1   the three risks associated with, one, use
2   of Fentora by opioid nontolerant
3   individuals, misuse, abuse and diversion
4   of Fentora and unintended exposure to
5   Fentora.
6           That's similar concerns or
7   rationales that were behind the Actiq
8   RiskMAP, right?
9       A.   Well, the pediatric issue
10  was removed.
11      Q.   Good point, yes.
12          So if you go to the next
13  page, it's Page 4 of the RiskMAP, up at
14  the top, it says 4.
15          But if you go to the bottom,
16  it says, In designing this RiskMAP,
17  Cephalon has focused on ensuring the
18  integrity of its supply chain for
19  Fentora; 2, tools that can be used to
20  educate broadly; and, 3, mechanisms by
21  which cases of diversion or abuse can be
22  detected promptly.  In this regard,
23  Cephalon will monitor geographical
24  evidence of abuse through the use of the

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1   RADARS system, see below, to assure that
2   rapid interventions can be applied to
3   areas where there may be a signal of
4   increasing abuse potential.
5        So the hope was here that
6   the RiskMAP would allow Cephalon to
7   identify -- that they would educate,
8   using these tools, educate broadly, but
9   also to identify problems and focus in on
10  solving them, right?
11       MR. DIAMANTATOS:  Objection
12  to form.  Foundation.  Calls for
13  speculation.
14  BY MR. CRAWFORD:
15       Q.   Is that a good summary of
16  what the FDA wanted?
17       MR. DIAMANTATOS:  Objection
18  to form.  Foundation.  Calls for
19  speculation.
20       THE WITNESS:  One of the
21  biggest issues in reference to the
22  SECURE program was to try to have
23  a closed-loop system where, if
24  something was going to be diverted

Page 447

1        from any point from the
2        manufacturer to the patient, that
3        there was a more controlled
4        tracking of that.
5   BY MR. CRAWFORD:
6        Q.   And if you turn to Page 9,
7   it lists the RiskMAP goals and
8   objectives.
9        And under 2.1, one of the
10  goals was abuse, misuse and diversion of
11  Fentora should not occur; is that right?
12       A.   That's correct.
13       Q.   And then Goal 2 is
14  elaborated upon in 2.2.2.  In Roman
15  Numeral III, it says, Reduce the
16  potential abuse, misuse and diversion of
17  Fentora by, A, providing education to
18  healthcare personnel and to pertinent
19  nationwide demographic communities; B,
20  performing ongoing surveillance of and
21  reaction to geographical outbreaks of
22  abuse, misuse and diversion; and, C,
23  cooperating with and providing assistance
24  to law enforcement in investigations of

Page 448

1   incidents of abuse or diversion.
2        You understand this was one
3   of the responsibilities of the company
4   here in preventing abuse and misuse that
5   the RiskMAP imposed, right?
6        MR. DIAMANTATOS:  Objection
7   to form.
8        THE WITNESS:  That's my
9   understanding.
10  BY MR. CRAWFORD:
11       Q.   And then on Page 11, there
12  is, 3, The overall strategy for
13  prescribing, dispensing, using Fentora.
14  And 3.1 is, Physician education.
15       So they're saying here,
16  basically -- I don't want -- I am not
17  going to read it all, but they're
18  basically outlining steps that the
19  company was to take with regard to
20  education of physicians about the drug,
21  right?
22       MR. DIAMANTATOS:  Objection
23  to form.
24       THE WITNESS:  Right.

Page 449

1   BY MR. CRAWFORD:
2        Q.   And then going to Page 15,
3   down at the bottom, 3.6.1, Strategy and
4   tools associated with Goal 1, Fentora
5   should be used only by opioid-tolerant
6   patients with cancer.
7        It does state, A variety of
8   tools will be used to communicate and
9   reinforce the message that Fentora should
10  only -- should be used only by
11  opioid-tolerant patients with cancer.
12       So that was -- the RiskMAP
13  contains, then, a list of tools that were
14  available to Cephalon to make sure that
15  only cancer patients use the drug, right?
16       A.   That's my understanding.
17       Q.   Okay.  And then at Page 16,
18  the first full paragraph there, it says,
19  From the outset, healthcare professionals
20  will be alerted to the risks of this new
21  product through product labeling and
22  promotion.  They will be educated about
23  the product's approved indication, as
24  well as about the definition of opioid

113 (Pages 446 to 449)

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1  tolerant as described in the package
2  insert.
3          Tools directed -- moving
4  down, Tools directed towards prescribers
5  will include introductory letters, visits
6  and assessments by Cephalon field
7  representatives, Fentora website and
8  targeted education and outreach programs
9  directed to pain centers of excellence
10 and professional societies.
11         So these were tools that the
12 FDA expected Cephalon to use proactively
13 to educate doctors about the proper use
14 of the drug, right?
15         MR. DIAMANTATOS: Objection
16 to form. Foundation.
17 Speculation.
18         Go ahead and answer.
19         THE WITNESS: Just to be
20 clear, we proposed this to the
21 FDA. So we voluntarily are
22 saying, we're going to be doing
23 this, and the FDA agreed.
24         So it wasn't that the FDA

Page 451

1          said, you do this and we agreed.
2          We prompted this.
3  BY MR. CRAWFORD:
4          Q.   Very good point.
5          So you -- the company was
6  involved in drafting this up, and the FDA
7  provided comment back?
8          A.   Exactly.
9          Q.   And so this was the final
10 one approved.
11         But, you're right, the
12 company was the one that said, this is
13 what we'll do to make sure the drug is
14 safely and properly used?
15         A.   That's correct, yes.
16         Q.   Thank you.
17         So if you could go to Page
18 26, you have a table there. It's a Goal
19 2 summary table, Goal 2 being misuse,
20 abuse and diversion of Fentora.
21         These charts here outline
22 the various tools that Cephalon intended
23 to use to ensure that there was no
24 misuse, abuse, or diversion of Fentora,

Page 452

1  right?
2          A.   And that's correct. It's
3  written in terms of the loop, you know,
4  so the points of intervention. So every
5  place that anything touched hands, how
6  they would communicate the proper
7  information.
8          Q.   And so on Page 28, some of
9  these tools, looking down, the third one
10 down, Take a look at that, starting with,
11 Launch professional societies.
12         A.   Right.
13         Q.   So professional societies,
14 at launch, will be contacted to offer
15 educational opportunities to learn about
16 Fentora and key messages and risks
17 described in the RiskMAP, including the
18 risk of misuse, abuse and diversion.
19         That was one tool that was
20 being offered, right?
21         A.   More than offered. It's
22 more --
23         Q.   Implemented?
24         A.   Implemented, yes.

Page 453

1          Q.   And then going to 29, you
2  have several ongoing tools.
3          One -- the top one being,
4  Cephalon will implement medical education
5  directed to geographic hotspots to focus
6  on preventing and/or minimizing misuse,
7  abuse and diversion of prescription
8  drugs.
9          Below that, Launch an
10 ongoing -- two below, Cephalon will
11 support independent education on
12 prescription drug misuse, abuse and
13 diversion targeted to physicians likely
14 to prescribe Fentora.
15         So I didn't read them all,
16 but these were tools that the -- that
17 Cephalon had agreed to utilize to prevent
18 misuse and abuse, and the FDA agreed with
19 this plan and approved Fentora,
20 conditioned upon Cephalon executing this
21 plan, correct?
22         MR. DIAMANTATOS: Objection
23 to form.
24         THE WITNESS: That's my --

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1      yes, that's my understanding.
2   BY MR. CRAWFORD:
3      Q.   Go to Page 54.  I just want
4   to point out one more tool here.
5           The second one down, Number
6   6, Page 54, at the top.  Second one down,
7   Number 6.
8           So that one is a -- the tool
9   is, Direct risk communication by Cephalon
10  field representatives.
11          So one of them was, At
12  launch and ongoing, prescribers will be
13  informed, in person, of the key messages
14  and elements of the Fentora RiskMAP,
15  including the potentially
16  life-threatening risk of use by an opioid
17  nontolerant individual, the high
18  potential for Fentora abuse, as well as
19  the risk of misuse and diversion and the
20  potentially life-threatening risk of
21  accidental use of Fentora in children or
22  adults.
23          That was, again, a tool that
24  Cephalon intended to use with its sales

Page 455

1   force, right?
2      A.   Yes.
3      Q.   Okay.  Moving down to 10, on
4   the next page, again, Physician education
5   directed at pain centers of excellence.
6           What is a pain center of
7   excellence?  Do you know what that is?
8      A.   No, I don't.  Sorry.
9      Q.   Were these tools that the
10  marketing department were supposed to
11  make sure were implemented?
12          MR. DIAMANTATOS:  Objection.
13  BY MR. CRAWFORD:
14     Q.   Marketing and sales, rather?
15          MR. DIAMANTATOS:  Objection
16  to form.  Foundation.
17          THE WITNESS:  So they
18      were -- so, I'm sorry, can you
19      repeat that question?
20  BY MR. CRAWFORD:
21     Q.   Yeah.
22          I'm just wondering, these
23  were tools -- if they deal with the sales
24  force and physician education through the

Page 456

1   sales force, that would be a tool that
2   the marketing and sales department were
3   required to ensure were utilized, right?
4      A.   I'd have to check.  It could
5   be -- it could be medical affairs, too,
6   the MSLs.  So it could have been -- it
7   could have been that group also.
8      Q.   Right.  But it could also be
9   sales and marketing, if they're sending
10  out sales reps, right?
11     A.   That's true.  But does it
12  say sales reps?  I didn't know if it said
13  that specifically.
14     Q.   Yes, it did -- the last one
15  we read was direct risk communication by
16  Cephalon field representatives, which is
17  a sales representative, right?
18     A.   I'm not quite sure.  It
19  could have been MSLs.  I don't know how
20  they define that, at that point.
21     Q.   Okay.  Well, 10 is, Launch
22  an ongoing -- Cephalon will contact each
23  of the identified top 25 pain centers of
24  excellence to offer further educational

Page 457

1   opportunities to learn about Fentora,
2   including the three principle risks
3   identified in the RiskMAP.  Specific
4   risks of use by opioid nontolerant
5   individuals, the risk of misuse, abuse,
6   and diversion, and the risk of accidental
7   exposure to Fentora will be addressed.
8           So the pain centers are
9   supposed to be contacted, under this
10  plan, to educate -- to offer educational
11  opportunities to learn about Fentora,
12  correct?
13     A.   It appears that way, yes.
14          MR. CRAWFORD:  So moving on
15  to Document 661.
16            - - -
17          (Whereupon, Teva-Marchione
18      Exhibit-33,
19      TEVA_MDL_A_00038282-295, was
20      marked for identification.)
21            - - -
22          MR. JENSEN:  Exhibit-33.
23  BY MR. JENSEN:
24     Q.   We've marked Exhibit-33,

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1  which is a -- let me ask you this, do you
2  recall, at any point in time, trying to
3  seek an expanded indication for Fentora
4  for noncancer uses?
5      A.  Vaguely.
6      Q.  And were you involved in
7  that effort?
8      A.  Well, I was at this meeting,
9  so I probably was.
10     Q.  Okay.  All right.  So this
11 is a letter from the FDA to you at
12 Cephalon, dated July 17th, 2007.
13         So what do you recall
14 about -- and it includes minutes from a
15 meeting here.  The meeting minutes, the
16 meeting objective -- like you pointed
17 out, you attended this meeting, correct?
18     A.  Yes.
19     Q.  Right.  And who is Eric
20 Floyd?
21     A.  That was my manager at the
22 time.
23     Q.  All right.  And Penny Levin
24 as well, she worked in your department?

Page 459

1      A.  Right.  She reported to me.
2      Q.  All right.  And, again, Mr.
3  Rappaport at the FDA attended the
4  meeting, correct?
5      A.  Yep.
6      Q.  And the meeting objective is
7  stated below.  And it is -- it states
8  that the purpose of the meeting was to
9  provide the sponsor with feedback on the
10 questions in their May 11, 2007 meeting
11 package, which were specifically related
12 to the submission of a supplemental new
13 drug application to expand the indication
14 for their product.
15         So what was -- what was
16 Cephalon trying to do here?
17     A.  I'm deducing they were
18 trying to have the product approved for a
19 broader indication than for just cancer.
20     Q.  And what was the broader
21 indication they were seeking?
22     A.  For any -- for anybody who
23 has breakthrough pain and who is tolerant
24 to opioid therapy, for their underlying

Page 460

1  persistent pain.
2      Q.  And do you recall what the
3  FDA's response was in this meeting?
4      A.  No, I'd have to review it.
5  Sorry.
6      Q.  Maybe -- okay.
7         They had a bunch of
8  responses here before they could approve
9  it.
10        They were trying to give
11 you -- were they trying to give you some
12 kind of guidance on getting it approved?
13        MR. DIAMANTATOS:  Objection
14 to form.
15        THE WITNESS:  That's --
16 that's what the meeting -- the
17 intention of the meeting, yes.
18 BY MR. CRAWFORD:
19     Q.  I think I want to direct
20 your attention in particular to Page 6 of
21 the letter, at the bottom, Question 11.
22        These are questions posed by
23 the company to the FDA prior to the
24 meeting, right?

Page 461

1      A.  That's correct.
2      Q.  And this question was, Does
3  the agency concur that the currently
4  approved RiskMAP for Fentora is
5  acceptable to support the use of Fentora
6  in opioid-tolerant patients with
7  persistent pain?
8         That means with -- broadly,
9  anyone with persistent pain, whether
10 Fentora should be approved, right?
11     A.  That's my understanding.
12     Q.  And so the FDA response is
13 here.  And the FDA -- what, generally,
14 was their response to this question?
15        MR. DIAMANTATOS:  Objection
16 to form.
17        THE WITNESS:  Do you want me
18 to read it to you?
19 BY MR. CRAWFORD:
20     Q.  Well, you were at this
21 meeting.  And you can either read it --
22 you're welcome to read it or give your
23 recollection of what they thought about
24 the RiskMAP.

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1           A.   I just have to review it,
2    because I just don't remember, sorry.
3        Q.   Sure.
4           A.   So they -- they're saying
5    that the RiskMAP that's currently
6    approved for the cancer subset would have
7    to be broadened and -- because it may
8    increase the risk of inadvertent
9    exposure, as well as misuse.
10          And so they want to have the
11   RiskMAP be evaluated to consider the
12   increased risks.
13      Q.   And did they have anything
14   to say at the meeting and in their
15   response about the current success of
16   the -- the success of the current RiskMAP
17   in place for Fentora?
18          MR. DIAMANTATOS:  Objection
19   to form.
20          THE WITNESS:  I can read
21   what is stated here.  I don't have
22   a recollection.
23          It says, It is clear that
24   this program has not been entirely

Page 463

1           successful, based on the known
2           postmarketing use patterns.
3    BY MR. CRAWFORD:
4        Q.   All right.  Let's read the
5    whole thing here.
6           It says -- at least the
7    first paragraph.  The currently approved
8    RiskMAP was intended to minimize the risk
9    of overdose and death as a result of use
10   by improperly selected nonopioid-tolerant
11   patients, inappropriate use by noncancer
12   patients and inadvertent exposure of
13   household contacts.  It is clear that
14   this program has not been entirely
15   successful, based on the known
16   postmarketing use patterns.
17          So in your view, and in this
18   meeting, was the FDA expressing to you
19   that it didn't think the current RiskMAP
20   was working with regard to stopping
21   inappropriate use by noncancer patients
22   as one element?
23          MR. DIAMANTATOS:  Objection.
24   Form.  Calls for speculation.

Page 464

1           THE WITNESS:  It says "not
2    entirely successful," is how I see
3    it.
4    BY MR. CRAWFORD:
5        Q.   But that was one of their
6    responses here.
7           So going down to the bottom
8    of that section, under discussion, with
9    respect to off-label use, it says, Dr.
10   Hertz stated that the sponsor had the
11   first RiskMAP of this kind with their
12   Actiq product, noting that the plan was
13   not very successful in limiting off-label
14   use.
15          So he's referring to the
16   whole Actiq RiskMAP and how it really was
17   not successful, right?
18          MR. DIAMANTATOS:  Objection
19   to form.  Calls for speculation.
20   Foundation.
21          THE WITNESS:  That's how she
22   references this.
23   BY MR. CRAWFORD:
24      Q.   And so it says that, The

Page 465

1    division cannot recommend how to better
2    formulate the plan.  The sponsor must
3    propose new ways to address and manage
4    the risks of the product in the proposed
5    expanded population.
6           So it was putting the
7    burden, the FDA, on Cephalon to come up
8    with a viable plan that the FDA thought
9    could work to minimize the risk of abuse,
10   if it expanded the indication, right?
11          MR. DIAMANTATOS:  Objection
12   to form.  Foundation.  Calls for
13   speculation.
14          THE WITNESS:  That's how it
15   is stated here.
16   BY MR. CRAWFORD:
17      Q.   So if you go to the next
18   page, the FDA is expressing some -- why
19   it's expressing reservations over
20   expanding the use, based on this --
21   concerns about the RiskMAP here.
22          It does say, I'll just read
23   here at the bottom, The sponsor stated
24   that they have surveillance and education

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1  in the current plan, but the plan to
2  boost the educational portion of the plan
3  in regard to proper patient selection --
4  I don't know if I'm reading that right.
5       Oh, okay.  Strike that.
6       It states here, The FDA
7  stated that they have surveillance and
8  education in the current plan, but plan
9  to boost the educational portion of the
10  plan in regard to proper patient
11  selection.  Dr. Hertz stated that they --
12  or the agency agreed with this, but noted
13  that Actiq failed in this goal.
14       So the FDA is concerned
15  about expanding based on the bad
16  experience with Actiq, correct?
17       MR. DIAMANTATOS:  Objection
18  to form.  Foundation.  Calls for
19  speculation.  Mischaracterizes the
20  exhibit.
21       THE WITNESS:  So it's kind
22  of strangely written.  It says the
23  sponsor was going to boost it for
24  a noncancer indication.  And Dr.

Page 467

1       Hertz stated that the agency
2       agreed with this, but noted that
3       Actiq failed in its goal.
4       Well, Actiq never -- we
5       never tried to get an expanded
6       indication.  So it's kind of not
7       really written that correctly.
8  BY MR. CRAWFORD:
9       Q.  Fair point.  Yep.  All
10  right.
11       MR. CRAWFORD:  We'll mark
12  the next exhibit.
13       MR. JENSEN:  34.
14            -  -  -
15       (Whereupon, Teva-Marchione
16       Exhibit-34, TEV_FE00116840-843,
17       was marked for identification.)
18            -  -  -
19  BY MR. CRAWFORD:
20       Q.  And this is the Exhibit-34,
21  TEV_FE00116840.  This is -- this is
22  addressed to Ms. Levin, who is in your
23  department.
24       This is the FDA finding that

Page 468

1  the -- the date is September 17th, 2008.
2  Actually, it was sent September 12th on
3  the back.
4       This was the FDA finding
5  that the request for a new expanded
6  indication to be not approvable, correct?
7       A.  That's correct.
8       Q.  Okay.  So do you know if the
9  FDA ever approved an expanded indication
10  for Fentora for noncancer patients?
11       A.  I believe they never did.
12       MR. CRAWFORD:  Next I'm
13  going to mark Document 303.  It's
14  going to be Exhibit-35.
15            -  -  -
16       (Whereupon, Teva-Marchione
17       Exhibit-35,
18       TEVA_MDL_A_00349300-301, was
19       marked for identification.)
20            -  -  -
21  BY MR. CRAWFORD:
22       Q.  I think we're getting very
23  close to the end here.
24       So at some point, do you

Page 469

1  have a recollection -- I think we talked
2  about a REMS at the beginning of the
3  deposition, right, a risk evaluation
4  mitigation strategy?
5       A.  Yes.
6       Q.  Right.  And at some point,
7  the FDA had indicated it wanted to impose
8  a REMS program on Actiq and Fentora,
9  correct?
10       MR. DIAMANTATOS:  Objection.
11  Form.
12       THE WITNESS:  A REMS?  So
13  it's a timing issue.  I don't know
14  if they ever wanted to get a REMS
15  on Actiq, because we stopped
16  marketing by the time the REMS
17  came into place.
18       But yes for Fentora.
19  BY MR. CRAWFORD:
20       Q.  All right.  And were you or
21  the company involved in spearheading any
22  effort to -- for the industry to put
23  together a proposed REMS for the FDA?
24       A.  So that was at the time when

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1   I -- my new manager, Jim Ottinger, came.
2   So I -- I was asked to kind of help him
3   get up to speed, because he was the
4   person spearheading that.  So I worked a
5   couple months overlapping with him on
6   that.
7       Q.   What was his name again?
8       A.   Jim Ottinger, James
9   Ottinger.  He was the vice president of
10  regulatory.
11      Q.   How do you spell his last
12  name?
13      A.   O-T-T-I-N-G-E-R.
14      Q.   And he was leading an effort
15  to -- collaboration with the other drug
16  makers that made that class of drugs, the
17  TIRF REMS, right, or the TIRF products to
18  prepare a REMS, right?
19      A.   Let me -- I'm sorry, let me
20  just back up.
21          It was a transition between
22  Eric Floyd, who left, and then Jim
23  Ottinger came.  So I think at that point,
24  Eric Floyd was leading that, left, they

Page 471

1   asked me to kind of cover for him until
2   Jim Ottinger, my new manager, got up to
3   speed to take that over.
4       Q.   And was this Teva, at this
5   time, it was -- well, it wasn't Teva.
6          It may have still been
7   Cephalon, right?
8       A.   Yeah, I think it -- I think
9   it was Teva.  It was around that
10  transition time, yes.
11      Q.   So Teva or Cephalon were
12  leading the effort, amongst this class of
13  drugs and manufacturers, to prepare and
14  propose a REMS for the FDA?
15      A.   You know, I'm trying to
16  remember --
17          MR. MUDGE:  Object to form.
18  BY MR. CRAWFORD:
19      Q.   Let me back up and strike
20  that.
21          So there was some kind of
22  group formed of manufacturers, right, to
23  do something with regard to the REMS,
24  right?

Page 472

1          MR. DIAMANTATOS:  Objection
2   to form.  Foundation.
3          THE WITNESS:  When this
4   started, I was not -- when -- an
5   expansion came more, I believe,
6   from the FDA than from us.
7          So my recollection, and
8   please, you know, it was a time
9   when I was transitioning off of
10  the program, I was under the
11  impression that the FDA was the
12  one that was trying to put a class
13  together, because -- so every
14  single manufacturer wouldn't have,
15  you know, to go through having
16  physicians attest to something.
17          So I could be wrong.  But I
18  thought it was the FDA who was
19  trying to group it, or maybe
20  discussions with different
21  manufacturers, because -- for
22  consistency.
23  BY MR. CRAWFORD:
24      Q.   So the manufacturers were

Page 473

1   all operating independently in
2   interfacing with the FDA, or was there
3   kind of a unified group working together
4   on the manufacturers' side?
5          MR. DIAMANTATOS:  Objection.
6   Form.  Foundation.  Calls for
7   speculation.
8          THE WITNESS:  So, obviously,
9   initially, it was -- manufacturers
10  were working individually.  And I
11  don't know who led -- or who had
12  the understanding to make it into
13  a group.
14          In my recollection, I
15  thought it was initiated by the
16  FDA.  But because I was not as
17  involved at that point, I'm
18  probably not the best person to
19  answer that.  But that was my
20  understanding.
21          So all the stopgaps that we
22  were putting in to the chain of
23  events, it would be consistent
24  amongst all the manufacturers

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1    doing the same thing. And I
2    think -- so I think that was the
3    issue, and it wouldn't be
4    repetitive as much for a doctor to
5    have to do multiple -- everything
6    in the short-acting class or
7    whatever. That was my
8    recollection.
9    BY MR. CRAWFORD:
10   Q.   Yeah. I'm just trying to
11   find out if there was a group of
12   manufacturers that were working together
13   to make some proposals to the FDA?
14   A.   So I remember --
15   MR. DIAMANTATOS: Objection
16   to form. Foundation. Asked and
17   answered. Speculation. Vague.
18   THE WITNESS: I remember,
19   actually, Sharon Hertz asking us
20   to go and talk to other
21   manufacturers. And it was -- it
22   was kind of soft, because they
23   didn't legally have the ability to
24   make you work together.

Page 475

1    But I remember saying, well,
2    how can we do that? And the more
3    I think about it, the more it was
4    directed by the FDA.
5    BY MR. CRAWFORD:
6    Q.   All right. But there was a
7    group that got together and worked on it,
8    of manufacturers?
9    MR. DIAMANTATOS: Objection.
10   Form. Foundation. Asked and
11   answered repeatedly. Calls for
12   speculation.
13   BY MR. CRAWFORD:
14   Q.   If you know.
15   A.   I think -- I know we started
16   talking to one of them, you know, because
17   they -- they kind of prompted -- they
18   kept prompting us to do that.
19   And, again, that's about the
20   time I went off the project.
21   Q.   And you say talked to "one
22   of them," one of the other manufacturers?
23   A.   Yeah. And I can't remember
24   which one.

Page 476

1    Q.   Okay. That's fine.
2    So we marked here as
3    Exhibit-35 a timeline here,
4    TEVA_MDL_A_00349300.
5    This is just a timeline we
6    found in the Teva documents called,
7    Timeline of Events Leading Up to the REMS
8    Requirement For Opioid Analgesics.
9    And I thought maybe this is
10   a good shortcut to trigger your memory of
11   the steps and processes that were
12   undertaken here.
13   So the first point that I
14   wanted you to look at, just for
15   reference, September 25th, 2006, says,
16   Fentora fentanyl buccal tablet approved
17   for use in breakthrough pain in
18   opioid-tolerant patients with cancer.
19   So that at least provides us
20   a guide point. That's an accurate date,
21   correct?
22   A.   I believe so.
23   Q.   And then -- and then June
24   22nd, 2007, it says, Fentora pre-SNDA

Page 477

1    call with the FDA to discuss SNDA risk
2    minimization action plan, RiskMAP, when
3    FDA indicated concerns whether or not the
4    approved RiskMAP was as effective as
5    possible. Concerns arose because of new
6    information regarding the safety of
7    Fentora, including reports of a death of
8    a patient who was not opioid tolerant and
9    taking Fentora for a migraine, conversion
10   from Actiq to Fentora, substitution at
11   pharmacy and patients not understanding
12   dosing.
13   So do you recall, during
14   this June 2007 time period, the FDA
15   raising these concerns?
16   MR. DIAMANTATOS: Objection
17   to form. Foundation.
18   THE WITNESS: I was
19   obviously on the project at the
20   time. I just don't remember that
21   specific incident.
22   BY MR. CRAWFORD:
23   Q.   All right. And then in
24   August, they're talking about, Cephalon

120 (Pages 474 to 477)

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1  notified of additional reports of deaths
2  due to the same reasons as June 22nd
3  discussion with FDA.
4         Do you recall that
5  notification?
6         MR. DIAMANTATOS: Objection
7  to form. Foundation.
8         THE WITNESS: You know, I
9  don't remember.
10 BY MR. CRAWFORD:
11       Q. All right. Skipping ahead,
12 the next page, to March 27th, 2008.
13       It states, FDA issues
14 federal register that identifies Actiq as
15 one of the 16 drugs needing a REMS by
16 September 21st.
17       Do you see that?
18       A. I do see that.
19       Q. Does that refresh your
20 recollection that maybe the FDA wanted a
21 REMS for Actiq?
22       MR. DIAMANTATOS: Objection
23 to form. Foundation.
24       THE WITNESS: I believe I

Page 479

1  was off the project by then. And
2  to be honest, I didn't even
3  remember if Actiq was still on the
4  market -- you know, I thought
5  they -- I didn't know -- they
6  weren't promoting it, maybe. It
7  was on the market. But I just
8  don't remember that.
9  BY MR. CRAWFORD:
10       Q. All right. And then
11 September 17th, 2008, Cephalon submits
12 initial REMS proposal for Actiq to the
13 FDA.
14       Were you involved at all in
15 that submission to the FDA?
16       A. Not that I can recall.
17       Q. All right. February 6,
18 2009, FDA informs 15 drug manufacturers
19 that will require a REMS for certain
20 opioid drug products to ensure safe use.
21       Do you recall that at all?
22       A. No, I don't.
23       Q. March 3rd, 2009, Cephalon
24 withdraws the amended RMP for Actiq since

Page 480

1  it was never approved, and a REMS will be
2  now substituted instead.
3         Do you recall withdrawing
4  the amended RiskMAP for Actiq in '09?
5         MR. DIAMANTATOS: Objection.
6  Form. Foundation.
7         THE WITNESS: No, I don't.
8  BY MR. CRAWFORD:
9         Q. And April 2nd, 2009, states,
10 Cephalon submits proposed REMS for Actiq
11 and proposed REMS for Fentora to the FDA.
12        Were you involved at all in
13 preparation of a submission of a proposed
14 REMS for Actiq and Fentora around this
15 April 2009 time period?
16        A. Not that I can recall.
17        MR. CRAWFORD: Let's mark
18 the next exhibit. That would be
19 632.
20             - - -
21        (Whereupon, Teva-Marchione
22 Exhibit-36,
23 TEVA_MDL_A_00651161-168, was
24 marked for identification.)

Page 481

1             - - -
2  BY MR. CRAWFORD:
3         Q. So we marked now a June
4  11th, 2010 letter from you to Dr.
5  Rappaport stating -- it's document
6  TEVA_MDL_A_00651161.
7         It states, At the request of
8  the agency, Cephalon representatives met
9  with FDA on May 25th, 2010, with the
10 intention of resolving outstanding issues
11 related to the REMS for both Actiq and
12 Fentora so that these strategies can be
13 implemented as soon as possible. The
14 submission contains Cephalon's minutes of
15 the discussions during the May 25th
16 meeting.
17        And it's signed by you.
18        So was this -- do you recall
19 now being involved in these discussions
20 around June 2010 time period?
21        MR. DIAMANTATOS: Objection
22 to form.
23        THE WITNESS: I do recall
24 now. This is when I was pulled

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1    back -- let me see.  Who was
2    there?
3            This is when Jim Ottinger
4    first came.  This was that period.
5    Yes, I do recall this.
6    BY MR. CRAWFORD:
7        Q.   So you were involved in
8    discussions with the FDA about the Actiq
9    and Fentora REMS and getting that in
10   place?
11       A.   I was on the transition team
12   during this, yes.
13       Q.   And if you look at the last
14   page, it looks like you had attended the
15   meeting as senior director and group
16   leader, regulatory affairs, Cephalon,
17   correct?
18       A.   That's correct.
19       Q.   And you attended with Jim
20   Ottinger, right?  That was when you were
21   helping him transition on this, right?
22       A.   That's correct, yes.
23       Q.   So that fits within your
24   recollection.  But at least it gives us a

Page 483

1    time period.
2            You were involved here in
3    this 2010 time period, right?
4        A.   Right.
5            MR. CRAWFORD:  So now we're
6    going to mark as Exhibit-587 --
7    I'm sorry, Document 587, that will
8    be Exhibit-37.  And then we're
9    going to attach to that two
10   documents which were attachments,
11   the Actiq REMS and the Fentora
12   REMS.
13           I don't have a copy of the
14   Actiq REMS.  I just have the
15   electronic copy.  But I want to
16   kind of get these into the record,
17   since it's regulatory and she's
18   our regulatory person.
19           So I'm going to flash it on
20   the screen and see if counsel is
21   agreeable to my --
22           MR. DIAMANTATOS:  If you're
23   going to show her an exhibit and
24   intend on asking her questions

Page 484

1    about it, I need you to show her
2    the entirety of the exhibit so she
3    can review it and comment on it.
4    Flashing it on the screen is not
5    good enough.
6            MR. CRAWFORD:  How about if
7    I get her to acknowledge and not
8    ask her questions about the
9    document?
10           MR. DIAMANTATOS:  No.  If
11   you're going to ask her any
12   questions about a document, she
13   has to be given the opportunity to
14   review it.
15           I'm not trying to be
16   difficult.  If you want to take
17   the time to go through it on the
18   screen page by page and give the
19   witness the ample opportunity to
20   review it appropriately so she can
21   intelligently answer your
22   questions, I don't necessarily
23   have an objection to that, since
24   you don't have a paper copy.

Page 485

1            MR. CRAWFORD:  Let's do
2    that, then.
3            - - -
4            (Whereupon, Teva-Marchione
5    Exhibit-37,
6    TEVA_MDL_A_07679381-383, was
7    marked for identification.)
8            - - -
9            (Whereupon, Teva-Marchione
10   Exhibit-38,
11   TEVA_MDLA_A07679384-521, was
12   marked for identification.)
13           - - -
14           MR. CRAWFORD:  So 587 is
15   Exhibit-38.  And then the Actiq
16   REMS, we'll get a hardcopy, will
17   be 39.  And then the Fentora REMS
18   is 40, because that's how the
19   document numbers go sequentially.
20   BY MR. CRAWFORD:
21       Q.   After that meeting with the
22   FDA and Mr. Ottinger was involved, did
23   you kind of drop off the REMS project?
24       A.   Yes, that's correct.

122 (Pages 482 to 485)

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1       Q.  So you weren't around for
2   the actual finalization of the REMS plan,
3   right?
4       A.  Not that I can recall.  I
5   don't think I was.
6       Q.  And did Mr. Ottinger, by
7   that point, take over kind of the duties
8   for the company with regard to the final
9   negotiations with the FDA on the REMS?
10          MR. DIAMANTATOS:  Objection.
11      Form.  Foundation.
12          THE WITNESS:  I don't
13      remember.  I'm seeing Susan
14      Frank's name here, so she may have
15      done that.
16  BY MR. CRAWFORD:
17      Q.  And so we marked here 37.
18  This is an e-mail.
19          I don't see you on this
20  e-mail, 37, but it's attaching the two
21  REMS documents that we marked as
22  Exhibit-38 and 39, or we will mark for 38
23  for Actiq.
24          Take a look at 39.  I just

Page 487

1   want to see, from your regulatory
2   experience, does that look like an FDA
3   approval of a REMS, at least for Fentora,
4   Exhibit-39?
5       A.  Yes, it does.
6       Q.  Okay.  All right.  I'm
7   having a little confusion here about what
8   we've attached, and I apologize.
9           So this e-mail chain, what
10  exhibit is that?  Do you have marked
11  there on your right hand?
12      A.  The e-mail chain is 037.
13      Q.  So that's 37.  And then we
14  marked --
15          MR. DIAMANTATOS:  Just to be
16      clear, do you want to say the
17      Bates for the record?
18          MR. CRAWFORD:  Yes, that's
19      good.  Thank you.  I think that
20      will make it clear.
21      TEVA_MDL_A_07679381.
22          And then what follows
23      sequentially is Exhibit 38, which
24      I believe is an attachment,

Page 488

1       TEVA_MDL_A_07679384.
2   BY MR. CRAWFORD:
3       Q.  That document states that,
4   This supplemental new drug application
5   proposes modifications to the approved
6   Fentora -- REMS for Fentora.  We have
7   completed our review of this supplemental
8   application as amended.  It is approved,
9   effective on the date of this letter, for
10  use as recommended in the enclosed,
11  agreed-upon labeling text.
12          So 38 is, you would agree,
13  from your regulatory experience, I know
14  you're not on the e-mail, but that would
15  be an FDA approval of the REMS, right,
16  for Fentora.
17      A.  That's my understanding.
18          MR. DIAMANTATOS:  Objection
19      to form.
20  BY MR. CRAWFORD:
21      Q.  And then 40, is that the
22  missing one?
23          MR. JENSEN:  39 is the
24      missing one.

Page 489

1           MR. CRAWFORD:  39, sorry.
2       Can we bring up 39 on the
3       screen?
4   BY MR. CRAWFORD:
5       Q.  I think it's just a similar
6   one.
7           And I want to ask you the
8   same question, if that looks to you like
9   an approval.  And you're welcome to flip
10  through as many pages as you want until
11  you feel comfortable that it would be an
12  approval of the Actiq REMS.
13          And he's going to bring it
14  up on the screen.
15          And that's all I'm going to
16  ask you about that, because you weren't
17  present at the time?
18      A.  No, I wasn't.
19          MR. CRAWFORD:  Why don't we
20      come back to that?
21      I want to mark the next
22  exhibit, which is Document 635.
23          MR. JENSEN:  Exhibit-40.
24              - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    (Whereupon, Teva-Marchione
2  Exhibit-40,
3  TEVA_MDL_A_08261145.xls, was
4  marked for identification.)
5      - - -
6  BY MR. CRAWFORD:
7    Q.    Now, when you were heading
8  up that regulatory department, did you
9  keep -- was there a call log or a contact
10 log with the FDA that was kept in the
11 department?
12   A.    There was.  There was some
13 informal calls, I think -- yes.  When
14 there were formal telecons and meetings,
15 there was a document that we would fill
16 out.
17      I believe, though, informal
18 calls we also logged, to the best of my
19 recollection.
20    MR. CRAWFORD:  And can we
21 have a copy of the exhibit for the
22 witness, please?
23    MR. JENSEN:  She has it.
24 BY MR. CRAWFORD:

Page 491

1    Q.    We marked Exhibit-40, which
2  is TEVA_MDL_A_08261145.xls.
3      So this appears to be, what
4  it states is, Actiq official
5  correspondence log.  Starting with
6  11/11/96, and it goes through 3/8/2005.
7      Does this look familiar to
8  you as a type of correspondence log that
9  was kept for your department?
10   A.    I mean, probably.  So many
11 of these logs that you deal with.  So it
12 looks reasonable.
13   Q.    So it was the practice of
14 your department, during the entire time
15 you were there, to keep some kind of log
16 of contacts and communications with the
17 FDA?
18   A.    Yes, that's correct.
19   Q.    And here there are -- you do
20 keep a log of submissions of promotional
21 materials to DDMAC, right?
22   A.    That's correct.
23   Q.    So if there was any
24 back-and-forth with DDMAC, and

Page 492

1  correspondence, at least, that should be
2  reflected in the logs that were kept with
3  the department, right?
4    MR. DIAMANTATOS:  Objection
5  to form.  Foundation.  Calls for
6  speculation.
7    THE WITNESS:  That's the
8  process.
9  BY MR. CRAWFORD:
10   Q.    So you had voiced some
11 concern that DDMAC kept changing its
12 demands on what it wanted on promotional
13 materials.
14      If that was in
15 correspondence, that should be reflected
16 in this official correspondence log,
17 right?
18   A.    So that was the details that
19 were in the letter.  When we -- I
20 expressed those concerns at that meeting.
21 Before then, we never -- I don't know if
22 I actually wrote to them and expressed
23 the concern.
24      So it's -- the details are

Page 493

1  within -- when you see the conflicting
2  information, you have to look at each of
3  the MACMIS numbers that are there, you
4  see MACMIS ID.
5      So every time we submitted
6  the document, we got an MACMIS number.
7    Q.    What is an MACMIS?
8    A.    It's a numbering system from
9  the FDA, from DDMAC.
10   Q.    You're pointing to something
11 on Exhibit-40.
12      What are you pointing to?
13   A.    Oh, like --
14   Q.    Here it is.  The submission
15 number?
16   A.    Right.
17   Q.    So, anyway, if it was in
18 writing, an exchange between DDMAC and
19 you, it should show up in this log,
20 right?
21   A.    It should, yes.
22   Q.    So when you're talking about
23 stuff that may have been transmitted in
24 writing that you were concerned about

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1  later and addressed with them verbally,
2  that dealt with these past MACMIS
3  exchanges, right?
4      A.   Correct.
5          You would have -- you would
6  have to go into a specific one and
7  show -- they would tell you to do one
8  thing and they would have to find another
9  one to say that they reversed their
10  issues.
11     Q.   All right.
12         MR. CRAWFORD:  I got one
13  more exhibit to attach.  That
14  would be 570.
15         MR. JENSEN:  Exhibit-41.
16         - - -
17         (Whereupon, Teva-Marchione
18  Exhibit-41,
19  TEVA_MDL_A_08475177-178, was
20  marked for identification.)
21         - - -
22  BY MR. CRAWFORD:
23     Q.   Did you ever do any kind of
24  analysis, while you were at Teva or

Page 495

1  Cephalon, about reprints and how they
2  should be used to comply with
3  regulations, reprints of journal
4  articles?
5          MR. DIAMANTATOS:  Objection
6  to form.
7          THE WITNESS:  Excuse me, I
8  don't understand specifically what
9  to do with reprints --
10  BY MR. CRAWFORD:
11     Q.   Yes.  Advising the company
12  on what the regulations were with
13  disseminating reprints, under FDA
14  regulations.
15         MR. DIAMANTATOS:  Objection
16  to form.  Foundation.
17  BY MR. CRAWFORD:
18     Q.   We've marked here
19  Exhibit-41.
20         It's an e-mail from you to
21  Eric Floyd, Forward:  Good reprint
22  practices, review team.
23         You state, Eric, if you have
24  a break from your meeting, could you

Page 496

1  please call to discuss?  I have a review
2  meeting today on this, and I wanted to
3  talk to you before that meeting, if
4  possible.  Thanks, Carol.
5          So do you recall anything
6  about dealing with reprints around this
7  2009 time period and having review
8  meetings?
9      A.   Let me see.
10         So I remember that the
11  compliance group that was supporting the
12  CIA wanted to have a policy about reprint
13  dissemination, and I went to a meeting
14  where they were proposing a policy.
15     Q.   And it was about this 2009
16  time period?
17     A.   I believe so.
18     Q.   And did you -- do you recall
19  anything about that meeting, any details?
20         MR. DIAMANTATOS:  Objection
21  to form.
22         THE WITNESS:  So when they
23  proposed a policy, I don't know if
24  I necessarily agreed with the

Page 497

1  policy.  And I was asked just to
2  kind of improve it, and it was --
3  I think -- I think the
4  understanding was that the
5  compliance group had a deadline to
6  meet and, you know, they didn't
7  want a lot of back-and-forth on
8  the policy, which I didn't
9  necessarily agree with all the
10  components.
11         And so I -- I wanted to
12  alert my manager that, you know,
13  this may be an issue, so I just
14  wanted to talk to him.
15  BY MR. CRAWFORD:
16     Q.   Just the final thing, let's
17  throw up 39, which I just wanted to see
18  if you agree that that looks to you like
19  the FDA approving the Actiq REMS in the
20  supplemental approval, similar to the
21  Fentora one that was attached.
22         And, again, we'll get a
23  hardcopy, an electronic copy, to the
24  court reporter on that, and counsel.

125 (Pages 494 to 497)

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1      MR. CRAWFORD:  Forward a
2   copy to counsel here, and the
3   court reporter.
4      MR. DIAMANTATOS:  Do you
5   mind calling out the Bates?
6      MR. CRAWFORD:  The Bates
7   number, TEVA_MDL_A_074679522.
8   BY MR. CRAWFORD:
9   Q.   What we have here is a --
10      MR. CRAWFORD:  Can we go
11   down to the date?  Scroll down.
12      THE WITNESS:  The date is
13   actually the last page.
14      MR. DIAMANTATOS:  I'll note
15   for the record this is a 142-page
16   document.
17   BY MR. CRAWFORD:
18   Q.   Right.  12/28/11.
19      It's similar to the other
20   Fentora one that was attached, I'll
21   represent.
22      If you want to scroll
23   through it, but all I want to ask is,
24   does this look like the approval for the

Page 499

1   REMS for Actiq?
2   A.   Yes, it does.
3      MR. CRAWFORD:  That's all I
4   have.  And I pass the witness.
5   Thank you.
6      THE WITNESS:  Thank you.
7      VIDEO TECHNICIAN:  Going off
8   the record at 5:56 p.m.
9          - - -
10      (Whereupon, a brief recess
11   was taken.)
12          - - -
13      VIDEO TECHNICIAN:  We're
14   back on the record at 6:01 p.m.
15          - - -
16      EXAMINATION
17          - - -
18   BY MR. GASTEL:
19   Q.   Good evening, Ms. Marchione.
20      My name is Ben Gastel, and I
21   represent a group of plaintiffs in the
22   state of Tennessee that have been
23   cross-noticed into this deposition today.
24      MR. GASTEL:  We normally

Page 500

1   begin these examinations with an
2   objection.  So I'll lodge my
3   standard objection with the record
4   that we object to the deposition
5   going forward on behalf of my
6   Tennessee clients, for Teva's
7   failures to meet its obligations
8   under the state, federal
9   cooperation protocol, as we've
10   laid out in our previous
11   depositions and in our motion to
12   quash.
13   BY MR. GASTEL:
14   Q.   Subject to that objection, I
15   am going to have some questions for you.
16   I'll be a lot shorter than Mr. Crawford's
17   examination throughout the day.
18      As I stated, the people that
19   I represent are in the state of
20   Tennessee.
21      So I'll begin with a
22   question that, for your work for Cephalon
23   and later Teva, did you ever have an
24   opportunity to travel to the state of

Page 501

1   Tennessee?
2   A.   I don't think so, no.
3   Q.   Did you ever review any
4   records of the Tennessee Department of
5   Health related to Tennessee's opioid
6   crisis?
7      MR. DIAMANTATOS:  Objection
8   to form.
9      Go ahead.
10      THE WITNESS:  No, I haven't.
11   BY MR. GASTEL:
12   Q.   Do you have any
13   understanding, as you sit here today,
14   about prescription -- about rates of
15   prescriptions for prescription opioids in
16   the state of Tennessee?
17   A.   No, I do not.
18   Q.   We've looked at a lot of
19   documents today showing concerns by
20   Cephalon, Teva and the FDA about abuse
21   and misuse of opioids.
22      Throughout your role as
23   director of regulatory affairs with Teva
24   and Cephalon, you knew that there were

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1   problems with abuse and misuse of opioids
2   throughout the country, right?
3           MR. DIAMANTATOS: Objection
4   to form.
5           Go ahead.
6           THE WITNESS: Generally,
7   yes.
8   BY MR. GASTEL:
9       Q.   And that would include abuse
10  and misuse of prescription opioids in
11  states like Tennessee, right?
12          MR. DIAMANTATOS: Objection
13  to form.
14          Go ahead.
15          THE WITNESS: Not
16  specifically. But in general,
17  country-wide.
18  BY MR. GASTEL:
19      Q.   You went through the Fentora
20  RiskMAP with Mr. Crawford earlier today,
21  and he read you a portion of that that
22  referenced geographic hotspots.
23          Do you remember that
24  document and that testimony?

Page 503

1       A.   I remember that phrasing,
2   yes.
3       Q.   Do you know if Cephalon or
4   Teva considered Tennessee a geographic
5   hotspot for abuse?
6       A.   Nothing was ever mentioned
7   specifically about any particular
8   hotspots to me.
9       Q.   Do you know what metric is
10  used to determine a geographic hotspot
11  for prescription opioid abuse?
12          MR. DIAMANTATOS: Objection.
13  Form. Foundation.
14          THE WITNESS: No, I do not.
15  BY MR. GASTEL:
16      Q.   I'm going to hand you a
17  document that we're going to mark as
18  Exhibit-42.
19          - - -
20          (Whereupon, Teva-Marchione
21  Exhibit-42,
22          TEVA_MDL_A_08380029-030, was
23          marked for identification.)
24          - - -

Page 504

1           MR. GASTEL: I've got a copy
2   for you, counsel.
3           THE WITNESS: Thank you.
4   BY MR. GASTEL:
5       Q.   And you'll see, Ms.
6   Marchione, that this is an e-mail
7   correspondence from July of 2006.
8           Do you see that?
9       A.   I do, yes.
10      Q.   And it's an e-mail from
11  Simon Diaz to you, dated July 21st, 2006,
12  with the subject line, Hydrocodone ER.
13          Do you see that?
14      A.   Yes.
15      Q.   Do you recall receiving this
16  e-mail?
17      A.   No.
18      Q.   It's forwarding an e-mail
19  from Iris Luo, sent to a variety of
20  folks. And it says, Hi Team.
21          Do you see that, ma'am?
22      A.   I do, yes.
23      Q.   And the e-mail says, Thank
24  you for participating in the evaluation

Page 505

1   of the hydrocodone ER program from ELAN.
2           Did I read that correctly?
3       A.   I think so.
4       Q.   Do you recall this
5   hydrocodone ER program from ELAN that's
6   referenced in this e-mail that was
7   forwarded to you back in 2006?
8       A.   No, I do not.
9       Q.   The e-mail you were
10  forwarded goes on to state, After the
11  recent commercial review, we have decided
12  not to move forward with this
13  opportunity, due to several concerns.
14  First and foremost, the product itself
15  doesn't possess any abuse deterrent
16  feature and any mechanism to prevent
17  alcohol dumping that the regulatory
18  agency prefers to see these days for
19  LAOs.
20          Did I read that correctly?
21      A.   Yes, you did.
22      Q.   Is the reference there to --
23  of "LAOs," long-acting opioids?
24      A.   I'm deducing that it is.

127 (Pages 502 to 505)

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1      Q.   And was it your
2  understanding that, at this time -- and
3  do you believe that the "regulatory
4  agency" there is a reference to the FDA?
5          MR. DIAMANTATOS:  Objection
6      to form.  Foundation.  Calls for
7      speculation.
8          THE WITNESS:  Because it's
9      in the U.S. -- because, I
10     think ELAN is in the U.S., I'm
11     deducing it would be the FDA.
12 BY MR. GASTEL:
13     Q.   Sure.  So do you recall that
14 the FDA was concerned, back in 2006,
15 about only approving hydro --
16 prescription opioids containing
17 hydrocodone if they also contained an
18 abuse-deterrent feature?
19     A.   Deterrent --
20         MR. DIAMANTATOS:  Objection
21     to form and foundation.
22         Go ahead.
23         THE WITNESS:  No.  I mean, I
24     know that abuse deterrence was

Page 507

1      starting to be a big plus at that
2      time.
3          But this is -- the person
4      who is saying that is from the
5      business development group, so
6      that's not really her area of
7      expertise.  So, you know, she
8      probably was referring to what was
9      in the local news, or whatever.
10 BY MR. GASTEL:
11     Q.   Sure.  And the reason why
12 abuse deterrents were picking up around
13 this time was because the widespread
14 abuse of prescription opioids throughout
15 the country, right?
16         MR. DIAMANTATOS:  Objection.
17     Form.  Foundation.  Argumentative.
18     Assumes facts.
19         THE WITNESS:  Again, I would
20     have to assume, in general, that
21     that was the case.
22 BY MR. GASTEL:
23     Q.   And at this time in 2006,
24 your formal employer was Cephalon,

Page 508

1  correct?
2      A.   That's correct.
3      Q.   And then at some point,
4  Cephalon merges with Teva; is that your
5  understanding?
6          MR. DIAMANTATOS:  Objection
7      to form.
8          THE WITNESS:  No.  Teva
9      acquired Cephalon.
10 BY MR. GASTEL:
11     Q.   Sure.  And then at that
12 point, you ceased being a Cephalon
13 employee and you became a Teva employee?
14     A.   That's correct.
15         - - -
16     (Whereupon, Teva-Marchione
17     Exhibit-43, TEVA_MDL_A_03130348,
18     was marked for identification.)
19         - - -
20 BY MR. GASTEL:
21     Q.   I'm going to hand you a
22 document that we'll mark as Exhibit-43.
23         MR. DIAMANTATOS:  Thank you.
24         THE WITNESS:  Thank you.

Page 509

1  BY MR. GASTEL:
2      Q.   And I'll represent to you
3  that this is an e-mail from Cynthia Arons
4  dated October 9th, 2015.
5          It doesn't have a "to" line,
6  but the subject line is, CCALC meeting
7  minutes, final comment period for bylaws.
8          Do you see that?
9      A.   I do see that.
10     Q.   And I'll represent to you
11 that this first page, ma'am, represents
12 the metadata that's associated with this
13 e-mail.  And it shows up in your
14 custodial file and that you're the
15 custodian of this.
16         Is it possible that you were
17 blind carbon-copied on this e-mail and
18 that's why it's showing up in your
19 custodial file?
20         MR. DIAMANTATOS:  Objection.
21     Form.  Foundation.
22         THE WITNESS:  I left the
23     company in 2013.
24 BY MR. GASTEL:

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1    Q.   Sure.
2    A.   So I have no idea.
3    Q.   Yeah.  It kind of puzzled
4  us, too.
5         Do you know what the CCALC
6  is?
7    A.   No.  I was trying to
8  determine that, but I don't -- I don't
9  know.
10   Q.   Does the term Cross-Company
11  Abuse Liability Council ring any bells in
12  your mind?
13   A.   No, it doesn't.
14   Q.   Do you ever recall reviewing
15  meeting minutes or the bylaws for that
16  organization?
17   A.   No, I do not.
18        MR. GASTEL:  Ms. Marchione,
19   I told you I would be very short.
20   That is the end of my examination.
21   Subject to our previous objection
22   and any need that we might need to
23   have to recall you, that's all the
24   questions we have, and we'll

Page 511

1  reserve.
2        THE WITNESS:  Thank you.
3        VIDEO TECHNICIAN:  Going off
4   the record at 6:11 p.m.
5             - - -
6        (Whereupon, a brief recess
7   was taken.)
8             - - -
9        VIDEO TECHNICIAN:  Back on
10  the record at 6:14 p.m.
11            - - -
12        EXAMINATION
13            - - -
14  BY MR. DIAMANTATOS:
15   Q.   Ms. Marchione, you were
16  asked a series of questions this morning
17  and afternoon by counsel with regard to
18  your role at Cephalon, and later Teva,
19  and your interactions with the FDA.
20        You're familiar with the FDA
21  approval process insofar as what
22  pharmaceutical companies are expected to
23  submit as part of their new drug
24  applications, correct?

Page 512

1    A.   That's correct.
2    Q.   Are you familiar with SNDAs,
3  or supplemental new drug applications?
4    A.   Yes, that's correct.
5    Q.   Who gets to decide if a
6  product is ultimately approved?
7    A.   The FDA.
8    Q.   Who gets to decide if a
9  product will -- approval will be pulled?
10   A.   FDA.
11   Q.   Does a pharmaceutical
12  company get to decide that?
13   A.   No, they do not.
14   Q.   You were asked a series of
15  questions --
16   A.   Excuse me.  There are times
17  when a pharmaceutical company can pull
18  product on their own.
19   Q.   So voluntarily a
20  pharmaceutical company can decide to pull
21  a product, correct?
22   A.   That's correct, yes.
23   Q.   But as far as the FDA
24  approval, am I correct that the final say

Page 513

1  so, in terms of that approval, is, of
2  course, the FDA?
3    A.   Yes, that's correct.
4    Q.   You were asked a series of
5  questions with regard to the FDA taking
6  issue with Cephalon and then, later, Teva
7  with the RiskMAP program.
8        Do you recall those
9  questions?
10   A.   Yes, I do.
11   Q.   How would you describe the
12  dialogue that you engaged with the FDA in
13  those instances?
14   A.   Very interactive.  Cordial.
15        That's it.
16   Q.   At any point in time, did
17  you refuse to give the FDA information
18  that they were seeking?
19   A.   Never.
20   Q.   At any point in time, did
21  you refuse to attend a meeting that the
22  FDA had requested?
23   A.   No.
24   Q.   Do you have any knowledge of

129 (Pages 510 to 513)

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1    anyone from your team, or at Cephalon or
2    Teva, receiving such a request from the
3    FDA?
4         A.   No, not at all.
5         Q.   To either provide
6    information --
7         A.   That's correct.
8         Q.   -- or sit down for a
9    meeting?
10        A.   Always, we were always
11   there.
12        Q.   You detailed for us earlier
13   this morning and afternoon, during the
14   approximate 2003 to 2004 time frame,
15   there was specific dialogue with the FDA
16   about concerns that were raised having to
17   do with Actiq in particular, correct?
18        A.   That's correct.
19        Q.   You detailed for us that
20   there was a meeting that culminated with
21   Cephalon asking for a sit-down and a July
22   12th, 2004 presentation, which in the
23   record is Exhibit-11.
24             Do you recall that?

Page 515

1             MR. CRAWFORD:  Objection.
2        Form.  Mischaracterizes.
3    BY MR. DIAMANTATOS:
4         Q.   Do you recall being shown an
5    Exhibit-11?  And it should be in front of
6    you, and if you can pull it out, that
7    would be great.
8             MR. DIAMANTATOS:  For the
9        record, I'll note that it's Bates
10       TEVA_MDL_A_01575289 through
11       TEVA_MDL_A_01575971.
12            THE WITNESS:  Yes.
13            And just to be clear, you
14       just said that we asked for a
15       sit-down.  It was the other way
16       around, the FDA asked us to come
17       out.
18   BY MR. DIAMANTATOS:
19        Q.   So Mr. Rappaport reached out
20   to you, right?
21            And we saw that in an
22   exhibit, with regard to the concerns that
23   Mr. Rappaport was raising, correct?
24        A.   That's correct.

Page 516

1         Q.   And you acknowledged that
2    you passed on that message to other team
3    members of yours at Cephalon, correct?
4         A.   That's correct.
5         Q.   And that this culminated in
6    a sit-down meeting with Mr. Rappaport and
7    others from the FDA, correct?
8         A.   That's correct.
9         Q.   That meeting happened some
10   time in 2004?
11        A.   That's correct.  July --
12   what was it?  The meeting was scheduled
13   for July 14, 2004.
14        Q.   And that meeting, of course,
15   occurred, and you testified about it
16   earlier today, right?
17        A.   Yes, I did.
18        Q.   The approximate 682 pages
19   that make up Exhibit-11, what is that, in
20   Exhibit-11?
21        A.   That was a meeting package
22   that the FDA specifically asked for, for
23   different pieces, that we provided prior
24   to the meeting.

Page 517

1         Q.   Did you assist in both the
2    gathering of the information and,
3    ultimately, the -- this presentation that
4    went to the FDA?
5         A.   Yes, I did.
6         Q.   It starts with a letter that
7    is addressed to Mr. Rappaport
8    specifically, correct?
9         A.   That's correct.
10        Q.   We reviewed only portions of
11   that letter earlier today during your
12   testimony.
13            But to be clear, it's about
14   a 15-page letter signed by you, correct?
15        A.   That's correct.
16        Q.   In that letter, you address
17   the concerns raised by the FDA and the
18   requested information; is that right?
19        A.   Yes.
20        Q.   You provide information with
21   regard to pediatric exposure in the
22   information that the company had
23   compiled; is that right?
24        A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1     Q.   Did you describe, in that
2  letter, details with regard to diversion,
3  abuse and misuse?
4     A.   Yes, we did.
5     Q.   What is meant by
6  "diversion"?
7     A.   Diversion was a product
8  taken or stolen outside of our chain, our
9  supply chain.
10    Q.   Did you detail, in this
11 letter, instances that the company was
12 aware of with regard to alleged diversion
13 that had occurred?
14    A.   Yes, we did.
15    Q.   Alleged abuse?
16    A.   Yes, we did.
17    Q.   Alleged misuse of the
18 product?
19    A.   Yes, we have that
20 information.
21    Q.   Overdose information?
22    A.   Yes, we have that.
23    Q.   Death information?
24    A.   Yes.

Page 519

1     Q.   Off-label use?
2     A.   Yes.
3     Q.   And to be clear --
4          MR. CRAWFORD:  Objection.
5     Form.
6  BY MR. DIAMANTATOS:
7     Q.   To be clear, off-label use
8  can include where a prescription, a valid
9  prescription, has been written by a
10 medical professional who may be writing
11 that script off label, correct?
12    A.   That's correct.
13    Q.   To your knowledge, is there
14 any law or regulation against off-label
15 prescription writing by a medical
16 professional who, in his or her own
17 professional judgment, decides to go off
18 label and write a prescription?
19    A.   My understanding, there's no
20 law against that.
21    Q.   It's off-label promotion
22 that is not permitted, correct?
23    A.   That's correct.
24    Q.   The cover letter goes on to

Page 520

1  describe certain statistical information
2  that the company had compiled, correct?
3     A.   That's correct.
4     Q.   Would you categorize --
5  sorry, would you characterize your letter
6  as open?
7     A.   Very much.
8          MR. CRAWFORD:  Objection.
9     Vague.
10 BY MR. DIAMANTATOS:
11    Q.   How would you characterize
12 your letter, Ms. Marchione, to the FDA?
13    A.   Extensive.  An extensive
14 summary of the status of misuse, abuse,
15 everything that they were concerned
16 about.
17    Q.   Would you call it -- any
18 form of this letter an effort to hide the
19 ball from the FDA?
20    A.   Just the contrary.  We were
21 completely forthcoming, including our
22 presentations.
23    Q.   Is that transparency
24 consistent with all of your

Page 521

1  communications that you participated in
2  with the FDA during your entire tenure
3  with Cephalon and later Teva?
4          MR. CRAWFORD:  Objection to
5     form.
6          THE WITNESS:  I believe that
7     it was.
8  BY MR. DIAMANTATOS:
9     Q.   I just want to highlight the
10 table of contents, which is found on
11 Bates number 5307.  It's immediately
12 after the 15-page letter.
13    A.   Yes.
14    Q.   Am I correct -- and I don't
15 want to go through each of the
16 attachments, but counsel didn't spend a
17 lot of time on this particular exhibit
18 during his examination.
19        But am I correct that you
20 included a number of items to supplement
21 the letter that you submitted to the FDA
22 in this time frame?
23    A.   Yes, we did.
24    Q.   Attachments included

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1  correspondence that you had engaged
2  with -- prior to this occasion, with the
3  FDA on this topic?
4       A.   On the RMP, yes.
5       Q.   What is an RMP?
6       A.   The risk management program.
7       Q.   Okay.  You included the risk
8  management program quarterly report, or
9  at least examples of them?
10      A.   That's correct.
11      Q.   You included attachments
12 that detailed pediatric exposure summary
13 information and pediatric exposure
14 listing information, correct?
15      A.   That's correct.
16      Q.   Diversion summary
17 information?
18      A.   That's correct.
19      Q.   Diversion listing?
20      A.   That's correct.
21      Q.   Drug abuse summary
22 information?
23      A.   That's correct.
24      Q.   Drug abuse listing?

Page 523

1       A.   That's correct.
2       Q.   Misuse summary information?
3       A.   Yes, we did.
4       Q.   Misuse listing?
5       A.   Yes, we did.
6       Q.   Overdose summary
7  information?
8       A.   Yes, we did.
9       Q.   Overdose listing?
10      A.   Yes.
11      Q.   Fatal outcome summary
12 information?
13      A.   Yes.
14      Q.   Fatal outcomes listing --
15      A.   Yes.
16      Q.   -- parens, spontaneous,
17 closed parens?
18      A.   Yes.
19      Q.   Actiq off-label counts
20 versus patient exposure?
21      A.   Yes.
22      Q.   Cephalon RMP audit report?
23      A.   Yes.
24      Q.   And to be clear, you

Page 524

1  included in this presentation the
2  concerns that Mr. Brennan had raised,
3  internally first with the company, and
4  thereafter in the letter that we saw that
5  he sent to the FDA, correct?
6       A.   That's correct.
7       Q.   You also included Cephalon's
8  response to that audit report?
9       A.   Yes, we did.
10      Q.   Did you ever attempt to hide
11 what Mr. Brennan had raised within the
12 company, as far as the concerns as he
13 perceived them?
14      A.   No, not at all.
15      Q.   Did you include Actiq sales
16 training materials as part of your
17 presentation?
18      A.   Yes, we did.
19      Q.   It appears as, at least
20 based on the table of contents, that that
21 was a very voluminous portion of the
22 exhibit, correct?
23      A.   Yes.
24      Q.   And to be clear, any type of

Page 525

1  marketing material that was to be used by
2  the company needed to be vetted first by
3  you and your team, correct?
4       A.   Any marketing that was going
5  to be distributed to healthcare
6  providers, yes.
7       Q.   And that also needed to be
8  submitted to the FDA, correct?
9       A.   Yes, that's correct.
10      Q.   And, of course, we heard
11 today about the back-and-forth with
12 regard to the FDA taking issue,
13 potentially, with certain promotional
14 materials and making recommendations on
15 how the materials needed to be changed,
16 right?
17      A.   Yes, correct.
18      Q.   And I think you detailed for
19 us that in each and every one of those
20 instances, you and your team took action
21 to correct those materials in line with
22 what the FDA had suggested, right?
23      A.   Yes, we did.
24      Q.   To your knowledge, were any

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    of the materials that you submitted and
2    the FDA ultimately approved, did they
3    describe any type of off-label promoting
4    or marketing?
5        A.   We never received any
6    feedback from the agency, once we
7    submitted it, the final copies.
8        Q.   According to the table of
9    contents, you also attached a sales
10   bulletin.
11           In this instance, Sales
12   Bulletin Number 9, right?
13       A.   Yes.
14       Q.   Example of unbranded
15   promotional piece?
16       A.   Yes.
17       Q.   Example of Actiq branded
18   promotional piece?
19       A.   Yes.
20       Q.   Actiq journal articles?
21       A.   Yes.
22       Q.   Cephalon compliance program?
23       A.   Yes.
24       Q.   Regulation of pharmaceutical

Page 527

1    products compliance program?
2        A.   Yes.
3        Q.   Business ethics review
4    questionnaire?
5        A.   Yes.
6        Q.   Historical overview of Actiq
7    approval and risk management program?
8        A.   Yes.
9        Q.   And a number of summaries of
10   certain media coverage having to do with
11   Actiq, correct?
12       A.   Yes.
13       Q.   You also included Cephalon
14   initiatives for risk minimization,
15   correct?
16       A.   That's correct.
17       Q.   At any point in time, did
18   you receive a warning letter from the FDA
19   with regard to Actiq?
20       A.   No.
21           MR. CRAWFORD:  Objection.
22   Vague.
23   BY MR. DIAMANTATOS:
24       Q.   At any point in time in your

Page 528

1    tenure as regulatory -- in regulatory
2    affairs, in any capacity, did you receive
3    a warning letter from the FDA with regard
4    to Actiq?
5            MR. CRAWFORD:  Objection.
6    Form.
7            THE WITNESS:  No.
8    BY MR. DIAMANTATOS:
9        Q.   Same question with regard to
10   Fentora.
11           Did you ever receive a
12   warning letter from the FDA with regard
13   to Fentora?
14           MR. CRAWFORD:  Objection.
15   Form.
16           THE WITNESS:  No.
17   BY MR. DIAMANTATOS:
18       Q.   Did you ever receive what
19   you referred to earlier as an NOV?
20           Do you recall that answer
21   that you gave earlier?
22       A.   We had one NOV letter.  And,
23   I'm sorry, I didn't remember if it was
24   for Treanda --

Page 529

1        Q.   What is an NOV?
2        A.   A notice of violation, which
3    means not as significant as a warning;
4    the FDA wants you to correct an issue.
5        Q.   At any point in time, did
6    the FDA pull its approval of Actiq?
7        A.   No.
8        Q.   At any point in time, did
9    the FDA pull its approval of Fentora?
10       A.   No.
11       Q.   To be clear, we talked about
12   Fentora's approval, and I know counsel
13   went through the timeline for you, and we
14   were able to pinpoint, through a number
15   of documents, including the timeline,
16   that the FDA approved Fentora some time
17   in 2006, correct?
18       A.   That's correct.
19       Q.   Was that after this meeting
20   that we talked about in July 12th of 2004
21   where the FDA --
22       A.   Yes.
23       Q.   -- had concerns?
24       A.   Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1    Q.   To be clear, the indication
2  for Actiq was identical to the indication
3  for Fentora, correct?
4    A.   That's correct.
5    Q.   Did the Fentora approval
6  come after the concerns raised in Mr.
7  Brennan's letter with regard to Actiq?
8    A.   Yes, they did.
9    Q.   Did they come after the
10 concerns raised by Dr. Rappaport in his
11 phone call to you and in his
12 correspondence to you?
13   A.   Yes, it did.
14   Q.   Going back to the notion of
15 black box warnings.
16      Counsel covered with you
17 what a black box warning is, and you
18 described that.
19      Am I correct that all of the
20 marketing materials that were used with
21 Actiq and Fentora included that black box
22 warning?
23   A.   Yes, it did.
24   Q.   Isn't a black box warning a

Page 531

1  form of an educational piece?
2       MR. CRAWFORD:  Objection.
3  Vague.
4  BY MR. DIAMANTATOS:
5    Q.   Let me be clear.
6       Does a black box warning --
7  the marketing materials, do they need to
8  contain information about the label
9  indication?
10      Is that a yes?
11   A.   Yes, it is.
12   Q.   Okay.  Do they need to
13 contain information about the benefits of
14 a product?
15   A.   Yes.  But the FDA wants you
16 to put safety first.
17   Q.   Safety goes first, right?
18   A.   Yes.
19   Q.   And every single piece of
20 marketing has to include safety and risk
21 information, right?
22   A.   That's correct.
23   Q.   You described earlier for us
24 that you participated in training with

Page 532

1  sales individuals.
2       The training that you
3  participated in with sales individuals,
4  what, if anything, did you describe to
5  them needed to be done in terms of their
6  education of doctors that they were
7  visiting?
8    A.   So my part of the training
9  was to review the RiskMAP, I went through
10 all the elements, what the FDA was
11 concerned about, how we had to report
12 information, and the specific details.
13   Q.   Counsel entered an exhibit
14 and asked you about the 2008 guilty plea
15 that the company entered into.
16      Do you recall that?
17   A.   Yes, I do.
18   Q.   You mentioned -- in
19 response, you made reference to a CIA.
20      Do you remember that?
21   A.   Yes, I do.
22   Q.   Were you referring to a
23 corporate integrity agreement?
24   A.   Yes, I was.

Page 533

1    Q.   Am I correct that you were
2  aware that there was a corporate
3  integrity agreement in place, correct?
4    A.   Yes, I was.
5    Q.   Did you have to sign,
6  acknowledging that you were aware of the
7  corporate integrity agreement and exactly
8  what it spelled out the company needed to
9  do?
10   A.   Yes, I did.
11   Q.   Do you recall how long of a
12 time period the corporate integrity
13 agreement covered?
14   A.   Not -- not --
15   Q.   Was it multiple years?
16   A.   It was multiple years.
17   Q.   Did you and members of your
18 team follow exactly what the corporate
19 integrity agreement spelled out the
20 company needed to do?
21   A.   I can only speak for myself.
22 But yes.
23   Q.   To your knowledge, did
24 people on your team also abide by what

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1  the corporate integrity agreement
2  called --
3     A.   To my knowledge.
4     Q.   At any point in time after
5  2008 and the guilty plea referenced by
6  counsel, did the FDA pull approval for
7  Fentora?
8     A.   No, it did not.
9     Q.   It might have not been
10 pertinent at this time, but was Actiq's
11 approval ever pulled?
12    A.   No, it was not.
13    Q.   There was a description
14 about a TIRF REMS program in the
15 afternoon portion of your testimony.
16        Can you please explain what
17 a TIRF REMS program is?  Do you know what
18 the acronym stands for?
19    A.   Actually, I don't -- I don't
20 remember.
21    Q.   Okay.  What is it?  What's a
22 TIRF REMS program?
23    A.   To my recollection, again,
24 the FDA started requesting manufacturers

Page 535

1  of short-acting, long-acting programs to
2  discuss, in groups, what the requirements
3  were in order to have consistency and not
4  to have extreme redundancy then be
5  imposed upon physicians, in terms of --
6  in terms of impacting the areas of
7  distribution and the whole chain of the
8  product.
9     Q.   You mentioned "chain of the
10 product."
11        Am I correct that only
12 certain doctors are authorized to write
13 scripts for products that fall within the
14 TIRF's category?
15    A.   I believe having a
16 controlled product limits the prescribing
17 of who can -- what levels can prescribe.
18    Q.   How about patients; patients
19 need to sign up for the TIRF REMS program
20 as well, don't they?
21    A.   My recollection, that was
22 what they were trying to initiate, yes.
23    Q.   Distributors?
24    A.   Yes.

Page 536

1     Q.   And that information is
2  gathered and, of course, provided to the
3  FDA, right?
4     A.   That was my recollection.
5     Q.   And am I correct that all of
6  Teva and Cephalon's opioid medications
7  that we've been discussing today,
8  including Actiq and Fentora, were FDA
9  approved and only available through a
10 prescription?
11    A.   Yes.
12    Q.   Am I correct that the FDA
13 approved both of these opioid
14 medications, notwithstanding the risks?
15    A.   Yes.
16    Q.   Am I correct that the
17 prescribing information and patient
18 labels provide information regarding
19 risks and benefits of the prescription
20 opioid?
21    A.   Yes.
22    Q.   Including the black box
23 warning that counsel walked you through
24 earlier this afternoon?

Page 537

1     A.   Yes.
2     Q.   And that black box warning
3  includes information about risk of
4  addiction, correct?
5     A.   That's correct.
6        MR. DIAMANTATOS:  I don't
7  have any further questions for the
8  witness.  Thank you, Ms.
9  Marchione.
10       THE WITNESS:  Thank you.
11       MR. CRAWFORD:  I have a
12 couple.
13       How many minutes do I have?
14       VIDEO TECHNICIAN:  Nineteen.
15        - - -
16       EXAMINATION
17        - - -
18 BY MR. CRAWFORD:
19    Q.   Counsel asked you about a
20 corporate integrity agreement that was
21 entered into by the company with the U.S.
22 government, right?
23    A.   Correct.
24    Q.   Is it your understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1    that that was a -- what's your
2    understanding of why they were required
3    to enter into a corporate integrity
4    agreement?
5            MR. DIAMANTATOS:  Objection.
6    Form.  Calls for a legal
7    conclusion.  Foundation.
8            THE WITNESS:  My
9    recollection, reading and signing
10   it, is that there were violations
11   of marketing and that the DOJ, I
12   think, or -- I mean, the Justice
13   Department or -- I can't remember
14   the exact details -- but wanted to
15   have oversight of the company for
16   corrective action.
17   BY MR. CRAWFORD:
18       Q.   And corrective action
19   because, previously, the government had
20   found that the company was marketing
21   products off label, correct?
22           MR. DIAMANTATOS:  Objection.
23   Form.  Foundation.
24           THE WITNESS:  Going back to

Page 539

1        the document you showed me, that
2        appeared to be the case, yes.
3    BY MR. CRAWFORD:
4        Q.   And it included Actiq,
5    off-label promotion of Actiq, correct?
6            MR. DIAMANTATOS:  Same
7    objections.
8            THE WITNESS:  That's what it
9        said in that document, yes.
10   BY MR. CRAWFORD:
11       Q.   And counsel had asked you
12   about doctors being able to prescribe off
13   label, prescribe products off label.
14           But a company -- a
15   pharmaceutical company is not allowed to
16   promote a drug off label, in other words,
17   for nonindicated uses, correct?
18       A.   That's correct.
19       Q.   And, in fact, when the FDA
20   approved Actiq and Fentora, it approved
21   it on a condition that the RiskMAPs be
22   adhered to, to ensure that the drugs be
23   used safely, right?
24           MR. DIAMANTATOS:  Objection.

Page 540

1        Form.
2            THE WITNESS:  The RiskMAP
3        was to support the
4        commercialization of the product
5        in a safe way, yes.
6    BY MR. CRAWFORD:
7        Q.   And they were integral to
8    the approval, were the words of the FDA,
9    right?
10       A.   Yes, that's correct.
11       Q.   And you're aware -- strike
12   that.
13           If you could pick up
14   Exhibit-11.  This was the July 12th, 2004
15   submission that you had made to the FDA
16   prior to the July 14th meeting that
17   counsel asked you about just now,
18   correct?
19       A.   Yes.
20       Q.   And this is information that
21   the FDA specifically requested be
22   provided to it before the meeting,
23   correct?
24       A.   Yes.

Page 541

1            But I'd have to look at, did
2    we add anything additional?  I just don't
3    remember if we had additional information
4    in this.
5        Q.   But much of it was actually
6    requested by the FDA?
7        A.   Yes.
8        Q.   And then, in fact, when the
9    information was given to the FDA, they
10   and DDMAC expressed great alarm over what
11   they were seeing in your packet that you
12   gave, right?
13           MR. DIAMANTATOS:  Objection.
14   Form.  Vague.
15           THE WITNESS:  So we had two
16   meetings.  The initial meeting,
17   which -- where DDMAC was part
18   of -- actually, there were
19   approximately 60, 70 people from
20   FDA in the room.  There was no --
21   there was no negative feedback
22   during that discussion, and they
23   thanked us for coming.
24           The secondary meeting with

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1    DDMAC, who, in their meeting
2    minutes, showed concern about
3    the -- we went through the
4    information. They expressed their
5    concerns about some of the
6    marketing targets.
7    BY MR. CRAWFORD:
8        Q.    Right. So this packet,
9    which is, you know, at least a couple of
10   inches thick, was submitted two days
11   prior to the meeting, right?
12       A.    Oh, God, I'd have to -- I'd
13   have to check. I don't know.
14       Q.    The meeting was July 14th,
15   right? That's what it references --
16       A.    Okay. And so the
17   submission --
18       Q.    -- on the letter, right?
19       A.    Submission date was the
20   12th, that's correct.
21       Q.    And it references a July
22   14th meeting, right?
23       A.    That's correct.
24       Q.    You said there were 60

Page 543

1    people from the FDA at the meeting?
2        A.    Yeah, approximately.
3        Q.    And then you went through
4    the meeting minutes, and those minutes
5    accurately reflected what happened at the
6    meeting, right?
7        MR. DIAMANTATOS:  Objection
8    to form. Mischaracterizes the
9    witness's testimony.
10       THE WITNESS:  Right. There
11   were two -- there were two
12   different meeting minutes.
13   BY MR. CRAWFORD:
14       Q.    Meaning the July 14th
15   minutes --
16       A.    Yes, yes.
17       Q.    -- that the FDA provided?
18       A.    Yes.
19       Q.    Those were accurate?
20       A.    I believe so.
21       Q.    And the FDA did express a
22   number of concerns about the off-label
23   marketing in that meeting, correct?
24       MR. DIAMANTATOS:  Objection.

Page 544

1    Form.
2        Go ahead.
3        THE WITNESS:  During the
4    meeting, they -- I mean, there
5    were questions. But it was -- it
6    was very -- it was really
7    one-sided where we presented
8    everything. And then we got the
9    meeting minutes that reviewed it.
10       But during that meeting,
11   they asked questions, there were
12   concerns. But they didn't -- they
13   didn't, at the end of it, say,
14   we're really -- a lot of issues or
15   problems.
16       We did hear that at the
17   DDMAC meeting. So that was where
18   it was more expressed.
19   BY MR. CRAWFORD:
20       Q.    Right. The DDMAC was very
21   concerned about these materials you had
22   submitted, correct?
23       MR. DIAMANTATOS:  Objection.
24   Form. Calls for speculation.

Page 545

1        THE WITNESS:  We reviewed
2    those. So however they -- I mean,
3    that's the -- that's how you --
4    they were concerned about the
5    issues, yes.
6    BY MR. CRAWFORD:
7        Q.    So if you pull up
8    Exhibit-22, these concerns were
9    expressed --
10       A.    I believe they were.
11       Q.    -- at length in these
12   minutes that were provided at the
13   meeting, correct? If you can pull that
14   up.
15       A.    Is it the DDMAC one?
16       Q.    Right.
17       A.    Yes.
18       Q.    If you can pull those out
19   and look at the second -- second page at
20   the top.
21       A.    The one doesn't seem to have
22   a label, by the way.
23       Q.    It doesn't?
24       A.    It may be his copy, I don't

137 (Pages 542 to 545)

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1  know.
2      Q.   We'll have to check that,
3  then.
4          It says, DDMAC agreed to
5  meet with Cephalon and also stated that
6  it would like to discuss various concerns
7  DDMAC had regarding the promotion of
8  Actiq, including concerns regarding
9  information about Cephalon's promotion
10 that was provided by Cephalon during the
11 July 14th, 2004 joint division meeting
12 and in Cephalon's briefing package for
13 the July 14th, 2004 meeting.
14         They are referencing the --
15 the July 12th submission was the briefing
16 package you provided, right?
17     A.   That's correct.
18     Q.   And so once they had a
19 chance to look through that, they were
20 meeting with you here to express their
21 concerns about what you provided them in
22 the packet?
23         MR. DIAMANTATOS:  Objection.
24 Form.  Foundation.  Calls for

Page 547

1  speculation.  Asked and answered.
2          THE WITNESS:  This is a
3  subsection of FDA, this is the
4  promotion review section.
5  BY MR. CRAWFORD:
6      Q.   All right.  So on Number 2,
7  that first sentence there saying that,
8  DDMAC expressed concerns that, as
9  indicated by Cephalon's briefing package
10 for and presentation at the July 14th,
11 2004 meeting, the company targets
12 physicians for Actiq promotion purely
13 based on the number of opioid
14 prescriptions they write, and the company
15 is making no effort to screen these
16 targeted physicians to determine whether
17 they treat cancer patients and, thus,
18 would be appropriate to be detailed on
19 Actiq, given its limited indication.
20         So the briefing packet and
21 the presentation actually raised a
22 serious concern by DDMAC, would you
23 agree, about the targeting of physicians?
24     A.   That's what it says here,

Page 548

1  yes.
2          MR. DIAMANTATOS:  Objection.
3  Form.  Foundation.  Calls for
4  speculation.  Asked and answered.
5  BY MR. CRAWFORD:
6      Q.   All right.
7          MR. CRAWFORD:  But I'm just
8  following up on your questions
9  here.
10 BY MR. CRAWFORD:
11     Q.   On 3, DDMAC did express
12 concerns about the briefing package and
13 its presentation instructing sales
14 force -- its sales force to open sales
15 calls in a manner that fails to focus on
16 Actiq's limited indication and instead
17 focuses on the physician's treatment of
18 breakthrough pain in general, thus,
19 inappropriately broadening physician's
20 perceptions of the drug's use to treat --
21 the treatment of all forms of BTP, rather
22 than BTCP in the indicated population,
23 correct?
24         MR. DIAMANTATOS:  Objection.

Page 549

1  Form.  Foundation.  Calls for
2  speculation.  Document speaks for
3  itself.  Asked and answered.
4          THE WITNESS:  That's what it
5  says here.
6          And there's also a response
7  from Cephalon that says that we
8  trained our sales representatives
9  to always provide the label
10 indication for Actiq during its
11 sales calls and promote only
12 Actiq's labeled education.  It
13 educates them on therapeutic area,
14 pain in general.
15 BY MR. CRAWFORD:
16     Q.   We'll go into -- directly to
17 4 and 5.  Again, you agree with me that
18 DDMAC is expressing concerns about
19 information Cephalon has provided in the
20 briefing package, right?
21         MR. DIAMANTATOS:  Objection.
22 Form.  Foundation.  Asked and
23 answered.
24         THE WITNESS:  Yes.

138 (Pages 546 to 549)

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1    BY MR. CRAWFORD:
2        Q.   So in sum, the FDA had
3    requested much of the information, you
4    would agree, in the briefing package.
5            And then when they had time
6    to look at it, and they had that meeting,
7    DDMAC, on August 30th, they expressed a
8    number of concerns about what they were
9    seeing in that package, right?
10           MR. DIAMANTATOS:  Same
11   objections.
12           THE WITNESS:  That's what it
13   says here, yes.
14           MR. CRAWFORD:  That's all I
15   have.  Thank you.
16           - - -
17           (Whereupon, Teva-Marchione
18   Exhibit-39, TEVA_MDL_A_074679522,
19   was marked for identification.)
20           - - -
21           VIDEO TECHNICIAN:  This ends
22   today's deposition.  We're going
23   off the record.  The time is 6:43
24   p.m.

Page 551

1            - - -
2            (Whereupon, the deposition
3    concluded at 6:43 p.m.)
4            - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 552

1                CERTIFICATE
2
3
4            I HEREBY CERTIFY that the
5    witness was duly sworn by me and that the
6    deposition is a true record of the
7    testimony given by the witness.
8
9
10
                 Amanda Maslynsky-Miller
11               Certified Realtime Reporter
                 Dated:  January 21, 2019
12
13
14
15
16
17           (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24

Page 553

1            INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8            After doing so, please sign
9    the errata sheet and date it.
10           You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14           It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

139 (Pages 550 to 553)

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1       - - - - - -
        E R R A T A
2       - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 556

1       LAWYER'S NOTES
2  PAGE LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 555

1     ACKNOWLEDGMENT OF DEPONENT
2
3     I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 551, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   CAROL MARCHIONE     DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

140 (Pages 554 to 556)

**A**

**Abbott** 206:13
206:20
**aberrant** 418:20
419:20 420:3
**abide** 533:24
**ability** 157:1
303:3 310:15
335:14 474:23
**able** 16:24 168:1
178:9 245:23
310:9,11
529:14 539:12
**above-referen...**
430:13
**Abrams** 349:4
350:1 351:2,18
352:24 404:6
404:13
**abrasive** 277:19
**abuse** 87:24
89:15 92:23
99:11,17 101:6
113:5 188:20
212:11 320:10
326:13 332:10
344:6,8 442:4
442:8 444:14
445:3,21,24
446:4 447:10
447:16,22
448:1,4 451:20
451:24 452:18
453:7,12,18
454:18 457:5
465:9 501:20
502:1,9 503:5
503:11 505:15
506:24 507:12
507:14 510:11
518:3,15
520:14 522:21
522:24
**abused** 99:23
**abuse-deterrent**
506:18

**Academy**
216:15
**accelerate** 16:20
**accept** 33:12
148:13
**acceptable**
238:2 461:5
**acceptance**
216:18
**accepted** 33:21
**access** 212:8
**accidental** 113:2
411:19 412:13
435:8 436:14
454:21 457:6
**accompany**
123:16
**accomplishme...**
18:16 428:7,24
429:14
**account** 128:7
149:4
**accounting**
150:3
**accuracy** 32:24
33:11
**accurate** 33:14
39:16 40:9
56:15 186:7
189:22 286:17
476:20 543:19
553:20
**accurately** 15:16
49:8 178:13
190:19 374:18
543:5
**acknowledge**
74:18 169:5,12
484:7
**acknowledged**
385:9 516:1
**acknowledging**
76:7 98:18
533:6
**acknowledgm...**
135:9 555:1

**acquired** 55:24
60:21 67:10,19
508:9
**acquisition**
57:12 58:18
**acronym** 19:2,8
19:11 534:18
**act** 21:3 78:5
360:16
**Actavis** 14:21
**acting** 77:3
416:6
**action** 156:13
181:18 183:21
240:4,4 291:23
340:21 353:9
354:4,15,18,20
390:24 477:2
525:20 538:16
538:18
**actions** 192:14
213:16 214:10
353:23 354:8
**Actiq** 12:8,13,18
16:12 17:18,20
18:19 23:7,10
23:24 24:1,2,8
24:16,20 26:9
26:10,16 27:3
28:14 29:15
30:4,7,16
34:16 36:6
37:4,17 55:16
68:24 69:20
70:3 71:7,14
71:18 72:15
73:4 75:2
80:19,24 81:4
82:16 83:23
84:9 87:18
88:13 90:2,17
93:14 94:4,12
94:17,23 99:3
99:3,4,5,7,13
100:16,16
102:3 105:14

105:21,22
111:18 112:21
112:24 113:8
114:21 115:9
117:6 118:12
118:15 119:10
120:8 121:13
124:8 125:23
126:2,15,20
129:3 131:8,24
132:12 134:11
139:15 140:5,8
144:2,4 145:22
147:3,4 153:13
156:11 161:6
162:10,15
163:2 180:6
181:10 192:15
195:17 197:10
205:8 210:3,9
212:4,7,20
213:8,15 214:9
215:3 218:11
218:23 219:6
219:11 220:19
221:18,21
223:20 224:1
225:19,22
231:21 232:1,4
232:9,10,10,11
234:19,19
235:20 247:9
248:21,23
249:13,17
255:23 257:2
257:22 258:2,7
258:23 266:16
267:1,19
268:20,23
269:3,16,18
270:22 273:8
273:23 276:9
281:12 284:21
287:7,9 288:23
293:12,15
316:14 317:6

317:22 319:15
321:14,23
323:19 329:13
329:16,20,21
330:8,13 331:8
331:10,12
333:22,24
343:5,8 344:7
344:11 349:10
349:23 356:15
359:8,11,15,16
359:18 360:13
360:15,21
361:2 365:3
366:2,9 369:22
372:1 375:15
375:22 377:10
377:14,20
378:5,6,9,23
380:11,20,23
381:9 382:5,5
382:13,21
385:7 389:12
391:9 394:21
395:21 397:11
399:1,13 401:2
402:1 405:6
406:21 407:1
408:6 409:6
410:14 412:12
412:14 413:2,5
413:9 416:20
417:4 418:8
434:13,16
439:19 443:5
443:15,18,24
444:11 445:7
464:12,16
466:13,16
467:3,4 469:8
469:15 477:10
478:14,21
479:3,12,24
480:4,10,14
481:11 482:8
483:11,14

485:15 486:23
489:12 491:4
497:19 499:1
514:17 523:19
524:15 526:17
526:20 527:6
527:11,19
528:4 529:6
530:2,7,21
536:8 539:4,5
539:20 546:8
547:12,19
549:10
**Actiq's** 378:16
387:3 388:11
534:10 548:16
549:12
**actively** 35:8,22
36:7,8
**activities** 112:20
132:3 162:17
186:4 219:4
419:5
**activity** 196:14
**actual** 70:6
132:7 134:3
143:7 171:19
173:2 201:17
318:23 319:8
346:21 486:2
**add** 341:11
363:12,14
382:24 541:2
**added** 55:3
85:18 121:16
174:3,8 387:21
**addiction**
317:16 326:12
537:4
**addition** 66:6
77:16 321:22
377:16 385:2
**additional** 29:23
121:15 126:16
143:23 174:7
180:12 196:14

478:1 541:2,3
**Additionally**
119:16 121:8
121:10 196:7
**address** 87:20
179:4 184:13
198:24 239:7
378:14 390:24
420:22 441:7
465:3 517:16
**addressed**
179:24 198:12
241:14 308:8
431:8 433:23
457:7 467:22
494:1 517:7
**addresses** 11:22
437:5
**addressing**
212:8
**adequate** 71:16
185:13 198:24
**adequately**
198:5,11 437:5
**adhered** 539:22
**adjustments**
202:21
**administration**
29:13 74:17
416:22
**administrative**
74:11 76:8
**ads** 406:21
407:7
**adults** 454:22
**adverse** 27:19
153:23 293:18
409:7 441:9,10
**advised** 391:9
**Advising** 495:11
**affairs** 5:18
14:16 29:6,9
29:18 30:8
32:16 35:1
36:20 46:2,8
46:15 47:13

48:2,21 49:20
50:3,12 56:21
57:6 163:4
181:11 183:22
184:5 185:12
186:9,14
195:20 212:14
215:19,22
216:20 217:1
227:21 394:14
427:5 456:5
482:16 501:23
528:2
**affect** 441:5
**affirmative**
358:2
**afternoon**
511:17 514:13
534:15 536:24
**agency** 138:24
175:23 253:8
254:4,10
319:24 320:13
320:13 323:21
325:21 329:11
339:12 344:5
344:12 397:21
405:9,19 406:1
461:3 466:12
467:1 481:8
505:18 506:4
526:6
**agency's** 319:19
433:18
**Agent-in-Cha...**
416:14
**aggressive**
126:17 142:17
145:11 180:13
**ago** 12:21,24
50:23 168:14
52:16 55:12
**agonist** 442:2
**agree** 76:15
87:23 104:13
122:22 135:21
135:24 143:24

189:9,20
236:20 237:2
238:7 239:1,21
257:20 268:15
272:1,3 277:6
280:13 284:7
287:14,24
302:5 309:11
318:16 320:18
343:9 366:4
371:14 383:11
383:15,23
386:9 427:8
442:7 488:12
497:9,18
547:23 549:17
550:4
**agreeable** 104:6
483:21
**agreed** 10:3 20:4
20:5 22:4
195:9 345:8
356:11 430:12
433:15 450:23
451:1 453:17
453:18 466:12
467:2 496:24
546:4
**agreed-upon**
488:1
**agreement**
22:16 255:7
285:5 532:23
533:3,7,13,19
534:1 537:20
538:4
**ahead** 17:9
20:20 22:8
25:7 31:14
35:12 36:2
42:23 49:15
52:16 55:12
57:17 60:1
78:13 79:8
85:4 120:11
124:18 135:3

161:1 180:22
203:2 204:20
206:2 210:19
214:1 224:13
241:12 250:10
281:9 282:12
284:12 285:17
289:20 292:9
300:3,10 312:1
321:1 332:22
337:11 354:13
359:2 361:17
380:15 381:14
383:10,19
388:6 391:23
396:10 397:17
405:14 407:11
413:18 424:1
434:21 435:16
450:18 478:11
501:9 502:5,14
506:22 544:2
**aid** 118:21 165:9
407:1
**alarm** 541:10
**alcohol** 505:17
**alert** 497:12
**alerted** 449:20
**ALFANO** 3:10
**algorithm** 63:17
237:16 339:1
**ALLEGAERT**
4:11
**alleged** 518:12
518:15,17
**alleges** 416:17
**alleviate** 25:24
**allow** 446:6
**allowed** 115:8
155:2 539:15
**alluded** 237:23
**Amanda** 1:17
10:24 552:10
**amended** 71:15
479:24 480:4
488:8

amendment
429:2,3,5
430:11
American 126:5
126:5 140:12
140:13 158:10
216:14,15
221:24 222:1
223:16 226:11
AmerisourceB...
4:8
amount 225:20
238:9 240:6
289:7 318:23
321:18
amounts 65:7
ample 484:19
analgesics 442:5
476:8
analyses 320:11
analysis 223:4
225:16 226:5
228:14 229:18
230:17 233:20
234:2 286:12
319:20 443:13
494:24
analyze 120:7
237:17 282:16
338:19 339:4
analyzed 119:22
317:19
Andy 192:6
219:13 231:21
255:7 257:16
283:12 285:4
347:24 348:22
and-a-half
392:13 424:5
and/or 99:17
453:6 552:20
Anes 277:3,4
Anesta 68:21
69:9 77:15
84:1,11 104:5
201:11 205:6

328:22
anesthesiologist
227:1 233:5
249:11
anesthesiologi...
126:6 140:14
141:17 155:16
156:6 158:11
158:13 159:12
222:1 223:1
225:15 226:12
226:16 235:4
277:8 287:11
367:15
anesthesiology
215:12,13
220:9,10 223:1
233:8,14,15
234:14 247:19
247:21 265:10
276:16 336:1
338:7 339:20
anesthetic
317:15
announced
416:7
announcement
416:13
annual 30:21
66:1,4
answer 9:5 90:4
137:11 156:24
230:4 261:20
272:15 277:2
280:7 281:9
283:24 284:12
285:17 325:9
332:19 335:16
380:15 381:13
381:14 391:23
418:17 422:4
450:18 473:19
484:21 528:20
answered 39:18
68:5 70:22
74:9 76:22

115:12 144:11
159:6 170:9
173:6 226:21
228:20 230:1
230:20 239:19
240:10 242:10
243:10 244:13
248:2 251:18
263:4 264:13
267:13,23
272:7,24
278:11 279:16
279:22 280:19
281:6 282:1,6
283:4 284:1,3
284:11 285:14
286:21 296:10
309:22 312:17
312:24 313:24
314:7 325:6
369:12 372:4
384:6,20
474:17 475:11
547:1 548:4
549:3,23
answering 328:5
answers 228:22
231:24 419:16
555:4
anybody 281:10
289:4 459:22
anymore 307:5
anyway 105:18
204:12 390:2
493:17
API 321:11
APM 233:4,12
234:9
apologize 487:8
apparently
337:5 410:12
appear 13:23
361:1 379:4
382:19
appearance
444:1

APPEARAN...
2:1 3:1 4:1
appeared 539:2
appears 15:9
39:14 46:7,10
48:23 68:23
184:17 194:7
201:7,23
204:21 356:3
430:17 457:13
491:3 524:19
applicable
216:13,22
application
69:19 71:3,14
168:17 169:22
410:6,8,9,19
411:5 426:6
428:20 434:3,6
439:13 459:13
488:4,8
applications
44:19 511:24
512:3
applied 18:1
299:23 417:4
446:2
applies 227:12
295:13
apply 215:1
397:8 398:23
399:10 552:18
applying 376:16
approach
224:15
appropriate
120:1 126:4
140:9 142:15
212:9 221:23
225:3 239:23
294:22 295:15
295:21 329:18
331:2 375:21
377:10 407:5
547:18 553:6
appropriately

172:4 484:20
approvable
410:19 412:5
468:6
approval 16:16
16:20 20:22
21:12,23 22:3
68:24 70:2
73:9,15,17,22
76:19 78:19
80:1 83:4 85:8
85:10 120:21
167:1 169:6
173:2 203:8,21
204:6 205:2,8
205:17,21
207:21 208:21
209:3,7 210:16
212:5,7 243:17
293:15 349:18
358:2 379:24
427:11 429:9
429:19 433:21
438:13 439:12
440:20 487:3
488:15 489:9
489:12 497:20
498:24 511:21
512:9,24 513:1
527:7 529:6,9
529:12 530:5
534:6,11 540:8
approvals 18:17
210:4 211:15
428:10
approve 75:1
85:16 121:1
310:18 433:5
460:8
approved 16:11
20:15,22 22:16
23:12,17 24:1
24:2,8,21,21
25:1 26:5
35:14,17,20
70:3,9,19 73:7

77:17 78:4
80:18,24 81:24
82:2,15,21
85:15 86:4,7
110:15,20,24
114:13 116:23
117:7 134:24
189:15 202:22
203:17 204:4,8
204:14 205:14
207:17 208:2,9
208:19 209:10
210:14,23
211:5,10,14
239:13 294:16
294:19 311:6
311:15 329:17
349:11 402:21
413:14 416:22
418:23 427:24
429:1,6 432:10
433:4 437:15
438:14,21
449:23 451:10
453:19 459:18
460:12 461:4
461:10 462:6
463:7 468:9
476:16 477:4
480:1 488:5,8
512:6 526:2
529:16 536:9
536:13 539:20
539:20
**approving** 210:8
439:15 497:19
506:15
**approximate**
12:23 61:12,17
404:23,24
514:14 516:18
**approximately**
18:13 23:11
42:4 51:6
63:11 66:10
181:12 182:2

183:5,17
288:23 301:5
367:14 416:18
541:19 543:2
**April** 40:9
131:10 480:9
480:15
**Arch** 4:5
**area** 36:13,24
40:18 41:1
95:19 160:11
189:18 281:3
322:24 324:6
422:3 507:6
549:13
**areas** 185:16
292:3 338:7
379:1 382:24
446:3 535:6
**argument**
378:15
**argumentative**
237:11 272:8
273:1 279:17
283:3 285:13
287:18 299:8
305:4 325:7
327:12 339:24
357:4 372:3
383:6 384:5
386:13 391:22
400:17 507:17
**arm** 385:15
386:8
**ARNOLD** 3:17
**Arons** 509:3
**arose** 477:5
**arrived** 69:11
87:9 204:17
334:10 336:18
339:6 340:5
**arthritis** 270:18
**articles** 323:24
495:4 526:20
**ascertain** 34:20
232:16 429:4

**aside** 228:14
229:18 236:23
**asked** 13:23
37:7 39:18
68:5 70:22
72:10 76:22
77:4 115:11
132:19 144:11
159:6 170:8
173:6 184:10
226:21 228:20
229:24 230:20
239:19 240:9
242:9 243:10
244:13 248:2,8
251:18 263:4
264:12 267:13
267:22 272:6
272:24 278:11
279:16,22
280:22 282:1,6
282:9 283:3
284:11 285:13
286:21 296:9
309:22 312:17
312:24 313:23
314:6 318:1,24
325:6 332:5
361:23 362:6
362:11,21
369:12,14
370:18 371:13
372:3 384:5,20
405:10 470:2
471:1 474:16
475:10 497:1
511:16 512:14
513:4 515:14
515:16 516:22
532:14 537:19
539:11 540:17
544:11 547:1
548:4 549:3,22
**asking** 72:9
170:4 190:21
229:10 248:5

280:9 281:1
283:20 395:4
474:19 483:24
514:21
**asks** 115:4
**aspect** 55:8
107:14 242:1
248:19
**aspects** 329:13
421:15
**assemble** 92:12
**assess** 183:1
**assessment**
353:15 439:2
439:16
**assessments**
450:6
**assigned** 185:18
**assignments**
186:22
**assist** 55:6 517:1
**assistance**
447:23
**assistant** 348:19
**associated** 16:10
22:24 212:9
247:4 274:13
274:16 385:12
431:19,20
445:1 449:4
509:12
**Associates** 14:13
41:17
**Association**
223:17
**assume** 34:24
35:17 184:4
210:21 247:8
418:15,21
507:20
**Assumes** 67:14
127:6 128:11
166:2,12,17
167:4 262:14
314:6 322:16
376:8 384:4

419:11 507:18
**assuming** 72:11
208:10,11
210:24 219:3
259:14
**assumption**
246:24
**assurance** 6:9
33:19,23
113:20 161:4
161:15 162:5
188:16 192:16
195:16,18
204:15 209:1
291:21
**assure** 71:8
80:14 81:3
82:15 212:7
294:17 446:1
**attach** 207:7
319:9 355:8
440:21 483:9
494:13
**attached** 73:5
189:9 193:20
201:19 205:20
207:18 231:24
232:8 245:16
317:11 431:2
437:4,9,21
438:22 487:8
497:21 498:20
526:9 553:12
555:6
**attaches** 185:3
430:15
**attaching**
486:20
**attachment** 6:16
211:15 231:11
232:21 316:17
332:14 347:24
348:7 430:14
487:24
**attachments**
430:10 483:10

521:16,24
522:11
**attempt** 524:10
**attend** 345:17
423:22 513:21
**attended** 342:20
348:18 374:20
386:15 458:17
459:3 482:14
482:19
**attendees** 361:6
**attention** 195:12
205:15 319:21
322:12 324:1
328:23,23
410:3 460:20
**attest** 472:16
**attorney** 416:5,6
553:16
**audible** 13:9
**audience** 108:13
189:1 329:18
**audit** 133:21,23
134:14 140:17
161:6,20 162:9
162:15,21
165:4 170:5,6
172:3 183:23
188:14 192:11
192:14,24
194:2 195:15
196:15 198:16
229:7 274:21
281:21 293:22
296:24 302:21
303:6,9 304:9
304:12 308:2
332:7,24
523:22 524:8
**auditing** 302:18
**auditor** 303:18
304:5,6 306:1
306:17
**audits** 34:3
291:21 303:10
303:11

**August** 85:6
163:1 201:10
345:13 348:8
353:19 356:4
395:17 400:6
431:1 437:1,17
477:24 550:7
**author** 217:13
218:8
**authority** 83:3
**authorized**
535:12
**available** 95:5
111:4 119:10
122:12 134:20
294:2 297:15
297:21 329:12
333:21 344:10
449:14 536:9
**Ave** 3:18
**Aventis** 44:1
**Avenue** 2:11,21
**avoid** 349:19
**awards** 64:17
**aware** 13:2,4,18
22:21 142:14
142:21 143:4
143:12 144:1
153:22,24
154:22 174:12
291:21 292:4
293:8 301:8
318:10 331:3
343:6 391:4
419:8 518:12
533:2,6 540:11
**awareness** 331:4
359:17 388:9
**awkward** 82:8
**a.m** 1:17 10:15
86:14,20 130:1
130:7

---

**B**

**B** 5:9 6:2 7:2 8:2
416:5 447:19

**Bachelor** 44:24
**back** 20:23 42:6
43:21 44:3
61:16 76:13
78:18 80:7
83:3 85:8
86:20 89:7
130:7 136:1,11
145:3 150:19
152:24 157:11
160:24 163:15
163:19 166:22
167:17 177:19
201:2 206:10
209:9 216:3
232:20,24
243:13 248:15
253:2 268:6,20
276:1,4,11
288:17 296:12
296:15 303:19
315:11 328:20
336:1 347:11
357:8 358:2,13
358:18,21
363:18 367:15
374:11 379:5
381:3 392:22
395:3 398:19
403:11 405:3
405:14 406:4
410:23 411:1
412:22 421:5
423:5 431:22
451:7 468:3
470:20 471:19
482:1 489:20
499:14 505:7
506:14 511:9
530:14 538:24
**background**
78:8 287:22
345:3 356:8
362:20 444:19
**back-and-forth**
58:11 203:6

254:8 491:24
497:7 525:11
**bad** 57:22
466:15
**Bader** 161:9
302:24
**badgering**
280:18 281:5
**ball** 520:19
**bar** 276:12
**Barstow** 351:19
**based** 53:13
62:2,3 63:13
64:5,17 65:24
120:4 162:21
197:1 237:20
249:6,15
266:15 275:20
348:11 375:16
377:4 398:11
443:4 463:1,15
465:20 466:15
524:20 547:13
**basic** 13:8 97:3
**basically** 27:2
84:22 89:12
123:20 146:19
154:13 157:19
186:22 198:8
203:18 220:13
220:23 226:9
246:8 259:16
448:16,18
**basis** 31:5 61:23
65:17 149:22
164:7 297:2
362:7
**Bates** 5:21 6:8
38:15,23 45:13
45:15 46:20
47:4,17 48:3
79:15,18
161:14 232:23
346:23 347:8
371:6 487:17
498:5,6 515:9

521:11
**began** 63:7
**beginning** 1:17
76:16 304:6
311:11 322:23
324:5 397:4
469:2
**behalf** 500:5
**belabor** 405:8
**belief** 377:4,8,16
378:3,7
**believe** 12:15
14:2 23:22
26:7 36:13,13
36:24 41:24
42:10 55:5
56:4 60:2
62:10 67:24
75:6 78:24
79:3 80:2
87:13 91:2
97:5,23 107:7
107:24 122:7
123:13 124:5
128:1 130:16
136:24 138:22
138:22 164:14
164:18 168:8,8
169:2 191:21
196:4 229:4
232:17 240:15
252:11 263:10
265:5 291:23
293:11 302:19
318:13 334:13
348:11 351:19
361:7 376:9
379:17 468:11
472:5 476:22
478:24 487:24
490:17 496:17
506:3 521:6
535:15 543:20
545:10
**believed** 422:13
**believes** 377:1

Highly Confidential - Subject to Further Confidentiality Review

**bells** 510:11
**Ben** 499:20
**benefits** 436:2
  531:13 536:19
**Beng@bsjfir...**
  2:13
**benign** 307:14
  307:21
**BENJAMIN**
  2:11
**Berg** 197:24
  199:20 200:2,5
  317:3 348:19
**BERGER** 4:11
**Berg's** 198:20
**best** 142:19
  150:18 152:14
  159:8 249:16
  254:2 255:8
  280:21 285:6
  339:3 352:19
  390:13 473:18
  490:18
**better** 28:11
  112:14 127:14
  145:13 465:1
**beyond** 78:3
  107:8 139:4
  281:4 353:5,9
  354:4,10
  388:11
**big** 82:24 175:21
  404:15 408:8
  440:22 507:1
**bigger** 261:2
**biggest** 446:21
**binder** 175:22
  176:4
**biology** 44:24
**BioScience** 44:2
**bit** 129:20
  324:24
**black** 440:22,23
  441:2,12,13,17
  441:20,24
  442:6,10,18

530:15,17,21
530:24 531:6
536:22 537:2
**Blake** 4:4 53:1
  164:4,5 191:18
  317:3
**blind** 509:17
**blow** 303:22
**board** 191:22
**boarding** 347:6
**Bob** 161:9
  302:24 317:14
  347:24
**BOCKIUS** 2:16
**bolded** 442:12
**bonus** 63:8
  64:16 65:2,23
  66:1,2,4
  424:11
**bonuses** 61:18
  62:1,2,15 66:7
**boost** 466:2,9,23
**BOSICK** 3:10
**boss** 191:19,23
  256:9 302:24
**boss's** 191:23
**bottom** 25:15
  46:9 77:12
  94:20 118:8
  184:2 221:14
  303:5 325:16
  351:1 362:19
  445:15 449:3
  460:21 464:7
  465:23
**box** 440:22,23
  441:2,11,12,13
  441:17,20,24
  442:6,10,18
  530:15,17,21
  530:24 531:6
  536:22 537:2
**brand** 218:11,23
  219:7,11
**branded** 60:4,5
  526:17

**Brandywine**
  291:18
**BRANSTETT...**
  2:10
**break** 41:8
  86:12 181:24
  200:14,17,19
  201:6 277:23
  288:7 334:4
  368:1 392:11
  495:24
**breakdown**
  245:18 339:18
**breaking** 116:21
  160:15 232:8
  287:9,10
**breaks** 13:15
  276:13 277:7
  337:16
**breakthrough**
  24:3,3,5,6,12
  24:13,17 26:1
  27:6 69:20
  77:18 93:16
  117:7 118:3
  266:17 331:5
  375:23 377:3
  377:15 378:11
  378:22 387:5
  402:20 434:8
  442:13 459:23
  476:17 548:18
**Brennan** 161:5
  161:20 162:4
  171:3 177:21
  189:8 192:10
  192:23 193:23
  291:10,15
  292:5 293:5
  296:21,21
  302:20 308:1
  308:15 309:7
  310:22 332:7
  524:2,11
**Brennan's**
  180:17 196:24

314:23 530:7
**brief** 86:16
  130:3 288:13
  392:19 499:10
  511:6
**briefing** 356:19
  375:12 378:17
  386:22 546:12
  546:15 547:9
  547:20 548:12
  549:20 550:4
**bring** 58:16
  489:2,13
**broad** 388:10
**broaden** 359:12
**broadened**
  378:12 462:7
**broadening**
  387:6 548:19
**broader** 459:19
  459:20
**broadly** 445:20
  446:8 461:8
**Broadway** 4:12
**broke** 182:24
  191:1 335:24
**broken** 182:5
  183:18
**brought** 36:9
  59:2 365:6
**BTCP** 378:21
  387:9 548:22
**BTCP/DTP**
  275:22
**BTP** 266:17
  267:20 273:8
  387:8 388:11
  548:21
**buccal** 28:17
  435:4 444:4
  476:16
**bucket** 409:9
**buckets** 286:11
**buildup** 27:17
**bullet** 93:13
  94:12 99:2

118:17 295:9
399:18,23
428:5,7
**bulletin** 526:10
  526:12
**bunch** 460:7
**burden** 465:7
**bureau** 102:4
**bus** 305:21
**business** 14:12
  14:14 42:6
  131:18 211:4
  327:10 507:5
  527:3
**bylaws** 509:7
  510:15

———————
        **C**
———————
**C** 447:22
**calculation**
  338:18
**California** 2:5
**call** 108:12
  121:13 317:13
  318:5 320:19
  321:3,7,10,14
  321:19 322:1
  322:10 323:12
  323:13,16
  326:15 346:23
  348:5 365:6
  376:24 377:2
  377:11,19
  385:6,16
  422:19 441:12
  477:1 490:9
  496:1 520:17
  530:11
**callback** 118:10
  118:11,24
  173:19
**called** 96:23
  97:17 103:21
  109:24 210:2
  213:5 225:6
  266:11 323:6

| | | | |
|---|---|---|---|
| 323:11 324:15 | 377:13 382:20 | 476:18 547:17 | 520:4 | 333:16 344:8 |
| 359:9 373:1 | 384:19 386:12 | **capabilities** 50:6 | **category** 215:10 | 344:13 345:13 |
| 476:6 534:2 | 387:2,15 | **capability** 354:9 | 220:5 230:11 | 350:2,5 351:7 |
| **calling** 276:24 | 389:19 391:21 | **capacity** 528:2 | 233:20 294:17 | 351:10 355:5 |
| 378:20 417:22 | 406:13 408:14 | **capture** 255:3 | 535:14 | 356:1,8,12,17 |
| 498:5 | 412:7 423:2 | 318:14 352:18 | **caused** 12:19 | 359:10 360:18 |
| **calls** 16:6 72:6 | 437:12 446:12 | **captured** 326:6 | 322:12 419:20 | 361:6,15 |
| 76:21 77:7 | 446:18 463:24 | 352:15 | **causing** 320:12 | 362:15 371:23 |
| 81:11 82:18 | 464:19 465:12 | **captures** 119:17 | **cc** 192:9 | 376:16,24 |
| 88:20 93:4,21 | 466:18 473:6 | **carbon-copied** | **CCALC** 509:6 | 377:11,15 |
| 94:7 96:3 | 475:11 490:13 | 509:17 | 510:5 | 378:2,7,18,19 |
| 104:10 106:9 | 490:18 492:5 | **Cardinal** 3:15 | **cc'd** 245:6 | 379:19 380:9 |
| 106:19 107:20 | 506:6 538:6 | **care** 223:3 236:8 | **cc'ing** 347:22 | 381:8 382:6 |
| 111:8 128:10 | 544:24 546:24 | 260:21 262:1,9 | **ceased** 508:12 | 385:11 386:21 |
| 158:23 159:5 | 548:3,15 549:1 | 276:3 289:12 | **cell** 418:13 | 391:1,3,9 |
| 159:18 178:17 | 549:11 | 317:15 328:22 | **center** 455:6 | 394:13,21 |
| 180:20 189:13 | **campaign** | 329:22 337:19 | **centers** 450:9 | 395:4 414:18 |
| 190:11 205:24 | 126:18 180:14 | 340:10 341:1 | 455:5 456:23 | 415:16,22 |
| 208:4 217:23 | **cancer** 24:3,9,17 | **careful** 116:13 | 457:8 | 416:10,19 |
| 226:20 229:23 | 24:24 25:2 | **carefully** 253:18 | **Cephalon** 7:17 | 422:18 423:9 |
| 230:19 239:18 | 27:6 69:21,24 | 553:4 | 14:18 18:5 | 445:17,23 |
| 240:8 241:10 | 70:10 77:18,22 | **caregivers** 88:10 | 23:10,21 26:15 | 446:6 449:14 |
| 243:9 244:12 | 93:16 116:8 | 100:15 101:11 | 29:4 33:24 | 450:6,12 |
| 246:15 250:9 | 117:8,14 141:4 | **Carol** 1:15 5:4 | 53:24 55:24 | 451:22 453:4 |
| 250:24 251:6 | 222:20 223:4 | 5:13,14 10:21 | 58:4 59:4 | 453:10,17,20 |
| 267:4,12,23 | 227:2 247:4 | 11:3,20 15:2 | 60:22,24 67:11 | 454:9,24 |
| 268:10 269:1 | 251:24 252:8 | 43:15 161:9 | 67:11,20 68:3 | 456:16,22 |
| 269:22 270:11 | 252:13,15 | 191:17 231:20 | 69:10,11,15 | 458:12 459:16 |
| 271:4,12 272:7 | 253:20 254:17 | 255:20 351:18 | 78:16 79:5 | 465:7 471:7,11 |
| 272:23 273:15 | 266:22 267:20 | 496:4 555:8 | 84:2,18,21 | 477:24 479:11 |
| 275:6 276:19 | 268:7 269:4 | **carries** 261:3 | 87:10 96:10 | 479:23 480:10 |
| 277:11 279:17 | 271:10,19 | **case** 1:7 13:24 | 108:9 109:4 | 481:8 482:16 |
| 281:24 287:17 | 272:2,10,13,19 | 26:12 36:14 | 121:6,11 122:1 | 495:1 500:22 |
| 299:7 300:2,17 | 272:21 273:8 | 72:12 172:19 | 126:3 127:3 | 501:20,24 |
| 301:11 304:20 | 273:10,12 | 321:4,12,24 | 128:24 140:9 | 503:3 507:24 |
| 306:7 312:16 | 274:8,17 279:1 | 337:13 403:23 | 155:14,21 | 508:4,9,12 |
| 312:23 313:23 | 329:22 330:2 | 440:5 507:21 | 157:24 158:12 | 511:18 513:6 |
| 320:24 322:3 | 375:20,23 | 539:2 | 162:23 178:9 | 514:1,21 516:3 |
| 322:15 325:5 | 376:3,20,21 | **cases** 1:8 12:6 | 180:6,12 | 521:3 523:22 |
| 327:14 330:20 | 377:4,9,15 | 211:9 445:21 | 201:12 211:5 | 526:22 527:13 |
| 336:5,13 337:3 | 378:11,22 | **cash** 66:7 | 221:22 256:5 | 546:5,10 549:7 |
| 337:8 343:24 | 379:3 386:5 | **categories** 220:2 | 257:6 262:8 | 549:19 |
| 350:18 357:3 | 434:8,11,17 | 220:3 233:5 | 270:16 291:17 | **Cephalon's** |
| 359:23 364:17 | 442:14,17 | 234:5 341:10 | 292:6 299:23 | 121:17,18 |
| 365:14 366:14 | 449:6,11,15 | 419:15 | 312:10 317:23 | 221:8 348:14 |
| 366:24 377:5 | 459:19 462:6 | **categorize** 286:8 | 328:23 329:11 | 356:16,19 |

360:24 375:12
385:4 388:8
424:10 433:17
481:14 524:7
536:6 546:9,12
547:9
**certain** 91:11
169:18 191:17
213:15 214:9
219:17 240:24
254:15 255:18
291:17 329:13
349:15 441:8
479:19 520:1
525:13 527:10
535:12
**certainly** 260:9
444:13
**CERTIFICA...**
552:1
**certification**
10:4 552:17
**Certified** 1:18
552:11
**certify** 552:4
555:3
**certifying**
552:21
**cetera** 101:3
225:16 249:12
418:14 424:16
424:17
**CFR** 5:22 79:18
**chain** 118:9
165:12 231:18
306:21 445:18
473:22 487:9
487:12 518:8,9
535:7,9
**chains** 165:11
178:5 312:6
**chance** 323:11
546:19
**change** 29:22
35:5 64:21
73:14 74:12,14

75:9 76:3,6,17
85:20,22 98:17
110:15,16,23
121:1 167:2
168:6,18
169:14,18,22
170:6 190:5
206:15 248:19
252:23 398:3
402:10,16
405:15 406:16
412:17 432:5
433:2 439:5
**changed** 30:2
73:21 80:8
122:16,20
135:6 136:13
299:22 300:14
411:14 433:3
433:14 525:15
**changes** 73:3,11
73:23 75:1,24
77:3 85:9,13
120:23 170:14
172:12 173:3
174:6 202:15
205:10,21
206:21 313:14
410:10,14
411:3 413:9,15
430:12 433:6
433:15 553:11
555:5
**CHANGE/RE...**
554:3
**changing** 73:15
74:15,18 75:12
76:9 135:12
166:7 492:11
**characterizati...**
17:12
**characterize**
520:5,11
**charge** 91:3
96:10 97:11
127:4 227:21

331:15 440:2
**charged** 416:23
**chart** 5:18 46:1
46:7,11 48:20
192:1 232:8,13
232:19,20,23
233:3 261:23
268:18 269:20
273:10 274:21
276:13 277:6
281:21 337:15
426:14
**charts** 45:12
46:13 259:2
265:16 451:21
**check** 33:20
114:6 261:14
334:12 348:2
426:22 427:1
456:4 542:13
546:2
**checked** 39:21
**Chester** 54:6
291:19 416:11
**Chicago** 2:18
**chief** 52:20
164:4
**child** 88:10
113:2 129:8
212:10
**children** 349:14
359:16 411:19
444:3 454:21
**choice** 116:21
**chose** 139:7
146:11 419:14
**Christian** 4:17
**chronic** 93:16
268:6
**chronology**
52:11
**CIA** 416:1 418:6
496:12 532:19
**Circle** 11:24
**circulated**
216:17

**circumstances**
40:13
**citrate** 293:12
**civil** 416:9
**claim** 397:8
399:10 423:13
**claims** 12:17,18
397:5,9 399:8
399:11 401:19
407:18
**clarification**
40:7 355:6
390:17
**clarifications**
388:2
**clarify** 21:15
141:24 394:23
417:21
**clarifying**
390:12
**class** 88:12
94:13,17 95:10
97:7 98:6,11
99:14,20
470:16 471:12
472:12 474:6
**classification**
94:22 95:4,23
99:21
**clause** 41:5
**clear** 48:13
103:17 176:19
204:10 248:7
258:17 305:12
305:19 316:21
352:7 367:22
368:16 395:24
426:19 432:18
450:20 462:23
463:13 487:16
487:20 515:13
517:13 519:3,7
523:24 524:24
529:11 530:1
531:5
**cleared** 420:24

**clearly** 72:11
126:19 323:8
385:6,24
**client** 41:3
**clients** 14:19
41:1 500:6
**clinical** 48:21
268:13
**clinicians**
105:23
**close** 468:23
**closed** 523:17
**closed-loop**
446:23
**closely** 227:17
353:8 389:14
397:7 399:9
**clue** 366:20
**code** 119:21
215:7 232:24
233:1
**collaboration**
470:15
**colleagues** 33:13
**collect** 331:19
**collected** 31:22
127:20 129:2
**collecting** 91:3
**collection** 436:8
**Colleen** 97:12
**College** 126:5
140:13 216:14
221:24
**colored** 232:7
**column** 276:17
277:4
**combination**
263:20
**combine** 234:11
**combined** 137:3
222:8 236:10
**combining**
136:4
**come** 160:13
164:2 234:21
300:23 317:23

319:20 322:11
323:24 326:9
386:7 395:17
465:7 489:20
515:16 530:6,9
**comes** 135:18
251:21 341:14
400:2
**comfortable**
489:11
**coming** 177:3
198:18 359:21
395:19 541:23
**comment** 303:22
358:4,13
403:21 451:7
484:3 509:7
**comments**
195:13 205:10
351:3 355:6
357:18 358:7
358:10 359:4
377:24 378:18
396:21 397:7
398:10,24
399:9 401:3,23
403:11 431:22
433:1,2
**commercial**
30:12 32:16,20
139:2 141:1
142:3 146:7,7
227:6 230:3
332:24 505:11
**commercializ...**
41:13 540:4
**commission**
555:12
**commitments**
162:18,24
**commits** 178:7
312:8
**committee**
420:16
**common** 401:6
401:23 404:8

**communicate**
169:4,4 310:15
310:16,19
311:4,5,14
406:9 449:8
452:6
**communicated**
74:12 136:3
138:23 162:24
163:4 168:11
169:2,11
172:11 173:10
326:5
**communicating**
261:6 377:21
385:18
**communication**
30:10 74:3
76:13 101:20
101:24 104:21
105:7 136:2
137:6 139:6
166:20 169:8
170:14 390:11
454:9 456:15
**communicatio...**
75:20,22
141:19 166:6
188:17 377:17
381:17 417:23
430:13 491:16
521:1
**communicative**
367:6
**communities**
447:19
**companies**
14:17 43:24
44:6,13 404:7
404:9 409:2,9
511:22
**company** 7:16
17:4 30:11
32:5 35:9,23
41:16,19,22
43:8 50:14

63:16 64:4,10
64:11,24 69:15
73:22 84:9
91:20,22,24
93:19 94:4
97:7 98:6
105:7 108:1
114:9 115:7
117:2 120:18
123:5,20
124:10 125:18
128:7 132:20
133:3 142:12
160:6 162:10
165:20,23
167:8 168:4,16
171:5 193:3
225:17 232:15
240:3 291:22
292:1,24 293:6
293:16,24
294:19 295:4
295:10 299:4
304:9,18
305:15 308:14
314:9 317:2
320:1 324:1
326:9 327:1,10
330:11,24
331:3,15,22
335:10,18
336:24 349:2
350:15 353:18
354:23 360:16
362:3 375:14
375:17 376:15
377:1,7 378:4
378:11 385:15
391:18 410:13
414:17 415:16
416:10,23
417:11 418:2
420:13 448:3
448:19 451:5
451:12 460:23
469:21 486:8

495:11 509:23
512:12,17,20
517:22 518:11
520:2 524:3,12
525:2 532:15
533:8,20
537:21 538:15
538:20 539:14
539:15 547:11
547:14
**company's**
100:20 241:1
343:15 386:2
**comparative**
401:19
**compares** 232:4
**comparing**
119:22
**comparison**
371:7
**compensation**
61:10,20
424:11
**competitor's**
404:10
**compilation**
30:23
**compile** 32:7
**compiled** 129:2
130:23 517:23
520:2
**complain** 404:7
**complaint**
404:10
**complaints**
353:5 391:5
404:14
**complete** 90:3
431:19
**completed** 71:13
410:16 488:7
**completely**
398:1 520:21
**complex** 66:21
273:21 274:4
**compliance**

96:11,23,24
97:16 121:21
123:11 162:9
162:17,23
171:15 218:10
218:22 219:4
291:17 293:19
293:24 300:15
301:23 302:4
353:12 391:11
398:13 496:11
497:5 526:22
527:1
**complied** 369:13
**complies** 391:2
**comply** 146:22
181:15 391:14
391:18 495:2
**complying** 92:11
97:7 98:6
162:10 257:9
392:3
**component** 73:8
98:9 111:6
118:9 119:5
134:22
**components**
129:14 435:22
436:21 439:9
497:10
**comport** 78:6
186:23
**comports** 273:6
**comprehensive**
88:9
**Compton** 430:7
**concepts** 198:2
**concern** 16:23
239:15 302:18
319:19 320:12
321:17 327:7
354:1 361:5
364:8,13 376:5
386:21 387:12
388:14 397:20
405:19 440:12

444:14 492:11 492:23 542:2 547:22
**concerned** 155:10 169:9 169:17 239:12 317:18 319:14 320:6,21 323:17 324:23 325:1,21 327:2 329:15 344:6 349:15,18 350:2,5 352:1 356:23 362:22 364:20 365:4,8 365:11,18,21 366:1,7 375:5 389:1,12 391:7 444:7,9 466:14 493:24 506:14 520:15 532:11 544:21 545:4
**concerning** 205:10 215:21 378:24 410:6
**concerns** 16:10 126:7 129:8,15 144:7 216:9 253:13 302:14 316:14 317:6 321:8 322:13 344:19 345:2 349:10,13,16 349:22 352:11 353:18 356:10 356:13,15 359:7,21 360:8 360:10,12,22 360:23 362:17 363:1,24 364:4 365:1 366:22 374:14,16,17 374:19 375:7 375:11 385:3 388:8 419:7 423:17 441:4,7

441:8 443:24 445:6 465:21 477:3,5,15 492:20 501:19 505:13 514:16 515:22 517:17 524:2,12 529:23 530:6 530:10 542:5 543:22 544:12 545:8 546:6,8 546:21 547:8 548:12 549:18 550:8
**concluded** 71:6 71:16 327:1 352:24 551:3
**concludes** 80:10
**conclusion** 162:20 312:13 383:1 538:7
**conclusive** 333:18 334:24
**concur** 461:3
**condition** 115:8 120:20 268:23 277:24 293:14 539:21
**conditioned** 453:20
**conditions** 17:3 20:13 70:20 82:1 268:19 276:11 359:18 377:6 388:10
**conduct** 216:10 295:5
**conducted** 165:17
**conducting** 291:20
**conference** 430:6
**confidential** 1:12 161:11
**confidentiality**

1:12 41:5
**configuration** 46:11
**confirm** 176:15 214:20 219:16 276:22
**confirmed** 377:11
**confirms** 376:17
**conflicting** 493:1
**conform** 174:23
**confusion** 331:1 487:7
**Congress** 19:20 20:4 21:10
**conjunction** 21:23 126:9 216:11 331:8
**connect** 292:16
**consent** 23:5
**conservative** 146:16
**conservatively** 147:1
**consider** 377:24 462:11
**considerable** 289:7 344:11
**considered** 65:15 78:4 85:22 203:15 205:13 245:21 432:3,22 503:4
**consistency** 443:8 472:22 535:3
**consistent** 94:24 473:23 520:24
**constitutes** 433:17
**consult** 40:16
**consultant** 290:10
**consulting** 14:11 14:17 43:8

**contact** 126:3 140:9 168:24 221:22 316:13 317:5,12 319:10 456:22 490:9
**contacted** 323:9 452:14 457:9
**contacts** 463:13 491:16
**contain** 443:17 531:8,13
**contained** 71:4 78:3 91:10 506:17
**containing** 196:18 442:1 506:16
**contains** 428:21 442:11,24 444:23 449:13 481:14
**contemplates** 226:15
**contents** 332:2 332:12 521:10 524:20 526:9
**context** 262:20 402:13
**contextual** 401:20
**continue** 40:18 106:16 107:14 115:9 126:14 294:13,14 351:20
**continued** 3:1 4:1 115:8 439:10
**continues** 132:5 180:11 293:5 293:21 326:7
**contractor** 310:10
**contradictory** 334:2

**contraindicated** 248:24 250:4
**contraindicati...** 249:16
**contrary** 520:20
**control** 16:8 17:1 151:8 320:8 421:2 552:20
**controlled** 112:14,16 442:3 447:3 535:16
**convened** 196:9 199:7
**conversation** 321:22 325:13 329:6
**conversations** 313:18 417:18 423:12
**conversion** 477:9
**convey** 93:1,19 94:4 110:2
**conveyed** 389:21 389:23
**conveying** 280:14
**cooperating** 447:23
**cooperation** 439:10 500:9
**copied** 210:24 285:1
**copies** 86:24 161:8 526:7
**copy** 176:11 201:21 217:1 291:12 294:1 346:18 483:13 483:15 484:24 490:21 497:23 498:2 504:1 545:24
**copying** 248:18

**Cordial** 513:14
**Corp** 84:1
  201:11
**corporate** 46:7
  49:11 353:12
  532:23 533:2,7
  533:12,18
  534:1 537:20
  538:3
**Corporation**
  2:23 4:14
  68:21 69:9
  328:22
**correct** 13:3,20
  16:3 18:5,6,19
  18:20,24 19:18
  19:21 22:1
  23:6 24:19
  25:4,19,22,23
  29:19,20 30:4
  31:20 32:22
  33:6 34:1 35:2
  35:3 37:14,19
  39:9,14 40:5
  40:11 42:9,17
  42:18 43:10
  45:1,2 48:24
  49:1,23 51:14
  51:15,21 53:22
  54:20 55:20
  56:1,24 57:3
  64:18 66:5,8,9
  69:11,12 70:11
  71:10 84:19
  87:24 89:15,16
  91:8 92:1,6,9
  92:15 98:8
  100:10 101:4,8
  101:15 102:9
  102:24 103:24
  104:1,18,22
  117:1,5,18,20
  120:22 121:2,3
  127:1 129:13
  131:1,3,4,15
  131:19,22

132:8 141:9
143:18 144:24
154:17 156:3
160:10 162:3,6
162:19 163:5
169:22 171:1
174:20 177:18
179:4 183:3
186:3,17
187:19,23
188:18,22
189:23 190:20
192:3,12 195:5
195:10 201:15
202:23 205:4
208:23 213:22
217:18 218:9
227:24 245:10
245:22 247:12
255:12 258:5
263:21 264:6
270:17 271:2
275:12 285:3
297:8 315:1
326:4,17 329:9
330:17 331:24
333:6,13 334:5
338:15 342:14
342:21 348:21
348:23,24
351:14 356:1,6
364:9 387:18
394:7,8,22
395:5,5 398:16
398:21 399:2
399:15,24
411:7 426:7
428:13 429:12
429:16 430:19
434:13,14,23
441:14,19,23
442:8 447:12
451:15 452:2
453:21 457:12
458:17 459:4
461:1 466:16

468:6,7 469:9
476:21 482:17
482:18,22
485:24 491:18
491:22 494:4
508:1,2,14
511:24 512:1,4
512:21,22,24
513:3 514:7,17
514:18 515:23
515:24 516:3,4
516:7,8,11
517:8,9,14,15
517:24 519:11
519:12,22,23
520:2,3 521:14
521:19 522:10
522:14,15,18
522:20,23
523:1 524:5,6
524:22 525:3,8
525:9,17,21
527:11,15,16
529:4,17,18
530:3,4,19
531:22 533:1,3
535:11 536:5
536:12,16
537:4,5,23
538:21 539:5
539:17,18
540:10,18,23
542:20,23
543:23 544:22
545:13 546:17
548:23 555:4
**corrected** 293:7
**correcting**
  398:19
**corrections**
  553:5,7 555:5
**corrective**
  156:13 240:4
  340:21 538:16
  538:18
**correctly** 39:22

134:4 171:16
172:22 209:5
467:7 505:2,20
**correlation**
  292:17
**correspond**
  132:6
**correspondence**
  136:12 203:5
  203:22 206:5
  217:2 218:3,6
  410:24 491:5,8
  492:1,15,16
  504:7 522:1
  530:12
**corresponding**
  134:11 295:20
**costing** 362:3
  398:4
**Council** 510:11
**counsel** 10:3,21
  13:22 14:4
  46:17 280:20
  284:4 289:14
  290:2 327:22
  348:20 371:10
  417:19 420:5
  432:20 483:20
  497:24 498:2
  504:2 511:17
  521:16 529:12
  530:16 532:13
  534:6 536:23
  537:19 539:11
  540:17
**count** 232:10,10
  416:23
**counterpart**
  57:13
**country** 502:2
  507:15
**country-wide**
  502:17
**counts** 369:22
  369:24 370:4
  523:19

**couple** 45:11
  53:4 146:5
  165:6 289:11
  317:24 374:24
  424:7 442:22
  470:5 537:12
  542:9
**coupons** 111:22
**course** 74:5
  131:17 146:6
  211:3 325:12
  422:21 513:2
  516:14 525:10
  536:2
**court** 1:1 10:23
  497:24 498:3
  553:20
**cover** 394:3
  471:1 519:24
**coverage** 527:10
**covered** 530:16
  533:13
**Crawford** 2:3,3
  5:5 11:12,15
  15:6 17:10,17
  20:8 21:13
  22:11 23:2
  25:8,16 26:19
  27:1,12 28:4
  28:12 31:16
  32:9,19 33:7
  33:17 34:12,22
  35:18 36:5,16
  37:21,24 38:6
  38:8,17 39:2,4
  39:12 40:2
  41:2 43:2,20
  44:10,22 45:8
  46:5,23 47:5
  47:11,19,23
  48:4,10,14,18
  49:17 50:21
  52:9,22 53:19
  54:17 55:14,21
  57:21 58:15
  59:8,18 60:8

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 60:20 62:6,12 | 169:19 170:3 | 272:16 273:5 | 372:10,23 | 489:4,19 490:6 |
| 62:13,23 63:18 | 170:15 172:24 | 273:20 274:7 | 373:7 374:10 | 490:20,24 |
| 63:23 64:14 | 174:16 175:3 | 274:18 275:10 | 376:13 380:21 | 492:9 494:12 |
| 65:13,22 66:18 | 176:3,10,14 | 275:17 277:1 | 382:2 383:14 | 494:22 495:10 |
| 67:9,16 68:1,7 | 177:12 178:21 | 277:20 279:7 | 383:24 384:14 | 495:17 497:15 |
| 68:16 69:8 | 179:9,17 180:1 | 279:11,19 | 384:24 386:14 | 498:1,6,8,10 |
| 70:16,24 72:13 | 181:4 182:9,20 | 280:8 281:8 | 388:5,21 | 498:17 499:3 |
| 72:24 74:23 | 183:15 186:6 | 282:2,8,11 | 389:20 390:21 | 502:20 515:1 |
| 75:8 76:14 | 188:5 190:2,14 | 283:15 284:6 | 392:5,7,14,24 | 519:4 520:8 |
| 77:1,10 78:15 | 191:12,14 | 284:17 286:14 | 393:20 394:1 | 521:4 527:21 |
| 79:10,14,22 | 193:10,13,15 | 287:5 288:2,6 | 395:15 397:1 | 528:5,14 531:2 |
| 81:1,7,16 82:9 | 197:7 200:12 | 288:18 289:9 | 398:15 399:5 | 537:11,18 |
| 83:8,11,20 | 201:4 202:7 | 289:24 290:19 | 401:16 403:15 | 538:17 539:3 |
| 84:6 85:24 | 203:12 204:24 | 291:4,6 292:13 | 406:17 407:14 | 539:10 540:6 |
| 86:11,21 87:14 | 206:6 208:14 | 298:3 299:20 | 408:11 409:14 | 542:7 543:13 |
| 88:24 89:4 | 209:20 211:2 | 300:4,12,24 | 409:24 412:8 | 544:19 545:6 |
| 91:1,18 93:8 | 211:11,23 | 301:18 304:23 | 413:21 414:10 | 547:5 548:5,7 |
| 94:1,10 96:7 | 214:4,17 216:7 | 306:2,9 309:18 | 415:5,7,9 | 548:10 549:15 |
| 96:21 98:2 | 218:4,20 | 311:16 312:2 | 417:24 419:17 | 550:1,14 |
| 100:5 103:18 | 224:14,21 | 312:18 313:15 | 420:1 421:14 | **Crawford's** |
| 104:15 105:17 | 225:5,12 226:7 | 314:1,10,22 | 423:8 424:9,20 | 500:16 |
| 106:6,13 107:1 | 227:8 228:17 | 315:12,21,24 | 425:4,24 432:8 | **creating** 313:12 |
| 107:18 108:2 | 229:9 230:5 | 316:10 318:15 | 432:12,19 | **Creative** 41:11 |
| 109:7,11,20 | 231:1,4,14 | 321:15 322:17 | 433:9 434:24 | **criminal** 380:10 |
| 110:9 111:15 | 235:16 236:18 | 325:15 327:22 | 435:20 436:23 | 416:8 418:2 |
| 112:2,8,17 | 238:4,17 | 328:6,9,18 | 437:13 439:24 | **crisis** 501:6 |
| 113:19 114:7 | 239:10 240:1 | 330:22 334:21 | 444:12 446:14 | **criteria** 62:17 |
| 114:19 115:5 | 240:18 241:20 | 335:23 336:7 | 447:5 448:10 | 63:3 64:7 |
| 115:14 116:5 | 242:5,15 | 336:22 337:4 | 449:1 451:3 | 115:19 142:9 |
| 116:17 120:14 | 243:19 244:14 | 337:14 339:15 | 454:2 455:13 | 359:8 366:7 |
| 123:2,17 | 244:24 246:21 | 340:8 341:23 | 455:20 457:14 | **critical** 255:16 |
| 124:24 127:7 | 247:17 248:4 | 342:8 343:18 | 460:18 461:19 | 317:15 443:24 |
| 127:16 128:5 | 248:14 250:14 | 344:2 346:6,15 | 463:3 464:4,23 | **criticisms** 308:1 |
| 128:14 129:19 | 251:1,9 252:5 | 346:19 347:2,4 | 465:16 467:8 | 395:3 |
| 130:14 133:10 | 256:15,24 | 347:14,19 | 467:11,19 | **criticizing** |
| 135:13 137:22 | 258:9,12,19,21 | 350:23 352:9 | 468:12,21 | 301:20 |
| 138:15 141:14 | 259:13 261:17 | 354:2,19 | 469:19 471:18 | **Cross-Compa...** |
| 145:19 147:17 | 262:7,23 | 355:16,19 | 472:23 474:9 | 510:10 |
| 148:18 156:4 | 263:15 264:7 | 357:12 359:5 | 475:5,13 | **cross-noticed** |
| 156:19 157:17 | 264:19 266:7 | 360:3 364:12 | 477:22 478:10 | 499:23 |
| 158:20 159:1,9 | 266:21 267:8 | 364:23 365:20 | 479:9 480:8,17 | **CRPS** 273:21 |
| 160:2,9,23 | 267:17 268:3 | 366:18 367:11 | 481:2 482:6 | **culminated** |
| 161:18 164:21 | 268:17 269:5 | 367:23 368:5 | 483:5 484:6 | 514:20 516:5 |
| 164:23 166:8 | 269:12,24 | 368:10,21 | 485:1,14,20 | **current** 11:21 |
| 166:13,23 | 270:7,13 271:8 | 370:8,20 371:1 | 486:16 487:18 | 14:6,9,19 |
| 167:6 168:3 | 271:17,24 | 371:9,16 372:6 | 488:2,20 489:1 | 39:22 165:15 |

Highly Confidential - Subject to Further Confidentiality Review

205:11 411:22
462:15,16
463:19 466:1,8
**currently** 66:24
351:21 461:3
462:5 463:7
**custodial** 509:14
509:19
**custodian**
509:15
**customer** 294:7
**customers**
124:12
**cut** 237:3 409:7
**cutoff** 133:17
350:6,16
**cutting** 338:18
**CVS** 165:13
**Cynthia** 509:3
**C-II** 94:21,24
95:3,18 96:18
99:8
**C.F.R** 16:15
71:5
**C.V** 39:22

**D**

**D** 3:18 5:2
**Dan** 1:8 245:22
246:3,4
**dangerous** 330:7
349:13
**dangers** 27:20
**Darren** 54:24
**data** 119:7,8,13
119:19,21
121:5 122:2
123:6 129:2,7
129:15 133:22
134:13 140:16
142:6,10
165:14 167:8
170:19 174:13
175:7 215:7
231:21 232:1
245:16 246:2

251:21 274:20
275:4 299:14
299:18 305:9
306:12 326:11
332:4 333:16
333:20 334:5,9
335:15 337:1
339:17,22
344:10 436:8
**database** 120:6
127:12 187:6
210:24 255:2
**date** 1:17 10:14
52:8 60:18
84:3 85:12,19
85:20 138:13
163:8,9 175:17
175:21 176:1
203:10 208:13
209:3 245:22
261:14,16,19
261:23,24
315:16 328:20
335:13 413:15
437:23 468:1
476:20 488:9
498:11,12
542:19 553:9
555:8
**dated** 46:8,12
49:2,5 84:20
130:17 161:22
163:1 192:13
205:12 207:7
209:24 231:19
291:10 314:24
316:24 394:14
394:17 400:1
410:7 415:13
437:3,20
458:12 504:11
509:4 552:11
**dates** 52:6 85:18
261:15
**Dave** 291:9
332:7

**David** 4:17
10:12 161:5
192:9
**day** 3:3 254:21
500:17 555:11
**days** 253:18
290:16,17
358:5,6,14
404:24 424:7
505:18 542:10
553:16
**day-to-day**
108:14
**DC** 2:22 3:19
**DDMAC** 344:18
344:21 345:1,6
345:7,13
347:23 349:9
349:22 353:7
355:4,24 356:9
356:11,14,21
357:22,23,23
360:11,18,23
361:5,15
374:19 375:11
378:14 379:18
385:3,9,14,24
386:20 387:12
388:7,24 389:8
389:11,15
390:4,22 391:4
394:4,12,16,18
394:21 395:2
395:19,19
419:7 491:21
491:24 492:11
493:9,18
541:10,17
542:1 544:17
544:20 545:15
546:4,7 547:8
547:22 548:11
549:18 550:7
**DDMAC's**
359:7,20 364:4
365:1 374:14

377:24 397:7
399:9 408:12
**DEA** 95:14
96:11,24 97:16
98:7 188:17
323:9
**deadline** 497:5
**deal** 42:20
455:23 491:11
**dealing** 20:5
44:12 132:11
496:6
**dealt** 494:2
**Dear** 147:5,9
**death** 343:4
463:9 477:7
518:23
**deaths** 326:12
478:1
**decay** 12:9
**December** 29:10
41:23 161:23
163:10 192:13
195:20 293:23
**decide** 512:5,8
512:12,20
**decided** 26:5
40:16 505:11
**decides** 519:17
**decision** 256:3
**decrease** 413:1
**decreased** 413:4
**deducing** 233:13
388:19 419:4
459:17 505:24
506:11
**Dee** 1:18
**deemed** 72:23
553:19
**deep** 172:5
**deeper** 172:16
311:17
**default** 389:24
390:2
**Defendant** 2:23
3:6,14,20 4:7

4:14
**defendant's**
422:20
**defer** 199:5
**Deficiencies**
411:10
**define** 142:8
383:21 456:20
**defined** 141:18
141:19
**definitely** 44:21
135:10 194:23
194:24 239:11
384:11
**definition**
449:24
**definitions**
296:16 298:11
**definitively**
266:5
**degree** 44:23
**degrees** 45:3,4
**Del** 316:12
**delineating**
260:18
**delve** 87:15
302:14 303:24
**delved** 303:20
**demands** 492:12
**demographic**
447:19
**demonstrate**
71:17
**dental** 12:9
**dentist** 252:14
**dentists** 249:1
250:6
**deny** 381:23
383:2
**denying** 324:18
379:18
**department**
7:16 32:21
33:24 49:10
50:3 52:1 55:4
58:18 59:21

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

63:15,19 64:12
68:20 69:14
78:17 96:9,19
96:24,24 97:11
97:16 98:3
113:15 114:5
125:17 127:3
127:18,20
130:23 151:4
162:5 184:9
187:12 198:3
199:24 215:22
219:8 232:15
236:12 238:5
245:11 246:6
263:1 279:13
280:1,3 286:16
341:19 377:18
414:16 415:11
426:11 429:18
455:10 456:2
458:24 467:23
490:8,11 491:9
491:14 492:3
501:4 538:13
**departments**
32:11 33:1
34:3 46:15
49:9 92:3
97:19 186:16
190:17 196:21
212:12 216:19
257:11 263:20
264:9
**depend** 32:23
257:10 286:15
286:23 287:1,3
**depended**
262:24 264:8
**depending**
122:11
**depends** 67:7
**deponent** 10:20
555:1
**deposed** 289:23
**deposing** 553:16

**deposition** 1:14
9:2 10:16 12:2
12:22 13:5
289:14 290:3
290:14 469:3
499:23 500:4
550:22 551:2
552:6 553:3,13
553:17,19
**depositions**
500:11
**deps@golkow...**
1:24
**describe** 25:9
129:7 513:11
518:1 520:1
526:3 532:4
**described** 71:20
129:3 294:21
437:4,21 450:1
452:17 530:18
531:23
**describes** 127:15
**description** 5:11
6:4 7:4 8:4
534:13
**designated**
155:14,16
295:14 379:8
**designed** 87:20
294:17 325:24
**designing**
445:16
**detail** 155:22
297:13,15
309:5 331:9
407:1 518:10
**detailed** 75:14
375:21 514:12
514:19 522:12
525:18 547:18
**detailing** 109:13
225:3 292:1
293:15,23
317:12 359:11
360:24

**details** 89:24
95:13,19
146:21 228:9
302:15 307:6
307:20 319:23
340:4 352:13
388:4 419:14
421:5 492:18
492:24 496:19
518:2 532:12
538:14
**detected** 445:22
**determination**
72:21 198:9
227:14 263:17
439:8
**determine**
112:23 119:12
162:17 236:12
249:5,9 251:14
281:11 284:20
375:19 436:11
503:10 510:8
547:16
**determined**
153:9 156:8
198:1 199:8
227:5 228:9
229:11,12
**determining**
62:18 229:6
**deterrence**
506:24
**deterrent**
505:15 506:19
**deterrents**
507:12
**development**
30:12 40:16
41:12 507:5
**device** 443:10
**diagnosis** 215:7
333:19 335:1
**diagram** 369:24
**diagrams** 266:4
**dialogue** 252:24

253:7 254:4
406:3 408:5
513:12 514:15
**Diamantatos**
2:17 5:6 17:7
17:13 19:23
20:18 22:6,18
25:5,11 26:17
26:21 27:8,23
28:8 31:12,24
32:13 33:3,15
34:6,17 35:10
35:24 36:10
38:5 39:10,17
40:22 42:21
44:7,14 46:17
46:24 47:6,16
47:24 48:6,11
49:13 50:15
52:3,14 53:15
54:15 55:10,17
57:15 58:5
59:6,10,23
60:15 62:4,8
62:19 63:4,21
64:8 65:9,18
66:14 67:5,13
67:22 68:4
69:4 70:12,21
72:5,18 73:24
75:3,15 76:20
77:6 78:11
79:6 80:20
81:5,10 82:4
82:17 85:2
87:11 88:19
89:2 90:18
91:14 93:3,20
94:6 96:2,12
97:21 99:24
103:9 104:9
105:15 106:4,8
106:18 107:16
107:20 109:6,9
109:14 110:4
111:7,24 112:4

112:11 113:17
113:21 114:15
115:1,10,24
116:10 120:9
122:5 123:7
124:16 127:5,9
127:23 128:9
133:6 135:1
137:20 138:1
141:10 144:10
147:14 148:4
155:24 156:16
156:21 158:19
158:22 159:4
159:17 160:7
164:19 166:1
166:11,16
167:3,10
168:20 169:23
170:7 171:8
173:5 175:1
178:16 179:7
179:15,20
180:19 182:7
182:14,17
183:8 185:24
188:3 189:12
190:10 193:4
197:3 200:16
202:24 204:18
205:23 208:3
210:17 211:7
211:17 213:19
213:23 214:13
216:4 217:22
218:15 224:7
224:11,17
225:4,8,23
226:19 228:16
228:19 229:22
230:18 235:12
236:13 237:10
238:15,19
239:17 240:7
241:9 242:4,8
243:8 244:10

246:14 247:13
248:1,6 250:8
250:23 251:5
251:17 258:6
258:10,14
259:8 261:11
262:3,13 263:3
264:3,11
265:17 266:18
267:3,11,21
268:9,24 269:8
269:21 270:5
270:10 271:3
271:11,20
272:5,22
273:14,24
274:10 275:5
275:13 276:18
277:10 278:10
279:10,15,21
280:16 281:23
282:4 283:2,22
284:10 285:12
286:20 287:16
288:8 289:2,18
292:7 296:7
299:6 300:1,8
300:16 301:10
304:19 305:3
306:6 309:17
309:20 311:22
312:15,22
313:22 314:5
314:20 315:6
315:18 318:11
320:23 322:14
325:4 327:11
328:3 330:19
334:6 335:21
336:4,9 337:2
337:7 338:22
339:23 343:16
343:20 346:22
347:3 350:17
352:4 353:20
354:11 357:2

358:24 359:22
364:10,16
365:13 366:10
366:14,23
367:18 368:3,8
368:12 369:11
370:14,22
371:3 372:2,8
373:6,24 376:7
380:13 381:11
383:5,8,17
384:3,18
386:11 387:14
388:15 389:18
390:6 391:20
392:9 393:22
395:6 396:8
397:15 399:3
400:13,16
402:3 406:12
407:9 408:9,13
412:6 413:16
417:15 419:10
419:22 420:4
423:1,23 432:7
432:11,14
434:19 435:14
436:19 437:11
439:20 443:19
446:11,17
448:6,22
450:15 453:22
455:12,15
460:13 461:15
462:18 463:23
464:18 465:11
466:17 469:10
472:1 473:5
474:15 475:9
477:16 478:6
478:22 480:5
481:21 483:22
484:10 486:10
487:15 488:18
492:4 495:5,15
496:20 498:4

498:14 501:7
502:3,12
503:12 506:5
506:20 507:16
508:6,23
509:20 511:14
515:3,8,18
519:6 520:10
521:8 527:23
528:8,17 531:4
537:6 538:5,22
539:6,24
541:13 543:7
543:24 544:23
546:23 548:2
548:24 549:21
550:10
**Diaz** 504:11
**died** 355:1
**differed** 62:21
**difference** 190:1
234:18 443:22
**differences**
311:10 313:11
**different** 28:24
46:11 48:17
59:2 70:7
109:18,19
110:10 112:9
134:13,16
166:14 167:18
168:11 186:5
190:17 238:23
296:16 311:2
443:14 472:20
516:23 543:12
**difficult** 58:13
484:16
**digging** 123:19
124:13
**dilemma** 252:16
252:19 253:22
254:13
**dilemmas**
254:11
**diminish** 441:10

**direct** 89:21
118:8 132:5
194:18 195:11
241:6 454:9
456:15 460:19
552:20
**directed** 106:23
450:3,4,9
453:5 455:5
475:4
**direction** 9:5
21:9 189:2
**directions** 417:1
**directly** 118:12
123:24 124:7
160:6 185:17
365:10 411:15
549:16
**director** 29:5,8
29:17 30:8
34:24 36:19
41:21 49:20
56:20,22
257:18 317:14
427:3,4 482:15
501:23
**disagree** 189:17
272:3
**disagreed**
385:24
**discipline**
430:24 431:3
431:12,16
433:12
**disclose** 369:10
**disclosed** 371:20
371:21
**disclosing**
370:12
**disclosure**
368:23
**disclosures**
373:13
**discontinue**
165:21,23
**discourage**

330:6 344:13
361:3 378:4
385:21 413:6
**discouraging**
351:8
**discovered**
113:7 145:24
**discuss** 41:7
184:12 196:9
199:7 255:16
318:1 345:9
356:9,13
359:18 362:16
388:10 477:1
496:1 535:2
546:6
**discussed**
101:21 136:23
322:6 331:10
360:22 420:17
439:6
**discusses** 16:15
**discussing**
304:18 319:23
331:5 418:1
536:7
**discussion**
199:12 255:14
319:12 347:16
353:1 359:6
364:24 417:10
464:8 478:3
541:22
**discussions**
323:20 345:7
351:18 472:20
481:15,19
482:8
**disease** 331:4
359:17 388:9
**diseases** 78:2
**disintegrated**
28:19
**dispensing**
88:12 121:22
448:13

Highly Confidential - Subject to Further Confidentiality Review

disseminated
331:11
disseminates
331:4
disseminating
108:22 495:13
dissemination
111:17 496:13
dissolve 25:20
dissolved 258:3
dissolving 28:14
distinctly 365:17
distress 28:3
distributed
525:5
distributing
396:24
distribution
16:8 71:4,7,20
80:12 82:22
112:16 124:14
268:19 333:23
339:8 411:13
411:23 416:24
435:24 535:7
Distributors
535:23
District 1:1,2
415:12
dive 172:16
diversion 87:23
89:14 92:23
99:10,17 101:6
113:5 129:8
212:10 316:15
316:16 317:7
317:21 319:15
320:10 321:5
321:13,24
322:21,22
323:18 324:2,4
325:2 326:11
343:3 344:6
445:3,21
447:10,16,22
448:1 451:20

451:24 452:18
453:7,13
454:19 457:6
518:2,6,7,12
522:16,19
diversion/abuse
94:3
diverted 446:24
divide 227:23
divided 186:19
186:24 187:1
divides 259:1
dividing 189:11
division 1:3
317:14 344:22
356:18 465:1
546:11
Djensen@skik...
2:7
doc 328:10
442:20
doctor 117:16
147:5,10 148:1
154:4 218:6
241:7,24
256:12 474:4
doctors 100:24
102:8,23 103:7
107:10 110:1
116:20 117:3
120:7 144:17
145:21 147:12
148:1,20 149:4
149:6 150:1
151:22 154:11
157:23 223:5
223:19 225:18
235:2 236:9
352:2,12 366:8
386:4 421:17
422:19 423:11
450:13 532:6
535:12 539:12
doctor's 147:10
422:21
document 1:7

15:8 32:3
37:22 38:7
39:6 45:9,10
47:3,8,10,17
48:8 68:8,22
79:11 83:21
84:4 89:24
90:23 93:10,24
94:9,14 96:6
107:5 109:1
110:8 114:18
115:4,6 129:6
131:14 146:23
151:8 154:20
161:3 180:17
182:23 184:13
184:20 189:4,7
189:15 191:13
200:7 201:6,21
201:22 204:2
207:11 209:12
209:22 211:16
212:17,22
222:11 253:17
256:16 257:13
260:14 261:19
262:6 263:6
266:1 267:7,10
268:16 273:13
275:9 276:22
291:4,7 306:4
306:4 313:2
316:1 325:20
327:8 336:8
337:6 345:21
345:22 347:10
370:2 371:19
372:4 387:21
410:5 418:5
437:5,21
443:14 457:15
468:13 481:5
483:7 484:9,12
485:19 488:3
489:22 490:15
493:6 498:16

502:24 503:17
508:22 539:1,9
549:2
documentation
74:22 134:3
171:19 172:1,8
172:10,23
177:1 180:14
286:1 297:7
documented
115:17 148:12
documents 9:10
38:14 123:16
141:21 257:15
281:1 297:1
299:15,19
301:24 302:1,5
303:14 402:8
404:11 405:6
420:11 476:6
483:10 486:21
501:19 529:15
document.doc
316:15,18
doing 40:19
91:24 92:11
104:6 137:9
142:4 162:8
168:19 172:21
174:15 200:12
219:4 253:9
254:12 262:22
262:22 280:21
307:5 309:1
310:13 313:7
379:14 390:2,4
404:11 405:22
418:16 450:22
474:1 553:8
DOJ 538:11
Dorman 55:1
doses 349:15
dosing 477:12
double 427:1
double-check
265:7

doubt 135:4
195:2 210:14
Downingtown
11:24
downstream
123:19 124:11
dozen 295:16
Dr 256:13
296:20 319:13
319:18 326:7
329:6 426:5
464:9 466:11
466:24 481:4
530:10
draft 184:18,24
185:2,20 189:3
190:5 203:17
344:20 347:23
348:7 350:15
351:13 394:23
395:12 398:9
398:11 401:9
402:2 432:23
drafted 216:16
352:17
drafting 325:19
451:6
drafts 189:19
333:10
draw 205:14
Drive 2:17
drop 389:17
390:5 485:23
dropped 206:13
dropping
166:10 206:20
drug 4:14 7:17
16:22 17:5
21:24 22:15
23:19 26:15
27:22 29:12
69:19 72:15
73:18 75:14
78:20 80:10,15
81:4,23 82:1
83:24 91:13

99:23 100:8
106:3,17 110:1
116:8,9 117:14
117:15 123:22
124:14 140:23
146:4 185:11
186:8 188:1,19
235:3 242:20
277:24 294:15
294:18 317:16
330:5,7 331:3
344:23 349:11
349:17 353:4
360:20 378:13
385:9,13 404:9
410:6,8,9
414:19 415:17
415:23 416:22
426:6 428:20
434:2,6 442:8
448:20 449:15
450:14 451:13
453:12 459:13
470:15 479:18
479:20 488:4
511:23 512:3
522:21,24
539:16
**drugs** 16:16,21
18:21 20:14
23:8 37:13
42:19 50:5
78:20 380:11
416:12,20,24
422:14,20
453:8 470:16
471:13 478:15
539:22
**drug's** 359:12
387:7 548:20
**due** 12:19
196:13 349:12
478:2 505:13
**dug** 311:1,17
**duly** 11:4 552:5
**dumping** 505:17

**duties** 186:24
486:7
**duty** 224:5,15
**DYLAN** 2:4
**dynamic** 204:1
**D0324** 161:11

───── **E** ─────

**E** 5:2,9 6:2 7:2
8:2 554:1
**earlier** 43:9
130:20 135:7
179:24 201:8
201:16 222:10
223:12 259:12
502:20 514:12
516:16 517:11
528:19,21
531:23 536:24
**early** 42:8 79:4
84:15
**easier** 143:6
233:10
**Eastern** 1:2,3
415:11
**easy** 136:16
**Eckerd** 118:21
165:9 307:17
310:10
**Ed** 197:23
198:19 200:5
317:3 347:24
348:19
**educate** 102:8
102:22 103:6
103:21 158:18
241:2,4 243:4
435:24 445:20
446:7,8 450:13
457:10
**educated** 449:22
**educates** 549:13
**educating**
242:24
**education**
100:13,24

102:4 106:15
180:14 213:17
214:11 244:2
247:11 293:20
447:17 448:14
448:20 450:8
453:4,11 455:4
455:24 465:24
466:8 532:6
549:12
**educational**
88:10 100:22
101:9,17 106:1
107:9,14 126:8
126:17 142:18
144:8 156:15
180:7 216:10
240:4 452:15
456:24 457:10
466:2,9 531:1
**effect** 186:11
204:17 249:24
360:15
**effective** 71:18
80:11 143:7
144:19 146:15
202:18 377:21
385:17 411:24
413:6 477:4
488:9
**effectively**
378:10
**effectiveness**
90:11 112:23
113:9
**effects** 91:13
101:14
**effectuating**
171:6
**efficacious** 78:1
**efficacy** 101:13
401:22 406:23
407:2,17,24
**effort** 88:4
251:12,13
333:11 375:18

428:1 458:7
469:22 470:14
471:12 520:18
547:15
**either** 151:22
263:18 294:22
380:5 411:16
461:21 514:5
**elaborated**
447:14
**ELAN** 505:1,5
506:10
**electronic**
211:20 409:3,5
409:11 483:15
497:23
**element** 90:3
99:9,15,21,22
103:15 463:22
**elements** 90:1,7
90:10,16,16
91:11 92:4
100:3,7 103:2
105:2 320:7
443:1,10,17
454:14 532:10
**elevated** 440:11
**elevating** 440:14
**eliciting** 359:13
**embark** 142:17
**emphasis** 105:24
444:10
**employed** 61:3
**employee** 14:7
60:22,23 61:1
291:19 508:13
508:13
**employer**
507:24
**employment**
291:23
**enclosed** 488:10
**encompassing**
212:19
**encourage** 361:1
377:5,23

385:20,20
**encouraged**
424:12
**encourages**
350:3
**Endo** 3:21,21
38:13
**ends** 47:4,17
48:9 550:21
**enforcement**
447:24
**engaged** 513:12
522:1
**ensure** 82:1
90:12 97:6
105:13,18,19
331:1 344:14
385:8 391:1,11
451:23 456:3
479:20 539:22
**ensures** 185:13
**ensuring** 440:2
445:17
**enter** 538:3
**entered** 382:7
532:13,15
537:21
**enticing** 444:2
**entire** 51:24
53:24 64:20
491:14 521:2
**entirely** 327:12
462:24 463:14
464:2
**entirety** 285:16
484:2
**entitled** 83:22
161:3 415:15
**entity** 61:2
**Entry** 7:20
414:24 422:7
**equate** 239:9
**ER** 504:12 505:1
505:5
**Eric** 53:6 458:19
470:22,24

Highly Confidential - Subject to Further Confidentiality Review

495:21,23
errata 553:6,9
  553:12,15
  555:6
especially
  249:22 256:9
  304:9 320:9
  360:20 378:24
ESQUIRE 2:3,4
  2:11,17,21 3:3
  3:11,18 4:4,11
essential 72:2
  73:8
essentially 87:7
establish 437:14
  438:10
established
  414:7
estimate 75:21
  290:15
estimated
  196:14
et 101:2 225:15
  249:12 418:13
  424:16,16
ethics 286:24
  527:3
evaluate 132:22
  411:22 436:11
evaluated
  171:17 172:4
  215:8 229:5
  236:16,24
  462:11
evaluation 19:12
  19:16 114:4
  182:5 183:19
  469:3 504:24
evening 499:19
event 90:9 99:10
  99:16 153:23
  441:9,10
events 27:19
  88:5,17 90:5
  293:19 409:7
  473:23 476:7

eventually 51:13
  60:6 174:10
evidence 445:24
evolution 17:24
evolved 20:24
  21:6 122:10
  123:1 189:4
  265:2 310:6
evolving 122:10
  134:19 173:20
exact 19:8 42:3
  52:6,8 109:17
  174:24 538:14
exactly 20:2
  34:21 35:15
  58:14 60:12,18
  98:13 110:12
  122:24 128:13
  132:20 137:1
  138:8 144:14
  152:16 159:14
  254:18,19
  265:3 336:16
  338:10 379:13
  427:18 451:8
  533:7,18
examination
  11:10 220:15
  250:2 499:16
  500:17 510:20
  511:12 521:18
  537:16
examinations
  500:1
examined 11:5
examining
  219:19
example 141:17
  171:24 275:23
  305:6 309:5,13
  310:24 397:5
  526:14,17
examples 140:12
  260:12,13
  522:9
exceed 126:15

137:18 144:3
  181:1 220:18
  230:13 247:7
exceeded 134:1
  136:8 138:8,13
  138:18 140:19
  141:6 142:13
  142:16 153:8
  153:12 156:10
  183:1 224:2
  246:1 262:10
  263:2,13,18
exceeding
  151:20 181:9
  181:21 215:15
  246:13 250:5
  263:23 264:10
exceeds 158:4
  158:17 170:20
  221:1 225:21
  226:13 233:17
  260:24 295:2
  295:12
excellence 450:9
  455:5,7 456:24
excepted 230:16
  233:19
exchange 493:18
exchanges 494:3
excuse 38:12
  46:18 311:18
  495:7 512:16
executing
  453:20
executive 162:14
exempted
  219:18 220:14
exempting
  221:10
exemptions
  181:14 301:7
exhibit 47:20
  68:9 139:14
  193:12 213:24
  221:12 231:3
  256:16 290:20

298:6 328:10
  345:21 346:21
  392:10 409:16
  414:11 424:21
  466:20 467:12
  480:18 483:23
  484:2 487:10
  487:23 489:22
  490:21 494:13
  515:22 521:17
  524:22 532:13
exhibits 46:19
  371:8 392:8
  393:2 425:5
  432:17
Exhibits-29
  426:3
Exhibits-30
  431:3
Exhibit-1 5:13
  15:2,7,8 56:8
  426:19,23
Exhibit-10 6:8
  161:14 193:16
  193:17,19,22
  312:4
Exhibit-11 6:11
  177:8,14 319:5
  331:24 342:17
  349:7 370:16
  371:5 372:9
  514:23 515:5
  516:19,20
  540:14
Exhibit-12 6:12
  191:6,9 308:9
  308:11
Exhibit-13 6:14
  209:13,16,22
Exhibit-14 6:15
  231:6,9 298:14
  298:15 306:3
Exhibit-15 6:17
  244:17,20
  277:23 278:3
  280:10,15

Exhibit-16 6:19
  256:18,21
Exhibit-17 6:20
  290:21,24
  314:24 315:4
Exhibit-18 6:22
  316:4,9 329:7
Exhibit-19 6:23
  328:11,14
Exhibit-2 5:14
  38:4 39:6
  43:12,15
Exhibit-20 7:5
  342:1,4,10
Exhibit-21 7:7
  346:1,5
Exhibit-22 7:8
  355:12,18,21
  374:11 545:8
Exhibit-23 7:10
  393:5 394:2
  397:4 401:17
Exhibit-24 7:11
  393:10 394:12
  399:17 406:19
Exhibit-25 7:13
  393:15 394:15
  399:20 407:16
Exhibit-26 7:14
  409:20
Exhibit-27 7:16
  414:16 415:15
Exhibit-28 7:19
  414:23 422:6
Exhibit-29 7:22
  425:1 429:24
  433:11 437:8
  438:3,23
  442:22
Exhibit-3 5:16
  45:15,20 46:6
  47:9,12,21
  48:1,19 163:19
Exhibit-30 7:23
  425:10
Exhibit-31 8:5

425:15
**Exhibit-32** 8:7
425:20
**Exhibit-33** 8:8
457:18,22,24
**Exhibit-34** 8:10
467:16,20
**Exhibit-35** 8:11
468:14,17
476:3
**Exhibit-36** 8:13
480:22
**Exhibit-37** 8:14
483:8 485:5
**Exhibit-38** 8:16
485:10,15
486:22
**Exhibit-39** 8:17
487:4 550:18
**Exhibit-4** 5:18
45:16 46:1
47:3 48:7 49:4
51:16 54:21
**Exhibit-40** 8:19
489:23 490:2
491:1 493:11
**Exhibit-41** 8:20
494:15,18
495:19
**Exhibit-42** 8:22
503:18,21
**Exhibit-43** 8:23
508:17,22
**Exhibit-5** 5:20
68:12,18 80:1
**Exhibit-587**
483:6
**Exhibit-6** 5:21
79:13,18
**Exhibit-7** 5:23
83:13,16 87:7
132:17 139:10
139:15 143:18
201:10 214:20
221:13 373:5
**Exhibit-8** 6:5

87:2 201:20
202:3
**Exhibit-9** 6:7
130:10,16
179:13 370:10
371:18,22
373:6,8
existing 198:11
expand 459:13
expanded 458:3
465:5,10 467:5
468:5,9
expanding
465:20 466:15
expansion
412:15 472:5
expect 303:24
305:24 306:17
439:9
expected 450:12
511:22
experience
15:13,21,22
466:16 487:2
488:13
expertise 95:20
507:7
expired 26:10
expires 555:12
explain 28:6,11
136:14 159:2
254:11 412:16
412:22 431:11
441:1 534:16
explained
123:14 159:8
171:11 222:16
246:18 259:5
323:1,23
explaining
250:20 313:11
395:20
explains 441:6
explicitly 136:7
152:6
exposed 27:16

exposure 320:10
326:12 369:23
370:1,5 435:9
436:15 445:4
457:7 462:9
463:12 517:21
522:12,13
523:20
exposures 343:3
411:19 412:13
express 374:16
543:21 546:20
548:11
expressed
239:15 317:16
345:1 353:24
360:11,23
361:5,8,15
375:11 380:3
385:3 386:21
387:12 388:7
388:14 390:17
492:20,22
541:10 542:4
544:18 545:9
547:8 550:7
expressing
352:11 463:18
465:18,19
549:18
extensive 520:13
520:13
extent 88:6
372:1 373:13
417:17
extreme 535:4
extremely 320:6
398:4
e-mail 231:17
245:1,4 261:7
284:2,14
285:15 316:11
316:24 317:8
346:9,13,17,18
347:21 486:18
486:20 487:9

487:12 488:14
495:20 504:6
504:10,16,18
504:23 505:6,9
509:3,13,17
e-mails 75:20
e.g 216:14 331:9

---

**F**

face 161:1 413:2
facetious 274:15
facsimile 207:20
fact 131:20
167:7 177:5
197:8 207:14
209:2 291:23
296:4 318:8
326:19 339:17
382:22 388:3
389:15 418:11
429:17 431:7
444:16 539:19
541:8
facts 67:14
127:6 128:11
166:2,12,17
167:4 262:14
314:6 322:16
376:8 384:4
419:12 507:18
fail 553:18
failed 308:12
371:7 466:13
467:3
fails 387:2
548:15
failures 500:7
fair 17:11 92:16
98:24 190:3
252:6 260:19
344:3 382:16
467:9
fairness 335:12
fall 223:8 260:2
260:10 535:13
familiar 97:13

97:14 193:1,8
267:6 491:7
511:20 512:2
family 235:18
236:7
far 63:2 155:13
189:10 199:19
228:24 286:4
307:23 512:23
524:12
fatal 359:15
523:11,14
faults 363:21
fax 1:23 394:3,4
394:16
FDA 15:23 16:6
16:8 20:6,12
21:7 22:3,13
23:4 30:10,10
30:24 31:4,18
70:4 72:23
73:9,13,14,17
73:22 74:4
76:16 77:2,15
80:9,12,18
81:2,23 83:2
85:9,15 86:4
90:22 91:5,24
92:2,14 93:1
93:19 94:3
95:9,22 98:11
104:4 110:15
114:13 120:19
121:1,23
123:12 129:2
129:16 131:2
131:21 134:23
136:12 140:1
140:16 148:20
148:22 149:14
149:19 151:12
151:19 153:15
155:6,9 158:16
165:20 166:6,9
167:1 169:1,20
172:11 173:2

| | | | | |
|---|---|---|---|---|
| 173:11 174:10 | 392:4 395:13 | 524:5 525:8,12 | 406:10 407:5 | 477:10 480:11 |
| 174:11 175:11 | 402:22 403:19 | 525:22 526:2 | 489:11 | 480:14 481:12 |
| 187:22 190:19 | 403:20 410:3 | 527:18 528:3 | **feels** 350:1 | 482:9 483:11 |
| 202:15,22 | 413:14 416:13 | 528:12 529:4,6 | 379:18 | 485:17 487:3 |
| 203:6,14,16 | 418:23 420:14 | 529:9,16,21 | **fell** 186:4 | 488:6,6,16 |
| 204:5,13 205:2 | 420:15 421:10 | 531:15 532:10 | **felt** 143:6 144:16 | 497:21 498:20 |
| 205:21 206:5 | 423:18 426:5 | 534:6,24 536:3 | 144:24 155:22 | 502:19 528:10 |
| 207:17,20 | 430:7,13,15 | 536:8,12 | **fentanyl** 12:9 | 528:13 529:9 |
| 208:8 209:9 | 431:10,16 | 539:19 540:8 | 25:22 95:1 | 529:16 530:3,5 |
| 213:8 217:3,11 | 433:4 436:17 | 540:15,21 | 239:6 283:9 | 530:21 534:7 |
| 217:17 226:14 | 439:3,6,17 | 541:6,9,20 | 293:12 435:4 | 536:8 539:20 |
| 226:24 228:2 | 440:3 441:6 | 543:1,17,21 | 442:2 444:23 | **Fentora's** |
| 230:9 237:7,16 | 443:6 446:16 | 547:3 550:2 | 476:16 | 529:12 |
| 239:11 246:9 | 450:12,21,23 | **FDA's** 71:23 | **Fentora** 16:12 | **Fibromyal** |
| 246:12 252:22 | 450:24 451:6 | 72:1,9 82:13 | 17:18,23 18:18 | 270:3 |
| 255:9,23 262:9 | 453:18 458:11 | 91:17 111:11 | 23:8,12,16 | **Fibromyalgia** |
| 264:1 285:7,11 | 459:3 460:23 | 252:24 253:3 | 26:4,14 27:2 | 270:8 |
| 285:21 286:19 | 461:12,13 | 319:21 435:13 | 28:6,16 35:8 | **field** 108:11 |
| 291:10 295:5 | 463:18 465:7,8 | 439:8 443:23 | 35:13,21 36:9 | 189:2 450:6 |
| 295:10 310:13 | 465:18 466:6 | 460:3 | 37:4,18 57:7 | 454:10 456:16 |
| 311:5,6,14 | 466:14 467:24 | **FDA-approved** | 147:3 402:20 | **fifteen** 75:21 |
| 313:3 314:17 | 468:4,9 469:7 | 78:10 207:7 | 405:6 414:4,6 | **figure** 136:13 |
| 315:2 316:13 | 469:23 471:14 | **FDA-ese** 408:1 | 427:11,24 | 149:24 227:22 |
| 316:14 317:5,6 | 472:6,11,18 | **feasibly** 173:14 | 428:11,19,22 | 303:17 427:22 |
| 317:17,24 | 473:2,16 | **feature** 505:16 | 429:9 430:9 | **figured** 300:20 |
| 318:6 319:13 | 474:13 475:4 | 506:18 | 432:6 433:13 | **file** 65:1 142:7 |
| 320:21 322:12 | 477:1,3,14 | **February** 65:2 | 433:21 434:7 | 148:8 150:22 |
| 322:13 323:10 | 478:3,13,20 | 66:3 84:4,20 | 434:15 435:2,6 | 151:2,7 161:4 |
| 323:17 327:17 | 479:13,15,18 | 85:6,20 86:7 | 435:7,9 436:3 | 184:15 387:21 |
| 328:19,21 | 480:11 481:9 | 86:23 201:24 | 436:12,14,15 | 509:14,19 |
| 329:1,14 | 482:8 485:22 | 204:7 205:6 | 437:1 439:11 | **filed** 163:2 |
| 331:14,17 | 486:9 487:2 | 208:12 210:1,6 | 440:15 442:1 | 216:24 |
| 334:11,23 | 488:15 490:10 | 291:11 314:24 | 443:2 444:3,22 | **files** 48:17 78:19 |
| 335:4 338:13 | 491:17 493:9 | 315:16,20 | 445:2,4,5,19 | 151:5 171:22 |
| 340:2 342:13 | 495:13 497:19 | 479:17 | 447:11,17 | 195:4 |
| 343:1,12 | 501:20 506:4 | **federal** 416:21 | 448:13 449:4,9 | **filing** 10:4 |
| 344:22 349:15 | 506:11,14 | 478:14 500:8 | 450:7 451:20 | 162:18 404:1 |
| 349:18 352:1 | 511:19,20 | **feedback** 74:7 | 451:24 452:16 | 416:7 |
| 352:11 353:1,5 | 512:7,10,23 | 118:9 132:5 | 453:14,19 | **fill** 490:15 |
| 354:8 355:24 | 513:2,5,12,17 | 169:10 407:20 | 454:14,18,21 | **filled** 51:13,18 |
| 356:5 357:17 | 513:22 514:3 | 431:16 459:9 | 457:1,7,11 | 278:24 |
| 357:22,24 | 514:15 515:16 | 526:6 541:21 | 458:3 461:4,5 | **filling** 83:9 |
| 363:1 364:4 | 516:7,22 517:4 | **feel** 200:15 | 461:10 462:17 | **filtered** 228:3 |
| 365:6 374:14 | 517:17 520:12 | 222:19 239:8 | 468:10 469:8 | **final** 185:2 |
| 381:1,2,4,17 | 520:19 521:2 | 253:11 303:20 | 469:18 476:16 | 312:13 398:14 |
| 381:21 390:23 | 521:21 522:3 | 304:14 363:3 | 476:24 477:7,9 | 430:9 433:14 |

438:20 451:9
486:8 497:16
509:7 512:24
526:7
**finalization**
486:2
**finalized** 348:14
437:2,19
**finally** 74:13
**find** 57:24 74:21
106:22 123:15
127:17 130:15
138:12 148:1
150:15 152:15
157:3 159:14
164:7 171:4
237:24 283:9
297:7 307:10
307:16 311:11
368:23 370:18
370:19,21,24
387:24 410:17
437:17 438:2
474:11 494:8
**finding** 196:16
208:21 467:24
468:4
**findings** 162:21
172:17 180:17
192:15 195:15
304:4 305:17
**fine** 41:8 50:22
98:23 155:5
332:21 336:23
380:10,10
417:11 418:3
419:20 476:1
**finish** 336:10
420:5
**fired** 297:4
**first** 18:3 73:22
81:14 131:7,23
137:12 165:18
172:14 195:13
208:10 233:3
248:16 257:17

259:18 264:23
273:7 276:17
277:4 287:6
294:10 295:8
319:16 322:8
322:19 323:9
324:15 334:1
365:2 389:7
399:6,21 400:1
415:19 422:17
428:5,6 441:22
444:18 449:18
463:7 464:11
476:13 482:4
505:14 509:11
524:3 525:2
531:16,17
547:7
**fits** 482:23
**five** 119:2
259:16 286:22
338:13
**flag** 98:22
**flagged** 170:23
**flash** 483:19
**Flashing** 484:4
**flexibility**
304:10
**flip** 489:9
**Floor** 4:12
**Floyd** 53:6
458:20 470:22
470:24 495:21
**fluctuate** 275:20
**FM** 235:23
**FMS/MPS**
270:1
**focus** 89:18
245:2 382:1
387:3 446:9
453:5 548:15
**focused** 95:14
444:24 445:17
**focuses** 387:4
548:17
**focusing** 101:18

249:13
**folks** 504:20
**follow** 115:7
121:20 177:22
195:22 312:5
312:13 313:20
533:18
**following** 88:8
101:12,22
197:24 198:16
294:5 305:1
362:15 395:18
400:9 435:22
439:12 548:8
**follows** 11:5
411:10 487:22
**follow-up**
172:19 178:4
199:6,12
245:15 312:21
356:9 362:13
362:16
**Food** 29:12
416:21
**force** 75:13
359:10 385:16
387:1 388:9
420:23 455:1
455:24 456:1
548:14,14
**foregoing**
552:17 555:3
**foremost** 505:14
**forever** 283:6
370:6
**forgot** 289:12
**form** 10:6 17:8
17:14 19:24
20:19 22:7,19
25:6,12 26:18
27:9 31:13
32:1,14 33:4
33:16 34:7,18
35:11 36:1,11
39:11,18 40:23
42:22 44:8,15

49:14 50:16
52:4,15 53:16
54:16 55:11,18
57:16 58:6
59:7,11,24
60:16 62:5,9
62:20 63:5,22
64:9 65:10,19
66:15 67:6,14
67:23 68:5
70:13,22 72:6
72:19 74:1
75:4,16 76:21
77:7 78:12
79:7 80:21
81:6,11 82:5
82:18 85:3
87:12 88:20
89:3 90:19
91:15 93:4,21
94:7 96:3,13
97:22 100:1
103:10 104:10
105:16 106:5,9
106:19 107:17
109:10,15
110:5 111:8
112:1,5,12
113:18,22
114:16 115:2
115:11 116:1
116:11 120:10
122:6 123:8
124:17 127:6
127:24 128:10
133:7 135:2
137:21 141:11
144:11 147:9
147:15 148:5
156:1,17,22
158:23 159:5
159:18 160:8
164:20,21
166:2,12,17
167:4 168:21
169:24 170:8

171:9 173:6
175:2 178:17
179:8,16,21
180:20 182:8
182:15,18
183:9 186:1
188:4 190:11
193:5 197:4
203:1 204:19
205:24 208:4
210:18 211:8
211:18 213:20
216:5 217:23
218:16 224:8
224:12 225:9
225:24 226:20
229:23 230:19
235:13 236:14
237:11 238:16
239:18 240:8
241:10 242:9
243:9 244:11
246:15 247:14
250:9,24 251:6
251:18 261:12
262:4,14 263:4
264:4,12
265:18 266:19
267:4,12,22
268:10 269:1,9
269:22 270:6
270:11 271:4
271:12 272:6
272:23 273:15
274:1,11 275:6
275:14 276:19
277:11 279:16
281:24 283:3
285:13 286:21
287:17 289:3
289:19 292:8
296:8 299:7
300:2,9,17
301:11 304:20
305:4 306:7
309:21 311:24

| | | | | |
|---|---|---|---|---|
| 312:16,23 | 478:7,23 480:6 | 180:15 204:13 | 259:9 262:14 | **fourth** 434:1,5 |
| 314:21 318:12 | 481:22 486:11 | 208:24 214:19 | 264:12 265:18 | **FP/GP** 249:12 |
| 320:24 322:15 | 488:19 492:5 | 241:24 299:21 | 266:19 267:4 | **frame** 62:20,22 |
| 325:5 327:12 | 495:6,16 | 300:13 305:2 | 267:12,22 | 405:1 514:14 |
| 330:20 334:7 | 496:21 501:8 | 308:24 311:18 | 268:10 269:1,9 | 521:22 |
| 335:22 336:5 | 502:4,13 | 412:4 476:6 | 269:22 270:12 | **framework** |
| 336:12 337:3,8 | 503:13 506:6 | 521:10 538:20 | 271:4,12 272:6 | 354:10 |
| 338:23 339:24 | 506:21 507:17 | **foundation** | 272:23 273:15 | **Fran** 347:23 |
| 343:17 350:18 | 508:7 509:21 | 19:24 20:19 | 274:11 275:6 | **Frances** 347:22 |
| 351:13 352:5 | 515:2 519:5 | 22:7,19 26:18 | 275:14 276:19 | **Francine** 316:12 |
| 353:21 354:12 | 520:18 521:5 | 27:24 28:9 | 277:11 281:24 | **Francisco** 2:5 |
| 357:3 359:1,23 | 528:6,15 531:1 | 34:7,18 36:1 | 287:17 292:8 | **Frank's** 486:14 |
| 364:11,17 | 538:6,23 540:1 | 59:7,11,24 | 296:8 299:7 | **free** 111:22 |
| 365:14 366:11 | 541:14 543:8 | 60:16 62:20 | 301:11 304:21 | 114:11 |
| 366:24 367:19 | 544:1,24 | 63:22 64:9 | 306:7 309:21 | **Friday** 1:10 |
| 368:4,9,13 | 546:24 548:3 | 69:5 72:6,19 | 312:24 315:7 | **front** 189:21 |
| 369:12 372:3 | 549:1,22 555:5 | 74:1 75:4 | 315:19 325:5 | 257:21 315:15 |
| 374:1 376:8 | **formal** 97:1 | 76:21 77:8 | 327:13 330:21 | 367:5 441:21 |
| 380:14 381:12 | 168:17 169:21 | 81:6,11 82:18 | 334:7 336:5,13 | 515:5 |
| 383:6,18 384:4 | 433:16 490:14 | 88:20 90:19 | 337:8 338:23 | **frustration** |
| 384:19 386:12 | 507:24 | 93:4,21 96:3 | 343:21 350:18 | 405:9 |
| 387:15 388:16 | **formally** 310:18 | 100:1 104:10 | 357:3 359:23 | **full** 61:5 201:20 |
| 389:19 390:7 | **format** 211:13 | 105:16 106:5,9 | 367:1 380:14 | 346:24 449:18 |
| 391:21 395:7 | **formed** 471:22 | 106:19 107:17 | 383:9 384:19 | **full-time** 108:10 |
| 396:9 397:16 | **former** 291:19 | 110:5 111:8 | 386:12 387:15 | 164:8 |
| 399:4 400:14 | **formerly** 18:4 | 112:5,12 115:2 | 391:21 419:11 | **function** 97:4 |
| 402:4 406:13 | **forming** 94:5 | 115:11 116:2 | 423:2 446:12 | 243:23 244:2 |
| 407:10 408:10 | **forms** 387:8 | 120:10 122:6 | 446:18 450:16 | 247:11 310:7 |
| 408:14 412:7 | 548:21 | 124:17 127:6 | 455:16 464:20 | 440:8 |
| 413:17 417:16 | **formulate** 465:2 | 127:24 128:10 | 465:12 466:18 | **functions** 50:2 |
| 419:11,23 | **forth** 363:18 | 158:23 159:5 | 472:2 473:6 | **fundamental** |
| 420:7 423:2,24 | 406:4 | 159:18 166:2 | 474:16 475:10 | 74:15 |
| 432:15 434:20 | **forthcoming** | 166:17 167:4 | 477:17 478:7 | **further** 1:12 |
| 435:15 436:20 | 339:12,21 | 167:11 168:21 | 478:23 480:6 | 178:7 180:9,9 |
| 437:12 439:21 | 370:4 371:24 | 169:24 170:8 | 486:11 492:5 | 198:4 235:17 |
| 443:20 446:12 | 520:21 | 171:9 178:17 | 495:16 503:13 | 250:1 311:1 |
| 446:18 448:7 | **forward** 37:5 | 180:20 182:8 | 506:6,21 | 312:8 325:23 |
| 448:23 450:16 | 495:21 498:1 | 182:18 205:24 | 507:17 509:21 | 345:7 351:18 |
| 453:23 455:16 | 500:5 505:12 | 208:4 217:23 | 538:7,23 | 360:23 368:15 |
| 460:14 461:16 | **forwarded** | 224:12 225:9 | 546:24 548:3 | 456:24 537:7 |
| 462:19 463:24 | 246:2 316:19 | 225:24 226:20 | 549:1,22 | **future** 397:10,22 |
| 464:19 465:12 | 505:7,10 | 229:23 230:19 | **four** 178:4,8 | 398:2,24 |
| 466:18 469:11 | **forwarding** | 236:14 237:11 | 253:17 269:13 | 399:12 405:13 |
| 471:17 472:2 | 504:18 | 239:18 240:8 | 294:8 295:13 | 405:18 |
| 473:6 474:16 | **found** 86:23 | 241:10 242:9 | 309:14 312:5,8 | |
| 475:10 477:17 | 149:20 171:3 | 243:9 246:15 | 425:5 | **G** |

**G** 2:3
**Gabitril** 380:22
  381:10 416:20
**Gastel** 2:11 5:6
  499:18,20,24
  500:13 501:11
  502:8,18
  503:15 504:1,4
  506:12 507:10
  507:22 508:10
  508:20 509:1
  509:24 510:18
**gathered** 31:22
  536:2
**gathering** 517:2
**GCP** 303:12
**general** 40:4
  70:5 122:17
  143:8 147:19
  153:21 220:3
  222:24 223:8
  348:19 360:9
  378:8 386:5
  387:6 403:2
  416:5 431:15
  502:16 507:20
  548:18 549:14
**generalizing**
  283:12
**generally** 17:15
  29:7 32:11
  61:24 331:6
  332:18,21,23
  338:8 461:13
  502:6
**generic** 59:9,14
  59:16 60:7
**gentleman**
  292:19
**geographic**
  453:5 502:22
  503:4,10
**geographical**
  445:23 447:21
**getting** 22:16
  86:24 169:10

211:5 280:17
305:11 323:9
324:21 395:2
429:9 460:12
468:22 482:9
**give** 25:21 54:3
  69:3 87:3
  102:10 128:6
  128:21 133:8
  148:14 149:4
  176:10 204:15
  209:1 214:24
  222:4 286:16
  303:2,3 315:2
  315:5,9 346:6
  346:24 347:5
  347:10 354:15
  354:17 358:6
  370:17 374:8
  374:24 376:14
  414:13 441:16
  460:10,11
  461:22 484:18
  513:17
**given** 20:13
  22:14 67:12
  237:16 375:22
  484:13 541:9
  547:19 552:7
  555:4
**gives** 83:2
  140:12 172:13
  482:24
**giving** 142:4,6
  257:1 286:11
  357:7 400:8
  401:7 407:3,19
**glass** 233:7
**glasses** 56:24
**global** 36:19
  195:19 212:13
  215:18 216:20
  373:20
**go** 14:1 17:9
  20:20 22:8
  25:7 31:14

35:12 36:2
40:16 42:23
48:5,15,22
49:15 52:16
55:12 57:17
60:1 69:17
73:2 78:13,18
79:8,11 85:4
89:19 94:19
100:11 108:6
120:11 121:4
124:18 125:3
129:19 131:6
135:3 136:11
139:4 144:22
145:13,17
150:19 152:24
155:2 158:18
160:24 165:3,5
177:22 180:22
185:7 200:11
203:2 204:20
204:22 206:2
207:14 209:11
210:19 214:1
214:23 222:20
223:4,9,13,13
223:15 224:13
226:11,15
227:1 228:8
231:23 236:2
241:2,12
243:15 244:14
250:10 254:10
269:10,14
278:23 281:9
282:12 284:12
285:17 289:20
292:9 296:15
296:24 297:6
297:12 299:18
300:3,10
301:23 302:4
302:11,18,22
303:12,16
304:11 305:7

306:16,17,19
308:17 312:1
315:8 319:8
321:1 327:18
332:13 335:13
337:11 344:16
347:20 348:6
354:13 356:22
359:2 361:13
361:17 367:20
368:14 370:7
371:17,22
374:11 375:3
380:15 381:14
383:10,19
388:11 391:23
396:10 397:17
405:14 407:11
412:22 413:18
424:1 428:4
434:4,21
435:16 442:20
442:21 445:12
445:15 450:18
451:17 454:3
465:17 472:15
474:20 484:17
485:19 494:6
498:10 501:9
502:5,14
506:22 519:17
521:15 544:2
549:16
**goal** 88:2,3,15
  102:6,21 238:8
  238:14 447:13
  449:4 451:18
  451:19 466:13
  467:3
**goals** 112:19,21
  114:21 132:2
  435:5 436:18
  447:7,10
**God** 12:23 50:17
  133:16 290:15
  542:12

**goes** 145:2
  213:14 214:8
  217:4 237:9
  423:5 491:6
  505:10 519:24
  531:17
**going** 39:5 43:21
  45:9 73:21
  85:8 86:13
  87:1 89:7,18
  89:21 129:24
  143:2 144:15
  144:16 145:12
  167:17 169:14
  179:10 199:11
  200:13,20
  248:15 266:3
  285:19,20
  288:10 309:3,6
  309:7,9 315:10
  319:17 327:24
  328:3 346:12
  351:9 363:20
  370:17 374:21
  389:17 391:18
  392:16 398:19
  401:1 409:15
  421:5 424:17
  425:4 443:6
  446:24 448:17
  449:2 450:22
  453:1 464:7
  466:23 468:13
  468:14 483:6,9
  483:19,23
  484:11 489:13
  489:15 499:7
  500:5,15
  503:16,17
  508:21 511:3
  525:4 530:14
  538:24 550:22
**Golkow** 1:15,23
  10:13
**gong** 315:9
**good** 11:13,14

48:15 50:7
92:16 129:22
280:6 286:13
377:2 426:10
432:20 445:11
446:15 451:4
476:10 484:5
487:19 495:21
499:19
**GORDON** 3:10
**gotten** 65:2
408:24
**government**
422:12 423:14
537:22 538:19
**Government's**
422:7
**Government's**
7:19 414:23
**grab** 298:4
370:9
**graduate** 45:4
**grant** 66:20
**granted** 67:3
**graph** 369:20
**great** 322:12
515:7 541:10
**greater** 126:1
140:7 180:5,11
181:18 221:21
**Greg** 348:1
**group** 35:1
56:20,23 59:14
59:16 105:23
142:3,5 143:2
143:8 144:1
145:15 146:1,2
151:3 152:1,8
153:8,12 155:8
155:12,18,23
156:5,7,9
158:13,16,17
159:12,15
171:15 187:8
198:16 213:14
213:17 214:8

214:11 215:6
220:18,21
221:1 223:11
223:13 224:1
225:14 227:16
228:8,12,18
229:5 234:10
236:11 241:2,5
241:7,17 243:5
243:15 265:11
332:23,24
340:18 341:6
341:12,14
379:7,8 427:4
427:20 443:11
456:7 471:22
472:19 473:3
473:13 474:11
475:7 482:15
496:11 497:5
499:21 507:5
**groups** 103:20
125:4,20
126:13,24
132:17,23
138:24 139:5,8
140:2 145:17
146:11 153:7
154:7 155:13
155:14 157:7
182:4 186:5
189:5 198:9,11
213:5,13 214:7
214:16,18
215:2 219:22
220:2,13,16
221:5,10,16
222:17,18,19
223:7 224:23
225:1,2 227:15
229:12,13,15
229:19 230:16
236:23 240:20
240:22 243:2
247:3,7,20
260:6 265:9

338:14 404:9
535:2
**guess** 13:8 22:3
36:3 104:5
139:1 151:8
152:5 187:7
195:12 249:21
278:13 384:10
400:5
**guidance** 407:4
408:16 443:7
460:12
**guidances** 20:7
21:8
**guide** 165:13
476:20
**guilty** 381:8
382:7 419:21
532:14 534:5
**guy** 192:10
**guys** 59:21
261:9
**gynecology**
228:5

---

**H**

**H** 5:9 6:2 7:2 8:2
16:11,13,14,18
16:19,24 20:23
21:12 71:5,9
80:3,17,23
81:8,21,24
82:24 349:12
357:15 403:5,6
403:12,16,24
404:21
**habit** 94:5
**habits** 293:18
294:20
**halfway** 236:3
**hall** 304:11
**hand** 186:9
210:16 487:11
503:16 508:21
**handed** 47:1,2,7
**handing** 112:15

**handle** 25:14,15
44:11
**hands** 452:5
**handwriting**
184:7 200:8
**handwritten**
161:23 184:1
**happen** 151:1
325:23
**happened** 34:21
151:10 171:18
313:17 354:6
414:2 422:1
516:9 543:5
**happening**
129:17 400:19
**happens** 282:17
**happy** 38:18
39:3 81:18
**hard** 262:19
266:4
**hardcopy** 38:2
43:11 485:16
497:23
**harm** 391:7
**HARRIS** 3:3
**harsh** 353:15
**hat** 381:2,2
**head** 13:10
36:19 56:12,17
57:2 59:19
60:4,5 171:14
411:1 429:18
**headache**
268:21 269:6
269:15 275:24
276:11 279:2
**heading** 490:7
**headquartered**
416:10
**health** 3:15,21
68:20 360:22
391:3,8 501:5
**healthcare**
447:18 449:19
525:5

**hear** 95:9
166:21 381:22
544:16
**heard** 114:1
147:5 154:2
258:14 274:3,5
323:8 372:19
381:3,7 382:4
525:10
**held** 1:15 345:13
381:5 415:22
**help** 31:3 50:2
105:18,19
235:9 304:7
385:8 470:2
**helped** 141:24
195:7
**helpful** 39:1
128:20
**helping** 482:21
**hematologists**
228:13
**hematologists/...**
119:24
**hematology**
215:11 220:6
230:12
**Hertz** 464:10
466:11 467:1
474:19
**hesitancy** 122:9
**hesitant** 124:23
189:16 234:17
**hesitating** 41:4
180:24
**hey** 151:19
**Hi** 504:20
**hide** 520:18
524:10
**hiding** 367:7
**hierarchy** 49:11
**high** 317:2,17
318:17 320:12
322:13 323:20
369:9 384:11
384:13 454:17

Highly Confidential - Subject to Further Confidentiality Review

**higher** 275:24
    276:1
**highest** 308:13
**highlight** 521:9
**highlighted**
    215:16,17,23
    230:14 234:6
**highly** 1:12
    106:1 282:14
**high-volume**
    121:13
**HIPAA** 157:15
**hired** 31:7 60:11
    60:12
**historical** 136:1
    527:6
**historically**
    136:11
**history** 15:17
    38:10 39:9
**hit** 152:19 153:5
    237:19
**Hoffman** 11:24
**hold** 42:3 174:21
**holders** 104:6
**holes** 313:9
**home** 11:22
**Hon** 1:8
**honest** 12:10
    75:7 111:12
    124:2 227:4
    286:17 380:17
    382:15 479:2
**hope** 309:3
    446:5
**hopefully** 287:2
**hospital** 303:13
**hotspot** 503:5,10
**hotspots** 453:5
    502:22 503:8
**hour** 290:12
    392:12 424:4,4
**hourly** 290:10
**hours** 290:13
**household**
    463:13

**huge** 175:23
    253:17 333:7
    367:8
**Human** 68:20
**hundreds**
    197:17
**hydro** 506:15
**hydrocodone**
    504:12 505:1,5
    506:17
**hydromorpho...**
    95:3

**I**

**ID** 493:4
**idea** 103:5 377:2
    510:2
**identical** 27:3
    248:9 530:2
**identification**
    15:4 43:17
    45:22 46:3
    68:14 79:20
    83:18 130:12
    161:16 177:10
    191:10 202:5
    209:18 231:12
    244:22 256:22
    291:2 316:6
    328:16 342:6
    346:3 355:14
    393:7,12,17
    409:22 414:20
    415:2 425:2,12
    425:17,22
    457:20 467:17
    468:19 480:24
    485:7,12 490:4
    494:20 503:23
    508:18 550:19
**identified**
    125:22 139:2,6
    140:4 151:13
    163:3 165:11
    221:18 222:18
    246:13 300:21

    341:9 439:12
    456:23 457:3
**identifies** 478:14
**identify** 142:12
    143:6 307:8
    446:7,9
**ignored** 422:13
**II** 88:12 94:13
    94:17,22 95:10
    95:23 97:8
    98:6,12 99:14
    99:20 330:1
    442:3
**III** 447:15
**illegal** 360:19
**Illinois** 2:18
**illustrated**
    333:21
**IM** 236:2
**imagine** 255:4
**immediately**
    521:11
**impacted** 196:21
**impacting** 535:6
**imperative**
    553:14
**implement**
    91:22 122:23
    126:8 144:8
    453:4
**implementation**
    73:15 90:1
    343:8 344:9
    435:23 436:7
    436:10
**implemented**
    34:5 72:3 92:5
    124:21 125:19
    132:21 133:5
    145:8 158:1
    452:23,24
    455:11 481:13
**implementing**
    73:23 76:18
    108:18,20
    127:4 185:22

    221:9
**implements**
    244:5
**implied** 110:7
**implying** 122:17
**important** 99:21
    111:6 293:10
    305:14 330:4
    377:21 385:10
    401:19 407:1
    435:2,11,18
**impose** 20:13
    22:14 23:4
    469:7
**imposed** 21:22
    22:2 95:12
    419:21 448:5
    535:5
**imposes** 81:24
**impossible**
    253:19
**impression**
    472:11
**improper**
    327:13 360:17
    395:21
**improperly**
    463:10
**improve** 113:8
    497:2
**improvement**
    412:2
**IMS** 119:5,9,12
    119:16 120:6
    127:12 133:18
    134:12,20
    136:4 142:6
    157:1 159:13
    159:22 170:18
    179:1 187:6
    188:13,13
    255:1,2 274:20
    275:3 278:16
    281:16,17,21
    282:14,15
    283:7 286:2,7

    299:14,18
    305:8 306:11
    308:22 332:4
    333:17 334:4
    334:10,12,23
    335:6,9,13,15
    335:16 339:22
**inaccurate**
    361:14
**inadequate**
    410:18 417:1
**inadvertent**
    462:8 463:12
**inappropriate**
    120:3 124:14
    126:21 180:3
    196:11 249:6
    294:23 295:1
    295:17,22
    330:6 350:6
    391:8 406:10
    407:6 463:11
    463:21
**inappropriately**
    125:23 140:5
    144:3 221:19
    359:12 387:6
    548:19
**inches** 542:10
**incidence** 113:1
    436:12
**incident** 322:22
    324:4,9 325:2
    325:14 477:21
**incidents** 448:1
**include** 92:7
    105:1 111:21
    118:20 151:18
    220:8 435:22
    450:5 502:9
    519:8 524:15
    531:20
**included** 118:20
    165:14 174:5
    178:5 181:13
    198:10 205:15

207:19 217:5
222:23 301:6
312:6 332:5
521:20,24
522:7,11 524:1
524:7 527:13
530:21 539:4
**includes** 15:23
88:7 185:10
217:1 294:4
417:18 439:2
458:14 537:3
**including** 71:14
200:4 210:5
215:12 219:24
286:1 308:15
317:2 328:21
332:6 356:15
452:17 454:15
457:2 477:7
520:21 529:15
536:8,22 546:8
**inconsistencies**
171:4,12 310:1
311:12
**inconsistent**
309:12,15
**incorporate**
285:10
**incorporated**
357:19
**incorrect** 41:14
**increase** 462:8
**increased**
382:23 462:12
**increasing**
317:20 320:11
360:12 411:20
412:14 413:2
446:4
**independent**
453:11
**independently**
473:1
**INDEX** 9:2
**indicate** 348:18

378:19
**indicated** 23:24
93:15 140:24
268:22 269:4
269:15,17
270:14,22,23
271:1,7 273:23
326:1 331:2
359:19 375:12
377:16 386:22
387:9 388:12
434:17 442:12
469:7 477:3
547:9 548:22
**indicates** 165:13
165:16,19
181:7
**indicating**
433:13
**indication** 24:1
25:2 27:3
44:20 70:2,6
118:4 268:8
320:3 329:17
359:13 378:12
382:22 387:3
434:13 449:23
458:3 459:13
459:19,21
465:10 466:24
467:6 468:6,9
530:1,2 531:9
547:19 548:16
549:10
**indications**
116:23 329:19
375:22 418:24
**individual**
136:18 143:11
143:14 147:12
149:5 151:21
154:3 181:8
241:4,23
242:22 295:11
454:17
**individually**

473:10
**individuals**
435:7 436:13
445:3 457:5
532:1,3
**industry** 469:22
**infer** 157:8
350:21
**inferred** 309:10
367:4
**infers** 351:7
**info** 232:2
**inform** 156:13
158:6 291:16
331:6
**informal** 490:13
490:17
**information**
30:23 31:21
32:6,12,24
33:10,12 39:15
71:16 91:4
103:3 121:7,15
121:17 127:21
134:6 146:3
160:5,15 176:5
176:24 198:6
240:17 265:5
275:3 286:17
317:18 323:15
327:16 329:12
330:15 331:14
331:20 332:6,8
332:18 333:18
334:15,19,24
335:17 336:17
343:2 345:2
356:16 363:12
363:14,16
377:22 385:8
385:11,18
386:7 401:20
401:21 406:22
407:2 408:22
409:11 410:17
416:8,17 452:7

477:6 493:2
513:17 514:6
517:2,18,20,22
518:20,21,23
520:1 522:13
522:14,17,22
523:2,7,12
531:8,13,21
532:12 536:1
536:17,18
537:3 540:20
541:3,9 542:4
546:9 549:19
550:3
**informed** 135:5
240:14 280:10
454:13
**informing** 335:4
**informs** 479:18
**ingestion** 113:2
**Inipcocoll** 42:15
**initial** 63:7
78:19 114:4
163:16 174:1
303:9 373:17
479:12 541:16
**initially** 31:6
52:18 54:5
138:12 194:14
254:1 264:15
323:6 361:23
361:24 473:9
**initiate** 114:8
180:13 535:22
**initiated** 126:18
473:15
**initiatives** 333:3
527:14
**innocent** 303:21
**inordinate** 240:5
**input** 97:20
190:16 255:19
286:1 333:8
**inquiries** 359:14
**insert** 187:18
329:21 433:7

441:17 450:2
**insofar** 511:21
**instance** 85:11
113:24 173:17
306:15 307:16
307:18 308:18
308:20 324:3
373:17 406:18
526:11
**instances** 358:19
513:13 518:11
525:20
**instituted** 19:20
**institution** 439:7
**instructing**
283:23 387:1
411:21 548:13
**INSTRUCTI...**
553:1
**integral** 73:6
100:16,19
205:13 540:7
**integrity** 445:18
532:23 533:3,7
533:12,19
534:1 537:20
538:3
**intelligently**
484:21
**intend** 483:24
**intended** 24:16
105:13 106:2
320:8 329:21
352:3,18
451:22 454:24
463:8
**intending**
389:16
**intense** 24:14
**intent** 16:18
26:2 107:13
109:23 196:23
212:5 241:22
326:14 384:15
398:22
**intention** 16:21

26:3 83:7
90:23 91:17
122:21 155:6
310:12 460:17
481:10
**intentions** 320:1
384:22
**interact** 59:13
**interacted** 57:14
**interactions**
29:12 511:19
**interactive**
513:14
**interchanged**
81:17
**interfacing**
473:2
**interim** 37:8,16
54:18 163:13
164:1,6 265:8
**internal** 161:6
199:6 236:2,6
249:11 257:13
257:15 260:14
293:22 304:9
305:14
**internally** 524:3
**interpret** 196:22
197:6 212:16
235:10 262:19
265:15 267:9
306:19 337:24
380:2
**interpretation**
107:7 108:1
114:18 157:24
219:9 223:23
225:11 226:2
230:7,23,24
234:8 246:10
246:19 248:12
250:12 253:1
254:3 262:17
267:16 273:19
297:9,20
311:21 338:5

351:5 352:22
392:1
**interpreted** 21:7
125:18 128:7
132:21 133:4
226:24 237:21
297:17 381:18
**interpreting**
205:19 260:7
271:23 272:2
338:2
**interrupt** 48:12
90:8 229:11
**interrupting**
328:4
**intervene** 90:7
**intervention**
125:12 180:15
215:4 238:12
413:6 452:4
**interventions**
88:11 113:6
121:24 129:5
446:2
**interview**
303:13
**introducing**
252:21
**introduction**
87:18 351:1
**introductory**
450:5
**investigate**
353:12
**investigated**
307:1
**investigating**
335:12
**investigation**
313:6
**investigations**
447:24
**invited** 255:19
**invoked** 16:24
80:22
**invokes** 404:2

**involve** 37:12
**involved** 42:12
95:7 99:19
164:16 210:7
211:4 257:4
280:1 325:18
451:6 458:6
469:21 473:17
479:14 480:12
481:19 482:7
483:2 485:22
**involving**
323:21
**in-house** 417:19
**Iris** 504:19
**issue** 85:7 98:12
179:3 183:23
198:12,24
252:11 303:5
313:13 345:7
378:1 409:4,5
409:10 423:6
440:12 445:9
469:13 474:3
497:13 513:6
525:12 529:4
**issued** 196:16,19
358:11
**issues** 74:11,16
74:17 163:3
175:8 184:12
184:14 255:17
291:17 293:9
307:8,14 308:8
310:20 323:21
343:5 345:10
380:3 446:21
478:13 481:10
494:10 544:14
545:5
**issuing** 443:6
**item** 178:3 198:4
199:6
**items** 177:22
195:21 196:13
312:4 521:20

**i.e** 126:4 221:24
349:13 375:23

---

**J**

**J** 4:11
**James** 470:8
**January** 1:10
10:14 42:8,16
43:6 196:19
416:18 552:11
**JENNINGS**
2:10
**JENSEN** 2:4
37:23 47:22
79:13 83:12
191:6 193:14
209:13 231:5
244:16 256:17
290:21 316:8
342:1 346:5
355:18 409:17
415:4 424:22
457:22,23
467:13 488:23
489:23 490:23
494:15
**Jim** 53:8 60:3
470:1,8,22
471:2 482:3,19
**job** 91:19 92:4
296:22 421:19
**jobs** 91:21
**Johnson** 44:2
**joined** 50:14
59:22 69:15
78:16 84:9,10
84:12,17,17
416:13
**joining** 43:22
**joint** 356:18
546:11
**JONES** 3:3
**JOSEPH** 2:3
**journal** 406:21
495:3 526:20
**judge** 304:24

**judgment**
519:17
**judgments**
398:8
**July** 43:24
175:16,18
176:7 177:17
177:18 253:14
326:21 333:4
342:14 349:5,5
356:18,20
362:11,12,15
365:7 369:1
375:13 378:18
385:4 386:23
458:12 504:7
504:11 514:21
516:11,13
529:20 540:14
540:16 542:14
542:21 543:14
546:11,13,15
547:10
**June** 46:12 49:5
131:10 259:19
261:4,5,23
262:11 265:13
265:14 316:12
316:13 317:1
328:20 329:7
410:1 476:23
477:14 478:2
481:3,20
**jury** 13:20 159:3
**Justice** 7:16
414:17 415:11
538:12
**justify** 412:16
413:3

---

**K**

**K** 4:4
**KAMATH** 2:21
**KAYE** 3:17
**Kearns** 54:24
**keep** 85:12

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 151:4 169:13 | 408:5 410:24 | 159:22,22 | 287:21 289:6 | 444:5 452:3 |
| 200:13 303:16 | 421:4 425:6 | 160:6 163:8 | 290:17 292:11 | 455:7 456:12 |
| 391:16 405:22 | 427:12 460:12 | 165:22 168:4,9 | 292:14,18,19 | 456:19 466:4 |
| 424:17 490:9 | 464:11 466:21 | 168:22 169:1 | 292:23 293:1,2 | 468:8 469:13 |
| 491:15,20 | 467:6 470:2 | 172:21 173:8 | 297:24 298:6 | 471:15 472:8 |
| **Ken** 51:4,4,5 | 471:1,21 473:3 | 173:16 174:9 | 299:1 301:14 | 472:15 473:11 |
| 52:18 163:11 | 474:22 475:17 | 175:10 178:20 | 301:17 303:12 | 475:14,15,16 |
| **kept** 150:23,23 | 483:16 485:23 | 184:6,7 189:4 | 304:14,16 | 478:8 479:4,5 |
| 151:8 173:20 | 486:7 491:15 | 197:8 202:14 | 305:11,20 | 488:13 492:21 |
| 253:9 311:13 | 494:23 497:2 | 203:16,20,24 | 307:1,3,13,17 | 496:23 497:6 |
| 362:1,1,23 | 510:3 | 206:4,11,19,20 | 308:5,19 310:2 | 497:12 503:3,9 |
| 398:6 416:2 | **kit** 118:15 294:9 | 207:1 208:18 | 310:7,23 313:6 | 506:24 507:7 |
| 475:18 490:10 | 411:23 412:1 | 209:9 210:21 | 313:17,21 | 510:5,9 529:12 |
| 491:9 492:2,11 | **kits** 411:13,14 | 218:13 219:10 | 314:8,14,15 | 534:17 542:9 |
| **Kerry** 291:10 | **knew** 147:13 | 220:1 222:7 | 318:20,22 | 542:13 546:1 |
| **key** 92:18,20 | 240:22 292:10 | 223:13,16,18 | 330:3,10,24 | **knowing** 147:23 |
| 100:12 101:17 | 318:17 501:24 | 223:18,20 | 332:17,20,20 | **knowledge** |
| 108:17,22 | **knock** 425:6 | 226:5 227:3,4 | 334:9,16,18 | 241:6 390:13 |
| 232:20 233:1 | **know** 12:16 13:1 | 227:16 229:3,4 | 335:16 336:16 | 513:24 519:13 |
| 251:21 452:16 | 13:9 16:17 | 230:2,23 | 337:12,23 | 525:24 533:23 |
| 454:13 | 19:4,6 20:4 | 233:24,24 | 338:9,9,24 | 534:3 |
| **kill** 349:14 | 23:13 26:9,11 | 234:11,17,18 | 339:5 340:1,4 | **knowledgeable** |
| **Kim** 416:14 | 30:1 35:15,16 | 237:18 238:1 | 340:6 341:8,8 | 329:24 |
| 430:6 | 36:4,6 39:23 | 241:3 243:6 | 341:10,11,13 | **known** 240:21 |
| **kind** 17:3 19:2 | 41:6 46:18 | 251:19,20,22 | 341:16 343:19 | 463:1,15 |
| 25:9,18 26:15 | 51:10 57:4 | 252:12 253:3 | 348:13,16 | **knows** 276:23 |
| 58:2 81:17 | 59:13,19 60:12 | 253:20 255:3 | 350:21 352:14 | 325:20 |
| 89:21 103:14 | 61:3,6,17 | 256:2 260:5,5 | 360:9 363:11 | |
| 113:12 123:3 | 63:24 74:19 | 260:5,7,16,17 | 363:19 365:9 | **L** |
| 123:19 124:11 | 75:17 76:4 | 261:18 262:8 | 374:8 379:12 | **L** 2:11 |
| 128:6 137:2 | 77:2 80:7 | 262:16,16,17 | 380:1,2,4,6,7 | **label** 115:23 |
| 147:18 162:8 | 95:18 96:16 | 264:9 265:3,20 | 380:19 382:8 | 116:22 143:13 |
| 162:13 165:5 | 97:1,10 108:4 | 266:2 270:2,4 | 382:11 383:21 | 144:18 146:18 |
| 168:17 185:20 | 110:18,19,22 | 271:15 272:9 | 384:7,10,12 | 147:13,24,24 |
| 186:19 193:2 | 111:5,10,16 | 272:11,14,14 | 387:24 398:5 | 148:3 156:12 |
| 198:17 201:20 | 118:13 120:17 | 274:4,12,14,15 | 402:9,14 404:5 | 157:9,14,14 |
| 232:19 235:9 | 123:20 124:1,1 | 277:19,21 | 404:16 405:8 | 158:15 159:16 |
| 236:8 238:13 | 124:3 125:7 | 278:6,6,16,18 | 406:2 408:4 | 160:17 220:17 |
| 248:13 272:18 | 129:17 134:4 | 278:20,20 | 413:12,13 | 224:4 225:20 |
| 273:6 297:2 | 134:23 135:8 | 279:1,2,5,9 | 414:5 417:7,8 | 226:17 233:21 |
| 298:17 302:2 | 138:5,7 139:1 | 280:4,7 281:13 | 418:5,7,11,20 | 240:23 241:8 |
| 309:10 312:21 | 141:20 142:2,8 | 281:14,15,19 | 418:22 419:4 | 242:24 243:7 |
| 333:10 353:17 | 144:20,23 | 282:16,18 | 419:13 420:2 | 247:1,10 249:3 |
| 380:4 401:3 | 145:2 146:10 | 283:8,13,16,16 | 421:1,4,4,7,17 | 250:19 251:16 |
| 402:6 403:6,10 | 146:10,14 | 283:17 286:3,9 | 422:2 424:5,7 | 267:2 273:23 |
| 404:17 405:2 | 150:11 151:12 | 286:9 287:20 | 427:18 431:13 | 287:13,13 |

288:24 289:8
327:20 339:13
351:10 367:9
367:12 368:17
372:22 373:18
374:9 377:20
378:6 380:11
385:7 408:8
440:21 441:17
519:11,18
531:8 538:21
539:13,13,16
545:22 549:9
**labeled** 47:9
70:6 115:19
359:13 382:21
549:12
**labeling** 78:4
94:20 432:1,3
449:21 488:11
**labels** 536:18
**lack** 359:9
401:19
**laid** 500:10
**LAM@pietra...**
3:14
**Lane** 4:17 10:12
**language** 222:2
**LAOs** 505:19,23
**large** 201:20
371:4,14 398:5
**largest** 119:9
**lateral** 36:22,23
**laugh** 297:5
**launch** 105:21
106:12,14,24
107:6,15
411:15 414:4
452:11,14
453:9 454:12
456:21
**launched** 253:5
**LAUREN** 4:11
**law** 21:3 22:22
23:1 116:21
376:15 391:2

391:12,14,19
392:3 447:24
519:14,20
**lawsuit** 12:13,14
416:2 417:20
**lawyers** 290:2
**LAWYER'S**
556:1
**lay** 272:18
305:23
**leader** 35:1
56:20,23
218:11,23
219:7,11 427:4
427:20 482:16
**leading** 470:14
470:24 471:12
476:7
**leaflet** 187:17
**learn** 242:23
243:2 302:3
452:15 457:1
457:11
**learned** 240:5
240:13,20
253:6
**leave** 18:11
**leaves** 273:9
**leaving** 40:13
**led** 473:11
**left** 23:20 37:9
37:20 40:8,9
40:20 41:10
42:14 46:9
51:5 52:1 53:5
53:7,9 61:11
63:1 64:23
65:5 163:17
236:11 292:11
292:14,24
314:8 470:22
470:24 509:22
**legal** 117:15
195:19 197:23
198:16 199:14
199:23 212:15

216:19 227:16
229:5 236:17
263:10,19
264:17,22
265:6 280:1,3
333:2 422:13
538:6
**legally** 474:23
**legitimate** 363:1
**legitimately**
155:22
**length** 545:11
**lengthy** 90:4
**Leslie** 3:11 53:1
**lethal** 27:18
**letter** 68:19,24
69:17 77:15
79:1 80:1
81:20 82:12
85:8,22 93:9
126:7 135:9
142:22 143:14
144:5 147:5,10
151:11,21
152:15 154:1
154:23 177:4
203:8,21 204:6
204:13 205:3,6
205:8 207:21
208:22 209:8
212:5 215:20
216:8,21,24
217:4,8 240:16
244:1 291:9,13
291:16 314:17
314:24 328:19
329:1 330:14
333:4,5,6
354:16,17
355:23 368:11
368:24 369:2
373:19 379:23
381:21 390:12
390:20 394:12
396:16 400:1
402:1 403:9

406:20 408:19
410:2,21 411:1
426:4,8 429:23
430:1,2,22
431:16,21
433:21 436:17
437:10 438:13
438:17 440:20
458:11 460:21
481:4 488:9
492:19 517:6
517:11,14,16
518:2,11
519:24 520:5
520:12,18
521:12,21
524:4 527:18
528:3,12,22
530:7 542:18
**letters** 142:16
143:9 147:12
148:19,24
149:5,9,12,18
149:22 175:9
241:4,23
242:22 351:6
353:10,10
354:5,5 369:17
370:4 372:18
394:19 395:17
396:3 397:3
401:7 406:9
407:4,20 431:1
431:3,12
432:13 433:12
450:5
**let's** 38:7 41:7
45:6 48:15
49:18 68:7
76:3 79:11
86:11 87:6
94:19 95:9
98:20 100:11
108:6 118:7
121:4 147:2
176:2,3 177:22

181:5,23
200:11,18
207:16 209:11
223:14 231:2
244:14 245:2
256:15 319:8
328:9 341:23
345:20,22
346:19 347:4
355:8 371:17
371:22 374:11
392:7 397:4
414:10,12
426:18 428:4
434:4 442:20
463:4 480:17
485:1 497:16
**level** 63:7 95:5
126:14 164:10
255:17 261:10
262:11 302:19
307:9 333:20
335:2 370:12
384:13
**levels** 95:17
308:14 317:17
320:12 323:20
535:17
**Levin** 54:24
57:9 426:9
430:1 433:11
438:11 458:23
467:22
**LEWIS** 2:16
**liabilities** 126:20
**liability** 442:4
510:11
**Liberty** 1:16
**lifecycle** 401:2
**life-threatening**
16:20 454:16
454:20
**Ligand** 44:1
**light** 360:14
**likewise** 209:4
433:6

Highly Confidential - Subject to Further Confidentiality Review

**limit** 196:13
320:2 325:24
**limitations**
253:13
**limited** 82:21
253:3 255:4
375:22 387:3
547:19 548:16
**limiting** 464:13
**limits** 535:16
**line** 9:6,6,6,11
9:11,11,16,16
9:16,21,21,21
65:8 138:23
406:5 504:12
509:5,6 525:21
554:3 556:2
**link** 108:14
208:20
**LinkedIn** 5:14
38:1,20 39:21
39:24 43:15
**links** 273:12
**list** 18:3,18
121:16 146:15
149:3 181:14
222:24 223:19
260:10 301:6
416:15 422:10
428:11 449:13
**listed** 49:19
92:21 93:12
102:2 133:18
177:24 178:5
188:21 229:15
257:17 287:7
312:5
**listen** 151:19
**listing** 201:11
371:5 522:14
522:19,24
523:4,9,14
**lists** 16:1 83:24
105:5 162:15
177:21 250:5
259:16,20

268:19 276:10
447:7
**litigation** 1:6,15
1:23 10:13,20
11:17
**little** 82:8
129:20 236:3
307:15 308:24
311:1 324:23
324:24 427:17
487:7
**living** 204:2
**LLC** 14:13
41:17
**LLP** 2:3,16 3:17
4:4,11
**local** 103:23
507:9
**located** 48:24
53:21
**lodge** 500:2
**log** 170:11
197:13,19
490:9,10 491:5
491:8,15,20
492:16 493:19
**Logan** 4:5
**logged** 490:18
**logical** 136:21
379:20
**logs** 136:2 169:8
491:11 492:2
**lollipop** 25:18
444:1
**long** 12:21 51:8
114:12 134:5
168:14 305:22
424:6 533:11
**longer** 134:21
307:18
**long-acting**
505:23 535:1
**look** 15:15 51:16
56:8 64:24
78:19 86:22
87:4 92:24

98:15 122:13
124:11 131:6
135:19 136:12
141:21 150:20
153:1 154:9
155:7 156:6,7
157:20 158:14
163:19 168:13
168:14 170:11
171:19 175:17
175:20 176:1
178:20 184:16
186:21 192:21
193:1,8,11,16
193:18 194:11
197:19 199:3
202:12 206:7
207:5 208:1
221:7 231:16
232:7,18 233:3
233:9,9 235:17
237:13,18
253:7,16
258:24 266:9
266:14 267:18
297:10 299:2
300:6 303:14
303:23 305:22
308:9 313:3
333:14 334:16
339:1 341:15
346:17 361:12
361:18 368:22
389:6 394:2
404:1,9 405:7
426:2,18
427:13 434:1
444:16 452:10
476:14 482:13
486:24 487:2
491:7 493:2
498:24 541:1
545:19 546:19
550:6
**looked** 25:10
65:1 127:13

136:1 137:5
144:14 163:15
170:23 171:13
171:22 179:14
192:1 198:24
211:21 264:15
264:20,21,22
264:24 288:20
296:3 297:23
299:10,13
300:6 301:16
306:5,11 327:9
329:8 444:5
501:18
**looking** 46:21
54:21 75:10
89:19 133:15
137:2 149:2
167:18 171:2
196:23 201:10
203:8 207:1
232:15 236:21
250:3 258:22
261:22 297:18
298:7 299:17
302:20 331:23
353:2 356:7
364:24 373:4
417:3 426:13
452:9
**looks** 42:5 43:22
44:1 50:9
51:12 54:22
68:18 69:1
161:22 186:18
187:15 188:24
190:7 192:22
199:11 200:2,5
207:5 208:8
209:23 219:15
227:10 230:15
231:15,18
232:19 233:2
234:15 257:21
258:2 265:11
275:2 277:5

482:14 489:8
491:12 497:18
**loop** 199:18
452:3
**Lori** 416:7
**loss** 12:19
**lot** 137:7 145:5,6
167:16,21
170:13 174:1,3
187:5 254:7
302:13 304:10
307:14,20
310:3 332:4
353:4 362:4
384:12 406:4
443:9,11,17
497:7 500:16
501:18 521:17
544:14
**lower** 84:3
**lozenge** 25:14
28:15,17 258:3
444:6
**Lpincus@abv...**
4:13
**lunch** 200:14,17
200:19 201:6
**luncheon** 200:23
**Luo** 504:19

**M**

**M** 3:3
**MACMIS** 493:3
493:4,6,7
494:2
**Magid** 416:7,12
**magnifying**
233:6
**mail** 119:17
126:18
**mailing** 145:21
146:2 147:19
147:22
**mailings** 146:6
**main** 89:17
**maintained**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

31:10
**major** 215:5
**majority** 268:5
**makers** 470:16
**making** 88:3
98:5 99:22
173:21 186:10
223:14 307:17
375:18 432:4
525:14 547:15
**malignancies**
69:21 70:10
77:19 375:24
**malignancy**
271:18 272:2
272:19 273:11
273:12
**malignant** 271:9
271:10 276:10
287:12
**Malvern** 53:18
53:21,23 54:10
**manage** 50:3
465:3
**management**
69:20 71:15,21
72:2 73:4,5,12
73:16 77:18
83:22 87:19
90:2 99:9,15
100:17 112:24
113:8 131:9
161:7 162:11
162:16 163:1,5
185:10 192:16
195:17 196:20
197:10 205:11
207:23 210:4
210:10 212:4,6
212:20 213:9
233:12,13
234:16 247:21
253:24 256:5
293:13 320:2
324:21 330:5
343:7 344:9

360:14 375:23
410:10,14
434:7 435:3,12
442:13 522:6,8
527:7
**management's**
256:3
**manager** 57:20
163:6,13,16
169:3 173:12
292:22 430:7
458:21 470:1
471:2 497:12
**managers** 52:7
52:11
**managing** 41:21
**mandates**
360:15
**mandatory**
173:4
**manner** 220:17
387:2 548:15
**manpower**
406:7
**manufacturer**
22:5,17 23:5
447:2 472:14
**manufacturers**
471:13,22
472:21,24
473:4,9,24
474:12,21
475:8,22
479:18 534:24
**manufacturing**
32:17
**map** 19:7
**March** 65:3,24
478:12 479:23
**Marchione** 1:15
5:4,13,15
10:21 11:3,20
14:13 15:3
41:17 43:16
130:15 161:9
191:17 231:20

288:19 394:17
499:19 504:6
510:18 511:15
520:12 537:9
555:8
**MARIOTTI**
3:11
**mark** 2:3 11:15
38:3 39:5 45:9
68:8 87:1,2
161:10 176:2
176:15 231:2
246:3,4 302:24
316:1 328:9
345:20,22
346:20 347:11
392:7 409:16
414:10,12
424:20 425:5
467:11 468:13
480:17 483:6
486:22 489:21
503:17 508:22
**marked** 9:20
15:3,7 43:12
43:16 45:22
46:2 68:14,17
79:19 83:18,21
130:12 161:2
161:10,15
177:10,13
184:18 191:10
191:15 202:5
209:18,21
231:11,17
244:22 245:1
256:22 290:19
291:2 316:6
328:16 342:6
342:10 346:3
355:14,21
393:1,7,12,17
394:11 409:22
410:1 414:20
415:1,6,10
422:6 425:2,12

425:17,22
426:2 457:20
457:24 467:17
468:19 476:2
480:24 481:3
485:7,12
486:17,21
487:10,14
490:4 491:1
494:20 495:18
503:23 508:18
550:19
**market** 1:16
3:12 26:20
115:9 117:3
215:8 396:24
479:4,7
**marketed** 23:10
23:21 34:16
35:9,22 36:7
71:19 72:16
238:23 239:5
294:18
**marketing** 7:18
16:15 32:21
33:9 36:8 73:9
92:8 106:17
127:19 138:6
142:5 160:14
160:18,19
185:11 186:8
187:4,8,9,11
188:2,12,23
192:5,7 195:19
196:8 198:19
206:13 210:3,9
212:13 215:20
216:17,21
219:7 227:11
227:14,18
228:3,15
229:20 232:14
236:12,16
238:5,10,11
239:12,23
241:17 242:13

243:13,17
246:6 257:2,6
257:11,14,22
258:7,23
260:14 263:1
263:19 265:23
266:9,24
277:15 279:13
286:16 287:8
288:20,21
289:8 293:18
306:24 327:4,8
332:6 333:2
334:3 335:20
339:17 340:10
341:20,21
381:9 382:6
414:19 415:18
415:23 416:11
421:16 424:12
455:10,14
456:2,9 469:16
525:1,4 526:4
530:20 531:7
531:20 538:11
538:20 542:6
543:23
**marketing's**
212:3,19
**Maslynsky-M...**
1:18 552:10
**mass** 145:20
146:2,5 147:19
147:22
**Massachusetts**
3:18
**match** 165:15
253:19
**matches** 39:22
**material** 525:1
**materials** 331:5
331:7,11
344:20 345:4
353:13 357:22
359:17 365:10
388:10 394:20

395:4,20
397:10,14
399:1,12
400:11 402:1
435:24 491:21
492:13 524:16
525:14,15,21
526:1 530:20
531:7 544:21
**matter** 10:18
**matters** 44:12
188:20
**ma'am** 504:21
509:11
**McGinn** 97:12
**McNeil** 44:16
**Mcrawford@...**
2:6
**MDL** 1:5 10:20
**mean** 27:13
51:23 57:19
109:21 115:16
120:17 136:15
136:19 145:23
153:4 154:3
155:12 157:18
168:15 171:2
173:7 194:8
198:13,20
219:3 228:4
229:1 230:7
237:12,14
239:4,20
241:19 252:13
252:19 253:9
265:19,21
267:14 271:22
273:18 277:13
278:12,20
280:5 281:16
296:21 297:5,9
302:10,22
305:6 308:18
308:19 320:18
332:3,15
335:11 339:11

343:22 352:6
353:22 357:5
357:13 361:7
363:8,21
364:21 367:16
372:17 374:13
380:24 387:17
387:18 404:15
408:2 416:1
419:8,18
426:16 427:16
428:14 433:5
491:10 506:23
538:12 544:4
545:2
**meaning** 117:22
264:20 341:18
543:14
**means** 32:20
101:24 115:15
115:17 234:19
239:5 270:2
272:19,20
273:12 354:7
411:24 461:8
529:3 552:19
**meant** 19:9
26:14 155:21
218:3 518:5
**measure** 90:10
**measured** 63:20
**mechanism** 28:6
127:8 132:22
133:5 143:20
143:24 154:2
505:16
**mechanisms**
15:24 91:23
242:19 243:4
445:20
**med** 223:2,2
**Medco** 118:22
165:10
**media** 527:10
**medical** 32:15
52:20 102:4

164:4 377:17
378:8 453:4
456:5 519:10
519:15
**medication**
94:13,17
**medications**
40:21 536:6,14
**medicine** 215:12
215:13,14,15
216:16 220:9
220:10,11,12
235:18 236:2,7
236:7 249:11
249:23 379:2,6
**meds** 222:24
**meet** 115:18
205:17 290:2
290:14 319:24
329:11 356:12
497:6 500:7
546:5
**meeting** 174:11
175:15,23
176:16 177:15
184:11 196:1,5
196:8 198:1
199:6 216:12
231:22 245:15
253:15 255:14
318:1,24 326:9
326:15,18,22
329:3 330:16
331:14,17
342:10,14,21
342:24 343:10
343:23,24
344:18 345:3,9
345:12,15,18
347:23 348:8,9
348:18 349:6
349:22 350:11
351:14 352:10
352:14,20
353:19 356:4,9
356:18,20,22

356:24 359:21
360:8 361:6,16
361:23 362:12
362:16,21
364:9,14 365:7
365:24 369:3,3
374:20 375:14
376:6,12
378:19 385:5
386:10,15,23
386:24 387:13
388:14 389:22
395:18,18
400:4,6,9,23
404:5 405:10
405:21 458:8
458:15,15,16
458:17 459:4,6
459:8,10 460:3
460:16,17,24
461:21 462:14
463:18 481:16
482:15 485:21
492:20 495:24
496:2,3,13,19
509:6 510:15
513:21 514:9
514:20 516:6,9
516:12,14,21
516:24 529:19
540:16,22
541:16,24
542:1,11,14,22
543:1,4,6,12
543:23 544:4,9
544:10,17
545:13 546:11
546:13,20
547:11 550:6
**meetings** 121:18
146:20 342:12
362:7 390:16
490:14 496:8
541:16
**members** 516:3
533:17

**memo** 148:7
151:2 165:1
191:16 192:19
194:9 195:14
196:15 197:10
299:10 308:8
**memorandum**
6:9 7:19 161:4
161:15 192:17
195:16 198:7
414:24 422:7
**memory** 476:10
**memos** 150:24
151:9
**mentioned**
18:22 106:22
135:7 166:18
170:2 199:13
296:5 317:3
350:4 503:6
532:18 535:9
**mentions** 215:16
221:3 230:14
299:3
**mentor** 304:6
**Merck** 118:21
165:10
**mercy** 405:2
**merged** 60:3
**merger** 58:2
60:14
**merges** 508:4
**message** 100:12
188:14 449:9
516:2
**messages** 92:19
92:20,24 93:1
93:12,18 94:3
101:5,7,17
102:8,23 103:7
105:2,8 107:10
108:23 110:3
452:16 454:13
**met** 64:2 175:5
195:20 197:24
198:2,10 481:8

**metadata** 509:12
**method** 411:13 411:15,22
**methodology** 301:20
**methods** 129:3
**metric** 503:9
**Michael** 219:13 231:19 245:5 245:14 248:17 284:24 416:5
**mid** 326:21
**middle** 231:24 444:22
**midway** 15:22 165:8
**migraine** 477:9
**migraines** 418:13
**Mike** 58:22
**Mike's** 58:22,24
**Miller** 10:24
**million** 7:17 119:14,17 380:10 414:18 415:17,23
**mind** 111:11 299:22 309:4 498:5 510:12
**mine** 306:1
**minimalize** 238:9
**Minimalizing** 359:15
**minimization** 406:24 477:2 527:14
**minimize** 85:13 249:17,20 435:5,7,8 463:8 465:9
**minimizing** 444:24 453:6
**Minneapolis** 3:5
**minus** 249:1

**minute** 125:7 133:9 222:4
**minutes** 342:9 342:13,24 343:1 347:23 348:8 350:15 355:5,7,9 356:4 360:5 361:10,11,14 374:13,24 387:19,22 388:2 404:5 458:14,15 481:14 509:7 510:15 537:13 542:2 543:4,4 543:12,15 544:9 545:12
**mirror** 334:19
**misbranded** 73:18 416:24
**mischaracteri-** 96:13 116:1 148:5 159:19 213:24 244:11 285:14 311:23 368:4,13 381:12 419:23 420:8 466:19 515:2 543:8
**misdemeanor** 417:2
**misinterpreting** 390:14
**misleading** 401:20 406:22 407:18
**mispronounced** 164:22
**misrepresented** 176:22
**missing** 82:23 83:5 179:18 207:4 208:20 302:7 346:9 373:21,22

488:22,24
**Misstates** 296:8
**misunderstood** 218:2
**misuse** 317:21 319:15 323:18 326:11 330:7 332:9 343:4 435:7 436:13 444:13 445:3 447:10,16,22 448:4 451:19 451:24 452:18 453:6,12,18 454:19 457:5 462:9 501:21 502:1,10 518:3 518:17 520:14 523:2,4
**mitigation** 19:13 19:17 469:4
**MN** 3:5
**modifications** 113:7 114:9,12 488:5
**moments** 131:6
**money** 362:4 398:5
**monitor** 114:23 121:21 123:10 153:14 154:14 294:20 389:16 436:11 445:23
**monitored** 119:8 126:13 196:12 379:10
**monitoring** 112:22 113:1 113:12 114:22 126:23 129:4 132:1 293:17 353:7 389:13 413:4
**montage** 406:21
**month** 35:16 42:3 326:10

400:2,3
**months** 39:24 121:9,11 317:24 376:23 470:5
**MORGAN** 2:16
**morning** 11:13 11:14 511:16 514:13
**morph** 443:13
**morphine** 95:2
**motion** 500:11
**mouth** 25:18,21 28:18 258:3 363:4
**move** 36:22 45:6 98:20 315:9,10 327:24 505:12
**moved** 42:6 54:7 54:9 57:1
**moving** 112:18 137:8 392:10 450:3 455:3 457:14
**MSL** 142:24
**MSLs** 456:6,15
**Mudge** 3:18 38:12,13,21 471:17
**Mukasey** 416:6
**multipage** 47:10
**multiple** 18:17 52:7 75:19 90:7 230:21 243:11 256:1 279:23 280:23 428:10 474:5 533:15,16
**myofacial** 270:8

**N**

**N** 5:2
**name** 10:11 11:15,19 41:16 50:18,20 53:6 58:23,24 61:3

61:5 75:12 97:2,13 109:22 110:11,16 119:20 147:10 164:22 210:5 210:12 257:17 292:20 470:7 470:12 486:14 499:20
**names** 148:14 151:23 240:22
**narrow** 168:6,18 294:16
**Nashville** 2:12
**national** 1:5 10:19 103:23 126:10 216:12
**nationwide** 447:19
**native** 232:22
**nature** 12:12
**NDA** 73:7,13 104:5,13 163:2 204:1 205:8,14 212:5 293:15 428:19 429:3 430:11 431:23 432:24 433:5 433:21
**NDA's** 73:9
**NDC** 133:21,22 134:14,22 140:17 170:17 170:18 178:24 308:21 333:17
**NDTI** 188:13
**near** 397:3 414:3,4
**necessarily** 72:21 112:7 204:3 222:21 239:4,9 363:21 366:20 374:7 400:22 427:15 484:22 496:24 497:9

necessary
  196:18 390:24
  391:10 553:4
necessity 82:14
need 13:16 52:6
  52:8 74:14
  85:10 102:15
  121:16 158:18
  233:6 275:22
  293:7 332:19
  361:18 373:17
  373:19 377:9
  378:8 484:1
  510:22,22
  531:7,12
  535:19
needed 71:7
  72:16 73:22
  80:14 169:18
  190:16 215:20
  216:8 432:5
  439:4 525:2,7
  525:15 532:5
  533:8,20
needing 478:15
needs 119:12
  196:8 312:20
negating 322:7
negative 177:4
  541:21
negotiate 165:20
negotiated 18:17
  165:23 166:14
  428:10
negotiations
  486:9
neuro 337:21
neurologists
  337:21
neurology
  259:21,23
  275:23 337:22
neuropathy
  270:24
never 74:8 135:8
  138:11,13

175:8 177:2,4
182:19 211:21
229:16,17
237:5,7,8
265:23 274:2,5
297:23 379:22
379:23,24
381:3,7,19
390:8,19 392:1
408:18 409:13
418:4 467:4,5
468:11 480:1
492:21 513:19
526:5
new 4:12,12
  69:18 73:18
  190:5 256:4,4
  256:10 410:6,8
  410:9 426:6
  428:20 434:2,6
  443:9 449:20
  459:12 465:3
  468:5 470:1
  471:2 477:5
  488:4 511:23
  512:3
news 321:6
  324:20 507:9
nice 327:21
Nineteen 537:14
nodding 13:10
non 117:9 419:1
noncancer 24:22
  115:21 254:17
  267:2 288:24
  458:4 463:11
  463:21 466:24
  468:10
noncompliance
  292:2 294:3
  343:5
nonindicated
  539:17
nonmalignant
  272:20,20
nonopioid-tol...

463:10
nonpromotional
  386:8
nontarget
  154:21 300:22
nontargeted
  133:24 136:7
  137:17 138:17
  138:21 140:18
  140:21 142:13
  147:20 154:11
  155:7 157:23
  183:2 214:15
  214:18 215:2
  221:1,4 222:18
  224:1,23 227:6
  227:15,22
  245:24 246:12
  246:23 247:2
  259:24 340:18
nontolerant
  113:4 420:20
  435:6 436:13
  445:2 454:17
  457:4
nontolerant/o...
  421:13
non-Subpart
  403:16,24
normal 211:13
  400:21 403:10
normally 272:17
  298:23 413:24
  422:19 499:24
Notary 555:14
note 73:5 77:16
  77:23 197:23
  207:18 345:11
  371:4 498:14
  515:9
noted 10:22
  198:7 210:5
  275:19 378:2
  390:23 466:12
  467:2 553:11
  555:6

NOTES 556:1
notice 1:15
  529:2
notification
  478:5
notified 478:1
noting 378:5
  464:12
notion 530:14
notwithstandi...
  536:14
NOV 353:9
  354:17 379:24
  381:20 390:19
  403:8 408:19
  408:24 409:13
  528:19,22
  529:1
November 18:8
  37:5 56:16
  57:2 68:19
  205:7,12 207:7
  207:18,19,20
  207:23 208:9
  394:14,17
  406:19 410:7
NOVs 381:5
number 38:23
  45:13 66:19
  79:15 84:5
  105:5 149:1
  151:23 163:2
  168:18 171:4
  178:22,24
  179:10 198:2
  199:3 232:23
  301:1 308:20
  317:1 344:17
  347:1,8 375:16
  411:11,18
  412:12 433:7
  454:5,7 493:6
  493:15 498:7
  521:11,20
  526:12 527:9
  529:14 543:22

547:6,13 550:8
numbered 38:16
  38:18
numbering
  493:8
numbers 38:15
  278:19 279:6
  281:15 298:10
  300:22 346:23
  373:18 485:19
  493:3
Numeral 447:15
numerous 58:12
nurses 100:14
  101:2,10,19
  108:15 436:1
NW 2:21 3:18

─────────
        O
─────────
oath 13:2
object 22:18
  135:1 164:19
  264:3 299:6
  328:4 387:20
  471:17 500:4
objection 17:7
  17:13 19:23
  20:18 22:6
  25:5,11 26:17
  27:8,23 28:8
  31:12,24 32:13
  33:3,15 34:6
  34:17 35:10,24
  36:10 39:10,17
  40:22 42:21
  44:7,14 49:13
  50:15 52:3,14
  53:15 54:15
  55:10,17 57:15
  58:5 59:6,10
  59:23 60:15
  62:4,8,19 63:4
  63:21 64:8
  65:9,18 66:14
  67:5,13,22
  68:4 69:4

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 70:12,21 72:5 | 208:3 210:17 | 320:23 322:14 | 477:16 478:6 | 169:9 301:8,19 |
| 72:18 73:24 | 211:7,17 | 325:4 327:11 | 478:22 480:5 | 353:24 356:21 |
| 75:3,15 76:20 | 213:19 216:4 | 330:19 334:6 | 481:21 484:23 | 361:19 368:19 |
| 77:6 78:11 | 217:22 218:15 | 335:21 336:4 | 486:10 488:18 | 376:11 431:24 |
| 79:6 80:20 | 224:7,11 225:4 | 336:12 337:2,7 | 492:4 495:5,15 | 435:17 473:8 |
| 81:5,10 82:4 | 225:8,23 | 338:22 339:23 | 496:20 500:2,3 | 477:19 |
| 82:17 85:2 | 226:19 228:16 | 343:16,21 | 500:14 501:7 | **occasion** 522:2 |
| 87:11 88:19 | 228:19 229:22 | 350:17 352:4 | 502:3,12 | **occupation** |
| 89:2 90:18 | 230:18 235:12 | 353:20 354:11 | 503:12 506:5 | 14:10 |
| 91:14 93:3,20 | 236:13 237:10 | 357:2 358:24 | 506:20 507:16 | **occur** 24:14 90:5 |
| 94:6 96:2,12 | 238:15,20 | 359:22 364:10 | 508:6 509:20 | 90:6 177:16 |
| 97:21 99:24 | 239:17 240:7 | 364:16 365:13 | 510:21 515:1 | 326:19 447:11 |
| 103:9 104:9 | 241:9 242:4,8 | 366:10,23 | 519:4 520:8 | **occurred** 322:22 |
| 105:15 106:4,8 | 243:8 244:10 | 367:18 368:3,8 | 521:4 527:21 | 324:4 325:22 |
| 106:18 107:16 | 246:14 247:13 | 368:12 369:11 | 528:5,14 531:2 | 335:14 347:17 |
| 109:6,9,14 | 248:1 250:8,23 | 372:2 373:24 | 538:5,22 | 516:15 518:13 |
| 110:4 111:7,24 | 251:5,17 258:6 | 376:7 380:13 | 539:24 541:13 | **occurring** |
| 112:4,11 | 259:8 261:11 | 381:11 383:5 | 543:7,24 | 344:15 |
| 113:17,21 | 262:3,13 263:3 | 383:17 384:3 | 544:23 546:23 | **occurs** 303:15 |
| 114:15 115:1 | 264:11 265:17 | 384:18 386:11 | 548:2,24 | **October** 35:2 |
| 115:10,24 | 266:18 267:3 | 387:14 388:15 | 549:21 | 274:21 275:11 |
| 116:10 120:9 | 267:11,21 | 389:18 390:6 | **objections** 10:6 | 281:21 509:4 |
| 122:5 123:7 | 268:9,24 269:8 | 391:20 395:6 | 26:22 127:10 | **offending** 295:6 |
| 124:16 127:5 | 269:21 270:5 | 396:8 397:15 | 214:14 224:18 | **offense** 417:2 |
| 127:23 128:9 | 270:10 271:3 | 399:3 400:13 | 271:21 279:22 | **offer** 126:8 |
| 133:6 137:20 | 271:11 272:5 | 402:3 406:12 | 336:10 539:7 | 156:14 180:7 |
| 138:2 141:10 | 272:22 273:14 | 407:9 408:9,13 | 550:11 | 216:10 452:14 |
| 144:10 147:14 | 273:24 274:10 | 412:6 413:16 | **objective** 162:15 | 456:24 457:10 |
| 148:4 155:24 | 275:5,13 | 417:15,16 | 283:7 342:24 | **offered** 452:20 |
| 156:16,21 | 276:18 277:10 | 419:10,22 | 343:10 344:1 | 452:21 |
| 158:19,22 | 278:10 279:10 | 420:5,7 423:1 | 458:16 459:6 | **offering** 144:8 |
| 159:4,17 160:7 | 279:15 280:16 | 423:23 432:7 | **objectively** | **offhand** 148:17 |
| 166:1,11,16 | 281:23 282:5 | 432:11,14 | 281:17 335:17 | **office** 53:14 54:6 |
| 167:3,10 | 283:2,22 284:5 | 434:19 435:14 | **objectives** 64:2 | 54:14 |
| 168:20 169:23 | 284:10 285:12 | 436:19 437:11 | 64:3,11,12,12 | **officer** 52:21 |
| 170:7 171:8 | 286:20 287:16 | 439:20 443:19 | 64:13 447:8 | 164:4 |
| 173:5 175:1 | 289:2,18 292:7 | 446:11,17 | **objects** 114:21 | **offices** 54:3,7 |
| 178:16 179:7 | 296:7 300:1,8 | 448:6,22 | **obligations** | **official** 167:1 |
| 179:15,20 | 300:16 301:10 | 450:15 453:22 | 100:21 241:1 | 199:10 491:4 |
| 180:19 182:7 | 304:19 305:3 | 455:12,15 | 293:16 500:7 | 492:16 |
| 182:14,17 | 306:6 309:17 | 460:13 461:15 | **obsolete** 19:5 | **Officially** 99:5 |
| 183:8 185:24 | 309:20 311:22 | 462:18 463:23 | **obtain** 335:15 | **officials** 304:18 |
| 188:3 189:12 | 311:23 312:15 | 464:18 465:11 | 411:24 | **off-label** 7:17 |
| 190:10 193:4 | 312:22 313:22 | 466:17 469:10 | **obtained** 333:16 | 113:4 114:23 |
| 197:3 202:24 | 314:5,20 315:6 | 472:1 473:5 | 335:19 | 115:15,20 |
| 204:18 205:23 | 315:18 318:11 | 474:15 475:9 | **obviously** 58:2 | 116:9 117:4,17 |

117:19,24
118:5 125:11
126:1 129:9,16
132:18 140:7
142:21 143:9
153:11,24
154:15,22
180:4,10
181:17 188:1
215:5 221:20
226:13 228:15
229:20 238:9
238:11 239:12
240:6,13
316:14 317:7
317:20 318:9
318:17 320:5,9
320:16,21
321:18 322:6
322:11 326:11
327:6,9 332:9
343:4 344:11
344:14 345:6
350:3 351:6,8
351:11 356:24
359:7,14
360:13,19
361:2 365:2,9
365:11 366:1
368:23 369:9
369:16,22,24
370:12 371:12
372:1,15,18
373:1,12,14
377:23 378:5
379:11 381:8
382:5,22 383:3
383:12,23
384:2,16
385:21 412:12
413:1,3,5
414:19 415:17
415:23 416:11
420:18 421:12
422:11 423:12
424:12 464:9

464:13 519:1,7
519:14,21
523:19 526:3
539:5 543:22
**oh** 50:17 56:14
133:16 332:12
431:20 466:5
493:13 542:12
**OHIO** 1:2
**okay** 13:1,17
15:12 19:16
23:16,18 38:22
41:15 46:23
47:5,19,23
48:4,10 56:14
56:19 87:15
91:19 104:19
111:16 125:13
134:10 139:22
147:2 160:3
163:7 167:7
174:17 176:17
176:21 178:2
183:4 193:11
193:24 194:18
194:24 195:6
207:3 211:24
216:2,8 224:22
225:13 235:8
246:22 247:18
260:19 264:21
264:22 288:3,4
289:10 305:9
306:19 315:14
328:2 329:4
340:15 343:14
348:17 350:13
355:3 366:6
372:24 375:8
386:20 389:2,5
390:22 394:9
397:21 400:7
401:17 405:13
412:11 414:6
415:6 422:17
427:6 429:3

438:8 440:7
449:17 455:3
456:21 458:10
460:6 466:5
468:8 476:1
487:6 522:7
531:12 534:21
542:16
**old** 15:11
**omits** 179:11
407:1
**omitted** 135:22
295:24 296:4
**onc** 338:1
**once** 87:2 98:16
138:9,14
149:20 153:5
229:14 425:7
526:6 546:18
**oncologists**
139:5 155:15
159:13 222:22
228:12 260:11
329:23 330:12
412:18
**oncology** 29:13
36:19 37:2,11
40:15,17 42:13
52:2 56:6,13
56:17 57:2
108:8,10,13,16
109:2,5 121:19
139:3 155:3
215:11 220:6
230:12 249:1
259:18 338:1
426:16,21
**ones** 29:23 46:21
110:2 243:6
402:2 405:13
**one-page** 47:3
48:8
**one-sided**
166:21 361:20
544:7
**ongoing** 439:2

439:16 447:20
453:2,10
454:12 456:22
**on/or** 99:11
**open** 253:15
383:22 387:1
520:6 548:14
**opening** 312:19
**opens** 252:23
**operate** 105:10
**operated** 28:7
**operating** 84:23
201:13 209:24
212:18 473:1
**operation** 91:6
209:2 439:4,17
**operational**
134:19 206:24
**operationally**
122:19 310:5
**operations** 58:3
186:5
**operative**
201:17
**opiate** 1:5 10:19
444:23
**opinion** 190:1
248:18
**opioid** 11:16
27:21 43:3
59:4 69:23
77:21 113:3
117:10,11,22
232:5 249:22
375:16 376:2
376:18,22
419:2 420:19
434:10 435:6
436:12 442:2,4
442:16 445:2
449:24 454:16
457:4 459:24
476:8 477:8
479:20 501:5
503:11 536:6
536:13,20

547:13
**opioids** 27:16
95:1 117:23
330:1 501:15
501:21 502:1
502:10 505:23
506:16 507:14
**opioid-naive**
349:14
**opioid-tolerant**
24:4 27:11,14
93:17 449:5,11
461:6 476:18
**opportunities**
452:15 457:1
457:11
**opportunity**
87:3 327:10
370:17 484:13
484:19 500:24
505:13
**opposed** 145:14
146:18 406:3
**option** 64:17
**options** 61:19
62:3,15 66:8
66:12,21 67:12
67:20
**oral** 293:12
**order** 71:23
72:15 76:17
119:17 182:24
296:19 297:7
535:3
**ordinary** 131:17
**org** 5:18 46:1,7
46:11 192:1
426:14
**organization**
46:14 108:10
216:14,22,24
510:16
**organizational**
45:12
**organizations**
178:8 312:9

**organized** 49:10
**original** 167:19
  171:13 207:9
  208:2 411:14
  553:15
**originally** 52:24
  171:21 298:19
**Ottinger** 53:8,10
  60:3 470:1,8,9
  470:23 471:2
  482:3,20
  485:22 486:6
**outbreaks**
  447:21
**outcome** 113:2
  523:11
**outcomes**
  523:14
**outline** 126:7
  413:5 451:21
**outlined** 103:8
  195:15 198:5
  374:14 429:14
**outlines** 212:2
**outlining** 144:7
  216:9 448:18
**outreach** 450:8
**outset** 449:19
**outside** 223:9
  266:22 267:20
  273:8 281:3
  294:18 341:7
  352:3 382:21
  422:1,3 518:8
**outstanding**
  481:10
**overall** 31:10
  95:5 232:4
  448:12
**overdose** 343:4
  463:9 518:21
  523:6,9
**overlap** 426:17
**overlapping**
  470:5
**overly** 145:11

**overpromotion**
  408:7
**oversaw** 50:6
  57:6 164:9
**oversee** 96:20
  303:11
**overseeing** 30:9
  428:1 429:19
**oversight** 30:24
  31:1 198:17
  538:15
**overstatement**
  401:22 402:15
  406:23 407:17
  407:23
**Overstates**
  407:2
**overview** 527:6
**Oxycodone** 95:2
**OxyContin**
  325:22
**O-T-T-I-N-G-...**
  53:11 470:13

**P**
**PA** 11:24 291:19
  416:11
**package** 187:17
  318:1 319:1,2
  329:20 349:6,7
  356:19 367:8
  369:4 375:13
  378:17 386:22
  433:7 441:16
  450:1 459:11
  516:21 546:12
  546:16 547:9
  548:12 549:20
  550:4,9
**packet** 207:6
  208:16 342:17
  541:11 542:8
  546:22 547:20
**page** 5:11 6:4
  7:4 8:4 9:6,6,6
  9:11,11,11,16

9:16,16,21,21
9:21 38:1,11
47:12,14,15,17
48:3,22 73:3
77:11 79:24
87:17 93:13
94:19 99:1
100:11 101:16
105:21 108:7
111:2 112:19
118:7,8,10
121:4 125:3
128:23,24
131:7,23,24
132:17 133:13
133:20 134:8
134:12 135:20
136:17 139:10
139:17 143:17
154:10 165:4
177:23 184:2
184:16 185:6
192:22 195:13
201:21,23
207:6,8,15,22
214:21 221:13
222:6 232:21
233:3 236:4
245:3 248:16
258:24 266:9
266:10,15
276:7 287:8
288:1 296:15
298:10,13
325:17 328:20
333:15 337:16
339:7 364:5
367:17 368:6
372:24 373:10
373:11 378:17
386:23 389:1,3
394:3,3 422:9
422:15 430:19
438:7 440:21
441:22 442:21
444:17,17,18

445:13,13
447:6 448:11
449:2,17
451:17 452:8
454:3,6 455:4
460:20 465:18
478:12 482:14
484:18,18
498:13 509:11
545:19 554:3
556:2
**pages** 101:22
  105:6 173:22
  178:1 263:8
  489:10 516:18
  555:3
**paid** 289:16,22
  290:5,8,9
**pain** 24:3,5,6,12
  24:13,14,17
  26:1,1 27:7
  29:14 36:24
  37:13 40:21
  41:1 43:1
  44:12,20,21
  59:5 69:21,24
  77:18,22 93:16
  109:12 117:8
  118:3 199:8
  215:11,12,13
  220:6,8,9,10
  222:24 223:1
  225:14 228:13
  230:13 233:4
  233:13 234:10
  234:13,15
  239:7 247:21
  249:10 252:9
  260:10,13
  265:10 266:17
  268:6,20 269:4
  270:9 272:10
  272:14 273:22
  276:1,5,10,11
  276:16 277:4,8
  281:11 284:20

287:11,13
289:1 329:23
330:2 331:5
336:1 338:6
339:20 367:15
375:24 376:3
376:21 377:4
377:15 378:7
378:11,22
387:5 412:18
427:16 434:8
434:11 442:13
442:17 450:9
455:5,6 456:23
457:8 459:23
460:1 461:7,9
476:17 548:18
549:14
**palliative** 215:15
  220:12 223:2
**paper** 285:22
  484:24
**Par** 3:21 38:13
**paragraph**
  69:18 71:2
  121:10 165:16
  212:1 319:18
  320:15 325:17
  333:15 343:11
  351:5,17
  352:23 355:3
  378:15 379:16
  380:7 382:18
  389:7 399:7,22
  416:17 430:4
  434:2,5 435:1
  442:11 449:18
  463:7
**parameters**
  238:3
**parens** 523:16
  523:17
**Parker** 31:9,19
  49:22 54:22
  194:15 245:5,9
  394:5,13

Highly Confidential - Subject to Further Confidentiality Review

**Parks** 2:11
**Parkway** 291:18
**parlance** 441:3
**part** 37:10 61:19
  73:6 80:4,5
  81:14 98:10
  100:16,20
  111:2 113:11
  117:7 120:20
  184:1 205:14
  241:2 330:4
  331:9 346:13
  352:24 380:20
  382:5,6 390:18
  394:24 430:3
  431:22 432:1
  435:3,11,19
  511:23 524:16
  532:8 541:17
**participate**
  178:9 312:9
**participated**
  521:1 531:24
  532:3
**participating**
  165:10 504:24
**particular** 42:11
  95:17 125:21
  140:3 147:24
  160:11 194:16
  208:22 210:8
  221:17 241:6
  243:6 322:10
  331:20 338:20
  397:8 399:10
  417:20 418:4
  460:20 503:7
  514:17 521:17
**particularly**
  329:15 360:13
**parties** 95:7
**partner** 206:13
**partners** 118:20
  119:2 168:19
**pass** 172:15
  347:6 499:4

**passed** 516:2
**pat** 357:8
**patent** 26:10
**patient** 78:2
  88:9 92:22
  93:12 115:22
  116:16 118:9
  118:14 120:1,3
  126:21 132:5
  165:21,24
  187:17 212:7,9
  227:2 248:22
  249:18,21
  274:21 275:20
  281:21 293:19
  294:22,23
  295:2,15,17,22
  333:19,20
  335:1,2,2
  360:17 369:23
  370:1 411:11
  447:2 466:3,10
  477:8 523:20
  536:17
**patients** 24:4,9
  24:18,22 25:2
  27:6,11,14,15
  69:21 70:10
  77:19 93:17
  100:15 101:11
  103:22 117:8
  118:12 141:4
  153:19 222:20
  223:4 247:4
  252:13,15
  329:22 349:14
  370:5 375:20
  375:24 376:20
  377:9 379:3
  386:5 411:12
  411:24 419:1
  420:19 434:8
  434:17 436:2
  442:14 449:6
  449:11,15
  461:6 463:11

  463:12,21
  468:10 476:18
  477:11 535:18
  535:18 547:17
**Patricia** 69:13
**patterns** 126:12
  463:2,16
**Paul** 52:24
  164:4,5 191:17
  317:3
**pay** 7:17 65:5
  380:9 414:18
  415:16,22
**paying** 415:22
  417:11
**payment** 65:4
  65:14,16,17
**PCP** 260:21
  276:1,4 337:18
  341:1,14
**PCPs** 262:17
  340:10 341:4
  341:17
**PDUFA** 405:1
**pediatric** 249:2
  250:7 317:22
  320:10 326:12
  343:3 412:13
  444:7 445:9
  517:21 522:12
  522:13
**peers** 103:22
**Pennsylvania**
  1:17 2:21 3:13
  4:6 10:18
  415:12
**Penny** 54:24
  57:9 426:9
  428:3 440:6,7
  458:23
**people** 32:4
  58:17 59:2
  95:14,17
  103:19 109:13
  153:19 155:3
  160:5 175:11

  189:20 190:8
  190:22 191:17
  192:5 239:2,24
  256:4,5 281:2
  282:22 302:15
  303:13 313:7
  317:1 333:8
  384:12 404:17
  500:18 533:24
  541:19 543:1
**people's** 404:18
**perceived**
  524:13
**percent** 39:20
  63:9,12 126:1
  126:15 128:8
  132:12 133:17
  134:1 135:16
  135:20 136:8
  136:22 137:18
  138:18 140:7
  140:19 141:6
  142:14 144:4
  145:10 147:22
  151:14,20
  152:2,9,19
  153:8,10,12
  155:9 156:8,10
  158:4,17
  170:21 171:23
  180:5,11 181:9
  181:18,21
  182:6 183:1,19
  196:13 198:12
  213:15 214:9
  215:16 219:19
  220:19 221:2
  221:21 223:10
  224:2,3 225:21
  226:13,17
  230:14,17
  231:21 232:16
  233:16,17,17
  234:7,10,12
  235:2,18,20
  236:4,21 237:1

  237:5,9,20,23
  245:8,20 246:1
  246:13 247:7,9
  247:20 250:2,5
  259:2,15,19,20
  259:21,22
  260:20,24
  261:4,10 262:1
  262:10 263:2
  263:18,24
  264:10 265:12
  265:14 266:16
  267:1,19 268:5
  268:20,21
  269:19 270:18
  270:20 271:1
  273:7,9,11
  275:24 276:2,5
  287:12 288:23
  295:2,12
  298:21 299:23
  318:21 327:6
  336:2 338:18
  338:21 340:11
  340:17,20
  350:6,16,22
  367:13 372:22
  374:4 379:10
  384:2
**percentage**
  225:18 229:19
  232:11,12
  234:22,24,24
  235:19 374:3,9
**percentages**
  298:2 339:10
  368:18
**perceptions**
  387:7 548:20
**perform** 34:3
  253:23
**performance**
  62:7 63:14,15
  63:16,20 64:5
**performance-...**
  62:14

Highly Confidential - Subject to Further Confidentiality Review

**performing**
447:20
**period** 23:9
34:15 35:8,21
35:21 37:6,16
51:9 54:19
55:15 64:20
254:23 288:22
292:15 358:3
358:20 380:12
403:20 415:21
415:24 477:14
480:15 481:20
482:4 483:1,3
496:7,16 509:7
533:12
**periodic** 439:3
439:16
**periodically**
34:2
**periods** 31:23
46:16
**permitted**
519:22
**persistent** 69:24
77:22 376:3
434:11 442:17
460:1 461:7,9
**person** 57:13
78:7 121:14
156:24 164:1
268:14 282:15
283:8 287:7
335:7,9 343:24
394:6 440:18
454:13 470:4
473:18 483:18
507:3
**personal** 64:13
308:20
**personally** 98:4
108:12 318:6
**personnel** 65:1
447:18
**perspective**
343:12,15

**401:8**
**pertains** 442:8
**pertinent** 447:18
534:10
**ph** 1:23
**pharma** 404:16
**pharmaceutical**
7:16 14:17
16:16 21:24
41:12 43:24
403:17 414:17
415:16 416:9
511:22 512:11
512:17,20
526:24 539:15
**Pharmaceutic...**
3:21,21 18:4
42:7,15 61:4,6
61:8
**pharmacies**
108:15 119:16
121:15 123:24
124:8 294:8
436:1
**pharmacists**
100:14 101:2
101:11,20
**Pharmacokin...**
29:3
**pharmacy**
118:10 121:8
178:5 293:19
312:6 477:11
**Philadelphia**
1:16 3:13 4:6
10:17 321:12
321:24 322:24
324:6,9 325:2
325:14
**phone** 168:24
317:13 323:10
530:11
**phrasing** 503:1
**physiatrist**
249:12
**physical** 215:13

**216:15 220:11**
223:2 379:2,6
**physician** 28:2
116:15 119:11
119:20 126:13
133:24 136:7
137:17 138:21
140:18,21
141:16 143:3
145:14 196:11
215:6,9 220:4
222:21 223:7
230:11 245:24
266:11,15
275:21 294:20
294:21 295:5
333:20 335:2
377:8 448:14
455:4,24
**physicians**
100:14 101:10
101:19 108:15
125:21 132:23
140:3 144:2
146:1,3,17
154:7 221:16
249:22 276:3
330:11 351:21
359:9 375:15
375:19 376:17
376:21 377:3,5
377:13,19,22
378:21 385:6
385:10,17
387:7 412:19
419:9 448:20
453:13 472:16
535:5 547:12
547:16,23
**physician's**
387:4 548:17
548:19
**pick** 323:10
540:13
**picking** 507:12
**picture** 353:2

**piece** 207:4
358:14,18
363:10,15,19
366:19 396:2
396:15,18
398:1,14
401:14 405:4
406:11 408:2
408:17,22,23
418:11 526:15
526:18 531:1
531:19
**pieces** 308:7
356:11 357:10
357:16 358:7
358:10 362:18
363:2 364:1,7
364:14 365:19
365:22 390:1
395:11 396:5
398:3,9,18
401:9 402:23
403:2,19
404:20 405:18
406:5 407:18
408:4 418:12
418:18,22
420:17,21,24
421:8,9 422:23
516:23
**PIETRAGAL...**
3:10
**pile** 315:14
**pill** 444:6
**PINCUS** 4:11
**pinpoint** 529:14
**PK** 28:24 29:2
**place** 1:16 10:17
16:7 21:5
22:13 84:8,14
113:13 122:3
145:1 164:2
174:19,23
179:1 185:14
238:12 243:4
308:22 452:5

**462:17 469:17**
482:10 533:3
**placed** 17:4
108:11
**plaintiffs** 2:7,14
11:16 499:21
**plan** 108:20
111:17 212:6
257:2,22 258:8
258:23 259:1
265:23 266:9
277:15 287:8
288:21 303:4
327:5 334:3
335:20 340:10
360:14 410:15
436:11 439:2
453:19,21
457:10 464:12
465:2,8 466:1
466:1,2,8,8,10
477:2 486:2
**plans** 19:13,15
20:14 257:6
339:18
**play** 108:17,21
**plea** 7:20 382:7
414:24 418:3
419:21 422:7
532:14 534:5
**pleaded** 381:8
**please** 11:7,18
13:13 73:5
74:19 77:16,22
102:15 133:9
159:2 222:5
321:22 331:6
336:11 348:4
420:6 472:8
490:22 496:1
534:16 553:3,8
**PLLC** 2:10
**plus** 259:17
338:14 507:1
**PM** 245:20
247:19

Highly Confidential - Subject to Further Confidentiality Review

**PNAN** 338:6
**point** 15:17
    29:14 36:24
    37:11 54:11
    56:1 74:10
    76:1 88:11
    93:14 94:12
    101:13 118:17
    121:22 137:14
    144:12 168:12
    168:16 194:5
    198:15 199:9
    199:14,15,18
    200:4 213:6
    229:8 255:13
    255:14,21
    256:2 280:17
    281:5 294:7,11
    294:14 295:9
    301:13 372:11
    396:13 426:1
    428:3,5,7
    445:11 447:1
    451:4 454:4
    456:20 458:2
    467:9 468:24
    469:6 470:23
    473:17 476:13
    476:20 486:7
    508:3,12
    513:16,20
    527:17,24
    529:5,8 534:4
**pointed** 241:16
    243:16 298:20
    302:2 405:13
    458:16
**pointing** 254:14
    313:10 396:5
    493:10,12
**points** 99:2
    100:13 177:24
    178:22 192:23
    193:20 194:1
    196:24 197:1
    200:4 293:23

    294:5 308:11
    359:6 365:1
    374:15 375:4
    388:23 399:18
    399:23 452:4
**policy** 184:18
    190:6 496:12
    496:14,23
    497:1,8
**Polster** 1:9
**POL-0009**
    184:18 190:5
**population**
    249:4 465:5
    548:22
**populations**
    78:3 88:6,18
    113:4 126:21
    215:6 248:22
    249:18,21
    387:10
**PORTER** 3:17
**portion** 466:2,9
    502:21 524:21
    534:15
**portions** 517:10
**pose** 248:23
**posed** 460:22
**position** 14:10
    35:5 50:10
    51:1,9,19 57:5
    57:6 163:23
    164:8,12
    386:10
**positions** 18:3
    44:5 398:7
**possess** 505:15
**possibility**
    312:20
**possible** 74:20
    88:7 100:8
    113:5 254:22
    278:4 352:19
    477:5 481:13
    496:4 509:16
**possibly** 201:15

    202:18 249:9
    250:17 281:11
    284:20 313:20
**Post** 197:22
**postmarketing**
    17:2 80:13
    435:3,12 463:2
    463:16
**post-meeting**
    197:23 345:11
**potent** 444:23
**potential** 87:20
    88:5 99:9,10
    99:16,16 113:1
    113:3 125:24
    126:19 140:6
    180:4,10
    181:17 212:8
    221:20 226:10
    391:7 446:4
    447:16 454:18
**potentially**
    153:9,10
    156:10 225:21
    247:8 330:6
    385:19 454:15
    454:20 525:13
**power** 20:13,16
    21:2 22:14
**practical** 307:4
**practice** 33:18
    78:18 149:11
    149:18 150:7
    151:17 165:15
    182:4 185:20
    189:10 377:7
    422:21 491:13
**practices** 171:5
    174:18,22
    227:19 345:5
    351:24 353:16
    359:11 361:1
    366:21 376:19
    422:11 495:22
**practicing**
    249:23

**PRAKASH** 2:21
**preceded** 20:3
    21:21
**predecessor**
    16:5 17:22
**predominantly**
    416:3
**prefers** 505:18
**preliminaries**
    289:12
**prep** 290:1
**preparation**
    480:13
**prepare** 31:3
    129:11 131:17
    195:7 290:3
    348:10 397:14
    470:18 471:13
**prepared** 31:19
    130:22 164:17
    192:11 194:21
    197:9 264:1
    296:3 353:9
    390:23
**preparing** 184:9
    192:19 257:5
    286:18
**prescribe** 95:18
    144:2 223:9
    225:19 252:7
    252:14 351:10
    422:20 453:14
    535:17 539:12
    539:13
**prescribed**
    116:14 117:15
    125:23 140:5
    221:18 238:22
    247:10 251:16
    280:12 288:24
    368:2
**prescriber**
    133:21,23
    134:14 140:17
    143:8,11,15
    170:19 179:1

    232:9,11
    234:19,22
    235:19 240:14
    253:21 308:21
    333:16 411:16
    411:17
**prescribers**
    119:15 125:5
    126:24 132:18
    136:18 141:3
    170:17 213:5
    213:13 214:8
    232:4,5 234:23
    234:23 240:21
    240:23 242:23
    243:3,5 249:23
    296:17 351:9
    412:16,18
    413:3 436:1
    450:4 454:12
**prescriber's**
    119:20
**prescribing**
    116:22 119:12
    120:7 126:7,12
    126:20 132:22
    139:3 140:23
    141:4 142:21
    143:4,13 144:7
    144:18 146:18
    147:13,21,23
    148:2 153:11
    153:20 155:3,8
    157:7,14
    158:15 159:15
    216:9 220:16
    226:13,17
    232:3 235:3,5
    239:3 240:16
    240:23 241:7
    242:24 243:6
    245:7,18
    248:21 249:6
    249:13 250:19
    251:23 252:1
    252:12 254:16

Highly Confidential - Subject to Further Confidentiality Review

281:12 284:21
293:18 294:20
333:22,24
337:17 376:19
378:23 384:17
448:13 535:16
536:17
**prescription** 1:5
10:19 119:7
146:4 181:9
231:22 232:10
232:12 252:10
278:24 453:7
453:12 501:14
501:15 502:10
503:11 506:16
507:14 519:8,9
519:15,18
536:10,19
**prescriptions**
119:10,14,18
119:23 125:24
126:2,16 134:2
136:9 137:19
140:6,8,20
141:7 144:4
153:13 156:9
156:11 180:3,6
181:10,16
220:18 221:19
221:22 224:2
225:22 229:21
233:16 234:13
235:1,6,20
236:5 246:24
247:10 259:3,3
259:15,15
261:24 265:12
294:24 295:3
375:17 376:23
382:23 501:15
547:14
**present** 4:16
18:10 43:7
329:12 331:16
439:9 489:17

**presentation**
275:21 375:13
386:24 401:21
406:22 514:22
517:3 524:1,17
547:10,21
548:13
**presentations**
103:22 520:22
**presented** 71:17
176:23 410:17
544:7
**president** 37:9
50:11 470:9
**press** 415:12
416:15
**pressure** 324:21
**presumption**
247:6
**pretty** 39:21
54:10 123:21
356:23 367:21
368:16 428:2
**prevent** 90:8
91:12 344:8
360:17 384:16
453:17 505:16
**preventing**
448:4 453:6
**prevention**
89:14 92:23
94:2 101:6
**previous** 141:19
500:10 510:21
**previously** 27:16
166:19 240:12
263:7 309:24
538:19
**pre-clearance**
363:15 395:1
395:14 402:19
403:3 407:13
**pre-cleared**
357:9,14
361:20 363:2
363:22 389:24

401:15 408:4
418:22 420:14
421:10
**pre-SNDA**
476:24
**primarily**
101:18 276:4
**primary** 88:3
99:8,14,22
100:4 108:14
232:9 236:8
248:22 260:20
262:1,9 276:3
337:19 340:10
341:1 435:4
436:18 440:18
**principal** 14:12
41:21 43:7
**principle** 457:2
**principles** 18:1
385:22
**printed** 331:11
346:11,13
364:2
**printout** 133:18
**printouts** 265:1
**prior** 21:4 43:22
43:24 73:14,16
76:19 318:2
319:1 365:7
401:24 413:13
433:4 439:6
460:23 516:23
522:2 540:16
542:11
**privilege** 417:17
**proactive** 406:1
**proactively**
450:12
**probably** 86:9
95:24 136:2
137:7,10
167:16 184:14
187:4 254:7
273:11,17,18
281:18 339:3

362:24 384:8
401:12 418:16
418:20 419:3
424:6 458:9
473:18 491:10
507:8
**problem** 151:13
174:14,17
175:9,12
238:10 280:24
402:22 404:3
408:7,8
**problems** 113:6
396:5,11
400:10 439:11
446:9 502:1
544:15
**ProCare** 165:14
**procedure**
209:24 212:2
212:18 220:15
**proceed** 87:6
**process** 20:12
28:20 114:6
122:2,3 165:13
168:18 173:3
175:7 182:22
198:4 199:16
215:1 216:3
228:11 234:3
253:24 344:20
356:10 362:17
395:1 396:1
400:21,24
403:1 404:1
429:19 492:8
511:21
**processes** 19:13
33:21 114:1,3
476:11
**produce** 408:23
**produced** 405:5
**product** 12:9,20
18:17 25:10
26:2 29:14
43:1,4 71:8

72:4 73:7,10
73:17 77:16,24
78:9,10 80:10
80:15 90:13
94:24 95:7,11
99:8,14 101:14
108:16 111:3
111:23 113:3
114:23 115:19
115:22 195:19
212:14 215:18
216:20 239:6
253:4 257:18
258:2 320:3,17
322:21 323:22
324:2 326:1
327:3 329:13
349:20 350:4
351:9,10 353:3
353:6 373:20
381:19 383:4
402:21 428:10
441:5 449:21
449:21 459:14
459:18 464:12
465:4 505:14
512:6,9,18,21
518:7,18
531:14 535:8
535:10,16
540:4
**Production** 9:10
**productive**
406:5
**products** 16:9
16:11 42:11
44:12 55:7
59:5,5 60:4
95:3 317:16
403:13,16
443:8 470:17
479:20 527:1
535:13 538:21
539:13
**product's**
449:23

Golkow Litigation Services - 877.370.DEPS

professional
88:9 126:4,10
140:10 144:6
156:14 158:6
180:8 213:18
214:12 216:11
216:13,23
221:23 224:16
450:10 452:11
452:13 519:10
519:16,17
**professionals**
103:13 449:19
**profile** 28:24
360:21
**profits** 64:6
**program** 16:7
22:13 71:15,21
72:2 73:4,6,12
73:16 83:22
87:19 88:7,16
89:13 90:2,9
100:17,23
105:10,12,21
112:22,24
113:8,11,13
114:11,22
118:24 126:9
129:4 131:9
142:18 161:7
162:11,16
163:1 165:17
166:10,15
185:14,23
186:11 192:16
195:17 197:11
205:11 207:23
210:4,10,15
212:4,21 213:9
216:10 218:10
218:12,14,19
218:22 219:1
242:3 293:13
293:14 320:2
330:5 343:7
344:10 410:11

421:22 435:23
439:4,6,18
444:24 446:22
462:24 463:14
469:8 472:10
505:1,5 513:7
522:6,8 526:22
527:1,7 534:14
534:17,22
535:19
**programs** 21:21
88:11 91:11
101:10 102:4,7
102:21 103:6
132:1 144:9
156:15 180:7
295:6 450:8
535:1
**progressing**
91:6
**progression**
137:5
**prohibited**
111:17
**project** 169:3
173:12 430:7
475:20 477:19
479:1 485:23
**promote** 110:1
155:23 351:20
359:10 378:6
382:21 539:16
549:11
**promoted** 29:16
34:23 36:18
329:16 379:21
416:19 428:16
**promoting** 78:9
106:3 330:8,13
357:20 380:11
408:7 422:14
479:6 526:3
**promotion** 16:1
29:17 34:24
36:21 105:24
331:8 333:1

344:15 349:10
349:23 351:11
352:12 353:3,6
356:14,16,24
357:9,16
360:11,19
363:2 375:15
379:11 389:12
389:13 391:5
394:24 401:14
404:10,18
408:3 418:11
418:18 420:12
420:15 421:9
449:22 519:21
539:5 546:7,9
547:4,12
**promotional**
77:23 188:13
344:20,23
345:5 353:16
356:11 359:16
362:2,18 364:7
364:14,21
365:10 366:19
385:15 390:1
394:20 397:10
398:24 399:12
400:11 402:1
403:2,19
407:18 422:23
491:20 492:12
525:13 526:15
526:18
**prompt** 180:6
423:11
**prompted** 451:2
475:17
**prompting**
391:16 475:18
**promptly**
445:22
**prompts** 181:18
**pronounce**
40:15 99:4
**pronounced**

99:3
**proper** 92:22
93:12 146:4
243:1 327:2
450:13 452:6
466:3,10
**properly** 34:4
397:13 451:14
**proportion**
119:22
**proposal** 413:4
479:12
**proposals**
474:13
**propose** 412:1
412:15,24
465:3 471:14
**proposed** 73:11
73:14 77:3
205:10 410:13
411:3 412:17
413:9 450:20
465:4 469:23
480:10,11,13
496:23
**proposes** 410:10
488:5
**proposing**
395:21 496:14
**propounded**
555:5
**prospective**
362:6 443:12
443:12
**prospectively**
405:21
**protected** 391:3
**protocol** 500:9
**provide** 15:20
74:7 90:3
97:19 119:19
129:1,7,15
326:10 333:17
334:23 339:22
355:4,6 385:7
459:9 514:5

517:20 536:18
549:9
**provided** 33:1
101:19 127:21
308:2 345:2
351:2 356:17
402:2 451:7
516:23 536:2
540:22 543:17
545:12 546:10
546:16,21
549:19
**providers**
260:21 262:1
262:10 337:19
340:11 341:1
525:6
**provides** 69:19
89:24 411:23
434:6 476:19
**providing** 33:13
111:18,22
112:10 196:24
356:5 395:3
447:17,23
**Provigil** 380:19
380:22 381:9
382:9 416:3,20
**provision** 158:1
168:6 230:9
244:5 300:15
**Psych** 338:4
**psychiatrist**
157:13
**psychiatrists**
223:15
**psychiatry**
223:16,17,24
334:18 340:23
**psychology**
338:4
**public** 360:22
391:2,8 395:11
555:14
**publication**
105:6

Highly Confidential - Subject to Further Confidentiality Review

**publications** 104:22 105:1
**published** 293:21 323:24
**publishing** 291:24
**pull** 68:7 80:6 83:3 128:19 132:16 256:15 341:23 405:14 512:17,20 515:6 529:6,9 534:6 545:7,13 545:18
**pulled** 38:10 47:12 79:23 81:22 221:12 481:24 512:9 534:11
**purchased** 59:3 69:10
**purely** 375:15 547:12
**purpose** 16:18 90:12 212:1 249:19 459:8
**purposes** 229:16 322:9
**pursuant** 1:15 340:21
**pursuing** 378:12
**purview** 423:7
**pushing** 391:16
**put** 16:7 22:13 28:18 33:10 38:7 53:1 97:17 134:6 136:16,20 137:13 145:4 186:11 194:2 194:14 197:18 236:23 253:17 258:2 265:4 272:12,13 309:9 321:21 333:11 341:19

363:14 401:14 441:21 469:22 472:12 531:16
**putting** 190:15 194:9 197:15 281:1 331:16 351:22 465:6 473:22
**puzzled** 510:3
**Pyfer** 192:6 219:13 231:21 248:17 249:24 257:17 261:6 277:22 279:8 280:10 282:24 284:2,8 287:6 348:22
**Pyfer's** 254:14
**p.m** 200:21 201:3 288:11 288:17 392:17 392:23 499:8 499:14 511:4 511:10 550:24 551:3

─────────
**Q**
─────────
**QA** 161:4 297:2 333:1
**qualifications** 15:18
**quality** 6:9 32:18 33:19,23 113:20 114:5 161:3,14 162:5 188:16 192:16 195:16,18 291:20
**quantify** 66:11
**quarter** 138:3 148:24 161:7 215:9 246:2
**quarterlies** 122:14 264:24 369:15
**quarterly** 30:23

31:4 76:2 91:4 97:17 121:23 123:12,14 126:2 127:22 128:3 129:1,21 130:16,19 131:9 133:2 139:19 140:8 148:21 149:15 149:21 150:2 150:19,22 151:18,24 162:22 179:11 187:22 213:7 217:2,6,14,20 245:17 262:12 295:10 339:8 362:7 367:3 369:8 370:10 371:17 405:21 522:8
**quarters** 126:17 142:17 180:12
**quash** 500:12
**queries** 118:14
**query** 118:12
**question** 9:20 10:7 13:13 28:11 57:22 81:15 82:8 89:7 102:13,19 116:4 124:9 126:14 132:9 141:1 214:3 227:7 228:21 236:1 248:7 261:21 277:2 280:19,22 281:7 282:9 283:18,24 284:1,4 285:18 327:13 328:1,5 328:8 332:19 370:15 371:15 374:12 380:16 417:22 419:16

455:19 460:21 461:2,14 489:8 500:22 528:9
**questioned** 228:5 385:14
**questioning** 302:9
**questionnaire** 527:4
**questions** 173:18,22 248:9 276:24 302:16 327:23 388:7 442:22 459:10 460:22 483:24 484:8 484:12,22 500:15 510:24 511:16 512:15 513:5,9 537:7 544:5,11 548:8 555:4
**quick** 15:15 86:12
**quickly** 25:21 145:4
**quite** 50:22 163:12 260:15 332:15 363:23 456:18
**quote** 157:20 180:13 196:10 236:22
**Q203** 140:20

─────────
**R**
─────────
**R** 347:24 554:1 554:1
**RA** 183:22 184:4 303:5
**Raczkowski** 51:13,18 52:12 53:3,13 164:2 164:15 191:24 256:11,12,13
**RADARS** 446:1

**raise** 294:7 307:24 308:10 353:17 375:5,6
**raised** 179:4 192:23 197:2 229:7 350:11 360:8 371:9 374:19 376:5 419:7 514:16 517:17 524:2 524:11 530:6 530:10 547:21
**raises** 95:5 316:14 317:6 360:21 366:21
**raising** 349:23 477:15 515:23
**ran** 202:18
**rapid** 446:2
**rapid-acting** 275:22
**Rappaport** 317:14 319:13 319:18 326:8 328:22 329:6 410:2 426:5 459:3 481:5 515:19,23 516:6 517:7 530:10
**RASPANTI** 3:11
**rate** 290:9,10
**rates** 181:9 501:14
**ratio** 294:24
**rational** 307:21
**rationale** 303:21 303:24 379:13 379:20 386:1,3 386:19
**rationales** 445:7
**Rblake@reed...** 4:7
**reached** 151:14 152:7,8 515:19

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**reaction** 447:21
**read** 38:19,24
  45:13 82:11,12
  99:11 102:14
  102:16 125:7
  125:14 181:5
  194:17,22
  195:8 199:1
  219:23 221:15
  226:2 234:4
  242:12 253:18
  267:15 268:2
  283:21 284:15
  285:16 287:19
  313:1 322:19
  325:9 336:19
  357:6 374:21
  382:18 385:2
  404:13 412:10
  431:17 448:17
  453:15 456:15
  461:18,21,22
  462:20 463:4
  465:22 502:21
  505:2,20 553:3
  555:3
**reading** 73:19
  102:10 103:12
  181:3 242:7
  252:20 284:13
  364:19 365:16
  466:4 538:9
**ready** 13:24
  323:10 354:4
**real** 252:19
  253:22 320:12
**realistically**
  237:4
**reality** 313:13
**really** 25:1
  51:10 58:8
  66:16 109:4
  150:10 173:24
  202:15 221:9
  237:4,6,7
  238:13 246:9

253:19,19
254:4 262:21
274:13 280:6
281:15 283:13
297:12,14
302:14 304:3
305:15,23
313:5 314:3,13
314:14,14
335:6 339:2
364:6 375:5
382:10 417:8,9
423:19 440:17
464:16 467:7
507:6 544:6,14
**Realtime** 1:18
552:11
553:11
**reason** 89:1,22
134:15 136:19
148:11 180:23
195:2 210:13
251:10 252:1
304:1 307:4
311:3 361:22
379:4 382:20
385:4 412:3
507:11 553:5
**reasonable** 88:4
338:10 491:12
**reasons** 88:23
89:13 148:15
307:21 413:8
421:6 422:10
478:2
**recall** 30:20 61:9
84:8 110:17
122:1 127:2
149:8 161:19
164:24 166:9
184:8,11 185:1
185:4 192:18
194:8 196:1
197:14 210:7
216:2 296:2
328:24 336:8
336:15 345:15

349:21 350:10
352:10,13
376:6 410:20
417:4 418:1
443:1 458:2,13
460:2 477:13
478:4 479:16
479:21 480:3
480:16 481:18
481:23 482:5
486:4 496:5,18
504:15 505:4
506:13 510:14
510:23 513:8
514:24 515:4
528:20 532:16
533:11
**receipt** 553:17
**receive** 61:18
121:7 330:16
385:11 527:18
528:2,11,18
**received** 33:22
66:12 118:14
176:24 177:4
216:23 317:13
348:2 391:4
423:21 526:5
**receiving** 69:22
77:20 164:24
192:18 320:4
328:24 330:9
376:1 410:20
411:12,15,16
434:9 442:15
504:15 514:2
**recess** 86:16
130:3 200:24
288:13 392:19
499:10 511:6
**recipient** 162:1
**recipients** 192:7
**recognition**
  275:21
**recollect** 152:10
**recollection**

46:14 49:8
56:9 64:22
65:8 73:20
132:14 133:3
142:20 149:16
150:5 162:12
169:16 182:11
184:23 186:12
186:23 190:13
196:3 202:9
206:9,10,17
294:3 382:8
415:21 461:23
462:22 469:1
472:7 473:14
474:8 478:20
482:24 490:19
534:23 535:21
536:4 538:9
**recommend**
  282:14 465:1
**recommendati...**
  406:16
**recommendati...**
  525:14
**recommended**
  345:6 351:23
  488:10
**record** 10:11,23
38:19 45:14
48:13 86:14,20
125:15 129:20
130:1,7 195:3
200:21 201:3
221:16 248:10
258:11,13,16
288:11,17
336:11 347:17
371:4 392:17
392:23 483:16
487:17 498:15
499:8,14 500:3
511:4,10
514:23 515:9
550:23 552:6
**records** 75:11

299:15 501:4
**reduce** 88:4,16
250:1 447:15
**reducing** 90:4
**redundancies**
  242:6
**redundancy**
  90:9 242:17,21
  535:4
**redundant**
  90:16 91:12
  95:24 100:6
  154:20 242:3
  242:18
**REED** 4:4
**refer** 132:10
  160:24 243:12
  321:22 329:5
**reference** 84:21
  150:2 178:4
  198:20 203:10
  205:7,9 261:24
  327:5 337:15
  404:4,12
  429:22 430:2,5
  430:22,23
  446:21 476:15
  505:22 506:4
  532:19
**referenced** 43:9
  79:24 83:23
  131:13 150:1
  172:10 182:22
  201:8 203:21
  268:21 299:11
  299:12 305:8
  502:22 505:6
  534:5
**references** 94:11
  282:13 430:21
  464:22 542:15
  542:21
**referencing** 73:3
  176:6 426:5
  433:11 438:13
  546:14

**referred** 130:20
223:11 528:19
**referring** 71:10
89:5 177:16
217:20 218:14
298:5 349:7
350:13 432:16
437:7 464:15
507:8 532:22
**refers** 219:1
**reflect** 15:16
46:13 152:1
178:13 265:16
317:19 320:7
363:20 374:18
418:24 430:12
433:14
**reflected** 148:21
198:6 340:13
360:4 492:2,15
543:5
**reflection** 403:1
**reflects** 49:9
258:16
**refresh** 56:9
73:20 182:10
206:16 478:19
**refreshes** 202:9
**refreshing** 196:2
**refuse** 513:17,21
**regard** 17:5
21:22 30:7,16
78:9 89:18
91:6 123:5
185:21 187:1
200:3 212:20
213:16 214:10
215:1 304:17
366:8 370:16
375:6 394:19
406:24 428:22
445:22 448:19
463:20 466:3
466:10 471:23
486:8 511:17
513:5 515:22

517:21 518:2
518:12 525:12
527:19 528:3,9
528:12 530:7
**regarding** 98:11
192:15 195:16
213:13 214:7
232:1 293:17
320:5 323:21
324:1 344:19
345:4 356:10
356:14,15
359:7,14
360:10 362:17
365:2 385:3,12
388:8 394:21
399:1 412:17
439:11 477:6
536:18 546:7,8
**regardless** 124:9
154:20 376:19
**regards** 293:11
**regional** 103:23
273:22 274:5
**register** 478:14
**regular** 164:8
198:3 211:3
404:19
**regulated** 15:24
**regulation**
519:14 526:24
**regulations**
30:13,14 71:4
402:13 495:3
495:12,14
**regulator**
268:13 277:14
**regulatory** 5:18
14:16 21:15
29:5,9,18 30:8
31:1 35:1
36:20 40:19
41:11 44:5
46:1,8,15
47:13 48:2,21
49:20 50:3,11

55:7 56:20
57:6,13 58:17
59:20,20 78:7
78:17 163:4
181:11 183:22
184:5 185:12
186:9,13 195:4
195:20 212:14
215:19,21
216:19 217:1
227:20 245:11
270:15 319:10
354:9 381:2
394:13 403:18
424:14 427:4
429:18 440:2
441:3 470:10
482:16 483:17
483:18 487:1
488:13 490:8
501:23 505:17
506:3 528:1,1
**rehab** 223:2
**rehabilitation**
215:14 216:16
220:11
**reinforce** 101:12
105:2 449:9
**reinforcing**
351:11
**reiterated**
320:16
**reject** 403:21
**rejected** 411:2
412:4 413:7
**relate** 345:5
**related** 215:10
220:6 230:12
343:2,6 397:7
399:9 419:4
459:11 481:11
501:5
**RELATES** 1:8
**relation** 248:5
**relatively**
105:23

**relay** 41:6
**relayed** 321:20
327:16
**relaying** 253:12
**release** 357:17
415:12 416:15
**relevant** 185:17
232:1
**relied** 227:13
**rely** 282:21
**remember** 12:10
19:8 20:2
26:13 27:4
29:1,24 30:2
35:6 50:18,20
50:24 51:3,11
57:8,10,11
58:10,13,20
63:2 66:17,23
75:10 97:24
98:13 109:17
110:19,21,23
124:3,21
128:16 134:4
137:1 138:17
138:19 144:13
144:21 146:8
146:13,19,21
148:17 150:23
151:7 152:4,6
163:17 165:7
166:4 167:13
167:14 168:23
170:12 175:16
179:18 182:19
182:21 183:20
191:4 197:12
209:5 210:11
210:22 219:12
222:8 242:2,7
278:2 289:5
292:18 293:1
298:11 307:6
307:19 308:5
323:7 329:3
335:24 348:16

350:12 353:23
360:7 365:5
367:16 368:6
379:12 382:12
387:22,23
388:4,18 390:4
413:20,22
414:2 416:1
417:9,9 418:7
426:13,16
440:13,16
462:2 471:16
474:14,18
475:1,23
477:20 478:9
479:3,8 486:13
496:10 502:23
503:1 528:23
532:20 534:20
538:13 541:3
**remind** 56:5
329:19
**reminded**
360:18
**removed** 445:10
**REMS** 16:6
17:22,24 18:23
19:10,19 20:3
20:12 21:21
22:12,23 23:4
23:4 107:12
469:2,8,12,14
469:16,23
470:17,18
471:14,23
476:7 478:15
478:21 479:12
479:19 480:1
480:10,11,14
481:11 482:9
483:11,12,14
485:16,17,23
486:2,9,21
487:3 488:6,15
489:12 497:19
499:1 534:14

Highly Confidential - Subject to Further Confidentiality Review

534:17,22
535:19
**render** 73:17
**reorganization**
58:9
**rep** 142:24
331:10 418:16
**repeat** 81:14
89:9 102:12
116:3 137:4
214:3 455:19
**repeated** 92:20
377:13
**repeatedly**
228:20,22
242:10 248:9
267:5 280:20
282:7 284:3
385:16 475:11
**repetitive** 474:4
**rephrase** 13:13
**replaced** 346:13
**replacement**
26:15
**report** 30:22
31:4,11,22
33:2,10 91:23
92:10,13
121:22 123:11
127:13,14,22
128:13,19
129:1,6,11,22
130:16,19
131:10,12,16
133:2 135:23
139:19 140:16
149:14 150:22
151:19 152:11
153:15 161:20
164:16 165:11
170:20 172:3
175:19 179:11
183:23 184:9
190:16,19
191:2 192:24
193:23 194:2

215:17,23
217:3,6,14,15
217:21 218:7
222:15 237:7
246:11 264:21
266:23,24
291:24 292:15
293:22 294:1,4
295:4 296:1,2
296:5 297:11
298:17 301:2,9
302:21,23
303:2,6,9,19
304:3,12,15,17
305:2 308:3
312:4 316:13
317:6,12 318:8
319:9,10
320:15 332:7
333:1 340:19
370:11,13
371:12,14,18
371:24 372:16
522:8 523:22
524:8 532:11
**reported** 51:17
52:20 58:23
98:14,21
137:16 145:24
152:11 170:19
181:11,13
182:2 246:8
262:9 263:22
263:23,24
295:23 296:6
297:12,16
301:5 318:4
340:19 394:7
459:1
**reporter** 1:18
10:23 497:24
498:3 552:11
552:21
**reporting** 92:1
98:11 122:3
139:24 162:16

187:22 213:8
218:7 228:2
230:9 237:6
247:22 266:16
293:17 338:12
436:7 439:3,17
439:19 440:15
**reports** 31:18
91:5 97:18
123:14 124:22
128:3 137:6,16
138:18 148:22
149:15 150:2
150:12,19
152:1,19,22
162:22 213:8
245:10,17
262:12 264:1
295:10 296:18
299:2 317:20
319:14,20
320:4 323:18
367:3 369:8
440:3 477:7
478:1
**represent** 11:16
124:5 125:24
140:6 221:20
295:14 498:21
499:21 500:19
509:2,10
**representation**
397:8 399:10
**representations**
77:24 397:6,9
399:8,11
**representative**
121:12 189:1
317:23 377:1
456:17
**representatives**
108:21 185:10
195:18 199:15
215:18 330:8
330:13 345:12
377:12,19

378:20 385:5
386:2,4 422:18
423:10 450:7
454:10 456:16
481:8 549:8
**represented**
14:3 165:12
178:11,15
289:13 306:22
307:2 312:11
**representing** 2:7
2:14,23 3:6,14
3:20 4:7,14
30:13 180:4
181:17 294:22
295:1,17,21
**represents**
119:13 509:11
**reprint** 495:21
496:12
**reprints** 495:1,3
495:9,13 496:6
**reproduction**
552:19
**reps** 351:7
418:21 419:20
421:20,22
423:21 456:10
456:12
**request** 9:10
32:3 121:14
199:5 430:6
468:5 481:7
514:2
**requested** 75:24
77:5 206:15
329:10 356:8
362:16 430:8
513:22 517:18
540:21 541:6
550:3
**requesting**
317:22 321:23
330:15 331:21
534:24
**requests** 331:13

433:18
**require** 80:13
378:4 479:19
**required** 78:22
104:3 115:7
120:5,20
124:10 129:11
134:16 144:5
154:18 167:22
171:7 178:6
198:1 240:20
294:19 295:4,5
312:7 411:6
439:8 456:3
538:2
**requirement**
124:10,20
126:22 128:8
132:12 154:8
181:15 219:19
226:4 247:23
295:23 476:8
**requirements**
17:4 96:17
97:8 98:7
153:18 437:6
535:2
**requires** 143:14
169:21 173:1
180:3 215:4
312:13
**requiring** 80:18
81:3 177:22
178:3 195:21
312:5
**research** 44:2
48:21 142:5
145:5,16
160:19 187:5
187:10 215:8
286:8 307:15
308:24 341:20
341:21
**reservations**
465:19
**reserve** 511:1

reserved 10:7
resolve 439:10
resolving 481:10
respect 464:9
respectfully
277:14
respective
103:21
respectively
199:4
respiratory 28:2
respond 75:23
114:2 192:14
196:15 199:19
255:7 280:21
303:3
responded 285:2
376:12
response 152:12
183:23 193:2
194:5 195:14
199:5,10 280:6
285:15 303:6
359:14 382:18
410:23 414:1
431:19 433:16
433:17 460:3
461:12,14
462:15 524:8
532:19 549:6
responses 13:9
216:22 405:3
460:8 464:6
responsibilities
29:8,22 30:4,7
30:16 35:5
37:4 104:17
185:8,22
187:16 191:1
200:3 212:3
448:3
responsibility
31:11 33:20
34:9,15 37:17
50:5 55:16
57:10 98:5

185:16 186:10
186:20 187:1
188:7,12,24
189:11 190:18
190:23 212:19
218:11,22
230:8 353:11
381:16 440:9
responsible
29:11 32:4
264:23 291:20
301:22 344:23
422:1 440:18
rest 236:24
287:13 321:7
323:14
restricted 71:3
71:20 80:12
82:7
restriction 124:6
124:7
restrictions 71:6
80:14 82:22
95:11,15 330:4
422:13
restrictive 95:4
result 121:24
463:9
resulting 205:2
results 165:4
228:2
resume 5:13
15:2,9,10,11
38:17 43:22
428:5 429:15
retail 119:15
121:7
retrieved 201:6
return 553:15
reveal 367:13
revenues 64:6
reversals 362:5
reverse 396:18
398:2
reversed 363:6,9
494:9

reversing 362:1
362:23 398:7
review 1:12 16:1
31:17 32:8
71:13 134:6
193:7 195:21
196:20 215:23
240:16 245:15
257:8,14
265:24 319:21
326:10 344:19
344:24 351:23
355:5 356:10
358:9 362:2,8
362:17 396:1
396:20 400:21
400:24 403:1
404:17 410:16
418:6 420:16
430:24 431:3
431:12,16,21
431:21 433:12
460:4 462:1
484:3,14,20
488:7 495:22
496:1,7 501:3
505:11 527:3
532:9 547:4
reviewed 71:2
79:1,4 174:12
206:11 215:17
263:10 264:17
402:7 418:10
420:15 517:10
544:9 545:1
reviewing
216:19 257:5
349:5 418:9
443:2 510:14
revise 74:6
285:20 310:17
398:11 408:11
408:22
revised 196:17
196:24 197:9

197:15 205:15
208:11 401:10
430:9 441:6
revising 285:11
revision 255:9
255:10,22
285:7,21
286:19 310:17
revisions 196:18
439:5
re-submitting
398:20
Ricci 316:12
Rice 416:14
Rich 4:17
Richards 69:13
Richardson
219:13 231:20
245:5 248:18
284:24
right 13:2,18
14:23 15:12
16:2 18:2,8,15
18:23 19:19,22
21:24 22:5,17
23:7,17,21
24:18 25:3
26:1,6,16 27:3
27:7 28:22
32:10 33:2,19
35:9,19,23
36:17 37:3
38:6 40:3
41:20,23 43:9
45:6 46:19,20
50:1,7,20
51:20 52:13
55:16,22 56:7
56:17,21 57:2
58:16 61:9
65:12 66:23
67:4 70:8,17
70:20 73:1
76:19 79:10
80:1,3 81:2,4
83:10 84:3,18

86:10,22 87:5
87:10 89:8,11
91:7,23 92:5,8
92:16 93:2,11
94:5,13 96:1
96:11,22 97:10
98:7 99:2,6,12
100:9,21 101:3
101:7,14 102:4
103:5,8,19
104:6,24 105:3
105:14,20,20
106:3 107:2,9
108:3,6 109:13
110:3 111:1,18
112:18 114:14
114:24 115:9
116:18,24
117:4,8,11,24
118:22 119:2,4
120:8,21
123:21 125:14
126:24 128:15
128:18 129:12
129:17 130:24
131:14,18
132:7,13
134:10 135:14
135:23 136:17
136:24 138:16
138:20 139:9
140:11,24
141:5 142:11
143:10,15,16
143:19,21,22
144:9 147:6
148:22 149:15
150:4,20
151:11,16,16
151:23 152:3
153:2,6,20
154:6,12,16
155:4,17,19,20
155:23 156:24
157:23 158:1,2
158:5,7,8,11

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 159:10 160:6 | 236:19 239:13 | 322:13 323:2 | 430:16,19 | 543:10 544:20 |
| 162:2,11,18 | 239:16 240:6 | 324:8 325:3 | 431:8 432:6 | 545:16 546:16 |
| 163:18 164:7 | 241:8,19,21 | 326:16,24 | 433:10,15,22 | 547:6 548:6 |
| 164:11,12 | 242:1,3,7,14 | 328:7 329:8 | 434:18 435:13 | 549:20 550:9 |
| 166:24 170:4 | 242:20 243:7 | 330:18 333:9 | 436:4,18 437:8 | **ring** 510:11 |
| 170:16,24 | 243:20 244:5,7 | 333:12 334:22 | 437:15 439:1 | **rise** 237:4 |
| 171:7 173:4 | 244:8 245:13 | 335:4,10,18,20 | 439:19 441:13 | **risk** 19:6,12,16 |
| 176:9,13 | 247:5,24 | 336:3 337:1,19 | 441:18,21,22 | 22:15 71:14,21 |
| 177:17 178:1 | 248:15 250:7 | 337:22 338:4 | 442:14,18 | 72:2 73:4,5,11 |
| 179:14,19,22 | 250:21,22 | 338:21 339:2 | 443:5,16,18 | 73:16 83:22 |
| 180:18 181:5 | 251:4 254:23 | 339:16 340:12 | 445:8 446:10 | 87:18,20,22 |
| 181:23 183:2 | 255:6,11,23 | 340:14,15,24 | 447:11 448:5 | 88:4,16 90:2,4 |
| 183:16,21,22 | 257:16,18,22 | 341:18,21,22 | 448:21,24 | 90:6,9 99:8,10 |
| 183:24 184:5 | 258:4 259:4,14 | 342:18,23 | 449:15 450:14 | 99:14,16 |
| 186:7,16 | 259:24 260:3 | 343:11 345:20 | 451:11 452:1 | 100:17 112:24 |
| 187:18,22 | 261:1,10 262:2 | 346:8 347:2,20 | 452:12,20 | 113:8 131:8 |
| 188:2,8,10,11 | 263:2,16 264:2 | 348:9,17,20 | 455:1 456:3,8 | 161:6 162:10 |
| 188:14,17,20 | 266:8,17 267:2 | 350:16,24 | 456:10,17 | 162:16,24 |
| 189:2 190:9,19 | 268:8,23 269:6 | 352:3,20 | 458:10,19,23 | 192:15 195:17 |
| 191:3,15 192:2 | 269:7,16,20 | 355:17 356:5 | 459:1,2 460:24 | 197:10 205:11 |
| 192:10 193:3 | 270:16,19,22 | 357:1 358:8,17 | 461:10 463:4 | 207:23 210:3,9 |
| 194:3,6 195:4 | 271:10,18,19 | 359:21 365:12 | 464:17 465:10 | 212:4,6,20 |
| 195:9 197:21 | 272:21 273:13 | 366:2,9,19,22 | 466:4 467:10 | 213:9 248:23 |
| 198:12,22 | 274:19,24 | 368:6 369:2 | 469:3,6,20 | 249:17,20 |
| 199:12,21 | 275:4 276:16 | 373:2,23 | 470:17,18 | 253:24 293:13 |
| 203:19 204:17 | 276:17 277:5,9 | 376:14 379:11 | 471:7,22,24 | 320:2 330:5 |
| 205:3,22 | 278:8 279:8,9 | 382:3 384:17 | 475:6 477:23 | 343:7 344:9 |
| 208:16,17,22 | 279:14,20 | 386:16,17 | 478:11 479:10 | 351:22 359:15 |
| 209:11 211:6 | 280:9 281:20 | 389:17 392:6 | 479:17 482:20 | 360:14,20 |
| 211:24 213:9 | 281:22,22 | 395:2,16,22,23 | 482:21 483:3,4 | 377:22 385:8 |
| 213:18 214:5 | 282:18,19,20 | 396:4 397:2,12 | 486:3 487:6,11 | 385:18 386:6 |
| 214:12,16,18 | 283:1,19 284:9 | 397:14 399:1 | 488:15 491:21 | 406:24 407:1 |
| 215:24 217:6,9 | 285:8,11 | 399:14,17,18 | 492:3,17 | 410:10,14 |
| 217:12,14,16 | 286:19 289:14 | 399:23 400:4,6 | 493:16,20 | 435:3,12 |
| 217:20 219:8 | 290:18 296:6 | 400:12 403:21 | 494:3,11 | 452:18 454:9 |
| 219:15,17,19 | 299:4 301:9,19 | 406:11 407:7 | 498:18 502:2 | 454:16,19,20 |
| 220:22 221:5 | 301:21 302:15 | 409:15 411:6 | 502:11 507:15 | 456:15 457:5,6 |
| 222:3 224:23 | 302:16 303:3,7 | 412:4,9,22 | 515:20 516:16 | 462:8 463:8 |
| 225:3,22 | 306:5,12,12 | 413:10 414:7,9 | 517:18,23 | 465:9 469:3 |
| 226:18 227:9 | 308:16 309:11 | 415:10 419:21 | 525:16,22 | 477:1 522:6,7 |
| 227:12 229:21 | 309:15,19,23 | 422:5 423:14 | 526:12 531:17 | 527:7,14 |
| 230:17 231:2 | 312:14,21 | 424:14,18,19 | 531:21 536:3 | 531:20 537:3 |
| 231:23 233:5 | 313:18,21 | 426:11,12 | 537:22 539:23 | **RiskMAP** 16:4 |
| 233:18,22 | 314:4,12,18,23 | 427:8,10 428:1 | 540:9 541:12 | 16:5 17:20 |
| 234:1,7,14,16 | 315:17 316:24 | 428:8,12,17,20 | 542:8,11,15,18 | 18:22 19:1 |
| 235:21,24 | 318:18 320:22 | 429:1,11,15,19 | 542:22 543:6 | 20:3,10 21:4 |

22:22 30:17
31:2 34:4
72:17 73:21
74:6 75:2
76:10 81:3
82:15 84:7
86:24 87:8
89:13 90:15
91:7,10 92:12
92:19 94:20
95:15 98:10
99:19 100:9,13
100:20 101:24
102:7,22 103:8
104:3,3 105:3
105:22 106:7
107:12,12
108:18,20,22
110:2 111:3,6
119:1 120:5,18
121:2 122:14
126:23 131:14
132:7,12
134:12,17
135:19 139:16
140:2 143:13
145:3 151:7
153:18 154:9
156:20 165:13
165:16 169:20
171:6,7 173:1
173:4,18 174:2
174:24 175:6
179:11 184:24
187:2 201:7,11
201:16,24
202:10,20
203:11,22
204:6,13
205:20 207:9
208:2 213:12
214:6 220:24
221:3 222:3
226:3,8,14
232:1 237:22
238:3,8,14

239:1,13,16,22
240:2,19
241:22 242:19
243:22 244:3
255:11,22,23
257:10 262:21
264:24 286:18
309:12,16
320:8 325:19
326:4 332:3
373:9 378:3
384:16,23
385:13,23
411:4,6 413:10
413:15 421:22
423:17 428:22
430:10,15,18
432:1,2,6
433:3,13 435:2
435:5,11,21
436:18,22
437:1,8,15
438:21 439:11
439:18 440:4
440:15 442:23
442:24 443:2,7
445:8,13,16
446:6 447:7
448:5 449:12
452:17 454:14
457:3 461:4,24
462:5,11,16
463:8,19
464:11,16
465:21 477:2,4
480:4 502:20
513:7 532:9
540:2
**RiskMAPs** 16:1
17:19 21:20,21
431:18 539:21
**risks** 103:3,3,7
212:9 385:12
436:2 445:1
449:20 452:16
457:2,4 462:12

465:4 536:14
536:19
**risky** 249:14
**Rite** 118:21
165:9
**RMP** 71:15 73:6
87:19 90:7,11
90:12 92:21
121:21 179:11
184:15 185:9
185:14,17
195:17 196:17
196:21 197:1,9
197:16 205:12
205:13,15
207:7,17,19
208:9 212:4
215:3 245:16
245:17 248:19
249:19 294:17
325:19,24
378:3 479:24
522:4,5 523:22
**roadmap** 305:16
**robust** 173:22
174:1
**Rochester** 4:14
**role** 108:17,22
501:22 511:18
**Roman** 447:14
**room** 151:9
175:11 541:20
**Rosa** 2:11
**rose** 237:1
**round** 38:9 39:8
**routine** 396:20
**routinely** 119:7
295:24 377:9
379:3
**rule** 117:4
**rules** 13:8 78:8
**run** 113:16
119:1
**rush** 107:3
**Russel** 53:2
**Ruth** 54:24

**RW** 44:2
**RYAN** 4:4

**S**

**S** 5:9,13,14 6:2
7:2 8:2 15:2
43:15
**safe** 71:8,18 72:3
72:15 78:1
80:14 82:15
90:13 100:15
105:13 379:21
385:8 479:20
540:5
**safely** 17:6
80:11 81:4
82:3 90:17
96:1 100:8
242:20 378:9
451:14 539:23
**safety** 16:9,23
32:16 101:18
113:23 129:8
151:3 185:11
186:8 188:1,19
195:19 212:10
212:14 215:19
216:20 332:8
332:23 349:12
349:17 373:20
436:8 441:5
477:6 531:16
531:17,20
**salary** 63:9
**sales** 16:9 32:21
33:9 75:13
92:7 108:9,9
108:10,13,17
108:21 109:3,5
109:23 121:8
121:11,19
127:19 138:6
142:23 160:14
165:18 185:11
186:8 188:23
189:1 192:5

196:8 197:24
198:3,19
212:13 215:19
227:10,13,17
228:3 232:14
257:10 286:15
289:8,10
330:12 331:10
332:4 341:19
350:7 351:7,23
353:2,13
359:10 376:24
376:24 377:11
377:12,18
378:20 382:20
385:5,15 386:2
386:3 387:1,2
388:9 418:16
418:20 419:5
419:20 420:3
420:22 421:16
421:20,21
422:12,18
423:10,20
454:24 455:14
455:23 456:1,2
456:9,10,12,17
524:15 526:9
526:11 532:1,3
548:13,14,14
549:8,11
**sample** 119:9,13
**samples** 111:4
111:18,23
112:10,15
**San** 2:5
**Sansome** 2:4
**sat** 300:19
**saw** 65:5 114:9
128:13 147:19
151:20 171:20
173:24 179:13
265:1 296:13
314:16 327:4
334:2 335:19
336:19 340:9

Highly Confidential - Subject to Further Confidentiality Review

357:10,19
418:4 515:21
524:4
**saying** 76:16
86:6 96:8,16
116:19 141:7
154:13,24
155:1 157:19
158:16 169:1
175:4 181:2,24
182:13 198:21
198:23 220:23
223:6 229:14
243:20 244:4
246:9,11
250:13 252:22
256:2 265:20
266:24 267:19
273:18 282:3
285:23 306:10
307:7 311:8,9
312:12 322:8
323:17 325:11
329:5 340:23
364:15 381:23
381:24 383:22
396:14 397:20
406:20 407:22
420:10 427:19
428:15 436:24
448:15 450:22
462:4 475:1
507:4 547:7
**says** 15:22 18:2
18:15 56:23
69:18 70:15
71:1 73:4
76:24 87:18
89:23 93:7,24
94:9,15,21,23
96:6 99:1
101:17 103:19
104:23 105:1,4
105:11 107:6
108:24 111:19
118:11,19,23

119:3,6 120:13
120:17 123:10
125:20 131:8
131:24 140:2
163:22 170:17
179:10 180:2
182:1 183:21
184:3 185:9,16
185:20 187:20
189:6 190:5
196:7 197:22
198:13 199:2
204:4,6 207:17
210:22 212:1
212:23 215:3
217:7 218:21
219:20,24
220:4 221:16
222:7 230:10
233:12 241:15
242:11,13
243:14,14,18
250:16 257:23
261:23 262:6
266:15 268:1,2
268:4,14,16
273:7,10 275:9
275:12,16,18
276:8 277:3,3
281:10 282:13
284:19 294:15
295:19 301:4
303:5 312:3,4
314:11 319:12
321:21 322:20
330:23 344:5
344:17 345:1
349:16 351:1,5
352:24 356:8
360:11 362:14
365:1 366:17
372:15 373:19
388:7 389:8
404:13 408:2
412:11,23
413:11 416:4

416:16 417:5
423:15 424:10
428:20 433:18
434:2,5 435:2
435:21 436:5
437:19 444:22
445:14,16
447:15 449:18
462:23 463:6
464:1,9,24
466:22 476:15
476:24 504:20
504:23 546:4
547:24 549:5,7
550:13
**Schedule** 94:22
95:23 330:1
442:3
**scheduled** 98:16
98:19 516:12
**SCHOLER** 3:17
**Science** 44:24
**scope** 82:24
212:2
**scratch** 307:11
**screen** 39:7
233:10 346:10
351:20 375:18
483:20 484:4
484:18 489:3
489:14 547:15
**screening** 359:9
**script** 519:11
**scripts** 535:13
**scroll** 498:11,22
**scrutiny** 353:4
391:6
**se** 381:4
**sealing** 10:4
**search** 142:9
**seat** 163:14
**second** 39:6 69:3
93:13 102:11
133:19 161:7
182:15,15
188:9 194:19

245:3 315:3,5
315:10 319:17
337:10 346:7
364:5 379:15
430:23 442:11
454:5,6 545:19
545:19
**secondary**
541:24
**section** 16:14
79:24 82:2,12
83:6 102:14
106:24 118:9
119:5 125:4,8
125:9 131:13
133:14,20
134:11 135:22
136:21,21,23
149:3 178:6,7
179:2,12 180:2
181:16 185:7
213:4 214:23
215:4 266:11
295:9,20,24
296:3 312:7,7
329:20 372:14
373:1,11,22
464:8 547:4
**sections** 129:5
132:2,6,7
185:18 213:11
214:6 232:2
**SECURE**
444:24 446:22
**see** 21:19 42:1
84:13 98:21
118:7,16 128:2
129:5 138:10
149:7 150:20
157:6,18 162:9
165:6 176:4
191:24 195:23
203:5 205:1,1
206:9 207:16
207:20 211:14
214:23 222:20

225:20 230:6
233:11 235:24
236:24 245:19
248:21 257:16
260:22,23
263:14 266:12
266:13 274:22
275:1 276:6,7
276:15 294:6
294:10,12
296:18 299:13
305:10 321:21
327:7,19 332:1
332:11 350:8,9
364:1,6 373:3
376:11 377:6,9
386:23 407:23
422:15 431:5
440:22 441:8
444:21 446:1
464:2 478:17
478:18 482:1
483:20 486:19
487:1 493:1,4
496:9 497:17
504:5,8,13,21
505:18 509:8,9
**seeing** 149:8
157:2 161:19
206:4 208:7,7
254:7 266:3
376:10 486:13
541:11 550:9
**seek** 458:3
**seeking** 205:18
459:21 513:18
**seen** 81:20,20
184:20 260:16
265:23 291:12
**segmented**
119:11
**selected** 463:10
**selection** 92:22
93:12 120:1,3
212:10 294:23
294:24 295:2

Highly Confidential - Subject to Further Confidentiality Review

295:15,18,22
360:18 466:3
466:11
**sell** 123:23 124:7
**send** 32:2,7
143:9 149:12
149:18 154:1
154:23 217:9
217:10,10,11
241:3,23
285:21,22
302:23 357:16
373:19 404:10
414:1
**sending** 147:11
242:22 351:6
377:18 385:5
386:1,3 456:9
**senior** 29:17
30:8 34:24
36:19 49:20
56:19,22 427:3
427:3 482:15
**sense** 23:14
85:23 137:7
172:13 181:19
183:12 235:11
235:15 249:5
313:4 363:5
**sent** 30:24
135:10 142:22
143:14 147:9
148:19 149:5
149:24 150:3
150:16,20
151:5,21
216:21 217:16
313:3 319:2,6
342:13 347:24
357:11 390:11
396:2,16
421:10 438:10
438:11 468:2
504:19 524:5
**sentence** 218:21
273:7 319:16

322:20 334:1
355:4 399:22
430:23 547:7
**Sentencing** 7:20
415:1 422:8
**separate** 59:17
85:19
**September**
130:17 394:4
400:2 415:13
426:4 429:10
429:24 430:8
430:22 431:1
437:3,20,24
438:1,11 468:1
468:2 476:15
478:16 479:11
**sequence** 90:5,8
205:2
**sequentially**
485:19 487:23
**series** 90:5
511:16 512:14
513:4
**serious** 153:23
293:8 385:12
441:15 547:22
**seriously** 376:16
**Services** 1:16,23
10:13 68:21
**set** 228:14
229:17 255:15
**setting** 126:11
216:13
**settings** 103:24
**settlement** 416:9
**Seventh** 3:4
**severance** 65:21
**severance-type**
65:16
**shared** 121:19
**shares** 66:19
**Sharon** 474:19
**Sheehan** 161:8
292:20 302:23
**sheet** 553:7,9,12

553:15 555:6
**short** 200:14
346:16 510:19
**shortcomings**
114:10
**shortcut** 476:10
**shorter** 500:16
**short-acting**
474:6 535:1
**shot** 25:21
**show** 140:17
333:22 334:16
334:17 369:23
370:11 483:23
484:1 493:19
494:7
**showed** 56:10
263:6 296:14
369:20 539:1
542:2
**showing** 38:14
298:1 340:2
501:19 509:18
**shown** 80:10
515:4
**shows** 133:23
134:13 232:3
441:4 509:13
**SHUBHA** 3:3
**Shubhaharris...**
3:6
**sickle** 418:13
**side** 101:14
380:5 473:4
**sides** 363:4
**sift** 252:18
**sign** 533:5
535:19 553:8
**signal** 446:3
**signatory**
217:13
**signature**
194:22
**signed** 130:17
166:10 218:13
418:6 481:17

517:14
**significant**
12:19 74:3
349:9,12
360:12,21
362:4 368:17
440:11 443:22
529:3
**signing** 538:9
553:10
**similar** 28:19
397:6,9 399:8
399:11 439:18
442:4 443:1,4
443:17 445:6
489:5 497:20
498:19
**Simon** 504:11
**simply** 228:1
295:11
**single** 85:9,21
89:20 90:3
146:23 322:21
324:3 363:19
405:4 409:13
418:10 472:14
531:19
**sit** 30:11 501:13
514:8
**situation** 87:22
178:13 206:19
237:8 325:22
**situations** 87:21
**sit-down** 514:21
515:15 516:6
**six** 376:23
**sixth** 444:17
**SKIKOS** 2:3,3
**skilled** 249:22
329:24
**skip** 133:13
332:21
**skipping** 88:8
121:9 185:15
187:21 351:16
388:6 436:6

478:11
**slightly** 70:6
**small** 105:23
351:17
**Smith** 4:4
347:22
**SNDA** 477:1
**SNDAs** 512:2
**societies** 144:23
156:14 158:7,9
180:8 226:10
450:10 452:11
452:13
**society** 126:4,6
126:10 140:10
140:13 144:6
144:15 148:12
158:10 213:18
214:12 216:12
221:23 222:1
224:16 226:11
**soft** 474:22
**sold** 123:20
**solely** 93:15
**Solomon** 161:10
246:3,5 303:1
**Solutions** 41:11
**solving** 446:10
**somebody** 27:21
37:1 78:7
115:18,20,21
116:7 117:14
117:21 159:23
189:16,19,24
194:21 195:7
200:5 251:23
277:16 278:22
304:8,11 440:1
**soon** 74:19
481:13
**SOP** 141:23
181:7,14
184:24 198:5
198:11,23
210:2,8 211:14
212:17 218:13

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 225:17 227:12 | **sources** 319:22 | 219:18 225:19 | 532:12 | 271:5,13 272:7 |
| 241:14,15 | 320:6 | 232:9,14 | **specifically** | 272:24 273:16 |
| 242:11,13 | **South** 3:4 | 234:14 245:7 | 57:19 93:14 | 275:7 276:20 |
| 243:13,21 | **space** 553:6 | 245:19,21 | 106:12 107:6 | 277:12 279:18 |
| 244:5 260:1,10 | **speak** 371:19 | 246:1,23 | 143:2 271:15 | 282:1 287:18 |
| 301:7 341:3 | 372:4 423:19 | 248:20 249:2 | 278:17 284:23 | 299:8 300:2,17 |
| **SOPs** 211:5,10 | 533:21 | 249:14,15 | 321:13 329:2 | 301:12 304:20 |
| 379:11 | **speakers** 102:3 | 250:4,7 251:11 | 350:4 372:21 | 306:8 309:21 |
| **SOP-0001053** | 103:6 | 251:15 259:17 | 376:21 388:18 | 312:16,23 |
| 209:24 | **speaks** 380:8 | 260:3 294:21 | 456:13 459:11 | 313:23 320:24 |
| **sorry** 30:22 48:1 | 549:2 | 295:1,7,14,16 | 495:8 502:16 | 322:15 325:6 |
| 48:11 50:19 | **spearheaded** | 295:20 299:3 | 503:7 516:22 | 327:14 330:20 |
| 57:3 66:23 | 333:11 | 301:5,9 339:14 | 517:8 540:21 | 336:6,14 337:3 |
| 81:13 82:7 | **spearheading** | 340:3 376:18 | **specifics** 96:17 | 337:9 350:19 |
| 89:9 102:12,13 | 469:21 470:4 | 379:7 | 98:1 369:19 | 352:5 357:4 |
| 139:15,17,20 | **special** 412:19 | **specialty** 119:11 | 421:7 | 359:24 364:17 |
| 175:20 176:21 | 416:13 | 119:21 125:22 | **specified** 107:11 | 365:14 366:15 |
| 182:16 193:21 | **specialist** 109:3 | 138:21 140:4 | 108:5 111:12 | 366:24 384:20 |
| 197:19 214:2 | 109:5 121:12 | 147:20 151:20 | 179:2 180:9 | 386:13 387:16 |
| 218:17 229:11 | 249:10 254:16 | 170:20 215:9 | **specifies** 180:9 | 389:19 391:22 |
| 330:9 355:17 | 270:15 281:12 | 220:5 221:17 | **specify** 110:7 | 397:16 399:4 |
| 365:15 373:4,8 | 281:17 284:21 | 230:11 232:3 | **speculating** | 400:14 406:14 |
| 373:10 393:22 | **specialists** 108:9 | 246:12 249:7 | 419:19 | 408:14 412:7 |
| 455:8,18 460:5 | 108:11,13,17 | 250:18 254:15 | **speculation** 72:7 | 423:3 435:15 |
| 462:2 470:19 | 109:23 110:16 | 259:16,24 | 76:22 77:7 | 437:12 446:13 |
| 483:7 489:1 | 121:20 199:8 | 263:2,17 | 81:12 82:19 | 446:19 450:17 |
| 520:5 528:23 | 215:11 220:7,8 | 275:19 276:9 | 88:21 90:20 | 463:24 464:19 |
| **sound** 403:13 | 225:15 228:13 | 276:14,15 | 93:5,22 94:7 | 465:13 466:19 |
| **sounded** 365:17 | 230:13 260:11 | 278:1 280:12 | 96:4 104:11 | 473:7 474:17 |
| **sounds** 65:11 | 277:8 287:11 | 287:9 295:12 | 106:10,20 | 475:12 492:6 |
| 176:8,12 | 329:23 333:24 | 333:22 334:4 | 107:21 111:9 | 506:7 544:24 |
| 206:18,19 | 379:2 412:19 | 336:3 337:17 | 128:11 158:24 | 547:1 548:4 |
| 207:3 338:10 | **specializes** | 338:14,20 | 159:6,19 | 549:2 |
| 354:3 387:18 | 159:23 | 339:9,19 | 178:18 180:21 | **speed** 470:3 |
| **source** 119:8 | **specialties** | 340:12 368:2 | 189:13 190:11 | 471:3 |
| 133:21,23 | 119:23 120:2 | 379:1,7 382:24 | 206:1 208:5 | **spell** 53:10 |
| 134:14,14 | 133:24 135:18 | **specific** 22:23 | 217:24 225:9 | 470:11 |
| 137:11 140:17 | 136:8 137:17 | 50:5 128:4 | 226:21 229:24 | **spelled** 533:8,19 |
| 150:18 170:17 | 138:17 140:19 | 144:17 145:12 | 230:20 239:19 | **spend** 521:16 |
| 170:18 178:24 | 140:22,22 | 185:16 205:9 | 240:9 241:11 | **spikes** 24:14 |
| 274:20 275:2 | 141:6,16 | 220:1 286:12 | 243:10 244:12 | **split** 147:2 |
| 281:21 296:24 | 142:13 154:15 | 319:23 332:20 | 246:16 250:9 | **sponsor** 84:1 |
| 297:6 299:18 | 160:16 181:8 | 351:2 367:9 | 250:24 251:6 | 121:20 123:10 |
| 301:23 302:1,4 | 181:12 182:2,4 | 372:14 385:2 | 267:5,13,23 | 343:2,6 344:17 |
| 308:21 321:23 | 182:24 183:6,7 | 457:3 477:21 | 268:11 269:2 | 345:8 459:9 |
| 334:5,11 | 183:18 196:12 | 494:6 514:15 | 269:23 270:11 | 464:10 465:2 |

465:23 466:23
**sponsor's** 345:4
**spontaneous**
523:16
**spreadsheet**
232:22
**Square** 4:5
**staff** 422:12
**staggering**
317:19 318:9
320:17 321:17
322:10 365:5
383:3,16 384:2
384:9
**stakeholders**
255:18
**stamp** 371:6
**stamped** 68:19
**stand** 19:3,11
**standard** 209:23
212:18 500:3
**standpoint**
21:16 348:15
**stands** 19:7 29:2
534:18
**start** 49:18
99:12 245:3
323:16
**started** 21:11
29:4 51:7 54:5
61:15 63:1
310:2 322:3
323:14 325:13
375:2 400:20
443:3,13 472:4
475:15 534:24
**starting** 48:20
51:19 165:4
452:10 491:5
507:1
**starts** 132:4
247:12 430:18
517:6
**state** 11:18
71:12 103:23
323:23 343:1

378:16 388:24
397:3,5 399:16
429:22 449:7
495:23 499:22
500:8,19,24
501:16 505:10
553:5
**stated** 319:13,19
319:22 321:4
325:18,23
326:8,24
343:10 344:17
349:4,11 350:1
351:19 353:3,8
353:10 356:12
377:8 378:7
385:4 410:5
413:8 459:7
462:21 464:10
465:15,23
466:7,11 467:1
500:18 546:5
**statement** 134:7
245:23 295:13
296:19 298:24
410:15
**statements**
77:23
**states** 1:1 73:10
88:2 100:13
105:22 133:22
195:14 295:11
319:18 320:15
333:15 410:11
415:19 416:5,6
439:1 459:7
466:6 478:13
480:9 481:7
488:3 491:4
502:11
**stating** 77:14
353:1 399:21
481:5
**statistical** 520:1
**status** 88:12
99:2,7,13

520:14
**Staubus** 2:14
**stay** 51:9 60:23
**stayed** 310:8
**stem** 324:3
**stems** 319:19
**stenographic**
10:22
**step** 413:24
**steps** 142:15
330:24 344:8
344:13 391:10
391:14,17,18
448:18 476:11
**stick** 25:17
28:15,21 161:1
257:24 293:12
**stipulated** 10:2
**Stipulations**
9:15
**stock** 61:19 62:2
62:15 64:17
66:8,11 67:1,4
67:11,20,21
68:3
**stolen** 518:8
**stood** 286:5
**stop** 106:15
303:15
**stopgaps** 473:21
**stopped** 36:8
40:15 469:15
**stopping** 463:20
**stored** 171:21
**straight** 177:20
**STRANCH** 2:10
**strangely** 466:22
**strategies**
481:12
**strategy** 19:14
19:15,17 22:15
412:1 448:12
449:3 469:4
**stream** 114:3
**street** 1:16 2:4
3:4,12 4:5 54:8

**strength** 40:18
**strengthen**
90:11
**strictly** 329:16
**strike** 20:10
62:12 238:6
466:5 471:19
540:11
**string** 245:2
**strong** 95:1
**strongly** 391:9
**structure** 49:11
424:11
**structured**
28:16
**stub** 65:6
**stuff** 304:14
493:23
**subcategory**
260:4
**subdepartment**
187:11
**subject** 1:12
161:5 245:7
317:5 365:24
439:7 500:14
504:12 509:6
510:21 553:10
**submission**
203:11 204:7
205:16 394:20
430:9 433:14
437:3,20 438:2
459:12 479:15
480:13 481:14
493:14 540:15
542:17,19
546:15
**submissions**
30:9 197:18
491:20
**submit** 75:11
120:24 168:17
202:13 203:4
403:18 432:23
511:23

**submits** 479:11
480:10
**submitted** 73:12
74:8 76:2
84:12 110:22
114:12 131:2
131:21 168:5
204:14 208:15
209:7 342:17
357:21 410:13
411:4 420:14
430:11 437:1
437:16 493:5
521:21 525:8
526:1,7 542:10
544:22
**submitting** 33:1
91:4 205:20
**subordinate**
31:7
**Subpart** 16:11
16:13,14,18,19
16:24 20:23
21:12 71:5,9
80:3,17,23
81:8,21,24
82:24 349:12
357:15 403:4,6
403:12 404:21
**Subscribed**
555:10
**subsection** 80:23
125:11 187:4
547:3
**subsequent**
104:5 197:9
345:9 402:21
**subsequently**
196:17 379:22
**subset** 187:10
357:24 462:6
**subsidiary** 84:2
201:12
**substance** 442:3
555:6
**substantive**

Highly Confidential - Subject to Further Confidentiality Review

206:23
substantively
  76:9
substitute
  178:10 312:10
substituted
  480:2
substitution
  477:10
subsumed 187:7
succeeded 57:5
success 15:23
  462:15,16
successful
  253:12 254:10
  463:1,15 464:2
  464:13,17
successfully
  18:16 428:9
sugar 12:20
suggest 335:6
suggested
  255:15 525:22
suggests 344:10
suit 12:17
Suite 1:16 2:5,12
  3:12 4:5
Suite 4950 3:4
sum 398:5 550:2
summaries
  302:6 527:9
summarized
  341:17 388:24
  389:9,11
  411:10
summarizes
  15:13
summary 15:20
  162:14,14
  388:22,23
  389:4,7 446:15
  451:19 520:14
  522:12,16,21
  523:2,6,11
superior 50:13
  51:24

superiors 54:13
supervision
  552:21
supplement
  73:13 75:12
  120:24 168:5
  169:21 428:14
  428:18,21
  521:20
supplemental
  110:15 173:3
  410:8,9,18
  411:5 459:12
  488:4,7 497:20
  512:3
supplements
  74:8 75:1
supplier 178:10
  312:11
supply 445:18
  518:9
support 9:2
  172:2,23
  185:14 210:3,9
  212:6 255:9
  285:6 402:12
  453:11 461:5
  540:3
supported
  420:13
supporting
  285:23 496:11
supports 304:4
suppose 406:2
supposed
  106:15,16
  123:18 125:18
  153:20 173:15
  173:19 217:5
  238:1 239:2
  297:11 302:5
  313:8 455:10
  457:9
sure 11:20 17:5
  21:17 30:1,1
  34:4 36:15

38:5 39:2
48:13 60:18
90:17 91:20,21
92:4 96:1 98:5
99:22 100:7
102:20 141:22
143:3 150:14
160:3 163:12
169:15 180:24
184:12 186:10
189:24 202:16
219:14 242:20
259:10 260:19
282:10 284:18
298:6 316:22
332:16 333:7
346:24 347:13
348:1 352:15
363:23 374:23
379:21 398:12
406:1 427:2
449:14 451:13
455:11 456:18
462:3 506:13
507:11 508:11
510:1
surface 307:11
surgeons 120:2
  126:5 140:13
  216:15 221:24
  249:1,2 250:6
surgery 43:1
surprised
  363:23
surveillance
  95:6 112:19,22
  113:12 114:22
  129:4 132:1,2
  185:6 413:1
  436:9 447:20
  465:24 466:7
survey 165:21
  165:24
surveys 294:8
  411:11
Susan 49:22

486:13
suspected 215:5
swear 10:24
switch 134:24
switched 54:4
  56:6 134:21
  211:19 427:12
  427:21
sworn 11:4
  552:5 555:10
syndrome
  273:22 274:6,9
  274:16
system 118:10
  118:11,20,22
  119:1 211:20
  436:8 446:1,23
  493:8
systems 185:13

---

**T**

T 5:9 6:2 7:2 8:2
  554:1
table 252:17
  296:13 297:24
  298:4 332:2,11
  451:18,19
  521:10 524:20
  526:8
tables 300:11
  332:9 341:15
tablet 435:4
  444:4 476:16
tactics 90:1
tag 25:14
take 13:15 15:14
  37:7 64:24
  86:11 87:4
  102:16 104:16
  107:2,7 125:6
  131:5 133:1,11
  156:12 193:11
  193:16,18
  194:11 199:3
  200:14,17,19
  221:7 228:24

231:16 232:6
238:12 240:3
283:8 288:7
289:12 315:13
318:5 347:7
353:9 354:4,15
361:11,17
363:17 368:22
370:6,24
390:23 391:10
391:13,17,18
392:11 397:4
398:11 408:21
426:2,18
427:13 440:9
448:19 452:10
471:3 484:16
486:7,24
taken 1:15 12:2
  57:9 86:17
  130:4 200:24
  213:16 214:10
  236:21 275:3
  288:14 291:22
  340:21 392:20
  499:11 511:7
  518:8
takes 330:24
  376:15
talk 148:23
  154:10 157:22
  158:3 181:21
  196:5 221:10
  277:17 282:15
  304:11 335:6
  369:16 386:6
  401:18 402:7
  408:1 421:8
  427:23 474:20
  496:3 497:14
talked 146:12,13
  173:11 302:11
  308:5 324:17
  327:19 372:17
  421:12 469:1
  475:21 529:11

Highly Confidential - Subject to Further Confidentiality Review

**talking** 67:8
136:17 154:6
175:13 218:18
222:10,12
242:16 243:21
243:22,24
258:17 261:9
298:1 340:24
363:4 364:3
381:15 407:16
475:16 477:24
493:22
**talks** 106:11
108:8 135:15
322:20 418:9
**target** 63:11
105:22 108:12
141:3 143:3,7
154:21 155:14
189:1 222:19
239:22 252:18
262:18 300:21
329:18 341:9
350:7 376:17
377:10,13
412:15
**targeted** 141:15
147:20 153:7,8
153:12,19
154:11,16
155:2,12,12,18
156:7 157:9,20
157:23 158:13
159:11,15
183:5,6 215:2
220:20 221:4
221:10 222:10
222:17 223:11
225:1,2,7,14
225:19 227:5
227:22 228:11
229:13,15
230:16 236:22
245:21 247:20
247:23 251:11
251:14 260:2

265:11 300:19
341:6 352:12
375:19 376:23
379:1,8,15
419:9,15 450:8
453:13 547:16
**targeting** 352:2
359:8 366:7,8
366:21 367:4
367:10 374:6
376:5 421:17
423:5 547:23
**targets** 225:3
227:15 330:11
352:3 375:14
542:6 547:11
**teach** 304:14
397:13
**teaching** 397:19
**team** 185:9,12
185:13 482:11
495:22 504:20
514:1 516:2
525:3,20
533:18,24
**teams** 30:12
**Technician** 4:17
10:10 11:7
86:13,19
129:24 130:6
200:20 201:2
288:10,16
392:16,22
499:7,13 511:3
511:9 537:14
550:21
**techniques**
423:11
**telecons** 490:14
**telephone**
317:12 319:10
329:6 430:6
**TELEPHON...**
4:2
**tell** 23:23 24:11
35:14 59:15

124:22 127:14
128:12 149:19
157:12 183:11
183:13 184:19
184:21 189:18
204:9 229:1
250:17 254:14
263:1 266:4
278:7,17
280:11 281:18
282:22 288:22
289:5 296:23
301:15,16
324:10 335:17
336:20 339:21
358:15 363:8
363:17 369:7
402:9 404:23
421:24 494:7
**telling** 85:7
184:15 250:15
251:3 263:12
279:13 326:3
334:22 398:17
398:23 400:10
432:5
**tells** 373:16
**temporarily**
52:21
**ten** 12:23 75:21
**tends** 275:20,23
**Tennessee** 2:12
499:22 500:6
500:20 501:1,4
501:16 502:11
503:4
**Tennessee's**
501:5
**tenor** 320:19
**tenure** 79:4
84:15 521:2
528:1
**term** 510:10
**terminated**
291:24 292:5
292:12 293:3

293:11 314:2,4
314:11,18
**terminology**
407:23
**terms** 20:6 71:19
73:8 172:16
174:24 252:17
297:20 452:3
513:1 532:5
535:5,6
**testified** 11:5
318:18 516:15
**testify** 14:1
**testimony** 5:4
13:19 96:14
116:2 148:5
159:11,20
244:12 296:9
311:24 368:13
419:24 420:9
502:24 517:12
534:15 543:9
552:7
**TetraLogic** 42:7
**Teva** 2:13 14:7
14:18 18:4,11
39:13 40:8,9
40:13,14,20
43:23 54:1
56:1 57:13
58:1,3,16,23
59:3,4,21
60:10,21,23
61:1,2,4,6,7,11
63:1 66:24
67:3,10,19,20
68:3 471:4,5,9
471:11 476:6
494:24 500:23
501:20,23
503:4 508:4,8
508:13 511:18
513:6 514:2
521:3 536:6
**Teva's** 500:6
**Teva-Marchio...**

5:12,14,16,17
5:19,21,23 6:5
6:6,8,10,12,13
6:15,17,18,20
6:21,23 7:5,6,8
7:9,11,12,14
7:15,19,21,23
8:5,6,8,9,11,12
8:14,15,17,18
8:20,21,23
15:1 43:14
45:19,24 68:11
79:17 83:15
130:9 161:13
177:7 191:8
202:2 209:15
231:8 244:19
256:20 290:23
316:3 328:13
342:3 345:24
355:11 393:4,9
393:14 409:19
414:15,22
424:24 425:9
425:14,19
457:17 467:15
468:16 480:21
485:4,9 490:1
494:17 503:20
508:16 550:17
**TEVA_CHI**
429:23
**TEVA_CHI_...**
7:22 425:1
**TEVA_CHI_...**
257:3
**TEVA_CHI_...**
6:19 256:21
**TEVA_MDL...**
485:11
**TEVA_MDL_...**
8:8 457:19
**TEVA_MDL_...**
7:11 393:11
**TEVA_MDL_...**
476:4

Highly Confidential - Subject to Further Confidentiality Review

**TEVA_MDL_...** 8:11 468:18
**TEVA_MDL_...** 481:6
**TEVA_MDL_...** 8:13 480:23
**TEVA_MDL_...** 191:16
**TEVA_MDL_...** 6:12 191:9
**TEVA_MDL_...** 291:8
**TEVA_MDL_...** 6:20 291:1
**TEVA_MDL_...** 45:17 49:6
**TEVA_MDL_...** 245:8
**TEVA_MDL_...** 6:17 244:21
**TEVA_MDL_...** 515:10
**TEVA_MDL_...** 6:11 177:9
**TEVA_MDL_...** 515:11
**TEVA_MDL_...** 342:11
**TEVA_MDL_...** 7:5 342:5
**TEVA_MDL_...** 410:4
**TEVA_MDL_...** 7:14 409:21
**TEVA_MDL_...** 7:13 393:16
**TEVA_MDL_...** 355:22
**TEVA_MDL_...** 7:8 355:13
**TEVA_MDL_...** 48:20
**TEVA_MDL_...** 5:16 45:21
**TEVA_MDL_...** 45:16

**TEVA_MDL_...** 8:7 425:21
**TEVA_MDL_...** 8:23 508:17
**TEVA_MDL_...** 84:5
**TEVA_MDL_...** 5:23 83:17
**TEVA_MDL_...** 6:23 328:15
**TEVA_MDL_...** 130:18
**TEVA_MDL_...** 6:7 130:11
**TEVA_MDL_...** 394:10
**TEVA_MDL_...** 7:10 393:6
**TEVA_MDL_...** 8:17 498:7
**TEVA_MDL_...** 550:18
**TEVA_MDL_...** 487:21
**TEVA_MDL_...** 8:14 485:6
**TEVA_MDL_...** 488:1
**TEVA_MDL_...** 8:16
**TEVA_MDL_...** 6:22 316:5
**TEVA_MDL_...** 6:15 231:10
**TEVA_MDL_...** 68:22
**TEVA_MDL_...** 5:20 68:13
**TEVA_MDL_...** 347:9
**TEVA_MDL_...** 7:7 346:2
**TEVA_MDL_...** 8:19 490:3 491:2
**TEVA_MDL_...** 8:22 503:22

**TEVA_MDL_...** 201:22
**TEVA_MDL_...** 6:5 202:4
**TEVA_MDL_...** 8:5
**TEVA_MDL_...** 7:23 425:11,16
**TEVA_MDL_...** 8:20 494:19
**TEVA_MDL_...** 209:22
**TEVA_MDL_...** 6:14 209:17
**TEV_FE0011...** 467:21
**TEV_FE0011...** 8:10 467:16
**text** 81:21 435:18 488:11
**Thank** 13:17 36:17 40:6 41:8 43:19 48:15 50:7 56:11 73:1 83:9 104:19 111:1 125:2 128:22 160:20 191:5 197:20 204:10 258:19 288:5 290:18 344:4 347:3,14 393:19,24 432:20 438:15 451:16 487:19 499:5,6 504:3 504:23 508:23 508:24 511:2 537:8,10 550:15
**thanked** 177:3 541:23
**Thanks** 255:19 496:4
**therapeutic** 294:16 549:13

**therapy** 69:23 77:21 376:2 434:10 442:16 459:24
**thereabouts** 42:2 318:21
**thick** 370:2 542:10
**thing** 128:17 137:3 146:23 157:16 209:6 220:24 248:13 258:18 278:14 412:21 418:21 421:24 423:18 463:5 474:1 494:8 497:16
**things** 58:11 91:5 122:10,15 122:18,19 134:19 136:10 137:8,9,12 142:1 145:7 167:16,17,21 168:1 169:18 173:13 174:4,7 187:5,24 206:24 238:23 239:14 260:18 281:2,2 293:7 294:4 297:17 307:21 308:6 308:12 310:5 360:16 402:10 408:5
**think** 17:23 18:13 19:6 20:24 28:23 32:17 37:8 38:22 41:5 44:19 53:1 56:15,16 60:3 60:6 61:7 63:6 63:9 75:11 86:23 89:11,17 95:16 99:11

100:2 110:13 110:14 129:21 131:13,23 132:9,11,15,19 133:12 134:21 135:17 137:3 137:24 138:11 139:18 144:13 144:14,22 145:18 153:16 153:17 157:3,4 157:10,12,15 159:7 163:18 164:3 169:11 172:2,14 179:4 182:22 184:13 198:15 199:17 201:9,12,15 206:8,8,12,22 222:23 223:11 226:22 228:23 234:21,22 235:14 237:13 238:24 241:13 246:7 251:21 254:9 255:8,13 255:17,24 256:1,14 257:7 258:10,15 260:16 263:9 273:3 278:23 281:15 282:8 283:5,7 285:5 292:21 299:10 300:5 301:2 302:13,13 304:2,12,12 305:18 306:5 307:5,22 308:7 308:23 313:9 322:5 327:20 341:3 346:8 352:7 357:6 358:6,23 359:3 362:14 364:8 367:24 368:15

374:12 375:9
379:19,19
380:6,7 390:16
393:23 404:4
408:6 414:6
423:4,20
426:14,20
427:10 440:10
443:21 460:19
463:19 468:22
469:1 470:23
471:8,8 474:2
474:2 475:3,15
486:5 487:19
489:5 490:13
497:3,3 501:2
505:3 506:10
525:18 538:12
**thinking** 17:21
111:14 147:8
202:11 203:7
406:6 416:3
**third** 69:18 99:9
99:15 121:9
185:5 294:14
452:9
**third-to-last**
235:22
**thirty** 553:16
**thorough** 296:22
297:19 303:9
304:3,15 305:1
309:8 313:5
**thoroughly**
305:7
**thought** 145:13
148:2 149:21
158:12 190:23
201:14 202:17
202:21 218:2
221:6 237:22
352:15 364:18
367:22 368:18
369:21 370:20
380:18,18
382:9 386:7

390:12 406:2
410:22 461:23
465:8 472:18
473:15 476:9
479:4
**three** 4:5 55:2
87:20 88:23
89:12 181:13
183:5 269:13
290:16 295:13
301:6 384:22
393:1 394:18
395:16 396:4
416:12 432:17
445:1 457:2
**three-digit**
215:7
**threshold**
151:14 182:6
232:16 236:22
237:2 240:24
250:3 340:20
**throw** 38:3
305:20 497:17
**tightly** 17:1
**Tim** 161:8
292:20,21
302:23
**time** 10:8,15
23:9,20 24:15
26:8 31:23
37:6 42:8
46:16 51:24
53:9,18,24
54:11 56:6
61:10 62:20,22
64:20 69:10
72:1 79:1
102:16 107:2
109:8 122:3
129:23 133:1
133:11 135:5
137:15,21,23
142:20 145:11
145:22 152:7
153:21,22,23

163:12 164:12
164:16 167:9
168:9,16
173:20 178:14
184:10 185:2
185:21 189:10
190:9 191:20
191:22 194:11
202:19 204:3
206:12,14
213:6 219:11
226:23 240:12
253:5 254:23
261:5,8 265:2
265:6 288:22
289:17 290:6
292:15,24
294:2 302:12
305:22 308:1
315:13 318:16
339:3 349:17
358:20 361:12
361:18 363:13
370:24 383:4
383:13 390:3
392:11 396:2
398:6 401:13
405:1 411:18
413:13,14
415:21,24
417:6 426:15
427:11,17
429:7 432:2
443:5 458:2,22
469:16,24
471:5,10 472:8
475:20 477:14
477:20 480:15
481:20 483:1,3
484:17 489:17
491:14 493:5
496:7,16 506:2
507:2,13,23
513:16,20
514:14 516:10
521:17,22

527:17,24
529:5,8,16
533:12 534:4
534:10 550:5
550:23
**timeline** 39:24
177:20 476:3,5
476:7 529:13
529:15
**times** 12:4 49:12
58:12 74:4
173:8 230:21
243:11 256:1
279:23 280:23
286:22 512:16
**timing** 401:4
414:5 469:13
**TINOS** 2:17
**Tinos.diaman...**
2:19
**TIRF** 470:17,17
534:14,17,22
535:19
**TIRF's** 535:14
**title** 41:18
109:17 427:14
**titles** 109:19
**today** 10:21
153:3 245:15
289:22 416:7
417:7 496:2
499:23 501:13
501:19 502:20
516:16 517:11
525:11 536:7
**today's** 10:14
416:12 550:22
**told** 17:21 104:8
137:8 149:22
169:3,12
179:23 259:11
263:19 277:22
278:3 279:8
282:24 283:18
284:2,8 310:1
322:18 324:8

324:12 334:13
335:5 367:3,24
369:2 371:11
420:23 422:3
510:19
**tolerant** 27:17
27:21 69:23
77:20 117:10
117:12,22
376:2 419:2
421:13 434:10
442:15 450:1
459:23 477:8
**toll-free** 411:18
**Tom** 349:4
351:2,18
352:24
**tongue-in-cheek**
404:6
**tool** 95:24,24
103:4 123:6
127:4 452:19
454:4,8,23
456:1
**tools** 445:19
446:8 449:4,8
449:13 450:3,4
450:11 451:22
452:9 453:2,16
455:9,23
**tooth** 12:19
**top** 15:21 83:24
118:10,16
212:1 258:4
259:1 266:14
294:8 445:14
453:3 454:6
456:23 545:20
**Topamax** 44:18
**topic** 522:3
**topiramate**
44:17,19
**total** 126:2,15
134:1 136:9
137:18 140:8
140:20 141:6

144:4 153:13
156:11 180:5
181:10 215:16
220:17 221:21
223:10 224:1
225:20,22
226:12 230:14
233:15 234:23
235:5 247:9
265:12 268:5
270:20 295:3
353:2
**totally** 281:16
339:11
**touched** 452:5
**Tracie** 31:9
49:22 54:22
194:15 245:4
265:3 348:1
394:5
**track** 248:20
**tracking** 46:21
249:14 447:4
**trade** 121:11
**train** 103:12,13
421:20 423:16
**trained** 103:20
286:24 420:22
421:18,21
423:10 549:8
**training** 189:2
295:6 351:24
353:13 359:11
360:24 412:20
422:11 423:21
424:3 524:16
531:24 532:2,8
**Tramadol** 44:18
44:21
**transcript**
552:18 553:17
553:19
**transcription**
555:4
**transition**
428:16 470:21

**trust** 205:16
**trusting** 279:12
280:2
**truth** 335:7
**truthful** 334:14
**TRx** 234:19,20
259:3,7
**try** 21:14 91:12
100:7 128:18
144:22 150:15
168:5 170:5
223:17 249:21
252:22 254:5
254:11 307:9,9
338:19 352:18
384:16 386:6
446:22
**trying** 57:24
91:22 103:16
110:19 127:17
128:16 139:11
139:23 145:16
146:12,13
149:23,24
168:23 183:14
190:8 209:8
227:21 230:6
239:7 249:5
253:7,9,23,23
255:8,15 266:6
277:18 283:14
285:5,10
303:16 308:19
310:8 311:13
332:1 341:3
376:11 381:23
382:3,10
397:12 402:16
406:8 417:12
426:13 427:22
429:4 437:14
437:17 438:2,9
443:7 458:2
459:16,18
460:10,11
471:15 472:12

**471:10 482:11**
482:21
**transitioning**
472:9
**transmitted**
493:23
**transparency**
520:23
**transpired**
351:14 352:19
**travel** 500:24
**Treanda** 528:24
**treat** 24:17
117:7 330:1
359:19 375:20
376:20 377:3,6
379:3 386:5
441:10 547:17
548:20
**treated** 268:19
**treating** 378:21
**treatment** 78:2
93:15 377:14
387:5,8 548:17
548:21
**tree** 48:23
**trial** 4:17 10:8
13:20,23 14:1
**tried** 74:4 80:6
85:12,13 145:9
146:22 148:1,6
148:9 168:9
170:1 254:2,3
311:4 318:14
467:5
**trigger** 113:5
224:3,4 241:1
321:18 324:19
476:10
**triggered** 146:8
321:3,7,14
322:8 324:16
**triggers** 133:2
149:20
**true** 252:3 367:2
456:11 552:6

472:19 474:10
484:15 510:7
535:22
**turn** 77:11 139:9
185:5 422:9
447:6
**turning** 101:16
**twice** 12:5 138:9
138:14 153:5
**two** 18:21 23:8
51:6 53:6
85:17 121:8,11
126:16 138:4
142:16 151:24
178:1 180:11
238:23 239:9
259:2 322:3
326:10 351:17
453:10 483:9
486:20 541:15
542:10 543:11
543:11
**two-level** 103:14
**type** 22:14 62:7
75:12 184:17
194:5 234:15
238:11 240:3
306:4 330:15
340:20 354:7
376:5 396:20
441:16 443:14
491:8 524:24
526:3
**types** 42:19
396:15 402:23
417:23

**U**

**Uh-huh** 366:3
**ultimately** 70:18
74:24 249:19
512:6 517:3
526:2
**umbrella** 223:8
272:12
**umbrellas** 260:6

**unable** 312:9
**unapproved**
73:18
**unbranded**
331:4 526:14
**underlings**
92:13
**underlying**
69:24 77:21
376:3 434:11
442:16 459:24
**underneath**
49:21 53:2
54:23 399:23
411:8
**underrated**
378:8
**understand**
13:11,12 21:9
28:3 66:22
70:9 101:23
116:18 125:1
139:11,24
141:22 150:13
155:13 158:21
181:22 182:12
207:11,13
212:17 227:18
254:5 256:6
282:15 286:2,7
301:24 344:3,7
344:12 362:24
382:4 386:18
386:18 418:5
427:14 438:15
438:18,20
448:2 495:8
**understanding**
13:21 20:9,11
21:7,18,20
22:10 23:3
26:24 34:14,20
64:16 69:7
70:1,18 71:22
72:22 80:17
81:9,23 82:11

Highly Confidential - Subject to Further Confidentiality Review

82:13 86:2
88:15 90:14
91:10 94:16
95:8,10 97:9
100:19 108:19
113:10 118:1,6
120:5,15
122:18 123:4
125:16 141:2
141:13 160:1
162:8 190:22
190:24 196:10
213:1,3 214:24
224:10,20
228:10 247:16
251:8,13 252:2
252:4 253:4
254:21,24
255:5 258:1
259:6 272:18
278:13,15
349:8 362:9
403:17 437:10
439:14,23
448:9 449:16
454:1 461:11
473:12,20
477:11 488:17
497:4 501:13
506:2 508:5
519:19 537:24
538:2
**understood**
71:24 72:14
95:21 99:20
105:9 175:13
197:20 255:2
278:21 435:10
438:16
**undertaken**
476:12
**Unfortunately**
296:20
**unified** 473:3
**unilaterally**
20:17

**unintended** 88:6
88:17 249:18
249:20 317:21
435:8 436:14
445:4
**United** 1:1 73:10
347:6 416:4,6
**unquote** 180:13
196:11
**unsafe** 349:19
**unsubstantiated**
401:18
**untargeted**
341:6
**untoward** 88:5
88:17 91:12
**unusual** 151:1
151:10 228:8
303:15
**update** 343:1
**updated** 167:20
197:23
**USA** 58:3 61:6
**usage** 120:1
125:11 126:1
129:9,16
132:18 140:7
154:15 180:4
180:10 181:17
188:1 266:11
275:19,23
276:1 277:7
327:6,9 329:20
338:13 339:19
373:2,12,14
**use** 24:9 25:2
27:5 69:19
71:7,8,20 72:3
80:12,14 82:16
90:13 100:15
103:6 105:13
113:3,4 114:23
115:15,21
116:9,22 117:4
117:17,19,24
118:5 120:6

153:24 154:22
213:15 214:9
215:5 221:20
240:6,13 243:1
266:16 267:1
267:19 268:5
269:16,17
270:14,22,23
271:2,7 273:8
273:23 276:9
287:9,10
294:19 298:23
316:15 317:7
317:20,22
318:9,17 320:3
320:5,9,16,22
321:18,23
322:6,11
323:22 325:24
326:1,11 327:2
330:1 331:2
332:9 334:17
343:3,4 344:11
344:14 345:6
349:19 350:3
351:7,8 358:2
358:4,13,18,22
359:7,17
360:13 361:2
365:2,5,6,9,11
366:2 367:14
369:9 370:12
371:12 372:1
372:15 377:23
378:5 383:3,12
383:23 384:2
385:8 387:7
388:12 391:8
412:12 413:2,3
413:5 417:1
421:12 434:6
434:17 435:6
436:12 442:12
445:1,24
449:15 450:12
450:13 451:23

454:16,21,24
457:4 461:5
463:2,9,11,16
463:21 464:9
464:14 465:20
476:17 479:20
488:10 519:1,7
548:20
**uses** 117:14
267:2 336:2
378:10 385:21
416:21 420:18
458:4 539:17
**usually** 16:22
247:4 343:23
**utilize** 105:8
453:17
**utilized** 133:4
456:3
**U.S** 7:16 30:13
44:1 414:16
415:11 506:9
506:10 537:21

---

**V**

**vacancy** 51:1
52:19
**vacant** 50:10
51:9 163:14,20
163:23 164:12
**Vague** 75:4
116:11 137:21
229:23 240:8
369:12 432:15
474:17 520:9
527:22 531:3
541:14
**Vaguely** 165:2
349:24 458:5
**valid** 519:8
**validity** 382:24
**value** 66:19
**variety** 15:23
449:7 504:19
**various** 43:23
51:23 55:7

180:8 185:17
196:20 356:13
376:18 451:22
546:6
**vehicle** 101:24
**vehicles** 101:21
104:21 105:7
**verbally** 418:16
494:1
**verified** 195:8
**verify** 33:11
**Verispan** 333:17
**version** 80:7
86:3 87:8
**versus** 227:5
295:21 297:11
300:21 339:6
370:1 523:20
**vetted** 525:2
**viable** 465:8
**vice** 37:8 50:10
470:9
**Victor** 51:13
53:3 191:21,24
255:16 348:1,3
**VIDEO** 10:10
11:7 86:13,19
129:24 130:6
200:20 201:2
288:10,16
392:16,22
499:7,13 511:3
511:9 537:14
550:21
**videographer**
4:17 10:12
**videotaped** 1:14
13:6
**view** 71:23 72:1
72:9 99:18
107:19 112:3
198:23 238:18
267:1 270:15
300:14 372:7
374:18 384:1
408:12 413:9

Highly Confidential - Subject to Further Confidentiality Review

463:17
viewed 436:17
views 82:14
  435:13
vigilance 95:6
Villanova 45:1
VINEETA 2:21
violate 385:22
violation 78:5
  529:2
violations
  121:22 123:11
  291:21 391:1
  538:10
virtually 324:3
visit 142:22
  240:15
visiting 532:7
visits 330:12
  450:5
VOGEL 4:11
voiced 492:10
volume 333:23
voluminous
  524:21
voluntarily
  450:21 512:19
vouchers 111:22
VP 255:17

_____
W
Wacker 2:17
wait 133:19
  359:4 391:15
  415:7
waited 358:16
waiting 38:2
waived 10:5
Walgreens 76:5
  118:21 165:10
  165:12 167:8
  167:24 168:7
  178:11,14
  306:18,20,21
  309:13,14
  310:11 312:11

walk 51:22
  52:10 62:24
walked 536:23
Walmart 3:7
  76:4
want 38:9 85:19
  89:19 103:12
  107:3 125:15
  128:17 139:20
  150:10,14,15
  165:5 173:8
  176:18 194:12
  194:17 195:11
  200:13 202:8
  206:9 214:22
  219:16 222:9
  223:19 245:2
  248:21 256:3
  258:16 265:22
  269:10,14
  273:3 284:14
  288:6 290:15
  294:14 298:5
  305:19,20
  309:4,6 315:24
  332:13 347:5
  348:6 361:12
  372:9 375:5
  389:6 401:9
  407:24 417:21
  426:19,24
  433:3 448:16
  454:3 460:19
  461:17 462:10
  483:15 484:16
  487:1,16 489:7
  489:10,21
  497:7 498:22
  498:23 521:9
  521:15
wanted 40:18
  48:12 49:7
  93:1,19 94:3
  95:22 102:14
  106:21 129:17
  132:10 138:9

143:2 151:12
  177:20 214:20
  239:22 240:3
  254:4 256:4,6
  288:19 310:14
  326:15 327:18
  332:17 363:16
  372:6 391:13
  405:24 412:22
  446:16 469:7
  469:14 476:14
  478:20 492:12
  496:2,12
  497:11,14,17
  538:14
wants 250:1,1
  349:19 529:4
  531:15
warning 126:19
  353:10 354:5
  354:16 379:23
  381:20 390:20
  403:9 408:19
  440:23 441:2
  441:16,17,21
  442:1,10,12
  527:18 528:3
  528:12 529:3
  530:17,22,24
  531:6 536:23
  537:2
warnings 442:7
  530:15
Washington
  2:22 3:19
wasn't 27:21
  72:20 85:14
  117:21 124:2
  134:20 150:21
  167:19 254:22
  259:10 260:4
  297:22 302:2
  305:1 308:19
  311:12 341:7
  357:7 365:24
  389:16 395:10

396:22 408:8
  421:19 426:8
  427:16 429:6
  444:9 450:24
  471:5 489:18
way 61:16 66:11
  76:11 107:23
  122:14 135:12
  143:5 152:15
  157:5 159:13
  173:11 193:9
  194:7 203:3
  204:8,22
  211:22 221:8
  237:14,20
  249:16 250:16
  255:8 279:9
  285:6 287:4
  301:14 309:9
  327:21 338:11
  377:21 379:18
  385:17 396:22
  405:12 419:5
  430:17 457:13
  515:15 540:5
  545:22
ways 465:3
website 450:7
welcome 118:15
  294:9 346:17
  411:13,23
  461:22 489:9
went 31:18
  36:24 41:10
  58:11 63:10
  76:3 102:9,24
  146:16,17,24
  148:24 149:22
  150:9 152:1,17
  173:17 175:6
  175:22 206:10
  253:5,14
  265:13 276:12
  302:1 307:13
  307:22 308:6
  308:13 329:3

333:10 338:20
  363:18 375:9
  395:13 396:2
  401:13 409:2
  426:15,21
  428:2 475:20
  496:13 502:19
  517:4 529:13
  532:9 542:3
  543:3
weren't 141:4
  168:1 169:10
  187:10 206:11
  290:16 307:22
  310:9 340:18
  357:7 392:2
  395:11 419:8
  444:6,8 479:6
  486:1 489:16
West 2:17 54:6
  291:18 416:10
we'll 87:1,3
  128:18 152:24
  176:10 177:19
  206:7 347:11
  405:16 414:12
  424:20 451:13
  467:11 485:16
  497:22 508:22
  510:24 546:2
  549:16
we're 38:2 39:5
  74:15 76:7
  86:19,24 87:1
  130:6 258:17
  258:22 285:23
  286:24 288:16
  340:2 346:8,12
  397:18 425:4
  450:22 468:22
  483:5,8 499:13
  503:17 544:14
  550:22
we've 15:7 68:17
  146:20 169:1
  177:2 191:15

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 201:13,19 | 32:2,15 33:5 | 171:10 173:7 | 309:23 313:1 | 492:7 495:7 |
| 213:12 214:7 | 34:8,19 35:13 | 176:8,12,18 | 314:7 315:8,20 | 496:22 498:12 |
| 231:17 334:13 | 36:3,12 39:19 | 178:19 179:22 | 318:13 321:2 | 499:4,6 501:10 |
| 355:20 392:12 | 40:24 42:24 | 180:23 182:16 | 325:8 327:15 | 502:6,15 |
| 394:11 422:5 | 43:19 44:9,16 | 182:18 183:10 | 328:2 334:8 | 503:14 504:3 |
| 457:24 487:8 | 47:2,8,15 48:7 | 186:2 189:14 | 336:15 337:12 | 506:8,23 |
| 495:18 500:9 | 49:16 50:17 | 190:12 193:6 | 338:24 340:1 | 507:19 508:8 |
| 501:18 536:7 | 52:5,17 53:17 | 197:5 200:18 | 343:22 347:13 | 508:24 509:22 |
| **whatsoever** | 55:13,19 57:18 | 203:3 204:21 | 350:20 352:6 | 511:2 515:12 |
| 85:14 | 58:7 59:12 | 206:3 208:6 | 353:22 354:14 | 521:6 528:7,16 |
| **when's** 403:8 | 60:2,17 62:10 | 210:20 211:9 | 357:5 359:3 | 537:8,10 538:8 |
| **white** 51:4,5 | 62:21 63:6 | 211:19 213:21 | 360:1 364:18 | 538:24 539:8 |
| 52:18 163:11 | 64:10 65:11,20 | 214:2,15 216:6 | 365:15 366:12 | 540:2 541:15 |
| 285:22 | 66:16 67:7,15 | 218:1,17 224:9 | 366:16 367:2 | 543:10 544:3 |
| **wholesaler** | 67:24 68:6 | 224:19 225:10 | 367:20 368:14 | 545:1 547:2 |
| 121:5,12 122:2 | 69:6 70:14,23 | 226:1,22 | 369:13 372:13 | 549:4,24 |
| 123:6 | 72:8,20 74:2 | 228:23 230:2 | 374:2 376:9 | 550:12 552:5,7 |
| **wholesalers** | 75:5,17 76:23 | 230:22 235:14 | 380:17 381:15 | 553:1 |
| 121:14,18 | 77:9 78:14 | 236:15 237:12 | 383:7,11,20 | **witness's** 96:14 |
| 123:21 124:12 | 79:9 80:22 | 238:21 239:20 | 384:7,21 | 116:2 159:20 |
| **wide** 15:23 | 81:13 82:6,20 | 240:11 241:13 | 387:17 388:17 | 296:9 311:24 |
| **widespread** | 85:5 87:13 | 242:11 243:12 | 390:8 391:24 | 381:13 420:8 |
| 507:13 | 88:22 90:21 | 246:17 247:15 | 393:19,24 | 543:9 |
| **Williamson** | 91:16 93:6,23 | 248:11 250:11 | 395:8 396:11 | **wondering** |
| 49:23 | 94:8 96:5,15 | 251:7,19 | 397:18 400:15 | 218:24 455:22 |
| **willing** 14:1 | 97:23 100:2 | 259:10 261:13 | 400:18 402:5 | **Woods** 291:10 |
| **WILSON** 3:18 | 103:11 104:12 | 262:5,15 263:5 | 406:15 407:12 | 291:16 |
| **Wilson.mudge...** | 106:11,21 | 264:5,14 | 408:15 413:19 | **word** 85:9 89:20 |
| 3:20 | 107:22 109:16 | 265:19 266:20 | 415:8 419:13 | 202:13,13 |
| **wing** 52:2 | 110:6 111:10 | 267:14,24 | 420:10 423:4 | 204:22,23 |
| **Winkelman** | 112:6,13 | 268:12 269:3 | 424:2 432:21 | 207:1,2 222:11 |
| 246:3,4 | 113:23 114:17 | 269:10 271:6 | 434:22 435:17 | 396:12 |
| **wire** 321:11 | 115:3,13 116:3 | 271:14,22 | 436:21 439:22 | **wording** 412:17 |
| **withdraw** 57:23 | 116:12 120:12 | 272:9 273:2,17 | 443:21 446:20 | **words** 123:4 |
| 328:7 371:1,15 | 122:7 123:9 | 274:2,12 275:8 | 448:8,24 | 125:17 215:21 |
| **withdrawing** | 124:19 127:11 | 275:15 277:13 | 450:19 453:24 | 307:11 318:14 |
| 370:15 480:3 | 128:1,12 133:8 | 278:12 279:24 | 455:17 460:15 | 539:16 540:8 |
| **withdrawn** | 135:4 138:3 | 280:18 281:6 | 461:17 462:20 | **work** 11:22 14:9 |
| 381:20 | 141:12 144:12 | 283:5,23 | 464:1,21 | 15:17 38:10 |
| **withdraws** | 147:16 148:6 | 284:13 285:19 | 465:14 466:21 | 39:9 40:21 |
| 479:24 | 156:2,18,23 | 286:23 287:19 | 469:12 472:3 | 227:18 287:1 |
| **witness** 9:5 11:1 | 159:7,21 | 289:4,21 | 473:8 474:18 | 308:4 465:9 |
| 17:15 20:1,21 | 160:21 166:3 | 292:10 296:11 | 477:18 478:8 | 474:24 500:22 |
| 22:9,20 25:13 | 166:18 167:5 | 299:9 300:11 | 478:24 480:7 | **worked** 44:17 |
| 26:23 27:10 | 167:12 168:22 | 300:18 301:13 | 481:23 484:19 | 124:4 194:15 |
| 28:1,10 31:15 | 170:1,10 | 304:22 305:5 | 486:12 490:22 | 227:17 297:3 |

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

426:10 458:24
470:4 475:7
**working** 49:21
78:21 87:8
255:22 256:1
298:18 316:15
316:18 326:2,4
427:16 429:7
429:10 463:20
473:3,10
474:12
**works** 203:4
278:16 281:19
284:24
**world** 227:11
249:9 250:17
281:11 403:18
**worldwide**
50:11
**worse** 303:23
**wouldn't** 27:18
85:15 100:3
141:3 146:24
148:13,14
156:12 187:9
226:24 236:6,7
237:2 247:3,3
249:4 272:13
303:8 358:17
366:20 472:14
474:3
**write** 142:16
144:5 219:2
279:3,3 316:20
317:11 349:3
375:17 376:22
401:6 519:18
535:12 547:14
**writes** 245:14
248:17 249:8
291:15 295:8
329:14,15
**writing** 135:11
169:13 190:9
213:7 244:1
284:22,23

329:4 406:3
493:18,24
519:10,15
**written** 72:10
107:23 119:23
157:5 174:24
179:6 235:1
254:1 295:3
349:4 350:14
350:15 351:12
352:7 361:8
388:19 394:19
420:11 452:3
466:22 467:7
519:9
**wrong** 19:21
110:14 128:17
201:16 245:22
396:12 398:18
472:17
**wrote** 74:13
183:12 200:5
316:12,23
317:9 325:10
333:5,6 360:2
492:22

___ **X** ___

**X** 5:2,9 6:2 7:2
8:2
**Xponent** 119:9
119:13,16
120:6 134:13
134:20 136:5
170:18 179:2
188:13 308:22

___ **Y** ___

**yeah** 18:10 52:5
98:20 132:15
152:24 175:24
178:19 187:13
200:6 202:17
205:1 233:8
235:8 271:14
298:13 314:13
358:5 375:3

426:24 428:6
455:21 471:8
474:10 475:23
510:3 543:2
**year** 51:6 54:8
60:12 61:13
64:1 66:22,22
67:8 119:18
122:11 165:18
165:19 196:16
322:23 324:5
**yearly** 61:22
**years** 12:24 53:4
53:6 74:5
533:15,16
**year-end** 198:7
**Yep** 178:2,2
213:21 400:7
433:24 459:5
467:9
**yesterday**
317:13
**York** 4:12,12

___ **Z** ___

**zip** 119:21

___ **$** ___

**$260,000** 65:4
65:14
**$275** 290:12
**$29,000** 65:5
**$425** 7:17
414:18 415:17
415:22
**$50** 380:9
**$50,000** 65:2
66:2
**$87,000** 65:3,23

___ **0** ___

**00028341**
429:23
**01** 202:20
**03** 49:18 163:10
275:11
**037** 487:12

**04** 175:18
262:11 265:14
**0426-J02** 181:7
198:5
**06** 35:20 429:10
**07** 35:2 426:20
**08** 19:22
**09** 480:4

___ **1** ___

**1** 9:17 79:24
119:14 163:1
212:1 293:22
374:15 375:10
411:11 430:4
449:4 555:3
**1st** 85:6 131:10
201:11
**1:13** 201:3
**1:17-MD-2804**
1:7
**10** 9:17 131:13
193:13,14
200:4 273:9,10
455:3 456:21
**10th** 205:6
**10.0** 128:24
**10:00** 310:3
**10:34** 86:14
**10:46** 86:20
**100** 39:19
350:22 401:12
**10006** 4:12
**101** 297:2
**106** 11:24
**11** 5:5 133:13
210:1 235:20
372:24 373:11
426:21 448:11
459:10 460:21
**11th** 195:21
210:6 481:4
**11/11/96** 491:6
**11:22** 130:1
**11:34** 130:7
**111** 4:12

**1111** 2:21
**1138** 176:3
**1140** 209:12
**1143** 244:15
**12** 100:11
133:13 136:17
179:10 196:13
235:2 270:24
290:17
**12th** 162:22
176:7 333:5
369:1 468:2
514:22 529:20
540:14 542:20
546:15
**12.38** 234:10
**12/11** 197:24
**12/2/03** 192:17
194:3
**12/28/11** 498:18
**12/31** 183:24
303:6
**12:39** 200:21
**124** 207:15,17
**125** 61:17
207:15
**13** 101:16 181:3
181:6 196:13
198:4 199:3,10
270:18,20
287:12 301:2
**13th** 231:19
**130** 6:7
**14** 5:13 177:24
192:22 193:20
194:1 195:21
298:7,13
516:13
**14th** 177:17
342:14 349:6
356:18,20,23
365:7 375:14
378:19 385:4
386:23 540:16
542:14,22
543:14 546:11

Highly Confidential - Subject to Further Confidentiality Review

546:13 547:10
**142-page** 498:15
**145** 291:18
**15** 105:21 126:1
126:15 128:8
132:11 133:17
134:1 135:15
135:20 136:8
136:22 137:18
138:18 140:7
140:19 141:6
142:13 144:3
147:21 151:13
151:20 152:2,8
152:19 153:8,9
153:12 155:9
156:8,10 158:4
158:17 170:20
171:23 175:10
180:5,11 181:9
181:18,21
182:5 183:1,19
196:12 198:12
213:14 214:9
215:15 219:18
220:18 221:1
221:21 223:10
224:2,3 225:21
226:13,17
230:13,17
231:21 232:16
233:17 234:7
235:18 236:21
237:1,5,9,19
237:23 245:7
245:20 246:1
246:13 247:7,9
247:19 250:2,5
260:24 261:2,9
262:10 263:2
263:18,23
264:10 290:17
295:2,12
298:21 299:23
338:17,20
340:16,20

350:6,16 374:4
379:10 409:2,9
449:2 479:18
**15th** 162:22
192:13
**15-page** 517:14
521:12
**1554** 45:10
**1572** 48:3
**16** 108:7 449:17
478:15
**161** 6:9
**1650** 1:16
**1689** 328:10
**1691** 355:17
**1692** 316:1
**1693** 231:4
**17th** 131:9
458:12 468:1
479:11
**1717** 4:5
**1753** 345:22
**177** 6:11
**18** 1:10
**18th** 10:14
245:17 430:8
**1818** 3:12
**19th** 204:7
245:17 426:4
430:1,22 437:3
437:20,24
438:1,12
**19-124** 207:8
**19.57** 233:16
235:5
**191** 6:12 386:23
**19103** 1:17 3:13
4:6
**1980** 45:1
**1998** 5:22 44:24
68:19 79:18
80:7 205:8,12
207:8,18,20,21
207:24 208:9
253:2
**1999** 84:4,21

86:7,24 201:7
201:24 205:6
208:12

_____
**2**
**2** 131:24 165:4
374:15 375:2,9
375:11 412:11
436:7 445:19
447:13 451:19
451:19 547:6
**2nd** 161:23
480:9
**2Q03** 134:2
**2.1** 447:9
**2.2.2** 447:14
**2:22** 288:11
**2:38** 288:17
**20** 233:16
260:20 261:2
340:11 555:11
**20th** 4:12
**20-747** 163:2
**200** 2:12
**2000** 18:7 29:5,9
44:1 54:6
61:16 84:18
257:22 258:7
258:15
**20001** 3:19
**20004** 2:22
**2001** 23:11
29:10 163:1
201:11 416:18
**2002** 29:18
**2003** 46:8 49:3
55:3 130:17
131:10,11
161:8,24
163:22 192:14
259:19 265:13
274:21 281:22
293:23 514:14
**2004** 5:18 46:2
46:12 49:5
51:19 176:7

177:17 196:19
231:19 259:20
261:4,5,7,23
288:22 291:11
298:18 300:7
315:1,17
316:13 317:1
326:22 328:21
329:7 339:18
345:14 349:6
356:18,20
375:14 386:23
394:4,14
406:20 410:7
514:14,22
516:10,13
529:20 540:14
546:11,13
547:11
**2005** 210:1,6
257:2 258:9,22
287:7 394:17
410:2 437:2
**2006** 23:14,17
26:5,10 29:18
35:14 414:7
416:19 426:4
430:2,8 437:3
437:20,24
438:12 476:15
504:7,11 505:7
506:14 507:23
529:17
**2007** 19:21
35:20 56:12,21
56:24 427:7
458:12 459:10
476:24 477:14
**2008** 382:7
415:13 468:1
478:12 479:11
532:14 534:5
**2009** 479:18,23
480:9,15 496:7
496:15
**2010** 23:13

481:4,9,20
483:3
**2011** 18:8 35:2
35:20 37:5
56:3,7,16,21
56:24 57:2
426:20 427:7
**2012** 65:3 66:3
**2013** 18:12,14
23:20 40:10
41:22 65:3,4
65:15,24
509:23
**2014** 41:23
**2015** 42:8 509:4
**2016** 42:9,16
**2017** 42:16
**2018** 43:6
**2019** 1:10 10:15
552:11
**202** 2:22 3:19
6:5
**209** 6:14
**21** 5:22 16:15
71:4 79:18
111:2 261:3
262:1 552:11
**21st** 478:16
504:11
**212** 4:13
**215** 3:13 4:6
**217-8800** 3:5
**22** 112:19 118:8
259:1 268:21
269:19
**22nd** 410:7
476:24 478:2
**223** 2:11
**23** 118:11
134:12 393:2
393:21
**23rd** 291:11
315:1,20
**231** 6:16 256:16
**24** 121:5 266:9
266:10 287:8

Highly Confidential - Subject to Further Confidentiality Review

376:22 393:2
393:23 394:14
**24th** 130:17
406:19
**245** 6:17
**25** 63:8 266:15
393:2,23
411:12 456:23
**25th** 410:1
476:15 481:9
481:15
**257** 6:19
**26** 409:17
451:18
**27** 125:3,3
132:17 135:20
139:10,13,20
143:17 154:10
157:21 214:21
221:13 222:6,8
415:4
**27th** 478:12
**270** 61:13
**28** 415:4 452:8
**28th** 46:8,12
49:2,5 163:22
**2804** 1:5
**2830** 2:5
**28345** 430:19
438:7
**28347** 444:17
**29** 128:24
424:22 426:3
438:4 453:1
**29th** 328:21
394:4,17 400:2
415:13 431:1
**291** 6:20

**3**

**3** 133:21 134:8
178:24 259:19
259:20 308:21
329:7 344:17
374:15 386:20
412:24 422:10

422:15 436:6,7
436:10 445:20
448:12 548:11
**3rd** 479:23
**3.1** 94:22 448:14
**3.6.1** 449:3
**3/8/2005** 491:6
**30** 358:5,6,14
404:24 426:3
431:6 432:19
553:16
**30th** 131:10
345:14 348:8
353:19 356:4
395:17 400:6
550:7
**30-day** 358:3
403:20
**303** 468:13
**3072** 47:4 48:9
**31** 234:12 426:3
431:4,6 432:19
432:21 433:8
437:17
**31st** 437:2
**3100** 4:5
**312** 2:18
**314** 16:15
**314.520** 5:22
71:5 79:19,23
**316** 6:22
**32** 63:11 426:3
433:20
**320-6200** 3:13
**324-1484** 2:18
**328** 6:23
**330** 177:23
**331** 184:2
**34** 467:13
**3402** 3:12
**342** 7:5
**345** 184:17,22
**346** 7:7
**35,000** 119:15
**355** 7:8
**369-0267** 2:13

**37** 486:17,20
487:13
**37203** 2:12
**38** 486:22
487:23 488:12
**39** 485:17
486:22,24
488:23 489:1,2
497:17
**393** 7:10,11,13

**4**

**4** 47:22,23
207:20 208:9
374:15 445:13
445:14 549:17
**4th** 68:19 205:7
205:12 207:8
207:18,19,24
253:14 317:1
349:5 362:12
**4.1** 100:12
**4.4** 104:22
**4.5** 213:5
**4:03** 392:17
**4:17** 392:23
**40** 485:18
488:21
**410** 7:14
**414** 7:18
**415** 2:6 7:20
**425** 7:22,23 8:5
**426** 8:7
**43** 5:15
**45** 5:16,18
404:24
**458** 8:8
**468** 8:10
**469** 8:11
**481** 8:13
**485** 8:14,16
**49** 336:1
**490** 8:19
**495** 8:20
**499** 5:6

**5**

**5** 87:17 185:7
549:17
**5.0** 105:21
**5.1** 186:21
**5.4** 188:8
**5:56** 499:8
**50** 367:13
**504** 8:22
**509** 8:23
**51** 265:13
**511** 5:6
**5150** 1:16
**5307** 521:11
**533** 414:12
**537** 5:5
**54** 454:3,6
**546-73300** 2:6
**548** 45:11
**55** 265:12 268:5
268:20
**551** 555:3
**552** 8:17
**554** 191:13
**55402** 3:5
**556** 38:7
**560** 15:8
**570** 494:14
**587** 483:7
485:14
**596** 68:8
**598** 378:17
**599** 291:5

**6**

**6** 374:15 388:7
454:6,7 460:20
479:17
**6:01** 499:14
**6:11** 511:4
**6:14** 511:10
**6:43** 550:23
551:3
**60** 119:17
541:19 542:24
**601** 3:18 83:11
**60601** 2:18

**612** 3:5
**616-7075** 4:13
**627** 341:24
355:9
**632** 480:19
**635** 489:22
**661** 457:15
**68** 5:20
**682** 516:18
**692** 77:12

**7**

**7** 259:21
**7th** 316:13 431:1
**7.0** 111:3
**70** 541:19
**72** 47:14,18
**739-3000** 2:22
**77** 2:17
**7855** 207:6
**7857** 201:21,23
**79** 5:22

**8**

**8** 132:2 236:4
259:21 312:7
333:15 368:7
**8.0** 112:19 129:5
178:7
**8.1** 165:8
**8.1.1** 178:6
312:7
**8.1.1.4A** 165:9
**8.2** 119:5
**8.2.1** 133:20
134:9,12
135:15 140:16
170:16,24
179:2 222:12
222:14 232:2
**8.2.2** 232:2
**8/29** 437:22
**81** 276:1,5
**83** 5:23
**85** 181:12 182:2
182:3 183:17
299:3 301:5,17

305:10
**851-8100** 4:6
**877** 2:13
**877.370.3377**
   1:23

---
**9**

**9** 84:4,21 85:6
   94:19 125:9
   132:2 198:2
   447:6 526:12
**9th** 85:20 86:7
   86:23 201:24
   208:12 509:4
**9.0** 125:12 129:5
**9.1** 125:11 373:1
   373:3
**9.1.1** 136:17
   143:11
**9.1.2** 125:4,10
   133:14 135:20
   135:22 136:16
   139:12 143:24
   149:13 154:8
   156:13 157:21
   179:12,18
   181:16 213:12
   214:6 215:4
   221:7 229:17
   232:2 243:3
   244:6 246:20
   296:4 340:22
   350:16 373:21
**9.2.1** 149:13
   229:17
**9.2.2** 149:13
**9:31** 1:17 10:15
**90** 3:4 145:10
   266:16,24
   267:19 273:7
   288:23 318:20
   327:5 384:1
**91** 44:3
**917.591.5672**
   1:23
**928** 440:21

**93** 131:7
**94104** 2:5
**942-5000** 3:19
**97** 275:24
**99** 201:18
   202:10,20
   204:12,16
   253:3 414:12