Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4   ---------------------------) MDL No. 2804

 5   IN RE:  NATIONAL           )

 6   PRESCRIPTION OPIATE        )

 7   LITIGATION                 )

 8   ---------------------------) No. 1:17-MD-2804

 9   THIS DOCUMENT RELATES TO:  )

10   ALL CASES                  )

11   ---------------------------) Hon. Dan A. Polster

12

13                HIGHLY CONFIDENTIAL

14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The videotaped deposition of MICHAEL M.

17   MILLER, M.D., called by the Plaintiffs for

18   examination, taken pursuant to the Federal Rules of

19   Civil Procedure of the United States District Courts

20   pertaining to the taking of depositions, taken before

21   JULIANA F. ZAJICEK, a Registered Professional Reporter

22   and a Certified Shorthand Reporter, at the offices of

23   Foley & Lardner, Suite 400, 150 East Gilman Street,

24   Madison, Wisconsin, on June 4, 2019, at 10:00 a.m.
```

## Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS:
 3       CRUEGER DICKINSON LLC
         4532 North Oakland Avenue
 4       Whitefish Bay, Wisconsin 53211
         414-210-3767
 5       BY:  ERIN DICKINSON, ESQ.
             ekd@cruegerdickinson.com
 6
             -and-
 7
         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
 8       275 Battery Street, 29th Floor
         San Francisco, California 94111-3339
 9       415-956-1000
         BY:  DONALD C. ARBITBLIT, ESQ.
10           darbitblit@lchb.com
11           -and-
12       BARON & BUDD, P.C.
         15910 Ventura Boulevard, Suite 1600
13       Encino, California 91436
         818-839-2333
14       BY:  JAY LICHTER, ESQ. (Telephonically)
             jlichter@baronbudd.com
15
             -and-
16
         SIMMONS HANLY CONROY LLC
17       112 Madison Avenue, 7th floor
         New York, NY 10016
18       212-784-6400
         BY:  SANFORD SMOKLER, ESQ. (Telephonically)
19           ssmokler@simmonsfirm.com
20
21
22
23
24
```

## Page 3

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
     AMERISOURCEBERGEN DRUG CORPORATION:
 3
         REED SMITH LLP
 4       1301 K Street, N.W., Suite 1000 - East Tower
         Washington, D.C. 20005
 5       202-414-9403
         BY:  KELLY H. HIBBERT, ESQ.
 6           khibbert@reedsmith.com
 7           -and-
 8       REED SMITH LLP
         Three Logan Square
 9       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania 19103
10       215-851-8100
         BY:  JEFFREY R. MELTON, ESQ. (Telephonically)
11           jmelton@reedsmith.com
12
     ON BEHALF OF HBC SERVICES:
13
         MARCUS & SHAPIRA LLP
14       One Oxford Centre, 35th Floor
         Pittsburgh, Pennsylvania 15219
15       412-471-3490
         BY:  DARLENE M. NOWAK, ESQ. (Telephonically)
16           nowak@marcus-shapira.com
17
     ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
18   and THE PURDUE FREDERICK COMPANY, INC.:
19       DECHERT LLP
         Three Bryant Park
20       1095 Avenue of the Americas
         New York, New York 10036-6797
21       212-698-3500
         BY:  NEGIN HADAGHIAN, ESQ. (Telephonically)
22           negin.hadaghian@dechert.com
23
24
```

## Page 4

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF JOHNSON & JOHNSON AND JANSSEN
     PHARMACEUTICALS, INC.:
 3
         O'MELVENY & MYERS LLP
 4       1999 Avenue of the Stars, 8th Floor
         Los Angeles, California 90067
 5       310-246-6705
         BY:  RYAN SNYDER, ESQ. (Telephonically)
 6           rsnyder@omm.com
 7
     ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:
 8
         BAILEY & WYANT, PLLC
 9       500 Virginia Street, Suite 600
         Charleston, West Virginia 25337
10       304-345-4222
         BY:  JUSTIN TAYLOR, ESQ. (Telephonically)
11           jtaylor@baileywyant.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1              I N D E X
 2
 3   WITNESS:                    PAGE:
 4   MICHAEL M. MILLER, M.D.
 5       EXAM BY MS. DICKINSON...............   7
 6       EXAM BY MS. HIBBERT.................  270
 7
 8              *****
 9
10          E X H I B I T S
11   MILLER EXHIBIT             MARKED FOR I
12   No. 1    Plaintiffs' Notice of Oral       20
13           Videotaped Expert Deposition of
14           Michael Miller
15   No. 2    Expert Report of Michael M.      27
16           Miller, M.D., DFASAM, DLFAPA, May
17           10, 2019
18   No. 3    Updated version of Dr. Miller's CV   26
19   No. 4    Michael M. Miller, M.D., DFASAM,   21
20           DLFAPA - Supplemental List of
21           Materials Reviewed and Considered,
22           June 3, 2019
23
24
```

Page 6

1  (WHEREUPON, certain documents were
2  marked Miller Deposition Exhibit
3  Nos. 1 through 4, for identification,
4  as of 06/04/2019.)
5  THE VIDEOGRAPHER: We are now on the record. My
6  name is Ben Stanson. I am a videographer for Golkow
7  Litigation Services.
8  Today's date is June 4th, 2019, and the
9  time is 10:22 a.m.
10  This video deposition is being held in
11  Madison, Wisconsin in the matter of the National
12  Prescription Opiate Litigation MDL No. 2804, pending
13  in the US District Court, Northern District of Ohio,
14  Eastern Division.
15  Are the -- the deponent is Michael Miller.
16  Will counsel please identify yourselves
17  for the record.
18  MS. DICKINSON: Erin Dickinson and Don Arbitblit
19  for the Plaintiffs.
20  MS. HIBBERT: Kelly Hibbert from Reed Smith on
21  behalf -- half of AmerisourceBergen Drug Corporation.
22  THE VIDEOGRAPHER: Counsel on the phone, if you
23  could announce yourselves for the record.
24  MR. Snyder: This is Ryan Snyder from O'Melveny

Page 7

1  & Myers on behalf of Johnson & Johnson and Janssen.
2  MS. HADAGHIAN: This is Negin Hadaghian from
3  Dechert LLP on behalf of the Purdue Defendants.
4  MS. NOWAK: This is Darlene Nowak from Marcus &
5  Shapira on behalf of HBC Services.
6  THE VIDEOGRAPHER: Thank you.
7  Our court reporter is Juliana Zajicek.
8  Will you please swear in the witness.
9  (WHEREUPON, the witness was duly
10  sworn.)
11  MICHAEL M. MILLER, M.D.,
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14  EXAMINATION
15  BY MS. DICKINSON:
16  Q. Good morning, Dr. Miller. Could you state
17  your full name for the record, please?
18  A. Yes. Michael M. Miller, M.D.
19  Q. Okay. Dr. Miller, we have just met a few
20  minutes ago, correct?
21  A. Yes.
22  Q. I -- can you state for the record whether
23  you've ever been known by any other name other than
24  Michael M. Miller?

Page 8

1  A. I have not.
2  Q. Okay. Can you confirm your home address
3  for me, please?
4  MS. HIBBERT: Objection. That's calling for
5  private information.
6  Does Dr. Miller list his address, his
7  professional address, on his CV? I'm sure he does.
8  Is that not sufficient, Counsel?
9  MS. DICKINSON: It just is an easier way of
10  getting to the question. I'm -- I'm unaware of ever
11  having this be an issue.
12  BY MS. DICKINSON:
13  Q. What's your home address?
14  MS. HIBBERT: How about a professional address?
15  That should be sufficient.
16  MS. DICKINSON: Are you really instructing him
17  not to answer the question of where he lives?
18  MS. HIBBERT: Yes. A professional address
19  should be sufficient.
20  MS. DICKINSON: Okay. Well, we'll have to deal
21  with that issue, too, as well, apparently.
22  BY MS. DICKINSON:
23  Q. What city do you live in, Dr. Miller?
24  A. Madison.

Page 9

1  Q. Okay. How long have you lived in Madison?
2  A. 30 years.
3  Q. Okay. Have you lived anywhere else in the
4  last 30 years?
5  A. No.
6  Q. Okay. And what is your business address
7  currently?
8  A. It depends on which business you speak of.
9  So I have a -- a private practice that's located at
10  6333 Odana Road, Suite 3, Madison 53719.
11  Q. Okay. And do you have any other business
12  addresses currently other than the Odana Road address?
13  A. I use as my business address the address
14  of my LLC, which is 22 Settler Hill Circle in Madison
15  53717.
16  Q. And which LLC is that that uses that
17  address?
18  A. It is entitled Michael M. Miller, M.D.,
19  Consulting LLC.
20  Q. Okay. Are you still practicing medicine
21  today?
22  A. I do.
23  Q. And where do you practice medicine?
24  A. I practice in three locations.

Page 10

1    Q.   Okay.  What are those?
2    A.   I have a halftime teaching position at the
3  University of Wisconsin.  So I teach addiction
4  medicine fellows and see patients with them.  And we
5  also work at Access Community Health Center one
6  afternoon a week seeing outpatients.  I have a 12-hour
7  week position with Rock County Department of Human
8  Services in their therapeutic court services area.  So
9  that's a drug court and an OWI court, and that is at
10  303 West Court Street in Janesville, Wisconsin.  So,
11  again, that's 12 hours a week.
12       My private practice is a practice of not
13  more than ten patients.  Right now I think I have a
14  census of seven.  They are all licensed professionals.
15  I think I have one attorney out of that bunch, but the
16  rest are physicians, nurses, pharmacists, dentists,
17  therapists, psychologists who have addiction issues
18  and are being monitored.  And so that's the Odana Road
19  address.
20       Those are the three locations where I see
21  patients.
22    Q.   Okay.  When you said halftime position at
23  UW, how many hours a week do you spend teaching at UW?
24    A.   20.

Page 11

1    Q.   Dr. Miller, how many years have you worked
2  in the area of addiction medicine?
3    A.   I generally date it to the beginning of my
4  fellowship because I worked in addiction in the -- in
5  my fellowship, but I've been in practice, done with
6  training since 1983.
7    Q.   Okay.  Ooh, math is not my strong point.
8  How many years is that?
9    A.   That's 36.
10    Q.   Have you alls -- also worked in the field
11  of public health?
12    A.   I am not a public health professional, but
13  I have worked in that area.  I could describe.
14    Q.   Okay.  Can you just briefly describe your
15  work in the area of public health?
16    A.   Right.  Well, currently I am the
17  chair-elect and as of next week will be the chair of
18  the American Medical Association Council on Science
19  and Public Health where we assist the AMA to develop
20  policy on public health.  In Wisconsin I was a
21  volunteer consultant to the Division of Public Health
22  in its development of the 20 -- or I'm sorry -- the
23  2000 and 2010 state health plans.
24       Excuse me.  I've got a cord that's around

Page 12

1  my foot and it is very uncomfortable.  So let me try
2  to undo.
3    Q.   Of course.
4    A.   There we go.  So -- pardon me.
5       So -- and actually, I coined the term, our
6  state health plan is called "Healthiest
7  Wisconsin 2000" and "Healthiest Wisconsin 2010."  And
8  so I -- the CV would have the actual titles.  I worked
9  on the addiction committee or subcommittee or
10  something like that with one addition, and I was on
11  the steering committee for the overall health plan, I
12  think for the second one, which was the 2010 health
13  plan.  So these were volunteer things that I did.
14    Q.   Okay.  I thought I saw in your CV, have
15  you also taught at the School of Public Health at UW?
16    A.   The -- the sch -- the medical school
17  changed its name to the School of Medicine and Public
18  Health.  So it's the medical school and the public
19  health school all blended into one.  They now
20  encourage students to spend five years and get an MPH
21  while they get their M.D.s, but there is -- there is
22  not a separate public health school in Madison.
23    Q.   In your halftime position teaching at UW,
24  do you teach the MPH students as well as the medical

Page 13

1  students?
2    A.   Actually, the preventive medicine
3  residency involves physicians who get an MPH during
4  their two-year preventive medicine residency placement
5  here, and I'm teaching one of their students now.
6    Q.   Okay.  Have you in the course of your
7  experience sat on any opioid task forces?
8    A.   Yes.
9    Q.   Okay.  Which ones?
10    A.   One for the Wisconsin Medical Society,
11  which I think is called Opioid Task Force, one for
12  Dane County, and that particular task force has
13  several subgroups and one is a health professionals
14  group and that's the one I sit on, which is
15  extraordinarily interesting, and I'm currently
16  co-chair of that group.  And the staff for that group
17  is a wonderful organization called Safe Communities of
18  Madison and Dane County.  We have a merged city/county
19  health department.  So I -- I don't know how that task
20  force brands itself as a county/city or city/county.
21    Q.   Okay.  And is -- is it fair to say that
22  all of those task forces were formed to address the
23  opioid epidemic?  Is that a fair characterization of
24  the purpose of those task forces?

Page 14

1    MS. HIBBERT: Objection to form.
2    BY THE WITNESS:
3       A.   The -- I would not respond in that way. I
4    would say that the Wisconsin Medical Society task
5    force was developed to assist practicing physicians in
6    improving their practice with regard to opioid
7    prescribing. And the changes in opioid prescribing
8    and the adverse effects of prescribing were part of
9    the impetus to create that.
10       The Dane County task force came out of an
11   initiative concerned about overdose deaths in our
12   county, yes, ma'am.
13   BY MS. DICKINSON:
14       Q.   Dr. Miller, is there an opioid epidemic in
15   the United States today?
16       MS. HIBBERT: Objection to form.
17   BY THE WITNESS:
18       A.   People use that term, but I say there are
19   several.
20   BY MS. DICKINSON:
21       Q.   Okay. Is there one today?
22       MS. HIBBERT: Objection to form, asked and
23   answered.
24   BY THE WITNESS:

Page 15

1       A.   An epidemic related to opioids, yes,
2    definitely.
3    BY MS. DICKINSON:
4       Q.   Is there an opioid epidemic in Wisconsin
5    today?
6       MS. HIBBERT: Objection to form.
7    BY THE WITNESS:
8       A.   There certainly is an epidemic of overdose
9    deaths in Wisconsin today.
10   BY MS. DICKINSON:
11       Q.   Dr. Miller, you understand that you are
12   here giving testimony in the multidistrict litigation.
13   It's called the In Re Prescription Opioid Litigation,
14   is that right?
15       A.   Yes, ma'am.
16       Q.   Okay. You understand that I represent
17   some of the communities' plaintiffs in that
18   litigation.
19       Is that your understanding?
20       MS. HIBBERT: Objection to form.
21   BY THE WITNESS:
22       A.   I'm -- you are -- you are informing me of
23   such, I'll accept that.
24   BY MS. DICKINSON:

Page 16

1       Q.   Okay. And you and I have obviously not
2    met before today, is that right?
3       A.   That's right.
4       Q.   Okay. And you are here today offering
5    testimony on behor -- behalf of AmerisourceBergen Drug
6    Corporation, is that right?
7       A.   I didn't know the word "drug" was in the
8    title until I just heard it this morning.
9       Q.   Okay. You have -- you are here giving
10   testimony on behalf of the company that is referred to
11   as AmerisourceBergen, is that fair?
12       A.   That's very fair.
13       Q.   Okay. Who is AmerisourceBergen Drug
14   Corporation?
15       MS. HIBBERT: Objection to form, calls for
16   speculation.
17   BY THE WITNESS:
18       A.   Yeah...
19   BY MS. DICKINSON:
20       Q.   What's your understanding of what the
21   company is that you are providing testimony on behalf
22   of?
23       A.   I have not looked at their SEC filings or
24   their website to know what all they are, but one of

Page 17

1    the things they do is they serve as one of the major
2    distributors of pharmaceuticals to retail pharmacies
3    and hospitals in the United States.
4       Q.   And are they one of the major distributors
5    of prescription opioids?
6       A.   I haven't --
7       MS. HIBBERT: Objection to form, calls for
8    speculation.
9    BY THE WITNESS:
10       A.   Yes, I have no idea. I honestly have no
11   idea.
12   BY MS. DICKINSON:
13       Q.   You don't know?
14       A.   I don't know the -- I don't know their
15   market share for opioids. That was the form of your
16   question. I have no idea.
17       Q.   Okay. You mentioned in your report that
18   your opinions may be offered on behalf of certain
19   other distributor defendants in this consolidated
20   action.
21       Which ones?
22       A.   I don't recall, and that's a very honest
23   answer.
24       Q.   Have you been retained by any other

Page 18

1 company to provide expert witness testimony in this
2 matter?
3    A.   I will give the answer to the best of my
4 ability.  I believe that there is a joint defense
5 agreement.  I don't think I signed anything.
6    Q.   Are you aware --
7    A.   But I agreed -- I agreed to be a part of a
8 joint defense process because that was considered to
9 be something that several defendants wanted to do.
10    MS. HIBBERT:  And, Counsel, first I'll advise
11 the witness and instruct the witness not to disclose
12 any communications that have taken place with any of
13 the attorneys involved in this matter.
14    And, Counsel, for the record, I will
15 represent the specific defendants that have adopted
16 Dr. Miller's opinions set forth in his report are
17 disclosed in the certain disclosures submitted with
18 those defendants' expert reports.  And for the record,
19 I believe the distributor defendants referenced in
20 Dr. Miller's report are Cardinal and McKesson.
21 BY MS. DICKINSON:
22    Q.   Dr. Miller, were you aware before sitting
23 here today listening to what counsel just said on the
24 record that you were offering opinions regarding

Page 19

1 Cardinal and McKesson?
2    A.   Yes, I'm offering -- I'm offering opinions
3 on behalf of more than one distributor defendant in
4 this litigation.
5    Q.   Okay.  And are you aware that your -- your
6 report does not specifically refer to other
7 distributor defendants by name?
8    MS. HIBBERT:  Objection to form.
9 BY THE WITNESS:
10    A.   I don't believe my report lists them by
11 name.
12 BY MS. DICKINSON:
13    Q.   Okay.  Is it your understanding that
14 you've been retained by the AmerisourceBergen Drug
15 company to offer expert testimony in this case?
16    A.   Yes.
17    Q.   Okay.  Have you signed a retainer
18 agreement with any other defendant in the case?
19    MS. HIBBERT:  Objection to form.
20 BY THE WITNESS:
21    A.   Not that I recall.
22 BY MS. DICKINSON:
23    Q.   Let's do a little housekeeping first.
24    I'm going to hand you what's been marked

Page 20

1 as Exhibit 1 to your deposition.
2    Have you ever seen this document?
3    A.   A copy of it, yes.
4    Q.   Okay.  When did you first receive a copy
5 of Exhibit 1?
6    A.   Oh, let me think.  It's dated May 21, so
7 it's been within the last two weeks.
8    Q.   Okay.  You don't recall other than within
9 the last two weeks more specifically when you were
10 given a copy of Exhibit 1?
11    A.   No, ma'am.  I would say it was closer to
12 May 21 than -- than it is to today.
13    Q.   Okay.  And can you turn to the last
14 page of Exhibit 1, please.  The last page of Exhibit 1
15 has a title "Exhibit A."
16    Do you see that?
17    A.   Yes, ma'am.
18    Q.   Okay.  And Exhibit A requests that the
19 deponent bring a number of materials.  There are three
20 items listed there.
21    Do you see that?
22    A.   Yes, ma'am.
23    Q.   Did you review these items at the time you
24 received Exhibit 1?

Page 21

1    A.   Since then I have, yes.
2    Q.   Okay.  In Item 1 requests:  "All documents
3 or other materials you reviewed since the date of your
4 report that you did not specifically identify in your
5 report in preparation for your testimony today."
6    Are there items responsive to Question 1?
7    A.   Yes.
8    MS. HIBBERT:  Objection to form.
9    Give me a pause to put an objection on the
10 record before you answer, okay.
11    THE WITNESS:  Okay.
12 BY MS. DICKINSON:
13    Q.   And what are those items?
14    A.   There were several additional journal
15 articles and I did not bring the list with me and I
16 have seen the document that responded to this request
17 or demand.
18    Q.   I'm going to hand you what's been marked
19 as Plaintiffs' Exhibit 4 -- or Miller Exhibit 4.
20    Are -- is Miller Exhibit 4 a list of the
21 materials that you have reviewed since the time of
22 preparing your report?
23    A.   That were not specifically listed in my
24 report at the time, yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 22

1    Q.   Okay.  Item 2 on this list is an --
2    requests: "An itemization of hours spent, and
3    compensated pay" -- "compensation paid, or to be paid,
4    for your work in this matter and your staff's work in
5    this matter, including all invoices you have submitted
6    to counsel."
7         Do you see that?
8    A.   Yes, ma'am.
9    MS. HIBBERT:  Objection to form.
10   THE WITNESS:  Oh, I'm sorry.
11   BY MS. DICKINSON:
12   Q.   Did you bring an itemization of the hours
13   you've spent to date including all of your invoices
14   that you have submitted to counsel with you today?
15   MS. HIBBERT:  Objection, as previously discussed
16   off the record, but for the record we have submitted
17   our objections to this request including the format in
18   which these requests were made, being a Notice of
19   Deposition as opposed to a Rule 45 subpoena.  The
20   issue is under consideration by the Special Master.
21   There has been recent correspondence, as recent as
22   Sunday on this, if not Monday morning, and we are
23   still awaiting guidance from Special Master Cohen as
24   to the specifics as to what indeed needs to be

Page 23

1    produced.  And as I specified in my e-mail to counsel
2    last night, Mr. -- sorry -- Dr. Miller is prepared to
3    testify here today about the number of hours spent and
4    invoiced in this matter.  And -- and the amount of
5    monies invoiced in this matter as well.
6    MS. DICKINSON:  So for the record, nothing is
7    being produced with respect to Request No. 2,
8    including redacted invoices that would show the number
9    of hours spent and the total amount, is that correct,
10   Counsel?
11   MS. HIBBERT:  Nothing has been produced at this
12   time.
13   MS. DICKINSON:  Okay.
14   BY MS. DICKINSON:
15   Q.   Dr. Miller, do you keep an itemization of
16   yours hours and time spent in this case?
17   A.   I do.
18   Q.   Okay.  Do you submit it to counsel?
19   A.   I do.
20   Q.   Okay.  And is that in the form of a
21   monthly invoice?
22   MS. HIBBERT:  Objection to form.
23   BY THE WITNESS:
24   A.   It is.

Page 24

1    BY MS. DICKINSON:
2    Q.   Okay.  Do any of the detail in the
3    mount -- monthly invoices summarize actual
4    conversations or the substance of conversations
5    between you and counsel to your knowledge?
6    MS. HIBBERT:  Objection to form, calls for a
7    legal conclusion that Dr. Miller is not qualified to
8    provide.
9         But to the extent that you can answer with
10   that qualification, Dr. Miller, please do.
11   BY THE WITNESS:
12   A.   I'm going to read her question, if I may.
13   BY MS. DICKINSON:
14   Q.   I'll just ask it maybe a little more
15   simply, Dr. Miller.
16        Do any of the detail in your invoices
17   summarize the actual substance of what you may have
18   discussed with counsel in this case?
19   MS. HIBBERT:  Objection to form.  Again, calls
20   for a legal conclusion.  Without those invoices in
21   front of him, I think it's pretty impossible for him
22   to say whether or not every single itemized narrative
23   description may include information pertaining to
24   conversations with counsel in this case.

Page 25

1         Dr. Miller, again, to the extent that you
2    can answer with that qualification and instruction,
3    please do.
4    MS. DICKINSON:  And I'm going to object --
5    object to the speaking objections.  If you have an
6    objection to form, that's fine.  If you are going to
7    instruct him not to answer, that's fine.  But beyond
8    that, you are coaching the witness.
9    BY MS. DICKINSON:
10   Q.   So could you --
11   MS. HIBBERT:  If you're going to --
12   BY MS. DICKINSON:
13   Q.   -- answer to the best of your ability,
14   Dr. Miller?
15   MS. HIBBERT:  If you are going to delve into
16   privileged communications with Dr. Miller in this
17   case --
18   MS. DICKINSON:  I am actually not asking him
19   that.  I'm asking whether they do contain such
20   communications.
21   MS. HIBBERT:  You're asking him for a legal
22   conclusion which is improper.
23   BY MS. DICKINSON:
24   Q.   I am not asking you the substance of the

Page 26

1 conversation, okay? I'm asking whether your invoices
2 record substance of conversations or just something
3 else?
4     MS. HIBBERT: Objection to form, calls for a
5 legal conclusion.
6 BY THE WITNESS:
7     A. They do not have anything on the substance
8 of conversations.
9 BY MS. DICKINSON:
10    Q. Okay. And Item 3 is a copy -- requests a
11 copy of your most current and accurate curriculum
12 vitae. I am going to hand you what has been marked as
13 Exhibit 3.
14       Exhibit 3 is what was provided to us by
15 counsel as an updated version of your curriculum
16 vitae.
17       Does that look like an updated version of
18 your curriculum vitae?
19    MS. HIBBERT: Objection to form.
20 BY THE WITNESS:
21    A. It does, and if I may, it also lists two
22 talks I'm about to give that I haven't given yet.
23 BY MS. DICKINSON:
24    Q. Okay. We are going to cover that in just

Page 27

1 a moment. Let me do one more housekeeping matter
2 before we do.
3       I'm going to hand you what has been marked
4 as Miller 2.
5    A. Oh, yes.
6    Q. Can you reach? There you go.
7       Dr. Miller, I've handed you what has been
8 marked as Miller Exhibit 2. I'll represent to you
9 that that is the report that was provided to us by
10 counsel on May 10th.
11       Does that look correct to you?
12    MS. HIBBERT: Objection to form.
13 BY THE WITNESS:
14    A. It looks right to me.
15 BY MS. DICKINSON:
16    Q. Okay. It is dated May 10th on the front
17 cover, is that right?
18    A. It is.
19    Q. Okay. And Exhibit 2 has two appendices to
20 it, is that correct?
21    A. That is correct.
22    Q. Okay. And Appendix A that was attached to
23 what was produced to Plaintiffs on May 10th, 2019,
24 looks to be a copy of your curriculum vitae, is that

Page 28

1 fair?
2    A. Right. There was slight revisions. I
3 revise it a few times a month as things come along.
4 And the what -- and what -- and the exhibit you gave
5 me before is a more up-to-date version, but very
6 little difference than what's in the report.
7    Q. That was going to be my next question.
8       Is Exhibit A the updated version of the CV
9 that was produced on May 10th?
10    A. No, no, no.
11    Q. Exhibit 3?
12    A. Please restate your question.
13    Q. Is Exhibit -- what I handed you as
14 Exhibit 3, is that the updated version of your CV that
15 is included in Exhibit 2?
16    A. Yes.
17    Q. Okay. Tell -- could you tell me on
18 Exhibit 3 what was added, that might make the day
19 shorter, to -- if you know?
20    A. Oh, my goodness. I'm trying to recall any
21 updates since May 10 in areas other than additional
22 professional presentations, and I would say end dates
23 of certain committee involvements.
24    Q. Okay.

Page 29

1    A. I know that my -- I can speak to one
2 specific fact, if you really want to know. Meriter
3 Hospital is a hospital where I joined the medical
4 staff in 1989. I was on the active staff for
5 21-and-a-half years and served as a medical director
6 of their addiction services. I have remained on their
7 medical staff in different capacities since April
8 of 1989. And as of June 1 I relinquished my
9 consulting privileges and am now considered a member
10 of the honorary medical staff as a retiree. So this
11 is the year I'm transitioning into retirement. And
12 what that means is that I don't pay dues anymore for
13 the next -- for the next dues year.
14    Q. And is that change noted on your current
15 CV that -- which is marked as Exhibit 3?
16    A. Yes. If you were to painstakingly go
17 through and compare them line by line, you would see
18 that the one in Exhibit 2 says I am on the medical
19 staff and the one in Exhibit 3 says I switched to
20 honorary status as of three days ago.
21    Q. That was three days ago. That's what I'm
22 trying to avoid is to painstakingly walk through and
23 figure out what's new.
24       So if you can, can you identify anything

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 else that was added since May 10th to the best of your
2 ability on Exhibit 3?
3     A.   I -- I honestly can't recall.
4     Q.   Fair enough.
5          I think you testified, I just want to be
6 clear for the record, that you may have added a few
7 presentations to Exhibit 3 that are new since
8 May 10th, is that fair?
9     A.   Um-hum.
10     Q.   Okay.
11          Other than presentations as you are
12 sitting here today and the job that we just talked
13 about at Meriter, you can't recall any other additions
14 to Exhibit 3 that would have been additional since
15 May 10th?
16     A.   May I reference the documents?
17     Q.   Of course.
18     A.   Okay.  Oops.
19     THE WITNESS:  Thank you.
20     MS. HIBBERT:  You're welcome.
21 BY THE WITNESS:
22     A.   I looked at what I was looking for and
23 some of the updates were, in fact, done by May 10 and
24 so the newer one reflects nothing newer.

Page 31

1 BY MS. DICKINSON:
2     Q.   Okay.  Exhibit 3, is that your most
3 current curriculum vitae?
4     A.   It is.
5     Q.   Okay.  To the best of your ability, does
6 Exhibit 3 accurately summarize your work and
7 professional history?
8     MS. HIBBERT:  Objection to form.
9 BY THE WITNESS:
10     A.   Yes.
11 BY MS. DICKINSON:
12     Q.   Dr. Miller, I forgot to ask you this, but
13 have you ever been deposed before?
14     A.   I have.
15     Q.   Okay.  How many times?
16     A.   My memory on that is really not as good as
17 it should be.  I've reflected on this obviously in
18 preparation for today.  And I -- I think in terms of
19 court reporters and videos and things like that, and
20 there have been a number of times that I've been in
21 that scenario, but I don't know if those were all
22 depositions.  I'm trying to figure it out.
23     Q.   Okay.
24     A.   I know that I was deposed in a

Page 32

1 professional liability case and I -- I've been deposed
2 in other cases and the one thing that I can tell you
3 is that I think my professional life in general and
4 days like today in specific would have been better if
5 I had kept detailed records of every legal thing I
6 ever did since day one.  And I never actually kept a
7 tally or a spreadsheet -- or a flow sheet.  So I'm
8 relying on my memory.
9          I've been involved in legal cases, but I
10 don't have a recollection of being formally deposed
11 except that most recent one.  I believe I've been
12 deposed as a fact witness somewhere, but never as an
13 expert until today.
14     Q.   Okay.  You actually guessed one of my
15 questions.
16          Okay.  Doctor, you testified that you may
17 have been deposed in a professional liability case.
18 What case was that?
19     A.   I cannot give you the name, but I can tell
20 you something about it.
21     Q.   Okay.  Can you tell me something about it?
22     A.   Yes.  When I was working as medical
23 director of the Herrington, with an E, Recovery Center
24 at Rogers Memorial Hospital, now rebranded as Rogers

Page 33

1 Behavioral Health, there was a patient who died while
2 in residential treatment.  The estate filed an action
3 against various parties, including the hospital,
4 various employees, and at least two physicians, one of
5 whom was the attending physician and one of whom was
6 myself as the medical director.  We were originally
7 named in the litigation and in the middle of the
8 process -- or in the midst of the process I was
9 removed from the case.
10     Q.   Were you removed from the case through a
11 settlement?
12     A.   No.
13     Q.   How were you removed from the case?
14     A.   The plaintiffs decided to not pursue that
15 line of litigation.
16     Q.   Okay.  And you think you gave a
17 deposition, much like we are doing today in that case?
18     A.   Oh, I know I did.
19     Q.   Okay.  It sounds like it was not a
20 pleasant memory.
21     A.   No, I -- quite frankly, I am really
22 impressed by the whole process and the -- the way
23 attorneys are and the way it's done.  I mean, I used
24 to be a high school drama coach and I just -- I just

Page 34

1 think it's fascinating and -- and the preparation you
2 folks do. So, no, I -- it was -- I was cool with it.
3    Q.   That is much kinder than most people that
4 are sitting in your chair, so I do appreciate it.
5 That is not usually people's reaction to a deposition,
6 but okay.
7        Did you testify at the trial in that case
8 or a trial in that case?
9    A.   I did not.
10   Q.   Okay. What year was that case in?
11   A.   I believe it was 2016.
12   Q.   Did you treat the patient that was in that
13 case or were you just sued as -- in your capacity as
14 the medical director?
15   A.   That requires more specificity.
16   Q.   Were you a treating physician of the
17 patient who died?
18   A.   I was not his attending physician.
19   Q.   Okay. Had you treated him, though, at
20 all, as other than a non-attending?
21   A.   I had seen him as a consultant.
22   Q.   Okay. Do you know how many times you had
23 seen him as a consultant?
24   A.   Actually, I'd like to restate my answer.

Page 35

1 I saw him as -- as a covering physician. The day I
2 met the individual, the deceased, I had not done a
3 consult formally. That was the first to sit down with
4 the individual and his physician was out of the
5 building and I saw the individual hours before the
6 demise. And so because I had had a clinical
7 interaction and charted on it, I was -- I was in the
8 chart.
9    Q.   You are doing a really nice job. I
10 actually -- one other thing I forgot was to go through
11 some basic ground rules of a deposition. Since you've
12 given one, this is going to be fairly easy.
13       The court reporter is here taking down
14 everything we say. We can't talk over each other.
15 We'll do our best. Is that okay?
16   A.   Yes, ma'am.
17   Q.   You are doing a nice job of answering
18 verbally instead of "uh-huhs," "uhn-uhns," saying
19 "yes" or "no," but that is a way that this record can
20 be clean. So we'll try to do that. I'll try to
21 remind you if you don't, okay?
22   A.   That's fine.
23   Q.   All right. You understand that you are
24 under oath today, correct?

Page 36

1    A.   Yes, ma'am.
2    Q.   If at any time during the course of the
3 deposition you don't understand the question I'm
4 asking you, please ask me to rephrase, okay. I will
5 assume that if you are answering the question you've
6 understood the question I'm asking.
7        Okay?
8    A.   Yes, ma'am.
9    Q.   All right. Fair.
10       You are doing a very nice job of it so
11 far, so I'll give you a compliment. You gave lawyers
12 a compliment. I will give you a compliment.
13       You said a minute ago that you had never
14 given a deposition as an expert witness, is that
15 correct?
16   MS. HIBBERT: Objection to form.
17 BY THE WITNESS:
18   A.   I can't swear that I haven't, but I can't
19 recall a specific one.
20 BY MS. DICKINSON:
21   Q.   Okay. Have you ever served as an expert
22 witness before?
23   MS. HIBBERT: Objection to form to the extent
24 the question is asking for information about any

Page 37

1 expert retentions in cases in which Dr. Miller was not
2 disclosed as an expert.
3        If you can answer, Dr. Miller, go ahead.
4 BY MS. DICKINSON:
5    Q.   Dr. Miller, have you ever been hired as an
6 expert witness before?
7    MS. HIBBERT: Same objection.
8 BY THE WITNESS:
9    A.   That's --
10   MS. HIBBERT: I'll -- I'll instruct not to
11 answer as to any cases in which you were hired as an
12 expert witness and not disclosed, the specifics of
13 those, okay.
14 BY THE WITNESS:
15   A.   Ms. Dickinson, I believe I've just been
16 instructed by counsel not to answer.
17 BY MS. DICKINSON:
18   Q.   Okay. Dr. Miller, just so we are clear
19 and -- and the record is clear, I'm not asking you to
20 disclose which cases or for who. I'm just asking
21 whether you have been hired as an expert witness
22 before. So please don't answer beyond the question of
23 have you been hired as an expert witness before.
24       But have you been hired as an expert

Page 38

1 witness before?

2    A.  I will answer that by saying I've been

3 asked to provide expert witness services to law firms

4 in the past.

5    Q.  Okay. On how many occasions?

6    A.  Four for which I have a clear memory and I

7 would think a couple more.

8    Q.  Is it fair to say somewhere between four

9 and ten?

10    MS. HIBBERT: Objection to form.

11 BY THE WITNESS:

12    A.  I would say as an expert witness below ten

13 is the definite correct answer.

14 BY MS. DICKINSON:

15    Q.  When was the last time before this case

16 that you were hired as an expert witness?

17    A.  One of two cases, and I can speak to

18 either. I don't recall the sequence.

19    Q.  Okay. Those two cases, roughly when was

20 the last -- when was that time that you were hired as

21 an expert witness? I'm just trying to get a sense of

22 when the last time you served as an expert or were

23 hired as one before this case.

24    A.  I think those would both be in the

Page 39

1 vicinity of four to eight years ago.

2    Q.  Have you ever discussed serving as an

3 expert witness with a set of lawyers where you decided

4 not to serve as an expert?

5    MS. HIBBERT: Objection to form. Again, with

6 the qualification as to she is not asking about the

7 specifics of those conversations, just yes or no.

8 BY THE WITNESS:

9    A.  Yes.

10 BY MS. DICKINSON:

11    Q.  How many times?

12    A.  Less than six.

13    Q.  Okay. When was the last time that you

14 were asked to serve as an expert but declined to do

15 so?

16    MS. HIBBERT: Objection to form.

17 BY THE WITNESS:

18    A.  Within the last 60 days.

19 BY MS. DICKINSON:

20    Q.  And was that case about -- had -- did that

21 case have anything to do with opioids?

22    MS. HIBBERT: Objection to form. Again, not

23 asking for anything more specific than yes or no

24 there.

Page 40

1    And, Counsel, I'm not trying to coach the

2 witness in any way. If you want to say the same thing

3 in your question, that's fine, too.

4    A.  I --

5    MS. HIBBERT: Dr. Miller, just let me finish

6 real quick.

7    I'm not trying to coach the witness. I

8 just want to make sure that we are protecting any

9 confidential communications with any other attorneys,

10 okay.

11    Go ahead, Doctor.

12 BY THE WITNESS:

13    A.  I attest, I'm not being coached because

14 I've figured this out myself. Anything to do with

15 opioids, yes.

16 BY MS. DICKINSON:

17    Q.  And in that instance who approached you

18 about serving as an expert witness?

19    MS. HIBBERT: Objection to form.

20    I'll instruct you not to answer that

21 question. That's getting -- that's crossing the line

22 as to --

23    MS. DICKINSON: Counsel, unless it is someone he

24 has a current retainer agreement, I -- I don't

Page 41

1 understand how any of that is protected. We've asked

2 and been given testimony on this in every case. If --

3 prior to a retainer letter, there is no privilege. So

4 if you want to instruct him not to answer, we may have

5 to call the special master, but I'm asking for -- I

6 can ask it a different way. I can ask if he was

7 retained in the case. He just said he wasn't. So I'm

8 entitled to explore who approached him and why he

9 didn't do it.

10    MS. HIBBERT: I think you need to ask clarifying

11 questions, because I think Dr. Miller might be

12 confused. If he was never retained, then I'd say

13 that's a fair question. If he was retained to review

14 any records and offer any opinions but not

15 disclosed --

16    MS. DICKINSON: Fair.

17    MS. HIBBERT: -- that's not fair, okay.

18    MS. DICKINSON: Fair, but that's not what I was

19 asking. So we'll go at this --

20 BY MS. DICKINSON:

21    Q.  I want to make sure you totally understand

22 what I'm asking, okay, Dr. Miller?

23    A few minutes ago I asked whether you had

24 ever been asked to work as an expert witness and

Page 42

1  declined to do so.
2      Do you remember that?
3      A.   Yes, ma'am.
4      Q.   And that's what I'm asking about right
5  now.  I'm not asking about instances in which you
6  actually accepted and were retained to work as an
7  expert, okay?
8      A.   Correct.
9      Q.   And you said there was one in the last
10  60 days in which you were asked to work as an expert
11  but you declined?
12      A.   Correct.
13      Q.   Okay.  And so what was the substance of
14  that case?
15      MS. HIBBERT:  Objection to form.
16  BY THE WITNESS:
17      A.   That was a case that I would say doesn't
18  have anything to do with opioids, but your question
19  was so broad, were there any patients ever prescribed
20  opioids in all of those cases, yes.  And were there
21  drug tests that looked for opioids in those cases,
22  yes.
23      But in the -- in that particular case
24  there were questions -- there -- there was the

Page 43

1  opportunity to provide expert testimony on behalf of a
2  company that has a 1-800 number phone bank to connect
3  people with treatment centers and has a company that
4  does urine drug tests.  And I was asked if I would be
5  willing to provide expert testimony with regard to
6  those aspects of a very complex litigation.  And I
7  said I'm -- I just don't have the time, I cannot do
8  it.
9  BY MS. DICKINSON:
10      Q.   Okay.  And who was that company?
11      A.   There were two separate firms that find
12  experts for law firms.  One was Thomson Reuters and
13  another is a company that is named in my CV, and if I
14  could look at it, I could find it for you.
15      Q.   Of course.
16      A.   It's called Vident Partners in York, Maine
17  on the bottom of Page 12 of Exhibit 3.
18      Q.   Is it fair to say that both Thomson
19  Reuters and Vident Partners contacted you about
20  serving as an expert witness?
21      MS. HIBBERT:  Objection to form.
22  BY THE WITNESS:
23      A.   They contacted me to say would you be
24  interested in providing expert witness services in our

Page 44

1  case.
2  BY MS. DICKINSON:
3      Q.   Okay.  And is that because you are listed
4  as an expert for Thomson Reuters or Vident Partners as
5  someone who may be interested in expert testimony?
6      MS. HIBBERT:  Objection to form.
7  BY THE WITNESS:
8      A.   I don't know if I've signed anything with
9  Vident, but one of the attorneys simply knows me from
10  a previous case.
11      Thomson Reuters, I believe I signed a --
12  an agreement saying, yeah, you can call me if you'd
13  like.
14  BY MS. DICKINSON:
15      Q.   Could you give me a list of the companies,
16  the expert finder companies that you are currently
17  working with?
18      A.   Those two.
19      Q.   Okay.
20      A.   Thomson Reuters Expert Witness Services is
21  initials TREWS, Vident Partners of York, Maine and
22  the -- the Gerson Lehrman Group, which goes by GLG.
23      Q.   Okay.  When did you first start working
24  with GLG?

Page 45

1      A.   My CV says July 2018 to the present and I
2  would say that's correct.
3      Q.   What is the nature of your relationship
4  with GLG?
5      MS. HIBBERT:  Objection to form.
6  BY THE WITNESS:
7      A.   It is interesting.  GLG sends blast
8  e-mails out to physicians and says, Would you like to
9  do this, and a lot of what they have is surveys where
10  you spend a half hour or an hour or whatever, and a
11  lot of it is market research for pharmaceutical
12  companies.  It looks like a lot of it is for venture
13  capital.  And they want to say, Do you have experience
14  in this domain and would you provide us some
15  information and blah, blah, blah.  And they cap their
16  rates at 250 an hour, and I'm not interested in a lot
17  of the things they have, but it's -- but when I was
18  expanding my consultation business, I said, Well, I'll
19  sign up with these people and see what happens.
20      I did not realize that within GLG they had
21  an expert witness finding.  So it can include that,
22  but most of it is just the survey stuff.  I believe
23  that's my answer to you.
24  BY MS. DICKINSON:

Page 46

1    Q.   And did there come a point in time when
2  you were expanding your consulting business that you
3  did sign up with several expert witness finders?
4    MS. HIBBERT: Objection to form.
5  BY THE WITNESS:
6    A.   The only one that I -- I'm trying to think
7  of how to answer that question, because I have had a
8  dialogue relationship with -- with TREWS for a while,
9  but I put in my CV May of '19 because that probably
10  means that I signed something, and I did not -- I
11  was -- I had a -- I had a dialogue relationship with
12  them before I signed anything.
13    With Vident they found me for another case
14  several years ago, and that's one of the ones I
15  mentioned to you. And if I signed something, it would
16  be very recent. So those actually predated. So the
17  form of your question was since I decided to expand my
18  consultation business have I signed up with firms, and
19  the only firm that I have a new relationship with
20  since I left full-time employment at Rogers is GLG.
21  BY MS. DICKINSON:
22    Q.   Okay. Well, let's talk about -- actually,
23  when -- when did you decide to expand your consulting
24  business?

Page 47

1    A.   In the summer of 2018.
2    Q.   I'm sorry. Did you say '18 or '19? I
3  didn't hear you.
4    A.   I said '18.
5    Q.   So last summer?
6    A.   Yes, ma'am.
7    Q.   Okay. And why last summer did you decide
8  to expand your consulting business?
9    A.   Again, I will give you several answers
10  today under the rubric of transitioning toward
11  retirement. So I was trying to set up things that I
12  could do after I'm not getting a paycheck.
13    Q.   And are you currently transitioning toward
14  retirement?
15    A.   You are watching it happen.
16    Q.   I wish, and I am jealous about that. No,
17  I'm just kidding. Okay.
18    When do you anticipate that you will be
19  fully retired or retired period?
20    MS. HIBBERT: Objection to form.
21  BY THE WITNESS:
22    A.   My salaried positions, the ones I
23  mentioned, the 12-hour job with Rock County is on
24  notice October 21.

Page 48

1  BY MS. DICKINSON:
2    Q.   Okay.
3    A.   And the UW position of -- of a 20-hour a
4  week on salary is on notice for November 29.
5    Q.   And are those both of 2019?
6    A.   Yes, ma'am.
7    Q.   Okay.
8    And as of October and November of 2019, do
9  you intend to fill that time with consulting work or
10  do you intend to retire?
11    A.   I intend to much more retire than fill it
12  with consulting work.
13    Q.   Okay. Is it fair to say, I think you said
14  that you were -- in the summer of 2018 you decided to
15  expand your consulting practice.
16    Since the summer of 2018, have you been
17  doing more consulting than you had prior to the summer
18  of 2018?
19    MS. HIBBERT: Objection to form.
20  BY THE WITNESS:
21    A.   Yes.
22  BY MS. DICKINSON:
23    Q.   Okay. And in looking at doing more
24  consulting, have you provided your name to these three

Page 49

1  groups we've talked about, GLG, Thomson Reuters and
2  Vident, as someone who may be willing to provide
3  expert testimony?
4    MS. HIBBERT: Objection to form.
5  BY THE WITNESS:
6    A.   Yeah, I would -- I don't know what
7  objection to form really means.
8    MS. HIBBERT: Don't worry.
9  BY THE WITNESS:
10    A.   But -- but -- but I would object to form
11  because I didn't -- I didn't send my name to anybody.
12  BY MS. DICKINSON:
13    Q.   I'm just trying to get a sense of
14  currently do those three companies have your name as
15  someone who is willing to provide expert testimony?
16    A.   I would think that's correct.
17    Q.   Okay. With GLG did you provide your name
18  to them or did they find you?
19    A.   All of these places found me.
20    Q.   Okay. When was your first contact with
21  GLG about doing expert witness work?
22    MS. HIBBERT: Objection to form.
23  BY THE WITNESS:
24    A.   That's a specific question.

Page 50

1    My first contact with GLG regarding doing
2 expert witness work was within the last couple of
3 months.
4 BY MS. DICKINSON:
5    Q.   Okay.  And who did you talk to at GLG
6 about doing that?
7    A.   There is a contact person.  Am I to name
8 them?
9    Q.   You can if you know it.
10    A.   Eleanor Hamilton.
11    Q.   Okay.  And do you know what your hourly
12 rate or compensation is for any work you may get hired
13 to do through GLG?
14    A.   Well, I listened to your English.  My rate
15 that I would be hired to do is a higher rate because I
16 changed my rates this year, and I'm working off of old
17 rates now.
18    Q.   Okay.  What is the hourly rate that if you
19 were hired through GLG you would be making?
20 ▮   ▮   ▮
21    Q.   Okay.  And with Thomson Reuters, what was
22 the first time you had contact with Thomson Reuters
23 about serving as a potential expert witness?
24    MS. HIBBERT:  Objection to form.

Page 51

1 BY THE WITNESS:
2    A.   I honestly believe that I had some contact
3 with them a while back, which is why I answered the
4 way I did earlier that it was not since I've decided
5 to expand my consult practice, which is the way you
6 phrased it, but a very specific case came up within
7 the last two months.
8 BY MS. DICKINSON:
9    Q.   Okay.  Did you end up being hired for that
10 very specific case that you are talking about in the
11 last few months?
12    A.   By Thomson Reuters?
13    Q.   Yes.
14    A.   No.
15    Q.   Okay.  Did you decline to be hired for
16 that very specific case?
17    A.   Now I've got to think.
18        Yes.
19    Q.   And what was the substance, generally, of
20 that case?
21    A.   I have testified to it previously, and it
22 is the one where I said I don't have time to do all of
23 that stuff.
24    Q.   Fair.  The one we talked about a few

Page 52

1 minutes ago with the -- the 1-800 number company,
2 correct?
3    A.   And the drug testing.
4    Q.   Okay.  Do you know if prior to the time
5 you signed a contract with Thomson Reuters whether
6 they had your name as someone they might contact about
7 expert witness testimony, do you know if they had your
8 name?
9    MS. HIBBERT:  Objection to form, calls for
10 speculation.
11 BY THE WITNESS:
12    A.   Exactly, I don't know.
13 BY MS. DICKINSON:
14    Q.   You don't know.
15        With respect to Vident Partners, when was
16 the first time you had contact with Vident Partners
17 about doing potential expert witness testimony?
18    A.   That was the one I mentioned the four to
19 eight-year window, and I really don't think it was
20 under that name at that point.  It was the same guy.
21 I don't know if the company has changed names.
22    Q.   I need to ask you one more question about
23 the Thomson Reuters relationship.
24        If you -- have you taken any case as an

Page 53

1 expert witness that was brought to you through the
2 Thomson Reuters relationship?
3    A.   I have not.
4    Q.   Okay.  And if you do choose to take such a
5 case, do you know what your hourly rate will be?
6 ▮   ▮   ▮
7    Q.   Okay.  Have you taken any case through a
8 relationship or with Vident Partners?
9    A.   I was involved with a case with, I think,
10 essentially the same entity.  I'm not sure if the name
11 is the same.
12    Q.   And remind me.  I'm sorry.  When was that?
13    A.   That was the four to eight years ago one.
14    Q.   Okay.  And did you serve as a disclosed
15 expert in that case or a consulting expert?
16    MS. HIBBERT:  Objection to form.
17 BY THE WITNESS:
18    A.   I was never disclosed.
19 BY MS. DICKINSON:
20    Q.   Okay.  Okay.  I am going to -- we marked,
21 I think you have in front of you as Exhibit 2, could
22 you pick that up.  Just find it in the shuffle of
23 papers in front of you.
24        Okay.  What is Exhibit 2?

Page 54

1    A.   My expert report in this case.
2    Q.   Okay.
3         Does Exhibit 2, your expert report in this
4  case, list all of the opinions you intend to offer in
5  this case?
6    MS. HIBBERT:  Objection to form.
7  BY THE WITNESS:
8    A.   Yes.
9  BY MS. DICKINSON:
10   Q.   Okay.  Do you have any plans to render any
11 additional opinions not listed here in Exhibit 2
12 before the trial?
13   MS. HIBBERT:  Objection to form.
14 BY THE WITNESS:
15   A.   I do not.
16 BY MS. DICKINSON:
17   Q.   Okay.
18   THE WITNESS:  Sorry.
19 BY MS. DICKINSON:
20   Q.   Does your report and all of the appendices
21 which are also contained in Exhibit 2 list all of the
22 bases for the opinions in this report?
23   MS. HIBBERT:  Objection to form.
24 BY THE WITNESS:

Page 55

1    A.   No.
2  BY MS. DICKINSON:
3    Q.   Okay.  What is not listed in the expert
4  report that formed the bases of your opinions?
5    A.   Years of practice, lots of reading of
6  things other than listed here, just my general
7  orientation as an experienced clinician in addiction
8  medicine and working in addiction policy.  So I did
9  not specify where every idea came from.  You said the
10 basis.
11   Q.   Well, Doctor, you understand that in -- if
12 you serve as an expert witness in litigation, you are
13 under an obligation to disclose the entire bases for
14 the opinions you are rendering in the case.
15        Do you understand that?
16   MS. HIBBERT:  Objection to form.
17 BY THE WITNESS:
18   A.   If I have a general thought about
19 something that has grown over decades of experience
20 and it's what I think and what I understand to be
21 true, that can form my opinion without my having to
22 reference any new specific article to put in a
23 bibliography.
24 BY MS. DICKINSON:

Page 56

1    Q.   Totally understood, and I think even in
2  the report you discussed your professional experience.
3         So taking your professional experience
4  aside, I'm just trying to understand as we sit here
5  today whether there is anything that you haven't
6  mentioned in your report that you relied upon in
7  forming the opinions that you -- that are contained in
8  this report?
9    A.   Yeah, I --
10   MS. HIBBERT:  Objection to form.
11 BY MS. DICKINSON:
12   Q.   Do you understand my question?
13   A.   I --
14   MS. HIBBERT:  Same objection.
15 BY THE WITNESS:
16   A.   I think we are getting there.  I think you
17 are asking is there something specific like a journal
18 article that I have not included, and I would say no.
19   Q.   Okay.  And if you could turn to Page 2 of
20 your report, please.  It is Page 2 at the bottom.
21   A.   Yes, ma'am.
22   Q.   The Paragraph 4 at the last sentence says:
23        "This expert report and Appendix B should
24         be read collectively as they are intended to set forth

Page 57

1  be read collectively as they are intended to set forth
2  my opinions regarding validity and material I relied
3  on in performing those opinions."
4         Do you see that?
5    A.   Yes.
6    Q.   So this report and the Appendix B, is that
7  an accurate statement that that was intended to set
8  forth both your opinions and the materials you relied
9  on?
10   MS. HIBBERT:  Objection to form.
11 BY THE WITNESS:
12   A.   Yes, ma'am.
13 BY MS. DICKINSON:
14   Q.   And I believe we marked, just to be fair
15 to you, I believe we've marked as Exhibit 4 some
16 additional materials that you've reviewed and
17 considered as of -- the date on this is June 3rd,
18 2019, is that right?
19   A.   Yes, ma'am.
20   Q.   And do those materials change -- the
21 review of those materials change the opinions in any
22 way that you have in Exhibit 2?
23   MS. HIBBERT:  Objection to form.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1   A.  No.
2   BY MS. DICKINSON:
3       Q.  Are there any corrections to Exhibit 2
4   that you're aware of that need to be made today?
5       A.  I have not discussed this with anyone, but
6   I think there are some secretarial issues with the
7   way -- with regard to the way some of the pages lined
8   up and some of the footnotes were cited.  So it could
9   be -- if there is an opportunity before trial, it
10  would be clearer if there could be some secretarial
11  amendments, but not anything on substance.
12      Q.  Okay.  Fair enough.
13          There may be some typos or some formatting
14  issues, but as you sit here today, do you believe
15  there is any substantive correction that needs to be
16  made to Exhibit 2 to accurately and fully state your
17  opinions in this case?
18      A.  I do not think so.
19      Q.  As -- as will happen throughout the day,
20  you are entitled breaks any time.  I think we've been
21  going over an hour, so let's take a quick break.  I
22  don't want to exhaust you, and so if you need a break
23  give me or your counsel a high sign and we'll take a
24  break.  We'll try not to do that more than every hour

Page 59

1   if that's okay, just to keep it moving, but why don't
2   we take five and come back just to keep it moving.  If
3   you need longer than that, you certainly are entitled
4   to it.
5       A.  Thank you so much, ma'am.
6       MS. DICKINSON:  Okay.  Back in just -- I'll be
7   back in five.  Whenever you are all ready, that would
8   be helpful if we could just keep moving.
9       THE VIDEOGRAPHER:  We are off the record at
10  11:20 a.m.
11          (WHEREUPON, a recess was had
12           from 11:20 to 11:31 a.m.)
13      THE VIDEOGRAPHER:  We are back on the record at
14  11:31 a.m.
15  BY MS. DICKINSON:
16      Q.  Dr. Miller, back on the record after a
17  short break.
18          When was the first time that you were
19  contacted about serving as an expert witness in this
20  case?
21      A.  Last summer.
22      Q.  Okay.  And by who?
23      A.  It may have been by Ms. Hibbert, but it
24  may have been by somebody else.  I -- I don't remember

Page 60

1   the very first call.
2       Q.  Do you remember if it was someone at the
3   Reed Smith firm?
4       A.  It wasn't a third party.
5       Q.  Was it an attorney?
6       A.  Probably.  That's speculating.
7       Q.  Okay.
8       A.  I don't remember.
9       Q.  Had you ever worked with anyone at the
10  Reed Smith firm before this case?
11      A.  No.
12      Q.  I assume that means you had not worked
13  with Ms. Hibbert before this case?
14      A.  Correct.
15      Q.  Okay.  What do you remember about the
16  first conversation about this case when you were
17  contacted?
18      A.  It was a phone call and they said we have
19  a litigation where we are wanting somebody to be an
20  expert to explain what addiction is.
21      Q.  Did that person let you know in that call
22  that they represented AmerisourceBergen?
23      MS. HIBBERT:  Objection to form.
24  BY THE WITNESS:

Page 61

1       A.  I don't believe that came up in the first
2   call.
3   BY MS. DICKINSON:
4       Q.  How long was the first call?
5       A.  I don't remember.
6       Q.  Less than an hour?
7       A.  Yes.
8       Q.  Less than 15 minutes?
9       MS. HIBBERT:  Objection to form.
10  BY THE WITNESS:
11      A.  Probably not.  Or may -- maybe.
12  BY MS. DICKINSON:
13      Q.  Okay.
14      A.  Maybe.
15      Q.  Prior to you being officially retained as
16  an expert in this case, did you have additional phone
17  calls or meetings to discuss the litigation?
18      MS. HIBBERT:  Objection to form.
19  BY THE WITNESS:
20      A.  My recollection is that before I was sent
21  any materials to sign there was more than one phone
22  call.
23  BY MS. DICKINSON:
24      Q.  Do you know when you signed a retainer to

Page 62

1 serve as an expert in this case?

2     A.   I -- I don't know exactly when, but what

3 you are getting at is some timeframes and I would say

4 this summer I think was when there was the first phone

5 call, but I traveled to their offices in July -- in

6 August for a face-to-face get acquainted meeting and

7 any signing would have been between the first phone

8 call and actually having a face-to-face meeting with

9 Ms. Hibbert and a -- another attorney from the firm.

10     Q.   Okay.  At some point in the summer

11 of 2018, you had a meeting at the Reed Smith law firm,

12 is that fair?

13     A.   Yes.  And as I sit here with you in

14 deposition, I could have gotten the first phone call

15 before the first day of summer.  It could have been in

16 late spring.

17     Q.   Okay.  And I'm just trying to find out

18 what -- how many contacts in between the time you were

19 first contacted and the time that you signed a

20 retainer letter with the Reed Smith law firm or with

21 Amerisource, how many contacts with there?

22     MS. HIBBERT:  Objection to form, lack of

23 foundation as well referencing the retainer letter as

24 opposed to a retention letter, just for clarification.

Page 63

1 BY MS. DICKINSON:

2     Q.   Actually, let's just start simple.

3         Do you have an agreement to work as an

4 expert in this case?

5     A.   Yes.

6     Q.   Okay.  What is that agreement called?

7     A.   Well, I don't know.  It's a legal term.

8     Q.   Is the agreement a retainer letter or a

9 retention letter, do you have any idea?

10     A.   Legal terms.  Not -- not my area.

11     Q.   You don't -- okay.

12     A.   The diff -- the difference between a

13 retainer and a retention, I -- you could give me some

14 medical terms, but those are legal terms I don't know

15 the meaning of.

16     Q.   Okay.  For purposes of our discussion, so

17 we know what we are talking about --

18     A.   Yeah.

19     Q.   -- when we refer to your agreement to work

20 in this case, can we call it your retainer agreement?

21     MS. HIBBERT:  Objection to form.

22 BY MS. DICKINSON:

23     Q.   Is that fair?

24     A.   I'll -- I'll go with that.

Page 64

1     Q.   Is there something that more accurately

2 summarizes what the agreement is?  I -- I -- I'm just

3 trying to refer to it as something so we both

4 understand what we are talking about when we talk

5 about the agreement to work in this case.

6         Is there something better?

7     A.   Very honestly, under oath, the word

8 "agreement" comes to mind.  Any adjective doesn't.

9     Q.   Okay.  Let's -- when we talk about this

10 for the purpose of the next few minutes, let's just

11 call it your agreement, okay?

12     A.   Thank you.

13     Q.   All right.  And you think you signed your

14 agreement in this case in the summer of -- August of

15 20 18?

16     A.   Before.

17     Q.   Okay.  Sometime over the summer --

18     MS. HIBBERT:  Objection to form.

19 BY MS. DICKINSON:

20     Q.   -- of 2018?

21     A.   That's my best recollection.

22     Q.   Is your agreement with AmerisourceBergen

23 or with the Reed Smith law firm?

24     A.   I believe it's with the firm.

Page 65

1     Q.   And before you signed your agreement,

2 which lawyers at the Reed Smith law firm did you have

3 conversations with?

4     MS. HIBBERT:  Objection to form.

5 BY THE WITNESS:

6     A.   I don't remember all of the names.

7 BY MS. DICKINSON:

8     Q.   Can you remember -- tell me the ones you

9 do remember.

10     A.   The only names I remember are Eric

11 Alexander, I think it is, and Ms. Hibbert, and that's

12 it.  I have not met with any other attorneys from that

13 firm or conversed with that I can recall.

14     Q.   Prior to signing your agreement, were you

15 given any documents to review?

16     MS. HIBBERT:  Objection to form.

17 BY THE WITNESS:

18     A.   I don't recall I got anything before I

19 signed an agreement.

20 BY MS. DICKINSON:

21     Q.   Okay.  Prior to your agreement to serve as

22 an expert for AmerisourceBergen, were you provided

23 with any information about the case?

24     MS. HIBBERT:  Objection to form.

Page 66

1 BY THE WITNESS:
2    A.   Yes.
3 BY MS. DICKINSON:
4    Q.   What information?
5    A.   That there was a case and that there were
6 plaintiffs and that there were distributor defendants
7 and that my expertise was going to be limited to
8 discussing what is addiction.
9    Q.   Is that the total of the information you
10 were provided before you signed your agreement?
11    MS. HIBBERT:  Objection to form.
12 BY THE WITNESS:
13    A.   I recall nothing else.
14 BY MS. DICKINSON:
15    Q.   And with that information, you executed an
16 agreement to serve as an expert for AmerisourceBergen,
17 is that right?
18    MS. HIBBERT:  Objection to form.
19 BY THE WITNESS:
20    A.   I did.
21 BY MS. DICKINSON:
22    Q.   And is your understanding of what your
23 opinion is limited to, does it fall within the subject
24 area of the what is addiction subject area?

Page 67

1    MS. HIBBERT:  Objection to form.
2 BY THE WITNESS:
3    A.   Yes, ma'am.
4 BY MS. DICKINSON:
5    Q.   Do you know if your retainer agreement is
6 just for this case, the National Prescription Opiate
7 Litigation that is MDL 2804 or is it a general
8 agreement to testify in other matters?
9    MS. HIBBERT:  Objection to form.
10 BY THE WITNESS:
11    A.   I can answer that, but if I may, I'd like
12 to correct my previous answer.
13 BY MS. DICKINSON:
14    Q.   Oh, sure.  Of course.
15    A.   When you said is it limited to what is
16 addiction, there are some related questions:  How does
17 addiction happen, who gets it, what are the factors
18 involved in the development of addiction.  I believe a
19 description of the condition and its pathogenesis is
20 what I am -- what I was and am being asked to opine
21 on.
22    Q.   Okay.  Prior to you signing the agreement,
23 did you have any discussions about what you would not
24 be willing to opine on?

Page 68

1    MS. HIBBERT:  Objection to form.
2 BY THE WITNESS:
3    A.   No.
4 BY MS. DICKINSON:
5    Q.   Is your agreement in this case, and this
6 is what I was asking you a few minutes ago --
7    A.   Oh, yes.
8    Q.   -- I'm going to get back to it.  But let
9 me ask the question just so the record is clear.
10          Is your agreement in this case to provide
11 testimony just in -- limited to MDL 2804, which is the
12 National Prescription Opiate Litigation or is it a
13 general retainer agreement with AmerisourceBergen to
14 provide testimony in an undefined set of cases?
15    MS. HIBBERT:  Objection to form.
16 BY THE WITNESS:
17    A.   I will answer the question to the best of
18 my ability.
19 BY MS. DICKINSON:
20    Q.   Okay.
21    A.   I believe that it's a retainer with the
22 firm.  They told me that their primary client is
23 AmerisourceBergen.  They later told me that there were
24 other distributor defendants who might want to use my

Page 69

1 expert opinion on their behalf.  It has also been
2 mentioned that there could be other litigations
3 besides the Ohio one.  And my understanding, which in
4 all honesty could be a misunderstanding, but based on
5 conversations, my understanding is that my expertise
6 is being provided to Reed Smith to assist them in
7 their representation of whoever might request their
8 services for whatever litigation might happen.  So I
9 think their primary relationship is with
10 AmerisourceBergen, as I understand it, and to the
11 extent that there could be other litigation regarding
12 AmerisourceBergen and the general topic of opioids in
13 other jurisdictions, I might be involved in those.
14    Q.   Okay.
15    A.   That's my -- that's the best I can say.
16    Q.   That was actually exactly my question.
17 That you understand -- do you understand that there
18 are thousands of cases filed into this multidistrict
19 litigation and AmerisourceBergen is a defendant in
20 those cases?
21    MS. HIBBERT:  Objection to form.
22          And I'll instruct the witness not to
23 disclose any conversations or communications that you
24 had with counsel about any other cases or this case.

Page 70

1  BY THE WITNESS:
2      A.   That's granted.  And -- and, in fact, I
3  was thinking in a whole different direction.
4          From the general media, news reports, and,
5  of course, I work in this area, I -- I read stuff, I'm
6  aware that there is a lot of stuff going on.  And --
7  and to the extent to which various manufacturers,
8  distributors and retail pharmacies might be involved
9  in these, I'm aware that there is a lot of active and
10  potential litigation in general, and that comes from
11  my -- you asked my knowledge, that comes from my
12  knowledge, not from discussions with Reed Smith.  I'm
13  just...
14      Q.   Were you disclosed as an expert in the
15  State of Oklahoma case, for example?
16      MS. HIBBERT:  Objection to form.
17  BY THE WITNESS:
18      A.   No.
19  BY MS. DICKINSON:
20      Q.   Have -- has anyone -- are you serving as
21  an expert in the City of Baltimore case?
22      MS. HIBBERT:  Objection to form.
23          Objection to form and instruction not to
24  answer to the extent that no expert witnesses have

Page 71

1  been dis -- disclosed in the City of Baltimore case.
2  So whether or not Dr. Miller or any other expert is
3  serving as an expert in that case is beyond the line
4  of --
5      MS. DICKINSON:  Well --
6      MS. HIBBERT:  -- what's appropriate for
7  Dr. Miller to respond to in this deposition.
8      MS. DICKINSON:  Act -- actually, he lists the
9  designation of experts in his CV --
10      MS. HIBBERT:  He lists the --
11      MS. DICKINSON:  -- or in his materials
12  considered list, so I -- I think it's been disclosed.
13      MS. HIBBERT:  He lists the designation of
14  Plaintiffs' experts.  There have been no defense
15  experts disclosed in that case.
16          If you want to -- if you want to phrase
17  the question of, Dr. Miller, have you been disclosed
18  as an expert witness in that case, that's a fair
19  question, but whether or not he is offering any
20  opinions in that case at this point prior to
21  disclosure of defense expert witnesses for that or any
22  other case is inappropriate and I'll instruct him not
23  to answer that question.
24  BY MS. DICKINSON:

Page 72

1      Q.   Have you been disclosed as an expert in
2  any other opioid-related litigation?
3      MS. HIBBERT:  Objection to form.
4  BY THE WITNESS:
5      A.   Not that I'm aware of.
6  BY MS. DICKINSON:
7      Q.   Okay.  Outside of your agreement to work
8  as an expert in this case, have you discussed working
9  as an expert but have not yet been retained with any
10  other law firm regarding opioid litigation?
11      MS. HIBBERT:  Objection to form.
12  BY THE WITNESS:
13      A.   No.
14  BY MS. DICKINSON:
15      Q.   Dr. Miller, can I ask you what I think is
16  an important question:  Why did you agree to defend
17  AmerisourceBergen in this case?
18      MS. HIBBERT:  Objection to form.
19  BY THE WITNESS:
20      A.   I agreed to provide an expert opinion to
21  the attorneys at Reed Smith and who their client was
22  doesn't really change that opinion.  It's just an
23  expert opinion.  Who the client was wasn't a central
24  consideration for me.

Page 73

1  BY MS. DICKINSON:
2      Q.   Do you understand that your expert opinion
3  is being offered on behalf of Defendant
4  AmerisourceBergen and the other distributor defendants
5  that we talked about?
6      A.   I do.
7      MS. HIBBERT:  Objection to form, asked and
8  answered.
9  BY MS. DICKINSON:
10      Q.   Did you understand that before you
11  rendered the opinion?
12      MS. HIBBERT:  Objection to form.
13  BY THE WITNESS:
14      A.   Yes.
15  BY MS. DICKINSON:
16      Q.   Okay.  And I guess I'm asking you if you
17  had that understanding, why did you agree to render an
18  opinion on behalf of AmerisourceBergen and some other
19  distributor defendants in the opioid litigation --
20      MS. HIBBERT:  Objection to form.
21  BY MS. DICKINSON:
22      Q.   -- that we are discussing today?
23      MS. HIBBERT:  Sorry.  Same objection.
24  BY THE WITNESS:

Page 74

1    A.  Because I believe in the American legal
2 system.
3 BY MS. DICKINSON:
4    Q.  What does that mean?
5    A.  There are different sides.  Everybody has
6 a right to have their side heard.
7    Q.  Did you look at any internal documents
8 from AmerisourceBergen in rendering your opinion?
9    A.  No.
10    Q.  Did you look at any of the conduct of any
11 AmerisourceBergen or any of the distributor defendants
12 in rendering your opinion?
13    MS. HIBBERT:  Objection to form.
14 BY THE WITNESS:
15    A.  I -- I did not.
16 BY MS. DICKINSON:
17    Q.  Did you ever ask to?
18    A.  No.  I read the Complaint.
19    Q.  That wasn't my question.  I was just --
20    A.  I know, but that -- that's -- as far as
21 the conduct of parties in this litigation, I know
22 nothing about the con -- I -- I have no specific
23 knowledge of the conduct of parties other than the
24 allegations of the Complaint.

Page 75

1    Q.  You don't know whether the allegations of
2 the Complaint are true or not, right, fair?
3    A.  I think that's why there is a trial.
4    Q.  Would it -- was it important to you to
5 know if whether the allegations in the Complaint are
6 true or not in deciding whether to testify on behalf
7 of AmerisourceBergen?
8    MS. HIBBERT:  Objection to form.
9 BY THE WITNESS:
10    A.  I -- in all due respect, I believe you are
11 not asking me my opinion.  I believe you are asking me
12 my personal motives.
13 BY MS. DICKINSON:
14    Q.  Which is the question.
15    A.  And is that a fair question?
16    Q.  Yes.
17    A.  Okay.
18    MS. HIBBERT:  Objection.  Same objection.  I'm
19 not really sure what question is pending right now,
20 so.
21 BY MS. DICKINSON:
22    Q.  I'll read it to you.
23    Was it important for you to know in
24 deciding whether to testify on behalf of

Page 76

1 AmerisourceBergen whether the allegations in the
2 Complaint were true or not?
3    MS. HIBBERT:  Objection to form.
4 BY THE WITNESS:
5    A.  Again, given my previous statement about
6 the American legal system, I wasn't asked to opine on
7 the allegations or the behaviors or anything.  I was
8 asked to opine on what is addiction, and that is
9 independent of whether even companies exist or are
10 incorporated.  And so I look at this as a matter of
11 being somebody who works in the field, has attained
12 certain status in the field, has certain expertise to
13 share and possibly said light -- shed light on a legal
14 process, and so I'm kind of neutral in this.
15 BY MS. DICKINSON:
16    Q.  Is the answer to my question then it was
17 not important to your opinion whether the allegations
18 in the Complaint are true or not, right?
19    MS. HIBBERT:  Objection to form, asked and
20 answered.
21 BY THE WITNESS:
22    A.  It was not an important consideration of
23 mine in my decision.  That's where you began.
24 BY MS. DICKINSON:

Page 77

1    Q.  Okay.  What is your compensation
2 arrangement in this case?
3    A.  Hourly rate for different services.
4    Q.  And what is that hourly rate?
5    A.  The hourly rate in this case for general
6 review of records and general consultation with
7 counsel, review of materials is 475 an hour, the rate
8 for deposition and preparation for deposition is 650
9 an hour, and the rate for trial is a half day and a
10 full day rate, and we haven't gotten there and you
11 have the exhibit somewhere, I believe, and I'm not
12 remembering.  It is in the letter of agreement.  There
13 is a $5,000 number, as I recall, and I don't remember
14 if that's a half day or a full day.
15    Q.  Okay.  Is -- I don't see it in your
16 report.
17    Is there a flat fee arrangement if you're
18 to give trial testimony of some kind for your work?
19    A.  It's a -- it's a -- it's a daily rate.
20    Q.  Okay.  And do you have any idea what that
21 daily rate is?  I don't see it in here.
22    A.  I would tend to think -- I would tend to
23 think it was a $5,000 rate is what was -- again, the
24 rates I'm working under, not my current rates for

Page 78

1 future work.
2     Q.   Have your current rates for future work
3 changed from the rates we just described in this case?
4     A.   Yes.
5     Q.   Okay. And how have they changed?
6     A.   Gone up.
7     Q.   To what?
8     A.   It was a significant change based on the
9 fact that I have been working off of rates that I set
10 in 2004. I never changed my rates. And in having a
11 conversation with a colleague who does a lot of this,
12 and we talked about other colleagues and her awareness
13 of what rates were, I realized that I had an
14 opportunity to revise my rates. And so I changed my
15 basic hourly rate from 475 to 675 and I changed the
16 trial rate in an equivalent percentage.
17     Q.   Okay. And who was the colleague you
18 discussed that with?
19     A.   Do I have to disclose that?
20     Q.   Yes.
21     A.   Andrea Barthwell.
22     Q.   And who is Andrea Barthwell?
23     A.   She is a former president of the American
24 Society of Addiction Medicine, like myself.

Page 79

1     Q.   Is she an addiction medicine specialist?
2     A.   She is.
3     Q.   Okay. And how do you know Dr. Barthwell?
4     A.   Well, we originally met when we were on
5 the faculty together of the first ASAM review
6 course --
7     Q.   Okay. Have -- have you done --
8     A.   -- back in the '80s.
9     Q.   Sorry. I spoke over you.
10     A.   That's quite all right.
11     Q.   Have you known each other ever since?
12     A.   Oh, yes.
13     Q.   Okay. Did anyone else in this case assist
14 with your work in preparing your opinions and your
15 report?
16     A.   No.
17     MS. HIBBERT: Objection to form.
18 BY MS. DICKINSON:
19     Q.   No staff time or anything like that?
20     A.   You are looking at staff.
21     Q.   Okay. How many hours have you spent
22 working on the case to date?
23     A.   Less than a hundred.
24     Q.   Okay. And when did you start billing

Page 80

1 hours in this case?
2     A.   My recollection is it was July.
3     Q.   July of 2018?
4     A.   Yes, ma'am.
5     Q.   Okay. Can you give me a sense of how the
6 less than a hundred hours you -- you've spent
7 developing the opinions in the case were spent over
8 the course of that year, and what -- what I mean by
9 that --
10     A.   Yes, ma'am.
11     Q.   -- is I just want a sense of if you have
12 spent 15 minutes in the last summer and a hundred
13 hours in the last two months, can you just give me a
14 general sense of how those hours were spent?
15     MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17     A.   I know that there were three or four
18 months where there was no activity in the middle. I
19 did a lot of reading at first because I read the
20 Complaint.
21 BY MS. DICKINSON:
22     Q.   Okay.
23     A.   Okay. Then, because I knew I would write
24 an expert report for the first time in my career, I

Page 81

1 was sent expert reports from totally unrelated cases
2 just to read to get a sense of what's the tone, what's
3 the depth, what's the duration, just a general frame
4 of reference of how to construct an expert report.
5     And before I began my position at the
6 university in October 1, I had time on my hands and I
7 began initial drafts of this report even back in
8 September. So I think September billing was a decent
9 number. And then things went pretty quiet. And then,
10 I don't know, three months ago things picked up again.
11 And May was probably my biggest month because I was
12 reading depositions of other experts and reading
13 them -- rereading journal articles, and so the last
14 two months have been pretty busy.
15     Q.   Okay. Let's break this up a little bit.
16     First, what expert reports from the sample
17 expert reports were you given?
18     MS. HIBBERT: Objection to form.
19 BY THE WITNESS:
20     A.   Could I reference my report?
21 BY MS. DICKINSON:
22     Q.   Yes. I don't see them anywhere in there.
23 That's what I'm asking.
24     A.   Oh, they weren't in there?

Page 82

1    Q.   I -- I don't see them.
2    A.   Oh.
3    Q.   If you can find them, great, but what
4  expert reports were you given is my question?
5        MS. HIBBERT:  I'll put an objection on the
6  record and instruct the witness not to answer.  These
7  aren't materials that are relied upon for Dr. Miller's
8  opinions.  They don't fall within any of the
9  exceptions to the communications disclosure under
10  Rule 26 and I'll thus instruct Dr. Miller not to
11  answer any questions pertaining to those
12  communications between counsel and himself.
13       MS. DICKINSON:  So, Counsel, for the record, you
14  are instructing the witness not to answer materials he
15  was given by counsel and considered in -- for -- in
16  drafting his opinion in this case, is that correct?
17       MS. HIBBERT:  You can ask him that question
18  whether he considered those reports in drafting his
19  opinions in this case.
20       MS. DICKINSON:  He just testified he did, so...
21       MS. HIBBERT:  He didn't.  That's a
22  mischaracterization.
23       MS. DICKINSON:  Are you instructing him not to
24  answer which reports he was given?

Page 83

1        MS. HIBBERT:  Yes.
2  BY MS. DICKINSON:
3    Q.   Okay.  Dr. Miller, you testified a minute
4  ago you were given some expert reports from other
5  cases, is that right?
6    A.   Yes, ma'am.
7    Q.   Did you read and review those?
8        MS. HIBBERT:  Objection to form.
9  BY THE WITNESS:
10   A.   I did.
11  BY MS. DICKINSON:
12   Q.   Okay.  Did you read and review those prior
13  to drafting your opinions in this case?
14       MS. HIBBERT:  Objection to form.
15  BY THE WITNESS:
16   A.   I did.
17  BY MS. DICKINSON:
18   Q.   Okay.  And what was the subject matter of
19  those expert reports?
20       MS. HIBBERT:  Objection to form.
21  BY THE WITNESS:
22   A.   I don't recall.
23  BY MS. DICKINSON:
24   Q.   Okay.  Would your billing detail show what

Page 84

1  the subject matter of those expert reports were?
2        MS. HIBBERT:  Objection to form.
3  BY THE WITNESS:
4    A.   Probably, yes.
5  BY MS. DICKINSON:
6    Q.   Okay.  Did you -- or who are the authors
7  of those expert reports?
8        MS. HIBBERT:  Objection to form.
9  BY THE WITNESS:
10   A.   I don't recall.
11  BY MS. DICKINSON:
12   Q.   Okay.  Would your billing detail show
13  that?
14       MS. HIBBERT:  Objection to form.
15  BY THE WITNESS:
16   A.   Probably.
17  BY MS. DICKINSON:
18   Q.   All right.  And, Dr. Miller, can -- can
19  you give me your best -- do you recall what date you
20  started working on this report?
21   A.   That's a matter of interpretation.  I
22  began working on the case and all of the work has
23  contributed to the report in some way, but actually
24  began drafting the report is a different question.

Page 85

1    Q.   Okay.  Fair enough.
2        Do you recall what date you started
3  working on the case?
4    A.   No, but it was right when we signed the
5  agreement and I would say that's when I began work.
6    Q.   Okay.  Would your invoices show what date
7  you started billing on the case?
8        MS. HIBBERT:  Objection to form.
9  BY THE WITNESS:
10   A.   They would.
11       MS. DICKINSON:  And for the record, we don't
12  have your invoices here today, do we?
13       MS. HIBBERT:  Objection to form, calls for
14  speculation.
15  BY THE WITNESS:
16   A.   I don't have them.
17  BY MS. DICKINSON:
18   Q.   Okay.  Do you have an idea what month you
19  started working on the case?
20   A.   Again, I believe it was in July.
21   Q.   July of 2018?
22   A.   Yes, ma'am.
23   Q.   Okay.  How many hours did you spend in
24  July of 2018 when you first started working on the

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 case?

2     A.  Less than 15.

3     Q.  And what did you do in those less than

4 15 hours in July of 2018?

5     A.  Madam, I'm going to be very careful in

6 answering these questions because I'm having to guess

7 at things that I really don't have specific memories

8 of.  You are asking me to break things down by month

9 and specific things.  I didn't review any of that and

10 I didn't try to refresh my memory and didn't reference

11 anything in preparation for today's deposition.  I can

12 tell you some things I've already testified to.  They

13 called me, we spoke, they said, What are your rates.

14 I pulled up my rate sheet which was my 2004 rate

15 sheet.  We spoke.  They said, Are you interested?  I

16 said, Sure.  They sent me a letter of agreement which

17 says, We are agreeing to do this and there is a

18 paragraph on rates and I don't even remember if it

19 specified what all I -- what all I was to do.  I don't

20 know if it, like, said, You will be asked to report,

21 you will be asked to appear at trial.  I don't

22 remember if it said all of that stuff.  It was

23 basically an agreement, okay?  So I signed it.  And

24 then they began shipping me stuff, like the Complaint,

Page 87

1 it's a long Complaint, okay.  Then they asked me to

2 start doing some research, and I began using my

3 librarian at Meriter Hospital to find articles and I

4 began reading that stuff.  And then, again, as I've

5 said in different ways, I didn't know what to do with

6 it.

7        The other reports were sent -- not -- like

8 I said, I don't remember what they were on or who the

9 authors were.  It was only formatting, it was the

10 concept -- the -- the -- it was the process of how one

11 does a report.  It didn't form my opinion.  It just

12 formed how I would package all of my knowledge and

13 expertise that's in my CV and the articles I read into

14 a report.  And then I began drafting in September.

15 That's what I can testify to the best of my ability.

16     Q.  Okay.  Doctor, you realize I'm just trying

17 to get a sense of what you did, what your methodology

18 was and how many hours you spent doing certain things

19 to get to the endpoint, okay?

20     A.  Okay.

21     Q.  That's the purpose of what -- these

22 questions that I'm about to ask you.

23        If you had your invoices in front of you,

24 could you tell me how many hours you spent reviewing

Page 88

1 materials in July of 2018?

2     MS. HIBBERT:  Objection to form.

3 BY THE WITNESS:

4     A.  If I had them in front of me, it would

5 specify what I did.

6 BY MS. DICKINSON:

7     Q.  Okay.  If you had your invoices in front

8 of you, could you tell me what you did in August

9 of 2018 before you started writing your report?

10     MS. HIBBERT:  Objection to form.

11 BY THE WITNESS:

12     A.  I would -- I would certainly think so.

13 BY MS. DICKINSON:

14     Q.  Okay.  If you had both of those two

15 invoices, could you tell me how many hours you spent

16 prior to the writing where you started writing the

17 report?

18     MS. HIBBERT:  Objection to form.

19 BY THE WITNESS:

20     A.  I would think so, yes.

21 BY MS. DICKINSON:

22     Q.  Okay.  Do you have any idea sitting here

23 today how many hours you spent both reviewing the

24 materials that were shipped to you, doing research or

Page 89

1 anything else before you started drafting in

2 September?

3     MS. HIBBERT:  Objection to form.

4 BY THE WITNESS:

5     A.  I hope my answer is correct.  30.

6 BY MS. DICKINSON:

7     Q.  Are you guessing?

8     A.  Yeah.

9     Q.  Okay.  Do you have any idea how long you

10 spent reviewing the Complaint?

11     A.  Yes, I have an idea.  I would say it was

12 two or three hours.

13     Q.  Okay.  Would your invoices show exactly

14 how long it actually was?

15     MS. HIBBERT:  Objection to form.

16 BY THE WITNESS:

17     A.  I think that level of detail would appear.

18 BY MS. DICKINSON:

19     Q.  Okay.  Do you have any idea -- you said

20 you were shipped a number of materials after you

21 started work and before you started drafting.

22        Where do I find -- how long did you spend

23 reviewing those materials?

24     MS. HIBBERT:  Objection to form.

Page 90

1  BY MS. DICKINSON:

2  Q.  Before you started drafting?

3  MS. HIBBERT:  Same objection.

4  BY THE WITNESS:

5  A.  Ten hours maybe.

6  BY MS. DICKINSON:

7  Q.  Is that a guess?

8  A.  Absolutely.  These are all going to be

9  guesses.

10  Q.  Okay.  You said you were asked to do some

11  research?

12  A.  Or estimates.

13  Q.  You said you were asked to do some

14  research.  Is -- prior to the drafting of your report,

15  did you conduct research?

16  A.  Yes, ma'am.

17  Q.  Okay.  What did you do to conduct

18  research?

19  A.  I read -- well, I had my own articles from

20  my own literature files that I keep and then I would

21  look in the bibliography and find other articles I

22  thought would be a deeper dive, provide more relevant

23  information.  I did some searches to find some

24  articles.  I asked the librarian at Meriter Hospital,

Page 91

1  Robert Koehler, K-o-e-h-l-e-r, to find things on

2  different topics for me.  He is wonderful.  And so I

3  had articles that I found on my own and that was part

4  of what I used.

5  Q.  Okay.  How many hours did you spend doing

6  that research up until the time you started drafting?

7  MS. HIBBERT:  Objection to form.

8  BY THE WITNESS:

9  A.  Again, I'm -- I'm thinking that seeking,

10  finding, reading, and taking notes on articles and

11  such was probably 30 hours.

12  BY MS. DICKINSON:

13  Q.  Is that also a guess?

14  MS. HIBBERT:  Objection to form.

15  BY THE WITNESS:

16  A.  Correct, ma'am.

17  BY MS. DICKINSON:

18  Q.  Okay.  Are all of the materials that you

19  pulled in researching before you started drafting, are

20  they all listed in the Appendix of Materials

21  Considered to Exhibit 2, your report?

22  MS. HIBBERT:  Objection to form.

23  BY THE WITNESS:

24  A.  Well, I read so much and -- and what's in

Page 92

1  the report is things relative to my opinions that

2  substantiate my opinions.  I could have read something

3  and decided, eh, that's not relevant and so it's not

4  included.

5  BY MS. DICKINSON:

6  Q.  I'm not asking what you thought was

7  relevant to your opinions.  I'm asking about materials

8  you reviewed or considered, okay.  And so in doing the

9  research prior to the writing of the report, are there

10  articles that you reviewed or considered that do not

11  appear in Appendix B of the Materials Considered?

12  MS. HIBBERT:  Objection to form.

13  BY THE WITNESS:

14  A.  I'm under oath and I'm going to answer

15  this as best I can.

16  Practicing addiction medicine is what I

17  do.  Delving into the topic of what is addiction is

18  something I really spend time on.  I'm always reading,

19  whether there is a lawsuit or not and whether I'm

20  involved in it or not, I'm always reading on the

21  topic.  I'm always finding new articles.  I am always

22  a student of the field in which I work.  And in all

23  due respect, I think I'm sitting in this room because

24  I am an expert on this area of what is addiction.

Page 93

1  Are there articles I have read in my life

2  that I have not cited here, sure.  They are what I've

3  done as part of my career, not as an expert witness,

4  to understand the disease I treat and the patients

5  that I take care of.  And so that when I give talks,

6  they are based on fact as much as possible and not on

7  speculation on my part.

8  Is there a whole library of literature

9  from my 30-year career that has contributed to my

10  thinking on this matter that I didn't go back and

11  reread specifically for this case, if there was

12  something I read for this case, you know about it and

13  it's public record in this document.  There is nothing

14  I've hidden, nothing else, but I can't say that there

15  is -- there aren't other articles I've ever read that

16  helped shape my understanding of what addiction is and

17  how people get it.

18  So I believe I've done a very good faith

19  and accurate representation to meet the legal

20  requirements of citing so that both sides have access

21  to it, but your questions have been sort of broad and

22  I -- I -- and I can't -- I can't -- I -- I can't rule

23  out that there is some article somewhere that somebody

24  wrote or some lecture I went to that helped shape my

Page 94

1 opinions that I -- I -- that I'm able to cite. I -- I
2 can't cite every single thing I've read in the last
3 30 years and I'm sorry.
4    MS. DICKINSON: Objection; nonresponsive.
5 BY MS. DICKINSON:
6    Q.  Doctor, my question was actually very,
7 very different. And I hope you understand I'm not
8 actually trying to ask you broad questions or trying
9 to be tricky. All I'm trying to understand is what
10 you did.
11        So my question was, you said you did
12 research. And I asked you, is -- are all of the
13 articles you pulled in the course of that research,
14 are they listed in Exhibit -- or Appendix B to
15 Exhibit 2? Simple question.
16    MS. HIBBERT: Objection to form, asked and
17 answered.
18 BY THE WITNESS:
19    A.  I'm going to answer no so that you can ask
20 a follow-up.
21 BY MS. DICKINSON:
22    Q.  Okay. Where would I find the -- a list of
23 the articles that don't appear in Exhibit B?
24    MS. HIBBERT: Objection to form.

Page 95

1 BY THE WITNESS:
2    A.  Okay.
3 BY MS. DICKINSON:
4    Q.  Or Appendix B, I'm sorry, Exhibit 2.
5    MS. HIBBERT: Same ob -- same objection.
6 BY THE WITNESS:
7    A.  Yeah, within discussions between the law
8 firm that has retained me and me, the expert, there
9 have been other articles that I've read that I thought
10 didn't pertain and so aren't listed.
11 BY MS. DICKINSON:
12    Q.  Is there anywhere that I can find the
13 articles that you read that you did not list here?
14    MS. HIBBERT: Objection to form, asked and
15 answered.
16 BY THE WITNESS:
17    A.  Yes.
18 BY MS. DICKINSON:
19    Q.  Where?
20    A.  At my house.
21    Q.  Do you have a file on this case that those
22 articles would exist in?
23    MS. HIBBERT: Objection to form.
24 BY THE WITNESS:

Page 96

1    A.  I do.
2 BY MS. DICKINSON:
3    Q.  Is it a hard copy file or an electronic
4 file?
5    A.  Hard copy.
6    MS. HIBBERT: Objection to form.
7        Give me a pause, please, Dr. Miller.
8    THE WITNESS: Yes, ma'am.
9 BY MS. DICKINSON:
10    Q.  So there are articles in that hard copy
11 that we were just talking about that you may have
12 read, but didn't feel that were relevant but they
13 are -- exist in that hard copy?
14    MS. HIBBERT: Objection.
15 BY MS. DICKINSON:
16    Q.  Is that a fair statement?
17    MS. HIBBERT: Same objection.
18 BY THE WITNESS:
19    A.  That is a fair statement.
20 BY MS. DICKINSON:
21    Q.  Okay.
22        And were you asked by counsel when
23 preparing Appendix B to Exhibit 2 to list all of the
24 materials that you had read?

Page 97

1    MS. HIBBERT: I'll object to that question and
2 instruct the witness not to answer any communications
3 with counsel outside of the boundaries of Rule 26 for
4 which that question does not fall.
5 BY MS. DICKINSON:
6    Q.  Do you know why there were materials that
7 you read that aren't listed in Appendix B?
8    MS. HIBBERT: Objection to form and you are not
9 to disclose any communications that you had with
10 counsel, Dr. Miller. You can answer to the extent
11 that you can with that qualification.
12 BY THE WITNESS:
13    A.  If they are not listed, I thought they
14 were from the literature but not relevant to my
15 opinions as formulated in my report.
16 BY MS. DICKINSON:
17    Q.  Okay. Let's talk about you started
18 drafting your report, I think you said, in September
19 of 2018, is that right?
20    A.  I believe that's correct.
21    Q.  You said in September that you had done a
22 decent amount of work.
23        What does that mean, roughly, how many
24 hours?

Page 98

1     MS. HIBBERT: Objection -- objection to form.
2 BY THE WITNESS:
3     A. I'll answer it a bit differently. I'd say
4 I -- I -- I did 40 percent of the rough draft of the
5 report.
6 BY MS. DICKINSON:
7     Q. Does that mean you said you spent roughly
8 100 hours. Does that mean 40 so of them were spent in
9 last September?
10     MS. HIBBERT: Objection to form.
11 BY THE WITNESS:
12     A. No, I would not make that calculation.
13 BY MS. DICKINSON:
14     Q. Okay. How much of the 100 or so hours
15 that you have worked on this case preparing your
16 report or working on the case were spent on drafting
17 back in last September?
18     A. Between four and six, as I recall.
19     Q. Four and six hours?
20     A. Yes, ma'am.
21     Q. Okay. And you said that there were a
22 couple months after September where there wasn't much
23 work, is that accurate?
24     A. Yes, ma'am.

Page 99

1     Q. Okay. Did you do any work in October or
2 November of 2018 on the case?
3     A. I believe I did work in October. I don't
4 recall about November. And I believe that to the best
5 of my memory January through March were dead months.
6     Q. When you say dead months, did you do any
7 work?
8     A. No work, no billing.
9     Q. Okay. And you said you believed you did
10 work in October and November.
11     How many hours did you spend in those
12 months?
13     A. I -- I -- I would just be guessing.
14     Q. If you had your invoices, would you know?
15     MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17     A. I believe I would.
18 BY MS. DICKINSON:
19     Q. You said January to March there was no
20 work, so that takes us up to April of 2019, is that
21 right?
22     A. Right. So March I really don't remember,
23 but April picked up and May was very heavy.
24     Q. Okay. Do you know how many hours you

Page 100

1 billed in April and May of 2019?
2     A. I know that in May it was, like, 33.
3     Q. Okay. Do you know how many in April?
4     A. No.
5     Q. Do you know what -- if you had your
6 invoices, would you know how many hours you spent in
7 April?
8     MS. HIBBERT: Objection to form.
9 BY THE WITNESS:
10     A. I would.
11 BY MS. DICKINSON:
12     Q. Do you know how many of the 33 hours you
13 billed in May, do you know how those hours were spent?
14     A. We just finished May, right?
15     Q. You told me that you thought you had spent
16 33 hours in May. I'm just asking how were those
17 33 hours spent, what kinds of activities were you
18 performing?
19     A. Reading the expert opinion of Dr. Lembke,
20 reading the deposition of Dr. Lembke. I actually read
21 a bunch of expert opinions which are listed in the
22 document here. You've got those names of expert
23 opinions in this case. And I did more writing, maybe
24 some revision, I finished up the final draft, and had

Page 101

1 phone calls and had -- in May I had a meeting with
2 Ms. Hibbert.
3     Q. Without your invoices, do you know how
4 much time you spent on each of those activities
5 sitting here today?
6     MS. HIBBERT: Objection to form.
7 BY THE WITNESS:
8     A. Within the -- I could give some percentage
9 guesstimates on the breakdown of the 33 hours if you
10 would like.
11 BY MS. DICKINSON:
12     Q. It is the best we have, so sure.
13     A. Thank you, ma'am.
14     MS. HIBBERT: Objection to form, calls for
15 speculation.
16 BY THE WITNESS:
17     A. In May a meeting with Ms. Hibbert at
18 around six hours; other consultation with her I would
19 guess about three in the course of the month; reading
20 of the Lembke deposition, probably three; reading
21 extra articles, eight.
22     I'm actually getting a little tired. So
23 I'm -- I'm going to -- I've -- I've answered that
24 about as well as I could.

Page 102

BY MS. DICKINSON:

2  Q.  Okay.  Do you need to take a break?

3  A.  I think it's mental fatigue related to

4  this line of questioning --

5  Q.  Okay.

6  A.  -- in all -- in all honesty.

7  Q.  I -- I think we are almost done with the

8  line of questioning --

9  A.  That's cool.

10  Q.  -- so if you are okay we'll keep going,

11  but if you need a break --

12  A.  No.

13  Q.  -- we certainly can take one.

14  A.  I'm -- I'm -- I'm doing fine except for

15  this line of questioning.  I think we'll be fine.

16  Q.  Okay.  Of the 33 hours you just -- I just

17  want to make sure I heard you correctly and then I

18  think we'll move on, you think you spent nine of those

19  meeting with the attorneys, is that right?

20  A.  Right.

21  Q.  Okay.

22  A.  Six face-to-face, three on the phone,

23  right.

24  Q.  Three hours reviewing the testimony of

Page 103

1  Dr. Lembke, is that right?

2  MS. HIBBERT:  Objection to form.

3  BY THE WITNESS:

4  A.  That's what I said, I think.

5  BY MS. DICKINSON:

6  Q.  Okay.  I just wanted to make sure I wrote

7  it down accurately.

8      And about eight hours reviewing articles,

9  is that right?

10  MS. HIBBERT:  Objection to form.

11  BY THE WITNESS:

12  A.  Okay.

13  BY MS. DICKINSON:

14  Q.  Okay.  The Appendix B to Exhibit 2, can

15  you turn to that?  When you get there, let me know.

16  A.  Um-hum.

17  Q.  Tell me, what is Appendix B to Exhibit 2?

18  MS. HIBBERT:  Object to form.

19  BY THE WITNESS:

20  A.  Appendix B is Materials Reviewed and

21  Considered.  And in the course of doing this work I've

22  come to understand how lawyers do this.  I consider

23  the literature to be the -- the materials, but

24  obviously there's all sorts of materials, these

Page 104

1  Complaints.

2      So what we see is one, two, three, four,

3  five, six Complaints, we see a little over three pages

4  of citations of articles and documents from

5  professional literature, a list of one, two, three,

6  four, five, six transcripts of depositions, and a list

7  of -- I thought it was ten expert reports, one, two,

8  three, four, five, six, seven, eight, nine -- boy, my

9  memory was right -- ten.

10  Q.  We are not going to cover again the -- the

11  things we've already gone over with respect to

12  materials considered.  You have this broken down into

13  several sections, so I'll just take them in sections.

14      One is court documents where you list some

15  various Complaints, right?

16  A.  Yes.

17  Q.  Okay.  Who selected which court documents

18  you would look at in the case?

19  A.  I have no idea.

20  MS. HIBBERT:  Objection to form.

21  BY MS. DICKINSON:

22  Q.  It was not you?

23  MS. HIBBERT:  Objection to form.

24  BY THE WITNESS:

Page 105

1  A.  It was not me.

2  BY MS. DICKINSON:

3  Q.  Okay.  Once you had -- or have you read

4  each and every page of the court documents that are

5  listed in Appendix B?

6  A.  No.

7  Q.  Okay.  Which part -- portions of the court

8  documents in Exhibit -- or Appendix B have you read?

9  MS. HIBBERT:  Objection to form.

10  BY THE WITNESS:

11  A.  If I may, in the four Ohios there was a

12  city and a county and there was a lot of repetition.

13  And one of them I read from start to finish and I

14  can't remember which of the four.  And then when I got

15  into the others, I zoomed in because I wasn't going

16  after all of the various allegations and what have

17  you.  And then when I was sent the Baltimore, my

18  recollection is that I looked at that less than an

19  hour total, again, to just look at some things that

20  would be relevant to what I thought I was asked to

21  form expert opinions on.

22      So I did not read all of these.  I -- I

23  read enough of Ohio that I got a sense of the broad

24  case and -- and then I -- I read segments of the

Page 106

1  others, and that would be on the court documents.
2      Now, was your question on the court
3  documents?
4  BY MS. DICKINSON:
5      Q.  Just on the court documents.  Let's take
6  it one by one.  Okay?
7      A.  Yes, ma'am.
8      Q.  Why was it relevant to you to consider the
9  City of Baltimore designation of experts and the
10 Second Amended Complaint in the City of Baltimore
11 case?
12     MS. HIBBERT:  Objection to form.
13 BY THE WITNESS:
14     A.  I would not say it was considered relevant
15 by me.
16 BY MS. DICKINSON:
17     Q.  I guess I -- I'm not sure.  We talked
18 earlier about the materials that you reviewed that you
19 thought weren't relevant.  You didn't list in the --
20 the list of materials, but here you list them.
21     So is there a reason these are listed and
22 other irrelevant materials were not?
23     MS. HIBBERT:  Objection to form.
24 BY THE WITNESS:

Page 107

1      A.  I listed all of the things that I would
2  consider non-literature, all of the legal things, I'll
3  use that term, legal things sent to me by Reed Smith.
4  And I didn't get anything in the -- in the form of
5  a -- of a legal thing from them that I didn't put in
6  the report.
7  BY MS. DICKINSON:
8      Q.  Okay.  Let's move onto the Professional
9  Literature portion.
10     The professional literature listed here
11 and the additional articles listed in Exhibit 4, is
12 that a complete list of the specific professional
13 literature that you reviewed with respect to this
14 case?
15     A.  Yes, ma'am.
16     MS. HIBBERT:  Objection to form.
17     THE WITNESS:  Sorry.
18     MS. HIBBERT:  Asked and answered.
19 BY MS. DICKINSON:
20     Q.  Are all of the professional literature
21 sources on this list sources that you found in your
22 own research?
23     MS. HIBBERT:  Objection to form.
24 BY THE WITNESS:

Page 108

1      A.  No.
2  BY MS. DICKINSON:
3      Q.  Okay.  What other source did you receive
4  professional literature from?
5      A.  Okay.
6      MS. HIBBERT:  Objection --
7      Hold on.
8      Objection to form.
9      She is not asking you about any substance
10 of the communications that you had with counsel, okay.
11 Understand?  With that qualification you can answer.
12 BY MS. DICKINSON:
13     Q.  I'll ask a better question.
14     Did you receive some of the professional
15 literature cited in here from counsel?
16     MS. HIBBERT:  Objection to form.
17 BY THE WITNESS:
18     A.  Yes.
19 BY MS. DICKINSON:
20     Q.  Okay.  Which articles on the professional
21 literature list, both in Exhibit 2, Appendix B, and
22 Exhibit 4, did you receive from counsel?
23     MS. HIBBERT:  Objection; form.
24 BY THE WITNESS:

Page 109

1      A.  Okay.  Let's take a deep breath.  If I
2  were to go through this list, which I have not done,
3  and say where did they come from, there are three
4  sources.  One is articles -- well, four sources.  One
5  is articles I already had.
6  BY MS. DICKINSON:
7      Q.  Okay.
8      A.  Another is articles that I researched on
9  my own using my librarian in Madison.
10     Then there were two different types of
11 articles sent to me by counsel.  One was things I
12 asked for --
13     Q.  Uh-huh.
14     A.  -- because I became impressed with the
15 quality of their library service and they could ship
16 me something in a printed form and I didn't have to
17 print it myself off an electronic, and I asked for a
18 number of things from them.  Then there was a
19 literature file that they had compiled for their own
20 purposes so they could understand the issues in the
21 case and they shared some articles with me that they
22 had researched on their own that I had not researched
23 myself.  So there is a mixture.
24     Q.  Okay.  I'm interested in the last bucket,

Page 110

1 which is just the things -- you said there are four
2 buckets, and I just want to make sure I understand you
3 correctly --
4 A. Yes.
5 Q. -- so I'm not misunderstanding.
6 There are things that you have on your
7 own?
8 A. Right.
9 Q. There is library research that you had
10 done on your behalf with your assistant or the library
11 you work with, correct?
12 A. Yes.
13 Q. Okay. There are things that you --
14 articles that you asked counsel to provide you,
15 correct?
16 A. Yes.
17 Q. And then there are things that the lawyers
18 had in their own file that they provided to you
19 without you making a specific request for, is that
20 fair?
21 MS. HIBBERT: Objection to form.
22 BY MS. DICKINSON:
23 Q. Does that summarize what you just told me?
24 A. It does.

Page 111

1 Q. Okay. That last bucket, the things the
2 lawyers had that you had not specifically asked for or
3 you haven't found on your own, how do I find those on
4 this list of professional literature?
5 MS. HIBBERT: Objection to form.
6 BY THE WITNESS:
7 A. You would not be able to because I have
8 not demarcated.
9 BY MS. DICKINSON:
10 Q. Okay. Do you have any idea as we sit here
11 today which of those articles fall in that Category
12 No. 4?
13 MS. HIBBERT: Objection to form.
14 BY THE WITNESS:
15 A. I could go through the list and give you
16 some examples that I hope would be accurate, because I
17 promise you there were things that they sent that
18 they -- were in their file, I already had them. I had
19 already read them. Things that were novel to me that
20 I would not have necessarily seen had it not been for
21 their prior research that they shared with me, I could
22 go through the list and name a few if that would be of
23 any help.
24 BY MS. DICKINSON:

Page 112

1 Q. It would. Do you mind?
2 A. I don't.
3 Q. Okay.
4 MS. HIBBERT: Objection to form.
5 BY THE WITNESS:
6 A. Are you ready?
7 BY MS. DICKINSON:
8 Q. Yes.
9 A. I don't believe I had seen the Marchione.
10 I had seen things similar, but I don't think I had
11 seen that.
12 Q. Okay.
13 A. The one after that, whatever MagMutual is,
14 I don't think I found that. I don't think the
15 FDA news was one of mine.
16 Q. Is that the one right after the MagMutual?
17 A. Yes, ma'am.
18 I'm guessing on Baker. I don't know if
19 I've read that before.
20 Q. Okay.
21 A. I had read the Peggy Compton article,
22 Tompkins lead author, when it first came out, but it
23 appearing on this list is a result of it being sent to
24 me.

Page 113

1 Q. Okay.
2 A. I didn't pull this one, but I had read it
3 before.
4 Q. Okay.
5 A. I asked for Kendler, I was sent Noble, I
6 think I was sent Volkow and Wang, Proceedings of
7 National Academy of Sciences. That's a great article.
8 Boscarino came off of another expert's report and then
9 came into my report. I'm trying to remember that one.
10 Boscarino's did not come from my research. The
11 Degenhardt article did not come from my research. The
12 Wise and Koob article did not come from my research.
13 Is Bosco list -- Boscarino listed twice or
14 are there three Boscarinos? 2015 -- I think that
15 Boscarino is listed twice.
16 Q. Okay.
17 A. It definitely is listed twice.
18 The NIH News and Events
19 titled "10 Percent," I don't believe that came from
20 me.
21 That's it.
22 Q. Okay. When -- just for -- so the record
23 is clear, when you say it didn't come from you, then
24 if it didn't come from you, it came from the lawyers

Page 114

1  at Reed Smith, is that correct?
2      MS. HIBBERT: Objection to form.
3  BY THE WITNESS:
4      A.  It came in the binder of literature that
5  they shared with me from their previous research.
6  BY MS. DICKINSON:
7      Q.  And when you say "they," you mean the
8  lawyers at Reed Smith?
9      A.  I do, ma'am.
10     MS. HIBBERT: Objection to form.
11 BY MS. DICKINSON:
12     Q.  I was just trying to make sure that there
13 wasn't anyone else that was providing you articles, is
14 that fair?
15     MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17     A.  That is very fair.
18 BY MS. DICKINSON:
19     Q.  Okay.  And then could you quickly just
20 take Exhibit 4, the few articles that were on that
21 Exhibit 4.
22         Were those articles you found yourself
23 following the generation of your expert report on
24 May 10th and between that time and June 3rd, which is

Page 115

1  the date on Exhibit 4 or were those provided to you?
2      MS. HIBBERT: Objection to form.
3  BY THE WITNESS:
4      A.  Krebs was provided.
5  BY MS. DICKINSON:
6      Q.  Okay.
7      A.  Edlund and Vowles I requested.
8      Q.  Okay.
9      A.  Robins I basically requested.  I had it,
10 but they got the new copy.
11     Q.  Had you reviewed any of the materials on
12 Exhibit 4 prior to authoring your expert report in the
13 case?
14     MS. HIBBERT: Objection to form.
15 BY THE WITNESS:
16     A.  Could I have a moment?
17 BY MS. DICKINSON:
18     Q.  Of course.
19     A.  This may take a while, if you don't mind.
20     Q.  Maybe I can ask the question just a little
21 bit better and maybe it will make it faster, but I
22 don't know.
23     A.  I don't know if it will --
24     Q.  Okay.

Page 116

1      A.  -- but go ahead.  Go ahead.
2      Q.  I was just going to say that Exhibit 4 is
3  titled "Supplemental List of Materials Reviewed and
4  Considered as of June 3rd, 2019"?
5      A.  That would suggest that they were not in
6  my report and I -- and I read them after.  I don't
7  think they are cited in my report.  I know Robins
8  isn't, but I read that years ago.
9      Q.  Did you -- did you, for example, consider
10 the Vowles article that's listed here in rendering
11 your report on May -- prior to rendering your report
12 on May 10th, I guess is the question?
13     A.  I -- I --
14     MS. HIBBERT: Objection to form.
15 BY THE WITNESS:
16     A.  -- I think not.
17 BY MS. DICKINSON:
18     Q.  Okay.  The same with the Edlund study that
19 appears on the supplemental list, did you consider
20 that in rendering your opinions that were generated on
21 May 10th?
22     MS. HIBBERT: Objection to form.
23 BY THE WITNESS:
24     A.  You have stated that correctly.

Page 117

1  BY MS. DICKINSON:
2      Q.  Okay.  Same with Krebs, fair?
3      A.  Yeah.
4      Q.  Okay.  And Robins, correct?
5      A.  Yes.
6      MS. HIBBERT: Objection to form.
7  BY THE WITNESS:
8      A.  Right.
9      MS. HIBBERT: Just give me a pause.
10     THE WITNESS: Yeah.
11 BY MS. DICKINSON:
12     Q.  Okay.  All right.  You said when you were
13 testifying a few minutes ago about the eight or so
14 hours you spent in May reviewing articles, you used
15 the word "extra articles."  It may have just been that
16 you misspoke, but I was just trying to understand,
17 were there articles in May -- why did you use the word
18 "extra"?  Maybe that's the easiest way.
19     MS. HIBBERT: Objection to form.
20 BY THE WITNESS:
21     A.  I think I --
22     THE WITNESS: Pardon me, ma'am.  Pardon me.
23 I've been -- I've been very disrespectful to
24 Ms. Hibbert repeatedly, I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

BY MS. DICKINSON:

2    Q.   It's hard to do.

3    A.   Well, I am trying to be conversational

4 with you and she is --

5    Q.   Right.

6    A.   -- jumping in as she is required to do,

7 and I appreciate it.

8    I used the wrong word.  "Supplemental" is

9 the right word.

10    Q.   That's what I was getting at.

11    Were the eight hours spent reviewing the

12 articles on Exhibit 4?

13    MS. HIBBERT:  Objection to form.

14 BY THE WITNESS:

15    A.   The eight hours included my rereading my

16 stuff -- well, rereading the articles I cited.

17 BY MS. DICKINSON:

18    Q.   Okay.

19    A.   I -- I will -- I will violate the

20 directions I've been given by my -- by -- by counsel.

21 She said --

22    MS. HIBBERT:  Please don't.

23 BY THE WITNESS:

24    A.   -- "Know your report."  And so I knew my

Page 119

1 report. I read my report again and again and I reread

2 the articles I used just to make sure because I knew I

3 was coming to a deposition.  So the eight hours was

4 not for Exhibit 4.

5 BY MS. DICKINSON:

6    Q.   Okay.

7    A.   The eight hours included my rereading the

8 literature that I had cited in my report to refresh my

9 memory given that the original drafting had begun way

10 back in September.

11    Q.   Fair enough.  I was just trying to

12 understand whether there were extra articles because

13 you used the word.

14    A.   No, ma'am.

15    Q.   Okay.

16    A.   No, ma'am.

17    Q.   All right.  We can cross that off the

18 list.

19    A.   Right.

20    Q.   In total -- the articles that are

21 mentioned in your professional literature list, both

22 on Appendix B of Exhibit 2 and Exhibit 4, did you read

23 each article start to finish?

24    MS. HIBBERT:  Objection to form.

Page 120

BY THE WITNESS:

2    A.   Essentially, yes, I read the whole thing.

3 BY MS. DICKINSON:

4    Q.   Okay.  And how many hours total did you

5 spend reading and reviewing the articles that are

6 listed in both Appendix B to Exhibit 2 and in

7 Append -- and in Exhibit 4?

8    A.   Ms. Dickinson, I'm -- I -- I obviously

9 want to give you very accurate answers for the purpose

10 of our meeting today and I really don't want to be

11 tripped up by saying something that then didn't make

12 sense.

13    Q.   Okay.

14    A.   It wasn't more than a hundred hours.  I

15 did spend time writing.  I mean, I think I spent half

16 of the hundred hours reading because it's a lot of

17 reading.  I think I probably spent, I don't know, 25

18 to 40 percent of the time reading legal things and 60

19 to 75 percent of the time reading journal articles.

20 So some of the answers I've given before, if you

21 compare them, and maybe, Ah-ha, his math is wrong.

22 I'm doing my best.

23    Q.   I'm actually not at all trying to trip you

24 up on math.  The problem is I don't have your invoices

Page 121

1 in front of me.  So it would be a lot easier if I did.

2 Because I don't, I have to ask you the questions about

3 what you did and when without the benefit of the

4 documents.

5    Do you understand, I'm not trying to

6 actually trip you up?

7    MS. HIBBERT:  Objection to form, move to strike

8 the colloquy.

9 BY MS. DICKINSON:

10    Q.   Do you understand why I'm asking these

11 questions and you have to answer them without the

12 document in front of you?

13    MS. HIBBERT:  Objection to form.

14 BY THE WITNESS:

15    A.   Ah, yes, and I'm -- and I'm doing my best.

16 So I would guess -- I would guess that I spent 30,

17 40 hours just reading journal articles.  That's just a

18 guess.

19 BY MS. DICKINSON:

20    Q.   Okay.  And, again, if we had your

21 invoices, would you know that is more for certain?

22    MS. HIBBERT:  Objection to form.

23 BY THE WITNESS:

24    A.   We'd have a really good estimate, yes,

Page 122

1 ma'am.
2 BY MS. DICKINSON:
3    Q.   Okay.  Let's move onto the depositions
4 that you list here.  There are one, two, three, four,
5 five, six deposition transcripts.
6       Is that -- have I read that correctly?
7    A.   Yes, ma'am.
8    Q.   Okay.  Who determined which deposition
9 transcripts you received in the case?
10       Was it you?
11    A.   I don't know.  I don't -- it was not me.
12    Q.   Okay.
13    MS. HIBBERT:  Objection to form.
14 BY MS. DICKINSON:
15    Q.   Did you ask for all of the deposition
16 transcripts in the case?
17    MS. HIBBERT:  Objection to form.
18 BY THE WITNESS:
19    A.   I did not ask for any.
20 BY MS. DICKINSON:
21    Q.   And were the deposition transcripts
22 provided to you by counsel at Reed Smith?
23    A.   Yes, ma'am.
24    Q.   Okay.  Let's look at the last portion,

Page 123

1 which is -- oh, I'm sorry.  Can we just -- can I ask
2 you one more question about the depositions?
3       You had testified earlier about reading
4 Dr. Lembke's deposition for roughly three hours.  The
5 remaining five depositions, do you know how much time
6 you spent reviewing those?
7    MS. HIBBERT:  Objection to form.
8 BY THE WITNESS:
9    A.   They are listed here, ma'am, but I don't
10 recall reading any of those depositions besides
11 Lembke's.
12 BY MS. DICKINSON:
13    Q.   Okay.
14    A.   And I read that one in detail.
15    Q.   Okay.  Prior to rendering your report on
16 May 10th, the only deposition you can recall reading
17 prior to that report is Dr. Lembke's, is that fair?
18    MS. HIBBERT:  Objection to form.
19 BY THE WITNESS:
20    A.   That's my best recollection.
21 BY MS. DICKINSON:
22    Q.   Okay.  Have you read those deposits --
23 depositions since rendering your report on May 10th?
24    A.   Yes.

Page 124

1    Q.   Okay.  When did you do that?
2    A.   Since May 10th.
3    Q.   Okay.
4    A.   Sometime in May.
5    Q.   Why did you not review them before you
6 rendered your opinions but you read them in May?
7    MS. HIBBERT:  Objection to form.
8 BY THE WITNESS:
9    A.   I did not have them.  I wanted to -- my
10 intent was to generate what I considered a clean
11 report, which is my thoughts and -- and the opinions
12 of Dr. Lembke are for a matter of the proceedings, not
13 for a matter of my statement.
14 BY MS. DICKINSON:
15    Q.   Fair.
16       How much time have you spent -- or
17 actually, just have you reviewed each and every
18 page of the rest of depositions after generating your
19 report in May?
20    MS. HIBBERT:  Objection to form.
21 BY THE WITNESS:
22    A.   No, ma'am.
23 BY MS. DICKINSON:
24    Q.   Okay.  Did you read certain portions?

Page 125

1    A.   No, ma'am.
2    Q.   Okay.  Would -- I guess I'm trying -- I
3 asked you if you read the whole thing and I asked you
4 if you read certain portions.
5       What did you do with the rest of the
6 deposition transcripts in terms of reading them?
7    A.   My best recollection, and I -- you know,
8 this may be -- my memory may be off because obviously
9 they are listed in the report and the date of the
10 report is May the 10th.  I didn't think I read this
11 stuff before -- oh, no, totally incorrect.  Totally
12 incorrect.
13    Q.   Okay.
14    A.   Yeah.
15    Q.   You can correct it.
16    A.   Oh, yeah.  No, no, right.
17       My report includes some rebuttal of some
18 of these -- well, it -- no, it wasn't deposition.
19 Let's be clear.  The last page is expert reports which
20 you haven't gotten to.
21    Q.   Correct.
22    A.   I read all of those.
23    Q.   Okay.
24    A.   And I rebutted some of them in my report.

Page 126

1 The deposition, I don't think I saw it until after the
2 report was done, and that was Lembke, and I don't
3 recall seeing the others even though they are listed
4 here. So that may be a secretarial thing.
5     Q. No, that's fine.
6         Sitting here today, do you think you've
7 read the other depositions other than Dr. Lembke?
8     A. I believe I have not.
9     Q. Okay. Let's flip over --
10     A. Yes, ma'am.
11     Q. -- to -- to the last portion which is the
12 Plaintiffs' Expert Reports?
13     A. Yes, ma'am.
14     Q. You list a number of Plaintiffs' expert
15 reports.
16         Do you know if these are all of the
17 Plaintiffs' experts in this case?
18     MS. HIBBERT: Objection to form.
19 BY THE WITNESS:
20     A. I have no idea.
21 BY MS. DICKINSON:
22     Q. Okay. Did you select which Plaintiffs'
23 experts reports you wanted to look at in this case?
24     A. No.

Page 127

1     Q. Okay. Did the counsel at Reed Smith
2 select those?
3     MS. HIBBERT: Objection to form.
4 BY THE WITNESS:
5     A. I believe so.
6 BY MS. DICKINSON:
7     Q. And the counsel at Reed Smith sent you the
8 reports that are listed here, is that right?
9     A. That is correct.
10     Q. Okay. Do you know when you received the
11 reports that are listed here?
12     A. I do not.
13     Q. And you said you read all of those reports
14 cover to cover, is that right?
15     A. I did.
16     Q. Okay. Do you know how long you spent
17 doing that?
18     A. Six, eight maybe.
19     Q. And when you say, "six, eight," six, eight
20 hours?
21     A. Hours, yes, ma'am.
22     Q. If you had your invoices, would you know
23 how long you spent reading the reports?
24     A. Yes, ma'am.

Page 128

1     MS. HIBBERT: Objection to form.
2         Give me a pause, Dr. Miller.
3     THE WITNESS: Sorry.
4 BY MS. DICKINSON:
5     Q. Did you ask for any other expert reports
6 that you didn't receive?
7     A. No.
8     Q. Okay. Did you ask counsel to provide you
9 with certain specialties of expert reports or did
10 counsel simply select?
11     MS. HIBBERT: Objection to form.
12 BY THE WITNESS:
13     A. Counsel selected.
14 BY MS. DICKINSON:
15     Q. Did you review the attachments to the
16 Plaintiffs' experts reports that are on your
17 Appendix B of Exhibit 2?
18     A. I'm sorry. Did I --
19     Q. Did you review the attachments to the
20 expert reports or just the reports themselves? A lot
21 of these reports have various attachments or
22 appendix -- appendices.
23     A. Oh, the Lembke report came as two huge
24 ring binders and all of her attachments, and I did not

Page 129

1 read all of that stuff.
2     Q. Okay. What portion of the binders did you
3 read?
4     MS. HIBBERT: Objection to the form.
5 BY THE WITNESS:
6     A. I read her bibliography and I'm pretty
7 sure that she had articles from her bibliography
8 preprinted attached to the report and I read a number
9 of those, but there was other stuff she -- there was a
10 transcript of a public radio show or something and
11 there was the entire photocopy of her book, which I --
12 I bought her book, I haven't read it yet, and I just
13 glossed over it to see what it was. The only thing --
14 the only things I would have read were her report in
15 full and literature articles she cited, not all of
16 that other, what did you call them, attachments, yeah,
17 yeah, no, I didn't read that stuff.
18 BY MS. DICKINSON:
19     Q. Okay. Would the time spent reviewing
20 Dr. Lembke's articles or materials that were sent in
21 the binders, would -- would that be included in the
22 six to eight hours that you said you spent on the
23 Plaintiffs' expert report review or is that something
24 in addition?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   Included.
2    Q.   Okay.  I think -- actually, do you have
3  something...
4        Do you know or do you -- do you still have
5  the binders that were sent regarding Dr. Lembke?
6    A.   I do.
7    Q.   Okay.  Are those in your physical file?
8    MS. HIBBERT:  Objection to form.
9  BY THE WITNESS:
10    A.   Yes.
11  BY MS. DICKINSON:
12    Q.   Okay.  Do you know if all of the materials
13  that were in those binders are on the literature list
14  of your materials considered or are there additional
15  materials in those binders?
16    MS. HIBBERT:  Objection to form.
17  BY THE WITNESS:
18    A.   Let me answer your question to the best of
19  my ability.
20  BY MS. DICKINSON:
21    Q.   Okay.
22    A.   She chose her list of articles.  Edlund
23  and Vowles were examples.  So if she had an article I
24  thought was relevant, I put it here.  If she had other

Page 131

1  stuff that I didn't find relevant to anything except
2  to her opinion, she is entitled to her opinion, I
3  didn't list it.  It's -- it's -- it's -- but she
4  listed it --
5    Q.   Okay.
6    A.   -- so it's a matter of court record.
7    Q.   Oh, sure.  I was just trying to understand
8  what it was that you read with respect to her
9  materials.  Does that make sense?  I mean, if you have
10  any idea of which materials of hers you read or maybe
11  you don't.  I'm -- I'm just trying to understand what
12  you actually looked at in that set of materials.
13    MS. HIBBERT:  Objection to form.
14  BY THE WITNESS:
15    A.   What's going through my mind, madam, is
16  that it -- it's sort of a blur.  I'm trying to make a
17  separation in my mind between her report and her
18  deposition and articles that she cited in one versus
19  the other.
20        If she cited it in her report and you know
21  that I had rebutted some things she said in her report
22  in my report, I could have included those articles in
23  my list of articles.  If there is something that she
24  cited in her deposition that was not previously

Page 132

1  listed, I -- I -- I think that's where this -- this is
2  where this list of -- I don't know where Krebs came
3  from, but Edlund and Vowles were things she really
4  relied on and I really wanted to study those
5  carefully.  And so I listed them here.  There is
6  nothing else that was in those binders that is not
7  listed in Appendix 4 -- I'm not -- not listed in
8  Exhibit 4 or Exhibit 2.
9  BY MS. DICKINSON:
10    Q.   Okay.
11    A.   Nothing.
12    Q.   Did reviewing the list of materials on
13  Exhibit 4 change your opinions from your May 10th
14  report in any way?
15    A.   No.
16    Q.   Okay.  All right.  I think this is a good
17  time to take a lunch break, and maybe we only have one
18  more segment to go, but I can't promise.  I'm just
19  going to try, okay.  So --
20    A.   That's cool.
21    MS. DICKINSON:  So let's try to take a quick one
22  given that because I don't think we are going to go,
23  you know, three more segments here.
24    THE WITNESS:  Yeah.

Page 133

1    MS. DICKINSON:  So however long you need, but
2  I'm going to be back in here in 20 or 25 minutes.  How
3  about that?
4    THE WITNESS:  Are -- are we off the record?
5    MS. HIBBERT:  Not yet.
6    THE VIDEOGRAPHER:  We are off the record at
7  12:50 p.m.
8        (WHEREUPON, a recess was had
9         from 12:50 to 1:28 p.m.)
10    THE VIDEOGRAPHER:  We are back on the record at
11  1:28 p.m.
12  BY MS. DICKINSON:
13    Q.   Okay.  Dr. Miller, we are back on the
14  record after lunch.  If you could pull out Exhibit 2
15  and turn to Appendix A, that would be helpful for the
16  next line of questions.
17    A.   All righty.
18    Q.   Okay.  And just so the record is clean,
19  remind me what Appendix A is in Exhibit 2?
20    A.   It is my curriculum vitae.
21    Q.   Oh, you know what, I -- let's actually not
22  do that.  If you could pull out Exhibit 3, I'm sorry,
23  your current curriculum vitae, that would be helpful.
24    A.   Okay.

Page 134

1    Q.   Okay.  Dr. Miller, prior to this case had
2  you ever worked with AmerisourceBergen before?
3    A.   No, ma'am.
4    Q.   Okay.  Prior to this case, had you done
5  any other work for any other pharmaceutical companies?
6    MS. HIBBERT:  Objection to form.
7  BY THE WITNESS:
8    A.   Yes.
9  BY MS. DICKINSON:
10   Q.   Okay.  I'm going to try to make this as
11  quick as I can.  If you can turn to Page 11 of
12  Exhibit 3 -- I'm sorry.  Maybe it is Page 10.  I'm
13  sorry.
14       Page 10 had -- has a section that starts
15  and it says, "Consulting Positions."
16       Do you see that?
17   A.   Yes, ma'am.
18   Q.   Would all of the work that was -- that you
19  have done with pharmaceutical companies be listed in
20  this section regarding consulting positions?
21   A.   I believe it would.
22   Q.   Okay.  Could we go through this list of
23  consulting positions and you identify for me which
24  ones are consulting positions with pharmaceutical

Page 135

1  companies, just so we can make the record clear?
2    A.   Yes, ma'am.
3    Q.   Okay.
4    A.   On Page 11, No. 4, Braeburn.
5    Q.   Okay.
6    A.   Two down from that, BioDelivery Sciences.
7    Q.   Okay.
8    A.   Below that, Purdue Pharma.  On the next
9  page, the top of the page, US WorldMeds.
10   Q.   Okay.
11   A.   And just below the middle of that
12  page another US WorldMeds.  Those are the
13  pharmaceutical companies.
14   Q.   Okay.  Let us, if you could, let's turn
15  back to the first one, Brae -- Braeburn
16  Pharmaceuticals.
17       It looks like from your CV that you did --
18  have done work for Braeburn Pharmaceuticals from
19  January of 2013 to the present.
20       Is that accurate?
21   A.   The relationship has not closed, but there
22  has been no activity in many years.  This activity was
23  pretty much 2013, '14, maybe '15.
24   Q.   Okay.  And what were you doing for

Page 136

1  Braeburn Phar -- Pharmaceuticals in between 2013 and
2  2015?
3    A.   They established an advisory board of
4  addiction experts and key opinion leaders to talk
5  about a product they wanted to bring to market.
6    Q.   And what was that product?
7    A.   The tradename is Probuphine.
8    Q.   And what is Probuphine?
9    A.   It is an implantable form of Buprenorphine
10  that's used to treat opioid addiction.
11   Q.   Okay.  And were -- how much time did you
12  spend on the advisory board for Braeburn
13  Pharmaceuticals in between 2013 and 2015?
14   A.   I would estimate less than 20.
15   Q.   And when you say that, 20 hours?
16   A.   Yes, ma'am.
17   Q.   Okay.  Were you compensated for your time?
18   A.   Yes, ma'am.
19   Q.   At what rate?
20   A.   I don't recall exactly, and it was not a
21  rate that I set.  It was a usual and customary rate
22  set by them based on industry standards and FDA
23  regulations.
24   Q.   Okay.

Page 137

1    A.   And it was a daily rate more than an
2  hourly rate.
3    Q.   Fair enough.
4        Do you recall what the daily rate roughly
5  was?
6    ▮▮▮▮   ▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮
7    ▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8    Q.   Okay.  And typically -- or actually, why
9  don't I ask you this:
10       What were you doing when you sat on the
11  advisory board for Braeburn Pharmaceuticals?
12   A.   Providing information about patients with
13  opioid addiction, the kind of patients who might be
14  candidates for this medication, existing medications
15  in the market and how this might find its own market
16  niche.  We also talked about how to use this
17  medication, how to train physicians, how to market the
18  drug to physicians.  I believe that's the summary.
19   Q.   Okay.  During -- when you were serving on
20  the advisory board, did Braeburn Pharmaceuticals pay
21  for your travel expenses with respect to your time on
22  the advisory board?
23   A.   Yes.
24   Q.   Did they pay for your meals with respect

Page 138

1 to your time that you were spending on the advisory
2 board?
3    A.   Yes.
4    Q.   Okay.  Did you have a written agreement
5 with Braeburn Pharmaceuticals?
6    A.   Yes.
7    Q.   Okay.  Do you still have that?
8    A.   I think I could find it, yes.
9    Q.   Do you know if that agreement has now
10 expired or is it currently ongoing, you just haven't
11 done any work for them?
12    A.   I don't know the answer to that question.
13 I -- I can tell you, I'm, again, saying more than a
14 yes-or-no answer, the folks involved with that company
15 still come to ASAM meetings, American Society of
16 Addiction Medicine, I see people there, there is
17 nothing active that they are asking me to do.  There
18 is the potential that there could be.  So it's -- it
19 was -- I have not looked to see if there was an
20 expiration date.
21    Q.   Do you know if -- typically in advisory
22 boards is it fair to say that you are providing
23 feedback to the pharmaceutical company?
24    MS. HIBBERT:  Objection to form.

Page 139

1 BY THE WITNESS:
2    A.   Well, feedback means they present you
3 something and you react to it, and some of it was that
4 they would present us something and we would react to
5 it.  There is a -- you know, documents that they must
6 create.  I'm not recalling with this product if we met
7 before or only after the new drug application was
8 approved by the FDA, but they would sometimes show us,
9 you know, we are thinking of presenting this to the
10 FDA and do you agree with that or how would you phrase
11 it.  And of course marketing materials.  And so some
12 of it was feedback but some of it was just, You tell
13 us about patient types.
14    Q.   Okay.  Who was your main contact at
15 Braeburn Pharmaceuticals?
16    A.   There was a -- an individual that I was
17 introduced to who arranged the relationship, and I
18 don't remember the extent to which she was on the
19 payroll or a consultant to them, and her name is
20 Sonnie Kim.
21    Q.   Okay.
22    A.   S-o-n-n-i-e, Kim, she is Korean.
23    Q.   And when you received compensation with
24 respect to your role on the advisory board for

Page 140

1 Braeburn, was that compensation being paid directly by
2 Braeburn or some other third party?
3    A.   I think it was paid by Braeburn.
4    Q.   Okay.  Okay.  Let's go on to the next
5 pharmaceutical company for which you worked -- did
6 work with, and -- and that one you identified as
7 BioDelivery Service -- or Sciences, is that right?
8    A.   Right.
9    Q.   Okay.
10    A.   They go by BDSI.
11    Q.   I'm sorry.  Say it again.  BDSI?
12    A.   SI.
13    Q.   Okay.
14    A.   For "Incorporated."
15    Q.   And what -- what were you doing for BDSI?
16    A.   Well, their product is a very, very
17 interesting product, and this was direct work and your
18 previous question was pharmaceutical company, Curry
19 Rockefeller is not a pharmaceutical company, but they
20 work -- provide services for pharmaceutical companies.
21 So some of the contract work was with Curry
22 Rockefeller as opposed to with BDSI itself, but I had
23 relationships with both regarding this particular
24 product called Bunavail, which is another formulation

Page 141

1 of Buprenorphine which is a specialized partial opioid
2 agonist, a-g-o-n-i-s-t, used to treat opioid
3 addiction.
4    Q.   Okay.  And it -- the -- your CV states
5 that you work -- did the work from February 2014 to
6 December 2016, is that accurate?
7    A.   Correct.
8    Q.   And I'm sorry.  Curry Rockefeller, what
9 kind of entity was that or what did they do?
10    A.   It's a consulting firm that says that
11 their services are education, and so some of it is
12 developing formal patient education documents required
13 by the FDA and some is marketing materials.
14    Q.   You said the -- you said they say that
15 their services are educational in a way that made --
16 made me think that you were thinking it was something
17 else.
18       Is that -- did I understand you correctly
19 or not?
20    MS. HIBBERT:  Objection to form.
21 BY THE WITNESS:
22    A.   Well, if -- if it's -- if it's marketing
23 materials, the word "promotional" would be an
24 appropriate word.

Page 142

BY MS. DICKINSON:

1  Q.  I -- I just want to understand, was it
2  your feeling that these educational materials were
3  really more like promotional materials?
4    MS. HIBBERT:  Objection to form.
5  BY THE WITNESS:
6    A.  Some yes, some no.  And -- and, again,
7  some of it was also, How do you develop continuing
8  education programs for physicians.  And so some of it
9  was, What would the content of a continuing education
10 program be to practicing physicians to teach them
11 about this medication.
12 BY MS. DICKINSON:
13   Q.  Okay.  Fair.
14        For this engagement with Bi -- the
15 pharmaceutical company BioDelivery Sciences, were you
16 compensated?
17   A.  Yes.
18   Q.  Okay.  And in what amount?  Or in what
19 way, an hourly rate or daily or --
20   A.  A daily rate.
21   Q.  Okay.
22   MS. HIBBERT:  Objection to form.
23        Dr. Miller, please give me a pause after

Page 143

1  the question is asked --
2    THE WITNESS:  Okay.
3    MS. HIBBERT:  -- so I can put an objection on
4  the record, okay?
5  MS. DICKINSON:
6    Q.  And what was the daily rate that you were
7  compensated on by BioDelivery Sciences?
8  ███  ███████████████████████████████████
9  ██ ███
10   Q.  And do you know how much time in between
11 2014 of -- April 20- -- I'm sorry -- December 2014 and
12 December 2016 you spent performing services for
13 BioDelivery Sciences?
14   A.  My recollection would be three days max.
15   Q.  Can you briefly describe what type of
16 services you were providing to BioDelivery Sciences?
17   A.  I think my answers that are provided for
18 Braeburn would apply to BioDelivery Sciences.
19   Q.  The same kind of work?
20   A.  Yes.
21   Q.  Okay.  And the same questions as I asked
22 you for Braeburn, when you were working for
23 BioDelivery Sciences, when you were serving on the
24 advisory board, did they pay your travel with respect

Page 144

1  to your services on the advisory board?
2    A.  Yes, ma'am.
3    Q.  Did the BioDelivery Service -- Sciences
4  pay for your meals with respect to your services?
5    A.  Yes, ma'am.
6    Q.  Was there a reason that you stopped
7  working in 2016 for BioDelivery Sciences?
8    A.  They stopped supporting the product.
9    Q.  Okay.  Did they ever bring that product to
10 market?
11   A.  Oh, yes.
12   Q.  Okay.  What did you mean by "they stopped
13 supporting the product"?
14   A.  If you support a product, you generate
15 educational materials, you have a sales staff, a
16 marketing staff and you are really trying to actively
17 grow market share, you are trying to sell --
18   Q.  Uh-huh.
19   A.  -- more product, and they pulled all of
20 their investment in this product and went to a
21 different product.  I think -- I think I'll -- I'll
22 just say that.
23   Q.  Okay.  Do you -- do you know why they
24 pulled their investment and went to a different

Page 145

1  product?
2    MS. HIBBERT:  Objection to form, calls for
3  speculation.
4  BY THE WITNESS:
5    A.  Pardon me for sounding lawyerly, but I
6  think that there was probably a confidentiality
7  agreement with them that would prevent me from sharing
8  any of that sort of information.
9  BY MS. DICKINSON:
10   Q.  Okay.  Totally fair.  I don't want to get
11 you into anything that would --
12   A.  Right.
13   Q.  -- run you afoul of that.
14        So had -- you said they went to a new
15 product -- or BioDelivery Sciences went to a new
16 product.
17        What was the new product?
18   A.  I don't remember the name of it, but I
19 could describe it to you.
20   Q.  Okay.  Please do.
21   A.  Okay.  What is unique about this product
22 is the engineering of how it's delivered to the
23 bloodstream, and it's -- the engineering has to do
24 with a patch that you don't put on your skin and it's

Page 146

1  not like some other Buprenorphine products that you
2  put under your tongue and dissolve, but it's a patch
3  that you place on the inside of your cheek.
4      Q.  Okay.
5      A.  And it has a special engineering to stick
6  to the inside of your cheek and it has a special
7  engineering for the active ingredient to flow from the
8  product into your bloodstream --
9      Q.  Okay.
10     A.  -- which has to do with all sorts of
11 physiology and pharmacology and physics, and that was
12 the engineering.
13         And they developed another product using
14 that engineering that was a treatment for pain as
15 opposed to a treatment for addiction and had a
16 different brand name, a different strength, and they
17 thought that their -- buccal means inside the cheek --
18 they thought that product would have a better chance
19 of improving the company's bottom line than the
20 Bunavail product.
21     Q.  Did they stop selling the original
22 Bunavail product?
23     A.  No, you --
24     MS. HIBBERT:  Objection to form.

Page 147

1  BY THE WITNESS:
2      A.  -- you can buy it today.  You can -- I can
3  prescribe it today.
4  BY MS. DICKINSON:
5      Q.  But internally they stopped -- I think
6  your words were "supporting" --
7      A.  Right.
8      Q.  -- the Bunavail product, correct?
9      A.  Right.
10     Q.  Okay.  And were they then turning to
11 supporting the new product that was being used in the
12 treatment for pain instead, is that a fair --
13     A.  That's my understanding.
14     MS. HIBBERT:  Objection to form.
15        Dr. Miller --
16     THE WITNESS:  Oh, I'm sorry.
17 BY MS. DICKINSON:
18     Q.  And at that time is that the reason you
19 stopped working for BioDelivery Sciences?
20     MS. HIBBERT:  Objection to form.
21 BY THE WITNESS:
22     A.  Yes.  I really liked the product and I
23 wished they had kept it going, and they stopped the
24 support which included paying physicians to help them

Page 148

1  with it.
2  BY MS. DICKINSON:
3      Q.  Did you use BioDelivery Sciences's product
4  Bunavail at any time in your practice?
5      A.  Yes.
6      Q.  How often?  Frequently?
7      A.  No.
8      Q.  Did you use the -- the other product, the
9  one that was in the treatment for pain in your
10 practice at any time?
11     A.  No, ma'am.
12     Q.  Okay.  Why not?
13     A.  Because I'm not a pain medicine doctor.
14     Q.  I forgot to ask you with respect to your
15 work for Braeburn Pharmaceuticals, did you use -- or
16 did their product come to market?  I'm sorry.
17     A.  Yes.
18     Q.  And did you use their product in your
19 practice?
20     A.  No.
21     Q.  Why not?
22     A.  Because I never went through the training
23 because it's an injectable and there are specific
24 things you have to do to be trained to be someone to

Page 149

1  put the implant in and take the implant out.
2      Q.  Was it -- it wasn't something you thought
3  would be useful in your practice, I take it?
4      MS. HIBBERT:  Objection to form.
5  BY THE WITNESS:
6      A.  I believe the product has merit and could
7  have been helpful to some of my patients, but I
8  decided to not go through the steps required to obtain
9  the expertise to do a minor office surgical procedure
10 in the practice settings where I practiced because it
11 is a minor surgical procedure.
12 BY MS. DICKINSON:
13     Q.  Okay.  All right.  Let's move to the next
14 one, Purdue Pharma.
15     A.  Yes, ma'am.
16     Q.  I see from your CV that you did work for
17 Purdue Pharma, it says from October 2016 to
18 December 2016.
19        Is that accurate?
20     A.  Yes, ma'am.
21     Q.  Okay.  Was that the first, October 2016,
22 was that the first time you had ever worked with
23 Purdue Pharma?
24     A.  Yes, ma'am.

Page 150

1    Q.   Had you ever come in contact with anyone
2  at Purdue Pharma prior to October 2016?
3      MS. HIBBERT:  Objection to form.
4  BY THE WITNESS:
5    A.   Could you restate that?
6  BY MS. DICKINSON:
7    Q.   Yes.
8        Had you ever come in contact with anyone
9  at Purdue Pharma prior to the time you went to work
10 for them in October of 2016?
11     MS. HIBBERT:  Same objection.
12 BY THE WITNESS:
13   A.   I was in places where their sales force
14 was promoting their drug, exhibits at meetings.
15 Because I didn't prescribe their products, I didn't
16 talk to them about it.  I would say I had no contact
17 with any quote/unquote corporate types.  So there is
18 nothing of substance that I would say would be an
19 affirmative answer to your question before I got this
20 phone call from Purdue Pharma.
21 BY MS. DICKINSON:
22   Q.   Okay.  What types of meetings would you be
23 at where there were sales representatives promoting
24 products to other doctors?

Page 151

1      MS. HIBBERT:  Objection to form.
2  BY THE WITNESS:
3    A.   Medical conferences where there would be
4  an exhibit hall.
5  BY MS. DICKINSON:
6    Q.   Okay.  Can you give me a couple of
7  examples of what types of medical conferences you were
8  attending where there would be sales reps promoting
9  Purdue's products?
10     MS. HIBBERT:  Objection to the form.
11 BY THE WITNESS:
12   A.   Madam, that's a very good question because
13 I'm originally trained in psychiatry and I go to
14 psychiatry meetings and I am an addiction medicine
15 physician, go to addiction meetings, and I'm trying to
16 think if I ever, for instance, would speak at a pain
17 conference.  Certainly I've -- I've been -- yes, I've
18 been on the faculty for a pain board review course
19 right here in Madison at the university.  And there
20 could have been Purdue Pharma reps having an
21 exhibit promoting their pain products to pain doctors
22 at those sorts of meetings.
23 BY MS. DICKINSON:
24   Q.   Okay.  What was the first -- was

Page 152

1  October 2016 the first date on which you performed
2  work for Purdue?
3    A.   Yes.
4    Q.   Okay.  How did you first come in contact
5  with Purdue Pharma?
6    A.   I got a phone call --
7      MS. HIBBERT:  Objection to form.
8      THE WITNESS:  Sorry.
9  BY MS. DICKINSON:
10   Q.   Go ahead.
11       Do you want me to repeat the question?
12   A.   No.
13   Q.   How did you first come in contact with
14 Purdue Pharma?
15     MS. HIBBERT:  Objection to form.
16 BY THE WITNESS:
17   A.   I got a phone call from a member of their
18 staff.
19 BY MS. DICKINSON:
20   Q.   Who is that?
21   A.   Gina Barbara -- Barbarotta, I believe it
22 is.
23   Q.   Could you give her your best idea of how
24 that is spelled, her last name?

Page 153

1    A.   Again, I -- I don't have any devices here,
2  so I can't look her up, because she is not with them
3  anymore, but B-a-r-b-a-r-o-t-t-a, I believe it is.
4  G-i-n-a, Gina Barbarotta.
5    Q.   Did you know Ms. Barbarotta before you
6  received the phone call?
7    A.   I did not.
8    Q.   Okay.  Who -- what position did
9  Ms. Barbarotta hold at Purdue at the time you received
10 the phone call?
11   A.   My understanding is that her job was to
12 help populate physician advisory boards for them.  She
13 would find physicians to sit on ad boards.
14   Q.   And is that what the phone call was asking
15 you to do?
16   A.   It was, but it was a different kind of ad
17 board.
18   Q.   Okay.  Let's talk about that.  So what was
19 Ms. Barbarotta asking you to do?
20     MS. HIBBERT:  Objection to form.
21 BY THE WITNESS:
22   A.   She was asking me to sit on an advisory
23 board, not for a pain medication or a product they
24 were selling, but to sit on an ad board to advise

Page 154

1  senior leadership of Purdue Pharma about addiction.
2  BY MS. DICKINSON:
3      Q.    Okay.  Anything else she told you about
4  what she wanted you to do when you had that first
5  conversation?
6      A.    My best guess is that any answer to that
7  question or follow-up questions of a similar type
8  would be covered by a confidentiality agreement I
9  signed with Purdue Pharma regarding being a member of
10 this addiction advisory board that I sat on.
11     Q.    Okay.  Do you -- can you tell me who the
12 senior leadership was that you were hired to advise
13 about addiction?
14     MS. HIBBERT:  Objection to form.
15 BY THE WITNESS:
16     A.    There was a -- I believe he was the chief
17 medical officer for the company.  When we met I
18 believe, if my memory serves me, the chief marketing
19 officer and the CEO of the whole company sat in for
20 part of the meeting.
21 BY MS. DICKINSON:
22     Q.    Okay.  How many -- how many meetings did
23 you have in the course of sitting on this advisory
24 board for Purdue Pharma?

Page 155

1      A.    One face-to-face meeting and I think two
2  follow-up conference calls.
3      Q.    Okay.  Tell me when the face-to-face
4  meeting was?  Was it sometime during -- between
5  October and December of 2016?
6      A.    I believe it was in October.
7      Q.    Okay.  And who was present at the
8  face-to-face meeting?
9      A.    Physicians, many of whom I knew from the
10 addiction community, and a variety of employees from
11 Purdue.  I would say 60 to 75 percent of the people in
12 the room were Purdue people because they wanted to
13 have a large number of their people hear directly what
14 the advisers were sharing.
15     Q.    Okay.  How many people from Purdue would
16 you estimate were in the room on that day?
17     MS. HIBBERT:  Objection to form.
18 BY THE WITNESS:
19     A.    I would say between 15 and 20.
20 BY MS. DICKINSON:
21     Q.    Okay.  And that included both the chief
22 marketing officer and the chief medical officer?
23     MS. HIBBERT:  Objection to form.
24 BY MS. DICKINSON:

Page 156

1      Q.    I think you told me that -- a minute ago
2  that the chief marketing officer --
3      A.    Yes, sir -- yes, ma'am.
4      Q.    -- and the chief medical officer sat in on
5  a meeting that you had at Purdue, was -- did the chief
6  marketing officer and the chief medical officer sit in
7  on that meeting in October?
8      MS. HIBBERT:  Objection; form, mischaracterizes.
9  He said he believes that they may have.
10         But you can answer, Dr. Miller.
11 BY THE WITNESS:
12     A.    Yes.
13 BY MS. DICKINSON:
14     Q.    Okay.  I'm going to ask the question again
15 because I'm totally confused now.
16         Is your answer yes that -- that you
17 believe the chief marketing officer and the chief
18 medical officer were at that October meeting?
19     MS. HIBBERT:  Objection to form.
20 BY THE WITNESS:
21     A.    Yes.
22 BY MS. DICKINSON:
23     Q.    Okay.  Do you know either one of those
24 individuals' names?

Page 157

1      A.    I also don't know if they are still there.
2      Q.    That's okay.
3         Do you know either one of those two
4  individuals' names?
5      A.    Uhn-uhn.
6      Q.    Okay.
7      A.    I'm sorry, ma'am, to the transcriptionist,
8  "no," not "uhn-uhn."
9      Q.    Do you -- other than Ms. Barbarotta, do
10 you know any of the other Purdue employees' names that
11 were in the room of the 15 to 20 people?
12     A.    David Haddox was there.
13     Q.    Okay.  Did you know Dr. Haddox before this
14 October meeting?
15     A.    Yes.
16     Q.    How?
17     A.    He came to ASAM conferences because he is
18 a member.
19     Q.    When did you first meet David Haddox?
20     A.    I don't remember, but I would estimate it
21 was at least four years prior and maybe a long time
22 before that.
23     Q.    Okay.  How often per year did you interact
24 with David Haddox?

Page 158

1  A.   Less than once a year.  Let me answer your
2  question.  I think I probably ran into David four to
3  six times over a span of years.
4  Q.   Okay.  During those four to six times, did
5  you ever have substantive interaction with David
6  Haddox on the issue of opioids?
7  MS. HIBBERT:  Objection to form.
8  BY THE WITNESS:
9  A.   I'm going to speculate and give you a -- a
10 yes answer to that.
11 BY MS. DICKINSON:
12 Q.   Okay.  What was the substance of the
13 conversation you had with David Haddox on the
14 substance -- that had to do with opioids?
15 MS. HIBBERT:  Objection to form, calls for
16 speculation.
17 BY THE WITNESS:
18 A.   The American Society of Addiction Medicine
19 has offered a special continuing education course for
20 20 years now called "Pain and Addiction:  Common
21 Threads."
22 Q.   Okay.
23 A.   I have been on the faculty of that course
24 a number of times and have served on the program

Page 159

1  committee for that course for a number of years, all
2  of which is reflected somewhere in Exhibit 3.
3  Q.   Okay.
4  A.   Both of those, look for the words "Common
5  Threads."
6  Dr. Haddox attended and served as faculty.
7  I don't believe he ever served on the program
8  committee.  But I would interact with him by sitting
9  in the audience, we would discuss informally
10 presentations that were made.  We were acquainted.
11 I will go a bit afield and say I was
12 President of the American Society of Addiction
13 Medicine, so I was more known to others than I would
14 know them.  Everybody knows who the president is.
15 Q.   Right.
16 A.   And so he made himself familiar to the
17 president.  So we had an acquaintanceship through the
18 American Society of Addiction Medicine where he was a
19 dues paying member, so we were equals in that regard.
20 So that's where -- or that would be the
21 context in which we might have interactions regarding
22 the substance of opioids, and one of the main purposes
23 of the Common Threads course is what do you do if
24 there is a common thread, what if you have a patient

Page 160

1  with addiction who has pain, how do you manage pain in
2  a patient with addiction, and would you ever use an
3  opioid to treat pain in a patient with addiction.  And
4  certainly Dr. Haddox had opinions about that, as would
5  other people.
6  So that -- that's -- when you said was
7  there a discussion about substance, that's what it
8  would have included.
9  Q.   Did you ever have lunches or dinner with
10 Dr. Haddox outside of presentations at ASAM?
11 MS. HIBBERT:  Objection to form.
12 BY THE WITNESS:
13 A.   None that I can recall.
14 BY MS. DICKINSON:
15 Q.   Did you have -- for your work with Purdue
16 Pharma, did you have a written agreement?
17 A.   Yes.
18 Q.   Okay.  Do you still have a copy of that?
19 A.   Probably.
20 Q.   Okay.
21 Was the written agreement to provide
22 services on their advisory board that we just
23 discussed?
24 MS. HIBBERT:  Objection to form.

Page 161

1  BY THE WITNESS:
2  A.   On this advisory board, yes.
3  BY MS. DICKINSON:
4  Q.   Did you provide any services to Purdue
5  Pharma other than work on this advisory board?
6  A.   No.
7  Q.   Okay.  You said there was a one-day
8  meeting.
9  Where did that take place?
10 A.   Corporate headquarters, Stamford,
11 Connecticut.
12 Q.   Okay.
13 And you said there were a number of
14 physicians in attendance.  Were those physicians also
15 members of the advisory board?
16 A.   Yes.
17 Q.   Can you tell me who any of those
18 physicians were?
19 A.   The one I have the greatest recollection
20 of is my friend and colleague, David Gastfriend,
21 G-a-s-t-f-r-i-e-n-d, M.D.
22 Q.   Okay.  Anyone else that you can remember
23 that was at that meeting that was a physician?
24 A.   I do not have specific recollections of

Page 162

1 others besides David.
2    Q.   Do you know -- did -- did the physicians
3 on the advisory board that day give presentations?
4    A.   No.
5    Q.   Okay.  What -- what was the structure of
6 the one-day meeting?
7    MS. HIBBERT:  Objection to form.
8 BY THE WITNESS:
9    A.   Roundtable.
10 BY MS. DICKINSON:
11   Q.   Did it have an agenda?
12   A.   Yes.
13   Q.   Do you know what types of issues were on
14 that agenda?
15   MS. HIBBERT:  Objection to form.
16 BY THE WITNESS:
17   A.   Yes.
18 BY MS. DICKINSON:
19   Q.   Okay.  What types of issues?
20   MR. HADAGHIAN:  Counsel for Purdue joins the
21 objection.
22       (Reporter clarification.)
23 BY MS. DICKINSON:
24   Q.   I'm sorry.  Do you know what types of

Page 163

1 issues were on the agenda at that October meeting?
2    MS. HIBBERT:  I'll object to form and also to
3 the extent that any of these -- this information is
4 protected pursuant to your confidentiality agreement,
5 I would instruct the witness not to answer.
6    MR. HADAGHIAN:  Counsel for Purdue joins the
7 objection.
8 BY THE WITNESS:
9    A.   I believe I can say something general that
10 is not forbidden by the confidentiality agreement.
11 BY MS. DICKINSON:
12   Q.   Okay.
13   A.   Again, in general, actually what we were
14 told is that this would be experts to advise Purdue on
15 what it could do about addiction.  And the substance
16 of what we advised them I certainly can't share with
17 you.
18       In the course of the day other than the
19 roundtable they threw in a couple of extra things, and
20 one was to present data on other products that they
21 had that had reached market or were being considered
22 for market, and I would put this under the overall
23 category of abuse deterrent formulations.  So some of
24 their medication development folks used this audience

Page 164

1 to throw out some ideas that quite honestly I thought
2 was off topic and I think my colleagues thought was
3 off topic, and it was like, What -- what's all this.
4 And we were not terribly helpful to them because we
5 said, You're choosing the time to do that, we thought
6 we were going to talk about addiction.
7       So the agenda included that they wanted to
8 throw these things in that we thought were not
9 pertinent to what we were doing in giving them advice,
10 but -- so that's general subject headings, but you
11 said -- what was it -- so in general, no, none of
12 the -- none of the physician experts who were brought
13 in gave presentations.  We all were in a roundtable
14 discussing concepts and brainstorming.
15   Q.   Okay.  Did you feel like the other
16 subjects that were thrown in about abuse deterrent
17 formulations, did you feel like that was a sales
18 pitch?
19   MS. HIBBERT:  Objection to form.
20   MR. HADAGHIAN:  Counsel for Purdue joins the
21 objection.
22 BY MS. DICKINSON:
23   Q.   Go ahead.
24   A.   I believe -- I believe you understand that

Page 165

1 this has nothing to do with the opinions I was asked
2 to formulate in this case.
3    Q.   Understood.
4    A.   This is completely off topic.
5       So you are asking my beliefs?
6    Q.   Well, you understand that Purdue is a
7 defendant in this case, correct?
8    A.   Yes.
9    Q.   Okay.  So I'm going to ask you again, you
10 stated that -- that some of the topics of that
11 roundtable were off topic for what you understood was
12 going to happen that day, is that fair?
13   A.   Correct.
14   MS. HIBBERT:  Objection; form.
15 BY MS. DICKINSON:
16   Q.   And did you feel like those topics that
17 were off topics were kind of part of a sales pitch?
18   MS. HIBBERT:  Objection to form.
19   MR. HADAGHIAN:  Purdue joins the objection.
20 BY THE WITNESS:
21   A.   I -- I would actually not characterize it
22 in that way, no, ma'am.
23 BY MS. DICKINSON:
24   Q.   How would you characterize it?

Page 166

1  MS. HIBBERT: Objection to form.
2  MR. HADAGHIAN: Counsel for Purdue joins the
3  objection.
4  BY THE WITNESS:
5  A.  It was more about, What are you experts on
6  addiction, because you are not pain experts, we get
7  advice from them in other ad boards, what do you
8  experts on addiction think of this material we are
9  sharing with you, just react to it.  So i -- I did not
10 see it as a sales pitch.
11 BY MS. DICKINSON:
12 Q.  Okay.  Did -- did the group on the
13 advisory board give their opinions and reactions to
14 people at Purdue?
15 MS. HIBBERT: Objection to form.
16 MR. HADAGHIAN: Counsel for Purdue joins the
17 objection.
18 BY THE WITNESS:
19 A.  We did.
20 BY MS. DICKINSON:
21 Q.  Okay.  Do you know -- did -- did the group
22 make any recommendations to Purdue of things they
23 should do differently or the same?
24 MS. HIBBERT: Objection to form.

Page 167

1  MR. HADAGHIAN: Counsel for Purdue joins the
2  objection.
3  BY THE WITNESS:
4  A.  We do what we are asked to do, yes.
5  BY MS. DICKINSON:
6  Q.  Okay.  And do you know if any of those
7  recommendations were followed by Purdue?
8  MS. HIBBERT: Objection to form.  It calls for
9  speculation.
10 BY THE WITNESS:
11 A.  I do not know.
12 MS. HADAGHIAN: Counsel for Purdue joins the
13 objection.
14 BY MS. DICKINSON:
15 Q.  Which colleagues in the field of addiction
16 medicine also were sitting on the Purdue advisory
17 board that you were sitting on, other than I think you
18 mentioned -- I'm sorry, the gentlemen you mentioned, I
19 can't remember his name?
20 A.  His name is Gastfriend and --
21 Q.  Okay.
22 A.  -- and what I've already testified is I
23 don't remember any other specific people.
24 Q.  Okay.

Page 168

1  A.  There -- there were certainly long time
2  friends and acquaintances there, but I don't remember
3  who was in that room that day.
4  Q.  Okay.  You said you had a written
5  agreement with Purdue.
6  What was the compensation under that
7  written agreement?
8  A.  It was a daily rate.
9  Q.  And do you know how much that was?
10 
13 Q.  Okay.  And were you paid for the day that
14 you spent in October of 2016?
15 A.  Yes.
16 Q.  Okay.  And with respect to traveling to
17 Purdue's corporate headquarters, did Purdue pay for
18 the travel?
19 A.  Yes.
20 Q.  Did Purdue pay for your meals during that
21 time that you were -- spent traveling to that meeting?
22 A.  Yes.
23 Q.  Okay.  Aside from that day, did you do any
24 other work for Purdue under the agreement you signed

Page 169

1  to be on their advisory board?
2  A.  Yes.
3  Q.  Okay.  What other work did you do?
4  A.  I joined in conference calls that were
5  follow-up to the face-to-face meeting.
6  Q.  Okay.  How many conference calls in the
7  months that you served on the advisory board did you
8  participate in?
9  A.  My memory is that there were two that I
10 participated in.
11 Q.  Do you know how long those were in length?
12 A.  An hour or less.
13 Q.  Okay.  And were you paid for your time on
14 those conference calls by Purdue?
15 A.  I do not think I was.
16 Q.  Did you participate in any written
17 communication or e-mail communication with folks at
18 Purdue pursuant to the agreement that you had between
19 October 2016 and December 2016?
20 MS. HIBBERT: Objection to form.
21 BY THE WITNESS:
22 A.  I believe I did.
23 BY MS. DICKINSON:
24 Q.  Okay.  Who were you communicating with?

Page 170

1    A.   The point person who the Purdue hierarchy
2  assigned to this was the CMO, and so I believe there
3  was e-mail exchange with him.
4    Q.   And who was the CMO?
5    A.   I have no idea.
6    Q.   Okay.  What was the purpose of the e-mail
7  exchange with the CMO following the meeting in October
8  of 2016?
9    MS. HIBBERT:  Objection to form.
10   MS. HADAGHIAN:  Purdue joins the objection.
11 BY THE WITNESS:
12   A.   Yeah.  I believe you previously asked me
13 did we provide any ideas to them.  And the conference
14 call, I think the first one was:  This is the list of
15 what we heard you say.  Did we hear correctly?  We
16 just want to know if this list is an accurate list.
17 And then another call was an update on what might
18 happen regarding any implementation, and that was it.
19   Q.   What was being discussed to be
20 implemented?
21   MS. HIBBERT:  Objection to form.
22 BY THE WITNESS:
23   A.   That's -- I think that's definitely --
24   MS. HADAGHIAN:  Purdue --

Page 171

1  BY THE WITNESS:
2    A.   That's --
3    MS. HADAGHIAN:  Purdue joins the objection.
4        I'm sorry for interrupting, Dr. Miller.
5    THE WITNESS:  No, that's quite all right.
6  BY THE WITNESS:
7    A.   But I was going to say that's -- that
8  would definitely be covered by the confidentiality
9  agreement.
10   MS. DICKINSON:  Counsel, are you taking the
11 position that he can't answer these questions because
12 I -- I think documents have actually been produced
13 about his participation in the advisory board and
14 e-mails -- the e-mail exchanges have been produced.
15       Are you taking the position he can't
16 answer these questions?  I think any confidentiality
17 has probably been waived by the production.  If you
18 want to mark the transcript confidential, I
19 understand, maybe you have a position there, but the
20 questions about it, I'm not sure you can instruct him
21 not to answer if the documents have been produced in
22 the case.
23   MS. HIBBERT:  I don't know what Purdue's
24 position is on this, but my position as being here

Page 172

1  with Dr. Miller here today, I've not instructed him, I
2  don't think, not to answer specific questions as to
3  this, but with regard to what Dr. Miller feels
4  comfortable answering pursuant to his confidentiality
5  agreement, I can't control, he is the only person that
6  knows about that, and the -- maybe counsel for Purdue,
7  too.  I -- I won't also advise him to answer questions
8  pertaining to matters that may or may not have been
9  put into the record in this case.  I haven't seen
10 those documents.  I haven't shown those document --
11 documents to Dr. Miller.  So if he doesn't feel
12 comfortable providing responses because he believes
13 the responses are covered pursuant to his
14 confidentiality agreement, that's a decision that
15 Dr. Miller has to make, but I am not instructing him
16 not to answer based on the -- his own confidentiality
17 agreement.
18       Counsel for Purdue, I don't know if you
19 have any other comment on that, but...
20   MS. HADAGHIAN:  Purdue's position is consistent
21 with what counsel for Dr. Miller has stated.
22 BY THE WITNESS:
23   A.   And -- and my answer is I'm trying to make
24 them general.  I think they are not a violation of the

Page 173

1  confidentiality agreement I signed.  There was an ad
2  board.  It wasn't about a product.  It was general,
3  and this is why addiction experts were brought in.
4  Were we asked to provide ideas, yes.  Did they write
5  them down, yes.  Do I know if they implemented them,
6  no.  And specific advice we gave then, that's what
7  they paid for in confidence and that would be
8  propriety.  So that's the way I'm dealing with this --
9  BY MS. DICKINSON:
10   Q.   Okay.
11   A.   -- line of questions.
12   Q.   Fair.
13       Do you believe that written down and
14 summarized in these either e-mail exchanges or in some
15 written form following the first meeting were the
16 ideas that were discussed?  You don't have to tell me
17 what was in the written form.
18   MS. HIBBERT:  Objection to form.
19   MS. HADAGHIAN:  Purdue objects to form.
20 BY MS. DICKINSON:
21   Q.   Go ahead.
22   A.   I would think so.
23   Q.   Okay.  Did you see documents that were
24 summarizing the discussion from the October meeting?

Page 174

1    MS. HIBBERT: Objection to form.
2    MS. HADAGHIAN: Purdue joins the objection.
3  BY THE WITNESS:
4    A.  I'm not trying to be splitting hairs, but
5  I think "related to" would be a better term than
6  "summarized" because I don't think it was a -- an
7  encapsulation, but it was related to the discussions
8  we had, yes.
9  BY MS. DICKINSON:
10   Q.  Okay.  Were there minutes from the
11 October meeting that you ever saw?
12   A.  No.
13   Q.  Okay.  Were there written documents that
14 discussed some of the ideas that were discussed at the
15 October meeting that you saw?
16   MS. HIBBERT: Objection --
17   MS. HADAGHIAN: Purdue objects to form.  And I
18 apologize if I interrupted.
19   MS. HIBBERT: That's okay.  I join the
20 objection.
21 BY THE WITNESS:
22   A.  Not wanting to make a misstep in my
23 answer, yes, there were e-mails that would have
24 content.  I believe that, you know, that e-mails can

Page 175

1  have more informality than form -- than final
2  documents.  I don't know that any of the e-mails
3  represented documents.  They may list ideas, points or
4  concepts.  How much that ever became part of a
5  document, I have no idea.
6    Do I ever recall getting an e-mail
7  attachment of a Purdue synopsis or anything like that,
8  no.  I just recall getting an e-mail -- getting
9  e-mails where, Ladies and gentlemen, we think this is
10 what you said, does this reflect that, and any further
11 elaboration you have on the ideas that we brainstormed
12 about.  I think that's about as far as it goes.
13   Q.  Okay.  Your CV lists the relationship for
14 Purdue ending in December 2016.  How did the
15 relationship end?
16   MS. HIBBERT: Objection to form.
17   MS. HADAGHIAN: Purdue joins the objection.
18   THE WITNESS: Should I proceed with an answer?
19   MS. HIBBERT: Yes.  To the extent that you can,
20 yes.
21 BY THE WITNESS:
22   A.  Yeah, no.  It was interesting, I'll --
23 I'll speak under oath that this is my opinion and my
24 recollection -- not my opinion, my -- my -- my

Page 176

1  attitude about all of this, we hoped Purdue was doing
2  this in good faith.  We thought there was a chance
3  they were doing it in good faith.  We had no idea what
4  would happen as a result of this.  We gave them some
5  pretty good and provocative ideas.
6    After a relatively brief period of time,
7  one of the comments made was, We want broad input on
8  this.  We're probably going to rotate the membership
9  of this advisory board and maybe you'll be in it after
10 January 1st and maybe you won't.  And after this brief
11 of an engagement, I found that curious.  And basically
12 by the time the calendar year 2016 ended, they said
13 something not explicit but sort of in the ballpark of,
14 Thank you.  We don't need you anymore and you are not
15 going to be involved anymore, and they -- and so,
16 honestly, honestly, because I revise my CV from time
17 to time, nothing happened after December '16, but it
18 was open-ended and I called Ms. -- Ms. Barbarotta and
19 I said, What would you say was the end date of this
20 deal?  And she said, December 16th.  So that's what I
21 put down.  I probably entered that date a year or two
22 later.  So it was just sort of -- it just sort of
23 evaporated.
24 BY MS. DICKINSON:

Page 177

1    Q.  After December of 2016, did you have any
2  further contact with Purdue at any time?
3    A.  I had further contact with --
4    MS. HADAGHIAN: Purdue objects to form.
5    THE WITNESS: I'm sorry, ma'am.  Pardon me.
6  BY MS. DICKINSON:
7    Q.  Go ahead.
8    MS. HADAGHIAN: I apologize.  Please go ahead.
9    THE WITNESS: Yes.
10 BY THE WITNESS:
11   A.  I had a few conversations with
12 Ms. Barbarotta along the line of, Hey, what's going
13 on, because at that time I still had it open, anything
14 going on, you need me for anything, and her answer
15 was, I hadn't heard anything from home office that
16 anything is happening on this.  So I touched base with
17 her a couple of times to say, Is this an active deal
18 and she said not for you at this time.  And then
19 eventually I came to understand that she found another
20 professional opportunity.
21 BY MS. DICKINSON:
22   Q.  How did you come to understand that?
23   A.  She told me.
24   Q.  Okay.  When did you talk to her about when

Page 178

1 she came to take another professional opportunity?
2     A.   Whenever it happened.  I don't -- I would
3 say probably -- probably in '18.
4     Q.   Did she tell you why she was leaving
5 Purdue?
6     A.   No.
7     Q.   Why were you talking to her in 2018?
8     MS. HIBBERT:  Objection to form.
9     MS. HADAGHIAN:  Purdue objects to form.
10 BY MS. DICKINSON:
11     Q.   Go ahead.
12     A.   We were connected on LinkedIn and so I can
13 speculate that I would have posted something on
14 LinkedIn that she may have at one point said, Oh, good
15 comment.  Or that she put something on LinkedIn and I
16 had said, Good comment.  And then I think probably
17 what happened was I saw that she had posted something
18 on LinkedIn, you know how these things work.
19     Q.   Uh-huh.
20     A.   And she had a different title, different
21 company.  And I wrote and said, Hey, you are no longer
22 at Purdue.  And she goes, No.  And that was it.
23     Q.   Do you know where she went after Purdue?
24     A.   No.  It's in her LinkedIn.  Go look -- go

Page 179

1 look her up.
2     Q.   Okay.
3          After the advisory committee and those two
4 phone calls, I take it from your comments, but I want
5 to make sure, that no one at Purdue ever reached out
6 to you again for your opinions or to serve on a
7 further advisory board, is that true?
8     A.   Right.  Except -- they did not reach out
9 after things came to whatever end they came to at the
10 end of 2016.
11     Q.   Okay.  Have you had at Pur -- have you had
12 any interaction with anyone at Purdue about any
13 addiction treatment drugs that they have either
14 patented or are considering?
15     MS. HIBBERT:  Objection to form.
16     MS. HADAGHIAN:  Purdue joins the objection.
17 BY THE WITNESS:
18     A.   No.
19 BY MS. DICKINSON:
20     Q.   Okay.  You -- let's go to the last
21 pharmaceutical company that you listed on -- under
22 Consulting Positions that you worked for.
23          US WorldMeds.  What is US WorldMeds?
24     A.   It's a pharmaceutical company in

Page 180

1 Louisville, Kentucky that is marketing and
2 distributing a medication for the treatment of opioid
3 withdrawal.  It's a non-opioid medication.
4     Q.   Okay.  And your CV lists November 4, 2017
5 as a date that you worked for US Meds and also a
6 little bit later, September 2018 to present.
7          Are those both accurate?
8     A.   They are accurate, but it might require
9 some elaboration.
10     Q.   Yes, okay.  So let's just take them in
11 turn.
12          The first one lists a Opioid Withdrawal
13 Leaders Forum Advisory Group on November 24th, 2017.
14          Have I read that correctly?
15     A.   Yes, ma'am.
16     MS. HIBBERT:  I'll object to form.  That's not
17 the date it says, but...
18 BY MS. DICKINSON:
19     Q.   November 4th, 2017.
20     MS. HIBBERT:  You said 24th, but...
21     MS. DICKINSON:  Oh, I'm sorry.
22     MS. HIBBERT:  Just so the record is clear.
23 BY MS. DICKINSON:
24     Q.   Doctor, let's read it again.  This -- part

Page 181

1 of your CV lists a withdrawal -- Opioid Withdrawal
2 Leaders Forum Advisory Group on November 4th of 2017.
3          Have I read that correctly?
4     A.   Yes, ma'am.
5     Q.   Okay.  And were you hired by US WorldMeds
6 pharmaceutical company to do some work with respect to
7 their Opioid Withdrawal Leaders Forum?
8     MS. HIBBERT:  Objection to form.
9 BY THE WITNESS:
10     A.   My recollection is that a third party
11 found the participants and then all of the payments
12 were through US WorldMeds.
13 BY MS. DICKINSON:
14     Q.   Okay.  Who is the third party?
15     A.   I'm drawing a blank.
16     Q.   Okay.  Do you know when you were first
17 contacted by -- by anyone regarding US WorldMeds?
18     A.   I would guess it was within 60 days of
19 that face-to-face meeting in November.
20     Q.   Okay.  60 days prior?
21     A.   Yes, ma'am.
22     Q.   What -- what were the service -- were you
23 hired to perform services on an advisory board for
24 US WorldMeds?

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    MS. HIBBERT:  Objection to form.
2    BY THE WITNESS:
3    A.  No.
4    BY MS. DICKINSON:
5    Q.  Okay.  What were the services that you
6    performed for US WorldMeds that are listed in this
7    first entry?
8    A.  It was interesting because it was as if it
9    were an advisory board but it was 85 people.  So
10   because of the scope, you couldn't do it like an ad
11   board and it was a one-and-done deal.  So this was
12   physicians of a variety of specialties, mostly
13   addiction medicine.  I can't remember who else would
14   have been there.  Maybe some pain medicine docs, but
15   at any rate, we were in breakout groups and we did the
16   sort of things that an ad board would do --
17   Q.  Uh-huh.
18   A.  -- in one day to advise them about their
19   product.  And there was follow-up e-mail with them
20   regarding documents and it had to do specifically with
21   some real formal documents, patient education
22   documents, again, required by the FDA and how you
23   would phrase them.
24   Also, the slide deck.  So, if you

Page 183

1    understand how the pharmaceutical industry works,
2    speakers bureau PowerPoints are developed by a company
3    but they cannot be used unless approved by the FDA,
4    and then you cannot deviate from them if you are a
5    speakers bureau presenter.
6    So we gave a lot of very direct hands-on
7    input to them about what their slide deck might look
8    like before they presented it to the DEA for final
9    approval and -- and actual use in marketing.  So we
10   really contributed quite a bit.  And I don't think we
        ████████████████████████████████████
        ████████████████████████████████████
13   the day, if I recall correctly, but so -- so what
14   happened with that is that they had this thing that
15   was way too many individuals to be a functioning ad
16   board but did similar fun███.  It was one and done
17   with some follow-up and then they got their FDA
18   approval and they brought their drug to market and
19   then they built their cadre of speakers, okay.  And
20   then the same third-party company invited me to go to
21   the speakers bureau training.  So that was in
22   September of '18, okay.
23   Q.  Um-hum.
24   A.  I think the first speakers bureau

Page 184

1    presentations were probably given in around
2    November or December for that product.  And the
3    elaboration that I was going to give is that I began
4    working for the University of Wisconsin on October 1st
5    as a faculty member and I had a strong hunch that
6    there would be prohibitions against being on speakers
7    bureaus for pharma companies by the medical school or
8    the UW Medical Foundation.  And I will -- again, I'm
9    elaborating here.  I asked for clearance regarding
10   conflict of interest and permission because I have my
11   relationship with Ammon Labs and I had this open
12   relationship with this one pharma company and I had
13   the potential to be on speakers bureaus for other
14   companies.
15   Actually, Alkermes is listed here
16   somewhere.  I'd be happy to talk about Alkermes.  It's
17   not listed here because it never went anywhere, but
18   I'll be happy to talk about Alkermes which makes a
19   non-opioid blocker, a product called Vivitrol.
20   But that having been said, when I began at
21   the university I stopped doing all form of work.  I
22   told different pharma companies I'm on hold until I
23   get a legal opinion.  It took me months to get the
24   opinion that I thought I would get, which is, Can't do

Page 185

1    it.  And on my disclosure slides and all of my
2    PowerPoints, if you were to ever subpoena all of my
3    PowerPoints, you would see that my disclosure listed
4    several pharmaceutical companies for a while until
5    the -- I got my legal opinion, I have taken that off
6    of my disclosure slide because I can't do it.
7    So -- so I never gave a speakers bureau
8    presentation for US WorldMeds, I never gave one for
9    Alkermes, I did give one for Bunavail, that was before
10   I worked at the university, and so that gave you some
11   information.
12   Q.  Okay.
13   MS. HIBBERT:  Counsel, we've been going for
14   about an hour now, can we take a comfort break?
15   MS. DICKINSON:  Sure.  Let's do five quick
16   minutes.
17   THE WITNESS:  Good timing.
18   THE VIDEOGRAPHER:  We are off the record at
19   2:26 p.m.
20   (WHEREUPON, a recess was had
21   from 2:26 to 2:35 p.m.)
22   THE VIDEOGRAPHER:  We are back on the record at
23   2:35 p.m.
24   BY MS. DICKINSON:

Page 186

1    Q.   Dr. Miller, we are back on the record
2  after a short break.
3         We were just discussing the last
4  pharmaceutical company that you worked for that's on
5  your CV, US WorldMeds.
6         Do you recall that?
7    A.   Yes, ma'am.
8    Q.   Okay.  We had briefly started talking
9  about the first entry for US WorldMeds which was an
10 advisory group.
11        Is -- am I correct that in that advisory
12 group one of the things you were advising on was the
13 slide deck for later speakers bureaus for a drug for
14 US WorldMeds?
15   A.   Yes.
16   MS. HIBBERT:  Objection to form.
17   THE WITNESS:  Oh, sorry.
18 BY MS. DICKINSON:
19   Q.   Okay.  And what was the drug?
20   MS. HIBBERT:  Objection to form.
21 BY THE WITNESS:
22   A.   The tradename is L-u-c-e-m-y-r-a.
23 BY MS. DICKINSON:
24   Q.   And from your experience with

Page 187

1  pharmaceutical company speakers bureaus, I think you
2  testified, but I just want to make sure, that the way
3  that the speakers bureau systems works is that
4  speakers are handed a slide deck drafted by the
5  pharmaceutical company, is that true?
6    A.   That's the way I understand it to be.
7    Q.   In your experience, are speakers that are
8  paid speakers in a speakers bureau for pharmaceutical
9  companies allowed to make revisions to that slide
10 deck?
11   MS. HIBBERT:  Objection to form, calls for
12 speculation.
13 BY THE WITNESS:
14   A.   Speakers are instructed that they should
15 not go off script, but if they want to put in their
16 own slides, they have to identify them as their own
17 slides and not the company's slides.
18 BY MS. DICKINSON:
19   Q.   And the script, the original script comes
20 from whichever pharmaceutical company is sponsoring
21 the speakers, correct?
22   A.   Yes.
23   MS. HIBBERT:  Objection to form.
24 BY MS. DICKINSON:

Page 188

1    Q.   Okay.
2    MS. HIBBERT:  Dr. Miller --
3    THE WITNESS:  Sorry.
4    MS. HIBBERT:  -- give me a pause, please.
5    THE WITNESS:  Sorry.
6  BY MS. DICKINSON:
7    Q.   Which pharmaceutical companies have you
8  served on the speakers bureau for, could you give me a
9  list of those?
10   A.   BDSI and US WorldMeds.
11   Q.   You mentioned Ammon Labs.
12        Did you serve on the speakers bureau for
13 Ammon Labs?
14   A.   That's a different deal, but, in fact,
15 yes.  They -- they don't really have it well formed,
16 but I've given talks on their behalf and been
17 compensated for them.
18   Q.   Okay.  You mentioned an additional company
19 that makes Vivitrol, I believe.
20        What is the name of that company?
21   A.   A-l-k-e-r-m-e-s.
22   Q.   Have you ever served on the speakers
23 bureau for Alkermes?
24   A.   No.

Page 189

1    Q.   Have you ever done any work for Alkermes?
2    A.   Yes.
3    Q.   What kind?
4    A.   I have been trained to be on the speakers
5  bureau twice.  Once I was compensated for that time
6  spent in training, then years later they revised the
7  deck and you have to do updates, and I did not get
8  compensated that time, but never did it get to the
9  point that I got an appointment date to go give a
10 talk.
11   Q.   Okay.  If I go through the list, BDSI,
12 US WorldMeds, and Ammon Labs, you have been
13 compensated as a paid speaker for those three
14 companies, is that correct?
15   MS. HIBBERT:  Objection to form.
16 BY THE WITNESS:
17   A.   That's not correct because I'm on the
18 speakers bureau for US WorldMeds but haven't taken any
19 engagements because I now work for an academic medical
20 center employer that does not allow such
21 relationships.
22 BY MS. DICKINSON:
23   Q.   Okay.  Fair.
24        I think my original question had been what

Page 190

1 companies have you been on the speakers bureau for,
2 and you listed BDSI and US WorldMeds, is that correct?
3    A. And, again, to clarify my answers, I'm on
4 the list but haven't actualized it.
5    Q. That was going to be my next question.
6       Did you ever give paid speeches for either
7 BDSI or US WorldMeds?
8    A. Only BDSI.
9    Q. Okay. How many did you give for BDSI?
10    A. I believe just one.
11    Q. And do you know what you were compensated
12 for that?



15    Q. Okay. And then you mentioned you were
16 compensated for speeches from Am -- Ammon Labs, is
17 that correct?
18    A. Correct.
19    Q. How many speeches?
20    A. I have given one.
21    Q. Okay. About what product?
22    A. About their drug testing services.
23    Q. Okay. And then you testified that you had
24 been trained twice for another pharmaceutical company,

Page 191

1 Alkermes, but that you haven't yet given a paid speech
2 for Alkermes, is that correct?
3    A. Yes. And to -- I need to retract --
4 revise my answer to the previous question.
5       I have not given any sort of promotional
6 speeches for Ammon about their drug testing services
7 per se. I have given goodwill presentations at their
8 request to audiences they have selected about
9 addiction and using medications to treat addiction.
10 There could be a few slides in there about the fact
11 that you should be doing drug testing when you are
12 treating patients, but it really was general education
13 about addiction treatment to clinical audiences who
14 might potentially become customers of Ammon. They
15 were not -- they were very, very indirectly
16 promotional for Ammon, for Ammon's drug testing
17 services which is what their business line is.
18    Q. Have we talked about all of the
19 pharmaceutical companies for which you've given paid
20 speeches in the last few minutes?
21    MS. HIBBERT: Objection to form.
22 BY THE WITNESS:
23    A. I believe we have.
24 BY MS. DICKINSON:

Page 192

1    Q. Okay. And you mentioned that in
2 October you went back to your employment with the
3 University of Wisconsin, is that correct?
4    A. Yes, ma'am.
5    Q. And you testified that University of
6 Wisconsin had a prohibition on taking money from
7 pharmaceutical companies, is that correct?
8    MS. HIBBERT: Objection to form.
9 BY THE WITNESS:
10    A. Some would characterize it as that.
11 It's -- it's a -- it would have to be much more
12 specifically stated, but physicians cannot be on
13 speakers bureaus, I can tell you that as a very
14 specific.
15 BY MS. DICKINSON:
16    Q. Okay. What is the rule at University of
17 Wisconsin about taking any sort of compensation from
18 pharmaceutical companies?
19    MS. HIBBERT: Objection to form.
20 BY THE WITNESS:
21    A. I can only speak to it in general.
22 BY MS. DICKINSON:
23    Q. Okay. What is the general rule?
24    A. If you are getting any money to support

Page 193

1 your research, you have to disclose that big time. So
2 that would be considered industry-supported research.
3 You cannot be on ad boards for pharmaceuticals and you
4 cannot be on speakers bureaus for pharmaceuticals.
5    Q. Why is -- why is it that you cannot be on
6 ad boards or speakers bureaus while you are working at
7 the University of Wisconsin?
8    MS. HIBBERT: Objection to form.
9 BY THE WITNESS:
10    A. I think you should ask them.
11 BY MS. DICKINSON:
12    Q. Do you know?
13    MS. HIBBERT: Objection to form.
14 BY THE WITNESS:
15    A. I don't know. No, I don't know. I --
16 I -- I -- I have -- I -- that's -- that's their deal.
17 BY MS. DICKINSON:
18    Q. What is your understanding of why you
19 can't be on speakers bureaus or ad boards while you are
20 working for the University of Wisconsin?
21    MS. HIBBERT: Objection to form.
22 BY THE WITNESS:
23    A. The general sense is that physicians'
24 prescribing habits are influenced by corporate

Page 194

1 relationships.
2 BY MS. DICKINSON:
3    Q.   Okay.  You mention on Page 3 of your
4 report that -- and when I'm talking about your report,
5 I'm talking about the report in Exhibit 2, if you want
6 to turn there you certainly can.  I'm just going to
7 ask you a question about Paragraph 7 of your report.
8         Paragraph 7, I'm going to read just the
9 second sentence of the Paragraph 7.
10        "I was the first" --
11   A.   Just one second.  Can I put this away?
12   Q.   Oh, I'm sorry.
13   A.   Can I put this away?
14   Q.   Of course you -- I wouldn't put it away,
15 to be honest.
16   A.   Well --
17   Q.   We are not quite done.  But -- but, yes,
18 you can pick up Exhibit 2.
19   A.   Yes, No. 7, yes, ma'am.
20   Q.   Okay.  Paragraph 7 in the sent -- the last
21 sentence states:
22        "I was the first physician in Madison,
23 Wisconsin to prescribe this medication and I am
24 considered a key opinion leader in medication-assisted

Page 195

1 treatment, MAT, of addiction by all leading
2 manufacturers of FDA-approved medications to treat
3 addiction involving opioid use."
4         Did I read that correctly?
5    A.   Yes, ma'am.
6    Q.   When -- when it was referring to this
7 medication, is that Buprenorphine?
8    A.   Yes, ma'am.
9    Q.   Okay.  So you can put the report aside.
10        When you were referring to working as a
11 key opinion leader for all of the major manufacturers
12 of Buprenorphine, what is a key opinion leader?
13   MS. HIBBERT:  Objection to form.
14 BY THE WITNESS:
15   A.   In my life I have read a definition,
16 because I think it exists.  My understanding of the
17 concept is that it is an experienced physician whose
18 opinions are valued by their colleagues.
19 BY MS. DICKINSON:
20   Q.   Okay.  Have you ever served as a paid key
21 opinion leader for any pharmaceutical company?
22   A.   Absolutely nothing beyond what we have
23 already discussed.
24   Q.   Okay.  You stated that you serve as a key

Page 196

1 opinion leader for the man -- for the manufacturers of
2 Buprenorphine.
3         Which manufacturers of Buprenorphine do
4 you serve as a key opinion leader for?
5    MS. HIBBERT:  Objection to form,
6 mischaracterizes the statement made in this report and
7 his deposition testimony.
8 BY MS. DICKINSON:
9    Q.   Doctor, let's just go back, if we have to,
10 to Paragraph 7.  It just says:
11        "I am considered a key opinion leader in
12 medication-assisted treatment of addiction by all
13 leading manufacturers of FDA-approved medications to
14 treat addiction involving opioid use."
15        Have I read that correctly?
16   A.   Yes, ma'am.
17   Q.   Okay.  What manufacturers of FDA-approved
18 medications to treat addiction involving opioid use
19 are you referring to there?
20   A.   Again, I -- I completely agree with the
21 objection by counsel.  That statement says my
22 understanding is that they have a consideration of me,
23 an opinion of me, but I don't have a relationship with
24 those companies and I'm not compensated to offer key

Page 197

1 opinions.  I'm considered to have an opinion that
2 carries weights with my colleagues because of my
3 experience and my leadership role in addiction
4 professional organizations.  But when I -- when I say
5 all the manufacturers of addiction -- FDA-approved
6 medications, I'll have to give you the list of the
7 medications and I'll do that.  And it's a -- it's a
8 shortlist.
9    Q.   Okay.
10   A.   Okay.
11        Injectable naltrexone.  The product is
12 Vivitrol and the manufacturer is Alkermes and we have
13 the spellings of that already.
14        Buprenorphine, the first medication was
15 trade named Suboxone.  It is no longer made.  The
16 original company was called Reckitt Benkiser,
17 R-e-c-k-i-t-t, second word B-e-n-k-i-s-e-r, a German
18 manufacturer.  Reckitt has got two T's, I think.  They
19 changed their name to Indivior, I-n-d-i-v-i-o-r.
20        The second product to market was Zubsolv,
21 it is capital S -- capital Z-u-b, capital S-o-l-v.
22 I'm not sure if they've kept the S capital since.  The
23 corporation is called Orexo, O-r-e-x-o.
24        The next product was the Bunavail product

Page 198

1 made by BDSI which we've talked about.
2 　　The next product was the Probuphine
3 injection made by Braeburn.
4 　　The next product is Sublocade,
5 S-u-b-l-o-c-a-d-e, made by Indivior.
6 　　There was a branded product called Revia,
7 R-e-v-i-a, that was oral naltrexone that's been off
8 patent for years. I don't remember who the
9 manufacturer was.
10 　　Now oral naltrexone is only by a number of
11 generic houses. So when I made my comment about being
12 considered a key opinion leader, because I was the
13 founding president of this state's chapter of ASAM and
14 had been on the board of directors of the Wisconsin
15 Society of Addiction Medicine since its founding over
16 25 years ago, and because I've been President of the
17 American Society of Addictive Medicine, people
18 consider that my opinion carries weight. And so the
19 manufacturers know who the leaders of the professional
20 societies are and I meant nothing beyond that and I
21 definitely meant nothing fiduciary other than things
22 I've testified to otherwise.
23 　Q.　Okay. Are you aware that the
24 pharmaceutical company Actavis makes a Buprenorphine

Page 199

1 product?
2 　A.　I am not aware of that and I also don't
3 know if that indication is for addiction or for pain.
4 　Q.　I'm just asking if you are aware.
5 　A.　Yeah.
6 　Q.　Are you aware that the company Mylan makes
7 a Buprenorphine product?
8 　A.　I'm not aware.
9 　Q.　Are you aware that the company Rhodes
10 makes a Buprenorphine product?
11 　A.　It sounds like generic houses. I have --
12 I have -- I have never heard the name Rhodes.
13 　Q.　Okay. Are you a -- you are not aware that
14 Rhodes is connected to Purdue Pharma in any way?
15 　MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17 　A.　I'm definitely not aware.
18 　MS. HADAGHIAN: Purdue joins.
19 BY MS. DICKINSON:
20 　Q.　Okay. Are you aware of -- that the
21 company Mallinckrodt sells a Buprenorphine product?
22 　A.　I am not so aware.
23 　Q.　Are you aware that the company Teva sells
24 a Buprenorphine product?

Page 200

1 　A.　I am not so aware. I'm -- I'm aware that
2 companies make Buprenorphine for pain and some of
3 those companies that you listed make pain meds and
4 they may even be companies that are defendants in this
5 case, but pain is not my specialty, so I don't keep
6 track of the products.
7 　Q.　Okay.
8 　A.　I don't remember who makes Bu -- Butrans
9 even. That's the best known. I don't know who makes
10 it.
11 　Q.　Okay. If you would turn to Exhibit, let's
12 go to 3, your CV, if you would again.
13 　A.　I'm ready.
14 　Q.　Okay. I'm going to try to go through some
15 of this in the quickest way possible. I will promise
16 you I will not go through every entry. I'm going to
17 try to just ask you some general questions about
18 groupings on your CV and maybe it can go a little
19 faster, I hope.
20 　　So at the very top of Page 1 of Exhibit 3,
21 you have a -- a grouping of entries that starts with
22 "Clinical Instructor at University of Wisconsin."
23 　　Do you see that? It's probably the second
24 full paragraph.

Page 201

1 　MS. HIBBERT: He is looking at Page 1 of your --
2 　MS. DICKINSON: Page 1.
3 BY THE WITNESS:
4 　A.　I'm going to say something which will
5 disappoint my counsel.
6 BY MS. DICKINSON:
7 　Q.　Okay.
8 　A.　On Page -- on Page 8 at the top of
9 Hospital Affiliations --
10 　Q.　Okay.
11 　A.　-- I've testified to this whole story
12 about honorary medical staff.
13 　Q.　Yes.
14 　A.　Of Meriter.
15 　Q.　Yes.
16 　A.　This does not reflect that. There is a --
17 　Q.　Understood.
18 　A.　There is a newer addition of that page.
19 　Q.　Okay.
20 　A.　Somewhere that somebody is going to want
21 to make an exhibit in this litigation.
22 　Q.　Okay.
23 　A.　I'll have to generate that for everybody
24 and get that to you.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    And so the most current version of my CV
2 is a version that -- that lists that change as of
3 June 1st which was three days ago.
4    Q.   Okay.
5    A.   So I just want -- I -- I just noticed that
6 and I wanted to be honest with you about that.
7    Q.   I appreciate it.  And if at any time when
8 we are going through your CV, it's -- it's not a
9 perfection test.  If you notice another time and there
10 is just an inaccuracy, just let me know.  Okay?
11    A.   Thank you, ma'am.  What page are you on,
12 please?
13    Q.   Page 1.
14    A.   Yes.
15    Q.   Right at the top, the first -- the
16 grouping of entries --
17    A.   Yes.
18    Q.   -- that starts with "Clinical Instructor"?
19    A.   Yes, ma'am.
20    Q.   Does that grouping of entries summarize
21 your current employment?
22    A.   Those four lines do, yes, ma'am.
23    Q.   Okay.  Can you tell me, please, can you --
24 actually, can you give me a breakdown if -- if

Page 203

1 100 percent of your time is spent between these four
2 what percent is spent on which employment?
3    A.   I'm happy to.
4        Line 1 --
5    MS. HIBBERT:  Objection to form.
6 BY THE WITNESS:
7    A.   Oh, I'm sorry.  Oh, my goodness.
8    Q.   You are good.  Go ahead.
9    A.   Not being a lawyer, I don't know what's
10 objectionable.
11    Q.   No, you're all right.
12    MS. HIBBERT:  You are not required to,
13 Dr. Miller.  You are required to give me a -- a beat
14 to put the objection on the record.
15    THE WITNESS:  I am and I apologize.
16 BY THE WITNESS:
17    A.   Line 1, 50 percent.
18 BY MS. DICKINSON:
19    Q.   Okay.
20    A.   Line 2, 1 percent.  Line 3, 30 percent.
21 Line 4, 6 percent.  And the remaining percentage is my
22 consultation business which is not really employment.
23 It is just what I do.  All of my consultation
24 activities would be beyond those hours.

Page 204

1    Q.   Of your -- when you say your "consultation
2 activities," is that your litigation consulting?
3    A.   All.
4    Q.   Okay.  And what percentage of your work
5 time does your consultation activities take up?
6    A.   On my daily schedule it would be
7 12 percent max, but lately I've been working overtime.
8    Q.   In the last year, if by my math you were
9 up to about 60 percent of your work time, has
10 40 percent been spent on consulting activities?
11    MS. HIBBERT:  I'll object to your math.
12 BY MS. DICKINSON:
13    Q.   Okay.  Go ahead and answer.
14    A.   I will too.
15    Q.   All right.  So -- so what is the math, how
16 much is the last year have your activities been spent
17 on consulting?
18    A.   I would say in the whole year, and, again,
19 going over 40 hours a week, I would say that we are
20 20 percent consulting.
21    Q.   How -- how much money have you been paid
22 to date in this case?
23    A.   In this case?
24    Q.   Um-hum.

Page 205

1    A.   I think I've received about $22,000.
2    Q.   Do you have any outstanding invoices that
3 are not included in that $22,000?
4    A.   Yes.
5    Q.   Do you know how much are in those
6 outstanding invoices?
7    A.   I would say about 21.
8    Q.   So the rough total of services built --
9 billed to date in this case is roughly $43,000?
10    A.   Yes, ma'am.
11    Q.   What was your annual income in 2018?
12    MS. HIBBERT:  Objection to form.
13 BY THE WITNESS:
14



Highly Confidential - Subject to Further Confidentiality Review



Page 206

Page 208

Page 207

Page 209

6    MS. HIBBERT:  Objection to form.

7    THE WITNESS:  Sorry.

8  BY MS. DICKINSON:

9    Q.   Correct?

10   A.   Yes, ma'am.

11   Q.   Okay.  When did you stop working for

12  Rogers?

13   A.   June.

14   Q.   I'm sorry.  June of 2018?

15   A.   Yes, ma'am.

16   Q.   And did you resign or were you terminated?

17   A.   I resigned.

18   Q.   Why did you resign in June of 2018 from

19  Rogers?

20   A.   Multiple factors, but one of them is what

21  we talked about many hours ago, the path toward

22  retirement.  And, quite honestly, leaving what I've

23  referred to as a job for life at Meriter through 2010,

24  leaving there to go to Rogers was part of the idea of

Page 210

1 disengagement from something that I was intensely
2 workaholicly engaged in. And so I've been disengaging
3 from professional role gradually since 2010. And part
4 of leaving full-time employment to do part-time things
5 and build the consulting practice for the retirement
6 years was getting out of those obligations. And so I
7 left.
8    Q.   Has it been hard to disengage? It sounds
9 like it.
10    MS. HIBBERT:  Objection to form.
11 BY THE WITNESS:
12    A.   It -- it's been okay.
13 BY MS. DICKINSON:
14    Q.   Okay. Fair.
15        Let's look at the same page, Page 1. You
16 have a section called "National Activities."
17        Do you see that?
18    A.   Yes.
19    Q.   Can you briefly tell me what you were
20 doing in the first one of those listed activities on
21 the Council on Science and Public Health, American
22 Medical Association?
23    A.   Yes.
24    Q.   Okay. What, briefly, were you doing or

Page 211

1 are you doing there?
2    A.   Still doing it.
3    Q.   Good.
4    A.   I become chair of the council in a week.
5    Q.   What are -- what generally are your duties
6 as chair of the council?
7    A.   The council assists the AMA house of
8 delegates in developing the official policies of the
9 AMA, specifically those policies related to science
10 and public health.
11    Q.   Okay. I'm sorry.
12        You also list below it a:  "Chair
13 Professional Technical Advisory Committee Hospital
14 Accreditation Program, the Joint Commission, formerly
15 JACO, in 1998."
16        Do you see that?
17    A.   Yes, ma'am.
18    Q.   What was that position?
19    A.   That was a position where I was appointed
20 to the PTAC to a seat that was jointly held or granted
21 to three organizations:  The National Association of
22 Addiction Treatment Providers (NAATP), the National
23 Association of Alcohol and Drug Abuse Counselors
24 (NAADAC), and the American Society of Addiction

Page 212

1 Medicine (ASAM). So of the 40-something seats on the
2 Hospital Accreditation Program Advisory Committee, one
3 seat was jointly held by these three organizations.
4 And the other organizations would generally turn to
5 the physician organization, ASAM, and say, give us a
6 nominee.
7        I was asked by the leadership of ASAM to
8 serve on the Professional Technical Advisory
9 Committee, which I did from '94 to '98. And the
10 members of that advisory committee, all volunteers,
11 selected a chair to preside over the meetings. And so
12 my peers there picked me to be the chair.
13    Q.   Okay. When you served on that technical
14 advisory committee, who else was serving on that
15 committee?
16    A.   Representatives from professional
17 societies, from hospitals. So it was physicians,
18 nurses, psychologists, hospital administrators, people
19 who were stakeholders in the process of accrediting
20 hospitals.
21    Q.   And what did the committee do?
22    A.   We provided professional technical advice.
23    Q.   What does that mean?
24    A.   Well, that means the accreditation

Page 213

1 programs, and at that time I think the Joint
2 Commission had five or six, one for nursing homes, one
3 for hospitals, one for outpatient clinics, one for
4 health plans, for instance.
5        So these accreditation programs go to
6 organizations and survey them to determine if they
7 meet quality standards. So the Joint Commission is
8 the best known entity to conduct surveys of hospitals
9 to determine that they are providing quality care
10 according to a million little dimensions that are
11 codified in the standards manual. So the Joint
12 Commission develops standards and then it develops
13 survey procedures, then it executes surveys, and then
14 it reports results.
15        Our committee was to provide advice to the
16 Joint Commission on its standards primarily, its
17 survey procedures to some extent, its reporting
18 mechanisms. I think back around that era, public
19 reporting of outcomes was just coming into the fore,
20 and so being stakeholders, again, hospital
21 administrators, members of hospital medical staffs,
22 nurses, pharmacists, professional societies, it is a
23 very diverse, very nice, very esteemed group, very
24 exciting, we would get together and we would be

Page 214

1  presented an agenda to react to, and back then the
2  PTACs met either four to six times a year. I think
3  they met less and less during the time and they've
4  become less and less influential since 1998, but the
5  PTACs were a big deal back in the '90s.
6      Q.  Your experience as the chair of the -- can
7  we call it the PTAC committee, is that fair?
8      A.  The PTAC, yes.
9      Q.  Okay. Was Joint Commission hospital
10 accreditation important to the hospitals?
11     A.  Oh, yes.
12     Q.  Why?
13     A.  It has to do with stature and prestige.
14 You don't want to be unaccredited. So it's like a
15 Good Housekeeping seal or a Consumer Reports seal.
16 That's extremely important. But there was a bottom
17 line consideration as well, and that is something that
18 I will call "deemed status." And this was set up by
19 the Federal Government.
20     The Centers for Medicare and Medicaid
21 Services are the branch of the Federal Department of
22 Health & Human Services that oversees the Medicare and
23 Medicaid program and how they pay inpatient,
24 outpatient, nursing home, healthcare providers for

Page 215

1  healthcare services, okay.
2      To be a hospital that receives Medicare
3  payments, you have to be surveyed by CMS. The CMS
4  gave deemed status to the Joint Commission years ago,
5  and by that they mean if you have been surveyed by the
6  Joint Commission, you are deemed to be surveyed by
7  CMS. And so the Joint Commission surveys serve in
8  lieu of a government survey to determine if you are
9  eligible to receive Medicare services. Therefore, if
10 you lose Joint Commission accreditation, you lose your
11 ability to get paid by Medicare and Medicaid. You
12 might imagine the impact that would have on a
13 hospital.
14     Q.  It's a huge financial impact, correct?
15     MS. HIBBERT:  Objection to form.
16 BY THE WITNESS:
17     A.  Exactly, that's the point I was trying to
18 make.
19 BY MS. DICKINSON:
20     Q.  You made -- you actually made it very
21 clear, in an area that is really complicated. I
22 appreciate it. I used to defend hospitals years ago
23 and I'm not sure I ever heard someone put it that
24 succinctly.

Page 216

1      So, what relationship did this Joint
2  Commission standards have to Joint Commission
3  accreditation?
4      MS. HIBBERT:  Objection to the previous colloquy
5  before the question.
6      Go ahead.
7  BY THE WITNESS:
8      A.  The -- the surveyors go into facilities
9  and survey regarding to what extent on probably a
10 five-point grade, one, two, three, four, five, to what
11 extent are the structures and processes of the
12 provider organization adhering to the standards. So
13 that's the -- that's the checklist they use is the
14 standards manual. So what's in the manual matters.
15 BY MS. DICKINSON:
16     Q.  So essentially what's in the manual also
17 matters to the hospital's bottom line, is that fair?
18     MS. HIBBERT:  Objection to form.
19 BY THE WITNESS:
20     A.  There is a circuitous dotted line, but,
21 yes, Point A does go to Point Z at some point.
22 BY MS. DICKINSON:
23     Q.  The survey that you talked about that does
24 matter to the bottom line is based essentially on a

Page 217

1  checklist of are they meeting the standards, is that
2  fair?
3      MS. HIBBERT:  Objection to form. Also object to
4  this line of questioning, getting pretty far afield
5  from the scope of the opinions that Dr. Miller has
6  offered in this case and supposedly the purpose of
7  this deposition.
8      You can answer, Dr. Miller, if you can.
9  BY MS. DICKINSON:
10     Q.  You can answer. Go ahead.
11     A.  Your general characterization is accurate.
12     Q.  Okay.
13     Can we refer to the JACO standards manual
14 as the JACO standards? Do you understand what I'm
15 talking about when I say that?
16     MS. HIBBERT:  Objection to form.
17 BY THE WITNESS:
18     A.  I can give you a technical term.
19 MS. DICKINSON:
20     Q.  Okay. That would be great.
21     A.  The CAMH.
22     Q.  What does CAMH stand for?
23     A.  The Comprehensive Accreditation Manual for
24 Hospitals. Again, each of the Joint Commission

Page 218

1  accreditation programs has its own manual.  There is a
2  Comprehensive Accreditation Manual for Behavioral
3  Healthcare, the CAMH is the Comprehensive
4  Accreditation Manual for Hospitals.
5     Q.  Okay.  Are you familiar with the
6  University of Wisconsin Pain and Policy Study Group?
7     A.  I am.
8     MS. HIBBERT:  Objection to form.
9  BY MS. DICKINSON:
10    Q.  Okay.
11    THE WITNESS:  Sorry.
12    MS. HIBBERT:  If you give me a pause, please,
13 Dr. Miller.
14 BY MS. DICKINSON:
15    Q.  Who is that group?
16    A.  I don't --
17    MS. HIBBERT:  Objection to form.
18       Also, again, Dr. Miller is not being
19 offered as a fact witness in this case.  He has not
20 been noticed as a fact witness.  This is supposed to
21 be an expert deposition pertaining to the opinions
22 that Dr. Miller has offered in this case and outlined
23 in his report marked as Exhibit No. 2.  I'll allow
24 this line to continue for a little bit longer, but,

Page 219

1  again, I caution I think we are getting a little far
2  afield from the expert deposition that's supposed to
3  be taking place today.
4     MS. DICKINSON:  Counsel, this is absolutely in
5  the scope of questions that can be asked about his
6  background, his experience in the field, and -- and
7  you can instruct him not to answer if you want to, but
8  we are going to call Special Master Cohen if you do
9  because that's just a completely inappropriate
10 objection.
11 BY MS. DICKINSON:
12    Q.  So, Doctor, I'll just start again.
13       What -- what is the UW Pain and Policy
14 Group?
15    MS. HIBBERT:  Objection to form, lack of
16 foundation.
17 BY THE WITNESS:
18    A.  I don't know that it exists today.
19 BY MS. DICKINSON:
20    Q.  Okay.  What was it?
21    A.  When I was aware of it, it was a group
22 that tried to advise various entities or stakeholders
23 on what policies they should have about the use of
24 opioids in the management of pain.

Page 220

1     Q.  How long have you been familiar with that
2  group?
3     MS. HIBBERT:  Objection to form.
4  BY THE WITNESS:
5     A.  I believe the early '90s.
6  BY MS. DICKINSON:
7     Q.  Okay.  Generally were -- did that group
8  have a previous name?  I think I read somewhere it was
9  the Comprehensive Cancer Center or something like
10 that?
11    MS. HIBBERT:  Objection to form.
12 BY THE WITNESS:
13    A.  Again, this is all sorts of facts that I'm
14 trying to help you with with your questions, but the
15 Carbone Comprehensive Cancer Center is largely a
16 clinical and research entity.  It is not a policy
17 entity.
18 BY MS. DICKINSON:
19    Q.  And who -- are you familiar with the
20 Carbone Cancer Center -- Comprehensive Cancer Center?
21    A.  I am.
22    Q.  Okay.  And what is that?
23    A.  It's the division of university hospital
24 and the medical school that houses clinical and

Page 221

1  research oncologists and medical scientists that do
2  cancer research.
3     Q.  Do you know if the Carbone Comprehensive
4  Cantor -- Cancer Center physicians had a role in
5  advocating for the use of opioids?
6     MS. HIBBERT:  Objection to form, calls for
7  speculation.
8  BY THE WITNESS:
9     A.  Yeah, this is way outside of -- I did not
10 form an opinion about that.  I don't have anything
11 formal to say about that.  My -- my -- my --
12 BY MS. DICKINSON:
13    Q.  Do you know is what I'm asking?
14    MS. HIBBERT:  Objection to form.
15 BY THE WITNESS:
16    A.  Can -- let me reread the question here.
17       "Do you know if Carbone Comprehensive
18 Cancer Center physicians had a role in advocating for
19 the use of opioids?"
20       Interesting question.  I don't know if
21 they did.
22 BY MS. DICKINSON:
23    Q.  Okay.  Do you know any of the doctors
24 in -- that were a part of the UW Pain and Policy

Page 222

1  Group?
2      MS. HIBBERT:  Objection to form.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MS. DICKINSON:
6      Q.   Okay.  Which doctors?
7      A.   I don't know of any physicians, but you
8  said doctors.
9      Q.   Right, Ph.D.s would be included in my
10 question.
11     A.   Exactly.
12          And David Joranson was a principal,
13 J-o-r-a-n-s-o-n, Ph.D., and either a part of or a
14 regular consultant to the WPP -- what are they called,
15 Wisconsin Pain & Policy Project, is that what they're
16 called, WPPP?
17     Q.   Typically it's referred to as the UW PPSG,
18 I think.
19          Does that sound right?
20     A.   Whatever.
21     Q.   Okay.  We know what we are talking about,
22 correct?
23     A.   Yes.
24     MS. HIBBERT:  Objection.

Page 223

1  BY MS. DICKINSON:
2      Q.   Okay.
3      A.   But June Dahl.
4      Q.   Okay.
5      A.   D-a-h-l, Ph.D.
6      Q.   How long have you known Dr. Joranson?
7      MS. HIBBERT:  Objection to form.
8  BY THE WITNESS:
9      A.   Over 25 years.
10 BY MS. DICKINSON:
11     Q.   How did you first know Dr. Joranson?
12     A.   I either attended a presentation he gave
13 or we were on a panel together presenting together to
14 some sort of conference.
15     Q.   Have you worked on -- have you worked with
16 Dr. Joranson over the years?
17     MS. HIBBERT:  Objection to form.
18 BY THE WITNESS:
19     A.   Again, listening to your question, I would
20 not say I have worked with him which implies
21 collaboration.  I have not.
22 BY MS. DICKINSON:
23     Q.   Okay.  That's a fair distinction.
24          You have not collaborated with

Page 224

1  Dr. Joranson on professional projects, is that fair?
2      A.   I'm having a hard time answering your
3  question, ma'am, because it was so many years ago and
4  would one characterize it as collaboration to be
5  working as an addiction medicine physician with a
6  professional society on a topic that they were also
7  working with.  So I didn't work with him, but did we
8  ever work in parallel and, you know, on -- on the same
9  general theme.  Well, certainly I've -- I've already
10 implied that we have sat on panels together where a
11 topic was discussed and the topic would be the use of
12 pain meds.
13     Q.   And when you say the use of pain meds, do
14 you mean the opioid pain meds?
15     A.   Yes, ma'am.
16     Q.   Okay.  How many times do you think you
17 interacted with Dr. Joranson on panels and those types
18 of things with respect to opioids over the 25 years?
19     MS. HIBBERT:  Object to form.
20 BY THE WITNESS:
21     A.   My best guess would be three to six.
22 BY MS. DICKINSON:
23     Q.   And when you say three to six, three to
24 six times?

Page 225

1      A.   Three to six times --
2      Q.   Okay.
3      A.   -- in 25 years, yes, ma'am.
4      Q.   Okay.  How long have you known June Dahl?
5      A.   Again, about 25 years, maybe a little
6  bit -- I -- I knew June before I knew David by a few
7  years.
8      Q.   Okay.  And what was June Dahl's specialty?
9      MS. HIBBERT:  Objection to form.
10 BY THE WITNESS:
11     A.   I should know the answer.  I'm pretty
12 certain she is a pharmacologist and not a pharmacist,
13 but she teaches in the school of pharmacy.  I don't
14 think she is a pharmacist.  I think she is a
15 pharmacologist.
16 BY MS. DICKINSON:
17     Q.   And teaches in the school of pharmacy you
18 meant at UW?
19     A.   University of Wisconsin, Rennebohm School
20 of Pharmacy.
21     Q.   How did you come to know Dr. Dahl?
22     A.   Again, she has been faculty, but mostly it
23 would be we were on faculty together in a particular
24 course.  We've taught together a number of times.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    Q.   Okay.  What course have you taught with
2  June Dahl?
3    A.   Well, most recently the board review
4  course for pain medicine sponsored by UW, and that's
5  in my CV.  I did it four or five years in a row.
6    Q.   Okay.  Have you taught other courses with
7  June Dahl?
8    A.   My general recollection is yes.  Specifics
9  I don't have.  I would certainly think that we invited
10  her to speak at Wisconsin Society of Addiction
11  Medicine educational conferences where I was also on
12  the faculty, but maybe that didn't happen, but I think
13  it did.
14    Q.   Okay.  On the courses that you taught with
15  June Dahl at UW, was there a syllabus?
16    A.   Yes.
17    Q.   Do you still have copies of those written
18  syllabus?
19    A.   I actually have thumb drives with three
20  different years' worth of syllabi.
21    Q.   And which years do you think you have?
22    A.   '18, '17 and '16 of this century.
23    Q.   Prior to these last five years where you
24  taught the course with June Dahl at UW, did you teach

Page 227

1  other courses with her ever at UW?
2    A.   You know, I don't even know if it's in my
3  CV, but it might be.  Over the years I have been asked
4  to present to classes in the law school, in the social
5  works school, in the pharmacy school, maybe even the
6  physical therapy school, maybe even the vet school,
7  I -- you know, but people just call up and say, We've
8  heard you are a good speaker or we need an expert.
9  And so I've probably taught in one of June's courses
10  where I'd come in for one session and teach a session.
11    Q.   Okay.  We talked about your work on the
12  PTAC for the Joint Commission back in 1998.
13       Did you ever come into contact with either
14  Dr. Dahl or Dr. Joranson during your time working on
15  that committee?
16    A.   Yes.
17    Q.   Okay.  When?
18    A.   My last year.
19    Q.   Okay.  And then is -- was that 1998?
20    A.   I believe so.
21    Q.   Okay.  What was the substance of that
22  contact?
23    A.   A presentation was made to the PTAC about
24  the idea of a new standard to put in -- in the manual.

Page 228

1    Q.   Okay.  And when you say "the manual," we
2  are talking about this CAMH?
3    A.   CAMH, yes, ma'am.
4    Q.   Okay.  And was -- that presentation was
5  made by Dr. Dahl and Dr. Joranson?
6    MS. HIBBERT:  Object to form.
7  BY THE WITNESS:
8    A.   No.
9  BY MS. DICKINSON:
10    Q.   Okay.  I'm sorry.  Who made that
11  presentation?
12    A.   Dr. Joran- -- Dr. Dahl and another person
13  whose name I don't recall.
14    Q.   Was that other person someone at the UW
15  pain and policy group?
16    MS. HIBBERT:  Objection to form.
17  BY THE WITNESS:
18    A.   To the best of my recollection, it was
19  not.
20  BY MS. DICKINSON:
21    Q.   Okay.  Was that other person someone from
22  the University of Wisconsin?
23    A.   To the best of my knowledge, it was not.
24    Q.   Okay.  Do you know what entity that other

Page 229

1  person was affiliated with?
2    MS. HIBBERT:  Objection to form.
3  BY THE WITNESS:
4    A.   No.
5  BY MS. DICKINSON:
6    Q.   Were there more than just Dr. Dahl and
7  this other person that you don't recall making that
8  presentation to the PTAC regarding the CM -- CAMH
9  standards?
10    A.   Yes.
11    Q.   Okay.  Who else was making the
12  presentation?
13    A.   The Joint Commission staff.
14    Q.   Okay.  Which Joint Commission staff?
15    A.   I have no idea what their name was.  I
16  don't remember if they worked for what was called
17  the -- the SSP, the Standards and Survey Processes
18  committee, which was one level up, if I can digress
19  for a second --
20    Q.   Yes.
21    A.   -- the Joint Commission has a Board of
22  Commissioners which is like the board of directors.
23  The SSP reports to them and oversees standards and
24  survey procedures across all of the accreditation

Page 230

1  programs for the Joint Commission. And then each of
2  the accreditation programs, as I mentioned, ambulatory
3  care, behavioral care, hospitals, long-term care, each
4  of those had a PTAC.
5       So the SSP was in between the PTACs and
6  the -- and the Board of Commissioners. So to get a
7  new standard, staff has to conceptualize it, you have
8  to present it to the PTAC and the PTAC has to approve
9  it. It goes to the SSP, this is the way it was then,
10 the SSP has to review it and approve it. If they
11 approve it, it goes to the Board of Commissioners and
12 the Board of Commissioners has to approve it and it
13 gets put in the book. That was the process.
14      And I don't remember if it was formally
15 somebody that worked for SSP or if it was just a staff
16 member, pardon the phrase, in the bowels of the Joint
17 Commission, who came, but it was a proposal of a new
18 standard.
19      Q.   Okay. And what was the content of the
20 proposal of the new standard that Dr. Dahl and the
21 others were --
22      MS. HIBBERT: Objection.
23 BY MS. DICKINSON:
24      Q.   -- presenting on?

Page 231

1       MS. HIBBERT: Sorry. Same objection.
2  BY MS. DICKINSON:
3       Q.   Go ahead.
4       A.   The proposal was that there be a standard
5  in the manual that would address how the accredited
6  organization addresses pain complaints.
7       Q.   And what were they proposing the
8  accredited organization would do to address pain
9  complaints?
10      MS. HIBBERT: Objection to form.
11 BY THE WITNESS:
12      A.   To shorten our dialogue, they were
13 proposing what became known as the Joint Commission
14 pain standard.
15 BY MS. DICKINSON:
16      Q.   Okay. The Joint Commission pain standard,
17 what was the general substance of the content of that?
18      MS. HIBBERT: Objection to form.
19 BY THE WITNESS:
20      A.   Again, I don't have any opinions about
21 this. I have facts because I was there at the time.
22 BY MS. DICKINSON:
23      Q.   Okay.
24      A.   The Joint Commission pain standard says

Page 232

1  that an accredited organization will be able to
2  demonstrate to the surveyors that it assesses patients
3  regularly regarding the status of any pain that they
4  may have.
5       Q.   Did that standard that they were adav --
6  advocating for require that every patient who came
7  into the hospital be assessed for pain?
8       Is that a short way of saying it?
9       MS. HIBBERT: Objection to form.
10 BY THE WITNESS:
11      A.   That's fair.
12 BY MS. DICKINSON:
13      Q.   Okay. Is this -- was the standards
14 summarizing what has been often called as the pain is
15 the vi -- fifth vital sign concept?
16      MS. HIBBERT: Objection to form.
17 BY THE WITNESS:
18      A.   I will answer your question by saying that
19 that is an extraordinarily commonplace and inaccurate
20 conflation of two different concepts.
21 BY MS. DICKINSON:
22      Q.   Okay. I -- I want to stick with what the
23 actual standard they were advocating for was.
24      A.   That's good.

Page 233

1       Q.   And so the standard, you said, I think,
2  and I just want to be clear, the standard that they --
3  Dahl and the others were advocating for was that each
4  patient that came into the hospital setting would be
5  assessed for pain.
6       Is that accurate?
7       A.   Yes.
8       Q.   Okay.
9       A.   To be -- to be clear, the fifth vital sign
10 language was never used by the Joint at that time.
11 Other people at the same time were developing the
12 concept of fifth vital sign. That was not the Joint
13 Commission.
14      Q.   Okay. Do you know who else was developing
15 that concept, the fifth vital sign?
16      MS. HIBBERT: Objection to form.
17 BY THE WITNESS:
18      A.   It came from some people, some clinicians,
19 some whatevers, some in California, and some in the
20 VA, both -- both California through some bureaucratic
21 arm of the state government and maybe the health
22 department, whatever. Somebody in California adopted
23 that term and some -- and the VA hospital system
24 developed that term, but they were never Joint

Page 234

1  Commission terms.
2  BY MS. DICKINSON:
3      Q.   Okay.  Is pain a vital sign?
4      A.   No.
5      MS. HIBBERT:  Objection to form.
6  BY MS. DICKINSON:
7      Q.   Do you --
8      MS. HIBBERT:  Please.
9  BY MS. DICKINSON:
10     Q.   -- the standard that we talked about with
11 respect to Dr. -- that Dr. Dahl was advocating for,
12 okay, so the Joint -- Joint Commission pain standard
13 change that she was advocating for, did you agree with
14 the change that she and others were advocating for?
15     MS. HIBBERT:  Objection to form.
16         Again, this is far afield from the expert
17 opinions that Dr. Miller has offered in this case.
18 Are you asking his personal opinion in this question,
19 because he is clearly not offering an expert opinion
20 about anything that you have been asking about pretty
21 much this entire deposition since we haven't talked
22 about his substantive opinions once.
23     MS. DICKINSON:  I am entitled to ask him about
24 his background.  This is his background.

Page 235

1      MS. HIBBERT:  This is not background.
2  BY MS. DICKINSON:
3      Q.   Doctor, please answer the question.
4      MS. HIBBERT:  This is a -- this is a opinion
5  about a -- this is a question about an opinion that he
6  has not offered in this case.
7  MS. DICKINSON:
8      Q.   Doctor, please answer the question.
9      A.   May I?
10     Q.   Did you agree with the -- with the change
11 in the standard that Dr. Dahl and others were
12 proposing?
13     MS. HIBBERT:  Objection for the same reasons I
14 just stated.
15 BY MS. DICKINSON:
16     Q.   Go ahead, Doctor.
17     THE WITNESS:  May I proceed with the objection
18 on -- on the table?
19     MS. HIBBERT:  You can proceed if you can answer
20 the question.
21 BY THE WITNESS:
22     A.   I can answer the question.
23 BY MS. DICKINSON:
24     Q.   I thought so.  Go ahead.

Page 236

1      MS. HIBBERT:  Same objection.
2  BY THE WITNESS:
3      A.   The PTAC advised that the standard not be
4  adopted.
5  BY MS. DICKINSON:
6      Q.   And did you agree with the PTAC committee
7  that the standard should not be adopted?
8      MS. HIBBERT:  Objection to form.
9  BY MS. DICKINSON:
10     Q.   Go ahead.
11     A.   I did.
12     Q.   When you were on the PTAC committee, did
13 the standard get adopted?
14     A.   It did not.
15     Q.   Okay.  Do you know if after you left the
16 committee that standard was adopted?
17     A.   It was.
18     Q.   Okay.  When?
19     A.   The following year.
20     Q.   Do you know if Dr. Dahl had renewed her
21 request to the committee the following year when it
22 was adopted?
23     MS. HIBBERT:  Objection to form, calls for
24 speculation.

Page 237

1  BY THE WITNESS:
2      A.   It -- it does call for speculation.  I --
3  I -- I believe that it was the exact same process
4  presented to a differently composed PTAC, possibly
5  with more forceful arguments, but I believe the
6  process of presenting it was staff with these
7  excise -- ex -- external people with them and it was
8  adopted.
9  BY MS. DICKINSON:
10     Q.   Okay.  And was one of the external people
11 to your understanding when the process happened the
12 next year Dr. Dahl?
13     MS. HIBBERT:  Objection to form.
14 BY THE WITNESS:
15     A.   You asked me only to my understanding, and
16 I would say to my understanding, but I could be wrong.
17 BY MS. DICKINSON:
18     Q.   Is it -- to your understanding is the
19 answer yes?
20     MS. HIBBERT:  Objection to form, asked and
21 answered.  He told you what he knew.  He said he
22 doesn't know is his understanding.
23 BY THE WITNESS:
24     A.   Yeah, I -- I don't --

Page 238

BY MS. DICKINSON:

1  BY MS. DICKINSON:
2      Q.  I'm ask -- wait, wait, wait.  Let's stop.
3      MS. HIBBERT:  You are putting words in his mouth
4  and we are not going to continue doing this.  This
5  is --
6      MS. DICKINSON:  I am not putting words in his
7  mouth.
8      MS. HIBBERT:  Yes, you are.  You absolutely are.
9      MS. DICKINSON:  I asked for his understanding
10  and he is going to give the answer.  Counsel, you are
11  breaking up the deposition --
12      MS. HIBBERT:  He has given the answer.
13      MS. DICKINSON:  -- to the point where the -- I
14  can't understand the witness's questions because you
15  are talking over him.
16      MS. HIBBERT:  He has not asked any questions.
17  He was giving a --
18      MS. DICKINSON:  Can you please be respectful and
19  wait --
20      MS. HIBBERT:  -- responsive answer.
21      MS. DICKINSON:  -- until he has finished his
22  answer.
23      MS. HIBBERT:  I will not.
24      MS. DICKINSON:  And there is another question on

Page 239

1  the table.
2      MS. HIBBERT:  I can object.  I can put an
3  objection on the record in between your question and
4  the answer.  I don't even know what you are talking
5  about.
6      MS. DICKINSON:  I will give you a running
7  objection to this entire line of questions if you
8  would stop breaking up the witness's testimony by
9  talking over him.
10      MS. HIBBERT:  No.
11      MS. DICKINSON:  Would you like a running
12  objection?
13      MS. HIBBERT:  Please ask a question.
14  BY MS. DICKINSON:
15      Q.  Okay.  I'm sorry, Doctor.  Can we start
16  again.
17          I asked if your understanding was the year
18  that it passed, the year after you rotated off the
19  PTAC committee, if Dr. Dahl had participated in again
20  advocating for the change?
21      MS. HIBBERT:  Objection; form.  He has already
22  answered that question.
23  BY MS. DICKINSON:
24      Q.  Go ahead, Doctor.

Page 240

1      A.  Yeah.  I am not certain that she was
2  there, but I think she was there.
3      Q.  Okay.  And when the new standards passed
4  requiring hospitals to assess pain in each patient,
5  did hospitals around the country have to follow them?
6      MS. HIBBERT:  Objection to form, calls for
7  speculation, lack of foundation.
8  BY THE WITNESS:
9      A.  No hospital has to follow any standard.
10  BY MS. DICKINSON:
11      Q.  Fair enough.
12          If hospitals did not follow the Joint
13  Commission standards, they would essentially -- they
14  may lose their accreditation, is that correct?
15      MS. HIBBERT:  Objection to form.
16  BY THE WITNESS:
17      A.  It takes a lot to lose accreditation.
18  BY MS. DICKINSON:
19      Q.  Okay.  We talked earlier, generally
20  hospitals endeavor to follow the standards, don't
21  they?
22      MS. HIBBERT:  Objection to form, calls for
23  speculation, lack of foundation.
24  BY THE WITNESS:

Page 241

1      A.  Is your question do hospitals in general
2  endeavor to adhere to Joint Commission standards?
3  BY MS. DICKINSON:
4      Q.  Yes.
5      A.  In general --
6      MS. HIBBERT:  Objection.  Same objections.
7  BY THE WITNESS:
8      A.  In general, hospitals do.
9  BY MS. DICKINSON:
10      Q.  In general was this new standard in your
11  view a good or a bad thing?
12      MS. HIBBERT:  Objection to form, outside the
13  scope of this witness' opinions.  This witness is not
14  being offered as a fact witness.
15  BY THE WITNESS:
16      A.  Yeah, I really feel like this is far
17  afield from what I've been asked to present as an
18  expert.  I don't have any opinions here about pain, I
19  don't have any opinions about pain treatment, about
20  evaluation of pain, about hospital accreditation.
21  Those are not opinions I was asked to formulate, nor
22  have I researched them.  You know --
23  BY MS. DICKINSON:
24      Q.  Doctor, this is a part of your background.

Page 242

1    MS. HIBBERT: Let him finish.  You are
2  interrupting his answer now.
3        Doctor, are you finished?
4  BY THE WITNESS:
5    A.  No, no -- -- my -- I -- I am never, ever
6  supposed to be debate you, but I -- I disagree with
7  your characterization that asking me my opinion about
8  whether a given Joint Commission standard was well
9  crafted or not is my background.
10  BY MS. DICKINSON:
11    Q.  Well, you served on the PTAC for the Joint
12  Commission, did you not?
13    A.  Oh, I did.
14    Q.  Okay.  So I'm going to ask my question
15  again.
16        Did you believe in your opinion that this
17  standard change was a good thing or a bad thing?
18    MS. HIBBERT: Same objections, asked and
19  answered.
20  BY THE WITNESS:
21    A.  I -- I honestly don't understand the
22  ramifications of my answering or not answering.  I
23  don't know if I'm compelled to answer.  I'm just
24  trying to understand the process, because, really, you

Page 243

1  are asking me about a lot of stuff that is not part of
2  what I thought I was brought here to do under oath,
3  honestly.
4  BY MS. DICKINSON:
5    Q.  Doctor -- doctor, I'm not trying to trick
6  you.  If you have no opinion, that's fine.  But if you
7  do have a pin -- an opinion, you are under oath.
8        Do you have an opinion whether the new
9  standard was a good or a bad thing?
10    A.  I do not --
11    MS. HIBBERT: Objection to form.
12  BY THE WITNESS:
13    A.  Right, right, I don't have an opinion.
14  BY MS. DICKINSON:
15    Q.  You don't have an opinion.
16        Have you ever stated an opinion in public
17  about --
18    MS. HIBBERT: Objection.
19  BY MS. DICKINSON:
20    Q.  -- whether the standard was a good or a
21  bad thing?
22    MS. HIBBERT: Objection to form.
23  BY THE WITNESS:
24    A.  My understanding is that stating an

Page 244

1  opinion in public and stating an opinion in deposition
2  as an expert are very different things.
3  BY MS. DICKINSON:
4    Q.  Doctor, I am not trying to argue with you.
5  I'm just asking if you hold an opinion.  You told me a
6  minute ago you do not have an opinion.  I was asking
7  if you ever have stated such an opinion in public.
8    MS. HIBBERT: Objection --
9  BY MS. DICKINSON:
10    Q.  Have you?
11    MS. HIBBERT: Objection to form, asked and
12  answered.
13  BY THE WITNESS:
14    A.  I don't think I've answered the question
15  of have I stated a general viewpoint in public about
16  the standard.  I have.
17  BY MS. DICKINSON:
18    Q.  Okay.  And what was that general viewpoint
19  about the standard that you have stated in public?
20    MS. HIBBERT: Objection to form.
21  BY THE WITNESS:
22    A.  I think the standard, on balance, has not
23  been helpful.
24  BY MS. DICKINSON:

Page 245

1    Q.  And -- and why is that?
2    A.  Because I believe that hospitals in their
3  efforts to adhere to the standards and implement
4  policies did things that were never required by the
5  Joint Commission.  I believe the hospitals did things
6  that have not been helpful.
7    Q.  When you say things that have not been
8  helpful, do you mean that the standard increased the
9  use of opioids?
10    MS. HIBBERT: Objection to form.
11  BY THE WITNESS:
12    A.  I think I know the question that I'd like
13  you to ask, and it is very similar to the one you
14  asked.  Could you rephrase, maybe?
15  BY MS. DICKINSON:
16    Q.  I can't guess as to one you want me to
17  ask.
18    A.  That's right, you can't read my mind.
19    Q.  I'm sorry.
20        Is part of the way that the standards have
21  not been helpful increasing the use of opioids in your
22  view?
23    MS. HIBBERT: Objection to form.
24  BY THE WITNESS:

Page 246

1    A.   Yes.
2  BY MS. DICKINSON:
3    Q.   Doctor, do you know if the UW Pain and
4  Policy Group also worked with the Federation of State
5  Medical Boards?
6    A.   I do know that.
7    MS. HIBBERT:  Objection to form.
8    THE WITNESS:  Sorry.
9  BY MS. DICKINSON:
10   Q.   Okay.  Do you know what their work with
11 the Federation of State Medical Boards was?
12   MS. HIBBERT:  Objection to form.
13 BY THE WITNESS:
14   A.   I have a general sense, yes.
15 BY MS. DICKINSON:
16   Q.   Okay.  What is that general sense?
17   A.   They advised the federation to revise its
18 own views on opioid prescribing.
19   Q.   Okay.  And in -- in what way were those
20 views revised?
21   MS. HIBBERT:  Objection to form.
22 BY THE WITNESS:
23   A.   Again, this is way outside of my expert
24 opinion, but you asked my knowledge about what

Page 247

1  happened, and I certainly have knowledge about all of
2  those things that played out.
3         Their hope was that licensure boards would
4  not discipline physicians for overprescribing and, in
5  fact, as a result of the dialogue, the federation
6  members who were the individual state licensure
7  entities became more prone to disciplining physicians
8  for undertreating pain.
9    MS. DICKINSON:  Doctor, I think it might make
10 sense to take a very short break and then I think we
11 have less than a half hour to go.  Maybe even much
12 shorter than that.  I'm going to try to consolidate a
13 little bit, okay?
14   THE WITNESS:  Yes, ma'am.
15   THE VIDEOGRAPHER:  We are off the record at
16 3:43 p.m.
17        (WHEREUPON, a recess was had
18         from 3:43 to 3:49 p.m.)
19   THE VIDEOGRAPHER:  We are back on the record at
20 3:50 -- 49 p.m.
21 BY MS. DICKINSON:
22   Q.   Okay.  Dr. Miller, we are back on the
23 record after a very short break, and I do appreciate
24 you keeping the breaks really short.  It has really

Page 248

1  helped the day move along.
2         I just have a -- I -- I may jump around
3  just a little bit with these last set of questions on
4  some different subject areas, so just let me know if
5  you don't understand where we are or what we are
6  talking about.
7         With respect to Exhibit 3, I just want to
8  ask about one more of your positions that you listed
9  in that.  At Page 10 at the top, could you go to that?
10   A.   Yes, ma'am.
11   Q.   Okay.  The -- under Consulting Positions,
12 the very top one says:  "To attorneys and insurance
13 companies" and then it says:  "Re legal consultations,
14 depositions, case reviews and independent medical
15 exams."
16        Is -- is this a description of the work
17 that you do for Michael Miller, M.D. LLC, your
18 consulting company?
19   A.   Yes, ma'am.
20   Q.   Okay.  We've already talked about some of
21 your consulting arrangements today.
22        Are there -- is there any work that you
23 are doing for attorneys consulting that we haven't
24 talked about today?  I don't want -- I don't want

Page 249

1  specifics yet.  Just let me ask the question first and
2  then I'll ask a follow-up.
3         Is there any work for attorneys that you
4  are currently performing for Michael Miller, M.D. that
5  we haven't talked about already today?
6    MS. HIBBERT:  Objection to form.
7  BY THE WITNESS:
8    A.   Yes, there is.
9  BY MS. DICKINSON:
10   Q.   Okay.  Does any of that work that we
11 haven't talked about already today have to do with
12 opioids?
13   MS. HIBBERT:  Objection to form.
14 BY THE WITNESS:
15   A.   You asked me that question before and,
16 again, if there is ever a case of opioid addiction, a
17 case of opioid withdrawal, I mean, there -- there
18 could be some in there, and -- and with regard to this
19 litigation and the -- and the -- and the issues here,
20 no, but opioids in the broadest sense, sure.
21 BY MS. DICKINSON:
22   Q.   Okay.  Maybe it's easiest to ask it this
23 way:
24        How much of your time, professional time,

Page 250

1 is spent for Michael Miller Consulting?
2     MS. HIBBERT:  Objection to form, asked and
3 answered.
4 BY THE WITNESS:
5     A.   The work expands as it presents itself.
6 So it could be as little as 5 percent of a 40-hour
7 workweek or it could expand to 20 hours a week which
8 would make my workweek 60 hours, so...
9 BY MS. DICKINSON:
10     Q.   Generally, I just want to get a sense of
11 it, and I may have already asked you this, I do really
12 apologize if I have, in the last year how much of your
13 time has been spent for Michael Miller Consulting?
14     MS. HIBBERT:  Objection to form, asked and
15 answered.
16 BY MS. DICKINSON:
17     Q.   What percentage?
18     MS. HIBBERT:  Same objection.
19 BY THE WITNESS:
20     A.   Again, I've been quite involved with
21 consulting work since I left full-time work.  And --
22 and, again, part of the reason to leave full-time work
23 is to be able to do more consulting work because I
24 kept getting demands for consult work and I'd keep

Page 251

1 going to my employer and saying, Can I do this, is it
2 a conflict, so finally we decided just leave this
3 full-time job so I could go do all of this stuff.
4     So, it's gotten to be pretty busy.  I have
5 two open cases now in addition to this one and I have
6 another one or two pending and another which has
7 already wrapped up all in the last ten months.
8 BY MS. DICKINSON:
9     Q.   Okay.  Is your ultimate goal to transition
10 your entire professional work to the consulting
11 business?
12     A.   Yes.
13     Q.   Okay.  Does UW allow you to do -- run your
14 consulting business?
15     A.   Yes.
16     MS. HIBBERT:  Objection to form.
17     THE WITNESS:  Sorry.
18 BY MS. DICKINSON:
19     Q.   So the UW prohibition on working for
20 advisory boards or speakers bureaus or things of that
21 nature does not extend to expert witness work for
22 pharmaceutical companies, is that fair?
23     MS. HIBBERT:  Objection to form.
24 BY THE WITNESS:

Page 252

1     A.   I am not aware of any such prohibition.
2 BY MS. DICKINSON:
3     Q.   Prior to 2018 when I think you were saying
4 you were starting to wrap up your consulting business,
5 what portion of your professional work in the last
6 five years has generally been for Michael Miller
7 Consulting?
8     A.   5 percent.
9     Q.   Okay.  Fair.
10     This was an odd question, actually, I
11 have.  Appendix A had some portions of your CV that
12 were in bold.
13     Is there any sig -- significance to the
14 bold?
15     A.   Where?
16     Q.   On mine, let's see, a good example on mine
17 was Page 14, and maybe this only existed on Appendix A
18 and not actually on Exhibit 3.
19     A.   Oh, those are things I considered to be
20 pretty significant, a total subjective rating by me.
21     Q.   Okay.  So there is actually a significance
22 to the bold, those are -- those are more significant
23 events on your CV, is that fair?
24     A.   More significant events on the CV, right,

Page 253

1 more significant committees, more significant
2 publications, more significant presentations.
3     Q.   I'm glad I asked because I just thought it
4 was a mistake.
5     A.   No, no.  It's like -- it's like if you
6 don't want to read all of this stuff, just let your
7 eyes go to the bolds.
8     Q.   Okay.  Fair.  That is helpful.
9     Do you retain copies of the presentations
10 that are listed in your CV?
11     A.   Some.
12     Q.   Okay.  So we would have to ask on a
13 specific basis whether you retained a copy?
14     A.   You would.
15     Q.   Okay.  Did you -- I think you mentioned in
16 your report you had involvement in the authorship of
17 the ASAM criteria for defining addiction, is that
18 right?
19     A.   You just conflated two things.
20     Q.   Oh, fair enough.  Okay.
21     What -- what two things?
22     A.   Ans -- answer yes to both.
23     Q.   Okay.
24     A.   But -- but -- but it is not the same

Page 254

1  thing.
2      Q.  Okay.  What involvement did you have in
3  authoring the ASAM criteria, what was typically
4  referred to as ASAM criteria?
5      A.  Exactly.  The first edition was published
6  in '91.  I had no role.
7      Q.  Okay.
8      A.  The next edition was published in '94, I
9  think, and I was on the work group that wrote it.
10     Q.  Okay.
11     A.  I was not on any other work groups
12 thereafter.  But then I was asked to be the managing
13 editor of the current edition, which was '13 and I
14 contributed, and I don't think I really got credit
15 for, the chapter on treatment of tobacco use disorder
16 and the treatment of seniors.  And so I reviewed the
17 full draft of the current edition and served as
18 managing editor.
19     Q.  Okay.  So the 2013 version is the current
20 version, correct?
21     A.  Yes, ma'am.
22     Q.  Okay.  I assume, but I'm not going to
23 assume, are you satisfied with the language in the
24 current version?

Page 255

1      MS. HIBBERT:  Objection to form.
2  BY THE WITNESS:
3      A.  The reason I will say that you asked a
4  loaded question is because I was specifically asked to
5  contribute to language.
6  BY MS. DICKINSON:
7      Q.  Okay.
8      A.  I was specifically asked to assist with
9  terminology, and I failed to mention that in addition
10 to the roles I have previously just testified to, I
11 wrote paragraphs -- I don't think a chapter, but
12 paragraphs with regard to terminology and I tried to
13 edit the full book for terminology with respect to the
14 ASAM definition, because the ASAM definition is a
15 specific thing and the ASAM criteria says that it uses
16 terminology of the Diagnostic and Statistical Manual
17 of the American Psychiatric Association which isn't
18 the same as the terminology of the ASAM definition of
19 addiction.  Therefore, language is something that
20 matters, and you said am I satisfied with the
21 language.  I am okay with where we got to in the final
22 version.
23     Q.  Okay.  And that includes the definition of
24 addiction?

Page 256

1      A.  Yes.
2      Q.  Okay.  Does the ASAM criteria define
3  opioid use disorder?
4      A.  No.
5      Q.  Does the ASAM criteria rely on the DSM for
6  the definition of opioid use disorder?
7      MS. HIBBERT:  Objection to form.
8  BY THE WITNESS:
9      A.  I'm scratching my head.  That was a very,
10 very specific question, and it -- what it does is it
11 relies on the DSM for all substance use disorder
12 diagnoses, and so I guess opioids would be included,
13 but it's -- it's not as precise as your question was.
14 BY MS. DICKINSON:
15     Q.  Okay.  Fair.
16         How does the ASAM criteria rely on the DSM
17 for all substance use diagnoses?
18     MS. HIBBERT:  Objection to form.
19 BY THE WITNESS:
20     A.  The way it does it goes back to the first
21 edition in '91, and it says:  This is the criteria for
22 the treatment of substance use disorder.  And it says
23 that a necessary first step is a diagnosis, that you
24 don't offer treatment for what I call addiction unless

Page 257

1  addiction is present.  So it says you must have a
2  diagnosis present and the diagnosis must comply with
3  the current edition of the DSM.  That's how it does
4  it.
5  BY MS. DICKINSON:
6      Q.  Totally understood.
7          Did you have any involvement with
8  authorship of any of the DSM criteria?
9      MS. HIBBERT:  Objection to form.
10 BY THE WITNESS:
11     A.  I was in regular dialogue with the
12 authors, but I was on none of the work groups and my
13 name is nowhere in it.
14 BY MS. DICKINSON:
15     Q.  Okay.  Who were the authors that you were
16 in regular dialogue with?
17     A.  The addiction and substance related
18 disorders chapter was chaired by Charles O'Brien and a
19 very active member of the committee was Wilson Compton
20 and those are the two gentlemen that I had most of my
21 e-mails with.
22     Q.  Was Charles O'Brien the pry -- and
23 Wills -- Wilson, I'm sorry, what is his last name?
24     A.  Compton.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

```
1    Q.  Compton.
2        Were Charles O'Brien and Wilson Compton
3  the primary authors of the addiction and substance
4  abuse portion of the DSM-V?
5    A.  That's not the way the APA categorizes it.
6  They say everything is done by committee and there are
7  committee chairs.  You can decide if that's the
8  equivalent of author.
9    Q.  Okay.  That's fair.
10       Who -- were Charles O'Brien and Wilson
11 Compton the committee chairs in charge of authoring
12 the addiction and substance abuse portion of DSM-V?
13   A.  I don't recall any particular title that
14 Dr. Compton had, but Dr. O'Brien was the chair of the
15 chapter.
16   Q.  Okay.  Do you know who else served on the
17 committee authoring that chapter other than
18 Dr. O'Brien and Dr. Compton?
19   A.  I do not recall today, ma'am.
20   Q.  Okay.  Did you have regular interaction
21 with Dr. O'Brien over the substance of what was going
22 to be in DSM-V?
23   A.  No.
24   MS. HIBBERT:  Objection to form.
```

Page 259

```
1    THE WITNESS:  Sorry.
2  BY THE WITNESS:
3    A.  No, I did not.
4  BY MS. DICKINSON:
5    Q.  Okay.  Did you have regular interaction
6  with Dr. Compton over the substance of what was going
7  to be in DSM-V?
8    MS. HIBBERT:  Objection to form.
9  BY THE WITNESS:
10   A.  No.
11 BY MS. DICKINSON:
12   Q.  When you said that you had regular
13 interaction with Dr. O'Brien and Dr. Compton over the
14 DSM criteria, what was the regular interaction about?
15   MS. HIBBERT:  Objection to form,
16 mischaracterizes the testimony.
17 BY THE WITNESS:
18   A.  Yeah, I don't recall that I ever said
19 "regular."  It was episodic.
20 BY MS. DICKINSON:
21   Q.  Okay.  Sorry.  I didn't mean to put words
22 in your mouth.
23       When you say that you had episodic
24 interaction with Dr. Compton and Dr. O'Brien over the
```

Page 260

```
1  DSM criteria, what was that episodic interaction
2  about?
3    MS. HIBBERT:  Objection to form.
4  BY THE WITNESS:
5    A.  I recall some specific, very specific
6  dialogue I had with them regarding cannabis use
7  disorder and tobacco use disorder and how I thought
8  that they could have formatted that differently.  I
9  had no specific comments about opioid use disorder.  I
10 had general concerns about the sort of fundamental
11 framework which considers there to be a continuity
12 between mild, what they call mild SUD and moderate and
13 severe SUD.
14   Q.  And did you discuss those concerns with
15 Dr. -- either Dr. O'Brien or Dr. Compton?
16   A.  I did.
17   Q.  With both of them?
18   A.  At different times.  I don't know if I
19 ever sent an e-mail copy to both, but at different
20 points each of them.
21   Q.  Did the resulting DSM-V reflect -- or was
22 the resulting DSM-V in -- in align with the way you --
23 that's a terrible question.  God, I'm sorry.  It is
24 getting late.
```

Page 261

```
1        The concerns you were expressing about the
2  language of the -- to Dr. Compton and Dr. O'Brien,
3  were those addressed in your view in the ultimate
4  resulting language in DSM-V?
5    MS. HIBBERT:  Objection to form.
6  BY THE WITNESS:
7    A.  No.
8    THE WITNESS:  Sorry.
9  BY THE WITNESS:
10   A.  No.
11 BY MS. DICKINSON:
12   Q.  Were Dr. O'Brien and Dr. Compton to your
13 knowledge on the committee that authored DSM-IV?
14   A.  I don't know.
15   Q.  Okay.  Same question with respect to
16 DSM-III, were Dr. O'Brien and Dr. Compton on the
17 committee that authored DSM-III?
18   A.  I do not recall.
19   Q.  Do you know what -- at what point in time
20 Dr. O'Brien started to chair the committee regarding
21 the DSM diagnostic criteria, specifically the
22 addiction and substance abuse chapter?
23   A.  I do not know exactly when that happened.
24   Q.  Do you know roughly?
```

Page 262

1    MS. HIBBERT: Objection to form.
2  BY THE WITNESS:
3    A.   I believe that the project was an
4  eight-year project and I think he was probably there
5  at the start.
6  BY MS. DICKINSON:
7    Q.   Okay.
8    A.   But I don't know that he was the original
9  chair. I honestly don't know.
10   Q.   Fair enough.
11        To your knowledge, he was involved in the
12 entirety of the project whether or not he was the
13 chair of that project the entire time you don't know,
14 is that fair?
15   MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17   A.   I honestly don't know if he was on the
18 committee from day one. I -- I can only speculate as
19 to that.
20 BY MS. DICKINSON:
21   Q.   Okay. In -- in your experience, did you
22 view Dr. O'Brien and Dr. Compton as the -- as the face
23 of that committee essentially?
24   MS. HIBBERT: Objection to form.

Page 263

1  BY THE WITNESS:
2    A.   I -- I would only characterize Dr. O'Brien
3  as such.
4  BY MS. DICKINSON:
5    Q.   Fair. Okay.
6        Let's talk for a minute about diagnostic
7  criteria for addiction. In your clinical practice,
8  how do you conduct an evaluation for diagnosing
9  someone with addiction?
10   A.   Clinical interview.
11   Q.   Are there any diagnostic tools that you
12 use, such as an MRI or a PET scan or some other
13 diagnostic tool other than a clinical interview to
14 diagnosis someone with addiction?
15   MS. HIBBERT: Objection to form.
16 BY THE WITNESS:
17   A.   I don't use anything besides the clinical
18 interview. At -- at times I've used a standard
19 questionnaire called the Michigan Alcoholism Screening
20 Test which was adapted to be the Drug Abuse Screening
21 Test by actually a colleague here at Wisconsin. So
22 I've used the MAST and the DAST at times.
23   Q.   Anything else other than that?
24   A.   Nothing else.

Page 264

1    Q.   Have you ever met with any other experts
2  on the defense side in this case?
3    MS. HIBBERT: Objection to form, lack of
4  foundation.
5  BY THE WITNESS:
6    A.   I don't know who they are.
7  BY MS. DICKINSON:
8    Q.   Fair enough. You are not aware that
9  you've met with any of the other experts that were
10 disclosed as defense experts regarding this case, is
11 that fair?
12   A.   Now, that was very well phrased because
13 they be and I may not know it and I may have met with
14 them in a meeting.
15   Q.   That was why I asked it the way I did.
16   A.   Yeah, I have no idea.
17   Q.   Okay.
18   A.   Yeah.
19   Q.   Have you been asked to provide trial
20 testimony in this case?
21   MS. HIBBERT: Objection to form.
22 BY THE WITNESS:
23   A.   I don't -- I don't know how to answer that
24 question. It hadn't -- it had -- it hasn't gotten to

Page 265

1  that point.
2  BY MS. DICKINSON:
3    Q.   Totally fair. My question -- my only
4  question is do you have plans to be at the
5  October trial in this case?
6    MS. HIBBERT: Objection to form.
7  BY THE WITNESS:
8    A.   If I'm asked to appear as an expert
9  witness, I expect to be there.
10 BY MS. DICKINSON:
11   Q.   Have you been asked to appear at the trial
12 as of today?
13   MS. HIBBERT: Objection to form, calls for a
14 disclosure of communications between Dr. Miller and
15 counsel that are outside of the bounds of Rule 26 and
16 I'll advise you not to answer.
17   THE WITNESS: I will -- I will follow your
18 advice.
19 BY MS. DICKINSON:
20   Q.   Dr. Miller, has -- have you blocked out on
21 your calendar the trial dates in this case?
22   A.   Yes.
23   Q.   You talked earlier about a presentation
24 that you may have given with David Haddox, and bear

Page 266

1 with me, I'm just reading from my notes so I'm not
2 sure if I'm characterizing this the correct way, the
3 DSM-V and the new ASAM criteria, is that a
4 presentation that you gave jointly with David Haddox?
5     MS. HIBBERT: Objection.
6 BY THE WITNESS:
7     A.   Absolutely not.
8 MS. DICKINSON:
9     Q.   Okay.  I thought my notes were wrong on
10 that.  Let's just talk about the presentation then.
11 There was a presentation listed in your CV, "DSM-V and
12 the New ASAM Criteria."
13         Do you know if you have and retained a
14 copy of that presentation?
15     A.   Do you see in your notes, ma'am, to whom
16 the audience was?
17     Q.   I don't, but the date on it was June 13th
18 of 2014.
19     A.   Of the ones that come to mind, I think I
20 still have all of those.
21     Q.   Okay.  Oh, here.  Now here is where my
22 notes were about it -- this.
23         There was -- you talked about serving on a
24 panel with David Haddox at the ACM meetings, is that

Page 267

1 accurate?
2     MS. HIBBERT: Objection to form.
3 BY THE WITNESS:
4     A.   That's accurate.
5 BY MS. DICKINSON:
6     Q.   Okay.  And there was a presentation
7 roughly titled "Pain and Addiction:  Common Threads,"
8 am I saying that accurately?
9     A.   That, ma'am, would be the name of the
10 course.  The presentation I have no idea what the --
11 what it was or if it happened.  I was speculating.
12     Q.   Okay.  Do you have course materials from
13 that course, have you retained those?
14     MS. HIBBERT: Objection to form.  He just said
15 he didn't know if it happened.
16 BY THE WITNESS:
17     A.   I don't know what I have and don't have.
18 I have some things.  I may have some of my talks.
19 They may be too old to have been retained.  And I may
20 have some syllabi, but I don't recall which ones.
21 BY MS. DICKINSON:
22     Q.   Okay.  Did Charles O'Brien participate in
23 the ASAM conferences that you were discussing earlier?
24     MS. HIBBERT: Objection to form.

Page 268

1 BY THE WITNESS:
2     A.   I do not believe that Dr. O'Brien was ever
3 on the faculty for Common Threads.
4 BY MS. DICKINSON:
5     Q.   Do you know if Dr. Bri -- O'Brien
6 generally participated in the ASAM organization?
7     MS. HIBBERT: Objection to form, calls for
8 speculation.
9 BY THE WITNESS:
10     A.   My response to your question is that
11 Charlie was a frequent attendee and a not uncommon
12 presenter at ASAM conferences over decades.
13 BY MS. DICKINSON:
14     Q.   Okay.  Dr. Miller, do you own stock in any
15 pharmaceutical companies currently?
16     A.   I do not.
17     MS. DICKINSON: I think that's all of the
18 questions I have for now.  I don't know if you are
19 going to ask questions, but I could -- if you're --
20 while you are asking, I could look at my notes,
21 otherwise I just need, like, a two-minute break.
22     MS. HIBBERT: Let's take a two-minute break.
23     MS. DICKINSON: Okay.
24     THE VIDEOGRAPHER: We are off the record at

Page 269

1 4:12 p.m.
2         (WHEREUPON, a recess was had
3          from 4:12 to 4:14 p.m.)
4 THE VIDEOGRAPHER: We are back on the record at
5 4:14 p.m.
6     MS. DICKINSON: Dr. Miller, we are back on the
7 record.  You are still under oath.
8         I think I am finished with my questions
9 for you here today.  I may have a few more depending
10 on what your counsel asks.
11         But just for the record, Counsel, I know
12 you were working on whether redacted invoices could be
13 produced here at the deposition today given Special
14 Master Cohen's ruling a few hours ago.
15         Is -- is that able to be done today or are
16 we going to have to wait?
17     MS. HIBBERT: Like I said off the record, we are
18 working on getting those invoices together and
19 redacted in hopes of producing them this evening.  I
20 have not gotten word that those are ready yet.  So
21 currently I'm still hoping to produce them this
22 evening, but I don't have them right now.
23 BY MS. DICKINSON:
24     Q.   Okay.  Dr. Miller, have I been respectful

Page 270

1 to you today?
2    MS. HIBBERT:  Objection to form.
3    THE WITNESS:  Objection to form?
4 BY THE WITNESS:
5    A.  Have you been respectful to me, yes,
6 ma'am.
7    MS. DICKINSON:  Thank you.  I don't think I have
8 any further questions, again, unless your counsel asks
9 something I need to clean up.  So thank you very much
10 for your time here today.  I really appreciate it.
11    THE WITNESS:  You are very welcome.  Thank you
12 too.
13         EXAMINATION
14 BY MS. HIBBERT:
15    Q.  Just a couple of quick questions,
16 Dr. Miller.
17       Earlier today you talked about a couple of
18 sample expert reports that were sent to you by
19 counsel.
20       Do you recall that testimony?
21    A.  I believe I do.
22    Q.  Did you rely on --
23    A.  Do you want to sit over there or I'll
24 just --

Page 271

1    Q.  No.
2    A.  -- I'll just not make eye contact with
3 you.
4    MS. DICKINSON:  I think she wants you to look at
5 the video.
6    THE WITNESS:  Yeah, yeah.
7 BY MS. HIBBERT:
8    Q.  Did you rely on your review of any of
9 those sample expert reports in forming your opinions
10 that you are offering in this case?
11    A.  Oh, absolutely not.  They -- they were --
12 they had no -- no material basis.
13    Q.  Earlier, Dr. Miller, you discussed some
14 limited engagements that you have had with various
15 pharmaceutical manufacturers as well as a drug testing
16 company.
17       Do you recall that testimony?
18    A.  Yes, ma'am.
19    Q.  Have any of those limited engagements
20 influenced the opinions that you are offering in this
21 case in any way?
22    MS. DICKINSON:  Objection; form.
23 BY THE WITNESS:
24    A.  I was really, really trying to understand

Page 272

1 how the answer could possibly be yes, and it's just
2 absolutely no, not at all.  It's no.
3    MS. HIBBERT:  Those are all of the questions
4 that I have for you, Dr. Miller.  Thank you.
5    THE WITNESS:  Oh, my goodness.  Thank you.
6    MS. DICKINSON:  I have nothing further.  You are
7 free.  Thank you.
8    THE VIDEOGRAPHER:  We are off the record at
9 4:16 p.m.
10       (Time Noted:  4:16 p.m.)
11       FURTHER DEPONENT SAITH NAUGHT.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 273

1       REPORTER'S CERTIFICATE
2
3    I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4 a Certified Shorthand Reporter, do hereby certify:
5    That previous to the commencement of the
6 examination of the witness herein, the witness was
7 duly sworn to testify the whole truth concerning the
8 matters herein;
9    That the foregoing deposition transcript
10 was reported stenographically by me, was thereafter
11 reduced to typewriting under my personal direction and
12 constitutes a true record of the testimony given and
13 the proceedings had;
14    That the said deposition was taken before
15 me at the time and place specified;
16    That I am not a relative or employee or
17 attorney or counsel, nor a relative or employee of
18 such attorney or counsel for any of the parties
19 hereto, nor interested directly or indirectly in the
20 outcome of this action.
21    IN WITNESS WHEREOF, I do hereunto set my
22 hand on this 5th day of June, 2019.
23
24       JULIANA F. ZAJICEK, Certified Reporter

Page 274

DEPOSITION ERRATA SHEET

Case Caption:  In Re:  National Prescription
                       Opiate Litigation

DECLARATION UNDER PENALTY OF PERJURY

        I declare under penalty of perjury that I
have read the entire transcript of my Deposition taken
in the captioned matter or the same has been read to
me, and the same is true and accurate, save and except
for changes and/or corrections, if any, as indicated
by me on the DEPOSITION ERRATA SHEET hereof, with the
understanding that I offer these changes as if still
under oath.

                MICHAEL M. MILLER, M.D.

SUBSCRIBED AND SWORN TO
before me this      day
of          , A.D. 20__.

        Notary Public

Page 275

DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
        MICHAEL M. MILLER, M.D.

Page 276

DEPOSITION ERRATA SHEET
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
Page No._____Line No._____Change to:_____
_____
Reason for change:_____
SIGNATURE:_____DATE:_____
        MICHAEL M. MILLER, M.D.