Highly Confidential - Subject to Further Confidentiality Review

```
1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3
    *************************
4
    IN RE:  NATIONAL          MDL No. 2804
5   PRESCRIPTION OPIATE
    LITIGATION                Case No.
6                             1:17-MD-2804
    *************************
7
    THIS DOCUMENT RELATES TO    Hon. Dan A. Polster
8   ALL CASES
9   *************************
10
11     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
13    VIDEOTAPED DEPOSITION OF THOMAS S. MOFFATT
14
15          Tuesday, January 15th, 2019
16                 8:04 a.m.
17
18      Held At:
19          Omni Hotel
20          One West Exchange Street
21          Providence, Rhode Island
22
23   REPORTED BY:
24   Maureen O'Connor Pollard, RMR, CLR, CSR
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFFS:
 3
           MICHAEL E. ELSNER, ESQ.
 4         KAITLYN EEKHOFF
                MOTLEY RICE LLC
 5              28 Bridgeside Boulevard
                Mt. Pleasant, South Carolina 29464
 6              843-216-9250
                melsner@motleyrice.com
 7
                    -and-
 8
           JAMES A. DeROCHE, ESQ., of Counsel
 9              WEISMAN, KENNEDY & BERRIS CO., LPA
                101 W. Prospect Avenue
10              Cleveland, Ohio 44115
                800-747-9330
11              lderoche@garson.com
12
13    FOR McKESSON CORPORATION:
14         KEVIN M. KELLY, ESQ.
                COVINGTON & BURLING LLP
15              One CityCenter
                850 Tenth Street, NW
16              Washington, DC 20001-4956
                202-662-5518
17              kkelly@cov.com
18
19    FOR CARDINAL HEALTH, INC.:
20         CHRISTOPHER N. DAWSON, ESQ.
                WHELAN, CORRENTE, FLANDERS, KINDER
21              & SIKET LLP
                100 Westminster Street, Suite 710
22              Providence, Rhode Island 02903
                401-270-4500
23              cdawson@whelancorrente.com
24
```

```
 1    APPEARANCES (Continued):
 2
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
 3
          JAMES A. PETKUN, ESQ. (Remotely)
 4            REED SMITH LLP
              Three Logan Square
 5            1717 Arch Street, Suite 3100
              Philadelphia, Pennsylvania 19103
 6            215-851-8100
              jpetkun@reedsmith.com
 7
 8
      FOR WALMART:
 9
          JOANNE CACERES, ESQ. (Remotely)
10            JONES DAY
              77 West Wacker
11            Chicago, Illinois 60601
              312-782-3939
12            jcaceres@jonesday.com
13
14    FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.
      and THE DEPONENT:
15
          ERIC R. DELINSKY, ESQ.
16            ZUCKERMAN SPAEDER LLP
              1800 M Street NW, Suite 1000
17            Washington, DC 20036-5807
              202-778-1800
18            edelinsky@zuckerman.com
19
20    FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
      SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
21    INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
          DOUGLAS L. SHIVELY, ESQ. (Remotely)
22            BAKER HOSTETLER
              127 Public Square
23            Cleveland, Ohio 44114
              216-861-6486
24            dshively@bakerlaw.com
```

```
1    APPEARANCES (Continued):

2


     FOR WEST VIRGINIA BOARD OF PHARMACY:

3


          HARRISON CYRUS, ESQ. (Remotely)

4              BAILEY & WYANT PLLC

               500 Virginia Street East

5              Charleston, West Virginia 25301

               304-345-4222

6              hcyrus@baileywyant.com

7

8    VIDEOGRAPHER:  Robert Sweig

9    TRIAL TECH:  Gina Veldman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      INDEX
 2   EXAMINATION                              PAGE
 3   THOMAS S. MOFFATT
 4    BY MR. ELSNER                            8
 5
 6
 7         E X H I B I T S
 8   NO.          DESCRIPTION                 PAGE
```

```
 9   CVS-Moffatt-1    9/27/06 letter fro DEA,
                      Bates CVS-MDLT1-000010552
10                    through 555................   40
11   CVS-Moffatt-2    12/27/07 letter from DEA,
                      Bates CVS-MDLT1-000013535
12                    and 3536...................   53
13   CVS-Moffatt-3    9/14/18 letter.............   74
14   CVS-Moffatt-4    Document titled CVS Health
                      At a Glance................   77
15
     CVS-Moffatt-5    Map, Red Lion Data.........   78
16
     CVS-Moffatt-6    Drug Fact Sheet,
17                    Hydrocodone, Bates
                      CVS-MDLT1-000055614 and
18                    55615......................   93
19   CVS-Moffatt-7    11/25/13 e-mail, Bates
                      CVS-MDLT1-000076135........   96
20
     CVS-Moffatt-8    5/15/14 e-mail, Bates
21                    CVS-MDLT1-000022230 and
                      2231.......................  101
22
     CVS-Moffatt-9    Letter from DEA to CVS
23                    Indiana, Bates
                      CVD-MDLT1-000008014 and
24                    8015.......................  122
```

Highly Confidential - Subject to Further Confidentiality Review

1

   CVS-Moffatt-10    E-mail chain with
2                    attachments, Bates
                     CVS-MDLT1-00006693 through
3                    955........................... 132
4  CVS-Moffatt-11    Document title CVS Health
                     Trade Association and
5                    Coalition Participation...... 140
6  CVS-Moffatt-12    E-mail chain, Bates
                     CVS-MDLT1-000103475 and 476.. 146
7
   CVS-Moffatt-13    Declaration of Joseph
8                    Rannazzisi................... 158
9  CVS-Moffatt-14    Settlement Agreement, Bates
                     CVS-MDLT1-000060796 through
10                   804........................... 175
11 CVS-Moffatt-15    In the Matter of Cardinal
                     Health, Government's
12                   Prehearing Statement, Bates
                     CAH_MDL_PRIORPROD_DEA12_
13                   00000001 through 54.......... 185
14 CVS-Moffatt-16    Settlement Agreement, Bates
                     CVS-MDLT1-000060805 through
15                   811........................... 200
16 CVS-Moffatt-17    Settlement Agreement, Bates
                     CVS-MDLT1-000060812 and 821.. 205
17
   CVS-Moffatt-18    Settlement Agreement, Bates
18                   CVS-MDLT1-000060822 through
                     829........................... 208
19
   CVS-Moffatt-19    Settlement Agreement, Bates
20                   CVS-MDLT1-000060847 through
                     855........................... 218
21
   CVS-Moffatt-20    Settlement Agreement, Bates
22                   CVS-MDLT1-000060856 through
                     871........................... 223
23 CVS-Moffatt-21    Stipulated Agreement, Bates
                     CVS-MDLT1-000060915 through
24                   921........................... 237

1

   CVS-Moffatt-22     Settlement Agreement, Bates

2                      CVS-MDLT1-000060839 through

                      846......................... 242

3

   CVS-Moffatt-23     Settlement Agreement, Bates

4                      CVS-MDLT1-000060830 through

                      838......................... 252

5

   CVS-Moffatt-24     Settlement Agreement, Bates

6                      CVS-MDLT1-000060872 through

                      906......................... 254

7

   CVS-Moffatt-25     Stipulated Agreement, Bates

8                      CVS-MDLT1-000060907 through

                      914......................... 260

9

   CVS-Moffatt-26     Chart titled CVS

10                     Settlements................. 262

11  CVS-Moffatt-27     CVS Caremark Corporation

                      January 8-9, 2014 Board of

12                     Directors Meeting minutes,

                      Bates CVS-MDLT1-000055303

13                     through 5352................. 266

14

15

16

17

18

19

20

21

22

23

24

```
 1                 P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4     record.  My name is Robert Sweig, and I'm a

 5     videographer for Golkow Litigation Services.

 6              Today's date is January 15, 2019, and

 7     the time is 8:04 a.m.

 8              This video deposition is being held in

 9     Providence, Rhode Island in the matter of In Re:

10     National Prescription Opiate Litigation pending

11     before the United States District Court for the

12     Northern District of Ohio, Eastern Division.

13              The deponent is Thomas Moffatt.

14              Counsel appearances will be as noted

15     on the stenographic record.

16              Our court reporter is Maureen Pollard,

17     who will now swear in our witness.

18

19              THOMAS S. MOFFATT,

20     having been duly sworn, was examined and

21     testified as follows:

22                    EXAMINATION

23     BY MR. ELSNER:

24        Q.   Good morning.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Good morning.

2      Q.   My name is Michael Elsner, I'm from

3  the law firm of Motley Rice, and I represent the

4  plaintiffs in these actions.

5           Can you please state your name?

6      A.   Thomas S. Moffatt, M-O-F-F-A-T-T.

7      Q.   And what is your date of birth?

8  ████   ████   ████████████████████

9      Q.   And where do you live, sir?

10     A.   Kingston, Rhode Island.

11     Q.   And you graduated from college with a

12  degree in history, is that right?

13     A.   Yes.

14     Q.   Did you take any pharmaceutical

15  courses in college?

16     A.   No.

17     Q.   Did you take any courses that related

18  to pharmacy distribution or regulations of

19  pharmacies?

20     A.   No.

21     Q.   What about courses in controlled

22  substances or other narcotics?

23     A.   No.

24     Q.   You then took a few years off and you

```
 1    went to law school, is that right?

 2          A.   I took a few years off, then I went to

 3    law school.

 4          Q.   What did you do in that intervening

 5    period?

 6          A.   I worked, principally I worked at

 7    Brother Industries in Nagoya, Japan as an

 8    English consultant, and then I came back and

 9    worked as a paralegal for a year in a personal

10    injury firm.

11          Q.   What was the name of the firm?

12          A.   Law offices of S. George Bromberg.

13          Q.   And where was that?

14          A.   Cambridge, Massachusetts.

15          Q.   And then you attended Northeastern

16    University School of Law, is that right?

17          A.   Correct.

18          Q.   Did you graduate from law school?

19          A.   Yes.

20          Q.   And did you take the Bar exam when you

21    graduated?

22          A.   Yes.

23          Q.   Are you a licensed attorney today?

24          A.   Yes.
```

1    Q.   What states are you licensed to

2    practice?

3    A.   I'm licensed in Massachusetts, and

4    then I'm registered as an out-of-state in-house

5    counsel in Rhode Island.

6    Q.   In law school did you take any courses

7    in pharmaceutical law or regulations of

8    pharmacies?

9    A.   No.

10    Q.   After law school you went to work for

11    Mintz Levin, is that right?

12    A.   Correct.

13    Q.   And what was your area of practice

14    when you worked there?

15    A.   I was a corporate attorney.

16    Q.   Okay.  What years were you there?

17    A.   I was there from 1993, the fall of '93

18    through August -- or July of '97.

19    Q.   What type of work did you do as a

20    corporate attorney for Mintz Levin?

21    A.   A wide variety of corporate matters,

22    transactions, securities, general corporate law.

23    Q.   Did you deal with any DEA regulations

24    while working at Mintz Levin?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   Was CVS a client of Mintz Levin while

 3   you were there?

 4        A.   Yes.

 5        Q.   Did you work on that -- for CVS while

 6   at Mintz Levin?

 7        A.   No.

 8        Q.   What type of work did Mintz Levin do

 9   for CVS, just generally?  I don't need the

10   specifics.

11        A.   Generally real estate matters.

12        Q.   Is that related to the purchase of

13   various pharmacies, or could you be a little bit

14   more specific without revealing a privilege?

15        A.   It was more general real estate

16   matters than acquisitions, as far as I recall.

17        Q.   But you didn't --

18        A.   I didn't work on any of them, so...

19        Q.   Okay.  And then you came to work for

20   CVS, is that right?

21        A.   Yes.

22        Q.   And what year was that?

23        A.   That was August of 1997.

24        Q.   Okay.  What were you hired to do for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   CVS?

 2        A.   I was a corporate lawyer.

 3        Q.   For CVS Health, or what was the name

 4   of the entity that hired you?

 5        A.   CVS Pharmacy, Inc., a Rhode Island

 6   corporation.

 7        Q.   And where were you based?

 8        A.   In Woonsocket, Rhode Island.

 9        Q.   Is that where you're based today?

10        A.   Yes.

11        Q.   How is it that you came to be hired by

12   CVS?

13        A.   A long story, but essentially it was

14   the lead real estate partner at Mintz, Levin

15   talking to the general counsel at CVS and the

16   general counsel saying, we're looking for a

17   corporate guy, do you know anybody, and the real

18   estate partner said -- came to me and said, you

19   know, don't take this the wrong way but CVS is

20   looking for a guy like you, and I said, don't

21   take this the wrong way but sign me up, and so I

22   went for an interview, and the rest is history.

23        Q.   Okay.  Do you recall what the name of

24   your position was when you started at CVS?
```

1     A.    Legal counsel.

2     Q.    And how long did you serve in that

3  role?

4     A.    Probably three years or so.

5     Q.    Okay.  Could you give me a sort of

6  snapshot of your work history with CVS from 1997

7  until today and the various positions that

8  you've held for CVS Pharmacy?

9     A.    That's a pretty long snapshot.  So

10 I've always been a corporate lawyer, general

11 corporate law.  I do a wide variety of corporate

12 matters for CVS, always have.  For many years I

13 was the only corporate lawyer at CVS.  And so I

14 was legal counsel first, then senior legal

15 counsel, then assistant general counsel, vice

16 president and assistant general counsel.

17    Q.    If I could just interrupt you real

18 quickly?

19    A.    Sure.

20    Q.    Can you give me some sense of the

21 years when you became senior legal counsel and

22 then vice president and assistant --

23    A.    Senior legal counsel was probably

24 around 2000, somewhere in that time frame.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Assistant general counsel would have been around

 2    2005 or so.  Then I was vice president 2007 or

 3    '8, something like that, and for a brief period

 4    of time I served as the corporate secretary of

 5    the public company.  I've been assistant

 6    secretary of the public company for several

 7    years now.  So I've held a variety of titles.

 8    My employer has always been CVS Pharmacy, Inc.,

 9    and then I have various titles with other

10    entities.

11         Q.   You said that you were a corporate

12    secretary for the public company.  Is the public

13    company CVS Pharmacy, Inc.?

14         A.   No.

15         Q.   What is the public company?

16         A.   CVS Health Corporation is the current

17    name.

18         Q.   And in what position did you serve?

19    You said secretary?

20         A.   I was vice president and corporate

21    secretary from 2011 through the end of 2013, and

22    I've been assistant secretary from 2013 to the

23    present, vice president and assistant secretary.

24         Q.   Why were you asked, if you know, to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    hold that position?

 2            MR. DELINSKY:  I would just like to

 3    object on privilege grounds.

 4            Mr. Moffatt, if you can answer without

 5    disclosing an attorney/client confidence, you

 6    can answer.  Otherwise I instruct you not to

 7    answer.

 8        A.   I don't know why.

 9    BY MR. ELSNER:

10        Q.   Was it a result of pending litigation?

11        A.   I can say that it was not a result of

12    litigation.

13        Q.   Who asked you to serve in that role?

14        A.   It would have been Doug Sgarro who was

15    the executive vice president and chief legal

16    officer.  The corporate secretary retired from

17    the company, and I became -- I was, you know,

18    kind of his second-in-command, so when he

19    retired I moved up.

20        Q.   You also served as the treasurer and

21    secretary of CVS Indianapolis which is the

22    distribution center for CVS in Indiana, is that

23    right?

24        A.   I don't recall serving as treasurer.
```

1    I believe I was secretary.

2        Q.   All right.  And was that from 2006 to

3    2011?

4        A.   That sounds about right.  We have many

5    entities, and keeping track of my specific title

6    with each entity is difficult.

7        Q.   How many entities do you serve as an

8    officer of for CVS?

9        A.   I don't know exactly, but hundreds.

10       Q.   Why?

11       A.   Mostly for administrative convenience.

12       Q.   Administrative convenience to whom?

13       A.   To the organization.

14       Q.   What organization are you referring to

15   when you say that?

16       A.   So there are 800-plus entities in the

17   CVS family of entities, and in order to provide

18   services to those entities I need to be able to

19   sign documents and so forth for the various

20   entities.

21       Q.   So it's a convenience -- is it a

22   convenience to CVS Health, or is it a

23   convenience to the entities themselves?

24       A.   It's to the entities themselves,

Highly Confidential - Subject to Further Confidentiality Review

1  because they all -- many of them need licenses,

2  leases, that sort of thing, so it's in order for

3  them to operate properly.

4       Q.   When did the Indianapolis distribution

5  center for CVS start operations?

6       A.   I don't know exactly.  We acquired it

7  in the Revco acquisition, which was just before

8  I joined the company, so in 1997.  I'm not sure

9  when it was first built or anything.

10      Q.   But then you joined as a secretary of

11 CVS Indiana in 2006, is that right?

12      A.   I believe the entity was formed

13 shortly before then, so when the entity was

14 formed I was either secretary or assistant

15 secretary.

16      Q.   Who asked you to play that role?

17      A.   It would have been my immediate

18 superior, Zenon Lankowsky.

19      Q.   How large is the legal department at

20 CVS?

21           MR. DELINSKY:  Object to form.

22      A.   I don't know exactly, depends on who

23 you count, but in terms of lawyers

24 post-acquisition it's over 100 lawyers, and then

Highly Confidential - Subject to Further Confidentiality Review

1    there's paralegals and support staff and clerks

2    and so forth, so it's several hundred people.

3    BY MR. ELSNER:

4        Q.    Okay.  In 2012 you became the

5    president of CVS Indiana, is that right?

6        A.    Yes.

7        Q.    Why was that?

8        A.    It was in connection with the

9    retirement of Mr. Lankowsky.

10       Q.    He was the previous president?

11       A.    Yes.

12       Q.    And have you served as president of

13   CVS Indiana since 2014?

14       A.    I believe so.  Since before that, I

15   think you said it was 2012.

16       Q.    That's right.  I just said dates of

17   through 2014, so I was curious whether you

18   continued to perform that role.

19       A.    Past that, yes.

20       Q.    And you're the president today?

21       A.    Yes.

22       Q.    All right.  Can you explain to me what

23   your duties and responsibilities are as

24   president of CVS Indiana?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   It's principally an administrative

2  function, so CVS Indiana needs a wide variety of

3  licenses and other documents that need to be

4  signed, and I sign documents on behalf of that

5  entity and the other entities.

6    Q.   Are there board meetings for CVS

7  Indiana?

8    A.   Yes.

9    Q.   Do you attend those?

10   A.   Yes.

11   Q.   How often are those held?

12   A.   Annually.

13   Q.   Where are they held?

14   A.   At CVS headquarters.

15   Q.   Who attends the board meetings

16  generally?

17   A.   Actually let me take a step back.  I

18  was mistaken there.  For CVS Indiana it's an LLC

19  that doesn't have a board, so we don't really

20  have board meetings.  We have, you know -- the

21  member would meet of CVS Indiana, and the member

22  is a sole member, so I sign -- typically we do

23  actions by written consent of the member, and I

24  execute those.

1    Q.   So there are no annual or quarterly

2    meetings of CVS Indiana?

3    A.   It doesn't --

4         MR. DELINSKY:   Object to form.

5    A.    It doesn't have a board, so it doesn't

6    have board meetings.

7    BY MR. ELSNER:

8    Q.   But you said that the member signs the

9    documents, and it's all by consent, and you are

10   the member, is that right?

11   A.    Well, there's -- a corporation is the

12   member.   CVS Pharmacy, Inc. is the member.

13   Q.   Okay.  Are there minutes of those

14   meetings?

15   A.    There would either be minutes, or

16   there would be a consent.

17   Q.   Do you recall meetings in which there

18   were minutes taken for CVS Indiana?

19   A.   I don't recall all the meetings that I

20   took part in.

21   Q.   And have you been to the facility at

22   CVS Indiana?

23   A.   No, I have not.

24   Q.   Do you interact with the management

```
 1   and staff of CVS Indiana?

 2        A.   No, not on a regular basis.

 3        Q.   Do they keep you apprised of the

 4   activities of CVS Indiana?

 5        A.   There are others at CVS that are

 6   responsible for operations of the distribution

 7   centers.  They would keep them apprised.  They

 8   wouldn't keep me apprised.

 9        Q.   They don't keep you apprised as

10   president?

11        A.   They keep the people that need to be

12   apprised.

13        Q.   And generally what are those offices

14   within CVS headquarters that are apprised?

15        A.   It would be the logistics department

16   is generally responsible for distribution center

17   operations and transportation.

18        Q.   You're also the president of CVS Rx

19   Services, Inc., is that right?

20        A.   That's correct.

21        Q.   And when have you served in that role?

22        A.   I believe since 2012, same time as

23   Indiana.

24        Q.   Were you formerly a secretary or
```

```
 1    treasurer of CVS Rx Services, Inc.?

 2         A.   I don't recall my exact titles, but in

 3    all likelihood I would have been secretary

 4    before I became president.

 5         Q.   What does CVS Rx Services do?

 6         A.   It was originally formed as the

 7    employer of our pharmacists in the various

 8    stores.

 9         Q.   When?

10         A.   When was it formed?  I don't know

11    exactly.  Probably around the late '90s, 1998,

12    '99, something like that, I believe.

13         Q.   Okay.  So are all pharmacists of CVS

14    and CVS pharmacies employees of CVS Rx Services?

15         A.   There are others that are responsible

16    for keeping track of who is employed by who, but

17    my understanding is yes.

18         Q.   Okay.  And what about the pharmacy

19    itself, is the pharmacy itself organized under

20    CVS Rx Services, or is it just the pharmacists?

21              MR. DELINSKY:  Object to form.

22         A.   Generally speaking, the pharmacies

23    would be in different store operating entities.

24    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We received a response to a request,

2    and the response stated that CVS Rx Services

3    distributed hydrocodone combination products

4    into track 1 jurisdictions between April 15,

5    2014 and September 30, 2014, and then it refers

6    to something called the Chemung distribution

7    period.  Do you know what that is, the Chemung

8    distribution period?

9    A.    I know that we have a distribution

10   center in Chemung, New York.

11   Q.    And is that distribution center

12   organized under CVS Rx Services?

13        MR. DELINSKY:  Object to form.

14   A.    Chemung is operated by CVS Rx

15   Services, Inc.

16   BY MR. ELSNER:

17   Q.    Okay.  And do you know why CVS was

18   distributing hydrocodone products into Summit

19   counties and Cuyahoga counties in Ohio between

20   April 15th, 2014 and September 30th, 2014?

21        MR. DELINSKY:  Object to form.

22   A.    I don't know.  I don't know that

23   that's the case.  I know that others at CVS

24   would have been responsible for which

1    distribution centers would distribute into which

2    stores.

3    BY MR. ELSNER:

4        Q.   So as president of CVS Rx Services,

5    what are your roles and responsibilities?

6        A.   Again, it's principally administrative

7    to sign various licenses and documents that CVS

8    Rx Services needs to sign.

9        Q.   Have you ever been to the Chemung

10   distribution center?

11       A.   No, I have not.

12       Q.   The whole period of time when you've

13   been operating as the president of CVS Indiana

14   and the president of CVS Rx Services, you always

15   worked out of the office in Rhode Island for

16   CVS, is that right?

17       A.   That's correct, I've only worked out

18   of the Woonsocket office.

19       Q.   Okay.  Are there board meetings or

20   minutes of meetings related to CVS Rx Services?

21       A.   Yes.

22       Q.   And how often do you meet?

23       A.   It would be annually.

24       Q.   And where are those meetings held?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    At Woonsocket.

2        Q.    Do you receive any compensation from

3   CVS Indiana or CVS Rx Services for your role as

4   president of those entities?

5        A.    Unfortunately, no.

6        Q.    So all of your payment is from CVS

7   Health?

8        A.    It's from CVS Pharmacy is my employer,

9   and it's as a corporate attorney.

10       Q.    Can you explain to me the relationship

11  between CVS Pharmacy, CVS Health, and CVS

12  Indiana, and CVS Rx Services?

13            MR. DELINSKY:  Object to form.

14       A.    That's a very broad question.  CVS

15  Health Corporation is the public company.  It's

16  a holding company.  It's formed in Delaware and

17  doesn't have any employees.  CVS Pharmacy is our

18  main operating company.  It's a Rhode Island

19  corporation.  It employs me.  It employs a

20  number of people.  And then CVS Pharmacy is the

21  parent company to Rx Services and CVS Indiana

22  and a large number of other entities.

23  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I think you also said that you have

2    responsibility at CVS for licensing issues.

3    Does that include DEA licenses?

4            MR. DELINSKY:  Object to form.

5    A.    So I said that I sign documents

6    related to licensing, so it would -- well, I

7    also have people that work for me that are

8    responsible for signing DEA documents, but I

9    have signed DEA documents in the past.

10   BY MR. ELSNER:

11   Q.    Are you the head of the licensing

12   division for CVS?

13           MR. DELINSKY:  Object to form.

14   A.    We don't have a licensing division, so

15   licensing is one of our functions in the legal

16   department, and the licensing -- the head of

17   licensing is a licensing director, and she

18   reports to me.

19   BY MR. ELSNER:

20   Q.    Okay.  And how many people are under

21   her?

22   A.    30 plus.

23   Q.    And who is that licensing director?

24   A.    Her name is Linda Cimbron.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So I'm just taking a look at your

2  LinkedIn page, and it's written here, it says --

3  it describes you as the vice president,

4  assistant secretary and assistant general

5  counsel for CVS Health Corporation.  And that's

6  your current role, is that right?

7    A.   That's my role with CVS Health

8  Corporation, yes.

9    Q.   And then it says under here, it says

10  Licensing, and it says "Oversees the licensing

11  department which obtains and maintains all

12  licenses for the company's 10,000-plus

13  facilities, over 150,000 licenses," is that

14  correct?

15    A.   That's correct.  As I said, Linda

16  Cimbron, licensing director, reports to me.  So

17  I oversee the licensing function.

18    Q.   So you oversee the licensing

19  department?

20    A.   Yes.

21    Q.   And then it says "Interacts with

22  government officials including DEA, state boards

23  of pharmacy, and alcohol boards."  Is that

24  accurate?

1     A.    It was more accurate a couple years

2   ago when that was written.  Now we have a board

3   of pharmacy practice that does a lot more of the

4   interaction with the boards of pharmacy.  We

5   also have an attorney that works on government

6   investigations, including DEA.  So, you know,

7   it's not as accurate today as it was several

8   years ago.

9     Q.    When was this written?

10     A.    I don't remember.  A couple years ago,

11   I think.  I might have updated numbers, but I

12   haven't changed a lot of it.

13     Q.    Every CVS distribution center,

14   including CVS Indiana, holds a DEA license, is

15   that right?

16     A.    I don't recall if they all have --

17   take a step back.  We used to have distribution

18   centers that had full registrations, and then we

19   had other facilities that did what was called

20   cross-talking, so they wouldn't necessarily have

21   drugs in the facility.  I don't recall what the

22   current structure of the distribution centers

23   is, so I don't know if every one of them has.

24     Q.    Okay.  But in order to distribute a

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substance, you need a DEA license to

2    do so, is that right?

3              MR. DELINSKY:  Object to form.

4        A.   Yes, I believe that's right.

5    BY MR. ELSNER:

6        Q.   And CVS Indiana had a DEA license to

7    distribute controlled substances, is that right?

8        A.   It definitely had a DEA registration,

9    yes.

10       Q.   And is the same true for the CVS

11   facility, the distribution center in Chemung,

12   New York?

13       A.   Yes.

14       Q.   What about CVS Pharmacy, does CVS

15   Pharmacy have its own DEA license?

16             MR. DELINSKY:  Object to form.

17       A.   So the DEA registrations are by

18   facility, so there are facilities that CVS

19   Pharmacy, Inc. operates that have DEA

20   registrations, there are actually many.

21   BY MR. ELSNER:

22       Q.   And is it CVS Pharmacy which holds

23   those licenses, or it's the entities themselves?

24       A.   The entities them -- the entities that

1    operate the facilities would hold the licenses,

2    so in some instances that is CVS Pharmacy, in

3    some instances it's another entity like CVS

4    Indiana or CVS Rx Services.

5        Q.   What is your understanding of why the

6    DEA requires distributors and dispensers of

7    controlled substances to have a DEA

8    registration?

9            MR. DELINSKY:  Object to form.

10       A.   I haven't really thought of it.  It's

11   been a requirement under their regulations, but

12   you'd have to ask somebody at the DEA why they

13   regulate the way they regulate.

14   BY MR. ELSNER:

15       Q.   Well, you're in charge of the whole

16   licensing department, everyone reports to you,

17   so I wanted to understand from you what you

18   believe the reason is that the DEA has a

19   registration requirement for distributing and

20   dispensing controlled substances.

21           MR. DELINSKY:  Object to form.

22       A.   Again, you'd have to ask somebody at

23   the DEA why they have regulations.  I'm not

24   sure.  I know that they need to -- we have

1  separate registrations for every facility so

2  they want the facilities that have controlled

3  substances to be registered in some way.

4  BY MR. ELSNER:

5      Q.   Why?

6      A.   So I don't know.

7      Q.   Are you familiar with the Controlled

8  Substances Act?

9      A.   Generally, yes.

10     Q.   What is your understanding of the

11  Controlled Substances Act?

12          MR. DELINSKY:  And, Mr. Moffatt, if

13  you can answer that question without it

14  disclosing attorney/client confidences you may

15  answer.  If you can't, I instruct you not to

16  answer.

17  BY MR. ELSNER:

18     Q.   Sir, you're a lawyer.  You understand

19  attorney/client confidences and privileges?

20          MR. DELINSKY:  Object to form.

21     A.   Generally speaking, yes.

22  BY MR. ELSNER:

23     Q.   So throughout this whole deposition,

24  I'm not trying to elicit a single response that

1    discloses any kind of attorney/client privilege,

2    so there's no need for a continued objection to

3    that.  When I ask you a question, I want you to

4    assume that I'm not asking you to divulge any

5    attorney/client privilege.  Do you understand

6    that?

7        A.   I understand you saying that, but it's

8    difficult given my role -- my principal role

9    being an attorney and interacting with other

10   attorneys all day every day, it's hard to

11   separate, you know, what I know based on

12   discussions with the people that have expertise

13   in the Controlled Substances Act as opposed to

14   me.  I'm a corporate lawyer, so general

15   corporate law I know.

16       Q.   That's fine.  What is your

17   understanding of the Controlled Substances Act?

18            MR. DELINSKY:  Same objection and

19   instruction.

20       A.   I don't have a specific understanding

21   of the Controlled Substances Act.  I know it's a

22   law that's out there.

23   BY MR. ELSNER:

24       Q.   Have you ever read it?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   No, I have not read the act in its

2  entirety.

3      Q.   Do you understand that controlled

4  substances are highly addictive?

5           MR. DELINSKY:  Object to form.

6      A.   I don't know.  No, I don't know that

7  controlled substances are -- I think there are

8  other people at CVS that will respond -- that

9  are focused on that sort of thing.

10  BY MR. ELSNER:

11      Q.   So as the president of CVS Indiana and

12  as the president of CVS Rx Services, you do not

13  know that controlled substances can be highly

14  addictive?

15           MR. DELINSKY:  Object to form.

16      A.   Others at CVS are responsible for

17  operations and so forth, and I have no view on

18  that.

19  BY MR. ELSNER:

20      Q.   I'm not asking whether anybody else

21  knows they're highly addictive.  I'm just asking

22  you, are controlled substances highly addictive?

23           MR. DELINSKY:  Object to form.

24  BY MR. ELSNER:

1    Q.   Yes, no, or I don't know.

2    A.   Other people at CVS know.  I don't

3 have an opinion on that.

4    Q.   You don't know?

5         MR. DELINSKY:  Object to form.

6    A.   Other people at CVS know.  I don't

7 have an opinion.

8 BY MR. ELSNER:

9    Q.   You don't have an opinion one way or

10 the other?

11        MR. DELINSKY:  Object to form.  Asked

12 and answered.

13   A.   Other people at CVS know about that.

14 It's not my role, and I don't have an opinion.

15 BY MR. ELSNER:

16   Q.   Do you believe that there's a risk

17 that controlled substances like an opioid may be

18 diverted?

19        MR. DELINSKY:  Object to form.

20   A.   Other people at CVS are responsible

21 for operations and so forth.  I don't have an

22 opinion on that.

23 BY MR. ELSNER:

24   Q.   Has CVS ever distributed a Schedule II

Highly Confidential - Subject to Further Confidentiality Review

1    drug, to your knowledge?

2        A.   To my knowledge, no.

3        Q.   Why not?

4             MR. DELINSKY:  Same instruction with

5    regard to the attorney/client privilege, to the

6    extent that your knowledge is based on

7    attorney/client communications.

8        A.   Other people at CVS made that

9    decision.  You know, I've been there since '97.

10   The company has been around longer than that.

11   It was before I got there.

12   BY MR. ELSNER:

13       Q.   So you don't know?

14       A.   Other people at CVS would have been

15   responsible for that.

16       Q.   Who?

17       A.   I'm not sure.

18       Q.   Are you sure someone is responsible

19   for that?

20       A.   Other people at CVS are responsible

21   for all the operations, compliance, logistics.

22   We have huge departments that are responsible

23   for those things.  I'm not responsible for those

24   things.

1    Q.   CVS has distributed Schedule III drugs

2   to CVS pharmacies, is that right?

3         MR. DELINSKY:  Object to form.

4    A.   My understanding is that our

5   registrations are for Schedules III through V,

6   so yes.

7   BY MR. ELSNER:

8    Q.   And CVS Indiana and CVS Rx Services

9   through the CVS Chemung distribution center

10  distributed Schedule III drugs, is that correct?

11        MR. DELINSKY:  Object to form.

12   A.   Other people at CVS were responsible

13  for the actual operations, but my understanding

14  is we had the registrations for Schedules III

15  through V, and that's what was distributed by

16  those distribution centers.

17  BY MR. ELSNER:

18   Q.   And that they distributed those drugs

19  into Cuyahoga and Summit Counties, is that

20  right?

21        MR. DELINSKY:  Object to form.

22   A.   I don't have any specific knowledge of

23  where the distribution centers distributed.

24  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   The Indiana distribution center for

2  CVS was distributing hydrocodone products until

3  hydrocodone was rescheduled as a Schedule II

4  drug in October of 2014, is that right?

5         MR. DELINSKY:  Object to form.  Same

6  objection as to attorney/client privilege.

7    A.   Other people at CVS were responsible

8  for what was distributed where.  I don't have

9  any knowledge of my own on that subject.

10  BY MR. ELSNER:

11    Q.   So as the president of CVS Indiana,

12  you don't know whether CVS Indiana was

13  distributing hydrocodone products until they

14  were rescheduled?

15         MR. DELINSKY:  Object to form.

16    A.   Others at CVS were responsible for

17  that.  I don't have any knowledge of my own.

18  BY MR. ELSNER:

19    Q.   I've marked this document as the first

20  exhibit.  This is Motley Rice 5.

21         (Whereupon, CVS-Moffatt-1 was marked

22         for identification.)

23  BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19      MR. ELSNER:  Mark this next document

20  as Moffatt Exhibit 2, this is MR 7.

21      (Whereupon, CVS-Moffatt-2 was marked

22      for identification.)

23  BY MR. ELSNER:

24      Q.  Mr. Moffatt, this is another letter

1    from Mr. Joseph Rannazzisi which was sent to all

2    the distribution centers in the United States.

3    The date was December 27, 2007.

4            Have you ever seen this letter before

5    preparing for this deposition?

6        A.   I don't recall if I've seen this

7    before.  I didn't see it before preparing for

8    the deposition.  I don't recall if I saw it in

9    connection with preparing.

10       Q.   Let me just break that down.

11           Before your deposition prep with

12   counsel, had you ever seen this letter before?

13       A.   I don't think so.

14       Q.   Okay.  The first line of the letter

15   says that "This letter is being sent to every

16   entity in the United States registered with the

17   Drug Enforcement" Agency "to manufacture or

18   distribute controlled substances."

19           Did I read that correctly?

20       A.   It's Drug Enforcement Administration.

21   You said agency.

22       Q.   I'm sorry.

23       A.   But otherwise, yes.

24       Q.   Okay.  And as the head of licensing

Highly Confidential - Subject to Further Confidentiality Review

1    for CVS, you do not recall ever receiving this

2    document before?

3              MR. DELINSKY:  Object to form.

4        A.   I've seen many, many documents.  I

5    don't specifically recall seeing this one.  It's

6    over ten years ago.

7    BY MR. ELSNER:

8        Q.   This, in the second paragraph in the

9    second sentence, it cites a code section, and

10   then it says "specifically requires that a

11   registrant 'design and operate a system to

12   disclose to the registrant suspicious orders of

13   controlled substances.'"

14             Did CVS in Indiana have a system in

15   place as of December 27, 2007 to electronically

16   monitor for suspicious orders of controlled

17   substances?

18             MR. DELINSKY:  Object to form.

19       A.   Others at CVS would have been

20   responsible for such a system.  I believe this

21   is the same code section as the previous

22   letter --

23   BY MR. ELSNER:

24       Q.   That's right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    -- from the previous year.

 2        Q.    It's the Controlled Substances Act,

 3   that's right.

 4              Does it concern you that CVS didn't

 5   have a system in place to electronically monitor

 6   for suspicious orders of controlled substances

 7   as of December 27, 2007?

 8              MR. DELINSKY:  Object to the form of

 9   the question.

10        A.    Others at CVS would have been

11   responsible for such a system.

12   BY MR. ELSNER:

13        Q.    Do you understand that a violation of

14   the Controlled Substances Act could result in a

15   distribution center losing its license to

16   distribute controlled substances?

17        A.    I'm generally aware of, you know, the

18   implications of violations, but I have no

19   specific knowledge.  It's not my area of

20   expertise.  I'm a corporate lawyer.

21        Q.    But you understand that CVS and other

22   pharmacies from time to time have had their

23   licenses suspended, correct?

24              MR. DELINSKY:  Object to the form of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the question.

2            Mr. Moffatt, further object on

3    privilege grounds.  To the extent that you

4    possess any responsive information that you

5    obtained in the context of attorney/client

6    communications, I instruct you not to disclose

7    that information.

8        A.    Information that it would have

9    received regarding other pharmacies or CVS would

10   have been through attorney communications.

11   BY MR. ELSNER:

12       Q.    Well, you've signed settlements with

13   the DEA in which you entered a settlement with

14   them to avoid the suspension of your

15   registration for a pharmacy, correct?

16           MR. DELINSKY:  Object to the form of

17   the question.

18       A.    I have signed settlements for various

19   entities, other attorneys work on those

20   settlements and they come to me at the end when

21   they're ready to be signed.  I don't know the

22   background as to why things were signed or

23   whether they were signed to avoid a suspension

24   or anything like that.  I've signed documents,

```
 1    but I don't know the full circumstances.  You'd

 2    have to give me the actual settlement that

 3    you're talking about.

 4    BY MR. ELSNER:

 5        Q.   Well, I'm just talking generally.

 6             You understand the DEA has the

 7    authority and the ability to suspend or remove a

 8    license for a distributor to distribute a

 9    controlled substance, you understand that,

10    right?

11             MR. DELINSKY:  Object to form.  Same

12    objection and same instruction as to privilege

13    in addition.

14        A.   I'm aware based on attorney

15    communications.

16    BY MR. ELSNER:

17        Q.   What was your understanding of why a

18    license was required at all to distribute

19    controlled substances?

20             MR. DELINSKY:  Object to form.  Same

21    objection and instruction to the extent the

22    question also implicates attorney/client

23    communications.

24        A.   As we discussed earlier, the DEA set
```

1    up the regulatory regime.  I don't have

2    information as to why it was set up the way it

3    was set up.

4    BY MR. ELSNER:

5        Q.   So you were just signing paper and

6    moving paper, right?  You don't understand what

7    the basis or need is for the license, why it's

8    required and what could result if you don't

9    fulfill your responsibilities?

10            MR. DELINSKY:  Object to form.  Same

11   objection and same instruction as to privilege

12   to the extent it pertains.

13       A.   What I know about it is based on

14   attorney communications.

15   BY MR. ELSNER:

16       Q.   I'm not talking about a specific

17   instance.  I'm talking generally.

18            You're the head of the licensing

19   department, you oversee them, and you have no

20   understanding of what the purpose of the license

21   is for the controlled substance or what could

22   result if you don't fulfill the requirements of

23   the Controlled Substances Act, is that right?

24            MR. DELINSKY:  Object to the form of

1    the question.  Further object on privilege

2    grounds.

3              To the extent this calls for

4    attorney/client communications, I'd instruct you

5    not to answer, Mr. Moffatt.

6              And I'd just state for the record that

7    the attorney/client privilege applies to -- not

8    only to information exchanged in connection with

9    specific instances, but also to general

10   information exchanged for the purpose of

11   obtaining legal advice.

12        A.   So other people at CVS are responsible

13   for operations and compliance, and they

14   understand the implications of, you know, the

15   need for licenses and for violations.

16   BY MR. ELSNER:

17        Q.   I'm not asking you what anyone else

18   understands about the licensing requirements.

19   I'm just asking you, because you're the head of

20   the licensing department, you oversee it, and

21   you have no understanding of the reason for the

22   license or the consequences of not fulfilling

23   your obligations under the controlled substances

24   and its implications for your ability to lose

1    the license, is that right?

2            MR. DELINSKY:  Object to form.  Same

3    objection as to privilege.  Same instruction as

4    to privilege.

5        A.   That's not right.  I have information,

6    but all my information would have been received

7    in the context of attorney information being

8    passed to me from other areas of the legal

9    department.

10   BY MR. ELSNER:

11       Q.   That simply can't be true.  I'm not

12   asking you about a particular instance or

13   investigation.  I'm asking you generally as the

14   head of the licensing department, do you have an

15   understanding of what the licensing requirements

16   were for distributing controlled substances?

17           MR. DELINSKY:  Object to the form of

18   the question.

19           I instruct the witness not to answer

20   based on his prior two answers.

21       A.   Again, my information was based on

22   information I received from other attorneys.

23   BY MR. ELSNER:

24       Q.   The next sentence in that same

1  paragraph reads "The regulation clearly

2  indicates that it is the sole responsibility of

3  the registrant to design and operate such a

4  system."

5          Did you understand that it was the

6  sole responsibility for CVS Indiana to design

7  and operate a system to prevent diversion of

8  controlled substances?

9          MR. DELINSKY:  Object to the form of

10  the question.

11          Same objection, same instruction,

12  Mr. Moffatt.

13      A.   You read the sentence as it's written

14  here.  I have no basis to agree or disagree with

15  the conclusion that it clearly indicates -- what

16  it says it indicates.

17  BY MR. ELSNER:

18      Q.   Did you know that as the president of

19  CVS Indiana that it was CVS Indiana's sole

20  responsibility to design such a system?

21          MR. DELINSKY:  Object to form.  Asked

22  and answered.

23      A.   As I said, that's what the sentence

24  says, but I don't have any basis to agree or

```
 1   disagree that it's its sole responsibility.

 2   BY MR. ELSNER:

 3       Q.   And you never saw this in 2007?

 4            MR. DELINSKY:  Object to form.  Asked

 5   and answered.

 6       A.   I don't recall seeing it.  I see many,

 7   many documents.

 8   BY MR. ELSNER:

 9       Q.   Do you believe there's an opioid

10   crisis in the United States?

11            MR. DELINSKY:  Object to form.

12       A.   I don't have any basis to characterize

13   anything as a crisis.  I'm a corporate lawyer.

14   BY MR. ELSNER:

15       Q.   What's your understanding?

16            MR. DELINSKY:  Object to form.

17   Further object to the extent that that question

18   calls for the disclosure of attorney/client

19   privilege information.

20       A.   I don't have any personal information.

21   I've gathered information on -- you know, based

22   on my services as an attorney for the company.

23   BY MR. ELSNER:

24       Q.   So you have no understanding at all
```

1    whether there's an opioid crisis or not in the

2    United States?

3              MR. DELINSKY:  Object to the form of

4    the question.  Asked and answered.

5         A.   The information that I've received

6    would have been in the context of being a

7    corporate attorney.

8    BY MR. ELSNER:

9         Q.   So I want to drill down on this a

10   little bit.

11             If someone told you that there was an

12   opioid crisis in the United States, and you're

13   an employee of CVS, you would consider that a

14   privileged communication?

15        A.   It would depend on the context.  I

16   don't think anybody would come out of the blue

17   and just walk up to me and say that.

18        Q.   So you've never heard -- have you ever

19   heard that there's an opioid crisis in the

20   United States?

21             MR. DELINSKY:  Object to the form.

22   Asked and answered.  I instruct the witness not

23   to answer further.

24   BY MR. ELSNER:

1     Q.   Are you going to answer the question?

2     A.   I was instructed not to answer.  No.

3          MR. DELINSKY:  I'd just like to make

4     clear for the record the objection is on -- the

5     instruction was based on privilege.

6     BY MR. ELSNER:

7     Q.   I'm going to show you Motley Rice 4.

8          MR. DELINSKY:  Before you show the

9     witness the exhibit, let's break.  I think we've

10    been going about an hour.

11         MR. ELSNER:  Okay.  Happy to.

12         THE VIDEOGRAPHER:  We're going off the

13    record at 9:05 a.m.

14         (Whereupon, a recess was taken.)

15         THE VIDEOGRAPHER:  We're back on the

16    record at 9:18 a.m.

17    BY MR. ELSNER:

18    Q.   Mr. Moffatt, have you read any

19    newspaper articles, magazine articles about the

20    opioid crisis in the United States?

21    A.   I'm sure I have.  I don't recall any

22    specifics.

23    Q.   What generally do you recall?

24         MR. DELINSKY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   Just general news stories.

2     BY MR. ELSNER:

3          Q.   What sources of news?

4               MR. DELINSKY:  Object to form.

5          A.   So like 60 Minutes, that sort of

6     thing.

7     BY MR. ELSNER:

8          Q.   Have you watched the 60 Minutes

9     episodes?

10         A.   No, I have not.

11         Q.   Have you read newspaper articles about

12    the 60 minutes episodes?

13              MR. DELINSKY:  Object to form.

14    BY MR. ELSNER:

15         Q.   Dealing with the opioid crisis?

16              MR. DELINSKY:  Object to form.

17         A.   Not that I recall, no.

18    BY MR. ELSNER:

19         Q.   Do you get a newspaper at your house?

20         A.   No, I don't.

21         Q.   Do you get a newspaper at work?

22         A.   No, I don't.

23         Q.   Do you watch the news in the evening?

24         A.   No, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Have you read any books about the

 2   opioid crisis in the United States?

 3        A.    No.

 4        Q.    Not a single one?

 5              MR. DELINSKY:  Object to form.

 6        A.    Not that I recall, no.  I don't read

 7   many books.  I'm, you know, at work most of the

 8   time.

 9   BY MR. ELSNER:

10        Q.    Have you read any congressional

11   testimony about the opioid crisis in the States?

12              MR. DELINSKY:  Object to form.

13   Further object on privilege grounds to the

14   extent that --

15              MR. ELSNER:  It can't be privilege

16   whether he read congressional testimony.  It

17   just can't be privileged if he read

18   congressional testimony.

19              MR. DELINSKY:  Mr. Elsner, you're not

20   the arbiter of what privilege is or isn't, so if

21   I could finish my objection.  It very well could

22   be.

23              To the extent that you reviewed

24   testimony in the context of attorney/client
```

 1    work, I instruct you to confer with me privately

 2    about that before answering.

 3            MR. ELSNER:  I think that's an

 4    improper instruction.

 5    BY MR. ELSNER:

 6        Q.    Sir, have you read any congressional

 7    testimony about the opioid crisis?

 8        A.    If I have, it would have been in the

 9    context of attorney/client communications.

10        Q.    Well, you can answer yes or no, and

11    then we can go to the next part.

12            Have you read such testimony?

13        A.    I don't recall reading such testimony,

14    but if I have, it would have been in the context

15    of attorney/client communication.

16        Q.    Okay.  So if I understand it, you've

17    read no books, don't recall any newspaper

18    articles, have watched no news programs at all

19    about the opioid crisis in the United States?

20            MR. DELINSKY:  Object to form.

21        A.    I've seen information, but it would

22    largely be in connection with my role as a

23    corporate attorney.

24    BY MR. ELSNER:

1    Q.   Have you attended any CLE programs

2  related to the DEA regulations?

3    A.   I have attended CLE programs.  I don't

4  recall specific topics.

5    Q.   Have you -- are they in the field of

6  DEA regulations?

7         MR. DELINSKY:  Object to form.  Asked

8  and answered.

9    A.   I have attended many over the years.

10  We have a CLE requirement for Rhode Island, but

11  I don't recall specific topics and specific

12  years that I would have.

13  BY MR. ELSNER:

14    Q.   You don't -- do you select CLE

15  programs in your field of practice?

16    A.   Typically they're in my field of

17  practice, but there are also CLE presentations

18  at work, there are ones that are online, so it

19  varies.

20    Q.   Tell me about the ones that CVS shows

21  at work.  What type of CLE programs does CVS

22  have internally?

23         MR. DELINSKY:  Object to form.

24    A.   They have a wide variety of programs.

1    Law firms come in and present on various topics.

2    BY MR. ELSNER:

3        Q.    What law firms?

4        A.    A wide variety of law firms.

5        Q.    Give me some names.

6        A.    I don't -- I'm not involved in setting

7    them up.  There are others in the department

8    that set up the programs and say, there's a CLE

9    on attorney/client privilege, or something like

10   that, and whatever firm they set it up with.

11   But, yeah, it varies.

12       Q.    Has there been a CLE on the

13   distribution or dispensing of opioids?

14       A.    I don't recall.

15       Q.    Has there been a CLE on the dispensing

16   or distribution of controlled substances?

17       A.    Are you talking about at CVS or --

18       Q.    At CVS.

19       A.    I don't recall.

20       Q.    Who at CVS would set those up?

21       A.    One of the other attorneys has an

22   administrative assistant that -- or a paralegal

23   that works with the firms to set up programs.

24       Q.    Who is the attorney that selects what

```
 1   CLE programs will be shown at CVS?

 2             MR. DELINSKY:  Object to form.

 3        A.   It varies.  Different attorneys would

 4   set them up.

 5   BY MR. ELSNER:

 6        Q.   Well, give me a couple names.

 7             MR. DELINSKY:  Object to form.

 8        A.   Typically it's -- it would be one of

 9   the senior vice presidents in the legal

10   department, so Betsy Ferguson or Colleen

11   McIntosh would be two of the attorneys that

12   might have -- you know, firms would come to them

13   and say, we have a program on attorney/client

14   privilege, do you want us to do it at CVS.

15   BY MR. ELSNER:

16        Q.   Have you attended any DEA

17   presentations?

18             MR. DELINSKY:  Object to form.

19        A.   Others at CVS have.  I have not

20   personally.

21   BY MR. ELSNER:

22        Q.   Have you ever seen any slides or

23   PowerPoint presentations prepared by the DEA?

24        A.   Other than in the context of
```

1    attorney/client information that I would have

2    received, no.

3        Q.   Well, let's break it down.

4             Have you ever seen such DEA

5    presentations?  Just yes or no.

6        A.   I don't recall seeing any DEA

7    presentations.

8        Q.   Have you ever spoke with Joseph

9    Rannazzisi?

10       A.   Not that I know of, no.

11       Q.   Have you spoken with anyone at the DEA

12   about any of its investigations of CVS?

13            MR. DELINSKY:  Object to form.

14       A.   I've spoken to people at the DEA.  I

15   don't believe I've ever spoken to them in the

16   context of an investigation.

17   BY MR. ELSNER:

18       Q.   In what context?

19       A.   Related to registrations.

20       Q.   Registrations of what?

21       A.   Either pharmacies or distribution

22   centers, in the context of acquisitions where

23   we're acquiring a large number of stores or

24   distribution centers and how we go about making

1    the transition from the prior owner to CVS,

2    that's typically where I would interact with

3    people at the DEA.

4        Q.   Who specifically, or what division of

5    the DEA would you interact with?

6        A.   It would vary, but I believe they're

7    typically in the Office of Diversion Control.

8        Q.   Do you know who?

9        A.   It would have varied over the years.

10   I've been doing it for 21 years, so different

11   people at different times.  I don't recall

12   anybody's name.

13       Q.   What about in the 2010 through 2012

14   period?

15            MR. DELINSKY:  Objection.  Asked and

16   answered.

17       A.   Well, we did acquisitions in that time

18   period, so I probably would have talked to them

19   sometime in that time period.

20   BY MR. ELSNER:

21       Q.   Do you know any names?

22       A.   I don't recall.  It's a long time ago.

23       Q.   I'm going to mark this next letter as

24   Exhibit 3.

```
 1                    (Whereupon, CVS-Moffatt-3 was marked

 2                    for identification.)

 3   BY MR. ELSNER:

 4        Q.    This is a letter from counsel to

 5   plaintiffs in this litigation, and it's a list

 6   of CVS custodians, and it says in the second

 7   sentence that this "list identifies individuals

 8   who we believe, based on our good-faith

 9   investigation to date, are most likely to have

10   non-cumulative discoverable information relating

11   to the claims against the CVS defendants in the

12   Track One cases."

13                    Do you see that?

14        A.    Yes.

15        Q.    Okay.  And if you turn to the second

16   page under the fifteenth person, your name

17   appears there.

18                    Do you see that?

19        A.    Yes.

20        Q.    What is your understanding of the

21   discoverable information that you have to offer

22   in this litigation?

23                    MR. DELINSKY:  Object to form.

24                    And I'd state on the record that you
```

1    left out the first sentence of the letter which

2    indicates that the list includes individuals

3    proposed by plaintiffs, and Mr. Moffatt's name

4    was proposed by the plaintiffs.

5              MR. ELSNER:  Okay.

6              MR. DELINSKY:  He was not identified

7    as a custodian by defense counsel who would have

8    relevant information.

9              MR. ELSNER:  Okay.

10   BY MR. ELSNER:

11        Q.   Do you have relevant information

12   concerning the claims and defenses in this

13   action?

14             MR. DELINSKY:  Object to form.

15             And to the extent that calls on you to

16   provide attorney/client legal analysis, I

17   instruct you not to answer.

18        A.   I wouldn't be the one making that

19   decision.

20   BY MR. ELSNER:

21        Q.   Would you agree that CVS is among the

22   largest of the chain pharmacies in the United

23   States?

24             MR. DELINSKY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes, we are.

 2   BY MR. ELSNER:

 3        Q.   And you're the largest by store number

 4   with more than 9,800 CVS pharmacies?

 5             MR. DELINSKY:  Object to form.

 6        A.   We're close to Walgreen's, so I'm not

 7   exactly sure what Walgreen's store count is

 8   these days.  We are among the largest.

 9   BY MR. ELSNER:

10        Q.   Among the top two?

11             MR. DELINSKY:  Object to form.

12        A.   As far as I know, yes.

13   BY MR. ELSNER:

14        Q.   Do you know how many pharmacies CVS

15   currently operates today in the United States?

16             MR. DELINSKY:  Object to form.

17        A.   Approximately 9,900.

18   BY MR. ELSNER:

19        Q.   And you're also the largest by the

20   number of pharmacists, right?  There are over

21   20,000 pharmacists for CVS?

22             MR. DELINSKY:  Object to form.

23        A.   I'm not familiar with the count of

24   pharmacists at, say, Walgreen's.
```

```
 1              MR. ELSNER:  I'll mark this next

 2    document as Exhibit 4.

 3              (Whereupon, CVS-Moffatt-4 was marked

 4              for identification.)

 5    BY MR. ELSNER:

 6         Q.   This is Motley Rice 206.  This is from

 7    CVS's website.

 8              Would you agree with me that CVS is

 9    one of the largest pharmacists by prescriptions,

10    handling over 2.5 billion prescriptions, is that

11    right?

12              MR. DELINSKY:  Object to form.

13         A.   So it says here "2.5 billion

14    prescriptions managed or filled."  That doesn't

15    mean we filled them necessarily.  But I know

16    that we are one of the bigger pharmacies and,

17    therefore, fill more prescriptions than most

18    other pharmacies.

19    BY MR. ELSNER:

20         Q.   And would you agree that CVS is one of

21    the largest pharmacies by revenue?

22              MR. DELINSKY:  Object to form.

23         A.   To my knowledge, yes.

24    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And would it be accurate to say that

2    that revenue is close to $60 billion in 2017?

3            MR. DELINSKY:  Object to form.

4      A.   I don't have the figures at hand, but

5    -- so I don't really know off the top of my

6    head.  There are many people that work on the

7    financials for the company.

8    BY MR. ELSNER:

9      Q.   Does that sound about right?

10     A.   I really couldn't say.

11           (Whereupon, CVS-Moffatt-5 was marked

12           for identification.)

13   BY MR. ELSNER:

14     Q.   Are we on Exhibit 5?

15     A.   Yes.

16     Q.   This is a map of the 9,800 pharmacies

17   that CVS has in the United States.  Does it

18   appear accurate in terms of the majority of your

19   pharmacies on the East Coast, the midwest, and

20   in California?

21           MR. DELINSKY:  Object to form.

22     A.   So I'm not familiar with Red Lion,

23   where this came from, but it appears generally

24   accurate.  I mean, I don't know that you'd call

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Texas midwest, there's a number of stores in

 2   Texas, Arizona, so this looks generally like the

 3   store map picture.

 4   BY MR. ELSNER:

 5        Q.   And by midwest, I was referring to

 6   sort of the Ohio area.  And CVS has about 329

 7   pharmacies in Ohio, is that right?

 8             MR. DELINSKY:  Object to form.

 9        A.   I don't recall the specifics of state

10   by state store count, but that sounds generally

11   accurate.

12   BY MR. ELSNER:

13        Q.   If you look back at Exhibit 4 on the

14   third page, it has a drop-down on the website,

15   facts by state, and for Ohio the drop-down says

16   329 pharmacies.  Does that sound about accurate?

17             MR. DELINSKY:  Object to form.

18        A.   I don't know when this was prepared,

19   so, you know, it could have changed a little

20   bit.  But, you know, at the time that the

21   information was loaded it was accurate, but, you

22   know, we opened new stores, we closed stores.

23   BY MR. ELSNER:

24        Q.   Sure.
```

1    A.   Pretty consistently.

2    Q.   It's generally accurate?

3    A.   Yes.

4    Q.   And what is CVS's market share in the

5    country?

6         MR. DELINSKY:  Object to form.

7         Mr. Moffatt, to the extent that that

8    calls for information you've obtained in

9    attorney/client context, I instruct you not to

10   answer.

11   A.   Well, it would depend on what product

12   you're talking about and so forth.  There are

13   other people at CVS that would be more attuned

14   to what market share we have.

15   BY MR. ELSNER:

16   Q.   I'm just describing the number of

17   pharmacies across the country.  Would you say

18   that you have about 14 percent of the total

19   market share?

20        MR. DELINSKY:  Object to form.  Same

21   objection and instruction as to privilege.

22   A.   I don't know what the market share is.

23   And again, it depends on what you're looking at,

24   whose statistics you're looking at.  Others at

```
1   CVS, you know, have responsibility -- well, they

2   would know more about market share than a

3   corporate attorney.

4   BY MR. ELSNER:

5       Q.   What about in Ohio, do you know what

6   the market share is that CVS has in Ohio?

7       A.   Others at CVS would know that

8   information.  I don't.

9       Q.   There are roughly 70 CVS stores in

10  Summit County and Cuyahoga County.  Does that

11  sound accurate to you?

12      A.   I have no basis for knowing how many

13  stores are in specific counties.

14      Q.   Are you aware that the Summit and

15  Cuyahoga Counties are -- sorry, strike that.

16           Are you aware that CVS stores in

17  Summit and Cuyahoga County were provided

18  controlled substances from the Indiana

19  distribution center?

20           MR. DELINSKY:  Object to form.

21      A.   Others at CVS would be responsible for

22  which distribution centers distribute to which

23  stores.  I'm not responsible for that, and I

24  don't have any information of my own.
```

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. ELSNER:

2      Q.  So as the president of CVS Indiana,

3  you don't know what states that distribution

4  center distributes controlled substances to, is

5  that right?

6          MR. DELINSKY:  Object to form.

7      A.  Others at CVS would be responsible for

8  that information.  It's -- in connection with my

9  licensing responsibility, I know that it has

10  licenses in a number of states.

11  BY MR. ELSNER:

12      Q.  Have you read the complaint in this

13  case?

14          MR. DELINSKY:  Object to form.

15      A.  In connection with preparing for this,

16  I probably was given it at some point.  I don't

17  recall seeing it.

18  BY MR. ELSNER:

19      Q.  Well, did you read it?

20          MR. DELINSKY:  Object to form.  Asked

21  and answered.

22      A.  Again, in connection with preparing --

23  either preparing for the case, or I think I

24  might have provided a declaration or an

 1    affidavit, so I may have read it back then, but

 2    I don't recall specifics about the complaint.

 3    BY MR. ELSNER:

 4         Q.   But you did provide a declaration.  In

 5    preparing the declaration, did you read the

 6    complaint?

 7              MR. DELINSKY:  Object to form.  Asked

 8    and answered.

 9         A.   I believe it would have been given to

10    me by counsel.  I don't recall.  I signed a

11    number of declarations, but typically I would be

12    given the documents that I need in order to

13    provide the declaration.

14    BY MR. ELSNER:

15         Q.   Did you write the declaration?

16              MR. DELINSKY:  Object to form.

17              To the extent that calls for the

18    disclosure of attorney/client communications, I

19    instruct you not to answer.

20         A.   It would have been purely

21    attorney/client communications.

22    BY MR. ELSNER:

23         Q.   What did you read to prepare your

24    declaration?  Did you read the declaration?

```
 1        A.   Of course, I read the declaration.

 2        Q.   What else did you read?

 3        A.   I don't recall specifics.  I'd have to

 4   see the declaration and then, you know, it

 5   would -- I'm not sure that I recall exactly what

 6   I read.

 7        Q.   Do you understand that the allegations

 8   in this case is that there is an opioid crisis

 9   in Summit and Cuyahoga Counties?

10             MR. DELINSKY:  Object to form.

11        A.   I don't have any basis for that

12   understanding.

13   BY MR. ELSNER:

14        Q.   To prepare for the deposition, did you

15   read any -- to prepare for the deposition, did

16   you read any other depositions that have been

17   taken in this case?

18        A.   I did not.

19        Q.   Did you read that, not just CVS

20   depositions, any other depositions from Purdue,

21   Cardinal, any other depositions?

22        A.   I don't recall reading any other

23   depositions in this case.

24        Q.   Have you been provided any?
```

```
 1        A.    I don't believe so, no.

 2        Q.    What did you do to prepare for your

 3   deposition?

 4        A.    Principally I met with our attorneys

 5   and --

 6        Q.    For how long?

 7        A.    -- both in-house counsel and out.

 8        Q.    For how long did you meet, and over

 9   how many days?

10        A.    I don't really recall.  We met a

11   couple of different times because my deposition

12   was originally scheduled earlier, so -- and I

13   don't recall, I didn't keep track of how long

14   meetings were or anything like that.

15        Q.    Did you review documents?

16        A.    I reviewed a handful of documents,

17   yes.

18        Q.    What documents did you review?

19             MR. DELINSKY:  I instruct you not to

20   answer that, and caution you to the extent you

21   even recall an attorney/client --

22   attorney/client privilege and attorney work

23   product grounds.

24             Mr. Elsner, if you would like to ask
```

1    about particular documents, we'll take those

2    questions as they come.  But to the extent your

3    question asks for a selection of documents

4    that's selected by counsel, I instruct the

5    witness not to answer.

6              MR. ELSNER:  I don't think that's an

7    appropriate objection, but I think it's one we

8    need to resolve with the court.

9    BY MR. ELSNER:

10        Q.   Did you discuss your deposition with

11   anyone other than counsel?

12        A.   No.

13        Q.   Did you discuss your deposition with

14   any other employees at CVS other than attorneys?

15        A.   Other than attorneys, no.  I let my

16   boss know that I was going to be here today.

17        Q.   What role, if any, did you play with

18   respect to the suspicious order monitoring

19   system at CVS?

20             MR. DELINSKY:  Object to form.

21        A.   Others at CVS were responsible for the

22   systems.  I didn't have any role in that.  I'm

23   an attorney.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    At one point in time CVS had hired the

2   Buzzeo Group to help it develop an algorithm for

3   suspicious order monitoring system.  Are you

4   familiar with the Buzzeo Group?

5      A.    I am familiar with Ron Buzzeo.  Many,

6   many years ago I communicated with him, but it's

7   been quite a long time since I did any of that.

8      Q.    What was the base -- what were you

9   communicating with him about?

10          MR. DELINSKY:  And I object to the

11   extent that question calls for privileged

12   information.  To the extent it does, I instruct

13   the witness not to answer.  If you're not sure

14   and you want to discuss it, we can discuss it.

15      A.    I don't recall specifically what I

16   might have talked to him about, but it would

17   have been because I'm an attorney and he was a

18   consultant.

19   BY MR. ELSNER:

20      Q.    Did you negotiate the contract between

21   CVS and the Buzzeo Group?

22          MR. DELINSKY:  Object to form.

23      A.    I don't recall any -- I don't even

24   know if there was a contract.  I don't recall if

Highly Confidential - Subject to Further Confidentiality Review

1    I was involved in the negotiation of it.

2    BY MR. ELSNER:

3         Q.    Did it relate to the development of a

4    suspicious order monitoring system at CVS, your

5    conversations with Ron Buzzeo?

6              MR. DELINSKY:    Object to form.

7         A.    I don't recall what I would have

8    talked to Mr. Buzzeo about.

1   BY MR. ELSNER:

2       Q.   You said you knew Ron Buzzeo, I may

3   misquote you, it's not my intention, but from

4   way back.  What period of time did you first

5   meet Ron Buzzeo?

6            MR. DELINSKY:  Object to form.

7       A.   It would have been sometime shortly

8   after I got to CVS, so late 1990s, early 2000s.

9   BY MR. ELSNER:

10      Q.   And was your meeting with him in

11  relationship to him serving as a consultant to

12  CVS?

13           MR. DELINSKY:  Object to form.

14      A.   As I recall, yes.  And I don't know

15  that I ever met him, I think I talked to him on

16  the phone.

17  BY MR. ELSNER:

18      Q.   Okay.  And what's your best

19  recollection of that discussion?  And how many

20  times did you talk to him on the phone?

21           MR. DELINSKY:  Object to form.

22      A.   It was 20 years ago.  I really don't

23  know.

24  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



23    BY MR. ELSNER:

24        Q.   Were you aware as the president of CVS

1    in Indiana that CVS Indiana was reviewing all

2    orders for controlled substances to determine

3    whether there was a suspicion of diversion?

4              MR. DELINSKY:  Object to form.

5        A.   Others at CVS were responsible for

6    operations, and I was not involved in that.

7    BY MR. ELSNER:

8        Q.   So as the president of CVS Indiana, no

9    operational issues were brought to your

10   attention, is that right?

11             MR. DELINSKY:  Object to the form of

12   the question.

13       A.   Others at CVS were responsible for

14   operations.  I was not involved in operations.

15   I'm not an operator.

16   BY MR. ELSNER:

17       Q.   Did you have any conversations with

18   Mark Nicastro who was an employee of CVS

19   Indiana?

20       A.   Not that I recall, no.

21       Q.   Do you recall any conversations with

22   any employees of CVS Indiana distribution center

23   while you served as president of CVS Indiana?

24             MR. DELINSKY:  Object to form.

```
 1        A.   Any communications I would have had
 2   would have been in my role as an attorney.  I
 3   don't recall specifics.
 4   BY MR. ELSNER:
 5        Q.   Let's break it down.
 6             Do you recall any conversations?  And
 7   we can deal with the privilege issue separately.
 8        A.   I believe I have talked to people at
 9   the distribution center in my role as an
10   attorney.
11        Q.   What people -- without disclosing the
12   conversation, what people at the CVS Indiana
13   distribution center did you communicate with?
14        A.   I don't recall.  It was many years ago
15   that we're talking about.  We're talking about,
16   you know, pre-2014, so I don't really know.
17        Q.   Did you ever speak with Gary Millikan?
18        A.   I don't recall.  I know the name, and
19   I probably have talked to Gary in the past,
20   either on conference calls or directly, I can't
21   recall.  But it would have been, again, in my
22   role as an attorney.
23        Q.   Aaron Burtner, did you ever have any
24   conversations with Aaron Burtner?
```

1          A.    I'm not familiar with that name.

2                MR. ELSNER:  Mark this as Exhibit 6.

3                (Whereupon, CVS-Moffatt-6 was marked

4                for identification.)

5    BY MR. ELSNER:

6          Q.    Mr. Moffatt, this is the DEA's Drug

7    Fact Sheet for hydrocodone.  Hydrocodone was one

8    of the drugs that the Indiana distribution

9    center distributed to CVS stores in Summit and

10   Cuyahoga County.

11               Are you familiar with the fact that

12   CVS distributed hydrocodone?

13               MR. DELINSKY:  Object to form.

14         A.    Others were responsible for what

15   distribution centers distributed what drugs, and

16   I'm not familiar with it.

17   BY MR. ELSNER:

18         Q.    Okay.  This says, if you read it in

19   the Overview with me here, that "Hydrocodone is

20   the most frequently prescribed opioid in the

21   United States and is associated with more drug

22   abuse and diversion than any other...illicit

23   opioid."

24               Were you aware of that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DELINSKY:  Object to form.

 2          A.   Well, it says "licit or illicit."

 3   BY MR. ELSNER:

 4          Q.   Licit or illicit, that's right.

 5          A.   I'm not familiar with this document at

 6   all, so I was not familiar until reading it just

 7   now.

 8          Q.   Are you aware that hydrocodone is the

 9   most frequently prescribed opioid in the United

10   States?

11          A.   That's what it says here.  I'm not

12   familiar with what drugs are prescribed.  Others

13   at CVS would be more knowledgeable about that.

14          Q.   Did you know in certain years the

15   dispensing of hydrocodone was more than double

16   that of Lipitor in the United States?

17                    MR. DELINSKY:  Object to form.

18          A.   Others at CVS are knowledgeable about

19   the prescribing of drugs.  That's not in my

20   area.

21   BY MR. ELSNER:

22          Q.   As the president of CVS Indiana, do

23   you know whether hydrocodone was the highest

24   drug distributed from CVS Indiana?
```

Highly Confidential - Subject to Further Confidentiality Review

 1              MR. DELINSKY:  Object to form.

 2       A.    Others at CVS would know about what

 3  drugs were distributed from what distribution

 4  centers.  It's not in my area.

 5  BY MR. ELSNER:

 6       Q.    Were you aware that hydrocodone was

 7  the subject of more drug abuse and diversion

 8  than any other licit or illicit opioid?

 9              MR. DELINSKY:  Object to form.

10       A.    Others at CVS were responsible for

11  that sort of thing.  It's not in my area.

12  BY MR. ELSNER:

13       Q.    Did it concern you as the president of

14  CVS Indiana that you were distributing

15  hydrocodone and that it was the subject of such

16  abuse?

17              MR. DELINSKY:  Object to form.

18       A.    Others at CVS were responsible for

19  this, and I don't have any basis for what you're

20  saying in your question.

21  BY MR. ELSNER:

22       Q.    So it didn't concern you one way or

23  the other?

24              MR. DELINSKY:  Object to form.

1        A.   Others at CVS would be responsible for

2    those areas.

3    BY MR. ELSNER:

4        Q.   And it didn't concern you?

5             MR. DELINSKY:  Object to form.

6        A.   Others at CVS were responsible for

7    that.

8    BY MR. ELSNER:

9        Q.   Well, they may have been, but did it

10   concern you?

11            MR. DELINSKY:  Object to form.

12       A.   Others at CVS were responsible, so I

13   was not involved in that, and so it was not --

14   it would not have been one of my concerns.

15            MR. ELSNER:  I'm going to mark this

16   next document as Exhibit 7.

17            (Whereupon, CVS-Moffatt-7 was marked

18            for identification.)

19   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

12              MR. ELSNER:  Why don't we take a quick

13     break.  Go off the record for a minute.

14              THE VIDEOGRAPHER:  We're going off the

15     record at 9:58 a.m.

16              (Whereupon, a recess was taken.)

17              THE VIDEOGRAPHER:  We're back on the

18     record at 10:10 a.m.

19     BY MR. ELSNER:

20        Q.   Mr. Moffatt, I'm going to show you

21     Exhibit 8.

22              (Whereupon, CVS-Moffatt-8 was marked

23              for identification.)

24     BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

■  ▬▬▬▬▬▬▬

■  ▬   ▬▬▬▬▬▬▬▬▬▬

■  ▬▬

■  ▬▬▬▬▬▬▬▬

■  ▬   ▬▬▬▬▬▬▬▬▬▬▬▬

■  ▬▬▬▬▬

7    BY MR. ELSNER:

8         Q.   What did you do as the president of

9    CVS Indiana?

10             MR. DELINSKY:  Object to form.  Asked

11   and answered.

12        A.   My role was largely administrative.

13   BY MR. ELSNER:

14        Q.   And to do what?

15        A.   Sign documents.

16        Q.   What documents?

17             MR. DELINSKY:  Objection.  Asked and

18   answered.

19        A.   I signed many, many documents for a

20   number of our entities.  I don't recall

21   specifics as to what I signed for a specific

22   entity.

23   BY MR. ELSNER:

24        Q.   Well, you knew you were being deposed

1    today, and you knew you were being deposed with

2    your role with respect to being the president of

3    CVS Indiana which is a defendant in this action,

4    right?

5        A.   Yes.

6        Q.   Did you take any steps to look through

7    the documents or the things you executed as the

8    president of CVS Indiana in the relevant time

9    period to prepare for today's deposition?

10            MR. DELINSKY:  Object to form.

11       A.   I don't know what documents I signed

12   on behalf of CVS Indiana.

13   BY MR. ELSNER:

14       Q.   And to come here today for your

15   deposition you didn't make any effort to

16   determine that, is that right?

17            MR. DELINSKY:  Object to form.

18       A.   I wasn't involved in the collection of

19   documents or anything like that, so I did not

20   myself go looking through files.

21   BY MR. ELSNER:

22       Q.   You, to prepare for today's

23   deposition, you didn't go back and look at the

24   documents you executed in the relevant time

1    period related to this lawsuit while you served

2    as the president of CVS Indiana, is that right?

3              MR. DELINSKY:  Object to form.

4    Further object to the insinuation that a fact

5    witness has a duty to review his old files in

6    preparation for a deposition.  There's no such

7    duty.

8              MR. ELSNER:  Objection.  You can

9    object on form or privilege.  You can't give

10   speaking objections, you know that.

11        A.   So I signed thousands of documents

12   during the time period we're talking about.  I

13   did not go back to try to find what specific

14   documents I signed for any specific entity.

15   BY MR. ELSNER:

16        Q.   Did you understand that this testimony

17   today and this lawsuit is important?

18             MR. DELINSKY:  Object to form.

19        A.   I understand it's important.  I don't

20   know the relevance of me going back to look at

21   files from many, many years ago to try to find

22   documents that I don't even know if they exist.

23   BY MR. ELSNER:

24        Q.   One of your roles as president of CVS

Highly Confidential - Subject to Further Confidentiality Review

1   Indiana was to make sure that the distribution

2   center maintained its license with the DEA, its

3   registration to distribute controlled

4   substances, right?

5           MR. DELINSKY:  Object to form.

6       A.   Could you repeat that?

7           MR. ELSNER:  Could you read it back?

8           (Whereupon, the reporter read back the

9   pending question.)

10          MR. DELINSKY:  Object to form.

11      A.   So a number of people were responsible

12  for maintaining the licenses of the facility.  I

13  don't think it was my role.  It was certainly

14  not my role individually.

15  BY MR. ELSNER:

16      Q.   Well, you were the president.  There's

17  no one higher than you at CVS Indiana, right?

18          MR. DELINSKY:  Object to form.

19  Misstates testimony.

20      A.   My role as president was

21  administrative.  There were other people that

22  were operating the facility.

23  BY MR. ELSNER:

24      Q.   Did you think it was important for CVS

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Indiana to maintain its license as the president
 2   of that entity?
 3            MR. DELINSKY:  Object to form.
 4       A.   Others are responsible for operations.
 5   It's important for each of our facilities to be
 6   properly licensed.
 7   BY MR. ELSNER:
 8       Q.   Did you think it was important that
 9   each facility is properly licensed, including
10   CVS Indiana as its president?
11            MR. DELINSKY:  Object to form.
12       A.   So other people are involved in the
13   operations of all the facilities.  They have
14   responsibility, and I believe that it's
15   important that we maintain proper licenses.
16   BY MR. ELSNER:
17       Q.   What steps did you take, if any, to
18   ensure that CVS Indiana was taking the
19   appropriate steps to maintain its license?
20            MR. DELINSKY:  Object to form.
21       A.   I don't recall anything specific with
22   regard to CVS Indiana.
23   BY MR. ELSNER:
```





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          MR. ELSNER:  I think that this is

24   totally improper coaching of a witness.  I'm

```
 1    entitled to answers to these questions, and he's

 2    been coached to repeat the same phrase back to

 3    me and not answer any of the questions that I'm

 4    asking him.  I think it's totally improper, and

 5    it's obstructive.

 6              MR. DELINSKY:  Your questions are

 7    completely and totally improper.  We've spent

 8    the last hour on documents that Mr. Moffatt has

 9    testified plainly that he has never seen before

10    concerning events that he has testified he is

11    not familiar with.  You've continued to ask

12    question after question on these topics.  That

13    is what's improper about this line of questions.

14              MR. ELSNER:  It's not improper because

15    he's the president of the entity, and I'm

16    entitled to ask him whether he's been made aware

17    of these activities, and if he has a view about

18    them.  It's totally proper.

19              MR. DELINSKY:  But his role as

20    president of the entity is an administrative

21    role only.  All operations are led and managed

22    by other persons, as he has testified.  It is

23    improper.

24              MR. ELSNER:  Mark this next document
```

```
1   as Exhibit 9.

2            (Whereupon, CVS-Moffatt-9 was marked

3            for identification.)

4   BY MR. ELSNER:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

▮  ▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮

3  BY MR. ELSNER:

4      Q.   I'd like to understand a little bit

5  about the process of purchasing controlled

6  substances at CVS.

7           CVS pharmacies fill prescriptions for

8  opioids, including OxyContin, oxycodone,

9  hydrocodone combination products, is that right?

10          MR. DELINSKY:  Object to form.

11     A.   Others at CVS are responsible for

12  pharmacy purchasing.  I'm not involved in that

13  process.

14  BY MR. ELSNER:

15     Q.   Do you know that that's what they

16  dispense?

17          MR. DELINSKY:  Object to form.

18     A.   Others at CVS are responsible for

19  that, and I'm aware we dispense thousands of

20  drugs.

21  BY MR. ELSNER:

22     Q.   Right.  Including opioids, right?

23          MR. DELINSKY:  Object to form.

24     A.   Others are more knowledgeable about

Highly Confidential - Subject to Further Confidentiality Review

1    this, but generally speaking, I'm aware that

2    opioids are among the drugs that we dispense.

3    BY MR. ELSNER:

4        Q.   Do all CVS pharmacies dispense

5    opioids, or only certain ones?

6             MR. DELINSKY:  Object to form.

7        A.   We have a handful of stores that don't

8    have pharmacies at all.  I believe that the ones

9    that have pharmacies -- I don't know -- I don't

10   have particular information about what

11   prescriptions are filled at what pharmacies, so

12   others in pharmacy operations would have

13   information about that.

14   BY MR. ELSNER:

15       Q.   You're the president of various

16   pharmacy entities, is that right?

17       A.   Yes, that's correct.

18       Q.   And so for those pharmacies, are you

19   aware whether they dispense opioids?

20            MR. DELINSKY:  Object to form.

21       A.   Others in pharmacy operations are more

22   versed in what stores fill what prescriptions.

23   To the extent anybody gives me information, it's

24   in my role as an attorney as opposed to in my

Highly Confidential - Subject to Further Confidentiality Review

1  role as president of one of the store

2  subsidiaries.

3  BY MR. ELSNER:

4      Q.   Is the fact that a CVS dispenses an

5  opioid a privilege issue?  Are you asserting

6  privilege over whether you dispense opioids or

7  not?

8          MR. DELINSKY:  Object to form.

9          You don't need to -- that question

10  should be directed to --

11  BY MR. ELSNER:

12      Q.   You're the president of certain CVS

13  pharmacies.  Do all those pharmacies dispense

14  opioids?  Yes or no.

15          MR. DELINSKY:  He's already answered

16  the question, Mike.  Asked and answered.

17      A.   People in pharmacy operations know

18  better than I do which pharmacies dispense which

19  drugs.  That's not part of my role as a

20  corporate attorney.

21  BY MR. ELSNER:

22      Q.   I know.  But I can't find the most

23  knowledgeable person on every single thing at

24  CVS to answer questions or this discovery period

1    would last for decades.  So I'm asking you, do

2    you know whether the pharmacies of which you are

3    the president of, do they dispense opioids?

4    Yes, no, I don't know.

5                MR. DELINSKY:  Object to form.  It's

6    already been asked and it's already been

7    answered.

8                MR. ELSNER:  No.  He's just said that

9    other people know more.  But I didn't get the

10   answer.

11               MR. DELINSKY:  He said right at the

12   beginning that he's not sure what pharmacies

13   dispense what pharmaceuticals.  He said it,

14   Mike.  It's in the transcript.

15   BY MR. ELSNER:

16        Q.   I'd like to have an answer, please.

17        A.   I'm not sure what pharmacies dispense

18   what drugs.  That's -- other people at CVS

19   handle that.

20        Q.   Did CVS ever purchase Schedule II

21   drugs like OxyContin or oxycodone directly from

22   manufacturers of those products?

23               MR. DELINSKY:  Object to form.

24        A.   Others at CVS are responsible for

1    pharmacy purchasing.  To the extent we carried

2    any Schedule IIs, those would have come from,

3    from my understanding, wholesalers.

4    BY MR. ELSNER:

5        Q.   Wholesalers?

6        A.   Not from our distribution centers.

7        Q.   Correct.

8             But would CVS ever purchase those

9    products directly from the manufacturer as

10   opposed to a wholesaler like Cardinal or

11   McKesson?

12            MR. DELINSKY:  Object to form.

13       A.   Others at CVS are responsible for

14   pharmacy purchasing.  I have no knowledge of

15   which drugs are purchased from where.

16   BY MR. ELSNER:

17       Q.   Have you ever been involved in

18   discussions with Purdue or any other

19   manufacturer of opioids concerning contracts to

20   purchase those drugs?

21            MR. DELINSKY:  Object to form.

22       A.   I have not.

23   BY MR. ELSNER:

24       Q.   Do you generally know whether CVS has

Highly Confidential - Subject to Further Confidentiality Review

1    ever purchased Schedule II drugs directly from a

2    manufacturer of those drugs or not?

3         A.   Other people at CVS would be

4    responsible for pharmacy purchasing.  I don't

5    have any knowledge about that.

6         Q.   The Schedule II drugs that CVS

7    purchased from wholesalers like Cardinal, would

8    CVS receive any type of incentive program or

9    rebate program from those wholesalers?

10             MR. DAWSON:  Object to form.

11             MR. DELINSKY:  Object to form.

12        A.   Others at CVS were responsible for

13   pharmacy purchasing, so I'm not knowledgeable

14   about that.

15   BY MR. ELSNER:

16        Q.   Have you been involved at all in any

17   of the contract negotiations or discussions with

18   Cardinal concerning agreements to purchase

19   controlled substances from them?

20             MR. DAWSON:  Object to the form.

21        A.   Others at CVS were responsible for

22   that.

23   BY MR. ELSNER:

24        Q.   So you've never had a role with

1    respect to that?

2        A.   I don't recall ever having a role with

3    that.

4        Q.   With respect to the hydrocodone

5    products that were distributed by CVS Indiana,

6    did CVS Indiana purchase those drugs from a

7    wholesaler?  Did it purchase hydrocodone from a

8    wholesaler or from the manufacturer of those

9    drugs?

10            MR. DELINSKY:  Object to form.

11       A.   I'm not involved at all in pharmacy

12   purchasing, so I don't know whether they came

13   from a wholesaler or from manufacturers.

14   BY MR. ELSNER:

15       Q.   When a pharmacy would select a

16   particular -- order a particular drug like

17   hydrocodone or a Schedule II drug, would the

18   pharmacy sell -- pharmacist select where that

19   drug would be purchased from, or delivered from,

20   or was that an automatic process?

21            MR. DELINSKY:  Object to form.

22       A.   Others are involved in pharmacy

23   purchasing and ordering.  The others, the people

24   that are responsible for ordering, would know

1    that.  I don't know that.

2    BY MR. ELSNER:

3        Q.   You don't know that?  Okay.

4             Would you agree with me that CVS,

5    given its size and market share, has a great

6    deal of data concerning the distribution and

7    dispensing of hydrocodone combination products?

8             MR. DELINSKY:  Object to form.

9        A.   Others at CVS are responsible for

10   whatever data we manage.

11   BY MR. ELSNER:

12       Q.   Do you know how that data is used, if

13   at all, in conducting analysis of controlled

14   substances to prevent diversion?

15            MR. DELINSKY:  Object to form.

16       A.   Others in various departments would

17   have knowledge about that.  I'm not involved in

18   information management or how information is

19   used.

20   BY MR. ELSNER:

21       Q.   So you have no information about that?

22       A.   Others at CVS would have information.

23   I am not involved in that process.

24       Q.   There came a time in which hydrocodone

Highly Confidential - Subject to Further Confidentiality Review

```
 1   was rescheduled from a Schedule III narcotic to

 2   a Schedule II narcotic.  Are you aware of that?

 3           MR. DELINSKY:  Object to form.

 4       A.   I'm aware of it through, you know, my

 5   role as an attorney.

 6           MR. ELSNER:  I'm going to mark this

 7   next document as Exhibit 10.

 8           (Whereupon, CVS-Moffatt-10 was marked

 9           for identification.)

10   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11   BY MR. ELSNER:

12        Q.   Were you aware that the State of New

13   York had rescheduled hydrocodone from a Schedule

14   III to a Schedule II within the state in August

15   of 2012?

16             MR. DELINSKY:  Object to form.

17        A.   Others at CVS would have been

18   responsible for which drug is coming from where,

19   so I was not involved in that process.

20   BY MR. ELSNER:

21        Q.   Generally when a state creates a

22   stricter requirement, either for the

23   distribution of a controlled substance or on

24   some other basis, was it CVS's policy to follow

Highly Confidential - Subject to Further Confidentiality Review

1    that stricter requirement within those states?

2           MR. DELINSKY:  Object to form.

3       A.   Others at CVS would have been

4    responsible for how we complied with various

5    regulations.  I'm not aware of how we addressed

6    the New York regulation that you just spoke of.

7    BY MR. ELSNER:

8       Q.   But do you understand that these

9    various regulations are minimum standards, and

10   that CVS could always do more than the minimum

11   standard if it chose to?

12          MR. DELINSKY:  Object to form.

13      A.   Again, others at CVS are responsible

14   for compliance and so forth, so they would be

15   making that decision.

16   BY MR. ELSNER:

17      Q.   But they may be, but from your

18   perspective as the president of all sorts of

19   pharmacies, the president of distribution

20   centers, did you understand that when the

21   federal government created regulations that

22   those were minimum standards that CVS could do

23   more?

24          MR. DELINSKY:  Object to the form of

1    the question.

2         A.    Others at CVS are responsible -- were

3    involved in that analysis.  It's not part of my

4    role.

5    BY MR. ELSNER:

6         Q.    Did you understand that CVS didn't --

7    wasn't required to distribute hydrocodone by the

8    government, right?

9              MR. DELINSKY:  Object to form.

10        A.    Others are responsible for which drugs

11   are distributed.  I'm not aware of the

12   government requiring us to do anything.  Pay

13   taxes, but other than that...

14   BY MR. ELSNER:

15        Q.    Right.  So there's no -- so CVS could

16   make a choice.  They could choose to distribute

17   hydrocodone or not, right?

18             MR. DELINSKY:  Object to form.

19        A.    Others are responsible for deciding

20   what drugs we distribute.

21   BY MR. ELSNER:

22        Q.    Well, CVS had a decision to make

23   whether to sell cigarettes or not, right?

24             MR. DELINSKY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

 1        A.    That's correct.

 2   BY MR. ELSNER:

 3        Q.    And CVS decided, I think wisely, not

 4   to do so, and they made that decision, and the

 5   same could have been chosen for hydrocodone,

 6   right?

 7              MR. DELINSKY:  Object to form.

 8        A.    I suppose that's true.  But tobacco

 9   has no therapeutic value, unlike prescription

10   drugs.

11   BY MR. ELSNER:

12        Q.    I agree.

13        A.    So there's a very big difference

14   between deciding not to sell tobacco and

15   deciding not to sell a medication that many

16   people need.

17        Q.    Understood, and I agree with that

18   statement.

19              But you would agree with me that

20   there's no requirement for CVS to distribute

21   hydrocodone?

22              MR. DELINSKY:  Object to form.  Asked

23   and answered.

24        A.    Again, other people make the decision

1    of what drugs to sell.  But I know that many

2    people need them, and I can't imagine a pharmacy

3    deciding not to sell a drug that's needed.

4    BY MR. ELSNER:

5        Q.   Under any circumstances?

6        A.   It's not my decision.

7        Q.   CVS was a member of the National

8    Association of Chain Drugstores, correct?

9        A.   Yes, and we still are.  It's not was,

10   is.

11       Q.   Is.  That's fair.

12            And that CVS contributes millions of

13   dollars to the NACDS, isn't that right?

14            MR. DELINSKY:  Object to form.

15       A.   I don't -- I'm not involved in what --

16   I don't know that we would contribute.  I'm not

17   familiar with NAC -- our involvement with NACDS.

18   I know we're a member.

19            MR. ELSNER:  I'm going to mark this

20   next exhibit, which is Exhibit 11.

21            (Whereupon, CVS-Moffatt-11 was marked

22            for identification.)

23   BY MR. ELSNER:

24       Q.   This is also from CVS Health's

Highly Confidential - Subject to Further Confidentiality Review

 1    website.  And it's Motley Rice 207.

 2            And there's a section on the website

 3    with Trade Association and Coalition

 4    Participation.

 5            Do you see that?

 6    A.   Yes.

 7    Q.   Okay.  If you turn to the next page,

 8    there's a listing here among the trade

 9    associations as the National Association of

10    Chain Drugstores.

11            Do you see that?

12    A.   Yes.

13    Q.   Okay.  And on the top, this is a list

14    of contributions/dues to the trade associations

15    and coalitions.  That's what the banner reads on

16    the top of the page, is that right?

17    A.   Yes.

18    Q.   Okay.  And next to the National

19    Association of Chain Drugstores, the

20    contribution from January, 2017 to March, 2018

21    was a little over $1.5 million, right?

22    A.   Yes.

23    Q.   Okay.  And then if you go to the next

24    page, 2016, for National Association of Chain

1    Drugstores the amount was over $1.4 million in

2    dues and contributions, is that right?

3         A.   The way it's characterized is

4    contributions/dues.   In some cases it's

5    contributions.   In other cases it's dues.

6         Q.   But regardless, the number in 2016 for

7    the National Association of Chain Drugstores was

8    $1.4 million, is that right?

9         A.   That -- yes, that's what this says.

10        Q.   And for 2015, that amount was also

11   about a little over $1.4 million.

12             MR. DELINSKY:   I'm sorry.   What year,

13   Mike?

14             MR. ELSNER:   2015 on the next page.

15        A.   Again, that's what this says, yes.

16   BY MR. ELSNER:

17        Q.   On the next page, in 2014 that amount

18   was $1.2 million?

19        A.   That's what this says, yes.

20        Q.   So you'd agree with me that CVS Health

21   was contributing dues and other contributions to

22   the National Association of Chain Drugstores at

23   least during this period of time over a million

24   dollars a year, is that right?

```
 1              MR. DELINSKY:  Object to form.

 2       A.   During the time frame that we were

 3   just reading, yes.  It looks like it was lower

 4   in the prior years.

 5   BY MR. ELSNER:

 6       Q.   Yes, that's true.  That's correct.

 7              In 2013, that amount was half a

 8   million dollars, is that right?

 9       A.   Let's see.

10       Q.   That's Page 6.

11       A.   Yes.  526,000.

12       Q.   In 2012 it was 421,000, is that right?

13       A.   Yes.

14       Q.   Okay.  Do you know why the amount

15   doubled in 2013 and '14, around the same time

16   that hydrocodone was being rescheduled by the

17   United States Government?

18       A.   I have no involvement in how dues are

19   paid for these organizations, so others at CVS

20   would be knowledgeable about that.

21       Q.   Are you aware that various executives

22   of CVS have served as directors of the National

23   Association of Chain Drugstores?

24              MR. DELINSKY:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.   Yes, I am aware of that.

2   BY MR. ELSNER:

3        Q.   Do you know that Larry Merlo served as

4   the president and -- who is the president and

5   chief executive officer of CVS Health, he served

6   as the director of the National Association of

7   Chain Drugstores in 2015?

8             MR. DELINSKY:  Object to form.

9        A.   Larry Merlo is his name.  I'm not

10  familiar with what specific role he played at

11  NACDS.

12  BY MR. ELSNER:

13       Q.   Okay.  But you were generally aware

14  that there were directors of CVS or executives

15  at CVS that served in leadership positions with

16  the National Association of Chain Drugstores?

17       A.   Yes, I was aware of that.

18       Q.   Okay.  Do you know who in particular?

19       A.   Mr. Merlo, as you said.  I believe

20  John Roberts might have been another.

21       Q.   Okay.

22       A.   Again, I'm not really involved in our

23  relationship with NACDS.

24       Q.   What about -- is it Kevin Hourican?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Hourican.  I know Kevin.  I'm not

2  familiar with any role he might play at NACDS.

3    Q.    And he was the executive vice

4  president of CVS Health and the president of CVS

5  Pharmacy at one point in time, is that right?

6    A.    That's his current title.

7    Q.    Current title?

8    A.    Yeah, in 2018 he became that.

9    Q.    He became that.

10        What about the Healthcare Distribution

11  Management Association, were you aware that CVS

12  was a member of that trade association?

13        MR. DELINSKY:  Object to form.

14    A.    I'm not familiar with that trade

15  association.  I'm not involved in which

16  associations we participate in.

17  BY MR. ELSNER:

18    Q.    Were you aware that the National

19  Association of Chain Drug Stores had opposed the

20  rescheduling of hydrocodone?

21    A.    I'm not -- others at CVS were involved

22  with NACDS.  We're not -- obviously we're not

23  the only participant in that organization, so

24  I'm not familiar with NACDS's activities.

1    Q.    Did you know that NACDS was opposing

2    the rescheduling of hydrocodone combination

3    products?

4         MR. DELINSKY:  Object to form.

5    A.    Others at CVS were involved with

6    NACDS.  I was not familiar with our relationship

7    and what their activities might have been.

8         (Whereupon, CVS-Moffatt-12 was marked

9         for identification.)

10   BY MR. ELSNER:

11   Q.    I'm going to mark this as Exhibit 12.

12   This is CVS-103475.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review

7        Q.    Did CVS support the rescheduling of

8   hydrocodone or not?

9        A.    Others at CVS would be responsible for

10  that.

11       Q.    Do you know the profit margin on the

12  dispensing of hydrocodone products?

13       A.    Others at CVS are involved in the

14  financials.  That's not my area.

15       Q.    Are you aware of the profit margin on

16  distributing hydrocodone combination products at

17  CVS?

18            MR. DELINSKY:  Object to the form.

19       A.    Others at CVS are responsible for all

20  financial information.

21  BY MR. ELSNER:

22       Q.    Are you aware that as a member of the

23  National Association of Chain Drug Stores that

24  CVS participated in an amicus brief in the

Highly Confidential - Subject to Further Confidentiality Review

1    Masters case?

2            MR. DELINSKY:  Object to the form of

3    the question.

4        A.   Others at CVS are involved with any

5    involvement we have with NACDS.  I'm not

6    familiar with the Masters case or any amicus

7    brief.

8    BY MR. ELSNER:

9        Q.   Have you ever read the Southwood

10   decision or the Masters decision?

11       A.   Others at CVS would be -- would follow

12   that sort of thing more closely.  It's possible,

13   but I don't recall.

14       Q.   Did you know that CVS through these

15   trade associations participated in an amicus

16   brief in the Masters case?

17           MR. DELINSKY:  Object to the form of

18   the question.

19       A.   Others at CVS were involved with

20   NACDS, so they would be informed about that.

21   BY MR. ELSNER:

22       Q.   Who at CVS would have made the

23   decision to participate or not in that amicus

24   brief?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I am not sure.  I don't know.

 2          Q.   Would it have been a decision in the

 3   legal department, or would it have been a

 4   decision in the regulatory affairs department?

 5               MR. DELINSKY:  Object to form.

 6          A.   Generally speaking, legal matters are

 7   legal -- the legal department decisions

 8   ultimately.

 9   BY MR. ELSNER:

10          Q.   And who in the legal department would

11   have made that decision?

12               MR. DELINSKY:  Object to form.  Asked

13   and answered.

14          A.   Others in the legal department.  I'm

15   not really sure.  It would depend on the type of

16   matter, and I'm not familiar with the Masters

17   case.  I don't know.

18   BY MR. ELSNER:

19          Q.   Okay.  Well, the Masters decision

20   involved a suspicious order monitoring program

21   and whether it met the requirements of the

22   Controlled Substances Act.  So assuming that to

23   be the case, who within the legal department

24   would have made the decision to participate or
```

Highly Confidential - Subject to Further Confidentiality Review

1    not in the Masters amicus brief filed by the

2    National Association of Chain Drugstores?

3         A.   I'm not sure.  It would probably be --

4    I don't know.  I don't know enough about the

5    matter.

6         Q.   Have you ever attended any CLE

7    programs at CVS or anywhere else that discussed

8    the Masters decision?

9         A.   I don't recall any CLEs that discussed

10   it, but we do a lot of them.

11             MR. ELSNER:  Why don't we take a quick

12   break.

13             THE VIDEOGRAPHER:  We're going off the

14   record at 11:05 a.m.

15             (Whereupon, a recess was taken.)

16             THE VIDEOGRAPHER:  We're back on the

17   record at 11:17 a.m.

18   BY MR. ELSNER:

19        Q.   Mr. Moffatt, you are aware that there

20   have been instances in which the DEA has issued

21   suspension orders to CVS pharmacies, correct?

22        A.   I am aware of that.

23        Q.   Okay.  And you understand that when a

24   pharmacy or a distribution center is not

1    adhering to the requirements of the Controlled

2    Substances Act that there's a danger that that

3    facility or pharmacy could lose its DEA license

4    or registration, correct?

5            MR. DELINSKY:  Object to form.

6        A.   I'm aware that that has happened, you

7    know.  It's not my area, other people handle

8    that sort of thing.

9    BY MR. ELSNER:

10       Q.   But you're aware that the DEA has that

11   authority, right?

12       A.   I'm generally aware.

13       Q.   Okay.  And are you aware of any other

14   actions that the DEA could take against a

15   pharmacy or distribution center other than

16   issuing a suspension order?

17       A.   It's not my area.  I don't handle the

18   government investigation type things, but I'm

19   aware that there are other penalties and fines

20   and letters and so forth.

21       Q.   And there are actions that could be

22   brought by the DEA against those pharmacies to

23   remove those registrations and licenses, is that

24   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. DELINSKY:  Object to form.

 2         A.   Again, not my area, but I'm generally

 3    aware that that's possible, yes.

 4    BY MR. ELSNER:

 5         Q.   Okay.  And you're aware, are you not,

 6    that the DEA issued an immediate suspension

 7    order for two CVS pharmacies in Florida because

 8    they posed an imminent danger to public health

 9    or safety, correct?

10              MR. DELINSKY:  Object to form.

11         A.   I am aware of the action in Florida.

12    I don't know about the characterization as to

13    the reason that you stated.

14    BY MR. ELSNER:

15         Q.   Okay.  You know that the DEA suspended

16    two CVS pharmacies from distributing controlled

17    substances in Florida, is that right?

18              MR. DELINSKY:  Object to form.

19         A.   I am aware of that situation, yes.

20    BY MR. ELSNER:

21         Q.   And those pharmacies were the Holiday

22    CVS, LLC pharmacies, numbers 5195 and 219, is

23    that right?

24         A.   Those store numbers sound familiar.
```

1   We have a lot of stores.  Holiday CVS operates

2   all or virtually all the stores in Florida.

3       Q.   And you're the president of Holiday

4   CVS, or were, is that right?

5       A.   I am currently, since the same time

6   frame as Indiana and Rx Services, early 2011.

7       Q.   In what year did you become the

8   president of Holiday CVS?

9       A.   I think it would have been the

10  beginning of 2012.

11      Q.   Okay.  And prior to that were you a

12  secretary of Holiday CVS?

13      A.   Yes.

14      Q.   Starting in 2006, or was it before?

15      A.   Again, I don't know specific titles

16  for specific entities back at that time frame.

17  I might have been assistant secretary and then

18  secretary.  But probably secretary at that

19  point.

20      Q.   Okay.  And are you the president of

21  Holiday CVS today?

22      A.   Yes.

23           MR. ELSNER:  I'm going to mark this as

24  Exhibit 13.

```
 1                    (Whereupon, CVS-Moffatt-13 was marked

 2                    for identification.)

 3     BY MR. ELSNER:

 4          Q.   And this is a declaration of Joseph

 5     Rannazzisi.  And we've seen that name before.

 6     He was with the DEA at this time, is that right?

 7          A.   Yes, that's what it says in the first

 8     couple paragraphs here.

 9          Q.   All right.  He's the deputy assistant

10     administrator for the DEA's Office of Diversion

11     Control at this time in 2012, is that right?

12               MR. DELINSKY:  Object to form.

13          A.   That's what the Paragraph 1 says, yes.

14     BY MR. ELSNER:

15          Q.   All right.  The caption here is for an

16     action that was filed in the U.S. District Court

17     for the District of Columbia, Holiday CVS versus

18     Eric Holder.

19               Do you see that?

20          A.   Yes, I see the caption.

21          Q.   And are you aware this action was

22     taken in the district court in DC?

23          A.   Others in the legal department would

24     have been involved in this.  I'm not familiar
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with this particular action.  So I see that, you

 2    know, it's Holiday CVS, Eric Holder was attorney

 3    general, but I don't know anything about, you

 4    know, this matter.

 5         Q.   So as the president of Holiday CVS,

 6    you didn't know that this action was pending in

 7    federal court in DC?

 8              MR. DELINSKY:  Object to form.

 9         A.   To the extent I knew anything about

10    it, it would have been in my role as an

11    attorney, so...

12    BY MR. ELSNER:

13         Q.   Before we get to what you know, did

14    you know that it existed or not, the filing was

15    made?

16              MR. DELINSKY:  Objection.  Asked and

17    answered.

18         A.   I would need to know more about the

19    case.  Just reading the caption.

20    BY MR. ELSNER:

21         Q.   Fair enough.

22         A.   I'm not a litigator.  I'm a corporate

23    guy, so I would need to know more about where

24    this fits into the whole picture.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Q.   Okay.  Let's go through it a little

 2   bit.

 3          If you turn to Paragraph 3 of the

 4   declaration, which is on Page 2, in the second

 5   sentence it reads "I participated in the

 6   decision-making process that led to the issuance

 7   of an Immediate Suspension Order against Holiday

 8   CVS, CVS Pharmacy 219 and CVS Pharmacy 5195 on

 9   February 2, 2012."  Is that right?

10    A.   Yes, that's what that says.

11    Q.   Okay.  And this was filed in 2012, and

12   so at this time you were the president of

13   Holiday CVS?

14    A.   I believe so, yes.

15    Q.   Okay.  If you turn to Page 9 of the

16   declaration, which is Paragraph 24, there's a

17   heading "CVS 219 and CVS 5195."  And if it's

18   easier to use the screen, that's available for

19   you, or the paper, whatever you'd prefer.

20          It says in Paragraph 24 that CVS 219

21   was located at 3798 Orlando Drive in Sanford,

22   Florida, and is registered with the DEA as a

23   chain pharmacy in Schedules II, III, IV and V

24   controlled substances under a DEA registration

Highly Confidential - Subject to Further Confidentiality Review

1    number.  And then in Paragraph 25 it says CVS

2    5195 was located at 4639 West 1st Street in

3    Sanford, Florida.

4           Do you see that?

5    A.   Yeah, well, it says "located at," not

6    "was."  They still are.  Yeah.

7    Q.   I wasn't sure about store 5195.  Are

8    you?  Is it still located at that address?

9    A.   I'm not sure.  I don't know the

10   particulars for all of this.

11   Q.   That's why I said "was" because I

12   don't know if today it's located at the same

13   address.  Do you know?

14   A.   I don't know.  I don't know the

15   particulars.  I just know that the store still

16   exists.

17   Q.   Were you aware that these were the two

18   stores that were the subject of the DEA

19   suspension in 2012?

20        MR. DELINSKY:  Object to form.

21   Objection, asked and answered.

22   A.   I am aware of that because, you know,

23   I was informed based on my role as an attorney.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  And these two stores were

2  Holiday CVS stores, correct?

3      A.   That's correct.

4      Q.   Okay.  It says in the next section,

5  "Notice to CVS of Diversion Problems."  In

6  Paragraph 26 it says that "On December 8, 2010,

7  DEA hosted a meeting with CVS at the DEA West

8  Palm Beach Resident Office."  And then it lists

9  a group of people who were in attendance.

10          Were you aware that CVS held a

11  meeting -- I'm sorry, that the DEA held a

12  meeting with CVS long before the suspension

13  order was issued in December of 2010 to warn

14  them of problems of diversion from their

15  pharmacies?

16          MR. DELINSKY:  Object to form.

17      A.   I'm not at all familiar with this

18  document, so I don't know the context of how

19  this was put together.  I wasn't involved in the

20  meeting certainly, so I don't really know

21  anything about what was said or anything at the

22  meeting.

23          MR. DELINSKY:  Mike, just hold on.

24  Did you say you were not, wasn't involved in the

1    meeting?

2           THE WITNESS:  Exactly.  I was -- no,

3    I'm not on the list here.

4           MR. DELINSKY:  Okay.

5           THE WITNESS:  So, no, I was not

6    involved, and I wouldn't have been.  It's not my

7    area.

8    BY MR. ELSNER:

9       Q.   In Paragraph 27 it says that John

10   Gilbert, Counsel for CVS/Caremark, made a brief

11   statement.  "Mr. Gilbert stated," this is a

12   quote from Mr. Rannazzisi's affidavit, "that CVS

13   was aware of the pill mill and/or pain clinic

14   situation and the diversion of controlled

15   substances, primarily oxycodone, in Florida."

16          What was CVS aware of the pain mill

17   and pain clinic situation in Florida at this

18   time?

19          MR. DELINSKY:  Object to form.

20      A.   I don't know anything about this

21   meeting, or if this is an accurate

22   characterization of what he said.  I don't know

23   Mr. Gilbert.  Again, it's not my area.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   You don't know Mr. Gilbert, counsel

2   for CVS/Caremark?

3      A.   That's not a real entity name, but

4   just as a corporate lawyer, that bugs me a

5   little bit.  But I know Mr. Gilbert.  I know the

6   name.  But again, I think he's a litigator.  And

7   I'm not a litigator, I'm a corporate person, so

8   I've seen the name, but I've never interacted

9   with him.

10      Q.   Is he in-house at CVS, or is he

11   outside counsel?

12      A.   He's outside counsel.

13      Q.   Do you know what firm he's with?

14      A.   I don't.  I didn't have direct

15   involvement with him.

16      Q.   And as the president of Holiday CVS,

17   no one informed you of the pill mill and/or pain

18   clinic situation in Florida?

19          MR. DELINSKY:  Object to form.

20      A.   Others at CVS would have been

21   responsible for that sort of thing.  Nobody

22   informed me of anything as president.  Again, as

23   a lawyer for the company I may have been

24   informed, but not as president.

```
 1   BY MR. ELSNER:

 2       Q.   If you turn to Paragraph 29 on

 3   Page 11, it reads "CVS 219's and CVS 5195's

 4   District Supervisor, Jennifer Lalani,

 5   acknowledged that she was aware of an increase

 6   in the number of oxycodone prescriptions that

 7   have been presented to CVS, especially in the

 8   Orlando, Florida area."  She then says that

 9   she -- Mr. Rannazzisi says that "Ms. Lalani also

10   made reference to an October '10 letter sent to

11   the pharmacies from the Hillsborough County

12   Sheriff David Gee.  In that letter, Sheriff Gee

13   made a plea to area pharmacies to work with law

14   enforcement and closely scrutinize the

15   prescriptions they receive in order to deal with

16   the prescription drug epidemic in Florida."

17            Were you aware that CVS pharmacies

18   that you were president of received a letter

19   from the sheriff in Hillsborough County?

20            MR. DELINSKY:  Object to form.

21       A.   Others at CVS would have been

22   responsible for operations and compliance, and

23   they would have been informed of this.  I would

24   not have been informed of this.
```

```
1    BY MR. ELSNER:

2         Q.   And you were not?

3         A.   Others at CVS that were responsible

4    for this sort of thing were aware.

5         Q.   But you were not?

6         A.   Others were.

7         Q.   Others were, but you were not, right?

8         A.   I may have been informed of something

9    in my capacity as an attorney.  I don't recall.

10        Q.   If you turn to Page 32, it reads

11   "Mrs. Lalani" -- sorry, I'll let you get there.

12   Not Page 32, sorry, Page 12, Paragraph 32.  My

13   apologies.

14             It reads "Ms. Lalani confirmed that

15   CVS 219 was located in Sanford, Florida and was

16   under her supervision.  Ms. Lalani agreed that

17   the volume of oxycodone purchased by this

18   pharmacy was extremely high; Ms. Lalani was

19   unable to explain why the volume was so high."

20             Were you aware that the two

21   pharmacies -- that CVS 219 that you were the

22   president of had a high volume of oxycodone

23   purchased by this pharmacy?

24             MR. DELINSKY:  Object to form.
```

1      A.   Others at CVS would have been

2   responsible for operations and compliance, and

3   they would have been involved in this.  I wasn't

4   informed as president.  As an attorney I may

5   have been informed of things, but I don't recall

6   seeing this.

7   BY MR. ELSNER:

8      Q.   It then reads in Paragraph 33 that on

9   August 12, 2011 that the DEA hosted a second

10  meeting with CVS at the DEA Weston Resident

11  Office, and that in attendance at the meeting

12  were DEA representatives and 24 supervisors and

13  managers from various South Florida CVS

14  pharmacies.

15         Were you aware that the DEA hosted a

16  second meeting solely as president of CVS

17  Holiday Inn August 12, 2011?

18     A.   Others at CVS would have been involved

19  in this -- this situation, but I don't recall

20  being involved in it.

21     Q.   As president of CVS Holiday, you were

22  not informed, correct?

23         MR. DELINSKY:  Object to form.

24     A.   Others would have been involved in

1    this type of meeting.  You know, as an attorney

2    I may have been informed about it, but not as

3    president.

4    BY MR. ELSNER:

5        Q.   Were you aware that the DEA conducted

6    an investigation of these two pharmacies, CVS

7    pharmacies in Florida, and interviewed employees

8    as part of its investigation?

9        A.   Others would have been involved

10   directly in that situation.  I was not involved

11   in that.

12       Q.   If you turn to Page 15 of the

13   affidavit, Paragraph 41, it says the "DEA

14   personnel interviewed employees from both CVS

15   219 and CVS 5195."  And under A, it says that

16   "The Pharmacist in Charge at CVS 219...stated

17   that the majority of the diagnosis codes listed

18   by the prescribing practitioners on the

19   oxycodone prescriptions were the same, and that

20   customers requested certain brands of oxycodone,

21   referring to them as 'Ms' or 'blues.'"

22            Were you aware of that?

23       A.   I was not.  The others were involved

24   in this situation.  I was not directly involved.

Highly Confidential - Subject to Further Confidentiality Review

1    And I don't know if that's Ms. or Ms.  But in

2    any event, other attorneys would have been

3    involved in this type of situation.

4    BY MR. ELSNER:

5         Q.   Have you heard of oxycodone being

6    referred to as Ms?

7         A.   No.  I just didn't see a period,

8    that's why I said Ms as opposed to Ms.  I am not

9    aware of them being referred to by either name.

10        Q.   Under paragraph B it reads "One of the

11   pharmacists at CVS 219...stated that many of the

12   patients receiving oxycodone prescriptions

13   received the same cocktail of prescriptions,

14   including oxycodone 30 milligrams, oxycodone

15   15 milligrams, alprazolam 2 milligrams."

16             Were you aware that individuals coming

17   to CVS 219 were -- held prescriptions for a

18   cocktail of drugs?

19             MR. DELINSKY:  Object to form.

20        A.   I was not involved in any of this.  I

21   wasn't there.  I don't know that that's her

22   characterization of the group of prescriptions

23   or if it's the -- Mr. Rannazzisi.  But, you

24   know, you've read that correctly.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ELSNER:

 2         Q.   Well, it states here that Susan Masso,

 3    who is one of the pharmacists at CVS, "stated

 4    that many of the patients."

 5              Do you see that there?

 6              MR. DELINSKY:   Object to form.

 7         A.   I do see that, and I see the word

 8    "cocktail" in quotes, and I don't know if that

 9    means that's a quote from her or if that's his

10    characterization of the group of prescriptions.

11    BY MR. ELSNER:

12         Q.   Well, regardless, she said patients

13    were coming in with prescriptions for multiple

14    different drugs that are listed there, oxycodone

15    30 milligrams and 15 milligrams and the others,

16    correct?

17         A.   Again, I was not involved in this,

18    others were.  That is what this paragraph says.

19         Q.   Okay.  And in paragraph C it reads

20    that "The Pharmacist in Charge at CVS 5195,

21    Jessica Merrill, stated that she set a daily

22    limit of how many oxycodone 30-milligram

23    prescriptions the pharmacy would fill each day.

24    The limit was set based upon the amount of
```

1    oxycodone the pharmacy had on-hand each day.

2    PIC Merrill" stated "that the reason she set

3    this daily limit was to ensure that the pharmacy

4    had enough oxycodone 30 milligrams to fill the

5    prescriptions for 'real pain patients.'"

6            Were you aware of that?

7            MR. DELINSKY:  Object to form.

8        A.   I was not involved in this.  Other

9    attorneys were.  I was not at the interview or

10   anything like that, so this is the first I'm

11   reading of it.

12   BY MR. ELSNER:

13       Q.   Well, as an executive at CVS, would it

14   concern you that a CVS Pharmacy was dispensing

15   drugs to patients that were not in real pain,

16   oxycodone in particular?

17           MR. DELINSKY:  Object to form.

18       A.   I was not involved in this at all, and

19   I don't know anything about how this was being

20   characterized, so I don't have a view on that.

21   BY MR. ELSNER:

22       Q.   Well, do you have any reason to

23   believe it's being mischaracterized by Joseph

24   Rannazzisi?

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I have no reason to believe either way

2    whether it is correct or incorrect.  I wasn't --

3       Q.   You're not suggesting that he lied

4    under oath?

5       A.   No.  I'm saying I -- you know, I

6    wasn't there, I don't know -- I wasn't at any of

7    these interviews, don't know anything about it.

8       Q.   Well, does it concern you as an

9    executive at CVS that pharmacists were saving

10   aside oxycodone in the height of the opioid

11   epidemic for, I quote, real pain patients?

12           MR. DELINSKY:  Object to form.

13   Objection, asked and answered.

14      A.   You know, I'm not involved in this

15   area, and I don't have a view on it.

16   BY MR. ELSNER:

17      Q.   I know, but you've been at CVS a

18   really long time.  Does it concern you, this

19   paragraph?  Does it concern you if it's true?

20           MR. DELINSKY:  Object to form.

21   Objection, asked and answered.

22      A.   CVS is -- we aim to comply with laws,

23   and so I -- you know, generally speaking that's

24   how we operate, so I would be concerned if we

Highly Confidential - Subject to Further Confidentiality Review

1    were not, but I have no information to lead me

2    to believe one way or another.

3    BY MR. ELSNER:

4        Q.   But this would indicate that, in fact,

5    in this instance CVS was not complying with

6    federal regulations, that they were, in fact,

7    selling drugs, oxycodone in particular, to

8    patients that they knew were not in real pain,

9    correct?

10            MR. DELINSKY:  Object to form.

11       A.   I wasn't involved in the interviews.

12   I don't know anything about the interviews, so I

13   can't really form on opinion on that.

14   BY MR. ELSNER:

15       Q.   If you turn to Page 57 -- sorry,

16   Page 24, Paragraph 57.  There's a heading just

17   above that paragraph that says the "DEA Issues

18   Immediate Suspension Orders for CVS 219 and CVS

19   5195," correct?

20       A.   Just above that paragraph, yes, I see

21   that.

22       Q.   And then it says that "Through my

23   training and experience" -- and this is Joseph

24   Rannazzisi's declaration again -- "as both a law

Highly Confidential - Subject to Further Confidentiality Review

1    enforcement officer and as a licensed

2    pharmacist, I believe that CVS 219's and CVS

3    5195's DEA registration to handle and distribute

4    any type of controlled substance poses an

5    imminent danger to the public health and

6    safety."

7           Did I read that correctly?

8       A.   Yes, you read it correctly.

9       Q.   Were you aware as president of Holiday

10   CVS at this time that the DEA had determined

11   that a suspension order should be issued because

12   these two CVS stores posed an imminent danger to

13   public health and safety?

14          MR. DELINSKY:  Object to form.

15      A.   I was not involved in this whole

16   situation, and we're kind of picking and

17   choosing paragraphs in a very long document, so

18   that is what it says here.

19   BY MR. ELSNER:

20      Q.   And you were not made aware of that as

21   the president of Holiday CVS, the president of

22   these two stores?

23          MR. DELINSKY:  Object to form.

24      A.   I was made aware of it because I'm an

Highly Confidential - Subject to Further Confidentiality Review

1    attorney in the legal department, but not due to

2    my role as president of Holiday.

3            MR. ELSNER:  Okay.  I'm going to mark

4    this next document as the next exhibit, which is

5    MR 68, and it's Exhibit 14 to the deposition.

6            (Whereupon, CVS-Moffatt-14 was marked

7            for identification.)

8    BY MR. ELSNER:

9        Q.   This is CVS-60796 through 60804.  This

10   is a settlement agreement, is it not, between

11   CVS Health and the -- and its subsidiaries and

12   the DEA related to the DEA's investigation of

13   stores 219 and 5195 in Sanford, Florida,

14   correct?

15       A.   Yes, that appears to be correct.

16       Q.   And it was the DEA's position, the US

17   government's position that CVS had failed in its

18   responsibilities under the Controlled Substances

19   Act, correct?

20           MR. DELINSKY:  Object to form.

21       A.   I was not involved in this settlement

22   agreement, so I mean, I'd have to go through the

23   whole thing to agree with your characterization

24   of what's in here.

1    BY MR. ELSNER:

2        Q.    Well, if we turn to Page 3 of the

3    settlement agreement, under paragraph I, it

4    reads the "DEA revoked the registrations issued

5    to CVS stores 219 and 5195 in an order published

6    on October 12, 2012" in the Federal Register.

7    The "DEA revoked the registrations of the DEA

8    stores...based, among other things, on their

9    failure to fulfill their corresponding

10   responsibilities under 21 CFR 1306.04," which is

11   the Controlled Substances Act.

12           Are you aware of that?

13       A.    I was not involved in putting this

14   together or anything like that.  I was generally

15   aware of the actions taken against the two

16   stores.

17       Q.    Okay.  And were you aware in

18   Paragraph 12 that CVS -- on Page 3, that "CVS

19   acknowledges that certain CVS/pharmacy retail

20   stores did dispense certain controlled

21   substances in a manner not fully consistent with

22   their compliance obligations under the CSA and

23   its implementing regulations"?

24       A.    I see that.  It's paragraph K.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Yes.

2        A.   Yes.

3        Q.   So, in fact, CVS agreed, did it not,

4   that there were certain violations of the

5   Controlled Substances Act in these two stores in

6   Florida?

7             MR. DELINSKY:  Object to form.

8        A.   It says CVS acknowledges that certain

9   stores dispensed controlled substances in a

10  manner not fully consistent with their

11  compliance obligations under the CSA and its

12  implementing regulations.

13  BY MR. ELSNER:

14       Q.   Right.

15       A.   That's what it says, yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



6        MR. ELSNER:  I'm going to mark this

7    next exhibit, which is Exhibit 16.  This is MR

8    70.

9        (Whereupon, CVS-Moffatt-16 was marked

10           for identification.)

11   BY MR. ELSNER:

12       Q.  Were you aware the DEA was conducting

13   an investigation of CVS pharmacies in Maryland?

14       A.  Others were handling this more

15   directly.  I was generally aware based on my

16   role as an attorney.

17       Q.  The investigation concerned potential

18   violations of the Controlled Substances Act, and

19   in particular it related to CVS's obligations

20   with respect to corresponding responsibility

21   between the pharmacist and the physician.  Were

22   you aware of that?

23       MR. DELINSKY:  Object to form.

24       A.  Others were handling this more

1    directly.  I was generally aware of that based

2    on my role as an attorney.

3    BY MR. ELSNER:

4         Q.   If you turn to -- what I've placed

5    before you is actually a settlement agreement

6    which was entered into by CVS Pharmacy, Inc.

7    with the DEA related to the DEA's investigation

8    in Maryland, is that right?

9         A.   Yes, that's what this appears to be.

10        Q.   Okay.  And if you turn to Page 2 of

11   the settlement agreement under paragraph F, it

12   reads that "The United States contends that CVS

13   failed to fulfill its corresponding

14   responsibilities under 21 CFR 1306.04," which is

15   the Controlled Substances Act, and "is subject

16   to civil penalties."

17             Did I read that correctly?

18        A.   You did read that correctly.

19        Q.   Okay.  And in paragraph E it states

20   that "CVS acknowledges that it has a

21   corresponding responsibility to dispense only

22   those prescriptions that have been issued for a

23   legitimate medical purpose by an individual

24   practitioner acting in the usual course of

1    professional practice and that knowingly filling

2    a prescription not in the usual course of

3    professional treatment or in legitimate and

4    authorized research subjects CVS to penalties

5    under the CSA," or the Controlled Substances

6    Act, correct?

7          A.   Yes, you read that correctly.

8          Q.   Were you aware that CVS acknowledged

9    in paragraph G that certain CVS Pharmacy retail

10   stores in Maryland did dispense certain

11   controlled substances in a manner not fully

12   consistent with their compliance obligations

13   under the CSA?

14         A.   You read that portion of the paragraph

15   G correctly as well.

16         Q.   Were you aware that CVS had made that

17   acknowledgment in the settlement agreement?

18         A.   I was not involved in putting this

19   settlement agreement together, and so I wouldn't

20   have been involved in the wording here.

21         Q.   If you turn to Page 3, it states --

22   Page 3, Paragraph 3 at the very bottom, it

23   states that CVS will pay the United States a sum

24   of $8 million in settlement, is that correct?

1      A.   Yes, that's what Paragraph 3 says.

2      Q.   Were you aware that CVS had entered

3  into a settlement with the DEA related to

4  violations of corresponding responsibilities of

5  its CVS pharmacies in Maryland for an amount of

6  $8 million?

7           MR. DELINSKY:  Object to form.

8      A.   I wasn't involved in the whole

9  process, but that appears to be what this says.

10  It also says that it was done to avoid the

11  delay, expense, and inconvenience and

12  uncertainty of litigation.  So it's not

13  necessarily, you know, an admission, but...

14  BY MR. ELSNER:

15      Q.   The DEA had reached certain findings,

16  and you could have fought those findings in

17  court, but rather than doing that you entered

18  into a settlement in the amount of $8 million,

19  is that right?

20           MR. DELINSKY:  Object to form.

21      A.   Again, there's another attorney, or

22  other attorneys would have been responsible for

23  making that sort of decision, and the reasons

24  behind it.  I'm not involved in that process.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ELSNER:

 2         Q.    Okay.  But CVS agreed to it and they

 3    signed -- Betsy Ferguson on behalf of CVS

 4    Pharmacy, Inc. executed the settlement agreement

 5    in February of 2016, correct?

 6         A.    Yes.

 7               MR. DELINSKY:  Could we take a quick

 8    five minutes?

 9               MR. ELSNER:  Sure.  Absolutely.

10               THE VIDEOGRAPHER:  We're going off the

11    record at 12:16 p.m.

12               (Whereupon, a recess was taken.)

13               THE VIDEOGRAPHER:  We're back on the

14    record at 12:24 p.m.

15    BY MR. ELSNER:

16         Q.    Mr. Moffatt, were you a secretary or

17    president of any of the pharmacies in Maryland

18    that were subject of the DEA investigation and

19    CVS settlement with the DEA?

20               MR. DELINSKY:  Object to form.

21         A.    I was president of the entity that

22    operated those pharmacies, yes.

23    BY MR. ELSNER:

24         Q.    Were you aware that the DEA also
```

1    conducted an investigation of certain CVS

2    pharmacies in Alabama?

3            MR. DELINSKY:  Object to form.

4        A.   Others at CVS are responsible for all

5    of those sort of matters, so I don't recall

6    specifically information about Alabama.

7    BY MR. ELSNER:

8        Q.   Let me show you Moffatt Exhibit 17,

9    which is a settlement agreement between CVS and

10   the DEA related to entities in Alabama.

11           (Whereupon, CVS-Moffatt-17 was marked

12           for identification.)

13   BY MR. ELSNER:

14       Q.   If I could -- the DEA was

15   investigating certain pharmacies in Alabama,

16   particularly in Calera, Alabama, for certain

17   recordkeeping and reporting violations of

18   controlled substances, regulations in place to

19   guard against theft and diversion.  This is

20   paragraph F on Page 2.  Do you see where I'm at?

21       A.   Yes.

22           MR. DELINSKY:  Objection.

23       A.   I see paragraph F.

24   BY MR. ELSNER:

1    Q.   And then in paragraph G on Page 2 that

2    as a result of the DEA's investigation and its

3    inspection of this CVS store in Calera, Alabama,

4    that the United States contends that on or

5    before the effective date of the agreement CVS

6    Calera violated the CSA, the Controlled

7    Substances Act, and then it lists three

8    violations that the DEA believed exists, is that

9    correct?

10           MR. DELINSKY:  Object to form.

11    A.   I was not involved in the preparation

12    of this, but that is what Paragraph G says.

13    BY MR. ELSNER:

14    Q.   On Page 3 of the agreement under

15    "Terms and Conditions," CVS agreed to pay a

16    $1 million sum in settlement of this contention

17    and these alleged violations, is that right?

18           MR. DELINSKY:  Object to form.

19    A.   I wasn't involved in this settlement

20    or anything, but it appears that that's what

21    Paragraph 1 on Page 3 says.

22    BY MR. ELSNER:

23    Q.   Okay.  And on Page 8 of the agreement,

24    CVS Pharmacy, Inc. agreed to the settlement

```
 1   terms in July of 2018, is that right?

 2        A.   What page were you on?

 3        Q.   Page 8, the very last page of the

 4   agreement.

 5        A.   Yes, yes, signed in July.

 6        Q.   Signed by Betsy Ferguson again, is

 7   that right?

 8        A.   And John Gilbert, our outside

 9   attorney.

10        Q.   Okay.

11        A.   Who is at Hyman, Phelps.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







```
15      Q.   And would you review any of the

16  letters or documentation provided by the DEA to

17  CVS related to those investigations before you

18  executed the document?

19           MR. DELINSKY:  Object to form.

20      A.   Not that I recall.  Not typically.

21  Typically it would be more a conversation with

22  the attorney.  I'm sure on some occasions I

23  would have some of the background, either -- you

24  know, sometimes I would be involved -- like in
```

1   this case I would be in providing a declaration

2   earlier in the matter, so I might have been

3   involved then.  For the signing of this

4   particular settlement agreement, I think it

5   would have just been a conversation with the

6   attorneys.

7        Q.   Was this approved by anyone at CVS

8   Pharmacy?

9        A.   It was signed by Josh Flum, who was

10  senior vice president.  I think at the time he

11  was pharmacy operations.  But again, it would be

12  one attorney or group of attorneys.  I'm not

13  sure who handled it.  They would have been

14  handing the matter and would have brought it to

15  both me and Josh to sign.

16       Q.   And who would those attorneys be at

17  CVS?

18       A.   It varies, but Betsy Ferguson was head

19  of the area, so it would be her and other

20  attorneys in her group.

21       Q.   But in settlement of the Oklahoma

22  investigation, CVS agreed to pay $11 million,

23  and you executed that settlement agreement on

24  behalf of Oklahoma CVS, is that right?

1          MR. DELINSKY:  Object to form.

2     A.   That's correct.  That's what

3  Paragraph 15 says.

4  BY MR. ELSNER:

5     Q.   There was also an investigation by the

6  DEA of CVS stores in Rhode Island, is that

7  right?

8          MR. DELINSKY:  Object to form.

9     A.   Others are involved in the various

10  investigations.  I'm generally aware that there

11  was one in Rhode Island.

12  BY MR. ELSNER:

13     Q.   Okay.  This is MR 225.  This is

14  Exhibit 19, Mr. Moffatt.

15          (Whereupon, CVS-Moffatt-19 was marked

16          for identification.)

17  BY MR. ELSNER:

18     Q.   If you turn to Page 3 of 7 of the

19  settlement agreement, paragraph I, it states,

20  does it not, that "Between October 18, 2013 and

21  March 2, 2015, the DEA Providence Resident

22  Office conducted an investigation into CVS'

23  dispensing of prescriptions from Rhode Island

24  CVS/pharmacy retail stores."  Is that right?

1           A.    Yes, that's what paragraph I says.

2           Q.    Did you have a role with respect to

3    CVS stores and pharmacies -- were you president

4    or secretary or treasurer of that entity?

5           MR. DELINSKY:   Object to form.

6           A.    I would have been president of the

7    Rhode Island entity, yes.

8    BY MR. ELSNER:

9           Q.    And what is that entity called?

10          A.    I have to look it up, but something

11   along the lines of Rhode Island CVS Pharmacy,

12   LLC.

13          Q.    Do you know the name sitting here

14   today?

15          A.    I don't.  We have separate store

16   entities in each state, sometimes multiple, so I

17   don't know exactly the name of the entity.

18   Sometimes it's just Rhode Island CVS, sometimes

19   it's CVS Rhode Island, it varies a little bit.

20          Q.    In paragraph J it states that "The

21   United States contends that it has certain civil

22   and administrative claims under the Act," this

23   is the Controlled Substances Act, and "it's

24   implementing regulations based on CVS' conduct

1    in Rhode Island CVS/pharmacy retail stores

2    between the 3rd of March, 2010 and the date of

3    this agreement," and then it goes on to list

4    certain conduct which includes "Filling

5    prescriptions with invalid prescriber DEA

6    numbers, or under circumstances where the

7    pharmacist filling the prescription knew or had

8    reason to know that the prescription in question

9    was invalid or unauthorized."

10          Did I read that correctly?

11    A.    That's what Paragraph 1 says.

12    Q.    In Paragraph 2 for "Filling

13    prescriptions for Schedule III controlled

14    substances written by psychiatric nurse

15    practitioners who were not authorized under

16    state law or by the terms of their DEA

17    registration to issue such prescriptions," is

18    that right?

19    A.    That's what Paragraph 2 says.

20    Q.    Okay.  And third that "Entering,

21    creating, or maintaining CVS dispensing records,

22    including prescription vial labels, in which the

23    DEA registration numbers of non-prescribing

24    practitioners, including non-prescribing

1    practitioners who were not really authorized to

2    prescribe the substances dispensed, were

3    substituted for the DEA registration numbers of

4    prescribing practitioners, in violation of the

5    Controlled Substances Act," is that right?

6         A.    That's what Paragraph 3 says, yes.

7         Q.    Were you aware that the DEA had made

8    such contentions with respect to CVS stores in

9    Rhode Island based on your role as the president

10   of the CVS entity in Rhode Island covering those

11   stores?

12        MR. DELINSKY:  Object to form.

13        A.    No.  Others at CVS would have been

14   responsible for this sort of investigation, and

15   for the settlement, so I was not involved in

16   preparing this document or in the investigation.

17   BY MR. ELSNER:

18        Q.    Okay.  And CVS agreed to pay in

19   settlement of these claims $450,000 to the

20   United States Government, is that right?

21        A.    That's what Paragraph 1 on Page 4

22   says.

23        Q.    Were you aware of that as the

24   president of the CVS Rhode Island entity

1    concerning these stores?

2            MR. DELINSKY:  Object to form.

3        A.   I was not involved in preparing any of

4    this or in the amount that was agreed upon.  To

5    the extent I knew about it, it was because of my

6    role as an attorney as opposed to because I'm

7    president of the store entity.

8    BY MR. ELSNER:

9        Q.   They wouldn't have informed you as

10   president of the store entity that a settlement

11   had been reached?

12           MR. DELINSKY:  Object to form.

13       A.   They informed me because I'm an

14   attorney.  I'm also president of the entity.  I

15   don't know if they would have informed somebody

16   else if somebody else was the president, but

17   they did inform me.

18   BY MR. ELSNER:

19       Q.   Okay.  And Betsy Ferguson executed

20   this document on August 5, 2015, Page 7 of 7?

21       A.   Yes, she did.  August 5th.

22       Q.   Were you aware that the DEA had

23   conducted investigations of CVS pharmacies in

24   California, in Nassau and Suffolk County, New

1    York, and also in -- related to the theft of

2    controlled substances and the failure to report

3    those thefts to the DEA promptly?

4          MR. DELINSKY:  Object to form.

5    A.    Others at CVS are involved in all of

6    the government investigations, so I may have

7    heard of those matters through my role as an

8    attorney, but other people were primarily

9    responsible for that sort of investigation and

10   the circumstances behind them.

11   BY MR. ELSNER:

12   Q.    Okay.  This is Motley Rice 226, which

13   is Exhibit 20 to your deposition.

14          (Whereupon, CVS-Moffatt-20 was marked

15          for identification.)

16   BY MR. ELSNER:

17   Q.    This is the settlement agreement

18   between CVS and the DEA related to its

19   investigation in California.

20          If you turn to paragraph F, which is

21   on Page 2 of the agreement, describes that the

22   DEA Sacramento field office, and U.S. Attorney's

23   Office for the Eastern District of California

24   conducted an investigation with respect to

Highly Confidential - Subject to Further Confidentiality Review

1  CVS/pharmacy retail stores and their compliance

2  with the Controlled Substances Act, it reads

3  "specifically investigating the recordkeeping,

4  reporting, procedures to guard against theft and

5  diversion, and certain dispensing practices

6  of...CVS Pharmacy Retail Stores in the Eastern

7  District of California."  Is that right?

8          MR. DELINSKY:  Object to form.

9      A.   I was not involved in preparing this,

10  but that appears to summarize paragraph F.

11  BY MR. ELSNER:

12      Q.   Okay.  Were you aware that the DEA was

13  concerned with thefts of controlled substances

14  across the country?

15      A.   Others at CVS are responsible for both

16  the investigation and for operations and

17  compliance with what would be involved in this

18  sort of activity.  I was not.

19      Q.   If you turn to paragraph J, which is

20  on Page 3, it reads that "CVS acknowledges that,

21  during the period" -- do you see where I'm at at

22  the bottom of Page 3, paragraph J?

23      A.   Yes.

24      Q.   "CVS acknowledges that, during the

1    period from April 30, 2011 through April 30,

2    2013, certain Eastern District of California CVS

3    Pharmacy Retail Stores failed to fulfill certain

4    recordkeeping obligations under the CSA in a

5    manner fully consistent with CVS's compliance

6    obligations."

7            Did I read that correctly?

8            MR. DELINSKY:  Object to form.

9       A.   You did read that sentence correctly,

10   but the next sentence starts with

11   "Notwithstanding," so I take it that's going to

12   say something different.

13   BY MR. ELSNER:

14      Q.   It might.

15           But were you aware that CVS

16   acknowledged during this period that those

17   recordkeeping violations existed?

18           MR. DELINSKY:  Object to form.

19      A.   It appears that we acknowledged it,

20   but we contend that a failure to fulfill those

21   recordkeeping obligations did not arise or did

22   not cause the diversion of controlled

23   substances.

24   BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Why did CVS admit that there were

2  recordkeeping violations, but contend that those

3  did not arise from or cause the diversion of

4  controlled substances?

5           MR. DELINSKY:  Object to the form of

6  the question to the extent that would require --

7  if you know the answer, if you possess

8  responsive information, to the extent it would

9  call you to divulge attorney/client privilege

10  information or work product, and I ask that you

11  not answer and instruct you accordingly.

12      A.   So I wasn't involved in the

13  investigation.  I don't know any particulars as

14  to why we would do that.  I could speculate, but

15  would not be advised to do so, I'm sure.

16  BY MR. ELSNER:

17      Q.   So the reason you read that sentence

18  was not because you had any personal information

19  about it?

20      A.   No, I just think it presents a fuller

21  picture.  And it also says the United States

22  does not contend to the contrary, so the United

23  States --

24      Q.   Did CVS --

1        A.    -- wasn't forcing the issue either.

2        Q.    Well, CVS did acknowledge that there

3    were recordkeeping violations related to thefts

4    of controlled substances in its California

5    stores, is that right?

6              MR. DELINSKY:  Object to form.

7        A.    I don't think it says anything related

8    to thefts.  It says "failed to fulfill certain

9    recordkeeping obligations."  I know that that

10   can sometimes be timing, you filed it a day

11   late, you gave the information but because it's

12   not filed within a certain time frame, I could

13   see where that might be something that they

14   would say, yet technically it's a recordkeeping

15   violation, but it's -- you know, it wouldn't

16   rise to the level of causing a diversion of

17   controlled substances.

18   BY MR. ELSNER:

19       Q.    If you look just above on Page 3 under

20   the various bullets, it states that "The United

21   States also contends that various EDCA CVS

22   Pharmacy Retail Stores failed to provide

23   effective controls and procedures to guard

24   against theft and diversion of controlled

Highly Confidential - Subject to Further Confidentiality Review

 1  substances."

 2          Did I read that correctly?

 3      A.   That is the contention that's there,

 4  yes.

 5      Q.   So it relates to thefts of controlled

 6  substances and the reporting obligations

 7  consistent with that, is that right?

 8          MR. DELINSKY:  Object to form.

 9      A.   Again, I'm not involved in the

10  preparation of this, you know, some of the

11  things above that -- what you just read, failed

12  to record the amount or the date or to do order

13  forms, that sort of thing, and then it says

14  "United States also contends."  So what's in

15  paragraph J, I don't know that we're agreeing

16  that we -- that we notified -- I kind of got

17  lost there.

18          Our recordkeeping obligations, our

19  failure to fulfill recordkeeping obligations did

20  not arise from or cause diversion of controlled

21  substances.

22  BY MR. ELSNER:

23      Q.   CVS agreed to pay a $5 million fine in

24  resolution of this investigation by the DEA, is

Highly Confidential - Subject to Further Confidentiality Review

1    that right?

2        A.    That's what Paragraph 1 says on

3    Page 4.

4        Q.    And did you have a role as either

5    president or secretary or treasurer for the --

6            MR. DELINSKY:  I apologize.  I just

7    want to object to the form of the prior

8    question.

9    BY MR. ELSNER:

10       Q.    Did have you a role as either

11   president, secretary, or treasurer of any of the

12   CVS stores in the Eastern District of California

13   which were the subject of this settlement?

14           MR. DELINSKY:  Object to form.

15       A.    So not with respect to the store, with

16   respect to the entities I would have a role.

17   Depends on the time frame and what entity we're

18   talking about, but I would have had an officer

19   role with the store entities.  I was not

20   involved in the investigation or the settlement

21   or anything like that.

22   BY MR. ELSNER:

23       Q.    Were you the president of the

24   California entity?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    What time frame are we talking about?

 2        Q.    Well, I think we can talk about two

 3   time frames.  The agreement was executed in June

 4   of 2017.

 5        A.    So today I am president of -- we have

 6   multiple store entities in California, and I'm

 7   president of both of those.  It looks like the

 8   entire time frame because it talks about on

 9   Page 2 early 2012, so that would be when I

10   became president when my predecessor retired.

11        Q.    So as of May, 2012 through 2000 --

12   well, through today, you've served as the

13   president of the California entities over these

14   pharmacies, is that right?

15        A.    That's correct.

16        Q.    Okay.  And were you made aware as

17   president of the CVS entities in California, of

18   these CVS pharmacies, that a settlement had been

19   reached with the DEA?

20        MR. DELINSKY:  Object to form.

21        A.    Others at CVS were responsible for

22   operations and compliance and the people that --

23   they were informed, and I as an attorney would

24   be aware of it, but not -- I wasn't informed of
```

1    something because I was president.

2    BY MR. ELSNER:

3         Q.   Do you know how many thefts occurred

4    at CVS Pharmacy stores in California of

5    controlled substances prior to and during this

6    period?

7         A.   Others are responsible for that sort

8    of information.  I don't have that information.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          (Whereupon, CVS-Moffatt-21 was marked

18          for identification.)

19    BY MR. ELSNER:

20          Q.   This is Exhibit 21, which is the

21    settlement agreement between CVS and the DEA,

22    and this is dated December of 2015.  If you look

23    at Paragraph 7.

24          A.   Paragraph 1 is wrong.  I can't help

Highly Confidential - Subject to Further Confidentiality Review

1    it.

2              What is it?  Which paragraph?

3         Q.    Paragraph 7.

4         A.    7, okay.  Okay.

5         Q.    Sorry, what was wrong about

6    Paragraph 1?

7         A.    "CVS is incorporated in Delaware."

8    It's incorporated in Rhode Island.  So it's

9    referring to CVS Pharmacy, Inc.

10        Q.    It's fair to say CVS's corporate

11   structure is pretty complicated, is that right?

12             MR. DELINSKY:  Object to form.

13        A.    It's -- we have a lot of entities,

14   yes, I'd agree with that.

15   BY MR. ELSNER:

16        Q.    How many entities?

17        A.    Right now?  Roughly a thousand.

18        Q.    And how many of those entities do you

19   serve as a president or officer of?

20        A.    I'd have to generate a report.  I'm

21   not sure.

22        Q.    What's your best estimate?

23             MR. DELINSKY:  Objection.  Asked and

24   answered.

```
 1        A.    Hundreds of those, not all of them,

 2   but a large number of them.

 3   BY MR. ELSNER:

 4        Q.    Did it -- let's go back to the

 5   document.

 6              Paragraph 7 of the settlement

 7   agreement.  It reads "The United States contends

 8   that it has certain civil claims against CVS for

 9   engaging in the following conduct from

10   January 1, 2013 through October 23, 2014."  And

11   it then states that "On October 15, 2014, DEA

12   issued a Notice of Inspection to CVS Pharmacy

13   5667," which is in Houston, Texas, "after that

14   pharmacy had reported a theft of over 40,000

15   dosage units of controlled substances by two

16   former employees."

17              Were you aware that there was a 40,000

18   dosage unit theft of controlled substances from

19   the CVS store in Houston, Texas?

20              MR. DELINSKY:  Object to form.

21        A.    I'm not responsible for this sort of

22   investigation or activity, so I was not

23   informed.  Others at CVS that would be

24   responsible for this would have been informed.
```

1   BY MR. ELSNER:

2        Q.   Did you serve as an officer of any of

3   the CVS -- of this CVS Pharmacy in Houston,

4   Texas in 2013 and '14?

5        A.   During the time frame, I believe so,

6   yes.

7        Q.   Okay.  Do you know the name of that

8   entity?

9        A.   The Texas stores are actually operated

10  by CVS Pharmacy, Inc.

11            MR. DELINSKY:  Would that change your

12  answer as to whether or not you were an officer?

13       A.   So I am an officer of CVS Pharmacy,

14  Inc., vice president and secretary.

15            MR. ELSNER:  Asked and answered, Eric.

16            MR. DELINSKY:  I was trying to clear

17  it up for myself.

18  BY MR. ELSNER:

19       Q.   There were also a listing of

20  recordkeeping -- allegations of recordkeeping

21  violations with respect to that theft, is that

22  right, under 1, 2, and 3, beneath it?

23       A.   Yes.

24       Q.   Okay.  And as a result of this

Highly Confidential - Subject to Further Confidentiality Review

1    investigation, CVS agreed to pay a settlement in

2    the amount of $345,000 in Paragraph 13 on

3    Page 4, is that right?

4             MR. DELINSKY:  Object to form.

5        A.   Paragraph 13 on Page 4 refers to a sum

6    of $345,000.

7    BY MR. ELSNER:

8        Q.   Were you made aware of that as the

9    president of CVS Texas entity?

10            MR. DELINSKY:  Object to form.

11   BY MR. ELSNER:

12       Q.   I'm sorry, as the president of CVS

13   Pharmacy?

14            MR. DELINSKY:  Object to form.

15   BY MR. ELSNER:

16       Q.   Were you made aware of the amount of

17   the settlement?

18       A.   I was vice president and secretary of

19   CVS Pharmacy.  I -- others would be responsible

20   for this settlement.  To the extent I learned

21   about it, it would have been as an attorney.

22       Q.   If I could show you the next exhibit.

23            There was also an investigation of CVS

24   in Nassau and Suffolk County, New York on Long

 1    Island between 2013 and 2015 concerning thefts

 2    of controlled substances and reporting

 3    violations.  Were you aware of that?

 4         A.   Yes, I was aware of that.

 5         Q.   This is Exhibit 22.

 6              (Whereupon, CVS-Moffatt-22 was marked

 7              for identification.)

 8    BY MR. ELSNER:

 9         Q.   This is Motley Rice 242.

10              Can you tell me what it is you

11    remember about this?

12         A.   I remember we settled it fairly

13    recently, although the conduct, as you said, was

14    from several years back, and I recall, I think,

15    I signed -- yeah, I signed this one.

16         Q.   You executed this on behalf of what

17    entity?

18         A.   CVS Pharmacy, Inc.

19         Q.   And that was the company controlling

20    the CVS Pharmacy, the subject of this

21    investigation pharmacies, is that right?

22         A.   Actually, no.  So it appears from

23    here, it says A, settlement, "CVS Pharmacy, Inc.

24    is a Rhode Island corporation with its corporate

1    headquarters in Woonsocket, Rhode Island.  CVS

2    directly or indirectly operates CVS retail

3    pharmacies in Nassau and Suffolk Counties."

4            So the entity that actually operates

5    stores in New York is called CVS Albany, LLC.

6    CVS Pharmacy, Inc. is its parent.

7        Q.   Are you an officer of CVS Albany?

8        A.   Yes.

9        Q.   President?

10       A.   I am president of CVS Albany.

11       Q.   And was that true for the time period

12   concerning this investigation, which is between

13   February of 2013 and January of 2015?

14       A.   Yes.

15       Q.   And the investigation here concerned

16   the failure to promptly report a theft of a

17   controlled substance from these stores, is that

18   right?

19            MR. DELINSKY:  Object to form.

20       A.   Another attorney would have been

21   involved in the whole matter.  So, you know, I

22   was brought in at the end, as I discussed

23   earlier, you know, so, you know, I was consulted

24   at the end when it needed to be signed.  But I

1    didn't have -- I wasn't directly involved in

2    this, so I don't recall the particulars.  Well,

3    I didn't know the particulars.

4    BY MR. ELSNER:

5        Q.   Well, CVS agreed to pay in settlement

6    of this matter $1.5 million, is that right,

7    Page 2?

8        A.   Yeah, Page 2, Paragraph 1.

9        Q.   Is that correct?

10       A.   That is correct.

11       Q.   Okay.  And you signed this settlement

12   agreement?

13       A.   Yes.

14       Q.   Other than the settlement agreement

15   itself, did you review any documents before you

16   executed this agreement?

17       A.   Another attorney would have been

18   responsible for the entire matter.  I don't

19   recall if I reviewed any documents.  I had a

20   discussion certainly with the attorney when I

21   was asked to sign it.

22       Q.   Who was the attorney?

23       A.   I believe it was Mark Vernazza.

24       Q.   And he's employed by CVS, is that

1     right?

2          A.   Yes, CVS Pharmacy.

3          Q.   CVS Pharmacy, Inc.

4               Did Mark show you any documents before

5     you executed the agreement?

6               MR. DELINSKY:  Objection.  Asked and

7     answered.

8          A.   I don't recall if he showed me

9     anything.

10    BY MR. ELSNER:

11         Q.   Did Mark share with you what the DEA

12    had found concerning the thefts and the

13    reporting from these CVS Pharmacy stores?

14              MR. DELINSKY:  Object to form.  And I

15    instruct the witness not to answer on the

16    grounds that that would involve attorney/client

17    privileged information.

18              MR. ELSNER:  So what I've asked him is

19    I've asked him whether he, Mark Vernazza, shared

20    with the witness what the DEA had found

21    concerning thefts in the reporting violations,

22    and you're asserting privilege over the DEA's

23    findings and facts, is that my understanding?

24              MR. DELINSKY:  I'm asserting privilege

1    as a result of the following circumstances.

2    Mr. Moffatt has testified that he doesn't recall

3    reviewing any documents in connection with his

4    signing the settlement agreement, so by

5    definition the only way that information could

6    have been conveyed to Mr. Moffatt would have

7    been through an attorney reflecting that

8    attorney's mental impressions upon hearing or

9    reading, depending on the facts, what the DEA

10   told him.  So on that basis I am asserting

11   privilege.

12          I think the manner in which to proceed

13   here would be for you to ask Mr. Moffatt if he

14   obtained any information from the attorney that

15   was separate from or in addition to the

16   information already contained in the settlement

17   agreement so we at least can see if there's even

18   a dispute.

19   BY MR. ELSNER:

20      Q.   Did you obtain any information

21   regarding the allegations here by the DEA above

22   and beyond what's written in the settlement

23   agreement?

24      A.   I don't recall getting any other

Highly Confidential - Subject to Further Confidentiality Review

 1    information.

 2         Q.   Did you ask for any?

 3         A.   I don't recall what we specifically

 4    discussed.

 5         Q.   This was just in June of last year,

 6    it's not a particularly old event, and you said

 7    you did have a recollection of it.  So did

 8    you -- did you personally discuss any of these

 9    matters with anyone at the DEA?

10         A.   No.  Mark or someone on Betsy's team

11    would be responsible for this sort of matter.

12         Q.   Did the DEA provide CVS with any

13    document describing its findings that you're

14    aware of?

15             MR. DELINSKY:  Object to form.

16             You may answer.

17         A.   I wouldn't have been involved, so I

18    don't know what the DEA would have provided.

19    BY MR. ELSNER:

20         Q.   Did you ask Mr. Vernazza if there were

21    any documents provided by the DEA?

22         A.   I did not ask him if there were

23    documents provided, not that I recall.

24         Q.   Did you -- did Mr. Vernazza, yes or

Highly Confidential - Subject to Further Confidentiality Review

```
1    no, tell you what the DEA findings were with

2    respect to these CVS stores in Long Island?

3              MR. DELINSKY:  Objection.  Asked and

4    answered.

5         A.   In connection with signing this we had

6    discussions, but I don't recall specifically

7    what he told me about the contentions or, you

8    know, any conclusions.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21      Q.    Are you aware that there was a DEA

22  investigation of CVS in Connecticut?

23      A.    I don't -- I wouldn't have been

24  involved in that.  Others would have handled it.

Highly Confidential - Subject to Further Confidentiality Review

 1    I don't specifically recall Connecticut.

 2            MR. DELINSKY:  And, Mike, you'd

 3    previously indicated that you hoped to finish by

 4    1:00 or earlier.  It's now 1:20.  Could you give

 5    us a sense of where you are?  We've been going

 6    an hour.  I'm just trying to --

 7            MR. ELSNER:  There are three

 8    additional settlements I want to address and ask

 9    some wrap-up questions.  So I'm happy to take a

10    break now if you want to do that, if you want to

11    take a break and go to lunch, we could do that.

12    But it took a little longer than I anticipated,

13    so...

14            MR. DELINSKY:  Can you give us an

15    estimate?  If it's a half hour, it's one thing.

16    If it's another hour, that's another.

17            MR. ELSNER:  Why don't we go off the

18    record and discuss it.

19            THE VIDEOGRAPHER:  We're going off the

20    record at 1:21 p.m.

21            (Whereupon, a recess was taken.)

22            THE VIDEOGRAPHER:  We're back on the

23    record at 1:31 p.m.

24    BY MR. ELSNER:

1    Q.   Mr. Moffatt, before we broke I had

2    shared with you Exhibit 23, which is the

3    settlement agreement between CVS and the DEA

4    concerning the DEA's investigation of CVS stores

5    in Connecticut, is that right?

6              (Whereupon, CVS-Moffatt-23 was marked

7              for identification.)

8              MR. DELINSKY:  Object to form.

9    A.   Yeah, it appears to be stores in these

10   two cities, Southington and New Britain.

11   BY MR. ELSNER:

12   Q.   And the DEA had determined that the

13   Southington store on at least 2,886 occasions

14   that CVS failed to keep paper Schedule III

15   through Schedule V prescriptions, and invoices

16   on 31 occasions with respect to the Southington

17   store and with respect to the New Britain store.

18   In Paragraph 3 the US determined that on 4,936

19   instances CVS failed to keep paper Schedule III

20   through V prescriptions in a readily retrievable

21   manner from other prescriptions in the pharmacy.

22   Is that right?

23             MR. DELINSKY:  Object to form.

24   A.   I wasn't involved in this

Highly Confidential - Subject to Further Confidentiality Review

1   investigation at all, but that appears to be a

2   summary of that paragraph.

3   BY MR. ELSNER:

4        Q.   And CVS entered a settlement with the

5   DEA and agreed to pay $600,000 in settlement, is

6   that right?

7        A.   That's in Section III, Paragraph 1.

8   Again, I wasn't involved in this.

9        Q.   Were you aware that CVS agreed to

10  settle these -- this investigation with the DEA

11  in that amount of $600,000?

12       A.   I have no specific recollection of

13  this matter.  To the extent I learned anything

14  about it, it would have been through discussions

15  between attorneys.

16       Q.   And the settlement agreement was

17  executed on behalf of Connecticut CVS Pharmacy,

18  LLC by Betsy Ferguson, the president and deputy

19  general counsel for CVS Health Corporation, is

20  that right?

21       A.   That's what her signature block says,

22  yes.

23            MR. DELINSKY:  I believe it says

24  senior vice president.

Highly Confidential - Subject to Further Confidentiality Review

1            MR. ELSNER:  Senior vice president.

2       A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q.    There was also an investigation, I

16    believe, of CVS stores in Massachusetts

17    regarding the prescription monitoring program.

18    Are you aware of that?

19    A.    That's not my area.  I'm not sure.

20    Q.    Did you know that CVS pharmacies in

21    Massachusetts didn't have access to the internet

22    so they couldn't operate the prescription

23    monitoring program?

24         MR. DELINSKY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Others in CVS would be responsible for

2  what access the stores had.  I have no knowledge

3  about that.

4  BY MR. ELSNER:

5      Q.   Were you aware that there was a second

6  investigation by the DEA into CVS's operations

7  in Texas concerning filling prescriptions for a

8  physician that was not properly licensed?

9  Exhibit 25.

10          (Whereupon, CVS-Moffatt-25 was marked

11          for identification.)

12      A.   It's Paragraph 7 you're talking about?

13  BY MR. ELSNER:

14      Q.   Yes.

15      A.   I see what Paragraph 7 says, yes.

16      Q.   Okay.  So the DEA was investigating

17  CVS pharmacies in Texas for filling

18  prescriptions for a Dr. Pedro Garcia, and it was

19  discovered that he didn't have a valid license

20  to prescribe those substances, correct?

21          MR. DELINSKY:  Object to form.

22      A.   It says that his Texas Department of

23  Public Safety controlled substances registration

24  was expired.

```
 1    BY MR. ELSNER:

 2         Q.   And CVS filled 153 of those

 3    prescriptions?

 4         A.   That's what Paragraph 7 indicates.

 5         Q.   And as a result CVS entered into a

 6    settlement with the DEA in Paragraph 13 on

 7    Page 4 and agreed to pay $1,912,500 to the DEA,

 8    is that right?

 9              MR. DELINSKY:  Object to form.

10         A.   That's what Paragraph 13 says.  Again,

11    I had no involvement in the settlement or the

12    underlying matter.

13    BY MR. ELSNER:

14         Q.   And it was executed by Betsy Ferguson

15    on behalf of CVS in August of 2014, is that

16    right, Page 7?

17         A.   Yes.  CVS, in this case CVS Pharmacy,

18    Inc., yes.

19         Q.   And did you play a role with respect

20    to being an officer of the CVS entity in Texas

21    responsible for this CVS store?

22         A.   So that's CVS Pharmacy, Inc., again

23    vice president, secretary, assistant general

24    counsel.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. ELSNER:  I don't think I have any

17   further questions at this time.  I do think,

18   though, that there were certain questions that I

19   believe should have been answered and were not

20   on the basis of a privilege, and I'm going to

21   reserve the rest of my time in the event that we

22   decide to raise that issue with the court.

23          MR. DELINSKY:  Okay.

24          MR. ELSNER:  Do you have any

Highly Confidential - Subject to Further Confidentiality Review

1    questions?

2              MR. DELINSKY:  Nothing further.

3              MR. DAWSON:  No questions.

4              THE VIDEOGRAPHER:  This concludes the

5    videotaped deposition of Thomas Moffatt.  The

6    time is 1:56 p.m., and we are now off the

7    record.

8              (Whereupon, the deposition was

9              concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1    STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

2

3              I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4    and Commissioner in the State of Rhode Island

5    and Providence Plantations, do certify that on

6    the 15th day of January, 2019, at 8:04 o'clock,

7    the person above-named was duly sworn to testify

8    to the truth of their knowledge, and examined,

9    and such examination reduced to typewriting

10   under my direction, and is a true record of the

11   testimony given by the witness.

12             I further certify that I am neither

13   attorney, related or employed by any of the

14   parties to this action, and that I am not a

15   relative or employee of any attorney employed by

16   the parties hereto, or financially interested in

17   the action.

18             In witness whereof, I have hereunto

19   set my hand this 17th day of January, 2019.

20

21             _____

22             COMMISSIONER

23             My Commission Expires April 30, 2020

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8                    After doing so, please sign the

9    errata sheet and date it.  It will be attached

10   to your deposition.

11                   It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of receipt of

14   the deposition transcript by you.  If you fail

15   to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                              - - - - - -

                             E R R A T A

2                              - - - - - -

3       PAGE   LINE   CHANGE

4       _____  _____  _____

5           REASON: _____

6       _____  _____  _____

7           REASON: _____

8       _____  _____  _____

9           REASON: _____

10      _____  _____  _____

11          REASON: _____

12      _____  _____  _____

13          REASON: _____

14      _____  _____  _____

15          REASON: _____

16      _____  _____  _____

17          REASON: _____

18      _____  _____  _____

19          REASON: _____

20      _____  _____  _____

21          REASON: _____

22      _____  _____  _____

23          REASON: _____

24      _____  _____  _____

```
 1                ACKNOWLEDGMENT OF DEPONENT
 2
 3           I, _____, do
     Hereby certify that I have read the foregoing
 4   pages, and that the same is a correct
     transcription of the answers given by me to the
 5   questions therein propounded, except for the
     corrections or changes in form or substance, if
 6   any, noted in the attached Errata Sheet.
 7
 8   _____
     THOMAS S. MOFFATT              DATE
 9
10
11
12
13
14
15   Subscribed and sworn
     To before me this
16   _____ day of _____, 20_____.
17   My commission expires: _____
18
     _____
19   Notary Public
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    LAWYER'S NOTES

 2    PAGE  LINE

 3    _____  _____    _____

 4    _____  _____    _____

 5    _____  _____    _____

 6    _____  _____    _____

 7    _____  _____    _____

 8    _____  _____    _____

 9    _____  _____    _____

10    _____  _____    _____

11    _____  _____    _____

12    _____  _____    _____

13    _____  _____    _____

14    _____  _____    _____

15    _____  _____    _____

16    _____  _____    _____

17    _____  _____    _____

18    _____  _____    _____

19    _____  _____    _____

20    _____  _____    _____

21    _____  _____    _____

22    _____  _____    _____

23    _____  _____    _____

24    _____  _____    _____
```