```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5    ----------------------------x

 6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7    OPIATE LITIGATION              ) 1:17-MD-2804

 8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9    ----------------------------x

10         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12

          VIDEOTAPED DEPOSITION OF HENRY JOHN MORTELLITI, III

13

                      WASHINGTON, D.C.

14

             WEDNESDAY, JANUARY 23, 2019

15

                      8:05 A.M.

16

17

18

19

20

21

22

23

24    Reported by: Leslie A. Todd
```

1      Deposition of HENRY JOHN MORTELLITI, III, held

2   at the law offices of:

3

4

5              ZUCKERMAN SPAEDER, LLP

6              1800 M Street, N.W.

7              Suite 1000

8              Washington, D.C. 20036

9              (202) 778-1801

10

11

12

13      Pursuant to notice, before Leslie Anne Todd,

14   Court Reporter and Notary Public in and for the

15   District of Columbia, who officiated in

16   administering the oath to the witness.

17

18

19

20

21

22

23

24

```
 1              A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFFS:

 3         ERIC KENNEDY, ESQUIRE

 4         WILLIAM BAKER, ESQUIRE

 5         BRIAN ROOF, ESQUIRE

 6         JAMES A. DeROCHE, ESQUIRE

 7         WEISMAN, KENNEDY & BERRIS, CO., L.P.A.

 8         101 West Prospect Avenue, Suite 1600

 9         Cleveland, Ohio 44115

10         (216) 781-1111

11

12    ON BEHALF OF CVS HEALTH AND THE WITNESS:

13         GRAEME W. BUSH, ESQUIRE

14         ZUCKERMAN SPAEDER, LLP

15         1800 M Street NW, Suite 1000

16         Washington, D.C. 20036-5807

17         (202) 778-1801

18

19    ON BEHALF OF CARDINAL HEALTH:

20         KATELYN ADAMS, ESQUIRE

21         WILLIAMS & CONNOLLY LLP

22         725 Twelfth Street, N.W.

23         Washington, D.C. 20005

24         (202) 434-5107
```

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF McKESSON CORPORATION:

 4        GABRIEL FULMER, ESQUIRE

 5        COVINGTON & BURLING LLP

 6        One City Center

 7        850 Tenth Street, N.W.

 8        Washington, D.C. 20001-4956

 9        (202) 662-5261

10

11   ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:

12        WREDE SMITH, ESQUIRE

13        ARNOLD & PORTER KAYE SCHOLER LLP

14        601 Massachusetts Avenue, N.W.

15        Washington, D.C. 20001-3743

16        (202) 942-5435

17

18   ON BEHALF OF WALMART:

19        CHRISTINE D. PROROK, ESQUIRE (Telephonically)

20        JONES DAY

21        77 West Wacker Drive

22        Chicago, Illinois 60601-1692

23        (312) 782-3939

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF AMERISOURCEBERGEN:

 4        M. JANE BRANNON, ESQUIRE (Telephonically)

 5        JACKSON KELLY, PLLC

 6        175 East Main Street

 7        Lexington, Kentucky 40507

 8        (859) 288-2805

 9

10   ON BEHALF OF CARDINAL HEALTH:

11        CHRISTOPHER N. DAWSON, ESQUIRE

12          (Telephonically)

13        WHELAN, CORRENTE, FLANDERS, KINDER & SIKET LLP

14        100 Westminster Street, Suite 710

15        Providence, Rhode Island 02903

16        (401) 270-4500

17

18   ALSO PRESENT:

19        STEPHANIE HACKMAN (Paralegal)

20        ZACH HONE (Trial technician)

21        DANIEL HOLMSTOCK (Videographer)

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                C O N T E N T S

 2   EXAMINATION OF HENRY JOHN MORTELLITI, III     PAGE

 3        By Mr. Kennedy                            13

 4        By Mr. Baker                         190, 377

 5        By Mr. Bush                               374

 6                E X H I B I T S

 7            (Attached to transcript)

 8   CVS-MORTELLITI DEPOSITION EXHIBITS          PAGE

 9   No. 2     Title 21 Code of Federal Regulations,

10             Part 1301 - Registration of

11             Manufacturers, Distributors and

12             Dispensers of Controlled Substances   28

13   No. 9     E-mail re DEA SOP 8-25-10.doc (with

14             attachment), Bates CVS-MDLT1-

15             0000088956 to 0000089025            100

16   No. 16    Business Idea Description, Submit to

17             IS-Business-Idea mailbox, Bates

18             CVS-MDLT1-000034175 to 000034176    129

19   No. 17    E-mail string re SOM Modifications,

20             Bates CVS-MDLT1-000024523 to

21             000024524                           173

22   No. 18A   E-mail re Logistics Business Support

23             Requests - 2011-04-28, Bates

24             CVS-MDLT1-000029864 to 000029866    177
```

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3   CVS-MORTELLITI DEPOSITION EXHIBITS            PAGE

 4   No. 22   CVS Pharmacy, Logistics, 2011

 5            Initiatives, January 28, 2011,

 6            Bates CVS-MDLT1-000018910 to

 7            000018945                           170

 8   No. 23   E-mail string re New BSR - Control

 9            Drug IRR Changes, Bates CVS-MDLT1-

10            000034168 to 000034171             141

11   No. 24   E-mail string re A new fax has

12            arrived from 4078585031 (Part 1 of

13            1) on Channel 3, Bates CVS-MDLT1-

14            000075542 to 000075547             152

15   No. 28   Conference Call invite, Bates

16            CVS-MDLT1-000024539 to 000024552   101

17   No. 48   CVS Controlled Drug Manual:

18            Suspicious Order Monitoring

19            Procedure                          104

20   No. 49   E-mail string re November 10, 2009,

21            Bates CVS-MDLT1-000087889 to

22            000087890                          111

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3   CVS-MORTELLITI DEPOSITION EXHIBITS          PAGE

 4   No. 111   E-mail re Agenda/Updates for

 5             Monday's staff meeting, Bates

 6             CVS-MDLT1-000103859 and 000103867   167

 7   No. 126   Item Review Report, Bates

 8             CVS-MDLT1-000100763 to 000100768    156

 9   No. 130   E-mail string re SOM Project Plan,

10             Bates CVS-MDLT1-000114320 to

11             000114328                           68

12   No. 132   Chart entitled VIPER x PDMR, Bates

13             CVS-MDLT1-000068377 to 000068381    77

14   No. 135   E-mail string re DEA day 3, Bates

15             CVS-MDLT1-000010223 to 000010224    58

16   No. 139   Item Review Report, Bates

17             CVS-MDLT1-000100775 to 000100850    38

18   No. 142   CVS Caremark, Year-End Review -

19             2012 (Finalized)                    74

20   No. 143   E-mail string re Prepared at the

21             Request of Legal Counsel - Subject to

22             Attorney Client Privilege, Bates

23             CVS-MDLT1-000117715 to 000117718    358

24
```

```
 1              E X H I B I T S (Continued)

 2                (Attached to transcript)

 3    CVS-MORTELLITI DEPOSITION EXHIBITS              PAGE

 4    No. 209   E-mail re SOM - Reporting, Bates

 5              CVS-MDLT1-000033126 to 000033154      247

 6    No. 506   E-mail string re IRR/SOM Retunement

 7              BSR_LOG_61148, Bates CVS-MDLT1-

 8              000057759                             244

 9    No. 521   E-mail string re Control Drug IRR

10              important info, Bates CVS-MDLT1-

11              000100370 to 000100373               335

12    No. 562   Portion of rough transcript (not

13              attached hereto)                      190

14    No. 562   June IRR Report (not attached hereto) 253

15    No. 562A  July IRR Report (not attached hereto) 257

16    No. 606   DEA, FDA, OSHA Regulatory Update,

17              Bates CVS-MDLT1-000061121 to

18              000061123                             228

19    No. 607   SOM Program, Bates CVS-MDLT1-

20              000002186                             229

21    No. 610   E-mail string re The CVS Retunement,

22              Bates CVS-MDLT1-000061141 and

23              000114642 to 000114652               258

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Continued)

 2               (Attached to transcript)

 3    CVS-MORTELLITI DEPOSITION EXHIBITS          PAGE

 4    No. 611   E-mail string re SOM Report

 5              Attorney Client Privilege, Bates

 6              CVS-MDLT1-000109623 to 000109625    268

 7    No. 612   E-mail re SOM Update, Bates

 8              CVS-MDLT1-000088734                 284

 9    No. 614   E-mail string re Adjustment to the

10              CVS SOM, Bates CVS-MDLT1-000110439

11              to 000110441                        292

12    No. 615   E-mail re Control Drug IRR UPdate,

13              Bates CVS-MDLT1-000034183           295

14    No. 623   E-mail string re IRR Narratives,

15              Bates CVS-MDLT1-000112597 to

16              000112600                           309

17    No. 624   E-mail re IRR Narratives, Bates

18              CVS-MDLT1-000109849 and 000109843

19              to 000109849                        309

20    No. 625   E-mail re Control Drug Suspicious

21              Order Monitoring.doc (with

22              attachment), Bates CVS-MDLT1-

23              000057736 to 000057738 and

24              000083969 to 000083971             309
```

```
 1              E X H I B I T S (Continued)

 2              (Attached to transcript)

 3   CVS-MORTELLITI DEPOSITION EXHIBITS          PAGE

 4   No. 634   List I Chemicals (PSE, EPH) and

 5             Control Drug Policy & Procedure,

 6             CVS-MDLT1-000009812 to 000009815   344

 7   No. 641   E-mail string re Attorney/Client

 8             Privileged Information, Bates

 9             CVS-MDLT1-000083855 to 000083856   353

10   No. 690   ARCOS Reporting, Bates CVS-MDLT1-

11             000019007                          339

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2              --------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4     record.  My name is Daniel Holmstock.  I am the

 5     videographer for Golkow Litigation Services.

 6     Today's date is January 23rd, 2019.  The time is

 7     8:05 a.m.

 8              This deposition is being held at the law

 9     offices of Zuckerman Spaeder LLP, 1800 M Street,

10     Northwest, Suite 1000, in Washington, D.C., in the

11     matter of In Re:  National Prescription Opiate

12     Litigation, pending before the United States

13     District Court for the Northern District of Ohio,

14     Eastern Division.

15              The deponent is Mr. John H. Mortelliti.

16              Counsel for appearances will be noted on

17     the stenographic record.

18              The court reporter is Leslie Todd, who

19     will now administer the oath.

20              HENRY JOHN MORTELLITI, III,

21          and having been first duly sworn,

22        was examined and testified as follows:

23              DIRECT EXAMINATION

24     BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    All right, sir, my name is Eric Kennedy,

 2    and I represent the plaintiffs in this case.

 3               Do you understand that?

 4          A    Yes.

 5          Q    Could you please state your full name

 6    for the record.

 7          A    It's Henry John Mortelliti, III.

 8          Q    And what is your professional address?

 9          A    One Berry Drive, Lumberton, New Jersey.

10          Q    And who is your current employer?

11          A    CVS Health.

12          Q    And what is the relationship of CVS

13    Health to CVS Pharmacy?

14          A    CVS Health had different businesses.

15    There's the pharmacy stores, Caremark, Omnicare.

16    There -- there's different branches.  And now

17    Aetna.

18          Q    So CVS Pharmacy would be a subsidiary of

19    CVS Health?

20          A    It's one of the branches, yes.

21          Q    What is your position?

22          A    Director of Asset Protection Supply

23    Chain.

24          Q    And how long have you held that
```

```
 1    position?

 2         A     Since 2010.

 3         Q     Tell me about the duties and

 4    responsibilities of your position.

 5         A     In my role, I oversee company loss from

 6    the supply chain point of view.  I oversee store

 7    shortages.  I also review government regulatory

 8    visits.  I have asset protection managers that

 9    report to me.  They're in each of the facilities.

10    And we oversee the audits as well as just the --

11    the entire supply chain to ensure the stores are

12    getting the product they need, no thefts in the

13    buildings, and overall safety of the employees.

14         Q     When did you take that position?

15         A     As director, it was summer of 2010.

16         Q     And can you tell when you began the

17    position in the summer of 2010, what

18    responsibility did you have or relationship did

19    you have with controlled substances?

20         A     We would oversee the auditing of the

21    pharmacy area, and my -- my role was to ensure

22    that all our managers were following the

23    guidelines of basically auditing the building,

24    from pick, pack to ship.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q    And when you say pick, pack and ship,

2    was that in relation to a particular distribution

3    center?

4         A    It was the -- the DCs I covered at the

5    time.

6         Q    Okay.  And what were those DCs?

7         A    2010, off the top of my head, it was

8    either going to be the Mid-Atlantic or -- or the

9    Southeast.  I -- I don't recall.

10        Q    Prior to 2010 when you took that

11   position, what was your -- your job at CVS, if

12   any?

13        A    I was the loss prevention manager of the

14   Lumberton distribution center.  I started in

15   Lumberton in January of 1999 as a supervisor for

16   loss prevention.

17        Q    And what were your duties and

18   responsibilities starting in January of '99?

19        A    I would audit different departments for

20   CVS policy and procedure compliance.  I also

21   oversaw the in-house safety program, as well as

22   store shortage research.

23        Q    And did you hold that position then from

24   1999 to 2010?
```

1        A    I was promoted to the manager of

2    Lumberton, and I'm going to say that may have been

3    the end of '99, early 2000.  And I held that

4    position till I was director.

5        Q    Now, CVS distributed -- distributes

6    hydrocodone products to CVS stores.  You're aware

7    of that?

8        A    Yes.

9        Q    When did you first learn that CVS was a

10   distributor of hydrocodone products to CVS

11   pharmacies?

12       A    When I was a supervisor.

13       Q    And so that would have been in 1999?

14       A    Yes.

15       Q    What were your duties and

16   responsibilities in 1999 as it related to the

17   CVS distribution of -- of hydrocodones to CVS

18   pharmacies?

19       A    We would just oversee the actual

20   shipments, ensure there were no store shortages,

21   and we shipped what we say we picked.

22       Q    In 1999, what were your duties and

23   responsibilities in relation to suspicious order

24   monitoring of -- of hydrocodone products?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A    I wasn't involved with it in 1999.

2        Q    When was your first involvement with

3   suspicious order monitoring of -- of hydrocodones?

4        A    It -- it was a while ago.  I'm going to

5   say somewhere around 2008, 2009.

6        Q    And you understand that hydrocodone is a

7   controlled substance?

8        A    Yes.

9        Q    You've known that since 1999?

10       A    Yes.

11       Q    You understand that it is a narcotic?

12       A    Yes.

13       Q    You understand that it is not just any

14   narcotic, but it is a narcotic that became a -- a

15   focus of what has been described as an opioid

16   crisis in this country.  Do you understand that?

17       A    I know there's a lot of talk about the

18   opioid situation.

19       Q    And you understand the role of

20   hydrocodone in that opioid -- what you call a

21   situation?

22       A    Yes.

23       Q    And we'll get into more detail, but

24   just -- just to start, you understand that -- that
```

Highly Confidential - Subject to Further Confidentiality Review

1   CVS had certain responsibilities with respect to

2   suspicious order monitoring as it relates to

3   hydrocodones.

4        A    I knew that I was given a responsibility

5   to oversee a process during a certain time period.

6   As for the overall expectation, I just -- I just

7   followed the process when it came to me.

8        Q    And that would have been in '08 and '09?

9        A    Somewhere in there, yes.

10       Q    In '08 or '09 when you first became

11  involved with suspicious order monitoring at CVS,

12  what was your official title at that point?

13       A    I was a loss prevention manager.

14       Q    At Lumberton?

15       A    Yes.

16       Q    Did you have any duties and

17  responsibilities beyond Lumberton in '08 and '09?

18       A    I -- I -- when -- okay.  I -- I believe

19  I had the Mid-Atlantic during this time period.

20       Q    And so that would have involved what

21  distribution centers?

22       A    The alignments changed almost every

23  year, so I'm not 100 percent sure, but it would

24  have been Fredericksburg, Lumberton, North

```
 1    Augusta, and that may have been it at the time.

 2         Q    Who was your immediate supervisor in

 3    '08, '09, when you took on this responsibility

 4    with respect to the suspicious order monitoring?

 5         A    Frank Devlin.

 6         Q    What responsibilities were you given

 7    then in '08, '09, with respect to suspicious order

 8    monitoring?

 9         A    There was -- there was a green -- we

10    called it a green bar, but it was actually the

11    IRR.  So I was reviewing the I -- the IRR for the

12    network.

13         Q    Prior to be given this responsibility to

14    review these IRRs -- and we'll talk about that in

15    detail -- prior to being given that

16    responsibility, explain to us what your experience

17    was with suspicious order monitoring of controlled

18    substances.

19         A    With -- prior to that my responsibility

20    was to ensure the overall accuracy for the

21    distribution centers.

22         Q    When you say "accuracy" -- oh, I'm

23    sorry, did you finish?

24         A    Yes.
```

```
 1         Q    When you say "accuracy," specifically
 2    what are you referring to?
 3         A    That we shipped exactly what was
 4    ordered.
 5         Q    Okay.  And that would have been your
 6    only experience that might relate to suspicious
 7    order monitoring prior to being given this job,
 8    correct?
 9         A    Aside from doing controlled drug
10    in-house audits, yes.
11         Q    And the controlled in-house audits would
12    be -- basically that's an inventory process; is
13    that true?
14         A    Yes.
15         Q    When you were given this -- this
16    responsibility of beginning to review these IRR
17    reports in relation to controlled substances, tell
18    me about the training and the education that you
19    were provided by CVS.
20         A    During -- during that time period, I was
21    working with Pam Hinkle.  She was -- she was --
22    she had the experience with pharmacy.  As for the
23    actual training itself, I -- I just don't recall
24    how -- how that -- all that went down.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Now, she had experience dealing at the

 2   pharmacy level, correct?

 3        A    Warehouse.

 4        Q    Warehouse.

 5        A    Right.

 6        Q    All right.  What materials were you

 7   provided to -- to prepare you for your job in

 8   reviewing IRRs?

 9        A    I -- I don't -- I don't remember.

10        Q    Were you provided with a copy or did

11   anybody explain to you the Controlled Substances

12   Act before you took on this responsibility?

13        A    I -- I don't remember.

14        Q    Did anybody explain to you or show you a

15   copy of the federal regulations as it related to

16   the duties and responsibilities of a distributor

17   of -- of opioids?

18        A    I don't remember.

19        Q    Did anybody provide you with -- with any

20   of the DEA letters that had been sent to

21   distributors in '06, '07, and a second letter in

22   '07, so that you could have a better understanding

23   of your responsibilities?

24        A    I don't remember.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q     Did anybody sit down and explain to you

 2   what the overarching responsibilities were of a

 3   distributor with respect to the distribution of

 4   opioids in 2008 when you began this role?

 5          A     I don't remember.

 6          Q     And if anybody would have given you that

 7   responsibility or provided you with that material,

 8   you say it would have been Pam Hinkle?

 9          A     It would either have been Pam Hinkle,

10   Frank Devlin, possibly someone in corporate.  I --

11   I don't recall the actual transition time period.

12          Q     Tell me, what was Mr. Devlin's

13   experience in relation to suspicious order

14   monitoring of controlled substances when you began

15   your role in 2008?

16          A     I don't -- I don't know what his

17   experience was.

18          Q     Now, you said you began to review this

19   IRR report.  That probably would have been 2009,

20   correct?

21          A     Somewhere in that time period.

22          Q     Tell the jury what an IRR report is.

23          A     It's an inventory review report.

24          Q     Did Mr. Devlin sit down and explain to
```

```
 1    you what an inventory review report was?

 2         A    I don't remember.

 3         Q    Did Pam Hinkle explain to you what an

 4    inventory review report was?

 5         A    I don't remember the transition period

 6    at that time.

 7         Q    Do you know -- do you have any memory

 8    who sat you down and said, This is an inventory

 9    review report?

10         A    I -- the only thing I recall was when I

11    was getting it, Frank filled me in and told me it

12    was coming.  I -- I don't remember who from

13    corporate reviewed it with me.  I just don't

14    recall.

15         Q    When you say "corporate," what are you

16    referring to?

17         A    Someone from Rhode Island.

18         Q    And who would they be employed by?

19         A    CVS.

20         Q    Did anybody explain to you the

21    importance and the significance of this report as

22    it related to CVS's responsibility to monitor

23    suspicious orders of narcotics?

24         A    Yeah, I -- I'm -- I don't recall how it
```

1   was explained, but being a narcotic itself and the

2   understanding of the report, I realized that it

3   was very important.

4        Q    Did anybody explain to you what was

5   going on in the country with respect to

6   hydrocodones in this crisis and the role CVS was

7   to play in somehow combatting that crisis?

8        A    During that time, again, I -- I don't

9   recall the exact transition of -- of taking that

10  over.  My -- my job was this is the procedure and

11  this is what the expectation is, and that's how I

12  performed it.

13       Q    All right.  When you say you were told,

14  This is the procedure and these are the

15  expectations, tell me what was explained to you

16  about the procedure and what were you told about

17  the expectations.

18       A    The importance of the IR -- the IRR,

19  when -- when I was reviewing the IRR.

20       Q    Who explained to you the importance of

21  the IRR?

22       A    Again, I -- I just don't remember.

23       Q    And what was the expectation that was

24  communicated to you?

Highly Confidential - Subject to Further Confidentiality Review

1      A    Well, the expectation was to look for

2  orders of interest.

3      Q    When you were provided with -- or had

4  taken this job in 2008 and '09, what was your

5  understanding of CVS's responsibility or duty with

6  respect to suspicious order monitoring?

7      A    Not to release any order that we deemed

8  an order of interest.

9      Q    And what that means is not to ship any

10 order of a narcotic that you deemed to be an order

11 of interest?

12     A    Right.

13     Q    Until you had completed some sort of

14 review or investigation of that order, true?

15     A    Right.

16     Q    Were you sent to any DEA seminars before

17 you began your -- your job in 2008 or 2009 as it

18 related to suspicious order monitoring?

19     A    I don't remember the dates, but I -- I

20 attended some NADDI, N-A-D-D-I, seminars.

21     Q    Would that have been before you took on

22 your responsibility?

23     A    I -- I don't remember.

24     Q    Let's go to January of 2006.  CVS was

```
 1   distributing hydrocodone products to its -- its

 2   stores, its pharmacies in 2006, correct?

 3        A    Yes.

 4        Q    You were at a DC at that point in time.

 5        A    Yes.

 6        Q    So you were aware of that at the DC.

 7        A    Yes.

 8        Q    And in 2006, given your responsibilities

 9   at the distribution center, were you aware of the

10   fact in 2006 that CVS had certain responsibilities

11   in relation to its distribution of hydrocodone

12   narcotics?

13        A    We -- we looked at the control cage as

14   high responsibility, which is why we did the

15   audits, the random audits and random inventories.

16        Q    So you knew and you understood that CVS

17   in 2006 did have a responsibility in relation to

18   the distribution of controlled substances.  You

19   understood that?

20        A    I understood that it was my position and

21   my job to ensure that we did what we could to make

22   sure the stores got exactly what they ordered, and

23   nothing was missing or diverted.

24        Q    Okay.  So you basically in 2006, you --
```

1    in your position you were monitoring for theft,

2    correct?

3        A    We -- we were monitoring for -- for

4    accuracy as well.

5        Q    All right.  What did you understand in

6    2006 to be CVS's duties and responsibilities with

7    respect to suspicious order monitoring?

8        A    Again, I -- I really didn't have the

9    thought process along those lines.  It was my job

10   to ensure that we could account for every bottle

11   of every controlled drug.

12       Q    Did you have any understanding of the

13   responsibilities -- CVS's responsibility at the --

14   at the distribution center in relation to

15   monitoring each and every order as to whether or

16   not it was suspicious?

17       A    At that time period, I -- nothing

18   outside of my role.

19       Q    Who had the role in 2006 at the

20   distribution center to -- to monitor suspicious

21   orders?

22       A    I don't know.

23       Q    Did anybody, to your knowledge?

24       A    I -- I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                (Exhibit No. 2 was premarked for

 2                identification.)

 3    BY MR. KENNEDY:

 4         Q    I'm going to show you what has been

 5    marked as Exhibit 2, if we could.

 6                MR. BUSH:  Is this the one for the

 7    witness?

 8                MR. KENNEDY:  Yes.

 9    BY MR. KENNEDY:

10         Q    Exhibit 2, do you see Title 21, Code of

11    Federal Regulations?  Do you see that up at the

12    top?

13         A    Yes.

14         Q    And then underneath that, 1301.74, if

15    you look down to (b), we're going to read through

16    (b).

17                Now, (b) states that:  "The registrant

18    shall design and operate a system to disclose to

19    the registrant suspicious orders of controlled

20    substances."

21                Do you see that?

22         A    I do.

23         Q    That first sentence of this

24    regulation -- and I'll tell you this regulation is
```

1    from 1971.  Okay?

2           Were you aware of this regulation from

3    1971 in your role at the distribution center in

4    2006?

5    A    In 2006, I -- I -- I may or may not have

6    seen this.  I don't remember.

7    Q    But it indicates that the registrant --

8    and CVS you understand would be a registrant that

9    would be subject to this regulation.  You knew

10   that, did you not?

11   A    Again, in 2006, my -- my position at

12   that time wasn't -- wasn't that deep into where --

13   where it went in 2008 and so forth, but I just

14   knew that my -- my job in the distribution center

15   was to ensure that we can account for the

16   inventory and the accuracy of the shipments.

17   Q    Well, let me ask you this:  In 2006,

18   what you have come to know about this regulation,

19   can we agree that this regulation that CVS shall

20   design and operate a system to disclose to the

21   registrant suspicious orders of controlled

22   substances, that regulation applied to CVS, did it

23   not, in 2006?

24   A    I -- again, I -- that was above my pay

```
 1   grade at that time.  I didn't have anything to do

 2   with this during that -- during that time period.

 3        Q    Well, let me ask you, did you ultimately

 4   become a manager of the DC?

 5        A    I did.

 6        Q    And would you have had overall authority

 7   over that distribution center?

 8        A    I had overall authority to audit and

 9   investigate our inventory and our shipments.

10        Q    Who was senior to you at -- at the

11   distribution center?

12        A    Nobody at the distribution center.

13        Q    All right.  And so -- and tell me then,

14   in 2006 at your distribution center where nobody

15   was senior to you, tell me in 2006 whether or not,

16   according to this regulation, CVS had designed and

17   was operating a system to disclose to the

18   registrant suspicious orders of controlled

19   substances.

20        A    Let me -- I'll back that up.  When I say

21   no one was over me in the distribution center, our

22   department was paid out of finance.  We were like

23   a third party in the DCs.  So the DCs would have a

24   distribution center director, ops manager,
```

1    pharmacy manager.

2              MR. KENNEDY:  All right, I'll move to

3    strike.

4    BY MR. KENNEDY:

5         Q    If you would just answer my question, if

6    you would, sir.

7              MR. BUSH:  Objection.  He gave -- he

8    clarified an answer.  That's perfectly

9    appropriate.

10             MR. KENNEDY:  Fine.

11   BY MR. KENNEDY:

12        Q    If you could answer my question, please.

13        A    Repeat the question.

14        Q    In 2006, tell me, according to this

15   regulation, at the DC where you were the manager,

16   tell me about the system that was designed and

17   operated to disclose to the registrant, CVS,

18   suspicious orders of controlled substances.

19        A    I wasn't involved with and I don't know

20   who did it.

21        Q    With -- as the manager, tell me about

22   the system that was in existence, if any, in 2006

23   that -- that fulfilled the obligation of this

24   regulation that says:  "Shall design and operate a

```
 1   system to disclose to the registrant suspicious

 2   orders of controlled substances."

 3        A    If there was a process in place, it

 4   would have went through the pharmacy manager to

 5   hold the orders.  I -- I don't know.  I just -- I

 6   wasn't involved in this at all at that time.

 7        Q    So as the manager of the DC, you don't

 8   know of a process that was in place.

 9        A    I don't know of a process or who was

10   responsible for it, no.

11        Q    Was anybody responsible for it?

12        A    I don't know.

13        Q    Were you at the DC every day --

14        A    Yes.

15        Q    -- as part of your job?

16        A    Yes.

17        Q    How many years were -- were you at that

18   DC?

19        A    From January '99.

20        Q    Until 2008?

21        A    Actually, I'm still hubbed there.

22        Q    All right.  And you were the manager of

23   that DC for how many years?

24        A    The loss prevention manager for five,
```

 1   six -- six years, seven years.

 2             And when we say "manager of the DC," I

 3   was the loss prevention manager.  I wasn't the DC

 4   ops manager or -- or pharmacy manager, production

 5   manager.  We -- again, we reported to a different

 6   entity so we could be a neutral part of the audit.

 7             MR. KENNEDY:  Okay.  I'll move to

 8   strike.

 9   BY MR. KENNEDY:

10        Q    At corporate headquarters in this period

11   of time from 2006 to 2009, who at corporate

12   headquarters -- let's go to CVS Pharmacy -- who at

13   CVS Pharmacy was responsible for suspicious order

14   monitoring?

15        A    From 2006 till 2009, I -- I don't know.

16        Q    And you understand the regulation that

17   we just read through, that came into existence in

18   1971.  You understand that?

19        A    Okay.

20        Q    So the period we're talking about in

21   2006 is some 35 years after that regulation came

22   into place.  Do you understand that?

23        A    Mm-hmm.

24        Q    Let's -- let's move to 2009, if we

Highly Confidential - Subject to Further Confidentiality Review

 1    could.

 2              Well, let me ask you this before we move

 3    to 2009.  In 2006, did anybody show you the letter

 4    that was received by CVS from the DEA outlining

 5    the duties and responsibilities of a distributor

 6    in relation to suspicious order monitoring?  Did

 7    anybody show you that letter in '06?

 8         A    I don't recall.

 9         Q    In 2007, the DEA sent two letters to

10    distributors, again outlining the duties and

11    responsibilities of a distributor in relation to

12    controlled substances in the distribution.  Did

13    anybody show you those letters in 2007?

14         A    I don't remember.

15         Q    Did they show those letters in 2008?

16         A    I don't remember.

17         Q    Were you shown those letters in 2009

18    when you took on this new position to review

19    the -- the controlled substance reports?

20              MR. BUSH:  Objection.

21              THE WITNESS:  I don't remember.

22    BY MR. KENNEDY:

23         Q    Now, our records indicate that -- that

24    this IRR report was not really delivered to -- to

```
 1   CVS until late 2008, December of 2008.

 2              Would you disagree with the timing of

 3   that?

 4              MR. BUSH:  Objection.

 5              You can go ahead and answer.

 6              THE WITNESS:  Okay.  I -- I can't agree

 7   or disagree.  I -- I don't know.

 8   BY MR. KENNEDY:

 9      Q    If that's true, then you wouldn't begin

10   to review the IRR narcotic reports until 2009.  Is

11   that consistent with your memory, 2009 is when you

12   began to review?

13      A    I -- I don't recall the exact year.

14      Q    Now, the IRR report that you were

15   reviewing, did that cover all controlled

16   substances being sold by CVS pharmacies?

17      A    I -- I believe it did, but I don't

18   remember.

19      Q    Well, were you doing it just for your

20   distribution center or just for a particular

21   region of distribution centers, or were you

22   reviewing --

23      A    Oh.

24      Q    -- the report for the entire country?
```

```
 1        A    Okay.  No, I was doing it for the

 2   country.

 3        Q    All right.  And were you also reviewing

 4   the PSE orders?

 5        A    Yes.

 6        Q    So you were reviewing both reports.

 7        A    Yes.

 8        Q    At that point in time when you began

 9   to -- to review this -- and I apologize if I've

10   asked you -- but we've come to this time frame of

11   the beginning of '09, at that point in time did

12   anybody sit you down and show you the Controlled

13   Substances Act or the regulation with respect to

14   suspicious orders that we looked at or any of the

15   DEA letters that had been sent out in '06 and '07?

16             MR. BUSH:  Objection.

17             THE WITNESS:  I don't -- I don't

18   remember any exact letters during that process.

19   BY MR. KENNEDY:

20        Q    Tell me about the IRR report.

21   Specifically what did it contain?  What was the

22   information in the report when you began to look

23   at it in '09?

24        A    And again going off memory, there was an
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    algorithm that would flag particular orders by

2    drug, and when an item would flag, we would view

3    it as an item of interest, an order of interest.

4         Q    And then you would do a review.

5         A    Do a review.

6         Q    Would you stop the order of interest at

7    the distribution center from being shipped prior

8    to your review?

9         A    Yes.

10        Q    So basically the algorithm would --

11   would create a score for each order, correct?

12        A    Yes.

13        Q    And if the score was above a certain

14   level, that would trigger a review, it would flag

15   the order for a review.

16        A    Mm-hmm.

17        Q    Was that the process?

18        A    Yes.

19        Q    And just looking at the controlled

20   substance IRR report, can we agree that daily

21   there would be hundreds of orders flagged

22   nationally for your review?

23        A    For the controlled substance?

24        Q    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A    Definitely not daily.  I -- I don't -- I
 2    don't recall hundreds flagging either.
 3          Q    Well, did the number of orders that were
 4    flagged, did that change over time or did it
 5    become greater in '09 and then greater in '10?
 6          A    If there was -- just -- just the system
 7    in general, it was steady.  If there was something
 8    that would come up that would cause more -- more
 9    items to generate when the IRR -- that would cause
10    the IRR to expand.
11               And when we're talking controls, cough
12    syrup is a good example, cough and cold season,
13    prometh would cause the IRR to grow because cough
14    syrup had codeine in it.  So there were situations
15    where the IRR would -- would be larger during
16    certain periods of time.
17               (Exhibit No. 139 was premarked for
18               identification.)
19    BY MR. KENNEDY:
20          Q    Let me show you Exhibit 139.
21          A    Okay.
22          Q    Is that a typical IRR?  Is that what
23    that report is?
24          A    This is an IRR.  I don't know if it's a
```

Highly Confidential - Subject to Further Confidentiality Review

 1   typical one.  This one seems pretty thick.

 2        Q    Well, this is 75 pages, isn't it?  Look

 3   at the Bates 775 to 850.  This is a 75-page IRR.

 4        A    Okay.

 5        Q    And you understand that this is for one

 6   day for one distribution center.  Correct?

 7        A    I'm looking at it, and it does appear to

 8   be that, yes.

 9        Q    How many distribution centers were there

10   in '09?

11        A    Maybe nine, ten, eleven.  Somewhere in

12   there.

13        Q    And about how -- take a look at -- pull

14   out any individual page and tell me how many

15   flagged orders of a controlled substance there are

16   on each page.

17        A    Well, I'm looking at the date, and again

18   it's November 30th.  You're in flu season, you're

19   in cough and cold season.  I don't know how many

20   of these were driven by codeine cough syrups.

21        Q    Sir, I asked you how many per page.

22   That was my question.

23        A    How many per page, it looks like five.

24        Q    And we've got 75 pages, 5 times 75 is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    close to 500, close to 400 -- 400, right?

 2         A    Yeah, 375 -- 150, 3 -- yep, 375.

 3         Q    And this is for one of ten distribution

 4    centers, and you were looking at IRRs for the

 5    entire country, all distribution centers, true?

 6         A    True.

 7         Q    In addition to an IRR -- and this is a

 8    daily report, right?

 9         A    Yes.

10         Q    And in addition to this daily report

11    that you were looking at beginning in '09, you

12    were also looking at the PSE report, true?

13         A    Yes.

14         Q    And the PSE report, would that be again

15    hundreds of -- of orders that you would also have

16    been looking at in addition to the hundreds of

17    orders of controlled substances?

18         A    I don't remember that many on a typical

19    IRR.

20         Q    This period of time, '09 and into '10

21    when you were looking at the IRR, were you the

22    only person nationally looking at the IRR every

23    single day for CVS?

24         A    For a period of time I was.
```

Highly Confidential - Subject to Further Confidentiality Review



16        Q    In addition to your responsibilities in

17   '09 and 2010 to review these IRRs daily, what were

18   your other job responsibilities?

19        A    Just to oversee my -- my area.

20        Q    The same job responsibilities that you

21   had had since 1999?

22        A    No, at this point we added an extra head

23   in Lumberton.  So there was a manager and

24   supervisor on each shift to pick up the slack in

Highly Confidential - Subject to Further Confidentiality Review

1    Lumberton.

2         Q     When was that person added?

3         A     I don't recall the exact date.

4         Q     2008, '07, '06, '05?  Give me the year.

5         A     I -- I would be guessing.  Maybe 2007,

6    2008.

7         Q     So you had a set of responsibilities at

8    your distribution center and for that region in

9    '07 and '08, and then this was added to your

10   responsibilities, this reviewing the PSE, daily

11   IRR and the controlled substances IRR, true?

12        A     Yes.

13        Q     You also had some responsibilities

14   during this period with the development of a

15   suspicious order monitoring policy, did you not?

16        A     I was asked for my opinions.  There were

17   policies being sent to me for feedback.  As for

18   actually writing, I don't recall actually writing

19   any policies.

20        Q     When you were reviewing the -- the IRR

21   controlled substances report in '09 and 2010,

22   could you tell the jury about the written policies

23   and procedures that were in place at CVS to guide

24   you in your responsibility.

```
 1                    MR. BUSH:  Objection.

 2                    You can answer.

 3                    THE WITNESS:  I -- I don't know.  I

 4     don't recall again the policies.  I had a process

 5     in place, and I followed the process.

 6     BY MR. KENNEDY:

 7          Q    No, I'm asking about what were the

 8     written policies and procedures provided you by

 9     CVS to guide you in your responsibility to review

10     the IRR.

11          A    I don't recall.

12          Q    Were there any?

13          A    I don't remember.

14          Q    How many -- how much time have you spent

15     preparing for this deposition today, this

16     testimony?

17          A    Oh, gosh.  A couple of days, off and on.

18          Q    During that preparation time, did

19     anybody ever show you any written policies and

20     procedures that were in place and utilized by you

21     in 2009 and 2010 to review this IRR report?

22                    MR. BUSH:  Objection.

23                    THE WITNESS:  I was -- I was shown

24     policies and procedures.  Which ones were -- were
```

1    reviewed with me at that time period, I don't

2    recall.

3    BY MR. KENNEDY:

4        Q    Vernazza -- Mr. Vernazza, do you know

5    who that is?

6        A    Yes.

7        Q    He indicated that he spoke with you or

8    met with you on four occasions to talk about

9    policies and procedures.

10           Do you remember that?

11       A    We had calls, yes.

12       Q    Did he inform you of any policies and

13   procedures that were in place in 2009 and 2010

14   with respect to what you were doing for CVS?

15           MR. BUSH:  Objection.

16           If that answer -- if that question calls

17   for any privileged communications with

18   Mr. Vernazza, then I instruct you not to answer.

19   You can answer with respect to the meetings or

20   calls that you had with Mr. Vernazza relating to

21   his testimony for CVS as a CVS representative, if

22   you can distinguish between the two.

23           THE WITNESS:  I -- I don't recall what

24   was privileged and what was on the record.

```
 1   BY MR. KENNEDY:

 2       Q    Well, let me ask you, when you spoke

 3   with him, did you say or did you tell him, Hey, I

 4   was -- I was looking at these IRRs in 2009 and

 5   '10, and these were the policies that -- that were

 6   provided to me to tell me what to do?  Did you

 7   tell him that?

 8            MR. BUSH:  Objection.  Same objection on

 9   privilege grounds.

10            THE WITNESS:  Yeah, I -- I -- I told him

11   the same thing I just told you, I don't recall

12   going off a particular policy.  I went off of the

13   process.

14   BY MR. KENNEDY:

15       Q    Well, did he tell you, Hey, we've been

16   looking and searching the documents at CVS, and we

17   found these policies that -- that were probably

18   guiding you in your job to review the IRR?  Did he

19   say that to you?

20            MR. BUSH:  Objection.  Privileged.

21            You can answer to the extent you had the

22   conversation with him about his testimony as a

23   corporate representative.

24            THE WITNESS:  Yeah.  Again, I don't
```

```
 1   remember what -- what we spoke about when -- in --

 2   in what kind of platform.

 3   BY MR. KENNEDY:

 4       Q    Let me -- let me kind of wrap it up.

 5   When you were given this responsibility by CVS on

 6   top of your other duties in 2009, do you have any

 7   memory of, number one, any policies and procedures

 8   to guide you or any specific training that you

 9   were provided in order for you to carry out

10   this -- this new job?

11           MR. BUSH:  Objection.  Compound.

12   BY MR. KENNEDY:

13       Q    Any memory.

14           MR. BUSH:  Objection.

15           THE WITNESS:  I -- I just don't remember

16   the details, and I don't want to -- I don't want

17   to assume that I remember under oath.  I just -- I

18   don't remember the details.

19   BY MR. KENNEDY:

20       Q    What is clear, though, from your memory

21   is that prior to 2009, prior to being given this

22   job that you told us was very important, you had

23   no prior experience reviewing suspicious order

24   monitorings pursuant to any type report.
```

```
 1                 MR. BUSH:  Objection.

 2   BY MR. KENNEDY:

 3        Q    Would that be true?

 4                 MR. BUSH:  Objection.

 5                 THE WITNESS:  Not in the process of what

 6   I was doing after I started it.

 7   BY MR. KENNEDY:

 8        Q    Correct.  You had never seen an IRR

 9   report prior to this, correct?

10        A    No.

11        Q    You had never seen a suspicious order

12   monitoring report prior to this, correct?

13        A    I don't recall.

14        Q    Who made the determination as to

15   specifically what you were to do with your review

16   of this IRR?  Who decided?

17        A    Frank Devlin was the person who assigned

18   it to me.

19        Q    And did he sit you down and say

20   specifically, This is what you are to do with

21   respect to each IRR?

22        A    I don't remember if I worked with Frank,

23   if I worked with Pam or if I worked with the

24   third-party consultants.  I just don't recall.  At
```

Highly Confidential - Subject to Further Confidentiality Review

1    one point or another I worked with all of them.

2          Q    And you don't know whether Mr. Devlin

3    had any experience with a -- an inventory report

4    for controlled substances, do you?

5          A    I have no idea, no.

6          Q    Did you create a daily report when you

7    began this process in 2009, a daily report as to

8    your activities as it related to your review of

9    the IRR?

10         A    If I remember correctly, I did not use a

11   daily report when I first started.  I actually

12   notated my information on the IRRs.

13         Q    Were you required to keep notations?

14         A    For -- for -- yes, for three years.

15         Q    You were required -- in 2009 when you

16   were given this, you were told to provide

17   documentation of -- of any of your reviews?

18         A    No, I just knew that anything that had

19   to do with pharmacy, we held for three years.

20         Q    And you were -- were you told you needed

21   to document every review?

22         A    I -- I don't recall if I was told or

23   not, but I -- I did put the notes on each review.

24         Q    The report would -- would flag what

```
1    might -- clearly might be hundreds of orders a

2    day.  Correct?

3         A    Sometimes it may only be five pages

4    total.  It wasn't always a hundred -- hundred

5    pages.

6         Q    All right.  But there were days when

7    there was a hundred pages and there were hundreds

8    of orders, right?

9         A    Yes.

10        Q    And in addition to that, you also had to

11   look at the PSE flagged orders, correct?

12        A    Yes.

13        Q    And you had to review it every single

14   day, true?

15        A    Yes.

16        Q    So you had to review it on the days when

17   there was 15 pages and you had to review it on the

18   days there were 50 pages, correct?

19        A    Yes.

20        Q    And you had to review it on the days

21   when there was a `hundred pages, true?

22        A    Yes.

23        Q    And you understood that -- I think you

24   told us you at least understood this was very
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   important, true?

 2        A    Yes.

 3        Q    When you would see a flagged order on a

 4   day when there were hundreds, tell us what you

 5   would do.

 6        A    I would go through and review whether or

 7   not there was a pattern of a particular drug that

 8   may be flagging that were wide.  And when they're

 9   as thick as this, I usually -- I usually find

10   that -- that the root cause would be, and I used

11   the prometh as an example, cough and cold season

12   could make this report go from five pages to a

13   book this thick.  So when those items flagged

14   validated cough and cold season, you validated

15   that's happening everywhere in the network.

16             And then I would go through and review

17   for all the other controlled drugs with an

18   emphasis on the drugs that I would review first,

19   being street drugs -- drugs that had street value,

20   I would go through and do those first, and then do

21   the rest of them.

22        Q    All right.  Number one, you said you

23   would look at all of these orders, even on the

24   days where there were hundreds, and you would look
```

1    for a pattern, correct?

2         A    Yes.

3         Q    In trying to identify a pattern, were

4    you looking within the four corners of the IRR

5    report?

6         A    I don't -- I don't know what you mean.

7         Q    Were you looking at materials other than

8    the report itself when you were identifying

9    patterns, the first thing you said you were doing?

10        A    Oh, I would use other resources.  If I

11   saw cough and cold, I would work with my field

12   partners to ensure that we do have a cough and

13   cold season in effect.

14        Q    So that's the pattern for cough and

15   cold.

16        A    Well, I'm using that as one example

17   because I remember that standing out in the fourth

18   quarter, which -- which is right around this --

19   this IRR that you gave me earlier.

20        Q    You have a flag on hydrocodone, which

21   you will see flagging of hydrocodones there.

22        A    Mm-hmm.

23        Q    Tell me what would you look at to

24   determine whether or not there was a pattern in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    relation to hydrocodone in 2009 and '10 when you

 2    were reviewing the IRR.

 3         A    I wouldn't use a pattern for

 4    hydrocodone.  Hydrocodone, street drugs are --

 5    they're -- they're not seasonal, so I would

 6    automatically freeze these.

 7         Q    Okay.  So, first of all, when you talk

 8    about pattern, you're looking for seasonal

 9    patterns, true?

10         A    I'm looking for drugs that have seasonal

11    patterns.

12         Q    Okay.  So hydrocodones, you would not be

13    looking for patterns, true?

14         A    No patterns for hydrocodone.

15         Q    Okay.  Tell me then when a hydrocodone

16    flags -- and "flagging" means it's potentially

17    suspicious, true?

18         A    Well, it's of interest.

19         Q    Of interest.  Well, and that's -- that's

20    potentially suspicious, that's of interest, same

21    thing?

22         A    Well, it becomes suspicious when we

23    don't root cause it.

24         Q    I said potentially suspicious.  Whatever
```

 1    is flagged is potentially suspicious, true?

 2         A    If it's -- I -- I mean, everything on

 3    this report is potentially suspicious.

 4         Q    All right.  But when you say an "order

 5    of interest," you -- what you mean is you're

 6    interested in reviewing it because it might be

 7    subject to diversion.

 8         A    Correct.

 9         Q    And diversion is what you're trying to

10    prevent, true?

11         A    Yes.

12         Q    And diversion is the -- is the movement

13    of narcotics from legitimate channels into

14    illegitimate channels.

15         A    Yes.

16         Q    And these illegitimate channels, you

17    understood at that point in time that's what was

18    killing a lot of Americans was illegitimate

19    channels of hydrocodones and other controlled

20    substances.

21              MR. BUSH:  Objection.

22              THE WITNESS:  I really didn't even look

23    at it that broadly.  I looked it as my job to make

24    sure every single drug in this report was

```
 1   legitimate, no matter what the drug was.  If it

 2   wasn't legitimate, I wasn't going to let it go.

 3   BY MR. KENNEDY:

 4        Q    Okay.  Let's go back to hydros then.

 5   You're not looking for patterns when you looked at

 6   the IRR in 2009 for hydrocodones.  What do you do

 7   with the hydrocodones that are flagged as of

 8   interest or potentially suspicious?

 9        A    Freeze the orders within the

10   distribution centers.  I would contact the field

11   VIPER analyst in those areas.  I would also

12   contact the regional loss prevention managers for

13   them to do an investigation.

14        Q    And you did that in 2009 up to October

15   of 2010 for every flagged hydrocodone order.  Is

16   that your testimony?

17        A    Yes.

18        Q    How long would these orders remain

19   freezed?

20        A    Until they were cleared by the field.

21        Q    How long would that take?

22        A    For the most part, a lot of the stores

23   were within range.  Sometimes the same day,

24   sometimes two days because they wanted to do more
```

1    investigation.

2          Q    And so it's -- it's your testimony that

3    for every hydrocodone order that was flagged in

4    the country, every day you would contact the field

5    VIPER analyst for them to do an investigation and

6    the regional loss prevention manager to do an

7    investigation.  Is that your testimony?

8          A    There could be times where one of those

9    guys weren't available, but one of them would be

10   involved.

11         Q    So if we were to take the testimony

12   of -- of those two folks, they would tell us that

13   every single day they were investigating

14   hydrocodone orders sent to them by you in 2009.

15   That's what they'll say?

16         A    I'm not sure if it would be every day,

17   but they would definitely tell you that I was

18   having them running around a lot.  They were --

19   they were very vocal.

20         Q    Hydrocodone orders were flagged every

21   single day in the country, were they not, every

22   day?

23              MR. BUSH:  Objection.

24              THE WITNESS:  I don't recall every day.

```
 1    I don't know.

 2    BY MR. KENNEDY:

 3         Q    For the, what is it, 5- to 7,000 CVS

 4    stores and pharmacies in 2009?

 5         A    Yeah, I -- I'm assuming that many, yes.

 6         Q    And it would be your testimony that you

 7    were contacting distribution centers to stop

 8    hydrocodone orders every single day?

 9              MR. BUSH:  Objection.

10              THE WITNESS:  I would contact them if it

11    was flagged.

12    BY MR. KENNEDY:

13         Q    And there was flagged hydrocodones every

14    day if you look at the IRRs, correct?

15              MR. BUSH:  Objection.

16              THE WITNESS:  I don't recall every day.

17    BY MR. KENNEDY:

18         Q    But these field VIPER analysts and

19    regional loss prevention managers should be

20    telling us that you were contacting them just

21    about every day to begin reviews and

22    investigations of hydrocodones.  That should be

23    their testimony, correct?

24         A    If it was in their area, yes.
```

```
 1          Q    And in 2009, tell me who -- give me the

 2    names of the different field VIPER analysts that

 3    you would have been contacting every day about

 4    hydrocodone flagged orders.

 5               MR. BUSH:  Objection.

 6               THE WITNESS:  Matt Listowsky.

 7    BY MR. KENNEDY:

 8          Q    And where -- where was he located?

 9          A    I believe he was in the Northeast.

10               Dennis Wilkinson.

11          Q    And where was he located?

12          A    He was in the Midwest.  There was a

13    Southeast gentleman, he had a British accent, I

14    cannot think of his name.  We've had a lot of

15    turnover since then.  I -- I don't remember.

16          Q    So according to your testimony, then in

17    2009 into 2010, you would have been contacting DCs

18    across the country to stop hydrocodone orders.

19          A    Yes.

20          Q    And that would be -- given what we know,

21    that would be -- you would be contacting DCs daily

22    in this country to stop hydrocodone orders because

23    they had been flagged, true?

24               MR. BUSH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  If they were flagged, I

 2   would contact them.

 3   BY MR. KENNEDY:

 4        Q    And say, Stop the orders.

 5        A    Freeze the order, yes.

 6        Q    And who would you contact at the DCs?

 7        A    I would contact the loss prevention

 8   manager and the pharmacy manager.

 9        Q    Of the DCs?

10        A    Yes.

11        Q    How would you contact them?

12        A    Phone calls.

13              MR. KENNEDY:  Give me Exhibit 135.

14              (Exhibit No. 135 was premarked for

15              identification.)

16   BY MR. KENNEDY:

17        Q    Exhibit 135, look at the front page of

18   that.  Do you see it's an e-mail from Terrence

19   Dugger?  Do you see Terrence Dugger?

20        A    Yes.

21        Q    That he's sending an e-mail.  Do you

22   know who Terrence Dugger is?

23        A    Yes.  He was the loss prevention manager

24   in Indianapolis at the time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    In Indianap- -- and that's a

 2   distribution center, true?

 3        A    Yes.

 4        Q    And this is dated August 26, 2010.  Do

 5   you see that?

 6        A    Yes.

 7        Q    He's sending this e-mail to Frank

 8   Devlin.  And was he your boss?

 9        A    Frank Devlin is, yes.

10        Q    And a copy of this to Sean Humphries.

11   Who is Sean Humphries?

12        A    He was my counterpart who oversaw

13   Indianapolis at the time.

14        Q    All right.  It says:  "Subject "DEA

15   Day 3."  Do you see that?

16        A    Yes.

17        Q    And this is an e-mail -- we'll go

18   through it -- this is an e-mail about a DEA

19   inspection that was going on, and Terrence Dugger

20   is reporting this to -- to your boss.  Do you see

21   that?

22             MR. BUSH:  Objection.

23             THE WITNESS:  Yes.

24   BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q    Look at bullet point -- the last bullet

2   point on page 10223.  Do you see that, it starts

3   with "I shared"?

4     A    Oh, yes.

5     Q    It starts with "I shared," that bottom

6   bullet point, and it states:  "I" -- and I think

7   that that's Terrence Dugger from the distribution

8   center.  "I shared with her" -- and that would be

9   the DEA inspector -- "I shared with her the

10  suspicious order monitoring report IRR, and she

11  asked how often I received it.  I told her daily

12  and weekly, but I have not received the file in a

13  few months as the report was being tweaked.  I

14  told her that it was monitored corporately by John

15  Mortelliti.  She asked what happens when he calls

16  regarding information on the report.  I told her

17  that I have never received a call regarding

18  information from the report."

19          Never received a call from you.  Is that

20  consistent with your memory?

21    A    I do remember terminating Terrence for

22  his performance.  But, no, this does not sound

23  familiar with my memory at all.

24    Q    Didn't you just tell us that you were

1    going through these IRRs, these hundreds of IRRs

2    every day, and then if a hydrocodone was flagged,

3    you were calling the DC to stop the order daily?

4         A    Could I take a minute to read this?

5         Q    Absolutely.

6              But, sir, please answer my question.

7    Didn't you just tell us that you reviewed the IRR

8    daily, and when hydrocodones were flagged, you

9    would call the DC that very day to stop the order?

10        A    Yes.

11        Q    And now we have a gentleman who says he

12   hasn't -- you never called him.  Is that what he

13   says?

14        A    I'm -- I'm going to read this.  I don't

15   know the context of the e-mail yet.

16        Q    All right.

17        A    (Peruses document.)

18        Q    Have you read it?

19        A    I did.

20        Q    All right.  Let's go to the second page

21   of that.

22        A    Okay.

23        Q    Now that you got a chance to read it,

24   and start with the sentence "She," and "she" would

```
 1   be the DEA?

 2              MR. BUSH:  Objection.

 3   BY MR. KENNEDY:

 4        Q    Do you agree that "she" is making

 5   reference to the DEA investigator on the second

 6   page?

 7        A    Okay.

 8              MR. BUSH:  Objection.

 9   BY MR. KENNEDY:

10        Q    The sentence that starts with "She

11   asked," now that you got a chance to read it -- so

12   let me ask you, "She asked what happens when he

13   calls regarding information on a report.  I told

14   her that I never received a call regarding

15   information from the report."

16              Did I read that right, now that you've

17   had a chance to review this?

18        A    Yeah, it's in here.

19        Q    Let me ask you, the IRR report itself --

20        A    Mm-hmm.

21        Q    -- you've reviewed tens of thousands of

22   these, have you not?

23        A    Tens of thousands reports or --

24        Q    Items on those reports.
```

```
 1        A    I -- I reviewed them all during that
 2   time period.

 3        Q    All right.  Tell me what conclusions
 4   from the IRR report itself can you draw as to
 5   whether or not an order is suspicious?

 6        A    We're talking about hydro?

 7        Q    Let's look at hydro.

 8             From the report itself, what conclusions
 9   can you draw, if any, from the information
10   contained in the report?

11        A    Okay.  Well, as for the report itself,
12   this -- this looks like the time period where data
13   was lost for three months.  We had a time period
14   where historical data fell off --

15        Q    I don't want to talk about that.  We
16   will talk about that in detail.

17             I just want to -- in a general sense,
18   when you would look at an IRR report --

19        A    Mm-hmm.

20        Q    -- you would have the score that would
21   be above a certain level so it would flag,
22   correct?

23        A    Yes.

24        Q    Generally, what other information on
```

Highly Confidential - Subject to Further Confidentiality Review

 1    that report, just the report itself, allowed you

 2    to or assist you in making the determination as to

 3    whether or not this order of interest is indeed

 4    suspicious?

 5        A    For hydro, I -- I went after all the

 6    hydro.  I went after all the cocktail drugs,

 7    street drugs.  I worked with DEA Agent Donna

 8    Walker.  She gave me a list of drugs to look out

 9    for for this particular program, and I posted it

10    on my wall.  It's still hanging there today.  And

11    I reviewed every single one of those drugs and

12    viewed them all as suspicious if they were on this

13    report.

14            MR. KENNEDY:  Okay.  I'm going to move

15    to strike.

16    BY MR. KENNEDY:

17        Q    You've got to listen carefully.

18            MR. BUSH:  Objection.

19            MR. KENNEDY:  He is not even close.

20    BY MR. KENNEDY:

21        Q    Listen very carefully --

22            MR. BUSH:  That's not true.  He answered

23    your question.  I'm sorry you don't like the

24    answer.  You can move to strike.  It's not -- the

```
 1    judge will decide.

 2              MR. KENNEDY:  The judge will decide.

 3    BY MR. KENNEDY:

 4         Q    But my question is real simple.  From

 5    the IRR report itself --

 6         A    Mm-hmm.

 7         Q    -- tell me what information -- other

 8    than the score, what information is there on that

 9    report that would assist you -- if any, would

10    assist you in determining whether or not that

11    order was suspicious.

12         A    If it flagged, it would be an item of

13    interest.

14         Q    Correct.  And we agree that there is no

15    other information that you would be able to

16    utilize on that report itself that would assist

17    you in your review and investigation of that

18    order.  True?

19         A    For hydrocodone, I would err on the side

20    of caution.  I also erred on the side of caution

21    for the street drugs.

22              MR. KENNEDY:  Okay.  I'm going to move

23    to strike.

24    BY MR. KENNEDY:
```

```
 1            Q    Listen very carefully.  What information

 2    is there on the IRR, other than the score, that

 3    you used and assisted you in determining whether

 4    or not the order was suspicious?

 5            MR. BUSH:  Objection.

 6            THE WITNESS:  I -- for -- depending on

 7    the drug, like in the e-mail you just gave me, it

 8    appears Tussionex.

 9    BY MR. KENNEDY:

10            Q    We're talking about hydrocodone.

11            A    For hydrocodone, if it's on there,

12    I'm -- I'm reviewing it as suspicious or --

13            Q    All right.  And what information in your

14    review -- what information on the IRR itself, if

15    any, would assist you in that review?

16            A    Nothing.  The fact that it's there.

17            Q    That's all I want.  Thank you.

18            When you would send or contact the field

19    VIPER analysts -- let's start with the field VIPER

20    analysts -- with a flagged potentially suspicious

21    order of hydrocodone, tell me specifically what

22    the field VIPER analysts would do in their review

23    of that order.

24            MR. BUSH:  Objection.
```

```
 1              THE WITNESS:  The VIPER analysts were

 2    the subject matter experts for exceptions.  So

 3    they would take that information.  How they went

 4    through their different reporting -- exception

 5    reporting, I wasn't there for it.  I know they

 6    used specific software reporting to -- to actually

 7    review what I would send them, but as for step by

 8    step, I'm not sure.

 9    BY MR. KENNEDY:

10         Q    You say that they used software in order

11    to evaluate an order of hydrocodone.  Is that your

12    testimony?

13         A    They used exception reporting and

14    whatever else they did.  I -- again, they were the

15    subject matter experts on -- on investigating.

16         Q    When you said they used exception

17    reporting, what is that?

18         A    We had a program VIPER in the field at

19    the time.

20         Q    And what else other than VIPER would

21    they use?

22         A    I don't know offhand.

23         Q    And we're talking about the time frame

24    of 2009 and 2010, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A     Yeah, I don't know.

2          Q     Have you ever heard of the term

3     "MicroStrategy"?

4          A     Yes.

5          Q     And can we agree that MicroStrategy was

6     not available in 2009 and 2010 to the VIPER

7     analysts?

8          A     I don't --

9                MR. BUSH:  Objection.

10               THE WITNESS:  I don't know.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
```

```
10          (Exhibit No. 142 was premarked for

11          identification.)

12  BY MR. KENNEDY:

13      Q    All right.  We'll look at VIPER.

14          Let me show you Exhibit 142.  Is that

15  your name up on the front page?

16      A    Yes.

17      Q    Henry Mortelliti, correct?

18      A    Yes.

19      Q    Go to page 6 of 9, if you would, please.

20  This is kind of a progress report, is it not?

21          MR. BUSH:  Objection.

22          THE WITNESS:  It's a year-end.

23  BY MR. KENNEDY:

24      Q    For 2012?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A    Yes.

 2         Q    Looking at page 6 of 9, go over on the

 3    right-hand column.  A couple of paragraphs down,

 4    does it say "April 2"?  Do you see that, April 2?

 5         A    Okay.

 6         Q    "April 2:  Meet deadline for

 7    understanding how to leverage WMS reporting,

 8    MicroStrategy and VIPER."

 9              MR. BUSH:  Objection.  I think you

10    misspoke, Eric.  It's met, not meet.  Small point,

11    but you didn't read it quite right.

12    BY MR. KENNEDY:

13         Q    Next sentence:  "Begin immediate use of

14    queries to analyze control drug and PSE order

15    data."  Do you see that?

16         A    I do.

17         Q    Do you have any evidence -- any memory,

18    any evidence that MicroStrategy existed and was

19    being utilized prior to 2012?

20         A    I -- I don't know.  I don't know if the

21    field was using it.  This -- this information

22    again was taken -- what we received on the IRR and

23    actually reviewing other -- other data, and a lot

24    of this information I got from the DEA Agent Donna
```

Highly Confidential - Subject to Further Confidentiality Review

 1   Walker on what we should be looking for.

 2        Q    I'm talking about 2009 right now up to

 3   October of '10.  That's what I'm talking about

 4   with respect to the use of MicroStrategy.

 5             Do you have any memory or any evidence

 6   that you can point us to that would -- that would

 7   indicate that MicroStrategy was in existence and

 8   being utilized in 2009 up to October of '10?

 9        A    I just don't recall using it.

10        Q    All right.  Now, you indicated that

11   these -- these folks in 2009 and '10, the field

12   VIPER analysts and the regional LP manager, that

13   they were utilizing VIPER to evaluate potentially

14   suspicious orders that you would refer to them,

15   true?

16        A    Yes.

17        Q    Let's -- let's look at VIPER.

18             MR. BUSH:  Is now a good time for a

19   break?  We've been going --

20             MR. KENNEDY:  Sure.

21             MR. BUSH:  -- for an hour and a half.

22             MR. KENNEDY:  Yeah.

23             THE VIDEOGRAPHER:  The time is 9:27 a.m.

24   We're going off the record.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  (Recess.)

 2                  THE VIDEOGRAPHER:  The time is 9:42 a.m.

 3      We're back on the record.

 4      BY MR. KENNEDY:

 5          Q    Now, Mr. Mortelliti, you -- you

 6      indicated that when you would refer a suspicious

 7      or potentially suspicious order of hydrocodone to

 8      the VIPER analysts and the LP prevention manager,

 9      that they would have available to them what was

10      known as the VIPER report, true?

11          A    Yes.

12          Q    And that's -- they would have had that

13      available to them in '09 and 2010; is that your

14      testimony?

15          A    Yes.

16                  (Exhibit No. 132 was premarked for

17                  identification.)

18      BY MR. KENNEDY:
```

19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
```

11          MR. BUSH:  Objection.

12   BY MR. KENNEDY:

13          Q    The LP analysts -- excuse me, the VIPER

14   analysts and the LP prevention manager who you

15   would refer investigation to, who did they work

16   for?  Who was their employer, what company?

17          A    The VIPER analysts in the field reported

18   to, it would be, the loss prevention area

19   directors.

20          Q    And who would they be?

21          A    In 2009?

22          Q    Yes.

23          A    Chris Knight, Gary Loreck, David Henry,

24   Jim Berry, Tim Curry, and I believe Paul Lehman

Highly Confidential - Subject to Further Confidentiality Review

 1    were the area directors.  There could be a couple

 2    that I missed by a couple of years.  We had some

 3    turnover.

 4         Q    What policies -- written policies and

 5    procedures were in place in 2009 and 2010 telling

 6    the -- the VIPER analysts and the LP prevention

 7    manager what they were to do with respect to

 8    investigating suspicious orders?

 9         A    I don't know.

10         Q    Who trained the VIPER analysts and the

11    LP prevention manager with respect to their

12    responsibilities to investigate suspicious orders?

13         A    They -- they had their own field

14    training.  I don't know who the trainers were.

15    But -- no, I don't know.

16         Q    What audit policy was in place to -- to

17    audit and monitor what the VIPER analysts and the

18    LP prevention manager were doing with respect to

19    their investigation of suspicious orders?

20         A    I don't know what their -- what their

21    process looked like.

22         Q    And in '09 and 2010, what -- what audit

23    procedure was in place to -- to audit what you

24    were doing with respect to the IRR reports?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I -- I don't recall if -- I don't recall

 2   an audit.

 3        Q    Do you remember an audit ever being done

 4   to monitor your performance with respect to what

 5   you were doing with the IRRs?

 6        A    We had meetings with outside counsel,

 7   Terry Woodworth.

 8        Q    In 2009?

 9        A    I -- I don't remember the dates.

10        Q    I'm talking about a formal audit of what

11   you were doing with respect to IRRs, was that ever

12   done in 2009 and '10?

13        A    I don't recall the dates.  I did have a

14   sit-down with our corporate attorneys at one

15   point, and again, I don't recall the dates.  I

16   know Terry Woodworth was our -- our -- gosh, I

17   don't know, DEA consultant maybe, pharmacy

18   consultant.  I'm not sure.  But they reviewed my

19   work.  But as for something written down, I -- I

20   don't recall seeing anything like that.

21        Q    The VIPER analysts and the LP prevention

22   manager, would they be required to create records

23   of any investigation that they performed in

24   relation to hydrocodones?
```

```
 1          A    I don't know.

 2          Q    You don't know?

 3          A    No.

 4          Q    Can we agree that any investigation or

 5    review that they did in 2009, '10, should be part

 6    of an IRR recap report?

 7               MR. BUSH:  Objection.

 8               THE WITNESS:  When I was doing the

 9    reports, I would write down on the IRR itself

10    time, date, who I spoke to, when they called me

11    back, and when the order was released, who I froze

12    the order with.

13               MR. KENNEDY:  I'm going to move to

14    strike.

15    BY MR. KENNEDY:

16          Q    Listen to my question, please.

17               I asked you, and I'll ask you again, can

18    we agree that any review or investigation that a

19    VIPER analyst or an LP prevention manager did with

20    respect to a potentially suspicious hydrocodone

21    order would be recorded in the IRR recap report?

22               MR. BUSH:  Objection.  And his answer

23    before was perfectly responsive to that question.

24               THE WITNESS:  Yeah, my answer is the
```

```
 1    same.  I wrote down the information, and they got

 2    back to me on the report.

 3    BY MR. KENNEDY:

 4         Q    Oh, so you would record not just what

 5    you did, you would record what they told you they

 6    did?

 7         A    Not what they did, no, I didn't record

 8    that.  I record when they told me it was okay to

 9    release the order.

10         Q    So you did not record anywhere what the

11    VIPER analyst or LP prevention manager did to

12    review an order, correct?

13         A    Not -- not all the steps.  No.

14         Q    And so my question again for the third

15    time, and listen very carefully, what they did do,

16    whatever review or investigation the VIPER analyst

17    did or the LP prevention manager did with respect

18    to a hydrocodone order should be recorded in the

19    IRR recap report.

20              MR. BUSH:  Objection.

21    BY MR. KENNEDY:

22         Q    True?

23              MR. BUSH:  Objection.

24              THE WITNESS:  I don't know if it should
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   be recorded there.  They may have it on file for

 2   themselves.  They didn't report to me.

 3   BY MR. KENNEDY:

 4        Q    All right.  But it should be recorded

 5   either by them in their own recordkeeping,

 6   correct?

 7        A    I don't know.

 8             MR. BUSH:  Objection.

 9   BY MR. KENNEDY:

10        Q    Or it should be on the IRR recap report,

11   correct?

12             MR. BUSH:  Objection.

13             THE WITNESS:  I only wrote what they

14   told me:  To release -- to release the orders.

15   BY MR. KENNEDY:

16        Q    We talked about VIPER.  Specifically,

17   can you name for us any other reports other than

18   VIPER that would have been utilized in 2009 and

19   '10 by the VIPER analyst or the LP prevention

20   manager in reviewing a hydrocodone suspicious

21   order?

22        A    I don't remember the reports.

23        Q    And with respect to hydrocodone, would I

24   be correct that you reviewed no reports, you just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   simply referred it to the LP prevention manager or

 2   the VIPER analyst?

 3              MR. BUSH:  Objection.

 4              THE WITNESS:  Aside from the store order

 5   history of hydrocodone, which I had historical

 6   data on, the store reports themselves I didn't

 7   have access to.  So...

 8   BY MR. KENNEDY:

 9       Q    And the historical data, you're talking

10   about what was in the IRR?

11       A    Yes.

12       Q    So in your position then from '09 to

13   '10, with respect to hydrocodones, you did nothing

14   more than take a flagged hydrocodone order and

15   refer it elsewhere to be reviewed, correct?

16              MR. BUSH:  Objection.

17   BY MR. KENNEDY:

18       Q    That is all you did with hydrocodones

19   that were flagging as potentially suspicious?

20              MR. BUSH:  Objection.  Misstates the

21   record.

22              THE WITNESS:  If there were also other

23   drugs that were flagged for that store, especially

24   if it was a cocktail, I would pass on that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   information as well.
 2   BY MR. KENNEDY:
 3        Q    But you did no review -- let's be just
 4   very clear.  You did no review and investigation
 5   yourself on flagged orders of hydrocodone,
 6   correct?
 7        A    That -- that was out of my area.  No.
 8   It was the field's responsibility.
 9        Q    So you didn't do an investigation,
10   correct?
11        A    For all the stores in the country?
12        Q    Correct, for hydrocodones.
13        A    No, the field did their -- their stores,
14   their own stores.
15        Q    You know of no policies and procedures
16   in place that in any way guided you as to your
17   responsibilities in '09 and '10, correct?
18             MR. BUSH:  Objection.
19             THE WITNESS:  I don't recall any
20   specific policy and procedure.  I read tons of
21   documents year end and year out.
22   BY MR. KENNEDY:
23        Q    As you sit here today, you can't
24   identify any single policy and procedure that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    existed in '09 and '10 to guide you in your job,

 2    true?

 3              MR. BUSH:  Objection.

 4    BY MR. KENNEDY:

 5         Q    Is that true?

 6         A    I don't recall any procedure.

 7         Q    You don't recall a single formal audit

 8    of you with respect to your duties and

 9    responsibilities and how you were carrying out

10    your job in '09 and '10; is that correct?

11         A    Formal audits with our corporate

12    attorney and Terry Woodworth, they reviewed my --

13    my information.  I didn't get any recommended

14    changes or anything.

15         Q    And can you tell me, sir, how many

16    suspicious orders of controlled substances were

17    reported to the DEA in '09 and '10 while you were

18    monitoring the IRR?  How many?

19         A    I don't recall.  Frank Devlin and Pam

20    Hinkle were the only two that were permitted to

21    speak with DEA.

22         Q    But you certainly would be aware of it,

23    right?

24         A    I -- I did my -- my job.  I did follow
```

```
 1    the procedure, the process.  If something was

 2    investigated, if we held an audit -- an order, I

 3    reported that up to them, they would follow up on

 4    their end, and then I moved on to the next phase.

 5    Everyone had their -- their position with the --

 6    with the SOM project.

 7        Q    Did you review suspicious orders in '09

 8    and '10, and -- and take a look at the cash

 9    percentages of purchases at particular pharmacies?

10    Did you do that?

11             MR. BUSH:  Objection.

12             THE WITNESS:  '09 and '10?  I don't

13    recall.

14    BY MR. KENNEDY:

15        Q    Who is Cricket Osment?

16        A    She was a VIPER analyst at the time.

17        Q    She's one of the people that you would

18    refer hydrocodone orders to to investigate?

19        A    She would have been, yes.

20        Q    What would happen when you were sick or

21    went on vacation in '09 and 2010, who would take

22    your job over?

23        A    Well, I had perfect attendance, but if I

24    had vacation, I would have Pam Hinkle take over
```

Highly Confidential - Subject to Further Confidentiality Review

1    the process.

2        Q    Let's move into the fall -- the fall of

3    2010.  There were -- things changed in the fall of

4    2010, did they not?

5        A    Yeah -- yes.

6        Q    The fall of -- of 2010, the first

7    written suspicious order monitoring policy came

8    into place, did it not?

9            MR. BUSH:  Objection.

10           THE WITNESS:  I don't recall dates.

11   There were several documents.

12   BY MR. KENNEDY:

13       Q    One second.

14           You don't recall that in October of --

15   of 2010, you stopped being the single person in

16   the country responsible for looking at all IRRs?

17       A    There was a --

18           MR. BUSH:  Objection.

19           THE WITNESS:  -- a brief time where we

20   were looking to remove it from my plate.

21   BY MR. KENNEDY:

22       Q    Does that sound about right, October of

23   2010, it got removed from your plate?

24           MR. BUSH:  Objection.

```
 1                 THE WITNESS:  I don't recall the exact

 2      time.

 3      BY MR. KENNEDY:

 4           Q    Well, it went from your plate to the

 5      plate of each of the 11 DCs, correct?

 6                 MR. BUSH:  Objection.

 7                 THE WITNESS:  That was the goal.  I -- I

 8      don't recall -- I don't recall that actually

 9      happening, though.

10      BY MR. KENNEDY:

11           Q    All right.  Let me ask you this:  Didn't

12      you represent to the DEA in August of -- of 2010

13      that that's exactly what was going to happen

14      within the next 30 days?  Wasn't that the express

15      representation to the DEA?

16                 MR. BUSH:  Objection.

17                 THE WITNESS:  I did present to DEA Agent

18      Donna Walker -- whew -- I don't recall the slides

19      off the top of my head, but I talked -- if -- if

20      I'm not mistaken, I believe there was -- there was

21      what we were doing and -- and what the plan may

22      have been or what we were doing because of -- or

23      what we planned on doing, but we didn't.  I don't

24      remember how that went down.  But I can tell you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if Donna Walker -- Walker was in my building, she

 2    was going to -- she was going to know the truth.

 3    So...

 4    BY MR. KENNEDY:

 5         Q    Are you saying Donna Walker?

 6         A    Donna Walker, yes.

 7         Q    Okay.  All right.

 8              Why didn't it go out to the distribution

 9    centers in October of 2010?  That was your -- your

10    written policy and procedure that was to be

11    implemented in October of 2010, to take your job

12    and send it to the distribution centers so that

13    they each could look at their own IRR.  Why did

14    that not happen?

15              MR. BUSH:  Objection.

16              THE WITNESS:  The IRR you provided in

17    November is showing that that's the time period

18    that we had lost historical data.  So I was the

19    only one that had that historical data in previous

20    IRRs.  I can't remember all the details, but I

21    couldn't turn over the program at the time because

22    no one else would be able to do it correctly.

23              (Exhibit No. 9 was premarked for

24              identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  MR. KENNEDY:  All right.

2                  Exhibit 9.

3                  (Exhibit No. 28 was premarked for

4                  identification.)

5     BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

15        Q     All right.  Let's take a look at that.

16              (Exhibit No. 48 was premarked for

17              identification.)

18   BY MR. KENNEDY:

19        Q     Let me show you Exhibit 48.

20              Now, put this in context.  The first

21   letter comes from the DEA to all distributors in

22   2006 outlining the responsibilities of a

23   distributor with respect to controlled substances.

24   2006, that's the first letter from the DEA,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   correct?

 2            MR. BUSH:  Objection.

 3            THE WITNESS:  Again, if you say it is.

 4   I -- I don't -- I don't remember.

 5   BY MR. KENNEDY:

 6       Q    Looking at this chart, do you -- do you

 7   recall, sir, that -- so you get the first DEA

 8   letter in '06, and then about a year and a half

 9   later on 12/1/07, CVS for the first time creates

10   standard operating procedures for controlled

11   substances.

12            Do you remember that in '07, sir?

13            MR. BUSH:  Objection.

14            THE WITNESS:  I do not.

15   BY MR. KENNEDY:

16       Q    Do you remember in that first version of

17   the standard operating procedures with respect to

18   suspicious order monitoring, it's stated "being

19   developed and written."

20            You remember that, don't you?

21            MR. BUSH:  Objection.

22            THE WITNESS:  I do not.

23   BY MR. KENNEDY:

24       Q    You told us there were various
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   revisions.  The second revision of the standard

 2   operating procedures at CVS, that suspicious order

 3   monitoring section again stated "being developed

 4   and written."  Do you remember that when it came

 5   across your desk?

 6             MR. BUSH:  Objection.

 7             THE WITNESS:  I do not.

 8   BY MR. KENNEDY:

 9        Q    The third version of the standard

10   operating procedures at CVS were put into effect

11   in 1/28/10.  When that came across your desk, do

12   you remember for suspicious order monitoring it

13   again stated "being developed and written"?  Do

14   you recall that?

15             MR. BUSH:  Objection.

16             THE WITNESS:  I don't.

17   BY MR. KENNEDY:

18        Q    And at this point in time, you're the

19   one reviewing the IRR reports to monitor

20   suspicious orders, correct?

21        A    Yes.

22        Q    And you don't remember that being stated

23   in the -- in the written policies, "being

24   developed and written"?
```

```
 1                MR. BUSH:  Objection.

 2                THE WITNESS:  There were policies out

 3   there that were constantly being updated.  I -- I

 4   don't recall nothing being out there, but I don't

 5   recall -- I don't recall three years of being

 6   developed.

 7   BY MR. KENNEDY:

 8        Q    Well, let's look to April 30, 2010.

 9                The standard operating procedures are

10   again revised for controlled substances, and in

11   the section for suspicious order monitoring, it

12   again states "being developed and written."

13                When that came across your desk, do you

14   remember that?

15                MR. BUSH:  Objection.

16                THE WITNESS:  I don't even know who this

17   would have came from.

18   BY MR. KENNEDY:

19        Q    Sir, this period that I'm talking about,

20   this -- this '07 to '10, this three-year period,

21   you -- you realize we've gone through that CVS

22   would have gotten two more letters from the DEA

23   outlining their responsibilities with respect to

24   controlled substances.
```

 1              Do you realize that?

 2              MR. BUSH:  Objection.

 3      BY MR. KENNEDY:

 4          Q    Two more letters --

 5              MR. BUSH:  Objection.

 6      BY MR. KENNEDY:

 7          Q    -- during this period.

 8              MR. BUSH:  Objection.

 9              THE WITNESS:  During our DEA audit in

10      Lumberton particularly, Donna Walker walked our

11      process.  She reviewed what we had.  She got the

12      information from our pharmacy manager.  She was

13      pleased with what we had.  I don't recall what we

14      had.  I don't recall what we -- what the pharmacy

15      manager gave her.  I showed her our SOM program.

16      She was -- she was pleased with that.  Donna

17      Walker came in early 2005, '06 maybe, and did a

18      nine-month audit in our building.

19      BY MR. KENNEDY:

20          Q    I'm not talking about '05 and '06.  I'm

21      talking about a period of time after that.  I'm

22      talking about a period of time where the DEA has

23      sent CVS three separate letters outlining their

24      duties and responsibilities with suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1   monitoring.  And during that period, your SOPs

2   with respect to suspicious order monitoring on

3   four different occasions stated "being developed

4   and written."

5           And you saw that every single time it

6   came across your desk, did you not, sir?

7           MR. BUSH:  Objection.

8           THE WITNESS:  I don't recall that.

9   BY MR. KENNEDY:

10      Q    And you knew, sir, all this interaction

11  with the DEA, you knew that the lack of any, any

12  written suspicious order monitoring policies, you

13  knew and you understood that that was a big issue

14  with the DEA, did you not, sir?

15          MR. BUSH:  Objection.

16  BY MR. KENNEDY:

17      Q    Did you not understand that?

18          MR. BUSH:  Objection.

19          THE WITNESS:  I was very proud of where

20  we were with the DEA.  She walked the process.

21  BY MR. KENNEDY:

22      Q    Did you understand that your failure --

23  CVS's failure to have any written policies in four

24  versions, you knew and you understood that that

```
 1   was a big issue with the DEA, sir, did you not?

 2        A    No.

 3             MR. BUSH:  Objection.

 4             THE WITNESS:  No, I -- I -- we were

 5   audited, our policies were audited.  She saw our

 6   SOM.

 7   BY MR. KENNEDY:

 8        Q    Your policies were audited for the first

 9   time in August 25th of 2010, sir.  Do you remember

10   that?

11        A    Not --

12             MR. BUSH:  Objection.

13             THE WITNESS:  -- off the top of my head,

14   no.

15   BY MR. KENNEDY:

16        Q    And do you remember within 48 hours, you

17   put together written policies for the very first

18   time in the history of CVS, sir, in August of

19   2010, for the very first time?

20             MR. BUSH:  Objection.

21             THE WITNESS:  I don't recall that.

22   BY MR. KENNEDY:

23        Q    And you were highly concerned, sir,

24   because you knew this was a big issue with the
```

Highly Confidential - Subject to Further Confidentiality Review

1   DEA, the lack of policies, did you not, sir?

2              MR. BUSH:  Objection.

3              THE WITNESS:  I don't recall that.

4              (Exhibit No. 49 was marked for

5              identification.)

6   BY MR. KENNEDY:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11          Q    Let's look at 16.  This document is from

12    10/8/2010.  All right?  Is it titled on the first

13    page "Business Idea Description"?  Do you see

14    that?

15          A    I do.

16          Q    And it says:  "Submit to

17    IS-Business-Idea mailbox."  What is IS?

18          A    They are the group in corporate that can

19    write a query for your programs.

20          Q    And this is requested for on behalf of

21    John Mortelliti.  Is that you?

22          A    Yes.

23          Q    And your department at that point in

24    time was loss prevention, true?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A    Yes.

 2          Q    And the title is "Control Drug IRR

 3   Update."  True?

 4          A    Yes.

 5          Q    And that is what we've been talking

 6   about, the IRR report that's kind of foundational

 7   to your monitoring program, true?

 8          A    Yes.

 9          Q    When was the last time you reviewed this

10   document?

11          A    I don't -- I don't know.  I --

12          Q    It says:  "Summary Description and

13   Objectives:  DEA expects CVS to prevent suspicious

14   orders from being filled out of our DCs."

15               Did I read that right?

16          A    You did.

17          Q    And that would be true, that's what the

18   DEA expects, does it not?

19          A    Yep.

20          Q    Next sentence:  "The current IRR does

21   not provide the proper information to meet the

22   DEA's needs."

23               Did I read that right?

24          A    You read it correctly.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q     Next sentence, does it state:  "We need

2    control drugs to be monitored by 'active

3    ingredient.'  Currently the control drugs are

4    monitored by item.  The IRR loses all order

5    history when the info on the item changes causing

6    CVS to be noncompliant with DEA expectations."

7                 Did I read that correct?

8           A     You read it correctly.

9           Q     Were those your words, sir?  Were those

10   your words?

11          A     That's what I put in here.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1    if you were noncompliant on this date, can we

2    agree that you and CVS would have been

3    noncompliant all the way back from the beginning

4    with your IRR in '09 when you started reviewing?

5              MR. BUSH:  Objection.

6    BY MR. KENNEDY:

7         Q    Can we agree?

8              MR. BUSH:  Objection.

9              THE WITNESS:  No, we were compliant.  I

10   worded this to get it pushed through the system.

11   BY MR. KENNEDY:

12        Q    Sir, the IRR with the way it was

13   structured, monitoring by active ingredient, that

14   was true from the very beginning.  True?

15             MR. BUSH:  Objection.  Misstates the

16   document and the testimony.

17   BY MR. KENNEDY:

18        Q    Is that true?

19             MR. BUSH:  Objection.

20   BY MR. KENNEDY:

21        Q    Excuse me.  Let me restate that.

22             The monitoring of controlled substances

23   was not being monitored by active ingredient since

24   the beginning of the IRR's creation in '09,

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17       Q   You said beginning -- you got a

18   half-inch report, and only about five total items

19   have historical data.  Five on a half-inch thick

20   report.  Did that alarm you?

21       A   It caused a lot of work for me.  I had

22   to go back and review previous IRRs and fill in

23   the blanks.

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

9      Q    And on this report every single -- every

10  single item is missing three to four except for

11  one.  Were you alarmed by that?

12           MR. BUSH:  Objection.

13           THE WITNESS:  I was alarmed about how

14  much work needed to be done to get the data.

15  BY MR. KENNEDY:

16      Q    Well, you were alarmed enough to fill

17  out a report to say, "CVS is noncompliant with DEA

18  expectations at this point."  True, sir?

19           MR. BUSH:  Objection.

20  BY MR. KENNEDY:

21      Q    What's based upon what we're reading

22  here, correct?

23           MR. BUSH:  Objection.

24           THE WITNESS:  That's -- that's -- yes, I

1   wrote it like that, like I said, because I had to

2   go back to all previous reports and manually fill

3   in all the data to do the IRR.

Highly Confidential - Subject to Further Confidentiality Review



```
 1    myself to get friendly with Gary Misiaszek, hoping

 2    he would push my -- my request through so I could

 3    get all the data put back onto the IRR and ease

 4    some of the workload I had.

 5         Q    What was your common sense approach?

 6         A    There was no common sense approach.  I

 7    was trying to be funny with him, trying to be

 8    friendly.  I manually took all the historical data

 9    from previous IRRs and filled in the blanks for

10    all the historical data.

11         Q    You were trying to do what a computer

12    and six algorithms were doing, right?

13         A    No, I was copying, and I had people

14    helping me.

15         Q    And what you were trying to do was fill

16    in historical data and do what a computer and six

17    algorithms were doing.

18         A    By filling in the historical data?

19         Q    Yes.

20         A    I guess the printer would have printed

21    it.

22         Q    And then what would you do with it when

23    you got it?

24         A    Review it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q    And what would you do, sir, when you

2     would review it?  What algorithms or mathematical

3     formulas were you applying that the algorithm had

4     previously been providing?

5               MR. BUSH:  Objection.

6               THE WITNESS:  Oh, okay.  Actually -- I

7     took the data from previous LAGs, filled it in,

8     and erred on the side of caution.  If -- if they

9     were over the trend, I just automatically

10    forwarded them out for investigation.  I froze

11    them.

12    BY MR. KENNEDY:

13         Q    The trending, before you did this with

14    common sense, was being done by the algorithms,

15    correct?

16              MR. BUSH:  Objection.

17              THE WITNESS:  But I -- I had that

18    information.  It was printed on previous IRRs.

19    Yes.

20              (Exhibit No. 24 was premarked for

21              identification.)

22    BY MR. KENNEDY:

23         Q    Let's go to Exhibit 24.

24              Start this one at the top.  This is an
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21        Q     "You may want to forward it to Dean."
22              Then, "Dean, there is a rewrite we are
23   trying to get approved for the control drug IRR.
24   The current report shows control drugs by item
```

Highly Confidential - Subject to Further Confidentiality Review

1    instead of active ingredient (such as PSE).  We

2    thought this would be a great idea at the time,

3    but what we found was that the system cannot match

4    historical data to an item if the manufacturer

5    changes the name of the item (Todd can forward you

6    the e-mail).  Example:  Hydro 5 mg can be changed

7    to hydro mg 5.  Same item, just put the 5 in front

8    of the mg.  The system cannot match this item

9    because of the change, and therefore loses

10   historical data."

11            Sir, was that simple of a change that

12   would cause you to lose historical data, right?

13       A    Yes.

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6      Q    Let's go down to test number 2 run on

7   each order of a controlled substance.  Test

8   number 2 of this computer algorithm says "Gives

9   the number of standard deviations the current

10  monthly total lies from the projected monthly

11  total based on historic ordering behavior."

12          And if you're missing four of six months

13  of historical data, whatever test number 2 spits

14  out, that's going to be inaccurate, true?

15          MR. BUSH:  Objection.

16          THE WITNESS:  It -- it will cause a lot

17  more flags.

18  BY MR. KENNEDY:

19      Q    It's going to be inaccurate, true?

20          MR. BUSH:  Objection.

21          THE WITNESS:  Yes.

22  BY MR. KENNEDY:

23      Q    Let's go down to number 4.  Test

24  number 4 of each order:  "Indicator:  Detects for

1   an increasing trend in ordering behavior."  If it

2   doesn't have four out of six months for the

3   historical data, it cannot evaluate trends, true?

4        A    It would -- it was -- the missing data

5   was coming up as zeros.

6        Q    Correct.

7        A    Right.

8        Q    So it's not going to be able to

9   accurately evaluate with this algorithm or this

10  test trending, true?

11       A    It would flag a lot more.

12       Q    Yeah, it's not going to be accurate.

13       A    No.

14       Q    The next test:  "Indicator:  Determines

15  if the GNC has been ordered for two or more months

16  prior to the current ordering date."  If it's got

17  zeroes in LAG 1 and 2 and 3 and 4, it's not going

18  to be able to accurately make that determination,

19  correct?

20       A    No.

21       Q    The next test that it's going to run,

22  this algorithm computer and the IRR determines if

23  the amount ordered for the GNC is less than or

24  equal to the six-month maximum.  Well, if it's

Highly Confidential - Subject to Further Confidentiality Review

1    missing data, historical data in this six-month

2    period, it's not going to be accurate when running

3    that test either, is it?

4          A     No.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15          (Exhibit No. 22 was premarked for

16          identification.)

17   BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          (Exhibit No. 17 was premarked for

21          identification.)

22    BY MR. KENNEDY:

23

24



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 9       Q    All right.  Well, let's look.  They

10    realized you're compliant.  Let's see what they

11    realized.  Let's go to Exhibit 18A.

12            It's now April 29th of 2011, and that's

13    about eight months after you identified this

14    problem with the IRR, correct?

15       A    There was no problem with the IRR.  I

16    wanted it changed to active ingredient instead of

17    by drug.

18       Q    And it's been eight months since you

19    wanted to have that done ASAP, true?

20       A    Yes.

21       Q    And now Gary, who you have identified

22    as -- he's somebody who's involved in IT, he makes

23    IT type changes, right?

24       A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    He's sending an e-mail out, and your

 2    boss, Frank Devlin, is included in -- in who he's

 3    sending this to, right?

 4          A    Yes.

 5          Q    And that's April 29th, 2011, true?

 6          A    Yes.

 7          Q    And "Attachments" is the "2011-04-28

 8    Logistics Business Support Requests," true?

 9          A    Yes.

10          Q    And it says:  "Good afternoon, All:

11    Attached you'll find the most current listing of

12    IT Business Support Request in the CVS IT

13    Logistics Team work queue."

14               True?

15          A    Yes.

16          Q    And that's the listing of things that

17    got to be done.  Yes?

18               MR. BUSH:  Objection.

19               THE WITNESS:  It's a listing of things

20    that we want to get done.

21    BY MR. KENNEDY:

22          Q    Right.  And that's when you sent your

23    request eight months earlier to have a change done

24    with respect to active ingredient, historical
```

1    data, because, at least in your words, on that day

2    you were noncompliant, right?

3         A    We were compliant, but I did write it

4    up that way to try to get it pushed through

5    quicker.

6         Q    Well, let's look at eight months later

7    and see what Frank Devlin, your boss, says.

8              Go to the next page, please, where we

9    have a -- a longer chart, if you would.

10             There is a column that says "Tasks."  Do

11   you see that column?

12        A    Yes.

13        Q    And the task that they're addressing is

14   "Revisions to IRR/SOM System."  True?

15        A    Yes.

16        Q    And then two over, it says "Business

17   Lead," Frank Devlin, and that would mean Frank

18   Devlin, your boss, is now responsible for this --

19   this revision.  It's his task.

20             MR. BUSH:  Objection.

21   BY MR. KENNEDY:

22        Q    Right?

23             MR. BUSH:  Objection.

24   BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q    Or is it your task?

 2          A    I mean --

 3               MR. BUSH:  Objection.

 4               THE WITNESS:  I don't recall now who --

 5   BY MR. KENNEDY:

 6          Q    Well, the next column over -- and again,

 7   this is April 29 of 2011, eight months after you

 8   filled out the original form, and under

 9   "Description / Objectives," does it say, April of

10   2011, "DEA expects CVS to prevent suspicious

11   orders from being filled out of our DCs.  The

12   current IRR does not provide the proper

13   information to meet the DEA's needs.  We need

14   control drugs to be monitored by 'active

15   ingredient.'  Currently the control drugs are

16   monitored by item.  The IRR loses all order

17   history when the info on the item changes causing

18   CVS to be noncompliant with DEA expectations."

19               Is that the statement still eight months

20   later, sir?  In April of 2011, is that the

21   statement?

22               MR. BUSH:  Objection.

23               THE WITNESS:  That's --

24   BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q    Did I read that right?

2        A    That's the statement.

3             MR. BUSH:  Did he -- did he read it

4    right?  That's what he asked.

5             THE WITNESS:  Yes.

6    BY MR. KENNEDY:

7        Q    "Priority," next column, it says,

8    "High."  You agree with that, don't you?

9        A    Because of the additional work, yes.

10       Q    And you said ASAP eight months earlier,

11   did you not?

12       A    I did.

13       Q    Where -- does it say here,

14   "Objectives" -- does it say we need to do this

15   ASAP because it's too much work for

16   Mr. Mortelliti?  Does it say that anywhere?

17       A    No, I wouldn't have got that through if

18   I worded it like that.

19       Q    Right.  Well, again, you weren't --

20   again, it wasn't your policy, wasn't your practice

21   to write things down that you -- that you believed

22   were untrue, was it, sir?

23       A    I wouldn't be here 25 years if I did.

24       Q    All right.  And it indicates "As of

Highly Confidential - Subject to Further Confidentiality Review

1    Date," 4/29/11 -- so this is the status as of that

2    date, is it not?

3         A    According to this paper.

4         Q    And it says "Start."  Do you see

5    "Start" -- the "Start" column?

6         A    Yes.

7         Q    It says:  "Start, 2/11/2011."  You

8    discovered this problem in 2010, five months

9    before that, did you not?

10        A    I don't know if this is the same

11   problem.  I don't know if they're referring to

12   strictly the active ingredient or if we were still

13   losing historical data.  I -- I didn't write this

14   piece.

15        Q    This is -- these are the same words

16   that you wrote eight months earlier.  Almost

17   identical, right, to what you wrote eight months

18   earlier?

19        A    Yeah, but I didn't put it in this form.

20   I --

21        Q    No, Frank Devlin now put it in this

22   form, and he put it in this form, sir, and he

23   states the same thing that you stated eight months

24   earlier:  "CVS is noncompliant with DEA

Highly Confidential – Subject to Further Confidentiality Review

1    expectations."  Isn't -- he says the same thing

2    eight months after you said it, does he?

3              MR. BUSH:  Objection.

4              THE WITNESS:  He says it, but he knew we

5    were compliant.

6    BY MR. KENNEDY:

7         Q    Was -- was your boss, Frank Devlin, was

8    he in the habit also of -- of writing things down

9    in formalized documents and forms that he believed

10   weren't true?

11             That wasn't his habit, was it?

12             MR. BUSH:  Objection.

13             THE WITNESS:  No.  But in -- in our

14   company, we've -- did word things to get things

15   accomplished.  Didn't happen often, but this is

16   one case where we really wanted to save manhours

17   and get the active ingredient.

18   BY MR. KENNEDY:

19        Q    Sir, let me -- let me ask you, it's 2011

20   when this is being written.

21        A    Mm-hmm.

22        Q    Was it a matter of manhours or was it a

23   matter of doing what was right for this country in

24   the midst of an opioid crisis?  Which one was it?

Highly Confidential - Subject to Further Confidentiality Review

1          A     If --

2                MR. BUSH:  Objection.

3                THE WITNESS:  If this was a noncompliant

4     issue and harming the public, this would have been

5     done instantly.  They knew we were compliant,

6     which is why it dragged out as long as it did.

7     BY MR. KENNEDY:

8          Q     And you knew and understand by 2011, did

9     you not, because you were getting communications

10    from a variety of sources that were letting you

11    know that clearly by 2011, that prescription

12    opioids were killing more people in America than

13    cocaine and heroin combined?  Were you aware of

14    that?

15         A     I don't recall dates, what years we

16    started hearing about the opioid crisis.  I

17    strictly knew my job was to prevent every single

18    pill leaving our distribution centers from

19    diversion.

20         Q     And you were good at your job, weren't

21    you?

22         A     I felt I was.

23         Q     And, sir, you were conscientious at your

24    job, were you not?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    I felt I was.

 2        Q    And that's why you wanted to do the

 3   right thing, didn't you?

 4        A    I did the right thing.

 5        Q    Yeah, and doing the right thing in

 6   October of 2010 was saying, We need to make this

 7   change ASAP because we are noncompliant with DEA

 8   expectations.  That's what you did in 2010.

 9             MR. BUSH:  Objection.

10   BY MR. KENNEDY:

11        Q    True, sir?

12        A    We were compliant.  I wanted to make it

13   easier.

14        Q    Let's look at here on this same -- look

15   at that last column where it says "Finish."  Do

16   you see that?

17        A    Yes.

18        Q    Expected finish, 12/31/2011, is that

19   when this was finally done, sir, more than a year

20   after you requested it?

21        A    I have --

22        Q    12/31/2011 was when they finally made

23   the change to become DEA compliant.

24             MR. BUSH:  Objection.
```

1           THE WITNESS:  I don't have a

2    recollection of that.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

18          MR. KENNEDY:  Let's take a quick

19    break -- I'm going to check with these folks, take

20    a quick break just to see -- I might be done.

21          THE VIDEOGRAPHER:  It's 12:00 p.m.  We

22    are going off the record.

23          (Lunch recess.)

24          THE VIDEOGRAPHER:  The time is 12:53

Highly Confidential - Subject to Further Confidentiality Review

```
 1   p.m., and we're back on the record.

 2                  DIRECT EXAMINATION

 3   BY MR. BAKER:

 4       Q    My name is William Baker.  I'm going to

 5   follow up with some questions that Mr. Kennedy

 6   asked you this morning, and then I may have some

 7   other questions.

 8            Fair enough?

 9       A    Yes.

10            (Exhibit No. 562 was premarked for

11            identification.)

12   BY MR. BAKER:

13

14

15

16

17

18

19

20

21

22

23

24
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8          Q    I'm asking you what policies and

9     process.  What policies and process do they follow

10    to do this investigation?

11         A    I don't know.

12         Q    Are there any policies and processes

13    that were in existence at CVS at that time that

14    determined what a VIPER field analyst would do for

15    an investigation of an order of hydrocodone that

16    you referred to them that came off the IRR form

17    that you were looking at?

18              MR. BUSH:  I object.

19              THE WITNESS:  I don't know.

20    BY MR. BAKER:

21         Q    Okay.  Well, if you don't know, then how

22    do you know that they're following some procedure?

23    How do you even know that?

24              MR. BUSH:  Objection.

```
 1                   THE WITNESS:  That's their position.

 2   That's what they're supposed to do.

 3   BY MR. BAKER:

 4        Q    The truth is you don't know what they

 5   were doing, am I correct?  That's the absolute

 6   bottom line truth is you don't know what they were

 7   doing to investigate these orders, correct?

 8                   MR. BUSH:  Objection.

 9   BY MR. BAKER:

10        Q    Correct?

11                   MR. BUSH:  Objection.

12                   THE WITNESS:  I don't know the steps

13   they were doing.  I know they were investigating.

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Q    Okay.  Every one of these oxycodone-

24   related products, OxyContin and the other related
```

Highly Confidential - Subject to Further Confidentiality Review

1   drugs that I talked about on that drug fact sheet,

2   are purchased by CVS pharmacies from outside

3   vendors, correct?

4        A    I don't know about the stores.

5        Q    Okay.  Well, if they don't get them from

6   the distribution centers, they have to get them

7   from somewhere, right?

8             MR. BUSH:  Objection?

9             THE WITNESS:  Yes.

10  BY MR. BAKER:

11       Q    Okay.  And if they don't get them from

12  the CVS distribution centers, they have to get

13  them from somewhere other than CVS, correct?

14       A    Yes.

15            MR. BUSH:  Objection.

16  BY MR. BAKER:

17       Q    That means an outside vendor, correct?

18       A    Yes.

19       Q    Such as McKesson and Cardinal, correct?

20       A    Yes.

21       Q    And you know who McKesson and Cardinal

22  are, right?

23       A    I do.

24       Q    Okay.  McKesson and Cardinal were also

```
 1    supplementing the Class IIIs, the hydrocodone

 2    combination products that were carried by the CVS

 3    pharmacies during the time that you had been

 4    employed there, correct?

 5              MR. BUSH:  Objection.

 6              THE WITNESS:  I don't know what deals

 7    the stores had or what contracts they had with the

 8    vendors.  I know those vendors supplied.

 9    BY MR. BAKER:

10        Q    Okay.  "Those vendors," meaning outside

11    vendors, helped supply CVS pharmacies with the

12    hydrocodone combination products that they sold at

13    those CVS pharmacies, correct?  You know that,

14    right?

15        A    Yes.

16        Q    And none of the monitoring that you did

17    through the suspicious order monitoring system

18    monitored the quantity of those outside vendors'

19    sales to those pharmacies, correct?

20              MR. BUSH:  Objection.

21              THE WITNESS:  That wasn't on the SOM.

22    BY MR. BAKER:

23        Q    Okay.  So is the answer "correct"?

24        A    Yes.
```

```
 1        Q    Okay.  In terms of suspicious order

 2   monitoring, however much was sold by outside

 3   vendors to those pharmacies, that's something that

 4   CVS did not monitor as far as you know; is that

 5   correct?

 6             MR. BUSH:  Objection.

 7             THE WITNESS:  I don't know that because

 8   that information is on the field's programs.

 9   BY MR. BAKER:

10        Q    Yeah, but you did not monitor that in

11   the suspicious order monitoring system, correct?

12             MR. BUSH:  Objection.

13             THE WITNESS:  I did not monitor it.

14   BY MR. BAKER:

15        Q    Okay.  And you're unaware of anybody

16   else monitoring it within the suspicious order

17   monitoring system, correct?

18             MR. BUSH:  Objection.

19             THE WITNESS:  I wouldn't know of anybody

20   else in the field monitoring.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

```
1

2

3

4

5

6
```

7        Q    Okay.  Where is the paperwork and what

8   do we call the paperwork that proves you did

9   exactly that, that you referred every single one

10  of the hydrocodone combination product orders that

11  appeared on the IRR out for further investigation?

12  What's the name of the document?  Where is it so I

13  can go get it?

14             MR. BUSH:  Objection.  Counsel, you know

15  that the production of documents in this case has

16  covered all of the documents that are available,

17  and they may not be available.  So...

18             MR. BAKER:  I'm going to ask counsel to

19  just object to form and to not give speaking

20  objections.

21  BY MR. BAKER:

22        Q    Where is the documents?

23        A    The documents are gone.

24        Q    The documents are gone.  Okay.  Who

Highly Confidential - Subject to Further Confidentiality Review

```
1    destroyed those documents?

2         A    I'm guessing when they hit their

3    three-year expiration date.

4         Q    Who destroyed those documents, CVS?

5              MR. BUSH:  Objection.  Let him finish

6    his answer, please, Bill.

7              THE WITNESS:  Don't know.

8    BY MR. BAKER:

9         Q    Okay.  CVS played a role in destroying

10   those documents, correct?

11             MR. BUSH:  Objection.

12             THE WITNESS:  When they hit their

13   three-year expiration date.

14   BY MR. BAKER:

15        Q    Okay.  So if we were to ask you for --

16   for paper proof of any document that proves that

17   you referred an order off the IRR to a VIPER field

18   analyst, your answer is that there is no such

19   paper because it's been destroyed; is that correct

20   or not?

21        A    I could not find any.  Believe me, I

22   tried.

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
11
12
```

13            MR. BUSH:  When we were going through

14    those, I didn't notice, but we went through

15    both -- both those dates?

16            MR. BAKER:  We did go through both those

17    dates.

18            MR. BUSH:  Okay.

19            MR. BAKER:  Okay?

20            MR. BUSH:  Yeah.

21    BY MR. BAKER:

22        Q    All right.  So is it true that before

23    CCS, which is C-E-G-E-D-I-M -- do you say Cegedim?

24    Is that --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Yeah.

 2        Q    Okay.  I'm going to call them CCS.

 3        A    That's fine.

 4        Q    The Buzzeo company, you know them,

 5   right?

 6        A    Yes.

 7        Q    Okay.  So before the Cegedim Buzzeo

 8   company was hired to write the SOM software, there

 9   was no software program that was based upon an

10   algorithm to flag orders to appear on an IRR at

11   CVS in the SOM department, correct?

12        A    I -- I don't know either way.  I was

13   just given a job to do.  When that came up, the

14   process was there.

15        Q    Okay.  In any event, you're unaware of

16   any that preceded that particular program,

17   correct?

18        A    Yeah, I don't know.

19        Q    Okay.  Let me show you Exhibit 10 --

20   610.

21             (Exhibit No. 610 was premarked for

22             identification.)

23   BY MR. BAKER:

24   ███████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



5        A     We had conversations with the people who

6    built the algorithm, and they assured us that we

7    were within line.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15    Q    Okay.  What you were fixing to do --

16  what you were intending to do, I should say, with

17  this algorithm was you wanted to tweak it up,

18  right?

19    A    I wanted to eliminate false positives.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
```

 9       Q    Okay.  And you have copies of all the

10  IRRs that you can show us from 2010 where you can

11  give it to us so we can see which one of these you

12  flagged and sent out to VIPER analysts, correct?

13       A    I do not.

14       Q    Okay.  Because you -- you, along with

15  other people in CVS, destroyed those documents,

16  correct?

17            MR. BUSH:  Objection.

18            THE WITNESS:  We have a set timeline to

19  hold documents.  We only have so much space.  Once

20  those three years are done, we start old out,

21  first out.

22  BY MR. BAKER:

23       Q    And you don't store them on a computer

24  database somewhere as opposed to the paper copy?

```
 1    You don't -- you don't store them on a computer

 2    database, the green -- the green bar copies?

 3         A    No.

 4         Q    Come on.  Aren't -- aren't they

 5    generated off of a computer?

 6              MR. BUSH:  Objection.

 7    BY MR. BAKER:

 8         Q    Aren't these generated off a SOM system

 9    that's computer-based?

10         A    Those -- those reports printed on a

11    green bar piece of paper, a stack of papers, that

12    I would receive every day.  You had the electronic

13    copy.  You saw what it was like in the electronic

14    copy.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12        Q    And the retuned program delivered in

13   2011, the program was designed to pend an order at

14   .15, according to that document from CCS, the

15   company that wrote the algorithm-based program,

16   correct?

17        A    Yes.

18        Q    Okay.  In spite of that, CVS still

19   raised the score from .15 to .65 to pend an order

20   from that point forward, correct?

21        A    We gave them the results of what we had

22   in investigations, and it was agreed upon, even

23   with this company, that it was acceptable to start

24   raising it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q    Sir, I showed you documents where y'all

2    went back and forth in 2010 about that, correct?

3    A    It doesn't mean we didn't have

4    conference calls.

5    Q    Okay.  You don't --

6    A    I --

7    Q    Can you point to one document in 2011

8    after the time that the program -- the retuned

9    program was delivered that says you had

10    conferences and did some testing with CCS to raise

11    the program to .65?  Do you have any documents to

12    that effect?

13         MR. BUSH:  Objection.

14         THE WITNESS:  So you're saying these

15    four documents that you presented today was the

16    only thing that went into retuning this?

17    That's -- that's what you're referring to?  That's

18    what you're trying to say?

19    BY MR. BAKER:

20    Q    Listen to my question.

21    A    I heard what you said.  I'm repeating it

22    to make sure I understood that you're saying --

23    Q    My question is this --

24    A    -- that you think these four documents

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that you just showed me are the only documents

 2   that took place for us to tweak a number,

 3   quote/unquote, as important as this.  You think

 4   this is the only thing that happened?

 5        Q    Let me explain to you, I have to rely

 6   upon what CVS produces to me.

 7        A    There's phone conversations, there's

 8   conference calls.  CVS is not going to allow me at

 9   my level to change an IRR.  I test it, I report

10   the results.  They take the results.  The company

11   that wrote the results, they review the results.

12   They saw the false positives.  I know you don't

13   like that word.  There were a ton of them.

14        Q    Listen --

15        A    They realized that there was an issue

16   with the original algorithm.

17        Q    The original algorithm that was

18   delivered in 2008 that was --

19        A    I don't know about the dates.

20        Q    -- that was retuned in 2011 is what

21   you're saying.

22        A    I don't know about -- I don't know about

23   those dates.  I really don't.

24        Q    Okay.  Now, after 2011, do you have any
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   documented conversation that you can show me in

 2   any document between you and CCS regarding raising

 3   the score from .15 to .65, yes or no?

 4        A    I had nothing from 2008.  Nothing.

 5   2009, two --

 6        Q    Well, I just showed you the e-mails.  Is

 7   there anything else?

 8        A    They didn't get this from me.

 9        Q    Okay.  Whose -- who raised the score

10   within CVS?  Was it the CVS IT department that did

11   it?

12        A    All the information was reported.  Frank

13   Devlin had the ultimate say because he was my

14   superior.

15        Q    Okay.  So it was Frank Devlin.  Is that

16   right?

17        A    He would have to bless it.  Frank would

18   have to bless it to the next level.  I don't know

19   who Frank worked with.  I do know that this

20   company was part of the -- part of the

21   understanding.  There were several conference

22   calls.  We even had our field guys, the analysts

23   and the regional manager, involved with this to

24   explain their investigations.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10            (Exhibit No. 143 was premarked for

11            identification.)

12    BY MR. BAKER:

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4        Q      Because they needed further due

5   diligence done to comply with the DEA requirements

6   of suspicious order monitoring, right?

7               MR. BUSH:  Objection.

8   BY MR. BAKER:

9        Q      Is that right?

10              MR. BUSH:  Objection.

11              THE WITNESS:  I don't know if that was a

12  DEA requirement that every single one get followed

13  up on.  I erred on the side of caution when I did

14  this during the time I did it.

15  BY MR. BAKER:

16       Q      Okay.  Because you were trying to comply

17  with the context of what the DEA required under

18  suspicious order monitoring, correct?

19              MR. BUSH:  Objection.

20              THE WITNESS:  I always looked at it as

21  I'm trying to ensure that to the best of my

22  ability that no bottles were diverted.

23

24

Highly Confidential - Subject to Further Confidentiality Review



22        Q     In other words, investigation required

23   at a minimum that you do some additional due

24   diligence of a HCP or hydrocodone combination

Highly Confidential - Subject to Further Confidentiality Review

1    product that showed up on the IRR, correct?

2         A    Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
9
10
11
12
13
```

14                    CROSS-EXAMINATION

15   BY MR. BUSH:

16        Q    Mr. Mortelliti, you recall that you were

17   asked some questions about what you called the

18   green bar?

19        A    Yes.

20        Q    And Mr. Baker put up on the screen what

21   I think he called an electronic version of the IRR

22   reports.

23        A    It was the electronic version, yes.

24        Q    All right.  And you did not take notes

Highly Confidential - Subject to Further Confidentiality Review

```
1    on any electronic version of an IRR, did you?

2         A    No.  Only green bar.

3         Q    And the electric -- green bar copies of

4    the reports were available in some circumstances

5    in places other than Lumberton, right?

6         A    Yes.

7         Q    And so if there were copies of green bar

8    reports from say Indy or Knoxville, they wouldn't

9    have your handwritten comments on the report that

10   reflected whatever review you had done of any of

11   the items on the report, right?

12             MR. BAKER:  Object to form.

13             THE WITNESS:  Correct.

14   BY MR. BUSH:

15        Q    And where would you have to go to find a

16   copy of an IRR that had your handwritten comments

17   on it?

18        A    I kept the six months plus current in my

19   office.  After the eighth month, they would go

20   into archives.

21        Q    All right.  And do you -- I think you

22   did testify a bit about looking for IRRs.  Do you

23   recall that subject general -- generally?

24        A    Yes.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              Q    And was the IRRs -- or were the IRRs

 2    that you were looking for the ones that had your

 3    handwritten notes on it?

 4              A    Yes.

 5              Q    And was the search that you conducted in

 6    Lumberton?

 7              A    Yes.

 8              Q    And is where -- is that where those

 9    copies were archived?

10              A    Yes.

11              Q    And -- and I think you also testified

12    about the three-year document retention policy

13    at -- that was in place at Lumberton?

14              A    Yes.

15              Q    And did you come to understand what had

16    happened to the copies of the IRR reports that had

17    your notes on them?

18              A    Yes.

19              Q    And what -- what had happened?

20              A    They got cleaned up by month.  All this

21    out by month until all -- all the years were gone.

22              Q    All right.  And -- and was that done in

23    accordance with the three-year document retention

24    policy that you testified about?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A    Yes.

 2              MR. BUSH:  All right.  I have nothing

 3   further.

 4                   RECROSS-EXAMINATION

 5   BY MR. BAKER:

 6        Q    Where does the three-year document

 7   retention policy originate?

 8        A    I don't know.  I -- I -- for compliance,

 9   I know OSHA has expectations of two years.  I

10   don't know where it originated.

11        Q    Well, we've seen e-mails that go way far

12   beyond three years that -- that were saved in the

13   computer systems at CVS, right?

14        A    Yeah, that -- yeah, not -- that wasn't

15   my computer.  That --

16        Q    Yeah, I understand.  And that's the --

17   the computer system at CVS is able to store that

18   data, which allowed it to be pulled when we

19   requested it in this case, correct?

20        A    Yes.

21        Q    Okay.  And that computer system at CVS

22   also has a computer copy of the green bar,

23   correct?

24              MR. BUSH:  Objection.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   BY MR. BAKER:

 2        Q    Right?

 3             MR. BUSH:  Objection.

 4             THE WITNESS:  Yes.

 5   BY MR. BAKER:

 6        Q    Okay.  And so if somebody destroyed the

 7   green bar off the computer system, that would be

 8   something in addition to the paper copy that was

 9   destroyed, correct?

10             MR. BUSH:  Objection.

11   BY MR. BAKER:

12        Q    Correct?

13             MR. BUSH:  Objection.

14             THE WITNESS:  It -- you're asking me if

15   someone intentionally destroyed?

16   BY MR. BAKER:

17        Q    If somebody was to have erased the CVS

18   green bars off the computer system, that would be

19   a separate task aside from destroying the paper

20   copies, correct?

21        A    Yeah, I had no control over the green

22   bars.  How long they stay, when they drop off,

23   I -- I don't know anything about the electronic

24   copies.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q    I think you said one of the reasons the

2   documents were destroyed is because of room in

3   warehouses.  Do you remember that?

4        A    Talking about the paper documents.

5        Q    Right.  But a computer can store things

6   on a system that doesn't take up a lot of room,

7   correct?

8        A    Yes.

9        Q    Okay.  So why was the computer copy

10  destroyed?  Tell me.

11            MR. BUSH:  Objection.

12            THE WITNESS:  I never had a computer

13  copy of that.

14  BY MR. BAKER:

15       Q    I -- well, it comes to you from a

16  computer, correct?  The IRR is printed off a

17  computer.

18       A    Yeah, not my computer.

19       Q    Right.  But it -- it pops up on a

20  computer system, and then somebody hits "print,"

21  and you go get the paper copy from that room,

22  correct?

23            MR. BUSH:  Objection.

24  BY MR. BAKER:
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q     Right?

2        A     Actually, it was an auto-print to a

3    specific job that's put into the system.

4        Q     Right.

5        A     So it comes from corporate auto-printed.

6    I would get that green bar first thing.

7        Q     Right.  But the green bar is kept on a

8    computer, not on a piece of paper.  The piece of

9    paper is printed off the computer, correct?

10               MR. BUSH:  Objection.

11               THE WITNESS:  How long that data is on

12    there, I don't know.

13    BY MR. BAKER:

14        Q     No, just listen to my question.  The

15    green bar is created on a computer, correct?

16               MR. BUSH:  Objection.

17               THE WITNESS:  Yes.

18    BY MR. BAKER:

19        Q     Okay.  And then somebody prints it onto

20    a printer, right?

21        A     Well, it's automatic.

22        Q     Right.  But when it's printed onto a

23    printer, it -- the whole set of data that you

24    print onto the printer still stays -- lives on

```
 1    that computer, correct?

 2         A    I don't know anything about the

 3    corporate computers.

 4         Q    Oh, come on.

 5         A    I don't.

 6         Q    When you -- when you open up and type a

 7    Word document in Word -- Microsoft Word and you

 8    save it, you can print it, and the paper copy

 9    prints out on a printer, right?

10         A    Yes.

11         Q    Okay.  And you have a choice to either

12    save or destroy that document that you print,

13    correct?

14         A    I do.

15         Q    Okay.  But the electronic copy of that

16    document lives on that hard drive of that

17    computer, correct?

18              MR. BUSH:  Objection.

19    BY MR. BAKER:

20         Q    Right?

21              I mean, everyday common sense, what's

22    the answer to that question?

23              MR. BUSH:  Objection.

24              THE WITNESS:  It -- yeah, it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    somewhere.

 2    BY MR. BAKER:

 3         Q    Right.  It's on the hard drive of that

 4    computer, right?  So if you wanted to go back and

 5    reprint it, you could by going into the hard

 6    drive, correct?

 7         A    No, I couldn't.  I would have to send a

 8    request to some of the people you saw earlier.

 9         Q    Oh, come on.

10         A    That's exactly how it was done.

11         Q    Do you own a laptop?

12         A    I do, but this green bar --

13         Q    Do you --

14         A    -- did not come from a laptop.

15         Q    Do you understand that when you create a

16    document that you're saving it on your computer in

17    the hard drive of the computer?  Do you even

18    understand that?

19         A    I never had that on my -- it's on the

20    internet.  It's not on my laptop.

21         Q    Okay.  I'm not talking about the green

22    bar.  I'm just using common sense.

23         A    Oh, I'm trying to work with you with

24    common sense --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q    Okay.  If I was --

2         A    -- but you're trying to tell me

3    something that doesn't exist.

4         Q    If you open up your laptop and type

5    something, and then you hit "Save," it saves onto

6    the computer hard drive, correct?

7         A    What's that have to do with the green

8    bar?

9         Q    I'm going to explain that to you.

10        A    Okay.

11        Q    But it saves on the computer hard drive,

12   right?

13        A    Sure.  In that scenario, yes.

14        Q    Okay.  And so this system, this computer

15   system through which the IRR green bar document is

16   created, that's a computer-generated document as a

17   result of an order or a set of nightly orders from

18   the pharmacies to the distribution centers going

19   through the SOM computer algorithm process,

20   correct?

21             MR. BUSH:  Objection.

22             THE WITNESS:  It goes through some

23   warehouse management system computerized.

24   BY MR. BAKER:
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q    Right.  Okay.  And when it does, it then

2    lives on the computer until it is -- until it is

3    printed onto a physical piece of paper, correct?

4             MR. BUSH:  Objection.

5    BY MR. BAKER:

6        Q    Right?

7             MR. BUSH:  Objection.

8             THE WITNESS:  I don't know how long it

9    lives on the computer.

10   BY MR. BAKER:

11       Q    I'm not asking you how long.  It's on

12   the computer and then you can print it, right?

13       A    No.  No.

14       Q    Come on.

15       A    It's automatically sent to a green bar

16   machine that prints it out.

17       Q    Yeah, there's data --

18       A    There's no --

19       Q    The data --

20            MR. BUSH:  Hold on.  Let him finish.

21            THE WITNESS:  Let me explain.  There's

22   no pulling up a computer, hit "Print" now, "Save."

23   There's none of that.

24   BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

1          Q    I understand.  If --

2          A    For whatever reason, if the thing jams

3    up, I don't know, something I get --

4          Q    Where is the server?

5          MR. BUSH:  Hold on.  Let him finish his

6    answer, please.

7    BY MR. BAKER:

8          Q    Go ahead.

9          A    You've got to ask them to resend the

10   print jobs.  They have print jobs.  I think that

11   was B106R or something, so you would have to

12   request that.  You would have to request that for

13   DEA if they did an audit.

14         Q    Okay.  Where is the data that exists for

15   what is put onto that green bar?  Where -- where

16   does it live?

17         A    I -- I don't know.  Corporate.  That's

18   the only thing, corporate.

19         Q    And that would be in Woonsocket, Rhode

20   Island?

21         A    I -- I'm assuming that.

22         Q    Okay.  On a computer system there?

23         A    On some warehouse management system.

24         Q    Okay.  Did you check that before you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    came to your deposition?

 2         A    No.  Why would I?

 3         Q    Okay.  For the same reason that you went

 4    and hunted for the paper copies.

 5         A    The paper copies had my information on

 6    it.  I would have loved to have been able to

 7    present that.

 8         Q    Correct.  But the -- the number that

 9    appeared on the IRR, that would be on the

10    documents that are inside the computer system in

11    Woonsocket, Rhode Island, not the paper copy.

12              MR. BUSH:  What number?

13    BY MR. BAKER:

14         Q    The number of hydrocodone combination

15    products that popped on the IRR daily would exist

16    on that green bar that's inside the computer

17    system in Woonsocket, correct?

18              MR. BUSH:  Objection.

19              THE WITNESS:  It would look like what

20    you sent me.

21    BY MR. BAKER:

22         Q    Sir, would that be correct?

23         A    It would look like what you put on the

24    board earlier.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q    Okay.  But it could be converted to the

 2   green bar, correct?

 3             MR. BUSH:  Objection.

 4   BY MR. BAKER:

 5        Q    That data could be converted to the

 6   green bar.

 7             MR. BUSH:  Objection.

 8   BY MR. BAKER:

 9        Q    Is that right?

10        A    I -- I don't know how that works.  I

11   never thought about it.

12        Q    Okay.  If anybody destroyed those green

13   bars, it was CVS, right?

14        A    After the three years, yes.

15             MR. BAKER:  That's all I have.  Thank

16   you.

17             MR. BUSH:  All right.  Thank you.

18             THE VIDEOGRAPHER:  The time is 4:19 p.m.

19   January 23rd, 2019.  Going off the record,

20   completing the videotaped deposition.

21             (Whereupon, the deposition of

22             HENRY JOHN MORTELLITI, III was concluded

23             at 4:19 p.m.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2        The undersigned Certified Shorthand Reporter

 3   does hereby certify:

 4        That the foregoing proceeding was taken before

 5   me at the time and place therein set forth, at which

 6   time the witness was duly sworn; That the testimony

 7   of the witness and all objections made at the time

 8   of the examination were recorded stenographically by

 9   me and were thereafter transcribed, said transcript

10   being a true and correct copy of my shorthand notes

11   thereof; That the dismantling of the original

12   transcript will void the reporter's certificate.

13        In witness thereof, I have subscribed my name

14   this date:  January 26, 2019.

15

16                       _____

17                       LESLIE A. TODD, CSR, RPR

18                       Certificate No. 5129

19   (The foregoing certification of

20   this transcript does not apply to any

21   reproduction of the same by any means,

22   unless under the direct control and/or

23   supervision of the certifying reporter.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2        Please read your deposition over carefully and

 3   make any necessary corrections. You should state the

 4   reason in the appropriate space on the errata sheet

 5   for any corrections that are made.

 6   After doing so, please sign the errata sheet

 7   and date it.

 8        You are signing same subject to the changes you

 9   have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative that

11   you return the original errata sheet to the deposing

12   attorney within thirty (30) days of receipt of the

13   deposition transcript by you. If you fail to do so,

14   the deposition transcript may be deemed to be

15   accurate and may be used in court.

16

17

18

19

20

21

22

23

24
```

```
 1              - - - - - -

 2            E R R A T A

 3              - - - - - -

 4   PAGE LINE CHANGE

 5   _____ _____ _____

 6   REASON: _____

 7   _____ _____ _____

 8   REASON: _____

 9   _____ _____ _____

10   REASON: _____

11   _____ _____ _____

12   REASON: _____

13   _____ _____ _____

14   REASON: _____

15   _____ _____ _____

16   REASON: _____

17   _____ _____ _____

18   REASON: _____

19   _____ _____ _____

20   REASON: _____

21   _____ _____ _____

22   REASON: _____

23   _____ _____ _____

24   REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3       I,_____, do hereby

 4   certify that I have read the foregoing pages, and

 5   that the same is a correct transcription of the

 6   answers given by me to the questions therein

 7   propounded, except for the corrections or changes in

 8   form or substance, if any, noted in the attached

 9   Errata Sheet.

10

11   _____

12   HENRY JOHN MORTELLITI, III                    DATE

13

14

15   Subscribed and sworn to

16   before me this

17   _____day of_____,20____.

18   My commission expires:_____

19   _____

20   Notary Public

21

22

23

24
```