Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4

 5    ---------------------------) MDL No. 2804

 6    IN RE:  NATIONAL            )

 7    PRESCRIPTION OPIATE         )

 8    LITIGATION                  )

 9    ---------------------------) Case No. 17-MD-2804

10    THIS DOCUMENT RELATES TO:   )

11    ALL CASES                   )

12    ---------------------------) Hon. Dan A. Polster

13

14                  HIGHLY CONFIDENTIAL

15        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

16            The videotaped deposition of KEVIN M. MURPHY,

17    Ph.D., called by the Plaintiffs for examination, taken

18    pursuant to the Federal Rules of Civil Procedure of

19    the United States District Courts pertaining to the

20    taking of depositions, taken before JULIANA F.

21    ZAJICEK, a Registered Professional Reporter and a

22    Certified Shorthand Reporter, at the offices of

23    Alvarez & Marsal, Suite 1800, 540 West Madison Street,

24    Chicago, Illinois, on June 6, 2019, at 10:08 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3          KELLER ROHRBACK L.L.P.
            1201 Third Avenue, Suite 3200
 4          Seattle, Washington 98101-3052
            206-623-1900
 5          BY:  DAVID J. KO, ESQ.
                 dko@kellerrohrback.com
 6
                      -and-
 7
            CRUEGER DICKINSON LLC
 8          4532 North Oakland Avenue
            Whitefish Bay, Wisconsin 53211
 9          414-210-3767
            BY:  KRISTA BAISCH, ESQ.
10               kkb@cruegerdickinson.com
11
      ON BEHALF OF WALGREEN CO.:
12
            BARTLIT BECK LLP
13          54 West Hubbard Street, Suite 300
            Chicago, Illinois 60654
14          312-494-4400
            BY:  PETER B. BENSINGER, JR., ESQ.
15               (Telephonically)
                 peter.bensinger@bartlit-beck.com
16
17    ON BEHALF OF THE H.D. SMITH ENTITIES:
18          BARNES & THORNBURG LLP
            11 South Meridian Street
19          Indianapolis, Indiana 46204
            317-231-7501
20          BY:  WILLIAM A. HAHN, II, ESQ.
                 (Telephonically)
21               william.hahn@btlaw.com
22
23
24
```

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
      AMERISOURCEBERGEN DRUG CORPORATION:
 3
          REED SMITH LLP
 4        1301 K Street, N.W., Suite 1000 - East Tower
          Washington, D.C. 20005
 5        202-414-9403
          BY:  LINDSAY A. DeFRANCESCO, ESQ.
 6            (Telephonically)
              ldefrancesco@reedsmith.com
 7
 8    ON BEHALF OF RITE AID CORPORATION (CUYAHOGA) and RITE
      AID OF MARYLAND, INC. D/B/A RITE-AID MID ATLANTIC
 9    CUSTOMER SUPPORT CENTER INC.:
10        MORGAN LEWIS & BOCKIUS LLP
          1701 Market Street
11        Philadelphia, Pennsylvania 19103
          215-963-5914
12        BY:  JOHN P. LAVELLE, JR., ESQ.
              (Telephonically)
13            john.lavelle@morganlewis.com
14
      ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
15
          ROPES & GRAY LLP
16        1211 Avenue of the Americas
          New York, NY 10036-8704
17        212-596-9451
          BY:  DANIEL C. KOLB, ESQ. (Telephonically)
18            daniel.kolb@ropesgray.com
19
      ON BEHALF OF McKESSON CORPORATION:
20
          COVINGTON & BURLING, LLP
21        The New York Times Building
          620 Eighth Avenue
22        New York, New York 10018-1405
          212-841-1000
23        BY:  DAVID W. HALLER, ESQ.
              dhaller@cov.com
24
```

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF McKESSON CORPORATION:
 3         COVINGTON & BURLING LLP
           Salesforce Tower
 4         415 Mission Street
           San Francisco, California 94105-2533
 5         415-591-7055
           BY:  BRYANT PULSIPHER, ESQ.
 6              bpulsipher@cov.com
 7                  -and-
 8         COVINGTON & BURLING LLP
           620 Eighth Avenue
 9         New York, New York
           212-841-1104
10         BY:  FATMATA S. KABIA, ESQ.
                fkabia@cov.com
11
12    ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES,
      INC.:
13
           ZUCKERMAN SPAEDER LLP
14         1800 M Street, NW, Suite 1000
           Washington, D.C. 20036
15         202-778-1800
           BY:  STEVEN N. HERMAN, ESQ. (Telephonically)
16              sherman@zuckerman.com
17
      ON BEHALF OF DISCOUNT DRUG MART, INC.:
18
           CAVITCH, FAMILO & DURKIN CO., LPA
19         1300 East Ninth Street, 20th Floor
           Cleveland, Ohio 44114
20         216-621-7860
           BY:  L. WILLIAM ERB, ESQ. (Telephonically)
21              lwerb@cavitch.com
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)

 2    ON BEHALF OF WALMART INC.:

 3         JONES DAY
           555 South Flowers Street, 50th Floor
 4         Los Angeles, California 90071
           213-243-2629
 5         BY:  CLAIRE E. CASTLES, ESQ.
                ccastles@jonesday.com

 6

 7    ON BEHALF OF HBC SERVICES:

 8         MARCUS & SHAPIRA LLP
           One Oxford Centre, 35th Floor
 9         Pittsburgh, Pennsylvania 15219
           412-471-3490
10         BY:  RICHARD I. HALPERN, ESQ. (Telephonically)
                halpern@marcus-shapira.com

11

12    ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
      and THE PURDUE FREDERICK COMPANY, INC.:

13
           DECHERT LLP
14         35 West Wacker Drive, Suite 3400
           Chicago, Illinois 60601
15         312-646-5800
           BY:  ALISON COONEY, ESQ.
16              alison.cooney@dechert.com
17                  -and-
18         DECHERT LLP
           Cira Centre
19         2929 Arch Street
           Philadelphia, Pennsylvania 19104-2808
20         215-994-2475
           BY:  JUSTIN M. KADOURA, ESQ. (Telephonically)
21              justin.kadoura@dechert.com
22

23

24
```

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF JOHNSON & JOHNSON AND JANSSEN
      PHARMACEUTICALS, INC.:
 3
          O'MELVENY & MYERS LLP
 4        Times Square Tower
          7 Times Square
 5        New York, New York 10036-6537
          212-326-2215
 6        BY:  MATTHEW T. MURPHY, ESQ.
              mmurphy@omm.com
 7
 8    ON BEHALF OF WEST VIRGINIA BOARD OF PHARMACY:
 9        BAILEY & WYANT, PLLC
          500 Virginia Street, Suite 600
10        Charleston, West Virginia 25301
          304-345-4222
11        BY:  JOHN FULLER, ESQ. (Telephonically)
              jfuller@bailywyant.com
12
13    ON BEHALF OF ALLERGAN FINANCE:
14        KIRKLAND & ELLIS LLP
          300 North LaSalle Street
15        Chicago, Illinois 60654
          312-862-3429
16        BY:  TIMOTHY W. KNAPP, ESQ. (Telephonically)
              timothy.knapp@kirkland.com
17            ZACHARY A. CIULLO, ESQ. (Telephonically)
              zac.ciullo@kirkland.com
18
19
20    THE VIDEOGRAPHER:
21        MR. ANTHONY MICHELETTO,
22        Golkow Litigation Services.
23
24
```

```
 1                     I N D E X

 2

 3   WITNESS:                                PAGE:

 4     KEVIN M. MURPHY, Ph.D.

 5         EXAM BY MR. KO...................... 11

 6

 7                      *****

 8

 9                  E X H I B I T S

10   MURPHY EXHIBIT                    MARKED FOR ID

11     No. 1    Plaintiffs' Notice of Oral        9

12              Videotaped Expert Deposition of

13              Kevin Murphy

14     No. 2    Expert Report of Kevin M. Murphy, 9

15              Ph.D., May 10, 2019

16     No. 3    Article titled: "A Look at the   28

17              Underlying Causes of the Opioid

18              Crisis," May 13, 2019, Council of

19              Economic Advisers

20     No. 4    Document titled: "Opioid Crisis  30

21              Update," Thomas Gilson, M.D.,

22              Cuyahoga County Medical Examiner

23              and Regional Forensic Sciences

24              Laboratory Director
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)

 2   MURPHY EXHIBIT                        MARKED FOR ID

 3    No. 5     Curriculum Vitae - Kevin M.        34

 4              Murphy, May 2019

 5    No. 6     Dr. Kevin M. Murphy - Hours and    115

 6              Compensation through May 31, 2019

 7    No. 7     Appendix B: List of Materials      194

 8              Relied Upon

 9

10

11

12                                            PAGES

13   CONFERENCE CALL WITH SPECIAL MASTER COHEN - 149 - 159

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    (WHEREUPON, certain documents were

 2                     marked Murphy Deposition Exhibit

 3                     Nos. 1 and 2, for identification, as

 4                     of 06/06/2019.)

 5          THE VIDEOGRAPHER:  We are now on the record.  My

 6     name is Anthony Micheletto.  I am a videographer for

 7     Golkow Litigation Services.

 8                    Today's date is June 6th, 2019, the time

 9     is 10:08 a.m., as indicated on the video screen.

10                    This video deposition is being held in

11     Chicago, Illinois, in the matter of In Re National

12     Prescription Opiate Litigation, in the United States

13     District Court for the Northern District of Ohio,

14     Eastern Division.

15                    Our witness is Kevin Murphy.

16                    Will counsel please identify yourselves

17     for the video record.

18          MR. HALLER:  David Haller of Covington & Burling

19     for McKesson and for the witness.

20          MR. PULSIPHER:  Bryant Pulsipher, Covington &

21     Burling, for the same.

22          MS. KABIA:  Fatmata Kabia from Covington &

23     Burling for the same.

24          MR. MURPHY:  Matthew Murphy from O'Melveny &
```

Highly Confidential - Subject to Further Confidentiality Review

1    Myers for Johnson & Johnson and Janssen.

2        MS. CASTLES:  Claire Castles with Jones Day on

3    behalf of Walmart.

4        MS. COONEY:  Alison Cooney from Dechert on

5    behalf of Purdue.

6        MS. BAISCH:  Krista Baisch, Crueger Dickinson,

7    here for the Plaintiffs.

8        MR. KO:  Good morning everyone.  David Ko from

9    Keller Rohrback, also on behalf of the Plaintiffs.

10       THE VIDEOGRAPHER:  Do we have counsel on the

11   phone?

12       MR. KNAPP:  Yes.  This is Tim Knapp with

13   Kirkland & Ellis on behalf of Allergan PLC.

14       MR. BENSINGER:  Peter Bensinger, Junior, of

15   Bartlit Beck for Walgreens.

16       MS. DeFRANCESCO:  Lindsay DeFrancesco from Reed

17   Smith on behalf of AmerisourceBergen Drug Corporation.

18       MR. HERMAN:  Steven Herman from Zuckerman

19   Spaeder on behalf of CVS Rx Services, Incorporated and

20   CVS Indiana, LLC.

21       MR. KOLB:  Dan Kolb of Ropes & Gray on behalf of

22   Mallinckrodt LLC and SpecGX LLC.

23       MR. LAVELLE:  John Lavelle, Morgan Lewis, on

24   behalf of Rite Aid of Maryland.

Highly Confidential - Subject to Further Confidentiality Review

1        MR. HALPERN:  Richard -- Richard Halpern of

2    Marcus & Shapira on behalf of HBC Service Company.

3        MR. MURPHY:  William Erb --

4        MR. HAHN:  Bill Hahn -- oh.

5            Bill Hahn with Barnes & Thornburg on

6    behalf of H.D. Smith.

7        MR. ERB:  William Erb, Cavitch, Familo & Durkin,

8    on behalf of Discount Drug Mart.

9        THE VIDEOGRAPHER:  Our court reporter today is

10   Juliana Zajicek.  Please swear in the witness.

11               (WHEREUPON, the witness was duly

12                sworn.)

13                KEVIN M. MURPHY, Ph.D.,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                    EXAMINATION

17   BY MR. KO:

18       Q.    Good morning.

19       A.    Good morning.

20       MR. HALLER:  Mr. Ko, can I interrupt for just

21   one second.  I'm -- I apologize.  I -- I --

22       MR. KO:  All right.

23       MR. HALLER:  I did mention -- yes, I know.  I'm

24   sorry.  I -- before we went on the record I mentioned

Highly Confidential - Subject to Further Confidentiality Review

 1    that there were some adjustments that Professor Murphy

 2    wanted to talk through in his report, but I neglected

 3    to mention that there were also two documents that

 4    he -- that were issued after the date of his report

 5    and before today's date and I have copies of those.

 6            So, again, I just didn't want to later

 7    interrupt or let you -- you know, I could give those

 8    to you whenever you would like a copy of those.

 9        MR. KO:  I would like a copy of those right

10    now --

11        MR. HALLER:  Okay.

12        MR. KO:  -- but when you say issued after the

13    report and before today, just so the record is clear,

14    as far as I know, this is the first time I've heard of

15    it, so are you saying that you are just disclosing it

16    right now for the first time?  Because I --

17        MR. HALLER:  Right.

18        MR. KO:  -- I don't believe I've seen -- okay.

19        MR. HALLER:  Right.  There was a request in the

20    deposition notice that the witness bring to the

21    deposition any documents that he has relied on since

22    the time of his report and today.  So there is two

23    documents responsive to that request in the deposition

24    notice.

```
 1         MR. KO:  Okay.  Great.

 2         MR. HALLER:  Okay.

 3         MR. KO:  Thanks for the clarification.

 4         MR. HALLER:  Sure.

 5         MR. KO:  So I'll grab those right now.

 6         MR. HALLER:  Oh, and we also have an updated CV

 7    that has, like -- which was also requested.

 8         MR. KO:  Perfect.

 9         MR. HALLER:  Do you want a copy as well?

10         MS. BAISCH:  Yes, please.

11         MR. HALLER:  Okay.  And do you have the CV?

12              Okay.  This is the updated CV.

13         MR. KO:  Thank you for that, Mr. Haller.

14    BY MR. KO:

15         Q.   Okay.  Now with those -- housekeeping out

16    of the way, we met earlier this morning, but just to

17    reintroduce myself, my name is David Ko and I'll be

18    asking questions about your report and your engagement

19    in this matter.

20              Do you prefer to go by Doctor or

21    Professor, Mr. Murphy, any preference?

22         A.   Anything is fine.

23         Q.   Okay.  Do you mind if I call you Doctor?

24         A.   Sure.
```

```
 1      Q.    We'll start with that.

 2            Dr. Murphy, I believe I saw in your report

 3   that you disclosed that you currently live in

 4   New Lenox, Illinois.

 5            Is that your current permanent address?

 6      A.    Yes, it is.

 7      Q.    And do you have any other permanent

 8   addresses?

 9      A.    No, that's my only permanent address.

10      Q.    Okay.

11            Dr. Murphy, I know you've been deposed

12   many times before, but I think it is always a good

13   idea to go over some of the ground rules.  And so let

14   me remind you of a few that are important to me.

15            It is very important that we create a

16   clean record and Juliana is able to transcribe

17   everything we say.  So please wait until I finish my

18   question before you move on to your answer and I'll

19   also try and wait until you finish your response

20   before I move on to my next question.

21            Okay?

22      A.    I will do my best and sometimes I pause,

23   so you might keep that in mind so you -- I sometimes

24   pause and then start up again, so.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Got it.

 2        A.    And I -- you might do the same, so.

 3        Q.    Sounds good.

 4              And to the extent I ask yes-or-no

 5   questions throughout this day and your answer is, in

 6   fact, yes or no, please do indicate as such rather

 7   than simply shaking your head or nodding your head.

 8              Does that sound good?

 9        A.    Yes, it does.

10        Q.    And from time to time throughout this day,

11   Mr. Haller or other counsel here at this table may

12   object to my questioning, but unless they clearly

13   instruct you otherwise, I'd ask that you answer my

14   question nonetheless.

15              Okay?

16        A.    Yes.

17        Q.    Okay.  And throughout this day if at any

18   time you need a break, please feel free to ask and

19   I'll do my best to accommodate.

20        A.    I will.

21        Q.    Dr. Murphy, is there anything that you can

22   think of today that will prevent you from testifying

23   honestly or truthfully?

24        A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Great.

2            Dr. Murphy, did you prepare for this

3      deposition?

4      A.    Yes, I did.

5      Q.    And can you describe to me what you did to

6      prepare?

7      A.    I would say I prepared by first reviewing

8      my report and some of the backup material for what

9      results I presented in my report.  I reviewed portions

10     of the reports of Mr. -- Dr. Gruber and Dr. Cutler.  I

11     discussed the case with my staff who worked with me

12     preparing the report, as well as yesterday I met with

13     counsel who are here today to prepare for today's

14     deposition.

15     Q.    And when you say that you met with

16     counsel, who did you meet with in particular?

17     A.    I met with the two gentlemen to my left

18     here, David --

19     MR. HALLER:  Mr. Haller and Mr. Pulsipher.

20     BY MR. KO:

21     Q.    Great.

22            And is that the only time you've met with

23     counsel in connection with preparing for this

24     deposition?

```
 1      A.    I believe that's the only time I've met

 2  with him since my report was filed.  I mean, I've met

 3  with counsel at other times prior to filing the

 4  report, but this has been the deposition prep --

 5      Q.    So that --

 6      A.    -- was yesterday.

 7      Q.    I just violated my own rule and

 8  interrupt -- interrupted you.

 9            But after May 10th when you disclosed your

10  report, the only time you met with counsel in

11  preparation for your deposition today was -- was

12  yesterday?

13      A.    I believe -- that is my recollection that

14  the only deposition preparation with counsel present

15  was yesterday.

16      Q.    And approximately how long did you meet

17  with counsel?

18      A.    About three-and-a-half hours, I believe.

19      Q.    And you also say you discussed, in

20  connection with preparing for this deposition, you

21  also said that you discussed the case with your staff.

22            Who is your staff?

23      A.    Well, the three primary people that I've

24  discussed it with and who worked with me on the report
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were Sean Taylor, that's S-e-a-n for Sean, Taylor is

 2    spelled like normal.  Jarrod Welch and -- and Daniel

 3    Garcia Schwartz.

 4        MR. HALLER:  And Jarrod I think is J-a-r-r-o-d.

 5    BY MR. KO:

 6        Q.    And are Mr. Taylor and Mr. Welch and

 7    Mr. Garcia Schwartz are all employees of Charles River

 8    Associates?

 9        A.    I believe they are all employees of

10    Charles River Associates, yes.

11        Q.    Okay.  Did you meet with them, I assume,

12    outside the presence of counsel?

13        A.    I did.  I saw them briefly this morning

14    outside the presence of counsel for, like, four

15    minutes.

16        Q.    Okay.  In addition to seeing them briefly

17    this morning, I imagine that you've -- as you said,

18    you've discussed this case with them.

19            Did you prepare for this deposition with

20    them as well?

21        A.    I would say in preparation for my

22    deposition I discussed it with them.  I -- they

23    weren't preparing for the deposition.  I was.  But I

24    discussed my report and various aspects of the case
```

Highly Confidential - Subject to Further Confidentiality Review

 1   with my staff as is -- as would be my standard

 2   practice.

 3        Q.    And when did you meet with them and for

 4   approximately how long prior to this morning's brief

 5   interaction?

 6        A.    I would say it was -- as far as I recall,

 7   it was all telephonically, that is, over the phone.  I

 8   think the in-person meetings, other than the brief

 9   interaction this morning, was the same one that I had

10   with counsel, I would say I probably had five or six

11   phone calls over the last roughly a week preparing for

12   this.

13        Q.    And approximately how long did those phone

14   calls last?

15        A.    I think it varied depending on the phone

16   call, total, upper single digit hours, five, seven

17   hours, kind of in that range total.

18        Q.    Total of all -- so just so the record is

19   clear, the five to six phone calls cumulative --

20   cumulative -- cumulatively added up to about five to

21   seven hours of total time?

22        A.    According to my best recollection.  I

23   mean, obviously those are not the kind of things that

24   one accurately recalls very well, but along -- on that

Highly Confidential - Subject to Further Confidentiality Review

1    order of magnitude I think is a fair statement of what

2    the time spent was.

3         Q.    Fair enough.

4              And you -- you said that a moment ago that

5    you discussed this case and various aspects -- well, I

6    think you said you discussed the report and various

7    aspects of this case.

8              Can you describe to me what you

9    specifically discussed with them?

10        A.    I think generally we went over the

11   exhibits, just to review the exhibits, since it had

12   been a while since the report had been filed, and I'm

13   teaching two classes this quarter, so my mind has been

14   on other things for the last few weeks, so I wanted to

15   go back over the exhibits so I could recall what some

16   of the more specifics.  Hopefully I'll remember them

17   today.  I'm not that great at always remembering

18   specifics, but we went over -- back over the -- the

19   exhibits as well as the text of the report and just

20   discussed through things.  I don't -- I don't think it

21   was any specific objective of material we wanted to

22   cover.

23        Q.    And when you say "exhibits," you are

24   talking about the exhibits in your report, correct?

Highly Confidential - Subject To Further Confidentiality Review

```
1        A.    Exhibits in my report, I think we also

2   discussed some of the exhibits in the Plaintiff

3   experts reports just so I could refresh myself of what

4   they had done as well.

5        Q.    Okay.  Do you recall which specific

6   exhibits in the Plaintiffs' expert reports that you

7   discussed with them?

8        A.    I would say it would be the same exhibits

9   that are discussed directly in my report.  So if -- if

10  you looked at my report, I would say pretty much went

11  over the Plaintiffs' exhibits that are directly

12  discussed in my report.  That would probably be the

13  easiest way to find them.  Probably Professor Cutler's

14  regression and various tables where he calculates his

15  Method 1 and Method 2 calculations, as well as a few

16  of the underlying regressions for that.

17       Q.    Okay.  And as you are most likely aware,

18  Professor Cutler has multiple regressions in his

19  report.  So can you give me an idea of which specific

20  regressions you reviewed?

21       A.    Well, I -- I think I've reviewed them all

22  over the course of time.  The one we went -- I went

23  back and looked at would be his regression for the

24  pre-2010 period that he relies on for his -- I -- I
```

```
 1    think -- think of it as primary Method 1 calculations

 2    for that early part, the corresponding regression that

 3    he uses for his post-2010 period, he has a

 4    cross-sectional regression that he uses for that, as

 5    well as the cross-sectional regression he uses for the

 6    whole time period under his Method 2 approach.  Those

 7    are the specific regression results I recall looking

 8    back at.

 9         Q.    Okay.  And just -- just so the record is

10    clear, I know in his report he describes these methods

11    as approaches.  So I believe when you are talking

12    about the various method, Method 1 and Method 2, are

13    you talking about the approaches that he sets forth in

14    his report or --

15         A.    I don't remember his terminology, but I

16    know he has a 1 and a 2.  I'll leave off the word that

17    comes before it.  And 1 is -- 1 is kind of a

18    bifurcated approach where he uses one regression for

19    the pre-2010 period and then a separate regression to

20    understand the post-2010 period, and then there is

21    another one where he essentially uses something

22    similar to that second stage for the entire period.  I

23    think that's his Approach 2.

24         Q.    Great.  So in addition to these
```

Highly Confidential - Subject to Further Confidentiality Review

1    regressions anal- -- analyses that you reviewed in

2    Professor Cutler's report, do you recall any other

3    exhibits from Plaintiffs' expert reports that you

4    reviewed in connection with preparing for this

5    deposition?

6         A.    I -- I think I probably at least looked at

7    most of them, because I went -- I kind of went through

8    the Gruber report and the -- and the Cutler report,

9    but that probably would have been more from Cutler,

10   the tables he as where he has the calculations that

11   kind of underlies his final results.

12              From Professor Gruber's analysis, I guess

13   the ones I recall are some of the charts he has where

14   he has plots over time of various, I think, mortality

15   outcomes were the primary ones.

16        Q.    And when you said a moment ago that you

17   probably looked at least -- at least most of them, you

18   are talking about the exhibits in Professor Gruber and

19   Professor Cutler's reports, correct?

20        A.    Yeah, because I went back through the

21   reports but not, like, reading every single word as I

22   went through.  So I was reading portions of it and at

23   the same time looking pretty much at the charts as I

24   went through because charts are a very easy way to see

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what he is talking about in that part of the report,

 2    so.  That's the sense to which I would have probably

 3    looked at virtually all of the charts.

 4        Q.    Great.  And in connection with preparing

 5    for this deposition, did you also speak with anyone

 6    outside of your two counsel present here or

 7    individuals at Charles River Associates who I'll from

 8    this point forward called CRA in a shorthand?

 9        A.    Not that I recall.

10        Q.    Okay.

11        A.    I mean, about this case.  Obviously I

12    spoke to other people.  Your question was did I speak

13    to other people.  The answer is yes, but not about

14    this case.

15        Q.    Right.  And just so that I can understand

16    clearly, in your report you make references to Greg

17    Bell.

18              Do you recall that?

19        A.    Yes, I do.

20        Q.    And who is Greg Bell?

21        A.    He is at Charles River Associates and

22    he's, I believe, head of the Life Science Division at

23    Charles River Associates, but I don't know him

24    personally very well.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And you know -- are you aware that

 2   he submitted an expert report on behalf of the

 3   Defendants in this case?

 4        A.    Yes, I am.

 5        Q.    Okay.  And did you speak with him at all,

 6   notwithstanding the fact that you don't know him very

 7   well, but did you speak with him at all about this

 8   case, either in connection with this deposition or

 9   prior to that?

10        A.    I have spoken with him at various points

11   since the onset of the case, not for any extensive

12   conversation and -- and usually as part of a lot of

13   people being on the phone, for example, at the same

14   time.  I don't -- I haven't had any one-on-one

15   conversations with him, for example.  So he has been a

16   participant in some of the conversations that I have

17   also been involved in.

18        Q.    Okay.

19        A.    And I believe counsel were on the phone

20   in -- whenever I've talked to him.

21        Q.    Were there any conversations that you had

22   with him where counsel were not present?

23        A.    No.

24        Q.    And when you said a moment ago that you
```

1   recall speaking or interacting with him since the

2   onset of the case, what is your understanding of when

3   the onset -- onset of this case started?

4        A.   I don't have a date.  It would have been

5   sometime earlier this year in the -- for me, that's

6   when I became involved.  I became involved earlier

7   this year.

8        Q.   Okay.  Great.

9             I'm going to hand you a copy of what has

10  been marked as Murphy Exhibit 1.

11       MR. KO:  And, David, there is a copy right here

12  between you and Bryant.

13       MR. HALLER:  Okay.  Thank you.  Thanks.

14  BY MR. KO:

15       Q.   Dr. Murphy, have you seen this notice

16  before?

17       A.   I don't recall seeing this specific

18  notice.  I was made aware of the contents of it.

19       Q.   Okay.  That's great.

20            And so with respect to the contents, what

21  were you made aware of?

22       A.   That there was going to be a deposition

23  today that was going to cover my opinions in the case.

24  My understanding, it was similar to other depositions

 1   that I've taken, so I didn't really gather any details

 2   that were substantially different than a --

 3   depositions that I've had in the past.

 4       Q.    Sure.  And notwithstanding the fact that

 5   you haven't seen this specific notice or recall

 6   specifically seeing it, I want to direct your

 7   attention to the first exhibit that's attached to

 8   this, Murphy Exhibit 1.

 9            And with respect to the first item, I

10   believe there is reference there made to certain

11   documents that you reviewed in connection with this

12   deposition.  And earlier today Mr. Haller did indicate

13   and provide to us certain documents that you did

14   review, and we'll get to those in a moment.

15            But can you briefly describe to me what

16   specific documents you reviewed in connection with

17   this dep -- deposition, outside of the ones we've

18   already discussed?

19       A.    Other than -- I believe other than ones

20   that are already disclosed in my report, and that

21   would be items that were cited in my report.  I think

22   the two that we're turning over today are the only

23   ones that I'm aware of.

24       Q.    Okay.  So in your report you -- in your

Highly Confidential - Subject to Further Confidentiality Review

1    Appendix B you set forth certain materials that you

2    relied upon for purposes of your report.  And your

3    testimony is that in addition to those documents and

4    the two documents that your counsel turned over today,

5    there is no other documents that you reviewed in

6    connection with this -- in connection with preparing

7    for this deposition, correct?

8         A.    Not that I recall.

9         Q.    Okay.  Great.

10             And let's turn to the exhibits that

11   Mr. Haller --

12        A.    Okay.

13        Q.    -- provided to me earlier this morning.

14        MR. KO:  Can we mark for the record -- do you

15   have an extra copy for the witness?

16        MR. HALLER:  Yes.  Should we mark this one, is

17   this -- is that the one you want to start with?

18        MR. KO:  Let's do the other, let's start with

19   this one.

20        MR. HALLER:  Okay.  She'll mark it.

21                  (WHEREUPON, a certain document was

22                   marked Murphy Deposition Exhibit

23                   No. 3, for identification, as of

24                   06/06/2019.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KO:

 2        Q.    So the court reporter has handed you a

 3   copy of what has been marked as Murphy Exhibit 2 --

 4        THE COURT REPORTER:  Three.

 5        MR. KO:  Three.  Thank you.

 6   BY MR. KO:

 7        Q.    And so this is one of the documents in

 8   addition to those that you disclose in Appendix B that

 9   you reviewed and you've obviously dis -- provided at

10   this deposition, correct?

11        A.    Yes.

12        Q.    And what is this document?

13        A.    It's actually a document that was produced

14   by the White House, I believe, Council of Economic

15   Advisers, that was essentially an update on some of

16   the data regarding opioid overdose deaths over time.

17   And it has some more recent data than the data that

18   were available at the time I prepared my report, as

19   well as some discussion from the Council of Economic

20   Advisers is what I infer from this in terms of some

21   recent work that they've been doing on what's going --

22   what's been going on in the -- with opioids.

23        Q.    Okay.  And how did you discover this

24   document?
```

```
 1        A.     It was brought to my attention that

 2   this -- that -- I knew that the council was working on

 3   this issue and that they had announced these things

 4   and then it was brought to my attention that there

 5   actually had been a release of some of that

 6   information.

 7        Q.     And did counsel, your attorneys this time,

 8   not the council, c-o-u-n-c-i-l, did your counsel bring

 9   this document to your attention?

10        A.     Yes, they did.

11        Q.     Okay.  And with res -- I'll now turn to

12   Murphy Exhibit -- what will be marked as Exhibit 4?

13        MR. HALLER:  She'll mark that.

14                    (WHEREUPON, a certain document was

15                     marked Murphy Deposition Exhibit

16                     No. 4, for identification, as of

17                     06/06/2019.)

18   BY THE WITNESS:

19        A.     Yes.

20   BY MR. KO:

21        Q.     And so Murphy Exhibit 4 is the second

22   document that you looked at in addition to the

23   materials cited in Appendix B of your report --

24        A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     -- in connection with preparing for this

2  deposition, correct?

3     A.     That is.

4     Q.     Okay.  And what is this document?

5     A.     It is an update from, and it says right on

6  the front, the Cuyahoga County Medical Examiner and

7  the Regional Forensic Sciences Laboratory Director.

8  And, again, it has some updates to some of the data

9  that had been available before.  And so I thought this

10  would be potentially something that would be useful

11  if -- beyond what I had available at my report.  I --

12  it's not something on which I formed additional

13  opinions in anything at this point, but I wanted to

14  bring to the attention of all of the parties that this

15  was information that was now available that

16  potentially would be helpful.

17     Q.     And what is your understanding of when

18  this particular document was published or disclosed to

19  the public?

20     A.     I -- I -- that I don't recall.  It -- I

21  was not aware of it until after my report.  And,

22  therefore, I -- given that I thought it might

23  potentially be something useful, it would be worth

24  bringing forward.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And did counsel, your attorneys, also

 2   provide this document to you?

 3        A.    Yes, they did.

 4        Q.    Okay.  And this document, as we, I believe

 5   we noted before, I don't think actually we did, it's

 6   authored -- it appears to be authored by Thomas

 7   Gilson.

 8              Did you see that?

 9        A.    Yes.

10        Q.    Do you know who Thomas Gilson is?

11        A.    I do not know him personally.  I -- I -- I

12   mean, I think on here it says what it -- what he is

13   affiliated with, but I -- I know that from this

14   document.  I don't -- I'm not very good with names, so

15   I don't recall his name.

16        Q.    Do you know he has been deposed before in

17   this case, right?

18        A.    It -- I think that sounds right, but,

19   again, I never remember people by their name.

20        Q.    Sure.

21        A.    It doesn't mean much to me.

22        Q.    And I believe you reviewed his deposition

23   transcript?

24        A.    Probably, but, again, I generally remember
```

1    things more for the content than I do for the name of

2    the person who is being deposed.

3        Q.    And a moment ago you said that you are not

4    necessarily -- well, you are not using this document

5    to form or support any of the opinions in this case.

6             I want to make sure I understand with

7    respect to Murphy Exhibit 3 that we just discussed a

8    moment ago, are you using that document in any way to

9    help inform or provide the bases for any of the

10   opinions that you are providing in this case?

11       A.    Not as of yet because I haven't had a

12   chance to fully study these documents and see how they

13   fit in with everything else I know.  But they are

14   potentially useful given they have more updated

15   information, so I thought it would be good to bring

16   those to your attention.

17       Q.    Okay.  I appreciate that.  You can set

18   those aside for now.

19            Going back -- well, you can set aside

20   Exhibits 3 and 4, but let me redirect your attention

21   to Murphy Exhibit 2, which is the notice of your

22   deposition.

23       A.    I believe it is actually Exhibit 1.

24       Q.    Thank you.  I'm getting -- you get -- you

```
 1    don't recall names, I don't recall numbers.

 2              With the Exhibit 1 -- thank you for

 3    that -- with respect to Murphy Exhibit 1, going back

 4    to the page that had the three bullets on it, the

 5    exhibit.  Turn your attention to the third item that

 6    requests your CV.

 7              Do you see that?

 8        A.    Yes.

 9        Q.    And it is my understanding, as Mr. Haller

10    indicated earlier, that you have an updated CV to

11    provide?

12        A.    That's correct.

13        Q.    Okay.  Let's go ahead and mark that.

14        MR. HALLER:  Did we give all of our copies?

15        MR. KO:  Do you have an extra copy?

16        MR. HALLER:  Do we have more of those?  Did I

17    hand them all out or --

18        MR. KO:  We can use this one.

19                  (WHEREUPON, a certain document was

20                   marked Murphy Deposition Exhibit

21                   No. 5, for identification, as of

22                   06/06/2019.)

23        MR. HALLER:  Did you want yours back?  Okay.

24    BY MR. KO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Juliana has handed you a copy of what has

2   been marked as Murphy Exhibit 5.  And so this reflects

3   an updated CV that you are providing in this case,

4   correct?

5        A.    Yes.

6        Q.    Can you describe to me what has been

7   updated relative to the version that you disclosed in

8   your report?

9        A.    It would be any of the items that would

10  be, I think -- believe on Page 19 would be the --

11  would be the -- would be the items that would be

12  updated.  And I don't remember which of these would be

13  after that date, but there were certain things that

14  showed up after that date, so we added them to the end

15  of the vitae and then the rest of the vitae should be

16  exactly the same with some additional items added at

17  the end.

18       Q.    Okay.  So the items that are set forth in

19  the Page 19, and I also believe Page 20, which

20  reflect, I believe, additional expert work that you've

21  done are the items that you have added that are

22  different than the CV that has been disclosed in your

23  report that was submitted on May 10th, correct?

24       A.    That's my understanding, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  And it looks like there have

2   been -- at least in terms of dates, the report you

3   have a submitted in this case was disclosed on

4   May 10th, correct?

5        A.    Yes.

6        Q.    So it looks like there are at least four

7   engagements that you -- or four expert reports that

8   you also provided on May 10th in -- in other matters?

9        A.    Well, they are all -- they are actually

10  all for the -- they are all from the same matter.

11  There is multiple -- it is -- it is a case that

12  involves multiple plaintiffs and it's a case where

13  there are multiple reports that are basically all

14  covering the same material, so.  Those -- if you

15  notice, the -- the case being described there is the

16  same case for all four of them.

17       Q.    Understood.

18             So you've discussed an -- and I see you

19  actually disclosed the expert report that you provided

20  in this matter, so in addition to that one, it looks

21  like you've provided in your CV the expert report

22  you've submitted in the In Re Package Seafood Products

23  case, correct?

24       A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.  Let's actually stay on your CV for

2    a moment.

3               And in the beginning of your CV on Page 1,

4    you list your current positions, correct?

5       A.      Yes.

6       Q.      And you've listed the fact that you are a

7    professor here at the University of Chicago, that you

8    are a facul- -- faculty research associate at the NBER

9    and also co-director at the Becker Friedman Institute,

10   correct?

11      A.      That's correct.

12      Q.      With respect to your work at the NBER, for

13   the record, National Bureau of Economic Research, how

14   long have you been a faculty research associate?

15      A.      A long time.  20 plus years.

16      Q.      And prior to being a faculty research

17   associate, did you serve in any other capacity at the

18   NBER?

19      A.      I think I was a faculty research fellow.

20   I think that's what you're called before you become a

21   faculty research associate.

22      Q.      Okay.  Is there any difference between a

23   faculty research associate and a -- and a research

24   associate?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I'm -- if there is one, I'm not aware of

2   what it is.

3        Q.    Okay.

4              Now, you were aware of -- obviously you've

5   reviewed Professor Cutler's and Professor Gruber's

6   report.

7              Do you know -- do you have a professional

8   relationship with either one of them?

9        A.    I wouldn't say I have a close professional

10  relationship with either of them.  I've known each of

11  them casually for a long period of time, basically

12  since they've been in the profession.  So I've known

13  them for 20 plus years as well, probably 30 years in

14  the case of...

15       Q.    Okay.  And are you aware that they are

16  also both research associates at the NBER?

17       A.    That was my general recollection.  I

18  didn't have specific knowledge of that outside of --

19  but, yes, I would be -- have been very surprised if

20  they weren't.

21       Q.    Have you ever worked with any of them in

22  connection with your role as an -- research associate

23  at the NBER?

24       A.    I haven't worked with them directly, for
```

Highly Confidential - Subject to Further Confidentiality Review

1   example, on a paper or anything, but David Cutler, for

2   example, was a contributor to a volume that Bob Topel

3   and I edited.  So we worked with him in that regard.

4   He participated in the corresponding conference.

5           I probably dealt with David Cutler

6   probably more frequently than Jon -- Jonathan Gruber,

7   but at time to time over the years I've come across

8   them at conferences and other things, some affiliated

9   with the NBER, some of them not.

10      Q.    Sure.

11          And with respect to Professor Cutler, you

12  said that he contributed to a volume that you edited.

13  Which volume or publication was that?

14      A.    It is a -- it is one of the books listed

15  on my -- on my vitae.  It's "Measuring the Gains For

16  Medical Research:  An Economic Approach."  So I

17  believe David Cutler had a piece in that one.

18      Q.    Do you recall what his specific

19  contributions were?

20      A.    No.

21      Q.    I was hoping they'd be very memorable for

22  you.

23      A.    It was probably memorable at the time, but

24  if you notice the date, it was 2003, so it's roughly

1   15 years ago, so it's pretty far back in time.

2        Q.    Fair enough.

3             With respect to Professor Cutler, do you

4   have a level of professional respect for him?

5        MR. HALLER:  Objection; vague.

6   BY THE WITNESS:

7        A.    I think he is reasonably -- I think he is

8   reasonably well regarded in the health economics

9   community.  So I -- I think I would generally share

10  that opinion.

11  BY MR. KO:

12       Q.    What about with respect to

13  Professor Gruber, do you respect him?

14       MR. HALLER:  Same objection.

15  BY THE WITNESS:

16       A.    I think he is a -- probably a little less

17  well known that Professor Cutler.  I don't know as

18  much of his work.  I don't think he has had as much of

19  an impact on the profession.  So I -- I -- I guess I

20  wouldn't place him at the same point.

21  BY MR. KO:

22       Q.    And when you say "impact on the

23  profession," are you talking about the profession of

24  economics or health economics in particular or both?

```
 1        A.    I think either.  I -- because I know

 2   Jonathan has done work in health economics.  He also

 3   dabbled some in labor economics.  So I don't -- I

 4   don't think his contributions would -- would rank as

 5   highly.

 6        Q.    Okay.

 7              Going back to your CV on Page 1 with

 8   respect to your current position -- positions,

 9   regarding your work at the Becker Friedman Institute,

10   can you describe to me what the Becker Friedman

11   Institute does?

12        A.    Yes.  It's a -- it's actually titled the

13   Becker Friedman Institute for Research and Economics.

14   So it supports economic research of the faculty at

15   Chicago as well as people from around the country.  So

16   it -- it engages in direct research support that helps

17   people gather data, hire support to work on their

18   data -- on their research products, it runs a large

19   number of conferences that bring researchers together

20   from around the country to discuss important topics

21   from an economic as well as policy perspective, it has

22   a pretty significant outreach program that tries to

23   make economics -- economic teachings and understanding

24   accessible to a broad population within the profession
```

```
 1    as well as outside the profession.

 2              I was one of the directors of the Becker

 3    Friedman Institute writ large up until, oh, I don't

 4    know, a little over a year ago and that was -- those

 5    were really our goals.  We wanted to really support

 6    high quality research and help support people

 7    disseminating what they have learned and making it

 8    useful to people more broadly.

 9        Q.    Okay.  So when you said a moment ago that

10    you were the director of the entire institute, that

11    position has changed, now -- you are now a co-director

12    of what I understand is a -- is a subgroup of the

13    Becker Friedman Institute.

14              Is that fair to say?

15        A.    That's roughly correct.  I wasn't the -- I

16    was the co-director actually even at that level.  But

17    I was the co-director of the Becker Friedman Institute

18    together with Lars Hansen who was the other

19    co-director at the time.

20        Q.    And how long were you a co-director at

21    Becker?

22        A.    Probably about three years.

23        Q.    Okay.  And when you said that they support

24    faculty at Chicago, are you talking about Booth or are
```

1    you talking about University of Chicago as a whole?

2         A.    It is much broader than Booth.  And

3    that -- in fact, one of the goals of the Becker

4    Friedman Institute has been to promote a broader

5    economics community at Chicago, that is, support

6    people at Booth, at the Harris school and the law

7    school and the medical school and the economics

8    department and really facilitate those different

9    groups interacting with each other because we always

10   felt that bringing the people together -- together

11   with bringing in people from outside Chicago was the

12   best way to create great ideas and -- and really first

13   quality work.  So that kind of unifying Chicago

14   together as well as integrating them more closely with

15   the broader economics community was probably the major

16   goal of the Becker Friedman Institute.

17        Q.    And does the institute work with any

18   entities?

19        MR. HALLER:  Objection; vague.

20   BY THE WITNESS:

21        A.    I would say -- I -- we don't really work

22   with -- with other entities on a long-term basis.  We

23   sort of have partnered with various groups, for

24   example, for specific conferences and things like

Highly Confidential - Subject to Further Confidentiality Review

1   that.  So we've done some things along with the Fed,

2   we've done some things along with other groups where

3   we felt that was a fertile combination.

4           But we've really focused most on providing

5   a forum that would bring people together and allow

6   them to kind of chart their course and do the best

7   research they could.

8       Q.    Now, I also understand, as we've discussed

9   a moment ago, you work with CRA, correct?

10      A.    That's correct.

11      Q.    And what is your position at CRA?

12      A.    I'm a consultant to CRA.  So I don't

13  have -- I'm not an employee of CRA.  So I'm a

14  consultant to CRA.

15      Q.    And -- and how long have you been at a

16  consultant at CRA?

17      A.    I think about five years.

18      Q.    Okay.  Is there any reason why you didn't

19  disclose that role in the list of current positions

20  that you have?

21      A.    I don't think -- because it's -- I don't

22  have a position there.  I'm not -- I'm not employed by

23  CRA, so it's not my -- I don't have as an official

24  position.  I just serve in a consulting capacity to

1    CRA.

2        Q.    Do you get paid by CRA?

3        A.    I get paid based on the consulting work I

4    do.  So I sub -- I submit my hours and billing for the

5    work I do and I get paid based on that, but I don't

6    draw a salary, for example, from CRA.

7        Q.    Okay.  I also understand that you -- well,

8    are you familiar with the Hoover Institute?

9        A.    Yes, I am.

10       Q.    Okay.  And it's my understanding that you

11   are a senior fellow at the Hoover Institute, is that

12   correct?

13       A.    Yes, I am.

14       Q.    Okay.  And how long have you been a senior

15   fellow there?

16       A.    Three or four years.

17       Q.    Okay.  And do you receive any compensation

18   in connection with your role as a senior fellow at the

19   Hoover Institute?

20       MR. HALLER:  Objection.  I -- I don't know the

21   relevance of that.

22            I mean, if you are comfortable explaining

23   that, that's fine with me, but...

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I receive some compensation from the

 2   Hoover Institute as part of my affiliation with them.

 3   BY MR. KO:

 4        Q.    And what is the amount of that

 5   compensation?

 6        MR. HALLER:  Same objection.

 7   BY THE WITNESS:

 8        A.    I don't recall.  It's -- it's a -- I don't

 9   recall exactly what it is.

10   BY MR. KO:

11        Q.    Do you have any understanding of whether

12   or not it's compensation that's tied to any other

13   compensation you receive or is it separate, standalone

14   compensation?

15        A.    It is standalone compensation.

16        Q.    Okay.  Is it over $50,000?

17        A.    No, it's not.

18        Q.    Is there any reason why you didn't

19   disclose the fact that you were a senior fellow at the

20   Hoover Institute in your current positions list of

21   your CV?

22        A.    Primarily because I don't really -- I

23   don't really do that much for the Hoover institution

24   on a regular basis, so it is not a regular part of my
```

1    activities.

2         Q.    Well, when -- what do you do for the

3    Hoover Institute?

4         A.    Mostly what they ask me, if there's --

5    going to have a conference and they want somebody to

6    speak at a conference, I will speak at a conference

7    for them, or if they are hosting their -- their

8    council, I think they have a council of outside

9    individuals who advise them on their program and

10   support their program.  So often I'll speak at those

11   and talk about my research and talk about my academic

12   work.  And that's really what I've been doing for

13   Hoover.  I don't teach any classes, I don't oversee

14   any programs.  I -- I really just do what I do for

15   many other organizations, which is come in and talk

16   about the kind of work that I do.

17              And so I think the difference between

18   doing that for Hoover and what I would do for numerous

19   organizations who might request that I come speak is

20   it's kind of more of an ongoing thing with Hoover,

21   whereas the other ones, it is more of a one-off

22   speaking engagement.

23        Q.    That's helpful.

24              Do you work with any other -- any of the

1    other senior fellows at the Hoover Institute?

2        MR. HALLER:  Objection; vague.

3    BY THE WITNESS:

4        A.    Not at -- in Hoover activities.  In --

5    Eddie Lazear, who is also, I believe, a senior fellow

6    at the Hoover Institute, he helps with a summer camp

7    that I run for Ph.D. students as part of the Becker

8    Friedman Institute.  So Eddie comes to Chicago in the

9    summer for a couple of days and teaches a couple

10   lectures as part of our summer camp.  So I -- he is

11   also a Hoover affiliate, but he is actually working

12   together with me as part of the Becker Friedman

13   Institute.

14       Q.    Do you know Daniel Kessler?

15       A.    Not well.

16       Q.    And today we are here at the offices of

17   Alvarez & Marsal.

18            Do you have any connection with them?

19       A.    Not that I'm aware of or I recall.

20       Q.    Okay.  Now, I understand from your CV that

21   you got your Ph.D. at the University of Chicago, and I

22   appreciate that you've disclosed your thesis topic on

23   here as well.

24            Do you recall being part of any

Highly Confidential - Subject To Further Confidentiality Review

```
 1    organizations or groups during your time at the

 2    University of Chicago when you obtained your Ph.D.?

 3         MR. HALLER:  Objection; vague.

 4    BY THE WITNESS:

 5         A.    I do not.

 6    BY MR. KO:

 7         Q.    Okay.  Do you recall receiving any honors

 8    or awards when you were at University of Chicago

 9    getting your Ph.D.?

10         A.    I believe I did.  I think I got various

11    awards associated with fellowships, for example.  I

12    think when I was getting my Ph.D. I got an award from

13    the Friedman Fund, I recall.  I think I got also an

14    Earhart Foundation fellowship, I believe.  There may

15    have been others.  I don't remember them all.

16         Q.    I'm sorry.  What was that second one?

17         A.    Earhart Foundation fellowship.  They

18    provide graduate student fellowships at the time.

19         Q.    Do you recall the amount of those

20    fellowships?

21         MR. HALLER:  Objection; vague.

22              If you remember, and I -- I don't see the

23    relevance.

24    BY THE WITNESS:
```

Highly Confidential - Subject To Further Confidentiality Review

1      A.    They were a lot less than graduate

2   students get today.  I think they were, like, $6,000

3   or something like that.

4   BY MR. KO:

5      Q.    Okay.  In connection with your

6   undergraduate studies at UCLA, do you recall receiving

7   any honors or awards at UCLA?

8      A.    I think I also had an Earhart Foundation

9   fellowship when I was an undergraduate at UCLA.

10     Q.    Other than that, do you recall any other

11  awards, honors or fellowships?

12     A.    I -- I don't know.  I think I graduated

13  Phi Beta Kappa.  I guess that's an award.  I don't

14  know if there were others, to be honest.

15     Q.    Well, actually, I see you've listed --

16  you've listed them in your CV, so, or a couple at

17  least.

18           Turning to Page -- well, the bottom of

19  Page 2 of your CV, you've set forth certain

20  publications.

21           Do you see that?

22     A.    Yes.

23     Q.    Does the CV contain all of the

24  publications that you have either authored or

Highly Confidential - Subject to Further Confidentiality Review

1    coauthored?

2        A.    It attempts to.  There may be something

3    missed along the way or something that was lost over

4    the years, but to the best of my abilities, it does.

5        Q.    And on Page 9 in particular, you've --

6    after you've gone through articles that you've written

7    and -- and books and chapters in books, you've

8    disclosed selected working papers.

9              Do you see that?

10       A.    Yes.

11       Q.    First of all, what's your definition of a

12   working paper?

13       A.    It's a -- there is a wide range.  Some are

14   papers that, you know, are virtually ready for

15   publication that have not yet been published, other

16   papers are things you just started on and really are

17   in a very crude form.  So I don't think -- it's not a

18   very precise definition, as I understand it.  It is

19   not even clear when something transits from being a

20   collection of papers of notes that you are working on

21   to being a working paper, so.  I would say it's --

22   it's not very systematic what actually ends up being

23   called a working paper.

24              Now, some working papers you submit to a

Highly Confidential - Subject to Further Confidentiality Review

1    working paper series, so you've -- you've made the

2    decision I'm going to put it in the Becker -- in the

3    BFI working paper series, in the NBER working paper

4    series, and then that's probably a working paper

5    almost by definition.

6              For the things that don't really go, like,

7    through a channel like that, I think it's pretty

8    unclear when it transitions to being a working paper.

9         Q.    And working papers are not peer reviewed,

10   correct?

11        A.    They don't have to be.  Some of them might

12   have been, if you're sort of in that limbo stage

13   between maybe getting it peer reviewed and getting it

14   actually published, it might still be called a working

15   paper until it gets peer reviewed.

16        Q.    With respect to the working papers that

17   you list here, did any of them eventually become peer

18   reviewed?

19        A.    Yeah, the -- for example, but probably

20   with a changed name, like this "Manipulation of Child

21   Preferences, Old Age Support and Investments in

22   Child" -- "Children's Human Capital," that paper kind

23   of morphed into another paper that's on my vitae

24   that -- that's there.  The -- that would be the one

Highly Confidential - Subject to Further Confidentiality Review

1    that I see.

2            And what usually happens is things get

3    taken out of the working paper category when they get

4    moved into the peer-reviewed publications.  So

5    sometimes if they change enough they stay there, too,

6    and they get added, but I think most commonly things

7    would have been working papers and then become peer

8    reviewed and ultimately published.

9        Q.    Regarding the penultimate article or

10   working paper you list in this section on Page 9

11   titled "Activating Actavis With a More Complete

12   Model," can you describe to me what that marketing

13   paper was about?

14       A.    Yeah, that was a working paper I did

15   looking at drug and -- and settlements in -- in -- in

16   generic drug patent litigation cases.  So I did that

17   along with a number of other individuals.  And I think

18   that ultimately -- I'm -- I'm not sure, actually,

19   where that paper has ended up, but for me, I -- it

20   ended up on this working paper list.

21       Q.    And what was the primary point of that

22   working paper?

23       A.    I think it was to try to understand the --

24   the economics of what goes into those kind of

1    settlements and why, in fact, those settlements look

2    the way they do in many cases.

3        Q.    And what conclusion did you and your

4    coauthors draw from looking at those settlements?

5        A.    That there were a lot of reasons why you

6    would see payment flows that would be consistent with

7    kind of the underlying economics, so that was kind of

8    the conclusion we reached.

9        Q.    When you say "payment flows," what are

10   you -- what do you mean?

11       A.    That you might, for example, see a payment

12   flowing from the holder of the patent to other

13   individuals, other challengers of those patents,

14   reflecting the fact that there was substantial value

15   to be gained in establishing certainty over where the

16   market was headed going forward.  That was one of the

17   main points that we had.  There were a variety of

18   points in that paper.

19       Q.    Did you focus at all or analyze, generally

20   speaking, the difference between generic and -- and

21   specialty drugs?

22       MR. HALLER:  Objection; vague.

23   BY THE WITNESS:

24       A.    No, I think it was -- it was more the

Highly Confidential - Subject to Further Confidentiality Review

1    interaction between generic entrants and brand name

2    pharmaceuticals -- pharmaceuticals already in the

3    marketplace.  So it wasn't so much a distinction

4    between them.

5    BY MR. KO:

6        Q.    Well, thank you for that clarification, I

7    actually did mean generic and brand, but do you recall

8    examining any settlements outside of those made in

9    patent litigation for purposes of this working paper?

10       A.    I don't recall, but I don't have a great

11   detailed recollection of what was there at the time.

12       Q.    When you say that you have -- in your CV

13   you've disclosed selected working papers, why have you

14   just disclosed some and not all?

15       A.    Partly for the reason I said before.  It

16   is not clear what a working paper is.  Also, they tend

17   to come and go.  Sometimes papers, you know, you --

18   you are working on them and then you decide, Well, I'm

19   going to set that one aside for a while.  So I -- I

20   don't focus too much on keeping track of all of the

21   projects I'm working on at a time.

22       Q.    The same question with respect to the next

23   section of your CV, "Selected Comments."  Well,

24   actually, let -- let me back up.

1          You've included in your CV a handful of

2     comments that you've made, I presume, on -- on

3     articles and other academic publications.

4          Do you see that?

5     A.    Yes.

6     Q.    And you've indicated that they are

7     selected comments.

8          Can you describe to me why you've selected

9     some and perhaps not others?

10    A.    I would say they are selected because I

11    don't generally keep track of all of the comments.  So

12    comments that I've -- you know, was aware of at a

13    point in time and put on the vitae are there.  I will

14    have commented on many papers over time and I don't

15    always put them in.  Again, it's not been -- not been

16    a focus of mine to focus on comments that I've made on

17    other people's work.

18    Q.    And the next section of your CV on

19    Page 10, you list "Popular Press Articles."

20         Do you see that?

21    A.    Yes, I do.

22    Q.    And so I assume that you've written more

23    articles in the press than just the four that you list

24    here?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I think so, yes.

 2      Q.    Can you identify for me why you've listed

 3  these?

 4      A.    I think when I was putting my vitae

 5  together at one time these were ones that I was aware

 6  of and they were put in there and I really haven't

 7  gone back to keep track of things that have happened

 8  since then.  So it's kind of a legacy of what I had

 9  available at the time.

10      Q.    Okay.  And the next section down you've

11  referred to articles that have been, I believe,

12  written about you, correct?

13      A.    Yes.

14      Q.    And is there any reason why you've listed

15  these and -- and not others?

16      A.    I don't know if there are others, but I,

17  again, it's not been a focus -- I -- I hate reading

18  things about myself, so I try to avoid reading them

19  whenever possible.  These are the ones -- these are

20  the ones that I'm aware of, actually.  I don't -- I'm

21  not aware of other articles about me.

22      Q.    Now, with respect -- you said that you've

23  compiled this CV.  I assume throughout your

24  professional career.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Have you prep -- prepared this CV that we

2    are looking at as well?

3         A.    I try to keep track of it, particularly

4    with regard to the testimony part of it.  I try to add

5    them or have them added as I go because that's the

6    best way to keep track of them, which is why you see

7    the -- at the end just everything listed that happened

8    since the time of the report being issued.  So I try

9    to add things in real-time as they get added.

10        Q.    Who helps you compile your CV?

11        A.    Deanna Siller, who is my assistant at

12   Charles River Associates, helps handle parts of my CV,

13   Virginia Bova, who is my assistant at the University

14   of Chicago, also helps updating with my CV.

15        Q.    And do you have a CV for your expert -- a

16   separate CV for your expert work and one for your

17   academic work or is it the same CV?

18        A.    I tend to -- I mean, the -- it is

19   basically my academic CV tends to be the first part of

20   this CV without the testimony.  That's basically -- I

21   don't maintain two separate CVs for that purpose.  I

22   just use the first part without the testimony as my

23   academic CV.

24        Q.    And have you tailored or revised your CV

```
 1    in any way for purposes of this litigation?

 2         A.    No, other than it has been updated, like

 3    it always is, to try to keep it -- it -- keep it

 4    current.

 5         Q.    Okay.  I want to now turn back to -- well,

 6    not back, but let me go ahead and hand you what has

 7    been marked as Murphy Exhibit 2, which Juliana will

 8    hand you shortly.

 9         MR. KO:  David, there's --

10         MR. HALLER:  Okay.  Thanks.

11         MR. KO:  -- copies right here.

12         MR. HALLER:  Professor Murphy also has a -- a

13    bound, spiral bound copy of his report which he might

14    also prefer to refer to if you don't have an objection

15    to that.

16         MR. KO:  I don't.

17    BY THE WITNESS:

18         A.    I'll use this one because it is a little

19    bit easier to --

20    BY MR. KO:

21         Q.    To turn the pages?

22         A.    -- keep them open.

23         Q.    Just so the record is clear, Exhibit 2

24    that I have handed you is a copy of your expert report
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    with all appendices.

2              And is that identical to what you have in

3    the bound copy that you brought with you today?

4         A.    I'm just trying to make sure it ends at

5    the same place.  Obviously I can't check every page,

6    but it appears to be.  If there is anything that's not

7    here, we'll just refer to that one.

8         Q.    All right.  I understand that your report

9    contains three appendices, A, B and C, is that

10   correct?

11        A.    Yes, I believe that is correct.

12        Q.    And does the bound version that you have

13   in front of you also contain those three appendices?

14        A.    Yes.  That's what I was just checking.

15        Q.    Okay.  Great.

16              Now, this report that you've submitted in

17   this case obviously contains the opinions that you

18   intend to offer if called upon at trial, correct?

19        A.    They -- it contains the opinions that I

20   had as of the time that I wrote the report.  Obviously

21   if new information comes in or other issues arise in

22   the case, I will try to address those as best as I can

23   based on that new information, but it -- it was a

24   disclosure of the opinions I expected to give as of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the time of the report.

2        Q.    And as of today's date, are there any

3    opinions outside of this report that you are aware or

4    intend on providing in this case?

5        A.    I would say in the -- in the scope of

6    broad opinions, no.  As I think was mentioned at the

7    beginning, there are some updates to what I wanted --

8    what's in the report.  So that would -- I would

9    consider part of my opinions in this case.  And I'm

10   happy to talk about those today, if you'd like.

11       Q.    Yes, let's talk about those actually right

12   now.

13             Can you describe to me what updates you've

14   made to your report?

15       A.    Yeah, there really is -- there is really

16   two updates.  Let me take the really simple one first.

17   If you turn to Exhibit, I believe, is Exhibit 40 --

18   44.

19       Q.    Can you tell me what page that's on?

20       A.    It's on Page 126.

21             Okay.  And it -- it -- the footnote of

22   sources says ARCOS.  That's not correct, that that

23   should be, as is described in the text, NSDUH,

24   National Survey on Drug Use and Health.  So I think,

1   if you read the text, it is pretty clear that that's

2   where it came from because that's what it says in the

3   text, but the footnote inadvertently put ARCOS

4   instead.  So that should be changed.

5       Q.   Okay.  So the one change you've made in

6   your report is to Exhibit 44 and the sources that you

7   cite are NVSS and NSDUH data and not NVSS and ARCOS

8   data, correct?

9       A.   That sounds correct, yes.

10      Q.   All right.  And with respect to this

11  graph, I did notice there is some missing data with

12  respect to the NSDUH information for 2014.  And I

13  think I know the answer to this, but let me ask you:

14  Did I -- am I reading the graph correctly and there is

15  a gap in the NSDUH data?

16      A.   Yeah, there's two series that are there.

17  There is a pre-2014 series that is there.  There was

18  some changes in the way in which things were done, and

19  there is a post-2014 series.  They are trying to

20  measure the same things, so I think it is fair to put

21  them on the same graph, but they are slightly

22  different in that regard.

23      Q.   And do you recall what changes were made?

24      A.   It was changes in the way the -- the -- as

Highly Confidential - Subject to Further Confidentiality Review

1    I recall, it was changes in the way they -- they --

2    the questionnaires worked, but I don't have a specific

3    recollection beyond that.

4        Q.    And the questionnaire is provided by the

5    NSDUH to?

6        A.    It's -- it is a survey that they use to

7    assess drug use and health and like most surveys they

8    changed their methodologies over time at certain

9    points, and this is one of those with regard to this

10   issue.

11       Q.    So for purposes of your corrected

12   Exhibit 44, you have data that is missing from 2014 as

13   a result of these changes that they were -- NSDUH

14   was -- was trying to make, is that your testimony --

15   do I understand your testimony correctly?

16       A.    My understanding is that there are -- as

17   I'm rec -- recall it, there are two different

18   methodologies that -- one for the later period and one

19   for the earlier period and there is -- they split at

20   2014 is the way I understand it.

21       Q.    And what were these two different

22   methodologies?

23       A.    I don't recall the specifics, but it was

24   in the way in which the data were gathered.  What they

1    are trying to measure is the same thing which is

2    opioid use disorder, but...

3         Q.    So this is the first, I believe you said

4    you made a few changes to the report, so this is the

5    first change that you wanted to make.

6              Can you describe to me what additional

7    changes were made?

8         A.    Yeah.  The -- the second one is in several

9    places in the report where we are looking at deaths of

10   despair measures, we talk about a Method 1 and a

11   Method 2.  And the changes I des -- I'm going to

12   describe for you will regard Method 2.

13             And in Method 2 we measure all of the

14   deaths of despair, measure it as a rate, and then

15   subtract the Plaintiffs' estimates -- the Plaintiff

16   expert's estimate of the ones associated with opioids

17   to get kind of a non-opioid number.

18             And it came to my attention that when we

19   did that subtraction, the Plaintiffs were using a

20   different denominator for the population.  So, in

21   other words, they were looking at a certain number of

22   deaths and dividing by the adult population, whereas

23   my calculations had divided by the -- the -- the

24   overall population.  And you really should use the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    same denominator for both.

 2              Now, the deaths are kind of overall, so

 3    you might say I want to use the overall population,

 4    but -- but anyway -- at any rate, you want to make

 5    them the same.  So the revision is to adjust their

 6    number to correspond to the same denominator that I

 7    used for my calculations.  That causes my Method 2

 8    numbers to be slightly different than they would have

 9    otherwise been.  So the exhibits that use that

10    Method 2 are going to change reflecting that.

11              Now, the qualitative opinions aren't going

12    to change, but the numbers are going to change

13    themselves.  In general, they got closer to Method 1.

14    So the discrepancy, the difference between Method 1

15    and Method 2 actually gets smaller when you make this

16    adjustment, because this adjustment sort of

17    overcorrected in some sense because it used a smaller

18    number in the bottom of the fraction which tends to

19    make the fraction bigger, the number bigger, which

20    tends to give you a bigger correction.  So when you

21    make that adjustment, the numbers get closer to

22    Method 1.

23              And so that's going to affect four

24    exhibits in the report and four corresponding appendix
```

Highly Confidential - Subject to Further Confidentiality Review

1    exhibits that have the full regression results.  So

2    there will be four regression results in the report

3    affected and four results in the appendix, which are

4    really the same results, it just lists all of the

5    coefficients from the regressions rather than just

6    those selected ones.

7         Q.    Can you identify for me which -- let's

8    start with the exhibits, do you recall which exhibits

9    you made the adjustment to?

10        A.    Yes, it is all of the ones that we were

11   using for the Method 2 for the death of despair, so we

12   can start at the end because we are very close to the

13   end now.

14        Q.    Great.

15        A.    So there's two exhibits.  Yeah, so

16   Exhibits 42 and 43.  In those exhibits the numbers

17   associated with the coefficients for Method 2 as well

18   as the other things in that row will change.  So --

19        Q.    For both Exhibits 42 and 43 --

20        A.    For both exhibits, the second set of

21   numbers, the second row of numbers will change

22   somewhat if we make -- when we make this adjustment.

23        Q.    In addition to Exhibits 42 and 43, which

24   the changes, as you said, were made to Method 2 in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    each of those exhibits, what were the other two --

 2         A.    Yeah.

 3         Q.    -- exhibits for which the adjustment was

 4    made?

 5         A.    I'm going to go find them for you now.

 6               Let's go to Exhibit 26, that's the next

 7    one I -- I find.

 8         Q.    I believe that's on Page --

 9         A.    81.

10         Q.    81.  Thank you.

11         A.    Okay.

12         Q.    And so staying on Exhibit 26 for a moment,

13    just to be clear to make sure I understand, again, the

14    shipment coefficient for Method 2 is the one that's

15    changing?

16         A.    Right.  So the 0.61 in the first row

17    wouldn't change but the second one, which is now 2 --

18    in 2.04 listed here is going to become smaller.  That

19    is closer to what you get for Method 1.

20         Q.    And do you recall actually what that

21    specific adjustment -- or coefficient is?

22         A.    Off the top -- I don't want to -- I don't

23    want to speculate.  I think I know what it is, but I

24    don't want to guess.  I think I could give it to you.
```

Highly Confidential - Subject to Further Confidentiality Review

1    I think it is 1.61.  That's -- but don't hold me to

2    that one.

3         Q.    I won't.

4         A.    It is on that order of magnitude --

5         Q.    Okay.

6         A.    -- something like that.

7               And then there is one more.  I'm trying to

8    find that.

9               Do you know where it is?

10        Q.    64.

11        A.    64.  Okay.

12        Q.    Page 64.

13        A.    I'm just not there yet.  Okay.  I thought

14   maybe I had passed it.

15              Yeah, there is -- there is 64.  And --

16        Q.    Page 64, right?

17        A.    I'm sorry.  Page 64, Exhibit 19.

18        Q.    Okay.

19        A.    Again, what will change is Method 2, not

20   Method 1, and that coefficient in this case will get

21   larger because it is going to get closer to Exhibit --

22   to the coefficient for Method 1, and I don't recall

23   what that one is.

24        Q.    So the changes that you have made that we

1    are describing here when adjusting for the population

2    of deaths that you have analyzed, the changes you've

3    made are to Exhibits 19, 26, 42 -- or sorry -- 40 --

4    yeah, 42 and 43?

5         A.    Correct.

6         Q.    Okay.

7         A.    And then there are corresponding appendix

8    tables that have exactly these results but show the --

9    all of the regression coefficients.  So those

10   corresponding tables will change for the --

11        Q.    And are all -- go ahead.

12        A.    And I -- I think we could go through them,

13   but it's -- it is actually the same set of regression

14   results.  It's just in the text we only show these

15   coefficients, whereas in the appendix we show all of

16   the regression coefficients from the same regression.

17        Q.    And those are the regressions that are

18   contained in Appendix C, correct?

19        A.    Correct.

20        Q.    Okay.  And I just want to make sure I

21   clearly understand the adjustment that you made.  So

22   in Plaintiffs' expert reports when counting the

23   deaths, they have defined the population as adults and

24   your analysis expanded that universe, I believe is

Highly Confidential - Subject to Further Confidentiality Review

```
 1   that what you -- or --

 2        A.    No.

 3        Q.    That's what I thought.

 4        A.    The deaths are the same.  They divided it

 5   by the adult population to make it into a rate.  I

 6   divide it by the broader population and that gives you

 7   a different rate.  In general, it is a lower number

 8   because you have got the same number of deaths spread

 9   over a broader population.

10             Now, you might say the way I did it is

11   more like I got the same group in both numerator and

12   denominator, it is not that different in terms of how

13   it changes over time because those two populations

14   move pretty closely together, but when you are

15   subtracting one rate from another, it makes a

16   difference.  You want to have the same rate in the

17   denominator, which is why I made that correction.

18        Q.    Thank you for that clarification.

19             So with respect to the adult population

20   that Plaintiffs' experts used, did you have an

21   understanding of how they defined that adult

22   population?

23        A.    I did.  I don't recall specifically, but

24   it's in their documents, and alls we did was take
```

Highly Confidential - Subject to Further Confidentiality Review

 1   their number and multiply by the ratio of those two

 2   populations and that takes their number and puts it

 3   into the same units that I'm measuring things in and

 4   then you subtract.

 5        Q.    Understood.

 6        A.    You could have used their population and

 7   corrected -- and changed my numbers to correspond to

 8   their population, you'd get extremely similar results

 9   to the revision I did.  They are basically the same.

10        Q.    And what was the basis for making the

11   adjustment that you did?

12        A.    Well, I just wanted to have the same

13   population for the two numbers I was subtracting from

14   one another.  I think if you are going to subtract one

15   from the other, you do want to have the same

16   population, which is why I thought it was important to

17   make that change.

18        Q.    I see.  So in your original analysis

19   before correcting Exhibits 19, 26, 42 and 43, you had

20   used -- you -- you had obviously analyzed the

21   Plaintiffs' experts' calculations to include the adult

22   population and then you analyzed it against the

23   broader adult population, but the adjustment you made

24   is essentially apples and apples, now the original

1  calculation includes the broader adult population,

2  correct?

3      A.    Yeah.  You could have done apples and

4  apples or oranges and oranges and it really wouldn't

5  matter which one you did in terms of the results you

6  get, but you wanted to do one of those two things.

7  And so what I just redid it to put it in the same

8  formulation with what my Method 1 did.

9      Q.    Okay.  Thank you.  That's helpful.

10          In addition to the changes that you've

11  made that we've just discussed and the change to the

12  cite in Exhibit 44, any additional changes that you've

13  made to your report?

14      A.    No.  Those are the -- that's the

15  changes -- those are the changes I'd like to make.

16      Q.    And with respect to the second category of

17  changes that we just discussed in the four exhibits,

18  are you planning on providing an update with the

19  updated regressions or are you just -- just disclosing

20  that you've done that for purposes of this deposition?

21      A.    I think I would prefer to provide an

22  updated version that reflects the revised numbers per

23  our discussions.  So it is going to be very similar to

24  what we just discussed, but I -- I think we would

Highly Confidential - Subject to Further Confidentiality Review

1    provide an update.

2        Q.    Okay.

3        A.    And we'll update the exhibit to get the

4    ARCOS replaced with the other survey.

5        Q.    Thank you.  I appreciate that.

6              So with respect to this report as a whole

7    that you are offering, did you draft this entire

8    report yourself?

9        MR. HALLER:  Objection.  On that question I

10   think you can sort of yes or no, but I -- we don't

11   think the drafting process itself is discoverable and

12   is protected by the Federal Rules, but I think on that

13   general question you can say yes or no, but if you get

14   further into who drafted the initial version of a

15   particular sentence or section, then I'll instruct him

16   not to answer.

17   BY THE WITNESS:

18       A.    No, I worked together with my staff on

19   drafting the report which is my standard practice.

20   BY MR. KO:

21       Q.    And -- and the staff, again, to be clear,

22   the staff is staff at CRA, correct?

23       A.    It would be the staff at CRA and the

24   primary people I worked with are the three people I

Highly Confidential - Subject to Further Confidentiality Review

1    talked about earlier in our discussion.

2        Q.    Did you have a primary contact for

3    purposes of preparing this report at CRA amongst those

4    three or did those three all work together with you in

5    creating this report?

6        A.    I would say two of the three, Jarrod Welch

7    and -- and Sean Taylor were the primary people I would

8    have had contact with, although Daniel Garcia Schwartz

9    would have been not that far behind.

10       Q.    And outside of Jarrod, Sean and Daniel,

11   were there other individuals at CRA that assisted with

12   the preparation of your expert report?

13       A.    There are other people at CRA who would

14   have worked on assisting and doing the analyses.  As

15   far as I recall, I don't think anyone else worked on

16   the report itself specifically.

17       Q.    So in terms of drafting, it was mostly

18   Jarrod and Sean and to a certain extent Daniel, and

19   then other individuals, as I understand it,

20   supported -- other individuals at CRA supported the

21   empirical work that's in your report.

22             Is that fair to say?

23       A.    It might have been -- I wouldn't say just

24   empirical work.  I mean, there is a lot of gathering

 1   documents and putting together cites and things like

 2   that.  So there would have been people who would have

 3   helped with all of that process as well.  You know,

 4   getting the footnotes correctly organized and things

 5   like that.  So there is -- there is a lot of kind of

 6   clerical aspects of putting together a report that

 7   other people would have helped with, but the people I

 8   worked most directly with on -- on kind of substance

 9   would have been the three I discussed.

10       Q.   And have you worked with these two or

11   three individuals before in other expert work that you

12   have provided outside of this litigation?

13       A.   Yes, I have.  I have worked with all three

14   of them for a fair period of time.

15       Q.   And when you say that's your standard

16   practice for them to be part of the preparation of the

17   drafting of your report, was the process that you

18   undertook in this case similar to the process that you

19   followed in other cases where they've provided support

20   for you?

21       A.   I would say in a general -- general, yes.

22       Q.   Okay.  And with respect to the other

23   expert work, does -- in the last five years, does CRA,

24   have they assisted you for every expert engagement?

1    A.    I believe in the last five years they

2    have.  Prior to that I may have done other things, but

3    it's my understanding that they are the -- I would

4    have been assisted by people at CRA for all of the

5    things I've done in the last five years to the best of

6    my knowledge.

7    Q.    Do you recall if there is any expert

8    engagement that you had in the last five years in

9    which CRA did not assist you?

10    MR. HALLER:  Objection.  Asked and answered, I

11    think.

12    BY THE WITNESS:

13    A.    I don't -- not that I recall, although,

14    you know, sometimes people just ask me personally for

15    some help on something, but nothing that would rise, I

16    don't think, to the level of a formal engagement.

17    Obviously people come up and ask me for advice on

18    things and I'll give them advice.  I don't think I'd

19    bill them for it either, though, so it's -- it's

20    pretty much -- anything that was a formal engagement

21    would have been done through CRA.

22    BY MR. KO:

23    Q.    And before you became a consultant at CRA,

24    did you work with any other litigation support firms?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I did.  In fact, Sean Taylor, for example,

2   worked with me in our previous engagement where I was

3   previously with Navigant.  And so when I was at

4   Navigant, many of the same people who were working

5   with me at CRA worked with me previously at Navigant

6   and many of those people even worked with me before

7   that when we were with a much smaller firm called

8   Chicago Partners.  So a lot of the teams I -- people

9   I've worked with have been with me for much longer

10   than I've been at CRA.

11      Q.    And approximately how long were you at

12   Navigant?

13      MR. HALLER:  Objection; vague as to being at

14   Navigant.

15   BY THE WITNESS:

16      A.    Well, I worked --

17      MR. KO:  What would you like for me to say?

18   BY THE WITNESS:

19      A.    Actually, at Navigant I think I was

20   officially an employee, so that might be fair to say I

21   was at Navigant.  So I was there about five years, I

22   think, about the same amount of time I've now been at

23   CRA.

24   BY MR. KO:

```
 1      Q.    And what was your position at Navigant?

 2      A.    I don't know.

 3      Q.    And prior to that you said you were at

 4   Chicago Partners.

 5            How long were you there?

 6      A.    Oh, at least ten years.

 7      Q.    And did both Chicago Partners and Navigant

 8   assist you for purposes of preparing expert reports?

 9      A.    Yes, they did.

10      Q.    I want to turn back to your CV which we

11   previously marked as Exhibit 5.  And in particular

12   let's start at the bottom of Page 2 where you list

13   your publications.

14            For the publications that you list from

15   Page 2 through Page 10, which includes your selected

16   working papers and selected comments, are there any

17   publications, selected working papers or selected

18   comments that deal specifically with opioid use or

19   abuse?

20      MR. HALLER:  Objection; vague.

21   BY THE WITNESS:

22      A.    Yeah, I mean, there are ones that

23   certainly would bear on some of the issues, although I

24   don't recall whether we would have specifically talked
```

1    about opioids per se.  You know, theory -- the work

2    I've done on rational addiction, for example, I -- I

3    think we probably even mentioned drugs and heroin and

4    other opioids.  I don't know if we used the term

5    "opioids," but we -- we -- we do talk about drugs in

6    that piece.  I also have some work on the supply of

7    illegal goods that also talks about illicit drugs as

8    one of the primary examples of that.

9            Again, I don't know if we specifically

10   used the word "opioids," but obviously illicit markets

11   were the focus of that paper, so that would be there.

12   BY MR. KO:

13      Q.   Just -- I'm sorry to interrupt, but let's

14   go back.

15      MR. HALLER:  Can we just not interrupt if that's

16   all right.  I'd prefer the witness to finish the --

17   his answer.

18      MR. KO:  That's fine.

19      MR. HALLER:  Pursuant to the agreement set at

20   the beginning of the deposition, if that's all right.

21      MR. KO:  Yeah, sure.

22   BY MR. KO:

23      Q.   But I'd actually like to -- when you

24   finish your answer, just so you know where I'm going

1    to go with this, I want to talk about your theory of

2    rational addiction and what -- what article you are

3    discussing, but go ahead.

4        A.    Yeah, so that would be -- those would be

5    the main ones that -- that I recall.  Obviously

6    there's a number of articles that cover the more labor

7    market side of things that I talk about in the first

8    part of the report here, so they'd be very relevant

9    for the report.  They don't specifically talk about

10   opioid -- opioids per se, but they are very relevant

11   to the material that's in my report, so.

12       Q.    So going back to the work you've done on

13   the theory of rational addiction, can you identify, I

14   can't recall if you said that you were -- were just

15   referring to one publication or more, but can you

16   identify which articles bear on the theory of rational

17   addiction?

18       A.    Yes.  So I guess one of the articles that

19   bears on that is an article by that very name, which

20   is "A Theory of Rational Addiction" that Gary Becker

21   and I wrote and was published in 1988 in the Journal

22   of Political Economy.  So that -- that was -- kind of

23   laid out the -- the economics of kind of addiction as

24   you can see it through pretty much a standard economic

Highly Confidential - Subject to Further Confidentiality Review

```
 1   model.
 2          We then kind of applied that to addiction
 3   regarding cigarettes.  So cigarette -- there are a
 4   couple of articles on cigarettes.  So if you look at
 5   Page 4, there is a -- a "Rational Addiction and the
 6   Effect of Price on Consumption," with Gary Becker and
 7   Michael Grossman in the American Economic Review.
 8   There is another article, "An Empirical Anax" --
 9   "Analysis of Cigarette Addiction" on Page 5, like
10   roughly in the middle.
11       Q.    That's the 1994 article?
12       A.    That's the 1994 article, that's correct.
13   And that's -- and, again, in the American Economic
14   Review.
15          So those are the ones that cover the
16   theory of rational addiction as -- as I recall.
17       Q.    So to be clear, the -- the three articles
18   that you just described to me that are contained in
19   your CV are the ones that deal with rational addiction
20   and -- and -- and/or bear on the theory of rational
21   addiction, is that correct?
22       A.    Yeah.  We had sort of one piece that laid
23   out the conceptual or theoretical framework and then
24   two papers that examined some of the empirical
```

1    implications of that.

2        Q.    Okay.  And those were all 1994 and prior,

3    correct?

4        A.    That's correct.

5        Q.    Okay.  With respect to the articles and

6    publications you identified bearing on illicit

7    markets, can you identify for me which ones those are

8    in your CV?

9        A.    Yeah.  Really, I think there is really

10   one, and -- and that would be "The Market for Illegal

11   Goods:  The Case of Drugs," which is a 2006 article,

12   again, with Gary Becker and Michael Grossman.  It is

13   on Page 7 of my vitae, slightly above the middle.

14       Q.    The one that's published in the Journal of

15   Political Economy?

16       A.    That's correct.

17       Q.    Okay.  So outside of this publication, are

18   there any other publications that you set forth in

19   your CV that bear on illicit markets?

20       MR. HALLER:  Objection; vague.

21   BY THE WITNESS:

22       A.    I -- I -- those would be the main ones.

23   There may be some mention of illicit markets

24   elsewhere, but those would be the main ones.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. KO:

2         Q.    Okay.  Have you ever done any research or

3    published any articles on the diversion of opioids?

4         MR. HALLER:  Objection; vague.

5    BY THE WITNESS:

6         A.    No, I have not published any articles on

7    the diversion of opioids.  I -- part of our work on

8    cigarettes, that did cover the diversion of

9    cigarettes, so that was actually a non-trivial part of

10   what we did in those cigarette papers.

11   BY MR. KO:

12        Q.    And would you say that you have done any

13   research or published articles, peer reviewed or

14   otherwise, on actual opioid use or abuse?

15        A.    I --

16        MR. HALLER:  Objection; asked and answered.

17   BY THE WITNESS:

18        A.    I'm trying to think.

19              We've looked -- I don't think I've

20   published anything on that.  I think I've looked at

21   data at that back when I was doing more work on

22   addiction, but I -- I don't -- nothing that we

23   ultimately published.

24   BY MR. KO:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    In what general timeframe are you

 2   referring to?

 3        A.    It would have been in the mid 2 -- earl --

 4   like 2004, 2005, something around there.

 5        Q.    And in "The Market for Illegal Goods"

 6   publication that we were just discussing that appears

 7   on Page 7, did you do any research or conduct any

 8   empirical analysis on the market for either heroin or

 9   fentanyl or carfentanil?

10        A.    Not that I recall in that paper, no.

11              We are kind of at an hour-and-a-half --

12        Q.    Yeah, I was just going to say.

13        A.    -- so we should probably take a break, and

14   he was think -- an hour 45, so that falls short of

15   that.

16        MR. KO:  That's fine with me.

17        MR. HALLER:  We were all thinking the same

18   thing, so.

19        MR. KO:  That's fine with me.

20        THE WITNESS:  Okay.

21        THE VIDEOGRAPHER:  We are off the record at

22   11:32 a.m.

23                   (WHEREUPON, a recess was had

24                    from 11:32 to 11:50 a.m.)
```

```
 1        THE VIDEOGRAPHER:  We are back on the record at

 2   11:50 a.m.

 3   BY MR. KO:

 4        Q.    Dr. Murphy, welcome back from the break.

 5              When were you first retained in this

 6   litigation?

 7        A.    I don't recall the -- the exact date.  It

 8   would have been sometime this winter, so sometime in

 9   2019.

10        Q.    So your recollection is that you were

11   retained at the beginning of this year?

12        A.    I don't think it would be right at the

13   beginning of this year, but sometime during 2019.

14   That's -- that's my recollection, but I know

15   retrospective dating is not an easy task for anybody.

16        Q.    And who first approached you about working

17   as an expert in this case?

18        A.    I think, actually, I was contacted by Greg

19   Bell, who is at CRA, because I think my recollection

20   is they were looking for an economic expert to help

21   with a -- with the case and people internal in CRA had

22   recommended me and it may also be that people outside

23   of CRA knew of me from other things and -- I -- I'm

24   not quite sure how it got there, but I think Greg was
```

Highly Confidential - Subject to Further Confidentiality Review

1    the first person who asked me about it.

2        Q.    And what did he -- what did you two

3    discuss in terms of the scope of your assignment?

4        A.    I don't think we discussed much.  I think

5    he said he -- you know, that people were interested in

6    speaking to me about the opioid litigation and that

7    probably is about it.  And I said, Sure, I'm -- I'm

8    happy to talk to them, see what -- what they're --

9    what they need and go from there.

10       Q.    And then after -- after you had your

11   initial discussion with -- with Greg, when did you

12   first speak with counsel about this engagement?

13       A.    I don't recall the date.  It would have

14   been within a couple of weeks after that.

15       Q.    And do you recall what the scope of your

16   assignment was when you spoke with counsel?

17       MR. HALLER:  I think you should answer that yes

18   or no.

19   BY THE WITNESS:

20       A.    Yes, to some extent.

21   BY MR. KO:

22       Q.    It evolved over time?

23       A.    It did, be -- partly because, you know, a

24   significant part of my assignment was to respond to

1    the reports of Plaintiff experts and they hadn't been

2    provided at that time, so knowing exactly what the

3    scope of the response was going to be was going to

4    depend on the nature of the reports that came from

5    Plaintiff experts.

6         Q.    Turn to your expert report which has been

7    marked as Exhibit 2, and in particular paragraph --

8    Paragraphs 11 and 12 that appear at Page 10.  Let me

9    know when you get there.

10        A.    Okay.

11        Q.    Does Paragraph 11 accurately reflect one

12   of the assignments that you've been provided by

13   counsel in this case?

14        A.    I think it does.  I think it provides a

15   summary of it.  I think there is more detail to that,

16   but I think that's a reasonable place to start for

17   part of my assignment.

18        Q.    And Paragraph 12 also reflects another

19   assignment you've been given by counsel in this case?

20        A.    Yeah, I think it's another part of my

21   assignment.  I -- I don't think it's entirely separate

22   from the first part, but, yeah, it's -- it's another

23   aspect and that was the aspect I talked about a moment

24   ago in terms of responding to particular Plaintiff

Highly Confidential - Subject to Further Confidentiality Review

1    reports.

2        Q.    Would it be fair to say that these are the

3    primary assignments or, as you put it, the aspects of

4    this engagement that you have been asked to work on?

5        A.    I think in a general sense, I think

6    these -- that was my intent in writing this was to try

7    to cover the -- in a broad sense the areas that I

8    intended to address in my analysis.

9        Q.    And with respect to the summary that you

10   provide in Paragraph 12, you have identified a variety

11   of -- or you've identified at least more than one of

12   the Plaintiffs' experts, but the primary assignment

13   you have been given in this case and what your expert

14   report discusses is to analyze the expert report of

15   Professor David Cutler.

16            Is that fair to say?

17       A.    I would say that was the greatest focus of

18   my analysis.  I think second to that would be Jonathan

19   Gruber, although I think the more specific analyses

20   tend to be in David Cutler's report, so that's

21   probably more of my attention is spent there.

22       Q.    And as you indicate in Paragraph 12,

23   you've reviewed in addition to Professor Cutler and

24   Professor Gruber's report you've, in connection with

```
 1    analyzing Professor Cutler's analysis, you've also

 2    looked at other expert reports, correct?

 3         A.    Yeah, again, I would say largely in the

 4    context of how they fit together with Professor

 5    Cutler's and to some extent Professor Gruber's

 6    results -- reports, and not so much as an independent

 7    evaluation of those other reports.

 8         Q.    And are you aware -- with respect to the

 9    expert report of Professor McGuire, I just want to

10    understand which report you may have reviewed.

11              Are you aware that he has submitted two

12    different reports in this case?

13         A.    As a general matter, I'm aware of it.  I

14    would have a hard time knowing which one is which at

15    this point.  I think he -- I -- I -- I can't say for

16    sure.

17         Q.    Did you review both of his reports?

18         A.    I don't have a specific recollection of

19    reviewing both of his reports, no.

20         Q.    You just recall reviewing one of his

21    reports?

22         A.    I review -- recall reviewing at least one

23    of his reports.  Whether that was two reports or one,

24    I don't recall at this point.
```

```
 1       Q.    And you also indicate in Paragraph 12 that

 2   you've reviewed two reports that were -- were

 3   submitted by Dr. McCann.

 4             Are you aware of how many reports that he

 5   submitted -- well, are you aware of how many

 6   supplements that he submitted to his original

 7   March 25th report?

 8       A.    I -- I'm not aware of how many.  I -- I --

 9   I'm not even aware that he's -- well, the last time I

10   knew I don't even think he had submitted all of the

11   things that supposedly he was going to submit.  He

12   might have finished submitting things at this point,

13   but my last recollection is that there were still

14   things to come, at least I think at the time I wrote

15   my report I think that was the case.

16       Q.    And turning back to Paragraph 12 and in

17   particular Footnote 7, you note that the two reports

18   of Craig McCann that you reviewed were his original

19   March 25th report and a second supplement.

20             Do you see that?

21       A.    I do, but I -- my, and this is just

22   recollection, I thought he was intending to submit

23   additional materials even at that time, but I --

24   that -- that's my recollection, so.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Beyond --

2    A.    I don't have any specific knowledge of

3    that.

4    Q.    Beyond the two reports that you have

5    disclosed here, have you since reviewed any additional

6    work or reports proffered by Dr. McCann?

7    A.    I don't recall doing that specifically,

8    no.

9    Q.    How did you select the expert reports that

10   you reviewed and have identified in Paragraph 12?

11   A.    I think they were selected largely because

12   they covered the issues that -- most closely covered

13   the issues that I was working on as part of

14   Paragraph 11 but also most closely tied in to, for

15   example, Professor Cutler's work.  They were the ones

16   that either relied on Professor Cutler's work or

17   provided input to Professor Cutler's work and,

18   therefore, they -- they were natural things to review

19   as part of that.

20   Q.    And did you select the expert reports

21   yourself?

22   A.    I don't recall whether I selected them.  I

23   mean, they were cited -- they -- they were discussed

24   in the Cutler report.  So I don't remember if I

Highly Confidential - Subject to Further Confidentiality Review

 1   suggested we should look at those as well or somebody

 2   else did.  I -- I don't recall the genesis of that.

 3        Q.    And you said a moment ago that you weren't

 4   necessarily offering an independent analysis of some

 5   of the expert reports outside of Professor Cutler's

 6   report, and I just want to make sure I understand what

 7   you are saying when you said that.

 8             Can you describe what you mean when you

 9   say that while the primary analysis focused on Cutler,

10   you're not necessarily offering a separate or

11   independent analysis of the other expert reports?

12        A.    Yeah.

13        MR. HALLER:  Objection; misstates the prior

14   testimony.

15   BY THE WITNESS:

16        A.    I guess I would say, for example, with

17   regard -- regard to the Rosenthal report, I didn't go

18   through the Rosenthal report and try to evaluate

19   the -- all of the claims that were made in there.  I

20   looked at it to see how it would fit together with

21   what Professor Cutler did, and that was the primary

22   reason for look -- for -- for going through the

23   Rosenthal report.  My understanding is other experts

24   are going to address the other reports.  And so I

```
 1   didn't focus my attention on doing that.

 2   BY MR. KO:

 3        Q.    So is it fair to say that you have not

 4   offered an independent critique of Dr. Rosenthal's

 5   expert report?

 6        MR. HALLER:  Objection; asked and answered --

 7   BY THE WITNESS:

 8        A.    I think --

 9        MR. HALLER:  -- misstates his testimony.

10   BY THE WITNESS:

11        A.    I think --

12        MR. HALLER:  Sorry.

13   BY THE WITNESS:

14        A.    Yeah, I think I would say I looked at

15   what's there to try to see how and whether that fits

16   in a coherent way with what Professor Cutler does, and

17   I don't see how the two fit together very well.  How

18   you can take the output of her analysis and combine

19   that with Professor -- what Professor Cutler does and

20   answer any of the relevant questions.  So, and I

21   believe I mentioned that in my report as one of my

22   opinions.

23             Similarly, when I talk about some of the

24   other reports, it's largely in the context of how they
```

1    fit together.  When I talk about Professor Gruber, I

2    more directly address some aspects of his report

3    independently.  So that would be the one where I think

4    I have a more direct evaluation of some of his

5    analyses.

6    BY MR. KO:

7        Q.    With respect to Dr. Rosenthal's report,

8    you understand that she's performed and analyzed

9    certain data and has done certain time series

10   regressions in her report, correct?

11       A.    That's my understanding based on reading

12   her report.

13       Q.    And have you done any separate empirical

14   work in response to any of the time series regressions

15   that she has run in her report?

16       A.    I have not.

17       Q.    With respect to either of Professor

18   McGuire's reports, have you done any independent or

19   separate empirical work in response to the analyses

20   Professor McGuire offers in either one of his reports?

21       MR. HALLER:  Objection; vague.

22   BY THE WITNESS:

23       A.    I do not recall any analysis that were

24   specific to the work that he does.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. KO:

 2        Q.    So you don't recall any analysis that

 3    McGuire did or you don't recall any anal -- doing --

 4    performing any analysis in this litigation that

 5    responds to the analysis that Professor McGuire did?

 6        A.    I'm saying I don't recall performing any

 7    analyses that specifically address him, that -- that

 8    were targeted at addressing his work.  Now, maybe some

 9    of the things that I do regarding Professor Cutler

10    would also apply to some of these other analyses.  I

11    don't want to say they are irrelevant to these other

12    analyses, but I don't recall any specific analyses

13    directed at evaluating their work along those lines.

14        Q.    In Paragraph 11 you indicate that you have

15    been asked -- well, in both Paragraph and -- 11 and 12

16    you -- you indicate you've been asked by counsel for

17    distributors to provide certain opinions.

18            Do you see those references?

19        A.    Yes, I do.

20        Q.    And when you say that you have been asked

21    by counsel for distributors, are you referring to all

22    counsel that -- for distributors that you set forth in

23    Paragraph 10?

24        A.    I -- Paragraph 10 sets forth the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors, not the counsel, just to be clear.

 2         Q.    Right.

 3         A.    Then these are the distributors that I

 4    understand are the distributor Defendants in this

 5    case.  My analysis is an analysis of the economics of

 6    the underlying marketplace, for lack of a better term,

 7    and it's not specific to any one of those Defendants.

 8    I don't -- I wouldn't say, Well, geez, if I was

 9    analyzing Cardinal I would do this analysis, if I was

10    analyzing McKesson I would do a different analysis.

11    My analysis would apply to distributors generally to

12    the extent it's relevant for distributors.

13         Q.    In Paragraph 10 you set forth the entities

14    that you identify as being distributor Defendants in

15    this litigation, correct?

16         A.    That's correct.

17         Q.    And in Paragraphs 11 and 12 you indicate

18    that you have been asked by counsel for these

19    distributors to address certain aspects of this case,

20    correct?

21         A.    That's correct.

22         Q.    And so when you indicate that you have

23    been asked by counsel for distributors, I'm -- I'm

24    curious to know which counsel for distributors you've
```

1    been asked to provide these opinions for?

2        A.    I would say to me I -- the request came as

3    kind of a joint request, a group request.  Whether

4    every one of those counsel would be part of that

5    request, I don't know.  You'd have to check with the

6    counsel.  I didn't receive any independent request to

7    do something different or not to do anything that I

8    did.  So my -- took it as that was what I was

9    requested to analyze by the group, and how they formed

10   that conclusion, I don't know.

11       Q.    Both you and CRA have a retainer agreement

12   in this case, correct?

13       A.    I think my agreement would be with --

14   through CRA, that there would be a retention agreement

15   with CRA that would specify me as the consulting

16   expert.  That's how it generally works.  I assume

17   that's how it works in this case.

18       Q.    So is it clear that your involvement in

19   this case is memorialized in a retainer agreement

20   between counsel and CRA?

21       MR. HALLER:  Objection; asked and answered.

22   BY THE WITNESS:

23       A.    My -- that's my understanding.  That's how

24   it generally works.  If there is something different

Highly Confidential - Subject to Further Confidentiality Review

1    in this case, I probably wouldn't know that.  I don't

2    generally get involved in that contractual side of

3    things.

4    BY MR. KO:

5        Q.    Do you have a separate agreement with CRA

6    in this case outside of the agreement that we were

7    just discussing?

8        A.    No.  I have my general consulting

9    agreement with CRA and working on a case like this

10   would fall under that general agreement that I have

11   with CRA.

12       Q.    And with respect to the specific agreement

13   that CRA has with counsel, have you seen that?

14       A.    I don't think I've seen the entire -- I

15   don't recall seeing it.  I'm not an employee of CRA,

16   so I really can't execute those kinds of agreements.

17   I don't have that authority.  I'm -- I'm a consulting

18   expert, so.  CRA has a -- a consulting contract with

19   me, they also have a retainer agreement with, for

20   example, in this case, counsel, but I work through CRA

21   as a consultant to CRA.  That's my understanding of

22   how it works.

23       Q.    What's your understanding of who or -- or

24   which entity CRA was engaged by in this case?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't have a particular understanding of
 2   that, about, you know, which of the specific
 3   Defendants would be on a retaining letter.
 4        Q.    Okay.  And do you have any understanding
 5   of which entity or which counsel signed the agreement
 6   with CRA?
 7        A.    I do not.
 8        Q.    Okay.  Obviously you've been communicating
 9   and preparing for this dep with the counsel that
10   you've identified before at Covington.
11              In preparing your report, did you work
12   with any attorneys or law firms outside of Covington?
13        A.    Not in the preparation of the report per
14   se.  I didn't work directly with anyone.  I think we
15   had a -- some phone call meetings in which multiple
16   counsel were present on the call.  We also had an
17   in-person meeting, I assume I can disclose this.
18        MR. HALLER:  The fact of the meeting you can.
19   BY THE WITNESS:
20        A.    In -- in -- in Chicago that, again, had
21   multiple counsel present at.  I can't recall who all
22   they represented, but, yeah, there were multiple
23   counsel present at that meeting and on the phone
24   calls.
```

1   BY MR. KO:

2       Q.    And was it your understanding that in the

3   in-person meeting and in phone calls that you had with

4   counsel, were all of these counsel attorneys for the

5   distributor Defendants?

6       A.    That's my rough understanding.  I -- I --

7   I don't think I actually confirmed that.

8       Q.    Do you recall having any conversations or

9   meeting with any counsel for the manufacturing

10  defendants?

11      A.    Not that I recall.

12      Q.    Okay.  A moment ago you talked about your

13  general agreement that you have with CRA.

14            What does that general agreement entail or

15  cover?

16      A.    I think it -- I essentially have a

17  exclusive contract with CRA that I'm going to do my

18  litigation and other consulting through CRA.

19  Occasionally I'll do small non -- very different type

20  projects for other people that don't go through CRA,

21  but basically I do my consulting work through CRA and

22  that's what that agreement says.

23      Q.    And does that agreement set forth the

24  terms of your compensation that you would receive in

1    connection with the expert work you provide?

2        A.    It doesn't set my rate.  It does say that

3    I will submit my time and I'll get reimbursed at

4    whatever my -- my -- my rate is at that point in time.

5    So, for example, it wouldn't -- it wouldn't say:  This

6    is your rate of pay.  It doesn't say that.  But it

7    says, like, I'll do my consulting work through CRA and

8    CRA will pay me in a timely fashion and things like

9    that.

10       Q.    So how do you determine with CRA the terms

11   of your compensation?

12       A.    Basically essentially on an annual basis I

13   review, you know, my rate and what I charge for my

14   services and some years I -- you know, that rate will

15   change, other years it will stay fixed.  It depends

16   on, you know, where I am, where the marketplace is,

17   like just about anybody else out there.

18       Q.    So in this litigation CRA is charging

19   $1400 an hour for your time, correct?

20       A.    That's correct.  That's my standard rate

21   at this point in time.

22       Q.    And how long has that been your standard

23   rate?

24       A.    I don't remember.  I don't remember if

1    that changed at the beginning of 2019 or 2018, but

2    that -- that -- that -- that is my standard rate right

3    now.

4        Q.    And is that rate applicable to this

5    deposition?

6        A.    Yes, I have -- I -- there is only a single

7    rate for all of my activities.

8        Q.    So for purposes -- if you are called on to

9    testify at trial this fall, that's also the rate that

10   you would charge, correct?

11       A.    That's correct.  There is -- like I said,

12   there is a single rate for independent of what hourly

13   activity that is.

14       Q.    And what portion of that $1,400 per hour

15   do you receive?

16       A.    I receive 100 percent of my hourly

17   compensation.

18       Q.    Okay.  And obviously you said a moment ago

19   that there are years in which this fluctuates, but

20   over the course of the last five years, can you

21   describe to me what you believe is your average annual

22   compensation that you receive from CRA?

23       MR. HALLER:  Objection; no foundation.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't really know.  I don't really keep

 2   track.  It varies year to year depending on how much

 3   work I do.  So I don't really know.

 4   BY MR. KO:

 5        Q.    So you said earlier today that you have

 6   been a consultant with CRA for at least -- or for

 7   approximately five years, correct?

 8        A.    I believe that's right.  I believe that's

 9   when I started.

10        Q.    So in the roughly 2014 or 2015 time period

11   you became a consultant at CRA?

12        A.    I think it -- I think it's a little over

13   five years, so I think -- I -- I -- I believe it was

14   2013.  I think my official start time is May.  So it's

15   very close to five years.

16        Q.    For 2018, do you recall approximately how

17   much you received in connection with the work you

18   performed for CRA?

19        MR. HALLER:  Objection; I don't think that's

20   relevant what he generally gets from CRA.  His

21   compensation in this case is relevant, but otherwise

22   not relevant.  So, one, I don't know if you know, but

23   if you know, I don't think you need to answer that

24   question.
```

1      MR. KO:  Well, David, you can stop coaching the

2  witness.

3  BY MR. KO:

4      Q.   I'd ask that you answer my question.  It's

5  completely relevant.

6      A.   I think I -- I -- at the advice of

7  counsel, I'm not going to -- I'm not going to ask --

8  nor do I know accurately what that is, and I wouldn't

9  want to provide an un-accurate number.

10      Q.   So just so the record is clear, you are

11  not responding at the advice of counsel?

12      A.   I would say for two reasons.  One, I don't

13  have an accurate recollection.  I haven't gone back to

14  look.  And, secondly, I think I have been advised by

15  counsel that that wasn't something that was relevant.

16      Q.   And you're -- well, and I disagree with

17  that instruction.  It is completely relevant.  So I'd

18  ask the following question:

19          Do you recall whether or not the

20  compensation you received from CRA in 2018 was over a

21  million dollars?

22      MR. HALLER:  You don't need to answer that

23  question.

24      MR. KO:  Why?

```
 1        MR. HALLER:  Because --

 2        MR. KO:  What's the basis, David?

 3        MR. HALLER:  His compensation in this case is

 4   fair inquiry.  His compensation for matters outside of

 5   this case is not fair inquiry.

 6        MR. KO:  On what grounds?  Can you -- can you

 7   inform to me --

 8        MR. HALLER:  The Federal Rules permit discovery

 9   into his compensation in this case and not otherwise.

10        MR. KO:  And your test -- your position is that

11   I cannot inquire into the compensation of any other

12   case than this case?

13        MR. HALLER:  Yes.

14        MR. KO:  Okay.  That's a very narrow view of the

15   world.

16   BY MR. KO:

17        Q.   Do you recall whether or not the

18   compensation you received from CRA in 2018 was over

19   $500,000?

20        MR. HALLER:  Same instruction.

21   BY THE WITNESS:

22        A.   I -- I will on the advice of counsel not

23   answer that question.

24   BY MR. KO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     Okay.  Do you recall whether or not the

2   compensation you received from CRA in 2018 was over

3   $2 million?

4        MR. HALLER:  Same instruction.

5   BY THE WITNESS:

6        A.     On the advice of counsel, I will not

7   answer that question.

8   BY MR. KO:

9        Q.     Let's turn to your updated CV that you

10  provided to me and earlier this morning which was

11  separate and apart from the binder that you have in

12  front of you.  It is reflected as Murphy Exhibit 5.

13       MR. HALLER:  So what is this, the CV?

14       MR. KO:  Yeah, I said the updated CV.

15  BY THE WITNESS:

16       A.     Got it.

17  BY MR. KO:

18       Q.     Now, with respect to the updated CV, I

19  want to turn your attention to Page 11.

20       A.     Okay.

21       Q.     So, so the record is clear, Page 11

22  through Page 20 of Exhibit 5 reflects the testimony,

23  reports and depositions you have provided over the

24  last four years, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.  It starts at the beginning of 2015.

 2   So it's four -- well, roughly four-and-a-half years at

 3   this point.

 4        Q.    And at one point in time I counted these

 5   up, but I believe that there are about 90 entries, but

 6   they cover about 50 engagements.

 7              And you don't have to take my word for it,

 8   but does that sound generally accurate as to the

 9   amount of times you've been engaged as an expert

10   witness?

11        A.    I -- I can't attest to any specifics of

12   that, but I think in general, it is a little higher

13   than I would have guessed, but it is not that far off.

14        Q.    And with respect to all of the engagements

15   that you have set forth in Pages 11 through 20 of your

16   CV, what is the compensation that you recall receiving

17   for these cases?

18        MR. HALLER:  Objection; no foundation.

19   BY THE WITNESS:

20        A.    I don't have -- I don't really have a good

21   recollection of that.

22   BY MR. KO:

23        Q.    Okay.  When you said earlier or a moment

24   ago that you obtained $1,400 an hour for your time and
```

1    you receive 100 percent of that compensation -- of

2    that rate, has that always been the case when you have

3    been a consultant for CRA?

4        A.    Not that my rate has been 1400, but I have

5    received 100 percent of my rate, I believe, since I

6    started at CRA.

7        Q.    Okay.  And when you started at CRA, do you

8    recall what your hourly rate was?

9        A.    I don't.  It would have been definitely

10   lower than the 1400.

11       Q.    Was it above a thousand?

12       A.    It would have been probably somewhat above

13   a thousand.

14       Q.    Do you recall whether or not it was 1200

15   an hour?

16       A.    It may have been.  It may have been 1100,

17   1200, it would have been in that range.  I would

18   presume based on recollection, which as I noted

19   earlier for everybody, is not so great.

20       Q.    So fair to say that since you started at

21   CRA through today you receive 100 percent of your

22   hourly rate from CRA, correct?

23       A.    I believe that's correct, yes.

24       Q.    Okay.  And when you first started at CRA,

1    just so the record is clear, I believe you have

2    charged somewhere between 11 to $1200 an hour and now

3    you charge $1400 an hour for your work, correct?

4        A.    I think that's roughly correct.  I can't

5    specifically attest to those earlier figures.  I know

6    the current figure is 1400 and I know it was lower

7    previously.  Exactly what it was year-by-year I really

8    don't have a great recollection.

9        Q.    And when you first started at CRA in

10   either 2000 or thir -- 2013 or 2014, do you have any

11   recollection of how much money you made from CRA that

12   year?

13       MR. HALLER:  Just yes or no.

14   BY THE WITNESS:

15       A.    No.

16   BY MR. KO:

17       Q.    Do you have any recollection of how much

18   money you made from CRA in 2014?

19       MR. HALLER:  Yes or no.

20   BY THE WITNESS:

21       A.    No, I don't.

22   BY MR. KO:

23       Q.    Do you have any recollection of how much

24   money you received from CRA in 2015?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. HALLER:  Same instruction.

 2   BY THE WITNESS:

 3        A.    I do not have a recollection of how much I

 4   made, no.

 5   BY MR. KO:

 6        Q.    Do you have any recollection of how much

 7   money you received from CRA in 2016?

 8        MR. HALLER:  Same objection --

 9   BY THE WITNESS:

10        A.    I -- no, I --

11        MR. HALLER:  -- instruction.

12        A.    I do not have a recollection.

13   BY MR. KO:

14        Q.    Do you have any understanding of how much

15   money you received from CRA in 2017?

16        MR. HALLER:  Same instruction.

17   BY THE WITNESS:

18        A.    Nothing specific and given the

19   instruction, I don't feel like I would speculate.

20   BY MR. KO:

21        Q.    Do you have any understanding of how much

22   money you received from CRA in 2018?

23        MR. HALLER:  Same instruction.

24   BY THE WITNESS:
```

```
 1        A.     No, I do not.

 2   BY MR. KO:

 3        Q.     Do you have any understanding of how much

 4   money you received from CRA up to the -- this point of

 5   June of 2019 in this year?

 6        MR. HALLER:   Same instruction.

 7   BY THE WITNESS:

 8        A.     I do not, not that I could rely upon, no.

 9   BY MR. KO:

10        Q.     Do you understand or are aware of how

11   frequently you get paid by CRA?

12        A.     I get paid by CRA typically every week or

13   two based on billings that are collected during that

14   period of time.

15        Q.     Okay.  When was the last time you recall

16   being paid by CRA?

17        A.     It would have been probably, oh, two weeks

18   ago.

19        Q.     And do you recall how much that amount

20   was?

21        A.     No.  It gets direct deposited into my

22   account.  So I get a notice that I received payment,

23   but I didn't look at it, what it was.

24        Q.     And do you -- so for that particular
```

Highly Confidential - Subject to Further Confidentiality Review

1    payment you didn't look at the amount.

2             Is that typical for all of the notices of

3    direct deposits you get from CRA?

4        A.    Yeah, I don't -- I don't keep track

5    biweekly on -- on -- on what I get.

6        Q.    So your testimony today is that you have

7    absolutely no understanding of how much money you've

8    received from CRA since you've been a consultant for

9    the last five years, correct?

10       A.    That's not my testimony.  I've -- as I

11   said before, I don't have a specific recollection that

12   I would be willing to rely upon as being accurate.  I

13   haven't gone back to look, so.

14       Q.    What's your general recollection?

15       MR. HALLER:  Objection.  He doesn't need to

16   answer that question.

17            I'll direct you not to answer it if

18   it's...

19       MR. KO:  On what basis?

20       MR. HALLER:  The same basis we discussed

21   earlier.

22       MR. KO:  And can you clearly identify that basis

23   for me, David?

24       MR. HALLER:  Yes.  The Federal Rules permit you

1   to inquire into his compensation in this case and not

2   into his compensation for unrelated work.

3        MR. KO:  And your testimony -- or your position

4   is that all of this other work is unrelated?

5        MR. HALLER:  You haven't established that

6   anything is related.  I don't think it's related.

7   BY MR. KO:

8        Q.    Okay.  My question for you, Dr. Murphy,

9   was:  Do you have any general understanding of how

10  much money you've obtained from CRA since you've been

11  a consultant there?

12       MR. HALLER:  Yes or no.

13  BY THE WITNESS:

14       A.    Nothing specific, no.

15  BY MR. KO:

16       Q.    Right.  And I didn't ask specific, but I

17  asked whether or not you have a general understanding

18  of how much money you've obtained from CRA since

19  you've been a consultant there?

20       MR. HALLER:  Just yes or no.

21  BY THE WITNESS:

22       A.    I would have a general recollection, but

23  nothing that I would be willing to rely upon as being

24  accurate.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. KO:

 2        Q.    What is your general recollection?

 3        MR. HALLER:  I will instruct you not to answer

 4   that question.

 5   BY THE WITNESS:

 6        A.    I have been instructed not to answer that

 7   question.

 8   BY MR. KO:

 9        Q.    And you are going to follow that advice?

10        A.    I will follow the advice of counsel, yes.

11        Q.    How much money do you make as a professor

12   at Booth?

13        MR. HALLER:  Same instruction.  You don't need

14   to answer that question.

15   BY THE WITNESS:

16        A.    I generally -- I mean, I don't know

17   specifically.  I know generally what my salary is, but

18   I've been instructed that I shouldn't answer that

19   question.

20   BY MR. KO:

21        Q.    And what's generally your salary?

22        A.    I have been instructed that I should not

23   answer, so I'm not going to answer.

24        MR. KO:  Well, I'm going to preserve this.  It's
```

1  clear that Mr. Haller is creating some unjustifiable

2  objections about your compensation.  So I'll note it

3  for the record and reserve my right to reopen this

4  deposition to ask you specific and general questions

5  about your compensation both received as a professor

6  and in connection with the prior testimony, reports

7  and depositions you've disclosed in your expert

8  report.

9  BY MR. KO:

10     Q.    I am going to now turn your attention to

11  what will be marked as Murphy Exhibit 6, I believe.

12     MR. KO:  Here you go, Juliana.

13              (WHEREUPON, a certain document was

14               marked Murphy Deposition Exhibit

15               No. 6, for identification, as of

16               06/06/2019.)

17     MR. KO:  I just have one extra copy.  This is

18  something that you provided, Bryant.

19  BY MR. KO:

20     Q.    Juliana had handed you a copy of what's

21  been marked as Murphy Exhibit 6.

22              Does this look familiar to you?

23     A.    It looks like a summary of hours and

24  billings for this matter through the end of May.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so does this look familiar to you?

2    A.    I didn't -- I have not seen this exact

3    document.  I -- but the general of what's there seems

4    generally familiar.

5    Q.    Well, that's helpful.  When you say you

6    haven't seen this exact document, I'd ask that you

7    actually turn and look through the entire exhibit that

8    I've handed you or that Juliana has handed you.

9    A.    Okay.

10    Q.    Do any of the documents that you just

11    looked through look familiar?

12    A.    No, not that I -- I have not seen these

13    documents before.

14    Q.    Okay.  Now, going back to the first

15    page of this exhibit, and notwithstanding the fact

16    that you either have not seen this before or are not

17    familiar with it, there is an indication of your rate,

18    which we've talked about, which is $1,400 an hour, and

19    then there is your consulting staff compensation rate

20    as well.

21    Do you see that?

22    A.    Yeah.  It is a rate range because there

23    are different rates for different people.

24    Q.    Correct.  Thank you for that

1   clarification.

2           That compensation rate range that's set

3   forth, is that the staff at CRA and -- and does the

4   rate range reflect the amounts that they are charging

5   in this case?

6       MR. HALLER:  Objection; no foundation.

7   BY THE WITNESS:

8       A.    That would be my understanding.  I can't

9   specifically confirm that those are the numbers.

10  BY MR. KO:

11      Q.    And with respect to the third item down

12  the list that sets forth "Murphy invoiced hours," do

13  you see that?

14      A.    Yes.

15      Q.    And there is the number next to it which

16  is 20.

17          Do you see that?

18      A.    Yes.

19      Q.    So as far as I understand, that would

20  reflect the amount of hours that you have informed CRA

21  that you have worked on in this matter who has then

22  subsequently put -- put it in some sort of bill.

23          Is that fair?  Is that a fair

24  characterization?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I think those are the hours that are

 2   billed already.  That's what it means by "invoiced."

 3   They have been actually recorded on an invoice as

 4   opposed to actual hours that may have been worked but

 5   not yet invoiced.

 6        Q.    In addition to those invoiced hours, I do

 7   see a line item, six lines down that say:  "Estimated

 8   Murphy additional hours not yet invoiced through

 9   May 31st, 2019."

10              Do you see that?

11        A.    Yes.

12        Q.    And there is a number there of 21,

13   correct?

14        A.    That's correct.

15        Q.    And so the total hours that you have spent

16   at least through May 31st, 2019, in this matter is

17   approximately 41 hours?

18        A.    That would be the hours that I've

19   submitted bills for.  Often I'll do brief work, you

20   know, have a phone call with somebody and I won't

21   always add that to my hours, but, you know, so I would

22   say probably it understates how many hours I actually

23   worked.  I don't -- I don't always record my hours

24   which is kind of a fault of mine.  I work on things,
```

 1    think about them, and don't always write it down.  But

 2    these are the ones that I -- that I recorded.

 3        Q.    So with respect to the approximate

 4    41 hours that you recorded and invoiced, when you --

 5    let's start with the ones that you've already

 6    invoiced.

 7            Do you disclose to CRA not just the amount

 8    of hours but the nature of the work involved?

 9        A.    I do not.  I generally submit the number

10    of hours that I've worked on a matter.  Again, as I

11    said, I don't always catch all of them, but the ones I

12    remember to keep track of I -- I inform CRA of how

13    many hours I had.

14        Q.    So the amount -- so as I understand it,

15    you disclosed to CRA the total amount of hours that

16    you work in a particular litigation, including for

17    this one, correct?

18        MR. HALLER:  Objection; vague.

19    BY THE WITNESS:

20        A.    I do it matter-by-matter.  So I will say

21    in this case I worked ten hours over some certain

22    period of time on this -- on a particular case and

23    that's the information I'll provide to CRA.

24    BY MR. KO:

1      Q.     So in -- for purposes of this litigation,

2   did you ever provide CRA with a narrative with respect

3   to the hours that you've worked in this case?

4      A.     I do not.  And that's my general practice.

5      Q.     With respect to the hours worked by

6   individuals at CRA, do you have any understanding of

7   whether or not there is a narrative associated with

8   their time?

9      A.     My understanding is that at least in some

10  cases there is.  I don't know if that's true in all

11  cases.  I -- I, again, I'm a consultant.  I think they

12  are all employees, and there is a somewhat different

13  process by which they submit their time and I submit

14  my time.  But I'm not aware of it because I've never

15  been an employee.

16     Q.     And do you have any understanding of what

17  the process is for this case?

18     A.     Yeah, I don't know exactly what their

19  process is.  I assume it's the same as it is for other

20  cases, but that's an assumption, not something I have

21  direct knowledge of.

22     Q.     Have you ever reviewed in this case any of

23  the invoices that CRA staff or CRA employees have

24  submitted to counsel?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I do not.

 2      Q.    You do not or you -- you have not, just so

 3   the record is --

 4      A.    I -- I have not and that's -- I generally

 5   don't review bills that go out.  That's not my area.

 6   I'm not -- I'm not an employee of CRA, so I don't send

 7   bills on behalf of CRA.

 8      Q.    Turn to Paragraph 7 of your expert report

 9   which actually, conveniently, is also on Page 7.

10      A.    Which one is that, Paragraph 7?

11      Q.    Paragraph 7 on Page 7 of your expert

12   report.

13      A.    Okay.

14      Q.    In the second-to-last sentence of

15   Paragraph 7 you set forth your -- the hourly rate that

16   CRA charges for your -- your work which we've

17   established before you receive 100 percent of and you

18   also indicate that you receive other compensation from

19   CRA as well.

20            Did I read that correctly?

21      A.    Yes.

22      Q.    Can you describe to me what that other

23   compensation from CRA consists of?

24      A.    Yeah, the -- the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. HALLER:  The nature of it.

 2   BY THE WITNESS:

 3        A.    The nature of the compensation I receive

 4   on matters such as this is I get compensated based on

 5   some percentage of the staff billings, and that will

 6   vary depending on which staff it is.  So I get -- on

 7   certain billings I will receive some percentage of

 8   those billings.

 9   BY MR. KO:

10        Q.    Okay.  Certain billings for a particular

11   engagement?

12        A.    They are generally parceled out

13   engagement-by-engagement, but -- and the amount I

14   receive doesn't generally, in terms of the percentage,

15   doesn't generally vary in engagement-to-engagement,

16   but it will be different for different types of staff,

17   depending on where they -- you know, how they bill and

18   things like that.

19        Q.    And what is -- you said a moment ago that

20   the term -- the terms -- or the percentage does not

21   generally vary from engagement to engagement.

22             What is the general percentage of the

23   billings that you receive or obtain?

24        A.    Anywhere from zero to 20 percent I think
```

Highly Confidential - Subject to Further Confidentiality Review

1    would be the highest, but zero would be -- anywhere

2    from zero to 20.

3         Q.    And -- and other than who at CRA bills for

4    the time, are there any other factors that determine

5    or provide the basis for the percentage that you

6    receive in any particular matter?

7         A.    Not that I'm aware of.  I'm -- I'm pretty

8    sure it is just by individual, although -- I don't

9    want to misspoke -- speak, so there is some chance for

10   some individuals.  It might depend on which role they

11   are playing, like if they are the leader on a case, it

12   might be different than if they are not, but I don't

13   think that's true.  I think it actually is just by

14   individual.

15        Q.    For the purposes of this litigation,

16   what's the percentage range that you will obtain based

17   on staff billing?

18        A.    I would say it's that same zero to 20.

19        Q.    Okay.  And do you have an understanding of

20   what percentage of the billing you receive of Sean

21   Taylor's work?

22        A.    I don't.

23        Q.    Do you have an understanding of what

24   percentage of the billing that you receive from Jarrod

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Welch's work?

 2        A.    I don't.

 3        Q.    Do you have an understanding of what

 4   percentage of the billing you received from Daniel

 5   Garcia Schwartz's billing?

 6        A.    I do not.

 7        Q.    Have you -- in addition to the amounts

 8   that you have received from CRA directly regarding

 9   your $1,400 an hour rate, have you also received

10   compensation that reflects the percentage of the

11   billing of CRA staff in connection with this

12   litigation?

13        A.    I don't think so, but I can't be

14   100 percent sure of that.  That gets paid on a

15   quarterly basis, and I don't believe I've been paid

16   based on this case, but, again, because of the way

17   this works there is often a significant lag because

18   I -- I don't get paid by CRA until the bills are paid

19   to CRA and it has to come in between a particular time

20   in the quarter so that it's reflected in that

21   quarter's numbers, so I wouldn't assume it's been

22   paid, but I can't say for sure because it -- to me

23   it -- it doesn't come in except for once a quarter.

24        Q.    So in addition to this percentage of the
```

Highly Confidential - Subject to Further Confidentiality Review

1   billing structure and your hourly compensation, is

2   there any other compensation you receive from CRA?

3          A.    I do also get, based on my contract, a

4   performance -- potentially get a performance payment

5   based on how much work I do over the entire contract.

6   But I won't know that for another three years or four

7   years whether I will earn a performance payment.

8          Q.    And the contract that you are describing,

9   is that the contract -- the general agreement that you

10  have with CRA that we were describing or discussing

11  before?

12         A.    Yes, it is.  Yes, it is.  It would -- it

13  would depend on how much work I end up doing for CRA

14  over that period of time.

15         Q.    And do you know when -- or how that gets

16  triggered?

17         A.    I don't recall.  I knew at the time I

18  signed the contract, but it's -- it's based on

19  reaching a certain threshold of billings over the time

20  of the contract.

21         Q.    In addition to your hourly rate, the

22  percentage of the billings and this potential premium

23  that we just discussed, are there any other forms of

24  compensation that you receive from CRA?

Highly Confidential - Subject to Further Confidentiality Review

```
1        MR. HALLER:  Objection; no foundation to the

2   word "premium," but you can answer.

3   BY THE WITNESS:

4        A.    Could you restate this question?

5   BY MR. KO:

6        Q.    So, you've indicated that you receive thus

7   far three general areas of compensation from CRA,

8   which consist of your hourly rate, a percentage of the

9   billing, and a certain term in the contract you have

10  with CRA that's based on reaching a certain threshold

11  of billings over the time of the contract.

12             Are there any other areas or categories of

13  compensation that you receive from CRA outside of

14  those three categories?

15       A.    Also, when I signed on with CRA I get a

16  bonus that's prorated out over the duration of my

17  contract, assuming I continue to work for CRA over

18  that period of that contract.

19       Q.    So if I understand correctly, you haven't

20  received that bonus yet?

21       A.    I'm -- in -- in some of my earlier I

22  had -- this is my second contract with CRA, so I did

23  receive some of that in -- in my first contract

24  because I continued to work for CRA.  So my -- my
```

1    understanding is it -- I will in the future collect

2    those payments based on that same idea.

3        Q.    How long was the term of your first

4    contract with CRA?

5        A.    It was actually five years, but I renewed

6    before the five years was up.  So I renewed my

7    five-year contract, I think, roughly a year early.  So

8    I renewed roughly after four years.

9        Q.    It seems like CRA follows general

10   practices of NFL teams in re-upping a year before.

11           So you re-upped a year prior to being a

12   free agent?

13       A.    Yes, I would have been a free agent and

14   I -- I would have been a free agent I think as of

15   May -- in May this year.  So I re-upped roughly before

16   that.  So I started -- I started my new contract about

17   a little earlier than I would have otherwise.

18       Q.    And do you recall the amount of the bonus

19   that you received?

20       MR. HALLER:  Yes or no.

21   BY THE WITNESS:

22       A.    I -- I don't have a specific recollection.

23   BY MR. KO:

24       Q.    When negotiating your second contract with

Highly Confidential - Subject to Further Confidentiality Review

```
 1    CRA -- well, first of all, the second contract that

 2    you have, what's the term?

 3          A.    It's five years.  So it's another -- it's

 4    a five-year deal with CRA, as was my first deal.

 5          Q.    Did you negotiate any of the terms of that

 6    deal or a contract?

 7          A.    Negotiate is kind of a strong word.  I

 8    didn't really.  It was pretty much a rollover of the

 9    contract that I had.  Pretty much the terms stayed

10    about where they were.  So I didn't -- I didn't

11    negotiate particularly hard.

12          Q.    So other than the four categories of

13    compensation that we have discussed thus far that you

14    obtain from CRA, are there any other types of

15    compensation you received from Charles River

16    Associates?

17          A.    No, nothing else that would be

18    compensation.  I get reimbursed for expenses, but

19    that's not compensation.

20          Q.    And with respect to the last category, the

21    bonus structure that is part of your second contract,

22    do you recall if that's similar or greater than the

23    amount that you negotiated for or discussed with CRA

24    for the first contract?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I think it's -- it's the same nominally

 2   because there was this rollover and I didn't finish

 3   the first contract, there -- it doesn't turn out to be

 4   exactly the same number, but it's per -- it -- it

 5   pretty much is just a rollover of the same deal, but

 6   you have to take account of the fact that I didn't

 7   finish the first deal, so that was kind of why it --

 8   but it was essentially a rollover of the same terms.

 9        Q.    Is any part of it guaranteed?

10        A.    No.  I mean, if I stopped working, I

11   wouldn't collect it.

12        Q.    Essentially you have to work the terms or

13   the duration of the contract in order to obtain the

14   bonus?

15        A.    Yeah, I -- I don't recall the precise

16   language.  It's -- you know, there is no specific

17   requirement that I work a certain number of hours, but

18   it's -- you know, I'm -- I'm expected to continue to

19   work with CRA and in my -- my normal pattern.  You

20   guys are lawyers, you know how these things are

21   written more than I do, but I take it as, Kevin, keep

22   working and keep working like you have and that will

23   fulfill your end of the deal, and I'm happy with that.

24        Q.    Now, we -- earlier this morning and,
```

Highly Confidential - Subject to Further Confidentiality Review

1    actually, about an hour ago we were also talking about

2    Greg Bell.

3             Do you recall that?

4         A.    Yes.

5         Q.    And CRA is -- well, he is an employee at

6    CRA, but he has staff at CRA that support his expert

7    report as well, correct?

8         A.    Yes.

9         Q.    Are you aware of whether or not CRA is

10   assisting any other expert in this case?

11        A.    None that I'm aware of, but I'm not aware

12   of everything that happens at CRA, so.  I'm probably

13   the last person you should ask that of.

14        Q.    What's your understanding of who or which

15   entity you and CRA have been retained by?

16        A.    My understanding, it was the distributor

17   Defendants.  Now, whether that includes every one of

18   them, I don't know.  I know -- it doesn't -- it

19   wouldn't affect my analysis one way or the other.  I

20   was going to do the analysis that I would do and it

21   doesn't matter whether it was for one distributor, all

22   of the distributors, none of the distributors.  I

23   analyze it the way an economist like myself would

24   approach it, so.  I -- I don't know specifically who

Highly Confidential - Subject to Further Confidentiality Review

1    is listed on the retention letter.

2         Q.    But it's your general understanding that

3    you and CRA have been retained by the distributor

4    Defendants in this case, correct?

5         A.    That's my general understanding.

6         Q.    Turning back to Paragraph 10 of your

7    report, which you are at -- well, I believe you are at

8    now, I just want to ask you about certain entities

9    that appear in Paragraph 10.

10             With respect to Cardinal Health, Inc.,

11    have you ever -- have you or CRA ever been retained as

12    an expert or consultant by Cardinal Health in the

13    past?

14         A.    I can't --

15         MR. HALLER:  Objection.

16    BY THE WITNESS:

17         A.    I --

18         MR. HALLER:  No foundation as to CRA.

19    BY THE WITNESS:

20         A.    I cannot speak for CRA.  I really don't

21    have a view into what CRA's contracting is because I'm

22    a consultant to CRA, so I don't really see their

23    broader contract, who they -- who they work for, I

24    don't -- I don't -- that I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I can speak for myself.  I don't recall

 2   specifically working for Cardinal.  They may have been

 3   involved in some multi-defendant litigation that I've

 4   been involved in, but I don't recall doing specific

 5   work for Cardinal.

 6   BY MR. KO:

 7        Q.    Do you recall ever doing any expert or

 8   consulting work for AmerisourceBergen?

 9        A.    Not -- not that I have, again, have a

10   specific recollection as they -- they -- I've been

11   involved in several matters that have multiple

12   defendants or multiple plaintiffs and whether they

13   were involved in those, I can't say for sure, but

14   there is nothing I can remember specific consulting

15   for them.

16        Q.    Do you have any recollection of any

17   specific expert or consulting work you have done in

18   the past for CVS?

19        A.    Again, I don't recall a specific project

20   for CVS, no.

21        Q.    Have you ever done any expert or

22   consulting work for Walgreens?

23        A.    Yes, I have.  I've done some work for

24   Walgreens.  I think the work I've done for Walgreens
```

1    is in the labor area.  I've worked with them on -- on

2    some labor issues that they had.  So I have worked as

3    a consultant for Walgreens previously.

4        Q.    And was that in connection with a

5    litigation or were you providing consulting services?

6        A.    Actually, I think both, but there was

7    litigation involved at least in part of it.

8        Q.    And when was that?

9        A.    Somewhere between five and ten years ago

10   would be my guess.

11       Q.    And do you recall the frequency of your

12   involvement in terms of the both litigation and

13   consulting services you provided for Walgreens?

14       MR. HALLER:  Objection; vague.

15   BY THE WITNESS:

16       A.    I don't know.  We probably worked for them

17   for about a year on a -- a set of matters related, as

18   I said, to labor issues that they had.

19   BY MR. KO:

20       Q.    And when you said "we" a moment ago, who

21   are you including in "we"?

22       A.    I would have been at Navigant, I believe,

23   at the time, so it would have been many of the same

24   people who are with me at CRA, but I was working

1    through Navigant at the time.

2        Q.    And with respect to the labor issues that

3    you were providing services to Walgreens for, can you

4    describe specifically what those labor issues were?

5        A.    The ones I recall, there may have been

6    more, but the one I recall was hiring and promotion of

7    managers for Walgreens' retail stores.  So it was

8    their retail store managers.

9        Q.    And is that the extent of which you were

10   providing litigation in -- or expert litigation and

11   consulting services to Walgreens for?

12       A.    That's what I recall.  There may have been

13   other things, but as far as I can recall, that was the

14   work I did for Walgreens.

15       Q.    Do you recall performing any expert work

16   or providing consulting services for Walmart?

17       A.    I mean, years ago I did some work

18   indirectly for Walmart, not through CRA or Navigant

19   actually, but that would have been ten plus years ago,

20   again, in the labor area.

21       Q.    And what specifically did you do for

22   Walmark -- Walmart in terms of the labor -- labor

23   work?

24       A.    I worked with a colleague of mine who is

Highly Confidential - Subject to Further Confidentiality Review

1    Finis Welch and his consulting outfit, which was Welch

2    Associates, and I consulted with as a non-testifying

3    consultant.

4        MR. HALLER:  Well, maybe, was this a

5    confidential engagement or is this -- or is this

6    something you could disclose if it was -- it wasn't

7    testimony in a court case?

8        THE WITNESS:  It was not testimony -- I was not

9    a testifying expert.  I just helped with some of the

10   statistical work and gave him -- talked to Finis about

11   some of the issues that were there in that case and...

12       MR. HALLER:  I just don't know if you were bound

13   by a confidentiality agreement in that case or not.

14       THE WITNESS:  I may have been.  I don't know,

15   but I -- I don't think I have disclosed anything

16   that's beyond the -- what would be there, but I --

17   I -- I don't even recall much more work beyond that.

18   It was more just statistical consultant.

19   BY MR. KO:

20       Q.    Other than this work that you said that

21   you indirectly provided to Walmart, have you done any

22   other expert or consulting work for them in the past?

23       A.    Not that I recall.

24       Q.    What about with respect to HBC Service

```
1    Company, have you ever provided any expert or

2    consulting work for them?

3         A.   Again, not that I have a specific

4    recollection of.

5         Q.   What about with respect to H.D. Smith,

6    have you provided any expert work or consulting --

7    expert or consulting work for them in the past?

8         A.   Not that I -- again, that I have a

9    specific recollection of.

10        Q.   In addition to providing these opinions

11   that you are setting forth on behalf of the

12   distributors and that you've been asked to provide by

13   counsel for distributors, do you or have you been

14   approached by any other Defendants in this litigation

15   to provide expert opinions on their behalf?

16        A.   No, not that I recall.

17        Q.   Are you currently involved in any

18   discussions with any other Defendants other than the

19   distributor Defendants to provide expert testimony on

20   their behalf?

21        A.   In this case?

22        Q.   Correct.

23        A.   No, not that I recall regarding anything

24   in this case, no.
```

1      Q.      Are you aware of opioid cases outside of

2    the MDL and the litigation that you have been retained

3    for here?

4      A.      I have no specific knowledge of cases

5    outside of the work -- the case I'm working on.

6      Q.      So in connection with the expert work you

7    are doing for this opioid litigation, is it fair to

8    say that this is the only expert work you are doing in

9    connection with any opioid-related case?

10     A.      As far as I know, yes.

11     Q.      You have not been engaged by any other

12   entity in any other matter outside of this opioid MDL

13   with respect to opioid lawsuits brought on behalf of

14   local governments --

15     A.      Again, I don't --

16     Q.      -- and state governments, correct?

17     A.      -- I don't know what specifically is in

18   the engagement letter, but as far as I know, the

19   engagement that I know of is to work on this matter

20   specifically.

21     Q.      And you have no other engagements with any

22   other counsel or entities involved in opioid

23   litigation outside of the one that you and CRA have

24   here, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    I don't think you can say that because

2   counsel that are involved here are involved in other

3   matters having nothing to do with opioids, so I might

4   have other litigation matters involving some of the

5   same firms that are in this litigation, but nothing in

6   other opioid-related matters, so...

7       Q.    And that's what I was asking.

8       A.    I know, but your question kind of didn't

9   say that.

10      Q.    Fair enough.

11            Dr. Murphy, in addition to the work you do

12  for CRA and in connection with your role as a

13  professor and other current positions you list on your

14  CV, do you have any professional licenses or

15  certifications or accreditations?

16      A.    Oh, do I have any professional licenses.

17  Not that I know of.  I mean, I've got a Ph.D. in

18  economics and I'm a professor of economics, but I

19  don't think I have any official professional licenses

20  that I'm aware of.

21      Q.    Are you a -- a member of any professional

22  organizations that you are aware of?

23      A.    I think I'm a member of the American

24  Economics Association.  I had to become a member when
```

Highly Confidential - Subject to Further Confidentiality Review

1    I won the Clark medal.  They wouldn't give it to me if

2    I didn't become a member, so I became a member at that

3    point.

4         Q.    And that was in the late '90s?

5         A.    I think that's right.  It should have been

6    like '97 or something like that.  I -- prior to that I

7    hadn't been a member of the American Economics

8    Association.  They found that out and they thought

9    that wasn't good, so I became a member of the American

10   Economics Association.

11              I'm a member -- I'm an elected member of

12   the American Academy of Arts and Sciences.  Those are

13   the ones I -- I recall that I'm a member.

14        Q.    Other than the American Economics Asso --

15   well, are you still a current member of the America --

16   American Economics Association -- Economics

17   Association?

18        A.    I don't know.  I haven't kept track.

19   Probably, probably my membership I -- likely has

20   lapsed.  I'm also -- I -- now that I think about it,

21   I'm -- I'm elected fellow of the Econometrics Society,

22   so.  I think I had to join that society when I got

23   elected a fellow of that.  So I joined that one, too.

24        Q.    And when were you elected to the

1    Econometrics Society?

2        A.    I don't know.  Sometime in the '90s,

3    probably.

4        Q.    Same question with respect to the American

5    Academy of Arts and Sciences, when did you become an

6    elected member of that?

7        A.    Around the same time.

8        Q.    A moment ago we talked about the expert

9    engagements that you've disclosed in connection with

10   your CV and that's reflected in Murphy Exhibit 5 that

11   we've been discussing.

12            Approximately how many more times have you

13   been engaged as an expert beyond what is disclosed in

14   that CV?

15       A.    I wouldn't know.  I -- I don't keep track

16   of those things.

17       Q.    When was the first time you recall being

18   engaged as an expert?

19       A.    Where I was specifically an expert witness

20   or a consulting expert?

21       Q.    Either one.

22            When was the first time you recall

23   specifically being retained as either an expert or

24   consulting witness?

```
 1          A.      Well, I was a consulting -- I have been a

 2     consulting expert probably running back to sometime in

 3     the '80s, you know, sometime in the '80s.  For a long

 4     time I worked with Economic Analysis Corporation in

 5     Los Angeles as a consulting non-testifying expert.

 6     That was kind of my original consulting arrangement.

 7     I believe the first time I was retained as a

 8     testifying expert would have been in the Microsoft

 9     antitrust trial where I was retained as an antitrust

10     expert in that trial.  That would have been -- I think

11     that was my first testifying expert engagement.

12          Q.      And was that -- I believe that was in the

13     late '90s, early 2000s.

14                  Is that the general timeframe?

15          A.      Your recollection is probably better than

16     mine.  Around that time, I would guess.  Post

17     Windows 98, I know that, so it would have been late

18     '90s.

19          Q.      Since you were retained by Microsoft as an

20     expert in that antitrust litigation, would you say

21     that you've been regularly engaged as an expert

22     witness?

23          MR. HALLER:  Objection; vague.

24     BY THE WITNESS:
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.    I think it's varied over time, but, yeah,

 2   I think in general that's -- over that time period

 3   since then I've done expert witness work.

 4   BY MR. KO:

 5      Q.    Is it fair to say that you've done a

 6   substantial amount of expert work in the past

 7   20 years?

 8      MR. HALLER:   Objection; vague.

 9   BY THE WITNESS:

10      A.    I mean, I think I -- I think that's one of

11   the things I've done is expert work in addition to my

12   work as a practicing economist and professor.

13   BY MR. KO:

14      Q.    Can you provide me with a general

15   breakdown of how much of your professional time is

16   spent on expert work relative to your work as a

17   professional economist?

18      A.    I would say, I'm trying to think what --

19   how much I do.  It has varied over time.  I would say

20   currently my work as a professional economist at the

21   university is by far the majority of my time.  I spend

22   much less time on the consulting side.

23      Q.    And has that changed over time?

24      A.    It's varied.  There were a couple of
```

```
 1    years, for example, where I was on leave from the

 2    university, so I didn't do as much university work and

 3    I did more consulting work during that period of time.

 4    These days I would say most of my work is at the

 5    university, much more so than in consulting.

 6         Q.    When were you on leave from the

 7    university?

 8         A.    I don't recall.  Maybe five or six years

 9    ago, something like that.

10         Q.    And how long ago was the leave?

11         A.    I took -- well, I never actually took a

12    full -- I officially took a leave, but I never

13    actually stopped teaching because I was teaching this

14    introductory Ph.D. class, so I kind of taught it for

15    free when I was, quote, on leave.

16              So -- and then the second year I taught

17    that and my Booth classes, even though offic- --

18    unofficially I was on leave that year as well.  So if

19    you call a non-leave a leave, it was two years.  It

20    probably amounted more to like a year-and-a-half given

21    that I still worked while I was on leave.

22         Q.    And what was the reason for your non-leave

23    leave?

24         A.    I was very busy with everything I was
```

Highly Confidential – Subject to Further Confidentiality Review

1  doing and I teach a lot.  I probably teach more than

2  just about any economist at -- at the university.

3  That was true then, it is still true today.  So I

4  think I needed a little bit of a break from teaching

5  so many classes.  So instead of teaching the number I

6  normally teach, I taught -- and the one year I taught

7  just one class and the next year I think I caught two

8  or two-and-a half classes.

9       Q.    And during this generally two-year time

10  period where you taught less classes at the

11  university, you were still working as an expert in

12  various engagements?

13       A.    I was working as an expert as well as I

14  was at the time, I believe this was around the time I

15  was also working as a consultant for the National

16  Basketball Players Association.  So I was doing that

17  kind of bargaining and labor consulting that I was

18  doing directly with them.

19       Q.    So in addition to the work you did for the

20  NBA and work you were doing as an expert, is there any

21  other areas of your professional career that you kind

22  of reduced during that time period?

23       MR. HALLER:  Objection; misstates his testimony.

24  He said he did work for the union, not for the NBA.

```
 1        MR. KO:  That is a very fair clarification,

 2   David.

 3   BY MR. KO:

 4        Q.    I apologize for misspeaking, but I think

 5   you get the gist of my question?

 6        A.    Yeah, I was going to correct you on that

 7   one, though, because if the players ever found out

 8   that I was working for the league, they would be

 9   pretty upset.

10             No, I -- that -- that's major what I -- I

11   do other stuff.  I mean, I have a woodworking business

12   that I also engage in, but it doesn't make any money,

13   so.

14   BY MR. KO:

15        Q.    In your work with the N -- NBA -- PA, did

16   you get compensation?

17        A.    I did.  I act -- I think -- I believe I

18   actually did that work through Navigant when I was at

19   Navigant, so, but it was a very different kind of work

20   than I generally do in my consulting work, so.

21        Q.    Putting aside consulting work, is it a

22   fair characterization to say with respect to the

23   expert work you have done over the past 20 years that

24   the expert work represents a substantial source of
```

```
 1    income for you?

 2        A.    Well, it has varied over time.  I have

 3    done other things.  I've -- you know, I had a currency

 4    trading business I did for a while that provided a

 5    substantial source of income.  That's become tougher

 6    to do these days.  But -- so it's varied how important

 7    consulting was relative to other things I did.

 8        Q.    With respect to the last five years, would

 9    you characterize expert work as being a substantial

10    source of income for you?

11        A.    I think it was a substantial source of

12    income.  The university is also a substance source, so

13    I make money working in both capacities.

14        Q.    Relative to the money that you make from

15    the university, is the money that you make as an

16    expert witness greater or less than the amount you

17    receive from Booth?

18        MR. HALLER:  Objection, I think -- I think --

19    you know, I've let some general questions go past, but

20    I think you are drifting back into the territory where

21    I was instructing him not to answer.  I -- I think his

22    compensation, again, not to repeat myself, in this

23    matter is discoverable, but now that we are comparing,

24    you know, whether he makes more money testifying or as
```

Highly Confidential - Subject to Further Confidentiality Review

1    a professor, particularly when he says things have

2    varied over time, I think I'm going to instruct him

3    not to answer that question.

4    BY THE WITNESS:

5         A.    I'm going to follow the advice of counsel.

6    BY MR. KO:

7         Q.    With respect to 2018, do you recall

8    whether or not the amount you made as an expert

9    witness was greater or less than the amount you

10   received from Booth?

11        MR. HALLER:  Same instruction.

12   BY THE WITNESS:

13        A.    I don't -- I'm not paid by Booth.  I'm --

14   I'm actually a professor at both Booth and the

15   economics department, as well as I have a courtesy

16   appointment in the law school.  So I'm actually

17   paid -- I'm a university employee.  I don't -- I

18   don't -- I'm not a specific Booth employee.

19   BY MR. KO:

20        Q.    Thank you for that clarification.

21             So the entity that signs your paychecks is

22   the university itself, not particular -- a particular

23   school, correct?

24        A.    Yeah, it is not just who signs my

Highly Confidential - Subject to Further Confidentiality Review

1    paycheck.  It is actually who I work for.  I actually

2    have a joint appointment in economics and the Booth

3    School of Business, so I wouldn't be one -- most of

4    the people who work at Booth would be Booth

5    professors.  I'm a Booth professor but also a

6    university professor.  I am also a professor in the

7    economics department which is part of the social

8    science division.

9         Q.    So in 2018 do you recall whether or not

10   the income you received as an expert was greater or

11   less than the money you received from the university?

12        MR. HALLER:  Same objection -- same instruction.

13   BY THE WITNESS:

14        A.    I'm -- based on the instruction of

15   counsel, I'm not going to answer.

16        MR. KO:  It is a little bit past 1:00.  I said

17   that we would probably break for lunch at this time.

18             Do you want to break for lunch?

19        THE WITNESS:  That sounds fine to me.

20        MR. HALLER:  Yep.

21        THE VIDEOGRAPHER:  We are off the record at

22   1:01 p.m.

23                  (WHEREUPON, a recess was had

24                   from 1:01 to 1:48 p.m.)

Highly Confidential – Subject to Further Confidentiality Review

```
1                    (WHEREUPON, the witness left the

2                     room.)

3                    (WHEREUPON, a conference call was had

4                     with Special Master Cohen, as

5                     follows:)

6        MR. KO:  All right.  Special Master, we are at

7    the Kevin Murphy deposition today.  He is one of the

8    expert witnesses for Defendants.  And unfortunately we

9    couldn't come to agreement on an issue that has

10   been -- that has arisen with respect to questions

11   regarding Mr. Murphy's compensation.

12              And in particular, I have been asking the

13   witness questions about the amounts he has made as an

14   expert witness, including all of the engagements that

15   he has listed in his CV over the last four years,

16   which total about 50 or so engagements.  And his

17   counsel, David Haller of Covington, is instructing him

18   not to answer.

19              In addition, his counsel is instructing

20   him not to answer any questions with respect to his

21   specific compensation that he makes as a professor

22   currently or historically and his counsel is

23   instructing him not to answer questions with respect

24   to any compensation outside ultimately of this
```

1    litigation.

2         My suggestion to Mr. Haller was that he

3    preserves his objection on the record, but that, of

4    course, Mr. Murphy should be able to respond to these

5    questions, but Mr. Haller has unfortunately drawn a

6    line in the sand and has said -- given clear

7    instructions not to -- for the witness not to answer

8    and Mr. Murphy has followed said instructions.

9         The one thing, additional thing I will

10   note is that Mr. Haller has made some suggestion how

11   he has never seen this type of questioning to be

12   answered in any previous litigation that he has been

13   involved in, and I would just note that in this

14   litigation, among others that I have been involved in,

15   these questions have been asked and answered of

16   defendants' expert witnesses.

17        So with that, I'm -- I'm happy to answer

18   further questions, but that's the general issue in a

19   nutshell.

20   MR. HALLER:  So, Special Master Cohen, this is

21   David Haller of Covington & Burling.

22        Professor Murphy is a professor at the

23   University of Chicago, both in the Department of

24   Economics and in the Booth school and has been for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    many years.  He has also, you know, testified in a

 2    variety of unrelated cases over the course of the last

 3    30 years.

 4              He has answered and we have provided, you

 5    know, at -- at your direction we have provided a

 6    statement of his compensation related to this matter,

 7    we have provided all of the invoices for the

 8    compensation being paid to him and to Charles River

 9    Associates who is supporting him in this matter.

10    We've let all sorts of -- all questions regarding his

11    compensation in this matter, we've answered, the

12    witness has answered.  And all questions relating to

13    the structure of his compensation and the sources of

14    it we've answered as well.

15              The -- the questions that we have

16    difficulty with are, for example:  What was your

17    compensation from the Uni -- University of Chicago

18    this year, what was it last year, what was it the year

19    before last year, what was it the year before that,

20    which is, one, I think sensitive and personal; and,

21    two, not relevant; and, three, doesn't go to bias in

22    any potential way; and, four, is not within the scope

23    of what's permitted under Rule 26, which is, you know,

24    that -- that -- that there can be inquiry into the
```

1    compensation in this case.

2              So additionally, there has been questions,

3    you know:  How much money did you make consulting in

4    unrelated cases in 2015, how much did you make in

5    consulting in unrelated cases in 2016, all of which,

6    again, is personal, sensitive information, doesn't go

7    to this case, doesn't relate to the compensation in

8    this case, and, therefore, can have no relationship

9    to, you know, whether or not the amount he is being

10   paid in this case is somehow biasing his testimony in

11   this case.

12             So for all of those reasons -- and

13   including the witness's discomfort and -- in -- in --

14   in disclosing what he views as personal and sensitive

15   information, he has not answered those questions at my

16   direction.

17        MR. KO:  Special Master, I just want to quickly

18   address a couple of things, if you don't mind, that

19   Mr. Haller --

20        SPECIAL MASTER COHEN:  Go ahead, just briefly.

21        MR. KO:  Sure.

22        SPECIAL MASTER COHEN:  Go ahead.

23        MR. KO:  First of all, Mr. Haller's citation of

24   Rule 26 is completely incorrect.  There is nothing in

```
 1   that rule that suggests that this type of information

 2   is precluded.

 3       SPECIAL MASTER COHEN:  Hello?

 4       MR. KO:  Oh, Special Master Cohen, can you hear

 5   me?

 6       SPECIAL MASTER COHEN:  Yeah.  I just lost you

 7   for a second.

 8       MR. KO:  Okay.  Let me just make sure I repeat

 9   what I said, which is that Mr. Haller's

10   characterization of Rule 26 is wholly incorrect.

11   There is nothing in that rule that precludes this type

12   of information from being discoverable.  Obviously the

13   only context in which income or compensation is raised

14   in that rule is with respect to whether or not

15   communications between counsel are discoverable

16   regarding compensation in a particular engagement.  It

17   doesn't talk about the relevancy of any other

18   engagement.

19           But, more importantly, Mr. Haller's

20   suggestion that this does not have any relevance to

21   bias or otherwise is also incorrect.  I mean, the

22   other expert witnesses have answered this question.

23   Mr. Haller is, I think, the sole attorney who is

24   taking this position.  Certainly I don't want to speak
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    for everything, but -- everyone, but I believe that to

 2    be the case.  And, of course, Mr. Murphy's discomfort

 3    is also no basis for which to not respond to this

 4    question.  Depositions are, of course, discomforting

 5    for many people.

 6        SPECIAL MASTER COHEN:  So here is -- here is

 7    where I think we need -- here is where I think we need

 8    to go.

 9            Certainly any compensation that he is

10    being paid on this matter is -- is clearly relevant.

11    I think that any compensation that he has received in

12    other matters from the same defendants or even the

13    same industry is also relevant to show possible bias.

14    So, in other words, if the witness has received

15    compensation in other matters from Purdue or from

16    Cardinal or anybody else, then I -- then I think that

17    is relevant.

18            And it is -- it is decreasingly relevant,

19    but it is still relevant, you know, kind of imagining

20    it's in circles and there is, you know, right on the

21    center of relevance and then a little bit less

22    relevant and a little bit less relevant.  I think

23    compensation that he has received from the university

24    is not relevant or -- or very barely relevant.  The
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    only reason that I can imagine that that's relevant is

 2    that, you know, if he receives a massive -- well, even

 3    that I'm -- I'm stretching it.  I just don't see that

 4    as relevant at all from the university.

 5              So what I think you should do is begin by

 6    asking the extent to which the other matters that you

 7    are inquiring about have anything to do with any of

 8    the parties in this case, and if they don't, on either

 9    side of the D, then it becomes questionable.  If it is

10    also true that those matters don't even involve

11    pharma, then I think it becomes irrelevant.

12              So those are the lines that I would draw.

13    I assume that I don't need to be more specific and

14    that you can go forward with that, but if I'm wrong,

15    tell me now.

16    MR. KO:  The one thing that I would just follow

17    up on, Special Master, is that I think you were

18    getting there with respect to the university

19    compensation, but the -- that's exactly the type of

20    question I was asking as a starting point in order to

21    inquire and understand what percentage of that income

22    or what that income is relative to his expert work in

23    order to get a general understanding of his overall

24    income.  Those questions were specifically shut down
```

1    as well by Mr. Haller.

2        SPECIAL MASTER COHEN:  Right.  So I can

3    imagine -- I get where you are going, and, you know,

4    you don't need the level of detail that I think maybe

5    you were seeking to make your point.  So once you've

6    gone through all of the other information, I think it

7    would be fair to ask your question along the lines of:

8    Is the expert compensation that you are being paid in

9    this case a substantial portion of your income.

10       MR. KO:  And I asked that question and that was

11   shut down, too, or a variation thereto.

12       SPECIAL MASTER COHEN:  Now, look, I am -- I am

13   largely agreeing with you, just not entirely.  I'm

14   largely saying, yes, directions and witness

15   instructions not to answer were inappropriate.  This

16   is -- you know, this territory is information that you

17   are allowed to elicit, but I'm not giving you carte

18   blanche.

19       MR. KO:  Sure.  As -- as one way forward -- and

20   I appreciate the guidance.  As one way forward can

21   we -- and -- and I clearly understand the guidelines

22   that you are giving and I would like to explore

23   generally a few more questions in this area.  Of

24   course, Mr. Haller has kind of shut it down initially.

```
1    I would suggest, so that we don't have to either call

2    you back again or -- or, you know, revisit this issue,

3    that Mr. Haller notes his objection for the record in

4    terms of what we've discussed here but, you know, have

5    Mr. Murphy, in fact, respond to the questions that

6    I'm -- I'm asking.

7         SPECIAL MASTER COHEN:  Well, I think that is the

8    better course for a couple of reasons, and by the way

9    I -- I have a telecon at 3 o'clock, so I only have a

10   couple of more minutes here with you.  We can get back

11   on the phone if necessary.

12              But, look, as a general matter,

13   instructions not to answer are inappropriate unless we

14   are talking about trade secrets or attorney privileged

15   information, none of which this is.  And, of course,

16   the questions that you asked are -- if they

17   quote/unquote go over the lines, then what should

18   happen is a motion in limine to preclude that

19   information from being elicited at trial or relied

20   upon in any way, you know, for summary judgment or

21   anything else.

22              But still, my expectation is that you try

23   and adhere to those lines and don't test that with the

24   expect -- with the understanding that the expectation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is that most of them get answered.  So...

 2        MR. HALLER:  Well, Special Master Cohen, this is

 3    David Haller, and I'm -- I'm comfortable with your

 4    direction, and I think, in fact, was willing to answer

 5    questions along those lines.  So, if there are

 6    questions about, you know, amounts paid in matters for

 7    same or similar defendants in the same industry, no

 8    problem with that.  If it relates to a case involving

 9    pharma, no problem with that.  No problem if it's --

10    you know, is most of the -- is your compensation for

11    this case a substantial portion of your income, no

12    problem with that.

13            But I understood, you know, that beyond

14    that it's -- there isn't relevance, that this is

15    highly sensitive personal information, that how much

16    the university pays him in absolute terms is just not

17    fair game.  And so --

18        SPECIAL MASTER COHEN:  I agree.

19        MR. HALLER:  -- I think we'll --

20        SPECIAL MASTER COHEN:  I agree with the latter,

21    but let me cut in.  I really do have to get on this

22    other telecon.  Here is what's going to happen.  You

23    guys go forward.  If you get stuck again, call me.

24        MR. HALLER:  Okay.
```

```
 1          SPECIAL MASTER COHEN:  Okay.

 2          MR. KO:  All right.

 3          SPECIAL MASTER COHEN:  But I have to get on this

 4     other call.  I'm sorry.

 5          MR. HALLER:  Thank you.

 6          MR. KO:  Thank you.

 7          SPECIAL MASTER COHEN:  Thank you.  Bye-bye.

 8          MR. KO:  Appreciate your time.

 9                    (WHEREUPON, the conference call with

10                     Special Master Cohen concluded.)

11          MR. KO:  We can go off the record.

12                    (WHEREUPON, a recess was had

13                     from 2:00 to 2:08 p.m.)

14          THE VIDEOGRAPHER:  We are back on the record at

15     2:08 p.m.

16     BY MR. KO:

17          Q.    Welcome back from lunch, Dr. Murphy.

18                During lunch or at least during the break

19     we had a call with the special master in this case to

20     resolve an issue regarding questions I had asked to

21     you about compensation you have received in other

22     expert work.  Defense counsel were present and we

23     memorialized that discussion on the record.  And so at

24     some point during this deposition I may revisit the
```

Highly Confidential - Subject to Further Confidentiality Review

1    questions I have asked you regarding your

2    compensation.  Okay?

3         A.    Okay.

4         Q.    During the most recent break, were you

5    given any instructions by counsel on how to respond to

6    this issue that we were -- that I just discussed?

7         MR. HALLER:  I have two objections to that.

8              One is that I think pursuant to the case

9    management order, the court has indicated that

10   conversations that happen between counsel and a

11   witness during a break are privileged.  And so I -- I

12   think that's not a permissible question.

13        MR. KO:  I'm waiting for your second point.

14        MR. HALLER:  The second point is I did show the

15   witness at least a small portion of the special

16   master's ruling or discussion on that question,

17   because I thought it might give the witness some

18   guidance.  You were here just now when I was scrolling

19   through it a bit just so he could see that guidance.

20        MR. KO:  So is your -- is that your

21   representation in terms of what you discussed with the

22   witness regarding the previous discussion with the

23   special master?

24        MR. HALLER:  I am disclosing just for the record

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that I have shown the witness a small portion of the

 2    special master's statement on the record.  And apart

 3    from that, that discussions that happened during a

 4    break are not permissible to be inquired into.

 5    That -- that's not the normal practice that I normally

 6    engage in, usually, but I think in this case that is

 7    the rule, and so I should abide by that rule.

 8         MR. KO:  No.  There were -- and to be clear, the

 9    rule in the CMO in particular suggests that any

10    assumptions or facts or data that you discuss, on the

11    firsthand, with the expert are discoverable --

12    discoverable no matter where they occur.

13              But secondly, and more importantly,

14    obviously as you know for someone with as much

15    experience as you, coaching and -- and -- coaching the

16    witness is impermissible under any rule.

17    BY MR. KO:

18         Q.   So I would like to know, Dr. Murphy,

19    whether or not you received any instructions on how to

20    respond to this issue by Mr. -- Mr. Haller during that

21    break?

22         MR. HALLER:  Well, and I'll just reiterate two

23    things.

24              One, that you can, I agree, that you can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   ask about whether there were any facts relayed to him

 2   on which he is relying, no -- no question about that,

 3   and -- but that's not your question.

 4              And I'll note that, you know, when the

 5   shoe was on the other foot and you were defending

 6   Professor Cutler or Professor Gruber, I and the others

 7   purposely did not ask any questions about what you

 8   discussed with those witnesses during the break, not

 9   because we thought it wasn't relevant, but because of

10   the -- of the prescriptions of the case management

11   order.

12              So on that point, I think the question, as

13   you posed it, is not permissible under the case

14   management order and I'll instruct the witness not to

15   answer.

16      MR. KO:  Okay.  And I wholly dispute that

17   instruction and I'll note for the record that the

18   grounds on which you're trying to preclude the witness

19   from answering this question are completely improper.

20   I preserve that.  And -- and as you know, Mr. Haller,

21   you -- you know, this -- this has nothing to do with

22   the shoe being on the other foot.  You just know that

23   you can't coach a witness.  And so --

24      MR. HALLER:  I never, ever do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. KO:  Okay.  Well, I'll take that
 2   representation --
 3        MR. HALLER:  Okay.
 4        MR. KO:  -- for now.
 5   BY MR. KO:
 6        Q.    Thank you for bearing with that,
 7   Mr. Murphy, or Dr. Murphy, as we do our attorney
 8   thing.
 9             Let's get back to Exhibit 5, which is your
10   updated CV.  And I see that you have it in front of
11   you.  And I want to go back to the previous expert
12   engagement set forth on Page 11.
13             With respect to the cases that you've
14   listed here, can you give me a general breakdown of
15   whether or not you are generally retained by
16   plaintiffs or defendants?
17        A.    I would say the majority of the cases are
18   defendant cases.
19        Q.    Okay.  And do you have any general
20   breakdown of the times that you've been retained by a
21   defendant relative to the times you've been retained
22   as a -- by plaintiff?
23        A.    I don't have a general breakdown.
24        Q.    So when you say majority, are we talking
```

Highly Confidential - Subject to Further Confidentiality Review

1    about the great majority, the vast majority?  I mean,

2    I know majority can be 51 percent or greater.  So I

3    just want a general understanding.  Is it --

4         A.    It was greater than 51 percent for sure,

5    but cert -- certainly not close to being exclusively

6    for defendants.

7         Q.    Is it fair to say that three-quarters of

8    the time, generally speaking, you were retained by

9    defendants?

10        A.    I would say probably three -- at least

11   three-quarters of the time it would be defendants.

12        Q.    80 percent of the time?

13        A.    I -- I would guess, but now we are

14   getting -- now we are in a territory where I'm not

15   sure whether it's higher or lower.  That's -- that's

16   probably as far as I can go on a -- and it has varied

17   over time and, really, in the types of matters from

18   one side to the other.

19        Q.    So with respect to the engagements that

20   you set forth in Pages 11 through 20 of your CV, is it

21   fair to say that you've been engaged by defendants at

22   least 75 percent of the time?

23        A.    I would think that's a fair

24   characterization, although I haven't gone back to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    check it.

 2        Q.    And I have my own interpretation of,

 3    generally speaking, the work that you've done in these

 4    cases, but can you describe to me for what purposes

 5    you've been retained by defendants?

 6        MR. HALLER:  Objection; compound.

 7    BY THE WITNESS:

 8        A.    A wide range of cases, actually.  A lot of

 9    the work I do is in the antitrust area, so it would be

10    business practices of various types or unilateral

11    conduct-type cases.  It could be merger cases, price

12    fixing cases.  Those would probably be the majority of

13    the antitrust cases.  I also do some patent work,

14    general tort liability-type cases.  That would be

15    the -- that would -- that would cover most of -- also

16    I do some -- an occasional labor case, so it would be

17    hiring or promotion, cases like that.

18    BY MR. KO:

19        Q.    And with respect to the expert opinions

20    that you are providing in these antitrust, patent,

21    tort liability and -- and labor cases, how would you

22    describe the general nature of the testimony that you

23    are providing?

24        MR. HALLER:  Objection; compound.
```

```
 1   BY THE WITNESS:

 2        A.    I think in all of the cases I am providing

 3   economic testimony.  So I -- I analyze the economic

 4   aspects of the various issues using my expertise and

 5   training as an economist and my experience using that,

 6   using those skills to analyze problems.

 7   BY MR. KO:

 8        Q.    And do your expert opinions generally

 9   relate to damages at issue in those cases?

10        A.    It varies.  I do some damage cases, some

11   class certification cases, some liability cases.

12   Those would be probably the major ones.  I also do

13   some regulatory type cases where it's about what

14   regulations should be adopted by, say, someone in the

15   railroad, regulating the railroad business, for

16   example.

17        Q.    And do your expert opinions also relate to

18   causation issues that are at issue in those matters?

19        MR. HALLER:  Same objection.

20   BY THE WITNESS:

21        A.    Yes, I would say probably in both the

22   damage cases as well as the liability cases, issues

23   related to causation play a role.

24   BY MR. KO:
```

```
 1        Q.    And so we've established that at least

 2   three-quarters of the time for the last four years

 3   you're generally retained by defendants.

 4              How would you characterize the types of

 5   entities that you are retained by?

 6        MR. HALLER:  Objection; vague, compound.

 7   BY THE WITNESS:

 8        A.    I think it varies a fair amount.

 9   Sometimes it's associations or organizations.  So, for

10   example, I've done a fair amount of work for ASCAP,

11   which is Association of Composers and -- and Music

12   Producers.  As I said earlier, I work for the NBA

13   Players Association, which is another association.

14   I've worked for the Railroad Association on railroad

15   issues.  Often it's a company or a group of companies

16   that I would work for.  So I've done a fair amount of

17   work for Microsoft, Apple, Intel, people like that.

18   So, yeah, I would say mostly those would be the types

19   of entities.

20        Q.    Okay.  Is it fair to say that you have

21   been retained by Fortune 500 companies for a

22   substantial part of your career?

23        MR. HALLER:  Same objection.

24   BY THE WITNESS:
```

1    A.    I would say more often than not it would

2  have been -- would have been a -- a larger company.

3  BY MR. KO:

4    Q.    And I know that we've generally discussed

5  some prior work you've done for some of the

6  distributor Defendants in this case.

7         Have you been retained in cases by

8  entities in the pharmaceutical industry?

9    A.    I have.

10    Q.    And approximately how many times?

11    A.    I don't know the number, but probably five

12  or six of them probably is in the ballpark.

13    Q.    And with respect to the five or six

14  engagements that you had in the pharmaceutical

15  industry, do you recall the amount of the compensation

16  you received in connection with that work?

17    A.    Not specifically, no.

18    Q.    Do you recall generally?

19    A.    It's going to vary from case to case.  I

20  wouldn't -- in terms of my own hours, it would be very

21  different on different cases.  Some I worked a lot on,

22  some I worked very little on.

23    Q.    Do you recall which case you worked the

24  most on in the pharmaceutical industry?

1    A.    Probably the case I worked the most on was

2  a case where I worked for Biogen in a patent

3  litigation against other pharmaceutical firms.

4    Q.    And do you recall the amount of your

5  compensation that you received in that case, in that

6  matter?

7    A.    No.  I -- I -- and I don't recall the

8  number of hours precisely, but it would have been a

9  couple hundred hours probably I worked on that total.

10    Q.    And do you know what --

11    A.    Maybe a hundred to 200 hours, something

12  like that.

13    Q.    Okay.  And when was that?

14    A.    I could find it on here, because I --

15    Q.    Was it within the last four years?

16    A.    Yeah, it was.

17    Q.    Okay.

18    A.    It is on here somewhere.  I'll -- I'll

19  find it.

20    Q.    So if it was within the last four years,

21  it was at a rate of approximately between 12 to $1,400

22  an hour?

23    A.    Yeah, it was probably closer to the 1200

24  level because it was an -- it was a case that went to

Highly Confidential - Subject to Further Confidentiality Review

1    trial that actually started quite a bit earlier, and

2    sometimes I keep my rate fixed even as we go forward

3    in a given engagement.  I -- I think I did that in

4    that case.

5         Q.    And in addition to the Biogen case, what

6    other cases do you recall being an expert for a

7    pharmaceutical -- or for an entity in the

8    pharmaceutical industry?

9         A.    I -- I worked for Genentech in -- in a --

10   in a case for -- in a preliminary injunction case and,

11   again, in a patent matter.

12        Q.    In addition to your work -- and do you

13   recall how much money you made in that case?

14        A.    I don't.

15        Q.    Do you recall how many hours you spent?

16        A.    I don't recall.  Less than a hundred I

17   would certainly say and probably less than 50, but I

18   don't know for sure.

19        Q.    In addition to Biogen, the Biogen and

20   Genentech matters, what other engagements have you

21   been involved in in the pharmaceutical industry?

22        A.    Those are the ones I remember recently.

23   Tho -- tho -- those are the ones that I recall.

24        Q.    Okay.  But -- well, those are the two

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specific engagements you recall, but it is your

 2    testimony, just to be clear, that you do recall being

 3    engaged approximately five to six times by entities in

 4    the pharmaceutical industry?

 5        A.    Yeah, although I'm not sure it was always

 6    on pharmaceutical matters, so, like, I've done a fair

 7    amount of work for Johnson & Johnson, but it was all

 8    in their medical products work is the work I've done

 9    in the past for them, so.  I think they have

10    pharmaceutical business, but that wasn't the part of

11    the business I worked on.

12        Q.    Sure.

13              And what -- can you describe to me the

14    work you did for Johnson & Johnson?

15        A.    It was about contracting practices.  It

16    was an antitrust case more than five years ago, and I

17    don't have many specifics beyond that.  It was -- it

18    was -- it was about contracting.

19        Q.    Contracting practices with respect to a

20    particular division at Johnson & Johnson?

21        A.    Yeah.  It was endoscopic and surgery --

22    and -- and sutures.

23        Q.    Okay.  In addition to Johnson & Johnson,

24    do you recall ever doing work for Purdue?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     The chicken people?

 2        Q.     Are you aware of Purdue Pharma?

 3        A.     Not really.

 4        Q.     Okay.  Are you a -- are you aware that

 5   they are a manufacturer Defendant in this litigation?

 6        A.     I wasn't.

 7        Q.     Have you done any previous expert or

 8   consulting work for Purdue Pharma?

 9        A.     Not that I recall.  Nothing that comes to

10   my mind.

11        Q.     Are you familiar with the entities

12   Mallinckrodt or SpecGX?

13        A.     I have heard of them.  I know some -- I

14   have some familiarity with them.

15        Q.     Have you ever done any expert or

16   consulting work for Mallinckrodt or SpecGX in the

17   past?

18        A.     I think I spoke to people at Mallinckrodt

19   before.  I don't remember if I was retained or not.

20   I'm pretty sure I didn't write a report.

21        Q.     And when you said you spoke to them, what

22   did you speak to them about?

23        A.     I don't even remember the issue, if they

24   spoke to me about issues that they were dealing with,
```

Highly Confidential - Subject to Further Confidentiality Review

1    I -- and I don't even remember if I was retained, but

2    I don't believe I got to the stage of even preparing a

3    report or anything.

4         Q.    And what timeframe was that?

5         A.    I didn't know.  Somewhere in the last five

6    years.

7         Q.    Do you recall whether or not any of the

8    issues involved Mallinckrodt or SpecGX manufacturing

9    of prescription opioids?

10        A.    Not that I recall at all.  I have no

11   recollection of that, so I believe that's not correct.

12        Q.    Okay.  Do you -- have you ever done any

13   expert or consulting work or been retained in any

14   fashion by the entity Teva?

15        A.    You know, I think I did some work for Teva

16   years ago.  Again, I don't have much specific

17   recollect of -- recollection of it, and I don't

18   remember whether we even -- I even filed a report in

19   that case, so.

20        Q.    And are you aware that Teva manufacturers

21   prescription opioids?

22        A.    I am, yes.

23        Q.    Did any of your work in that matter

24   involve Teva's manufacturing of prescription opioids?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    No, it did not.

 2      Q.    Are you familiar with the entity Endo?

 3      A.    I have heard of them but I'm not really

 4   familiar with -- at all with what they do.

 5      Q.    Have you heard of the entity Par

 6   Pharmaceuticals?

 7      A.    I'm not sure.

 8      Q.    Have you done any expert or consulting

 9   work for Endo or Par in your career?

10      A.    Not that I'm aware of.

11      Q.    Have you done any expert or consulting

12   work on behalf of Insys, I-n-s-y-s?

13      A.    Not that I'm aware of.

14      Q.    Have you done any expert or consulting

15   work on behalf of Allergan?

16      A.    Again, not that I'm aware of.

17      Q.    Have you done any expert or consulting

18   work on behalf of Actavis?

19      A.    I did work -- I -- but I think that was

20   all done not as an expert but as amicus brief that I

21   did on a matter involving Actavis.  I think -- it's

22   related to the paper that's on there, so I don't

23   believe I was working in any retained capacity for

24   Actavis.
```

1      Q.     And that was an amicus brief to the

2  Supreme Court, correct?

3      A.     I believe that's correct, yes.

4      Q.     With respect to the generic drug issues?

5      A.     Yes, that's what I recall.

6      Q.     Other than that amicus brief that I

7  believe you co-signed with other economists, correct,

8  or is it -- was it simply your own?

9      A.     No.  It was, like, five of us, I think,

10  were on that, so.  It was -- it was -- it was a group

11  of economists who were on that, which is pretty

12  typical for amicus briefs.

13      Q.     So other than the amicus brief that you

14  co-signed with other economists, have you done any

15  other expert work or consulting work for Ac- --

16  Actavis?

17      A.     Yeah, I should say I don't think that was

18  technically for Actavis, it involved Actavis, Actavis

19  or whatever -- however you say that word.  But -- so

20  I -- I would say I wasn't retained by them.  It

21  involved a case they were involved in.  They are

22  actually in the title of the paper we talked about

23  earlier.  But I don't believe I've worked for them on

24  a consulting basis.

1    Q.    Are you familiar with the entity Watson

2    Pharmaceuticals?

3    A.    I am not.

4    Q.    So I take it you've not -- you don't

5    recall or you have not ever been retained as an expert

6    or a consultant by Watson, correct?

7    A.    To the best of my recollection, no.

8    Q.    Dr. Murphy, I know that we've talked

9    before about Greg Bell who has submitted an expert

10   report on behalf of the Defendants in this case.

11        Are you aware of any of the other defense

12   experts in this matter?

13   MR. HALLER:  Objection; asked and answered.

14   BY THE WITNESS:

15   A.    Not particularly, no.

16   BY MR. KO:

17   Q.    Have you had any discussions with any of

18   the defense experts in this matter about this

19   litigation?

20   A.    The only person I had discussions with was

21   Greg Bell.  That's the only other expert I recall

22   having any discussions with.  And those were of two

23   types.  I had a discussion early on where he contacted

24   me about the interest in people in talking to me and

1    he was also a joint participant in the communications

2    with counsel that I talked about before.

3         Q.    So, just so I understand clearly, other

4    than Greg Bell, is it your testimony that you have not

5    spoken with any other defense expert about this

6    litigation?

7         A.    Not that I recall.

8         Q.    And after you had that initial

9    conversation with Greg Bell, I presume at some point,

10   as we discussed earlier, you began having some

11   discussions with counsel, correct?

12        A.    That's correct.

13        Q.    And who was the first counsel you recall

14   discussing this matter with?

15        A.    I -- I believe David Haller would have

16   been the first person, but I don't know for sure.

17        Q.    Okay.  In addition to David Haller and

18   lawyers at Covington, do you recall having discussions

19   with any other counsel, either at Covington or at

20   other firms about this litigation?

21        A.    I know that --

22        MR. HALLER:  Asked and answered.

23   BY THE WITNESS:

24        A.    I know there were other people on some of

Highly Confidential - Subject to Further Confidentiality Review

1    the calls and at some of the meetings, but I couldn't

2    tell you who was there.

3    BY MR. KO:

4        Q.    And I think you had said before that there

5    was an in-person meeting that you attended here in

6    Chicago, correct?

7        A.    That's correct.

8        Q.    And at that in-person meeting I assume

9    that Mr. Haller was present, correct?

10       A.    Yes, he was present.

11       Q.    And do you recall the identities of any

12   other counsel beyond Mr. Haller who were present at

13   that meeting?

14       A.    I don't.

15       Q.    Do you recall how many people were at that

16   meeting?

17       A.    I don't know.  Probably a dozen, maybe a

18   little more.

19       Q.    And out of the approximately dozen people,

20   they consisted of counsel and/or CRA employees, is

21   that accurate?

22       A.    I don't remember who else was there.  I

23   know we had myself and Jarrod Welch and -- and Sean

24   Taylor from CRA.  I don't recall if there was anyone

Highly Confidential - Subject to Further Confidentiality Review

```
 1    else from CRA there, and I know there was counsel

 2    there.  I don't recall who else was there beyond that.

 3         Q.    Other than this in-person meeting that you

 4    had with Mr. Haller and others at CRA and other people

 5    that you don't recall, do you -- did you have any

 6    other in-person meetings with counsel since the

 7    beginning of your engagement in this matter?

 8         MR. HALLER:  And including yesterday or not

 9    including yesterday?

10    BY THE WITNESS:

11         A.    Yeah, I would say yesterday there was one.

12    I think I mentioned that already, but I think those

13    were the only two.

14    BY MR. KO:

15         Q.    Okay.  So outside --

16         A.    As far as I recall.  There may have been

17    others, but those are the two I recall.

18         Q.    And your best recollection is that you

19    were retained in this matter in February -- January or

20    February of 2019?

21         A.    I couldn't say whether it was January or

22    February, but I would have -- that timeframe sometime.

23         Q.    Okay.  Have you done any work for

24    Covington in the past?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.    Yes, I have.

2      Q.    Okay.  And can you describe what work you

3  have done either for them or on their behalf in the

4  past?

5      A.    Well, I -- I -- matters that they were the

6  counsel on is kind of the way to think about it.

7  Probably the -- I've done some of the railroad work I

8  did for people who were at Covington.  That's the one

9  I recall specifically Covington was involved in.  I'm

10  sure they have been involved in other matters I have

11  worked on, but that's the one that comes most directly

12  to my mind.  Some of the railroad work I have done is

13  with people at Covington.

14      Q.    Have you ever worked with Mr. Haller

15  before in the past?

16      A.    I don't think so, but he might know better

17  than I.

18      Q.    Are you familiar with the firm

19  Kirkland & Ellis?

20      A.    I am familiar with the firm

21  Kirkland & Ellis.

22      Q.    Have you done any work on matters in which

23  Kirkland & Ellis were counsel?

24      A.    Yes, I have done work for
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    Kirkland & Ellis.

 2        Q.    In approximately how many times?

 3        A.    Oh, probably five or -- at least five or

 4    six.  I -- I have to go back over the years, but,

 5    yeah, I've done a fair amount of work with

 6    Kirkland & Ellis.

 7        Q.    Okay.  And in what type of cases did you

 8    work with Kirkland & Ellis on?

 9        A.    I worked on antitrust cases for sure, I've

10    worked on a labor case with Kirkland & Ellis involving

11    Allstate Insurance, I've worked on a patent -- I mean,

12    I'm sorry -- a bankruptcy case with Kirkland & Ellis

13    regarding a bankruptcy matters.  Those would be the

14    types of matters I recall working on with

15    Kirkland & Ellis.

16        Q.    Are you familiar with a firm Arnold &

17    Porter?

18        A.    Yes, I am.

19        Q.    Have you done any work for Arnold & Porter

20    in which they were counsel on matters you were engaged

21    in?

22        A.    Arnold & Porter has been a counsel on

23    matters that I've been involved in in the past, yes.

24        Q.    Approximately how many times?
```

```
 1      A.    I really can't give you an accurate

 2   figure.

 3      Q.    Is it more than one occasion?

 4      A.    More than one occasion.  Typically as part

 5   of a joint defense group.  So they would have been one

 6   of several law firms involved, typically.

 7      Q.    Okay.  Do you have any recollection of

 8   approximately how many times they were an entity that

 9   was part of that joint defense agreement?

10      A.    I don't.  I really couldn't give you an

11   accurate figure.

12      Q.    And what types of cases were these?

13      A.    I -- it is my recollection they would be

14   antitrust cases.

15      Q.    Okay.  Have you ever worked for the law

16   firm Holland & Knight in a matter that you were an

17   expert on?

18      A.    Not that I specifically recall.  I may

19   have, but not that I have specific recollection of.

20      Q.    I believe there is counsel from O' --

21   O'Melveny here.  Have you ever worked with O'Melveny

22   in the past?

23      A.    I have worked with -- with O'Melveny in

24   the past.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Approximately how many times?

 2      A.    I don't know.

 3      Q.    More than one?

 4      A.    More than one, sure.

 5      Q.    More than five?

 6      A.    Probably around five, but, again, that's a

 7   very, very rough estimate.

 8      Q.    And what types of cases have you worked

 9   with O'Melveny on?

10      A.    I would say pretty much antitrust cases is

11   where I've tended to be involved with O'Melveny.

12      Q.    Have you ever worked for counsel from

13   Ropes & Gray?

14      A.    I have.

15      Q.    Approximately --

16      A.    At least the name sounds familiar.  I

17   don't know how many times.

18      Q.    At least once?

19      A.    I would say at least once.

20      Q.    At least five times?

21      A.    I don't think so, no.

22      Q.    Okay.  And do you know -- do you recall

23   the general nature of the cases that you worked with

24   them on?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I do not.

 2        Q.    Are you familiar with the law firm

 3   Dechert?

 4        A.    Yes.

 5        Q.    Have you worked with Dechert on any matter

 6   in which you were an expert on?

 7        A.    I don't recall specifically.  I probably

 8   have, but I don't recall any specific matters where

 9   that's the case.

10        Q.    Do you recall how many times that you have

11   been involved in a case in which Dechert has also been

12   involved?

13        MR. HALLER:  No foundation.

14   BY THE WITNESS:

15        A.    That's impossible given I can't recall.

16   BY MR. KO:

17        Q.    That's true.  That's true.  My question

18   was -- was not good.  It was not what I was intending

19   to ask.

20             Do you recall how many times you have been

21   involved in a case with Dechert in which you were also

22   an expert for which they were counsel in a matter that

23   you were involved in as an expert?

24        A.    I do not recall how many.
```

```
 1        Q.    Okay.  Have you ever worked with the law

 2   firm Mor -- Morgan Lewis?

 3        A.    Yes, I have.

 4        Q.    Have you ever been engaged -- well, have

 5   you ever worked with them in a matter in which you

 6   were also engaged in as an expert?

 7        A.    Yes, I have.

 8        Q.    Approximately how many times?

 9        A.    I don't know for sure.  Probably three or

10   four times, something in that range.

11        Q.    And were these also antitrust cases?

12        A.    No.  I was involved with them on a labor

13   case and also antitrust.

14        Q.    Have you ever been -- or do you know the

15   law firm Reed Smith?

16        A.    I do.  I've heard of them.

17        Q.    Have you worked with them in any matter

18   that you were an expert on?

19        A.    I don't know.  They may have been involved

20   in one of the multi-defendant cases I've been

21   involved, but I don't have any specific recollection.

22        Q.    Have you ever worked with the law firm

23   Williams & Connolly?

24        A.    Yes, I have.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Approximately how many times?

2      A.      I don't know.

3      Q.      Three times at least?

4      A.      I couldn't say.

5      Q.      Antitrust matters or other types of cases?

6      A.      I would assume antitrust, but, again, I

7  can't say for sure.

8      Q.      Have you worked with the law firm

9  Zuckerman Spaeder before?

10     A.      Probably, but I don't have any specific

11  recollection.  The name sounds familiar which makes me

12  think I have, they have been involved in something I

13  have been involved in, but...

14     Q.      Do you recall what type of case that you

15  were involved in with them?

16     A.      No.  And if I don't recall for sure

17  whether I did, it's hard to know what type.

18     Q.      Have you ever worked with the firm Locke

19  Lord?

20     A.      I don't know.

21     Q.      Have you ever worked with the firm Bartlit

22  Beck, I think they are based here out of Chicago?

23     A.      Yes, I have worked for Bartlit Beck --

24  with Bartlit Beck.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Approximately how many times?

2    A.    Oh, probably five or six times roughly.

3  And, again, that's very roughly.

4    Q.    What types of cases?

5    A.    Antitrust I would say, generally.

6    Q.    Have you worked with the law firm

7  Barnes & Thornburg?

8    A.    The name does not sound familiar, so I

9  don't know.

10   Q.    Have you worked with a law firm Cavitch,

11  Familo & Durkin?

12   A.    Again, I -- name doesn't sound familiar to

13  me.

14   Q.    Have you worked with the law firm Bingham

15  Greenebaum & Doll -- or Doll?

16   A.    The Bingham part sounds familiar.  I don't

17  know if that's the Bingham I'm thinking of, but I've

18  certainly come across the Bingham name before.

19   Q.    And what types of cases?

20   A.    I wouldn't have that recollection.

21   Q.    Are you aware of any work that -- let's

22  start with the previous five years in which you've

23  been associated with CRA, have you -- are you aware of

24  any work that CRA has done on behalf of any of the

Highly Confidential - Subject to Further Confidentiality Review

1    Defendants in this litigation in the past?

2        A.    Off the top of my head, no.  Not that --

3    not that I can put the two pieces together off of the

4    top of my head.

5        Q.    So are you aware of any consulting work

6    that CRA has done on behalf of Purdue?

7        A.    Not, no, I have no direct knowledge of any

8    of that.

9        Q.    Are you aware of any consulting work that

10   CRA has done on behalf of Janssen or Johnson &

11   Johnson?

12       A.    Well, I've done work for Johnson &

13   Johnson, but I'm not aware of work beyond the work

14   that I've done.

15       Q.    And that work that you've done for

16   Johnson & Johnson, did you do it in connection with

17   anybody at CRA?

18       A.    I did it through -- I -- well, the

19   original work I did, which I spoke about earlier,

20   which was on endoscopic and surgical items, was done,

21   I believe, originally at Chicago Partners and then

22   carried over to Navigant, that sounds right to me,

23   that gives you an idea of how long ago it was.

24             I've also done some other work over time

Highly Confidential - Subject to Further Confidentiality Review

```
1    for Johnson & Johnson.  I have some current work I'm

2    doing with Johnson & Johnson, but I don't even know if

3    I can disclose that, so.  All right.  Certainly

4    nothing I've been -- I don't even think I've been

5    declared as an expert in those matters.

6         Q.    So, setting aside the current work, when

7    you said a moment ago that you've done some other work

8    over time for Johnson & Johnson other than the

9    endoscopic work, what is the general nature of the

10   work you've provided to Johnson & Johnson?

11        MR. MURPHY:  And I'll just object and ask the

12   witness to keep in mind any confidentiality agreements

13   that he has with Johnson & Johnson.

14   BY THE WITNESS:

15        A.    Yeah, I don't know the specifics of any

16   con -- any confidentiality agreements.  I don't think

17   there is other ones that I recall that I have filed

18   any reports in.  So I've consulted with them on

19   various matters over that time.

20   BY MR. KO:

21        Q.    Are you aware of any consulting work that

22   CRA has provided for Teva?

23        A.    No, not that I'm aware of.

24        Q.    Are you aware of any con -- consulting
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work that CRA has provided for Mallinckrodt?

 2         A.    Nothing that I recall, no.

 3         Q.    Earlier today we were talking somewhat at

 4    length about your compensation and your counsel

 5    instructed you not to answer certain questions.

 6               Let me try and ask what I think will be a

 7    slightly different question that I believe you should

 8    answer to.  Obviously Mr. Haller might think

 9    otherwise.

10               I understand that you're not willing to

11    disclose the amount -- the absolute amount that you've

12    made as a professor, but relative to the amounts that

13    you've made as a professor, how would you describe the

14    amounts that you've made as an expert witness?

15         MR. HALLER:  Well, let me just object.  What was

16    cleared, I think, with the special master is that you

17    could ask a question as to whether the compensation he

18    is receiving in this case is a substantial portion of

19    his total compensation from all sources, and that I

20    think would be a fair question, but that's not the one

21    you are asking here.

22         MR. KO:  Well, that's not what he said, but let

23    me just ask my question.

24    BY MR. KO:
```

```
 1        Q.    How would you describe the general nature

 2   of your expert witness compensation that you've

 3   received relative to your compensation as a professor?

 4        MR. HALLER:  And I'll instruct you not to answer

 5   that question, but you can ask the one that the

 6   special master did articulate and which I showed to

 7   Professor Murphy before this started.  It was -- it

 8   was very clear what he said he would permit on that.

 9   And you don't have to ask the permitted question.  I

10   suppose you could just pass it by, but that is a

11   permitted question.

12        MR. KO:  Okay.  You can note your objection and

13   that's about it.  I -- I don't know what -- I

14   completely disagree with -- with what you believe the

15   special master permitted or not.

16             So let me ask -- let me --

17        MR. HALLER:  That's why we put it on the record.

18        MR. KO:  Hold on.  Let me ask you once again.

19   BY MR. KO:

20        Q.    How would you describe the general nature

21   of your expert witness compensation that you received

22   relative to your compensation as a professor?

23        MR. HALLER:  Objection; vague, no timeframe, and

24   not relevant if it doesn't relate to compensation in
```

Highly Confidential - Subject to Further Confidentiality Review

1    this case.  And so unless you want to answer the

2    question, but I -- I think you are permitted to not

3    answer it.

4    BY THE WITNESS:

5        A.    I believe I had a previous instruction

6    just a few minutes ago not to answer that question and

7    I'm going to heed that recommendation.

8    BY MR. KO:

9        Q.    Well, actually, in -- in that soliloquy by

10   your counsel he did not actually instruct you to

11   answer.  He has lodged his objection which he was

12   instructed by the special master to do and note it for

13   the record.  But I'd ask that you actually answer my

14   question.  So let me try one more time.

15            How would you describe the general nature

16   of your expert witness compensation that you have

17   received relative to your compensation as a professor?

18       A.    I -- I would ask to reread the record

19   because I think in a previous statement before that

20   one he did instruct me not to answer, but I would like

21   the record --

22       MR. HALLER:  Well, given your view that -- which

23   I agree with that that's not relevant and it is

24   sensitive and personal information, I'll instruct the

1    witness not to answer that question.  And I don't know

2    why you are bypassing a permitted questions in order

3    to jump to that one except to be, you know, to --

4    to -- to -- cause a problem when there isn't one.  So

5    the special master has outlined a clear path for you

6    and I think if you don't want to follow it, that's

7    fine, but then you're -- once you stray outside the

8    path then we are going to end up with objections.

9        MR. KO:  I just want to get a clean record here

10   and prevent the multiple soliloquies where counsel --

11   let me ask once again, and Mr. Haller, you can just

12   object your -- or note your objection for the record.

13   BY MR. KO:

14       Q.   Dr. Murphy, how would you describe the

15   general compensation that you've received as an expert

16   witness relative to the compensation you receive as a

17   professor?

18       A.   I'm going to follow the instructions of my

19   counsel, which has now been given twice, and -- and

20   not answer the question.

21       Q.   Thank you.

22            I want to turn back to your expert report

23   and actually Appendix B which we've created a separate

24   exhibit for.  So let me hand you a copy of what will

Highly Confidential - Subject to Further Confidentiality Review

1    be marked as Murphy Exhibit 7, I believe.

2                    (WHEREUPON, a certain document was

3                     marked Murphy Deposition Exhibit

4                     No. 7, for identification, as of

5                     06/06/2019.)

6    BY MR. KO:

7        Q.    For the record, Murphy Exhibit 7 is

8    Appendix B that's contained in your expert report that

9    was reflected in Exhibit 2 of today's deposition.

10             Does this accurately ref -- reflect the

11   list of materials you relied upon in preparing the

12   expert report you are providing in this case?

13       A.    To the best of my knowledge, it does.

14       Q.    And you've identified documents, sources

15   and data here that you rely upon, correct?

16       A.    Yes.

17       MR. HALLER:  I'll just note for the record that

18   this list does not include the two documents that we

19   brought to the deposition today.

20   BY MR. KO:

21       Q.    So, Dr. Murphy, does this Exhibit 7

22   accurately reflect the list of materials that you

23   relied upon in preparing your report in addition to

24   the two documents that you pro -- provided to me this

Highly Confidential - Subject to Further Confidentiality Review

```
 1   morning?

 2       A.    I believe, as long as this is the copy of

 3   my Appendix B, to the best of my knowledge, that was a

 4   list of the materials I relied upon.

 5       Q.    And what is your definition of "relied

 6   upon"?

 7       A.    Well, I think it would include materials

 8   that form the basis -- that I use as a basis for my

 9   opinions.  So anything that's a basis of my opinion

10   would be included in the materials relied upon.

11   Anything that -- other things might be on the list of

12   materials if they were things that were part of the

13   process by which I put my report together and formed

14   my opinions even if ultimately I didn't rely upon them

15   for the report itself.

16       Q.    So, just so I understand correctly.  There

17   were obviously more documents that you have reviewed

18   outside of this Appendix B, but I just want to make

19   sure I understand your testimony.

20             You're saying that those documents did not

21   necessarily inform the opinions that you are

22   providing, is that fair to say?

23       A.    I think that's -- I -- I try in general

24   when it comes to materials relied upon to definitely
```

Highly Confidential - Subject to Further Confidentiality Review

1  include things that I specifically rely on that form a

2  basis for my opinion and -- and include things that

3  were part of that process.  There may be other things

4  I saw, that I looked at.  If they don't really inform

5  my opinions, they are not something I could typically

6  list in the list of materials relied upon.

7        Q.    Regarding the academic sources that you

8  list here, did you review all of these academic

9  sources?

10       A.    I would say I probably reviewed most of

11 them in some part or another.  Many of -- many of

12 them, more economics ones I was very familiar with

13 prior to working on this case because it's -- you

14 know, but certainly when it comes to the labor market

15 side of things, there are areas that I do my research

16 in all of the time, so.  Others I would have looked at

17 partially or, you know, in some form or discussed at

18 least with my staff.

19       Q.    Did CRA review any of these academic

20 sources?

21       A.    I would say somebody at CRA probably

22 reviewed virtually all of them in addition to myself.

23       Q.    And do you know which individuals were

24 responsible for reviewing these academic sources at

```
 1    CRA?

 2         A.    In general, the people would be the three

 3    people I talked about before would be the people who

 4    would be looking at the academic literature on these

 5    things.

 6         Q.    Can you provide an approximate breakdown

 7    of which documents that appear here you've reviewed in

 8    part?

 9         A.    I probably can't.  I can tell you -- the

10    ones I can distinctly remember off the top of my head.

11    Certainly the -- the Are -- Autor arg -- articles I

12    remember.  These other ones, Birnbaum, I think I

13    remember looking at those.  The Case and -- and Deaton

14    articles.  The Kofi article, Chetty article.  I

15    don't -- the other one is the Cicero and -- Ciccarone,

16    I -- I -- I know I've looked at some of those.  I

17    don't know which ones.  The Janet Currie article

18    obviously I remember.  And the Jones article I

19    remember.  Some of these other ones I'm sure I looked

20    at.  Obviously the John Murphy and Topel articles I

21    remember.  The Karabarbounis and -- and Nei -- Neiman

22    article I remember, Katz and Murphy I remember, the

23    Krueger articles I remember, Moretti, the Murphy

24    article I remember, Newhouse, the Pierce and Schott
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    article I remember, the Ruhm article, the Singer

 2    article, Solow.  Those are the ones I remember.

 3        Q.    So I just want to make sure I understand

 4    your testimony.

 5             Are those all -- the ones you just cited,

 6    are those articles that you reviewed in their entirety

 7    or at least some portion?

 8        A.    I would say the vast majority of those I

 9    reviewed -- I've reviewed in my entirety, not

10    necessarily as part of my case.  A lot of ones I was

11    familiar with before I started working on this case.

12                   (WHEREUPON, there was a short

13                    interruption.)

14    BY MR. KO:

15        Q.    With respect to the Bates numbered

16    documents that you --

17                   (WHEREUPON, there was a short

18                    interruption.)

19    BY MR. KO:

20        Q.    So with respect to the documents that

21    appear on Page B-3 of Appendix B, and in particular

22    the Bates numbered documents, are those all documents

23    that you've reviewed as well?

24        A.    I don't know the Bates numbers, so it
```

1  would be hard for me to go through those documents

2  by -- based on Bates numberings.  I -- I couldn't tell

3  you.

4       Q.    Fair enough.

5             Did you review all of the documents that

6  appear in this section of your report?

7       A.    I do not believe I did, but I would have

8  reviewed some of them, I would assume.

9       Q.    And I'll represent to you that the

10  documents that appear here at least with the initial

11  acronym ODH are from the Ohio Department of Health.

12             Do you recall reviewing documents from the

13  Ohio Department of Health?

14       A.    I know we -- I know we've discussed some

15  of those, but I don't know if I specifically looked at

16  them or just talked to people about them.

17       Q.    Is there any particular reason why you

18  selected those documents?

19       A.    Not without looking at them.

20       Q.    Were these documents provided to you?

21       A.    I believe we had access to a large number

22  of documents, so we would have gotten them through the

23  channels from the production in the case.

24       Q.    And when you say "we," are you talking,

Highly Confidential - Subject to Further Confidentiality Review

 1    once again, to be clear, about you and individuals at

 2    CRA that were helping you?

 3         A.    They would come through CRA because CRA

 4    would handle all things like communication of

 5    documents and things like that.

 6         Q.    Did you ever ask counsel or CRA to look at

 7    specific documents that were produced in this

 8    litigation?

 9         MR. HALLER:  Objection; vague.

10    BY THE WITNESS:

11         A.    I know when it came to academic articles I

12    definitely asked people at CRA to look at particular

13    academic articles or areas of academic articles.

14              In terms of documents, I don't recall

15    asking for a specific document.  We did look into

16    documents in various areas, but specific documents, I

17    don't recall.

18    BY MR. KO:

19         Q.    So outside of the articles that you spoke

20    with people at CRA about, with respect to the

21    documents produced in this litigation, do you recall

22    ever asking for or requesting from counsel or CRA

23    certain documents that were produced in this

24    litigation?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I don't recall requesting specific

2   documents, no.

3        Q.    With respect to the documents that appear

4   in the bottom of B-3, and I'm looking at the court

5   documents, did you review all of the documents that

6   appear in this section of your report?

7        A.    I would -- would have reviewed at least

8   part of those, yes.

9        Q.    Okay.  And I want to ask you about the

10  third item that you list here, which is a decision in

11  the City of New Haven's case.

12       A.    Okay.

13       Q.    Do you see that?

14       A.    Yes.

15       Q.    Do you recall reviewing that?

16       A.    No, I don't.

17       Q.    Okay.  Do you have any recollection

18  sitting here today of why you've included that

19  particular order in your court documents list?

20       A.    I do not.  I don't have a specific

21  recollection of why that's on the list.

22       Q.    What about with respect to the order on

23  the Brooke County Commissioner's case which is the

24  next one down dated December 28th, 2018, did you
```

Highly Confidential - Subject to Further Confidentiality Review

1    review that document?

2        A.    I can't recall.  If it's cited in my

3    report, I definitely reviewed it, because I've

4    reviewed everything that was cited in my report, but

5    linking that up with a name is pretty tough.

6        Q.    Is there -- do you recall any particular

7    reason why you reviewed or requested to review the

8    Brooke County Commissioner's -- or the order in the

9    Brooke County Commissioner's case?

10       A.    I do not.

11       Q.    With respect to any of these court

12   documents, do you recall why you've requested to look

13   at these particular court documents?

14       A.    Well, in terms of the Complaints, I think

15   that's a pretty straightforward, you know, answer,

16   which is looking back at what the Complaint was can be

17   helpful for understanding what the issues you are

18   supposed to look at are from an economic standpoint,

19   so.  And so the Complaints I think are pretty

20   straightforward.

21       Q.    Other than the Complaints, so in

22   particular the commend -- Amended Complaints on behalf

23   of County of Cuyahoga and the City of Cleveland which

24   you have a listed here, and the first one, the Summit

1    County Complaint, do you have any recollection of why

2    you reviewed the other court documents that are --

3    appear here?

4         A.    Well, then the other ones are sort of

5    responses, and I'm sure that that would have been

6    based on information that's contained in those

7    responses.

8         Q.    Turning to Page B-4 of this exhibit, you

9    list certain depositions, correct?

10        A.    That's correct.

11        Q.    Did you review all of those depositions?

12        A.    I -- any ones that are cited in my report,

13   I would have reviewed at least the sections that are

14   cited in the report.  If they are not cited in my

15   report, I may have only discussed them with staff, but

16   anything that's cited, I would have reviewed.

17        Q.    And when you are saying cited, you mean

18   the specific citations, is that correct?

19        A.    Yes, anything that's specifically cited in

20   the report, I would have reviewed that.

21        Q.    With respect to the depositions that you

22   list here that are not expert reports, and so I'm

23   excluding the -- or sorry -- not experts, so I'm

24   excluding the deposition of Cutler, Gruber and

1    McGuire, is there any particular reason why you've

2    selected those to review?

3         A.    I don't have a specific recollection for

4    the individual ones, but I would assume they had

5    relevant information of a factual nature that would be

6    helpful for putting together the report.

7         Q.    And do you recall reviewing those specific

8    deposition transcripts?

9         A.    No, I don't have a specific recollection

10   of reviewing those.

11        Q.    And with respect to the deposition of

12   David Cutler, did you read the entire thing?

13        A.    No.  I looked through it and read a fair

14   amount, but not the entire thing.

15        Q.    How much is a fair amount?

16        A.    I don't know.

17        Q.    Half of it?

18        A.    I probably didn't read -- and, you know,

19   it depends on what you mean by read.  I skimmed

20   through it to see what he was talking about in various

21   states.  Usually I can figure out what he is talking

22   about pretty quickly and things that were important I

23   stopped and read in detail.  That's kind of the way I

24   would go through an expert deposition typically.

Highly Confidential - Subject to Further Confidentiality Review

1          He is an economist, so understanding what

2    he is trying to say is a lot easier for me than it

3    might be for some other people.

4          Q.    Do you recall reviewing and reading the

5    deposition of Jonathan Gruber in its entirety?

6          A.    I don't believe I read it in his

7    entirety -- in its entirety.  I definitely considered

8    parts of it.

9          Q.    Did you follow the same process that you

10   did for Cutler's deposition that you did for -- for

11   Gruber's deposition -- let me ask it, a clear

12   question.

13         Did you follow the same process of

14   reviewing deposition -- the deposition of Jonathan

15   Gruber as you did for the deposition of David Cutler?

16         A.    I would have gone faster through Gruber's

17   deposition.  He had less to say.

18         Q.    What about with respect to the depositions

19   of Thomas McGuire, did you review that transcript in

20   its entirety?

21         A.    I did not, no.

22         Q.    Did you read portions of it?

23         A.    That, I think, I would be even more

24   selective in, because, again, he is not the primary

Highly Confidential - Subject to Further Confidentiality Review

1    focus of my testimony.

2        Q.    And did you select which depositions to

3    review or were they provided to you?

4        A.    I would say when it came to the experts,

5    obviously I selected certainly the -- the three

6    experts.  When it came to the others, I think they

7    were provided to me by staff based on the topical

8    interest that we had, the information we were trying

9    to gather to put together an economic report.

10       Q.    So is it fair to say for the non-expert

11   deposition transcripts, those transcripts were

12   provided to you by CRA or by counsel?

13       A.    Yeah.  They would all physically have been

14   provided to me by CRA because I wouldn't have gotten

15   them any other way, but those would be ones where they

16   would have followed from a general request to examine

17   the, you know, the record for information.

18       Q.    With respect to the expert reports that

19   you list in B-4, did you review all of those?

20       A.    I think I've been through this already.  I

21   think I would say, you know, the Cutler report in the

22   most detail followed by the Gruber report, and then

23   the McGuire and McCann reports and Rosenthal reports

24   less -- less detailed.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    With respect to the Cutler and Gruber

2   reports, you're aware that they had various appendices

3   supporting their reports, correct?

4     A.    Yes.

5     Q.    Did you review any of the supporting

6   materials to their reports?

7     A.    I did, and I mean Cutler in particular,

8   some of his tables are easier to understand in the

9   appendix than they are in the text itself.  So I

10  certainly remember reviewing some of his appendix

11  tables.  I -- I believe Gruber as well, but Cutler

12  specifically I recall going through his appendix

13  tables.

14    Q.    Do you recall whether or not you reviewed

15  the shared data appendix?

16    MR. HALLER:  Objection; vague.

17  BY THE WITNESS:

18    A.    Well, we went through some of the -- I --

19  I don't know if that's the same as some of the backup

20  material we went through or that's in addition to the

21  backup material, but we definitely went through some

22  of the backup material to their reports.  I don't

23  recall whether that was in the shared data appendix or

24  independently in the backup that they provided, but

```
 1    that was part of doing the analysis we did was to go

 2    through their backup.

 3    BY MR. KO:

 4         Q.    We have gone over your knowledge of Cutler

 5    and Gruber.

 6               Do you know any of the other experts that

 7    you identify here as reviewing their expert reports?

 8         A.    I didn't understand that.

 9         Q.    Sure.

10         A.    Do you mean do I know these people

11    personally?

12         Q.    Do you know Thomas McGuire?

13         A.    No.

14         Q.    Do you know Craig McCann?

15         A.    No.

16         Q.    Do you know Meredith Rosenthal?

17         A.    No.

18         Q.    Do you know -- are you aware of the

19    Plaintiffs' experts in this case?

20         MR. HALLER:  Objection; vague.

21    BY THE WITNESS:

22         A.    Beyond these, I know there is a lot of

23    them.  I don't know who they are.

24    BY MR. KO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.    Okay.

2            Turning to the last section of your

3    Appendix B, you set forth three data sources.

4            Do you see that, on B-5?

5      A.    Yes.

6      Q.    You list ARCOS data, IQVIA data and NVSS

7    data.

8            Are those the datasets that you relied

9    upon in form the opinions in your report?

10     A.    There are other datasets actually listed

11   in prior sections, but those are public data sources,

12   so there is -- I -- I wouldn't say those are all of

13   the data.  Those are -- those are propriety -- those

14   are data sources specific to this case.  So, for

15   example, we do a lot with the IPUMS-CPS and that's a

16   publicly available dataset.  So if we are talking

17   data, we should include some of the pieces from the

18   prior section, but --

19     Q.    Fair.

20     A.    -- those are three datasets that I had

21   access to through this case that -- I think that's why

22   they are in this separate section from the public

23   sources.

24     Q.    With respect to the ARCOS data, do you
```

1   recall whether or not you reviewed what's commonly

2   referred to as publicly available ARCOS data or

3   private ARCOS data and/or both?

4        A.   I don't recall whether it was the public

5   or private version.  It is the version that people

6   were using in this case, and so I wasn't sure -- I'm

7   not sure whether that's public or private.

8        Q.   How about with respect to the IQVIA data.

9             Do you recall whether or not you've

10  utilized data that's separate from what the data

11  was -- or how the data was utilized by Plaintiffs'

12  experts?

13       A.   I don't know.  I believe some of that data

14  was data that -- I'm not sure that came from

15  Plaintiffs per se, so, I -- I don't know what

16  Plaintiffs used that data for, but -- so I don't know

17  if whether they used it the same way I did or had

18  access to the same data.

19       Q.   And what is your understanding of what the

20  IQVIA data consists of?

21       A.   My -- my understanding, I -- I believe by

22  my recollection is that that's prescription data, so.

23  We used it, I think, for the prescription part of my

24  report.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     And with respect to the NVSS data, do you

2     recall reviewing that?

3     A.     Yes.  We did the -- the vital statistics

4     data.  We had two sources of data we used there, some

5     of which we got from the Plaintiffs who I believe had

6     access to some proprietary vital statistics data.  We

7     also had the more publicly available vital statistics

8     data that we were able to access, so.

9     Q.     And -- and is that access available

10    through the CDC Wonder database, is that what you are

11    describing?

12    A.     We were able to access vital statistics

13    through CDC Wonder.

14    Q.     Okay.  With respect to -- well, first of

15    all, do you have an understanding of what types of

16    information was available in the data that was

17    provided to you by the Plaintiffs?

18    A.     Yeah.  The Plaintiffs -- my understanding

19    is that the Plaintiffs had the ability -- they

20    actually had individual record level data that they

21    could query directly.

22           The CDC Wonder data allows you to access

23    data but you have to go through an interface that

24    would limit the kinds of queries that you could run,

Highly Confidential - Subject to Further Confidentiality Review

```
1   so it was sort of behind a curtain in some sense that

2   you had to use.  And so that was a slight difference

3   in what could be done with those two datasets.

4            So for some of the purposes where you

5   wanted some fine level detail, we had to rely on the

6   NVSS data that the Plaintiffs had because it allowed

7   access to information that you couldn't get through

8   CDC Wonder.

9        Q.   And are you aware of any data use

10  agreement regarding access to this NVSS data?

11       A.   I do not know the specifics of the

12  agreement that the Plaintiffs had.  I -- I know we

13  didn't have access to the same data they did directly,

14  at least originally, and, therefore, we were using

15  data that we got through their analysis of those data.

16       Q.   And ultimately did you or someone at CRA

17  review the same data that Plaintiffs had access to

18  regarding the NVSS mortality data?

19       A.   I don't know if we had access to -- if we

20  eventually got access to everything.  I don't know

21  whether that happened eventually.  I know originally

22  we didn't.  I don't know whether -- and I know we got

23  more access to more stuff, but I don't know whether we

24  actually got access to everything.  I couldn't tell
```

Highly Confidential - Subject to Further Confidentiality Review

1    you.

2         Q.    In your report you've done certain

3    empirical analysis analyzing NVSS mortality data,

4    correct?

5         A.    Yes.  Most of what we did in the report

6    was done through the CDC Wonder interface.  There are

7    some other things on which we are relying on NVSS

8    data, but we actually were relying on summaries that

9    the Plaintiffs provided.  So that's the ones that I

10   recall.  So, for example, the Wood County analyses

11   that we do in the report, we couldn't have done with

12   CDC Wonder.  We got the data directly from the

13   summaries that the Plaintiffs' experts had done.

14        Q.    So the analysis that you performed in your

15   report regarding mortality data consists both of the

16   CDC Wonder database and the dataset that Plaintiffs

17   had access to, is that fair to say?

18        A.    I don't want to -- necessarily want to

19   say, because the one I recall where the Plaintiffs'

20   data played a role was the Wood County one, and that's

21   one where it was more that that their summary had that

22   information already, so we were able to use the data

23   they provided to us at a summarized level for Wood

24   County to make that figure.

```
 1        Q.    Did you ever see a data use agreement

 2   regarding access to this NVSS data?

 3        A.    Personally, no, but I didn't personally

 4   access those data files, so I would not have access --

 5   I only accessed things that were provided to me by the

 6   Plaintiffs' side in this case, so.

 7        Q.    And individuals at CRA did access those

 8   materials, correct?

 9        A.    I do -- I -- I don't know for sure whether

10   they -- the -- the level at which they accessed those

11   materials, whether they actually accessed the

12   underlying materials or materials that were -- they

13   had received from Plaintiffs.  I don't know the

14   details on that.

15        Q.    Do you have any understanding of whether

16   or not any individuals at CRA, including the ones that

17   you worked with, signed any data use agreements?

18        A.    I -- if it was required, I'm sure they did

19   it.

20        Q.    A moment ago you were discussing certain

21   data -- publicly-available datasets and -- and you

22   identified IPUMS-CPS as one particular database.

23              What -- what does that stand for?

24        A.    IPUMS, I don't remember what it cites for.
```

1    It's actually a -- it's a -- it's a harmonized version

2    of the current population survey.  I actually know

3    those -- I know the source of those data pretty well.

4    They were put together, I -- if you recall I talked

5    earlier about this fellow Finis Welch, his -- his --

6    one of his outfits, Unicon Research -- Research, was

7    the first people to put together the IPUMS-CPS.  I

8    actually remember when they were putting that together

9    because Finis and I had done a lot of the work before

10   that was put together on our own harmonizing the CPS

11   and -- and it kind of grew out of the project that we

12   did personally, so.  It is now a great dataset that a

13   lot of people use.  So it is really good that that got

14   out there.

15        Q.   And all of that data that appears in the

16   IPUMS-CPS dataset that you've cited to in your report

17   is all publicly available, correct?

18        A.    It is available through the IPUMS-CPS and

19   it -- it is a lot easier to use because they took the

20   time to put it together in a compatible format.  Back

21   when we used to first used it, you had to do all of

22   that hard work yourself.  So it is really good that

23   they did that.

24        Q.    With respect to the first dataset that you

1    list -- or the first reference you make in your public

2    sources list at the bottom of B-4, you -- you make a

3    reference to -- to the FRED dataset, right?

4             Do you see that?

5        A.   Right.  FRED is a -- it's a Federal

6    Reserve database put together by the St. Louis Fed.

7    It is actually a very useful database.  It has lots of

8    macroeconomic series.  It has got a pretty useful

9    interface.  You can go download a wide range of data

10   that they've assembled, so.

11       Q.   And I know you've cited to and utilized

12   the FRED database in various exhibits to your report.

13            In all of those instances are those

14   datasets that you can -- that one can publicly obtain?

15       A.   That's my understanding.  I don't think we

16   did anything that couldn't be done through the FRED

17   interfa- -- interface.

18       Q.   And you have several citations in the

19   public sources to the -- the BLS or to certain

20   datasets maintained by BLS.

21       A.   Yes.

22       Q.   For the record, what -- what does BLS

23   stand for?

24       A.   Bureau of Labor Statistics.  They put

 1   together a lot of datasets, including -- including the

 2   current population survey, but also the American

 3   Community Survey, these other survey datasets, many of

 4   which are now much more readily available than they

 5   used to be because they have an online interface you

 6   can use to actually access the data pretty

 7   efficiently.  So, again, that's something that's

 8   really nice.

 9        Q.    And I know that, again, you have

10   referenced and utilized the BLS datasets at various

11   times in your report including in many exhibits.

12   That's all information that's publicly available

13   and -- and for purposes of your report there wasn't

14   any non-publicly available -- or non-public data that

15   you accessed for those exhibits, correct?

16        A.    No.  Those would have all been based on

17   the public versions of those data.

18        MR. HALLER:  Mr. Ko, how are we doing heading

19   towards another break?

20        MR. KO:  I was just about to say, why don't we

21   take a quick break.

22        THE WITNESS:  Take a quick break.

23        THE VIDEOGRAPHER:  We are off the record at

24   3:14 p.m.

```
 1                 (WHEREUPON, a recess was had

 2                  from 3:14 to 3:32 p.m.)

 3        THE VIDEOGRAPHER:  We are back on the record at

 4   3:32 p.m.

 5   BY MR. KO:

 6        Q.    Dr. Murphy, I want to turn your attention,

 7   which I see that you have it up -- open already, but

 8   to Paragraph 17 on Page 12 of your report.

 9              Are you there?

10        A.    Yes, I am.

11        Q.    And this section of your report reflects

12   the summary of the conclusions that you are reaching

13   for purposes of your expert report, correct?

14        A.    Yes, it is.  That's how it's titled and

15   that's what it is intended to do.

16        Q.    So this is the summary of the opinions

17   that you intend to offer in this case, correct?

18        A.    It is a summary of the opinions I intend

19   to offer, obviously reflecting the work I had done up

20   through the time of my report.

21        Q.    And as of today are there any opinions

22   that are not contained in this summary of conclusions

23   section of your report?

24        A.    There are no opinions that I currently
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   plan to put forward.  Obviously others could arise

 2   subsequently, but as of now this still summarizes my

 3   opinions.

 4        Q.   And the basis for all of your opinions as

 5   of this date are all set forth in your report as well,

 6   correct?

 7        A.   I would say I've summarized the basis for

 8   my opinions throughout the report.  It doesn't mean

 9   that includes everything I could possibly talk about,

10   but I've tried to include the summary of -- of the

11   bases for my opinions.

12        Q.   Is there anything that you are aware of at

13   this point to support any of your opinions that are

14   not contained in this report?

15        A.   Not specifically, no.  I have a lot of

16   general knowledge as an economist and if asked some of

17   that may make what I'm saying here clearer, but I'm

18   not trying to -- there is nothing I intend to put

19   forward that is not contained in my report.

20        Q.   Speaking of your general knowledge as an

21   economist, I believe you have made it publicly known

22   that you would fairly characterize yourself as more

23   focused on the concept of microeconomics rather than

24   macroeconomics.
```

1        Is that a fair characterization of

2   statements you have made in the past?

3        A.    Yes, I consider myself a micro economist,

4   although I should make clear that microeconomics is a

5   very useful tool for thinking about macroeconomic

6   issues, but I don't claim to understand the voodoo of

7   macroeconomics.

8        Q.    I'll leave that one alone.

9              I want to turn your attention to

10  Paragraph 18 of your report.

11       A.    Yes.

12       Q.    Paragraph 18, which has several subparts,

13  reflect the core opinions that you are reaching in

14  this case, correct?

15       A.    Yes.  That's a brief summary of opinions

16  that are described throughout the remainder of the

17  report, but I tried to put them in one place to make

18  them accessible.

19       Q.    And this -- and the core opinions you --

20  you now -- you list under Paragraph 18, and I believe

21  I've counted them, so I'll represent to you that there

22  are 17 core opinions that are reflected in subsections

23  A through Q of your report.

24             So the question is:  Are -- are all of

Highly Confidential - Subject to Further Confidentiality Review

```
 1   those -- are all of the core opinions that you are

 2   giving in this case reflected in 16 -- 18A through Q?

 3        MR. HALLER:  Objection; vague as to "core."

 4   BY THE WITNESS:

 5        A.    My goal was to have in one place a summary

 6   of the areas on which I was opining and what those

 7   opinions were.  I -- I think everything that's in the

 8   report is related to something that's talked about in

 9   A through Q, so.  It was intended to be a summary of

10   those things.  It is not a substitute for reading the

11   whole report, obviously, but it's intended to provide

12   a summary of the opinions.

13   BY MR. KO:

14        Q.    And I just want to make sure the record is

15   clear and to address your counsel's objection.

16             The core opinions that you are providing,

17   those are your words, not mine, right, in Paragraph 18

18   you -- you indicate that you are setting forth core

19   opinions, is that correct?

20        A.    Yes, I -- I -- but I'm trying to explain

21   to you what I mean by core opinions.  It's -- it's --

22   it's a -- I think of core as kind of a brief

23   description of what those opinions are.  They are

24   obviously fleshed out in greater detail throughout the
```

1    report.

2         Q.    With respect to your -- as we discussed

3    earlier today, the primary analysis that you are

4    providing in this report is in response to David

5    Cutler's report, correct?

6         A.    I would say of the responsive, in terms of

7    responding to experts, I would say the majority of

8    that is in response to David Cutler's report.  There

9    is also a fair amount of independent analysis that I

10   put forward that's not directly responding to work

11   that Professor Cutler did but certainly relevant to

12   that work.

13        Q.    And as I'm sure you are aware, in

14   Professor Cutler's report, he provides an estimate of

15   the share of opioid-related harms attributable to

16   shipments, correct?

17        A.    He does.  That's one of the figures he

18   purports -- he claims that he can as -- that he puts

19   forward, yes.

20        Q.    And -- and you have a critique of that

21   analysis, correct?

22        A.    I have, yeah, I would say several

23   critiques of that analysis, but ultimately I have a

24   critique of that analysis throughout my report.

```
 1        Q.    Are you providing your own estimate of the

 2   share of opioid-related harms attributable to --

 3   attributable to shipments?

 4        MR. HALLER:  Objection; vague.

 5   BY THE WITNESS:

 6        A.    I have not been asked to do that, so I did

 7   not do that as part of my report.

 8             Unfortunately, Professor Cutler doesn't

 9   explain exactly from an economic point of view what

10   that means, but -- so I have not attempted to do that,

11   but -- for either of those -- or for both of those

12   reasons.

13   BY MR. KO:

14        Q.    And as of today, do you have any intention

15   of providing your own estimate of the share of

16   opioid-related harms attributable to shipments?

17        MR. HALLER:  Objection; no foundation, vague.

18   BY THE WITNESS:

19        A.    I do not have a plan to provide such an

20   estimate.  My plan and my opinions as stated in my

21   report are a critique of Professor Cutler's

22   calculations and why those calculations are not

23   reliable is a matter of economics.

24   BY MR. KO:
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      And you're also aware that among the other

2   analyses that Professor Cutler performs, he also

3   provides an estimate of the share of harms

4   attributable -- attributable to opioids, correct?

5       MR. HALLER:  Objection; no foundation.

6   BY THE WITNESS:

7       A.      He does some of that.  I don't -- I --

8   I -- he does in various places provide numbers along

9   those lines.  I -- I'd have to go back and make sure

10  he does that throughout his report, but he does --

11  that's one of the things he definitely talks about

12  doing.

13  BY MR. KO:

14      Q.      Just bear with me one second.

15              And where he does talk about this

16  analysis, again, you -- you offer a critique of his

17  analysis and his methodology used to calculate the

18  share of harms attributable to opioids, correct?

19      A.      Yes, I do.

20      Q.      Are you providing your own conclusion or

21  assessment as to what share of the harms are

22  attributable to opioids in this case?

23      MR. HALLER:  Objection; no foundation, vague.

24  BY THE WITNESS:

```
 1        A.    I have not performed an independent

 2   estimate of the share of harms due to opioids as part

 3   of my report.  That was not part of my assignment and

 4   not something that I attempted to do.

 5   BY MR. KO:

 6        Q.    In your report, are you offering any

 7   opinion or conclusion as to the historical or future

 8   costs incurred by the bellwethers that are or are not

 9   the responsibility of the Defendants in this case?

10        A.    That sounds like from your question a

11   legal question.  And to the extent it's a legal

12   question, I'm not offering any legal opinions in my

13   case -- in -- in this case.

14        Q.    And I wasn't intending it -- for it to be

15   a legal question.  I guess I can try and ask it more

16   simply.

17              Does any aspect of your report identify

18   costs incurred by the bellwethers as a result of the

19   opioid crisis or as a result of Defendants' alleged

20   misconduct in this case?

21        A.    I would say I discussed those issues.  I

22   don't think I identify specific costs associated with

23   anything.  So I was not asked to identify specific

24   costs or measure those specific costs.  I was asked to
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    provide an economic analysis of the marketplace and

 2    what happened, as well as critique Professor Cutler

 3    and the other experts' analysis, but I wasn't asked to

 4    provide an independent assessment of costs.

 5        Q.   You're aware that Professor Cutler in his

 6    report analyzes to a great degree the level of

 7    shipments on, among other things, harms in the

 8    bellwether communities, correct?

 9        MR. HALLER:  Objection; vague.

10    BY THE WITNESS:

11        A.   Your question, I think, needs to be

12    rephrased, because, yeah, I didn't understand it.

13    BY MR. KO:

14        Q.   Fair enough.

15             Do any of the opinions that you are

16    offering in this case identify the specific percentage

17    of shipments that Defendants are or are not

18    responsible for as being unlawful in the bellwether

19    communities?

20        MR. HALLER:  Objection; vague.

21    BY THE WITNESS:

22        A.   That sounds 100 percent like a legal

23    question because you talk about unlawful.  I -- I

24    can't give you an opinion as to what's unlawful.  I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    not an attorney, so.  I'm an economist.

2    BY MR. KO:

3        Q.    Have you con -- have you made any

4    conclusions regarding the percentage of shipments that

5    the Defendants are responsible for in this case?

6        MR. HALLER:  Objection; vague.

7    BY THE WITNESS:

8        A.    When -- when you say responsible for, that

9    they actually shipped, that those are the shipments

10   that they made?

11   BY MR. KO:

12       Q.    Let me ask -- let me try again.

13             Have you made any conclusions regarding

14   the percentage of shipments that the Defendants are or

15   are not responsible for as being unlawful in the

16   bellwether communities in this case?

17       A.    Again, I can't give you a legal opinion.

18   That, I mean, what's unlawful is a -- fundamentally a

19   legal question, and I can't give you an assessment of

20   what's unlawful.

21       Q.    Have you made any conclusions regarding

22   the percentage of shipments that the Defendants are or

23   are not responsible for preventing in the bellwether

24   communities in this case?

Highly Confidential – Subject to Further Confidentiality Review

```
 1        MR. HALLER:  Same objection.

 2   BY THE WITNESS:

 3        A.    Responsible for -- for preventing under

 4   what standard?  Is that, again, a legal standard that

 5   re -- that they are required to do something by law

 6   or -- what's the standard that you think -- asking

 7   whether I apply?

 8   BY MR. KO:

 9        Q.    Fair enough.

10              Are you familiar with the Controlled

11   Substances Act?

12        A.    Again, that's a legal -- that's a --

13   that's a con -- that's a legal doctrine.  I -- I am

14   not well positioned to assess what that requires

15   people to do.  And my understanding, there is debate

16   among the attorneys as to what that requires people to

17   do.  So I don't want to venture into that fray.

18        Q.    And I'm not -- I appreciate the response

19   that you gave me, but I simply asked you whether or

20   not you are familiar with the Controlled Substances

21   Act?

22        A.    I'm familiar with its existence.  I can't

23   tell you I'm an expert on the Controlled Substances

24   Act.
```

```
 1        Q.    Are you aware of whether or not -- or are

 2   you aware of which entities are responsible for being

 3   registrants under the CSA or the Controlled Substances

 4   Act?

 5        A.    I'm not familiar with all of the details.

 6   My understanding is that industry participants are

 7   required to do certain things, whether that's

 8   registration, I don't know what it's called, but they

 9   are certainly governed by aspects of the Controlled

10   Substances Act is my understanding as an economist.

11   What those requirements are is, again, a legal issue

12   and I can't really speak to that.

13        Q.    Now, a moment ago we were talking about

14   whether or not you've made any calculations of costs

15   the bellwether governments have incurred.  And I

16   believe you said you have not directly done any of

17   that type of analysis, correct?

18        A.    Well, I've -- I've looked at some of the

19   costs that Plaintiffs claim the bellwether comp --

20   counties have occurred -- incurred.  I haven't done my

21   own independent assessment of what that number is, but

22   I've -- you know, that's part of my analysis is

23   looking at costs that they've claimed they incurred.

24        Q.    And as you sit here today, do you have any
```

Highly Confidential - Subject to Further Confidentiality Review

 1    intention or plans to offer an independent assessment

 2    of what costs the bellwether governments have incurred

 3    as a result of the opioid crisis or as a result of

 4    Defendants' alleged misconduct?

 5        A.    I would say that the places where I would

 6    comment on that are whether Professor Cutler's

 7    analysis and the analysis of other Plaintiff experts

 8    that relate to that would provide reasonable economic

 9    estimates of those quantities.  I do not have plans at

10    this point to offer my own assessments.

11        Q.    At trial?

12        A.    Other -- at trial other than to comment on

13    their assessments and whether those -- their

14    assessments are reasonable as a matter of economics.

15        Q.    Speaking of the trial, do you have plans

16    to be at the trial this fall if called to do so?

17        A.    If called to testify, I would likely -- I

18    would expect to testify.  I have not made any specific

19    plans to be there at this point.

20        Q.    Are you aware that this case is currently

21    scheduled for trial in October of this year?

22        A.    I had not paid particular attention to

23    that.  Those dates usually change, which is why I

24    don't usually write them down on my calendar.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Have you been told to keep those dates

 2   open or any dates open for trial?

 3      MR. HALLER:  Objection.

 4         If you did, that was a communication with

 5   counsel, and I'll instruct you not to answer that

 6   question.

 7   BY THE WITNESS:

 8      A.    I think I've been told that testimony is

 9   expected.  I mean, I try to -- you know, I -- I have

10   to teach.  So I always work my testimony around my

11   teaching schedule.  So I -- to the extent I can work

12   it in around my teaching, I'll be there to testify,

13   but teaching is my No. 1 priority, so.

14   BY MR. KO:

15      Q.    By the way, with respect to the courses

16   that you teach, I recall that you said that you are

17   teaching two classes this semester or currently

18   teaching two classes, correct?

19      A.    Yes.

20      Q.    And what two classes are those?

21      A.    I'm teaching a course called "Big

22   Problems" that looks at public policy issues.  It's a

23   course offered for public -- for business school

24   students as well as law students.  So it's jointly
```

Highly Confidential - Subject to Further Confidentiality Review

1    taught by myself and Robert Topel from the business

2    school and Anup Malani and -- and -- and David

3    Weisbach from the law school.  So we co-jointly teach

4    that course.  And then I jointly teach a sports

5    economics course with John Huizinga that's a business

6    school class.

7        Q.    And what's the general nature of the

8    sports economics class?

9        A.    Kind of quite a few things.  Mostly about

10   sports analytics.  So it's mostly about player

11   evaluations, strategic decision-making, things like

12   that in -- in -- in professional sports.

13       Q.    And these two courses that you teach, are

14   those the two courses that -- or how long have you

15   taught these two courses?

16       A.    This is, I think, the third year we've

17   taught the Big Problems class.  It actually picked up

18   on a class that I taught for a long time with Gary

19   Becker before he passed away and Ted Snyder who was

20   for a while the Dean at Chicago.  We taught a very

21   similar public policy class for about 13 years and

22   then there was a break of a few years where I wasn't

23   teaching and this -- we started teaching this class

24   again.  So that class in one form or another has been

1    around for, you know, 15 plus years.

2        Q.    Have you ever taught a class at Booth or

3    anywhere else to the extent that you were a visiting

4    professor that deals directly with opioid use or

5    misuse or abuse?

6        A.    Drug abuse has been part of and -- and

7    markets for illegal goods and addictive behavior have

8    been part of the classes that I've taught for a long

9    time, but I've not taught a specific course on

10   opioids.

11       Q.    With respect to the Big Problems class

12   that you teach, would you -- what types of big

13   problems are you generally discussing in these

14   classes?

15       A.    Generally environmental issues tend to

16   play a pretty big role.  So water, climate change,

17   inequality and -- and trade and health, health

18   economics, you know, healthcare expenditures and --

19   and -- and health insurance.  We've also done ant --

20   those topics change.  We've done antitrust, we've done

21   tort liability.  Those would be the main areas we

22   typically would do.

23       Q.    Have you ever discussed or analyzed or

24   studied the opioid crisis in connection with this

Highly Confidential - Subject to Further Confidentiality Review

1    class?

2        A.    I have not.  I think it's come up in some

3    discussions that we've had.  The health issues, the

4    sort of Case and Deaton things was part of what we've

5    talked about in that class, sort of the deteriorating

6    prospects for less educated men and women in the

7    United States has been a part of many of the classes I

8    have taught over the last 20 years.

9        Q.    And to be clear, you are talking about the

10   elements that are discussed in the Case and Deaton

11   article and not the article itself, correct?

12       A.    Yeah, I mean, the Case and Deaton articles

13   have been a topic of more recent years, but the ideas

14   there of declining labor market prospects and how they

15   relate to other aspects of people's lives, whether

16   it's family, living arrangements, health, that's been

17   part of these courses preceding Case and Deaton's work

18   by quite a bit.  That's been something we've been

19   talking about for, like I say, 20 years roughly.

20       Q.    Going back to our earlier discussion about

21   trial, if -- if the trial is scheduled for this fall,

22   is there anything that you can think of that will

23   prevent you from testifying as an expert in trial --

24   at trial this fall?

```
 1      A.    Only if I had to testify right when I had

 2   to be teaching.  As long as I can work it around my

 3   teaching, I'll be there to testify, and I've been able

 4   to do that in the past.  I anticipate I'll be able to

 5   do that in this case.

 6      Q.    And with respect to the additional work

 7   that you may do in this case, at this point do you

 8   have any understanding as to what additional work you

 9   may be asked to do before -- between now and trial?

10      A.    I don't have a specific knowledge of what

11   would come up.  I mean, obviously if the Plaintiffs

12   submit anything that would be relevant for economic

13   analysis, I would expect to respond to that.  If the

14   case goes to trial, I imagine there would be work to

15   organize the opinions I have and the materials that

16   support them in a format that would be suitable for

17   preventing it -- presenting at trial.  So that would

18   be kind of -- that part of the case would begin.

19      Q.    At this point do you intend to do any

20   further research between now and trial in connection

21   with the expert report that you've provided in this

22   case?

23      A.    I don't have any specific plans at this

24   point.
```

Highly Confidential - Subject to Further Confidentiality Review

 1        Q.    And do you have any specific plans or

 2   intention to do any further empirical work or analysis

 3   related to your expert work between now and trial?

 4        A.    I don't have specific plans to do that.

 5   I'm not ruling out that that would happen, but I don't

 6   have any specific plans at this point.

 7        MR. KO:  Well, Dr. Murphy, that is actually --

 8   those are all of the questions I have for you this

 9   afternoon.  So I really appreciate your time.  And I

10   don't know if your counsel has any specific questions.

11        MR. HALLER:  I doubt we do, but I should

12   probably just consult with people and make sure, so

13   why don't we go off the record for a few minutes and

14   then come back.

15        THE VIDEOGRAPHER:  We are off the record at

16   3:54 p.m.

17                  (WHEREUPON, a recess was had

18                   from 3:54 to 4:01 p.m.)

19        THE VIDEOGRAPHER:  We are back on the record at

20   4:01 p.m.

21        MR. HALLER:  I have no questions.  Does anybody

22   else have questions?  I think the answer is no.

23        MR. MURPHY:  No.

24        MS. CASTLES:  No questions.

Highly Confidential - Subject to Further Confidentiality Review

```
1          MR. HALLER:  So we are concluded.

2          THE VIDEOGRAPHER:  We are off the record at

3    4:01 p.m.  This concludes the videotape deposition of

4    Kevin Murphy.

5                    (Time Noted:  4:01 p.m.)

6                FURTHER DEPONENT SAITH NAUGHT.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5            That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9            That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14            That the said deposition was taken before

15    me at the time and place specified;

16            That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 7th day of June, 2019.

23            Juliana F. Zajicek

24    JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  In Re:  National Prescription

 5                 Opiate Litigation

 6

 7          DECLARATION UNDER PENALTY OF PERJURY

 8

 9          I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                              KEVIN M. MURPHY, Ph.D.

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of                 , A.D. 20___.

23

24          Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                         KEVIN M. MURPHY, Ph.D.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                       KEVIN M. MURPHY, Ph.D.
```