```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

      ------------------------   )

 4   IN RE: NATIONAL             ) MDL No. 2804

     PRESCRIPTION OPIATE         )

 5   LITIGATION                  ) Case No.

      ------------------------   ) 1:17-MD-2804

 6                               )

     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7   ALL CASES                   )

      ------------------------   )

 8

 9                  HIGHLY CONFIDENTIAL

10      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12              VIDEOTAPED DEPOSITION OF

13                   MARK NICASTRO

14                 December 6, 2018

15

16              Indianapolis, Indiana

17

18

19

20

21

22           GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23               deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3          The videotaped deposition of MARK NICASTRO,

4     called by the Plaintiffs for examination, taken

5     pursuant to the Federal Rules of Civil Procedure of

6     the United States District Courts pertaining to the

7     taking of depositions, taken before CORINNE T.

8     MARUT, C.S.R. No. 84-1968, Registered Professional

9     Reporter and a Certified Shorthand Reporter of the

10    State of Illinois, 251 East Ohio Street,

11    Indianapolis, Indiana on December 6, 2018,

12    commencing at 9:04 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFFS:
 3          MOTLEY RICE LLC
            28 Bridgeside Boulevard
 4          Mt. Pleasant, South Carolina  29464
            843-216-9250
 5          BY:  MICHAEL E. ELSNER, ESQ.
                 melsner@motleyrice.com
 6               AMANDA UNTERREINER, ESQ.
                 aunterreiner@motleyrice.com
 7                  (via livestream/teleconference)
 8
 9          WEISMAN KENNEDY & BERRIS CO LPA
            101 West Prospect Avenue
10          1600 Midland Building
            Cleveland, Ohio  44115
11          216-781-1111
            BY:  JAMES A. DeROCHE, ESQ.
12               Of Counsel
                 jderoche@weismanlaw.com
13               AMY KENNEDY, ESQ.
                 akennedy@weismanlaw.com
14                  (via livestream/teleconference)
                 DANIEL GOETZ, ESQ.
15               dgoetz@weismanlaw.com
                    (via livestream/teleconference)
16
17          GARSON JOHNSON LLC
            101 West Prospect Avenue
18          Midland Building, Suite 1610
            Cleveland, Ohio  44115
19          800-747-9330
            BY:  PATTI CARDINAL, ESQ.
20               pcardinal@garson.com
                    (via livestream/teleconference)
21
22
23
24
```

```
 1    APPEARANCES (Continued):
 2         LEVIN PAPANTONIO THOMAS MITCHELL
           RAFFERTY & PROCTOR P.A.
 3         316 South Baylen Street, Suite 600
           Pensacola, Florida  32502
 4         205-396-3982
           BY:  WILLIAM BAKER, ESQ.
 5             wcb850@gmail.com
                   (via livestream/teleconference)
 6
 7    ON BEHALF OF CVS INDIANA, LLC,
      CVS RX SERVICES, INC. and THE DEPONENT:
 8
           ZUCKERMAN SPAEDER LLP
 9         1800 M Street, NW
           Suite 1000
10         Washington, DC  20036-5807
           202-778-1800
11         BY:  PAUL B. HYNES, JR., ESQ.
               phynes@zuckerman.com
12
13    ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
      ENDO PHARMACEUTICALS, INC.,
14    PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
      COMPANIES, INC. (f/k/a Par Pharmaceutical
15    Holdings, Inc.):
16         ARNOLD & PORTER KAYE SCHOLER LLP
           70 West Madison Street, Suite 4200
17         Chicago, Illinois  60602-4231
           312-583-2435
18         BY:  MICHAEL BULLERMAN, ESQ.
               Michael.Bullerman@arnoldporter.com
19                 (via livestream/teleconference)
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2     ON BEHALF OF McKESSON CORPORATION:
 3        COVINGTON & BURLING LLP
          1999 Avenue of the Stars
 4        Los Angeles, California  90067
          424-332-4780
 5        BY:  MICHAEL LANOSA, ESQ.
               mlanosa@cov.com
 6              (via livestream/teleconference)
 7
 8     ON BEHALF OF CARDINAL HEALTH, INC.:
 9        WILLIAMS & CONNOLLY LLP
          725 Twelfth Street, N.W.
10        Washington, DC  20005
          202-434-5013
11        BY:  JOSEPH S. BUSHUR, ESQ.
               jbushur@wc.com
12
13     ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
       AMERISOURCEBERGEN CORPORATION:
14
          REED SMITH LLP
15        Three Logan Square
          1717 Arch Street, Suite 3100
16        Philadelphia, Pennsylvania  19103
          BY:  ABIGAIL M. PIERCE, ESQ.
17             abigail.pierce@reedsmith.com
                 (via livestream/teleconference)
18
19     ON BEHALF OF WALMART:
20        JONES DAY
          325 John H. McConnell Boulevard
21        Suite 600
          Columbus, Ohio  43215
22        614-469-3939
          BY:  EDWARD M. CARTER, ESQ.
23             emcarter@jonesday.com
                 (via livestream/teleconference)
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2     ON BEHALF OF RITE AID:
 3          MORGAN, LEWIS & BOCKIUS LLP
            101 Park Avenue
 4          New York, New York  10178-0060
            212-309-6000
 5          BY:  MATTHEW R. LADD, ESQ.
                 matthew.ladd@morganlewis.com
 6                 (via teleconference)
 7
 8   ON BEHALF OF HBC COMPANY:
 9          MARCUS & SHAPIRA LLP
            One Oxford Centre, 35th Floor
10          Pittsburgh, Pennsylvania  15219
            412-338-4383
11          BY:  JAMES F. ROSENBERG, ESQ.
                 rosenberg@marcus-shapira.com
12                 (via livestream/teleconference)
13
14     ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
15          ROPES & GRAY, LLP
            Prudential Tower
16          800 Boylston Street
            Boston, Massachusetts  02199-3600
17          617-951-7000
            BY:  SEAN B. KENNEDY, ESQ.
18               Sean.Kennedy@ropesgray.com
                   (via livestream/teleconference)
19
20
21
22
23
24
```

```
 1    APPEARANCES (Continued):
 2      ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC.:
 3          CLARK MICHIE LLP
            220 Alexander Street
 4          Princeton, New Jersey  08540
            609-423-2142
 5          BY:  BRUCE CLARK, ESQ.
                 bruce.clark@clarkmichie.com
 6                  (via livestream/teleconference)
 7
 8
      ALSO PRESENT:
 9
            MEGAN NEUBERT, Paralegal,
10             Motley Rice LLC
11          KAITLYN EEKHOFF, Research Assistant,
               Motley Rice LLC
12
            STEPHANIE HACKMAN, Paralegal,
13             Levin Papantonio Thomas Mitchell
               Rafferty & Proctor P.A.
14                (via teleconference)
15
            GINA VELDMAN, Trial Technician
16
17
18
19
      VIDEOTAPED BY:  MICHAEL NEWELL
20
21
      REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
22
23
24
```

```
 1                    I N D E X
 2   MARK NICASTRO                      EXAMINATION
 3        BY MR. ELSNER................  15
          BY MR. DeROCHE...............  289
 4
 5
 6               E X H I B I T S
 7   CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID
 8   CVS-          PowerPoint, Prescription Drug    26
     Nicastro-     Abuse; CVS-MDLT1-15502
 9   001
10   CVS-          document, "Track One CVS Store   35
     Nicastro-     Information";
11   002           CVS-MDLT1-000007362 - 000007364
12   CVS-          9/27/06 letter to CVS Indiana,   38
     Nicastro-     LLC from DEA;
13   003           CVS-MDLT1-000010552 - 000010555
14   CVS-          2/7/07 letter from DEA;          42
     Nicastro-     CVS-MDLT1-000091513 - 000091516
15   004
16   CVS-          12/27/07 letter from DEA;        43
     Nicastro-     CVS-MDLT1-000013535 - 000013536
17   005
18   CVS-          CVS Distribution Centers         45
     Nicastro-     Controlled Drug-DEA Standard
19   006           Operating Procedures Manual;
                   CVS-MDLT1-000066576 - 000066641
20
     CVS-          12/11/09 e-mail string with      51
21   Nicastro-     attachment;
     007           CVS-MDLT1-000081281 -
22                 000081346
23
24
```

```
 1                    E X H I B I T S
 2    CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID
 3     CVS-          8/24/10 e-mail string;         56
       Nicastro-     CVS-MDLT1-000076281
 4     008
 5     CVS-          8/24/10 e-mail string;         58
       Nicastro-     CVS-MDLT1-000076282
 6     009
 7     CVS-          9/2/10 e-mail with attachment;  61
       Nicastro-     CVS-MDLT1-000076283 - 000076285
 8     010
 9     CVS-          5/19/09 e-mail string;         62
       Nicastro-     CVS-MDLT1-000034234 - 000034235
10     011
11     CVS-          CVS Controlled Drug-DEA        66
       Nicastro-     Standard Operating Procedures
12     012           Manual; CVS-MDLT1-000088957 -
                     000089025
13
       CVS-          8/26/10 e-mail;                70
14     Nicastro-     CVS-MDLT1-000088956
       013
15
       CVS-          9/1/10 e-mail string with      71
16     Nicastro-     attachment;
       014           CVS-MDLT1-000075299 - 000075312
17
       CVS-          1/5/11 e-mail string with      94
18     Nicastro-     attachment;
       015           CVS-MDLT1-000076236 - 000076238
19
       CVS-          2/4/11 e-mail with attachment;  97
20     Nicastro-     CVS-MDLT1-000076353 - 000076389
       016
21
       CVS-          10/7/10 e-mail string;        106
22     Nicastro-     CVS-MDLT1-000034172 - 000034177
       017
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S

 2   CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID

 3   CVS-          10/12/10 e-mail;                  109
     Nicastro-     CVS-MDLT1-000104883
 4   018

 5   CVS-          organizational chart;            115
     Nicastro-     CVS-MDLT1-000030733
 6   019

 7   CVS-          4/15/11 e-mail with              117
     Nicastro-     attachment;
 8   020           CVS-MDLT1-000076286 - 000076352

 9   CVS-          11/27/12 e-mail with             131
     Nicastro-     attachment;
10   021           CVS-MDLT1-000029867 - 000029870

11   CVS-          11/27/12 e-mail string;          138
     Nicastro-     CVS-MDLT1-000106664 - 000106673
12   022

13   CVS-          5/20/13 e-mail string;           143
     Nicastro-     CVS-MDLT1-000057783 - 000057784
14   023

15   CVS-          7/17/13 e-mail string;           145
     Nicastro-     CVS-MDLT1-000076114 and
16   024           000076115

17   CVS-          7/16/13 e-mail string;           151
     Nicastro-     CVS-MDLT1-000028615 - 000028617
18   025

19   CVS-          8/18/13 e-mail;                  152
     Nicastro-     CVS-MDLT1-000012363
20   026

21   CVS-          9/27/13 e-mail string;           156
     Nicastro-     CVS-MDLT1-000017250
22   027

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                E X H I B I T S
 2    CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID
 3    CVS-          10/3/13 e-mail string with      158
      Nicastro-     attachments;
 4    028           CVS-MDLT1-000022055 - 000022061
 5    CVS-          11/13/13 e-mail string;         160
      Nicastro-     CVS-MDLT1-000017255 - 000017258
 6    029
 7    CVS-          3/14/14 e-mail string;          165
      Nicastro-     CVS-MDLT1-000017246
 8    030
 9    CVS-          3/20/14 e-mail string with      169
      Nicastro-     attachment;
10    031           CVS-MDLT1-000076146 - 000076148
11    CVS-          8/5/13 Notice of Inspection of  176
      Nicastro-     Controlled Premises;
12    032           CVS-MDLT1-000010522 - 000010523
13    CVS-          Handwritten notes;              177
      Nicastro-     CVS-MDLT1-000010525 - 000010529
14    033
15    CVS-          8/7/13 e-mail;                  179
      Nicastro-     CVS-MDLT1-000061606 - 000061607
16    034
17    CVS-          Document, "DEA Visit 8/5 - 8/8  180
      Nicastro-     2013"; CVS-MDLT1-000008389 -
18    035           000008395
19    CVS-          11/15/13 e-mail string;         190
      Nicastro-     CVS-MDLT1-000022277
20    036
21    CVS-          11/15/13 e-mail string;         193
      Nicastro-     CVS-MDLT1-000111940 - 000111941
22    037
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2    CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID
 3    CVS-           11/19/13 e-mail with            195
      Nicastro-      attachment;
 4    038            CVS-MDLT1-000076142 - 000076145
 5    CVS-           11/20/13 e-mail;                196
      Nicastro-      CVS-MDLT1-000058093
 6    039
 7    CVS-           11/21/13 e-mail with            198
      Nicastro-      attachment;
 8    040            CVS-MDLT1-000076136 - 000076141
 9    CVS-           11/21/13 e-mail;                201
      Nicastro-      CVS-MDLT1-000076127
10    041
11    CVS-           11/21/13 e-mail with            203
      Nicastro-      attachments;
12    042            CVS-MDLT1-000000409 - 000000420
13    CVS-           11/25/13 e-mail string;         206
      Nicastro-      CVS-MDLT1-000000421 - 000000422
14    043
15    CVS-           11/25/13 e-mail;                211
      Nicastro-      CVS-MDLT1-000076135
16    044
17    CVS-           Graph, "Annual CVS Hydrocodone  219
      Nicastro-      Purchase Benchmarks - Dosage
18    045            Units (2006 - 2014)"; no Bates
                     numbers
19
      CVS-           5/15/14 e-mail;                 227
20    Nicastro-      CVS-MDLT1-000022230 - 000022231
      046
21
      CVS-           3/5/14 e-mail string with       242
22    Nicastro-      attachment; and
      047            CVS-MDLT1-000076100 - 000076107
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2   CVS-NICASTRO DEPOSITION EXHIBIT      MARKED FOR ID
 3   CVS-          1/20/14 e-mail string;          253
     Nicastro-     CVS-MDLT1-000076153 - 000076154
 4   048
 5   CVS-          Declaration of Joseph            258
     Nicastro-     Rannazzisi
 6   049
 7   CVS-          Settlement Agreement;            271
     Nicastro-     CVS-MDLT1-000060796 - 000060804
 8   050
 9   CVS-          8/26/14 e-mail string;           279
     Nicastro-     CVS-MDLT1-000003065 - 000003066
10   051
11   CVS-          8/22/14 e-mail string;           280
     Nicastro-     CVS-MDLT1-000000437 - 000000438
12   052
13   CVS-          12/31/15 letter from U.S. DOJ    287
     Nicastro-     DEA to CVS Indiana;
14   053           CVS-MDLT1-000008014 - 000008015
15   CVS-          8/9/13 e-mail string;            321
     Nicastro-     CVS-MDLT1-000000397
16   216
17   CVS-          8/6/13 e-mail string;            317
     Nicastro-     CVS-MDLT1-000003026 - 000003032
18   232
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        THE VIDEOGRAPHER:  We are now on the record.

 2   My name is Michael Newell.  I'm a videographer for

 3   Golkow Litigation Services.

 4              Today's date is December 6, 2018.  The

 5   time is 9:04 a.m.

 6              This deposition is being held in

 7   Indianapolis, Indiana, in the matter of National

 8   Prescription Opiate Litigation.

 9              The deponent today is Mark Nicastro.

10              Will counsel please identify themselves.

11        MR. ELSNER:  My name is Michael Elsner from

12   the law firm of Motley Rice on behalf of

13   Plaintiffs, and with me today from my office is

14   Kaitlyn Eekhoff and Megan Neubert.

15        MR. DeROCHE:  James DeRoche, of counsel,

16   Weisman Kennedy & Berris, for the Plaintiffs.

17        MR. BUSHUR:  Joseph Bushur of

18   Williams & Connolly on behalf of Cardinal Health.

19        MR. HYNES:  Paul Hynes of Zuckerman Spaeder on

20   behalf of CVS Indiana, LLC, CVS RX Services, Inc.

21   and the witness, Mark Nicastro.

22        THE REPORTER:  Counsel on the phone.

23        MR. BULLERMAN:  This is Michael Bullerman of

24   Arnold & Porter on behalf of the Endo and Par
```

Highly Confidential - Subject to Further Confidentiality Review

1    Defendants.

2         MR. LADD:  This is Matthew Ladd from Morgan

3    Lewis on behalf of Defendant Rite Aid.

4         MR. LANOSA:  This is Michael Lanosa from

5    Covington & Burling on behalf of McKesson.

6         MS. PIERCE:  This is Abigail Pierce from Reed

7    Smith on behalf of AmerisourceBergen Drug

8    Corporation.

9         MR. CARTER:  Ed Carter from Jones Day on

10   behalf of Wal-Mart.

11        THE VIDEOGRAPHER:  The Court Reporter today is

12   Corinne Marut and will now swear in the witness.

13                  (WHEREUPON, the witness was duly

14                   sworn.)

15                  MARK NICASTRO,

16   called as a witness herein, having been first duly

17   sworn, was examined and testified as follows:

18                      EXAMINATION

19   BY MR. ELSNER:

20        Q.    Good morning.

21        A.    Good morning.

22        Q.    My name is Michael Elsner and I

23   represent the Plaintiffs.

24              Could you tell us your name, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It's Mark Nicastro.

 2          Q.    And where do you live?

 3          A.    I live in Carmel, Indiana.

 4          Q.    And how old are you?

 5          A.    53.

 6          Q.    And I saw that you graduated from

 7   Bowling Green University, is that right?

 8          A.    I did.

 9          Q.    And did you graduate with a degree?

10          A.    I did.

11          Q.    What was your degree in?

12          A.    General business.  BSBA in general

13   business.

14          Q.    In what year was that?

15          A.    1987.

16          Q.    Okay.  And before working for CVS you

17   were working with Best Buy, is that right?

18          A.    That's correct.

19          Q.    And what were you doing for Best Buy?

20          A.    I was an operations manager for a

21   distribution center.

22          Q.    For how long did you do that?

23          A.    Approximately three years.

24          Q.    And what years were those?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      1995 to 1998.

2       Q.      After leaving Best Buy where did you go

3   to work after that?

4       A.      For CVS.

5       Q.      When you say "CVS," who hired you

6   exactly?

7       A.      The person that hired me or the company?

8       Q.      The company.

9       A.      I believe it was CVS Pharmacy.

10      Q.      Okay.

11      A.      Because I went to work in Somerset,

12  Pennsylvania.

13      Q.      Okay.  And what did you do in Somerset,

14  Pennsylvania?

15      A.      I was the director of operations for

16  that DC.

17      Q.      And by "DC" you mean distribution

18  center?

19      A.      Distribution center.

20      Q.      Okay.  And how long did you -- were you

21  in Somerset, Pennsylvania?

22      A.      Almost ten years to the date.

23      Q.      Okay.  And what were the dates?

24      A.      August '98 to around August of --

Highly Confidential - Subject to Further Confidentiality Review

1    probably about September of 2008.

2        Q.    September of 2008?

3        A.    Yes.  Ten years.

4        Q.    Okay.  And what were your

5    responsibilities in Somerset, Pennsylvania?

6        A.    Oversee the operation for distributing

7    products to CVS stores.

8        Q.    And what were -- what was the geographic

9    region of that distribution center in Somerset,

10   Pennsylvania?

11       A.    We covered West Virginia, New York,

12   Pennsylvania, Ohio, a little bit of Maryland.

13       Q.    And did there come a time when you moved

14   to Indianapolis?

15       A.    Yes.

16       Q.    And when was that?

17       A.    That was in 2008.

18       Q.    And what job did you take in

19   Indianapolis?

20       A.    Director of operations.

21       Q.    Okay.  And were you hired by

22   CVS Pharmacy at the time in 2008?

23       A.    To me it was all the same, just moving

24   from CVS to CVS, but I know the title of our

Highly Confidential - Subject to Further Confidentiality Review

```
 1   building is different.  It's CVS Indiana, LLC.

 2        Q.   Okay.  But you viewed it all as CVS?

 3        A.   Yes.

 4        Q.   And in 2008 what was your position?

 5        A.   Director of operations.

 6        Q.   Director of operations.  Okay.  And

 7   that's for the distribution center in Indiana?

 8        A.   Yes.

 9        Q.   For CVS?

10        A.   Yes.

11        Q.   And what was the geographical territory

12   of that operation center in Indiana?

13        A.   We had a little bit of Ohio, but most

14   states went out west and north.  So, we had Indiana

15   of course, Illinois, Missouri, Kansas, Montana,

16   North Dakota, Minnesota, Wisconsin.

17        Q.   A large number?

18        A.   Yeah.

19        Q.   And in this case we're particularly

20   interested in Summit County and Cuyahoga County.

21   Were those -- were those CVS stores in those

22   locations, what distribution center provided

23   hydrocodone products and other products to those

24   stores?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    They would have been serviced through

2   the Somerset distribution center; but the

3   hydrocodone, the pharmacy products were distributed

4   through Indianapolis and cross-docked to Somerset,

5   and then Somerset delivered to those stores the

6   pharmacy product.

7      Q.    Okay.  And did Somerset, Pennsylvania

8   ever distribute hydrocodone products?

9      A.    The products would have come from

10  Indianapolis to Somerset and then -- so, yes, the

11  control drugs would have been part of that pharmacy

12  delivery.

13     Q.    Okay.  And did you have access to the

14  Internet at the facility in Somerset, Pennsylvania,

15  and, if so, in what year?

16     A.    Yes.

17     Q.    Do you remember when?

18     A.    The -- the Internet?

19     Q.    Yes.

20     A.    Have access to the Internet?

21     Q.    At work.

22     A.    I believe the entire time.

23     Q.    The entire time?

24     A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    From 1998 till 2008?

2    A.    Yes.

3    Q.    Okay.  As the director of the

4    Indianapolis distribution center, who do you report

5    to?

6    A.    I report to -- currently I report to Jim

7    Hall.  He is a regional director.

8    Q.    For CVS?

9    A.    Yes.

10   Q.    CVS Pharmacy?

11   A.    I believe.

12   Q.    When you first joined the Somerset,

13   Pennsylvania distribution center, were you given

14   any training on the distribution of controlled

15   substances in 1998?

16   A.    No.

17   Q.    When is the first year that you recall

18   being given training on the distribution of

19   controlled substances?

20   A.    Our process in Somerset was much

21   different than Indianapolis because we did not

22   carry any control drugs or any pharmacy products

23   within the -- within the distribution center.

24        So, the only access or training that I

1    needed around pharmaceuticals is how we handled it

2    once it came into the building.

3         Q.    But my question was slightly different,

4    which is:  In what year do you first recall

5    receiving training on the distribution of

6    controlled substances at CVS?

7         A.    It would depend on what kind of training

8    we are talking about.

9         Q.    Any training.

10        A.    When I came on site, I would have been

11   brought up to speed very quickly on how we handle

12   the drugs as they come through the building.  They

13   are a special color tote.  We kept them in a

14   secured area and then we distribute, loaded them up

15   with the stores.  So, that -- that process and

16   understanding the importance of it would have been

17   immediate.

18        Q.    Immediate.  And at what point in time do

19   you first recall receiving any kind of training in

20   the distribution of controlled substances as it

21   relates to monitoring for suspicious activities and

22   those types of programs?

23        A.    I would not have had any of that until I

24   moved to Indianapolis.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And that was in 2008, is that right?

 2        A.    Correct.

 3        Q.    Did you receive that training in 2008?

 4        A.    I had a team that managed that process,

 5   my operations manager, pharmacy manager, pharmacy

 6   supervisor.  So, they were -- they managed that

 7   process.  I just oversaw that part of the

 8   operation.  But I would have -- so I don't recall

 9   exactly when I became familiar with that or

10   received any type of training, but it would have

11   been shortly after I arrived.

12        Q.    When did the Indianapolis distribution

13   center open, to your knowledge?

14        A.    I don't know.

15        Q.    When you joined in 2008, who was

16   responsible for the pharmacy-related aspects of the

17   business in Indianapolis?

18        A.    Gary Millikan was my operations manager,

19   and he oversaw the pharmacy.

20        Q.    How many people did Gary Millikan have

21   under him that reported to him?

22        A.    I -- I don't remember.

23        Q.    I saw some statistics that the

24   distribution center in Indiana in 2013 had about
```

1    $109 million worth of pharmacy inventory.  Does

2    that sound about right to you?

3         A.    I don't know the exact number, but

4    roughly.

5         Q.    Okay.  And also in 2013 I saw some

6    statistics that the CVS distribution center in

7    Indiana had shipped about 85 million pieces of

8    pharmaceutical products.

9              Does that number sound about right to

10   you?

11        A.    I -- I'm not -- I don't recall in 2013.

12   It's been a long time ago.

13        Q.    Does that sound about right in terms of

14   the volume that the Indiana distribution center

15   would distribute?

16        A.    I -- I don't remember.  I'm sorry.

17        Q.    Do you believe there is an opioid crisis

18   in the United States?

19        MR. HYNES:  Objection to form.

20   BY THE WITNESS:

21        A.    I believe there is issues with opioids.

22   I see the news and I read the paper and a lot of

23   discussion about it in the political stage, too.

24   So, I -- I understand there is issues with opioids.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. ELSNER:

2        Q.    Okay.  And you follow those issues?

3        A.    Not closely.  Just what I see on TV and

4   in the paper.

5        Q.    What is your understanding of the opioid

6   crisis in the United States?

7        MR. HYNES:  Objection to form.

8   BY THE WITNESS:

9        A.    There is -- there is some addiction

10  issues with opioids.

11  BY MR. ELSNER:

12       Q.    And did anyone ever tell you from

13  CVS Pharmacy or in CVS that there is an opioid

14  crisis in the United States?

15       A.    Not in that manner.

16       Q.    Were you aware that the Center for

17  Disease Control and Prevention had declared

18  prescription drug abuse to be an epidemic?

19       MR. HYNES:  Objection.  Time frame.

20       MR. ELSNER:  2010.

21  BY THE WITNESS:

22       A.    No.

23  BY MR. ELSNER:

24       Q.    Did you know as early as 2007 that

```
 1    approximately 27,000 unintentional overdose deaths

 2    occurred in the United States, which is one in

 3    every 19 minutes?

 4         MR. HYNES:  Objection; form.

 5    BY THE WITNESS:

 6         A.    No.

 7    BY MR. ELSNER:

 8         Q.    Were you aware that every component of

 9    the distribution chain, it had been determined, had

10    been breached as a result of the opioid crisis?

11         MR. HYNES:  Objection; form.

12         MR. ELSNER:  Why don't we show the PowerPoint.

13    First exhibit is CVS-MDLT1-15502.  We will mark

14    this as Exhibit 1.

15                   (WHEREUPON, a certain document was

16                    marked as CVS-Nicastro-001:

17                    PowerPoint, Prescription Drug

18                    Abuse; CVS-MDLT1-15502.)

19         MR. HYNES:  Did you say this has a Bates

20    number on it?

21         MR. ELSNER:  It does.  Can we see a copy of

22    the Bates number?

23         MR. HYNES:  Could I have this copy?  Thank

24    you.  But I appreciate this is easier to read.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          MR. ELSNER:  Right.  And in color.

2     BY MR. ELSNER:
```

```
1
2
3
4
5
6
7
8
9
10
11
12
```

13   BY MR. ELSNER:

14        Q.    Would you agree with me that the

15   oversupply of opioids leads to diversion?

16        MR. HYNES:  Objection to form.

17   BY THE WITNESS:

18        A.    Could you repeat that.

19   BY MR. ELSNER:

20        Q.    Sure.  Would you agree with me that the

21   oversupply of opioids may lead to diversion?

22        MR. HYNES:  Objection to form.

23   BY THE WITNESS:

24        A.    The oversupply.  I don't really

1    understand the -- are you asking me a specific

2    question like was I oversupplying drugs to areas

3    or --

4    BY MR. ELSNER:

5        Q.    No, I'm asking you whether you

6    understood that if there was an oversupply of

7    opioid drugs that there was a risk that those drugs

8    might be diverted?

9        MR. HYNES:  Objection.  Time frame.  Now or?

10   BY MR. ELSNER:

11       Q.    At any time.

12       A.    As long as we had -- as long as there

13   are controls in place to manage those drugs,

14   whatever they are, I don't think it would be a

15   higher risk for diversion.

16       Q.    So, even if those numbers were 10,000

17   pills into a community of a size of 12,000 people,

18   you wouldn't see that as a risk of diversion so

19   long as there were some controls in the

20   distribution center?

21       MR. HYNES:  Objection to form.

22   BY THE WITNESS:

23       A.    As long as there were controls

24   throughout the supply chain network and at the --

Highly Confidential - Subject to Further Confidentiality Review

1    at the pharmacy level, at the store level.

2              I -- I deal with very large numbers

3    every day.  So, we store a lot of inventory.  We

4    move a lot of inventory.  But it's still every

5    piece is managed and controlled.  So, I think as

6    long as you have the proper controls in place, it

7    should prevent diversion.

8    BY MR. ELSNER:

9         Q.    Regardless of volume?

10        MR. HYNES:  Objection to form.

11   BY THE WITNESS:

12        A.    Regardless of volume.

13   BY MR. ELSNER:

14

15

16

17

18

19

20

21

22

23

24   BY MR. ELSNER:

1      Q.    Okay.  What other states on this chart

2  were also serviced by your distribution center in

3  the hydrocodone?

4      A.    For hydrocodone?

5      Q.    Yes.

6      A.    Michigan, Illinois and Indiana.

7      Q.    And Ohio?

8      A.    And I believe Ohio.

9      Q.    Okay.  So, were you aware that four of

10  the top ten states for the dispensing of

11  hydrocodone were supplied that hydrocodone by CVS?

12      MR. HYNES:  Objection to form.

13  BY THE WITNESS:

14      A.    I was not.

15  BY MR. ELSNER:

16      Q.    Okay.  Were you aware that the CVS

17  Indiana distribution center was the largest

18  distributor of hydrocodone in Ohio?

19      MR. HYNES:  Objection to form.

20  BY MR. ELSNER:

21      Q.    From 2006 through 2014, distributing

22  nearly 287 million dosage units.

23      MR. HYNES:  Objection to form.

24  BY THE WITNESS:

```
 1          A.    I was not aware of that.

 2   BY MR. ELSNER:

 3          Q.    You were not aware that CVS was the

 4   largest distributor of hydrocodone in the entire

 5   state of Ohio?

 6          MR. HYNES:  Objection to form.

 7   BY THE WITNESS:

 8          A.    No.

 9   BY MR. ELSNER:

10          Q.    The Indiana distribution center provided

11   controlled substances to all CVS stores in Summit

12   and Cuyahoga County, Ohio, is that correct?

13          A.    Correct.

14          Q.    And do you know from what period of time

15   that distribution took place?

16          A.    I -- I don't know the beginning dates.

17   No, I don't.

18          Q.    Okay.  But the Indianapolis distribution

19   center was distributing hydrocodone combination

20   products to CVS stores in Summit County and

21   Cuyahoga County in 2008 when you arrived, is that

22   right?

23          A.    Yes.

24          Q.    And they did so through 2014, is that
```

1    right, for hydrocodone combination products?

2        A.    I -- I'm not sure of the date, but we

3    did move that operation where Somerset was serviced

4    from another facility, and that's when we no longer

5    serviced that area.  So, if it was -- if we have

6    numbers that are 2014, then, yes, it would be 2014.

7        Q.    So, from -- do you know prior to 2008

8    who was providing opioid products, distributing

9    opioid products to CVS stores in Summit County and

10   Cuyahoga County, Ohio?

11       MR. HYNES:  Objection to form.

12   BY MR. ELSNER:

13       Q.    You can answer if you know.

14       A.    Okay.  Yes, the Indianapolis

15   distribution center.  Was there a begin date?  I

16   know the time that I was in Somerset, from '98 to

17   2008, Indianapolis was providing us with the

18   pharmacy which we were delivering to Ohio.

19       Q.    Okay.  So, if I understand that

20   correctly, from 1998 to 2008, when you were in

21   Somerset, Pennsylvania, the Indianapolis

22   distribution center would ship the controlled

23   substances for distribution in Ohio to Somerset,

24   Pennsylvania, is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     That's correct.

 2        Q.     And then in Somerset, Pennsylvania, you

 3   would then ship those products to the stores in

 4   Ohio, is that right?

 5        A.     Correct.

 6        Q.     And did that change when you moved to

 7   Indianapolis in 2008 or is that -- or did that

 8   process continue where the Indianapolis

 9   distribution center would send it to Somerset and

10   then Somerset would ship it to the stores?

11        A.     That process remained in place.

12        Q.     Remained in place.  Did it remain in

13   place for controlled substances and hydrocodone

14   products through 2014 before hydrocodone was

15   rescheduled?

16        MR. HYNES:  Hydrocodone combination products?

17        MR. ELSNER:  Yes.

18   BY THE WITNESS:

19        A.     No.  I believe -- I believe we ended the

20   Somerset, delivering to Somerset before we

21   eliminated hydrocodone from our inventory.  And I'm

22   just thinking here.  I think it was around 2012

23   that we stopped shipping to Somerset.

24   BY MR. ELSNER:
```

1      Q.    Okay.  And so from 2012 on, you would --

2  you would ship it from Indianapolis directly to the

3  stores in Ohio?

4      MR. HYNES:  Objection.

5  BY THE WITNESS:

6      A.    Only to the stores that the Indianapolis

7  DC was servicing, and we were not servicing

8  Cleveland or Akron area.

9  BY MR. ELSNER:

10     Q.    In 2000 -- in what year?

11     A.    I'm not sure of the year, but when --

12  Somerset continued to deliver to those areas, but

13  they were getting their -- their controlled

14  products from another distribution center.

15     Q.    I'm going to mark this as Exhibit 2,

16  which is a list of stores that had been produced to

17  us by CVS.

18               (WHEREUPON, a certain document was

19                marked as CVS-Nicastro-002:

20                Document, "Track One CVS Store

21                Information"; CVS-MDLT1-000007362 -

22                000007364.)

23  BY MR. ELSNER:

24     Q.    I want to ask whether you recognize

1    these as CVS stores that were provided hydrocodone

2    combination products in Summit County and Cuyahoga

3    County from the Indiana distribution center.

4         A.    I couldn't confirm each store number and

5    date, but we did deliver to this area.  So, if

6    these are CVS stores, then, yes, we would have

7    delivered to these stores.

8         Q.    Okay.  Were you aware that the

9    Controlled Substances Act had been in place since

10   1970?

11        A.    Yes.

12        Q.    Okay.  And are you aware that the

13   Controlled Substances Act schedules various drugs

14   based on their potential for abuse and whether the

15   drug has an accepted medical use?

16        A.    I'm vaguely aware of the -- I know the

17   schedules, but I am not an expert on it and I

18   couldn't tell you what a Controlled II, III, IV, V,

19   why they are in those classes based on those

20   parameters.

21        Q.    But you know those schedules exist, is

22   that right?

23        A.    Yes.

24        Q.    And you know that drugs that are a

```
 1    Schedule II and Schedule III pose a high risk of

 2    addiction and diversion, is that right?

 3         MR. HYNES:  Objection to form.

 4    BY THE WITNESS:

 5         A.    I know we are required -- well, we don't

 6    carry C-IIs because there is a lot more regulatory

 7    control over it than C-III through V.

 8    BY MR. ELSNER:

 9         Q.    When you say there is a lot more

10    regulatory control, did someone tell you that

11    that's the reason that you don't -- that CVS does

12    not distribute Schedule II drugs?

13         A.    No.  But the facility that I'm in used

14    to be the Hooks headquarters, and I was told back

15    in the day when Hooks had that, you know,

16    distributed drugs, they did C-IIs and they had --

17    it was a safe, a vault.  So, the C-IIs had to be

18    stored in a vault and all that kind of thing.

19              So, but that's -- that's my knowledge of

20    it.  I don't know the regulations to control -- to

21    handle C-IIs.  I just know we don't.

22    ███████████████████████████████████████████████

23    ███████████████████████████████████████████████

24    ███████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
```

10       MR. HYNES:  Can we go off the record for a

11   second.  This is not updating.

12       MR. ELSNER:  Can we go off the record.

13       THE VIDEOGRAPHER:  Going off the record at

14   9:35.

15                 (WHEREUPON, a recess was had

16                 from 9:35 to 9:37 a.m.)

17       THE VIDEOGRAPHER:  We are back on the record

18   at 10:30 -- I'm sorry -- 9:37.

19   BY MR. ELSNER:

```
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And what's the purpose of the process?

2      A.      To identify orders that we need to do

3   further research on to determine if it truly is

4   suspicious or not.

5      Q.      And suspicious of what?

6      A.      Suspicious of -- well, kind of the three

7   things, unusual size, frequency and pattern, to try

8   to identify if there is anything suspicious about

9   the order I guess that we shouldn't be shipping

10  this product to a particular store for one of those

11  reasons.  It's unusually large, the pattern,

12  frequency.

13     Q.      And what was the purpose behind that?

14  Why were you looking for orders of unusual size,

15  unusual frequency?

16     A.      To -- to basically prevent product from

17  going to a store that they don't need or don't, you

18  know -- don't need.  Sending too much of one item

19  to a store that they don't require.

20     Q.      Was it put in place to -- was it that?

21  Was it for supply reasons, to make sure that the

22  store wasn't oversupplied or undersupplied with the

23  controlled substances?

24     A.      It's part of knowing our customer.  So,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    knowing the store's ordering habits and just making

 2    sure that too much inventory is not going into a

 3    particular store if it's not what they normally

 4    order.

 5         Q.    Why?

 6         MR. HYNES:  Objection; asked and answered.  Go

 7    ahead.

 8    BY THE WITNESS:

 9         A.    It's required by the DEA.

10    BY MR. ELSNER:

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22    Q.    And where was he located?

23    A.    Rhode Island.

24    Q.    In Rhode Island?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Corporate.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11     Q.    Who is Terrence Dugger?

12     A.    Terrence Dugger was the loss prevention

13  manager at Indianapolis.

14     Q.    And so he worked for you?

15     A.    No.  He worked for Frank Devlin.  The

16  loss prevention managers don't report to the

17  operations.

18     Q.    But he worked in the Indianapolis

19  facility, is that right?

20     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
```

6        MR. ELSNER:  Why don't we take a quick break

7   if we could.

8        MR. HYNES:  Okay.

9        THE VIDEOGRAPHER:  Going off the record at

10  10:06.

11                (WHEREUPON, a recess was had

12                 from 10:06 to 10:19 a.m.)

13       THE VIDEOGRAPHER:  We are back on the record

14  at 10:19.

15                (WHEREUPON, a certain document was

16                 marked as CVS-Nicastro-011:

17                 5/19/09 e-mail string;

18                 CVS-MDLT1-000034234 - 000034235.)

19  BY MR. ELSNER:

20       Q.    Mr. Nicastro, I'm going to show you what

21  we've marked as Exhibit 11.  Just have it nearby.

22  We may refer back to it.

```
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1 ▮▮▮▮▮▮▮

2              I'm sorry.  Can you ask the question

3    again?

4    BY MR. ELSNER:

5        Q.    Well, let me show you Exhibit 12.   I

6    will strike that question.

7                      (WHEREUPON, a certain document was

8                       marked as CVS-Nicastro-012:   CVS

9                       Controlled Drug-DEA Standard

10                      Operating Procedures Manual;

11                      CVS-MDLT1-000088957 - 000089025.)

12    BY MR. ELSNER:

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22      Q.    And Mr. Dugger worked at the

23   Indianapolis distribution center, is that right?

24      A.    He did.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And he was involved in the DEA audit in

2  Indianapolis?

3      A.    Yes.

17      Q.    Yes.

18      A.    Denise Byers is my current loss

19  prevention manager, but she worked in -- well, I

20  can't say for sure.  I think she worked in

21  Lumberton in 2010.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

```

```

2      Q.    If we go back to Exhibit 12 and we look

3   at 88997.

4      MR. HYNES:  Michael, is the number 88997?

5      MR. ELSNER:  Yes.

6   BY MR. ELSNER:

7      Q.    It's actually, yeah, 88997.  Under

8   Section 4, "Item Review Report."

9      A.    Sorry.  I don't see that.  8895.

10     MR. HYNES:  88997.  VIII-7.

11  BY THE WITNESS:

12     A.    88997.  Okay.

13  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8          MR. HYNES:  Objection to form.  Let me see
 9     that document again.  What page was that on?
10          MR. ELSNER:  75301.
11          MR. HYNES:  No.  75309.
12          MR. ELSNER:  It's actually 75306.
13     BY MR. ELSNER:
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4      MR. ELSNER:  Why don't we go off the record

5  for a couple minutes.

6      THE VIDEOGRAPHER:  We are going off the record

7  at 11:01.

8             (WHEREUPON, a recess was had

9              from 11:01 to 11:13 a.m.)

10     THE VIDEOGRAPHER:  We're back on the record at

11  11:13.

12  BY MR. ELSNER:

13     Q.   Mr. Nicastro, I'm going to show you what

14  I've marked as Exhibit 15.

15     MR. ELSNER:  Can I have that?  Sorry.  I gave

16  you my version.

17             (WHEREUPON, a certain document was

18              marked as CVS-Nicastro-015:  1/5/11

19              e-mail string with attachment;

20              CVS-MDLT1-000076236 - 000076238.)

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5       MR. ELSNER:  This is Exhibit 17.

6                (WHEREUPON, a certain document was

7                 marked as CVS-Nicastro-017:

8                 10/7/10 e-mail string;

9                 CVS-MDLT1-000034172 - 000034177.)

10  BY MR. ELSNER:

11     Q.   I want to direct your attention to the

12  middle e-mail from John Mortelliti to Gary

13  Misiasek.  Who is Gary Misiasek?

14     A.   He works in our corporate office.  He

15  does IT type things.  Pulls data.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          MR. ELSNER:  Go off the record for one quick

17     minute.

18          MR. HYNES:  Sure.  That's fine.

19          THE VIDEOGRAPHER:  We are going off the record

20     at 11:37.

21                    (WHEREUPON, a recess was had

22                     from 11:37 to 11:40 a.m.)

23          THE VIDEOGRAPHER:  We are back on the record

24     at 11:40.

```
1                    (WHEREUPON, a certain document was

2                     marked as CVS-Nicastro-019:

3                     Organizational chart;

4                     CVS-MDLT1-000030733.)

5    BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



（空白）

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

13     Q.    And, in fact, Kelly Baker did leave, is

14  that right?

15     A.    He did leave.

16     Q.    And Shauna left, is that right?

17     A.    No.   Shauna stayed.

18     Q.    She stayed.   Okay.

19     A.    She is still with me.

20     Q.    Why did Aaron Burtner leave in June of

21  2013?

22     A.    I don't know the reason, but he left for

23  a position with Amazon out in Seattle.   I believe

24  Frank Devlin had some input in that because Frank

```
 1    Devlin had left for Amazon and he called Aaron to

 2    come out and work with him.

 3         Q.    And when did Frank Devlin leave?

 4         A.    I don't know.  I don't know the dates

 5    around that.  It was --

 6         Q.    Do you have a rough estimate?

 7         A.    Before Aaron, but really I don't know.

 8         Q.    Do you know, was it shortly before Aaron

 9    in 2013 or was it earlier than that?

10         A.    I don't know.  I'm not sure.

11         Q.    Next document I'm going to show you is

12    CVS 22055 through 61, and it's Exhibit 28.

13                    (WHEREUPON, a certain document was

14                     marked as CVS-Nicastro-028:

15                     10/3/13 e-mail string with

16                     attachments; CVS-MDLT1-000022055 -

17                     000022061.)

18    BY MR. ELSNER:

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

18    Q.    Okay.  And Pamela Hinkle responds.  Who

19    is Pamela Hinkle?

20    A.    She -- her -- she is -- she was LP

21    manager in Knoxville, but she -- I'm not exactly

22    sure what her title is today.  But she was involved

23    with the SOM process.

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15   Q.  Is it customary for the DEA agents to

16 give you copies of their business cards when they

17 begin their audits?

18   A.  Yes.

19   Q.  Who is Daniel Gillen?

20   A.  He was the group supervisor.  Andrew and

21 Michael reported to Dan, the way I understood the

22 relationship.

23   MR. ELSNER:  This next document is Exhibit 34.

24       (WHEREUPON, a certain document was

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked as CVS-Nicastro-034:  8/7/13

 2                    e-mail; CVS-MDLT1-000061606 -

 3                    000061607.)

 4    BY MR. ELSNER:

 5         Q.    This is an e-mail from Pamela Hinkle to

 6    Joseph Scholl.  Who is Pamela Hinkle?

 7         A.    Pamela Hinkle is -- she works out of the

 8    Knoxville DC.  She is in the LP world, loss

 9    prevention world.  But she is heavily involved with

10    DEA compliance.

11

12

13

14

15    BY MR. ELSNER:

16         Q.    Oh, sorry.  I'm sorry.  He describes.

17    Who is Joseph Scholl?

18         A.    Joseph Scholl would have been my loss

19    prevention manager at this time.

20         Q.    Okay.  And he was based in Indianapolis,

21    is that right?

22         A.    Yes.

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



```
 7        Q.    I'm going to show you Exhibit 33.

 8        MR. HYNES:  35.  This was 34.

 9        THE WITNESS:  33 was the handwritten.

10        MR. ELSNER:  Sorry.  35.

11        MR. HYNES:  I would have made that mistake a

12   few times if I was taking the deposition.

13        MR. ELSNER:  Just put 35.  We will go from

14   there.

15                  (WHEREUPON, a certain document was

16                   marked as CVS-Nicastro-035:

17                   Document, "DEA Visit 8/5 - 8/8

18                   2013"; CVS-MDLT1-000008389 -

19                   000008395.)

20   BY MR. ELSNER:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11    BY MR. ELSNER:

12          Q.    That's the process, right?

13          MR. HYNES:  Objection to form.

14    BY THE WITNESS:

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20       MR. HYNES:  I'm going to object on privilege

21   and direct the witness not to answer.

22       MR. ELSNER:  Without asking -- without him

23   revealing precisely what he asked for, I think I'm

24   entitled to know what the general subject matter of

Highly Confidential - Subject to Further Confidentiality Review

1    the inquiry was.

2        MR. HYNES:  It shows he forwarded the e-mail

3    from Gillen, right?

4        MR. ELSNER:  Yes.

5        MR. HYNES:  I mean, if that's your question, I

6    think the answer is yes.  As to what he said to

7    counsel, he is not going to discuss that.

8    BY MR. ELSNER:

9        Q.    Well, I want to know, I want to know in

10   this e-mail, were you asking for legal advice from

11   counsel with respect to this request or were you

12   describing the conference call you had with Agent

13   Gillen and the collection of these documents

14   related to the shipments over the last three years?

15       MR. HYNES:  We are -- objection stands.  We

16   are not going to discuss what he said to counsel in

17   this e-mail.

18       MR. ELSNER:  I think I am entitled to know

19   whether he was asking for legal advice, not asking

20   what the advice, what the advice was he was

21   requesting or if he was describing the factual

22   content of the call he had with them.

23       MR. HYNES:  I think even describing the

24   factual content of the call to them could be a

1    request for legal advice.

2        MR. ELSNER:  I'm going to mark this next

3    document as Nicastro 38.

4                    (WHEREUPON, a certain document was

5                     marked as CVS-Nicastro-038:

6                     11/19/13 e-mail with attachment;

7                     CVS-MDLT1-000076142 - 000076145.)

8    BY MR. ELSNER:

9        Q.    This is a -- this is 76142.  It's

10   Exhibit 38.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



14          Who is Pamela Hinkle at this time?  What

15    position did she hold at CVS?

16      A.    I'm not sure what her title was at this

17    point, but she was very involved with DEA

18    compliance, DEA relationships with all the

19    facilities.

Highly Confidential - Subject to Further Confidentiality Review



```
 1        MR. HYNES:  Objection; asked and answered.

 2   BY MR. ELSNER:

 3        Q.    This is --

 4        MR. ELSNER:  Actually, this may be a good time

 5   for a break.

 6        MR. HYNES:  Okay.

 7        MR. ELSNER:  Why don't we take a quick break.

 8        THE VIDEOGRAPHER:  We are going off the record

 9   at 2:07.

10                  (WHEREUPON, a recess was had

11                   from 2:07 to 2:20 p.m.)

12        THE VIDEOGRAPHER:  We're back on the record at

13   2:20.

14   BY MR. ELSNER:

15        Q.    I'm going to show you Exhibit 41.

16                  (WHEREUPON, a certain document was

17                   marked as CVS-Nicastro-041:

18                   11/21/13 e-mail;

19                   CVS-MDLT1-000076127.)

20   BY MR. ELSNER:

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1        A.    That's -- that was what Mr. Gillen

 2   suggested many times.

 3   BY MR. ELSNER:

 4        Q.    And you believe that if you had more

 5   stopped orders to show him, then he would have been

 6   satisfied that you had a suspicious order

 7   monitoring system in place that was robust,

 8   correct?

 9        MR. HYNES:  Objection to form.

10   BY THE WITNESS:

11        A.    To satisfy him.

12   BY MR. ELSNER:

13        Q.    I'm going to show you Exhibit 42.

14                  (WHEREUPON, a certain document was

15                   marked as CVS-Nicastro-042:

16                   11/21/13 e-mail with attachments;

17                   CVS-MDLT1-000000409 - 000000420.)

18   BY MR. ELSNER:

19        Q.    And this is a copy of the final letter

20   that you e-mailed to Agent Gillen with a cover

21   e-mail.

22                  Do you see that?

23        A.    Yes.

24        Q.    And this is November 21, 2013, right?
```

1      A.     Correct.

2      Q.     And you write, "Hello Dan.  I apologize

3   for all the attachments, but the information I've

4   included provides a clear strategy on how we manage

5   suspicious orders," and then it provides a list of

6   the various things that you were going to provide

7   him, correct?

8      A.     Yes.

9      Q.     And if you switch to the letter on the

10  second page, which is at 410, in the second

11  paragraph, you write, "In our" -- to Mr. Gillen,

12  "In our conversation on November 14," this is the

13  third sentence of the second paragraph, "you had

14  concerns about our SOM process, specifically

15  stating that you were going to report to your

16  program manager in Chicago that we have no

17  reporting structure in place."

18             Is that what you wrote?

19      A.     That's -- that's what I wrote because

20  that's what he said.

21      Q.     Because that's what he said in your

22  conference call on November 14 to you, correct?

23      A.     In our -- yes, yes.  I was thinking we

24  had that conversation during the audit, the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   meeting.

 2             Can I verify that date real quick

 3   from --

 4        Q.    Well, whether it was on the 13th or the

 5   14th, in the letter that's the conversation you are

 6   referring to, right, is that call you had with him

 7   where he expressed concern that you didn't have a

 8   suspicious order monitoring program in place,

 9   correct?

10        A.    Yes.

11        Q.    There was only that one call or were

12   there other calls like that between you and him

13   during this time period?

14        A.    We had many calls.  I couldn't tell you

15   what exactly was on each phone call.  But -- but we

16   did -- we had this conversation.

17        Q.    You had this conversation.  Okay.

18             How many calls did you have with Agent

19   Gillen before you sent this letter concerning the

20   SOM program and his -- and the DEA's concern about

21   CVS' SOM program?

22        A.    The only conversations I would have had

23   with him from the time of our audit would have been

24   from the time of our audit until this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    November 14th.  I hadn't -- I hadn't met Mr. Gillen

 2    before he came in for our audit in August.

 3         Q.    And if you turn to the attachment, among

 4    the attachments to the letter is a list of the stop

 5    orders and the reports to the DEA.  This is on 417,

 6    correct?

 7         A.    Yes.

 8         Q.    Okay.  And this is what you sent to

 9    Agent Gillen in response to his request for a list

10    of all of the stop orders that CVS had made and

11    reports that it had made to the DEA, correct?

12         MR. HYNES:  Objection to form.

13    BY THE WITNESS:

14         A.    That's correct.

15    BY MR. ELSNER:

16         Q.    Okay.  And it lists seven suspicious

17    orders that were stopped, right?

18         A.    Yes, there are seven orders on this

19    document.

20         Q.    The following day, Agent Gillen writes a

21    letter to you.  This is Exhibit 43.

22                    (WHEREUPON, a certain document was

23                    marked as CVS-Nicastro-043:

24                    11/25/13 e-mail string;
```

```
 1              CVS-MDLT1-000000421 - 000000422.)

 2   BY MR. ELSNER:

 3      Q.    And he -- he sends an e-mail to you and

 4   he thanks you for your responses.

 5            Actually, let me have you turn to

 6   page 422.  The e-mail is on the very bottom of 421.

 7   It's an e-mail he sends November 22, 2013.

 8      MR. HYNES:  Starts at the bottom.

 9      MR. ELSNER:  Starts at the bottom of the first

10   page.

11      MR. HYNES:  And goes over.

12      THE WITNESS:  Okay.

13   BY MR. ELSNER:

14      Q.    And then it says --

15      MR. ELSNER:  It's actually a little bit lower,

16   Gina.  It's at the bottom of that.  Am I right

17   about that?  On 421.

18      MR. HYNES:  We got it.  We're good.

19   BY MR. ELSNER:

20      Q.    And then on the 422 he asks, "We were

21   under the impression that sales of controlled

22   substances from your DC location in Indianapolis

23   were for approximately six states in the region but

24   you provided a list of four pharmacies that CVS had
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    stopped shipments to in 2012 and 2013 for

2    California, Texas and Hawaii.  Could you please

3    confirm that these shipments originated from your

4    CVS DC location.  Also by 'stopped' does that mean

5    that no further orders were filled at these

6    pharmacies for controlled substances?  Appreciate

7    the clarification."

8              Did I read that right?

9         A.   You did.

10        Q.   Okay.  And that's what Agent Gillen

11   wrote to you after he received your letter,

12   correct?

13        A.   Correct.

14        Q.   And then you responded to that on

15   November 25, which is on page 421, and you write to

16   him in the second line, "No, those shipments did

17   not originate from the Indianapolis distribution

18   center."  And then you write, "Our SOM algorithms

19   are the same algorithms for all the distributions

20   in the CVS chain."

21              Is that what you wrote?

22        A.   It is.

23        Q.   Okay.  And, so, this attachment that we

24   were looking at of these seven stopped orders are
```

Highly Confidential - Subject to Further Confidentiality Review

1    seven stopped orders not from the Indianapolis

2    distribution center, correct?

3         A.    Correct.

4         Q.    These were all of the stopped orders for

5    all CVS distribution centers across the entire

6    country, right?

7         MR. HYNES:  Objection to form.

8    BY THE WITNESS:

9         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14      Q.    But there were no suspicious orders

15   reported for sales of hydrocodone or other

16   controlled substances into stores in Ohio, is that

17   right?

18      MR. HYNES:  Objection to form.

19   BY THE WITNESS:

20      A.    That -- yes.

21      MR. ELSNER:  Let's see Exhibit 44.

22              (WHEREUPON, a certain document was

23               marked as CVS-Nicastro-044:

24               11/25/13 e-mail;

Highly Confidential - Subject to Further Confidentiality Review

1                    CVS-MDLT1-000076135.)

2    BY MR. ELSNER:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    BY MR. ELSNER:

19

20

21

22            Hydrocodone is a Schedule II --

23    Schedule III narcotic at this point in time,

24    correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     Correct.

2        Q.     And it was later rescheduled --

3        MR. HYNES:  Combination.

4   BY MR. ELSNER:

5        Q.     Combination.  And it was later

6   rescheduled to Schedule II, correct?

7        A.     Yes.

8        Q.     Okay.  And part of the reason for that,

9   it's highly addictive.  Would you agree with that?

10       A.     I don't know the -- I'm not a chemist.

11  I'm not a biologist.  I'm not a pharmacist.  I

12  can't speak to the addictive qualities or -- of the

13  drugs, but...

14            So, would I agree with her or not?  I

15  can't -- I can't agree that it's a highly addictive

16  drug.  I've taken it once for a medical procedure.

17  My wife has taken it for multiple procedures and we

18  didn't become addicted.  That's all I can tell you

19  about hydrocodone.
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12    BY MR. ELSNER:

13        Q.    And you would have supported that

14    rescheduling program, right?

15        A.    Yes.

16        Q.    And this is an e-mail from Pam Hinkle.

17                (WHEREUPON, a certain document was

18                 marked as CVS-Nicastro-051:

19                 8/26/14 e-mail string;

20                 CVS-MDLT1-000003065 - 000003066.)

21    BY MR. ELSNER:

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15     Q.    Okay.  Prior to the rescheduling of

16  hydrocodone by the Federal Government, the State of

17  New York rescheduled hydrocodone, is that right?

18     MR. HYNES:  Objection to form and based on

19  Discovery Ruling 3.  Go ahead.

20  BY THE WITNESS:

21     A.    I'm not aware of that.  I didn't know

22  they did it before the Federal Government.

23  BY MR. ELSNER:

24     Q.    Well, New York is in -- is New York in

1    the region for the Indianapolis distribution center

2    for the distribution of hydrocodone or not?

3         A.    No.  Well, what time frame are we

4    talking about?

5         Q.    In 2012.

6         A.    Okay.  I apologize.  Indianapolis would

7    have been servicing a portion of New York at that

8    time.

9              Well, let me take that back.

10             Yeah, I believe -- if we were still

11   servicing Somerset, kind of qualify it with that,

12   because our Chemung facility was coming up, I'm not

13   sure of the dates, I believe that was 2010, 2011

14   when that facility was built and came online, but

15   I'm not sure when they took over all the New York

16   stores.

17             So, potentially we could have been

18   servicing New York in 2012 out of Indianapolis.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24         Q.    The -- if we go back to Exhibit 46, the
```

Highly Confidential - Subject to Further Confidentiality Review

1    very last -- if we go to the second, sort of the

2    last phrase there starting with "Dan said."

3         And when Agent Gillen heard that CVS was

4    no longer going to distribute hydrocodone, he said

5    that the DEA's main concern with the SOM was

6    hydrocodone.  Is that right?

7         A.    Yes.

8         Q.    Okay.  And then you wrote, "He didn't

9    come right out and say it, but it was picked up by

10   everyone in the room that he was establishing a

11   reason not to escalate this," DEA investigation,

12   "past a letter of admonishment based on that

13   rescheduling."  Correct?

14        MR. HYNES:  Objection to form.  I don't think

15   that's exactly what it says.  You may answer.

16   BY THE WITNESS:

17        A.    Yeah, it was my opinion that he was --

18   because hydrocodone is going to be going to a

19   Schedule II, that there would be no reason to do

20   anything more than a letter of admonishment.  That

21   hadn't been determined at that point.

22   BY MR. ELSNER:

23        Q.    On the following page, you write in the

24   very last sentence, "I'm pretty sure this is a

1   feeling out meeting to see if we were prepared to

2   defend ourselves and Betsy made that crystal

3   clear."

4           Is that right?

5       A.    Correct.

6       Q.    Meaning that she told Agent Gillen that

7   if he proceeds past a letter of admonishment that

8   she was going to request a meeting with his boss

9   and CVS would fight the DEA in court like Walgreens

10  did, correct?

11      MR. HYNES:   Objection to form.

12  BY THE WITNESS:

13      A.    Yeah, this was -- this was my opinion,

14  that -- because the reason for the meeting, it was

15  still to meet with his boss to discuss what they

16  wanted to do, and in my opinion there was really no

17  reason that we had the meeting that week other than

18  maybe for some feeling out of what was -- what

19  would be our position.

20  BY MR. ELSNER:

21      Q.    I'm going to show you Exhibit 53.

22              (WHEREUPON, a certain document was

23              marked as CVS-Nicastro-053:

24              12/31/15 letter from U.S. DOJ DEA

```
 1                    to CVS Indiana; CVS-MDLT1-000008014

 2                    - 000008015.)

 3   BY MR. ELSNER:

 4       Q.    This is a letter from Daniel Gillen from

 5   the DEA, is that right?

 6       A.    Yes.

 7       Q.    The signature line?

 8       A.    Yes.

 9       Q.    And the date of this letter is

10   December 31, 2015, correct?  It's next to his

11   signature.

12       A.    Oh.  Yes.

13       Q.    And this is after the hydrocodone

14   products had been rescheduled, correct?

15       A.    Correct.

16       Q.    So, the DEA left this investigation open

17   from July of 2013 until this final letter in

18   December of 2015, is that right?

19       MR. HYNES:  Objection to form.

20   BY THE WITNESS:

21       A.    That's correct.

22   BY MR. ELSNER:

23       Q.    And Agent Gillen found and the DEA found

24   that as a result of the investigation that there
```

Highly Confidential - Subject to Further Confidentiality Review

1    was a violation of the Controlled Substances Act.

2              Do you see that at the end of the first

3    paragraph?

4         A.    Yes.

5         Q.    Okay.  And you're aware, are you not,

6    that he found and the DEA determined that there was

7    a "Failure to design and maintain a system to

8    detect suspicious and report suspicious orders for

9    Schedule III to V controlled substances" as

10   required under the Controlled Substances Act,

11   correct?

12        A.    Correct.

13        Q.    And -- okay.

14        MR. ELSNER:  At this time I'm going to go off

15   the record.

16        THE VIDEOGRAPHER:  We are going off the record

17   at 4:17.

18                   (WHEREUPON, a recess was had

19                   from 4:17 to 4:22 p.m.)

20        THE VIDEOGRAPHER:  We're back on the record at

21   4:22.

22                        EXAMINATION

23   BY MR. DeROCHE:

24        Q.    Good afternoon, Mr. Nicastro.  My name

1    is Jim DeRoche.  I just have a few follow-up

2    questions for you based on earlier testimony.

3              First of all, when you started with CVS,

4    you were in Somerset, Pennsylvania?

5         A.    Correct.

6         Q.    Is that correct?  What is that facility?

7         A.    It's a distribution center for CVS.

8    It's a smaller than Indianapolis.

9         Q.    What did it distribute?

10        A.    It distribute front store product

11   basically.  So, any product, almost any product you

12   see in a CVS store.

13        Q.    So, the front of store products included

14   things like ephedrine and pseudoephedrine, is that

15   correct?

16        A.    Pseudo -- what time frame are we talking

17   about?

18        Q.    The time frame when you were working

19   there.

20        MR. HYNES:  I'm objecting based on Discovery

21   Ruling 2.

22   BY MR. DeROCHE:

23        Q.    You can answer.

24        A.    I -- I don't remember if that was an

1    item that we carried or an item that was delivered

2    to us from Indianapolis.

3              So, Indianapolis delivered our pharmacy

4    product each day, but they also delivered what we

5    call centrally warehoused items, and that's about

6    10,000 items that they carry that we don't carry.

7    And they would deliver those.

8              And I -- I don't remember if the

9    pseudoephedrine was part of our inventory or part

10   of Indianapolis' inventory.

11        Q.   Well, I guess --

12        A.   Before it was regulated I think is what

13   we are talking about?



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
```

4      Q.    And you understand what a license is,

5   right?

6      A.    I do.

7      Q.    You have a driver's license, right?

8      A.    Correct.

9      Q.    You have to -- you understand you have

10  to meet certain requirements in order to keep your

11  license, correct?

12     A.    Yes.

13     Q.    Just like a driver's license, the DEA

14  license is the same thing, right?

15     A.    Correct.

16     Q.    Okay.  And the requirements included the

17  design and operation of a system that was intended

18  to disclose suspicious orders to the DC, correct?

19     MR. HYNES:  Objection to form.

20  BY THE WITNESS:

21     A.    That's correct.

22  BY MR. DeROCHE:

23     Q.    And that requirement was in place when

24  you took over at Indianapolis, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    And that is, in fact, one of the primary

3   requirements for the Indianapolis DC to keep its

4   DEA license, correct?

5        MR. HYNES:  Objection to form.

6   BY THE WITNESS:

7        A.    There were many -- there are many

8   requirements for us to keep our -- keep our

9   license.

10  BY MR. DeROCHE:

11       Q.    That was an important requirement, was

12  it not?

13       MR. HYNES:  Objection to form.

14  BY THE WITNESS:

15       A.    It's important as there were many

16  important requirements.

17  BY MR. DeROCHE:
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1    process for you, right?

 2        A.    It was a daylight process, day shift

 3    process.

 4        Q.    You didn't get orders overnight and have

 5    to fill them overnight?

 6        A.    No.  No, we only filled control drugs on

 7    one shift in an eight-hour period.

 8        Q.    Okay.  And that was during the day?

 9        A.    Yes.

10        Q.    And you were fulfilling orders from a

11    thousand-odd stores in the Indianapolis

12    distribution center, right?

13        A.    Per week, yes.

14        Q.    Per week.  Well, every day, right?

15        MR. HYNES:  Objection.

16    BY THE WITNESS:

17        A.    No, it was a thousand stores -- a little

18    over a thousand stores in total.

19    BY MR. DeROCHE:

20        Q.    In total that you were servicing?

21        A.    Correct.

22        Q.    Right.  And how many folks worked in the

23    control cage at the distribution center in

24    Indianapolis?
```

1      A.    Approximately eight.

2      Q.    And so you had eight of these pickers

3  and packers at any one time, is that correct?

4      A.    Yes.

5      Q.    Did they all work every day or were

6  there three or four and you spread out the shifts?

7      A.    No.  We only ran that department on one

8  shift, day shift, and those eight folks were our

9  controlled substance pickers and packers and

10 checkers.

11     Q.    Okay.  And in 2008 when you came in, how

12 long had those folks been working for CVS that were

13 working in that position?

14     MR. HYNES:  Objection to form.

15 BY THE WITNESS:

16     A.    I can't tell you the -- all their

17 seniority dates at that point.  What I can tell you

18 is most of those folks were more tenured

19 associates.  And even today I still have one -- two

20 associates in that department that are still there

21 today from when I came in in 2008.

22 BY MR. DeROCHE:

23     Q.    And, so, the process that they followed

24 when they were picking these controlled substances

Highly Confidential - Subject to Further Confidentiality Review

1    that you were then going to ship to Somerset, what

2    was the actual process that they followed?

3              Why don't you explain that to me.  I'm

4    talking about 2008.

5        A.    They would -- they would go through and

6    pick the orders and they would review the orders

7    for anything of unusual size.

8              These were our experts.  They were in

9    the cage every single day.  They picked these

10   orders every single day.  And they are going to be

11   the best -- have the most knowledge as to whether

12   an order seems unusual size or pattern.

13       Q.    For a particular store, in other words,

14   they had to have a knowledge of what the store had

15   ordered in the past for these thousand stores?

16       A.    They had a general knowledge of how many

17   bottles they would pick for any particular store.

18       Q.    I mean, you have a wide range of

19   controlled substances that would go to your stores,

20   wouldn't you?

21       A.    It's a small number of items that we

22   have in our control cage.

23       Q.    I'm not talking about the items.  I'm

24   talking about the range of the number of orders

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11      Q.    What did they have access to in terms of

12    information that would help them be efficient

13    spotters of suspicious orders as required by the

14    DEA?

15      MR. HYNES:  Objection to form.

16    BY MR. DeROCHE:

17      Q.    What did they have?

18      A.    Their knowledge.  We relied on them to

19    use their experience to flag anything that looked

20    suspicious to them, and they would -- they would

21    escalate those to their pharmacy supervisor or

22    manager, and they would take it from there.

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17      Q.    You can answer, sir.

18      A.    Our -- if patterns or frequencies were

19  to change, that would have been flagged with our --

20  our stores order once a week with the exception of

21  a handful of stores that order twice a week.  So,

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1   BY MR. DeROCHE:

 2       Q.    Were the pickers and packers provided

 3   any kind of training, specific training, as to

 4   suspicious order monitoring and how to flag orders?

 5       MR. HYNES:  Objection; asked and answered --

 6   BY MR. DeROCHE:

 7       Q.    That you can recall.

 8       MR. HYNES:  -- by Mr. Elsner.  Go ahead.

 9   BY THE WITNESS:

10       A.    We -- they were trained when they went

11   into the department by the pharmacy supervisor or

12   manager as to what to look for and then with the

13   other experienced pickers in that area.

14             So, if we had a new person go in, they

15   would, you know, learn from their -- from the --

16   what we showed them from the pharmacy supervisor or

17   manager and then from the rest of the team that was

18   in there.

19             Again, it was a very small team of, you

20   know, tenured folks that knew the process.

21   BY MR. DeROCHE:

22       Q.    Was there any kind of quality control

23   that was undertaken with respect specifically to

24   the suspicious order monitoring activities of the
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4      MR. DeROCHE:  Give me a moment to review my

5  notes.  I think I may be done.

6      THE VIDEOGRAPHER:  Do you want to go off the

7  record?

8      MR. DeROCHE:  Let's go off the record, yeah.

9  Sorry.

10      THE VIDEOGRAPHER:  We're going off the record

11  at 4:56.

12            (WHEREUPON, a recess was had

13             from 4:56 to 4:59 p.m.)

14      THE VIDEOGRAPHER:  We're back on the record at

15  4:59.

16      MR. DeROCHE:  Mr. Nicastro, I have nothing

17  further.  Thank you for your time.

18      THE WITNESS:  Thanks.

19      MR. DeROCHE:  Off the record.

20      THE VIDEOGRAPHER:  Going off the record at

21  4:59.

22            (WHEREUPON, the following

23             proceedings were had off the video

24             record:)

Highly Confidential - Subject to Further Confidentiality Review

1    THE REPORTER:  Signature?  Do you read and

2  sign?

3    MR. HYNES:  Yes.

4         (Time Noted:  4:59 p.m.)

5       FURTHER DEPONENT SAITH NAUGHT.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1
                I, CORINNE T. MARUT, C.S.R. No. 84-1968,
 2      Registered Professional Reporter and Certified
        Shorthand Reporter, do hereby certify:
 3              That previous to the commencement of the
        examination of the witness, the witness was duly
 4      sworn to testify the whole truth concerning the
        matters herein;
 5              That the foregoing deposition transcript
        was reported stenographically by me, was thereafter
 6      reduced to typewriting under my personal direction
        and constitutes a true record of the testimony
 7      given and the proceedings had;
                That the said deposition was taken
 8      before me at the time and place specified;
                That the reading and signing by the
 9      witness of the deposition transcript was agreed
        upon as stated herein;
10              That I am not a relative or employee or
        attorney or counsel, nor a relative or employee of
11      such attorney or counsel for any of the parties
        hereto, nor interested directly or indirectly in
12      the outcome of this action.
13
                _____
14              CORINNE T. MARUT, Certified Reporter
15
                (The foregoing certification of this
16      transcript does not apply to any
        reproduction of the same by any means, unless under
17      the direct control and/or supervision of the
        certifying reporter.)
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.  You

 5   should state the reason in the appropriate space on

 6   the errata sheet for any corrections that are made.

 7              After doing so, please sign the errata

 8   sheet and date it.

 9              You are signing same subject to the

10   changes you have noted on the errata sheet, which

11   will be attached to your deposition.

12              It is imperative that you return the

13   original errata sheet to the deposing attorney

14   within thirty (30) days of receipt of the

15   deposition transcript by you.  If you fail to do

16   so, the deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -  -  -  -

                      E R R A T A

 2                    -  -  -  -  -  -

 3

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6                 REASON: _____

 7   _____  _____  _____

 8                 REASON: _____

 9   _____  _____  _____

10                 REASON: _____

11   _____  _____  _____

12                 REASON: _____

13   _____  _____  _____

14                 REASON: _____

15   _____  _____  _____

16                 REASON: _____

17   _____  _____  _____

18                 REASON: _____

19   _____  _____  _____

20                 REASON: _____

21   _____  _____  _____

22                 REASON: _____

23   _____  _____  _____

24                 REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
                IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
 3
 4     ------------------------    )
       IN RE: NATIONAL             ) MDL No. 2804
 5     PRESCRIPTION OPIATE         )
       LITIGATION                  ) Case No.
 6     ------------------------    ) 1:17-MD-2804
                                   )
 7     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster
       ALL CASES                   )
 8     ------------------------    )
 9
                         ACKNOWLEDGMENT
10
             I, MARK NICASTRO, the undersigned,
11     being first duly sworn, on oath say that
       the testimony given at my deposition at the time
12     and place aforesaid is the truth, the whole truth,
       and nothing but the truth, and that I have read the
13     foregoing transcript consisting of Pages 1 to 331
       inclusive, and do subscribe and make oath that the
14     same is a true, correct, and complete transcript of
       my deposition so given as aforesaid, and includes
15     changes, if any, so made by me.
16
17
                          _____
18
                          MARK NICASTRO
19
20     SUBSCRIBED AND SWORN TO before me
21     this     day of      , A.D. 20 .
22     _____
23     Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                           LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```