Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

                          -   -   -

 3

    IN RE:  NATIONAL           :  HON. DAN A. POLSTER

 4  PRESCRIPTION OPIATE        :

    LITIGATION                 :

 5                             :

    APPLIES TO ALL CASES       :  NO.

 6                             :  1:17-MD-2804

 7              - HIGHLY CONFIDENTIAL -

 8      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

 9                      -   -   -

                    January 9, 2019

10                      -   -   -

11

12              Videotaped sworn deposition of

13          RITA NORTON, taken pursuant to notice,

14          was held at REED SMITH LLP, Three Logan

15          Square, 1717 Arch Street, Suite 3100,

16          Philadelphia, Pennsylvania, beginning at

17          9:44 a.m., on the above date, before

18          Margaret M. Reihl, a Registered

19          Professional Reporter, Certified

20          Shorthand Reporter, Certified Realtime

21          Reporter, and Notary Public.

22                      -   -   -

23          GOLKOW LITIGATION SERVICES

       877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```



**Page 2**

1  A P P E A R A N C E S :
2
3  BARON & BUDD, P.C.
   BY: STERLING L. CLUFF, ESQUIRE
4      JAY LICHTER, ESQUIRE (telephonically)
   Encino Plaza
5  15910 Ventura Boulevard, Suite 1600
   Encino, California 91436
6  (818) 839-2333
   scluff@baronbudd.com
7  Representing the Plaintiffs
8
9  BLASINGAME BURCH GARRARD ASHLEY, P.C.
   BY: ALEXANDRA HUGHES, ESQUIRE
10 440 College Avenue, Suite 320
   Athens, Georgia 30601
11 (706) 354-4000
   ahughes@bbga.com
12 Representing the Plaintiffs
13
14 THE CREADORE LAW FIRM PC
   BY: DONALD E. CREADORE, ESQUIRE
15 450 Seventh Avenue, 14th Floor
   New York, New York 10123
16 (212) 355-7200
   www.donald@creadorelawfirm.com
17 Representing AMH in U.S. District
   Court, Western District of NY
18 Docket 1:18-cv-01018
19
   REED SMITH LLP
20 BY: ROBERT A. NICHOLAS, ESQUIRE
       JOSEPH J. MAHADY, ESQUIRE
21 Three Logan Square
   1717 Arch Street, Suite 3100
22 Philadelphia, Pennsylvania 19103
   (215) 851-8100
23 rnicholas@reedsmith.com
   jmahady@reedsmith.com
24 Representing the Defendant AmerisourceBergen

**Page 3**

1
2
3  JONES DAY
   BY: TAYLOR A. GOODSPEED, ESQUIRE
   555 California Street, 26th Floor
4  San Francisco, California 94104-1500
   (415) 626-3939
5  tgoodspeed@jonesday.com
   Representing the Defendant Wal-Mart
6
7
8  WILLIAMS & CONNOLLY LLP
   BY: KATELYN ADAMS, ESQUIRE
   725 Twelfth Street, N.W.
9  Washington, D.C. 20005
   (202) 434-5091
10 kadams@wc.com
   Representing the Defendant,
11 Cardinal Health
12
13 COVINGTON & BURLING LLP
   BY: GABRIEL E. FULMER, ESQUIRE
14 One CityCenter
   850 Tenth Street, NW
15 Washington, DC 20001-4956
   (202) 662-5769
16 gfulmer@cov.com
   Representing the Defendant McKesson
17
18
19 ALSO PRESENT:
20     CHRISTOPHER CASALENUOVO,
       ASSISTANT GENERAL COUNSEL,
21     AmeriSourceBergen
22     ABIGAIL PIERCE
23     BILL GEIGERT, VIDEOGRAPHER
24

**Page 4**

1  A P P E A R A N C E S :  (telephonic/stream)
2
3  ALLEGAERT BERGER & VOGEL LLP
   BY: MICHAEL VOGEL, ESQUIRE
       DAVID SHAIMAN, ESQUIRE
4      LAUREN PINCUS, ESQUIRE
   111 Broadway, 20th Floor
5  New York, New York 10006
   (212) 616-7050
6  callegaert@abv.com
   Representing the Defendant,
7  Rochester Drug Co-operative, Inc.
8
9  ARNOLD & PORTER KAYE SCHOLER LLP
   BY: HEATHER A. HOSMER, ESQUIRE
10 601 Massachusetts Avenue, NW
   Washington, DC 20001-3743
11 (202) 942-6208
   heather.hosmer@arnoldporter.com
12 Representing the Defendants, Endo
   Health Solutions; Par
13 Pharmaceuticals, Inc.; Par
   Pharmaceutical Companies, Inc. f/k/a
14 Par Pharmaceutical Holdings, Inc.
15
16 FOX ROTHSCHILD LLP
   BY: JACOB S. PERSKIE, ESQUIRE
17 1301 Atlantic Avenue
   Midtown Building, Suite 400
18 Atlantic City, New Jersey 08401-7212
   (609) 572-2225
19 jperskie@foxrothschild.com
   Representing the Defendant
20 Validus Pharmaceuticals
21
22
23
24

**Page 5**

1  A P P E A R A N C E S :  (telephonic/stream)
2
3  BAILEY & WYANT, PLLC
   BY: JUSTIN C. TAYLOR, ESQUIRE
       MICHAEL W. TAYLOR, ESQUIRE
4  Suite 600
   500 Virginia Street East
5  Charleston, West Virginia 25301
   (304) 720-0714
6  jtaylor@baileywyant.com
   Representing West Virginia Board
7  of Pharmacy
8
9  CLARK MICHIE LLP
   BY: CHRISTOPHER J. MICHIE, ESQUIRE
10 220 Alexander Street
   Princeton, New Jersey 08540
11 (609) 423-2142
   chris.michie@clarkmichie.com
12 Representing Pernix Therapeutics
   Holdings, Inc.
13
14
15         – – –
16
17
18
19
20
21
22
23
24

Page 6

I N D E X
WITNESS                          PAGE
RITA NORTON
    By Mr. Cluff          9
    By Mr. Creadore          357

E X H I B I T S

AmerisourceBergen-Norton Exhibits          PAGE
1     E-mail string, top one dated
      4/16/18, Subject Re: Walgreens
      Hosted McCarthy Fundraiser
      [WAGMDL00646203 through 6204]     117

2     Redacted e-mail string, top one
      dated 10/16/15, Subject RE: TIME
      SENSITIVE: White House/ONDCP
      Request
      [ABDCMDL00251549 through 1550]     134

3     E-mail string, top one dated
      1/16/14, Subject, FW: HDMA Update
      [ABDCMDL00276999 through 7000]     157

4     E-mail string, top one dated
      1/31/08, Subject, RE: DEA's
      probe slowing Cardinal
      [PPLP004301234 through 1237]     171

5     Pain Care Forum, 2012 Meetings
      Schedule
      (last updated December 2011)
      no Bates          184

6     E-mail string, top one dated
      10/17/17, Subject, Re: Check In
      Follow Ups
      [ABDCMDL00367642 through 7643]     199

7     E-mail string, top one dated
      12/7/17, Subject, T/I Questions
      [HDA_MDL_000030946 through 0947]     211

Page 7

E X H I B I T S (cont'd)
AmerisourceBergen-Norton Exhibits          PAGE

8     E-mail string, top one dated
      12/27/16, Subject, FW: Industry
      talking points
      [ABDCMDL00161397 through 1402]     225

9     HDMA CEO Quarterly Update --
      December 2006 dated 12/22/06
      [MCKMDL00615139 through 5143]     236

10    E-mail string, top one dated
      5/30/07, Subject, CONFIRMED HDMA
      Conference Call on DEA Issues
      [HSI-MDL-00620224 through 0229]     245

11    E-mail dated 6/5/07, with
      attachments, Subject, Next RAC
      Teleconference; Meeting Agenda
      Subjects
      [HDS-MDL-00317399 through 7425]     251

12    E-mail dated 10/2/07, with attachment
      Subject, FW: HDMA DEA Strategy
      Meeting Request
      [HDS_MDL_001367 through 6794]     257

13    **Skipped

14    E-mail dated 3/1/12, Subject,
      Hearion(sic) today on
      Drug Diversion
      [MCKMDL00652338]          278

15    E-mail dated 4/26/13, Subject,
      HDMA Legislative Strategy
      Meeting Agenda-Discussion
      Questions
      [HDS_MDL_00388635 through 8638]     284

16    E-mail string, top one dated
      8/2/17, Subject, FW: Proposed
      Meeting with DEA
      [ABDCMDL00322436 through 2437]     297

Page 8

E X H I B I T S (cont'd)
AmerisourceBergen-Norton Exhibits          PAGE

17    E-mail string, top one dated
      8/2/17, Subject, RE: Proposed
      Meeting with DEA
      [ABDCMDL00156582 through 6584]     301

18    E-mail string, top one dated
      11/9/17, Subject, Re: Brain
      Storming Session
      [PPLPC01800147198 through 7200]     306

19    E-mail string, top one dated
      6/3/16, Subject, RE: 10%
      assessment on first sale of
      Opioid
      [ABDCMDL00160553 through 0556]     315

20    Handwritten notes
      [ABDCMDL00375376 through 5379]     322

21    E-mail string, top one dated
      10/17/17, Subject, Re:
      Legislative solution
      [ABDCMDL00157014]          326

22    E-mail string, top one dated
      9/15/14, Subject, RE: Pharmacy-
      Opioid Abuse Prevention Coalition
      Followup
      [ABDCMDL00277296 through 7298]     330

23    E-mails dated 3/24/14, Subject,
      RE: Coordination call today?
      [MCKMDL00652447 through 2448]     333

24    E-mails dated 4/19/18, Subject,
      Fwd: Wyden's opening statement
      [ABDCMDL00367355 through 7356]     342

25    E-mail string, top one dated
      10/21/17, Subject, FW: More
      on PhRMA -- for your CEO
      [ABDCMDL00367840 through 7841]     346

Page 9

1     THE VIDEOGRAPHER:  Good morning.
2 We are now on the record.  My name is
3 Bill Geigert, I'm a videographer for
4 Golkow Litigation Services.  Today's
5 date is January 9th, 2019, and the time
6 is 9:44 a.m.
7     This video deposition is being
8 held in Philadelphia, Pennsylvania In
9 Re: National Prescription Opiate
10 Litigation MDL Number 2804.
11     Counsel will be noted on the
12 stenographic record.  The deponent is
13 Rita Norton.  The court reporter is Peg
14 Reihl, and she will now swear in the
15 witness.
16     ... RITA NORTON, having been duly
17 sworn as a witness, was examined and
18 testified as follows:
19 BY MR. CLUFF:
20     Q.     Good morning, Ms. Norton, we
21 introduced ourselves earlier, my name is
22 Sterling Cluff.  I work for a law firm called
23 Baron & Budd, and we represent numerous
24 plaintiffs in this MDL litigation, and I'll be

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 taking your deposition today.
2 Do you understand the oath and
3 everything that you just took?
4 A. Yes.
5 Q. Okay. Have you ever had your
6 deposition taken before?
7 A. No.
8 Q. Okay. Have you ever given
9 testimony in any proceedings where you were
10 under oath before?
11 A. No.
12 Q. I'm sure in preparation for
13 today's deposition, your counsel explained sort
14 of the rules of the road on how a deposition
15 proceeds, but just so that we're all kind of
16 clear about what those perimeters are today, I'd
17 like to run through what we kind of call
18 admonitions sometimes before a deposition.
19 One of them is that of course you
20 are under oath, and so you've agreed to tell the
21 truth to the best of your recollection.
22 So do I have your agreement to do
23 that today?
24 A. Yes.

Page 11

1 Q. Okay. Another admonition we talk
2 about is that we would request that you not
3 guess about any information that you're asked
4 about today, but I am entitled to your best
5 recollection or your best estimate.
6 So if you don't know some
7 information, I would tell you not to guess at
8 what it may or may not be, but if you have some
9 recollection, you can tell me that.
10 Does that make sense?
11 A. Yes.
12 Q. From time to time I may
13 misunderstand your answers or my question may
14 not be clear and so I might ask you to rephrase
15 an answer or I might ask a follow-up question to
16 get some clarification, especially where it's
17 not clear if your answer is based on
18 recollection or you're guessing.
19 Does that make sense?
20 A. Yes.
21 Q. Okay. Because we're entitled to
22 your best recollection, sometimes I'll ask
23 questions that go towards your qualifications to
24 give an answer. One of those is going to come

Page 12

1 up right now, and it's not meant to be
2 insensitive, but do you have any health issues
3 that would prevent you from telling the truth or
4 fully testifying here today?
5 A. No.
6 Q. Are you on any medication that
7 might prevent you from telling the truth or
8 giving a full deposition today?
9 A. No.
10 Q. From time to time you might be a
11 little confused by a question or your counsel
12 and I might have a conversation that leads you
13 to not remember what the question was. If
14 you're ever unclear about what a question is or
15 you don't remember what the question was, you
16 can ask me for clarification and I'll be happy
17 to give you a clarification to the best of my
18 ability.
19 Does that make sense?
20 A. Yes.
21 Q. Okay. Do you understand today
22 that you are here testifying on behalf of
23 AmerisourceBergen?
24 A. Yes.

Page 13

1 Q. How long have you worked at
2 AmerisourceBergen?
3 A. Fourteen years.
4 Q. I'm not super good with the
5 maths, so would that mean that you joined the
6 company in approximately 2004?
7 A. Yes.
8 Q. And when you joined
9 AmerisourceBergen, what was your official title?
10 A. Vice president government
11 affairs.
12 Q. Is that still your title today?
13 A. No.
14 Q. What is your title today?
15 A. Senior vice president government
16 and public policy.
17 Q. So it sounds like at some point
18 in time you received a promotion?
19 A. Yes.
20 Q. Was there a change in your
21 responsibilities from vice president to senior
22 vice president?
23 A. Just taking on the policy
24 function, which is a new function for the

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 company.
2      Q.   The policy function is public
3 policy, correct?
4      A.   Yes.
5      Q.   Okay. So it sounds like
6 currently you have two job responsibilities,
7 government affairs and public policy?
8      A.   Yes.
9      Q.   Okay. When did that promotion
10 take place?
11      A.   Approximately four years ago.
12      Q.   So approximately 2014?
13      A.   Yes.
14      Q.   So before 2013 as the vice
15 president of government affairs, how would you
16 describe your responsibilities at
17 AmerisourceBergen?
18      A.   Well, I run the Washington
19 office, and I'm responsible for federal and
20 state government affairs, so advocacy and
21 educating our associates as well as our elected
22 officials who represent the company on the
23 business and keeping our associates and our
24 executives informed about what -- what policies

Page 15

1 are before the state and federal governments.
2      Q.   You mentioned that you run the
3 Washington office. Is that something that you
4 still do after you received your promotion?
5      A.   Yes.
6      Q.   What kind of office does
7 AmerisourceBergen have in Washington?
8      A.   We have a small office of six --
9 there's six of us, and three of us are federal
10 registered lobbyists, and then we have a manager
11 who is an office manager, an admin, and that's
12 it. And the -- sorry -- vice president of
13 policy.
14      Q.   So a total of six employees; is
15 that right?
16      A.   That's in Washington. And then
17 we have two remote employees who are state
18 government affairs lobbyists.
19      Q.   What office do those employees
20 work at?
21      A.   Out of their homes.
22      Q.   You referred to those employees
23 as state government affairs employees. Is that
24 different than the people who work in the

Page 16

1 Washington office?
2      A.   Just that their responsibility is
3 to monitor the state capitals, the state
4 legislatures versus where we focus more on
5 the -- on Washington and the federal legislature
6 and administration.
7      Q.   When you say "we," you mean to
8 the "we" as in the employees in the DC office,
9 right?
10      A.   Yes.
11      Q.   Who are the individuals in the
12 Washington office that are registered lobbyists?
13      A.   In addition to myself, Beth
14 Mitchell, Brad Tallamy and Ashley O'Sullivan.
15      Q.   When you counted six employees at
16 the Washington office, were you counting
17 yourself?
18      A.   Yes.
19      Q.   Okay. Who is the VP of policy
20 that you mentioned?
21      A.   Stacie Heller.
22      Q.   Okay. And who are the two
23 employees that work remotely on state government
24 affairs?

Page 17

1      A.   John Benske and Pete Stokes.
2      Q.   How do you spell Mr. Benske's
3 name?
4      A.   B, like boy, e-n-s-k-e.
5      Q.   You mentioned that part of your
6 job responsibilities in the government affairs
7 region was to be responsible for federal and
8 state affairs.
9         What does that mean?
10      A.   So we are primarily, as I said,
11 responsible for monitoring the legislative and
12 policies that the state and federal governments
13 are developing and reporting that back to our
14 employees and our executives, and our other
15 primary responsibility is to educate legislators
16 who represent our operations around the country
17 so they know who we are, they understand our
18 business, and we provide -- we serve as a
19 resource to them. So if they have questions
20 about how the pharmaceutical supply chain works
21 or distribution, we can supply that.
22      Q.   You earlier mentioned advocacy as
23 one of the elements of your responsibilities or
24 your work in the federal and state government

Page 18

1 affairs.
2        What is -- what would you -- how
3 would you describe the advocacy portion of your
4 work?
5        A.    Advocacy is kind of a standard
6 term that's used in all government operations.
7 I mean, everybody has an advocacy to represent
8 them with legislators as they work on the laws,
9 making the laws that govern our country and our
10 business and our personal lives, and so advocacy
11 means we educate.
12        Q.    So in the legal field we use the
13 term advocate as well, and when I'm an advocate
14 for my client, I'm working on behalf of my
15 client, like for my client's interests.
16        Do that make sense?
17        A.    Yes.
18        Q.    Is that the same way that the
19 word is used in your work?
20        MR. NICHOLAS:  Object to the
21 form.
22        THE WITNESS:  Well, we represent
23 our company and help educate, as I said,
24 policy makers so they understand our

Page 19

1        business and some of the complexities of
2        our business.
3 BY MR. CLUFF:
4        Q.    And when you say your business,
5 you refer to AmerisourceBergen, correct?
6        A.    Yes, AmerisourceBergen.
7        Q.    So in your work when you're
8 advocating, you're advocating for policies that
9 are supported by AmerisourceBergen?
10        MR. NICHOLAS:  Object to the
11 form.
12        THE WITNESS:  Generally or our
13 customers.
14 BY MR. CLUFF:
15        Q.    Who are AmerisourceBergen's
16 customers?
17        A.    Pharmacists, hospitals,
18 manufacturers, patients.  I mean, we serve
19 everybody who receives pharmaceuticals.
20        Q.    So one of the things that you're
21 doing in your work is advocating on behalf of
22 AmerisourceBergen's customers as well?
23        A.    Yes.
24        MR. NICHOLAS:  Object to the

Page 20

1        form.
2 BY MR. CLUFF:
3        Q.    That's another admonition I
4 forgot to give, I'm sorry.  So we have a video
5 recording happening today, and we're also going
6 to get a transcription of everything that's
7 said, and so in order to get a clean record, a
8 clean written record, it's important that you
9 and I and Bob all let each other have a chance
10 to finish our questions and answers.  So after I
11 ask you a question, give Bob a second or two or
12 your counsel a second or two to interpose any
13 objections that he might have.
14        A.    Okay.
15        Q.    I'll do my best to give you the
16 same courtesy and let you finish your answers
17 before I ask another question.
18        A.    Okay.  Veterinarians are our
19 customers too.
20        Q.    Okay.  So that's -- veterinarians
21 would be included in the list of customers that
22 AmerisourceBergen works with, okay.
23        Earlier you mentioned that part
24 of your work, in addition to advocacy, was

Page 21

1 educating AmerisourceBergen's associates.
2        How does your work involve
3 educating AmerisourceBergen's associates?
4        A.    So we develop e-mails and we have
5 in our company website a link so that they can
6 learn about --
7        MR. CLUFF:  Hold on one second.
8 Could we turn the phones off, please.
9        THE WITNESS:  So that they can
10 get updated and have information about
11 policies that impact our business and
12 our customers.
13 BY MR. CLUFF:
14        Q.    Does your office ever do any
15 in-person training with AmerisourceBergen
16 associates?
17        A.    No.
18        Q.    Have you ever conducted any
19 webinars or seminars with AmerisourceBergen
20 associates?
21        A.    In a limited sense.
22        Q.    How so?
23        A.    Well, we don't participate in
24 company-wide type educational like our HR

Page 22

1 department, for example. We just have set our
2 asset times to provide updates on issues that we
3 provide for interested associates.
4    Q.    When you use the word
5 "associates," were you referring to sort of rank
6 and file AmerisourceBergen associates or anybody
7 employed by AmerisourceBergen?
8    A.    Anybody employed by
9 AmerisourceBergen. AmerisourceBergen refers
10 their employees as associates.
11    Q.    Understood. Thank you for the
12 clarification.
13       So in educating
14 AmerisourceBergen's associates then, you would
15 have been responsible for educating people like
16 Steven Collis?
17       MR. NICHOLAS: Object to the
18    form.
19       THE WITNESS: Yes.
20 BY MR. CLUFF:
21    Q.    How about AmerisourceBergen's
22 Executive Committee?
23    A.    Yes.
24    Q.    You also referred to advocacy and

Page 23

1 educating AmerisourceBergen's associates as well
2 as its elected officials.
3       What did you mean by
4 AmerisourceBergen's elected officials?
5    A.    So we have operations throughout
6 the country because we distribute
7 pharmaceuticals anywhere in the country within
8 12 hours. So we are constituents of many
9 elected officials around the country. So as
10 their constituent, we -- they look to us to help
11 them understand, sometimes visit our businesses.
12    Q.    AmerisourceBergen can't vote in
13 elections, can it?
14       MR. NICHOLAS: Object to the
15    form.
16       THE WITNESS: As a company?
17 BY MR. CLUFF:
18    Q.    Mm-hmm.
19    A.    No.
20    Q.    Okay. So how are you a
21 constituent of an elected official?
22       MR. NICHOLAS: Object to the
23    form.
24       THE WITNESS: Well, the

Page 24

1 associates who live and work at these
2 operations are constituents, so elected
3 official considers the business
4 operations in their districts to be
5 constituents.
6 BY MR. CLUFF:
7    Q.    Does AmerisourceBergen make
8 campaign contributions to the elected officials
9 where it does business?
10       MR. NICHOLAS: Object to the
11    form.
12       Go ahead.
13       THE WITNESS: Corporate
14    contributions?
15 BY MR. CLUFF:
16    Q.    Yeah.
17    A.    So we do, in a very limited
18 situations for states that do not accept PAC
19 contributions, we do make small, limited
20 corporate contributions, but it's a very nominal
21 amount.
22    Q.    AmerisourceBergen then also makes
23 contributions through a PAC?
24    A.    Yes.

Page 25

1    Q.    And what does a PAC stand for,
2 just so we have it on the record?
3    A.    A PAC is a political action
4 committee, which were formed in the '70s by the
5 government to allow employees of companies to
6 pool their resources to help educate elected
7 officials who represent them or who have an
8 interest in learning about their business.
9    Q.    And so AmerisourceBergen has a
10 PAC that it uses to make contributions to its
11 elected officials?
12    A.    Yes, to -- we make a budget every
13 year and we have a PAC for it, and we have -- we
14 make contributions to elected officials.
15    Q.    You mentioned that part of your
16 responsibilities were educating elected
17 officials who represent the company on the
18 business.
19       What did you mean when you said
20 that the elected officials who represent the
21 company?
22       MR. NICHOLAS: Object to the
23    form.
24       THE WITNESS: So, as I mentioned,

Page 26

1  we have operations in more than half the
2  states, so we have a constituent
3  presence in many congressional
4  districts, so that is one of our primary
5  focuses of education is on legislators
6  who represent us, in addition to
7  legislators who have jurisdiction over
8  issues that are -- affect healthcare.
9  BY MR. CLUFF:
10  Q.    Do you understand that there are
11  some elected officials who represent
12  AmerisourceBergen?
13       MR. NICHOLAS:  Object to the
14  form.
15       THE WITNESS:  I don't understand
16  the question.
17  BY MR. CLUFF:
18  Q.    Sure.  I'll rephrase it or I'll
19  explain it.
20       We were talking earlier about
21  your job responsibilities, and, you know, I kind
22  of asked you to generally describe them, and one
23  of the things you said was that you advocate and
24  educate our associates as well as our elected

Page 27

1  officials who represent the company.
2       So my question is does
3  AmerisourceBergen have elected officials who
4  represent it?
5       MR. NICHOLAS:  Same objection to
6  the form.
7       THE WITNESS:  AmerisourceBergen
8  has associates who reside in
9  congressional districts, and elected
10  officials represent those associates or
11  employees.
12  BY MR. CLUFF:
13  Q.    But do they also represent
14  AmerisourceBergen?
15       MR. NICHOLAS:  Object to the
16  form.
17  BY MR. CLUFF:
18  Q.    After 2014 you continued to
19  maintain your role over government affairs, even
20  though you became the senior vice president,
21  correct?
22  A.    Yes.
23  Q.    Did the work that you did under
24  the umbrella of government affairs change after

Page 28

1  2014?
2  A.    No, just the added policy
3  responsibility.
4  Q.    What was the added public policy
5  responsibility?
6  A.    Well, we brought in a person to
7  help us develop policy, primarily policies
8  related to administration, policies,
9  regulations, commenting, public comments on
10  regulations.
11  Q.    Who is the person that
12  Amerisource brought in to help develop policies?
13  A.    Stacie Heller.
14  Q.    And I believe you referred to her
15  earlier as the vice president of public policy?
16  A.    Yes.
17  Q.    When you use the word "policy,"
18  do you mean public policies?
19  A.    Yes.
20  Q.    And that's different than
21  Amerisource's internal policies and procedures,
22  correct?
23  A.    Yes.
24  Q.    Okay.  As much as possible then,

Page 29

1  let's try to refer to those policies as public
2  policies, so we don't get any confusion, because
3  one of the things that is at issue in this case
4  is AmerisourceBergen's policies and procedures
5  internally, and I don't want to confuse the
6  record on that, if possible.
7  A.    Okay.
8  Q.    What kind of public policies was
9  AmerisourceBergen concerned about developing
10  when they hired Stacie Heller?
11       MR. NICHOLAS:  Object to the
12  form.
13       Go ahead.
14       THE WITNESS:  So we frequently
15  prepare public comments, as do most
16  public corporations, on -- and private
17  corporations on regulations, proposed
18  regulations that the government issues
19  related to our businesses and our
20  customers' businesses.  She primarily
21  oversees those public comments,
22  developing those in coordination with
23  our customers.
24  BY MR. CLUFF:

Page 30

1    Q.    You said Stacie is responsible
2  for coordinating those with your customers?
3    A.    Well, that's one of the things
4  she does.
5    Q.    I'm sorry.  You actually used the
6  word oversees those public comments?
7    A.    She develops them.
8    Q.    Okay.  And she develops them in
9  coordination with your customers?
10   A.    It depends on the -- you know,
11 the proposed regulation, but at times, yes.
12   Q.    That word coordination, is that a
13 word that you use a lot in your work?
14        MR. NICHOLAS:  Object to the
15   form.
16        THE WITNESS:  I don't know.
17 BY MR. CLUFF:
18   Q.    Maybe we need some more specific
19 context.
20        What are some examples of --
21 well, let me step back for a second.
22        This public policy work, did you
23 have any responsibility for public policy before
24 2014?

Page 31

1    A.    No.
2    Q.    Who did?
3    A.    Nobody.
4    Q.    Did any of the work that you did
5  under the umbrella of government affairs before
6  2014 fall into the category of public policy
7  work?
8    A.    Yes.
9    Q.    If you could give me an estimate,
10 you know, in your work by percentage, how much
11 was government affairs and how much was public
12 policy?
13        MR. NICHOLAS:  I'll object to the
14   form.
15        THE WITNESS:  Well, they're kind
16   of intertwined.  So I would say 20%
17   policy and 30% government affairs or 40%
18   government affairs.
19 BY MR. CLUFF:
20   Q.    I don't think those percentages
21 come to 100.
22        So is there some other work that
23 you did in your role prior to 2014 that would
24 have rounded out the 100?

Page 32

1    A.    There's just a lot of
2  administrative work involved in working for a
3  corporation and travel, and so it's hard to
4  estimate.
5    Q.    So it sounds like even though
6  public policy was broken out as a specific focus
7  of your job responsibilities in 2014, that's
8  always work that you've done at
9  AmerisourceBergen, correct?
10   A.    Yes.
11   Q.    And then when Stacie Heller was
12 hired, she took over primary responsibility
13 under your supervision for public policy work?
14   A.    Yes.
15   Q.    You said that AmerisourceBergen
16 frequently prepares public comments on
17 regulations.
18        Do you have any recollection of
19 some regulations that AmerisourceBergen provided
20 public comment about?
21        MR. NICHOLAS:  Object to the
22   form.
23        THE WITNESS:  Every year the
24   Department of Health and Human Services

Page 33

1  issues proposed regulations on physician
2  payment and hospital patient -- hospital
3  outpatient payment.  For example, those
4  are proposed regulations that we prepare
5  and provide public comments that are
6  available to the public.
7  BY MR. CLUFF:
8    Q.    Are there any other regulations
9  you can remember commenting on on behalf of
10 AmerisourceBergen?
11        MR. NICHOLAS:  Object to the
12   form.
13        THE WITNESS:  It's primarily
14   Medicare related.
15 BY MR. CLUFF:
16   Q.    When you use the word
17 "regulations," does that refer to the Code of
18 Federal Regulations, or do you use that term
19 more broadly?
20        MR. NICHOLAS:  Object to the
21   form.
22        THE WITNESS:  I'm not -- I don't
23   know.
24 BY MR. CLUFF:

Page 34

1     Q.   What do you understand a
2 regulation to be?
3     A.   A federal regulation that
4 implements the law.
5     Q.   Are you aware that Amerisource --
6 or if AmerisourceBergen ever issued public
7 comments or prepared public comments about
8 federal regulations related to the Department of
9 Justice?
10     A.   No.
11     Q.   How about the DEA?
12     A.   No.
13     Q.   Are you aware if
14 AmerisourceBergen ever issued public comments
15 about DEA registrations?
16     A.   I don't know.
17     Q.   How about DEA quotas?
18     A.   I don't know.
19     Q.   Is there somebody at
20 AmerisourceBergen who might know that
21 information?
22     MR. NICHOLAS: Object to the
23 form.
24     THE WITNESS: Chris Zimmerman.

Page 35

1 BY MR. CLUFF:
2     Q.   If AmerisourceBergen had issued
3 public comments about issues related to the DEA
4 or the DOJ, would you have worked with Chris
5 Zimmerman to put those out?
6     MR. NICHOLAS: Object to the
7 form.
8     THE WITNESS: I don't know.
9 BY MR. CLUFF:
10     Q.   You also mentioned earlier that
11 part of the public comment about regulations
12 that AmerisourceBergen works on are regulations
13 related to your customers' businesses; is that
14 right?
15     A.   Yes.
16     Q.   Do you recall any regulations
17 related to your customers' businesses that
18 AmerisourceBergen worked on?
19     A.   Well, the physician payment rule
20 impacts our physician customers, and the
21 hospital outpatient rule impacts our hospital
22 customers.
23     Q.   Why does AmerisourceBergen
24 comment on regulations related to its customers?

Page 36

1     MR. NICHOLAS: Object to the
2 form.
3     THE WITNESS: Because of our role
4 in the supply chain.
5 BY MR. CLUFF:
6     Q.   What do you mean by that?
7     A.   Just that we supply those
8 customers so the regulations will seek comment
9 on issues related to that.
10     Q.   When I asked you about
11 regulations affecting your customers, you
12 mentioned physicians and hospitals.
13     How about pharmacies, has
14 AmerisourceBergen ever commented on regulations
15 affecting its pharmacy customers?
16     MR. NICHOLAS: Object to the
17 form.
18     THE WITNESS: Yes.
19 BY MR. CLUFF:
20     Q.   Do you recall any of those?
21     A.   No.
22     Q.   How about manufacturers, do you
23 recall any public comment about regulations
24 related to manufacturers?

Page 37

1     A.   No.
2     Q.   How about any regulations issued
3 by the FDA regarding marketing of drugs?
4     A.   No.
5     Q.   How about other distributors,
6 have you commented on regulations affecting
7 other distributors?
8     A.   Any regulation affecting us would
9 likely affect other distributors.
10     Q.   When you mentioned Stacie
11 Heller's work, you said she primarily oversees
12 the public comments developing those in
13 coordination with our customers.
14     Do you recall that?
15     A.   Yes.
16     Q.   Okay. What did you mean when you
17 said "in coordination with our customers"?
18     MR. NICHOLAS: Object to the
19 form.
20     THE WITNESS: So we are -- you
21 know, participate in the pharmacy
22 associations, for example, like chain
23 drug stores and the independent
24 pharmacists and long-term care

Page 38

1    pharmacies, so we usually -- and the
2    physician community, and we usually
3    circulate amongst our associations our
4    thoughts and ideas for the comments.
5  BY MR. CLUFF:
6    Q.    So based on your testimony, it
7  seems that your understanding of coordination is
8  participating in trade associations, correct?
9          MR. NICHOLAS:  Object to the
10         form.
11         THE WITNESS:  Communicating with
12    trade associations is my definition of
13    coordinating.
14  BY MR. CLUFF:
15    Q.    You mentioned participating in
16  pharmacy associations in response to my question
17  about coordination.
18         Is that not a way in which you
19  coordinate with your customers?
20         MR. NICHOLAS:  Object to the
21    form.
22         THE WITNESS:  I -- I don't know.
23  BY MR. CLUFF:
24    Q.    But AmerisourceBergen does

Page 39

1  participate in pharmacy associations?
2    A.    Yes.
3    Q.    Do you know which ones?
4    A.    NACDS.
5    Q.    What does that stand for?
6    A.    National Association of Chain
7  Drug Stores.  NCPA, National Community
8  Pharmacists Association.  SCPC, the Specialty
9  Community Pharmacy Association.  And COA, the
10  Community Oncology Alliance, that's physicians.
11    Q.    Do you know who the members of
12  NACDS are?
13    A.    There are many members of NACDS.
14    Q.    Do you know if Rite Aid is a
15  member of NACDS?
16    A.    Yes.
17    Q.    How about Walgreens?
18    A.    Yes.
19    Q.    Walmart?
20    A.    Yes.
21    Q.    CVS?
22    A.    Yes.
23    Q.    AmerisourceBergen is a member?
24    A.    Yes.

Page 40

1    Q.    Do you know if McKesson is a
2  member?
3    A.    Yes.
4    Q.    How about Cardinal Health?
5    A.    Yes.
6    Q.    Do you know if any manufacturers
7  are members of NACDS?
8    A.    No.
9    Q.    Is the answer that you don't know
10  or that none of the manufacturers are members?
11    A.    I don't know.
12    Q.    Is the HDA a member of the NACDS?
13    A.    No.
14    Q.    How about the NCPA, is Rite Aid a
15  member of the NCPA?
16    A.    I don't know.
17    Q.    How about Walgreens?
18    A.    I don't know.
19    Q.    Walmart?
20    A.    No.
21    Q.    CVS?
22    A.    No.
23    Q.    Okay.  Is AmerisourceBergen a
24  member of the NCPA?

Page 41

1    A.    We are a member of their policy
2  committee.
3    Q.    What does that mean?
4    A.    That we're not a member like an
5  actual pharmacy.  The pharmacies are their
6  primary members, and we are, as a supplier to
7  the pharmacies, a member of their policy
8  committee.
9    Q.    Is McKesson a member of the NCPA?
10    A.    I don't know.
11    Q.    How about Cardinal Health, do you
12  know if they're a member of NCPA?
13    A.    I don't know.
14    Q.    Do you know if McKesson is on the
15  policy committee?
16    A.    I don't know.
17    Q.    Do you know if Cardinal Health is
18  on the policy committee there?
19    A.    I don't know.
20    Q.    What is Amerisource's role as a
21  member of the policy committee of the NCPA?
22    A.    They have policy committee
23  meetings several times a year that someone from
24  our business participates in to help them

Page 42

1 determine their policy positions.
2     Q.    Do you know who that person is?
3     A.    Chuck Reed.
4     Q.    Sorry.  Could you say it again?
5     A.    Chuck Reed.
6     Q.    And his role on the policy
7 committee is to help the members of the NCPA
8 figure out their policy positions?
9     A.    Yes.  All the members of the
10 association are -- participate in that policy
11 committee.
12     Q.    I want to go back to the NACDS
13 for a second.
14        What is AmerisourceBergen's
15 involvement with the NACDS?
16     A.    Similar to NCPA, we have a role
17 as a member to provide input on their policy
18 decision or their policy positions.
19     Q.    Does AmerisourceBergen sit on any
20 committees of the NACDS?
21     A.    Yes.
22     Q.    What are those?
23     A.    Their government affairs and
24 their policy committee, and we have a board

Page 43

1 position.
2     Q.    Who is the government affairs --
3 well, who from Amerisource sits on the
4 government affairs committee at NACDS?
5     A.    Myself and Beth Mitchell.
6     Q.    Beth Mitchell is one of the
7 registered lobbyists that you oversee in
8 Washington?
9     A.    Yes.
10     Q.    Who from Amerisource sits on the
11 policy committee of NACDS?
12     A.    Chuck Reed and Stacie Heller.
13     Q.    I think Chuck Reed we haven't
14 discussed.
15        Where does he work?
16     A.    He works in -- out of -- he works
17 in California.
18     Q.    Who does he report to?
19     A.    Brian Nightingale.
20     Q.    Are these people that you oversee
21 as a senior vice president?
22     A.    No.
23     Q.    Who oversees Chuck Reed and Brian
24 Nightingale?

Page 44

1     A.    Bob Mauch.
2     Q.    Do you know what their job
3 responsibilities are?  I'll back it up.
4        What is -- what are Chuck Reed's
5 job responsibilities?
6     A.    I don't know.
7     Q.    Do you know his title?
8     A.    No.
9     Q.    How about Brian Nightingale, do
10 you know his job responsibilities?
11     A.    Only that he oversees our
12 independent pharmacies, the Good Neighbor
13 pharmacies.
14     Q.    Is that like a sales position or
15 a marketing type position?
16     A.    Management.
17     Q.    Who sits on the board for
18 AmerisourceBergen of the NACDS?
19     A.    Brian Nightingale.
20     Q.    Does AmerisourceBergen have
21 anybody sitting on the Executive Committee of
22 the NACDS?
23     A.    No.
24     Q.    Does AmerisourceBergen

Page 45

1 participate in any other trade associations that
2 you're aware of?
3     A.    The Health Distribution Associa
4 -- Alliance, Health Distribution Alliance and
5 the Healthcare Leadership Council.
6     Q.    Are you aware whether if the HDA
7 or the Healthcare Distribution Alliance ever
8 went by any other names?
9     A.    Health Distribution Management
10 Association.
11     Q.    If I refer to the Healthcare
12 Distribution Alliance as the HDA, is that a term
13 that you understand?
14     A.    Yes.
15     Q.    And if I refer to the Healthcare
16 Distribution Management Association as the HDMA,
17 is that a term that you understand?
18     A.    Yes.
19     Q.    Can we refer to both entities as
20 just the HDA?
21     A.    Sure.
22     Q.    Okay.  What is the Healthcare
23 Leadership Council?
24     A.    That's an organization of -- that

Page 46

1 represents the cross-section of the healthcare
2 industry, so everything from hospitals,
3 pharmacies, insurers to pharmacies,
4 distributors. Basically, anybody in the
5 healthcare industry is represented or can be
6 represented in the Healthcare Leadership
7 Council.
8     Q. So it looks like you mentioned
9 hospitals, pharmacies, insurers and
10 distributors.
11     What about physicians or
12 prescribers?
13     A. Possibly. You know, like Mayo
14 Clinic is a member, and also manufacturers are
15 members and pharmacies.
16     Q. Does the Healthcare Leadership
17 Council have like committees or subgroups or
18 working groups?
19     A. They have task forces.
20     Q. Does AmerisourceBergen hold any
21 positions in the Healthcare Leadership Council?
22     A. Steve Collis is on the board, and
23 then Stacie Heller and I serve on their task
24 force committees or task forces.

Page 47

1     Q. What task forces are those?
2     A. I can't remember the names, but
3 there's one on the uninsured. I think there's
4 another one on healthcare quality.
5     Q. Is McKesson a member of the
6 Healthcare Leadership Council?
7     A. Yes.
8     Q. How about Cardinal Health?
9     A. Yes.
10     Q. Do you know which manufacturers
11 are members of the Healthcare Leadership
12 Council?
13     MR. NICHOLAS: Object to the
14     form, foundation.
15     THE WITNESS: No.
16 BY MR. CLUFF:
17     Q. Have you -- do you have any
18 understanding about Johnson & Johnson
19 participating in the Healthcare Leadership
20 Council?
21     A. I don't know.
22     Q. Do you have any understanding
23 about Mallinckrodt participating in the
24 Healthcare Leadership Council?

Page 48

1     A. I don't know.
2     Q. You mentioned pharmacies.
3     Do you know which pharmacies
4 participate in the Healthcare Leadership
5 Council?
6     A. I don't know. The membership
7 changes, and sometimes they join and then they
8 drop out, and so I don't know. At this time I
9 don't know.
10     Q. Do you have any understanding
11 about Rite Aid participating in the Healthcare
12 Leadership Council?
13     A. I don't know.
14     Q. Some of these questions I have to
15 ask just to get your understanding. I'm not
16 trying to trick you into saying yes or no, just,
17 you know, looking in all the cupboards, so to
18 speak.
19     A. Okay.
20     Q. How about Walgreens, do you know
21 in Walgreens participated in the Healthcare
22 Leadership Council?
23     A. Yes.
24     Q. How about Walmart?

Page 49

1     A. I don't know.
2     Q. How about CVS?
3     A. I don't know.
4     Q. You made an interesting point
5 about membership changing, people coming in and
6 going out.
7     I want to go back to the chain or
8 the other pharmacy memberships that
9 AmerisourceBergen has.
10     With the NACDS, do you know how
11 long AmerisourceBergen has been a member of the
12 NACDS?
13     A. No.
14     Q. You've worked at
15 AmerisourceBergen since 2004.
16     Do have a recollection of when
17 you started working with the NACDS as part of
18 your job responsibilities?
19     A. Since 2004.
20     Q. Since 2004.
21     So AmerisourceBergen potentially
22 has been a member of the NACDS since that time?
23     A. Yes.
24     Q. Do you know if Cardinal and

Page 50

1 McKesson are both members during the same time
2 period?
3     A.   Yes.
4     Q.   How about the NCPA, do you know
5 when AmerisourceBergen's membership started with
6 the NCPA?
7     A.   Since before 2004.
8     Q.   How about the Healthcare
9 Leadership Council, do you know when
10 AmerisourceBergen started participating in that
11 group?
12     A.   No.
13     Q.   Do you have a recollection, based
14 on your work with AmerisourceBergen, when --
15 when that may have happened?
16         MR. NICHOLAS:  Object to the
17     form.
18         THE WITNESS:  I don't remember.
19 BY MR. CLUFF:
20     Q.   Do you recall doing any work with
21 the Healthcare Leadership Council before you
22 became the senior vice president?
23     A.   Yes.
24     Q.   So sometime before 2014 then?

Page 51

1     A.   Yes.
2     Q.   Do you know if Cardinal Health
3 was a member at that time?
4     A.   I don't know.
5     Q.   How about McKesson?
6     A.   I don't know.
7     Q.   You mentioned the HDA and the
8 HDMA.
9         Do you have any knowledge as to
10 how long AmerisourceBergen has been a member of
11 the HDA or the HDMA?
12     A.   Since before 2004.
13     Q.   Do you have any knowledge about
14 which employees for AmerisourceBergen
15 participate in the HDA?
16     A.   There's quite a few.
17     Q.   So I don't want to quiz you on
18 every single one of them, but let's talk about
19 some highlights, and maybe we work our way from
20 the top down at the HDA.
21         So the HDA has a Board of
22 Directors and an Executive Committee.  Does
23 AmerisourceBergen hold any positions with the
24 HDA on either the Board of Directors or the

Page 52

1 Executive Committee?
2     A.   Yes.
3     Q.   What are those?
4     A.   Board member and Executive
5 Committee member.  It's the same person.
6     Q.   Who is that?
7     A.   Bob Mauch.
8     Q.   Does Mr. Mauch hold any special
9 positions on either the Board of Directors or
10 the Executive Committee?
11     A.   I don't know.
12     Q.   So you don't know whether he
13 might be a chairman of the board or a chairman
14 of the Executive Committee?
15     A.   Incoming chairman.
16     Q.   Of which?
17     A.   The board -- I'm not sure.  I
18 think he -- I should say I don't know.  I know
19 he's --
20     Q.   Do you know if he's ever held a
21 position like chairman --
22     A.   No.
23     Q.   -- with the Board of Directors or
24 the Executive Committee?

Page 53

1     A.   He has not.
2     Q.   Okay.  Before Mr. Mauch served on
3 the Executive Committee, do you know who held
4 positions for AmerisourceBergen on the Executive
5 Committee?
6     A.   Dave Yost, Steve Collis, Dave
7 Neu.
8     Q.   Who is Dave Yost?
9     A.   Our former CEO.
10     Q.   Do you know when he sat on the
11 Executive Committee?
12     A.   Since before 2004 until he left
13 the company, which was 2010.
14     Q.   Is that a guess or your best
15 estimate?
16     A.   That's my best estimate.
17     Q.   Okay.  Who is Steve Collis?
18     A.   Our chair -- AmerisourceBergen's
19 chairman, CEO and president.
20     Q.   Do you know when he held a
21 position on the Executive Committee of the HDA?
22     A.   I don't remember the exact years.
23     Q.   Was it before or after Mr. Yost?
24     A.   After.

Page 54

1  Q.  So sometime after 2010?
2  A.  Yes.  No.  I don't remember.
3  Q.  Who is David Neu?
4  A.  Former president of the company.
5  Q.  And his last name is spelled
6 N-e-u, correct?
7  A.  Yes.
8  Q.  Do you know when he held a
9 position on the Executive Committee of the HDA?
10  A.  I don't remember the exact years.
11  Q.  Do you know if it was before or
12 after Mr. Collis?
13  A.  After Mr. Collis.
14  Q.  Do you know how long Mr. Neu
15 served on the Executive Committee of the HDA?
16  A.  Approximately four years.
17  Q.  Do you know when Bob Mauch
18 started holding a position on the Executive
19 Committee of the HDA?
20  A.  I don't know.
21  Q.  How about the Board of Directors,
22 do you know if Dave Yost ever held a position on
23 the Board of Directors for the HDA?
24  A.  I don't know.

Page 55

1  Q.  And how about Mr. Collis, do you
2 know if he held a position on the Board of
3 Directors of the HDA?
4  A.  I don't know.
5  Q.  How about David Neu, did he ever
6 hold a position with the HDA?
7  A.  Chairman.
8  Q.  Was Mr. Neu ever a chairman of
9 the Executive Committee of the HDA?
10  A.  Chairman of the board.
11  Q.  Are you generally familiar with
12 the membership of the HDA?
13  A.  Yes.
14  Q.  Do you know if manufacturers are
15 member of the HDA?
16  A.  Manufacturers have some sort of
17 subsidiary or associate type of membership, but
18 it's not policy making or it's sort of, as I
19 said, subsidiary committee almost.
20  Q.  What do you mean by that?
21  A.  I just -- I think they just, as
22 a -- as a customer and a part of the supply
23 chain, they have some kind of minor membership,
24 but we don't interact with them, I mean meaning

Page 56

1 the primary members as part of that.
2  Q.  You've referred to manufacturers
3 a couple times as customers of
4 AmerisourceBergen.
5  What do manufacturers purchase
6 from AmerisourceBergen that would make them
7 customers?
8  MR. NICHOLAS:  Object to the
9  form.
10  THE WITNESS:  We purchase
11  pharmaceuticals from manufacturers.
12  They don't purchase from us.
13 BY MR. CLUFF:
14  Q.  I'm just trying to understand the
15 words "they" you're using today, so I'm going to
16 ask the question a little bit differently.
17  You've referred to manufacturers
18 multiple times as customers of
19 AmerisourceBergen.  How are manufacturers
20 customers of AmerisourceBergen, in your
21 understanding?
22  MR. NICHOLAS:  Object to the
23  form.
24  Go ahead.

Page 57

1  THE WITNESS:  We purchase
2  pharmaceuticals from manufacturers, and
3  we aggregate them and distribute them
4  anywhere in the country.
5 BY MR. CLUFF:
6  Q.  So that makes AmerisourceBergen a
7 customer of manufacturers, correct?
8  MR. NICHOLAS:  Object to the
9  form.  Word bickering.
10  THE WITNESS:  We view them as a
11  customer, but I guess it's up to you how
12  you want to...
13 BY MR. CLUFF:
14  Q.  It's not up to me.  These are
15 your words.  I'm just trying to understand them.
16  A.  We view them as a customer.
17  Q.  Why?
18  A.  Because we purchase
19 pharmaceuticals from them.
20  Q.  Are you aware if
21 AmerisourceBergen is selling anything to
22 manufacturers?
23  A.  No.
24  Q.  Are you aware if

Page 58

1  AmerisourceBergen sells transactional data back
2  to manufacturers?
3      A.   I don't know.
4      Q.   You said we view them as
5  customers.
6          Who have you learned from at
7  AmerisourceBergen that manufacturers are
8  customers?
9          MR. NICHOLAS:  Object to the
10  form.
11         THE WITNESS:  I don't know.
12  BY MR. CLUFF:
13     Q.   Earlier you talked about
14  coordinating policies with AmerisourceBergen's
15  customers.
16         Are manufacturers groups that
17  AmerisourceBergen coordinates with?
18         MR. NICHOLAS:  Object to the
19  form.
20         THE WITNESS:  No.
21  BY MR. CLUFF:
22     Q.   Have you in your work as the vice
23  president or senior vice president of government
24  affairs ever worked with any manufacturers to

Page 59

1  coordinate efforts?
2      A.   No.
3      Q.   Never?
4      A.   I don't know.
5      Q.   We talked earlier -- we were
6  talking earlier about membership in the HDA, and
7  we just covered manufacturers.
8          Do you know if other distributors
9  are members of the HDA?
10     A.   Yes.
11     Q.   Which manu -- or which
12  distributors do you understand to be members of
13  the HDA?
14     A.   So they're referred to as primary
15  distributors or the distributors who purchase
16  from manufacturers directly.  I believe there's
17  38 total or something around 35 to 38.
18     Q.   Is AmerisourceBergen a primary
19  distributor?
20     A.   Yes.
21     Q.   Okay.  How about McKesson?
22     A.   Yes.
23     Q.   Cardinal Health?
24     A.   Yes.

Page 60

1      Q.   H.D. Smith?
2      A.   Yes.
3      Q.   Henry Schein?
4      A.   Yes.
5      Q.   Can you think of any other
6  distributors that are primary distributors?
7      A.   Smith Drug and...
8      Q.   Do you know if McKesson holds a
9  board position or a position on the Executive
10  Committee of the HDA?
11     A.   Yes.
12     Q.   Do you know how long that
13  McKesson has held the board position or
14  Executive Committee position with the HDA?
15     A.   Since before 2004.
16     Q.   How about Cardinal Health, do you
17  know if --
18     A.   Yes.
19     Q.   I'm sorry.  Let me ask the
20  question, so we know what you're agreeing to
21  first.
22         Do you know if Cardinal Health
23  has held board positions or Executive Committee
24  positions at the HDA?

Page 61

1      A.   Yes.
2      Q.   Okay.  Do you know how long
3  Cardinal Health has held those positions?
4      A.   Since before 2004.
5      Q.   Earlier you talked about part of
6  your job responsibilities in government affairs
7  being educating associates at AmerisourceBergen,
8  correct?
9      A.   Yes.
10     Q.   So in part of your work would you
11  have educated the people who held board
12  positions or Executive Committee positions in
13  the HDA?
14         MR. NICHOLAS:  Object to the
15  form.
16         THE WITNESS:  Yes.
17  BY MR. CLUFF:
18     Q.   Did you ever attend any board
19  meetings or Executive Committee meetings of the
20  HDA?
21     A.   Once.
22     Q.   When was that?
23     A.   Approximately 2005.
24     Q.   Do you recall why you attended

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 that meeting or those meetings?
2    A.   No.
3    Q.   Would you have attended with
4 Mr. Yost?
5    A.   Yes. I'm sorry. I attended
6 with -- at that time our board member was Kurt
7 Hilzinger.
8    Q.   Who is Kurt Hilzinger?
9    A.   He was a former -- I can't
10 remember his title, but he was a former
11 executive under Mr. Yost at AmerisourceBergen,
12 and he was our HDA board member when I started
13 with the company in 2004.
14    Q.   Do you know if any other
15 AmerisourceBergen associates would have attended
16 HDA board meetings?
17    A.   No.
18    Q.   How about Executive Committee
19 meetings?
20    A.   No.
21    Q.   Okay. Before the HDA held board
22 meetings or Executive Committee meetings, did
23 they ever disseminate materials to the board or
24 Executive Committee members?

Page 63

1    A.   I don't understand your question.
2    Q.   Sure.
3    Do you know if the HDA ever
4 created a packet of information for board
5 members to review prior to a board member
6 meeting?
7    A.   Yes.
8    Q.   Did you ever receive, review any
9 of those packets before a board member meeting?
10    A.   Yes.
11    Q.   In what capacity would you have
12 reviewed or received those?
13    A.   In a limited capacity. I receive
14 usually the government affairs portion of the
15 presentation.
16    Q.   And would you have reviewed the
17 government affairs portion of the presentation?
18    A.   Yes.
19    Q.   For what purpose?
20    A.   Just to be informed for sharing
21 of information.
22    Q.   How about the Executive
23 Committee, do you know if the HDA created a
24 packet of information for Executive Committee

Page 64

1 members to review before those meetings?
2    A.   I don't know.
3    Q.   Do you recall if you ever
4 received such a packet about an Executive
5 Committee meeting?
6    A.   I don't know.
7    Q.   Do you recall if you ever
8 reviewed such a packet about an Executive
9 Committee meeting?
10    A.   My understanding is that the
11 board materials are the Executive Committee
12 materials, so I'm not aware that there's any
13 separate Executive Committee materials except
14 for possibly the association's budget, which
15 I -- which I don't see and I believe goes to the
16 Executive Committee.
17    Q.   I want to talk about your work
18 with the HDA for a second to kind of lay some
19 groundwork for some more topics we're going to
20 discuss during the rest of the day, and then --
21 how long have we been going? And then I think
22 let's take a break, how about that?
23    A.   Yes.
24    Q.   Do you recall working on a

Page 65

1 committee of the HDA called the 340B task force?
2    A.   Yes.
3    Q.   What was that task force?
4    A.   There's a program in Medicare
5 called 340B that is for patients who are low
6 income, hospital patients.
7    Q.   Do you recall if your
8 participation on that committee started around
9 2011?
10    A.   I don't remember.
11    Q.   Is that a committee that you're
12 still working with?
13    A.   No.
14    Q.   Do you recall working with a
15 committee called the controlled -- or a
16 committee or other organization called the
17 Controlled Substances Abuse Task Force in the
18 HDA?
19    A.   I don't remember.
20    Q.   How about the Emergency
21 Preparedness and Influenza Task Force, do you
22 recall working on such a task force?
23    A.   Yes.
24    Q.   What was that task force about?

Page 66

1  A.   There were problems a few years
2  ago with making sure that there were enough
3  vaccines available for certain pandemics or flu
4  outbreaks, and so we worked with the government
5  to help advise and prepare so that those
6  shortages wouldn't occur.
7  Q.   Are you still working with that
8  task force?
9  A.   Not lately.
10  Q.   How about the Federal Government
11  Affairs Committee, were you a member of that
12  committee?
13  A.   Yes.
14  Q.   Did you ever hold any leadership
15  positions in that committee?
16  A.   Yes.
17  Q.   What were those?
18  A.   I chaired federal government
19  affairs.
20  Q.   Do you recall when you first
21  began working with the -- if I say the FGAC, is
22  that the same as the Federal Government Affairs
23  Committee?
24  A.   Yes.

Page 67

1  Q.   Do you recall when you first
2  began working with the FGAC?
3  A.   Since 2004.
4  Q.   Do you recall when you were the
5  chairperson?
6  A.   No.  I would estimate 2014 to
7  2016.
8  Q.   What were your responsibilities
9  as the chairperson of that committee?
10  A.   It's just a figure head.  It's
11  just a name as chairman.  Sometimes I would
12  review the agendas for the meetings in advance.
13  Q.   Who are the other members of the
14  Federal Government Affairs Committee?
15  A.   Any primary member of HDA can
16  participate in the Federal Government Affairs
17  Committee.
18  Q.   So was Cardinal Health a member
19  of the FGAC?
20  A.   Yes.
21  Q.   How about McKesson?
22  A.   Yes.
23  Q.   Do you know if Cardinal Health or
24  McKesson ever held any leadership positions on

Page 68

1  the FGAC?
2  A.   Yes.
3  Q.   Do you know when that was?
4  A.   No.
5  Q.   Was there a person from Cardinal
6  Health who you worked with on the FGAC?
7  A.   Yes.
8  Q.   Who was that?
9  A.   Sean Callinicos.
10  Q.   Do you know what his title is
11  with Cardinal Health?
12  A.   I think it's vice president,
13  government affairs.
14  Q.   Did you interact with anybody at
15  -- from McKesson on the FGAC?
16  A.   Yes.
17  Q.   Who was that?
18  A.   Pete Slone.
19  Q.   Is his name Pete or Peter?
20  A.   Peter.
21  Q.   Okay.  And then how do you spell
22  his last name?
23  A.   S-l-o-n-e.
24  Q.   Do you know what his position at

Page 69

1  McKesson was?
2  A.   I think it's vice president of
3  government affairs.  I mean, they could be
4  senior vice president.  I don't know.
5  Q.   But it seems like generally
6  they're executive level employees over
7  government affairs?
8  A.   Yes.
9  Q.   How about the Federal Pedigree
10  Working Group, do you know what that is?
11  A.   I don't know if that's still in
12  existence.
13  Q.   Is that a committee that you
14  recall working on?
15  A.   No.
16  Q.   How about the Government and
17  Public Policy Council, do you recall working on
18  that group?
19  A.   Yes.
20  Q.   If I call that the GPPC, is that
21  accurate?
22  A.   Yes.
23  Q.   What was the GPPC responsible for
24  or what did it do?

Page 70

1   A.   It was created to oversee policy
2 development for state, federal policy
3 development for the association.
4   Q.   Did you hold any leadership
5 positions in that council?
6   A.   Yes.
7   Q.   What are those?
8   A.   I chaired that committee.
9   Q.   Do you recall when?
10   A.   My -- I would estimate 2012 to
11 2016.
12   Q.   Do you recall who the other
13 members of the GPPC were?
14   A.   Cardinal, McKesson, H.D. Smith,
15 just any of the major distributors who wanted to
16 participate.  I think everybody was invited to.
17   Q.   Was there a person from Cardinal
18 Health who you interacted with on the GPPC?
19   A.   Well, Connie Woodburn and then
20 Sean Callinicos.
21   Q.   How about McKesson, is there
22 somebody at McKesson you interacted with on the
23 GPPC?
24   A.   So Ann Berkey and then Pete

Page 71

1 Slone.
2   Q.   Can you spell Amber's last name?
3   A.   Ann Berkey.
4   Q.   Oh, I'm sorry, I misheard you
5 say, Ann Berkey?
6   A.   Yes.
7   Q.   Can you spell her last name?
8   A.   B-e-r-k-e-y.
9   Q.   And then after that it was Pete
10 Slone?
11   A.   Yes.
12   Q.   Do you recall working on a group
13 called the Ohio Tax Group?
14   A.   No.
15   Q.   Do you recall working on the PAC
16 Advisory Group for the HDA?
17   A.   Yes.
18   Q.   When did you work on that group?
19   A.   Since approximately 2012.
20   Q.   Did you ever hold any leadership
21 positions in the PAC Advisory Group?
22   A.   No.
23   Q.   Do you know if Cardinal and
24 McKesson participated in the PAC Advisory Group?

Page 72

1   A.   Yes.
2   Q.   Who did you interact with from
3 Cardinal on the PAC Advisory Group?
4   A.   Connie Woodburn and then Sean
5 Callinicos.
6   Q.   How about McKesson, did McKesson
7 participate in the PAC Advisory Group?
8   A.   Yes.
9   Q.   Who did you interact with from
10 McKesson on there?
11   A.   Ann Berkey and then Pete Slone.
12   Q.   Do you recall participating in a
13 group called the PCC Coordinating Committee?
14   A.   No, but the GPPC has become the
15 PPC, so I don't know what the coordinating
16 committee is.  I would only recognize the PPC.
17   Q.   Is PPC Public Policy Council?
18   A.   Yes.
19   Q.   And that's the group that became
20 the GPPC?
21   A.   It started as the GPPC, and now
22 it's the PPC.
23   Q.   So when we talked earlier about
24 the GPPC and you talked about your work there,

Page 73

1 would you give me the same answers about the
2 Public Policy Council in terms of --
3   A.   Yes.
4   Q.   -- in terms of duration and the
5 role that you held?
6   A.   Yes.
7   Q.   Okay.  And the same would be true
8 for your interaction with Cardinal and McKesson
9 on that?
10   A.   Yes.
11   Q.   Okay, that's great.  We can cut
12 that out.
13   How about do you recall working
14 on a Prescription Drug Abuse Strategy Group with
15 the HDA?
16   A.   No.
17   Q.   How about the Reimbursement Task
18 Force, do you recall working with that group?
19   A.   Yes.
20   Q.   What's the Reimbursement Task
21 Force?
22   A.   It's basically they're a
23 committee that focuses on Medicare and Medicaid
24 policies, similar to what I've mentioned earlier

Page 74

1  about preparing comments on regulations and
2  policy positions on legislation that involves
3  Medicare and Medicaid reimbursement for our
4  customers.
5      Q.    How about the Specialty and
6  Biotech Distributors Council, do you recall
7  working with that group?
8      A.    Yes.
9      Q.    What do they do?
10     A.    They are no longer in existence,
11 but that's been a coalition that was in
12 existence when I joined the company in 2004, and
13 they focused on specialty distribution versus
14 traditional retail distribution.
15     Q.    What's the difference between
16 specialty distribution and traditional retail
17 distribution?
18     A.    It's hard to explain and I think
19 it's changed over the years, but at that time it
20 was basically injectable products or products
21 that would be administered by a physician versus
22 pills.
23     Q.    How about the State Government
24 Affairs Committee, do you recall working on that

Page 75

1  committee?
2      A.    Yes.
3      Q.    During what time periods did you
4  work with that group?
5      A.    Since 2004.
6      Q.    Did you ever hold any leadership
7  positions on the State Government Affairs
8  Committee?
9      A.    No.
10     Q.    Did you interact with Cardinal
11 Health on the State Government Affairs
12 Committee?
13     A.    Yes.
14     Q.    Who did you interact with?
15     A.    Connie Woodburn and Sean
16 Callinicos.
17     Q.    Did you interact with McKesson on
18 the State Government Affairs Committee?
19     A.    Yes.
20     Q.    Who did you interact with there?
21     A.    Ann Berkey and Pete Slone.
22     Q.    Anyone else?
23     A.    No.
24     Q.    Did you ever work with a

Page 76

1  committee called the Regulatory Affairs
2  Committee?
3      A.    No.
4      Q.    How about the Tax Task Force?
5      A.    Yes.
6      Q.    What was the Tax Task Force?
7      A.    It's like a committee that they
8  have where any member can participate and we
9  discuss tax legislation or tax policies that may
10 be under development.
11            MR. CLUFF:  All right.  Let's
12 take a break.
13            THE VIDEOGRAPHER:  Going off the
14 record at 10:53 a.m.
15            (Brief recess.)
16            THE VIDEOGRAPHER:  We are back on
17 the record at 11:10 a.m.
18 BY MR. CLUFF:
19     Q.    Good morning, Ms. Norton.
20     A.    Good morning.
21     Q.    Are you all situated with your
22 microphone?
23     A.    I'm not sure.
24     Q.    Maybe the other side is better.

Page 77

1            MR. CLUFF:  Switch to back on the
2  record?
3            THE VIDEOGRAPHER:  We're on the
4  record.
5  BY MR. CLUFF:
6      Q.    We're back on the record, which
7  means that you're back under oath.
8            Do you understand that?
9      A.    Yes.
10     Q.    Okay, great.
11            When we broke we had just
12 finished going through some councils and
13 committees and task forces of the HDA.  We
14 reviewed a list of them.
15            I don't expect you to remember
16 every single one we discussed, but are there any
17 other task forces, councils, committees or
18 working groups of the HDA that you recall
19 working on?
20     A.    No.
21     Q.    I want to talk about how
22 frequently that you or AmerisourceBergen
23 participated in some of these trade
24 associations.  So I want to start with the

Page 78

1  NACDS. I think that stands for National
2  Association of Chain Drug Stores, right?
3      A.   (Witness shakes head.)
4      Q.   Did you personally participate in
5  any activities of the NACDS?
6      A.   Not usually. I oversee that, so
7  I don't typically participate in their regular
8  scheduled calls.
9      Q.   How often do they have regularly
10  scheduled calls?
11      A.   Weekly.
12      Q.   And does AmerisourceBergen
13  generally have somebody participate in the
14  regularly scheduled calls --
15      A.   Yes.
16      Q.   -- of the NACDS?
17      A.   Yes.
18      Q.   And who would that be?
19      A.   Beth Mitchell and Stacie Heller.
20      Q.   I believe you also testified that
21  AmerisourceBergen holds a board position at the
22  NACDS; is that right?
23      A.   Yes.
24      Q.   Do you know how often the board

Page 79

1  meets?
2      A.   No.
3      Q.   When the board does have
4  meetings, does AmerisourceBergen's
5  representative attend those meetings?
6      A.   Yes.
7      Q.   You testified that
8  AmerisourceBergen participates on the policy
9  committee of the NACDS as well.
10          Do you know if that committee had
11  regularly scheduled calls or meetings?
12      A.   Yes.
13      Q.   How often were those?
14      A.   Weekly.
15      Q.   And did somebody from
16  AmerisourceBergen participate in those calls,
17  generally?
18      A.   Yes.
19      Q.   Are those calls different than
20  the calls you described earlier, the regularly
21  scheduled calls?
22      A.   No.
23      Q.   I believe you also testified that
24  the NACDS has a Government Affairs Committee or

Page 80

1  council; is that right?
2      A.   Yes.
3      Q.   Did that council have regularly
4  scheduled calls?
5      A.   Yes.
6      Q.   How often did those occur?
7      A.   Weekly.
8      Q.   Did somebody from
9  AmerisourceBergen participate in those as well?
10      A.   Yes.
11      Q.   Were those different than the
12  Policy Committee calls?
13      A.   No.
14      Q.   So the NACDS had a weekly call
15  that covered government affairs and policy
16  committee issues all in one?
17      A.   They have separate calls, but
18  they're weekly. Both groups meet weekly and we
19  have the same people on both of those
20  committees.
21      Q.   So there would be two separate
22  calls for the NACDS on a weekly basis?
23      A.   I believe they meet weekly, both
24  of them.

Page 81

1      Q.   Did you ever participate in calls
2  of the Government Affairs or Public Policy
3  Committee?
4      A.   Just a few times.
5      Q.   Somebody that you oversee would
6  have participated then?
7      A.   Yes.
8      Q.   So, generally, AmerisourceBergen
9  is participating in two weekly calls of the
10  NACDS a week?
11      A.   Yes.
12      Q.   Does somebody from McKesson
13  participate in those weekly calls?
14      A.   I -- I believe so. I don't know.
15      Q.   Do you have reason to believe
16  that somebody from McKesson participates in
17  those calls?
18          MR. NICHOLAS: Object to the
19  form.
20          THE WITNESS: Yes.
21  BY MR. CLUFF:
22      Q.   How about Cardinal Health, do you
23  know if Cardinal Health participates in those
24  weekly calls of the NACDS?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.    I don't know, but I think so.

2    Q.    You earlier described another

3 trade organization called the NCPA.  Is that the

4 National Chain Pharmacy Association?

5    A.    No, that's the National Community

6 Pharmacists Association.

7    Q.    Thank you for the clarification.

8         Does that organization have

9 meetings or phone calls?

10    A.    I don't know.  Yes.

11    Q.    Okay.  Is it meetings or phone

12 calls?

13    A.    Phone calls.

14    Q.    Do you know how often those phone

15 calls occur?

16    A.    No.

17    Q.    Do you know how long those calls

18 are, ballpark?

19    A.    No.

20    Q.    Going back to the NACDS calls we

21 discussed, do you have an estimate on how long

22 those calls are, the weekly calls?

23    A.    One hour.

24    Q.    You also testified that

Page 83

1 AmerisourceBergen participates in a group called

2 the SCPC?

3    A.    Yes.

4    Q.    Does that group have weekly phone

5 calls?

6    A.    Every other week.

7    Q.    Do you recall the or could you

8 approximate the duration of those calls?

9    A.    One hour.

10    Q.    Do you know if anybody from

11 Cardinal Health participates in the calls of the

12 SCPC?

13    A.    No.

14    Q.    How about anybody from McKesson?

15    A.    I don't know.

16    Q.    You also referred to

17 AmerisourceBergen participating in the COA or

18 the Community Oncology Association?

19    A.    Yes.

20    Q.    Do you know if that organization

21 has regularly scheduled calls?

22    A.    No.

23    Q.    Does it have any regularly

24 scheduled meetings?

Page 84

1    A.    They don't have committee

2 meetings, government affairs committee meetings

3 like the other organizations.  They just have --

4 they have one-hour sort of update government

5 affairs or legislative calls like quarterly.

6    Q.    Did AmerisourceBergen participate

7 in those quarterly update calls?

8    A.    Yes.

9    Q.    Do you know if anybody from

10 Cardinal Health or McKesson participated in

11 those calls?

12    A.    McKesson does.  I don't know

13 about Cardinal.

14    Q.    You talked about the Healthcare

15 Leadership Council?

16    A.    Yes.

17    Q.    Do you know if anybody from

18 AmerisourceBergen participates in meetings of

19 the Healthcare Leadership Council?

20    A.    Yes.

21    Q.    Do you know who?

22    A.    Stacie Heller.

23    Q.    I believe you testified that

24 Stacie Heller participates in the Healthcare

Page 85

1 Leadership Council on a task force or task

2 forces?

3    A.    Yes.

4    Q.    Do you also participate in task

5 forces of the Healthcare Leadership Council?

6    A.    No.

7    Q.    What task forces does Stacie work

8 on?

9    A.    I don't remember the names of

10 their task force.  One is on the uninsured and

11 one is on healthcare quality, that's all I know.

12         They also have a policy committee

13 that meets every other -- or a legislative -- I

14 can't remember what they call it, something like

15 that, every other week, and she participates in

16 those.

17    Q.    Aside from the policy committee

18 calls or meetings that Ms. Heller attends every

19 other week, do you know if anybody from

20 AmerisourceBergen attends other meetings of the

21 healthcare leadership council?

22    A.    No.

23    Q.    How about any of their phone

24 calls?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   A.   No.  I mean, other members
2  might -- we fill in for each other in our
3  Washington office, but that's it.
4       Q.   You mean other members of
5  AmerisourceBergen?
6       A.   If somebody -- if Stacie can't be
7  on, somebody might fill in for her.
8       Q.   I think you mentioned that Steve
9  Collis holds a board position with the
10 Healthcare Leadership Council; is that right?
11      A.   Yes.
12      Q.   Do you know if he attends Board
13 of Directors meetings?
14      A.   When he can.
15      Q.   Do you know how often those are
16 held?
17      A.   Three times a year.
18      Q.   Do you have an approximation of
19 how often he is able to attend?
20      A.   Once or twice a year.
21      Q.   Do you know if Cardinal Health
22 holds a Board of Directors position on the
23 Healthcare Leadership Council?
24      A.   No.  They did.

Page 87

1       Q.   At what time period did they hold
2  that position?
3       A.   2015 to 2017.
4       Q.   Do you know if their board member
5  attended Board of Directors meetings?
6       A.   Yes.
7       Q.   Do you know who their Board of
8  Directors member was?
9       A.   George Barret.
10      Q.   Do you know if McKesson has ever
11 held a board position on the Healthcare
12 Leadership Council?
13      A.   Yes.
14      Q.   Do you know how long they held
15 that position?
16      A.   Approximately two years.
17      Q.   So since 2016?
18      A.   No, it was before.  So it would
19 have been 2013 to 2015, I guess, approximately.
20      Q.   Do you know if McKesson's board
21 member with the Healthcare Leadership Council
22 have attended board meetings?
23      A.   Yes.
24      Q.   Do you know who their Board of

Page 88

1  Directors representative was?
2       A.   John Hammergren.
3       Q.   Can you spell the last name?
4       A.   H-a-m-m-e-r-g-r-e-n.
5       Q.   Do you know if any pharmaceutical
6  manufacturers held board of director's positions
7  in the Healthcare Leadership Council?
8       A.   I don't -- I don't know.
9       Q.   How about any pharmacies, like
10 chain pharmacies?
11      A.   I don't know.
12      Q.   Turning to the HDA now, I know
13 that AmerisourceBergen's overall involvement in
14 HDA is probably larger than you may know about,
15 so I'm just going to confine it to your work in
16 the government affairs and public policy group.
17      Do you know how frequently your
18 staff in the government affairs and public
19 policy group attend HDA meetings?
20      MR. NICHOLAS:  Object to the form
21 of the question, particularly the
22 characterization at the beginning of the
23 question.
24      Go ahead.  You can answer.

Page 89

1       THE WITNESS:  They're usually
2  phone calls, and some are weekly, some
3  are monthly.
4  BY MR. CLUFF:
5       Q.   What are some of the weekly calls
6  that your staff participate in with the HDA?
7       A.   The Federal Government Affairs
8  Committee and the State Government Affairs
9  Committee.
10      Q.   Are those calls held separately?
11      A.   Yes.
12      Q.   So between the Federal Government
13 Affairs Committee and the State Government
14 Affairs Committee, people that you work with at
15 AmerisourceBergen are in at least two HDA calls
16 a week, correct?
17      A.   Yes.  I mean, there are times
18 where there's -- when Congress isn't in session
19 they might lapse, but, generally, it's once a
20 week.
21      Q.   Are there any other weekly calls
22 that you can remember?
23      A.   No.
24      Q.   How about the Public Policy

Page 90

1 Council or the GPPC?

2     A.    Three times a year -- or, wait,

3 two times a year. Two times a year.

4     Q.    Were there ever instances where

5 meetings were held of the PPC or the GPPC aside

6 from the two regularly scheduled calls?

7     A.    No. Those are meetings.

8     Q.    Did the PPC or GPPC ever have

9 calls aside from the meetings?

10     A.    No.

11     Q.    Going back to the FGAC and the --

12 or excuse me -- the Federal Government Affairs

13 Committee and State Government Affairs

14 Committee, do you recall how long those meetings

15 would last?

16     A.    One hour.

17     Q.    Do you recall if representatives

18 from McKesson and Cardinal Health were generally

19 present for the Federal Government Affairs

20 Committee calls?

21     A.    Yes.

22     Q.    Do you recall if Cardinal Health

23 representatives were generally present for the

24 calls from the Federal Government Affairs

Page 91

1 Committee?

2     A.    Yes.

3     Q.    How about the State Government

4 Affairs Committee were representatives of

5 McKesson generally present for those?

6     A.    Yes.

7     Q.    And the same question for

8 Cardinal?

9     A.    Yes.

10     Q.    Aside from the weekly calls, were

11 there ever meetings of the Federal Government

12 Affairs Committee?

13     A.    Rarely. Maybe once a year.

14     Q.    Would somebody from

15 AmerisourceBergen have attended that meeting?

16     A.    Yes.

17     Q.    How about McKesson, would someone

18 from McKesson have been present at that meeting?

19     A.    Yes.

20     Q.    How about Cardinal Health?

21     A.    Yes.

22     Q.    Were there ever meetings aside

23 from the weekly calls of the State Government

24 Affairs Committee?

Page 92

1     A.    No. I think they have a once

2 annual in person, the state, but I'm not

3 positive. I have never participated in that.

4     Q.    Does somebody from

5 AmerisourceBergen participate in a meeting like

6 that if it happened?

7     A.    Yes.

8     Q.    Who would that have been?

9     A.    Either John Benske or Pete Stokes

10 or their predecessor. We had one position,

11 Juliette.

12     Q.    I'm going to go through this list

13 again of the involvement you may have had with

14 the HDA, just to see if you recall any meetings

15 of these groups.

16     We talked earlier about the

17 Controlled Substances Abuse Task Force. Is

18 that -- I believe you said you did not recall

19 that task force.

20     Do you recall any meetings of

21 that task force, if they ever occurred?

22     A.    No.

23     Q.    How about the PAC Advisory Group,

24 do you recall any meetings of the PAC Advisory

Page 93

1 Group?

2     A.    Yes.

3     Q.    Okay. What kind of meetings do

4 you recall of the PAC Advisory Group?

5     A.    They have one annual meeting.

6 It's a call.

7     Q.    Are there any meetings or calls

8 besides that one annual?

9     A.    I don't think so.

10     Q.    Do you recall if representatives

11 from McKesson were present for the annual call

12 of the PAC?

13     A.    Yes.

14     Q.    How about from Cardinal Health?

15     A.    Yes.

16     Q.    Do you know who those were?

17     A.    Pete Slone from McKesson, Sean

18 Callinicos from Cardinal.

19     Q.    It seems like your work in the

20 HDA overlapped significantly with the work of

21 Sean Callinicos from Cardinal Health; is that

22 right?

23     MR. NICHOLAS: Object to the

24     form.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    THE WITNESS:  I don't understand
2  the question.
3  BY MR. CLUFF:
4    Q.   Is there some portion of my
5  question you didn't understand, so I can -- so I
6  can help rephrase it, just so I can help
7  clarify?
8    A.   Overlapped, I don't understand
9  that word.
10   Q.   Okay.  It seems like you worked
11 pretty closely with Sean in your work with the
12 HDA?
13   A.   He's my counterpart, so we attend
14 the same meetings usually, but I don't know that
15 overlapped would characterize it.
16   Q.   Did you have a close working
17 relationship with Sean?
18     MR. NICHOLAS:  Object to the
19   form.
20     Sorry, go ahead.
21     THE WITNESS:  Business
22   relationship.
23 BY MR. CLUFF:
24   Q.   Did you guys e-mail or talk on

Page 95

1  the phone frequently?
2    A.   Not frequently.  I'd say couple
3  times a month.
4    Q.   And the couple times a month you
5  did talk, would that be by e-mail or phone
6  predominantly?
7    A.   Phone.
8    Q.   Did you ever share any
9  information with Sean that would have benefited
10 Cardinal Health?
11     MR. NICHOLAS:  Object to the
12   form.
13     THE WITNESS:  Benefited?  What do
14   you mean?  I don't understand.
15 BY MR. CLUFF:
16   Q.   Did you ever share any
17 information with Sean that you thought would
18 have been helpful to his work at Cardinal
19 Health?
20   A.   No.
21   Q.   Do you recall if Sean ever shared
22 information with you that would have helped your
23 work at AmerisourceBergen?
24   A.   No.

Page 96

1    Q.   Do you know if he ever did share
2  information with you that would have helped your
3  work at AmerisourceBergen?
4    A.   No.
5    Q.   Are you telling me that that
6  never happened or that you don't recall it?
7    A.   We shared information about
8  government relations or government affairs type
9  activities, hearings, what's going on on the
10 hill, but not anything related to our companies.
11   Q.   Do you recall if Sean ever shared
12 anything that he thought would be helpful for
13 AmerisourceBergen's CEO?
14     MR. NICHOLAS:  Object to the
15   form.
16     THE WITNESS:  No.
17 BY MR. CLUFF:
18   Q.   Are you telling me that that
19 didn't happen or that you don't recall it?
20   A.   It didn't happen.
21   Q.   I believe another person that you
22 identified as attending HDA meetings with you
23 from Cardinal was Connie Woodburn; is that
24 right?

Page 97

1    A.   Yes.
2    Q.   Did you -- did you develop a
3  working relationship with Ms. Woodburn?
4    A.   Yes.
5    Q.   Did you guys communicate by phone
6  and by e-mail?
7    A.   Phone.
8    Q.   How often would you communicate
9  with Ms. Woodburn by phone?
10   A.   A couple times a year.
11   Q.   Is there a reason that you spoke
12 with Ms. Woodburn less frequently than Sean?
13   A.   No.
14   Q.   Do you recall ever sharing
15 information with Ms. Woodburn that would have
16 been helpful for her work at Cardinal Health?
17   A.   Only as it relates to legislative
18 activity, government affairs.
19   Q.   How about do you recall
20 Ms. Woodburn ever sharing information that was
21 helpful to you in your work at
22 AmerisourceBergen?
23     MR. NICHOLAS:  Object to the
24   form.

Page 98

1 THE WITNESS: No.
2 BY MR. CLUFF:
3 Q. I think you previously talked
4 about working with a woman named Ann Berkey from
5 McKesson in the HDA.
6 Do you recall that?
7 A. Yes.
8 Q. Do you recall developing a
9 working relationship with Ms. Berkey?
10 A. Yes.
11 Q. Did you communicate with her?
12 A. Yes.
13 Q. How often would you communicate
14 with Ms. Berkey?
15 A. Two or three times a year.
16 Q. Did you guys communicate or did
17 you -- could you communicate with Ms. Berkey by
18 e-mail or by phone?
19 A. Phone.
20 Q. How about Pete Slone, do you
21 recall developing a working relationship with
22 Mr. Slone?
23 A. Yes.
24 Q. And how often did you communicate

Page 99

1 with Mr. Slone?
2 A. Once a month.
3 Q. Did you communicate with
4 Mr. Slone by e-mail or by phone?
5 A. Both.
6 Q. Is there a reason that you spoke
7 with Mr. Slone less frequently than
8 Mr. Callinicos?
9 A. No, and I probably talked to them
10 approximately the same. I knew both of them
11 before they came to Cardinal McKesson, so I have
12 more of a -- I know them better than I knew
13 their predecessors.
14 Q. How did you know both of them
15 before they came to Cardinal and McKesson?
16 A. Because Sean worked for Sanofi,
17 and so I've known him in that capacity in
18 Washington, and Pete worked for a device company
19 so they were in DC and Ann and Connie were --
20 did not live in DC, so they weren't here very
21 much.
22 Q. Do you know the name Gary
23 Hillard?
24 A. No.

Page 100

1 Q. You never worked with Mr. Hillard
2 before?
3 MR. NICHOLAS: Well, object to
4 the form, if she doesn't know the name.
5 THE WITNESS: I don't know.
6 BY MR. CLUFF:
7 Q. Did you ever work with any
8 government affairs employees of pharmaceutical
9 manufacturers?
10 A. Did I ever work for, you mean --
11 Q. Work with.
12 A. Yes.
13 Q. Who would that be?
14 A. Before I came to
15 AmerisourceBergen, I worked for two
16 manufacturers.
17 Q. Let me clarify. That was not a
18 great question, based on your answer.
19 In your work at
20 AmerisourceBergen, did you ever work with
21 government affairs employees from any
22 pharmaceutical manufacturer?
23 A. Yes.
24 Q. Who would that be?

Page 101

1 A. David Burt from Genentech.
2 Q. Can you spell that last name?
3 A. B-u-r-t.
4 Jesse Kerns from Amgen. I can't
5 remember everybody's name, but they participate
6 in the -- in a -- I don't know -- a physician
7 coalition.
8 Q. What's that physician coalition?
9 A. This is the COA.
10 Q. The Community Oncology
11 Association?
12 A. Alliance or -- something like
13 that. I don't know if it's association or
14 alliance.
15 Q. But that's the entity you
16 referenced earlier that is abbreviated COA?
17 A. Yes.
18 Q. Did you ever work with any
19 government affairs people from Purdue?
20 A. No.
21 Q. Do you know the name Burt Rosen?
22 A. Yes.
23 Q. You ever worked with Burt Rosen?
24 A. Well, I've known Burt since when

Case: 1:17-md-02804-DAP  Doc #: 2173-48  Filed: 08/12/19  27 of 92.  PageID #: 315774
Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 I was in the pharmaceutical industry and he was
2 in the pharmaceutical industry.
3      Q.    So have you ever worked with
4 Mr. Rosen?
5      A.    I have --
6           MR. NICHOLAS:  I object to the
7      form.  If you could just -- ever or just
8      so we don't have the same thing with the
9      last.
10 BY MR. CLUFF:
11      Q.    Have you worked with Mr. Rosen
12 since you've been employed by AmerisourceBergen?
13      A.    No.
14      Q.    Have you ever exchanged
15 correspondence with Mr. Rosen since you've been
16 employed at AmerisourceBergen?
17      A.    Yes.
18      Q.    In what capacity would you have
19 exchanged correspondence with Mr. Rosen?
20      A.    He e-mailed me about the Pain
21 Coalition several years ago, and we talked about
22 it, but that's about it.
23      Q.    Do you recall if he initiated
24 that correspondence or if you initiated that

Page 103

1 correspondence?
2      A.    He initiated that.
3      Q.    What was the purpose of his
4 correspondence with you?
5           MR. NICHOLAS:  Object to the
6      form.
7           THE WITNESS:  Just to see if we
8      were interested in participating.
9 BY MR. CLUFF:
10      Q.    And when you say "we," you mean
11 AmerisourceBergen?
12      A.    Yes, AmerisourceBergen.
13      Q.    And you specifically recall
14 receiving and corresponding with Mr. Rosen about
15 the Pain Care Coalition?
16      A.    That's the only official
17 communication I've had with him since I've been
18 at AmerisourceBergen.
19      Q.    How about Teva Pharmaceuticals or
20 Teva Pharmaceuticals, have you communicated with
21 anybody from Teva?
22      A.    Yes.
23      Q.    Okay.  Who was that?  And I'll
24 clarify it, after you started working for

Page 104

1 AmerisourceBergen.
2      A.    Yes, Rob Falb.
3      Q.    Can you spell that last name?
4      A.    F-a-l-b.  And Debra -- I'm
5 blanking on her last name.  She used to be my
6 counterpart there.
7      Q.    Do you recall what the substance
8 of those communications were?
9      A.    They used to hold a charitable
10 dinner that we participated in.
11      Q.    Do you recall when that would
12 have been?
13      A.    Probably 2007 to -- annually,
14 2015.
15      Q.    How about Mallinckrodt, have you
16 ever communicated after you started working at
17 AmerisourceBergen with anybody from government
18 affairs office at Mallinckrodt?
19      A.    Yes.
20      Q.    Who would that be?
21      A.    I can't remember the name right
22 now.  I can't remember her name.
23      Q.    Do you recall what the substance
24 of that communication might have been?

Page 105

1      A.    We talked about the opioid
2 legislation that passed Congress last year, the
3 CARA and CARA 2.0.  Actually, we talked about
4 CARA 2.0.  Erika Long.
5      Q.    What does CARA 2.0 stand for?
6      A.    The -- I can't remember.  CARA
7 was a comprehensive legislation to help -- to
8 help solve the opioid crisis.
9      Q.    Is CARA 2.0 something that
10 AmerisourceBergen was lobbying in favor of?
11           MR. NICHOLAS:  Object to the
12      form.
13           THE WITNESS:  No.  I mean, we
14      weren't lobbying on that issue
15      specifically.  We weren't lobbying on
16      that bill specifically, but we supported
17      it, but we were not -- if asked, but we
18      were not lobbying on that bill.
19 BY MR. CLUFF:
20      Q.    Do you recall why you were
21 communicating with Mallinckrodt about that bill?
22      A.    Yes, we were working with them on
23 some provisions to improve the DEA's use of
24 ARCOS data to help provide more transparency.

Golkow Litigation Services                    Page 27 (102 - 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.    Is that also referred to as the
2  DEA clearinghouse?
3    A.    Yes.
4    Q.    Is the DEA clearinghouse
5  something that AmerisourceBergen was lobbying in
6  favor of?
7    A.    Yes.
8       MR. NICHOLAS:  I was going to
9    object to the form, but you've already
10   answered the question, but I'll
11   interpose my belated objection.
12      It's okay.  Go ahead.
13 BY MR. CLUFF:
14   Q.    Try to give your counsel a
15 chance.
16   A.    I will.
17   Q.    Do you recall who Amerisource --
18 did AmerisourceBergen work with any other
19 manufacturers or distributors in favor of the
20 clearinghouse?
21   A.    No.
22   Q.    Just for clarity, are you telling
23 me that you don't recall or that
24 AmerisourceBergen did not work with anyone else?

Page 107

1    A.    I don't know.
2    Q.    Have you heard of the
3  Anti-Diversion Industry Working Group?
4    A.    No.
5    Q.    Aside from the DEA clearinghouse,
6  was there anything else that AmerisourceBergen
7  was working with Mallinckrodt on?
8    A.    No.
9    Q.    Do you know the manufacturer
10 Actavis?
11   A.    I know who they are.
12   Q.    Have you worked with anybody
13 since you joined AmerisourceBergen from the
14 government affairs office of Actavis?
15   A.    No.
16   Q.    How about Allergan, do you know
17 that manufacturer?
18   A.    Yes.
19   Q.    Since joining AmerisourceBergen
20 have you worked with anybody from government
21 affairs at Allergan?
22   A.    No.
23   Q.    Do you know the manufacturer
24 Johnson & Johnson?

Page 108

1    A.    Yes.
2    Q.    Do you know the manufacturer
3  Janssen?
4    A.    Yes.
5    Q.    Have you worked since you joined
6  AmerisourceBergen with anybody from government
7  affairs from either of those manufacturers?
8    A.    Yes.
9    Q.    Which one?
10   A.    Johnson & Johnson.
11   Q.    Who did you work with from
12 Johnson & Johnson?
13   A.    Mark Reese.
14   Q.    Can you spell that last name?
15   A.    R-e-e-s-e.
16   Q.    And in what capacity did you work
17 with Mark Reese?
18   A.    Physician reimbursement issues.
19   Q.    Do you recall when that was?
20   A.    From 2006 to 2017.
21   Q.    So it sounds like an ongoing
22 relationship on that issue?
23   A.    He retired.  Yes.
24   Q.    I want to talk about some

Page 109

1  pharmacies for a minute, and it's going to be a
2  similar line of questioning that we did with the
3  manufacturers, just to understand the scope of
4  the world, I guess.
5       Did you, after you joined
6  AmerisourceBergen, work with anyone in the
7  regulatory affairs -- or excuse me -- government
8  affairs office at Rite Aid?
9    A.    Yes.
10   Q.    Who would that have been?  Does
11 the name Yong Choe ring any bells?
12   A.    Yes, Yong Choe.
13   Q.    When did you start working with
14 Mr. Choe?
15   A.    Well, I worked with him before he
16 went to Rite Aid, so he worked on the hill, so
17 since 2008.
18   Q.    Do you recall in what capacity
19 you worked with Mr. Choe before he joined Rite
20 Aid?
21   A.    He was a congressional staffer
22 working on pharmacy and healthcare issues.
23   Q.    Did Mr. Choe also work at the
24 NACDS?

Page 110

1    A.    I don't know.

2    Q.    After Mr. Choe joined Rite Aid,
3  what did you work with him on?

4    A.    Pharmacy reimbursement issues.

5    Q.    Do you recall anything more
6  specific than that?

7    A.    Provider status.

8    Q.    What does that mean?

9    A.    That's legislation to recognize
10  and reimburse pharmacists for services that they
11  can do on behalf of physicians in areas where
12  there's not enough physicians available.

13    Q.    Did you e-mail or have phone
14  calls with Mr. Choe?

15    A.    Yes.

16    Q.    Do you recall how frequently that
17  was?

18    A.    Once or twice a month.

19    Q.    After you joined
20  AmerisourceBergen, did you work with anybody
21  from the government affairs office at Walgreens?

22    A.    Yes.

23    Q.    Who would that have been?

24    A.    First Debby Garza and then Ed

Page 111

1  Kaleta, now Ed Kaleta.

2    Q.    When would you have worked with
3  Ms. Garcia -- or Garza, excuse me?

4    A.    Since 2004 to -- I think she left
5  in 2015.

6    Q.    And would you have worked with
7  Mr. Kaleta from 2015 to the present?

8    A.    Yes.

9    Q.    Do you recall what issues or
10  anything that you would have worked with
11  Ms. Garza about between 2004 and 2015?

12    A.    Just pharmacy, general pharmacy
13  issues.

14    Q.    How about Mr. Kaleta, do you
15  recall anything that you would have worked with
16  Mr. Kaleta on?

17    A.    Pharmacy issues and we have been
18  working together on controlled substance
19  disposal issues.

20    Q.    What does that mean?

21    A.    Well, it's not really issues.
22  Walgreens has the kiosks in their -- in their
23  stories so people can dispose of their unused
24  pharmaceuticals, and we've worked together on

Page 112

1  some congressional events.

2    Q.    So -- sorry, I didn't mean to
3  interrupt you.

4    A.    That's it.

5    Q.    So was AmerisourceBergen
6  coordinating with Walgreens on this controlled
7  substance disposal program?

8    A.    Yes.

9    Q.    Did you ever discuss making
10  campaign contributions with anybody from
11  Walgreens?

12    A.    We discussed fundraisers.

13    Q.    What fundraisers did you discuss?

14    A.    I don't remember.

15    Q.    Are fundraisers different than
16  campaign contributions?

17    A.    Fundraisers are events where the
18  participants will provide PAC contribution or a
19  person contribution.

20    Q.    Do you recall if Walgreens ever
21  asked AmerisourceBergen to make campaign
22  contributions to any specific candidates?

23    A.    No.

24    Q.    Are you aware that Walgreens is

Page 113

1  one of AmerisourceBergen's customers?

2    A.    Yes.

3    Q.    And they're also a large
4  stockholder of AmerisourceBergen as well?

5    A.    Yes.

6    Q.    Are you aware that Walgreens
7  holds a board position --

8    A.    Yes.

9    Q.    -- at AmerisourceBergen?

10    A.    Yes.

11    Q.    Sorry.  I paused during my
12  question.  My fault.

13        As a government affairs person,
14  is it part of your job responsibilities to be
15  aware of the laws and statutes governing
16  campaign contributions?

17    A.    Yes.

18    Q.    Is there any prohibition for
19  making campaign contributions in the name of
20  another person?

21        MR. NICHOLAS:  Object to the
22  form.

23        THE WITNESS:  I don't know.  I
24  don't understand the question.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

BY MR. CLUFF:

Q. What about CVS, after you joined AmerisourceBergen, did you work with anybody from CVS?

A. Yes.

Q. Who would that have been?

A. Melissa Schulman.

Q. Can you spell her last name?

A. S-c-h-u-l-m-a-n.

Q. When would you have worked with Ms. Schulman?

A. Approximately 2014 until now.

Q. Do you recall what issues you might have worked with Ms. Schulman on?

A. No, just general pharmacy related.

Q. Before you began working with Ms. Schulman in 2014, was there another person at CVS that you worked with?

A. I don't remember.

Q. After you joined AmerisourceBergen, did you work with anybody from government affairs at Walmart?

A. No.

Page 115

Q. Going back to CVS for a second, with Ms. Schulman, did you communicate with her by e-mail or telephone?

A. Telephone.

Q. Do you recall how frequently?

A. Rarely. Maybe once or twice.

Q. Do you know the pharmacy chain Discount Drug Mart?

A. No.

Q. I'm guessing then that you never communicated, after you joined AmerisourceBergen, with anybody in their government affairs office?

A. No.

Q. That's easy.

I want to go back to Walgreens for a second.

Ed Kaleta was one of the people that you communicated with at Walgreens, correct?

A. Yes.

Q. Do you recall exchanging correspondence with Ms. Kaleta -- or excuse me -- Mr. Kaleta?

Page 116

A. Yes.

Q. Do you recall exchanging correspondence with Mr. Kaleta in 2018?

A. Not specifically.

Q. I think you mentioned fundraisers that you discussed with the government affairs people from Walgreens; is that correct?

A. Yes.

Q. Do you recall that Walgreens hosted a McCarthy fundraiser in 2018?

A. I don't recall.

Q. Do you recall if Mr. Kaleta ever asked you if AmerisourceBergen had money left for McCarthy?

A. I don't recall.

Q. Let's look at a document then. I'm going to hand you a copy of WAGMDL00646203.

MR. CLUFF: I'll note for the record that Ms. Norton is a recipient and author of every e-mail in this chain, and, therefore, we are permitted to use it with her during the deposition pursuant to the Protective Order in place.

Page 117

This copy is yours. You'll see at the bottom it's marked Exhibit 1.

(Document marked for identification as Norton Deposition Exhibit No. 1.)

BY MR. CLUFF:

Q. Go ahead and take a second to look at, Ms. Norton.

MR. MAHADY: Sterling, just so the record is clear, I think she's a recipient or author. I believe you said recipient and author.

MR. CLUFF: Yes, recipient or author. Thanks for the correction, Joe.

(Witness reviews document.)

BY MR. CLUFF:

Q. It's a pretty short document, Ms. Norton. If you look at the second page of the document, there's a subject that says "Walgreens Hosted McCarthy Fundraiser."

Do you see that?

A. Yes.

MR. NICHOLAS: Could you just -- this is all fine. I just want to make

Page 118

1    sure she has the opportunity to read the
2    document.
3         MR. CLUFF:  Yeah, I'm not going
4    to try to ask her questions about stuff
5    that I haven't directed her to.
6         MR. NICHOLAS:  No, I know, but
7    she probably wants to look at the whole
8    thing.
9         (Witness reviews document.)
10  BY MR. CLUFF:
11    Q.   Have you had a chance to review
12  the document?
13    A.   Yes.
14    Q.   Okay.  Let's start on the second
15  page.  You'll note down at the bottom that the
16  Bates number ends in 646204.
17         Do you see that?
18    A.   Yes.
19    Q.   During the day we might talk
20  about documents that are slightly more
21  complicated than this one, so I'll try to use
22  the Bates number at the bottom to help us all
23  get on the same page.
24    A.   Okay.

Page 119

1    Q.   So you see the subject here is
2  "Walgreens Hosted McCarthy Fundraiser."
3         Do you see that?
4    A.   Yes.
5    Q.   And if you turn to the first
6  page, which ends in 646203, in the middle of the
7  page there is an e-mail from Ed -- is it Kaleta?
8    A.   Kaleta.
9    Q.   And he sends it to you and to
10  Brad Tallamy.
11         Do you see that?
12    A.   Yes.
13    Q.   Subject is "Forward:  Walgreens
14  Hosted McCarthy Fundraiser."
15         Do you see that?
16    A.   Yes.
17    Q.   And he says, Rita, we could
18  really use help on this.  Do you have McCarthy
19  money left?
20         Do you see that?
21    A.   Yes.
22    Q.   What did he mean or do you
23  understand what he meant when he asked you if
24  you had McCarthy money left?

Page 120

1         MR. NICHOLAS:  Object to the
2    form.
3         THE WITNESS:  He meant do we have
4    money left in our budget, our PAC budget
5    for Congressman McCarthy.
6  BY MR. CLUFF:
7    Q.   So did you understand that to be
8  a request that AmerisourceBergen contribute PAC
9  money to the McCarthy fundraiser?
10    A.   Yes.
11    Q.   Earlier I asked you if Walgreens
12  ever asked AmerisourceBergen to make campaign
13  contributions.
14         Does this e-mail refresh your
15  recollection?
16         MR. NICHOLAS:  Object to the
17    form.
18         THE WITNESS:  Yes.
19  BY MR. CLUFF:
20    Q.   So Walgreens did, in fact, ask
21  AmerisourceBergen to make campaign
22  contributions?
23         MR. NICHOLAS:  Object to the
24    form.

Page 121

1         THE WITNESS:  They asked us to
2    participate in a fundraiser.
3  BY MR. CLUFF:
4    Q.   The next e-mail up the chain, you
5  reply to Ed and you say "Hi, Ed, we are maxed to
6  his re-elect but can do leadership PAC?"
7         What does it mean to be maxed to
8  a re-elect?
9    A.   So Political Action Committees
10  are strictly regulated by the Federal Election
11  Commission, and there are strict limits.  We
12  report monthly how much we contribute, and you
13  can't contribute more than $5,000 per campaign,
14  per candidate from a Political Action Committee
15  to a federal candidate.
16         So if we've given 5,000 to his
17  campaign, then we can't give any more, and that
18  means we're maxed.
19    Q.   So, essentially, the first part
20  of your answer to Ed is that AmerisourceBergen
21  was maxed on McCarthy's re-election campaign?
22    A.   Yes.
23    Q.   But then your sentence continues
24  and says, "but can do leadership PAC."

Page 122

1    A.    Yes.

2    Q.    What does make mean?

3    A.    So some members of Congress also

4 form a separate PAC from their re-election PAC

5 called a leadership PAC, and that means that --

6 they use the funds in those Political Action

7 Committees to support colleagues' campaigns in

8 Congress.

9         And so according to the laws

10 regulating and regulations on PACs, you could --

11 you can give another annual $5,000 from your PAC

12 to their leadership PAC.  But their re-elect

13 PAC, you can only give $5,000 per campaign every

14 two years because that's a cycle for a house

15 member.

16    Q.    So to kind of break out your

17 answer based on the information you just gave

18 us, you essentially replied to Ed and say,

19 AmerisourceBergen is maxed on PAC contributions

20 to McCarthy's re-election campaign, but

21 AmerisourceBergen could donate to McCarthy's

22 leadership PAC.

23         MR. NICHOLAS:  I'm going to

24         object to the form.

Page 123

1 BY MR. CLUFF:

2    Q.    Is that what you're communicating

3 to him?

4    A.    Yes.

5    Q.    And then is there a reason why

6 you ended it with a question mark, that

7 sentence?

8    A.    Because -- oh, well, because I

9 was asking if that was acceptable.

10    Q.    And then you continue by asking

11 another question you say, "Can you do a trade

12 with us for Sessions?"

13         Do you see that?

14    A.    Yes.

15    Q.    What did you mean by that?

16    A.    So Congressman Pete Sessions was

17 having a fundraiser that I had responsibility

18 for, I was hosting, I guess, and so we

19 frequently will ask each other to support events

20 that we're hosting because we like to do these

21 events together, these fundraisers.

22    Q.    So when Mr. Kaleta asked if

23 you could -- if AmerisourceBergen had any

24 McCarthy money left, you essentially said that

Page 124

1 AmerisourceBergen could contribute to the

2 leadership PAC, but you wanted a trade from

3 Walgreens for a donation to Sessions?

4    A.    Congressman Pete Sessions.

5    Q.    Was it commonplace in the

6 pharmaceutical industry to trade campaign

7 contributions between like distributors and

8 customers?

9         MR. NICHOLAS:  Object to the

10         form.

11         THE WITNESS:  I don't know.

12 BY MR. CLUFF:

13    Q.    Did you ever enter into such an

14 arrangement with any other pharmacies?

15         MR. NICHOLAS:  Object to the

16         form.

17         THE WITNESS:  Yes.

18 BY MR. CLUFF:

19    Q.    Which ones?

20    A.    Did you say with any pharmacies?

21    Q.    Yeah, so Walgreens is a pharmacy,

22 correct?

23    A.    Yes.

24    Q.    Right.  And here it appears that

Page 125

1 you're entering into a trade for campaign

2 contributions with Walgreens, which is a

3 pharmacy.

4         So my question is did

5 AmerisourceBergen ever form any other agreements

6 like that with other pharmacies?

7         MR. NICHOLAS:  Object to the

8         form.

9         THE WITNESS:  Yes.

10 BY MR. CLUFF:

11    Q.    Do you recall which ones?

12    A.    Rite Aid.

13    Q.    Do you remember who you would

14 have spoken to about that kind of an agreement

15 at Rite Aid?

16    A.    Yong Choe.

17    Q.    Okay.  Any other pharmacies that

18 you had agreements with?

19    A.    No.

20    Q.    How about other distributors, did

21 Amerisource ever make agreements like this one

22 with Walgreens with other distributors?

23         MR. NICHOLAS:  Object to the

24         form.

Page 126

1    THE WITNESS: So it's very common
2  to do this. It's just a way of
3  supporting each other, and these
4  fundraisers are attended by all -- you
5  know, we try to make them very much
6  educational opportunities for whoever
7  we're raising funds for so that we can
8  speak as a community on issues that we
9  are educating on, and so it's frequent
10 for us -- it's common for us to talk to
11 other, you know, pharmacy organizations
12 to see if we can do things together, so
13 we can communicate together, so this is
14 not unusual.
15    MR. CLUFF: I'm going to pause
16 the record for just a second. Is the
17 live feed down for anybody else?
18    MR. CREADORE: Right, mine is
19 down.
20    THE VIDEOGRAPHER: Off the record
21 at 12:02.
22    (Luncheon recess.)
23    THE VIDEOGRAPHER: Back on the
24 record at 1:00.

Page 127

1  BY MR. CLUFF:
2    Q.   Welcome back, Ms. Norton, from
3  the lunch break. We're back on the record. So,
4  once again, you're back under oath.
5    Do you understand that?
6    A.   Yes.
7    Q.   Okay, great. So before we broke
8  for lunch, we were talking about an agreement on
9  campaign contributions that you were discussing
10 with Ed Kaleta.
11    Do you recall that?
12    A.   Yes.
13    Q.   Okay. And I asked you if it was
14 -- if AmerisourceBergen had made any other such
15 agreements about campaign contributions with
16 distributors.
17    Do you recall that discussion?
18    MR. NICHOLAS: Go ahead. You're
19 just asking if she recalls the question,
20 right?
21    MR. CLUFF: Yeah.
22    MR. NICHOLAS: Okay.
23    THE WITNESS: No.
24 BY MR. CLUFF:

Page 128

1    Q.   Then I'll ask it fresh.
2    Did AmerisourceBergen ever make
3  agreements about campaign contributions with any
4  other wholesale distributors?
5    MR. NICHOLAS: Object to the
6  form.
7    THE WITNESS: We work with the
8  other distributors on fund -- you know,
9  fundraisers together and we agree to
10 support each other's fundraisers, but
11 that's, you know, a very common practice
12 in Washington and among all companies.
13 BY MR. CLUFF:
14    Q.   So if I understand you correctly,
15 it's common practice to support -- when you say
16 each other, you would mean, for example, for
17 Amerisource to support a McKesson fundraiser?
18    A.   Yes.
19    Q.   How about a Cardinal Health
20 fundraiser?
21    A.   Yes.
22    Q.   And would it be common for both
23 of those entities to support an
24 AmerisourceBergen fundraiser?

Page 129

1    MR. NICHOLAS: Object to the
2  form.
3    THE WITNESS: Yes.
4  BY MR. CLUFF:
5    Q.   How about is that kind of a
6  practice common with pharmacies like Rite Aid or
7  Walgreens, for example?
8    MR. NICHOLAS: Object to the
9  form.
10    THE WITNESS: Yes.
11 BY MR. CLUFF:
12    Q.   How about with manufacturers, is
13 that a practice that was common with
14 pharmaceutical manufacturers?
15    MR. NICHOLAS: Object to the
16 form.
17    THE WITNESS: Yes.
18 BY MR. CLUFF:
19    Q.   I think earlier when I asked you
20 about, you know, that kind of a practice in the
21 supply chain industry, you did tell me that it
22 was common.
23    Is that a way that
24 AmerisourceBergen, for example, could support

Page 130

1  other members of the supply chain?
2         MR. NICHOLAS:  Object to the
3     form.
4         THE WITNESS:  I don't understand
5     that question.
6  BY MR. CLUFF:
7     Q.    Was it a way that
8  AmerisourceBergen could help its partners in the
9  supply chain by, you know, agreeing to support
10  their fundraisers?
11        MR. NICHOLAS:  Same objection.
12        THE WITNESS:  So holding
13     fundraisers in Washington is a common
14     practice among all companies,
15     associations, charitable organizations.
16     I mean, everybody does it because it's
17     an opportunity to sit together and
18     educate an elected official or a
19     candidate for elected office, and the
20     reason that we often do this, the
21     healthcare industry does them together
22     is because then we can talk about issues
23     and educate on our industry all
24     together.

Page 131

1         If the oil and gas industry was
2     in the room and we'd be talking about
3     oil and gas issues and not healthcare
4     issues.
5         So this practice of supporting
6     each other's fundraisers is just a way
7     to organize so that we can do our
8     fundraisers together and spend that time
9     together, you know, talking about and
10     educating about our industry.
11  BY MR. CLUFF:
12     Q.    So one of the purposes of these
13  fundraisers was for the industry members who
14  were present to coordinate and educate
15  legislators?
16     A.    To educate legislators.
17     Q.    And was supporting -- was
18  supporting other industry members' fundraisers,
19  was that a way to coordinate the educational
20  efforts?
21        MR. NICHOLAS:  Object to the
22     form.
23        THE WITNESS:  I would not use the
24     word "coordinate."

Page 132

1  BY MR. CLUFF:
2     Q.    What word would you use?
3        MR. NICHOLAS:  Object to the
4     form.
5        THE WITNESS:  I would -- I don't
6     know.  Quick communicate.
7  BY MR. CLUFF:
8     Q.    Do you feel that it was important
9  for the pharmaceutical industry to speak as one
10  voice when they were educating legislators about
11  issues?
12        MR. NICHOLAS:  Object to the
13     form.
14        THE WITNESS:  Well, every company
15     is going to have its own perspective, so
16     there might be a commonality among
17     support for particular legislation or
18     that impacts an industry, but every
19     company is going to have a unique
20     perspective.
21  BY MR. CLUFF:
22     Q.    So that wasn't quite my question.
23        I'm asking if the pharmaceutical
24  industry -- members of the pharmaceutical, you

Page 133

1  know, supply chain industry if they try to speak
2  as one voice when they're dealing with
3  legislators?
4        MR. NICHOLAS:  Object to the
5     form.  Object to the statement at the
6     beginning of your question.
7        THE WITNESS:  I don't think that
8     would accurately characterize it.
9  BY MR. CLUFF:
10     Q.    Do you know if anybody at
11  AmerisourceBergen has ever talked about wanting
12  to speak as one voice on behalf of the supply
13  chain industry?
14        MR. NICHOLAS:  Object to the
15     form.
16        THE WITNESS:  No.
17  BY MR. CLUFF:
18     Q.    Is the answer you don't know or
19  the answer is no, no one has ever said that?
20     A.    I don't know.
21        MR. CLUFF:  I want to show you a
22     copy of the document that's been
23     produced in the case by
24     AmerisourceBergen.  We'll mark it as

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1   Exhibit 2. It's Bates stamped
2   ABDCMDL00251549. It's number 42.
3       (Document marked for
4   identification as Norton Deposition
5   Exhibit No. 2.)
6  BY MR. CLUFF:
7       Q.   As you can see, the document has
8  been heavily redacted. The substance of the
9  document that's not redacted is at the very
10 bottom of the second page, I think.
11      A.   (Witness reviews document.)
12          Okay.
13      Q.   So just to sort of lay some
14 foundation here, do you see at the bottom of the
15 first page there is a large bold block of text
16 that says CEPOP, with what look like gears next
17 to it?
18      A.   Yes.
19      Q.   And then in very small, faint
20 print it says, to my best eyesight,
21 "Collaborative For Effective Prescription Opioid
22 Policies"?
23      A.   Yes.
24      Q.   Do you know what that is?

Page 135

1       A.   Yes, it's a coalition that's
2  working together to try to support solutions to
3  the opioid crisis.
4       Q.   Do you know who the members or
5  participants of that entity are?
6       A.   There's quite -- there's a lot of
7  members, a lot of companies and associations,
8  patient organizations. It's, you know, a
9  consortium of organizations.
10      Q.   What are the -- let's start with
11 companies. Are any pharmaceutical manufacturer
12 companies members of -- I'm going to call it
13 CEPOP, is that okay?
14      A.   Yes.
15      Q.   Are any manufacturer companies
16 members of CEPOP?
17      A.   Yes.
18      Q.   Which ones?
19      A.   Mallinckrodt. I can't remember
20 any other manufacturers, but I know there are
21 other manufacturers, not a lot. We're the only
22 distributor in this organization.
23      Q.   Do you know whether -- so you
24 said no other manufacturer members?

Page 136

1       A.   I don't know. I think there are,
2  but I don't know who they are. I can't name
3  them.
4       Q.   And you said you think that there
5  are no other distributor companies that are
6  members?
7       A.   No, and I think when they were
8  formed, they were not trying to be like
9  dominated by any particular industry, they
10 wanted to have representation from all areas
11 that touched the opioid abuse crisis, and so
12 they weren't looking to have, you know, over
13 concentration from any one industry.
14      Q.   Do you know if any pharmacy
15 companies are members of CEPOP?
16      A.   I don't know.
17      Q.   How about trade organizations or
18 associations, do you know if any trade
19 organizations or associations are members of
20 CEPOP?
21      A.   I don't know.
22      Q.   How about, for example, NADDI,
23 N-A-D-D-I, are they a member?
24      A.   I don't know.

Page 137

1       Q.   NACDS?
2       A.   I don't know.
3       Q.   How about NCPA?
4       A.   I don't have the membership, you
5  know.
6       Q.   It's okay. I'm just --
7       A.   And I haven't been to any of
8  their meetings recently, so I can't say.
9       Q.   Do you recall how frequently
10 CEPOP met?
11      A.   Approximately once or twice a
12 month.
13      Q.   Okay. I want to look at the
14 second to last e-mail there. It says
15 Friday, October 16, 2015, 3:41 p.m. The sender
16 is probably over privileged there, but it looks
17 like it's sent to Zimmerman, Chris and Steve
18 Mays.
19          Do you think this is an e-mail
20 you might have sent to Chris or Steve?
21      A.   I don't know.
22      Q.   If you look above that, Chris
23 Zimmerman replies to you, to Elizabeth Campbell,
24 Steve Mays, David Casalenuovo, David May, Chris

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  -- and Brad Tallamy.
2          MR. CLUFF:  Is that Chris?
3          MR. NICHOLAS:  Yeah.
4  BY MR. CLUFF:
5      Q.   Looking at the e-mail from
6  Zimmerman to you and Elizabeth Campbell, et al.,
7  do you think that this is an e-mail you might
8  have sent to Chris?
9          MR. NICHOLAS:  Object to the
10     form.
11         THE WITNESS:  I don't recall.
12 BY MR. CLUFF:
13     Q.   Looking at the text of the second
14 to last e-mail on the first page, in the second
15 sentence someone writes, I know we usually speak
16 as one voice through HDMA.
17         Do you see that?
18         MR. NICHOLAS:  Go ahead.  Object
19     to the form.
20         Go ahead.
21         THE WITNESS:  Yes.
22 BY MR. CLUFF:
23     Q.   Does that refresh your
24 recollection that the industry tried to speak as

Page 139

1  one voice through the HDMA?
2          MR. NICHOLAS:  Object to the
3      form.
4          THE WITNESS:  I think that is a
5      really general statement that anybody
6      could use.  I don't -- but it could be.
7      I don't know if I wrote this or not.  I
8      don't know who wrote this.
9  BY MR. CLUFF:
10     Q.   But, generally, you would agree
11 as a general statement that the industry tried
12 to speak as one voice through the HDMA?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  Not generally, but,
16     I mean, on certain issues.  You know,
17     that's a very difficult question.
18 BY MR. CLUFF:
19     Q.   Why is it difficult?
20     A.   Because it's, you know -- there
21 are times like if the industry is supporting a
22 bill, then the position would be unified, but a
23 lot of times the positions among each company it
24 differs because every company is different and

Page 140

1  sees things differently.  So I don't -- I
2  wouldn't normally say that, so I don't know what
3  the context of this is.
4      Q.   Well, we can agree that this
5  e-mail says somebody knows we usually speak as
6  one voice through the HDMA, correct?
7          MR. NICHOLAS:  You're asking
8      whether that's what the words say on the
9      piece of paper?
10         MR. CLUFF:  Yes, Bob.
11         MR. NICHOLAS:  Okay.  Go ahead.
12 BY MR. CLUFF:
13     Q.   So, Ms. Norton, we can agree --
14     A.   That's what this says, yes, this
15 e-mail.
16     Q.   Okay, great.  So then the e-mail
17 continues, but I don't see the harm -- and it
18 says is sending a letter out from ABC directly
19 to ONDCP with HDMA copied.
20         Do you see that?
21     A.   Yes.
22     Q.   And then there's a parenthetical
23 statement that says "unless there is some
24 agreement in place which would prohibit this."

Page 141

1          Have you ever heard of any
2  agreements that would prohibit a company like
3  AmerisourceBergen from speaking out directly
4  about an issue?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  No, I have never
8      heard of that.
9  BY MR. CLUFF:
10     Q.   Do you know why anybody who wrote
11 this e-mail would have thought that there could
12 be an agreement limiting ABC's ability to speak
13 directly about an issue?
14         MR. NICHOLAS:  Object to the
15     form, lack of foundation.
16         THE WITNESS:  No, I don't.
17 BY MR. CLUFF:
18     Q.   Earlier we talked about some
19 individuals from other companies that you would
20 have worked with in your role as a government
21 affairs employed at AmerisourceBergen.
22         Do you recall that?
23     A.   Do I recall --
24     Q.   That we had that conversation.

Page 142

1    A.    Yes.
2    Q.    I want to ask you about some
3    other names.
4          In your work with Rite Aid after
5    you joined AmerisourceBergen, did you work with
6    Daniel Miller?
7    A.    I don't know that name.
8    Q.    Did you work with John Koster?
9    A.    Yes.
10   Q.    What was your work with John
11   Koster?
12         MR. NICHOLAS:  Object to the
13         form.
14         THE WITNESS:  When?  I've known
15         John Koster a long time, in a lot of
16         different roles.  When are you referring
17         to?
18   BY MR. CLUFF:
19   Q.    What did you work on with Mr.
20   Koster after you joined AmerisourceBergen?
21   A.    Medicaid pharmacy reimbursement
22   issues.
23   Q.    Anything else?
24   A.    No, not that I -- I don't recall.

Page 143

1    Q.    You mentioned that you've known
2    John Koster a long time.  How do you know him
3    before your work with him at AmerisourceBergen?
4    A.    I knew John when he worked in the
5    Senate and when he worked at NACDS, NCPA.  He
6    worked as a consultant for us, and now he works
7    for CMS.
8    Q.    What's CMS?
9    A.    CMS is the Center for Medicaid
10   and Medicare Services under the Department of
11   Health and Human Services.
12   Q.    In what capacity did Mr. Koster
13   work for AmerisourceBergen as a consultant?
14   A.    He worked for us as a consultant
15   for about a year after he left NCPA on Medicaid
16   pharmacy reimbursement issues.
17   Q.    In your work after you joined
18   AmerisourceBergen, did you have occasion to work
19   with a person named Allen Horne from CVS?
20   A.    I'm sorry, repeat the name.
21   Q.    Yeah, Allen Horne, H-o-r-n-e?
22   A.    No.
23   Q.    How about Elizabeth Brooks?
24   A.    Yes.

Page 144

1    Q.    And what work did you do with
2    Elizabeth Brooks after you joined
3    AmerisourceBergen?
4    A.    I'm sorry, let me step back.  I
5    know Elizabeth Brooks, but I have never worked
6    with her.
7    Q.    How do you know Ms. Brooks?
8    A.    She's been in the healthcare
9    industry for several years, and she will
10   participate in meetings with NC -- NACDS, where
11   we will see her, so just to the extent our
12   companies work on similar pharmacy issues.
13   Q.    Okay.  Did you ever work with
14   Ms. Brooks on similar pharmacy issues between
15   AmerisourceBergen and CVS?
16   A.    No.
17   Q.    In the HDA did you communicate
18   with any specific individual on a regular basis?
19   A.    At HDA?
20   Q.    HDA specifically employees, yes.
21   A.    Several.
22   Q.    Which ones?
23   A.    Patrick Kelly, Elizabeth
24   Gallenagh, Kristen Freitas, Jewelyn Cosgrove.

Page 145

1    Q.    Is that J-e-w-e-l-y-n?
2    A.    I think it's J-e-w-e-l-y-n.
3          And Matt DiLoreto I would say are
4    the main ones.
5    Q.    How about Perry Fri?
6    A.    I know Perry Fri, but I don't
7    work with him.
8    Q.    How about Anita Ducca?
9    A.    I know Anita, but I don't work
10   regularly with her.
11   Q.    How about John Gray?
12   A.    I have limited contact with John
13   Gray.
14   Q.    In what capacity did you during
15   your time at AmerisourceBergen work with
16   Mr. Kelly in the HDA?
17   A.    Please can you repeat that
18   question.
19   Q.    Sure.  I'm trying to limit the
20   question to the time you were at
21   AmerisourceBergen, first of all, and then I'm
22   curious during that time what did you -- in what
23   capacity did you work with Mr. Kelly?
24   A.    So he oversees federal government

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  affairs, and so I work with him just generally
2  on government affairs issues.
3      Q.    How -- when did you start working
4  with Mr. Kelly on federal government affairs?
5      A.    When he joined HDA.
6      Q.    And when was that?
7      A.    I don't know exactly.  I'm
8  guess -- I would estimate five years ago.
9      Q.    Who did you work with at the HDA
10 prior to Mr. Kelly becoming the person who
11 oversees the federal government affairs issues?
12     A.    Scott Melville.
13     Q.    And when did you start working
14 with Scott Melville?
15     A.    Well, I worked with Scott
16 Melville before I joined AmerisourceBergen, but
17 he was at HDA when I started with it.
18     Q.    So from 2004 --
19     A.    Yes.
20     Q.    -- till Mr. Patrick Kelly took
21 over?
22     A.    Yes, and Scott left.
23     Q.    Between 2004 and when Mr. Kelly
24 took over the federal government affairs, how

Page 147

1  often did you speak with Mr. Melville?
2      A.    Mr. Melville, oh, before?
3      Q.    Mm-hmm.
4      A.    When he was still at HDA?
5      Q.    Yeah, when he was at HDA and you
6  were working at AmerisourceBergen.
7      A.    Two to three times a month.
8      Q.    Did you have also e-mail
9  correspondence with him?
10     A.    Yes.
11     Q.    How often do you think you would
12 e-mail with him?
13     A.    Once a week.
14     Q.    Did any of those e-mail
15 communications or telephone calls involve
16 representatives from Cardinal Health or
17 McKesson?
18     A.    Yes.
19         MR. NICHOLAS:  Object to the
20 form.
21         Go ahead.
22         THE WITNESS:  I would clarify
23 that most of my e-mail correspondence
24 with Scott Melville during his time at

Page 148

1  HDA were e-mails he would send to
2  everybody in the federal government
3  affairs committee or state government
4  affairs or public policy.  I didn't have
5  a lot of one-on-one e-mail interaction
6  with Mr. Melville, maybe once or twice a
7  month.
8  BY MR. CLUFF:
9      Q.    How about the phone calls, do you
10 recall if Cardinal Health or McKesson would have
11 participated on the phone calls you had with
12 Mr. Melville?
13     A.    I would -- usually, usually we
14 had group calls.  It wasn't just one-on-one.
15     Q.    When Mr. Kelly took over the
16 federal government affairs, how often would you
17 say that you spoke with him?
18     A.    Maybe once a month.
19     Q.    Did you have e-mails with
20 Mr. Kelly?
21     A.    In the same sense.  He would
22 e-mail the large group and I would respond and
23 rarely would we have one-on-one e-mails or
24 conversations.

Page 149

1      Q.    When you spoke with Mr. Kelly by
2  phone, were representatives of Cardinal and
3  McKesson generally present for those phone calls
4  or participating in those calls?
5      A.    Sometimes, most of the time.
6      Q.    Elizabeth Gallenagh, she's
7  currently chief legal counsel for the HDA.  I
8  don't know if you're aware of that, so I'm going
9  to ask you some questions about her, but I
10 caution you to be careful.  I know that
11 you're -- the company you work for is asserting
12 what's called a common interest privilege.  The
13 plaintiffs are disputing the basis for that
14 privilege, but until it's been resolved, I would
15 caution you not to give me answers about legal
16 strategy that you're aware of that was formed in
17 conjunction with the HDA.
18         Does that make sense?
19     A.    Yes.
20     Q.    Okay, great.
21         So Ms. Gallenagh, have you worked
22 with Ms. Gallenagh during your time at
23 AmerisourceBergen?
24     A.    Yes.

Page 150

1    Q.    In what capacity did you work
2 with Ms. Gallenagh?
3    A.    On government affairs policy
4 issues.
5    Q.    How often did you speak with
6 Ms. Gallenagh?
7    A.    Well, one-on-one, maybe a couple
8 times a year, but less frequently recently.
9    Q.    How about in group calls, how
10 often did you have group calls with
11 Ms. Gallenagh?
12    A.    Maybe six times a year.
13    Q.    And in those group calls, would
14 representatives from Cardinal Health and
15 McKesson be present?
16    A.    Yes.
17    Q.    How about e-mail communications,
18 did you receive e-mail communications from
19 Ms. Gallenagh?
20    A.    Just in the group e-mails.
21    Q.    And what group would that have
22 been?
23    A.    Government affairs, public
24 policy.

Page 151

1    Q.    Who is Kristen Freitas?
2    A.    She is HDA's federal government
3 affairs lobbyist.
4    Q.    Is she a registered lobbyist?
5    A.    Yes.
6    Q.    Do you need to take that?
7    A.    Just turning off my phone.
8    Q.    Did you work with her in your
9 time at AmerisourceBergen?
10    A.    Yes.
11    Q.    When do you recall first starting
12 to work with Ms. Freitas?
13    A.    Since she's been with the
14 organization, which I don't remember when she
15 started.
16    Q.    How often do you estimate that
17 you would have spoken with Ms. Freitas?
18    A.    Individually maybe once or twice
19 a year and as a group probably once every other
20 week.
21    Q.    And then what group would that
22 have been?
23    A.    Federal or -- federal government
24 affairs or public policy.

Page 152

1    Q.    And in those group calls would
2 representatives from Cardinal and McKesson have
3 been present?
4    A.    Yes.
5    Q.    Who is Jewelyn Cosgrove?
6    A.    Jewelyn Cosgrove is also a
7 lobbyist for HDA.
8    Q.    Did you work with her since you
9 joined AmerisourceBergen?
10    A.    Yes.
11    Q.    In what capacity did you work
12 with Ms. Cosgrove?
13    A.    Just, you know, lobbying,
14 educating on federal and policy issues.
15    Q.    And how often would you speak
16 with Ms. Cosgrove?
17    A.    Maybe once or twice a month.
18    Q.    Did you have any group calls that
19 involve Ms. Cosgrove?
20    A.    Yes.
21    Q.    How often were those group calls?
22    A.    Twice a month.
23    Q.    And would representatives from
24 Cardinal and McKesson be present for those

Page 153

1 calls?
2    A.    Yes.
3    Q.    And then who is Matthew DiLoreto?
4    A.    He is the state government
5 affairs vice president for HDA.
6    Q.    Did you work with Mr. DiLoreto in
7 your time at AmerisourceBergen?
8    A.    Yes.
9    Q.    In what capacity?
10    A.    State government affairs and
11 policy issues.
12    Q.    How often do you think you would
13 have spoke with Mr. DiLoreto?
14    A.    Twice a month.
15    Q.    Did you ever have any group calls
16 with Mr. DiLoreto?
17    A.    Yes.
18    Q.    How often were those?
19    A.    Well, it varies depending on --
20 we've had times when we didn't have anybody
21 in-house on state government affairs, so I had
22 to fill in, so there were times where I might be
23 on a call with him once a week or maybe once a
24 month.  It depends.  It varies.

Page 154

1  Q.   Aside from the individual
2  conversations and e-mails and group calls that
3  we've discussed with these members of the HDA or
4  employees of the HDA, excuse me, were there ever
5  big three coordinating calls or strategy calls?
6          MR. NICHOLAS:  Object to the
7  form.
8          THE WITNESS:  No, not that I
9  recall.
10 BY MR. CLUFF:
11     Q.   Not that you recall?
12     A.   I do not recall.
13     Q.   But it's possible that they
14 happened?
15         MR. NICHOLAS:  Object to the
16 form.
17         THE WITNESS:  I don't know.
18 BY MR. CLUFF:
19     Q.   Do you know if these calls were
20 regularly scheduled calls?
21         MR. NICHOLAS:  Which calls?
22         MR. CLUFF:  The big three
23 coordination calls.
24         MR. NICHOLAS:  Object to the

Page 155

1  form.
2          MR. CLUFF:  You can object to the
3  form.  That doesn't mean she can't
4  answer.
5          MR. NICHOLAS:  No foundation.
6          THE WITNESS:  I don't know what
7  you're -- I don't understand.
8  BY MR. CLUFF:
9      Q.   Do you know who the big three
10 are?  I'm just asking if you know what that term
11 means.
12         MR. NICHOLAS:  Object to the
13 form.
14         Go ahead.
15         THE WITNESS:  Not officially.  I
16 can guess but, I'm not supposed to
17 guess, so no.
18 BY MR. CLUFF:
19     Q.   So you don't officially know who
20 the big three distributors are?
21     A.   No, there's no official big three
22 that I know of.
23     Q.   Have you ever heard that term
24 used by the HDA?

Page 156

1      A.   I don't recall.
2      Q.   Have you ever heard anybody use
3  that term before, the big three?
4      A.   I've heard -- I guess I've heard
5  it said at NACDS.
6      Q.   And when you heard it said at
7  NACDS, did you have an understanding of who it
8  referred to or what it referred to?
9      A.   Not officially.
10     Q.   How about unofficially?
11     A.   Yes.
12     Q.   And so what was your
13 understanding?
14     A.   The biggest, the largest three
15 chain drug stores.
16     Q.   And who are those?
17     A.   Rite Aid, CVS and Walgreens.
18     Q.   So there are -- there's a group
19 of big three chain drug stores?
20         MR. NICHOLAS:  Object to the
21 form.
22         MR. CLUFF:  I'm just trying to
23 understand.
24         THE WITNESS:  I don't -- nobody

Page 157

1  refers to them that way that I know.
2  That would be a joke.
3  BY MR. CLUFF:
4      Q.   Have you ever heard of Cardinal
5  Health, McKesson and AmerisourceBergen referred
6  to as the big three?
7      A.   Not that I recall.
8      Q.   Okay.  Give me one second.
9          MR. CLUFF:  I'm going to hand you
10 another document.  We're going to call
11 it Exhibit 3.  It's been produced by
12 AmerisourceBergen.  It's
13 ABDCMDL00276999.  Here is your copy.
14         (Document marked for
15 identification as Norton Deposition
16 Exhibit No. 3.)
17 BY MR. CLUFF:
18     Q.   Please take a moment to review
19 that.  Let me know when you've had a chance to
20 review it.
21     A.   (Witness reviews document.)
22         Okay.
23     Q.   So you've had a chance to review
24 that document now?

Page 158

1    A.    Yes.
2    Q.    All right.  Let's start at the
3 first e-mail, which is at the bottom of page 1.
4 The subject line is "HDMA Update."
5       Do you see where I'm at?
6    A.    Yes.
7    Q.    The sender of that e-mail is
8 Patrick Kelly.
9       Is that the same Patrick Kelly
10 that we discussed earlier from the HDA?
11    A.    Yes.
12    Q.    And then the recipients are Ann
13 Berkey, Connie Woodburn and Rita Norton,
14 correct?
15    A.    Yes.
16    Q.    And Ann Berkey is from McKesson.
17 We discussed her earlier, correct?
18    A.    Yes.
19    Q.    And Connie Woodburn, she's from
20 Cardinal.  We discussed her earlier, correct?
21    A.    Yes.
22    Q.    And those would be your
23 counterparts at McKesson and Cardinal Health?
24    A.    Yes.

Page 159

1    Q.    There are other members of the
2 HDA, correct --
3    A.    Yes.
4    Q.    -- besides Cardinal Health,
5 McKesson and AmerisourceBergen?
6    A.    Yes.
7    Q.    They're not copied on this
8 e-mail, are they?
9    A.    No.
10    Q.    The subject line is "HDMA
11 Update."
12       Do you see that?
13    A.    Yes.
14    Q.    Let's work on this e-mail from
15 the bottom up.  So if you turn to the second
16 page ending in 277000, you see the top of that
17 page there's a number 4 and then a paragraph of
18 text?
19    A.    Yes.
20    Q.    And see the first line it says,
21 "And finally, I would like to restart a monthly
22 Big 3 briefing call."
23       Do you see that?
24    A.    Yes.

Page 160

1    Q.    Do you have an understanding in
2 this e-mail who the "Big 3" are?
3    A.    Yes.
4    Q.    Who are they?
5    A.    Cardinal, McKesson and
6 AmerisourceBergen.
7    Q.    And this e-mail says that
8 Mr. Kelly wants to restart a monthly "Big 3"
9 briefing call, right?
10    A.    Yes.
11    Q.    So at some point before the date
12 of this e-mail, which is 2014, there was a
13 monthly "Big 3" briefing call?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  I never heard it
17    called that.  That was a Patrick Kelly
18    term, I think.
19 BY MR. CLUFF:
20    Q.    What did you hear it called?
21    A.    Just a coordinating call.
22       I mean, to be clear, there's only
23 three members of HDA that have Washington
24 presence or have a government affairs function

Page 161

1 at all.  So there were times when we would
2 coordinate or have calls with HDA with our three
3 companies and Patrick or Scott Melville, but
4 that almost completely stopped when Patrick took
5 over because we could never get a time worked
6 out.
7    Q.    So prior to -- prior to Mr. Kelly
8 taking over the federal government affairs work
9 at HDA, there was what you've referred to as a
10 coordination call between Cardinal, McKesson and
11 AmerisourceBergen and HDA?  I'm asking for your
12 understanding.  I'm not talking about the
13 document.
14    A.    So we would try to do calls with
15 our three government affairs leads and HDA
16 occasionally, but, as I said, it was very hard
17 to get scheduled.
18    Q.    And you referred to those as
19 coordination calls?
20       MR. NICHOLAS:  Object to the
21    form.
22       THE WITNESS:  I don't know what
23    we've referred to them as.
24 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

---

Page 162

1    Q.   Okay.  Well, Mr. Kelly's e-mail
2  refers to them as briefing calls.
3         Do you see that?
4    A.   Yes.
5    Q.   Okay.  And he refers to them as
6  actually monthly "Big 3" briefing calls.
7         Is that what you recall them
8  being described as during this time period?
9         MR. NICHOLAS:  Object to the
10       form.
11        THE WITNESS:  I don't recall what
12       they were described as.
13 BY MR. CLUFF:
14   Q.   But, as you said earlier, there
15 were no other distributors that participated in
16 those calls; it was just Cardinal,
17 AmerisourceBergen and McKesson?
18        MR. NICHOLAS:  Object to the
19       form.
20        THE WITNESS:  Whenever -- when we
21       had them and oftentimes not everybody
22       could even be on the call.
23 BY MR. CLUFF:
24   Q.   Let's turn back to the first page

---

Page 163

1  and look at number 1 in this e-mail from Patrick
2  Kelly.
3         He says "We are trying to
4  finalize the agenda for the upcoming GPPC
5  meeting."
6         Previously we talked about the
7  GPPC, and I think you testified that they had --
8  how often were the meetings of the GPPC again?
9    A.   Two or three times a year.  They
10 might have originally been three times, but now
11 I think they're two times a year.
12   Q.   Were those in-person meetings?
13   A.   Yes.
14   Q.   Who would attend those meetings?
15   A.   Representatives from all the
16 members were invited.
17   Q.   The next sentence says, "I wanted
18 to let you know that we are going to try to
19 secure Congressman Marino as our morning
20 speaker."
21        Do you see that?
22   A.   Yes.
23   Q.   Have you heard of the Marino
24 Blackburn bill?

---

Page 164

1    A.   I'm sorry, what did you --
2    Q.   The Marino Blackburn bill.
3    A.   Yes.
4    Q.   Is inviting Mr. Marino or
5  Congressman Marino to speak at this HDA GPPC
6  meeting, was that a part of the HDA's lobbying
7  efforts with Mr. Marino?
8         MR. NICHOLAS:  Object to the
9       form.
10        THE WITNESS:  It was a common
11       practice for us and still is to invite a
12       member of Congress to speak to this
13       group, and usually it's a member of
14       Congress who is working on an issue of
15       interest to the companies that
16       participate.
17 BY MR. CLUFF:
18   Q.   Moving forward a couple
19 sentences, this e-mail says, "In addition to
20 that we are also going to try to organize a
21 supply chain panel discussion for the luncheon
22 portion of the agenda."
23        The next sentence reads, initial
24 thought are to reach out to NCPA, NACDS, I'm

---

Page 165

1  going to say PhRMA and GPhA to see if we can
2  secure a government affairs person from each
3  association to present their association's
4  advocacy priorities for 2014.
5         Do you see that?
6    A.   Yes.
7    Q.   We talked about the NCPA and
8  NACDS earlier, correct?
9    A.   Yes.
10   Q.   They're both pharmacy
11 associations?
12   A.   Yes.
13   Q.   That manuf -- I mean, excuse me
14 -- distributors participate in both of those
15 organizations, correct?
16   A.   Yes.
17   Q.   What's PhRMA, do you know what
18 that is?
19   A.   That's the manufacturers trade
20 association.
21   Q.   Do you know what that stands for?
22   A.   Pharmaceutical Research
23 Manufacturers Association.
24   Q.   Do you know what the GPhA is?

---

Page 166

1     A.    Generic Pharmaceutical
2  Association.
3     Q.    So is that another manufacturers
4  association?
5     A.    Generic manufacturers.
6     Q.    So the HDA was proposing to
7  create a supply chain panel discussion that
8  included pharmacies, distributors and
9  manufacturers, correct?
10         MR. NICHOLAS:  Object to the
11     form.
12         THE WITNESS:  Yes.
13         MR. NICHOLAS:  Go ahead.
14  BY MR. CLUFF:
15     Q.    And the purpose was to have a
16  discussion about each association's advocacy
17  priorities for 2014?
18     A.    Yes.
19     Q.    Was the purpose of that so the
20  industry could coordinate a unified position on
21  their advocacy priorities?
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  No.

Page 167

1  BY MR. CLUFF:
2     Q.    What was the purpose?
3     A.    The purpose was to hear what each
4  association's priorities were.
5     Q.    Why was it important to hear what
6  each association's priorities were?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  Because that would
10     be interesting to learn and we -- again,
11     as a common practice among related and
12     healthcare industry associations to hear
13     about what the priorities are, that's a
14     very common practice, and it's of
15     interest to us.
16  BY MR. CLUFF:
17     Q.    So it was a common practice for
18  related trade associations to share their policy
19  positions?
20     A.    Yes.
21     Q.    And their advocacy priorities?
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  Yes.

Page 168

1  BY MR. CLUFF:
2     Q.    You'll have to forgive me, I'm
3  just a kid from southern California.  I don't
4  know a lot about Washington, so I'm not trying
5  to -- to use Bob's favorite line, I'm not trying
6  to trick you with these questions, I'm really
7  just trying to understand how these
8  organizations work together.
9     A.    Yes.
10         MR. NICHOLAS:  Just to --
11         MR. CLUFF:  There's not a
12     question pending.
13         MR. NICHOLAS:  Also, he also like
14     to say he's a kid from southern
15     California, I've heard him say that in
16     about ten depositions.  So, go ahead,
17     Sterling, you may now proceed.
18         MR. CLUFF:  Thank you.
19  BY MR. CLUFF:
20     Q.    Did any of these trade
21  organizations cooperate together on advocacy or
22  policy positions at all?
23         MR. NICHOLAS:  Object to the
24     form.

Page 169

1  BY MR. CLUFF:
2     Q.    Let me give you an example.
3         Did the HDA ever cooperate or
4  collaborate or coordinate any of those words you
5  want to use with, for example, the NACDS?
6         MR. NICHOLAS:  Object to the
7     form.
8         THE WITNESS:  I don't know.
9  BY MR. CLUFF:
10     Q.    Do you know if the HDA ever
11  worked with PhRMA on advocacy positions or
12  policy positions?
13         MR. NICHOLAS:  Objection, form.
14         THE WITNESS:  Can you please
15     repeat that.
16  BY MR. CLUFF:
17     Q.    Sure.  Did the HDA ever work on
18  PhRMA on any advocacy or policy positions?
19         MR. NICHOLAS:  Same objection.
20         THE WITNESS:  Not that I know of.
21  BY MR. CLUFF:
22     Q.    Let's set that document aside.
23         Do you know what the Pain Care
24  Forum is?

Page 170

1    A.    I've heard of it.
2    Q.    Did you ever talk to anybody
3  about joining the Pain Care Forum?
4    A.    Well, as I mentioned this
5  morning, I recall Burt Rosen contacting me to
6  see if we wanted to get involved.
7    Q.    Do you recall when Burt Rosen
8  contacted you about that?
9    A.    Years ago.
10    Q.    But you do recall exchanging
11  correspondence with Burt Rosen about the Pain
12  Care Forum?
13    A.    Vaguely, yes.
14        MR. CLUFF:  I'm going to hand you
15      a copy of document that we're going to
16      mark as Exhibit 4.  This was produced by
17      Purdue.  It is marked PPLP004301234.  I
18      will note for the record that Ms. Rita
19      Norton is an author or recipient of each
20      e-mail in the chain and that the
21      attachment to the document PPLP004301237
22      was delivered to her in the very last
23      e-mail exchange.  So give that to you
24      guys and give you a second to look at

Page 171

1      it.
2        (Document marked for
3      identification as Norton Deposition
4      Exhibit No. 4.)
5        (Witness reviews document.)
6  BY MR. CLUFF:
7    Q.    And just to give you a heads-up,
8  I'm going to work from the bottom up with this
9  e-mail, like we've done for some others, so if
10  you want to start at 4301235 and work your way
11  to the front.
12    A.    Okay.  (Witness reviews
13  document.)  Okay.
14    Q.    So let's start on the first page,
15  which ends in 1234.  Do you see at the bottom
16  there, there's an e-mail from Burt Rosen to you
17  dated January 30th, 2008?
18    A.    Yes.
19    Q.    Okay.  And the subject line is
20  forward "DEA's probe slowing Cardinal."
21        Do you see that?
22        Okay.  So Mr. Rosen's e-mail
23  starts at the bottom of that page and goes to
24  the next.  It looks like he starts off by saying

Page 172

1  "just left you a voice message," sorry for the
2  inflection there, "glad to get together if
3  useful to you."
4        Do you see that?
5    A.    Yes.
6    Q.    Do you recall receiving a voice
7  mail from Mr. Rosen at that time?
8    A.    No, I don't recall.
9    Q.    Do you know why he was offering
10  to get together with you?
11    A.    To discuss the Pain Care Forum I
12  would -- is what I recall.
13    Q.    Had you had any communications
14  with Mr. Rosen prior to this e-mail about the
15  Pain Care Forum?
16    A.    I don't recall.
17    Q.    Were you aware of the Pain Care
18  Forum -- I think you've been using the words
19  coalition, so I'll use that, that term.
20    A.    I think what happened was HDA got
21  involved or joined the Pain Care Forum or got
22  involved with them, and Scott Melville suggested
23  we talk to Burt -- Scott and Burt and I had
24  known each other for many years -- to just learn

Page 173

1  more about it because in Washington it's very
2  common practice for -- to build coalitions on
3  issues.  And right around this time we had no
4  idea about, you know, the controlled substances
5  problems that were to develop in the future, but
6  we started to pay more attention to them with
7  these incidents that happened to all our
8  companies where the DEA just shut us down out of
9  the blue.
10        So I imagine I called, reached
11  out to Burt, at Scott's suggestion, to find out
12  who was in it and learn more about it, and
13  that's why he sent me their membership list,
14  which includes patient organizations and
15  providers and, you know, the whole scope of
16  entities that would be impacted by these issues.
17    Q.    You testified that you think that
18  HDA got involved with the Pain Care Forum.
19  Let's look at the very last page, which is a
20  document.  There's a bold underlined heading
21  that says "Pain Care Forum," underneath that
22  another bold heading that says "Participating
23  Organizations."
24        Do you see that?

Page 174

1    A.    Yes.
2    Q.    Do you see the HDA there
3 anywhere?
4    A.    No.
5    Q.    Do you see any of the HDA's
6 predecessors there?
7    A.    No.
8    Q.    So at this point in time, it's
9 fair to say that the HDA was not participating
10 in the Pain Care Forum?
11        MR. NICHOLAS:  Object to the
12    form.
13        THE WITNESS:  Apparently not.  It
14    might have just been Scott and Burt
15    having that prior relationship and
16    talking about it.
17 BY MR. CLUFF:
18    Q.    How do you know that Scott -- and
19 referring to Scott, you mean Scott Melville?
20    A.    Yes.
21    Q.    Of the HDA?
22    A.    Mm-hmm.
23    Q.    Why do you have a belief that
24 Scott and Burt Rosen from Purdue have some

Page 175

1 pre-existing relationship?
2        MR. NICHOLAS:  Object to the
3    form, mischaracterizes the testimony.
4        THE WITNESS:  Because Scott and I
5    worked for Roche, and I knew Scott
6    before he worked for Roche, when he
7    worked for Sterling and Burt worked for
8    Bristol-Myers Squibb and
9    SmithKlineBeecham, and we all knew each
10    other and saw each other regularly and
11    became friends before we even got to all
12    these different companies and
13    associations that we were with at this
14    time.
15 BY MR. CLUFF:
16    Q.    In 2008 it looks like Burt Rosen
17 is forwarding you an e-mail about the DEA probe
18 slowing Cardinal.
19        Do you see that?
20    A.    Yes.
21    Q.    And there's an article on the
22 second page of this e-mail?
23    A.    Yes.
24    Q.    What did you understand to be the

Page 176

1 issue with Cardinal Health at this time?
2        MR. NICHOLAS:  Object to the
3    form.
4        THE WITNESS:  I saw that subject
5    line to refer to the title of this
6    article.
7 BY MR. CLUFF:
8    Q.    Did you understand that Cardinal
9 may have experienced interruption or a
10 suspension of its -- an interruption of its
11 business at this time?
12    A.    Yes.
13    Q.    Why was that?
14    A.    Because --
15        MR. NICHOLAS:  Object to the
16    form.
17        THE WITNESS:  Because the DEA had
18    closed their controlled substance
19    distribution and some of their
20    distribution centers.
21 BY MR. CLUFF:
22    Q.    Did AmerisourceBergen ever have a
23 suspension of its registration to distribute
24 controlled substances?

Page 177

1    A.    Yes.
2    Q.    And when was that?
3    A.    2006.
4    Q.    So approximately two years before
5 Cardinal had their registration suspended?
6    A.    I think it was 2006 or 2007.
7    Q.    So it's in the same time period,
8 basically?
9    A.    Yes.
10    Q.    All right.  Let's look at your
11 response to Mr. Rosen.  It's on the first page.
12 It says, "Burt, we would really appreciate it if
13 we could meet with you on the 13th after 12
14 (lunch?) Chris Zimmerman our VP of Regulatory
15 and Security and Mike Kilpatrick our VP of
16 Communications and Investor."
17        Is that who you intended to
18 include in the meeting?
19    A.    Yes.
20    Q.    Did you intend to participate in
21 that meeting yourself?
22    A.    Yes.
23    Q.    You continue and say "they'd like
24 to meet informally."

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1     Do you mean "they" being Chris
2 and Mike?
3     A.    Yes.
4     Q.    So you continue to say, "They'd
5 like to meet informally with you and talk about
6 our issues and how to work with the Coalition."
7     Do you see that?
8     A.    Yes.
9     Q.    Who is the "our" you're referring
10 to in that sentence?
11     A.    AmerisourceBergen.
12     Q.    Were you also interested in
13 working with or getting help about Cardinal
14 Health's issues?
15     A.    No.
16     Q.    How about McKesson's issues?
17     A.    No.
18     Q.    Okay.  And the coalition there,
19 is that the pain care coalition that we've been
20 talking about?
21     A.    I would assume so, based on the
22 way this is written, and I'm not supposed to
23 assume, so I don't know.
24     Q.    Well, you referred to a coalition

Page 179

1 with a capital C, do you know what that
2 coalition was?
3     A.    I'm -- the Pain Care Forum.
4     Q.    Okay.  Is there a reason that
5 AmerisourceBergen wanted to keep this meeting
6 informal?
7     MR. NICHOLAS:  Object to the
8     form.
9     THE WITNESS:  I don't recall
10     specifically, but I remember -- I do
11     recall that we were just trying to learn
12     about who they were and what their focus
13     was.  It was -- and that's why it was
14     informal, because, as I mentioned
15     earlier, the -- well, my role is to
16     educate internally as well as our
17     elected officials, and Mike Kilpatrick
18     and Chris Zimmerman had never spent much
19     time in Washington, so I was trying to
20     introduce them, I think, to a coalition
21     so they could understand this is a very
22     common practice in Washington and can be
23     useful.
24 BY MR. CLUFF:

Page 180

1     Q.    And when you say "this is a very
2 common practice," are you referring to the
3 practice of forming coalitions or working with
4 coalitions?
5     MR. NICHOLAS:  Object to the
6     form.
7     THE WITNESS:  Yes.
8 BY MR. CLUFF:
9     Q.    Okay.  And so you were looking on
10 behalf of AmerisourceBergen to meet with Burt to
11 talk about this coalition to see if it could
12 help AmerisourceBergen work out its issues?
13     MR. NICHOLAS:  Object to the
14     form.
15     THE WITNESS:  No.  We were
16     meeting with Burt to learn about the
17     coalition.
18 BY MR. CLUFF:
19     Q.    In the next few e-mails it looks
20 like you and Burt set up a lunch meeting roughly
21 2:00.
22     Do you see that?
23     A.    It looks like we could not have
24 lunch so we just had a meeting.

Page 181

1     Q.    And you ask him if you can e-mail
2 the membership list, that's the second to the
3 top e-mail, that I can share in advance, that
4 would be great.
5     Do you see that?
6     A.    Yes.
7     Q.    Who would you have shared that
8 membership list with?
9     MR. NICHOLAS:  Object to the
10     form.
11     THE WITNESS:  Mike Kilpatrick and
12     Chris Zimmerman.
13 BY MR. CLUFF:
14     Q.    Anybody else?
15     A.    No.
16     Q.    And then up at the very top you
17 see there's an attachment that says "Pain Care
18 Forum Lists (02-2008)."
19     Do you see that?
20     A.    Yes.
21     Q.    And then on the last page,
22 there's a document that says "Pain Care Forum
23 Participating Organizations"?
24     A.    Yes.

Page 182

1    Q.    And then under that it says "last
2  updated: February 2008"?
3    A.    Yes.
4    Q.    Based on your review of this
5  document, does it appear to be an accurate
6  version of the e-mail and attachment that you
7  would have received in 2008?
8          MR. NICHOLAS:  Object to the
9      form.
10         THE WITNESS:  I don't recall.
11 BY MR. CLUFF:
12    Q.    Do you recall if you, Chris and
13 Mike ended up meeting with Burt Rosen?
14    A.    I don't remember.  I don't
15 remember that meeting, but we may have.
16    Q.    Did you ever discuss the Pain
17 Care Forum with any of your counterparts at
18 Cardinal Health or McKesson?
19    A.    I don't remember.
20    Q.    Do you recall if you ever
21 discussed the Pain Care Forum with any of your
22 counterparts from the HDA?
23    A.    I don't remember.  It's a long
24 time ago.

Page 183

1    Q.    Let's set that to the side for a
2  second.
3          You previously testified that you
4  thought that the HDA eventually became involved
5  in the Pain Care Forum.
6          Do you recall that?
7    A.    Yes.
8          MR. CLUFF:  I was able to find a
9      membership list and a meeting schedule
10     of the Pain Care Forum online.  It's
11     publicly available from 2012, so I'm
12     going to hand you a copy of that, just
13     so we can kind of talk through some of
14     those issues.  Since it's gathered from
15     the internet, it doesn't have a Bates
16     number.  I'm going to hand you this
17     copy, hand these to counsel.
18         For the record, I'll note that
19     the search I ran to find this document
20     was Pain Care Forum 2012 meeting
21     schedule.  I was able to retrieve it
22     from
23     www.documentcloud.org/documents/3108982-
24     pain-care-forum-meetings-schedule-amp.ht

Page 184

1  ml.
2          MR. NICHOLAS:  I mean, I'm
3      obviously not going to prevent you from
4      asking questions about this, but I will
5      preserve an objection on the basis of
6      authenticity.
7          (Document marked for
8      identification as Norton Deposition
9      Exhibit No. 5.)
10 BY MR. CLUFF:
11    Q.    When you've had a chance to look
12 at that, Ms. Norton, please let me know.
13    A.    (Witness reviews document.)
14          Okay.
15    Q.    Have you had a chance to look at
16 it?
17    A.    Yes.
18    Q.    Okay.  Let's just turn to the
19 second page.  I know there are not page numbers,
20 and it looks like some portion of the document
21 got cut off at the top, which is an unfortunate
22 retrieval error from the internet, which I will
23 apologize for.  At the bottom it's difficult to
24 make out, but it says "Pain Care Forum" and then

Page 185

1  underneath that "Participating Organizations."
2          And if you look at the last page
3  of Exhibit 4 that we just discussed, you'll see
4  that there are some similarities between the two
5  documents.
6    A.    Right.
7    Q.    Do you see that?
8          If you look down at the bottom of
9  the first column on the left-hand side, do you
10 see that it says Healthcare Distribution
11 Management Association --
12    A.    Yes.
13    Q.    -- two up from the bottom?
14          Does that confirm your
15 recollection that at some point the Healthcare
16 Distribution Management Association, or what is
17 currently referred to as the HDA, was a member
18 of the Pain Care Forum?
19    A.    I don't recall.
20    Q.    But it's on the list here of
21 participating organizations, correct?
22          MR. NICHOLAS:  Okay.  I'll object
23      to the form at this point.
24          Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    THE WITNESS:  So I don't -- I
2  don't know if this is a membership list
3  or if these were organizations that
4  participated in a meeting, but -- so I
5  don't know, but they might have joined.
6  I don't know for sure.
7  BY MR. CLUFF:
8    Q.    Looking at the top of that, that
9  first column, do you see two down from the top
10 there's Allergan.
11       Do you see that?
12   A.    Yes.
13   Q.    That's a manufacturer, correct?
14   A.    Yes.
15   Q.    We previously talked about
16 Allergan and whether or not you had done any
17 work with any government affairs people from
18 Allergan.
19       Do you remember that?
20   A.    Yes.
21   Q.    The next line down is Alliance of
22 State Pain Initiatives.  Is that an organization
23 you're familiar with?
24   A.    No.

Page 187

1    Q.    How about the next down from
2  that, the Academy -- American Academy of Pain
3  Management.
4       Do you know that?
5    A.    No.
6    Q.    Have you ever worked with them?
7    A.    No.  I don't know, but I don't
8  recognize that name.
9    Q.    How about the American Academy of
10 Pain Medicine; do you recognize that name?
11   A.    No.
12   Q.    How about the American Cancer
13 Society?
14   A.    Yes.
15   Q.    Have you done any work while
16 you've been employed at AmerisourceBergen with
17 the American Cancer Society?
18   A.    Not directly.
19   Q.    How about indirectly?
20   A.    Well, I'm on some charitable
21 organizations with cancer, so indirectly.
22   Q.    How about the American Chronic
23 Pain Association; do you know that entity?
24   A.    No.

Page 188

1    Q.    How about two down from that, the
2  American Pain Foundation?
3    A.    No.
4    Q.    Do you know if AmerisourceBergen
5  has ever done any work with the American Pain
6  Foundation?
7    A.    I don't -- I don't know.
8    Q.    One down from that it says
9  American Pain Society.
10       Do you recognize that entity?
11   A.    No.
12   Q.    If you continue down into the Cs
13 in that first column, eventually you'll get to a
14 name that is Covidien.
15       Do you recognize that name?
16   A.    Yes.
17   Q.    Is that the -- an affiliated
18 entity with Mallinckrodt?
19   A.    I don't know.  There was I know
20 some companies split up, but that may have been
21 part of that.
22   Q.    While you've been employed at
23 AmerisourceBergen, have you done any work with
24 Covidien?

Page 189

1    A.    No.
2    Q.    Has AmerisourceBergen done any
3  work with Covidien?
4    A.    I don't know.
5    Q.    How about Eli Lilly & Company; do
6  you recognize that name?
7    A.    Yes.
8    Q.    Is that a manufacturer?
9    A.    Yes.
10   Q.    During your time at
11 AmerisourceBergen, have you done any work with
12 Eli Lilly & Company?
13   A.    On physician reimbursement and
14 340B, yes.
15   Q.    All right.  So that's a yes?
16   A.    Yes.
17   Q.    All right.  Endo Pharmaceuticals
18 is the next one down the list.
19       Do you recognize that name?
20   A.    Yes.
21   Q.    While you've been employed at
22 AmerisourceBergen, have you done any work with
23 Endo Pharmaceuticals?
24   A.    Yes.

Page 190

1    Q.    What would that have been?

2    A.    Pardon me?

3    Q.    What work would that have been?

4    A.    On compounding.

5    Q.    What does that mean?

6    A.    We have a sterile-to-sterile
7  compounding business, and they have a product
8  that was being compounded, and they sued the FDA
9  so that they would -- the compounding would
10 cease and desist because they said they had
11 active product available.

12    Q.    What is a sterile compounding
13 business?

14    A.    That's the companies that make --
15 when you go in the hospital and you get a drip
16 bag, that's a product -- that's a pharmaceutical
17 that's been diluted with a diluting substance so
18 that they can feed it into your body through IV.

19    Q.    Does that involve compounding
20 pharmaceutical opioids?

21    A.    Yes.

22    Q.    For what purposes?

23    A.    For so that you can be operated
24 on.

Page 191

1    Q.    And so then is AmerisourceBergen
2  in the business of compounding pharmaceutical
3  opioids?

4          MR. NICHOLAS:  Object to the
5      form.

6          THE WITNESS:  AmerisourceBergen
7      as a company called PharMEDium that
8      compounds sterile-to-sterile
9      pharmaceuticals, and that includes
10     opioids.

11 BY MR. CLUFF:

12    Q.    Moving down from Endo
13 Pharmaceuticals, the next entity is the
14 Federation of State Medical Boards.

15          Do you recognize that name?

16    A.    I'm sorry.  Can you repeat that,
17 please.

18    Q.    Sure.  It's the Federation of
19 State Medical Boards, it's four up from the
20 bottom on the first column.

21    A.    Oh, I'm not familiar with them.

22    Q.    All right.  Going to the top of
23 the second column on the right-hand side,
24 there's a name there Johnson & Johnson.

Page 192

1          We talked about them, right?

2    A.    Yes.

3    Q.    Moving down the list, do you see
4  the Purdue Pharma LP is there, close to the
5  bottom third of the page?

6    A.    Yes.

7    Q.    Did you ever do any government
8  affairs work with Purdue Pharmaceuticals?

9    A.    No.

10    Q.    Okay.  While you've been employed
11 at AmerisourceBergen?

12          MR. NICHOLAS:  Objection, asked
13     and answered this morning.

14          Go ahead.

15          THE WITNESS:  No.

16 BY MR. CLUFF:

17    Q.    And then moving down the list, we
18 also see Teva.

19          Do you see that?

20    A.    Yes.

21    Q.    We talked about them earlier.

22          And then two down from that is
23 the US Pain Foundation.

24          Do you recognize the US Pain

Page 193

1  Foundation?

2    A.    No.

3    Q.    Do you know if the HDA's
4  participation in the Pain Care Forum, was that
5  in any way motivated by a request from
6  distributor members?

7          MR. NICHOLAS:  Object to the
8      form.

9          THE WITNESS:  I don't know.

10 BY MR. CLUFF:

11    Q.    Have you ever had any
12 conversations with anybody from the HDA about
13 the Pain Care Forum?

14    A.    Just the one I mentioned earlier
15 with Scott Melville.

16    Q.    Do you recall what you discussed
17 with Scott Melville about the Pain Care Forum?

18    A.    As I recall, he suggested we talk
19 to them, just to learn about them, which we did.

20    Q.    Was any action taken at
21 AmerisourceBergen after this meeting with Burt
22 Rosen?

23    A.    We decided not to join.

24    Q.    Why was that?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.    Because it didn't make sense for
2  us.
3    Q.    Who is the "we" that decided not
4  to join?
5    A.    Chris, Mike and myself.
6    Q.    Did you consult with anybody else
7  before that decision was made?
8    A.    I don't recall.
9    Q.    Why did it not make sense for
10  AmerisourceBergen to participate in the Pain
11  Care Forum?
12    A.    I don't remember why we decided,
13  but I think we -- well, we wanted to learn about
14  them because we -- there is a legitimate need
15  for pain medication and we recognize that, and
16  these -- many of these organizations and this
17  coalition are patient organizations, and they
18  were expressing concerns about access when these
19  shutdowns would occur.  So I think that's why,
20  as I recall, we had this conversation, but it
21  was a learning -- it was a learning experience,
22  and that was it.
23    Q.    You said there's a legitimate
24  need for pain medication.  What is that opinion

Page 195

1  based on?
2          MR. NICHOLAS:  I'll object to the
3      form.
4          THE WITNESS:  So when you get
5      your knee replaced, you need pain
6      medication, or when you get your tonsils
7      out or your appendix out, you need pain
8      medication.
9  BY MR. CLUFF:
10    Q.    You're not a doctor, are you,
11  Ms. Norton?
12    A.    When you're dying of cancer --
13          MR. NICHOLAS:  Hold on.  You
14      asked her a question, she started to
15      answer.
16          MR. CLUFF:  I'll let her finish.
17          MR. NICHOLAS:  You interrupted
18      her.  I know you don't like hearing what
19      she has to say.
20          MR. CLUFF:  Everything's cool,
21      Bob.  I said I'll let her finish.
22          MR. NICHOLAS:  It's the first
23      time you've interrupted her all day.
24          MR. CLUFF:  I know, Bob.  I don't

Page 196

1  need to be told about it five times.
2          MR. NICHOLAS:  I told you about
3      it three times.
4          MR. CLUFF:  Okay.  I don't need
5      to be told about it three times.
6          THE WITNESS:  So there's a
7      recognized need for pain medication.
8  BY MR. CLUFF:
9    Q.    Who is it recognized by?
10          MR. NICHOLAS:  Object to the
11      form.
12          THE WITNESS:  Doctors, patients,
13      the public at large.
14  BY MR. CLUFF:
15    Q.    Have you ever talked to any of
16  the manufacturers about their opinion about pain
17  medicine?
18    A.    No.
19    Q.    Did you ever talk to anybody from
20  a manufacturer or a trade organization about
21  advocating in favor of pain management?
22    A.    No, not that I recall, but no.
23    Q.    Has AmerisourceBergen ever
24  supported any initiatives to advocate in favor

Page 197

1  of treating chronic pain?
2    A.    No.
3    Q.    So then where did you develop
4  this understanding that these pain medications
5  are necessary?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  From personal
9      experience.
10  BY MR. CLUFF:
11    Q.    But nothing else?
12          MR. NICHOLAS:  Object to the
13      form.
14          THE WITNESS:  Well,
15      AmerisourceBergen was sued once for
16      withholding pain medication, so I'm -- I
17      mean, there's many reasons why people
18      need -- legitimately need pain
19      medication, and we were ensuring that --
20      doing everything we could to ensure that
21      that access would be maintained.
22  BY MR. CLUFF:
23    Q.    You just referenced a lawsuit,
24  and I'll caution you that if there was a lawsuit

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 and you learned anything about a lawsuit from
2 counsel that you shouldn't disclose anything you
3 learned about that lawsuit from counsel.
4      A.    Okay.  I don't know anything
5 about it other than that.
6            MR. NICHOLAS:  Well, I think
7      unless you've got some continuation of
8      this line of questioning, it is a good
9      time for a break.
10            MR. CLUFF:  How long have we been
11      going?
12            THE VIDEOGRAPHER:  One hour and
13      eight minutes.
14            MR. CLUFF:  Good time for a
15      break.
16            MR. NICHOLAS:  Okay.
17            THE VIDEOGRAPHER:  Going off the
18      record at 2:09 p.m.
19            (Brief recess.)
20            THE VIDEOGRAPHER:  We are back on
21      the record at 2:29.
22 BY MR. CLUFF:
23      Q.    Ms. Norton, we're back on the
24 record, so we'll all back under oath.

Page 199

1            Do you still understand that?
2      A.    Yes, I do.
3      Q.    I want to talk about the HDA
4 probably for the bulk of the afternoon now, and
5 to start off, I'd like to give you a copy of a
6 document that was produced by AmerisourceBergen.
7 It's Bates marked ABDCMDL00367642.  It's number
8 81 for Mr. Trial Tech.
9            (Document marked for
10      identification as Norton Deposition
11      Exhibit No. 6.)
12 BY MR. CLUFF:
13      Q.    It appears to be an e-mail that
14 you originally authored and which you received a
15 reply to.
16      A.    (Witness reviews document.)
17      Q.    Have you had a chance the read
18 that?
19      A.    Yes.
20      Q.    So the subject of the e-mail is
21 "Check In Follow Ups."
22            Do you see that --
23      A.    Yes.
24      Q.    -- at the very top there?

Page 200

1            Who is Annette Hegler?
2      A.    My sister.
3      Q.    And she is the sender of the top
4 e-mail, correct?
5      A.    Yes.
6      Q.    She sends that to you, the very
7 top e-mail --
8      A.    Yes.
9      Q.    -- it looks like.
10            And then immediately underneath
11 that it says on Tuesday, October 17, 2017 at
12 9:41 Rita Norton wrote, "A little perspective
13 from the side of reality!  For my friends and
14 family."
15            Do you see that?
16      A.    Yes.
17      Q.    Looking down underneath that, it
18 looks like it says, "Thanks for all the info,
19 Rita.  I had a feeling that Rannazzisi character
20 is less than trustworthy and has an ax to grind
21 for some reason."
22            Would your sister Ms. Hegler have
23 written that portion of this e-mail?
24      A.    Yes.

Page 201

1      Q.    The portion that says, a little
2 bit -- "A little perspective from the side of
3 reality! For my friends and family," did you
4 write that?
5      A.    Yes.
6      Q.    So underneath the portion that
7 your sister wrote, there's a bold portion that
8 says "Updated Statement."
9            Do you see that?
10      A.    Yes.
11      Q.    Okay.  The first line of that
12 first paragraph underneath it says, "The 60
13 Minutes and Washington Post investigation is a
14 one-dimensional presentation of a multi-faceted
15 public health crisis."
16            Do you see that?
17      A.    Yes.
18      Q.    And then if you flip to the next
19 page, which is ABDCMDL00367643, there's a
20 signature block at the bottom says "John Parker,
21 Senior Vice President, Communications,
22 Healthcare Distribution Alliance."
23      A.    Yes.
24      Q.    So is this updated statement

Page 202

1 looking at it and that signature block, do you
2 understand if this is something that the HDA
3 would have distributed through John Parker?
4     A.    I don't recall.
5     Q.    You've had a chance to read this
6 entire document, though, correct?
7     A.    Yes.
8     Q.    Okay.  And did you read the
9 portion, the three paragraphs that follow the
10 Updated Statement bold heading?
11     A.    Yes.
12     Q.    Having read those, do you have an
13 understanding of who would have written those?
14     A.    I don't remember.
15     Q.    Is it possible that it could have
16 come from the HDA?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  I don't know.
20 BY MR. CLUFF:
21     Q.    Is it something that you would
22 have written on behalf of AmerisourceBergen?
23     A.    No.
24     Q.    Would it have come from any other

Page 203

1 supply chain members in the supply chain
2 industry?
3         MR. NICHOLAS:  Object to the
4     form, lack of foundation.
5         THE WITNESS:  I don't remember.
6 BY MR. CLUFF:
7     Q.    Okay.  I want to look at the last
8 paragraph in this section under Updated
9 Statement.  It says, "The opioid epidemic is a
10 national tragedy and distributors are committed
11 to doing our part to address this crisis."
12         Do you see that?
13     A.    Yes.
14     Q.    Who are the distributors do you
15 think that are referenced in that statement?
16         MR. NICHOLAS:  Object to the
17     form, lack of foundation.
18         THE WITNESS:  Pharmaceutical
19     distributors.
20 BY MR. CLUFF:
21     Q.    Would that include
22 AmerisourceBergen?
23         MR. NICHOLAS:  Same objection.
24         THE WITNESS:  Yes.

Page 204

1 BY MR. CLUFF:
2     Q.    How about Cardinal Health and
3 McKesson?
4     A.    Yes.
5     Q.    And, presumably, it would include
6 the other distributors who are members of the
7 HDA as well?
8         MR. NICHOLAS:  Object to the
9     form, lack of foundation.
10         THE WITNESS:  Yes.
11 BY MR. CLUFF:
12     Q.    That paragraph continues, it
13 says, "We support actions taken by the FDA, the
14 CDC, the DEA and others to reduce the potential
15 for overprescribing while preserving pain
16 treatment options for those for whom there is no
17 other option."
18         Do you see that?  Let's do this,
19 did I read that correctly?
20     A.    Yes.
21     Q.    Okay.  Do you have any
22 understanding about what that sentence means?
23         MR. NICHOLAS:  Object to the
24     form.

Page 205

1         THE WITNESS:  Yes.
2 BY MR. CLUFF:
3     Q.    Okay.  What actions -- it's tough
4 because we -- you don't seem to understand who
5 wrote the e-mail, so I'm trying to understand
6 who this "we" is that is speaking.
7         Do you have any understanding
8 from reading that sentence who the "we" is that
9 is speaking?
10     A.    So I am not responsible for
11 communications.  We have a communications
12 department who works with our trade association,
13 and many things were developed to respond to the
14 Washington Post and 60 Minutes.  I don't have
15 any recollection of where this came from or
16 who -- why I sent this to my sister.  I don't
17 know.  I don't remember.
18     Q.    Going back up to the top of the
19 document, there's this line "a little
20 perspective from the side of reality," do you
21 see that?
22     A.    Yes.
23     Q.    And then you continue "for my
24 friends and family."

Page 206

1    Do you see that?
2  A.   Yes.
3  Q.   Does that refresh your
4  recollection on why you might have sent this
5  article to your family?
6  A.   Because anyone who saw 60 Minutes
7  saw a perspective, and we saw many inaccuracies,
8  and so I think that this was -- I shared this
9  with my sister so she could see there was other
10 facts that were not -- that were not
11 communicated in that, in those pieces.
12 Q.   So I'm trying to understand where
13 then this information would have come from,
14 especially the last paragraph where it says "we
15 support," I'm trying to figure out who the "we"
16 would be. Is that the HDA? Is it some group of
17 distributors?
18     MR. NICHOLAS:  Object to the
19 form, lack of foundation.
20     THE WITNESS:  I don't know.
21 BY MR. CLUFF:
22 Q.   Okay. So looking at this
23 document, do you believe that anything in here
24 was from a credible source?

Page 207

1      MR. NICHOLAS:  Okay. I'll object
2  to the form. That's an inappropriate
3  question.
4      MR. CLUFF:  No, it's not.
5      MR. NICHOLAS:  Go ahead. I'm
6  objecting to the form. I think it's an
7  inappropriate question, and there's no
8  foundation. She said four or five times
9  she doesn't know where the document came
10 from or who wrote it.
11     MR. CLUFF:  Let me ask a
12 different question. Bob, also, we all
13 know that the Special Master called and
14 said that we really shouldn't be talking
15 to each other for more than ten seconds.
16     MR. NICHOLAS:  That wasn't ten
17 seconds.
18     MR. CLUFF:  I was just going to
19 say I think we've done a reasonably good
20 job here. Let's cut the speaking
21 objections back down to how we've been
22 doing it in the future -- I mean in the
23 past.
24     MR. NICHOLAS:  Sterling, we will

Page 208

1  do that, if you -- we will do that. It
2  becomes increasingly difficult to do if
3  your questions become inappropriate, so
4  there's a cause and effect.
5      MR. CLUFF:  Bob, you're allowed
6  to make an objection. If you think the
7  objection -- or if the question is
8  inappropriate, you're not allowed to
9  make a speaking about it. With that
10 understood, you're free to make your
11 objection. I'm going to continue my
12 questioning. Do you understand that?
13     MR. NICHOLAS:  Yeah, yeah, yeah.
14 You should definitely --
15     MR. CLUFF:  Okay, great. So we
16 have an understanding. We don't need to
17 have more conversation about it.
18     MR. NICHOLAS:  You --
19     MR. CLUFF:  Bob, you're
20 continuing to talk. It's ridiculous.
21     MR. NICHOLAS:  Sterling, you have
22 a bad habit when you don't like what
23 you're hearing of interrupting and not
24 letting the other person who is talking

Page 209

1  finish. I haven't done a lot of
2  interrupt -- I haven't done any
3  interrupting today. I've made very,
4  very, very few objections that go beyond
5  two or three words. I have not made
6  objections that last more than ten
7  seconds, so I think your lecture to me
8  is inappropriate.
9  BY MR. CLUFF:
10 Q.   Rita, you forwarded this e-mail
11 or this information to your sister, right?
12 A.   Yes.
13 Q.   Did you have a belief at the time
14 you forwarded it to her that it was from a
15 reliable source?
16 A.   Yes.
17 Q.   What would a reliable source be
18 for this information?
19     MR. NICHOLAS:  Object to the
20 form.
21     THE WITNESS:  I don't know.
22 BY MR. CLUFF:
23 Q.   Let's go back to that third
24 paragraph. It says, "We support actions taken

Page 210

1  by the FDA, the CDC and the DEA." We talked
2  about that.
3      Did AmerisourceBergen support
4  actions taken by the FDA, the CDC and the DEA?
5      MR. NICHOLAS: Object to the
6      form.
7      THE WITNESS: To reduce the
8      potential for overprescribing, yes.
9  BY MR. CLUFF:
10     Q.   Okay.  Do you know if Cardinal
11 Health supported those same -- those same
12 actions taken by the FDA, the CDC and the DEA?
13     A.   I don't know.
14     Q.   Do you know if McKesson supported
15 those actions taken by the FDA, the CDC and the
16 DEA?
17     A.   I don't know.
18     Q.   Has AmerisourceBergen ever worked
19 with any members of the HDA to attack former DEA
20 agents?  Let me rephrase the word "attack."
21     Attack the testimony of DEA
22 agents?
23     MR. NICHOLAS: Object to the
24     form, foundation.

Page 211

1      THE WITNESS: No.
2      MR. NICHOLAS: Go ahead.
3  BY MR. CLUFF:
4      Q.   Has AmerisourceBergen ever worked
5  with any other members of the HDA to undermine
6  the credibility of former DEA agents?
7      MR. NICHOLAS: Objection to form,
8      foundation.
9      THE WITNESS: No, and I don't
10     know.
11     MR. CLUFF: Let me hand you a
12     copy of a document that was produced by
13     the HDA.  It's from Brad Tallamy, who is
14     an AmerisourceBergen employee, to
15     Kristen Freitas.  Copied on the e-mail
16     are Rita Norton and Beth Mitchell, who
17     are also both HDA employees.  I'm going
18     to mark it as Exhibit 7.
19     (Document marked for
20     identification as Norton Deposition
21     Exhibit No. 7.)
22     MR. MAHADY: AmerisourceBergen
23     employees?
24     MR. CLUFF: What did I say?

Page 212

1      MR. MAHADY: HDA employees.
2      MR. CLUFF: Yeah,
3  AmerisourceBergen employees. I might
4  have handed you my copy.  Can you hand
5  me back one.  Thanks.  It's number 54.
6      MS. HOSMER: This is Heather
7  Hosmer on the phone.  Could you read the
8  Bates number, please.
9      MR. CLUFF: Sure.  It's
10 HDA_MDL_000030946 to 30947.
11     MS. HOSMER: Thanks very much.
12     (Witness reviews document.)
13 BY MR. CLUFF:
14     Q.   Have you had a chance to review
15 this document?
16     A.   Yes.
17     Q.   Okay.  Do you recall receiving
18 this document or this e-mail from Brad Tallamy
19 in December 2017?
20     A.   Yes.
21     Q.   So it appears to be only one
22 e-mail that covers two pages, but it's from Brad
23 Tallamy to Kristen Freitas?
24     A.   Yes.

Page 213

1      Q.   Is that the same Kristen Freitas
2  that we discussed worked at the HDA?
3      A.   Yes.
4      Q.   And you received a copy of it and
5  so did Beth Mitchell, correct?
6      A.   Yes.
7      Q.   What does "T/I Questions" stand
8  for in the subject line?
9      A.   I don't know.
10     Q.   Moving down into the first
11 paragraph it says, "Kristen, we had a great
12 meeting with Smucker today and are seeing
13 Barletta tomorrow."
14     A.   It's the Transportation and
15 Infrastructure Subcommittee, that's what T/I is.
16     Q.   So T/I in the subject line stands
17 for Transportation and Infrastructure Committee?
18     A.   Mm-hmm.
19     Q.   Is that a Senate or a House
20 committee?
21     A.   House subcommittee.
22     Q.   And so this is about questions
23 for the Transportation and Infrastructure
24 Committee?

Page 214

1  A.  Yes.

2  Q.  Understood.

3  Then so moving down into the body

4  of the e-mail Brad writes, "Kristen, we had a

5  great meeting with Smucker today and are being

6  Barletta tomorrow."

7  Are those Congresspeople?

8  A.  Yes.

9  Q.  The e-mail continues "Below are

10  questions we prepped when Joe R was expected and

11  have tailored."

12  So the "we" in those two

13  sentences, is that "we" AmerisourceBergen?

14  A.  Yes.

15  Q.  Is Joe R, Joe Rannazzisi?

16  A.  Yes.

17  Q.  And he's a former DEA agent,

18  right?

19  A.  Yes.

20  Q.  Brad asks, "Are you OK with us

21  sending these to Smucker and Barletta after we

22  meet with him tomorrow?"

23  So is that Brad asking the HDA

24  commission to send these questions out?

Page 215

1  A.  Yes.  He's not asking me.  He's

2  asking Kristen just if she's comfortable with us

3  sending those.

4  Q.  Right, that was my question.  So

5  is that Brad asking the HDA for permission to

6  send these questions out?

7  A.  Not permission, but just ensuring

8  it's consistent, I guess, with their thinking or

9  what they're preparing.

10  Q.  So is it important to

11  AmerisourceBergen to make sure these questions

12  were consistent with what the HDMA was doing?

13  MR. NICHOLAS:  Object to the

14  form.

15  THE WITNESS:  I didn't say that

16  right.  It's just -- I think it was just

17  a courtesy to run those by Kristen.

18  BY MR. CLUFF:

19  Q.  So there's three lines of bold

20  underlined text.  The first two say "House

21  Transportation and Infrastructure Subcommittee

22  on Economic Development, Public Buildings and

23  Emergency Management."

24  Do you see that?

Page 216

1  A.  Yes.

2  Q.  And then the next is "Draft

3  questions for Jonathan Novak"?

4  A.  Yes.

5  Q.  Do you know who Jonathan Novak

6  is?

7  A.  No.

8  Q.  Is he a former DEA agent as well?

9  A.  I don't know.

10  Q.  Let's look at the motivation

11  section.

12  The first bullet point says, "To

13  confirm, your fellow whistleblower

14  Mr. Rannazzisi is currently consulting on behalf

15  of plaintiffs' attorneys engaged in litigation

16  against drug manufacturers and wholesalers?"

17  Do you see that?

18  A.  Yes.

19  Q.  Do you know how Brad knew that

20  Mr. Rannazzisi was consulting on behalf of

21  plaintiffs' attorneys?

22  MR. NICHOLAS:  Object to the

23  form.

24  THE WITNESS:  It was in the

Page 217

1  newspaper.

2  BY MR. CLUFF:

3  Q.  The next one says, "So he stands

4  to benefit financially if the supply chain

5  stakeholders you both have criticized in the

6  media reach settlements?  Why are we to believe

7  you both are credible voices in this debate?"

8  Do you see that?

9  A.  Yes.

10  Q.  Is that a question designed to

11  attack the credibility of Mr. Rannazzisi?

12  MR. NICHOLAS:  Object to the

13  form.

14  THE WITNESS:  I don't know.

15  BY MR. CLUFF:

16  Q.  Well, the question asks if

17  Mr. Rannazzisi or Mr. Novak are credible voices,

18  correct?

19  A.  It's a question.  I don't know --

20  I don't know that it was to undermine anyone's

21  credibility.

22  Q.  What would a point of a question

23  about credibility be if not to undermine it?

24  MR. NICHOLAS:  Okay, well, I'll

Page 218

1  object to the question, unless it was
2  rhetorical.
3       MR. CLUFF: It's not rhetorical.
4       MR. NICHOLAS: Object to the form
5  of the question.
6       THE WITNESS: I don't know. I
7  didn't write it, so I can't say with
8  certainty.
9  BY MR. CLUFF:
10      Q.  That's fair.
11           Did Brad tell you that he was
12 writing these questions?
13      A.  Yes.
14      Q.  What did he tell you about
15 writing these questions?
16      A.  I don't recall.
17      Q.  Are you aware that at any point
18 in time between 2004 and the present during your
19 work at AmerisourceBergen that the HDMA helped
20 its members to create a joint DEA strategy?
21      A.  No.
22      Q.  In response to the opioid
23 litigation that's been filed against your client
24 and other manufacturers, distributors and

Page 219

1  pharmacies, have you ever participated in a
2  meeting to create a joint strategy to respond to
3  the litigation?
4       A.  No.
5       Q.  Has a meeting ever been suggested
6  to do that?
7       A.  No.
8       Q.  Do you know if there's ever been
9  a coordination of efforts to blame the DEA for
10 the opioid crisis?
11      A.  No.
12      Q.  Is the answer that you do not
13 know or that there has never been a coordination
14 of that effort?
15      A.  Not -- no, I have not seen that,
16 and I don't know if there has been.
17      Q.  Let's look at the third bullet
18 point of that motivation section. At the end
19 there is a bold section it says, "Is your recent
20 'whistleblowing' really an attempt to mask a
21 failed enforcement policy during the worse years
22 of the opioid epidemic, and pass blame elsewhere
23 while now profiting off this terrible epidemic?"
24      Do you see that?

Page 220

1       A.  Yes.
2       Q.  Isn't that an attempt to blame
3  the DEA for the opioid crisis?
4       MR. NICHOLAS: Object to the
5       form.
6       THE WITNESS: I don't know. I
7  don't know how you interpret this. I
8  didn't write this. I just -- it is what
9  it is. I don't know.
10 BY MR. CLUFF:
11      Q.  Did you read this e-mail when it
12 was sent to you?
13      A.  Yes.
14      Q.  Did you ever look at it and say
15 we should not be attacking the DEA with these
16 questions?
17      MR. NICHOLAS: Object to the
18      form, lack of foundation.
19      THE WITNESS: These questions
20      were suggestions that were prepared at
21      the request of legislators or -- I don't
22      even think they were prepared at the
23      request. We are -- in the event we were
24      requested questions for a hearing in

Page 221

1  which the DEA was going to testify, I
2  don't even know that these were ever
3  even shared with anybody, so I don't --
4  I can't say.
5  BY MR. CLUFF:
6       Q.  Did you ever look at these and
7  say maybe we shouldn't suggest attacking the DEA
8  in questions that are going to asked of them
9  during a committee hearing?
10      MR. NICHOLAS: Objection, lack of
11      foundation. Object to the form, asked
12      and answered.
13      THE WITNESS: No, we wanted to
14      work with the DEA. We weren't
15      interested in attacking the DEA. We
16      wanted to restore our relationship with
17      the DEA.
18 BY MR. CLUFF:
19      Q.  Let's look at the word "Quotas"
20 there, the next bullet point down. I'm just
21 trying to understand this statement you made
22 that "we wanted to work with the DEA."
23      The first bullet point says, "If
24 Mr. Rannazzisi was so concerned about going

Page 222

1 after the 'choke point,' why did he approve
2 increased opioid production quotas year after
3 year as the epidemic worsened?"
4         Do you see that?
5     A.    Yes.
6     Q.    Does that feel like it's a
7 question designed to work with the DEA?
8         MR. NICHOLAS:  Object to the
9     form.
10        THE WITNESS:  Mr. Rannazzisi was
11    no longer at the DEA.
12        MR. CLUFF:  I don't think that
13    answers my question.
14        Go ahead, Bob.
15        MR. NICHOLAS:  Objection. She
16    answered your question.
17        MR. CLUFF:  No, she answered your
18    question, so I'll answer my -- I'll ask
19    my question again.
20 BY MR. CLUFF:
21    Q.    This question about
22 Mr. Rannazzisi going after the choke point and
23 increasing opioid production quotas, he would
24 have been approving opioid production quotas

Page 223

1 while he was at the DEA, right?
2         MR. NICHOLAS:  Object to the
3     form.
4         THE WITNESS:  Yes.
5 BY MR. CLUFF:
6     Q.    So does this question -- is this
7 question designed to work with the DEA, or is it
8 designed to attack the DEA?
9         MR. NICHOLAS:  Object to the
10    form, asked and answered, badgering.
11        THE WITNESS:  We wanted to work
12    with the DEA and Mr. Rannazzisi was no
13    longer at the DEA when this would have
14    been asked.
15 BY MR. CLUFF:
16    Q.    Let's turn to the next page.
17 There's a bold heading there "DEA Registration."
18 It says, "You blame distributors for
19 exacerbating the opioid crisis, yet they are
20 filling orders by DEA licensed pharmacists who
21 provide medications to DEA licensed physicians."
22        Do you see that?
23    A.    Yes.
24    Q.    You continue or -- excuse me --

Page 224

1 Brad continues and says, "You cannot get a
2 legitimate controlled substance from a
3 distributor without a valid prescription."
4         Do you see that?
5     A.    Yes.
6     Q.    Then there's a question.  "What
7 due diligence did DEA perform on pharmacies and
8 prescribers in this region or across the country
9 before issuing a registration to allow them to
10 prescribe and dispense controlled substances?"
11        Do you see that?
12    A.    Yes.
13    Q.    Is that a question that's
14 designed to work with the DEA or blame the DEA?
15        MR. NICHOLAS:  Object to the
16    form, lack of foundation.
17        THE WITNESS:  All I can say is we
18    wanted to work with the DEA.  We wanted
19    to restore the relationship we had
20    previously with the DEA.
21 BY MR. CLUFF:
22    Q.    Can you point to me a statement
23 in this two-page e-mail that says we want to
24 work with the DEA, or we want to restore the

Page 225

1 relationship we had with the DEA?
2         MR. NICHOLAS:  Object to the
3     form, argumentative, lack of foundation,
4     since she didn't write it.
5         THE WITNESS:  No.
6         MR. CLUFF:  I'm going to hand you
7     another document.  This one is produced
8     by AmerisourceBergen.  It's Bates
9     stamped ABDCMDL00161397.  It's an e-mail
10    that you wrote or that you replied to
11    that you received from Patrick Kelly.
12    There's an attachment which are
13    "Industry talking points on opioid
14    abuse," they're attached to the e-mail.
15    The attachment begins on
16    ABDCMDL00161398.  And for Mr. Mike down
17    there, that is number 45.
18        (Document marked for
19    identification as Norton Deposition
20    Exhibit No. 8.)
21 BY MR. CLUFF:
22    Q.    To save some time, I'm just going
23 to ask you some questions to begin with on the
24 first page of this document, which is the

Page 226

1   e-mails.
2           If you want to read the entirety
3   of the attachment, I am going to have some
4   questions about it.  You can do that now, or you
5   can do it in a second, whichever you prefer.
6       A.   (Witness reviews document.)
7       Q.   We've been talking a lot about
8   today -- a lot today about agreements and
9   coordination, I'm sure you've been aware of
10  that.
11          So I want to start with
12  Mr. Patrick Kelly's e-mail to you and to Kristen
13  Freitas, subject line, forward:  "Industry
14  talking points" at the bottom of the first page.
15          Do you see that?
16          It says Rita, not sure my
17  previous e-mail got through from my phone but
18  hopefully the attached Word document is
19  accessible.
20          Do you see that?
21      A.   Yes.
22      Q.   All right.  Up at the top of the
23  e-mail, there is an attachment that you include
24  to various individuals from AmerisourceBergen?

Page 227

1       A.   Yes.
2       Q.   Have you reviewed that attachment
3   as part of this document that's been marked as
4   Exhibit 8?
5       A.   Yes.
6       Q.   Is that the same exhibit that you
7   received from Kristen Freitas and Patrick Kelly?
8       A.   Yes.
9       Q.   All right.  So Mr. Kelly, he
10  continues in the second paragraph of his e-mail
11  and says, "As agreed upon by the companies that
12  crafted these talking points."
13          You've had a chance to review
14  these talking points, correct?
15      A.   I don't recall.
16      Q.   Who would have the companies --
17  who would the companies have been who crafted
18  talking points like this?
19          MR. NICHOLAS:  Object to the
20      form.
21          THE WITNESS:  I don't recall.  I
22      don't remember.  I would have -- I don't
23      know.  I don't -- I don't remember who
24      put this document together.

Page 228

1   BY MR. CLUFF:
2       Q.   So stepping back a second then,
3   just generally, this document confirms that some
4   companies crafted these talking points?
5           MR. NICHOLAS:  Object to the
6       form.
7           THE WITNESS:  Possibly HDA
8       drafted this document and circulated it
9       and got comments on it, I don't
10      remember.
11  BY MR. CLUFF:
12      Q.   Who would the HDA have circulated
13  it to?
14      A.   Member companies.
15      Q.   You say member companies?
16      A.   Yes.
17      Q.   The last sentence of Mr. Kelly's
18  e-mail says, these are simply agreed upon
19  talking points to be used by staff in meetings
20  where we are called upon to explain the role of
21  distributors, correct?
22      A.   Yes.
23      Q.   So do these talking points
24  essentially reflect an industry -- well, an

Page 229

1   agreed upon way in which HDMA member companies
2   were going to talk about opioid abuse?
3           MR. NICHOLAS:  Objection to the
4       form and lack of foundation.
5           Go ahead.
6           THE WITNESS:  These are facts
7       about the pharmaceutical distribution
8       industry and our efforts to prevent
9       diversion.
10  BY MR. CLUFF:
11      Q.   Can you show me where on the face
12  of this document it says facts?
13          MR. NICHOLAS:  Object to the
14      form.  It's not an English test.
15          THE WITNESS:  No.
16  BY MR. CLUFF:
17      Q.   These are talking points?
18          MR. NICHOLAS:  Object to the
19      form.
20  BY MR. CLUFF:
21      Q.   Right?
22          MR. NICHOLAS:  Object to the
23      form.
24          THE WITNESS:  In this case it's

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 the same thing.
2 BY MR. CLUFF:
3     Q.   Can you show me in this e-mail
4 from Mr. Kelly or that you share with the people
5 at AmerisourceBergen where you say that these
6 talking points should be considered facts?
7        MR. NICHOLAS: Object to the
8    form, just argument, you're just
9    arguing.
10      Go ahead.
11      THE WITNESS: I'm just calling
12    them facts.
13 BY MR. CLUFF:
14     Q.   Okay. So you're going to call
15 them facts, but I'm going to say talking points
16 because that's what this document says. I'm
17 just going to be clear so we understand which
18 words we're using.
19        MR. NICHOLAS: Object to the
20    form, arguing.
21 BY MR. CLUFF:
22     Q.   So regardless if you want to call
23 them facts or talking points, I think this
24 e-mail we can agree states that these are simply

Page 231

1 agreed upon talking points to be used by staff,
2 correct?
3     A.   Yes.
4     Q.   And I believe you testified
5 earlier that if the HDA circulated these to
6 companies, it would have been member
7 distributors?
8        MR. NICHOLAS: Object to the
9    form.
10      Go ahead.
11      THE WITNESS: Members of HDA.
12 BY MR. CLUFF:
13     Q.   So that would include, for
14 example, AmerisourceBergen, Cardinal Health and
15 McKesson?
16     A.   Yes, among others.
17     Q.   Look at the next page it says
18 "Industry talking points on opioid abuse,"
19 November 6, 2016. There's another heading that
20 says "Document Objective."
21      Do you see that?
22     A.   Yes.
23     Q.   It says, "This document is
24 intended to serve as an omnibus version of our

Page 232

1 talking points."
2      Is that "our" as the HDA?
3        MR. NICHOLAS: Object to the
4    form, lack of foundation.
5      THE WITNESS: I would say our as
6    pharmaceutical distribution industry.
7 BY MR. CLUFF:
8     Q.   So the pharmaceutical
9 distribution industry had commonly used talking
10 points?
11        MR. NICHOLAS: Object to the
12    form, mischaracterizes the testimony.
13      THE WITNESS: What's the
14    question?
15 BY MR. CLUFF:
16     Q.   Well, I asked you about the
17 purpose of this document, and you said that this
18 was our pharmaceutical industry -- distribution
19 industry talking points, so I was just trying to
20 understand if that means that the pharmaceutical
21 distribution industry had like commonly accepted
22 talking points?
23        MR. NICHOLAS: Object to the
24    form. I think you're paraphrasing it.

Page 233

1      That's not what she said.
2 BY MR. CLUFF:
3     Q.   Do you understand my question,
4 Ms. Norton?
5     A.   We had lots of talking points,
6 lots of fact documents, lots of information that
7 we shared among each other, and this was just
8 one of them, to be educational.
9     Q.   Who is the "we" you're referring
10 to?
11     A.   Our industry.
12     Q.   When you say "our industry," who
13 do you include within that?
14     A.   Pharmaceutical distributors.
15     Q.   Did "our industry" also include
16 pharmaceutical manufacturers?
17     A.   No.
18     Q.   How about pharmacies?
19     A.   Only those that distribute.
20     Q.   So you had lots of talking points
21 and lots of fact documents and lots of
22 information that you shared among each other; is
23 that accurate?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.    And this talking points document,
2  do you feel that it's a good example of one of
3  those kinds of things that have would been
4  shared?
5          MR. NICHOLAS:  Object to the
6  form, lack of foundation.
7          THE WITNESS:  This is just
8  informational education to educate
9  anyone who was interested about our
10  industry, the distribution industry.
11 BY MR. CLUFF:
12   Q.    And then my question went a
13 little further, it was that is this document an
14 example of something that would have been shared
15 within the industry?
16          MR. NICHOLAS:  Object to the
17 form.
18          THE WITNESS:  Yes.
19 BY MR. CLUFF:
20   Q.    Going back to the HDA.
21          Have there been other instances,
22 in your memory, where the HDA was working on
23 behalf of its members to facilitate the sharing
24 of information?

Page 235

1          MR. NICHOLAS:  Object to the
2  form.
3          THE WITNESS:  That's the role of
4  a trade association.
5  BY MR. CLUFF:
6    Q.    Can you give me some examples of
7  information that the HDA would have helped
8  facilitate the sharing between its members?
9          MR. NICHOLAS:  Objection,
10  overbroad, form.
11          THE WITNESS:  On tax issues.
12 BY MR. CLUFF:
13   Q.    Would the HDA have helped share
14 information about DEA strategies?
15   A.    I don't know.
16          MR. CLUFF:  I'm going to hand you
17  a copy of a document that's been
18  produced by McKesson.  I met and
19  conferred with counsel for McKesson
20  before today's deposition and obtained
21  permission to use this document.  It is
22  Bates marked MCKMDL00615139.
23          For the record, it's captioned
24  "HDMA CEO Quarterly Update -

Page 236

1  December 2006."  The sender is HDMA CEO
2  quarterly jgray@hdmanet.org.  There's a
3  to line at the top, Hilliard, Gary.
4  Underneath that there appears to be the
5  text of a HDMA CEO quarterly release.
6  Please go ahead and read that.
7          (Document marked for
8  identification as Norton Deposition
9  Exhibit No. 9.)
10          (Witness reviews document.)
11 BY MR. CLUFF:
12   Q.    Actually, I'll be candid, if you
13 read it there, it's a rather voluminous
14 document.  I don't really want to waste your
15 time going through the whole thing.  I have
16 questions on the first two pages and
17 predominantly the first page.  If you'd like me
18 to just walk you through those and give you a
19 chance to like review the paragraphs I want to
20 ask you about, that would probably cut down the
21 time, if it's okay with your counsel.
22          MR. NICHOLAS:  Why don't you at
23 least flip through the whole document to
24 see what's in it and take it one step at

Page 237

1  a time.
2          (Witness reviews document.)
3          THE WITNESS:  Okay.  I didn't
4  read it all, but I just like read the
5  first two pages and skimmed the rest.
6  BY MR. CLUFF:
7    Q.    That's plenty enough for all of
8  us.
9          Let's look at the first paragraph
10 on the first page that starts "Through active
11 member participation."
12   A.    Yes.
13   Q.    Do you see that?
14          There's a sentence there in the
15 middle that starts, "HDMA is more proactive and
16 issue-driven than ever before, and our results
17 this year are a testament to new levels of
18 effective collaboration between HDMA members and
19 association staff."
20          Do you see that?
21   A.    Yes.
22   Q.    Do you have an understanding that
23 the HDA members would have been collaborating
24 with the HDA or the HDMA?

Page 238

1    A.   Yes.

2    Q.   The last sentence there reads in
3  that first paragraph, "We are accelerating the
4  process of decision-making and building member
5  consensus in order to develop strategic,
6  long-term positions that advance our core
7  mission."

8         Do you see that?

9    A.   Yes.

10   Q.   Was building member consensus a
11 key function of the HDA?

12        MR. NICHOLAS:  Object to the
13        form, lack of foundation.

14        THE WITNESS:  That is the goal of
15        all trade associations.

16 BY MR. CLUFF:

17   Q.   Let's look at the second
18 paragraph.  It starts, "together, with your help
19 and counsel, we are creating a strategic
20 framework for continuous improvement based on
21 targeted positions, strategies and
22 communications that support sound business
23 practices and public policies."

24        Do you see that?

Page 239

1    A.   Yes.

2    Q.   It continues, "From the FDA to
3  DEA, and from Capitol Hill to state capitols
4  across the country, HDMA has worked tirelessly
5  to advocate for key initiatives that further
6  secure the supply chain while permitting the
7  continued, reliable and cost-efficient
8  distribution of healthcare products to providers
9  and pharmacies."

10        Do you see that?

11   A.   Yes.

12   Q.   All right.  The next sentence
13 starts, "Guided by member input and
14 Board-approved strategic priorities, HDMA has
15 established a clear future focus on behalf of
16 our active distributor members, and the industry
17 as a whole."

18        Do you see that?

19   A.   Yes.

20   Q.   My question is were the HDMA's
21 activities really guided by member input and
22 board-approved strategic priorities?

23        MR. NICHOLAS:  Object to the
24        form, lack of foundation.

Page 240

1         THE WITNESS:  That was the goal.

2  BY MR. CLUFF:

3    Q.   So the goal of the HDA was to be
4  driven by member input?

5    A.   Yes.

6    Q.   So, effectively, when the HDA was
7  acting, it was acting on behalf of its
8  distributor members?

9         MR. NICHOLAS:  Object to the
10        form.

11        THE WITNESS:  Yes.

12 BY MR. CLUFF:

13   Q.   If you go down a little bit more,
14 there's a brief text that says "Key highlights
15 of 2006 include."

16        Do you see that?

17   A.   Mm-hmm.

18   Q.   If you go to the third bullet
19 point it says, "HDMA's Industry Relations group
20 developed business process guidelines to help
21 distributors and manufacturers make better and
22 more efficient use of EDI transaction sets."

23        Do you see that?

24   A.   Yes.

Page 241

1    Q.   Do you know what EDI transaction
2  sets are?

3    A.   No.

4    Q.   Do you have any idea what these
5  business process guidelines might be?

6    A.   No.

7    Q.   If you go to the second page,
8  there's a paragraph in the middle that says,
9  "given what's ahead."

10   A.   Yes.

11   Q.   That paragraph appears to be
12 talking about what HDMA intends to do in the
13 coming year.

14        And then in the middle of the
15 paragraph there's a sentence that starts "HDMA
16 will achieve these goals."

17        Do you see that?

18   A.   Yes.

19   Q.   That sentence continues, it says,
20 "HDMA will achieve these goals by continuing to
21 build our alliances with allied healthcare
22 associations, including PhRMA, NCPA, BIO, GPhA
23 and NACDS."

24        Do you see that?

Page 242

1  A.  Yes.
2  Q.  I believe we talked about every
3 single one of those trade organizations except
4 for BIO.  Do you know who BIO is?
5  A.  BIO is the organization -- or the
6 association that represents biotechnology
7 companies.
8  Q.  Is that a manufacturer
9 organization?
10  A.  Yes.
11  Q.  So in this sentence, the HDA is
12 informing its members that it's going to achieve
13 its goals by building alliances with other
14 healthcare associations?
15  MR. NICHOLAS:  Objection, object
16 to the form, foundation.
17  THE WITNESS:  You should ask HDMA
18 these questions, but I would say yes.
19 BY MR. CLUFF:
20  Q.  Okay.  Well, you've worked with
21 the HDA since you joined AmerisourceBergen,
22 right?
23  A.  Yes.
24  Q.  So I'm just trying to understand

Page 243

1 your understanding of how the HDA worked with
2 its members and its role in assisting its
3 members?
4  MR. NICHOLAS:  Objection.  I
5  think it just needs to be stated on the
6  record that she didn't write the
7  document.
8 BY MR. CLUFF:
9  Q.  Do you understand the question?
10  MR. NICHOLAS:  It's not even
11  clear that she received the document.
12  Go ahead.
13 BY MR. CLUFF:
14  Q.  Do you understand my purpose in
15 asking you these questions?
16  MR. NICHOLAS:  Object to the
17  form.  We all have our views as to what
18  your purpose might be.
19  Go ahead.
20 BY MR. CLUFF:
21  Q.  Let me reexplain it because we
22 had some objections in there that kind of
23 confused what I was trying to make as a point is
24 that I understand you didn't author this

Page 244

1 document.
2  In my review of documents
3 produced by AmerisourceBergen, you are
4 potentially one of the longest running employees
5 in the company who has had interaction and
6 worked with the HDA, so I'm not trying to have
7 you explain to me what the HDA meant when they
8 wrote this.  I'm just asking for your
9 understanding of what statements like this would
10 mean and also to understand your experience with
11 how the HDA worked with its members.
12  Does that make sense?
13  A.  Yes.
14  MR. NICHOLAS:  Object to the
15  form.
16  THE WITNESS:  Correct.
17  MR. CLUFF:  Let's set this one
18  aside.
19 BY MR. CLUFF:
20  Q.  Did you ever sit on the
21 regulatory affairs committee?
22  A.  No.
23  Q.  Do you recall receiving e-mails
24 from the regulatory affairs committee?

Page 245

1  A.  Yes.
2  Q.  Do you recall receiving e-mails
3 from Pam Ritter at the HDMA?
4  A.  Yes.
5  MR. CLUFF:  I'm going to hand you
6  a document that's been produced by Henry
7  Schein.  It's marked as
8  HSI-MDL-00620224.  Ms. Norton is a
9  recipient of the document.  She has also
10  just testified that she recalls
11  receiving e-mails like this that were
12  addressed to the regulatory affairs
13  committee from Ms. Ritter.
14  That's number 22 for my trial
15  tech down the way.
16  (Document marked for
17  identification as Norton Deposition
18  Exhibit No. 10.)
19  (Witness reviews document.)
20 BY MR. CLUFF:
21  Q.  My questions are going to be
22 confined to the third page of this e-mail,
23 Ms. Norton, under the section background and
24 purpose and to the attachment which begins on

Page 246

1  the fourth page.
2      A.    (Witness reviews document.)
3          MR. MAHADY:  Sterling, I believe
4  you when you say she's a recipient, I'm
5  just --
6          MR. NICHOLAS:  I was going to ask
7  the same question.
8          MR. CLUFF:  Yeah, yeah, yeah.
9          MR. NICHOLAS:  Tell us where.
10  There's a lot of names.
11          MR. CLUFF:  So if you look down
12  one, two, three, four, five, six,
13  seven -- eight lines of recipients up
14  from the very bottom of the document.
15  She is the rnorton@AmerisourceBergen.  I
16  will also note that Chris Zimmerman
17  received this document, so plenty of
18  AmerisourceBergen people on it, at least
19  two.  See Steve Mays is on there too.
20          (Witness reviews document.)
21  BY MR. CLUFF:
22      Q.    Okay.  Let's start at the second
23  page at the bottom.  There's an e-mail from Pam
24  Ritter to Pam Ritter.

Page 247

1          Do you see that at the bottom?
2      A.    Yes.
3      Q.    She says, "This document is being
4  sent to you at the request of Anita Ducca," and
5  then writes "Dear RAC members."
6          Do you see that?
7          Based on your experience with
8  receiving correspondence from the HDMA and the
9  HDA, were there like Listservs of people who
10  would receive e-mails like this?
11      A.    Yes.
12      Q.    So like there was an RAC
13  Listserv?
14      A.    I guess so, yes.
15      Q.    Okay.  So continuing she writes,
16  "This is to ask if you are interested in, and
17  when you are available for, a conference call to
18  discuss DEA issues in preparation for a meeting
19  between HDMA and DEA officials."
20          Do you see that?
21      A.    Yes.
22      Q.    Based on your, you know, tenure
23  with AmerisourceBergen and work with HDMA, do
24  you recall the HDMA and its successor to the

Page 248

1  HDMA coordinating meetings for HDMA members to
2  discuss DEA issues?
3      A.    I don't think this meeting ever
4  happened.  I think the request was that we
5  wanted to meet with the DEA for this reason, and
6  it was appropriate for a trade association to
7  arrange it, rather than us going individually,
8  but, I mean, I'm not on the RAC committee.  I
9  just -- I don't know why I received this.  It
10  looks like it went to almost everybody.
11      Q.    I just want to ask you a couple
12  more questions then.  These are about the HDMA
13  generally, not necessarily like this meeting.
14          There's a bold heading there that
15  says "Background/Purpose."
16          Do you see that, that same second
17  page?
18      A.    Yes.
19      Q.    It says, "At the May 17 Executive
20  Committee meeting, there was a discussion about
21  recent DEA activities to involve wholesale
22  distributors in efforts to prevent diversion,
23  particularly diversion by way of internet
24  pharmacies."

Page 249

1          Do you see that?
2      A.    Mm-hmm.
3      Q.    Then it continues, "The Executive
4  Committee requested that HDMA become involved
5  and recommended that HDMA hold meet with
6  appropriate DEA officials to discuss this
7  issue."
8          In your work with the HDMA, do
9  you recall that the Executive Committee often
10  gave the HDMA directives?
11      A.    I don't know about often, but
12  regularly.
13      Q.    Regularly.  And so here it
14  appears that the HDMA is taking action as a
15  result of the request from the Executive
16  Committee, was that common in your experience
17  with the HDMA?
18      A.    I would say this occasionally
19  happened.
20      Q.    And just, again, to confirm our
21  understanding, the Executive Committee included
22  representatives from AmerisourceBergen, Cardinal
23  Health and McKesson, right?
24      A.    Among others.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.   Among others.

2        MR. NICHOLAS: Just for the

3 record, Sterling, this is a document

4 from 2007; is that correct?

5        MR. CLUFF: Appears to be, yes.

6        MR. NICHOLAS: Okay.

7 BY MR. CLUFF:

8    Q.   I believe you previously

9 testified that you don't recall if this -- this

10 meeting occurred, right?

11    A.   Yes.

12    Q.   Do you know if the meeting with

13 the DEA ever occurred?

14    A.   No, I don't.

15    Q.   Do you recall ever receiving an

16 update about the meeting from the HDA?

17        MR. NICHOLAS: Object to the

18    form, lack of foundation.

19        THE WITNESS: No.

20        MR. CLUFF: I'm going to hand you

21    a copy of another document. This one

22    has been produced by H.D. Smith. It's

23    from Brian Cherico to a number of

24    recipients. I'll note that Ms. Norton

Page 251

1 is a recipient of the document. Her

2 name appears one, two, three, four --

3 five lines up from the bottom of the CC

4 column.

5        MS. HOSMER: Can you read the

6    Bates, please.

7        MR. CLUFF: Yeah, sorry. I'm

8    just getting the witness' copy.

9        MS. HOSMER: Thank you.

10        MR. CLUFF: The Bates numbers are

11    HDS_MDL_00317399. There were

12    attachments to the document which are

13    also included. They appear to begin on

14    HDS_MDL_00317403.

15        (Document marked for

16    identification as Norton Deposition

17    Exhibit No. 11.)

18 BY MR. CLUFF:

19    Q.   I'm handing you this document so

20 we can just talk about one of the attachments

21 that has a discussion of a June 1, 2007 meeting.

22 That portion of this document begins second from

23 the -- three pages from the back, which is

24 HDS_MDL_00317423.

Page 252

1    A.   (Witness reviews document.)

2    Q.   Are you good?

3    A.   Uh-huh.

4    Q.   I want to review this and one

5 more document, and then let's take a break.

6        MR. CLUFF: Do you have a

7    comment?

8        MR. MAHADY: Yeah, I just --

9    looking at the document ending in Bates

10    317423, this is not a AmerisourceBergen

11    produced document, so I want to make

12    sure that no other defendant has clawed

13    back this document, redacted portions of

14    this document, since there's a reference

15    to the call -- having legal counsel on

16    the call.

17        MR. CLUFF: I'm not aware of it.

18    This is available on the database, so

19    let's do this.

20 BY MR. CLUFF:

21    Q.   Ms. Norton, do you recall

22 participating in the meeting that's that

23 discussed on this page?

24    A.   No.

Page 253

1    Q.   Okay. Do you recall if anybody

2 from AmerisourceBergen would have participated

3 in this meeting?

4    A.   No.

5    Q.   Okay. Do you know of any other

6 defendants who participated in this meeting?

7    A.   No.

8    Q.   Given the reference to counsel,

9 I'm not going to ask you about any of the

10 substance of this meeting. All I want to talk

11 about is the heading; how about that?

12    A.   Okay.

13    Q.   You see the heading it says,

14 "Summary of HDMA Member Strategy Discussions on

15 the Distributor's Role in Combating the

16 Diversion of Controlled Substances Under the

17 CSA"?

18    A.   Yes.

19    Q.   Okay. So my only question is

20 there were member strategy discussions that

21 happened within the HDMA, correct?

22        MR. NICHOLAS: Object to the

23    form.

24        THE WITNESS: You're asking me if

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  what?
2  BY MR. CLUFF:
3      Q.    If members had strategy
4  discussions within the HDMA?
5      A.    Yes.
6      Q.    In the document prior to this, we
7  talked about a meeting to discuss an upcoming
8  HDMA DEA meeting?
9      A.    Yes.
10     Q.    Having looked at this document,
11 do you see that that strategy meeting occurred?
12         MR. NICHOLAS:  Object to the
13      form, lack of foundation.
14         THE WITNESS:  It says, HDMA staff
15      conducted a teleconference meeting with
16      members, so, yes.
17 BY MR. CLUFF:
18     Q.    Okay.  That's my only question
19 about that.
20         MR. CLUFF:  Did you want to
21      interpose an objection, Joe?
22         MR. MAHADY:  No.  I just want to
23      clarify.  Are you asking about whether
24      or not the HDMA strategy meeting

Page 255

1  occurred or the meeting with the DEA?
2          MR. CLUFF:  The HDMA strategy
3      meeting.
4          MR. MAHADY:  Okay.
5  BY MR. CLUFF:
6      Q.    Was it common for strategy
7  meetings to happen within the HDMA?
8          MR. NICHOLAS:  Object to the
9      form.
10         THE WITNESS:  As needed.
11 BY MR. CLUFF:
12     Q.    What do you mean "as needed"?
13     A.    Well, that's what you do with
14 your trade association is when issues arise and
15 you need to have a strategy discussion, that's
16 what you do, you get together and try to
17 understand everyone's concerns.
18     Q.    Did you ever participate in any
19 strategy meetings about the DEA?
20     A.    This was not my area of
21 expertise.  DEA was -- is under the purview of
22 our regulatory and security department, and so I
23 have little to nothing -- in fact, I would say I
24 had no role on this whatsoever, so I can't tell

Page 256

1  you anything about this.
2      Q.    Are you saying "this" as in the
3  document that's in front of you?
4      A.    Yes.
5      Q.    Okay.  I'm asking you just a more
6  broad question about your participation in
7  general.
8          Did you ever participate in
9  general aside from Exhibit 11, in DEA strategy
10 meetings?
11         MR. NICHOLAS:  Objection to the
12      form, asked and answered.
13         THE WITNESS:  Not in any DEA
14      strategy, no.
15 BY MR. CLUFF:
16     Q.    Okay.  Do you -- you were a
17 member of the Federal Government and Affairs
18 Committee we discussed correctly?
19     A.    Yes.
20     Q.    And the PPC, which eventually
21 became the GPPC, correct?
22     A.    Well, vice versa the GPPC become
23 the PPC.
24     Q.    Okay, I got it wrong.

Page 257

1          Do you recall receiving e-mails
2  as a member of both of those committees?
3      A.    Well, I don't recall all of them.
4  I recall receiving e-mails from them generally.
5      Q.    I'm going to hand you a copy of a
6  document that's been produced by H.D. Smith.
7  It's HDS_MDL_00136792, Bates numbers end in
8  136794.  We'll mark it as Exhibit 12.
9          MR. NICHOLAS:  Before you do,
10      since you erroneously promised that the
11      last document would be the last --
12         MR. CLUFF:  I said one more
13      document after that one.  This is it,
14      and we'll take a break.
15         MR. NICHOLAS:  All right.  Are
16      you okay?
17         THE WITNESS:  Yes.  Well, I'm --
18         MR. NICHOLAS:  Okay.  We'll do
19      one more quick, if you're okay.
20         THE WITNESS:  I'm okay.
21         (Document marked for
22      identification as Norton Deposition
23      Exhibit No. 12.)
24 BY MR. CLUFF:

Page 258

1 Q. How about this one, I'll walk you
2 through it much more quickly.
3 So at the top it's from Pam
4 Ritter, correct?
5 A. Yes.
6 Q. And you can see it says Subject:
7 Forward: "HDMA DEA Strategy Meeting Request."
8 Do you see that?
9 A. Yes.
10 Q. And the to line up at the top
11 says Pam Ritter, but if you drop down, there's a
12 bold to that says "RAC, FGAC, GPPC, IRC
13 Distributor Members," correct?
14 A. Yes.
15 Q. And we've previously talked that
16 you were a member of at least two of those
17 committees and that you received e-mails as a
18 member of those committees, correct?
19 A. Yes.
20 Q. All right. The first line says,
21 "The DEA strategy meeting has been confirmed for
22 October 16-17 at the HDMA offices in Arlington,
23 Virginia."
24 Do you see that?

Page 259

1 A. Yes.
2 Q. Okay. Now, if you go down to the
3 bottom of that page, it says "Possible Meeting
4 Attendees."
5 Do you see that?
6 A. Mm-hmm.
7 Q. If you flip the page, you see
8 your name there?
9 A. Yes.
10 Q. And so you were anticipating
11 attending this DEA strategy meeting for at least
12 one day with Steve Mays and Chris Zimmerman?
13 MR. NICHOLAS: Object to the
14 form.
15 THE WITNESS: Yes.
16 BY MR. CLUFF:
17 Q. Do you recall if that meeting
18 happened?
19 A. I don't recall the meeting. It
20 was a long time ago.
21 Q. It says down at the bottom or in
22 the middle "Overview/Tentative Agenda."
23 Do you see that?
24 A. Yes.

Page 260

1 Q. It says, our initial thoughts are
2 to review the major DEA issues (Suspicious
3 Orders, Methadone, In-Transit Losses, and the
4 Proposed rule to obtain retailers' PST
5 compliance self-cert), then develop specific
6 policy positions and supporting information for
7 them, as well as begin to discuss an overall
8 strategy for identifying solutions and accessing
9 decision makers.
10 Do you see that?
11 A. Yes.
12 Q. This is another example of the
13 HDA providing a forum for its members to create
14 strategies together?
15 MR. NICHOLAS: Object to the
16 form.
17 THE WITNESS: I don't know. Yes.
18 BY MR. CLUFF:
19 Q. Do you recall why you may have
20 been listed as an attendee?
21 A. Recall what?
22 Q. Why you would have been listed as
23 a possible meeting attendee?
24 A. No.

Page 261

1 Q. Is that because this kind of
2 activity is outside of your governmental affairs
3 role?
4 A. Yes.
5 MR. CLUFF: Let's take a break.
6 THE VIDEOGRAPHER: Going off the
7 record at 3:37 p.m.
8 (Brief recess.)
9 THE VIDEOGRAPHER: We are back on
10 the record, 3:59.
11 BY MR. CLUFF:
12 Q. Okay, Ms. Norton, we're back on
13 the record so, again, you're back under oath.
14 Do you understand that?
15 A. Yes.
16 Q. Okay, great. I just wanted to
17 take a step back and kind of understand your
18 day-to-day work as the senior vice president of
19 government affairs.
20 What do you kind of do on a daily
21 basis for AmerisourceBergen?
22 A. Well, as I think I mentioned
23 earlier, my job is to educate elected officials
24 and policy makers and the administration on our

Page 262

1 business and, also, to help communicate what's
2 going on in the policy world to our company. So
3 I have meetings, I spend a lot of time here at
4 our headquarters. I visit our facilities around
5 the country, and I take legislators and
6 policymakers on tours so they can see it and
7 understand it.
8      And I -- I am on a lot of
9 conference calls.
10    Q.   All the lawyers in this room
11 sympathize with your involvement on those
12 conference calls.
13      How often would you say that you
14 are meeting with like we'll limit it to federal
15 legislators?
16    A.   So little less than I used to
17 because now I'm kind of overseeing the whole
18 department and our policy development, so I
19 would say 20% of my time is actually
20 face-to-face with legislators and staff, 20 to
21 25%.
22    Q.   And so for you that 20 to 25% is
23 down from what it used to be?
24    A.   A little bit, yes.

Page 263

1    Q.   So before you became the senior
2 vice president, were you meeting with federal
3 legislators more often than you are now?
4    A.   Well, a lot of times legislators
5 and staff so -- yes.
6    Q.   How much before you became the
7 senior vice president were you meeting with
8 federal legislators and/or their staff?
9    A.   Probably more like 35%.
10    Q.   That change, was that -- was that
11 work pushed on to the other associates that you
12 oversee in the government affairs office?
13    A.   I share this responsibility with
14 them, so, yes, they -- they do a lot more of the
15 meetings that I used to do on -- with
16 legislators.
17    Q.   When I asked you about federal
18 legislators, you included with them their staff?
19    A.   Yes.
20    Q.   Do you communication with
21 legislators oftentimes through their staff?
22    A.   Well, we spend probably more time
23 educating staff than we actually educate the
24 members directly because they rely on their

Page 264

1 staff to brief them.
2    Q.   How about state legislators,
3 before you became the senior vice president, how
4 much time do you think you spent communicating
5 or meetings with state legislators and/or their
6 staff?
7    A.   Very little.
8    Q.   How about now as the senior vice
9 president, has there been any change?
10    A.   No.
11    Q.   These conference calls that you
12 referred to, how often do you think you're on a
13 conference call with either a federal or a state
14 legislator or their staffers?
15    A.   Well, most of my conference calls
16 are with our internal company people, and then I
17 have conference calls with the people throughout
18 Washington, and our trade association calls are
19 regular, and so I would say 50/50
20 internal/external.
21    Q.   And how much of the time do you
22 think of your, you know, total day do you spend
23 on internal calls?
24    A.   Well, it varies, but anywhere

Page 265

1 from 10 to 20% of my day.
2    Q.   And how about external calls,
3 about the same?
4    A.   Oh, I'm sorry. Total. Internal
5 calls so 10 to 15 and 10 to 15, something like
6 that.
7    Q.   We previously talked about like
8 fundraisers. How often would you say that you
9 attend fundraisers for federal or state
10 legislators?
11    A.   So, again, that is -- that is --
12 relates to the time of year. When Congress is
13 in Washington, we attend a lot more than we do
14 when they're not in Washington, but then we do
15 weekend events as well, so I don't know -- do
16 you -- I don't know how to quantify, you know,
17 probably I attend 50 fundraisers a year.
18    Q.   And that would include some
19 weekend fundraisers, you said?
20    A.   Yes.
21    Q.   Okay. And that's skewed more
22 towards the times when Congress is in session,
23 you said?
24    A.   Yes.

Page 266

1    Q.    Has that changed over time, has
2  it increased or decreased?
3    A.    It's increased.
4    Q.    Is there any reason for the
5  increase?
6    A.    Well, I mean, if you read the
7  papers, people spend a lot more money on their
8  campaign so they are under -- they raise a lot
9  more money, so there's a lot more events to help
10  them raise money.
11    Q.    Have you ever had occasion to
12  have meetings with White House staff?
13    A.    Yes.
14    Q.    When was that?
15    A.    Many times.
16    Q.    Is that something that's happened
17  throughout your career?
18    A.    Yes.
19    Q.    At AmerisourceBergen?
20    A.    At AmerisourceBergen and my other
21  jobs as well.
22    Q.    How often in your career at
23  AmerisourceBergen have you met with White House
24  staff?

Page 267

1    A.    Well, White House staff, probably
2  ten times in the last -- in this
3  administration -- well, in this administration
4  probably, yeah, ten times.
5    Q.    So since President Trump has
6  assumed office, you've met with his
7  administration about ten times?
8    A.    Yes, and that would include HHS
9  and the White House.
10    Q.    How about before that, the prior
11  administration, how many times did you meet with
12  that administration?  I know it was a while ago,
13  and it was a long period of administration, but
14  if you can ballpark it, that's fine.
15    A.    You know, ten times.
16    Q.    Has there been any increase in
17  the frequency with which you interact with
18  legislators either federal or state or their
19  staff as a result of the focus on the opioid
20  crisis?
21    A.    I would say we've met with them
22  on the -- equally on the opioid crisis as well
23  as on Medicare, Medicaid and pharmacy
24  reimbursement issues, physician.

Page 268

1    Q.    Have the number of meetings
2  you've held about the opioid crisis increased in
3  the last few years?
4    A.    No.
5    Q.    Have you noticed any increase at
6  all in the last ten years about the opioid
7  crisis or meetings about the opioid crisis?
8    A.    We haven't really had many
9  meetings with the administration on the opioid
10  crisis.
11    Q.    You limited your answer to the
12  administration.  I'm asking just more broadly
13  about meetings in general with, you know,
14  federal or state government.
15    A.    Oh, with legislators?
16    Q.    Yeah.
17    A.    Yes, when the legislation both --
18  you know, there's been a lot of legislative
19  activity over the last five or six years, so
20  we've spent a lot more time with legislators on
21  those issues.
22    Q.    What are some of the legislative
23  activities that's happened in the last few
24  years?

Page 269

1          MR. NICHOLAS:  Object to the
2      form.
3          THE WITNESS:  There's been
4      various pieces of legislation to help
5      resolve the opioid crisis that we have
6      been involved with.
7  BY MR. CLUFF:
8    Q.    We mentioned earlier the Marino
9  Blackburn bill?
10    A.    Yes.
11    Q.    I think it was also referred to
12  as like S.483 and H.R.471?
13    A.    Yes.
14    Q.    Do you know what the name of that
15  bill became eventually?
16    A.    Ensuring patient access to
17  something.
18    Q.    Yeah, that's my best
19  recollection.  It wasn't a memory test, but I
20  think that's -- we can all agree it's ensuring
21  patient access something?
22    A.    Long title.
23    Q.    Yeah.  Is that a bill that HDA
24  supported?

Page 270

1     A.   Yes.
2     Q.   Did HDA support that bill along
3 with the HDA?
4     MR. NICHOLAS: Say again.
5 BY MR. CLUFF:
6     Q.   I said -- that was a bad
7 question.
8     Did AmerisourceBergen support
9 that bill along with the HDA?
10     A.   Yes.
11     Q.   Did it also support that bill
12 along with McKesson and Cardinal Health?
13     A.   Yes.
14     Q.   Do you know if the NACDS
15 supported that bill?
16     A.   Yes, they did.
17     Q.   Can you describe some of the
18 activities that AmerisourceBergen undertook to
19 support the Ensuring Patient Access Act?
20     A.   Well, just educational briefings,
21 you know, with legis -- with staff and their
22 legislators to talk about our efforts to prevent
23 diversion, and we would bring our experts from
24 the company in to meet with them and talk about

Page 271

1 the challenges that we have, our interest in
2 working more closely with the DEA again to -- so
3 we could work together to solve the problem
4 versus DEA was not wanting to talk to us at that
5 time.
6     Q.   Did AmerisourceBergen coordinate
7 its approach to supporting the Ensuring Patient
8 Access Act with Cardinal Health and McKesson?
9     MR. NICHOLAS: Object to the
10     form.
11     THE WITNESS: Coordinate? I mean
12     HDA would -- I would say was more of the
13     coordinator. We would coordinate with
14     HDA as an industry.
15 BY MR. CLUFF:
16     Q.   So the HDA was more of a
17 coordinating entity about the Ensuring Patient
18 Access Act than AmerisourceBergen?
19     A.   Yes.
20     MR. NICHOLAS: Object to the
21     form.
22     THE WITNESS: Yes.
23 BY MR. CLUFF:
24     Q.   Okay. Let's -- we've been

Page 272

1 talking a lot about the HDA. I have just a few
2 more documents about the HDA, and then hopefully
3 we can put that subject to the rest for all of
4 the rest of our lives, until trial.
5     Do you recall participating in
6 the HDA in approximately 2008 on a -- in a
7 meeting about model best practices for
8 suspicious order -- suspicious orders?
9     A.   No.
10     Q.   Do you know who Richard Cooper is
11 from Williams and Conley?
12     A.   No.
13     Q.   Do you know who David Durkin is
14 from Olsson Frank and Weeda?
15     A.   No.
16     Q.   Do you know who Roger Peters is
17 from Valley Wholesale Drug?
18     A.   No.
19     Q.   How about George Euson from H.D.
20 Smith?
21     A.   The name sounds familiar, but I
22 don't know him.
23     Q.   Let's go to some bigger names.
24 How about Bruce Russell from McKesson

Page 273

1 Corporation, do you recognize that name?
2     A.   No.
3     Q.   How about Rick Frank from Olsson
4 Frank and Weeda?
5     A.   Yes.
6     Q.   Who is that?
7     A.   He is one of the partners at
8 Olsson Frank and Weeda that advises HDA.
9     Q.   Do you know why Mr. Olsson Frank
10 and Weeda would have been included in a meeting
11 about model best practices for suspicious
12 orders?
13     A.   Do I know when Mr. Frank --
14     MR. NICHOLAS: You said
15     Mr. Olsson Frank and Weeda, but I think
16     you just mean to say Mr. Frank, right?
17 BY MR. CLUFF:
18     Q.   Do you know why --
19     MR. NICHOLAS: It's not its
20     fault. Don't blame the teleprompter.
21     MR. CLUFF: I was just looking to
22     see what happened, Bob. Just looking to
23     see what happened.
24 BY MR. CLUFF:

Page 274

1    Q.    Do you know why Mr. Frank would
2  have been included in a meeting about model best
3  practices for suspicious orders?
4    A.    Outside counsel is always in our
5  meetings at HDA.
6    Q.    In communications with the HDA,
7  do you have an understanding about why outside
8  counsel is always included in the meetings with
9  HDA?
10   A.    Standard anti-trust.
11   Q.    What does that mean?
12   A.    Well, I mean, because all
13 companies within the same industry, there's
14 always, for protection, an outside lawyer to
15 make sure nothing is said that could be
16 construed as conflict.
17   Q.    What could be construed as
18 violating the anti-trust rules?  I mean just if
19 you have an understanding.
20       MR. NICHOLAS:  Yeah, I'll object
21   to the form.  She's not a lawyer.
22       THE WITNESS:  I can't really say.
23 BY MR. CLUFF:
24   Q.    Do you know who Gary Hilliard is

Page 275

1  from McKesson?
2    A.    No.
3    Q.    How about Connie Woodburn, do you
4  know Connie Woodburn?
5    A.    Yes.
6    Q.    And would it make sense to you
7  that Chris Zimmerman and Steve Mays from
8  AmerisourceBergen would have participated in a
9  meeting about model best practices for
10 suspicious orders?
11       MR. NICHOLAS:  Object to the
12   form.
13       THE WITNESS:  Yes.
14 BY MR. CLUFF:
15   Q.    Why is that?
16   A.    Because that involved their
17 responsibilities for the company.
18   Q.    Do you have any idea why you
19 might have participated in a meeting about model
20 best practices for suspicious orders?
21   A.    No.
22   Q.    I know you don't recall it, but
23 I'm just asking if you were included as an
24 attendee, do you know why?

Page 276

1       MR. NICHOLAS:  Object to the
2   form.
3       THE WITNESS:  No.
4  BY MR. CLUFF:
5    Q.    How about Connie Woodburn, do you
6  know why she might have been included as an
7  attendee at a meeting about model best practices
8  for suspicious orders?
9    A.    No.
10   Q.    Do you recall in 2012 that there
11 was a hearing of the E&C committee on drug
12 diversion?
13   A.    No.
14   Q.    Do you know what the E&C
15 committee is, the Energy and Commerce
16 Subcommittee?
17   A.    So the Energy and Commerce is a
18 full committee, and it has subcommittees.
19   Q.    Okay.  So do you recall that
20 maybe there was an Energy and Commerce
21 Subcommittee on Health hearing on drug diversion
22 in 2012?
23       MR. NICHOLAS:  Object to the
24   form.

Page 277

1       THE WITNESS:  I don't recall.
2  BY MR. CLUFF:
3    Q.    Do you recall if there was such a
4  meeting whether or not AmerisourceBergen would
5  have met with the HDA to prepare for it?
6       MR. NICHOLAS:  Object to the
7   form, lack of foundation.
8       THE WITNESS:  I don't remember.
9  BY MR. CLUFF:
10   Q.    If I showed you a document about
11 that hearing, would it refresh your
12 recollection?
13       MR. NICHOLAS:  Object to the
14   form.  That's a hypothetical.
15       MR. CLUFF:  It's not.  It's a
16   factual question.
17       MR. NICHOLAS:  Then please show
18   her the document.  She can't know
19   whether it would refresh her
20   recollection.
21       MR. CLUFF:  I'm going to hand you
22   a copy of a document that's been -- this
23   was produced by McKesson.  It's
24   MCKMDL00652338.  This is an e-mail from

Page 278

1 Patrick Kelly to Connie Woodburn, Ann
2 Berkey and Rita Norton, which makes Rita
3 Norton a recipient of the document. I'm
4 going to mark it out of order as 14
5 because I put 13 on the wrong --
6     MR. NICHOLAS: I'm sorry. Who
7 produced the document?
8     MR. CLUFF: McKesson.
9     (Document marked for
10 identification as Norton Deposition
11 Exhibit No. 14.)
12     (Witness reviews document.)
13 BY MR. CLUFF:
14    Q.   Did you have a chance to look at
15 that?
16    A.   Yes.
17    Q.   Okay.  So does this refresh your
18 recollection that there was an Energy and
19 Commerce Subcommittee on Health hearing in 2012?
20    A.   Yes.
21    Q.   Do you have any understanding
22 having read this e-mail what that hearing was
23 about?
24    A.   Yes.

Page 279

1    Q.   What was it about?
2    A.   According to this, it was on
3 prescription drug diversion.
4    Q.   Are you looking at the first line
5 of the body of the e-mail?
6    A.   Yes.
7    Q.   So it looks like --
8     MR. MAHADY: It's not working
9 real time. I'm not sure if you want it
10 or not, but it stopped again.
11     MR. CLUFF: I'm okay with it.
12 I'd like to just finish, unless you guys
13 really need it.
14     MR. MAHADY: No.
15 BY MR. CLUFF:
16    Q.   It looks like this first line of
17 the e-mail refers to the Energy and Commerce
18 Subcommittee on Commerce, Manufacturing and
19 Trade, right?
20    A.   Yeah.
21    Q.   So when I was referring to
22 Subcommittee on Health, I was using the wrong
23 term?
24    A.   Yes.

Page 280

1    Q.   Okay.  Okay.  So but, in any
2 event, there was a 2012 hearing about
3 prescription drug diversion.
4     Do you see that?
5    A.   Yes.
6    Q.   It says, It was very apparent
7 that the preliminary work with Committee members
8 was very effective."
9     Do you see that?
10    A.   Yes.
11    Q.   And that "there were no
12 accusatory attacks"; is that right?
13    A.   Yes.
14    Q.   Is that something that you recall
15 the HDA or its members were concerned about
16 leading up to this hearing?
17    A.   I don't remember.
18    Q.   Do you recall ever discussing
19 that with Connie Woodburn or Ann Berkey?
20    A.   No.
21    Q.   If you look at the next -- it's
22 hard to discern the paragraphs because they're
23 all jammed together, but a couple lines down it
24 says "Joe Rannazzisi from DEA."

Page 281

1     Do you see that?
2    A.   Yes.
3    Q.   It says, he did "spend most of
4 his testimony and follow-up admitting that DEA
5 is focusing on its Distributor Initiative.  At
6 one point he stated something to the effect that
7 DEA has been very up front about expectations
8 from the supply chain, 'but distributors choose
9 not to comply'."
10     Do you see that?
11    A.   Yes.
12    Q.   Do you understand that the DEA
13 was saying that distributors were not complying
14 with their obligations?
15     MR. NICHOLAS: Object to the
16 form, lack of foundation.
17     THE WITNESS: I don't understand
18 what that means at all.
19 BY MR. CLUFF:
20    Q.   Do you understand that it's a
21 point that Mr. Rannazzisi at least was making in
22 2012?
23     MR. NICHOLAS: Object to the
24 form, lack of foundation.

Page 282

1    THE WITNESS: No. I mean, I
2    don't understand that sentence.
3 BY MR. CLUFF:
4    Q. Okay. Previously we talked about
5 the fact that AmerisourceBergen is committed
6 to -- and if I'm getting your understanding
7 incorrect, please clarify for me.
8 AmerisourceBergen is committed to working with
9 the DEA, correct?
10    A. Yes.
11    Q. Okay. So the next sentence in
12 this e-mail says, "John Gray did rebuff that
13 assertion point during his testimony," correct?
14    A. Yes.
15    Q. So John Gray was contradicting
16 what Joe Rannazzisi was saying about DEA
17 efforts?
18    MR. NICHOLAS: Object to the
19    form.
20    Go ahead.
21    THE WITNESS: I have no idea. I
22    don't recall this hearing specifically.
23 BY MR. CLUFF:
24    Q. Let's go down to just above where

Page 283

1 it says sincerely. It looks like there's a
2 two-line paragraph. It starts with "thank you."
3    Do you see that?
4    A. Yes.
5    Q. It says, "thank you and your GA
6 teams."
7    Does that refer to government
8 affairs teams?
9    A. Yes.
10    Q. All right. "For any and all help
11 you provided in educating committee members in
12 advance of this hearing."
13    Do you see that?
14    A. Yes.
15    Q. Do you recall if
16 AmerisourceBergen, McKesson and Cardinal were
17 working together to educate committee members in
18 advance of this hearing?
19    MR. NICHOLAS: Object to the
20    form, lack of foundation. Go ahead.
21    THE WITNESS: I don't recall.
22    MR. CLUFF: I want to talk some
23    more about efforts to work with the DEA.
24    I'm going to hand you another document

Page 284

1 that's been produced by H.D. Smith.
2 It's an e-mail sent from Patrick Kelly.
3 Ms. Norton is a recipient. She is on
4 the second line in the to section. The
5 document has been Bates marked by H.D.
6 Smith as HDS_MDL_00388635.
7    MR. MAHADY: Is this 13,
8 Sterling?
9    MR. CLUFF: No, this is 15. We
10 skipped 13. It's my fault, I numbered
11 them out of order.
12    (Document marked for
13    identification as Norton Deposition
14    Exhibit No. 15.)
15    (Witness reviews document.)
16    THE WITNESS: Okay.
17 BY MR. CLUFF:
18    Q. So let's start at the first page.
19 The top there you can see that this is an e-mail
20 from Kelly Patrick, right?
21    A. Patrick Kelly.
22    Q. Oh, Patrick Kelly, I'm sorry. I
23 was reading correctly in order but backwards.
24    So he's with the HDA, correct?

Page 285

1    A. Yes.
2    Q. All right. And you see there on
3 the second line you are one of the recipients of
4 this e-mail?
5    A. Yes.
6    Q. And your colleague -- or excuse
7 me -- your counterpart Ann Berkey from McKesson,
8 she's a recipient of this e-mail as well?
9    A. Yes.
10    Q. As is Connie Woodburn, right?
11    A. Yes.
12    Q. Do you know who Robert Giacalone
13 is from Cardinal Health underneath your name?
14    A. Yes.
15    Q. Who's that?
16    A. He was Chris Zimmerman's
17 counterpart at Cardinal.
18    Q. Looking the subject it says,
19 "HDMA Legislative Strategy Meeting
20 Agenda-Discussion Questions."
21    Do you see that?
22    A. Yes.
23    Q. And if you look at the attachment
24 line, it looks like there are two attachments,

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  one that is legislative strategy meeting draft
2  agenda and then draft discussion questions.
3          Do you see that?
4      A.   Yes.
5      Q.   Do you recall receiving this
6  e-mail in 2013?
7      A.   No.
8      Q.   Do you recall participating in a
9  legislative strategy meeting?
10     A.   I don't remember.
11     Q.   Do you recall if in 2013
12 Amerisource already had developed this strategy
13 of cooperating with the DEA?
14         MR. NICHOLAS:  Object to the
15     form.
16         THE WITNESS:  A strategy of
17     cooperating with the DEA?
18 BY MR. CLUFF:
19     Q.   Let me rephrase it.  You've
20 talked about AmerisourceBergen being committed
21 to working with the DEA, right?
22     A.   That was what our goal was, to
23 restoring our working relationship with the DEA.
24     Q.   And was that one of

Page 287

1  AmerisourceBergen's strategies in combating the
2  opioid crisis?
3          MR. NICHOLAS:  Object to the
4      form.
5          THE WITNESS:  Yes.  We wanted to
6      get everyone working together to help
7      solve the opioid or help -- do what we
8      could to solve the opioid crisis.
9  BY MR. CLUFF:
10     Q.   Do you recall if
11 AmerisourceBergen had formed that understanding
12 and that strategy in 2013?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  All I know is that
16     was an ongoing objective of
17     AmerisourceBergen.
18 BY MR. CLUFF:
19     Q.   Let's look at the third page of
20 this document.  It's the first attachment.  You
21 will see at the top it says, "HDMA Drug Abuse
22 and Diversion Legislative Planning Meeting."
23 About halfway down the page there's another line
24 says "Draft Agenda."

Page 288

1          Do you see that?
2      A.   Mm-hmm.
3      Q.   I want to focus your attention on
4  III there.  It says "Overview of existing
5  legislative/regulatory activities pertaining to
6  reducing Drug Abuse/Diversion."
7          Do you see that?
8      A.   Yes.
9      Q.   The first one says "Legislative
10 Activity."
11         Do you recall any legislative
12 activities that were occurring in 2013 that
13 pertained to reducing drug abuse and diversion?
14     A.   No, not -- I don't remember.
15     Q.   Looking at b, it says "Regulatory
16 Activity."
17         Are you aware from participating
18 or in reviewing this agenda of any regulatory
19 activities that pertained to diversion in 2013?
20     A.   I don't remember.  2013 was a
21 long time ago.
22     Q.   So then do you recall any legal
23 challenges that pertain to reducing drug abuse
24 and diversion at that time?

Page 289

1      A.   No.
2      Q.   Look at V for me, it says
3  "Developing a Statement of Principles on Drug
4  Abuse and Diversion."
5          Do you see that?
6      A.   Yes.
7      Q.   Okay.  Do you recall anything
8  about that discussion from having looked at this
9  portion of the document?
10     A.   No.
11     Q.   Underneath that Roman numeral,
12 there's a parenthetical that says "Refer to
13 Discussion Questions."
14         Do you see that?
15     A.   Yes.
16     Q.   And then if you flip the page,
17 there's a new document -- well, a new attachment
18 that says "Questions for HDMA Drug Abuse
19 Strategy Meeting."
20         Do you see that?
21     A.   Mm-hmm.
22     Q.   Do you recall reviewing these
23 questions before this meeting on April 30th?
24     A.   I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1   Q.   At number 1 it says, "What should
2  the focus of the 4/30 meeting, e.g. define."
3        And then do you see the first one
4  there says, "Specific abuse/diversion prevention
5  options HDMA can be 'for'?"
6        Do you see that?
7   A.   Yes.
8   Q.   Are there some specific abuse and
9  diversion prevention options that the HDMA would
10 be against?
11       MR. NICHOLAS:  Object to the form
12   of the question.
13       THE WITNESS:  No.  I -- no.
14 BY MR. CLUFF:
15   Q.   Looking down at the next bullet
16 point, it says the focus of the 4:30 meeting
17 should be "approaches for relief/protection for
18 controlled substances distributors."
19       Do you see that?
20   A.   Where is that?
21   Q.   Second bullet point under number
22 1.
23   A.   Okay.
24   Q.   Do you recall any discussions

Page 291

1  about how to protect controlled substance
2  distributors with the HDMA?
3    A.   So I don't remember this meeting.
4  I mean, this is a long time ago, and it looks to
5  me like this was a brainstorming meeting and
6  they just put these -- all these questions
7  together just for the purposes of discussion so
8  that our industry could come up with a set of
9  principles, because we were all concerned about
10 the growing problem and we wanted to be part of
11 the solution, and I think that's what this was
12 all about.
13   Q.   Let's talk about some more of the
14 proposed solutions that were part of this
15 brainstorming session that you described.  Look
16 at number 2, the last bullet point there.
17       Do you see that?
18   A.   Yes.
19   Q.   What does that say?
20   A.   "Prevent adverse DEA/State
21 Actions."
22   Q.   Is that one of the ways that the
23 HDMA was brainstorming how to fix the opioid
24 crisis?

Page 292

1        MR. NICHOLAS:  Object to the
2    form.
3        THE WITNESS:  I don't remember.
4  BY MR. CLUFF:
5    Q.   Let's look at number 3.  Do you
6  see the second to last bullet point there, it
7  starts with "create a strategy"?
8    A.   Yes.
9    Q.   What does -- what does that one
10 say?
11   A.   "Create a strategy to mitigate
12 the industry's risk of adverse DEA/state or
13 other legal actions."
14   Q.   Is that another way that the HDMA
15 was brainstorming how to fix the opioid crisis?
16       MR. NICHOLAS:  Object to the
17   form.
18       THE WITNESS:  I don't remember.
19 BY MR. CLUFF:
20   Q.   Look at number 4 it says,
21 "Options and positions may inadvertently pose
22 substantial risks, require additional
23 distributor resources, or result in customer,
24 supplier, or other objections."

Page 293

1        Do you see that?
2    A.   Yes.
3    Q.   Look at bullet point -- it's the
4  fourth one down from the top, it starts with
5  "risking DEA's anger."
6    A.   Mm-hmm.
7    Q.   So it says, "Risking DEA's anger
8  or giving them even more authority, such as
9  could occur if we support moving DEA's
10 responsibilities to FDA, mandatory DEA
11 inspections for pharmacies before registration,
12 or mandating that DEA shares ARCOS data with
13 states and distributors."
14       That's another example of the way
15 that the HDMA was brainstorming how to fix the
16 crisis?
17       MR. NICHOLAS:  Object to the
18   form.
19       THE WITNESS:  Yes.
20 BY MR. CLUFF:
21   Q.   And then how about the next one
22 down, "Risking unintended consequences, such as
23 better regulatory clarity for distributors may
24 not be achievable without also agreeing to

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  greater regulatory responsibilities."
2       Do you see that one?
3       A.   Yes.
4       Q.   So that's another one that the
5  HDMA was willing to consider solving the crisis
6  by taking on greater regulatory
7  responsibilities?
8       MR. NICHOLAS:  Object to the
9       form.
10      THE WITNESS:  I don't remember.
11 BY MR. CLUFF:
12      Q.   Do you recall if there was ever
13 any discussion of those -- any of those points
14 within the AmerisourceBergen?
15      A.   I don't remember.
16      Q.   Going back to the first page, we
17 noted that Ann Berkey and Connie Woodburn were
18 copied on this e-mail.
19      Do you recall discussing any of
20 the substance of this e-mail with them?
21      A.   No.
22      Q.   All right.  Let's set that aside.
23      Do you recall that there were
24 Attorney General press announcements in 2017

Page 295

1  about distributors and lawsuits against them?
2       MR. NICHOLAS:  Object to the
3       form.
4       THE WITNESS:  I don't remember.
5  BY MR. CLUFF:
6       Q.   Do you recall that a 60 Minutes
7  episode aired in 2017 about pharmaceutical
8  distributors?
9       A.   Yes.
10      Q.   What do you recall about that?
11      A.   I remember that episode.
12      Q.   Were you concerned that
13 AmerisourceBergen had been ambushed by the 60
14 Minutes article?
15      A.   Ambushed?
16      Q.   Yeah.
17      MR. NICHOLAS:  Object to the
18      form.
19      THE WITNESS:  I was concerned
20      that we needed to do education because
21      our -- I felt that our industry was
22      misrepresented in that 60 Minutes.
23 BY MR. CLUFF:
24      Q.   After the 60 Minutes episode

Page 296

1  aired, did the HDA, McKesson, Cardinal Health
2  and AmerisourceBergen work to align their
3  responses to it?
4       MR. NICHOLAS:  Object to the
5       form.
6       THE WITNESS:  Yes.
7  BY MR. CLUFF:
8       Q.   Is that a regular part of the
9  work that the HDA did with Cardinal, McKesson
10 and AmerisourceBergen?
11      MR. NICHOLAS:  Same objection.
12      THE WITNESS:  Not just Cardinal,
13      McKesson and AmerisourceBergen, but with
14      all the members.
15 BY MR. CLUFF:
16      Q.   Would that have included the
17 manufacturer members and the pharmacy members?
18      A.   No.
19      Q.   Do you know if the HDA was
20 working to align its responses with other
21 industry trade associations?
22      A.   I don't remember.
23      Q.   Do you recall AmerisourceBergen
24 trying to set up a meeting with the HDA -- or

Page 297

1  excuse me -- with the DEA through the HDA at any
2  point in time?
3       A.   No.
4       Q.   Do you know if that's the kind of
5  a meeting that somebody from the CSRA department
6  would have tried to coordinate with Cardinal and
7  McKesson?
8       MR. NICHOLAS:  Object to the
9       form, lack of foundation.
10      THE WITNESS:  I don't know.
11      You'd have to ask our regulatory people.
12      MR. CLUFF:  I'm going to hand you
13      a copy of a document that's been
14      produced by AmerisourceBergen.  We'll
15      mark it 16.
16      (Document marked for
17      identification as Norton Deposition
18      Exhibit No. 16.)
19      MR. CLUFF:  I'll hand you this
20      copy, and then I'm going to find ones
21      for everybody else while you're looking
22      at it.
23      For the record, the document was
24      produced by AmerisourceBergen as

Page 298

1    ABDCMDL00322436.
2         (Witness reviews document.)
3  BY MR. CLUFF:
4    Q.    Did you have a chance to look at
5  that?
6    A.    Yes.
7    Q.    Let's start with David May's
8  e-mail to Ruth Miller and Kristen Freitas.  Do
9  you see on the bottom of the first page?
10   A.    Yes.
11   Q.    Apparently, according to his
12 e-mail, there was an RAC call that day, but you
13 couldn't make it, right?
14   A.    That's what it says.
15   Q.    Okay.  And in the second sentence
16 in the first line he says, "I have been meaning
17 to reach out to you as I am concerned with some
18 of the language and reasoning found in the
19 Appellate Court's recent decision in the Masters
20 case."
21        Do you see that?
22   A.    Yes.
23   Q.    Do you recall having any
24 discussions inside of AmerisourceBergen outside

Page 299

1  of the presence of counsel about the Masters
2  case?
3    A.    No.
4    Q.    He continues and says, "I have
5  had discussions at my company and we think it
6  would be a good idea to have a meeting with DEA
7  to raise our concerns and to get further
8  clarification from them, particularly as it
9  relates to reporting suspicious orders."
10        Do you see that?
11   A.    Yes.
12   Q.    Do you have any recollection of
13 what meetings he might be talking about?
14   A.    No.
15   Q.    He continues and says, "I have
16 not yet approached my colleagues at Cardinal or
17 McKesson yet, but I'm confident we all share
18 similar concerns."
19        Do you see that?
20   A.    Yes.
21   Q.    Do you have any idea why he was
22 so confident that they shared similar concerns?
23        MR. NICHOLAS:  Object to the
24    form, lack of foundation.

Page 300

1         THE WITNESS:  I don't -- this is
2    not my area.  I would not have had
3    really anything to do with this.
4  BY MR. CLUFF:
5    Q.    Let's go up to the top of the
6  document then.  You write to Patrick Kelly.
7         Do you see that?
8    A.    Yes.
9    Q.    You say, "Hi Patrick, wanted to
10 check in with you to see if this DEA meeting
11 request is in the works?"
12        Do you see that?
13   A.    Yes.
14   Q.    And then you comment, "Per Ruth
15 and David's messages below it sounds like it
16 would be a good opportunity to do together?"
17   A.    Yes.
18   Q.    What did you mean by "together"?
19        MR. NICHOLAS:  Object to the
20    form.
21        THE WITNESS:  For our industry to
22    go in together.
23 BY MR. CLUFF:
24   Q.    Through the HDA?

Page 301

1    A.    Yes.
2    Q.    You said this was outside of your
3  area.
4         Do you recall why you would have
5  written this e-mail to Patrick Kelly on the
6  August 2nd, 2017?
7         MR. NICHOLAS:  Same objection,
8    lack of foundation, form.
9         THE WITNESS:  I don't remember.
10 BY MR. CLUFF:
11   Q.    Do you know if David May ever
12 reached out to Cardinal and McKesson about this
13 meeting?
14   A.    No.
15        MR. CLUFF:  I'm going to hand you
16    another document that was produced by
17    AmerisourceBergen as ABDCMDL00156582.
18        (Document marked for
19    identification as Norton Deposition
20    Exhibit No. 17.)
21        (Witness reviews document.)
22 BY MR. CLUFF:
23   Q.    Turn to the second page.  Do you
24 see in the middle there you write to Patrick

Page 302

1 Kelly and say, "Hi Patrick, wanted to check in
2 with you to see if this DEA meeting request is
3 in the works?"
4        Do you see that?
5     A.   Yes.
6     Q.   So the rest of this e-mail
7 continues from where the last one left off.
8     A.   Mm-hmm.
9     Q.   I'm sorry to show you two
10 documents. I didn't mean to do that.
11        If you flip back to the first
12 page, Patrick Kelly writes back to you, copies
13 Ruth Miller, Brad Tallamy and Stacie Heller.
14        Who is Ruth Miller?
15     A.   Ruth Miller works at HDA.
16     Q.   Okay. And then Brad Tallamy and
17 Stacie Heller are AmerisourceBergen associates?
18     A.   Yes.
19     Q.   Patrick Kelly writes to you and
20 says, "I have been in communication with Demetra
21 Ashley at the DEA's Office of Diversion
22 Control," right?
23     A.   I'm sorry, what did you say?
24     Q.   The first -- yeah, maybe I

Page 303

1 mumbled. It's getting late.
2        Patrick Kelly writes back to you
3 and explains that he has been in communication
4 with Demetra Ashley at the DEA's Office of
5 Diversion Control?
6     A.   Yes.
7     Q.   Do you recall ever receiving that
8 e-mail correspondence from Patrick Kelly?
9     A.   No.
10     Q.   Looking at the bottom of the
11 first page it says, "The last conversation I had
12 with Demetra was about the need to have DEA host
13 another supply chain association briefing
14 similar to the meeting they hosted in February
15 of 2016."
16        Do you see that?
17     A.   Yes.
18     Q.   Continuing two sentences later he
19 says, "We attended the peeing along with
20 representatives from PhRMA, GPhS, APhA, NABP,
21 NACDS, NCPA, ASHP and several other trade groups
22 that I cannot immediately remember."
23        Do you see that?
24     A.   Yes.

Page 304

1     Q.   Do you have any recollection of
2 that meeting occurring?
3     A.   I don't remember.
4     Q.   Did you ever discuss that kind of
5 a meeting with anybody at AmerisourceBergen
6 outside of counsel?
7        MR. NICHOLAS: Object to the
8     form, foundation.
9        THE WITNESS: I don't remember.
10 BY MR. CLUFF:
11     Q.   You forward this e-mail to David
12 May on August 7th, do you see that, or
13 August 2nd?
14     A.   Yes.
15     Q.   And he responds to you pretty
16 quickly thereafter, right?
17     A.   Yes.
18     Q.   He says, "I know Demetra and
19 quite frankly I would prefer to wait until
20 Administrator Rosenberg names a replacement for
21 Milione to have the meeting. That said, it
22 takes DEA so long to coordinate these meetings,
23 I don't want to wait too long to make this
24 specific request (and want it on the "record"

Page 305

1 that we are seeking clarification in this
2 area)."
3        And then he continues, I have
4 reached out to McKesson and will do with the
5 same with Cardinal and will get back to you when
6 I have their responses.
7        Do you see that?
8     A.   Yes.
9     Q.   In your work with people from the
10 CSRA department at AmerisourceBergen, was it
11 common for them to reach out and discuss issues
12 with their counterparts at Cardinal Health and
13 McKesson?
14        MR. NICHOLAS: Object to the
15     form.
16        THE WITNESS: I don't know. You
17     would have to ask them.
18 BY MR. CLUFF:
19     Q.   Outside of your conversations
20 with AmerisourceBergen's counsel, are you
21 generally aware that AmerisourceBergen has been
22 named as a defendant in multiple lawsuits across
23 the country?
24     A.   Yes.

Page 306

1    Q.   We previously talked about Burt
2  Rosen.  He is someone who you know from your
3  work prior to AmerisourceBergen, correct?
4    A.   Yes.
5    Q.   Do you recall in 2017 that Burt
6  invited people to a meeting at Purdue
7  headquarters to brainstorm if there was anything
8  that the Washington offices could do from a
9  public policy perspective to educate
10 policymakers about the litigation?
11   A.   I don't remember that.
12   Q.   I'm going to show you a document
13 that may help refresh your recollection.
14      MR. CLUFF:  This is an e-mail
15   chain produced by Purdue.  It's been
16   produced as PPLPC018001477198 to
17   1477200.  Ms. Norton is a recipient of
18   each portion of the chain.  We'll mark
19   it as Exhibit 18.
20      (Document marked for
21   identification as Norton Deposition
22   Exhibit No. 18.)
23      MR. CLUFF:  Give that one and
24   I'll find the ones for the lawyers.

Page 307

1       MR. NICHOLAS:  While you're doing
2    that, before I forget, we went back and
3    looked at Exhibit 11, which you used,
4    Sterling, for some questioning, and it's
5    the one where --
6       MR. CLUFF:  Is that the CEPOP
7    document?
8       MR. NICHOLAS:  Mr. Mahady asked
9    whether it had been clawed back and we
10   didn't know.
11      MR. CLUFF:  Oh, the --
12      MR. NICHOLAS:  So what we've
13   learned is that Cardinal did claw the
14   document back.  It doesn't look like
15   H.D. Smith has clawed the document back,
16   and it was their Bates stamp document.
17   So I'm a little uncertain about its
18   status.  I don't remember the
19   questioning being -- or the answers
20   being tremendously noteworthy, but just
21   to be the way you're supposed to be in
22   these things, I'm going to preserve
23   whatever it is I'm supposed to preserve
24   in case the thing turns out to be clawed

Page 308

1    back in its entirety, okay.
2       MR. CLUFF:  Okay.  Who are you
3    preserving an objection on behalf of,
4    AmerisourceBergen or some other
5    defendant?
6       MR. NICHOLAS:  Yeah,
7    AmerisourceBergen.  I mean, if the
8    document wasn't supposed to be used, it
9    was supposed to be clawed back and not
10   used, and I'll object to its having been
11   used.
12      MR. CLUFF:  Well, if it hasn't
13   been pro -- or clawed by H.D. Smith,
14   then there's no claw back yet.  We can
15   meet and confer about the Cardinal
16   clawback, if necessary.
17      MR. NICHOLAS:  I kind of doubt
18   it's necessary, because, like I said --
19      MR. CLUFF:  Because that
20   questioning wasn't very particularly
21   exciting or the answers weren't, either
22   which way.
23 BY MR. CLUFF:
24   Q.   Let's look at the last -- second

Page 309

1  to last page of this document.  Do you see there
2  in the middle of the page there is an e-mail
3  from Burt Rosen to a group of people, including
4  yourself in the middle?
5    A.   Mm-hmm.
6    Q.   It says "Subject:  Brainstorming
7  Session."
8       Do you see that?
9    A.   Yes.
10   Q.   He starts off by saying, "I would
11 like to invite you to our office at 1001 Penna.
12 Avenue NW, 13th floor at 2:30 p.m. on Monday the
13 November 13th."
14      Do you see that?
15   A.   Yes.
16   Q.   And he continues, he says, "I
17 will allocate the time from 2:30 to 4:00 for
18 brainstorming to determine if there is anything
19 the Washington offices may be able to do from a
20 public policy perspective to better educate or
21 impact Washington policymakers' thinking with
22 respect to the litigation brought by plaintiffs'
23 lawyers and states, cities, counties, and
24 municipalities against the opioid supply chain."

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    Do you see that?
2    A.    Yes.
3    Q.    Having reviewed this document
4 now, does it refresh your recollection that Burt
5 Rosen proposed a brainstorming session?
6    A.    Yes.
7    Q.    Let's look at who he invited.
8          Do you know who Dolly Judge from
9 Teva Pharma is?
10   A.    Yes.
11   Q.    Who is she?
12   A.    She was -- she's one of their
13 lobbyists.
14   Q.    Did you work with Ms. Judge in
15 your work or in your time at AmerisourceBergen?
16   A.    Not really, no.  She worked for
17 me at Hoffmann-La Roche.
18   Q.    So that's how you know who she
19 is?
20   A.    Mm-hmm.
21   Q.    Pete Slone we talked about.  He's
22 the McKesson counterpart, right?
23   A.    Yes.
24   Q.    Do you know who Brian Monroe from

Page 311

1 Endo is?
2    A.    Yes.
3    Q.    Who is that?
4    A.    He heads their government
5 affairs.
6    Q.    Do you recall working with him
7 while you've been employed at AmerisourceBergen?
8    A.    Very little.
9    Q.    What would you have worked on
10 with Mr. Monroe?
11         MR. NICHOLAS:  Object to the
12    form.
13         THE WITNESS:  I think primarily
14    these issues related to compounding that
15    I mentioned before.
16 BY MR. CLUFF:
17   Q.    Do you know who
18 bburns7@corus.jnj.com is?
19   A.    Yes.
20   Q.    Who is that?
21   A.    Brian Burns.  He ran their
22 government affairs at Johnson & Johnson.
23   Q.    Did you have occasion to work
24 with Mr. Burns during your time at

Page 312

1 AmerisourceBergen?
2    A.    No.
3    Q.    I think earlier we talked about
4 Janssen and their government affairs people.
5          Did you work with anybody from
6 Janssen's public affairs -- or government
7 affairs office?
8    A.    No.
9    Q.    The next name on the list is
10 Robert Lively from Allergan.
11         Do you know who that is?
12   A.    Yes.
13   Q.    Who is that?
14   A.    He's in charge of their
15 government affairs.
16   Q.    Did you have occasion to work
17 with Mr. Lively while you've been employed at
18 AmerisourceBergen?
19   A.    No.
20   Q.    And then the last name on the
21 list after yours is Sean Callinicos.
22         Do you see that?
23   A.    Yes.
24   Q.    We've talked about that's your

Page 313

1 counterpart at Cardinal Health?
2    A.    Right.
3    Q.    So if you look at the next page,
4 there is an e-mail from Sean Callinicos?
5    A.    Yes.
6    Q.    He writes, "Burt - Pete, Rita and
7 I spoke and we think it would be preferable for
8 you to have at this meeting Patrick Kelly copied
9 and his team from our HDA trade group rather
10 than the individual distributor companies,"
11 correct?
12   A.    Yes.
13   Q.    So rather than participate
14 directly, you, Pete and Sean spoke and decided
15 that the HDA should represent you in this
16 brainstorming session?
17   A.    Yes.
18   Q.    And then Burt replies and says
19 that "Patrick and his group would be welcome."
20         Do you see that?
21   A.    Yes.
22   Q.    Do you recall ever speaking to
23 Mr. Kelly about this meeting occurring?
24   A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  Q.   Do you recall if there were any
2 concerns from lawyers about this kind of a
3 meeting happening without disclosing the
4 substance of that communication?
5       MR. NICHOLAS:  Object to the
6    form.  I just caution you not to
7    disclose anything that would invade the
8    attorney-client privilege.
9 BY MR. CLUFF:
10      Q.   Let me reask my question.
11       How about this:  Do you recall
12 talking to Pete Slone about whether any of
13 McKesson's lawyers were concerned about this
14 meeting happening?
15      A.   No.
16      Q.   Do you recall talking with Sean
17 Callinicos about whether or not any of the
18 litigators had concerns about this meeting
19 occurring?
20      A.   No.
21      Q.   Do you know if this meeting
22 occurred?
23      A.   I don't recall.
24      Q.   Earlier we talked about

Page 315

1 strategies that the HDA could be for.
2       Do you remember that?
3      A.   Yes.
4      Q.   Wasn't it AmerisourceBergen's
5 policy to say what it was for so that it could
6 kill other things that it was against?
7       MR. NICHOLAS:  Object to the form
8    of the question.
9       THE WITNESS:  No.
10       MR. NICHOLAS:  Lack of
11    foundation.
12 BY MR. CLUFF:
13      Q.   Sorry.  I think the objection got
14 over your answer.
15      A.   No.
16      Q.   No, okay.
17       MR. CLUFF:  I'm going to hand you
18    a copy of a document that's produced by
19    AmerisourceBergen.  We're going to mark
20    it as 19.  This is going to be
21    ABDCMDL00160553.
22       (Document marked for
23    identification as Norton Deposition
24    Exhibit No. 19.)

Page 316

1       (Witness reviews document.)
2       THE WITNESS:  Okay.
3 BY MR. CLUFF:
4      Q.   All right.  So this e-mail chain
5 is kind of a circuitous route before it finally
6 ends up in your inbox.  If you start on the
7 second page, there is an e-mail at the very
8 bottom from Russell Tracy to Gary Riddle and
9 Julie Eddy and Carolyn Grant.
10       Do you know who Tracy Russell is?
11      A.   No.
12      Q.   Do you know who Gary Riddle is?
13      A.   He was at HDA in state government
14 affairs.
15      Q.   And who is Julie Eddy?
16      A.   She was -- used to be our state
17 government affairs lobbyist.
18      Q.   Is she no longer with the
19 company?
20      A.   No.
21      Q.   Do you know who Carolyn Grant is?
22      A.   I don't know her, but I know she
23 was a state lobbyist for Cardinal.
24      Q.   So Tracy Russell says, my PA

Page 317

1 lobbyist alerted me to the press release below
2 released today.  The HB1115 has been around a
3 while, now some traction in the Senate.
4       Do you see that?
5      A.   Yes.
6      Q.   And there's an article that's
7 below her e-mail, correct?
8      A.   Yes.
9      Q.   Do you see that?
10      A.   Yes.
11      Q.   It says, "Senator Jay Costa:
12 Senate Democrats outline legislation to combat
13 opioid and heroin crisis"?
14      A.   Yes.
15      Q.   We previously discussed that
16 AmerisourceBergen is in favor of solutions that
17 help fix the opioid crisis, correct?
18      A.   Yes.
19      Q.   If you go up to the very top,
20 there's an e-mail from Julie Eddy to David May
21 and a number of other associates, including Brad
22 Tallamy and Rita Norton, yourself.
23       Do you see that?
24      A.   Yes.

Page 318

1    Q.    And Julie Eddy writes, "We like
2  to say what we are 'for' instead of only
3  against.  We want to totally kill the opioid tax
4  bills by pointing to our support of other
5  bills."
6         Do you see that?
7    A.    Yes.
8    Q.    So Ms. Eddy believed it was
9  AmerisourceBergen's policy to say what they were
10  for so they could kill things they were against,
11  right?
12         MR. NICHOLAS:  Object to the
13     form.
14         THE WITNESS:  I have no idea why
15     she said that.  I mean, she was prone to
16     saying irresponsible things.
17  BY MR. CLUFF:
18    Q.    Did you reply back and say,
19  Julie, that's an irresponsible thing to say?
20    A.    No, but I probably told her that.
21    Q.    But it's not in this e-mail,
22  right?
23    A.    No.
24    Q.    Did you write her an e-mail about

Page 319

1  it?
2    A.    No, I don't remember this.
3         MR. CLUFF:  It's about 5:00, so
4     we've been going another little bit of
5     an hour.  Why don't we take a break.
6     Let's come back maybe quick, though,
7     from the break, and then I'll see if I
8     have anything else.  I know there's like
9     just a couple more documents I want to
10     talk to you about and then just a few
11     like general, and then I think I'm going
12     to be done with the questioning for
13     today.
14         THE WITNESS:  Okay.
15         MR. NICHOLAS:  Okay.
16         THE VIDEOGRAPHER:  Off the
17     record, 5:00.
18         (Brief recess.)
19         THE VIDEOGRAPHER:  We are back on
20     the record 5:14 p.m.
21  BY MR. CLUFF:
22    Q.    Ms. Norton, you're still under
23  oath so we'll proceed.
24    A.    Okay.

Page 320

1    Q.    Before today's deposition, did
2  you have an opportunity to look for some notes
3  that you took during Mr. Collis' testimony
4  before the Energy and Commerce committee?
5    A.    Yes.
6    Q.    Okay.  I reviewed some of your
7  documents and I don't want to misrepresent the
8  way that you conduct business, but I notice that
9  you do keep notes sometimes on documents.
10         Is that a part of your practice
11  as a AmerisourceBergen employee?
12    A.    Occasionally, yes.
13    Q.    Is there any particular reason
14  why for the hearing in which Mr. Collis
15  testified that you decided to keep notes?
16    A.    Just in case there was any
17  follow-up or anything.
18    Q.    Okay.  We talked today about a
19  lot of other meetings and phone calls that you
20  would have been a participant in over time.
21         Would it have been your practice
22  to keep notes during any of those meetings or
23  during those phone calls?
24    A.    When?

Page 321

1    Q.    Any time between 2004 and today.
2         MR. NICHOLAS:  Object to the
3     form.
4         THE WITNESS:  It's possible.
5  BY MR. CLUFF:
6    Q.    I'm not trying to get you to
7  recall specific instances where you may have
8  kept notes.
9         I'm just wondering just as a
10  general practice, do you keep notes about the
11  meetings and phone calls that you participate
12  in?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  Yes, but never
16     extensive.  I'm just usually a few -- a
17     few notes jotted to me for my own
18     memory.
19  BY MR. CLUFF:
20    Q.    Okay.  Where would you keep those
21  notes, if they existed?
22    A.    Sometimes I write them on the
23  documents that are in front of me.  Sometimes I
24  write them on envelopes.  Sometimes I write them

Page 322

1  in a notebook.
2      Q.   And do you keep those notebooks
3  at your office, or do they sometimes travel with
4  you?  Do they make it home ever?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  They don't go home.
8          MR. CLUFF:  Okay.  I'm going to
9      hand you a copy of the notes that were
10     produced, just so I can get you to look
11     at them and authenticate that they're a
12     true and correct copy of the notes that
13     you believe you took.  I'm not going to
14     ask you any questions about them because
15     I don't know if your eyes or mine could
16     take it.  But I just want to make sure
17     that you can confirm for me that these
18     are -- that these are the notes you
19     took.
20         (Document marked for
21         identification as Norton Deposition
22         Exhibit No. 20.)
23         (Witness reviews document.)
24         THE WITNESS:  Yes, these are my

Page 323

1      notes.
2  BY MR. CLUFF:
3      Q.   All right.  You can go ahead and
4  set those aside.
5          Earlier we talked about, you
6  know, a number of the trade associations or
7  trade organizations that AmerisourceBergen
8  participants in.  I don't want to rehash any of
9  that, but I want to talk about some maybe less
10 formal groups that AmerisourceBergen may have
11 participated in just to see if you have any
12 understanding about them.  And when I go through
13 them, I'm going to give you the full name, as I
14 understand it, and then the abbreviation and you
15 can tell me whether or not you recognize either
16 one.
17         How does that sound?
18     A.   Okay.
19     Q.   The first one I'm curious about
20 is the New Jersey Pharmaceutical Industry
21 Working Group.
22         Have you ever heard of that?
23     A.   No.
24     Q.   If I use the abbreviation NJPIG,

Page 324

1  is that something you're familiar with?
2      A.   No.
3      Q.   Okay.  Do you know if anybody at
4  AmerisourceBergen would be the person qualified
5  to testify about that group?
6          MR. NICHOLAS:  Object to the
7      form, lack of foundation.
8          THE WITNESS:  No.
9  BY MR. CLUFF:
10     Q.   Okay.  The next one I'd like to
11 describe for you is called the Midwest
12 Discussion Group, have you ever heard of that?
13     A.   No.
14     Q.   That one is also abbreviated as
15 the MWDG, does that ring any bells?
16     A.   No.
17     Q.   Another one that I think I
18 briefly mentioned before, but I want to just see
19 if we get any more traction there is the
20 Anti-Diversion Industry Working Group.
21         Have you heard of that?
22     A.   Not that I recall.
23     Q.   If I use the abbreviation ADIWG,
24 does that ring any bells?

Page 325

1      A.   No.
2      Q.   We previously talked about the
3  DEA Clearinghouse, you're familiar with that
4  idea?
5      A.   Yes.
6      Q.   Okay.  How are you familiar with
7  the DEA Clearinghouse?
8      A.   It's a -- well, it's a proposal
9  that's been talked about for legislation.
10     Q.   What do you mean it's a proposal
11 that has been talked about for legislation?
12         MR. NICHOLAS:  Object to the
13     form.
14         THE WITNESS:  Just that there's
15     been concepts developed to discuss
16     whether it could -- should be legislated
17     or whether there was a need for
18     legislation.
19 BY MR. CLUFF:
20     Q.   Do you recall when the concept
21 was first raised?
22     A.   No.
23     Q.   Do you know who suggested the
24 concept for the first time?

Page 326

1 A. No.

2 Q. Have you ever had any

3 conversations with, for example, Chris Zimmerman

4 or David May about the DEA Clearinghouse?

5 A. Yes.

6 Q. Do you recall the substance of

7 those conversations?

8 A. No.

9 MR. CLUFF: I'm going to hand you

10 a copy of document that was produced by

11 AmerisourceBergen. It's Bates stamped

12 ABDCMDL00157014. It's a one-page

13 document. Here you go.

14 (Document marked for

15 identification as Norton Deposition

16 Exhibit No. 21.)

17 (Witness reviews document.)

18 MR. MAHADY: What is the number

19 on that?

20 MR. CLUFF: Twenty-one I believe,

21 sir.

22 BY MR. CLUFF:

23 Q. All good?

24 A. Yes.

Page 327

1 Q. Let's start at the bottom. That

2 e-mail is authored by you there on October 17,

3 2017.

4 Do you see that?

5 A. Yes.

6 Q. Okay. And you write, "Brad Chris

7 has a real lie good idea for a opioid

8 clearinghouse type proposal that he has already

9 started to talk to Cardinal and McK."

10 Do you know if McK stands for

11 McKesson?

12 A. Yes.

13 Q. Okay. And you continue and say,

14 "Maybe we can connect later this week to start

15 to put ideas on paper for the HDA discussion?"

16 Do you see that?

17 A. Yes.

18 Q. Who is Brad in that paragraph?

19 A. Brad Tallamy.

20 Q. Does this refresh your

21 recollection about discussing this idea of an

22 opiate clearinghouse with Chris Zimmerman and

23 David May?

24 A. Yes.

Page 328

1 Q. Going up to the paragraph above

2 that, it looks like Chris Zimmerman replies to

3 this e-mail.

4 Do you see that?

5 A. Yes.

6 Q. He says, "This actually came out

7 of ADWIG."

8 Do you see that?

9 A. Yes.

10 Q. Do you know what ADWIG is?

11 A. Well, that's that working group

12 that Chris and David participate in. I've never

13 had any interaction with them.

14 Q. So does it refresh your

15 recollection that AmerisourceBergen participated

16 in the Anti-Diversion Working Group?

17 MR. NICHOLAS: Object to the

18 form, lack of foundation.

19 THE WITNESS: Like I said, I only

20 know of it from Chris and David.

21 BY MR. CLUFF:

22 Q. Okay. It looks like Chris

23 continues and says or identifies some ADWIG

24 persons. I'm using that abbreviation because

Page 329

1 that's what he wrote.

2 He includes ABC, Cardinal, McK,

3 Teva, Mallinckrodt.

4 Do you see those names?

5 A. Yes.

6 Q. Do you know if those are

7 participants in this ADWIG or APIWIG?

8 MR. NICHOLAS: Objection, lack of

9 foundation.

10 THE WITNESS: You'd have to ask

11 Chris.

12 BY MR. CLUFF:

13 Q. Do you recall ever doing any work

14 on the opioid clearinghouse, for example,

15 creating a clearinghouse white paper?

16 A. No, I don't.

17 Q. Okay. Do you know if Brad

18 Tallamy did any work on a DEA clearinghouse

19 white paper?

20 A. Yes.

21 Q. What did that work entail, based

22 on your recollection?

23 A. Just as an -- just as a reviewer.

24 Q. Do you know if he did that work

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  in conjunction with Mallinckrodt?
2      A.   Yes.
3      Q.   Do you recall ever discussing
4  with Chris Zimmerman an opioid abuse prevention
5  coalition?
6      A.   No.
7          MR. CLUFF:  I want to show you a
8      document really quickly that's been
9      produced by AmerisourceBergen.  We'll
10     mark it as Exhibit 22.  The Bates
11     numbers are ABDCMDL00277296.
12         (Document marked for
13     identification as Norton Deposition
14     Exhibit No. 22.)
15  BY MR. CLUFF:
16     Q.   Here's your copy.
17     A.   (Witness reviews document.)
18     Q.   I just want to ask you some
19  questions about the e-mail between you and Chris
20  at the very top, but feel free to read the
21  entire thing, if you would like to.
22     A.   (Witness reviews document.)
23  Okay.
24     Q.   Having reviewed this document,

Page 331

1  does it refresh your recollection at all about
2  discussions with Chris related to an Opioid
3  Abuse Prevention Coalition?
4      A.   I don't remember the specific
5  conversation but --
6      Q.   Looking at just the top portion
7  of this document, which is the e-mail you write
8  to Chris on September 15th, 2014, you say, "I
9  think it's for optics - for example - Senator
10 Whitehouse is going to introduce a comprehensive
11 abuse prevention proposal and we need to look
12 like we are concerned about the broader problem
13 - maybe this coalition would help with that or
14 maybe not - I think you would be the best rep if
15 we do it."
16         Do you see that?
17     A.   Yes.
18     Q.   How come AmerisourceBergen was
19 concerned with looking like they were concerned
20 about the broader problem?
21         MR. NICHOLAS:  Objection to the
22     question, the form.  This misrepresents
23     testimony, the document.
24         THE WITNESS:  This does not say

Page 332

1  Amerisource was -- AmerisourceBergen was
2  concerned about looking like they were
3  concerned.
4          It was a poor choice of words on
5  my part because we -- I was concerned,
6  AmerisourceBergen was concerned, we were
7  concerned, so this was a poor choice of
8  words on my part.
9  BY MR. CLUFF:
10     Q.   But the words that you chose were
11 that we need to look like we are concerned about
12 the broader problem, correct?
13         MR. NICHOLAS:  Objection.  Just
14     bickering, arguing.
15         THE WITNESS:  Those are the words
16     on the e-mail.
17         MR. CLUFF:  Okay.  That's all.
18     You can set that aside.
19         I want to hand you a copy of a
20     document that was produced by McKesson.
21     Ms. Norton is a recipient of a portion
22     of this document, but then there is a
23     continuing discussion between Ann Berkey
24     and Kelly Patrick.  I met and conferred

Page 333

1  with counsel for AmerisourceBergen prior
2      to the deposition, and we obtained
3      approval to use this document.
4          MR. NICHOLAS:  You mean counsel
5      for McKesson.
6          MR. CLUFF:  Yes, thank you.  So
7      we'll mark this as Exhibit 23.  It's
8      Bates marked for the record as
9      MCKMDL00652447.
10         (Document marked for
11     identification as Norton Deposition
12     Exhibit No. 23.)
13         (Witness reviews document.)
14         THE WITNESS:  Okay.
15  BY MR. CLUFF:
16     Q.   Starting with Mr. -- the very
17 bottom there it says on March 24, 2014, Kelly
18 Patrick wrote.
19         Do you see that?
20     A.   Yes.
21     Q.   We can blow it up on the screen
22 in front of you too, if that makes it easier.
23         MR. NICHOLAS:  Patrick Kelly.
24         MR. CLUFF:  Did I say Kelly

Page 334

1    Patrick again.  Thank you.
2  BY MR. CLUFF:
3    Q.  He writes "Ann, Connie and Rita,
4  well, it looks like we had some challenges
5  finding a time that worked for everyone.  Can we
6  possibly do a quick call at 4:00?"  And then he
7  says, "If not, I can fill everyone in via e-mail
8  regarding a discussion the Executive Committee
9  had last week on the topic of drug
10  abuse/diversion."
11    Do you see that?
12    A.  Yes.
13    Q.  And apparently that was
14  specifically with regard to the Marino Blackburn
15  legislation?
16    A.  Yes.
17    Q.  And that's the same bill we
18  talked about earlier eventually became the
19  Ensuring Patient Access Act?
20    A.  Yes.
21    Q.  Okay.  If you go up, Patrick
22  Kelly eventually responds to Ann Berkey and he
23  says, "Ann, sorry to miss you.  And sorry for
24  short notice on the call."  Then he continues,

Page 335

1  "The HDMA Executive Committee (EC) had a call
2  last week (March 19) to discuss issues
3  pertaining to drug abuse and diversion."
4    Do you see that?
5    A.  Yes.
6    Q.  Okay.  Continuing on it discusses
7  a person who could not make the call but said
8  that "at the February 27 EC meeting where there
9  was a pretty robust discussion about drug abuse
10  and diversion issues - including the
11  Marino/Blackburn bill."
12    Do you see that?
13    A.  Yes.
14    Q.  Did you ever have any discussions
15  with any of AmerisourceBergen's Executive
16  Committee members about conversations happening
17  within the HDA about the Marino Blackburn bill?
18    A.  Did I ever have discussions?
19    Q.  I'll narrow it down.  How about
20  in 2014, do you recall having discussions with
21  AmerisourceBergen's representatives to the HDA's
22  Executive Committee about the Marino Blackburn
23  bill?
24    A.  I don't recall.

Page 336

1    Q.  Continuing the next sentence
2  says, "The Executive Committee agreed to meet
3  monthly via telephone to discuss this issue."
4    Do you see that?
5    A.  Yes.
6    Q.  Were you aware that the Executive
7  Committee was meeting on a monthly issues to
8  discuss diversion issues like the Marino
9  Blackburn bill?
10    A.  I don't remember this.
11    Q.  Did you ever talk to anybody from
12  Amerisource who sat on the Executive Committee
13  about their monthly meeting schedule?
14    A.  Not that I recall.
15    Q.  Are you familiar with Senators
16  Hatch and Whitehouse?
17    A.  Yes.
18    Q.  Are you familiar with a Senate
19  bill that would have been called S.2862?  If
20  you're not, it's okay.  I'm just curious.
21    A.  No.
22    Q.  Okay.  Do you recall ever working
23  with the NACDS to submit a patient support
24  letter on behalf of the NACDS to Senators Hatch

Page 337

1  and Whitehouse?
2    A.  No.
3    Q.  Do you recall the Regulatory
4  Transparency Patient Access and Effective Drug
5  Enforcement Act of 2014?
6    A.  No.
7    Q.  Answers get simple if the answer
8  is no.
9    MR. NICHOLAS:  That hasn't been
10    your track record to date, but glad to
11    hear that that's going to be your
12    approach from now on.
13    MR. CLUFF:  I'll object to
14    counsel's characterization of my
15    questioning.
16  BY MR. CLUFF:
17    Q.  Was AmerisourceBergen ever
18  conflicted about supporting legislation that
19  would combat the opioid crisis but might result
20  in penalties to manufacturers?
21    MR. NICHOLAS:  Object to the
22    form.
23    THE WITNESS:  I don't know.
24  BY MR. CLUFF:

Page 338

1     Q.   Do you recall ever having a
2 discussion about it complicating
3 AmerisourceBergen's support?
4     A.   No.
5     Q.   Just need to check one thing
6 really quickly.
7         Would a penalty against a
8 manufacturer have presented a complication for
9 AmerisourceBergen if it was going to support a
10 bill?
11         MR. NICHOLAS: Object to the
12   form.
13         THE WITNESS: No.
14 BY MR. CLUFF:
15     Q.   Why not?
16     A.   I don't know, it -- I don't know.
17 It depends.
18     Q.   I think previously you mentioned
19 CARA 2.0.
20         Do you recall that?
21     A.   Yes.
22     Q.   Is that the Comprehensive
23 Diversion and Recovery Act?
24     A.   Yes.

Page 339

1     Q.   And 2.0, did it update the
2 original CARA 1.0?
3     A.   I think it provided additional
4 funding and support and programs for opioid
5 crisis.
6     Q.   Do you recall that one of the
7 original provisions of CARA 2.0 would have been
8 to increase civil and criminal penalties against
9 manufacturers that failed to report suspicious
10 orders or failed to maintain effective controls
11 against opioid diversion?
12     A.   I don't recall that.
13     Q.   Do you recall ever expressing
14 concern that that provision might complicate
15 AmerisourceBergen's support?
16     A.   No.
17     Q.   Do you know who -- do you
18 recognize the last name Wyden, W-y-d-e-n?
19     A.   Senator Ron Wyden.
20     Q.   Do you recall him giving a
21 statement during any hearings in 2018?
22     A.   Many.
23     Q.   Do you recall that Senator Wyden
24 called for opioid manufacturers and distributors

Page 340

1 and executives to be brought before the Finance
2 Committee and be held accountable for the
3 epidemic?
4     A.   Yes.
5     Q.   Did you have any concerns about
6 that?
7     A.   Yes.
8     Q.   What were your concerns?
9     A.   I didn't think that was a good
10 idea.
11     Q.   Why not?
12     A.   For distributors, let me say. I
13 haven't -- I don't know about anybody else.
14     Q.   Why would it not be a good idea
15 to call distributors before the finance
16 committee to be held accountable for the
17 epidemic?
18     A.   Because it wasn't -- we had no
19 role in the opioid crisis, creating the opioid
20 crisis, so we weren't the people to question.
21     Q.   Does any of your work involve
22 monitoring the orders that AmerisourceBergen
23 receives or fills on a daily basis?
24     A.   No.

Page 341

1     Q.   Does any of your work at
2 AmerisourceBergen involve identifying suspicious
3 orders?
4     A.   No.
5     Q.   So what's the basis for your
6 statement that AmerisourceBergen didn't
7 contribute to the opioid crisis?
8         MR. NICHOLAS: Object to the form
9   of the questioning and just the arguing,
10   start an argument at 5:30 in the
11   afternoon.
12         THE WITNESS: Just that we don't
13   manufacture, market, prescribe, we don't
14   have any role in knowing or having any
15   role in creating the opioid crisis.
16   We're filling the order from our
17   customers.
18 BY MR. CLUFF:
19     Q.   If AmerisourceBergen was filling
20 suspicious orders to its customers, would that
21 have contributed to the opioid crisis?
22         MR. NICHOLAS: Objection. It's a
23   hypothetical.
24         THE WITNESS: We would not -- we

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  would not do that.
2  BY MR. CLUFF:
3      Q.   In April of 2018, did you feel
4  like it was hell in DC for distributors?
5          MR. NICHOLAS:  Object to the
6  form.
7          MR. CLUFF:  I'll mark an
8  AmerisourceBergen document as Exhibit
9  24.  It's produced as ABDCMDL00367355.
10         (Document marked for
11  identification as Norton Deposition
12  Exhibit No. 24.)
13         MR. NICHOLAS:  Sterling, you were
14  going to do that in any event.
15         MR. CLUFF:  No, I wasn't --
16         MR. NICHOLAS:  So you don't have
17  to act like --
18         MR. CLUFF:  -- Bob, you pushed me
19  into it, that's fine.  I was just going
20  to ask her a simple question.
21         MR. NICHOLAS:  Yeah.
22         MR. CLUFF:  I don't know if I
23  said for the record, we'll mark that as
24  Exhibit 24.

Page 343

1          (Witness reviews document.)
2  BY MR. CLUFF:
3      Q.   The only reason I asked you the
4  question that I just did is because, as you can
5  see at the top of this document, you wrote
6  "Things are hell here."
7          Can you just explain to me what
8  you meant when you wrote that?
9      A.   I'm -- it was a stressful time.
10     Q.   Why was it hell there?
11     A.   Well --
12         MR. NICHOLAS:  Asked and
13  answered.
14         THE WITNESS:  I think that was an
15  overstatement.
16  BY MR. CLUFF:
17     Q.   What was --
18     A.   I may not --
19     Q.   Sorry.  I didn't mean to
20  interrupt you.
21     A.   An exaggeration, I was just tired
22  probably.
23     Q.   You write, "This really worries
24  me - hope Schumer doesn't jump on board."

Page 344

1          Why did this really worry you?
2      A.   Because I didn't think it was
3  right for us to -- for our industry and our
4  company to have to testify in a -- before a
5  committee on our -- on the opioid crisis.
6      Q.   Then you write, "hope Schumer
7  doesn't jump on board."
8          What did you mean by that?
9      A.   Senator Schumer is the leader in
10  the Senate, and Senator Wyden is one of the
11  chairman, so senator Schumer has a lot of
12  influence and so I just wanted to make sure -- I
13  just made that statement.  It was a careless
14  statement.
15     Q.   Earlier we discussed that your
16  understanding is that AmerisourceBergen is
17  committed to combating the opioid crisis.  We
18  didn't use those exact words, but would you
19  agree with that statement?
20     A.   Yes.
21     Q.   If testifying before Congress
22  could contribute to solving the opioid crisis,
23  don't you think it was a good idea for
24  AmerisourceBergen to do it?

Page 345

1          MR. NICHOLAS:  Object to the form
2  and the word play and the arguing.
3          Go ahead.
4          THE WITNESS:  I don't think
5  AmerisourceBergen's testifying helps
6  solve the opioid crisis.
7  BY MR. CLUFF:
8      Q.   Did you agree -- you disagreed
9  then with Senator Wyden when he said that the
10  distributors should be held accountable for the
11  epidemic?
12     A.   Yes.
13     Q.   So even though Senator Wyden
14  appeared to believe that that would help solve
15  the crisis, AmerisourceBergen didn't agree?
16         MR. NICHOLAS:  Object to the
17  form, but go ahead.
18         THE WITNESS:  I'm not -- I'm
19  speaking on behalf of myself, and I do
20  not think that it was -- would do
21  anything to solve the crisis.
22         MR. CLUFF:  I just have two more
23  documents for you, and then I may be
24  done with the questioning for today.

Page 346

1      The first is a document produced
2 by AmerisourceBergen as ABDCMDL00367840.
3 We're going to mark it as Exhibit 25.
4 This is an e-mail from Sean Callinicos
5 to Rita Norton at the top.
6      (Document marked for
7 identification as Norton Deposition
8 Exhibit No. 25.)
9      (Witness reviews document.)
10      THE WITNESS: Okay.
11 BY MR. CLUFF:
12   Q.   Earlier we talked about whether
13 or not you and your counterparts from Cardinal
14 Health or McKesson ever exchanged information
15 that you thought would be helpful to your
16 respective companies.
17      Do you recall that question?
18   A.   Yes.
19   Q.   Who is Robert Zirkelbach, do you
20 see that name at the bottom of the --
21   A.   Yes, he is the head of
22 communications for PhRMA.
23   Q.   Do you know how Sean Callinicos
24 may have come into possession of this e-mail

Page 347

1 from Robert Zirkelbach?
2   A.   No.
3   Q.   Did you ever ask him?
4   A.   I may have, but I don't know.  I
5 don't remember.
6   Q.   The subject line of these two
7 e-mails is that the Washington -- it's
8 abbreviated Wash Post, Washington Post retracts
9 PhRMA claim in opioid story.
10      Do you see that?
11   A.   Yes.
12   Q.   And then Mr. Callinicos forwards
13 that, and now the subject line becomes "More on
14 PhRMA - for your CEO."
15      Do you see that?
16   A.   Yes.
17   Q.   So was Cardinal Health looking
18 out for AmerisourceBergen's CEO?
19   A.   I don't know.
20   Q.   Do you know why Sean forwarded
21 you this e-mail?
22   A.   No.  You'd have to ask him.
23   Q.   Did you ever ask him why he
24 forwarded you this e-mail?

Page 348

1   A.   No.
2   Q.   Were you in the habit of ignoring
3 e-mails from Sean Callinicos?
4   A.   No.
5      MR. NICHOLAS:  Wait a minute.
6 Object to the form, mischaracterization
7 of prior testimony.
8 BY MR. CLUFF:
9   Q.   Did you do anything with this
10 information that you received from Sean?
11   A.   I don't remember.
12   Q.   Do you recall in October of 2017
13 why this information may have been helpful to
14 AmerisourceBergen's CEO?
15      MR. NICHOLAS:  Object to the
16 form.
17      THE WITNESS:  That was Sean's
18 words that he put in that subject of
19 that e-mail, not mine.
20 BY MR. CLUFF:
21   Q.   Do you recall anything in 2017
22 that would have required AmerisourceBergen's CEO
23 to know information about PhRMA?
24      MR. NICHOLAS:  Object to the

Page 349

1 form, badgering.
2      THE WITNESS:  I don't think this
3 was intended for our CEO.
4 BY MR. CLUFF:
5   Q.   But Sean wrote "for your CEO,"
6 correct?
7      MR. NICHOLAS:  Object to the
8 form.
9      THE WITNESS:  It looks like
10 someone sent it to Sean for their CEO.
11 BY MR. CLUFF:
12   Q.   Okay.  Can you go back to
13 document it's Exhibit Number 24, it's just one
14 back.  It's the Wyden's opening statement
15 document.
16      Who is Vincent A. Roberti or
17 Roberti?
18   A.   He's one of our consultants.
19   Q.   Does Amerisource -- well, what
20 kind of consultant is he?
21   A.   A lobbyist.
22   Q.   Does AmerisourceBergen hire other
23 lobbyists as consultants?
24   A.   Yes.

Page 350

1 Q. Do you know how many there are?
2 A. Seven.
3 Q. What are their names?
4 MR. NICHOLAS: When?
5 MR. CLUFF: That's a good point.
6 BY MR. CLUFF:
7 Q. Are there seven lobbyists
8 currently?
9 A. Approximately.
10 Q. Okay. Do you know if the number
11 of lobbyists that AmerisourceBergen has employed
12 as consultants has changed during your tenure
13 with AmerisourceBergen?
14 A. Yes.
15 Q. Has it increased, decreased?
16 A. It fluctuates regularly.
17 Q. So currently it's approximately
18 seven?
19 A. Yes.
20 Q. And is Mr. Roberti one of them?
21 A. Yes.
22 Q. Do you recall who the others
23 might be?
24 A. Well, there's firms that we -- I

Page 351

1 mean not individuals. Some are individuals,
2 some are firms.
3 Q. Who are the individuals?
4 A. So Nossaman.
5 Q. Is that a law firm?
6 A. It's a law firm. And Horizon
7 Government Affairs and John O'Neill's firm,
8 which is -- I can't remember the name of his
9 firm, John O'Neill. John Feehery.
10 Q. How do you spell that last name?
11 A. F-e-e-h-e-r-y. Mike Tonger and
12 Julie Hershey Carr.
13 Q. We might need you to get some of
14 those spellings for the court reporter
15 afterwards.
16 A. Sure.
17 Q. What is generally the role that a
18 independent or a consultant lobbyist would play
19 for AmerisourceBergen?
20 A. So we retain consultants who --
21 some consultants have relationships with Senate
22 Democrats, some have relationships with Senate
23 Republicans, some have relationships with House
24 Republicans and some have relationships with

Page 352

1 House Democrats, and some among them might have
2 relationships with the administration.
3 Q. Sort of covering all the bases?
4 A. Yes.
5 Q. Does AmerisourceBergen ever
6 retain consultants for a more specific purpose
7 like with a targeted engagement on a specific
8 issue?
9 A. No.
10 Q. Okay. How does AmerisourceBergen
11 select these independent consultants that it
12 hires?
13 MR. NICHOLAS: Object to the
14 form.
15 THE WITNESS: Just based on who
16 they know and who their relationships
17 are and their experience in the
18 healthcare industry generally.
19 BY MR. CLUFF:
20 Q. Has AmerisourceBergen in the 14
21 years you've worked there always employed these
22 consultant lobbyists?
23 A. Yes.
24 Q. I don't want to belabor this

Page 353

1 issue, but is there anywhere that
2 AmerisourceBergen keeps a list or a roster of
3 the consultants that it's retained?
4 A. It's publicly available.
5 Q. Is it?
6 A. Yes.
7 Q. That's something that
8 AmerisourceBergen discloses?
9 A. Every company discloses the
10 lobbyists. That's part of our lobbying report
11 that we file quarterly with the Clerk of the
12 House and the Senate and the Clerk of the
13 Senate.
14 Q. When AmerisourceBergen hires a
15 consultant as their lobbyist, is there a
16 retainer agreement that's signed?
17 A. Yes.
18 MR. NICHOLAS: Object to the
19 form.
20 Go ahead, I'm sorry.
21 BY MR. CLUFF:
22 Q. Do you know if those are
23 disclosed along with the identity of the
24 consultant that's hired?

Page 354

1    A.   No.
2    Q.   But that's information that would
3 be within AmerisourceBergen's files?
4         MR. NICHOLAS:  Object to the
5    form.
6         THE WITNESS:  Yes.
7 BY MR. CLUFF:
8    Q.   Would you as the head of
9 government affairs have had meetings with
10 AmerisourceBergen's lobbyists?
11   A.   Yes.
12   Q.   Do you know if those meetings
13 ever involved topics related to suspicious order
14 monitoring?
15   A.   No.
16   Q.   How about diversion of controlled
17 substances?
18   A.   No.
19   Q.   Did you have any meetings with
20 independent or these consultants related to the
21 Marino Blackburn bill?
22   A.   Yes.
23   Q.   How about the Senators White and
24 Hatch bill, how about that one?

Page 355

1    A.   Whitehouse and Hatch, yes.
2    Q.   How about CARA 2.0, would you
3 have had meetings with lobbyists about that?
4    A.   Yes.
5    Q.   What would the substance of those
6 meetings generally have been about?
7         MR. NICHOLAS:  Object to the
8    form.
9         THE WITNESS:  Just general
10        information sharing and taking
11        assignments to who was going to talk to
12        who and things like that.
13 BY MR. CLUFF:
14   Q.   Would they have been reporting
15 back to you or AmerisourceBergen about what the
16 sort of opinion in the House and the Senate
17 would be about issues?
18        MR. NICHOLAS:  Object to the
19        form.
20        THE WITNESS:  They would report
21   back information from their meetings.
22        MR. CLUFF:  Okay.  I'm going to
23   conclude my questioning for the day, so
24   you're free to go.  I'm going to make a

Page 356

1 record with your counsel that he is
2 going to object to, and then we're going
3 to reasonably disagree that I'd like to
4 leave the deposition open because I
5 think that there may be some additional
6 areas of documents that need to be
7 searched for, collected and potentially
8 produced.  So pending a meet and confer
9 with AmerisourceBergen's counsel on
10 that, I'm going to reserve my right to
11 call you back.  Hopefully, it won't be
12 necessary, but it's something that I
13 have to do just to preserve the record.
14        MR. NICHOLAS:  You're right, I
15 disagree.  I think that this deposition
16 is concluded and that everything that is
17 supposed to have been produced has
18 already been produced, but, you're
19 right, we can --
20        MR. CLUFF:  Reasonably disagree.
21        MR. NICHOLAS:  Maybe we'll never
22 have to argue about it, you know.
23        So we're off the record, and
24 we're good to go.

Page 357

1         THE VIDEOGRAPHER:  That concludes
2 today's deposition.  The times is --
3         MR. CLUFF:  I'm sorry.  You know
4 what, we should go back on the record
5 really quickly.
6         THE VIDEOGRAPHER:  We're still on
7 the record.
8         MR. CLUFF:  Okay.  Did you guys
9 want to revisit whether or not you want
10 to ask Rita any questions?  I didn't ask
11 if you wanted to.
12        MR. NICHOLAS:  Well, he has
13 questions.
14        MR. CLUFF:  Do you have a couple?
15        MR. CREADORE:  I do have several.
16        MR. NICHOLAS:  He said he had
17 three or four questions.
18        THE VIDEOGRAPHER:  Off the
19 record, 5:55.
20        (Pause.)
21        THE VIDEOGRAPHER:  We are back on
22 the record at 5:56.
23 BY MR. CREADORE:
24   Q.   Good afternoon, Ms. Norton.  My

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  name is Don Creadore. I'm a member of the
2  Creadore law firm, and I don't represent
3  government entities, but I do represent babies
4  and families affected by the opioid crisis,
5  particularly babies diagnosed with NAS, which is
6  neonatal absent syndrome, babies who have been
7  diagnosed or suffer from NOWS, neonatal opioid
8  withdraw syndrome, and other afflictions and so
9  forth.
10         I want this record to reflect
11  today that my attendance is at the behest and
12  the notice of AmerisourceBergen and its counsel,
13  who we have spoken to previously, and not by any
14  other party.
15         And I cannot respectfully waive
16  my client's right at this time and its
17  entitlement to seek at a later date additional
18  testimony from you or other members of your
19  corporation.
20         Indeed, the letter notice that
21  was provided to me contains certain details of
22  today's deposition, but it was unaccompanied by
23  any notice or any other materials from either
24  your counsel or from anybody else. So I'm here

Page 359

1  today effectively without any information to
2  back up any of the items that you may have
3  submitted or your counsel may have submitted in
4  this proceeding. I do have a question, though,
5  to ask of you.
6         Earlier in your deposition --
7         MR. NICHOLAS: Before you ask --
8         MR. CREADORE: Go ahead, yes.
9         MR. NICHOLAS: Let me respond to
10  your statement --
11         MR. CREADORE: Please do.
12         MR. NICHOLAS: -- by saying we
13  disagree with it. We think we provided
14  proper notice. You have an opportunity
15  to ask the questions you want to ask
16  here today, and we can defer to another
17  day any fight we may have about whether
18  Ms. Norton would be brought back to a
19  different deposition. We don't have
20  to -- we don't have to have that fight
21  today, but I disagree with you.
22         MR. CREADORE: Okay. We can
23  agree to disagree, respectfully, but --
24  and I don't need to have you put it on

Page 360

1  the record, it's not your testimony, but
2  I think you're aware of the fact that I
3  have not received any documents from
4  your offices or anybody else on behalf
5  of the defendants.
6         MR. NICHOLAS: As I say, we can
7  argue about all this later. Go ahead.
8  BY MR. CREADORE:
9     Q.    In your testimony earlier today
10  you provided the following statement, and you
11  can refer back to the transcript at page 55,
12  line 4 if you need to. Basically you said there
13  is legitimate need for pain medication and we
14  recognize that.
15         Do you recall saying that earlier
16  today?
17     A.    Yes.
18     Q.    Okay. When you refer to pain
19  medication, you were referring to opioid
20  medications? Is that what you're referring to
21  in your statement?
22         MR. NICHOLAS: Object to the
23  form.
24  BY MR. CREADORE:

Page 361

1     Q.    In your statement that you
2  mentioned pain medications, this lawsuit
3  involves opioid medications, was that what your
4  reference was in connection with?
5         MR. NICHOLAS: Object to the
6  form.
7         Go ahead.
8         THE WITNESS: Generally, I -- all
9  pain medication, including opioid.
10  BY MR. CREADORE:
11     Q.    Okay. Does then your claim that
12  there's a legitimate need for pain medication,
13  does that reference also encompass pregnant
14  women?
15         MR. NICHOLAS: Object to the
16  form.
17         THE WITNESS: I don't know.
18  BY MR. CREADORE:
19     Q.    Okay. In terms of your testimony
20  that there is a legitimate need for pain
21  medication and that we recognize that, does that
22  also include pain medications for infants in
23  utero?
24         MR. NICHOLAS: Object to the

Page 362

1    form.
2         THE WITNESS:  No.  I don't have
3    any knowledge or understanding of that.
4         MR. CREADORE:  Okay.  Very good.
5    I have no other questions to ask of you.
6    Simple, okay.
7         MR. NICHOLAS:  Thank you.
8         THE VIDEOGRAPHER:  Is that it?
9         MR. CREADORE:  That's it.
10        THE VIDEOGRAPHER:  That concludes
11   today's deposition.  The time is
12   5:59 p.m.
13        (Witness excused.)
14             – – –

Page 364

1    - - - - - -
2    E R R A T A
3    - - - - - -
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6    REASON:  _____
7    ____  ____  _____
8    REASON:  _____
9    ____  ____  _____
10   REASON:  _____
11   ____  ____  _____
12   REASON:  _____
13   ____  ____  _____
14   REASON:  _____
15   ____  ____  _____
16   REASON:  _____
17   ____  ____  _____
18   REASON:  _____
19   ____  ____  _____
20   REASON:  _____
21   ____  ____  _____
22   REASON:  _____
23   ____  ____  _____
24   REASON:  _____

Page 363

1    C E R T I F I C A T I O N
2         I, MARGARET M. REIHL, a
3    Registered Professional Reporter,
4    Certified Realtime Reporter, Certified
5    Shorthand Reporter, Certified LiveNote
6    Reporter and Notary Public, do hereby
7    certify that the foregoing is a true and
8    accurate transcript of the testimony as
9    taken stenographically by and before me
10   at the time, place, and on the date
11   hereinbefore set forth.
12        I DO FURTHER CERTIFY that I
13   am neither a relative nor employee nor
14   attorney nor counsel of any of the
15   parties to this action, and that I am
16   neither a relative nor employee of such
17   attorney or counsel, and that I am not
18   financially interested in the action.
19
20
21   -------------------------------
     Margaret M. Reihl, RPR, CRR, CLR
22   CSR #XI01497  Notary Public
23
24

Page 365

1    ACKNOWLEDGMENT OF DEPONENT
2
3         I, RITA NORTON, do hereby certify
4    that I have read the foregoing pages,
5    and that the same is a correct
6    transcription of the answers given by me
7    to the questions therein propounded,
8    except for the corrections or changes in
9    form or substance, if any, noted in the
10   attached Errata Sheet.
11
12
13   _____
14   RITA NORTON                DATE
15   Subscribed and sworn to before me this
16   _____ day of _____, 2019.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24