```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF OHIO

 3                 EASTERN DIVISION

 4                     -  -  -

 5   IN RE: NATIONAL PRESCRIPTION

 6   OPIATE LITIGATION              Case No.

 7                                  1:17-MD-2804

 8   APPLIES TO ALL CASES           Hon. Dan A.

 9                                  Polster

10   Case No. 1:17-MD-2804

11                     -  -  -

12              January 9, 2019

13      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14              CONFIDENTIALITY REVIEW

15              Videotaped deposition of

16   SOPHIA NOVACK, held at 101 Park Avenue,

17   New York, New York, commencing at 9:37 a.m.,

18   on the above date, before Marie Foley, a

19   Registered Merit Reporter, Certified

20   Realtime Reporter and Notary Public.

21                     -  -  -

22            GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24              Deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1 APPEARANCES:
2
3 BARON & BUDD, P.C.
4 BY: W. SCOTT SIMMER, ESQUIRE
5    WILLIAM G. POWERS, ESQUIRE
6    600 New Hampshire Avenue NW
7    The Watergate, Suite 10-A
8    Washington, DC 20037
9    202.333.4562
10   ssimmer@baronbudd.com
11   Representing the MDL Plaintiffs
12
13
14
15 MORGAN LEWIS & BOCKIUS, LLP
16 BY: JOHN P. LAVELLE, JR., ESQUIRE
17   1701 Market Street
18   Philadelphia, Pennsylvania 19103
19   215.963.5000
20   john.lavelle@morganlewis.com
21      - and -
22
23
24

Page 4

1 APPEARANCES VIA TELEPHONE AND STREAMING:
2
3
4 ARNOLD & PORTER KAYE SCHOLER, LLP
5 BY: RYAN Z. WATTS, ESQUIRE
6    601 Massachusetts Avenue NW
7    Washington, DC 20001
8    202.942.5000
9    Ryan.watts@arnoldporter.com
10   Representing Par and Endo
11
12
13 BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
14 BY: LESTER C. HOUTZ, ESQUIRE
15   1801 Wewatta Street
16   Suite 1200
17   Denver, Colorado 80202
18   303.592.3100
19   lester.houtz@bartlit-beck.com
20   Representing Walgreens
21
22
23
24

Page 3

1 APPEARANCES (Cont.):
2
3 MORGAN LEWIS & BOCKIUS, LLP
4 BY: KELLY A. MOORE, ESQUIRE
5    CAROLYN A. SILANE, ESQUIRE
6    101 Park Avenue
7    New York, New York 10178
8    212.309.6000
9    kelly.moore@morganlewis.com
10   Representing Rite Aid and the Witness
11
12
13 FARRELL FRITZ, LLP
14 BY: JAMES M. WICKS, ESQUIRE
15   400 RXR Plaza
16   Uniondale New York 11556
17   516.227.0617
18   jwicks@farrellfritz.com
19   Representing Cardinal Health
20
21
22
23
24

Page 5

1 APPEARANCES VIA TELEPHONE AND STREAMING
2 (Cont.):
3
4 COVINGTON & BURLING, LLP
5 BY: AMBER CHARLES, ESQUIRE
6    One CityCenter
7    850 Tenth Street NW
8    Washington, DC 20001
9    202.662.6000
10   acharles@cov.com
11   Representing McKesson
12
13
14 JONES DAY
15 BY: SCOTT D. QUELLHORST, ESQUIRE
16   77 West Wacker
17   Chicago, Illinois 60601
18   312.782.3939
19   squellhorst@jonesday.com
20   Representing Walmart
21
22
23
24

Page 6

1 APPEARANCES VIA TELEPHONE AND STREAMING

2 (Cont.):

3

4 JACKSON KELLY PLLC

5 BY: GRETCHEN M. CALLAS, ESQUIRE

6  500 Lee Street East

7  Suite 1600

8  Charleston West Virginia  25301-2302

9  304.340.1000

10  gcallas@jacksonkelly.com

11  Representing AmerisourceBergen

12

13 BAILEY & WYANT, PLLC

14 BY: JUSTIN C. TAYLOR, ESQUIRE

15  500 Virginia Street East

16  Suite 600

17  Charleston West Virginia  25337

18  304.345.4222

19  jtaylor@baileywyant.com

20  Representing West Virginia Board of

21  Pharmacy

22

23 ALSO PRESENT:

24  Ray Moore, videographer, trial tech

Page 8

1  - - -

2  E X H I B I T S

3  - - -

4  NO.  DESCRIPTION  PAGE

5 Rite Aid -  LinkedIn page for Sophia  21

6 Novack  Novack

7 Exhibit 1

8 Rite Aid -  Corporate Loss Prevention  51

9 Novack  Department chart January

10 Exhibit 2  26, 2011, Bates No.

11  Rite_Aid_OMDL_0044539

12 Rite Aid -  Corporate Asset Protection  61

13 Novack  Department organization

14 Exhibit 3  chart, Bates No.

15  Rite_Aid_OMDL_0044732 to

16  Rite_Aid_OMDL_0044733

17 Rite Aid -  E-mail dated January 25,  79

18 Novack  2012, with attachment,

19 Exhibit 4  Bates No.

20  Rite_Aid_OMDL_037355 to

21  Rite_Aid_OMDL_037371

22

23

24

Page 7

1  - - -

2  TRANSCRIPT INDEX

3  PAGE

4 APPEARANCES...................... 2 - 6

5 INDEX OF EXHIBITS................. 8 - 11

6 EXAMINATION OF SOPHIA NOVACK:

7 BY:  MR. SIMMER................... 14

8 AFTERNOON SESSION................ 181

9 SIGNATURE PAGE................... 403

10 ERRATA........................... 404

11 REPORTER'S CERTIFICATE........... 405

12

13

14

15  - - -

16

17

18

19

20

21

22

23

24

Page 9

1  - - -

2  E X H I B I T S

3  - - -

4  NO.  DESCRIPTION  PAGE

5 Rite Aid -  Email chain ending  137

6 Novack  November 10, 2012, with

7 Exhibit 5  attachment, Bates No.

8  Rite_Aid_OMDL_00029787 to

9  Rite_Aid_OMDL_00029954

10 Rite Aid -  Email chain ending  185

11 Novack  September 16, 2011, Bates

12 Exhibit 6  No. MCK_MDL_00632923 to

13  MCK_MDL_00632925

14 Rite Aid -  Pleading in Case No.  202

15 Novack  5-14CR096

16 Exhibit 7

17 Rite Aid -  Press release dated  209

18 Novack  October 20, 2014

19 Exhibit 8

20 Rite Aid -  Cleveland.com article  211

21 Novack  dated February 13, 2015

22 Exhibit 9

23

24

Page 10

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION          PAGE
Rite Aid - Email chain ending        217
Novack      December 19, 2012, Bates
Exhibit 10  No. MCK_MDL_00571625 to
          MCK_MDL_00571628
Rite Aid - Email chain ending        231
Novack      February 21, 2014, Bates
Exhibit 11  No. MCK_MDL_00547503 to
          MCK_MDL_00547510
Rite Aid - Email chain ending October   257
Novack      7, 2017, Bates No.
Exhibit 12  MCK_MDL_00633242
Rite Aid - Email chain ending August    267
Novack      27, 2014, Bates No.
Exhibit 13  MCK_MDL_00627585 to
          MCK_MDL_00627587
Rite Aid - Email chain ending August    286
Novack      27, 2014, Bates No.
Exhibit 14  Rite_Aid_OMDL_0030479 to
          Rite_Aid_OMDL_0030684

Page 12

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
Page  Line
19   15

REQUEST FOR PRODUCTION OF DOCUMENTS
Page  Line
- -none- -

STIPULATIONS
Page  Line
- -none- -

QUESTIONS MARKED
Page  Line
- -none- -

Page 11

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION          PAGE
Rite Aid - Email chain ending August    316
Novack      28, 2014, Bates No.
Exhibit 15  MCK_MDL_00630329 to
          MCK_MDL_00630330
Rite Aid - Email chain ending June     333
Novack      17, 2013, Bates No.
Exhibit 16  Rite_Aid_OMDL_003075 to
          Rite_Aid_OMDL_003077
Rite Aid - Email chain ending October   349
Novack      9, 2013, Bates No.
Exhibit 17  Rite_Aid_OMDL_0050291 to
          Rite_Aid_OMDL_0050306

Page 13

- - -
9:37 a.m.
New York, New York
- - -
THE VIDEOGRAPHER:  We are now on the record.
My name is Ray Moore.  I am a videographer for Golkow Litigation Services.
Today's date is January 9th, 2019, and the time is 9:37 a.m.
This video deposition is being held in New York, New York in the matter In Re: National Prescription Opiate Litigation, for the United States District Court for the Northern District of Ohio, Eastern Division, MDL Number 2804.
The deponent is Sophia Novack.
Counsel will be noted on the stenographic record.
The court reporter is Marie Foley, and will now swear in the witness.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1           - - -
2   SOPHIA NOVACK, the Witness herein, having
3     been first duly sworn by a Notary
4     Public in and of the State of New
5     York, was examined and testified as
6     follows:
7   EXAMINATION BY
8   MR. SIMMER:
9     Q.   Good morning, ma'am.  My name is
10  Scott Simmer.  I'm here on behalf of the
11  plaintiffs in the -- this litigation from
12  Baron and Budd.
13        Have you been deposed before?
14    A.   No.
15    Q.   Okay.  I expect your counsel or
16  the counsel sitting next to you has talked
17  to you about this as well.  I may go
18  through some of the ground rules.
19        I'm going to be asking you a
20  series of questions.  The court reporter
21  is taking down verbatim what we each say.
22  For that reason, it's important that we do
23  not talk over each other.  She can only
24  take down one speaker at a time.

Page 15

1         Is that fair?
2     A.   Yes.
3     Q.   And, for that reason too, you
4   must answer verbally.  You can't just nod
5   your head.  She can't take down a nod of
6   the head.  So you have to answer verbally.
7         Do you understand?
8     A.   Yes.
9     Q.   You also have to answer fully
10  and accurately and verbally.
11        You understand?
12    A.   Yes.
13    Q.   If you don't understand a
14  question, please say so and I'll try to
15  rephrase it.  Otherwise, I can -- I will
16  assume that you understood what I'm
17  asking.
18        Is that fair?
19    A.   Yes.
20    Q.   You understand that you must
21  answer truthfully, correct?
22    A.   Yes.
23    Q.   You can request a break at any
24  time.  My only request is that if there's

Page 16

1   a question pending, you have to answer it
2   before we take a break.
3         You understand?
4     A.   Yes.
5         MR. LAVELLE:  The witness
6     reserves the right to consult with
7     counsel on issues of privilege.
8   BY MR. SIMMER:
9     Q.   Just as happened just now with
10  Mr. Lavelle, from time to time, the
11  attorneys will lodge objections.  You are
12  still expected to answer unless counsel
13  directs you not to answer.
14        Do you understand?
15    A.   Yes.
16    Q.   And, do you understand these
17  procedures?
18    A.   Yes.
19    Q.   Is there any reason why you
20  cannot testify truthfully and accurately
21  today?
22    A.   No.
23    Q.   You're not taking any medication
24  of any kind that would interfere with your

Page 17

1   ability to answer truthfully?
2     A.   No.
3     Q.   There's counsel sitting next to
4   you.
5         Did you retain this -- Morgan
6   Lewis to defend you in this deposition?
7     A.   Yes.
8     Q.   Are you paying for your counsel
9   today?
10    A.   No.
11    Q.   Who's paying for your counsel
12  today?
13    A.   Rite Aid headquarters.
14    Q.   What's your understanding of why
15  you are here today?
16    A.   Involvement in lit -- opioid
17  litigations.
18    Q.   I can tell right away I'm going
19  to have to ask you to speak up a bit.  I'm
20  a little hard of hearing, so.
21    A.   Okay.
22    Q.   Thank you.
23        Did you meet with attorneys
24  representing the company in preparation

Page 18

1   for your testimony?
2       A.   Yes.
3       Q.   Who did you meet with?
4       A.   I met with John, Kelly and
5   Carolyn.
6       Q.   And when did you meet with them?
7       A.   The last couple of days.
8       Q.   How long did you meet with them?
9       A.   For couple hours over three
10  days.
11      Q.   Couple?
12      A.   Couple of hours over three days.
13      Q.   Did they show you any documents?
14      A.   Yes.
15      Q.   How many?
16      A.   A binder full.
17      Q.   What kind of documents, just
18  generally?
19      A.   Communications that I've had,
20  training documents that we've done.
21      Q.   I asked you a moment ago, but
22  I'm going to ask you again just to
23  clarify.
24           Have you been involved in

Page 19

1   litigation of any kind before?
2       A.   No.
3       Q.   Not as a party?
4       A.   No.
5       Q.   Not as a witness?
6       A.   No.
7       Q.   Have you ever testified before
8   in a deposition?
9       A.   No.
10      Q.   In preparation for your
11  testimony the counsel got in touch with
12  you, did they ask you to produce to them
13  any documents you had in your possession?
14           MR. LAVELLE:  Objection.
15           Direct the witness not to answer
16  to the extent it will require
17  disclosure of attorney/client
18  communications.
19  BY MR. SIMMER:
20      Q.   Did they ask you to produce
21  documents in your possession?
22           MR. LAVELLE:  Same objection.
23           Direct the witness not to answer
24  to the extent it would require

Page 20

1   disclosure of attorney/client
2   communications.
3   BY MR. SIMMER:
4       Q.   There's nothing privileged about
5   whether -- a yes-or-no question whether
6   you asked -- they asked you to produce
7   documents.
8       A.   No.
9       Q.   Did they ask you to produce any
10  hard copy files you had in your
11  possession?
12           MR. LAVELLE:  Objection.
13           Direct the witness not to answer
14  to the extent it would require
15  disclosure of attorney/client
16  communications.
17      A.   No.
18      Q.   Do you have any hard copy files
19  or electronic files from your time at
20  Rite Aid in your possession?
21      A.   No.
22      Q.   Nothing on a computer or
23  anywhere from your time at Rite Aid?
24      A.   No.

Page 21

1       Q.   No boxes of documents from your
2   time at Rite Aid?
3       A.   No.
4           (Rite Aid - Novack Exhibit 1,
5   LinkedIn page for Sophia Novack, was
6   marked for identification, as of this
7   date.)
8           MR. LAVELLE:  Counsel, what are
9   we labeling this?  Is this Novack 1?
10          MR. SIMMER:  Novack Exhibit 1.
11          MR. LAVELLE:  Thank you.
12  BY MR. SIMMER:
13      Q.   I handed you what we are marking
14  as Novack Exhibit 1, which is your
15  LinkedIn page.
16           Have you seen -- have you
17  prepared that?
18           MR. LAVELLE:  Object to form.
19  BY MR. SIMMER:
20      Q.   Is the information on the
21  LinkedIn page something you prepared?
22      A.   Yes.
23      Q.   When he objects to form, you
24  still have to answer.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1      You understand?
2      A.   Yes.
3      Q.   Okay.  So, the information is
4  information that you put on your LinkedIn
5  page, correct?
6      A.   Correct.
7      Q.   Okay.  Let me start with your
8  educational background.
9      It says here that you went to
10  the Arnold Marie Schwartz College of
11  Pharmacy.
12      Do you see that?
13      A.   Yes.
14      Q.   And what was your year of
15  graduation?
16      A.   2005.
17      Q.   Did you have any special area of
18  specialization while you -- when you went
19  to pharmacy school?
20      A.   I achieved the doctorate of
21  pharmacy and also the university honors
22  program.
23      Q.   My question was somewhat
24  different.

Page 23

1      I asked you if you had any area
2  of specialization in your pharmacy degree.
3      MR. LAVELLE:  Object to form.
4      A.   Just pharmacy.
5      Q.   Okay.  And, where did you get
6  your undergraduate degree?
7      A.   Same college, Long Island
8  University.
9      Q.   And you had a pharmacy degree?
10      A.   I graduated with a doctor of
11  pharmacy.  It's one program, one degree.
12      Q.   How many years did you go to
13  school there?
14      A.   Six years.
15      Q.   And, what was your first job
16  post-graduation?
17      A.   Rite Aid Pharmacy as an intern.
18      Q.   When you say an intern, is that
19  a full-time position?
20      A.   It was a part-time position.
21      Q.   Was that a paid position?
22      A.   It was a paid position.
23      Q.   What was the geographic location
24  where you worked?

Page 24

1      A.   Brooklyn, New York.
2      Q.   And, what were your job
3  responsibilities?
4      A.   Counsel patients and dispense
5  medications in the data entry system under
6  the supervision of a pharmacist.
7      Q.   And you worked in an actual
8  pharmacy; is that correct?
9      A.   Correct.
10      Q.   What was the name of the
11  pharmacy where you worked?
12      A.   Rite Aid Pharmacy.
13      Q.   Is there a number for the
14  Rite Aid Pharmacy where you worked?
15      A.   Yes.
16      Q.   That's how they keep track of
17  them is by a four-digit number, correct?
18      A.   It was a four-digit number, yes.
19      Q.   And, what was the number?
20      A.   I don't recall the number
21  exactly.
22      It was the location on Seaview
23  Avenue in Brooklyn, New York.
24      Q.   And, how many years did you work

Page 25

1  there as an intern?
2      A.   I worked there as an intern for
3  a couple months.
4      Q.   And, what was your next
5  position?
6      A.   Pharmacist position.
7      Q.   At the same pharmacy?
8      A.   At a different location in
9  Brooklyn, New York.
10      Q.   And, what was the location for
11  that pharmacy?
12      A.   It was in -- on Pennsylvania
13  Avenue in Brooklyn, New York.
14      Q.   And, what were your
15  responsibilities?
16      A.   Dispense medications to
17  patients, counsel and make sure that they
18  understood what the medications were for.
19      Q.   What hours did you work, if you
20  recall?
21      A.   Usually an eight-hour shift
22  during the week and rotating weekends.
23      Q.   This was a full-time position
24  this time?

Page 26

1    A.    Full-time position.
2    Q.    And, how long did you work in
3  this position in Brooklyn?
4    A.    I was in that position for about
5  a year, and then I became a pharmacy
6  manager.
7    Q.    And a pharmacy manager is of a
8  specific pharmacy; is that correct?
9    A.    Yes.
10   Q.    And, what pharmacy were you the
11 manager for?
12   A.    A pharmacy in Jackson Heights,
13 New York.
14   Q.    What are the responsibilities of
15 a pharmacy manager?
16   A.    Same as the pharmacist, except
17 oversee the operations of the pharmacy
18 along with the personnel.
19   Q.    So, when you say you oversee the
20 operations of the pharmacy, what did you
21 do for that?
22   A.    Insure that we were operating
23 within regulatory compliance, be ready for
24 any type of inspection, and we had direct

Page 27

1  P&L responsibility.
2    Q.    What training did you receive in
3  regulatory compliance in order to fulfill
4  that function?
5    A.    We had training from our
6  pharmacy district manager.  We had various
7  computer-based training, and there were a
8  lot of job aids and help guides that were
9  on our Rite Aid portal for resources.
10   Q.    Did you receive any kind of
11 certification of any kind for your
12 compliance?
13   A.    Did not receive any, no.
14   Q.    Did you take any kind of exams
15 in order to, you know, make sure that you
16 understood the content of the compliance
17 training you received?
18        MR. LAVELLE:  Object to form.
19   A.    There were questions that you
20 had to pass at the end of the e-learnings.
21   Q.    Did you have to answer a certain
22 percentage of the questions correctly
23 before you could continue on?
24   A.    Yes.

Page 28

1    Q.    Do you recall what percentage
2  you had to answer correctly?
3    A.    I don't recall the passing rate.
4    Q.    When you say compliant --
5  "regulatory compliance," what did that
6  entail?
7    A.    Entailed following DEA
8  regulations, recordkeeping, following our
9  dispensing regulations and if we had any
10 inspections that were coming into the
11 door.  Basically making sure that we were
12 following policies and procedures.
13   Q.    You also said as manager you had
14 to be ready for any type of inspection.
15        What kind of inspections were
16 you talking about?
17   A.    From any outside agency or
18 internal agency.  We have our internal
19 audits that come in to do compliance
20 checks too.
21   Q.    What outside agencies are you
22 talking about?
23   A.    Anyone that could regulate us,
24 whether it's a fire inspection, whether

Page 29

1  it's a DEA, whether it's the Board of
2  Pharmacy, whether it's a third-party
3  audit.
4    Q.    And you also said that as a
5  manager of this pharmacy, you had direct
6  P&L responsibility.
7        What is that?
8    A.    The profit and loss statement.
9    Q.    I understand.  But, what does
10 that include?
11   A.    The overall operations of the
12 store from sales to gross profit to what
13 our losses, our expenses are, and at the
14 end of the day, what the bottom line is.
15   Q.    So, am I right you had a
16 responsibility to make sure the pharmacy
17 was profitable?
18        MR. LAVELLE:  Object to form.
19   A.    We had responsibility to make
20 sure that we were operating the store as
21 best as we can.
22   Q.    Just as best you could.  Is that
23 the only expectation the company had?
24        MR. LAVELLE:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   The expectation was to control
2  what we can control.
3    Q.   To control what you can control.
4  I don't have any idea what you just said.
5       What does that mean?
6       MR. LAVELLE:  Object to form.
7    A.   To control our expense lines
8  that we directly have impact over, making
9  sure that we're not over-ordering to
10 create overstock or ultimately damages
11 that will decrease our line, making sure
12 that we're protecting our assets inside
13 the pharmacy, managing our supply,
14 managing our payroll, managing the things
15 that we can control.
16   Q.   Did you in turn train the others
17 working in the pharmacy with you?
18   A.   Yes.
19   Q.   What kind of training did you
20 give them?
21   A.   On-the-job training in
22 conjunction with their CBTs and their
23 e-learnings that download throughout the
24 course of their time.

Page 31

1    Q.   What is CBT?
2    A.   Computer-based training.
3    Q.   And e-learnings, what is that?
4    A.   It's the same thing.  It's all
5  electronic learnings.
6    Q.   So, they had computer-based
7  training and e-learnings and you trained
8  them in addition to that.
9       Is that -- do I have it right?
10      MR. LAVELLE:  Object to form.
11   A.   There are training guides that
12 are available that we go through with them
13 manually that we check off as they, go
14 depending on their job role.
15   Q.   How many people did you have
16 that you were supervising as manager of
17 the pharmacy?
18   A.   In that particular location, a
19 staff pharmacist and a -- one associate.
20 It was a new store.
21   Q.   And the associate, is that a
22 pharmacy tech?
23   A.   That was a pharmacy tech.
24   Q.   What about the front of the

Page 32

1  store, the non-pharmaceutical items, did
2  you have any responsibility for those?
3    A.   No.
4    Q.   So your only job was to manage
5  what was back in the pharm -- the
6  prescription pharmacy section of the
7  store, correct?
8    A.   Yes.
9    Q.   And your P&L responsibilities
10 were only for the prescription drug part
11 of the pharmacy, correct?
12   A.   We were tied to the whole store,
13 but my contributions would have been the
14 pharmacy side.
15   Q.   Okay.  You said you were
16 district manager for this store --
17      MR. SIMMER:  Strike that.
18   Q.   You were the manager for this
19 store for how long?
20   A.   About a year.
21   Q.   Until when?
22   A.   Until some time the next year,
23 February.  I was promoted to a different
24 position.

Page 33

1    Q.   February of what year?
2    A.   February of 2007.
3    Q.   And you were promoted to what
4  position?
5    A.   A pharmacy district manager.
6    Q.   And, what are the
7  responsibilities a pharmacy district
8  manager?
9    A.   To oversee the multi unit
10 pharmacies within that area.
11   Q.   Okay.  Now, if you could look at
12 Novack Exhibit 1.  I think that's what's
13 reflected on your LinkedIn page.
14      Correct?
15   A.   Yes.
16   Q.   And it says you had that
17 position from February 2007 to August
18 2011.
19      Do I have that right?
20   A.   Yes.
21   Q.   Okay.  And, where were you
22 physically working out of?
23   A.   The Queens, Long Island district
24 and then parts of Brooklyn.  It was

Page 34

1  throughout the entire time we had
2  different parts of the metro New York
3  area.
4      Q.   How many pharmacies were you
5  responsible for?
6      A.   It ranged throughout the
7  districts, either from 18 to about 23
8  stores.
9      Q.   When I asked you what your
10 responsibilities were, you said you were
11 to oversee the multi unit pharmacies.
12     What's a multi unit pharmacy?
13     A.   Not just one location.  Like in
14 the pharmacy manager, I was responsible
15 for one location.  As a pharmacy district
16 manager, I was responsible for multiple
17 locations.
18     Q.   So, as a district manager, do
19 you go out and visit the -- each pharmacy
20 to make sure that they're doing what the
21 expect -- the company expects them to do?
22     A.   We go out, yes.
23     Q.   What else do you do in terms of
24 making sure that they're following the

Page 35

1  company's directives?
2      A.   We review with the store teams.
3  We conduct visits to do multiple
4  compliance checks.  We do training and
5  mentorship for our pharmacy managers so
6  that they can operate, help them
7  understand some of the policies and
8  procedures that we have and understand
9  overall pharmacy and providing care for
10 patients.
11     Q.   You said you do multiple
12 compliance checks.
13     What did that entail?
14     A.   We have a quarterly store visit
15 guide that we would do for our pharmacy.
16 We had a DEA checklist that we would do
17 annually for our pharmacies.
18     Q.   A quarterly store visit guide,
19 is that an actual physical manual of some
20 kind?
21     A.   It's a checklist.
22     Q.   A checklist of what items?
23     A.   Multitude of items that go over
24 from service to the business to just

Page 36

1  compliance overall.
2      Q.   You said you also had a DEA
3  checklist.
4      Is that a checklist that the DEA
5  prepared?
6      A.   It's an internal checklist that
7  we prepared as a corporation.
8      Q.   That somehow then reflects DEA
9  regulations?
10     A.   It gives us things that we want
11 to review in the store to make sure that
12 we are compliant with our policies and
13 procedures and regulations.
14     Q.   You also said that you did
15 training and mentorship for your pharmacy
16 managers, correct?
17     A.   Yes.
18     Q.   And, what did that entail?
19     A.   It entailed anything that they
20 needed from completing their job duties as
21 a pharmacy manager, questions about
22 operations, questions related to a policy
23 and procedure, just going through our
24 systems and how to use and operate those.

Page 37

1      Q.   This is in addition to the
2  online training you referred to earlier?
3      A.   Yes.
4      Q.   So, how did you know what you
5  were supposed to be training these people
6  about?  Did you have materials that you
7  were provided for that purpose?
8      MR. LAVELLE:  Object to form.
9      A.   It would be questions that the
10 teams would ask while we're there.  As we
11 do these audits, if there are any
12 deficiencies or any opportunities, we
13 would know that there may be a training
14 gap and we would fill in that information.
15     Q.   So, you simply would respond to
16 the questions that arose during the audit
17 and that's the kind of training you
18 provided?
19     MR. LAVELLE:  Object to form.
20     A.   That's not what I'm saying.
21     I'm saying that we go and
22 reinforce some things that we may identify
23 that are deficiencies to understand if
24 it's just a performance issue or if it's a

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 knowledge issue, but we do have structured
2 training guides as we onboard a new
3 pharmacist, and we have different things
4 as programs roll out just to make sure
5 that they understand the different pieces
6 of that program.
7    Q.   So, how long -- you said -- I
8 think it says in here you were a district
9 manager for a little over four years.
10      Is that right?
11   A.   Yes.
12   Q.   Did the DEA audit any of your
13 pharmacies during this time period?
14   A.   No.
15   Q.   Did the company audit any of
16 your pharmacies during this time period?
17   A.   We do internal audits all the
18 time throughout the year.
19   Q.   So you as a district manager did
20 the audit; is that right?
21   A.   I did the audit as a district
22 manager.  There's another department, the
23 Asset Protection Department also does
24 audits.  We have an Internal Assurance

Page 39

1 Department that also comes in and does
2 audits.
3    Q.   Well, let's go through that.
4      So, you said that you did
5 audits, right?
6    A.   That's correct.
7    Q.   During that four-year time
8 period, how many audits of pharmacies did
9 you do?
10   A.   I couldn't give you an exact
11 number.
12   Q.   More than ten?
13   A.   More than ten.
14   Q.   More than 50?
15   A.   I couldn't tell you.
16   Q.   Approximately how many?
17      MR. LAVELLE:  Objection; asked
18   and answered.
19   A.   I don't know if I can give you a
20 concrete number.  It was something that we
21 did routinely.
22   Q.   How many pharmacies did you --
23 were you responsible for?
24   A.   Depends on the time in the

Page 40

1 districts that I had.  So, it ranged from
2 anywhere from 18 up to over in the 20s.
3    Q.   18 to 20, correct?
4    A.   Depending on the district.  So,
5 the districts were 15 stores.  As we
6 restructured, we went to another district.
7 So it can vary in store count.
8    Q.   So, I don't -- I don't quite
9 follow.
10      You said that districts were 15
11 stores, but you were responsible for 18 to
12 20.
13      What's the reason for the
14 variance there?
15      MR. LAVELLE:  Object to form.
16   A.   Depending on the -- over the
17 four years, we covered different
18 districts.  So, my first district was 18
19 stores.  My second district was 20
20 some-odd stores.  My third district was in
21 that range.  So it's anywhere from a range
22 of that district depending on the size.
23   Q.   And, how often were you to audit
24 the pharmacies that you were responsible

Page 41

1 for?
2    A.   We had quarterly audits.
3    Q.   And, tell us everything you did
4 in an audit of a pharmacy.
5      MR. LAVELLE:  Object to form.
6    A.   We would review the questions on
7 the checklist and we'd insure compliance.
8 We rated it depending on whether they were
9 compliant or not.
10   Q.   What are the questions on a
11 checklist?  What's that reference to?
12      MR. LAVELLE:  Object to form.
13   A.   As I mentioned before, it
14 referenced business, service and some
15 compliance and profitability pieces.
16   Q.   Focusing on the compliance part
17 of that, what were the compliance areas
18 that you were to audit of your stores?
19   A.   Overall recordkeeping, making
20 sure that we were processing recalls, they
21 were doing their damages and outdates,
22 making sure that they were completing the
23 transfer paperwork correctly, making sure
24 that our files were filed correctly, et

Page 42

1 cetera.
2    Q.   Did you audit for suspicious
3 orders, or suspicious prescriptions, I
4 mean?
5        MR. LAVELLE:  Object to form.
6    A.   We audited hard copy
7 prescriptions.  We audited to make sure
8 that we had controls in place where we
9 were locking the safe.  We audited the
10 control box.  We audited the control
11 invoices.  So we audited a lot of
12 different things in relation to ordering.
13    Q.   You said there was another
14 department, the Asset Protection
15 Department, that also did audits.
16        What did that department do?
17        MR. LAVELLE:  Object to form.
18    A.   The Asset Protection Department
19 basically had their audits that were
20 either dictated by the Internal Assurance
21 Department, or they came in to do their
22 checklist that was related to compliance,
23 risk and loss.
24    Q.   You really haven't answered my

Page 43

1 question.
2        I asked what did they actually
3 do in their audit?
4        MR. LAVELLE:  Object to form.
5    A.   So, I couldn't tell you because
6 that wasn't an audit that I did, but I do
7 know that they have a checklist that they
8 reviewed when they were in the store
9 different ones at different times.
10    Q.   You later went to work in asset
11 protection though, right?
12    A.   Correct.
13    Q.   So you don't have any idea what
14 the asset protection audits included?
15        MR. LAVELLE:  Object to form.
16    A.   The Asset Protection Department
17 audits included different ones depending
18 on which one.  It was about protecting
19 their assets, whether it be in the front,
20 cash register, point of sale.  If it's a
21 risk one, it can be different things from
22 checking if the back door is locked.
23    Q.   So, they did -- when asset
24 protection came in and did an audit, they

Page 44

1 didn't do all of these together; they only
2 did one at a time.
3        Is that right?
4    A.   It depended on their audit
5 schedule.
6    Q.   What do you mean by their audit
7 schedule?
8    A.   So, in order to make sure that
9 we are completing all different audits and
10 making sure that we're doing the right
11 audits, it -- they had different audits at
12 different times so that we can get to
13 every store and that we had it on the
14 calendar and that we knew that every store
15 was at least routinely audited.
16    Q.   In advance of asset protection
17 coming in and auditing one of your stores,
18 did you know they were coming?
19    A.   No.
20    Q.   How often did asset protection
21 audit your stores?
22        MR. LAVELLE:  Objection; asked
23    and answered.
24    A.   They do quarterly audits also.

Page 45

1 So --
2    Q.   Of every store?
3    A.   They do quarterly audits for
4 visit guides.  They have different levels
5 for risk.  So, they were always in the
6 stores.
7        Whether they were doing a
8 specific audit at which specific time, I
9 couldn't tell you.
10    Q.   And there was a third department
11 that you said that did audits as well.
12 You called it, I think, the assurance
13 department?
14    A.   The Internal Assurance
15 Department.
16    Q.   And, what were their
17 responsibilities?
18    A.   They -- they went and did a lot
19 of the different audits that the asset
20 protection did, but they were a --
21 basically our internal assurance audit.
22 So separate from the field, they did the
23 same audits, see if we got the same
24 results.

Highly Confidential - Subject To Further Confidentiality Review

Page 46

1    Q.    So, is Asset Protection
2  considered field?
3    A.    Asset Protection, yes.
4    Q.    And the Internal Assurance
5  Department is not field, right?
6    A.    They work for headquarters.
7    Q.    So, internal assurance is an
8  audit function that is run out of
9  headquarters, right?
10    A.    Yes.
11    Q.    And this Asset Protection is not
12  a headquarters operation?
13    A.    They are field leaders.  They
14  are considered part of the district field
15  team.  They do report up to Asset
16  Protection, that reports up to Internal
17  Assurance, but they're one of our field
18  partners.
19    Q.    I failed to ask you this
20  earlier, I think, that when you became a
21  district manager, where were you working
22  out of?
23    A.    I had initially the Queens, Long
24  Island market, and then I had the Brooklyn

Page 47

1  market after that.
2    Q.    Okay.  But where was your office
3  physically located?
4    A.    We had an office in Flushing and
5  we had an office in Brooklyn on Nostrand
6  Avenue.
7    Q.    Is that where you worked all
8  four years?
9    A.    Most of my work is in the field,
10  meaning we were in stores and in sites.
11  We hardly spent time in the office.
12    Q.    Okay.  My question was a little
13  bit different.
14      Did, as district manager, did
15  you always work out of that same district
16  that you described?
17      MR. LAVELLE:  Object to form.
18  BY MR. SIMMER:
19    Q.    In other words, did you get
20  realigned to any other location during
21  that time period?
22      MR. LAVELLE:  Same objection.
23    A.    I've already said we realigned
24  several times with different markets,

Page 48

1  different store count.  I had Queens, Long
2  Island.  Then I had Brooklyn.  So those
3  were realignments.
4    Q.    And, your -- your LinkedIn page
5  says your next position was as director of
6  pharmacy loss prevention.
7      Is that correct?
8    A.    Yes.
9    Q.    And it says you had that
10  position from August 2011 to October 2014,
11  correct?
12    A.    Yes.
13    Q.    Or, so, three years, three
14  months, correct?
15    A.    Yes.
16    Q.    And it says that you were
17  working out of Camp Hill, Pennsylvania?
18    A.    Yes.
19    Q.    That's the company's
20  headquarters, right?
21    A.    Yes.
22    Q.    So that was your physical
23  location where your office was?
24    A.    Yes.

Page 49

1    Q.    What were your responsibilities
2  as director of pharmacy loss prevention?
3    A.    To assist the asset protection
4  district managers in training and learning
5  the systems for field investigations.  We
6  also worked closely with the different
7  departments in the company to insure
8  compliance and different ways to review
9  analytics so that we can improve our
10  tactics against theft and diversion.
11    Q.    So, what is -- what are asset
12  protection district managers doing?
13    A.    They are part of the field team.
14  They are district managers that really
15  help us protect our assets in the field.
16  They do shrink investigations.  They do
17  drug loss investigations.  They do all
18  different types of investigations while
19  they are also helping with maintaining
20  compliance and safety.
21    Q.    Just so we're on the same page,
22  when you say that the -- you were to
23  insure compliance in different ways to
24  review analytics so that you could improve

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  tactics against theft and diversion, what
2  do you mean by "theft"?
3      A.   Stolen goods.
4      Q.   Goods stolen from one of your
5  stores?
6      A.   Yes.  Anything that's stolen
7  from our store is loss, comp loss,
8  anything that at the end of the day we
9  should have had that is no longer there.
10     Q.   And what do you mean by
11 "diversion"?
12     A.   Diversion, anything that is
13 diverted not for its intended use.
14     Q.   Can you give us some examples of
15 what you mean by "diverted not for its
16 intended use"?
17     A.   So, for instance, drugs that are
18 diverted and ultimately end up on the
19 street, something that goes missing or
20 goes lost and it's for illegal use.
21     Q.   So, I take it that the position
22 of director of pharmacy loss prevention
23 was a promotion for you, correct?
24     A.   Yes.

Page 51

1      Q.   Did you have people working
2  under you in that position?
3      A.   Yes.
4      Q.   How many people?
5      A.   Three analysts.
6      Q.   Those are direct reports,
7  correct?
8      A.   Yes.
9      Q.   Did you have dotted line reports
10 to you as well?
11     A.   No.
12         (Rite Aid - Novack Exhibit 2,
13     Corporate Loss Prevention Department
14     chart January 26, 2011, Bates No.
15     Rite_Aid_OMDL_0044539, was marked for
16     identification, as of this date.)
17         MR. LAVELLE:  Counsel, are we
18     finished with Novack 1?
19         (Pause.)
20         MR. SIMMER:  Actually, I'm not
21     done with it yet.  I have a few more
22     questions.  Just hold on to it for a
23     minute.
24         (Pause.)

Page 52

1          MR. SIMMER:  Is there reason why
2      you have to push them to the side,
3      John?
4          MR. LAVELLE:  To avoid
5      confusion.
6  BY MR. SIMMER:
7      Q.   Okay.  I hand you what we marked
8  Novack Exhibit 1, Bates
9  Rite-Aid_OMDL_0044539, identified for the
10 record as an org chart dated January 26,
11 2011, with the, I guess the heading on the
12 document Corporate Loss Prevention
13 Department.
14         MS. MOORE:  Counsel, did you
15     just say Novack 1?
16         MR. SIMMER:  I'm sorry, Novack
17     2.  Thank you.
18 BY MR. SIMMER:
19     Q.   Do you see that?
20     A.   Yes.
21     Q.   Was the department you worked in
22 always, or did -- when you first started
23 working there, was it called Loss
24 Prevention?

Page 53

1      A.   When I started working there, it
2  was already called Asset Protection.

7      Q.   And Sophia Lai, that is your --
8  before you became Ms. Novack, you were Ms.
9  Lai, correct?
10     A.   That is correct.
11     Q.   That was your maiden name,
12 correct?
13     A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Page 54

3      MR. LAVELLE:  Counsel, is there
4   a Bates number for this document?  I
5   don't see it on the copy that's here.
6      MR. SIMMER:  There is on my
7   copy.  I don't know why that one
8   doesn't.
9      I just read it into the record,
10  John.
11     MR. LAVELLE:  Okay.
12  BY MR. SIMMER:

Page 55

Page 56

Page 57



Page 58

Page 59

Page 60

Page 61

16    Q.   You can put that aside.
17          (Pause.)
18          (Rite Aid - Novack Exhibit 3,
19    Corporate Asset Protection Department
20    organization chart, Bates No.
21    Rite_Aid_OMDL_0044732 to
22    Rite_Aid_OMDL_0044733, was marked for
23    identification, as of this date.)
24

Highly Confidential - Subject to Further Confidentiality Review



Page 62

BY MR. SIMMER:

1  BY MR. SIMMER:
2      Q.   I hand you what we've marked as
3  Novack Exhibit 3.  I'll identify it for
4  the record.  It's a two-page exhibit,
5  Rite_Aid_OMDL_0044732 to 0044733.
6          If you could take a moment to
7  look at that.
8          MR. LAVELLE:  Counsel, there's
9  only one page in front of her.
10         MR. SIMMER:  They didn't print
11  the back?
12         If we could go off the record
13  for a minute.
14         MR. LAVELLE:  Yes, of course.
15         THE VIDEOGRAPHER:  The time is
16  now 10:20 a.m.
17         We are going off the record.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  The time is
20  now 10:30 a.m.
21         We are back on the record.
22  BY MR. SIMMER:
23      Q.   Ma'am, we handed you what we've
24  marked as Novack Exhibit 3.  I'll identify

Page 64

1  please.
2          MR. SIMMER:  That's fine.
3  BY MR. SIMMER:

Page 63

Page 65

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 70



Page 72

1    Q.   What were the three states that
2  you were responsible for?
3    A.   I had Georgia, South Carolina,
4  and Tennessee.
5    Q.   And, where were you physically
6  located as -- in this position?
7    A.   In Marietta, Georgia.
8    Q.   So, was the regional
9  vice-president position a promotion for
10  you?
11    A.   Yes.
12    Q.   Did you have direct reports?
13    A.   Yes.
14    Q.   And what direct reports did you
15  have?
16    A.   Pharmacy district managers.
17    Q.   How many?
18    A.   We had -- we realigned.  I think
19  we had 13 direct reports at the time.
20    Q.   And this position as regional
21  vice-president, is that a field-based
22  position?
23    A.   That is a field-base, yes.
24    Q.   And I ask that because you're

Page 71

1    Q.   Okay.  You can set that aside.
2       Go back to your résumé for a
3  moment, if we could.
4       So, the next thing on your
5  résumé is that your next position in
6  October of 2014 became a regional
7  vice-president.
8       What were your responsibilities?
9       MR. LAVELLE:  Object to form.
10    A.   As a regional vice-president, I
11  basically oversaw multiple districts
12  within three different states.
13    Q.   Are you no longer in Asset
14  Protection at this point?
15    A.   No longer in Asset Protection.
16    Q.   And you're a regional
17  vice-president of pharmacy, correct?
18    A.   Yes.
19    Q.   So you didn't have any of the
20  front of the store responsibilities as a
21  regional VP, correct?
22    A.   I had a partner that was
23  responsible for that, a regional
24  vice-president.

Page 73

1  not working out of the corporate office
2  any longer, correct?
3    A.   Correct.
4    Q.   And, what did you actually do as
5  the vice-president -- regional
6  vice-president?
7    A.   We trained and mentored our
8  pharmacy district managers to insure
9  operations in the stores that they
10  oversaw, which ultimately rolled up to our
11  region, over 300 stores at the time.
12    Q.   Did you have P&L responsibility?
13    A.   Yes.
14    Q.   And that would be for the 13
15  districts that were under you?
16    A.   Yes.  It's a region --
17    Q.   And ultimately for the
18  pharmacies that were under them, correct?
19    A.   Yes.
20    Q.   And again, that's only the
21  pharmacy side of those stores, correct?
22    A.   It's one P&L, but I was
23  responsible for the pharmacy
24  contributions.

Page 74

1    Q.    And then your partner was
2  responsible for the -- the rest of the
3  contribution, correct?
4    A.    Yes.
5    Q.    Is there a term for what the
6  rest of that function is called?
7    A.    Just store operations.
8    Q.    Okay.  You had that position for
9  two years and then you became then, in
10  September 2016, a pharmacy district
11  manager.
12        Do you see that?
13    A.    Yes.
14    Q.    And that was in September 2016,
15  correct?
16    A.    Yes.
17    Q.    And you held that position for
18  one year six months, correct?
19    A.    Yes.
20    Q.    And that was in Clifton, New
21  Jersey?
22    A.    Yes.
23    Q.    Is that a promotion for you?
24    A.    No.

Page 75

1    Q.    You stepped down; is that
2  correct?
3    A.    Yes.
4    Q.    Was that a voluntary move on
5  your part?
6    A.    Yes.
7    Q.    Why?
8    A.    Relocated back for family so
9  that I could start a family of my own.
10    Q.    I think we -- you got married at
11  some point along the way; is that correct?
12    A.    I got married when I was in
13  headquarters, and then we had a baby about
14  a year-and-a-half ago.
15    Q.    Okay.  Congratulations.
16    A.    Thank you.
17    Q.    So, in 2016, you made a family
18  decision that you would step down your
19  responsibilities and move back to New
20  Jersey.
21        Is that -- do I have it right?
22    A.    Yes.  We moved back to New York.
23  My responsibility was in New Jersey.
24    Q.    Okay.  And, the pharmacy

Page 76

1  district manager position you took in
2  September 2016, did that have the same
3  duties as when you had been pharmacy
4  district manager back in February 2007 to
5  August 2011?
6    A.    Similar.  The position has
7  evolved a bit, but overall, direct store
8  responsibility for multiple pharmacies,
9  yes.
10    Q.    And, how many pharmacies are you
11  responsible for, or were you responsible
12  for?  Excuse me.
13    A.    In that market, 17.
14    Q.    And the next position you
15  have -- actually, it looks like you left
16  the company in February 2018.
17        Do I have that right?
18    A.    I was actually acquired through
19  an asset purchase through Walgreens
20  acquiring the Rite Aid stores.  So my
21  employment had transitioned over in
22  February.
23    Q.    You were actually acquired; is
24  that right?

Page 77

1    A.    Yes.
2    Q.    It's like a baseball player
3  getting acquired.
4    A.    I feel like I was drafted.
5    Q.    So they acquired the stores that
6  you were managing.
7        Is that right?
8    A.    Yes.
9    Q.    So, did your responsibilities
10  change when you became a Walgreens
11  employee?
12    A.    No.  We're currently still
13  operating under the Rite Aid structure.
14  We haven't converted our stores yet.
15    Q.    And, so, the labels on the
16  stores that you manage are still Rite Aid,
17  correct?
18    A.    Yes.
19    Q.    But you're actually a Walgreens
20  employee?
21    A.    Yes.
22    Q.    So, other than sort of what we
23  just said, what changes have there been in
24  your job function when you became a

Page 78

1 Walgreens employee in February 2018?

2    A.   There haven't been any changes
3 in function.  We are still operating the
4 same stores with the same systems and the
5 same everything.

6    Q.   Okay.  Have you gone through any
7 kind of retraining or -- when you became a
8 Walgreens employee?

9         MR. LAVELLE:  Object to form.

10    A.   We have not gone through any
11 training until we have a conversion
12 schedule.  So, once we are ready to
13 convert our systems, we will go through
14 that timelines training -- timeline
15 training.

16    Q.   By conversion schedule, you mean
17 actually for these to be physically made
18 into Walgreens drug stores?

19    A.   Yes.

20    Q.   Okay.  Does your husband still
21 work for Rite Aid?

22    A.   No.

23    Q.   Does he work for Walgreens as
24 well?

Page 79

1    A.   No.

2    Q.   Where is he working now?

3    A.   He works at H & M.

4    Q.   How long did he work for
5 Rite Aid?

6    A.   I don't know exactly, but over
7 20-plus years through multiple
8 acquisitions.

9    Q.   Was he always in Asset
10 Protection?

11    A.   For Rite Aid?

12    Q.   Yes, ma'am.

13    A.   I don't know.  When I met him,
14 he was in Asset Protection.  I don't know
15 if he was always with Asset Protection.

16    Q.   Okay.  You can set that aside.

17         (Rite Aid - Novack Exhibit 4,
18    e-mail dated January 25, 2012, with
19    attachment, Bates No.
20    Rite_Aid_OMDL_037355 to
21    Rite_Aid_OMDL_037371, was marked for
22    identification, as of this date.)

23 BY MR. SIMMER:

24    Q.   The court reporter is handing

Page 80

1 you what we marked as Novack Exhibit 8.

2 Again the printing service cut off the
3 Bates numbering, so I'll read it into the
4 record as Rite_Aid_OMDL_037355 through
5 37371.  And we've put it up on the screen
6 too.

7         MR. LAVELLE:  Counsel, you said
8 Exhibit 8, but it's been marked by the
9 court reporter as 4.

10         MR. SIMMER:  I'm sorry.  I said
11 8?  I meant 4.

12         You didn't read my mind, John.
13 Come on.

14         MR. LAVELLE:  I just want to
15 make sure the record is clear.

16 BY MR. SIMMER:

17    Q.   Take a moment and look at that
18 document, if you would.

19         MR. LAVELLE:  I'll just note,
20 while the witness is looking at this
21 document, that it's another one where
22 the Bates number is not on the copy
23 that's in front of her.  So we'll need
24 to substitute, as we discussed

Page 81

1 earlier.

2         MR. SIMMER:  I think I said the
3 same thing.

4         MR. LAVELLE:  Right.

5 BY MR. SIMMER:

(Lines 6-24 redacted)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

Page 84

Page 83

Page 85



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 94

Page 96

1 individual code.

2 Q. What -- but, I'm not clarifying this.

3 What is a base code? The term

4 "base," what does that mean?

5 MR. LAVELLE: Object to form.

6 A. It's the ingredient.

7 Q. So, oxycodone could have

8 multiple codes, but what is its base code?

9 MR. LAVELLE: Object to form.

10 A. Oxycodone is the base code.

11 Q. As I understand it, every drug

12 comes with an NDC, correct?

13 A. Yes.

14 Q. The NDC reflects the actual

15 ingredient, but also has package size and

16 strength, correct?

17 A. Correct.

18 Q. So, when you're talking about

19 individual base code, does that also

20 reflect package size and strength, or is

21 it just the chemical ingredient?

22 MR. LAVELLE: Object to form.

23 A. The base code is the chemical

24 ingredient, accounts for all different

Page 95

Page 97

1 NDCs.

2 Q. Okay. That's what I'm trying to

3 understand.

4 When you're changing a

5 threshold, let's say I want to change the

6 oxycodone base -- threshold and I want

7 more -- that would include all package

8 sizes, all strengths, right, that base

9 code?

10 MR. LAVELLE: Object to form.

11 A. That, yes.

12 Q. So, when I'm communicating to

13 McKesson I want to increase that

14 threshold, how do they convert that into

15 strength and package size as well?

16 MR. LAVELLE: Object to form.

17 BY MR. SIMMER:

18 Q. Do you see what I'm saying, the

19 problem I'm having with just increasing

20 base code only?

21 MR. LAVELLE: Same objection.

22 A. The base code is the individual.

23 So, once they've exceeded that threshold,

24 it doesn't matter which NDC you're

21 Q. What's an individual base code?

22 A. It's a drug. So, if it's

23 oxycodone, whether it's hydrocodone,

24 whether it's clonazepam, that's an

Highly Confidential - Subject to Further Confidentiality Review



Page 98

1  ordering, it debits to the same threshold.
2     Q.   So, if I understand it, Rite Aid
3  had a threshold of 5,000 per month; is
4  that right?  For individual base codes,
5  correct?
6        MR. LAVELLE:  Object to form.
7     A.   Could you repeat that?
8     Q.   Do I have it right that Rite Aid
9  had a threshold of 5,000 units for each
10 base code per month?
11    A.   No, that's not right.
12    Q.   Okay.  What was the threshold?
13    A.   It was 5,000 dosage units per
14 NDC per order.
15    Q.   And a dosage unit, it would be
16 what?
17    A.   The count of tablets, capsules.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 106



20    What is a clinic protocol?
21    A.    A clinic protocol is something
22 we designed for our store teams to go
23 through when they are requesting for a
24 threshold increase that we need some more

Page 107

1 information on.
2    Q.    Is that an actual document or a
3 online procedure they're supposed to
4 follow?
5    A.    It's an actual document.
6    Q.    Where is that housed?
7    A.    We send it out to them
8 individually each time we need a clinic
9 protocol done.
10    Q.    And, what is the document
11 called?
12    A.    Clinic protocol.
13    Q.    And, are these retained by the
14 company?
15    A.    Yes.
16    Q.    And, where are they retained?
17    A.    In the Government Affairs
18 Department.
19    Q.    So, every time a threshold
20 increase is requested, the -- the store --
21 excuse me.  The pharmacy manager, and then
22 in turn the district manager, have to
23 complete the form; is that correct?
24    MR. LAVELLE:  Object to form.

Page 108

1    A.    It is determined based off of
2 the request.
3    Q.    What do you mean by that?
4    A.    So, upon a second request or
5 upon a request that does not seem -- that
6 we need additional information on to
7 determine that there is a legitimate
8 business need or a patient need, we will
9 send out a clinic protocol to that store
10 and that store team.
11    Q.    Okay.  So, the clinic protocol
12 is not something routinely required.  It's
13 only if the Asset Protection people feel
14 it's necessary, correct?
15    A.    Yes.
16    Q.    And, what are the circumstances
17 under which Asset Protection would require
18 the clinic protocol to be completed?
19    A.    We go through a lot of different
20 analytics to review the base business, the
21 reason for the business and to review
22 doctors.  We utilize our KPIs and also IMS
23 data to feed a lot of that information.
24 If it was something simplistic, like we

Page 109

1 purchased a independent pharmacy and their
2 files are coming and we're increasing our
3 overall business by 60 percent, then we
4 can look at our dispensing history.  But
5 if there was no external reason for this
6 increase in demand, then we would do our
7 due diligence.
8    Q.    And that's when you would
9 request the clinic protocol form to be
10 completed?
11    A.    Yes.
12    Q.    And you do the analytics in
13 every instance?
14    A.    For a threshold increase, yes.
15    Q.    You said you review the business
16 business.
17    What is that?
18    A.    We review the business needs.
19    Q.    Business need.  I'm sorry.
20    What is business need?
21    A.    Our patients that come in
22 through our door that have prescriptions
23 for legitimate need, medical need.
24    Q.    So, when you say you review the

Page 110

1 patients that come through our door to
2 determine if there's a legitimate need,
3 what do you actually do to determine that?
4    A.   You asked what business needs
5 meant.  So that's what I meant by business
6 needs.
7    Q.   Is that something you do in
8 every instance, look at the patient need?
9        MR. LAVELLE:  Object to form.
10    A.   For any threshold increase, we
11 do review the full base business before we
12 recommend or request a threshold increase.
13    Q.   You said you also review the
14 doctors, correct?
15    A.   We review the prescribers that
16 drive some of the -- or their top
17 prescribers in the base code for that
18 store.
19    Q.   And how do you do that?
20    A.   We run our dispensing history.
21    Q.   And then when you say you review
22 them, what do you do?
23    A.   We pull up the information.  We
24 look at what the dosage units are that

Page 111

1 they are dispensing, how many
2 prescriptions, how many patients, are they
3 also dispensing other medications that are
4 non-controlled.  Then we look at their
5 disciplines for our top doctors through
6 IMS, check for their DEA registration,
7 make sure that they have prescribing
8 authority for controlled substances.  We
9 check to make sure that they have an
10 active license.  We check to see what
11 their profession is to make sure that it
12 is within their prescribing rights.
13    Q.   You also said you utilize your
14 KPIs.
15        What is that?
16    A.   In Naviscript we have a lot of
17 key performance indicators that allow us
18 to review the business and if there's any
19 instance of diversion in our stores.  So,
20 before we increase a threshold, we make
21 sure we don't have any indication of an
22 internal issue.
23    Q.   So, this Naviscript third party
24 vendor program, where do they get their

Page 112

1 information?
2    A.   From our dispensing information.
3 We give them a data feed of all of our
4 transactions.
5    Q.   So, a performance indicator is a
6 what?  What is that?
7        MR. LAVELLE:  Object to form.
8    A.   A performance indicator are
9 different metrics that we've identified
10 that, if there was an anomaly, could lead
11 us to suspicious activity.
12    Q.   And what do you mean by metrics
13 that you've identified?  What are they?
14        MR. LAVELLE:  Object to form.
15    A.   There's a lot of different ones
16 that are in the system.  We track cycle
17 countdowns.  We track order adjustments.
18 We track number of manual orders that are
19 placed.  We track dispensing information.
20 We track if anything has been sold and
21 then resold or deleted.  So, a lot of
22 different information that feeds in and we
23 can look at it.
24    Q.   I take it that what you are

Page 113

1 doing in Asset Protection, you're using
2 the dispensing data for that purpose?
3    A.   Yes.  Dispensing data and
4 transaction data from inventory and we're
5 using transaction data from our point of
6 sale system.
7    Q.   You said that you track cycle
8 countdowns.
9        What is that?
10    A.   Any time an on-hand adjustment
11 is down.
12        We actually track all cycle
13 counts, whether it's up or down.
14    Q.   Still don't follow what you mean
15 by an on-hand adjustment.
16        MR. LAVELLE:  Object to form.
17    A.   If our inventory system shows
18 that we should have one cup and I go to
19 the shelf and I don't have one cup, I put
20 zero because I don't physically have it.
21 That's considered an on-hand adjustment.
22 It's a cycle counting down.
23    Q.   What's an order adjustment?
24    A.   We have an auto replenishment

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  system that takes our trend and generates
2  an order for our store.  If the store
3  decides that they want to increase or
4  decrease the order, then that would be an
5  adjustment, and we would track that too.
6      Q.   You said you also track the
7  number of manual orders that are placed?
8      A.   Yes.  We can see any type of
9  orders that were placed in through our
10 vendors, and that will also come up in our
11 KPI system.
12     Q.   But what is a manual order
13 adjustment?
14     A.   Somebody that goes in and
15 overrides the order manually,
16 replenishment suggested this and they do
17 more, or they went and placed an order
18 through our vendors.
19     Q.   Okay.  I'm not following you
20 though.
21         So, a manual adjustment, who's
22 doing a manual change here?  Is it the
23 local pharmacist?
24         MR. LAVELLE:  Object to form.

Page 115

1      A.   It's the associate in the store.
2  So the --
3      Q.   The associate and not the
4  pharmacist?
5          MR. LAVELLE:  I think the
6  witness was not finished answering --
7  giving her answer.
8  BY MR. SIMMER:
9      Q.   I apologize.  Go ahead.
10 Complete your answer.
11     A.   The ordering system is
12 accessible by our pharmacy associate, and
13 a pharmacy associate can place an order
14 for medications.
15     Q.   Again, is it pharmacy associate,
16 that's not the pharmacist, right?
17         MR. LAVELLE:  Object to form.
18     A.   It could be the pharmacist,
19 pharmacy manager.  It could be a pharmacy
20 technician.
21     Q.   So you're using the term
22 "pharmacy associate" to include all three?
23     A.   Anyone in that pharmacy.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 134

Page 136



15        MR. SIMMER:  Could we take a
16    break?
17        MR. LAVELLE:  Yes.
18        THE VIDEOGRAPHER:  The time is
19    now 11:39 a.m.
20        We're going off the record.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  The time is
23    now 11:55 a.m.
24        We are back on the record.

Page 135

Page 137

1        (Rite Aid - Novack Exhibit 5,
2    email chain ending November 10, 2012,
3    with attachment, Bates No.
4    Rite_Aid_OMDL_00029787 to
5    Rite_Aid_OMDL_00029954, was marked for
6    identification, as of this date.)
7    BY MR. SIMMER:
8        Q.   The court reporter is going to
9    hand you what we've marked as Novack
10    Exhibit 5.  It's a massive document.  I'm
11    going to direct your attention to a few
12    pages in it.  You can look at the whole
13    thing.  I think it would save us all some
14    time if I could just have you look at the
15    cover email and then direct your attention
16    to these pages starting -- and, you can
17    see, they don't have Bates numbers on it,
18    but the slides themselves have numbers in
19    the lower right-hand corner.  If I could
20    direct your attention to slide 125 through
21    149, I think it is.
22        MR. LAVELLE:  Counsel, the copy
23    does not have numbers on them.  Not
24    only does it not have Bates numbers,

Highly Confidential - Subject to Further Confidentiality Review



Page 138

1   it doesn't have slide numbers.
2       MR. SIMMER:  Did they cut that
3   off too?
4       On the Power Point slides
5   themselves there's not?
6       Can we see?
7       THE WITNESS:  (Handing.)
8       MR. SIMMER:  It's not on there
9   either.
10      They successfully ruined this
11  exhibit.
12      MR. LAVELLE:  We'll muddle
13  through.  You just tell us where we
14  need to be and we'll find it.
15      MR. SIMMER:  So, it's going to
16  be about more than halfway through
17  probably, and it's the slide that
18  begins "Controlled Substance
19  Purchasing Limits."
20      We can pull it up on the screen
21  too.
22      If he pulls it up on the screen,
23  you can at least eyeball it.  It has
24  this, the store on it, and that

Page 139

1   (indicating).
2       He's got it on the screen now.
3       MR. WATTS:  If someone would
4   please read the Bates number into the
5   record.
6       MR. SIMMER:  Be glad to.  Trying
7   to get her on the same page.
8       The exhibit itself I'll identify
9   for the record is Novack 5 begins at
10  Rite_Aid _OMDL_00029787 through
11  '29954.
12      (Pause.)
13      MR. SIMMER:  That's it.
14      MR. LAVELLE:  Okay.  Can I put
15  it in front of the witness?
16      MR. SIMMER:  Yes.
17      MR. LAVELLE:  Okay.
18      MR. SIMMER:  Again, I apologize
19  for this printing job.  It's made our
20  jobs a lot more difficult today.
21  BY MR. SIMMER:

Page 140

Page 141

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP  Doc #: 2173-49  Filed: 08/12/19  40 of 103.  PageID #: 315879.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 2173-49 Filed: 08/12/19 45 of 103. PageID #: 315884



Page 174

Page 176

Page 175

Page 177

Highly Confidential - Subject to Further Confidentiality Review



Page 178

Page 180

Page 179

Page 181

9     MR. SIMMER: This is a good time
10 for our lunch break, if that's okay.
11     MR. LAVELLE: Okay.
12     MR. SIMMER: Go off the record.
13     THE VIDEOGRAPHER: The time is
14 now 12:38 p.m.
15     We are going off the record.
16     (Luncheon recess taken.)
17     - - -
18    A F T E R N O O N   S E S S I O N
19     - - -
20     THE VIDEOGRAPHER: The time is
21 now 1:29 p.m.
22     We are back on the record.
23     MR. SIMMER: So, we'd like to
24 just put on the record that we're

Page 182

1  going to be using a few exhibits that
2  actually came out of the McKesson
3  production, and this is something
4  that's been a regular subject in other
5  depositions.
6      And the protocol we would
7  suggest is this. And this is dealt
8  with in CMO-2 33(h). That to the
9  extent that the deponent authored,
10 prepared or previously reviewed or
11 received the information, it can be
12 used in a deposition even though it
13 came out of another defendant's
14 production.
15     So, our proposal is that for
16 these exhibits, and they're all
17 McKesson exhibits, no other defendant,
18 we'll send them to McKesson's counsel.
19 And those communications or exhibits
20 where Ms. Novack is on the entire
21 email string, we propose to introduce
22 that exhibit into evidence without any
23 changes whatsoever, but some of the
24 exhibits the parties -- the McKesson

Page 183

1  employees then go on and have a
2  back-and-forth interchange in which
3  Ms. Novack was not included. How
4  we've handled that is to simply redact
5  all of that in the spirit of the
6  CMO 33(h).
7      So, if there are any concerns
8  about that, we'd like to go ahead and
9  get that on the record now. If that
10 proposal is acceptable, get that on
11 the record as well.
12     MS. CHARLES: So, this is Amber
13 Charles for McKesson Corporation.
14     I will note that our
15 understanding of the CMO is that for
16 documents where Ms. Novack does not
17 appear, we should have been granted an
18 opportunity several days ago to review
19 those documents and essentially allow
20 their use in an unredacted format.
21 There may well be, I haven't seen the
22 documents, but there well may be an
23 interest of completeness.
24     You know, it is in McKesson's

Page 184

1  interest that the document be
2  introduced, but we are where we are.
3  So I'm happy to take a look at those
4  documents and I will lodge any
5  objections for the record.
6      MR. SIMMER: And for the record,
7  we have just sent you those documents.
8  If you want us to go off the record
9  right now so you can review those
10 documents and you can come back on and
11 make your objections, or we can
12 continue on with the questioning and
13 you can lodge your objection as to
14 each exhibit as it's entered into the
15 examination.
16     MS. CHARLES: Well, I agree with
17 your reading of the CMO as it relates
18 to documents where Ms. Novack is on.
19 So I'm happy for you -- I don't want
20 to hold up everyone's day. So I'm
21 happy for you to proceed.
22     And as for the documents where
23 you've made redactions, I will have to
24 take a look and I'll email your

Page 185

1  colleague back. I think that might be
2  the sufficient way.
3      MR. SIMMER: Okay. Let's
4  proceed that way. And if, for some
5  reason, you have concerns, we can deal
6  with that at the time.
7      MS. CHARLES: Right.
8      (Rite Aid - Novack Exhibit 6,
9  email chain ending September 16, 2011,
10 Bates No. MCK_MDL_00632923 to
11 MCK_MDL_00632925, was marked for
12 identification, as of this date.)
13 BY MR. SIMMER:
14 Q.   The court reporter is handing
15 you what she has marked as Novack
16 Exhibit 6.
17     MR. SIMMER: I'll identify it
18 for the record as MCK_MDL_00632923
19 through '632925. And for the record



Highly Confidential - Subject to Further Confidentiality Review



Page 186

Page 188

1    Special Master Polster Kelly has
2  ruled in previous depos that he
3  attended we are able to state the
4  basis for our objection.
5  BY MR. SIMMER:
6    Q.   You can answer.

Page 187

13    MS. CHARLES:  Objection;
14  foundation.
15    MR. SIMMER:  That's an improper
16  objection.
17    MS. CHARLES:  I'm sorry.  I
18  didn't realize you were asking her a
19  question about McKesson conversations.
20  She is not a McKesson employee.
21    MR. SIMMER:  The objection is as
22  to form.
23    MS. CHARLES:  Form or
24  foundation.

Page 189

Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 192

Page 191

Page 193

Highly Confidential - Subject to Further Confidentiality Review





Page 202



11    Q.    Are you familiar with Dr.
12 Harper?
13    A.    Not personally.
14        (Rite Aid - Novack Exhibit 7,
15 pleading in Case No. 5-14CR096, was
16 marked for identification, as of this
17 date.)
18 BY MR. SIMMER:
19    Q.    I'll identify for the record
20 that the court reporter has handed you
21 Exhibit 7, Novack 7.  It's a pleading
22 styled United States of America versus
23 Adolph Harper, Junior, et al.  The -- this
24 is Case No. 5-14CR096.  The time stamp is

Page 203

1 March 25th, 2014.  The document is -- it's
2 an indictment and it's 36 pages long.
3        Have you seen this before?
4    A.    No, I have not.
5    Q.    Refresh your recollection about
6 Dr. Harper?
7    A.    I don't recall seeing this.
8    Q.    Let me read you just from the
9 introduction section, paragraph number 1:
10 From on or about September 1, 2009 and
11 continuing through on or about May 18,
12 2012, the defendants, Adolph Harper,
13 Junior, Adria Harper, Patricia Laughman,
14 Tequila Barry, and others, (collectively
15 the Harper Drug Trafficking Organization
16 or "Harper DTO") agreed to illegally
17 distribute hundreds of thousands of doses
18 of prescription painkillers to customers
19 located in the Northern District of Ohio
20 and elsewhere.
21        Do you see that?
22    A.    Yes.
23    Q.    Have you ever heard of this
24 before?

Page 204

1    A.    I don't recall the specific
2 situation.  I may have heard of something
3 about this, but didn't recall the name of
4 the doctor.
5    Q.    I direct your attention to page
6 8, paragraph 21 under the offense.  See
7 where it says:  Beginning at least on or
8 about September 1, 2009 and continuing
9 through on or about May 18, 2012, the
10 exact dates to the grand jury unknown, in
11 the Northern District of Ohio, Eastern
12 Division, Adolph Harper, Junior, Adria
13 Harper, Patricia Laughman and Tequila
14 Barry, the defendants herein, and others
15 known and unknown to the grand jury, did
16 unlawfully, knowingly and intentionally
17 combine, conspire, confederate and agree
18 together and with each other, and with
19 diverse others known and unknown to the
20 grand jury, to knowingly and intentionally
21 distribute and dispense oxycodone,
22 oxymorphone, methadone and amphetamines,
23 Schedule II controlled substances,
24 buprenorphine, hydrocodone, Schedule III

Page 205

1 controlled substances, and alprazolam and
2 zolpidem, Schedule IV controlled
3 substances, outside the usual course of
4 professional practice and not for a
5 legitimate medical purpose, contrary to
6 and in violation of Title 21, U.S. Code
7 Sections 841(a)(1), (b)(1)(C), (b)(1)(E),
8 and (b)(2) and 846.
9        Do you see that?
10        MR. LAVELLE:  Object to form.
11    A.    Yes.
12    Q.    Have you ever heard of this
13 before?
14    A.    These sections?
15    Q.    This description about Dr.
16 Harper and his confederates?
17    A.    No.
18    Q.    I direct your attention to
19 paragraph 25.
20        On the top of page 10:  It is
21 further part of the conspiracy that Adolph
22 Harper, Junior distributed "prescription"
23 to customers who he knew had tested
24 positive for illegal controlled substances

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  during the customer's appointment.
2      Did I read that correctly?
3  A.  Yes.
4  Q.  Did you hear of this before?
5  A.  No.
6  Q.  Paragraph 26: It was further
7  part of the conspiracy that Adolph Harper,
8  Junior distributed prescriptions -- excuse
9  me. Quote, prescription, close quote, for
10  controlled substances to customers after
11  he learned that the customer had overdosed
12  on controlled substances.
13      Did you see that?
14  A.  I see that here.
15  Q.  Have you heard of this before?
16  A.  No.
17  Q.  Paragraph 26: It was further
18  part of the conspiracy that Adolph Harper,
19  Junior continued to distribute
20  "prescriptions" for controlled substances
21  after he learned that some of his
22  customers had died from overdose-related
23  deaths.
24      Do you see that?

Page 207

1  A.  Yes.

15  Q.  Look at paragraph 31 at the
16  bottom of the page: It was further part
17  of the conspiracy that Harper DTO posted
18  in Adolph Harper Junior's "medical" office
19  a list of pharmacies that were likely to
20  fill Adolph Harper, Junior's
21  "prescriptions."
22      Did you see that?
23  A.  Yes.
24  Q.  Have you heard of that before?

Page 208

1  A.  No.
2  Q.  Look at the next paragraph,
3  paragraph 32: It was further part of the
4  conspiracy that Adria Harper and Tequila
5  Barry completed patient treatment notes
6  for some of Harper DTO's customers before
7  the customers arrived at the office for an
8  appointment.
9      Do you see that?
10  A.  Yes.
11  Q.  Paragraph 33: It was further
12  part of the conspiracy that members of the
13  Harper DTO wrote the same diagnosis for
14  several of the Harper DTO's customers
15  regardless of the customer's
16  individualized medical needs.
17      Did you see that?
18  A.  I see it here.
19  Q.  Paragraph 34: It was further
20  part of the conspiracy that Adria Harper,
21  Patricia Laughman and Tequila Barry wrote
22  "prescriptions" for controlled substances
23  in their names and the names of their
24  friends and family members.

Page 209

1      Do you see that?
2      MR. LAVELLE: Object to form.
3  A.  I see it here.
4  Q.  Have you heard of any of this
5  prior to today?
6  A.  No.
7      (Rite Aid - Novack Exhibit 8,
8  press release dated October 20, 2014,
9  was marked for identification, as of
10  this date.)
11  BY MR. SIMMER:
12  Q.  The court reporter has handed
13  you what she's marked Exhibit 8. I'll
14  identify it for the record as a press
15  release from the United States Attorney's
16  Office for the Northern District of Ohio
17  dated October 20, 2014, a two-page
18  document. The headline is "Akron Doctor
19  Pleads Guilty to Illegally Prescribing
20  Painkillers."
21      Do you see that?
22  A.  Yes.
23  Q.  Did you ever hear of Dr. Harper
24  pleading guilty to illegally prescribing

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  painkillers?
2       MR. LAVELLE:  Object to form.
3  Objection; asked and answered.
4       A.  Not that I recall.
5       Q.  I direct your attention to the
6  fifth paragraph.
7       Do you see where it says:
8  Together they distributed hundreds of
9  thousands of doses of prescription
10 medications, including OxyContin,
11 Percocet, Roxicet, Opana and others, from
12 Adolph Harper's medical offices in Akron
13 between 2009 and 2012, according to court
14 documents.
15      Do you see that?
16      MR. LAVELLE:  Object to form.
17      A.  I see it here.
18      Q.  Have you ever heard of this
19 before?
20      A.  Aside from the document you just
21 read.
22      Q.  Look at the last paragraph on
23 this page:  Adolph Harper's customers,
24 many of whom were drug addicts exhibiting

Page 211

1  clear signs of drug addiction during their
2  visits to this office, came to his office
3  and received "prescriptions" for addictive
4  prescription medications without being
5  examined by Harper and often without
6  seeing him at all, according to court
7  documents.
8       Do you see that?
9       A.  Yes.
10      Q.  Are you aware at all that Dr.
11 Harper pled guilty and any of this
12 information conveyed I just read?
13      MR. LAVELLE:  Object to form.
14 Objection; asked and answered.
15      A.  Outside of this release, I don't
16 recall anything specific to this doctor.
17      (Rite Aid - Novack Exhibit 9,
18 Cleveland.com article dated February
19 13, 2015, was marked for
20 identification, as of this date.)
21 BY MR. SIMMER:
22      Q.  The court reporter has handed
23 you what she's marked as Novack Exhibit 9.
24 I'll identify it for the record as an

Page 212

1  article in the Cleveland.com dated, it's
2  February 2015 -- February 13, 2015,
3  written by Eric Heisig entitled "Akron
4  Doctor Who Illegally Prescribed
5  Painkillers Sentenced to Ten Years in
6  Prison."
7       Have you ever heard of this
8  doctor getting sentenced to ten years in
9  prison?
10      A.  I don't recall this specific
11 doctor.
12      Q.  Let me direct your attention to
13 the first paragraph:  Akron, Ohio.  A
14 former Akron doctor who doled out hundreds
15 of thousands of prescription painkillers
16 without any medical purpose will spend up
17 to ten years in a federal prison.
18      Do you see that?
19      A.  Yes.
20      Q.  I take it your answer would be
21 the same if I ask again you've never heard
22 of this before, right?
23      A.  I don't recall this.
24      MR. LAVELLE:  Object to form.

Page 213

1  BY MR. SIMMER:
2       Q.  You don't recall whether you --
3       A.  I don't recall this particular
4  doctor situation.  You hear in the media
5  all the time that a doctor is getting
6  arrested and they've been pushing pill
7  mills and -- but I don't recall this
8  specific doctor or if this was one of the
9  ones I've heard.
10      Q.  Let me go back here on
11 Exhibit 6, the email we looked at a moment
12 ago.
13      A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

Q. Now, if you would, look at Exhibit 7, the indictment.

A. Yes.

Q. And that first sentence under overview, do you see where it says: From on or about September 9 --

MR. SIMMER: Strike that. I'll start again.

Q. From on or about September 1, 2009 and continuing through on or about May 18, 2012.

So, I guess my question is, and I just want to establish for the record, your request, the one that you passed on to McKesson for a 15 percent threshold increase, you'd agree with me is during the time period of the indictment of Dr. Harper, right?

MR. LAVELLE: Object to form.

A. Based off of this information, the threshold increase for this location was September 2011.

Q. It's within the time period of

Page 215

the indictment, right?

A. Yes.

MR. LAVELLE: Object to form.

BY MR. SIMMER:

Q. This has some of the redactions I'm talking about. I'm going to show this to counsel first. So --

MR. POWERS: And also for the record, counsel for McKesson has e-mailed back saying that they do not object to the use of these documents for this deposition.

MR. SIMMER: So we'll go ahead and proceed unless Rite Aid counsel want to lodge any objection.

MR. LAVELLE: I'd like to see the document before you show it to the witness.

MS. CHARLES: On behalf of McKesson, I'll just note I think it's already clear on the record that the redactions on this document were not as produced by McKesson. They were added by plaintiff's counsel.

Page 216

MR. SIMMER: That is correct.

We can waste a lot of time here. What you're reviewing it for is not the content of the document, it's the redactions.

Beyond that, if you have any concerns about that, we're going to go ahead and proceed with our questioning.

MR. LAVELLE: Well, I don't know what you've redacted. And the copy you've given to me doesn't have a Bates number on it.

MR. SIMMER: I've told you what the issue was, and I'll go ahead and read into the record what the Bates number is. We'll substitute in Bates numbered documents when we get it, so.

MS. CHARLES: I don't want to hold this up, but if the Bates number was removed, was our confidentiality stamping also removed?

MR. SIMMER: We talked about this this morning, counsel, and we're

Page 217

going to substitute back in the ones, but the printing service, for whatever reason, cut all of the Bates numbering off of every exhibit.

MS. CHARLES: So, I'll just have a standing objection to the use of exhibits without our confidentiality stamping, but I understand the excuse.

MR. SIMMER: And Rite Aid's counsel made the same objection early on.

Do we have one for the witness too? I don't think we gave it to her yet.

MR. LAVELLE: You want me to give this to the court reporter?

MR. SIMMER: The court reporter, so she can mark it, please.

(Rite Aid - Novack Exhibit 10, email chain ending December 19, 2012, Bates No. MCK_MDL_00571625 to MCK_MDL_00571628, was marked for identification, as of this date.)

MR. SIMMER: I identify it for

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  the record as an email string. The
2  Bates numbering, which unfortunately
3  was cut off, but it's MK --
4  MCK_MDL_00571625 through '1628.
5  BY MR. SIMMER:
6  Q.   Take a moment to review that,
7  and let me ask you a few questions about
8  that.
9  A.   (Perusing document.)
10  MR. SIMMER: For the record, I'm
11  going to make clear that the exhibit
12  that we have proffered, the only
13  redactions on the document were those
14  that counsel for the plaintiffs did,
15  which included communications in which
16  Ms. Lai, or Ms. Novack, was not party.
17  MR. LAVELLE: So when this was
18  produced by McKesson, the redaction
19  was not on there, correct?
20  MR. SIMMER: That's correct.
21  MR. LAVELLE: Okay. Thanks.
22  THE WITNESS: (Perusing document.)
23  Okay.
24

Page 219

1  BY MR. SIMMER:



Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 224

Page 223

Page 225

Highly Confidential - Subject to Further Confidentiality Review

Page 226

Page 228

Page 227

Page 229

8      MR. SIMMER:  I have another
9  exhibit that's got some redactions on
10  it you should look at.  McKesson's
11  counsel, I understand, has no
12  objections to it.
13      Do you want to tell her which
14  one this is?  I'll read the exhibit
15  numbers.  We're going to be
16  introducing to the witness in a moment
17  another exhibit that's from the
18  McKesson production.  It's Bates
19  numbered '547503 through '547510.



Highly Confidential - Subject to Further Confidentiality Review

Page 230

2      MS. MOORE:  We're marking this
3  one what?
4      MR. SIMMER:  I think we're
5  marking this as 11.
6      MR. LAVELLE:  We should be at
7  11.  Right?
8      And again, the redaction that's
9  on this page was not in the document
10  as it was originally produced by
11  McKesson?  Is that correct?
12      MR. SIMMER:  That's correct.
13      MR. LAVELLE:  Okay.
14      MR. SIMMER:  We've only redacted
15  that portion as a communication on
16  which -- or, no Rite Aid employee,
17  including Ms. Novack, was included.
18      MR. LAVELLE:  Okay.  I just
19  wrote on this one.
20      Do you have a copy that's clean?
21      MR. SIMMER:  That's the one for
22  the witness right there.
23      MR. LAVELLE:  All right.  Just
24  put the stamp on top of what I wrote

Page 231

1  on there.
2      MR. SIMMER:  Just swap in the
3  clean one.
4      MR. LAVELLE:  Here.  Take this
5  one (handing).
6      (Rite Aid - Novack Exhibit 11,
7  email chain ending February 21, 2014,
8  Bates No. MCK_MDL_00547503 to
9  MCK_MDL_00547510, was marked for
10  identification, as of this date.)
11  BY MR. SIMMER:
12  Q.   The court reporter has handed
13  you what she's marked as Novack
14  Exhibit 11.  I'll identify again for the
15  record as Bates numbered MCK_MDL_00547503
16  through '547510.
17      Just take a moment to review
18  that and I'll ask you some questions.
19  A.   (Perusing document.)
20      Okay.







Highly Confidential - Subject To Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 2173-49 Filed: 08/12/19 63 of 103. PageID #: 315902



Highly Confidential - Subject to Further Confidentiality Review





Page 254

Page 256

Page 255

Page 257

12    MR. SIMMER:  Can we take a
13  break?
14    MR. LAVELLE:  Yes.
15    THE VIDEOGRAPHER:  The time is
16  now 2:50 p.m.
17    We're going off the record.
18    (Recess taken.)
19    THE VIDEOGRAPHER:  The time is
20  now 3:13 p.m.
21    We are back on the record.
22    (Rite Aid - Novack Exhibit 12,
23  email chain ending October 7, 2017,
24  Bates No. MCK_MDL_00633242, was marked

Highly Confidential - Subject to Further Confidentiality Review

Page 258



1      for identification, as of this date.)
2   BY MR. SIMMER:
3      Q.   Ma'am, the court reporter has
4   handed you what she's marked as Novack
5   Exhibit 12, which I'll identify for the
6   record as MCK_MDL_00633242.  And it's an

Page 259

Page 260

Page 261

Highly Confidential - Subject to Further Confidentiality Review



Page 262

Page 264

Page 263

Page 265

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 270

Page 272

Page 271

Page 273

Highly Confidential - Subject to Further Confidentiality Review



Page 274

Page 276

Page 275

Page 277

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 290

Page 292

Page 291

Page 293

Highly Confidential - Subject To Further Confidentiality Review



Page 294

Page 295

Page 296

Page 297



Highly Confidential - Subject To Further Confidentiality Review



Page 302

Page 304

Page 303

Page 305

8       Q.    When these drugs were
9   rescheduled, would that -- did all of them
10  happen simultaneously, or did they happen
11  over time by drug?
12        MR. LAVELLE:  Object to form.
13      A.    I don't understand what all are
14  being rescheduled means.
15      Q.    For example, the Schedule IIIs
16  that were rescheduled to be Schedule IIs,
17  did they all happen at the same time?
18      A.    I still don't understand the
19  question.
20        The rescheduling happens on the
21  federal side.
22      Q.    That's what I'm asking.
23        So, as the DEA reschedules
24  Schedule IIIs so that they're Schedule

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  IIs, did that all happen at the same time?
2      A.    For a specific medication, it
3  would have happened at the same time.  So,
4  when it was tramadol, tramadol is going to
5  be a scheduled medication.  When they
6  rescheduled hydrocodone, there was all
7  different strengths of hydrocodone that
8  was rescheduled at the same time.
9          I don't know if that's --
10     Q.    Well, I'm asking not just about,
11  you know, isolated tramadol or hydrocodone
12  combination.
13         All those Schedule III drugs
14  when they were rescheduled, did all of
15  them happen at the same time?
16         MR. LAVELLE:  Object to form.
17     A.    I don't understand the question.
18     Q.    There's a disconnect here.  I'm
19  doing the best I can to ask what I thought
20  was a simple question.
21         It was the DEA that decided that
22  these were going to be rescheduled, right?
23         MR. LAVELLE:  Object to form.
24     A.    For the federal scheduling of

Page 307

1  the medications.
2      Q.    Right.
3          They are the ones that decided
4  that, right?
5      A.    It was changed from the federal,
6  yes.
7          So, when a schedule change
8  happened with a medication, tramadol was
9  non-control, we didn't have threshold set
10  for a non-control medication.  So, when
11  tramadol was rescheduled, it now had a
12  base code.  It had a controlled substance
13  limiting threshold, and we had to set
14  those for the first time, whether it be in
15  the supply chain.
16         So it looks like this is during
17  McKesson.
18     Q.    I think I'm starting to
19  understand why we have disconnects.
20         All of these changes the DEA
21  made, the reschedule, you know, scheduling
22  products that were not scheduled at all or
23  controlled before who now are, all those
24  changes, did they happen at the same time

Page 308

1  for all the drugs, or did it phase in by
2  drug?
3          MR. LAVELLE:  Object to form.
4      A.    It was one drug at a time.
5          I still don't understand.
6      Q.    If it was one drug at a time,
7  that's fine.
8          So it was -- we had a date for
9  the change that happened that affected
10  tramadol.  There was another date for
11  hydrocodone combination, another date for
12  another drug.
13         Is that what you're saying?
14     A.    Yeah.
15         MR. LAVELLE:  Object to form.
16     A.    I'm saying that there were
17  specific dates where the rescheduling had
18  to happen.
19     Q.    Okay.
20     A.    Not dictated by any of us here.
21     Q.    Understood.  Okay.

Page 309

Highly Confidential - Subject to Further Confidentiality Review





Page 314

Page 316

Page 315

Page 317

Case: 1:17-md-02804-DAP Doc #: 2173-49 Filed: 08/12/19 81 of 103. PageID #: 315920.
Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 326

Page 328

Page 327

Page 329

```
 1    Q.   Okay.
 2         MR. LAVELLE:  Counsel, if we're
 3    finished with that document, can we
 4    take a break?  We've been going for
 5    about an hour and 15 minutes.
 6         MR. SIMMER:  That's fine.
 7         THE VIDEOGRAPHER:  The time is
 8    now 4:25 p.m.
 9         We're going off the record.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  The time is
12    now 4:42 p.m.
13         We are back on the record.
14    BY MR. SIMMER:
15    Q.   Ma'am, we talked several times
16    today about the 5,000 base code unit
17    threshold that Rite Aid had used with this
18    pharmacy.
19         Is that right?
20         MR. LAVELLE:  Object to form.
21    A.   It's 5,000 dosage unit per NDC
22    per order.
23    Q.   But isn't that what you called
24    the base code?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    A.   No.
2    Q.   Am I getting this mixed up
3  again?
4       It's McKesson is the base code;
5  for Rite Aid it was NDC, right?
6    A.   Yes.
7    Q.   Okay.  Did you have anything to
8  do with setting that 5,000 limit per NDC?
9    A.   No.
10   Q.   Do you know when that was, that
11 particular policy was set for Rite Aid?
12   A.   I'm not aware when it was set.
13   Q.   But it -- but it was something
14 that was in place when you took your job
15 in Asset Protection?
16   A.   It was already in place, yes.
17   Q.   Do you have any idea how long it
18 had been in place?
19   A.   I'm not sure.
20   Q.   So, that how did this work sort
21 of in the Rite Aid environment, when a
22 pharmacy ordered more than 5,000 of a
23 particular NDC in any given month, would
24 they receive the full 5,000, or was there

Page 331

1  some -- how was that handled?
2       MR. LAVELLE:  Object to form.
3    A.   The stores may not have been
4  able to order the 5,000.  We have a
5  replenishment system that goes through an
6  algorithm.  It takes into account the
7  medication on hand and the movement.  So
8  it didn't allow you to just manually order
9  5,000 units if that's not what you've been
10 dispensing or that's not what your sales
11 show.
12      So, in that scenario, you would
13 not be able to reach that threshold.  The
14 ordering system would tell you you can't
15 order above this because it's already
16 exceeded the max based off of your store
17 algorithm.  If the store orders more than
18 5,000, or for whatever reason the order is
19 over 5,000, then the order would be
20 omitted.  So they would not get anything
21 above that.
22   Q.   They would get the 5,000 though,
23 right?
24   A.   You know, I don't know.

Page 332

1    Q.   So, I'm just trying to
2  understand so that if a store ordered,
3  just give an example, 7500 of that
4  particular NDC, 7500 units, would they get
5  the 5,000 or would they get nothing?
6       MR. LAVELLE:  Object to form.
7    A.   I don't -- I'm not clear.  I
8  know in McKesson, it would -- the whole
9  order would be omitted.
10      From the supply chain, I'm not
11 sure.  I'm not involved in that.
12   Q.   So that McKesson, at least
13 you're sure that they would not do a
14 partial order up to -- or delivery up to
15 the threshold, right?
16   A.   Correct.
17   Q.   Do you know why they did it that
18 way?
19      MS. CHARLES:  Objection;
20 foundation.
21   A.   I'm not sure.
22   Q.   Do you know whether Rite Aid had
23 a similar policy?  Just to be real clear.
24      MR. LAVELLE:  Object to form.

Page 333

1    A.   Rite Aid's policy was somebody
2  will look at the lines that were ordered.
3  If it was over the 5,000, then somebody
4  would come out and pick the lines, and
5  they would have a protocol in place to
6  contact the stores, document that call,
7  that activity in a log.
8    Q.   Okay.  I'm not sure I got a
9  clear answer there.
10      Would they get a partial order
11 shipped to them?
12      MR. LAVELLE:  Object to form.
13 Objection; asked and answered.
14   A.   I don't recall if they partially
15 would fulfill that order.  I don't
16 remember.
17   Q.   Okay.
18      (Rite Aid - Novack Exhibit 16,
19 email chain ending June 17, 2013,
20 Bates No. Rite_Aid_OMDL_003075 to
21 Rite_Aid_OMDL_003077, was marked for
22 identification, as of this date.)
23 BY MR. SIMMER:
24   Q.   The court reporter has handed



Page 334

1  you what she's marked as Novack Exhibit
2  16, I'll identify for the record as
3  Rite_Aid_OMDL_003075 to '003077.
4      Take a moment to review that, if
5  you would.
6      A.   (Perusing document.)
7      Okay.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 342

Page 344

Page 343

Page 345

Highly Confidential - Subject To Further Confidentiality Review

Page 346



Page 348

1    MR. LAVELLE:  Object --

2    Q.   That's your testimony?

3    MR. LAVELLE:  -- to the form.

4    A.   I can't tell you what they would

5    say in their deposition.

6    Q.   You just said they already knew

7    about this.

8    MR. LAVELLE:  Object to form.

9    That's not even a question.

10   A.   So, you asked --

11   MR. LAVELLE:  Wait until he asks

12   a question.

13   BY MR. SIMMER:

14   Q.   Did they know about it or not?

15   You just said that they did.

16   Now you're saying you don't know what they

17   know.

18   Which is it?

19   MR. LAVELLE:  Object to form.

20   A.   I said I don't know what they

21   would answer in their deposition or if you

22   were to ask them.

23   Q.   But it's your belief that they

24   would testify they knew about it, right?

Page 347

15   Q.   So when I go take the

16   depositions, or we go take the depositions

17   of these individuals, they're going to say

18   we already knew about all the stuff we

19   had.  We knew it was housed in different

20   places.  Even though the description

21   doesn't say that anywhere, they're going to

22   confirm they agree with you that they

23   knew this stuff was already being done,

24   right?

Page 349

1    MR. LAVELLE:  Object to form.

2    Objection; asked and answered.

3    A.   I don't know what they would

4    testify.  I don't know what they would say

5    they would answer.  I don't know what they

6    would or would not remember.

7    (Rite Aid - Novack Exhibit 17,

8    email chain ending October 9, 2013,

9    Bates No. Rite_Aid_OMDL_0050291 to

10   Rite_Aid_OMDL_0050306, was marked for

11   identification, as of this date.)

12   BY MR. SIMMER:

13   Q.   The court reporter has handed

14   you what she's marked as Novack

15   Exhibit 17, which I'll identify for the

16   record is Rite_Aid_OMDL_0050291 through

17   '0050306.

18   Please take a moment to review

19   that.

20   A.   (Perusing document.)

21   Okay.

22   Q.   We discussed a moment ago the

23   right -- that Rite Aid started a project

24   in 2013 to develop a suspicious order

Highly Confidential - Subject to Further Confidentiality Review



Page 350

1  monitoring system, right?
2      MR. LAVELLE:  Objection to the
3  form of the question.
4      A.  I'm sorry.  Could you repeat the
5  question?
6      Q.  You see, when he makes his
7  objections, you lose your train of
8  thought, don't you?  I do the same thing.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review

Page 362

1    MR. LAVELLE:  Counsel, you don't
2  get to both ask the questions and
3  answer them.
4    MR. SIMMER:  I need to get a
5  clear record here.
6    MR. LAVELLE:  You already do
7  have a clear record.  You're really
8  making it difficult here because you
9  ask every question five times and
10  you're berating the witness.
11    Let's move on.
12  BY MR. SIMMER:



Highly Confidential - Subject to Further Confidentiality Review



Page 366

Page 368

Page 367

Page 369

Highly Confidential - Subject to Further Confidentiality Review



Page 370

Page 372

Page 371

Page 373

Highly Confidential - Subject to Further Confidentiality Review



Page 374

Page 376

Page 375

Page 377

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 386

Page 388

Page 387

Page 389





Page 394

Page 396

Page 395

Page 397

Highly Confidential - Subject to Further Confidentiality Review



Page 398

Page 400

17    MR. SIMMER:  Go off the record.
18    THE VIDEOGRAPHER:  The time is
19  now 5:55 p.m.
20    We're going off the record.
21    (Recess taken.)
22    THE VIDEOGRAPHER:  The time is
23  now 6:04 p.m.
24    We are back on the record.

Page 399

Page 401

1    MR. SIMMER:  No further
2  questions.
3    I did want to get one thing on
4  the record.  We need to talk about
5  swapping in the exhibits so they have
6  the Bates numbers, and we're going to
7  make sure we get that done.  So I
8  guess we'll work with the court
9  reporter.  Unless there's any
10  questions or any things you want to
11  say on the record about that, that's
12  what we're going to do over the next
13  couple days.
14    MR. LAVELLE:  We have no
15  questions for the witness.
16    The witness reserves the right
17  to read and sign.
18    I would like to put on the
19  record that we are going to need to be
20  involved in the process of confirming
21  that all the documents that are going
22  to be attached to this transcript are,
23  in fact, exact copies of what was used
24  during the testimony today.  We have

Page 402

1  copies of what was provided to us by
2  counsel, and we will be included in
3  whatever communications there are
4  between plaintiff's counsel and the
5  court reporter to make sure we have a
6  record of the complete documents,
7  including Bates numbers.
8      MS. CHARLES:  McKesson we would
9  appreciate being involved in that as
10  well, as well as for our confidential
11  stamping of the documents.
12      MR. SIMMER:  Of course.
13      MR. LAVELLE:  We agree with
14  that.
15      THE VIDEOGRAPHER:  The time is
16  now 6:05 p.m.
17      This concludes today's
18  deposition.  We are going off the
19  record.
20      (Deposition adjourned at
21  approximately 6:05 p.m.)
22
23
24

Page 404

1          E R R A T A
2  PAGE / LINE / CHANGE   /   REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Page 403

1      A C K N O W L E D G M E N T
2
3  STATE OF          )
4                    :ss
5  COUNTY OF         )
6
7      I, SOPHIA NOVACK, hereby certify
8  that I have read the transcript of my
9  testimony taken under oath in my
10  deposition of January 9, 2019; that the
11  transcript is a true and complete record
12  of my testimony, and that the answers on
13  the record as given by me are true and
14  correct.
15
16
17      _____
18          SOPHIA NOVACK
19  Signed and subscribed to before me this
20  _____ day of _____, 2019.
21
22  _____
23  Notary Public, State of
24

Page 405

1          C E R T I F I C A T E
2  STATE OF NEW YORK
3  COUNTY OF NEW YORK
4
5      I, Marie Foley, RMR, CRR, a
6  Certified Realtime Reporter and Notary
7  Public within and for the State of New
8  York, do hereby certify:
9      THAT SOPHIA NOVACK, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that such
12  deposition is a true record of the
13  testimony given by the witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I am
17  in no way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 11th day of
21  January, 2019.
22
23      _____
24          MARIE FOLEY, RMR, CRR

Page 406

1           LAWYER'S NOTES
2     PAGE / LINE
3     ____ ____ _____
4     ____ ____ _____
5     ____ ____ _____
6     ____ ____ _____
7     ____ ____ _____
8     ____ ____ _____
9     ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23    ____ ____ _____
24    ____ ____ _____